1  ALEXANDRA M. WALSH (*pro hac vice* forthcoming)
   **Walsh Law PLLC**
2  14 Ridge Square NW, Suite 342
   Washington, DC 20016
3  Telephone: 202.780.3014
   Facsimile: 202.780.3678
4  Email: awalsh@alexwalshlaw.com

5  KIMBERLY CHANNICK (Cal Bar No. 325089)
   WILLIAM L. SMITH (Cal Bar No. 324235)
6  **Walsh Law PLLC**
   13428 Maxella Ave., Ste. 203
7  Marina del Rey, CA  90292-5620
   Telephone: 202.780.3014
8  Facsimile: 202.780.3678
   Email: kchannick@alexwalshlaw.com
9  Email: wsmith@alexwalshlaw.com

10
11              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
12                **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 13  H.B., an individual, | Case No.  23-5625 |
| 14 | **COMPLAINT FOR DAMAGES AND** |
| 15             Plaintiff, | **DEMAND FOR JURY TRIAL** |
| 16       v. | **1.     GENERAL NEGLIGENCE** |
| 17  UBER TECHNOLOGIES, INC., a | **2.     NEGLIGENT HIRING, RETENTION, AND SUPERVISION** |
| 18  Delaware Corporation; RASIER, LLC, a Delaware Limited Liability Company; and | |
| 19  DOES 1 through 50, Inclusive, | **3.     COMMON CARRIER NEGLIGENCE** |
| 20             Defendants. | **4.     NEGLIGENT FAILURE TO WARN** |
| 21 | **5.     INTENTIONAL MISREPRESENTATION** |
| 22 | |
| 23 | **6.     NEGLIGENT MISREPRESENTATION** |
| 24 | **7.     NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** |
| 25 | |
| 26 | **8.     BREACH OF CONTRACT** |
| 27 | **9.     STRICT PRODUCT LIABILITY – DESIGN** |
| 28 | **10.    STRICT PRODUCT LIABILITY** |

```
 1                                              )        – FAILURE TO WARN

 2

 3
```

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff, H.B., by her undersigned counsel, makes the following Complaint against Defendants Uber Technologies, Inc., A Delaware Corporation, and Raiser, LLC ("Raiser"), (collectively, "Uber" or "Defendants"), alleging as follows:

## NATURE OF ACTION

1.      Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom she had been paired through the Uber App. As a common carrier, Uber is vicariously liable for the injuries its driver inflicted on its passenger. In addition, through its officers, directors, and managing agents, Uber contributed to the attack on plaintiff by abandoning its utmost duty of heightened care toward its passengers, and instead adopting a culture that prized growth above all else, celebrated toxic masculinity, and exploited and endangered women and girls in conscious disregard for their rights and safety.

2.      Uber is a transportation company headquartered in San Francisco, California that, beginning in 2009, pioneered an app-based transportation system that has been implemented around the world, including across the entire United States and in this State.

3.      As early as 2014 Uber became aware that Uber drivers were physically and/or sexually assaulting and raping female passengers. In the nine years since, sexual predators driving for Uber have continued to sexually assault, harass, kidnap, physically assault, rape, and/or other attack Uber's passengers. Complaints to Uber by female passengers who had been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber has been fully aware of these continuing attacks by sexual predators driving for Uber. Uber's response to these ongoing sexual assaults by Uber drivers has been slow and inadequate and has put the lives and well-being of its customers at grave risk.

4.       While Uber has, in recent years, publicly acknowledged this sexual-assault crisis—including through the publication of Uber's U.S. Safety Report, in December 2019—Uber has failed to implement basic safety measures necessary to prevent these serious physical and/or sexual assaults, which continue to occur to this day.

5.       As more fully set forth below, Plaintiff was assaulted, battered, harassed, and attacked by the Uber driver she was led to believe would give her a safe ride to her destination.

6.       The Uber ride at issue was ordered by Plaintiff through the ride-sharing software application owned and controlled by Uber ("the Uber App").

7.       At all relevant times Defendants Uber and Rasier (collectively "Uber") operated and controlled the Uber App.

8.       The Uber driver, while in the course and scope of his employment for Uber and while otherwise working on behalf of Uber, assaulted, battered, harassed, and/or attacked Plaintiff as set forth below.

9.       Plaintiff brings this civil action against Uber to recover damages for the injuries she suffered as a result of being assaulted, battered, harassed, and/or attacked by the Uber driver during an Uber ride.

10.      Uber is a common carrier under this State's laws.

**PARTIES**

11.      Plaintiff is over the age of 18 and is a resident of West Virginia. The assault described below took place in the state of Florida.

12.      Plaintiff files this action under a pseudonym because as a victim of sexual assault, she needs anonymity to protect her privacy in this sensitive and highly personal matter. Plaintiff respectfully requests that this Court grant her motion to proceed anonymously pursuant to Federal Rule of Civil Procedure 26(c), filed contemporaneously herewith, and ensure that Defendants keep her identity confidential throughout the pendency of the lawsuit and thereafter. As set forth

in that motion, disclosure of Plaintiff's full name would expose her to stigmatization, invade her privacy and make her vulnerable to retaliation. For these reasons, Plaintiff's need for anonymity outweighs both the prejudice to Defendants and the public's interest in knowing her identity. Counsel for Plaintiff will inform Defendants of Plaintiff's true name and the circumstances surrounding these causes of action. Plaintiff further anticipates seeking concurrence from Defendants for entry into a protective order to prevent the unnecessary disclosure of Plaintiff's real name in the public record.

13.     Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, San Francisco County, California, 94158.

14.     Defendant Rasier, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1515 3rd St., San Francisco, California, 94158.

15.     Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc. and Rasier, LLC collectively as "Uber."

16.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Does 1 through 50, inclusive, are unknown to Plaintiff who therefore sue said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff. Plaintiff is informed and believe, and thereon allege, that each of the Defendants designated herein as a Doe was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries

and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

17.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Plaintiff was injured.

18.     Plaintiff is informed and believes that each Defendant, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, assistant, or consultant.

19.     Plaintiff is further informed and believes, that at all relevant times, each Defendant, through its officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each Defendant by and through its officers, directors, supervisors, and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct that injured Plaintiff.

20.     Defendants are liable for the acts of each other through principles of *respondeat superior*, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

21.     The Uber driver who perpetrated the assault described herein ("Uber driver") was an agent, servant, and employee of Uber.

22.     This Complaint refers to Defendant Uber Technologies, Inc., Defendant Rasier, LLC, and Does 1 through 50, inclusive, as Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURISDICTION AND VENUE**

23.     The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**DIVISIONAL ASSIGNMENT**

25.     Division is proper in this Court under Local Rules 3-2(c) and 3-5(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial division.

**RELEVANT FACTUAL BACKGROUND**

***Uber's Sexual-Assault Problem Started At The Top***

26.     Uber is a transportation company. In 2010, one of its founders, Travis Kalanick, became its second chief executive officer and—at one time—its largest shareholder. Uber drivers and Uber split the fare Uber charges riders for the riders' trips.

27.     In 2014, Uber started charging Uber passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[1]

28.     The "Safe Rides Fee" was not split with drivers.[2] It was pure revenue for Uber.

---

[1] Uber, *What is the Safe Rides Fee*, (available at https://web.archive.org/web/20148420053019/http://support.uber.com/hc/en-us/articles/201950566) (last accessed Mar. 31, 2023).

[2] Mike Isaac, SUPER PUMPED: THE BATTLE FOR UBER (2019) at 136 ("The drivers, of course, got no share of the extra buck.").

29.     Uber collected its "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue from the fee.[3] But it never earmarked the money for improving safety or spent it on safety.[4] Instead, it pocketed the money it told the world it was going to directly towards enhancing safety. As a former Uber employee said "[w]e boosted our margins saying our rides were safer."[5] It "was obscene."[6]

30.     Rider safety was never Uber's concern. Growth was. To increase growth, which required not only new riders but new drivers, Travis Kalanick and the executives at Uber made it as easy as possible for Uber drivers to sign up. They used a background-check system designed to get drivers approved as quickly and conveniently as possible.[7]

31.     Uber hired Hirease, Inc. to do its background checks.[8] Hirease brags that it can vet drivers within 36 hours.[9] To have such a short turnaround, Uber eschewed industry standards used by other taxi companies and livery services. For example, it abandoned fingerprinting— which takes weeks—and running applicant drivers against private databases, such as FBI records.[10] These shortcuts led to growth for Uber. But they put people, including Plaintiff, in danger. Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers, so they could begin driving, before Uber's cursory and ineffective background check was even complete.[11]

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.* at 115 ("Uber made it as easy as possible for drivers to sign up.").

[8] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, NEW YORK TIMES (Dec. 9, 2014) (available at https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?searchResultPosition=1) (last accessed Mar. 31, 2023).

[9] *Id.*

[10] *Id.*

[11] Isaac, SUPER PUMPED, at 218.

CASE NO. 23-5625                                          PLAINTIFF'S ORIGINAL
COMPLAINT AND JURY DEMAND

32.     Travis Kalanick made the decision that Uber was not going to fingerprint its drivers and that it was not going to scrub applicant drivers against FBI records. Rather, the decision was made to use a fast and shallow background check process.

33.     Travis Kalanick also made the decision not to interview drivers or train drivers to ensure Uber's drivers understood their responsibilities and what was appropriate and inappropriate when interacting with passengers. Mr. Kalanick decided not to implement policies to protect passengers from sexual assault—policies such a zero-tolerance policy with respect to fraternizing or making sexual advances towards passengers, and most certainly with respect to engaging in sexual activity with or sexual touching of passengers.

34.     Mr. Kalanick had actual knowledge that these decisions would put passengers in greater danger. As such, he acted with conscious disregard for the rights and safety of female passengers, including Plaintiff.

35.     Travis Kalanick intentionally performed the act of hiring drivers without fingerprinting them, without running them through the FBI databases, and using fast and shallow background checks. When he took these actions, he knew or should have known that it was highly probable that harm would result. This quick-and-dirty approach represented a deliberate choice to gamble with passenger safety.

36.     When Uber's current Chief Executive Officer, Dara Khosrowshahi, assumed that role in August 2017, he continued the policy of hiring drivers without biometric fingerprinting to be run through the FBI database. This was a very intentional and deliberate decision, evidenced by Uber's active lobbying and resistance against municipalities or regulatory bodies implementing any kind of biometric fingerprinting requirement for drivers.[12]

---

[12] Ellen Huet, *Uber Publicly Resists Fingerprinting But Is Quietly Testing It On Some Drivers*, FORBES (Oct. 14, 2015) (available at https://www.forbes.com/sites/ellenhuet/2015/10/14/uber-publicly-resists-fingerprinting-its-drivers-but-is-quietly-testing-it-live-scan/?sh=2bed4ac4c086)

*Footnote continued on next page.*

37.     Uber's greed and complete disregard for rider safety or the rule of law is breathtaking. Uber's policy is that it will not report any criminal activity it learns of to law-enforcement authorities.[13] That includes allegations of sexual assault.[14] Thus, Uber's policy is that if it learns from an Uber rider, such as Plaintiff, that she was sexually assaulted, Uber will not report this sexual assault to law enforcement.[15] Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the to the police on behalf of customers when an Uber driver rapes an Uber passenger.[16]

38.     Current CEO Mr. Khosrowshahi has supported this non-reporting policy. When he took the action of intentionally embracing this policy, he knew or should have known that it was highly probable that harm would result. After all, drivers will feel less constrained to commit sexual assault if they know it is less likely that law enforcement will be informed.

39.     Uber's greed, parochial focus on growth, and misogyny has had tragic consequences. In December 2014, a 26-year-old finance worker hailed an Uber to take her home from a work dinner near New Delhi, India.[17] When she fell asleep in the car, her Uber driver

---

(last accessed Mar. 31, 2023). Curt Devine, et al., *Thousands of criminals were cleared to be Uber drivers. Here's how rideshare companies fought stronger checks*, CNN (June 1, 2018) (available at https://www.cnn.com/2018/06/01/us/felons-driving-for-uber-invs/index.html) (last accessed Mar. 31, 2023); Meir Rinde, *Philly parking czar wants to know who's driving your Uber, says Pa. audit doesn't go far enough*, WHYY PBS (Apr. 4, 2019) (available at https://whyy.org/articles/philly-parking-czar-wants-to-know-whos-driving-your-uber-says-pa-audit-doesnt-go-far-enough/) (last accessed Mar. 31, 2023).

[13] Greg Bensinger, *Uber Says Safety is its First Priority. Employees Aren't so Sure*, WASHINGTON POST (Oct. 1, 2019) (available at https://www.washingtonpost.com/podcasts/post-reports/uber-says-safety-is-its-first-priority-employees-arent-so-sure/) (last accessed Mar. 31, 2023).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, NEW YORK TIMES (Dec. 8, 2014) (available at https://www.nytimes.com/2014/12/09/world/asia/new-delhi-bans-uber-after-driver-is-accused-of-rape.html?_r=0&module=inline) (last accessed Mar. 31, 2023); Isaac, SUPER PUMPED, at 149.

moved to the backseat and raped her.[18] The driver had been detained previously for rape.[19] The rape caused an international imbroglio and New Delhi temporarily banned Uber.[20] Uber dealt with the situation by attacking the victim.

40.     Eric Alexander was president of Uber in the Asia–Pacific region; he was Uber's "number three" and Kalanick's fixer.[21] He secured, possibly illegally, the New Delhi rape victim's medical records through a law firm.[22] The records contained the medical examination that doctors performed within hours of her rape.[23] Alexander shared these records with Mr. Kalanick and Uber's number two at the time, Emil Michael.[24] Many other Uber executives either saw the records or learned of them.[25] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[26] (This despite two people pointing out to him that the victim could have been anally raped.[27]) He began cultivating and sharing a bizarre conspiracy that the woman was not raped; the whole incident was a plot against Uber by Olga, Uber's major ride-sharing competitor in India.[28] No matter that the Uber driver had a history of sexual assault and had confessed the assault to police.[29]

---

[18] Isaac, SUPER PUMPED, at 149.

[19] Barry and Raj, *Uber Banned in India's Capital After Rape Accusation*.

[20] *Id*.

[21] Isaac, SUPER PUMPED, at 260.

[22] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017) (available at https://www.vox.com/2017/6/7/15754316/uber-executive-india-assault-rape-medical-records) (last accessed Mar. 31, 2023).

[23] Isaac, SUPER PUMPED, at 261.

[24] Swisher and Bhulyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*.

[25] *Id*.

[26] Isaac, SUPER PUMPED, at 261.

[27] *Id*. at 262.

[28] *Id*. at 261; Swisher and Bhulyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*.

[29] Barry and Raj, *Uber Banned in India's Capital After Rape Accusation*.

CASE NO. 23-5625

10

PLAINTIFF'S ORIGINAL
COMPLAINT AND JURY DEMAND

41.     Mr. Kalanick and Uber's leadership and board were the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.[30] When Uber customers accused Uber drivers of sexual assault—something that happened with increasing frequency as Uber grew, given its lax supervision and shoddy background checks—Mr. Kalanick would pace around Uber headquarters, not wondering about how to improve rider safety but repeating the bromide, legally correct but a bromide nonetheless, "innocent until proven guilty."[31] When law enforcement decided not to bring criminal charges against an Uber driver accused of sexual assault because it felt it did not have enough evidence for a criminal conviction, "a round of cheers would ring out across the fifth floor of Uber HQ."[32]

42.     At a cocktail and dinner party with journalists in New York City, Mr. Michael attacked journalists who criticized Uber.[33] He was particularly angry with Sarah Lacy who had, in a recent story, accused Uber of "sexism and misogyny" and had said she was going to delete her Uber App because she feared for her safety because of Uber's drivers.[34] Mr. Michael said that if any woman deleted her Uber App because of Ms. Lacy's story and was sexually assaulted, Ms. Lacy "should be held personally responsible."[35]

43.     The actions of Uber's executives and board members demonstrate Uber's contempt for women and myopic focus on profits. Uber only cares about growth. This culture permeates the entire company and endangers Uber's female riders. Sarah Fowler wrote an

---

[30] Isaac, SUPER PUMPED, at 194 ("The tone of Uber's culture was being set from the top . . . The result was a workforce that largely reflected Kalanick.").

[31] *Id*. at 167.

[32] *Id*.

[33] Ben Smith, *Uber Executive Suggest Digging Up Dirt On Journalists*, BUZZFEED (Nov. 17, 2014) (available at https://www.buzzfeednews.com/article/bensmith/uber-executive-suggests-digging-up-dirt-on-journalists) (last accessed Mar. 31, 2023).

[34] *Id*.

[35] *Id*; Isaac, SUPER PUMPED, at 129.

explosive blog post, describing how pervasive this culture was at Uber.[36] Ms. Fowler was hired

by Uber as a site-reliability engineer in 2016.[37] On her first day on the job, post-training, her

manager sent her a message over the Uber chat system.[38] He said that he "was in an open

relationship . . . and his girlfriend was having an easy time finding new partners but he wasn't.

He was trying to stay out of trouble at work, he said, but he couldn't help getting in trouble,

because he was looking for women to have sex with."[39] Ms. Fowler felt it "was clear that he was

trying to get [her] to have sex with him, and it was so clearly out of line that [she] immediately

took screenshots of [the] chat messages and reported him to" Human Resources.[40] Uber Human

Resources and "upper management" told her that "even though this was clearly sexual harassment

and he was propositioning [her], it was this man's first offense, and that they wouldn't feel

comfortable giving him anything other than a warning and a stern talking-to."[41] Upper

management told her that her manager "was a high performer," so "they wouldn't feel

comfortable punishing him for what was probably just an innocent mistake on his part."[42] Upper

management told Ms. Fowler that she had two choices, join a new Uber team, or stay on her team,

under the manager who propositioned her, but she "would have to understand that [the manager]

would most likely give [her] a poor performance review when review time came around, and

there was nothing [Human Resources] could do about that."[43] She was told that by Human

Resources that if she chose to stick with the team she was on, that a poor review by her then

---

[36] Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber*, SUSAN J. FOWLER, (Feb. 19, 2017) (available at https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber) (last accessed Mar. 31, 2023).
[37] *Id*.
[38] *Id*.
[39] *Id*.
[40] *Id*.
[41] *Id*.
[42] *Id*.
[43] *Id*.

manger wouldn't be retaliation because she had "been given an option."[44] Because working under a harassing manager was untenable to Ms. Fowler, she chose to switch teams.[45] She eventually learned, by talking to other women employees at Uber, that many of them had similar sexual-harassment stories and that the manager who sexually harassed her had sexually harassed others before he sexually harassed her.[46] That is, she learned that Human Resources and upper management had been mendacious with her. "Within a few months, [the harasser] was reported once again for inappropriate behavior, and those who reported him were told it was still his 'first offense.' The situation was escalated as far up the chain as it could be escalated, and still nothing was done" by Uber.[47]

44.     With the bad press Uber was getting because of the sexual assaults, Mr. Michael's comments, and the Sarah Fowler affair, Uber realized it needed to appear that it was making changes and trying to eradicate its toxic-male culture, so it held a company-wide meeting to announce changes. At the meeting, Uber announced that it was going to increase its diversity and sensitivity by adding a female board member. Board member David Bonderman chimed in that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[48]

45.     Uber's "culture was poisoned from the very top."[49] Indeed, John William Gurley was a longtime board member of Uber and a close confidant of Mr. Kalanick. He sat on his hands

---

[44] *Id*.

[45] *Id*.

[46] *Id*.

[47] *Id*.

[48] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, NEW YORK TIMES (June 13, 2017) (available at https://www.nytimes.com/2017/06/13/technology/uber-sexual-harassment-huffington-bonderman.html?hp=&action=click&pgtype=Homepage&clickSource=story-heading&module=inline&region=top-news&WT.nav=top-news) (last accessed Mar. 31, 2023); Isaac, SUPER PUMPED.

[49] Isaac, SUPER PUMPED, at 280.

1   and watched silently as Uber put in place a culture and policies that have hurt many innocent

2   women, including Plaintiff.

3         46.     In an attempt to buff its tarnished reputation, Uber also hired former Attorney

4   General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture

5   and work-place environment.[50]

6

7         47.     During his investigation, as detailed in the publicly released "Holder Report,"

8   Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred

9   across hundreds of global offices, including sexual assault and physical violence."[51]

10        48.     As Uber's sexual-assault and harassment problems publicly ballooned, it made

11  pale and perfunctory attempts to act as though it is trying to confront them. In May 2018, Uber

12  acknowledged the "deeply rooted problem" of sexual assault and proclaimed it was committed to

13  solving the problem, stating that "we're making some important changes today."[52] Included in

14  these "important changes" was Uber's promise to publish a "safety transparency report that will

15  include data on sexual assaults . . . that occur on the Uber platform."[53] Uber explained its

16  commitment to publishing such data because "transparency fosters accountability." Uber further

17  explained that "sexual predators often look for a dark corner" and announced to the world that

18  "we [Uber] need to turn the lights on."

19

20        49.     Despite these promises, Uber persisted in darkness and did not release any data on

21  sexual assaults for another year and a half.

22

23

24

---

25  [50] Covington & Burling, LLP, *Covington Recommendations* (available at
    https://www.documentcloud.org/documents/3863793-Uber-Covington-Recommendations.html)
26  (last accessed Mar. 31, 2023)
    [51] Isaac, SUPER PUMPED, at 271.
27  [52] Troy West, *Turning the Lights On*, Uber Newsroom (May 15, 2018) (available at
    https://www.uber.com/newsroom/turning-the-lights-on/) (last accessed Mar. 31, 2023).
28  [53] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

50.     When Uber finally released a report in December 2019, it was forced to acknowledge that there were 5,981 sexual assaults in the United States during Uber trips recorded in 2017 and 2018.[54]

51.     Uber did not release a second safety report for more than two years.

52.     On December 2, 2021, the California Public Utilities Commission approved a settlement agreement with Uber on reporting of data on sexual harassment and assault in which Uber agreed to pay $9 million and provide information on sexual assault and harassment to the CPUC on a going-forward basis.[55]

53.     It was another six months after Uber agreed to provide these data to the CPUC before Uber publicly released another safety report per its commitment in May 2018. In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic) stating it received 3,824 sexual-assault reports for that time period.[56]

54.     Uber's own data confirms that sexual assaults by Uber drivers continue to occur at an unacceptable rate.

55.     Uber has not released any sexual-assault data for 2021 or 2022. Uber's decision to withhold that data prevents Uber passengers and the public from understanding the true rate at which such assaults continue to occur each day.

---

[54] Uber, US Safety Report 2017–18 (available at https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a) (last accessed Mar. 31, 2023).

[55] CPUC Press Release (Dec. 2, 2021) (available at https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-approves-9-million-settlement-with-uber) (last accessed Mar. 31, 2023); see also *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services* (available at) https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M427/K636/427636880.PDF ) (last accessed Mar. 31, 2023).

[56] Uber, US Safety Report 2019–20 (available at https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a) (last accessed Mar. 31, 2023).

56.    Uber became aware of its sexual-assault problem long before it released the Holder report. Uber's operations team "dealt with thousands of misconduct cases every year, including instances of sexual assault."[57]

57.    Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[58]

58.    As described earlier, these decisions to lower the bar were made by Travis Kalanick and other officers, directors, and managing agents.

59.    But it was not that Uber simply lowered the bar. It failed to take adequate steps to make its rides safe; it failed to provide everything necessary for safe transportation of its passengers. For example, Uber failed to install video cameras in the cars. Such a step would have chilled the wantonness of potential predators. It failed to provide an option in the Uber App that allowed female riders to select to be driven by female drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers. These policies to fail to make its rides safe were put in place by Mr. Kalanick and other officers, directors, and managing agents of Uber.

60.    Mr. Kalanick's successor, Mr. Khosrowshahi, continued the policy of not requiring third-party-operated cameras in Uber vehicles.

61.    Mr. Kalanick, Mr. Khosrowshahi, and other officers, directors, and managing agents of Uber knew that if they put cameras in cars, fewer sexual assaults would occur during Uber rides. They knew that if they provided an option that would allow female passengers to choose to be driven by female drivers, fewer sexual assaults would occur during Uber rides. They knew that if they better trained their drivers in sexual-assault prevention, fewer sexual assaults would occur during Uber rides. They intentionally refused to put these safety policies in place

---

[57] Isaac, SUPER PUMPED, at 166.
[58] Id. at 177.

with actual and constructive knowledge that declining to implement such policies made it highly probable that harm to female Uber passengers would result.

62.     Uber's response to the driver sexual assaults that were reported to the company also evidenced the conscious disregard of Uber executives, including Mr. Kalanick and Mr. Khosrowshahi. A 2019 Washington Post investigative piece revealed Uber maintained a three-strikes policy for its drivers.[59] Investigators hired by Uber to investigate the more serious passenger complaints about drivers—such as drug use, physical violence, and sexual assault—reported: "A driver would only be deactivated under three circumstances: 1) if it was the second or third reported offense; 2) if there is corroborative evidence like video or a police report; 3) if the driver admits to the assault."[60]

63.     Even with a three-strikes policy, Uber executives would make exceptions to keep dangerous drivers on the road. "For instance, a New York-area driver allegedly made three separate sexual advances on riders, said an investigator assigned to the case. After an executive overruled the investigator, the driver was allowed to continue working until a fourth incident, when a rider claimed he raped her."[61]

64.     As Uber became more popular, more people realized Uber had so lowered the bar that people with checkered backgrounds could drive for Uber. People also realized that Uber had not provided everything necessary for safe rides, that is, everything that might make it more difficult to get away with sexual assaults, like video cameras in cars. In addition, they recognized Uber was at the same time marketing itself to women as a safe mode of transportation, including

---

[59] Greg Bensinger, *When rides go wrong: How Uber's investigation unit works to limit the company's liability*, WASHINGTON POST (Sept. 26, 2019) (available at https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/) (last accessed Mar. 31, 2023).
[60] *Id.*
[61] *Id.*

after drinking. Because of these factors, Uber became a magnet for sexual predators—men who knew that driving for Uber meant they would get to drive intoxicated women late at night. These men started sexually assaulting women at alarming rates, as the Holder Report shows. And, as stated earlier, Uber and its officers, directors, and managing agents—including Mr. Kalanick—had actual knowledge that these sexual assaults were going on, on the platform and women were being hurt. But they did nothing. They failed to start screening drivers better and failed to place video cameras in cars. They intentionally refused to implement these safety measures despite actual knowledge of the problem, and these officers, directors, and managing agents—including Mr. Kalanick—had actual or constructive knowledge that refusing to do so meant there was a high probability that more female passengers would be harmed, which—foreseeably—is what happened to Plaintiff.

## THE ATTACK ON PLAINTIFF

65.     This suit arises from the serious harm Plaintiff suffered as a result of the wrongful acts and omissions of Defendants.

66.     On or about October 13, 2023, Plaintiff requested an Uber ride using the Uber App for herself and her three children to take them to a hotel.

67.     During the ride, the Uber driver asked intrusive questions about her relationship status and who she was staying with at Plaintiff's destination.

68.     When they arrived at Plaintiff's destination, the Uber driver followed Plaintiff into the hotel lobby and began rubbing Plaintiff's back and neck. The Uber driver rubbed Plaintiff's lower back both under and above her clothing and right above her buttocks.

69.     In addition to this unwanted and inappropriate physical contact, the Uber driver made offensive and suggestive remarks. As he inappropriately touched Plaintiff, the Uber driver repeatedly said "do I need to go?" and asked whether he could come to Plaintiff's room. This contact happened in full view of Plaintiff's minor children and the hotel's front desk attendant.

Plaintiff rebuffed the Uber driver's unwanted touching and advances. Security for the hotel ended up escorting Plaintiff and her family to their room.

70.     This unwanted and inappropriate behavior by the Uber driver humiliated, violated, and robbed Plaintiff of her dignity and personal safety.

71.     By failing to take reasonable steps to confront the problem of multiple rapes and sexual assaults of Uber passengers by Uber drivers, Uber has acted in conscious disregard of the safety of its passengers, including Plaintiff, has breached its duty of reasonable care, and has breached the implied and express covenants arising from its contract with its passengers.

72.     The Uber driver who assaulted Plaintiff perpetrated the above-described assault, harassment, and/or attack in the course and scope of his employment with Uber and while under Uber's direction and control. These acts caused Plaintiff pain and suffering that persists to this day.

73.     The Uber driver who assaulted Plaintiff was acting on behalf of, for the benefit of, at the direction of, and within the course and scope of employment with Uber and engagement by Uber. Uber provided the Uber driver with access to its ride-sharing app platform, a tool necessary for Uber drivers to perform the work Uber assigned. Uber, through the Uber App, directed the Uber driver regarding the location of the pickup, time of the pickup, and routes for both the pickup of Plaintiff and transportation to her destination, and much more, as discussed below.

74.     The Uber driver who assaulted Plaintiff was an agent or employee of Uber, which is a common carrier. His duties were directed at the comfort and protection of passengers in his vehicle, including Plaintiff.

75.     Uber derived a monetary benefit from every ride assigned to said Uber driver through its Uber App, including Plaintiff's ride during which she was harassed, battered, and/or assaulted.

1
2

**Uber Misled Plaintiff And The Public Into Believing It Was Addressing The Deeply Rooted Issue Of Sexual Assault On Its Platform In Violation Of Its Statutory And Common-Law Duties.**

3
4
5
6
7
8

76.     Uber is a transportation company. Its core business is providing transportation to the public at large through its network of drivers. It connects its drivers to the public through the Uber App. Anyone from the public may download the Uber App for free. Using the app, a customer may request a ride from one of Uber's drivers for a standardized charge unilaterally set by Uber. Uber directs its drivers to pick up the passengers and transport them to their destinations.

9
10
11
12
13
14
15
16

77.     Uber provides transportation through a digital application made available to the general public for the purpose of transporting its users—the passengers—from place to place for profit. Uber has widely offered its services to the general public and charges standard fees for its services through its application. Uber represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

17
18
19
20
21
22
23
24

78.     Uber is a common carrier under California Civil Code §2168 and the common law.[62] Uber holds itself out to the public generally and indifferently to transport persons from place to place for profit. As a common carrier, Uber owes its passengers, including the Plaintiff named herein, a heightened duty of care. Uber has an affirmative duty to protect its passengers from assault by one of its employees or contractors and is liable for its employees' or agents' assaults, regardless of whether such acts were committed within the course and scope of employment for Uber.

25
26
27
28

---

[62] *See, e.g., Doe v. Uber Techs., Inc.*, 184 F. Supp.3d 774, 787 (N.D. Cal. 2016) ("Plaintiff's allegations support the claim that Uber 'offers to the public to carry persons,' thereby bringing it within California's definition of common carrier for tort purposes.")

79.     Given the heightened duty Uber has as a common carrier, to the extent it failed or refused to implement procedures, policies, and app functions that it knew or should have known would prevent assaults such as those suffered by Plaintiff, as Plaintiff has alleged, Uber is liable for the above-described tortious acts of its driver, which harmed Plaintiff.

80.     Further, the heightened duty Uber has as a common carrier a non-delegable duty. Under the common law, Uber has a non-delegable duty to safely transport its passengers from the place it picks them up to their destination. This duty cannot be delegated to Uber drivers. When an Uber driver assaults a passenger, Uber is liable for the driver's actions due to its non-delegable duty.

81.     Uber drivers are largely nonprofessional, untrained, and use their own vehicles. Uber employs and engages its drivers, including the driver who assaulted Plaintiff, in traditional at-will relationships, in which:

a.      Uber has discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

b.      Drivers are not charged a fee by Uber to apply to become employees;

c.      At all times relevant, there was no agreement between Uber and the driver designating the driver as an independent contractor;

d.      Drivers are not charged a fee to download the app or to receive notifications from Uber that customers want rides;

e.      Fare prices for rides are set exclusively by Uber;

f.      Drivers have no input on fares charged to consumers;

g.      Drivers are not permitted to negotiate with consumers on fares charged;

h.      Drivers do not know what riders are charged for a given ride;

i.    Uber can and does modify charges to consumers; for example, if Uber determines that a driver has taken a circuitous route to a destination;

j.    Uber takes a fee of every ride charged to a consumer;

k.    Uber retains control over customer-contact information;

l.    Uber controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information.

m.    In some instances, Uber controls the hours a driver works;

n.    Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

o.    Driving for Uber is not a specialized skill;

p.    Uber's business model depends on having a large pool of non-professional drivers;

q.    Drivers must abide by a list of regulations to drive for Uber;

r.    Uber requires its drivers to pick up Uber customers on the correct side of the street;

s.    Uber forbids its drivers from talking on their cell phones while driving customers;

t.    Uber tracks drivers' speed and braking and sends drivers reports based on how many times the driver had to brake hard;

u.    Uber drivers are not allowed to ask Uber customers for their contact information;

v.    Drivers who reject ride requests risk discipline, including suspension or termination from the platform;

w.    Consumers give feedback on rides they have taken and rate drivers on a scale from one star to five stars. These ratings are used by Uber to discipline and terminate drivers; and

x.    Such other acts of control that discovery will show.

82.     Uber actively markets itself as a safe company that provides safe rides. Both before 2014 and after, Uber actively and aggressively marketed the supposed safety of its transportation services. These efforts continue to this day, and include email messages sent to every Uber customer, including Plaintiff.

83.     Over the years, Uber has launched marketing campaigns specifically marketing its transportation services to, among others, young women too intoxicated to drive.

84.     Uber represented to its customers, including Plaintiff, on its website all of the following:

a.      "How we help keep you safe—We're committed to helping you get where you want to go with confidence, whether it's building emergency features in the app or making it easy for you to check your ride."

b.      "Ride with confidence—The Uber experience was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

c.      "Ride with confidence—Designing a safer ride—driver screenings—All potential drivers in the US must complete a screening before becoming an Uber driver-partner, and current drivers continue to be vetted for criminal offenses."

d.      "Ride with confidence—Designing a safer ride—On every trip, you can tap a button for safety tools and get help whenever you need it."

e.      "Ride with confidence—Designing a safer ride—An inclusive community—Through our joint efforts with cities and safety experts and by working together, we're helping to create safe journeys for everyone."

f.   "Our commitment to safety—You deserve to be able to move safely. To look forward to the opportunities ahead. To be connected to people and places that matter most. Which is why we're focused on your safety, from setting new standards to developing technology with the goal of reducing incidents."

g.   "How safety is built into your experience—Safety features in the app—Tap a button for emergency assistance. Share your trip details with loved ones. Our technology helps put peace of mind at your fingertips."

h.   "How safety is built into your experience—An inclusive community—Millions of riders and drivers share a set of Community Guidelines, holding each other accountable to do the right thing."

i.   "How safety is built into your experience—Coverage on every trip—We've put insurance from leading companies in place for every ride."

j.   "Building safer journeys for everyone—Rider safety—Uber driver-partners in the US go through a multi-point screening check for their driving and criminal history before they are authorized to take trips through the app. Every rider has access to safety features built into the app and a support team if you need them."

k.   "The future of safety—More than 200 Uber employees, from researchers and scientists to designers and engineers, are focused on building technology that puts safety at the heart of your experience."

l.   "Safe rides around the clock—Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber."

85.   Uber actively and publicly markets its transportation services to be safe and reliable services.

86.     Uber actively and publicly markets its transportation services to be safe and reliable during late-night hours.

87.     Uber has cultivated an image among its customers of safety and superiority to public transportation and traditional taxis. Because of aggressive marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to believe a ride with Uber is a safer and better alternative.

88.     In 2016, Uber agreed to pay $28.5 million to settle a class-action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

89.     Riders, including Plaintiff, reasonably rely on Uber's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Uber as a result of this reliance.

90.     Uber markets its ride hailing service to female riders as a safer alternative to traditional taxis.

91.     On a "Women's Safety" page on its website, Uber advertised that it was "driving change for women's safety," specifically representing that "[s]exual assault and gender-based violence don't belong anywhere in our communities, which is why Uber is committed to help stop incidents before they happen" and touting its "safety features and education" and "transparency."[63] Through such representations, Uber encourages women like Plaintiff to trust its services to secure safe transportation.

92.     In 2015, Uber released a report with Mothers Against Drunk Driving "MADD" that states "The Uber App was created to ensure reliable access to safe rides." The report states that with Uber, intoxicated persons can find "a safe, reliable ride home" that is "always within

---

[63] Uber, Women's Safety (available at https://www.uber.com/us/en/safety/womens-safety/) (last accessed Mar. 31, 2023).

CASE NO. 23-5625

25

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

reach."[64] The report further represents that "Uber is a better late[-]night option" and reports that "93% of people would recommend Uber to a friend if they have been drinking. Not only would people take Uber themselves—they would trust Uber to take their drunk friend home safely."[65]

93.     The safe image that Uber aggressively cultivates suggests to customers, including Plaintiff, that riding while intoxicated with Uber is safe. Uber does not inform riders, like Plaintiff, that hailing a ride after drinking puts riders in peril from the drivers themselves. By marketing heavily to young women who have been drinking, and promising safe rides, Uber puts riders in peril.

94.     Uber knew its representations and promises about rider safety were false and misleading yet continued to allow riders to believe in the truth of these representations and promises and continued to profit from riders' reliance on those representations and promises.

95.     Unfortunately, an Uber driver sexually assaulting a passenger is not an isolated or rare occurrence. The safety report referenced above that Uber released in December 2019 showed there were thousands of sexual assaults during Uber rides in 2018 alone.[66] Tony West, Uber's Chief Legal Officer, said in response to that report, the "numbers are jarring and hard to digest."[67]

96.     Uber employs a vast network of drivers. But, at all relevant times, Uber provided its drivers with inadequate training regarding sexual assault, sexual relations, sexually inappropriate behavior, sensitivity, and customer relations.

---

[64] Uber and MADD Report, "More Options. Shifting Mindsets. Driving Better Choices" (Jan. 2015) (available at http://newsroom.uber.com/wp-content/uploads/madd/uber_DUI_Report_WIP_12.12.pdf) (last accessed Mar. 31, 2023).
[65] *Id*. at 2 and 3.
[66] Kate Conger, *Uber says 3,045 sexual assaults were reported in U.S. rides last year*, NEW YORK TIMES (Dec. 5, 2019) (available at https://www.nytimes.com/2019/12/05/technology/uber-sexual-assaults-murders-deaths-safety.html) (last accessed Mar. 31, 2023).
[67] *Id.*

97.     Uber has also provided inadequate background checks and screening of its drivers. Among other things, it does not fingerprint its drivers (unless forced to do so by state or local laws), it does not run the applicant drivers against all available public databases, and it does not do international background checks (despite its global presence).

98.     Uber lobbies state and local governments to limit what is required of Uber with respect to driver background checks. Uber also lobbies local government entities to continue allowing Uber to perform its own background checks of its driver applicants, rather than municipalities performing the more stringent and reliable screening they conduct for traditional taxi drivers.

99.     Uber has successfully persuaded lawmakers in several states to keep background-check requirements for its drivers limited.

100.    As a direct result of Uber's lobbying efforts, those entities largely self-enforce hiring standards for their drivers. In cities where municipalities perform the screening, such as in Houston, Texas and Seattle Washington, hundreds of driver applicants Uber approved are ultimately rejected by the municipality.

101.    Even where authorized to do so, Uber generally does not perform driver background checks and instead outsources the checks to a third-party vendor that often limits the extent of its background check and that does not verify the information provided by the applicant is accurate or complete. The turnaround time for an Uber background check is often under 36 hours. The application process to become an Uber driver is simple, fast, and designed to allow the company to hire as many drivers as possible while incurring minimal associated costs. Uber fought for and implemented a less robust hiring process knowing it would be at the expense of passenger safety.

102.    Although Uber claims its drivers are not employees, Uber engages its drivers as part of its business and the Uber drivers are charged with the responsibility of safely transporting Uber passengers to their destination.

**DELAYED DISCOVERY AND FRAUDULENT CONCEALMENT**

103.    The discovery rule applies to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence, should have known of the existence of her claim against Uber.

104.    Plaintiff was not aware of the foreseeability of the assault she endured because Uber intentionally concealed the fact that Uber drivers had been regularly physically and/or sexually assaulting women since at least 2014 and instead represented that Uber was a safe mode of transportation.

105.    A reasonable investigation by Plaintiff at the time of her assault would not have revealed the factual basis of her claims against Uber. This is because Uber, through marketing and more, took actions to conceal that its drivers regularly and frequently assaulted women. This is also because Uber has publicly claimed that it does not control its drivers and that its drivers are not Uber employees. As such, despite reasonable diligence, Plaintiff was unable to discover Uber's negligent or wrongful conduct, which brought about or contributed to bringing about the assault she suffered.

106.    Furthermore, the running of any statute of limitations has been equitably tolled by reason of Uber's intentional representations and fraudulent concealment and conduct.

107.    Through its affirmative misrepresentations and omissions, Uber actively concealed from Plaintiff the true risks associated with using the Uber App and riding in an Uber, specifically, the risk of being assaulted, battered, harassed, and/or otherwise attacked.

108.    As a result of Uber's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Uber could be held liable for the risks its

drivers posed and that those risks were the direct and proximate result of Uber's acts and omissions.

109.    Plaintiff did not learn of Uber's negligent or wrongful actions and omissions in bringing about the assault until after she saw advertisements for legal help.

110.    Furthermore, Uber is estopped from relying on any statute of limitations because of its concealment of the truth about its failure to adequately employ measures to ensure the safety of its passengers. Uber had a duty to disclose the true character, quality, and nature of its background checks and the incidence of Uber drivers sexually assaulting or otherwise attacking passengers, because this was non-public information over which Defendants had, and continue to have, exclusive control, and because Defendants knew this information was not available to Plaintiff, Uber passengers/customers, and/or the general public.

## CLAIM 1: GENERAL NEGLIGENCE

111.    Plaintiff incorporates all prior allegations.

112.    By providing transportation to the general public using its application and network of drivers, Uber owed a duty to act with due and reasonable care towards the public and in particular its own passengers, including Plaintiff.

113.    Uber has been on notice that its drivers have been sexually harassing, sexually assaulting, and raping its passengers since at least 2014. Uber was aware or should have been aware that some Uber drivers would continue to sexually assault, stalk, harass, kidnap, physically assault, rape, and/or otherwise attack their vulnerable Uber patrons and passengers.

114.    Since learning of the sexual assaults perpetrated by its drivers, Uber never adapted or improved its safety procedures in any meaningful way.

115.    Uber does not require video monitoring of its drivers that cannot be turned off, nor does it provide emergency notification to law-enforcement authorities when a driver drastically veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the

intended destination but GPS data indicates the passenger remains in the car for a significant period of time.

116.    At all times relevant, Uber was well aware of the dangers its drivers posed, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means of transportation. In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being assaulted, battered, harassed, and/or otherwise attacked by an Uber driver.

117.    At the time Plaintiff was assaulted, Uber did not require sexual harassment/assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engages in sexual misconduct.

118.    Uber does not cooperate with the police when a driver commits an illegal sexual attack on its passengers. Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires that extensive standards be met before the company will even consider law enforcement requests for information. Even after a report of sexual assault has been made, Uber generally requires a subpoena before it will release information. Uber's policy of noncooperation discourages police agencies from making recommendations to local prosecutors to file complaints against Uber drivers and provides Uber's predatory drivers with tacit assurance that their illegal attacks will not be detected by law enforcement.

119.    When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks that would provide the most comprehensive means of screening applicant drivers. Uber does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

120.    Uber does not have a consistent, reliable system for addressing passenger reports of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Uber.

121.    For the above reasons and others, Uber breached its duty of reasonable care to Plaintiff.

122.    As a legal and direct result of Uber's actions and omissions, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The assault on Plaintiff caused her to suffer psychological and physical harm from which she may never fully recover.

123.    As a direct and proximate result of Defendants' general negligence, Plaintiff suffered economic and non-economic damages.

124.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**CLAIM 2: NEGLIGENT HIRING, RETENTION, AND SUPERVISION**

125.    Plaintiff incorporates all prior allegations.

126.    Uber engaged and retained or otherwise employed the Uber driver who assaulted, harassed, and/or otherwise attacked Plaintiff as described above.

127.    Uber did not interview, check the references of, provide training to, or advise the Uber driver of any anti-sexual assault policies when hiring him. Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, and failed to use reasonable care in determining whether the driver in question was fit for the task. Uber should have known of the unfitness of the Uber driver involved in the assault on Plaintiff but failed to use reasonable care to discover his unfitness and incompetence.

128.    Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the one who harmed Plaintiff, for transporting vulnerable and/or intoxicated women in a moving vehicle, Uber hired said driver to do exactly that.

129.    Uber knew or should have known that assigning the task of transporting vulnerable passengers to an inadequately screened driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual assaults committed by Uber's drivers.

130.    Uber failed to employ measures to adequately supervise its drivers.

131.    Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Uber drivers.

132.    Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

133.    The Uber driver who assaulted Plaintiff was, and/or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to her destinations, which caused her psychological and/or physical harm.

134.    Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was assaulted, harassed, battered, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

135.    Uber's negligence in hiring, retaining, and or supervising Uber drivers, including the driver who harmed Plaintiff, caused Plaintiff to be assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff

of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

136. As a direct and proximate result of Defendants' negligent supervision, hiring, and retention of Uber drivers, including the driver who harmed Plaintiff, Plaintiff suffered economic and non-economic damages.

137. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 3: COMMON-CARRIER NEGLIGENCE

138. Plaintiff incorporates all prior allegations.

139. At the time Plaintiff was sexually assaulted, Uber was a common carrier as it provided transportation, generally and indifferently, to the general public.

140. Uber provides transportation through a digital application and transportation network made available to the general public, generally and indifferently, for the purpose of transporting its users, the passengers, from place to place for profit. Uber has widely offered its services to the general public and charges standard fees for its services through its application. Uber represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

141. Uber is registered with the State of California, Public Utilities Commission, as a Transportation Network Company, which is "defined as an organization . . . that provides prearranged transportation services for compensation using an online-enabled application (app) or platform to connect passengers with drivers using their personal vehicles." (CPUC Decision 13-09-045, Rulemaking 12-12-011, September 19, 2013.)

1

142.     As a common carrier, Uber must carry its passengers, including Plaintiff, safely.

143.     Uber has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company. Uber has a duty to do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff.

144.     Uber must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business.

145.     Despite complaints to Uber of physical and/or sexual assaults committed by Uber drivers and lawsuits against Uber for physical and/or sexual assault, to this day Uber has failed to implement safety precautions that would adequately address its assault problem.

146.     Uber does not provide a consistent and reliable way for passengers to report physical and/or sexual abuse.

147.     Uber does not warn passengers of the dangers of riding with Uber and fails to warn passengers of past complaints regarding Uber drivers.

148.     Uber does not have an effective program in place to deal with the sexual-predator crisis posed by some of its drivers.

149.     Uber knows its female passengers are in a uniquely vulnerable situation enclosed in a moving vehicle and that a subset of its drivers are sexual predators.

150.     Uber has not exercised reasonable care to protect its passengers from harassment and assault by Uber's drivers.

151.     Uber has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Uber. If Uber had used the highest degree of care, Uber could have prevented or dramatically reduced the likelihood of the physical and/or sexual assault of its passengers, including Plaintiff.

152.    Uber failed to safely transport Plaintiff.

153.    Uber failed to use the utmost care and vigilance to protect Plaintiff from its own driver who assaulted, harassed, and/or otherwise attacked Plaintiff while she was being transported by Uber.

154.    Uber failed to take reasonable precautions to protect its vulnerable female passengers, including Plaintiff, from the foreseeable and known risk of assault and/or harassment by its drivers. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

155.    As a legal and proximate result of Uber's actions and omissions of Uber, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

156.    As a direct and proximate result of Uber's negligence as a common carrier, Plaintiff suffered economic and non-economic damages.

157.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**CLAIM 4: NEGLIGENT FAILURE TO WARN**

158.    Plaintiff incorporates all prior allegations.

159.    Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

160.    In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and abuse by Uber's drivers since at least 2014. Since then, Uber has received frequent passenger complaints about driver misbehavior, has been notified of police

investigations of drivers' criminal conduct while acting in their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

161.    Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of physical and/or sexual assault by Uber drivers. In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being physically and/or sexually assaulted.

162.    Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from physical and/or sexual assault.

163.    Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger reports to Uber that she was physically and/or sexually assaulted.

164.    Uber had reason to know that passengers would be unaware of the risk of physical and/or sexual assault by Uber drivers.

165.    A warning to its passengers that they were at risk of physical and/or sexual assault by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Uber drivers.

166.    Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being assaulted, battered, harassed, and/or otherwise attacked by an Uber driver.

167.    As a legal and proximate result of Uber's actions and omissions, Plaintiff was assaulted, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

168.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered economic and non-economic damages.

169.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 5: INTENTIONAL MISREPRESENTATION

170.    Plaintiff incorporates all prior allegations.

171.    At the time Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, she had downloaded the Uber App and had an account with Uber.

172.    Uber represented to Plaintiff and the general public that safety was Uber's top priority, and it was Uber's goal to make every ride safe, comfortable, and reliable. At the same time, Uber already knew that a number of its drivers had preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

173.    Uber made intentional misrepresentations of fact to all users of the Uber App, including Plaintiff, that were known by Uber to be false including the false statements Uber made, stating it would provide Plaintiff with a safe ride to her destination.

174.    These representations regarding safety were made to Uber customers, including Plaintiff, through periodic emails Uber sent to its customers, social-media advertisements, and Uber's own website and app. Plaintiff relied upon several advertisements and statements where Uber proclaimed it would provide a safe ride. Plaintiff read Uber's self-promoting statements

regarding safety both before and after Plaintiff was assaulted, harassed, battered, and/or otherwise attacked by the Uber driver.

175.    Prioritizing profits over passenger safety, Uber made these intentional misrepresentations of material fact to induce women, including Plaintiff, to use Uber's services.

176.    Uber made these representations to Plaintiff and the general public despite knowing it had chosen not to take the measures necessary to provide a safe ride to her intended destination and, as a result, continued physical and/or sexual assault of its passengers by its drivers was a foreseeable occurrence.

177.    Uber made these representations to induce women, like Plaintiff, to use Uber's services and to derive profit from women like Plaintiff.

178.    In ordering and entering an Uber vehicle, Plaintiff reasonably relied on Uber's representations that it would get her safely to her destination.

179.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by the Uber driver who assaulted, harassed, and/or otherwise attacked Plaintiff.

180.    As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

181.    As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff suffered economic and non-economic damages.

182.   Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 6: NEGLIGENT MISREPRESENTATION

183.   Plaintiff incorporates all prior allegations.

184.   Uber represented to Plaintiff and the general public that safety is Uber's top priority, and that it is Uber's goal to make every ride safe, comfortable, and reliable. At the time of the assault alleged, Uber knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

185.   Uber continued to represent that its services were safe to further Uber's own pecuniary interests.

186.   In choosing to represent to its customers/users that its services were safe, Uber had a duty to provide correct and accurate information about the actual safety of its services.

187.   Uber knew or should have known that it could not provide the safe ride that it represented it could.

188.   Knowing of the incidence of sexual assault of its passengers by its drivers and knowing that Uber had not implemented adequate precautions, Uber had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride as represented.

189.   In getting into the Uber, Plaintiff reasonably relied on Uber's representations that it would get her safely to her intended destination.

190.   In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by an Uber employee, the Uber driver, who assaulted, battered, harassed, and/or otherwise attacked Plaintiff.

191.   As a direct and proximate result of Uber's conduct, Plaintiff was assaulted, harassed, battered, and/or otherwise attacked by the Uber driver, which humiliated, degraded,

violated, and robbed her of her dignity and personal safety. The depraved attack on Plaintiff caused her to suffer physical and/or psychological harm from which she may never fully recover.

192.    As a direct and proximate result of Uber's negligent misrepresentations, Plaintiff suffered economic and non-economic damages.

193.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 7: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

194.    Plaintiff incorporates all prior allegations.

195.    For several years before Plaintiff was assaulted by the Uber driver, Uber was fully aware that other female passengers had been assaulted by Uber drivers. Since at least 2014, Uber has received frequent passenger complaints about driver misconduct, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

196.    Uber made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers to identify and terminate drivers who were sexual predators.

197.    Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber decided not to implement such precautions and instead continues to place its passengers at greater risk of assault and harassment by Uber's own drivers.

198.    Additional safety precautions that Uber chose not to make include but are not limited to: ongoing monitoring of Uber drivers through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer-service representatives. Uber chose not to implement such precautions, nor did it warn passengers of the risk of being physically and/or sexually assaulted given that these safety precautions had not been implemented.

199.    In failing to take these and other safety precautions designed to protect passengers from sexual predators driving for Uber, Uber breached its duty of reasonable care, negligently inflicting emotional harm upon Plaintiff, and acted recklessly and in conscious disregard of her safety.

200.    As a direct and proximate result of Uber's negligent infliction of emotional distress, Plaintiff suffered economic and non-economic damages.

201.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 8: BREACH OF CONTRACT

202.    Plaintiff incorporates all prior allegations.

203.    Plaintiff entered a contract with Uber. The essence of this commercial transaction was the payment of a fee to Uber in exchange for safe and reasonable transportation to Plaintiff's destination.

204.    As a result of the conduct, acts, and omissions set forth above, Uber breached its contract with Plaintiff, including breaching implied covenants inherent in such a contract.

1    205.    As a direct and proximate result of Uber's breach of contract, Plaintiff suffered

economic and non-economic damages.

**CLAIM 9: STRICT PRODUCT LIABILITY BASED ON DESIGN DEFECT OF THE UBER APP AND FAILURE OF THE UBER APP TO MEET MINIMUM REASONABLE CONSUMER SAFETY EXPECTATIONS**

206.    Plaintiff incorporates all prior allegations.

207.    Uber manufactured and distributed the Uber App.

208.    The Uber App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because the Uber App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

209.    The Uber App did not include safety features such as a GPS tracking system that would alert Uber to the early termination of a ride, substantial deviation from the intended route, or a passenger continuing to travel in the Uber vehicle after the driver ended the ride in the app. It also did not include the automatic activation of the camera in drivers' smart phones when a ride is in progress. And it did not include automatic notification of law enforcement of suspicious circumstances that suggest a rider may be in danger.

210.    The Uber App also failed to communicate with Plaintiff a true expectation of the lack of safety in using Uber.

211.    These flaws in the design of the Uber App, were a substantial factor in causing harm to the Plaintiff, which included being assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

212.    As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

213.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 10: STRICT PRODUCT LIABILITY - FAILURE TO WARN

214.    Plaintiff incorporates all prior allegations.

215.    Uber manufactured and distributed the Uber App.

216.    The Uber App presented potential risks of introducing each driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Uber App, could neither escape from the Uber driver's vehicle nor control the place where the driver would take the passenger, which could result in the sexual assault of that passenger; these are risks that were known or knowable at the time of manufacture and distribution of the Uber App.

217.    The potential risks presented a substantial danger when the Uber App was used or misused in an intended or reasonably foreseeable way.

218.    Ordinary consumers such as Plaintiffs would not have recognized the potential risks.

219.    Defendant Uber failed to adequately warn consumers, including Plaintiffs, of these potential risks.

220.    Uber's failure to provide passengers, including Plaintiffs, with sufficient warnings regarding the risk of harm to which they were being exposed with each Uber ride was a substantial factor in causing the harm suffered by Plaintiffs, including being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver which humiliated, degraded, violated, and robbed Plaintiffs of their dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which she may never fully recover.

221.   As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

222.   Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

<h3 style="text-align:center"><strong>VICARIOUS LIABILITY FOR DRIVER'S TORTS</strong></h3>

223.   Plaintiff incorporates all prior allegations.

224.   Uber is vicariously liable for the acts of its drivers by statute.

   a.   Uber is a transportation network company subject to California Public Utilities Code section 5354.

   b.   Public Utilities Code section 5354 provides, in pertinent part, that the "act, omission, or failure of any . . . person offering to afford the authorized service [transportation] with the approval or consent of the permit or certificate holder [Uber] is the act, omission, or failure of the permit or certificate holder [Uber]."

   c.   The Uber driver, at all relevant times, was a person offering to afford the transportation service with the approval and consent of Uber.

   d.   Uber was, at all relevant times, a permit or certificate holder subject to Public Utilities Code section 5354.

225.   At all relevant times, the Uber driver was Uber's employee for purposes of common law *respondeat superior* liability.

   a.   At all relevant times, Uber exercised control over the Uber driver's work by dispatching the Uber driver to particular locations and passengers, instructing him regarding the route to use, instructing him regarding decals to place on his vehicle, setting the fares and rates, limiting his ability to see where he will be driving before he accepts a ride, instructing him via his conduct during passenger rides,

monitoring his speed and route while rides were in progress, specifying the manner of payment, accepting payment on his behalf, gathering feedback from his passengers, tracking his performance, and reserving the right to terminate drivers with or without cause.

b.  At all relevant times, Uber supplied the equipment and tools of work to the Uber driver by supplying the decals, map tools, communication tools, and payment acceptance tools, among other things.

c.  The work that the Uber driver was doing, namely providing transportation services, was part of Uber's regular business in that Uber was and is in the business of providing transportation.

d.  Before he began doing rideshare work for Uber, the Uber driver had not been a professional driver.  He did not have a distinct occupation or business as a professional driver. He was simply a lay person with a vehicle.

e.  The work performed by the Uber driver did not require specialized or professional skill, in that he was simply driving passengers from one location to another.

f.  The Uber driver was not hired to do one or several discrete projects, but was rather hired to perform work for Uber over a long, and even indefinite, period of time.

226.  At all relevant times, the Uber driver was acting as an agent of Uber in that Uber had given him authority to transport passengers on its behalf, and he was acting within that authority while he was transporting Plaintiff.

227.  At all relevant times, the Uber driver was acting within the scope of his employment and/or agency with Uber.

a.  The nature of the Uber driver's work gave him unique power over passengers like Plaintiff, including the ability to exercise general control over their liberty by

activating locks or operating the vehicle in a manner that prevents the passenger from exiting the vehicle, thereby restraining and keeping her in an isolated setting (a private vehicle). The Uber passengers, such as Plaintiff, have limited means to escape, thus increasing the risk for sexual violence.

b.  Uber drivers, including the Uber driver, occupied a unique position of trust in society insofar as Uber riders like Plaintiff were trusting these drivers to take them from point A to point B without incident.

c.  At all relevant times, the Uber driver was on duty as an Uber driver.

d.  At all relevant times, Plaintiff was exposed to injury by the Uber driver because of the unique power he exercised over her in his capacity as an Uber driver, and because of the trust she placed in him because of his unique position of trust as an Uber driver.

e.  The Uber driver's sexual assault, harassment and/or other attack of Plaintiff was reasonably foreseeable in light of Uber's business, including the situational risks presented by granting to a large fleet of non-professional drivers control over a trusting population of passengers who would ride alone and isolated in a vehicle, with their liberty potentially restrained by their drivers.

228.  At all relevant times, Uber as a common carrier had an absolute duty to protect its passengers from assault by its own employees and agents, and was therefore vicariously liable for the sexual assault, battery, harassment, and/or other attack which the Uber driver perpetrated on Plaintiff, whether or not that conduct occurred in the course and scope of employment.

229.  At all relevant times, Uber as a common carrier had a nondelegable duty for the safety of its passengers and was therefore liable for the sexual assault, harassment, and/or other

attack which the Uber driver perpetrated on Plaintiff, whether or not that conduct occurred in the course and scope of employment.

    a.   As a common carrier which owes its vulnerable passengers, such as Plaintiff, an utmost duty of heightened care, Uber has a non-delegable duty to transport its passengers safely.

    b.   The doctrine of nondelegable duty recognizes that, for public policy reasons, certain duties cannot be delegated to a third party. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors to further the employer's pecuniary interests.

    c.   In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the assaults committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

    d.   Uber drivers act as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

    e.   Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide— transportation.

230.    The Uber driver at all relevant times was acting as Uber's ostensible agent.

a.    Through its advertising, Uber intentionally encouraged its customers to identify the Uber decal as indicating that a driver with a decal is a safe and authorized Uber driver who had been vetted by Uber, and was being held out by Uber as a trustworthy driver.

b.    Uber gave the Uber driver its decals, and had him place the decals on his vehicle to identify himself as an Uber driver.

c.    Uber granted the driver the authority to transport its passengers and represent its business in doing so.

d.    By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including the Uber driver at issue here, were Uber's employees and/or agents.

e.    Plaintiff reasonably believed that the Uber driver was an employee or agent of Uber, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result of her contact with the driver.

231.    As a direct and proximate result of the Uber driver's tortious conduct, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

232.    As a direct and proximate result of Uber driver's tortious conduct for which Uber is legally liable, Plaintiff has suffered economic and general, non-economic damages according to proof.

233.   Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## VICARIOUS LIABILITY FOR SEXUAL BATTERY

234.   Plaintiff incorporates all prior allegations.

235.   The Uber driver made harmful and offensive contact with the Plaintiff. Plaintiff did not consent to the contact. Plaintiff was harmed and offended by the Uber driver's contact. The Uber driver intentionally and recklessly committed acts that resulted in harmful contact with Plaintiff's person, and/or touching of Plaintiff in a sexual manner.

236.   As a result of the Uber driver's sexual battery of the Plaintiff, which occurred while in the course and scope of Uber driver's employment, Plaintiff was humiliated, degraded, violated, and robbed of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

237.   As a legal result of the sexual battery committed by the Uber driver, and Uber's liability and vicarious liability for the same, Plaintiff suffered economic and non-economic damages.

238.   Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## PUNITIVE DAMAGES

239.   Plaintiff incorporates all prior allegations.

240.   As stated above, Uber knew that it faced an ongoing problem of sexual predators driving for Uber and assaulting its passengers. As early as 2014 Uber knew that its drivers were physically and/or sexually assaulting female passengers. Since 2014, Uber has received frequent passenger complaints about driver physical and/or sexual misconduct, including physical and/or

sexual assault and rape, it has been notified of police investigations of the criminal physical and/or sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits and/or arbitrations alleging the sexual harassment and physical and/or sexual assault of Uber's passengers by Uber's drivers.

241.    Nevertheless, even though Uber was fully aware of its sexual predator problem it failed to take safety precautions to protect its passengers.

242.    Even after Uber was aware some Uber drivers were using driving for Uber as an opportunity to get unsuspecting women into their vehicles and to physically and/or sexually assault them, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

243.    The decision not to implement more thorough and persistent background checks was driven by Uber executives' desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

244.    Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers/users of the risk of being assaulted even after Uber and its leadership were fully aware of this risk.

245.    Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Uber drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines

mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, rape, and exploitation by Uber's own drivers.

246.    Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiff, and the public.

247.    As a direct and proximate result of the intentional, negligent, reckless, grossly negligent conduct of Uber, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

248.    The depraved attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and/or psychological harm from which she may never fully recover.

249.    As a result of Uber's misconduct as stated above, Plaintiff seeks punitive damages to punish Uber for its misconduct and to deter future misconduct.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief:

- Entry of judgment on each of her claims against Defendants jointly and severally;

- Past and future economic and non-economic damages including physical pain, mental anguish, anxiety, medical expenses, lost earnings or earning capacity;

1    • Punitive damages;

2    • Pre- and post-judgment interest;

3    • The costs and expenses of litigation;

4

5    • Attorneys' fees;

6    • Equitable relief; and

7    • Such other relief as this Court may deem just and proper.

8    ///

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16                          **JURY DEMAND**

17        Plaintiff demands a trial by jury on all issues so triable.

18    Dated: November 16, 2023              Respectfully submitted,

19
                                           By: */s/ Alexandra M. Walsh*
20                                         ALEXANDRA M. WALSH (*pro hac vice*
                                           forthcoming)
21                                         **Walsh Law PLLC**
                                           14 Ridge Square NW, Suite 342
22                                         Washington, DC  20016
                                           Telephone: 202.780.3014
23                                         Facsimile: 202.780.3678
                                           Email: awalsh@alexwalshlaw.com
24

25                                         By: */s/ Kimberly J. Channick*
                                           KIMBERLY J. CHANNICK (Cal Bar No. 325089)
26                                         WILLIAM L. SMITH (Cal Bar No. 324235),
                                           admission to N.D. Cal. pending)
27                                         **Walsh Law PLLC**
                                           13427 Maxella Avenue, Suite 203
28

Marina del Rey, CA  90292
Telephone: 202.780.3014
Facsimile: 202.780.3678
Email: kchannick@alexwalshlaw.com
Email: wsmith@alexwalshlaw.com

*Counsel for Plaintiff*