1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Lisa J. Cisneros, Magistrate Judge

4

5   IN RE: UBER TECHNOLOGIES,      )  No. 3:23-MD-03084-CRB
    INC., PASSENGER SEXUAL         )
6   ASSAULT LITIGATION             )
    _____)
7

8                                  San Francisco, California
                                   Monday, January 8, 2024
9

10   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
               RECORDING 12:32 - 1:25 = 53 MINUTES
11

    APPEARANCES:
12

    For Plaintiffs:
13                              Chaffin Luhana, LLP
                                600 Third Avenue, 12th Floor
14                              New York, New York 10016
                           BY:  ROOPAL P. LUHANA, ESQ.
15
                                Peiffer Wolf Carr Kane Conway
16                                & Wise, LLP
                                555 Montgomery Street
17                              Suite 820
                                San Francisco, California
18                                94111
                           BY:  RACHEL B. ABRAMS, ESQ.
19                              Lieff Cabraser Heimann &
                                  Bernstein, LLP
20                              275 Battery Street
                                29th Floor
21                              San Francisco, California
                                  94111
22                         BY:  SARAH R. LONDON, ESQ.

23

24

25

2

1 | Transcribed by:                    Echo Reporting, Inc.
                                     Contracted Court Reporter/
2 |                                    Transcriber
                                     echoreporting@yahoo.com
3 |

3

Monday, January 8, 2024                                    12:32 p.m.

1 <u>Monday, January 8, 2024</u>                                    <u>12:32 p.m.</u>

2                          P-R-O-C-E-E-D-I-N-G-S

3                                --oOo--

4             THE CLERK:  We are calling civil matter 23-MD-

5 03084, In Re: Uber Technologies, Inc.

6        Counsel, will you please state your appearances for the

7 record, beginning with Plaintiff's counsel.

8             MS. LUHANA (via Zoom):  Good afternoon, Judge

9 Cisneros.  Roop Luhana for the Plaintiffs.

10            MS. LONDON (via Zoom):  Sarah London for the

11 Plaintiffs.

12            THE COURT:  Ms. Abrams, you're on mute.

13            MS. ABRAMS (via Zoom):  Yes.  I apologize.  Good

14 afternoon, your Honor.  Rachel Abrams for the Plaintiffs.

15            MR. ATKINS (via Zoom):  Robert Atkins with Kyle

16 Smith for Uber.

17            THE COURT:  Okay.  Thanks, everyone for -- for

18 being here today.  I think that we can just jump right into

19 this.  I've read all your papers and looked at the history

20 of the -- the dispute, including the filing that was -- came

21 in today concerning some disclosures that Defendants made on

22 January 4th.

23        I guess to start with, I wanted to find out exactly

24 what's still at issue.  So, I saw the information about the

25 January 4th submissions, but what, if any, other information

4

1  has been produced since the protective order was issued on

2  December 28th?

3          MR. ATKINS:  I think I can answer that.  As set

4  forth in our papers, we produced a deposition from the JCCP,

5  a corporate rep regarding --

6          THE COURT:  Okay.  I -- I think the papers said

7  that there was a bunch of information that had been

8  disclosed in the JCCP, that that information Defendants were

9  willing to turn over once the protective order was issued,

10 but it wasn't clear to me.  That -- that was filed before

11 the protective -- your -- your opposition was filed before

12 the protective order issued on December 28th.  So -- so, you

13 did end up disclosing all of those -- those items?

14         MR. ATKINS:  Yes.  yes, your Honor.

15         THE COURT:  Okay.

16         MS. LUHANA:  Judge, Roop Luhana for the

17 Plaintiffs.  Defendants produced documents just a couple of

18 hours ago that were produced in the JCCP.  Plaintiffs don't

19 believe this is any substitute for the information we're

20 seeking in our motion, and I'm happy to get into that if

21 you'd like.

22         THE COURT:  Okay.  But I'll let Mr. Atkins just,

23 you know, walk me through again kind of exactly what was in

24 the JCCP information.  I mean, it's in the papers, but it's

25 -- just --

5

1          MR. ATKINS:  Yes.  So --

2          THE COURT:  -- to be crystal clear on that.

3          MR. ATKINS:  -- several things.  Your Honor, I

4  apologize for my voice.  I also want to thank my colleagues

5  and your Honor for extending this hearing.  I would advise

6  everybody not to get the flu that's going on.  So, you'll

7  forgive me.  I'm not -- my voice has not come back.

8          THE COURT:  Yeah.  The -- please take your time.

9          MR. ATKINS:  Thank you very much.

10     So, we've turned over the following, which was set

11 forth in our papers, a corporate rep deposition that was

12 taken with regard to document and data preservation and

13 retention, sort of the equivalent of a 30(b) -- (b)(6).

14     We've also produced the policies themselves which we

15 had produced in the JCCP.  There's a -- we produced a list.

16 As set forth in our papers -- pardon me -- the parties, the

17 Plaintiffs and the Defendant, have been in meet and confer

18 negotiations quite productively I might add, without any

19 rancor over the custodian.  So, we've -- we've moved on from

20 preservation.  There's no issues about preservation in the

21 JCCP.  But we're now actually getting to custodians.  The

22 Plaintiffs requested 143.  We have identified those names,

23 and those names have now been provided to the MDL

24 Plaintiffs.  Interestingly, just as a contrasting point, I

25 think your Honor saw and now you have a copy of the -- our

6

1  preservation net, if you will, has captured more than 15,000

2  email files, 15,000 jobs and positions.  But in the JCCP,

3  the Plaintiffs started at 143 custodians.  They're actually

4  now down to -- and we're sort of down to the short strokes.

5  They're down to I believe 55, which isn't to say they might

6  not enlarge that.  But that gives you a sense of the scale

7  of the relevant custodians.

8      And I -- we also turned over the -- a transcript of the

9  most recent hearing before Judge Schulman that addressed a

10 number of discovery issues, including custodians and data

11 searching.

12     I guess I should underscore that -- because I think

13 it's the star of the show today, we turned over the list of

14 15,700 positions, titles, jobs, the email accounts for which

15 have now been -- or in some cases have been for a long time

16 but are now on hold.

17     And, to give your Honor a sense of the scale of that

18 hold, I conservatively estimate, but I think it's a lot

19 more, it's at least 100 email files that are now on hold.

20         THE COURT:  Okay.  So, I was -- read in your

21 papers that -- that there was a -- a deposition transcript

22 from the Uber's person most knowledgeable, and then there

23 was -- it also seemed like Uber was willing to turn over the

24 communications platforms used by Uber, the electronic

25 platforms, programs, databases, information, technology,

7

1  systems that Uber uses, and has historically used.

2      So, is that infor -- is that information that's just

3  kind of in the transcript, so, if somebody goes through and

4  reads the transcript or is it sort of separately listed out

5  and you've disclosed that to the JCCP and now the Plaintiffs

6  here and the MDL have it as well?

7          MR. ATKINS:  It's -- it's both, your Honor.  It's

8  in written communications with Plaintiffs' counsel and the

9  JCCP.  And, of course, it's in the deposition at some length

10 and depth.

11         THE COURT:  Okay.  Well, why don't I turn to Ms.

12 Luhana then to -- it seems I got the sense from her that she

13 doesn't think that it's enough information at this point,

14 and it did to me overall seem like the heart of the dispute

15 is the extent to which Defendants are obligated to disclose

16 the noncustodial sources of potentially relevant ESI.

17         MS. LUHANA:  Thank you, Judge.  Actually, it's --

18 it's two-fold.  The first request we have is that Uber

19 produce the names and job titles --

20         THE COURT:  Right.

21         MS. LUHANA:  -- the corresponding names and job

22 titles of everyone that's placed on hold.  Importantly, we

23 want to know the dates of the employment of the custodians,

24 when each individual received the litigation hold, the date

25 range of the ESI that was preserved, and what litigation it

8

1  relates to.  So, that -- that's our first request.

2      And then the second request is going into the

3  noncustodial sources, because if you reviewed this

4  Defendant's opposition, Uber believes that when litigation

5  holds are in place, they're complying with their PTO2

6  duties.  However, there are a number of unanswered questions

7  as to the noncustodial sources, including structured and

8  unstructured databases, common places where they store

9  information regarding marketing and safety, human resources

10  and training resources and things like that.  There is no

11  mention of that in their opposition papers.  So, the --

12  those are two buckets of things that we're looking for.

13      And then, lastly, we ask that Uber suspend its auto

14  deletion policy just temporarily until we get to the bottom

15  of this and, you know, Uber provides the assurances that the

16  information, the relevant ESI that needs to be placed on

17  hold is, in fact, placed on hold.

18      And would you indulge me to go into the history of this

19  matter and how this arose and why there is a concern here?

20          THE COURT:  Sure.

21          MS. LUHANA:  Okay.  So, let me briefly run through

22  the background here.  So, it's established that the duty to

23  preserve arises not only during litigation but also extends

24  to the period before litigation, when a party should

25  reasonably know that evidence may be relevant to anticipated

9

1  litigation.

2      So, the allegations in this case are very serious.

3  We've alleged that Plaintiffs have been sexually assaulted

4  by Uber drivers, and Uber has failed to put adequate safety

5  measures in place to protect its passengers.

6      So, at the November 3rd hearing, before the hearing,

7  Judge Breyer recognized the critical issues in the case.  He

8  said what Uber knew about these incidents of sexual assault,

9  when Uber knew, what actions Uber took, what were Uber's

10  hiring practices and monitoring practices for drivers, and

11  how Uber vetted its drivers was critical.  He recognized the

12  scope of the allegations and what was involved.

13      However, before the parties appeared before the Court

14  on November 3rd, Uber in its submission to the Court, on

15  October 27th, had represented that it issued litigation

16  holds for multiple custodians who work on sexual assault

17  incidents.

18      So, clearly, the scope goes beyond those who just work

19  on sexual assault incidents.  And, so, Uber's hiring

20  practices, its marketing practices, its safety protocols or

21  lack thereof historically are relevant.  And, so, Uber's

22  obligation to preserve goes back to when Uber first knew

23  about these allegations, which we believe is no later than

24  2013.

25      In fact, Mr. Atkins had confirmed and represented that

10

1  to the Court, that these claims go back to 2013 on November

2  3rd.

3      So, even though passenger sexual assault litigation

4  began no later than 2013, Uber from September 2015 to

5  January 2023 was deleting emails every six months.  And then

6  in 2020, Uber deleted all Slack messages over 90 days old.

7  So now, as of January 2023, Uber has a 24-month email

8  retention policy.  And per Mr. Anderson's declaration, he's

9  Uber's senior e-discovery analyst.  Google Drive documents

10 are currently -- currently just not automatically deleted.

11 But if Uber only had litigation holds on those multiple

12 custodians who work on sexual assault as Uber represented

13 and not, let's say, the company managers, the executives,

14 the engineers who were in charge of safety policies for

15 vetting drivers, then marketing, and Uber was deleting

16 emails every six months and all Slacks older than 90 days,

17 then there's a serious concern that the relevant ESI is

18 being destroyed if Uber didn't place timely litigation holds

19 on relevant custodians when Uber reasonably became aware of

20 the sexual assault allegations in 2013.

21      So, as a result of these concerning red flags, Judge

22 Breyer entered PTO2 as an interim measure which, among other

23 things, ordered that no party shall destroy any information

24 subject to discovery within their control without applying

25 to the Court.

1    So, therefore, Plaintiffs were really surprised when we

2  met with Uber on November 17th to discuss PTO2.  The

3  Defendants provided conflicting information.  We were told

4  Uber had not suspended its automatic deletion policy.

5  Plaintiffs were told that Uber at that time had a six-month

6  retention email policy and that Uber was having -- went from

7  having multiple custodians on hold to thousands of

8  litigation holds for undisclosed matters that may overlap

9  with this litigation.

10    So, Defendants can certainly inform Plaintiffs that

11  Uber had not suspended its auto deletion policy despite PTO2

12  and hadn't sought relief from the Court to do so.

13    And then, on December 1st, Uber clarified a couple of

14  things.  They clarified their email retention policy that

15  they said was previously six months, was that -- was the

16  case in the past and that January 2023 there was a two-year

17  retention policy.

18    However, while Judge Breyer entered, you know, PTO2 on

19  November 3rd, on December 1st, almost one month later, Uber

20  represented that it still was unable to identify the number

21  of litigation holds for this litigation, and that's Uber --

22  that's Uber not -- that's despite Uber not having the

23  certainty that it still had not suspended its auto deletion

24  policy.

25    Then on December 13th, Plaintiffs for the first time

12

learned that thousands of employees had been placed on hold
in connection finally with this litigation.  So, it wasn't
until Defendants filed their opposition, Judge, in this case
that Uber disclosed and Plaintiffs learned about the actual
number of litigation holds for this matter and other
matters.

So, because of this conflicting information that we've
received from Uber and the concern that relevant ESI is
still being destroyed, Plaintiffs have brought this motion.
And, so, we are requesting those three things I raised
previously.  We're requesting that Uber produce to
Plaintiffs the basic details surrounding its litigation
holds and ESI sources to confirm what is being preserved for
PTO2, and require Uber to temporarily suspend its deletion
policies until the parties can come up with a more tailored
approach.

And, Judge, in terms of the details around the
litigation hold, that's something that's routinely provided
in litigation, and we cited to case law showing that.  You
know, the ESI guidelines confirmed that as well as the
Advisory Committee notes to Rule 26.  So, this is something
that's commonplace in litigation.  And, because of all these
concerns, it's appropriate to produce here.

And, so, for these reasons, we believe Plaintiffs'
motion should be granted.

13

1          THE COURT:  Okay.  Thank you.

2      I think that we'll get to this question of suspending

3  company-wide document retention policies, but I think what

4  stood out to me most in the papers was the delay in

5  disclosing basic information about potential sources of

6  relevant ESI.  And, to me, it seemed, you in reading the

7  case law, it -- or even the Sedona principles, pretty

8  straightforward, that while a litigant's not entitled to a

9  copy of the -- of the litigation hold letters or the

10  preservation letters, the litigants are entitled to have

11  some basic information about what is -- what's been

12  preserved.

13      And, so, I mean, there's Judge SEEBORG's decision in

14  the eBay case.  There's the -- the Cohn v. Trump decision.

15  It's really kind of not -- not controversial.  And then even

16  the Sedona principles, I think it's comment 5(c) that talks

17  about the parties should discuss custodial and noncustodial

18  sources of relevant or potentially relevant ESI.

19      So, and I think, you know, to the -- Judge Breyer's

20  pretrial order number two, I mean, while it's interim with

21  respect to -- to preservation, it expressly directed the

22  parties to -- to consider whether or not there -- they'd

23  like to make some kind of proposal for a more tailored order

24  concerning preservation of -- of relevant information.

25      And, so, because that order, you know, was issued with

14

1  an expectation that there might need to be a more tailored

2  preservation order, I think implicit in that is that there

3  is going to be disclosure of this basic information so that

4  if the scope of preservation needed to be adjusted or

5  somehow clarified by the Court, that could be done, but that

6  process to me seems like it was handicapped by the -- the

7  withholding of basic information.  Granted, I recognize that

8  Defendant said, Well, you know, we want to -- we'll disclose

9  some of this after the protective order was finalized.  You

10 know, Judge Breyer's pretrial order number two issued in

11 November -- on November 3rd, the protective order was

12 proposed by Plaintiffs on November 15th.  I know we had a

13 Thanksgiving holiday.  It then -- the feedback wasn't sent

14 along before that Thanksgiving holiday, and then it came

15 back sometime maybe in the second week of December.  So --

16 so, anyhow, all of this seems to me rather delayed.  I

17 didn't quite understand why some of this basic information

18 would -- what the connection was between the protective

19 order and some of this basic information about potential

20 sources of -- of relevant ESI.  I mean, job titles, like,

21 that's the kind of information you see on LinkedIn.  But

22 perhaps Mr. Atkins can elaborate on that.  I mean, it's kind

23 of a moot point at this point because there is a protective

24 order, but to the extent we're talking about, you know, to

25 what extent this process is going as quickly as I think

15

Judge Breyer was contemplating, you know, why -- what is --
is there some connection between the protective order and --
and certain of this basic information that needed to be
turned over.

      MR. ATKINS:  So, your Honor, let me address a
number of those things.  The connection with the protective
order is that because we interpreted Judge Breyer's office
-- order as being rather capacious, we put together this --
we put in a hold and then put together a list of all the
relevant job titles for 15,000 positions.  And we -- we can
litigate the question of whether it should remain under
seal, but we had concerns about confidentiality.

     But I think the point to understand here is this is
where we now are.  We have put in place what in my
experience is an unprecedented preservation hold.  It's not
just the scale, the 15,000 and the 100 million documents.
It's who's covered.

     So, the Judge's order said define it broadly.  It
should be executives and managers and directors, and it
should cover, you know, not just sexual assaults but safety,
technology, marketing.  And we heard that, and we heeded
that.  And if you'll just indulge me to give you a sense of
what we have preserved, which is the issue before us, that
list includes all the chiefs, CEO, CFO, Chief Safety
Officer, Chief Product Officer, Chief Technology Officer,

16

1   Chief Marketing Officer, all the topics Judge Breyer
2   identified and, frankly, more.  I mean, and Chief Economist,
3   the general counsels.  Then it's everybody else in the
4   corporate ladder, vice presidents, directors, managers,
5   heads, leaders, engineers, including but not limited to
6   safety marketing, safety legal, safety products.  And -- for
7   example, there are literally hundreds of app developers,
8   coders, software engineers.  There's 200 people involved in
9   investigations, including claims like these.  There's --
10  there's nearly 200 lawyers.
11       We -- we just -- we threw as wide a net as we could
12  imagine.  And, for what it's worth, I've been doing this for
13  a couple of years.  I've never seen anything like it, but we
14  saw Judge Breyer.  We understood him to want on this interim
15  basis to lock down anything that could be conceivably
16  relevant, and we've done that and I think more, number one.
17       Number two, there's no relevant evidence being
18  destroyed, full stop.  There is a hold on thousands and
19  thousands and thousands of employees.  And, importantly,
20  that goes back to the 2013 era.  There have been holds in
21  place, many of them associated with individualized claims
22  like this.  So, it's not as if the hold went into place last
23  week or even with the JCCP.  So, it's thousands and
24  thousands of files with thousands and thousands of employees
25  going back a decade.  And an indication of that, your Honor,

17

1  is that roughly two-thirds of the employees and executives

2  covered by this whole, two-thirds of them are former

3  employees.  So, this is vast.  It's deep.  It's old.  And in

4  terms of what's happening today, the 20-month hold sort of

5  rather -- sort of renders this academic because anything

6  that was created from January 23, 2023 forward, including

7  today, is going to be held for -- for two years, everybody's

8  in the company, people who work for Uber Eats, people who

9  work for the freight business.  Everything's going to be

10  held.

11      So, at the earliest, an email that was created in let's

12  say January 2023 is not going to be deleted under the auto

13  deletion policy until January of 2025.  And if a document is

14  created today, it's not going to be deleted until January

15  2026, and that's separate and apart from the 15,000 that are

16  on hold and are not going anywhere.

17      So, there's no urgency.  There's been -- there's no

18  risk.  And the time that it took to get this up and running

19  has had zero consequence in terms of the preservation of the

20  information.

21      Now, in terms of the nature of the information, we did

22  what we view as being proscribed by the practices and

23  standards.  The Northern California checklist which the

24  Plaintiffs invoked says that you should disclose general job

25  descriptions and it should say it -- and an example it

18

1  gives, it has a paren with e.g., is managers, heads,

2  leaders.  It's exactly what we do.  So, we complied in full

3  with the Judge's order where our conduct is consistent with

4  the -- the governing standards and practice.  And,

5  conversely, I think it's wholly unprecedented.  I've seen no

6  precedent authority, much less case law from the Plaintiffs,

7  for suspending the entire retention and deletion policy.

8  There's no factual findings or evidentiary support that

9  there's any risk that warrant such an extreme result.  And

10 there's a good reason here why it's 15,000, which is way

11 beyond what's relevant, because maybe, contrary to

12 perception, Uber does a lot more than ride sharing.  It's

13 got the delivery business.  It's got a freight business.  In

14 fact, more than 50 percent of its revenue comes from

15 businesses other than ride sharing.

16      So, there's -- there's just absolutely no

17 justification, no legal precedent for putting a hold on, you

18 know, the folks in Uber Eats, although our net caught some

19 of them.  So, again, we were over over over broad.  So --

20          THE COURT:  Well --

21          MR. ATKINS:  -- that's where we are today.

22          THE COURT:  Yeah.  I'm not inclined to grant a

23 company-wide suspension of the -- any -- the document

24 retention policies, but I did wonder, you know, why are the

25 litigation holds placed on employees pursuant to litigation.

19

1  You know, other -- cases other than this litigation, why is

2  that relevant to demonstrate that Defendants have met their

3  preservation obligations for this case?  I mean, you've got

4  5,500 current and former employees who have document holds

5  for this case, and then you say, Okay, well, there's 10200

6  of employees who happen to have litigation holds for some

7  other litigation.  Why -- why does that bear the Court's

8  consideration?  I mean, it does show sort of an overall the

9  extent to which Uber, you know, has this burden I guess, but

10  those are burdens kind of associated with -- with other

11  cases.

12       So, I mean, we -- we don't know the time --

13            MR. ATKINS:  I can ans --

14            THE COURT:  -- time frame --

15            MR. ATKINS:  I can --

16            THE COURT:  -- of when these other litigation

17  holds were put in place.  You know, that -- and I think

18  you're talking about numbers of people who have litigation

19  holds for their facility workers but not -- we don't --

20  there's not a lot of detail for Plaintiffs to evaluate when

21  were those litigation holds in place.  And, you know, you

22  look at a case like Cohen v. Trump, and there's like the

23  name and titles of the person, the dates when -- when they

24  got notification of the litigation hold, the types of

25  documents and files that are subject to the litigation holds

20

1  and the efforts undertaken to enforce it.

2      I mean, so, anyhow, what -- I'm getting a little bit

3  off what my question was, but 10,200, why is that important

4  here?

5          MR. ATKINS:  A couple of reasons.  First of all,

6  it captures people -- mostly former, not entirely -- who may

7  have relevant information.  It -- it does cover them.  We --

8  rather than going through every single existing hold, we

9  just said hold the holds, but many of those people -- I

10 can't quantify that.  We'll do that when we pick custodians

11 and start running search terms, but the last thing we wanted

12 was to be here today and accused of having lifted other

13 holds.  But those other holds may well include folks who

14 have or had relevant information.  So, that's why.

15     Also, I thought it was important for the Court to

16 understand how seriously we take this, and we didn't want to

17 be said to have lifted any holds, deleted any documents that

18 were already held.  But there will be documents, I suspect,

19 among those 10,200 that are relevant.

20         THE COURT:  Okay.

21         MR. ATKINS:  And, so -- and, again, we're -- you

22 know, my view is, your Honor, we're here on preservation.

23 So, we locked everything down.

24     And now, to your -- your Honor's questions about

25 additional information.  With all respect, that's what

1  becomes next.

2          THE COURT:  Yeah.  What's the basis for

3  withholding basic information about noncustodial sources of

4  ESI?

5          MR. ATKINS:  I'm going to let Mr. Smith address

6  that if you'll permit me to step aside.

7          MR. SMITH (via Zoom):  Thank you, your Honor.

8          THE CLERK:  Sir, can you please state your

9  appearance for the record?

10          MR. SMITH:  Yes.  Kyle Smith for the Uber

11  Defendants.

12      Thank you, your Honor.  So, that information is not

13  being withheld.  What the -- what the noncustodial sources

14  are, what databases exist, how the data structure, where

15  it's stored, what the policies around the storage of that

16  information are, that is information that is proprietary

17  and, thus, therefore, confidential to Uber.  And that's what

18  we were waiting for the December 28th protective order

19  before making the disclosure, and that is the information

20  that went out today to Plaintiffs in the form of deposition

21  transcript, in the form of exhibits to the deposition

22  transcript in terms of correspondence that had been sent to

23  counsel in the JCCP saying, Hey, here is source one, source

24  two, source three of noncustodial information that you may

25  have questions about and disclosures about that.  So, that

22

1  -- the answer -- that's a long-winded answer to your Honor's
2  question of it's not being withheld.  That's being provided.
3  There are follow-up questions.  They will be answered now
4  that we have the protective order in place and are able to
5  make the appropriate disclosures under the protections of
6  the order.
7      (Pause.)
8          THE COURT:  Well, I mean, I guess it's kind of
9  tricky for me to issue an order in some ways because I don't
10 know exactly what's been disclosed and what's still at issue
11 at this point.  And, you know, Plaintiffs haven't had an
12 opportunity to go through those most recent disclosures and,
13 you know, clarify for the Court what's still at issue.
14         MS. LUHANA:  Judge, can I say a few things --
15         THE COURT:  Yes.
16         MS. LUHANA:   -- in response?  In terms of what
17 Uber recently produced last week, it was 296 pages of just
18 job titles.  And, as you importantly pointed out, case law
19 supports producing names, corresponding titles, the ESI
20 that's preserved when the notices go out, all that
21 information in addition to just the titles.
22     In addition to that, the ESI checklist, one facet of it
23 it mentions is job titles, but it goes beyond that.  So, we
24 request that Uber produce that.
25     In terms of the noncustodial sources and information

23

that was produced just hours before today, critically the
questions are what was preserved and when it was preserved,
in addition to the different types of noncustodial sources
and, historically, what the sources were used from, from at
least 2013 beyond.

And, so, I don't know if we're going to get answers to
those questions.  And, so, we request that you provide that
relief so we don't have to go rifling through the deposition
transcript.  These are answers that Uber should be able to
provide to us in a declaration or some other form.

THE COURT:  Okay.  All right.  Well, I've got a
couple of questions for you about, you know, this company-
wide suspension of --

MR. ATKINS:  Sure.

THE COURT:  -- document retention policies.  I
mean, why -- why does this make sense?  I know earlier you
were talking about given the sort of history of this
litigation and the history of sexual assault allegations as
to Uber drivers, that they should have been on notice a long
time ago and there are different document retention policies
over the course of the -- of the company's history for
different types of data.  But, you know, your brief
characterizes it as essentially like it's plausible that --
that relevant ESI is being destroyed.  And this is a big
ask.  It wasn't clear to me, you know, like what's -- what's

1  the best case legal authority for issuing such sweeping

2  relief.  I mean, is it even feasible just thinking about it

3  from a practical operational standpoint?  The company would

4  not be able to throw out any single piece -- record, piece

5  of electronic information?

6          MS. LUHANA:  So, Judge, our thinking in terms of

7  what Defendants had raised in their papers, we believe it's

8  a straw man.  PTO2 was an interim order, and it was raised

9  in the context of some red flags that were raised, some

10 conflicting information that we were provided and, lastly,

11 some unanswered questions that we still have today.

12         So, the goal here is to sort through this --

13 Defendants produced the information that we have requested

14 -- appropriately, meet and confer, and then, you know, until

15 that point, just suspend the deletion process, which would

16 be temporary and very minimal, a 30-day period to just

17 suspend that deletion policy.  Until we get to the bottom of

18 this and they produce this information, we meet and confer,

19 and we ensure that that relevant ESI is being preserved.

20         And, so, what we were looking to is PTO2, which

21 Judge Breyer implemented as an interim measure and

22 specifically ordered and said to the parties, I understand

23 this is broad.  You are going to need relief, but you must

24 apply to it.  And Uber never had applied for it and

25 continued with their auto deletion policy despite being able

25

1  to tell us at that time what litigation holds it had even in

2  this litigation, which was of concern to us.

3      So, all we're asking for is a small window of time to

4  allow Uber to produce the requested information, us meet and

5  confer with them and then come up with a tailored response

6  to -- to narrow PTO2.

7          THE COURT:  Do you have -- like, what's the best

8  example of a court doing -- issuing that kind of relief?

9          MS. LUHANA:  I mean, I believe in --

10         THE COURT:  Can you come up with any particular

11 circumstances?

12         MS. LUHANA:  -- <u>Apple v. Samsung</u>.

13         THE COURT:  Yeah.

14         MS. LUHANA:  It told, you know, the parties to

15 suspend the deletion process, but, of course, it was for the

16 information that was relevant to the litigation, and that's

17 what we're looking for here.  And, so, the concern is if you

18 look at Uber -- Uber's opposition, it truly does miss the

19 mark.  They put in a chart, right, in terms of PTO2 and how

20 they were accomplishing and meeting the requirements of

21 PTO2.  And there are significant voids there because they

22 continue to say, Hey, we got the custodial holds.  We have

23 the litigation holds, and that answers all our questions

24 when, in fact, if you go through each individual request

25 there, I mean, each individual part of PTO2, the custodial

26

1  holds don't answer a slew of other questions.  And, so,

2  that's my -- that's our concern, that there is still

3  relevant ESI being deleted because there are sources that

4  are still not being preserved today.

5          THE COURT:  Well, in the background, you also have

6  the JCCP and, you know, presumably, there's all sorts of

7  litigation holds.  That case has been going on for a while.

8  I mean, that seems to me to reduce the risk that there's any

9  relevant information that's being destroyed.

10         MS. LUHANA:  Right.

11         THE COURT:  Or, if it was destroyed, it was

12  destroyed a long time ago and nothing --

13         MS. LUHANA:  Right.  My concern is -- my --

14         THE COURT:  -- at this point that the Court can --

15         MS. LUHANA:  My concern is --

16         THE COURT:  -- do would --

17         MS. LUHANA:  I apologize.

18         THE COURT:  -- [Zoom glitch] that.  That seems to

19  be like potentially what you're going to discover if you get

20  more --

21         MS. LUHANA:  My -- that's why the --

22         THE COURT:  -- retention policies and the dates

23  and to whom they applied and so forth.

24         MS. LUHANA:  To dig into if the relevant ESI has

25  been preserved and for whom and when those litigation

1  notices were sent and what exactly was preserved is

2  critical.  But if those documents and custodians, if the

3  holds were put in place, I truly don't understand why Uber

4  represented to this Court on October 27th that only multiple

5  custodial holds were in place.  If there were thousands of

6  holds at that time, why was that not -- that not raised with

7  the Court.

8       And, in addition to that, you know, a six-month

9  deletion policy starting in 2015 to January 2023 is very

10  alarming.  It's a very short policy to delete emails.  And,

11  so, you know, Mr. Atkins said to us right now that January

12  2023 to 2025 you'll have that.  But what about all the

13  documents pre-2023?  And that's why the -- to get to the

14  bottom of this, it's critical that Uber produced this

15  information that we're requesting.

16       THE COURT:  Mr. Smith, do you want to respond to

17  what Ms. Luhan a was saying?

18       MR. SMITH:  I would like to, your Honor.  Thank

19  you.

20       So, as to the authority that supports entering an order

21  suspending the deletion policy, we think the answer is there

22  is no such authority.  The Apple v. Samsung case involved a

23  case where after, at the end of the discovery process, there

24  was a showing, evidentiary showing of deficiencies, of gaps

25  in what had been done.  And at the end of that process,

28

1  there was a consideration whether some other sanctions,

2  remedies, or some things needed to be entered, and it was

3  not suspending all of Samsung's company-wide deletion -- so-

4  called deletion policy in any event, but it wall after there

5  was a showing.

6       Here, we don't think any such showing is going to be

7  made because of the extraordinary efforts that have been

8  taken.  And Ms. Luhana circled back to, Well, this is why we

9  need the disclosure of information.  That disclosure is

10  underway.  If the -- if the dispute here is, Well, you what,

11  the 26(f) checklist calls for names and/or job titles.

12  They've only got job titles, frankly, that seems to us to be

13  the most pertinent piece of figuring out is everything going

14  okay.  But if there's a need for some names to go with some

15  of the job titles, we're happy to confer with Ms. Luhana,

16  Ms. Abrams, Ms. London, find out which job titles they want

17  to know the names for, and talk about them now that we have

18  the protective order.

19       In terms of authority for ordering more than that, such

20  as identifying what matter -- what the underlying litigation

21  matters where -- in which a hold was placed or the precise

22  dates on which a hold was placed, we don't think that any of

23  the authority the Plaintiffs have cited supports ordering

24  such a production before there is some showing of a gap in

25  what's being produced in litigation.  There is no showing

29

1    right now.  We don't think there will be such a showing.

2    But if there is some issue in the future where there's some

3    gap, that's where the question of what -- who -- well, when

4    did that hold go in place might be relevant.  But it's not

5    something that's needed as to the 15,700 people that are on

6    hold at the company.  It's not something that's needed or

7    warranted as to the 5,000-some-odd people that are on hold

8    even in this matter.  That -- who those people are is what's

9    needed.  They have that.  If there's as question about the

10   names of some of those folks, we're happy to work with them

11   on that.

12            THE COURT:  Okay.  I mean, I'll give some more

13   thought to Plaintiff's request to suspend the company-wide

14   document retention policies, but it does feel a bit

15   premature to me.  What -- what I am considering more

16   strongly is -- is putting you all on a very tight schedule

17   to get this in for me, for Defendants to get this basic

18   information about the ESI sources over to Plaintiff right

19   away.  And, I mean, some of that has come in of late, but

20   just to ensure that all of the information that I think that

21   they're entitled to is turned over, I could still issue an

22   order that says this is the information that has to be

23   turned over.  To the extent that it's been around for a long

24   time and the timing of it was tethered to a protective

25   order, to Rule 26(f) disclosures, which I didn't quite

1    understand that argument because Judge Breyer's order from

2    December 6 set case management deadlines that essentially

3    called for the Rule 26 conference, 26(f) conference.  So,

4    anyhow, seems like -- well, I won't -- I won't go back into

5    that background, but what I'm thinking is 24 hour -- 20 --

6    48 hours to disclose some of the most basic information,

7    seven days to -- for Defendants to produce information about

8    the custodial and noncustodial ESI sources, you know, what

9    the sources -- each source that was -- identifying each

10   source, whether each source is preserved, when -- you know,

11   how that -- that -- that that source was used by Uber, what

12   each source was used for.  I mean, this is information that,

13   well, you could get in a deposition transcript, but I don't

14   see why it can't also be listed out in a declaration.  I

15   think those are -- it's really about the substance, and, you

16   know, Plaintiffs can ask for it in a deposition or they can

17   ask for it in a declaration.  It doesn't -- at the end of

18   the day, I think they -- it seems like a litigant has a

19   prerogative to decide what form they want the information to

20   be presented in, provided it's not burdensome.  So -- unduly

21   burdensome.

22        So, anyhow, that's -- that's kind of what I've been

23   thinking is no suspension of the company-wide document

24   retention.  We'll put you guys on the short schedule so that

25   you can proceed to actually meaningfully meeting and

1 conferring and figuring out whether you need a more tailored

2 preservation order from the Court.  And you can dig into

3 what this 15,000 plus group of employees, current and

4 former, how -- how meaningful that is as far as they're

5 being custodians.  I mean, maybe it's not necessary, but the

6 Plaintiffs and the Court can't evaluate that if we don't

7 know who they are, what their job titles are, what the sort

8 of time frame is for their records and so forth.

9       So -- so, just so you're aware of what direction I

10 think I'm going in, but I -- I will give more thought to all

11 of the arguments that were made today.  And, Mr. Smith, if

12 you want to, you know, add anything in the last couple of

13 minutes, you can react to what I just laid out.

14           MR. SMITH:  Thank you, your Honor.  We -- what we

15 would like to do if it meets with your Honor's approval, it

16 is true -- Ms. Luhana has said a lot of the information was

17 produced very recently, including this morning.  That is

18 absolutely true.  It took us a little time to get it

19 packaged up on the entry of the protective order.

20 Plaintiffs have not had time with it.  The Court does not

21 have the benefit of that information.

22       We would propose to submit to the Court a status report

23 that describes what was produced since the December 22nd

24 opposition up until the time of this hearing, and we think

25 it's, frankly, virtually everything your Honor just

1   identified contemplating going into an order, and we'd like

2   to be able to identify that for your Honor and submit in

3   camera under seal the actual underlying materials and have

4   that serve as identifying whether any further next steps are

5   needed.

6           THE COURT:  That seems like it might just create

7   some delay to me because --

8           MS. LUHANA:  Yes.

9           THE COURT:  -- then I have to look through your

10  filing, but, I mean --

11          MS. LUHANA:  Judge --

12          THE COURT:  -- I've read the basis, and I've read

13  the briefings.

14          MR. SMITH:  I mean, I -- and I --

15          THE COURT:  You could see what my order says, go

16  and look at what you've turned over already, and maybe you

17  -- you can check most of it's taken care of.

18          MS. LUHANA:  Yes, Judge, the concern is delay

19  here.  And, you know, Mr. Smith raised that there has to be

20  some sort of showing of wrongdoing to get this information

21  around the litigation hold, and that certainly just isn't

22  the case.  The ESI checklist makes recommendations of the

23  type of information that needs to be produced.  And, so,

24  we'd request that the Defendants produce those names and job

25  titles and the types of documents and files that are on

33

1  litigation hold and when these holds were sent out.

2      And, so, there is a concern there's already been

3  significant delay.  We've rescheduled this hearing twice

4  already.  And, so, the litigation --

5          THE COURT:  Well, you all wanted it on January

6  19th and --

7          MS. LUHANA:  No, no, no --

8          THE COURT:  -- I wanted to do it before Christmas.

9  So --

10         MS. LUHANA:  No, no.  My point is is, of course --

11  no, no.  I -- my -- I was raising that because there --

12  there is going to be a continued delay if we do what Mr.

13  Smith has suggested.  It makes sense to take direction from

14  your order and then proceed with a meet and confer, Judge.

15         MR. ATKINS:  May I make one final response, your

16  Honor?

17         THE COURT:  Um-hmm.

18         MR. ATKINS:  As to the question of are the

19  Plaintiffs entitled to know the details of what matters and

20  which litigation hold was entered, what the precise date of

21  that was, we don't think the case law supports that.  The

22  issue of names and job titles, we acknowledge that is

23  contemplated by the cases and the 26(f) checklist, and that

24  won't be any issue.  But, as to the details and surrounding

25  when holds were issued, and, in particular, what matters

34

1  they were issued in, that does go beyond what the case law

2  requires in the absence of a showing of some wrongdoing,

3  which has not been made here.

4           THE COURT:  Well, I -- I think this is kind of an

5  unusual case.  I mean, it's an MDL.  It's -- it involves

6  individual cases that were filed going back to 2013.  I

7  mean, the typical case that -- that I've read about, it

8  doesn't involve like 15,000 litigation holds, 10,000 plus of

9  which relate to some other litigation.  So, it's just kind

10 of an unusual footing.  It seems to me like it's maybe

11 information that's not needed and that it would take a long

12 time to maybe suss out each of those details.  And the point

13 is that it seems like the most important information is when

14 the information was preserved, the date period for when it

15 was preserved, what the -- what information, what type of

16 data was preserved.

17      As far as to what litigation it ties to, I mean, I'll

18 let Ms. Luhana -- like, why is that necessary?  Like, why

19 should I put Defendants through, you know, the time and

20 effort and the labor that's required to gather that

21 information and add it into the column?

22           MS. LUHANA:  Judge, we're not concerned about the

23 specifics of other litigation.  It could just be sexual

24 assault litigation and other.  That's all that has to be

25 provided if -- if they want to note it.  We just want to

35

ensure, as you had appropriately stated earlier on, that

we're concerned about the litigation holds for this case,

the sexual assault litigation against Uber.  And, so, that

is truly the focus.  And, so, for the other litigations,

they can just note other, and that would be fine to us as

well.

           MR. ATKINS:  May I respond, your Honor?

           THE COURT:  Sure.

           MR. ATKINS:  Undertaking -- as your Honor

identified, undertaking the effort to sort out for 15,000

people would be a massive undertaking, one that may incur

some delay.  We don't think it -- it's needed.  And I want

to address one question your Honor raised, which is why do

the 10,000 people matter?  Why does Uber get credit for

that?  Well, that's explained in paragraph eight of Mr.

Anderson's declaration that was submitted with our papers.

I'm going to read it, if I may.  It's one sentence.

              "When a current or former

              employee's account is placed on a legal

              hold, the individual's electronic

              materials are preserved regardless of

              the subject matter of the litigation."

So, why do those 10,000 matter?  Well, they matter

because their documents are being held just like the

documents for the some 5500 who've received a hold in

36

1  connection with these litigations.  So, Uber is meeting its

2  obligations in this case by sending out holds to 5500

3  people.  But, on top of that, there are some 10,000 others

4  whose documents are being held in exactly the same way, and

5  Uber's duty was to meet its obligations to identify the

6  people that are on hold, some after the job titles, and if

7  there's a need for the -- for the names for the people for

8  this litigation or for all 15,000, that can be done.  But

9  beyond that, it's not something that's necessary to drill

10 down on who are the 100 or 50 people that are going to be

11 custodians in this case.

12         THE COURT:  Well, I -- I mean, yeah, their --

13 their information is preserved.  It's not discarded.  But,

14 you know, what if that person's got a litigation hold due to

15 a slip and fall case in the lobby of the Uber building or a

16 breach of contract case?  Like, why -- what's the likelihood

17 that they're going to have information that's relevant to

18 this case?

19    So, it sort of creates a sort of image like a lot of

20 information that's potentially relevant for the claims in

21 this case have been saved and, you know, Uber's therefore

22 doing a good job, but should the Court really take that --

23 weigh that heavily because, you know, this -- these holds

24 might be related to cases that have like absolutely nothing

25 to do with this particular MDL.

37

1      So, but maybe -- maybe a lot of it does.  So, just
2 there is very little information at this point to know one
3 way or another.  I mean, we should credit it if it's -- if
4 it's likely to be relevant, but -- but I think it's --
5 anyways, I think I've heard enough for -- for today.
6 Everybody has been very helpful in terms of filings and --
7 and the argument today.  So, I appreciate your time, and it
8 was tricky to schedule this.  It was unfortunate that Mr.
9 Atkins got so sick, but, you know, he's improving, and
10 that's a good thing, and we -- we did finally have this
11 hearing.
12      So, I will do my best to issue this order as quickly as
13 possible given the timing on all of this, but -- I can't
14 make a specific commitment, but it should be quick.
15           MR. ATKINS:  Thank you, your Honor.  And we do
16 sincerely appreciate your Honor's and Plaintiff's counsel's
17 accommodations and respect of Mr. Atkins' illness.  They
18 were extremely cordial and courteous with that, and we do
19 appreciate that and the Court's indulgence on that as well.
20           MS. LUHANA:  Thank you, Judge, so much for your
21 time.
22           THE COURT:  Okay.  Thank you.  Take care.
23      (Proceedings adjourned at 1:25 p.m.)
24
25

38

CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17      Echo Reporting, Inc., Transcriber

18          Thursday, January 11, 2024

19

20

21

22

23

24

25