# EXHIBIT A

[Submitting counsel below]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF PROPOSED DEFENDANT FACT SHEET** |
| This Document Relates to:<br><br>All Cases | Judge: Honorable Lisa J. Cisneros<br>Date: TBD<br>Time: TBD<br>Courtroom: G – 15th Floor |

## I.   <u>INTRODUCTION</u>

On December 28th, the Court ordered the parties to submit proposals for "Plaintiff-related discovery, including plaintiff and defense fact sheets." PTO 5, ECF 175. Uber possesses documents and data sets regarding the Uber driver and Uber trip connected to each specific Plaintiff's incident. The parties have, for the most part, agreed on the types of information Uber must reference in order to fill out a defense fact sheet (DFS). They disagree, however, as to whether Uber should also produce the source documents and data.

Uber should. It insists that defense document productions must proceed via the Rule 34 process. This objection is unfounded. Rule 34 document requests would not address the rolling need for Plaintiff-related discovery pertaining to newly filed cases. Moreover, it is standard practice for defense fact sheets to include requests appropriately tailored to target documents for which relevance is undisputable and burden proportional. *See* Appendix (excerpting document requests from 15 recent court-ordered defense fact sheets); *see also Guidelines and Best Practices*

*for Large and Mass-Tort MDLs*, Bolch Jud. Inst., Duke Law Sch. (2d ed.), at 11.[1]

The content of defense fact sheets should depend in part on "the likelihood of defendant possessing plaintiff-specific documents or information, and the accessibility and potential relevance of any such documents or information." *Id.* Here, both factors are present. For each case in this litigation with an identifiable driver, Uber can use a unique driver code to immediately pull up an organized data set regarding exactly what Uber knew about the driver and when, and what Uber did with that knowledge. And Uber can use a unique trip code to pull up the GPS data and other details of the Uber trip connected with the assault.

Uber's driver, rider, and trip-related documents are plainly relevant. As the Court advised the parties early on, early case management and discovery will focus on "common issues of fact," including:

> What did Uber know; when did they know it; and what actions did they take…what were Uber's practices with respect to hiring drivers? … What were the drivers told? What was the monitoring of the drivers? What did Uber learn about driver's conduct? What was their response to that?

11/3/23 Hearing Tr. at 7-8. Plaintiffs' proposed DFS is narrowly tailored to these common facts, and to facts that would help both sides categorize these cases and evaluate their basic merits. It poses little additional burden (and may even reduce the burden) on Uber to produce, rather than summarize, the documents containing the definitive evidence on these issues.

For these reasons, and those explained below, Plaintiffs respectfully request the Court adopt Plaintiffs' proposed DFS, attached as Exhibit 1.

## II.   DETAILED COMPARISON OF THE COMPETING PROPOSALS

### A.   Case Information and Plaintiff Information

Except for formatting differences, the two proposals are identical with respect to the sections titled "Case Information" and "Plaintiff Information." Exhibit 1 at Q.1-11; Exhibit 2 (Uber's proposed DFS) at Q.1-4.

### B.   Uber Trip Information: Scope and Format of GPS Data

There is also quite a bit of agreement between the two proposals with respect to the

---

[1] https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1004&context=bolch

section titled "Uber Trip Information." Exhibit 1 at Q.12-17; Exhibit 2 at Q.5-10. There are, however, two significant differences.

First, Uber's proposed DFS offers a spreadsheet of GPS data reflecting the driver's movements during the "Subject Trip" (the ride itself), while Plaintiffs' proposed DFS expands this to include GPS data for both the driver and rider's movements, including ten minutes before the Subject Trip, and up to two hours after the Subject Trip or whenever the Driver next accepted a ride request (whichever is earlier). Exhibit 1 at Q.14; Exhibit 2 at Q.7. Many Plaintiffs' allegations involve driver conduct (and competing versions of events) that began before, and continued after, the ride itself. Because it is relatively simple for Uber to print from its database a larger section of its GPS spreadsheet, and because this is a key source of objective data that can aid the parties in identifying subgroups of cases with corroborating or contradictory evidence about the incident, the request for expanded GPS data is appropriate at this stage of the case.

Second, Plaintiffs also request:

15. Produce (if available) the Chronicle Trip map for the Subject Trip displaying (to the extent available) the date, time, and location where the Subject Trip began and ended, the Driver acceptance location, the Preferred Route, the Actual Route, and the time and location the trip was cancelled (if applicable).

[redacted to preserve private information]

[redacted to preserve private information]

### C.    Driver Information: Areas of Agreement

The two proposals agree with respect to basic identifying information that should be produced regarding the subject driver. Exhibit 1 at Q.18-30; Exhibit 2 at Q.11-20. They also agree regarding production of the log of agreements the driver accepted with Uber, Exhibit 1 at Q.32 and Exhibit 2 at Q.22, and each driver's annual tax summary (like a 1099), Exhibit 1 at Q.35; Exhibit 2 at Q.23.

### D.    Driver Information: Background Check

Uber requests and receives third-party background checks for its drivers. The results of these background checks are relevant to common issues, including the adequacy of Uber's background checks, and also to defining the subgroup of cases involving a driver who should not have passed a background check. Plaintiffs seek production of the actual background check results. Exhibit 1 at Q.31. Uber offers only "Yes/No" answers as to whether or not background checks were conducted (either at the time a Driver was first onboarded and/or at any subsequent time). Exhibit 2 at Q.21. Only Plaintiffs' proposal would move the ball forward. Merely knowing whether a background check was conducted—without more detail about what information was gathered and what was revealed—is practically useless. Further, if Uber can determine whether a background check was performed, it can easily produce the document supporting that assertion.

### E.    Driver Information: Account Status Log

Using a driver's unique identifying number (UUID), Uber can pull from its database an Account Status Log, which is a spreadsheet reflecting the date and time of each change in the driver's status (e.g., when he applied to be a driver, when he became active as an Uber driver,

whether and when he was deactivated). This log is centrally relevant to common issues, including how rapidly Uber onboarded drivers, and whether and when Uber suspended and/or reactivated drivers whose histories were concerning). It is also relevant to defining the subgroup of cases in which Uber failed to deactivate a driver with a known prior history of serious misconduct. For example, if a driver had been suspended, but then reactivated, an Account Status Log would reflect this fact. The prior (unsealed) testimony of Uber's corporate designee on the topic of Account Status Logs illustrates this:

> Q. Well, was his status, for example, as reflected in Exhibit 4 [the Account Status Log], any different than his status as it had been before this report of a sexual assault?
>
> [Objection]
>
> A. When we are referring to "Status" here, I was looking at Exhibit 4 in the second column, the Status was put back to Active. So that active status is the same active status as it was prior to the report. There's no indication within the Status of any type of probation or anything of that nature.
>
> Q. And on January 5 when he had been deactivated for a short time, Mr. Sherman was unable to log in to the driver app, right?
>
> A. Yes.
>
> Q. On January 6 when he was reactivated, he could again log in to the driver app, right?
>
> A. Yes.

Exhibit 4 (Deposition Testimony of Matthew Baker), Vol. I, at 84:4-85:2.

Plaintiffs request production of the Account Status Log. Exhibit 1 at Q.33. Uber instead proposes that it answer "Yes/No" as to whether Uber ever restricted the Driver's access to the app as a result of certain categories of negative feedback. Exhibit 2 at Q.28. And Uber would also state whether the driver is "still able to access the Uber Driver App" and the date access was restricted. Exhibit 2 at Q.29. A great deal of potentially relevant information would be lost under Uber's proposal. Under circumstances like those described by Mr. Baker, Uber's proposed DFS would only state that a suspension had occurred, not that the driver had been reactivated. Likewise, if a driver had failed an initial background check and passed a subsequent one, that would not be captured by Uber's proposed DFS. Beyond the stock objection that document productions might be burdensome and should be handled via the Rule 34 process, Uber has

offered no explanation for why it will not produce this log. *See* Exhibit 3 (Meet and Confer Correspondence).

The Account Status Log provides the best bird's eye view of when and why Uber moved drivers onto and off its platform. Its production is fundamental to the common issues, and basic categorization of these cases.

### F.   Driver Information: Trip History Report

Using a driver's UUID, Uber can also pull from its database a Trip History Report, which is a spreadsheet listing, e.g., each trip the driver accepted, the location of that trip, whether the trip was finished or cancelled, what rating the rider gave the driver, and any feedback or comments the rider made regarding the driver. These are centrally relevant to the common issue of what Uber knew about drivers and how it responded to that knowledge, and also relevant to defining the subgroup of cases in which Uber had notice of safety issues, but failed to respond.

Plaintiffs' proposal includes production of this Trip History Report. Exhibit 1 at Q.34. Uber refuses to produce it, offering instead to tell Plaintiffs how many total trips each driver has completed, Exhibit 2 at Q.24, and each driver's "average star rating," Exhibit 2 at Q.25. But the average obscures key information about what Uber knew – such as how often a driver received "one star"—an indication that something went wrong during a trip. Further, one of Plaintiffs' allegations in this litigation is that Uber artificially and deceptively inflates drivers' average star ratings to help retain drivers and to induce increased trust on the part of riders. Thus, Uber's counterproposal would provide information that is not only inadequate, but also misleading.

Uber also offers to tell Plaintiffs whether Uber received feedback such as star ratings or comments regarding "any form of misconduct or inappropriate behavior involving the Driver." Exhibit 2 at Q.27. This proposal relies on an inherently subjective interpretation of ambiguous categories of conduct. Those concerns would be alleviated by simply producing the spreadsheet, which seemingly would be less burdensome than reading and describing it.

### G.   Driver Information: Communication Log

Using a driver's UUID, Uber can pull from its database a Communications Log, which is a spreadsheet of communications sent and received between Uber and the driver. This might

include, for example, a query from Uber asking the driver why he is going off route during a trip. Plaintiffs request production of the Communications Log. Exhibit 1 at Q.36. The Log is relevant to what Uber knew about the driver and the Subject Trip and what it did with that knowledge. Uber refuses to produce it but has no explanation for its refusal.

### H.  Driver Information: Incident Tickets and Attachments

Using a driver's UUID, Uber can pull up formal complaints (aka "tickets") lodged regarding that driver. Plaintiffs' proposed DFS includes production of these formal complaints. Exhibit 1 at Q.37 and Q.38. Uber's proposal would limit production to communications, and scant additional information, regarding each Plaintiff's own incident that is at issue in this lawsuit, *but would not include any information about prior or subsequent incidents involving the same driver*. Exhibit 2 at Q.30.

Prior complaints regarding the same drivers who went on to injure Plaintiffs are facially relevant to the common issues in this case. Such common issues include Plaintiffs' allegations that Uber made it difficult for riders to report sexual assaults, handled such reports in haphazard ways, did not until 2018 systematically track such reports, and responded to such reports (as evidenced by Uber's admissions in Exhibit 4 hereto) by reactivating drivers who had been credibly accused of sexual assault and by downplaying and tacitly approving the drivers' behavior. Production of prior complaints for the drivers whose conduct is at issue would accomplish two goals at once—developing these truly universal common issues regarding Uber's corporate policies and conduct, and also defining the subgroup of cases that involve drivers whose prior disqualifying misconduct Uber knew or should have known.

The particular documents Plaintiffs seek are centrally organized and relatively easy to produce. Since Uber's inception, it has organized, tracked, responded to, and recorded incoming complaints from riders, drivers, and third parties. It calls each of these customer support interactions a "ticket." In 2021, Uber centralized its Content Management System into a single platform.[2] The tickets themselves act as a sort of dashboard, linking together all relevant

---

[2] Ranganathan, A., *Unifying Support Content to Enable More Empathetic and Personalized Customer Support Experiences*, https://www.uber.com/blog/personalized-customer-support-experiences/

1    information about a given complaint or safety incident. A sample 2018 ticket, which was

2    unsealed in a prior lawsuit involving crimes committed by imposter Uber drivers, is attached

3    hereto as Exhibit 5. It reflects the date of the incident, the Uber jurisdiction involved, the Uber

4    personnel who responded, who else at Uber was made aware, the manner in which Uber classified

5    the incident, and any response taken. It also contains links to all attachments and

6    communications, including with the rider, driver, and any third party witnesses. *See* Exhibit 5.

7        It is important that the production include the actual communications linked to the ticket.

8    A sample printout of (unsealed) communications between Uber and a rider with respect to a

9    single ticket (a reported sexual assault) is attached as Exhibit 6. A sample printout of (unsealed)

10   communications between Uber and the driver, regarding the same sexual assault, is attached as

11   Exhibit 7. Although the details of the assault are redacted, these communications illustrate Uber's

12   handling of a criminal sexual assault by telling the driver that he "may have come off as

13   flirtatious," and concluding "We appreciate and value you as an Uber partner...I can confirm that

14   your account is now active…" *See* Exhibit 7.

15        This sort of information is centrally relevant to the common issues in these cases. But it

16   is, for now, in the sole possession of Uber. Until Uber produces it, no Plaintiff will know whether

17   her own attacker was someone whose dangerous behavior was already known to Uber, and the

18   Court will not have the ability to define the subgroup of such cases.

19        Plaintiffs break their request for tickets and related communications into two time periods,

20   pre and post-implementation of Uber's Safety Taxonomy, Exhibit 1 and Q.37-38, which the

21   proposed DFS defines as "the date by which Uber had fully implemented its Sexual Misconduct

22   and Violence Taxonomy (which implementation is described in Uber's 2018 Safety Report as

23   occurring sometime in late 2018)." Exhibit 1, definitions.

24        The reason for this temporal division is that, for the time period after Uber developed its

25   safety taxonomy in 2018, it is possible to narrow the request to specific categories of misconduct.

26   However, given that one of Plaintiffs' core allegations is that (at least before 2018) Uber did not

27

28

1   adequately investigate, classify, or respond to complaints,[3] it is not appropriate to narrow the

2   request to only include particular keywords or classifications before that time. Rather, Plaintiffs

3   have narrowed the request to complaints initiated by a rider against a driver.

4   Uber's counterproposal, at Exhibit 2, Q. 26, is to answer "Yes/No" whether Uber has ever

5   received a formal ticket lodging a complaint against the Driver regarding "misconduct or

6   inappropriate behavior" and, if yes, to provide the date of the report "as well as the misconduct

7   that was alleged." As described above, it is Plaintiffs' contention that, at least before 2018, tickets

8   were gathered and recorded in a problematic manner such that Uber's classifications are

9   unreliable.[4] Thus, it is Plaintiffs' position that a manual review would be required in order to state

10  what misconduct was alleged. Production of the tickets and communications is therefore more

11  efficient and less burdensome, in that it would avoid the need for Uber's counsel to read,

12  interpret, and summarize each ticket.

13  **I.      Driver Information: Communications with Law Enforcement**

14  Finally, Plaintiffs seek production of all communications exchanged between Uber and its

15  Law Enforcement Response Team (LERT), Uber and law enforcement, Uber and prosecutors,

16  and/or Uber and Lyft, related to alleged misconduct and/or crimes by the subject drivers. Exhibit

17  1 at Q.39. These communications would not be included in the tickets produced in response to

18  Q.37-38 because, *separate* from Uber's ticket system, (a) Uber's "dedicated [LERT] team [ ]

19  responds to requests for information from law enforcement and public health officials,"[5] and (b)

20  since 2021, Uber and Lyft "exchange basic information about drivers and delivery people who

21  have been deactivated for serious sexual assault or physical assault fatalities...."[6]

22

23  [3] Uber's initial Safety Report stated that it adopted a new Sexual Misconduct and Violence

24  Taxonomy in late 2018, and acknowledged that its prior system had been inadequate. 2017-2018
    U.S. Safety Report at Appendices I-IV https://www.uber-

25  assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullRe
    port.pdf?uclick_id=0320bd2c-0139-43a8-8d46-dcb7d0b68629

26  [4] "Because of the sheer number of tickets that flow through [Uber] investigators' queue, they
    rarely have time to spend more than a few minutes at a stretch talking to victims and the accused,

27  the [Uber] workers said." https://www.washingtonpost.com/technology/2019/09/25/ubers-
    investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/

28  [5] https://lert.uber.com/s/terms-and-conditions?language=en_US
    [6] https://www.uber.com/newsroom/industry-sharing-safety/

- 9 -

The relevance arguments are the same for these communications as for the tickets. The burden is anticipated to be less, since not all incidents involve serious sexual assault or fatalities, nor give rise to law enforcement involvement, and because communications with and productions to law enforcement have likely already undergone privilege review.

### J.        Alternatives to Plaintiffs' Proposal

Plaintiffs' proposed case management order implementing the Plaintiff-related discovery would require that, if a plaintiff did not produce a ride receipt, but provided information sufficient for Uber to produce the ride receipt, Uber should do so (before the time when PFSs and DFSs are due). If the Court rejects that proposal, Plaintiffs request in the alternative that the ride receipt production be made part of the DFS.

Plaintiffs' proposed PFS and DFS focus on discovery that addresses common issues and/or allows for the high-level categorization of cases into groups for pretrial and trial management. Plaintiffs sought to avoid discovery relevant only for making custom adjustments to individual case value. If, however, the Court is inclined toward Uber's contrary position regarding the present scope of discovery, Plaintiffs would ask leave to broaden the DFS to include Uber's production of all documents in its possession regarding the Plaintiffs (including their ratings, feedback, comments, prior trip history, background checks if applicable, and all data collected about Plaintiffs and where such information was sold or disclosed, etc.).

## III.   CONCLUSION

Plaintiffs respectfully request that the Court adopt Plaintiffs' Proposed DFS.

Dated: January 31, 2024                                 Respectfully submitted,

                                                        By: */s/ Sarah R. London*
                                                            Sarah R. London (SBN
                                                            267083)

                                                            **LIEFF CABRASER HEIMANN &
                                                            BERNSTEIN, LLP**
                                                            275 Battery Street, 29th Floor
                                                            San Francisco, CA 94111-3339
                                                            Telephone: (415) 956-1000
                                                            Facsimile: (415) 956-1008
                                                            slondon@lchb.com

                                                        By: */s/ Rachel B. Abrams*
                                                            Rachel B. Abrams (SBN
                                                            209316)

                                                            **PEIFFER WOLF CARR KANE
                                                            CONWAY & WISE, LLP**
                                                            555 Montgomery Street, Suite 820
                                                            San Francisco, CA 94111
                                                            Telephone: (415) 426-5641
                                                            Facsimile: (415) 840-9435
                                                            rabrams@peifferwolf.com

                                                        By: */s/ Roopal P. Luhana*
                                                            Roopal P. Luhana

                                                            **CHAFFIN LUHANA LLP**
                                                            600 Third Avenue, 12th Floor
                                                            New York, NY 10016
                                                            Telephone: (888) 480-1123
                                                            Facsimile: (888) 499-1123
                                                            luhana@chaffinluhana.com

                                                            *Co-Lead Counsel for Plaintiffs*

# APPENDIX

# SAMPLE DEFENDANT FACT SHEETS WITH DOCUMENTS REQUIREMENTS

**Appendix**

***In re: DePuy Orthopedics, Inc., ASRtm Hip Implant Products Liability Litigation*** **(MDL No. 2197) Defendants' Fact Sheet**

[Scope: "Pursuant to agreement of counsel in this MDL, this Order shall apply to all actions currently pending in MDL No. 2197, all future actions transferred to MDL No.2197, and all future actions directly filed in MDL No. 2197."]

"For each Device identified by Plaintiff in response to Section II of the Plaintiff FactSheet (hereinafter "PFS") submitted by Plaintiff, please provide the following . . . Produce the Device History Record for the Device."

"For each Device identified by Plaintiff in response to Section II of the PFS submitted by Plaintiff, please provide the following . . .  Produce a copy of the complaint file(s), including medical records, if any, for the Plaintiff."

"Produce documents that relate in a reasonably direct manner to the ASR HipSystem from the sales representative company identified in question C.1, above ("Provide the name and business address of the sales representative company that received the Device that was implanted in Plaintiff.")"

"1. Produce Communications between the Defendants, the sales representative company and/or sales representative(s) identified in section C above and Plaintiff's Healthcare Provider(s) about any ASR Hip Systems, including but not limited to Dear Healthcare Provider letters, recall letters, telephone or email contacts or meetings.

2. Produce Communications between the Defendants, the sales representative company and/or sales representative(s) identified in section C above and Plaintiff, to the extent not contained in the complaint file, if any, and identify the Bates numbers of such communications.

3. Produce documents that relate in a reasonably direct manner to consulting agreements, if any between Defendants and any of Plaintiff's Healthcare Providers, including but not limited to all consulting relationships to provide advice on the design, study, testing or use of hip replacement systems, or to consult as a thought leader, opinion leader, member of a speaker's bureau or similar arrangement.

4. Produce documents that relate in a reasonably direct manner to relationships, if any, between Defendants and any of Plaintiff's Healthcare Providers to conduc tany pre-clinical, clinical, post-marketing surveillance or other study or trial concerning any hip replacement systems including but not limited to any ASRHip System.

5. Produce documents that reflect financial compensation, things of value and promotional items provided by Defendants to Plaintiff's Healthcare Providers. Please include all fees, expenses, honoraria, royalties, grants, gifts, travel (i.e., airfare, hotel etc.) and any other payments or things of value given."

"Produce all documents Broadspire has obtained directly from the Plaintiff."

"Produce all documents Broadspire has obtained from sources other than Plaintiff (Plaintiff's Healthcare providers, employers, insurers, or others) using an authorization

**Appendix**

executed by Plaintiff. Identify any and all payments made by Broadspire on behalf of Plaintiff to any medical providers who have asserted or may assert liens against Plaintiffs recovery."

"Identify and produce all medical or laboratory records relating to plaintiff obtained by DePuy, Johnson and Johnson and/or Broadspire through the use of a written authorization."

**Appendix**

***In re: Proton-Pump Inhibitor Products Liability Litigation*** **(MDL No. 2789) AstraZeneca Defendant Fact Sheet**

[Scope: "This Order applies to the named defendants in (a) all actions transferred to In Re: Proton-Pump Inhibitor Products Liability Litigation ("MDL 2789") by the Judicial Panel on Multidistrict Litigation ("JPML") pursuant to its Order of August 2, 2017; (b) all related actions originally filed in or removed to this Court; and (c) any "tag-along" actions transferred to this Court by the JPML pursuant to Rules 6.2 and 7.1 of the Rules of Procedure of the JPML, subsequent to the filing of the final transfer order by the Clerk of this Court (collectively, "Member Actions").]

"Have YOU been contacted by anyone regarding an alleged side effect or alleged adverse event experienced by Plaintiff while on a PPI drug, excluding contact/reporting by counsel for Plaintiff and/or submission in connection with this litigation? If yes, please identify and produce any documents related to such contact, a copy of any summary report from YOUR adverse event database."

"Please identify and produce all DOCUMENTS created before the filing of this lawsuit which reflect any communication between any person and YOU concerning Plaintiff's use of PPIs.

    a. If Plaintiff indicates that (s)he received DEFENDANTS' PPI(s) at no cost via enrollment in an AstraZeneca patient assistance program, please produce all DOCUMENTS relating to Plaintiff's enrollment in such program."

"Please produce a copy of any MedWatch form, other than DOCUMENTS initiated in the course of litigation, which refers or relates to Plaintiff. Any MedWatch form produced may be redacted in accordance with federal law."

"Please produce a copy of any pictures, videos, and/or other surveillance materials and/or documents that YOU have obtained, which refers or relates to Plaintiff."

**Appendix**

***In re: Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Relevant Products Liability Litigation* (MDL No. 2100) Defendants' Fact Sheet**

[Scope: "Consistent with the provisions of Amended CMO No. 9, in every case currently part of or later transferred or filed into the In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Product Liability litigation, MDL 2100, Defendants Bayer Health Care Pharmaceuticals Inc., Bayer Schering Pharma AG, Barr Laboratories, Inc. and Teva Pharmaceuticals USA, Inc. shall provide fully responsive answers and documents to the Defendant Fact Sheet ("DFS"), in the form attached hereto as Exhibit "1," to Plaintiff's individual attorney as identified in the Plaintiff Fact Sheet, with a copy of the DFS (without documents) to Plaintiffs Liaison counsel in paragraph A(8) below."]

"As set forth in Section II. B. 6 of the DFS attached hereto as Exhibit 1, for all Sales Representatives or detail persons identified in Section II (B) (2) of a particular DFS, copies of the sales representatives' custodial files are to be produced no later than 60 days in advance of the first deposition noticed by the defendants specific to the action to which that DFS pertains . . .

"Sales Representative Custodial" files may include all written materials, video and or audio tapes in the possession of the Sales Representative identified in the DFS that had contact with Plaintiff's Dispensing/Prescribing Health Care Provider including but not limited to:

    (a) training materials (including videotapes and/or audio-tapes) related to physician detailing and obstacle handling, including any workbooks or forms completed by the Sales Representative at the time that he or she had Yaz, Yasmin, Ocella, Gianvi related responsibilities;

    (b) E-mails, bulletins, memoranda, reports, activity reports, call notes, belief notes, tactical plans, voice-mail transcripts or summaries, meeting or conference summaries;

    (c) materials obtained at any national, regional, district or other sales meeting, including but not limited to written materials, videos and/or audio tape;

    (d) physician prescribing data and/or ratings;(e)incentive plans (to the extent the incentive plans specifically relate to Yaz, Yasmin, Ocella, Gianvi or drugs that are cross-promoted;

    (f) promotional or cross-promotional and marketing materials related to Yaz, Yasmin, Ocella, Gianvi;

    (g) all hardcopy generic training materials (including videotapes and audiotapes) related to physician detailing and obstacle handling, including any work books or forms completed by the Sales Representative;

    (h) all documents signed by the Sales Representative reflecting Defendants business and or ethics practices and or policies at the time that he or she had Yaz,Yasmin, Ocella, Gianvi related responsibilities;

    (i) all documents provided to Plaintiff's Dispensing/Prescribing Health Care Provider;

**Appendix**

(j) reports of goal attainment; plans or action;(k)materials and information regarding budgets available for speaker's programs;

(l) materials relating to speakers programs;

(m) material relating to any testing taken by the Sales Representatives; and,

(n) all communication by and between the Sales Representatives and managers."

**Appendix**

***In re: Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Technology and Versys Femoral Head Products Liability Litigation*** **(MDL No. 2859) Defendant Fact Sheet**

[Scope: "This Order shall apply to those actions previously transferred to this Court by the Judicial Panel on Multidistrict Litigation ("Panel") pursuant to its order of October 3, 2018, any tag-along actions transferred to this Court by the Panel, and any related actions that have been or will be originally filed in, transferred to, or removed to this Court and assigned thereto as part of MDL No. 2859."]

"For each Device(s) identified by Plaintiff in his/her PPD and/or PFS, provide the Distribution History Report showing the chain of distribution of the Device(s)."

"For each Device(s) identified by Plaintiff in his/her PPD and/or PFS, provide a complete copy of the Plaintiffs complaint file(s), including all records (if any), that were obtained or received as a part of the complaint investigation process in the ordinary course of business and identify the complaint file number."

"Produce copies of any photographs or other images of the Device(s) removed from Plaintiff."

"Produce all documents indicating that a sales representative was present during any portion of the implantation surgery or its setup."

"Produce all documents indicating that a sales representative was present during any portion of the revision surgery or its setup."

"Provide all documentation or information regarding whether Plaintiff's implanting or explanting surgeon notified defendants about complications suffered by the plaintiff."

"Provide the call log, call or detail notes, and any other documentation of all communications made by Defendants' Sales Representatives to the surgeons who implanted and/or explanted the Device(s)."

"Produce documents that relate in a reasonably direct manner to the Device(s) from the Sales Representative and/or his or her employer or company identified in Question 1 above.  Such sales representative documentation should include:

    a.  Scheduling documents including operating room schedules, scheduling calendars, date books, and/or other documents that record the Sales Representative's schedule as it relates to the Device(s).
    b.  Call notes, field reports, operative or procedure summaries, and other documents provided to the Sales Representative, prepared by the Sales Representative, and/or prepared at the request of the Sales Representative identified in response to Question 1 above.

**Appendix**

   c. Communications from the Defendants and/or Distributor to the Sales Representative identified in response to Question 1 above concerning the Device(s), including but not limited to marketing materials, medical device reports, sales data, budgetary and sales information, surgeon, health care provider or orthopedic sales, implant, explant and other related data.

   d. Training materials provided to the Sales Representative identified in response to Question 1 above concerning his/her position, job requirements, standards (whether Zimmer internal or external) and/or regulations concerning the promotion, distribution, sale and/or operating room procedures, and/or protocols, including reporting requirements and preservation requirements including adverse event reporting, medical device reports, and/or surgical or other reports concerning the Device(s) and any components compatible to the Device(s), the failure of or any other problem(s) related to the Device(s) and any compatible components, interaction and relations with surgeons, health care providers, Distributors, Defendants, health care office staff, key opinion leaders, thought leaders, consultants, orthopedic clinics, and/or hospitals."

"Produce documents that relate in a reasonably direct manner to the Device(s) from the Distributor identified in response to Question 2 above.  Such Distributor documentation should include:

   a. Call notes, field reports, operative or procedure summaries and any and all other Documents prepared by the Distributor or at the request of the Distributor identified in response to Question 2 above.

   b. Communications from the Sales Representative and/or Defendants to the Distributor identified in response to Question 2 above, concerning the Device(s), including but not limited to marketing materials, medical device reports, sales data, budgetary information, surgeon, health care provider or orthopedic sales, implants, explants, and other related data.

   c. Training materials provided to the Distributor identified in response to Question 2 above, concerning their position, job requirements, standards (whether Zimmer internal or external), and/or regulations concerning the promotion, distribution, device sale, and/or operating room procedure, including all reporting requirements and preservation requirements, adverse event reports, medical device reports, surgical and/or other reports concerning the Device(s), and any components compatible to the Device(s), the failure of or any other problem{s) related to the Device(s) and any compatible components, interaction and relations with surgeons, health care providers, health care office staff, Sales Representatives, Defendants, key opinion leaders, thoughts leaders, consultants, orthopedic clinics, and hospitals.

   d. Files pertaining to the Distributor identified in response to Question 2 above, including but not limited to their sales data, complaint data, training data and contract and related documentation between and among Defendants and the Distributor, and training requirements."

**Appendix**

"Produce communications between the Defendants, the Sales Representative(s), the Sales Representative(s)'s employer or company identified in response to Question B(l), and/or the Distributor identified in response to Question B(2), and Plaintiffs Health Care Providers about the Device(s), including but not limited to Dear Health Care Provider letters, recall letters, telephone or email contacts, or meetings."

"Produce documents that relate in a reasonably direct manner to consulting agreements, if any, between Defendants and Plaintiffs Health Care Provider(s), including but not limited to all consulting relationships to provide advice on the design, study, testing, or use of hip replacement systems, or to consult as a thought leader, opinion leader, member of a speaker's bureau, or similar arrangement."

"Produce documents that relate in a reasonably direct manner to relationships, if any, between Defendants and Plaintiffs Health Care Provider(s) to conduct any pre-clinical, clinical, post-marketing surveillance, or other study or trial concerning any hip replacement systems including the Device(s)."

"Produce documents that reflect financial compensation, things of value and promotional items provided by Defendants, the Sales Representative, the Sales Representative's employer or company identified in response to Question B.l, and/or the Distributor identified in response to Question B.2, to Plaintiffs Health Care Provider(s) including all fees, expenses, honoraria, royalties, grants, gifts, travel (i.e., airfare, hotel etc.), and any other payments or things of value given to Plaintiffs Health Care Provider(s)."

"Produce a copy of the Product Experience Report ("PER") Summary that relates to the Plaintiff."

"Produce a copy of the Medical Device Adverse Event Report ("MDR") that relates to the Plaintiff."

"Produce any documentation that Defendants obtained from Plaintiff prior to the time this lawsuit was initiated and to the extent not produced in response to Question A.4 above and/or by issuance of any authorization executed by and received from Plaintiff (but excluding materials received from Plaintiff's counsel), including, but not limited to medical records, billing records, pharmacy records, employment records, workers' compensation records, tax records, earnings information, insurance information, statements, e-mails, correspondence, notes, and/or releases(s)."

**Appendix**

*In re: Xarelto (Rivaroxaban) Products Liability Litigation* **(MDL No. 2952) Defendant Fact Sheet**

[Scope: In conjunction with Paragraph 4 of the Case Management Order No. 1 ("CMO No. 1"), this Order governs the form and schedule for service of Defendant Fact Sheets ("DFS") to be completed by Defendants in all individual cases that were: (1) transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to its Order of December 12, 2015; (2) subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel; and (3) originally filed in this Court or transferred or removed to this Court.]

> "Please identify and produce all documents created before the filings of this lawsuit which reflect any communication between any person and you concerning Plaintiff."

> "Please produce a copy of any MedWatch form, other than documents initiated in the course of litigation, which refers or relates to Plaintiff. Any MedWatch form produced shall be redacted as necessary per federal law."

> "To the extent you have not already done so, please produce a copy of all documents and things that fall into the categories listed below. These include documents in the possession of any of your present and former employees, including information provided to your attorneys:
> 1. Any document created before the filing of this lawsuit which relates to or refers to Plaintiff other than documents received or produced in discovery in this matter.
> 2. Subject to limitations set forth in this fact sheet concerning timeframes and categories of relevant information, any document sent to or received from any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS.
> 3. "Dear Doctor," "Dear Health Care Provider," "Dear Colleague" letters, or PIRs sent to or received from any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS.
> 4. Subject to limitations set forth in this fact sheet concerning timeframes and categories of relevant information, any and all documents reflecting any contacts or communications between you and any of Plaintiff's Prescribing Health Care Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS regarding Xarelto®.
> 5. Any and all documents which purport to describe, analyze, investigate, track, and/or report the prescribing practices of any of Plaintiff's Prescribing Healthcare Providers identified in Section III.A.1(a) of the PFS and/or Primary Treating Physician identified in Section III.B.1 of the PFS relating to Xarelto®, subject to the approval and/or agreement of the owner of the prescribing data (IMS Health) to release the data, which approval and/or agreement Defendant will request.

**Appendix**

***In re: Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation
(MDL No. 1699) Defendant Fact Sheet***

[Scope:  This Order shall apply to all Plaintiffs who allegedly suffered personal injury from taking Bextra® and/or Celebrex® in cases currently pending in MDL No. 1699 ("the product liability actions") and to all related product liability actions that have been or will be originally filed in, transferred to, or removed to this Court and assigned thereto (collectively, "the MDL proceedings"). This Order is binding on all parties and their counsel in all product liability cases currently pending or subsequently made part of these proceedings. This Order shall not apply to those plaintiffs who are asserting exclusively purchase claims in these proceedings. . . .

The Pfizer Entities shall provide a complete and verified Defendant Fact Sheet within sixty (60) days after receipt of a substantially complete and verified PFS and substantially complete authorizations."

      "Produce a copy of any document reflecting or memorializing all BEXTRA® and/or CELEBREX® samples provided to Plaintiff's prescribing healthcare provider."

      "Please produce a copy of any MedWatch form which refers or relates to Plaintiff, including backup documentation concerning Plaintiff and any evaluation you did concerning the Plaintiff."

**Appendix**

***In re: Avaulta Pelvic Support Systems Products Liability Litigation*** (MDL No. 2187)
**Defendants' Fact Sheet**

[Scope: The parties have agreed upon the use of a form Defendant Fact Sheet ("DFS"), attached to this Order as Exhibit B. The DFS shall apply to every case within MDL 2187, and in all other cases that become part of this MDL by virtue of being filed in, removed to, or transferred to this Court.]

"Please ensure that the production of documentation includes specific reference to the question to which the documentation is provided in response. Documentation is defined to include all forms of documents, including but not limited to paper, email, video, audio, spreadsheets, or otherwise.
A. Identify and attach complete documentation of all information set forth in I through IV above; except, you may identify but not serve copies of medical records that were provided to defendants by plaintiff's counsel.
B. Aside from any privileged materials, identify and attach all records, documents, and information that refer or relate to the plaintiff in defendants' possession or control, to the extent not identified and attached in response to a prior question.
C. Produce a true and complete copy of the Device History Record for the Plaintiff's lot number(s).
D. Produce a true and complete copy of the complaint file relating to the Plaintiff."

**Appendix**

***In re: Boston Scientific Corp. Pelvic Repair System Products Liability Litigation* (MDL No. 2326) Defendant Fact Sheet**

[Scope: **"**For each case, the Boston Scientific defendants must complete this Fact Sheet"]

"Please provide the following documents:

A. Identify and attach the specific documentation described in I through III above; except, you may identify but not serve copies of medical records that were provided to Defendants by Plaintiff's counsel.

B. Aside from any privileged or attorney-work product materials, identify and attach all documents that refer or relate to the Plaintiff in Defendant's possession or control, to the extent not identified and attached in response to a prior question.

C. All call notes, detail notes or call summaries regarding each implanting and/or treating physician during the relevant time period.

D. All communications by and between Defendant, its sales representative and each of Plaintiff's implanting and/or treating physicians."

**Appendix**

*In re: Cook Medical, Inc. IVC Filters Marketing, Sales, Practices, and Product Liability Litigation* **(MDL No. 2570) Defendant Fact Sheet**

[Scope: "For each case, the Cook Defendants must complete this Defendant Fact Sheet ("DFS") in according with the schedule established by the Court's Pretrial Order."]

"Produce all annual, semi-annual or quarterly Plans of Action ("POA") documents used to set out the performance goals and expectations of the sales representatives/teams/territories/company (whether in terms of market share, total prescriptions/new prescriptions, or dollar sales volume); the approved messaging for Representative(s); and that sets out all approved promotional materials (whether approved for "leave behind" or not).

"Produce communications between the Defendants, the sales representative company and/or sales representative(s), Sales Manager, Marketing Organization Representative, medical liaison, and/or Representative identified in section B above and Plaintiff, to the extent not contained in the complaint file, if any, and identify the Bates numbers of such communications."

"Produce and identify any documents that relate in a reasonably direct manner to consulting agreements, if any, between Defendants and any of Plaintiffs healthcare providers, including, but not limited to, all consulting relationships to provide advice on the design, study, testing or use of inferior vena cava devices, or to consult as a thought leader, opinion leader, member of speaker's bureau or similar arrangement. For any of these relationships, please provide the title, location and date of any speaker's programs or conferences attended by Plaintiffs healthcare provider(s), all speakers at the program/conference, and the agenda/brochure for the conference/program."

"Produce documents that relate in a reasonably direct manner to relationships, if any, between Defendants and any of Plaintiffs healthcare providers to conduct any pre-clinical, clinical, post-marketing surveillance or other study or trial concerning any blood clot preventative systems, including, but not limited to, the Cook Inferior Vena Cava Filters."

"Produce and identify documents that reflect financial compensation, things of value and promotional items provided by Defendants to Plaintiffs healthcare providers. Please include all fees, expenses, honoraria, royalties, grants, gifts, travel (i.e., airfare, hotel, etc.) and any other payments or things of value given.

"Have you been contacted by Plaintiff, any of his/her physicians, or anyone on behalf of Plaintiff concerning Plaintiff? If yes, please provide: a) the name of the person(s) who contacted you; b) the person(s) who were contacted including their name, address and telephone number; and c) produce or identify any and all documents which reflect any communication between any person and you concerning Plaintiff."

"Produce a true and complete copy of the Device History Record for the Plaintiffs lot number(s)."

**Appendix**

"Produce a true and complete copy of the complaint file relating to the Plaintiff."

"All call notes, detail notes, call summaries, entries made by sales representatives into any database or e-room, laptop or other computer or handheld device, hard copy documents, emails, and/or notes or records or summaries of calls, contacts and/or communications of any kind regarding each implanting or treating physician for plaintiff during the relevant time period."

"Call notes for all of the plaintiffs' providers who were called upon by Defendants."

"Detail, sample and voucher history of IVC Filters for the plaintiffs healthcare provider and/or entity."

"Copies of all medical/scientific articles or information related to any IVC Filter provided by Defendant(s) employees, representatives, sales representatives, contractors or agents to plaintiffs healthcare provider(s)."

"Any and all documents reviewed, referred to or relied on in answering this DFS."

**Appendix**

***In re: Exactech Polyethylene Orthopedic Products Liability Litigation* (MDL No. 3044)
Defendant's Fact Sheet**

[Scope: "This Document applies to: All Cases"]

"State whether a "Dear Doctor" or "Dear Healthcare Provider" letter, or any other written communication was sent to plaintiff's implanting and/or revising orthopedic surgeon, regarding the Exactech Implant implanted into Plaintiff. If yes, please produce a copy of the letter."

"Identify whether you have provided to any Plaintiff's healthcare orthopedic surgeons who implanted and/or explanted the Devices financial compensation in the five years before Plaintiff's implant surgery. If yes, please provide copies of consulting agreements and the amount of compensation."

"Please state whether Exactech has received or retained any specimens from any of Plaintiff's surgeries.

      b. If yes, please produce all chain of custody forms, photos, and documents relating to any testing or examination of any retained specimens, except for any documents prepared by consulting experts.

      c. Produce any complaint files, retrieval analysis or reports for any inspections and/or done of any such devices, except for any documents prepared by consulting experts.

      d. Produce any documentation of retrieval analysis findings submitted to the FDA of said revision surgery if the documentation exists."

"Produce all Complaint File records for Plaintiff in Defendant's possession."

"Produce copies of any Adverse Event Reports/Medical Device Reports (MDRs) pertaining to Plaintiff submitted to the FDA pursuant to the Manufacturer and User Facility Device Experience (MAUDE) requirements or submitted to any other entity or person."

"Produce copies of documents reflecting any direct contact, either written or oral, between Plaintiff and/or Plaintiff's representative and any employee and/or representative of Defendants."

**Appendix**

***In re: Taxotere (Docetaxel) Eye Injury Products Liability Litigation*** **(MDL No. 3023) Defendant Fact Sheet**

[Scope: "Within seventy-five (75) days of receiving a substantially completed Plaintiff Fact Sheet ("PFS"), the relevant Defendant or Defendants (collectively referred to as "Defendants") must complete and serve this Defendant Fact Sheet ("DFS") and identify or provide DOCUMENTS and/or data responsive to the questions set forth below for each such Plaintiff."]

"Please provide all DOCUMENTS reflecting sale or purchase agreements regarding Taxotere (Docetaxel) between DEFENDANTS and the HEALTHCARE PROVIDERS identified by Plaintiff in Sections IV.47 and IV.48 of the PFS in effect during the time period spanning from twenty-four (24) months prior to plaintiff's first administration of Taxotere (Docetaxel) through Plaintiff's last administration of Taxotere (Docetaxel)."

"Please provide all DOCUMENTS, including product labels, patient information packets, order forms, purchase orders, billing records, invoices, and other DOCUMENTS related to the shipments of Taxotere (Docetaxel) shipped to the HEALTHCARE PROVIDERS identified by Plaintiff in Sections IV.47 and IV.48 of the PFS for the time period spanning from twenty-four (24) months prior to plaintiff's first administration of Taxotere (Docetaxel) through Plaintiff's last administration of Taxotere (Docetaxel) and associate each label with the code numbers to which they are applicable. With regard to product labels, identification of the labels that applied to applicable lot numbers or dates is acceptable."

"For each DEFENDANT'S SALES REPRESENTATIVES, MARKETING ORGANIZATION REPRESENTATIVES, MEDICAL SCIENCE LIAISONS, and/or any other detail persons who came in contact with any of Plaintiff's HEALTHCARE PROVIDER(S) in connection with Taxotere(Docetaxel) during the timeframe for which such records are available, please produce the following:

    1.His/her complete CALL NOTES for each such contact that relates to (a)Taxotere(Docetaxel); and/or (b) ocular injuries; and/or (c) epiphora/excessive tearing; and/or(d)"lacrimal duct obstruction.
    2.Produce all emails or other written correspondence with the HEALTHCARE PROVIDER(S) that relates to (a) Taxotere (Docetaxel); and/or (b) ocular injuries; and/or (c) epiphora and/or excessive tearing; and/or(d) "lacrimal duct obstruction.
    3.Produce any and all TARGETING INFORMATION related to the HEALTHCARE PROVIDER(S) identified by Plaintiff in Sections V.13 and V.14 of the PFS."

"Please identify and produce any and all consulting agreements/contracts and/or retainer agreements/contracts entered into by DEFENDANTS with the HEALTHCARE PROVIDERS identified in Sections IV.47 and IV.48 of the PFS."

**Appendix**

"Provide all chemotherapy related prescriber-level data designed to track prescribing or treating practices that YOU obtained on Plaintiff's HEALTHCARE PROVIDERS identified in Sections IV.47and IV.48 of the PFS."

"Did the Plaintiff's HEALTHCARE PROVIDER ever report any adverse events to DEFENDANTS as they pertain to Taxotere (Docetaxel)? If yes, provide all DOCUMENTS related to the adverse event report/MedWatch form."

**Appendix**

***In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Liability Litigation* (MDL No. 3014) Defendants' Fact Sheet**

[Scope: "Within 60 days after a Plaintiff submits a PFS, including applicable executed Authorizations and Responsive Documents, Defendants with responsive information shall serve a completed DFS and Responsive Documents upon that Plaintiff's counsel via MDL Centrality."]

"1. Identify and produce complete documentation of all information set forth above, including any and all documents reviewed, referred to or relied on in answering this DFS, except, you may identify but not serve copies of medical records that were provided to Defendants by Plaintiff's counsel.

2. Produce a true and complete copy of the Device History Record for the Plaintiff's lot/serial number(s), which includes the date of manufacture, the place of manufacture, the date when the manufacturing process began and the date on which the device was released for sale.

3. Produce the adverse event information relating to the Plaintiff, including, identification of the relevant PR#; documents relating to the Plaintiff that pre-existed the filing of this action; and Copies of any MedWatch forms submitted to the FDA with regard to the Plaintiff.

4. Produce any photographs, evaluation, studies, or other documents relating to Plaintiff's Device, including the condition, storage, and testing of Plaintiff's Device, Plaintiff's SDcard, including all available identifying information including the dates, and who took the photographs or conducted the testing on Plaintiff's Device.

5. Produce all documents relating to Plaintiff's use of the device including any documents created by Plaintiff's use of Defendant's Dream Mapper application or other method of tracking device use.

6. Produce all communications between the Defendants, the sales representative company and/or sales representative(s) identified above and Plaintiffs Healthcare Provider(s) and/or DME about any device(s), including but not limited to general correspondence, device related correspondence, telephone or email contacts, meetings, or sales literature.

7. Produce all Call Notes relating to Plaintiff's identified Healthcare Provider(s) and/or DME(s), including all call notes, detail notes, call summaries, entries made by sales representatives into any database or e-room, laptop or other computer or handheld device, hard copy documents, emails and/or notes or records or summaries of calls, contacts and/or communications of any kind regarding each device or physician for Plaintiff during the relevant time period.

8. For each Device identified by Plaintiff, produce a copy of the complaint file(s), including any and all medical records, if any.

9. Produce documents which reflect communications between Plaintiff or anyone acting on Plaintiff's behalf (other than Plaintiff's counsel) and Defendant concerning Plaintiff's device or medical condition, including any script used for telephone communications, and summaries or notes of any communication between Plaintiff and Defendant, as well as all information stored in the Patient Portal related to Plaintiff's Device.

19

**Appendix**

      10. Aside from any privileged materials, identify and attach all records, documents, and information that refer to or relate to the Plaintiff to the extent not identified and attached in response to a prior question."

**Appendix**

***In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*** **(MDL No. 2875)
Defendants' Fact Sheet**

[Scope: "In accordance with the Court's January 30, 2020 Order (Dkt. 360) and May 29, 2020
Order (Dkt. 452), within 60 days of completion of a Defendants' Fact Sheet by the Finished
Dose Manufacturer Defendants, the API manufacturer Defendants ("API Manufacturer
Defendants") identified in the applicable Plaintiff Fact Sheet ("PFS") must complete and serve
this Defendant Fact Sheet ("DFS") on each Plaintiff's counsel identified in the PFS and on the
Plaintiffs' Executive Committee through MDL Centrality."]

"If plaintiffs answered "yes" to question III.B.7 in the PFS ("Have you been contacted
through customer call or contact centers by Plaintiff or by anyone acting on behalf of
Plaintiff (other than Plaintiff's counsel) at any time from the date Plaintiff began takin the
valsartan-containing drugs through the present?"), Defendants are ordered to produce "all
documents evidencing that contact including video or audio recording of such contacts."

**Appendix**

*In re: Paragard IUD Products Liability Litigation* **(MDL No. 2974) Defendant Fact Sheet**

[Scope: "Cases to which this Order applies. This Order applies only to those cases in which a Plaintiff has served a PFS which is compliant with the requirements of Case Management Order Regarding Plaintiff Fact Sheets and PFS Document Production [Doc. 331, as amended [Doc. 385], and has served all documents responsive to the Document Requests in the PFS."]

   **"**Please produce the following:

   1. The Product Quality Complaint File relating to Plaintiff's claims.

   2. The sales invoice for each Paragard implanted in Plaintiff.

   3. The Paragard call activity, if any, for each sales representative, medical liaison, territory manager and/or district manager and Plaintiff's HCP identified in IV. 3 above.

   4. All documents or information constituting or containing data that tracks or purports to track the prescribing practices of any healthcare providers identified by Plaintiff who implanted, attempted to remove and/or removed Paragard.

   5. Any consulting agreement identified in response to IV.1 above.

   6. Any and all 1099s and/or other documents which memorialize the payments identified in IV.2 above.

   7. Any MedWatch Report for Plaintiff.

   8. Any Dear Doctor, Dear Healthcare Provider, Dear Colleague or similar type of letter or document sent by Defendants to any of Plaintiff's HCPs identified in Section III of the Plaintiff Fact Sheet regarding Paragard.

   9. Copies of any written contact between the Plaintiff and You, or anyone acting on Plaintiff's behalf (if known), and any employee or representative of yours, including any responses as identified in IV. 5. above.

   10. A copy of all communications identified in IV. 6, including initial correspondences and all replies from any party."

**Appendix**

***In re: Ethicon, Inc. Pelvic Repair System Products Liability Litigation*** (MDL No. 2327)
**Defendant Fact Sheet**

[Scope: "It is ORDERED that defendant must submit a completed DFS pursuant to PTO # 33 for each case in the Discovery Pool on or before April 8, 2013."]

"Please ensure that the production of documentation includes specific reference to the question to which the documentation is provided in response. Documentation is defined to include all forms of documents, including but not limited to paper, email, video, audio, spreadsheets, or otherwise.

A. Identify and attach complete documentation of all information set forth in I through IV above; except, you may identify but not serve copies of medical records that were provided to defendants by plaintiff's counsel.

B. Aside from any privileged materials, identify and attach all records, documents, and information that refer or relate to the plaintiff in defendants' possession or control, to the extent not identified and attached in response to a prior question.

C. Produce a true and complete copy of the device history record for the Plaintiff's lot and reference number(s).

D. Produce a true and complete copy of the complaint file relating to the Plaintiff.

E. All call notes, detail notes, call summaries, entries made by sales representatives into any database or e-room, laptop or other computer or handheld device, hard copy documents, emails, and/or notes or records or summaries of calls, contacts and/or communications of any kind regarding each implanting or treating physician during the relevant time period."