# EXHIBIT A-2

# ATTACHMENT A

UBER-MDL3084-000000322

**ATTACHMENT A**: JOINT MOTION OF THE CONSUMER PROTECTION AND ENFORCEMENT DIVISION, UBER TECHNOLOGIES, INC. AND THE RAPE, ABUSE & INCEST NATIONAL NETWORK, INC. FOR ADOPTION OF A SETTLEMENT AGREEMENT, AND THE SETTLEMENT AGREEMENT.

UBER-MDL3084-000000323

BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services. | Rulemaking 12-12-011 |

**JOINT MOTION OF THE CONSUMER PROTECTION AND ENFORCEMENT DIVISION, UBER TECHNOLOGIES, INC., AND THE RAPE, ABUSE & INCEST NATIONAL NETWORK, INC. FOR ADOPTION OF A SETTLEMENT AGREEMENT**

**SELINA SHEK**
Attorney

Consumer Protection and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
Telephone: (415) 703-2423
Email: Selina.Shek@cpuc.ca.gov

**CAROLYN KUBOTA**
**ISAAC CHAPUT**

Rape, Abuse & Incest National Network (RAINN), Inc.
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Email: Ckubota@cov.com
        Ichaput@cov.com

**VIDHYA PRABHAKARAN**
**ROB MAGUIRE**
Attorneys

Uber Technologies, Inc.
Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
Telephone: (415) 276-6500
Fax (415) 276-6599
Email: vidhyaprabhakaran@dwt.com
        robmaguire@dwt.com

July 15, 2021

UBER-MDL3084-000000324

## I.    INTRODUCTION

Pursuant to Rule 12.1, *et seq.*, of the California Public Utilities Commission's ("Commission") Rules of Practice and Procedure, the Commission's Consumer Protection and Enforcement Division ("CPED"), Uber Technologies, Inc. ("Uber"), and the Rape, Abuse & Incest National Network, Inc. ("RAINN") file this joint motion[1] for approval and adoption of the Settlement Agreement ("Agreement"), which is attached as Exhibit A.

The Agreement resolves Uber's and RAINN's appeals from the *Presiding Officer's Decision Imposing Penalties Against Uber Technologies, Inc. for Violating the Assigned Administrative Law Judge's December 19, 2019 and January 17, 2020 Rulings Requiring Information Regarding Sexual Assault and Sexual Harassment Claims* (December 14, 2020) ("POD") addressing the *Administrative Law Judge's Ruling Ordering Uber Technologies, Inc. to Show Cause Why it Should not be Sanctioned by the Commission for Refusing to Answer Questions Regarding Sexual Assaults and Sexual Harassment Claims and for Refusing to Submit the Information Under Seal* (July 27, 2020) ("OSC Ruling") and all related disputed issues.

The highlights of the Agreement are:

(1)  Uber's acknowledgements and affirmations of the Commission's broad authority to protect public safety and specifically to regulate charter-party carriers like Uber pursuant to the Public Utilities Code, Uber's duty to "maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges" pursuant to Rule 1.1 and Uber's duty to adhere to Public Utilities Code section 314(a) with respect to the examination of its agents and employees;

(2)  Uber's agreement to pay $150,000.00 as a fine and $9,000,000.00 to support several timely safety initiatives directly promoting the public interests at the heart of the Rulemaking ("R.") 12-12-011 (e.g., providing for compensation

---

[1] In accordance with Rule 1.8(d) of the Commission's Rules of Practice and Procedure, counsel for Consumer Protection and Enforcement Division has been authorized by Uber Technologies, Inc. and the Rape, Abuse & Incest National Network, Inc. to file this joint motion on their behalf.

UBER-MDL3084-000000325

to victims and support efforts to address physical and sexual
violence, evaluation and development of potential industry best
practices and industry-wide outreach, education and training), as
elaborated upon below; and

(3)  Uber's agreement to produce data in response to the questions in
the December 19, 2019 Ruling consistent with the format,
process and production timeframe agreed to in the Agreement.

In addition to resolving all disputed regulatory compliance issues in the OSC
Ruling and the POD and the appeals to the POD by Uber and RAINN, the Agreement
provides the Commission and CPED with a framework to collect upcoming Safety
Report data in an agreed form and manner that will facilitate ease of data analysis to
effectively perform their regulatory oversight duties to ensure passenger safety within the
Transportation Network Company ("TNC") industry while also respecting and protecting
victims of sexual violence.

It is worth noting, the Agreement terms were negotiated to carefully balance and
promote these compelling and competing public interests:

- Confirms and reinforces the Commission's authority and ability
to carry out its safety and regulatory duties to perform effective
investigations, perform regulatory oversight, and set and enforce
regulatory standards where appropriate to protect the public;

- Provides the Commission and CPED with the necessary data to
evaluate passenger safety within the TNC industry;

- Increases TNC data transparency for the public;

- Respects and protects victims of sexual violence; and

- Mitigates and avoids the uncertainties and protracted timelines
involved in litigation efforts, saving time and costs to the Parties
and the Commission.

CPED, Uber, and RAINN (collectively the "Parties") are the sole parties to the
Agreement and the preceding mediation efforts as directed by the Assigned
Administrative Law Judge's February 22, 2021 Ruling.  The Parties jointly support the
proposed Agreement as reasonable, consistent with the law, and in the public interest in
compliance with the Commission's Rules of Practice and Procedure, Rule 12.1(d), as

2

discussed below, and respectfully request Commission approval and adoption of the Agreement.

## II.    BACKGROUND

In December 2019, Uber issued a national Safety Report.[2]  The Safety Report described Uber's efforts to address its safety concerns, including the development of new technology, strengthening of background screenings for drivers, deployment of new safety features, changes to support staff training, updated policies, and a tripling in size of Uber's safety team.  The Safety Report set forth a Sexual Assault and Sexual Misconduct Taxonomy, developed through a multi-year collaboration with sexual violence prevention advocacy groups,[3] as well as data about safety incidents, such as sexual assault and misconduct on Uber's platform.

Soon after Uber's release of the Safety Report, the assigned Administrative Law Judge ("ALJ") issued a December 19, 2019 Ruling ordering Uber to file said Safety Report in the docket of this proceeding, and to produce a large set of documents and data and answer questions relating the Safety Report, including those concerning the authorship of the report and reported alleged sexual assaults and sexual misconduct (the "December 19, 2019 Ruling").[4]

RAINN and other advocates of sexual violence prevention submitted letters to the Commission stating that certain disclosures required by the December 19, 2019 Ruling would be harmful to sexual assault victims, would violate hard-won victim confidentiality rights, and would harm public safety by deterring future sexual assault

---

[2] *See* Uber, *US Safety Report* (Dec. 5, 2019) ("Safety Report"), available at: https://www.uber.com/us/en/about/reports/us-safety-report/.

[3] *See* Foreword by Karen Baker, Chief Executive Officer, National Sexual Violence Resource Center Safety Report at 6.

[4] *See* ALJ's Ruling Ordering Uber Technologies, Inc. to File and Serve Its US Safety Report for 2017-2018 and to Answer Questions Regarding Alleged Sexual Assault and Sexual Misconduct Incidents. (Dec. 19, 2019).

UBER-MDL3084-000000327

reporting.[5]  These advocates requested review and modification of the December 19, 2019 Ruling "to remove or rescind Section 2.4 of the ruling, so as not to require undue disclosure of victim information or information about sexual assaults," emphasizing this information should not be shared by Uber with *anyone* without victim consent.[6]

On January 10, 2020, prior to the deadline for responding to the December 19, 2019 Ruling, Uber filed its Motion for Reconsideration of the December 19, 2019 Ruling, seeking rescission and replacement of the December 19, 2019 Ruling with a separate ruling directed to the entire TNC industry.  In a January 27, 2020 Ruling, the assigned ALJ denied Uber's January 10, 2020 Motion for Reconsideration but ruled that Uber could file victim information under seal so that the names of the alleged victims would remain confidential (the "January 27, 2020 Ruling").[7]

On January 30, 2020, Uber filed a partial response to the December 19, 2019 Ruling,[8] responsive to the majority of what was ordered in the December 19, 2019 Ruling.  Uber, however, did not produce the information ordered for each incident of sexual assault and sexual misconduct that occurred in California in 2017, 2018, and 2019 as requested in Questions 1.1, 1.2, 1.4, 2.4.1, 2.4.2, 2.4.3 and 2.4.4 from the December 19, 2019 Ruling.  In its partial response, Uber asserted that it believed providing this information would violate sexual assault victim and employee privacy rights and harm the public interest.[9]

---

[5] The California Coalition Against Sexual Assault ("CALCASA"), Pennsylvania Coalition Against Rape ("PCAR") and National Sexual Violence Resource Center ("NSVRC"), and National Network to End Domestic Violence ("NNEDV") submitted letters raising similar concerns.  *See* Hearing Exhibits Uber-9 (CALCASA Letter); Uber-10 (NNEDV Letter), Uber-11 (PCAR NSVRC Letter) and Uber-12 (RAINN Letter).

[6] Hearing Ex. Uber-9 (CALCASA Letter).

[7] *See* January Ruling (Jan. 27, 2020).

[8] *See* Response to the December 19, 2019 Administrative Law Judge's Ruling Ordering Uber Technologies, Inc. to File and Serve its US Safety Report (Jan. 30, 2020) ("Uber Response").

[9] Uber also reiterated its hope that the Commission would address sexual assault and sexual misconduct prevention industry-wide and require other TNCs, not just Uber, to respond to similarly targeted questions.

UBER-MDL3084-000000328

Uber filed a Motion for Stay and a Motion to the full Commission for Reconsideration of the December 19, 2019 Ruling on January 31, 2020.[10]

On July 27, 2020, the assigned ALJ issued the OSC Ruling ordering Uber to show cause why it should not be sanctioned for its failure to provide all of the information ordered in the December 19, 2019 Ruling (specifically, Questions 1.1, 1.2, 1.4, 2.4.1, 2.4.2, 2.4.3, and 2.4.4 of the December 19, 2019 Ruling) and to file certain victim information under seal.  On August 12, 2020, Uber filed a Motion requesting Alternative Dispute Resolution ("ADR") and clarification of the OSC procedures.[11]  Also on August 12, 2020, RAINN, one of the nation's largest anti-sexual violence organizations, moved for party status in both the proceeding and this OSC phase.  CALCASA, which oversees California's 84 rape crisis center programs, moved for party status on August 20, 2020.

On August 20, 2020, the assigned Commissioner Genevieve Shiroma issued a ruling confirming the OSC Ruling.

On August 21, 2020, Uber filed its Verified Statement, expanding on its legal and policy-based objections to disclosing victims' personally identifiable information and the public filing of employee information.  RALIANCE, another national organization dedicated to ending sexual violence, submitted a declaration opposing the ordered filing and service on the service list of sensitive sexual assault and sexual misconduct information.

On September 1, 2020, the assigned ALJ held an Evidentiary Hearing for the OSC.  Commissioner Shiroma and ALJ Mason examined Uber's witness Tracey Breeden, head of the Women's Safety and Gender-Based Violence Operations at Uber regarding Uber's failure to comply with ALJ Mason's December 19, 2019 Ruling and

---

[10] *See* Motion of Uber Technologies, Inc. for an Assigned Commissioner or Administrative Law Judge Ruling Staying Certain Requirements of the December 19, 2019 ALJ Ruling Ordering Uber Technologies, Inc. to file and serve its US Safety Report (Jan. 31, 2020) ("Motion for Stay"); Motion of Uber Technologies for Reconsideration to the Full Commission of the January 27, 2020 ALJ Ruling (Jan. 31, 2020) ("Motion for Reconsideration to Full Commission").

[11] *See* Motion Requesting ADR and Clarification (Aug. 12, 2020).

UBER-MDL3084-000000329

January 20, 2020 Ruling, and Uber's refusal to file confidential information under seal as allowed by the January 27, 2020 Ruling.[12]  Uber reiterated its request for ADR during that hearing.

On December 14, 2020, the assigned ALJ issued the POD imposing penalties against Uber for violating the December 19, 2019 Ruling and January 27, 2020 Ruling. The POD found that Uber's refusal to comply with the Rulings and assertion of defenses that were factually and legally insufficient to excuse its non-compliance violated Rule 1.1, and penalized Uber $59,085,000, and threatened suspension of Uber's permits to operate as a Transportation Network Company and a Charter-party Carrier.  Both Uber[13] and RAINN[14] filed timely appeals of the POD.

On February 22, 2021, the assigned ALJ issued a ruling granting Uber's motion requesting ADR ("ADR Ruling").  The ADR Ruling identified the following topics to be addressed:

- How to provide to the Commission information about the authorship of Uber's US Safety Report (Questions 1.1., 1.2., and 1.4. from the December 19, 2019 Ruling) in a manner that best protects the claims of employee privacy;

- How to provide to the Commission information about sexual assaults and sexual harassment (Questions 2.4.1., 2.4.2., 2.4.3., and 2.4.4. from the December 19, 2019 Ruling) in a manner that best protects the claims of privacy of personally identifiable information;

- What monetary amount, if any, Uber should pay as part of a joint settlement; and

- What other regulatory sanctions, if any, should be imposed on Uber.

---

[12] Reporter's Transcript (September 1, 2020), Vol. 4, p. 493:1-6.

[13] *Uber Technologies, Inc. Appeal of the Presiding Officer's Decision Imposing Penalties Against Uber Technologies, Inc.* (Jan. 13, 2021).

[14] *The Rape, Abuse & Incest National Network's (RAINN) Appeal of Presiding Officer's Decision Imposing Penalties Against Uber Technologies, Inc. for Violating the Assigned Administrative Law Judge's December 19, 2019 and January 27, 2020 Rulings Requiring Information Regarding Sexual Assault and Sexual Harassment Claims* (Jan. 11, 2021).

UBER-MDL3084-000000330

In the ADR Ruling, the assigned ALJ also invited RAINN to participate in the ADR process.

On March 8, 2021, Assistant Chief ALJ Kimberly Kim and ALJ Charles Ferguson were assigned as mediators for this ADR and CPED was directed to participate in the ADR, along with its counsel.  From March through July 2021, the Parties participated in a non-stop marathon of negotiation, assisted by the mediators.  The Parties worked in good faith and diligently to work through countless impasses and touch-and-go negotiations to understand the competing public interest considerations and each other's perspectives to find a balanced and packaged solution to present to the assigned ALJ and the Commission.

CPED carefully guided the negotiation to ensure that any settlement be balanced and in proportion to the alleged harm, and reflected the Commission's safety, regulatory and enforcement authority, as well as other important public interest considerations.  To set the foundation for negotiation and to provide a glimpse into Uber's practices, in the confines of the confidential mediation, Uber shared its internal policies, procedures, practices, and data pertaining to the reporting and investigation of sexual assault and sexual misconduct.  RAINN provided ongoing guidance, while also adding critical perspective and insight concerning the impact of various settlement terms and options on victims of sexual violence.

After dozens of joint mediation and private caucuses with the mediators as well as additional separate informal exchanges and meetings among the Parties, the Parties have finally reached the Agreement resolving the issues outlined by the assigned ALJ in the ADR Ruling while striking a careful balance on the public interest considerations and advancing numerous compelling public interests.

The Parties support the terms of the Agreement in its entirety, as proposed in Exhibit A.  If the Commission approves and adopts the Agreement with any modification or in part, the Parties must consent to the modification(s) or the partial approval and adoption; otherwise, the Agreement is deemed void.  In addition, consistent with Rule

UBER-MDL3084-000000331

12.5, the Agreement is a compromise of disputed issues amongst the Parties and not a statement of precedent or policy, because the Parties believe that entering this Agreement serves several compelling public interests and will allow for more efficient, cost-effective resolution of the issues raised by the OSC than the alternative – a lengthy, costly and contentious continued litigation which would distract from the rulemaking efforts.

## III.   AGREEMENT

This Agreement resolves all disputes that gave rise to the POD in R.12-12-011, including the appeals to the POD filed by Uber and RAINN.  The Agreement is attached as Exhibit A.  The salient terms of the Agreement are summarized below:

A.   Uber acknowledges and affirms:

(1)   The Commission has broad authority to protect public safety and specifically to regulate charter-party carriers like Uber pursuant to the Public Utilities Code;[15]

(2)   Uber must "maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges" pursuant to Rule 1.1;[16] and,

(3)   Uber shall abide by Public Utilities Code section 314(a) with respect to the examination of its agents and employees.[17]

B.   Uber agrees to pay $150,000.00 (One Hundred and Fifty Thousand Dollars) (the "Settlement Fine Payment").[18]

C.   Uber agrees to deposit with the Commission $9,000,000.00 (Nine Million Dollars) in funding to support safety initiatives directly promoting the public interests at the heart of the R.12-12-011 (the "Safety Settlement Funds") which includes:

(1)   Contribution of $5,000,000.00 (Five Million Dollars) of the Safety Settlement Funds to the California Victim's Compensation Fund for the compensation of victims of sexual violence and violence; and

---

[15] Exhibit A, Recitals and Stipulated Facts, term A.

[16] Exhibit A, Recitals and Stipulated Facts, term C.

[17] Exhibit A, Recitals and Stipulated Facts, term D.

[18] Exhibit A, Agreement, term E.1.

UBER-MDL3084-000000332

(2)     Allocation of the remaining $4,000,000.00 (Four Million Dollars) of the Safety Settlement Funds to support the goals of R.12-12-011 and Commission efforts to address physical and sexual violence in the passenger carrier industry, including by (a) an industry-wide evaluation, informed or conducted by industry experts, of the California TNC industry's existing protocols and practices for classifying and reporting violence, including sexual violence, (b) the development and recommendation of industry-wide best practices, informed or conducted by industry experts, for receiving, reporting, and responding to complaints of violence, including sexual violence, and (c) industry-wide education, outreach, and training on all forms of violence, including sexual violence, for the passenger carrier industry, including TNCs.[19]

D.  Uber agrees to produce data that fully resolves the data needs with respect to Questions 1.1, 1.2, 1.4, 2.4.1, 2.4.2, 2.4.3, and 2.4.4 in the December 19, 2019 Ruling consistent with the format, process, and production timeframe agreed to under Agreement Sections A and B.[20]

E.  Uber, CPED and RAINN agree to a forward-looking framework for Uber's provision of upcoming Safety Report data, and a further commitment regarding future comprehensive TNC industry data collection regarding sexual violence;[21]

F.  Uber and CPED agree to file a joint motion in R.12-12-011 no later than 30 days after the Commission's adoption of the Agreement requesting that the Commission require all TNCs to release public versions of previously filed TNC annual reports kept confidential by the Commission pursuant to D.13-09-045, footnote 42 and follow the requirements of General Order ("G.O.") 66-D to keep any portion of those previously filed TNC annual reports confidential.[22]

G.  Uber agrees to submit to CPED a public version of the data from the 2014 to 2020 Annual Reports and may redact portions of the data that it seeks to keep confidential and submit a claim of

---

[19] Exhibit A, Agreement, term E.4.

[20] Exhibit A, Agreement, term A.1-A.3.

[21] Exhibit A, Agreement, section C.

[22] Exhibit A, Agreement, term D.1.

UBER-MDL3084-000000333

confidentiality in accordance with the G.O. 66-D process.[23]

## IV.   DISCUSSION

Under Rule 12.1(d), "[t]he Commission will not approve settlements, whether contested or uncontested, unless the settlement is reasonable in light of the whole record, consistent with law, and in the public interest."  In deciding whether to approve and adopt a proposed settlement, the Commission "balances various factors such as: the risk, expense, complexity, and likely duration of further litigation; the amount offered in settlement; the strengths and weaknesses of the parties; the stage of the proceedings; the presence of a government participant; whether the settlement negotiations were at arm's length and without collusion; and whether the major issues are addressed in the settlement."[24]  The Commission has a well-established policy of approving settlements that are fair and reasonable in light of the whole record, because doing so conserves resources, reduces the cost of litigation, and allows Parties to "reduce the risk that litigation will produce unacceptable results."[25]  As discussed below, the Agreement meets this criteria, and should be approved by the Commission.

### A.      The Settlement Agreement is in the Public Interest.

One of the three Rule 12.1(d) criteria for approval of a settlement is that it be in the public interest.  Here, the Agreement reflects a series of careful trade-offs and compromises negotiated and reached by the Parties during the course of this lengthy and intense marathon of mediation sessions from March to July 2021.  The Agreement resolves all disputed issues in the OSC Ruling efficiently and effectively, avoids costly and continued litigation, and carefully balances and advances the numerous compelling

---

[23] Exhibit A, Agreement, term D.2.

[24] D.94-11-018/I.92-01-002, *Investigation on the Commission's own motion into all facilities-based cellular carriers and their practices operations and conduct in connection with their siting of towers, and compliance with the Commission's General Order No. 159*, 1994 Cal PUC LEXIS 1090, at *151.

[25] D.11-06-023, *In the Matter of the Application of Golden State Water Co. on Behalf of its Bear Valley Elec. Serv. Div. (U913E) for Approval of RPS Contract with BioEnergy Solutions, LLC, and for Authority to Recover the Costs of the Contract in Rates*, at 13.

UBER-MDL3084-000000334

and competing public interests while respecting and preserving the diverse interests of the Parties, as elaborated below.  The Agreement is in the public interest, as discussed below.

      1.      **Uber's Acknowledgements of the Commission's Broad Safety and Regulatory Authority over TNCs and Its Corresponding Duties Are Critical Elements of the Packaged Settlement Agreement.**

Serving as the foundation for the Agreement are Uber's express acknowledgements and affirmations of (1) the Commission's broad authority to protect public safety and specifically to regulate charter-party carriers like Uber pursuant to the Public Utilities Code, (2) Uber's duties under Rule 1.1. to "maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges" and (3) Uber's duty to abide by Public Utilities Code section 314(a) with respect to the examination of its agents and employees.  These affirmations set a tone of clear understanding by the Parties and their respective roles before the Commission, which in turn will contribute to the reduction and avoidance of future disputes and unnecessary litigation.

      2.      **The Agreement Terms Associated with Uber's Agreed Data Production Carefully Balance and Advance Important Competing Public Interests.**

In the Agreement, Uber agrees to produce data responsive to the outstanding questions ordered by December 19, 2019 Ruling consistent with the format, process and production timeframe agreed to under the Agreement, Sections A and B.  The relevant terms of the Agreement were carefully negotiated by the Parties that represent varied interests, to ensure that the agreed-upon format, process, and manner of production yields meaningful and usable data (for ease of data sorting and analysis) and does so in a manner that is respectful and mindful of the applicable privacy concerns and victim's rights.

The terms of the Agreement go beyond mere production of the outstanding data and provide a forward-looking framework for Uber's upcoming Safety Report and commitment for more comprehensive TNC industry data collection regarding sexual

UBER-MDL3084-000000335

violence.  In addition, Uber will offer all witnesses, including survivors, involved in incidents of sexual assault or misconduct the opportunity to provide written consent to being contacted by the Commission.[26]  Such consent will memorialize the victim's willingness to be contacted by the Commission while facilitating ease of access by the Commission to those witnesses willing to participate in future investigations into how Uber handles and resolves sexual violence incidents, when needed.  The Agreement also requires Uber to provide the Commission with the California-specific sexual assault and sexual misconduct incident data used to support Uber's anticipated upcoming Safety Report.

In short, the Agreement enhances Uber's practices on data sharing of sexual assault and sexual misconduct-related data with the Commission and does so in a transparent manner that satisfies CPED's data requirements.  The Agreement and its above-discussed terms relevant to agreed data production will ensure the Commission can fulfill its mandated duties while advancing the above public interests.

3.      **Uber's Payment of $9,150,000 Is Reasonable Under the Totality of Circumstances, Holds Uber Accountable and Achieves Numerous Safety Initiatives That Are Directly Linked to the Public Interests at the Heart of R.12-12-011.**

The Agreement also results in Uber's payment of nine million, one hundred and fifty thousand dollars ($9,150,000).  One hundred and fifty thousand dollars ($150,000.00) would be paid as a fine and $9,000,000.00 would be paid to fund important safety initiatives that are directly linked to the public interest concerns at the heart of R.12-12-011.  Specifically, five million dollars ($5,000,000.00) will be donated to the California Victim's Compensation Fund for the compensation of victims of sexual violence and the rest will be used for (1) an industry-wide evaluation, informed or conducted by industry experts, of the California TNC industry's existing protocols and

---

[26] Recognizing the importance of victims' right to control their own information, witnesses are permitted to withdraw at any time their consent to be contacted.

UBER-MDL3084-000000336

practices for classifying and reporting violence, including sexual violence, (2) the development and recommendation of industry-wide best practices, informed or conducted by industry experts, for receiving, reporting, and responding to complaints of violence, including sexual violence, and (3) industry-wide education, outreach, and training on all forms of violence, including sexual violence, for the passenger carrier industry, including TNCs.

These efforts will feed into a critical baseline assessment of the industry-wide TNC practices concerning violence, including sexual violence.  Such baseline assessment will also set the foundation for developing recommended best practices for the TNC industry as a whole concerning violence and sexual violence, and underwrite education and outreach concerning the same.  Ultimately, these series of efforts would feed into the Commission's policy aims of
R.12-12-011 toward the sharing of best practices as well as developing and adoption of industry standards, which will raise the bar for the TNC industry as a whole.

Moreover, Uber's agreed payment represents Uber's further acknowledgement of the importance of compliance with the Commission's decisions and directives, and that of abiding by the Commission's Rules of Practice and Procedure and to maintain the respect due to the Commission and its ALJs.

Uber acknowledges in the Agreement that it did not provide all of the data requested by the December 19, 2019 Ruling.  However, the Parties agree that there is no economic or physical harm caused by Uber's non-compliance with the December 19, 2019 Ruling.  While CPED is most concerned with the harm to the regulatory process caused by Uber's decision not to provide all of the data requested in the December 19, 2019 Ruling, this concern is mitigated by Uber's continued participation in the Commission's process, including the filing of appeals and making multiple attempts and requests for ADR, and its good faith belief that the provision of all information requested in the rulings would cause harm to the victims involved in the incidents.

The Parties believe Uber's agreement to contribute a substantial sum of money to victim compensation and toward the future prevention of violence and sexual violence in

UBER-MDL3084-000000337

the TNC industry will significantly advance numerous public interests.  The sizable contribution made by Uber will do much to redress the past harms suffered by victims of violent crime and will go a long way to prevent future crimes by focusing on education and outreach to reduce violence, and to develop best practices in the TNC industry so that future violence is accurately assessed, reported, and that steps are taken to avoid such incidents.  Therefore, on balance and in recognition of the complete settlement package, Uber's payment of $9,150,000.00 as agreed to in the Agreement is fair and in the public interest.

4.      **The Agreement Is Fair and Reasonable and Provides for Increased Transparency Within the TNC Industry.**

In the Agreement, Uber also agrees to immediately provide to CPED a public version of the data underlying its 2014 to 2020 Annual Reports.  Uber and CPED commit to the filing of a joint motion in R.12-12-011 to request that the Commission require all TNCs to release public versions of all previously filed TNC annual reports.  These reports are currently kept confidential by the Commission pursuant to the provisions of D.13-09-045, footnote 42.

Finally, in the Agreement, CPED agrees to issue future data requests for comprehensive Safety Report datasets or comprehensive datasets associated with sexual violence broadly to the TNC industry as a whole.

The Parties believe it is in the public interest to allow the public and the Commission to learn more clearly about the state of safety and sexual violence in the TNC industry.  Likewise, the Parties believe it is fair, reasonable and just for CPED to issue future data requests for comprehensive Safety Report datasets or comprehensive datasets associated with sexual violence broadly to the industry.

5.      **The Agreement Protects Victims of Sexual Violence.**

The Agreement protects victims of sexual violence by respecting their right to privacy and preserving their ability to consent to be contacted going forward.  Experts in

UBER-MDL3084-000000338

sexual violence prevention, including RAINN, CALCASA, PCAR, NSVRC, and NNEDV, have greatly informed the record of this proceeding by emphasizing the experience of victims of sexual assault.  As RAINN describes it, "Sharing victims' private information . . . without their consent would only compound the damage done by the assault itself."[27]

The Agreement will protect victims of sexual assault in several ways.  First, it will require Uber to anonymize the upcoming Safety Report incident data it provides to the Commission, removing victim and witness personally identifiable information.  This protects victim privacy and prevents a chilling effect on future sexual assault reporting.  Second, the Agreement will provide that, going forward, Uber shall offer witnesses an opportunity to provide written consent to be contacted by the Commission. Witnesses will be able to opt-in and shall be able to withdraw that consent at any time.  The Agreement's protection of sexual assault victims is in the public interest.

### 6.   The Agreement Protects Uber Employees' Personal Information.

The Agreement will protect Uber employees by allowing Uber to submit certain employee information requested in the December 19, 2019 Ruling under seal.  The Commission has previously recognized that employee information may be entitled to protection and should not be disclosed publicly absent a compelling reason.[28]  The

---

[27] *See* Hearing Ex. Uber-12 (RAINN Letter); *see also* Lori Haskell and Melanie Randall, Dep't of Justice, *The Impact of Trauma on Adult Sexual Assault Victims* 1, 11 (2019), https://www.justice.gc.ca/eng/rp-pr/jr/trauma/trauma_eng.pdf; Alison Bowen, Harm from a Sexual Assault Can Continue for Years. The Triggers Are All Around., CHI. TRIB (Sept. 27, 2018), https://www.chicagotribune.com/lifestyles/sc-fam-how-assault-lingers-1002-story.html.

[28] The Commission routinely allows regulated entities to redact personally identifiable employee information when making public filings. *See, e.g.,* examples of the redacted annual General Order 77-M report filed by Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and Southern California Gas Company, (https://www.cpuc.ca.gov/General.aspx?id=6442454119) redacting individual employee names; Pacific Gas & Electric Root Cause Analysis (RCA) for Metcalf Substation Unauthorized Entry filed Aug. 27, 2014 (https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_and_Rel

(continued on next page)

UBER-MDL3084-000000339

Agreement will protect Uber employees involved in drafting of the Safety Report from such exposure by allowing Uber to submit all information identified in questions 1.1, 1.2, and 1.4 of the December 19, 2019 Ruling to the Commission under seal.  It is in the public interest to ensure the protection of the privacy of regulated entities' employees.

### 7.    Conclusion

For all of these reasons, the Agreement is in the public interest.  The Parties have strived to strike a thoughtful balance of important public interests while yielding a creative outcome that could not be achieved by further litigating the OSC and the POD and is a package settlement that advances numerous important public interests.

### B.    The Settlement Is Reasonable in Light of the Whole Record.

The second criterion, under Rule 12.1(d), for approval of a settlement is that it be reasonable in light of the whole record.  In reviewing a settlement, the Commission will also consider (1) the risk, expense, complexity and likely duration of further litigation, (2) whether the settlement negotiations were at arms-length, (3) whether major issues were addressed, and (4) whether the parties were adequately represented.[29]

There is a long-standing and "strong public policy favoring settlement of disputes to avoid costly and protracted litigation."[30]  The Commission has held that such a policy "supports worthwhile goals, including reducing the expense of litigation, conserving scarce Commission resources, and allowing parties to reduce the risk that litigation will produce an unacceptable result."[31]

---

iability/Facility_Safety/Citations/Enclosure%203%20-%20RCA%20Redacted.pdf) redacting team and individual contributor names at 4; and Pacific Gas & Electric Root Cause Analysis of Fatal Injury at Kern Power Plant dated Feb. 6, 2013 (ftp://ftp2.cpuc.ca.gov/ElectricGenerationperf/BV_Report_CPUC_Redaction%20PGE%20Kern%20Powe r%20Plant%20Root%20Cause%20Analysis%20Final%20Report%2020130206%20Project%2033112-012262%2000.pdf) redacting individual team members in incident review starting at 3.

[29] *Re Pacific Gas & Electric Company*, 30 CPUC 2d 189, 222.

[30] D.88-12-083, *Re PG&E*, 30 CPUC 2d 189, at 221.

[31] D.11-12-053, at p. 72.

UBER-MDL3084-000000340

The Commission approves settlement agreements based on whether the settlement is just and reasonable as a whole, not based on its individual terms:

> In assessing settlements we consider individual settlement provisions but, in light of strong policy favoring settlements, we do not base our conclusion on whether any single provision is the optimal result. Rather, we determine whether the settlement as a whole produces a just and reasonable outcome.[32]

The Commission will also consider and approve settlements that are not joined by all parties where the settlement taken as a whole is in the public interest and generally balances the various interests at stake in a manner consistent with the applicable policy objectives and law.[33]

Finally, D.98-12-075 defines the criteria for determining Commission penalties. They include consideration of the severity of the offense, the conduct of the utility, the financial resources of the utility, the totality of the circumstances in furtherance of the public interest, and the role of precedent.[34]

Here, the record shows that, absent a settlement, contentious and protracted litigation will continue.  The record includes voluminous filings of multiple motions and rulings on those motions, motions for reconsiderations and rulings on those motions, the OSC Ruling, OCS hearing, the POD, and the appeals to the POD and ADR Ruling, spanning more than a year in duration and is still not resolved.  During that period, the underlying dispute has consumed an extraordinary amount of the Administrative Law Judges', Parties' and the Commission's time and resources.  The Parties believe this litigation has caused distraction within the R.12-12-011 proceeding. The Parties further believe that to bring an end to this protracted litigation, the assigned ALJ granted Uber's motion for ADR. The Parties spent the last several months mediating the issues.

In these mediation sessions, the Parties devoted substantial time and effort to

---

[32] D.12-03-013, at 19.

[33] *Id.* at p.76.

[34] See D.98-12-076, at 20-21.

UBER-MDL3084-000000341

working collaboratively to identify and achieve a better common understanding of the range of issues in dispute, the various options for narrowing the number of disputed issues, and opportunities to develop compromise positions that would permit resolution of the disputed issues.  The Agreement is a product of those arduous and thoughtful efforts and represents the collective best efforts of the Parties.

The Agreement on all of the disputed terms was finally reached after many impasses and touch-and-go moments during the course of the three months of marathon negotiation.  These teams worked around the clock during the negotiation to produce this Agreement, resolving all the issues ordered for resolution in the ADR Ruling.  Moreover, it sets up a thoughtful framework for (1) access to data in highly usable format for CPED to effectively perform its oversight and investigation functions and (2) transparent data exchanges which will also reduce or eliminate future similar data-based litigation.

The outcome is the Agreement of three knowledgeable negotiation teams representing the Commission's regulatory interest (CPED), interests of a TNC (Uber) and anti-sexual violence advocates (RAINN).  Furthermore, the Agreement is consistent with Commission decisions on settlements, which express the strong public policy favoring settlement of disputes if they are fair and reasonable in light of the whole record.  This Agreement resolves all issues identified in the ADR Ruling, preserves the interests of all parties, puts an end to continued litigation costs, resolves litigation risk and uncertainties, and conserves Parties' and the Commission's resources.  The Agreement incorporates the negotiations of all parties participating in the ADR, preserves the interests of the Commission while fairly balancing the privacy interests of both employees and victims of sexual misconduct.  If the Agreement is not approved, the litigation which preceded for well-over a year will undoubtedly continue and continue to distract this proceeding.

The record is clear that (1) the risk, expense, complexity and likely duration of further litigation is very high; (2) the settlement negotiations were at arms-length; (3) all of the disputed issues were addressed and resolved; and (4) the Parties were fully-represented.  The Agreement constitutes a packaged settlement that includes a combination of affirmations, fine, settlement fund, data production and other terms that

UBER-MDL3084-000000342

balances the D.98-12-075 factors, including the mitigating factors of Uber's good-faith effort to protect victim and employee interests, Uber's requests for ADR to resolve the matter, the lack of physical or economic harm caused by Uber's noncompliance with the December 19, 2019 Ruling, and Uber's agreed-upon future cooperation and provision of data to CPED.

Based on the foregoing and in view of the Commission's long standing strong policy favoring settlements and consistent with the Commission's policy of evaluating the settlement as a whole, the Commission should therefore find that the Agreement as a whole produces a just and reasonable outcome here.

### C.     The Settlement Is Consistent with Law.

The third and last criterion, under Rule 12.1(d), for approval of a settlement is that it be consistent with law.  As described above, the Agreement is fundamentally fair and reasonable in light of the whole record and is in the public interest.  The Agreement is also consistent with the law, in that it does not contravene or conflict with any statute or prior decision, or regulatory principle.  In D.92-12-019, the Commission articulated the Commission's role and responsibilities in approving settlements and noted, in addition to the Rule 12.1(d) elements, settlements must be freely and fairly negotiated, reflect a balancing of interests, and the settlement itself should convey sufficient information upon which the Commission can base its decision.[35]  That is what occurred here.

The Parties are not aware of any statutory provision or prior Commission decision that would be contravened by adopting the Agreement.

The Commission has approved and adopted settlement agreements where, as here, the agreement resolves issues raised in an OSC as well related issues within the scope of the proceeding.[36]  The Commission has also adopted settlement agreements that resolve

---

[35] *In re SDG&E*, D.92-12-019, 1992 Cal PUC LEXIS 867.

[36] *See* D.94-11-018/I.92-01-002, 1994 Cal PUC LEXIS 1090, at *153 (approving and adopting proposed settlement agreement that "address[ed] the issues raised in the OSC of the Echo Summit site, and also resolve[d] potential issues concerning" other sites).

UBER-MDL3084-000000343

the issues quickly and fairly,[37] as does the Agreement here, under which Uber will provide relevant sexual assault-related information to the Commission more quickly and with greater protection of victim privacy than would be possible if the Parties continued litigating with a subsequent rehearing and possible appeal of the POD to the judiciary.

The Parties therefore believe the Agreement—which they entered voluntarily and on the advice of their legal counsel and technical staff and assisted by the Commission's mediators—is consistent with the law.

## V.    CONCLUSION

In D.14-08-009, the Commission noted unequivocally, as follows:

> Today's decision affirms that our staff must have reasonable discretion to negotiate settlements when circumstances warrant and indeed, that not every OII need be fully litigated.  It also affirms, however, that the parties to such a settlement must explain their rationale, and the public interest therein, for settling on the terms they then ask us to approve.[38]

Here, CPED was the staff (or industry division with the support of attorneys from the Legal Division) tasked with the "discretion to negotiate" with Uber and RAINN, and the Parties provide in the foregoing sections of this motion their rationale for the Agreement and its terms and the public interests served and advanced by the same.  The Parties support the Agreement and its terms, as reasonable, consistent with the law, and in the public interest.

As the Agreement has terms that will require some administration decisions and acts to implement as part of the Agreement, including Agreement terms E.2, E.3, E.4 and E.5, the Parties also request that the Commission authorize and empower the Director of

---

[37] *See* D.07-03-048/I.02-06-003, at 4 (approving and adopting proposed settlement agreement that resolved issues raised in investigation "quickly and fairly").

[38] *See* D.14-08-009/I.14-03-004, at 19 (approving Settlement in Order Instituting Investigation on the Commission's Own Motion into the Operations and Practices of Southern California Edison Company Regarding the Acacia Avenue Triple Electrocution Incident in San Bernardino County and the Windstorm of 2011.)

UBER-MDL3084-000000344

the Consumer Protection and Enforcement Division to take any and all reasonable and necessary actions to effectuate and facilitate the successful implementation of the Agreement, including Agreement terms E.2, E.3, E.4 and E.5.

The Parties therefore jointly sponsor and respectfully request that the Commission: (1) approve and adopt the Agreement in full, as expeditiously as possible; and (2) authorize the Director of the Consumer Protection and Enforcement Division to take any and all reasonable and necessary actions to effectuate and facilitate the successful implementation of the Agreement, including Agreement terms E.2, E.3, E.4 and E.5.

Respectfully submitted,

/s/     SELINA SHEK
_____
Selina Shek
Attorney for

Consumer Protection and Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
Telephone: (415) 703-2423
July 15, 2021                    Email: Selina.Shek@cpuc.ca.gov

21

UBER-MDL3084-000000345

### EXHIBIT A

SETTLEMENT AGREEMENT

UBER-MDL3084-000000346

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is entered into as of the last signature date below by and between the Consumer Protection and Enforcement Division ("CPED") of the California Public Utilities Commission ("Commission"), Uber Technologies, Inc. ("Uber"), and the Rape, Abuse & Incest National Network, Inc. ("RAINN") (each also referred to as a "Party" and collectively as the "Parties") in full settlement of the *Presiding Officer's Decision Imposing Penalties Against Uber Technologies, Inc. for Violating the Assigned Administrative Law Judge's December 19, 2019 and January 27, 2020 Rulings Requiring Information Regarding Sexual Assault and Sexual Harassment Claims* issued by Administrative Law Judge ("ALJ") Robert M. Mason III on December 14, 2020 in the Commission's Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services, (R.) 12-12-011.

## RECITALS AND STIPULATED FACTS

A. Uber acknowledges that the Commission has broad authority to protect public safety and specifically to regulate charter-party carriers like Uber pursuant to the Public Utilities Code.

B. The Commission's decisions regulating Transportation Network Companies ("TNCs"), D.13-09-045 and D.16-04-041, also provide the Commission broad authority to ensure public safety and establish additional rules for charter-party carriers.

C. Uber acknowledges that it must "maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges" pursuant to Rule 1.1.

D. Uber affirms it shall abide by Public Utilities Code section 314(a) with respect to the examination of its agents and employees.

E. In his *December 19, 2019 Ruling*[1], ALJ Mason ordered Uber to provide information pertaining to its US Safety Report[2] and incidents of sexual assault and misconduct. The Ruling included, *inter alia,* the following questions:

*Questions Pertaining to Employee Information*

Question 1.1. Identify (i.e., provide the persons full name, job title, contact information, and job responsibilities) all persons employed by Uber who drafted any part of the Safety Report.

Question 1.2. If more than one person wrote the Safety Report, identify which portions of

---

[1] Administrative Law Judge's Ruling Ordering Uber Technologies, Inc. to File and Serve Its US Safety Report for 2017-2018 and to Answer Questions Regarding Alleged Sexual Assault and Sexual Misconduct Incidents, R.12-12-011 (December 19, 2019).

[2] Uber, US Safety Report (Dec. 5, 2019) ("Safety Report"), available at https://www.uber.com/us/en/about/reports/us-safety-report/.

the Safety Report each person drafted.

Question 1.4. Identify all persons who approved the final version of the Safety Report for public dissemination.

*Questions Pertaining to Incident Information*

For each incident of sexual assault and sexual misconduct that occurred in California in 2017, 2018, and 2019:

Question 2.4.1. State the date, time, and place of each incident.

Question 2.4.2. Give a detailed description of the circumstances of each incident.

Question 2.4.3. Identify (i.e., provide the person's full name and contact information) each witness to each incident.

Question 2.4.4. Identify (i.e., provide the person's full name, job title, contact information, and job responsibilities) each person to whom each incident was reported.

F.  In his *January 27, 2020 Ruling*[3], ALJ Mason denied Uber's Motion for Reconsideration, ordered Uber's answers to questions 2.4.1., 2.4.2., 2.4.3., and 2.4.4 to be filed under seal and all other questions in the *December 19, 2019 Ruling* to not be filed under seal.

G.  Uber filed a partial response to the *December 19, 2019 Ruling*.[4] Uber did not and has not produced the information requested in Questions 1.1, 1.2, 1.4, 2.4.1, 2.4.2, 2.4.3 and 2.4.4 from ALJ Mason's *December 19, 2019 Ruling*.

H.  On July 27, 2020, ALJ Mason issued an *Assigned Commissioner's Ruling Ordering Uber Technologies, Inc. to Show Cause Why It Should Not be Sanctioned by the Commission for Refusing to Answer Questions Regarding Sexual Assaults and Sexual Harassment Claims and for Refusing to Submit the Information Under Seal*.

I.  On December 14, 2020, ALJ Mason issued a *Presiding Officer's Decision Imposing Penalties Against Uber Technologies, Inc. for Violating the Assigned Administrative Law Judge's December 19, 2019 and January 27, 2020 Rulings Requiring Information Regarding Sexual Assault and Sexual Harassment Claims*.

J.  On January 13, 2021, Uber filed an Appeal of the Presiding Officer's Decision.

K.  On February 22, 2021, ALJ Mason issued an *Assigned Administrative Law Judge's Ruling Granting Uber Technologies, Inc.'s Motion Requesting Alternative Dispute Resolution*.  Said Ruling ordered parties to address the provision of information requested

---

[3] Administrative Law Judge's Ruling Denying Motion of Uber Technologies, Inc. for Reconsideration of the December 19, 2019 ALJ Ruling Ordering Uber Technologies, Inc. to File and Serve Its US Safety Report, R.12-12-011 (January 27, 2020).

[4] Response of Uber Technologies, Inc. to the December 19, 2020 ALJ Ruling Ordering Uber Technologies, Inc. to File and Serve Its US Safety Report, R.12-12-011 (January 30, 2020).

UBER-MDL3084-000000348

in the December 19, 2019 Ruling questions in a manner that best protects claims of employee privacy and personally identifiable information, and what monetary amounts and other regulatory sanctions should be imposed on Uber.

L.  With respect to these facts, including the Commission's authority over charter-party carriers, Uber agrees to pay a $150,000 fine and $9 million in Safety Settlement funding.

M.  At ALJ Mason's direction, the Parties engaged in mediation which involved extensive efforts over approximately three months (April to June 2021) with the assistance of ALJ Kimberly Kim and ALJ Charles Ferguson as mediators.

N.  With the mediators' assistance, the Parties desire to fully and finally settle and resolve all issues relating to the above-referenced Order to Show Cause and Presiding Officer's Decision. The Parties, therefore, for good and valuable consideration, including the mutual covenants contained in this Agreement, agree as follows:

## AGREEMENT

### A.  Timeline and Confidentiality of Uber's Responses

1.  ***Uber Production of Data in Response to Questions 1.1, 1.2, 1.4, 2.4.1, and 2.4.4.*** Within 30 days of Commission adoption of the Agreement, Uber will submit full responses to Questions 1.1, 1.2, 1.4, 2.4.1, and 2.4.4 pursuant to this Agreement in the docket for proceeding R.12-12-011 under seal, with a copy to CPED, and subject to the terms in Section B below.

2.  ***Uber Production of Data in Response to Question 2.4.2***. At CPED's discretion, within 30 days of receiving the data provided by Uber in response to Question 2.4.1, CPED may request additional data referenced in Question 2.4.2 for up to 15% of the incidents included in the Question 2.4.1 dataset. Uber shall submit the data associated with Question 2.4.2 in the docket for proceeding R.12-12-011 under seal, with a copy to CPED, and subject to the terms in Section B below.

3.  ***Effect of Compliance / Failure to Respond***.  CPED agrees that Uber's compliance with this section and in the manner described in Section B of this Agreement fully resolves the issues with respect to Questions 1.1, 1.2, 1.4, 2.4.1, 2.4.2, 2.4.3, and 2.4.4.  Failure by Uber to produce data in a timely manner as identified in this section constitutes a violation of the terms of this Agreement.  If the Agreement is adopted by the Commission, failure by Uber to produce data in a timely manner as identified in this section will also be a violation of the Commission order adopting the Agreement.

### B.  Data Terms

1.  ***Electronic Format.***  Uber shall submit all data in CSV electronic format that allows for data sorting and analysis.

2.  ***Questions 1.1, 1.2, and 1.4 (Employee Information).***  Uber shall submit all information identified in questions 1.1, 1.2, and 1.4 of the *December 19, 2019 Ruling* for current

UBER-MDL3084-000000349

employees involved in the drafting of Uber's 2017-2018 Safety Report, except as follows: for "contact information," Uber shall submit the employee's Uber email address; for "job responsibilities," Uber shall submit the employee's team that describes the functional role for employees responsible for the development of the Safety Report within Uber.

3. ***Question 2.4.1 (Incident Time/Date/Place).***  Uber shall submit unique identifiers that are associated with each reported incident allowing Uber to easily identify the full set of records Uber maintains that are associated with each incident, in order to expeditiously fulfill any future data requests on specific incidents or groups of incidents.  Uber shall also submit the date of the trip associated with the incident, the time the trip was completed, and the latitude and longitude coordinates trimmed to two decimal places of where the trip ended.

4. ***Question 2.4.2 (Description of Circumstances).***  Uber shall have 30 days after CPED's request to submit all of the detailed descriptions of circumstances, with redactions reasonably necessary to protect witnesses and survivors' identities.  CPED will request up to 15% of California incidents identified in the Safety Report.  Uber shall not be held liable for any inadvertent, negligent, or good faith misclassification of incidents.

5. ***Question 2.4.3 (Witness Information) – Historic***.  For incident data collected prior to Commission adoption of this Agreement, Uber will have no obligation to provide, and will not provide, witness and survivor names, or contact information.

6. ***Question 2.4.4 (Employee Receiving Report).***  For each person within Uber to whom each incident was reported, Uber shall submit a unique identifier and the employee's job title, Uber business address, and employee's team which describes the functional role within Uber.

## C. **Future Data Requests**

1. ***Witness Information – Prospective.*** Within 60 days of Commission adoption of this Agreement, Uber shall ensure that, for any incident of sexual assault or sexual misconduct occurring thereafter, Uber offers witnesses involved in such incidents (including survivors) an opportunity to "opt-in" in writing to consent to be contacted by the CPUC. Witnesses will be able to opt-in or withdraw that consent at any time.  Uber shall submit to CPED the names and contact information for witnesses that have opted-in upon CPED request and such information may be accompanied by a claim of confidentiality pursuant to G.O. 66-D.  CPED agrees to notify Uber via email before it contacts any such witnesses.  CPED agrees to allow Uber a reasonable period of time to coordinate with organizations, such as RAINN, on any anticipated CPED contact of witnesses.

2. ***TNC-Wide Data Requests.*** CPED agrees that future data requests for comprehensive Safety Report datasets or comprehensive datasets associated with sexual violence will be issued broadly to the TNC industry.  CPED agrees that future data requests regarding sexual violence will take into consideration and respect the privacy rights of the victims

UBER-MDL3084-000000350

involved in the incidents.  For purposes of this Agreement, "comprehensive datasets" refers to broad requests for records contained in a data set, such as the data requested in ALJ Mason's *December 19, 2019 Ruling*.  Comprehensive datasets do not refer to distinct, one-off data requests issued to a single TNC related to an isolated incident or group of incidents, or the policies and/or procedures related to such incident(s), for purposes of an investigation or analysis of those incidents.  TNCs will submit responses to these comprehensive data requests in accordance with G.O. 66-D.

3. ***Upcoming Uber Safety Report.*** If Uber issues an upcoming Safety Report and no later than 60 days thereafter:

    a. Uber shall provide any California-specific sexual assault and sexual misconduct incident data used to support the Safety Report in CSV format, consistent with the relevant Annual Reports and associated Charter Party Carrier (TCP) permit, driver, and/or vehicle data.

    b. Uber shall use the same unique identifiers across the Annual Report and Safety Report data sets for where the incidents are the same.  For incidents involving TCP drivers, Uber shall provide the associated TCP permit, driver, and/or vehicle data.

    c. Uber may exclude witness and survivor identities (name and contact information). If data are excluded, Uber must indicate what data fields were excluded.

    d. CPED shall not use the linked information to de-anonymize driver victims.

    e. CPED may request the detailed descriptions of up to 15% of California incidents identified in the Safety Report.  Uber will submit all of the detailed descriptions of circumstances requested by CPED, with redactions reasonably necessary to protect witnesses and survivors' identities.  Uber shall not be held liable for any inadvertent, negligent, or good faith misclassification of incidents.

    f. Except as identified in provisions C.3.c and C.3.d. above, Uber may submit Safety Report data accompanied by a claim of confidentiality in accordance with General Order 66-D, unless and until the Commission establishes a preemptive determination of confidentiality for some or all of this data to apply industrywide as provided for by General Order 66-D, Section 3.4.

4. ***G.O. 66-D Claims.*** Except for data provided in response to ALJ Mason's *December 19, 2019 Ruling*, as agreed upon by the Parties in Section B above, all other information or data submitted by Uber pursuant to this Agreement will be accompanied by a public version of the submission if Uber makes a confidentiality claim pursuant to G.O. 66-D.

D. **Previously Submitted Annual Reports**

1. ***Motion to Waive Confidentiality of Prior Annual Reports.***  As authorized by Decision 20-03-014, Uber and CPED agree to file a joint motion in Rulemaking 12-12-011 no later than 30 days after the adoption of this Agreement requesting that the CPUC require all

UBER-MDL3084-000000351

TNCs to release public versions of previously filed TNC annual reports kept confidential by the CPUC pursuant to Decision 13-09-045, footnote 42 and follow the requirements of G.O. 66-D to keep any portion of those previously filed TNC annual reports confidential.

2. ***Provision of Public Version of Previous Annual Reports.***  No later than 60 days after the adoption of this Agreement, Uber shall submit to CPED a public version of the data from the 2014 to 2020 Annual Reports, and may redact portions of the data that it seeks to keep confidential and submit a claim of confidentiality in accordance with the G.O. 66-D process.

## E.  **Fine and Safety Settlement Funds**

1. ***Settlement Fine Payment.***  Uber agrees to pay $150,000.00 (One Hundred and Fifty Thousand Dollars) (the "Settlement Fine Payment") in one lump sum, by check, money order, or other acceptable electronic forms of payment by CPUC, payable to the Commission and mailed or delivered to the Commission's Fiscal Office at 505 Van Ness Avenue, Room 3000, San Francisco, CA 94102 within thirty (30) days of the Commission issuing a final decision approving this Agreement.  The Commission shall deposit the Settlement Fine Payment into the State's General Fund.  The Settlement Fine Payment is the total fine amount payable under this Agreement, and no additional fine shall be paid by Uber regarding this Order to Show Cause.

2. ***Safety Settlement Funds.***  Uber agrees to deposit with the Commission, within thirty days of Commission approval of this Agreement, $9,000,000.00 (Nine Million Dollars) in funding to support safety initiatives (the "Safety Settlement Funds").  The Commission's Fiscal Office will receive Uber's $9 million payment, subject to the provisions, payment authorizations, and funding designations outlined in this Agreement.

   a.   The Commission's Fiscal Office will create a Special Deposit Fund to receive the Safety Settlement Funds. If the Special Deposit Fund is not established within thirty days of Commission approval of this Agreement, Uber will deposit the $9 million payment into a separate, temporary bank account administered by Uber, and provide CPED with documentation of the deposit into the account upon creation and current balance statements upon request.

   b.   The temporary bank account shall be a separate and dedicated account where the $9 million payment will be deposited and subject to the following restrictions:

      *i.* Uber shall restrict access to the funds in this account.  Once deposited, funds shall only be disbursed for the purpose of transferring the total balance of the account into the Special Deposit Fund.  The Director of the Consumer Protection and Enforcement Division shall provide authorization to Uber in a letter, or scanned electronic copy of a letter, authorizing Uber to direct the bank to transfer the funds to the Special Deposit Fund.  The letter shall provide specific directions to complete the transfer.

   c.   The period of availability for these funds is 5 years from the establishment of the

6

UBER-MDL3084-000000352

Special Deposit Fund, which may be extended upon approval by the Department of Finance.

d.   The Special Deposit Fund shall accrue interest according to standard State practice.  Accrued interest will be added to the total balance of funds distributed in accordance with this Agreement.

e.   Disbursement of the Special Deposit Fund shall be directed by the Director of the Consumer Protection and Enforcement Division according to the funding designations in this Agreement.

f.   If any of the funding designations set forth in this Agreement are unavailable for administrative or technical reasons, the Commission shall identify and redirect funds as appropriate and consistent with the stated objectives of this Agreement.

3.   ***California Victim's Compensation Fund.***  $5,000,000.00 (Five Million Dollars) of the Safety Settlement Funds shall be transferred to the California Victim's Compensation Fund for the compensation of victims of sexual violence and violence. If the California Victim's Compensation Fund has a fund or can create a fund that provides compensation to victims of sexual violence and violence that occurred in the passenger carrier industry, the five-million-dollar transfer will be designated for that fund. Disbursement of these funds shall be prioritized and transferred as soon as reasonably practicable.

4.   ***Support for Commission Efforts to Address Physical and Sexual Violence in the Passenger Carrier Industry.***

a.   ***Industry-wide Education, Outreach, and Training.***  Up to $1,000,000.00 (One Million Dollars) from the Safety Settlement Funds shall be used to pay for industry-wide education, outreach, and training on all forms of violence, including sexual violence, for the passenger carrier industry, including TNCs. A portion of these funds may go towards immediate education, outreach, and training efforts and a portion may be reserved for education, outreach, and training efforts following the completion of Section E.4.b.

b.   ***Industry-wide Evaluation of TNC Practices Concerning Incidents of Violence and Development of Industry Standards.***  Up to $3,000,000.00 (Three Million Dollars) from the Safety Settlement Funds shall be used for (1) an evaluation, informed or conducted by industry experts, of the California TNC industry's existing protocols and practices for classifying and reporting violence, including sexual violence, and (2) the development and recommendation of industry-wide best practices, informed or conducted by industry experts, for receiving, reporting, and responding to complaints of violence, including sexual violence.  The specific tasks will be finalized in a Scope of Work and RFPs by CPED after seeking input from interested parties and stakeholders.

c.   The consultant(s) discussed in subparagraph E.4.b above shall be selected by a panel convened by the CPED that will include a representative from each of CPED, Uber and at least two other TNCs.

UBER-MDL3084-000000353

    *d.* Contract development, consultant selection, and contract implementation pursuant to this Section will be governed by and conform to State contracting rules and requirements.

    *e.* ***Disclosure of RAINN's Intent to Submit Bids.*** RAINN has disclosed that it may submit bids for contracts pursuant to this Section. The Parties acknowledge that disclosure and agree, subject to State contracting rules and requirements, that RAINN's participation in this mediation and status as a Party to this Agreement shall have no bearing on whether RAINN is awarded a contract pursuant to any such bid.

5. ***Residual Funds.*** Any residual funds, at the end of the period of availability, after any extensions, will be transferred to the California Victim's Compensation Fund.

6. ***Joint Request for Delegation of Authority.*** The Parties agree, in their joint motion for adoption of this Agreement, to seek Commission's authorization of the Director of the Consumer Protection and Enforcement Division to take any and all reasonable and necessary actions to effectuate and facilitate the successful implementation of the preceding terms E-2, E-3, E-4 and E-5 above.

## F. <u>Additional Terms</u>

1. ***Release of Claims***. The Parties agree that Commission approval of this Agreement releases all claims, penalties, appeals, or other liabilities, arising from or associated with the Order to Show Cause issued on July 27, 2020, and the Presiding Officer's Decision issued on December 14, 2020, by ALJ Mason.

2. ***Compromise of Disputed Claims.*** The Parties agree that the Agreement represents a compromise, is not an endorsement of disputed facts or law, and does not constitute an admission by any Party with respect to any issue of fact or law, or any alleged violation or liability. The Parties further agree and understand that Commission approval and adoption of this Agreement may not be construed as an admission by any Party regarding any fact, matter of law, or issue that pertains to this Agreement or the OSC.

3. ***Confidentiality***. Except as otherwise stated in this Agreement, the Parties agree to keep the negotiations and information exchanged relating to this Agreement that were undertaken subject to Rule 12.6 of the Commission's Rules of Practice and Procedure confidential, and will not reveal such information to any other person or entity, except (a) as required by law, court order, or other government authority; (b) as is reasonably necessary to disclose to accountants, tax advisors, attorneys, bankers, or employees (provided the disclosing Party obtains assurances that such recipients will abide by the confidentiality requirement set forth here); or (c) as is reasonably necessary in any action concerning the terms of this Agreement.

4. ***Commission Approval.*** The Parties acknowledge that this Agreement is subject to approval by the Commission, and further agree to support this Agreement and use their best efforts to secure Commission approval of it. The Parties agree to recommend that the Commission approve and adopt this Agreement in its entirety, without change. The

UBER-MDL3084-000000354

Parties also agree that if the Commission fails to adopt the Agreement in its entirety, the Parties will reconvene a settlement conference within twenty (20) business days of the Commission's decision, to discuss whether the Parties can resolve the issues raised by the Commission's actions. If the Parties cannot mutually agree to resolve the issues raised by the Commission's actions, the Agreement shall be considered voided, and the Parties shall be released from their obligation to support the Agreement, and may pursue any action they deem appropriate, including beginning settlement discussions anew or litigating.

5. ***Defending the Agreement.*** The Parties agree to actively and mutually defend this Agreement if its adoption is opposed by any other party.

6. ***Jurisdiction and Governing Law.*** The Parties agree that as provided in California Const., art. XII § 8, the Commission will maintain primary jurisdiction over any interpretation, enforcement, or remedies relating to this Agreement. No Party may bring an action relating to this Agreement in any local, state, or federal court, or other administrative agency, without first exhausting administrative remedies before the Commission. The laws of the State of California shall govern the interpretation and enforcement of this Agreement.

7. ***Non-Severability.*** The provisions of this Agreement are non-severable, and if the Commission fails to approve or modifies some portion of this Agreement, any Party may withdraw from the Agreement. Uber, RAINN, and CPED agree to negotiate any Commission ordered modifications in good faith before withdrawing from the Agreement.

8. ***Free and Voluntary.*** The Parties acknowledge and agree they enter this Agreement freely, voluntarily, and without fraud, duress, or undue influence by any other party. Each Party declares it has read and fully understands its rights, privileges, and duties under the Agreement, and discussed the Agreement with its respective legal counsel. Except as expressly stated in this Agreement, no promise or inducement is or has been made by or to any Party to enter into this Agreement. This Agreement has been mutually negotiated and drafted by the Parties.

9. ***Public Interest.*** The Parties declare and agree that the terms and conditions of the Agreement are reasonable, consistent with the law, and in the public interest, under Rule 12.1(d).

10. ***Entire Agreement.*** The Parties declare and agree that this Agreement constitutes the Parties' entire agreement, and the Agreement cannot be amended, modified, or changed without the express written consent of all Parties to the Agreement.

11. ***Execution by Counterparts.*** The Agreement may be executed in any number of separate counterparts by the Parties, and such execution will have the same effect as if all Parties had signed one and the same document. All such counterparts shall be deemed to be an original and shall together constitute one and the same Agreement.

UBER-MDL3084-000000355

12. **Effective Date.** The Agreement shall become effective and binding on the Parties as of the date the Commission approves it.

CONSUMER PROTECTION & ENFORCEMENT DIVISION

By: _Douglas Ito_

Signature: _Douglas Ito_          Date: _7/15/2021_

Title: _Director, Consumer Protection + Enforcement Division_

UBER TECHNOLOGIES, INC.

By: _____

Signature: _____          Date: _____

Title: _____

RAPE, ABUSE & INCEST NATIONAL NETWORK, INC.

By: _____

Signature: _____          Date: _____

Title: _____

UBER-MDL3084-000000356

12. **Effective Date.** The Agreement shall become effective and binding on the Parties as of the date the Commission approves it.

CONSUMER PROTECTION & ENFORCEMENT DIVISION

By: _____

Signature: _____          Date: _____

Title: _____


UBER TECHNOLOGIES, INC.

By: _Molly Moran_____

Signature: _Molly Moran_____          Date: _July 15, 2021_____

Title: _Associate General Counsel, US & Canada_


RAPE, ABUSE & INCEST NATIONAL NETWORK, INC.

By: _____

Signature: _____          Date: _____

Title: _____

10

UBER-MDL3084-000000357

12. **Effective Date.** The Agreement shall become effective and binding on the Parties as of the date the Commission approves it.

CONSUMER PROTECTION & ENFORCEMENT DIVISION

By: _____

Signature: _____    Date: _____

Title: _____


UBER TECHNOLOGIES, INC.

By: _____

Signature: _____    Date: _____

Title: _____


RAPE, ABUSE & INCEST NATIONAL NETWORK, INC.

By: _Scott Berkowitz_

Signature: _____    Date: _July 15, 2021_____

Title: _President and Founder_____

10

UBER-MDL3084-000000358