# EXHIBIT A-4

# Uber

*VIA ELECTRONIC MAIL*

June 20, 2023

Caroline M. O'Brien
Hearing Officer
Transportation Network Company Division
Massachusetts Department of Public Utilities

**Re:  Inquiry  Regarding  Transportation  Network  Company  (TNC)  Complaint Reporting (D.P.U. Docket 23-33)**

Hearing Officer O'Brien:

I write in response to your email correspondence dated April 19, 2023. On behalf of Rasier, LLC ("Rasier"), below please find responses relating to Department of Public Utilities ("DPU") Docket 23-33.

Please contact me with any questions.

Respectfully,



Diego Diaz
Counsel for Rasier, LLC

Encl.

UBER-MDL3084-000000359

# Uber

***1-1 Describe how the Company defines a "complaint" for a Driver and for a Rider.***

A "report" may refer to any information, from any source, that suggests a potential customer service or safety issue connected to the Uber platform.[1] A "reporter" is the individual (e.g. Rider, Driver) or entity (e.g., law enforcement) that is the source of the report.[2] Reports are made by various means and vary in detail. Drivers and Riders may get help or report an incident to Uber's Support Team through the Help menu within the Uber app. Alternatively, safety incidents may be reported by Riders and Drivers on Uber's website.[3] While on a trip, Riders may discreetly make a report within Uber's app through the On-Trip Reporting feature. Uber also receives and proactively gathers reports from a variety of other channels, including Uber's critical safety line, social media, and law enforcement agencies.

Not every report made through these channels is a "complaint." Uber defines a "complaint" as any report that is logged and falls into particular categories. In Massachusetts, Uber has created specific labels for the various types of reports that are to be treated as "complaints." Once a report is received through the channels described above, it is reviewed and will be categorized as a "complaint," and included in Uber's monthly reporting pursuant to 220 CMR 274.12(3).

***1-2 Provide classifications or taxonomies for each type of complaint that a Rider and Driver may submit through the Company's mobile application. Provide descriptions and diagrams of the classifications, including subclassifications, within the mobile Application.***

In Massachusetts, once an report is received through one of Uber's channels, it is reviewed and will be categorized as a "complaint" if it falls into one of the following categories: (1) Driver Account Related Complaint; (2) Driver Non-Account Related Complaint; (3) Rider Account Related Complaint; (4) Rider Non-Account Related Complaint; (5) Incident or Accident; (6) Accessibility; (7) Pickup or Dropoff (8) Payment and (9)Tech.

---

[1] Rasier, LLC is a Transportation Network Company (TNC) permit holder in Massachusetts, and a subsidiary of Uber Technologies, Inc. This submission includes descriptions of operations that may be performed by other entities affiliated with Uber Technologies, Inc. For the purposes of this submission, all entities shall be referred to collectively as "Uber.''

[2] Capitalized terms shall have the same meaning as they are defined in 220 CMR 274.02.

[3] *Report a Safety Incident Involving a Driver*, Uber.com (available at: https://help.uber.com/riders/article/report-a-safety-incident-involving-a-driver?nodeId=5e9dff97-1094-4e0d -a81c-8442799eed84); *My Rider Made Me Feel Unsafe*, Uber.com (available at: https://help.uber.com/riders/article/my-rider-made-me-feel-unsafe?nodeId=71b61db7-37ef-4d56-82fa-a2f 145e41270&uclick_id=be40f332-73e2-4772-a840-11647bbacec2).

1

# Uber

Reports may be further classified following Uber's Safety Taxonomy. Uber's Safety Taxonomy is a set of categories used to classify and prioritize incoming safety incidents, apply action on individual reports, and inform Uber's efforts to prevent future incidents. The Safety Taxonomy forms a basis for measuring and reporting incident data – which is vital to understanding and improving safety on the Uber platform.

Under its Safety Taxonomy, Uber classifies all safety-related reports according to the description given by a reporting party. Uber's agents take action according to the appropriate protocol for the initial classification of a report. Uber's approach to classifying reports according to the description of the reporting party ensures that reports are categorized with as little subjective assessment as possible. Uber's Safety Taxonomy provides a structure that supports proper agent routing, consistent response protocols, and data tracking.

As part of its Safety Taxonomy, Uber developed its Sexual Misconduct and Violence Taxonomy in partnership with RALIANCE, the National Sexual Violence Resource Center (NSVRC), and the Urban Institute. The Sexual Misconduct and Violence Taxonomy is used to identify, categorize, and count sexually violent behaviors. With this submission, Uber has included the joint report of RALIANCE and the Urban Institute entitled, *Helping Industries To Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*. The joint report, drafted by experts in the field, describes the trauma-informed, victim-centered approach to Uber's Sexual Misconduct and Violence Taxonomy.[4]

As detailed in the joint report, Uber's Sexual Misconduct and Violence Taxonomy includes two overarching categories—sexual assault and sexual misconduct—which are further divided into a total of twenty-one (21) secondary categories (some with tertiary categories) that correspond to behaviorally specific definitions. Data relating to the five most serious sexual assault categories in this taxonomy are released publicly as part of Uber's US Safety Report.[5]

Uber's Safety Taxonomy is intended to be exhaustive and comprehensive, but it is not static. For that reason, the taxonomy is open to revision, though any revisions are intended to be narrow so that the taxonomy does not become overly granular or prevent comparisons from being made over time.

---

[4] *Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*, a joint report of RALIANCE and the Urban Institute, is included with this submission as **Appendix A.** The implemented Sexual Misconduct and Violence Taxonomy, with underlying definitions, can be found on pg. 40 - 45.

[5] In 2019, Uber released an industry-first US Safety Report, which has been included with this submission as **Appendix B.** In 2021,Uber released its second US Safety Report, which is included with this submission as **Appendix C.** Uber's US Safety Reports provide further information on Uber's Safety Taxonomy and methodologies for reporting safety incidents.

UBER-MDL3084-000000361

# Uber

***1-3 Describe whether the Company further categorizes complaints received through its mobile application.***

Based on the initial categorization of a report, an Uber agent's interaction with a reporting user may begin with a particular response and means of contact. During their investigation, agents may freely escalate a report classification and elevate Uber's effort expended in response to any report as they gain more information about a particular incident. For reports involving safety incidents, the Uber's Safety Taxonomy uses a hierarchical approach, which means that although multiple incidents or injuries can occur simultaneously during a single event, each report is assigned to only the most serious category. A hierarchical approach helps agents provide appropriate and immediate response to each case, and it ensures that the most serious experiences are preserved and fully represented in company data

Uber's customer support agents respond to a user's report by an email, or by calling the user's mobile phone and having a conversation with the reporting party. Uber's customer service agents receive substantial training to perform their duties, and the agents who handle reports of sexual misconduct or sexual assault receive additional training to respond appropriately, with empathy and understanding.

On the Uber platform, incident reporting is seamless and often much easier than it is at many other companies (including airlines, hotels, and taxi companies). For example, app-based reporting may encourage users to report more often since they can do so more quickly and discreetly than they can in person or by phone.

Uber encourages feedback and reporting, even though this increases the total number of safety reports the company receives and investigates. The large volume of feedback and reporting provides Uber a view of the reality of our users' experiences and helps improve the company's safety processes and policies. Uber has also worked with safety groups and advocates to make its reporting channels and support processes more trauma-informed and easily accessible so survivors can report in the way that best meets their needs.

3

UBER-MDL3084-000000362

# Uber

***1-4 Identify the types of complaints that trigger the Company to put a Driver account and a Rider account on hold (i.e., immediate prevention of trips) pending completion of an investigation. Explain why and why not.***

Uber's agents take action on user accounts using consistent policies, regardless of reporting method. Agents collect all available information. Their review of all information, in totality, informs the appropriate response protocol – which can range from a warning, to education on Uber's community standards, to removal of a user's access to the platform.

Uber's goal is to quickly respond to every report of a safety incident, handle it with care, and gather robust information that helps enable future incident prevention. Uber's teams assess the situation, take preliminary action – such as temporary account suspension – and determine next steps for response. Specialized teams provide dedicated customer support to Riders and Drivers dealing with the most serious and urgent incidents, such as reports of sexual assault, that require an in-depth review and support for the victim.

***1-5 Describe whether a certain number of complaints in a certain category or subcategory trigger a review of a Driver's account. If so, identify these complaint types and the number of complaints per type that would trigger an account review.***

Uber's safety team handles a wide range of incidents, and there is no one-size-fits-all approach to managing them.

For example, a single serious safety incident can be grounds for a Rider or Driver deactivation. Serious safety incidents are quickly routed to Uber's Safety Response team. From there, an Uber agent will reach out to all parties for a thorough review of the report and to take action on an account if needed. This may include temporary or permanent deactivation from the Uber platform.

Less severe or infrequent behaviors make up the majority of safety incidents reported to Uber. These incidents may not warrant immediate removal from the platform. For example, deactivation may not be justified based solely on one Rider's report of a Driver's hard braking, or when a Driver reports that a Rider initiated a verbal argument. These reports do, however, warrant further examination of the user's past behavior and will be noted in a user's account history.

4

UBER-MDL3084-000000363

# Uber

Uber's systems work to identify patterns of potentially risky behavior by evaluating a variety of factors including user feedback and driving patterns. If a pattern is flagged, the system will trigger a review of the user's account by a specialized safety agent who examines the user's history and any previously reported issues to take appropriate action. This approach helps Uber remain accountable and fair to both Drivers and Riders. It also accounts for the fact that a Driver with thousands of trips may have received a proportionately small number of infrequent, minor complaints.

Importantly, no Rider or Driver is deactivated from Uber for a safety report without a human review. While data and technology are useful tools for strengthening platform safety, safety reports are personal—and human review is critical to investigation and safety decision-making.

***1-6 Describe how the Company defines whether a complaint has been "resolved."***

Some reports, such as those related to payments, may be "resolved" by users. Within the Uber app, users can categorize complaints based on drop-down menu selections and may even take action required on an account or trip, such as automatic calculation of a refund. However, should a user reach a point where drop-down menus are not helpful, they will be routed to an Uber agent for further assistance.

Other reports are "resolved" when an Uber agent completes their investigation and takes appropriate action.  Agents gather any available data pertaining to a report. This information can include GPS information, timestamps, photos/videos submitted by users, in-app communications, and audio recordings. Agents may also speak to all involved parties, including reporting parties, potential victims, and accused parties. Pending the completion of their investigation, agents are empowered to make immediate account-access decisions (such as whether to deactivate a user's account) and to provide victims with support resources.

Uber's specialized agents take their responsibilities seriously and share a common mission: to do the right thing for people reporting a safety incident. Agents on Uber's Incident Response Team (IRT), who manage the most serious incidents on the company's platform, receive six weeks of expert-informed training on how to review, document, and recommend appropriate action to help ensure safety on the platform. They also receive ongoing, tailored training on how to address difficult, often emotional conversations with precision, empathy, and care.

Further, Uber's IRT agents receive regular refresher training on incident classification and use of Uber's Sexual Misconduct and Violence Taxonomy, as well as training about the Uber Survivor Hotline and Fund, developed in partnership with the Rape, Abuse and Incest National Network

5

# Uber

(RAINN). Uber has also invested in training to support agents on phone investigation skills, investigative sufficiency, and identifying racism and discrimination in customer service. These trainings inform how agents investigate and resolve reports.

**1-7 State the different categories that the Company records for complaint resolution.**

As noted above in Uber's response to Information Request 1-5, a single serious safety incident may result in the deactivation of a Rider or Driver. For less serious incidents, among other actions, Uber's agents may log a notation on a user's account without further action, send communications regarding Uber's Community Guidelines, send a warning, or temporarily suspend a user's account. Again, each safety incident on Uber's platform is unique. Agent actions are informed by the specific circumstances of the incident and the totality of the information collected through their investigation.

**1-8 Discuss whether the Division should adopt the Uniform Taxonomies for Sexual Assaults and Harassment announced by the California Public Utilities Commission on June 23, 2022. Please include reasoning and any suggested substitutions. Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online Enabled Transportation Services, Decision 22-06-029 (June 23, 2022.)**

With this submission, Uber has included the company's public comments on the taxonomy announced by the California Public Utilities Commission (CPUC) on June 23, 2022.[6] For the reasons detailed in the comments, the Division should not adopt the approach adopted by the CPUC. Instead, Uber's victim-centered, trauma-informed Sexual Misconduct and Violence Taxonomy, developed in partnership with outside experts, provides victims of sexual misconduct a responsive, better-designed, and more equitable system for categorizing and reporting on complaints of a sexual nature on the Uber platform.

**1-9 Discuss possible uniform taxonomies for Non-Sexual Assaults and Harassment that the TNCs could report to the Division.**

Uber's Community Guidelines prohibit any unwanted physical contact, as well as aggressive, confrontational, and harassing behavior.[7] Uber's Community Guidelines are at the center of the

---

[6] *Comments of Uber Technologies, Inc. on Proposed Decision Adopting Uniform Taxonomies for Sexual Assaults and Sexual Harassments that Transportation Network Companies Must Use for Their Annual Reports, As Well As Adopting Training, Investigating, and Reporting Protocols,* filed before the California Public Utilities Commission on June 13, 2023, are included with this submission as **Appendix D**.

[7] *Uber Community Guidelines: Treat Everyone With Respect,* Uber.com (available at: https://www.uber.com/us/en/safety/uber-community-guidelines/respect/).

UBER-MDL3084-000000365

# Uber

company's commitment to safety and form the foundation for a safe, respectful, and positive platform. In Massachusetts, Uber asks all Riders and Drivers to commit to the company's Community Guidelines in the Uber app.

On a weekly basis, pursuant to a Division order, the Division receives up-to-date reporting on serious Driver misconduct on Uber's platform – including violations of Uber's Community guidelines that involve assaults and harassment. Uber is required to provide a list of all Drivers deactivated "for public safety reasons," and provide all information "materially relied upon" by the company in its decision to deactivate.[8] Through these weekly reports, the Division receives specific information, including the full text of relevant reports, for the most serious physical assaults and harassment incidents that occur in Massachusetts on Uber's platform.

As the Division is aware, these reports vary in detail. Uber's agents strive to obtain the most complete and accurate understanding of a reported event. However, it is impossible for Uber's agents to know exactly what happened between users at any given time. When considering the totality of the circumstances available to them, Uber's agents are trained to make every attempt to avoid assumptions about a report unless they obtain additional clarifying statements or relevant facts. To that end, Uber's agents make numerous attempts to contact the reporting party, victim, or other witnesses to clarify the report, though sometimes these attempts are not successful.

A uniform taxonomy for non-sexual assaults and harassment should be tailored specifically to the TNC platform experience, where users experience temporary interactions – and information is often limited. Further,  Uber does not aim to and cannot act as the justice system. Borrowed legal standards and definitions are inappropriate in such a taxonomy. For example, Uber's agents do not have the ability, background, or evidentiary information required to determine whether a user acted with the "intent to cause serious injury" during an alleged assault; or whether alleged harassing conduct would cause "a reasonable person to suffer substantial emotional distress."[9] An expansion of reporting beyond weekly deactivation reporting, and any related reporting taxonomies, must account for these realities.

Further, physical assaults, particularly those that result in minor or no injuries, along with harassing conduct, are less objective than other safety incidents – such as accidents. Without sufficient objectivity, or a holistic review of available information, such incidents may not always be reported accurately.

---

[8] *Amendatory Order Clarifying Suitability Notice Requirements for Transportation Network Companies*, Transportation Network Company Division, Massachusetts Department of Public Utilities (June 2, 2021).
[9] See, e.g., M.G.L. c. 265, § 43A (defining the crime of Criminal Harassment in Massachusetts)

7

# Uber

Uber's approach to safety deactivations meets these challenges by constantly evaluating a variety of factors, including user feedback, fraud signals, and data science to identify patterns of user behavior. When incidents are reported, trained safety agents will examine a user's history and any previous incidents to reach the appropriate resolution. Agents may also review the reporter's account for patterns of fraudulent reporting. Currently, Uber's weekly deactivation reporting provides the Division the product of this holistic review of available information and data patterns gathered across Uber's platform. When compared to weekly deactivation reporting, a simplistic accounting of all potential harassment and assault incidents – including those that did not lead to deactivation – would lack the rigor of Uber's holistic deactivation review.

***1-10 Discuss the necessity and feasibility of including the Universally Unique Identifier ("UUID") of each Driver subject to each complaint type. As an example of a necessity for this information, the UUID would allow the Division to identify patterns of misconduct by Drivers across TNCs.***

Currently, the Division receives extensive information to support its mission to ensure the "safety and convenience of the public."[10] Indeed, the Division collects safety-related information from TNCs weekly, monthly, quarterly, and annually. From these recurring submissions, the Division can both review the conduct of individual Drivers  – and effectively track industry safety trends.

As detailed below, in many safety-related submissions, the Division already tracks individual Drivers by requiring that Uber provide their Universally Unique Identifier (UUID). For certain bulk data submissions, such as Uber's monthly submission pursuant to 220 CMR 274.12(3), tracking data by UUID is both infeasible and unnecessary.

Weekly, under a Division order, Uber provides a list of all deactivated Drivers – identified by UUID.[11] The records that accompany Uber's weekly list are varied and detailed. They include the full text of Rider reports, background check reports, images of documents, and other company records. On a weekly basis, the Division receives an individualized account of the most serious Driver misconduct on Uber's platform. With this weekly stream of records from each company, the Division can readily "identify patterns of misconduct by Divers across TNCs."

---

[10] M.G.L. c. 159A1/2 § 2.
[11] *Amendatory Order Clarifying Suitability Notice Requirements for Transportation Network Companies*, Transportation Network Company Division, Massachusetts Department of Public Utilities (June 2, 2021).

8

UBER-MDL3084-000000367

# Uber

Monthly, under Division regulations, TNCs must provide a "detailed accounting" of "all Driver and Rider complaints, received through any means."[12] The weekly deactivation submission provides depth of detail on alleged misconduct of specific Drivers; this monthly submission provides the Division breadth to track larger public safety patterns. In its monthly submissions, Uber provides a comprehensive accounting of the thousands of reports received through the sources described above. Reports are organized into the nine complaint categories referenced in Information Request 1-2. With this data, the Division can efficiently track safety patterns in the Commonwealth across Uber's platform.

Quarterly, the Division administers methodical audits of Uber's safety-related compliance.[13] Individual Drivers are randomly selected, identified by UUID, and pertinent company records are examined by Division auditors. Through multiple rounds of information requests, the Division thoroughly examines compliance with all safety regulations. The Division also completes reports that detail each instance of noncompliance. Quarterly audits allow the Division to spot safety risks and track how the industry upholds safety regulations over time.

Annually, Uber provides the Division a complete accounting of Vehicle accidents.[14] Following Division specifications, Uber provides an accounting of all reported accidents by municipality where they occurred. The Division tracks and publicizes this data in its annual Rideshare Data Report.[15]

From the above-described information collected weekly, monthly, quarterly, and annually, the Division possesses a multi-faceted repository of safety data from TNC companies. Using UUIDs to track "each Driver subject to each complaint type," will provide negligible additional insight. Indeed, a review of Uber's monthly complaints accounting reveals that most reports are unrelated to the Division's public safety mission. In a typical monthly submission, the largest categories of reports relate to payments, technical problems within the Uber app, and pick up/drop locations. Tying such complaints to individual Drivers by UUID is not feasible – nor desirable – as many of these reports are unrelated to Driver conduct.

Further, tying "each Driver" to "each complaint type," is unnecessary as it is duplicative of current safety reporting. Those Drivers or Riders who engage in conduct that may endanger the

---

[12] 220 CMR 274.12(3).

[13] 220 CMR 274.13(1), 220 CMR 274.13(3).

[14] 220 CMR 274.12(2)(a)(4) (Requires TNCs to "annually… report to the Division the … [l]ocation of Vehicle accidents.")

[15] *See, 2022 Rideshare Data Report*, Transportation Network Company Division, Massachusetts Department of Public Utilities (Apr. 14, 2023) (available at: https://www.mass.gov/info-details/2022-rideshare-data-report#average-speed,-distance,-and-accident-data-)

9

UBER-MDL3084-000000368

# Uber

public – and/or violate Uber's Community Guidelines – are subject to Uber's investigation and review processes described above. In Massachusetts, all Driver deactivations that implicate public safety are already reported weekly to the Division with supporting evidence. Beyond Uber's platform, TNCs also already collaborate to "identify patterns of misconduct by Drivers across TNCs." Since 2021, Uber and Lyft have collaborated through the Industry Sharing Safety Program. Through the program, the companies exchange information about Drivers who have been deactivated for serious sexual assaults or physical assaults to prevent them from operating on each company's platform.[16] Drivers deactivated on information obtained through the Industry Safety Sharing Program are routinely included in Uber's weekly deactivation lists sent to the Division. Through this program misconduct has been tracked across TNCs and reported directly to the Division.

***1-11 Seeking to establish uniform taxonomies for complaints made by Riders and Drivers, the Division proposes the categories and subcategories in Section V and Section VI of the Order opening a Notice of Inquiry. Provide analysis of these proposals, including length of time and technological changes needed by the TNCs to implement the new categories. Provide definitions that facilitate uniform reporting across TNCs in these categories and subcategories.***

Uber appreciates the Division's request for analysis of its proposed uniform taxonomies. As a guiding principle, to ensure accuracy of reporting, the Division should create uniform taxonomies of categories that are mutually exclusive and collectively exhaustive. Categories and subcategories should draw clear lines that accurately reflect user reports and minimize subjective assessments. As proposed, the Division's taxonomies lack clear lines, create many overlapping subcategories, and invite extensive subjective decision-making.

For example, the Division's proposed Driver taxonomy relating to "Unsafe Operation of Vehicle" is overly granular without being mutually exclusive. Indeed, three of the seven subcategories could encompass identical conduct: a report describing a Driver's abrupt lane change could accurately be reported as "Swerving," "Improper Lane Change," or "Signals." Presumably, an Uber agent would make a subjective choice on how to record this report amongst these three subcategories. Other subcategories of "Unsafe Operation of a Vehicle" are too prescriptive – and fail to categorize common Rider reports. Distracted driving is limited to "texting" – no other Driver distractions (e.g., speaking on mobile telephone) are contemplated. Categories that more broadly refer to "dangerous driving" and "distracted driving" would facilitate more accurate and fulsome reporting.

---

[16] *Sharing to Build a Safer Industry*, Uber.com (Mar. 11, 2021) (available at: https://www.uber.com/newsroom/industry-sharing-safety).

UBER-MDL3084-000000369

# Uber

Similarly, the Division's subcategories for "Accidents," "Law Enforcement Interaction," and "Driver Misconduct" are overlapping. All accidents resulting in medical treatment would fall under both "Accident" subcategories. Under the "Driver Misconduct" category, reports would very often fall under both "Rudeness" and "Verbal argument" subcategories. Also, insight from experts and victim advocates has informed Uber that reports of  "Personal questions" are often more accurately categorized under the rubric of sexual harassment.[17]

The overlapping subcategories in Division's proposed taxonomy depart from Uber's hierarchical approach to incident reporting. This approach ensures that although multiple incidents or injuries can occur simultaneously during a single event, Uber's agents assign only the most serious category to a particular incident. The proposed taxonomy does not provide a coherent hierarchy of seriousness of reported incidents, particularly in the categories of "Driver Misconduct" and "Rider Conduct."

Critically, to the extent practicable, the Division's taxonomy for Driver reports should mirror the taxonomy for Rider reports. Many common safety incidents, particularly interpersonal disputes, will involve both a Driver and a Rider reporting similar conduct against each other. To accurately reflect real world experiences on TNC platforms, and ensure fairness, the Division should seek to balance data reported by Drivers and Riders.

Instead, as proposed, the taxonomy is unfairly tilted toward Driver misbehavior. Interpersonal incidents ("Hostile Attitude") are categorized as "Rider *Conduct*" in the Rider taxonomy. In the Driver taxonomy, identical behavior ("Rudeness") is categorized as "Driver *Misconduct*." Problematically, the Division included certain subcategories for Drivers only, such as "Hygiene." This subcategory may allow discrimination and culturally insensitive stereotyping of Drivers to creep into reporting. In collecting incident data, the Division should use more neutral language and consider the impact of cultural, racial, and ethnic biases.

Implementing the Division's proposed taxonomy will require Uber to make significant contributions of time, technical resources, and human capital. Data reflecting many of the very granular subcategories (e.g., "Improper Lane Change" vs. "Signals") are not currently captured by Uber's systems. Further, even with data updates, the many overlapping subcategories will require Uber agents to continuously make subjective decisions on how to categorize reports with limited information. The result will be an extremely administratively burdensome process that produces less accurate, less comparable safety data.

---

[17] Reports of users asking "personal questions" fall under Uber's Sexual Misconduct and Violence Taxonomy. *See,* **Appendix A**, pg. 43.

UBER-MDL3084-000000370

# Uber

Given the detailed safety information already provided to the Division on a weekly, monthly, quarterly, and annual basis, Uber encourages the Division to continue its engagement on these matters. With additional collaboration between the Division and the TNCs, the industry can create a more practical taxonomy that is less redundant of existing reporting – and measures incident data more fairly and accurately.

***1-12 Identify and discuss in detail a proposed joint TNC alternative to the proposal in Information Request 1-11, if appropriate. If necessary, each TNC may supplement the joint proposal.***

At this time, Uber does not believe a joint TNC alternative is appropriate.

12

UBER-MDL3084-000000371

Uber

# APPENDIX A

UBER-MDL3084-000000372



# HELPINGINDUSTRIES TO CLASSIFY REPORTS OF SEXUAL HARASSMENT, SEXUALMISCONDUCT, AND SEXUAL ASSAULT

A JOINT REPORT OF RALIANCE AND THE URBAN INSTITUTE



UBER-MDL3084-000000373

**Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault:** A Joint Report of RALIANCE and the Urban Institute

By Chad Sniffen, Julia Durnan, and Janine Zweig

This work is licensed under a Creative Commons Attribution 4.0 International License.

cc BY

creative commons



# ACKNOWLEDGMENTS

The authors would like to acknowledge the following
contributors to this work:

- Numerous individuals representing the Safety and Insurance
  Team at Uber Technologies, Inc., and especially the Global
  Safety Support, Safety Product and Engineering, Community
  Operations, and Safety Data Science teams. For their help in
  telling this story, we are also grateful to the Safety Brand &
  Initiatives and Communications teams.

- Sally Laskey, Evaluation Coordinator, RALIANCE, who
  was an initial member of RALIANCE / Urban team and
  instrumental in the development of the draft taxonomy.

- Kristen Houser, Chief Public Affairs Officer, RALIANCE,
  for her review and feedback.

- Nancy La Vigne, Vice President of Justice Policy, Urban
  Institute, for her review and feedback.

- The Communications and Library Teams at RALIANCE,
  who contributed assistance with research, formatting,
  and editing.

## RECOMMENDED CITATION:

Sniffen, C., Durnan, J., & Zweig, J. (2018). *Helping industries
to classify reports of sexual harassment, sexual misconduct,
and sexual assault.* Washington DC: RALIANCE.

*This study was funded by Uber Technologies, Inc.
The opinions, findings, conclusions, and recommendations
expressed in this document are those of the authors and
do not necessarily reflect those of the Urban Institute,
its trustees, or its funders.*

UBER-MDL3084-000000375

# CONTENTS

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Use of Terms in this Paper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Forewords . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Overview of Challenge and Opportunity . . . . . . . . . . . . . . . . . . . . . 13

Why Clear Categories Are Important . . . . . . . . . . . . . . . . . . . . . . . 18
    Specific vs. Non-Specific Categories . . . . . . . . . . . . . . . . . . . . . . . 20

Taxonomy Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Mix-and-Match Exercise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

How Did We Develop the Taxonomy? . . . . . . . . . . . . . . . . . . . . . . . 25
    Behaviorall Specific Questions Exercise . . . . . . . . . . . . . . . . . . . . . 28

Considerations for Sexual Violence Transparency Publications . . . . . . . . 29

Key Transparency Publications Considerations . . . . . . . . . . . . . . . . . 32

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

About the Organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

About the Authors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Appendix A: Developing the Sexual Misconduct and Violence Taxonomy . . 37
    Table A.1: Proposed Taxonomy . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Table A.2: Implemented Taxonomy . . . . . . . . . . . . . . . . . . . . . . . . 40
    Validating the Sexual Misconduct and Violence Taxonomy . . . . . . . . . . 41
    Modifications after Extensive Review . . . . . . . . . . . . . . . . . . . . . . 41
    Table A.3: Modifications to the Taxonomy after Review . . . . . . . . . . . . 42

Appendix B: Taxonomy Behavior-Based Definitions . . . . . . . . . . . . . . . 43

Appendix C: Ways to Learn More . . . . . . . . . . . . . . . . . . . . . . . . . 46

Appendix D: How Customer Service Works at Uber . . . . . . . . . . . . . . . 47
    Example Snapshots of Customer Service Training Materials . . . . . . . . . 50

UBER-MDL3084-000000376



# USE OF TERMS
## IN THIS PAPER

**BEHAVIORALLY SPECIFIC QUESTION**: A question that is constructed using specific descriptions of behavior and does not require respondents to use subjective interpretation to understand concepts or experiences.

**CUSTOMER SERVICE AGENTS (AGENTS)**: As it relates to Uber, agents refers to Uber's team of trained professionals that receive, review, and respond to reported safety issues.

**REPORTS**: As it relates to Uber, reports refer to any information (of varying detail), from any source, that suggests a potential customer service or safety issue connected to the Uber app. A "reporter" is the individual or entity (e.g., law enforcement) that is the source of the report.

**SEXUAL ASSAULT**: Refers to unwanted sexual experiences that involve physical contact.

**SEXUAL HARASSMENT**: Refers to unwanted experiences that are sexually explicit or implicit in nature, do not involve physical contact, and happen between users (as defined below) in a business setting. It is not used in reference to experiences between employees, which imply expansive legal questions and power dynamics that the taxonomy in this paper was not designed to include.

**SEXUAL MISCONDUCT**: Refers to unwanted sexual experiences that do not involve physical contact. As used in the taxonomy, it is inclusive of sexual harassment as defined above.

**SEXUAL VIOLENCE**: A broad term that refers to any form of unwanted sexual experience. It includes, but is not limited to, acts of sexual harassment, sexual misconduct, and sexual assault as described above.

**TAXONOMY**: As it relates to Uber, a taxonomy is a hierarchy of categories that agents use to classify reports they receive. See Appendix D for a detailed description of this process.

**TRANSPARENCY PUBLICATION**: A published document that includes data on sexual violence and other incidents as they relate to a business.

**USER**: As it relates to Uber, user refers to the riders and driver partners who use the Uber platform.

UBER-MDL3084-000000377



Karen L. Baker

Karen Baker,
**Managing Partner**
RALIANCE



Sandra Henriquez

Sandra Henriquez,
**Managing Partner**
RALIANCE



Monika Johnson-Hostler

Monika Johnson-Hostler,
**Managing Partner**
RALIANCE

**RALIANCE** BUSINESS

# FOREWORDS

## KAREN BAKER, SANDRA HENRIQUEZ, and MONIKA JOHNSON-HOSTLER
MANAGING PARTNERS, RALIANCE

Every day, as experts working on behalf of survivors of sexual violence, we talk and think about a topic that most people hope to never have to talk or think about. We have the unique privilege of encountering survivor after survivor, becoming familiar with their lives and stories, and learning from the harm that was done to them in a way that helps us better support the next survivor we meet. Wherever our work takes us, we remain rooted in the stories of survivors, and we rely on their experiences to guide us as we seek to create healthier systems, institutions, and environments for us all. When we share our specialized knowledge with partners outside of our field, we take another step towards a world without sexual harassment, sexual misconduct, or sexual assault, where people are empowered to reach their full potential.

RALIANCE has partnered with Uber Technologies, Inc. to help them improve their categorization system for reports of sexual harassment, sexual misconduct, and sexual assault on their platform. This has given us the opportunity to bring the perspective of experts on sexual violence into Uber's corner of the transportation industry and to share this work with business and corporate sectors, the larger transportation industry, and beyond. Though building partnerships requires time, effort, and learning, it is only by working with community partners – whether they are corporate, non-profit, health care, law enforcement or education – that we can help build safer communities for everyone.

We hope that this work will help not just Uber, but all of us identify the best ways to gather information about, and respond to, sexual violence. Through this partnership, we also hope to demonstrate the value that those working on behalf of survivors can bring to industries as they take critical steps to respond to and prevent sexual harassment, sexual misconduct, and sexual assault. With better information about the scale of sexual violence in all areas of life, we can better show the need for investment in response and prevention efforts and invite everyone to play a role in advancing our work. With better information about sexual violence comes the opportunity to trust and fulfill the potential that resides in all of us to create a better world. RALIANCE stands ready to build relationships across sectors, so that together we can become a part of the solution!

UBER-MDL3084-000000378





Nancy La Vigne, **Vice President**

JUSTICE POLICY CENTER,
URBAN INSTITUTE

## NANCY LA VIGNE, VICE PRESIDENT, JUSTICE POLICY CENTER, URBAN INSTITUTE

The Urban Institute has conducted and disseminated objective, rigorous research to inform decision makers and improve policy for 50 years. Our goal has been and remains to discover the truth without agenda regardless of the project or funder, sharing the results of our research to inform evidence-based decision-making. When working with advocates and industries, that role does not change. It is our hope to lend our expertise to influential leaders across sectors, elevating the debate and equipping leaders to make the best possible choices in policy and practice changes. Our senior researchers have authoritative expertise in their fields, which can be hugely beneficial to business leaders who may not know how to collect or interpret research and data.

For this project, Urban provided a framework for the data collection and coding for development of a new taxonomy to collect, categorize, and report on sexual harassment, sexual misconduct, and sexual assault experiences on the Uber platform in collaboration with RALIANCE. Our sexual violence experts contributed expertise around sexual violence data collection and reporting in the development of the taxonomy. While our perspectives differed, our shared goal was to create a better system for categorizing and reporting on complaints of a sexual nature on the Uber platform to ultimately minimize the risk of sexual violence. Together, we constructed a taxonomy that was not only evidence-based and rigorously constructed, but usable and effective for Uber staff. Urban was able to bring evidence to bear in a relevant and actionable manner to effect practice on a large scale.

We hope to encourage and empower other companies to follow an evidence-based approach to better understand and minimize experiences of sexual violence across their platforms. This is the opportunity that partnerships with private entities provides: to empower decision makers with the information they need to make smarter, more effective choices in their policy and practice. We hope this project has accomplished this goal and made a small step toward a safer environment, for Uber and others across the industry.

UBER-MDL3084-000000379

# PREFACE



### TONY WEST, CHIEF LEGAL OFFICER, UBER TECHNOLOGIES, INC.



Tony West
**Chief Legal Officer**
UBER TECHNOLOGIES, INC.

Uber is committed to the safety of our entire community – driver partners, riders, employees, and the public. As a technology service that connects people in the real world, we have a responsibility to constantly work to improve the safety of our platform and contribute to safety in our communities. In 2018, CEO Dara Khosrowshahi made this clear when he announced safety as a top corporate priority. Since then, Uber has strengthened its driver screening process with new technology, launched several new safety features, including an in-app emergency button that connects to 911 assistance, and ended mandatory arbitration for individual claims of sexual harassment and sexual assault. The work outlined in the subject of this report is another step in our mission to go further on customer safety.

Our app reaches users across the U.S.; more than 80% of the U.S. population lives in areas with Uber service. We connected one billion trips in 2017, and have already connected over one billion trips so far in 2018 in the U.S. alone. Our business has grown quickly, which can be a challenge to our efforts to ensure consistency in identifying and categorizing harmful and inappropriate behavior so we can respond quickly and appropriately, and then in managing that data to improve our safety measures. At the same time, our technology and our scale provides an opportunity to capture information that will allow us to see and understand how, when, and where sexual violence occurs. This is critical, because better identification and measurement is an essential step for improvement – we cannot ultimately solve something we cannot fully see and understand.

This is especially true for sexual violence, which is a vastly underreported crime. There is no common definition of criminal sexual assault across the 50 states or in federal crime statistics. There is no common set of descriptive behaviors that businesses such as Uber can use to take in reports and capture data on sexual violence. This is often an area where society looks the other way and victims avoid coming forward, out of fear and belief that nothing will change. This is not the sort of metric that businesses look to report publicly. But at Uber, we believe that if we can play a role in bringing this issue out of the shadows and into the sunlight by providing data that will ultimately lead to solutions, then we need to step forward.

With very few examples available to rely upon, we recognized early on that even developing a taxonomy to identify, categorize, and count sexually violent behaviors was going to be an unprecedented challenge. That is why we partnered with

UBER-MDL3084-000000380

RALIANCE and the Urban Institute for their expertise and help in this complex, novel, and important effort. Our goal was to develop a suitable taxonomy that could be used to help understand conduct at scale and a methodology for our hundreds of customer service agents to apply those categories uniformly to a complex set of behaviors.

Our focus was on the user experience of both our riders and driver partners. The taxonomy is built to categorize the customer reports we receive, using the behaviors described by the reporter. It does not include the outcome of reports, including, for example, any law enforcement investigations (an outline of our reporting process and response is in Appendix D). We also know that users of our platform (and in any business) experience behaviors that make them feel threatened or uncomfortable such as flirting, leering, or asking overly personal questions, that may not rise to the level of criminal activity. We wanted a taxonomy that would capture those behaviors as well, as they are important to our efforts to make our user experience as safe and inclusive as we can.

And we needed a taxonomy based upon actual behaviors exhibited in the real world. It was important that we provide real examples to help capture actual experiences of riders and driver partners as they perceived and reported it to Uber. So our Uber team, RALIANCE, and the Urban Institute built the categories in this taxonomy from actual reports (with personal information removed) made to Uber. The categories were tested and refined in an effort to make sure that similar behaviors were consistently counted in the same category. This consistency is important to make sure that when we use the data to analyze trends and patterns, we are actually comparing the same type of reported incidents. This will be especially critical if, as we hope, this taxonomy is adopted and used by other businesses and organizations that deal with users and customers on a regular basis. We know that this information can be even more powerful if we share a common language which will allow us to work together

as a community to fully understand and confront this issue. That is why we are sharing this taxonomy publicly, even at this early stage of development and implementation.

The taxonomy that we – along with RALIANCE and Urban Institute – are introducing is specific to the platform experience relevant to Uber where our users experience temporary interactions with each other. This taxonomy reflects this, and was not developed to address other settings, such as in workplace environments. For example, the taxonomy does not take into account issues such as reporting structure, which would be critical to institute into the taxonomy for sexual harassment in the workplace.

When it comes to criminal conduct, Uber actively cooperates in any law enforcement investigation, where actions are taken based on varying definitions of criminal behavior. This taxonomy, however, accounts for more than just criminal descriptions because as a business, we need to address the issues of safety and security of users, which may not rise to the level of criminal behavior as it is defined in applicable laws.

We also understand that this is a first step, and that there will be trial and error involved in the process. For example, the categories of "leering," "flirting," and "touching of non-sexual body parts" have less of a track record of being clearly defined. At Uber we will continue to refine and learn as we implement this new process.

Ending sexual violence is a long and difficult journey, and we want to be part of the solution. Uber is grateful for the leadership and guidance of so many who have paved the way, including RALIANCE and the Urban Institute, whose expertise and dedication were essential to this effort. This taxonomy will help to name and count the human interactions on our platform, and is an important step on the journey to confront this issue meaningfully. At Uber, we know that there are many more steps to come as we strive toward our shared goal of safety and respect for all. We hope you join us on that journey.

UBER-MDL3084-000000381

# INTRODUCTION

- This taxonomy provides a structure or consistent classification of reports of sexual violence.

- Businesses need data-driven information about the problems of sexual misconduct and sexual assault in their own business and across their industry.

- Transparently sharing data drives accountability and may lead to enhanced safety for businesses and the communities they serve.

UBER-MDL3084-000000382



# INTRODUCTION

Sexual harassment, sexual misconduct, and sexual assault are among the defining issues of our time. The personal stories of survivors have prompted massive challenges to cultural norms, social expectations, and political will around these problems, which we collectively refer to in this paper as sexual violence or unwanted sexual experiences. More than one in three women and nearly one in five men have experienced some form of unwanted sexual experience in their lifetime (Smith et al., 2017). Given the prevalence of sexual violence in this country, customer-serving companies like Uber are facing an imperative to collect, measure, and respond appropriately to complaints of a sexual nature to improve safety in their businesses and beyond. These are age-old, albeit complex, societal problems, but today they exist in an entirely new information environment. Mobile phones and social media make it possible and practical to immediately report experiences of sexual violence to companies, and companies can take immediate action to address such situations. This provides a unique opportunity to gain actionable information about sexual violence, respond appropriately to each claim, and transparently report data to further accountability.

The question that businesses must answer is not *if* these issues affect their business, but *how* their business is affected by them and *what* they can do to address it. Finding this answer begins by understanding the scope of the problem, carefully measuring it, evaluating response and prevention efforts, and transparently reporting data to drive accountability. Sexual harassment,[1] sexual misconduct, and sexual assault are complex social problems. Although clear to the person harmed, communication about unwanted sexual experiences is often infused with fear, misunderstanding, judgment, cultural norms, and multiple interacting layers of past experiences related to sex and violence. Gaining useful, actionable information about these complex social problems requires consistent data collection methods, trauma-informed perspectives on these experiences, and structured measurement tools. Without data to understand the various ways sexual violence is manifested in the course of business activities, responses will be limited in their potential to address the problem.

Recognizing the need to better gather and respond to this data, Uber contracted with RALIANCE and the Urban Institute (Urban) to create an improved section of their customer service taxonomy to more effectively categorize reports of sexual harassment, sexual misconduct, and sexual assault. When a report is received by Uber's customer service system, it is evaluated and classified into a structured taxonomy categorizing a variety of customer service and safety issues (see Appendix D). The taxonomy helps define both the outreach and ultimate action taken in response to each report.

UBER-MDL3084-000000383



Collectively, the RALIANCE and Urban team has over forty years of experience working with survivors of sexual violence, advocating for their needs, and studying the impact of sexual violence and responses to it. The team's revision to the taxonomy described here underwent multiple rounds of validation and continuous review and revision, and reflects the best of what we know today about sexual violence data collection and reporting. Urban and RALIANCE believe sharing this data in transparent reporting, while potentially controversial, may lead to establishing trust with communities and improved understanding of and response to the problem of sexual violence.

> **THE VALUE OF A CAREFULLY DEVELOPED TAXONOMY FOR REPORTED INCIDENTS OF SEXUAL HARASSMENT, SEXUAL MISCONDUCT, OR SEXUAL ASSAULT IS THAT IT CAN HELP IDENTIFY COMMONALITIES AND TRENDS AMONG REPORTS THAT CAN INFORM THE DEVELOPMENT OF RESPONSE AND PREVENTION EFFORTS.**

This is most likely to happen if the taxonomy being used helps to effectively communicate the experience of the person who was harmed.

In this paper, we provide an outline for the development of such a taxonomy. First we provide an overview of the challenge of this project and the opportunity it presents by reviewing the impetus for this project and the context of reporting in the sexual violence field. This is followed by an explanation of our approach explaining why using clear categories for such efforts is important and by an overview of the taxonomy RALIANCE and Urban team developed. Then we detail how we developed the taxonomy, and its purpose and applications for businesses across industries. Finally, we conclude with a review of the benefits, challenges, and considerations for others interested in undertaking a similar project.

It's clear that sexual violence is not unique to any particular mode of transportation, business, or industry. To acknowledge the problem of sexual violence in the diverse spaces it occurs in, and to measure that problem in consistent ways, would be unprecedented in any sector of commerce and could substantially benefit communities in terms of awareness of the problem of sexual violence. The taxonomy and recommendations outlined in this paper aim to encourage such achievements.

¹ The use of the term sexual harassment in the context of this taxonomy does not refer to complaints handled by a human resources department, but rather in a customer service setting.

UBER-MDL3084-000000384



# OVERVIEW OF CHALLENGEAND OPPORTUNITY

- Sexual harassment, sexual misconduct, and sexual assault are prevalent experiences in the United States and sometimes overlap with business services.

- Differences in definitions and methodology make statistics about sexual violence from different sources difficult to compare.

- When effort is spent creating consistent and accessible ways for survivors to report sexual violence, the rate of reporting goes up.

- Though it may seem counterintuitive, initial increases in reports of sexual violence indicate increased effectiveness at addressing the problem.

UBER-MDL3084-000000385



## OVERVIEW OF CHALLENGE AND OPPORTUNITY

In the United States, one in five women (21%) and one in 14 men (7%) have experienced an attempted or completed rape in their lifetime. More than one in three women (37%) and nearly one in five men (18%) have had some form of unwanted sexual experience in their lifetime (Smith et al., 2017). A woman in the United States is far more likely to experience an attempted or completed rape than she is to develop breast cancer (which one in eight women experience – or 12%) (Breastcancer.org, 2018). Experiences of sexual harassment are so prevalent that they can be difficult to measure. One recent study (Kearl, 2018) found that 81% of women and 43% of men surveyed had experienced some form of sexual harassment.

Reports of sexual violence can be found in all sectors of society, and the struggle to gather consistent information and data is nearly as common across industries. In the past year, sexual violence in the entertainment sector has been of particular note and helped fuel the explosion of the #MeToo movement and the Time's Up response. Media reports have focused on sexual harassment on the streets of urban areas; sexual assault on cruise ships and airplanes; sexual violence in prisons, jails, and other correctional settings; sexual abuse within youth, club, collegiate, and professional sports; and sexual coercion in government. Each of these sectors has a responsibility (sometimes legally mandated) to gather information about sexual violence that occurs in them, and yet they often meet that responsibility in substantially different ways. Methods of reporting, ways to gather data, and the definitions of acts to be considered sexually violent vary widely both across and within sectors, including between branches of government (U.S. Government Accountability Office, 2016). These discrepancies, coupled with the unique challenges associated with collecting data about sexual violence, create widely varying reports on the true prevalence of sexual violence and a scattered picture of the impact of sexual violence on society and organizations. This scattered picture makes it difficult to gain a thorough understanding of factors that contribute to sexual violence or to assess the effectiveness of efforts to respond to it.

As challenging as gathering data about sexual violence remains today, efforts and systems to do that work have progressed remarkably over the past decades. A clear example of this progress can be seen in the passage of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act) of 1990. Prior to the Clery Act (Clery Center, n.d.), there was no standardization in the way that colleges and universities collected or disclosed information about sexual violence occurring on their campuses and few incentives beyond moral obligation and good policy to do either.

UBER-MDL3084-000000386





**CAMPUSES THAT REPORT HIGH NUMBERS OF SEXUAL ASSAULT IN CLERY REPORTS TEND TO HAVE INVESTED SIGNIFICANT RESOURCES – FIRST IN MEASURING THE MAGNITUDE OF THE PROBLEM ON THEIR CAMPUS, THEN IN PROVIDING SUPPORT TO STUDENT VICTIMS/ SURVIVORS, MAKING STUDENTS AWARE OF THOSE SERVICES, GIVING CAMPUS LAW ENFORCEMENT SUFFICIENT RESOURCES FOR EFFECTIVE INVESTIGATIONS, AND MAKING SURE THAT STUDENT JUDICIAL AFFAIRS CAN DETERMINE AND ENFORCE APPROPRIATE SANCTIONS ON THOSE WHO COMMIT SUCH CRIMES.**

The Clery Act required colleges and universities receiving Federal financial aid to inform students of campus crime policies and victim resources, to publicly disclose standardized annual campus crime statistics that include rape and dating violence, and to provide timely warnings to students after a campus-based crime has occurred. Despite these improvements in campus reporting, many gaps remain in the information that campuses are required to provide. Only the most criminalized aspects of sexual violence (such as completed or attempted rape) are included in Clery mandated reports, so non-criminalized sexually violent behaviors, such as harassment, coercion, or intimidation, do not make it into the report.

There has been a paradoxical impact of Clery reports on the public reputation of campuses, such that campuses that report a high number of sexual assaults relative to the size of their student population (and relative to other campuses of similar size) are often labeled as "dangerous," while campuses that report low numbers of sexual assault may be labeled as "safe." In reality, sexual assault is an underreported problem across student populations of all sizes. The number of sexual assaults reported on a campus tends to increase with the amount of effort and attention focused on addressing sexual assault on that campus (Boyle, Barr, & ClayWarner, 2017).

These efforts create an environment where student survivors feel empowered to report the crimes against them with the hope that their report will result in a just outcome. Conversely, campuses with low reported numbers of sexual assault (or no reports of assaults at all) in an academic year tend to have made few, if any, significant investments in services for student survivors, awareness of services on campus, or resources for campus law enforcement or student judicial affairs, leading to a lack of student reporting.

UBER-MDL3084-000000387



Republished with permission. Becker, A. (2017, May 10). 89 percent of colleges reported zero incidents of rape in 2015. Retrieved from AAUW.org.

Uber's interest in developing a taxonomy to classify complaints of a sexual nature is similar to efforts described on campuses above, but it also is distinctly different:

- First, Uber is voluntarily addressing such issues on their platform, while colleges and universities are federally mandated to do so.

- Second, unlike Clery Act reporting requirements, Uber's customer service concerns represent not just those acts that rise to criminal behaviors, but all complaints of a sexual nature. Many of the most common unwanted sexual experiences, such as street harassment or sexual intimidation, are not criminalized. While not illegal, these experiences can be profoundly damaging to those who experience them, limiting the harmed person's ability to feel comfortable or safe in the setting in which it occurred. Gathering and responding to reports of non-criminal sexual acts (such as violations of company policy) may benefit their customers, employees, and the communities they work in just as much as doing so with criminalized acts. A comprehensive system of data collection should gather information on both (the figure on the next page shows examples of such criminal and non-criminal behaviors).

- Finally, the interaction between Uber and its users is quite different from a university's interaction with its students. Universities have extensive, years-long interactions with their students, while Uber has brief, episodic interactions with its users.

UBER-MDL3084-000000388



Still, despite distinctions, it can be helpful to think of how these issues affect a business in the context of how they have affected other settings.

## EXAMPLES OF HARMFUL BEHAVIORS

- Staring or leering
- Flirting
- Unwanted communication (phone calls, emails, etc.)
- Sexually suggestive comments or gestures
- Sexually explicit comments or gestures
- Requesting a hug, kiss, or other
- Physical contact

## EXAMPLES OF CRIMINAL BEHAVIORS

- Violent threats
- Refusing to allow someone to exit a vehicle (false imprisonment)
- Unwanted touch of a sexual body part
- Unwanted penetration of the mouth, vagina, or anus

The history of the Clery Act, its impact on campus reporting, and its effect on campus reputations can provide a valuable lesson for businesses who are considering gathering and publishing information about the impact of sexual violence on their work. Sexual assault is an underreported crime (National Research Council, 2014), and non-criminalized acts of sexual violence often go entirely unacknowledged. Creating structured systems to count and categorize experiences of sexual harassment, sexual misconduct, and sexual assault can result in helpful information that businesses can use to thoughtfully examine their current practices and share publicly, particularly in industries where addressing sexual violence is not yet common.

UBER-MDL3084-000000389



# WHY CLEAR CATEGORIES ARE IMPORTANT

- Clear categories for reports help businesses make informed decisions.

- Clear categories lead to consistent information, which businesses need to understand how their work is impacted by sexual violence.

UBER-MDL3084-000000390



# WHY CLEAR CATEGORIES ARE IMPORTANT

We need a method to consistently and accurately categorize experiences of sexual violence to understand the scope and nature of the problem. The challenge of any taxonomy of social interactions is to classify the personal experiences of participants in an interaction into clear categories that multiple people with different backgrounds, biases, and perspectives can quickly and consistently apply to any given situation. These categories must not overlap (be mutually exclusive) and yet be applicable to a vast array of possible scenarios (be collectively exhaustive).

If categories overlap and are not mutually exclusive, then observers will classify incidents in an unstructured way, and some may classify an interaction in one way while others classify the same incident in a different way. The different decisions that observers make about overlapping categories will be based on their individual biases, instead of being grounded in the data. In the end, the count of the number of incidents in any particular category will be inaccurate. Likewise, if categories are not collectively exhaustive, then some relevant interactions may not be counted at all, or be misclassified just because there is no logical category in which to put them in.

Another consideration around clarity is ensuring that this taxonomy, in particular, does not include experiences of a non-sexual nature. Instead, we developed categories that were only filled with experiences of sexual harassment, sexual misconduct, or sexual assault, and other kinds of non-sexual experiences (threatening or not) were channeled into other parts of Uber's larger customer support system.

UBER-MDL3084-000000391



# SPECIFIC VS. NON-SPECIFIC CATEGORIES

Below is an example of two categories that have not yet been made specific, demonstrating why specificity is necessary for clarity in the taxonomy and why definitions may expand over time to encompass scenarios that had not been considered at the time of their creation. According to the non-specific definitions, the quoted report could fit into either "Flirting" or "Comments About Appearance." Using the specific definitions, we see it clearly fits under "Comments about Appearance."

**USING THESE CATEGORIES, WHERE WOULD THIS REPORT FIT?**

**"MY DRIVER KEPT SAYING I WAS PRETTY. IT MADE ME FEEL AWKWARD."**

|  | FLIRTING | COMMENTS ABOUT APPEARANCE |
|---|---|---|
| **NON-SPECIFIC** | Someone makes verbally suggestive comments to user, in a way that makes them uncomfortable. | Someone makes uncomfortable comments on a user's appearance. |
| **SPECIFIC** | Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. | Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |

UBER-MDL3084-000000392

# TAXONOMY OVERVIEW

- There are 21 categories of reports, each with specific behavior-based definitions.

- Reports that could fit into multiple categories because multiple behaviors are identified are assigned based on the most severe behavior described.

UBER-MDL3084-000000393



## TAXONOMY OVERVIEW

The final taxonomy classifies acts of sexual violence into two overarching categories – sexual assault and sexual misconduct – which are further stratified by sub-categories and tertiary categories that correspond to behaviorally specific definitions (see Appendix B for definitions currently in use by Uber, the following section for details on how we developed the taxonomy, and Appendix D for how the Uber customer service system works). Defining specific categories of sexual misconduct and assaultive behaviors using behaviorally specific definitions is in line with best practices related to measuring sexual victimization (Basile, Smith, Breiding, Black, & Mahendra, 2014; Cook, Koss, Gidycz, Murphy, 2011; Fisher, 2009).

In total, the taxonomy includes 21 categories of sexual misconduct and sexual assault behaviors, which agents select from when categorizing reports of unwanted sexual experiences received from users through their customer service system. Each category corresponds to an initial type of response, which can become more involved as agents gather more information about the report. This list of categories is meant to be both mutually exclusive and collectively exhaustive; meaning, all possible sexually related incidents reported to Uber have a clear category and each report is defined by only a single category. Reports communicating more than one unwanted sexual experience are categorized based on the most severe experience described in the report.

Asking a person if they had been "raped" is not a straightforward question. It involves concepts and experiences that vary substantially from person to person, and the decision to call an experience a "rape" raises complex questions and emotions, including whether one is willing or able to label themselves as a victim (Donde, Ragsdale, Koss, Zucker, 2018). As such, asking someone about rape leads to subjective answers to the question that can vary from person to person.

Instead, the question, "Did someone penetrate your vagina or anus when you didn't want them to?" can be less emotionally difficult to respond to. It is a clear question that describes a specific action, without putting a label on the experience. This type of question is called "behaviorally specific," and such questions are standard in rigorous research about sexual violence (Cook, Koss, Gidycz, Murphy, 2011).

UBER-MDL3084-000000394

Sexual misconduct behaviors are non-contact unwanted experiences, and include any reported behavior of a sexual nature that is without consent or has the effect of threatening or intimidating a user against whom the conduct is directed. In this taxonomy, the sexual misconduct category encompasses behaviors which are usually described as sexual harassment. Non-contact categories include the following behaviors:

- staring or leering
- asking personal questions
- comments about appearance
- flirting
- explicit gestures
- explicit comments
- displaying of indecent material
- indecent photography/video without consent
- soliciting a sexual act
- masturbation or indecent exposure
- verbal threat of sexual assault

Each of these above categories is described further by a behaviorally specific definition, along with examples where appropriate. For instance, under "asking personal questions," the agent would see this clarifying definition:

SOMEONE ASKS SPECIFIC, PROBING, AND PERSONAL QUESTIONS OF THE USER. THIS WOULD INCLUDE QUESTIONS ABOUT THE USER'S PERSONAL LIFE, HOME ADDRESS, CONTACT INFORMATION (E.G. PHONE, EMAIL, SOCIAL MEDIA), OR ROMANTIC OR SEXUAL PREFERENCES.

Sexual assault behaviors include any reported attempted or completed physical contact of a sexual nature, as described by the reporter. This category includes:

- attempted touching of a non-sexual body part
- attempted kissing of a non-sexual body part
- attempted touching of a sexual body part
- attempted kissing of a sexual body part
- non-consensual touching of a non-sexual body part
- non-consensual kissing of a non-sexual body part
- attempted non-consensual sexual penetration
- non-consensual touching of a sexual body part
- non-consensual kissing of a sexual body part
- non-consensual sexual penetration

Each of these above categories is further defined using behaviorally specific language. For example, under attempted touching of a non-sexual body part, this definition appears:

SOMEONE ATTEMPTED TO TOUCH, BUT DID NOT COME INTO CONTACT WITH, ANY NON-SEXUAL BODY PART (HAND, LEG, THIGH) OF THE USER, AND THE USER PERCEIVED THE ATTEMPT TO BE SEXUAL.

UBER-MDL3084-000000395

# MIX-AND-MATCH EXERCISE

Match the text of the report on the left with the appropriate category on the right. Remember that reports describing multiple experiences are categorized based on the MOST severe experience. For the purposes of categorization, assume that categories are listed in increasing order of severity. For example: category D (Flirting), can be considered more severe than categories A, B, or C above it.

1. "My driver told me to smile, said I would be prettier if I smiled."

2. "The customer got into my passenger seat and we had a pleasant conversation for most of the ride. When I arrived at his destination, he put his hand on my thigh and then asked me to come upstairs with him to have a drink."

3. "Two customers got into the back seat; they both seemed very drunk. They immediately started kissing and groping each other. At one point I thought I heard the sound of a zipper, and while at a stoplight, I looked back and saw that one passenger had pulled out his penis and the other was going down on him."

4. "My driver asked me a lot of questions, like where I went to university, what I liked to do, and if he was driving me home or not. He asked me if I have a boyfriend. I told him yes, and he asked me if my boyfriend and I had gone 'all the way' yet or not. He asked me if I thought I would like that."

5. "The customer got into my passenger seat and was looking at his phone the whole ride. I could see and hear he was watching porn. At the end of the ride he looked at me and asked if I wanted to make an extra fifty bucks and pointed at his phone."

6. "My driver was very fast and aggressive in traffic, and I complained to him about it. He didn't say anything back, but I could tell he was really angry the whole ride. At the end of the ride, he said that I lived in a nice house, and that if I didn't give him five stars, I could get raped tonight."

a. Staring or Leering

b. Comments or Gestures > Asking Personal Questions

c. Comments or Gestures > Comments About Appearance

d. Comments or Gestures > Flirting

e. Comments or Gestures > Explicit Gestures

f. Comments or Gestures > Explicit Comments

g. Displaying Indecent Material

h. Indecent Photography / Video Without Consent

i. Soliciting Sexual Act

j. Masturbation / Indecent Exposure

k. Verbal Threat of Sexual Assault

l. Attempted Touching: Non-Sexual Body Part

m. Attempted Kissing: Non-Sexual Body Part

n. Attempted Touching: Sexual Body Part

o. Attempted Kissing: Sexual Body Part

p. Non-Consensual Touching: Non-Sexual Body Part

q. Non-Consensual Kissing: Non-Sexual Body Part

r. Attempted Non-Consensual Sexual Penetration

s. Non-Consensual Touching: Sexual Body Part

t. Non-Consensual Kissing: Sexual Body Part

u. Non-Consensual Sexual Penetration

These reports are fictitious, but informed by the authors' experience reviewing actual reports.

ANSWER KEY
1C / 2P / 3J / 4F / 5I / 6K

UBER-MDL3084-000000396



# HOW DID WE DEVELOP THE TAXONOMY?

- This taxonomy was created by first developing a conceptual framework and then using that framework to categorize over five hundred real user reports covering sexual misconduct and sexual assault.

- The taxonomy follows best practices in measuring unwanted sexual experiences by focusing on specific behaviors.

- This taxonomy was created using a dynamic process, and we expect that this taxonomy will continue to grow and improve over time.

UBER-MDL3084-000000397



# HOW DID WE DEVELOP THE TAXONOMY?

Staff from RALIANCE and Urban worked together to create the sexual harassment, sexual misconduct, and sexual assault taxonomy by:

- Reviewing a total of 362 reports made within the United States and Canada across three sets of randomly selected reports spanning the spectrum of unwanted sexual experiences (including behaviors like flirting, asking rude questions, and making inappropriate comments) categorized as either sexual misconduct or sexual assault, and identifying and coding common behaviors across reports. Personally identifying information, including potential identifiers of the people or places involved in these reports, was removed before being provided to RALIANCE and Urban team.

- Creating initial categories for the taxonomy based on the behaviors observed in these reports, as well as our own understanding of sexual violence. We updated the taxonomy categories continually throughout the coding process.

- Validating the taxonomy categories using two additional sets of randomly selected samples of reports (n=200 reports total), using the newly developed sexual misconduct and assault taxonomy.

We continuously reviewed, revised, and updated the taxonomy throughout the five rounds of coding and validation based upon the behaviors we observed in the reports. This process allowed us to refine the taxonomy over time, increasing its specificity as more and more data were applied to it, as well as broadening categories, or creating new ones, when the data indicated that was necessary. The final product represents a mutually exclusive and collectively exhaustive taxonomy to categorize these sexual violence reports. The wording and descriptions used to define and contextualize the elements of the taxonomy were developed in alignment with best practices (Cook, Koss, Gidycz, Murphy, 2011; Fisher, 2009) in measuring and categorizing experiences of sexual violence by using specific, behaviorally focused identifiers.

Notably, the multiple behaviors contained in the taxonomy can occur simultaneously during a single event, and are therefore not mutually exclusive in that regard; however, each report is assigned to only one category in the taxonomy. Each report is classified by the most severe behavior documented in it in order to prompt the most appropriate response to the report.

Our development process was guided by application and implementation concerns impacting the way the taxonomy was structured and defined. For instance, from the start, we understood the importance of defining each category with behaviorally specific language. This ensures definitions used

UBER-MDL3084-000000398

limited subjective decision-making, were universally understandable, and produced consistent results over time. In line with best practices in the sexual assault measurement field, we avoided language such as "street harassment," opting instead for specific definitions that centered on the behaviors described such as, "Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments." Behaviorally specific language (Cook, Koss, Gidycz, Murphy, 2011; Fisher, 2009) is important not just for how the taxonomy is defined, but also for the training of staff. Definitions of this kind make the training process simpler and less vague and subjective.

In developing the taxonomy, we encountered three specific challenges to be solved. First, it became clear during the coding phase of taxonomy development that there would be unique reports throughout the life of this taxonomy that we would not be able to identify and plan for at the outset. We sought to include a collectively exhaustive list of possible sexual misconduct and assault behaviors, but we also understand that there will be reports that may not fit exactly into the categories as they are currently defined. For that reason, the taxonomy is a living document – open to revision as deemed appropriate, though revisions might be narrow so that the taxonomy does not lose its behaviorally specific focus, become overly granular, or prevent comparisons being made over time. Toward that end, revisions may involve expanding a category to include additional behavioral examples if something not previously captured comes up repeatedly.

Second, the lack of detailed information contained in some reports presents challenges. Several reports referenced vague transgressions, such as "(s)he harassed me," without providing further detail of the behaviors that occurred. The initial information provided in a report may not be sufficient to accurately categorize that report. For that reason, we also included a category to identify

the report as too vague, triggering follow-up procedures to better understand and eventually appropriately categorize the report. This procedure is intended to ensure that reports are categorized and responded to correctly.

A third implementation challenge was the need to balance the necessary granularity in the taxonomy and comprehensiveness of the categories with the accessibility of the system for agents and the feasibly of its implementation. It could be unduly challenging to find the correct category if the taxonomy included too fine a detail, ultimately running counterproductive to Uber's goal of accurately identifying and appropriately responding to every report. We collapsed some of the categories defined in our first draft (see Appendix A) of the taxonomy to maintain a balance between these two focuses and create a streamlined taxonomy that would contain the same level of detail, but in a more accessible format. This format also allows for more straightforward analysis on the types of reports. With overly specific categories, the extent of experiences occurring could be difficult to track over time.

While this taxonomy is comprehensive and represents the best information we have today regarding sexual violence reported by users of the Uber platform, it is not intended to be a static document. We found ways to continue to improve this taxonomy the more we used it, and we anticipate Uber will continue to refine and update this taxonomy as their data collection continues and expands, adding relevant behaviors not previously identified and refining the descriptive prompts for the taxonomy's various categories. See Appendix A for a fuller description of our method of creating this taxonomy.

UBER-MDL3084-000000399



# BEHAVIORALLY SPECIFIC QUESTIONS EXERCISE

## IS THIS A BEHAVIORALLY SPECIFIC QUESTION?

1. Was the person's behavior inappropriate?                                                                          YES/NO

2. Did the person make comments about your appearance that you were uncomfortable with?                              YES/NO

3. Were you touched on your breast or genitals without your permission?                                               YES/NO

4. Were you assaulted or raped?                                                                                       YES/NO

5. Are you a victim of domestic violence?                                                                            YES/NO

6. Has your partner ever hit you hard enough to cause pain or to leave a bruise?                                      YES/NO

7. Does your partner limit your ability to contact your friends or family?                                           YES/NO

8. Were you afraid that the other person would hurt you if you didn't say what they wanted to hear?                   YES/NO

9. Were you stalked by your partner?                                                                                  YES/NO

10. Does your partner know where you've been even though you haven't told them?                                       YES/NO

1N / 2Y / 3Y / 4N / 5N / 6Y / 7Y / 8Y / 9N / 10Y
ANSWER KEY

UBER-MDL3084-000000400



# CONSIDERATIONS FOR SEXUAL VIOLENCE TRANSPARENCY PUBLICATIONS

- Statistics about sexual violence are only truly meaningful in the context of the way those numbers were generated.

- Transparency in every aspect of how a statistic is generated is the responsible way to share such information with the public.

- All publications should categorize issues as users have reported them.

- Behaviorally specific wording should be used in transparency publications to enhance clarity in the reporting, just as it is used in the taxonomy.

- Transparency publications can be used to educate consumers about the ways a business responds to the problem of sexual violence.

UBER-MDL3084-000000401



# BENEFITS & CHALLENGES

Any business or institution that seeks to be transparent in its relationship with the communities it serves by publishing a report about sexual violence needs to consider not only the information it wants to report, but also how the numbers it reports will be compared to numbers from other businesses and institutions. As has been made evident with reporting for campuses and universities, even in an environment of legislatively enforced standardization of reporting, individual institutions can vary dramatically in their efforts to comply with existing requirements, which can generate significantly different results with very different impacts on public perception. If an industry uses a single taxonomy to document the scope of unwanted sexual experiences within it, then the information is more easily understood by businesses and the public alike.

For a business trying to take responsible action, the best way to approach such problems is to be as transparent as possible about every aspect of the process by which the numbers being reported are collected. Although such transparency cannot prevent controversy, transparency forms the basis for productive dialogue and narratives formed in response to controversy. Transparency is essential to establishing trust with the communities a business serves. As seen in campus reporting, "zero rapes on campus" may be a number that immediately sounds good, but after brief reflection, does little to encourage the trust a campus seeks to establish with its community, given potential doubt surrounding the accuracy of the report.

# CONSIDERATIONS

How, then, can a business that wants the public to trust that it is sincere and honest in its efforts to address sexual violence communicate those values in a transparency publication? The simple answer is to be transparent. We believe the following elements of a report are needed to communicate those qualities:

- **Accept reports at face value when counting and categorizing them.** Agents who respond to these reports should categorize each report they receive without subjective assessment of the credibility of the report. There should be no discretion to ignore a report. While businesses may have a need to investigate incidents beyond receiving a report, each and every report should be categorized as part of this process, and responded to according to the nature of the report. This helps users to feel that reporting is safe and meaningful – knowing that their report will not be immediately discredited by an agent, and followed up on appropriately. **It is important to remember that the most threatening experience after the violence itself is not being**

UBER-MDL3084-000000402

believed about the violence experienced. As such, ensuring that reports will be acknowledged creates a system that is responsive to the needs of users without expanding any harm they have experienced.

- **Define incidents in terms of specific behaviors, not abstract words.** The concepts and experiences that come to mind when hearing the word "rape" can vary substantially from person to person, and the decision to call an incident "a rape" begs complex questions that most businesses and institutions are not in a position to address. However, if an agent asks themselves the question, "Did someone penetrate the customer's vagina or anus without their permission?" when classifying an incident, then this is not complex. It is a clear question that describes a specific action. It does not ask an agent receiving a report to assign a legalistic, value-laden label to an incident. Such a question simply asks what happened.

  This type of question is called "behaviorally specific," and such questions are a standard in rigorous research about sexual violence. The taxonomy discussed in this paper was developed with specific behaviors in mind and uses behaviorally specific prompts in its definitions. We recommend that behaviorally specific questions and/or prompts be used by any business seeking to understand the impact of sexual violence on consumers of its services, and that such information be reported in a similar manner.

- **Be explicit about how data are gathered and received.** A complex business may have multiple points of contact with consumers and the public through which they may learn about incidents of sexual violence. These may include in-app messages and reports, phone calls, reviews on websites, social media posts, news reports, police investigations, and lawsuits. An honest transparency effort will be specific about which sources of information a business included in its transparency publication.

- **Show how numbers were determined.** Information about sexual violence is routinely scrutinized by the media, researchers, policymakers, and the general public. Corporate transparency publications risk being undeservedly criticized or mis-characterized if they sacrifice sufficient background information about the process of arriving at the numbers in their publication and statistics used. Companies must contend with a common perception that they are acting in bad faith or prioritizing their own interests when communicating about sexual violence. Transparency about how data are processed enhances the credibility of a publication.

- **Provide context to the numbers by relating them to the scope of the business's reach.** Transparency about the size and scope of a business's operations lends context and credibility to its transparency publication. To borrow a non-business example for illustrative purposes, a small private college of 2,000 students might reasonably receive fewer than 10 reports of sexual assault in a given academic year (a number aligned with known rates of sexual assault and reporting among college students) (Fisher, Cullen, & Turner, 2000). The same could not be said of a large public university with a student population of 40,000 or more. Such a reported number would simply not be believable, and likely say more about that university's reporting infrastructure and student services than the amount of sexual violence experienced by its students.

- **Be descriptive about the response process.** There are many ways a business might practically respond to acts of sexual harassment, sexual misconduct, and sexual assault, and many additional impractical ways the public may expect or assume a business might respond. It is important to detail the process by which a business responds to such incidents.

UBER-MDL3084-000000403



# KEY TRANSPARENCY PUBLICATIONS CONSIDERATIONS

☐ **STATEMENT OF ASSUMPTIONS.**

What assumptions go into the process of categorization?

☐ **SPECIFICITY OF WORDING.**

Give samples of tools used to gather information from both consumers and employees to clarify how items are worded. What thoughts and decisions went into these tools?

☐ **DESCRIPTION OF PROCESS.**

Is the publication clear about the different kinds of data that were available, what data were used, and how those data were processed to generate statistics and other information? How did the business get its information and what did it do with it?

☐ **DESCRIPTION OF RESPONSE.**

What are the different ways that the business responds to reports of incidents? How did it respond over the term of the transparency publication? How will the data help the business reevaluate or improve its procedures for responding to these types of reports?

UBER-MDL3084-000000404

# CONCLUSION

The threat of sexual harassment, sexual misconduct, and sexual assault inform the daily choices of people around the world. Businesses across every industry should take note of this prevalent issue and take action to improve the safety of their practices. One way to begin is to develop a consistent structured system for collecting, understanding, and reporting on ways sexual violence manifests in business practices. Taxonomies of this kind provide actionable information to prompt the most appropriate and helpful response a business can provide to the person who was harmed. If used effectively, they also can help businesses and communities understand that sexual violence is a widespread social problem potentially impacting many industries in similar ways.

THIS HELPS TO FOCUS CONVERSATIONS AND EFFORTS ON THE ROOT CAUSES OF SEXUAL VIOLENCE, WHICH BECOME EASIER TO IDENTIFY AS INCREASING AMOUNTS OF DATA ABOUT THE PROBLEM ARE COLLECTED IN CONSISTENT WAYS .

The best policies and practices to effectively address and prevent sexual violence are rooted in a broad view of the problem that is informed by the experiences of individual survivors, but not limited to those experiences in its scope.

CONSISTENT TAXONOMIES, CONSISTENT DATA COLLECTION, AND THE PUBLIC DISCLOSURE OF THE INFORMATION LEARNED PROVIDES AN OPPORTUNITY FOR BUSINESSES TO BE TRANSPARENT ABOUT THE WAY SEXUAL VIOLENCE IMPACTS THEIR BUSINESS.

We believe that this taxonomy and the process of its creation can be useful to any business that is impacted by sexual violence. Sexual violence is not unique to ride-sharing platforms, transportation, or any business or industry. This paper seeks to inform businesses on the impact of the problem of sexual violence and provide guidance on how to best categorize reports of such experiences. Meaningful collection of data on sexual violence is a real challenge, but it is necessary to inform conversations on the existence of and responses to sexual violence in diverse contexts. The consistent collection, categorization, and reporting of such data is paramount to progress on ending sexual violence, and it is our hope that this project is a meaningful step to progress on that goal.

UBER-MDL3084-000000405

# REFERENCES

Basile, K. C., Smith, S. G., Breiding, M. J., Black, M. C., & Mahendra, R. (2014). *Sexual violence surveillance: Uniform definitions and recommended data elements: Version 2.0.* Retrieved from the Centers for Disease Control and Prevention: https://www.cdc.gov/violenceprevention/pdf/sv_surveillance_definitionsl-2009-a.pdf

Boyle, K. M., Barr, A., & Clay-Warner, J. (2017) The effects of feminist mobilization and women's status on universities' reporting of rape. *Journal of School Violence,* 16, 317-330. doi: https://doi.org/10.1080/15388220.2017.1318580

BreastCancer.org. (2018). *U.S. breast cancer statistics.* Retrieved from BreastCancer.org

Clery Center. (n.d.). *Summary of the Jeanne Clery Act.* Retrieved from https://clerycenter.org/policy-resources/the-clery-act/

Cook, S.S., Koss, M.P., Gidycz, C., & Murphy, M. (2011). Emerging issues in the measurement of rape victimization. *Violence Against Women, 17,* 201-218. doi: 10.1177/1077801210397741

Donde, S. D., Ragsdale, S. K. A., Koss, M. P., & Zucker, A. N. (2018). If it wasn't rape, was it sexual assault? Comparing rape and sexual assault acknowledgment in college women who have experienced rape. *Violence Against Women.* doi: 10.1177/1077801217743339

Fisher, B. S. (2009). The effects of survey question wording on rape estimates: Evidence from a quasi-experimental design. *Violence Against Women, 15,* 133-147. doi: https://doi.org/10.1177/1077801208329391

Fisher, B. S., Cullen, F. T., & Turner, M. G. (2000). *The sexual victimization of college women.* Retrieved from the National Criminal Justice Reference Service: https://www.ncjrs.gov/pdffiles1/nij/182369.pdf

Kearl, H. (2018). *The facts behind the #MeToo movement: A national study on sexual harassment and assault.* Retrieved from Stop Street Harassment: http://www.stopstreetharassment.org/wp-content/uploads/2018/01/Full-Report-2018-National-Study-on-Sexual-Harassment-and-Assault.pdf

National Research Council. (2014). *Estimating the incidence of rape and sexual assault.* Available from The National Academies Press: https://www.nap.edu/catalog/18605/estimating-the-incidence-of-rape-and-sexual-assault

Smith, S. G., Chen, J., Basile, K. C., Gilbert, L. K., Merrick, M. T., Patel, N., ... Jain, A. (2017). *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010-2012 state report.* Retrieved from the Centers for Disease Control and Prevention: https://www.cdc.gov/violenceprevention/pdf/NISVS-StateReportBook.pdf

U.S. Government Accountability Office. (2016, July). *Sexual violence data: Actions needed to improve clarity and address difference across federal data collection efforts* (GAO-16-546). Retrieved from https://www.gao.gov/assets/680/678511.pdf

UBER-MDL3084-000000406



# ABOUT THE ORGANIZATIONS

## RALIANCE

RALIANCE partners with a wide range of organizations to improve their cultures and create environments free from sexual harassment, misconduct and abuse. Every day, RALIANCE helps leaders establish safe workplaces and strong communities by advancing research, influencing policy, and supporting innovative programs. RALIANCE is based in Washington, DC and combines decades of experience and resources from three leading national sexual violence prevention organizations into a single, unified force.

RALIANCE Business's strategic and forward-thinking experts provide customized, data-driven solutions to help prevent and respond to sexual misconduct in the workplace and across all business operations. We partner with organizational leaders to create cultures that improve the safety of employees, customers, and organizations.

## URBAN INSTITUTE

For more than five decades, the Urban Institute has been a trusted source for unbiased, authoritative insights that inform consequential choices about the well-being of people and places in the United States. They are a nonprofit research organization that believes decisions shaped by facts, rather than ideology, have the power to improve public policy and practice, strengthen communities, and transform people's lives for the better. Urban Institute experts diagnose current challenges and look ahead to identify opportunities for change. The Urban Institute's Justice Policy Center is committed to developing evidence related to criminal justice challenges and has a long history of examining sexual assault, domestic violence, and other victimization experiences for the US Department of Justice, state governments, and local jurisdictions. Notably, Urban published the first national documentation of payment practices for sexual assault medical forensic exams and an assessment of the extent to which survivors are billed for such exams and the first national documentation of state departments of corrections' responses to the Prison Rape Elimination Act.

UBER-MDL3084-000000407

# ABOUT THE AUTHORS

JULIA DURNAN is a policy analyst at the Justice Policy Center at the Urban Institute. She provides research support to a range of projects related to justice policy reform and victimization. At Urban, her research focuses on comprehensive criminal and juvenile justice reforms, including work on the Justice Reinvestment Initiative, the American Civil Liberties Union 50 state blueprint project, and the Youth First initiative. She is currently pursuing a Master of Public Affairs at the Lyndon B. Johnson School at the University of Texas, and graduated from Duke University in 2015 with a BA with distinction in public policy.

CHAD SNIFFEN, MPH, is the Research and Evaluation Director for RALIANCE. He was the Online Resource Coordinator for the National Sexual Violence Resource Center from 2015-2021. He has worked or volunteered in the movements against sexual and domestic violence as a prevention educator, victim advocate, researcher, women's self-defense instructor, and board member since 1999. Prior to RALIANCE, he worked at the California Coalition Against Sexual Assault for eight years focusing on technical assistance to rape prevention education programs and building the PreventConnect online community of practice. He has also worked for community rape crisis and domestic violence programs in California and Arizona, as well as campus prevention programs at the University of Arizona and the University of California, Davis. He holds a Master of Public Health degree from the University of Arizona.

JANINE ZWEIG, PH.D., is Associate Vice President and a Senior Research Fellow in the Justice Policy Center at Urban Institute. She conducts both theoretical research and program and policy evaluations related to sexual violence and victimization, intimate partner and dating violence, substance use, and criminal justice policies. She has examined several provisions of the Violence Against Women Act and the Prison Rape Elimination Act. Before graduate school, Dr. Zweig served as a volunteer/intern for a Women-In-Crisis program. This shelter for battered women serves five rural counties, and she participated in legal and child advocacy, case management, and hotline operation. She holds a Ph.D. in Human Development and Family Studies from the Pennsylvania State University.

UBER-MDL3084-000000408



# APPENDIXA:

## DEVELOPING THE SEXUAL MISCONDUCT AND VIOLENCE TAXONOMY

RALIANCE and the Urban Institute (Urban) created the sexual misconduct and violence taxonomy. We relied upon data from past Uber reports categorized as sexual misconduct or sexual assault to define the scope of behaviors to include in the new revised taxonomy. Review of these reports helped us clarify distinctions between categories, with the ultimate goal of making a mutually exclusive and collectively exhaustive taxonomy.

Notably, the behaviors contained in the taxonomy can occur simultaneously during a single event and are therefore not mutually exclusive in that regard; however, each report is assigned to only one category in the taxonomy. In keeping with best practices in the field, each report is classified by the most severe behavior, prompting the most comprehensive response.

To create the most representative sample of past reports from throughout the United States and Canada, Uber provided three sets of randomly selected reports marked under their current categories of sexual assault or sexual misconduct between January and September 2017. Random selection was achieved by randomly assigning numbers to reports and then choosing the number needed for each sample.

In our first round of reviewing reports, three staff teams reviewed 150 reports (in which personally identifying information had been removed), coding them for 12 pre-defined behaviors:

- verbal harassment
- physical harassment
- staring/leering
- exposure
- masturbation
- non-consensual penetration

- attempted penetration
- soliciting further interaction
- unwanted encounter while impaired
- witness/third parties
- isolation/refusal to leave.

UBER-MDL3084-000000409

We also included a category for "no sexual violence," to capture those reports that we identified as incorrectly assigned to the sexual assault or misconduct categories.

We compared across coders once the first round of review was completed and identified sources of agreement and disagreement with the initial coding schema. This process revealed specific behaviors that had not been initially included in our schema specific to the Uber environment, and essential for inclusion, such as indecent photography or video recording of a person by positioning a camera at a specific angle (commonly referred to as "up-skirting").

The schema was revised to include the specific behaviors for subsequent rounds of coding and, at this point, we developed the first draft of the taxonomy. This initial draft taxonomy included four large categories, each containing four levels of severity as defined by specific behaviors identified in the first round of coding. The four categories were:

- communications of a sexual nature

- sexual comments

- non-contact/verbal interactions

- sexual contact

Next, the same three coding teams completed two more rounds of coding (first 100 reports, then 112 reports for a total of 212 reports) using the first draft of the taxonomy. The teams met after coding each set of reports to compare how individuals classified each report within the draft taxonomy and identify sources of agreement and disagreement. We used this information to update the initial taxonomy draft with clarifications of specific behaviors. This second round of review was critical in identifying edge cases falling between the different categories. For instance, the distinction between flirting and soliciting further contact through asking someone for their contact information was a source of disagreement among the coding teams. To clarify those categories, we added more specific descriptions of common flirting

behaviors to the taxonomy definitions. We also identified additional categories of behavior that had not been included in our first taxonomy draft. For example, we incorporated asking for exchange of money for sex into the taxonomy based on the second round of coding, identifying this behavior sufficiently distinct as to warrant its own category.

We then finalized a recommended taxonomy and shared it with Uber to solicit feedback on usability and feasibility. See Table A.1 for the full proposed taxonomy.

UBER-MDL3084-000000410

# TABLE A.1: PROPOSED TAXONOMY

## NON-VERBAL, NON-CONTACT SEXUAL INTERACTION

Reporter was stared or leered at

Reporter saw pornography or other sexual images inside the vehicle

Reporter saw sexually suggestive gestures

Someone else came close to the reporter in a sexual or flirtatious way

Reporter saw simulated sex acts, but did not see exposed genitals

Reporter was followed after feeling sexually threatened

A picture or video was taken of the reporter's sexual body part (down shirt, up skirt, etc.)

Reporter was not allowed to exit the vehicle, or someone else refused to leave, after feeling sexually threatened

Reporter saw someone engaging in sex acts (including masturbation), or saw exposed genitals

## SEXUAL COMMENTS

Reporter was talked to about sex or heard sexual comments directed at other people

Reporter was flirted with or heard unwanted comments on their appearance

Reporter heard non-threatening sexual comments, or sexual questions directed at them

Reporter heard threatening sexual comments, or talk of sexual violence directed at other people

Reporter wrote that they were sexually harassed

Reporter heard explicit threats of sexual violence directed at them

## REQUESTS AND OFFERS OF A SEXUAL NATURE

Reporter was asked for their contact information or other personal details after hearing sexual or flirtatious comments

Reporter was asked for a hug or other non-sexual contact after hearing sexual or flirtatious comments

Reporter was asked to go out on a date, have drinks, or engage in other activities

Reporter received unwanted communication (texting, calls) after hearing sexual or flirtatious comments

Reporter was asked for a kiss, displays of nudity, sex, or contact with a sexual body part (breast, genitals, etc.)

Reporter was offered money or favors in exchange for sex, nudity, or contact with a sexual body part
(breast, genitals, etc.)

## UNWANTED SEXUAL CONTACT

Someone kissed, or attempted to kiss the reporter on their hand or cheek

Someone touched, or attempted to touch the reporter on a non-sexual (leg, arm, hand, head, etc.)
or unspecified body part after hearing sexual or flirtatious comments

Someone kissed, or attempted to kiss the reporter on their mouth or other non-sexual body part
(not including their hand or cheek)

Someone touched or kissed, or attempted to touch or kiss, the reporter on a sexual body part (breast, genitals, etc.)

Reporter wrote that someone in the vehicle was a rapist, or had sexually assaulted someone other than the reporter

Reporter wrote that they were raped or sexually assaulted

Someone attempted to penetrate the reporter's mouth, anus, or vagina with a body part or object

Someone penetrated the reporter's mouth, anus, or vagina with a body part or object, or said they were raped

UBER-MDL3084-000000411

## TABLE A.2: IMPLEMENTED TAXONOMY

The central feedback was that the taxonomy might be too complex for agents to accurately assess and assign a report consistently. RALIANCE/Urban team and representatives from Uber met several times to discuss edits and efficiencies to the recommended taxonomy, with the goal to increase usability and consistency for the large number of agents who categorize reports in the Uber system. We reached agreement on an updated taxonomy, which sought to balance the usability concerns with the need to maintain a comprehensive and behaviorally specific taxonomy. Some categories were collapsed or reorganized in this updated taxonomy (see Table A.2).

### SEXUAL MISCONDUCT

| |
|---|
| Staring or Leering |
| Comments or Gestures > Asking Personal Questions |
| Comments or Gestures > Comments About Appearance |
| Comments or Gestures > Flirting |
| Comments or Gestures > Explicit Gestures |
| Comments or Gestures > Explicit Comments |
| Displaying Indecent Material |
| Indecent Photography Without Consent |
| Soliciting Sexual Contact |
| Masturbation / Indecent Exposure |
| Verbal Threat of Sexual Assault |

### SEXUAL ASSAULT

| |
|---|
| Attempted Touching: Non-Sexual Body Part |
| Attempted Kissing: Non-Sexual Body Part |
| Non-Consensual Touching: Non-Sexual Body Part |
| Non-Consensual Kissing: Non-Sexual Body Part |
| Attempted Touching: Sexual Body Part |
| Attempted Kissing: Sexual Body Part |
| Non-Consensual Touching Sexual Body Part |
| Non-Consensual Kissing: Sexual Body Part |
| Attempted Non-Consensual Sexual Penetration |
| Non-Consensual Sexual Penetration |

UBER-MDL3084-000000412

## VALIDATING THE SEXUAL MISCONDUCT AND VIOLENCE TAXONOMY

The final step was validating the new taxonomy. Five Uber agents who regularly categorize reports underwent training on the updated taxonomy, and used the taxonomy to categorize two rounds of 100 randomly selected reports each. The RALIANCE/Urban team also completed a set of coding during each round, which was used as a key. We compared across coders after the first validation round and identified sources of disagreement in the taxonomy. As a result, we added a category for "no sexual violence" for those reports that did not fall into our taxonomy.

The Uber agents and the RALIANCE/Urban team coded a second set of user reports as a second round of validation. The RALIANCE/Urban team analyzed this round for inter-rater reliability, aiming for 80% agreement among coders. Coders achieved 79.3% agreement. One primary source of disagreement among the agents was the existence of a "too vague" category, which was not included in our original taxonomy. When excluding that category, we reached 84% agreement.

## MODIFICATIONS AFTER EXTENSIVE REVIEW

After alignment of the implemented taxonomy presented in Table A.2, Uber undertook a course of extensive internal testing, where nearly 100,000 past user reports across a wide range of safety and non-safety related customer service issue types were re-reviewed by a large number of agents. The taxonomy was applied to reports that were sexual in nature. This review revealed low alignment among agents in two areas. First, low alignment was found in the way agents used categories that included the phrase "attempted," likely due to the subjective nature of guessing the intent of described actions, as well as the taxonomy instruction that items were listed in ascending order of severity. In Table A.2, "attempted" items are in parallel order with their counterpart completed actions. This left agents with a choice between categorizing reports based on what actions agents thought the text implied might have happened or been attempted, and what actions the text stated had actually occurred. A secondary unintended effect of ordering the "attempted" categories this way was to undercount serious harmful actions that had actually taken place, in favor of counting attempts at even more serious harmful actions, though they did not actually occur.

Uber's internal data analysts made a recommendation to correct for this unforeseen consequence of the way "attempted" categories were ordered, and we agreed that this recommendation would refine the taxonomy by improving agents' ability to consistently categorize such reports. The affected portion of the taxonomy is restructured as shown in Table A.3. We agree that this ordering of categories (all of which are considered egregious by Uber and in need of an immediate response) is the best way to promote consistent taxonomy use across agents, as well as an accurate count of completed actions.

UBER-MDL3084-000000413

Second, the review found low alignment among agents reviewing reports involving unwanted kissing or oral penetration by objects that were not clearly sexual in nature (such as fingers or food items). We agreed with recommendations from Uber's internal data analysts that agent alignment could be improved by updating the taxonomy and instructional definitions so that:

**The definition of Non-Consensual Sexual Penetration be narrowed to include penetration of a user's mouth with a sexual organ or sexual body part excluding kissing with tongue, because:**

a.  Any type of kissing on the mouth will be defined in the category of Non-Consensual Kiss: Sexual Body Part, and

b.  All penetration of the mouth with an object that is not a sexual organ will be categorized as Non-Consensual Touching: Sexual Body Part.

The updated behavior-based definitions for the taxonomy currently in use by Uber appear in Appendix B of this paper.

## TABLE A.3: MODIFICATIONS TO THE TAXONOMY AFTER REVIEW

SEXUAL ASSAULT

| |
|---|
| Attempted Touching: Non-Sexual Body Part |
| Attempted Kissing: Non-Sexual Body Part |
| Attempted Touching: Sexual Body Part |
| Attempted Kissing: Sexual Body Part |
| Non-Consensual Touching: Non-Sexual Body Part |
| Non-Consensual Kissing: Non-Sexual Body Part |
| Attempted Non-Consensual Sexual Penetration |
| Non-Consensual Touching: Sexual Body Part |
| Non-Consensual Kissing: Sexual Body Part |
| Non-Consensual Sexual Penetration |

UBER-MDL3084-000000414



# APPENDIX B:

## TAXONOMY BEHAVIOR-BASED DEFINITIONS

| CATEGORY | DEFINITION |
|---|---|
| SEXUAL MISCONDUCT | Non-physical conduct (verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a user against whom such conduct is directed. This includes explicit or non-explicit verbal comments (or non-verbal, non-physical) such as flirting, personal comments on appearance, and inquiries on relationship status. Catcalling (shouting, yelling, whistling) is also defined as sexual misconduct. |
| Staring or Leering | Someone gazed at a user in an unpleasant, uncomfortable, prolonged, or sexual manner. Staring or leering is constant and unwavering. This includes viewing both sexual and non-sexual body parts. |
| Comments or Gestures > Asking Personal Questions | Someone asked specific, probing, and personal questions of the user. This would include questions about the user's personal life, home address, contact information (e.g. phone, email, social media), or romantic or sexual preferences. |
| Comments or Gestures > Comments About Appearance | Someone made uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |
| Comments or Gestures > Flirting | Someone made verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. |
| Comments or Gestures > Explicit Gestures | Someone made sexually suggestive gestures at the user. |

UBER-MDL3084-000000415

| | |
|---|---|
| Comments or Gestures > Explicit Comments | Someone described or represented sexual activity or body parts in a graphic fashion. |
| Displaying Indecent Material | Indecent material, including pornography or other sexual images, was seen by the user. |
| Indecent Photography/ Video Without Consent | Someone has taken, without consent, an inappropriate photograph of a user's sexual body part (e.g. down shirt, up skirt, etc.). |
| Soliciting Sexual Act | Someone either directly asks for a kiss or displays of nudity, sex, or contact with a sexual body part (breast, buttock, genitals). This could be a direct solicitation or a solicitation in exchange for money or favors. |
| Masturbation / Indecent Exposure | Someone has exposed genitalia and/or is engaging in sexual acts in presence of a user. This excludes public urination where no sexual body part (buttock, penis, breast) was exposed. |
| Verbal Threat of Sexual Assault | Someone directed verbal explicit/direct threats of sexual violence at a user. |
| SEXUAL ASSAULT | Physical or attempted physical conduct that is reported to be sexual in nature and without the consent of the user. <br><br> NOTE: <br><br> 1. Sexual body parts are defined as the mouth, female breasts, buttocks, or genitalia. The phrase "between the legs" is considered to reference a sexual body part. All other body parts are characterized as non-sexual. <br><br> 2. When only a non-sexual body part is involved, either of the following provides context for the 'sexual nature' of the contact/ attempted contact: <br><br> • Sexual misconduct of any type <br> • Reporter's explicit perception that the contact was either flirtatious, romantic, or sexual |
| Attempted Touching: Non-Sexual Body Part | Someone attempted to touch, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Kissing: Non-Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Touching: Sexual Body Part | Someone attempted to touch, but did not come into contact with, any sexual body part (breast, genitalia) of the user, and the user perceived the attempt to be sexual. |

UBER-MDL3084-000000416

| | |
|---|---|
| Attempted Kissing: Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with the breast(s) or buttock(s) of the user, and the user perceived the attempt to be sexual. |
| Non-Consensual Touching: Non-Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any non-sexual body part (hand, leg, thigh) of the user. |
| Non-Consensual Kissing: Non-Sexual Body Part | Without consent from the user, someone kissed, licked, or bit or forced a kiss, lick, or bite on any non-sexual body part (hand, leg, thigh) of the user. |
| Attempted Non-Consensual Sexual Penetration | Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as 'Attempted Non-Consensual Sexual Penetration.' This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue. |
| Non-Consensual Touching: Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user. |
| Non-Consensual Kissing: Sexual Body Part | Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue. |
| Non-Consensual Sexual Penetration | Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue. |

UBER-MDL3084-000000417



# APPENDIX C:

## WAYS TO LEARN MORE

### RALIANCE - WWW.RALIANCE.ORG

- A collaborative initiative dedicated to ending sexual violence in one generation.

### URBAN INSTITUTE - WWW.URBAN.ORG

Urban Wire - urban.org/urban-wire
- The voices of Urban Institute's researchers and staff.

### UBER - WWW.UBER.COM

Commitment to Safety - uber.com/safety
- How safety is built into your experience.

UBER-MDL3084-000000418



# APPENDIXD:

## HOW CUSTOMER SERVICE WORKS AT UBER

**THE SAFETY TEAM**
**UBER TECHNOLOGIES, INC.**

Our partnership with RALIANCE and Urban Institute helped us embark on an important initiative and first step to better identify and measure sexual misconduct and sexual assault. In creating and implementing the taxonomy, we have the opportunity to better understand dangerous behaviors reported by users of the platform and the problems of sexual assault and sexual misconduct as a whole.

To understand our approach to implementation, it is first important to understand how a user report is handled within Uber.

**See image on page 49 to view how customer service works at Uber.**

Uber's customer support agents respond to a user's safety report by an email, or by calling the user's mobile phone and having a conversation with that person.

Our customer service agents receive substantial training to perform their duties, and the agents who handle reports of sexual misconduct or sexual assault receive additional training to respond appropriately, with empathy and understanding. An agent's interaction with a reporting user may begin with a particular response and means of contact based on the initial categorization of a report, but agents may freely elevate Uber's involvement and effort expended in response to any report as that agent gains more information about a particular incident through interaction with the user.

Since creating the taxonomy, with the help of RALIANCE and Urban Institute, we have worked to begin to implement this into our business. A key first step included the development of accompanying training materials to bring this into our customer service organization. This includes a training course (with both a presentation and written learning guide) and a full knowledge base with definitions, keywords, and salient examples for agents.

**See pages 50 - 51 for examples of customer service training materials.**

UBER-MDL3084-000000419

The taxonomy also helps agents better understand reports, and informs the appropriate response protocol – ranging from warnings, to education on Uber's community standards, to removal of a user's access to the platform.

In addition to training our agents on this new process, we have also taken first steps to implement the taxonomy into our data collection and analysis efforts, which serves as the baseline for prevention efforts.

While the work to implement this new taxonomy is a first step, over time, we are hopeful that this work will enable new intervention protocols and will help encourage even more reporting.

**The business principles that will continue to define this work include:**

- We are focused on the user's experience, so we accept all reports at face value with the behaviors as described by the reporter and respond to them with the appropriate protocol for that type of report. We seek to build an environment in which all users feel that reporting will make a difference and where more people report to Uber.

- We have many channels to receive reports and respond to those reports regardless of how it was reported. This includes gathering reports from sources that include in-app, in-person, phone, email, social media, law enforcement integration, and website comments.

- We develop methods of collecting and categorizing structured data about reported incidents. Properly categorized data helps us to quantify the problem.

- We use collected data and information about reported experiences to understand how the problem changes over time and evaluate and improve procedures for responding to reports.

- We believe that greater focus on the issues encourages more people to feel comfortable reporting, allowing us to more accurately quantify the problem.

We plan to promote awareness of response and prevention efforts by publishing data in an upcoming transparency report. An increased awareness of responses and prevention efforts encourages the further reporting of incidents, improving the volume and quality of data collected. Recognizing that other businesses may also find this effort valuable, we have worked to make our process transparent, in partnership with RALIANCE and Urban Institute, so that it can be used by others.

UBER-MDL3084-000000420

## HOW CUSTOMER SERVICE WORKS AT UBER

# Uber



# Reporting a Safety Incident

**1**

## A safety issue can be filed many ways



**Help.Uber.com**

Visit help.uber.com for FAQs and to connect with customer support



**Uber Support**

RIDERS go to Menu > Help and tap Report an issue with this trip

DRIVERS tap profile image > Help > Trips and Fare Review to report



**Emergency Assistance**

If you call a 911 dispatcher right from the app, a report is automatically filed with Uber



**Additional Channels**

Any safety issues from social media, in-person support centers, and Law Enforcement are documented



**2**

## Reports are evaluated right away

We use advanced technology to enable safety-related reports to be acknowledged and given to a trained professional agent within minutes of receipt.

**3**



## Each safety issue is triaged and reviewed by a professional agent



Each incident is categorized based on our taxonomy and responded to appropriately.

**How we conduct reviews:**
Agents make outreach, by email or phone, to all parties and review Uber trip data

**How we take action:**
Warnings, temporary suspensions, or permanently removing riders and drivers if our community guidelines are violated

**4**

# Your safety is critical to us and we take action on every report



UBER-MDL3084-000000421

# EXAMPLE SNAPSHOTS OF CUSTOMER SERVICE TRAINING MATERIALS

## COMMENTS OR GESTURES > FLIRTING

Definition: Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious.

| QUALIFYING EXAMPLES OF COMMENTS OR GESTURES > FLIRTING | QUALIFYING JUSTIFICATION |
|---|---|
| "Trip started out fine with the driver telling me about some local bars. After a while, though, he kept getting really pushy and saying he wanted to be my tour guide. I'm really tired of getting hit on by drivers." | Making suggestive comments about romantic activities or non-romantic activities outside of the Uber app clearly meets the definition of flirting. In this case, the driver's offer to be the rider's "tour guide" is a suggestive offer to engage in romantic activities. |
| **NON-QUALIFYING EXAMPLES OF COMMENTS OR GESTURES > FLIRTING** | **NON- QUALIFYING JUSTIFICATION** |
| "My rider was talking about how much money he had…said he would make it worth my while if I gave him a blowjob. I don't think he should get to keep using Uber." | Offering a user money in exchange for sexual activities / favors is more serious than flirting. This report should be classified as: **Soliciting Sexual Act**. |

UBER-MDL3084-000000422

# EXAMPLE SNAPSHOTS OF CUSTOMER SERVICE TRAINING MATERIALS

## CONSENT: WHAT IT IS AND ISN'T

Consent means granting permission for something to happen or agreeing to do something. People often think consent is only important when it comes to sex. Really, consent is about always choosing to respect personal boundaries.

**When something is consensual, whether it's a hug or sex**, it means everyone involved has agreed to what they are doing and has given their permission. Non-consensual sexual behavior, or sex without someone's agreement or permission, is sexual assault. Some important things to know about consent:

- Only yes means yes. Consent is not the absence of a no. It is the presence of a clear, affirmative expression of interest, desire, and wants. The exchange of consent involves all parties. Each person sets their boundaries or shares their desires. Consent is respectful, mutual decision-making.

- Drugs and alcohol impact decision-making and blur consent. When drugs and alcohol are involved, clear consent cannot be obtained. An intoxicated person cannot give consent.

- Consent needs to be clear. Consent is more than not hearing the word "no." A partner saying nothing is not the same as a partner saying "yes." Don't rely on body language, past sexual interactions, or any other nonverbal cues. Never assume you have consent. Always be sure you have consent by asking.

- Consent is specific. Just because someone consents to one set of actions and activities does not mean consent has been given for other sexual acts. Similarly, if a partner has given consent to sexual activity in the past, this does not apply to current or future interactions. Consent can initially be given and later be withdrawn.

UBER-MDL3084-000000423

# RALIANCE
## BUSINESS

- 🌐 www.raliance.org
- f www.facebook.com/RalianceOrg
- 🐦 twitter.com/RALIANCEOrg

UBER-MDL3084-000000424

Uber

# APPENDIX B

UBER-MDL3084-000000425

UBER-MDL3084-000000426

Uber Technologies, Inc.
San Francisco, CA
Published: December 5, 2019

Disclaimer: The data included in this Report is being provided for informational purposes only and reflects incidents report -
ed to Uber in numerous ways, as discussed further herein. The data consists of reported incidents that allegedly occurred in
connection with (as defined here) an Uber -facilitated trip. Given the limitations described herein, the Report does not assess
or take any position on whether any of the reported incidents actually occurred, in whole or in part. Accordingly, no data,
analysis, statement, representation, or other content contained in this Report can be relied upon by any party for any other
purpose. This Report is issued as of the publication date listed above. Uber has undertaken reasonable efforts to ensure that
the data, analysis, statements, representations, and other content contained in this Report are accurate as of the publica -
tion date, and will not update the Report or its contents after such publication date.

UBER-MDL3084-000000427

4        Terms used in this Safety Report

6        Foreword

8        An introduction letter

10       Executive summary

20       Safety investments

33       Methodology

49       Uber's scale in the United States

50       Data insights

50           Motor vehicle fatalities

57           Fatal physical assaults

58           Sexual assault

71       Conclusion

         Appendix I: Why data standards matter

         Appendix II: Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy and the Development of Uber's
         United States Safety Report (by National Sexual Violence Resource Center, RALIANCE, and Urban Institute)

         Appendix III: An Evaluation of Safety Incident Categorization Capabilities for Uber (by The Chertoff Group)

         Appendix IV: Sexual Misconduct and Sexual Violence Taxonomy

UBER-MDL3084-000000428

Section Three

**Audit function (or audit process)**
Uber's data-quality assurance process, which is designed to ensure data classification accuracy, reliability, and consistency across all safety incident reports.

**FARS**
The Fatality Analysis Review System. Operated by the National Highway Traffic Safety Administration (NHTSA), FARS is a nationwide census of fatal traffic crashes within the 50 states, the District of Columbia, and Puerto Rico.

**Guest rider**
Any rider in an Uber-facilitated trip who is not the rider who requested the trip through their Uber account. Guest riders can accompany rider account holders on trips or take the trip without the rider account holder present.

**NISVS**
The National Intimate Partner and Sexual Violence Survey. Administered through the Centers for Disease Control (CDC), NISVS is an ongoing survey that collects national and state-level data on intimate partner violence, sexual violence, and stalking victimization in the United States.

**Relevant facts**
During the incident-report review process, safety support agents may gather relevant facts that may aid in the ultimate resolution of a report. These relevant facts may include but are not limited to: GPS information, trip timestamps, and any additional information provided to us, such as dashcam, phone, or audio recordings and screenshots of text conversations. Although these relevant facts can be useful, they are not necessary for an accused party's account to be removed from the platform, and we rely heavily on a survivor's statement of experience.

**Ridesharing (or ridesharing platform)**
For the purposes of this report, the Uber ridesharing platform involves peer-to-peer ride services inclusive of, but not limited to, UberPool, UberX, Uber Black, Uber SUV, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (e.g., New York City).

**Safety support agent(s)**
Customer support personnel at Uber who are tasked with handling and responding to reported safety incidents and actioning user accounts as necessary.

**Sexual assault**
Based on the [Sexual Misconduct and Sexual Violence Taxonomy](#), sexual assault is defined as any physical or attempted physical contact that is reported to be sexual in nature and without the consent of the user. This can include incidents within the taxonomy ranging from Attempted Touching of a Non-Sexual Body Part (e.g., a user trying to touch a person's shoulder in a sexual/romantic way) to Non-Consensual Sexual Penetration. (For further sexual assault categories and their definitions, please see [Appendix IV](#).)

**Sexual misconduct**
The [Sexual Misconduct & Sexual Violence Taxonomy](#) defines sexual misconduct as non-physical conduct (verbal or staring) of a sexual nature that happens without consent or has the effect of threatening or intimidating a user against whom such conduct is directed. This can include incidents within the taxonomy ranging from Staring/Leering to Verbal Threat of Sexual Assault. (For further sexual misconduct categories and their definitions, please see [Appendix IV](#).)

**Statement of experience**
During the case-review process, specialized safety support agents aim to speak directly with the victim or survivor to obtain a firsthand account on the details of their reported incident. In cases where a survivor is not able or willing to provide that statement of experience, Uber considers all other relevant facts obtained during the review.

**Taxonomy**
A system used for incident categorization. Uber's Safety Taxonomy is used to categorize safety incidents for proper agent routing, support protocol design, data tracking, and other purposes.

**Third party**
Any person who is not a driver, rider account holder, or guest rider involved in a reported safety incident.

UBER-MDL3084-000000429

**User**

Any person using the Uber platform. For the purposes of this report, it pertains specifically to drivers and riders.

**Victim/ Survivor**

We've learned from experienced advocates that people impacted by sexual violence may identify in many different ways, which can be deeply personal to the individual. In an effort to be inclusive and to ensure that all people impacted by sexual violence can identify with the language used in this report, Uber has chosen to use the terms victim and survivor throughout this report. Both terms are intended to refer to a person who has experienced any type of sexual misconduct or sexual assault.

Section Three

UBER-MDL3084-000000430



As an advocate who has been working in the movement to end sexual violence for the past 20 years, I welcome this unprecedented report, which provides an opportunity to shed light on how this information-sharing emboldens our work for a safer future.

When the National Sexual Violence Resource Center (NSVRC) began working with Uber and the Urban Institute two years ago to create a classification system for unwanted behaviors, we didn't anticipate how much we would learn about informing and enhancing the way industries and corporations enact meaningful change, and how those changes contribute to efforts to prevent and end all forms of sexual violence.

The publication of this report is a bold step that builds off of that effort and sets a new bar for corporate responsibility and transparency. Never before have we seen a company disclose this level of information proactively. As experts in this field, we know first-hand that sexual harassment and abuse occur in all industries because they are a part of our larger society. All too often we have seen institutions respond to this reality by dismissing, denying, and downplaying the data and the broader problem. A 2019 national study found that 81% of women and 43% of men report experiencing some form of sexual harassment and/or assault in their lifetime [1]—the research speaks for itself, and it is irresponsible and unconscionable to deny the pervasive harms experienced by so many.

All too often, victims of sexual assault and rape don't know where to go or how to report, and are silenced by the fear that they won't be believed or that their report won't be taken seriously. This contributes to why sexual assault is such an under-reported crime across society. A recent US Department of Justice study found only 25% of sexual assaults or rape were reported to police. [2] Technology can make it easier for people to come forward, and it has the potential to increase accountability. For example, trip information and tracking in ridesharing apps may make it more likely for riders and drivers to report incidents.

We also know that reporting goes up when people know how to report and feel that their reports will be taken seriously. By releasing this data publicly, Uber is confronting these challenging issues head-on rather than shying away from or minimizing the numbers. In fact, they made the intentional decision to be overinclusive, capturing data by accepting every report at face value, without requiring corroboration; and by placing incidents in the highest possible category of severity, when the descriptions were vague.

More than ever, business leaders have a unique opportunity to play a role in addressing the pervasive problem of sexual assault and harassment. In order to contribute, they need to first accurately assess the nature and scope of sexual misconduct in their context. Second, they must respond appropriately when incidents occur; and third, they must enforce standards of safety and respect to reduce and prevent further occurrences.

1. Holly Kearl, "The Facts Behind the #MeToo Movement: A National Study on Sexual Harassment and Assault," February 21, 2018, p. 7, http://www.stopstreetharassment.org/wp-content/uploads/2018/01/Full-Report-2018-National-Study-on-Sexual-Harassment-and-Assault.pdf.
2. Rachel E. Morgan, Ph.D. and Barbara A. Oudekerk, Ph.D., "Criminal Victimization, 2018," Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 2019, p. 8, https://www.bjs.gov/content/pub/pdf/cv18.pdf.

Section Three

UBER-MDL3084-000000431

Consistent categorization of reports of sexual harassment, misconduct, and assault make it possible for companies to capture reliable data and to hold themselves accountable to handling reported incidents responsibly.

Sexual assault is not just one company's problem or issue. It is perpetrated in every industry and every form of transportati on. If we want to change this reality, we need more data and more companies who are willing to be transparent and accountable.

We are excited to announce the next wave of this work, which will move forward through RALIANCE, a national partnership dedicate d to ending sexual violence in one generation. RALIANCE is working with Uber to establish  RALIANCE Business: a resource center dedicated to helping public and private sector leaders adopt consistent, evidence      -based standards and strategies to improve how they measure, respond to, and prevent sexual violence. This will build momentum to address and reduce sexual violence across ind    us-tries, and will bring  us all closer to our common  goal of a future  built  on safety  and respect.

We encourage other companies to follow Uber's lead by bringing sexual violence to light, counting it consistently, and publicly sharing data. This is how we can build on what we know, share best practices, and make every industry safer for everyone.

Section Three

UBER-MDL3084-000000432

An introduction letter
from the desk of Tony West,
Chief Legal Officer, Uber



Dear Reader,

Nearly 2 years ago, Uber CEO Dara Khosrowshahi convened a dozen of the company's top executives in a room to discuss an important issue: the safety of drivers and riders. The topic was broad: how could Uber —with nearly 4 million trips happening every day in the US alone—become the safest ridesharing app in the world?

It was clear from this conversation that successfully achieving that mission required a deeper understanding of the toughest issues we face as a company, listening to the specific concerns and experiences shared by drivers and riders, and a close examination of how our technology could help us keep people safe.

What began that day was a 21-month effort that has included a review of hundreds of thousands of customer support requests; a complete rethink of how we categorize the most serious safety incidents that happen during Uber trips; an overhaul of how we train our support staff; and an even bigger investment in cutting -edge safety technology.

All of that work culminates in the Safety Report that we are sharing with you, the public, today.

To put US safety challenges in context:

- In 2018, over 36,000 people lost their lives in car crashes in the United States alone[3]
- Approximately 20,000 people were the victims of homicide in 2017[4]
- Nearly 44% of women in the US have been a victim of sexual violence in their lifetime — which means that more than 52 million women live with that experience every day [5]

Every form of transportation is impacted by these issues. For example, the NYPD received 1,125 complaints of sex offenses in the transit system during the same time period covered by this report. [6,7]

In the United States alone, more than 45 rides on Uber happen every second. At that scale, we are not immune to society's most serious safety challenges, including sexual assault. Yet when collecting data for that portion of our report, we found there was no uniform industry standard for counting and categorizing those types of incidents.

That's why, last fall, we partnered with the National Sexual Violence Resource Center and the Urban Institute to create this much -needed classification system —and we made it open source so that other companies can use it to improve safety for their own customers.

Voluntarily publishing a report that discusses these difficult safety issues is not easy.

3. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," (October 2019) p. 1. https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812826 .
4. Kenneth D. Kochanek, M.A., et al, "Deaths: Final Data for 2017," National Vital Statistics Reports 68, no. 9 (June 24, 2019): p. 51. https://www.cdc.gov/nchs/data/nvsr/nvsr68 /nvsr68_09-508.pdf .
5. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1. https://www.cdc.gov /violenceprevention/pdf/2015data_-brief 508.pdf .
6. "Complaints for Offenses Described in Administrative Code 14-150(d) Occurring in Transit Jurisdiction Calendar Year 2018," New York Police Department (NYPD), n.d., https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/transit_-bus-crime_-reports/ 2018/complaints -in-transit -report -cy-2018.pdf.
7. "Complaints for Offenses Described in Administrative Code 14-150(d) Occurring in Transit Jurisdiction Calendar Year 2017," New York Police Department (NYPD), n.d., https:// www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/transit_-bus-crime -reports/2017/complaints_-in-transit -report -cy-2017.pdf .

Section One

UBER-MDL3084-000000433

Most companies don't talk about issues like sexual violence because doing so risks inviting negative headlines and public criticism. But we feel it's time for a new approach. As someone who has prosecuted sex crimes and worked on these issues for more than 25 years, I can tell you that a new approach is sorely needed.

Confronting sexual violence requires honesty, and it's only by shining a light on these issues that we can begin to provide clarity on something that touches every corner of society. And, most importantly, by bringing hard data to bear, we can make every trip safer for drivers and riders alike.

Because we alone cannot meet all of the safety challenges inherent in our industry, we're already working with law enforcement officials, road safety organizations, and more than 200 gender-based violence prevention experts —including the Rape, Abuse & Incest National Network (RAINN), the National Alliance to End Sexual Violence, and the Nationa Network to End Domestic Violence —to innovate on new approaches that will raise the bar on safety in ridesharing.

Because intent alone is not enough, we've tripled the size of our safety team since 2017, with more than 300 professionals now dedicated to safety for our core rides business.

And because we have one of the best technology teams in the world focused on safety, we've also added new safety features like our In-App Emergency Button, more rigorous background checks that continuously look for new criminal offenses, and technology that allows us to check in with customers if we detect a potential crash or unexpected long stop during a trip.

We're constantly pushing to do more on safety. We're rolling out new features that allow riders to verify their driver with a secure PIN code, send a text message directly to 911 operators, and report safety incidents to Uber before their trip is even over.

In some countries, we're testing a feature to give drivers and riders the option to securely record audio during their trip as a safety precaution. We're also committed to sharing the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers.

Of course, this is more than an "Uber thing." Safety should never be proprietary, and it's our intention to make an impact well beyond our own company, encouraging others to be more transparent with their data and to share best practices that can make everyone safer.

To that end, we're teaming up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish [RALIANCE Business](#) a new resource center that will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence that may occur in the workplace or within business operations.

The moment is now for companies to confront it, count it, and work together to end it.

Sincerely,

Tony West
Chief Legal Officer, Uber

## The moment is now for companies to confront it, count it, and work together to end it.

Section One

UBER-MDL3084-000000434

This Safety Report, the first comprehensive publication of its kind to be issued by a company, shares details on Uber's safety progress, processes, and data related to reports of the most critical safety incidents on our platform. It represents the latest in a series of actions Uber has taken to continually improve the safety of our platform for all who use it.

We know most companies would not share publicly much of the information we have included here. But even though the decision to do so was hard, we have chosen to produce this report because we believe that for too long, companies have not discussed these issues publicly, particularly those relating to sexual violence. And simply put, we don't believe corporate secrecy will make anyone safer.

People have a right to know about the safety records of the companies and organizations they rely on every day. And we believe that publishing this data will help us develop best practices that will prevent serious safety incidents from occurring in the first place.

The issues in this report are bigger than Uber and impact every corner of society as a whole. The data itself may challenge assumptions. For example, while media coverage of the issue of sexual assault related to Uber has almost entirely portrayed drivers as the alleged offenders, our data shows that **drivers report assaults at roughly the same rate** as riders across the 5 most serious categories of sexual assault. Drivers are victims, too.

> We don't believe corporate secrecy will make anyone safer.

This report includes information about Uber's safety investments and the actions we take as a result of safety-related reports from users. But its primary focus is to share data about reports of serious safety incidents —and to derive insights that help us track our progress, be more accountable, and strengthen safety on our platform and across the industry.

It's important to understand the scale of Uber's business in interpreting this data. This year, nearly **4 million Uber trips** happened every day in the US—more than **45 rides every second**. At such a large scale, Uber's platform ultimately reflects the world in which we operate —both the good and the bad. As the numbers in this report will show, critical safety incidents on our platform are, statistically, extremely rare. But even one critical safety incident is unacceptable because it represents the lived experience of someone in the Uber community.

For the purposes of this report, we examine data from 2017 and 2018 —a time frame in which an average of more than 3.1 million trips took place each day in the US. **The vast majority (99.9%) of Uber trips end without any safety-related issue at all**. For example, for the trips in 2017 and 2018:

- **1.4%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback.

- **0.1%** of trips had a support request for a safety-related concern, and the majority of those concerns were about less-severe safety issues such as complaints of harsh braking or a verbal argument.

- **0.0003%** of trips had a report of a critical safety incident,[8] which are the incidents referenced in this report.

The vast majority of the reports that Uber receives are **not** safety related at all. All potential safety-related reports are manually reviewed by teams of specialized agents for proper adjudication. When our support teams receive safety-related reports, they are triaged and classified by agents based on the description given by the reporting party, and appropriate action is then taken on each and every case.

---

8. This percentage includes the 5 categories of sexual assault published in this report, fatal motor-vehicle crashes, and fatal physical assaults reported to occur in 2017 and 2018 in relation to the Uber platform.

UBER-MDL3084-000000435

Section X

# Safety investments

In 2017, Uber kicked off a comprehensive effort across the company to focus on safety. We developed new technology, strengthened background screenings for drivers, launched new safety features, overhauled how we train our support staff, updated our policie s, and tripled the size of our safety team.

## Driver background checks and screenings

Every US driver undergoes an annual Motor Vehicle Record (MVR) review [9] and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potent        ial drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requ irements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

Uber's background -check process is very rigorous. During 2017 a nd 2018, more than **one million prospective drivers** [10] **did not make it through Uber's screening process**. The majority (76%) of the drivers who failed Uber's screening process were disqualified during the MVR check and did not advance to the criminal backgrou nd check portion of our screening.

> Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process.

Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for certain serious criminal convictions    —including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnap        - ping [11]—at any time in the person's history, the potential driver will be disqualified according to  our standards.

Beyond performing annual background check reruns, we were the first US ridesharing company to implement    **continuous driver screening technology** , which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can t ake action to ensure that every driver continues to meet our high standards. Since we launched this technology, more than  **40,000 drivers have been removed** from the app due to continuous screening.

## Community Guidelines

Uber's Community  Guidelines, which  we ask all US users  to read and acknowledge,  are designed  to help users understand the behaviors expected by everyone who uses the Uber app. They are grounded in the principles of treating everyone with respect, h elping to keep one another safe, and following the law. Drivers have long been expected to meet a minimum rating threshold, and we  strengthened our policies    this year so that riders, too, may lose access to Uber if they develop a signifi   - cantly below -average rating.

## New safety technology

Over the past 2 years, we've launched more safety features than we did in the previous 8 years combined. Some  of these features  include:



**In-App Emergency Button**
Connects riders and drivers directly to 911 with the simple press of a button. In some cities, trip details and location can be shared automatically with first responders, or riders and drivers can send a text message to 911.



**RideCheck**
Can detect rare events such as unexpected long stops on a trip or possible vehicle crashes. The tech - nology proactively  checks in with riders and drivers to see if everything  is OK, and the app provides tools that they can use to get help, if needed.

---

9. In New York City, the MVR screening is conducted  through  the  NYC Taxi and Limousine  Commission  (TLC). The TLC Driver licensing  process is separate from the process described  here.

10. "Prospective drivers" is defined  as drivers who consented  to a background  check in 2017-2018 as part of the sign- up process to drive on the Uber platform.

11. This section describes Uber's default standards. The criminal offense descriptions may vary based on jurisdiction. Certain lo  calities or states may require rideshare companies to disqualify  drivers for additional  offenses or pursuant  to differen t lookback periods. In those jurisdictions,  individuals  cannot drive on the Uber platform  if they do not meet our default standards or if they have otherwise been convicted of any disqualifying offense under the applicable jur   isdiction's law.

UBER-MDL3084-000000436

Section X



**Share My Trip/Follow My Ride**
Gives riders and drivers the option to share their trip with designated loved ones who can then follow their trip on a map in real time and know when they've arrived.



**Phone number and address anonymization**
When riders and drivers contact each other thro ugh the app, their actual phone numbers do not appear. Additionally, we've taken steps to anonymize exact pickup and dropoff addresses in the driver's trip history.



**Driving-hours tool**
Requires drivers to go offline for 6 straight hours after a total of 12 hours of driving [12] to help prevent drowsy driving on the Uber platform.



**Speeding alerts**
Drivers can receive notifications to maintain a speed that's within the posted limits. The speed limit is displayed on the driver's app, and they can be visually or audibly alerted when they go over the limit.



**Real-time ID check**
Prompts drivers to take  a live photo of themselves in the Uber app before  they can accept rides.[13] The tool then utilizes facial comparison technol  - ogy to match a driver's real  - time photo with their account photo, which helps to verify that the right driver is behind the wheel.

## Sexual assault standards

Uber does not tolerate sexual assault or misconduct from anyone, anywhere, at any time. We take all allegations of sexual assault and sexual misconduct extremely seriously and work to take action quickly and fairly.

In 2017, as a result of input from exte rnal experts, drivers, and riders, we created a specialized team to provide customer support to riders and drivers reporting the most serious safety incidents, including sexual assault. The agents receive tailored training on how to address difficult and s ensitive situations, and are empowered to make immediate account   - access decisions and provide victims with further support.

Uber believes it's important to hear from everyone involved when an incident is reported. When we receive a report  of sexual assault, [14] a trained safety support agent begins by identifying  the accused party and their associated Uber account. We immediately remove the accused party's access to the Uber app so that they cannot take trips while we complete a review. If t  he accused party is a guest rider, we attempt to identify whether they have their own Uber account and, if they do, we restrict it. If the guest rider cannot be identified, or if they do not have an Uber account, we may restrict the account holder's access to the Uber app since they are responsible for their guest riders' actions while on a trip. Regardless of the outcome of our case review, we make sure that the involved parties are not p aired again in the future on the Uber platform. Importantly, blocking a pairing is not the only action Uber will take on a report, and further action will depend on what the subsequent review finds.

> When we receive a report of sexual assault, we immediate ly remove the accused party's access to the Uber app while support agents complete a review.

When reviewing an incident report, agents gather information by speaking with all parties involved and examining other relevant facts obtained through the case  - review process, such as GPS trip data, photos and/or videos, in  - app communi  - cations, etc. Based on learnings from  experts, we rely heavily on a survivor's statement  of experience; it does not  require

12. Configurations  of the driving - hours tool may vary in accordance  with state and local requirements.
13. Due to legal restrictions  contained  in the Illinois Biometric Information  Privacy Act, real-time ID check is not yet available in the state of Illinois.
14. Similar protocols  are followed for the following  urgent  categories  of sexual misconduct:  Indecent  Photography/Video  Without  Consent, Masturbation/Indecent   Exposure, and Verbal Threat of Sexual Assault.

conclusivity, corroboration, or survivor "credibility" for us to take action. If a survivor is not able or willing to provide     this statement of experience, we rely on any   relevant facts obtained through the case  -review process.

Violent offenders  have no place in the Uber community,  and it's our priority  to prevent  their access to our platform.  Uber will ban users from the platform if we are able to obtain a statement of experience from the survivor and/or obtain relevant facts (e.g., GPS data, timestamps, videos/photos, in  -app communications). We adhere to this standard for all sexual assault categor ies described in this report.

## Approach to safety deactivations [15]

This report  includes data on the most severe reported  cases, but it's important  to note that Uber takes every report  of a safety  incident  seriously. Our specialized support  team investigates  issues and takes appropriate  action based on the information  available. The types of reports  we receive encompass  a wide spectrum,  and we have a broad range of responses as a result.

A single serious safety incident  can result  in a rider's or driver's loss of access to the Uber app. However, the vast majority of safety incidents reported to Uber involve less severe or infrequent behaviors that may not warrant being immediately removed  or permanently  banned from the app. Our systems are constantly  evaluating a variety of factors,  including  user feedback,  local driving patterns,  fraud  signals, and data science to identify  patterns  of potentially  risky behavior. If a pattern of behavior is found,  this can trigger  further  review and result  in the accused  party's loss of access to the Uber platform.

While data and technology  are useful tools for strengthening  our safety  strategies,  safety itself  is personal —and people have an essential role to play. Our safety support agents are trained to detect reports that may have alternative intentions     — for example, a rider  seeking refunds by making identical unsafe driving complaints about multiple drivers. It's important  to note that no rider or driver is banned from the Uber app for a safety report without a human review.

## Connecting survivors to third-party advocates

Supporting  users who have reported  sexual assault or misconduct  on our platform  is incredibly  important  to us. Our agents offer survivors resources such as the National Sexual Assault Hotline, which is operated by the     Rape, Abuse & Incest National  Network  (RAINN). The hotline  can provide  survivors  with  confidential  support  such as crisis counseling,  informa - tion and options  for seeking  medical  services or reporting  to law enforcement,  or referrals  to longer - term  support  services in their area.

## Prevention initiatives

From more than 200 expert and advocacy organizations around the world, including women's groups and road safety and crime - prevention organizations, we've consistently heard that education is key in helping prevent unsafe behaviors. That's why we've worked in partnership  with  the experts  to develop prevention,  awareness, and education  campaigns  including:

**Sexual misconduct  education**
Educational modules  , developed by RAINN for riders and drivers, share information about appropriate behavior while on the app and are sent to a user when they receive an initial report of unwanted behavior.

**Driving Change Initiative**
$5 million initiative to support the sexual violence prevention programs of leading organizations such as     A CALL TO MEN, Casa de Esperanza, National Coalition of Anti - Violence Programs , National Network to End Domestic Violence, NO MORE, RALIANCE, Futures Without Violence  , Rape, Abuse, Incest National Network (RAINN) , and Women of Color Network, Inc, as well as grassroots rape crisis centers nationally and globally.

**#DontStandBy Bystander Intervention  Campaign**
Key safety education on safe intervention in unsafe situatio    ns developed with NO MORE local law enforcement, local rape crisis centers, and the nightlife community.

15.Deactivations  or "bans" refer to the specific Uber account  that was being used during the safety incident(s)  that led to removal. For example, if a driver is flagged by Uber's system and subsequently  deactivated  for dangerous driving, they may still be allowed to ride with Uber using the Rider app.

UBER-MDL3084-000000438

**Drunk driving prevention**
We partnered with Mothers Against Drunk Driving for our #ReasonsToRide campaign, which reminds people of the dangers of driving under the influence.

**Seat belt safety awareness**
We partnered with the Governors Highway Safety Association (GHSA) and Volvo to educate users with in-app notifications and emails about the safety benefits of seat belts.

**Bike and scooter safety**
We developed Bike Lane Alerts to remind riders to look before opening the door when their upcoming dropoff point is near a bike lane or along a bike route.

## What's next for safety at Uber?

This Safety Report is just one part of our commitment to helping drive accountability in our industry. What matters most are the actions we take to raise the bar. Below are some of our newest investments in safety, along with what we're excited to bring to our users in the future.

**Deactivation sharing**
We're committed to finding a way to share the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers. We want companies to be able to use this information to protect their customers.

**Sexual misconduct education for all drivers**
In 2020, Uber will expand sexual misconduct and assault education to all US drivers. We are partnering with RAINN, the nation's largest sexual violence organization, to design this program.

**Verify Your Rides**
Soon we will offer all riders the option to verify each of their rides with a unique, 4-digit PIN that they can verbally provide to their driver, who will have to enter it into their own app in order to start the trip. This helps riders ensure that they're getting into the right car.

**On-trip reporting**
This feature, soon to be available nationally, allows riders to report a non-emergency safety issue during an Uber trip, when it is top of mind, so they don't have to wait until after the trip ends.

**Text to 911**
In select cities, in addition to calling 911 through the app, users are now able to text 911 to discreetly share car information, location, and direction of travel with 911 call-takers.

**Uber Survivor Support Hotline**
In 2020, Uber will partner with RAINN to provide a dedicated survivor hotline that will provide confidential crisis support and specialized services to survivors.

# Methodology

In this report, we are sharing information about 3 categories of critical safety incidents:

- Motor vehicle fatalities

- Fatal physical assault

- Sexual assault (further detailed in 5 subcategories)
    - Non-Consensual Kissing of a Non-Sexual Body Part
    - Attempted Non-Consensual Sexual Penetration
    - Non-Consensual Touching of a Sexual Body Part

UBER-MDL3084-000000439

- Non‑Consensual Kissing of a Sexual Body Part
- Non‑Consensual Sexual Penetration

The report includes a comprehensive look at user reports of critical safety incidents that come in to Uber's support centers through more than 10 different reporting channels. From the ability to report through the app to our 24/7 Critical Safety Response Line, our technology means that riders and drivers can get in touch with us quickly, discreetly, and more seamlessly than is possible with many other companies.

## Motor vehicle methodology

In the US, the National Highway Traffic Safety Administration (NHTSA) makes annual traffic fatality information available to the public through the Fatality Analysis Reporting System (FARS). The motor vehicle fatality data in this Safety Report is built off the data standards established by FARS. Each fatal crash in the Uber dataset was reconciled to a fatal crash in the FARS database.

For a fatal motor vehicle crash to be included in this Safety Report, the crash must have involved the vehicle of at least one driver using the Uber platform and the death of at least one person within 30 days of the crash. Fatal crashes are included in this report regardless of whether the deceased party was an Uber user or whether a driver using the Uber platform or their vehicle was the cause of the crash or was carrying the deceased parties.

The Uber‑related [16] vehicle miles traveled (VMT) in this report are based on the miles driven during trips and GPS data calculated while a driver was en route to the rider's pickup location. [17] This helps align with national statistics, which use VMT (per 100 million miles) as the denominator in calculating a fatality rate. [18]

## Fatal physical assault methodology

This report includes physical assault incidents that resulted in one or more fatalities. In order for a fatal physical assault incident to be established as Uber‑related for the purposes of this report, one or more of the following must be true:

- The incident involved at least one person on an Uber‑facilitated trip, [19] not necessarily with parties paired by the Uber app
- The incident occurred between parties that were paired by the Uber app, and it occurred within 48 hours [20] of the trip ending

## Sexual assault methodology

In 2018, we partnered with experts from the National Sexual Violence Resource Center (NSVRC) and the Urban Institute to develop a new taxonomy to better understand the reality of unwanted sexual experiences. [21] Prior to this effort, a standardized tool that corporations could use to consistently classify reports of sexual violence received from their consumers did not exist. The taxonomy has since been made open source for use by other companies and organizations.

Uber has intentionally adopted broader definitions, particularly in the area of sexual assault, than most jurisdictional criminal codes and research entities.

16. "Relation to the Uber platform" or "Uber‑related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.
17. For a small portion of driver miles during 2017, the GPS data is missing during the period when the driver is en route to a rider's pickup location. For the missing data, we have used Uber's best estimate in calculating the mileage.
18. US Department of Transportation (USDOT), "VMT per Capita," February 2, 2016, https:// www.transportation.gov/mission/health /vmt-capita.
19. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while en route to the rider's pickup location, this would be included in the dataset.
20. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post‑trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.
21. Chad Sniffen, Julia Durnan, and Janine Zweig, "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," 2018, https://www .nsvrc.org/sites/default/files/publications/2018 -11/NSVRC_HelpingIndustries.pdf.

UBER-MDL3084-000000440

In order for a sexual assault to be established as Uber-related for purposes of data classification for this report, one or more of the following must be true:

- The incident occurred during an active Uber-facilitated trip,[22] not necessarily with parties paired by the Uber app
- The incident occurred between parties that were paired by the Uber app, and it occurred within 48 hours [23] of the trip's completion

The data in this report is derived from incident reports, which reflect the description given by the reporting party, as classified by agents. As a result, it does not necessarily reflect the actual number of occurrences of critical safety incidents, nor does it signal the ultimate disposition of any particular case. Uber uses a survivor-centered approach in our review process for sexual assault reports. Survivors are not required to "prove" their own assault. Because we know that survivors of sexual violence may withdraw their reports or refuse to pursue them further for any number of personal reasons, this report consciously includes data about reports that were later withdrawn (but not disaffirmed) by survivors.

Importantly, we believe that responsible data reporting is critical to improving the safety of the Uber ridesharing platform and the communities we serve. Each of these reported safety incidents is more than just a data point to us. Such incidents can represent serious traumas for real individuals in our communities. This reality leaves little room for error, and we take this responsibility for data accuracy and consistency extremely seriously.

## Data quality

Uber strived for the data included in this report to have measurably high degrees of classification accuracy, reliability, and consistency. In determining which categories of sexual assault were appropriate to include in this report, we prioritized:

1. Including the most serious categories of sexual assault outlined in the taxonomy
2. Maintaining a high degree of confidence and consistency in the quality of the overall dataset
3. Remaining as consistent as possible with the types of sexual assault that are already published in external research and national estimates

This report includes categories of sexual assault which, in aggregate, have at least 85% of auditor classifications aligned with internal Safety Taxonomy experts. We are able to achieve much higher confidence [24] in the auditor classifications for Non-Consensual Sexual Penetration and fatalities. For sexual assault and misconduct in particular, Uber user reports can be interpreted subjectively by safety support agents and auditors, even for the most severe incidents, because of a historical lack of shared and consistent definitions.

## Data auditing process

To prepare for this publication, Uber created a specialized audit team to review and accurately categorize the data contained in this report. This team reviewed approximately hundreds of thousands of user reports, representing a range of safety- and non-safety-related consumer issues to ensure that all necessary information was documented and all incident reports were categorized accurately and comprehensively. In order to gain confidence in the results of the internal audit, we created a curriculum and certification process for auditors and measured their categorization accuracy at a regular cadence.

## Limitations of Uber safety incident data

We recognize that this data and our user base are neither a representative national sample nor, necessarily, a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults in other contexts. Direct comparisons to other datasets are therefore difficult.

22. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.
23. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's completion. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.
24. Here "confidence" refers to the rate of agreement when 2 auditors are separately shown the same facts and come to the same conclusion on the classification of an incident.

UBER-MDL3084-000000441

# Data insights

When developing this Safety Report, Uber was intentionally overinclusive in determining which incidents to capture in each category. We have adopted broader definitions —particularly in the area of sexual assault —than most jurisdictional criminal codes and research entities. The data we are releasing encompasses reports of safety incidents, regardless of outcome or fault, as opposed to those that simply meet criminal definitions or that may have resulted in law enforcement action.    For more examples and information on how more restrictive data standards may impact the overall dataset for a publication of this nature, see  Appendix I: Why data standards matter .

## Motor vehicle fatalities data[25]

While we have tried in this report to align with available methodologies and statistics, we know that drawing direct compar-isons to national motor vehicle fatality rates is not easily done. For example, all drivers using the Uber platform    [26] must be at least 21 years old and have at least one year of driving history, and their motor vehicle records must be screened before they can drive on the Uber platform.   [27] Also, vehicles used on the Uber platform are generally newer than the average light -duty vehicle on US roads (4 years old compared to 10). [28]

- There were 107 total  fatalities  in 2017 and 2018 across 97 fatal  crashes reported  in relation  to the Uber app.[29]

- The Uber-related  motor  vehicle  fatality  rate for 2017 was 0.59 fatalities  per 100 million  vehicle  miles  traveled;  it was 0.57 fatalities per 100 million miles traveled in 2018. For both years, the Uber data is about half of the national rates. [30]

- Approximately  90% of Uber-related  fatal  crashes occurred  in urban  areas.[31]

- 21% (n=22) of the fatalities in this report were drivers using the Uber platform; 21% (n=23) were riders using the Uber platform, and the rest were third parties.   [32]

  - 8 of the drivers and riders using the Uber platform were fatally struck while      they were outside the vehicle (and therefore counted as pedestrians in FARS).   [33]

- 30% of fatal crashes involved a pedestrian, 25% (n=8) of which were drivers or riders using the Uber platform who were outside the vehicle. [34]

- Across 2017 and 2018, pedalcyclist s were the  deceased party  in 2% (n=2) of  cases.[35]

## Fatal physical assault data[36]

- Fatal physical assault was reported to occur in about 1 in every 122,000,000 US trips, or approximately 0.000001% [37] of US trips.

- Among the 19 deceased parties in 2017 and 2018 included in this report, 8 were riders using the Uber platform, 7 were drivers using the Uber platform, and 4 were third parties.

25. Uber occasionally receives notice of a possible safety incident  well after the trip was taken (sometimes  years after). This is extremely rare for fatalities,  but for this reason, the data presented in this report  may change over time. The motor  vehicle data presented  in this report includes incident  reports resolved on or before October 31,2019. The motor vehicle data in this report reconciled to the 2018 FARS Release published October 22, 2019.

26. United  States and rideshare platform  only. Drivers 22 years old and under require  at least 3 years of license history. Drivers 23 and over are required  to have at least 1 year of license history.

27. In New York City, the MVR screening  is conducted  through  the NYC Taxi and Limousine  Commission.  The TLC Driver  licensing  process is separate from the process described  here.

28. In the US Department  of Transportation's  2018 Transportation  Statistics  Annual Report, a light - duty vehicle is defined by the US Environmental  Protection  Agency as a passenger  car with a maximum  Gross Vehicle Weight  Rating (GVWR)<8,500 lbs. (pp. 2-7), https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/browse  - statistica l -products - and-data/transportation  - statistics - annual-reports/Preliminary  - TSAR Full- 2018-a.pdf .

29. An additional  22 Uber-related  road fatalities  either fell outside the scope of the FARS definitions  or were otherwise unable to be accounted  for in FARS (see Methodology). Because these fatal  crashes are not in the FARS dataset, they are not included  in the data analysis presented  in this report.

30. National  Highway  Traffic  Safety Administration  (NHTSA), "2018 Fatal Motor  Vehicle  Crashes: Overview," p. 1, October  2019, https://crashstats.nhtsa.dot.gov/Api/Public  /ViewPublication/812826 .

31. FARS data retrieved from  the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query  .

32. Ibid.

33. Ibid.

34. Ibid.

35. Ibid.

36. Uber occasionally receives notice of a possible safety incident  well after the trip was taken (sometimes  years after). This is extremely rare for fatalities,  but this means that the data could change over time. The data presented  in this report includes incident  reports resolved on or before October 31,2019.

37. Incident  reports as a percent of total trips are rounded.

UBER-MDL3084-000000442

## Sexual assault data[38]

Sexual violence is all too common in our society. In the US, nearly 44% of women and almost 25% of men will be the victim of sexual violence in their lifetime. [39]

For 2017 and 2018 combined:

- Non-Consensual Kissing of a Non-Sexual Body Part was reported to occur in about 1 in every 2,000,000 completed trips.

- Attempted Non-Consensual Sexual Penetration was reported to occur in about 1 in 4,000,000 completed trips. This category covers a wide range of reports and includes attempted clothing removal and incide nt reports that are fragmented or incomplete due to memory loss or lack of event recall.

- Instances of Non-Consensual Touching of a Sexual Body Part were reported to occur in about 1 in every 800,000 trips.

- Non-Consensual Kissing of a Sexual Body Part was reported to occur in 1 in every 3,000,000 completed US trips.

- Non-Consensual Sexual Penetration —the most serious sexual assault category—was reported to occur in about 1 in 5,000,000 US trips, or on approximately 0.00002% [40] of US trips.

- Across these 5 categories of sexual assault, riders account for nearly half (45%) of accused parties.

- From 2017 to 2018, Uber saw approximately a 16% decrease in the average incident rate of the 5 most serious sexual assault categories reported.

Based on preliminary estimates for the first half of 2019, the same 5 categories of sexual assault currently reflect a 17-20% decrease when compared to the full year of 2018. [41] However, as Uber invests even more in sexual assault prevention and reporting initiatives (including with the release of this Safety Report), there may be increased reporting of these 5 catego-ries of sexual assault independent of the underlying frequency of occurrence.

Section X

# Conclusion

Following this 21-month effort, Uber has put in place stronger safety policies and training for support staff, implemented a new cla ssification system for the most serious safety incidents, and launched more safety features than ever before to protect both drivers and riders.

The data presented in this report shows that the rates of reported sexual assault incidents on the Uber rideshare platform in the US declined year-over-year; that traffic-related fatality rates with Uber are roughly half of the national average [42]; and that 99.9% of trips ended without any safety-related issue at all, no matter how minor . In fact, only 0.0003% of all Uber trips in this time period involved one of the critical safety incidents outlined in this report.

Uber will continue to release a Safety Report every 2 years. But we know that published reports only go so far. We can onl y make society safer if we all work together. And that requires implementing best practices based on expertise, as well as sharing data that benefits everyone.

Moving forward, we encourage all organizations—airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report.

38. This report reflects audited sexual assault reports th at were classified into one of the following categories. Uber occasionally receives notice of a potential sexual assault well after the trip has ended. The sexual assault data presented in this report includes incident reports resolved on or before October 31, 2019, and for this reason may change over time.

39. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release,"(November 2018) p. 1, https://www.cdc.gov /violenceprevention/pdf/2015data - brief 508.pdf.

40. Incident reports as a percent of total trips are rounded.

41. DISCLAIMER Uber is including a preview of estimated 2019 sexual assault data due to the interest our users and communities have in these numbers. These numbers are estimates and have not undergone the same auditing process described in the Methodology, and we expect they may change over time as Uber receives additional, delayed reports of incidents. In addition, the 2019 estimates were not reviewed by the NSVRC and Urban Institute and, as a result, ar e outside the scope of the validation statement provided in Appendix II. 2019 data is an estimate based on reports as of November 15, 2019.

42. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview,"p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812826.

UBER-MDL3084-000000443

Moving forward, we encourage all organizations —airline, taxi, ridesharing, home -sharing, and hotel companies, as well as others —to share their safety records with their customers and exceed this report.

We've teamed up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish RALIANCE Business: a new resource center that will be dedicated to helping public and private sector leaders adopt consistent, evidence -based standards and strategies to improve how they measure, respond to, and prevent se    xual violence that may occur in the workplace or within business operations.

Uber is taking an important step, but every company has a role to play. We look forward to working together to confront these issues, count them, and make progress toward ending    them.

Section X

UBER-MDL3084-000000444

Transparency about serious incident reports is just one part of our safety commitment. The actions we take to improve the safety of our platform —day in and day out —matter much more. While Uber has the ability to bring new safety benefits to communities through technology, we also have a responsibility to help keep the people we s erve safe.

In his first year as Uber's CEO, Dara Khosrowshahi made safety the company's top priority and committed to putting safety at the heart of everything we do. Since then, we've made significant investments in safety technology, strength - ened background checks for drivers and accountability for riders, and made major changes to our safety policies and processes.

Uber has built a team of hundreds of people dedic ated to keeping riders and drivers safe. This team includes engineers who develop new safety features, data scientists who analyze data for actionable insights, experts who build programs geared toward women's safety, support agents who are specially trained to respond to safety reports, operations specialists who ensure that our safety protocols are being met at every level, and many more. The safety team closely collaborates with other de partments across the company to help ensure that safety is built into every element of the Uber experience.

Uber also works with external experts to inform our safety strategy and business decisions. Uber's Safety Advisory Board was created in 2015 to bring expertise, feedback, and counsel to our safety processes, policies, and technology. The Safety Advisory Board is chaired by former US Secretary of Homeland Security Jeh Johnson.

The following chapter outlines the actions we're taking to constantly impr ove safety for the people and communities we serve.

> "Every day, our technology puts millions of people together in vehicles in cities around the world. Helping keep people safe is a huge responsibility and one we do not take lightly."
>
> Dara Khosrowshahi, Uber CEO

# Driver background checks and screenings

Every US driver undergoes a Motor Vehicle Record (MVR) review [43] and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber plat form. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

Uber's driver screening process also include s several measures to detect fraud, including a review of identity documents such as a driver's license, Social Security number, proof of insurance, vehicle registration, and other personal information. In the US, we also collect and examine a driver's bac kground history through a third -party vendor, accredited by the Professional Background Screening Association.

While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

43. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission (TLC). The TLC Driver licensing process is separate from the process described here.

UBER-MDL3084-000000445

Section Three

During 2017 and 2018, more than one million prospective drivers [44] did not make it through Uber's screening process.

Given the importance of an individual's driving record, our screening process starts with a thorough MVR check. [45] This includes verification of the individual's license status, a review of their driving history for any violations or crashes, and a check for any driving-related restrictions on their license. Disqualifying violations from the last 7 years include, but are not limited to, driving under the influence, reckless driving, and leaving the scene of a crash (see Table 1). Our process also disqualifies individuals who have been found to be at fault for a fatal crash or have been convicted of vehicular homicide or vehicular manslaughter at any time in their driving history.

### Table 1: Sample motor vehicle record screening standards[46]

| Minor violations<br>No more than 3 in 3 years | Major violations<br>None in the past 3 years | Severe violations<br>None in the past 7 years | Forbidden violations<br>None ever |
| --- | --- | --- | --- |
| Crashes (non-fatal) | Driving on suspended, revoked, or invalid license | DUI or drug-related driving violation | Fatal crashes |
| Traffic-light violations | Driving while uninsured/ insurance suspended, revoked or invalid | Speeding at 100+ mph | Vehicular homicide |
| Speeding violations | | Leaving scene of crash | Vehicular manslaughter |
| Moving violations | | Evading/eluding police | |
| | | Reckless driving | |
| | | Street racing/contest | |

The majority (76%) of the more than one million prospective drivers who failed Uber's screening process were disqualified during the MVR check, meaning they did not advance to the criminal background check portion of our screening.

#### Vehicle safety standards
In addition to reviewing violations, we also follow all applicable state and local laws pertaining to the safety and fitness of vehicles used for ridesharing. The average vehicle used to drive on the Uber platform is about 4 years old, while, according to the US Department of Transportation's Bureau of Transportation Statistics, the average light-duty vehicle active on US roads is about 10 years old.[47] Given this difference, vehicles driven on the Uber platform often have updated features that promote greater safety. These features can include rearview cameras, which many automakers made standard as of 2015; [48] electronic stability control, which became standard on all new cars as of 2011[49] and automatic emergency braking, which high-volume automakers began equipping in more than half of vehicles between 2017 and 2018. [50]

<div style="writing-mode: vertical">Section Three</div>

44. "Prospective drivers" is defined as drivers who consented to a background check in 2017-2018 as part of the sign-up process to drive on the Uber platform.
45. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission. The TLC Driver licensing process is separate from the process described here.
46. This list of violations is not exhaustive, as some local jurisdictions impose additional MVR screening criteria that may disqualify someone from driving on the Uber platform. The local definitions of each violation can also vary based on jurisdiction.
47. In the US Department of Transportation's 2018 Transportation Statistics Annual Report, a light-duty vehicle is defined by the US Environmental Protection Agency as a passenger car with a maximum Gross Vehicle Weight Rating (GVWR)<8,500 lbs. (p. 2-7), https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/browse-statistical-products-and-data/transportation-statistics-annual-reports/Preliminary-TSAR Full-2018-a.pdf.
48. Aaron Turpen, "Affordable Cars with a Standard Backup Camera," Carfax (blog), March 2, 2015, https://www.carfax.com/blog/cars-with-standard-rearview-cameras.
49. "Electronic Stability Control," Safercar.gov, accessed August 6, 2019, https://www.safercar.gov/Vehicle-Shoppers/Safety-Technology/esc.
50. Insurance Institute for Highway Safety (IIHS), "10 automakers equipped most of their 2018 vehicles with automatic emergency braking," March 13, 2019, https://www.iihs.org/news/detail/10-automakers-equipped-most-of-their-2018-vehicles-with-automatic-emergency-braking.

UBER-MDL3084-000000446

If an individual passes the MVR check, they then proceed to the criminal background check before being approved to drive on the Uber platform. We work with Checkr, a third-party background check provider accredited by the Professional Background Screening Association. Drivers are required to provide their full name, date of birth, Social Security number, and driver's license number, which Uber provides to Checkr. Based on this information, Checkr runs a Social Security trace and checks the potential driver's driving and criminal history in a series of national, state, and local databases and court record repositories. These include the US Department of Justice National Sex Offender Public Website, the federal PACER database, and several databases used to flag suspected terrorists.

Upon identifying a potential criminal record, Checkr sends an individual to review the record in person at the relevant courthouse or, if possible, pulls the record electronically. These screenings use information that is maintained by national, state, and county-level authorities whose processes may vary by jurisdiction. Verifying potential criminal records at the primary source —the courthouse or court database system —helps ensure that we are checking the most up-to-date records available.

Uber will disqualify individuals with any felony convictions in the last 7 years. Uber will also disqualify individuals with violent or other disqualifying misdemeanors in the last 7 years.

Our process also reviews records beyond 7 years, as allowed by law and where those records are made available and reported to us. If we identify a report made at any time in a person's history for certain serious criminal convictions (listed below), the potential driver will be disqualified according to our standards. These convictions are as follows, and include the "attempted" and "conspiracy" crimes associated with each: [51]

- Sexual assault (includes rape, sexual battery, indecent assault, indecent liberties, criminal sexual abuse, forcible sodomy, sexual exploitation, predatory criminal sexual assault, custodial sexual misconduct, sexual misconduct of a person with a disability)

- Sex crimes against children (includes carnal knowledge of a child, carnal knowledge, indecent solicitation of a child, using a computer to seduce/lure/entice a child for sexual purposes, possession/distribution/manufacture of child pornography, patronizing a minor engaged in prostitution, permitting sexual abuse of a child)

- Murder/homicide (includes assault with intent to kill, reckless homicide, and concealment of homicidal death)

- Manslaughter

- Terrorism (includes harboring or concealing terrorists, providing material support to terrorists, providing material support or resources to designated foreign terrorist organizations, receiving military-type training from a foreign terrorist organization)

- Kidnapping (includes abduction, child abduction, false imprisonment, human trafficking, unlawful restraint, unlawful/forcible detention)

## Yearly background reruns and ongoing screenings

Beyond the initial screening, Uber proactively reruns criminal and motor vehicle checks each year. This is a standard practice at Uber, regardless of whether there is a statute or regulation requiring us to do so. This helps ensure that our screening standards are applied consistently and continuously across the country.

Beyond performing annual reruns, we were the first US ridesharing company to implement new technology to further strengthen our screening process. This technology continuously monitors data sources to detect when a driver is involved in a new criminal offense, and it notifies Uber when this is the case. Our screening team then reviews any potentially disqualifying information to evaluate the driver's continued eligibility with Uber, and removes them from the platform if the driver is found to no longer meet Uber's screening criteria and local laws. Since implementing this technology, it has already had a significant positive impact on safety. More than 40,000 drivers have been removed from the app due to continuous checks as of the publication of this report.

---

51.This section describes Uber's default standards. The criminal offense descriptions may vary based on jurisdiction. Certain localities or states may require rideshare companies to disqualify drivers for additional offenses or pursuant to different lookback periods. In those jurisdictions, individuals cannot drive on the Uber platform if they do not meet our default standards or if they have otherwise been convicted of any disqualifying offense under the applicable jurisdiction's law.

UBER-MDL3084-000000447

Section Three

# Uber's Community Guidelines

Uber's Community Guidelines are at the core of our commitment to safety. That's why we ask all users to read and acknowledge them. These Guidelines are designed to help users understand the behaviors expected by everyone who uses the Uber platform. They emphasize 3 simple principles:



**Treat everyone with respect**
Unwanted physical contact, sexual assault and sexual misconduct, threatening and rude behavior, and discrimination are not tolerated by Uber and have no place on our platform.

**Help keep one another safe**
Everyone has a role to play in helping to create a safe environment. That's why we have standards on account sharing and looking out for others on the road such as pedestrians, people on bicycles, and more.

**Follow the law**
Everyone using the Uber platform must follow the law —no matter what. This includes following all traffic laws and not engaging in any criminal activity while on our platform.

Drivers have long been expected to meet a minimum rating threshold, which can vary city to city, and in May 2019 we strengthened our policies so that riders, too, may lose access to Uber if they develop a significantly below-average rating.

# New safety technology

Our work on safety is never done, and we're constantly working to raise the bar. Over the last 2 years, we have pioneered a number of new safety technologies and features, many of which have now been adopted by other companies in the ridesharing industry.




### Safety Toolkit

In 2018, Uber launched the Safety Toolkit, a single place in the Uber app where riders and drivers can access safety features during a trip. This suite of resources includes access to features like Share My Trip, Follow my Ride, Trusted Contacts, and the In-App Emergency Button, which are described in greater detail later in this chapter. The Safety Toolkit also provides key safety information to riders, including tips built in partnership with law enforcement, driver screening processes, insurance protections, and Community Guidelines.



### Share My Trip, Trusted Contacts, and Follow My Ride

One of our original safety features gives riders and drivers the option to share trip details so loved ones can follow them on a map in real time —something not previously available when traveling traditionally.

In 2018, we enhanced that feature with Trusted Contacts, which allows riders to automatically share trip information with up to 5 friends and family members. Riders can use the Trusted Contacts feature on all trips or just nighttime trips, according to their preference. Follow My Ride is a similar feature available to drivers, enabling them to designate loved ones in advance to share their live location during or in between trips. [52]

---

52. Follow My Ride does not share any rider information with the driver's contacts.

UBER-MDL3084-000000448



## In-App Emergency Button

Federal regulators estimate that about 10,000 lives could be saved every year if first responders were able to get to 911 callers just one minute faster.[53] In 2018, based on rider and driver feedback, Uber developed a feature that allows users to connect with 911 directly through the Uber app in the most urgent situations. When a user taps the In-App Emergency Button, they are provided with critical trip details to relay to the dispatcher, including the vehicle's location, the rider's and driver's names, and the vehicle's make, model, color, and license plate information. In more than 250 US cities and counties, we partner with RapidSOS on 911 integration technology to automatically transmit these details to the 911 dispatcher who responds to your call. At least 45% of all Uber-facilitated trips in the US occur in areas with RapidSOS integration, and we will continue to expand as local emergency service providers modernize their systems.

**Case spotlight**

Lauren* is a female driver who experienced a safety incident when an intoxicated male rider entered her vehicle and began harassing and touching her. She persuaded the rider to exit the vehicle, immediately locked the doors, and dialed 911 through the In-App Emergency Button in the Uber app. Moments later, police arrived and arrested the rider, and Uber permanently removed the rider's access to the app.

*Names and details have been changed to protect privacy.



## RideCheck

In 2018, we announced RideCheck, an innovative safety feature that leverages technology in the driver's smartphone to detect potential motor vehicle crashes and other indicators of safety incidents such as unexpected or prolonged stops. While the vast majority of these indicators do not reflect an actual incident (for example, a rider has requested a stop at a convenience store), our goal is to proactively identify potential issues so we can provide support to customers as quickly as possible. When a potential crash or suspicious trip issue is detected, both the rider and the driver will receive a notification asking if everything is OK. They are provided with resources from the in-app Safety Toolkit and can let Uber know that all is well, or can take other actions like dialing 911 through the In-App Emergency Button. Our specialized Safety team can also follow up with a phone call to see if everyone is safe or if additional resources and support are needed.

## Phone number and address anonymization



Protecting driver and rider privacy is a crucial part of our safety commitment. We take issues such as inappropriate contact between a rider and driver very seriously, and have listened closely to experts like the National Network to End Domestic Violence (NNEDV), a leader in survivor privacy and stalking prevention, to inform our privacy features.

Uber offers in-app messaging and calling with phone number anonymization so drivers and riders are able to communicate without sharing their real phone numbers. The app also features address anonymization so that the driver will only be able to see in their trip history the general area where a trip started and ended, not the rider's exact pickup or dropoff address. Riders also have the option to request trips using cross-streets instead of exact addresses for an added layer of privacy.

53. Federal Communications Commission, FCC 14-13, https://docs.fcc.gov/public/attachments/FCC_-14-13A1.pdf.

UBER-MDL3084-000000449

Section Three

## Driving-hours tool

A National Sleep Foundation survey reports that 3% of all US drivers on the road, or nearly 7 million people, admitted to dozing off behind the wheel during a 2-week time frame.[54] To encourage safer, well-rested driving, Uber implemented a policy in 2018 that requires drivers to go offline for 6 straight hours after a total of 12 hours of driving time.[55] This policy is designed to prevent drowsy driving on our platform and to help keep the roads safer for riders, drivers, and other motorists.

## Phone-handling prevention

Researchers have found that handling a cell phone while driving, including dialing and texting, can increase the likelihood of a crash by 12.2 and 6.1 times, respectively.[56] Uber offers drivers discounts on phone mounts and, if we receive complaints about a driver's potential phone handling, we also provide education on the associated safety risks.

## Speed-limit alerts

Speeding is a key road safety risk factor that makes roads less safe for all travelers. According to NHTSA, speeding accounted for more than a quarter (26%) of all traffic fatalities in 2017.[57] With Uber's speed-limit alerts, drivers can receive notifications to maintain a speed that's within the posted limits. The speed limit is displayed on the driver's app by default, and drivers can adjust their settings so they're visually or audibly alerted when they go over the limit.



### Real-time ID check

Uber also offers real-time ID check to help keep our platform reliable, safe, and secure. This feature periodically prompts drivers to take real-time photos of themselves in the Uber app before they can accept rides. It then utilizes Microsoft's facial comparison technology to match the driver's real-time photo with their Uber account photo. If the 2 photos do not match, the driver loses access to the platform while the photo is manually reviewed. Real-time ID check helps ensure that the right driver—who has been vetted and approved by Uber—is behind the wheel, while reducing fraud and account theft risks.[58]

> "Our commitment to safety is long term. What you will continue to see from us is ongoing commitment and continuing to launch features based on what we hear from experts and our users."
>
> Sachin Kansal, Senior Director of Product Management and Head of Safety Product

# Sexual assault standards

Uber does not tolerate sexual assault or sexual misconduct from anyone. We take all allegations of sexual assault and sexual misconduct by our users extremely seriously and work to take appropriate action on every report quickly and fairly.

When our Incident Response Team (IRT) receives a report of sexual assault,[59] a trained agent begins by identifying the accused party and their associated Uber account. We immediately remove the accused party's access to the Uber app so that they cannot take trips while we complete a review. If the accused party is a guest rider, we attempt to identify whether they have their own Uber account and, if they do, we restrict that account. If the guest rider cannot be identified, or if they do not have an Uber account, the account holder may be restricted from the Uber platform since our Community Guidelines state that account holders are responsible for their guest riders' actions while using Uber. Regardless of the outcome of our case review, we make sure that the involved parties are not paired again in the future on the Uber platform. It is important

54. "Sleep Health Index Quarterly Report - Q4 2016," accessed August 6, 2019, p. 1, https://www.sleepfoundation.org/sites/default/files/2019-02/NSF_SHI2016Report.pdf.
55. Configurations of the driving-hours tool may vary, subject to state and local requirements.
56. Thomas A. Dingus et al, "Driver Crash Risk Factors and Prevalence Evaluation Using Naturalistic Driving Data," Proceedings of the National Academy of Sciences 113, no. 10, March 8, 2016, p. 2639, doi https://doi.org/10.1073/pnas.1513271113.
57. National Highway Traffic Safety Administration (NHTSA), "Speeding," accessed August 6, 2019, https://www.nhtsa.gov/risky-driving/speeding.
58. Due to legal restrictions contained in the Illinois Biometric Information Privacy Act, Real-Time ID check is not yet available in the state of Illinois.
59. Similar protocols are followed for the following urgent categories of sexual misconduct: Indecent Photography/Video Without Consent, Masturbation/Indecent Exposure, and Verbal Threat of Sexual Assault.

UBER-MDL3084-000000450

Section Three

to note that this is not necessarily the only action Uber will take on a report, and that further action will depend on what the agent's subsequent review finds.

During the case-review process, agents work to obtain the necessary information to make a determination as to whether the accused party's account should be banned from the Uber app. This may include speaking with the survivor, reporting party, accused party, and any relevant witnesses. Where possible, we also consider any relevant facts that agents gather during the review process —such as GPS information, trip timestamps, and any additional information provided to us. This may include dashcam or audio recordings and screenshots of texts.

Although these relevant facts are useful in the ultimate resolution of a report, they are not necessary for an accused party's account to be removed from the platform. We respect and rely heavily on the survivor's statement of experience, as we know their voice is defining and important in this process. While we understand that trauma can prevent survivors from providing these sometimes painful accounts, the statement of experience is an integral piece that has great impact on reaching the most fair and swift decision possible. In cases where a survivor is not able or willing to provide that statement of experience, we will consider all other relevant facts obtained during the review.

> "Each day I come into work, I'm motivated by and feel fulfilled in knowing that the work we all do here is helping ensure we don't just revolutionize the way people get around their city, but that we're also doing all of this responsibly."
>
> Uber Safety Support Agent

Uber's approach to reports of sexual assault uses the learnings from partnerships built with dozens of gender-based violence advocate groups and experts. It also builds directly off of the Sexual Misconduct and Sexual Violence Taxonomy, developed in partnership with the National Sexual Violence Resource Center (NSVRC) and the Urban Institute. A main hallmark of this approach is to remove the requirements of conclusivity, corroboration, and survivor "credibility" in order to ban an accused party's account from the Uber app.

### Conclusivity
Uber strives to obtain the most complete and accurate understanding of a reported event. However, we realize that it is not realistic to know exactly what happened between users at any given time. In Uber's review process for sexual assault reports, survivors are not required to "prove" their own assault. Instead, Uber's aim is to gather the most pertinent information from the survivor's statement of experience and relevant facts such as GPS data, timestamps, photos/videos, etc. (where possible) to arrive at a resolution that best protects the safety of the Uber community.

### Corroboration
We know that it may not always be possible to obtain corroborating information in connection with an incident report of sexual assault. A lack of corroborating information is not an indication that an assault or incident did not occur. Uber can take action against the accused party's account if the information gathered during an agent's review warrants such action.

### Survivor "credibility"
The issue of "credibility" —and the harm caused by positioning certain populations of survivors as less worthy of trust or plausibility than others —is a subject that has been discussed at length in the gender-based violence field.[60] When it comes to sexual assault, Uber applies the same standard for drivers and riders, both new and tenured, without regard to race, gender identity, socio-economic status, sexual orientation, education level, or app rating or status.

Violent offenders have no place in the Uber community, and it's our priority to prevent their access to our platform. Uber will ban users from the platform if we are able to obtain a statement of experience from the survivor and/or obtain relevant facts (e.g., GPS data, timestamps, videos/photos, in-app communications). We adhere to this standard for all sexual assault categories described in this report.

However, when we receive a report with sparse information, our ability to take further action may be limited. For example, if we receive a report with one single word (e.g., "Rape" or "Touched") and we are unable to speak with or obtain further

---

60. Deborah Tuerkheimer, "Incredible Women: Sexual Violence and the Credibility Discount," University of Pennsylvania Law Review 166, no. 1, p. 13, December 2017, https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9601&context=penn_law_review.

UBER-MDL3084-000000451

Section Three

information from the victim, it becomes difficult to review the report effectively. These types of reports, although tr    oubling, unfortunately do not provide adequate information, such as identifying the accused party or other details that allow us to take further action.

When considering the totality of the circumstances as they are known to us, we make every attempt to avoid assumptions about a report unless we have additional clarifying statements or relevant facts. To that end, agents make numerous attempts to contact t  he reporting party, victim, or other witnesses to clarify the report, though sometimes these attempts are not successful. In these circumstances, Uber unfortunately may not have enough information to remove an individual account from the app.

**Addressing sexual misconduct**

Unwanted sexual experiences occur on a spectrum, as outlined in the Sexual Misconduct and Sexual Violence Taxonomy. Some sexual misconduct incident reports can include staring or leering, asking personal questions, making inappropriate comments/gestures, or unwanted flirting. While these interactions are inappropriate and troubling, they have a very d    ifferent impact than sexual assault, where attempted or actual unwanted physical contact has occurred. However, sexual misconduct may be far more prevalent than sexual assault, with one recent survey by Stop Street Harassment finding more than 3 in 4 women    (77%) and 1 in 3 men (34%) experiencing verbal sexual misconduct. [61]

Our approach to reported sexual misconduct incidents was formulated in consultation with national advocacy experts, evidence - based best practices in the field of sexual violence prevention and response, and technology to detect potentially risky behavior (see Approach to safety deactivations ). Uber's response to these types of incidents focuses on education regarding a    ppropriate boundaries and the precepts of our Community Guidelines (see Sexual misconduct education modules    ). When we receive a report of potential sexual misconduct, each incident is routed to the appropriate team of specialized agents, classified, and acted on according to factors including the level of severity and user history. If a pattern of behavior is found, this can trigger further review and result in the accused party's loss of access to the Uber platform.

# Approach to safety deactivations

Uber takes a dynamic, comprehensive approach to safety deactivations to help reduce serious interpersonal incident and motor crash rates. Our safety team handles a wide range of incidents, and there is no one - size -fits -all approach to manag - ing them.

A single serious safety incident can be grounds for a rider or driver deactivation. [62] Serious safety incidents, including the ones covered by this report, are quickly routed to our safety response team; from there, an agent will reach out to all parti    es for a thorough review of the report and to take action on an account, if needed. This may include temporary or permanent deactiv ation from the app. (See Sexual assault standard  and Incident Reponse Teams  .)

However, the vast majority of safety incidents repo  rted to Uber involve less severe or infrequent behaviors that may not warrant immediate removal. For example, removal may not be justified when a rider reports a driver for hard braking, or when a driver reports that a rider initiated an argument. Either of these reports, however, could warrant further examination of the user's past behavior and will be noted in the user's account history.

61. Holly Kearl, "The Facts Behind the #MeToo Movement: A National Study on Sexual Harassment and Assault," February 21, 2018, p. 7, http://www.stopstreetharassment.org    /wp-content/uploads/2018/01/Full  - Report- 2018- National - Study- on- Sexual-Harassment    - and- Assault.pdf.
62. Deactivations or "bans" refer to the specific Uber account that was being used during the safety incident(s) that led to removal. For example, if a driver is flagged by Uber's system and subsequently deactivated for dangerous driving, they may still be allowed to ride with Uber using the Rider app.

UBER-MDL3084-000000452

Section Three

In addition, our systems are constantly evaluating a variety of factors, including user feedback, local driving patterns, fraud signals, and data science to identify patterns of potentially risky behavior. If a pattern is flagged, the system will trigger a review of the user's account by a specialized safety agent who examines the user's history and any previous reported issues to take appropriate action. This approach makes Uber more accountable and fair to both drivers and riders. It accounts for the fact that a tenured driver with thousands of trips may have received a proportionally small number of infrequent, minor complaints.

No rider or driver is deactivated from Uber for a safety report without a human review. While data and technology are useful tools for strengthening our safety strategies, safety is personal —and people will always have a role to play.

**Incident Response Teams**

Uber's US Incident Response Teams (IRT) respond to and support people who report safety incidents to Uber. Their goal is to quickly respond to every safety report, handle it with care, and gather robust information that helps enable future incident prevention.

Within the IRT, there are multiple teams that address safety incidents. Safety support agents on these teams receive training to review, document, and recommend appropriate action to help ensure safety on the platform. These teams are often a rider's or driver's first touchpoint for assistance after a serious crash or interpersonal incident. They assess the situation, take preliminary action (such as account suspension), and determine next steps for response.

Uber created a specialized team within IRT in 2017 to provide specialized customer support to riders and drivers dealing with the most serious and urgent of incidents, such as reports of sexual assault, that require an in-depth review and victim support. They gather data pertaining to an incident report (such as GPS information, timestamps, photos/videos submitted, in-app communications, etc.) and may speak to all involved parties, including reporting parties, potential victims, and accused parties. These agents receive tailored training on how to address difficult, often emotional conversations with precision, empathy, and care. This important team is empowered to make immediate account-access decisions, including user account deactivation, and to provide victims with support resources.

Uber's IRT agents take their responsibilities extremely seriously and share a common mission: to do the right thing for people reporting a safety incident. As with all frontline and crisis-related roles, this is a hard job and Uber is focused on providing agents with ongoing support to help them cope with any possible stress, emotional concerns, and vicarious trauma.

"We have an amazing opportunity to make a positive impact on the safety of the communities that we are in and I truly enjoy helping people. We are empowered to handle these safety incidents ... and my team values that responsibility."

Uber Safety Support Agent

"Doing the right thing is a consistent practice here at Uber. I love being committed to something I can be proud of and being part of the Incident Response Team gives me that satisfaction. Having the responsibility of being that hand that reaches out when someone needs it most is an honorable position to be in."

Uber Safety Support Agent

Section Three

UBER-MDL3084-000000453

## Connecting survivors to third-party advocates

Supporting users who have reported sexual assault or misconduct on our platform is incredibly important to Uber. That's why, following such a report, our agents offer survivor resources such as the National Sexual Assault Hotline, which is operated by our partner   Rape, Abuse & Incest National Network (RAINN)  . The hotline can provide survivors with confidential support such as crisis counseling, information and options for seeking medical services or reporting to law enforcement, or referrals to longer -term support services i n their area. We want to help break down the barriers that survivors may face in seeking the specialized support and services they might need.

### Working with law enforcement

Uber is committed to working closely with law enforcement officials to promote     safety within our communi -ties. That's why, in 2017, we created the Uber law enforcement portal, a website where public safety officials can quickly and securely submit legal process documents to request trip data and other information that may be critical in investigating potential criminal cases.

Uber's 24/7 Law Enforcement Response Team (LERT) handles these data requests  and works with investi -gators to help them get the information they need through valid legal processes. In the US, for example, this team works diligen tly to provide information requests after receiving subpoenas, court orders, or search warrants. Furthermore, Uber's global Law Enforcement Outreach Team is made up of former law enforcement professionals who work to proactively partner with police and edu     cate them about how Uber can assist during an investigation.

# Prevention initiatives

As we have learned from our expert partners, education can help get to the root of tough safety issues in a way that emergency interventions cannot. That's why we've worked to develop prevention policies and proactive campaigns to address unsafe behavior before it begins.

## Sexual misconduct education (in partnership with RAINN)

Sexual misconduct is all too common in our society, and we're constantly working to prevent it on the Uber platform. As experts tell us, certain forms of sexual misconduct may often escalate to more serious behaviors over time. In our multicultural, multigenerational community, many users may not share the same level of understanding about what behavior is appropriate in a shared space with a stranger.

Uber has teamed up with RAINN (operater of the National Sexual Assault Hotline) to create educational    modules  to inform riders and drivers about the best ways to respect each other when using the Uber app. This targeted educa     -tion, which covers various forms of sexual misconduct such as staring or leering, asking personal questions, making inappropriate comments/ges    tures, or unwanted flirting, is sent to users who receive initial reports of sexual miscon     -duct. This education is designed to foster equality and respect for one another and to help intercept problematic behaviors before they become more serious.

"The best way to change certain behaviors is through education. If someone were to be immediately deactivated without understanding why, they are likely to repeat the offending behavior —just somewhere else. Education, delivered at the right time and in an accessible way, provides both that understanding and the opportunity to become a respectful member of the Uber community. These trainings are bigger than just the interactions that take place during a ride share. Together, RAINN and Uber are taking this conversation beyond the ride, to encourage everyone, including drivers and riders, to create a respectful and safe environment."

Scott Berkowitz, President, RAINN

UBER-MDL3084-000000454

Section Three

## Driving Change Initiative

Women experience travel differently  and encounter  a number of particular  safety risks that men are less likely to face. That's why making the platform safer for women and other communities that may face marginalization makes it safer for everyone. In 2017, we established Driving Change , an initiative to help prevent gender  -based violence in our global commu  - nity. Uber committed  $5 million  in grant  funding  over 5 years to support  the sexual violence  prevention  programs  of local and national organizations.

To date, we have partnered with l eading organizations such as   A CALL TO MEN, Casa de Esperanza, National Coalition of Anti -Violence Programs , National Network to End Domestic Violence , NO MORE, RALIANCE, Futures Without Violence   , Rape, Abuse, Incest, National Network (RAINN) , and the Women of Color Network, Inc. as well as grassroots rape crisis centers, both to integrate their expertise into our products and programs and to support their core prevention work in our communities.  For example, Driving Change grants have helped A CALL TO MEN create the Institute  of Higher Learning, an online educatio n platform providing training modules on healthy masculinity and sexual violence prevention. Futures Without Violence was able to organize a National Youth Summit to encourage teens to engage healthy relationship strategies.

## #DontStandBy Bystander Awareness Campaign

In 2019, Uber teamed up with  NO MORE, local law enforce - ment, local rape crisis centers, and the nightlife community to launch  #DontStandBy , a bystander intervention cam  - paign to prevent sexual assault before it starts. Alcohol has been linked to increased vulnerability for potential victims, and it ha s been used as a tool by offenders to facilitate sexual assault.[63] Working with our partners, we've devel - oped and distributed key safety tips and tools for nightlife staff, drivers, riders, and the general public on how to look out for others and safely  intervene in unsafe situations. To date, we have launched #DontStandBy in 4 US cities with 14 law enforcement and advocate partners and 30+ bars and nightlife  establishments.

"Bystander intervention campaigns like #DontStandBy are a crucial part of stoppi ng sexual violence before it starts by spotlighting the important role we all play in keeping each other safe. To address such a deeply embedded social issue, we need to coordinate efforts with companies and services people use every single day."

Pamela Zaballa, Executive Director, NO MORE

## Drunk driving prevention

Even though it's never been easier to get a bus, train, subway, or ride home through Uber, our partner      Mothers Against Drunk Driving (MADD)  estimates that every 2 minutes someone is injured in a drunk driving crash, and every 51 minutes someone is killed. Through our  #ReasonsToRide  campaign with MADD , we are reminding the public that there are no excuses for driving impaired when there are so many options available to get you home safely and not endanger others on the roads. Since the company's inception,  the Uber platform  has served communities  as an alternative  to impaired  driving  so that  no family  has to live through this devastating and preventable loss.

## Seat belt safety awareness

A 2017 survey by the Insurance Institute for Highway Safety (IIHS) found that 4 in 5 adults admitted they don't wear a seat belt when taking short trips or when traveling by taxi or rideshare.[64] Uber and the Governors Highway Safety Association (GHSA) teamed up to launch our Make It Click campaign to help change these behaviors. This initiative educates users with in -app notifications and emails about the safety benefits of seat belts and encourages them to buckle up in every seat and every ride. This year, Uber partnered      with GHSA and Volvo to create the first National Seat Belt Day, which also commemorated the 60th anniversary of Volvo's invention of the modern seat belt.

63. Rape, Abuse & Incest National Network (RAINN), "Drug Facilitated  Sexual Assault," accessed August  6, 2019, https://www.rainn.org  /articles/drug  -facilitated -sexual-assault.
64. Insurance Institute for Highway Safety (IIHS), "Adults admit to not always using safety belts in the back seat, IIHS survey finds," August 3, 2019, https://www.iihs.org/news /detail/adults -admit -to-not -always-using-safety-belts -in-the-back-seat-iihs- survey-finds .

UBER-MDL3084-000000455

Section Three



### Bike and scooter safety

Our commitment to safety extends to road safety and to all travelers on the road, including people on bicycles and scooters. Working with road safety experts and bicycle advocates, Uber developed Bike Lane Alerts. The app uses publicly available mapping data to give riders notifications when their upcoming dropoff point is near a bike lane or along a bike route, reminding them to look before opening the door. Bike Lane Alerts are now available in more than 200 cities in 30 countries, and in nearly 50 different languages around the world, where mapping data is available.

In addition, we've also shared our 'Dutch Reach' awareness video with all riders and drivers in the US and Canada to raise awareness and encourage them to look over their shoulder before opening the door. This is an expert-endorsed tip to help reduce the risk of "dooring" a person passing by on a bike or scooter.

# What's next for safety at Uber?

This Safety Report is one part of our safety commitment to helping drive accountability in our industry. What matters most are the actions we take to raise the bar. Below, you'll find an overview of our newest safety investments and the next wave of product features, policies, and programs we're excited to bring to our users in the future.

### Deactivation sharing

We're committed to finding a way to share the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers. We want companies to be able to use this information to protect their customers.

### Sexual misconduct education

As sexual violence experts tell us, education is key to fostering a community of safety and respect. [65] Uber currently provides sexual misconduct education to riders and drivers when they receive an initial report of sexual misconduct. In 2020, we'll take this a step further by asking all US drivers to proactively complete an education program on preventing sexual misconduct and sexual assault. We'll partner with RAINN to design a program that promotes positive, respectful social interactions, and we'll work to ensure that every driver completes it.

### Verify Your Rides

In 2017, we began improving messaging to riders and the public about ways to check their ride. A key safety tip that we share with people encourages them to check that the driver matches their profile photo and that the car make, model, and license plate number match what's in their app before getting into the vehicle. Earlier this year, we built on this initiative by sending push notifications and in-app reminders to riders before they started a trip. We are going a step further and will begin offering riders the option to verify their ride with a unique, 4-digit PIN they can verbally provide to their driver before they enter the vehicle. The driver must enter this 4-digit PIN into their app in order to start the trip. This helps riders ensure that they're getting into the right car, and it helps drivers ensure that they're picking up the right rider.

> "We want to make sure that we are using technology to be able to implement really smart solutions. We are never in a place to say that we have done enough on safety."
>
> Sachin Kansal, Senior Director of Product Management and Head of Safety Product

65. National Sexual Violence Resource Center (NSVRC) and National Alliance to End Sexual Violence (NAESV),"Rape Prevention & Education Program (RPE),"2011,p. 2, https://www.nsvrc.org/sites/default/files/Publications_NSVRC_Factsheet_Rape_-Prevention-and_-Education-Program.pdf.

Section Three

UBER-MDL3084-000000456

## On-trip reporting

We are committed to making safety incident reporting as easy as possible because the more information we receive about what went wrong on a trip, the more action we can take. In an emergency, we encourage users to first call 911 and then report the issue to Uber once it's safe to do so. Uber offers a number of ways to report safety issues (e.g., through the app or by calling Uber's Critical Safety Response Line) that are not readily available in the absence of a technology platform. Based on customer feedback, we developed a feature (soon to roll out nationally) that allows riders to report a non-emergency safety issue during an Uber trip, while it is top of mind, so they don't have to wait until after the trip ends. Safety reports are evaluated and routed to our specialized safety support team for a timely response after the trip has concluded.

## Text to 911

Starting in Indiana, Minnesota, and Los Angeles County, riders now have the ability not only to call 911, but also to text 911, all directly from the Uber app. During a trip, riders can access this new feature through the Safety Toolkit, where an auto-populated text message with location, car information, and the intended destination can be sent directly to 911 call centers. We see this as an innovative and powerful safety solution for situations that may require discreet emergency assistance and an accessible option for the 48 million Americans who are deaf or hard of hearing. [66] As more cities and states build the infrastructure to support Text to 911, we will continue working to launch this feature in more markets in the future.

## Uber Survivor Support Hotline (operated by RAINN)

Uber expects the most professional and compassionate conduct toward those who have reported sexual violence on our platform. We currently partner with RAINN to share resources—such as the National Sexual Assault Hotline—with victims. To further ensure that these critical interactions are handled with care and sensitivity, we are again teaming up with RAINN in 2020 to implement a dedicated Survivor Support Hotline operated by qualified RAINN advocates. RAINN will provide confidential individual crisis support and offer services that survivors may need.

## In-app feature awareness

Developing safety features and strong policies is important—as is ensuring that people know how to use them. That's why feature awareness is a key priority as Uber works to make every trip safer. In April 2018, we launched the Safety Center in our in-app Safety Toolkit to make our safety features more accessible and visible to all users. In July 2019, we began sending notifications and messages within the app to raise awareness about key safety features such as the In-App Emergency Button, driver screenings, and phone number anonymization.

## RALIANCE Business

Through our work with advocates to develop the Sexual Misconduct and Sexual Violence Taxonomy and this Safety Report, it has become very clear that companies face unique, longstanding challenges in sexual violence prevention. This report is a step forward to drive transparency and accountability about the hardest safety issues. However, we believe that greater safety for all is only possible when companies are working together to share tools, standards, and best practices, and to issue expertise for the collective benefit of the public. Safety should never be proprietary.

That's why Uber is teaming up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish a resource center to provide companies and organizations with a comprehensive, data-driven approach to addressing and eliminating all forms of sexual misconduct and sexual assault that may occur in the workplace or within business operations. This resource center—RALIANCE Business—will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence. RALIANCE Business will support organizations as they tap into their power to change culture for the better.

It's our hope that the services available through this resource center will prompt more companies to take action and do their part to end sexual violence. To learn more about RALIANCE Business, please visit the RALIANCE website.

Safety remains a long-term priority and a core investment for Uber. We are always learning from our data, our customers, and expert partners about how we can improve. Uber is committed to continuing to do our part in tackling tough issues and taking strong actions that will make our communities safer for all.

---

66. National Association of the Deaf, "Position Statement on Accessible Emergency Management for Deaf and Hard of Hearing People," 2019, https://www.nad.org/about-us/position-statements/position-statement-on-accessible-emergency-management-for-deaf-and-hard-of-hearing-people/.

UBER-MDL3084-000000457

Section Three

Quality data is the foundation of Uber's safety efforts. This report includes data on critical safety incidents that were reported to occur in connection with the Uber ridesharing platform [67] in the United States [68] from January 1, 2017, through December 31, 2018.

Every safety incident included in this report is directly linked to a rideshare trip facilitated by the Uber app. This report does not include safety incident data related to other Uber platforms and/or lines of business. The data in this report is based on Uber's Safety Taxonomy (see Overview of Uber Safety Taxonomy).

This report includes categories that represent serious safety incidents reported by riders, drivers, and third parties:

- Motor vehicle crash fatalities
- Physical assault fatalities
- Sexual assault
  - Non-Consensual Kissing of a Non-Sexual Body Part
  - Attempted Non-Consensual Sexual Penetration
  - Non-Consensual Touching of a Sexual Body Part
  - Non-Consensual Kissing of a Sexual Body Part
  - Non-Consensual Sexual Penetration

**Why these categories?**

Uber recognizes the immense importance of quality data, particularly given the serious nature of these incident reports. We strived to provide a clear and accurate reflection of the most serious incidents reported in connection with the US Uber ridesharing platform while recognizing that these incidents can pose unique classification challenges. Uber strived for the dataset included in this report to have measurably high degrees of:

- Classification accuracy
- Reliability
- Consistency in standards to ensure a measurable and repeatable process

These 3 requirements helped inform which categories we felt confident publishing in this report. Aside from being the most serious incidents that occur on our platform, these incident categories were chosen for public release because they appropriately satisfied our standards for overall data quality (see Data auditing process and each issue area methodology further in the chapter).

Section Four

---

67. For the purposes of this report, the Uber ridesharing platform involves peer-to-peer ride services inclusive of, but not limited to, Uber Pool, UberX, Uber Black, Uber SUV, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (e.g., New York City).
68. Excludes US territories.

UBER-MDL3084-000000458

# Collection of safety incident data

Technology has the ability to help make travel safer than ever before. We use technology to enable our users to submit incident reports quickly and easily. With Uber, incident reporting is seamless and often much easier than with many other companies (incl uding airlines, hotels, and taxi companies). For example, app -based reporting may encourage users to report more often, since they can do so more quickly and discreetly than they can in person or by phone.

Currently, Uber receives and proactively gathers safety incident reports from more than 10 different channels, including:

**User-driven methods**
Post-trip in -app support
On-trip in-app reporting
Uber's website
24/7 Critical Safety Response Line
Uber Greenlight Hubs

**Proactive incident report gathering**
Social media mentions (Twitter, Facebook, etc.)
News media mentions

**Uber outreach after incidents** (see Safety investments )
RideCheck
In-App Emergency Button

**Incoming third-party communications**
Law enforcement (see Working with law enforce - ment in Safety commitments)
Regulator inquiries
Insurance claims
Other third parties

Because we aggregate safety incident data from many sources, Uber's dataset is likely more comprehensive than other sources of data, both in the transportation industry and more broadly. As a result, it is diff icult to compare insights drawn from Uber's dataset to datasets with more limited reporting channels.

# Safety support processes

By design, Uber receives an immense amount of user feedback across a wide range of topics, the vast majority of which are not related to safety issues. To isolate user feedback related to safety, Uber sorts the data using key words and phrases, in addition to our advanced natural language processing techniques, to identify reports that may indicate safety concerns. All potential safety -related reports are manually reviewed by teams of safety support agents for proper adjudication. The most serious reports a re escalated to a specialized team within Uber's Incident Response Team, which aims to gather additional information on an incident report by speaking with incident parties and gathering necessary data in order to determine what user account action to take . Beyond triaging and adjudicating incidents, support agents are also responsible for the initial classification of the incident within Uber's Safety Taxonomy. [69]

# Overview of Uber's Safety Taxonomy

Uber's Safety Taxonomy is a set of categories used to classify and prioritize incoming safety incidents, apply action on individual reports, and inform Uber's efforts to prevent future incidents. The Safety Taxonomy is the basis for measuring and reporting the data needed to understand and improve safety on o ur platform.

Uber classifies all incident reports according to the description given by the reporting party, and our agents take action according to the appropriate protocol for the initial classification of the report. This approach to classifying report s according to the description of the reporting party is supported by experts [70] and ensures that reports are categorized with as little subjective assessment as possible.

---

69. The incident's data classification may be updated, if appropriate, as additional facts are developed in the course of the case review and then again by a specialized team of data auditors (see Data auditing process ).
70. Chad Sniffen, Julia Durnan, and Janine Zweig. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," 2018, p. 49, https:// www.nsvrc.org/sites/default/files/publications/2018 - 11/NSVRC_HelpingIndustries.pdf.

UBER-MDL3084-000000459

Section Four

The Safety Taxonomy uses a hierarchical approach, which means that although multiple incidents or injuries can occur simultaneously during a single event, each report is assigned to only the most serious category. A hierarchical approach helps safety support agents provide the most appropriate and immediate response to each case, and it allows Uber to ensure that the most serious experiences are preserved and fully represented in the dataset.

While we have taken every effort to make Uber's Safety Taxonomy exhaustive and comprehensive, it is not intended to be static. For that reason, the taxonomy is open to revision, though any revisions are intended to be narrow so that the taxonomy does not become overly granular or prevent comparisons being made over time. [71]

# Motor vehicle fatalities methodology

Motor vehicle crashes occur across a wide spectrum, from minor incidents with no damage to crashes that result in serious bodily injury or death. While there are many ways of defining the full range of motor vehicle crashes, public reporting standards and methods for motor vehicle fatalities are well established and relatively consistent. For more than 100 years, motor vehicle fatality data has been collected and reported to the public in order to better understand public safety as it relates to travel and transportation. Therefore, rather than having to create a new taxonomy or methodology, Uber's efforts for this Safety Report were focused on aligning to the standards from this mature field of study as best as possible.

## Reconciling to the Fatality Analysis Reporting System (FARS)

In the US, one of the primary sources for motor vehicle fatality data is the Fatality Analysis Reporting System (FARS), operated by the National Highway Traffic Safety Administration (NHTSA). FARS dates back to 1975 and is a nationwide census of fatal traffic crashes within the 50 states, the District of Columbia, and Puerto Rico.[72] While there are other public sources for motor vehicle fatality data, FARS is more frequently referenced by governing entities, academics, and practitioners both in the US and internationally. Additionally, the agency and independent government entities also acknowledge that NHTSA data is rigorous and nationally representative. [73,74]

For methodological purposes of this Safety Report, Uber aligned to FARS data standards as best as possible. Under US Department of Transportation (USDOT) reporting standards, to be included in the FARS dataset, "a crash must involve a motor vehicle traveling on a trafficway customarily open to the public and must result in the death of at least one person (occupant of a vehicle or a non-motorist) within 30 days of the crash." [75]

FARS's definition of "crash" is aligned with the definition for "motor vehicle traffic accident" as defined in the American National Standard Institute (ANSI) D16.1 – The Manual on Classification of Motor Vehicle Traffic Accidents (2007). [76] As such, in order for an incident to be considered a motor vehicle traffic crash for inclusion in FARS, the answer to each of the following must be "Yes": [77]

1. Did the incident include one or more occurrences of injury or damage?
2. Was there at least one occurrence of injury or damage which was not a direct result of a cataclysm? [78]
3. Did the incident involve one or more motor vehicles?

71. In some jurisdictions, Uber is required by law to submit periodic reports to certain regulatory bodies with data about safety incidents that occur on the Uber platform. The taxonomy used for those reports and the type of incidents reported may differ from those found in this Safety Report.
72. National Highway Traffic Safety Administration (NHTSA), "Fatality Analysis Reporting System," April 2014, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811992.
73. United States Government Accountability Office, "Status of NHTSA's Redesign of Its Crashworthiness Data System," GAO-15-334 (March 2015), p. 5, accessed November 21, 2019, https://www.gao.gov/assets/670/668900.pdf.
74. National Highway Traffic Safety Administration (NHTSA), "Report to Congress NHTSA's Crash Data Collection Programs," April 2010, p. Ii, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811337.
75. National Highway Traffic Safety Administration (NHTSA), "Fatality Analysis Reporting System," April 2014, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811992.
76. National Highway Traffic Safety Administration (NHTSA), "2017 FARS/CRSS Coding and Validation Manual," October 2018, p. 9, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812559.
77. National Safety Council, "ANSI D16.1 2007 Manual on Classification of Motor Vehicle Traffic Accidents," August 2, 2007, p. 42, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/07D16.
78. A "cataclysm" is defined on p. 20 of the ANSI D16.1 2007 Manual on Classification of Motor Vehicle Traffic Accidents as an avalanche, landslide/mudslide, hurricane, cyclone, downburst, flood, torrential rain, cloudburst, lightning, tornado, tidal wave, earthquake or volcanic eruption.

UBER-MDL3084-000000460

4. Of the motor vehicles involved, was at least one in-transport? [79]

5. Was the incident an unstabilized situation? [80]

6. Did either the unstabilized situation originate on a trafficway or the injury or damage occur on a trafficway? [81]

7. (For incidents involving a railway train in -transport only) Did a motor vehicle in -transport become involved prior to any injury or damage involving the train?

8. Is it true that neither an aircraft in-transport nor a watercraft in-transport was involved in the incident?

Unlike FARS, which collects information on fatal crashes from police, medical, and other source documents maintained by the state, Uber classifies motor vehicle crashes according to the information provided to us by the reporting party, or according to additional information retrieved via insurance claims. For the purposes of data classification, Uber does not act as law enforcement in determining fault or the causal or contributing factors involved in the crash.

By using identifying crash characteristics that Uber has access to (such as a driver's Vehicle Identification Number (VIN), vehicle make and model, location, date, and time), we were able to query the FARS dataset to find and reconcile each fatal crash in the Uber dataset to a fatal crash in the FARS database. As a result, 97 fatal crashes deemed to be Uber-related for the purposes of this report were able to be individually reconciled with FARS. Uber was then able to gather additional contextual data points on Uber -related crashes, such as roadway surface conditions, land use, work zone, etc.

There were 22 Uber-related fatal crashes that either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS. The reasons for this may include, but are not limited to:

• Fatalities occurred more than 30 days after the crash

• Health-related fatalities occurred immediately prior to a crash (death was deemed by official documentation to not be the result of a motor vehicle crash)

• Fatalities occurred that were reported to Uber, but FARS data does not record the vehicle operated by a driver using the Uber app as a party to the crash [82]

• Other fatalities occurred that were reported to Uber to be the result of a motor vehicle crash but t hat were not deemed by official documentation to be a result of a motor vehicle crash

Because these fatal crashes are not in the FARS dataset, the contextual data points (such as road class, road surface conditions, etc.) obtained from FARS are not availa ble for these 22 fatal crashes. Including these crashes would reduce comparability to FARS.


## Defining a motor vehicle fatality's relation to the Uber platform [83]

In order for a fatal motor vehicle crash to be "Uber -related" for the purposes of this Safety Report, the crash must have involved the vehicle of at least one driver using the Uber platform and involved the death of at least one person (occupant of a vehicle or a non -motorist, regardless of whether they were an Uber user or third party) within 30 days of the crash. Fatal crashes are included in this report regardless of whether the deceased party was an Uber user or whether a driver using the Uber platform or their vehicle was the cause of the crash or was carrying the deceased parties.

Additionally, the fatal crash must have occurred at any time between when the driver accepted the trip request in the app and when the trip was completed (see Fig. 2).

---

79. "In-transport" is defined on p. 14 of the ANSI D16.1-2007 Manual on Classification of Motor Vehicle Traffic Accidents as a term that denotes the state or condition of a transport vehicle that is in motion or within the portion of a transport way ordinarily used by similar transport vehicles. When applied to motor vehicles, "in-transport" means on a roadway or in motion within or outside the trafficway.

80. An "unstabilized situation" is defined on p. 19 of the ANSI D16.1-2007 Manual on Classification of Motor Vehicle Traffic Accidents as a set of events not under human control. It originates when control is lost and terminates when control is regained or, in the absence of persons who are able to regain control, when all persons and property are at rest.

81. A "trafficway" is defined on p. 3 of the ANSI D16.1-2007 Manual on Classification of Motor Vehicle Traffic Accidents as any land way open to the public as a matter of right or custom for moving persons or property from one place to another.

82. Time and location of crash reconciled to FARS data, but driver/driver's vehicle could not be identified in FARS dataset as a party to the crash. An example would be a multi -car pileup where FARS only recorded certain vehicles as party to the fatal incident.

83. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

UBER-MDL3084-000000461

Fig. 2: Motor vehicle fatality: What is Uber-related?

| | Not Uber-related (excluded from report) |
|---|---|
| ✓ Driver has accepted trip request and is en route to rider's pickup location | ✗ Driver offline, not driving on the Uber platform |
| ✓ Driver or rider is actively entering or exiting the vehicle at the rider's pickup location or destination | ✗ Driver online with no trip requests |
| ✓ During trip, en route to rider's destination | ✗ Rider has been safely dropped off at their destination |

| Uber-related: examples & rationales | |
|---|---|
| Driver has accepted trip request and is en route to rider's pickup location | |
| Example<br>While a driver using the Uber platform is en route to pick up a rider, their vehicle fatally strikes a pedestrian. | Rationale<br>The fatal crash involved the vehicle of a driver using the Uber platform while they were en route to pick up a rider; it is theref ore considered Uber -related for the purposes of data classification for this report. |
| Driver or rider is actively entering or exiting vehicle at the rider's pickup location or destination | |
| Example<br>A driver using the Uber platform arrives to pick up their rider and exits their vehicle to help load the rider's luggage into the trunk. A third -party vehicle strikes and fatally wounds the driver while they are outside their vehicle. | Rationale<br>The fatal crash occurred while a driver using the Uber platform was exiting their vehicle to assist their rider; this is considered Uber -related for the purposes of data classification for this report. |
| During trip, en route to rider's destination | |
| Example<br>During a trip, a third party collides with the vehicle of a driver using the Uber platform, fatally wounding the driver and rider. | Rationale<br>The fatal crash involved the vehicle of a driver using the Uber platform during an active trip en route to the rider's destination; it is therefore considered Uber -related for the purposes of data classification for this report. |
| During a large multi -vehicle crash, 2 passengers in a third -party vehicle are fatally wounded, and the vehicle of a driver using the Uber platform is struck. Neither the driver who's using the Uber app nor their riders are injured. | For the purposes of data classification for this report, Uber counts any human being that is fatally injured during a motor vehicle crash that also involved the vehicle of a driver using the Uber platform during a trip or while en route to a rider's pickup location. The driver who's using the Uber app does not have to be the cause of the crash, nor carrying the deceased parties. |
| While a driver using the Uber platform is transporting a rider, their vehicle and a third party on a bicycle collide, and the third party on the bicycle is fatally wounded. | For the purposes of data classification for this report, Uber counts any human bei ng that is fatally injured during a motor vehicle crash that also involved the vehicle of a driver using the Uber platform during a trip or while en route to a rider's pickup location. The driver who's using the Uber app does not have to be the cause of the crash, nor carrying the deceased parties. |
| While a driver using the Uber platform is transporting a rider, they collide with another vehi cle and are seriously injured. Two weeks after the crash, the driver who was using the Uber app passes away due to injuries sustained. | The fatality occurred within 30 days of a crash involving the vehicle of a driver using the Uber platform, and is theref ore considered Uber -related for the purposes of data classification for this report. |

Section Four

UBER-MDL3084-000000462

| Not Uber-related: examples & rationales | |
|---|---|
| **Example**<br>A third-party vehicle collides with a driver who has an Uber account but is not driving on the Uber platform at that moment. The driver and the third party are both fatally wounded. | **Rationale**<br>Since the incident occurred during a time when the driver was not using the platform, the incident is not considered Uber-related for the purposes of data classification for this report. |
| A driver using the Uber platform drops off a rider at their destination and leaves. The rider walks down the street and is fatally struck by a third-party vehicle. | Since the fatal crash occurred after the driver had safely dropped off the rider at their destination and left the area, the fatality is not considered Uber-related for the purposes of data classification for this report. |
| A driver using the Uber platform writes in to Uber safety support to report that they witnessed 2 third-party vehicles collide, fatally wounding an occupant. | Despite the fact that the driver witnessed the crash, they were not directly involved in it. These fatalities are therefore not Uber-related for the purposes of data classification for this report. |
| Reports with alternative intents | |
| **Example**<br>A rider writes in to Uber safety support describing an alleged fatal crash that is objectively implausible and is clearly a practical joke. | **Rationale**<br>The intent of the safety support interaction was clearly not to report a safety incident, but to carry out a practical joke. Therefore, the situation is not considered Uber-related for the purposes of data classification for this report. |

## Calculating vehicle miles traveled (VMT)

Calculating miles traveled is a common method of calculating for frequency of road fatalities. Indeed, this is the same measure that the US Department of Transportation uses for traffic data counts collected through permanent automatic traffic recorders on public roadways.[84] Therefore, in this report, Uber uses VMT when representing motor vehicle fatality rates. Uber calculates the miles underlying motor vehicle fatality accidents by utilizing GPS data from Uber's ridesharing app used by drivers. The miles included in the calculation encompass miles driven while the driver was en route to the rider's pickup location, and the miles driven during rider trips. [85]

## Data quality measures for motor vehicle fatalities

Fatalities, while extremely tragic, can be classified consistently with a clear outcome. Motor vehicle crashes resulting in non-fatal injuries or damage (e.g., with serious, minor, or no injuries) are more challenging to consistently classify.

As a final check to help ensure data completeness, Uber underwent a reconciliation process where all fatalities reported via Uber safety support channels were cross-referenced with other internal data sources, including insurance-claims data and law-enforcement reports. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases [86] and escalating details that had not otherwise been reported to Uber through other channels. For example, fatalities that occur weeks or more after the vehicle crash are often discovered through the insurance-claims process, rather than through Uber safety support. Uber maintains insurance coverage for passenger trips in the US, so there are strong incentives for users to report incidents to Uber.

# Fatal physical assault methodology

## Selecting physical assault categories for this report

This report includes physical assault incidents that resulted in one or more fatalities. Physical assault incidents that may have resulted in serious, minor, or no injuries were excluded from this report.

---

84. US Department of Transportation (USDOT), "VMT per Capita," February 2, 2016, https://www.transportation.gov/mission/health /vmt-capita.
85. For a small portion of driver miles during 2017, the GPS data is missing during the period when the driver is en route to a rider's pickup location. For the missing data, we have used Uber's best estimate in calculating the mileage.
86. Safety support agents action accounts using consistent policies, regardless of reporting method.

UBER-MDL3084-000000463

Section Four

In determining which categories of reported physical assault incidents were appropriate to include in this report, it was necessary to include the most serious reported physical assault incidents while maintaining a high degree of confidence and consistenc y in the quality of the overall dataset.

Similar to motor vehicle fatalities, fatal physical assaults can be more consistently categorized. Any physical assault category not resulting in a fatality (e.g., with serious, minor, or no injuries) is less objective, making it more difficult to achieve a classification standard that is both accurate and capable of consistent application. The final dataset included in this report is Uber's good -faith effort to responsibly report on information with the highes      t reasonable degree of accuracy, reliability, and consistency.

As a final step to help ensure that the dataset for this report was as comprehensive as possible, Uber underwent a reconcil -iation process where all fatalities reported via Uber safety suppor      t channels were cross -referenced with insurance claims data. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases and/or escalati      ng details on cases that would not otherwise have been present in the safety support dataset. For example, fatalities that occur weeks after the physical assault incident are often discovered through the insurance    -claims process, rather than through Uber s   afety support.

## Defining a fatal physical assault's relation to the Uber platform [87]

In order for a reported fatal physical assault incident to be established as Uber       -related for purposes of this report, one or more of the following must be true (see Fig. 3):

- The incident involved at least one person on an Uber    -facilitated trip, [88] not nec essarily with parties paired by the Uber app

- The incident occurred between parties that were paired by the Uber app, and the incident occurred within 48 hours [89] of trip completion (regardless of whether the parties were still on the app at the time)

There are limited circumstances in which a reported fatality may, on its surface, meet one or both of the preceding qualifying requirements but then, due to additional information from the reporting party, contradict the classification as Uber-related. For example, the reporting party may later disaffirm or refute the accuracy of the original report by stating that the incident was reported to the wrong rideshare company or mistake. Uber also occasionally receives reports where the reporting party's intent is clearly not to report a safety incident (e.g., practical jokes claiming to "test" Uber's resp          onse). These inciden ts were also excluded from the dataset for this report.

---

87. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

88. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while en route to the rider's pickup location, this would be included in the dataset.

89. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of o erinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

UBER-MDL3084-000000464

## Fig. 3: Fatal physical assault: What is Uber-related?

Section Four

|  | Not Uber-related (excluded from report) |
|---|---|
| ✓ During trip [90] | ✗ Driver is online with no trip requests |
| ✓ Involves parties matched by app, incident takes place up to 48 hours after trip completion | ✗ Involves parties matched by app, incident takes place more than 48 hours after trip completion |

| Uber-related: examples & rationales | |
|---|---|
| Incident occurred during an Uber-facilitated trip | |
| **Example** During an Uber-facilitated trip, a third party outside of the vehicle fatally wounds the rider in the back seat of the vehicle. | **Rationale** Even though the Uber app did not pair the victim and the accused, the incident occurred while at least one of the involved parties was actively on a trip facilitated by the Uber app; it is therefore considered Uber-related for the purposes of data classification for this report. |
| During an Uber-facilitated trip, 2 riders get into a physical altercation and one fatally wounds the other. | This incident occurred during a trip facilitated by the Uber app, and is therefore considered Uber-related for the purposes of data classification for this report. |
| Incident parties were paired via the Uber app (and incident occurred up to 48 hours after the trip concluded) | |
| **Example** During an Uber-facilitated trip, the driver and rider get into a physical altercation, and the rider fatally wounds the driver. | **Rationale** The victim and the accused party were paired by the Uber app; the incident is therefore Uber-related for the purposes of data classification for this report. |
| After an Uber-facilitated trip ends, the rider fatally wounds the driver. | Even though the trip had ended, the accused party was initially paired with the victim via the Uber app, and the fatal incident occurred within 48 hours of the trip's conclusion; the incident is therefore Uber-related for the purposes of data classification for this report. |

| Not Uber-related: examples & rationales | |
|---|---|
| **Example** Law enforcement requests data on a rider who took an Uber-facilitated trip to a destination where they fatally wounded third parties. | **Rationale** Since the incident did not occur during an Uber-facilitated trip and did not involve parties paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |
| While a rider using the Uber platform is waiting to be picked up by their driver, a third party robs and fatally wounds them. | Since the incident did not occur during an Uber-facilitated trip and did not involve parties paired by the Uber app, this inciden t is not considered Uber-related for the purposes of data classification for this report. |
| Disaffirmed reports or reports with alternative intents | |
| **Example** The family member of a driver using the Uber platform reports that the driver was found fatally wounded in their vehicle. However, upon review of the driver's activity, it is determined that the driver was not driving on the Uber platform around the time o f their death. | **Rationale** It was determined that this incident did not involve parties paired by the Uber app and did not occur on an Uber-facilitated trip. The incident is therefore not considered Uber-related for the purposes of data classification for this report. |
| A rider on the Uber platform writes in to Uber safety support describing an alleged fatal situation that is objectively implausible and is clearly a practical joke. | The intent of the safety support interaction was clearly not to report a safety incident but to carry out a practical joke. The situation is therefore not considered Uber-related for the purposes of data classification for this report. |

90. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was fatally wounded by a third party while en route to the rider's pickup location, this would be included in the dataset.

UBER-MDL3084-000000465

# Sexual assault methodology

### Sexual Misconduct and Sexual Violence Taxonomy[91]

In 2018, we partnered with experts from the National Sexual Violence Resource Center (NSVRC) and the Urban Institute to refine the sexual assault and sexual misconduct portions of our Safety Taxonomy in order to better understand the reality of unwanted se xual experiences. Prior to this effort, a standardized tool for corporations to consistently classify reports of sexual violence received from their consumers did not exist.

To develop the Sexual Misconduct and Sexual Violence Taxonomy, the NSVRC and the Urban Institute reviewed 3 rounds of anonymized Uber incident reports, totaling more than 350 reports. Throughout the 3 rounds of review, the NSVRC/Urban team compared classification opinions and developed an initial taxonomy. Uber then met with the NSVRC/ Urban team and collaborated with them to refine the taxonomy to more accurately reflect the complexities of reported safety incidents. Uber undertook a course of extensive internal testing in which nearly 100,000 customer reports spanning a wide range of safety - and non-safety -related issue types from trips in 2017 were reviewed by internal Uber auditors using the second draft of the taxonomy. The teams made additional modifications to the taxonomy in response to this testing, which resulted in the final Sexual Misconduct and Sexual Violence Taxonomy implemented at Uber and published by the NSVRC in Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault.

The final taxonomy cla ssifies unwanted sexual experiences into 2 overarching categories —**sexual assault** and **sexual mis- conduct**—which are further divided into a total of 21 secondary categories (some with tertiary categories) that correspond to behaviorally specific definitions (see Appendix IV: Sexual Misconduct and Sexual Violence Taxonomy).

## Selecting sexual assault categories for this report

Uber strived for the dataset included in this report to have measurably high degrees of classification accuracy, reliability, and consistency. We believe it would be a disservice if data were released on categories where classification quality could not ac hieve adequate levels of confidence, as this would jeopardize the accuracy of the data presented.

It's important to note that Uber user reports of sexual assault can be interpreted subjectively by safety support agents and auditors, even for the most seve re incidents. This is further exacerbated by the lack of shared definitions and inconsistent ways in which sexual assaults are tracked and codified across public and private organizations. Despite operating with defined categories created by national exper ts and investing in extensive taxonomy training for Uber agents and auditors, classification opinions for sexual assault and misconduct can vary from one auditor to another. This is compounded by the natural limitations in Uber's incoming safety data, which can sometimes lack the critical clarifying details necessary for more precise classification (see Limitations of Uber safety incident data ).

---

91. For more information on the development and details of the Sexual Misconduct and Sexual Violence Taxonomy, please see "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," a white paper in partnership with the National Sexual Viol ence Resource Center (NSVRC), Urban Institute, and Uber.

UBER-MDL3084-000000466

**Difficulty in categorizing unwanted sexual experiences**

Even among experts, and despite the taxonomy's behaviorally specific definitions, auditor interpretations of Uber user reports of sexual assault can be subjective, meaning categorization opinions can differ from one auditor to another.

Some categories within the Sexual Misconduct and Sexual Violence Taxonomy are more challenging to classify than others, particul arly those involving non -sexual body parts, 'attempted' sexual assault, or vague descriptions of comments or gestures. With situations involving non      -sexual body parts, Uber agents and auditors must determine if the contact was interpreted by the reporting       party as being sexual or romantic in nature. This context is not always indicated or evident in the incident report. On the other hand, an incident report detailing the touch of a sexual body part, such as breasts or buttocks, leaves little room for misint       er-pretation as it is much more objectively sexual in nature. Conversely, touches of non      -sexual body parts, such as a rider patting a driver's shoulder while saying thank you, or 2 UberPool co   -riders' legs touching in a tight back seat, can be less clear and likely would not indicate sexual assault. It can be even more challenging to categorize when the touch wasn't completed, and Uber agents and auditors must ascertain if attempted touching occurred and whether the attempt was sexual or romantic in nature      .

Reports of potential  inappropriate  comments  or gestures  can be just as difficult  to categorize. For example, it is challenging to differentiate between comments about appearance and flirting, for example. This is why Uber remains focused on investing in improvements to data quality measures and taxonomy training enhancements, in conjunction with the NSVRC and Urb   an Institute, in order to accurately report on further categories in the future.

Section Four

In determining  which categories  of sexual assault were appropriate  to include  in this report,  we prioritized:

1. The most serious  categories  of sexual assault outlined  in the taxonomy
2. Maintaining  a high degree  of confidence  and consistency  in the quality  of the overall dataset
3. Remaining as consistent as possible with the types of sexual assault that are already published in external research and national estimates

This report includes categories of sexual assault which, in aggregate, have at least 85% of auditor classifications       aligned [92] with internal Safety Taxonomy experts (see Data auditing process ). Although an aggregate confidence benchmark of 85% for the overall dataset was established, some individual categories had even higher alignment. For example, auditor classification for Non -Consensual Sexual Penetration incident reports aligned with internal Safety Taxonomy subject matter experts more than 99% of the time, indicating an extremely high level of classification reliability and consistency fo     r the most serious sexual assault category. The only individual cat   egory of sexual assault in this report that did not reach 85% auditor alignment on its own was Attempted Non -Consensual Sexual Penetration, which reached 78% auditor alignment with Safety Taxonomy experts. Despite this category not reaching the 85% auditor alignment benchmark, Uber felt it was crucial to include it as it is one of the most serious forms of sexual assault that are reported in connection to the Uber platform. Uber  continues to work with the NSVRC and Urban Institute to improve auditor alignment for this category and others.

The final dataset included in this report is Uber's good   -faith effort to responsibly report on information with the highest reasonable degree o f accuracy, reliability, and consistency.

Furthermore, the categories of incidents we are reporting align with the forms of sexual assault already collected and reported by the National Intimate Partner and Sexual Violence Survey (NISVS) administered thro     ugh the Centers for Disease Control (CDC). "NISVS is an ongoing survey that collects the most current and comprehensive national  - and state -level data on intimate  partner violence, sexual violence, and stalking  victimization  in the United States" and its data is used to inform

---

92. Here "alignment"  refers to the rate of agreement  when 2 auditors  are separately shown the same facts and come to the same conclusion  on the classification  of an incident.

UBER-MDL3084-000000467

policy, programs, and best practices in reducing the occurence of this violence in our communities. [93] While the Sexual Misconduct and Sexual Violence Taxonomy includes more categories for data collection, Uber is reporting on a range of categories that are generally consistent with those reported by NISVS. [94]

As a final check to help ensure data completeness, Uber underwent a reconciliation process where all reports of Non-Consensual Sexual Penetration reported via Uber safety support channels were cross-referenced with other internal data sources, including reports received directly through law enforcement. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Ra ther, it allowed Uber to identify new cases and details that had not otherwise been reported to Uber through other channels.

> Each of these safety incidents is more than just a data point to us. They can represent serious traumas for real individuals in our communities.

Ultimately, we believe responsible data reporting is critical to improving the safety of the Uber ridesharing platform and the com munities we serve. Each of these safety incidents is more than just a data point to us. They can represent serious traumas for real individuals in our communities. This reality leaves little room for error, and we take this responsibility for data accuracy and consistency extremely seriously.

## Defining a sexual assault's relation to Uber's ridesharing platform [95]

Even if an incident is ultimately determined to be unrelated to Uber and not reflected here for the purposes of data classification, Uber's safety support agents still follow all appropriate response protocols and take necessary action when able, up to and including deactivation from the Uber app (see Sexual assault standards in Safety commitments).

Uber sometimes receives reports of po tential sexual assault or misconduct that do not have any connection to the Uber ridesharing platform. Thus, it is necessary to clearly define what is in scope for the purposes of Uber's data classification and safety reporting.

Before breaking down this scope, it is important to differentiate between counting an incident for the purposes of public reporting and Uber's work to follow established protocols to take action on a reported incident. Uber has multiple teams of specially trained support agents who review potential safety incidents accurately and quickly in order to recommend the most appropriate actions to protect the safety of the Uber community at large. For example, if Uber is made aware that a driver has been charged with sexual assault stemmin g from an incident that occurred while they were not driving on the Uber ridesharing platform, Uber safety support agents would still conduct a review of that driver's account. If the Uber support agent confirmed a criminal sexual assault charge, then the driver would be removed from the Uber ridesharing platform because the charge would violate our background check standards.

In order for a sexual assault to be established as Uber-related for purposes of data classification for this report, one or more of the following must be true (see Fig. 4):

• The incident occurred during an active Uber-facilitated trip, [96] not necessarily with parties paired by the Uber app

• The incident occurred between parties that were paired by the Uber app, and the incident occurred within 48 hours [97] of trip completion (regardless of whether the parties were still on the app at the time)

---

93. "The National Intimate Partner and Sexual Violence Survey (NISVS)," Centers for Disease Control & Prevention (CDC), June 19, 2019, https:// www.cdc.gov /violenceprevention/datasources/nisvs/index.htm ].

94. NISVS reports data on "contact sexual violence." "Contact sexual violence" is a NISVS combined category that includes rape, b eing made to penetrate someone else, sexual coercion, and/or unwanted sexual contact. In Uber's taxonomy, this term would encompass (1) Non-Consensual Sexual Penetration, (2) Non-Consensual Kissing of a Sexual Body Part, (3) Non-Consensual Touching of a Non-Sexual Body Part, (4) Attempted Non-Consensual Sexual Penetration, and (5) Non-Consensual Kissing of a Sexual Body Part. However, given the different aims of Uber and the CDC, as well as the limitations of their respective data collections, it is still likely that significant methodological differences in classification may exist.

95. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

96. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.

97. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of trip completion. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

UBER-MDL3084-000000468

There are limited circumstances in which an incident report may, on its surface, meet one or both of the preceding qualifying requirements but then, due to additional information from the reporting party, contradict the classification as Uber-related. For example, the reporting party may later disaffirm or refute the accuracy of the original report by stating that the incident was reported to the wrong ridesharing company by mistake. In other situations, Uber occasionally receives reports where the reporting party's intent is clearly not to report a safety incident (e.g., practical jokes claiming to "test" Uber's response). These incidents were excluded from the dataset for this report.

In cases of reported sexual assault, Uber understands that survivors may withdraw an incident report due to fear, frustra-tion, or simply not wanting to continue with the reporting process for a number of personal reasons. In cases where a sexual assault report was apparently withdrawn for one of these reasons (and the original details of the incident were not later refuted o r disaffirmed by the survivor), these reports were still considered Uber    -related. Therefore, we did not exclude these withdrawn reports from the dataset.

## Fig. 4: Sexual assault: What is Uber-related?

| | Not Uber-related (excluded from report) |
|---|---|
| ✓ During trip [98] | ✗ Driver is online with no trip requests |
| ✓ Involves parties paired by the app, incident occurs up to 48 hours after trip completion | ✗ Involves parties paired by the app, incident occurs more than 48 hours after trip completion |

| Uber-related: examples & rationales | |
|---|---|
| Incident occurred during an active Uber-facilitated trip | |
| **Example** <br> During an Uber-facilitated trip, a driver touched a rider's buttocks and the rider reported the assault to Uber. | **Rationale** <br> This incident occurred while on an Uber-facilitated trip, so it is considered Uber-related for the purposes of data classification f or this report. |
| A man and a woman meet at a club and decide to share a ride home on the man's Uber account. During the trip, the woman falls asleep and the man sexually assaults the woman. The driver observes the incident and reports it to Uber. | Even though the Uber app did not pair the victim and the accused party, the incident occurred while the riders were on an Uber-facilitated trip; it is therefore considered Uber-related for the purposes of data classification for this report. |
| Incident parties were paired via the Uber app (up to 48 hours after the trip concluded) | |
| **Example** <br> During an UberPool trip, one rider non-consensually kisses another rider on the cheek, and the rider who was kissed reports the incident to Uber. | **Rationale** <br> The victim and the accused party were paired on an UberPool trip by the Uber app; therefore, the incident is Uber-related for the purposes of data classification for this repo rt. |
| A rider takes an Uber-facilitated trip. After the driver arrives at the desti-nation and completes the trip, the rider tries to remove the driver's clothes without their consent, and the driver later reports the incident to Uber. | Even though the trip had ended, the accused party was initially paired with the victim by the Uber app, and the assault occurred within 48 hours of the trip's completion; the incide nt is therefore Uber-related for the purposes of data classification for this report. |

Section Four

---

98. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning    when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.

UBER-MDL3084-000000469

| | |
|---|---|
| **Not Uber-related: examples & rationales** | |
| **Example**<br>A driver using the Uber platform picks up a rider who immediately discloses that their aquaintance attempted to rape them just prior to the trip. The driver reports the disclosure to Uber. | **Rationale**<br>Since the incident did not occur during an Uber -facilitated trip, and because the parties were not paired by the Uber app, this incident is not considered Uber -related for the purposes of data classification for this report. |
| Law enforcement requests data on a rider who took an Uber -facilitated trip to a destination where they sexually assaulted a third party. | Although we would cooperate with law enforcement's request, the incident did not occur on an Uber-facilitated trip and did not involve parties paired by the Uber app, so this assault is not considered Uber -related for the purposes of data classification for this report. |
| A rider and driver are paired for a trip through the Uber app and begin dating. A week or 2 into their relationship, the driver sexually assaults the rider, and the victim reports the incident to Uber. | While the incident parties were paired through the ap p, the incident occurred more than 48 hours after the trip concluded. Since Uber's taxonomy is intended to capture events that occur as a result of temporary or episodic interactions facilitated through the app rather than prolonged interpersonal relations hips, this incident is outside of Uber's scope, and is not Uber-related for the purposes of data classification for this report. |
| **Disaffirmed reports or reports with alternative intents** | |
| **Example**<br>A rider reports that they were kissed by a driver using the Uber platform during an Uber -facilitated trip the night before; they later realize that the incident occurred with another ridesharing company and that they filed the ticket with the wrong company . | **Rationale**<br>The original report's details were disaffirmed, and new information changed the fundamental accuracy of the original report's connection with Uber (i.e., it clarified that Uber did not pair the 2 parties and was not involved in any other way). Therefore, the incident is not Uber -related for the purposes of data classification for this report. |
| A rider writes in to Uber safety support describing an alleged situation that is objectively implausible and is clearly a practical joke. | The intent of the safety support interaction was clearly not to report a safety incident, but to carry out a practical joke. Therefore, the situation is not considered Uber -related for the purposes of data classification for this report. |

Section Four

# Data auditing process

In preparation for the release of this Safety Report and the implementation of the new Sexual Misconduct and Sexual Violence Taxonomy in 2018, we started the process of auditing historical safety incident data. It was also paramount to keep our frontline support agents focused on their primary responsibility: providing support to reporting parties and collecting user statements and information in relation to potential safety incidents. Although these frontline agents make the initial classification attempt in order to prioritize the report, they are primarily responsible for providing a prompt and sensitive response to individuals reporting concerns, and as such, precise classification of data is not their primary concern. To enhance our data-quality efforts, we created a specialized team dedicated to re-classifying safety incident reports. According to the NSVRC and Urban Institute:

> "It is much more realistic to align this smaller group of data auditors whose sole job is to e    nsure the quality of data and the alignment with the proposed taxonomy, versus the virtually impossible task of assigning the task to a larger group of frontline agents, whose primary responsibility lies in high -quality response and resolution." [99]

This specialized audit team had 3 main objectives:

1. Ensure all relevant safety incident reports were audited with the necessary data documented
2. Audit to a high standard for quality
3. Update our historical data with the most accurate classification, addressing any discrepancies in auditor opinion

99. National Sexual Violence Resource Center and Urban Institute, "Taxonomy & Transparency Workshop Update: The Importance of Consistent Application and Classification," p. 2, June 2019, https://www.nsvrc.org/sites/default/files/publications/2019    -06/Taxonomy_%20%26%20Transparency%20Workshop%20Updat e_Final508.pdf.

UBER-MDL3084-000000470

These 3 goals then translated into the primary phases of our audit process.

## Phase 1: Auditing all potentially relevant safety incident reports and documenting necessary data

We understood that the original classification of safety incident reports may not accurately reflect the updated Sexual Misconduct and Sexual Violence Taxonomy. We also recognized that our new specialized auditor team was better positioned to ensure the accurate classification of historical motor vehicle and physical assault incidents. With this in mind, Uber audited all reports of sexual assault and sexual misconduct, inappropriate post-trip contact, any vehicle crash resulting in bodily injury, and any physical or theft-related altercation resulting in bodily injury. The team reviewed approximately 500,000 user reports, representing a range of safety- and non-safety-related consumer issues to ensure that all necessary information was documented and all incident reports were categorized accurately and comprehensively.

Once we ensured that all relevant incident reports had been audited and classified appropriately, we also documented other useful data points such as the reporting party and the accused party for sexual assaults and fatal physical assault incidents,[100] as well as whether the incident report was Uber-related for purposes of data classification.

## Phase 2: Auditing with a high standard for quality

In order to gain confidence in the results of the internal audit, we needed a robust and rigorous process for measuring the accuracy, reliability, and consistency of our data classifications. The most effective way to do this was to measure auditor performance quality and their Safety Taxonomy comprehension. In particular, it was necessary to measure an auditor's understanding of the Safety Taxonomy at 2 valuable checkpoints:

1. Before an auditor begins the internal classification audits
2. At a regular cadence after starting audits

These quality checkpoints allowed us to understand the baseline for how an auditor was interpreting our Safety Taxonomy, as well as any changes in their performance over time, and how this performance may impact overall data quality.

To measure an auditor's readiness to adequately interpret the Safety Taxonomy and perform classification audits, we created a certification process in which every auditor was required to participate in instructor-led courses, self-study guides, knowledge checks, and various interactive group audit activities. At the end of the training, auditors completed a practical assessment, where they were asked to classify a subset of incident reports. Their classification opinions were then compared to the classifications for the same incident reports (i.e., an "answer key") created by internal subject-matter experts in our Safety Taxonomy. Once the auditor completed the practical assessment, they received a score that determined whether they were ready to begin classification audits or whether additional training would be required.

The process to measure auditor performance quality during the active auditing process was similar. On a regular cadence, all auditors classified a subset of safety incident reports that were compared to the classification answer key prepared by the internal Safety Taxonomy experts. Auditor alignment scores were then aggregated to quantify our classification confidence in the overall dataset for each issue area (sexual assault, motor vehicle fatalities, and fatal physical assault). This confidence metric was critical as we considered where to invest in additional training to enhance quality, and what data categories contained an appropriate level of confidence for inclusion in this report.

To this end, aggregate classification confidence benchmarks of a minimum of 85% for sexual assault and 99% for all fatalities were set (see each issue-area methodology). Including categories for which auditor classification was measurably less consistent would have jeopardized the confidence of the larger dataset for this report. The final dataset included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

---

100. Reporting party and accused party are not data points available for motor vehicle fatalities.

UBER-MDL3084-000000471

### Phase 3: Addressing differences in auditor opinion and updating underlying data

Our final goal was to change the underlying data classification in Uber's database to ensure that final accuracy aligned with auditor classification opinion. Before doing this, however, we wanted to provide additional review measures in circum- stances where classification may have been particularly challenging. We identified 2 potential circumstances for further examination of auditor classification:

1. Circumstances where the auditor classifications differed from the original classification entered by the frontline support agent

2. Proactive escalation from an auditor to their manager on incident reports deemed particularly difficult

In the event that an auditor's classification opinion differed from the original classification by frontline support agents, we built a process that required a second auditor opinion before any underlying data was changed. The second auditor was then able to take into account the incident report itself and the previous classification opinions of other auditors in order to determine the final classification opinion that would be used to update the underlying data.

Lastly, auditors were able to self-identify the incident reports that they felt were particularly challenging to classify, and then escalate these reports to an internal audit manager. These escalated reports facilitated collaborative discussions across the internal audit team. If the team still struggled to identify the appropriate classification, the incident report was then escalated to the internal cross-functional taxonomy experts to evaluate. Once the determination on the correct classification was made, it was used to update the initial classification and was then shared with the audit team, who could then use the learnings from the discussion to improve future auditor training.

While this auditing process was initially developed to prepare for safety reporting, these standards, performance bench- marks, and processes remain active within the Uber business to help achieve higher levels of data quality for all safety incident data analysis moving forward.

Section Four

# Limitations of Uber safety incident data

The data included in this report is not the result of a nationally random sample, nor is it intended to be a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults nationally beyond Uber. For example, the vast majority of US Uber users are individuals with access to a smartphone and a credit or debit card who use rideshar- ing services to navigate their geographies. This could cause a sampling bias leaning toward these populations, and may not be representative of the national population. As such, Uber urges caution in comparing the data contained in this report to the findings of national prevalence estimates as significant methodological differences may be present.

In addition, when interpreting the data in this report, one must consider the societal reality of potential under-reporting, particularly for incidents of sexual assault, which has been widely documented in external research.[101] For sexual assault, this is dependent on a number of victim identification factors such as an individual having access to, knowledge, and/or desire to reach Uber reporting channels, and/or those who are able to identify an incident as potentially sexually violent or unwanted. While Uber makes every effort to mitigate under-reporting by increasing reporting mechanisms and reducing barriers to reporting (see Collection of safety incident data), it is important to consider that the data in this report is only based on what is reported to Uber or that Uber became aware of through previously discussed channels.

Incoming Uber data can also be fragmented. Agents and auditors take incident reports at face value when classifying the report. There are times when an initial incident report lacks critical details necessary for auditors to classify the report accurately within the taxonomy. Examples include incident reports that may simply state that a user was sexually harassed or sexually assaulted —both terms encompass many manifestations of experiences and do not provide the necessary details for accurate classification within the Safety Taxonomy. Although frontline support agents will make numerous attempts to contact the reporting party to clarify the report, there are times when further contact is declined or not possible. Incoming requests from law enforcement are primary examples since these requests can often identify the potential crime generally as "sexual assault" with no clarifying details. Due to the sensitive and confidential nature of law-enforcement

---

101. Rachel E. Morgan, Ph.D., and Barbara A. Oudekerk, Ph.D., "Criminal Victimization, 2018," Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 2019, p. 8. https://www.bjs.gov/content/pub/pdf/cv18.pdf

UBER-MDL3084-000000472

investigations, Uber is not always privy to additional details. Unless we obtain more information on the incident through law enforcement or other channels (e.g., a subsequent report from the victim), these types of reports are unable to be sufficiently cl assified within Uber's Safety Taxonomy and are therefore classified as "Insufficient Information." All reports of insufficient information were excluded from this report.

Furthermore, auditors focused on alignment across classification, reporting party, a nd accused party. Uber's audit function was not scoped to document  the Uber party (rider account holder, guest rider, driver, etc.) of the potential  victim (in cases of sexual assault) or the deceased party (in fatality cases). Although the reporting party is sometimes the potential victim themselves, this is not the case for all incident reports (e.g., loved ones reporting on behalf of a victim or law enforcemen t requ esting data). Therefore, capturing the reporting party is not always adequate in understanding trends on who may experience incidents. To remediate this, a subsequent manual audit was performed in order to collect the party of the potential victim in all N on-Consensual Sexual Penetrations, as well as the deceased party in all fatality cases. As such, this potential victim data is not available for all categories within the sexual assault taxonomy.

Lastly, it is important to note certain lim itations on Uber's data related to riders, particularly regarding rider demographics. While Uber collects identity details on drivers through our normal background and identity check processes, these same requirements  do not exist for riders using the Uber platform.  Therefore, some of the demographic  data included  in the report is not available for riders unless it was collected through a manual audit of incident reports as in the case of Non - Consensual Sexual Penetration survivors.

Section Four

UBER-MDL3084-000000473

Today in 2019, nearly 4 million Uber trips happen every day in the US —that's more than 45 rides every second. At such a large scale, Uber ultimately reflects the world in which we operate —both the good and the bad. This includes difficult, deeply ingrained societal problems like sexual assault, fatal physical assaults, and fatal motor vehicle crashes. As the numbers in this report show, critical safety incidents on our platform are, statistically, extremely rare. However, these numbers are unacceptable beca use each one represents an experience of a person in the Uber community.

For the purposes of this report, we examine data from 2017 through 2018, a time frame in which an average of more than 3.1 million trips took place daily in the US. These figures provide an important backdrop to understanding the incident rates included in the Data insights chapter of this Safety Report.

### US trips[102]

| 2017 | 2018 |
|------|------|
| **1.0** billion | **1.3** billion |

| 2017-2018 total | 2017-2018 average US trips per day |
|------|------|
| **2.3** billion | **3.1+** million |

### US miles[103]

| 2017 | 2018 |
|------|------|
| **8.2** billion | **10.3** billion |

## Uber customer support requests

**The vast majority (99.9%) of Uber trips end without any safety -related issue at all.** For example, for the trips in 2017 and 2018:

- **1.4%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback.

- **0.1%** of trips had a support request for a safety -related concern, the majority of which included more minor safety issues, such as complaints of harsh braking or a verbal argument.

- **0.0003%** of trips had a report of a critical safety incident,[104] which are the incidents referenced in this report.

102.US trips are defined as any completed trip facilitated by the Uber ridesharing app within the US (excluding US territories).
103.Miles driven is derived from GPS data from Uber's ridesharing app used by drivers and includes miles driven while the driver was en route to the rider's pickup location, as well as the miles driven during rider trips. We have used Uber's best estimate in calculating the mileage.
104.This percentage includes the 5 categories of sexual assault published in this report, fatal motor vehicle crashes, and fatal physical assaults report ed to occur in 2017-2018 in relation to the Uber platform.

UBER-MDL3084-000000474

In reporting this data, we are intentionally overinclusive. For example, as detailed in the methodology, we have adopted broader definitions of safety incidents —particularly in the area of sexual assault —than most criminal codes and research entities. This report also captures incident reports of physical and sexual assaults that occurred between parties paired by the Uber app, not only during an Uber trip, but within 48 hours of a trip's completion. Motor vehicle fatalities include incidents in which a driver using the Uber app was the victim. Uber shares this data to raise public awareness of safety generally across the rideshare industry.

The data outlined in this section encompasses reports of safety incidents, regardless of the outcome of the safety support agent's review process, as opposed to those that simply meet criminal definitions or that may have resulted in law enforcement action. For more examples and information on how more restrictive data standards may impact the overall dataset for a publication of this nature, see Appendix I: Why data standards matter.

# Motor vehicle fatalities

Section Five

In 2018 alone, 36,560 people lost their lives in motor vehicle fatalities in the US. [105] While national trends in traffic fatalities have decreased over recent years, [106] too many families are living with these losses.

As stated in the methodology, the data presented in this report is derived from a direct 1:1 reconciliation with the national Fatality Analysis Reporting System (FARS) dataset. [107,108] By using identifying crash characteristics that Uber has access to (such as a driver's Vehicle Identification Number [VIN], vehicle make and model, location, date, and time), Uber was able to query the FARS dataset to find and reconcile each fatal crash in the Uber dataset to a fatal crash in the FARS database. In doing this, Uber was able to obtain additional data points documented in FARS for each fatal crash. The vast majority of the demographic data presented on Uber-related fatal crashes in this report was obtained from the FARS dataset to maintain consistency.

Although we recognize that our user base is not a representative national sample, and that the data in this report is not necessarily a representation of the size or scope of motor vehicle fatalities in other contexts, this 1:1 reconciliation process using publicly available data standards makes it possible for Uber-related data on fatal crashes to be analyzed in context with national data. This same process is not currently possible in the sexual assault or fatal physical assault fields of study since definitions, data standards, and publicly available data either do not exist or are widely inconsistent.

Finally, it's worth noting the data presented here is irrespective of fault. For the purposes of data classification, Uber does not determine fault or the causal or contributing factors involved in the crash. Similarly, FARS does not explicitly document the party at fault for any fatal crash.

In order for a fatal motor vehicle crash to be "Uber-related" [109] for the purposes of data classification for this report, the crash must have involved at least one vehicle of a driver using the Uber platform and the death of at least one human being (occupant of a vehicle or a non-motorist, regardless of whether they were an Uber user or third party) within 30 days of the

---

105. National Highway Traffic Safety Administration (NHTSA), "U.S. Transportation Secretary Elaine L. Chao Announces Further Decreases in Roadway Fatalities," October 22, 2019, https://www.nhtsa.gov/press-releases/roadway-fatalities-2018-fars.

106. Ibid.

107. An additional 22 Uber-related road fatalities either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS (see Methodology). Because these fatal crashes are not in the FARS dataset, they are not included in the data analysis presented in this report.

108. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason, the data presented in this report may change over time. The motor vehicle data presented in this report includes incident reports resolved on or before October 31, 2019. The motor vehicle data in this report reconciled to the 2018 FARS Release published October 22, 2019.

109. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

UBER-MDL3084-000000475

crash. For the purposes of determining "Uber-related" data classification, the vehicle of the driver using the Uber platform does not have to be the cause of the crash, nor carrying the deceased parties (see Methodology).

### Table 5: 2017-2018 motor vehicle fatalities by vehicle miles traveled (Uber-related and US rates)[10]

| | 2017 | | 2018 | | Uber YoY change |
|---|---|---|---|---|---|
| | Uber rate[111] (per 100 million VMT) | National rate[112] (per 100 million VMT) | Uber rate (per 100 million VMT) | National rate[113] (per 100 million VMT) | Uber rate change[114] |
| | 0.59 | 1.17 | 0.57 | 1.13 | -5% |
| Total miles | 8.2 billion | 3.2 trillion | 10.2 billion | 3.2 trillion | |

### Table 6: 2017-2018 motor vehicle fatalities by trips (Uber-related)[115]

| | 2017-2018 | | | 2017 | | 2018 | | Uber YoY change |
|---|---|---|---|---|---|---|---|---|
| | Frequency of rider fatalities (by # of trips) | Frequency of driver fatalities (by # of trips) | Frequency of total fatalities (by # of trips) | # of Uber-related fatalities | % of total trips | # of Uber-related fatalities | % of total trips | % change incident rate[116] |
| | ~1 in 100,000,000 | ~1 in 100,000,000 | ~1 in 20,000,000 | 49 | 0.000005% | 58 | 0.000005% | -5% |
| Total trips | | 2.3 billion | | 1.0 billion | | 1.3 billion | | |

### Rate (per 100 million VMT)

In the 2017-2018 time frame, there were 107 individual motor vehicle fatalities across 97 fatal Uber-related crashes. In 93% (n=90) of Uber-related fatal crashes, one person lost their life.[117] The remaining crashes involved multiple fatalities each.[118]

While NHTSA has published fatality rates of 1.17 per 100 million VMT in 2017 and 1.13 per 100 million VMT in 2018,[119] which are approximately double the rates observed for Uber-related trips (see Table 5), these rates cannot be easily compared to Uber's rate due to methodological differences in the calculation. In particular, the Uber incident rate per 100 million VMT considers crashes that involve a vehicle using the Uber platform, while NHTSA's rate looks at all vehicles on the road. When looking at crash es involving all vehicles, there is no need to assign a fatality to any particular vehicle in a multi-vehicle crash. However, if we consider a rate for a subset of vehicles (such as just those vehicles using the Uber platform), the rate for t hat population would be overstated unless one assigns each fatality to a particular vehicle.

110 Uber occasionally receives notice of a possible safety incident well after when the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason the data may change over time. The data presented in this report is accurate as of October 31, 2019.

111 Uber yearly rates are rounded.

112 National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.

113 Ibid.

114 Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.

115 Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason, the data presented in this report may change over time. The motor vehicle data presented in this report includes incident reports resolved on or before October 31, 2019. The motor vehicle data in this report reconciled to the 2018 FARS Release published October 22, 2019.

116 Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.

117 FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.

118 Ibid.

119 National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," October 2019, p. 1, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.

UBER-MDL3084-000000476

For example, suppose that only blue and red vehicles exist on the road. A collision between a red vehicle and a blue vehicle results in one fatality. Using a simple ratio of fatalities involving vehicles of one color divided by the miles traveled by vehicles of that color would result in double counting of fatalities. The incident rate for blue vehicles and the incident rate for red vehicles would both include the example crash; thus, the rate for both subsets could be higher than the "all vehicles" rate because the one fatality involves both vehicles and would be counted twice. One could assign each fatal crash to a single vehicle to avoid double counting when there are multiple vehicles involved. However, that is difficult to do consistently, especially without introducing a concept of fault, which is often disputed. We have therefore not adjusted the rates shown for this effect, even though doing so would lead to a lower fatality rate for Uber-related trips.

There are many other reasons why Uber's motor vehicle fatality rates may differ from the national average. First, anyone under the age of 21 is not allowed to drive on the Uber platform, and all drivers must have at least one year of license history. [120] According to NHTSA, drivers aged 15-20 tend to have higher overall crash rates than older and more experienced drivers. [121] While young drivers between 15 and 20 years old accounted for 5.4% of the total number of licensed drivers in the US in 2017, they made up 8% of all drivers involved in fatal crashes that year. [122]

Second, as discussed in Safety investments , Uber screens every prospective driver's Motor Vehicle Record (MVR) for any violations or crashes, verification of their license status, and any driving-related restrictions on their license. [123] For example, individuals with histories of severe violations such as DUIs, reckless driving, or evading police within the last 7 years are disqualified from driving on the Uber platform and are therefore not represented in our dataset.

And finally, vehicles of drivers using the Uber platform are generally newer than the average vehicle on the road (4 years old compared to 10 years old). [124] According to NHTSA Acting Administrator James Owens, "New vehicles are safer than older ones and when crashes occur, more new vehicles are equipped with advanced technologies that prevent or reduce the severity of crashes." [125]

## Types of fatal crashes

About 65% (n=63) of fatal Uber-related motor vehicle crashes involved one or more motor vehicles, and 31% (n=30) involved a crash with a pedestrian or pedalcyclist. 4% (n=4) represented other types of fatal crashes such as crashes with non-vehicles (e.g., a tree) or fatalities that occurred while the driver or rider was entering or exiting the vehicle (see Fig. 7).

### Fig. 7: Types of fatal crashes (Uber-related)

Crash with motor vehicle(s)

4%

Crash with pedestrian/pedalcycle

Other

120. United States and rideshare platform only. Drivers 22 years old and under require at least 3 years of license history. Drivers 23 and over are required to have at least 1 year of license history.
121. National Highway Traffic Safety Administration (NHTSA), "Young Drivers," p.1, May 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812753 .
122. Ibid.
123. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission. The TLC Driver licensing process is separate from the process described here.
124. In the US Department of Transportation's 2018 Transportation Statistics Annual Report, a light-duty vehicle is defined by the US Environmental Protection Agency as a passenger car with a maximum Gross Vehicle Weight Rating (GVWR)<8,500 lbs. (pp. 2-7), https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/browse -statistica l -products -and -data/transportation -statistics -annual -reports/Preliminary -TSAR Full-2018-a.pdf.
125. National Highway Traffic Safety Administration (NHTSA), "U.S. Transportation Secretary Elaine L. Chao Announces Further Decreases in Roadway Fatalities," October 22, 2019, https://www.nhtsa.gov/press -releases/roadway -fatalities -2018-fars.

UBER-MDL3084-000000477

Section Five

About half (n=45) of Uber's total fatal crashes inv olved 2 motor vehicles. [126] Three motor vehicles were involved in 21% (n=20) of fatal crashes, and 4 or more motor vehicles accounted for nearly 8% (n=8) of fatal crashes.[127] 25% (n=24) of all Uber-related fatal crashes involved only one motor vehicle.[128] These incidents typically involved a crash with a pedestrian.

## Speed limit zones

Fig. 8 shows the speed limit zones for vehicles involved in Uber -related fatalities and vehicles involved in fatalities from the national dataset. Vehicles involved in Uber-related fatalities most frequently occurred in speed limit areas of 30-35 mph, as compared to the national dataset, where vehicles involved in fatalities most frequently occurred in speed limit areas of 50-55 mph. [129]

### Fig. 8: Percent of vehicles in fatal crashes by speed limit[130]



Uber-related fatalities          Total US fatalities

## Roadway surface conditions

Nearly 91% (n=179) of all vehicles involved in Uber-related fatal crashes were on dry roadways. [131] This is slightly higher than the national dataset, where 83% of vehicles involved in fatal crashes were on dry surfaces. [132] Nationally, 12% of vehicles invol ved in fatal crashes were on wet roadways, while only 7% (n=14) of vehicles involved in Uber -related fatal crashes were on wet surfaces. [133]

126.FARSdata retrieved from the NHTSA'sQuery Tool on October 28,2019, https://cdan.dot.gov/query .
127.Ibid.
128.Ibid.
129.Ibid.
130.Figure is based on FARSdata retrieved from the NHTSA'sQuery Tool on October 28,2019, https://cdan.dot.gov/query .
131.FARSdata retrieved from the NHTSA'sQuery Tool on October 28,2019, https://cdan.dot.gov/query .
132.Ibid.
133.Ibid.

UBER-MDL3084-000000478

## Land use and route type

Approximately 90% (n=87) of Uber-related fatal crashes occurred in urban areas, while 9% (n=9) occurred in rural areas.[134] This is compared to national FARS data in which 53% of fatal crashes occurred in urban areas, and 46% occurred in rural areas.[135] This disparity is to be expected, as Uber's operations are more concentrated in US cities.

Consistent with land use, only 4% (n=4) of Uber-related fatal crashes occurred on a country road, compared to nearly 13% in the national dataset.[136] Accordingly, 40% (n= 39) of Uber-related fatal crashes occurred on local streets while nationally, only 17% of crashes occurred on local streets.[137] Another large discrepancy is found when analyzing fatal crashes occurring on US highways. Crashes on US highways comprised only 5% n=5) of Uber-related fatal crashes, while nationally, about 16% of fatal crashes occurred on a US highway. [138,139] Fatal crash rates on state highways among both datasets were similar, each accounting for roughly 30% of fatal crashes. [140]

## Work zone

According to USDOT's Federal Highway Administration, although work zones play a key role in "maintaining and upgrading our nation's roadways," they can also "often create a combination of factors resulting in crashes, injuries, and fatalities."[141] Approximately 2% (n=2) of Uber-related fatal crashes occurred in a work zone, which is generally consistent with national data (1% of all fatal crashes).[142]

## Light condition

Table 9 shows that the majority of Uber-related fatal crashes (49% or 48 crashes) occurred within lighted areas, such as areas lit by streetlights, while it was dark.[143] This differs greatly from national data, where the plurality of fatal crashes (47%) occurred in daylight.[144] Only 20% of crashes in the national dataset occurred in lighted areas while it was dark.[145] This is to be expected and accounted for by Uber's heavy concentration in metropolitan US cities, where most roadways are well lit and in high use on weekend evenings.

### Table 9: Percent of fatal crashes by light condition [146]

|  | Uber-related crashes | National crashes |
|---|---|---|
| Dark - lighted area | 49% | 20% |
| Dark - not lighted area | 22% | 27% |
| Daylight | 27% | 47% |
| Other | 2% | 6% |

134. Ibid.
135. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 5, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812826 .
136. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
137. Ibid
138. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
139. US highways, interstates, and state highways pulling from 'ROUTE' datafield defined in their codebook: https://crashstats .nhtsa.dot.gov/Api/Public /ViewPublication/812559 .
140. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
141. Federal Highway Administration, "FHWA Work Zone Facts and Statistics," March 25, 2019, https://ops.fhwa.dot.gov/wz/resources /facts_stats.htm .
142. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
143. Ibid.
144. Ibid.
145. Ibid
146. Table is based on FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .

UBER-MDL3084-000000479

Section Five

## Deceased parties

Table 10 shows a breakdown of deceased parties in Uber -related fatal crashes. In 2017 -2018, about 67% (n=72) of Uber -related deceased parties were a motor vehicle occupant, and the remaining 33% (n=35) were non -motor -vehicle occupants (e.g., pedestrians or pedalcyclists). [147]

Of the total number of Uber-related deceased parties, 21% (n=22) were drivers using the Uber platform, and 21% (n=23) were riders using the Uber platform. [148] It's important to note that drivers and riders using the Uber platform are n ot always inside the vehicle when a fatal crash occurs. In fact, 8 such individuals were fatally struck while outside the vehicle. [149] This can occur when a driver exits the vehicle to assist a rider into the vehicle, or while drivers or riders may be assis ting another vehicle on the road. In such cases, FARS considers these to be pedestrian fatalities. [150]

Across 2017 and 2018, 30% (n=32) of Uber related deceased parties were pedestrians, 25% (n=8) of which were drivers or riders using the Uber platform. [151] In 2018, FARS reported a 3.4% increase in pedestrian fatalities nationally when compared to 2017, and also noted the highest number of total pedestrian fatalities since 1990. [152]

There were 2 pedalcyclists who lost their lives in Uber -related fatal crashes in 2017 -2018. [153] FARS reported a 6.3% national increase in pedalcyclists who lost their lives. [154] This concerning national trend reinforces our recent investment in Bike Lane Alerts, a feature that notifies riders when their upcoming dropoff location is near a bike lane or along a bike route. These alerts are examples of critical prevention initiatives aimed at reducing avoidable pedalcyclist tragedies.

Of the total deceased parties in all Uber -related motor vehicle fatalities, 33% (n=35) were third -party motor -vehicle occupants. [155] In particular, 13% (n=14) of total deceased parties were motorcyclists. [156]

### Table 10: Number of deceased parties in Uber-related motor vehicle crashes[157]

| Deceased party | 2017-2018 |
|---|---|
| Occupant | 67% (n=72) |
| Driver using Uber app | 16 |
| Rider using Uber app | 21 |
| Third -party driver | 17 |
| Third -party passenger | 4 |
| Third -party motorcyclist | 14 |
| Other/unknown | 0 |
| Non -occupant | 33% (n=35) |
| Drivers/riders using Uber fatally struck outside vehicle (as pedestrians) | 8 |
| Third -party pedestrians | 24 |
| Pedalcyclists | 2 |
| Other/unknown | 1 |

147 FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
148. Ibid
149. Ibid
150. Ibid
151 FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
152. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview,"p. 3, October 2019, https://crash_stats.nhtsa.dot.gov/Api/Public /ViewPublication/812826 .
153 FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
154. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview,"p. 3, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812826 .
155 FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .
156. Ibid.
157. Table is based on FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query .

UBER-MDL3084-000000480

## Alcohol involvement

The National Highway Transportation Safety Administration (NHTSA) estimates that more than 10,000 lives are lost annually in crashes involving alcohol. [158] Since its inception, Uber has served communities as an alternative to drunk driving (see the Safety investments chapter to learn about our drunk driving prevention work with our partner Mothers Against Drunk Driving [MADD]). However, being an alternative t o drunk driving also means that Uber trips tend to peak at times when external research says that other intoxicated drivers may be on the road: late at night, on weekends, and during holidays and special events. [159]

Uber recognizes the importance of includ ing this critical data element in a report on road safety. However, this FARS data comes with considerable limitations. "Not Reported," "Unknown," and other reporting inconsistencies occur frequently in the FARS data due to varying reporting standards across different jurisdictions. To account for the missing data, NHTSA im - plements a statistical method to impute missing values of blood alcohol concentration (BAC). [160] Since Uber's motor vehicle fatality dataset is too small to attempt NHTSA's imputation procedure, the data likely under - represents the frequency of incidents involving the use of alcohol.

However, FARS data is able to show that 29% (n=13) of the fatalities of riders and drivers using the Ub er platform involved a third -party driver who was reported as driving under the influence.

Section Five

158. National Highway Traffic Safety Administration (NHTSA), "Drunk Driving," accessed November 20, 2019, https://www.nhtsa.gov /risky-driving/drunk -driving.
159. National Highway Traffic Safety Administration (NHTSA), "Alcohol Impaired Driving," November 2018, p. 4, https://crashstats.nhtsa.dot.gov/Api/Public/ ViewPublication/812630 .
160. National Highway Traffic Safety Administration (NHTSA), "Transitioning to Multipl e Imputation  – A New Method to Impute Missing Blood Alcohol Concentration (BAC) values in FARS," October 2002, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication /809403 .

UBER-MDL3084-000000481

# Fatal physical assaults

## Table 11: 2017-2018 fatal physical assaults[161]

| 2017 -2018 | 2017 | | 2018 | |
|---|---|---|---|---|
| **Frequency of incident reports (by # of trips)** | **# of fatalities** | **% of total trips** | **# of fatalities** | **% of total trips** |
| 1 in 122,000,000 | 10 | 0.000001% | 9 | 0.000001% |

| | | | | |
|---|---|---|---|---|
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion |

According to the CDC, in 2017 alone, 19,510 people in the US died due to homicides.[162] Uber data on fatal physical assaults cannot be directly compared to those using criminal definitions, since Uber does not aim to and cannot act as the justice system. Furthermore, our agents and auditors do not have the agency, background, or evidentiary information required to determine the "intent and capability of the assailant to cause serious injury," aspects that the National Incident -Based Reporting System (NIBRS) definition for homicide requires. [163] However, our safety support process provides us with sufficient inform ation to validate the level of injury (e.g., fatality) in a given assault.

During 2017 and 2018, there were 19 fatal physical assaults occurring in a total of 18 incidents in relation to Uber, [164] which accounts for approximately **0.000001% of total trips** or 1 in 122,000,000 trips (see Table 11).

As noted in the methodology, Uber considers a fatal physical assault to be Uber-related for the purposes of this report if:

- The incident involved at least one person on an Uber -facilitated trip, [165] not necessarily with parties paired by the Uber app, or;
- The incident occurred between parties that were paired via the Uber app, regardless if the incident occurred during a trip (u p to 48 hours after the trip has concluded).

This means that the accused party is not necessarily a party using the Uber platform. In fact, in many of the fatal incidents reported to Uber, it was a third party who was accused of fatally wounding a rider o r driver using the Uber app. Additionally, the deceased party is not always a rider or driver using Uber; the deceased party can be a third party if a driver or rider u sing the Uber platform was otherwise involved (i.e., as the accused party).

Among the 19 deceased parties:

- 8 were riders
- 7 were drivers using the Uber app
- 4 were third parties (such as bystanders outside the vehicles)

Section Five

---

161. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but this means that the data could change over time. The data presented in this report includes incident reports resolved on or before October 31,2019.

162. Kenneth D. Kochanek, M.A.,et al,"Deaths: Final Data for 2017,"National Vital Statistics Reports 68, no. 9 (June 24,2019):p.51,https://www.cdc.gov/nchs/data/nvsr/nvsr68/ nvsr68_09-508.pdf.

163. Law Enforcement Support Section Crime Statistics Management Unit, "2019.1National Incident - Based Reporting System User Manual," July 31,2018,pp. 21-22,https:// www.fbi.gov/file -repository/ucr/ucr - 2019- 1-nibrs -user-manual.pdf/view .

164. In one incident, 2 deceased parties were identified.

165. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while en route to the rider's pickup location, this would be included in the dataset.

UBER-MDL3084-000000482

# Sexual assault

Sexual assault is one of the most pervasive yet under-reported crimes in modern society. While perpetrators are most often known to the victim, [166] sexual assault can happen to anyone, anywhere: in our homes, our schools, our workplaces, our transportation systems, and even our public spaces. According to the National Intimate Partner and Sexual Violence Survey (NISVS), an ongoing survey administered by the Centers for Disease Control, **nearly 44% of US women and nearly 25% of US men** will be the victim of contact sexual violence [167] in their lifetimes. [168] This is an issue that almost 52.2 million women and 27.6 million men live with every single day. [169]

No community is immune. There were approximately 20,500 instances of unwanted sexual contact in 2018 in the military, according to the US Department of Justice's Annual Report on Sexual Assault in the M    ilitary. [170] One quarter of undergradu-ate women say they have been victims of sexual touching or penetration without consent since starting college, according to the latest survey from the Association of American Universities. [171]

Although a direct comparison cannot be made to Uber's data due to substantial methodological differences, Non -Consensual Sexual Penetration incidents, the most serious sexual assault category within the [Sexual Misconduct And Sexual Violence Taxonomy], were reported to occur in about **1 in 5,000,000 completed trips during the 2017 -2018 time frame** . In other words, these incidents were reported on **0.00002% of trip** s. While these reports are rare, every report rep -resents an indivi dual who came forward to share an intensely painful experience. Even one report is one too many.

> Riders account for nearly half of the accused parties across the 5 most serious sexual assault categories.

For purposes of this report, we have included the 5 most serious categories in the Sexual Misconduct and Sexual Violence Taxonomy (see Table 1  2).

Section Five

166."Preventing Sexual Violence," Centers of Disease Control and Prevention (CDC), March 12, 2019, https:// www.cdc.gov/violenceprevention/sexualviolence/fastfact.htm    l.
167."Contact sexual violence" is a NISVS combined category that includes rape, being made to penetrate someone else, sexual coercion, and/or unwanted sexual contact. In Uber's taxonomy, this term would encompass (1) Non-Consensual Sexual Penetration, (2) Non-Consensual Kissing of a Sexual Body Part, (3) Non-Consensual Touching of a Non-Sexual Body Part, (4) Attempted Non-Consensual Sexual Penetration, and (5) Non-Consensual Kissing of a Sexual Body Part. However, given the different aims of Uber and the CDC, as well as the limitations of their respective data collections, it is still likely that significant methodologi cal differences in classification may exist.
168.Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1, https:// www.cdc.gov /violenceprevention/pdf/2015data    - brief508.pd f.
169.Ibid.
170.United States Department of Defense, "Department of Defense Annual Report on Sexual Assault in the Military: Fiscal Year 2018,"(April 9, 2019) p. 5, https://int.nyt. com /data/documenthelper/800    - dod- annual- report - on- sexual- as/d659d6d0126ad2b19c18/optimized    /full.pdf#page=1 .
171 Nick Anderson, Susan Svrluga and Scott Clement, "Survey finds evidence of widespread sexual violence at 33 universities," Washington Post, October 14, 2009, https:// www. washingtonpost.com/local/education/survey    - finds - evidence - of - widespread. - sexual- violence- at- 33- universities/2019/10/14/bd75dcde   - ee82- 11e9.b648- 76bcf86eb67e_sto - ry.html).

UBER-MDL3084-000000483

Table 12: 5 categories of sexual assault[172] (2017-2018)[173]

| Subcategory | 2017-2018 Frequency of incident reports (by # of trips) | 2017 # of incident reports | % of total trips[174] | 2018 # of incident reports | % of total trips | YoY incident rate change % change incident rate[175] |
|---|---|---|---|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 2,000,000 | 570 | 0.00006% | 594 | 0.00005% | -16% |
| Attempted Non-Consensual Sexual Penetration | ~1 in 4,000,000 | 307 | 0.00003% | 280 | 0.00002% | -26% |
| Non-Consensual Touching of a Sexual Body Part | ~1 in 800,000 | 1,440 | 0.0001% | 1,560 | 0.0001% | -12% |
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 3,000,000 | 390 | 0.00004% | 376 | 0.00003% | -22% |
| Non-Consensual Sexual Penetration | ~1 in 5,000,000 | 229 | 0.00002% | 235 | 0.00002% | -17% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

## Rate decrease

From 2017 to 2018, **Uber saw approximately a 16% decrease** in the average incident rate across the 5 most serious sexual assault categories reported. Additionally, there were rate decreases across each of the 5 individual categories. These decreases may correlate with Uber's substantial investments in safety over the past 2 years (see    Safety commitments   ), although causation is difficult to determine given the myriad factors that can impact reported sexual assault rates.

We also know these decreases may not always be the trend. Experts and advocates have told us that releasing this type of report may actually lead to an **increase** in the number of reports in the future. That's beca   use, when it becomes clear that Uber is paying close attention to reports of sexual violence and taking action, survivors may feel more comfortable coming forward. For example, external research has shown the number of sexual assaults reported on a college    campus tends to increase in relation to the amount of attention focused on addressing sexual assault on that campus.      [176] Experts tell us that when high-profile cases of sexual assault hit the news, organizations that support survivors are likely to see sharp increases in call volume or requests for support services. While incident reduction will always be our primary goal in our safety effor   ts, building and maintaining the trust of our community is an integral step toward gaining the most accurate pictur   e of user experiences.

## A note on "reporting party"

It is important to understand that the party who reports an incident to Uber is not always the victim. For example, a driver may observe and report a sexual assault between riders; a law enforcement offi  cer may report an assault on behalf of a rid  - er; or a rider account holder may report an assault on behalf of a guest rider who took a trip using their account. As noted       in the methodology, Uber was able to capture data regarding the party of the potentia   l victim for reports of Non  -Consensual Sexual Penetration  only. For all other sexual assault and misconduct categories, the reporting party is the closest proxy to

172. "Relation to the Uber platform" or "Uber-related" is in reference to data classification for the purposes of this Safety Report only.
173. This report reflects audited sexual assault reports that were classified into one of these categories. Uber occasionally receives notice of a potential sexual assault well after the trip has ended. The sexual assault data presented in this report includes incident reports resolved on or before October 31,2019, and for this reason may change over time.
174. Incident reports as a percent of total trips are rounded.
175. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
176. Kaitlin M Boyle, Ashley Barr, and Jody Clay-Warner. "The Effects of Feminist Mobilization and Women's Status on Universities' Reporting of Rape." Journal of School of Violence 16, no. 3 (July 11,2017):pp. 317–30, https://doi.org/10.1080/15388220.2017_.1318580

UBER-MDL3084-000000484

the potential victim in Uber's dataset (see   Limitations of Uber safety data   in Methodology). [177] However, the survivor data analysis for Non-Consensual Sexual Penetration shows that approximately 99.4% of rider reports were reporting a rider (either themselves or a guest rider) as the victim, and about 66.7% of driver reports were reporting themselves as the victim.

Therefore, Fig. 13 and Fig. 14 show that the majority of reporting parties are indeed the victims themselves in the cases they report.

Fig. 13: Victim and reporting party overlap broken down by <u>riders</u>

    Riders as victims

    Riders as victims & reporting party

    Riders as reporting party

Fig. 14: Victim and reporting party overlap broken down by <u>drivers</u>

    Drivers as victims

    Drivers as victims & reporting party

    Drivers as reporting party

177 As noted in the methodology, Uber's audit function was not initially scoped to document the gender or party (rider, driver, third party, etc.) of the potential victim in cases of sexual assault. While this was later captured for reports of Non-Consensual Sexual Penetration through a subsequent manual audit, this potential victim data is not available for other categories of sexual assault or misconduct.

UBER-MDL3084-000000485

## The facts about who reports sexual assault

Uber data suggests that both riders and drivers face sexual assault incidents on our platform. According to an analysis of 2,894 media mentions that referenced sexual assault with a possible connection to Uber, the vast majority of references (92%) focused on the driver party as the potential perpetrator, while only 8% highlighted incidents in which the rider party was accused.[178]

**In reality, riders account for nearly half (45%) of the accused parties across the 5 most serious sexual assault catego-ries** (see Fig. 16). Drivers have a right to have their experiences told, and we have a responsibility to stand with them —so that we can create the safest possible environment for drivers and their passengers.

### Fig. 15: Breakdown of 5 categories of sexual assault by reporting party



### Fig. 16 Breakdown of 5 categories of sexual assault by accused party



178. During the 2017-2018 time frame of media analysis, a total of 5,120 media mentions were analyzed. 90% of the media mentions referencing riders as the accused party referred to the highly public story of NFL player Jameis Winston sexually assaulting a driver using the Uber platform and subsequently being suspended from games. When removing the outlier of the Winston mentions, the total media mention volume became 2,894.

UBER-MDL3084-000000486

**Overinclusion of data and under-reporting of sexual assault**

For purposes of this report, Uber has intentionally been overinclusive in determining what incident reports and circumstances to capture within our data standards. For example, as detailed in the methodology, we have adopted broader definitions of sexual a  ssault than most criminal codes and research entities. This report also captures incident reports of sexual assault that occur between parties paired by the Uber app, not only during a trip facilitated by the Uber platform, but within 48 hours after such a       trip ends. In the interest of completeness, the data represented here reflects incident reports as classified by agents and auditors based solely on the descriptions   provided by the reporting   party. The data does not necessarily reflect the ultimate   disposition of each incident report, and further proof or evidence from the reporting party is not necessarily required for precise data classification. Because we know that survivors of sexual assault may withdraw their reports for any number of personal reaso  ns, this report intentionally includes reports from survivors that are later withdrawn but not refuted by them.

For more examples and information on how more restrictive data standards may impact the overall dataset for a publication of this nature, see   Appendix I: Why data standards matter   ).

At the same time, sexual assault is also one of the most under -reported crimes in the US generally, with some researchers believing that nearly 3 out of every 4 sexual assaults go unreported to police.     [179] In fact, researchers on behalf of the US Department of Justice found multiple reasons why survivors chose not to report to police between 2005 and 2010: [180]

- 20% feared retaliation
- 13% believed the police would not do anything to help
- 13% believed it was a personal matter
- 8% reported to a different  official
- 8% believed it was not important   enough to report
- 7% did not want to get the perpetrator  in trouble
- 2% believed the police could not do anything  to help
- 30% gave another reason, or did not cite the reason

Uber encourages users to report safety incidents, which allows us to constantly improve safety on the platform. In fact, the ease and accessibility of reporting an incident to Uber may encourage users to report more often since they can do so more quickly and discreetly than they can in person or by phone. Uber's dataset is likely to be relatively comprehe  nsive, because we aggregate safety incident data from many sources, including in -app reports, online reports, reports via our Critical Safety Response Line, and other sources. As a result, it may be difficult to compare insights drawn from Uber's dataset t       o datasets with more limited reporting channels.

179.Rachel E.Morgan, Ph.D.,and Barbara A.Oudekerk, Ph.D.,"Criminal Victimization,  2018,"Department  of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 2019,p. 8, https:// www.bjs.gov/content/pub/pdf/cv18.pd    f.
180.Michael Planty, Ph.D.,et al,"Female Victims of Sexual Violence, 1994-2010,"Department  of Justice, Office of Justice Programs, Bureau of Justice Statistics, May 31,2016,p. 7, https://www.bjs.gov/content/pub/pdf/fvsv9410.pd    f.

UBER-MDL3084-000000487

# Non-Consensual Kissing of a Non-Sexual Body Part

Defined as: Without consent from the user, someone kissed, licked, or bit, or forced a kiss, lick, or bite on any non-sexual body part (e.g., hand, leg, thigh) of the user.

### Table 17: Non-Consensual Kissing of a Non-Sexual Body Part (2017-2018)

| Subcategory | 2017-2018<br>Frequency of incident reports (by # of trips) | 2017<br># of incident reports | % of total trips [181] | 2018<br># of incident reports | % of total trips | YoY incident rate change<br>% change incident rate [182] |
|---|---|---|---|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 2,000,000 | 570 | 0.00006% | 594 | 0.00005% | -16% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

Incidents of Non-Consensual Kissing of a Non-Sexual Body Part often involve unwanted sexual/romantic kisses on body parts such as the cheek, hands, head, and shoulders. Including this category in this Safety Report poses a unique opportunity, since data on these non-criminal acts of sexual assault are frequently sparse, despite being intrusive, harmful, and potentially just as prevalent.

Through keyword queries, Uber identified that the majority (roughly 60%) of reports in this category involved a person kissing another person's cheek or neck. [183]

## Reporting party

Across 2017 and 2018, the majority of reports of Non-Consensual Kissing of a Non-Sexual Body Part came from drivers, who comprised about 54% (n=628) of reporting parties for this category. Riders accounted for 46% (n=535) of reporting parties for this category.

181.Incident reports as a percent of total trips are rounded.
182.Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
183.Produced by keyword queries. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

UBER-MDL3084-000000488

# Attempted  Non-Consensual Sexual Penetration

## (Includes clothing  removal and attempted  clothing removal)

Defined as: Without  explicit  consent  from  a user, someone  attempted  to penetrate  the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as 'Attempted Non  -Consensual Sexual Penetration.' This also includes attempted penetration of the user's mouth with  a sexual organ  or sexual body part; however,  it excludes kissing with tongue  or attempts  to kiss with tongue.

### Table 18: Attempted  Non-Consensual Sexual Penetration (2017-2018)

| Subcategory | 2017-2018<br>Frequency of<br>incident reports<br>(by # of trips) | 2017<br># of incident<br>reports | % of total<br>trips[184] | 2018<br># of incident<br>reports | % of total<br>trips | YoY incident<br>rate change<br>% change<br>incident rate[185] |
|---|---|---|---|---|---|---|
| Attempted Non-<br>Consensual Sexual<br>Penetration | ~1 in 4,000,000 | 307 | 0.00003% | 280 | 0.00002% | -26% |
| Total  US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

Situations  included  in the Attempted  Non-Consensual Sexual Penetration  category  are the most varied and can therefore be the most difficult  to categorize  within the taxonomy.  It would be incorrect  to define this category as "attempted  rape." It is in fact comprised of a wide range of circumstances where the incident report may allude to a potential assault but lacks details that would allow it to be categorized more definitively.

According to experts, sexual assault survivors often experience memory loss, fragmented memories, or a complete lack of event recall, which can be attributed to voluntary, coerced, or involuntary substance consumption,     [186] or the psychological trauma of the event itself.   [187] Therefore, victims do not always recall these events in precise detail. With this in mind, Uber chose to expand the standards for this category in an effort to be as inclusive as possible, without compromising the categorization accuracy of other, more precise categories (such as touching, kissing, or completed penetration).

Accordingly,  this category  includes but is not limited  to the following  types of reports:

- The attempted  or completed  removal or bypassing of clothing  to expose a sexual body part of the survivor.
- The use of restraint or force to overcome the victim (e.g., accused party being on top of the victim or holding them down).
- Situations where the potential victim can recall and has a record of being on an Uber     -facilitated trip, but is experiencing signific ant memory loss or fragmentation, and without explanation:
  - Woke up/regained  consciousness  without  clothing;  or
  - Woke up/regained  consciousness  not at their intended  destination.

For example, an incident report stating that a rider tried to pull up a female     driver's shirt would be classified as Attempted Non-Consensual Sexual Penetration, despite the lack of further details of the incident, since there was an attempt to remove clothing to access the breasts. If an incident report contains any mention of touching or kissing of a sexual body part (including the mouth), this automatically escalates the report to a higher category within the taxonomy.

184. Incident  reports  as a percent  of total  trips  are rounded.
185. Uber year-over-year rate change may not sum according  to chart. Rate change is based on unrounded  yearly rates.
186. Rape, Abuse & Incest National Network (RAINN),"Drug Facilitated Sexual Assault," accessed August 6, 2019, https://www.rainn.org/articles/drug -facilitated -sexual-assault.
187. James Hopper and David Lisak, "Why Rape and Trauma Survivors Have Fragmented and Incomplete  Memories," Time, December 9, 2014, https://time.com/3625414 /rape-trauma -brain -memory/ .

Section Five

UBER-MDL3084-000000489

On average between 2017-2018, approximately 20% of reports in this category included explicit mentions of attempted rape, penetration, or sexual intercourse. [188] Uber can often receive an initial incident report that states the accused party "tried to rape [the reporting party]," but the Uber safety agent is unable to make further contact with the reporting party, after multiple attempts, to obtain a full statement of experience and clarifying details. Uber will still classify those reports as Attempted Non-Consensual Sexual Penetration. It's worth noting that since the term "rape" can involve varying degrees of identification, concepts, and experiences that vary substantially from person to person and in different cultures, it does not always describe specific actions. It becomes even less clear whe n considering the phrase "tried to rape." There are times when a reporting party's use of the phrase, though based on their valid perception of their safety in the moment, may have an intended meaning other than sexual penetration. Regardless, Uber still considers the reporting party's language at face value when classifying user reports.

## Reporting party

72% (n=423) of reports in this category across both years were made by riders.

188. Produced by keyword queries. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident..

**UBER-MDL3084-000000490**

# Non-Consensual Touching of a Sexual Body Part

**Defined as:** Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user.

## Table 19: Non-Consensual Touching of a Sexual Body Part (2017-2018)

| Subcategory | 2017-2018 Frequency of incident reports (by # of trips) | 2017 # of incident reports | 2017 % of total trips [189] | 2018 # of incident reports | 2018 % of total trips | YoY incident rate change % change incident rate [190] |
|---|---|---|---|---|---|---|
| Non-Consensual Touching of a Sexual Body Part | ~1 in 800,000 | 1,440 | 0.0001% | 1,560 | 0.0001% | -12% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

As noted in Appendix IV, the Sexual Misconduct and Sexual Violence Taxonomy defines sexual body parts as:

- Mouth/lips
- Breasts (in a female-identified user)
- Buttocks
- Genitals

Across the 2017-2018 time frame, roughly half of all Non-Consensual Touching of a Sexual Body Part incident reports involved touching of female breasts, while 15% and 4% of incident reports involved the buttocks and mouth, respectively. Touching of the genitals or the genital area was reported in 46% of user reports of this sexual assault category. [191]

According to the National Sexual Violence Resource Center and other experts, the comfort level of explicitly naming sexual body parts can vary from person to person, especially when a reporting party may feel shame or fear in describing what happened to them. Uber chose to take an expansive view on what kinds of words or phrases are considered sexual body parts for the purposes of data classification.

## Reporting party

Throughout 2017-2018, reporting parties for this category were about even, with slightly more reports (51% or 1,536 incident reports) coming from drivers. Within rider reports of this category, 9% accused another rider. This is of note since it is the sexual assault category (within the 5 categories published in this report) with the highest percentage of riders accusing other riders.

189. Incident reports as a percent of total trips are rounded.
190. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
191. Produced through keyword queries. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

Data insights                                                    Uber                                                    66

UBER-MDL3084-000000491

# Non-Consensual Kissing of a Sexual Body Part

## (Includes kissing on the mouth)

Defined as: Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue.

Table 20: Non-Consensual Kissing of a Sexual Body Part (2017-2018)

| Subcategory | 2017-2018 Frequency of incident reports (by # of trips) | 2017 # of incident reports | % of total trips [192] | 2018 # of incident reports | % of total trips | YoY incident rate change % change incident rate [193] |
|---|---|---|---|---|---|---|
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 3,000,000 | 390 | 0.00004% | 376 | 0.00003% | -22% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

The Sexual Misconduct and Sexual Violence Taxonomy considers the mouth a sexual body part. Therefore, the vast majority of Non-Consensual Kissing of a Sexual Body Part (approximately 88%) involved non-consensual kissing on the mouth.

## Reporting party

On average, throughout both years, about 75% (n=576) of all reports of Non-Consensual Kissing of a Sexual Body Part were made by riders; about 23% (n=179) of these reports were made by drivers, and 1% (n=11) were made by third parties.

192. Incident reports as a percent of total trips are rounded.
193. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.

UBER-MDL3084-000000492

# Non-Consensual Sexual Penetration

Defined as: Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue.

## Table 21: Non-Consensual Sexual Penetration (2017–2018)

| Subcategory | 2017-2018 | 2017 | | 2018 | | YoY incident rate change |
| --- | --- | --- | --- | --- | --- | --- |
| | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips [194] | # of incident reports | % of total trips | % change incident rate [195] |
| Non-Consensual Sexual Penetration | ~1 in 5,000,000 | 229 | 0.00002% | 235 | 0.00002% | -17% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

The National Intimate Partner and Sexual Violence Survey (NISVS) estimates that 1 in 5 US women have experienced an attempted or completed rape in their lifetime, and 1 in 14 men have been made to penetrate someone else during their lifetime. [196] In relation to Uber, Non-Consensual Sexual Penetration occurred in about **1 in 5,000,000 completed trips**. However, since definitions and other methodological points do not precisely align, an exact comparison is not able to be achieved.

## A note on definitions

Non-Consensual Sexual Penetration is the most serious category captured in the Taxonomy. While many may believe this category is equivalent to "rape," Uber's definition is generally more expansive than how many jurisdictional criminal codes and research methodologies define rape or forced sexual penetration. When creating the Taxonomy, the NSVRC and Urban Institute intentionally created a definition for Non-Consensual Sexual Penetration that was as inclusive as possible and did not vary based on the sex or gender of the survivor. The Non-Consensual Sexual Penetration definition encompasses forms of penetrative sex acts beyond sexual intercourse, including:

- Non-consensual digital penetration (of the vagina or anus)
- Non-consensual oral sex (of the genitals or anus)
- Non-consensual penetration with a foreign object (of the vagina or anus)
- Non-consensual anal sex
- Non-consensual vaginal sex

## Survivors

Non-Consensual Sexual Penetration is the only sexual assault category in which data on victims (as opposed to reporting party) is available (see Limitations of Uber safety data in Methodology). [197] Across both years, for Non-Consensual Sexual Penetration, t he survivor was the rider in roughly 92% (n= 429) of incident reports, and 25% (n=109) of those were guest riders. Drivers were survivors in about 7% (n=31) of incident reports.

194. Incident reports as a percent of total trips are rounded.
195. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
196. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release,"(November 2018) p. 1, https://www.cdc.gov /violenceprevention/pdf/2015data_-brief 508.pdf.
197. As noted in the methodology, Uber's audit function was not initially scoped to document the gender or party (rider, driver, t hird party, etc.) of the potential victim in cases of sexual assault. While this was later captured for reports of Non-Consensual Sexual Penetration through a subsequent manual audit, this potential victim data is not available for other categories of sexual assault or misconduct.

UBER-MDL3084-000000493

Section Five

External research and prevalence estimates on the topic are clear that females are disproportionately impacted by sexual violence.[198] For example, one study estimates that female s account for nearly 94% of victims of completed rape and 91% of victims of attempted rape.[199] These trends are very similarly reflected for Non-Consensual Sexual Penetration in relation to Uber. In fact, women and female-identifying survivors made up 89% of the survivors in the dataset.[200] Still, men and male-identifying survivors comprised about 8% of Non-Consensual Sexual Penetration survivors, and <1% of survivors identified as gender minorities.[201]

It's worth noting that this gender analysis is limited to the Non-Consensual Sexual Penetration category. A core limitation in Uber's data is that gender (and other demographic) information is not collected from riders generally, and victim information is not collected at the incident level. Therefore, a n analysis of how victimization by gender may vary across subcategories is not currently available (see Limitations of Uber safety data in Methodology).[202]

## Law enforcement involvement

This category had the highest percentage of third-party reports: about 13% compared to an average of about 1% for other critical sexual assault categories. This is primarily due to reports submitted by law enforcement agencies to Uber's Law Enforcement Response Team (LERT) (see Working with law enforcement in Safety investments). Despite the chronic under-reporting of sexual violence, the most serious types of sexual assault are more likely than other unwanted sexual behaviors within the taxonomy to constitute a criminal offense, and can be pursued by law enforcement.

In fact, law enforcement was reported to be involved in approximately 37% of all Non-Consensual Sexual Penetration incidents reported to Uber. This includes cases where law enforcement reported the incident directly to Uber's law enforce - ment team, as well as incidents where Uber learned about the involvement of law enforcement through other means, such as the reporting party, victim, or media. Furthermore, in an additional 11% of these reports, reporting parties and/or victim s indicated that they intended to involve law enforcement but had not yet initiated the process at the time of their contact with Uber's safety support team. In these cases, Uber's safety support agents are trained to connect law enforcement officials with Uber's law enforcement team so they can obtain Uber data that aids in their investigation.

Section Five

198. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release,"(November 2018) p. 1, https://www.cdc.gov /violenceprevention/pdf/2015data _ - brief508.pd f.

199. Rennison, C. M., "Rape and sexual assault: Reporting to police and medical attention, 1992-2000," U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, August 2002, p. 1, https://www.bjs.gov/content/pub/pdf/rsarp00.pd _ f.

200. Uber does not systematically collect information about riders' gender, so for the purposes of analysis for this report, gender was inferred through the safety support agent's notes (through the use of normative pronouns, survivor self-identification, etc.) when speaking with the survivor.

201. The survivor's gender was unknown in <3% of incident reports.

202. As noted in the methodology, Uber's audit function was not initially scoped to document the gender or party (rider, driver, t hird party, etc.) of the potential victim in cases of sexual assault. While this was later captured for reports of Non-Consensual Sexual Penetration through a subsequent manual audit, this potential victim data is not available for other categories of sexual assault or misconduct.

UBER-MDL3084-000000494

## Early estimates for 2019 sexual assault data

While the following 2019 data for the 5 categories of sexual assault are simply early estimates at this time, [203] Uber believes that our users and communities at large have an interest in these numbers. Based on these preliminary estimates, the overall occurrence rate of these 5 categories of sexual assault is averaging a projected 17 -20% decrease when compared to rates from full year 2018 (see Table 22).

However, as previously mentioned, this decreasing trend may not always be the case. As Uber invests more and more into sexual assault prevention and reporting initiatives (including with the release of this Safety Report), there may be increased reporting of these 5 categories of sexual assault independent from the underlying frequency of occurrence. It's also worth noting that these are indeed estimates, and they are subject to change due to factors such as late reporting and further auditing.

**Table 22: Early 2019 estimates of 5 categories of sexual assault in relation to the Uber rideshare platform [204] (January–June)**

| Subcategory | Frequency of incident reports (by # of trips) | % of total trips | % estimated incident rate change vs. full year 2018[205] |
|---|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 3,000,000 | 0.00003% | [-33%, -30%] |
| Attempted Non-Consensual Sexual Penetration | ~1 in 6,000,000 | 0.00002% | [-37%, -34%] |
| Non-Consensual Touching of a Sexual Body Part | ~1 in 900,000 | 0.0001% | [-14%,-11%] |
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 4,000,000 | 0.00002% | [-20%, -17%] |
| Non-Consensual Sexual Penetration | ~1 in 6,000,000 | 0.00002% | [-11%,-5%] |

Section Five

203. DISCLAIMER Uber is including a preview of estimated 2019 sexual assault data due to the interest our users and communities have in these numbers. These numbers are estimates and have not undergone the same auditing process described in the Methodology, and we expect they may change over t ime as Uber receives additional, delayed reports of incidents. In addition, the 2019 estimates were not reviewed by the NSVRC and U rban Institute and, as a result, are outside the scope of the validation statement provided in Appendix II. 2019 data is an estimate based on reports as of November 15, 2019.

204. "Relation to the Uber platform" or "Uber-related" is in reference to data classification for the purposes of this Safety Report only.

205. Uber rate change may not sum according to chart. Rate change is based on unrounded rates for full year 2018 vs. Jan-Jun 2019.

UBER-MDL3084-000000495

Following this 21-month effort, Uber has put in place stronger safety policies and training for support staff, implemented a new classification system for the most serious safety incidents, and launched more safety features than ever before to help protect  both drivers and riders.

The data presented in this report shows that the rates of sexual assault incidents on the Uber rideshare platform in the US declined year-over-year; that traffic-related fatality rates with Uber are roughly half of the national average;[206] and that 99.9% of trips ended without any safety-related issue at all, no matter how minor. Only 0.0003% of all Uber trips involved one of the critical safety incidents outlined in this report.

Our commitment to you is that we will continuously work to reduce these incident rates, work to make Uber the safest platform on earth, and work to make rideshare an even safer way to travel.

<div style="float:left; width:45%">

At its core, this report is about more than Uber. It's about taking a new, better approach to an age-old problem that too many in our society normalize and may live with every day. It's about improving safety for women and everyone else. It's about **accountability**—to riders, drivers, and the entire industry.

Uber will continue to release a Safety Report every 2 years. But we know that published reports only go so far. We can make society much safer if we all work together. And that requires implementing best practices based on expertise, and sharing data that benefits everyone.

Moving forward, we encourage all organizations —airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report. People have the right to know.

</div>

> We encourage all organizations—airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report. People have the right to know.

We've teamed up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish RALIANCE Business: a new resource center that will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence that may occur in the workplace or within business operations.

Uber is taking an important step, but every company has a role to play.  We look forward to working together to confront these issues, count them, and make progress toward ending them.

206. National Highway Traffic Safety Administration  (NHTSA),"2018 Fatal Motor Vehicle Crashes: Overview,"p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public_/ViewPublication/812826.

UBER-MDL3084-000000496

Section Three

The data in this report could have looked a lot different. It was just as important to Uber to develop overinclusive data standards that govern how we apply the taxonomy as it was for us to implement a clear taxonomy in the first place. These standards hav e a real and important impact. When it comes to voluntary public safety reporting by companies, these standards are adopted entirely at an individual company's discretion  Therefore, the value a standard ta onomy could bring to an industry is all but lost   if not applied and reported on consistently within that industry.

The following  must be established  to achieve comparable  reported  results:

1. A taxonomy  that  is mutually  exclusive and collectively  exhaustive, with  clear definitions  and application  standards

2. A clear definition  for how a safety  incident  relates  to a given company

3. Clear and unambiguous   conditions  on exactly  what is included  in public safety  reporting

To demonstrate the powerful impact that different data standards can have on results, Uber manually reviewed a random sample of 100 incident reports for 2 categories of sexual assault and classified them using alternative standards, all of which were less inclusive than the standard applied in this report. The results below demonstrate how differences in standards, even when using the same taxonomy, can produce dramatically different outcomes.

## Non-Consensual Sexual Penetration example

In this example, a random sample of Non  -Consensual Sexual Penetration incident reports could decrease from 100 to 35, depending on the alternative standard applied (see Exercise 1: Alternative standards A   -E).

If Uber then combined and applied   **all 5** of the se alternative standards to this random sample of 100 incident reports, the cumulative effect on the number of Non   -Consensual Sexual Penetration incident reports   **would dramatically decrease from 100 incident reports to 10**   (see Fig. 23).

## Non-Consensual Touching of a Sexual Body Part example

Even more drastic results occur when repeating the same exercise for a less severe category, such as Non    -Consensual Touching of a Sexual Body Part (see Exercise 2: Alternative standards A  -E). Again, if Uber then combine d and applied all 5 of these alternative standards to this random sample of 100 incident reports, the cumulative effect on the number of Non     - Consensual Touching of a Sexual Body Part incident reports  **would drop even lower, from 100 incident reports to 3** (see Fig. 24).

UBER-MDL3084-000000497

Section Three

# Exercise 1: Sample of 100 NonConsensual Sexual Penetration Incident Reports

**Alternative Standard A:**
**Incident must be reported against a known Uber account holder (i.e., no third parties, no guest riders)**

Must be accusing an
Uber account holder
(rider or driver)

| 0 | 25 | 50 | 75 | 100 |

**Alternative Standard B:**
**Support agent must have successfully communicated with the victim after initial report**

Support agent
communicated with
victim following initial
report

| 0 | 25 | 50 | 75 | 100 |

**Alternative Standard C:**
**Incident must have occurred within an hour of trip completion**

Occurred within an
hour of the trip

| 0 | 25 | 50 | 75 | 100 |

**Alternative Standard D:**
**Incident report must be corroborated (i.e., third-party witness, other supporting facts)**

Must be corroborated

| 0 | 25 | 50 | 75 | 100 |

**Alternative Standard E:**
**Incident report must have confirmed police involvement**

Confirmed police
involvement

| 0 | 25 | 50 | 75 | 100 |

Section Three

Why data standards matter

# Exercise 1 (continued): Sample of 100 Non-Consensual Sexual Penetration Incident Reports

Fig. 23: All 5 alternative standards applied to sample set of 100 reports of Non-Consensual Sexual Penetration



Section Three

Why data standards matter

UBER-MDL3084-000000499

# Exercise 2: Sample of 100 Non-Consensual Touching of a Sexual Body Part incident reports

**Alternative Standard A:**
**Incident must be reported against a known Uber rider or driver (i.e. no third parties, guest riders)**

Must be accusing an
Uber account holder
(rider or driver)

| 0 | 25 | 50 | 75 | 100 |
|---|----|----|----|----|

**Alternative Standard B:**
**Support agent must have successfully communicated with the victim after initial report**

Support agent
communicated with
victim following
initial report

| 0 | 25 | 50 | 75 | 100 |
|---|----|----|----|----|

**Alternative Standard C:**
**Incident must have occurred within an hour of trip completion**

Occurred within an
hour of the trip

| 0 | 25 | 50 | 75 | 100 |
|---|----|----|----|----|

**Alternative Standard D:**
**Incident report must be corroborated (i.e. third-party witness, other supporting facts)**

Must be corroborated

| 0 | 25 | 50 | 75 | 100 |
|---|----|----|----|----|

**Alternative Standard E:**
**Incident report must have confirmed police involvement**

Confirmed police
involvement

| 0 | 25 | 50 | 75 | 100 |
|---|----|----|----|----|

Section Three

Why data standards matter

UBER-MDL3084-000000500

# Exercise 2 (continued): Sample of 100 Non-Consensual Touching of a Sexual Body Part incident reports

Fig. 24: All 5 alternative standards applied to sample set of 100 reports of Non-Consensual Touching of a Sexual Body Part



Section Three

Why data standards matter

UBER-MDL3084-000000501

  

# Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy and the Development of Uber's United States Safety Report: Executive Summary

By: Janine Zweig, Chad Sniffen, and Emily Tiry

## Overview

This project set out to assess Uber's integration of the Sexual Misconduct and Violence Taxonomy into its system of receiving and accurately categorizing complaints from platform users — the verification analysis, and Uber's approach to developing the US Safety Report — the systems assessment. Through the data collection and analysis activities we conducted, we learned that Uber has implemented the taxonomy with accuracy, employing strong quality assurance processes to ensure ongoing accuracy. They engage in a robust initial and ongoing training process that focuses on continual categorization alignment among employees who use the taxonomy for incident response and auditing purposes. These efforts aim to produce reliable data across all categories, and our analyses conclude that the goal has been largely achieved; the sexual assault data in the taxonomy categories included in the US Safety Report are statistically reliable. In general, we found the processes to develop the US Safety Report focused on accuracy and used rigorous data.

## Background and Project Approach

In 2017, Uber Technologies' leadership recognized that their system to categorize users' reports of incidents of sexual harassment, sexual misconduct, and sexual assault could be improved to better help them more fully understand the nature and scope of these problems experienced by users of their platform. The classification system had limited categories and relied heavily on subjective determinations by agents. Without an objective basis, categorization could not be consistently applied. Recognizing the need for outside expertise to create an effective categorization system, Uber's leadership engaged with RALIANCE, the National Sexual Violence Resource Center (NSVRC) and the Urban Institute (Urban) to develop a research-informed categorization system. We published the [Sexual Misconduct and Violence Taxonomy](#) in late 2018.[1]

Once the taxonomy was published, Uber began implementing it to categorize all new incidents of sexual harassment, sexual misconduct, and sexual assault reported by platform users going forward. Uber also

UBER-MDL3084-000000502

Section Three

retrospectively applied the taxonomy to such incidents reported in 2017 and 2018. The NSVRC/Urban team conducted a project to assess Uber's integration of the taxonomy into its system of receiving and accurately categorizing complaints from platform users, and Uber's approach to developing the Safety Report. The project resulted in a brief report (with the findings summarized below) and had two components:

1. A verification analysis of how Uber agents and auditors categorize reported incidents into the taxonomy. This process compared the way Uber's staff categorized user-reported incidents to the way staff from NSVRC and Urban did for two samples of reports. The goal of this comparison was to determine the overall reliability with which Uber staff categorize reports into the taxonomy and the process of auditing these data.

2. A system assessment of Uber's overall integration of the taxonomy into its incident-reporting process, of how taxonomy data are managed and audited, and of how the sexual assault data are to be presented in Uber's forthcoming 2019 US Safety Report. The goal of this assessment was to document the taxonomy data cleaning and processing system, and provide an assessment as to the integrity, objectivity and rigor with which Uber analyzed sexual assault data and intended to report it in the US Safety Report.

For the first component, NSVRC/Urban staff used the taxonomy to categorize two samples of user-reported sexual misconduct and sexual assault incident reports during the time period being considered for Uber's 2019 US Safety Report (2017 and 2018): a representative, random sample of 383 reports spanning the full range of sexual misconduct and sexual assault incidents and a random sample of 200 sexual assault incident reports focused on serious and difficult to categorize reports. Our categorizations were assessed for the extent of alignment within our team and compared with Uber's categorization.

For the second project component, and to assess Uber's overall integration of the taxonomy into their incident reporting system and how that integration might contribute to the sexual assault data intended for their 2019 US Safety Report, staff from NSVRC and Urban conducted seven interviews with nine Uber employees (six individual interviews and one three-person interview). Each of these individuals have direct influence over the way that use of the taxonomy is implemented, how incident data categorized by the taxonomy are managed, and how aggregate sexual assault data based on the taxonomy are likely to be disclosed by Uber in its US Safety Report.

## Summary of Findings and Observations

Below, we summarize our findings and observations from both project components for the following topics: the training of customer service agents and incident report auditors; the incident report categorization and alignment process; and the approach to and analytic strategies for sexual assault data intended for the US Safety Report.

- Training of Customer Service Agents and Incident Report Auditors
  - We found that Uber engages in a robust training process that focuses on continual categorization

---

[1] Sniffen, C., Durnan, J., & Zweig. J. (2018). *Helping industries to classify reports of sexual harassment, sexual misconduct, and sexual assault.* Retrieved from the National Sexual Violence Resource Center: https://www.nsvrc.org/helping-industries-classify-reports

[2] This verification comparison was conducted by three NSVRC/Urban staff; two of whom were among the original staff that developed the taxonomy.

Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy and the Development of Uber's United States Safety: Executive Summary

UBER-MDL3084-000000503

alignment between employees who use the taxonomy for both incident
response and auditing purposes.

- Incident report categorization and alignment process

  - We found that, overall, Uber has developed a rigorous process to promote the accuracy of
    incident report categorizations, leading to reliable data being captured by the taxonomy. In
    addition, Uber has high accountability when processing incident report data. All modifications to
    an incident report (e.g., a change in taxonomy categorization) are logged as part of that
    data record.

  - Data categorized in Uber's taxonomy are reliable and reports can be consistently classified across
    agents. According to common interpretation standards of kappa statistics, our analysis showed
    almost perfect agreement (0.800) among the NSVRC/Urban team members in classifying
    sexual misconduct and assault reports made to Uber, and substantial agreement (0.61-8.0)
    between Urban/NSVRC staff and Uber staff.

- Approach to and analytics strategies for sexual assault data intended for the US Safety Report

  - During our system analysis, Uber shared that the US Safety Report would include specific
    taxonomy categories, provided reasons for including such categories, discussed their data
    cleaning and analysis approach, and provided a snapshot of the internal report review process.
    In general, we found these processes to be based on careful consideration with a focus on
    reporting safety information accurately, and using rigorous data.

## About the Organizations

RALIANCE is a national partnership dedicated to ending sexual violence in one generation. RALIANCE
partners with a wide range of organizations to improve their cultures and create environments free from
sexual harassment, misconduct, and abuse. Every day, RALIANCE helps leaders establish safe workplaces
and strong communities by advancing research, influencing policy, and supporting innovative programs.

The National Sexual Violence Resource Center (NSVRC) is the leading nonprofit in providing information
and tools to prevent and respond to sexual violence. NSVRC translates research and trends into best
practices that help individuals, communities and service providers achieve real and lasting change.

The Urban Institute, founded in 1968, is a trusted source for unbiased, authoritative insights that
inform consequential choices about the well-being of people and places in the United States. They are a
nonprofit research organization that believes decisions shaped by facts, rather than ideology, have the
power to improve public policy and practice, strengthen communities, and transform people's lives for
the better.

This study was funded by Uber Technologies, Inc. The opinions, findings, conclusions, and recommendations expressed are this d
those of the authors and do not necessarily reflect those of the Urban Institute, National Sexual Violence Resource Center, or RALIANCE, or
their trustees or funders.

UBER-MDL3084-000000504



# An Evaluation of Safety Incident Categorization Capabilities for Uber

December 3, 2019

The Chertoff Group LLC (TCG) was retained by Uber Technologies Inc. (Uber) to conduct a strategic-level evaluation of Uber's application of an independently developed sexual harassment, sexual misconduct, and sexual assault taxonomy to its U.S. rideshare platform incident data set and its classification of incidents of physical assault or theft and robbery that result in fatality ("fatal physical assaults"). Uber undertook this program to help the company and other key stakeholders better understand and address the prevalence of these incidents within its U.S. rideshare platform.

The TCG team was tasked with using its past experience overseeing the normalization and categorization of large incident and criminal justice system data sets to (1) notionally define key project risk and performance factors; and then (2) evaluate the extent to which these factors have been incorporated into and mitigated by the company's approach. In developing criteria, TCG leveraged authoritative U.S. Government strategic requirements and planning guidance for how to translate desired outcomes into supporting capability descriptions, resource components (the ways and means of operationalizing a capability), and evaluative measures (that is, a means of verifying that the capability in question is operating as intended).

In particular, we developed evaluation criteria based on the core resourcing categories that, in our experience, taken together define an effective capability. While all aspects of Uber's program are, of course, important, we determined that the following evaluation factors were of acute significance:

- The extent of leadership's commitment to the taxonomy classification project;
- The adequacy of training and education for the frontline auditors who validated the classification against Uber's larger incident data set; and
- The successful implementation of the technological systems to support the program.

With respect to these critical factors, after a month-long examination of Uber's activities (including review of relevant documents; multiple interviews with Uber personnel; and a literature review) we reached the following conclusions:

UBER-MDL3084-000000505

Section Three

- There is a substantial commitment within leadership to the project, reflected both in the level of attention being paid to the taxonomy program by senior management and in the alignment of management performance evaluations with measures of success for the program;

- Training and education were treated as a critical factor by the program managers, resulting in the deployment of meaningful resources to the effort. While this novel taxonomy program is difficult to train for, we found that Uber devoted significant effort to the development of the program; to the creation of an intuitive, usable taxonomy; and to evaluative measures that ensured alignment between auditors and program objectives; and

- Uber devoted significant resources to the creation of an integrated in-house technology system that appropriately supported the classification program. While we observed strong change management controls within technology-level implementation of the taxonomy, we see some residual risk in the need for greater change management controls at the non-technology level (for example, a more rigorous processes to document the consideration, adoption, and deployment of modifications to the taxonomy classification system). While we also see some inherent risk in any in-house software development project, we were impressed by the level of expertise and attention demonstrated by the staff to these issues.

We also observed that Uber's taxonomy effort and its collaboration with the National Sexual Violence Resource Center (NSVRC) and the Urban Institute has several notable similarities to the successful implementation of select large federal incident-based data systems with which we are familiar, strongly suggesting that the processes Uber has adopted are appropriate. Key federal-systems lessons learned include: the necessity of stakeholder buy-in; development of precise requirements/statement of work; and integration of end-user subject matter experts in all aspects of the process.

In Uber's program we noted that there was: buy-in and resourcing of the effort from Uber executives; recognition of the challenges and opportunities associated with implementing the classification system; establishment of a clear objective for the program; and creation of an integrated team of subject matter experts including Uber staff who would ultimately be the end-users of this taxonomy system. The development process involved several iterations of taxonomy development that were subjected to review by and input from the Uber staff, as well as extensive validation by NSVRC and Urban Institute experts until a version was agreed upon and ultimately put in the operational environment. This integration of subject matter expertise from Uber and NSVRC/Urban Institute was, in our view, critical to the successful creation and implementation of the taxonomy, much as it was in the successful creation and implementation of federal incident-based data systems. Lastly, as with related federal systems, Uber's taxonomy was created using a dynamic process and we expect it will continue to grow and improve over time.

In addition, we made the following general observations:

- Uber had a meaningful taxonomy-related doctrine and policy development process, although it requires some greater formality;

- A steering committee and a matrixed safety team provided organizational oversight of the program;

- Adequate and appropriately trained staff were assigned to the special audit program;

- Dedicated funding was in place for the effort; and

- Suitable standards and processes were in place to help ensure the accuracy and calibration of the classification process.

Section Three

We also made some recommendations to Uber to strengthen their program management. In addition to the need for a more formalized policy process and better change management practices already noted, we recommend: continued human sampling to verify automated natural language processing safety classifications; and the creation of a feedback loop to inform safety classifications by intake customer service representatives.

Based on our examination of Uber's program (and as limited in the next paragraph), **our opinion is that Uber's efforts to apply the taxonomy to its incident dataset were reasonable and made in good faith**. We are further of the opinion that, given the time and resource constraints that necessarily attend any effort to characterize a database of this size, scope, and complexity, the baseline offered by Uber's analysis is a reasonable starting point from which to develop polices and a suitable beginning for the iterative process of further taxonomical development and application to other databases.

*Limitation of Work: Given the limited scope of the review requested by Uber, our opinion is restricted to a qualitative assessment of the taxonomy classification program as of the date hereof to evaluate the reasonableness of Uber's application of the taxonomy to its selected data set and the company's identification of fatal physical assaults as they relate exclusively to the company's U.S. rideshare platform. Uber did not ask us to extend this review to any of its international rideshare platforms, nor did the company ask us to conduct any quantitative analysis of the underlying incident data set or the data as categorized using Uber's methodologies, as we understand that such a review was conducted by the NSVRC and the Urban Institute. Uber also did not ask us to evaluate Uber's substantive efforts to prevent, respond to, or otherwise address sexual harassment, sexual misconduct, sexual assault, and fatal physical assaults – or more general safety risks – in its platform.*

*About The Chertoff Group Team: The Chertoff Group is an internationally recognized leader in security and risk management advisory services and applies its unmatched industry insights around security technology, global threats, strategy and public policy to enable a more secure world. It starts from the proposition that there is no such thing as risk elimination and the firm helps clients understand risk and address the fundamentals of security risk management. Members of The Chertoff Group's assessment team included **Thomas Bush**, an advisor to The Chertoff Group and former Assistant Director of the Criminal Justice Information Services (CJIS) Division of the Federal Bureau of Investigation (FBI) who spent his entire career designing, managing, and evaluating case management systems, including the design and management of the FBI case management system and the national database of criminal justice data; **Joseph Ford**, an advisor to The Chertoff Group, former Associate Deputy Director of the FBI and former Chief Security Officer for Bank of the West, who has extensive experience in the use of case management systems both in law enforcement and commercial environments; **Adam Isles**, a Principal at The Chertoff Group and former Deputy Chief of Staff at the U.S. Department of Homeland Security (DHS) who works with clients across industries to build security risk management programs and was the principal drafter of the firm's security risk management methodology, which was approved by DHS for SAFETY Act designation in 2017; and **Paul Rosenzweig**, a senior advisor to The Chertoff Group and former Deputy Assistant Secretary for Policy at DHS who has extensive knowledge on data management and developed policy, strategic plans, and global approaches to homeland security, ranging from immigration and border security policies to avian flue and international rules for data protection. The Chertoff Group report was reviewed by **Michael Chertoff**, the Executive Chairman of The Chertoff Group, a former Secretary of Homeland Security, and federal judge on the U.S. Court of Appeals for the Third Circuit, and **Jayson Ahern**, a Principal at The Chertoff Group and former acting Commissioner of U.S. Customs and Border Protection at DHS.*

(Ordered from least to most severe)

Section Three

| Sexual Misconduct | |
|---|---|
| Staring or Leering | Someone gazes at a user in an unpleasant, uncomfortable, prolonged, or sexual manner. Staring or leering is constant and unwavering. This includes viewing both sexual and non-sexual body parts. |
| Comments or Gestures >Asking Personal Questions | Someone asks specific, probing, and personal questions of the user. This would include questions about the user's personal life, home address, contact information (e.g., phone, email, social media), romantic or sexual preferences. |
| Comments or Gestures >Comments About Appearance | Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |
| Comments or Gestures >Flirting | Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. |
| Comments or Gestures >Explicit Gestures | Someone made sexually suggestive gestures at the user. |
| Comments or Gestures >Explicit Comments | Someone described or represented sexual activity or body parts in a graphic fashion. |
| Displaying Indecent Material | Indecent material, including pornography or other sexual images, was seen by the user. |
| Indecent Photography/Video Without Consent | Someone has taken, without consent, an inappropriate photograph of a user's sexual body part (e.g., down shirt, up skirt, etc.). |
| Soliciting a Sexual Act | Someone directly asks for a kiss, displays of nudity, sex, or contact with a sexual body part (breast, buttock, genitals). This could be a direct solicitation or a solicitation in exchange for money or favors. |
| Masturbation/Indecent Exposure | Someone has exposed genitalia and/or is engaging in sexual acts in presence of a user. This excludes public urination where no sexual body part (buttock, penis, breast) was exposed. |
| Verbal Threat of Sexual Assault | Someone directed verbal explicit/direct threats of sexual violence at a user. |

Sexual Misconduct and Sexual Violence Taxonomy

UBER-MDL3084-000000508

**Sexual Assault**
- Sexual body parts are defined as the mouth, female breasts, buttocks, and genitalia. The phrase "between the legs" is considered to reference a sexual body part. All other body parts are characterized as non-sexual.
- When only a non-sexual body part is involved, either of the following provides context for the 'sexual nature' of the contact/attempted contact:
  - Sexual misconduct of any type
  - Reporter's explicit perception that the contact was either flirtatious, romantic, or sexual

| | |
|---|---|
| Attempted Touching of a Non-Sexual Body Part | Someone attempted to touch, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Kissing of a Non-Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with, any non-sexual body part (ha nd, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Touching of a Sexual Body Part | Someone attempted to touch, but did not come into contact with, any sexual body part (mouth, breast(s), buttock(s), or genitalia) of the user, and the user perceived the attempt to be sexual. |
| Attempted Kissing of a Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with the mouth, breast(s), or buttock(s) of the user, and the user perceived the attempt to be sexual. |
| Non-Consensual Touching of a Non-Sexual Body Part | Without explicit consent fro m the user, someone touched or forced a touch on any non-sexual body part (hand, leg, thigh) of the user. |
| Non-Consensual Kissing of a Non-Sexual Body Part | Without consent from the user, someone kissed, licked, or bit, or forced a kiss, lick, or bite on any non -sexual body part (hand, leg, thigh) of the user. |
| Attempted Non-Consensual Sexual Penetration | Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as Attempted Non -Consensual Sexual Penetration. This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue. |
| Non-Consensual Touching of a Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user. |
| Non-Consensual Kissing of a Sexual Body Part | Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue. |
| Non-Consensual Sexual Penetration | Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue. |

For more information on the Sexual Misconduct and Sexual Violence Taxonomy, please visit the publication from the National Sexual Violence Resource Center, Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault.

Section Three

Sexual Misconduct and Sexual Violence Taxonomy

UBER-MDL3084-000000509

Uber

# APPENDIX C

UBER-MDL3084-000000510

2019-2020

# US Safety Report

**Uber**

UBER-MDL3084-000000511

Uber Technologies, Inc.
San Francisco, CA
Published: June 30, 2022

Disclaimer: The data included in this report is being provided for informational purposes only and reflects incidents reported to Uber in numerous ways, as discussed further herein. The data consists of reported incidents that allegedly occurred in connection with (as defined here) an Uber-facilitated trip, and includes such reports even if there is no allegation against a rider or driver connected with the trip. Given the limitations described herein, the report does not assess or take any position on whether any of the reported incidents actually occurred, in whole or in part. Accordingly, no data, analysis, statement, representation, or other content contained in this report can be relied upon by any party for any other purpose. This report is issued as of the publication date listed above. Uber has undertaken reasonable efforts to ensure that the data, analysis, statements, representations, and other content contained in this report are accurate as of the publication date, and will not update the report or its contents after such publication date.

UBER-MDL3084-000000512

# Table of contents

4       Terms used in this report

6       Foreword

7       An introduction letter

9       Executive summary

19      Safety investments

37      Uber's scale in the United States

38      Methodology

48      Data insights

48          Motor vehicle fatalities

54          Fatal physical assaults

56          Sexual assault

67      Conclusion

68      Appendices

68          I. RALIANCE: External validation of Sexual Misconduct and Violence Taxonomy for Uber

71          II. GHSA: Independent validation of Uber's methodology for analyzing fatal crashes

73          III. Sexual Misconduct and Violence Taxonomy

75          IV. Determining which reported safety incidents are Uber-related

UBER-MDL3084-000000513

# Terms used in this report

Section Three

**Audit function (or audit process)**
Uber's data-quality assurance process, which is designed to ensure data classification accuracy, reliability, and consistency across all safety incident reports.

**FARS**
The Fatality Analysis Reporting System. Operated by the National Highway Traffic Safety Administration (NHTSA), FARS is a nationwide census of fatal traffic crashes within the 50 states, the District of Columbia, and Puerto Rico.

**Pedalcyclist**
Pedalcyclist is a term that NHTSA defines as "bicyclists and other cyclists including riders of two-wheel, non-motorized vehicles, tricycles, and unicycles powered solely by pedals." For this report, we have chosen to use the word "bicyclist" or "scooter rider."

**Relevant facts**
During the incident-report review process, safety support agents may gather relevant facts that may aid in the ultimate resolution of a report. These relevant facts may include but are not limited to: GPS information, trip timestamps, and any additional information provided to Uber, such as dashcam, phone, audio recordings, or screenshots of text conversations. Although these pieces of information can be useful, they are not necessary for an accused party's account to be removed from the platform. We rely heavily on a survivor's statement of experience.

**Ridesharing (or rideshare platform)**
For the purposes of this report, the Uber rideshare platform involves peer-to-peer ride services inclusive of but not limited to Uber Pool/UberX Share, UberX, Uber Black, Uber Black SUV, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (such as New York City).

**Safety support agent(s)**
Customer support personnel at Uber who are tasked with handling and responding to reported safety incidents and actioning user accounts as necessary.

**Sexual assault**
Based on the Sexual Misconduct and Violence Taxonomy, which provides a structure of consistent classification of reports of sexual violence, sexual assault is defined as any physical or attempted physical contact that is reported to be sexual in nature and without consent. This can include incidents within the ta onomy ranging from attempted touching of a non-sexual body part (e.g., a user trying to touch a person's shoulder in a sexual/romantic way) to non-consensual sexual penetration. (For further sexual assault categories and their definitions, please see Appendix III: Sexual Misconduct and Violence Taxonomy.)

**Sexual misconduct**
The Sexual Misconduct and Violence Taxonomy defines sexual misconduct as non-physical conduct (verbal or staring) of a sexual nature that happens without consent or has the effect of threatening or intimidating a user against whom such conduct is directed. This can include incidents within the taxonomy ranging from staring/leering to verbal threat of sexual assault. (For further sexual misconduct categories and their definitions, please see Appendix III: Sexual Misconduct and Violence Taxonomy.)

**Statement of experience**
During the case-review process, specialized safety support agents aim to speak directly with the reporter or survivor to obtain a firsthand account on the details of their reported incident. In cases where a survivor is not able or willing to provide that statement of experience, Uber considers all other relevant facts obtained during the review.

**Taxonomy**
A system used for incident categorization. Uber's Safety Taxonomy is used to categorize safety incidents for proper agent routing, support protocol design, data tracking, and other purposes. The Sexual Misconduct and Violence Taxonomy, developed in partnership with RALIANCE, the National Sexual Violence Resource Center (NSVRC), and the Urban Institute, is used in this report to identify, categorize, and count sexually violent behaviors. In total, the taxonomy includes 21 categories of sexual misconduct and sexual assault behaviors. Data from the 5 most serious sexual assault categories in this taxonomy are presented in this report.

UBER-MDL3084-000000514

**Third party**

Any person who is not a driver, rider account holder, or guest rider involved in a reported safety incident.

**User**

Any person using the Uber platform. For the purposes of this report, it pertains specifically to drivers and riders.

**Victim/Survivor**

We've learned from safety advocates that people impacted by sexual violence may identify in many ways, which can be deeply personal to the individual. In an effort to be inclusive and to ensure that all people impacted by sexual violence can identify with the language used in this report, Uber has chosen to use the terms victim and survivor throughout this report. Both terms are intended to refer to a person who has experienced any type of sexual misconduct or sexual assault.

**Vulnerable road user**

The term vulnerable road user encompasses any road user who is unprotected by an outside shield (like a vehicle), and therefore at great risk of injury or fatality. For the purposes of this report, the term vulnerable road user includes pedestrians, bicyclists, motorcyclists, and users of any other micromobility vehicles, such as scooters.

Section Three

UBER-MDL3084-000000515

# Foreword

## Safety Advisory Board members

**Dr. Indira Henard**, Executive Director, DC Rape Crisis Center, and **Dr. T. Bella Dinh-Zarr**, former Vice Chairman and Acting Chairman of the National Transportation Safety Board (NTSB)



Dr. Indira Henard



Dr. T. Bella Dinh-Zarr

We welcome the publication of Uber's second Safety Report. Reporting on critical safety incidents is never easy, but it is the right thing to do.

Through our work advocating for safety—across public safety, road safety, and supporting survivors of sexual assault—we know the importance of data transparency. Reports like this help us all better understand the scope of these issues, provide us with the data needed to work together on solutions, and keep companies accountable.

Uber was the first company to take a stand of this kind, voluntarily publishing its first US Safety Report in December 2019. This represented a turning point in corporate transparency. In general, companies have been reluctant to share this information, especially when it comes to sexual assault. We know sexual harrassment and abuse can happen in any setting, but all too often it is kept secret.

This report covers a turbulent time for society. National safety statistics speak for themselves: A 2019 national study found that 81% of women and 43% of men report experiencing some form of sexual harassment and/or assault in their lifetime. Violent crime tragically took more lives in the US in 2020 than in the past 20 years, and 2020 was also the deadliest year on US roadways in more than a decade. During this time, we also entered into a global pandemic that amplified these issues and more. As safety advocates, we have seen the impact firsthand.

Rape crisis centers and shelters across the country continue to be on the frontlines of the COVID-19 pandemic. At the DC Rape Crisis Center, the oldest rape crisis center in the country, we are seeing a continued increase in requests for services for survivors of sexual assault, specifically survivors who represent marginalized communities and are disproportionately impacted by both the COVID-19 pandemic and sexual violence. In order to maintain a high response level during this unprecedented time, we turned to Uber to help us meet the needs of our survivor community. We are grateful that Uber was able to provide rides for survivors seeking life-saving services. To that end, it is vital that companies do their part to help disrupt gender-based violence by developing partnerships and standing with organizations like the DC Rape Crisis Center in difficult times.

The devastating effects of traffic crashes were also felt across the country, with an increase in pedestrian and bicycle deaths as well as deaths due to speeding, impairment, and lack of seat belt use. We know it takes a multidisciplinary Safe System Approach to make our roads safer for everyone, and Uber is trying to do its part. Independent studies have shown Uber's direct impact on reducing drunk driving, saving hundreds of lives in 2019 alone. It takes a broad coalition to tackle this epidemic of traffic deaths, and we're pleased Uber is joining advocates and city leaders in supporting Vision Zero efforts throughout the country.

The safety enhancements Uber is making are having a practical, on-the-ground impact in the lives of millions, especially in their support for victims and survivors. We're pleased to see the expanded commitments Uber has made to support survivors through their Survivor Resource Hotline and Fund and the Families for Safe Streets partnership, and for their investment in impaired-driving prevention and organizations that work to end gender-based violence.

Our hope is that more companies follow Uber's lead and commit to being transparent about critical safety incidents. Silence on these issues doesn't mean a company or organization is safe; instead it points to a lack of transparency and willingness to engage. We know from years of experience advocating for change that it doesn't come until companies are honest with themselves, their customers, and the public.

UBER-MDL3084-000000516

# Uber

An introduction  letter
from the desk of Tony West,
Chief Legal Officer, Uber



In December 2019, Uber became the first in our industry to proactively release a comprehensive U.S. Safety Report detailing our safety-related policies and processes, as well as data on the most serious safety incidents reported on our platform.

The report, validated by third-party experts, was part of Uber's larger efforts to drive a new approach to safety in the rideshare industry and set a new standard for corporate transparency.

Since then, no one could have predicted how drastically the world and everyone's lives would change. A global pandemic. A racial reckoning. A complete shift in how we work. Everything we knew to be true was turned upside down in ways that were both challenging and thought-provoking.

Despite the extreme impact of the pandemic on our business, Uber remained steadfast in following through on the safety commitments we had made—and building on them—by:

- Pioneering innovative safety features in the app such as Text-to-911, On-Trip Reporting and Seat Belt Alerts.
- Creating the Industry Sharing Safety Program with Lyft to share driver account deactivation information related to serious safety incidents with Lyft and other platforms.
- Establishing the Uber Survivor Resources Hotline & Fund administered by experts from  RAINN.
- Developing and deploying safety education to drivers all over the country.
- Introducing new standards and mask verification technology to prioritize health and safety in the face of COVID-19.

Today we are delivering on yet another commitment by releasing our second U.S. Safety Report , with data that continues to show that the vast majority of trips on Uber–more than 99.9%--are completed without any safety report at all. But we know that each incident included in this report affects a real person. Behind every data point is a personal experience, and sometimes pain and loss, that must be acknowledged. That's why we continue to invest in safety, building new features to help prevent incidents and challenging the entire industry to raise the safety bar.

Because this Safety Report covers the years 2019 and 2020, it reflects the impact of COVID-19 on our business and trends across the country. In early 2020, when COVID-19 began sweeping the globe, Uber encouraged  users to stay home. Rides decreased as much as 80% as people limited their travel to essential trips.

Although the impact of COVID-19 on sexual assault generally remains unclear, data from various federal sources shows a significant increase in violent crime during the pandemic, including murder, which according to the CDC increased nearly 30% in 2020. Government data also revealed that 2020 was the deadliest year on American roads since 2007 as a result of a rise in risky behaviors such as drunk driving, speeding, and not wearing a seat belt. Uber's platform was not immune to those broader trends.

As our report shows, Uber received 3,824 reports across the five most severe categories of sexual assault and misconduct. Compared to the first Safety Report, which covered 2017 and 2018, the rate of sexual assault reported on the Uber app decreased by 38%.

Section One

UBER-MDL3084-000000517

# Uber

Similar to our first report, Uber's motor vehicle fatality rate is still half the national average. Consistent with national trends, more than half of the motor vehicle fatalities highlighted in this report include at least one risky behavior, such as impairment or speeding—and 94% were related to third-party drivers. Third parties were also the accused party in the majority of physical assault fatalities.

We have used the same clear principle to guide our transparency efforts and publication of this second safety report: secrecy doesn't make anyone safer. By sharing our safety record, we can help end the silence surrounding issues like gender-based violence that remain far too common in our society, and help improve safety for all.

We wouldn't be where we are today without the guidance and support of experts and advocacy groups. We are thankful for the opportunity to listen, to learn, and to partner with people from around the world. They continue to guide our safety journey and help us create many of the policies and processes we have in place today.

To be clear, disclosing our safety data doesn't mean Uber's platform is less safe—it means we're being more honest about the rare safety incidents that do occur. Most companies won't talk about these tough issues, but pretending they don't exist only leaves everyone less safe. So we hope stakeholders, regulators and others will recognize, support and encourage proactive transparency efforts—not blunt them.

We want Uber to be the safest way to go anywhere and get anything, and we'll continue to lead by taking an expert-driven, action-oriented, and transparent approach. And because safety should never be proprietary, we'll encourage others to be more open themselves and to work together to improve safety for our industry and beyond.

Sincerely,

Tony West
Chief Legal Officer, Uber

Section One

UBER-MDL3084-000000518

# Executive summary

At Uber, we embed safety into everything that we do. We're committed to making Uber safer for everyone using the platform. Since 2017, we've doubled the size of our Safety team, made safety a core company value, and continued our investment in new safety technologies and features.

We've consistently  raised the bar on safety for the industry  by embracing  an expert-driven,  action-oriented,  and transparent approach while holding ourselves accountable to the commitments we've made.

**Leading on safety  means being transparent  about safety incidents that happen on our platform** . This is why we released an industry-first US Safety Report in 2019 to track our progress, drive accountability, and strengthen safety on our platform and beyond. Our first Safety Report covered the years 2017 and 2018. This report, our second, looks at 2019 and 2020.

In this report we share the most serious incidents that occur on our rideshare platform in the US: motor vehicle fatalities, physical assault fatalities, and sexual assaults. Though critical safety incidents on our platform are, statistically, extremely rare—**99.9% of Uber trips ended without any safety-related issue at all**   —even one critical incident is one too many, as it reflects the experience of an individual using Uber.

Our platform is not immune to deeply ingrained societal issues such as sexual assault, or to significant shifts in national trends, such as the increases in homicides and fatal motor vehicle crashes that were observed during the COVID-19 pandemic. These issues are bigger than Uber, and ultimately our platform reflects the world in which we operate.

Over the following pages, we cover Uber's investments in safety, our scale, the methodology used for this report, and the serious safety incident data. We are transparent in sharing what we learn and which steps we're taking to improve safety on our platform because we believe it can make an impact well beyond our own company.

## Safety investments

Uber's work on safety is never done. We are continuously investing and innovating to enhance the safety of our platform for all users, riders and drivers alike.

**Uber's approach to safety focuses on 4 key pillars:**

1. **Platform  access:** Elevate industry standards with clear platform protocols, strong governance, and robust  screening  technology.
2. **Product experience:** Strive to help reduce safety incidents by building new technology solutions as a core part of the app.
3. **Support and response:** Support riders and drivers with empathy and care in times of need.
4. **Partnering with experts and advocates:** Ensure that Uber's safety approach is guided by expert and advocate advice as part of our commitment to building trust with the people and communities we serve.

UBER-MDL3084-000000519

# Access to the platform

Uber continues to prioritize robust screening processes and technology to help strengthen the safety of our platform, and we're proud to have applied innovative technology to enhance our overall screening initiatives as outlined below. Every US driver undergoes a thorough screening before their first trip. This includes a motor vehicle records (MVR) review [1] and a criminal history background check. In 2019-2020, more than 500,000 prospective drivers [2] did not make it through Uber's screening process.

In addition, Uber reruns criminal and motor vehicle checks each year, regardless of whether there is a statute or regulation requiring us to do so. We use technology to continuously check new criminal records and, as of the publication of this report, **more than 80,000 drivers have been removed from the app** due to continuous checks.

We believe everyone has the right to a safe experience while using Uber. Everyone who uses the app must commit to adhering to Uber's Community Guidelines, which are centered on 3 key principles: treating everyone with respect, helping to keep one another safe, and following the law.

# Safety product experience

We have long set the standard for platform safety technology. Our core safety features include:

 **The Safety Toolkit**, a single spot in the app where drivers and riders can access safety features during their trip.

 **In-app Emergency Button**, which connects riders and drivers directly to 911 with the push of a button and, where available, allows users to text 911.

 **Phone number and address anonymization**, which hides the personal details between riders and drivers.

 **Share My Trip/Follow My Ride**, which allow riders and drivers to share their trip with designated loved ones who can follow their trip in real time.

 **Speed Limit Alerts and Driving-Hours Tool**, which help reduce speeding and fatigued driving.

 **RideCheck** can detect rare events such as long stops, unexpected routes, or possible vehicle crashes and send a notification to riders and drivers to see if all is well. The app also provides tools they can use to get help if needed.

Since the publication of our last report, we have continued to innovate and launch new safety features for riders and drivers. A full list of new features is included in the "Safety investments" section. Highlights include:

- **Verify My Ride:** Riders can opt in to receiving a unique 4-digit PIN before each trip, which they provide verbally to their driver, who needs to enter it into their app to start the trip.
- **On-Trip Reporting:** This feature allows riders to discreetly report a non-emergency safety issue during a trip.
- **Rider Seat Belt Alerts:** To improve adoption of rear seat-belt use, we began rolling out Rider Seat Belt Alerts to prompt riders to take this lifesaving step. After a driver starts the trip, an audio tone will be emitted from the driver's phone and riders will receive a push notification reminding them to buckle up.
- **Audio Recording:** We began piloting a new Audio Recording feature that allows drivers and riders to record audio during a trip. Any recorded content is encrypted on the phone so that no one can access it without permission. Uber can only access it if the user reports a safety incident and includes the audio file.
- **Rider Verification:** Riders who try to set up a new account with an anonymous form of payment, such as a prepaid gift card, are required to upload an ID, which undergoes a series of validity checks. These additional verification requirements can act as a deterrent to those who are trying to use the app for theft or to harm drivers.

---

1. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission (TLC). The TLC driver licensing process is separate from the process described here.

2. Prospective drivers are defined as drivers who consented to a background check in 2019-2020 as part of the signup process to drive on the Uber platform.

UBER-MDL3084-000000520

# Support and response

At Uber, we're committed to supporting riders and drivers with empathy and care in times of need.

## Reporting channels and response teams

Uber receives and proactively gathers safety incident reports from more than 10 different channels, including the app, our critical safety line, social media, and law enforcement. We encourage feedback and reporting, even though this increases the total number of safety reports we receive and need to manage, because it shows us the reality of our users' experiences and helps us improve our safety processes and policies.

All potential safety-related reports are manually reviewed by teams of specialized customer support agents for proper adjudication. When our support teams receive safety-related reports, they are triaged and classified by agents based on the description given by the reporting party, and appropriate action is then taken in each and every case.

> If anything happens, 24/7 support is available in the app from a specialized team of Uber agents who are trained to handle sensitive reports.

## Approaching safety deactivations

A comprehensive, robust response to safety deactivations is a core part of our work to help reduce serious interpersonal-incident and crash rates—no rider or driver is deactivated from Uber for a safety report without a human review. Uber's Safety team handles a wide range of incidents, and there is no one-size-fits-all approach to managing them. While a single serious safety incident can be grounds for a rider or driver deactivation, [3] the vast majority of reported incidents are less severe behaviors which may not warrant immediate removal from the platform, such as a single complaint about driving. These reports do, however, warrant further examination of the user's past behavior, and our systems are constantly working to identify patterns of potentially risky behavior.

## Sexual assault standards

Uber does not tolerate sexual assault or sexual misconduct. We take all allegations of sexual assault and sexual misconduct by our users extremely seriously and work to take appropriate action on every report quickly and fairly.

Our approach is grounded in learnings from our partnerships with groups, experts, and organizations that advocate against gender-based violence. The core tenets of our approach are to remove requirements of conclusivity, corroboration, and survivor "credibility" when determining whether to ban the accused party from Uber's app.

## Connecting survivors to advocates

We partnered with RAINN (Rape, Abuse & Incest National Network), to provide a dedicated Survivor Resources Hotline offering immediate, confidential, and trauma-informed support for survivors reporting critical sexual assault incidents related to the Uber app in the United States. RAINN specialists also help facilitate assistance through a support fund created by Uber to provide resources such as trauma-informed counseling and other means of support.

## Working with law enforcement

Uber is committed to working closely with law enforcement officials to promote safety within our communities. We have a dedicated global Public Safety Liaison team made up of former law enforcement professionals who work to proactively partner with law enforcement and educate them about how Uber can assist during an emergency or investigation.

Section X

---

3. Deactivation refers to the specific Uber account that was being used during the safety incident(s) that led to removal. For example, if a driver is flagged by Uber's system and subsequently deactivated for unsafe driving, they may still be allowed to ride with Uber using the rider app.

UBER-MDL3084-000000521

# Partnerships and preventative initiatives

We have engaged with hundreds of advocacy organizations worldwide, including women's safety groups, road safety organizations, and crime-prevention organizations to ensure we incorporate their perspectives and follow best practices. We are proud to have worked with partners to develop impactful programs and initiatives, including those highlighted below.

**Drunk-driving prevention**
Since 2012, we have partnered with Mothers Against Drunk Driving (MADD) to reduce drunk driving throughout the country. Last year we launched a first-of-its kind coalition with MADD and Anheuser-Busch to raise awareness and ultimately shift behavior when it comes to drinking and driving. Together we reached tens of millions of people with our "Decide to Ride" campaign and provided discounted rides. In addition, we partnered with the Governors Highway Safety Association (GHSA) to support impaired-driving prevention efforts in states across the country.

**"Return to the Road" safety education**
In 2020, we convened a coalition of road safety advocates to help address the growing national crisis of increased traffic fatalities during COVID-19, due in large part to increased speeding and impaired driving. We partnered with GHSA, the National Safety Council, MADD, and the League of American Bicyclists to create and disseminate educational tips to help address top road safety issues during the pandemic.

**Sexual misconduct education**
In partnership with RAINN, a national anti-sexual-violence organization, we developed and launched comprehensive sexual misconduct education for drivers in the US, led by real drivers. These video modules cover a wide range of topics, including respecting privacy and personal space, conversational boundaries, and sexual assault awareness and bystander intervention; they also offer resources and strategies for promoting safety on the Uber app.

**Driving Change initiative**
Since 2017, Uber's Driving Change initiative has provided funding to organizations working to prevent, address, and respond to gender-based violence. This funding has supported the critical work of organizations working to eliminate gender-based violence, including those that are survivor-led and that provide culturally specific resources and support to communities. This work includes initiatives like NO MORE's #DontStandBy bystander awareness campaign and Rise's Survivor Safe Haven project.

**Industry Safety Sharing Program**
When we published our first US Safety Report, we committed to finding a way to share deactivation [4] data with other rideshare companies. In 2021, we made good on that promise, launching the Industry Safety Sharing Program. This initiative enables companies to exchange basic information about drivers who have been deactivated for serious sexual assault or physical assault fatalities to help prevent these individuals from operating on another platform.

Section X

# COVID-19 response

Our longstanding commitment to safety meant Uber was well positioned to respond quickly when the COVID-19 pandemic first emerged and brought our lives to a standstill. Our teams quickly pivoted to focus on public health and worked to support the safety and well-being of our users and the cities and communities we serve. We led the industry in mobilizing our technology and resources to support riders, drivers, and cities [5] by doing the following:

- **We launched a redesign of the Uber app experience with health and safety in mind.** This included implementing a "no mask, no ride" policy in May 2020 with mask verification technology, and launching pre-trip COVID-19 checklists.

---

4. Deactivation refers to the specific Uber account that was being used during the safety incident(s) that led to removal. For example, if a driver is flagged by Uber's system and subsequently deactivated for unsafe driving, they may still be allowed to ride with Uber using the rider app.
5. Our COVID-19 safety responses are grounded in public health and governmental guidance. As governments have lifted requirements such as masking, we have evolved our policies to align with them.

UBER-MDL3084-000000522

- **We supported drivers to help them stay safe.** We allocated $50 million globally to provide drivers with health safety supplies, sending over 30 million masks, wipes, and bottles of sanitizer to more than 2.5 million earners. We also created a financial assistance policy for drivers affected by COVID-19, with drivers receiving more than $40 million  globally. [6]
- **We helped people get to and from vaccine appointments once COVID-19 vaccines were available.**   We committed 10 million free or discounted rides to help ensure that lack of transportation didn't prevent anyone from getting the vaccine. We also worked with the White House to donate free rides (up to $25) to and from vaccine appointments for all Americans.

# What's next for safety at Uber?

We're committed to creating safer communities for everyone who uses Uber, as well as thinking about Uber's broader societal impact when it comes to safety. We'll continue to invest in the following ways:

**Safety reporting**
With the publication of this report, we are continuing with our commitment to transparency by reporting on the most serious safety incidents that occur on our platform. As we said when we released our last report, secrecy doesn't make anyone safer, and we encourage other companies to follow suit.

**Supporting driver safety**
We remain as committed as ever to the safety of the drivers who use our platform to earn. Since our last report, we've used our technology and scale to support drivers with, for example, new features like Rider      Verification, Audio Recording, and Dashcam Registration. Looking forward, we'll continue to expand these efforts while also listening to and incorporating driver feedback as we design new features and initiatives centered around their safety.

**Preventing drunk driving**
Independent  research shows Uber's direct role in reducing drunk driving. In the coming year, we're doubling our efforts on drunk-driving prevention by dedicating an additional $1 million to the cause.

**Supporting Vision Zero efforts**
Cities around the world have signed on to Vision Zero, a commitment to eliminating all traffic fatalities by taking a holistic Safe System approach to road safety. We believe that private companies are critical partners in achieving Vision Zero, and we are committed to supporting Vision Zero efforts in cities across the country.

**Continuing the fight against gender-based violence**
Uber's partnerships with advocates and experts to improve women's safety and address societal issues of gender-based violence will continue in 2022 and beyond, with a renewed focus on equity, survivor-informed initiatives, and supporting women who earn on our platform.

**Expanding support to survivors and victims**
We're expanding our existing survivor   support  fund (launched in 2020 in partnership with RAINN) to give survivors increased flexibility and choice in how they use the resources made available to them through this fund. We'll also help families of crash victims access support and resources through a new partnership we're launching with Families for Safe Streets, a nonprofit run by volunteers who have lost loved ones in traffic crashes.

Section X

---

6. See the "Safety investments, COVID-19 response" section for more detail.

UBER-MDL3084-000000523

# Uber scale

When interpreting safety data, it is important to understand Uber's scale. For the purposes of this report, we examine data from 2019 and 2020, a time in which the world experienced devastating impacts from the COVID-19 pandemic. Compared with 2019, the number of trips taken with Uber decreased by as much as 80% in April 2020. [7]

With this significant shift, an average of almost 3 million trips took place each day in the US over the 2019-2020 period. **The vast majority (99.9%) of Uber trips in 2019-2020 ended without any safety-related issue at all, similar to our first report.**

> 99.9% of Uber trips end without any safety-related issue at all.

For example, for trips in 2019 and 2020:

- **1%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback

- **0.1%** of trips had a support request for a safety-related concern, and the majority of those concerns were about less-severe safety issues such as complaints about driving or a verbal argument

- **0.0002%** of trips had a report of a critical safety incident, which are the incidents referenced in this report

# Methodology

In this report, we share information about 3 categories of critical safety incidents that were reported to occur in connection with the Uber rideshare platform [8] in the United States [9] from January 1, 2019, through December 31, 2020:

- Motor vehicle fatalities
- Fatal physical assault
- Sexual assault (further detailed in 5 subcategories)
    - Non-consensual sexual penetration
    - Non-consensual kissing of a sexual body part
    - Non-consensual touching of a sexual body part
    - Attempted non-consensual sexual penetration
    - Non-consensual kissing of a non-sexual body part

Our approach to safety data in this report is consistent with our first Safety Report, and prioritizes data accuracy, reliability, and consistency. We also continue to work with RALIANCE, a sexual violence prevention expert, and Governors Highway Safety Association (GHSA), a road safety advocate organization, to maintain high levels of data integrity and classification. As part of our commitment to fulsome reporting, our methodology is inclusive of reports even if there is no allegation against a rider or driver connected with the Uber-facilitated trip.

## Motor vehicle methodology

As with our first Safety Report, we have aligned our standards with NHTSA's Fatality Analysis Reporting System (FARS), the national standard for motor vehicle fatality data.

For a fatal motor vehicle crash to be included in this Safety Report, the crash must have involved the vehicle of at least one driver using the Uber platform and the death of at least one person within 30 days of the crash. Fatal crashes are included in this report regardless of whether the deceased party was an Uber user or whether a driver using the Uber platform or their vehicle was the cause of the crash.

Section X

---

7. "Uber Q1 2020 Earnings Conference Call," Uber webcast, 5:50, (May 7, 2020), investor.uber.com/news-events/events-and-presentations/event-details/2020/Uber-Q1-2020-Earnings-Conference-Call/default.aspx
8. For the purposes of this report, the Uber rideshare platform involves peer-to-peer ride services including, but not limited to, Uber Black, Uber Black SUV, Uber Pool, UberX, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (such as New York City).
9. Excludes US territories.

UBER-MDL3084-000000524

The Uber-related [10] vehicle miles traveled (VMT) in this report are based on the miles driven during trips and while a driver was on the way to a rider's pickup location (calculated using GPS data). This helps align with national statistics, which use VMT as the denominator (specifically, per 100 million VMT) in calculating a motor vehicle fatality rate. [11]

## Fatal physical assault methodology

This report includes physical assault incidents that resulted in one or more fatalities. In order for a fatal physical assault incident to be established as Uber-related for the purposes of this report, one or more of the following must be true:

- The incident involved at least one person on an Uber-facilitated trip, [12] not necessarily with parties paired by the Uber app [13]

- The incident occurred between parties that were paired by the Uber app, and it occurred within 48 hours [14] of the trip's completion

## Sexual assault methodology

We take very seriously the responsibility of accurately and consistently classifying reports of sexual violence. Unlike the other safety incident categories in this report, there was no common definition for sexual assault and misconduct. We partnered with safety advocates and experts in 2018 to develop the Sexual Misconduct and Violence Taxonomy to better understand and document the reality of unwanted sexual experiences. [15] The taxonomy is open source, which means that it can be used by other companies and organizations. We continue to use this taxonomy today and we believe it is important to have a standardized tool that corporations can use to consistently classify reports of sexual violence.

In order for a sexual assault to be established as Uber-related for purposes of data classification for this report, one or more of the following must be true:

- The incident occurred during an active Uber-facilitated trip, [16] not necessarily with parties paired by the Uber app

- The incident occurred between parties that were paired by the Uber app, and it occurred within 48 hours [17] of the trip's completion

It is important to note that the data prepared and presented in this report comes from initial reports from our users or a third party, and as such represents the number of reports of sexual violence, but does not reflect the number of actual occurrences. Uber uses a survivor-centered approach in our review process, which means that we trust survivors and do not require them to "prove" that they have experienced harm. In an effort to be as overinclusive as possible while also respecting the agency of survivors, we include data about reports that were later withdrawn [18] (but not disaffirmed) by survivors.

## Data quality

As explained in depth in our 2019 Safety Report, categorizing unwanted sexual experiences remains a challenge even among experts. Prioritizing and reporting on just the most severe categories helps us maintain a higher level of classification accuracy and reliability and is consistent with our previous report.

10. "Uber-related" or "relation to the Uber platform" is a reference to how the data was classified and applies for the purposes of this Safety Report only.

11. "Glossary of Highway Safety Terms and Definitions," National Highway Traffic Safety Administration (accessed May 3, 2022), nhtsa.gov/resources-guide/glossary-highway-safety-terms-and-definitions#s-z-29531.

12. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is on the way to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while on the way to the rider's pickup location, this would be included in the data set.

13. A physical assault fatality does not need to be between persons on an Uber-facilitated trip. For example, a shooting by a third party outside of the vehicle towards the vehicle that leads to a fatality of an occupant is included in our report.

14. Incidents between parties paired by the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

15. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," Raliance (2018), https://www.raliance.org/wp-content/uploads/2018/11/helping-industries.pdf .

16. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is on the way to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while on the way to the rider's pickup location, this would be included in the data set.

17. Incidents between parties paired by the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

18. We know that survivors of sexual violence may withdraw their reports or refuse to pursue them further for any number of personal reasons.

UBER-MDL3084-000000525

Section X

The sexual assault categories included in this Safety Report prioritize:

- Reporting the most serious categories of sexual assault outlined in the taxonomy
- Maintaining a high degree of confidence and consistency in the quality of the overall data set
- Aligning as far as possible with types of sexual assault that are already published in external research and national estimates [19]

To this end, as with our first report, we set aggregated classification confidence benchmarks of 85% as minimum for sexual assault and 99% for all fatalities (see the " Methodology " section).

## Data auditing process

Uber conducts an extensive internal data auditing process on the most serious safety incidents to maintain the data and statistical rigor for producing accurate data for this Safety Report.

Similar to the audit function introduced in our first report, this process is run by our specialized auditing team, which is dedicated to checking and confirming the classification of safety incident reports after they are first categorized and investigated by our frontline agents. We use the same quality controls, including a curriculum and certification process for auditors, to gain confidence in the results of our internal audit.

While this auditing process was initially developed to prepare for our first Safety Report, these standards, performance benchmarks, and processes remain active so we can maintain high levels of data quality.

## Limitations of Uber safety incident data

We recognize that this data and our user base are neither a representative national sample nor, necessarily, a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults in other contexts. In addition, COVID-19's impact  on how society moved affected  how, where, and when people used Uber, which  makes yearly comparisons a challenge without contextualizing the safety incident rates of the public at large.

# Data insights

We report the most serious incidents that occur on our rideshare platform in the US: motor vehicle fatalities, physical assault fatalities, and sexual assaults. While these incidents on our platform are extremely rare, even one is one too many. They each reflect an intensely tragic and traumatizing experience of an individual using Uber.

Uber ultimately reflects the world in which we operate. Societal issues, national trends, and impacts of major events like a pandemic are also seen on our platform. In the early days of COVID-19, cities ground to a halt, with most people traveling only to meet essential needs. These trends were reflected on the Uber platform, where trips decreased. With the closure of nighttime venues like bars and nightclubs, the number of these types of trips also dropped.

## Motor  vehicle fatalities[20]

The year 2020 saw the highest number of motor vehicle fatalities since 2007 and the highest increase in the fatality rate on record. [21] NHTSA attributes the dramatic increase in deaths in 2020 to a rise in 3 risky behaviors in particular: alcohol-involved fatalities (+14%), unbuckled occupant fatalities (+14%), and speeding related fatalities (+17%),      [22]  due in large part to less congestion on the roadways.

---

19. The categories of incidents we're reporting align with the forms of sexual assault already collected and reported by the National Intimate Partner and Sexual Violence Survey (NISVS) administered through the Centers for Disease Control (CDC). NISVS is an ongoing survey that collects the most current and comprehensive national- and state-level data on intimate partner violence, sexual violence, and stalking victimization in the US.
20. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason the data may change over time. The motor vehicle data presented in this report includes incident reports reported on or before April 15, 2022. The motor vehicle data in this report reconciled to the 2020 FARS release published March 2, 2022.
21. "Overview of Motor Vehicle Crashes in 2020," National Highway Traffic Safety Administration (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813266 .
22. "Overview of Motor Vehicle Crashes in 2020," National Highway Traffic Safety Administration (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813266 .

UBER-MDL3084-000000526

Uber operates on the same streets as everyone else, and we are not immune to the national road safety trends. Overall, motor vehicle fatalities per VMT increased by 7% from 2017-2018 to 2019-2020, in line with a 6% increase nationally comparing the same sets of years. [23] **The motor vehicle fatality rate connected with the Uber platform in both 2019 and 2020 is about half the national average, similar to our first report**.

Half of the fatalities connected to the Uber app in 2019-2020 involved at least one risky driving behavior, such as alcohol impairment, speeding, or wrong-way driving [24]—**94% were the result of such behaviors by third-party drivers**. While there was a marked increase in risky driving by third parties, these trends were not evident among drivers [25] using the Uber app.

High-level findings in 2019-2020 include:

- 101 individual motor vehicle fatalities occurred across 91 fatal Uber-related crashes [26]
    - This accounts for approximately 0.000005% of total trips or one in 20,000,000 trips
- 32% (n=32) of fatalities involved at least one vehicle that was speeding
    - 91% (n=29) were third-party drivers
- 23% (n=23) of fatalities involved an alcohol-impaired driver
    - 100% were third-party drivers
- 15% (n=15) of fatalities involved a driver driving the wrong way [27]
    - 100% were third-party drivers
- 13% (n=9) of occupant fatalities involved an unbuckled third-party driver
- 15% (n=11) of occupant fatalities involved an unbuckled rider using the Uber platform
- 42% (n=42) of fatalities were vulnerable road users; 64% (n=27) of those fatalities were pedestrians, 29% (n=12) were third-party motorcyclists, and 7% (n=3) were bicyclists or scooter riders
    - Of the pedestrian fatalities, the majority were on larger roadways such as interstates and principal arterial roads and not at a crosswalk or intersection

## Fatal physical assault [28]

In 2020, more lives were tragically lost to violent crime in the United States than in any other year over the last 2 decades. [29] According to CDC data, 24,576 people died due to homicide in the US in 2020. [30] This represents a 30% increase from 2019—the largest single-year increase in more than a century. [31] It is critical to acknowledge that numbers alone are unable to capture the devastating impact of these incidents on families and communities.

In 2019 and 2020, 20 fatalities were reported in a total of 19 physical assault incidents in relation to Uber. [32] Of these fatalities, 75% (n=15) were riders using the Uber app, and 25% (n=5) were drivers using the Uber app. This accounts for approximately 0.000001% of total trips, or one in 100,000,000 trips. Overall, we observed an increase of 18% from 2017-2018 to 2019-2020, in line with the increase in national homicide fatalities.

23. Derived from the calculated fields in the "Data insights" section - see Table 1.

24. Alcohol impairment, speeding, wrong-way and other data elements in this report regarding Uber-related fatal crashes are derived from FARS data pulled from NHTSA's Fatality and Injury Reporting System Tool (FIRST) at cdan.dot.gov/query on March 2, 2022.

25. Drivers here include drivers as motor vehicle occupants, not as pedestrians.

26. An additional 11 Uber-related road fatalities either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS (see "Methodology" section). Because these fatal crashes are not in the FARS data set, they are not included in the data analysis presented in this report.

27. The wrong way is defined as a combination of FARS data elements looking at the manner of the vehicle collision (such as "front to front"), pre-crash vehicle events (such as drivers traveling over the lane line of travel), and pre-crash driver events (such as leaving the original travel lane, driving on the wrong side, etc.).

28. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but this means that the data could change over time. The data presented in this report includes incident reports reported on or before April 15, 2022.

29. "New CDC/NCHS Data Confirm Largest One-Year Increase in US Homicide Rate in 2020," CDC/National Center for Health Statistics (October 6, 2021), cdc.gov/nchs/pressroom/nchs_press_releases/2021/202110.htm.

30. FastStats, CDC (last reviewed January 5, 2022), cdc.gov/nchs/fastats/homicide.htm.

31. "New CDC/NCHS Data Confirm Largest One-Year Increase in US Homicide Rate in 2020," CDC/National Center for Health Statistics (October 6, 2021), cdc.gov/nchs/pressroom/nchs_press_releases/2021/202110.htm.

32. In one incident, 2 deceased parties were identified.

UBER-MDL3084-000000527

## Sexual assault[33]

Sexual assault is a devasting crime that impacts every corner of our society. Nationally, nearly 52.2 million women (43.6%) and a quarter of men (24.8%, or 27.6 million) experience some form of sexual violence in their lifetime. [34] While sexual assault is drastically underreported, [35] research shows that raising awareness of sexual assault policies that are in place [36] and drawing attention to the issue of sexual assault [37] can lead to increased incident reporting.

Overall, the rate of sexual assault reported on the Uber app decreased by 38% between our first report (2017-2018) and this report (2019-2020). **The total number of sexual assault reports across the 5 categories included in this report went from 5,981 in 2017-2018 to 3,824 in 2019-2020.**

The change in rate of sexual assault reports over time may have been impacted by a number of factors, including how the COVID-19 pandemic altered usage of the platform as well as Uber's safety and transparency efforts. But each reported incident represents a harrowing lived experience for the survivor. Even one report is one report too many.

**Riders were the accused party nearly half (43%) of the time in sexual assaults from 2019-2020, which is similar to what we found in our first report.**

This second Safety Report also includes a breakdown of reports by category of sexual assault:

- Non-consensual sexual penetration was reported to occur on about 1 in 5,000,000 US trips, or on approximately 0.00002% of US trips.

- Non-consensual kissing of a sexual body part was reported to occur in 1 in every 5,000,000 completed US trips.

- Instances of non-consensual touching of a sexual body part were reported to occur in about 1 in every 1,000,000 trips.

- Attempted non-consensual sexual penetration was reported to occur in about 1 in 7,000,000 completed trips. This category covers a wide range of reports, including reports of attempted clothing removal and reports that are fragmented or incomplete due to memory loss or lack of event recall.

- Non-consensual kissing of a non-sexual body part was reported to occur in about 1 in every 3,000,000 completed trips.

Section X

# Conclusion

As this report shows, 99.9% of trips on the Uber platform ended without a safety incident. Only 0.0002% of trips involved a critical safety event, and the rate of sexual assault decreased by over 30% since our last report. Although these incidents are incredibly rare, we recognize that each one represents a devastating experience for the individuals, families, and communities impacted.

That's why our work on safety will never stop. We're constantly innovating and investing in the safety of our platform. We've prioritized robust screening processes and technology, built new safety features, and invested in providing riders and drivers with support in times of need. We remain dedicated to helping protect drivers and riders who use the Uber platform, and we're committed to following the advice and guidance of safety experts and advocates.

Our commitment to transparency also continues. We encourage others—such as airlines and taxi, rideshare, homeshare, and hotel companies—to also be transparent on safety. We all have a responsibility to make our companies and communities as safe as possible, and sharing our data is one step we can all take toward making that goal a reality.

---

33. This report reflects audited sexual assault reports that were classified into one of the categories defined at the end of the "Sexual assault" section. Uber occasionally receives notice of a potential sexual assault well after the trip has ended. The sexual assault data presented in this report includes incident reports made on or before April 15, 2022, and for this reason may change over time.

34. "National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," CDC/National Center for Injury Prevention and Control (November 2018), cdc. gov/violenceprevention/pdf/2015data-brief508.pdf .

35. "The Criminal Justice System: Statistics," RAINN (accessed May 3, 2022), rainn.org/statistics/criminal-justice-system.

36. "Sexual Violence on the College Campus: A Template for Compliance With Federal Policy." Journal of American College Health (2008) https://doi.org/10.3200/JACH.57.3.361-366.; "Sexual Assault Prevention and Reporting on College Campuses in the US: A Review of Policies and Recommendations"Journal of Education and Practice (2015) https:// files.eric.ed.gov/fulltext/EJ1083737.pdf.

37.https://www150.statcan.gc.ca/n1/en/pub/85-002-x/2017001/article/14842-eng.pdf?st=AjjMlzJy     ; Levy, Roee, and Martin Mattsson. "The effects of social movements: Evidence from# MeToo." Available at SSRN 3496903 (2021).

UBER-MDL3084-000000528

# Safety investments

At Uber, we've consistently raised the bar on safety for the industry by embracing an expert-driven, action-oriented, and transparent approach while holding ourselves accountable to the commitments we've made. We are transparent in sharing what we learn and which steps we're taking to improve safety on our platform because we believe it can make an impact well beyond our own company.

Uber is constantly innovating on safety. That's why we've built new safety features , put in place stronger background checks , and improved our policies to continue to prioritize safety. We remain committed to working closely with experts—including our Safety Advisory Board—to ensure that their guidance and knowledge is reflected in our ongoing efforts.

Since our first Safety Report in 2019, we've kept at our work of enhancing our safety processes and are continually investing in new safety technologies and features, many of which have now been adopted by other companies in the rideshare industry.

We've also led collaboration across companies and sectors by sharing our learnings related to the Sexual Misconduct and Violence Taxonomy, encouraging others to adopt a survivor-centric and transparent approach to safety, and working together to create the Industry Sharing Safety Program, which enables the sharing of information related to drivers whose accounts have been deactivated for the most serious safety incidents.

**Uber's approach to safety focuses on 4 key pillars:**

1. **Platform access controls:** Elevate industry standards with clear platform protocols, strong governance, and robust screening technology.
2. **Product experience:** Strive to help reduce safety incidents by building new technology solutions as a core part of the app.
3. **Support and response:** Support riders and drivers with empathy and care in times of need.
4. **Input from experts and advocates:** Ensure that Uber's safety approach is guided by expert and advocate advice as part of our commitment to building trust with the people and communities we serve.

These pillars and the safety framework we've built over the past several years enabled us to respond quickly and effectively to the COVID-19 outbreak and shaped our efforts to help protect riders, drivers, and our communities during the pandemic.

In this chapter we share the major investments we've made since our last Safety Report.

Section Three

UBER-MDL3084-000000529

# COVID-19 response

COVID-19 brought our lives to a standstill and forced everyone around the globe to focus on public health safety to help slow the spread of the virus. Since the earliest days of the pandemic, Uber worked to support the health and well-being of our users and the cities and communities we serve. Guided by experts in health and science, we worked to combine compassion, resources, and innovation with the mission of keeping our users safe.

We led the industry in mobilizing our technology and resources to support riders, drivers, and cities. This included launching a complete redesign of the Uber app experience with health and safety in mind; providing financial assistance to drivers diagnosed with COVID-19 or directed to self-quarantine or isolate by a doctor or public health official; and offering free and discounted rides to help ensure that anyone seeking a vaccine had access to transportation.

During the earliest days of the pandemic, when cities were in lockdown, we encouraged people to stay at home through in-app messaging and a public media campaign thanking     users for not riding with Uber. Across our platform, we emphasized our shared responsibility to support essential workers and help keep our communities safe and healthy.

The health and well-being of our users has been a top priority throughout the pandemic, and Uber has taken a number of steps to help support drivers, riders, and communities by grounding our evolving response in updated guidance as we return to a new normal. [38]

---

# Implementing new health and safety measures

At the start of the pandemic, Uber was quick to launch a Door-to-Door Safety Standard consisting of COVID-specific measures, policies, programs, and features intended to help keep everyone on the Uber platform safe from the virus.



### COVID-19 safety education

We worked with the Centers for Disease Control and Prevention (CDC) and the World Health Organization (WHO) to develop a set of safety tips specific to ridesharing, which included washing hands before riding or driving, wearing a mask while on a trip, rolling down windows to ventilate the vehicle, and having riders sit in the back seat. This messaging was provided in-app on ezvery trip and was communicated to riders and drivers globally.

To remind people to follow important safety tips, we launched several awareness campaigns, including Wash, Wear, Air, which reminds people to follow 3 simple steps on every trip including washing hands, wearing a mask, and sitting in the back seat with the windows down. We made the creative assets available to organizations promoting safety in their own communities.



### No mask, no ride

In May 2020 we implemented our No Mask, No Ride policy, requiring everyone to wear a mask or face cover when using the Uber app. Riders and drivers both had the option to cancel a trip without penalty if another Uber user on their trip was not wearing a mask. Users with multiple reports of mask-policy violations risked losing access to the app.

---

38. Our COVID-19 safety responses are grounded in public health and governmental guidance. As governments have lifted requirements such as masking, we have evolved our policies to align with them.

UBER-MDL3084-000000530



### Mask verification technology and go-online checklists

Uber was the first platform in the US to implement mask verification technology. Drivers were asked to take a selfie while wearing a mask before they could start accepting trips. Riders reported for not wearing a mask were also required to take a selfie with a mask on in order to request their next ride.

We also launched pre-trip checklists asking riders and drivers using the Uber app to confirm that they had taken steps recommended by public health experts (wearing a mask, keeping hands washed or sanitized) to help stop the spread of COVID-19.



### Restricting front-seat riding and shared trips

To help riders and drivers social distance, we limited the number of passengers per trip and encouraged drivers to have riders sit in the back seat only. We also discontinued shared rides products such as Uber Pool.

---

# Safety and support for drivers

At the outset of the pandemic, we acted quickly to support drivers so they wouldn't feel like they had to choose between staying safe and making money.

### Safety supplies and PPE

We allocated $50 million globally to provide drivers with cleaning supplies, masks, and sanitizer. We sent more than 30 million masks, wipes, and bottles of sanitizer to more than 2.5 million drivers and delivery people.

### Financial assistance

In March 2020, Uber created a financial assistance policy for drivers affected by COVID-19. The program provided up to 14 days of financial assistance for any driver with an active case of COVID-19 or who had preexisting health conditions that put them at higher risk of serious illness due to COVID-19. Drivers around the world received more than $40 million in assistance through this program.

> 70% of drivers and delivery people in the US told us they thought Uber had either done enough or gone above and beyond for drivers during the pandemic. [38]

Working with policymakers around the world, we pushed to ensure that independent workers were included in government relief packages. And we published government relief guides for all 50 states in the US, featuring up-to-date information for drivers about eligibility and how to request government financial support.

### COVID-19 Resource Hub

Drivers had access to a COVID-19 Resource Hub in the app where they could find the latest health and safety information (including educational videos) and get help with applying for financial relief from local governments.

---

39. "Uber Experience Survey" (October 1-16, 2020), uber.com/us/en/u/your-voices-create-change.

UBER-MDL3084-000000531

Section Three

# Collaborating with governments and public health officials

In order to do our part to help keep communities safe during the pandemic, Uber worked with government officials and public health authorities to help slow the spread of the virus.

## Public health portal and contact-tracing efforts

In response to the COVID-19 pandemic, Uber partnered with public health experts to build a dedicated response process for inquiries from public health authorities (PHAs) related to outbreaks or cases that could affect users on our platform.

Our Safety team was available 24/7 to provide information and, in some cases (under the guidance of public health authorities), temporarily restrict the access of users confirmed to have contracted or been exposed to COVID-19. We also consulted with an epidemiologist and public health experts to make sure our efforts as a company were grounded in expert medical advice.

In July 2020, we launched an updated public health portal where officials could submit emergency requests to Uber for data needed to conduct contact tracing. [40]

## Supporting access to vaccines

With the emergence of COVID-19 vaccines, we have continued to use our platform and resources to help people get to and from vaccine appointments. In December 2020, Uber committed 10 million free or discounted rides to help ensure that lack of transportation didn't prevent anyone from getting the vaccine. We partnered with the National Urban League, Morehouse School of Medicine, and National Action Network, all organizations with deep ties to communities of color who had been disproportionately impacted by the pandemic.

In July 2021, we worked with the White House to donate free rides (up to $25) to and from vaccine appointments for all Americans. In partnership with PayPal and Walgreens, we also created the Vaccine Access Fund, which, with help from the Local Initiatives Support Corporation (LISC), allows companies to fund even more rides to communities in need. We also launched an in-app feature allowing users to donate to the fund, which has raised $376,462 to date.

# Access to the platform

Uber continues to prioritize robust screening processes and technology to help strengthen the safety of our platform, and we're proud to have applied innovative technology to enhance our overall screening initiatives as outlined below.

## Driver background checks and screenings

Every US driver undergoes a thorough screening before their first trip. This includes a Motor Vehicle Record (MVR) review [41] and a criminal history background check.

While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, [42] Uber's process supplements these requirements in several important ways.

> During 2019 and 2020, more than 500,000 prospective drivers [43] did not make it through Uber's screening process.

---

40. Please refer to Uber's Government Transparency Report, which includes more information about the requests Uber received from public health authorities.
41. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission (TLC). The TLC Driver licensing process is separate from the process described here.
42. The rideshare industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform.
43. Prospective drivers are defined as drivers who consented to a background check in 2019-2020 as part of the signup process to drive on the Uber platform.

UBER-MDL3084-000000532

Section Three

- Uber's driver screening process consists of several identity safeguards, including a review of identity information such as a driver's license, Social Security number, proof of insurance, and vehicle registration.
- In the US, we also collect and examine a driver's background history through a third-party vendor accredited by the Professional Background Screening Association. These checks are rerun annually.

The following pages outline our standard screening process for US drivers.

## Motor Vehicle Record check

Given the importance of an individual's driving record, our screening process starts with a thorough MVR check. [44] This includes verification of the individua 's license status, a review of their driving history for any violations or crashes, [45] and a check for any driving-related restrictions on their license.

Disqualifying violations from the last 7 years include, but are not limited to, driving under the influence, reckless driving, and leaving the scene of a crash. Our process also disqualifies individuals who have been involved in a fatal crash or have been convicted of  ehicular homicide or vehicular manslaughter at any time in their driving history.

## Vehicle safety standards

In order to join the Uber platform, drivers' vehicles must meet vehicle standards set by Uber and local regulations. [46] The average age for a vehicle used for rides on the Uber platform is 5 years old, while the average age of a passenger vehicle on the road in the US is 12 years old.[47] Newer vehicles often have more and improved safety features.

## Criminal background checks and screenings

If an individual passes the MVR check, they then proceed to the criminal background check.

Uber continues to work with Checkr, a third-party background check provider accredited by the Professional Background Screening Association. Drivers are required to provide their full name, date of birth, Social Security number, and driver's license number, which Uber provides to its third parties to use in record collection.

Based on this information, Checkr runs a Social Security trace and checks the potential driver's driving and criminal history in a series of national databases from all 50 states, DC, and territories; sex offender lists; the federal Public Access to Court Electronics Records (PACER) database; and several databases used to flag suspected terrorists. Checkr also runs checks at a local level, checking state and county databases and court record repositories based on the driver's history of residence. After identifying a potential criminal record, Checkr sends an individual to review the record in person at the relevant courthouse or, if possible, pulls the record electronically.

Checkr's criminal history screenings use information that is maintained by national, state, and county-level authorities whose processes may vary by jurisdiction. Verifying potential criminal records at the primary source—the courthouse or court database system—helps ensure that the most up-to-date records available are being checked.

## Disqualification standards

Drivers cannot access the app if they have any felony convictions or any violent or other disqualifying misdemeanors in the last 7 years. Our process also reviews records from more than 7 years ago, as allowed by law and where those records are made available and reported to us.

44. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission (TLC). The TLC driver licensing process is separate from the process described here.
45. Violations and crashes may be disqualifying depending on the number or severity of incidents, and depending on the regulatory requirements of the applicable city or state.
46. Regulations may vary by local jurisdiction.
47. "Average age of cars and light trucks in the US rises to 12.1 years, accelerated by COVID-19," IHS Markit (June 14, 2021), ihsmarkit.com/research-analysis/average-age-of-cars-and-light-trucks-in-the-us-rises.html,

UBER-MDL3084-000000533

If we identify a report made at any time in a person's history for certain serious criminal convictions (listed below), the potential driver will be disqualified according to our standards. These convictions are as follows, and include the "attempted" and "conspiracy" crimes associated with each: [48]

- Sexual assault (includes rape, sexual battery, indecent assault, indecent liberties, criminal sexual abuse, forcible sodomy, sexual exploitation, predatory criminal sexual assault, custodial sexual misconduct, sexual misconduct of a person with a disability)

- Sex crimes against children (includes carnal knowledge of a child, indecent solicitation of a child, using a computer to seduce/lure/entice a child for sexual purposes, possession/distribution/manufacture of child pornography, patronizing a minor engaged in prostitution, permitting sexual abuse of a child)

- Murder/homicide (includes assault with intent to kill, reckless homicide, and concealment of homicidal death)

- Manslaughter

- Terrorism (includes harboring or concealing terrorists, providing material support to terrorists, providing material support or resources to designated foreign terrorist organizations, receiving military-type training from a foreign terrorist organization)

- Kidnapping (includes abduction, child abduction, false imprisonment, human trafficking, unlawful restraint, unlawful/forcible detention)

## Yearly background reruns and ongoing screenings

Beyond the initial screening, Uber reruns criminal and motor vehicle checks each year. This is a standard practice at Uber, regardless of whether there is a statute or regulation requiring us to do so. This helps ensure that our screening standards are applied consistently and continuously across the country.

In addition to a rigorous background check conducted before a driver can start using the platform, we also use technology to continuously check records to strengthen our screening process. This technology continuously receives information from data sources to detect whether a driver is involved in a new criminal offense, and it notifies Uber when this is the case. If an offense involving an active driver is identified, our screening team reviews it to evaluate the driver's continued eligibility with Uber, and removes them from the platform if the driver is found to no longer meet Uber's screening criteria and the criteria set forth in local laws.

> Uber was the first US rideshare company to implement Continuous Checking Technology. Since launching, more than 80,000 drivers have been removed from the app due to continuous checks as of the publication of this report.



## Industry Sharing Safety Program

When we published our first US Safety Report, we committed to finding a way to share deactivation data with other rideshare companies. This was part of our ongoing work to build a survivor-centric process that prioritizes safety, privacy, and fairness in partnership with survivor advocates like RALIANCE, National Sexual Violence Resource Center (NSVRC), National Network to End Domestic Violence (NNEDV), and others. Based on their feedback—and what we heard directly from survivors—we knew that a program like this would not only improve safety across the industry but also support survivors by helping to give them peace of mind.

---

48. This section describes Uber's default standards. The criminal offense descriptions may vary based on jurisdiction. Certain localities or states may require rideshare companies to disqualify drivers for additional offenses or pursuant to different lookback periods. In those jurisdictions, individuals cannot drive on the Uber platform if they do not meet our default standards or if they have otherwise been convicted of any disqualifying offense under the applicable jurisdiction's law.

UBER-MDL3084-000000534

In March 2021, we made good on this promise with the launch of the Industry    Sharing Safety Program. This program helps prevent any offenders from operating on other platforms and potentially harming others.

This is a first-of-its-kind effort to exchange information about drivers and delivery people who have been deactivated for serious sexual assault or physical assault fatalities. Our goal is to further enhance the safety of the ridesharing and delivery industries and equip participating companies with important safety information they can use to help further protect their customers.

- Uber and Lyft are sharing information about driver deactivations related to physical assault fatalities and the 5 most critical safety issues in the RALIANCE Sexual Misconduct and Violence Taxonomy.
- The information sharing is administered by HireRight, a workforce solutions provider that collects and manages the data from individual companies, matches and shares information between the companies, and ensures that each company is abiding by best practices and industry standards informed by sexual violence prevention experts and the RALIANCE Sexual Misconduct and Violence Taxonomy.
- We have worked with HireRight to develop a survivor-centric, comprehensive process that incorporates learnings from anti-sexual-violence advocates over the past several years and prioritizes safety, privacy, and fairness.

We were pleased to launch this initiative in partnership with Lyft, and hope that other companies, including delivery network companies, will participate. We are encouraging others to join this program, adopt the Sexual    Misconduct and Violence Taxonomy, and work with experts such as those at RALIANCE Business to implement processes and policies that are data-driven, more transparent, survivor-centric, and trauma-informed.

## Rider verification

Uber is investing in rider verification tools to help increase peace of mind for drivers. We were the first platform in the US to implement a feature that requires an extra layer of verification for riders using anonymous forms of payment such as prepaid cards, gift cards, or Venmo. A rider who sets up a new account using one of these anonymous forms of payment—or who logs in to a new device using an existing account—will be required to upload an ID or driver's license from any state or a passport from any country for verification. The ID then undergoes a series of validity checks. These additional verification requirements can act as a deterrent to those who are trying to use the app to harm drivers.

# Uber's Community Guidelines

Our Community Guidelines are at the center of our commitment to safety and foundational to helping create a safe, respectful, and positive platform. We ask all riders, drivers, and couriers to commit to our Community Guidelines in the Uber app. These guidelines help us move Uber forward together. By using the Uber app and accepting our guidelines, users agree to the following principles:



**Treat everyone with respect**
Unwanted physical contact, sexual assault and sexual misconduct, threatening and rude behavior, and discrimination are not tolerated by Uber and have no place on our platform.

**Help keep one another safe**
Everyone has a role to play in helping to create a safe environment. That's why we have standards on account sharing and looking out for others on the road such as pedestrians, people on bicycles, and more.

**Follow the law**
Everyone using the Uber platform must follow the law—no matter what. This includes following all traffic laws and not engaging in any criminal activity while on our platform.

UBER-MDL3084-000000535

Section Three

# Safety product experience

Uber is dedicated to continually developing robust technology that puts safety at the heart of our service and platform. We also routinely educate riders and drivers about our safety features and how they can use them.

Below is a summary of our core safety features and those launched since our first Safety Report (marked as "new feature"). [49]



### Safety Toolkit

We launched the Safety Toolkit in 2018 as a single place in the app where drivers and riders could access safety features during a trip—including many of the features listed below. We're continuing to create and add new features to the toolkit.

It's important that our users are aware of the safety products available to them, so continuous education is provided in addition to updates to the features themselves.

## Pre-trip



### Real-Time ID Check

In-app prompts ask drivers to take a live photo of themselves before they can accept rides, which helps verify that the properly screened driver is behind the wheel.



### Verify My Ride (new feature)

In 2020, we launched an optional feature that sends riders who've opted in a unique 4-digit PIN before each trip. Once they get into the car, they provide this PIN to the driver verbally. The driver can only start the ride once the correct PIN has been entered in the Driver app. This added layer of verification can help ensure that a rider is in the correct car and that a driver is picking up the correct rider.



### Rider Seat Belt Alerts (new feature)

Buckling up may be one of the safest choices riders can make—in 2017, seat belts saved an estimated 14,955 lives in the US. [50] Yet according to the Insurance Institute for Highway Safety, 4 out of 5 adults surveyed say they don't always use a seat belt in a taxi or while using a rideshare platform. [51] In February, we began rolling out Rider Seat Belt Alerts to prompt riders to take this life-saving step. After a driver starts the trip, an audio seat belt tone will be emitted from the driver's phone and riders will receive a push notification reminding them to buckle up.



### Phone number and address anonymization

When riders and drivers contact each other through the app, their actual phone numbers are anonymized for the duration of the trip and are not valid after. Riders can contact drivers post-trip if they have lost an item, and this will be with a new anonymized number. Additionally, we've taken steps to anonymize exact pickup and dropoff addresses in the driver's trip history.

---

49. For an overview of previously announced safety features, please refer to the "Safety investments" section of our 2017-2018 Safety Report (pages 20-32).
50. "Seat Belts: Overview," National Highway Traffic Safety Administration (accessed May 3, 2022,) nhtsa.gov/risky-driving/seat-belts .
51. "Adults admit to not always using safety belts in the back seat, IIHS survey finds," Insurance Institute for Highway Safety (August 3, 2017), iihs.org/news/detail/ adults-admit-to-not-always-using-safety-belts-in-the-back-seat-iihs-survey-finds .

UBER-MDL3084-000000536

Section Three

# On-trip



## Share My Trip, Trusted Contacts, and Follow My Ride

Riders can use Share My Trip to provide trip details to their loved ones, giving visibility and peace of mind. Trusted Contacts also allows riders to automatically use Share My Trip with up to 5 friends and family members that they select. They can choose to use the feature on all trips or just select to do so on nighttime trips based on their preferences. Follow My Ride, which is available to drivers, lets them share their live location (during or between trips) with designated loved ones. [52]



## In-app Emergency Button and Text to 911

In 2018, we launched an in-app Emergency Button that connects riders and drivers to their local emergency number with the simple tap of a button. In more than 2,000 cities, trip details and location information are shared automatically with first responders. Also, drivers and riders can send a text to emergency dispatch in cities where text-to-911 is available.



## On-Trip Reporting (new feature)

In addition to providing 24/7 in-app support, we launched On-Trip Reporting to allow riders to discreetly report a non-emergency safety issue during a trip on the Uber platform. This feature enables Uber to capture valuable feedback from riders when it's top of mind instead of after the trip, when they may be distracted.



## RideCheck

When our system detects a possible issue with a trip, such as a suspected crash or unexpected long stop, both the rider and driver will receive a RideCheck notification asking if everything is OK. They can let us know through the app that all is well, or, if all is not well, they can use the Emergency Button or report the issue to Uber's Safety Incident Reporting Line. In late 2021, we expanded the capabilities of our RideCheck technology to detect when a trip takes an unexpected route or when a trip ends before the rider's final destination.



## Unsafe driving notifications (new feature)

When our data suggests a driver may be demonstrating unsafe behavior, like speeding or harsh braking, we send them driving safety education to help make them aware of the issue.

---

52. Follow My Ride does not share any rider information with the driver's designated contacts.

UBER-MDL3084-000000537

Section Three



### Bike Lane Alerts

Bike Lane Alerts remind riders to look for people on bikes before opening a door when their upcoming dropoff point is near a bike lane or along a bike route. To date, we have sent more than 100 million notifications. As cities expand their bike networks, we continue to update the feature to include new routes.



### Audio Recording (new feature)

After the success of our Audio Recording feature in Latin America, we began piloting it in selected cities in the US in 2021. Once riders and drivers enable this feature, they can choose to record audio by tapping the shield icon on the map screen and selecting **Record Audio**. Riders and drivers can choose to record individual trips, and drivers will also have the option to leave the feature on while they're online. Before the trip, we'll let the rider know in their app if a driver has opted in to the feature.



### Dashcam Registration (new feature)

Drivers are free to install dashcams in their vehicle and record their trips as long as they follow state and local laws. In 2021, we rolled out a Dashcam Registration feature nationally, which enables drivers to directly share video with Uber Support when reporting a safety incident through the app. Riders receive an alert that their trip will be recorded when matched with a driver who has registered their dashcam.



### Speed Limit Alerts

According to NHTSA, approximately one-third of all motor vehicle fatalities involve speeding.[53] To help reduce speeding, this feature can display the local speed limit in the Driver app and will alert drivers visually or audibly if they go over the limit.



### Driving-Hours Tool

In 2019, 697 people lost their lives due to drowsy driving–related crashes in the US.[54] To help prevent drowsy driving, the Driver app is unavailable for 6 hours after 12 hours of driving on the platform.[55]

Section Three

---

53. "Speeding: Overview," National Highway Traffic Safety Administration (accessed May 3, 2022), nhtsa.gov/risky-driving/speeding.
54. "Drowsy Driving: Overview," National Highway Traffic Safety Administration (accessed May 3, 2022), nhtsa.gov/risky-driving/drowsy-driving.
55. This may vary by local regulation. Some jurisdictions set other limits, which the app is adjusted to comply with.

UBER-MDL3084-000000538

## Support and response

At Uber, we're committed to supporting riders and drivers with empathy and care in times of need. This belief has led us to provide multiple reporting channels to make it as easy as possible to share feedback with Uber. We're also continuing to invest in training and development opportunities for the members of our Support team who handle sensitive reports.

## Reporting channels

With Uber, incident reporting is seamless and often much easier than it is at many other companies (including airlines, hotels, and taxi companies). For example, app-based reporting may encourage users to report more often since they can do so more quickly and discreetly than they can in person or by phone.

Currently, Uber receives and proactively gathers safety incident reports from more than 10 different channels, including the app, our critical safety line, social media, and law enforcement. We encourage feedback and reporting, even though this increases the total number of safety reports we receive and need to manage, because it shows us the reality of our users' experiences and helps us improve our safety processes and policies. We have also worked with safety groups and advocates to make our reporting channels and support processes more trauma-informed and easily accessible so survivors can report in the way that best meets their needs.

> If anything happens, 24/7 support is available in the app from a specialized team of Uber agents who are trained to handle sensitive reports.

# Incident Response Teams

Uber's goal is to quickly respond to every report of a safety incident, handle it with care, and gather robust information that helps enable future incident prevention. Our US Incident Response Teams (IRT) are at the front lines of responding to and supporting people who report safety incidents to Uber.

**What IRT does**

These teams are often a rider's or driver's first touchpoint for assistance after a traumatic event such as a serious crash or interpersonal  incident.

- Our teams assess the situation, take preliminary action (such as account suspension), and determine next steps for response. Specialized teams provide dedicated customer support to riders and drivers dealing with the most serious and urgent incidents, such as reports of sexual assault, that require an in-depth review and support for the victim.

- They gather any available data pertaining to an incident report (such as GPS information, timestamps, photos/videos submitted, in-app communications, etc.) and may speak to all involved parties, including reporting parties, potential  victims,  and accused parties.

- This important team is empowered to make immediate account-access decisions (such  as whether to deactivate a user's account) and to provide victims with support resources.

**Training and support**

Uber's IRT agents take their responsibilities seriously and share a common mission: to do the right thing for people reporting a safety incident.

IRT safety support agents receive 6 weeks of expert-informed training on how to review, document, and recommend appropriate action to help ensure safety on the platform. They also receive ongoing, tailored training on how to address difficult, often emotional conversations with precision, empathy, and care.

Section Three

UBER-MDL3084-000000539

The team receives regular refresher training on Incident Classification and use of the Sexual Misconduct and Violence Taxonomy, as well as training about the Uber Survivor Hotline and Fund, developed in partnership with RAINN. We've also invested in new trainings to support agents on phone investigation skills, investigative sufficiency, and identifying racism and discrimination in customer service.

As with all frontline and crisis-related roles, this is a hard job and Uber is committed to providing agents with ongoing support to help them cope with any possible stress, emotional concerns, and vicarious trauma.

# Approaching safety deactivations

A comprehensive, robust response to safety deactivations is a core part of our work to help reduce serious interpersonal-incident and crash rates. Uber's safety team handles a wide range of incidents, and there is no one-size-fits-all approach to managing them.

- **A single serious safety incident** can be grounds for a rider or driver deactivation. [56] Serious safety incidents, including the ones covered by this report, are quickly routed to our Safety Response team; from there, an agent will reach out to all parties for a thorough review of the report and to take action on an account if needed. This may include temporary or permanent deactivation from the app.

- **Less severe or infrequent behaviors** make up the majority of safety incidents reported to Uber. These may not warrant immediate removal from the platform. For example, deactivation may not be justified based solely on one rider's report of a driver's hard braking, or when a driver reports that a rider initiated a verbal argument. These reports do, however, warrant further examination of the user's past behavior and will be noted in the user's account history.

Uber's systems are constantly working to identify patterns of potentially risky behavior by evaluating a variety of factors including user feedback and local driving patterns. If a pattern is flagged, the system will trigger a review of the user's account by a specialized safety agent who examines the user's history and any previously reported issues to take appropriate action. This approach helps Uber remain accountable and fair to both drivers and riders. It accounts for the fact that a driver with thousands of trips may have received a proportionately small number of infrequent, minor complaints.

Importantly, no rider or driver is deactivated from Uber for a safety report without a human review. While data and technology are useful tools for strengthening platform safety, safety reports are personal—and people will always have a role to play.

# Sexual assault standards

Uber does not tolerate sexual assault or sexual misconduct. We take all allegations of sexual assault and sexual misconduct by our users extremely seriously and work to take appropriate action on every report quickly and fairly.

Our approach to reports of sexual assault relies on learnings from our partnerships with groups, experts, and organizations that advocate against gender-based violence. It is also grounded in the Sexual Misconduct and Violence Taxonomy, developed in partnership with RALIANCE, the National Sexual Violence Resource Center, and the Urban Institute.

This taxonomy addresses the need to consistently and accurately categorize experiences of sexual violence so we no longer have differing definitions and methodologies making statistics about sexual violence difficult to compare. In developing the taxonomy it was important to ensure that categories did not overlap—at the same time, we had to make sure that all categories captured exhaustive scenarios in order to reach consistency in the taxonomy's application. In addition, the taxonomy is behaviorally specific, [57] in line with best practices for measuring acts of sexual violence. Through the development of this free and open-source taxonomy, it is now possible for companies to consistently classify reports of sexual violence.

---

56. Deactivations or "bans" refer to the specific Uber account that was being used during the safety incident(s) that led to removal. For example, if a driver is flagged by Uber's system and subsequently deactivated for unsafe driving, they may still be allowed to ride with Uber using the rider app.
57. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," Raliance (2018), https://www.raliance.org/wp-content/up-loads/2018/11/helping-industries.pdf.

UBER-MDL3084-000000540

Section Three

The core tenets of our approach are to remove requirements of conclusivity, corroboration, and survivor "credibility" when determining whether to ban the accused party from Uber's app.

## Sexual assault standard principles

**We trust survivors**

The issue of "credibility"—and the harm caused by positioning certain populations of survivors as less worthy of trust or plausibility than others—is a subject that has been discussed at length in the gender-based-violence field. [58] When it comes to sexual assault, Uber applies the same standard for everyone (drivers and riders, new and long-time users) without regard to race, gender identity, socioeconomic status, sexual orientation, education level, or app rating or status.

**We do not require conclusivity**

Uber seeks to obtain the most complete and accurate understanding of a reported event. However, we realize it is not realistic to know exactly what happened between users at any given time. In Uber's review process for sexual assault reports, survivors are not required to "prove" their own assault. Instead, Uber's aim is to gather the most pertinent information from the survivor's statement of experience and relevant facts such as GPS data, timestamps, photos/videos, etc. (where possible) to arrive at a resolution that best protects the safety of the Uber community.

**We do not require corroboration**

We know that it may not always be possible to obtain corroborating information in connection with a report of sexual assault. Uber considers all relevant facts gathered about a report, including the survivor's account of events, and can take action against the accused party's account if the information gathered during an agent's review warrants such action. A lack of corroborating information is not an indication that an assault or incident did not occur.

## Response process

When our Incident Response Team (IRT) receives a report of sexual assault, a trained agent begins by identifying the accused party and their associated Uber account. [59]

- **Removing access:** We immediately remove the accused party's access to the Uber app so they cannot take trips while we complete a review. [60] In the event that, after the review, the accused party regains access, we make sure that the user accounts involved are not paired again in the future on the Uber platform. It is important to note that blocking the pairing is not necessarily the only action Uber will take on a report, and that further action will depend on what the agent's subsequent review finds.

- **Case review:** During the case-review process, agents work to obtain the necessary information to make a determination as to whether the accused party should be banned from the Uber app.
  - This may include speaking with the survivor, reporting party, accused party, and any relevant witnesses.
  - Where possible, we also consider any relevant facts that agents gather during the review process—such as GPS information, trip timestamps, and any additional information provided to us. This may include dashcam or audio recordings and screenshots of texts.

---

58. "Incredible women: sexual violence and the credibility discount," University of Pennsylvania Law Review (December 2017) scholarship.law.upenn.edu/cgi/viewcontent. cgi?article=9601&context=penn_law_review .

59. Similar protocols are followed for the following urgent categories of sexual misconduct: indecent photography/video without consent, masturbation/indecent exposure, and verbal threat of sexual assault.

60. If the accused party is a guest rider (that is, not the account holder), we attempt to identify whether they have their own Uber account, and, if they do, we restrict that account. If the guest rider cannot be identified, or if they do not have an Uber account, the account holder may be restricted from the Uber platform because our Community Guidelines state that account holders are responsible for their guest riders' actions while using Uber.

UBER-MDL3084-000000541

Section Three

- Although these relevant facts are useful in the ultimate resolution of a report, they are not necessary for an accused party to be removed from the platform. We respect and rely heavily on the survivor's statement of experience, as we know their voice is defining and important in this process.

- While we understand that trauma can prevent survivors from providing painful details, a statement of experience has a great impact on reaching the most fair and swift decision possible. In cases where a survivor is not able or willing to provide a statement of experience, we will consider all other relevant facts obtained during the review.

- **Decision:** Uber will ban users from the platform if we are able to obtain a statement of experience from the survivor and/or obtain relevant facts (such as GPS data, timestamps, videos/photos, in-app communications). We adhere to this standard for all sexual assault categories described in this report.

There are unfortunately instances in which Uber may not have enough information to remove an individual account from the app. Reports with sparse information may limit our ability to take further action. For example, if we receive a report with one single word (for example, "Rape" or "Touched") and we are unable to speak with or obtain further information from the victim, it becomes difficult to review the report effectively. These types of reports, although troubling, unfortunately do not provide adequate information, such as the identity of the accused party or other details that allow us to take further action.

Uber makes every attempt to avoid assumptions about a report unless we have additional clarifying statements or relevant facts. To that end, agents make numerous attempts to contact the reporting party, victim, and other witnesses to clarify the report, though sometimes these attempts are not successful. Again, if we are not able to obtain further information, this may limit our ability to remove an individual account from the app.

### Addressing sexual misconduct

Sexual misconduct may be far more prevalent in society than sexual assault, with one survey finding that more than 3 in 4 women (77%) and 1 in 3 men (34%) have experienced verbal sexual misconduct. [61] As outlined in the Sexual Misconduct and Violence Taxonomy, some sexual misconduct incident reports can include staring or leering, asking personal questions, making inappropriate comments/gestures, or unwanted flirting. [62]

While these interactions are troubling and not acceptable, they have very different impacts than sexual assault, where attempted or unwanted physical contact has occurred.

Uber's approach to reported sexual misconduct incidents was developed in consultation with national advocacy experts and evidence-based best practices in the field of sexual-violence prevention and response. Our response to these types of incidents focuses on education regarding appropriate boundaries (see "Uber's Community Guidelines" and "Sexual misconduct education"). We also leverage our technology to detect and respond to potentially risky patterns of behavior (see "Approaching  safety deactivations").

When we receive a report of potential sexual misconduct, each incident is routed to the appropriate team of specialized agents, classified, and acted on according to factors including the level of severity and user history. If a pattern of behavior is found, this can trigger further review and result in the accused party's loss of access to the Uber platform.

61. "Measuring #MeToo: A National Study on Sexual Harassment and Assault," UC San Diego Center on Gender Equity and Health Stop Street Harassment (2019).
62. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," Raliance (2018), https://www.raliance.org/wp-content/up - loads/2018/11/helping-industries.pdf .

UBER-MDL3084-000000542

Section Three

**Connecting survivors to advocates: Uber Survivor Resources Hotline and Fund**

Developed in partnership with RAINN, this dedicated hotline offers immediate, confidential, and trauma-informed support for survivors reporting critical sexual assault incidents related to the Uber app in the United States. The hotline is staffed by RAINN support specialists who are experienced in working with survivors of sexual violence and can help survivors better understand their options related to short- and long-term support. RAINN specialists will also help facilitate assistance through a fund created by Uber to provide survivors with financial support for resources such as trauma-informed counseling.

**Working with law enforcement**

Uber is committed to working closely with law enforcement officials to promote safety within our communities. We have a dedicated global Public Safety Liaison team made up of former law enforcement professionals who work to proactively partner with law enforcement and educate them about how Uber can assist during an emergency or investigation.

Uber also has a law enforcement portal, where public safety officials can quickly and securely submit legal process documents to request trip data and other information that may be critical in investigating potential criminal cases.

Uber's 24/7 Public Safety Response team handles these data requests and works with investigators to help them get the infor - mation they need through valid legal processes. This team works diligently 24/7 to handle emergencies and respond to requests after receiving subpoenas, court orders, or search warrants.

---

# Partnering with experts and advocates

We are committed to continuing to partner closely with experts so we can learn from them and base our approach to safety on their advice, expertise, and proven strategies. We continue to work with third parties to develop prevention policies and proactive campaigns to address unsafe behavior, engage our users, and ultimately do our part to drive systemic change on safety issues.

**Safety Advisory Board**

Uber's Safety Advisory Board was created in 2015 to bring new approaches, feedback, and expertise to our safety processes and technology. The board is chaired by **former US Secretary of Homeland Security Jeh C. Johnson** and includes leaders in gender-based violence and domestic-violence prevention, road safety, public health, and law enforcement.

In addition to Secretary Johnson, current Board Members include:

- **Dr. T. Bella Dinh-Zarr**, former Vice Chairman and Acting Chairman of the National Transportation Safety Board (NTSB); Senior Advisor at TIRF and FIA Foundation
- **Dr. Indira Henard**, Executive Director, DC Rape Crisis Center
- **Roberta Jacobson**, Senior Advisor at ASG; former US Ambassador to Mexico and Special Assistant to President Biden for the Southwest border on the National Security Council
- **Dr. Claire Jarashow**, Principal Epidemiologist, The Public Health Company
- **Erica Olsen**, Director of the Safety Net Project, National Network to End Domestic Violence
- **Dr. Harris Pastides**, Interim President of University of South Carolina; former Dean of the Arnold School of Public Health;. Trustee, American Medical Association
- **John Pistole**, President of Anderson University; former administrator of the US Transportation Security Administration and Deputy Director of the Federal Bureau of Investigation

Section Three

UBER-MDL3084-000000543

## Uber's role in reducing drunk driving

Every day, 28 people lose their lives to drunk drivers in the US. And nearly one-third of all traffic fatalities involve alcohol. At Uber, we're committed to doing our part to end drunk driving.

Two independent studies confirmed that Uber plays a big role in reducing drunk driving. A study out of the University of Texas and published in the Journal of the American Medical Association showed that after Uber came to Houston, motor vehicle traumas decreased by 23.8% on Friday and Saturday nights for all ages and by 38.9% for individuals under the age of 30. DUI arrests also declined. And a national study out of UC Berkeley showed that Uber reduced alcohol-related traffic fatalities by 6.1%, equating to 214 lives saved in 2019 alone.

> "These studies confirm what MADD has believed for years—that ridesharing offers a convenient transportation option that helps reduce the risk of drunk-driving crashes, especially among younger drivers. The more options that are available, the easier it is to make sure that if you drink, you don't drive."
>
> Alex Otte, MADD National President

We're committed to working with road safety advocates, city leaders, and law enforcement to end drunk driving. We know that if people have more options for getting around, they're empowered to make better decisions. In 2021, we launched a first-of-its kind coalition with MADD and Anheuser-Busch to end drunk driving. Together we reached tens of millions of people with our "Decide to Ride" marketing campaign and provided rideshare discounts on Friday and Saturday nights. In addition, we partnered with the GHSA to support local anti-DUI efforts in states across the country.

## "Return to the Road" safety education

In 2020, we convened a coalition of road safety advocates to help address the growing crisis of increased traffic fatalities during COVID-19. With fewer cars on the road, auto crashes in the US were less frequent—but they were more severe due to an increase in risky behaviors like excessive speeding and impaired driving. We partnered with the GHSA, National Safety Council, MADD, and the League of American Bicyclists to create a road safety coalition and road safety tips to help address top safety concerns as traffic crashes increased throughout the second half of the pandemic.

## Driving safety education

We partnered with the GHSA to develop a series of driving safety videos designed specifically for rideshare drivers. The content includes 6 modules covering the most important driving safety topics, including speeding, distracted driving, impaired driving, safe pickups and dropoffs, occupant protection, and sharing the road with other users.

## Bicycle-friendly driver education

Bicycling is booming in cities around the country, [63] and we want to do our part to make it safer for the growing number of people taking to 2 wheels. We partnered with the League of American Bicyclists to develop bicycle -friendly driver education for drivers on the platform. The education, which focuses on how to safely share the road with people biking, includes instructions on how to make safe pickups and dropoffs, how to pass bicyclists safely, and how to avoid the most common types of crashes.

> "Uber and the League of American Bicyclists have a shared goal of increasing the safety of all road users. We hope the rollout of Bicycle-Friendly Driver education lays the foundation for continued efforts together to build a bicycle-friendly America for everyone."
>
> Bill Nesper, Executive Director, League of American Bicyclists

## RAINN sexual misconduct education

In partnership with RAINN, we developed and introduced comprehensive sexual misconduct education for drivers in the US, led by actual drivers. The education is made up of 6 video modules covering a wide range of topics including respecting privacy and personal space, conversational boundaries, sexual assault awareness, and bystander intervention. These videos offer resources and strategies for promoting safety on the Uber app. We also continue to send educational videos that were developed by RAINN to riders and drivers when they receive a report of inappropriate behavior.

---

63. "More People Are Cycling During COVID-19. That Matters." Outside Magazine (May 13, 2021), outsideonline.com/outdoor-gear/bikes-and-biking/ more-people-cycling-coronavirus-pandemic.

UBER-MDL3084-000000544

## Driving Change initiative

In 2017, Uber launched our Driving Change initiative, committing $5 million in grant funding over 5 years to support organizations working to prevent, address, and respond to gender-based violence in the US. Not only have we recommitted these funds every year since, but we've also expanded Driving Change to every continent where Uber operates.

In 2021, we maintained longstanding partnerships with national organizations against gender-based violence, and we announced support for new Driving Change partners who provide survivor-led or culturally specific resources to communities in the US.

"I'm incredibly grateful to Uber for their steadfast commitment in protecting survivors' agency and prioritizing our dignity. Their support will go directly toward our work in uplifting millions of survivors around the country."

Amanda Nguyen, CEO and Founder, Rise

Survivors of color and those who are immigrants face additional barriers in seeking help through mainstream channels. Uber believes it's critically important to support organizations that are responsive to survivors' intersecting identities. We also firmly believe that survivors should be at the forefront of guiding change in this area.

"Through Tahirih's partnership with Uber, we continue our work to improve the laws, practices, and attitudes that can help immigrant survivors vulnerable to abuse. With Uber's support, we provide each survivor with the resources they need to secure personal protection and support their agency in their healing journey. By working at both the systemic and individual levels, we seek to have a truly transformative impact on our justice system."

Archi Pyati, CEO, Tahirih Justice Center

### College campus safety

Over the years, Uber has partnered with leading college campus organizations to raise awareness of rideshare safety features with college students. This past spring break, Uber partnered with It's On Us and The International Association of Campus Law Enforcement Administrators (IACLEA) to share important rideshare safety tips with riders getting picked up or dropped off near a college campus. Students across the US received emails and in-app messaging that shared safety tips and reminded them of important in-app safety features such as Verify My Ride, Share My Trip, and Uber's Emergency Button.

## Free rides to domestic violence shelters

COVID-19 has had devastating impacts on individuals and communities. Researchers and service providers have maintained that stay-at-home orders and the economic impact of the pandemic heightened risk factors and incidents of domestic violence. [64] With rates of domestic violence rising worldwide amidst the pandemic, [65] we wanted to do our part to help survivors access life-saving services and find a safe place to shelter. Uber partnered with domestic violence organizations and local governments globally to donate 50,000 free rides to shelters and other safe spaces and more than 45,000 free meals.

## Human trafficking education

Nearly 25 million people around the world are estimated to be trapped in some form of forced labor. [66] The economic instability and social disruption resulting from COVID-19 has caused many people to become more vulnerable to human trafficking. In partnership with leading anti-human-trafficking advocacy organizations, we continue to run annual anti-human-trafficking campaigns to mark World Day Against Trafficking in Persons and Human Trafficking Prevention Month in the US. Our most recent campaign in January 2022 included virtual expert-developed resources including videos and tips on identifying human trafficking.

---

64. "Domestic violence during the COVID-19 pandemic - Evidence from a systematic review and meta-analysis," Journal of Criminal Justice (May-June 2021), sciencedirect.com/science/article/pii/S0047235221000026X#bb0090.

65. "The Shadow Pandemic: Violence against women during COVID-19," UN Women (accessed May 3, 2022), unwomen.org/en/news/in-focus/in-focus-gender-equality-in-covid-19-response/violence-against-women-during-covid-19.

66. "Forced labour, modern slavery, and human trafficking," International Labour Organization (accessed May 3, 2022), ilo.org/global/topics/forced-labour/lang--en/index.htm.

UBER-MDL3084-000000545

Section Three

# What's next for safety at Uber?

We're committed to creating safer communities for all our users. Over the next 2 years, we'll continue to take action to strengthen safety in the following ways:

## Safety reporting

With the publication of this report, we are continuing with our commitment to transparency by reporting on the most serious safety incidents that occur on our platform—and we encourage other companies to follow suit. As we said when we released our last report, secrecy doesn't make anyone safer.

## Supporting driver safety

We remain as committed as ever to the safety of the drivers who use our platform. Since our last report, we've used our technology and scale to support drivers with new features such as rider verification, audio recording, and dashcam registration. Looking forward, we'll continue to expand our efforts by listening to and incorporating driver feedback as we design new features and initiatives centered around their safety.

## Preventing drunk driving

Independent research shows Uber's direct role in reducing drunk driving. In the last year, we partnered on national and local campaigns to reduce impaired driving. In the coming year, we're doubling our efforts on drunk-driving prevention by dedicating an additional $1 million to the cause.

## Supporting Vision Zero efforts

Cities around the world have signed on to Vision Zero, a commitment to eliminating all traffic fatalities by taking a comprehensive Safe System approach that focuses on safe roads, safe speeds, safe vehicles, safe road users, and post-crash care. We believe that private companies are critical partners in achieving Vision Zero, and we are committed to partnering with city leaders and advocates in helping them reach their Vision Zero goals. In the coming year, in partnership with Vision Zero Network, we will redouble our efforts to support Vision Zero efforts in cities across the country.

## Continuing the fight against gender-based violence

Uber's partnerships with advocates and experts to improve women's safety and address societal issues of gender-based violence will continue in 2022 and beyond, with a renewed focus on equity, survivor-informed initiatives, and supporting women who use the Uber platform as drivers and/or couriers.

## Keeping students safe

We're deepening our efforts to make college campuses safer by working with safety experts and campus law enforcement to increase awareness on how to use Uber as a tool for safety and how to use the safety technology features in the Uber app.

## Expanding support to survivors and victims

- Based on feedback from survivors, we're expanding our existing survivor support fund (launched in 2020 in partnership with RAINN) to increase flexibility for survivors to use this fund to cover transportation, therapy, and a wide range of other accommodations.
- We'll partner with Families for Safe Streets, a national nonprofit run by volunteers who have lost loved ones in traffic crashes. Through this partnership, we'll help provide fiscal support for Families for Safe Streets advocacy; our customer support agents will receive training by Families for Safe Streets; and we'll help the families of crash victims access support and resources by connecting them with Families for Safe Streets.

Section Three

**UBER-MDL3084-000000546**

# Uber's scale in the United States

In 2019-2020, nearly 3 million trips occurred on the Uber platform per day. That's more than 32 rides every second.

At this scale, Uber ultimately reflects the world in which we operate. As we explained in our last report, this means that our platform is not immune to deeply ingrained societal issues and national trends such as sexual assault, fatal physical assault, and fatal motor vehicle crashes. The numbers included in this report continue to show that critical safety incidents on our platform are, statistically, extremely rare. But even just one critical safety incident is one too many, as it reflects the experience of an individual using Uber.

In this report, we examine data from 2019 through 2020, a time in which the world experienced devastating impacts from the COVID-19 pandemic. Compared with 2019, the number of trips taken with Uber decreased by as much as 80% in April 2020, when cities went into lockdown and many people stayed home to prevent the spread of COVID-19. [67]

These figures provide an important backdrop to understanding the incident rates included in the "Data insights" section of this Safety Report.

## US trips[68]

| 2019 | 2020 |
|---|---|
| 1.4 billion | 650 million |

| 2019-2020 total | 2019-2020 average US trips per day |
|---|---|
| 2.1 billion | 2.8+ million |

## US miles[69]

| 2019 | 2020 |
|---|---|
| 10.9 billion | 5.4 billion |

| 2019-2020 total |
|---|
| 16.3 billion |

## Uber customer support requests

**The overwhelming majority (99.9%) of trips on the Uber app end without any safety-related issue at all.**
For example, for trips in 2019 and 2020:

- **1%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback

- **0.1%** of trips had a support request for a safety-related concern, the majority of which included more minor safety issues, such as complaints about driving or a verbal argument

- **0.0002%** of trips had a reported critical safety incident, which are the incidents referenced in this report [70]

---

67. "Uber Q1 2020 Earnings Conference Call," Uber webcast, 5:50, (May 7, 2020), investor.uber.com/news-events/events-and-presentations/event-details/2020/Uber-Q1-2020-Earnings-Conference-Call/default.aspx.
68. US trips are defined as any completed trip facilitated by the Uber rideshare app within the US (excluding US territories).
69. Miles driven is derived from the GPS data from Uber's rideshare app used by drivers and includes miles driven while the driver was en route to the rider's pickup location, as well as the miles driven during rider trips. We have used Uber's best estimate in calculating the mileage.
70. This percentage includes the 5 categories of sexual assault published in this report, fatal motor vehicle crashes, and fatal physical assaults reported to occur in 2019 and 2020 in relation to the Uber platform.

UBER-MDL3084-000000547

# Methodology

By publicly sharing safety incident data, we can help improve safety across our industry and beyond through increased transparency and accountability. In order to be impactful, however, we understand that these efforts must be grounded in quality data and methodological rigor. Our approach to safety data in this report is consistent with our first Safety Report (2019), and prioritizes data accuracy, reliability, and consistency. We also continue to work with RALIANCE, a sexual violence prevention expert, and Governors Highway Safety Association (GHSA), a road safety advocate organization, to maintain high levels of data integrity and classification. (See "Appendix I: "RALIANCE: External validation of Sexual Misconduct and Violence Taxonomy for Uber" and Appendix II: "GHSA: Independent validation of Uber's methodology for analyzing fatal crashes.")

In this methodology section, we detail the categories included in this report, how Uber collects safety incident data, how data is classified and reconciled, our data quality and auditing processes, and, lastly, some of the limitations of Uber's safety incident  data.

This report includes data on critical safety incidents that were reported to occur in connection with the Uber rideshare platform [71] in the United States [72] from **January 1, 2019** , through **December  31, 2020** . Every safety incident included in this report is directly linked to a rideshare trip facilitated by the Uber app and categorized based on Uber's Safety Taxonomy (see "Overview of Uber's Safety Taxonomy  "). It's important to note that our data includes reports even if there is no allegation against a rider or driver connected with the Uber-facilitated trip (for example, motor vehicle fatalities caused by a third-party  driver).

The categories included represent the most serious safety incidents reported by riders, drivers, and third parties:

- Motor vehicle crash fatalities
- Physical assault fatalities
- Sexual assault, broken down into 5 subcategories:
    - Non-consensual kissing of a non-sexual body part
    - Attempted  non-consensual sexual penetration
    - Non-consensual touching of a sexual body part
    - Non-consensual kissing of a sexual body part
    - Non-consensual sexual penetration

**Recap: Why these categories?**
The categories included in this report are consistent with Uber's 2019 report and cover the most serious safety incidents that occur on our platform; they're also the categories with the highest measurable quality of data. Our stance on the importance of data quality remains unchanged—it's imperative for us and others in the industry to maintain a high quality of data so we all can be accountable  for improvement.

We continue to prioritize the following when reporting safety  data publicly:
- Classification  accuracy
- Reliability
- Consistency in standards to ensure a measurable and repeatable  process

(See "Uber's safety incident data auditing process  .")

71. For the purposes of this report, the Uber rideshare platform involves peer-to-peer ride services including, but not limited to, Uber Black, Uber Black SUV,  Uber Pool, UberX, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (such as New York City).
72. Excludes US territories.

# Safety incident data collection and support process

Technology has made it easier than ever to provide feedback and report when things go wrong. Uber is constantly looking to improve our incident reporting and support process to help users submit incident reports quickly and easily in a manner that suits their needs. We also continue to proactively reach out to users to gather safety information and incident reports through safety features such as RideCheck.

We receive and gather safety incident reports from multiple channels, including:

**User-driven methods**
Post-trip in-app support
On-trip in-app reporting
Uber's website
24/7 Safety Incident Reporting Line
Uber Greenlight Hubs

**Proactive incident report gathering**
Social media mentions (Twitter, Facebook, etc.)
News media mentions

**Uber outreach to users** (see "Safety investments")
RideCheck
In-app Emergency Button

**Incoming third-party communications**
Law enforcement (see " Working with law enforcement")
Regulator outreach
Insurance claims
Other third parties

Given the multitude of sources Uber uses to aggregate data, it's likely that our data set is more comprehensive than other sources of data, both in transportation and more broadly. It is therefore difficult to draw comparisons between Uber's data set and data sets with more limited reporting channels.

# Safety support processes

At Uber, we rely on feedback from users to inform and improve the Uber app and rideshare experience. Our processes are set up to encourage feedback from our users across almost every interaction. In fact, the vast majority of feedback we receive is unrelated to safety issues.

We have a robust process to isolate and respond to user feedback related to safety. This includes:

- Sorting the data using key words and phrases, in addition to our advanced natural language processing technology, to identify reports that may indicate safety concerns

- Ensuring that all potential safety-related reports are manually reviewed by teams of safety support agents for proper resolution

- Escalating the most serious reports to a specialized support team, which speaks to incident parties and gathers necessary data to determine appropriate account actions

- Classifying incidents within Uber's Safety Taxonomy [73]

---

73. The incidents' data classification may be updated, if appropriate, as additional facts are developed in the course of the case review and then again by a specialized team of data auditors (see "Uber's safety incident data auditing process").

UBER-MDL3084-000000549

# Overview of Uber's Safety Taxonomy

Our Safety Taxonomy continues to act as the basis for measuring and reporting the data needed to understand and improve safety on our platform. Uber classifies all incident reports according to the description given by the reporting party, and our agents take action according to this initial classification. This approach to classifying reports according to the description of the reporting party is supported by experts [74] and ensures that reports are categorized with as little subjective assessment as possible.

> Uber's Safety Taxonomy is a set of categories used to classify and prioritize incoming safety incidents, apply action on individual reports, and inform Uber's efforts to prevent future incidents.

The Safety Taxonomy uses a hierarchical approach, which means that although multiple incidents or injuries can occur simultaneously during a single event, each report is assigned to only the most serious category. A hierarchical approach helps safety support agents provide appropriate and immediate response to each case, and it ensures that the most serious experiences are preserved and fully represented in the data set. [75]

# Motor vehicle fatalities methodology

As with our first Safety Report, we have chosen to align our standards with the Fatality Analysis Reporting System (FARS), the national standard for motor vehicle fatality data. Operated by the National Highway Traffic Safety Administration (NHTSA), FARS dates to 1975 and is a nationwide annual census of fatal crashes within the 50 states, the District of Columbia, and Puerto Rico. [76]

## Reconciling to the Fatality Analysis Reporting System (FARS)

For methodological purposes, Uber aligned to FARS data standards as closely as possible. Under US Department of Transportation (USDOT) reporting standards, to be included in the FARS data set, "a crash must involve a motor vehicle traveling on a trafficway customarily open to the public and must result in the death of at least one person (occupant of a vehicle or a non-motorist) within 30 days of the crash." [77]

Consistent with recommendations from road safety advocates, we use the word "crash" or "collision" versus "accident." FARS's definition of "crash" is aligned with the definition for "motor vehicle traffic crash" as defined in the American National Standard Institute (ANSI) D16.1 – The Manual on Classification of Motor Vehicle Traffic Crashes (2017). [78] As such, in order for an incident to be considered a motor vehicle traffic crash for inclusion in FARS, the answer to each of the following must be "Yes": [79]

1. Did the incident include one or more occurrences of injury or damage?

2. Was there at least one occurrence of injury or damage which was not a direct result of a cataclysm? [80]

3. Did the incident involve one or more motor vehicles?

---

74. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," the National Sexual Violence Resource Center and the Urban Institute, page 49 (2018), nsvrc.org/sites/default/files/publications/2018-11/NSVRC_HelpingIndustries.pdf .

75. As stated in our first Safety Report, Uber's Safety Taxonomy is intended to be exhaustive and comprehensive, but it is not static. For that reason, the taxonomy is open to revision, though any revisions are intended to be narrow so that the taxonomy does not become overly granular or prevent comparisons from being made over time. In some jurisdictions, Uber is required by law to submit periodic reports to certain regulatory bodies with data about safety incidents that occur on the Uber platform. The taxonomy used for those reports and the type of incidents reported may differ from those found in this Safety Report.

76. "Fatality Analysis Reporting System," NHTSA (April 2014), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811992.

77. "Fatality Analysis Reporting System," NHTSA (April 2014), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811992.

78. "2020 FARS/CRSS Coding and Validation Manual," NHTSA, page 10 (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813251.

79. "Manual on Classification of Motor Vehicle Traffic Crashes," Association of Transportation Safety Information Professionals (ATSIP), page 68 (December 18, 2017), transportation.gov/sites/dot.gov/files/docs/resources/government/traffic-records/304331/ansid16-2017.pdf .

80. A cataclysm is defined as "an avalanche, landslide/mudslide, hurricane, cyclone, downburst, flood, torrential rain, cloudburst, lightning, tornado, tidal wave, earthquake, or volcanic eruption." Manual on Classification of Motor Vehicle Traffic Crashes," ATSIP, page 21 (December 18, 2017), transportation.gov/sites/dot.gov/files/docs/resources/government/traffic-records/304331/ansid16-2017.pdf .

UBER-MDL3084-000000550

Section Four

4. Of the motor vehicles involved, was at least one in-transport?  [81]

5. Was the incident an unstabilized situation?  [82]

6. Did the unstabilized situation originate on a trafficway or did injury or damage occur on a trafficway?  [83]

7. If the incident involved a railway train in-transport, did a motor vehicle in-transport become involved prior to any injury or damage involving the train?

8. Is it true that neither an aircraft in-transport nor a watercraft in-transport was involved in the incident?

Unlike FARS, which collects information on fatal crashes from police, medical, and other source documents maintained by states, Uber classifies motor vehicle crashes according to the information provided to us by the reporting party (such as rider, driver, or third party), or according to additional information retrieved via insurance claims or police reports. For the purposes of data classification, Uber does not act as law enforcement in determining fault or the causal or contributing factors involved in the crash.  [84]

By using identifying crash characteristics that Uber has access to (such as a driver's vehicle identification number [VIN], vehicle make and model, location, date, and time), we were able to query the FARS data set to find and reconcile fatal crashes in the Uber data set to specific fatal crashes in the FARS database. As a result, 91 fatal crashes deemed to be Uber-related for the purposes of this report were able to be individually reconciled with FARS. Uber was then able to gather additional contextual data points from FARS on Uber-related crashes, such as occupant seat belt usage, vehicle speed, land use, etc.

There were 11 Uber-related fatal crashes that either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS. The reasons for this may include, but are not limited to:

- Fatalities occurred more than 30 days after the crash

- Health-related fatalities that occurred immediately prior to a crash (death was deemed by official documentation to not be the result of a motor vehicle crash)

- Fatalities that were reported to Uber, but FARS data does not record the vehicle operated by a driver using the Uber app as a party to the crash  [85]

- Other fatalities that were reported to Uber to be the result of a motor vehicle crash but that were not deemed by official documentation to be a result of a motor vehicle crash

Because these fatal crashes are not in the FARS data set, the contextual data points (such as occupant seat belt usage, vehicle speed, etc.) obtained from FARS are not available for these 11 fatal crashes. Including these crashes would reduce comparability to FARS and misalign with the national data standard.

## Defining a motor vehicle fatality's relation to the Uber platform[86]

In order for a fatal motor vehicle crash to be "Uber-related" for the purposes of this Safety Report, the crash must have involved the vehicle of at least one driver using the Uber platform and involved the death of at least one person (occupant of a vehicle or a non-motorist, regardless of whether they were an Uber user or third party) within 30 days of the crash. Fatal crashes are included in this report regardless of whether the deceased party was an Uber user and regardless of fault.

81. In-transport is defined as a term that "denotes the state or condition of a transport vehicle which is in motion or within the portion of a transport way ordinarily used by similar transport vehicles. When applied to motor vehicles, 'in-transport' means on a roadway or in motion within or outside the trafficway." "Manual on Classification of Motor Vehicle Traffic Crashes," ATSIP, page 15 (December 18, 2017), transportation.gov/sites/dot.gov/files/docs/resources/government/traffic-records/304331/ansid16-2017.pdf.

82. An unstabilized situation is defined as "a set of events not under human control. It originates when control is lost and terminates when control is regained or, in the absence of persons who are able to regain control, when all persons and property are at rest." "Manual on Classification of Motor Vehicle Traffic Crashes," ATSIP, page 20 (December 18, 2017), transportation.gov/sites/dot.gov/files/docs/resources/government/traffic-records/304331/ansid16-2017.pdf.

83. A trafficway is defined as "any land way open to the public as a matter of right or custom for moving persons or property from one place to another." "Manual on Classification of Motor Vehicle Traffic Crashes," ATSIP, page 3 (December 18, 2017), transportation.gov/sites/dot.gov/files/docs/resources/government/traffic-records/304331/ansid16-2017.pdf.

84. Data included in this report is being provided for informational purposes and reflects incidents reported to Uber in numerous ways, consisting of reported incidents that allegedly occurred in connection with (as defined here) an Uber-facilitated trip. Given the limitations described herein, the report does not assess or take any position on whether any of the reported incidents actually occurred, in whole or in part, and reporting incidents as "Uber-related" is not an admission of fault.

85. Time and location of crash reconciled to FARS data, but driver/driver's vehicle could not be identified in FARS data set as a party to the crash (when driver is reported as vehicle occupant). An example would be a multi-car pile-up where FARS only recorded certain vehicles as party to the fatal incident.

86. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and it applies for the purposes of this Safety Report only.

UBER-MDL3084-000000551

Additionally, the fatal crash must have occurred at any time between when the driver accepted the trip request in the app and when the trip was completed (see Appendix IV: "Determining which reported safety incidents are Uber-related ").

## Calculating vehicle miles traveled (VMT)

Calculating miles traveled is a common method of calculating for frequency of traffic fatalities. This is the same measure that NHTSA uses for "determining exposure in calculating fatality rates." [87] Therefore, in this report, Uber uses VMT when representing motor vehicle fatality rates. Uber calculates the miles underlying motor vehicle fatality crashes by using GPS data from Uber's rideshare app used by drivers. The miles included in the calculation encompass miles driven while the driver was on the way to the rider's pickup location and the miles driven during rider trips.

## Data quality measures for motor vehicle fatalities

To help ensure data completeness, Uber underwent a reconciliation process where all fatalities reported via Uber safety support channels were cross-referenced with other internal data sources, including insurance claims data and law enforcement reports. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases and escalating details that had not otherwise been reported to Uber through other channels. [88] For example, fatalities that occur weeks or more after a vehicle crash are often discovered through the insurance-claims process, rather than through Uber safety support.

In addition to our own rigorous reconciliation process, this year Uber partnered with the Governors Highway Safety Association (GHSA), a leading national road safety advocate, to conduct a thorough audit of our motor vehicle fatality data. GHSA reviewed Uber's methodology, including a ticket-level analysis of all Uber-related fatalities, to ensure our alignment with FARS was accurate. (See Appendix II: "GHSA: Independent validation of Uber's methodology for analyzing fatal crashes ").

# Fatal physical assault methodology

## Physical assault categories

As with our first Safety Report, we have included physical assault incidents that resulted in one or more fatalities. Physical assault incidents that may have resulted in serious, minor, or no injuries were excluded.

This approach supports our intention to include the most serious reported physical assault incidents while also maintaining a high degree of confidence and consistency in the quality of the overall data set. Any physical assault resulting in fatality can be consistently categorized, whereas assaults not resulting in fatalities (e.g. with serious, minor, or no injuries) are less objective, making them more difficult to achieve a classification standard that is both accurate and capable of consistent application.

To ensure consistency and data quality, we conducted a reconciliation process where all fatalities reported through Uber safety support channels were cross-referenced with insurance claims data. The additional reconciliation process is consistent with our approach in the first Safety Report. The process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases and escalating details on cases that would not otherwise have been present in the safety support data set. For example, fatalities that occur weeks after the physical assault incident are often discovered through the insurance-claims process, rather than through Uber safety support.

The final data set included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

---

87. "Glossary of Highway Safety Terms and Definitions," National Highway Traffic Safety Administration (accessed May 3, 2022), nhtsa.gov/resources-guide/glossary-high-way-safety-terms-and-definitions#s-z-29531.
88. Safety support agents take action on user accounts using consistent policies, regardless of reporting method.

UBER-MDL3084-000000552

Section Four

Defining a fatal physical assault's relation to the Uber platform[89]

One or more of the following criteria must be true in order for a reported fatal physical assault incident to be defined as Uber-related for purposes of this report:

- The incident involved at least one person on an Uber-facilitated trip,[90] not necessarily with parties paired by the Uber app

- The incident occurred between parties that were paired by the Uber app, and the incident occurred within 48 hours[91] of trip completion (regardless of whether the parties were still on the app at the time)

For more information and examples of Uber-related and non Uber–related incidents, please view Appendix IV: "Determining which reported safety incidents are Uber-related."

There are limited circumstances in which a reported fatality may, on its surface, meet one or both of the preceding qualifying requirements but then, due to additional information from the reporting party, contradict the classification as Uber-related. For example, the reporting party may later disaffirm or refute the accuracy of the original report by stating that the incident was reported to the wrong rideshare company by mistake. Uber also occasionally receives reports where the reporting party's intent is clearly not to report a safety incident (e.g., practical jokes claiming to "test" Uber's response). These incidents were also excluded from the data set for this report.

# Sexual assault methodology

## Sexual Misconduct and Violence Taxonomy[92]

Uber partnered with the National Sexual Violence Resource Center, the Urban Institute, and RALIANCE in 2018 to create the Sexual Misconduct and Violence Taxonomy, a system companies and organizations can use to more clearly classify unwanted sexual experiences and better understand this type of data. This taxonomy, which didn't exist before, also provides a framework that can be used to categorize incidents of sexual assault and misconduct in a consistent manner across companies and industries. The taxonomy includes 2 overarching categories—sexual assault and sexual misconduct—which are further divided into a total of 21 secondary categories (some with tertiary categories) that correspond to behaviorally specific definitions (see Appendix III: "Sexual Misconduct and Violence Taxonomy".)

We've applied this taxonomy to incidents dating back to January 2017 and it's available as a free resource that other companies and organizations can use for the benefit of improving safety for their own customers.

## Sexual assault categories

The categories included in this Safety Report prioritize:

- Reporting the most serious categories of sexual assault outlined in the taxonomy

- Maintaining a high degree of confidence and consistency in the quality of the overall data set

- Aligning as far as possible with types of sexual assault that are already published in external research and national estimates[93]

---

89. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

90. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident whi e en route to the rider's pickup location, this would be included in the data set.

91. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

92. For more information on the development and details of the Sexual Misconduct and Violence Taxonomy, please see "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," Raliance (2018), raliance.org/wp-content/uploads/2018/11/helping-industries.pdf.

93. The categories of incidents we are reporting align with the forms of sexual assault already collected and reported by the National Intimate Partner and Sexual Violence Survey (NISVS) administered through the Centers for Disease Control (CDC). NISVS is an ongoing survey that collects the most current and comprehensive national- and state-level data on intimate partner violence, sexual violence, and stalking victimization in the US.

UBER-MDL3084-000000553

Section Four

As explained in depth in our 2019 report, categorizing unwanted sexual experiences remains a challenge even among experts. [94] While the taxonomy helped create shared categories, definitions, and a means of codifying incidents across public and private organizations, there is a risk that classifications may vary by auditor. Limiting the categories of incidents to the most severe helps us maintain a higher level of classification accuracy, reliability, and consistency with our previous report.

Auditor classification alignment with safety taxonomy experts

Uber aims to ensure that the categories of sexual assault included in this report have at least 85% of auditor classification alignment [95] with internal safety taxonomy experts (see "Uber's safety incident data auditing process"). For this report, our aggregated confidence benchmark exceeded the 85% threshold, reaching over 90% alignment. Only one category (Attempted non-consensual sexual penetration) was lower than our 85% threshold, a similar finding to our first report. Some categories reached alignment well beyond it, such as Non-consensual sexual penetration and Non-consensual kissing of a sexual body part, both reaching 99% alignment. We continue our work with RALIANCE to improve auditor alignment across the taxonomy (see "Appendix I: RALIANCE: External validation of Sexual Misconduct and Violence Taxonomy for Uber").

Additional data reconciliation process

To help ensure data completeness, Uber underwent a reconciliation process where all reports of Non-consensual sexual penetration reported through our safety support channels were cross-referenced with other internal data sources, including reports received directly through law enforcement. [96]

The final data set included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

## Defining a sexual assault's relation to Uber's rideshare platform[97]

In order for a sexual assault to be established as Uber-related for purposes of data classification for this report, one or more of the following must be true:

- The incident occurred during an active Uber-facilitated trip, [98] not necessarily with parties paired by the Uber app
- The incident occurred between parties that were paired by the Uber app, and the incident occurred within 48 hours [99] of trip completion (regardless of whether the parties were still on the app at the time

As with physical assault fatalities, there are limited circumstances in which an incident report may, on its surface, meet one or both of the preceding qualifying requirements but then, due to additional information from the reporting party, contradict the classification as Uber-related. For example, the reporting party may later disaffirm or refute the accuracy of the original report by stating that the incident was reported to the wrong rideshare company by mistake. In other situations, Uber occasionally receives reports where the reporting party's intent is clearly not to report a safety incident (such as practical jokes claiming to "test" Uber's response). These incidents were excluded from the data set for this report.

We do, however, understand that survivors may withdraw an incident report due to fear, trauma, or simply not wanting to continue with the reporting process for a number of personal reasons. In these cases, where a sexual assault report was withdrawn (and the original details of the incident were not later refuted or disaffirmed by the survivor), these reports are still considered Uber-related and are therefore included in the data set in this report.

---

94. "Scope of the Problem: Statistics," RAINN (accessed May 3, 2022), rainn.org/statistics/scope-problem.

95. Here, "alignment" refers to the rate of agreement when 2 auditors are separately shown the same facts and come to the same conclusion on the classification of an incident.

96. As with our internal physical assault fatality reconciliation process, this additional process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases and details that had not otherwise been reported to Uber through other channels. Ultimately, we believe responsible data reporting is critical to improving the safety of the Uber rideshare platform and the communities we serve.

97. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

98. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.

99. Incidents between parties paired by the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of trip completion. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

UBER-MDL3084-000000554

Safety support and response protocols

It's important to note that even if an incident is ultimately deemed unrelated to Uber for purposes of data classification (and thereby not included in this report), Uber's safety support agents still follow our response protocols and take necessary action when able, up to and including deactivation from the Uber app. For example, if Uber is made aware that a driver has been charged with sexual assault stemming from an incident that occurred while they were not driving on the Uber ride -
share platform, Uber safety support agents would still conduct a review of that driver's account. If the Uber support agent confirmed a criminal sexual assault charge, then the driver would be removed from the Uber rideshare platform because the charge would violate our background check standards.

For more information and examples of Uber-related and non-Uber related incidents, please see Appendix IV: "Determining which reported safety incidents are Uber-related."

# Uber's safety incident data auditing process

Uber conducts an extensive internal data auditing process on the most serious safety incidents to maintain the data and statistical rigor for producing accurate data for this Safety Report.

Similar to the audit function introduced in our first report, this process is run by our specialized auditing team, which is dedicated to checking and confirming the classification of safety incident reports after they are first categorized and investigated by our frontline agents. Although these frontline agents make the initial classification attempt in order to prioritize the report, we believe their focus should remain on providing support to reporting parties and collecting user statements and information relating to the reported incident.

While this auditing process was initially developed to prepare for our first Safety Report, these standards, performance benchmarks, and processes remain active within the Uber business to maintain high levels of data quality.

> "Our analysis indicates that Uber staff are effectively using the Taxonomy and coding the identified incident data with a high degree of adherence relative to what we see with coding from experts working on issues of sexual misconduct and assault."
>
> Yolanda Edrington, Managing Director, RALIANCE

The specialized audit team has 3 main objectives that translate into key audit phases:

- Ensure that all relevant safety incident reports are audited with the necessary data documented
- Audit to a high standard for quality
- Update our historical data with the most accurate classification, addressing any discrepancies in auditor opinion

## Phase 1: Auditing potentially relevant safety incident reports and documenting necessary data

Uber audits all reports of sexual assault and sexual misconduct, inappropriate post-trip contact, any vehicle crash resulting in bodily injury, and any physical or theft-related altercation resulting in bodily injury to ensure that all critical sexual assault incidents, motor vehicle fatalities, and physical assault fatalities are classified accurately. In addition to ensuring accurate category classification, the auditing process increases accuracy of data elements such as whether the incident report was Uber-related, who the reporting party was, and who the accused party was. [100] For this report, the team reviewed over 350,000 user reports to ensure that all necessary information was documented and that the incident reports were categorized accurately and comprehensively.

## Phase 2: Auditing with a high standard for quality

In order to gain confidence in the results of the internal audit, a robust and rigorous process for measuring the accuracy, reliability, and consistency of our data classifications is required. The most effective way to do this is to measure auditor performance quality and their Safety Taxonomy comprehension. In particular, it is necessary to measure an auditor's understanding of the Safety Taxonomy at 2 valuable checkpoints:

1. Before an auditor begins the internal classification audits
2. At a regular cadence after starting audits

---

100. The reporting party and accused party are available for sexual assaults and fatal physical assaults, but not for motor vehicle fatalities.

UBER-MDL3084-000000555

Section Four

These quality checkpoints allow us to understand the baseline for how an auditor interprets our Safety Taxonomy, as well as changes in their performance over time and how this may impact overall data quality.

To measure an auditor's readiness to adequately interpret the Safety Taxonomy and perform classification audits, we use a certification process in which every auditor is required to participate in instructor-led courses, self-study guides, knowledge checks, and various interactive group audit activities. At the end of the training, auditors complete a practical assessment in which they are asked to classify a subset of incident reports. Their classification opinions are then compared to the classifications for the same incident reports (i.e., an "answer key") created by internal subject-matter experts in our Safety Taxonomy. Once the auditor completes the practical assessment, they receive a score that determines whether they are ready to begin classification audits or whether additional training would be required.

The process for measuring auditor performance quality during the active auditing process is similar. On a regular cadence, all auditors classify a subset of safety incident reports that are compared to the classification answer key prepared by the internal Safety Taxonomy experts. Auditor alignment scores are then aggregated to quantify our classification confidence in the overall data set for each issue area. This confidence metric continues to be a critical measurement as we consider where to invest in additional training to enhance quality, and, for the purposes of inclusion in this report, what data categories provide an appropriate level of confidence and reliability.

To this end, similar to our first report, aggregate classification confidence benchmarks of a minimum of 85% for sexual assault and 99% for all fatalities were set.

The final data set included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

## Phase 3: Addressing differences in auditor opinion and updating underlying data

Our final goal is to change the underlying data classification in Uber's database to the updated, more accurate classification identified during the audit process. Before doing this, however, we conduct additional quality checks on an auditor's classification in circumstances where classification may have been particularly challenging. We've identified 2 potential circumstances for further examination of auditor classification:

1. Circumstances where the auditor classifications differ from the original classification entered by the frontline support agent.
2. Proactive escalation from an auditor to their manager on incident reports they deem to be particularly difficult to classify.

In the event that an auditor's classification opinion differs from the original classification by frontline support agents, a second auditor opinion is required before any underlying data is changed. The second auditor is then able to take into account the incident report itself and the previous classification opinions of other auditors in order to determine the final classification opinion that would be used to update the underlying data.

In addition, auditors are able to self-identify incident reports that they feel are particularly challenging to classify and escalate these reports to an internal audit manager. These escalated reports facilitate collaborative discussions across the internal audit team. If the team still struggles to identify the appropriate classification, the incident report is then escalated to the internal cross-functional taxonomy experts to evaluate. Once the determination on the correct classification is made, it is used to update the initial classification and is then shared with the audit team, who can then use the learnings from the discussion to improve future auditor training.

Based on feedback received from sexual violence advocates following the release of our first Safety Report, all sexual assault incidents included in this report also underwent an additional manual audit to capture key data fields relevant to understanding the prevalence of sexual assault, including identifying the survivor of the incident. This manual audit was extended to physical assault fatalities to identify the deceased party.

UBER-MDL3084-000000556

## Limitations of Uber safety incident data

The data included in this report is not intended to be a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults nationally beyond Uber. For example, the vast majority of US Uber users are individuals with access to a smartphone and a credit or debit card who use rideshare services to navigate their geographies. Thus the incident data leans more toward representing these populations. COVID-19 also impacted rideshare trips, both in terms of the number of trips taken as well as the times of day and locations traveled to, which creates differences between Uber's safety incident rates and the safety incident rates of the public at large. As such, Uber urges caution in comparing the data contained in this report to the findings of national prevalence estimates as significant demographic and methodological differences may be present.

## Underreporting of incidents and incident details to Uber

In addition, when interpreting the data in this report, one must consider the issue of underreporting, particularly for incidents of sexual assault. This isn't specific to Uber; research has highlighted this as a challenge across society. [101] For sexual assault, this is dependent on a number of victim identification factors such as an individual having access to, knowledge of, and/ or desire to reach Uber reporting channels, and/or those who are able to identify an incident as potentially sexually violent or unwanted. While Uber makes every effort to mitigate underreporting by increasing reporting mechanisms and reducing barriers to reporting (see " Safety incident data collection and support process "), it is important to consider that the data in this report is based only on what is reported to Uber or that Uber became aware of through previously discussed channels.

Incoming Uber data can also be fragmented. Agents and auditors take incident reports at face value when classifying the report. There are times when an initial incident report lacks critical details necessary for auditors to classify the report accurately within the taxonomy. Examples include incident reports that may simply state that a user was sexually harassed or sexually assaulted—both terms encompass many manifestations of experiences and do not provide the necessary details for accurate classification within the Safety Taxonomy. Although frontline support agents will make numerous attempts to contact the reporting party to clarify the report, there are times when further contact is declined or not possible. Incoming requests from law enforcement are primary examples since these requests can often identify the potential crime generally as "sexual assault" with no clarifying details. Due to the sensitive and confidential nature of law-enforcement investigations, Uber is not always privy to additional details. Unless we obtain more information on the incident through law enforcement or other channels (e.g., a subsequent report from the victim), these types of reports are unable to be sufficiently classified within Uber's Safety Taxonomy and are therefore classified as "Insufficient information." All reports of insufficient information were excluded from this report.

## FARS reporting processes and procedures

The data and analysis included in this report using FARS data is subject to the limitations of FARS' data processing. These include underreporting of incidents to the police, inaccurate or incomplete police reports, or any potential errors during the FARS analysts' processing of police reports into FARS codification. [102] FARS also updates their prior year's data set in the following year; any subsequent updates from FARS not available at the time of the report's release are not included.

## Demographics

Lastly, it is important to note certain limitations on Uber's data related to riders, particularly regarding rider demographics. While Uber collects identity details on drivers through our normal background and identity check processes, these same requirements do not exist for riders using the Uber platform. Therefore, some of the demographic data included in this report is not available for riders unless it was collected through a manual audit of incident reports. It is also worth noting that some demographic data that is not relevant for our driver background check processes, such as race or ethnicity, is not available for riders or drivers.

101. "Criminal Victimization, 2018," US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, page 8 (September 2019), bjs.gov/content pub/pdf/cv18. pdf.
102. "MMUCC Guideline: Model Minimum Uniform Crash Criteria," National Highway Traffic Safety Administration, page 3 (July 2017), crashstats.nhtsa.dot.gov/Api/Public/ ViewPublication/812433.

UBER-MDL3084-000000557

# Data insights

In this chapter of the report, we provide a breakdown of the most serious safety incidents reported in connection with the Uber platform  in 2019 and 2020: motor  vehicle fatalities,  physical assault  resulting  in fatality,  and sexual assault. We recognize that behind each of these statistics are devastating personal experiences. We share this data to raise public awareness of safety and work together on solutions, across the rideshare industry and in transportation more broadly.

Uber continues to be intentionally overinclusive when reporting this data. This is detailed in the "      Methodology  " section, and we provide context below on how adopting less inclusive data standards could adversely impact the overall data set for reporting of these types of safety incidents.

**Impact of the COVID-19 pandemic on Uber's safety incident trends**

Uber's rigorous and inclusive data standards and reporting processes have remained unchanged throughout the pandemic. However, it's necessary to acknowledge the impact the pandemic had on our business and on safety issues in society.

Beyond Uber, the pandemic had a widespread effect on many aspects of our lives and the way we move, which scientists and researchers are still working to understand. Since Uber ultimately reflects the world in which we operate, we expect to see societal issues, national trends, and effects of major events like a pandemic play out on our platform.

In fact, as detailed in " Uber's scale in the United States  ," when COVID-19 began spreading in the US, cities went into lockdown and Uber encouraged users to stay home if they could. These disruptions in how people interacted with each other and with our platform make yearly comparisons challenging and unclear, especial ly without contextualizing in light of larger national trends. With that in mind, we highlight within each section below how both national trends in safety incidents as well as the disruption to the business might have interplayed with safety incidents on the Uber platform.

## Motor  vehicle fatalities

In the United States, traffic crashes are the leading cause of death for people ages 1-54. [103] Each crash is a tragic loss that impacts families and communities across the country.

In 2019, 36,355 people lost their lives in traffic crashes in the US, [104] and in 2020 that number rose 6.8% to 38,824. [105] The year 2020 saw the highest number of motor vehicle fatalities since 2007 and the highest increase in the fatality rate on record. [106]

103. "Road Safety Facts," Association for Safe International Road Travel (accessed May 3, 2022), asirt.org/safe-travel/road-safety-facts.
104. "NHTSA Releases 2020 Traffic Crash Data," NHTSA (March 2, 2022), nhtsa.gov/press-releases/2020-traffic-crash-data-fatalities.
105. "NHTSA Releases 2020 Traffic Crash Data," NHTSA (March 2, 2022), nhtsa.gov/press-releases/2020-traffic-crash-data-fatalities.
106. "Overview of Motor Vehicle Crashes in 2020," NHTSA (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813266.

**UBER-MDL3084-000000558**

Section Five

Like all aspects of life, the pandemic changed the way we move. Vehicle miles traveled (VMT) decreased by 11% in 2020 compared to 2019, [107] as schools and businesses went virtual. Even as Americans traveled less, traffic fatalities increased. In 2020, the fatality rate per 100 million VMT increased by 21% compared with 2019. [108]

NHTSA attributes the dramatic increase in deaths to a rise in 3 risky behaviors. In 2020, alcohol-involved fatalities increased by 14%, unrestrained passenger fatalities increased by 14%, and speeding-related fatalities increased by 17%, [109] due in large part to less congestion on the roadways. There were likely other large changes in the mix of road use (time of day, urban vs. rural, etc.) as schools closed and many office workers stayed home. [110] We contextualize the numbers below in light of these drastic changes in the environment.

**Table 1: 2019-2020 motor vehicle fatalities by vehicle miles traveled (Uber-related and US rates)[111]**

| | 2017-2018 | | 2019-2020 | | Incident rate change over reports (2019-2020 compared with 2017-2018) | |
|---|---|---|---|---|---|---|
| | Uber rate [112] (per 100 million VMT) | National rate [113] (per 100 million VMT) | Uber rate (per 100 million VMT) | National rate [114] (per 100 million VMT) | Uber rate change[115] | National rate change[116] |
| | 0.58 | 1.15 | 0.62 | 1.22 | +7% | +6% |
| Total miles | 18.5 billion | 6.4 trillion | 16.3 billion | 6.2 trillion | | |

**Table 2: 2019-2020 motor vehicle fatalities by trips (Uber-related) [117]**

| | 2019-2020 | | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|
| | Frequency of rider fatalities (by # of trips) | Frequency of driver fatalities (by # of trips) | Frequency of total fatalities (by # of trips) | # of Uber-related fatalities | % of total trips | # of Uber-related fatalities | % of total trips |
| | ~1 in 90,000,000 | ~1 in 140,000,000 | ~1 in 20,000,000 | 59 | 0.000004% | 42 | 0.000006% |
| Total trips | 2.1 billion | | | 1.4 billion | | 650 million | |

107. "NHTSA Releases 2020 Traffic Crash Data," NHTSA (March 2, 2022), nhtsa.gov/press-releases/2020-traffic-crash-data-fatalities.

108. "NHTSA Releases 2020 Traffic Crash Data," NHTSA (March 2, 2022), nhtsa.gov/press-releases/2020-traffic-crash-data-fatalities.

109. "NHTSA Releases 2020 Traffic Crash Data," NHTSA (March 2, 2022), nhtsa.gov/press-releases/2020-traffic-crash-data-fatalities.

110. "Continuation of Research on Traffic Safety During the COVID-19 Public Health Emergency: January – June 2021," NHTSA (October 2021), nhtsa.gov/sites/nhtsa.gov/files/2021-10/Traffic-Safety-During-COVID-19_Jan-June2021-102621-v3-tag.pdf.

111. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason the data may change over time. The motor vehicle data presented in this report includes incident reports reported on or before April 15, 2022. The motor vehicle data in this report reconciled to 2020 FARS data.

112. Uber yearly rates are rounded.

113. Two-year NHTSA rates are calculated by adding the number of fatalities provided by NHTSA for both years and dividing by VMT, derived from the rate of fatalities per 100M VMT produced by NHTSA (2017 2018).

114. Two-year NHTSA rates are calculated by adding the number of fatalities provided by NHTSA for both years and dividing by VMT, derived from the rate of fatalities per 100M VMT produced by NHTSA (2019 2020).

115. Uber rate change may not sum according to chart. The rate change is based on unrounded rates.

116. Derived from the calculated fields in the table.

117. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason, the data presented in this report may change over time. The motor vehicle data presented in this report includes incident reports reported on or before April 15, 2022. The motor vehicle data in this report reconciled to 2020 FARS data.

Section Five

UBER-MDL3084-000000559

Figure 3: 2017-2020 motor vehicle fatality rate, Uber-related and US



As in our first report, the motor vehicle fatality rate connected with the Uber platform in both 2019 and 2020 is about half the national average.

## Rate of motor vehicle fatalities over time: 2017-2020

In 2019-2020 alone, 101 motor vehicle fatalities occurred across 91 fatal Uber-related crashes. This accounts for approximately 0.000005% of total trips, or one in 20,000,000 trips. As in our first report, the motor vehicle fatality rate connected with the Uber platform in both 2019 and 2020 is about half the national average.

Overall, motor vehicle fatalities per VMT increased by 7% between the 2017-2018 and the 2019-2020 time frames, in line with a 6% increase nationally comparing the same sets of years. [118] The total number of motor vehicle fatalities on the Uber platform decreased from 59 in 2019 to 42 in 2020. While we did see an increase in rate from 2019 to 2020, it is difficult to quantitatively compare Uber's year-on-year data given the significant reduction in trips and volatility the pandemic brought to how and when users interacted with our platform.

Table 4: Deceased parties in Uber-related motor vehicle crashes[119]

| Deceased party | 2019 | 2020 |
|---|---|---|
| Occupant | 68% (n=40) | 74% (n=31) |
| Driver using Uber app | 10 | 4 |
| Rider using Uber app | 9 | 10 |
| Third-party driver | 9 | 9 |
| Third-party motorcyclist | 6 | 6 |
| Third-party passenger | 6 | 2 |
| Non-occupant | 32% (n=19) | 26% (n=11) |
| Driver/rider using Uber app fatally struck outside of vehicle | 2 | 2 |
| Third-party pedestrian | 15 | 8 |
| Bicyclist/scooter rider | 2 | 1 |
| Total | 59 | 42 |

The increase in motor vehicle fatality rate in 2019-2020 largely represents an increase in occupant fatalities in 2020. Most of these fatalities in 2020 were either third-party drivers [120] (n=15) or riders using the Uber app (n=10).

These changes in the rate of motor vehicle fatalities over time may have been impacted by a combination of national roadway factors, including more risky driving and passenger behaviors.

---

118. Derived from the calculated fields in Table 1.
119. Deceased parties and other data elements in this section regarding Uber-related fatal crashes are derived from FARS data pulled from NHTSA's Fatality and Injury Reporting System Tool (FIRST) at cdan.dot.gov/query on March 2, 2022.
120. Third-party drivers here include both motorcyclists and non-motorcyclist third-party drivers.

UBER-MDL3084-000000560

## Impact of more risky driving on the roadways

NHTSA identified a sharp increase in particularly risky behavior by drivers in 2020 nationwide, including increases in motor vehicle fatalities involving alcohol-impaired driving (+14%) and speeding (+17%).   [121]

> **By the numbers: risky driving on the roadways**
> Across 2019 and 2020:
> - 32% (n=32) of fatalities involved at least one vehicle that was speeding
>   - 91% (n=29) were third-party drivers
> - 23% (n=23) of fatalities involved an alcohol-impaired driver
>   - 100% were third-party drivers
> - 15% (n=15) of fatalities involved a driver driving the wrong way   [122]
>   - 100% were third-party drivers

This national increase in risky driving behaviors appears in our data as well. In fact, 53% (n=54) of the fatalities included in this report from Uber's data involved at least one of the following risky driver behaviors: alcohol-impaired driving, speeding, or wrong-way driving. Of these fatalities, **nearly all (94%) were the result of risky behavior by third-party drivers**. Over a quarter of these fatalities (n=15) included more than one risky behavior.

For example, in 2019-2020, 23% (n=23) of motor vehicle fatalities connected to the Uber platform involved third-party alcohol-impaired drivers. Of those fatalities, half of the third-party drivers (n=12) were also speeding, and 43% of the time (n=10) the third-party driver was the fatal party themselves, with nearly all not wearing their seat belts.   [123]

The same holds true when looking only at fatalities of a rider or driver using the Uber app: of those 37 fatalities in 2019-2020, 57% (n=21) involved at least one of the risky behaviors outlined above, and all but one fatality were the result of risky driving by a third-party driver.

These national third-party risky behaviors not only appear in our data but also are increasing over time (Figures 5 and 6). We saw the most significant  increases in motor vehicle fatalities involving  2 particular third-party  driver behaviors: wrong-way driving, which doubled from 7% (n=8) of fatalities in 2017-2018 to 15% (n=15) in 2019-2020; and unrestrained third-party drivers, which tripled from 4% (n=3) in 2017-2018 to 13% (n=9) of occupant fatalities in 2019-2020.   [124] Consistent with national trends, these changes largely stem from increases observed in 2020.

### Figure 5: % of Uber-related fatalities involving risky driving behavior, predominantly by third parties



### Figure 6: % of national fatalities involving risky driving behavior [125]



---

121. "Overview of Motor Vehicle Crashes in 2020," NHTSA (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813266

122. The wrong way is defined as a combination of FARS data elements looking at the manner of the vehicle collision (such as "front to front"), pre-crash vehicle events (such as drivers "traveling over the lane line of travel"), and pre-crash driver events (such as "leaving the original travel lane", driving on the wrong side, etc.).

123. Three of the 10 third-party drivers were motorcyclists and were excluded from this statistic. Five of the 7 third-party drivers driving passenger vehicles were not wearing seat belts.

124. Unrestrained third-party drivers defined here does not include motorcyclists.

125. FARS data was pulled from NHTSA's Fatality and Injury Reporting System Tool (FIRST) at cdan.dot.gov/query on March 2, 2022.

UBER-MDL3084-000000561

There was a marked increase in risky driving by third parties, but these trends were not evident among drivers [126] using the Uber app: 91% (n=79) were properly wearing seat belts, and 97% (n=84) were not speeding, impaired by alcohol, or driving the wrong way in traffic. Given that we operate on the same streets as everyone else, riders and drivers using the Uber app are not immune to the impacts of less safe roadways.

## Impact of risky passenger behavior

NHTSA also identified an increase in passengers not buckling seat belts. Nationally, the motor vehicle fatality rate for unrestrained passenger-vehicle occupants rose 14% in 2020, compared to 2019. Among passenger-vehicle occupants killed in 2020, 51% were not wearing a seat belt. [127]

Similar to NHTSA's other noted behaviors, we have seen that increase in our data as well. In addition to the increase in unbuckled third-party drivers, we observed an increase in fatalities of unbuckled riders using Uber, representing 8% (n=3) of occupant fatalities in 2019 and increasing to 26% (n=8) in 2020.

Most riders [128] (70%, or n=77) involved in fatal crashes in 2019-2020 were wearing seat belts in the vehicle. However, of those who were involved in a fatal crash while not wearing a seat belt, half (n=11) were one of the fatal parties.

Research has shown that while most Americans buckle up in the front seat, they don't always do so in the back seat, on shorter rides, in a taxi, or while using ridesharing. [129] We are committed to improving seat-belt usage on the platform by increasing our education efforts and building new technology like Rider Seat Belt Alerts (see " Safety investments ").

## Vulnerable road user safety

People walking, biking, or riding motorcycles are considered "vulnerable road users" [130] and are more at risk than other road users because they don't have the structure of a vehicle to protect them. Nationally, rates of pedestrian and bicyclist fatalities have increased faster than the fatality rate of vehicle occupants. Vulnerable road user fatalities are also more likely to occur in urban environments, where the majority of Uber trips occur. [131]

Across 2019 and 2020, 42% (n=42) of motor vehicle fatalities were vulnerable road users. Of those fatalities, 64% (n=27) were pedestrians, 29% were third-party motorcyclists (n=12), and 7% (n=3) were bicyclists or scooter riders.

Of the pedestrian fatalities, most occured in the dark, in either lit or unlit areas (n=23), and on larger roadways such as principal arterials, state highways, or even interstates (n=23). The majority, 70% (n=19), were not at a crosswalk or intersection, and 22% (n=6) were crossing an expressway.

As noted in our last report, Uber-related pedestrian fatalities included drivers or riders who were outside of the vehicle at the time of the crash. This might happen when, for example, a driver exits the vehicle to assist a passenger, or when drivers or riders assist other road users in some way. In 2019-2020, there were 4 such fatalities.

While non-occupant fatalities connected with the Uber platform decreased as a proportion of overall fatalities in 2020, the nationwide increase in vulnerable road user fatalities is concerning.

126. Drivers are defined here as occupants, not pedestrians.
127. "Overview of Motor Vehicle Crashes in 2020," National Highway Traffic Safety Administration (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813266 .
128. Riders are defined here as vehicle occupants only, not pedestrians.
129. "Unbuckled in Back: An Overlooked Issue in Occupant Protection," Governors Highway Safety Association (accessed May 3, 2022), ghsa.org/sites/default/files/2016-11/ RearBelts_FINAL.pdf.pdf.
130. "Position/Policy Statement: Vulnerable Road Users," National Safety Council (2018), nsc.org/getattachment/ d5babee6-582d-4e66-804f-8d06f9b021a4/t-vulnerable-road-users-147 .
131. "Rural/Urban Comparison of Motor Vehicle Traffic Fatalities," NHTSA (November 2021), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813206 .

Section Five

UBER-MDL3084-000000562

### Challenges to comparisons: how Uber trips differ from the national average

While there are many similarities between our data and the national numbers, a direct comparison cannot be made due to demographic and methodological differences.

### Demographic differences

Uber-related trips occur in primarily urban environments, with 91% of fatalities on the platform occurring in an urban setting in 2019-2020. NHTSA data shows that since 2016, fatalities on urban roadways have consistently been more frequent than they've been on rural roadways. In particular, from 2019 to 2020, urban fatalities increased nationwide by 8.5%, whereas rural fatalities increased only 2.3% in that same time frame. [132]

This difference affects which risk factors are more prevalent on the Uber platform relative to the national context, such as fatalities involving pedestrians or bicyclists [133] (defined as pedalcyclists in FARS).

Additionally, Uber's rigorous signup requirements mean that our demographics vary from the national average, in part because of the following factors:
- **Age and experience of driver:** Drivers on the Uber platform must be at least 21 years old and have at least one year of license history. [134] According to NHTSA, drivers aged 15-20 tend to have higher overall crash rates than older and more experienced drivers. [135]
- **Motor vehicle records (MVR) check:** As discussed in the "Safety investments" section, Uber screens every prospective driver's MVR for violations or crashes; verification of license status; and violations such as DUI, reckless driving, or evading police as reported by each state's Department of Motor Vehicles. [136]
- **Vehicle age:** Vehicles on the Uber platform are generally newer than the average age on the road (5 years old compared with 12 years old).[137] NHTSA reports that newer vehicles are safer than older ones because they are more likely to include safety features like electronic stability control, backup cameras, and blind-spot detection. [138]

### Methodological differences

While we can reconcile fatalities reported to Uber uniquely against the FARS database (see "Methodology" section), the calculation for VMT differs between Uber and NHTSA such that the comparison of motor vehicle fatality rates cannot be made directly.

**Uber considers only the Uber-related vehicle miles traveled, while NHTSA captures the vehicle miles traveled by all vehicles on the road. This key difference results in overcounting or overstating Uber's rate relative to NHTSA's "all vehicles" rate measuring the entire population.**

For example, suppose that only blue and red vehicles exist on the road, that both sets of vehicles have driven 100 miles each, and that a collision between a red vehicle and a blue vehicle occurs, resulting in one fatality. Using a simple ratio of fatalities involving vehicles of one color divided by the miles traveled by vehicles of that color, the blue vehicle fatality rate would be 1 fatality/100 miles. The red vehicle fatality rate would be the same: 1 fatality/100 miles. Each rate is double counting the same fatality.

However, that fatality is only counted once when looking at the "all vehicles" rate, which includes the miles driven by both red and blue vehicles: 1 fatality/200 miles. Thus, the rate for both subsets (1/100 fatalities per VMT) is higher than the "all vehicles" rate (1/200 fatalities per VMT).

One could assign each fatal crash to a single vehicle to avoid double counting when there are multiple vehicles involved. However, that is difficult to do consistently, especially without introducing a concept of fault, which is often disputed. We have therefore not adjusted the rates shown for this effect, even though doing so would lead to a lower fatality rate for Uber-related trips.

132. "Overview of Motor Vehicle Crashes in 2020," National Highway Traffic Safety Administration (March 2022), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813266 .
133. "Rural/Urban Comparison of Motor Vehicle Traffic Fatalities," NHTSA (November 2021), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813206 .
134. As of November 15, 2021, the licensing requirement for new 23- and 24-year-old drivers is now 3 years. Drivers who are 21 and 22 years old are still required to have at least 3 years of license history.
135. "Young Drivers," NHTSA (May 2019), crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812753
136. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission. The TLC driver licensing process is separate from the process described here.
137. "Average age of cars and light trucks in the US rises to 12.1 years, accelerated by COVID-19," IHS Markit (June 14, 2021), ihsmarkit.com/research-analysis/average-age-of-cars-and-light-trucks-in-the-us-rises.html.
138. "Newer Cars Are Safer Cars," NHTSA (accessed May 3, 2022), nhtsa.gov/newer-cars-are-safer-cars

UBER-MDL3084-000000563

Section Five

# Fatal physical assaults

Tragically, more lives were lost to violent crime in the United States in 2020 than in any other year over the last 2 decades. [139] According to CDC data, 24,576 people died due to homicide in the US in 2020. [140] This represents a 30% increase from 2019— the largest single-year increase in more than a century. [141] FBI data also highlights an increase in the number of aggravated assaults (up 12.1% from 2019 to 2020), as well as murder and non-negligent manslaughter (up 29.4%). [142]

## Fatal physical assaults related to the Uber platform

Uber includes reports of fatal physical assaults related to the Uber platform.

- Reported incidents that involved at least one person on an Uber-facilitated trip, [143] not necessarily with parties paired by the Uber app. For example, this could include an incident where a third party was accused of fatally wounding a rider or driver on an Uber-facilitated trip.

- Reported incidents that occurred between parties that were paired via the Uber app, up to 48 hours after the completion of the trip.

The focus on fatality is due to the gravity of the incident as well as data limitations. Any physical assault not resulting in a fatality (for example, a physical assault resulting in serious, minor, or no injuries) is less objective, making it more difficult to achieve accuracy or consistency. Unlike motor vehicle fatalities, Uber data on fatal physical assaults cannot be compared to national criminal standards and definitions, since Uber does not aim to and cannot act as the justice system. Furthermore, our agents and auditors do not have the ability, background, or evidentiary information required to determine the "intent and capability of the assailant to cause serious injury," aspects that the National Incident-Based Reporting System (NIBRS) definition for homicide requires. [144]

### Table 7: 2019-2020 physical assault fatalities [145]

| 2019-2020 | 2019 | | 2020 | | Incident rate change over reports (2019-2020 compared with 2017-2018) |
|---|---|---|---|---|---|
| Frequency of incident reports (by # of trips) | # of fatalities | % of total trips | # of fatalities | % of total trips | % change incident rate [146] |
| 1 in 100,000,000 | 9 | 0.000001% | 11 | 0.000002% | 18% |
| Total US trips | 2.1 billion | 1.4 billion | 650 million | | |

139. "New CDC/NCHS Data Confirm Largest One-Year Increase in US Homicide Rate in 2020," CDC/National Center for Health Statistics (October 6, 2021), cdc.gov/nchs/pressroom/nchs_press_releases/2021/202110.htm.

140. "Assault or Homicide," CDC/National Center for Health Statistics (January 5, 2022), cdc.gov/nchs/fastats/homicide.htm.

141. "New CDC/NCHS Data Confirm Largest One-Year Increase in US Homicide Rate in 2020," CDC/NCHS (October 6, 2021), cdc.gov/nchs/pressroom/nchs_press_releases/2021/202110.htm.

142. "FBI Releases 2020 Crime Statistics," FBI (September 27, 2021), fbi.gov/news/pressrel/press-releases/fbi-releases-2020-crime-statistics .

143. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is on the way to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while on the way to the rider's pickup location, this would be included in the data set.

144. "2021 National Incident-Based Reporting System User Manual," FBI Uniform Crime Reporting, page 17 (April 15, 2021), fbi.gov/file-repository/ucr/ucr-2019-1-nibrs-user-manual.pdf/view .

145. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but this means that the data could change over time. The data presented in this report includes incident reports reported on or before April 15, 2022.

146. Uber rate change may not sum according to chart. The rate change is based on unrounded rates.

UBER-MDL3084-000000564

In 2019 and 2020, 20 fatalities were reported in a total of 19 physical assault incidents in relation to Uber. [147] This accounts for approximately 0.000001% of total trips, or one in 100,000,000 trips (see Table  7). It is critical to acknowledge that numbers alone are unable to capture the devastating impact of these incidents on families and communities.

Among the 20 deceased parties:

- 75% (n=15) were riders
- 25% (n=5) were drivers using the Uber app

Of the 15 rider fatalities, the accused was a third party or another rider in nearly all cases (80%, or n=12). In fact, the accused was a third party in the majority of all physical assault fatalities reported (~55%, or n=11).

Figure 8: 2017-2020 physical assault fatality rate



> National homicides increased 30% from 2019 to 2020—the largest single-year increase in more than a century.

## Rate of physical assault fatalities over time: 2017-2020

We observed an increase of 18% from 2017-2018 to 2019-2020, in line with the increase in homicide fatalities. This is largely due to an increase seen in 2020, similar to national homicide and aggravated assault statistics beginning in 2020 during the pandemic. [148]

Similar to what we've observed in motor vehicle fatalities, riders and drivers using the Uber app are not immune to the impacts of a less safe environment. The increase in homicide nationally is deeply concerning, and Uber is committed to doing our part to keep riders and drivers using the Uber app safe (see "  Safety investments  " section).

---

147. In one incident, 2 deceased parties were identified.
148. "What we know about the increase in US murders in 2020," Pew Research Center (October 27, 2021), pewresearch.org/fact-tank/2021/10/27/what-we-know-about-the-increase-in-u-s-murders-in-2020 .

UBER-MDL3084-000000565

# Sexual assault

Sexual assault is a devastating crime that impacts every corner of our society. It's estimated that every 68 seconds an American is sexually assaulted. [149] Nationally, **nearly 52.2 million women (43.6%) and a quarter of men (24.8% or 27.6 million)** experience some form of sexual violence in their lifetime. [150]

While the vast majority of sexual violence is perpetrated by individuals known to the survivor, [151] it can happen anywhere and to anyone. Nearly 7 million women and 3 million men reported experiencing sexual violence in the workplace. [152] One in 4 undergraduate women experience non-consensual sexual conduct during their time at college. [153] In 2018, the US military estimated that 20,500 service members experienced sexual assault, and reports increased from 2019 to 2020. [154] No industry, institution, or aspect of public life is immune to sexual violence.

## Categories of sexual assault

For the purposes of this report, we have included the 5 most serious categories in the Sexual Misconduct and Violence Taxonomy.

### Table 9: 2019-2020 [155] 5 categories of sexual assault[56]

| Subcategory | 2019-2020 Frequency of incident reports (by # of trips) | 2019 # of incident reports | % of total trips [157] | 2020 # of incident reports | % of total trips | Incident rate change over reports (2019-2020 compared with 2017-2018) % change incident rate [158] |
|---|---|---|---|---|---|---|
| Non-consensual kissing of a non-sexual body part | ~1 in 3,000,000 | 513 | 0.00004% | 137 | 0.00002% | -37% |
| Attempted non-consensual sexual penetration | ~1 in 7,000,000 | 202 | 0.00001% | 82 | 0.00001% | -54% |
| Non-consensual touching of a sexual body part | ~1 in 1,000,000 | 1,526 | 0.00011% | 528 | 0.00008% | -23% |
| Non-consensual kissing of a sexual body part | ~1 in 5,000,000 | 338 | 0.00002% | 110 | 0.00002% | -28% |
| Non-consensual sexual penetration | ~1 in 5,000,000 | 247 | 0.00002% | 141 | 0.00002% | -6% |
| Total US trips | 2.1 billion | 1.4 billion | | 650 million | | |

149. "Scope of the Problem: Statistics," RAINN (accessed May 3, 2022), rainn.org/statistics/scope-problem.
150. "National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," NISVS (November 2018), cdc.gov/violenceprevention/pdf/2015data-brief508.pdf.
151. "Perpetrators of Sexual Violence: Statistics," RAINN (accessed May 3, 2022), rainn.org/statistics/perpetrators-sexual-violence; "Fast Facts: Preventing Sexual Violence," CDC (February 5, 2022) cdc.gov/violenceprevention/sexualviolence/fastfact.html.
152. "National Prevalence of Sexual Violence by a Workplace-Related Perpetrator," American Journal of Preventive Medicine (December 10, 2019), ncbi.nlm.nih.gov/pmc/articles/PMC7092813.
153. "Report on the AAU Climate Survey on Sexual Assault and Sexual Misconduct," Association of American Universities (2019; revised January 17, 2020), nsvrc.org/resource/report-aau-climate-survey-sexual-assault-and-sexual-misconduct.
154. "Department of Defense Annual Report on Sexual Assault in the Military: Fiscal Year 2020," DOD (March 15, 2021), sapr.mil/sites/default/files/DOD_Annual_Report_on_Sexual_Assault_in_the_Military_FY2020.pdf.
155. This report reflects audited sexual assault reports that were classified into one of the categories in this table. Uber occasionally receives notice of a potential sexual assault well after the trip has ended. The sexual assault data presented in this report includes incident reports reported on or before April 15, 2022, and for this reason may change over time.
156. "Relation to the Uber platform" or "Uber-related" is in reference to data classification for the purposes of this Safety Report only.
157. Incident reports as a percent of total trips are rounded.
158. The Uber rate change may not sum according to the table. Rate change is based on unrounded rates.

UBER-MDL3084-000000566

Figure 10: 2017-2020 sexual assault rate, aggregated across 5 categories



> Overall, the rate of sexual assault reported on the Uber app decreased by 38% between our first report (2017-2018) and our second report (2019-2020), and the total number of sexual assault reports in these 5 categories went from 5,981 to 3,824.

## Rate of sexual assault reports over time: 2017-2020

Overall, the rate of sexual assault reported on the Uber app decreased by 38% between our first report (2017-2018) and our second report (2019-2020), and the total number of sexual assault reports in these 5 categories went from 5,981 to 3,824.

Most categories of sexual assault saw reductions of up to 20-30% between 2017-2018 and 2019-2020. The smallest decrease we observed in categories of sexual assault was in reports of non-consensual sexual penetration, a reduction of 6%. The change in rate of sexual assault reports over time may have been impacted by a number of factors, such as how the COVID-19 pandemic altered usage of the platform, as well as Uber's safety and transparency efforts, including the release of our first Safety Report. Although we observed a decreasing trend, each reported incident represents a harrowing lived experience for the survivor. Even one report is one too many.

## Potential impact of COVID-19

The impact of COVID-19 on sexual assault trends remains unclear. Research has shown that disasters, including pandemics, can increase risk factors for sexual violence perpetration and victimization. [159] For example, stay-at-home orders meant that survivors were isolated with their abusers and public spaces became more deserted as a result of mandated movement restrictions. [160]

With 90% of the US population under some form of "shelter-in-place" mandate, Uber saw a large decrease in trips as we encouraged users to stay home and provided free and discounted rides to essential workers. Nighttime trips and those to venues like bars or nightclubs were particularly impacted as societal nightlife halted.

People's caution when moving around cities and interacting with others might have impacted how riders and drivers behaved when on an Uber trip. A study from Yale University reported that regardless of shelter-in-place restrictions, the majority of people socially distanced voluntarily, influenced by media coverage and public messaging highlighting the risk of the virus. [161] Uber also introduced COVID-19 safety messaging and a no mask, no ride policy in 2020.

These shifts in societal behavior, as well as how people used the platform, make comparing our 2020 sexual assault rates against pre-pandemic 2019 difficult and unclear. The year 2020 was an anomaly, and researchers are still examining the effects of the pandemic on sexual assault. We won't have a clear understanding of the pandemic's effect until we are able to view 2020 in relation to both pre- and post-pandemic rates.

159. "Sexual Violence in Disasters," National Sexual Violence Resource Center (November 16, 2021), nsvrc.org/resource/2500/sexual-violence-disasters; "The Shadow Pandemic: Violence against women during COVID-19," unwomen.org/en/news/in-focus/in-focus-gender-equality-in-covid-19-response/violence-against-women-during-covid-19; "COVID-19 and ensuring safe cities and safe public spaces for women and girls," unwomen.org/en/digital-library/publications/2020/05/brief-covid-19-and-ensuring-safe-cities-and-safe-public-spaces-for-women-and-girls; "COVID-19 and ensuring safe transport with and for women and girls," unwomen.org/en/digital-library/publications/2020/12/brief-covid-19-and-ensuring-safe-transport-with-and-for-women-and-girls

160. "The Shadow Pandemic: Violence against women during COVID-19," UN Women (accessed May 3, 2022), unwomen.org/en/news/in-focus/in-focus-gender-equality-in-covid-19-response/violence-against-women-during-covid-19

161. "Measuring voluntary and policy-induced social distancing behavior during the COVID-19 pandemic," Yale School of the Environment (May 4, 2021), environment.yale.edu/bibcite/reference/1501.

UBER-MDL3084-000000567

## Investments in safety and corporate transparency

The launch of Uber's Safety Report in December 2019 was the first time Uber—and indeed, any company in our industry—spoke publicly about assaults reported in connection to their platforms. This drove a significant public conversation about the need for corporate transparency and for companies to shine a light on sexual assault and misconduct.

The majority of sexual assaults are not reported to police, with estimates of more than 2 out of 3 sexual assaults going unreported.[162] Research shows that raising awareness of sexual assault policies that are in place [163] and drawing attention to the issue of sexual assault [164] can lead to increased incident reporting. This has been true in the university setting, where the number of sexual assaults reported on a college campus increases in relation to the amount of attention focused on addressing sexual assault on that campus.[165] Similarly, raising awareness of the school's reporting policies and regulations have been shown to help increase reporting. [166] Safety experts and advocates counseled Uber that highlighting the issue of sexual assault and committing to reporting on these troubling incidents could result in an increase of reports to Uber.

In addition to our commitment to transparency, in 2019 Uber made a series of forward-looking investments as a commitment to continuing to increase the safety of our platform and support for survivors. Uber rolled out sexual misconduct education for drivers on the platform and launched new product features. We invested in making it easier for users to report safety issues, for example with on-trip reporting, [167] and provided more resources to survivors who reported through our Survivor Support Fund and Hotline managed by RAINN specialists. We were, and remain, committed to gaining the confidence of our users, and emphasized that we will listen and take action to end sexual violence on our platform.

### Challenges to comparisons: defining and collecting sexual assault data

Our data standards and approach to reporting sexual assault are grounded in feedback from women's safety advocates. We are intentionally broad and overinclusive, in a number of ways.

- **Defining sexual assault:** Uber follows the Sexual Misconduct and Violence Taxonomy, which uses broader definitions of sexual assault than most criminal codes and research entities. For example, we include reports of sexual assault such as "non-consensual kissing of a non-sexual body part" such as a hand or arm, which would not be deemed sexual assault by criminal codes in many jurisdictions.

- **Defining connection to Uber platform:** Our approach also captures incident reports of sexual assault occurring between parties paired by the Uber app, not only during a trip facilitated by the Uber platform, but within 48 hours of a trip's completion. In addition, we include reports made against third parties and unknown parties where the survivor does not provide clarity on the party being reported.

- **Increasing number of reporting channels:** This report aggregates incidents from an expanding list of ways a user can communicate with Uber (see the " Methodology " section), or that Uber can otherwise learn of an incident. Uber's data set is likely to be relatively comprehensive and, as a result, it may be difficult to compare insights drawn from Uber's data set to those drawn from more limited reporting channels.

- **Survivor accounts:** Uber takes survivor reports at face value. [168] The numbers in this Safety Report include all instances in which an incident has been reported to us. Survivors are able to provide a statement of experience if they so choose. However, Uber does not require it for inclusion in our data. Adding requirements for any additional "proof" or "evidence" such as a third-party witness or other "supporting facts" would have resulted in about 20% of reports being excluded from our data set.

- **Sufficiency of initial report:** We know from advocates that survivors might choose not to speak or correspond with an Uber safety support agent after initially reporting the assault. This could be for any number of valid personal reasons. As a result, Uber does not require a "successful" agent follow-up for the incident to meet our data standards and be included in the Safety Report. In fact, in 17% of the sexual assault incidents in 2019-2020, Uber safety support agents were unable to reach the survivor after an initial report was made. These incidents are still included in this report.

- **Withdrawn reports:** We also know that survivors may choose to withdraw their report of sexual assault. We intentionally include incidents for which the report is withdrawn (but not disaffirmed or refuted) by the survivor at a later date. [169]

As a result of our approach, meaningful comparisons to other data sets are not possible.

162. "The Criminal Justice System: Statistics," RAINN (accessed May 3, 2022), rainn.org/statistics/criminal-justice-system.

163. "Sexual Violence on the College Campus: Template for Compliance with Federal Policy,"Journal of American College Health (2008) doi.org/10.3200/JACH.57.3.361-366; "Sexual Assault Prevention and Reporting on College Campuses in the US: A Review of Policies and Recommendations,"Journal of Education and Practice (2015) files.eric.ed.gov/fulltext/EJ1083737.pdf .

164. "The Effects of Social Movements: Evidence from #MeToo," available at SSRN (March 16, 2022), papers.ssrn.com/sol3/papers.cfm?abstract_id=3496903

165. "The Effects of Feminist Mobilization and Women's Status on Universities' Reporting of Rape," Journal of School Violence (July 11, 2017), www.tandfonline.com/doi/abs/10.1080/15388220.2017.1318580?journalCode=wjsv20

166. "Sexual Violence on the College Campus: Template for Compliance with Federal Policy," Journal of American College Health (2008) doi.org/10.3200/JACH.57.3.361-366

167. See the "Methodology: Safety incident data collection and support process " section of this report.

168. A survivor report is classified by agents and auditors based on a description from the survivor and/or accounting party.

169. We do not include incidents that are actively refuted by survivors.

Section Five

UBER-MDL3084-000000568

## The parties involved in sexual assault

Both riders and drivers report sexual assault incidents on the Uber platform. In 2019 and 2020, riders [170] accounted for nearly half (43%) of the accused parties across the 5 most serious categories of sexual assault, similar to our finding in our first Safety Report.

Figure 11: Breakdown of 5 categories of sexual assault by accused party



Figure 12: Breakdown of 5 categories of sexual assault by survivor



While only 1% of the reports of all 5 categories of sexual assault were against a third party, this rate doubles and triples for attempted non-consensual sexual penetration and non-consensual sexual penetration, respectively. This highlights the importance of our emphasis on overinclusivity when developing standards for counting total incident numbers and rates of sexual assaults related to the platform (see " Challenges to comparisons: defining and collecting sexual assault data").

For this report, we captured the survivor party in addition to the reporting party for each incident at the recommendation of safety advocates, as noted in the " Methodology " section. We observed that riders were reported as the survivor in 61% of the reports, while drivers were reported as the survivor in 39% of incidents. As noted in the first report, the reporting party and the surviving party are not always the same. In fact, ~5% of reports made by drivers were on behalf of riders.

---

170. Riders are defined as account holders and guests of account holders.

UBER-MDL3084-000000569

# Non-consensual sexual penetration

Non-consensual sexual penetration is the most serious category captured in the Taxonomy and is defined as: Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This also includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue.

It encompasses forms of penetrative sex acts beyond sexual intercourse, including:

- Non-consensual digital penetration (of the vagina or anus)
- Non-consensual oral sex (of the genitals or anus)
- Non-consensual penetration with a foreign object (of the vagina or anus)
- Non-consensual anal sex
- Non-consensual vaginal sex

## Table 13: Non-consensual sexual penetration (2019-2020)

| Subcategory | 2019-2020 Frequency of incident reports (by # of trips) | 2019 # of incident reports | % of total trips [171] | 2020 # of incident reports | % of total trips | Incident rate change over reports (2019-2020 compared with 2017-2018) % change incident rate [172] |
|---|---|---|---|---|---|---|
| Non-consensual sexual penetration | ~1 in 5,000,000 | 247 | 0.00002% | 141 | 0.00002% | -6% |

Non-consensual sexual penetration incidents were reported to occur in about one in 5,000,000 completed trips during the 2019-2020 time frame. In other words, these incidents were reported on 0.00002% of trips. While these reports are rare, each one represents an intensely traumatic experience for an individual who came forward to share it, and even one report is one too many.

## Survivors

Across both years, for non-consensual sexual penetration, the survivor was the rider in ~91% (n= 354) of incident reports. Drivers were survivors in ~7% (n=26) of incident reports. In 3% (n=13) of incidents, a third party is reported as the accused party—which is 3 times higher than in other sexual assault categories.

## Gender[173]

Women made up 81% (n=316) of the survivors in the data set, while men comprised about 15% (n=57) of non-consensual sexual penetration survivors—doubling from 7% in 2017-2018, as reported in first Safety Report. In 4% (n=15) of incidents, the survivor's gender was unknown. [174] This data is in line with broader research documenting that women are disproportionately affected by sexual violence. [175]

---

171. Incident reports as a percent of total trips are rounded.
172. The Uber rate change may not sum according to the table. Rate change is based on unrounded rates.
173. For the purposes of this report, the gender analysis is limited to the non-consensual sexual penetration category and is the result of a manual audit. A core limitation in Uber's data is that gender (and other demographic) information is not collected from riders generally. Therefore, an analysis of how victimization by gender may vary across subcategories is not currently available. (See "Limitations of Uber safety incident data" in the "Methodology" section.)
174. Identified by manual audit.
175. "Victims of Sexual Violence: Statistics," RAINN (accessed May 3, 2022), rainn.org/statistics/victims-sexual-violence.

UBER-MDL3084-000000570

## Factors impacting rate of reporting

Comparing our first report to our second, the rate of non-consensual sexual penetration decreased 6%. While we did observe an increase in the rate of reporting unique to 2020, it is difficult to compare year-on-year data given the significant reduction and volatility the pandemic brought to how users interacted with each other and our platform (see " Potential impact of COVID-19 ").

Increased reports of sexual assault could in part be driven by Uber's public commitment to safety—in particular our first Safety Report published in December 2019, our stance against sexual violence, and continued investment in making reporting easier and more trauma-informed. [176]

It is also important to note that it's not possible for us to compare rates of sexual violence directly to national statistics given how overinclusive Uber is in our reporting standards, as well as a lack of conclusive analysis (see " Challenges to comparisons: defining and collecting sexual assault data").

## Law enforcement involvement

The decision to report to law enforcement is a deeply personal one. Safety advocates note that after a sexual assault, it is very normal for survivors to choose not to report to law enforcement right away, or to not report at all. [177] Uber does not presume to know what's best for survivors. We offer all survivors information on how we can help police with an investigation if they choose to report. Our 24/7 law enforcement response team works with police departments around the world to provide information related to investigations (including through our online portal lert.uber.com ).

We also provide the RAINN hotline to survivors who report sexual assault, as well as information about how RAINN can help. RAINN can advise them about laws in their community and can also help connect them with law enforcement.

Fourteen percent (n=56) of non-consensual sexual penetration reports came to Uber through third-party reports, with the vast majority coming from law enforcement, via Uber's Public Safety Liaison team and portal (see " Working with law enforcement " in "Safety investments" section). This is far higher than all other categories of sexual assault, where we see roughly 2% of reports come in from a third party. A potential explanation for this difference may be that non-consensual sexual penetration is more likely to constitute a criminal offense and can be pursued by law enforcement (whereas other categories in the taxonomy may be less likely to be reported or prosecuted under criminal statutes).

Section Five

---

176. Examples of continued investment include reporting channels like on-trip reporting, and expansion of RideCheck, since the 2019 Uber Safety Report. For a full list of reporting channels, please refer to the "Methodology " section of this report.

177.  Reporting to law enforcement can be a retraumatizing and complex decision for survivors of sexual violence, and this can be particularly true for survivors of marginalized communities such as communities of color. Sources: "Community Approaches to Sexual Assault: VAWA's Role and Survivors' Experiences," Violence Against Women (December 30, 2020), journals.sagepub.com/doi/10.1177/1077801220949696; "A Qualitative Study Of Sexual Assault Survivors' Post-Assault Legal System Experiences,"Journal of Trauma & Dissociation (May 9, 2019), doi.org/10.1080/15299732.2019.1592643

UBER-MDL3084-000000571

# Non-consensual kissing of a sexual body part

(Includes kissing on the mouth)

This category is defined as: Without consent from the user, someone kissed or forced a kiss on a sexual body part of the user (breast, genitalia, mouth, buttocks). This would include kissing on the lips or kissing while using tongue.

### Table 14: Non-consensual kissing of a sexual body part (2019-2020)

| Subcategory | 2019-2020 | 2019 | | 2020 | | Incident rate change over reports (2019-2020 compared to 2017-2018) |
|---|---|---|---|---|---|---|
| | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips [178] | # of incident reports | % of total trips | % change incident rate [179] |
| Non-consensual kissing of a sexual body part | ~1 in 5,000,000 | 338 | 0.00002% | 110 | 0.00002% | -28% |

The vast majority of reports of non-consensual kissing of a sexual body part (over 75%) involved non-consensual kissing on the mouth. [180]

## Survivors

On average, throughout both years, riders were the survivor in about 79% (n=356) of all reports of non-consensual kissing of a sexual body part; in about 20% (n=91) of these reports, the driver was the survivor. [181]

---

178. Incident reports as a percent of total trips are rounded.
179. The Uber rate change may not sum according to the table. Rate change is based on unrounded rates.
180. Identified by manual audit.
181. The survivor was a third party or unknown in less than 1% of reports.

UBER-MDL3084-000000572

# Non-consensual touching of a sexual body part

This category is defined as: Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user.

### Table 15: Non-consensual touching of a sexual body part (2019-2020)

| Subcategory | Frequency of incident reports (by # of trips) | 2019 | | 2020 | | Incident rate change over reports (2019-2020 compared to 2017-2018) |
| --- | --- | --- | --- | --- | --- | --- |
| | | # of incident reports | % of total trips [182] | # of incident reports | % of total trips | % change incident rate [183] |
| Non-consensual touching of a sexual body part | ~1 in 1,000,000 | 1,526 | 0.00011% | 528 | 0.00008% | -23% |

Across the 2019-2020 time frame, ~41% of all reports of non-consensual touching of a sexual body part involved touching of women's breasts, while 15% and 1% of incident reports involved the buttocks and mouth, respectively. [184] Touching of the genitals or the genital area was reported in 44% of user reports of this sexual assault category. [185]

According to the National Sexual Violence Resource Center (NSVRC) and other experts, the comfort level of explicitly naming sexual body parts can vary from person to person, especially when a reporting party may feel shame or fear in describing what happened to them. Uber chose to take an expansive view on what kinds of words or phrases are considered sexual body parts for the purposes of data classification. For example, the Sexual Misconduct and Violence Taxonomy includes the phrase "between the legs" as a sexual body part. [186]

## Survivors

Throughout 2019-2020, riders and drivers were reported as the survivors evenly across incidents. In fact, the driver was the survivor in 49% (n=999) of incidents, whereas riders were survivors 51% (n=1,050) of the time. In 10% of the reports where the rider was the survivor (n=100), the accused was another rider. This is of note since it is the sexual assault category (within the 5 categories published in this report) with the highest percentage of riders accusing other riders.

---

182. Incident reports as a percent of total trips are rounded.
183. The Uber rate change may not sum according to the table. Rate change is based on unrounded rates.
184. Produced through manual review. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.
185. Produced through manual review. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.
186. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," RALIANCE (2018), raliance.org/wp-content/uploads/2018/11/helping-industries.pdf .

UBER-MDL3084-000000573

# Attempted non-consensual sexual penetration

(Includes clothing removal and attempted  clothing removal)

This category is defined as: Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as attempted non-consensual sexual penetration. This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue.

## Table 16: Attempted non-consensual sexual penetration (2019-2020)

| Subcategory | 2019-2020 Frequency of incident reports (by # of trips) | 2019 # of incident reports | % of total trips [187] | 2020 # of incident reports | % of total trips | Incident rate change over reports (2019-2020 compared to 2017-2018) % change incident rate [188] |
|---|---|---|---|---|---|---|
| Attempted non-consensual sexual penetration | ~1 in 7,000,000 | 202 | 0.00001% | 82 | 0.00001% | -54% |

## A note on definitions

The "attempted non-consensual sexual penetration" category covers of a wide range of incident reports that may allude to a potential assault but lack details that would allow it to be categorized more definitively. For example:

- The attempted or completed removal or bypassing of clothing to expose a sexual body part of the survivor

- The use of restraint or force to overcome the survivor (for example, the accused party being on top of the survivor or holding them down)

- Situations where the potential victim can recall and has a record of being on an Uber-facilitated trip, but is experiencing significant memory loss or fragmentation, and without explanation:

  - Woke up/regained consciousness without clothing; or

  - Woke up/regained consciousness not at their intended destination

It is common for sexual assault survivors to experience memory loss, fragmented memories, or a complete lack of memory of the event—either due to the psychological trauma of the incident [189] or to voluntary, coerced, or involuntary substance consumption. [190] This is why the Sexual Misconduct and Violence Taxonomy adopts inclusive and expansive definitions without compromising  the categorization  accuracy of other, more precise categories (such as touching,  kissing, or completed penetration). [191]

On average between 2019 and 2020, only 13% of reports in this category included any mention of genitalia. [192]

---

187. Incident reports as a percent of total trips are rounded.
188. The Uber rate change may not sum according to the table. Rate change is based on unrounded rates.
189. "Why Rape and Trauma Survivors Have Fragmented and Incomplete Memories,"Time (December 9, 2014), time.com/3625414/rape-trauma-brain-memory .
190. "Drug-Facilitated Sexual Assault," RAINN (accessed May 3, 2022), rainn.org/articles/drug-facilitated-sexual-assault.
191. For example, an incident report stating that a rider tried to pull up a female driver's shirt would be classified as attempted non-consensual sexual penetration, despite the lack of further details of the incident, since there was an attempt to remove clothing to access the breasts. If an incident report contains any mention of touching or kissing of a sexual body part (including the mouth), this automatically escalates the report to a higher category within the taxonomy.
192. Produced by manual review. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

UBER-MDL3084-000000574

With reports of attempted non-consensual sexual penetration (for example where the accused party "tried to rape" the reporting party), Uber maintains our reporting standard. Uber safety agents will attempt to make further contact with the reporting party to obtain a full statement of experience and clarifying details. If a follow-up conversation is not possible, Uber will still classify such reports as attempted non-consensual sexual penetration per the Sexual Misconduct and Violence Taxonomy (see " Challenges to comparisons: defining and collecting sexual assault data").

## Survivors

Across both years, riders were the survivors in 88% (n=250) of reports in this category. Drivers were the surviving party in 11% (n=32) of the reports.

Section Five

**UBER-MDL3084-000000575**

# Non-consensual kissing of a non-sexual body part

This category is defined as: Without consent from the user, someone kissed, licked, or bit, or forced a kiss, lick, or bite on any non-sexual body part (e.g., hand, leg, thigh) of the user.

Table 17: Non-consensual kissing of a non-sexual body part (2019-2020)

| Subcategory | 2019-2020 | 2019 | | 2020 | | Incident rate change over reports (2019-2020 compared to 2017-2018) |
|---|---|---|---|---|---|---|
| | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips [193] | # of incident reports | % of total trips | % change incident rate [194] |
| Non-consensual kissing of a non-sexual body part | ~1 in 3,000,000 | 513 | 0.00004% | 137 | 0.00002% | -37% |

Through a manual review, Uber identified that the majority (~37%) of reports in this category involved a person kissing another person's cheek or neck.[195] Incidents of non-consensual kissing of a non-sexual body part often involve unwanted kissing on body parts such as the cheek, hands, head, and shoulders.

## Survivors

Across 2019 and 2020, in a slight majority of reports of non-consensual kissing of a non-sexual body part, the driver was the survivor, comprising about 53% (n=347) of incidents for this category. Riders accounted for 47% (n=303) of survivors.

Section Five

---

193. Incident reports as a percent of total trips are rounded.
194. The Uber rate change may not sum according to the table. Rate change is based on unrounded rates.
195. Produced by manual review. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

UBER-MDL3084-000000576

# Conclusion

As this report shows, 99.9% of trips on the Uber platform ended without a safety incident.  Only 0.0002% of trips involved a critical safety event, and the rate of sexual assault decreased by over 30% since our last report. Although these incidents are incredibly rare, we recognize that each one represents a devastating experience for individuals, families, and communities impacted.

> The safety issues covered in this report are bigger than Uber.

We remain steadfast in our commitment to making Uber the safest platform in the world. This is why Uber's work on safety will never stop. We're constantly innovating and investing in the safety of our platform. We've prioritized robust screening processes and technology, built new safety features, and invested in providing riders and drivers with support in times of need. We remain dedicated to helping protect drivers and riders who use the Uber platform, guided by expert and advocate advice.

But the safety issues covered in this report are bigger than Uber. What happens in the broader society and across the country impacts our platform as well. Nationally, motor vehicle fatalities and fatal assaults increased during the pandemic, and sexual violence continues to be far too prevalent in our society, affecting the lives of millions of people in the US. These trends are reflected in our numbers as well. Although we are not immune to significant societal shifts in safety, we are doing our part to drive accountability and transparency on these issues so that we can make the world safer for all.

> Tackling these challenges requires a broad coalition of partners committed to safety and transparency.

Uber can't do this alone. Tackling these societal issues requires a broad coalition of partners committed to safety and transparency. We call on others—such as airline, taxi, rideshare, homeshare, and hotel companies—to also be transparent on safety. We all have a responsibility to make our companies and communities as safe as possible, and sharing our data is one step we can all take toward making that goal a reality.

Section Three

UBER-MDL3084-000000577

# Appendix  I



## External Validation of Sexual Misconduct and Violence Taxonomy for Uber

### Background

In 2018, RALIANCE published a Sexual Misconduct and Violence Taxonomy[1] (Taxonomy) to track and codify reports of sexual misconduct and sexual assault. RALIANCE developed the Taxonomy for organizations to identify and track reports of sexual misconduct and sexual assault within their systems for purposes of resolution and accountability, as well as to inform their internal sexual violence prevention efforts.

In 2019, RALIANCE published its report Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy[2] that validated Uber's use of the Taxonomy to classify incidents reported to have occurred in 2017 and 2018. In 2020 and 2021 RALIANCE reviewed Uber's use of the Taxonomy again for incidents reported to have occurred in 2019-2020.

### Purpose

To conduct an external validation of Uber's application of the Sexual Misconduct and Violence Taxonomy on identified incidents of concern, 2019-2020.

RALIANCE: External validation of Sexual Misconduct and Violence Taxonomy for Uber

UBER-MDL3084-000000578

## Sample

Similar to the approach used in the first Safety Report, RALIANCE reviewed two sets of reports: a random sample of reports spanning the entire taxonomy of sexual misconduct and sexual violence, as well as a non-random sample focused on the most serious reports. For the random sample, RALIANCE reviewed a sample of 383 reports from incidents reported in 2019, as well as a random sample of 385 reports from incidents reported in 2020. Both samples were representative of reports across the entire Taxonomy, and were selected by Uber using a power calculation to ensure that RALIANCE would have a subsample of incidents representative of the total sample with 95% confidence.

For the non-random sample which was focused on the most serious incidents such as attempted or actual contact, solicitation, masturbation/indecent exposure, verbal threats of sexual assault, or sexual assault, RALIANCE reviewed 200 incidents reported to have occurred in 2019 and 2020 in the United States. The purpose of this review was to further evaluate Uber's ability to apply the Taxonomy on the more severe, and infrequent events.

Uber staff members had previously coded all subsamples of incidents using the Taxonomy, allowing for external validation of Uber coding by RALIANCE. All tickets reviewed were from events that were reported to have occurred in the United States.

## Methods

The external validation team, comprised of representatives from RALIANCE and an academic research group, reviewed the subsample of incident reports. Uber provided incident data without codes to allow for objective external validation. Incident tickets contained the incident information provided to Uber in text format. Uber redacted all personal information in tickets to ensure anonymity of all involved.

Each incident was reviewed independently by three members of RALIANCE's external validation team. External validation coders then met to review and discuss all coding to reach consensus on codes. Finally, RALIANCE compared the external validation team's coding against Uber coding for both the randomly and non-randomly selected subsamples to assess concordance (i.e., agreement between external validators and Uber) in coding and to determine reasons for discordance. In cases of ambiguity, where Uber coders categorized a given incident at a higher tier or comparable offense as compared with external validation coders, and the external validation coders found justification for higher tier or equivalent categorization, RALIANCE supported concordance with the Uber team. Concordance rates were calculated with updated data for the random and non-random incidents. Subsequently, we conducted Cohen Kappa statistic to account for potential concordance due to chance for both subsamples.

## Results

For the random sample of 383 incidents from 2019, we found 81% concordance, and 87% for the random sample of 385 incidents from 2020.  This concordance was found after removing disagreements that were not meaningful, such as the example given above in our methodology, and when the report provided insufficient detail to the sexual context of the report, which does not support use of the Taxonomy. Ambiguities were more likely to arise from comments and gestures rather than from physical contact-based abuses. Nonetheless, concordance was high even for the comment and gesture incidents. The Cohen kappa for the random subsample of incidents from 2019 and 2020 was 0.78 and 0.85 respectively, indicating strong concordance between coding from the Uber team and the external validation team even after accounting for chance agreement.

For the non-random sample of incidents from 2019-2020 we also found 87% concordance once accounting for ambiguity issues as noted above in our methodology.

## Conclusion

Our analysis indicates that Uber staff are effectively using the Taxonomy and coding the identified incident data with a high degree of adherence relative to what we see with coding from experts working on issues of sexual misconduct and assault.

## Credits

Urban Institute conducted sampling and statistical calculations for the first sample from 2019. Sampling and statistical calculations were conducted by Anita Raj, Ph.D. for the second data set from 2019-2020.

Section Three

[1] Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault, RALIANCE, 2018: https://www.raliance.org/wp-content/uploads/2018/11/helping-industries.pdf

[2] Uber's Use of the Sexual Misconduct and Violence Taxonomy in 2019, RALIANCE, 2020, https://www.raliance.org/report_posts/examining-ubers-use-of-the-sexual-misconduct-and-violence-taxonomy/

RALIANCE: External validation of Sexual Misconduct and Violence Taxonomy for Uber

UBER-MDL3084-000000580

# Appendix  II



## Independent validation of Uber's methodology for analyzing fatal crashes

Uber requested the assistance of the Governors Highway Safety Association (GHSA), a nonprofit association representing the state and territorial highway safety offices, to independently validate the motor vehicle section of this report. GHSA contracted with Dr. James Hedlund, Principal of Highway Safety North, who retired as Associate Administrator for Traffic Safety Programs after a 22-year career with the National Highway Traffic Safety Administration (NHTSA). Hedlund reviewed Uber's methodology using data from NHTSA's Fatality Analysis Reporting System (FARS) as described below. Based on Dr. Hedlund's analysis, GHSA found Uber's methodology to be sound and agrees with the findings discussed in Appendix II.

Uber supplied a file with FARS case matches for most fatalities recorded by Uber in 2019 and 2020. The Uber file contained the FARS case number and, from both Uber and FARS files, the reported date and time, the latitude and longitude of the crash location (lat/long), and the vehicle identification numbers (VINs) of the involved vehicles. (Uber supplied only the VIN of the vehicle being used on their platform; FARS supplied VINs of all involved vehicles.)

The validation began by comparing the Uber and FARS dates and times. The Uber date-time was the time when the rider requested the trip. Uber also provided the trip duration, from the time when the driver picked up the passenger(s) to the time when the trip ended (often but not always the time of the crash). The FARS date-time was the time of the crash. Subtracting the trip duration time from the FARS crash time usually gives the Uber pickup time, but the time from the trip request time to the pickup time is unknown. This means that the Uber and FARS date-times cannot be matched precisely. They were considered matched if the unknown time from trip request to trip pickup was short, or if the trip continued after the crash. Using these criteria, all cases matched.

UBER-MDL3084-000000581

The Uber and FARS lat/longs were compared. Lat/longs can contain up to eight decimal places. A difference of one in the third decimal place translates to about 450 feet. The lat/longs were considered matched if they agreed this closely. If not, the two locations were compared via online open-source mapping and with the location recorded in other FARS variables. The Uber lat/long recorded where the trip ended. If the vehicle being used on Uber did not require towing from the crash scene, then the trip may have ended at a hospital or repair shop. Using these criteria, all cases matched.

The VIN provided by Uber and FARS VINs were compared. Each file contained the first 12 characters of the 17-digit VIN. The VIN provided by Uber may not have been involved in the crash (for example, if the fatality was a rider crossing the road to meet up with the driver and was struck by another vehicle). If the VIN of the vehicle on the Uber platform did not appear in FARS, the make and model were identified with a VIN lookup. Uber staff reviewed these cases and all cases matched.

Uber also supplied a file of fatal crashes occurring in connection with Uber's platform that appeared to have no match in FARS – five in 2019 and six in 2020. Each VIN from the Uber platform was compared with a sorted list of FARS VINs and each case date-time was compared with FARS date-times from the hours before, during and after the case's reported hour. No matches were found for either comparison. This likely was because the Uber-related crash did not qualify for FARS, for example if the crash occurred in a parking lot or other location not on a public roadway.

Section Three

# Appendix III

## Sexual Misconduct and Violence Taxonomy

(Ordered from least to most severe)

| Sexual misconduct | |
|---|---|
| Staring or leering | Someone gazes at a user in an unpleasant, uncomfortable, prolonged, or sexual manner. Staring or leering is constant and unwavering. This includes viewing both sexual and non-sexual body parts. |
| Comments or gestures > asking personal questions | Someone asks specific, probing, and personal questions of the user. This would include questions about the user's personal life, home address, contact information (e.g., phone, email, social media), romantic or sexual preferences. |
| Comments or gestures > comments about appearance | Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |
| Comments or gestures > flirting | Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. |
| Comments or gestures > explicit gestures | Someone made sexually suggestive gestures at the user. |
| Comments or gestures >explicit comments | Someone described or represented sexual activity or body parts in a graphic fashion. |
| Displaying indecent material | Indecent material, including pornography or other sexual images, was seen by the user. |
| Indecent photography/video without consent | Someone has taken, without consent, an inappropriate photograph of a user's sexual body part (e.g., down shirt, up skirt, etc.). |
| Soliciting a sexual act | Someone directly asks for a kiss, displays of nudity, sex, or contact with a sexual body part (breast, buttock, genitals). This could be a direct solicitation or a solicitation in exchange for money or favors. |
| Masturbation/indecent exposure | Someone has exposed genitalia and/or is engaging in sexual acts in presence of a user. This excludes public urination where no sexual body part (buttock, penis, breast) was exposed. |
| Verbal threat of sexual assault | Someone directed verbal explicit/direct threats of sexual violence at a user. |

Section Three

UBER-MDL3084-000000583

Section Three

| **Sexual assault**<br>• Sexual body parts are defined as the mouth, female breasts, buttocks, and genitalia. The phrase "between the legs" is considered to reference a sexual body part. All other body parts are characterized as non-sexual.<br>• When only a non-sexual body part is involved, either of the following provides context for the "sexual nature" of the contact/attempted contact:<br>  • Sexual misconduct of any type<br>  • Reporter's explicit perception that the contact was either flirtatious, romantic, or sexual | |
| --- | --- |
| Attempted touching of a non-sexual body part | Someone attempted to touch, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted kissing of a non-sexual body part | Someone attempted to kiss, lick, or bite, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted touching of a sexual body part | Someone attempted to touch, but did not come into contact with, any sexual body part (mouth, breast(s), buttock(s), or genitalia) of the user, and the user perceived the attempt to be sexual. |
| Attempted kissing of a sexual body part | Someone attempted to kiss, lick, or bite, but did not come into contact with the mouth, breast(s), or buttock(s) of the user, and the user perceived the attempt to be sexual. |
| Non-consensual touching of a non-sexual body part | Without explicit consent from the user, someone touched or forced a touch on any non-sexual body part (hand, leg, thigh) of the user. |
| Non-consensual kissing of a non-sexual body part | Without consent from the user, someone kissed, licked, or bit, or forced a kiss, lick, or bite on any non-sexual body part (hand, leg, thigh) of the user. |
| Attempted non-consensual sexual penetration | Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as attempted non-consensual sexual penetration. This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue. |
| Non-consensual touching of a sexual body part | Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user. |
| Non-consensual kissing of a sexual body part | Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue. |
| Non-consensual sexual penetration | Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue. |

For more information on the Sexual Misconduct and Violence Taxonomy, please visit " Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault ," a publication from the National Sexual Violence Resource Center.

Sexual Misconduct and Violence Taxonomy

# Appendix  IV

Determining which reported safety incidents are Uber-related

Section Three

Table 1: Motor vehicle fatality: What is Uber-related?

| Uber-related  (included in report) | Not Uber-related  (excluded from report) |
|---|---|
| ✓  Driver has accepted trip request and is on the way to rider's pickup location | ✗  Driver offline, not driving on the Uber platform |
| ✓  Driver or rider is actively entering or exiting the vehicle at the rider's pickup location  or destination | ✗  Driver online with no trip requests |
| ✓  During trip, on the way to rider's destination | ✗  Rider has been safely dropped  off at their destination |

| Not Uber-related: examples and rationales | |
|---|---|
| Example | Rationale |
| A third-party vehicle collides with a driver who has an Uber account but is not driving on the Uber platform at that moment. The driver and the third party are both fatally wounded. | Since the incident occurred during a time when the driver was not using the platform, the incident is not considered Uber-related for the purposes of data classification for this report. |
| A driver using the Uber platform drops off a rider at their destination and leaves. The rider walks down the street and is fatally struck by a third-party vehicle. | Since the fatal crash occurred after the driver had safely dropped off the rider at their destination and left the area, the fatality is not considered Uber-related for the purposes of data classification for this report. |
| A driver using the Uber platform writes in to Uber's Safety Support team to report that they witnessed 2 third-party vehicles collide, fatally wounding an occupant. | Despite the fact that the driver witnessed the crash, they were not directly involved in it. These fatalities are therefore not Uber-related for the purposes of data classification for this report. |

UBER-MDL3084-000000585

Section Three

| Uber-related: examples and rationales | |
|---|---|
| Driver has accepted trip request and is on the way to rider's pickup location | |
| Example<br>While a driver using the Uber platform is on the way to pick up a rider, their vehicle fatally strikes a pedestrian. | Rationale<br>The fatal crash involved the vehicle of a driver using the Uber platform while they were on the way to pick up a rider; it is therefore considered Uber-related for the purposes of data classification for this report. |
| Driver or rider is actively entering or exiting vehicle at the rider's pickup location or destination | |
| Example<br>A driver using the Uber platform arrives to pick up their rider and exits their vehicle to help load the rider's luggage into the trunk. A third-party vehicle strikes and fatally wounds the driver while they are outside their vehicle. | Rationale<br>The fatal crash occurred while a driver using the Uber platform was exiting their vehicle to assist their rider; this is considered Uber-related for the purposes of data classification for this report. |
| During trip, on the way to rider's destination | |
| Example<br>During a trip, a third party collides with the vehicle of a driver using the Uber platform, fatally wounding the driver and rider. | Rationale<br>The fatal crash involved the vehicle of a driver using the Uber platform during an active trip on the way to the rider's destination; it is therefore considered Uber-related for the purposes of data classification for this report. |
| During a large multi-vehicle crash, 2 passengers in a third-party vehicle are fatally wounded, and the vehicle of a driver using the Uber platform is struck. Neither the driver who's using the Uber app nor their riders are injured. | For the purposes of data classification for this report, Uber counts any human being that is fatally injured during a motor vehicle crash that also involved the vehicle of a driver using the Uber platform during a trip or while on the way to a rider's pickup location. The driver who's using the Uber app does not have to be the cause of the crash, nor carrying the deceased parties. |
| While a driver using the Uber platform is transporting a rider, their vehicle and a third party on a bicycle collide, and the third party on the bicycle is fatally wounded. | For the purposes of data classification for this report, Uber counts any human being that is fatally injured during a motor vehicle crash that also involved the vehicle of a driver using the Uber platform during a trip or while on the way to a rider's pickup location. The driver who's using the Uber app does not have to be the cause of the crash, nor carrying the deceased parties. |
| While a driver using the Uber platform is transporting a rider, they collide with another vehicle and are seriously injured. Two weeks after the crash, the driver who was using the Uber app passes away due to injuries sustained. | The fatality occurred within 30 days of a crash involving the vehicle of a driver using the Uber platform, and is therefore considered Uber-related for the purposes of data classification for this report. |

Determining which reported safety incidents are Uber-related

## Table 2: Fatal physical assault: What is Uber-related?

| Uber-related (included in report) | Not Uber-related (excluded from report) |
|---|---|
| ✓ During trip [1] | ✗ Driver is online with no trip requests |
| ✓ Involves parties matched by app, incident takes place up to 48 hours after trip completion | ✗ Involves parties matched by app, incident takes place more than 48 hours after trip completion |

| Uber-related: examples and rationales | |
|---|---|
| Incident occurred during an Uber-facilitated trip | |
| Example<br>During an Uber-facilitated trip, a third party outside of the vehicle fatally wounds the rider in the back seat of the vehicle. | Rationale<br>Even though the Uber app did not pair the victim and the accused, the incident occurred while at least one of the involved parties was actively on a trip facilitated by the Uber app; it is therefore considered Uber-related for the purposes of data classification for this report. |
| During an Uber-facilitated trip, 2 riders get into a physical altercation and one fatally wounds the other. | This incident occurred during a trip facilitated by the Uber app, and is therefore considered Uber-related for the purposes of data classification for this report. |
| Incident parties were paired via the Uber app (and incident occurred up to 48 hours after the trip concluded) | |
| Example<br>During an Uber-facilitated trip, the driver and rider get into a physical altercation, and the rider fatally wounds the driver. | Rationale<br>The victim and the accused party were paired by the Uber app; the incident is therefore Uber-related for the purposes of data classification for this report. |
| After an Uber-facilitated trip ends, the rider fatally wounds the driver. | Even though the trip had ended, the accused party was initially paired with the victim via the Uber app, and the fatal incident occurred within 48 hours of the trip's conclusion; the incident is therefore Uber-related for the purposes of data classification for this report. |

| Not Uber-related: examples and rationales | |
|---|---|
| Example<br>Law enforcement requests data on a rider who took an Uber-facilitated trip to a destination where they fatally wounded third parties. | Rationale<br>Since the incident did not occur during an Uber-facilitated trip and did not involve parties paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |
| While a rider using the Uber platform is waiting to be picked up by their driver, a third party robs and fatally wounds them. | Since the incident did not occur during an Uber-facilitated trip and did not involve parties paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |

Section Three

---

1. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is on his way to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was fatally wounded by a third party while on their way to the rider's pickup location, this would be included in the data set..

Determining which reported safety incidents are Uber-related

UBER-MDL3084-000000587

## Table 3: Sexual assault: What is Uber-related?

| Uber-related (included in report) | Not Uber-related (excluded from report) |
|---|---|
| ✓ During trip | ✗ Driver is online with no trip requests |
| ✓ Involves parties paired by the app, incident occurs up to 48 hours after trip completion | ✗ Involves parties paired by the app, incident occurs more than 48 hours after trip completion |

| Uber-related: examples and rationales | |
|---|---|
| Incident occurred during an active Uber-facilitated trip | |
| Example<br>During an Uber-facilitated trip, a driver touched a rider's buttocks and the rider reported the assault to Uber. | Rationale<br>This incident occurred while on an Uber-facilitated trip, so it is considered Uber-related for the purposes of data classification for this report. |
| A man and a woman meet at a club and decide to share a ride home on the man's Uber account. During the trip, the woman falls asleep and the man sexually assaults the woman. The driver observes the incident and reports it to Uber. | Even though the Uber app did not pair the victim and the accused party, the incident occurred while the riders were on an Uber-facilitated trip; it is therefore considered Uber-related for the purposes of data classification for this report. |
| Incident parties were paired via the Uber app (up to 48 hours after the trip concluded) | |
| Example<br>During an UberPool trip, one rider non-consensually kisses another rider on the cheek, and the rider who was kissed reports the incident to Uber. | Rationale<br>The victim and the accused party were paired on an UberPool trip by the Uber app; therefore, the incident is Uber-related for the purposes of data classification for this report. |
| A rider takes an Uber-facilitated trip. After the driver arrives at the destination and completes the trip, the rider tries to remove the driver's clothes without their consent, and the driver later reports the incident to Uber. | Even though the trip had ended, the accused party was initially paired with the victim by the Uber app, and the assault occurred within 48 hours of the trip's completion; the incident is therefore considered Uber-related for the purposes of data classification for this report. |

| Not Uber-related: examples and rationales | |
|---|---|
| Example<br>A driver using the Uber platform picks up a rider who immediately discloses that their acquaintance attempted to rape them just prior to the trip. The driver reports the disclosure to Uber. | Rationale<br>Since the incident did not occur during an Uber-facilitated trip, and because the parties were not paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |
| Law enforcement requests data on a rider who took an Uber-facilitated trip to a destination where they sexually assaulted a third party. | Although we would cooperate with law enforcement's request, the incident did not occur on an Uber-facilitated trip and did not involve parties paired by the Uber app, so this assault is not considered Uber-related for the purposes of data classification for this report. |
| A rider and driver are paired for a trip through the Uber app and begin dating. A week or 2 into their relationship, the driver sexually assaults the rider, and the victim reports the incident to Uber. | While the incident parties were paired through the app, the incident occurred more than 48 hours after the trip concluded. Since Uber's taxonomy is intended to capture events that occur as a result of temporary or episodic interactions facilitated through the app rather than prolonged interpersonal relationships, this incident is outside of Uber's scope, and is not Uber-related for the purposes of data classification for this report. |

Section Three

Determining which reported safety incidents are Uber-related

Uber

# APPENDIX D

UBER-MDL3084-000000589

**BEFORE THE PUBLIC UTILITIES COMMISSION**

**OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services. | R.12-12-011 (Filed December 20, 2012) |

**COMMENTS OF UBER TECHNOLOGIES, INC.**
**ON PROPOSED DECISION ADOPTING UNIFORM TAXONOMIES FOR SEXUAL ASSAULTS AND SEXUAL HARASSMENTS THAT TRANSPORTATION NETWORK COMPANIES MUST USE FOR THEIR ANNUAL REPORTS, AS WELL AS ADOPTING TRAINING, INVESTIGATING, AND REPORTING PROTOCOLS**

Ashley Fillmore
UBER TECHNOLOGIES, INC.
1515 3rd Street
San Francisco, California 94158
Email: ashley.fillmore@uber.com
Telephone: (707) 572-5216

June 13, 2022

Attorney for Uber Technologies, Inc.

UBER-MDL3084-000000590

**SUBJECT INDEX OF RECOMMENDED CHANGES TO THE PROPOSED DECISION**

The Proposed Decision should be revised to address the following legal and factual errors:

- The Proposed Decision improperly seeks to implement standards for classifying and reporting sexual assault and harassment; driver training; and investigative protocols without the consultation of an expert in the field of sexual violence. The Settlement Agreement between CPED, Uber, and the Rape, Abuse & Incest National Network, Inc. ("RAINN") ("Settlement Agreement"), as approved and adopted in Decision 21-12-003, specifies that up to a combined $4,000,000 from the safety settlement funds should be used to retain an expert in order to develop these standards.

- The Proposed Decision's definition of sexual assault erroneously excludes touching of a non-sexual body part and also relies on criminal and civil legal standards, which are not well suited to the TNC context.

- The Proposed Decision's definition of sexual harassment inaptly applies law designed for workplace harassment to the TNC context and conflates sexual misconduct with gender-based discrimination.

Accordingly, the CPUC should find that:[1]

---

[1] *See* Appendix for further detail.

i

UBER-MDL3084-000000591

- "Sexual Assault" is defined as any physical or attempted physical conduct that is reported to be sexual in nature and is without consent, and includes the complete RALIANCE taxonomy proposed in Attachment A of Uber's Opening Comments.

- "Sexual Misconduct" is defined as non-contact, unwanted experiences, and includes the complete RALIANCE taxonomy proposed in Attachment A of Uber's Opening Comments.

- Driver training must be operational within 90 days of the final decision and completed within 180 days.

- Only TNCs are required to maintain training completion data, rather than requiring a copy to be sent to the driver.

- Investigators are not required to make credibility assessments of victims.

- Rather than implementing the investigative questions as currently written in the Proposed Decision, TNCs shall develop investigative questions in partnership with experts in the field of sexual assault and sexual harassment.

UBER-MDL3084-000000592

**TABLE OF CONTENTS**

I.     INTRODUCTION…………………………………………………………... 1

II.    THE COMMISSION SHOULD NOT IMPLEMENT REQUIRED TRAINING AND INVESTIGATIVE PROTOCOLS WITHOUT THE INPUT OF AN EXPERT CONSULTANT, AS PER THE TERMS OF THE SETTLEMENT AGREEMENT……..2

III.   DEFINITIONS AND TAXONOMIES FOR SEXUAL ASSAULT AND SEXUAL HARASSMENT………………………………………………………………… 5

       A.  Sexual Assault………………………………………………………… 5

       B.  Sexual Harassment…………………………………………………...6

IV.   TRAINING FOR DRIVERS…………………………………………………... 8

       A.  Implementation Deadlines………………………………………………... 8

       B.  Certification Requirement……………………………………………9

V.    STANDARDS FOR INVESTIGATING AND RESOLVING CLAIMS OF SEXUAL HARASSMENT……………………………………………………………10

VI.   CONCLUSION…………………………………………………………...13

UBER-MDL3084-000000593

**TABLE OF AUTHORITIES**

**CALIFORNIA PUBLIC UTILITIES COMMISSION RULINGS AND DECISIONS**

R.12-12-011……………………………………………………………………………...*passim*

D.21-12-003……………………………………………………………………………*passim*


**OTHER AUTHORITIES**

JL Heinze, *Trauma and Sexual Violence*, National Sexual Violence Resource Center (Sept. 16, 2021)……………………………………………………………………………………..11, 12

L. Camille Hebert, *How Sexual Harassment Law Failed its Feminist Roots*, Georgetown Journal of Gender and the Law, XXII:57 Geo. J. Gender & L. 57 (2021)………………………………...7

Lori Haskell, et al., *The impact of trauma on adult sexual assault victims*, Department of Justice Canada (2019)…………………………………………………………………………………12

UBER-MDL3084-000000594

**BEFORE THE PUBLIC UTILITIES COMMISSION**

**OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services. | R.12-12-011 (Filed December 20, 2012) |

**COMMENTS OF UBER TECHNOLOGIES, INC.
ON PROPOSED DECISION ADOPTING UNIFORM TAXONOMIES FOR SEXUAL
ASSAULTS AND SEXUAL HARASSMENTS THAT TRANSPORTATION NETWORK
COMPANIES MUST USE FOR THEIR ANNUAL REPORTS, AS WELL AS ADOPTING
TRAINING, INVESTIGATING, AND REPORTING PROTOCOLS**

## I.     INTRODUCTION

Pursuant to Rule 14.3 of the Commission's Rules of Practice and Procedure, Uber

Technologies, Inc. ("Uber") respectfully submits the following comments on the Proposed

Decision on Adopting Uniform Taxonomies for Sexual Assaults and Sexual Harassments that

Transportation Network Companies Must Use for Their Annual Report, as well as Adopting

Training, Investigating, and Reporting Protocols ("Proposed Decision" or "PD").

As demonstrated through the publication of Uber's 2019 U.S. Safety Report; partnerships

with survivor advocate groups; and continual improvement of safety features on Uber's platform,

safety is paramount at Uber. Overall, Uber strongly supports, and appreciates the Commission's

commitment to, an industry-wide taxonomy, robust training, and thorough investigative

protocols for sexual assault and misconduct incidents. However, Uber maintains that any such

taxonomy, training, and protocol must be developed in a victim-centered, trauma-informed way,

1

UBER-MDL3084-000000595

rather than borrowed from criminal, employment, or insurance contexts that do not adequately reflect these perspectives. To that end, Uber respectfully requests that the Commission modify (or in some cases defer the implementation of) the Proposed Decision's requirements as recommended below.

## II.   THE COMMISSION SHOULD NOT IMPLEMENT REQUIRED TRAINING AND INVESTIGATIVE PROTOCOLS WITHOUT THE INPUT OF AN EXPERT CONSULTANT, AS PER THE TERMS OF THE SETTLEMENT AGREEMENT

The Proposed Decision's implementation of "minimum standards" for driver training and for "Investigating and Resolving Claims of Sexual Assault and Sexual Harassment" are not in keeping with the safety settlement, as approved and adopted in Decision ("D.") 21-12-003, between CPED, Uber, and the Rape, Abuse & Incest National Network, Inc. ("RAINN") (the "Settlement Agreement"). D.21-12-003 specifies that:

- up to $1,000,000 from the safety settlement funds "shall be used to pay for industry-wide education, outreach, and training on all forms of violence, including sexual violence, for the passenger carrier industry, including TNCs";

- up to an additional $3,000,000 "shall be used for (1) an evaluation, informed or conducted by industry experts, of the California TNC industry's existing protocols and practices for classifying and reporting violence, including sexual violence, and (2) the development and recommendation of industry-wide best practices, informed or conducted by industry experts, for receiving, reporting, and responding to complaints of violence, including sexual violence"; and

2

UBER-MDL3084-000000596

- the industry expert "shall be selected by a panel convened by the CPED that will include a representative from each of CPED, Uber and at least two other TNCs."[2]

Nowhere in the Proposed Decision does the Commission indicate that its proposed definitions, training directives, or investigative protocols were developed in partnership with or informed by a consultant or expert on sexual violence. Rather, the Commission attempts to sidestep these provisions by suggesting that "TNCs may supplement the training, investigation, and reporting protocols adopted today with additional best practices that are learned after consulting with persons and companies who are recognized experts in the fields of sexual assault and sexual harassment training and investigating."[3] The Commission also states that while experts could be helpful for refining the actual investigative steps, there are baseline standards that TNCs should implement now, which can be refined by a consultant later.[4] This approach is wholly inadequate. Not only is it operationally inefficient – requiring TNCs to expend resources and time to stand up processes that will inevitably change – but it also results in the immediate implementation of protocols that were clearly developed without the necessary expertise in sexual violence and trauma and that are *actively harmful to victims*, as described in greater detail below. The Commission cannot "unring the bell" for victims who are negatively impacted by these protocols.

---

[2] Decision ("D.") 21-12-003, at 42-43.
[3] R.12-12-011, Proposed Decision Adopting Uniform Taxonomies for Sexual Assautls and Sexual Harassments that Transportation Network Comanies Must Use for Their Annual Reports, as well as Adopting Training, Investigating, and Reporting Protocols ("Proposed Decision"), Apr. 29, 2022, at 2.
[4] Notably, there is no indication of the Commission's intended timeline for retaining an expert consultant. To date, CPED has not indicated that any steps have been taken toward convening a panel to select a consultant, leaving the TNC industry subject to the Commission's problematic baseline standards indefinitely.

3

UBER-MDL3084-000000597

As Uber urged in its opening comments, the Commission should *first* proceed by utilizing the millions of dollars from safety settlement funds received by the Commission pursuant to the Settlement Agreement adopted in D.21-12-003 to hire a consultant.[5] These funds are explicitly available to "pay for industry-wide education, outreach, and training on all forms of violence, including sexual violence, for the passenger carrier industry" and to go toward the "development and recommendation of industry-wide best practices . . . for receiving, reporting, and responding to complaints of violence, including sexual violence."[6] It is critical that the consultant have expertise in gender-based violence to ensure a survivor-centric and trauma-informed approach, and Uber therefore reiterates its request that the Commission direct CPED to proceed with convening a panel that includes a representative of CPED, Uber, and at least two other TNCs to select the consultant, as contemplated by the D.21-12-003.[7] It is because it is essential for victims' advocates to have a seat at the table that this language was included in the Settlement Agreement. While the D.21-12-003 does not affirmatively prohibit the Commission from setting "baseline standards" for TNCs without the guidance of experts, such an approach is at odds with the intent of the Settlement Agreement, requires TNCs to change existing practices only to have them potentially revised again, and fails to acknowledge the purpose behind the provisions cited above.

---

[5] R.12-12-011, Opening Comments of Uber Technologies, Inc. on Third Amended Phase III. C. Scoping Memo and Ruling of Assigned Commissioner ("Uber's Opening Comments"), Jan. 21, 2022, at 6, 8.
[6] D.21-12-003, at 42-43.
[7] Uber's Opening Comments, at 9.

4

UBER-MDL3084-000000598

III.     **DEFINITIONS AND TAXONOMIES FOR SEXUAL ASSAULT AND SEXUAL HARASSMENT**

   A.     **Sexual Assault**

The Commission proposes adopting a definition of sexual assault drawn from California civil and criminal statutes. Uber urges the Commission to adopt the definition of sexual assault utilized by Uber and Lyft and developed with input and approval from survivor advocate organizations. The taxonomy developed by the National Sexual Violence Resource Center (now known as RALIANCE) and Urban Institute is a credible, expert-backed taxonmy developed specifically to provide a structure for consistent classifcation of reports of sexual violence tailored specifically to the platform experience, where users experience temporary interactions with each other. The taxonomy was developed to provide a mutually exclusive, collectively exhaustive way for businesses to classify incidents of sexual assault, and to provide a lingua franca among similar businesses to encourage transparent sharing of data, as Uber has done with its U.S. Safety Report released in 2019. Specifically, Uber raises the following concerns:

The Commission's definition of sexual assault does not include touching of non-sexual body parts. Perhaps this is an oversight, given that the Commission's qualifying examples of sexual assault do include touching of non-sexual body parts. However, the Commission does not provide context or qualifiers to determine what makes these touches sexual in nature versus not sexual in nature since an intimate body part is not involved. As a result, individual TNCs are left to interpret for themselves what qualifies touching of a non-sexual body part as sexual assault. This may lead to overinclusion of incidents involving touching or attempted touching of non-sexual body parts, such as reports of physical or verbal altercations. Alternatively, it may

UBER-MDL3084-000000599

lead to underreporting if TNCs are overly narrow in interpreting what constitutes sexual intent when touching or attempted touching of non-sexual body parts occurs. Importantly, the interpretative flexibility of this definition would almost certainly lead to inconsistent record keeping and reporting across TNCs, which would make it difficult or impossible for the Commission to compare or evaluate sexual assault incident rates.

To address this gap, Uber proposes that the sexual assault definition specify that when a non-sexual body part is involved, either of the following provides context for the sexual nature of the contact or attempted contact: (1) sexual misconduct of any type;[8] (2) the reporter's explicit perception that the contact was either flirtatious, romantic, or sexual.

### B.    Sexual Harassment

The Commission proposes adopting a definition of sexual harassment guided by FEHA and Title VII of the Civil Rights Act of 1964. Uber urges the Commission to instead adopt the definition of sexual *misconduct* utilized by Uber and Lyft and developed with input and approval from survivor advocate organizations. Specifically, Uber raises the following concerns:

*Conduct Based on Sex.* The definition the Commission proposed necessitates that the qualifying conduct be "based on sex (*i.e.*, gender)."[9] The decision to use this legal definition of sexual harassment, rather than broadening the definition to include all forms of sexual misconduct, means that some forms of sexual misconduct not demonstrably based on sex or gender would be excluded from incident counts. Legal researchers have identified that this is a

---

[8] It is important to note here that relying on the presence of sexual misconduct as an indicator of sexual intention in touching of non-sexual body parts means that the definition of sexual misconduct also needs to be clear and consistent across TNCs.
[9] Proposed Decision, at 11.

UBER-MDL3084-000000600

difficulty which already exists in court systems for victims of sexual harassment whose claims have been dismissed on technical grounds given this requirement.[10] Additionally, this added requirement would put the burden directly onto the victims and survivors of abuse to provide evidence of the cause of sexual misconduct incidents, a burden Uber feels strongly they cannot and should not carry. It is important that the sexual misconduct category of a sexual violence taxonomy be sufficiently broad enough to capture incidents which a user cannot explicity prove were on the basis of their sex or gender.

Uber is also concerned that the Commission's definition of sexual harassment does not distinguish between sexual misconduct and sex-based discrimination. This means that incidents of discrimination involving pregnant or LGBTQIA+ individuals would be grouped with incidents involving flirting, sexually graphic comments, and displaying indecent materials. While discrimination is a serious matter, it would be inconsistent to record incidents of discrimination in this category which is otherwise focused on sexual behaviors.

*Reasonable Person Standard*. The Commission's definition also requires that the behavior "creates an intimidating, hostile, or offensive environment to a reasonable person."[11] While this seems logical on the surface, it ultimately represents a definition that is very difficult to operationalize in the TNC context. First, Uber does not have the authority to require victims and survivors to cooperate in investigations of situations reported to us. Because of that, it is

---

[10] L. Camille Hebert, *How Sexual Harassment Law Failed its Feminist Roots*, XXII:57 Geo. J. Gender & L. 57, 73-74 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2021/08/how-sexual-harassment-law-...-.pdf.

[11] Proposed Decision, at 31.

UBER-MDL3084-000000601

possible that we may not be able to ascertain enough information on incidents to determine how a reasonable person would feel about these incidents. Second, even in situations where victims and survivors would be willing to share these details, asking questions sufficient to satisfactorily answer this question could be retraumatizing and inconsistent with the Commission's requirements for "Selecting the claims investigator," which indicate that "[t]he persons conducting the investigation must be sensitive to the privacy interests of the claimants and conduct their investigations in a manner that does not traumatize the claimants."[12] In contrast, Uber's proposed definition indicates that a victim or survivor's perception of the incident is sufficient to classify the report as sexual in nature. This reduces the amount of retraumatization that a victim may experience in the course of providing incident details during the investigation.

## IV.   TRAINING FOR DRIVERS

Uber currently requires drivers to complete a robust training on sexual assault and sexual misconduct, as defined by and developed in partnership with survivor advocate groups. We believe this training, which was designed for the ridesharing context specifically, is more appropriate than training designed for a traditional workplace environment (based on laws that were enacted before ridesharing even existed). Again, Uber requests that the Commission consult an industry expert before imposing training and education requirements on TNCs.

### A.   Implementation Deadlines

Uber's existing training will need to be updated in order to comply with some of the Commission's proposed standards, including the development of gender identity training and the

---

[12] *Id.* at 25.

UBER-MDL3084-000000602

incorporation of the Commission's proposed definitions. We are working diligently to make these changes; however, to do so within 60 days of the Commission's final decision, as well as to require driver completion of the new training within 120 days of the final decision, will be quite arduous. Uber respectfully requests that the Commission extend these deadlines to require TNCs' updated training to be operational within 90 days, and completion within 180 days of the Commission's final decision. This timeline is consistent with the timeline for implementing the new training requirements under Prop 22, which went into effect on January 1, 2021 and required driver completion by July 1, 2021. This timeline will allow TNCs to implement these new requirements with sufficient time to consult experts, ensure accuracy and sensitivity with respect to the material, communicate with drivers, and undergo the necessary quality assurance processes. Uber adheres to a philosophy that training should be engaging, relevant, and guided by experts. In short, effective training warrants a meaningful investment of time.

### B.    Certification Requirement

The Proposed Decision includes a requirement that drivers receive a certificate of completion for the driver training and that TNCs maintain a copy of the certificate as well. While this requirement makes sense in the context of in-person education, it is not necessary for an app-based platform, where education is administered electronically and completion data can be stored indefinitely.

Uber therefore proposes that the same purpose could be served by a requirement that TNCs store the training completion data, rather than placing an additional burden on drivers. Simplifying the requirement in this way will also allow TNCs to focus resources on the more

UBER-MDL3084-000000603

substantive aspects of the training program. Finally, it will presumably be TNCs, rather than drivers, who would be audited, so it makes sense for the certification requirement to focus on TNC data retention. Inasmuch as the Commission has not articulated a reason for requiring that both the driver *and* the TNC retain these records, Uber believes it should suffice for TNCs to maintain training completion data and provide it to the Commission as needed.

## V.    STANDARDS FOR INVESTIGATING AND RESOLVING CLAIMS OF SEXUAL HARASSMENT

The Proposed Decision prescribes standards for investigating and resolving claims of sexual asssault and sexual harassment, including requirements for selecting a "claims investigator" and a list of questions that an investigator would be required to ask of a "claimant," an "alleged perpetrator," and any witnesses.[13] From the start, it is clear that the proposed protocol is not based on a victim-centric approach, as the TNCs urged. Indeed, the investigation process as a whole refers to survivors as "claimants," suggesting that the prescribed standards are borrowed from an insurance or litigation context, without the appropriate adjustments to make these standards suitable for addressing claims of sexual assault or misconduct.

First, Uber opposes the explicit requirement that "the selected investigator must be able to make credibility assessments of the claimant, alleged perpetrator, and any witnesses interviewed."[14] This is inconsistent with Uber's current approach and with expert-recommended best practices for addressing sexual assault and misconduct. Uber has taken the advice of survivor advocates and removed exactly these types of conclusivity requirements because

---

[13] *Id*. at 25-26.
[14] *Id*. at 25.

10

survivors should not be required to "prove" their own assault. As Uber articulated in its opening

comments, it is essential to a victim-centric approach to "remove the requirements of

conclusivity, corroboration, and survivor 'credibility' in order to ban an accused party's account

from the Uber app."[15]

Second, Uber is troubled that the investigator's required lines of questioning are neither

trauma-informed nor victim-centric. Indeed, the Proposed Decision pays lip service to the need

to avoid retraumatizing victims, yet the investigator questions themselves are traumatizing.

Tellingly, the Proposed Decision does not refer to consultations with survivor advocates or

experts in the field of sexual assault. Specifically, Uber is opposed to the following:

- Many of the questions for the victim are likely to be perceived as accusatory or

  victim blaming, such as "How did you react?" and "What response did you make

  when the incident occurred or afterward?" These types of questions have long

  been considered by experts as flawed and triggering for survivors.[16]

- Questions such as "What exactly occurred or was said?" and "Are there any notes,

  physical evidence, or other documentation regarding the incident?" impose, or at

  minimum suggest, a higher burden of proof on a survivor--as does the fact that

  there are 10 required questions of the victim, but only four required questions for

  "alleged perpetrators" and third-party witnesses. The question "What exactly

  occurred or was said?" also indicates a lack of understanding of how the brain

---

[15] *See* Uber's Opening Comments, at 10.
[16] JL Heinze, *Trauma and Sexual Violence*, National Sexual Violence Resource Center (Sept. 16, 2021), available at
https://www.nsvrc.org/blogs/exploring-conversation-trauma-blog-series/Trauma-and-sexual-violence

UBER-MDL3084-000000605

processes trauma and implies that a victim of sexual assault will need to immediately recall all relevant facts and details in order for the incident to be addressed. Research has shown that the experience of trauma can have significant impacts on survivors, including their memory and recall,[17] and it is therefore critical to integrate trauma-informed responses to engaging with survivors, which this proposal currently lacks.

- The instruction, "If the perpetrator claims that the allegations are false, ask why the claimant would allegedly fabricate a story" is unnecessarily combative and sets up an adversarial process where one party must be lying in order for the other party to be telling the truth. It is possible that a victim's experience or recollection could be misaligned with the perpetrator's, and that does not mean the incident did not happen or should not be addressed.

Questions like these inappropriately place extra responsibility on the victim, suggest a victim's responsibility to prevent an incident or react a certain way, and ultimately contribute to a culture that discourages victims from coming forward. The problematic nature of the proposed questions is illustrative of why an expert consultant is essential at this stage of the development of an investigative protocol, rather than implementing unworkable requirements now and refining them later, as the Commission suggests. Accordingly, Uber urges that the investigator

---

[17] Lori Haskell, et. al., *The impact of trauma on adult sexual assault victims*, Department of Justice Canada 18-23 (2019), available at https://www.justice.gc.ca/eng/rp-pr/jr/trauma/trauma_eng.pdf; Heinze, *supra*, note 16.

UBER-MDL3084-000000606

questions in the Proposed Decision be set aside at this time and revisited once a consultant,

selected by a panel as described above, has been retained.

## VI.    CONCLUSION

Uber fully supports the need for reporting standardization, robust training, and

investigative standards around incidents of sexual assault and sexual misconduct on TNC

platforms. However, as detailed above, many of the Proposed Decision's requirements would

risk retraumatizing and inappropriately burdening survivors. To avoid this result, and for the

reasons stated herein, the Proposed Decision should be modified to adopt the taxonomy proposed

by Uber and developed in partnership with RALIANCE and the Urban Institute, and the

Commission should wait to implement training and investigative standards until an expert

consultant is selected.

Respectfully submitted on this 13th day of June, 2022 in San Francisco, California.


ASHLEY FILLMORE

_____/s/ Ashley Fillmore_____
Ashley Fillmore
UBER TECHNOLOGIES, INC.
1515 3rd Street
San Francisco, California 94158
Email: ashley.fillmore@uber.com
Telephone: (707) 572-5216

Attorney for Uber Technologies, Inc.

13

UBER-MDL3084-000000607

**APPENDIX SETTING FORTH PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PROPOSED ORDERING PARAGRAPHS**

## I.    PROPOSED FINDINGS OF FACT

Uber does not object to Findings of Fact 1-4. Uber proposes that the Commission add the following Findings of Fact:

[#].    Input from third-party advocates and survivors is necessary for the development of industry-wide education and training.

[#].    Input from third-party advocates and survivors is necessary for the development of protocols for classifying and reporting sexual assault and misconduct.

[#].    Input from third-party advocates and survivors is necessary for the development of best practices for investigating reports of sexual assault and misconduct.

## II.    PROPOSED CONCLUSIONS OF LAW

Uber does not object to Conclusions of Law 1-4. Uber proposes the Commission add the following Conclusions of Law:

[#].    Decision 21-12-003 Adopting the Settlement Agreement between CPED, Uber, and the Rape, Abuse & Incest National Network, Inc. ("RAINN") requires that up to $1,000,000 from the safety settlement funds be used to pay for industry-wide education, outreach, and training on all forms of violence, including sexual violence, for the passenger carrier industry, including TNCs. (Decision ("D.") 21-12-003, at 42-43.)

[#].    D.21-12-003 requires (1) an evaluation, informed or conducted by industry experts, of the California TNC industry's existing protocols and practices for classifying and

14

reporting violence, including sexual violence, and (2) the development and recommendation of industry-wide best practices, informed or conducted by industry experts, for receiving, reporting, and responding to complaints of violence, including sexual violence. (D.21-12-003, at 43.)

[#].     D.21-12-003 requires that the industry expert be selected by a panel convened by the CPED that will include a representative from each of CPED, Uber and at least two other TNCs. (D.21-12-003, at 43.)

[#].     It is therefore <u>not</u> reasonable that the Commission should set baseline standards for classifying, reporting, training on, and investigating instances of sexual assault and sexual misconduct without first seeking input from an industry expert on sexual violence.

## III.     PROPOSED ORDERING PARAGRAPHS

Uber proposes the Commission revise the Ordering Paragraphs as follows:

1. The Commission adopts the following definition of sexual assault: Sexual assault behaviors include any physical or attempted physical conduct that is reported to be sexual in nature and is without consent. Categories include:

- Attempted Touching Non-Sexual Body Part[18]
- Attempted Kissing Non-Sexual Body Part
- Attempted Touching Sexual Body Part
- Attempted Kissing Sexual Body Part
- Non-Consensual Touching Non-Sexual Body Part
- Non-Consensual Kissing Non-Sexual Body Part
- Attempted Non-Consensual Sexual Penetration
- Non-Consensual Touching Sexual Body Part
- Non-Consensual Kissing Sexual Body Part
- Non-Consensual Sexual Penetration

---

[18] These categories appear in the Proposed Decision as "examples" of sexual assault. Please note that categories are intentionally ordered from least to most severe.

15

UBER-MDL3084-000000609

2. The Commission adopts the following definition of sexual ~~harassment~~ misconduct:

Sexual misconduct includes any reported behavior of a sexual or romantic nature that is without consent or has the effect of threatening or intimidating a user against whom the conduct is directed. Non-contact categories include the following behaviors:

- Staring or leering.
- Comments about or asking personal questions (which would include questions about the user's personal life, home address, contact information, romantic or sexual preferences).
- Comments about or gestures regarding appearance.
- Flirting.
- Explicit sexually suggestive gestures.
- Explicit sexually suggestive comments.
- Displaying of indecent material.
- ~~Displaying~~ Indecent photography/video without consent.
- Soliciting a sexual act.
- Masturbation or engaging in acts of indecent exposure.
- ~~Turning general conversations into conversations regarding sex.~~
- Verbal threats of a sexual nature.

3. The Commission adopts the following baseline standards for training Transportation Network Company (TNC) drivers regarding sexual assault and sexual ~~harassment~~ misconduct:

- Each TNC must develop a training program on its own or in partnership/consultation with a recognized expert in the field of sexual assault and sexual ~~harassment~~ misconduct, that is accessible either in person, on a computer, or mobile device. As for the sexual assault component of the training, the course shall, at a minimum, instruct on the definition of sexual assault including the categories above ~~and the various examples of conduct that can constitute sexual assault~~.
- As for the sexual ~~harassment~~ misconduct component of the training, the course shall cover the definition and behaviors above ~~of unlawful sexual harassment under the FEHA and Title VII of the Civil Rights Act of 1964 and provide examples of the types of conduct that constitute sexual harassment~~.
- As part of its sexual assault and sexual ~~harassment~~ misconduct training, each TNC must also adopt gender identity training as required by Senate Bill 396.
- Each TNC shall also provide written policies (either in hard copy or electronic form) for preventing sexual assault and sexual ~~harassment~~ misconduct to each of its TNC drivers.

16

UBER-MDL3084-000000610

- Each TNC's training program shall be operational within ~~60~~ 90 days from the adoption of this decision.
- All TNC drivers shall have completed the training within ~~120~~ 180 days from the adoption of this decision.
- Each TNC shall provide a copy of the current version of its training program and written policies to the Commission upon request.
- The training and written policies must be available in English, and may also be available in (but not limited to) Spanish, Korean, Chinese, Russian, Tagalog, and Vietnamese.
- Each TNC driver must complete and pass the training annually.
- ~~Each TNC must maintain training completion data for each driver must receive a certificate of completion, with a copy going to TNC for whom the driver provides TNC transport through that TNC's app.~~ Each TNC shall maintain ~~the certificates of~~ completion data for each driver providing TNC transport. For drivers no longer subscribing to the TNC's app, the TNC shall maintain the certificates of completion for two years.

4. Transportation Network Companies may supplement the training standards adopted by this decision after consulting with experts in the field of sexual assault and sexual ~~harassment~~ misconduct.

5. The Commission adopts the following baseline standards for Transportation Network Companies (TNCs) to follow when investigating sexual assault and sexual ~~harassment~~ misconduct claims:

The claims investigation process.

- Each TNC shall have a written claims investigation manual which sets forth how the TNC will investigate and resolve each claim.
- The written claims investigation manual must include the requirement that claims should be responded to in a timely manner once the TNC has been made aware that a claim has been made.
- The written claims investigation manual must include the steps for conducting a complete analysis of the claim.
- The written claims investigation manual must include the steps for conducting interviews with the ~~claimant~~ victim and any witnesses to the claim.
- The person(s) conducting the investigation of the claim must document (in writing or electronically) the results of each step of the investigation, including any ~~claimant~~ victim and witness statements.

17

- The written claims investigation manual must include steps for interviewing the driver named in the claim.
- The conclusions reached regarding the claim must be documented (in writing or electronically).
- Any appropriate action taken as a result of the conclusions reached regarding the claim must be documented (in writing or electronically).

Selecting the claims investigator.

- The investigator should be trained in investigating sexual assault and sexual ~~harassment~~ misconduct claims.
- The persons conducting the investigation must be sensitive to the privacy interests of the ~~claimants~~ victims and conduct their investigations in a manner that does not traumatize the ~~claimants~~ victims.
- If the investigator is already employed by the TNC, the investigator must not have any personal involvement with any of the parties who are part of the investigation.
- Depending on the nature of the allegations, and to avoid the appearance of influence or bias, it may be necessary for a TNC to retain an outside third-party that is independent from the TNC to conduct the investigation.
- ~~The selected investigator must be able to make credibility assessments of the claimant, alleged perpetrator, and any witnesses interviewed.~~

Suggested questions to ask the ~~claimant~~ victim.

- Who committed the alleged act?
- ~~What exactly occurred or was said?~~
- When did it occur?
- Where did it occur?
- Was it a single act or multiple acts?
- How did the act(s) affect you?
- ~~How did you react?~~
- ~~What response did you make when the incident occurred or afterwards?~~
- ~~Are there any notes, physical evidence, or other documentation regarding the incident?~~
- How would you like to see the situation resolved?

Suggested questions to ask the alleged perpetrator.

- What is your response to the allegations?
- ~~If the perpetrator claims that the allegations are false, ask why the claimant would allegedly fabricate a story.~~
- Are there any persons who have relevant information?
- Are there any notes, physical evidence, or other documentation regarding the incident?

18

Suggested questions to ask third parties.

- What did you see or hear?
- When did this occur?
- What did the complainant tell you?
- When did the complainant tell you this?

6. Transportation Network Companies may supplement the investigation standards adopted by this decision after consulting with experts in the field of sexual assault and sexual ~~harassment~~ misconduct or after consulting with Commission staff.

7. In lieu of the above suggested questions, TNCs may develop their own investigative questions for victims, alleged perpetrators, and third parties in partnership with experts in the field of sexual assault and sexual misconduct.

~~7~~ 8. The Commission orders all Transportation Network Companies (TNCs) to continue complying with the requirement to report sexual assault and sexual ~~harassment~~ misconduct claims in their Annual Reports. Commission staff may supplement or modify those reporting requirements as needed and shall notify each TNC of such changes in writing.

~~8~~ 9. Commission staff may supplement and/or modify the standards for reporting sexual assault and sexual ~~harassment~~ misconduct claims in the Annual Reports.

~~9~~ 10. In the event Commission staff wants to conduct any follow up investigation with a Transportation Network Company (TNC) regarding any of the sexual assault or sexual ~~harassment~~ misconduct claims reported in its Annual Reports, the Commission agrees that the reporting requirements that it adopted in Decision 21-12-003 shall be adopted and applied to all TNCs operating in California as follows:

> Each TNC shall ensure that, for any incident of sexual assault or sexual harassment that has been reported to the TNC, the TNC will offer witnesses

19

UBER-MDL3084-000000613

involved in such incidents (including survivors) an opportunity to "opt-in" in writing to consent to be contacted by the Commission. Witnesses will be able to opt-in or withdraw that consent at any time. Each TNC shall submit to CPED the names and contact information for witnesses that have opted-in upon CPED request and such information may be accompanied by a claim of confidentiality pursuant to G.O. 66-D. CPED agrees to notify the TNC via email before it contacts any such witnesses. CPED agrees to allow the TNC a reasonable period of time to coordinate with organizations, such as RAINN, on any anticipated CPED contact of witnesses.

UBER-MDL3084-000000614