# EXHIBIT A-7

Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

IN RE: UBER TECHNOLOGIES, INC. )
PASSENGER SEXUAL ASSAULT      )    NO. 23-md-03084 CRB
LITIGATION.                   )
_____)

San Francisco, California
Friday, November 3, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
        275 Battery Street - 29th Floor
        San Francisco, California  94111
   BY:  **SARAH LONDON, ATTORNEY AT LAW**

        CUTTER LAW P.C.
        401 Watt Avenue
        Sacramento, California  95864
   BY:  **C. BROOKS CUTTER, ATTORNEY AT LAW**
        **CELINE E. CUTTER, ATTORNEY AT LAW**

        PEIFFER WOLF CARR KANE CONWAY & WISE
        4 Embarcadero Center - Suite 1400
        San Francisco, California  94111
   BY:  **RACHEL ABRAMS, ATTORNEY AT LAW**

        LEVIN SIMES LLP
        1700 Montgomery Street - Suite 250
        San Francisco, California  94111
   BY:  **DAVID M. GRIMES, ATTORNEY AT LAW**
        **WILLIAM A. LEVIN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:      Marla F. Knox, CSR No. 14421, RMR, CRR
                United States Official Reporter

```
 1  APPEARANCES:  (continued)

 2  For Plaintiffs:
                        WILLIAMS HART & BOUNDAS LLP
 3                      8441 Gulf Freeway - Suite 600
                        Houston, Texas  77017
 4             BY:  JOHN E. WILLIAMS, JR., ATTORNEY AT LAW
                    BRIAN A. ABRAMSON, ATTORNEY AT LAW
 5
                        CHAFFIN LUHANA LLP
 6                      600 Third Avenue - 12th Floor
                        New York, New York  10016
 7             BY:  ROOPAL P. LUHAHA, ATTORNEY AT LAW

 8  For Defendant:
                        PAUL, WEISS, RIFKIND, WHARTON
 9                      GARRISON LLP
                        2001 K Street, NW
10                      Washington, D.C.  20006
               BY:  KYLE N. SMITH, ATTORNEY AT LAW
11
                        PAUL, WEISS, RIFKIND, WHARTON
12                      GARRISON LLP
                        535 Mission Street - 24th Floor
13                      San Francisco, California  94105
               BY:  RANDALL S. LUSKEY, ATTORNEY AT LAW
14
                        PAUL, WEISS, RIFKIND, WHARTON
15                      GARRISON LLP
                        1285 Avenue of the Americas
16                      New York, New York  10019
               BY:  ROBERT A. ATKINS, ATTORNEY AT LAW
17                  ANDREA KELLER, ATTORNEY AT LAW

18

19

20

21

22

23

24

25
```

| | |
|---|---|
1 | **Friday - November 3, 2023**                                        **11:03 a.m.**

2                                      **P R O C E E D I N G S**

3                                             ---000---

4           **THE CLERK:**  All rise.  Court is now in session.  The

5    Honorable Charles R. Breyer presiding.

6                             (Pause in the proceedings.)

7           **THE CLERK:**  You may be seated.  Calling civil action

8    MDL 23-MD-3084, In Re: Uber Technologies, Inc. Passenger Sexual

9    Assault Litigation.

10         Parties, please step forward and state your appearances

11   for the record.  And, again, please speak into the microphone.

12   Plaintiffs, you may go first.

13         **MS. LONDON:**  Good morning, Your Honor, Sarah London

14   from Lieff Cabraser on behalf of Plaintiff MFA.

15         **THE COURT:**  Good morning.

16         **MR. CUTTER:**  Good morning, Your Honor, Brooks Cutter

17   from Cutter Law on behalf of Plaintiff CL 1, 2, 3.

18         **MS. CUTTER:**  Good morning, Your Honor, Celine Cutter,

19   Cutter Law, Jane Doe -- or Jane Roe, CL 1, 2 and 3 and John

20   Roe.

21         **THE COURT:**  Okay.

22         **MS. ABRAMS:**  Good morning, Your Honor, Rachel Abrams

23   from Piper Wolf Carr Conway & Wise.  I was Petitioner for this

24   MDL and represent about 45 Plaintiffs currently filed with the

25   MDL.

1        **THE COURT:**  Okay.

2        **MS. LUHANA:**  Good morning, Your Honor, Roopal Luhana,

3  Chaffin Luhana, and I represent Plaintiff Cunningham.

4        **THE COURT:**  Good morning.

5        **MR. LEVIN:**  Good morning, Your Honor, Bill Levin from

6  Levin Simes.  We represent all of the Plaintiffs on Exhibit A

7  that have the LS or LSA designation in front of their name, but

8  LSA 341 is one of those and we are co-leads in the JCCP in

9  front of Judge Schulman.

10        **THE COURT:**  How many -- how many Plaintiffs do you

11  represent roughly?

12        **MR. LEVIN:**  I think we have got 77 cases tagged,

13  Your Honor.

14        **THE COURT:**  Okay.  Great.

15        **THE CLERK:**  If the Defendants can please state your

16  appearances, thank you.

17        **MR. ATKINS:**  Good morning, Your Honor, Robert Atkins

18  from the Paul Weiss firm.  I represent Uber.

19        **THE COURT:**  Good morning, Mr. Atkins.

20        (Pause in the proceedings.)

21        **THE COURT:**  Good morning, ladies and gentlemen.  Thank

22  you so much for being here.  I always think that with MDL

23  proceedings maybe nobody wants to be here, but you are here.

24  And I would like to welcome you on behalf of the Northern

25  District of California.

1     And I also want to thank the parties for submitting

2  statements that -- actually, several have come from both sides,

3  and I appreciate that -- which, of course, I have read and

4  considered.

5     And I have a number of questions.  And let me just point

6  out that if anybody wants to speak to any of these questions

7  can do so.  I don't want to -- I don't want to prevent anyone

8  from speaking.

9     If they have a different role and they simply want to join

10  in, they can; but on the other hand, I don't want to compel

11  speech.  You know, we -- I only have this case for my lifetime,

12  and I want to make sure that the case is completed before the

13  other issue is resolved.

14     So, let me start out by raising a couple of questions

15  that, perhaps, are somewhat unique to this litigation that may

16  be common frequently in other cases.

17     First, let me just address an overall question so it's

18  clear, at least in the Court's mind, as to -- as to why this is

19  an MDL.

20     An MDL under the statute, 1407, can be created by the

21  judicial panel if there is a determination by that panel that

22  there are common issues of fact, which will -- which will be

23  best adjudicated in terms of efficiency -- of economy and

24  efficiency.  I think they are slightly different concepts.

25     One is spend less money and the other is do it sooner.

1  And the panel obviously heard arguments.  I have read the

2  submissions of the parties before the panel, and they have

3  resolved the fact that there are common issues that can be

4  adjudicated in -- or be assisted by a -- by multi-district

5  litigation being coordinated in a single court.

6       So, in looking at these cases, one is struck by two

7  things.  And I -- by the way, I say this preliminarily.  I

8  mean, I haven't made up my mind about anything.  I have no idea

9  about the merits of it.  I'm trying to tell the parties how I

10 think about things as they unfold because I think how I think

11 about things helps govern the manner in which issues are going

12 to be resolved.

13      So I think it is very important that an MDL judge say to

14 the parties what they are thinking, what is a judge thinking

15 because it does shape the path for resolution of the issues.

16      After all, that's everybody's goal; that these issues --

17 that they are resolved.  It is maybe different how they are

18 resolved but that the issues be resolved.

19      So there's sort of several categories of issues.  And let

20 me talk about the things that aren't common at the outset.

21      The question of -- and I will use the term "sexual

22 assaults," but that I mean any inappropriate conduct of a

23 sexual nature that -- that a Plaintiff believes occurred during

24 the course of -- either the use of the -- in some manner

25 related to the use of the Uber app, in some manner related to

1    an Uber transportation or a transportation that was within the

2    contemplation of the manner in which Uber would -- would

3    provide the service to people.

4         So, after saying that, what I mean by sexual assault --

5    and what -- not what I mean by sexual assault but what I mean

6    by a separate issue is that I believe that each Plaintiff has a

7    different story to tell.

8         In terms of what happened to that passenger in connection

9    with that ride provided by an Uber driver.  Their stories,

10   there may be some commonality with respect to those stories;

11   but on the other hand, they are different.

12        And it's not the idea of this Court nor should it be that

13   I'm going to sit around and hear a thousand stories -- when I

14   say "stories," I mean a thousand presentations of each one

15   being individualized.

16        First of all, that may be best set for a -- the transferor

17   court, not the transferee court.  I'm here to decide issues

18   that are traditionally decided in a pretrial setting, and that

19   is the scope of my duties with respect to the -- to the MDL

20   save and except for those cases that are properly venued here

21   that I can hear and -- but I think I would only hear those

22   cases after the second part -- as I call it, the first part --

23   of why it's here, which are the common issues of fact.

24        The question is -- and I may -- this is sort of an

25   abbreviated version but the factual questions are:  What did

1    Uber know; when did they know it; and what actions did they

2    take, with respect to allegations of sexual misconduct or --

3    harassment that's -- now, those issues while obviously it can

4    be somewhat individualized because it's in response to any

5    particular complaint, there are enough common issues that --

6    that they would benefit from a -- from pretrial determination

7    by the Court.

8         Now, if there are issues of fact and so forth that have to

9    be resolved, obviously the jury has preserved to resolve those

10   differences of fact.

11        But, on the other hand, there my be a number of issues

12   that the facts are not contested; and then the question is

13   given those uncontested facts or given the allegations and

14   complaints, is it possible to resolve some of those issues in a

15   pretrial setting?

16        And I note that that's exactly what Judge Schulman did

17   so -- and he had a coordinated state court proceeding, and he

18   decided that there were search issues as a matter of law given

19   the factual -- given the assertions, given the claims that were

20   asserted that he could resolve; and he did resolve some of

21   those issues.

22        Okay.  So, I believe that there are certainly a number of

23   issues that -- that would be common that can be resolved among

24   them being, as an example, what were Uber's practices with

25   respect to hiring drivers?  What vetting occurred?  What were

1   the techs given?  What were the drivers told?  What was the

2   monitoring of the drivers?  What did Uber learn about drivers'

3   conduct?  What was their response to that?

4   These are all -- these may be matters of policy.  They may

5   not.  I don't know.  But that is the kind of thing that I want

6   to explore -- that I think ought to be explored because how

7   they come out dictate how the case should proceed.

8   Okay.  So after saying that, it may look like, well, this

9   is a monumental task.  I don't know -- you know, it's just so

10  big.  How are you going to do it and then when are you going to

11  do it?

12  So let me address that.  The way I'm going to do it is I

13  have great lawyers in front of me; and when they are given a

14  direction to do something, they will do it.  So that's how it

15  is going to be done.

16  Now, when is it going to be done?  I'm going to tell you

17  it is going to be done quickly.  And I saw in going through

18  Judge Schulman's orders and what was told to me is that there

19  is a, quote, "bellwether" case that is set for 2025, mid-May.

20  So, let me give you assurance to everybody in the

21  courtroom that we are going to move a lot faster than that.

22  And there is no reason not to.  There is absolutely no reason

23  not to.

24  So I don't know what the status is of a thousand

25  Plaintiffs whose cases have been dismissed pursuant to -- for

1    non conveniens -- and they haven't been dismissed.  I mean,

2    technically they have been stayed pending a determination of

3    the appellate court, but these are -- at least from may way of

4    looking at it, they are -- they are diverse.  I mean, almost by

5    definition they seem to be diverse.

6         Now, there's an exception.  I think it is, like, 37 cases

7    in which somebody -- the incident occurred outside of

8    California -- and when I say "occurred," I'm saying allegedly

9    occurred -- outside of California, and then the person moved

10   into California.  Therefore, they may not have diversity

11   jurisdiction.  I got that.  That's 36 out of a thousand.

12        So, you know, I can handle that; but it means there are a

13   thousand cases.  So the thing that occurred to me was why

14   aren't there a thousand cases here?  You know, why aren't all

15   of those people filing here?

16        Because -- now, they may not -- first of all, where they

17   file is their choice.  That's number one.  But they filed in

18   California, so I have to believe that for some reason they want

19   to be in California.

20        Number two is they may be operating on the assumption that

21   the remedies that they are seeking will be -- well, an

22   adjudication of the case will move faster in the California

23   system than it will in the federal courts.  They are wrong.

24   I'm just telling you they are wrong.

25        And the argument is:  Well, look, Judge, why don't you

1    just wait and see what the DCA is going to do?  You will be

2    waiting for months to see what the DCA is doing.

3         The DCA hasn't scheduled argument on the -- on the

4    forum -- I wasn't told that there was an argument.  I was told

5    that there was a final brief that's due in December.  And the

6    way they work is -- I have a lot of friends in the DCA and they

7    work very hard -- but I'm here to tell you, they are going to

8    go through it all.  There will be memos written, and then you

9    are going to find out about an argument date.

10        And once that argument date takes place, 90 days -- within

11   90 days you will get some opinion.  Then maybe it will be

12   appealed or not.  I don't know.

13        But I'm telling you -- and you can tell me if it is

14   different -- you are not going to hear from the DCA, I don't

15   think, until some time next year; but you are hearing from this

16   Court now.  And this Court is going to wait for -- for the

17   California court to adjudicate whether or not a thousand people

18   who are not California residents can be heard in the California

19   state court.  Okay.

20        So, I would simply say to Plaintiffs' Counsel, that's up

21   to you.  You know, I'm not -- I'm not telling you what to do,

22   but I am telling you what the schedule is.

23        So everybody who has one of these cases should think about

24   the scheduling because a lot of things happen over the passage

25   of time.  Time is the great enemy of the resolution of cases

1   for a variety of reasons.  Not all cases.  Some cases do much

2   better if they are not resolved, but this is not one of them in

3   my view.

4        This is one that's -- that the allegations are serious.

5   The injuries are real -- apparently real.  They are injuries of

6   a type that are so personal, very emotionally laden that it is

7   important one way or the other to bring some closure to these

8   situations.

9        And, you know, this is not my first rodeo.  It's my second

10  big car case.  And I also think -- so I want Uber to understand

11  this -- Uber has an ongoing, very successful, extremely

12  important and significant business that grew out of -- I always

13  think it grew out of the frustration of San Franciscans with

14  the Yellow Cab.  Now, I'm sure that's not true.  It's in my

15  mind it's sort of true, but you guys didn't grow up in -- where

16  you tried to get a taxi and you just couldn't, and then you got

17  in one and it was "I think I would be better off outside the

18  taxi than inside the taxi."

19       But it's an important -- it's an important service --

20  significantly important service that you -- that you operate.

21  I'm mindful of that and I'm also concerned that going forward

22  there is enough guidance and practice that these types of

23  situations can be minimized and I think -- believe me, I don't

24  for a moment think that Uber doesn't want to do that.

25       So, when I talk about it, it's not all mutually exclusive.

1    There are some things in common that can benefit both sides by

2    having a quick resolution of a case.

3         Now, when I talk about a quick resolution of the case, I'm

4    not suggesting that the niceties of vicarious liability,

5    independent contractor, intentional infliction of emotional

6    distress, fraud and so forth aren't -- aren't -- should be

7    shunted aside and treated in some way, ignored by the Court in

8    the resolution of the case.

9         Every case has to have a firm legal basis for proceeding,

10   and it's important to test it; and I'm not going to short

11   circuit that process.  It's going to be done, but it can be

12   done sooner rather than later.  And that's -- that's my --

13   that's my view.

14        Okay.  That's quite a preliminary statement, isn't it?

15   Okay.  So let me see if -- I have a whole list of things that I

16   wanted to talk about.

17        The final thing I want to talk about is the preservation

18   of information, which we will talk about that at the end; but

19   I guess my question is -- and nobody has to address this --

20   should I expect more cases to be filed here?  Does anybody have

21   a sense of what the volume is going to be?

22        And in response to that, I turn to Uber and I say one of

23   their requests is that I set a cut-off date for filing of the

24   complaints.

25        And the answer to that is I could set a cut-off date, but

 1    the question is:  Should I -- it's not really should I.  It is

 2    when should I?

 3         And to set it now is totally antithetical to the whole

 4    purpose of an MDL.  You know, to some extent there is always

 5    the problem -- and I have sympathy for Defendants on this

 6    issue -- build it and they will come.  Have an MDL and they

 7    will file, you know.  And that -- there is a certain amount of

 8    that phenomena occurring.

 9         On the other hand, forums are open.  Access to the court

10    must be preserved.  If a person thinks that they have been

11    wronged, you want them in court.  You don't want them in the

12    streets, and you don't want them to take matters into their own

13    hands.  You want it to be litigated.

14         And I have no idea whether I would put a cut-off in a

15    year's time or two-year's time; but I will tell you when I do,

16    I generally think everybody is in favor of the cut-off, you

17    know, because we have gone so far down the road in resolving

18    issues, that it just makes sense.

19         It's not -- I thought it is a perfectly legitimate request

20    but not today.  You know, will other people file?  I suppose

21    so.  I don't know whether -- I don't know, like, the nature of

22    an ongoing problem.  I don't know.  But we will see as it

23    progresses, and there may be at some time that we will impose a

24    cut-off.  How do we deal with it?

25         You know, I was on the MDL panel for seven years -- maybe

1    six.  It was sort of like a biblical plague.

2                          (Laughter)

3          **THE COURT:**  And it may be that, you know, with the hip

4    transplant or the asbestos cases or all of the cases that I'm

5    familiar with in terms of management, that we thought it's a

6    good idea not to send any more tagalong actions; but those

7    cases have been around a long time before that happened.

8    Nevertheless, there may be a good reason to do it.  And if so,

9    I will address it at the appropriate time.

10         Okay.  Next -- well, let me ask the first question first:

11   What -- and anybody can speak to it who thinks they have a

12   handle on it -- what should we expect in terms of future

13   filings in this matter?  And you have to remind me of your

14   name.  I'm very sorry.

15         **MS. ABRAMS:**  No problem.  Rachel Abrams from Peiffer

16   Wolf.  And thank you for that very thoughtful introduction to

17   the case and a lot of words of wisdom there to go from.

18         So just to speak to how many in terms of volume, there

19   are, as you noted, approximately a thousand on appeal in the

20   JCCP.

21         So -- but in addition to that, this is an ongoing problem.

22   These sexual assaults are happening at an alarming rate.  Every

23   day thousands of women are being sexual assaulted.  Even Uber's

24   own reports show that -- which albeit are slightly skewed in

25   our opinion.  This is -- this is a problem that is continuing

1   and will continue until the appropriate safety measures are in

2   place, which is in Uber's control.

3        So if they want a cut-off date, the cut-off date will be

4   when they start doing the things that you had mentioned; proper

5   hiring practices, vetting of drivers, background checks,

6   monitoring, responding to the conduct, policy changes -- and

7   most importantly in my opinion -- cameras in all cars,

8   mandatory cameras.

9        That's when we will start seeing a cutoff date because

10  that's when the sexual assaults will stop happening or at least

11  decrease considerably.

12       So my firm currently represents over a thousand Plaintiffs

13  that are not filed in the JCCP and on appeal.  And I know

14  amongst --

15           **THE COURT:**  They are not -- I'm sorry.  Your firm

16  represents approximately a thousand cases?

17           **MS. ABRAMS:**  A thousand cases, Plaintiffs, yes.

18           **THE COURT:**  And they are not part of the state action?

19           **MS. ABRAMS:**  That is correct.

20           **THE COURT:**  So they are not -- they are not part of

21  the ones that had been stayed?

22           **MS. ABRAMS:**  No.  Originally --

23           **THE COURT:**  It is an additional thousand?

24           **MS. ABRAMS:**  Yes.  Just my firm I can speak to.  I

25  cannot speak to other firms currently but my firm has over a

```
 1   thousand cases right now that are going to be filed before

 2   Your Honor in this MDL.

 3        And we did originally pull cases from the JCCP appeal.

 4   The first cases that were filed in federal courts around the

 5   country that formed the petitioners for this MDL were cases

 6   that were on appeal that we decided as a firm we didn't want to

 7   sit idle for however months or years waiting to potentially be

 8   right where we are now and potentially have to re-file in

 9   another federal -- another district.

10        So we started filing those cases in various district

11   courts including here in the Northern District of California

12   and moved for the MDL.

13        So a lot of the initial Plaintiffs that we -- at least my

14   firm filed were ones that were stayed and on appeal in JCCP,

15   but we have over a thousand cases currently that are -- that

16   were not part of the JCCP.

17        And, unfortunately, my phone is still ringing every day

18   and continues to ring because this is a -- really an epidemic

19   right now that's going on.

20        And I think you also hinted at the fact that, you know,

21   you build it, they will come.  I mean, this is going to empower

22   other sexually assaulted women who have not come forward when

23   they hear about it and when there's more attention to it

24   because they feel like they are not alone.  And that is

25   empowering to women to feel like it didn't just happen to me.
```

1    So, yeah, that part of it will also bring a lot of other

2    injured Plaintiffs to file suit.

3         **THE COURT:**  Okay.  And by the way I'm not -- I have to

4    be careful here.  I'm not encouraging people to file.  What I'm

5    saying is that if they have a case and it is their intention to

6    file, I think that they would -- they have to make the choice

7    themselves obviously with Counsel's input -- but I think it

8    is -- I think it is acceptable to be in these proceedings.

9    That's all I'm saying.  So you expect that the -- the

10   individuals that you represent will be filing in the MDL?

11        **MS. ABRAMS:**  Yes, that is correct.  And, I mean, we

12   are working collaboratively with many Plaintiffs' firms as we

13   file --

14        **THE COURT:**  Yeah.

15        **MS. ABRAMS:**  -- to make sure that the cases get filed

16   are appropriate and meet the criteria that we all --

17        **THE COURT:**  And we will talk a little bit about it.  I

18   mean, I will get to that in a minute.  I just need to get the

19   numbers.

20        **MS. ABRAMS:**  And just one more thing.  As a native San

21   Franciscan myself, born and raised in San Francisco, you are

22   actually correct.  The original CEO and founder of Uber started

23   Uber because he was frustrated at the inability to get a

24   taxicab in San Francisco, just as a side note.

25        **THE COURT:**  Okay.  Great.  Yes.  You are Mr. Cutter;

1    is that right?

2              **MR. CUTTER:**  I am.  Good morning, Your Honor.

3              **THE COURT:**  Good morning.  Identify yourself for the

4    record.

5              **MR. CUTTER:**  Yes, I'm Brooks Cutter of Cutter Law, and

6    my daughter is Celine is liaison counsel in the JCCP; and we

7    represent several hundred women with claims against Uber, some

8    of which have been filed in the JCCP, some of which have been

9    filed here and we will be continuing to file here.

10       I think the Court's focus on these issues is critical, and

11   I also believe that -- to your point about where people file,

12   that we have to be respectful -- and I know we will be -- of

13   the courage it takes to come forward and that there may be a

14   difference between someone wanting to come forward and assert

15   their case and be a bellwether candidate and actually have a --

16             **THE COURT:**  Well, let me tell you something about

17   bellwether because that was raised in the papers.

18       I would have to be shown -- and I can be but I haven't

19   been yet -- why it's necessary to have a bellwether in these

20   particular cases.

21       My experience with bellwethers is that they are very

22   useful in getting a sense from the community as to what is the

23   value of injuries, what is causation, and perhaps there are

24   some other related issues.

25       In this case it seems to me that damages are sort of

1    highly individualized.  One person's sexual assault may be very

2    different from another person's sexual assault.  It may be

3    different in kind and it may be different in effect.

4         And so we can sit down and spend hours selecting a

5    bellwether case, which when all is said and done, nothing has

6    happened because what happens in bellwether cases -- and I

7    know -- is that one -- a verdict is arrived at and one side

8    says, "see" and, as I said, "Oh, but look at these facts.  This

9    is a very unusual case."

10        So I don't want to spend -- I don't want to spend a lot of

11   time going through something that is in a book somewhere about

12   this is a process you can use unless we become convinced it

13   would be helpful, and I'm not so sure it would be helpful in

14   this case.

15        I think there are things that are very helpful in this

16   case.  I mean, I think it is helpful to know how are drivers

17   hired.  Sure, that's helpful to know.

18        And I can go through a list of things that I think are

19   helpful to know because it may be -- and I'm -- by the way, I

20   am not rendering a judgment as to whether or not Uber would be

21   liable for A, B, C or D, you know, given particular hiring

22   practices and given the -- the requirements of the law.  What

23   is vicarious liability?  What is causation?  I mean, these are

24   all sometimes very technical questions.

25        So I don't want to spend a lot of time thinking about the

 1    perfect bellwether when I ought to be spending time on is, you

 2    know, are -- the legal theories and the facts that are asserted

 3    and not necessarily the bellwether.

 4         I mean, I can -- I can -- at any point I can send out a

 5    case to Oshkosh or Ho-Ho-Kus to be tried.  I don't have to try

 6    it.  There's a lot of very good judges.  Judge Schulman, he is

 7    a wonderful judge.

 8         So, I mean, there are cases that can be tried in various

 9    places to adjudicate various claims, but it is important to try

10    to get them all together and it is important to decide these

11    common issues.

12         So I did read it in the papers about, of course, that's

13    what they are doing in the state court; and I also did read it

14    in the submission I got from the Plaintiffs, but that was the

15    reaction that I had.  Let's deal with the common issues first

16    and then go from there.

17         **MR. CUTTER:**  Absolutely, Your Honor.  And I think it

18    will be critical on the schedule the Court has laid out for us

19    to work as quickly and efficiently as possible utilizing the

20    side protocols for the Northern District in combination with

21    the side protocols in state court.

22         Even under the -- what the Court may view as a lengthy

23    schedule, in state court fact discovery ends 14 months from

24    today or so, which seems like a lot of time; but, you know, in

25    negotiating protocols, getting documents produced, it is not

1    necessarily a great deal of time.  So we will --

2         THE COURT:  But it's not my -- nor can I nor should I

3    try to intervene in the state court process.  I will set up my

4    own process.

5         MR. CUTTER:  Absolutely.

6         THE COURT:  But I will do so mindful of what the state

7    court has done because if there is a way to avoid duplication

8    and -- I welcome it.  That's something that we can talk about a

9    bit later.  Thank you, Mr. Cutter.  Yes?

10        MS. LONDON:  Good morning, Your Honor, Sarah London.

11   I just want to speak to the Court's question about the value of

12   Your Honor presiding over bellwether trials.

13        You know, Your Honor sits here in San Francisco where we

14   can subpoena witnesses from Uber.  I think that's extremely

15   valuable to have Your Honor ruling on important evidentiary

16   issues, deposition designations.

17        One of our core functions of running as Plaintiffs in this

18   MDL is creating a trial package for folks to take back to

19   Oshkosh or wherever so that they are ready and able to

20   efficiently and effectively get to the damages phase of those

21   trials.

22        THE COURT:  Well, don't I have to view certain things

23   first?  Let's say the claim of vicarious liability -- and, by

24   the way, the state court I know has ruled on some of those

25   things.  I don't feel bound by any of those rulings, whatever

1    they are -- but don't I -- like, shouldn't I decide these

2    things first?  As an example, doesn't the Defendant have a

3    right to have those things decided first?

4          **MS. LONDON:**  Absolutely.  We think Your Honor should

5    decide these common legal questions.  The question, I think,

6    between us is really what's the right vehicle to do that so --

7          **THE COURT:**  But why is a bellwether the right vehicle?

8    That came as a surprise to me.  I don't have to have a

9    bellwether to decide it.  We can have a consolidated master

10   complaint or something to that nature that procedurally can set

11   forth a complaint of which I can then address.  Maybe that's

12   the way I do it; right?

13         **MS. LONDON:**  Absolutely.  And in terms of the vehicle

14   for that, our proposal is that if you have bellwether

15   complaints -- so one threshold question might be, you know,

16   what's the choice of law?  What law will apply to certain

17   claims?  Vicarious liability, common carrier, there's all kinds

18   of important issues that we would love to have Your Honor

19   decided and we think is important to be decided.

20       So our view is, perhaps, we do some bellwether --

21         **THE COURT:**  Maybe we can't call it a bellwether.

22         **MS. LONDON:**  Right.

23         **THE COURT:**  Don't use the word "bellwether."  Let's --

24   the *McKinsey* case, I had to decide -- although nobody wanted to

25   see my opinion -- I had to decide whether or not 50 states,

1    whether a settlement arrived at by *McKinsey* bound entities in

2    50 states.

3         I can do it.  I got people who can help.  And, you know,

4    that's okay.  That's part of the job.  So I'm not daunted by

5    that.  I just don't know -- we call it a bellwether.  I don't

6    know.  I don't know.  Maybe it's a quirk.

7              **MS. LONDON:**  Well, Your Honor --

8              **THE COURT:**  It's mine, not yours.

9              **MS. LONDON:**  -- the good news is with this group here,

10   we can walk, chew gum, dance, you know, skip.  We can do all

11   kinds of things all at the same time, Your Honor.

12             **THE COURT:**  Ah, but can you litigate?  That's the best

13   question.

14                          (Laughter)

15             **THE COURT:**  Okay.  I got it.  Yes, okay.  Yeah, go

16   ahead.

17             **MR. LEVIN:**  Bill Levin again.  So on the question of

18   cases, of the 77 that we -- that came from the appellate pool,

19   so to speak, there's another 250 clients that we represent that

20   will be filed in due course here.

21        And you probably will hear from Mr. Williams because he

22   has a large number of those cases.  And then there are 100 plus

23   cases that are unfiled that have not yet been filed and new

24   clients come in all the time.

25             **THE COURT:**  Okay.  Anybody else on the Plaintiffs'

```
 1   side?

 2                      (No response.)

 3          THE COURT:  Does the Defense have a view on that or

 4   not?

 5          MR. ATKINS:  On the number?

 6          THE COURT:  Pardon?

 7          MR. ATKINS:  On the number, Your Honor?

 8          THE COURT:  Well, yeah, I mean, you don't have to --

 9   by the way, you don't have to -- people say things all the time

10   in the court, sort of in the background.  I know what is in

11   front of me, what I'm considering, what I don't need to

12   consider at this point.

13       So don't feel that you have to say anything.  On the other

14   hand, I don't want to cut you off.  I mean, you are an advocate

15   for a party.  And if you think that you need to say something

16   for your party's position, I will certainly hear you, sir.

17          MR. ATKINS:  I thought I would --

18          THE CLERK:  Mr. Atkins, please use --

19          MR. ATKINS:  Robert Atkins on behalf of Uber.  I

20   thought I would comment on some of the comments that I heard.

21   Obviously no view as to the number.

22       In terms of the -- this issue of whether there are common

23   issues that can be resolved -- of course, you have read our

24   position in the JPML, so you know where I'm coming from -- it

25   seems to me a couple things.
```

1    To follow up on Your Honor's comments about the viability

2  of the claims, those are common issues.  I think we can get a

3  consolidated master complaint.  Presumably there will be short

4  form complaints in which new Plaintiffs will join whatever they

5  want to join and lay out their own facts.

6    And we can take up, it sounds in any number of creative

7  ways, the legal issues; vicarious liability, whether the app is

8  a product for product liability purposes, whether they have

9  sufficiently alleged any species of fraud and the like, very

10  much along the lines that we litigated across -- on the other

11  side of town.

12    Those are clearly common and we look forward to doing

13  that, and we are ready to get going as soon as we see sort of a

14  common single uniform pleading.

15    The issue that I thought was addressed effectively and

16  very recently as of yesterday -- because we sent you a

17  supplemental submission in the JCCP -- and particularly

18  important given the volume that I'm hearing, which is which of

19  these claims can really be substantiated at the starting gate.

20    And with Judge Schulman's guidance, we had a process that

21  moved in parallel to everything else based largely on the

22  Plaintiff fact sheets, which I presume we will do here.  We

23  have got the form.  It has been agreed upon by any number of

24  Plaintiffs' Counsel; and, of course, we have been a part of

25  that.  And that helps at the outset to sort of put to a side

1   cases that really just -- you know, there's just no proof that

2   we can find that they happened, at least on our platform.

3        And that's a process that I would urge the Court to

4   consider.  It doesn't need to slow down anything.  In fact, we

5   can get going with Plaintiff fact sheets as soon as they would

6   like, and you have seen the order that Judge Schulman entered;

7   and I think that's very -- that's been productive; and I would

8   like to see that done here.  And we can move expeditiously when

9   we get fact sheets to identify those that we think should be

10  excluded.

11       So those are some common issues, something that can be

12  done productively with all of us together.

13       What I don't believe are common -- and I don't think there

14  are, frankly, any common issues that go to the -- that

15  establish elements of the causes of action.

16       Why do I say that?  These cases vary dramatically from

17  case to case partly in the way you have identified, which is

18  there is a broad spectrum of alleged misconduct.  It's sexual

19  in nature but it ranges from inappropriate comments all the

20  way, at least allegedly, to violent sexual assault and

21  everything in between.

22       So, there's -- you know, it's not, you know, a toxic tour.

23  It is not a carcinogen.  They are all individual sexual

24  assaults, as Judge Schulman observed and obviously with which

25  we agree and it was part of his thinking in the form

1   non-context.

2        So, there's no way to resolve any of the elements of

3   liability let alone damages on any common wide basis.

4        As to Uber's conduct, that varies in a multitude of ways.

5   When?  We have claims that go back to 2013.  So we have got a

6   decade -- and as you probably know better because I am from the

7   city where you can hail a cab, sort of -- the company has grown

8   from a nutshell to a tree; and the conduct and the practices

9   and protocols and procedures of the company, the evolution of

10  the technologies involved are very different today than they

11  were in '13.  They are very different today than they were in

12  '14.

13       So questions about hiring practices, the availability of

14  technologies to theoretically, perhaps, prevent some injuries

15  but not others, there's no common set of facts temporally.  So

16  that's when.

17       Where matters a lot.  Why?  One, the common law, obviously

18  of the tort law or fraud law varies from state to state insofar

19  we are able to establish to Your Honor that there are conflicts

20  of law issues that would point to the states of injury,

21  plaintiff and driver.  So that's standard tort law varies.

22       The other thing and maybe more important --

23            THE COURT:  But as to that, why can't I resolve that?

24  I mean, I do that all the time.  Federal courts, all the time

25  look at 50 states and try to figure out --

1          **MR. ATKINS:**  We are in agreement.

2          **THE COURT:**  Okay.

3          **MR. ATKINS:**  Yeah, yeah.  No.  What I meant by --

4          **THE COURT:**  You meant that that's the complexity in

5     dealing with the litigation.

6          **MR. ATKINS:**  Absolutely.

7          **THE COURT:**  I'm sure you're right.

8          **MR. ATKINS:**  We are on the same page, Your Honor.

9     There is -- there is an added element that varies from state to

10    state, which is Uber and other transportation network companies

11    are regulated -- and in some cases city by city issues.

12         And so issues such as background checks are governed by

13    statutes and regs, both at state and large city levels.

14         So the standard of care, the practices -- so both the

15    legal standard of care is going to vary, but the company's

16    practices and protocols for hiring and doing background checks

17    is not a single common practice because it's done in order to

18    comply with various different regulations.  And that too

19    changes over time.

20         Another good example of that is, you know, questions

21    related to, you know, employee versus independent contractor

22    status.  There are statutes and regs -- I think you have

23    probably seen this in the papers -- and the same thing for

24    common carrier.  There are statutes that govern that.  They

25    come out in a multitude of different ways.

1       So when matters.  Where matters.  Then what matters.

2       I think of that in two ways.  We have already talked about

3   what happened.  Put aside -- you know, did it happen.

4   Obviously that's case by case.  What happened -- what happened

5   along that spectrum of alleged misconduct.  And that -- so, you

6   know, to your point about bellwether cases, one case is --

7   doesn't tell us much about any other case.  And, you know, a

8   case about an inappropriate comment tells us nothing in my view

9   about a case involving, you know, violent behavior.

10      But that then leads to the other what question, which for

11  me, is causation, which is not general causation.  It's

12  specific causation, you know, cause in fact, proximate cause.

13      What conduct by Uber could have prevented, what -- we

14  heard about cameras.  It sounds good.  Of course in reality

15  it's not the panacea that it sounds like, but the question is

16  what could Uber have done -- in terms of technology,

17  procedures, hybrids -- that would have prevented the incident?

18      These are personal injury tort cases.  And what could have

19  prevented it, which is going to be the key question, is going

20  to vary case to case fact to fact.

21      For example, cameras, many of these incidents you will --

22  you know, you will come to learn as we spend more time

23  educating each other happen outside the car, happened after the

24  app has been turned off and the camera would have been turned

25  off.

 1       Unfortunately there are incidents where driver's ride is

 2  over, app is off and they follow passengers.

 3       So this covers a gamut of behavior which if proven is

 4  concerning but it's different; and the solution is different.

 5  And, of course, we will show that in many cases there was no

 6  solution because you are talking about a criminal intent on

 7  doing -- committing a crime in a way that was not preventable

 8  from Uber's point of view, on and on.

 9       So, with each of those elements -- where, when, what -- I

10  don't see there being common issues.

11       There can be discovery about common issues.  There can be

12  discovery about, you know, Uber's technologies and practices

13  and hiring standards, sure; but I don't think there are any

14  questions that can resolve any elements of the claim like there

15  could be if there were a general causation question; but we

16  don't have that here.

17       So that's my sort of take on the big picture of what can

18  be accomplished here and what I think, you know, will have to

19  be sent for trial wherever the cases belong.

20       A comment about that, if you will indulge me.  I think

21  there is a real question that at least we think that Your Honor

22  needs to grapple with, which is where are these cases properly

23  venued.

24       One issue that's important to us is our ability --

25            THE COURT:  Well, when will I get to that?  I mean,

1   isn't that a later determination?  I mean, I think the venue

2   question, if you are saying I have to address it now, I don't

3   know why.

4        I think -- I think it is an important question.  And under

5   lexicon, I'm very sensitive to the rights of a party to have it

6   litigated in someplace other -- resolved, litigated in some

7   other place; but that's down the line after there has been one,

8   as you point out, discovery; and two, some rulings with respect

9   to legal issues based upon the facts that have been presented.

10       I'm not quarreling with venue.  I'm just saying:  You

11   know, I don't have to get that one today.

12            **MR. ATKINS:**  So here is the --

13            **THE COURT:**  Unless you take a different position.

14            **MR. ATKINS:**  I -- I will explain my position.

15       There's a unique issue here, which arises from the fact

16   that cases involving incidents -- Plaintiffs and drivers from

17   other states -- were brought here, which, you know, of course,

18   is the issue we dealt with in JCCP.

19       And that is, it is our intention -- and it has been our

20   practice -- which is to bring in the drivers as Third-Party

21   Defendants.

22       That presents, I will call it, interesting questions with

23   respect to service jurisdiction.  That wouldn't be an issue if

24   a case involving a New York driver and a New York Plaintiff and

25   a New York incident were brought in New York.

1          That would be easy.  Instead, that -- taking a

2     hypothetical, what I will call a New York case, had been

3     brought here.

4          And in our view we need some regime to enable us --

5          **THE COURT:**  That's fine.  I will address that.  I

6     think you are right.  I think I have to address what do you do

7     about Third-Party Defendants -- I guess that's what they are --

8     and how are they served and what protocols should be put in

9     place and how we deal with it.  Yeah.

10         For these proceedings, though, I don't know that they are

11    indispensable parties.  I haven't heard any argument on that

12    issue.

13         So, why am I saying anything?  I just -- I have just got

14    to figure it out, and I will give you the opportunity to

15    educate me on that.

16         **MR. ATKINS:**  Well, I appreciate that.  We have a view

17    about whether there are indispensable parties.  We have

18    litigated it at the state level, so it is something that we can

19    tee up for Your Honor.

20         **THE COURT:**  Yeah.

21         **MR. ATKINS:**  And in conjunction with how do we solve

22    for this issue of bringing in the third-party drivers because

23    we don't want to be left without the ability to do that.

24         **THE COURT:**  Well --

25         **MR. ATKINS:**  And I'm sure there is a solution and we

 1  would like --

 2          **THE COURT:**  I'm sure there is.

 3          **MR. ATKINS:**  And so that's -- that's -- so that's --

 4  those are my comments about --

 5          **THE COURT:**  Well, thank you very much.

 6          **MR. ATKINS:**  Well, thank you for listening,

 7  Your Honor, I appreciate it.

 8          **THE COURT:**  I will listen to the extent that I'm able

 9  to.

10      I want to make sure that the -- that the Plaintiffs will

11  be submitting a -- a proposed Plaintiffs' steering committee.

12  I think I gave you a date.  Now, I extended that date -- it's

13  like November, what?

14          **MS. LONDON:**  29th.

15          **THE COURT:**  I was thinking maybe I can move it up.

16  The only thing I didn't want to do is discourage Counsel who

17  aren't here today and wanted to be considered for that position

18  an opportunity to be considered for that position.

19      But I think, you know, in looking -- number one, this

20  litigation in one form or another has been around since 2000,

21  what, '18?  So it's not like, oh, wow, you know, this is a new

22  case.  It's been around.

23      I can't speak for the fact that people who aren't here

24  aren't interested in -- in being considered for the Plaintiffs'

25  steering committee, but I want to give them that opportunity.

1          Nevertheless, I don't see why it should be -- why isn't

2     two weeks enough or does anybody think it's not enough

3     because --

4                         (No response.)

5          **THE COURT:**  Okay, so I'm going to send out an order

6     doing it sooner rather than later.  And what I think I will do

7     is send -- have applications and then have anybody who wants to

8     comment on it can do so within a week.

9          I don't know that I need a hearing.  You know, I had one

10    of those in Volkswagen.  It was quite a sight, and I found it

11    useless.  You know, I mean, everybody gives one minute -- it's

12    like argument in front of the judicial panel on multi-district

13    litigation.  It evolves into what city is convenient in terms

14    of airports.

15         And, you know, you put it all in.  You put it in the

16    application.  I hear the objections, and then I make up my

17    mind.

18         So I'm going to give you some new dates for that and -- I

19    don't have a calendar in front of me but -- oh, I do?  Do I?  I

20    don't.  That's --

21                       (Pause in proceedings.)

22         **THE COURT:**  I will give you dates since you are all

23    here.

24                       (Pause in proceedings.)

25         **THE COURT:**  Great.  So I said, what, November 29th?

1    That's what I said.  And today is the 3rd.  Okay, have the

2    application in by the 17th.

3        And I will have any opposition -- any comments on that --

4    any comments on that by the 22nd.  That's -- that's pretty

5    quick, and then I will issue an order setting it up.

6        Okay.  I did think I solicited in my order a suggestion

7    for a settlement master.  Let me say something about that

8    because this is where judges get into trouble.

9        I don't know -- first of all, whether or not the case is

10   settled is up to you people.  It is not up to the Judge.

11       Secondly, I don't participate in any way, shape or form in

12   the settlement process for a very good reason.

13       I, unlike a number of my colleagues, are susceptible of

14   immediately deciding that one side or the other is

15   unreasonable.  And that's unfair to litigants.  It's maybe fair

16   in the settlement process.  It's unfair to litigants.  And so

17   in recognizing this weakness that I have, I have just moved out

18   of the process.

19       Now, what ultimately was decided in terms of the

20   settlement and what the settlement person can say to me is a

21   matter that you people decide.  That's between you and the

22   settlement person.

23       The reason I move forward and want a settlement person is

24   because I recognize that 92 percent of civil litigation is

25   settled.  And so not to have a mechanism is to simply deny

1    reality.

2        So, it -- I need to get from both sides comments and --

3    and I will deal with it on that basis; okay.  Any questions

4    about that?  I don't want you to mention anybody now, but do

5    you understand why I'm doing it?

6        I'm doing it because there is a mechanism then.  And

7    either side says:  "Hey, Judge, we want to settle it and we

8    don't have a very good case" or you don't have a very good

9    defense.  No, no.  That means nothing.  It is simply a

10   recognition of the fact that 92 percent of the cases settle.

11       Finally -- when I say "finally,"  everybody is relieved to

12   hear that word -- finally -- maybe not finally, but

13   ultimately --

14                          (Laughter)

15       **THE COURT:**  -- I need to have an idea about discovery.

16   Obviously you are -- I've stayed discovery in this action, and

17   you are continuing with discovery in the state court actions.

18       I don't know that you need to have some discovery done

19   before I make a selection on the Plaintiffs' steering

20   committee.

21       It just seems to me, you know, while we want to do

22   everything at once, it doesn't seem to make sense to do

23   everything at once.

24       So unless I hear some great argument about why it

25   should -- discovery should be set up now when I don't even have

1   a Plaintiffs' steering committee, I'm inclined to just wait

2   because when the -- when this month is over, there will be a

3   Plaintiffs' steering committee.

4        I want the Plaintiffs' steering committee to put forward a

5   proposed discovery schedule.  I want the Defense to put forward

6   a proposed discovery schedule, and I will do that and get that

7   going.  Okay.  It won't be going next week or the following,

8   but I will get it going.

9        Okay, which brings me to the -- now the final point, which

10  is the preservation of evidence.  In reviewing the -- and I

11  want to say two things.

12       In reviewing the submissions of the parties, I am

13  concerned that there has been evidence that may be relevant

14  that is part of what we euphemistically call a documentation

15  retention program.

16       Why do I say it is a euphemism?  Because it is actually a

17  document destruction policy; that is, it permits a party to

18  destroy certain documents or not to retain them.

19       And I am saying that without a pejorative term.  There is

20  no way companies, especially ones that are in intensive

21  gathering factual information, whether they be -- you know,

22  rides, whether they be hirings, whatever it is, it becomes so

23  enormous that there has to be some system for preserving and

24  discarding documents.

25       However, it was my view that it is a mistake to take a

 1    narrow view at this point of discovery.

 2        So I'm going to issue today a large interim order which

 3    essentially directs Uber -- directs both parties.  I mean, it's

 4    mutual -- to preserve any and all documentation that might be

 5    relevant to all of the issues that have been raised.  And I

 6    will explain what I mean by it.

 7        If a party believes it's too onerous, they may come in

 8    immediately -- I mean, next week, not today -- they may come in

 9    next week and seek a modification of the order.

10        So, it is not my intention to try to run Uber and try to

11    run the Plaintiffs on how they preserve documents.

12        You know, they have their business concerns.  They have

13    their IT concerns.  They have all sorts of concerns out there

14    that are beyond my present comprehension.

15        So if they don't like it or it's ambiguous or it is

16    burdensome or it is unreasonable -- and all of those things may

17    be true about my interim order -- come on in.

18        Now, what do I have set up?  I'm blessed -- that's the

19    right word -- with Magistrate Judge Cisneros, who is seated

20    here, who will be handling all of those issues.

21        And while I go on bike rides and take vacations and have a

22    wonderful life of an Article III judge --

23                        (Laughter)

24        **THE COURT:**  -- she never rests and -- and she will be

25    available to address these concerns as they come in.  I'm not

1  going to be wedded to you have to give 30 days notice or this

2  one or this one.  Obviously, you have to give notice.

3      But we are available to address these issues sooner rather

4  than later, and it is -- you know, it takes some time to work

5  out a combination and there are some rough spots in the

6  beginning; but I want to get people to be able to work in a

7  highly professional -- you know, with each other because it is

8  to everybody's benefit -- absolutely everybody's benefit, and

9  in particular the Court.  I mean, I don't want to say it's all

10  about me but -- certainly how I can address issues and so forth

11  because it's very much the Court's concern.

12      And so -- but it takes some time.  So there will be some

13  rough spots, and we will try to figure out.  Judge Cisneros is

14  experienced, and she has graciously consented to be available

15  for these proceedings.

16      So with that, I note I'm five minutes over my limit; and I

17  want to thank the parties for coming in.

18      Unless there is something that I need to discuss -- there

19  doesn't seem to be -- I will get out a document preservation

20  order today and I will await submissions from -- as to proposed

21  Plaintiffs' steering committee.

22      And I want to encourage once again that if cases are going

23  to be filed, they be filed sooner rather than later.  Thank you

24  very much.  We are in recess.

25          (Proceedings adjourned at 12:06 p.m.)

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   November 4, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25