EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re: PARAQUAT PRODUCTS LIABILITY LITIGATION | Case No. 3:21-md-3004-NJR |
| This Document Relates to All Cases | MDL No. 3004 |

## ORDER REGARDING PRESERVATION AND PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION

**ROSENSTENGEL, Chief Judge:**

Pursuant to Federal Rule of Civil Procedure 26 and the agreement of the parties, the Court enters this order regarding the preservation and production of documents and electronically stored information ("ESI") in this case ("Order").

### I.      In General

1.      The purpose of this Order is to facilitate the timely, efficient, and economical production of discoverable and responsive documents and ESI in this case.

2.      This Order shall be binding on all parties to this case (including any parties substituted or appearing in MDL No. 3004, and the parties to any case that is consolidated into MDL No. 3004, after this Order is entered) and their attorneys of record, and its provisions shall govern the preservation and production of documents and ESI in this case unless and except to the extent that the parties (or the affected parties) otherwise agree in writing or the Court otherwise orders. Additionally, any obligations set forth in this Order, to the extent they differ from the *Hoffmann* Protective Order, shall apply only to document productions after entry of this Order.

3.     The designation of documents and ESI produced in this case as containing Confidential Information and any restrictions on the use and disclosure of same shall be governed by a separate protective order entered by the Court and incorporated herein. The parties are not aware of, and do not intend, any conflict between the treatment of Confidential Information pursuant to this Order and the protective order.

4.     This Order is not intended and shall not be construed as a ruling by the Court on the discoverability, relevance, authenticity, or admissibility of any documents, data, or information in this case. All objections to discovery requests are expressly preserved and shall be raised in due course as permitted by the rules. With the exception of actions this Order expressly requires a producing party to take and information it expressly requires a producing party to disclose or produce to a requesting party, it is not intended and shall not be construed as a ruling by the Court on the subject matter or temporal scope of permissible discovery in this case or as a determination by the Court about whether the likely burden or expense of any proposed discovery outweighs the likely benefit, taking into account the factors set forth in Fed. R. Civ. P. 26. A party may raise any of these issues with the Court by timely objection or motion.

5.     This Order shall not preclude any party from raising any proper objection to the admissibility at trial of any document or ESI produced in this case.

6.     This Order is not intended to define all the rights and obligations of the parties regarding the preservation of potentially discoverable documents and ESI or the production in this case of discoverable and responsive documents and ESI, to narrow or enlarge any party's obligation under applicable law to preserve potentially discoverable

documents and ESI, or to limit or enlarge any remedy that may be available for the breach of any such obligation.

7.     To further facilitate the timely, efficient, and economical production of documents and ESI in this case and to limit the Court's involvement in the discovery process to circumstances where such involvement is necessary, the parties (or the affected parties) may at any time, by an agreement confirmed in writing, waive, modify, or resolve any ambiguity in any provision of this Order.

8.     No motion seeking the waiver, modification, or construction of any provision of this Order, or any relief expressly authorized by or otherwise based on any provision of this Order, shall be filed until the party seeking such relief has complied with the Court's rules and/or orders regarding meet-and-confer conferences.

9.     The Syngenta Defendants and the Chevron Defendants have previously made voluminous productions of documents in the *Hoffmann, et. al. v. Syngenta, et al.*, St. Clair County, Illinois, Cause No. 17-L-4517 case, including re-productions of materials from litigation involving the herbicide atrazine.[1] To the extent any documents, ESI, or other materials produced in *Hoffmann* are re-produced in this litigation, neither Syngenta nor Chevron is under any obligation to produce those materials in a manner different from how they were produced in *Hoffmann*. This paragraph does not, however, bar

---

[1] Pursuant to the *Hoffmann* 9/11/2018 Protective Order, documents from the following cases were deemed to have been produced in *Hoffmann*: (i) *Holiday Shores Sanitary District v. Syngenta Crop Protection, Inc., et al.*, Madison County, Illinois, Cause No. 2004-L-710; (ii) *City of Greenville, Illinois, et al. v. Syngenta Crop Protection, Inc., et al. and Syngenta AG*, U.S. District Court for the Southern District of Illinois, Cause No. 10-cv-188-JPG-PMF; and (iii) *Doe, James, et al. v. Syngenta Crop Protection, LLC, et al.*, St. Clair County, Illinois, Cause No. 13-L-425.

limited requests for data fields identified in Appendix 1 that are missing from any ESI materials produced in *Hoffmann*, requests for natives or color copies, or the ability of the parties to address other production issues.

**II.    Definitions**

10.    For purposes of this Order and any anticipated agreements relating to the production of ESI, the following definitions shall apply, unless any such definition conflicts with the Federal Rules of Civil Procedure, in which case, the Rules shall govern.

a.    *Cache file* means a copy of data created by a computer system to a temporary location or "cache" that allows frequently used data to be accessed more quickly by the computer.

b.    *Case* means the above-captioned lawsuit.

c.    *Chat* means any form of communication over an intranet, the internet, or other network, including instant messaging and video chat, that offers real-time transmission of text messages or video from sender to receiver, whether point-to-point from a sender to one receiver, or multicast from one sender to many receivers, whether such communications are transmitted over a party's or third-party's network and whether facilitated by an application residing on a party's or a third-party's network or device.

d.    *Cookie file* means a file that a web browser creates on a user's computer system that a website uses to identify the user and information about the user.

e.    *Custodian* means a person who had or has possession, custody, or control of documents or ESI.

 f. *Document* means any written, typed, printed, recorded, imaged, or graphic information or data, including ESI.

 g. *Electronically stored information* or *ESI* means any writing, drawing, graph, chart, photograph, sound recording, image, and other data or data compilation stored in any medium from which such information can be obtained either directly or, if necessary, after translation by the producing party into a reasonably usable form, including any hard-copy document scanned and stored electronically as a static image.

 h. *Extracted text* means a file or files containing text extracted from a document, and shall include all available information contained in the document's body and in any header, footer, comments, and notes that are part of or appended to the document.

 i. *Family* means a group of documents that includes a "parent" document such as an email, memorandum, or report and one or more "child" documents such as attachments or embedded files. A document family need not include .gif or .jpeg files with no substantive content, such as banners and logos.

 j. *Hard copy documents* means documents that are maintained in the ordinary course of business in a tangible format, such as paper or micro fiche. The generic term "documents" shall include hard copy and electronic documents.

 k. *Hash value* means the unique numeric value identifying a specific document, generated by a standard algorithm disclosed by the parties.

 l. *Load file* means an electronic file containing information identifying and describing a production set of scanned documents or processed ESI, including where

individual pages or files belong together as documents, associating attachments with their parent documents, associating documents with members of their document family, and identifying where each document begins and ends, and containing information about the individual documents, including any extracted or user-created metadata and OCR or extracted text.

  m. *Media* means a disc, tape, solid-state drive, computer, or other device used to store data.

  n. *Metadata* means information describing characteristics of a file, generated by the application that created or modified it or generated automatically by a computer or network operating system on which the file is located.

  o. *Native format* means the format in which a file was originally created or modified (in contrast to a static image, such as a .tiff or .pdf file, of a file originally created by a different application).

  p. *Networked* or *shared storage system* means any physical or virtual data storage device that is accessible to multiple users.

  q. *OCR file* means a searchable text file created by an optical character recognition application from a static image or scanned hard-copy document.

  r. *Person* means an individual; a private or public for-profit or non-profit corporation, company, partnership, firm, association, cooperative, foundation, business trust, or other organization; a unit of government, government agency, department, or board, or other public entity; or a college, university, or school or department thereof.

s.   *Preserve* or *preservation* means to prevent the destruction, alteration, deletion, shredding, incineration, wiping, or theft of documents or ESI.

t.   *Produce* and *production* mean the transmission or delivery of documents by one party to another party, whether voluntarily or in response to a formal or informal request, and the transmission or delivery of documents by a third party to a party, whether voluntarily or pursuant to subpoena, for the purpose of discovery in this case.

u.   *Producing Party* means the Party with the obligation to produce ESI.

v.   *Receiving Party* means a Party to whom ESI is produced to.

w.   *Rolling production* means a process in which a producing party responds to a request for production incrementally, by making a series of deliveries of responsive documents and ESI to the requesting party.

x.   *Search term* means a word or string of words or phrases related by proximity or search operators for the purpose of identifying potentially discoverable ESI.

y.   *Specified Time Period* means the period of time for which documents or ESI created, revised, modified, saved, sent or received may be subject to production. The specified time period may vary by party, issue, subject matter, or other factors, and will be determined either by agreement of the parties, or by order of the Court.

z.   *Static image* means a representation of ESI produced by converting a native file or a hard copy document into a standard image format, such as Tagged Image File Format (TIFF), Portable Document Format (PDF), or Joint Photographic Experts Group (JPEG) format, which can be displayed and printed on multiple computer platforms using a commonly available application.

### III.     Preservation

11.     The parties shall preserve all discoverable or responsive documents and ESI reasonably expected to exist, including any metadata that may exist. If any such documents and ESI are likely contained on a source that a party identifies as not accessible, the parties will meet and confer with respect to the preservation requirements, if any, that the party should undertake with respect to any sources that are not accessible.

12.     The parties recognize that platform changes, upgrades, and other system modifications are often necessary for business or security purposes, and the parties will use their best efforts to avoid altering potentially discoverable ESI prior to collection. If a party intends for business purposes to retire a source of potentially responsive documents or ESI prior to collection, it shall give reasonable notice to all liaison counsel in writing, including a description of the source in question, the nature of the potentially responsive documents and ESI it contains, and the location of identical, accessible ESI (if any), and shall allow a reasonable time thereafter for any objections.

13.     Parties have no obligation to preserve ESI created automatically by the routine operation of a computer system or application, including metadata not listed in Appendix 1, cookie files, cache files, temporary system files, and ESI filtered out by an automatic spam or virus filter. To the extent a party knows of ESI in its custody or control that are discoverable or responsive to a request for production then this paragraph shall not relieve them of their obligation to preserve this information. Furthermore, no party shall be in violation of this protocol as a result of any of the following actions undertaken

in good faith and in the ordinary course of business and not for any reason related to this

case:

> a. inputting, accessing, updating or modifying a database, provided the underlying potentially discoverable data is not altered, deleted, modified or rendered inaccessible prior to collection;

> b. editing, modifying, or taking down an internet, extranet, or intranet site provided all potentially discoverable documents and ESI are preserved and remain accessible;

> c. editing or revising a discoverable document or discoverable ESI, as long as an unedited or unrevised original version is preserved.

## IV. Supplementation of *Hoffmann* Production; Rolling Productions

14. The Defendants will not be required to respond to requests or re-produce documents that are duplicative of the documents already produced in *Hoffmann*. The parties will meet and confer regarding the scope of any productions and present any disputes to the Court for prompt resolution.

15. A producing party who intends or reasonably expects to comply with a requesting party's request for production through the use of rolling production shall notify the requesting party of its intention or expectation during the meet-and-confer discussions noted above, on a timeline consistent with the Court and the Parties' mutual desire for a prompt resolution of this action. A producing party who is using a rolling production will notify the receiving party when the production is substantially complete.

## V. Search Methodologies for ESI Productions

16. Prior to engaging in any search methodologies, including, but not limited to, search terms, technology assisted review, or other methods, the parties will meet and confer and attempt to reach agreement. The parties shall in good faith attempt to reach

agreement on protocols, such as hit reports or TAR validation, for identifying, searching, and review of documents that may be produced prior to any productions. If no agreement can be reached, then the parties may present the dispute to the Court. Each party may use one or more methods to collect, search, and review documents for production, and to produce discoverable non-privileged ESI that is responsive to another party's request for production. To the extent the producing party knows of documents and data in its custody or control that are discoverable or responsive to a request for production, then its use of one or more of these methods, shall not relieve it of its obligation to produce that information.

## VI.     Production of Hard-Copy Documents

17.     The following production specification shall apply to paper documents, photographic slides, negatives, and prints, and other documents that are on paper or in any other tangible form ("hard copy documents"), and were scanned in electronically for review and/or production in this case or any other litigation or in response to a subpoena.

### A.     Production Format

18.     Black-and-white ("B&W") hard-copy documents shall be produced as single-page, B&W group IV TIFFs imaged at 300 dpi. To the extent that a static image has been created of any hard copy document containing color and/or grayscale, such static image containing color and/or grayscale shall be produced. If not previously imaged in color or grayscale, the parties will use reasonable efforts to produce hard copy documents containing color and/or grayscale as static images with grayscale and color, respectively; however, a party may, unless previously imaged in color and/or grayscale, produce

documents containing color in grayscale if it determines that the color-portion of a document is minimal and that production using grayscale would not in any way affect a reader's understanding of that document (*e.g.*, a letter where the only color included is a corporate logo on the first page). Notwithstanding such a provision, reasonable requests to produce grayscale documents in color shall be accommodated.

19.     Nothing herein shall preclude a party from, at its discretion, producing for inspection hard copy documents for which there are no electronic images or other tangible things in hard copy or tangible form. However, to the extent that a party elects to produce for inspection hard copy documents in tangible form, the producing party shall also make available to the requesting party any existing indices, inventories, lists, catalogs, or other data or documents that identify or describe the documents produced. Nothing in this paragraph, however, prevents a party from asserting undue burden in response to a request for such documents, and nothing in this paragraph waives or dilutes such an objection.

20.     Upon notice from the requesting party that a document or portion thereof is illegible, the producing party shall, if possible, produce a legible copy in the form of either a new TIFF, static image, or hard copy, or, if not possible, explain why a more legible copy of the document cannot be produced. The document's original orientation should be maintained (*i.e.*, portrait to portrait, landscape to landscape). No producing party shall be required to alter or re-create any document for which no grayscale or color version is in the party's possession or control or for which the original hard copy document is illegible.

### B. Bates Numbers, Designations, and Redactions

21.     Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions shall be burned into the image. TIFF image files shall be provided in an "Images" folder.

22.     For productions after the *Hoffmann* productions, any bates numbers previously assigned to a document as a result of a legal, regulatory, or governmental production shall be included, to the extent such document is collected from such a production. The start and end bates numbers from the production in another matter shall be added as distinct metadata fields for these document and be included in the production file.

### C. Notes and Attachments

23.     If any original hard copy document has any note or attachment affixed to it, the producing party shall scan and produce copies of the original hard-copy document along with all notes and attachments to it in the same manner as other documents. If any such note or attachment obscures any information on the original hard copy document, the producing party shall also produce a copy of the original hard-copy document without the note or attachment affixed in order to make the underlying information visible.

### D. Unitizing Documents

24.     In scanning paper documents, parties shall use their best efforts to ensure that distinct documents are not merged into a single record, and single documents are not split into multiple records (*i.e.*, paper documents should be logically unitized). Within

14 days (or as otherwise agreed) after notice from a requesting party that a document appears to have been unitized incorrectly, the producing party shall either explain why the unitization is correct or produce a correctly unitized replacement.

### E. Parent-Child Relationships

25.    A producing party shall use best efforts to preserve parent-child relationships (the associations between and among a parent document and its attachments) when scanning hard copy documents. A "parent" document in a production set shall be followed immediately by its "child" or "children." To the extent feasible, each non-privileged document within the family shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family. Notwithstanding the foregoing, a document that is unitized at its lowest binding element (*e.g.*, letter with stapled or clipped attachments) may be scanned as one document, in which case it will be noted by begin and end Bates numbers. If there is any question about unitization or family members of any produced document, the parties shall meet and confer to discuss a remedy.

### F. OCR for Scanned Hard-Copy Documents

26.    The producing party shall provide for each document an appropriately formatted text file (.txt) of OCR text, named to match the first Bates number of the document. Text files shall be provided in a "Text" folder. If a document is redacted for privilege, the text file shall not contain the text of the redacted portions. If a receiving

party notifies the producing party that a document's OCR text is of poor quality, the producing party will use reasonable efforts to provide a replacement file of better quality or alternatively explain why it is unable to do so.

### G. Search of Hard-Copy Documents, Including Testing and Validation

27.     A producing party may apply search terms and/or advanced analytics to search the OCR text of scanned hard-copy documents for the purpose of screening documents for relevance and responsiveness if the OCR text is of sufficient quality that search terms or advanced analytics can be applied reliably. Subject to section V, the producing party will notify the receiving party if they intend to use search terms for hard copy documents and the parties will meet and confer prior to any such search occurring.

### H. Unique IDs

28.     Each TIFF image shall have a unique filename corresponding to the Bates number of that page. The filename shall not contain any blank spaces and shall be consistently zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. Bates numbers should be in the lower right-hand corner of each page on which they appear, if possible. If a Bates number or set of Bates numbers would otherwise be skipped in a production, the producing party shall fill any gaps with slip sheets so that there are no missing Bates numbers. Bates number prefixes will be consistent across all documents a party produces in the case.

### I. Data load files

29.     Documents shall be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

    a.    Field Separator: ASCII character 20 ("ii");

    b.    Quote: ASCII character 254 ("þ"); and

    c.    New Line: ASCII character 174 ("®").

30.    Relativity-compatible image and data load files shall be provided in a "Data" folder.

## VII. Production Format for Future ESI Productions

### A. In General

31.    Black-and-white ("B&W") documents shall be produced as single-page, B&W group IV TIFFs imaged at 300 dpi. Documents evaluated to contain grayscale or color shall be produced as grayscale static or color images, respectively, at the greater of 300 dpi or their resolution in native format. For native documents that are produced as static images, upon notice from the requesting party that a document or portion thereof is illegible, the producing party shall produce a legible copy in the form of either a new TIFF image, a native file of the illegible document, or shall provide an explanation as to why a legible copy or native file is not available for production. No producing party shall be required to alter or re-create any document for which no grayscale or color version is in the party's possession or control or for which the original native file is illegible. The document's original orientation should be maintained (*i.e.*, portrait to portrait, landscape to landscape). If a document is produced in static image format in accordance with this Order, Bates numbers, confidentiality designations (in accordance with the protective order entered or to be entered in this case), and redactions for privilege shall be burned into the image. TIFF image files shall be provided in an "Images" folder.

32.     All extractable text of native files shall be extracted directly from the native file and shall be delivered in an appropriately formatted text file (.txt) named to match the first Bates number of the document. Text files shall be provided in a "Text" folder. With the exception of spreadsheets, if a document is redacted for privilege, the document shall undergo OCR after redaction in order to remove the redacted text. If a receiving party notifies the producing party that a document's text file is of poor quality, the producing party will use reasonable efforts to provide a replacement file of better quality or alternatively explain why it is unable to do so.

### B.     Unique IDs

33.     Each image shall have a unique filename corresponding to the Bates number of that page. The filename shall not contain any blank spaces and shall be consistently zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. Bates numbers should be in the lower right-hand corner of each page on which they appear, if possible. If a Bates number or set of Bates numbers would otherwise be skipped in a production, the producing party shall fill any gaps with slip sheets so that there are no missing Bates numbers. Bates numbers shall be unique across the entire production and prefixes will be consistent across all documents a party produces in the case. Any Bates numbers previously assigned to a document in the *Hoffmann* litigation shall contain those Bates numbers. The document's start and end Bates number from *Hoffmann* shall be included as produced fields for the document.

### C. Parent-Child Relationships

34.     A producing party shall preserve parent-child relationships (the associations between and among a parent document and its attachments) for ESI. If a producing party believes there is a logical or compelling reason to break the parent-child relationship, it shall notify the requesting party of its belief and explain the justification prior to doing so, with a sufficient description of the documents to give the requesting party adequate basis to determine whether to object. A "parent" document in a production set shall be followed immediately by its "child" or "children." Each non-privileged document within the responsive family shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family. A producing party shall identify all documents for which it has broken the parent-child relationship with an explanation of why the relationship was broken and the documents that were not produced. If a receiving party identifies any document for which the parent-child relationship appears to have been broken, the producing party shall explain why the parent-child relationship is correct as produced or shall provide a replacement file with the correct parent-child relationship if it is possible to do so.

### D. Metadata

35.     Metadata shall be produced for all ESI, whether produced in native format or static image formats (*e.g.*, TIFF) as listed in Appendix 1 to the extent it exists in the file.

If certain metadata does not exist for a particular file, the corresponding metadata field will be blank.

36.     A producing party that redacts or withholds metadata from any field identified in Appendix 1 shall disclose that fact to the requesting party, describing the metadata withheld or redacted, shall explain why any metadata has been withheld, and shall include the redaction on its privilege log and preserve the redacted metadata.

### E.     Production of documents in native format

37.     The following types of documents shall be produced in native format and linked to the database by the metadata field "NativeLink":

      a.     Spreadsheets (*e.g.*, MS Excel, .CSV);

      b.     Word processing files containing tracked changes or comments;

      c.     Presentation files containing tracked changes, comments, hidden slides, or presenter's notes;

      d.     ESI containing audio or video;

      e.     Structured Databases;

      f.     other files which cannot be reasonably converted to TIFF.

38.     The native file shall be named with the first Bates number of the respective document and any appropriate confidentiality designation (*e.g.*, "BATES_000000 – CONF" or "BATES_000000 – CONF-AEO"). The corresponding load file shall include native file link information for each native file produced.

39.     A requesting party may ask that other specified documents or ESI, including ESI from a database, initially produced in TIFF format be produced in native format in the event that the TIFF format is not reasonably usable. The requesting party

shall identify the documents by Bates numbers. Within 14 days (or as otherwise agreed) after such a request, the parties shall attempt to reach an agreement on the matter, including if it is possible to rectify the issue with the TIFF itself in lieu of producing the native document. If they are unable to do so, either party may move the Court to resolve the disagreement.

40.     Where native files are produced in lieu of TIFF images, each native file shall be assigned a unique Bates number. The producing party shall produce a placeholder (a single-page TIFF slip sheet indicating that the native item was produced) along with the native file. The placeholder shall be branded with the production number in the lower right-hand corner and the phrase "PRODUCED IN NATIVE ONLY" (or a similar phrase), and the name of the file as collected shall be branded in the center of the page. The producing party shall also brand any confidentiality or similar endorsements in the lower left hand corner of the placeholder.

41.     The receiving party may request production of other specified documents or ESI in native format by providing (1) a list of the Bates numbers of documents it requests to be produced in native format; and (2) an explanation of the need for reviewing such documents in native format. The producing party shall not unreasonably deny such requests, and within 14 days (or as otherwise agreed) after any such request is made, shall either explain why it will not or cannot comply with the request or produce the native documents with an overlay to ensure that the "NativeLink" entry in the data load file indicates the relative file path to each native file in such production, and all extracted text and applicable metadata fields required under this Order.

### F. Password-Protected Files

42.     A party shall attempt to unprotect and image any files protected by password. If it is not possible to do so, or if there is a compelling reason not to do so, the producing party shall produce passwords for any password-protected files if such passwords are available.

### G. Embedded Documents

43.     With the exception of small .gif files that are likely to be company logo images, any embedded ESI document (*e.g.*, a spreadsheet embedded within a word processing document) shall be extracted, produced as a separate document, and related back to the top-level parent document (*e.g.*, standalone file, email message, etc.) via the BegAttach and EndAttach fields referenced in Appendix 1. Related documents shall be produced within a continuous Bates range.

### H. Data Load Files

44.     Documents shall be provided with an Opticon Cross-Reference File and Relativity data load file using standard Relativity delimiters:

  a.  Column - ASCII 020

  b.  Quote - ASCII 254

  c.  Newline - ASCII 174

  d.  Multi-Value - ASCII 059

  e.  Nested Values - ASCII 092

45.     All rows shall contain the same number of delimiters and fields. The multi-value field delimiter must be consistent across all fields. For example, if the "Cc" field contains semi-colons between email addresses, the "Bcc" field should also contain semi-

colons. Relativity-compatible image and data load files shall be provided in a "Data" folder. If parties exchange sample load files, any load-file change request shall be made within 14 days. Nothing in this Order shall preclude the parties from agreeing at any time to make changes to load files.

### I. De-duplication

46. A producing party may de-duplicate documents across its custodians at the family-group level using a hash value calculated at the family level and including any blind copy fields. All custodians that were in possession of a de-duplicated document in the metadata will be populated in the ALL CUSTODIANS production field.

47. The Parties agree that a Producing Party may review only the most inclusive email thread, however a Producing Party shall produce all e-mails separately and not as part of an inclusive e-mail thread.

### J. Identification of Custodians and Sources

48. The custodian or originating source of a document or ESI shall be identified in the ALL CUSTODIANS field of the database load file. De-duplicated documents with other custodian values will have those custodian values appended to the ALL CUSTODIANS field. Documents found in the possession, custody, or control of a division, department, group, or other common entity or facility (*e.g.*, office, file room, archive, shared or networked storage, file-share, backup, warehouse, library, or reading room) shall be produced with that entity or facility identified as their custodian. The producing party shall use a uniform description of each particular custodian across productions.

### K.     Foreign Language

49.     Foreign-language text files and metadata shall be produced with the correct encoding to enable the preservation of the original language. The processing of documents containing a foreign language shall be Unicode compliant.

### L.     Date/Time format

50.     Dates shall be formatted consistently as MM/DD/YYYY, *i.e.*, a record with a sent date should have the same format in the last modified date field. If a date is unknown or unavailable, or the date field is not populated, the particular date field shall be left blank.

51.     Provided that they are consistently delimited in the data, date delimiters, such as slashes and colons, shall be consistent across all fields. In the format of MM/DD/YYYY, there are no spaces and only forward slashes.

52.     Times shall be formatted consistently as HH:MM:SS (zzz). If a time is unknown or unavailable, or the time field is not populated, the particular time field shall be left blank.

53.     All documents shall be processed to show the date and time in Coordinated Universal Time (UTC).

## VIII.   Production Method and Media for Supplementation to *Hoffmann* Production

54.     Production media shall always be encrypted and will be sent via SFTP link provided via e-mail at the time a production letter is e-mailed, unless the parties agree otherwise. On the occasion in which a particular production is of a size that would make sending it via SFTP link impractical, the parties may agree to send encrypted physical

media such as a hard drive or USB. Production letters or e-mails will always accompany productions including the name of the matter in which it was produced, the production date, and the Bates number range of the material contained in the production.

55.     Passwords for encrypted media will be sent separately from the media itself. Each piece of production media or the electronic transfer of documents must be assigned a production number or other unique identifying label corresponding to the date of the production of documents on the production media, as well as the sequence of the material in that production. Production media must include text referencing the case name and number.

56.     Any replacement production media must cross-reference the original production media and clearly identify that it is a replacement and cross-reference the document-number range that is being replaced.

57.     All production media capable of write protection should be write-protected before production.

58.     The producing party must retain native electronic-source documents for all ESI produced in this litigation until the conclusion of this litigation. The producing party must take all reasonable measures to maintain the original native electronic-source documents in a manner so as to preserve the metadata associated with these electronic materials as it existed at and before the time of production, in the event review of such metadata becomes necessary. The producing party must maintain a cross-reference file from the original documents to the production set of documents.

59. Production media shall use AES-256 or an equivalent, industry-accepted method of encryption to preserve security of production deliverables.

**M. Inability to Produce Metadata**

60. At this time, the parties do not represent that any or all metadata described in this Order exists. During the course of collection, review, and production of documents and ESI, the parties shall determine what metadata exists. If metadata does not exist for any production document, the required production field will be blank.

61. If data is encrypted when it is produced, the producing party shall transmit the credentials necessary to decrypt the data subsequent to that production.

**IX. Assertions of Privilege**

62. Nothing in this Order shall be interpreted to require production of Data protected from disclosure by the attorney-client privilege, work-product doctrine, or any other applicable protection or privilege.

63. A party may withhold or redact a portion of a document or ESI if and to the extent that the document or portion redacted is protected by attorney-client privilege, the work-product doctrine, or another applicable privilege.

**A. Privilege Logs**

64. To the extent that a document or any portion thereof (including any data from the agreed metadata fields) is withheld from production on the basis of the attorney client privilege, the work product doctrine, or any other applicable privilege, the producing party shall produce a rolling privilege log of withheld and redacted documents within 30 days after the document was withheld from the rolling production.

65.     Privilege logs shall be provided containing the information below (*see* Appendix 2 for privilege log fields):

a.     Each document listed on the privilege log will be sequentially numbered. If a privilege number is not used for any reason, it shall be identified as "Not Used" on the log.

b.     Document date (date created or last modified) for non-email messages or date sent for email.

c.     The identity of each person who sent, authored, signed or otherwise prepared the document, including which were employed and acting as licensed attorneys in good standing, as reflected in the document's metadata.

d.     The identity of each person designated as an addressee or copyee, including which, if any, were employed and acting as licensed attorneys in good standing, as reflected in the document's metadata.

e.     The identity of each person designated as a blind copyee, including which, if any, were employed and acting as licensed attorneys in good standing, as reflected in the document's metadata.

f.     A general description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the general subject matter of the document and the basis of the claim of privilege or other protection from disclosure, and the location of any redaction if the redaction was applied to a native file.

g.     The nature of the privilege or protection asserted (*i.e.*, attorney-client privilege; work product doctrine), and if no privilege claim is asserted, the basis of withholding the document or any portion thereof.

h.     For documents which are produced in redacted form, the location(s) of the redaction(s) shall be logged using the production bates numbers assigned to the redacted page(s).

i.     Nothing in a-h will relieve a party of reviewing the actual document(s) for privilege, and parties are not permitted to solely utilize metadata for privilege review.

66.     Where multiple email messages are part of a single chain or "thread," a party is only required to include on a privilege log the most inclusive message ("Last In

Time Email") and need not log earlier, less inclusive email messages or "thread members" that are fully contained within the thread, provided that the log entry includes the names of the authors, addressees, and recipients (including copyees and blind copyees) for all thread members, that the description of the thread include the factual bases sufficient to support the claim of privilege for each thread member over which privilege is asserted, and that the log entry include the privilege designations applicable to any thread members.

67. All persons/entities identified on the log who were employed or retained for the purpose of rendering legal advice, and duly licensed to practice law and in good standing as of the date of the document for which privilege is asserted shall be identified on the privilege log by a "*" following their name.

68. After the receipt of a privilege log, any party may dispute a claim of privilege. Prior to seeking Court intervention, the party disputing, questioning, or otherwise objecting to a claim of privilege shall provide in writing the identification of the documents or category of documents for which it questions the claim of privilege and the reasons for disputing, questioning, or otherwise objecting to the privilege designation. Within fourteen (14) days, the party that designated the documents as privileged will provide a written response explaining the basis for its claim or privilege, or if applicable, de-designating documents as privilege and producing such documents in accordance with this Order. Thereafter, if the parties continue to disagree, they will then then meet and confer in good faith as to the claims of privilege. If agreement has not

been reached after fourteen (14) days, the parties shall submit the dispute to the Court for resolution.

**B.    Documents Presumptively Excluded from Privilege Logs**

69.    The following types of communications shall be presumed to be protected by the attorney-client privilege or to constitute attorney work product. Documents and ESI consisting of such communications need not be included on a party's privilege log:

     a.    Communications exclusively between or among a party's attorneys;

     b.    Outside counsel files;

     c.    Communications exclusively between plaintiffs and their attorneys after September 15, 2017;

     d.    Communications exclusively between defendants and their attorneys after September 15, 2017;

     e.    Communications exclusively between or among two or more defendants' attorneys pursuant to a joint defense agreement regarding this case;

     f.    Communications exclusively between or among a party's attorneys and expert consultants hired for purposes of litigation related to paraquat;

     g.    Work product of any party's attorney(s) created after September 15, 2017.

As used in this paragraph, a party's attorneys include non-employee attorneys retained in anticipation of or connection with this litigation, and in-house attorneys authorized to act and acting in the capacity of attorneys.

70.    The parties further agree to meet and confer regarding any proposed additional categories of documents that presumptively need not be logged.

## X. Assertions of Foreign Data Privacy Laws and Regulations

71.      To the extent that the document or portion redacted contains information exempt from disclosure in accordance with applicable foreign data privacy laws and regulations the parties agree to meet and confer in good faith regarding potential redactions, logging, and production.

## XI. Disclosure of Attorney-Client Privileged or Work-Product Protected Information

### A. Clawback Procedures

72.      Pursuant to Federal Rule of Evidence 502(d), a producing party that discloses information subject to a claim of attorney-client privilege, the work-product doctrine, or other applicable privilege does not as a result waive or forfeit any such claim that it would otherwise be entitled to assert regarding that information. A separate Order regarding Federal Rule of Evidence 502(d) shall govern this procedure. The parties are not aware of, and do not intend, any conflict between this protocol and an Order regarding the Clawback procedure pursuant to Federal Rule of Evidence 502(d).

## XII. Documents not subject to this protocol

73.      Documents produced by Plaintiffs in connection with the Plaintiff Assessment Questionnaire ("PAQ") pursuant to Case Management Order No. 7 (ECF No. 328) are not subject to the requirements of this protocol. Such documents shall be produced in accordance with the capabilities of the portal established for processing completed PAQs. In all events, such documents must comply with the requirements of this protocol with respect to containing a unique Bates number burned onto the image of

the document. The Bates number requirement for these documents may be satisfied if each page is labeled as follows [PAQ#]_[Unique Document ID Number]_[Page Number].

74.     As contemplated by Case Management Order No. 7, certain Plaintiffs will later be required to complete a Plaintiff Fact Sheet ("PFS") and produce the documents associated with a PFS. Document productions required by the PFS, as well as any document productions made by Plaintiffs after completion of the PAQ must comply with this protocol. Furthermore, to the extent a Plaintiff is selected to complete a PFS, such a Plaintiff must update the PAQ production to ensure compliance with this protocol.

## XIII.   Apportionment of Discovery Costs

75.     Absent an Order of the Court to the contrary, each party shall be responsible for the cost of preserving and producing documents and ESI that are in its possession or control.

**IT IS SO ORDERED.**

**DATED:  October 27, 2021**

_Nancy J. Rosenstengel_

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**