1  RANDALL S. LUSKEY (SBN: 240915)
       rluskey@paulweiss.com
2  **PAUL, WEISS, RIFKIND, WHARTON**
       **& GARRISON LLP**
3  535 Mission Street, 24th Floor
   San Francisco, CA 94105
4  Telephone: (628) 432-5100
   Facsimile:  (628) 232-3101
5
   ROBERT ATKINS (*Pro Hac Vice* admitted)
6      ratkins@paulweiss.com
   CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
7      cgrusauskas@paulweiss.com
   ANDREA M. KELLER (*Pro Hac Vice* admitted)
8      akeller@paulweiss.com
   **PAUL, WEISS, RIFKIND, WHARTON**
9      **& GARRISON LLP**
   1285 Avenue of the Americas
10 New York, NY 10019
   Telephone: (212) 373-3000
11 Facsimile:  (212) 757-3990

12 *Attorneys for Defendants*
   UBER TECHNOLOGIES, INC.,
13 RASIER, LLC, and RASIER-CA, LLC

14 *[Additional Counsel Listed on Following Page]*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S PROPOSED ESI PROTOCOL**<br><br>Judge: Hon. Charles R. Breyer<br>Courtroom: 6 – 17th Floor |

|   |   |
|---|---|
| 1 | KYLE N. SMITH (*Pro Hac Vice* admitted) |
|   | ksmith@paulweiss.com |
| 2 | JESSICA E. PHILLIPS (*Pro Hac Vice* admitted) |
|   | jphillips@paulweiss.com |
| 3 | **PAUL, WEISS, RIFKIND, WHARTON** |
|   | **& GARRISON LLP** |
| 4 | 2001 K Street, NW |
|   | Washington DC, 20006 |
| 5 | Telephone: (202) 223-7300 |
|   | Facsimile:  (202) 223-7420 |
| 6 |   |
|   | *Attorney for Defendants* |
| 7 | UBER TECHNOLOGIES, INC., |
|   | RASIER, LLC, and RASIER-CA, LLC |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1
I.    INTRODUCTION ..................................................................................................... 1
II.    ARGUMENT ............................................................................................................ 3
    A.    Summary of Argument ................................................................................. 3
    B.    Uber's Section 3: Cooperation (Ex. B, § III) ............................................... 4
    C.    Uber's Section 7: Identification of Custodial and Non-Custodial Documents (Ex. B, § IV) ............................................................................. 4
    D.    Uber's Section 8: Using Search Terms Before TAR, Key Word Search (Ex. B, §§ V, VII, XIV) ................................................................... 4
    E.    Uber's Section 8(a): Technology Assisted Review, End-to-End Validation, Reassessment (Ex. B, §§ VI, XIII, XV, XVII, XVIII) ............ 7
    F.    Uber's Section 17: Google Drive Hyperlinks Embedded in Emails (Ex. B, § XX) ................................................................................................ 10
    G.    Uber's Section 10: Non-Traditional ESI (Ex. B, § XVII) ......................... 14
    H.    Uber's Section 12: Deduplication (Ex. B, § XIX) .................................... 14
    I.    Miscellaneous Additional Disputes ............................................................ 14
III.    CONCLUSION ....................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                        **Page(s)**

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
  MDL No. 02885 (S.D. Fla.) .................................................................................................... 9

*In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*,
  No. 22md3043DLC (S.D.N.Y. Jan. 2023) ............................................................................ 11

*Alivecor, Inc.* v. *Apple, Inc.*,
  2023 WL 2224431 (N.D. Cal. Feb. 23, 2023) ..................................................................... 3, 5

*In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*,
  2022 WL 16630821 (D.N.J. Oct. 25, 2022) ........................................................................... 6

*In re Biomet M2a Magnum Hip Implant Prods. Liab. Litig.*,
  2013 WL 1729682 (N.D. Ind. Apr. 18, 2013) ........................................................................ 6

*In re East Palestine Train Derailment*,
  No. 4:23-cv-00242-BYP (N.D. Ohio June 2023) ................................................................. 11

*Freedman* v. *Weatherford Int'l Ltd.*,
  2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014) ....................................................................... 9

*Huntsman* v. *Sw. Airlines Co.*,
  2021 WL 3504154 (N.D. Cal. Aug. 10, 2021) ....................................................................... 6

*IQVIA, Inc.* v. *Veeva Systems., Inc.*,
  2019 WL 3069203 (D.N.J. July 11, 2019) ........................................................................... 11

*Kaye* v. *N.Y.C. Health and Hosp. Corp.*,
  2020 WL 283702 (S.D.N.Y. Jan. 21, 2020) ........................................................................... 7

*Kelly* v. *Provident Life & Accident Ins. Co.*,
  2009 WL 10664172 (S.D. Cal. May 29, 2009) .................................................................... 11

*Livingston* v. *City of Chicago*,
  2020 WL 5253848 (N.D. Ill. Sept. 3, 2020) .............................................................. 4, 5, 6, 7

*Maurer* v. *Sysco Albany, LLC*,
  2021 WL 2154144 (N.D.N.Y. May 27, 2021) ....................................................................... 6

*In re Meta Pixel Healthcare Litig.*,
  2023 WL 4361131 (N.D. Cal. June 2, 2023) ............................................................ 10, 11, 12

*Nichols* v. *Noom Inc.*,
  2021 WL 948646 (S.D.N.Y. Mar. 11, 2021) ............................................................ 11, 12, 13

*NuVasive, Inc.* v. *Alphatec Holdings, Inc.*,
  2019 WL 4934477 (S.D. Cal. Oct. 7, 2019) ........................................................................ 3, 4

*Porter* v. *Equinox Holdings, Inc.*,
  2022 WL 887242 (Cal. Super. Ct. Mar. 17, 2022) ............................................................... 11

- - -

*Raine Grp. LLC* v. *Reign Cap., LLC*,
　2022 WL 538336 (S.D.N.Y. Feb. 22, 2022)..................................................................3, 4

*Reinsdorf* v. *Skechers U.S.A., Inc.*,
　296 F.R.D. 604 (C.D. Cal. 2013) ........................................................................................5

*Rio Tinto PLC* v. *Vale S.A.*,
　306 F.R.D. 125 (S.D.N.Y. 2015) ........................................................................................9

*Shenwick* v. *Twitter, Inc.*,
　2018 WL 5735176 (N.D. Cal. Sept. 17, 2018) .................................................................11

*Stitch Editing Ltd.* v. *TikTok, Inc.*,
　No. CV 21-06636-SB(SKX) (C.D. Cal. Sept. 1, 2022) ....................................................11

*In re StubHub Refund Litig.*,
　2023 WL 3092972 (N.D. Cal. Apr. 25, 2023) ..................................................................11

*In re Uber Rideshare Cases*,
　Case No. CJC-21-005188 (S.F. Super. Ct.) .......................................................................1

*In re Viagra (Sildenafil Citrate) Prod. Liab. Litig.*,
　2016 WL 7336411 (N.D. Cal. Oct. 14, 2016) ................................................................5, 8

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litig.*,
　MDL No. 2672 CRB (JSC)............................................................................................8, 9

*Winfield* v. *City of New York*,
　2017 WL 5664852 (S.D.N.Y. Nov. 27, 2017) ...............................................................6, 7

*Zhulinska* v. *Niyazov L. Grp., P.C.*,
　2021 WL 5281115 (E.D.N.Y. Nov. 12, 2021) ...............................................................5, 6

**Statutes and Rules**

Fed. R. Civ. P. Rule 26 ...................................................................................................... *passim*

**Other Authorities**

*Google Drive, Meet, and Sites*, Google Vault Help,
　https://support.google.com/vault/answer/7654308?hl=en#zippy=%2Csearch-within-the-revision-history-of-a-file (last visited Feb. 8, 2024) .............................................13

*Vault export contents*, Google Vault Help,
　https://support.google.com/vault/answer/6099459?hl=en&ref_topic=4238976&sjid=7086696684988601940-NA#zippy=%2Cexport-contents%2Cvoice-data-parameters-in-the-metadata-file%2Cmessage-parameters-in-the-metadata-file (last visited Feb. 12, 2024)..............................................................................14

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Pursuant to the Court's Pretrial Order No. 5, ECF No. 175, and February 5, 2024 Order, ECF No. 247, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") submit this memorandum outlining the areas of disagreement concerning the ESI protocol.

Uber is not writing on a blank slate here. Over the course of the past two years, Uber has been negotiating an ESI protocol with plaintiffs in the state court proceedings, *In re Uber Rideshare Cases*, Case No. CJC-21-005188 (S.F. Super. Ct.) (hereinafter, the "JCCP Action"). Declaration of Caitlin E. Grusauskas ("Grusauskas Decl.") ¶ 2. The parties in the JCCP Action have met and conferred extensively over that time, including on various technical aspects of e-discovery and Uber's anticipated search and review methodologies. Throughout that process, Uber has been consulting with its e-discovery vendor and e-discovery experts, including retaining a renowned expert on technology assisted review ("TAR"), Dr. Maura Grossman, to help design a TAR process that Uber would utilize to review its documents, and has made those experts available to answer the JCCP plaintiffs' questions.[1]

The parties in the JCCP Action also have appeared before the JCCP Court several times to discuss those issues, and the JCCP Court has provided useful guidance—the parties were down to just three or four remaining disputes. Indeed, Uber believes the parties were close to reaching agreement on those few issues, but the JCCP plaintiffs abruptly and unilaterally walked away from those discussions just a few weeks ago—despite the fact that the JCCP Court had ordered the parties to submit an ESI protocol on February 2—stating that they will defer completely to the outcome of negotiations and any litigation in this MDL. This was an apparent attempt at a second bite at the apple given the JCCP Court's recent observation that it would not "micromanage how Uber reviews and produces documents, particularly where they're relying on [an] expert who

---

[1] The MDL plaintiffs and the JCCP plaintiffs have engaged the very same e-discovery consultant, International Litigation Services ("ILS"), a self-described "Plaintiff-only eDiscovery provider," *see About Us*, ILS, https://ilsteam.com/about-us/ (last visited Feb. 12, 2024), and are both working with the same individual at that company, Doug Forrest. Mr. Forrest has participated in meet and confers in both proceedings. *See* Grusauskas Decl. ¶¶ 7, 11.

-1-

apparently [Plaintiffs] acknowledge is an expert in the field." Grusauskas Decl., Ex. C at 130:1–4.[2] And, as it turns out, the MDL plaintiffs indeed have backtracked in significant ways from the agreements reached in the JCCP on issues such as the use of search terms prior to TAR, whether plaintiffs should be permitted to review documents as part of Uber's TAR process, and other significant issues. In seeking to relitigate these issues, the MDL plaintiffs are undermining months and months of efforts by the parties and the JCCP Court to reach agreement. Indeed, there have been at least eight conferences before the JCCP Court where the ESI protocol was discussed, and those discussions have been more involved in more recent conferences, including a conference on September 18, 2023 involving nearly an hour of relevant discussion, and a conference on December 7, 2023 also involving nearly an hour of relevant discussion. Grusauskas Decl. ¶ 3.[3]

To be clear, Uber recognizes that this is a separate proceeding, and the MDL plaintiffs have made clear that they do not wish to follow in the JCCP plaintiffs' footsteps with respect to the ESI protocol. But that does not negate the substantial efforts that Uber has made in examining these issues in good faith over the course of more than a year or the concessions the parties have made during that time.

Informed by that extensive experience, Uber has been actively meeting and conferring with the MDL plaintiffs since they sent their first draft ESI protocol to Uber on January 17, 2024. *See* Grusauskas Decl. ¶¶ 9–12. On January 24, 2024, Uber sent plaintiffs its revisions to that proposed protocol, which were intended to align the draft with the JCCP draft, much of which has been agreed-upon. *Id.* ¶ 9. The parties continued to exchange their respective comments and edits in the weeks that followed, and they met and conferred on January 25, January 29, February 1, February 7, February 8, February 11, and February 12, 2024. *Id.* ¶ 10. Unfortunately, despite Uber's best efforts to explain the basis for its positions, as informed by its experience in the JCCP, plaintiffs have been unwilling to compromise on several important issues. A copy of Uber's

---

[2] Each exhibit referenced in this memorandum is an exhibit attached to the Grusauskas Decl.

[3] At the most recent conference regarding these issues, the JCCP Court indicated that it would consult with this Court about the entry of an ESI protocol and ordered the parties to provide the JCCP Court with copies of all the briefing before this Court on the issue. *See* Feb. 5, 2024 Order Setting Deadline for Submission of Competing ESI Protocols at 1, JCCP Action.

-2-

proposal is attached as Exhibit A, and a chart outlining the disputed language clearly for the Court is attached as Exhibit B.

## II.   ARGUMENT

### A.   Summary of Argument

The Federal Rules of Civil Procedure provide that the scope of discovery shall not exceed what is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Under this proportionality principle, the standard for discovery is reasonableness, not perfection. *Alivecor, Inc.* v. *Apple, Inc.*, 2023 WL 2224431, at *2 (N.D. Cal. Feb. 23, 2023). The parties' obligations to conduct reasonable searches for discoverable information flow from the Rules themselves, and ESI protocols do not need to restate the parties' obligations. *See Raine Grp. LLC* v. *Reign Cap., LLC*, 2022 WL 538336, at *2 (S.D.N.Y. Feb. 22, 2022). Moreover, it is widely accepted that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." *NuVasive, Inc.* v. *Alphatec Holdings, Inc.*, 2019 WL 4934477, *2 (S.D. Cal. Oct. 7, 2019) (quoting *The Sedona Principles, Third Edition*, 19 Sedona Conf. J. 1, Principle 6, 118 (2018)).

As explained in the dispute-specific sections below, Uber's proposed protocol far exceeds this standard, providing fulsome disclosures about its anticipated discovery procedures beyond what is required. By contrast, plaintiffs' proposal would grant plaintiffs an unprecedented role in micromanaging Uber's discovery and would subject Uber to an impossibly high standard that is both beyond what the Rules require and that is often technologically impossible to satisfy.[4] Hence, in accordance with the Rules and the Sedona Principles, the Court should reject plaintiffs' proposal and adopt Uber's proposed ESI protocol.

---

[4] Plaintiffs have justified their intrusive demands in part by suggesting that because this multidistrict litigation includes hundreds of plaintiffs, Uber must shoulder a larger discovery burden than it would if these cases were brought individually. But plaintiffs have provided no authority for their position, and it contradicts the statements of other courts, including this one. *See, e.g.*, Pretrial Order No. 7, ECF 255 ("PTO 7") at 10 ("[T]he discovery to which Plaintiffs are entitled in the MDL *is arguably no greater than the discovery to which they would be entitled in each of the individual actions* taken together." (emphasis added)), 12 ("Uber will be free to argue before this Court that MDL Plaintiffs are seeking overly broad discovery, *just as it could in any individual case.*" (emphasis added)).

-3-

B.   Uber's Section 3: Cooperation (Ex. B, § III)

Plaintiffs' proposed "cooperation" provision fails to recognize the baseline principle that the responding party is best positioned to assess the procedures and technologies needed to satisfy its own discovery obligations. *See* Ex. B, § III. But federal courts in this Circuit have endorsed this proposition, set forth in Sedona Principle 6, and it is a central pillar of modern e-discovery. *See, e.g.*, *NuVasive, Inc.*, 2019 WL 4934477, *2 (quoting *The Sedona Principles, Third Edition*, 19 Sedona Conf. J. 1, Principle 6, 118 (2018)); *Livingston* v. *City of Chicago*, 2020 WL 5253848, at *3 (N.D. Ill. Sept. 3, 2020). The parties' ESI protocol should acknowledge this principle, and plaintiffs' refusal to include it is troubling.

C.   Uber's Section 7: Identification of Custodial and Non-Custodial Documents (Ex. B, § IV)

Although the parties agree on the majority of this section, Plaintiffs' proposed language concerning data sources that are not reasonably accessible is inappropriate. Rule 26(b)(2)(B) provides the framework for addressing ESI that is not reasonably accessible, and there is no basis for modifying it. *See Raine Grp. LLC*, 2022 WL 538336, at *2. Uber's proposal, acknowledging that rule and offering to meet and confer concerning accessibility, is far more reasonable and appropriate.

D.   Uber's Section 8: Using Search Terms Before TAR, Key Word Search (Ex. B, §§ V, VII, XIV)

The volume of documents collected in this litigation likely will amount to tens of millions of files; for reference, Uber has already exported nearly 21 million documents for 46 proposed custodians in the JCCP Action.[5] Grusauskas Decl. ¶ 4. This will entail substantial processing and hosting costs. To mitigate these costs and make document review more efficient, Uber intends to cull that data using search terms before beginning technology assisted review ("TAR"). Plaintiffs' protocol would bar Uber from doing so. Ex. B, § VII.

---

[5] These figures represent the collection of just a segment of these proposed custodians' data (Gmail and Gchat), before accounting for various other sources, such as Google Drive, which are expected to add many millions more documents. Grusauskas Decl. ¶ 4.

-4-

There is good reason for using search terms before TAR. It helps filter out irrelevant documents, which can make the process work much more efficiently and avoid the significant costs and complications that likely would arise if a producing party were required to load millions of potentially irrelevant documents into a TAR process without previously culling using search terms. Search terms used for this purpose would be broader than if they were used to select a set of documents for manual human review, because in that instance, part of the objective is to be more narrowly tailored. And Uber is willing to both disclose its anticipated custodians and search terms and to meet and confer with plaintiffs in the hopes of reaching agreement. Ex. B, § V, XIV. In other words, Uber does not intend to select search terms unilaterally. But search terms are an important tool to filter out likely irrelevant documents and thus avoid the costs of hosting and reviewing such documents. Again, by way of example, application of the JCCP plaintiffs' requested search terms reduced the nearly 21-million document collection to a potential review set of 3.5 million documents (after deduplication), which is still a staggering volume. Grusauskas Decl. ¶ 5.

Plaintiffs have objected to Uber's proposal, claiming that using search terms before TAR might exclude some responsive documents. But "[p]erfection in ESI discovery is not required," nor even possible, and a producing party satisfies its obligations if it takes "reasonable steps to identify and produce relevant documents." *Alivecor, Inc.*, 2023 WL 2224431, at *2 (citation omitted); *accord Reinsdorf* v. *Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013). Under this reasonableness standard, plaintiffs' speculation that using search terms before TAR may possibly exclude some undefined but relatively small number of potentially responsive documents does not justify imposing substantial costs to host and review countless documents that are likely irrelevant. *See In re Viagra (Sildenafil Citrate) Prod. Liab. Litig.*, 2016 WL 7336411, at *1 (N.D. Cal. Oct. 14, 2016) (recognizing that the discovery "standard [under the Rules] is not perfection, or using the 'best' tool . . . , but whether the search results are reasonable and proportional" (quoting *Hyles* v. *New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016)).

Courts overwhelmingly reject plaintiffs' argument about the hypothetical risks of applying search term culling before TAR. *See, e.g.*, *Livingston*, 2020 WL 5253848, at *3 (rejecting

plaintiffs' argument that "pre-TAR culling [with search terms] will eliminate large amounts of potentially relevant ESI," because the argument "assumes that those emails removed by the keyword searches likely would have been identified using TAR at the outset instead"); *Zhulinska* v. *Niyazov L. Grp., P.C.*, 2021 WL 5281115, at *3 (E.D.N.Y. Nov. 12, 2021) ("Moreover, as courts have recognized, predictive coding is an efficient and acceptable means of culling relevant responsive documents to be produced from ESI identified through keyword searches."). In fact, courts recognize that using search terms before TAR satisfies a party's discovery obligations. *See, e.g.*, *Huntsman* v. *Sw. Airlines Co.*, 2021 WL 3504154, at *3 (N.D. Cal. Aug. 10, 2021) ("[The defendant's] approach to using keyword searches and technology-assisted review in tandem does not offend the court's expectation that the parties conduct a reasonable inquiry as required by the rules."); *Maurer* v. *Sysco Albany, LLC*, 2021 WL 2154144 (N.D.N.Y. May 27, 2021) (finding "reasonable the defendants' proposed use of a general search-term-based search of the custodian accounts . . . to be followed by a second level of review using predictive coding"); *Livingston*, 2020 WL 5253848, at *3 (holding that pre-TAR culling with search terms "satisfies the reasonable inquiry standard and is proportional to the needs of this case under the federal rules"); *Winfield* v. *City of New York*, 2017 WL 5664852, at *7–8 (S.D.N.Y. Nov. 27, 2017) (permitting application of search terms in connection with defendant's TAR process); *In re Biomet M2a Magnum Hip Implant Prods. Liab. Litig.*, 2013 WL 1729682, at *2–3 (N.D. Ind. Apr. 18, 2013) (concluding, in an MDL, that use of pre-TAR search term culling was appropriate and satisfied defendant's discovery obligations under Rule 26).[6]

In sum, Uber's proposal to use search terms before TAR is reasonable and has been accepted by courts throughout the country. This court should do the same.[7]

---

[6] The parties' dispute does not resemble *In re Allergan Biocell Textured Breast Implant Products Liability Litigation*, 2022 WL 16630821 (D.N.J. Oct. 25, 2022), where the court's decision not to permit the use of TAR after a search-term review was "driv[en]" by "the fact that the parties ha[d] not agreed to the application of TAR" in the ESI protocol the court entered "[m]ore than a year" before its decision, *id.* at *4.

[7] Although plaintiffs object to using search terms before TAR, plaintiffs' proposed protocol also would require a party that wishes to use search terms to meet and confer regarding those terms within seven days after the ESI protocol has been entered. Ex. B, § XIV. It is incredibly premature to require a party to generate an appropriate list of search terms at this stage, before discovery requests have even been served. Uber's proposal—which provides that the parties will meet and

      E.     <u>Uber's Section 8(a): Technology Assisted Review, End-to-End Validation, Reassessment (Ex. B, §§ VI, XIII, XV, XVII, XVIII)</u>

The parties agree that Uber should provide transparency into its intended use of TAR, though they disagree as to what level of transparency is appropriate. Uber's position is that the numerous disclosures it has agreed to provide (and already has provided) regarding its TAR process are above and beyond what is necessary or warranted and would provide plaintiffs with information that is more than sufficient to enable plaintiffs to assess Uber's TAR process and raise questions or concerns as appropriate. As detailed in Uber's protocol, Uber has agreed to disclose numerous details and metrics concerning its TAR process and validation, and has provided that the parties can meet and confer at the conclusion of that process. Ex. B §§ VI, XIII. No more is required. *See* Declaration of Maura R. Grossman ("Grossman Decl.") ¶¶ 21–34, 39–41.

In light of Sedona Principle 6's recognition that the responding party is best positioned to determine how to satisfy its own discovery obligations, it is no surprise that courts have repeatedly held that the type of transparency Uber is willing to provide here is more than enough for a requesting party to evaluate a responding party's TAR process. *See, e.g.*, *Livingston*, 2020 WL 5253848, at *3 (finding that defendant's disclosure of "the TAR software—Relativity's [Active Learning]—it intend[ed] to use and how it intend[ed] to validate the review results . . . [was] sufficient information to make the production transparent"); *Kaye* v. *N.Y.C. Health and Hosp. Corp.*, 2020 WL 283702, at *2 (S.D.N.Y. Jan. 21, 2020) (parties' sharing of "detailed information regarding the collection criteria they used, the name of their continuous active learning ('CAL') software, their CAL review workflow, and how they intend to validate the review results" deemed "sufficient information to make the production transparent").

Yet, plaintiffs demand to be directly involved in reviewing an initial set of documents at the beginning of the TAR process and to have direct input into whether those documents are coded as responsive—including reviewing *non-responsive* documents. Plaintiffs have further demanded to have a role in the process Uber would employ to validate its TAR workflow. *See e.g.,* Ex. B,

---

confer about search terms before their use, *see id.*—is all that is appropriate at this early juncture. Plaintiffs' provision on search terms also purports to predetermine various details of such meet and confers, which is premature and unnecessary. *See id.*

-7-

MEMORANDUM IN SUPPORT OF
DEFENDANTS' PROPOSED ESI PROTOCOL            Case No. 3:23-md-3084-CRB

§§ VIII, XII.  This level of involvement is inappropriate and contrary to Sedona Principle 6 and standard discovery practice.  *Winfield*, 2017 WL 5664852, at *9 ("[T]here is nothing so exceptional about ESI production that should cause courts to insert themselves as super-managers of the parties' internal review processes, including training of TAR software, or to permit discovery about such process, in the absence of evidence of good cause . . . .").  Grossman Decl. ¶¶ 15–20.  Furthermore, granting plaintiffs this involvement could significantly prejudice Uber as it "may reveal work product, litigation tactics, and trial strategy."  *Winfield*, 2017 WL 5664852, at *9.

Moreover, granting plaintiffs the level of involvement they seek would be inconsistent with the process Uber intends to follow.  Uber intends to use a TAR 2.0 process, which employs an iterative continuous active learning application that allows the technology to continuously learn from the coding decisions of human reviewers to better classify and prioritize likely responsive documents.  *See eDiscovery and predictive coding—Artificial intelligence and the roadmap to the future,* eDiscovery for Corporate Counsel § 7:29.  The TAR 2.0 process operates by prioritizing documents for human reviewers.  Grossman Decl. ¶ 15.  As reviewers code documents responsive or non-responsive, those coding decisions continually inform the TAR 2.0 technology on how to better prioritize the next documents to be reviewed.  *Id.*  As a result, any involvement from plaintiffs in coding documents at the outset of the TAR 2.0 process is inconsistent with the fact that—in contrast to TAR 1.0—the technology does not require a discrete "training" phase, since it is continuously learning.  *Id.* ¶ 16.  To the extent Plaintiffs express concern about ensuring the model is set up properly at the outset, and are concerned about correcting the model later on, studies show that a TAR 2.0 process's ability to identify relevant documents is not impacted by how the TAR 2.0 process begins.  *Id.* ¶ 17.  Lastly, Plaintiffs also request involvement in reviewing documents as part Uber's validation process, but that too is uncommon in modern ESI protocols.  *Id.* ¶ 18-19.

This dispute is yet another illustration of why courts have found that it is best practice to allow the responding party to determine how to meet its production obligations; after all, it is counsel's responsibility, under Rule 26(g), to certify that counsel has made a reasonable effort to assure that the responding party has provided responsive information.  *See In re Viagra (Sildenafil*

-8-

*Citrate) Prod. Liab. Litig.*, 2016 WL 7336411, at *1 (N.D. Cal. Oct. 14, 2016) (recognizing that "responding party is the one best situated to decide how to search for and produce ESI responsive to discovery requests," and that discovery "standard is not perfection, or using the 'best' tool . . . but whether the search results are reasonable and proportional").

During the meet and confers, plaintiffs failed to articulate a compelling basis for such an extraordinary measure of involvement in Uber's TAR process. Plaintiffs' only stated reason for their position is their claim that this has been done in other MDLs, citing two examples. Neither case is relevant here since one protocol—entered 8 years ago—was based on an antiquated TAR 1.0 methodology Uber does not intend to follow; and the other example involves parties who consented to the requesting part's involvement in the TAR process. Grossman Decl. ¶ 19 n.1. The fact that those defendants agreed to such a process—for any number of unknown reasons particular to those cases—does not justify plaintiffs' demand to intrude on Uber's TAR 2.0 process absent a showing of deficiency in Uber's production. *See Freedman* v. *Weatherford Int'l Ltd.*, 2014 WL 4547039, at *1 (S.D.N.Y. Sept. 12, 2014) (denying reconsideration of decision that "discovery on discovery" was not warranted because "plaintiff had not 'proffered an adequate factual basis for their belief that the current production is deficient.'" (citation omitted)); *The Sedona Principles, Third Edition*, 19 Sedona Conf. J. 1, Principle 6, 118 & n.92 (2018) (collecting authorities in support of conclusion that each party should fulfill "its discovery obligations without direction from . . . opposing counsel").

In sum, Uber has and will continue to disclose many pieces of information to plaintiffs that will provide them with more than enough information to evaluate Uber's TAR process. *See* Grossman Decl. ¶¶ 39–41. But granting plaintiffs the level of involvement they seek would be inappropriate and inefficient. *See Rio Tinto PLC* v. *Vale S.A.*, 306 F.R.D. 125, 128–29 (S.D.N.Y. 2015) (noting that "requesting parties can insure that training and review was done appropriately by other means [than reviewing a seed set]").

Uber has also proposed a stopping criteria and validation methodology that is unbiased and empirically validated, and Uber has agreed to provide Plaintiffs with disclosures that courts have found are all that is required to provide transparency into a producing party's TAR

-9-

1  process. Grossman Decl. ¶¶ 21–34, 39–41. First, there is no principled basis for Plaintiffs'
2  proposed stopping criteria. *Id.* ¶ 23. Second, Plaintiffs' proposed additional methodology for
3  conducting "end-to-end" validation, and a process for "reassessing" validation, unnecessary in
4  light of the validation process Uber has set forth and the disclosures it has agreed to provide. *Id.*
5  ¶¶ 37–38. Lastly, Plaintiffs' proposal to require 80% recall is unreasonable, in light of studies that
6  establish such a recall rate is virtually unachievable. *Id.* ¶¶ 26–28.

F.  Uber's Section 17: Google Drive Hyperlinks Embedded in Emails (Ex. B, § XX)

Uber uses the Google Workspace, which offers a suite of cloud-based web applications and file storage, including Google Docs, Sheets, and Drive. A feature of Google Drive, which is a file storage application, is that a user can send an email message containing a hyperlink to a document stored on Drive.

Plaintiffs' proposal calls for Drive links in emails to be treated as traditional "attachments" in a parent-child relationship. *See* Ex. B, §§ I, XXII (plaintiffs' proposal defining "Attachments" to include "documents linked, hyperlinked, stubbed or otherwise pointed to within or as part of other ESI" and requiring that "Attachments" be produced in a family relationship with their parent document).[8] Plaintiffs also insist that Uber create that parent-child relationship with the particular "version" of the hyperlinked document in the form that it existed at the precise time that the email containing the link was sent. Ex. B, § XX. Plaintiffs suggested that Uber utilize a software program called Forensic Email Collector ("FEC") developed by a company called Metaspike to collect these contemporaneous versions. Plaintiffs' positions are untenable. As explained further below, the Court should adopt Uber's proposals on this issue, which recognize the unique technological constraints involved with Google Drive documents but—unlike plaintiffs—propose

---

[8] Plaintiffs' proposal also requires Uber to make "reasonable efforts to maintain and preserve the relationship between any message or email and any cloud-hosted document hyperlinked or referenced within the message or email." Ex. B, § XX (emphasis added). The tool that Uber proposes it use to make reasonable efforts to preserve the metadata relationships between email messages with hyperlinks to files on Google Drive, Google Parser, is able to access cloud-hosted documents only on Google Drive, not other cloud-hosting services. *See* Declaration of Jake Alsobrook ("Alsobrook Decl.") ¶ 10.

-10-

a reasonable solution to accommodate plaintiffs' desire to mimic a "family" relationship[9] that is the only viable option under the circumstances. *See* Ex. B, §§ XX, XXIV.

Plaintiffs' demand that Uber treat hyperlinks as traditional attachments should be rejected for several reasons. Hyperlinks serve many different functions than traditional attachments and present considerable and unique challenges in the discovery context. For instance, while attachments function on a one-to-one relationship between an email and attached file, a hyperlinked document often has a one-to-many relationship whereby the hyperlink to one document is present in several different emails or documents. Declaration of Philip Favro ("Favro Decl.") ¶ 14. Courts have confronted this very issue and have concluded that due to these significant differences, hyperlinks should not be considered attachments. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 2023 WL 4361131, at *1 (N.D. Cal. June 2, 2023) ("[T]he ESI protocol should make clear that hyperlinked documents are not treated as conventional attachments for purposes of preserving a 'family' relationship in production."); *Porter* v. *Equinox Holdings, Inc.*, 2022 WL 887242, at *2 (Cal. Super. Ct. Mar. 17, 2022) ("[L]inked documents can present unique challenges that make them different from email attachments."); *Nichols* v. *Noom Inc.*, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) ("[T]he Court does not agree that a hyperlinked document is an attachment.").[10]

---

[9] Notably, the JCCP plaintiffs initially made the same requests, but ultimately did *not* insist that cloud-based documents be treated the same as traditional attachments, and agreed to the language Uber had proposed to describe how Uber would attempt to create metadata associations between Gmails and linked Google Drive documents.

[10] Admittedly, there are older cases that treat hyperlinks as traditional attachments, *see, e.g.*, *Kelly* v. *Provident Life & Accident Ins. Co.*, 2009 WL 10664172, at *5 (S.D. Cal. May 29, 2009), but these cases are outdated, *see Porter*, 2022 WL 887242, at *2 (explicitly rejecting *IQVIA, Inc.* v. *Veeva Systems., Inc.*, 2019 WL 3069203 (D.N.J. July 11, 2019)—and, by extension, other cases— "which essentially [hold] that linked documents [are] comparable to attachments"). Similarly, cases where the amount of hyperlinked material is much more manageable than it is here or where the parties reached an agreement to produce hyperlinked material are not similar to the parties' dispute. *See, e.g.*, *Shenwick* v. *Twitter, Inc.*, 2018 WL 5735176, at *1 (N.D. Cal. Sept. 17, 2018) (plaintiffs were permitted to identify "up to 200 hyperlinks for which they seek the referenced documents" out of "725 specific hyperlinks to documents at issue"); Hearing Tr. at 40–42, *Stitch Editing Ltd.* v. *TikTok, Inc.*, No. CV 21-06636-SB(SKX) (C.D. Cal. Sept. 1, 2022), ECF 126 (ordering production of hyperlinked material for "even fewer" than "about 30 URLs in the document productions"); *In re StubHub Refund Litig.*, 2023 WL 3092972, at *1 (N.D. Cal. Apr. 25, 2023) (parties *agreed* to an ESI protocol that treated hyperlinks as traditional attachments); *In re East Palestine Train Derailment*, No. 4:23-cv-00242-BYP (N.D. Ohio June 2023), ECF 95, 100 (adopting *joint* proposal for treating hyperlinks as traditional attachments on page two); *In re*

To be clear, Uber is not arguing that the plaintiffs should not receive any hyperlinked material. Uber will collect Google Drive data. Uber's proposal provides that it will then use reasonable efforts to create a metadata relationship between documents (using a tool discussed further below) and permits plaintiffs, on a case-by-case basis, to request that Uber identify individual documents corresponding to a Drive hyperlink in an email. *See* Ex. B, § XX. This proposal is reasonable and similar to the proposals adopted by other courts. *See, e.g.*, *In re Meta Pixel*, 2023 WL 4361131, at *1 ("[P]arties should consider reasonable requests for production of hyperlinked documents on a case-by-case basis. Such requests should not be made as a matter of routine."); *Noom Inc.*, 2021 WL 948646, at *4 ("[T]here has been no showing by Plaintiffs that they actually need to link to or even care about all of the hyperlinked documents. . . . [I]f Plaintiffs determine there is a need for an additional targeted pull or production or clarifying information about a hyperlinked document's identity or Bates number, Plaintiffs can request it.").

Uber has explained its proposed solution for creating a metadata relationship between (a) emails containing hyperlinks to cloud-based documents in Google Drive, and (b) the underlying Google Drive documents in several discussions with plaintiffs. Uber has explained that its e-discovery vendor, Lighthouse—an experienced vendor with the expertise and capability to handle and support e-discovery in large complex cases—has developed a proprietary tool, the "Google Parser," that is capable of creating a metadata relationship between emails and hyperlinks to Google Drive documents as part of the processing phase following collection and that has been used successfully in other litigations. In the course of the negotiations in both cases, Uber has not only sent both sets of plaintiffs a written description of how Google Parser works, *see* Ex. D, but even convened two separate calls with Lighthouse, the plaintiffs in this litigation, the JCCP plaintiffs, and their shared e-discovery vendor, ILS, to permit plaintiffs to question Lighthouse regarding the specifics of its tool, *see* Grusauskas Decl. ¶¶ 7, 11.[11]

Notably, when the MDL plaintiffs sent their proposed protocol to Uber, on January 17,

---

*Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, No. 22md3043DLC (S.D.N.Y. Jan. 2023), ECF 344-1, 345 (adopting *joint* proposal for treating hyperlinks as traditional attachments on page 10).

[11] Plaintiffs' e-discovery consultant Doug Forrest from ILS participated in both of these calls. *See id.* Additional information on Google Parser is set forth in the Alsobrook Decl.

-12-

2024, plaintiffs' protocol explicitly stated that Uber could use Lighthouse's Google Parser tool. Grusauskas Decl. ¶ 8. Plaintiffs have since deleted their acknowledgement that Uber will use the Google Parser tool, and other aspects of plaintiffs' draft reflect that they do not fully appreciate the general technological limitations with treating hyperlinked documents as "attachments."

For instance, plaintiffs continue to demand that Uber create a metadata relationship between a given email and the historic "version" of a Google Drive document in the form that it existed at the precise time that the email containing the link was sent.[12] This demand is technologically infeasible. Favro Decl. ¶ 22. Uber's Google Drive documents are archived in Google Vault, which does not permit exporting multiple "versions" of documents.[13] Hence, to satisfy plaintiffs' request for a contemporaneous iteration of a document hyperlinked in an email, Uber would have to perform a manual review using the information from the specific email to locate the Google Drive document. Favro Decl. ¶ 22. Uber would then need to conduct a manual search in the revision history of that Google Drive document to locate the "last version saved before 12:00 AM on the specified date" of the specific email at issue. *Id.*[14] There is currently no way to automate this process, Favro Decl. ¶ 19, and it would be enormously burdensome to require Uber to complete it for every hyperlinked document in every responsive email. It is also worth

---

[12] It is unclear whether plaintiffs are continuing to suggest that Uber use the Metaspike FEC tool to complete this task. For several reasons, not the least of which being that Metaspike confirmed to Uber's counsel that FEC cannot, in fact, access items stored in the document retention and archiving system, Google Vault, that Uber uses for Google Workspace data, Metaspike is not a viable tool. Grusauskas Decl. ¶ 6, Ex. D. Moreover, courts have rejected the use of this very tool in other cases in which similar disputes have arisen. *See, e.g.*, *In re Meta Pixel*, 2023 WL 4361131, at *1 (considering "the declaration of Douglas Forrest" and concluding that "the commercially available tools [namely, Metaspike FEC] plaintiffs suggest may be used for automatically collecting links to non-public documents have no or very limited utility"); *Noom Inc.*, 2021 WL 948646, at *2 ("The Court also took into account the relative costs and delays attendant to utilizing FEC.").

[13] Although Google Drive maintains a "version history" that records any changes to a document over time, Google Drive saves and records these changes at arbitrary times automatically without any human action. In some instances, these changes can be recorded on a minute-by-minute basis, resulting in several dozen copies of a given document. This results in an enormous quantity of highly duplicative data, and has the potential to exponentially increase the size and cost of document collection and review. This distinguishes the "version history" in Google Drive from traditional document management systems, like Sharepoint or iManage, where new versions are affirmatively created by users.

[14] *Use Vault to search Google Drive, Meet, and Sites*, Google Vault Help, https://support.google.com/vault/answer/7654308?hl=en#zippy=%2Csearch-within-the-revision-history-of-a-file (last visited Feb. 8, 2024).

noting that Plaintiffs' request for historic "versions" of documents is premised on the assumption that all such documents were modified after emails referencing them were sent, but there is no basis for that assumption.

In summary, given how Google Vault functions, plaintiffs' request for Uber to treat hyperlinks as traditional attachments and create a parent-child relationship with the particular "version" of the hyperlinked document in the form that it existed at the precise time that the email containing the link was sent is impossible, and grossly disproportionate, in a case like this where the volume of documents is expected to be significant. Instead, the Court should adopt Uber's proposal that it use reasonable efforts to create a metadata relationship between documents with hyperlinks and the hyperlinked material and permit plaintiffs, on a case-by-case basis, to request that Uber identify individual documents corresponding to a Drive hyperlink in an email.

G.   Uber's Section 10: Non-Traditional ESI (Ex. B, § XVII)

Uber believes this provision is necessary to address how the parties will deal with unconventional sources of ESI. These include ESI from social media, ephemeral messaging systems, collaboration tools, data formats identified on a mobile or handheld device, and modern cloud sources. Ex. B, § XVII. At this time, the parties cannot fully predict the myriad of sources of ESI that will be subject to the discovery process, but they must provide for the potential need to address non-traditional sources of ESI if they arise. Uber's proposal fulfills that need.

H.   Uber's Section 12: Deduplication (Ex. B, § XIX)

Plaintiffs' proposal would require Uber to list the original file paths of a document prior to deduplication in the "ALL FILE PATHS" metadata field "in the order corresponding to the order of names in ALL CUSTODIANS." Ex. B, § XIX. While Uber does not object to providing this filepath information, presenting it in this particular order would require manual sorting that would be unduly burdensome for Uber to provide.

I.   Miscellaneous Additional Disputes

The parties have several additional disputes that are smaller in magnitude and generally self-evident based on a comparison of the respective language.[15] Of these disputes, the most

---

[15] *See* Ex. B §§ II, IX, X, XI, XVI, XXIII, XXV, XXVI, XXVII.

-14-

significant are the parties' disputes regarding the production of certain metadata fields, *see id.* § XXIX, and unsearchable documents, *see id.* § XVI.  With respect to metadata, plaintiffs sent a list of over 40 newly requested metadata fields on Thursday, February 8, just two business days prior to the deadline for the parties' submissions.  These fields appear to have been pulled en masse from Google's website[16] without any thought given to their actual utility.  Uber and its vendor nonetheless hurried to review them, and explained to plaintiffs that many of the fields cannot reasonably be provided and would require extensive work outside Uber's normal processes, yet plaintiffs were unwilling to budge.  Uber requests that the Court reject plaintiffs' unjustified demand for those fields which would impose undue burden on Uber.  Alsobrook Decl. ¶¶ 13–15.  Further, plaintiffs' proposal for unsearchable documents is premature given the parties' ability to meet and confer about such documents once discovery actually begins and the parties have a better sense of the issue.

Uber is prepared to submit further briefing to elaborate on its positions, if it would be helpful to the Court.

Uber recognizes that the parties' disputes over an ESI protocol are complicated.  If it would be helpful, Uber would be happy to submit further briefing, appear for oral argument, and/or produce experts to testify at a hearing in order to assist the Court in its resolution of these issues.

### III.  CONCLUSION

Uber respectfully requests that the Court enter its proposed ESI protocol (Ex. A).

DATED:  February 12, 2024

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  */s/ Randall S. Luskey*
RANDALL S. LUSKEY
ROBERT ATKINS

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.;
RASIER, LLC; and RASIER-CA, LLC

---

[16] *Vault export contents*, Google Vault Help, https://support.google.com/vault/answer/6099459?hl=en&ref_topic=4238976&sjid=7086696684988601940-NA#zippy=%2Cexport-contents%2Cvoice-data-parameters-in-the-metadata-file%2Cmessage-parameters-in-the-metadata-file (last visited Feb. 12, 2024)

-15-