# EXHIBIT E

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE (Rule 3.550)<br><br><br>**IN RE: UBER RIDESHARE CASES** | **JUDICIAL COUNCIL COORDINATED PROCEEDING NO. 5188**<br><br>Case No. CJC-21-005188<br><br>**[PROPOSED] CASE MANAGEMENT ORDER REGARDING DOCUMENT PRODUCTION PROTOCOL AND ELECTRONICALLY STORED INFORMATION**<br><br>*Assigned for All Purposes to the Honorable Ethan P. Schulman, Dept. 304* |

The procedures and protocols outlined herein govern the production of electronically stored information ("ESI") and paper documents by the Parties during the pendency of this litigation. The production formats for any other materials will be addressed by the Parties after a meet and confer regarding the specific item or category of items. The Parties, by and through their undersigned counsel, STIPULATE AND AGREE to the following protocol for the efficient and effective production of ESI in discovery, which may be subject to confidentiality limitations on disclosure due to federal laws, state laws, and privacy rights. The Parties stipulate as follows:

**A.      Purpose**

1.      This Order will govern discovery of electronically stored information ("ESI") in *Uber Rideshare Cases*, JCCP 5188 ("JCCP 5188") as a supplement to the California Rules of Civil Procedure, the Superior Court of California County of San Francisco Local Rules, and any other applicable orders and rules.

1

Case No. CJC-21-005188      [PROPOSED] CASE MANAGEMENT ORDER [   ] REGARDING DOCUMENT PRODUCTION PROTOCOL AND ELECTRONICALLY STORED INFORMATION

2.      Nothing in this Order shall supersede the provisions of the Stipulation and Protective Order, dated September 14, 2022, (the "Protective Order").  In the event there is a conflict between the Protective Order and this Order, the Parties agree to meet and confer to address that conflict.

3.      Nothing in this Order is intended to expand or limit the obligations under the California Code of Civil Procedure.

4.      This Order applies to any third-party discovery, pursuant to Code of Civil Procedure §§ 1985, et. seq., if agreed to by the subpoena recipient. Nothing contained herein modifies Code of Civil Procedure §§ 1985, et. seq., and specifically, the provisions of Code of Civil Procedure § 1985.8 regarding the effect of an objection to the specified form or forms for producing ESI.

5.      In the event of removal or transfer to other courts, this Order will remain in effect in all respects, until adopted by the remand or transferee court or replaced by a successor order.

6.      Nothing in this Order shall be deemed to constitute a waiver of any objections a producing party may have with respect to any discovery request.

7.      Subject to the Parties' objections and responses to Requests for Production of Documents, all non-privileged Documents that are identified as responsive to discovery requests shall be produced in the manner provided herein and consistent with the Protective Order.

8.      This Order governs ESI within the Parties' possession, custody, or control.

9.      The Parties recognize that this protocol is based on facts and circumstances as they are currently known to each party, and that additions or modifications to this protocol may become necessary as more information becomes known. This Order may be modified by a Stipulation of the Parties with approval of this Court or by the Court for good cause shown.

**B.      Duty of Cooperation**

The Parties acknowledge their duty to work together cooperatively throughout the discovery process.  The Parties additionally acknowledge that responding parties are best situated to evaluate the

procedures, methodologies, and technologies appropriate for search, review, and production of their own electronically stored information, but that any such procedures must be consistent with the responding parties' obligation to make a reasonable and good faith effort to obtain the requested information via diligent search and reasonable inquiry, and any other duties owed.

**C.    Definitions**

1.    "**And**" and "**or**" shall be construed conjunctively or disjunctively as necessary to make their use inclusive rather than exclusive, e.g., "**and**" shall be construed to mean "**and/or**."

2.    "**Confidentiality Designation**" means the legend affixed to Documents for Confidential Discovery Information as defined by, and subject to, the terms of the Parties' Discovery Confidentiality Stipulation in this Litigation.

3.    "**Defendant**" or "**Defendants**" means and refers to the named defendants in the above-captioned matter, as well as any later added defendants.

4.    "**Document**" as used herein has the same meaning as in the California Code of Civil Procedure Section 2016.020.

5.    "**Electronic Document or Data**" means Documents or Data existing in electronic form at the time of collection, including but not limited to: email messages (including all active messages and archived or otherwise stored messages), other electronic messaging platforms (such as instant messaging, chat messaging, app-based messaging, Slack messaging, and collaboration tool messaging), calendar items, address book entries, voicemails, recorded phone calls, memoranda, letters, reports, presentations, spreadsheets, databases, charts, handwritten notes, and any storage media.

6.    "**Electronically stored information**" or "**ESI**," as used herein has the same meaning as in the California Code of Civil Procedure Section 2016.020.

7.    "**Hard-Copy Document**" means Documents existing in paper form at the time of collection.

8.      "**Include**" and "**Including**" shall be construed to mean "include but not be limited to" and "including, but not limited to."

9.      "**Load files**" means electronic files provided with a production set of documents and images used to load that production set into a receiving party's document review platform, and correlate its data within that platform.

10.     "**Metadata**" means:  (i) structured, i.e., fielded, information embedded in a native file which describes, *inter alia,* the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device, or the custodian or non-custodial data source from which it was collected.

11.     "**Media**" means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

12.     "**Native Format**" means and refers to the format of ESI in which it was generated and/or as used by the producing party in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is a .xls or .xslx file.

13.     "**Optical Character Recognition**" or "**OCR**" means the process of recognizing, and creating a file containing, visible text within an image.

14.     "**Plaintiff**" refers to the named plaintiffs in the above-captioned matter, as well as any later added plaintiffs.

15.     "**Parties**" means any Plaintiff or Defendant to this action.

16.    "**Searchable Text**" means the native text extracted from an Electronic Document and any Optical Character Recognition text ("**OCR text**") generated from a Hard-Copy Document or electronic image.

17.    Reference to the singular shall also be deemed to refer to the plural, and vice-versa.

**D.    Preservation**

1.    The Parties represent that they have and will continue to abide by their obligations, under the California Code of Civil Procedure, to preserve discoverable information.

2.    Nothing in this Order shall be construed to alter the producing party's rights arising under the California Code of Civil Procedure (the "Code"), or other applicable laws or rules, to withhold production of Documents because the source of the Documents is not reasonably accessible or its production would be unduly burdensome or duplicative.

3.    All processes and procedures which would result in the elimination, or transfer to a less accessible medium, of any unpreserved data and associated metadata which would otherwise be required to be preserved or produced have been suspended.

4.    Notwithstanding the above, the Parties have discussed their preservation obligations arising under the Code, and agree that preservation of potentially relevant ESI will be reasonable and proportionate according to their obligations under the Code and in accordance with any applicable corporate policies.  To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the Parties agree that:

a.    The Parties will meet and confer as soon as practicable if any Party intends to request the preservation or production of these categories of ESI:

   i.    "deleted," "slack," "fragmented," or "unallocated" data on hard drives;

   ii.    random access memory (RAM) or other ephemeral data;

   iii.    online access data such as temporary internet files, history, cache, cookies, etc.;

5

  iv. data in metadata fields that are frequently updated automatically, such as last-opened dates;

  v. backup data that is substantially duplicative of data that is more accessible elsewhere; and

  vi. other forms of ESI whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business.

b. Uber is preserving devices for individuals who are subject to a litigation hold in this litigation. Uber will continue to preserve those devices to the extent they may contain relevant ESI, although such ESI is likely to be duplicative of ESI that is accessible elsewhere, e.g., in Gmail or Google Drive.

c. Nothing herein is intended to or does waive any objections based on burden or proportionality that the Parties may have with respect to documents or information sought by specific requests.

d. If there is a dispute concerning the scope of a Party's preservation efforts, the Parties or their counsel must meet and confer and fully explain their reasons for believing that additional efforts are, or are not, reasonable and proportionate. If the Parties are unable to resolve a preservation issue, then the issue should be raised promptly with the Court.

**E. Disclosure Concerning Review Methodology**

  1. <u>Obligation To Meet And Confer.</u> The Parties will meet and confer as appropriate to discuss certain aspects of the discovery process, for example, the number of custodians, the identity of those custodians, keywords to be used as part of culling files, and collection from non-custodial files.  This process will be iterative.  For the avoidance of doubt, Plaintiffs will meet and confer with Defendants about their collection of documents, including the sources from which such documents will be collected and any other parameters for search and collection.

  2. <u>Search Term Methodology.</u>  If a producing party intends to cull a Document collection to by using Search Terms or other limiters prior to applying TAR, such that only Documents captured by such Search

Terms and limiters are subject to the TAR process, the parties shall meet and confer concerning the proposed Search Terms or other limiters. To facilitate the meet and confers, the Producing Party shall make disclosures reasonably necessary for the Requesting Party to assess the proposed terms and resolve any disputes.

3.   <u>TAR Review Methodology.</u> As part of document review, Defendants intend to use a technology assisted review ("TAR") methodology known as TAR 2.0, which utilizes continuous active learning to classify and prioritize documents for attorneys to review.  Specifically, Defendants selected a vendor (Lighthouse) that uses the Relativity Active Learning ("RAL") platform.  Commonly, a TAR 2.0 methodology begins with putting a robust document population into the TAR 2.0 software where the algorithm uses data points collected through attorney review of documents to classify and prioritize the documents in the review queue in a more efficient manner.  Attorney reviewers then review documents the TAR 2.0 model has prioritized as likely responsive.  As the review continues and reviewers code documents, the TAR 2.0 model continues to learn and prioritize likely responsive documents.  Once two consecutive reasonably sized review batches are found to contain 10% or fewer documents marked responsive, Defendants will pause the review and turn to validation.  At that point, Defendants will conduct a validation test to calculate recall and to confirm that the null set likely contains few responsive documents.

Uber intends for the validation test to proceed as follows:

a.   A statistically valid sample consisting of three strata will be drawn from the entire TAR population.  500 documents will be drawn, at random, from documents coded responsive prior to validation; 500 documents will be drawn, at random, from documents coded nonresponsive prior to validation; and 2,000 documents will be drawn, at random, from documents not coded prior to validation (*i.e.*, the null set).  This will ensure an estimate of Richness with a margin of error no larger than 2.1% at 95% confidence.  As for all statistical estimates, the precise margin of error can only be

7

Case No. CJC-21-005188          [PROPOSED] CASE MANAGEMENT ORDER [    ] REGARDING DOCUMENT PRODUCTION
PROTOCOL AND ELECTRONICALLY STORED INFORMATION

known after the sample is reviewed.

b.  The 3,000 documents will be reviewed *de novo* for responsiveness, interleaved in random order, with no indication to the reviewer of their prior coding status.

c.  Recall and Richness will be calculated using the following quantities:

     i.  the number of documents in the TAR population that were coded responsive prior to validation;

     ii.  the number of documents sampled from (i) that are coded responsive in the *de novo* review;

     iii.  the number of documents in the TAR population that were coded nonresponsive prior to validation;

     iv.  the number of documents sampled from (iii) that are coded responsive in the *de novo* review;

     v.  the number of responsive documents in the TAR population that were not coded prior to validation; and,

     vi.  the number of documents from (v) that are coded responsive in the *de novo* review.

Defendants will determine, based on this validation test, whether further review or other targeted searches may be warranted, or whether further review would be disproportionate and the TAR 2.0 process can be concluded.

    4.  <u>Disclosures.</u>  Once the TAR process is complete, Defendants intend to disclose various metrics regarding the TAR 2.0 methodology utilized, including the following: (i) the total TAR population, (ii) the total population produced, (iii) the total population not produced, (iv) the total population not reviewed, (v) the size of the validation set used to verify the TAR 2.0 results, and (vi) a summary of the validation process.  The summary of the validation process will include the following

8

figures from the Validation Sample: (a) the number of documents within the sample that were previously coded relevant; (b) the number of documents within the sample that were previously coded not relevant; (c) the number of unreviewed documents within the sample.  The summary of the validation process will also include the number of actual responsive documents identified in (a), (b), and (c) during the validation process.  After Defendants disclose these metrics, the parties may meet and confer to discuss reasonable questions relating to the TAR process.

5.   Rolling Production.  Defendants will produce documents on a rolling basis once their TAR 2.0 process is underway.   Defendants will provide periodic status updates regarding the number of documents remaining in the review population, the rate of the review, and the number of documents marked responsive and non-responsive.  Defendants' TAR 2.0 workflow will not be conducted on a custodian-by-custodian basis, as it would be unreasonably burdensome and inefficient to proceed in this manner.  Defendants will use reasonable efforts to notify Plaintiffs, in good faith, when the production of documents for a given custodian is substantially complete.

6.   Court To Have Final Say.  None of the above is intended to limit the Court's  power to decide whether a responding party has satisfied its discovery obligations.

**F.   Discrete Document Collections.**

The Parties reserve the right to identify discrete document collections that shall be produced in their entirety without regard to whether or not each document in the collection has been identified as possibly responsive, or deemed to be or classified as, responsive, or, if search terms are used, contains a search term, except that privileged documents in such a collection may be withheld and listed in a privilege log as specified elsewhere in this order.

**G.      Documents with Insufficient Text**

To the extent that responsive documents, such as images or spreadsheets, cannot be located through text-based technology, the parties will meet and confer about conducting targeted collections through other means.

**H.      Non-Traditional ESI**

While this Order is intended to address the majority of Documents and data sources handled in this matter, there may be situations where the Parties come into contact with more complex, non-traditional or legacy data sources, such as ESI from social media, ephemeral messaging systems, collaboration tools, data formats identified on a mobile or handheld device, and modern cloud sources.  In the event such data sources are relevant, the Parties agree to take reasonable efforts to appropriately address the complexities introduced by such ESI.  The Parties further agree to abide by their obligations under the Code to take reasonable and proportionate steps to avoid the deletion of all data associated with any non-traditional ESI accounts in their possession or control, including social media accounts.

**I.      Production Format and Processing Specifications**

1.      All documents, with the exception of spreadsheet and media files, shall be produced as TIFF images.  The receiving party may make reasonable and proportionate requests for particular documents or ESI be produced in native format, and the Parties agree to meet and confer regarding such requests as appropriate.

2.      All spreadsheet (e.g., Microsoft Excel or Google Sheets) files shall be produced as native files with TIFF placeholder images. Spreadsheet files requiring redaction, including Microsoft Excel files, will be redacted within the native file, and the redacted native file will be produced as provided herein.

3.      All media files, such as audio and video files, shall be produced as native files with TIFF placeholder images.

4.      Image files, including digital photographs, shall be produced as TIFFs.  If the receiving party is not satisfied with the quality of TIFFs for particular images, it may request the producing party to produce those images in native format.

5.      In the event more complex, non-traditional or legacy data sources are relevant, the Parties agree to take reasonable efforts to appropriately address the complexities introduced by such ESI, including, when appropriate, to meet and confer regarding relevant production formats.

6.      In advance of depositions, the Parties reserve the right to produce Bates-stamped TIFF versions of any previously produced native file at their discretion.

7.      All ESI shall be produced with applicable metadata as specified in Attachment A, and searchable text extracted from the ESI. Redacted ESI, other than spreadsheet files which will be produced as redacted native files, will be produced as TIFFs with applicable metadata and OCR'ed searchable text. Hard-copy documents will be scanned and produced as TIFFs, with applicable metadata as set out in Attachment A, and OCR'ed searchable text.

8.      <u>Embedded Objects.</u> OLE embedded objects (embedded MS Office files, etc.) shall be extracted as separate files and treated as attachments to the parent document. Images embedded in emails shall not be produced separately.

9.      General productions in this case shall include e-mail attachments, which means a file encoded into text and transmitted as part of a single multipart message with the MIME protocol containing both the desired message and the desired file as a single 7-bit ASCII text file, or in some instances an embedded file encoded into the message itself, most commonly within a .eml file, which single file the recipient then may decode to recreate the attached file after transmission.  Thus, e-mail attachments subject to production as attachments are capable of automatic association with the e-mail itself. The association between an email and its attachment(s) must be preserved in the appropriate fields in the Concordance delimited data file. Additionally, an attachment must immediately follow its email and the Bates numbers

must be sequential within a group of related emails and attachments. If one document in a group is relevant, the entire group shall be produced, unless a document is being withheld on the basis of privilege.

10.     Uber will make reasonable and proportionate efforts to preserve the metadata relationship between email messages with links to files on Google Drive, to the extent Uber's vendor for processing and managing the documents to be reviewed and produced in this action possesses technology that enables it to maintain such a relationship.  Notwithstanding that Uber agrees to make reasonable and proportionate efforts in this regard, because of technological limitations inherent in the processing of emails containing embedded links, it shall not be presumed that all emails containing links to files on Google Drive will be produced with a metadata relationship between the parent email and the linked document. To the extent the Receiving Party believes that there is a lack of a metadata relationship between a specific email message and a specific linked document, Plaintiffs may notify the Producing Party and request that the particular linked file be extracted and produced or identified.  To the extent that the linked file in question is nonprivileged, and is relevant to either Party's claims or defenses and the efforts required to search for it would be proportional to the needs of the case, the Producing Party shall use reasonable and proportionate efforts to collect and produce/identify the document that was linked in the original email. The Parties agree to meet and confer to resolve any disagreements as to what constitutes reasonable and proportionate discovery efforts.

11.     Defendants will provide the underlying URLs associated with hyperlinks within the extracted text files associated with produced emails.

12.     Load Files.  Productions will include image load files in Opticon or IPRO format as well as Concordance format data (.dat) files with the metadata fields identified in Exhibit 1 for all included documents.  All metadata will be produced in UTF-8 format.

13.     Foreign Language Documents.  Hard-copy documents and ESI that contain languages other than English, in whole or in part, shall be produced in the original language(s).  Existing translations refer

to translations generated in the ordinary course of business and do not include translations generated for the purpose of litigation.

14.    Text Files.  A single text file shall be provided for each document. The text file name shall be the same as the Bates number of the first page of the document with the document extension ".txt" suffixed.  Files names shall not have any special characters or embedded spaces.  Electronic text must be extracted directly from the native electronic file unless the document requires redaction and is not a spreadsheet, is an image file, or is any other native electronic file that does not contain text to extract (*e.g.,* non-searchable PDFs).  In these instances, and in the case of imaged hard-copy documents, a text file shall be created using OCR and shall be produced in lieu of extracted text. Text shall be provided in UTF-8 format. Extracted text shall include all comments, revisions, tracked changes, speaker's notes and text from documents with comments or tracked changes, and hidden worksheets, slides, columns and rows.

15.    OCR.  OCR software should be set to the highest quality setting during processing. Documents containing foreign language text shall be OCR'ed using the appropriate settings for that language, e.g., OCR of German documents will use settings that properly capture umlauts. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

16.    Text Extracted from Emails.   Text extracted from emails shall include all header information that would be visible if the email was viewed in Outlook including: (1) the individuals to whom the communication was directed ("To"), (2) the author of the email communication ("From"), (3) who was copied and blind copied on such email ("CC" and "BCC"), (4) the subject line of the email ("RE" or "Subject"), (5) the date and time of the email, and (6) the names of any attachments.

17.    TIFFs.  All TIFFs produced by any party in this matter will be single page Group IV TIFF format, 300 dpi quality or better. Image file names will be identical to the corresponding Bates numbered images, with a ".tif" file extension. All images of documents which contain comments, deletions and revision marks (including the identity of the person making the deletion or revision and the date and time

thereof), speaker notes, or other user-entered data that the source application can display to the user will be processed such that all that data is visible in the image. The producing party will brand all TIFF images in the lower right-hand corner with its corresponding Bates number, using a consistent font type and size. The Bates number must not obscure any part of the underlying image.  If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number should be placed as near to that position as possible while preserving the underlying image.

18.   <u>TIFFs of Redacted ESI.</u>  TIFFs of redacted ESI shall include all non-redacted elements and formatting which are visible in any view of the document in its native application, and each redacted area must bear a label for the basis of the redaction.

19.   <u>Bates Numbers.</u>  All Bates numbers will consist of an Alpha Prefix, followed immediately by a 9 digit numeric: AAA#######.  There must be no spaces in the Bates number.   Any numbers with less than 9 digits will be front padded with zeros to reach the required 9 digits.

20.   <u>Date Fields Time Zone.</u>  All documents shall be processed so as to show fielded dates and times in Coordinated Universal Time (UTC).

21.   <u>Exception Files.</u>  The Parties will use reasonable efforts and standard industry practices to address Documents that present imaging or form production problems (including encrypted and/or protected files identified during the processing of ESI) ("Exception Files").  The Parties will meet and confer regarding procedures that will be used to identify, access, and process Exception Files. If the Parties cannot reach agreement on the handling of Exception Files through the meet and confer process, the matter may be submitted to the Court for determination.

22.   <u>Native File Image Placeholders.</u>  A Bates-stamped placeholder TIFF, bearing the legend "This document has been produced in native format" shall be provided for ESI produced in native format; these placeholders will be Bates numbered in the same way as any other TIFF, and the Bates number of that single page shall be used as the BegBates and EndBates of the associated document.

23.  <u>Databases, Structured, Aggregated or Application Data.</u>  The Parties will meet and confer to address the production and production format of any responsive data contained in a database or other structured or aggregated data source or otherwise maintained by an application.  The Parties will cooperate in the exchange of information concerning such databases and data sources to facilitate discussions on productions and production format.  If the Parties cannot reach agreement, the matter will be decided by the Court or its designee.

24.  <u>De-NISTing.</u>  Electronic files will be De-NISTed, removing commercially available operating system and application file information contained on the current NIST file list.

25.  <u>Lost, Destroyed or Irretrievable ESI.</u>  If a Defendant learns that responsive ESI that once existed was lost, destroyed, or is no longer retrievable as a result of acts or circumstances not occurring in the ordinary course of business, the Defendant shall comply with its obligations under the California Code of Civil Procedure, including Section 2031.230, to explain where and when the responsive ESI was last retrievable in its original format and to disclose the circumstances surrounding the change in status of that responsive ESI, whether that information is available from other sources, and whether any backup or copy of such original responsive ESI exists.

26.  <u>Scanning of Hard-Copy Documents.</u>  In scanning paper documents, documents are to be produced as they are kept. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-It notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-It. Defendants will use best efforts to unitize documents (*i.e.*, distinct documents should not be merged into a single record, and a single document should not be split into multiple records), and maintain document relationships, i.e., attachment status. Original document orientation (*i.e.*, portrait v. landscape) should be maintained.

27.  <u>Proprietary Software.</u>  To the extent that relevant ESI cannot be rendered or reviewed without the use of proprietary software, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format, including issues as may arise with respect to obtaining access to any such software and operating manuals.

28.  <u>Redactions</u>.  Redactions for relevance may only be made where necessary to protect particularly sensitive or proprietary confidential information, and the Parties agree to meet and confer regarding any disputes over the propriety of relevance redactions for any particular document(s) or category(ies) of documents.  For redacted items which were originally ESI, all metadata fields will be provided and will include all non-redacted data unless such metadata contains privileged information or information otherwise protected from disclosure.  Redacted documents shall be identified as such in the load file provided with the production.  A document's status as redacted does not relieve the producing party from providing all of the discoverable metadata required herein.

29.  <u>Color</u>. Any ESI that is not an email communication and contains color will be processed as a JPEG file at 300 DPI.  Where the receiving party reasonably suspects that particular email communications contain color that is necessary to determine the meaning of the communication, the receiving party may make reasonable and proportionate requests for particular email communications to be produced in color.  The Parties agree to meet and confer regarding such requests as appropriate.

30.  <u>Email Threading</u>.  No email may be withheld because it is included in whole or in part in a more inclusive email, although parties may use email threading for their own internal review and other internal processes.

31.  <u>De-Duplication</u>. The Parties shall de-duplicate stand-alone documents or entire document families globally using MD5 or SHA-1 Hash value matching. Email attachments shall not be eliminated from the parent email. Hard copy documents shall not be eliminated as duplicates of responsive ESI.

16

32.   <u>Legibility.</u>  Reasonable care shall be taken not to degrade the legibility of documents during the imaging process.  If legibility is found to have been degraded, the receiving party may make reasonable and proportionate requests for re-production of these documents, and the Parties agree to meet and confer regarding such requests as appropriate.

33.   <u>Encrypted or Password-Protected ESI.</u>  To the extent a Receiving Party identifies any ESI that is produced in encrypted format or is password-protected, the Receiving Party may notify the Producing Party of its need to access the encrypted or password protected ESI.  The Producing Party shall use reasonable and proportionate efforts to provide the Receiving Party a means to gain access to those native files (for example, by supplying passwords).  The Parties agree to meet and confer to resolve any disagreements as to what constitutes reasonable and proportionate discovery efforts.

34.   <u>Parent-Child Relationships.</u>  The Parties shall use methods of collection and processing that preserve the integrity of document metadata. Except for hyperlinked documents, the parties shall use methods of collection and processing that preserve the parent-child relationships such as the association between attachments and parent documents, or between embedded documents and their parents, or between documents.  For documents where the parent-child relationship is produced, all document family relationships shall be produced together and children files should follow parent files in sequential Bates number order.

35.   <u>Family Groups.</u>  A document and all other documents in its attachment range, emails with attachments, files with extracted embedded OLE documents, and email or other documents together with any documents referenced by document stubs all constitute family groups. If any member of a family group is produced, all members of that group must also be produced or else logged as privileged, and no such member shall be withheld from production as a duplicate.

36.   <u>Production Media.</u> The producing party will use the appropriate electronic media (CD, DVD or hard drive) or secure electronic transfer for its ESI production, and, if physical media is being

provided, will cooperate in good faith to use the highest-capacity available media to minimize associated overhead.  The producing party will label the physical media with the producing party, production date, media volume name, and document number range. Any replacement Production Media will cross-reference the original Production Media, clearly identify that it is a replacement and cross-reference the Bates Number range that is being replaced.

37.  <u>Write Protection and Preservation.</u>  All computer media that is capable of write protection should be write-protected before production.

**J.   Alternate Formats**

Notwithstanding the Parties' stipulations herein, upon reasonable request made by the Receiving Party, the Parties shall confer regarding the production in an alternate format of a document previously produced in accordance with this order.

**K.   ESI Liaisons**

In the spirit of cooperation and transparency, the Parties shall designate a member of their respective counsel teams as e-discovery liaisons for purposes of meeting and conferring on ESI topics. Counsel for Plaintiffs and Uber shall designate their respective ESI liaisons within 30 days of entry of this order, and thereafter the designation may be updated by counsel via email with 10 days' notice.  The Plaintiffs hereby designate International Litigation Services ("ILS") and Tony Chu as the host of their production, and all productions should be sent to ILS and Mr. Chu. All productions of ESI by Plaintiffs or non-party shall be sent to the Uber's ESI liaison and lead counsel, and any identified designees.  Uber may, in the future, identify a host for its productions and request that productions be sent to that host as well.

**L.   Limitations and Non-Waiver.**

This protocol provides a general framework for the production of ESI and paper documents on a going forward basis.  The Parties and their attorneys do not intend by this protocol to waive their rights to

the attorney-client or work-product privileges, except as specifically required herein, and any such waiver shall be strictly and narrowly construed and shall not extend to other matters or information not specifically described herein.  The inadvertent production or disclosure of ESI that contains privileged material shall be governed by the principles and procedures in Section 11 of the Parties' Stipulation and Protective Order, dated September 14, 2022.

**M.      General Provisions.**

1.      Any practice or procedure set forth herein may be varied by agreement of the Parties, and first will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of electronic data or other covered discovery materials.

2.      Should any Party subsequently determine in good faith that it cannot proceed as required by this order or that the order requires modification, the Parties will meet and confer to resolve any dispute before seeking Court intervention.

3.      The Parties agree that e-discovery will be conducted in phases and the Parties will meet and confer regarding discovery of data sources not listed herein.

4.      Regardless of the foregoing, the Parties retain the obligation to produce, or log for privilege, all responsive documents of which they are aware.

[PROPOSED] CASE MANAGEMENT ORDER [   ] REGARDING DOCUMENT PRODUCTION
                                PROTOCOL AND ELECTRONICALLY STORED INFORMATION

1   DATED:  November __, 2023      **PAUL, WEISS, RIFKIND, WHARTON &**
                                                 **GARRISON LLP**

2

3                              By: _____

4                                  ROBERT ATKINS
                                  RANDALL S. LUSKEY

5                              *Attorneys for Defendants/Cross-Complainants*
                              UBER TECHNOLOGIES, INC., RASIER,

6                              LLC and RASIER-CA, LLC

7   DATED:  November __, 2023      **LEVIN SIMES, LLP**

8

9                              By: _____
                                  WILLIAM A. LEVIN

10                               LAUREL L. SIMES
                                DAVID M. GRIMES

11                              *Co-Lead Counsel for Plaintiffs*

12   DATED:  November __, 2023      **WILLIAMS HART & BOUNDAS, LLP**

13

14                              By: _____
                                JOHN EDDIE WILLIAMS, JR.
                                JOHN BOUNDAS

15                               BRIAN ABRAMSON
                                MARGET LECOCKE

16                               WALT CUBBERLY

17                              *Co-Lead Counsel for Plaintiffs*

18   DATED:  November __, 2023      **ESTEY & BOMBERGER, LLP**

19

20                              By: _____
                                STEPHEN J. ESTEY
                                KRISTEN BARTON

21                              *Co-Lead Counsel for Plaintiff*

22

23

24

25

DATED:  November __, 2023

**CUTTER LAW, P.C.**

By: _____
    CELINE E. CUTTER

*Liaison Counsel for Plaintiffs*

DATED:  November __, 2023

**BREMER WHYTE BROWN & O'MEARA LLP**

By: _____
    ARASH S. ARABI

*Attorneys for Defendant/Cross-Defendant*
WILLIAM FRANCISCO GONZALEZ
(erroneously sued and served as "WILLIAM GONZALEZ")

DATED:  November __, 2023

**LIBERTYBELL LAW GROUP,  P.C.**

By: _____
    ALAN TAVELMAN
    MICHELE KENDALL

*Attorneys for Defendant/Cross-Defendant*
CALEB BUENCONSEJO

DATED:  November __, 2023

**GIBSON LAW OFFICES**

By: _____
    WENDY MARIE GIBSON

*Attorneys for Defendant/Cross-Defendant*
ELCID RODRIGO FAMORCAN

DATED:  November __, 2023

**REISZ SIDERMAN EISENBERG, APC**

By: _____
    MAHESH SUBRAMANIAN
    FREDERICK S. REISZ
    JACK WITCHER

*Attorneys for Defendant/Cross-Defendant*

21

DATED:  November __, 2023

PRINCE TOBECHI ONONIWU
**ESSA MOHAMMAD ARZO**


By: _____
       ESSA MOHAMMAD ARZO

*Self-Represented Defendant/Cross-Defendant*

22

**[PROPOSED ORDER]**

PURSUANT TO THIS STIPULATION BETWEEN THE PARTIES, IT IS SO ORDERED.

Date: _____

_____

HONORABLE ETHAN P. SCHULMAN

**Attachment A**

| Field | Definition | Doc Type |
|---|---|---|
| ALLCUSTODIAN | Name(s) of person(s) or other data source (non-human) from where documents/files are produced. *Where redundant names occur, individuals should be distinguished by an initial which is kept constant throughout productions (e.g., Smith, John A. and Smith, John B.)* | All |
| BEGBATES | Beginning Bates Number (production number) | All |
| ENDBATES | Ending Bates  Number (production number) | All |
| PGCOUNT | Number of pages in the document | All |
| LINKBEGBATES | One-to-many field used to identify the beginning Bates value for any Google Drive linked documents referenced within a given Gmail document | Gmail documents containing linked Google Drive documents |
| LINKSOURCEBEGBATES | One-to-many field used to identify the beginning Bates value for any source Gmail documents linking to a given Google Drive document | Google Drive documents linked to Gmail documents |
| FILESIZE | File Size | All |
| APPLICAT | Commonly associated application for the specified file type. | All |

| FILEPATH | Original file/path of the location where the item was located at the time of collection, where applicable. This should include location, and, for e-documents and e-attachments, file name, and file extension. Folder names and path should be included, and, for emails and attachments collected from a container such as a .pst, the full folder path within the container. Any container names should be included in the path. | E-document, Email, excluding cloud-based documents. For cloud-based documents, the responding party will provide the following data fields, to the extent those data fields exist for a document: PublishedURL, DocParentID, and SharedDriveID. |
|---|---|---|
| FILENAME | Original file name at the point of collection | E-Document. |
| NATIVEFILELINK | For documents provided in native format only | All |
| TEXTPATH | File path for OCR or Extracted Text files | All |
| MSGID | Email system identifier assigned by the host email system. This value is extracted from parent message during processing | E-mail |
| FROM | Sender | E-mail |
| TO | Recipient | E-mail |
| CC | Additional Recipients | E-mail |
| BCC | Blind Additional Recipients | E-mail |
| SUBJECT | Subject line of e-mail | E-mail |
| PARENTMSGID | Where the item is an email which is a REPLY or FORWARD, the ConversationID of the original email which was REPLIED to or FORWARDED | E-mail |
| CONVERSATIONID | Email thread identifier | E-mail |
| ATTACHBATES | Bates number from the first page of each attachment | E-mail |

| BEGATTACH | First Bates number of family range (i.e. Bates number of the first page of the parent e-mail or document) | E-mail, E-Documents |
|---|---|---|
| ENDATTACH | Last Bates number of family range (i.e. Bates number of the last page of the last attachment or, if no attachments, the document itself) | E-mail, E-documents |
| ATTACHCOUNT | Number of attachments to an e-mail | E-mail |
| ATTACHNAMES | Names of each individual Attachment, separated by semi-colons | E-mail, E-documents |
| DATESENT (mm/dd/yyyy hh:mm:ss AM) | Date Sent | E-mail |
| DATERCVD (mm/dd/yyyy hh:mm:ss AM) | Date Received | E-mail |
| SORTDATE (mm/dd/yyyyhh:mm:ss AM) | Date of the parent e-mail or document | E-mail and documents |
| HASHVALUE | MD5 hash value | All |
| TITLE | Internal document property | E-document |
| AUTHOR | Internal document property | E-document |
| DATECRTD (mrn/dd/yyyy hh:mm:ss AM) | Creation Date | E-document |
| LAST MODIFIED BY | Last person who modified (saved) a document | E-document |
| LASTMODD (mrn/dd/yyyy hh:mm:ss AM) | Last Modified Date | E-document |
| HiddenContent | Denotes if file contains hidden content. Format: Yes/No value. | Loose files and attachments. |
| DocumentType | Descriptor for the type of document: **"E-document"** for electronic documents not attached to e-mails; **"E-mail"** for all e-mails; **"E-attachment"** for files that were attachments to e- | All |

|  | mails; and **"Physical"** for hard copy physical documents that have been scanned and converted to an electronic image. |  |
|---|---|---|
| Importance | High Importance - indicates Priority E-mail message. | E-mail |
| Redacted | Descriptor for documents that have been redacted. "Yes" for redacted documents; "No" for un-redacted documents. | All |
| ProdVol | Name of media that data was produced on. | All |
| Confidentiality | Confidentiality level if assigned pursuant to any applicable Protective Order or stipulation. | All |
| The following fields should be included ONLY if de-duplication is allowed. | | |
| Other Custodians | Custodians of all duplicate documents. Multiple values separated by semi-colons. | |

27

| Duplicate Filepaths | Original file/path of the locations where the unproduced duplicate items were located at the time of collection. This should include location, and, for e-documents and e-attachments, file name, and file extension. Folder names and path should be included, and, for emails and attachments collected from a container such as a .pst, the full folder path within the container. Any container names should be included in the path. Multiple values should be separated by semi-colons. | E-Document |