[Submitting counsel below]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB <br><br> **MASTER LONG-FORM COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| This Document Relates to: <br><br> All Cases | Judge: Honorable Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT .................................................................................. 1

II. INTRODUCTION ...................................................................................................... 2

III. PARTIES ................................................................................................................... 10

    A. Plaintiffs ........................................................................................................ 10

    B. Defendants ..................................................................................................... 10

IV. JURISDICTION AND VENUE ................................................................................ 10

V. FACTUAL ALLEGATIONS .................................................................................... 11

    A. The Uber Transportation System ................................................................. 11

        1. Uber maintains complete control over its transportation system, including the Uber App, and so has the ability and responsibility to prevent sexual misconduct facilitated by that system. .............................. 12

        2. Uber controls its drivers and their work.................................................. 14

    B. An elevated risk of sexual assault was always a foreseeable consequence of Uber's transportation model, and Uber always had a duty to address and prevent this harm.......................................................................................... 19

    C. From the outset, Uber did not address or prevent sexual assault. ....................... 21

    D. Uber chose to increase the risk of sexual assault by making it too easy to become a driver. ............................................................................................. 23

        1. In order to create a large and ready supply of drivers, Uber opened its platform to unscrupulous, unqualified, and dangerous drivers. ........... 24

        2. In order to create a large and ready supply of drivers, Uber broke the law, then wrote its own rules.............................................................. 29

    E. Uber deceptively convinced the public and Plaintiffs to trust Uber to offer safe rides. ........................................................................................................ 31

        1. Because women are more vulnerable to gender-based violence, and thus require more persuasion to feel safe enough to get in a stranger's private car, Uber specifically targets its safety representations to women. ................................................................................ 40

        2. Even though Uber knows intoxicated Uber riders have the highest risk of being the targets of sexual misconduct, it specifically advertises its transportation as safe for intoxicated riders, including intoxicated women. ................................................................................... 41

    F. Uber tried not to learn about sexual misconduct on its platform. ........................ 44

    G. Despite itself, Uber learned that its riders were being sexually assaulted, but it concealed and downplayed the problem...................................................... 47

    H. When Uber learns of misconduct by specific drivers, it puts riders at risk to protect its product and reputation.......................................................................... 52

    I. Instead of trying to prevent sexual misconduct, Uber launders its reputation. ...................................................................................................... 58

VI. TOLLING OF STATUTES OF LIMITATIONS ......................................................... 61

**TABLE OF CONTENTS**
(continued)

Page

VII.   PUNITIVE DAMAGES ............................................................................. 62

VIII.  STANDING TO SEEK INJUNCTIVE RELIEF ..................................... 64

IX.    CLAIMS ................................................................................................. 65

    B.   Negligence (including Negligent Hiring, Retention, Supervision, and Entrustment) ........................................................................ 65

    C.   Fraud and Misrepresentation ................................................... 71

    D.   Negligent Infliction of Emotional Distress ............................. 72

    E.   Common Carrier's Non-Delegable Duty to Provide Safe Transportation [Certain States Only] ........................................ 73

    F.   Other Non-Delegable Duties to Provide Safe Transportation [Certain States Only] ............................................................... 74

    G.   Vicarious Liability for Drivers' Torts (Employee, Retained Control, Apparent Agency, Ratification, California Public Utilities Code) ...................... 77

        1.   Employee [Certain States Only] ................................. 78

        2.   Apparent Agency ........................................................ 81

        3.   Ratification ................................................................. 83

        4.   California Public Utilities Code § 535 ........................ 83

    H.   Strict Products Liability (Failure to Warn and Design Defect) ........................... 83

        1.   Design Defect ............................................................. 88

        2.   Failure to Warn .......................................................... 91

        3.   Product Liability Acts ................................................. 94

    I.   Unfair Competition Law (Cal. Bus. & Prof. Code §v 17200 et seq.) ................... 94

X.     PRAYER FOR RELIEF .......................................................................... 94

XI.    JURY DEMAND ..................................................................................... 95

## I.    **PRELIMINARY STATEMENT**

Under Pretrial Order No. 5 (ECF 175), Plaintiffs' Co-Lead Counsel and the Plaintiffs' Steering Committee submit this Master Long-Form Complaint. This complaint is an administrative device as described in *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 142 (E.D. La. 2002) and *Gelboim v. Bank of Am.*, 574 U.S. 405, 413 n.3 (2015) (discussing the procedure where a "master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs"). This complaint does not supersede any complaints already filed (or that will be filed) in cases filed in or transferred to this MDL. This complaint is submitted for the purposes of defining the scope of common discovery in this multidistrict litigation, permitting the Court to address certain common legal issues, and setting forth potential claims that individual Plaintiffs may assert against the following Defendants (together, "Uber"):

- Uber Technologies, Inc.;
- Rasier, LLC; and
- Rasier-CA, LLC.

Any claims Plaintiffs may assert against other defendants are not within the scope of this complaint. Plaintiffs anticipate the short-form complaint envisioned by PTO 5 to include an opportunity for Plaintiffs to identify additional defendants.

This complaint does not necessarily include all claims asserted in all of the transferred actions to this Court, nor is it intended to consolidate the separate claims asserted by Plaintiffs. As a result, this complaint does not include every Plaintiff-specific fact alleged in underlying complaints or that would be alleged in a short-form complaint. Plaintiffs anticipate the short-form complaint envisioned by PTO 5 will include an opportunity for Plaintiffs to identify additional claims.

Plaintiffs expressly seek injunctive relief on an individual basis, but may also pursue such relief through a class complaint, to be filed at a later date, seeking class certification and class-wide relief under Federal Rules of Civil Procedure 23(b)(1)(A) or 23(b)(2).

Plaintiffs plead all claims in this complaint in the broadest sense, under any laws that may

apply under choice-of-law principles, including the laws of Plaintiffs' resident states, the laws of states in which Plaintiffs were assaulted or harassed, the laws of the states in which Plaintiffs' complaints were filed, or the laws of the state where Uber maintains its headquarters and where its wrongful conduct occurred.

## II.   **INTRODUCTION**

1.      In 2009, when Uber was founded, the general public considered it unreasonably dangerous for a young woman (or any solo traveler for that matter) to get into a complete stranger's private car in order to travel to a specific destination. That would have been considered hitchhiking. A foreseeable risk of hitchhiking was the potential for sexual assault.

2.      If someone needed a ride, one approach that had long been considered reasonably safe was to hail a licensed taxi. For decades, local authorities have heavily regulated taxi drivers and taxicabs to provide safeguards and protections for prospective passengers against unscrupulous or predatory drivers. For example, currently in San Francisco, an applicant to become a taxi driver must: submit fingerprints that are checked against the California DOJ "RAP Sheet" database; pass a written exam; complete a driver training course; provide a recent photograph; submit to an alcohol and drug test; receive a negative result on the alcohol and drug test; authorize the city to obtain the results of past alcohol and drug tests; notify the city whether he or she has previously failed an alcohol or drug test; be free of any condition that might render the applicant unsafe to operate a motor vehicle; have no prior convictions of a crime that would present a risk to public safety; be at least 21; and speak, read, and write the English language.[1] A permitted taxi driver must conspicuously display his or her permit on the outside of his or her clothing at all times while operating a taxi and show that permit to any peace officer upon request. The permit can be worn only by the driver to whom it is issued.[2]

3.      Uber first launched in San Francisco in 2010 as UberCab. At first, it used its mobile phone application to dispatch black Lincoln Town Cars and limousines, operated by

---

[1] S.F. Transp. Code § 1103(c).
[2] *Id.* § 1108(a).

1   licensed professional drivers who worked with regulated, licensed Charter-Party Carrier (TCP)

2   businesses. It branded itself "Everybody's Private Driver."

3          4.       In 2012, Uber expanded its offerings to include traditional taxi services, and also

4   less expensive rides in unmarked "hybrid and mid-range cars in a variety of colors," still operated

5   by licensed, regulated TCPs. It called these cheaper rides "UberX."

6          5.       Meanwhile, in 2012, Uber noticed a small, local San Francisco start-up company,

7   Zimride (later re-named Lyft), that facilitated less expensive rides than Uber's by harnessing

8   "ridesharing" where trips were provided by random laypersons rather than professional drivers.

9   This was a radical concept, with some obvious risks. But in 2012, Lyft was growing slowly and

10  deliberately, initially rolling out to just friends and family. It marked the cars with giant fuzzy

11  pink mustaches and encouraged drivers and passengers to "fist bump" upon the passenger

12  entering the car. Payments consisted of a reimbursement for gas, and a suggested donation from

13  the rider to the driver. Lyft was candid about the fact that these drivers were not professionals.

14         6.       Uber, which by then had expanded into markets around the world, saw in Lyft's

15  "ridesharing" concept the potential to make a lot more money.

16         7.       In 2013, Uber decided to start offering this novel form of application-supported

17  transportation, where Uber would connect individuals who need a ride with individuals who have

18  a driver's license, access to a car, and willingness to offer a ride (so-called "peer-to-peer rides" or

19  "ridesharing"). For the first time, Uber was connecting riders with drivers who were not

20  associated with licensed taxis or TCPs.

21         8.       Unlike Lyft, Uber was not candid with riders that they were taking rides from

22  random people. Uber sneaked "peer-to-peer" rides into its existing "UberX" menu option so that,

23  when riders selected "UberX," the driver who showed up might be either a licensed professional

24  driver in an unmarked car, or an unknown random person in an unmarked car. Nobody but Uber

25  could tell the difference.

26         9.       Uber was not content with a local friends-and-family market, nor with slow

27  growth. It on-boarded a massive fleet of drivers practically overnight. It did not request donations,

28

instead charging mandatory fares. The public did not know it, but a paradigm shift had occurred. Uber had effectively monetized hitchhiking, all the while hiding that reality from riders.

10.     Uber's new transportation system was convenient and affordable for the public, and lucrative for Uber. On the other hand, Uber's business model placed a rider who was trusting in Uber's reputation, and a driver about whom the rider and Uber both knew very little, in an isolated setting (a private vehicle) with limited means for the rider to escape if something went awry. This business model foreseeably increased risk of sexual assault, especially for solo women passengers.[3] Uber should have taken action to prevent such assaults, but chose instead to pursue rapid growth at all costs.

11.     In order to keep building this new industry and beat the competition, Uber needed to make the acquisition of drivers and riders as cheap and frictionless as possible. Anything that discouraged riders or drivers from using the product would hurt the bottom line.

12.     *First*, Uber had to change the public's attitude toward getting into a private car driven by a random layperson such that there would be demand for its rides. Uber did so by assuring passengers that Uber was safe: the "safest rides on the road,"[4] "a ride you can trust,"[5] and a service that "was created to ensure reliable access to safe rides[.]"[6] Even today, Uber continues to maintain that "safety is a top priority[.]"[7] This ubiquitous messaging generated reassurance that passengers could count on Uber to keep them safe. It removed the friction that would otherwise prevent people from using Uber's product.

13.     The result is a universal understanding by the public that an Uber ride is not a ride with a stranger; it is a ride *with Uber,* arranged and procured *by Uber*, in cars operated by vetted

---

[3] References to pronouns, gender, and sexual orientation are not exclusive. This Complaint includes claims on behalf of individuals whose identities may not align with such language.

[4] Uber, *Safety*, https://web.archive.org/web/20140701103201/uber.com/safety (archived Jul. 2014).

[5] Uber, *Safety*, https://web.archive.org/web/20180224182422/https://www.uber.com/safety/ (archived Feb. 2017).

[6] Uber, UberIMPACT Report, at 1, https://newsroom.uber.com/wp-content/uploads/madd/uber_DUI_Report_WIP_12.12.pdf.

[7] https://www.uber.com/us/en/about/?campaign_id=427272530&kw=uber%20information&kwid=kwd-76279030966261%3Aloc-190&uclick_id=6f5e58af-b714-4f85-abbe-fe9b056d98b9

and approved *Uber drivers*, and with trip monitoring and fare management exclusively within the *Uber App*. It is the imprimatur of a legitimate and responsible corporation—Uber— overseeing virtually every aspect of the ride that gives passengers the necessary sense of safety and security to get into the car with an Uber driver. Based on Uber's own metrics, passengers are largely motivated by safety when choosing Uber's services.[8]

14.     *Second*, Uber had to circumvent the taxi industry's existing safety regulations, and minimize background checks, safety checks, and oversight of drivers, in order to rapidly recruit a fleet of non-professional drivers to meet this demand.

15.     Uber's business plan required that its drivers never be treated as Uber's employees. If the drivers could establish employee status, then Uber would be on the hook for the associated costs, such as overtime, workers' compensation, unemployment insurance, etc. This motivation in turn informed the company's approach to safety. If Uber effectively deterred its drivers from misconduct, it would have demonstrated Uber's control over those drivers, thereby supporting their employment-based claims.

16.     At every step, Uber's approach to safety reflected its dominant goals of recruiting riders and drivers with as little friction as possible. Uber chose to achieve growth at the expense of women's safety. When Uber launched its new transportation system, it did not hire any safety experts nor did it spend a single minute or a single dollar thinking about how to prevent sexual assault. To this day, Uber's efforts regarding safety are primarily focused on appearing safe, not actually being safe.

17.     Uber reassures riders that it uses "multi-step safety screening" of drivers, along with regular review of drivers' histories.[9] But, unlike the taxi industry, Uber conducts background checks using the information a driver provides (name and social security number, which may or may not be that of the actual driver) and not using any biometric information (e.g., fingerprints). Uber conducts these background checks using often-sparse public databases, not the FBI database

---

[8] Uber, 2019 S-1 at 154, https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm.
[9] https://www.uber.com/us/en/safety/ and https://www.uber.com/us/en/ride/safety/driver-screening/

used by the taxi industry. When states (such as Maryland and Massachusetts) performed their own fingerprint-based background checks, 12-15% of drivers who were eligible under Uber's standards flunked the official background checks. Uber knows its background checks are inadequate, and knows that fingerprint-based background checks would be safer for riders. But because Uber's business requires rapid onboarding of new drivers to maintain a steady supply of rides, it will not change its practices.

18.     Despite their known inadequacy, Uber relies on these flawed background checks as its sole method for screening out ill-intentioned drivers. It does not meet its drivers in person or online. It does not interview them. It does not require any references. It does not contact prior employers. There are no drug and alcohol tests. There are no exams.

19.     Uber invites riders to find out more about what Uber is "doing to set safer standards."[10] But Uber is not setting safer standards. Instead, Uber became what it is today by flouting existing standards. Uber got permission to use its inadequate background checks by first breaking the law and ignoring existing regulations that applied to taxis and limos. This let Uber offer inexpensive and convenient rides, which made it popular. Then it harnessed that popularity to force regulators to adopt lax regulations drafted by Uber.

20.     In the past, Uber gained riders' trust by fraudulently advertising "the safest ride on the road," saying that it sets "the strictest standards possible" and that it "aims to go above and beyond local requirements" with "gold standard" and "industry leading" background checks. Even after it paid more than $50 million to settle lawsuits based on this fraudulent marketing, Uber never told riders the truth. Instead, Uber changed its safety representations to be increasingly vague, such as asserting: "At Uber, Safety Never Stops."

21.     Uber knows that its transportation system is particularly high risk for intoxicated riders, especially intoxicated women. Nonetheless, Uber's advertising disproportionately targets women with dedicated ad campaigns and webpages devoted to "driving women's safety forward." Its marketing photos and videos predominantly feature smiling women riding in Ubers.

---

[10] https://www.uber.com/br/en/ride/safety/rider-safety-features/

22.     Uber also specifically markets its rides as a safe, smart transportation option for intoxicated riders. Uber heavily promotes its rides, on New Year's Eve and other holidays, as a safe way to get home after an evening of drinking. This marketing is broadly targeted, appearing in such innocuous places as Safeway grocery stores. Uber engages in joint marketing with alcohol manufacturers and local bars, telling women that it is ok to have another drink and be assured they have a ride home.

23.     Uber knowingly puts drunk women riders at risk. And when those riders report sexual assaults in court, Uber uses the fact of their intoxication to question their credibility.

24.     To maintain a false sense of security, Uber builds low-cost features that superficially and superfluously address safety, such as a button to call emergency responders from inside the Uber App. (Never mind the ease of simply pressing "9-1-1" on one's phone) Uber knows that many of its passengers (1) did not order the ride themselves and therefore cannot use this feature, (2) their cell phone batteries are dead, or they cannot find them; or (3) they are intoxicated and unable to properly navigate the App feature. Uber avoids taking more meaningful steps readily available to it as a resource-rich tech company with complete control over the ride environment and experience.

25.     One such step would be requiring cameras in cars. For years, Uber has known that mandatory cameras (which the driver cannot disable during a trip) would effectively deter sexual assault. It knows that cameras would help women report sexual assaults with more confidence that they could prove their claims. But it also knows that requiring cameras would slow onboarding of new drivers, discourage some drivers from signing up (and so decrease Uber's revenue), and jeopardize Uber's argument that drivers are independent contractors. Cameras might also make it more difficult to find passengers because they would be reminded, contra Uber's messaging, that Uber's product carried dangerous risks. For these reasons, Uber does not mandate cameras.

26.     Uber does not adequately monitor drivers' safety performance. Uber makes it hard for riders to report sexual assault, since it does not want to disclose the true safety risks to regulators or the public. When a rider gives a low rating to a driver, Uber presents a menu with at

least 44 different options (e.g., "fast driving," "unpleasant car smell," "talked too much," "didn't follow map") but the menu does not include sexual misconduct, sexual harassment, or sexual assault. By impeding reports of sexual assault, Uber fails to protect riders from drivers it should terminate. Uber also deprives itself of the true data on sexual assault, preventing it from meaningfully studying prevention.

27.     Uber also misleads riders by displaying each driver's purported overall rating (out of five stars) next to the driver's total number of trips. But the star rating actually reflects only the past 500 trips, not a complete track record. Moreover, Uber drops some low reviews from the overall star rating it displays. It does not tell riders that this information is incomplete and inflated.

28.     Uber does not protect riders from drivers who have shown themselves to be a threat. For most of its years in business, Uber's official policy has been to require more than one sexual assault complaint before terminating a driver. Depending on how much money a particular driver was making for Uber, Uber would sometimes tolerate three or four sexual assaults before terminating the driver. It is unknown how many of these drivers, who received "free passes" for one, two, or three sexual assaults, are still driving for Uber.

29.     Even though sexual assault is underreported, and even though Uber discourages reporting, thousands of women have come forward to say they were sexually assaulted during Uber rides. Uber refuses to take any responsibility for allowing these assaults to occur.

30.     In fact, Uber's legal position is and always has been starkly different from what it tells the public. Uber pretends that it takes responsibility for the safety of its rides. Its in-App welcome screen long promised prospective customers, "Safe, reliable rides in minutes." When people view the Uber App in the app store, they see the tagline, "ride with Uber." To this day, Uber's website proclaims: "Ride with confidence. The Uber experience was built with safety in

mind," "we're dedicated to helping you move safely,"[11] "our commitment to safety,"[12] and "at Uber, Safety Never Stops."[13]

31.     In contrast to these representations, Uber has aggressively lobbied for the enactment of laws and regulations saying that Uber is merely a technology platform, or a middleman between riders and drivers, and that it does not control, direct, or manage its drivers and so cannot be held culpable for what occurs during a ride. Uber spends over $6 million annually in the U.S. alone on these lobbying efforts.

32.     For Uber, sexual assault and harassment in its vehicles is the price of doing business. This philosophy has been its consistent view since at least 2014, and it continues to be its view today. When women are assaulted on its platform, Uber does not take responsibility but instead blames its drivers and even the passengers themselves. Uber defends against liability by pointing to resources telling women they should "take an active role in increasing your safety or the safety of those you care about."[14] As if it were passengers' responsibility to avoid dangerous Uber drivers, rather than Uber's responsibility to provide the safe ride it promised.

33.     Uber's litigation strategy is to blame everyone except Uber. Uber blames the driver, even though Uber's marketing position is that passengers ride "with Uber" and that Uber will keep them safe. And Uber blames passengers for not reporting their assaults to law enforcement, even though Uber makes it as difficult as possible for them to do so.

34.     This attitude dates back to Uber's earliest days, but did not change with the company's much-touted 2017 leadership reset. Uber's removal of its founding leadership rehabilitated its reputation, and enabled a lucrative IPO. But it did little to protect victims of sexual misconduct. Worse: Uber's improved PR skills reinforced and spread its message of a "safe ride," reassuring women that they were protected using the company's product.

35.     This litigation aims to require a different way of doing business—to force Uber to live up to its promise and undertaking of providing safe transportation. Plaintiffs are women and

---

[11] https://www.uber.com/br/en/ride/safety/?uclick_id=67784b19-68a5-4d00-b3ad-da14c2066d23
[12] https://www.uber.com/us/en/safety/
[13] https://www.uber.com/br/en/ride/safety/rider-safety-features/
[14] https://www.rainn.org/safety-prevention (cited in ECF 83, Pet. for Writ of Mandamus, at 22).

1    others who were sexually assaulted or harassed by Uber drivers in connection with Uber rides.

2    They seek compensation, punitive damages, and appropriate injunctive relief to ensure sexual

3    assault in Uber vehicles is foreclosed to the greatest extent possible.

4    **III.    PARTIES**

5         **A.    Plaintiffs**

6         36.    This complaint includes all Plaintiffs who file a short-form complaint, the content

7    of which will be negotiated by the parties and ordered by the Court. *See* ECF 175 ¶ 8. Plaintiffs

8    are individuals who suffered personal injuries as a result of their use of Uber's product and

9    services.

10        **B.    Defendants**

11        37.    Defendant Uber Technologies, Inc. is a Delaware corporation with its principal

12   place of business at 1515 3rd Street, San Francisco, California, 94158.

13        38.    Defendant Rasier, LLC is a Delaware limited liability company. On information

14   and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its

15   principal place of business at 1515 3rd St., San Francisco, California, 94158. On information and

16   belief, Rasier, LLC is entirely controlled by Uber Technologies, Inc.

17        39.    Defendant Rasier-CA, LLC is a Delaware limited liability company. On

18   information and belief, Rasier-CA is a wholly owned subsidiary of Uber Technologies, Inc.

19   Rasier-CA maintains its principal place of business at 1515 3rd St., San Francisco, California,

20   94158. Rasier-CA is the one of the primary Uber entities that has interfaced with the California

21   Public Utilities Commission, and so its activities affect Uber passengers in all states. On

22   information and belief, Rasier-CA is entirely controlled by Uber Technologies, Inc.

23        40.    Defendants Uber Technologies, Rasier, and Rasier-CA are collectively referred to

24   as "Uber."

25   **IV.    JURISDICTION AND VENUE**

26        41.    As an MDL transferee court, this Court has subject matter and personal

27   jurisdiction to the same extent as the respective transferee courts do.

28

42.     In general, federal courts have subject matter jurisdiction over each of the actions under 28 U.S.C. § 1332(d) because Plaintiffs are citizens of states other than California and Delaware, and Defendants are citizens of California and Delaware. However, this complaint does not purport to establish or refute subject matter jurisdiction in any given individual's case.

43.     This Court has personal jurisdiction over Defendants because their significant contacts related to this litigation in each State makes personal jurisdiction proper over any of them.

44.     In particular, this Court has personal jurisdiction over Defendants for cases filed in this District because they are at home in this district and so are subject to both general and specific personal jurisdiction here.

45.     Venue is proper in this District for pretrial purposes for all cases because this litigation was centralized here under 28 U.S.C. § 1407.

46.     Venue is proper in this District under 28 U.S.C. § 1391(a) for cases filed here because a substantial part of the events and omissions giving rise to those Plaintiffs' claims occurred in this district.

## V.    FACTUAL ALLEGATIONS

47.     Plaintiffs assert that each fact stated in this Complaint was and is true at all relevant times, past and present, unless otherwise specified.

### A.    The Uber Transportation System

48.     Uber is a transportation company headquartered in San Francisco, California that pioneered an app-based transportation system that eventually spread through the United States and around the world.

49.     Uber provides an online and mobile application—the "Uber App." The Uber App connects persons seeking transportation with persons who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Uber App. Drivers are notified of requested rides, which they can then accept and be compensated for by Uber through the driver version of the Uber App. Both versions of the app connect to the same website, Uber.com, which is Uber's website.

50.     Anyone from the public may download either version of the Uber App for free.

**1.     Uber maintains complete control over its transportation system, including the Uber App, and so has the ability and responsibility to prevent sexual misconduct facilitated by that system.**

51.     Uber is the designer and operator of its transportation system, and the designer, manufacturer, operator, and seller of the Uber App that supports that system.

52.     Uber alone decides who can access the Uber App.

53.     On the passenger end, Uber decides who will be approved, and on what terms, to be an Uber account holder and thus be able to use the Uber App. This includes promulgating and enforcing rules regarding age restrictions, number of accounts per person, assignability and transferability of the account, and the ultimate right to approve, delete, or deactivate accounts.

54.     On the driver end, Uber alone decides which drivers it will recruit, who will receive access to its transportation platform, and on what terms. It chooses whether and how to screen those drivers. It alone decides what background checks to use, how far back to look, what prior offenses will be disqualifying, whether and how to onboard drivers in the absence of meaningful background checks (e.g., when a driver has recently moved to the jurisdiction where the background check is conducted), whether to conduct in-person interviews, whether to conduct in-person trainings or orientations, whether to have any in-person interactions with drivers, whether to conduct drug alcohol screenings, and whether to require training or have drivers take exams.

55.     Uber passengers and Uber drivers are subject to Uber's policies and procedures, of which Uber has ultimate authority to enforce.

56.     Uber designs the way in which the entire transportation experience will work.

57.     Uber selects which driver will be matched with which rider, and the basis on which that match will occur.

58.     Uber designs the ride pick-up experience. It sets the pick-up and drop-off location. It decides what trade dress, markings, decals, devices, and in-App tools will be used for the driver and rider to recognize one another.

59.     Uber decides which aspects of a driver and rider's transportation experience (including but not limited to requesting a ride, requesting a ride for someone else, accepting a ride, locating a rider, locating a driver, getting into a driver's vehicle, driving to a destination, making stops, changing destinations, adding multiple destinations, arriving at a destination, and disembarking) will be supported by buttons, controls, information, and other tools within the Uber App, or by technology, devices, and services external to the Uber App.

60.     When users arrange transportation with the Uber App, they input their destination and request a driver. The Uber App then uses an algorithm to match the user with a nearby driver. Uber drivers must be logged onto the Uber App and indicate their ability to provide rides to be matched with a rider.

61.     Uber has complete control over the amount of the fare, including additional fees and when to implement dynamic pricing.

62.     Likewise, Uber controls all promotional offers, vouchers, and discounts (e.g. Uber Cash) and how they can be applied to a particular fare.

63.     If a rider chooses to cancel a trip, it must be canceled through the Uber App and Uber will determine if a cancellation fee will be charged and in what amount.

64.     If a rider chooses to modify a trip, such as adding additional stops, it must be modified through the Uber App and Uber will determine if additional fees will be charged and in what amount.

65.     Uber collects GPS data and information on its drivers whenever they are using the Uber App, and on riders from at least the time they request a ride until five minutes after they are dropped off.

66.     Uber decides what information will be provided to the passenger about the Uber driver and vice versa. In doing so, Uber has decided that limited information should be provided. Passengers receive only a photo of the Uber driver, along with the driver's first name, vehicle type and license plate number.

67.     Uber does not provide drivers and riders with one another's contact information. Instead, all communications must be made through, or to, Uber. Uber decides what

1   communications can be sent and when. After a ride, for example, a rider cannot request a refund

2   directly from a driver, but only from Uber.

3       68.     Uber handles and decides the outcome of all complaints, issues, and grievances

4   regarding the Uber ride.

5       69.     When an Uber driver or rider sends a support message through the Uber App, or

6   calls Uber with a concern or complaint, Uber responds using automated software programming

7   and, where necessary, deploying a global customer support staff that follows Uber's protocols to

8   address the concern or complaint. Uber facilitates, controls, tracks, and records these interactions

9   via its internal customer service software.

10      70.     Neither drivers nor riders have access to the information in Uber's internal

11  customer service relations platform. Uber has the ability to track and investigate driver and rider

12  misconduct that occurs when drivers and riders use Uber's transportation services, and over time

13  it has increased its actual tracking of driver misconduct.

14      71.     A rider has no knowledge of an Uber driver's prior bad actions, including whether

15  the Uber driver had prior complaints, is or was under investigation for misconduct, or had been

16  subject to any suspension or other disciplinary action. A rider further has no control over which

17  Uber driver they will be paired with on any ride. Uber alone controls the pairing and controls

18  access to all information between the rider and the driver.

19              **2.      Uber controls its drivers and their work.**

20      72.     Uber exercises extensive control and direction over its drivers in connection with

21  the performance of the work that Uber hires the drivers to perform.

22      73.     Uber is a transportation company that provides transportation as its core business.

23  Uber drivers' work is thus squarely within and integral to the usual course of Uber's business, as

24  Uber cannot provide transportation services without drivers.

25      74.     Driving for Uber is not a specialized skill. Uber drivers are largely

26  nonprofessional, untrained individuals, who have no specialized background, education, training,

27  or experience related to their work for Uber. Uber drivers are not customarily engaged in an

28  independently established trade, occupation, or business.

75.     No preparation or up-front investment is required to work for Uber. Any person with a vehicle and driver's license can decide to drive for Uber, and apply to do so within the very same hour.

76.     Uber's investments into its transportation company greatly outweigh the investments by the Uber driver. Uber has invested hundreds of millions of dollars into its transportation network and transportation systems. Additionally, Uber maintains brick and mortar facilities around the world where it employs thousands of individuals to interact with Uber drivers and riders.

77.     No specialized tools or equipment are required to drive for Uber. Rather, Uber drivers need only have a personal vehicle that is subject to approval by Uber. For example, Uber currently requires, among other things, that Uber vehicles have four doors, be in good condition with no cosmetic damage, and be free of any commercial branding.[15]

78.     Uber provides its approved Uber drivers with access to Uber-branded decals and signage for use in their vehicles while they maintain active Uber accounts.[16]

79.     Uber requires drivers to comply with a list of "Community Guidelines" that Uber promulgates. The term is itself misleading because it makes it sound like driving for Uber is like visiting a fitness center or the library. In reality, Uber drivers operate in an environment and under such restrictions (or lack thereof) as Uber unilaterally decides. Violation of any of the "Guidelines" is grounds for termination.

80.     Uber drivers must use the Uber App to access, accept, and complete Uber rides.

81.     Uber sets the minimum amount of work that an Uber driver must complete. For example, Uber requires that an Uber driver complete at least one trip each month; otherwise, Uber will deactivate their account.

---

[15] Uber Help, Driving & Delivering, Vehicle Requirements, https://help.uber.com/driving-and-delivering/article/vehicle-requirements?nodeId=2ddf30ca-64bd-4143-9ef2-e3bc6b929948
[16] Uber Help, Driving & Delivering, Uber Decal Requirements, https://help.uber.com/driving-and-delivering/article/uber-decal-requirements/?nodeId=421b14ed-0685-4188-9fa3-f2104e881c3f

1    82.    Uber monitors how long an Uber driver has been driving and disables the driver's

2 App for six hours after driving time reaches 12 hours.[17]

3    83.    Uber retains the ability to deactivate a driver's App without notice or investigation.

4    84.    Uber has exclusive access to the customer list (riders), customer locations, and the

5 customer's destination requests.

6    85.    Uber designates the approved geographical region for the Uber driver. If the Uber

7 driver wants to receive rides outside of that area, they must submit a request to Uber.

8    86.    When Uber offers a trip to an Uber driver, its practice has been to withhold

9 information from Uber drivers such as the rider's destination address, gross fares, net fares to the

10 driver, per mile rate, and per minute rate. By withholding this information, Uber requires Uber

11 drivers to blindly accept the trip without knowing the final destination or the amount that the

12 driver will earn.

13    87.    Uber assigns all drivers' work through its driver/rider matching algorithm. The

14 Uber driver cannot choose which rider to be matched with, nor can riders choose their drivers.

15    88.    Uber has exclusive control of the customer volume. Uber decides who, when,

16 where, and how many ride requests to assign to each driver.

17    89.    The Uber driver has zero control over the value of the services provided. Uber

18 unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares

19 (algorithmic increases in fares to reflect supply of drivers and demand of riders).

20    90.    Uber dictates what forms of payment are accepted and forbids Uber drivers from

21 requesting or accepting cash for fares.

22    91.    Uber forbids drivers from negotiating a different fare with riders for any trip on its

23 system.

24    92.    Uber tracks Uber driver locations and suggests certain routes for trips. Uber has

25 the right to adjust a fare if a driver takes a different route.

26

27 [17] Uber Newsroom, *Another Step to Prevent Drowsy Driving*,
https://www.uber.com/newsroom/drowsydriving?utm_term=wH-UFOSSU0N-

28 QETxEITLuSw1UkjxB0QVMRbX0M0&adg_id=218769&cid=10078&utm_campaign=affiliate-
ir-Skimbit%20Ltd._1_-99_national_D_all_ACQ_cpa_en&utm_content=&utm_source=affiliate-ir

93.     Uber alone decides what percentage of each fare to keep and what percentage to pay to the driver or, in some cases, whether to share certain fares with the driver at all. Uber does not inform drivers how much the rider is paying.

94.     Uber processes all payments and distribution of payments to the driver.

95.     To begin work, a driver logs into the Uber App and then waits for Uber to select a customer. Uber refers to this time that a driver is activated but un-dispatched as "Period 1" time (or "P1").

96.     Uber uses real-time GPS monitoring to track the driver at all times while logged into the app, beginning with P1 time.

97.     During P1, Uber unilaterally decides when and where to send the driver trip assignments for customers requesting rides.

98.     Once Uber gives a driver a trip assignment, Uber allows the driver only 15 seconds during which to "accept" the assignment. However, the appearance of a "decision" by the Uber driver as to whether to "accept" a ride is only superficial. Uber controls the information provided to the Uber driver during the 15 seconds, and it generally does not provide the driver the estimated fare, estimated distance, rider's pickup location, or final destination (despite possessing all of the information) to allow the driver to make an economic assessment.

99.     Uber monitors the driver's use of the Uber App, and the rate of accepted, declined, and cancelled assignments, which Uber can use to deactivate or suspend the driver.

100.     Once a driver accepts a trip assignment, the driver enters what Uber refers to as "Period 2" time ("P2"). This is the period in which the driver is dispatched but has not picked up the rider.

101.     During P2, Uber provides a driver with the rider's pickup location, but it still does not provide the driver with the estimated fare, trip time, distance, or destination.

102.     Upon arriving at a rider's location, the driver remains in P2 until the rider physically enters the vehicle. Once the rider enters, the driver must inform the Uber App to begin the trip. The time during which the driver is transporting the rider to her destination is referred to as "Period 3" ("P3").

103.   During P3, Uber uses its technology to monitor the driver's speed and location; whether the driver is arriving within Uber's estimated time of arrival; whether the driver is taking the rider "off route;" and whether the driver is operating his vehicle in a way Uber deems acceptable. Uber can, and at least sometimes does, monitor audio within a vehicle, but does not make the audio recording available to drivers or riders, and instead uses the audio when doing so would protect Uber's interests.

104.   Additionally, Uber uses its technology and GPS data to monitor the speed, braking, and other driving maneuvers. Uber's system monitors this data for every trip.

105.   Uber advertises that, during P3, it offers a service called RideCheck. In Uber's words, "Using sensors and GPS data, this feature can help detect if a trip doesn't go as planned. We'll check in to make sure the driver and rider are safe and provide easy access to emergency assistance features for immediate help if needed."

106.   Uber advertises: "If an incident occurs, in-app support is available around the clock. Our specialized team of safety agents are trained to handle sensitive reports and can offer support resources."

107.   If an Uber driver deviates from Uber's suggested route, Uber notifies the driver that they are not following the suggested route.

108.   Uber controls the driver's actions by threatening to deactivate or suspend drivers if they do not maintain a certain star rating. Uber unilaterally sets the star rating and constantly prompts Uber drivers to keep a high star rating or to improve the star rating if the driver is not performing to Uber's standards.

109.   Uber unilaterally sets the percentage of trips a driver can cancel. A "cancelation" occurs if the driver accepts the trip and then cancels the trip before the rider enters the vehicle. Despite the driver not having key information prior to accepting the trip Uber offers, Uber can deactivate a driver if the driver cancels too many trips.

110.   If a driver engages in misconduct or alleged misconduct that Uber considers to be a "strike," Uber can and will issue a "strike." In Uber's discretion, a certain number of strikes can

result in the driver being permanently removed from the Uber App. However, Uber does not inform drivers or riders whether a driver was previously issued a strike.

111.    In addition, Uber engages in personnel management typical of an employer-employee relationship, including: facilitating "meaningful dialogue" with drivers; "hold[ing] regular meetings with Driver associations and conduct[ing] regular surveys to gather feedback on our app, our support services, and other matters"; "continually developing new technology that Drivers can use to acquire information that may help them save on costs and make informed choices about where and when to drive (based on when and where their earnings potential is highest)[;]" and "partner[ing] with learning and academic institutions to provide opportunities to eligible Drivers and their family members through undergraduate degree programs and courses on entrepreneurship, skills development and language learning."[18]

### B.    An elevated risk of sexual assault was always a foreseeable consequence of Uber's transportation model, and Uber always had a duty to address and prevent this harm.

112.    Reasonably careful and responsible businesses adopt a "think before you act" way of doing business. They do not just think about how to make money, but also about the effects their actions will have on others, including on public safety. They think about whether their business will put people at risk, including the risk of crime, and they think about how to reduce any such risk.

113.    Transportation companies have a particular duty to keep passengers safe. By offering transportation services, such companies assert that they can be trusted to safely transport someone from one place to another. Riders who get in a plane, train, taxi, or Uber, are trusting that the transportation company will keep them safe.

114.    More so than other businesses, transportation companies have to think about and address the ways that passengers could be harmed, including the risk of crime in connection with the pick-up, transport, or drop-off process.

---

[18] Uber 2022 Annual Report, Form 10-K, at p. 9-10, https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf

115. The more innovative a business, the more important it is for the business to think about the potential that it might introduce new but foreseeable risks to public safety.

116. Uber is an extraordinarily innovative transportation company. Its business model disrupted and transformed the entire transportation industry.

117. When Uber introduced so-called "peer-to-peer" transportation in 2013, this innovation foreseeably brought an elevated risk of sexual assault. Uber's transportation model involved aggressively recruiting large numbers of random people who just happened to have a driver's license and a car, learning little about them, and requiring of them virtually no up-front investment. The drivers had almost nothing to lose in comparison with professional drivers. Uber then convinced riders to trust that Uber's business model was safe, that the dangers were thoroughly vetted, and that riders could securely entrust their safety with Uber drivers, who, in turn, would have the power to control the riders' freedom of movement. Once in Uber drivers' cars, the riders were isolated from potential witnesses, aid, and escape.

118. A driver's license is not even a minimal guarantee of a safe driver. Almost anyone can get and maintain a driver's license. Loss of a license is not a typical consequence of committing a crime, including sexual assault, domestic violence, or violent behavior. No one has to undergo any type of background check to get a driver's license.

119. The foreseeable use environments for Uber's transportation system include: drunk riders, to whom Uber specifically advertises its service; inexperienced riders (by definition all new riders—there is no Uber passenger training); riders who fall asleep during a trip; drivers who sign up for Uber thinking that it is an opportunity to meet sexual partners or engage in sexual activity; drivers who sign up for Uber not understanding riders' expectations that professional drivers will respect their boundaries and keep them safe even if they are intoxicated, distracted, friendly, flirtatious, or sleepy.

120. In 2013, when Uber opened its business to non-professional drivers, it was well known that situational and environmental factors contributed to sexual violence, and that sexual predators take advantage of situational vulnerability to perpetrate sexual violence.

121.     An elevated risk of sexual assault was always a foreseeable consequence of Uber's business model, and Uber knew or should have known this.

122.     Indeed, Uber's model gave predatory drivers incentives (rather than deterrents) to drive in the area of late-night venues and clubs—habits that Uber easily could have tracked. The drive-when-you-want approach provided an ideal opportunity for bad actors to sign onto the App late at night. Uber easily could have, but failed to, address this issue using its algorithms.

123.     Reasonably careful and responsible businesses, when they innovate in ways that foreseeably introduce new or heightened public safety risks, think about and address those risks in an evidence-based way, including by hiring the right experts, and devoting adequate money and other resources to study those risks and prevent harm. Uber took none of these measures.

**C.**     **From the outset, Uber did not address or prevent sexual assault.**

124.     From its founding, Uber's culture had little regard for legal compliance or responsibility.

125.     This attitude informed how Uber approached sexual assault. Uber did not think about, talk about, or study the risk of sexual assault on its platform. It did not conduct studies, focus groups, or user testing for the purpose of preventing sexual assault.

126.     Uber did not devote money or resources to preventing sexual assault on its platform.

127.     Uber did not assign accountability to any employee for the issues of safety, identifying or addressing potential risks to Uber's riders, or preventing sexual assault. Uber asserted that safety was everybody's job as a way of disguising that it was nobody's job. Uber did not hire safety engineers, certified safety professionals, or any other personnel with expertise in safety, crime prevention, or sexual assault prevention.

128.     Uber did not build the Uber App, nor design its transportation system, nor adopt measures or policies, in a way aimed at preventing sexual assault.

129.     In 2017 and 2018, when Uber finally began appointing employees to positions ostensibly focused on sexual violence prevention, it did not require expertise or background in

safety fields. Personnel at Uber whose job titles involved safety were tasked with protecting Uber's reputation rather than ensuring the safety of its riders.

130.    Uber could have dramatically and effectively reduced—if not eliminated—sexual assault on its platform if it had designed its transportation system with that goal in mind. When companies that operate daycare centers, schools, and business offices engage in evidence-based research on situational sexual violence prevention, they are usually able to dramatically and successfully reduce or eliminate these crimes.

131.    Uber had many tools at its disposal for reducing riders' vulnerability to sexual assault, including but not limited to: rigorous screening of drivers; prompt termination of drivers who engage in sexual misconduct; in-App tools such as panic buttons with prompt responses from Uber and coordination with law enforcement; surveillance for unusual conduct (such as lengthy stops) during rides; training drivers and communicating to them that there will be strict penalties and accountability; diligently investigating allegations of sexual assault; communicating to riders that because Uber's drivers are not professionals and are not well known to Uber, Uber is unsafe and unsuitable for use by solo intoxicated riders; immediate termination of drivers who violate policies, mandatory installation of cameras that could not be deactivated during trips, and so forth.

132.    Uber, as a technologically advanced company that tracks drivers for its own benefit, had the ability to require drivers to use inward-facing cameras that would record whenever a passenger was in the vehicle. Uber had the ability to design these cameras to remain operational until both the driver and rider confirmed that the trip was over. Uber knew that requiring such cameras would be a powerful deterrent to sexual assault. However, Uber had no interest in requiring drivers to have cameras or other physical equipment that might slow its rapid onboarding of new drivers or discourage some drivers from applying. It also worried that requiring cameras might be construed as evidence of "control" that would establish an employer-employee relationship between Uber and its drivers. Therefore, it did not require cameras.

133.    More generally, Uber had no interest in slowing its growth in order to study safety. Consequently, it did not take sufficient action to study or prevent sexual assault. The safety-

related studies the company did conduct were ignored, asked the wrong questions, or were designed in a way to lead to pre-determined conclusions (such as cameras not preventing sexual assault).

134. It is well established that sexual assault is preventable through environmental modifications that deter sexual violence. If Uber had been reasonably thoughtful and careful in the rollout of its transportation product, it could have prevented the sexual misconduct that harmed Plaintiffs.

**D.** **Uber chose to increase the risk of sexual assault by making it too easy to become a driver.**

135. The key to Uber's competitiveness and profitability was and is to have as many drivers on the road as possible.

136. Starting in about 2013, Uber was threatened by competition from start-up companies, including Lyft, which at the time was a smaller start-up company that had started offering "peer-to-peer" rides locally in San Francisco just before Uber did so, and Sidecar, another small start-up that sought to compete against Uber and Lyft.

137. In 2013, when Uber started monetizing rides with non-professional drivers, it had an initial advantage over Lyft and other startups as a better established company with an international presence. However, Uber did not control any unique resources or trade secrets that would allow it to easily maintain this initial advantage. Uber was aware that it was vulnerable to being overtaken by competitors if it did not outpace their growth.

138. Uber understood that the company with the most drivers would be able to offer cheaper prices and shorter wait times, thereby attracting more riders, fueling demand for yet more drivers, and facilitating an upward spiral of growth and continued market control.

139. Uber understood that if it wanted to achieve and maintain market dominance, it would need to eliminate barriers to entry that would slow expansion of, or limit the size of, its fleet of drivers.

140. At the same time, Uber understood that the background checks, interviews, in-person interactions, checking of references, drug and alcohol testing, training, tests, and other

barriers to becoming a licensed taxi driver traditionally existed to protect passengers from unscrupulous, unqualified, and dangerous drivers, including those who would use their position of trust to commit sexual assaults.

141.    To create a large and ready supply of drivers, Uber decided not to implement reasonable or traditional measures to protect passengers from dangerous drivers. It committed to beat its competitors in a "race to the bottom," where the winning company would be the one that broke the most rules and eliminated the most barriers to driver onboarding. This decision foreseeably came at the expense of the safety of Uber passengers, especially female riders.

### 1.    In order to create a large and ready supply of drivers, Uber opened its platform to unscrupulous, unqualified, and dangerous drivers.

142.    In 2013, when Uber opened up its platform to non-professional drivers, its then largest shareholder and CEO Travis Kalanick made the decision that Uber would not fingerprint drivers or run applicants against gold-standard databases, such as FBI records.

143.    Instead, he made the decision to use a fast and shallow name-based background check with a short look-back period, and spotty coverage of potentially relevant jurisdictions, records, and crimes.

144.    Name-based background checks of the sort Uber uses present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Second, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) is greatly increased. For example, if an individual changes his name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

145.    Uber hired Hirease, Inc. to do its background checks. Hirease bragged that it could vet drivers within 36 hours.[19] At times, Uber enrolled drivers before the cursory and ineffective background check was even complete.[20]

146.    Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[21]

147.    Mr. Kalanick made the decision not to interview drivers, talk to drivers, meet drivers, require any prior experience, get any references, do any other screening beyond the cursory background check, conduct any trainings of any sort, do any drug or alcohol testing, require any tests or exams, or require any up-front investment of time or money on the part of applicants to drive.

148.    Uber aggressively marketed to potential drivers that it was easy to become an Uber driver, with emails offering sign-up bonuses and promising that applicants could be approved after only 20 minutes.

149.    Mr. Kalanick also made the decision to do a background check only once, and not to monitor drivers' safety records for the purpose of learning of new disqualifying criminal offenses.

150.    Ever since 2013, Uber has been aware that its security screening processes are insufficient to prevent unsafe applicants from successfully registering as Uber drivers. Its inadequate background checks have been the subject of a number of municipal lawsuits and fines.

151.    In 2014, the District Attorneys of San Francisco and Los Angeles filed a complaint alleging that individuals who passed Uber's security screening process and were found driving for Uber had the following felony convictions: second degree murder; lewd and lascivious acts against a child under the age of 14; sexual exploitation of children; kidnapping for ransom with a firearm; assault with a firearm; grand theft; robbery; identity theft; burglary; and taking a vehicle

---

[19] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, N.Y. Times (Dec. 9, 2014), https://www.nytimes.com/2014/12/10/technology/ubers-system-forscreening-drivers-comes-under-scrutiny.html?searchResultPosition=1

[20] Mike Isaac, *Super Pumped*, at 218 (2019).

[21] Isaac, *Super Pumped*, at 167.

without consent. In connection with the litigation, the San Francisco District Attorney called background checks without fingerprinting "completely worthless."

152.     When cities and states (such as Houston and Maryland) performed their own fingerprint-based background checks, numerous driver applicants who had already been approved by Uber were ultimately rejected by the governmental screenings. For example, in Maryland, nearly 15 percent of new drivers who were eligible under Uber's standards were disqualified for failing the state's background checks.

153.     In 2017, when Massachusetts began running its own background checks on Uber and Lyft drivers, the state rejected 20,000 out of 170,000 driver applications that had been approved by the companies. Of those, 3,471 were rejected due to violent crimes.

154.     In 2017, the Colorado Public Utilities Commission fined Uber $8.9 million after "state criminal investigators found it had allowed 57 individuals with past criminal or motor vehicle offenses to drive and pick up passengers on its platform" for the prior year and a half.[22]

155.     In August 2017, Mr. Kalanick was forced out of the company under a wave of scandal, and was replaced by Uber's current CEO, Dara Khosrowshahi. While Mr. Khosrowshahi represented a fresh face for the company, he did not—and could not, consistent with his charge to grow the company as fast as possible—institute fundamental change in how the company thought about and protected its passengers' safety.

156.     For example, Mr. Khosrowshahi continued the policy of hiring drivers without biometric fingerprinting that could be run through the FBI database. This decision was deliberate, as evidenced by Uber's active lobbying against municipal or regulatory proposals to require any kind of biometric fingerprinting for drivers.

157.     Uber's need to quickly and easily onboard large numbers of new drivers did not abate over time in part because of a high rate of turnover among Uber. Its drivers are not well paid and often move on to other jobs.[23]

---

[22] Lomas, Natasha. "Uber fined $8.9 in Colorado for driver screening failures." TechCrunch. Nov. 21, 2017, https://techcrunch.com/2017/11/21/uber-fined-8-9m-in-colorado-for-driver-screening-failures/

[23] James Doubek, *Uber, Lyft Drivers Earning a Median Profit of $3.37 Per Hour, Study Says*,

158.     Furthermore, Uber's competitors, primarily Lyft, had imitated Uber in eliminating barriers to entry. The rapid onboarding process Uber first introduced thus became a competitive necessity.

159.     To this day, in Uber's words: "Most people can drive with Uber, even if you don't have a car or commercial permit." The minimum requirements to become a driver vary slightly by city, but are typically now: "Meet the minimum age requirement; be legally allowed to drive in your country; watch a short training video."[24]

160.     To this day, Uber still performs almost no meaningful screening of its drivers. It still outsources background checks of driver applicants to third party vendors who do not perform stringent background checks. There is no verification that social security numbers and other personal identification numbers submitted through the application process do, in fact, belong to the applicants.

161.     In fact, Uber acknowledges that its current processes are flawed: "[T]hese qualification processes and background checks may not expose all potentially relevant information" and "our third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility."[25]

162.     Uber remains willing to accept the consequences of its failings, candidly noting that, as a consequence of the gaps in background checks, "we expect to continue to receive complaints from riders and other consumers, as well as actual or threatened legal action against us related to Driver conduct."[26]

163.     Uber readily admits that its willingness to accept this consequence is because the trade-off is business profitability: "Changes in Driver qualification and background-check requirements may increase our costs and reduce our ability to onboard additional Drivers to our

---

NPR (Mar. 2, 2018), https://www.npr.org/sections/thetwo-way/2018/03/02/590168381/uber-lyft-drivers-earning-a-median-profit-of-3-37-per-hour-study-says
[24] https://www.uber.com/mt/en/drive/requirements/
[25] Uber 2022 Annual Report, Form 10-K, at 18. https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf
[26] *Id.*

platform."[27] Indeed, Uber expressed concerns that legislative and regulatory changes to driver requirements—which may be prompted by increased awareness of sexual assaults by Uber drivers—could reduce the number of Uber drivers on the market or extend the time required to recruit drivers: this "would adversely impact our business and growth."[28] Thus, because more stringent background checks would negatively impact Uber's bottom line, Uber made the choice to sacrifice passenger safety in order to maximize profit.

164.    Uber still does not require fingerprinting for comparison against Department of Justice and Federal Bureau of Investigation databases.

165.    Uber has its vendors simply run potential drivers' social security numbers through public databases similar to those held by private credit agencies. These public databases are often incomplete and do not capture all arrests or convictions. The availability and quality of data varies depending on the jurisdiction, and some drivers have spent years living in jurisdictions, including foreign jurisdictions, from which criminal histories are very limited or unavailable via public databases. Uber also places unreasonable limits on how far its vendors look back at criminal history, and what types of crimes are disqualifying.

166.    To this day, neither Uber nor its third-party vendors verify that the information provided by applicants is accurate or complete.

167.    To this day, Uber does not require any references or gather information from prior employers.

168.    To this day, Uber does not interview its drivers either in person or through online platforms such as Skype or Zoom.

169.    To this day, there is little to no up-front investment required of Uber drivers. In fact, it is no longer a requirement that a driver even have a vehicle. Uber partners with car rental companies to make rental cars available to prospective drivers. It advertises: "Drive with Uber without owning a car. Don't have your own car? You can choose one that comes with insurance,

---

[27] *Id.* at 16; *see also* Uber 2019 Form S-1, at 30, https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm
[28] *Id.*

unlimited mileage, basic maintenance, and/or other possible options" and "You can pick a car from our vehicle partners with low or no upfront costs and no long-term contracts, so you can return it when you're ready."[29]

**2.     In order to create a large and ready supply of drivers, Uber broke the law, then wrote its own rules.**

170.     In order to create a large and ready supply of drivers, Uber leapfrogged over safety regulations and laws that governed the transportation industry.

171.     Rather than work with regulators to develop heightened protections to address the inherently increased risk posed by its transportation model, Uber did the opposite. It deliberately flouted existing safety regulations and laws that applied to taxi companies and other motor carriers.

172.     In at least one market, Uber trained its drivers how to avoid law enforcement, and promised to reimburse drivers for any tickets they received.[30]

173.     Uber employed its unmatched technological skills to break the law.

174.     One of the company's most effective tools was a software program called "Greyball." Greyball identified Uber App users that posed a threat to Uber's business, including law enforcement officers, transportation officials, and legislative opponents.

175.     If a user was "Greyballed," their App might show a map of nonexistent "ghost cars," or falsely reflect no available cars at all. Either way, real Uber drivers would never accept a Greyballed user's ride request.

176.     In order to identify law enforcement, Uber used "geofencing" to draw a digital perimeter around police stations and flag users in that area who were quickly opening and closing the Uber App (likely to monitor nearby drivers). Uber would then review the personal information on those users' accounts for other indicators. If the data suggested the user was police or parking enforcement, their account would be "Greyballed."

177.     Internally, Uber justified the Greyball program by reasoning that authorities hailing rides solely to impound cars and fine drivers were violating Uber's terms of service. Uber

---

[29] https://www.uber.com/us/en/drive/vehicle-solutions/
[30] Isaac, *Super Pumped*, at 243-44.

1   employees around the globe were trained on how to use the program to break through in difficult

2   markets.

3       178.    Uber developed Greyball in 2014 in response to an especially difficult battle to

4   enter the market in Philadelphia, Pennsylvania. The program was successfully used for nearly

5   three years, until news broke in March 2017 that Uber had an internal program specifically

6   designed to evade local authorities. Numerous local, state, and federal investigations followed.

7       179.    Uber got away with breaking the law, and then rewriting its own laws, by using the

8   following formula. It ignored existing laws and regulations, enabling itself to quickly onboard

9   many drivers. This allowed it to offer a service that was immediately cheaper and more

10  convenient than existing options, and therefore popular. It then harnessed this popularity,

11  mobilizing the public to oppose enforcement of existing laws against Uber, and to support new

12  legal standards that Uber wrote.[31] This formula allowed Uber to escape penalties for violating

13  existing laws, and successfully resulted in low cost, convenient transportation for the public, and

14  in huge growth for Uber. But these benefits to Uber and the public came at a high price for a

15  group of riders, primarily women, who were sexually assaulted because of the lack of safety

16  standards and regulations.

17      180.    Per one researcher: "When local law enforcement and other officials respond [to

18  Uber's illegal operations], the company mobilizes a campaign to 'save Uber.' …. Uber usually

19  wins these battles against rules and regulations the company opposes, but when it loses, it keeps

20  fighting. When cities pass laws that Uber opposes, the company commonly seeks to have them

21  preempted with Uber-approved state law or repealed through voter referenda."[32]

22      181.    In the words of two journalists, "Uber's ascent to the largest rideshare company in

23  the world was fueled by a recurring cycle in which it blatantly ignored state and local laws,

24  _____

25  [31] Edward Ongweso Jr. & Jason Koebler, *Uber Became Big by Ignoring Laws (and It Plans to Keep Doing That)*, Motherboard (Sept. 11, 2019), https://www.vice.com/en/article/8xwxyv/uber-

26  became-big-by-ignoring-laws-and-it-plans-to-keep-doing-that

27  [32] Rick Claypool, *Disrupting Democracy: How Uber Deploys Corporate Power to Overwhelm and Undermine Local Government*, Public Citizen (May 16, 2016), at 5,
    https://www.citizen.org/wp-content/uploads/uber-disrupting-democracy-corporate-power-

28  report.pdf

became entrenched and widely used in a community, and then tried to use its largesse to change the laws it was breaking."[33]

182.     Uber's philosophy was that the popularity of its product gave it effective immunity against legal regulations and consequences. Its corporate policy was: "seek forgiveness rather than permission."[34]

183.     Through these aggressive tactics, Uber succeeded in getting some state legislatures and regulatory agencies to pass laws or regulations stating that Uber does not manage, control, or direct its drivers; that its drivers are not employees for wage and hour purposes and need not receive employee benefits; that Uber is not a common carrier for rate-setting and regulatory purposes; or that Uber is a mere technology company.

184.     Using traditional lobbying efforts as well as its own social media clout, Uber lobbied (and continues to lobby) state and local governments, including in California, to adopt its own proposed "model" regulations, which allow it to conduct its own background checks, instead of more stringent regulations like those used for taxi drivers.

185.     In Austin, Texas, where regulators imposed fingerprint background checks, Uber retaliated by pulling out of the city altogether. Uber returned to the city only after successfully lobbying the state legislature to preempt Austin's rules.[35] When Uber returned, competing companies that had abided by Austin's rules were driven out of business.[36]

186.     As a direct result of Uber's lobbying efforts and social media campaigns, Uber largely self-enforces standards for hiring, training, and supervising of its drivers.

### E.     Uber deceptively convinced the public and Plaintiffs to trust Uber to offer safe rides.

187.     In order to disrupt the public's cautious attitude on the topic of getting into a private car driven by a random unknown person, Uber spent many millions of dollars marketing

---

[33] Ongweso and Koebler, *supra*.

[34] Benjamin Edelman, *Uber Can't Be Fixed—It's Time for Regulators to Shut It Down*, Harv. Bus. Rev. (June 21, 2017), https://hbr.org/2017/06/uber-cant-be-fixed-its-time-for-regulators-to-shut-it-down

[35] Dave Lee, *What happened in the city that banned Uber*, BBC (Sept. 29, 2017), https://www.bbc.com/news/technology-41450980

[36] *Id.*

1    and promoting the concept that its UberX drivers, driving unregulated, non-distinctive personal

2    cars, could be summoned with the "Uber App" and trusted to transport people safely.

3         188.    Uber saturated the public with safety marketing directed to every single Uber

4    customer as well as the general public. Uber promoted its safety message through advertising in

5    bars, stores, and other business establishments and public places, and as well as placing ads

6    online in search engines, social media, and direct email and app-based communications to Uber

7    customers. Examples of safety-based marketing are collected in **Appendix A**.

8         189.    Safety remains today part of the essential value proposition of the Uber product.

9    This is so because of Uber's representations. It is also the case because of the inherent nature of

10   the product. To some extent, all providers of public transportation are implicitly agreeing to

11   provide safe transit to passengers. To an even greater extent, because Uber requires people to

12   voluntarily enter into an enclosed environment controlled by a random stranger, Uber's

13   passengers are relying on Uber's express and implied promise to provide a safe ride, and Uber's

14   reputation for safety.

15        190.    As a result, every rider can be presumed to have relied on Uber's representations

16   of safety and its concealment of a lack of safety for those using its transportation system.

17        191.    When Uber sends a driver to a rider, and the driver shows up at the specified time

18   and place in a vehicle bearing an Uber decal or otherwise matching the expectations Uber

19   established, Uber intends the Uber decal and other matching features to reassure the prospective

20   passenger: "This is not just a random stranger's car. It is an UberX and it is safe to get in."

21        192.    Uber owns several trademark registrations for "UBER" and several Uber-based

22   marks. It has used Uber as a trademark and trade name in connection with goods and services

23   since 2010. In opposing applications submitted by others to the United States Patent and

24   Trademark Office that contain some form of the word "Uber", Uber has stated that through its

25   "marketing, promotion, advertising, and commercial activity, the public readily associates the

26   UBER Marks and Names with Uber and its goods and services. The UBER Marks and Names are

27   thus valuable assets of Uber and symbols of its goodwill." Uber has argued that "Even more, the

28   fame and reputation of Uber is of such a nature that a connection with Uber would be presumed

when [an unaffiliated person or company] uses [a trademark containing the word uber] in connection with its services." Uber has further argued that "[a trademark containing the word 'uber'] uniquely and unmistakably points to Uber's famous name and identity." Trademarks and service marks are recognized to function both as an indication of origin or ownership and to serve as a guarantee of constancy of the quality or other characteristics of a product or service.

193.   Uber knows that its riders recognize, are familiar with, and trust its famous transportation brand, and that they do not recognize, know, or automatically trust Uber drivers. To induce riders to get into these drivers' vehicles, Uber knows that it must cultivate a reputation for safety and transfer that reputation to Uber drivers.

194.   Because of Uber's representations, Uber's riders believe that Uber drivers are working for Uber, that Uber has vetted them and is certifying that they are safe drivers who will provide safe transportation. Uber advertises and markets its brand and safety record in a manner designed to cause the public to believe these things. And it knows that the public believes these things and relies on these beliefs.

195.   By initially using the term "UberX" to refer to rides provided by licensed professional drivers in unmarked cars, and then using it to refer to rides provided by random non-professional drivers in unmarked cars, Uber deceived its riders. It did not tell its riders that UberX drivers were random drivers who happened to have a driver's license and access to a vehicle. In 2013 and 2014 it described UberX simply as "the low-cost Uber."

196.   Uber has never presented itself to the public as a mere technology company or broker of transportation services. It has always advertised itself as a transportation company that provides reliable and safe rides. For example, in 2011-2013, its website and ubiquitous advertising called Uber "Everyone's Private Driver." It also advertised the fact that it was dispatching "licensed, professional drivers." In 2015, its website said Uber provided rides on demand and in 2016 it said "Uber is the smartest way to get around." In 2017 and 2018, its website said "Wherever you're headed, count on Uber for a ride" and "Ride with Uber."

197.   At all times, Uber has communicated with drivers using language such as "Sign up to drive" as opposed to "sign up to offer your driving services via our app."

198.     At all times, Uber has communicated with riders using language such as "Sign up to ride" as opposed to "sign up to connect with rides, which may or may not be safe, offered by random drivers whom we don't know and can't vouch for other than to say they passed our cursory background check."



199.     To this day, Uber's listing in the Apple app store advertises that the public can "ride with Uber." It does not say "You can request a ride with a person we've never met, for whom we've conducted only a quick and superficial background check."

200.     Uber held out its transportation as available to any member of the public. For years, it advertised: "Open to everyone, everywhere. All ride requests are blindly matched with the closest available driver. So there is no discrimination based on race, gender, or destination."

201.     Uber built its brand and business by aggressively marketing safety. For example, Uber Boston General Manager Michael Pao was quoted in the Boston Globe on March 13, 2013 as saying: "We proudly give thousands of riders a safe, reliable ride…"

202.     In June 2014, Uber's Head of Communications, Lane Kasselman, told NBC Bay Area: "We're confident that every ride on the Uber platform is safer than a taxi."[37]

203.     In 2014, Uber started charging passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[38]

---

[37] NBC Bay Area, *Is Uber Keeping Riders Safe* (Nov. 29, 2019), https://www.nbcbayarea.com/news/local/is-uber-keeping-riders-safe/70922/
[38] Uber Support, What is the Safe Rides Fee, https://web.archive.org/web/20140420053019/http://support.uber.com/hc/en-

204.    Uber collected the "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue as a result."[39] But it never earmarked the money for improving safety or for the safety-related items it promised.[40] The actual purpose of the "Safe Rides Fee" was to "add $1 of pure margin to each trip."[41] As one former Uber employee said, "[w]e boosted our margins saying our rides were safer. … It "was obscene."[42]

205.    Uber has actively marketed and successfully cultivated an image among its customers of safety and superiority to public transportation and traditional taxis – which is reflected in its very name.[43]

206.    Over the years, Uber's marketing has consistently promoted the theme of safety. In its early years, Uber advertised the "safest rides on the road" and designed ads showing children using its service. For example, Uber's Safety page displayed this ad:



207.    Until 2016, Uber continued advertising its rides as being the safest rides on the road, presented its standard as the strictest possible, and presented its background checks as "gold standard" and "industry leading." For example it said: "Wherever you are around the world, Uber is committed to connecting you to **the safest ride on the road**. That means setting **the strictest standards possible**, and then working hard to improve them every day. The specifics vary

us/articles/201950566
[39] Isaac, *Super Pumped*, at 135-36.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] Dictionary.com defines "uber" as "designating a person or thing that exceeds the norms or limits of its kind or class."

depending what local governments allow, but within each city we operate, **we aim to go above and beyond local requirements** to ensure your comfort and security – what we are doing in the US is an example of our standards around the world." In 2016, it also advertised: "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."

208.    Uber knew this marketing was false. In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry-leading." In 2016, Uber also agreed to pay $25 million to settle a consumer protection action filed by the County of Los Angeles and City of San Francisco, and it agreed as part of the settlement to stop using phrases such as "safest ride on the road" and describing its background checks as "gold standard."

209.    When Uber announced the 2016 settlements, it did not correct its misstatements or tell the truth about its standards, background checks, or safety record. Instead, it explained its advertising changes as follows: "[N]o means of transportation can ever be 100 percent safe. Accidents and incidents do happen. That's why we need to ensure that the language used to describe safety at Uber is clear and precise."[44]

210.    Uber's fraudulent safety advertising caused it to gain a large customer base. Even after the 2016 settlements, Uber kept the benefit of its fraud. Uber kept pointing to its fraudulently-gained large customer base as evidence of its purported trustworthiness, and as a reason for more customers to trust it. For example, to this day, its listing in the Apple app store invites the public to "join the millions of riders who trust Uber for their everyday travel needs."

Join the millions of riders who trust Uber for their everyday travel needs. Whether you're running an errand across town or exploring a city far from home, get   more

Uber Technologies, Inc.
Developer

---

[44] Uber, Settlement with District Attorneys of San Francisco and Los Angeles, published April 7, 2016 (still online as of February 3, 2024) https://www.uber.com/blog/da-settlement/

211.     In 2017, following its fraud settlements, Uber subtly changed its advertising to be slightly more vague, but still misleading. It advertised: "From start to finish, a ride you can trust" and "[S]afe rides for everyone: Whether riding in the backseat or driving up front, every part of the Uber experience is designed around your safety and security." It also described "How we keep you safe" and proclaimed, "Trip Safety, Our Commitment to Riders." It further proclaimed: "Uber is dedicated to keeping people safe on the road."

212.     In 2018, Uber continued advertising: "Safety, Our commitment to riders and drivers. Uber is dedicated to keeping riders and drivers safe on the road."

213.     In 2019, Uber continued advertising, "Your safety is always a top priority. We're committed to helping drivers and riders get where they want to go with confidence." It also advertised that it was "Building safer journeys for everyone." Uber CEO Dara Khosrowshahi said "Helping keep people safe is a huge responsibility and one we do not take lightly."

214.     In 2020, Uber advertised "Our new Door-to-Door Safety Standard. We want you to feel safe riding with Uber."

215.     From 2020 to the present, Uber has advertised (with minor variations): "Before anyone can drive with Uber, they must undergo a multi-step safety screen, including being checked for driving violations, impaired driving, violent crime, and other checks. In addition, Uber rescreens drivers every year and uses technology to look for issues in between." Uber described these background checks as "part of our commitment to help keep you safe when you request a ride with Uber."

216.     Uber has never explained to riders the many limitations of its background checks. Instead, it has falsely represented that the background checks are comprehensive, and made it sound as though anyone with any criminal history would be precluded from driving for Uber. For example, Uber previously advertised: "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards," which "includes a three-step criminal background screening for the U.S.—with country, federal and multi-state checks that go back as far as the law allows—and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

217.     From 2021 through the present, Uber has continued prominently advertising "Our commitment to your safety," and told the public it was "Focused on safety, wherever you go." It also said "we're committed to helping to create a safe environment for our users."

218.     To this day, Uber's website advertises: "Ride with confidence—The Uber experience was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

219.     To this day, Uber's website describes how Uber is "Designing a safer ride" and that it offers "features to help keep you safe."

220.     To this day, Uber advertises on its "ride with confidence" page that "Drivers must clear several screenings." It also says: "Before anyone can drive with Uber in the US, they must complete a background check. Current drivers continue to be vetted every year."

221.     To this day, Uber advertises on its "ride with confidence" page: "Designing a safer ride—An inclusive community—Through our joint efforts with cities and safety experts and by working together, we're helping to create safe journeys for everyone." Uber further states: "Before anyone can drive with Uber, they must undergo a multi-step safety screen. We regularly review their history for issues like impaired driving and violent crime."

222.     To this day, Uber falsely maintains that safety is its top priority.[45]

---

[45] *See* Uber, About Us, https://www.uber.com/se/en/about/?uclick_id=c0abc880-f3dd-428b-b9ef-d82bf674772c (touting "safety is a top priority every single day"); Uber, Ride Safety, https://www.uber.com/se/en/ride/safety/ (claiming that Uber is "[d]riving safety forwards[,]" that "[y]our safety is our priority" and that "[w]e never stop working to reduce incidents and set new standards, so you can stay connected and protected every time you ride with us. Because safety never stops").

223.    Uber's website currently includes the following images:[46]



## Our commitment to safety

We want you to move freely, make the most of your time, and be connected to the people and places that matter most to you.

That's why we're committed to safety—from the creation of new standards to the development of technology with the aim of reducing incidents.



## Rider Safety Features

**At Uber, Safety Never Stops**

Uber is committed to safety. Our in-app safety features help keep you connected and protected when you ride. And because we believe that safety never stops, we'll keep working to drive safety forwards.

224.    Because of Uber's aggressive marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to think of Uber as a well-known, widely trusted transportation company that rigorously vets drivers and stands behind the safety of the rides it offers. Most Uber customers are not aware of all the limitations of Uber's screening process, background checks, safety measures, and oversight of drivers. Nor are they aware that Uber refuses to take any responsibility for driver misconduct.

---

[46] Our commitment to safety. https://www.uber.com/us/en/safety/; Rider Safety Features https://www.uber.com/br/en/ride/safety/rider-safety-features/

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.** **Because women are more vulnerable to gender-based violence, and thus require more persuasion to feel safe enough to get in a stranger's private car, Uber specifically targets its safety representations to women.**

225.    Since its inception, Uber has disproportionately featured smiling women riders in its advertisements. These ads were intended to and did create the impression that its transportation system is designed for and safe for women. Eight images of Uber's marketing copy follow:













1
2
3
4
5
6
7
8




9      226.    Uber also promulgated video campaigns specifically aimed at reassuring women

10  its platform is designed for them and safe for them. For example, in 2015, it ran an ad campaign

11  called "Driven Women" featuring "the stories of the women who ride and drive with Uber in the

12  Pacific Northwest region of the United States."[47]

13      227.    To this day, Uber has an entire webpage devoted to "Driving women's safety

14  forward."[48] The page describes "safety features built into every ride." It advertises, "We're

15  dedicated to building a platform where women feel safe." Until recently this page also advertised,

16  "Uber is committed to help stop incidents before they happen."

17      228.    Through such representations, Uber successfully induces women to trust Uber as a

18  safe transportation provider and, on that basis, to get into private vehicles with Uber drivers.

19           **2.      Even though Uber knows intoxicated Uber riders have the highest risk
              of being the targets of sexual misconduct, it specifically advertises its
20            transportation as safe for intoxicated riders, including intoxicated
              women.**

21      229.    Environment is a major risk factor for sexual assault. When potential witnesses are

22  nearby or when a potential victim is someone likely to be believed, even unscrupulous people

23  otherwise willing to engage in sexual misconduct are often deterred by the potential for unwanted

24  consequences. The converse is true: when a potential victim is isolated away from potential

25  witnesses and when intoxication would undermine the potential victim's ability to persuasively

26  testify against a perpetrator, the risk of sexual violence is particularly high. Researchers call this

27

28  [47] https://www.youtube.com/watch?v=Ite9YjpLI7I
    [48] https://www.uber.com/us/en/safety/womens-safety/

"situational vulnerability." Situational vulnerability was well known to sexual violence experts, businesses, and the general public by 2013.

230.    By 2013, when Uber started a new transportation system, it either understood or should have understood the concept of situational vulnerability. It knew or should have known that its new transportation system gave rise to a heightened risk of sexual assault, and that this situational vulnerability would be at its highest for intoxicated women taking Uber rides alone.

231.    Since 2013, Uber observed that a big segment of its potential market consisted of intoxicated individuals and that it could increase its profitability by targeting these potential customers.

232.    Despite the known heightened risk to intoxicated riders, and especially intoxicated women riders, over the years, Uber has launched numerous marketing campaigns specifically promoting its product to, among others, people, including young women, who are too intoxicated to drive.

233.    In 2015, Uber released a report with Mothers Against Drunk Driving that states "The Uber App was created to ensure reliable access to safe rides." The report states that with Uber, intoxicated persons can find "a safe, reliable ride home" that is "always within reach."[49] The report further represents that "Uber is a better late[-]night option" and reports that "93% of people would recommend Uber to a friend if they have been drinking. Not only would people take Uber themselves—they would trust Uber to take their drunk friend home safely."[50]

234.    In 2016, Uber published a video showing a large breathalyzer machine that it installed on a sidewalk in Portland, where anybody could test their blood alcohol content. If their blood alcohol was at a level unsafe for driving, Uber would provide them with a free ride. The video ended with the tagline, "A safe ride home is always just a tap away," which faded to show Uber's logo.[51]

---

[49] Uber and MADD, *More Options. Shifting Mindsets. Driving Better Choices* (Jan. 2015), http://newsroom.uber.com/wp-content/uploads/madd/uber_DUI_Report_WIP_12.12.pdf.
[50] *Id*. at 2, 3.
[51] Keeping Portland Safe (published March 14, 2016). https://www.youtube.com/watch?v=v71WbymbxVE

235.     Another Uber ad campaign proclaimed: "Safe rides around the clock—Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber."

236.     On holidays and special occasions, Uber often advertises its rides as a safe option for intoxicated people. For example, these ads are from New Year's Eve 2023:

 

237.     Uber partners with alcohol manufacturers and bars to promote drinking and riding with Uber in tandem.

238.     As a result of Uber's marketing, the public became convinced that it is a good and safe idea for intoxicated people, including women, to take an Uber ride. For this reason, Uber has become the go-to transportation option for intoxicated people, including intoxicated women. This has resulted in increased profits for Uber.

239.     Uber's conduct cornered the market and prevented a competitor from emerging that would have provided a true public service: both preventing DUIs *and* addressing safety for passengers.

**F.** **Uber tried not to learn about sexual misconduct on its platform.**

240.     Sexual assault is an underreported crime, for a variety of reasons. It is often difficult for survivors to come forward and tell their stories. Many survivors struggle with trauma and find it inherently painful to "relive" the incident by talking about it. Many survivors worry that they would be interrogated, or subjected to other painful treatment if they came forward. Many survivors worry that they would be disbelieved if they came forward. Often sexual assault is unwitnessed and the survivor has to carry the weight of knowing that the outcome depends entirely on the survivor's testimony. Survivors may also struggle with feelings of guilt, confusion, doubt, and self-blame.

241.     Thus, the reports of sexual misconduct by Uber passengers to Uber represent only a small fraction of the actual sexual misconduct that riders experience during Uber rides. But that conservative number was still enough to garner national attention, including the initiation of various federal and state investigations, into Uber's inadequate response, management and investigation of these claims.[52] That it took national publicity—of crimes that are historically underreported—for Uber to deign to acknowledge the problem reflects the willful disregard that Uber has regarding passenger safety and sexual assault.

242.     Uber, if it wanted to learn about sexual misconduct occurring on its platform, would have encouraged reporting, including building clear methods for survivors to report sexual assault, reassuring them that they will be treated with respect and protected against retaliation, and offering supportive interactions from trauma-informed individuals.

243.     Instead, Uber focused on making money, not on the safety of its riders. Therefore, it was not a priority for Uber to learn about sexual misconduct occurring within its transportation system.

---

[52] *See, e.g.* Letter from Senator Blumenthal to Uber CEO Dara Khosrowshahi, September 25, 2019 (initiating inquiry into, among other things, Uber's procedures for approving Uber Drivers in the wake of "deeply disturbing reports about sexual assault and harassment"), https://www.blumenthal.senate.gov/imo/media/doc/Final%20Uber%20Letter%20Signed.pdf.

244.    Instead, Uber prioritized its *reputation* for safety— which was based on a lie— and maintaining its "critical mass" of Uber drivers and consumers.[53] On reputation, Uber knows that acknowledging and publicizing reports of sexual assaults by Uber drivers would be bad for its reputation. According to Uber, "[p]ublic reporting or disclosure of reported safety information, including information about safety incidents reportedly occurring on or related to our platform, whether generated by us or third parties such as media or regulators, may adversely impact our business and financial results."[54] On maintaining Uber drivers, and as noted above, Uber has repeatedly acknowledged and accepted that heightened background changes would not serve its profit-based interests because the changes would "increase our costs and reduce our ability to onboard additional drivers to our platform."[55]

245.    Therefore, Uber did not encourage—and in fact discouraged—sexual assault reporting. Uber wanted to keep sexual assault hidden, and it acted accordingly. Simply put, it was not in Uber's interest to even *acknowledge* the incidents of sexual assaults. In order to preserve its brand reputation and massive growth, Uber intentionally turned a blind eye to what was a glaring defect in its global enterprise.

246.    Uber thus fostered a system in which complaints were not encouraged (either directly through the manner in which complaints were processed, or indirectly through the provision of subpar reporting tools); proper investigations not conducted; categorization of the type and nature of assaults mismanaged; proper training and supervision for Uber drivers not provided; and, safety tools and mechanisms during a ride not initiated.

---

[53] Uber 2019 Form S-1 at 29, https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm; *see also* Uber, 2022 Annual report, Form 10-K, at 17, https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf

[54] Uber, 2022 Annual Report, Form 10-K at 18, https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf; Uber, 2019 S-1 at 33, https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm.

[55] Uber 2019 Form S-1 at 30, *supra*.

247.    Uber did not build straightforward or simple ways for riders to report sexual misconduct that occurred during a ride. Instead, the features were intentionally obscured in the Uber App, making it difficult and confusing for passengers to report sexual assault.

248.    Further, Uber did not provide any mechanism, or even assurances, of protection for passengers who did make a report.

249.    Uber drivers often drop a rider off at home or work and therefore know where to find the rider again. Many riders who would otherwise give drivers low ratings or report sexual misconduct do not do so because they are fearful that if they make a report the driver could identify them, find them, and potentially retaliate. But these realities were ignored by Uber. There are no protections against retaliation afforded riders at any level of reporting—whether it be a low-star rating or a formal complaint.

250.    In fact, Uber provides no transparency on the impact, if any, that a passenger's low rating or complaint would have on the Uber driver's ability to continue accessing the Uber App, which, in turn, contains the passenger's pick-up and drop-off information.

251.    Even when riders report sexual misconduct, Uber does not devote sufficient resources to reasonably investigate such reports.

252.    Until at least 2018, Uber assigned the job of investigating serious safety incidents, including sexual misconduct, to a small, insufficient number of employees. Until at least 2018, these employees were overworked, and had too little time to investigate such reports.

253.    Until at least 2018, the employees Uber assigned to respond to reported safety incidents, including sexual misconduct, were also underqualified, undertrained, and non-specialized. Uber did not require any investigation experience or relevant safety background, and its employees assigned between 2016 to 2018 to investigate the most serious conduct included a former day care worker, former fry cook, grocery store cashier, and barista.[56]

254.    Until 2018, Uber had no formal taxonomy for tracking sexual misconduct on its platform and did not standardize how to classify sexual misconduct. Frequently, Uber

---

[56] See, e.g., https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/

investigators mislabeled sexual assault as flirtation, inappropriate comments, or inappropriate communications.

255.    Until at least 2018, Uber's deficient categorizations of sexual misconduct and sexual assault limited its ability to learn about, study, and prevent sexual misconduct directed at its riders.

256.    In 2021, the New York Times reported that Uber's team of purported "investigators" typically had "little to no background in trauma response… They are given scripts to read to often-upset passengers and drivers, and strict company policies prohibit the agents from reporting the incidents to the police, even when perpetrators acknowledge their actions."[57] Critically, "[t]he agents can't even suggest that victims call the police themselves. Why? Because police reports can puncture Uber's carefully crafted safety -image – and open the company up to more lawsuits and liability."[58] "[E]ven in the most egregious of cases – including confessions of rape, armed assaults and kidnappings – Uber won't contact authorities unless a person is in immediate and present danger."[59]

257.    To this day, Uber's deficient information gathering and investigations limit its ability to learn about, study, and prevent sexual misconduct by Uber drivers.

**G.    Despite itself, Uber learned that its riders were being sexually assaulted, but it concealed and downplayed the problem.**

258.    By 2014, less than a year after Uber started onboarding non-professional drivers, it started receiving reports of sexual assault committed by Uber drivers against riders. It continued receiving these reports from 2014 to the present. Uber did not publicize what it was learning, because its goal was not safety but rather the appearance of safety.

259.    But the rate and viciousness of attacks could not be concealed forever. Media outlets began to report on incidents, and victims began to speak out.

---

[57] New York Times, *Why Uber Won't Call the Police, (*Dec. 22, 2021), https://www.nytimes.com/2021/12/22/opinion/uber-safety-ride-sharing.html.
[58] *Id.*
[59] *Id.*

260.    For example, in December 2014, a 26-year-old finance worker in New Delhi, India, hailed an Uber to take her home.[60] Uber provided her with a driver who was already awaiting trial for at least four other criminal charges. When the woman fell asleep in the car, her driver raped her in the backseat.[61]

261.    Since Uber's focus was its reputation, Uber reacted by attacking the victim's credibility. Eric Alexander, Uber's President in the Asia–Pacific region and Kalanick's designated fixer,[62] managed to obtain the rape victim's medical records, including the exam performed within hours of her rape.[63] Alexander shared these records with Mr. Kalanick.[64] Many other Uber executives either saw the records or learned of them.[65] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[66] Despite the Uber driver's history of sexual assault and confession to the police, he began cultivating and sharing a story that the woman was not raped, but rather the whole incident was a plot against Uber by a major ride-sharing competitor in India.[67]

262.    The response to the New Delhi incident was representative of Uber leadership's approach to sexual assault generally. [68] When Uber customers accused Uber drivers of sexual assault—something that happened with increasing frequency as Uber grew, given its lax supervision and shoddy background checks—Mr. Kalanick would pace around Uber headquarters, not wondering about how to improve rider safety but repeating "innocent until

---

[60] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, N.Y. Times (Dec. 8, 2014), https://www.nytimes.com/2014/12/09/world/asia/newdelhi-bans-uber-after-driver-is-accused-of-rape.html; Isaac, *Super Pumped*, at 149.

[61] Isaac, *Super Pumped*, at 149.

[62] *Id.* at 261.

[63] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017), https://www.vox.com/2017/6/7/15754316/uber-executive-india-assault-rape-medical-records; Isaac, *Super Pumped*, at 261.

[64] *Id.*

[65] *Id*.

[66] Isaac, *Super Pumped*, at 261.

[67] *Id*.

[68] *Id.* at 194 ("The tone of Uber's culture was being set from the top . . . The result was a workforce that largely reflected Kalanick.").

proven guilty."[69] When law enforcement decided not to bring criminal charges against an Uber driver accused of sexual assault because it felt it did not have enough evidence for a criminal conviction, "a round of cheers would ring out across the fifth floor of Uber HQ."[70]

263.    In July 2015, Uber began leasing cars to high-risk individuals with poor or non-existence credit ratings (the "Xchange leasing program"), and noticed the rate of safety incidents spiked after, with a correlation between incidents and drivers with bad ratings.[71]

264.    Until 2018, Uber did not tell riders anything about the sexual assaults occurring during Uber rides unless it was forced to comment on an already-public news story involving sexual assault.

265.    To this day, Uber has never told the public how many sexual assaults riders reported to it from 2013 to 2017, a period for which its information gathering was particularly inadequate.

266.    Until 2018, Uber required confidentiality as a condition of settlement with sexual assault survivors, effectively forcing survivors to stay quiet so that the public would not learn about the true risks of riding with Uber.

267.    Likewise, until 2018, Uber enforced mandatory arbitration of "sexual misconduct claims by platform users," ending the practice only due to "increasing public scrutiny."[72]

268.    In late 2018, Uber finally developed a "Taxonomy" to identify, categorize, and count incidents of sexual misconduct on its platform.[73] It did not do this out of genuine concern for safety, but because research showed that negative views of Uber were rising in part due to public reports of rampant sexual harassment and misogyny directed at Uber's female engineers and other corporate employees, and in part due to a continued lack of transparency regarding

---

[69] *Id*. at 167.

[70] *Id*.

[71] Isaac, *Super Pumped*, at 218-19.

[72] Uber, 2019 S-1 at 62,
https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm.

[73] Chad Sniffen et al., *Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*, Raliance & The Urban Inst. (2018).

sexual misconduct by Uber drivers in the wake of the #MeToo movement. Uber promised riders improved transparency and reporting.

269.   When Uber announced a commitment to transparency in 2018, it did so for the sake of public relations. It took the position that sexual assaults on Uber's platform were merely a reflection of a society-wide problem, and not a reflection on Uber's transportation system or business practices.

270.   On May 15, 2018, Uber's new Chief Legal Officer, Tony West, working with new CEO Dara Khosrowshahi, announced: "[O]ur service ultimately reflects the world in which we operate—both the good and the bad. And it's clear that sexual violence remains a huge problem globally. The last 18 months have exposed a silent epidemic of sexual assault and harassment that haunts every industry and every community. Uber is not immune to this deeply rooted problem, and we believe that it is up to us to be a big part of the solution."[74]

271.   The Taxonomy identified 21 categories of sexual misconduct or assault based on "real examples … reported to Uber":

| SEXUAL MISCONDUCT | SEXUAL ASSAULT |
| --- | --- |
| Staring or Leering | Attempted Touching: Non-Sexual Body Part |
| Comments or Gestures > Asking Personal Questions | Attempted Kissing: Non-Sexual Body Part |
| Comments or Gestures > Comments About Appearance | Non-Consensual Touching: Non-Sexual Body Part |
| Comments or Gestures > Flirting | Non-Consensual Kissing: Non-Sexual Body Part |
| Comments or Gestures > Explicit Gestures | Attempted Touching: Sexual Body Part |
| Comments or Gestures > Explicit Comments | Attempted Kissing: Sexual Body Part |
| Displaying Indecent Material | Non-Consensual Touching Sexual Body Part |
| Indecent Photography Without Consent | Non-Consensual Kissing: Sexual Body Part |
| Soliciting Sexual Contact | Attempted Non-Consensual Sexual Penetration |
| Masturbation / Indecent Exposure | Non-Consensual Sexual Penetration |
| Verbal Threat of Sexual Assault | |

272.   Using the Taxonomy, Uber went back and tried to retroactively analyze and categorize reports of sexual misconduct reported to it from 2017 to 2018. Uber's ability to accurately do so was limited by its deficient information gathering.

---

[74] Tony West, *Turning the Lights On*, Uber Newsroom (May 15, 2018), https://www.uber.com/newsroom/turning-the-lights-on/

273.     In Uber's first Safety Report, published on December 5, 2019, Uber admitted to receiving reports of 5,981 sexual assaults (in five categories) in the United States in 2017 and 2018.[75] These included 235 rapes, 280 attempted rapes, 1,560 groping incidents, 376 instances of unwanted kissing of the breast, buttocks, or mouth, and 594 reports of unwanted kissing to another body part.

274.     The sexual assaults that Uber reported to the public represent only the tip of the iceberg. Significantly, Uber reports data on sexual assaults in only five of the categories, providing zero transparency regarding the other 16 categories of sexual misconduct and sexual assault occurring on its system. As described above, there are also inherent and Uber-created limitations that affect sexual assault reporting.

275.     Uber did not voluntarily publish additional data on sexual assaults after its 2019 report.

276.     On December 2, 2021, the California Public Utilities Commission (CPUC) approved a settlement agreement with Uber regarding its failure to report data on sexual harassment and assault, notwithstanding CPUC demands for it. Uber agreed to pay $9 million and to provide information on sexual assault and harassment to the CPUC on a going-forward basis.[76]

277.     It was another six months after this settlement, before Uber publicly released another safety report. In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic).[77]

278.     Despite a drastic reduction in total rides due to the pandemic (a decline of approximately 30-77% depending on the geographic region) Uber admitted in its 2022 report that

---

[75] Uber, *US Safety Report 2017-18* (Dec. 5, 2019), https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a

[76] CPUC Press Release (Dec. 2, 2021), https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-approves-9-million-settlement-with-uber.

[77] Uber, US Safety Report 2019-20, https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a

1    it still received 3,824 reports of sexual assault (within the same five categories) in the United

2    States in 2019 and 2020.[78]

3          279.   After Uber's IPO in 2019, securities laws required it to start publishing annual

4    reports for shareholders, truthfully disclosing risks facing the company. Its 2020 Annual Report

5    disclosed: "There have been numerous incidents and allegations worldwide of drivers, or

6    individuals impersonating drivers, sexually assaulting, abusing, kidnapping, or fatally injuring

7    consumers, or otherwise engaging in criminal activity while using our platform or claiming to use

8    our platform."[79] Uber did not publicize these same statements, or anything like them, in

9    communications designed to reach riders.

10         280.   Uber has not publicly released sexual assault data for years after 2020. Uber's

11   decision to withhold that data deprives Uber passengers and the public from important

12   information about risk and accountability.

13         281.   Despite its efforts to discourage accurate reporting of sexual misconduct and to

14   minimize publication of such incidents, Uber has known since 2013 that its riders were being

15   sexually assaulted and harassed by drivers during Uber trips.

16        **H.     When Uber learns of misconduct by specific drivers, it puts riders at risk to
17                 protect its product and reputation.**

18         282.   Particularly troubling is the way Uber responds to instances of known or suspected

     driver misconduct.

19
20         283.   To this day, when a rider gives a one-star review to a driver because of sexual

21   misconduct, Uber makes it difficult for the rider to indicate sexual misconduct as the reason for

     the low rating.

22
23         284.   When the rider gives a low rating, Uber presents a menu of forced-choice

24   rationales for the low rating. The option most appropriate for sexual assault or other sexual

25   misconduct is "Report a Safety Issue." If the rider selects this option, the Uber App will present

26   _____
     [78] Uber, US Safety Report 2019-20,
27   https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-
     4c4a-b1a2-abd1e253f24a
28   [79] Uber 2020 Annual Report, Form 10-K, at 20,
     https://www.sec.gov/Archives/edgar/data/1543151/000154315121000014/uber-20201231.htm

her with another forced-choice menu with the following options: "My driver's vehicle was unsafe or broke down; I was involved in an accident; I was discriminated against by my driver; My driver drove dangerously; My driver's license plate was different; My driver didn't match the profile in my app; My driver's vehicle was different; Emergency contact information; Report a safety incident involving a driver; Safety incident reporting line."

285.    Of these, the most appropriate option for someone reporting sexual assault or other sexual misconduct would seem to be, "Report a safety incident involving a driver." If the rider selects this option, Uber redirects her to another page with the following links: (1) "My driver was rude," (2) "I have a different concern about my driver or their vehicle," and (3) "worried about a cancellation fee?" Near the bottom of the page is a small, free-form field that is hard to see, and which Uber designs not to be seen.

286.    The other options on the "Report a Safety Issue" main menu take riders to user-friendly lists of options including: "(1) Dangerous driving – fast driving, distracted by phone, drowsy driving, swerves, sharp turns, harsh stop and go, illegal driving, aggressive driving, other; (2) Vehicle – wrong vehicle, vehicle cleanliness, unpleasant car smell, mechanical issues, vehicle damage, disturbing radio, other; (3) Driver behavior – driver not polite, ignored my requests, communication issues, talked too much, other, distracted by phone, talking on phone; (4) Navigation – bad map route, didn't follow map, wrong turns, slow driving, other; (5) Pickup/Dropoff – wrong driver, dropoff too far, pickup too far, unsafe dropoff, unsafe pickup, wrong pin location, other."

287.    There is nothing on any menu that lists "sexual assault," "sexual misconduct," "sexual harassment" or anything of the sort. This omission is by design, since Uber does not want to tell regulators or the public about rates of sexual assault.

288.    Whenever a rider rates a driver with one star but does not specify a reason, Uber knows or should know there is a high probability the low rating reflects sexual misconduct but that the rider was unable to navigate Uber's menu to specify that reason or leave a comment.

289.    When Uber sends a driver to a rider, the Uber App provides the rider with a picture of the driver, and with a total number of rides the driver has offered on the platform along with a

star rating and a number corresponding to the star rating (out of a total of 5 stars). Uber tells riders that these ratings are designed to "help keep riders and drivers safe." It represents on its safety page that a rider can "get to know your driver before you step into their car. You can see their rating, how many trips they've completed, how long they've been driving, compliments from previous riders, and more."[80]

290.    Uber does not tell riders how many one-star ratings a driver received, but only provides an average star rating. This rating system provides a false sense of assurance to women and other vulnerable riders who perceive a high average rating to indicate a safe driver. However, a driver who receives primarily positive reviews, may also occasionally engage in sexual misconduct or harassing behavior. Such a driver might have a high average star rating but a concerning pattern of one-star reviews. Uber does not share such patterns with riders.

291.    Uber does not share with riders the reason for prior one-star reviews. Even when Uber knows that the prior one-star reviews were for reports of sexual assaults, it does not communicate this to riders.

292.    Uber tells riders that they can "see [the driver's] rating." In reality, and unbeknownst to riders, Uber only includes the last 500 ratings in the driver's reported rating. Thus, for a typical full-time driver who provides about 50 rides per week, Uber is effectively scrubbing the driver's record every ten weeks.

293.    Uber also omits ratings from riders who have a history of giving what Uber considers to be too much negative feedback, and omits low ratings for certain types of feedback.

294.    When riders, despite deterrent factors, manage to go beyond star ratings and report sexual assault to Uber, the ensuing investigations are designed to soothe the rider but not to hold the driver accountable.

295.    Research shows that sexual assault survivors who report their assaults most often do so out of a motivation to protect others, and secondarily to bring accountability to the perpetrator. A superficially soothing interaction with an investigator that does not result in punitive action does not achieve either of these goals, and indeed can be affirmatively harmful.

---

[80] https://www.uber.com/ae/en/ride/safety/

296.     Uber's primary purpose in conducting its investigations is to protect Uber and its reputation. According to former Uber investigator Lilli Flores, Uber trained its investigators that they were there "first to protect Uber; and then next to protect the customer."[81]

297.     Until at least 2019, it was Uber's policy that, if a rider reported sexual assault by a driver, the driver would be allowed to maintain his driving privileges unless it was a second, third, or fourth sexual assault on Uber's platform or if there was "conclusive" evidence of the assault (namely a criminal conviction, admission of fault, or video or photographic evidence). In effect, this meant that virtually no initial allegations of sexual assault were considered sufficient to revoke a driver's privileges. Uber admitted these facts in sworn testimony.

298.     In the absence of so-called "conclusive" evidence (conviction, admission, video, or photo), Uber's policy to allow multiple sexual assaults before terminating a driver applied to all reports of sexual assault, no matter how credible or serious, and even if the rider's allegations were corroborated by GPS evidence showing that a driver went off route or stopped for a long time.

299.     In fact, depending on how many rides a driver had given on the platform, and thus how profitable the driver was for Uber, the driver might be allowed two, three, or four sexual assaults before being terminated. Uber executives would make exceptions in order to keep dangerous drivers on the road. For example, "a New York-area driver allegedly made three separate sexual advances on riders, said an investigator assigned to the case. After an executive overruled the investigator, the driver was allowed to continue working until a fourth incident, when a rider claimed he raped her."[82]

300.     Uber has admitted in sworn, unsealed testimony that, after receiving initial allegations of sexual assault, it would temporarily suspend the driver during its investigation, then

---

[81] *Greg Bensinger*, When rides go wrong: How Uber's investigations unit works to limit the company's liability (September 26, 2019)
https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/

[82] *Id.*

(sometimes within twenty-four hours) reactivate the driver and allow him to go pick up other riders.

301.    Uber has admitted in sworn testimony that it knew that individuals who have committed sexual assault may go on to reoffend.

302.    Uber has admitted in sworn testimony that it did nothing to warn or protect these other riders from drivers with a known history of sexual assault.

303.    In fact, corroborative evidence was considered insufficient to result in revocation of driving privileges. Rather, the evidence had to be "conclusive." Uber has admitted in unsealed testimony that even if GPS evidence corroborated the rider's account, the rider's account was otherwise consistent and credible, and the driver's account was not credible, it would not be enough to terminate a driver for a "first time" sexual assault.

304.    Uber also will not report drivers' criminal sexual assaults and rapes to law enforcement.[83]

305.    Uber claims that its policy not to contact law enforcement is victim-centric and designed to empower the sexual assault survivor to decide whether to press charges. However, even if the driver admits the crime to Uber in a recorded call, potentially allowing the criminal justice system to protect the public without imposing on the victim, Uber still will not report to law enforcement. This reticence demonstrates that Uber's true motivation is to reduce negative publicity.

306.    Furthermore, Uber deceives riders into thinking that Uber will convey reports of misconduct to law enforcement. Uber tells riders that it has a "law enforcement response team" that will work with law enforcement but does not explain to riders that this will occur if and only if the rider first self-reports the crime to law enforcement.

307.    Uber does not encourage riders to report to law enforcement after receiving complaints, nor empowers them to do so.

---

[83] Greg Bensinger, *Uber Says Safety is its First Priority. Employees Aren't So Sure*, Washington Post (Oct. 1, 2019), https://www.washingtonpost.com/podcasts/post-reports/uber-says-safety-is-its-first-priority-employees-arent-so-sure/).

308.     Uber does not provide the rider with any information about how to report to law enforcement, does not explain that this can be accomplished by calling "911," and does not give or offer them any other phone numbers or information to make reporting easier.

309.     Uber does not give riders the option of requesting that Uber report to law enforcement.

310.     Even when riders express an interest in reporting to law enforcement, Uber does nothing to help them do so. Even when riders tell Uber they are confused and do not know how to report, Uber does not help them.

311.     Uber's public position is that sexual assault survivors are responsible for reporting their own assaults to law enforcement, and that whether to report a crime is an inherently personal choice.[84] But, of course, Uber knows that its own policies discourage such reporting and, partly as a result, most victims of sexual misconduct in Uber vehicles do not report the incidents to law enforcement.

312.     Until at least 2018, when Uber communicated with drivers who had been credibly accused of sexual assault, it downplayed the nature of their assaults. For example, in 2018, it told a driver, Brandon Sherman, who had been credibly accused of kidnapping and sexual assault, that he "may have come off as flirtatious," and reactivated him, concluding: "We appreciate and value you as an Uber partner...I can confirm that your account is now active…" Uber admits it did nothing to protect other riders from Mr. Sherman. He went on to sexually assault another rider.

313.     Until March of 2021, even if a driver had multiple allegations of sexual assault, or conclusive evidence of sexual assault, such that Uber deactivated the driver, it would not share this information with Lyft, its largest competitor. And until March of 2021, Uber did not try to find out from Lyft whether the driver had a prior sexual assault on Lyft's platform. Belatedly, in March of 2021, Lyft and Uber agreed to share information about the five "serious sexual assault" categories that Uber includes in its safety report, but not about other categories of sexual assault.

314.     For years, Uber's conduct with respect to known or suspected sexual assaults has aimed at shielding drivers from consequences for their actions, and to downplay their crimes.

---

[84] *See, e.g.*, 9/25/19 Ltr. from Uber to Sen. Blumenthal, UBER-MDL3084-297

These policies reinforced the message that their victims will not be believed and that their sexual misconduct will not be taken seriously or result in consequences. This empowered offending drivers to continue to engage in sexual misconduct.

315.     Uber has given countless drivers with known histories of sexual misconduct access to additional victims, and given them the opportunity to prey on riders who are trusting Uber to keep them safe.

316.     These policies, at all relevant times, have been initiated or maintained by Uber's leadership, including its officers, directors, and managing agents. Uber knew or should have known that failure to alter its policies and practices would result in sexual assaults and harassment committed by drivers against passengers.

I.      **Instead of trying to prevent sexual misconduct, Uber launders its reputation.**

317.     Uber has a tried and true strategy for dealing with controversy, especially those involving sexual misconduct: protect its reputation by offering limited and inadequate transparency and hiding behind the reputation of third parties.

318.     In 2017, bad press about Uber was piling up due to, among other things, the New Delhi assault, reports of widespread sexual harassment among employees, and rampant misogyny and "bro culture" at the top of the company.[85]

319.     Uber's goal of going public was threatened. Uber knew it needed to clean up its image.

320.     On June 12, 2017, Uber held a company-wide meeting to announce changes. At the meeting, Uber proclaimed that it was going to increase its diversity and sensitivity by adding a female board member. Board member David Bonderman chimed in that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[86] Though Mr. Bonderman soon resigned after his comments were reported, the fact that this attitude came from

---

[85] Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber* (Feb. 19, 2017), https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber); Isaac, *Super Pumped*, at 84, 192-93.

[86] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, N.Y. Times (June 13, 2017).

the person "working on Uber's culture after the company was rocked by scandals over claims of sexual harassment and other misbehavior"[87] demonstrates that Uber's "culture was poisoned from the very top."[88]

321.    Uber hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[89] Holder's investigation uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[90]

322.    Holder produced hundreds of pages of findings, but only Uber's board of directors ever saw the full report.[91]

323.    Uber's primary response to the Holder report was to replace its leadership— forcing out the founding generation, including Mr. Kalanick. But, while Uber presented fresh and trusted faces to the public, such as new CEO Khosrowshahi and board member Ariana Huffington, the underlying conduct and business practices did not change. Instead, the retention of Mr. Holder and the leadership "reset" merely served to cover up the continuation of the fraud that Uber cared about safety and would work to provide a safe ride.

324.    As discussed above, after using Mr. Holder to burnish its image, Uber did not release any data on sexual assaults until December 2019.

325.    Uber partners with third parties, often non-profits, to use their reputation to enhance its own. These include the National Sexual Violence Resource Center, the Urban Institute, and Mothers Against Drunk Driving.

326.    Uber is not transparent about what data or information it provides to these organizations and what it withholds. These outside organizations also have no real ability to affect Uber's actions, as demonstrated by Uber's approach to the Covington-mandated Safety Reports.

---

[87] *Id.*

[88] Isaac, *Super Pumped*, at 280.

[89] Covington & Burling, LLP, *Uber Covington Recommendations*, https://www.documentcloud.org/documents/3863793-Uber-Covington-Recommendations.html

[90] Isaac, *Super Pumped*, at 271.

[91] *Id.*

327.    Uber also coopts third parties like RAINN (Rape, Abuse & Incest National Network), to hide behind messaging about how victims can protect themselves from sexual violence. Uber does this to deflect attention away from its own institutional responsibility to meet its promises to protect its riders. Uber donates millions of dollars annually to RAINN and similar nonprofit organizations, so that Uber can appear committed to safety, so that these groups will have a conflict that prevents them from criticizing Uber or opposing it as amicus in court), and also so that Uber can influence the messages put out by those groups. On the other hand, Uber gives those groups no real influence over the way Uber does business.

328.    Indeed, Uber's partnership with safety-oriented organizations only underscores that it has voluntarily undertaken the duty to ensure a safe ride.

329.    While Uber hides behind third parties who have no power to investigate the real and complete truth of Uber's approach to sexual misconduct, and no power to alter that conduct, Uber's attitude towards courts and regulators—those actually in a position to modify Uber's conduct—is very different.

330.    For an unknown period of time, Uber deliberately deleted internal communications. The company included an entity called the "Strategic Services Group" that engaged in competitive intelligence and other unknown activities.[92] Internal communications within the Group were carried out using an app called Wickr. Wickr automatically deleted messages after a certain period of time, preventing future legal discovery.[93] The group's practices may also have included improperly designating documents as attorney-client privileged.[94]

331.    "Employees were unnerved by mass deletion of internal emails, groups chats, and company data, carried out under an internal initiative to 'eliminate data waste' throughout all levels of the company. Internally, many believed executives wanted to cover Uber's tracks, anticipating a subpoena for some unknown future court case."[95]

---

[92] Isaac, *Super Pumped*, at 257.
[93] *Id.* at 258.
[94] *Id.*
[95] *Id.* at 259.

332.     Uber regularly flouts transparency demands placed on it by courts and regulators. Uber refused to comply with CPUC document demands for months, leading to the regulator imposing a $59,085,000 fine (reduced after settlement), and threatening to revoke Uber's license.[96]

333.     Uber has also been sanctioned by a Washington court for defying court orders, including attempt[ing] to reinterpret a "discovery order" that "was clear on its face." The court found that "[g]iven the history of non-compliance in this case, fees and costs are not enough. Punitive sanctions are warranted."[97]

334.     Also in 2019, Uber skipped a congressional hearing aimed at examining its safety and labor practices.[98] This was after the Committee on Transportation and Infrastructure had repeatedly sought Uber's participation. Uber, instead, "suggested that [the committee] invite third party industry associations to generally talk about technology innovation in transportation."[99]

## VI.     TOLLING OF STATUTES OF LIMITATIONS

335.     **Discovery Rule**. Any applicable statutes of limitations were tolled until Plaintiffs had the ability to discover the essential elements of their claims against Uber. In general, Plaintiffs had no way of knowing that Uber was not, as it represented, a safe mode of transportation. Plaintiffs have no way of knowing the inadequacy of Uber's mechanisms to prevent sexual misconduct.

336.     **Fraudulent Concealment**. Any applicable statutes of limitations were tolled due to Uber's fraudulent concealment of the dangers of its product. Through its affirmative

---

[96] Joint Motion for Adoption of Settlement Agreement, July 15, 2021, *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Servs.*, Rulemaking 12-12-011 (Cal. Pub. Util. Comm'n)

[97] *Richards v. Uber USA, LLC*, No. 19-2-16858-7 (Wash. Sup. Ct. Mar 11, 2020).

[98] Siddiqui, Faiz. "Congress wanted to grill Uber and Lyft on safety. The companies blew them off." The Washington Post. Oct. 16, 2019, https://www.washingtonpost.com/technology/2019/10/16/congress-wants-grill-uber-lyft-safety-companies-are-blowing-them-off/s.

[99] Committee on Transportation and Infrastructure Letter to Uber CEO Dara Khosrowshahi, Oct. 14, 2019, https://democrats-transportation.house.gov/imo/media/doc/2019-10-14%20LTR%20to%20Khosrowshahi%20CEO%20Uber.pdf

misrepresentations and omissions, Uber actively concealed from Plaintiffs the true risks associated with using the Uber App, as well as its own conduct in permitting those risks to exist.

337.    Plaintiffs did not discover Uber's affirmative misrepresentations and omissions earlier because Plaintiffs had no reason to suspect that Uber was making such affirmative misrepresentations and omissions. Uber took active steps to conceal the dangers associated with using the Uber App, as described above.

338.    Indeed, Uber even charged users a "Safe Rides Fee" for the purpose of convincing the public that using the Uber App is safe.

339.    Defendants' statements proclaiming the safety of the Uber App and disregarding its dangers were designed to mislead users and the public at large, including Plaintiffs.

## VII.    PUNITIVE DAMAGES

340.    Plaintiffs seek punitive or exemplary damages for any claim under any state's law under which they are permitted.

341.    Uber acted intentionally, recklessly, wantonly, maliciously, and fraudulently.

342.    As alleged above, Uber knew it faced an ongoing problem of its drivers assaulting or harassing its passengers. As early as 2014, Uber knew that its drivers were sexually assaulting or harassing women or other vulnerable passengers. Since 2014, Uber has received frequent passenger complaints about driver sexual misconduct, including sexual assault and rape, it has been repeatedly notified of police investigations of the criminal sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits and arbitrations alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers.

343.    Nevertheless, even though Uber was fully aware of its sexual misconduct problem it failed to take safety precautions to protect its passengers.

344.    Even after Uber was aware of widespread sexual misconduct on the part of its drivers, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

345.    The decision not to implement more thorough and persistent background checks was driven by Uber executives' desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

346.    Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers or users of the risk of being assaulted, even after Uber and its leadership were fully aware of this risk.

347.    Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Uber drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, harassment, rape, and exploitation by Uber's own drivers.

348.    Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiffs and the public.

349.    Uber also misrepresented the safety of its rides to Plaintiffs and the public, intentionally and actually inducing reliance on those statements and omissions.

1

**VIII.   STANDING TO SEEK INJUNCTIVE RELIEF**

2

350.    It is plausible that each Plaintiff will seek to use Uber's product in the future and

3

necessarily will rely on Uber's obligations and representations regarding safety.[100]

4

351.    Transportation companies like Uber are a ubiquitous part of modern life in this

5

country. Uber represents 67% of the market. Most of the remainder of the market is controlled by

6

Lyft, which (after Uber adopted "peer-to-peer rides" in 2013) entered into a competitive race with

7

Uber regarding who could onboard more drivers and take market share faster. For this reason,

8

Lyft ultimately copied almost all of Uber's bad business practices. Lyft has also faced allegations

9

of sexual assault.

10

352.    Plaintiffs reasonably expect to be able to use Uber's product in the future.

11

Conversely, it would be a concrete and significant injury if they were precluded from accessing

12

those common carrier services.

13

353.    Uber is also often less expensive than Lyft.

14

354.    The widespread nature of sexual misconduct on Uber's platform, paired with

15

Uber's refusal to take adequate corrective measures, creates a substantial risk of future harm to

16

Plaintiffs.

17

355.    Some Plaintiffs must use Uber because third parties, such as medical benefit

18

payors, utilize Uber's product to transport clients to medical or rehabilitation appointments.

19

356.    The injuries to Plaintiffs stem from Uber's established corporate policies, further

20

demonstrating a likelihood of repetition in the immediate future.[101]

21

357.    Plaintiffs also suffer a concrete, particularized injury because they plausibly desire

22

to purchase Uber's product as advertised, i.e., as a safe ride. As constituted, Uber's rides are not

23

safe and so are not as advertised.

24

_____

25

[100] *See, e.g.*, *Susan B. Anthony List*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if … there is a substantial risk that the harm will occur."); *Davidson v. Kimberly-*

26

*Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018) ("[T]he threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact

27

it was once marred by false advertising or labelling, as she may reasonably, but incorrectly, assume the product was improved.").

28

[101] *See Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001).

358.     Finally, Plaintiffs suffer a real and immediate threat of future injury because Uber's lack of adequate protections against sexual assault constitutes a barrier that deters Plaintiffs from using the product and thus restricts their access to transportation.[102]

359.     The threat of future injury is directly traceable to Uber's policies regarding driver screening and sexual misconduct and is redressable if those policies are changed.

## IX.     CLAIMS

360.     Except as otherwise indicated, Plaintiffs plead claims under any applicable state laws.

361.     Each claim incorporates all allegations above.

### B.     Negligence (including Negligent Hiring, Retention, Supervision, and Entrustment)

362.     Plaintiffs plead claims for negligence under all theories that may be actionable under any applicable state laws.

363.     Uber owed Plaintiffs a duty to act with reasonable care.

a.     The factors courts consider in assessing whether a defendant owes a duty of care all support finding a duty here: (1) Plaintiffs' injuries were a foreseeable risk of Uber's business model and practices; (2) Plaintiffs' injuries are certain and compensable; (3) there is a close connection between Uber's conduct and Plaintiffs' injuries; (4) Uber's conduct, relative to the but-for world where it acted reasonably, had no social utility; (5) Uber is in the best position to modify its conduct to prevent future harm; (6) the burden to Uber of upholding its duty is reasonable in light of the potential to avoid injuries; and (7) Uber is in a strong position to insure or self-insure.[103]

b.     Uber owed a duty because it distributed and promoted its platform while on notice of acts of widespread sexual assault and harassment committed by its drivers against its passengers.

---

[102] *See Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014).
[103] *See, e.g.*, *Rowland v. Christian*, 69 Cal. 2d 108 (1968).

1          c.          Uber owed a duty because its prior conduct created a risk of harm to

2    Plaintiffs, and caused them actual harm.[104]

3          d.          Uber owed a duty because the risk of harm to Plaintiffs was embedded in,

4    and an inherent component of, its negligent business practices.

5          e.          Uber owed a duty because it controlled the drivers.

6          f.          Uber owed a duty because it designed and controlled the transportation

7    experience and environment for both drivers and passengers.

8          g.          Uber owed a duty because it voluntarily undertook to provide a "safe ride"

9    to passengers, its failure to exercise case increased the risk of harm to passengers, and the harm

10   was suffered because of passengers' reliance on Uber's undertaking.[105]

11         h.          Uber owed a duty because it offered and contracted to provide rides to the

12   public, and this offer carried an implied warranty that it would provide rides safely.

13         i.          Uber owed a duty because it retained control over its drivers and exercised

14   that retained control in a manner that affirmatively contributed to Plaintiffs' injuries by making

15   sexual assaults in Uber vehicles dramatically more likely.[106]

16         j.          Uber owed a duty because it has a special relationship with its passengers:

17              i.          Uber has a special relationship with its passengers since its

18   passengers are in a relationship of vulnerability and dependence toward Uber while they are

19   summoning a ride, waiting for a ride, getting into an Uber, riding with Uber, and parting ways

20   with the driver.

21                   ii.          Uber has a special relationship with its passengers since Uber, like

22   an innkeeper, business proprietor, common carrier, or train station, exercises control and has the

23   ability to exercise control over the environment the passenger occupies. In Uber's case, this

24   environment is not merely physical but also consists of an "online platform" which is a type of

---

[104] *See* Restatement (Second) of Torts §§ 321, 322

[105] *See* Restatement (Second) of Torts §§ 323, 324A.

[106] *See* Restatement (Second) of Torts § 414; *Sandoval v. Qualcomm Inc.*, 494 P.3d 487 (Cal. 2021).

digital environment. Uber is in a superior position relative to its riders to provide a safe (physical and technological) environment.

        iii.     Uber has a special relationship with its passengers since Uber derives a special benefit from its passengers' dependence and reliance upon Uber. Uber makes a financial profit from this relationship.

        iv.     Uber has a special relationship with its passengers because it collects large amounts of detailed data on their location and movements, and, on information and belief, utilizes that data for its own commercial purposes, including potentially selling the data to third parties.

        v.     Uber has a special relationship with its passengers because, based on its representations, undertakings, and business model, Uber stood in the shoes of the drivers. Passengers pay Uber, not the driver, and get a receipt from Uber, not the driver. All communications about the experience come from Uber. Passengers have no ability to identify or contact their driver outside of the channels controlled exclusively by Uber.

        vi.     The special relationship between Uber and its passengers has defined boundaries since it exists specifically between Uber and those individuals who use Uber's application to request a ride, as opposed to all members of the public.

        k.     Uber owed a duty because it had a special relationship with its drivers and so was obligated to prevent them from harming passengers.[107]

        l.     Uber owed a duty as a common carrier to protect passengers under the laws of states **except** the following: **Arizona**, **Colorado**, **District of Columbia**, **Illinois** (for incidents prior to August 11, 2023), **Michigan**, **Montana** (for incidents prior to April 23, 2023), **New York**, **Pennsylvania**, **Wisconsin**, and **Wyoming**.[108] As a common carrier, Uber owed a duty to use the utmost and highest care and vigilance, and to do all that human foresight, care, and vigilance can do to avoid harm to passengers.

---

[107] *See id.*

[108] *See* Restatement (Second) of Torts § 314A.

1        m.      Uber owed a duty to prevent drivers from harming passengers because the

2  drivers (1) were on Uber's premises, (2) were using Uber's product, and (3) Uber knew or had

3  reason to know it has the ability to control the drivers and of the necessity and opportunity for

4  exercising such control.[109]

5        n.      Uber owed a duty to prevent drivers from harming passengers, including

6  from intentionally doing so, because (1) Uber permits drivers to use its chattel—the Uber product

7  and trademarks, (2) Uber was virtually present in the vehicles, and (3) Uber knew or had reason

8  to know Uber had the ability to control the drivers and of the necessity and opportunity for

9  exercising such control.[110]

10        o.      Uber owed a duty because it took charge of drivers whom it knew or

11  should have known were likely to cause bodily harm to others.[111]

12        p.      Uber owed a duty because it voluntarily took custody of passengers under

13  circumstances such as to deprive them of their normal power of self-protection and subjected

14  them to association with persons likely to cause them harm, and (1) knew or had reason to know

15  Uber had the ability to control the drivers and (2) knew or should have known the necessity and

16  opportunity for exercising such control.[112] Uber also owed this duty because passengers were

17  helpless to adequately aid or protect themselves.[113]

18     364.    Plaintiffs specifically include claims based on negligent hiring, retention, and

19  supervision. Under those theories, Uber owed a duty to protect passengers from drivers

20  because:[114]

21        a.      Uber hired the drivers;

22        b.      Drivers were or became unfit to perform the work of driving for Uber; and

23        c.      Uber knew or should have known that the drivers were or became unfit and

24  that this unfitness created a particular risk to others.

---

[109] *See* Restatement (Second) of Torts § 317.

[110] *See* Restatement (Second) of Torts § 318.

[111] *See* Restatement (Second) of Torts § 319.

[112] *See* Restatement (Second) of Torts § 320.

[113] *See* Restatement (Second) of Torts § 324.

[114] *See, e.g.*, Restatement (Second) of Torts § 411.

365.    Uber breached its duty to Plaintiffs.

a.    Uber introduced a new form of transportation without taking any study of the evident risks or efforts to prevent them.

b.    Uber failed to adapt or improve its safety procedures.

c.    Uber marketed its product as one that would provide safety for passengers, lulling passengers into a false sense of security, and making it seem like a good option for vulnerable riders late at night.

d.    Uber failed to warn passengers of the risk of Uber rides.

e.    Uber failed to adequately vet prospective drivers.

i.    When hiring new drivers, Uber did not verify driver identities with biometric background checks. Uber did not correct for false negatives created by its name-based screening procedures. Uber did not provide industry-standard background checks that would provide the most comprehensive means of screening applicant drivers. Uber did not invest in continuous monitoring of its drivers and was not immediately alerted when one of its drivers is implicated in criminal acts.

ii.    Uber had no reasonable basis to believe Uber drivers were fit to drive vulnerable riders, particularly at night, and failed to use reasonable care in determining whether any given driver was fit for the task.

iii.    Uber knew or should have known both that the drivers were unfit, and that the unfitness of a driver created an unreasonable risk of harm to Uber's passengers.

f.    Uber endorsed or recommended drivers to passengers without adequate basis for doing so.

g.    Uber failed to create clear expectations and conduct training or otherwise exercise control over driver behavioral norms to make clear and effective that Uber was not a "hookup site."

h.    Uber failed to remove drivers from its platform who it knew posed a risk of sexual misconduct.

i.       Uber failed to respond appropriately to reports of driver misconduct, including for years letting drivers remain on the system until they had two or more reports of misconduct.

j.       Uber failed to establish and maintain an appropriate and robust system for receiving passenger complaints of sexual misconduct.

k.       Uber made it difficult for passengers to report sexual assaults, failed to conduct root cause analyses, and chose not to investigate, understand, or adopt evidence-based prevention options.

l.       Uber failed to provide technological tools to deter sexual assaults, including video monitoring.

m.       Uber failed to provide alerts to law enforcement when a driver veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination but GPS data indicates the passenger remains in the car for a significant period of time.

n.       Uber failed to cooperate with police with a driver assaults a passenger. Uber refused to release driver information to law enforcement absent a subpoena, discouraging police and prosecutors from investigating and prosecuting Uber drivers and providing Uber drivers with assurance that their illegal behavior will go unpunished.

o.       Uber failed to use the utmost care and vigilance to protect Plaintiffs from its own drivers who assaulted, harassed, or otherwise attacked Plaintiffs while they were being transported by Uber.

p.       Uber failed to take reasonable precautions to protect its vulnerable female riders and other passengers, including Plaintiffs, from the foreseeable and known risk of assault or harassment by its drivers. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of the sexual assault of its passengers, including Plaintiffs.

366.       As a proximate result of Uber's negligence, Plaintiffs were assaulted or harassed by Uber drivers and suffered psychological and physical harm.

367.    As a proximate result of Uber's negligence, Plaintiffs suffered economic and non-economic damages.

**C.    Fraud and Misrepresentation**

368.    Plaintiffs plead both claims for affirmative misrepresentation and misrepresentation by omission.

369.    Uber represented to Plaintiffs and the general public that safety was Uber's priority, and that Uber's goal was to provide a "safe ride."

370.    Uber made intentional misrepresentations of fact to all users of the Uber App.

371.    These statements were false when made.

372.    Uber failed to disclose the truth that Uber prioritized growth and driver supply over passenger safety.

373.    Uber failed to disclose the truth that Uber failed to adequately protect passengers against sexual assault or harassment committed by drivers.

374.    Uber had a duty to disclose the truth of its priorities and lack of adequate safety mechanisms.

a.    Uber had a duty to disclose because, as alleged above, it had a special relationship with the passengers.

b.    Uber had a duty to disclose because it had a special relationship with the drivers.

c.    Uber had a duty to disclosure because of its exclusive, superior knowledge.

d.    Uber had a duty to disclose due to its active concealment of the safety conditions of Uber rides.

e.    Uber had a duty to disclose because of the dangerous conditions of the Uber product.

f.    Uber had a duty to disclose because Uber made affirmative incomplete misrepresentations with knowledge of undisclosed facts that materially qualified the facts disclosed or rendered the disclosed facts likely to mislead.

375.    These representations and omissions regarding safety were made to Uber customers through various channels, including but not limited to: retail advertising, emails, social media, and Uber's own website, app store product placement, and Uber App.

376.    While the precise wording of different communications and advertising varied, Uber's messaging consistently presented and reinforced a unique selling proposition of a safe ride.

377.    Uber intended that its marketing proposition reach the widest possible audience, including every passenger, and especially including women and other vulnerable riders.

378.    Uber intended that every passenger rely on its safety marketing.

379.    Regardless of Uber's intent, it can be presumed that every Uber passenger, especially a vulnerable female passenger, assumes Uber is doing everything it can to provide a safe ride and relies on that assumption in deciding to use Uber's product.

380.    As a result of relying on Uber's misrepresentations and omissions, Plaintiffs were assaulted or harassed by Uber drivers, and suffered economic and non-economic damages.

**D.      Negligent Infliction of Emotional Distress**

381.    Plaintiffs incorporate all allegations pleaded under the Negligence claim.

382.    Each of the asserted duties owed by Uber included the duty to exercise reasonable care to avoid causing Plaintiffs emotional distress.

383.    In particular, Uber owed a duty because it had a special relationship with its passengers.

384.    Uber also owed a duty because it should have realized that its conduct involved an unreasonable risk of causing emotional distress and, from facts known to it, should have realized that the distress might result in illness or bodily harm.[115]

385.    As a proximate result of Uber's negligence, Plaintiffs were assaulted or harassed by Uber drivers and suffered severe emotional distress.

---

[115] *See* Restatement (Second) of Torts § 313.

E.   **Common Carrier's Non-Delegable Duty to Provide Safe Transportation [Certain States Only]**

386.   This claim is pleaded under the laws of every state **except**: **Arizona**, **Colorado**, **District of Columbia**, **Illinois** (for incidents prior to August 11, 2023), **Michigan**, **Montana** (for incidents prior to April 23, 2023), **New York**, **Pennsylvania**, **Wisconsin**, and **Wyoming**.

387.   This claim includes Uber's direct liability, for each breach of the duty to provide safe transportation, whether acts constituting the breach were committed by Uber or by its drivers.

388.   At the time Plaintiffs were sexually assaulted or harassed, Uber was a common carrier because it was, and held itself out to the public as, a business that undertook (whether directly or indirectly) to transport passengers by motor vehicle, and did in fact provide transportation by motor vehicle, offering these services to the general public indiscriminately and in exchange for compensation.

389.   Through a digital application made available to the general public, Uber connects passengers with its transportation network drivers to provide them with transportation, from place to place, for profit.

390.   Uber charges standard fees for its services through its application.

391.   Uber represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's transportation services.

392.   As a common carrier, Uber owes its passengers a heightened duty of care. Uber owes a duty to employ the utmost degree of care, skill, judgment, and diligence that would be expected of a very cautious company. And Uber has a duty to do all that care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiffs. Uber also owes a duty to keep its passengers safe from misconduct (including any sexual misconduct) during its rides, especially from its participating drivers.

393.     As a common carrier, Uber has an implied contract with its passengers to carry them safely to their destination and to protect them against sexual misconduct during that carriage.

394.     As a common carrier, Uber has a non-delegable duty to protect its passengers against harm including sexual assault.

395.     A common carrier may contract out the performance of its non-delegable duty but may not contract out its ultimate legal responsibility. Thus, although Uber may transfer the task of transporting its passengers to a contractor, it may not thereby shift its duty to transport its passengers safely.

396.      When Uber's drivers engaged in sexual misconduct toward Plaintiffs, this was a breach of Uber's non-delegable duty, as a common carrier, to safely transport Plaintiffs.

397.     When Uber's drivers engaged in sexual misconduct toward Plaintiffs, this was a breach of Uber's implied warranty of safe carriage.

398.     When Uber's drivers engaged in sexual misconduct toward Plaintiffs, this meant that Uber had failed in its duty to keep Plaintiffs safe and protect them against sexual misconduct.

399.     As a legal and proximate result of Uber's actions and omissions, Plaintiffs were assaulted, battered, harassed, or otherwise attacked by Uber drivers, which humiliated, degraded, violated, and robbed Plaintiffs of their sense of dignity and personal safety. The attacks on Plaintiffs caused Plaintiffs to suffer physical or psychological harm.

400.     As a direct and proximate result of Uber's breach of its duty of care as a common carrier, Plaintiffs suffered economic and non-economic damages.

**F.     Other Non-Delegable Duties to Provide Safe Transportation [Certain States Only]**

401.     This claim, which is premised on Uber's non-delegable duties that do not arise from its status as a common carrier, is pleaded under the laws of every state **except**: **District of Columbia**, **Michigan**, **New York,** and **Pennsylvania**.

402.     This claim includes liability for each breach of Uber's non-delegable duty to provide safe transportation, whether acts constituting the breach were committed by Uber or by its drivers.

403.     Uber's non-delegable duties are grounded on two independent bases: (1) its own representations to the public, voluntarily undertaking to provide safe transportation; and (2) the nature of its business.

404.     Uber holds itself out to the public as providing safe transportation. Riders reasonably believe that, when they request an Uber, they are receiving transportation from Uber. Thus, Uber has a non-delegable duty to supply safe transportation, just as if Uber were supplying that transportation itself, whether or not it in fact engages independent contractors to provide that transportation.[116]

405.     Uber, by transporting persons, including intoxicated persons, in an isolated setting in private vehicles driven by random individuals unknown to Uber, was engaged in work involving a special danger of sexual misconduct, which Uber knew or should have known was inherent in the transportation business it operated, and which Uber should have contemplated when agreeing to transport passengers. Thus, Uber has a non-delegable duty to protect passengers against the danger of sexual misconduct, and Uber is liable for the failure of its drivers to protect against this danger, and for their active and intentional breach of Uber's duty of protection.[117]

406.     Uber, by transporting persons, including intoxicated persons, in an isolated setting in private vehicles driven by random individuals unknown to Uber, was engaged in an abnormally dangerous activity. Uber knew or should have known that this was an abnormally dangerous activity. Thus, Uber has a non-delegable duty to protect its passengers against the dangers of such transportation, including sexual assault. Uber is thus subject to liability to the same extent as a driver is for physical harm caused by sexual assault during transportation.[118]

---

[116] Restatement (Second) of Torts § 429

[117] Restatement (Second) of Torts § 427 (Negligence as to Danger Inherent in the Work).

[118] Restatement (Second) of Torts § 427A (Work Involving Abnormally Dangerous Activity).

407.     Uber, which transports persons for profit in private vehicles, was and is engaged in a type of activity that Uber should have known would likely create a peculiar risk of physical harm to others in the absence of special precautions. As such, Uber owed to its passengers a non-delegable duty to see that its drivers used such precautions.[119]

408.     Uber has been granted state and local authority (in the form of licenses, franchises, and charters) to do business as a transportation network company, and it can only carry out its business and offer transportation services pursuant to this authority. By regulation, it can only carry out its transportation business under its proprietary UBER trademark. Uber's drivers are non-professional drivers who cannot lawfully offer transportation services except under the grant of authority to Uber and using Uber's trademark. Uber's transportation business carries an unreasonable risk of harm to others. As such, Uber owes passengers a non-delegable duty and is subject to liability for physical harm caused to others by the negligence of drivers who operate under the authority granted to Uber, and using Uber's trademark.[120]

409.     Uber, which offers transportation to the public and creates a public digital environment for that purpose, was engaged in work that unless carefully done involved a risk of making this environment unsafe for use by members of the public. As such, Uber owed a non-delegable duty to keep its transportation environment safe for riders' use.[121]

410.     Statutes and regulations require that Uber use specific safeguards and precautions for the safety of its passengers. As such, Uber owed to its passengers a non-delegable duty to provide those safeguards and precautions.[122]

411.     Uber was and is engaged in transportation activities that are illegal unless licensed. As such, Uber owed to its passengers a non-delegable duty to see that due care was used in their protection.

---

[119] Restatement (Second) of Torts § 416 (Work Dangerous in Absence of Special Precautions).

[120] Restatement (Second) of Torts § 428 (Contractor's Negligence in Doing Work Which Cannot Lawfully be Done Except Under a Franchise Granted to His Employer).

[121] Restatement (Second) of Torts § 417 (Work Done in a Public Place).

[122] Restatement (Second) of Torts § 424 (Precautions Required by Statute or Regulation).

412.     Uber contracts with passengers to provide them with rides, and its drivers carry Uber's passengers pursuant to the contract between Uber and the passenger. As such, Uber owed to its passengers a non-delegable duty to see that due care was used in their protection.

413.     Uber owed to its passengers a non-delegable duty to see that due care was used in their protection, including in protecting them against sexual assaults. This was the type of duty that, even if Uber contracted its performance to an agent, employee, or third party, Uber would be subject to liability for the failure of such agent, employee, or third party to perform the duty.[123]

414.     A business that has a non-delegable duty may contract out the performance of the non-delegable duty but may not contract out its ultimate legal responsibility. Thus, although Uber may transfer the task of transporting its passengers to a contractor, it may not thereby shift its duty to transport its passengers safely.

415.     Uber failed to safely transport Plaintiffs.

416.     As a legal and proximate result of the breach of Uber's non-delegable duty to safely transport its passengers and protect them from sexual assault, Plaintiffs were assaulted, battered, harassed, or otherwise attacked by Uber drivers, which humiliated, degraded, violated, and robbed Plaintiffs of their sense of dignity and personal safety. The attacks on Plaintiffs caused Plaintiffs to suffer physical or psychological harm.

417.     As a direct and proximate result of Uber's breach of its non-delegable duties, Plaintiffs suffered economic and non-economic damages.

**G.     Vicarious Liability for Drivers' Torts (Employee, Retained Control, Apparent Agency, Ratification, California Public Utilities Code)**

418.     Uber is vicariously liable for the negligence and intentional torts—including but not limited to assault, battery, rape, false imprisonment, and intentional infliction of emotional distress—committed by drivers.

---

[123] Restatement (Second) of Agency § 214.

1

        **1.**    **Employee [Certain States Only]**

2

419.    This claim is pleaded under the laws of every state and territory **except**: **District of**

3

**Columbia, Connecticut**, **Michigan**, **Nevada**, **New York, Oklahoma**, **Pennsylvania, Tennessee**,

4

**Texas**, **Utah**, **West Virginia**, and **Wyoming**.

5

420.    Under the doctrine of respondeat superior, Uber is responsible for the torts of its

6

employees committed within the scope of employment, connected with acts otherwise within the

7

scope of employment, in furtherance of Uber's business, necessary to accomplish the purpose of

8

employment or authorized by Uber. The modern rationale for the theory is that an employer who

9

profits from an enterprise which, through the torts of his employees, causes harm to others should

10

bear the costs of the injury instead of the innocent injured Plaintiffs.

11

421.    Uber profits from transporting vulnerable passengers. Uber encourages female

12

passengers to use its services. At the same time, Uber does not take reasonable steps to protect its

13

passengers or warn them of the dangers of riding with Uber. Uber should bear the costs of injuries

14

that result from torts such as assault and harassment, rather than the victims of Uber's negligence,

15

willful wrongdoing, and intentional omissions made at the expense of passenger safety.

16

422.    Uber drivers are employees and agents of Uber. Uber reserves the right to control

17

the activities of Uber drivers. Uber controls the prices charged to customers, controls contact with

18

the customer base, controls the ability of drivers to see where they will be driving before they

19

accept a ride, and reserves the right to terminate drivers with or without cause.

20

423.    Uber retains and in fact exercises overwhelming control over its drivers.

21

        a.    Uber controls the App which all drivers must use to receive, accept, and

22

complete rides with passengers.

23

        b.    Uber sets the fare prices, including additional fees and costs imposed on

24

the passenger, any opportunity for bonus and incentive payments to the driver, and any

25

promotional offers or discounts for the passenger.

26

        c.    Uber retains control over primary passenger contact and full control over

27

the passenger's contact information via the App.

28

d.      Uber monitors the driver's route and determines fees and costs for any modification or cancellations, including provisions related to driver deviations or delays (which may result in modified charges and notices to the passenger), and instructing drivers on where to pick up and drop off passengers in relation to their destination.

e.      Uber retains the right to terminate drivers at will and impose disciplinary actions if drivers fail to comply with Uber's rules.

f.      Uber imposes a code of conduct on drivers, including requiring drivers to dress professionally and limiting the number of times a driver may contact a passenger.

g.      Uber instructs drivers on how to maintain and operate their vehicle during an Uber ride.

h.      Uber maintains the driver rating system, which displays the average star rating for each driver.

i.      Uber maintains customer service support where customers can report driver-related complaints.

j.      Uber drivers do not require any specialized skills or training.

k.      Uber drivers' job duties of driving passengers to and from destinations is the essential core of Uber's business.

l.      The assault, harassment, or other attacks Plaintiffs suffered were perpetrated by the Uber drivers within the scope of their employment and authority. The assault or harassment of intoxicated and unaccompanied women or other vulnerable individuals who have been placed in an improperly screened Uber drivers' car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

424.    Uber drivers' torts occurred within the scope of their employment.

a.      The conduct took place during, or was precipitated by, Uber trips.

b.      The conduct directly grew out of and was aided by the employment.

c.      The conduct was accomplished using the instrumentalities of the employment.

1           d.       The conduct was not unexpected but, instead, a predictable risk created by

2 the employment.

3           e.       The conduct arose out of a core and indispensable part of Uber's

4 employment arrangement and requirements: the drivers' mandate and ability to restrict the

5 passengers' freedom of movement.

6           f.       The conduct was motivated, at least in part, by a purpose to serve the

7 employer, because the conduct included luring riders into the vehicle and confining them there.

8           g.       Drivers were able to initiate contact with passengers and obtain passengers'

9 locations through the Uber app, which were only accessible to drivers through their employment

10 with Uber.

11           h.       Drivers lured passengers into their vehicles using their status as screened

12 and trusted Uber drivers, and passengers initiated and engaged in these rides under the mistaken

13 belief that Uber had properly screened and supervised its driver.

14           i.       Drivers' employment with Uber placed them in positions of power over

15 passengers and in each case, the drivers leveraged their status as Uber drivers to further the

16 assault, including, in some cases, physical entrapment of passengers in vehicles, threats of unpaid

17 fares, and refusal to complete rides.

18           j.       Uber passengers are placed in highly vulnerable positions. Passengers are

19 in close proximity to drivers without the ability to control their surroundings or escape from the

20 physical confines of drivers' vehicles. Passengers relinquish their autonomy and the control over

21 their own safety and well-being to Uber drivers, who Uber represents as screened, safe, and

22 trusted. This vulnerability is exacerbated for intoxicated passengers, to whom Uber specifically

23 markets. The power imbalance created by the driver-passenger relationship and Uber's

24 representations to passengers create the risk of abuse.

25           k.       Sexual assaults are further predictable because, for over a decade, Uber has

26 known that drivers were sexually assaulting passengers.

27           l.       The assaults are neither unusual nor unforeseeable, such that it would be

28 unfair to include resulting losses from the costs of Uber's business. Thus, holding Uber liable

1   would promote the states' public interest and policy goals of preventing future sexual assault

2   injuries and assuring compensation to victims.

3        m.      Policy rationales underlying vicarious liability indicate the acts occurred

4   within the scope of employment, in that Uber's business model was solely the provision of

5   passenger transportation and, but for that transportation and the reliance on Uber's reputation and

6   safety, passengers would not have engaged with and gotten into the cars of Uber drivers.

7        425.    In states **except Arizona, Colorado**, **District of Columbia**, **Illinois** (for incidents

8   prior to August 11, 2023), **Michigan**, **Montana** (for incidents prior to April 23, 2023), **New**

9   **York**, **Pennsylvania**, **Wisconsin**, and **Wyoming**, any requirement that a tort be committed within

10  the scope of employment does not apply because Uber is a common carrier that owes its

11  passengers a non-delegable duty to protect them from sexual misconduct in connection with

12  Uber's transportation of them. As such, Uber is vicariously liable for a sexual assault upon a

13  passenger by one of its employees whether or not the sexual assault was beyond the scope of

14  employment.[124]

15       426.    In states **except District of Columbia**, **Michigan**, **New York,** and **Pennsylvania**,

16  any requirement that a tort be committed within the scope of employment does not apply because

17  the drivers' torts were a breach of Uber's non-delegable duties other than those that arise from its

18  status as a common carrier.

19                         **2.     Apparent Agency**

20       427.    Uber is vicariously liable for the acts of its drivers under the theory of apparent

21  agency.

22       428.    Uber, through its words and conduct, represented that Uber drivers were its agents

23  or employees and that they had the authority to, on Uber's behalf, provide safe transportation.

24       429.    Uber passengers, including Plaintiffs, look at the Uber institution rather than its

25  individual drivers to provide transportation services, and Uber holds these drivers out to

26  passengers as agents of Uber.

27

28

---

[124] 66 A.L.R.7th Art. 2 (Originally published in 2021).

430.     Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people at the company with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide—safe transportation.

431.     By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including the Uber driver at issue here, were Uber's employees or agents. Uber holds its drivers to third parties, including passengers and Plaintiffs, as having authority to act on behalf of Uber, or causes third parties, including passengers and Plaintiffs, to reasonably believe that its drivers have authority as agents or employees of Uber.

432.     Given Uber's representations and undertaking, Uber is estopped from maintaining now that passenger safety was the responsibility of Uber drivers, and that Uber has no connection with nor accountability for what befell Uber's passengers that it delivered into the hands of ill-intentioned drivers.

433.     Plaintiffs justifiably relied on Uber's express and implied representations to their detriment, i.e., they entered a vehicle with an Uber driver believing that the Uber driver was an employee or agent of Uber, and that Uber had adequately screened, supervised, and retained the driver.

434.     Uber's words and conduct leading to the appearance of agency for Uber drivers include but are not limited to:

a.     Uber requires that all Uber rides be initiated, modified, and cancelled through the Uber App.

b.     Uber requires Uber drivers to have an Uber logo prominently displayed in the vehicle.

c.     Uber maintains control of all payments, communications, and complaints regarding the Uber ride.

d.     At no point during the request for, course, or completion of a ride does Uber disavow an employee/agent relationship with the Uber driver.

e.     Uber requires all passengers who wish to engage with an Uber driver to agree to the Uber terms of service.

435.     The scope of the apparent agency extends to any failure on the part of the driver to provide safe transportation, including intentional acts of sexual misconduct.

### 3.     Ratification

436.     Uber is vicariously liable for the acts of its drivers under the theory of ratification.

437.     As alleged above, despite being aware of the scope and scale of sexual assaults perpetrated by Uber drivers throughout the United States, Uber intentionally normalized hitchhiking, falsely marketed its rides as safe, and repeatedly failed to take adequate measures to redress the issue.

438.     Among other acts and omissions, Uber failed to respond adequately to reports of sexual misconduct, failed to adequately investigate reports of sexual misconduct, failed to report sexual misconduct to law enforcement, and reinstated drivers after complaints of sexual misconduct.

439.     Uber's conduct amounts to ratification of the torts committed by the drivers.

### 4.     California Public Utilities Code § 535

440.     Uber is vicariously liable for the acts of its drivers by statute.

441.     Uber is a transportation network company subject to California Public Utilities Code § 5354.

442.     Section 5354 provides, in relevant part, that that the "act, omission, or failure of any . . . person offering to afford the authorized service [transportation] with the approval or consent of the permit or certificate holder [Uber] is the act, omission, or failure of the permit or certificate holder [Uber]."

443.     Uber drivers are persons offering to afford the transportation service with the approval and consent of Uber.

444.     Uber was, at all relevant times, a permit or certificate holder subject to § 5354.

### H.     Strict Products Liability (Failure to Warn and Design Defect)

445.     Uber manufactures, designs, sells, markets, advertises, labels, and makes available in the stream of commerce the Uber App, which is a self-contained computer program or software package that runs inside of an operating system.

446.     Users or consumers download the Uber App from a distribution source, such as the Apple Store. Users may download either (or both) the passenger version of the Uber App or the driver version of the Uber App. Regardless of which "version" of the Uber App a person purchases, downloads, or uses, it is connected to the same backend technology infrastructure that includes, but is not limited to, Uber's algorithms, data, and physical hardware. The passenger version of the Uber App, driver version of the Uber App, and Uber's backend technology infrastructure "communicate" and work together to facilitate the exchange of data, "match" passengers and drivers using different versions of the app, transmit payments, obtain and store "ratings" for drivers and passengers, and perform other functionalities as developed, implemented, updated, modified, or controlled by Uber.

447.     When end users or consumers download the driver or passenger version of the Uber App onto their mobile devices, they download a computer program or software package which then must be installed on their mobile device, in much the same way that individuals who purchase the Microsoft Office software package either download the software to install it or install it off of a disk onto their computers.

448.     When end users or consumers who have installed the Uber App on their mobile devices open the Uber App, they are interacting with the user interface on the "frontend." The frontend includes visual elements (for example, buttons, check boxes, and text in natural language). The frontend or user interface is what allows end consumers to actually interact with the Uber application and to make financial transactions through it. That is, this is the point of human-computer interaction. Each and every feature that end users or consumers interact with on the front end is directly and necessarily controlled by Uber's physical servers (its backend technology infrastructure and technical specifications). The backend infrastructure is what actually makes the Uber App work and has, at all relevant times, included identifiable, tangible elements, including but not limited to physical servers located at data centers around the country.

449.     Every feature of the Uber App was designed, developed, implemented, and controlled exclusively by Uber.

450. Unlike social media platforms, the Uber App does not consist of user-controlled content.

451. The features and functionality of the Uber App, including but not limited to all aspects of the user interface and all subsurface algorithms and coding, were designed, developed, implemented, coded, and controlled by Uber.

452. Uber makes all decisions regarding the technical specifications and design of the Uber App, including but not limited to the user interface and subsurface algorithms and coding that operate as part of Uber's backend infrastructure.

453. Uber controls who, when, and how the Uber App is used and exercises this control through the features and functionalities of the app which were designed, developed, coded, and implemented by Uber.

454. For example, Uber is in complete control of which drivers get matched with which passengers and whether passengers and drivers may use the app.

455. Uber also has complete control over the text of all communications sent to drivers or passengers who contact Uber for support of any kind.

456. Uber also sets rates which are charged for each ride and further sets the amount drivers earn for each ride.

457. Uber retains complete control over modifications, updates, and bug fixes to the code or algorithm that are released for the Uber App. As with traditional software packages, end users or consumers must download and install updates to the Uber App software when they are released.

458. Uber made design, guarding, and warning choices which have affected the experience of end users of the Uber App by developing, updating, or modifying its technology infrastructure to develop, update, or modify the Uber App or features of the Uber App that are available to end consumers, including Plaintiffs on the user interface. Specifically, Uber has controlled what features, including but not limited to buttons, information sharing, or camera usage, are involved in the end user experience of the Uber app.

459.    Uber controlled the user experience for end users of the Uber App (both drivers and passengers), by developing, updating, and modifying its technology infrastructure on the backend, to develop, update, or modify the Uber App and or features of the Uber App that are available to end consumers, including Plaintiffs, on the user interface. Specifically, Uber has controlled what features, including but not limited to buttons, choices, information sharing, or camera usage, are involved in the end user experience of the Uber app.

460.    Uber made decisions about and controlled all text that appears when end users access the Uber App or Uber website, by developing, updating, or modifying its technology infrastructure on the backend, to develop, update, or modify the Uber App and or website. Specifically, Uber made decisions about what statements, representations, or warnings, if any, would or would not appear in natural language on the frontend of the Uber App or Uber website that end consumers, including Plaintiffs, interact with.

461.    Uber made decisions concerning the use of its algorithms, which on information and belief it considers proprietary to it, and which it developed using programming language. Uber's algorithms operate on the backend of Uber's technology infrastructure and utilize data to "match" riders and drivers. Uber has at all times been responsible for the development, updating, and modification of its algorithm, which directly affects or affected the experience of end users, including Plaintiffs, interacting with the Uber app.

462.    Uber made design choices that defined the experience of end users of the Uber app, by developing, updating, or modifying its technology infrastructure on the backend, to develop, update, or modify the Uber App and or features of the Uber App that control the use and experience of end users including riders and drivers. This includes but is not limited to features related to Uber's "rating" system by which users, at the completion of the ride interact with the Uber App interface to select a rating from one to five stars for the rider or driver and the reporting system, by which users can use their keyboards to submit complaints or reports to Uber in natural language. This data is then transmitted to Uber's servers at various locations and used, among other things, for future matching purposes.

463.   Uber facilitated the exchange of data and information between the user interface of the driver or rider versions of the Uber App and its backend technology infrastructure.

464.   As the designer of a product, Uber had the duty to conduct a hazard analysis to identify risks associated with its product and then to mitigate those risks in accordance with industry standards for severity and frequency, among other things.

465.   Specifically, as the designer of a product, Uber had a duty to control for risks in accordance with the design hierarchy by (1) designing away the risks; (2) guard against any risks that cannot be designed out; and (3) warn against any risks that could not be designed away or guarded against.

466.   Uber did not conduct an adequate hazard analysis and did not adequately control for risks associated with its product.

467.   It was reasonably foreseeable to Uber, as the designer of the Uber App, that end users or consumers were at risk of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

468.   However, Uber failed to design away the risks of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

469.   Uber has publicly acknowledged that thousands of passengers and drivers have been sexually assaulted or harassed while using the Uber app.

470.   As discussed above, the exact number of sexual assaults is unknown due to underreporting and Uber's failure to disclose the true number of sexual assaults reported to it.

471.   Uber also failed to mitigate the risks of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

472.   Specifically, Uber failed to design away the risks associated with using its app by, among other things, failing to provide and require the installation of dash cameras in each vehicle used by drivers and failing to provide other audio or video monitoring of rides.

473.   Uber similarly failed to guard against the risk of risks of sexual harassment, assault, kidnapping, or other sexual misconduct by, among other things,

a.      Failing to design an effective safety-focused reporting system to capture safety data so it could be acted on;

b.      Failing to permit passengers to select drivers of the same gender;

c.      Failing to enact and appropriately enforce a zero tolerance policy toward drivers with a history of inappropriate behavior;

d.      Failing to appropriately monitor rides to detect known patterns of sexual assault, harassment, kidnapping or other forms of sexual assault, including but not limited to using existing GPS and predictive technology to monitor and respond to route deviations or drivers spending excessive time with passengers at the start or end of a route;

e.      Failing to offer timely support during unsafe rides; and

f.      Failing to add appropriate background checks before and after allowing drivers onto the app, including but not limited to biometric screening.

474.    Further, Uber failed to provide adequate warnings to users of its app by failing to warn them to the actual risk of sexual harassment, assault, kidnapping, or other sexual misconduct.

475.    As a result, Uber passengers were unable to make an informed decision about whether to use Uber.

476.    Instead of warning users that they faced a risk of sexual misconduct, Uber instead represented that it provided a "safe" ride and that safety was designed into its product. Thus, users did not know the true risk of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

### 1.      **Design Defect**

477.    At all relevant times, Uber manufactured, designed, marketed, advertised, labeled, produced, sold, and made available in the stream of commerce the Uber application.

478.    Customers, including Plaintiffs, purchased or downloaded the Uber application from app stores on their devices, including but not limited to the Apple Store or Google Play Store.

479.    The Uber application was in a defective condition unreasonably dangerous to users or consumers, including Plaintiffs.

480.    Uber was engaged in the business of manufacturing, designing, producing, marketing, advertising, labeling, selling, and making the Uber application available to the public as a product in the stream of commerce.

481.    As the designer of the Uber app, Uber has superior knowledge and was in the best position to understand the risks and hazards associated with the product. The risks associated with using the Uber application that form the subject of this Complaint were largely unknown to Uber passengers, and Uber passengers relied upon Uber and its superior knowledge when they decided to use the Uber application to obtain rides.

482.    The Uber application was expected to and did reach the end users without substantial change in its condition. The end users were members of the public, including Plaintiffs, who interacted with the interface of the Uber application to obtain rides as passengers.

483.    The Uber application was dangerous to an extent beyond that contemplated by the ordinary consumer who purchases or downloads it.

484.    The Uber application created a risk of harm to persons that was not ordinarily expected by users or consumers, including Plaintiffs. Specifically, users and consumers were at a risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct while using the Uber App and the risk of this harm was not expected by the ordinary user or consumer of the Uber application.

485.    The risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct against users or consumers was not reasonably foreseeable to the ordinary user or consumer, including Plaintiffs.

486.    The ordinary user or consumer could not know the risk of sexual harassment, sexual assault, kidnapping, or sexual misconduct that users of the Uber App face because, as set forth above, Uber does not notify law enforcement when it receives reports of sexual harassment, sexual assault, kidnapping, or other sexual misconduct involving the Uber app; Uber's own Safety Reports, published only for limited time periods, provide data on just five of twenty-one

categories of sexual misconduct; and Uber has, since its inception, marketed itself as the provider of a "safe" ride and as a company with adequate safety features for passengers, including Plaintiffs.

487.    The foreseeable risks of harm posed by the Uber app, including sexual harassment, sexual assault, kidnapping, or other forms of sexual misconduct, could have been reduced or avoided by the adoption of a reasonably alternative design by Uber, as set forth in the preceding paragraphs.

a.    The Uber App was designed to operate on smartphones which are equipped with cameras and microphones. Numerous other mobile applications interact with the smartphone's preexisting hardware to operate cameras or microphones in conjunction with use of the application (for example, Snapchat, Instagram). This technology is not only available, but widely used and could be adopted as part of Uber's technology infrastructure. Alternatively, when individuals sign up to drive with Uber, the driver version of the Uber App includes a feature to have a camera shipped directly to the driver's home address; this same feature could be used to ship dash cameras to drivers.

b.    The Uber App included GPS tracking technology which is used to monitor the exact location of drivers and predict the time it takes them to reach their destination. Uber also has safety alert features, but these features require affirmative action to be triggered by a user, which is often not possible in the context of sexual assaults or kidnapping. Uber need only utilize its existing GPS, alert, and predictive technology to implement a feature whereby safety alerts are triggered in the event of route deviations or excessive time spent with a passenger at the beginning or end of a route.

c.    The Uber App was been designed to operate on smartphones which are equipped with touchscreens. Various mobile applications, including, for example, password manager applications, utilize biometric features for security purposes. Additionally, many mobile phones use biometric features, including fingerprints or facial recognition, to unlock the phone. Thus, the technology to obtain biometric data from a driver's mobile phone itself—at minimal cost to Uber—already exists and has been implemented in other contexts.

488.    Implementation of reasonable and feasible alternative designs would not impair the usefulness of the Uber application or affect the cost to Uber.

a.    Uber already tracks its drivers in order to match them with passengers and, during the duration of the route, as they transport passengers to ensure that drivers are taking the most efficient route. These steps are done to maximize Uber's profits. Tracking drivers to ensure that they do not remain with passengers for excessive periods of time after the conclusion of a route or that they do not divert from a planned route with a passenger would better protect users and consumers while utilizing existing technology.

b.    Uber already employs a matching algorithm designed to connect passengers and drivers. The algorithm accounts for the distance between prospective passengers and drivers and whether the passenger has given the driver a one-star rating in the past. The addition of an option to allow female passengers to select female drivers would not require substantial modification of the existing algorithm.

c.    The collection of biometric information on the driver version of the Uber application would not impair its usefulness or add additional cost, because the application would function in much the same way with regard to the arrangement of rides. Additionally, by using functionality already existing on smartphones, the additional cost, if any, would be minimal.

489.    The Uber App was designed, maintained, and updated by large teams of data scientists, user experience researchers, and similar professionals and includes subsurface algorithms and systems and complex code. Many product features, including but not limited to the inner workings of Uber's algorithms, are unobservable on the frontend. Discovery will reveal additional detail about the defects to the functionalities of the features of the product.

490.    As a proximate result of Uber's acts and omissions, Plaintiffs suffered both economic and non-economic damage.

## 2.    Failure to Warn

491.    At all relevant times, Uber manufactured, designed, produced, marketed, advertised, labeled, sold, and made available in the stream of commerce the Uber application.

492.   Customers, including Plaintiffs, purchased or downloaded the Uber application from "app stores" on their devices, including but not limited to the Apple Store or Google Play Store.

493.   The Uber application was in a defective condition unreasonably dangerous to users or consumers, including Plaintiffs.

494.   Uber was engaged in the business of manufacturing, designing, producing, selling, and making the Uber application available to the public as a product in the stream of commerce.

495.   The Uber application was expected to and did reach the end users without substantial change in its condition. The end users were members of the public, including Plaintiffs, who interacted with the interface of the Uber application to obtain rides as passengers.

496.   Uber had a duty to warn users and consumers, including Plaintiffs, that using the Uber App in the ordinary, customary, and reasonably foreseeable manner posed a danger to users and consumers. Specifically, Uber had a duty to warn users and consumers that when using the Uber App or interacting with the Uber App interface, users were in danger of sexual harassment, sexual assault, kidnapping, or other sexual misconduct.

497.   Uber had a duty to warn users and consumers that the features of the Uber App posed a risk of harm to users and consumers, including Plaintiffs, who used the Uber App in a reasonably foreseeable manner. For example:

a.   Uber had a duty to warn users including Plaintiffs that the matching algorithm could pair passengers with drivers who had a criminal history; a history of receiving low- or no-star ratings from passengers; or a history of being the subject of reports or complaints from passengers.

b.   Uber had a duty to warn users including Plaintiffs that the GPS tracking and predictive features, including the exchange of data between the frontend of the user interface and the backend of Uber's technology interface, did not include any feature to alert Uber or law-enforcement in the event that an Uber driver deviated from the predicted or planned route or spent excessive time with a passenger at the beginning or end of a route.

c.      Uber had a duty to warn users including Plaintiffs that when interacting with the interface of the Uber app, including but not limited to the use of buttons and screens to order a ride, which in turn resulted in an exchange of information and data on the backend of Uber's technology infrastructure, Uber may transmit their location to individuals who posed a risk of harm, including sexual harassment, sexual assault, kidnapping, or other sexual misconduct.

d.      Uber had a duty to warn users and consumers including Plaintiffs that they were at a risk of being sexually harassed, sexually assaulted, kidnapped, or subjected to other sexual misconduct when using the Uber App or otherwise interacting with the user interface of the Uber app.

498.    Uber failed to provide any warning to the users and consumers of the Uber app, including Plaintiffs, regarding the risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct. In particular, Uber failed to provide any warning of the risks, detailed in the preceding paragraphs, that users and consumers including Plaintiffs faced while using the Uber App or otherwise interacting with its user interface.

499.    To the extent Uber can be construed to have provided any warning regarding the risks described in the preceding paragraphs, the warning was inadequate.

500.    To the extent Uber can be construed to have provided any warning regarding the risks described in the preceding paragraphs, the warning was mitigated by Uber's representations that Uber prioritized the safety of users and consumers, including Plaintiffs, "designed" safety into the user experience, and provided a "safe" ride.

501.    The breach of Uber's duty to warn users and consumers of the risks detailed in the preceding paragraphs proximately caused Plaintiffs' injuries.

502.    Specifically, because Uber failed to warn Plaintiffs that they were at risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct when using the Uber App or interacting with the Uber app's user interface, Plaintiffs used the Uber App and were sexually harassed, sexually assaulted, kidnapped, or otherwise subjected to sexual misconduct.

503.    Had Uber warned users and consumers, including Plaintiffs, of the risks detailed in the preceding paragraphs associated with use of the Uber App and interaction with the Uber user

interface, Plaintiffs (or the third parties that required Plaintiffs to use the Uber App) would not have used the Uber App.

504.    As a direct and proximate result of Uber's failure to provide adequate warnings, plaintiffs have suffered physical and emotional damages.

### 3.    Product Liability Acts

505.    To the extent any claims above are subsumed by state product liability statutes, Plaintiffs assert all design defect and failure-to-warn claims authorized by those statutes.

### I.    Unfair Competition Law (Cal. Bus. & Prof. Code §v 17200 et seq.)

506.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business acts or practices."

507.    Uber's conduct was unlawful because it violated Uber's common law duties of care.

508.    Uber's conduct was unfair because it was unscrupulous, contrary to public policy, and presented a serious risk of harm to persons Uber was responsible for protecting.

509.    Uber's conduct was fraudulent because it was grounded in Uber's representations that it would protect its passengers' safety.

510.    Uber's conduct was grounded in unfair competition because the company enjoys a competitive advantage by not adequately protecting its passengers.

511.    Plaintiffs have suffered injury in fact and have lost money or property as a result of Uber's unfair competition. Lost money or property includes money spent on rides falsely promoted as safe, "Safe Ride" fees, and other economic damages.

512.    Uber's conduct is ongoing.

513.    Plaintiffs seek appropriate injunctive relief to prevent future unfair competition.

### X.    Prayer for Relief

Plaintiffs respectfully request the following relief:

- Entry of judgment in their favor;
- Economic compensatory damages;
- Non-economic compensatory damages;

1      • Punitive and exemplary damages;

2      • Attorneys' fees and costs;

3      • Pre-judgment and post-judgment interest;

4      • Appropriate declaratory, injunctive, and equitable relief; and

5      • Such other and further relief the Court may deem proper.

6  **XI.   <u>Jury Demand</u>**

7      Plaintiffs demand a trial by jury on all issues so triable, and a bench trial on any issues or

8  claims not so triable.

1

2

3    Dated: February 15, 2024                        Respectfully submitted,

4

5                                                    By: */s/ Sarah R. London*
                                                         Sarah R. London (SBN
6                                                        267083)

7                                                    **LIEFF CABRASER HEIMANN &
                                                     BERNSTEIN, LLP**
8                                                    275 Battery Street, 29th Floor
                                                     San Francisco, CA 94111-3339
                                                     Telephone: (415) 956-1000
9                                                    Facsimile: (415) 956-1008
                                                     slondon@lchb.com
10

11                                                   By: */s/ Rachel B. Abrams*
                                                         Rachel B. Abrams (SBN
12                                                       209316)

13                                                   **PEIFFER WOLF CARR KANE
                                                     CONWAY & WISE, LLP**
14                                                   555 Montgomery Street, Suite 820
                                                     San Francisco, CA 94111
15                                                   Telephone: (415) 426-5641
                                                     Facsimile: (415) 840-9435
16                                                   rabrams@peifferwolf.com

17
                                                     By: */s/ Roopal P. Luhana*
18                                                       Roopal P. Luhana

19                                                   **CHAFFIN LUHANA LLP**
                                                     600 Third Avenue, 12th Floor
20                                                   New York, NY 10016
                                                     Telephone: (888) 480-1123
21                                                   Facsimile: (888) 499-1123
                                                     luhana@chaffinluhana.com
22
                                                     *Co-Lead Counsel*
23

24

25

26

27

28