# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Lisa J. Cisneros, Magistrate Judge

IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION ) No. 3:23-MD-03084-CRB

San Francisco, California
Monday, January 8, 2024

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 12:32 - 1:25 = 53 MINUTES

APPEARANCES:

For Plaintiffs:

Chaffin Luhana, LLP
600 Third Avenue, 12th Floor
New York, New York 10016
BY: ROOPAL P. LUHANA, ESQ.

Peiffer Wolf Carr Kane Conway & Wise, LLP
555 Montgomery Street
Suite 820
San Francisco, California 94111
BY: RACHEL B. ABRAMS, ESQ.

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street
29th Floor
San Francisco, California 94111
BY: SARAH R. LONDON, ESQ.

Transcribed by: Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Monday, January 8, 2024 12:32 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: We are calling civil matter 23-MD-03084, In Re: Uber Technologies, Inc.

Counsel, will you please state your appearances for the record, beginning with Plaintiff's counsel.

MS. LUHANA (via Zoom): Good afternoon, Judge Cisneros. Roop Luhana for the Plaintiffs.

MS. LONDON (via Zoom): Sarah London for the Plaintiffs.

THE COURT: Ms. Abrams, you're on mute.

MS. ABRAMS (via Zoom): Yes. I apologize. Good afternoon, your Honor. Rachel Abrams for the Plaintiffs.

MR. ATKINS (via Zoom): Robert Atkins with Kyle Smith for Uber.

THE COURT: Okay. Thanks, everyone for -- for being here today. I think that we can just jump right into this. I've read all your papers and looked at the history of the -- the dispute, including the filing that was -- came in today concerning some disclosures that Defendants made on January 4th.

I guess to start with, I wanted to find out exactly what's still at issue. So, I saw the information about the January 4th submissions, but what, if any, other information

has been produced since the protective order was issued on December 28th?

MR. ATKINS: I think I can answer that. As set forth in our papers, we produced a deposition from the JCCP, a corporate rep regarding --

THE COURT: Okay. I -- I think the papers said that there was a bunch of information that had been disclosed in the JCCP, that that information Defendants were willing to turn over once the protective order was issued, but it wasn't clear to me. That -- that was filed before the protective -- your -- your opposition was filed before the protective order issued on December 28th. So -- so, you did end up disclosing all of those -- those items?

MR. ATKINS: Yes. yes, your Honor.

THE COURT: Okay.

MS. LUHANA: Judge, Roop Luhana for the Plaintiffs. Defendants produced documents just a couple of hours ago that were produced in the JCCP. Plaintiffs don't believe this is any substitute for the information we're seeking in our motion, and I'm happy to get into that if you'd like.

THE COURT: Okay. But I'll let Mr. Atkins just, you know, walk me through again kind of exactly what was in the JCCP information. I mean, it's in the papers, but it's -- just --

MR. ATKINS: Yes. So --

THE COURT: -- to be crystal clear on that.

MR. ATKINS: -- several things. Your Honor, I apologize for my voice. I also want to thank my colleagues and your Honor for extending this hearing. I would advise everybody not to get the flu that's going on. So, you'll forgive me. I'm not -- my voice has not come back.

THE COURT: Yeah. The -- please take your time.

MR. ATKINS: Thank you very much.

So, we've turned over the following, which was set forth in our papers, a corporate rep deposition that was taken with regard to document and data preservation and retention, sort of the equivalent of a 30(b) -- (b)(6).

We've also produced the policies themselves which we had produced in the JCCP. There's a -- we produced a list. As set forth in our papers -- pardon me -- the parties, the Plaintiffs and the Defendant, have been in meet and confer negotiations quite productively I might add, without any rancor over the custodian. So, we've -- we've moved on from preservation. There's no issues about preservation in the JCCP. But we're now actually getting to custodians. The Plaintiffs requested 143. We have identified those names, and those names have now been provided to the MDL Plaintiffs. Interestingly, just as a contrasting point, I think your Honor saw and now you have a copy of the -- our

preservation net, if you will, has captured more than 15,000 email files, 15,000 jobs and positions. But in the JCCP, the Plaintiffs started at 143 custodians. They're actually now down to -- and we're sort of down to the short strokes. They're down to I believe 55, which isn't to say they might not enlarge that. But that gives you a sense of the scale of the relevant custodians.

And I -- we also turned over the -- a transcript of the most recent hearing before Judge Schulman that addressed a number of discovery issues, including custodians and data searching.

I guess I should underscore that -- because I think it's the star of the show today, we turned over the list of 15,700 positions, titles, jobs, the email accounts for which have now been -- or in some cases have been for a long time but are now on hold.

And, to give your Honor a sense of the scale of that hold, I conservatively estimate, but I think it's a lot more, it's at least 100 email files that are now on hold.

THE COURT: Okay. So, I was -- read in your papers that -- that there was a -- a deposition transcript from the Uber's person most knowledgeable, and then there was -- it also seemed like Uber was willing to turn over the communications platforms used by Uber, the electronic platforms, programs, databases, information, technology,

systems that Uber uses, and has historically used.

So, is that infor -- is that information that's just kind of in the transcript, so, if somebody goes through and reads the transcript or is it sort of separately listed out and you've disclosed that to the JCCP and now the Plaintiffs here and the MDL have it as well?

MR. ATKINS: It's -- it's both, your Honor. It's in written communications with Plaintiffs' counsel and the JCCP. And, of course, it's in the deposition at some length and depth.

THE COURT: Okay. Well, why don't I turn to Ms. Luhana then to -- it seems I got the sense from her that she doesn't think that it's enough information at this point, and it did to me overall seem like the heart of the dispute is the extent to which Defendants are obligated to disclose the noncustodial sources of potentially relevant ESI.

MS. LUHANA: Thank you, Judge. Actually, it's -- it's two-fold. The first request we have is that Uber produce the names and job titles --

THE COURT: Right.

MS. LUHANA: -- the corresponding names and job titles of everyone that's placed on hold. Importantly, we want to know the dates of the employment of the custodians, when each individual received the litigation hold, the date range of the ESI that was preserved, and what litigation it

relates to. So, that -- that's our first request.

And then the second request is going into the noncustodial sources, because if you reviewed this Defendant's opposition, Uber believes that when litigation holds are in place, they're complying with their PTO2 duties. However, there are a number of unanswered questions as to the noncustodial sources, including structured and unstructured databases, common places where they store information regarding marketing and safety, human resources and training resources and things like that. There is no mention of that in their opposition papers. So, the -- those are two buckets of things that we're looking for.

And then, lastly, we ask that Uber suspend its auto deletion policy just temporarily until we get to the bottom of this and, you know, Uber provides the assurances that the information, the relevant ESI that needs to be placed on hold is, in fact, placed on hold.

And would you indulge me to go into the history of this matter and how this arose and why there is a concern here?

THE COURT: Sure.

MS. LUHANA: Okay. So, let me briefly run through the background here. So, it's established that the duty to preserve arises not only during litigation but also extends to the period before litigation, when a party should reasonably know that evidence may be relevant to anticipated

litigation.

So, the allegations in this case are very serious. We've alleged that Plaintiffs have been sexually assaulted by Uber drivers, and Uber has failed to put adequate safety measures in place to protect its passengers.

So, at the November 3rd hearing, before the hearing, Judge Breyer recognized the critical issues in the case. He said what Uber knew about these incidents of sexual assault, when Uber knew, what actions Uber took, what were Uber's hiring practices and monitoring practices for drivers, and how Uber vetted its drivers was critical. He recognized the scope of the allegations and what was involved.

However, before the parties appeared before the Court on November 3rd, Uber in its submission to the Court, on October 27th, had represented that it issued litigation holds for multiple custodians who work on sexual assault incidents.

So, clearly, the scope goes beyond those who just work on sexual assault incidents. And, so, Uber's hiring practices, its marketing practices, its safety protocols or lack thereof historically are relevant. And, so, Uber's obligation to preserve goes back to when Uber first knew about these allegations, which we believe is no later than 2013.

In fact, Mr. Atkins had confirmed and represented that

to the Court, that these claims go back to 2013 on November 3rd.

So, even though passenger sexual assault litigation began no later than 2013, Uber from September 2015 to January 2023 was deleting emails every six months. And then in 2020, Uber deleted all Slack messages over 90 days old. So now, as of January 2023, Uber has a 24-month email retention policy. And per Mr. Anderson's declaration, he's Uber's senior e-discovery analyst. Google Drive documents are currently -- currently just not automatically deleted. But if Uber only had litigation holds on those multiple custodians who work on sexual assault as Uber represented and not, let's say, the company managers, the executives, the engineers who were in charge of safety policies for vetting drivers, then marketing, and Uber was deleting emails every six months and all Slacks older than 90 days, then there's a serious concern that the relevant ESI is being destroyed if Uber didn't place timely litigation holds on relevant custodians when Uber reasonably became aware of the sexual assault allegations in 2013.

So, as a result of these concerning red flags, Judge Breyer entered PTO2 as an interim measure which, among other things, ordered that no party shall destroy any information subject to discovery within their control without applying to the Court.

So, therefore, Plaintiffs were really surprised when we met with Uber on November 17th to discuss PTO2. The Defendants provided conflicting information. We were told Uber had not suspended its automatic deletion policy. Plaintiffs were told that Uber at that time had a six-month retention email policy and that Uber was having -- went from having multiple custodians on hold to thousands of litigation holds for undisclosed matters that may overlap with this litigation.

So, Defendants can certainly inform Plaintiffs that Uber had not suspended its auto deletion policy despite PTO2 and hadn't sought relief from the Court to do so.

And then, on December 1st, Uber clarified a couple of things. They clarified their email retention policy that they said was previously six months, was that -- was the case in the past and that January 2023 there was a two-year retention policy.

However, while Judge Breyer entered, you know, PTO2 on November 3rd, on December 1st, almost one month later, Uber represented that it still was unable to identify the number of litigation holds for this litigation, and that's Uber -- that's Uber not -- that's despite Uber not having the certainty that it still had not suspended its auto deletion policy.

Then on December 13th, Plaintiffs for the first time

learned that thousands of employees had been placed on hold in connection finally with this litigation. So, it wasn't until Defendants filed their opposition, Judge, in this case that Uber disclosed and Plaintiffs learned about the actual number of litigation holds for this matter and other matters.

So, because of this conflicting information that we've received from Uber and the concern that relevant ESI is still being destroyed, Plaintiffs have brought this motion. And, so, we are requesting those three things I raised previously. We're requesting that Uber produce to Plaintiffs the basic details surrounding its litigation holds and ESI sources to confirm what is being preserved for PTO2, and require Uber to temporarily suspend its deletion policies until the parties can come up with a more tailored approach.

And, Judge, in terms of the details around the litigation hold, that's something that's routinely provided in litigation, and we cited to case law showing that. You know, the ESI guidelines confirmed that as well as the Advisory Committee notes to Rule 26. So, this is something that's commonplace in litigation. And, because of all these concerns, it's appropriate to produce here.

And, so, for these reasons, we believe Plaintiffs' motion should be granted.

THE COURT: Okay. Thank you.

I think that we'll get to this question of suspending company-wide document retention policies, but I think what stood out to me most in the papers was the delay in disclosing basic information about potential sources of relevant ESI. And, to me, it seemed, you in reading the case law, it -- or even the Sedona principles, pretty straightforward, that while a litigant's not entitled to a copy of the -- of the litigation hold letters or the preservation letters, the litigants are entitled to have some basic information about what is -- what's been preserved.

And, so, I mean, there's Judge SEEBORG's decision in the eBay case. There's the -- the Cohn v. Trump decision. It's really kind of not -- not controversial. And then even the Sedona principles, I think it's comment 5(c) that talks about the parties should discuss custodial and noncustodial sources of relevant or potentially relevant ESI.

So, and I think, you know, to the -- Judge Breyer's pretrial order number two, I mean, while it's interim with respect to -- to preservation, it expressly directed the parties to -- to consider whether or not there -- they'd like to make some kind of proposal for a more tailored order concerning preservation of -- of relevant information.

And, so, because that order, you know, was issued with

an expectation that there might need to be a more tailored preservation order, I think implicit in that is that there is going to be disclosure of this basic information so that if the scope of preservation needed to be adjusted or somehow clarified by the Court, that could be done, but that process to me seems like it was handicapped by the -- the withholding of basic information. Granted, I recognize that Defendant said, Well, you know, we want to -- we'll disclose some of this after the protective order was finalized. You know, Judge Breyer's pretrial order number two issued in November -- on November 3rd, the protective order was proposed by Plaintiffs on November 15th. I know we had a Thanksgiving holiday. It then -- the feedback wasn't sent along before that Thanksgiving holiday, and then it came back sometime maybe in the second week of December. So -- so, anyhow, all of this seems to me rather delayed. I didn't quite understand why some of this basic information would -- what the connection was between the protective order and some of this basic information about potential sources of -- of relevant ESI. I mean, job titles, like, that's the kind of information you see on LinkedIn. But perhaps Mr. Atkins can elaborate on that. I mean, it's kind of a moot point at this point because there is a protective order, but to the extent we're talking about, you know, to what extent this process is going as quickly as I think

Judge Breyer was contemplating, you know, why -- what is -- is there some connection between the protective order and -- and certain of this basic information that needed to be turned over.

MR. ATKINS: So, your Honor, let me address a number of those things. The connection with the protective order is that because we interpreted Judge Breyer's office -- order as being rather capacious, we put together this -- we put in a hold and then put together a list of all the relevant job titles for 15,000 positions. And we -- we can litigate the question of whether it should remain under seal, but we had concerns about confidentiality.

But I think the point to understand here is this is where we now are. We have put in place what in my experience is an unprecedented preservation hold. It's not just the scale, the 15,000 and the 100 million documents. It's who's covered.

So, the Judge's order said define it broadly. It should be executives and managers and directors, and it should cover, you know, not just sexual assaults but safety, technology, marketing. And we heard that, and we heeded that. And if you'll just indulge me to give you a sense of what we have preserved, which is the issue before us, that list includes all the chiefs, CEO, CFO, Chief Safety Officer, Chief Product Officer, Chief Technology Officer,

Chief Marketing Officer, all the topics Judge Breyer identified and, frankly, more. I mean, and Chief Economist, the general counsels. Then it's everybody else in the corporate ladder, vice presidents, directors, managers, heads, leaders, engineers, including but not limited to safety marketing, safety legal, safety products. And -- for example, there are literally hundreds of app developers, coders, software engineers. There's 200 people involved in investigations, including claims like these. There's -- there's nearly 200 lawyers.

We -- we just -- we threw as wide a net as we could imagine. And, for what it's worth, I've been doing this for a couple of years. I've never seen anything like it, but we saw Judge Breyer. We understood him to want on this interim basis to lock down anything that could be conceivably relevant, and we've done that and I think more, number one.

Number two, there's no relevant evidence being destroyed, full stop. There is a hold on thousands and thousands and thousands of employees. And, importantly, that goes back to the 2013 era. There have been holds in place, many of them associated with individualized claims like this. So, it's not as if the hold went into place last week or even with the JCCP. So, it's thousands and thousands of files with thousands and thousands of employees going back a decade. And an indication of that, your Honor,

is that roughly two-thirds of the employees and executives covered by this whole, two-thirds of them are former employees. So, this is vast. It's deep. It's old. And in terms of what's happening today, the 20-month hold sort of rather -- sort of renders this academic because anything that was created from January 23, 2023 forward, including today, is going to be held for -- for two years, everybody's in the company, people who work for Uber Eats, people who work for the freight business. Everything's going to be held.

So, at the earliest, an email that was created in let's say January 2023 is not going to be deleted under the auto deletion policy until January of 2025. And if a document is created today, it's not going to be deleted until January 2026, and that's separate and apart from the 15,000 that are on hold and are not going anywhere.

So, there's no urgency. There's been -- there's no risk. And the time that it took to get this up and running has had zero consequence in terms of the preservation of the information.

Now, in terms of the nature of the information, we did what we view as being proscribed by the practices and standards. The Northern California checklist which the Plaintiffs invoked says that you should disclose general job descriptions and it should say it -- and an example it

gives, it has a paren with e.g., is managers, heads, leaders. It's exactly what we do. So, we complied in full with the Judge's order where our conduct is consistent with the -- the governing standards and practice. And, conversely, I think it's wholly unprecedented. I've seen no precedent authority, much less case law from the Plaintiffs, for suspending the entire retention and deletion policy. There's no factual findings or evidentiary support that there's any risk that warrant such an extreme result. And there's a good reason here why it's 15,000, which is way beyond what's relevant, because maybe, contrary to perception, Uber does a lot more than ride sharing. It's got the delivery business. It's got a freight business. In fact, more than 50 percent of its revenue comes from businesses other than ride sharing.

So, there's -- there's just absolutely no justification, no legal precedent for putting a hold on, you know, the folks in Uber Eats, although our net caught some of them. So, again, we were over over over broad. So --

THE COURT: Well --

MR. ATKINS: -- that's where we are today.

THE COURT: Yeah. I'm not inclined to grant a company-wide suspension of the -- any -- the document retention policies, but I did wonder, you know, why are the litigation holds placed on employees pursuant to litigation.

You know, other -- cases other than this litigation, why is that relevant to demonstrate that Defendants have met their preservation obligations for this case? I mean, you've got 5,500 current and former employees who have document holds for this case, and then you say, Okay, well, there's 10200 of employees who happen to have litigation holds for some other litigation. Why -- why does that bear the Court's consideration? I mean, it does show sort of an overall the extent to which Uber, you know, has this burden I guess, but those are burdens kind of associated with -- with other cases.

So, I mean, we -- we don't know the time --

MR. ATKINS: I can ans --

THE COURT: -- time frame --

MR. ATKINS: I can --

THE COURT: -- of when these other litigation holds were put in place. You know, that -- and I think you're talking about numbers of people who have litigation holds for their facility workers but not -- we don't -- there's not a lot of detail for Plaintiffs to evaluate when were those litigation holds in place. And, you know, you look at a case like Cohen v. Trump, and there's like the name and titles of the person, the dates when -- when they got notification of the litigation hold, the types of documents and files that are subject to the litigation holds

and the efforts undertaken to enforce it.

I mean, so, anyhow, what -- I'm getting a little bit off what my question was, but 10,200, why is that important here?

MR. ATKINS: A couple of reasons. First of all, it captures people -- mostly former, not entirely -- who may have relevant information. It -- it does cover them. We -- rather than going through every single existing hold, we just said hold the holds, but many of those people -- I can't quantify that. We'll do that when we pick custodians and start running search terms, but the last thing we wanted was to be here today and accused of having lifted other holds. But those other holds may well include folks who have or had relevant information. So, that's why.

Also, I thought it was important for the Court to understand how seriously we take this, and we didn't want to be said to have lifted any holds, deleted any documents that were already held. But there will be documents, I suspect, among those 10,200 that are relevant.

THE COURT: Okay.

MR. ATKINS: And, so -- and, again, we're -- you know, my view is, your Honor, we're here on preservation. So, we locked everything down.

And now, to your -- your Honor's questions about additional information. With all respect, that's what

becomes next.

THE COURT: Yeah. What's the basis for withholding basic information about noncustodial sources of ESI?

MR. ATKINS: I'm going to let Mr. Smith address that if you'll permit me to step aside.

MR. SMITH (via Zoom): Thank you, your Honor.

THE CLERK: Sir, can you please state your appearance for the record?

MR. SMITH: Yes. Kyle Smith for the Uber Defendants.

Thank you, your Honor. So, that information is not being withheld. What the -- what the noncustodial sources are, what databases exist, how the data structure, where it's stored, what the policies around the storage of that information are, that is information that is proprietary and, thus, therefore, confidential to Uber. And that's what we were waiting for the December 28th protective order before making the disclosure, and that is the information that went out today to Plaintiffs in the form of deposition transcript, in the form of exhibits to the deposition transcript in terms of correspondence that had been sent to counsel in the JCCP saying, Hey, here is source one, source two, source three of noncustodial information that you may have questions about and disclosures about that. So, that

-- the answer -- that's a long-winded answer to your Honor's question of it's not being withheld. That's being provided. There are follow-up questions. They will be answered now that we have the protective order in place and are able to make the appropriate disclosures under the protections of the order.

(Pause.)

THE COURT: Well, I mean, I guess it's kind of tricky for me to issue an order in some ways because I don't know exactly what's been disclosed and what's still at issue at this point. And, you know, Plaintiffs haven't had an opportunity to go through those most recent disclosures and, you know, clarify for the Court what's still at issue.

MS. LUHANA: Judge, can I say a few things --

THE COURT: Yes.

MS. LUHANA: -- in response? In terms of what Uber recently produced last week, it was 296 pages of just job titles. And, as you importantly pointed out, case law supports producing names, corresponding titles, the ESI that's preserved when the notices go out, all that information in addition to just the titles.

In addition to that, the ESI checklist, one facet of it it mentions is job titles, but it goes beyond that. So, we request that Uber produce that.

In terms of the noncustodial sources and information

that was produced just hours before today, critically the questions are what was preserved and when it was preserved, in addition to the different types of noncustodial sources and, historically, what the sources were used from, from at least 2013 beyond.

And, so, I don't know if we're going to get answers to those questions. And, so, we request that you provide that relief so we don't have to go rifling through the deposition transcript. These are answers that Uber should be able to provide to us in a declaration or some other form.

THE COURT: Okay. All right. Well, I've got a couple of questions for you about, you know, this company-wide suspension of --

MR. ATKINS: Sure.

THE COURT: -- document retention policies. I mean, why -- why does this make sense? I know earlier you were talking about given the sort of history of this litigation and the history of sexual assault allegations as to Uber drivers, that they should have been on notice a long time ago and there are different document retention policies over the course of the -- of the company's history for different types of data. But, you know, your brief characterizes it as essentially like it's plausible that -- that relevant ESI is being destroyed. And this is a big ask. It wasn't clear to me, you know, like what's -- what's

the best case legal authority for issuing such sweeping relief. I mean, is it even feasible just thinking about it from a practical operational standpoint? The company would not be able to throw out any single piece -- record, piece of electronic information?

MS. LUHANA: So, Judge, our thinking in terms of what Defendants had raised in their papers, we believe it's a straw man. PTO2 was an interim order, and it was raised in the context of some red flags that were raised, some conflicting information that we were provided and, lastly, some unanswered questions that we still have today.

So, the goal here is to sort through this -- Defendants produced the information that we have requested -- appropriately, meet and confer, and then, you know, until that point, just suspend the deletion process, which would be temporary and very minimal, a 30-day period to just suspend that deletion policy. Until we get to the bottom of this and they produce this information, we meet and confer, and we ensure that that relevant ESI is being preserved.

And, so, what we were looking to is PTO2, which Judge Breyer implemented as an interim measure and specifically ordered and said to the parties, I understand this is broad. You are going to need relief, but you must apply to it. And Uber never had applied for it and continued with their auto deletion policy despite being able

to tell us at that time what litigation holds it had even in this litigation, which was of concern to us.

So, all we're asking for is a small window of time to allow Uber to produce the requested information, us meet and confer with them and then come up with a tailored response to -- to narrow PTO2.

THE COURT: Do you have -- like, what's the best example of a court doing -- issuing that kind of relief?

MS. LUHANA: I mean, I believe in --

THE COURT: Can you come up with any particular circumstances?

MS. LUHANA: -- Apple v. Samsung.

THE COURT: Yeah.

MS. LUHANA: It told, you know, the parties to suspend the deletion process, but, of course, it was for the information that was relevant to the litigation, and that's what we're looking for here. And, so, the concern is if you look at Uber -- Uber's opposition, it truly does miss the mark. They put in a chart, right, in terms of PTO2 and how they were accomplishing and meeting the requirements of PTO2. And there are significant voids there because they continue to say, Hey, we got the custodial holds. We have the litigation holds, and that answers all our questions when, in fact, if you go through each individual request there, I mean, each individual part of PTO2, the custodial

holds don't answer a slew of other questions. And, so, that's my -- that's our concern, that there is still relevant ESI being deleted because there are sources that are still not being preserved today.

THE COURT: Well, in the background, you also have the JCCP and, you know, presumably, there's all sorts of litigation holds. That case has been going on for a while. I mean, that seems to me to reduce the risk that there's any relevant information that's being destroyed.

MS. LUHANA: Right.

THE COURT: Or, if it was destroyed, it was destroyed a long time ago and nothing --

MS. LUHANA: Right. My concern is -- my --

THE COURT: -- at this point that the Court can --

MS. LUHANA: My concern is --

THE COURT: -- do would --

MS. LUHANA: I apologize.

THE COURT: -- [Zoom glitch] that. That seems to be like potentially what you're going to discover if you get more --

MS. LUHANA: My -- that's why the --

THE COURT: -- retention policies and the dates and to whom they applied and so forth.

MS. LUHANA: To dig into if the relevant ESI has been preserved and for whom and when those litigation

notices were sent and what exactly was preserved is critical. But if those documents and custodians, if the holds were put in place, I truly don't understand why Uber represented to this Court on October 27th that only multiple custodial holds were in place. If there were thousands of holds at that time, why was that not -- that not raised with the Court.

And, in addition to that, you know, a six-month deletion policy starting in 2015 to January 2023 is very alarming. It's a very short policy to delete emails. And, so, you know, Mr. Atkins said to us right now that January 2023 to 2025 you'll have that. But what about all the documents pre-2023? And that's why the -- to get to the bottom of this, it's critical that Uber produced this information that we're requesting.

THE COURT: Mr. Smith, do you want to respond to what Ms. Luhan a was saying?

MR. SMITH: I would like to, your Honor. Thank you.

So, as to the authority that supports entering an order suspending the deletion policy, we think the answer is there is no such authority. The Apple v. Samsung case involved a case where after, at the end of the discovery process, there was a showing, evidentiary showing of deficiencies, of gaps in what had been done. And at the end of that process,

there was a consideration whether some other sanctions, remedies, or some things needed to be entered, and it was not suspending all of Samsung's company-wide deletion -- so-called deletion policy in any event, but it wall after there was a showing.

Here, we don't think any such showing is going to be made because of the extraordinary efforts that have been taken. And Ms. Luhana circled back to, Well, this is why we need the disclosure of information. That disclosure is underway. If the -- if the dispute here is, Well, you what, the 26(f) checklist calls for names and/or job titles. They've only got job titles, frankly, that seems to us to be the most pertinent piece of figuring out is everything going okay. But if there's a need for some names to go with some of the job titles, we're happy to confer with Ms. Luhana, Ms. Abrams, Ms. London, find out which job titles they want to know the names for, and talk about them now that we have the protective order.

In terms of authority for ordering more than that, such as identifying what matter -- what the underlying litigation matters where -- in which a hold was placed or the precise dates on which a hold was placed, we don't think that any of the authority the Plaintiffs have cited supports ordering such a production before there is some showing of a gap in what's being produced in litigation. There is no showing

right now. We don't think there will be such a showing. But if there is some issue in the future where there's some gap, that's where the question of what -- who -- well, when did that hold go in place might be relevant. But it's not something that's needed as to the 15,700 people that are on hold at the company. It's not something that's needed or warranted as to the 5,000-some-odd people that are on hold even in this matter. That -- who those people are is what's needed. They have that. If there's as question about the names of some of those folks, we're happy to work with them on that.

THE COURT: Okay. I mean, I'll give some more thought to Plaintiff's request to suspend the company-wide document retention policies, but it does feel a bit premature to me. What -- what I am considering more strongly is -- is putting you all on a very tight schedule to get this in for me, for Defendants to get this basic information about the ESI sources over to Plaintiff right away. And, I mean, some of that has come in of late, but just to ensure that all of the information that I think that they're entitled to is turned over, I could still issue an order that says this is the information that has to be turned over. To the extent that it's been around for a long time and the timing of it was tethered to a protective order, to Rule 26(f) disclosures, which I didn't quite

understand that argument because Judge Breyer's order from December 6 set case management deadlines that essentially called for the Rule 26 conference, 26(f) conference. So, anyhow, seems like -- well, I won't -- I won't go back into that background, but what I'm thinking is 24 hour -- 20 -- 48 hours to disclose some of the most basic information, seven days to -- for Defendants to produce information about the custodial and noncustodial ESI sources, you know, what the sources -- each source that was -- identifying each source, whether each source is preserved, when -- you know, how that -- that -- that that source was used by Uber, what each source was used for. I mean, this is information that, well, you could get in a deposition transcript, but I don't see why it can't also be listed out in a declaration. I think those are -- it's really about the substance, and, you know, Plaintiffs can ask for it in a deposition or they can ask for it in a declaration. It doesn't -- at the end of the day, I think they -- it seems like a litigant has a prerogative to decide what form they want the information to be presented in, provided it's not burdensome. So -- unduly burdensome.

So, anyhow, that's -- that's kind of what I've been thinking is no suspension of the company-wide document retention. We'll put you guys on the short schedule so that you can proceed to actually meaningfully meeting and

conferring and figuring out whether you need a more tailored preservation order from the Court. And you can dig into what this 15,000 plus group of employees, current and former, how -- how meaningful that is as far as they're being custodians. I mean, maybe it's not necessary, but the Plaintiffs and the Court can't evaluate that if we don't know who they are, what their job titles are, what the sort of time frame is for their records and so forth.

So -- so, just so you're aware of what direction I think I'm going in, but I -- I will give more thought to all of the arguments that were made today. And, Mr. Smith, if you want to, you know, add anything in the last couple of minutes, you can react to what I just laid out.

MR. SMITH: Thank you, your Honor. We -- what we would like to do if it meets with your Honor's approval, it is true -- Ms. Luhana has said a lot of the information was produced very recently, including this morning. That is absolutely true. It took us a little time to get it packaged up on the entry of the protective order. Plaintiffs have not had time with it. The Court does not have the benefit of that information.

We would propose to submit to the Court a status report that describes what was produced since the December 22nd opposition up until the time of this hearing, and we think it's, frankly, virtually everything your Honor just

identified contemplating going into an order, and we'd like to be able to identify that for your Honor and submit in camera under seal the actual underlying materials and have that serve as identifying whether any further next steps are needed.

THE COURT: That seems like it might just create some delay to me because --

MS. LUHANA: Yes.

THE COURT: -- then I have to look through your filing, but, I mean --

MS. LUHANA: Judge --

THE COURT: -- I've read the basis, and I've read the briefings.

MR. SMITH: I mean, I -- and I --

THE COURT: You could see what my order says, go and look at what you've turned over already, and maybe you -- you can check most of it's taken care of.

MS. LUHANA: Yes, Judge, the concern is delay here. And, you know, Mr. Smith raised that there has to be some sort of showing of wrongdoing to get this information around the litigation hold, and that certainly just isn't the case. The ESI checklist makes recommendations of the type of information that needs to be produced. And, so, we'd request that the Defendants produce those names and job titles and the types of documents and files that are on

litigation hold and when these holds were sent out.

And, so, there is a concern there's already been significant delay. We've rescheduled this hearing twice already. And, so, the litigation --

THE COURT: Well, you all wanted it on January 19th and --

MS. LUHANA: No, no, no --

THE COURT: -- I wanted to do it before Christmas. So --

MS. LUHANA: No, no. My point is is, of course -- no, no. I -- my -- I was raising that because there -- there is going to be a continued delay if we do what Mr. Smith has suggested. It makes sense to take direction from your order and then proceed with a meet and confer, Judge.

MR. ATKINS: May I make one final response, your Honor?

THE COURT: Um-hmm.

MR. ATKINS: As to the question of are the Plaintiffs entitled to know the details of what matters and which litigation hold was entered, what the precise date of that was, we don't think the case law supports that. The issue of names and job titles, we acknowledge that is contemplated by the cases and the 26(f) checklist, and that won't be any issue. But, as to the details and surrounding when holds were issued, and, in particular, what matters

they were issued in, that does go beyond what the case law requires in the absence of a showing of some wrongdoing, which has not been made here.

THE COURT: Well, I -- I think this is kind of an unusual case. I mean, it's an MDL. It's -- it involves individual cases that were filed going back to 2013. I mean, the typical case that -- that I've read about, it doesn't involve like 15,000 litigation holds, 10,000 plus of which relate to some other litigation. So, it's just kind of an unusual footing. It seems to me like it's maybe information that's not needed and that it would take a long time to maybe suss out each of those details. And the point is that it seems like the most important information is when the information was preserved, the date period for when it was preserved, what the -- what information, what type of data was preserved.

As far as to what litigation it ties to, I mean, I'll let Ms. Luhana -- like, why is that necessary? Like, why should I put Defendants through, you know, the time and effort and the labor that's required to gather that information and add it into the column?

MS. LUHANA: Judge, we're not concerned about the specifics of other litigation. It could just be sexual assault litigation and other. That's all that has to be provided if -- if they want to note it. We just want to

ensure, as you had appropriately stated earlier on, that we're concerned about the litigation holds for this case, the sexual assault litigation against Uber. And, so, that is truly the focus. And, so, for the other litigations, they can just note other, and that would be fine to us as well.

MR. ATKINS: May I respond, your Honor?

THE COURT: Sure.

MR. ATKINS: Undertaking -- as your Honor identified, undertaking the effort to sort out for 15,000 people would be a massive undertaking, one that may incur some delay. We don't think it -- it's needed. And I want to address one question your Honor raised, which is why do the 10,000 people matter? Why does Uber get credit for that? Well, that's explained in paragraph eight of Mr. Anderson's declaration that was submitted with our papers. I'm going to read it, if I may. It's one sentence.

> "When a current or former employee's account is placed on a legal hold, the individual's electronic materials are preserved regardless of the subject matter of the litigation."

So, why do those 10,000 matter? Well, they matter because their documents are being held just like the documents for the some 5500 who've received a hold in

connection with these litigations. So, Uber is meeting its obligations in this case by sending out holds to 5500 people. But, on top of that, there are some 10,000 others whose documents are being held in exactly the same way, and Uber's duty was to meet its obligations to identify the people that are on hold, some after the job titles, and if there's a need for the -- for the names for the people for this litigation or for all 15,000, that can be done. But beyond that, it's not something that's necessary to drill down on who are the 100 or 50 people that are going to be custodians in this case.

THE COURT: Well, I -- I mean, yeah, their -- their information is preserved. It's not discarded. But, you know, what if that person's got a litigation hold due to a slip and fall case in the lobby of the Uber building or a breach of contract case? Like, why -- what's the likelihood that they're going to have information that's relevant to this case?

So, it sort of creates a sort of image like a lot of information that's potentially relevant for the claims in this case have been saved and, you know, Uber's therefore doing a good job, but should the Court really take that -- weigh that heavily because, you know, this -- these holds might be related to cases that have like absolutely nothing to do with this particular MDL.

So, but maybe -- maybe a lot of it does. So, just there is very little information at this point to know one way or another. I mean, we should credit it if it's -- if it's likely to be relevant, but -- but I think it's -- anyways, I think I've heard enough for -- for today. Everybody has been very helpful in terms of filings and -- and the argument today. So, I appreciate your time, and it was tricky to schedule this. It was unfortunate that Mr. Atkins got so sick, but, you know, he's improving, and that's a good thing, and we -- we did finally have this hearing.

So, I will do my best to issue this order as quickly as possible given the timing on all of this, but -- I can't make a specific commitment, but it should be quick.

MR. ATKINS: Thank you, your Honor. And we do sincerely appreciate your Honor's and Plaintiff's counsel's accommodations and respect of Mr. Atkins' illness. They were extremely cordial and courteous with that, and we do appreciate that and the Court's indulgence on that as well.

MS. LUHANA: Thank you, Judge, so much for your time.

THE COURT: Okay. Thank you. Take care.

(Proceedings adjourned at 1:25 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Thursday, January 11, 2024