# EXHIBIT A

1  GEORGE GASCÓN, SBN 182345
   District Attorney of San Francisco
2  JUNE D. CRAVETT, SBN 105094
   Assistant Chief District Attorney
3  EVAN H. ACKIRON, SBN 164628
   Managing Assistant District Attorney
4  ERNST A. HALPERIN, SBN 175493
   NANCY TUNG, SBN 203236
5  SEAN M. KILEY, SBN 282075
   PHOEBE MAFFEI, SBN 271346
6  Assistant District Attorneys
   732 Brannan Street
7  San Francisco, California 94103
   Telephone: (415) 551-9545
8
   JACKIE LACEY, SBN 110808
9  District Attorney of the County of Los Angeles
   STANLEY PHILLIP WILLIAMS, SBN 106658
10 Head Deputy District Attorney
   HOON CHUN, SBN 132516
11 Assistant Head Deputy District Attorney
   JESSIE LEE ANN MCGRATH, SBN 131702
12 CHRISTOPHER D. CURTIS, SBN 236978
   Deputy District Attorneys
13 211 West Temple Street, Suite 1000
   Los Angeles, CA 90012
14
   *Attorneys for Plaintiff,*
15 The People of the State of California

ELECTRONICALLY
**FILED**
*Superior Court of California,*
*County of San Francisco*
**08/18/2015**
**Clerk of the Court**
BY:WILLIAM TRUPEK
**Deputy Clerk**

16           SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                 CITY AND COUNTY OF SAN FRANCISCO

                        UNLIMITED JURISDICTION
18

19 | THE PEOPLE OF THE STATE OF
   | CALIFORNIA,                    | Case No.  CGC-14-543120
20 |
   |              Plaintiff,
21 |                                | FIRST AMENDED COMPLAINT FOR
   | vs.                            | PERMANENT INJUNCTION, CIVIL
22 |                                | PENALTIES, RESTITUTION AND
   | UBER TECHNOLOGIES, INC., a Delaware | OTHER EQUITABLE RELIEF
23 | Corporation; RASIER, LLC, a Delaware |
   | Limited Liability Company; RASIER-CA, | Business & Professions Code
24 | LLC, a Delaware Limited Liability Company; | Sections 17200 *et seq.* & 17500 *et seq.*
   | and DOES 1 through 100, inclusive,
25 |
   |              Defendants.
26 |

27

The District Attorneys for the City and County of San Francisco and the County of Los Angeles, acting to protect the general public within the State of California from untrue and misleading representations and unlawful and fraudulent business practices, bring this suit in the name of the People of the State of California.  The People hereby allege the following on information and belief:

PARTIES AND VENUE

1.    The authority of the District Attorneys for the City and County of San Francisco and the County of Los Angeles to bring this action is derived from the statutory law of the State of California, specifically Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*

2.    Defendant UBER TECHNOLOGIES, INC. is a Delaware corporation with its headquarters and primary place of business located in the City and County of San Francisco at 1455 Market Street, San Francisco, CA 94103.

3.    Defendant RASIER, LLC is a Delaware limited liability company with its headquarters and primary place of business located in the City and County of San Francisco at 1455 Market Street, San Francisco, CA 94103.  It is a subsidiary of UBER TECHNOLOGIES, INC. and licenses technology from defendant UBER TECHNOLOGIES, INC.

4.    Defendant RASIER-CA, LLC is a Delaware limited liability company with its headquarters and primary place of business located in the City and County of San Francisco at 1455 Market Street, San Francisco, CA 94103.  It is a subsidiary of UBER TECHNOLOGIES, INC.  RASIER-CA, LLC has obtained a Class P Transportation Network Company Permit from the California Public Utilities Commission ("CPUC").

5.    The true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein under the fictitious names of DOES 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names.  Each fictitiously named defendant is responsible in some manner for the violations of law herein alleged.  Plaintiff will amend its complaint to show the true names and capacities of such defendants, as well as the manner in which each fictitious defendant is responsible for the

violations of law herein alleged, when these facts are ascertained.

6.     At all relevant times, each defendant has committed the acts, caused others to commit the acts, ratified the commission of the acts, or permitted others to commit the acts alleged in this complaint and has made, caused, ratified, or permitted others to make, the untrue or misleading statements alleged in this complaint.  Whenever reference is made in this complaint to any act of defendants, such allegation shall mean that each defendant acted individually and jointly with the other defendants.  UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC shall be referred to collectively as "Uber," and the term "defendants" wherever used in this complaint shall mean all named defendants.

7.     Whenever in this complaint reference is made to any act of any corporate defendant, such allegation shall be deemed to mean that such corporate defendant did the acts alleged in the complaint through its officers, directors, agent, employees, and/or representatives while they were acting within the actual or ostensible scope of their authority.

8.     Defendants at all times mentioned herein have transacted business within the City and County of San Francisco, the County of Los Angeles and throughout the State of California.  Each of the violations of law herein described has been committed in whole or in part within and/or from the City and County of San Francisco.  The unlawful business practices alleged herein were conceived, reviewed, approved and otherwise controlled from Uber's headquarters in San Francisco.  The misrepresentations and omissions alleged herein were developed in and otherwise emanated from San Francisco, and they were contained on, among other places, Uber's website and smartphone application, which are maintained in San Francisco.  When passengers throughout the State of California used Uber's services those transactions, including but not limited to the calculation of the fares, the billing and the payment for those services, were processed on Uber's servers in San Francisco.  In addition, many of the violations of law herein described occurred, in part, in each county in California in which Uber does business, including but not limited to the County of Los Angeles.

///

9. The actions of the defendants, as hereinafter set forth, are in violation of the laws and public policies of the State of California and are inimical to the rights and interests of the general public as consumers, competitors and citizens. Unless Plaintiff is granted the remedies sought herein, including injunctive relief by order of this Court, defendants will continue to engage in the unlawful acts and practices set forth below and will continue to cause injury and harm to the general public.

INTRODUCTION

10. Uber provides prearranged transportation services for compensation through its subsidiaries, using an online-enabled smartphone application ("the Uber App") to connect passengers with drivers. Uber provides different levels of service, at different prices. Uber calls these different service levels "platforms." In California, Uber brands these levels of service with names such as "uberPOOL," "UberX," "UberXL," "UberPLUS," "UberBLACK," and "UberSUV." The UberBLACK and UberSUV services are restricted to drivers who also work for individuals or companies that are separately registered with the California Public Utilities Commission as "Transportation Charter Party Carriers" ("TCPs"). Uber allows drivers who are not driving a car registered as a TCP vehicle to collect fares using the "uberPOOL," "UberX," and "UberXL," platforms. These drivers often use their own cars. Uber also provides a service to connect customers with taxi cabs, which it calls "UberTAXI."

11. From San Francisco, Uber controls the financial transaction for each passenger trip between the customer, Uber, and the driver. A customer hails an Uber driver through the Uber App downloaded on the customer's smartphone; Uber performs a calculation in San Francisco of the customer's fare based upon location information from a GPS enabled mobile device; Uber receives the customer fare by charging the credit card the customer provided to Uber when registering her personal information on the Uber App; and then Uber pays the Uber driver's portion of the fare to the driver. Uber retains a portion of every fare, commonly 20% and sometimes more. The core service being provided by Uber – passenger transportation for compensation on public roadways – has implications for the safety of Uber's customers, third

1    parties, and public and private property.

2        12.    Through this civil enforcement action, Plaintiff seeks to address Uber's flagrant and

3    unlawful business practices, including its practice of: (1) making untrue or misleading

4    representations regarding the measures it takes to ensure customer safety in order to induce people

5    to get into a stranger's car; (2) using the Uber App to calculate fares based upon a measurement of

6    time and distance without first obtaining the statutorily required approval of the California state

7    agency charged with ensuring that measuring technology is accurate, reliable, and does not

8    facilitate fraud; (3) conducting operations at California airports without obtaining authorization

9    from the airport authorities; (4) charging a fraudulent and misleading "Airport Fee Toll" to its

10   customers who travel to California airports; and (5) charging a fraudulent and misleading $1.00

11   "Safe Rides Fee" to its UberX customers.  Plaintiff seeks injunctive relief designed to prevent

12   Uber from engaging in these and similar unlawful acts and practices in the future; civil penalties in

13   an amount sufficient to deter Uber as well as others who seek to replicate its model from flouting

14   the law in a bid to grab market share; full restitution for all California consumers who paid any

15   amount designated as an "Airport Fee Toll" which was not in fact charged by or paid to an airport

16   authority; and full restitution for all California consumers who paid any amount designated as a

17   "Safe Rides Fee" prior to November 1, 2014.

18                            GENERAL ALLEGATIONS

19                    UBER'S REPRESENTATIONS ABOUT SAFETY MEASURES

20       13.   Uber's business model depends upon convincing its customers it is safe to get into a

21   stranger's car despite its admission in its terms and conditions through at least April 7, 2015, that

22   its customers "may be exposed to situations involving third party providers that are potentially

23   unsafe, offensive, harmful to minors, or otherwise objectionable."  In a successful effort to do so,

24   Uber makes a number of representations on its webpages, in communications with customers, and

25   in the media designed to create the impression that Uber does everything it can to ensure its

26   customers' safety.  The representations about safety contain true statements, false statements of

27   fact, and statements that are misleading, either on their own, or when viewed in the context of the

rest of Uber's safety representations.  Uber's false and misleading statements are so woven into the fabric of Uber's safety narrative that they render Uber's entire safety message misleading.  Viewed separately or together, the representations are likely to mislead consumers into believing that Uber does everything it can to ensure their safety and that Uber's background check process will capture all of the criminal history of an applicant that would result in that person being disqualified from driving a for-hire vehicle, whether under the criteria from Uber's regulator imposed by law, or under Uber's own disqualification criteria, or under the most stringent criteria applied by taxi regulators in any city.

14.   Under the tagline "SAFEST RIDE ON THE ROAD – Going the Distance to Put People First" on the prominent "Safety" webpage (www.uber.com/safety) Uber represented, through the first week of June, 2015, that, "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road."  Uber created the "Safety" page in April 2014 following a spate of bad press across the country concerning the criminal histories of Uber drivers.



Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - what we're doing in the US is an example of our standards around the world.

15. Uber expanded on this theme, explaining below the picture of a young girl riding in an Uber car, "That means setting the strictest safety standards possible, then working hard to improve them every day.  The specifics vary, depending upon what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – and what we're doing in the US is an example of our standards around the world."

16. On the same page (www.uber.com/safety) under the tagline, "RIDER SAFETY," Uber introduced the centerpiece of its advertising about customer safety under the heading "BACKGROUND CHECKS YOU CAN TRUST."  Through the end of October, 2014, Uber represented to its customers, "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three-step criminal background screening for the U.S. — with county, federal and multi-state checks that go back as far as the law allows — and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."



RIDER SAFETY

From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind.

BACKGROUND CHECKS YOU CAN TRUST

Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three-step criminal background screening for the U.S. – with county, federal and multi-state checks that go back as far as the law allows – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber.

READ MORE

17.   The "read more" link on the "BACKGROUND CHECKS YOU CAN TRUST" segment of Uber's "Safety" page connected readers to an entry dated April 25, 2014 on the Uber blog (formerly at http://blog.uber.com/driverscreening) in which Lane Kasselman, Uber's Head of Communications for the Americas, expanded further on Uber's theme.  The Kasselman blog entry that Uber published through at least December 10, 2014 stated that, "All Uber ridesharing and livery partners must go through a rigorous background check that leads the industry. . . .Screening for safe drivers is just the beginning of our safety efforts.  Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving.  Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver."

POLICY

# UBER BACKGROUND CHECKS

APRIL 25, 2014

## POSTED BY LANE

All Uber ridesharing and livery partners must go through a rigorous background check that leads the industry. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard. These checks go back 7 years, the maximum allowable by the Fair Credit Reporting Act. We apply this comprehensive and new industry standard consistently across all Uber products, including uberX.

Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver.

18.  Kasselman's blog entry dated April 25, 2014 also represented to the public that:

**All drivers are screened against:**

- County courthouse records going back 7 years for every county of residence
- Federal courthouse records going back 7 years
- Multi-State Criminal Database going back 7 years
- National Sex Offender Registry screen
- Social Security Trace (lifetime)
- Motor Vehicle Records (historical and ongoing)

**Criteria for drivers to pass through Uber's screening, going back seven years:**

- No DUI or other drug related driving violations or severe infractions*
- No Hit and Runs
- No fatal accidents
- No history of reckless driving
- No violent crimes
- No sexual offenses
- No gun related violations
- No resisting/evading arrest
- No driving without insurance or suspended license charge in the past 3 years

*CA requires no DUI in the past 10 years

19.  Kasselman's blog entry ended, "Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers and cities are just the beginning. We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road."

20.  Uber reinforced the message about its efforts to ensure customer safety and the quality of its background checks when it charged UberX customers a $1.00 "Safe Rides Fee," which is separately itemized on the electronic receipt sent to each customer.

///

///

///

///

///

UBER                                                          OCTOBER 15, 2014

**$26.09**                                                    Thanks for choosing Uber.

| FARE BREAKDOWN | |
| --- | --- |
| Base Fare | 2.20 |
| Distance | 14.92 |
| Time | 3.97 |
| **Subtotal** | **$21.09** |
| SFO Airport Fee Toll (?) | 4.00 |
| Safe Rides Fee (?) | 1.00 |

10:49
Pickup Location

11:04
Airport Access Road, San Francisco International Airport
(SFO), San Francisco, CA

| CAR | MILES | TRIP TIME | CHARGED | |
| --- | --- | --- | --- | --- |
| uberX | 11.48 | 00:15:17 | Personal | **$26.09** |

21.  Beginning with Uber's April 2014 introduction of the "Safe Rides Fee" through the end of October, 2014, a question mark next to the words "Safe Rides Fee" contained a hyperlink that connected the customer to the following explanation stating that the fee is used to support, among other things, "an industry-leading background check process."

## What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road. The Safe Rides Fee is a small fee added to uberX fares on behalf of drivers in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD.

22.  In March of 2015, news reports came out about Uber drivers being prosecuted for raping their customers in Paris, France and Santa Clara, California.  Also in March of 2015, Uber came out with a new advertising campaign, which appears to have been designed to respond to these reports and to reassure its customers once again that it is safe to get into an Uber.  In an email to California customers on or about March 26, 2015, entitled "Safety By Design," Uber told its customers that, "From before the start of your trip until after it's finished, safety is built into every step of the Uber experience.  Look under the hood and see how."  Uber then represented to its customers that "Uber prohibits drug or alcohol offenses, severe traffic violations, and sexual offenses."



**BACKGROUND CHECKS**

Drivers pass federal, multi-state, and county background checks before driving.



**EXTENSIVE SCREENING**

Uber prohibits drug or alcohol offenses, severe traffic violations, and sexual offenses.

23.  Unlike Uber's Kasselman blog post setting forth the time limitations on how old a conviction can be in order to disqualify an applicant (e.g., conviction for sex offense must be within 7 years), in this email Uber set forth no time limitation whatsoever, sending the clear and unequivocal message directly to the inbox of its customers that they can rest assured that they will not be getting into the car with a person who has committed "drug or alcohol offenses, severe

traffic violations," or "sexual offenses" no matter how old the convictions.  In order to reinforce Uber's message that its "extensive screening" is robust enough to prevent the possibility that the customer will get into an Uber car driven by a sex offender, Uber's March 26, 2015 "Safety By Design" email included a link to a video of a pregnant woman taking a ride alone with a male Uber driver while telling the audience all of the reasons she feels safe riding with Uber.



24.   Uber eliminated the "read more" hyperlink connecting the Rider Safety Page to the Kasselman Blog sometime during the second or third week of June, 2015.  Uber's elimination of the "read more" link created a new misleading impression.  The "Background Checks" description now simply reads:

> Every ridesharing and livery driver in the U.S. is thoroughly screened through a process that includes court, federal, and multi-state criminal background checks that go back as far as the driver's state's law allows, and ongoing reviews of drivers' motor vehicle records throughout their time driving with Uber.

25.   The statement fails to explain any disqualification criteria, leading consumers to believe that Uber eliminates drivers who have <u>any</u> kind of criminal convictions.  The lack of any specific time limits in the statement also amplifies the impression that Uber's background checks go as far back as legally possible.

26.  Systemic failures in Uber's background check process came to light through the discovery process in this enforcement action, including the fact that in Los Angeles alone, registered sex offenders, a kidnapper, identity thieves, burglars, and a convicted murderer had passed Uber's "industry leading" background check.  They were discovered to be driving for Uber only after being cited for an illegal airport ride or street hail.  Following these revelations, Uber removed the Kasselman blog from its website altogether and replaced it with a new blog entry written by Joe Sullivan, Uber's new "Chief Security Officer" in the portion of the Uber website dubbed the "Newsroom."

27.  Sullivan's blog entry ("the Sullivan blog"), dated July 2, 2015, states that Uber's background check process consists of running an applicant's name and address through databases identified as "the National Sex Offender Registry, National Criminal Search, and several different databases used to flag suspected terrorists."  The blog goes on to explain that if the database search identifies a criminal record, then Uber's background check provider will send someone to the relevant local courthouse to gather the records.  Gathering records at the courthouse, Sullivan claims, "helps ensure the records match the identity of the potential driver."

28.  In addition to listing the National Sex Offender Registry as one of the databases Uber drivers are screened against, the Sullivan blog further represents that Uber's background check process results in, "Disqualification if potential driver appears on the National Sex Offender Registry . . . ."

29.  On July 16, 2015, Uber reposted the Sullivan blog's content to the Uber "Newsroom" under the heading "Details on Safety."  According to the post, Uber added this content to the "Newsroom" with the intent that "anyone can easily" see Joe Sullivan's description of Uber's "approach to safety in California."  While Uber made some modifications to the language used in the Sullivan blog, its content remained virtually unchanged.

30.  The disqualification criteria listed in the Sullivan blog also changed certain representations that Uber had made in the past.  Uber had previously represented that it disqualified drivers in California with convictions for driving under the influence going back ten

years, but the Sullivan blog represented that Uber's background check process only looked back seven years for such convictions.  The Sullivan blog also added disqualification criteria that were missing from Uber's earlier representations, including convictions for fraud, theft-related offenses, and any other felony conviction.

31.   Uber had previously backed away from other of the representations it had made on the Safety Page.  In September of 2014, after the District Attorneys notified Uber that representing its background check process as "industry-leading" is false and misleading, Uber changed the words "industry-leading" under the heading "BACKGROUND CHECKS YOU CAN TRUST" to "constantly improving."  In October of 2014, Uber changed the description of the background check hyperlinked to the "Safe Rides Fee" on every UberX receipt by replacing the words "industry-leading" with "Federal, state, and local."  Sometime in December, 2014, following the filing of this enforcement action, Uber dropped the claim that its background check "leads the industry" from the first sentence of the Kasselman blog.  Three months later, on or about March 26, 2015, Uber eliminated its claim to be the "Safest Ride on the Road" and modified the banner over the picture of the little girl on its Safety Page to read, "Safety By Design," and then "Safe Rides Safer Cities – Putting People First."  Uber dropped its claim to be "setting the strictest safety standards possible, then working hard to improve them every day."  Uber also stopped claiming to have "BACKGROUND CHECKS YOU CAN TRUST."

32.   Although Uber backed away from some of its representations, Uber's safety representations continue to be misleading.  Since the debut of Uber's "Safety Page" in April of 2014, Uber has strengthened the impression that it does everything it can to ensure its customers' safety by incorporating specific misrepresentations of fact into the very impressive sounding laundry-list of process descriptions and disqualification criteria that Uber communicates to the public, both in the statements made by Uber on its web-pages described above, and in statements made by Uber's spokespeople that are discussed in the succeeding paragraphs.  These misrepresentations include, but are not limited to Uber's representations that:

///

- "All Uber ridesharing and livery partners must go through a rigorous background check that leads the industry;"

- The Safe Rides Fee supports an "industry-leading" background check process;"

- Uber has "Background Checks that Exceed any Local or National Standard;"

- Uber's background check process is "often more rigorous than what is required to become a taxi driver;"

- Uber's safety measures "always exceed what is required of local taxi companies;"

- "Within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security;"

- Uber's background checks "go back as far as the law allows;"

- Uber's background checks go back "the maximum allowable by the Fair Credit Reporting Act;"

- Uber checks the National Sex Offender Registry and disqualifies applicants who appear on the Registry;

- "Verifying potential criminal records at the source - the courthouse records - helps ensure the records match the identity of the potential driver;"

- "Uber prohibits drug or alcohol offenses, severe traffic violations, and sexual offenses;"

- Uber's background check process includes a "lifetime" disqualification for sex offenders.

*Uber's Background Check Process Cannot Ensure Its Information Pertains to The Applicant*

33.   The centerpiece of Uber's customer safety assurances — the background check process Uber touts as "often more rigorous than what is required to become a taxi driver" — does not use fingerprint identification and therefore cannot ensure the information Uber obtains from a background check actually pertains to the applicant.  Uber's representations concerning the quality of its background check process are untrue or misleading.  Contrary to Uber's multiple representations concerning the superiority of its background check process, including but not

limited to representations that it uses a background check process that "leads the industry," and that its background check process is "often more rigorous than what is required to become a taxi driver," Uber's background check process does not provide the level of security provided by the fingerprint-based background check process employed for performing background checks on taxi drivers in California's most populous cities.

34.   Instead of using fingerprints, Uber's background check process relies upon its drivers to submit personal identifiers (name, address, driver's license number and state, and social security number) through an online webpage.  Uber provides this information to a private background check vendor.  One of the vendors Uber uses is Hirease, Inc. (a division of Accurate Background, Inc.).  Another vendor Uber uses is Checkr, Inc.  Uber's process cannot ensure that the information in the background check report is actually associated with the applicant since it does not use a unique biometric identifier such as a fingerprint.

35.   Because of inaccuracies in background check information provided by private companies, California's Investigative Consumer Reporting Agencies Act requires those companies to include on the first page of every background check report a notice, in at least 12-point boldface type, setting forth that "the report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report."

36.   In fact, the sample report Hirease makes available on its website (http://info.hirease.com/consumer-resource) has a disclaimer stating, "Final verification of an individual's identity and proper use of report contents are the user's responsibility."  Similarly, the report generated by Checkr has a disclaimer stating, "The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject

of the report."

37.   By contrast, the taxi regulators in the most populous parts of California require drivers to undergo criminal background checks processed by the California Department of Justice (the "CALDOJ").  This process (the "Live Scan/CALDOJ Process") requires each driver to submit fingerprints through a technology called "Live Scan," and the fingerprint images are used to automatically search against all other fingerprint images in government criminal record databases maintained by the CALDOJ and the FBI.  Taxi regulators in Uber's home town of San Francisco, as well as California's most populous city – Los Angeles, and, at a minimum, the rest of the 10 most populous cities in California, and all 34 cities in Orange County all require Live Scan.

38.   Live Scan fingerprinting in California occurs at a facility designated by the California Department of Justice.  The fingerprints allow a biometric search of the California Department of Justice's criminal history databases and the option to obtain a search of the Federal Bureau of Investigation's database of multistate criminal history information.  The process of using a biometric identifier to search government databases through the California Department of Justice is the gold standard for a background check process in California.

39.   Fingerprints vary from person to person, and as a result they are an effective way of verifying a person's identity.  Because of the unique identifying characteristics of fingerprints, the Live Scan/CALDOJ Process provides assurance that the person whose criminal history has been run is, in fact, the applicant.  This would ensure that a registered sex offender could not use his law-abiding brother's identification information to become an Uber driver, and that a convicted burglar could not borrow his cousin's identification information to become an Uber driver in order to case the empty homes of customers he takes to the airport.

40.   One of Uber's own background check providers, Hirease, explains why a fingerprint-based background check process is far superior: "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."  Accurate Background, Inc., which is the parent company of Hirease, makes the same admission: "Fingerprinting helps uncover criminal history not discovered

through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."

41.  The private background check companies employed by Uber do not conduct finger-print based checks for Uber.  Rather, they search certain databases using personally identifiable information provided by applicants ("names-based checks").  The use of name-based checks decreases the accuracy of the information that the checks produce.  Name-based checks can result in false positives because one person may be associated with another person's records.  They can also result in false negatives. For example, if an individual provides false personally identifiable information or for some other reason has a criminal history under a different name, such as a maiden name, the name-based checks can miss the individual's criminal history.

42.  In the July, 2015 Sullivan blog, Uber attempted to diffuse the impact of several matters raised by the District Attorneys in this case.  One was the fact that Uber's background check process cannot ensure the information Uber obtains actually pertains to the applicant.  Uber's response in the Sullivan blog was to double-down on its misleading representations by asserting that its background check process does, in fact "ensure the records match the identity of the potential driver" because Uber's "background check provider sends someone to review the record in-person at the relevant courthouse or, if possible, pulls the record digitally."   This representation is untrue or misleading.  Obtaining records at a courthouse does not verify the identity of the applicant.  If an applicant provides Uber with incorrect identifying information, then Uber will search for the wrong name in the databases it searches and never go to the correct courthouse.  Even if Uber went to a courthouse to obtain records, it would request the wrong records because it would have the wrong name.

43.  In light of the fact that Uber does not use fingerprint identification, and therefore cannot ensure the information Uber obtains from a background check actually pertains to the applicant, Uber's factual representations described above, when viewed separately or together, are false or misleading.  For instance, Uber cannot ensure that "all drivers are screened against" county courthouse records going back seven years for every county of residence, because Uber's

background check process cannot ensure that Uber actually learns of every county where a driver may have been convicted during the past seven years while living under an alias that the driver has not given to Uber.  Furthermore, Uber cannot ensure that "all drivers are screened" for criminal histories because applicants who provide inaccurate or false information are effectively not screened at all.

*Uber's Background Check Process Does Not Access Complete Criminal Record Repositories*

44.   The private background check companies employed by Uber do not have access to the CALDOJ and federal databases of criminal history repositories.  Rather, the background check companies employed by Uber search for criminal convictions in commercial databases that do not index their records by unique biometric identifiers.

45.   By contrast, the criminal records in government criminal record databases contain unique numerical identifiers associated with a unique biometric identifier, such as a person's fingerprints.  These numerical identifiers allow for the tracking of individuals who use aliases or who, for other reasons, have criminal records associated with different names, different addresses, or different social security numbers.  The use of a numerical identifier associated with a unique biometric identifier, enables database searches to capture all criminal history of the subject even if the subject gives untruthful or inaccurate identifying information.

46.   The private background check companies employed by Uber cannot search their databases using a unique identifier associated with a person's fingerprints to identify criminal history information that otherwise might have been missed if the person was convicted under an alias name, or gave a false date of birth or social security number.  The private databases are inferior to the government databases because the background check companies must rely upon the truthfulness and accuracy of the information given to them by the subject of the search.

47.   In order to bolster public perception about its own background check system, Uber affirmatively mischaracterizes the accuracy of the Live Scan/CALDOJ background check process.  Uber's Sullivan blog represents that the Live Scan/CALDOJ process relies on databases that include arrest records for people who were never charged or convicted of crimes.  According to

Uber, the Live Scan/CALDOJ process therefore flags innocent people and impacts minorities in particular. These representations are untrue or misleading. They are also irrelevant in light of the fact that Uber does not – and cannot by law in California – disqualify drivers based on arrests that did not result in convictions.

48. If a background check processed by the CALDOJ includes a record of arrest with no corresponding disposition, the CALDOJ is required by law to make a "genuine effort" to determine the disposition. The CALDOJ may contact the law enforcement agency who made the arrest, the district attorney's office that prosecuted the case, and the relevant court. The CALDOJ completes the records for out-of-state and federal arrests, as well as in-state arrests. Only after completing the record will the CALDOJ disseminate the results of the background check.

49. In fact, the July 2013 report of the National Employment Law Project ("NELP"), which Joe Sullivan and other Uber employees and officers misleadingly cite to criticize the accuracy of the Live Scan/CALDOJ Process, specifically praises California's process as follows: "California Tracks Down Problem FBI Records to Ensure Fair Access to Jobs and Occupational Licenses." More specifically, the NELP report states that the CALDOJ "timely ensures that the completeness and accuracy of records that are requested for employment and licensing decisions."

50. In light of the fact that Uber does not access complete criminal record repositories, and therefore cannot ensure Uber obtains all of an applicant's criminal history, Uber's factual representations described above, when viewed separately or together, are false or misleading. For instance, Uber cannot ensure that it screens out all drivers who have disqualifying criminal histories, because Uber cannot ensure that it actually obtains complete or accurate criminal history information.

*Uber's Background Check Process Does Not Go Back As Far As The Law Allows*

51. The information available to taxi regulators using the Live Scan/CALDOJ Process is unlimited in duration. Uber, in contrast, limits its background check to criminal convictions going back seven years. On Uber's "Safety" webpage and in the Sullivan blog, Uber represents that state or federal law bars it from considering convictions older than seven years. This representation is

1   untrue or misleading.

2       52.  Federal law allows criminal convictions to be reported indefinitely.  The Fair Credit

3   Reporting Act cited by Uber does not have time limitations on reporting criminal convictions for

4   employment purposes.

5       53.  California's Investigative Consumer Reporting Agencies Act ("ICRAA"), Civil Code

6   section 1716.18, allows Uber's background check providers to report criminal convictions of a

7   driver that are older than seven years, so long as the date of release or parole is no more than seven

8   years before the date of the background check report.  Thus, the law allows Uber's background

9   check provider to report a driver applicant's 1995 murder conviction when he was released on

10   parole in 2014.  Yet, Uber's background check process does not report or identify that conviction.

11       54.  Uber's regulator, the CPUC, requires Uber to disqualify, "any person who has been

12   convicted, within the past seven years, of driving under the influence of drugs or alcohol, fraud,

13   sexual offenses, use of a motor vehicle to commit a felony, a crime involving property damage,

14   and/or theft, acts of violence, or acts of terror."  These disqualification criteria established by the

15   CPUC set a floor, not a ceiling, for Uber's background checks and do not prohibit Uber from

16   utilizing a background check process that goes back as far as allowed under California's

17   Investigative Consumer Reporting Agencies Act.  Rather than going "above and beyond local

18   requirements to ensure your comfort and security" as Uber claims to do, Uber instead chooses to

19   apply disqualification criteria that meet the bare minimum durational requirements imposed by its

20   regulator.

21       55.  San Francisco has a Fair Chance Ordinance that bars employers from basing hiring

22   decisions on convictions older than seven years.  However, this ordinance only applies to

23   employees who must work eight or more hours per week in San Francisco.  Uber does not require

24   that its drivers work in San Francisco for any amount of time, so the Fair Chance Ordinance is

25   inapplicable.

26       56.  Another matter raised by the District Attorneys in this case was that Uber's

27   background check process does not, as represented, go back "as far as the law allows."  Rather

than correct this false statement, Uber's Sullivan blog repeats the untrue and misleading claim that California law limits private background check companies to a "lookback" period of seven years, and claims that this period of time "strikes the right balance between protecting the public while also giving ex-offenders the chance to work and rehabilitate themselves."

57. In the Sullivan blog, Uber cites two California laws that it claims limit its ability to consider convictions older than seven years. AB 218 is a "Ban the Box" law that prevents public employers – not private employers like Uber – from asking applicants to disclose certain criminal history information on applications prior to an initial interview. SB 530 prevents private employers from considering arrests that did not result in convictions, as well as convictions that were subsequently dismissed or expunged. Neither law has anything to do with Uber's ability to consider convictions older than seven years.

58. Uber may have decided that seven years is the proper limit for achieving a balance between rehabilitation and opportunity for former offenders. The law, however, imposes no such limit on Uber. If Uber has decided on its own to limit its background checks to seven years in order to provide employment opportunities for former offenders, such efforts do not give Uber license to make false or misleading statements to its consumers which prevent them from making an informed decision about using Uber's services.

59. In light of the fact that Uber's background check process is limited in duration and does consider criminal convictions going back as far as the law allows, Uber's factual representations described above, when viewed separately or together, are false or misleading. For instance, Uber cannot ensure that it screens out all drivers who have disqualifying criminal histories going back as far as the law allows, because Uber does not gather information concerning the date that an offender was released from prison or the date that an offender was released from parole.

*Uber's Background Check Process Cannot Uncover Many Categories of Sex Offenders*

60. While Uber's background check process will only identify applicants whose sex offense convictions occurred within the past seven years, the Live Scan/CALDOJ process used by

the taxi regulators in California's most populous cities identifies all sex offense convictions regardless of when they occurred.  To bolster its claims that its background check process "leads the industry" despite this critically important difference, Uber has undertaken a campaign to convince the general public, its existing customers, and various regulators that its screening would disqualify all applicants who are registered as sex offenders anywhere in the United States no matter when the conviction occurred.

61.   The campaign began with factual representations in the Kasselman blog that were likely to lead a reasonable California consumer to believe that Uber's background check process is robust enough to prevent the possibility that the customer will get into an Uber car driven by a sex offender.  Kasselman represented that all drivers "are screened against" county courthouse records going back seven years for every county of residence, federal courthouse records going back seven years, and a purported multi-state criminal database going back seven years.

62.   On top of these supposedly comprehensive checks, the Kasselman blog also represented that all drivers "are screened against" a "National Sex Offender Registry screen."  This reinforces the message that Uber's background check process enables Uber to identify any registered sex offender, since the "National Sex Offender Registry" (NSOR) is a government sex-offender registry maintained by the FBI's National Criminal Information Center (NCIC).

63.   Uber's General Counsel, Salle Yoo, repeated Uber's messaging about sex offenders in a June, 2015 Marie Claire Magazine article questioning the efficacy of Uber's background check process.  The article discussed 14 reported instances of Uber drivers assaulting passengers in Chicago, Los Angeles, Philadelphia, Washington, D.C., London, and Paris.  It also discussed charges of kidnapping and rape brought against a New Delhi Uber driver, and charges of sexual assault brought in early April against an Uber driver in Houston.  The Marie Claire article quoted General Counsel Yoo as trotting out the company's public-relations script message that Uber's safety measures "always exceed what is required of local taxi companies."

64.   Uber's public-relations machine often repeats this refrain.  In an Uber blog entry dated January 5, 2015 and entitled "Uber Chicago Team Unveils New Safety Team Initiatives,"

Uber spokesperson "Chris" represented that Uber has "Background Checks that Exceed any Local or National Standard."  In other local blogs, such as the Uber "Newsroom" blog for Pittsburgh and for Chicago, Uber represents that its background check process, which is "consistent" throughout the country, includes a "lifetime" disqualification for sex offenders.

65.   Uber's statements that it searches the National Sex Offender Registry are false.  The NSOR is a database available to law-enforcement personnel only.  Uber kept the Kasselman blog visible to consumers on its website through June 30, 2015.

66.   The publicly-available government websites that allow private parties to search for registered sex offenders do not list all registered sex offenders.  The Dru Sjodin National Sex Offender Public Website maintained by the United States Department of Justice (the "NSOPW"), omits approximately one quarter of the registered sex offenders in California.  The list of registered sex offenders NOT included on NSOPW include certain California offenders convicted of:

- child pornography offenses where the victims are between the ages of 16 and 18,
- sexual exploitation of a child,
- employment of a minor for sexual exploitation,
- misdemeanor child molestation,
- felony sexual battery, and
- sex offenses against a grandchild, child, stepchild or sibling not involving penetration.

67.   Under California law, offenders convicted of these offenses may apply for an exemption from being reported on the publicly-available website of sex-offenders maintained by the California Department of Justice, the "Megan's Law Website."  According to the California Department of Justice, there are more than 30,000 registered sex offenders who have received this exemption and, therefore, do not appear on the Megan's Law Website.  This category of registered sex offenders will also not appear on the NSOPW because, for California registered sex offenders, NSOPW simply reports the information available on the Megan's Law Website.

68.   Moreover, other sex offenses do not require registration at all.  For instance, an Uber driver convicted of misdemeanor sexual battery, Penal Code § 243.4, or engaging in lewd conduct in a public place, Penal Code § 647(a), would not have to register as a sex offender - and a search of the NSOPW would not disclose the convictions.

69.   Because Uber's background check process only identifies sex offense convictions less than seven years old, and must reply upon publicly-available sex-offender data sources that omit 30,000 registered sex offenders in California, Uber's process will miss any one of the more than 30,000 registered sex offenders who fall into this category and whose conviction is more than seven years old, and Uber's process will miss them 100 percent of the time.  This means, for example, that Uber's background check process will NEVER disqualify a registered sex offender who applies to become an Uber driver in 2015 who was convicted in 2007 for molesting his daughter or for committing felony sexual battery on a stranger, so long as the applicant had successfully petitioned to have his name removed from the public website.

70.   And, because Uber's background check process does not use fingerprints or other biometrics to verify the identity of the applicant, it will miss a registered sex offender who applies by using the identifying information of someone with a clean criminal history and driving record 100 percent of the time.  This means, for example, that Uber's background check process will NEVER disqualify a registered sex offender who was convicted of rape in 2007 and released from prison in 2015 just weeks before he applied to Uber by using the identifying information of someone with a clean criminal history and driving record.

71.   By contrast, the Live Scan/CALDOJ background check process used by taxi regulators in California's most populous counties will identify that same applicant as a registered sex offender by: (1) revealing all convictions, including convictions for sex offenses, regardless of when the conviction occurred and (2) ensuring the applicant has not avoided detection as a registered sex offender by using someone else's identifying information.

72.   Uber's misleading representations present a special danger to public safety in light of the well-documented phenomenon of parents sending their teenage children unaccompanied in

Uber vehicles.  Parents' increasing reliance on Uber to shuttle their children from school to sports practice, music lessons and after-school activities has been reported in national news-media articles such as the Washington Post's March 10, 2015 article, "Harried Parents Embracing Uber To Move Kids Around Town," the Wall Street Journal's December 17, 2014 article, "Uber Is the New Family Chauffeur - Teens Gain Independence; Parents Track the Rides," and the New York Times' April 17, 2015 article, "For Some Teenagers, 16 Candles Mean It's Time to Join Uber."

73.   When confronted through the discovery process in this enforcement action with the fact that Uber's background check process has systemic deficiencies that prevent Uber from identifying a large number of sex offenders, Uber made assertions designed to mislead consumers into believing that Uber's process is as comprehensive as the Live Scan/CALDOJ Process.  The Sullivan blog continues to lie to the public and assert that Uber searches the National Sex Offender Registry.  The Sullivan blog also falsely claims that not every registered sex offender appears on the California Department of Justice's registry of sex offenders, and thus creates the implication that the Live Scan/CALDOJ Process will also, like Uber's process, miss approximately 25% of registered sex offenders in California.  The CALDOJ/Live Scan background check process identifies all convictions, including sex offenses, without time limitation.

*Drivers With Disqualifying Criminal Histories Pass Uber's Background Check*

74.   Since the filing of the original Complaint eight months ago, the People have received records of Uber drivers who were issued citations by airport police at San Francisco and Los Angeles International Airports and the Los Angeles Police Department's Bandit Cab detail.  From this small sample, the People have identified drivers with disqualifying criminal histories or driving records who nonetheless passed Uber's background check.  The criminal histories include convictions for murder, sex offenses, kidnapping, assault, robbery burglary, fraud, and identity theft.  The individuals' driving records include convictions for driving under the influence, driving with a suspended license, and reckless driving, as well as individuals who had more than three DMV points within the preceding three years.  What follows is a sample of the drivers who passed Uber's background check process despite having criminal histories and driving records that are

disqualifying under Uber's own representations, PUC rules and regulations, and/or the rules and regulations applied by local taxi regulators.

75.   Uber Driver # 1 was convicted of second degree murder, a felony, in Los Angeles in 1982.  After spending 26 years in prison, he was released on parole in 2008.  He applied to drive for Uber using a different name than the name appearing on the court records relating to his murder conviction.  A background report generated by Hirease on November 10, 2014 states that Driver # 1 had no known aliases.  The background report shows no criminal history for Driver # 1. In November of 2014, less than seven years after being released from prison, he became an Uber driver.  Uber Driver #1 drove for Uber in Los Angeles until May 28, 2015 and provided 1,168 rides to consumers.  California law allowed Hirease to report Uber Driver #1's criminal history to Uber, since he was released from prison within seven years of the Uber background check.  Uber's background check process did not identify Driver #1's murder conviction because Uber's process (a) does not utilize a unique biometric identifier, (b) does not access criminal record repositories that allow for the tracking of individuals using aliases, and (c) does not actually go back as far as the law allows.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 1's criminal history.

76.   Uber Driver # 2 was convicted of committing lewd or lascivious acts against a child under 14, a felony, on July 25, 1999.  He is required to register as a sex offender in the State of California.  He applied for, and was granted, exclusion from the California Megan's Law Website. And his name does not appear on the NSOPW.  In February of 2014, he applied to drive for Uber. A background report generated by Hirease on February 17, 2014 did not uncover Driver # 2's conviction for lewd or lascivious acts with a child under 14, or the fact that he is a registered sex offender.  Driver # 2 drove for Uber until May of 2015.  He provided 5,697 rides to Uber passengers, including unaccompanied children.  Uber's background check process did not identify Driver # 2's conviction or his status as a registered sex offender because Uber's process (a) does not access criminal record repositories of unlimited duration and (b) does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the

same limitations and would have identified Driver # 2's criminal history.

77.   Uber Driver # 3 was convicted of felony sexual exploitation of children in Wyoming on November 7, 2005.  According to publicly available court records, he was found to be in violation of his probation in April 2011.  He was not released from probation until March 2013. He registers as a sex offender in the State of California.  In August 2013, he applied to drive for Uber.  A background report generated by Hirease on August 19, 2013 did not uncover Driver # 3's conviction for felony sexual exploitation of children, his status as a registered sex offender, or the fact that he was on probation until just five months earlier.  He drove for Uber in Los Angeles until May 22, 2015 and provided 3,173 rides to consumers, including unaccompanied children. California law allowed Hirease to report Driver # 3's conviction to Uber because he was released from probation within seven years of the background check.  Uber's background check process did not identify Driver # 3's conviction or his status as a registered sex offender because Uber's process (a) does not access databases with complete criminal history information, (b) does not access criminal record repositories of unlimited duration, and (c) does not actually go back as far as the law allows.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 3's criminal history.

78.   Uber Driver # 4 was convicted of felony kidnapping for ransom with a firearm on November 21, 1994 in Los Angeles, and he was sentenced to a term of eight years to life in prison. He has earlier convictions for a variety of crimes including felony robbery with a firearm, felony sale of cocaine, and driving under the influence in San Bernadino and Pomona.  He was released from prison in 2013, and he remains on parole.  He applied to drive for Uber in March of 2015.  A background report generated by Checkr on March 18, 2015 did not uncover Driver # 4's extensive criminal history.  The Checkr report indicates that a county-level check was only performed in San Bernadino, California and Middlesex, Massachusetts, but not in Los Angeles where Driver # 4 had been convicted of kidnapping.  California law allowed Checkr to report Driver # 4's conviction to Uber because, within seven years of the background check, he was released from prison after serving a prison sentence for a violent crime.  Uber's background check process either failed to

1  identify Uber Driver # 4's criminal history, or identified the history and passed him nonetheless.

2  Uber's background check process did not identify Driver # 4's conviction for kidnapping because

3  Uber's process (a) does not access databases with complete criminal history information, (b) does

4  not access criminal record repositories of unlimited duration, and (c) does not actually go back as

5  far as the law allows.  The Live Scan/CALDOJ Process does not have the same limitations and

6  would have identified Driver # 4's criminal history.  Upon learning of Driver # 4's criminal

7  history, Uber temporarily deactivated his account.  Uber subsequently reactivated his account, and

8  Driver # 4 continues driving for Uber in Los Angeles at this time.

9      79.  Uber Driver # 5 was convicted on December 14, 1999 of assault with a firearm in Los

10  Angeles.  Publicly available court records show he was sentenced to 14 years in state prison.

11  Under California law, Driver # 5 was required to serve 85% of his sentence and was therefore

12  released from prison no earlier than mid-2011.  Upon his release from prison, he became an Uber

13  driver.  Uber Driver # 5 drives for Uber in the Los Angeles area.  California law allowed Hirease

14  to report Driver # 5's conviction to Uber because he was released from prison within seven years

15  of the background check.  Uber's background check process either failed to identify Uber Driver #

16  5's criminal history, or identified the history and passed him nonetheless.  On information and

17  belief, Uber's background check process did not identify Driver # 5's conviction for assault

18  because Uber's process (a) does not access databases with complete criminal history information,

19  (b) does not access criminal record repositories of unlimited duration, and (c) does not actually go

20  back as far as the law allows.  The Live Scan/CALDOJ Process does not have the same limitations

21  and would have identified Driver # 5's criminal history.

22      80.  Uber Driver # 6 was convicted of felony assault with a firearm in 1994.  In 2000, he

23  was convicted of residential burglary, and he was sentenced to 13 years in state prison.  Under

24  California law, Driver # 6 was not eligible for release from prison until 2010.  On information and

25  belief, he drives for Uber in the Los Angeles area.  California law allowed Uber's background

26  check provider to report Driver # 6's conviction to Uber because, within seven years of the

27  background check, he was released from prison after serving a sentence for a violent crime.

Uber's background check process either failed to identify Uber Driver # 6's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 6's conviction for residential burglary because Uber's process (a) does not access databases with complete criminal history information, (b) does not access criminal record repositories of unlimited duration, and (c) does not actually go back as far as the law allows.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 6's criminal history.

81.  Uber Driver # 7 was convicted in 2010 of 29 felony counts of theft, grand theft, filing false or fraudulent real estate trust deeds, and money laundering.  Court records show that he victimized nine people – three of whom were elderly or disabled – and that he stole $3 million.  The victims were only able to recover $1 million.  On information and belief, he drives for Uber in the Los Angeles area.  California law allowed Uber's background check provider to report Driver # 7's conviction to Uber because he was convicted within seven years of the background check.  Uber's background check process either failed to identify Uber Driver # 7's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 7's conviction for assault because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 7's criminal history.

82.  Uber Driver # 8 was convicted of felony robbery on July 5, 2006.  He was sentenced to serve a term of two years in prison.  He was subsequently convicted of driving on a suspended license in 2009 and again in 2010.  Also in 2010, Driver # 8 was convicted of a felony for being an ex-felon in possession of a gun.  Uber Driver # 8 began driving for Uber in June 2013 in Los Angeles.  In March 2014, he was arrested for residential burglary.  He was convicted of that crime in August 2014.  And he is currently in state prison serving his sentence for this offense.  Uber did not deactivate his account until June 2015.  California law allowed Hirease to report Driver # 8's criminal history to Uber because he was convicted of robbery and being an ex-felon in possession of a gun within seven years of the background check.  Uber's background check process either

failed to identify Uber Driver # 8's convictions for residential burglary or being an ex-felon in possession of a gun, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 8's conviction for robbery because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 8's criminal history.

83.    Uber Driver # 9's criminal history includes convictions for misdemeanor identity theft in 2008, as well as for felony identity theft in 2012.  On information and belief, he drives for Uber in the Los Angeles area.  California law allowed Hirease to report Driver # 9's criminal history to Uber because he was convicted of multiple disqualifying offenses within seven years of the background check.  Uber's background check process either failed to identify Uber Driver # 9's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 9's convictions for identity theft because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 9's criminal history.

84.    Uber Driver # 10 was convicted of 14 counts of felony identity theft in 2011.  After his release from incarceration, he applied to work for a commercial transportation company but was rejected after undergoing a fingerprint-based background check.  He began driving for Uber in February of 2013 in Los Angeles, and his account was deactivated on March 25, 2015.  California law allowed Uber's background check provider to report Driver # 10's criminal history to Uber because he was convicted of a disqualifying offense within seven years of the background check.  Uber's background check process either failed to identify Uber Driver # 10's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 10's conviction for identity theft because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 10's criminal

1   history.

2          85.   Uber Driver # 11 was convicted of felony welfare fraud in 2009 and felony burglary

3   in 2011.  On information and belief, she drives for Uber in the Los Angeles area.  California law

4   allowed Uber's background check provider to report Driver # 11's criminal history to Uber

5   because she was convicted of multiple disqualifying offenses within seven years of the background

6   check.  Uber's background check process either failed to identify Uber Driver # 11's criminal

7   history, or identified the history and passed her nonetheless.  On information and belief, Uber's

8   background check process did not identify Driver # 11's convictions for welfare fraud and

9   burglary because Uber's process does not access databases with complete criminal history

10  information.  The Live Scan/CALDOJ Process does not have the same limitations and would have

11  identified Driver # 11's criminal history.

12         86.   Uber Driver # 12 was convicted of multiple felonies on February 26, 2007, including

13  burglary, identity theft, access card fraud, and receiving stolen property.  Court records show that

14  on May 25, 2007, he was sentenced to a term of two years in prison, but the court suspended the

15  sentence.  Court records show that on June 29, 2009, the court became aware that a new and

16  unrelated criminal case had been filed against Uber Driver # 12.  He was subsequently found in

17  violation of his probation.  On August 17, 2009, he was ordered to serve the two-year prison

18  sentence, which had been suspended.  On information and belief, Uber Driver # 12 drives for Uber

19  in the Los Angeles area.  He received a citation on March 3, 2015 while driving for Uber at Los

20  Angeles International Airport.  He was driving a car that was not registered to him, but rather to

21  somebody else with no criminal history.  California law allowed Uber's background check

22  provider to report Driver # 12's criminal history to Uber because he was released from prison

23  within seven years of the background check.  Uber's background check process either failed to

24  identify Uber Driver # 12's criminal history, or identified the history and passed him nonetheless.

25  On information and belief, Uber's background check process did not identify Driver # 12's

26  multiple convictions for fraud and theft offenses because Uber's process does not utilize a unique

27  biometric identifier and does not access databases with complete criminal history information.

The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 12's criminal history.

87.    Uber Driver # 13 was convicted in 2007 of felony taking a vehicle without consent. In August 2008, he was convicted of being an ex-felon with a gun.  On information and belief, he drives for Uber in the Los Angeles area.  California law allowed Uber's background check provider to report Driver # 13's criminal history to Uber because he was convicted of multiple disqualifying offenses within seven years of the background check.  Uber's background check process either failed to identify Uber Driver # 13's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 13's convictions because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 13's criminal history.

88.    Uber Driver # 14 was convicted in 2011 of two theft-related felonies: filing a forged power of attorney and filing a forged real estate grant deed.  He was ordered to pay $47,500 in restitution, which he had unlawfully obtained from the victim of his crime.  According to publicly available court records, he failed to pay the court-ordered restitution, and the court then imposed a two-year prison sentence.  On information and belief, he drives for Uber in the Los Angeles area. California law allowed Uber's background check provider to report Driver # 14's criminal history to Uber because he was convicted of multiple disqualifying offenses within seven years of the background check.  Uber's background check process either failed to identify Uber Driver # 14's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 14's conviction for two theft-related felonies because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 14's criminal history.

89.    Uber Driver # 15 was convicted of misdemeanor driving under the influence in 2007. He drove for Uber in the Los Angeles area.  Uber terminated his driving privileges in January of

2015 after a well-publicized incident in which he was accused of sexually assaulting a passenger. Uber has represented that it disqualifies drivers with convictions for driving under the influence going back 10 years. Uber's background check process either failed to identify Uber Driver # 15's criminal history, or identified the history and passed him nonetheless. On information and belief, Uber's background check process did not identify Driver # 15's conviction for driving under the influence because Uber's process does not access databases with complete criminal history information. The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 15's criminal history.

90. Uber Driver # 16 was convicted of misdemeanor driving under the influence and driving with a suspended license in 2010. On information and belief, he drives for Uber in the Los Angeles area. Uber has represented that it disqualifies drivers with convictions for driving under the influence going back 10 years, and currently represents that it disqualifies drivers with convictions for driving under the influence going back seven years. Uber's background check process either failed to identify Uber Driver # 16's criminal history, or identified the history and passed him nonetheless. On information and belief, Uber's background check process did not identify Driver # 16's conviction for driving under the influence because Uber's process does not access databases with complete criminal history information. The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 16's criminal history.

91. Uber Driver # 17 was convicted of misdemeanor driving under the influence in 2011. On information and belief, he drives for Uber in the Los Angeles area. Uber has represented that it disqualifies drivers with convictions for driving under the influence going back 10 years, and currently represents that it disqualifies drivers with convictions for driving under the influence going back seven years. Uber's background check process either failed to identify Uber Driver # 17's criminal history, or identified the history and passed him nonetheless. On information and belief, Uber's background check process did not identify Driver # 17's conviction for driving under the influence because Uber's process does not access databases with complete criminal history information. The Live Scan/CALDOJ Process does not have the same limitations and

would have identified Driver # 17's criminal history.

92.   Uber Driver # 18 was convicted of misdemeanor driving under the influence in 2006. On information and belief, he drives for Uber in the Los Angeles area.  Uber has represented that it disqualifies drivers with convictions for driving under the influence going back 10 years, and currently represents that it disqualifies drivers with convictions for driving under the influence going back seven years.  Uber's background check process either failed to identify Uber Driver # 18's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 18's conviction for driving under the influence because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 18's criminal history.

93.   Uber Driver # 19 was convicted of misdemeanor driving under the influence in 2013. On information and belief, he drives for Uber in the San Francisco area.  Uber has represented that it disqualifies drivers with convictions for driving under the influence going back 10 years, and currently represents that it disqualifies drivers with convictions for driving under the influence going back seven years.  Uber's background check process either failed to identify Uber Driver # 19's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver # 19's conviction for driving under the influence because Uber's process does not access databases with complete criminal history information.  The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 19's criminal history.

94.   Uber Driver # 20 was convicted in 2007 of misdemeanor reckless driving and driving in excess of 100 miles per hour.  On information and belief, he has been driving for Uber since at least December 2013 in the Los Angeles area.  Uber represents that it disqualifies drivers with convictions for reckless driving going back seven years.  Uber's background check process either failed to identify Uber Driver # 20's criminal history, or identified the history and passed him nonetheless.  On information and belief, Uber's background check process did not identify Driver

# 20's conviction for reckless driving because Uber's process does not access databases with complete criminal history information. The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 20's criminal history.

95. Uber Driver # 21 sustained a misdemeanor conviction in March 2013 for driving under the influence. In July 2013, he was convicted of a felony conviction for possession of methamphetamine. On information and belief, he drives for Uber in the Los Angeles area. Uber's background check process either failed to identify Uber Driver # 21's criminal history, or identified the history and passed him nonetheless. On information and belief, Uber's background check process did not identify Driver # 21's convictions because Uber's process does not access databases with complete criminal history information. The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 21's criminal history.

96. Uber Driver # 22 sustained a felony conviction for maintaining a place for the sales of methamphetamine in April 2012. On information and belief, he drives for Uber in the Los Angeles area. Uber's background check process either failed to identify Uber Driver # 22's criminal history, or identified the history and passed him nonetheless. On information and belief, Uber's background check process did not identify Driver # 22's conviction because Uber's process does not access databases with complete criminal history information. The Live Scan/CALDOJ Process does not have the same limitations and would have identified Driver # 22's criminal history.

97. Some Uber drivers evade the background check process entirely by using an account belonging to another person. At this time, the People have identified at least three Uber drivers who used another person's account to drive for Uber even though they did not hold a valid driver's license.

98. Uber Driver # 23 received a citation at SFO on May 4, 2014. He provided San Francisco Police with a driver's license that had expired in December of 2007. When the citing police officer noticed that the photograph on the driver's Uber profile did not look like Driver # 23, Driver # 23 stated that he was using his brother's Uber account.

99.  Uber Driver # 24 was taken into custody at SFO on May 21, 2014.  Uber Driver # 24 provided San Francisco Police with two different names, neither of which matched any valid driver's license.  When the San Francisco Police officer noticed that the photograph on the driver's Uber profile did not look like Driver # 24, Driver # 24 stated that he was using the account of his cousin.

100. Uber Driver # 25 received a citation at LAX on June 7, 2015.  Uber Driver # 25 did not hold a valid driver's license.  His interim driver's license had expired.  Driver # 25 stated that he was leasing his car from someone else and using their Uber account.

*Uber's Misleading Statements In Response To Incidents Involving Its Drivers*

101.  During 2014 and 2015 Uber has consistently repeated its misleading statements about the quality of its background checks and commitment to safety in response to a series of well-publicized incidents involving Uber drivers.  Trotting out the company line about its background check process is a corporate policy set at the very top of the organization.  In September, 2013 Uber CEO Travis Kalanick wrote in an internal email, "we need to make sure that these writers don't come away thinking we are responsible, even when things do go bad. . . [T]hese writers are starting to think that we are somehow liable for these incidents that aren't even real in the first place."

102.  In January 2014, online news site PandoDaily.com reported that an Uber driver in San Francisco who had been accused of verbally and physically assaulting a passenger had a significant criminal history which should have disqualified him from becoming an Uber driver.  In June 2014, Forbes.com reported that the driver had been on probation for a battery conviction when Uber hired him in October 2013.  When questioned about the decision to allow an applicant with a conviction for violent crime to drive for Uber, spokesperson Kasselman told NBC Bay Area News that "Uber works with Hirease to conduct stringent background checks, which all drivers must undergo and clear to partner with Uber."  Kasselman then claimed that the driver "had a clean background check in October."

///

103.   On December 31, 2013, an Uber driver struck and killed a six-year-old girl while driving in San Francisco.  In response to the incident, the next day Uber posted a "Statement on New Year's Eve Accident" on its blog in which the company represented, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers."  Two weeks after Uber made its statement, the San Francisco Business Times reported that the driver had been convicted of reckless driving in Florida in September 2004.

104.   In February 2014, the Chicago Tribune reported that a 24-year-old Uber driver had a felony conviction for residential burglary in 2010, a misdemeanor conviction for criminal damage to property in 2009, another misdemeanor conviction in 2008 for breaking into a car to steal a GPS and satellite radio receiver, a history of speeding tickets, and had his license suspended twice in 2008.  Uber posted an apology on its website: "[W]e have already taken steps to prevent this from happening again, by expanding our background check process to set new industry-leading standards. . . We are sincerely sorry for this error, and want to assure all riders that we are taking the necessary steps to fix it and build the safest option for consumers."

105.   Two months later, on April 24, 2014, an NBC television affiliate in Los Angeles aired an investigative report about Uber's driver background checks in which the station enlisted a woman to apply to become an Uber driver.  She was on felony probation for making criminal threats (willfully threatening to commit a crime which will result in death or great bodily injury to another person), and during the broadcast described the conduct leading to her arrest: "I pulled a girl out of a car and almost beat her to death."  On March 3, 2014, Uber sent the woman an email notifying her that she passed her background check.  According to the NBC report, Uber would not respond to the station's request for comment about this case.  Instead, Uber spokesperson Lane Kasselman sent an email explaining Uber's background screening policy.  The email ended with, "We're confident that every ride on Uber is safer than a taxi."

106.   In July 2014, WDIV-TV 4 in Detroit broadcast a segment on an investigation it had performed in which it found Uber drivers who had previously had their licenses suspended, Uber drivers who had been in a serious accident with injuries, Uber drivers with speeding tickets, Uber

drivers who been cited for no proof of insurance, and Uber drivers who were driving vehicles registered to other people.  In response to the report, Uber spokesperson Lauren Altmin issued this statement: "We work every day to connect riders with the safest rides on the road and go above and beyond local requirements in every city we operate.  Uber only partners with drivers who pass an industry-leading screening that includes a criminal background check at the county, federal and multi-state level going back as far as the law allows. We also conduct ongoing reviews of drivers' motor vehicle records during their time as an Uber partner. . . .  For more information on what makes Uber the safest rides on the road, please see our website: https://www.uber.com/safety."

107.  In December, 2014 the United States edition of The Guardian reported that Uber admitted that a driver accused of sexual assault had been driving on an account created in his wife's name.  Uber's response was to blame the victim, and repeat the false assertion that Uber's background check "far exceeds what's expected of taxis."  The Guardian quoted Uber spokesperson Jennifer Mullin as telling the Associated Press that, "We do our best to send drivers though our background check process, which far exceeds what's expected of taxis.  But there is also a responsibility for the rider to make sure that when they get into an Uber that they're checking the license plate and they're checking the driver's face and making sure all that matches up."

108.  An April 10, 2015 article in the Houston Press reported that an Uber driver whom Houston prosecutors charged with raping a female passenger had been released from federal prison in 2012 and was on probation after serving 14 years in prison on a felony drug charge.  According to the article, Uber's third party background check did not disqualify the driver.  The article reported that, when questioned by Texas lawmakers about the failure, Uber Spokesperson Sally Kay told them "that the company's third party system is better than the FBI fingerprint check -- she said the employment background check company Uber uses, called Hirease, sends people directly to courthouses to pull records for each applicant."

109.  Uber's response to well-publicized incidents involving its drivers is to repeat its misleading mantra about the quality of its background check process, and to continue to assure the

public that it does everything it can to ensure its customers' safety.  Uber continues to repeat its claims that it aims "to go above and beyond local requirements to ensure your comfort and security," that it "is committed to connecting you to the safest ride on the road," that it makes "continued efforts to ensure the safest possible platform for Uber riders," and that it goes "above and beyond local requirements in every city we operate."

110.  Uber's representations are untrue or misleading.  At the same time Uber was stating that it is "working diligently to ensure we're doing everything we can to make Uber the safest experience on the road," it was instead working diligently to ensure it was doing everything it could to successfully defeat a bill pending in the California legislature that would have actually made Uber safer for its customers and the public.  Introduced in the 2013-2014 California legislative session, Assembly Bill 612 would have made three important changes to current California law.

111.  First, the legislation would have required Transportation Network Companies ("TNCs") to use the Live Scan/CALDOJ Process to obtain background check information from the same government repositories of criminal history information used by law enforcement.  The legislative analysis prepared for hearings by the Assembly Committee on Transportation noted that existing California Public Utilities Commission regulations allow TNCs to "use a third party firm that fails to provide a comprehensive search."  The analysis stated that the bill would provide "a uniform process by using the DOJ system to ensure the most comprehensive and updated data of an employee is provided . . . ."

112.  Second, the legislation would have required mandatory controlled substance and alcohol testing for TNC drivers.  This would have provided a mechanism for identifying drivers with substance abuse problems before a rider or member of the public was hurt, and would have put teeth into Uber's "Zero Tolerance Policy" which currently relies upon after-the-fact complaints from riders.

113.  Third, the legislation would have required TNCs to participate in the Department of Motor Vehicles Employer Pull Notice Program ("EPN").  Participants in the program receive

automatic notification of any driving-related convictions, failures to appear in court, accidents, driver's license suspensions or revocations, and any other actions taken against the driving privileges of their drivers.  Although Uber represents to the public that it conducts "ongoing reviews of drivers' motor vehicle records during their time as an Uber partner," the company does not choose to participate in EPN, and therefore does not receive automatic and timely notification. While Uber does not disclose how often it checks its drivers' motor vehicle records, under current California law it is only required to do so quarterly.

114.  Within six weeks of creating a blog posting devoted to safety in which Uber represented, "We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road," Uber mounted a campaign to defeat Assembly Bill 612.  As part of this campaign, Uber created its June 11, 2014 blog posting with the heading "California: Get on Board" in which it described the legislation as "a flagrant attempt to stymie innovation and competition."  Uber listed the names and contact information for all of the members of the California Senate Energy, Utilities and Communications Committee, encouraged the public to contact the legislators to oppose the bill, and provided a link for the public to "tweet your support for Uber in California!"

115.  As a result of its successful efforts, Uber is not required to fingerprint drivers during the application process, is not required to test its drivers for abuse of controlled substances and alcohol that could impair their ability to drive safely, and is not required to participate in the program that would provide automatic notification of significant events reflecting on its drivers' ability to drive safely.  Moreover, contrary to its representations that it goes "above and beyond local requirements in every city we operate," Uber has not chosen to do any of these things voluntarily.

116.  Uber's untrue or misleading representations regarding the measures it takes to ensure customer safety, taken together and separately, have violated and continue to violate California Business and Professions Code sections 17500 and 17200.  Uber has violated the law by making these representations on its website, to the media, on its blog, in email communications to its

customers, and in connection with receipts sent to UberX customers.

COMMERCIAL USE OF THE UBER APP TO MEASURE TIME AND DISTANCE
WITHOUT APPROVAL OF THE CALIFORNIA DEPARTMENT OF FOOD AND AGRICULTURE

117.  Before any weighing or measuring device can be sold or used in California, it must first be evaluated and approved by the Department of Food and Agriculture.  This process is known interchangeably as "type certification," "certification," or "type evaluation."  The process examines the design, features, operating characteristics, and performance of devices for compliance with legal requirements.  Its purpose is to ensure devices are accurate, reliable, and do not facilitate fraud.

118.  California Business and Professions Code section 12500.5 prohibits anyone from using a weighing, measuring or counting instrument or device for commercial purposes in the State of California without first obtaining approval of the measuring or counting instrument or device from the California Department of Food and Agriculture.  Business and Professions Code section 12500.5 states, in relevant part:

> It shall be unlawful to sell or use for commercial purposes any weight or measure, or any weighing, measuring, or counting instrument or device, of a type or design that has not first been so approved by the department . . . .

119.  The California Department of Food and Agriculture's Division of Measurement Standards ("DMS") reviews and certifies the accuracy of weighing, measuring, and counting instruments or devices that are used for commercial purposes in California.  DMS's mission is to ensure the accuracy of commercial weighing and measuring devices in order to ensure fair competition for industry and accurate value comparison for consumers.

120.  DMS has adopted, by regulation and pursuant to statute, the latest standards for tolerances, specifications, and other technical requirements recommended by the National Conference on Weights and Measures and published in the National Institute of Standards and Technology Handbook 44, "Specifications, Tolerances, and other Technical Requirements for Weighing and Measuring Devices" ("Handbook 44 Standards").  The National Conference on

Weights and Measures is a voluntary organization that develops model standards.  California's Business and Professions Code permits the Secretary of the California Department of Food and Agriculture to establish tolerances and specifications for commercial weighing and measuring devices not governed by the Handbook 44 Standards, and the Secretary does so when necessary.

121.  DMS's type evaluation of weighing, measuring, and counting instruments or devices includes type evaluation of any software written to interact with, control, connect into, or receive output from, a commercial weighing or measuring system or device.  Such software is "an accessory used or connected therewith" under California Business and Professions Code section 12500, subdivisions (a) and (b), and must be evaluated.

122.  Uber uses the Uber App technology to measure time and distance in order to calculate its customers' fares.  The Privacy Policy Effective July 13, 2013 that Uber posts on its website disclosed this fact:

> *If you are traveling in a vehicle requested via our Services, the driver's mobile phone will send your GPS coordinates, during the ride, to our servers. Most GPS enabled mobile devices can define one's location to within 50 feet. We collect this information for various purposes – including to determine the charge for the transportation you requested via our Services, to provide you with customer support, to send you promotions and offers, to enhance our Services, and for our internal business purposes.*

123.  In order to obtain type evaluation of a measuring technology, an applicant must submit a written application for type evaluation and one or more of the applicant's measuring devices preloaded with any controlling software as part of the type evaluation process.  Submission of a device and its controlling software is necessary to enable DMS's type evaluation personnel to verify that the measuring device operates within the specifications and tolerances established by the California Department of Food and Agriculture, and that the measuring device does not facilitate fraud.  DMS evaluates the software and any other component of a weighing or measuring device as part of the type evaluation process.  Submission of a device and its controlling software also allows DMS to determine which of the Handbook 44 Standards is applicable to components of the particular technology, or in cases where the Handbook 44 Standards do not govern, to establish

1    tolerances and specifications for the particular technological components which have a

2    metrological effect on the device.

3          124.  The Uber App technology is a  "measuring instrument" within the meaning of

4    California Business and Professions Code section 12500, subdivision (b), which states,

5    "`Measuring instrument' means any device, contrivance, apparatus, or instrument used, or

6    designed to be used, for ascertaining measure and includes any tool, appliance, or accessory used

7    or connected therewith."

8          125.  From at least 2010 up until May 19, 2015, Uber used its Uber App technology in

9    California to calculate each and every fare without having ever submitted the Uber App

10    technology to DMS for type evaluation.

11          126.  Uber violated Business and Professions Code section 12500.5 with each use of the

12    Uber App technology to calculate a customer's fare in California.

13          127.  In October, 2010, the San Francisco Municipal Transit Agency sent Uber a cease-

14    and-desist letter in which it informed Uber that, "Because you have a system that measures time

15    and distance, you are clearly in violation of type certification requirements that are placed upon

16    such devices by the Department of Agriculture's Weights and Measures Division."  Uber's CEO at

17    the time, Ryan Graves, posted the cease-and-desist letter on Uber's website and told a Techcrunch

18    reporter, "We are working with the agencies [involved] to figure out their exact concerns and make

19    sure that we're in compliance."  But, Uber did not cease operations in San Francisco, and did not

20    submit the Uber App technology to DMS for type evaluation.

21          128.  In December of 2012, DMS contacted Uber's CEO Travis Kalanick to discuss type

22    evaluation of the Uber App technology.  That same month the Director of the Consumer Protection

23    Safety Division of the California Public Utilities Commission ("the CPUC") forwarded to Mr.

24    Kalanick an email from the DMS Director explaining that the Uber App technology must be type

25    evaluated by DMS and that Business and Professions Code section 12500.5 prohibits the

26    commercial use of a measuring device that has not been type evaluated by DMS.  Despite

27    correspondence over several months between Uber CEO Kalanick and the DMS Director, Uber

1   never submitted the Uber App for certification.

2   129. DMS continued its efforts to convince Uber to comply with the law over the next

3   year and, in December of 2013, the DMS Director wrote a formal letter to CEO Kalanick

4   requesting a meeting to discuss the steps Uber must take to obtain type evaluation of the Uber App

5   technology.  On February 14, 2014, the DMS Director and Chief of Enforcement met with

6   representatives from Uber, including in-house counsel and Uber's outside counsel.  The DMS

7   Director sent a detailed confirming letter to Uber's outside counsel on February 28, 2014.  In the

8   letter, the Director informed Uber that a DMS evaluator was available to test the Uber App

9   technology beginning March 25, 2014, and asked Uber to contact the DMS Enforcement Division

10  to arrange for submission of the Uber App technology to DMS.

11  130. Uber once again did not submit the Uber App technology to DMS for type

12  evaluation.  On April 7, 2014, the DMS Director wrote Uber another letter in which she informed

13  Uber that it must immediately submit the Uber App technology for type evaluation.

14  131. In response to the April 7, 2014 letter, a member of Uber's public policy group, Sally

15  Kay, left a voice mail for the DMS Enforcement Branch Chief.  When they spoke by telephone on

16  or about April 16, 2014, the Enforcement Branch Chief reiterated to Ms. Kay that Uber must

17  submit the Uber App technology for type evaluation, and offered to provide assistance to Uber

18  with the application forms.  Ms. Kay responded that she knew where to find the information.

19  132.  A week later Ms. Kay sent the Enforcement Branch Chief an email saying, "Hi

20  Steve, didn't want you to think I had forgotten about you!  Just got some new staff on board that

21  may be able to help with this.  Thanks for understanding!  Talk soon, Sally Kay."

22  133. Despite Ms. Kay's assurances, Uber took no further action to comply with the law.

23  134. In September of 2014 the District Attorneys sent Uber a letter informing Uber that it

24  was violating the law by failing to submit its measuring technology to DMS for approval.

25  135. On October 10, 2014, the DMS Director sent Uber yet another letter directing Uber

26  to submit the Uber App technology for type evaluation.  She gave Uber a deadline of October 17,

27  2014 to submit the Uber App technology to DMS.

136.  Uber ignored the October 17, 2014 deadline, and continued to violate the law each time it uses its non-approved Uber App technology to calculate a customer fare.

137.  On May 19, 2015, about six months after the People instituted this enforcement action, Uber finally submitted the Uber App technology to DMS for type evaluation.  On August 5, 2015, DMS announced that it had issued Uber a Temporary Use Permit, temporarily authorizing legal use of the Uber App technology for commercial purposes while DMS and Uber continue to work through technical requirements.

138.  In an announcement following the issuance of the Temporary Use Permit, Uber admitted that its Uber App technology meets the criteria for regulation by DMS in that it "recommends fares by processing Global Positioning System (GPS) data from smartphones on its servers to measure time and distance."  Similarly, in a blog post following the issuance of the Temporary Use Permit, DMS described the Uber App technology as follows: "The company's software application . . . provides on-demand transportation services with fares determined using the Global Positioning System to measure time and distance."

<u>UNLAWFUL OPERATION AT CALIFORNIA AIRPORTS</u>

139.  In January of 2013, Uber CEO Travis Kalanick signed a term sheet with the California Public Utilities Commission ("CPUC") that allowed Uber to operate pending the CPUC's rulemaking proceedings.  As a condition of the term sheet, Kalanick agreed that Uber drivers "shall not transport passengers for hire onto airport property unless such transportation provider possesses the requisite authority or license from the airport authority involved."

140.  On September 23, 2013, when the CPUC issued Rulemaking 12-12-011 Decision 13-09-045 ("Decision 13-09-045"), the Commission mandated that, "TNCs shall not conduct any operations on the property of or into any airport unless such operations are authorized by the airport authority involved."

141.  On April, 7, 2014 the California Public Utilities Commission issued a permit to Uber ("Uber CPUC Permit") to operate as a Transportation Network Company ("TNC") in California. The Uber CPUC Permit explicitly states that the company continues to be subject to Decision 13-

09-045's restriction against airport operations: "This permit does not authorize the Carrier to conduct operations on the property of or into any airport unless such operation is authorized by the airport authority involved."

142. Uber has operated and continues to operate at airports throughout California in violation of Decision 13-09-045, the Uber CPUC Permit, and state law every day. In the first seven months of 2014, Los Angeles International Airport issued more than 260 citations to Uber drivers and impounded vehicles. In a six-month period in 2014 before Uber signed a permit to operate at San Francisco International Airport, authorities there issued more than 540 warnings and citations to Uber drivers. These represent a tiny fraction of the unauthorized trips by Uber drivers to these California airports during any given six month period. Each unauthorized trip to a California airport by an Uber driver constitutes a violation of the terms of Decision 13-09-045, a violation of the terms of the Uber CPUC permit, a violation of state law pursuant to California Public Utilities Code section 5411, and a trespass aided and abetted by Uber.

143. In April, 2013, San Francisco International Airport's Deputy Airport Director for Operations and Security sent a cease-and-desist letter to Uber CEO Kalanick in which he informed Kalanick that Uber's drivers who did not have permission to operate at San Francisco International Airport ("SFO") were committing trespass.

144. Uber did not comply with the cease-and-desist letter. Instead, on August 19, 2013, Uber posted a misleading "SFO Update" on its blog in which it told its customers that, "you can request whatever type of car you'd like when your flight lands at SFO – UberX, Uber Black, or Uber SUV." It also told its customers that, even though SFO had begun issuing citations to Uber drivers who lacked permission to drop off passengers at the airport, "We believe that all rides to and from SFO are legal and that airport officials are acting without proper authority in issuing these citations." Uber posted the misleading "SFO Update" despite the fact that, eight months before, CEO Kalanick had signed the term sheet with the CPUC in which he agreed that Uber drivers would not conduct unauthorized trips to airports.

///

# SFO UPDATE

AUGUST 19, 2013
## POSTED BY TESS

Some of our San Francisco riders have asked about recent issues they've had or heard about when taking Uber to the airport so we've compiled a few tips to help make sure your trip starts off on the right foot.

*Pickups at the airport:*

**You can request whatever type of car you'd like when your flight lands at SFO — uberX, UberBLACK, or UberSUV.** Any driver that accepts your ride request can take you home from SFO. For a quick and seamless pickup, call the driver and provide information about the terminal and door number where you're waiting.

*Drop-offs at the airport:*

SFO has taken an aggressive stance against uberX and has begun citing some drivers. We believe that all Uber rides to and from SFO are legal and that airport officials are acting without the proper authority in issuing these citations, but we want to make sure you're aware of the current situation.

145. Uber's willful violations continued throughout 2014, and Uber's August 19, 2013 "SFO Update" remained on Uber's blog throughout 2013 and 2014. Uber's "SFO Update" remained on Uber's blog even after the CPUC issued Decision 13-09-045 mandating that "TNCs shall not conduct any operations on the property of or into any airport unless such operations are authorized by the airport authority involved." And Uber's "SFO Update" remained on Uber's blog even after Uber obtained the Uber CPUC Permit on April, 7, 2014, which explicitly states that the company continues to be subject to Decision 13-09-045's restriction against airport operations: "This permit does not authorize the Carrier to conduct operations on the property of or into any airport unless such operation is authorized by the airport authority involved."

146. Moreover, when confronted with demands by airport authorities and the CPUC to cease the unlawful activities at airports, Uber's response was an intransigent refusal. On or about April 2, 2013, San Francisco International Airport's Deputy Director for Operations and Security sent Uber a cease-and-desist letter. Uber did not comply. A year later, on or about June 10, 2014, the CPUC's President sent Uber CEO Kalanick a letter demanding that Uber stop its unauthorized operations at airports in California. The letter informed Kalanick that seven members of the PUC's staff had met with law enforcement personnel from Los Angeles International, Oakland International, San Diego International, San Jose International, and San Francisco International airports who described numerous contacts with Uber drivers who did not have permission to

1    operate at the airports.

2        147. The CPUC President's letter reminded Kalanick that, "none of your firms have

3 obtained a permit from the airports to transport passengers to and from airport facilities.  Decision

4 13-09-045 specifically requires TNCs to obtain such permits."  It concluded with an order to

5 comply:  "Within two weeks of this letter I expect full compliance with each of the measures

6 adopted in D.13-09-045."  Nevertheless, Uber continued, in violation of Decision 13-09-045, the

7 terms of the Uber CPUC Permit, and state law, to encourage its drivers who lacked permission to

8 operate at SFO to do so during the entire period it was negotiating the license agreement that SFO

9 announced in a press release on October 20, 2014.

10        148. Moreover, at SFO, Uber gave its drivers a financial incentive to break the law.  Until

11 approximately October 20, 2014, Uber charged UberX customers who traveled to SFO an

12 additional $4.00 on top of the fare and passed the $4.00 on to the driver.  Uber labeled the charge

13 on the customers' receipts an "SFO Airport Fee Toll $4.00."  Uber's website support page

14 described and continues to describe the "Airport Fee Toll" as "a nominal fee to compensate drivers

15 for any airport fees they are charged as part of your trip."  However, Uber's drivers who were not

16 authorized to operate commercially at SFO did not pay anything to the airport.  Uber encouraged

17 these unauthorized drivers to trespass at SFO by paying them $4.00 in addition to their portion of

18 the fare.  The incentive to uberPOOL drivers who were not authorized to operate at SFO was twice

19 as much, given that Uber charged each customer a separate "Airport Fee Toll" for a total of $8.00.

20        149. Uber fails to comply with Decision 13-09-045 each time one of its drivers picks up or

21 drops off a passenger at a California airport where Uber does not have authorization to operate.

22 Each failure to comply with the terms of Decision 13-09-045 and with the Uber CPUC Permit is a

23 violation of state law pursuant to California Public Utilities Code section 5411.  Each unauthorized

24 trip to a California airport by an Uber driver also constitutes a trespass and a violation of Business

25 and Professions Code section 17200.

26        150. Uber's violations are numerous.  Within the past four years, Uber's drivers made

27 hundreds of thousands of unauthorized trips to California airports.

1

<u>U</u><small>NTRUE,</small> <u>M</u><small>ISLEADING AND</small> <u>F</u><small>RAUDULENT</small> <u>A</u><small>IRPORT</small> <u>F</u><small>EE</small> <u>T</u><small>OLL</small>

2      151. As described in Paragraph 103, Uber had a practice that lasted at least until October

3  20, 2014, of charging its passengers travelling to SFO a $4.00 "Airport Fee Toll" and telling its

4  customers that the charge was to compensate drivers for airport fees.

5

## What Is This Charge For A Toll?

6

7      If your driver pays a toll during your trip—or if your drop-off location is outside
       the city limits and a toll is required to return to the city—then the price of the toll
8      will be added to your fare.

9      In these situations, Uber returns 100% of the toll fee to drivers to ensure that
       they're fully reimbursed for the additional cost.

10     You might also notice an **Airport Fee Toll** on your receipt. In select cities, there
       may be a nominal fee to compensate drivers for any airport fees they are
11     charged as part of your trip. If you think you might have been charged this fee
       incorrectly, please let us know. You can contact your local community manager
12     at: t.uber.com/support

13

14     152. When two unrelated customers travel in the same car to SFO using the uberPOOL

15  service, Uber charges the $4.00 "Airport Fee Toll" twice, once to each customer.

16     153. However, as described in Paragraph 148, above, Uber charged this "Airport Fee Toll"

17  even though it knew its drivers who were not authorized to operate commercially at SFO paid

18  nothing to the airport.  Uber's representation to its customers that the $4.00 is an "Airport Fee

19  Toll," and explanation that "[i]n select cities, there may be a nominal fee to compensate drivers for

20  any airport fees they are charged as part of your trip" was likely to mislead its customers who were

21  riding with these unauthorized drivers to believe that the driver had to pay $4.00 to the airport for

22  the trip, and that the $4.00 would serve to reimburse the driver.

23     154. Moreover, Uber's representation to its customers that "[i]n select cities, there may be

24  a nominal fee to compensate drivers for any airport fees they are charged as part of your trip" was

25  also likely to mislead its customers who travel to SFO in a car driven by a driver who had

26  permission to operate commercially at SFO.  These drivers paid the airport a trip fee that in 2013

27  and 2014 varied over time but was $3.85 at its maximum.  Uber's representation was likely to

mislead customers of these authorized drivers into believing that the entire $4.00 would actually be paid to SFO.

155. Uber's Airport Fee Toll fraud was not unique to San Francisco.  It occurred throughout airports in California.

<u>UBER'S CORPORATE POLICY OF "REGULATORY DISRUPTION"</u>

156. California Business and Professions Code section 17206 requires the Court to consider the persistence, length of time, and willfulness of Uber's misconduct in assessing the amount of civil penalties.

157. Uber launched its business in California without obtaining approval of the Uber App technology as required by Business and Professions Code section 12500.5, and then over a period of at least four years has repeatedly ignored and continues to ignore demands to come into compliance.  Uber also began operating at California airports without first obtaining the requisite permits, and has encouraged its drivers to swarm the airports even after receiving multiple cease-and-desist orders from the applicable airport authorities and from the California Public Utilities Commission.

158. Uber has been acting pursuant to its well-known corporate policy of setting up shop first and dealing with the regulators later.  This policy, which was begun under former Uber CEO Ryan Graves, and which CEO Kalanick proudly dubs "Regulatory Disruption," consists of ignoring laws and regulations that get in the way of the company's rapid expansion into the market, and then aggressively fighting any regulatory enforcement efforts which may follow.  One reporter who interviewed Kalanick for a lengthy profile story remarked, "All told, it's not just that Uber has adopted the business school maxim 'Don't ask for permission; ask for forgiveness'—it has instituted a policy of asking for neither."

159. Uber's unabashed refusal to comply with California regulators and California law is consistent with its "Regulatory Disruption" policy, is willful and persistent within the meaning of Business and Professions Code section 17206, and has been ongoing for five years.  It has also enabled the company to become – within those five years – the world's most valuable pre-IPO

startup.  Uber's $50 billion valuation is greater than 70% of the companies in the Fortune 500 including Kraft Foods Group, Delta Air Lines, General Mills, CBS, Kellogg, Aetna, Campbell Soup Company, ConAgra Foods, and Northrop Grumman Corporation.

**FIRST CAUSE OF ACTION**

Business & Professions Code § 17500, *et seq.*
(Untrue or Misleading Statements Concerning Safety – General Public)

160.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 159 as though fully set forth herein.

161.  Beginning at an exact date unknown to Plaintiff, but in any event within three years of the commencement of the People's civil enforcement action, and continuing to the present, defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public in the State of California statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which defendants knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500 *et seq.*  Such statements include but are not limited to all of the representations set forth and discussed in paragraphs 13 through 19, 24 through 73, and 101 through 116, above.

**SECOND CAUSE OF ACTION**

Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices:
Untrue or Misleading Statements Concerning Safety – General Public)

162.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 161 as though fully set forth herein.

163.  Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

A.   Defendants engaged in fraudulent business acts or practices by making representations likely to deceive members of the public, as set forth and discussed in paragraphs 13 through 19, 24 through 73, 101 through 116, above, and in the First Cause of Action;

B.   Defendants made untrue or misleading statements in violation of Business and Professions Code section 17500, as set forth and discussed in paragraphs 13 through 19, 24 through 73, 101 through 116, above, and in the First Cause of Action; and

C.   Defendants undertook the following unfair methods of competition or unfair or deceptive acts or practices in transactions intended to result or which did result in the sale of services to consumers, in violation of Civil Code section 1770(a):

1)   Defendants by use of the untrue or misleading statements set forth and discussed in paragraphs 13 through 19, 24 through 73, and 101 through 116, above, represented that services have characteristics or benefits which they do not have, in violation of Civil Code section 1770(a)(5);

2)   Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 13 through 19, 24 through 73, and 101 through 116, above, represented that services are of a particular standard or quality when they are of another, in violation of Civil Code section 1770(a)(7); and

3)   Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 13 through 19, 24 through 73, and 101 through 116, above, disparaged the services or business of another by false or misleading representation of fact, in violation of Civil Code section 1770(a)(8).

**THIRD CAUSE OF ACTION**

Business & Professions Code § 17500, *et seq.*
(Untrue or Misleading Statements Concerning Safety – Receipts)

164.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 163 as though fully set forth herein.

165.  Beginning at an exact date unknown to Plaintiff, but in any event within three years of the commencement of the People's civil enforcement action, and continuing to the present, defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated to defendants' customers in the State of California statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which defendants knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500 *et seq.*  Such statements include but are not limited to all of the representations set forth and discussed in paragraphs 20 through 21, above.

**FOURTH CAUSE OF ACTION**
Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices:
Untrue or Misleading Statements Concerning Safety – Receipts)

166.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 165 as though fully set forth herein.

167.  Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

A.  Defendants engaged in fraudulent business acts or practices by making representations likely to deceive members of the public, as set forth and discussed in paragraphs 20 through 21, above, and in the Third Cause of Action;

B.  Defendants made untrue or misleading statements in violation of Business and Professions Code section 17500, as set forth and discussed in paragraphs 20 through 21, above, and in the Third Cause of Action;

C.  Defendants committed fraud within the meaning of Civil Code section 1572 by charging customers who used the UberX service a $1.00 "Safe Rides Fee" purportedly to

1  cover the cost of background checks that Uber falsely advertised as "industry-leading"; and

2       D.  Defendants undertook the following unfair methods of competition or unfair

3  or deceptive acts or practices in transactions intended to result or which did result in the sale of

4  services to consumers, in violation of Civil Code section 1770(a):

5       1)  Defendants by use of the untrue or misleading statements set forth and

6  discussed in paragraphs 20 through 21, above, represented that services have characteristics or

7  benefits which they do not have, in violation of Civil Code section 1770(a)(5);

8       2)  Defendants, by use of the untrue or misleading statements set forth and

9  discussed in paragraphs 20 through 21, above, represented that services are of a particular

10  standard or quality when they are of another, in violation of Civil Code section 1770(a)(7); and

11       3)  Defendants, by use of the untrue or misleading statements set forth and

12  discussed in paragraphs 20 through 21, above, disparaged the services or business of another by

13  false or misleading representation of fact, in violation of Civil Code section 1770(a)(8).

14
### FIFTH CAUSE OF ACTION
15  Business & Professions Code § 17500, *et seq.*
(Untrue or Misleading Statements Concerning Safety – Emails)
16

17  168.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1

18  through 167 as though fully set forth herein.

19  169.  Beginning at an exact date unknown to Plaintiff, but in any event within three years

20  of the commencement of the People's civil enforcement action, and continuing to the present,

21  defendants, with the intent to perform services, or to induce members of the public to enter into

22  obligations relating thereto, made or disseminated or caused to be made or disseminated to

23  defendants' customers in the State of California statements concerning such services, or matters of

24  fact connected with the performance thereof, which were untrue or misleading, and which

25  defendants knew or reasonably should have known were untrue or misleading, in violation of

26  Business and Professions Code section 17500 *et seq.*  Such statements include but are not limited

27  to all of the representations set forth and discussed in paragraphs 22 through 23, above.

**SIXTH CAUSE OF ACTION**

Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices:
Untrue or Misleading Statements Concerning Safety – Emails)

170.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 169 as though fully set forth herein.

171.  Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

A.   Defendants engaged in fraudulent business acts or practices by making representations likely to deceive members of the public, as set forth and discussed in paragraphs 22 through 23, above, and in the Fifth Cause of Action

B.   Defendants made untrue or misleading statements in violation of Business and Professions Code section 17500, as set forth and discussed in paragraphs 22 through 23, above, and in the Fifth Cause of Action; and

C.   Defendants undertook the following unfair methods of competition or unfair or deceptive acts or practices in transactions intended to result or which did result in the sale of services to consumers, in violation of Civil Code section 1770(a):

a.   Defendants by use of the untrue or misleading statements set forth and discussed in paragraphs 22 through 23, above, represented that services have characteristics or benefits which they do not have, in violation of Civil Code section 1770(a)(5);

b.   Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 22 through 23, above, represented that services are of a particular standard or quality when they are of another, in violation of Civil Code section 1770(a)(7); and

c.   Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 22 through 23, above, disparaged the services or business of another by

false or misleading representation of fact, in violation of Civil Code section 1770(a)(8).

### SEVENTH CAUSE OF ACTION
Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices – Failure to Submit App to DMS)

172. Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 171 as though fully set forth herein.

173. Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to May 19, 2015, defendants engaged in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following: Defendants used the Uber App technology for commercial purposes to measure time and distance in calculating fares for its customers without first having obtained approval from the California Department of Food and Agriculture, in violation of Business and Professions Code section 12500.5.

### EIGHTH CAUSE OF ACTION
Business & Professions Code § 17500, *et seq.*
(Untrue or Misleading Statements Concerning Airport Access)

174. Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 173 as though fully set forth herein.

175. Beginning at an exact date unknown to Plaintiff, but in any event within three years of the commencement of the People's civil enforcement action, and continuing to the present, defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public in the State of California statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which defendants knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500 *et seq.* Such statements include but are not limited to all of the representations

set forth and discussed in paragraphs 144, 145, and 148, above.

**NINTH CAUSE OF ACTION**

Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices –
Untrue or Misleading Statements Concerning Airport Access)

176. Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 175 as though fully set forth herein.

177. Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

    A.   Defendants engaged in fraudulent business acts or practices by making representations likely to deceive members of the public, as set forth and discussed in paragraphs 144, 145, and 148, above, and in the Eighth Cause of Action;

    B.   Defendants made untrue or misleading statements in violation of Business and Professions Code section 17500, as set forth and discussed in paragraphs 144, 145, and 148, above, and in the Eighth Cause of Action; and

    C.   Defendants undertook the following unfair methods of competition or unfair or deceptive acts or practices in transactions intended to result or which did result in the sale of services to consumers, in violation of Civil Code section 1770(a):

        a.   Defendants by use of the untrue or misleading statements set forth and discussed in paragraphs 144, 145, and 148, above, represented that services have characteristics or benefits which they do not have, in violation of Civil Code section 1770(a)(5); and

        b.   Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 144, 145, and 148, above, above, represented that services are of a particular standard or quality when they are of another, in violation of Civil Code section 1770(a)(7).

**TENTH CAUSE OF ACTION**

Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices – Unlawful Operations at Airports)

178.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 177 as though fully set forth herein.

179. Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

      A.      Defendants violated California Public Utilities Code section 5411 by disobeying CPUC Decision 13-09-045, the terms of the Uber CPUC Permit, and CPUC demands; and

      B.      Defendants committed trespass in violation of Penal Code section 602 by encouraging, aiding and abetting Uber drivers to operate at California airports without permission of the airport authorities.

**ELEVENTH CAUSE OF ACTION**

Business & Professions Code § 17500, *et seq.*
(Untrue or Misleading Statements Concerning Airport Fee Tolls)

180.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 179 as though fully set forth herein.

181.  Beginning at an exact date unknown to Plaintiff, but in any event within three years of the commencement of the People's civil enforcement action, and continuing to the present, defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated to customers in the State of California statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which defendants knew or reasonably should have known were untrue or misleading, in violation of Business and

Professions Code section 17500 *et seq.*  Such statements include but are not limited to all of the representations set forth and discussed in paragraphs 148 and 151 through 155, above.

**TWELFTH CAUSE OF ACTION**
Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices –
Untrue or Misleading Statements Concerning Airport Fee Tolls)

182.  Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 181 as though fully set forth herein.

183. Beginning at an exact date unknown to Plaintiff, but in any event within four years of the commencement of the People's civil enforcement action, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

A.   Defendants engaged in fraudulent business acts or practices by making representations likely to deceive members of the public, as set forth and discussed in paragraphs 148 and 151 through 155, above, and in the Eleventh Cause of Action;

B.   Defendants made untrue or misleading statements in violation of Business and Professions Code section 17500, as set forth and discussed in paragraphs 148 and 151 through 155, above, and in the Eleventh Cause of Action; and

C.   Defendants undertook the following unfair methods of competition or unfair or deceptive acts or practices in transactions intended to result or which did result in the sale of services to consumers, in violation of Civil Code section 1770(a):

a.   Defendants by use of the untrue or misleading statements set forth and discussed in paragraphs 148 and 151 through 155, above, represented that services have characteristics or benefits which they do not have, in violation of Civil Code section 1770(a)(5); and

b.   Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 148 and 151 through 155, above, represented that services are of a

particular standard or quality when they are of another, in violation of Civil Code section 1770(a)(7).

        D.     Defendants committed fraud within the meaning of Civil Code section 1572 by adding an "Airport Fee Toll" charge on customer receipts for trips to and from California airports to compensate drivers for airport fees the drivers never pay and/or when the amount actually paid to the airport was less than $4.00; and

        E.     Defendants committed theft within the meaning of Penal Code section 484 adding an "Airport Fee Toll" charge on customer receipts for trips to and from California airports to compensate drivers for airport fees the drivers never pay and/or when the amount actually paid to the airport was less than $4.00.

## PRAYER FOR RELIEF

    **WHEREFORE**, Plaintiff prays for judgment as follows:

    1.   That pursuant to Business and Professions Code sections 17203 and 17535, and the Court's inherent equity powers, defendants their subsidiaries; their successors and the assigns of all or substantially all the assets of their businesses; their directors, officers, employees, agents, independent contractors, partners, associates and representatives of each of them; and all persons, corporations and other entities acting in concert or in participation with defendants, be permanently restrained and enjoined from:

        A.   Making, disseminating, or causing to be made or disseminated, any misleading, untrue or deceptive statements in violation of section 17500 of the Business and Professions Code, including, but not limited to, the untrue or misleading statements alleged in the First, Third, Fifth, Eighth, and Eleventh Causes of Action of this complaint; and

        B.   Engaging in any acts of unfair competition, in violation of section 17200 of the Business and Professions Code, including but not limited to the unlawful business acts and practices alleged in the Second, Fourth, Sixth, Seventh, Ninth, Tenth, and Twelfth Causes of Action of this complaint.

1    2.    That pursuant to Business and Professions Code section 17536, defendants and

2  each of them be ordered to pay a civil penalty of Two Thousand Five Hundred Dollars

3  ($2,500.00) for each violation of Business and Professions Code section 17500, according to

4  proof.

5      3.    That pursuant to Business and Professions Code section 17206, defendants and

6  each of them be ordered to pay a civil penalty of Two Thousand Five Hundred Dollars

7  ($2,500.00) for each violation of Business and Professions Code section 17200, according to

8  proof.

9      4.    That pursuant to Business and Professions Code sections 17535 and 17203, and

10  pursuant to the Court's inherent equitable power, defendants be ordered to restore to every

11  person in interest all money and property which was acquired by defendants through their

12  unlawful conduct, according to proof.

13      5.    That Plaintiff be awarded its costs of suit.

14      6.    That Plaintiff be given such other and further relief as the nature of this case may

15  require and this Court deems proper to fully and successfully dissipate the effect of the

16  unlawful business practices and untrue or misleading representations contained herein.

DATED: August 18, 2015        GEORGE GASCÓN
                              District Attorney, City and County of San Francisco

                              BY: _____
                                 JUNE D. CRAVETT
                                 Assistant Chief District Attorney

DATED: August 18, 2015        JACKIE LACEY
                              District Attorney, County of Los Angeles

                              BY: _____
                                 STANLEY P. WILLIAMS
                                 Head Deputy District Attorney