1  RANDALL S. LUSKEY (SBN: 240915)
      rluskey@paulweiss.com
2  **PAUL, WEISS, RIFKIND, WHARTON**
      **& GARRISON LLP**
3  535 Mission Street, 24th Floor
   San Francisco, CA 94105
4  Telephone: (628) 432-5100
   Facsimile:  (628) 232-3101

5
6  ROBERT ATKINS (*Pro Hac Vice* admitted)
      ratkins@paulweiss.com
   JACQUELINE P. RUBIN (*Pro Hac Vice* admitted)
7     jrubin@paulweiss.com
   CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
8     cgrusauskas@paulweiss.com
   ANDREA M. KELLER (*Pro Hac Vice* admitted)
9     akeller@paulweiss.com
   **PAUL, WEISS, RIFKIND, WHARTON**
10     **& GARRISON LLP**
   1285 Avenue of the Americas
11 New York, NY 10019
   Telephone: (212) 373-3000
12 Facsimile:  (212) 757-3990

13 *Attorneys for Defendants*
   UBER TECHNOLOGIES, INC.,
14 and RASIER, LLC.

15 *[Additional Counsel Listed on Following Page]*

16
                **UNITED STATES DISTRICT COURT**
17
                **NORTHERN DISTRICT OF CALIFORNIA**
18
                **SAN FRANCISCO DIVISION**
19

20 | IN RE: UBER TECHNOLOGIES, INC., | Case No. 3:23-md-03084-CRB |
   PASSENGER SEXUAL ASSAULT
21 LITIGATION                        **DECLARATION OF ROBERT ATKINS**
                                     **IN SUPPORT OF DEFENDANTS UBER**
22 _____      **TECHNOLOGIES, INC. AND RASIER, LLC'S,**
                                     **MOTION TO DISMISS PLAINTIFF K.P.'S**
   This Document Relates to:         **COMPLAINT**
23
   *K.P.* v. *Uber Technologies, Inc., et al.*,   Judge:      Honorable Charles R. Breyer
24 24-cv-00772-CRB                   Date:       TBD
25                                   Time:       TBD
                                     Courtroom:  6 – 17th Floor
26

27

28

---

1    KYLE N. SMITH (*Pro Hac Vice* admitted)
         ksmith@paulweiss.com
2    JESSICA E. PHILLIPS (*Pro Hac Vice* admitted)
         jphillips@paulweiss.com
3    **PAUL, WEISS, RIFKIND, WHARTON**
         **& GARRISON LLP**
4    2001 K Street, NW
     Washington DC, 20006
5    Telephone: (202) 223-7300
     Facsimile:  (202) 223-7420
6
     *Attorney for Defendants*
7    UBER TECHNOLOGIES, INC.,
     and RASIER, LLC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATKINS DECLARATION IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF K.P.'S COMPLAINT          Case No. 3:23-md-03084-CRB

**DECLARATION OF ROBERT ATKINS**

I, Robert Atkins, declare pursuant to 28 U.S.C. § 1746:

1.      I am an attorney at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys of record for Defendants Uber Technologies, Inc., and Rasier, LLC, (collectively, "Uber").  I respectfully submit this declaration in support of Uber's Motion to Dismiss Plaintiff K.P.'s Complaint.  I know the following facts to be true of my own knowledge, and if called to testify, I could competently do so.

2.      On September 22, 2023, Plaintiff K.P. filed her complaint against Uber in the District of Maryland, alleging that she was assaulted by a driver in Dubai, United Arab Emirates. Attached as **Exhibit 1** is a true and correct copy of Plaintiff K.P.'s Complaint in *P.* v. *Uber Technologies, Inc.*, No. 23-cv-02580-GLR (D. Md.) (ECF No. 1).

3.      On January 12, 2024, Uber filed a motion to dismiss for failure to state a claim in *P.* v. *Uber Technologies, Inc.*, No. 23-cv-02580-GLR (D. Md.) (ECF. No. 13).  Attached as **Exhibit 2** is a true and correct copy of Uber's Memorandum in Support of Its Motion to Dismiss in *P.* v. *Uber Technologies, Inc.*, No. 23-cv-02580-GLR (D. Md.) (ECF No. 13-1).

4.      Attached as **Exhibit 3** is a true and correct copy of the Declaration of Alejandra O'Connor in Support of Defendants' Motion to Dismiss in *P.* v. *Uber Technologies, Inc.*, No. 23-cv-02580-GLR (D. Md.) (ECF No. 13-2).

5.      On February 5, 2024, the Panel on Multidistrict Litigation ordered transfer of Plaintiff K.P.'s case to the Northern District of California for inclusion in the present MDL.  *See In re Uber Technologies, Inc.*, MDL No. 3084 (ECF No. 249).  The transferee case number is 24-cv-00772-CRB.

6.      Uber hereby refiles its January 12, 2024, Motion to Dismiss Plaintiff K.P.'s Complaint before this Court.

7.      The Memorandum of Points and Authorities being filed in this Court in support of Uber's Motion to Dismiss K.P.'s Complaint is identical in substance to the memorandum previously filed in the District of Maryland on January 12, 2024 (Exhibit 2).  The only changes

made to the prior memorandum are the inclusion of a Table of Authorities and non-substantive formatting in compliance with local rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on April 1, 2024, in New York, New York.

_/s/ Robert Atkins_
Robert Atkins

ATKINS DECLARATION IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF K.P.'S COMPLAINT          Case No. 3:23-md-03084-CRB

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| K.P., <br> Baltimore City <br><br>     Plaintiff, <br><br>     v. <br><br> UBER TECHNOLOGIES, INC., a <br> Delaware Corporation; RASIER, LLC, a <br> Delaware Limited Liability Company; and <br> DOES 1 through 50, Inclusive, <br><br>     Defendants. | **REDACTED** <br><br> Civil Action No. _____ |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff, K.P., by her undersigned counsel, makes the following Complaint against Defendants Uber Technologies, Inc., A Delaware Corporation, and Raiser, LLC ("Raiser"), (collectively, "Uber" or "Defendants"), alleging as follows:

**NATURE OF ACTION**

1. Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom she had been paired through the Uber App. This case is about this attack as well as the toxic-male culture at Uber that caused this attack. A culture that started at the very top of Uber that prized growth above all else and in the process exploited, endangered, and hurt women and girls, including Plaintiff. This culture was put in place by Uber's officers and directors— including Travis Kalanick—with conscious disregard to the rights and safety of Uber passengers, particularly female Uber passengers.

1

2.      Uber is a transportation company headquartered in San Francisco, California that, beginning in 2009, pioneered an app-based transportation system that has been implemented around the world, including across the entire United States and in this State.

3.      As early as 2014 Uber became aware that Uber drivers were physically and/or sexually assaulting and raping female passengers. In the nine years since, sexual predators driving for Uber have continued to sexually assault, harass, kidnap, physically assault, rape, and/or other attack Uber's passengers. Complaints to Uber by female passengers who had been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber has been fully aware of these continuing attacks by sexual predators driving for Uber. Uber's response to these ongoing sexual assaults by Uber drivers has been slow and inadequate and has put the lives and well-being of its customers at grave risk.

4.      While Uber has, in recent years, publicly acknowledged this sexual-assault crisis—including the publication of Uber's U.S. Safety Report, in December 2019— Uber has failed to implement basic safety measures necessary to prevent these serious physical and/or sexual assaults, which continue to occur to this day.

5.      As more fully set forth below, Plaintiff was assaulted, battered, harassed, and attacked by the Uber driver she was led to believe would give her a safe ride to her destination.

6.      The Uber ride at issue was ordered by or for Plaintiff through the ride-sharing software application owned and controlled by Uber ("the Uber App").

7.      At all relevant times Defendants Uber and Rasier (collectively "Uber") operated and controlled the Uber App.

8.      The Uber driver, while in the course and scope of his employment for Uber and while otherwise working on behalf of Uber, assaulted, battered, harassed, and/or attacked Plaintiff

as set forth below.

9.      Plaintiff brings this civil action against Uber to recover damages for the injuries she suffered as a result of being assaulted, battered, harassed, and/or attacked by the Uber driver during an Uber ride.

10.     Uber is a common carrier under this State's laws.

**PARTIES**

11.     Plaintiff is over the age of 18 and is a resident of Baltimore, Maryland. The assault described below took place in the country of Dubai, United Arab Emirates.

12.     Plaintiff files this action under a pseudonym because as a victim of sexual assault, she needs anonymity to protect her privacy in this sensitive and highly personal matter. Plaintiff respectfully requests that this Court grant her motion to proceed anonymously pursuant to Federal Rule of Civil Procedure 26(c), filed contemporaneously herewith, and ensure that Defendants keep her identity confidential throughout the pendency of the lawsuit and thereafter.

13.     Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, San Francisco County, California, 94158.

14.     Defendant Rasier, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1515 3rd St., San Francisco, California, 94158.

15.     Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc. and Rasier, LLC collectively as "Uber."

16.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Does 1 through 50, inclusive, are unknown to Plaintiff who therefore

sue said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff. Plaintiff is informed and believe, and thereon allege, that each of the Defendants designated herein as a Doe was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

17.      Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Plaintiff was injured.

18.      Plaintiff is informed and believes that each Defendant, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, assistant, or consultant.

19.      Plaintiff is further informed and believes, that at all relevant times, each Defendant, through its officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each Defendant by and through its officers, directors, supervisors, and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct that injured Plaintiff.

20.      Defendants are liable for the acts of each other through principles of *respondeat*

*superior*, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

21.     The Uber driver who perpetrated the assault described herein ("Uber driver") was an agent, servant, and employee of Uber.

22.     This Complaint refers to Defendant Uber Technologies, Inc., Defendant Rasier, LLC, and Does 1 through 50, inclusive, as Defendants.

## JURISDICTION AND VENUE

23.     The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(c)(1) because the Plaintiff resides in the city of Baltimore.

## RELEVANT FACTUAL BACKGROUND

### *Uber's Sexual-Assault Problem Started At The Top*

25.     Uber is a transportation company. In 2010, one of its founders, Travis Kalanick, became its second chief executive officer and—at one time—its largest shareholder. Uber drivers and Uber split the fare Uber charges riders for the riders' trips.

26.     In 2014, Uber started charging Uber passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[1]

---

[1] Uber, *What is the Safe Rides Fee*, (available at https://web.archive.org/web/20148420053019/http://support.uber.com/hc/en-us/articles/201950566) (last accessed Mar. 31, 2023).

27.     The "Safe Rides Fee" was not split with drivers.[2] It was pure revenue for Uber.

28.     Uber collected its "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue from the fee.[3] But it never earmarked the money for improving safety or spent it on safety.[4] Instead, it pocketed the money it told the world it was going to directly towards enhancing safety. As a former Uber employee said "[w]e boosted our margins saying our rides were safer."[5] It "was obscene."[6]

29.     Rider safety was never Uber's concern. Growth was. To increase growth, which required not only new riders but new drivers, Travis Kalanick and the executives at Uber made it as easy as possible for Uber drivers to sign up. They used a background-check system designed to get drivers approved as quickly and conveniently as possible.[7]

30.     Uber hired Hirease, Inc. to do its background checks.[8] Hirease brags that it can vet drivers within 36 hours.[9] To have such a short turnaround, Uber eschewed industry standards used by other taxi companies and livery services. For example, it abandoned fingerprinting—which takes weeks—and running applicant drivers against private databases, such as FBI records.[10] These shortcuts led to growth for Uber. But they put people, including Plaintiff, in danger. Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers, so they could

---

[2] Mike Isaac, SUPER PUMPED: THE BATTLE FOR UBER (2019) at 136 ("The drivers, of course, got no share of the extra buck.").

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.* at 115 ("Uber made it as easy as possible for drivers to sign up.").

[8] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, NEW YORK TIMES (Dec. 9, 2014) (available at https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?searchResultPosition=1) (last accessed Mar. 31, 2023).

[9] *Id.*

[10] *Id.*

begin driving, before Uber's cursory and ineffective background check was even complete.[11]

31.     Travis Kalanick made the decision that Uber was not going to fingerprint its drivers and that it was not going to scrub applicant drivers against FBI records. Rather, the decision was made to use a fast and shallow background check process.

32.     Travis Kalanick also made the decision not to interview drivers or train drivers to ensure Uber's drivers understood their responsibilities and what was appropriate and inappropriate when interacting with passengers. Mr. Kalanick decided not to implement policies to protect passengers from sexual assault—policies such a zero-tolerance policy with respect to fraternizing or making sexual advances towards passengers, and most certainly with respect to engaging in sexual activity with or sexual touching of passengers.

33.     Mr. Kalanick had actual knowledge that these decisions would put passengers in greater danger. As such, he acted with conscious disregard for the rights and safety of female passengers, including Plaintiff.

34.     Travis Kalanick intentionally performed the act of hiring drivers without fingerprinting them, without running them through the FBI databases, and using fast and shallow background checks. When he took these actions, he knew or should have known that it was highly probable that harm would result. This quick-and-dirty approach represented a deliberate choice to gamble with passenger safety.

35.     When Uber's current Chief Executive Officer, Dara Khosrowshahi, assumed that role in August 2017, he continued the policy of hiring drivers without biometric fingerprinting to be run through the FBI database. This was a very intentional and deliberate decision, evidenced by Uber's active lobbying and resistance against municipalities or regulatory bodies implementing

---

[11] Isaac, SUPER PUMPED, at 218.

any kind of biometric fingerprinting requirement for drivers.[12]

36.     Uber's greed and complete disregard for rider safety or the rule of law is breathtaking. Uber's policy is that it will not report any criminal activity it learns of to law-enforcement authorities.[13] That includes allegations of sexual assault.[14] Thus, Uber's policy is that if it learns from an Uber rider, such as Plaintiff, that she was sexually assaulted, Uber will not report this sexual assault to law enforcement.[15] Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the to the police on behalf of customers when an Uber driver rapes an Uber passenger.[16]

37.     Current CEO Mr. Khosrowshahi has supported this non-reporting policy. When he took the action of intentionally embracing this policy, he knew or should have known that it was highly probable that harm would result. After all, drivers will feel less constrained to commit sexual assault if they know it is less likely that law enforcement will be informed.

38.     Uber's greed, parochial focus on growth, and misogyny has had tragic consequences. In December 2014, a 26-year-old finance worker hailed an Uber to take her home

---

[12] Ellen Huet, *Uber Publicly Resists Fingerprinting But Is Quietly Testing It On Some Drivers*, FORBES (Oct. 14, 2015) (available at https://www.forbes.com/sites/ellenhuet/2015/10/14/uber-publicly-resists-fingerprinting-its-drivers-but-is-quietly-testing-it-live-scan/?sh=2bed4ac4c086) (last accessed Mar. 31, 2023). Curt Devine, et al., *Thousands of criminals were cleared to be Uber drivers. Here's how rideshare companies fought stronger checks*, CNN (June 1, 2018) (available at https://www.cnn.com/2018/06/01/us/felons-driving-for-uber-invs/index.html) (last accessed Mar. 31, 2023); Meir Rinde, *Philly parking czar wants to know who's driving your Uber, says Pa. audit doesn't go far enough*, WHYY PBS (Apr. 4, 2019) (available at https://whyy.org/articles/philly-parking-czar-wants-to-know-whos-driving-your-uber-says-pa-audit-doesnt-go-far-enough/) (last accessed Mar. 31, 2023).

[13] Greg Bensinger, *Uber Says Safety is its First Priority. Employees Aren't so Sure*, WASHINGTON POST (Oct. 1, 2019) (available at https://www.washingtonpost.com/podcasts/post-reports/uber-says-safety-is-its-first-priority-employees-arent-so-sure/) (last accessed Mar. 31, 2023).

[14] *Id.*

[15] *Id.*

[16] *Id.*

from a work dinner near New Delhi, India.[17] When she fell asleep in the car, her Uber driver moved

to the backseat and raped her.[18] The driver had been detained previously for rape.[19] The rape

caused an international imbroglio and New Delhi temporarily banned Uber.[20] Uber dealt with the

situation by attacking the victim.

39.     Eric Alexander was president of Uber in the Asia–Pacific region; he was Uber's

"number three" and Kalanick's fixer.[21] He secured, possibly illegally, the New Delhi rape victim's

medical records through a law firm.[22] The records contained the medical examination that doctors

performed within hours of her rape.[23] Alexander shared these records with Mr. Kalanick and

Uber's number two at the time, Emil Michael.[24] Many other Uber executives either saw the records

or learned of them.[25] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[26]

(This despite two people pointing out to him that the victim could have been anally raped.[27]) He

began cultivating and sharing a bizarre conspiracy that the woman was not raped; the whole

---

[17] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, NEW YORK TIMES (Dec. 8, 2014) (available at https://www.nytimes.com/2014/12/09/world/asia/new-delhi-bans-uber-after-driver-is-accused-of-rape.html?_r=0&module=inline) (last accessed Mar. 31, 2023); Isaac, SUPER PUMPED, at 149.

[18] Isaac, SUPER PUMPED, at 149.

[19] Barry and Raj, *Uber Banned in India's Capital After Rape Accusation*.

[20] *Id.*

[21] Isaac, SUPER PUMPED, at 260.

[22] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017) (available at https://www.vox.com/2017/6/7/15754316/uber-executive-india-assault-rape-medical-records) (last accessed Mar. 31, 2023).

[23] Isaac, SUPER PUMPED, at 261.

[24] Swisher and Bhulyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*.

[25] *Id.*

[26] Isaac, SUPER PUMPED, at 261.

[27] *Id.* at 262.

incident was a plot against Uber by Olga, Uber's major ride-sharing competitor in India.[28] No matter that the Uber driver had a history of sexual assault and had confessed the assault to police.[29]

40.     Mr. Kalanick and Uber's leadership and board were the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.[30] When Uber customers accused Uber drivers of sexual assault—something that happened with increasing frequency as Uber grew, given its lax supervision and shoddy background checks—Mr. Kalanick would pace around Uber headquarters, not wondering about how to improve rider safety but repeating the bromide, legally correct but a bromide nonetheless, "innocent until proven guilty."[31] When law enforcement decided not to bring criminal charges against an Uber driver accused of sexual assault because it felt it did not have enough evidence for a criminal conviction, "a round of cheers would ring out across the fifth floor of Uber HQ."[32]

41.     With the bad press Uber was getting because of the sexual assaults, Uber realized it needed to appear that it was making changes and trying to eradicate its toxic-male culture, so it held a company-wide meeting to announce changes. At the meeting, Uber announced that it was going to increase its diversity and sensitivity by adding a female board member. Board member David Bonderman chimed in that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[33]

---

[28] *Id.* at 261; Swisher and Bhulyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired.*

[29] Barry and Raj, *Uber Banned in India's Capital After Rape Accusation.*

[30] Isaac, SUPER PUMPED, at 194 ("The tone of Uber's culture was being set from the top . . . The result was a workforce that largely reflected Kalanick.").

[31] *Id.* at 167.

[32] *Id.*

[33] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, NEW YORK TIMES (June 13, 2017) (available at https://www.nytimes.com/2017/06/13/technology/uber-sexual-harassment-huffington-bonderman.html?hp=&action=click&pgtype=Homepage&clickSource=story-

42.     Uber's "culture was poisoned from the very top."[34] Indeed, John William Gurley was a longtime board member of Uber and a close confidant of Mr. Kalanick. He sat on his hands and watched silently as Uber put in place a culture and policies that have hurt many innocent women, including Plaintiff.

43.     In an attempt to buff its tarnished reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[35]

44.     During his investigation, as detailed in the publicly released "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[36]

45.     As Uber's sexual-assault and harassment problems publicly ballooned, it made pale and perfunctory attempts to act as though it is trying to confront them. In May 2018, Uber acknowledged the "deeply rooted problem" of sexual assault and proclaimed it was committed to solving the problem, stating that "we're making some important changes today."[37] Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."[38] Uber explained its commitment to publishing such data because "transparency fosters accountability." Uber further

---

heading&module=inline&region=top-news&WT.nav=top-news) (last accessed Mar. 31, 2023); Isaac, SUPER PUMPED.

[34] Isaac, SUPER PUMPED, at 280.

[35] Covington & Burling, LLP, *Covington Recommendations* (available at https://www.documentcloud.org/documents/3863793-Uber-Covington-Recommendations.html) (last accessed Mar. 31, 2023)

[36] Isaac, SUPER PUMPED, at 271.

[37] Troy West, *Turning the Lights On*, Uber Newsroom (May 15, 2018) (available at https://www.uber.com/newsroom/turning-the-lights-on/) (last accessed Mar. 31, 2023).

[38] *Id.*

explained that "sexual predators often look for a dark corner" and announced to the world that "we [Uber] need to turn the lights on."

46.     Despite these promises, Uber persisted in darkness and did not release any data on sexual assaults for another year and a half.

47.     When Uber finally released a report in December 2019, it was forced to acknowledge that there were 5,981 sexual assaults in the United States during Uber trips recorded in 2017 and 2018.[39]

48.     Uber did not release a second safety report for more than two years.

49.     On December 2, 2021, the California Public Utilities Commission approved a settlement agreement with Uber on reporting of data on sexual harassment and assault in which Uber agreed to pay $9 million and provide information on sexual assault and harassment to the CPUC on a going-forward basis.[40]

50.     It was another six months after Uber agreed to provide these data to the CPUC before Uber publicly released another safety report per its commitment in May 2018. In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic) stating it received 3,824 sexual-assault reports for that time period.[41]

51.     Uber's own data confirm that sexual assaults by Uber drivers continue to occur at

---

[39] Uber, US Safety Report 2017–18 (available at https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a) (last accessed Mar. 31, 2023).

[40] CPUC Press Release (Dec. 2, 2021) (available at https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-approves-9-million-settlement-with-uber) (last accessed Mar. 31, 2023); see also *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services* (available at) https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M427/K636/427636880.PDF ) (last accessed Mar. 31, 2023).

[41] Uber, US Safety Report 2019–20 (available at https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a) (last accessed Mar. 31, 2023).

an unacceptable rate.

52.     Uber has not released any sexual-assault data for 2021 or 2022. Uber's decision to withhold that data prevents Uber passengers and the public from understanding the true rate at which such assaults continue to occur each day.

53.     Uber became aware of its sexual-assault problem long before it released the Holder report. Uber's operations team "dealt with thousands of misconduct cases every year, including instances of sexual assault."[42]

54.     Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[43]

55.     As described earlier, these decisions to lower the bar were made by Travis Kalanick and other officers, directors, and managing agents.

56.     But it was not that Uber simply lowered the bar. It failed to take adequate steps to make its rides safe; it failed to provide everything necessary for safe transportation of its passengers. For example, Uber failed to install video cameras in the cars. Such a step would have chilled the wantonness of potential predators. It failed to provide an option in the Uber App that allowed female riders to select to be driven by female drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers. These policies to fail to make its rides safe were put in place by Mr. Kalanick and other officers, directors, and managing agents of Uber.

57.     Mr. Kalanick's successor, Mr. Khosrowshahi, continued the policy of not requiring third-party-operated cameras in Uber vehicles.

---

[42] Isaac, SUPER PUMPED, at 166.
[43] *Id.* at 177.

58.     Mr. Kalanick, Mr. Khosrowshahi, and other officers, directors, and managing agents of Uber knew that if they put cameras in cars, fewer sexual assaults would occur during Uber rides. They knew that if they provided an option that would allow female passengers to choose to be driven by female drivers, fewer sexual assaults would occur during Uber rides. They knew that if they better trained their drivers in sexual-assault prevention, fewer sexual assaults would occur during Uber rides. They intentionally refused to put these safety policies in place with actual and constructive knowledge that declining to implement such policies made it highly probable that harm to female Uber passengers would result.

59.     Uber's response to the driver sexual assaults that were reported to the company also evidenced the conscious disregard of Uber executives, including Mr. Kalanick and Mr. Khosrowshahi. A 2019 Washington Post investigative piece revealed Uber maintained a three-strikes policy for its drivers.[44] Investigators hired by Uber to investigate the more serious passenger complaints about drivers—such as drug use, physical violence, and sexual assault—reported: "A driver would only be deactivated under three circumstances: 1) if it was the second or third reported offense; 2) if there is corroborative evidence like video or a police report; 3) if the driver admits to the assault."[45]

60.     Even with a three-strikes policy, Uber executives would make exceptions to keep dangerous drivers on the road. "For instance, a New York-area driver allegedly made three separate sexual advances on riders, said an investigator assigned to the case. After an executive overruled the investigator, the driver was allowed to continue working until a fourth incident, when a rider

---

[44] Greg Bensinger, *When rides go wrong: How Uber's investigation unit works to limit the company's liability*, WASHINGTON POST (Sept. 26, 2019) (available at https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/) (last accessed Mar. 31, 2023).

[45] *Id.*

claimed he raped her."[46]

### THE ATTACK ON PLAINTIFF

61.     This suit arises from the serious harm Plaintiff suffered as a result of the wrongful

acts and omissions of Defendants.

62.     On or about May 4, 2023, K.P. ordered an Uber to pick her up from the Dubai

Marina and take her to hotel, also in Dubai.

63.     The Uber driver picked K.P. up at 1:59 pm.

64.     The driver's name was Ali Babar.

65.     K.P. entered the backseat of the Uber.

66.     Within minutes, the Uber driver drove past her hotel, locked the doors and drove

almost an hour away all the while K.P. was asking him what was going on.

67.     The Uber driver finally pulled the car over into a parking lot. He got into the back

seat with K.P. and assaulted her by digitally penetrating her and pulling her clothes off.

68.     The Uber driver overpowered K.P.

69.     The Uber driver stopped the assault after a short amount of time and went back to

the driver's seat.

70.     At that point, the Uber driver drove her to the correct location.

71.     The Uber driver told K.P. to give him a 5-star review.

72.     K.P. then exited the Uber and went to her hotel room and told her closest friend.

73.     This unwanted inappropriate behavior and sexual assault by the Uber driver

humiliated, violated, and robbed Plaintiff of her dignity and personal safety.

74.     By failing to take reasonable steps to confront the problem of multiple rapes and

---

[46] *Id.*

sexual assaults of Uber passengers by Uber drivers, Uber has acted in conscious disregard of the safety of its passengers, including Plaintiff, has breached its duty of reasonable care, and has breached the implied and express covenants arising from its contract with its passengers.

75.     The Uber driver who assaulted Plaintiff perpetrated the above-described assault, harassment, and/or attack in the course and scope of his employment with Uber and while under Uber's direction and control. These acts caused Plaintiff pain and suffering that persists to this day.

76.     The Uber driver who assaulted Plaintiff was acting on behalf of, for the benefit of, at the direction of, and within the course and scope of employment with Uber and engagement by Uber. Uber provided the Uber driver with access to its ride-sharing app platform, a tool necessary for Uber drivers to perform the work Uber assigned. Uber, through the Uber App, directed the Uber driver regarding the location of the pickup, time of the pickup, and routes for both the pickup of Plaintiff and transportation to her destination, and much more, as discussed below.

77.     The Uber driver who assaulted Plaintiff was an agent or employee of Uber, which is a common carrier. His duties were directed at the comfort and protection of passengers in his vehicle, including Plaintiff.

78.     Uber derived a monetary benefit from every ride assigned to said Uber driver through its Uber App, including Plaintiff's ride during which she was harassed, battered, and/or assaulted.

**Uber Misled Plaintiff And The Public Into Believing It Was Addressing
The Deeply Rooted Issue Of Sexual Assault On Its Platform
In Violation Of Its Statutory And Common-Law Duties.**

79.     Uber is a transportation company. Its core business is providing transportation to the public at large through its network of drivers. It connects its drivers to the public through the

Uber App. Anyone from the public may download the Uber App for free. Using the app, a customer may request a ride from one of Uber's drivers for a standardized charge unilaterally set by Uber. Uber directs its drivers to pick up the passengers and transport them to their destinations.

80.     Uber provides transportation through a digital application made available to the general public for the purpose of transporting its users—the passengers—from place to place for profit. Uber has widely offered its services to the general public and charges standard fees for its services through its application. Uber represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

81.     Given the heightened duty Uber has as a common carrier, to the extent it failed or refused to implement procedures, policies, and app functions that it knew or should have known would prevent assaults such as those suffered by Plaintiff, as Plaintiff has alleged, Uber is liable for the above-described tortious acts of its driver, which harmed Plaintiff.

82.     Further, the heightened duty Uber has as a common carrier a non-delegable duty. Under the common law, Uber has a non-delegable duty to safely transport its passengers from the place it picks them up to their destination. This duty cannot be delegated to Uber drivers. When an Uber driver assaults a passenger, Uber is liable for the driver's actions due to its non-delegable duty.

83.     Uber drivers are largely nonprofessional, untrained, and use their own vehicles. Uber employs and engages its drivers, including the driver who assaulted Plaintiff, in traditional at-will relationships, in which:

     a.    Uber has discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

b.      Drivers are not charged a fee by Uber to apply to become employees;

c.      At all times relevant, there was no agreement between Uber and the driver designating the driver as an independent contractor;

d.      Drivers are not charged a fee to download the app or to receive notifications from Uber that customers want rides;

e.      Fare prices for rides are set exclusively by Uber;

f.      Drivers have no input on fares charged to consumers;

g.      Drivers are not permitted to negotiate with consumers on fares charged;

h.      Drivers do not know what riders are charged for a given ride;

i.      Uber can and does modify charges to consumers; for example, if Uber determines that a driver has taken a circuitous route to a destination;

j.      Uber takes a fee of every ride charged to a consumer;

k.      Uber retains control over customer-contact information;

l.      Uber controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information.

m.      In some instances, Uber controls the hours a driver works;

n.      Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

o.      Driving for Uber is not a specialized skill;

p.      Uber's business model depends on having a large pool of non-professional drivers;

q.      Drivers must abide by a list of regulations to drive for Uber;

r.      Uber requires its drivers to pick up Uber customers on the correct side of the street;

s.      Uber forbids its drivers from talking on their cell phones while driving customers;

t.      Uber tracks drivers' speed and braking and sends drivers reports based on how many times the driver had to brake hard;

u.      Uber drivers are not allowed to ask Uber customers for their contact information;

v.      Drivers who reject ride requests risk discipline, including suspension or termination from the platform;

w.      Consumers give feedback on rides they have taken and rate drivers on a scale from one star to five stars. These ratings are used by Uber to discipline and terminate drivers; and

x.      Such other acts of control that discovery will show.

84.     Uber actively markets itself as a safe company that provides safe rides. Both before

2014 and after, Uber actively and aggressively marketed the supposed safety of its transportation

18

services. These efforts continue to this day, and include email messages sent to every Uber customer, including Plaintiff.

85.     Over the years, Uber has launched marketing campaigns specifically marketing its transportation services to, among others, young women too intoxicated to drive.

86.     Uber represented to its customers, including Plaintiff, on its website all of the following:

   a.   "How we help keep you safe—We're committed to helping you get where you want to go with confidence, whether it's building emergency features in the app or making it easy for you to check your ride."

   b.   "Ride with confidence—The Uber experience was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

   c.   "Ride with confidence—Designing a safer ride—driver screenings—All potential drivers in the US must complete a screening before becoming an Uber driver-partner, and current drivers continue to be vetted for criminal offenses."

   d.   "Ride with confidence—Designing a safer ride—On every trip, you can tap a button for safety tools and get help whenever you need it."

   e.   "Ride with confidence—Designing a safer ride—An inclusive community—Through our joint efforts with cities and safety experts and by working together, we're helping to create safe journeys for everyone."

   f.   "Our commitment to safety—You deserve to be able to move safely. To look forward to the opportunities ahead. To be connected to people and places that matter most. Which is why we're focused on your safety, from setting new standards to developing technology with the goal of reducing incidents."

   g.   "How safety is built into your experience—Safety features in the app—Tap a button for emergency assistance. Share your trip details with loved ones. Our technology helps put peace of mind at your fingertips."

   h.   "How safety is built into your experience—An inclusive community—Millions of riders and drivers share a set of Community Guidelines, holding each other accountable to do the right thing."

   i.   "How safety is built into your experience—Coverage on every trip—We've put insurance from leading companies in place for every ride."

j.   "Building safer journeys for everyone—Rider safety—Uber driver-partners in the US go through a multi-point screening check for their driving and criminal history before they are authorized to take trips through the app. Every rider has access to safety features built into the app and a support team if you need them."

k.   "The future of safety—More than 200 Uber employees, from researchers and scientists to designers and engineers, are focused on building technology that puts safety at the heart of your experience."

l.   "Safe rides around the clock—Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber."

87.   Uber actively and publicly markets its transportation services to be safe and reliable services.

88.   Uber actively and publicly markets its transportation services to be safe and reliable during late-night hours.

89.   Uber has cultivated an image among its customers of safety and superiority to public transportation and traditional taxis. Because of aggressive marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to believe a ride with Uber is a safer and better alternative.

90.   In 2016, Uber agreed to pay $28.5 million to settle a class-action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

91.   Riders, including Plaintiff, reasonably rely on Uber's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Uber as a result of this reliance.

92.   Uber markets its ride hailing service to female riders as a safer alternative to traditional taxis.

93.   On a "Women's Safety" page on its website, Uber advertised that it was "driving change for women's safety," specifically representing that "[s]exual assault and gender-based

violence don't belong anywhere in our communities, which is why Uber is committed to help stop incidents before they happen" and touting its "safety features and education" and "transparency."[47] Through such representations, Uber encourages women like Plaintiff to trust its services to secure safe transportation.

94.     Uber knew its representations and promises about rider safety were false and misleading yet continued to allow riders to believe in the truth of these representations and promises and continued to profit from riders' reliance on those representations and promises.

95.     Unfortunately, an Uber driver sexually assaulting a passenger is not an isolated or rare occurrence. The safety report referenced above that Uber released in December 2019 showed there were thousands of sexual assaults during Uber rides in 2018 alone.[48] Tony West, Uber's Chief Legal Officer, said in response to that report, the "numbers are jarring and hard to digest."[49]

96.     Uber employs a vast network of drivers. But, at all relevant times, Uber provided its drivers with inadequate training regarding sexual assault, sexual relations, sexually inappropriate behavior, sensitivity, and customer relations.

97.     Uber has also provided inadequate background checks and screening of its drivers. Among other things, it does not fingerprint its drivers (unless forced to do so by state or local laws), it does not run the applicant drivers against all available public databases, and it does not do international background checks (despite its global presence).

98.     Uber lobbies state and local governments to limit what is required of Uber with respect to driver background checks. Uber also lobbies local government entities to continue

---

[47] Uber, Women's Safety (available at https://www.uber.com/us/en/safety/womens-safety/) (last accessed Mar. 31, 2023).
[48] Kate Conger, *Uber says 3,045 sexual assaults were reported in U.S. rides last year*, NEW YORK TIMES (Dec. 5, 2019) (available at https://www.nytimes.com/2019/12/05/technology/uber-sexual-assaults-murders-deaths-safety.html) (last accessed Mar. 31, 2023).
[49] *Id.*

allowing Uber to perform its own background checks of its driver applicants, rather than municipalities performing the more stringent and reliable screening they conduct for traditional taxi drivers.

99.     Uber has successfully persuaded lawmakers in several states to keep background-check requirements for its drivers limited.

100.    Although Uber claims its drivers are not employees, Uber engages its drivers as part of its business and the Uber drivers are charged with the responsibility of safely transporting Uber passengers to their destination.

## COUNT 1
### NEGLIGENCE

101.    Plaintiff incorporates all prior allegations.

102.    By providing transportation to the general public using its application and network of drivers, Uber owed a duty to act with due and reasonable care towards the public and in particular its own passengers, including Plaintiff.

103.    Uber has been on notice that its drivers have been sexually harassing, sexually assaulting, and raping its passengers since at least 2014. Uber was aware or should have been aware that some Uber drivers would continue to sexually assault, stalk, harass, kidnap, physically assault, rape, and/or otherwise attack their vulnerable Uber patrons and passengers.

104.    Since learning of the sexual assaults perpetrated by its drivers, Uber never adapted or improved its safety procedures in any meaningful way.

105.    Uber does not require video monitoring of its drivers that cannot be turned off, nor does it provide emergency notification to law-enforcement authorities when a driver drastically veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination but GPS data indicates the passenger remains in the car for a significant period

of time.

106.    At all times relevant, Uber was well aware of the dangers its drivers posed, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means of transportation. In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being assaulted, battered, harassed, and/or otherwise attacked by an Uber driver.

107.    At the time Plaintiff was assaulted, Uber did not require sexual harassment/assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engages in sexual misconduct.

108.    Uber does not cooperate with the police when a driver commits an illegal sexual attack on its passengers. Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires that extensive standards be met before the company will even consider law enforcement requests for information. Even after a report of sexual assault has been made, Uber generally requires a subpoena before it will release information. Uber's policy of noncooperation discourages police agencies from making recommendations to local prosecutors to file complaints against Uber drivers and provides Uber's predatory drivers with tacit assurance that their illegal attacks will not be detected by law enforcement.

109.    When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks that would provide the most comprehensive means of screening applicant drivers. Uber does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

110.    Uber does not have a consistent, reliable system for addressing passenger reports

of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Uber.

111.    For the above reasons and others, Uber breached its duty of reasonable care to Plaintiff.

112.    As a legal and direct result of Uber's actions and omissions, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The assault on Plaintiff caused her to suffer psychological and physical harm from which she may never fully recover.

113.    As a direct and proximate result of Defendants' general negligence, Plaintiff suffered economic and non-economic damages.

114.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT 2
### NEGLIGENT HIRING, RETENTION, AND SUPERVISION

115.    Plaintiff incorporates all prior allegations.

116.    Uber engaged and retained or otherwise employed the Uber driver who assaulted, harassed, and/or otherwise attacked Plaintiff as described above.

117.    Uber did not interview, check the references of, provide training to, or advise the Uber driver of any anti-sexual assault policies when hiring him. Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, and failed to use reasonable care in determining whether the driver in question was fit for the task. Uber should have known of the unfitness of the Uber driver involved in the assault on Plaintiff but failed to use reasonable care to discover his unfitness and incompetence.

24

118.    Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the one who harmed Plaintiff, for transporting vulnerable and/or intoxicated women in a moving vehicle, Uber hired said driver to do exactly that.

119.    Uber knew or should have known that assigning the task of transporting vulnerable passengers to an inadequately screened driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual assaults committed by Uber's drivers.

120.    Uber failed to employ measures to adequately supervise its drivers.

121.    Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Uber drivers.

122.    Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

123.    The Uber driver who assaulted Plaintiff was, and/or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to her destinations, which caused her psychological and/or physical harm.

124.    Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was assaulted, harassed, battered, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

125.    Uber's negligence in hiring, retaining, and or supervising Uber drivers, including the driver who harmed Plaintiff, caused Plaintiff to be assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff

of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

126.    As a direct and proximate result of Defendants' negligent supervision, hiring, and retention of Uber drivers, including the driver who harmed Plaintiff, Plaintiff suffered economic and non-economic damages.

127.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT 3
## NEGLIGENT FAILURE TO WARN

128.    Plaintiff incorporates all prior allegations.

129.    Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

130.    In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and abuse by Uber's drivers since at least 2014. Since then, Uber has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of drivers' criminal conduct while acting in their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

131.    Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of physical and/or sexual assault by Uber drivers. In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being physically and/or sexually

assaulted.

132.    Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from physical and/or sexual assault.

133.    Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger reports to Uber that she was physically and/or sexually assaulted.

134.    Uber had reason to know that passengers would be unaware of the risk of physical and/or sexual assault by Uber drivers.

135.    A warning to its passengers that they were at risk of physical and/or sexual assault by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Uber drivers.

136.    Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being assaulted, battered, harassed, and/or otherwise attacked by an Uber driver.

137.    As a legal and proximate result of Uber's actions and omissions, Plaintiff was assaulted, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

138.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered economic and non-economic damages.

139.    Plaintiff will seek actual and punitive damages based on Defendants' above-

described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT 4
### INTENTIONAL MISREPRESENTATION - FRAUD

140.   Plaintiff incorporates all prior allegations.

141.   At the time Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, she had downloaded the Uber App and had an account with Uber.

142.   Uber represented to Plaintiff and the general public that safety was Uber's top priority, and it was Uber's goal to make every ride safe, comfortable, and reliable. At the same time, Uber already knew that a number of its drivers had preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

143.   Uber made intentional misrepresentations of fact to all users of the Uber App, including Plaintiff, that were known by Uber to be false including the false statements Uber made, stating it would provide Plaintiff with a safe ride to her destination.

144.   These representations regarding safety were made to Uber customers, including Plaintiff, through periodic emails Uber sent to its customers, social-media advertisements, and Uber's own website and app. Plaintiff relied upon several advertisements and statements where Uber proclaimed it would provide a safe ride. Plaintiff read Uber's self-promoting statements regarding safety both before and after Plaintiff was assaulted, harassed, battered, and/or otherwise attacked by the Uber driver.

145.   Prioritizing profits over passenger safety, Uber made these intentional misrepresentations of material fact to induce women, including Plaintiff, to use Uber's services.

146.   Uber made these representations to Plaintiff and the general public despite knowing it had chosen not to take the measures necessary to provide a safe ride to her intended destination

28

and, as a result, continued physical and/or sexual assault of its passengers by its drivers was a foreseeable occurrence.

147.    Uber made these representations to induce women, like Plaintiff, to use Uber's services and to derive profit from women like Plaintiff.

148.    In ordering and entering an Uber vehicle, Plaintiff reasonably relied on Uber's representations that it would get her safely to her destination.

149.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by the Uber driver who assaulted, harassed, and/or otherwise attacked Plaintiff.

150.    As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

151.    As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff suffered economic and non-economic damages.

152.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**COUNT 5**
**NEGLIGENT MISREPRESENTATION**

153.    Plaintiff incorporates all prior allegations.

154.    Uber represented to Plaintiff and the general public that safety is Uber's top priority, and that it is Uber's goal to make every ride safe, comfortable, and reliable. At the time

of the assault alleged, Uber knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

155.    Uber continued to represent that its services were safe to further Uber's own pecuniary interests.

156.    In choosing to represent to its customers/users that its services were safe, Uber had a duty to provide correct and accurate information about the actual safety of its services.

157.    Uber knew or should have known that it could not provide the safe ride that it represented it could.

158.    Knowing of the incidence of sexual assault of its passengers by its drivers and knowing that Uber had not implemented adequate precautions, Uber had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride as represented.

159.    In getting into the Uber, Plaintiff reasonably relied on Uber's representations that it would get her safely to her intended destination.

160.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by an Uber employee, the Uber driver, who assaulted, battered, harassed, and/or otherwise attacked Plaintiff.

161.    As a direct and proximate result of Uber's conduct, Plaintiff was assaulted, harassed, battered, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety. The depraved attack on Plaintiff caused her to suffer physical and/or psychological harm from which she may never fully recover.

162.    As a direct and proximate result of Uber's negligent misrepresentations, Plaintiff suffered economic and non-economic damages.

163.    Plaintiff will seek actual and punitive damages based on Defendants' above-

described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## **COUNT 6**
### **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

164.    Plaintiff incorporates all prior allegations.

165.    For several years before Plaintiff was assaulted by the Uber driver, Uber was fully aware that other female passengers had been assaulted by Uber drivers. Since at least 2014, Uber has received frequent passenger complaints about driver misconduct, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

166.    Uber made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers to identify and terminate drivers who were sexual predators.

167.    Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber decided not to implement such precautions and instead continues to place its passengers at greater risk of assault and harassment by Uber's own drivers.

168.    Additional safety precautions that Uber chose not to make include but are not limited to: ongoing monitoring of Uber drivers through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route; a zero-tolerance

31

program for sexual assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer-service representatives. Uber chose not to implement such precautions, nor did it warn passengers of the risk of being physically and/or sexually assaulted given that these safety precautions had not been implemented.

169.    In failing to take these and other safety precautions designed to protect passengers from sexual predators driving for Uber, Uber breached its duty of reasonable care, negligently inflicting emotional harm upon Plaintiff, and acted recklessly and in conscious disregard of her safety.

170.    As a direct and proximate result of Uber's negligent infliction of emotional distress, Plaintiff suffered economic and non-economic damages.

171.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT 7
### BREACH OF CONTRACT

172.    Plaintiff incorporates all prior allegations.

173.    Plaintiff entered a contract with Uber. The essence of this commercial transaction was the payment of a fee to Uber in exchange for safe and reasonable transportation to Plaintiff's destination.

174.    As a result of the conduct, acts, and omissions set forth above, Uber breached its contract with Plaintiff, including breaching implied covenants inherent in such a contract.

175.    As a direct and proximate result of Uber's breach of contract, Plaintiff suffered economic and non-economic damages.

**COUNT 8**

**BREACH OF WARRANTY – DESIGN DEFECT OF THE UBER APP AND FAILURE OF THE UBER APP TO MEET MINIMUM REASONABLE CONSUMER SAFETY EXPECTATIONS**

176.    Plaintiff incorporates all prior allegations.

177.    Uber manufactured and distributed the Uber App.

178.    The Uber App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because the Uber App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

179.    Reasonably safer alternatives existed that would have reduced or eliminated the dangers. For example, the Uber App did not include safety features such as a GPS tracking system that would alert Uber to the early termination of a ride, substantial deviation from the intended route, or a passenger continuing to travel in the Uber vehicle after the driver ended the ride in the app. It also did not include the automatic activation of the camera in drivers' smart phones when a ride is in progress. And it did not include automatic notification of law enforcement of suspicious circumstances that suggest a rider may be in danger.

180.    The Uber App also failed to communicate with Plaintiff a true expectation of the lack of safety in using Uber.

181.    These flaws in the design of the Uber App, were a substantial factor in causing harm to the Plaintiff, which included being assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

182.    As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

183.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT 9
## BREACH OF WARRANTY - FAILURE TO WARN

184.    Plaintiff incorporates all prior allegations.

185.    Uber manufactured and distributed the Uber App.

186.    The Uber App presented potential risks of introducing each driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Uber App, could neither escape from the Uber driver's vehicle nor control the place where the driver would take the passenger, which could result in the sexual assault of that passenger; these are risks that were known or knowable at the time of manufacture and distribution of the Uber App.

187.    The potential risks presented a substantial danger when the Uber App was used or misused in an intended or reasonably foreseeable way.

188.    Ordinary consumers such as Plaintiffs would not have recognized the potential risks.

189.    Defendant Uber failed to adequately warn consumers, including Plaintiffs, of these potential risks.

190.    Uber's failure to provide passengers, including Plaintiffs, with sufficient warnings regarding the risk of harm to which they were being exposed with each Uber ride was a substantial factor in causing the harm suffered by Plaintiffs, including being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver which humiliated, degraded, violated, and robbed Plaintiffs of their dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from

which she may never fully recover.

191.    As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

192.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### VICARIOUS LIABILITY FOR DRIVER'S TORTS

193.    Plaintiff incorporates all prior allegations.

194.    Uber is vicariously liable for the torts of its driver through the theories of *respondeat superior*, nondelegable duties, agency, and ostensible agency. Uber's liability for the acts of its driver is not contingent upon the classification of its driver as an employee.

195.    Under the doctrine of *respondeat superior*, Uber is responsible for the torts of its employees committed within the scope of employment. The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others should bear the costs of the injury instead of the innocent injured Plaintiff.

196.    Uber profits from transporting vulnerable passengers. Uber encourages female passengers to use its services. At the same time, Uber does not take reasonable steps to protect its passengers or warn them of the dangers of riding with Uber. Uber should bear the costs of injuries that result from torts such as assault and harassment, rather than the victims of Uber's negligence, willful wrongdoing, and intentional omissions made at the expense of passenger safety.

197.    Uber drivers are employees and agents of Uber. Uber reserves the right to control the activities of Uber drivers. Uber controls the prices charged to customers, controls contact with the customer base, controls the ability of a driver to see where he will be driving before he accepts a ride, and reserves the right to terminate drivers with or without cause.

35

198.    The assault, harassment, and/or other attack Plaintiff suffered was perpetrated by the Uber driver within the scope of his employment and authority. The assault and/or harassment of intoxicated and unaccompanied women who have been placed in an improperly screened Uber driver's car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

199.    Uber may maintain that its drivers are contractors and not employees. Nevertheless, whether Uber drivers are characterized as contractors, employees, or agents, Uber has a non-delegable duty to transport its passengers safely.

200.    The doctrine of nondelegable duty recognizes that for public-policy reasons, certain duties cannot be delegated to a third party. It operates to ensure that when a harm occurs the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors to further the employer's pecuniary interests.[50]

201.    In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the assaults committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber would be

---

[50] *See e.g.*, *Barry v. Raskov* (Ct. App. 1991) 232 Cal. App. 3d 447, 454, where the court recognized that allowing a broker to delegate the liability for the fraudulent torts of its contractor property appraiser would incentivize the broker to hire potentially insolvent contractors, to the detriment of the public.

disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

202.    Further, Uber drivers act as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

203.    Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide—transportation.

204.    By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including the Uber driver at issue here, were Uber's employees and/or agents.

205.    Plaintiff reasonably believed that the Uber driver was an employee or agent of Uber, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result of her contact with the driver.

206.    For these reasons and others, Uber is vicariously liable for the tortious acts of its drivers, regardless of whether Uber's drivers are employees, agents, apparent agents, or contractors of Uber.

207.    As a direct and proximate result of the Uber driver's tortious conduct, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

208.    As a direct and proximate result of Uber driver's tortious conduct for which Uber is legally liable, Plaintiff has suffered economic and general, non-economic damages according to proof.

209.    Plaintiff will seek actual and punitive damages based on Defendants' above-

described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## VICARIOUS LIABILITY FOR SEXUAL BATTERY

210.    Plaintiff incorporates all prior allegations.

211.    The Uber driver made harmful and offensive contact with the Plaintiff. Plaintiff did not consent to the contact. Plaintiff was harmed and offended by the Uber driver's contact. The Uber driver intentionally and recklessly committed acts that resulted in harmful contact with Plaintiff's person, and/or touching of Plaintiff in a sexual manner.

212.    As a result of the Uber driver's sexual battery of the Plaintiff, which occurred while in the course and scope of Uber driver's employment, Plaintiff was humiliated, degraded, violated, and robbed of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

213.    As a legal result of the sexual battery committed by the Uber driver, and Uber's liability and vicarious liability for the same, Plaintiff suffered economic and non-economic damages.

214.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief:

- Entry of judgment on each of her claims against Defendants jointly and severally;
- Past and future economic and non-economic damages including physical pain, mental anguish, anxiety, medical expenses, lost earnings or earning capacity;
- Pre- and post-judgment interest;
- The costs and expenses of litigation;

- Attorneys' fees;

- Equitable relief; and

- Such other relief as this Court may deem just and proper.


Dated: September 21, 2023   Respectfully submitted,

          By: _____/s_____
          Reza Davani, Esq. (Fed. Bar No. 30168)
          KETTERER, BROWN & ASSOCIATES, LLC
          336 S. Main Street
          Bel Air, MD 21014
          Tel: (855-522-5297)
          Fax: (855-334-5626)
          reza@kbaattorneys.com
          *Counsel for Plaintiff*


## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: September 21, 2023   Respectfully submitted,

          By: _____/s_____
          Reza Davani, Esq. (Fed. Bar No. 30168)
          KETTERER, BROWN & ASSOCIATES, LLC
          336 S. Main Street
          Bel Air, MD 21014
          Tel: (855-522-5297)
          Fax: (855-334-5626)
          reza@kbaattorneys.com
          *Counsel for Plaintiff*

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| P. | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-02580-GLR |
| UBER TECHNOLOGIES, INC., ET AL. | |
| Defendants. | |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS ........................ 1

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    Plaintiff travels to UAE, where she was allegedly assaulted by an individual with no relationship with Uber or Rasier. ............................................................ 3

    B.    Babar is a foreign independent driver with no relationship with Uber. ........................ 3

    C.    Plaintiff sues UTI and Rasier, but does not sue Babar. ................................................. 4

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

    A.    UAE law applies to Plaintiff's tort claims, and the UAE does not recognize common-law causes of action. .................................................................................... 5

        1.    UAE law applies to Plaintiff's tort claims. ................................................. 5

        2.    The UAE does not recognize common-law torts or punitive damages. ................ 7

    B.    Even if the Court were to read Plaintiff's common-law claims as claims under the UAE Civil Code, those claims must be dismissed. .......................................................... 8

    C.    Even if this Court applies Maryland law, Plaintiff's claims must be dismissed ......... 10

        1.    Count 1—Negligence .................................................................................... 10

        2.    Count 2—Negligent hiring, retention, and supervision ........................................ 16

        3.    Counts 3, 8, and 9—Negligent failure to warn, breach of warranty (design defect and failure to warn) ............................................................................ 18

        4.    Count 4—Intentional misrepresentation (fraud) ................................................ 23

        5.    Count 5—Negligent misrepresentation ............................................................. 25

        6.    Count 6—Negligent infliction of emotional distress ......................................... 26

        7.    Count 7—Breach of contract ......................................................................... 26

        8.    Vicarious liability for Babar's torts ................................................................ 27

CONCLUSION ................................................................................................................... 30

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Defendants Uber Technologies, Inc. ("UTI") and Rasier, LLC ("Rasier") respectfully move to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## <u>INTRODUCTION</u>

This case involves a tragedy that occurred in Dubai, United Arab Emirates. Plaintiff P. alleges she was sexually assaulted in May 2023 by a resident of the UAE while on a trip to Dubai. Plaintiff claims that, on May 4, 2023, she used the Uber App to request transportation from the Dubai Marina to her hotel. Plaintiff's driver was a man named Ali Babar—a Pakistani national living in the UAE. Plaintiff claims that Babar did not take her directly to her hotel, but instead drove "almost an hour away" to a parking lot where he assaulted her. She alleges that, following the assault, Babar drove Plaintiff to her hotel. Plaintiff sued UTI and Rasier in September 2023, asserting various tort and contract claims, and alleges that Uber is vicariously liable for Babar's criminal actions. Plaintiff does not allege that UTI or Rasier had any knowledge of any prior incidents involving Babar, nor does she allege that either entity had any reason to anticipate that Babar would commit sexual assault, and she has not named Babar as a party to this action.

Plaintiff's case must be dismissed for several reasons.

First, Plaintiff's Maryland common-law tort claims fail as a matter of law because UAE law—not Maryland law—governs. This is so because the *lex loci delicti* approach adopted by Maryland courts requires application of the tort law of the place where the injury occurred—here, Dubai. But Plaintiff has not pleaded any claims under UAE law, and the Complaint does not invoke UAE law at any point. Furthermore, the UAE is a civil law jurisdiction, not a common law jurisdiction, so Plaintiff's Maryland common-law claims cannot be brought in the first instance.

Second, even assuming Plaintiff's Complaint could be read as asserting civil law tort claims under UAE law, Plaintiff fails to state a claim upon which relief may be granted. Plaintiff's

tort claims against UTI and Rasier are inextricably intertwined with the criminal acts of Babar. But the UAE recognizes vicarious liability in extremely narrow circumstances that do not apply here. Neither UTI nor Rasier have any relationship—contractual or otherwise—with Babar. Therefore, it follows that neither UTI nor Rasier exercised any direction or control over Babar, which is required to impose vicarious liability under UAE law for Babar's acts.

Third, all of Plaintiff's claims fail under Maryland law because she does not (and cannot) plead facts to satisfy the legal elements as prescribed by Maryland courts. Her common-law negligence claim cannot survive because Plaintiff cannot plead facts to show that either UTI or Rasier—who have no relationship with Babar—were in a "special relationship" giving rise to a duty of care. Nor does she allege that Babar's independently tortious acts were foreseeable to UTI or Rasier. Plaintiff's negligent hiring, retention, and supervision claims fail because she cannot allege any relationship between UTI or Rasier and Babar, and fails to plead any facts in support of the required element of proximate cause. Her product liability claims must be dismissed because, among other reasons, the Uber App is not a "product," which is a threshold issue before bringing a product liability claim. Plaintiff's fraud claims fail because she cannot satisfy the stringent pleading requirements of Federal Rule of Civil Procedure 9(b), and her negligent misrepresentation claims are similarly deficient because she identifies no particular statements on which she reasonably relied to her detriment. Plaintiff's NIED claim is legally foreclosed because Maryland does not recognize such a cause of action. Plaintiff's breach of contract claims fail because she does not allege any specific contract between herself and UTI or Rasier, nor does she identify any terms of that contract that were allegedly breached. And, finally, Plaintiff's vicarious liability theories fail because, as dozens of courts have held nationwide, UTI and Rasier are not vicariously

liable as a matter of law for the independent criminal acts of a driver, because such acts fall outside the scope of any agency or employment relationship.

## FACTUAL BACKGROUND

**A.  Plaintiff travels to UAE, where she was allegedly assaulted by an individual with no relationship with Uber or Rasier.**

Plaintiff is a resident of Baltimore, Maryland.  Compl. ¶ 11.  Plaintiff alleges she was traveling in Dubai in May 2023.  *See id.* ¶ 62.  Plaintiff alleges that, on May 4, 2023, she used the Uber App to request transportation services from the Dubai Marina to her hotel.  *Id.*  She was picked up by a driver named Ali Babar.  *Id.* ¶ 64.  Babar allegedly locked the doors of his car, drove Plaintiff an hour away from her hotel, and assaulted her in a parking lot.  *Id.* ¶ 66.  Plaintiff alleges that she "was asking him what was going on," but does not allege that she used any of the emergency features made available to her through the Uber App during the hour drive.  *Id.*  Following the assault, Babar allegedly drove Plaintiff back to her hotel, and demanded that Plaintiff "give him a 5-star review."  *Id.* ¶¶ 66–71.  Plaintiff alleges she returned to her hotel room, and informed her "closest friend" of what had occurred.  *Id.* ¶ 72.

**B.  Babar is a foreign independent driver with no relationship with Uber.**

Babar is a Pakistani national who lives in the United Arab Emirates.  *See* Declaration of Alejandra O'Connor ¶ 19.  In order to access the Uber App to connect with riders in the UAE, Babar was required to enter into a UAE Driver Agreement.  *Id.* ¶ 18.  But that agreement did not involve UTI or Rasier; instead, the agreement was between Babar and Uber B.V., a private limited company based in the Netherlands.  *See id.* ¶¶ 15–18. Uber B.V. is a separate entity from UTI and Rasier, both of which are based in and incorporated in the United States.  *Id.* ¶ 16.

3

### C.  Plaintiff sues UTI and Rasier, but does not sue Babar.

On September 22, 2023, Plaintiff filed this lawsuit against UTI and Rasier—she has not sued Babar or Uber B.V.  *See* Complaint.  She brings nine claims: (1) negligence, *id.* ¶¶ 101–14; (2) negligent hiring, retention, and supervision, *id.* ¶¶ 115–27; (3) negligent failure to warn, *id.* ¶¶ 128–39; (4) intentional misrepresentation—fraud, *id.* ¶¶ 140–52; (5) negligent misrepresentation, *id.* ¶¶ 153–63; (6) negligent infliction of emotional distress, *id.* ¶¶ 164–171; (7) breach of contract, *id.* ¶¶ 172–75; (8) breach of warranty (design defect), *id.* ¶¶ 176–83; and (9) breach of warranty, failure to warn, *id.* ¶¶ 184–92.  She also alleges vicarious liability for Babar's torts, *id.* ¶¶ 193–209, and vicarious liability for sexual battery, *id.* ¶¶ 210–14.  Plaintiff is seeking punitive damages for all of her claims except her breach of contract claim.  *See id.* ¶¶ 101–92.

Plaintiff does not cite any statutes for her claims—all are common-law claims.  *See id.* And although the alleged incident occurred in Dubai, Plaintiff does assert any claims under the UAE's civil law regime, and solely invokes Maryland common law.  *Id.*

## LEGAL STANDARD

"The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of Plaintiff's Complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999). The dismissal for failure to state a claim upon which relief may be granted does not require Defendant to establish 'beyond doubt' that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–62 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 562. The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United*

4

*Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir.1979)." *Roberts v. Pruitt*, No. CIV.A. GLR-13-3604, 2014 WL 4182215, at *1 (D. Md. Aug. 20, 2014), aff'd, 591 F. App'x 201 (4th Cir. 2015).

## ARGUMENT

The Court should grant this Motion to Dismiss. UAE law applies to Plaintiff's tort claims because Dubai was the site of Plaintiff's injury. But Plaintiff's common-law tort claims are not recognized in the United Arab Emirates (a civil law jurisdiction), and therefore cannot be brought as a matter of law, nor can her claims for punitive damages (which are not recognized in the UAE). And even if Plaintiff's claims were interpreted as claims under the UAE Civil Code, they still fail as a matter of law because Plaintiff cannot allege that UTI or Rasier controlled Babar's actions. Furthermore, even if Maryland common law applies, all of Plaintiff's claims fail because she does not (and cannot) plead facts to satisfy the various legal elements required under Maryland law.

**A. UAE law applies to Plaintiff's tort claims, and the UAE does not recognize common-law causes of action.**

Plaintiff alleges six different tort claims against Uber, and additionally seeks to hold UTI or Rasier vicariously liable for Babar's torts. But these claims must be dismissed, as they are governed by UAE law, which is a civil law system.

**1. UAE law applies to Plaintiff's tort claims.**

A federal court applies the choice of law rules of the forum state in which it sits—here, Maryland. *See Adobe Sys. Inc. v. Gardiner*, 300 F. Supp. 3d 718, 728 (D. Md. 2018). For tort claims, Maryland has adopted the *lex loci delicti* approach from the Restatement (First) of Conflict of Laws. *Lab'y Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006). "Under that approach, where the events giving rise to a tort action occur in more than one State, [the Court] appl[ies] the law of the State where the injury—the last event required to constitute the tort—occurred." *Id.*

Here, the analysis is straightforward: Plaintiff alleges she suffered an injury in the United Arab Emirates and, consequently, UAE law applies to her tort claims. Nowhere in Plaintiff's Complaint does she allege any connection with Maryland, other than the fact that she is a resident of Baltimore.

Plaintiff may argue, despite the *lex loci delicti* approach requiring application of UAE law, that Maryland public policy leans in favor of applying Maryland law. That is incorrect. Public policy does not control in "merely a situation in which Maryland law is different from the law of another jurisdiction." *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). Indeed, "public policy is not a term to be bandied about lightly in every conflict of laws case" and the Court must be "well convinced of the weight of a supposed policy before advancing it against bedrock legal principles." *Jacobs v. Adams*, 505 A.2d 930, 937 (Md. 1986). It follows that Maryland courts have "made it clear that for the argument of 'public policy' to succeed the alleged public policy must be a very strong one." *Id.*

The simple fact that a particular cause of action is available in Maryland, but is not available in another forum, is *not* a public policy consideration that requires application of Maryland law. For example, in *Hartford Mutual Insurance Co. v. Bruchey*, the Maryland Court of Appeals rejected the application of Maryland law in a loss of consortium case, even though Maryland law permitted recovery for loss of consortium while the other jurisdiction (Virginia) did not. 238 A.2d 115, 117 (Md. 1968). In so doing, the court held that the mere lack of the particular remedy in Virginia did not mandate the application of Maryland law, and the movant failed to identify any overriding public policy considerations. *Id.* at 119.

Similarly, in *Jacobs*, the court rejected application of Maryland law for an injury that occurred in the District of Columbia. *Jacobs*, 505 A.2d at 937. The plaintiff resisted application

of the District of Columbia's automobile negligence no-fault liability scheme, arguing that it was inconsistent with Maryland's supposed public policy that "permit[s] an injured party to pursue any remedy available at law." *Id.* The court roundly rejected this argument: it noted that the District of Columbia had chosen to "close the doors of its courts" to such negligence cases, and that "[i]f Maryland were to entertain these suits, our courts might well become small claims courts for the District of Columbia, flooded with suits barred by the laws of that neighboring jurisdiction. If there is any strong public policy in these cases, it is to avoid such a result." *Id.* at 938.

Critically, the burden does not rest with UTI or Rasier to show that UAE law applies. Instead, the burden is on Plaintiff to show why Maryland law overrides the default application of UAE law under the *lex loci delicti* approach. *Cunningham v. Feinberg*, 107 A.3d 1194, 1211–12 (Md. 2015). And "the requirement of showing that the public policy is sufficiently strong has been described as a heavy burden on the party that urges rejection of the application of the otherwise applicable foreign law." *Id.* (cleaned up). Plaintiff cannot meet that burden here. Moreover, as discussed *infra*, this is not a scenario where Plaintiff has no redress under UAE law. The UAE Civil Code provides remedies for tort (though, as discussed *infra*, Plaintiff does not allege facts to overcome the gatekeeping function of Rule 12(b)(6)). In short, there are no public policy considerations at play, and UAE law controls for any remedy Plaintiff seeks in tort.

### 2. The UAE does not recognize common-law torts or punitive damages.

Plaintiff's Complaint pleads six tort claims, as well as vicarious liability, and seeks punitive damages against UTI and Rasier. All of Plaintiff's claims are common-law claims—she cites no Maryland state statutes, regulations, or other codification. And critically, although UAE law applies, Plaintiff does not cite to any of the UAE's Civil Code that governs tort claims.

Plaintiff is legally foreclosed from pursuing her common-law claims under UAE law. The UAE is not a common law jurisdiction: it is a civil law regime that has adopted the UAE Civil

7

Code (available at https://elaws.moj.gov.ae/English.aspx?val=UAE-KaitEL1).  Chapter 3 of the UAE Civil Code covers "Torts" and contains the various articles under which Plaintiff could allege cause of actions against tortfeasors.  Plaintiff has not invoked any of those articles here, nor has she made any attempt to explain how her distinctly American common-law claims fall within the scope of a foreign country's civil law scheme.  Plaintiff's attempts to force a square peg into a round hole are inappropriate.  This Court is bound to apply UAE law, which does not recognize common-law tort claims.  Plaintiff's claims should be dismissed.

Plaintiff's claims for punitive damages should be dismissed for similar reasons.  The UAE does not recognize punitive damages.  Article 292 of the UAE Civil Code allows only for compensatory damages based on "prejudice sustained" and "lost profit[s]," provided that each is "a natural consequence of the prejudicial act."  And Article 293 recognizes "moral" damages that pertain to "trespassing against others in their freedom, honor, dignity, reputation, social standing or financial position."  But the Civil Code does not recognize recovery for punitive damages.  So Plaintiff's claims for punitive damages are legally foreclosed under UAE law and, consequently, cannot survive the gatekeeping threshold of Rule 12(b)(6).  The Court should dismiss all of Plaintiff's punitive damages claims.

### B.  Even if the Court were to read Plaintiff's common-law claims as claims under the UAE Civil Code, those claims must be dismissed.

Plaintiff brings six tort claims against Uber: (1) negligence, Compl. ¶¶ 101–14; (2) negligent hiring, retention, and supervision, *id.* ¶¶ 115–27; (3) negligent failure to warn, *id.* ¶¶ 128–39; (4) intentional misrepresentation—fraud, *id.* ¶¶ 140–52; (5) negligent misrepresentation, *id.* ¶¶ 153–63; and (6) negligent infliction of emotional distress, *id.* ¶¶ 164–71. She also alleges vicarious liability for Babar's torts, *id.* ¶¶ 193–209, and vicarious liability for sexual battery, *id.* ¶¶ 210–14.

8

Although she attempts to cast these claims as different causes of action, they are all inextricably intertwined with the alleged sexual assault committed by Babar. Put another way, Plaintiff could not bring any lawsuit in the first place were it not for Babar's actions. The injury-causing conduct in this case is the assault allegedly committed by Babar. Any "misrepresentations," "fraud," or "failure to warn" relate to the allegation that Plaintiff was not made aware she could have been sexually assaulted by Babar. And Plaintiff's negligence, negligent hiring, emotional distress, and vicarious liability theories all turn on UTI or Rasier's alleged relationship with, or control over, Babar.

But the default rule under the UAE Civil Code is that third parties, like the defendants here, are not responsible for the intentional acts of others, like Babar. Article 313(1) of the Civil Code establishes the baseline that "[n]o one is liable for the act of another person."[1] There are two limited exceptions to this rule, neither of which apply here. The first exception is where the tortfeasor is a person subject to supervision by the third party due to the tortfeasor's minority, or mental or physical condition. UAE Civil Code, art. 313(1)(a). Those facts are not present, or alleged, here. The second exception is where the third party has actual control over the tortfeasor, and that the tortfeasor was in a "subordinate" role and committed the tort "in the exercise of his duty." UAE Civil Code, art. 313(1)(b). But this second exception also does not apply.

The entities named as defendants in this lawsuit are United States-based entities that are incorporated in Delaware, with their principal place of business in California. O'Connor Decl. ¶ 16. As a matter of common sense, therefore, Plaintiff does not (and cannot) allege that these entities have any level of supervision or control over any individual drivers in a foreign country

---

[1] *See also* UAE Civil Code, art. 289(1) (noting that an "act is the responsibility of the doer and not of the one who ordered it, unless the doer was compelled to act. Compulsion that is taken into consideration must amount to imminent duress.").

like the UAE (especially where, as here, the party to Babar's Driver Agreement was Uber B.V., a foreign entity).  Plaintiff's Complaint offers nothing more than conclusory allegations (devoid of any specific factual support) about how Babar was subject to UTI or Rasier's "direction and control."  *E.g.* Compl. ¶ 75.  But Plaintiff pleads no facts to allege *how* this is so.

Put another way, Plaintiff could not simply allege that "black is white" or "white is black" and hope to survive Rule 12 dismissal.  As this Court has noted, it is not required to accept unsupported legal allegations, nor should it give weight to "legal conclusions couched as factual allegations," or "conclusory factual allegations devoid of any reference to actual events."  *Roberts*, 2014 WL 4182215, at *1.  And it should not do so here.  Plaintiff offers no factual allegations to show how UTI or Rasier's actions fit within the narrow exception to UAE Civil Code Article 313(1)(b) that would impose liability upon Uber for any UAE tort claim stemming from Babar's acts.  She does not allege any facts as to how UTI or Rasier had actual control, or supervised or directed Babar on the date of the incident.  UAE Civil Code Article 313(1)(b).  She does not allege that Babar was in a "subordinate" role to anyone at UTI or Rasier.  Id.  And, critically, she does not (and cannot) allege that Babar's sexual assault was committed "in the exercise of his duty."  *Id.*  Plaintiff cannot state a claim against UTI or Rasier under UAE Civil Code Article 313(1)(b) and, therefore, cannot hold either entity liable for Babar's actions as a matter of law.

**C.  Even if this Court applies Maryland law, Plaintiff's claims must be dismissed.**

Plaintiff brings six tort claims, three contract claims, and two vicarious liability claims.  Even if the Court applies Maryland law to these claims, they should be dismissed for the reasons set forth below.

**1.  Count 1—Negligence**

Plaintiff's negligence claim should be dismissed because: (1) she fails to plead facts to show that UTI or Rasier owed her a duty of care; and (2) she fails to plead facts to show that the

attack by Babar was foreseeable.  Both elements are required under Maryland law in order to hold

Uber responsible for the acts of a third party like Babar, but neither element is satisfied by Plaintiff.

The default rule in Maryland is that there is no duty to protect another from the criminal

acts of a third person, in the absence of either a statute or a special relationship.  *E.g.*, *Scott v.*

*Watson*, 359 A.2d 548, 552 (Md. 1976).  And, even if a special relationship is established, under

Maryland law, there is no duty to protect against criminal acts that are unforeseeable.  *See*

*McGuiness v. Brink's Inc.*, 60 F. Supp. 2d 496, 499 (D. Md. 1999) (granting motion to dismiss).

### a. Plaintiff cannot allege that UTI or Rasier are common carriers under these facts.

Plaintiff cannot plead facts showing that she was in a special relationship with UTI or

Rasier at the time of the accident, because neither entity has any relationship with Babar, who lives

in the UAE, where the incident occurred.  Maryland has adopted Section 314A of the Restatement

(Second) of Torts, which encapsulates four types of special relationships: (1) common carrier to

passenger; (2) innkeeper to guest; (3) landowner to invitee; and (4) individuals required by law to

take custody of another.  *See* RESTATEMENT (SECOND) OF TORTS § 314A; *Corinaldi v. Columbia*

*Courtyard, Inc.*, 873 A.2d 483, 490 (Md. 2005).

Of those four, only common carrier bears any remote resemblance to the claims here, but

Plaintiff nevertheless cannot plead facts to show that UTI or Rasier is a common carrier in this

situation.  This is so for two reasons.

First, even assuming *arguendo* that UTI or Rasier are common carriers under Maryland

law, the incident in question occurred in Dubai, not Maryland.  The Maryland code section

pertaining to Public Utilities defines a "transportation network company" as a company "that

operates in the State."  MD. CODE, PUB. UTIL. § 10-101(l).  And the Maryland Public Utilities

Commission itself only has jurisdiction over entities that engage in business in Maryland.  Md.

11

Code, Pub. Util. § 2-112. Thus, whether Maryland considers UTI or Rasier to be a common carrier in the state of Maryland has no bearing on whether either of those entities is a common carrier in Dubai.[2] And Plaintiff has pleaded no facts, nor cited any law, to establish whether either entity is a common carrier overseas.

Second, and relatedly, the entity that operates in the UAE is Uber B.V., a private limited company that is based in the Netherlands. Declaration of Alejandra O'Connor ¶¶ 15–18. When Plaintiff traveled to Dubai and used the Uber App, she agreed that she was subject to the UAE Terms of Use, which named Uber B.V. as the appropriate entity—not UTI or Rasier. *Id.* And it is Uber B.V. that is a party to the UAE Driver Agreement that was signed by Babar. *Id.* But Plaintiff has not named Uber B.V. as a defendant, she has not referenced Uber B.V. in her Complaint, and she does not plead anywhere that Uber B.V. is a common carrier. Nor does she plead any facts whatsoever to establish how Uber B.V.'s operations in the UAE can impute common carrier liability to UTI and Rasier, two entities that are based in the United States.

Consequently, Plaintiff fails to plead the threshold requirement that UTI or Rasier were in a special relationship with Plaintiff that gave rise to a duty of care. Because she cannot do so, her negligence claim must be dismissed.

### b. Even assuming a duty exists, Plaintiff fails to allege that Babar's crime was foreseeable.

To survive a motion to dismiss her negligence claim, Plaintiff must do more than plead the existence of a duty—she must also plead facts to show that Babar's criminal attack on her was foreseeable by these defendants. She has not done so.

---

[2] And, even if Maryland considers UTI or Rasier to be "common carriers," they are the only state in the country to arguably have adopted this outlier position.

"A carrier is not an insurer of the absolute safety of his passengers, yet he is bound to use reasonable care according to the nature of his contract."  *Tall v. Balt. Steam-Packet Co.*, 44 A. 1007, 1008 (Md. 1899).  This common-sense principle is reflected in Comment *e.* to Section 314A, which states, in relevant part: "The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury. He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate, or to give aid to one whom he has no reason to know to be ill."  RESTATEMENT (SECOND) OF TORTS § 314A cmt. *e.*  It follows, therefore, that foreseeability is a necessary element that Plaintiff must plead.

*McGuiness* is instructive.  There, a plaintiff sued Brink's security after he was shot by a firearm owned by Brink's and issued to a Brink's employee.  60 F. Supp. 2d at 497.  The tortfeasor who shot the plaintiff acquired the firearm from the Brink's employee, who lent the gun to the tortfeasor illegally.  *Id.*  Plaintiff sued Brink's, seeking to hold Brink's liable for the third-party shooting, and Brink's moved to dismiss pursuant to Rule 12(b)(6).  *Id.*  In dismissing the plaintiff's negligence claim, this Court held that, even assuming the existence of a duty, the unforeseeable acts of the employee loaning the weapon to the tortfeasor, and his use of the weapon to commit a crime, superseded any liability on behalf of Brink's.  *Id.* at 499; *see also Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 642 A.2d 219, 232 (Md. 1994) (declining to impose liability where third-party tortfeasor's criminal acts were unforeseeable and, accordingly, broke the causal chain); *Jackson v. A.M.F. Bowling Ctrs., Inc.*, 128 F. Supp. 2d 307, 314 (D. Md. 2001) (declining to impose liability under Maryland law where criminal incident that occurred was unforeseeable and "spontaneous").

Plaintiff does not plead any specific facts to show that Babar's alleged attack on Plaintiff was foreseeable.  Much of her Complaint focuses on allegations related to UTI's prior CEO, who departed the company in 2017—six years before Plaintiff's incident—or UTI or Rasier's United States-based operations.  But, again, this incident did not occur in the United States, it occurred in Dubai.  Plaintiff makes no factual allegations about UTI or Rasier's operations in Dubai, whether there have been any prior sexual assaults in Dubai involving the Uber platform, or whether Babar himself has ever been accused of any other sexual assaults.  She similarly makes no allegations that Babar's sexual assault of Plaintiff was foreseeable in any way.

Recently, this Court granted dismissal in UTI's favor on a similarly-pleaded complaint, only with a United States incident.  *See Tchakounte v. Uber Techs., Inc.*, No. CV CCB-20-3028, 2022 WL 326727, at *7 (D. Md. Feb. 3, 2022).  In *Tchakounte*, the plaintiff sued UTI following the death of an independent driver.  *Id.* at *1–2.  Like here, the plaintiff alleged UTI was negligent due to failure to perform proper background checks and screenings and that UTI's United States Safety Report illustrated that UTI was aware of the issue of assault on its platform.  *Id.* at *7.

In granting UTI's motion to dismiss pursuant to Rule 12(b)(6), this Court rejected both sets of allegations as unconvincing.  *Id.*  It rejected Plaintiff's use of UTI's Safety Report data, citing that the rate of fatal assaults on the Uber platform (.00093%) was too remote to establish foreseeability.  *Id.*  But the Safety Report allegations in Plaintiff's Complaint show that the rate of sexual assault is even lower: for 2017–2018 it was .00002%, and for 2019–2020 it was .000002%.  *See* Compl. at 12 nn. 39, 41. Both of these numbers are lower than the assault rate cited by this Court in *Tchakounte*, which this Court held did not support an allegation of foreseeability as a matter of law.  *Tchakounte,* 2022 WL 326727, at *7.  So those numbers certainly cannot survive a motion to dismiss here (especially where the numbers cited by Plaintiff only pertain to United

States sexual assault data, and Plaintiff presents no allegations regarding the rate of sexual assault on the Uber platform in the UAE).

Furthermore, in *Tchakounte*, the plaintiff alleged that the third-party tortfeasor had a criminal history (including a 21-year-old robbery conviction) that UTI allegedly failed to screen and properly vet. *Id.* at *8. But this Court also rejected that as evidence of foreseeability of the tortfeasor's unprompted, criminal attack on the decedent. *Id.* And this type of allegation is far more specific than the vague claims Plaintiff makes regarding a failure to screen in this case. As discussed, Plaintiff identifies no prior misconduct by Babar, and does not allege any specific facts that could have put UTI or Rasier on notice of the fact that he intended to assault Plaintiff. If a specific allegation of prior crimes in misconduct was not sufficient to establish foreseeability, it follows that vague, conclusory allegations of the type in Plaintiff's Complaint must also be insufficient.[3]

In sum, Plaintiff does not meet her burden to allege facts that allow her negligence claim to survive the pleading stage, and her claim must be dismissed.

---

[3] Numerous other courts around the country have similarly refused to impose a duty upon Uber or Lyft for third-party criminal acts. *See Mendoza v. Uber Techs, Inc.,* Case FCS057560, Superior Court of California, Solano County (Nov. 9, 2022) (sustaining Uber's demurrer finding "Plaintiff has failed to allege facts establishing misfeasance by Defendant Uber or a special relationship or other circumstance that would have created a duty for Defendant Uber to protect Plaintiff from Defendant Doe from which Defendant Uber could be held liable for nonfeasance." and again sustaining Uber's demurrer after Plaintiff replead his allegations); *Jane Doe v. Uber Techs., Inc.*, Case No. 19-cv-03310-JSC (N.D. Cal. Sept. 15, 2022)(holding Uber had no duty to protect against third-party criminal conduct and there was no special relationship between Uber and Plaintiff); *Jane Doe No. 1 v. Uber Techs, Inc.*, 79 Cal. App. 5th 410, 294 Cal. Rptr. 3d 664 (June 1, 2022) (affirming Uber's demurrer and holding that Uber did not owe a duty of care to warn passengers against criminal acts of third-parties who were posing as authorized drivers); *Ameer v. Morgan et al.*, Case No. 222-CC00417, Circuit Court for the City of St. Louis (holding that Lyft did not owe a duty of care to a driver to protect him from the criminal acts of third parties); *Estate of Tchakounte v. Uber Techs., Inc.* (D. Md. Feb 3, 2022) 2022 WL 326727 (holding Uber did not owe a duty of care to a driver to protect him from the criminal acts of third parties); *Estate of Ceesay v. Uber Techs., Inc.* (D. Wa. Sept. 27, 2022) 2:21-cv-202-BJR (holding same).

### 2.   Count 2—Negligent hiring, retention, and supervision

To survive a motion to dismiss on her negligent hiring claim, Plaintiff must allege facts to support five elements: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, supervising or retaining the employee as the proximate cause of plaintiff's injuries." *Mitchell v. Rite Aid of Md., Inc.*, 290 A.3d 1125, 1160, cert. denied, 483 Md. 579, 296 A.3d 419 (Md. Ct. App. 2023). But Plaintiff cannot allege an employment relationship between UTI or Rasier and Babar, nor can she allege that Uber was aware or any incompetence on behalf of Babar. And, crucially, she cannot allege that Uber's conduct was the proximate cause of her injuries.

At the outset, UTI again notes that neither UTI nor Raiser entered into any agreement with Babar and, consequently, could not have formed any sort of employment relationship.[4]  And the entity that is a party to the UAE Driver Agreement, Uber B.V., is not a party to this action.  So as a matter of common sense, Plaintiff cannot plead the existence of an employment relationship between Babar, a Pakistani national, living and working in the UAE, and UTI and Rasier, two domestic companies who have no relationship whatsoever, or interacted with, Babar.

Plaintiff alternatively alleges, without any supporting facts, that Babar was the defendants' "agent." Compl. ¶ 77.  But this is not enough to bring a negligent hiring, retention, or supervision claim.  "Apparent agency can only exist in the absence of actual authority, and therefore cannot form the basis for a claim for negligent hiring, supervision, or retention which requires the existence of an employment relationship." *Doe v. Uber Techs., Inc.*, No. CV JKB-20-0370, 2021 WL 2382837, at *3 (D. Md. June 9, 2021).  Thus, in *Doe*, the Court granted UTI's motion to

---

[4] And Uber does not concede that Babar, an independent contractor, ever entered into any sort of employment relationship with UTI, Rasier, or Uber B.V.

dismiss where the driver in question (who was also alleged to have committed assault) was not driving on the Uber platform at the time of the alleged incident.  *Id.* at *3–4.

Thus, in the absence of an actual employer-employee relationship, the driver was (at most) an apparent agent of UTI, but such alleged agency could not support a negligent hiring claim as a matter of law.  *Id.*  So too here.  There exists no relationship whatsoever, let alone an employer-employee relationship, between UTI or Rasier and Babar.  The Court should reject Plaintiff's vague allegations regarding employment, which amount to little more than rote recitations of causes of action and legal conclusions.

Furthermore, Plaintiff fails to allege specific facts to support the critical element of proximate cause.  Plaintiff again relies on nothing more than recitations of legal elements without any supporting facts.  For example, she alleges that Babar was "inadequately screened" by UTI or Rasier.  Compl. ¶ 118.  And she baldly alleges that Babar was not "adequate[ly] supervised."  *Id.* ¶ 120.  But this is not enough, and *Doe* is again instructive.  There, this Court observed that, even assuming a driver was UTI or Rasier's actual agent or employee, the Plaintiff still was required to plead facts establishing that UTI or Rasier's failure to screen or perform an adequate background check of the driver was the proximate cause of the plaintiff's injuries.  *Id.* at *4.  But although the *Doe* plaintiff alleged that a proper screening would have potentially uncovered reports of prior theft committed by the driver, she did not allege that the screening would have uncovered some link to sexual misconduct, or was otherwise connected to her sexual assault.  *Id.*  Thus, the *Doe* court granted UTI's motion to dismiss because Plaintiff failed to plead facts to support the critical element of proximate cause.  *Id.*

This Court should reach the same conclusion.  Plaintiff's Complaint does not allege *any* prior misconduct by Babar that either UTI or Rasier allegedly could have identified through a more

17

adequate screening.  She does not allege that Babar had a history of sexual assault.  She alleges no statistics or information about the rate or history of sexual assaults in the UAE as they pertain to the Uber platform.  In short, Plaintiff does not allege a single fact to show how a different screening of Babar would have produced a different result.  And because she fails to do so, she does not establish the required element of proximate cause.  The Court should dismiss Plaintiff's negligent hiring claim.

### 3. Counts 3, 8, and 9—Negligent failure to warn, breach of warranty (design defect and failure to warn)

Plaintiff's failure to warn claims and design defect claims are essentially a re-hashing of her negligence claim.  But these claims fail for a simple reason: all three claims are rooted in product liability, but the Uber App is not a product.  But even if it were, Plaintiff's claims fail because she has not alleged any facts to support her failure to warn and defect theories, and she has disclaimed all of her warranty claims.

#### a. The Uber App is not a "product."

For a general product liability case, "the plaintiff must satisfy three basics from an evidentiary standpoint: (1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a causal relation between the defect and the injury." *Jones v. Reichert Jung, Inc.*, 211 F. Supp. 2d 661, 666 (D. Md. 2002). Failure to warn claims are only appropriate for injuries caused by products that are inherently dangerous, and therefore required some sort of warning to the end user. *E.g., Moran v. Faberge, Inc.*, 332 A.2d 11, 15 (Md. 1975).  Maryland's legislature has defined a "product" as a "tangible article, including attachments, accessories, and component parts, and accompanying labels, warnings, instructions, and packaging."  MD. CODE ANN., CTS. & JUD. PROC. § 5-115 (emphasis added).  It almost need not be said that software, like the Uber App, is not tangible.  Likewise, the Third Restatement of Torts defines a "product" as "tangible personal

property distributed commercially for use or consumption." RESTATEMENT (THIRD) OF TORTS:

PROD. LIAB. § 19 (West Grp., June 2020 Update) (emphasis added). It does not define a "product"

to include phone applications or even software as products. Recognizing that most software is

designed to itself provide a service, at least one commentator has suggested that "the proper answer

holds that most software does not fall within the purview of product liability law under this

definition." RAYMOND T. NIMMER, LAW OF COMPUTER TECH. § 12:41 (West, Jan. 2020 Update).

No Maryland court has yet considered whether the Uber App is a product, but numerous

other courts across the country have flatly rejected such an argument. *See, e.g.*, *In re Uber*

*Rideshare Cases*, Case No. CJC-21-005188 (June 22, 2023).[5]  This Court should reach the same

---

[5] *See also Ramos v. Uber Techs., Inc. et al.*, Case No. 22STCV33007 (June 1, 2023) (Los Angeles Superior Court
sustained Uber's demurrer as to Plaintiff's strict products liability claim without leave to amend, finding the primary
function of the Uber application is to facilitate a service); *Luna, Avelardo v. UTI, et al.*, Case No. 22STCV10806
(Sept. 27, 2022) (Los Angeles County court sustained Uber's demurrer as to Plaintiff's strict products liability claim
without leave to amend, finding the Uber application was not a product as a matter of law); *Norman v. Uber
Technologies, Inc., et al.*, Los Angeles County Superior Court No. 21STCV35632 (March 8, 2022) (Court sustained
Uber's Demurrer without leave to amend as to Plaintiff's three (3) separate causes of action for strict products liability
finding, "Uber's dominant role in the subject accident was as a provider of a service rather than as a distributor of a
product."); *Flores v. Uber Techs., Inc., et al.*, Case No. 19STCV24988 (March 22, 2022) (Los Angeles County,
California Superior Court granted Uber's demurrer without leave to amend finding that as a matter of law the Driver
App is not a "product" for purposes of a cause of action for strict products liability but is rather a service, *i.e.* matching
drivers with customers who require transportation services); *Shannon v. Uber Techs., Inc., et al.*, Los Angeles County
Superior Court Case No. 21STCV42029 (April 15, 2022) (Court granted Uber's demurrer without leave to amend
finding as a matter of law the App is not a "product" but rather is a service and"[...] the service aspect of the parties'
transaction predominates, and the use of the Uber App [...] was merely incidental to the provision of Defendants'
service."); *Toral v. Uber Techs., Inc., et al.*, Los Angeles County Superior Court Case No. 20STCV02030 (April 14,
2021) (Court granted Uber's demurrer without leave to amend, dismissing Plaintiff's product liability/negligent design
cause of action holding "[o]ffering services, however, is not a product."); *Cruz Lopez v. Uber Techs., Inc.*, Santa Clara
County Superior Court Case No. 21CV376012 (Nov. 23, 2021) (Court granted Uber's demurrer dismissing Plaintiff's
holding "the primary objective of the Uber App is to facilitate and provide a service" and accordingly, the Uber App
is merely a service rather than a product.") *Polanco v. LYFT, Inc., et al.*, Orange County Superior Court Case No. 30-
2019-01065850-CU-PA-CJC (May 13, 2021) (Uber's demurrer granted with Court finding "the Uber App does App
is not a 'tangible good' or 'physical object' . . . and the predominant purpose of the Uber App is the service of matching
drivers with passengers); *Jane Doe v. Uber Techs, Inc., et al.*, Los Angeles Co., CA Sup. Ct. Case No. 19STCV11874(
Nov. 30, 2020) (Granted Uber's demurrer without leave to amend ruling the "Uber App is not a product" and "[t]here
is no legislation or case law to support plaintiffs' position [that the Uber App is a product].");  *A.T. v. Lyft, Inc., et al.*,
No. 2019-CV-1759 (Ct. of Common Pleas Lackawanna Co., Penn. (Dec. 29, 2022) (noting "the Lyft app is 'an
application, software, website or system' as a matter of Pennsylvania law -- not a product"); *Baumgartner v. Uber
Techs., Inc., et al.*, Case No. 21-2-15753-6 (Sup. Ct. King Co., WA Mar. 9, 2022) (Washington Court granted Uber's
Motion to Dismiss Plaintiff's product liability claim.;  *See also Ameer v. Morgan et al* Case No. 222-CC00417 Circuit
Court for the City of St. Louis (holding the Lyft App is not a tangible product and is instead a service, not subject to
products liability theory); *DeRose v. DoorDash, Inc.*, et al Case NO. 5:22-CV-413-D (E.D. North Carolina June 1,

conclusion and, as a federal court sitting in diversity, should not recognize a new category of liability where one does not presently exist.

Although she attempts to pursue product liability claims, a reading of Plaintiff's Complaint makes clear that she characterizes UTI as a transportation services provider, and not a manufacturer of physical "products." For example, Plaintiff alleges that "Uber has widely offered its services to the general public and charges standard fees for its services through its application" and that "Any member of the public can use Uber's services for transportation." Compl. ¶ 80. Elsewhere, she refers to UTI as providing transportation "services" no fewer than 16 times. *See id.* ¶¶ 84, 85, 87, 88, 92, 93, 123, 131, 145, 147, 155, 156, 196 and 203. A "service" is not a "*tangible* article, including attachments, accessories, and component parts, and accompanying labels, warnings, instructions, and packaging." MD. CODE ANN., CTS. & JUD. PROC. § 5-115 (emphasis added); *see also e.g. Toral v. Uber Techs., Inc., et al.*, Los Angeles County Superior Court Case No. 20STCV02030 (April 14, 2021) (dismissing product liability claims and noting "[o]ffering services, however, is not a product.").

Because software is generally not considered a product and the Uber App is intended for use only in facilitating the provision of services, the Uber App is not a product. Plaintiff's product liability claims fail for this threshold reason alone.

### b. Plaintiff fails to plead facts to support her product liability claims.

In addition to the fact that the Uber App is not a product, Plaintiff's failure to warn claim fails for two separate reasons. First, Plaintiff (for the same reasons discussed *supra*) fails to plead facts showing a duty to protect Plaintiff from the unforeseeable acts of Babar. Second, under Maryland law, a failure to warn claim is predicated upon a particular product defect, but Plaintiff

---

2023) (Court held the DoorDash App was not inherently dangerous, rejecting Plaintiff's argument that the company's business model could foreseeable cause accidents.).

does not allege there was any defect or inherent danger with the Uber App, nor could she (she merely alleges that UTI or Rasier failed to share information).  Such allegations cannot support a failure to warn claim.

In Maryland, a failure to warn claim requires factual allegations to support the following elements: "(1) that the defendant owed a duty to warn; (2) that the defendant breached that duty; (3) that there was a direct causal connection between the defendant's failure and the alleged injuries; and (4) that the plaintiff was harmed." *Higgins v. Diversey Corp.*, 998 F. Supp. 598, 604 (D. Md. 1997).  And a duty to warn only applies where a defendant knows, or has reason to know, that the product or chattel "is or is likely to be dangerous for the use for which it is supplied," and "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition," *and* "fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." *Moran*, 332 A.2d at 15.

But Plaintiff alleges no dangerous condition that is inherent in the Uber App for its use in the UAE.  She does not allege there were any prior incidents of sexual assault in the UAE.  She does not allege that Babar, her alleged assailant, previously used or exploited any defect in the Uber App to commit sexual assault.  The only sexual assault data Plaintiff cites is from the United States, but this data actively contradicts Plaintiff's factually-unsupported allegation that UTI or Rasier did not warn the public about sexual assault on the Uber platform.  Indeed, Plaintiff alleges that UTI issued two public-facing safety reports that detailed the occurrence of sexual assault on the Uber platform in the United States, which also discussed the measures UTI and Rasier were taking to combat the issue.  *See* Compl. ¶¶ 47–50 and nn. 39 & 41.  Plaintiff cannot simultaneously allege that defendants did not make any public statements about the occurrence of sexual assault on the Uber platform, while also alleging that UTI publicly discussed reports of sexual assault in

its safety reports. And this Court is entitled to—and should—disregard such unsupported and inconsistent allegations. *Roberts*, 2014 WL 4182215, at *1.

### c. Plaintiff has disclaimed her warranty claims.

Plaintiff's breach of warranty claims should be dismissed because Plaintiff agreed that UTI and Rasier disclaimed any and all warranties when she entered into Uber's Terms of Use. Section 7 of the Terms of Use state, in all capital letters:

> THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.
>
> UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD-PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD REQUESTED OR OBTAINED FROM THIRD-PARTY PROVIDERS IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

O'Connor Declaration ¶ 13 & Exh. C. It is clear from the face of the Terms of Use that Plaintiff disclaimed any and all warranties against UTI and Rasier as they relate to her use of the Uber App and her interaction with third-party drivers like Babar, and therefore her claims are legally foreclosed.

But Plaintiff's breach of warranty claims separately fail because they are again rooted in product liability law, but the Uber App is not a product. *Jane Doe No. 1*, 294 Cal. Rptr. 3d at 671.

And, in any event, Plaintiff fails to allege any warranty made by Uber regarding the safety functionality of the Uber App that UTI or Rasier breached.  Plaintiff's claims should be dismissed.

### 4.   Count 4—Intentional misrepresentation (fraud)

Plaintiff's fraud claim fails for the simple reason that Plaintiff does not allege with any specificity any statement made by UTI or Rasier that was allegedly fraudulent.  An allegation of fraud is subject to the heightened standard of Federal Rule of Civil Procedure 9(b), and courts do not allow such claims to proceed where the allegedly fraudulent statement is vague, ambiguous, or represents an opinion by the speaker.

A claim for "intentional misrepresentation" requires Plaintiff to plead facts to support the following five elements: "(1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation." *Brass Metal Prod., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 386 (Md. Ct. Spec. App. 2009).

Regarding the representation in question, Maryland courts require the plaintiff to make a heightened showing of particularity.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  Thus, a plaintiff must specifically allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Id.* at 784 (cleaned up).  "[W]here there are multiple defendants, plaintiffs must, where the gravamen of the claim is fraud, allege all claims with particularity as to each of the defendants." *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D. Md. 2000).  And,

for each defendant, "the Complaint must contain facts sufficient to give rise to a plausible inference of defendants' specific intent to defraud." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 460 (D. Md. 2014), as corrected (Mar. 20, 2014). Furthermore, a particular misrepresentation must be one of a "material fact"—it cannot be an estimate or an opinion. *E.g.*, *Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 466 (D. Md. 2020).

Plaintiff does not allege a single specific statement made by UTI or Rasier to support her fraud claim, and falls well short of Rule 9(b)'s strict particularity requirement. *See* Compl. ¶¶ 140–52. At most, she alleges that "Uber represented to Plaintiff and the general public that safety was Uber's top priority, and it was Uber's goal to make every ride safe, comfortable, and reliable" and that Uber "stat[ed] it would provide Plaintiff with a safe ride to her destination. *Id.* ¶¶ 142–43. But Plaintiff does not identify who made these statements, when they were made, where they were made, or what the statements are.

Although, elsewhere in her Complaint, Plaintiff lists various statements allegedly pulled from Uber's website, *see* Compl. ¶¶ 86–87, she does not allege when these statements were made. Critically, Plaintiff also does not allege that she ever read any of these statements, nor does she allege that she relied on any of these specific statements in a manner that caused her injury. Nor does Plaintiff provide any facts to show how these statements, most of which describe various safety features available in the Uber App, are false. For example, Plaintiff's Complaint highlights the following statement: "Ride with confidence—Designing a safer ride—driver screenings—All potential drivers in the US must complete a screening before becoming an Uber driver partner, and current drivers continue to be vetted for criminal offenses." *Id.* ¶ 86.c. But Plaintiff does not plead any facts to show why or how this statement is false. And fatally, she also does not plead any facts to show that, *even if* she relied on the above statement, why a statement regarding UTI or Rasier's

operations in the United States deceived her into taking a ride in the UAE.  Numerous courts nationwide have granted dismissal or judgment in Uber's favor for this exact reason.[6]

Plaintiff's fraud allegations are conclusory, unsupported, and fail to satisfy the high bar imposed by Maryland courts.

### 5.  Count 5—Negligent misrepresentation

Plaintiff's negligent misrepresentation claims fail for similar reasons to her fraud claims. In order to adequately plead a claim for negligent misrepresentation, Plaintiff must allege facts to support that: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence." *White v. Kennedy Krieger Inst., Inc.*, 110 A.3d 724, 747 (Md. Ct. Spec. App. 2015) (quoting *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 273 (2007)).

Plaintiff again speaks in generalities, and points to no specific statements or representations by UTI or Rasier on which Plaintiff relied.  *See* Compl. ¶¶ 153–163.  She alleges no specific facts to show how either entity, in making statements regarding their United States operations, would have known, or intended for, Plaintiff to rely on such statements when using the Uber App outside

---

[6] *See, e.g.*, *In re Uber Rideshare Cases* Case No. CJC-21-005188 (Sup. Ct., San Francisco Cnty., CA June 22, 2023); *Estate of Stella Yeh, et al. v. Uber Techs., Inc., et al.*, (Sup. Ct. San Francisco Cnty., CA Aug. 5, 2021); *Soo Yeon Lee v. Uber Techs., Inc., et al.*, (District Court, Denver Cnty. CO, Dec. 21, 2023); *Jorge Rodriguez v. Uber Techs., Inc., et al.,* (Circuit Court of the 9th Judicial Circuit Osceola County, FL Aug. 9, 2021); *Gregory Strand v. Uber Technologies, Inc.* (Jefferson Co., KY Cir. Ct., Nov. 29, 2022); *Baraili v. Farmers Insurance Exchange, et al.,* Case No.C-03-CV-22-000156 (Baltimore Co., MD Dist. Ct. Jan. 9, 2023); *Youel-Nathan Tchakounte Peton v. Uber Technologies, Inc.* Civil Action No. CCB-20-3028 U.S. District Court for the District of Maryland (Feb. 2, 2022); *Hoffman v. Junior Silverio-Delrosar, et al.*, U.S. District Court District of New Jersey Case No. 20-cv-1391 (Dec. 23, 2021); *Jane Doe v. Uber Techs., Inc.*, (Erie Co. Sup. Ct., NY Nov. 9, 2022); *Minzer v. Barga et al* (New York Co. Sup. Ct. NY Sept. 27, 2019); *Fusco v. Uber Techs., Inc.*, No. 17-36, 2018 WL 3618232 (E.D. Pa. July 27, 2018).

the United States.  And, as a corollary, she offers no allegations that her reliance on those statements was justified, nor that she would have taken a ride with Babar but for any alleged statement made by UTI or Rasier.  *See supra* n.6.

### 6.  Count 6—Negligent infliction of emotional distress

Plaintiff's claim for negligent infliction of emotional distress should be "easily dispatched" by this Court.  *Bond v. U.S. Postal Serv. Fed. Credit Union*, 164 F. Supp. 3d 740, 750 (D. Md. 2015).  "Maryland does not recognize an independent tort for negligent infliction of emotional distress."  *Id.* (quoting *Miller v. Bristol-Myers Squibb Co.*, 121 F. Supp. 2d 831, 839 (D. Md. 2000).  The Court should dismiss Plaintiff's NIED claim.

### 7.  Count 7—Breach of contract

Plaintiff's breach of contract claim is comprised of four short paragraphs, none of which contain any factual allegations to support her claim.  *See* Compl. ¶¶ 172–75.  "In order for a cause of action for breach of contract to exist, a party must show contractual obligation, breach of that obligation, and damages."  *Curry v. Trustmark Ins. Co.*, 600 F. App'x 877, 882 (4th Cir. 2015).  Plaintiff does not do so here.

Plaintiff's Complaint does not identify, or discuss, *any* contract between Plaintiff and UTI or Rasier.  She does not allege when such a contract was entered into between the parties.  She does not allege with specificity any of the contract's supposed terms.  She does not allege with any specificity which terms were allegedly breached.  Without more, "skeletal factual allegations accompanied by nothing more than mere conclusions and general averments of a breach of a contractual duty do not suffice" to support a claim for breach.  *Cont'l Masonry Co. v. Verdel Constr. Co.*, 369 A.2d 566, 569 (1977); *RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 442 (2010) (dismissing breach of contract claim because "[a]lthough Count II states in conclusory fashion that 'BAA was bound to a configuration of concession sales locations for news/gifts of four locations,'

26

nowhere in the Amended Complaint does RRC allege an explicit or implicit promise by BAA to be so bound.").

Plaintiff's conclusory allegations, without more, cannot satisfy the threshold requirement of Rule 12(b)(6), and her breach of contract claim should be dismissed.

### 8.   Vicarious liability for Babar's torts

Plaintiff's Complaint contains a standalone final two sections, wherein she seeks to hold Uber liable for Babar's torts and sexual misconduct.  The Court should dismiss these claims because they are not valid causes of action in Maryland and, in any event, Plaintiff cannot allege that Babar was acting within the scope of any agency or employment[7] when he assaulted Plaintiff.

At the outset, it is well-settled that, under Maryland law, vicarious liability is not an independent cause of action, but rather a theory of assigning liability. *McCullough v. Liberty Heights Health & Rehab. Ctr.*, 830 F. Supp. 2d 94, 97 (D. Md. 2011).  So to the extent Plaintiff's vicarious liability claims are put forth as a standalone cause of action, they should be dismissed.

But in addition to the above, Plaintiff cannot adequately plead vicarious liability here because Babar's actions were not within the scope of any alleged employment or agency with UTI or Rasier.  The doctrine of *respondeat superior* allows an employer to be held vicariously liable for the tortious conduct of its employee when that employee was acting within the scope of the employment relationship. *Oaks v. Connors*, 660 A.2d 423, 426 (1995).

Even assuming *arguendo* Babar was an employee of either UTI or Rasier, it is black-letter law in Maryland that liability to the employer cannot attach unless the employee's tortious acts were "in furtherance of the employer's business and were 'authorized' by the employer." *Fid. First Home Mortg. Co. v. Williams*, 56 A.3d 501, 514 (Md. Ct. Spec. App. 2012). "To be within the

---

[7] Uber does not concede that Babar was an employee of any Uber entity.

scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master." *Id.* (quoting *East Coast Freight Lines, Inc. v. Mayor & City Council of Balt.*, 58 A.2d 290, 304 (1948)).

Plaintiff baldly alleges that Babar's sexual assault was within the scope of his employment, without citing any factual support for why such a remarkable proposition could be so.  She does not, and cannot, allege how Babar's sexual assault was "authorized" by UTI or Rasier.  She does not, and cannot, allege how sexual assault was part of Babar's job responsibilities, or was otherwise in furtherance of either entity's business.  And she does not allege that Babar committed his acts within a nearby locality to where he was supposed to have provided a ride to Plaintiff—indeed, she alleges Babar drove an hour away from Plaintiff's hotel to assault her.  Compl. ¶ 66.

This Court has previously rejected such attempts to hold UTI vicariously liable for a sexual assault committed by a driver.  In *Doe*, this Court correctly observed that "Courts applying Maryland law have consistently found that an employer is not vicariously liable for the torts of assault and battery based on sexual assaults by an employee as they are outside the scope of employment."  *Doe*, 2021 WL 2382837, at *4 (cleaned up and collecting cases).  And more than a dozen courts across the country have reached similar conclusions, and have declined to hold Uber and others liable for another's intentional torts because they fall outside the scope of any employment or agency relationship.[8]  There is no reason for this Court to depart from that well-

---

[8] *See, e.g.*, *Browne v. Lyft, Inc., et al.*, 2021-01314 (N.Y.S. 2d Dept., Aug. 2, 2023) (reversing trial court's denial of Lyft's motion to dismiss and finding that a driver's alleged sexual misconduct was outside the scope of any purported employment as it was a departure from his duties as a Lyft driver and was committed solely for personal motives unrelated to Lyft's business); *Pratt v. Lyft, et al.*, Supreme Court of Kings County, New York, Index No. 501701/2018 (July 1, 2021) (New York court granted Lyft's MTD as to, *inter alia*, Plaintiff's *respondeat superior*, fraud, and intentional infliction of emotional distress claims after potential rider assaulted by third-party during course of

commencing trip arranged through Lyft platform); *Burmakova v. Uber Techs., Inc., et al.*, 20STCV24517 (Cal. Super. Oct. 22, 2021) (Los Angeles County Superior Court granted Uber's demurrer finding that "there is nothing to suggest that Prince's actions were foreseeable in light of the nature of work performed in a ride-share trip. Rather, the assault was "the independent product of [Defendant's] aberrant decision to engage in conduct unrelated to his duties."); *Dier v. Armbruster, et al.*, MSC20-01742 (Cal. Super. May 21, 2021) (Contra Costa County Superior Court granted Airbnb's demurrer dismissing Plaintiff's negligence claim in case where plaintiffs alleged that an individual who rented next door property through Airbnb platform assaulted them during course of the rental); *Cho v. McEwan, et al.*, BC697693 (Cal. Super. Mar. 18, 2021) (California court granted Lyft's MSJ holding that plaintiff's vicarious liability argument failed as a matter of law because, regardless of how one characterized the relationship between Lyft and subject defendant driver, at the time of the incident, McEwan was not acting within the scope of that relationship when he allegedly assaulted an individual in an act of road rage); *Gonzalez v. Sierras, et al.*, 20STCV22103 (Cal. Super. Apr. 29, 2021) (Lyft's outside the scope demurrer granted where driver allegedly assaulted rider when rider would not exit the driver's vehicle); *Doe v. Uber Techs., Inc.*, No. 19-cv-03310-JSC, 2019 U.S. Dist.LEXIS 203466 (N.D. Cal. Nov. 22, 2019) (California court granted Uber's MTD finding that "Plaintiff has not plausibly alleged facts that support a finding that the assailant was acting within the scope of his ostensible employment when he assaulted Plaintiff."); *Flynn v. Bagumyan, et al.*, No. BC699997 (Cal. Super. Oct. 25, 2018 (Los Angeles County Superior Court sustained Uber's demurrer as to the plaintiff's claims of negligence, assault, battery, intentional infliction of emotional distress and negligent infliction of emotional distress finding defendant driver's alleged physical assault was outside the scope); *Karlen v. Uber Technologies, Inc.* (D.C. Conn. 3:21-cv-835 August 27, 2022) (Uber's motion to dismiss granted as to vicarious liability claims where the driver allegedly assaulted a rider); *Echevarria v. Uber Techs., Inc., et al.*, No. 2021-002103-CA-01 Miami-Dade Co., FL April 21, 2021) (Uber and Portier's MTD granted as to Plaintiff's vicarious liability and negligent hiring and retention claims in case where delivery driver was allegedly involved in a verbal and physical assault with Uber Eats user's husband); *Jorge Rodriguez v. Uber Techs, Inc., et al.* (9th J.D. Osceola Cty. Feb. 10, 2021) (Florida court granted Uber's MTD finding Plaintiff failed to state a claim for vicarious liability based on alleged physical assault of rider); *Walls v. Uber Techs., Inc., et al.*, Cause No. 2018CV311540 (Fulton Co., GA July 11, 2019) (Uber's motion for judgment on the pleadings granted with prejudice with Georgia court finding alleged physical assault by driver was "outside the scope as a matter of law"); *Strand v. Uber Techs., Inc., et al.*, No. 19-CI-004701 (Jefferson Co. Cir. Ct, KY Nov. 29, 2022) (Kentucky Court granted Uber's MSJ finding that the driver's alleged assault was "clearly outside the course and scope of his relationship with Uber" and accordingly, Uber could not be vicariously liable as a matter of law); *Doe v. Lyft, Inc.*, 2020 IL App (1st) 191328 (Ill. 2021) (Illinois trial court granted Lyft's MTD as to Plaintiff's counts of false imprisonment and assault/battery based on longstanding Illinois law and Illinois Appellate Court held that per the Transportation Network Providers Act, the common carrier exception to said law did not apply to Lyft); *Freni v. Uber Techs., Inc.*, No. 2018CV00326-C (Suffolk Co. Sup. Ct., Mass. August 10, 2021) (Court granted Uber's MTD finding that rider's criminal conduct was unforeseeable and did not rise to any duty for Uber); *Murray v. Uber Techs., Inc., et al.*, No. 20-11250-NMG (Mass. D.C. Sept. 11, 2020) (Massachusetts federal court granted Uber's 12(b)(6) motion finding that "as a matter of law, sexual assault necessarily falls outside the scope of employment" as "rape and sexual assault. . . do not serve the interests of the employer" and are "not motivated by a purpose to serve the employer."); *Cooper v. Postmates, LLC, et al.* (Case No. A-21-834317-C, 8th Judicial District Court, Clark County, NV) (NV trial court granted Postmates' MSJ finding no material evidence supporting Plaintiff's contention the delivery driver's alleged assault of the Plaintiff-customer was foreseeable to Postmates); *Huh v. Carr, et al.*, HUD-L-2488-20 (Hudson Co. Sup. Ct. March 25, 2021) (New Jersey Superior Court granted Uber's Motion to Dismiss punitive damages finding driver's intentional act of assaulting a third-party was not foreseeable and was outside the scope of any relationship with Uber); *Hoffman v. Silverio-Delrosar, et al.*, No. 20-cv-13291 (D.N.J. Dec. 23, 2021) (New Jersey federal court granted Uber's MTD dismissing Plaintiff's *respondeat superior* claim as a matter of law finding that driver's punching of rider was not a foreseeable act and did not further the driver's role.); *Cortese v. Aman, et al.*, Supreme Court of Suffolk County, New York, Index No. 605477/2019 (Feb. 19, 2021) (New York court granted Uber's MSJ with prejudice in alleged sexual assault case dismissing Plaintiff's assault, battery, false imprisonment, and negligent hiring claims); *Minzer v. Barga, et al.*, Supreme Court, New York County, New York, Index No. 151979/2019 (May 22, 2020) (New York court

29

settled principle.  Plaintiff cannot state a claim for vicarious liability as a matter of law, and her attempts to do so should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Uber's Motion to dismiss.

[Signature Page Follows]

---

granted Uber's Motion to Dismiss based on the independent driver's physical assault of a rider being outside the scope of any agency relationship); *Phillips v. Uber Techs, Inc.*, 2017 U.S. Dist. LEXIS 94979 (S.D.N.Y. 2017) (June 14, 2017) (New York federal court granted Uber's 12(b)(6) MTD based on finding that driver's physical assault, battery, and false imprisonment could not be 'reasonably anticipated' by Uber and was accordingly, outside the scope of any relationship); *Mazaheri v. Doe, et al.*, No. CIV-14-225-M, 2014 U.S. Dist. LEXIS 70342 (W.D. Okla. May 22, 2014) (Oklahoma federal court granted Uber's MTD where driver allegedly physically assaulted rider after verbal dispute with court holding, "it cannot plausibly be said…such behavior is a natural impulse growing out of or incident to the attempt to complete the master's business. [Driver] was not acting to protect or further the interests of his employer, but instead pursued this course of conduct for his own personal interest of assaulting plaintiff."); *Owens v. Uber Techs., Inc.*, et al., No. 20-13942 (Ct. of Common Pleas, Berks Co., PA Mar. 11, 2021) (Pennsylvania court sustained Uber's Preliminary Objections dismissing  Plaintiff's battery, assault, and intentional infliction of emotional distress claims with prejudice in incident where driver alleged to have thrown tire iron at rider outside of driver's vehicle); *Coughlin v. Uber Techs., Inc., et al.*, No. 200203083 (Ct. of Common Pleas, Philadelphia Co., PA June 12, 2020) (Pennsylvania court sustained Uber's Preliminary Objections dismissing Plaintiff's *respondeat superior* and assault and battery claims with prejudice in case where driver allegedly sexually assaulted rider); *Fusco v. Uber Techs., Inc.*, No. 17-36, 2018 WL  3618232 (E.D. Pa. July 27, 2018) (Pennsylvania federal court granted Uber's Motion to Dismiss dismissing Plaintiff's *respondeat superior* and negligent hiring claims after driver allegedly violently attacked a passenger upon learning that the passenger wanted to travel from  Philadelphia to New Jersey. Court found that conduct actuated by a purpose to serve the employer may nevertheless fail to create vicarious liability if the act is "so excessive and dangerous, as to be totally without responsibility or reason under the circumstances . . . [and here,].the brutality of the beating takes the act outside the scope of employment as a matter of law."); *Angela Robinson v. Uber Techs., Inc., et al.*, No. 2022CP4000496 (Ct. of Common Pleas, Richland Co., SC) (Nov. 30, 2022) (Uber's Motion to Dismiss was granted as to Plaintiff's vicarious liability, negligent selection of an independent contractor, and negligent infliction of emotional distress claims with the Court finding the driver who discharged a firearm into Plaintiff's vehicle during a road rage incident was acting outside the scope).

DATED:  January 12, 2024   Respectfully submitted,


By:_____/s/_____
Thomas J. Tobin (USDC-MD Bar No. 22008)
PERKINS COIE LLP
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
Phone: (206)-359-8000
Facsimile: (206)-359-9000
TTobin@perkinscoie.com

*Attorneys for Defendants Uber Technologies,*
*Inc. and Rasier, LLC*

# EXHIBIT 3

# Exhibit 1

DocuSign Envelope ID: E9BFB1EB-DA19-4DEF-95C0-2BEFFFD0D2F7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| P. | |
|    Plaintiff, | |
| v. | Case No. 1:23-cv-02580-GLR |
| Uber Technologies, Inc., et al. | |
|    Defendants. | |

**DECLARATION OF ALEJANDRA O'CONNOR IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS**

I, Alejandra O'Connor, hereby declare and state as follows:

1.  I am a citizen of the United States, over the age of 18, have personal knowledge of the facts set forth herein, and am competent to testify as to the matters contained in this Declaration.

2.  I am currently employed at Uber Technologies, Inc. ("Uber") as a Lead Paralegal. I have been employed by Uber since 2016.

3.  Uber is a technology company that uses its proprietary technology to develop and maintain digital multi-sided marketplace platforms. Some specific examples of platforms that Uber has developed include the Rides platform (connecting riders with independent drivers) and the Eats platform (merchants, delivery people, and eaters).

4.  As a result of my position with Uber, I have personal knowledge of Uber's operations and business model, as well as the operations of Uber's wholly owned subsidiaries, including Rasier, LLC ("Rasier"). Both Uber and Raiser are incorporated in Delaware, with their principal place of business in California (Rasier's sole member is Uber Technologies, Inc.). I also

DocuSign Envelope ID: E9BFB1EB-DA19-4DEF-95C0-2BEFFFD0D2F7

am familiar with and have personal knowledge of the documents provided to and generally utilized by Uber and its subsidiaries in their interactions with independent transportation providers.

5.      Rasier is a wholly owned subsidiary of Uber. Rasier is engaged in the business of providing ridesharing lead generation services to Drivers.

6.      In order to utilize Uber's platforms, a user must register for an account and agree to the Terms of Use (also referred to as "Terms of Service" or "Terms & Conditions," hereafter the "Terms").

7.      In the ordinary course of its business, Uber maintains records regarding when and how Users register for an account, when users indicate consent to Terms of Use, and the Terms of Use in effect and as amended from time to time.  As a Lead Paralegal, I have access to these records and am personally familiar with them.

<u>**JANUARY 2023 TERMS**</u>

8.      On January 21, 2023, Plaintiff was presented with an in-app blocking pop-up screen with the header "We've updated our terms."  It also stated in large type, "We encourage you to read our Updated Terms in full" and under that message had the phrases "Terms of Use" and "Privacy Notice," which were displayed underlined and in bright blue text, all of which set the text apart from other text on the screen and indicated a hyperlink. When a user clicked either hyperlink, the Terms of Use or Privacy Notice, that were published on Uber's website respectively, were displayed. Attached hereto as **Exhibit A** is a true and correct copy of a representation of the in-app blocking pop-up screen.

9.      Based upon my personal knowledge, the in-app blocking pop-up screen precluded the use of the Uber app unless or until a user clicked the checkbox on the screen and clicked the large "Confirm" button at the bottom of the screen.

DocuSign Envelope ID: E9BFB1EB-DA19-4DEF-95C0-2BEFFFD0D2F7

10.     The in-app blocking pop-up screen expressly stated that: "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Notice." It also states that: "I am at least 18 years of age."

11.     Based upon my personal knowledge, when a user clicks the checkbox and clicks the "Confirm" button a record of this consent is electronically captured, recorded, maintained and stored in the ordinary course of Uber's business at the time of the events being recorded.  This record is linked to the user's email address and/or mobile telephone number associated with the user's account.

12.     On December 12, 2023, I personally searched Uber's database for Plaintiff's account by entering the telephone number they provided to Uber.  Uber's records indicate that Plaintiff clicked the checkbox and tapped "Confirm" on January 21, 2023.  Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's user account sign-up date and consent record.

13.     In the ordinary course of business, Uber maintains and stores all prior versions of Terms of Service agreements that have been published on its website. I accessed Uber's business records and reviewed the Terms that went into effect for U.S. users on or about January 17, 2023. Attached hereto as **Exhibit C** is a true and correct copy of the January 17, 2023 Terms.

14.     Section 1 of the Terms of Use in Exhibit C specify that, when a rider is traveling and using Uber's Services in another country, they "agree to be subject to Uber's terms of service for that country."

15.     The Terms and Conditions for the United Arab Emirates apply to any Services provided in the United Arab Emirates.  Those terms and conditions specify that the contracting party is a Dutch entity called Uber B.V.  *See* **Exhibit D**.

DocuSign Envelope ID: E9BFB1EB-DA19-4DEF-95C0-2BEFFFD0D2F7

16.     Uber B.V. is a private limited liability company established in the Netherlands.  It has no United States presence, and is a completely separate entity from either Uber Technologies, Inc. or Rasier, LLC, both of which are based in the United States.

17.     Uber also maintains records in the ordinary course of business of the various agreements to which a Driver has agreed in order to maintain continued access to the Driver App. In order to access the "online" functionality of the Driver App (i.e., in order for a Driver to be able to connect with individuals seeking transportation services through the Rides marketplace) a Driver must affirm that they have reviewed, and that they agree to, all applicable agreements provided by Uber B.V. each time that those agreements are updated.

18.      In connection with this case, I accessed the Driver Accepted Agreements for Ali Babar, which are attached hereto as **Exhibit E**. These records show that Mr. Babar agreed to the UAE Driver Agreement on February 26, 2023. *See* **Exhibit F**.  Uber B.V., and not Uber Technologies, Inc. or Rasier, LLC, is the party to the UAE Driver Agreement.

19.     In addition to complying with various other requirements, as well as local regulations, drivers in the UAE such as Ali Babar, are required to provide Uber with various documentation.  One of those documents is a government ID card, attached as **Exhibit G**.  Mr. Babar's ID card shows that he is a Pakistani national, who is living in the UAE.

 I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 12, 2024 in Chicago, Illinois.

*Alejandra O'Connor*

_____

Alejandra O'Connor

4

# EXHIBIT A



# EXHIBIT B

Case 3:23-md-03084-CRB   Document 383-1   Filed 04/01/24   Page 88 of 150
Case 1:23-cv-02580-GLR   Document 13-2   Filed 01/12/24   Page 9 of 71
CONFIDENTIAL

# Uber Reports

## Checkbox Consent History

| Account Holder UUID | d045ed5b-2d4d-431e-9361-20e4de687306 | Account Holder Name | K█████ P█████ |
|---|---|---|---|

**4** rows returned on Dec 12, 2023, 11:43:58 PM (UTC)

|   | Signup Timestamp UTC | Consent Timestamp UTC | Consent Type |
|---|---|---|---|
| 1. | Jul 1, 2016, 1:58:13 AM | Jan 21, 2023, 7:51:28 PM | post_signup_checkbox |
| 2. | Jul 1, 2016, 1:58:13 AM | Jun 17, 2022, 2:53:09 PM | post_signup_checkbox |
| 3. | Jul 1, 2016, 1:58:13 AM | Mar 25, 2021, 5:46:58 PM | post_signup_checkbox |
| 4. | Jul 1, 2016, 1:58:13 AM | Feb 14, 2021, 6:01:05 AM | post_signup_checkbox |

# EXHIBIT C

EFFECTIVE DATE 2023-01-17 UBER TERMS



Select jurisdiction:    Select language:

United States ▾      English    ▾

Last modified: 1/17/2023

# U.S. Terms of Use

These Terms of Service ("Terms of Service") constitute a legally binding agreement between you and Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber") governing your use of Uber's personalized, multipurpose, digital marketplace platform ("Uber Marketplace Platform") and any related content or services, including mobile and/or web-based applications ("Applications" or the "Uber App," and together with the Uber Marketplace Platform, the "Services").

IMPORTANT: PLEASE BE ADVISED THAT THESE TERMS OF SERVICE CONTAIN PROVISIONS THAT GOVERN HOW YOU CAN BRING CLAIMS BETWEEN YOU AND UBER, INCLUDING THE ARBITRATION AGREEMENT IN SECTION 2 BELOW. THESE TERMS OF SERVICE OUTLINE HOW SUCH CLAIMS ARE RESOLVED, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS THAT AROSE OR WERE ASSERTED BEFORE THE EFFECTIVE DATE OF THESE TERMS OF SERVICE. PLEASE REVIEW THE ARBITRATION AGREEMENT IN SECTION 2 CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION, YOU ARE WAIVING YOUR RIGHT TO SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL ON YOUR CLAIMS. BY AGREEING TO THESE TERMS OF SERVICE, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD ALL OF THESE TERMS OF SERVICE AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.

Notwithstanding the foregoing, if you choose, now or in the future, to provide transportation (e.g., ride-hailing), logistics (e.g., freight), delivery (e.g., food, packages, and other goods) and other services (collectively, "Third-Party Services"), these Terms of Service do not supersede or otherwise impact the enforceability of any agreements you may have with Uber or its subsidiaries regarding such Third-Party Services (e.g., the Platform Access Agreement, the Technology Services Agreement and/or any similar agreements). To the extent (but only to the extent) any agreement you may have with Uber regarding Third-Party Services conflicts with

these Terms of Service, those agreements (and not these Terms of Service) will prevail with
respect to any disputes arising from your provision of Third-Party Services; otherwise, any
relevant provisions in these Terms of Service apply.

# 1. Contractual Relationship; Termination; and Modification

In addition to these Terms of Service, your access to, and use of the Services is also governed
by the applicable terms found on our website, including without limitation, the Privacy Notice,
which describes how we collect, use and disclose your personal information; the Generated
Content Terms; Community Guidelines; Referral Policies; and Uber's other applicable Uber
standards and policies (including, without limitation, Uber's safety standards, the accessibility
policies and U.S. Service Animal Policy), as well as the ADT Mobile Security Monitoring Terms,
which we refer to collectively as the "Supplemental Terms."

Collectively, we refer to these Terms of Service and the Supplemental Terms as the "Terms."
These Terms govern your access or use, from within the United States and its territories and
possessions, of the Services made available in the United States and its territories and
possessions (the "Territory"). If you use the Services in another country, you agree to be
subject to Uber's terms of service for that country. PLEASE READ THESE TERMS CAREFULLY,
AS THEY CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND UBER. In these Terms, the
words "including" and "include" mean "including, but not limited to."

By accessing or using the Services, you confirm your agreement to be bound by these Terms.
If you do not agree to these Terms, do not access or use the Services. These Terms expressly
govern the use of the Services in the Territory.

**Termination.**

Uber, in its sole discretion, may immediately terminate these Terms or any Services with
respect to you, or generally cease offering or deny access to the Services or any portion
thereof, at any time for any reason.

**Modification.**

Uber reserves the right to modify these Terms or its policies relating to the Services at any
time, effective upon posting of an updated version of these Terms through the Services or
Uber's website. You should regularly review these Terms, as your continued use of the Services
after any such changes constitutes your agreement to such changes.

# 2. Arbitration Agreement

By agreeing to these Terms, you agree that you are required to resolve any claim that you may
have against Uber on an individual basis in arbitration as set forth in this Arbitration

Agreement, and not as a class, collective, coordinated, consolidated, mass and/or representative action. You and Uber are each waiving your right to a trial by jury. This Arbitration Agreement will preclude you from bringing any class, collective, coordinated, consolidated, mass and/or representative action against Uber, and also preclude you from participating in or recovering relief in any current or future class, collective, coordinated, consolidated, mass and/or representative action brought against Uber by someone else—except as provided below in Section 2(a)(3)(c). Thus, the parties agree that the Arbitrator shall not conduct any form of class, collective, coordinated, consolidated, mass and/or representative arbitration, nor join, coordinate, or consolidate claims of multiple individuals against Uber in a single proceeding—except as provided below in Section 2(a)(3)(c). For the avoidance of doubt, except as provided below in Section 2(a)(3)(c), this Arbitration Agreement precludes you from bringing or participating in any kind of class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber, other than participating in a classwide, collective, coordinated, consolidated, mass and/or representative settlement of claims.

**(a) Agreement to Binding Arbitration Between You and Uber.**

(1) <u>Covered Disputes</u>: Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to these Terms, and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

(2) <u>Class Action Waiver</u>: Any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration. The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, consolidated, and/or representative action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any class, collective, coordinated, consolidated, and/or representative action, or to award relief to anyone but the individual in arbitration. The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. Notwithstanding anything else in this agreement, this Class Action Waiver does not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims.

The parties further agree that if for any reason a claim does not proceed in arbitration, this Class Action Waiver shall remain in effect, and a court may not preside over any action joining, coordinating, or consolidating the claims of multiple individuals against Uber in a single proceeding, except that this Class Action Waiver shall not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims. If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (i) any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (ii) the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration; (iii) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Agreement; and (iv) severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Agreement or the arbitrability of any remaining claims asserted by you or Uber.

(3) Mass Actions:

a. Mass Action Waiver: Any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration. The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a mass action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any mass action or to award relief to anyone but the individual in arbitration—except as provided below in Section 2(a)(3)(c). The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. The parties agree that the definition of a "Mass Action" includes, but is not limited to, instances in which you or Uber are represented by a law firm or collection of law firms that has filed 50 or more arbitration demands of a substantially similar nature against the other party within 180 days of the arbitration demand filed on your or Uber's behalf, and the law firm or collection of law firms seeks to simultaneously or collectively administer and/or arbitrate all the arbitration demands in the aggregate. Notwithstanding anything else in this agreement, this Mass Action Waiver does not prevent you or Uber from participating in a mass settlement of claims.

b. Dispute Procedure: Notwithstanding any provision to the contrary in the applicable arbitration provider's rules, the arbitrator shall be empowered to determine whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver. Either party shall raise with the arbitrator or arbitration provider such a dispute within 15 days of its arising. If such a dispute arises before an arbitrator has been appointed, the parties agree that (i) a panel of three arbitrators shall be appointed to resolve only disputes concerning whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver. Each party shall select one arbitrator from the arbitration provider's roster to serve as a neutral arbitrator, and these arbitrators shall appoint a third neutral arbitrator. If the parties' arbitrators cannot agree on a third arbitrator, the arbitration provider will select the third arbitrator; (ii) Uber shall pay any administrative fees or costs incidental to the appointment of

Arbitrators under this provision, as well as any fees or costs that would not be incurred in a court proceeding, such as payment of the fees of the arbitrators, as well as room rental; (iii) the arbitrators shall issue a written decision with findings of fact and conclusions of law; and (iv) any further arbitration proceedings or assessment of arbitration-related fees shall be stayed pending the arbitrators' resolution of the parties' dispute. If the arbitrator or panel of arbitrators determines that you have violated the Mass Action Waiver, the parties shall have the opportunity to opt out of arbitration within 30 days of the arbitrator's or panel of arbitrator's decision. You may opt out of arbitration by providing written notice of your intention to opt out to the arbitration provider and to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158 via USPS Priority Mail or hand delivery. This written notice must be signed by you, and not any attorney, agent, or other representative of yours. Uber may opt out of arbitration by sending written notice of its intention to opt out to the arbitration provider and to you or your attorney, agent, or representative if you are represented. For the avoidance of doubt, the ability to opt out of arbitration described in this Section 2(a)(3)(b) only applies if the arbitrator or panel of arbitrators determines that you have violated the Mass Action Waiver. If the parties proceed with arbitration, the parties agree that arbitrations will be batched as provided in Section 2(a)(3)(c) below.

c. Batching:

i. To increase efficiency of resolution in the event a Mass Action is filed and neither party exercises its right to opt out of arbitration pursuant to Section 2(a)(3)(b) above, the following procedure shall apply. At the request of either party, an arbitrator shall be selected according to the applicable arbitration provider's rules to act as a special master ("Special Master") to resolve threshold disputes regarding the propriety of some or all the arbitration demands submitted in the Mass Action ("Mass Arbitration Demands"). These threshold disputes may include, but are not limited to:

1. Any dispute regarding filing fees owed with respect to the Mass Arbitration Demands, including whether claimants have submitted valid fee waivers;

2. Any dispute regarding whether the applicable arbitration provider has complied with the Arbitration Agreement with respect to processing and administering the Mass Arbitration Demands;

3. Any dispute regarding whether the Mass Arbitration Demands meet the requirements set forth in Section 2(d) below;

4. Whether claimants are barred from proceeding with their claims based on a prior settlement agreement, violation of these Terms, or expiration of the statute of limitations;

5. Any dispute relating to representation of the same claimant by multiple law firms;

6. Any dispute regarding whether the Mass Arbitration Demands were filed with the correct arbitration provider;

7. Any dispute regarding discovery common to all claims; and

8. Any disputes regarding legal or factual issues common to all claims.

Any such request shall be made within 15 days following the expiration of the opt-out period described in Section 2(a)(3)(b), and may be made by providing written notice to the arbitration provider. Upon the request of either party to appoint a Special Master to resolve the foregoing issues, the applicable arbitration provider shall refrain from further processing any of the Mass Arbitration Demands to which a dispute has been raised. No further payment for filing fees, administrative costs, or arbitrator fees shall be deemed due with respect to any of the Mass Arbitration Demands as to which a dispute has been raised until after the dispute(s) has/have been resolved by the Special Master. Uber shall be responsible for the applicable arbitration provider's and Special Master's fees and costs related to the proceedings before the Special Master.

A Special Master appointed pursuant to this procedure shall have no authority to consolidate cases.

ii. After proceedings before the Special Master have concluded, to the extent any of the Mass Arbitration Demands are permitted to proceed, the parties shall group the Mass Arbitration Demands into batches of no more than 100 demands per batch by state of residence, and then alphabetically by last name (plus, to the extent there are less than 100 arbitration demands left over after the batching described above, a final batch consisting of the remaining demands), and shall inform the arbitration provider of the batches and their compositions within 14 days of the conclusion of proceedings before the Special Master. The arbitration provider shall treat each batch of claims as one case, with each case having one demand for arbitration, one appointed arbitrator, and one set of administrative documents and administrative and filing fees per batch. The parties shall randomly assign sequential numbers to each batch, and only one batch shall proceed to arbitration at a time in the order of the random sequential numbers. A separate arbitrator will be appointed to, and administrative and filing fees assessed for, each batch as the batch proceeds to arbitration. You agree to cooperate in good faith with Uber and the arbitration provider to implement such a batch approach to resolution and fees. Nothing in this provision shall be construed as limiting the right to object that the filing or presentation of multiple arbitration demands by or with the assistance of the same law firm or organization violates any term of this Agreement.

iii. If any Mass Arbitration Demands were originally processed as individual arbitration demands before this batching procedure was commenced, further proceedings, including the assessment of further arbitration filing or administration fees to either party shall be governed by the procedures set forth in this Section 2(a)(3).

(4) Delegation Clause: Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. However, only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable—except that, as stated and pursuant to the procedures provided in Section 2(a)(3)(b), an arbitrator or panel of arbitrators shall have authority to determine whether the party bringing any claim has violated the Mass Action Waiver.

(5) Application to Third Parties: This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third parties, including but not limited to your spouses, heirs, third-party beneficiaries and assigns, where their underlying claims arise out of or relate to your use of the Services. To the extent that any third-party beneficiary to this agreement brings claims against the Parties, those claims shall also be subject to this Arbitration Agreement.

**(b) Exceptions to Arbitration.**

Notwithstanding the foregoing, this Arbitration Agreement shall not require arbitration of the following claims: (i) individual claims brought in small claims court so long as the matter remains in such court and advances only on an individual basis; (ii) individual claims of sexual assault or sexual harassment occurring in connection with your use of the Services; and/or (iii) injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights.

Such claims may be brought and litigated in a court of competent jurisdiction by you on an individual basis only. On an individual basis means that you cannot bring such claims as a class, collective, coordinated, consolidated, mass and/or representative action against Uber. For the avoidance of doubt, this precludes you from bringing claims as or participating in any kind of any class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber and no action brought by you may be consolidated or joined in any fashion with any other proceeding. Where your claims are brought and litigated to completion on such an individual basis in a court of competent jurisdiction, Uber agrees to honor your election.

The parties' agreement not to require arbitration in these limited instances does not waive the enforceability of this Arbitration Agreement as to any other provision (including, but not limited to, the waivers provided for in Section 2(a), which will continue to apply in court as well as in arbitration), or the enforceability of this Arbitration Agreement as to any other controversy, claim, or dispute.

**(c) Rules and Governing Law.**

For disputes arising in California, the arbitration will be administered by ADR Services, Inc. ("ADR") in accordance with ADR's Arbitration Rules (the "ADR Rules") in effect at the time that the claim is brought, unless the parties agree otherwise in writing. The ADR Rules are available at www.adrservices.com or by searching for "ADR Arbitration Rules" using a service such as www.google.com or www.bing.com. The arbitration shall be heard by one arbitrator (the "Arbitrator") selected in accordance with the ADR Rules.

For disputes arising outside of California (or for disputes arising in California only if ADR cannot or will not administer the arbitration), the parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in the state in which the dispute arises. Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis as set forth in this Section 2. Once the parties mutually agree upon a neutral arbitration provider, or an arbitrator provider is appointed under 9 U.S.C. § 5, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider, except as designated herein. Once an arbitration provider is agreed upon or appointed, an Arbitrator shall be appointed. The Arbitrator will be either (1) a retired judge or (2) an attorney licensed to practice law in the state where the arbitration is conducted with experience in the law underlying the dispute. The Arbitrator will be selected by the parties from the applicable arbitration provider's roster of arbitrators. If the parties are unable to agree upon an Arbitrator after a good faith meet and confer effort, then the applicable arbitration provider will appoint the Arbitrator in accordance with its rules.

Notwithstanding any choice of law or other provision in these Terms, the parties agree and acknowledge that this Arbitration Agreement evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this Arbitration Agreement, and that the FAA and the applicable arbitration provider's rules shall preempt all state laws to the fullest extent permitted by law. All statutes of limitations that would otherwise be applicable will apply to any arbitration proceeding. If the FAA and applicable

arbitration provider's rules are found to not apply to any issue regarding the interpretation or enforcement of this Arbitration Agreement, then that issue shall be resolved under the laws of the state where you reside when you accept these Terms.

Any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to the Terms, shall be governed by and construed in accordance with the laws of the state in which the incident or accident occurred.

(d) Process.

Pre-Arbitration Dispute Resolution and Notification. The parties agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome. The parties therefore agree that, before either party demands arbitration against the other, we will personally meet and confer, via telephone or videoconference, in a good-faith effort to resolve informally any claim covered by this Arbitration Agreement. Multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference. If you are represented by counsel, your counsel may participate in the conference, but you shall also fully participate in the conference. The party initiating the claim must give notice to the other party in writing of their intent to initiate an informal dispute resolution conference, which shall occur within 60 days after the other party receives such notice, unless an extension is mutually agreed upon by the parties. To notify Uber that you intend to initiate an informal dispute resolution conference, write to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, providing your name, the telephone number(s) associated with your Uber account (if any), the email address(es) associated with your Uber account, and a description of your claim. Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing arbitration, and the Arbitrator shall dismiss any arbitration demand filed before completion of an informal dispute resolution conference. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by this paragraph.

Initiating Arbitration. In order to initiate arbitration following the conclusion of the informal dispute resolution process required by this Section, a party must provide the other party with a written demand for arbitration and file the demand with the applicable arbitration provider, as determined by Section 2(c). A party initiating an arbitration against Uber must send the written demand for arbitration to Uber Technologies, Inc., LLC, Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, or serve the Demand on Uber's registered agent for service of process, c/o Uber Technologies, Inc. (the name and current contact information for the registered agent in each state are available online here). Additionally, a party initiating arbitration against Uber must send an electronic version of the demand for arbitration to the

Arbitration Provider, and must send an electronic version of the as-filed demand to filed-arbitration-demands@uber.com.

By signing the demand for arbitration, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that (i) the demand for arbitration is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (ii) the claims and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (iii) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The Arbitrator shall be authorized to afford any relief or impose any sanctions available under Federal Rule of Civil Procedure 11 or any applicable state law for either party's violation of this requirement.

**(e) Location.**

Unless you and Uber otherwise agree, if you reside in the United States, the arbitration will be conducted in the county where you reside. If you do not reside in the United States, the arbitration will be conducted in the county where the dispute arises. Your right to a hearing will be determined by the applicable arbitration provider's rules. Subject to the applicable arbitration provider's rules, the Arbitrator will have the discretion to direct a reasonable exchange of information by the parties, consistent with the expedited nature of the arbitration.

**(f) Offers of Judgment.**

At least 10 days before the date set for the arbitration hearing, any party may serve an offer in writing upon the other party to allow judgment on specified terms. If the offer is accepted, the offer with proof of acceptance shall be submitted to the arbitrator, who shall enter judgment accordingly. If the offer is not accepted prior to the arbitration hearing or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the arbitration. If an offer made by one party is not accepted by the other party, and the other party fails to obtain a more favorable award, the other party shall not recover their post-offer costs and shall pay the offering party's costs from the time of the offer.

**(g) Arbitrator's Decision.**

The Arbitrator will render an award within the time frame specified in the applicable arbitration provider's rules. Judgment on the arbitration award may be entered in any court of competent jurisdiction. The Arbitrator may award declaratory or injunctive relief only in favor of the claimant and only to the extent necessary to provide relief warranted by the claimant's individual claim. An Arbitrator's decision shall be final and binding on all parties.

The Arbitrator is not bound by decisions reached in separate arbitrations, and the Arbitrator's decision shall be binding only upon the parties to the arbitration that are the subject of the decision.

The Arbitrator shall award reasonable costs incurred in the arbitration to the prevailing party in accordance with the law(s) of the state in which arbitration is held.

**(h) Fees.**

With the exception of the provisions governing payment of arbitration costs set forth above, your responsibility to pay any filing, administrative, and arbitrator fees will be solely as set forth in the applicable arbitration provider's rules and shall be up to the amount you would be required to pay if you filed a claim in court.

If you have a gross monthly income of less than 300% of the federal poverty guidelines, you are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. If you believe that you meet the requirements to obtain a fee waiver, and your demand for arbitration arises outside of California, then you may request a fee waiver only by submitting to the arbitration provider AO 240, Application to Proceed in District Court Without Prepaying Fees or Costs (found here), or a declaration under oath containing all the information required by AO 240; if your demand for arbitration arises in California, then you must submit a declaration under oath providing your monthly income and the number of persons in your household.

Any and all disputes regarding a party's obligation to pay any arbitration fees or costs that arise after an arbitrator is appointed shall be determined solely by the arbitrator. If such a dispute arises before an arbitrator has been appointed, and if no Special Master has been requested by either party pursuant to Section 2(a)(3)(c)(i) of these Terms, the parties agree that (i) the due date for any disputed fees shall be stayed pending resolution of the parties' dispute, (ii) a panel of three arbitrators shall be appointed to resolve the parties' dispute concerning a party's obligation to pay fees or costs of arbitration, (iii) the panel of arbitrators shall be appointed by each party selecting one arbitrator from the arbitration provider's roster to serve as neutral arbitrators, and these arbitrators shall appoint a third neutral arbitrator. If the parties' arbitrators cannot agree on a third arbitrator, the arbitration administrator will select the third arbitrator, (iv) Uber shall pay any administrative fees or costs incidental to the appointment of a panel of arbitrators under this provision, as well as any fees or costs that would not be incurred in a court proceeding, such as payment of the fees of the arbitrator(s), as well as room rental, and (v) the arbitrator(s) shall issue a written decision with findings of fact and conclusions of law. If two or more fee disputes between a claimant and Uber arise at or around the same time, the disputes may be consolidated for resolution by a single arbitrator or panel of arbitrators either at the agreement of the parties or the election of the party common to all such disputes.

**(i) Severability and Survival.**

If any portion of this Arbitration Agreement is found to be unenforceable or unlawful for any reason, (i) the unenforceable or unlawful provision shall be severed from these Terms; (ii) severance of the unenforceable or unlawful provision shall have no impact whatsoever on the remainder of the Arbitration Agreement or the parties' ability to compel arbitration of any remaining claims on an individual basis pursuant to the Arbitration Agreement; and (iii) to the extent that any claims must therefore proceed on a class, collective, consolidated, or representative basis, such claims must be litigated in a civil court of competent jurisdiction and not in arbitration, and the parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

## 3. The Services

The Services enable you and other consumers to find, request, or receive (i) Third-Party Services from third party service providers, including without limitation, merchants, retailers, grocers, restaurants, independent drivers and delivery persons, and autonomous vehicles or autonomous vehicle fleet providers ("Third-Party Providers"); (ii) related personalized content, including features, recommendations and advertisements for products or services tailored to your needs and interests; and (iii) certain supporting services, including providing you the ability to express certain preferences about the Third-Party Services or Third-Party Service Providers, payment processing and customer support. Unless otherwise agreed by Uber in a separate written agreement with you, these Services are made available solely for your personal, noncommercial use.

Once you make a request, Uber notifies Third-Party Providers that an opportunity is available so that the Third-Party Provider may complete your request. It is up to the Third-Party Provider to decide whether or not to offer Third-Party Services to you or at all, and it is up to you to decide whether or not to accept such services from a Third-Party Provider. Please note that once your request for the Services has begun, you may no longer have the option to reschedule or cancel. If Uber is able to reschedule or cancel your request, you may be charged a fee and/or may not be refunded for items that have been purchased on your behalf.

UBER IS NOT A COMMON OR MOTOR CARRIER AND DOES NOT TRANSPORT YOU OR YOUR GOODS. GENERALLY, THE SERVICES ARE ONLY OPEN TO REGISTERED USERS OF THE SERVICES AND NOT TO THE GENERAL PUBLIC. YOUR ABILITY TO REQUEST, AND IF APPLICABLE, OBTAIN THIRD-PARTY SERVICES FROM THIRD-PARTY PROVIDERS IN CONNECTION WITH THE USE OF THE SERVICES DOES NOT ESTABLISH UBER AS A PROVIDER OF ANYTHING OTHER THAN THE SERVICES. INDEPENDENT THIRD-PARTY PROVIDERS ARE NOT ACTUAL AGENTS, APPARENT AGENTS, OSTENSIBLE AGENTS, OR EMPLOYEES OF UBER IN ANY WAY. ANY EFFORT, FEATURE, PROCESS, POLICY, STANDARD OR OTHER EFFORT UNDERTAKEN BY UBER TO FACILITATE YOUR RECEIPT OF THIRD PARTY SERVICES OR IN THE INTEREST OF SAFETY OR SECURITY (WHETHER REQUIRED BY APPLICABLE REGULATIONS OR

NOT) IS NOT AN INDICIA OF AN EMPLOYMENT, ACTUAL AGENCY, APPARENT AGENCY, OR OSTENSIBLE AGENCY RELATIONSHIP WITH A THIRD-PARTY PROVIDER.

**Third-Party Services and Content.**

While many Third-Party Services are available in the Uber App, certain Third-Party Services or content are only accessible by exiting the Uber App ("Out-of-App Experiences"). Once you click on a link to access Out-of-App Experiences, you will be subject to the terms and conditions and privacy policy of that website, destination, or Out-of-App Experience provider, which are different from Uber's. Uber will not warn you that you have left the Services or that you are subject to the terms and conditions (including privacy policies) of another website, destination, or Out-of-App Experience provider. You use all links in third-party websites and advertisements at your own risk as these are not part of the Services and are not controlled by Uber. Uber does not endorse such Out-of-App Experience providers and in no event shall Uber be responsible or liable for any products or services of such third-party providers.

Third-Party Services made available to you through the Uber App may be provided by an autonomous vehicle. An autonomous vehicle is a vehicle that is capable of operating at, or is equipped with an automated driving system that will enable the vehicle to operate at SAE Levels 3, 4 or 5 of driving automation as defined in the J3016 April 2021 SAE International specification ("Autonomous Vehicle" or "AV"). Autonomous Vehicles are operated by Third-Party Providers that operate a fleet of one or more AVs and may employ or contract with individuals to manage, monitor, or operate its AVs while such vehicles are in motion (such Third-Party Providers, "Autonomous Vehicle Fleet Providers"). Your access to Third-Party Services provided by AV may be subject to your acceptance of Autonomous Vehicle Fleet Providers' terms.

In the event of a conflict in the terms of any Third-Party Services and these Terms, these Terms shall control with respect to Uber and your agreements with Uber herein, and the limitations of liability set forth in Section 7 shall also apply to the Third-Party Provider. The Arbitration Agreement provisions in Section 2 above shall apply instead of the terms of any Third-Party Services for all purposes except with respect to claims that are solely against the Third-Party Provider.

**App Stores.**

The availability of the Services may be dependent on the third-party from which you received the license to the Uber App, e.g., the Apple iPhone or Android app stores ("App Store"). These Terms are between you and Uber and not with the App Store and Uber is responsible for the provision of Services as described in these Terms. However, if you downloaded the Uber App from the Apple App Store, Apple and its subsidiaries are third-party beneficiaries of these Terms. Upon your acceptance of these Terms, Apple shall have the right (and will be deemed to have accepted the right) to enforce these Terms against you as a third-party beneficiary

thereof. These Terms incorporate by reference Apple's Licensed Application End User License Agreement, for purposes of which, you are the "end-user." In the event of a conflict in the terms of the Licensed Application End User License Agreement and these Terms, these Terms will control.

**Ownership; License; and Restrictions.**

The Services and all rights, title, and interest, including all related intellectual property rights therein are and shall remain Uber's property or the property of Uber's licensors. These Terms are not a sale and do not convey or grant to you any rights in or related to the Services, or any intellectual property rights owned by Uber, except for the limited license granted above.

Subject to your compliance with these Terms, Uber grants you a limited, non-exclusive, non-sublicensable, revocable, non-transferable license to: (i) access and use the Uber App solely in connection with your use of the Services on your personal device; and (ii) access and use any content, information and related materials that may be made available through the Services, in each case solely for your personal, noncommercial use. Any rights not expressly granted herein are reserved by Uber and Uber's licensors. You agree that you will not use Uber's copyrights, trademarks, service marks, or trade dress, aside from use incidental to your use of the Services, without express, written permission from Uber. This prohibition includes use in domain names, websites, and social media accounts. You may not: (i) remove any copyright, trademark or other proprietary notices from any portion of the Services; (ii) reproduce, modify, prepare derivative works based upon, distribute, license, lease, sell, resell, transfer, publicly display, publicly perform, transmit, stream, broadcast or otherwise exploit the Services except as expressly permitted by Uber; (iii) decompile, reverse engineer or disassemble the Services except as may be permitted by applicable law; (iv) link to, mirror or frame any portion of the Services; (v) cause or launch any programs or scripts for the purpose of, or which result in, unduly burdening or hindering the operation and/or functionality of any aspect of the Services; or (vi) attempt to gain unauthorized access to or impair any aspect of the Services or its related systems or networks.

## 4. Accessing the Services

**User Accounts.**

In order to use most aspects of the Services, you must register for and maintain an active personal user Services account ("Account"). You cannot register for or maintain an Account if you have previously been banned from accessing or using the Services. Account registration may require you to submit to Uber certain personal information, such as your name, address, mobile phone number and age, as well as at least one valid payment method that you are authorized to use and is supported by Uber. For more information regarding Uber's use of your personal information, please see our Privacy Notice. You agree to maintain accurate, complete,

and up-to-date information in your Account, including a valid phone number, address and payment method. Except as described below, you must be at least 18 years of age, or the age of legal majority in your jurisdiction (if different than 18), to obtain an Account, unless a specific Service permits otherwise. Unless otherwise permitted by Uber in writing, you may only possess one Account and you may not assign or otherwise transfer your Account to any other person or entity. You are responsible for all activity that occurs under your Account, and you agree to maintain the security and secrecy of your Account credentials at all times.

**Minors.**

Except as described below, the Services are generally not available for use by persons under the age of 18. You may not authorize third-parties to use your Account, and you may not allow persons under the age of 18 to use the Services unless they are accompanied by you or an adult. However, we may offer parents and guardians the ability to create Accounts for their children. If you are a parent or legal guardian, and you allow your child to use the Services, then these Terms apply to you and you are responsible for your child's activity on the Services. If you are under the age to obtain an Account, you must have your parent or legal guardian's permission to use an Account and accept any additional terms required in connection with your access and use of the Services as a minor. Please have your parent or legal guardian read these additional terms with you.

**Network Access and Devices.**

You are responsible for obtaining the data network access necessary to use the Services. Your mobile network's data and messaging rates and fees may apply if you access or use the Services from your device. You are responsible for acquiring and updating compatible hardware or devices necessary to access and use the Services and any updates thereto. Uber does not guarantee that the Services, or any portion thereof, will function on any particular hardware or devices. In addition, the Services may be subject to malfunctions and delays inherent in the use of the Internet and electronic communications. Uber is not responsible for any delays, delivery failures, or damage, loss or injury resulting from such problems.

# 5. User Conduct and Requirements; Communications; and User Content

## User Conduct and Requirements.

In addition to complying with these Terms, you agree to comply with all applicable laws when accessing or using the Services, and you may only access or use the Services for lawful purposes (e.g., no request for the purpose or intent of transport of unlawful or hazardous materials). You may not access or use the Services to cause nuisance, annoyance, inconvenience, damage, or loss to Uber, the Third-Party Provider, or any other party.

If you request a ride option with a child restraint system, neither Uber nor the Third-Party Provider is responsible for the safety of a child restraint system that may be available in the Third-Party Provider's vehicle. It is your obligation to ensure that the child restraint system is installed correctly and that the child is properly secured in the child restraint system. Please refer to your state's laws regarding specific height, age, and weight requirements for using child restraint systems, as well as Uber's policies for child restraint systems, which may be set forth on city-specific web pages. If you request a ride option where a Third-Party Provider agrees to provide you with assistance outside of the vehicle (e.g., Uber Assist), Uber is not responsible for any injury or incident that may arise out of the assistance provided by the Third-Party Provider. In certain instances, you may be asked to provide proof of age, identity or other method of identity verification to access or use the Services, and you agree that you may be denied access to or use of the Services if you refuse to provide proof of age, identity, or other method of identity verification.

Subject to the discretion of a Third-Party Provider, you may be allowed to bring a small animal, such as a dog or cat, on a ride requested through the Services. For such trips, you are responsible for properly securing the animal with a leash, harness, crate / carrier, or through other means. You are also responsible for ensuring that the animal does not cause damage or a mess in the Third-Party Provider's vehicle. You may be subject to a Charge for Repair or Cleaning under Section 6 below for any damage or mess caused by an animal that is transported during a ride requested under your Account. Please note, in accordance with Uber's policies on Service Animals and Assistive Devices, Service Animals are generally permitted to accompany riders without extra charge, regardless of whether it is a Pet Friendly Trip.

For the purpose of assisting us with our compliance and insurance obligations, you agree to notify us within 24 hours and provide us with all reasonable information relating to any incident or accident that occurs during your use of the Services and you agree to cooperate with any investigation and attempted resolution of such incident.

**Communications with Uber.**

By creating an Account, you electronically agree to accept and receive communications from Uber, Third-Party Providers or third parties providing services to Uber including via email, text message, WhatsApp, calls, in-app communications, and push notifications to the telephone number(s) or email addresses you provided to Uber. You may also receive communications generated by automatic telephone dialing systems and/or which will deliver prerecorded messages sent by or on behalf of Uber, and/or Third-Party Providers, including but not limited to communications concerning requests placed through your Account on the Services. Message and data rates may apply. You can learn more about how Uber may contact you by reading our Privacy Notice.

If you do not wish to receive promotional emails, text messages, or other communications from Uber, you may change your notification preferences by accessing Settings in your Account. To opt out of receiving text messages from Uber, you must reply "STOP" from the mobile device receiving the messages. For purposes of clarity, text messages between you and Third-Party Providers are transactional text messages, not promotional text messages. You acknowledge that opting out of receiving all communications may impact your use of the Services. Notwithstanding the foregoing, if we suspect fraud or unlawful activity on your Account, Uber may contact you using any of the contact information you provided in connection with your Account (including via text or voice-recorded message).

**Use of Accounts Owned by Others.**

In the event you use an Uber product or service that enables use of or billing to another person or business, certain information will be shared with that party. This may include information regarding the time and date of services you request, the transportation, logistics and/or delivery requested, and the associated charges for such services. If used to request transportation, we may also share information with such person or business regarding safety-related incidents that occur in connection with such transportation. You acknowledge that such data sharing is a condition of use of any such Uber product or service.

**User Provided Content; Feedback.**

Content that you provide to Uber is governed by Uber's Generated Content Terms, which are incorporated in these Terms by reference. Feedback that you provide to Uber is governed by Uber's Feedback Policy, which are incorporated in these Terms by reference.

## 6. Payment

**Prices & Charges.**

Your use of the Services may result in charges to you for the services or goods you receive from Uber and/or from Third-Party Providers ("Charges"). Prices displayed to you when purchasing goods through the Services may be inclusive of retail prices charged by the Third-Party Provider and fees paid to Uber. Uber will enable your payment of the applicable Charges for services or goods obtained through your use of the Services. Charges will include applicable taxes where required by law. Charges may include other applicable fees such as delivery fees, service fees, product return fees, cancellation fees, government-mandated fees (such as bag fees), estimated or actual tolls, and/or surcharges. Further, Charges applicable in certain geographical areas may increase substantially during times of high demand or due to other marketplace factors.

With respect to Third-Party Providers, Charges you incur will be owed directly to Third-Party Providers, and Uber will collect payment of those charges from you, on the Third-Party

Provider's behalf as their limited payment collection agent, and payment of the Charges shall be considered the same as payment made directly by you to the Third-Party Provider. Payment to a Third-Party Provider of goods or services shall be considered to occur at the moment you submit payment through Uber. You retain the right to request lower Charges from a Third-Party Provider for services or goods received by you from such Third-Party Provider at the time you receive such services or goods. A Third-Party Provider also retains the right to request higher Charges from you for services or goods provided. For example, a Third-Party Provider that is a merchant may collect lower or higher charges where the actual goods provided differ from the products originally requested, including in connection with differences in quantity, weight, or item type. Subject to requests from you to lower such Charges from a Third-Party Provider, you agree to pay such higher or lower Charges associated with such product differences. Uber will consider in good faith any request from a Third-Party Provider to modify the Charges for a particular service or good. This payment structure is intended to fully compensate a Third-Party Provider, if applicable, for the services or goods obtained in connection with your use of the Services.

There also may be certain Charges you incur that will be owed and paid directly to Uber or its affiliates. For the avoidance of doubt, Uber does not charge a fee for you to access the Uber App, but may charge you a fee or any other Charge for accessing Third-Party Services. Even if not indicated in the Uber App, the prices for product or menu items displayed through the Services may differ from the prices offered or published by Third-Party Providers for the same product or menu items, including as may be offered or published at a physical location operated by a Third-Party Provider, and/or from prices available at other third-party websites/mobile applications. Prices for product or menu items displayed through the Services may not be the lowest prices at which the product or menu items are sold. The product or menu item prices displayed through the Services or fees charged by and paid to Uber may vary based on whether you choose to pick up your order or have it delivered.

All Charges and payments will be enabled by Uber using the preferred payment method designated in your Account, after which you will receive a receipt. If your primary Account payment method is determined to be expired, invalid or otherwise not able to be charged, you agree that Uber may use another available payment method in your Account.

As between you and Uber, Uber reserves the right to establish or adjust Charges for any or all services or goods obtained through the use of the Services at any time. Uber will use reasonable efforts to inform you of Charges that may apply, provided that you will be responsible for Charges incurred under your Account regardless of your awareness of such Charges or the amounts thereof.

**Refunds.**

Charges paid by you are final and non-refundable, unless otherwise determined by Uber and the Third-Party Provider assessing the Charge. If you have any requests for cancellations, refunds, or returns, or if you think a correction should be made to any Charge you incurred, please visit the "Help" tab in your Account to initiate such requests within 30 days after the Charge took place or Uber will have no further responsibility and you waive your right to later dispute the amounts charged.

**Promotional Offers.**

Certain users may, from time to time, receive promotional offers and discounts that result in different amounts charged for the same or similar services or goods obtained through the use of the Services, and you agree that such promotional offers and discounts, unless also made available to you, shall have no bearing on your use of the Services or the Charges applied to you. Promotional offers and discounts are subject to change or withdrawal at any time and without notice.

**Gratuity.**

Except for amounts provided by you through the Services as part of the "tip" feature, Uber does not designate any portion of your payment as a tip or gratuity to a Third-Party Provider. You understand and agree that, while you are free to provide additional payment as a gratuity to any Third-Party Provider who provides you with services or goods obtained through the Service, you are under no obligation to do so.

**Damage, Cleaning, Lost and Found, and Charges for Violation of Terms.**

Uber may charge you a fee on behalf of Third-Party Providers if, during your use of the Services, you have caused damage to a vehicle or property that requires repair or cleaning ("Repair" or "Cleaning"). The amount of such fee shall be determined, in Uber's sole discretion, based on the type of damage and the severity. Uber reserves the right to verify or otherwise require documentation of damages prior to processing a fee. In the event that a Repair or Cleaning request is verified by Uber in Uber's reasonable discretion, Uber reserves the right to facilitate payment for the reasonable cost of such Repair or Cleaning using your payment method designated in your Account. Such amounts, as well as those pertaining to lost and found goods, will be transferred by Uber to a Third-Party Provider, if applicable, and are non-refundable. Additionally, if you fail to comply with these Terms, you may be responsible for Charges, including without limitation, for transactions that could not be completed properly, arising out of or in connection with your failure to comply with these Terms.

# 7. Disclaimers; Limitation of Liability; and Indemnity.

**Disclaimers.**

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.

UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD-PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD REQUESTED OR OBTAINED FROM THIRD-PARTY PROVIDERS IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

UBER DOES NOT CONTROL, MANAGE OR DIRECT ANY THIRD-PARTY PROVIDERS. THIRD-PARTY PROVIDERS ARE NOT ACTUAL AGENTS, APPARENT AGENTS, OSTENSIBLE AGENTS, OR EMPLOYEES OF UBER. IF A DISPUTE ARISES BETWEEN YOU AND OR ANY OTHER THIRD PARTY, YOU RELEASE UBER FROM LOSSES OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

UBER DOES NOT CONTROL, ENDORSE OR TAKE RESPONSIBILITY FOR ANY USER CONTENT OR THIRD-PARTY CONTENT AVAILABLE ON OR LINKED TO BY THE SERVICES. UBER CANNOT AND DOES NOT REPRESENT OR WARRANT THAT THE SERVICES ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

UBER'S USE OF ALGORITHMS IN AN ATTEMPT TO PROVIDE SERVICES OR IMPROVE THE EXPERIENCE OF USERS AND THE SECURITY AND SAFETY OF THE SERVICES DOES NOT CONSTITUTE A GUARANTEE OR WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED.

**Limitation of Liability.**

UBER SHALL NOT BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOST DATA, PERSONAL INJURY, OR PROPERTY DAMAGE RELATED TO, IN CONNECTION WITH, OR OTHERWISE RESULTING FROM ANY USE OF THE SERVICES, REGARDLESS OF THE NEGLIGENCE (EITHER ACTIVE, AFFIRMATIVE, SOLE, OR CONCURRENT) OF UBER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF: (i) YOUR USE OF OR RELIANCE ON THE SERVICES OR YOUR INABILITY TO ACCESS OR USE THE SERVICES; OR (ii) ANY TRANSACTION OR RELATIONSHIP BETWEEN YOU AND ANY THIRD-

PARTY PROVIDER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR DELAY OR FAILURE IN PERFORMANCE RESULTING FROM CAUSES BEYOND UBER'S REASONABLE CONTROL. YOU ACKNOWLEDGE THAT THIRD-PARTY PROVIDERS PROVIDING TRANSPORTATION SERVICES REQUESTED THROUGH SOME UBER SERVICES MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTATION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. YOU ACKNOWLEDGE THAT THIRD-PARTY PROVIDERS ARE NOT OSTENSIBLE AGENTS, APPARENT AGENTS, ACTUAL AGENTS, OR EMPLOYEES OF UBER.

THE SERVICES MAY BE USED BY YOU TO REQUEST AND SCHEDULE TRANSPORTATION, GOODS, OR LOGISTICS SERVICES WITH THIRD-PARTY PROVIDERS, BUT YOU AGREE THAT UBER HAS NO RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY TRANSPORTATION, GOODS OR LOGISTICS SERVICES PROVIDED TO OR NOT PROVIDED TO YOU BY THIRD-PARTY PROVIDERS OTHER THAN AS EXPRESSLY SET FORTH IN THESE TERMS.

UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF LACK OF OR IMPROPER INSTALLATION OR USE OF CHILD RESTRAINT SYSTEMS FOR GUESTS ON RIDES REQUESTED THROUGH THE SERVICES FOR WHOM A CHILD RESTRAINT SYSTEM IS LEGALLY REQUIRED.

THE LIMITATIONS AND DISCLAIMERS IN THIS SECTION DO NOT PURPORT TO LIMIT LIABILITY OR ALTER YOUR RIGHTS AS A CONSUMER THAT CANNOT BE EXCLUDED UNDER APPLICABLE LAW. BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, UBER'S LIABILITY SHALL BE LIMITED TO THE EXTENT PERMITTED BY LAW. THIS PROVISION SHALL HAVE NO EFFECT ON UBER'S CHOICE OF LAW PROVISION SET FORTH BELOW.

**Indemnity.**

You agree to indemnify and hold Uber and its affiliates and their officers, directors, employees, and agents harmless from and against any and all actions, claims, demands, losses, liabilities, costs, damages, and expenses (including attorneys' fees), arising out of or in connection with: (i) your use of the Services or services or goods obtained through your use of the Services; (ii) your breach or violation of any of these Terms; (iii) Uber's use of your User Content; or (iv) your violation of the rights of any third party, including Third-Party Providers.

## 8. Other Provisions

**Choice of Law.**

These Terms shall be governed by and construed in accordance with the laws of the state in which your dispute arises, without regard to the choice or conflict of law principles of any

jurisdiction, except as may be otherwise provided in the Arbitration Agreement in Section 2 above or in Supplemental Terms applicable to your region. This Choice of Law provision applies only to the interpretation of these Terms, and these provisions shall not be interpreted as generally extending any state's law to you if your dispute did not arise in that state.

Any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to these Terms, shall be governed by and construed in accordance with the laws of the state in which the incident or accident occurred.

### Choice of Forum.

Any dispute, claim or controversy arising out of or relating to these Terms or the existence, breach, termination, enforcement, interpretation or validity thereof, shall be brought exclusively in the state and federal courts of the state in which the dispute, claim or controversy arose, notwithstanding that other courts may have jurisdiction over the parties and subject matter, except as may be otherwise provided by the Arbitration Agreement above or in Supplemental Terms applicable to your region.

Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to these Terms, shall be brought exclusively in the state or federal courts in the state in which the incident or accident occurred, notwithstanding that other courts may have jurisdiction over the parties and subject matter, and except as may be otherwise provided in the Arbitration Agreement in Section 2 or in Supplemental Terms applicable to your region, to the extent permitted by law.

The foregoing Choice of Law and Choice of Forum provisions do not apply to the Arbitration Agreement in Section 2, and we refer you to Section 2 for the applicable provisions for such disputes.

### Claims of Copyright Infringement.

Claims of copyright infringement should be sent to Uber's designated agent. Please see Uber's Copyright Policy for the designated address and additional information.

### Notice.

Uber may give notice by means of a general notice on or through the Services, electronic mail to the email address associated with your Account, telephone or text message to any phone number provided in connection with your Account, or by written communication sent by first class mail or pre-paid post to any address connected with your Account. Such notice shall be

deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or at the time of sending (if sent by email, telephone, or on or through the Services). Notwithstanding the foregoing, notice of any modifications to these Terms shall be effective upon posting an updated version of these Terms on Uber's website or through the Services. You may give notice to Uber, with such notice deemed given when received by Uber, at any time by first class mail or pre-paid post to our registered agent for service of process, c/o Uber Technologies, Inc. The name and current contact information for the registered agent in each state are available online at https://www.wolterskluwer.com/en/solutions/ct-corporation/sop-locations. If another provision of these Terms addresses any specific notice (for example, notice of updates to these Terms, or notice of a dispute or arbitration demand), those specific notice provisions shall prevail to the extent there is any conflict or inconsistency between those provisions and this notice provision.

**General.**

You may not assign these Terms without Uber's prior written approval. Uber may assign these Terms without your consent to: (i) a subsidiary or affiliate; (ii) an acquirer of Uber's equity, business or assets; or (iii) a successor by merger. Any purported assignment by you in violation of this Section shall be void. No joint venture, partnership, employment, or agency relationship exists between you, Uber, any Third-Party Provider, or any Out-of-App Experience Provider as a result of these Terms or use of the Services. If any provision of these Terms is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced to the fullest extent under law. Uber's failure to enforce any right or provision in these Terms shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing. This provision shall not affect the Severability and Survivability section of the Arbitration Agreement of these Terms.

## Return to Legal Hub→

Uber

Visit Help Center

Do not sell or share my personal information

Google Data Policy

## Company

About us

Our offerings

Newsroom

Investors

Blog

Careers

AI

Gift cards

## Products

Ride

Drive

Deliver

Eat

Uber for Business

Uber Freight

## Global citizenship

Safety

Diversity and Inclusion

## Travel

Case 1:23-cv-02580-GLR    Document 13-2    Filed 01/12/24    Page 36 of 71



# EXHIBIT D

Uber                                                        Log in    **Sign up**

Select jurisdiction:        Language:

[ United Arab Emirates ▾ ]     English

Last modified: 8/10/2023

UBER B.V.

# Terms and Conditions

*Last updated: December 4 2017*

## 1. Contractual Relationship

These Terms of Use ("*Terms*") govern the access or use by you, an individual, from within any country in the world (excluding the United States and its territories and possessions and Mainland China) of applications, websites, content, products, and services (the "*Services*") made available by Uber B.V., a private limited liability company established in the Netherlands, having its offices at Burgerweeshuispad 301, 1076 HR, Amsterdam, the Netherlands, registered at the Amsterdam Chamber of Commerce under number 56317441 ("*Uber*").

PLEASE READ THESE TERMS CAREFULLY BEFORE ACCESSING OR USING THE SERVICES.

Your access and use of the Services constitutes your agreement to be bound by these Terms, which establishes a contractual relationship between you and Uber. If you do not agree to these Terms, you may not access or use the Services. These Terms expressly supersede prior agreements or arrangements with you. Uber may immediately terminate these Terms or any Services with respect to you, or generally cease offering or deny access to the Services or any portion thereof, at any time for any reason.

Supplemental terms may apply to certain Services, such as policies for a particular event, activity or promotion, and such supplemental terms will be disclosed to you in connection with the applicable Services. Supplemental terms are in addition to, and shall be deemed a part of, the Terms for the purposes of the applicable Services. Supplemental terms shall prevail over these Terms in the event of a conflict with respect to the applicable Services.

Uber may amend the Terms related to the Services from time to time. Amendments will be effective upon Uber's posting of such updated Terms at this location or the amended policies or supplemental terms on the applicable Service. Your continued access or use of the Services after such posting constitutes your consent to be bound by the Terms, as amended.

Our collection and use of personal information in connection with the Services is as provided in Uber's Privacy Policy located at https://www.uber.com/privacy/notice. Uber may provide to a claims processor or an insurer any necessary information (including your contact information) if there is a complaint, dispute or conflict, which may include an accident, involving you and a Third Party Provider (including a transportation network company driver) and such information or data is necessary to resolve the complaint, dispute or conflict.

# 2. The Services

The Services constitute a technology platform that enables users of Uber's mobile applications or websites provided as part of the Services (each, an "*Application*") to arrange and schedule transportation and/or logistics services with independent third party providers of such services, including independent third party transportation providers and independent third party logistics providers under agreement with Uber or certain of Uber's affiliates ("*Third Party Providers*"). Unless otherwise agreed by Uber in a separate written agreement with you, the Services are made available solely for your personal, noncommercial use. YOU ACKNOWLEDGE THAT UBER DOES NOT PROVIDE TRANSPORTATION OR LOGISTICS SERVICES OR FUNCTION AS A TRANSPORTATION CARRIER AND THAT ALL SUCH TRANSPORTATION OR LOGISTICS SERVICES ARE PROVIDED BY INDEPENDENT THIRD PARTY CONTRACTORS WHO ARE NOT EMPLOYED BY UBER OR ANY OF ITS AFFILIATES.

License.

Subject to your compliance with these Terms, Uber grants you a limited, non-exclusive, non-sublicensable, revocable, non-transferrable license to: (i) access and use the Applications on your personal device solely in connection with your use of the Services; and (ii) access and use any content, information and related materials that may be made available through the Services, in each case solely for your personal, noncommercial use. Any rights not expressly granted herein are reserved by Uber and Uber's licensors.

Restrictions.

You may not: (i) remove any copyright, trademark or other proprietary notices from any portion of the Services; (ii) reproduce, modify, prepare derivative works based upon, distribute, license, lease, sell, resell, transfer, publicly display, publicly perform, transmit, stream, broadcast or otherwise exploit the Services except as expressly permitted by Uber; (iii) decompile, reverse engineer or disassemble the Services except as may be permitted by applicable law; (iv) link to, mirror or frame any portion of the Services; (v) cause or launch any programs or scripts for the

purpose of scraping, indexing, surveying, or otherwise data mining any portion of the Services or unduly burdening or hindering the operation and/or functionality of any aspect of the Services; or (vi) attempt to gain unauthorized access to or impair any aspect of the Services or its related systems or networks.

**Provision of the Services.**

You acknowledge that portions of the Services may be made available under Uber's various brands or request options associated with transportation or logistics, including the transportation request brands currently referred to as "*Uber*," "*uberPOP*," "*uberX*," "*uberXL*," "*UberBLACK*," "*UberSUV*," "*UberBERLINE*," "*UberVAN*," "*UberEXEC*," and "*UberLUX*" and the logistics request brands currently referred to as "*UberRUSH*," "*UberFRESH*" and "*UberEATS*". You also acknowledge that the Services may be made available under such brands or request options by or in connection with: (i) certain of Uber's subsidiaries and affiliates; or (ii) independent Third Party Providers, including transportation network company drivers, transportation charter permit holders or holders of similar transportation permits, authorizations or licenses.

**Third Party Services and Content.**

The Services may be made available or accessed in connection with third party services and content (including advertising) that Uber does not control. You acknowledge that different terms of use and privacy policies may apply to your use of such third party services and content. Uber does not endorse such third party services and content and in no event shall Uber be responsible or liable for any products or services of such third party providers. Additionally, Apple Inc., Google, Inc., Microsoft Corporation or BlackBerry Limited and/or their applicable international subsidiaries and affiliates will be third-party beneficiaries to this contract if you access the Services using Applications developed for Apple iOS, Android, Microsoft Windows, or Blackberry-powered mobile devices, respectively. These third party beneficiaries are not parties to this contract and are not responsible for the provision or support of the Services in any manner. Your access to the Services using these devices is subject to terms set forth in the applicable third party beneficiary's terms of service.

**Ownership.**

The Services and all rights therein are and shall remain Uber's property or the property of Uber's licensors. Neither these Terms nor your use of the Services convey or grant to you any rights: (i) in or related to the Services except for the limited license granted above; or (ii) to use or reference in any manner Uber's company names, logos, product and service names, trademarks or services marks or those of Uber's licensors.

# 3. Your Use of the Services

**User Accounts.**

In order to use most aspects of the Services, you must register for and maintain an active personal user Services account ("*Account*"). You must be at least 18 years of age, or the age of legal majority in your jurisdiction (if different than 18), to obtain an Account. Account registration requires you to submit to Uber certain personal information, such as your name, address, mobile phone number and age, as well as at least one valid payment method (either a credit card or accepted payment partner). You agree to maintain accurate, complete, and up-to-date information in your Account. Your failure to maintain accurate, complete, and up-to-date Account information, including having an invalid or expired payment method on file, may result in your inability to access and use the Services or Uber's termination of these Terms with you. You are responsible for all activity that occurs under your Account, and you agree to maintain the security and secrecy of your Account username and password at all times. Unless otherwise permitted by Uber in writing, you may only possess one Account.

**User Requirements and Conduct.**

The Service is not available for use by persons under the age of 18. You may not authorize third parties to use your Account, and you may not allow persons under the age of 18 to receive transportation or logistics services from Third Party Providers unless they are accompanied by you. You may not assign or otherwise transfer your Account to any other person or entity. You agree to comply with all applicable laws when using the Services, and you may only use the Services for lawful purposes (*e.g.*, no transport of unlawful or hazardous materials). You will not, in your use of the Services, cause nuisance, annoyance, inconvenience, or property damage, whether to the Third Party Provider or any other party. In certain instances you may be asked to provide proof of identity to access or use the Services, and you agree that you may be denied access to or use of the Services if you refuse to provide proof of identity.

**Text Messaging.**

By creating an Account, you agree that the Services may send you text (SMS) messages as part of the normal business operation of your use of the Services. You may opt-out of receiving text (SMS) messages from Uber at any time by following the directions found at https://www.uber.com/unsubscribe/. You acknowledge that opting out of receiving text (SMS) messages may impact your use of the Services.

**Promotional Codes.**

Uber may, in Uber's sole discretion, create promotional codes that may be redeemed for Account credit, or other features or benefits related to the Services and/or a Third Party Provider's services, subject to any additional terms that Uber establishes on a per promotional code basis ("*Promo Codes*"). You agree that Promo Codes: (i) must be used for the intended audience and purpose, and in a lawful manner; (ii) may not be duplicated, sold or transferred in any manner, or made available to the general public (whether posted to a public form or otherwise), unless expressly permitted by Uber; (iii) may be disabled by Uber at any time for

any reason without liability to Uber; (iv) may only be used pursuant to the specific terms that Uber establishes for such Promo Code; (v) are not valid for cash; and (vi) may expire prior to your use. Uber reserves the right to withhold or deduct credits or other features or benefits obtained through the use of Promo Codes by you or any other user in the event that Uber determines or believes that the use or redemption of the Promo Code was in error, fraudulent, illegal, or in violation of the applicable Promo Code terms or these Terms.

**User Provided Content.**

Uber may, in Uber's sole discretion, permit you from time to time to submit, upload, publish or otherwise make available to Uber through the Services textual, audio, and/or visual content and information, including commentary and feedback related to the Services, initiation of support requests, and submission of entries for competitions and promotions ("*User Content*"). Any User Content provided by you remains your property. However, by providing User Content to Uber, you grant Uber a worldwide, perpetual, irrevocable, transferrable, royalty-free license, with the right to sublicense, to use, copy, modify, create derivative works of, distribute, publicly display, publicly perform, and otherwise exploit in any manner such User Content in all formats and distribution channels now known or hereafter devised (including in connection with the Services and Uber's business and on third-party sites and services), without further notice to or consent from you, and without the requirement of payment to you or any other person or entity.

You represent and warrant that: (i) you either are the sole and exclusive owner of all User Content or you have all rights, licenses, consents and releases necessary to grant Uber the license to the User Content as set forth above; and (ii) neither the User Content nor your submission, uploading, publishing or otherwise making available of such User Content nor Uber's use of the User Content as permitted herein will infringe, misappropriate or violate a third party's intellectual property or proprietary rights, or rights of publicity or privacy, or result in the violation of any applicable law or regulation.

You agree to not provide User Content that is defamatory, libelous, hateful, violent, obscene, pornographic, unlawful, or otherwise offensive, as determined by Uber in its sole discretion, whether or not such material may be protected by law. Uber may, but shall not be obligated to, review, monitor, or remove User Content, at Uber's sole discretion and at any time and for any reason, without notice to you.

**Network Access and Devices.**

You are responsible for obtaining the data network access necessary to use the Services. Your mobile network's data and messaging rates and fees may apply if you access or use the Services from a wireless-enabled device and you shall be responsible for such rates and fees. You are responsible for acquiring and updating compatible hardware or devices necessary to access and use the Services and Applications and any updates thereto. Uber does not

guarantee that the Services, or any portion thereof, will function on any particular hardware or devices. In addition, the Services may be subject to malfunctions and delays inherent in the use of the Internet and electronic communications.

# 4. Payment

You understand that use of the Services may result in charges to you for the services or goods you receive from a Third Party Provider ("*Charges*"). After you have received services or goods obtained through your use of the Service, Uber will facilitate your payment of the applicable Charges on behalf of the Third Party Provider as such Third Party Provider's limited payment collection agent. Payment of the Charges in such manner shall be considered the same as payment made directly by you to the Third Party Provider. Charges will be inclusive of applicable taxes where required by law. Charges paid by you are final and non-refundable, unless otherwise determined by Uber. You retain the right to request lower Charges from a Third Party Provider for services or goods received by you from such Third Party Provider at the time you receive such services or goods. Uber will respond accordingly to any request from a Third Party Provider to modify the Charges for a particular service or good.

All Charges are due immediately and payment will be facilitated by Uber using the preferred payment method designated in your Account, after which Uber will send you a receipt by email. If your primary Account payment method is determined to be expired, invalid or otherwise not able to be charged, you agree that Uber may, as the Third Party Provider's limited payment collection agent, use a secondary payment method in your Account, if available.

As between you and Uber, Uber reserves the right to establish, remove and/or revise Charges for any or all services or goods obtained through the use of the Services at any time in Uber's sole discretion. Further, you acknowledge and agree that Charges applicable in certain geographical areas may increase substantially during times of high demand. Uber will use reasonable efforts to inform you of Charges that may apply, provided that you will be responsible for Charges incurred under your Account regardless of your awareness of such Charges or the amounts thereof. Uber may from time to time provide certain users with promotional offers and discounts that may result in different amounts charged for the same or similar services or goods obtained through the use of the Services, and you agree that such promotional offers and discounts, unless also made available to you, shall have no bearing on your use of the Services or the Charges applied to you. You may elect to cancel your request for services or goods from a Third Party Provider at any time prior to such Third Party Provider's arrival, in which case you may be charged a cancellation fee.

This payment structure is intended to fully compensate the Third Party Provider for the services or goods provided. Except with respect to taxicab transportation services requested through the Application, Uber does not designate any portion of your payment as a tip or

gratuity to the Third Party Provider. Any representation by Uber (on Uber's website, in the Application, or in Uber's marketing materials) to the effect that tipping is "voluntary," "not required," and/or "included" in the payments you make for services or goods provided is not intended to suggest that Uber provides any additional amounts, beyond those described above, to the Third Party Provider. You understand and agree that, while you are free to provide additional payment as a gratuity to any Third Party Provider who provides you with services or goods obtained through the Service, you are under no obligation to do so. Gratuities are voluntary. After you have received services or goods obtained through the Service, you will have the opportunity to rate your experience and leave additional feedback about your Third Party Provider.

**Repair or Cleaning Fees.**

You shall be responsible for the cost of repair for damage to, or necessary cleaning of, Third Party Provider vehicles and property resulting from use of the Services under your Account in excess of normal "wear and tear" damages and necessary cleaning ("*Repair or Cleaning*"). In the event that a Third Party Provider reports the need for Repair or Cleaning, and such Repair or Cleaning request is verified by Uber in Uber's reasonable discretion, Uber reserves the right to facilitate payment for the reasonable cost of such Repair or Cleaning on behalf of the Third Party Provider using your payment method designated in your Account. Such amounts will be transferred by Uber to the applicable Third Party Provider and are non-refundable.

# 5. Disclaimers; Limitation of Liability; Indemnity.

DISCLAIMER.

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD REQUESTED IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

LIMITATION OF LIABILITY.

UBER SHALL NOT BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOST DATA, PERSONAL INJURY OR

PROPERTY DAMAGE RELATED TO, IN CONNECTION WITH, OR OTHERWISE RESULTING FROM ANY USE OF THE SERVICES, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF: (i) YOUR USE OF OR RELIANCE ON THE SERVICES OR YOUR INABILITY TO ACCESS OR USE THE SERVICES; OR (ii) ANY TRANSACTION OR RELATIONSHIP BETWEEN YOU AND ANY THIRD PARTY PROVIDER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR DELAY OR FAILURE IN PERFORMANCE RESULTING FROM CAUSES BEYOND UBER'S REASONABLE CONTROL. YOU ACKNOWLEDGE THAT THIRD PARTY TRANSPORTATION PROVIDERS PROVIDING TRANSPORTATION SERVICES REQUESTED THROUGH SOME REQUEST BRANDS MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTATION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. IN NO EVENT SHALL UBER'S TOTAL LIABILITY TO YOU IN CONNECTION WITH THE SERVICES FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION EXCEED FIVE HUNDRED EUROS (€500).

UBER'S SERVICES MAY BE USED BY YOU TO REQUEST AND SCHEDULE TRANSPORTATION, GOODS OR LOGISTICS SERVICES WITH THIRD PARTY PROVIDERS, BUT YOU AGREE THAT UBER HAS NO RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY TRANSPORTATION, GOODS OR LOGISTICS SERVICES PROVIDED TO YOU BY THIRD PARTY PROVIDERS OTHER THAN AS EXPRESSLY SET FORTH IN THESE TERMS.

THE LIMITATIONS AND DISCLAIMER IN THIS SECTION 5 DO NOT PURPORT TO LIMIT LIABILITY OR ALTER YOUR RIGHTS AS A CONSUMER THAT CANNOT BE EXCLUDED UNDER APPLICABLE LAW.

**Indemnity.**

You agree to indemnify and hold Uber and its officers, directors, employees and agents harmless from any and all claims, demands, losses, liabilities, and expenses (including attorneys' fees) arising out of or in connection with: (i) your use of the Services or services or goods obtained through your use of the Services; (ii) your breach or violation of any of these Terms; (iii) Uber's use of your User Content; or (iv) your violation of the rights of any third party, including Third Party Providers.

# 6. Governing Law; Arbitration.

Except as otherwise set forth in these Terms, these Terms shall be exclusively governed by and construed in accordance with the laws of The Netherlands, excluding its rules on conflicts of laws. The Vienna Convention on the International Sale of Goods of 1980 (CISG) shall not apply. Any dispute, conflict, claim or controversy arising out of or broadly in connection with or relating to the Services or these Terms, including those relating to its validity, its construction or its enforceability (any "*Dispute*") shall be first mandatorily submitted to mediation

proceedings under the International Chamber of Commerce Mediation Rules ("*ICC Mediation Rules*"). If such Dispute has not been settled within sixty (60) days after a request for mediation has been submitted under such ICC Mediation Rules, such Dispute can be referred to and shall be exclusively and finally resolved by arbitration under the Rules of Arbitration of the International Chamber of Commerce ("*ICC Arbitration Rules*"). The ICC Rules' Emergency Arbitrator provisions are excluded. The Dispute shall be resolved by one (1) arbitrator to be appointed in accordance with the ICC Rules. The place of both mediation and arbitration shall be Amsterdam, The Netherlands, without prejudice to any rights you may have under Article 18 of the Brussels I bis Regulation (OJ EU 2012 L351/1) and/or Article 6:236n of the Dutch Civil Code. The language of the mediation and/or arbitration shall be English, unless you do not speak English, in which case the mediation and/or arbitration shall be conducted in both English and your native language. The existence and content of the mediation and arbitration proceedings, including documents and briefs submitted by the parties, correspondence from and to the International Chamber of Commerce, correspondence from the mediator, and correspondence, orders and awards issued by the sole arbitrator, shall remain strictly confidential and shall not be disclosed to any third party without the express written consent from the other party unless: (i) the disclosure to the third party is reasonably required in the context of conducting the mediation or arbitration proceedings; and (ii) the third party agrees unconditionally in writing to be bound by the confidentiality obligation stipulated herein.

# 7. Other Provisions

**Claims of Copyright Infringement.**

Claims of copyright infringement should be sent to Uber's designated agent. Please visit Uber's web page at https://www.uber.com/legal for the designated address and additional information.

**Notice.**

Uber may give notice by means of a general notice on the Services, electronic mail to your email address in your Account, or by written communication sent to your address as set forth in your Account. You may give notice to Uber by written communication to Uber's address at Burgerweeshuispad 301, 1076 HR, Amsterdam, The Netherlands.

**General.**

You may not assign or transfer these Terms in whole or in part without Uber's prior written approval. You give your approval to Uber for it to assign or transfer these Terms in whole or in part, including to: (i) a subsidiary or affiliate; (ii) an acquirer of Uber's equity, business or assets; or (iii) a successor by merger. No joint venture, partnership, employment or agency relationship exists between you, Uber or any Third Party Provider as a result of the contract between you and Uber or use of the Services.

If any provision of these Terms is held to be illegal, invalid or unenforceable, in whole or in part, under any law, such provision or part thereof shall to that extent be deemed not to form part of these Terms but the legality, validity and enforceability of the other provisions in these Terms shall not be affected. In that event, the parties shall replace the illegal, invalid or unenforceable provision or part thereof with a provision or part thereof that is legal, valid and enforceable and that has, to the greatest extent possible, a similar effect as the illegal, invalid or unenforceable provision or part thereof, given the contents and purpose of these Terms. These Terms constitute the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In these Terms, the words "including" and "include" mean "including, but not limited to."

**Return to Legal Hub→**

# EXHIBIT E

**CONFIDENTIAL**

| *Driver First Name* | *Driver Last Name* | *Date Accepted Agreements (UTC)* | *Reg Doc Title* |
|---|---|---|---|
| Babar Ali | Zada | 2/17/23 6:58:03 PM | IMPORTANT SAFETY INFORMATION - PLEASE READ |
| Babar Ali | Zada | 2/26/23 2:39:57 AM | UAE Driver Agreement |
| Babar Ali | Zada | 10/16/23 8:53:42 AM | Fleet Driver Agreement |
| Babar Ali | Zada | 11/28/23 1:33:21 PM | DRIVER ADDENDUM - UBER DROPOFF SUPPLEMENT |

# EXHIBIT F

**UBER B.V. DRIVER AGREEMENT**
Dated: 02 November 2020

This Driver Agreement ("**Agreement**") constitutes a legal agreement between Uber B.V., a private limited liability company established in The Netherlands, having its offices at Mr. Treublaan 7, 1097 DP, Amsterdam, The Netherlands, registered at the Amsterdam Chamber of Commerce under number 56317441 **("Uber")** and an individual who satisfies the Driver Requirements set out in Section 3.1 below to be an active Driver-Partner and whom Uber has authorised to access the Uber Services and to provide  passenger transportation services to Users through the  Uber Services (a **"Driver-Partner"**).

To facilitate the provision of the transportation services the Driver-Partner performs, the Driver-Partner wishes to receive lead generation and related services through the Uber Services. This Agreement defines the terms and conditions under which the Driver-Partner may receive such lead generation and related service, the parties responsibilities in respect of cash collection and payment terms and receiving Uber Cash Payments (as defined in Section 4.3 below).

In order to provide the Uber Services to the Driver-Partner for the Driver-Partner's use, the Driver-Partner must agree to the terms and conditions that are set forth below and the Uber B.V. Terms and Conditions (as amended by Uber from time to time) which govern the access or use of applications, websites, content, products, and services made available by Uber B.V. to the Driver-Partner (the "**General Terms**") and any other terms and conditions as notified by Uber or any of its Affiliates to the Driver-Partner from time to time.

To facilitate the execution of this Agreement (where undertaken electronically) by the Driver-Partner, Uber will provide the Agreement (and any subsequent amendments or addendums to this Agreement) to the Driver-Partner via the Driver App.  Upon the Driver-Partner clicking **"I accept"** or executing this Agreement in written form, the Driver-Partner shall be bound by the terms and conditions set forth herein which shall its entirety replace any Agreements between Driver-Partner and Uber and any amendments, modifications or supplements thereto.

1. **Definitions.**
1.1.    "**Affiliate**" means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest, the majority of the voting rights of such entity, the ability of such entity to ensure that the activities and business of that Affiliate are conducted in accordance with the wishes of that entity or the right to receive the majority of the income of that Affiliate on any distribution by it of all of its income or the majority of its assets on a winding up.

1.2.    "**Driver App**" means Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified by Uber at its discretion from time to time.

1.3.    "**Driver ID**" means the identification and password key assigned by Uber to the Driver-Partner that enables the Driver-Partner to use and access the Driver App.

1.4.    "**Driver-Provided Device**" or "**Device**" means a mobile device owned or controlled by the Driver-Partner: (a) that meets the then-current Uber specifications for mobile devices as set forth at https://www.uber.com/byod_devices; and (b) on which the Driver App has been installed as authorised by Uber for the purpose of providing Driver-Partner is

entitled to charge a User for each completed Transportation Service which has been sourced via the Uber Services and provided to a User.

1.5.   *"Fare"* has the meaning set forth in Section 4.1.

1.6.   **"Gratuity"** has the meaning set forth in Section 4.6.

1.7.   **"Non-Cash Payment"** means payment by a credit card or any other non-cash, electronic form of payment.

1.8.   *"Service Fee"* has the meaning set forth in Section 4.7.

1.9.   "**Territory**" means the city or metro areas within the United Arab Emirates in which the Driver-Partner is enabled by the Driver App to receive requests for Transportation Services.

1.10.  "**Transportation Services**" means the provision of passenger transportation services to Users via the Uber Services in the Territory by the Driver-Partner using the Vehicle.

1.11.  **"Uber Cash"** means the prepaid balance which is represented electronically, denominated in UAE Dirhams (AED) and attributed to a User's account, and which:

   (i)   is credited to a User by Uber upon collection or receipt of funds;

   (ii)  may be reloaded with additional value by the User (subject to any limits imposed by Uber or by law and notified to a User from time to time);

   (iii) may be redeemed or applied by a User as a payment method for a Transaction whereby Uber will satisfy and settle the payment obligation to the relevant third party provider of goods or services up to the Uber Cash credit balance reflected in a User's account; and

   (iv)  is not redeemable for cash in accordance with the Uber Cash and Underpayments Terms of Use.

1.12.  "**Uber Data**" means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.13.  "**Uber Services**" mean Uber's electronic services rendered via a digital technology platform, being on-demand intermediary and related services that enable transportation providers to seek, receive and fulfil on-demand requests for transportation services by Users seeking transportation services; such Uber Services include Uber's software, websites, payment services, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

1.14.  "**User**" means an end user authorised by Uber to use Uber's mobile application for the purpose of obtaining Transportation Services.

1.15.  "**User Information**" means information about a User made available to the Driver-Partner in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.16.  **"User Negative Balance"** has the meaning in Section 4.5.

1.17.   "**Vehicle**" means any vehicle that: (a) meets the then-current Uber requirements for a vehicle on the Uber Services; and (b) Uber authorises for use by the Driver-Partner for the purpose of providing Transportation Services.

2.   **Use of the Uber Services**.

2.1. **Driver IDs**. Driver-Partner will be issued a Driver ID for providing Transportation Services to enable Driver-Partner to access and use the Driver App on a Device in accordance with this Agreement. Driver-Partner will maintain his or her Driver ID in Uber of any actual or suspected breach or improper use or disclosure of the Driver ID or the Driver App.

2.2. **Provision of Transportation Services**. When the Driver App is active, User requests for Transportation Services may appear to Driver-Partner via the Driver App if Driver-Partner is available and in the vicinity of the User. If Driver-Partner accepts a User's request for Transportation Services, the Uber Services will provide certain User information to Driver-Partner via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and Driver-Partner's Transportation Services, it is recommended that Driver-Partner waits at least ten (10) minutes for a User to show up at the requested pick-up location. Driver-Partner will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. Driver-Partner acknowledges and agrees that once he or she has accepted a User's request for Transportation Services, the Uber Services may provide certain information about Driver-Partner to the User, including Driver-Partner's first name, contact information, photo and location, and Driver-Partner's Vehicle make and license plate number. Driver-Partner shall not contact Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. Driver-Partner agrees that his or her contact and/or insurance information may be released to a User upon such User's reasonable request. Driver-Partner may not, unless specifically consented to by a User, transport or allow inside any Vehicle individuals other than a User and any individuals authorized by such User during the performance of Transportation Services for such User. Driver-Partner shall transport all Users directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.3. **Driver-Partner's Relationship with Users**. Driver-Partner acknowledges and agrees that Driver-Partner's provision of Transportation Services to Users creates a legal and direct business relationship between the Driver-Partner and the User, to which Uber is not a party. Uber is not responsible or liable for the actions or inactions of a User in relation to the activities of the Driver-Partner or any Vehicle. Driver-Partner shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from its provision of Transportation Services. Driver-Partner acknowledges and agrees that the Driver-Partner is solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws) regarding any acts or omissions of a User or third party. Driver-Partner acknowledges and agrees that Uber may release the contact and/or insurance information of the Driver-Partner to a User upon such User's reasonable request. Driver-Partner acknowledges and agrees that, unless specifically consented to by a User, the Driver-Partner may transport or allow inside any Vehicle individuals other than a User and any individuals authorized by such User during the performance of Transportation Services for such User. Driver-Partner acknowledges and agrees, that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4. **Driver-Partner's Relationship with Uber**.

2.4.1.  Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from Users on behalf of Driver-Partner, the relationship between the parties under this Agreement is solely that of independent contractors. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship (including from a labour law, tax law or social security law

perspective), between Uber and the Driver-Partner; and (b) no joint venture, partnership, or agency relationship exists between Uber and the Driver-Partner.

2.4.2.  Driver-Partner has no authority to bind Uber and undertakes not to hold itself out as an employee, agent or authorized representative of Uber or its Affiliates. Where, by implication of mandatory law or otherwise, the Driver-Partner may be deemed an employee, agent or representative of Uber, Driver-Partner undertakes and agrees to indemnify, defend (at Uber's option) and hold Uber and its Affiliates harmless from and against any claims by any person, entity, regulators or governmental authorities based on such implied employment, agency or representative relationship.

2.4.3.  Driver-Partner expressly acknowledges and agrees that by agreeing to the terms and conditions of this Agreement, Driver-Partner intends to perform Transportation Services in a non-incidental manner and, as such, Uber will consider the Driver-Partner to be a taxable person in accordance with all applicable VAT and indirect tax legislation.

2.4.4.  Uber does not, and shall not be deemed to, direct or control Driver-Partner generally or in Driver-Partner's performance of Transportation Services or maintenance of any Vehicles. Driver-Partner acknowledges that Uber does not control, or purport to control: (a) when or for how long Driver-Partner will utilize the Driver App or the Uber Services; or (b) Driver-Partner's decision, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services, or to cancel an accepted request for Transportation Services, via the Driver App, subject to Uber's then-current cancellation policies. Driver-Partner may be deactivated or otherwise restricted from accessing or using the Driver App or the Uber Services in the event of a violation of this Agreement, or Driver-Partner's disparagement of Uber or any of its Affiliates, or Driver-Partner's act or omission that causes harm to Uber's or any of its Affiliates' brand, reputation or business as determined by Uber in its sole discretion. Uber also retains the right to deactivate or otherwise restrict Driver-Partner from accessing or using the Driver App or the Uber Services for any other reason at the sole and reasonable discretion of Uber.

2.4.5.  Driver-Partner acknowledges Uber's rights in the UBER family of trademarks and names, including UBER, alone and in combination with other letters, punctuation, words, symbols and/or designs, the UBER Logo and EVERYONE'S PRIVATE DRIVER ("UBER Marks and Names"). Driver-Partner agrees that he or she will not try to register or otherwise claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark or name.

2.5. **Ratings**.

2.5.1.  Driver-Partner agrees that: (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of such Transportation Services and Driver-Partner and, optionally, to provide comments or feedback about such Transportation Services and Driver-Partner; and (b) after providing Transportation Services, Driver-Partner will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. Driver-Partner shall provide ratings and feedback in good faith.

2.5.2.  In order to continue to receive access to the Driver App and the Uber Services, Driver-Partner acknowledges that he or she must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Uber for the Territory, as may be updated from time to time by Uber in its sole discretion

("**Minimum Average Rating**"). In the event Driver-Partner's average rating falls below the Minimum Average Rating, Driver-Partner may be provided a limited period of time to raise his or her average rating above the Minimum Average Rating. Driver-Partner agrees that if Driver-Partner does not increase his or her average rating above the Minimum Average Rating within the time period allowed (if any), Uber may deactivate such Driver-Partner's access to the Driver App and the Uber Services. Driver-Partner agrees that repeated failure to accept User requests for Transportation Services while Driver-Partner is logged in to the Driver App creates a negative experience for Users of Uber's mobile application. Accordingly, Driver-Partner agrees that if they are logged in to the Driver App, they will strive to accept a substantial portion of User requests for Transportation Services, and that if they do not wish to accept User requests for Transportation Services for a period of time, they will log off of the Driver App.

2.5.3.   Uber and its Affiliates reserve the right to use, share and display Driver-Partner and User ratings and comments in any manner in connection with the business of Uber and its Affiliates without attribution to or approval of Driver-Partner. Driver-Partner acknowledges that Uber and its Affiliates are distributors (without any obligation to verify) and not publishers of Driver-Partner and User ratings and comments, provided that Uber and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Uber's or its Affiliates' content policies.

2.6. **Devices**. In respect of any Driver-Provided Device(s), Driver-Partner acknowledges that Uber is not responsible for the acquisition, cost or maintenance of any such Driver-Provided Device(s) or any necessary wireless data plan. Uber shall make available the Driver App for installation on such Driver-Provided Devices. Driver-Partner agrees to not provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party. Driver-Partner will delete and fully remove the Driver App from the Driver-Provided Device in the event that the Driver-Partner ceases to provide Transportation Services using the Driver-Provided Device. Driver-Partner agrees that: (i) use of the Driver App on a Driver-Provided Device requires an active data plan with a wireless carrier associated with the Driver-Provided Device, which data plan will be provided by the Driver-Partner at the Driver-Partner's own expense; and (ii) use of the Driver App on a Driver-Provided Device as an interface with the Uber Services may consume very large amounts of data through the data plan. Uber advises that Driver-Provided Devices only be used under a data plan with unlimited or very high data usage limits, and Uber shall not be responsible or liable for any fees, costs or overage charges associated with any data plan.

2.7. **Location Based Services**. Driver-Partner acknowledges and agrees that his or her geo-location information must be provided to the Uber Services via a Device in order to provide the Transportation Services. Driver-Partner acknowledges and agrees that: (a) his or her geo-location information will be monitored and tracked by the Uber Services when Driver-Partner is logged into the Driver App and available to receive requests for Transportation Services, or when Driver-Partner is providing Transportation Services; and (b) the approximate location of Driver-Partner's Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Uber may monitor, track and share Driver-Partner's geo-location information obtained by the Driver App and

Device for safety, security, technical, marketing and commercial purposes, including to provide and improve Uber's products and services.

**3. Drivers and Vehicles**

3.1. **Driver-Partner Requirements**. Driver-Partner agrees that he or she will at all times: (a) hold and maintain (i) a valid Driver-Partner's license with the appropriate level of certification to operate the Vehicle assigned to them, and (ii) all licenses, permits, approvals and authority necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy.

Driver-Partner agrees that he or she may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services. Driver-Partner may be deactivated from or otherwise restricted from accessing or using the Driver App or the Uber Services if Driver-Partner fails to meet the requirements set forth in this Agreement.

3.2. **Vehicle Requirements.** Driver-Partner acknowledges and agrees that the Vehicle shall at all times be: (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by Driver-Partner, or otherwise in Driver-Partner's lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3. **Documentation.** To ensure Driver-Partners' compliance with all requirements in Sections 3.1 and 3.2 above, Driver-Partner must provide Uber with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to the Driver-Partners' provision of any Transportation Services. Thereafter, Driver-Partner must submit to Uber written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Uber shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and Driver-Partner's failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Uber reserves the right to independently verify any Driver-Partner's documentation from time to time in any way Uber deems appropriate in its reasonable discretion.

**4. Payment Terms.**

4.1. **Fare Calculation and Driver-Partner Payment.**

4.1.1 Driver-Partner is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("**Fare**"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Uber using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("**Fare Calculation**").

4.1.2 If applicable, Driver-Partner is also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services. Driver-Partner:
(a) appoints Uber as Driver-Partner's limited payment collection agent solely for the purpose of accepting the Fare (where paid with a Non-Cash Payment method), applicable Tolls and, depending on the region and/or if requested by Driver-Partner, applicable taxes

and fees from the User on behalf of the Driver-Partner via the payment processing functionality facilitated by the Uber Services; and

(b) agrees that payment made by User to Uber shall be considered the same as payment made directly by User to Driver-Partner.

4.1.3   The parties acknowledge and agree that as between Driver-Partner and Uber, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event the Driver-Partner does not negotiate a different amount. Driver-Partner shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Driver-Partner's request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "***Negotiated Fare***"). Uber shall consider all such requests from Driver-Partner in good faith.

4.1.4   Uber agrees to remit funds to Driver-Partner at periodic intervals and subject to Driver-Partner meeting the minimum transfer threshold for remittance of funds set by Uber (in its sole discretion) and notified to the Driver-Partner from time to time, as follows:

   a)   the Fare **plus** Gratuities (see Section 4.6 (Gratuities)) **less** the applicable Service Fee (see Section 4.7 below) **less** the Uber Cash Payment (as described in Section 4.3) and **less** the amount of any refund owing to a User or amounts owing to Uber, arising from Driver-Partner error, or inaccuracy in calculating or entering the amounts constituting Uber Cash Payments, from amounts otherwise collected on behalf of the Driver-Partner for Transportation Services performed by Driver-Partner;

   b)   any other amounts agreed to be paid by Uber in its sole discretion (from time to time) including incentive payments (if any);

   c)   the Tolls; and

   d)   depending on the region, certain taxes and ancillary fees.

Notwithstanding the above, Uber agrees to remit to the Driver-Partner all remaining funds held on behalf of the Driver-Partner which have not previously been transferred to the Driver-Partner  (less any of the deductibles described in (a) to (d) above), at the end of each four week period or such shorter time period, as determined by Uber in its sole discretion.

4.1.5   If Driver-Partner has separately agreed, other amounts may be deducted from the Fare prior to remittance to Driver-Partner (e.g., vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of those deductions from the Fare to be determined exclusively by Uber.

4.2.   **Cash Rides.** Uber may facilitate an option for Users in the Territory that allows Users to pay for a given instance of Transportation Services provided by the Driver-Partner in cash (a ***"Cash Fare"***).  For the avoidance of doubt, Cash Fare has the same meaning as *"Fare"* (see Section 1.5 above) **and 4.1 (Fare Calculation and Driver-Partner Payment)** above except as specifically set forth herein.  Notwithstanding the appointment of Uber as the Driver-Partner's limited payment collection agent (for Fares paid by a User through a payment card or other payment means other than cash), in the event that the Driver-Partner provides Transportation Services to Users utilising the Cash Fare option, the Driver-Partner acknowledges and agrees that no such agency is required and instead:

(a)   User shall pay Driver-Partner directly rather than through the Driver App;

(b)   Driver-Partner shall have sole responsibility for collecting the Cash Fare from each User and for providing the correct change, as appropriate, to such User;

(c)   Driver-Partner shall retain the Cash Fare at his/her own risk, and therefore the Driver-Partner acknowledges and agrees that Uber shall offset the amounts due to the Driver-Partner in accordance with Section 4.10.1 (Set-off);

(d)   the Driver-Partner shall be responsible for all applicable taxes payable in the Territory in connection with the Cash Fare (including for the avoidance of doubt any Service Fee).

Uber bears no responsibility for the collection of any Fares or other amounts, including Cash Fares and Uber Cash Payments, from Users by the Driver-Partner.

4.3.   **Uber Cash Payment.**  Where a User has chosen a Cash Fare as the payment method for a transaction, the User shall have the option to:

(a)   receive the User's change as cash directly from the Driver-Partner; or

(b)   to request that the Driver-Partner apply some or all of the User's change to reload Uber Cash (**"Change for Uber Cash"**), by informing the Driver-Partner at the time of payment. For the avoidance of doubt, Uber Cash Payments do not constitute a tip from the User to the Driver-Partner. The Driver App will automatically specify the Cash Fare for providing Transportation Services.  Where the User opts to apply some or all of their change as Change for Uber Cash (the **"Uber Cash Payment"**), the Driver-Partner must enter the amount of the Cash Fare (for example AED15) plus the Uber Cash Payment (for example AED10) (together the **"Total Payment Received"**), under the tab *'Enter received amount'*. The Driver App will reflect the Total Payment Received (that is the Cash Fare plus the Uber Cash Payment) and will specify the amount attributable to Uber Cash as 'credits'.

(c)   The Driver-Partner acknowledges and agrees that where the User has opted to pay change        as Change for Uber Cash:

(i)   Uber Cash Payments will constitute a debt owing by the Driver-Partner to Uber; and

(ii)   Uber Cash Payments (together with Service Fee) shall be set off by Uber in accordance with Section 4.10 (Collections) below.

For the avoidance of doubt, no service fee may be charged to Users by the Driver-Partner in respect of amounts constituting Uber Cash Payments.

Uber shall bear no liability or responsibility for miscalculations, errors or inaccuracies in the calculating or entering the amounts constituting Uber Cash Payments into the Driver App by the Driver-Partner. The Driver-Partner acknowledges and agrees that any loss or liability incurred as a result of Driver-Partner error, miscalculation or inaccuracy in calculating or entering the amounts constituting Uber Cash Payments into the Driver App shall be at the Driver-Partner's own risk and the Driver-Partner further agrees that Uber shall bear no liability for errors, loss or liability which the Driver-Partner may incur as a result of such actions.

4.4.   **Recording of underpayments.** In the event that a User has insufficient funds to pay for a Transaction (whether in whole or part, each such event is considered an **"Underpayment"**), the Driver-Partner acknowledges and agrees that:

4.4.1.   the Driver-Partner shall record the amount of the Underpayment for that transaction in the Driver App.

4.4.2.   an amount equivalent to the Underpayment recorded by the Driver under Section 4.4.1 will be recorded by Uber as a negative balance on the User's Account.

4.4.3.   Uber shall set a maximum limit which a User will be permitted to accumulate on his or her Uber account as a negative balance and upon reaching this limit and a User will not be permitted to book further Services via the Driver App until such balance has been cleared.

4.4.4.   Uber may from time to time deactivate Underpayments as a specific feature available to a Driver-Partner in accordance with Section 2.4.4.

4.5.   **Collection of underpayments in cash.** The Driver-Partner acknowledges and agrees that notwithstanding Uber's (and its Affiliates') role to facilitate the payment of Transactions using Non-Cash Payment methods and act as limited collection agent for the Driver-Partner, where a User selects cash as his or her payment method for a Transaction, it is the Driver-Partner's (and not Uber's) obligation to collect such Cash Fare. The Driver-Partner agrees and acknowledges that at the time of payment for a trip the Driver-Partner may be notified via the Driver App that the User has incurred a negative balance comprising the total cumulative amount of any underpayments incurred by the User on his account up to (but excluding) the current transaction (the "*User Negative Balance*"). In such circumstances:

4.5.1.   the Driver App will reflect that the total amount owing by the User comprises of: (a) the transaction amount owing for that trip; and (b) the User Negative Balance owing to Uber.

4.5.2.   the Driver-Partner is under no obligation to compel or demand payment for the User Negative Balance from the User and Uber agrees and acknowledges that it (Uber) bears ultimately responsibility for seeking recourse for any User Negative Balance from Users.

4.5.3.   where the User pays the User Negative Balance in cash and where the Driver-Partner elects to accept such cash the parties acknowledge that such funds will be settled with Uber as part of the set off set out in Section 4.10.1 (Set-off) below, as determined by Uber and notified to the Driver-Partner from time to time.

4.6.   **Gratuities**.  The Driver-Partner may have the option to receive an additional discretionary payment from Riders through the Uber Services ("**Gratuity**"). Any such Gratuities are provided at the sole discretion of a Rider, and Uber does not guarantee that the Driver-Partner will receive Gratuities from Users. Gratuities payable to Driver-Partners will be remitted to the Driver-Partner in accordance with Section 4.1.1 (Fare Calculation and Driver-Partner Payment) of this Agreement. Uber will also report the Gratuity amounts received by each Driver-Partner in accordance with Section 4.10.2 (Reports). Gratuities paid to Driver-Partners through the Uber Service are the property of the Driver-Partner.

4.7.   **Service Fee.**  In consideration of Uber's provision of the Uber Services, Driver-Partner agrees to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare (regardless of any Negotiated Fare), as provided to Driver-Partner via email or electronically by Uber from time to time for the applicable

Territory *("Service Fee")*. Unless regulations applicable to the Driver-Partner's Territory require otherwise, taxes will be calculated and charged on the Fare, and Uber shall calculate the Service Fee based on the Fare inclusive of such taxes. Uber reserves the right to change the Service Fee at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Driver-Partner in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute Driver-Partner's consent to such change.

4.8.   **Changes to Fare Calculation.** Uber reserves the right to change the Fare Calculation at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Driver-Partner in the event of such change that would result in a change in the recommended Fare. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute Driver-Partner's consent to such change.

4.9.   **Fare Adjustment.** Uber reserves the right to: (i) adjust the Fare for a particular instance of Transportation Services (e.g., Driver-Partner took an inefficient route, Driver-Partner failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (e.g., a User is charged for Transportation Services that were not provided, in the event of a User complaint, fraud, etc.). Uber's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.10.   **Collections.**

4.10.1.   **Set off.** The Driver-Partner acknowledges and agrees that at the end of each week, Uber will calculate and set off:

(a)      (i) the total amount received by Uber constituting payments made by Users to the Driver-Partner for the provision of Transportation Services using a Non-Cash Payment method including any Gratuities **plus** (ii)  such other amounts which Uber (in its sole discretion) agrees to pay to the Driver-Partner, **less** (iii) Service Fees owing with respect to Fares paid using Non-Cash Payments, **less** (iv) such other deductible amounts which the Driver-Partner and Uber have agreed to deduct from the Fare prior to remittance *("Uber Remittance Amount")*; against

(b)      (i) Service Fees owing with respect to Cash Fares **plus** (ii) total Uber Cash Payments plus (iii) User Negative Balance paid to the Driver-Partner in cash **less** (iv)  such other deductible amounts which the Driver-Partner and Uber have agreed to deduct from the Fare *("Driver Remittance Amount")*.

Where the Uber Remittance Amount is greater than the Driver Remittance Amount, the Driver-Partner understands that Uber will remit the difference to the Driver-Partner. For the avoidance of doubt, the Driver-Partner understands that where the Driver Remittance Amount is greater than or equal to the Uber Remittance Amount, Uber shall have no further obligation to pay or remit funds to the Driver-Partner (as applicable).

4.10.2.   **Reports**. Uber agrees to report to the Driver-Partner, all collections (including Fares and Gratuities) performed by Uber in respect of Transportation Services provided by Driver-Partner.

4.10.3.   **Driver-Partner negative balance.** Where the Driver Remittance Amount is greater than the Uber Remittance Amount, such that there are insufficient funds from Fares paid by Non-Cash Payments associated with the Transportation Services provided by Driver-Partner to set off against the recoupment of Service Fees due on Cash Fares and Uber Cash Payment and other amounts owed to Uber, and the Driver-Partner has not provided Uber another means of repayment, Uber shall record the shortfall against the Driver-Partner's account, which shall be carried forward until the Driver-Partner has repaid such amounts. Uber may make collection options available to Driver-Partner (e.g., cash collection kiosks, bank transfer, debit card acceptance, and mobile wallets) in order to repay any amounts owed to Uber. In the event Driver-Partner has a card on file (or other means of payment such as a bank account or PayPal for example) with Uber for payment purposes in connection with Driver-Partner's use of the Uber Services, Driver-Partner acknowledges and agrees that Uber or its affiliates may collect amounts owed from that card (or other payment means) as described here. Driver-Partner acknowledges and agrees that it shall bear the cost of any fees related to repayment (e.g., fees for overdraft, top-up, currency exchange, cross-border, bank transfer, or any other similar fee, charge, or expense) and any taxes (including withholding taxes, indirect taxes, VAT and GST), grossing up amounts owed to Uber accordingly so Uber receives the full amount owed.

4.10.4.   **No waiver.** For the avoidance of doubt, Uber shall not be deemed to have waived its right to any amounts owed for provision of the Uber Services and Uber Cash Payment if: (a) there are insufficient payment card Fares to set off against; (b) the Driver-Partner does not repay in a timely manner any amounts owed Uber on a weekly basis as required; or (c) Uber elects to require a minimum amount owed prior to initiating collection efforts or otherwise delays collecting amounts owed by the Driver-Partner.

4.10.5.   **Suspension of Driver-Partner account.** Uber reserves the right to suspend Driver-Partner's account if Driver-Partner maintains a negative balance for more than one (1) week. With each payment statement, Uber shall report any offsetting and deductions. Uber reserves the right to apply interest to any funds that remain outstanding for an extended period of time and/or assess a reactivation fee and/or assess any other fee allowed under applicable law in connection with fees that remain due and outstanding to Uber for the Uber Services past their due date. Any such interest or fees shall be exclusive of the repayment and settlement of all principal payments owed to Uber for the Uber Services and Uber Cash Payments.

4.11.   **Cancellation Charges.** Driver-Partner acknowledges and agrees that Users may elect to cancel requests for Transportation Services that have been accepted by Driver-Partner via the Driver App at any time prior to the Driver-Partner's arrival. In the event that a User cancels an accepted request for Transportation Services, Uber may charge the User a cancellation fee on behalf of the Driver-Partner. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Driver-Partner hereunder *("Cancellation Fee")*. The parties acknowledge that and agree that as between Driver-Partner and Uber, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as the default amount in the event Driver-Partner does not negotiate a different amount. Driver-Partner shall

always have the right to: (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at the Driver-Partner's request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a *"Negotiated Cancellation Fee"*). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to the Driver-Partner hereunder.

4.12.   **Receipts.** As part of the Uber Services, Uber provides Driver-Partner a system for the delivery of receipts to Users for Transportation Services rendered. Upon the completion of Transportation Services for a User by the Driver-Partner, Uber prepares an applicable receipt and issues such receipt to the User via email or via the User's Uber application on behalf of the Driver-Partner. Such receipts are also provided via email or the online portal available to the Driver-Partner on the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about the Driver-Partner, including the Driver-Partner's name and photo, as well as a map of the route taken by the Driver-Partner. Any corrections to a User's receipt for Transportation Services must be submitted to Uber in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Uber shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.13.   **No Additional Amounts.** The Driver-Partner acknowledges and agrees that, for the mutual benefit of the parties, through advertising and marketing, Uber and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. Driver-Partner acknowledges and agrees such advertising or marketing does not entitle Driver-Partner to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.14.   **Taxes.** The Driver-Partner acknowledges and agrees that they are required to (a) complete all tax registration obligations and calculate and remit all tax liabilities related to the Driver-Partner's provision of Transportation Services as required by applicable law; and (b) provide Uber with all relevant tax information requested of you by Uber and/or each of its Affiliates. Driver-Partner further acknowledges and agrees that they are responsible for taxes on their own earnings arising from Driver-Partner's provision of Transportation Services, including without limitation, income tax and VAT. Notwithstanding anything to the contrary in this Agreement, Uber may in its reasonable discretion based on applicable tax and regulatory considerations, or as required under the law, collect and remit taxes resulting from your provision of Transportation Services and/or provide any of the relevant tax and other information you have provided pursuant to the foregoing requirements in this Section 4.14 (Taxes) directly to the applicable governmental tax authorities on your behalf or otherwise.

5.   **Additional Undertakings.**
The Driver-Partner acknowledges and agrees that the Driver-Partner shall comply with, and bear sole responsibility for, all of the obligations under tax and social security laws applicable in the Territory to him or her, including where Uber acts as limited payment collection agent (including with respect to transactions taxes and duties). The parties also acknowledge and agree that at no time, and under no circumstance, shall Uber be liable for the payment, settlement, and/or obligation to pay and/or settle any tax or social security liabilities owed by the Driver-Partner to any authority under applicable laws and regulations. Uber's exclusive role shall be limited to a

payment collection agent in respect of Non-Cash Payments and other roles expressly agreed with the Driver-Partner.  Driver-Partner shall register his/her bank account to be associated with Driver-Partner's Uber Account for the purpose of receiving remittances from Uber.  Driver-Partner acknowledges and agrees that funds directed by Uber to such bank account shall be subject to the provisions set out in this Driver Agreement.

**6.     Proprietary Rights; License.**

6.1.     **License Grant**. Subject to the terms and conditions of this Agreement, Uber hereby grants Driver-Partner a non-exclusive, royalty-free, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use the Driver-Partner App in connection with the provision by Uber of the Uber Services solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to Driver-Partner are reserved by Uber, its Affiliates and their respective licensors.

6.2.     **Restrictions**. Driver-Partner shall not, and shall not allow any other party to: (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services or the Driver App in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, Driver-Partner shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to: (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks, all except to the extent such actions must be allowed under Dutch law.

6.3.     **Ownership**. The Uber Services, Driver App and Uber Data, including all intellectual property rights therein, shall remain the property of Uber, its Affiliates or their respective licensors. Neither this Agreement nor Driver-Partner's use of the Uber Services, Driver App or Uber Data conveys or grants to Driver-Partner any rights: (a) in or related to the Uber Services, Driver App or Uber Data, except for the limited license granted above; or (b) to use or reference in any manner Uber's, its Affiliates', or their respective licensors' company names, logos, product and service names, trademarks, service marks or other indicia of ownership. Additionally, Driver-Partner acknowledges Uber's rights in its UBER family of trademarks and names, including UBER, alone and in combination with other letters, punctuation, words, symbols and/or designs, the UBER Logo and EVERYONE'S PRIVATE DRIVER ("UBER Marks and Names"). Driver-Partner agrees it will not try to register or otherwise claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark or name.

**7.  Confidentiality**

7.1.    Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Uber Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

7.2.    Each party acknowledges and agrees that: (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers *("Permitted Persons")* as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Uber, its internal record-keeping requirements).

7.3.    Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it: (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

8.  **Privacy**.

Subject to all applicable laws, Uber may provide to a third party any information (including personal data and any Uber Data) about Driver-Partner provided under the Agreement if: (a) there is a complaint, dispute or conflict, including an accident, between Driver-Partner and a User; (b) it is necessary to enforce the terms of the Agreement; (c) it is required, in Uber's or any Affiliate's sole discretion, by applicable law or regulation; (d) it is necessary, in Uber's or any Affiliate's sole discretion, to protect the safety, rights, property or security of User, the Uber Services or any third party; to detect, prevent or otherwise address fraud, security or technical issues; and/or to prevent or stop activity which Uber or any of its Affiliates, in their sole discretion, consider to be, or to pose a risk of being, illegal, unethical or legally actionable; or (e) it is required or necessary, in Uber's or any Affiliate's sole discretion, for insurance or other purposes related to Driver-Partner's ability to qualify, or remain qualified, to use the Uber Services. Driver-Partner understands that Uber may retain Driver-Partner's personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated. Uber processes personal data (including that referenced in Section 2.7 (Location Based Services) above) in accordance with its privacy policy located at www.uber.com/legal.

9.  **Insurance**.

Driver-Partner represents and agrees that he or she holds or is otherwise covered by a valid policy of liability insurance (in industry-standard coverage amounts) with respect to Driver-Partner's operation of the Vehicle(s) under this Agreement.

**10. Representations and Warranties; Disclaimers**

10.1.   **By Driver-Partner**. Driver-Partner hereby represents and warrants that: (a) he/she has full power and authority to enter into this Agreement and perform its obligations hereunder; (b) he/she has not entered into, and during the term will not enter into, any agreement that would prevent it from complying with this Agreement; (c) he/she will comply with all applicable laws in his/her performance of this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide: (i) Transportation Services using the Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally; and (d) he/she shall comply with the applicable terms and conditions set forth in this Agreement, the General Terms and all applicable laws.

10.2.   **Disclaimer of Warranties**. Uber provides, and Driver-Partner accepts, the Uber Services and the Driver App on an "as is" and "as available" basis. Uber does not represent, warrant or guarantee that the Driver-Partner's access to or use of the Uber Services or the Driver App: (a) will be uninterrupted or error free; or (b) will result in any requests for Transportation Services. Uber functions as an on-demand lead generation and related service only and makes no representations, warranties or guarantees as to the actions or inactions of the Users who may request or receive Transportation Services from the Driver-Partner hereunder, and Uber need not screen or otherwise evaluate Users. By using the Uber Services and Driver App, Driver-Partner acknowledges and agrees that Driver-Partner may be introduced to a third party (including Users) that may pose harm or risk to the Driver-Partner or other third parties. The Driver-Partner is advised to take reasonable precautions with respect to interactions with third parties encountered in connection with the use of the Uber Services or Driver App. Notwithstanding Uber's appointment as the limited payment collection agent of the Driver-Partner for the purpose of accepting payment from Users on behalf of Driver-Partner as set forth in Section 4 (Payment Terms) above, Uber expressly disclaims all liability for any act or omission of the Driver-Partner, any User or other third party.

10.3.   **No Service Guarantee.** Uber does not guarantee the availability or uptime of the Uber Services or Driver App. Driver-Partner acknowledges and agrees that the Uber Services or Driver App may be unavailable at any time and for any reason (e.g., due to scheduled maintenance or network failure). Further, the Uber Services or Driver App may be subject to limitations, delays, and other problems inherent in the use of the internet and electronic communications, and Uber is not responsible for any delays, delivery failures or other damages, liabilities or losses resulting from such problems.

**11. Indemnification**

11.1.   Driver-Partner shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to: (a) Driver-Partner's breach of its representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to Driver-Partner's provision of Transportation Services or use of the Uber Services.

11.2.   As between Driver-Partner and Uber, the Driver-Partner shall be solely responsible for its Driver-Partners' provision of Transportation Services. As such, Driver-Partner shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes directly or indirectly arising out of or related to its Driver-Partners' provision of Transportation Services or use of the Uber Services.

11.3.   Driver-Partner shall comply with all of their obligations under tax laws to the extent applicable to this Agreement. Driver-Partner shall indemnify Uber from all tax liabilities, duties, levies, claims, and penalties that may be imposed on Uber as a result of the Driver-Partner's failure to comply with any of their tax obligations, or for providing false information requested of Driver-Partner under clause 4.14 (Taxes).

## 12. Limits of Liability.

Uber and its Affiliates shall not be liable under or related to this Agreement for any of the following, whether based on contract, tort or any other legal theory, even if a party has been advised of the possibility of such damages: (i) any incidental, punitive, special, exemplary, consequential, or other indirect damages of any type or kind; or (ii) Driver-Partner's or any third party's property damage, or loss or inaccuracy of data, or loss of business, revenue, profits, use or other economic advantage. Except for Uber's obligations to pay amounts due to Driver-Partner pursuant to Section 4 above, but subject to any limitations or other provisions contained in this Agreement which are applicable thereto, in no event shall the liability of Uber or its Affiliates under this Agreement exceed the amount of Service Fees actually paid to or due to Uber hereunder in the six (6) month period immediately preceding the event giving rise to such claim. Driver-Partner acknowledges and agrees that any and all claims Driver-Partner has or purports to have against Uber and/or its Affiliates should be notified to Uber and/or its Affiliates within one (1) year after the event(s) that gave rise to such claim and that Driver-Partner forfeits all rights in respect of that claim if Driver-Partner fails to do so. These limitations do not purport to limit liability that cannot be excluded by applicable law.

## 13. Term and Termination

13.1.   **Term.** This Agreement shall commence on the date that the Agreement is executed by Driver-Partner (electronically or otherwise) and shall continue until terminated as set forth herein.

13.2.   Termination. Either party may terminate this Agreement: (a) without cause at any time upon seven (7) days prior notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate the Driver-Partner immediately, without notice, with respect to Driver-Partner in the event the Driver-Partner, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

13.3.   **Effect of Termination**. Upon termination of the Agreement, the Driver-Partners shall immediately delete and fully remove the Driver App from any applicable Driver-Provided Devices. Outstanding payment obligations and Sections 1 (Definitions), 2.3 (Driver-Partner's Relationship with Users), 2.4 (Driver-Partner's Relationship with Uber), 2.5.3 (Sharing and Displaying Ratings), 4.13 (No Additional Amounts), 4.14 (Taxes) 6 (Proprietary Rights; License), 7(Confidentiality), 8(Privacy), 10 (Representations and

Warranties; Disclaimers) 11 (Indemnification), 12 (Limits of Liability), 13.3 (Effects of Termination, 14 (Miscellaneous Terms, and 15 (Governing Law; Arbitration) shall survive the termination of this Agreement.

## 14. Miscellaneous Terms.

14.1.   **Modification.** Uber reserves the right to modify the terms and conditions of this Agreement at any time, effective upon publishing an updated version of this Agreement, as applicable, on the online portal available to Driver-Partner on the Uber Service or on the Driver App. Uber reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. Driver-Partner hereby acknowledges and agrees that, by using the Uber Services, or downloading, installing or using the Driver App, Driver-Partner is bound by any future amendments and additions to this Agreement, information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations. Continued use of the Uber Services or Driver App after any such changes shall constitute Driver-Partner's consent to such changes.

14.2.   **Supplemental Terms.** Supplemental terms may apply to the Driver-Partner's use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time *("Supplemental Terms")*. Driver-Partner may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3.   **Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable, in whole or in part, under any law, such provision or part thereof shall to that extent be deemed not to form part of this Agreement but the legality, validity and enforceability of the remainder of this Agreement shall not be affected. In that event, the parties shall replace the illegal, invalid or unenforceable (part of the) provision with a (part of a) provision that is legal, valid and enforceable and that has, to the greatest extent possible, a similar effect as the illegal, invalid or unenforceable (part of the) provision, given the contents and purpose of this Agreement.

14.4.   **Assignment.** Driver-Partner may not assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party. Uber may assign or transfer this Agreement or any or all of its rights or obligations hereunder, in whole or in part, under this Agreement from time to time without consent.

14.5.   **Entire Agreement.** This Agreement, including the recitals and all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6.   **No Third Party Beneficiaries.** The parties acknowledge that no third party beneficiaries exist under this Agreement.

## 15. Governing Law; Arbitration.

ai/6022158_117

15.1 **Governing law of this Agreement.** Except as otherwise set forth in this Agreement, this shall be exclusively governed by and construed in accordance with the laws of The Netherlands, excluding its rules on conflicts of laws. The Vienna Convention on the International Sale of Goods of 1980 (CISG) shall not apply.

15.2 **Arbitration agreement.** This arbitration agreement, shall be exclusively governed by and construed in accordance with the laws of The Netherlands, excluding its rules on conflicts of laws. The Vienna Convention on the International Sale of Goods of 1980 (CISG) shall not apply. Any dispute, conflict or controversy, howsoever arising out of or broadly in connection with or relating to this Agreement, including those relating to its validity, its construction or its enforceability, shall be first mandatorily submitted to mediation proceedings under the International Chamber of Commerce Mediation Rules ("*ICC Mediation Rules*"). If such dispute has not been settled within sixty (60) days after a Request for Mediation has been submitted under such ICC Mediation Rules, such dispute can be referred to and shall be exclusively and finally resolved by arbitration under the Rules of Arbitration of the International Chamber of Commerce *("ICC Arbitration Rules")*. The ICC Rules' Emergency Arbitrator provisions are excluded. The dispute shall be resolved by one (1) arbitrator to be appointed in accordance with the ICC Rules. The place of arbitration shall be Amsterdam, The Netherlands. The language of the arbitration shall be English. The existence and content of the mediation and arbitration proceedings, including documents and briefs submitted by the parties, correspondence from and to the ICC, correspondence from the mediator, and correspondence, orders and awards issued by the sole arbitrator, shall remain strictly confidential and shall not be disclosed to any third party without the express written consent from the other party unless: (i) the disclosure to the third party is reasonably required in the context of conducting the mediation or arbitration proceedings; and (ii) the third party agrees unconditionally in writing to be bound by the confidentiality obligation stipulated herein.

By clicking **"I accept"** or **signing below** , Driver-Partner expressly acknowledges that he or she: (i) has read and understood this Agreement; (ii) has had the opportunity to consult with others (including an attorney) regarding this Agreement; (iii) agrees to be bound by the terms and conditions of this Agreement; and (iv) is legally competent to enter into this Agreement.

**Driver-Partner
Signature:** _____

**Name:** _____

**Date:**
_____

ai/6022158_118

# Exhibit G

CONFIDENTIAL



CONFIDENTIAL

CONFIDENTIAL

تصريح مزاولة مهنة
**Practice permit**

هذه البطاقة ملك لهيئة الطرق والمواصلات ولا يجوز
رهنها أو استخدامها من قبل الآخرين.

This card is a property of the Roads and Transport
Authority and cannot be given to or used by
others.

الفئة المصرحة بقيادتها مرتبطة برخصة قيادة السائق
The authorized category is linked to the driver's
driving license.

| | | |
|---|---|---|
| تصريح مزاولة مهنة | | رمز المرور |
| Permit Number | | Traffic code |
| 2507476 | | 14847388 |

يعتبر التصريح لاغيا في حالة العمل لدى أية جهة
أخرى غير المصرح بها
The permit is void in case the bearer works for
any unspecified party.

يرجى ممن يعثر على البطاقة إعادتها إلى هيئة الطرق
والمواصلات أو الاتصال على8009090.
If found, please return the card to Roads
and Transport Authority or contact 8009090.

| | |
|---|---|
| تاريخ الانتهاء | تاريخ الإصدار |
| Expiry Date | Issue Date |
| 17-02-2024 | 17-02-2023 |

CONFIDENTIAL