1
RANDALL S. LUSKEY (SBN: 240915)
    rluskey@paulweiss.com
2 **PAUL, WEISS, RIFKIND, WHARTON**
    **& GARRISON LLP**
3 535 Mission Street, 24th Floor
San Francisco, CA 94105
4 Telephone: (628) 432-5100
Facsimile: (628) 232-3101
5
ROBERT ATKINS (*Pro Hac Vice* admitted)
6     ratkins@paulweiss.com
JACQUELINE P. RUBIN (*Pro Hac Vice* admitted)
7     jrubin@paulweiss.com
CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
8     cgrusauskas@paulweiss.com
ANDREA M. KELLER (*Pro Hac Vice* admitted)
9     akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
10     **& GARRISON LLP**
1285 Avenue of the Americas
11 New York, NY 10019
Telephone: (212) 373-3000
12 Facsimile: (212) 757-3990
13 *Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
14 RASIER, LLC, and RASIER-CA, LLC
15 *[Additional Counsel Listed on Following Page]*
16
17                 **UNITED STATES DISTRICT COURT**
18                 **NORTHERN DISTRICT OF CALIFORNIA**
19                 **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 20 IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>21<br>22<br>23 This Document Relates to:<br><br>24 *A.H.M.* v. *Uber Technologies, Inc.*, et al., 3:23-cv-03482-CRB<br>25<br>26 *R.T.* v. *Uber Technologies, Inc.*, et al., 3:23-cv-04301-CRB<br>27 | Case No. 3:23-md-03084-CRB<br><br>**DECLARATION OF ROBERT ATKINS IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S MOTION TO DISMISS PLAINTIFFS' MASTER LONG-FORM COMPLAINT PURSUANT TO NEW YORK LAW**<br><br>Judge:      Honorable Charles R. Breyer<br>Date:        TBD<br>Time:        TBD<br>Courtroom:  6 – 17th Floor |

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Jane Doe LS 231* v. *Uber Technologies, Inc.*, et al., 3:23-cv-04367-CRB

*Jane Doe LS 155* v. *Uber Technologies, Inc., et al.*, 3:23-cv-04374-CRB

*A.I.* v. *Uber Technologies, Inc., et al.*, 3:23-cv-04740-CRB

*E.E.* v. *Uber Technologies, Inc., et al.*, 3:23-cv-04744-CRB

*Jane Doe LS 66* v. *Uber Technologies, Inc., et al.*, 3:23-cv-05414-CRB

*L.E. v. Uber Technologies, Inc., et al.*, 3:23-cv-05567-CRB

*Jane Doe LS 302* v. *Uber Technologies, Inc.*, et al., 3:23-cv-05577-CRB

*S.E.* v. *Uber Technologies, Inc., et al.*, 3:23-cv-05869-CRB

*Moore* v. *Uber Technologies, Inc., et al.*, 3:24-cv-00482-CRB

*Gacovino* v. *Uber Technologies, Inc.*, et al.,  3:24-cv-00501-CRB

*Moye* v. *Uber Technologies, Inc., et al.*, 3:24-cv-00695-CRB

*M.C.* v. *Uber Technologies, Inc., et al.*, 3:24-cv-01347-CRB

*B.C.* v. *Uber Technologies, Inc., et al.*, 3:24-cv-01917-CRB

*S.M.* v. *Uber Technologies, Inc., et al.*, 3:24-cv-01920-CRB

- ii -

1

KYLE N. SMITH (*Pro Hac Vice* admitted)
    ksmith@paulweiss.com

2

JESSICA E. PHILLIPS (*Pro Hac Vice* admitted)
    jphillips@paulweiss.com

3

**PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP**

4

2001 K Street, NW
Washington DC, 20006

5

Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

6

7

*Attorney for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- iii -

**DECLARATION OF ROBERT ATKINS**

I, Robert Atkins, declare pursuant to 28 U.S.C. § 1746:

1.      I am an attorney at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys of record for Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC, (collectively, "Uber").   I respectfully submit this declaration in support of Uber's Motion to Dismiss Plaintiffs' Master Long-Form Complaint Pursuant to New York Law.   I know the following facts to be true of my own knowledge, and if called to testify, I could competently do so.

2.      Attached as **Exhibit 1** is a true and correct copy of the Consolidated Class Action Complaint filed on January 7, 2016 in *McKnight* v. *Uber Techs., Inc.*, No. 3:14-cv-05615-JST (ECF No. 67).

3.      Attached as **Exhibit 2** is a true and correct copy of the Amended Stipulation of Settlement filed on June 1, 2017 in *McKnight* v. *Uber Techs., Inc.*, No. 3:14-cv-05615-JST (ECF No. 125).

4.      Attached as **Exhibit 3** is a true and correct copy of the Mandate from the Ninth Circuit filed on December 22, 2022 in *McKnight* v. *Uber Techs., Inc.*, No. 3:14-cv-05615-JST (ECF No. 276).

5.      Attached as **Exhibit 4** is a true and correct copy of the Superior Court of California for the County of San Francisco's June 22, 2023 Order on Defendants Uber Technologies, Inc. and Rasier, LLC's Demurrer to Plaintiffs' Master Long-Form Complaint in *In Re: Uber Rideshare Cases*, No. CJC-005188.

6.      Attached as **Exhibit 5** is a chart listing cases filed by Plaintiffs whose alleged incidents occurred in New York (entries 1-16); the case number corresponding to each case; the U.S. District Court where each case was originally filed; and the date of each alleged incident.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.   Executed on April 1, 2024, in New York, New York.

_/s/ Robert Atkins_____
Robert Atkins

-1-

ATKINS DECLARATION IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO NEW YORK LAW              Case No. 3:23-md-03084-CRB

# EXHIBIT 1

ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
MEREDITH S. LIERZ, SBN 296650
mlierz@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
1016 Palm Ave.
West Hollywood, California 90069
Tel: 310-474-9111; Fax: 310-474-8585

*Attorneys for Plaintiffs*,
Julian Mena, Todd Schreiber, Nate Coolidge,
and Ernesto Mejia

MIKE ARIAS, SBN 115385
mike@asstlawyers.com
ALFREDO TORRIJOS, SBN 222458
alfredo@asstlawyers.com
**ARIAS, SANGUINETTI, STAHLE &
TORRIJOS, LLP**
6701 Center Drive West, Suite 1400
Los Angeles, California 90045-7504
Tel: 310-844-9696; Fax: 310-861-0168

*Attorneys for Plaintiffs*,
Matthew Philliben and Byron McKnight

STEVEN D. LIDDLE (admitted *pro hac vice*)
sliddle@ldclassaction.com
NICHOLAS A. COULSON (admitted *pro hac vice*)
ncoulson@ldclassaction.com
**LIDDLE & DUBIN, P.C.**
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015; Fax: 313-392-0025

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW PHILLIBEN, JULIAN MENA, TODD SCHREIBER, NATE COOLIDGE, ERNESTO MEJIA, and BYRON MCKNIGHT, individually and on behalf of all others similarly situated, | Case No. 3:14-cv-05615-JST |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | Honorable Jon S. Tigar, Presiding |
| v. | |
| UBER TECHNOLOGIES, INC., a Delaware Corporation, and RASIER, LLC, a Delaware Limited Liability Company, | JURY TRIAL DEMANDED |
| Defendants. | |

---

Plaintiffs Matthew Philliben, Julian Mena, Todd Schreiber, Nate Coolidge, Ernesto Mejia, and Byron McKnight ("Plaintiffs"), by and through their counsel, file this Consolidated Class Action Complaint against Uber Technologies, Inc. and Rasier, LLC (collectively "Defendants" or "Uber"), on behalf of themselves and on behalf of a class of similarly situated individuals, and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Defendants operate a "ride sharing" service, commonly known as "Uber," which provides transportation services to consumers in cities throughout the United States.  Uber operates its ride sharing service through a smartphone application (the "Uber App") that permits consumers to summon, arrange and pay for transportation services electronically via their smartphone.

2.      Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals who were subjected to certain of Uber's misstatements, misrepresentations, and/or misrepresentative advertising to consumers regarding its "Safe Rides Fee" and the nature and character of the background checks and safety measures conducted in association therewith.

3.      Uber offers a variety of rideshare options that are differentiated by the size and type of the vehicle and /or the number of riders; the options are or have been referred to as UberPool, UberX, UberXL, UberSelect, UberBlack, UberSUV, *etc.*  Uber charges different fares depending on the type of option a consumer orders.  For all of these options, Uber represents that all of its drivers are "thoroughly screened through a rigorous process we've developed using industry leading standards." Any person with a qualifying vehicle (usually later model vehicles) can apply and become a driver who provides transportation under a number of these options.

4.      When creating an account with Uber, consumers place a credit card, debit card or PayPal account on file with Uber, which eliminates the need for cash payments. When a consumer orders and/or completes an Uber ride, Uber obtains payment from that consumer's credit card, debit card or PayPal account, retains a portion for itself and pays the balance to the driver.

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

5.     For a number of these Uber ride options, Uber adds a charge, in the amount of at least one dollar, to every ride.  Uber represents that this charge supports its "industry leading" background check process and other alleged safety measures.  However, Uber's background check procedures and purported safety measures are woefully inadequate and fall well short of what is required of other commercial providers of transportation.

6.     Specifically, in April 2014, Uber began to charge all consumers who used certain Uber ride options, including their UberX or UberXL, an undisclosed, mandatory "Safe Rides Fee" ostensibly to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including an *industry-leading* background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app. . . ."

7.     Uber originally set the amount of the Safe Rides Fee at $1.00.  On or about October 2015, Uber raised the price of the Safe Rides Fee.  The fee now apparently varies by city.  For example, in San Francisco the Safe Rides Fee is now approximately $1.35, in Los Angeles it is approximately $1.65, in Detroit it is approximately $2.30, and in Boston it is approximately $1.15.

8.     Despite its statements, Uber does not and has never provided an "industry-leading background check process."  To the contrary, the background check process used by Uber does not use fingerprint identification and therefore cannot ensure that the information obtained from a background check actually pertains to the driver that submitted the information.  By contrast, taxi regulators in the most populous parts of the United States require drivers to undergo criminal background checks using fingerprint identification, usually employing a technology called "Live Scan."  Requiring fingerprints for background checks ensures that the person whose criminal history has been run is, in fact, the applicant – and is the industry leading background check process.

9.     Furthermore, revenue generated from the Safe Rides Fee is not used to provide "regular motor vehicle checks" for all vehicles operating on platforms that charge a Safe Rides Fee.  In some cases, Uber drivers pay for the annual inspection of their own vehicles.

10.     Revenue generated from the Safe Rides Fee is also not used to provide sufficient "driver safety education" for all Uber drivers.  Uber allegedly requires its drivers to participate in driver safety education, but this training, if any, is minimal.

2

11.     The safety features of the Uber App are also insufficient.  For example, in late December 2014, Uber made a single-page, pop-up "Safe Ride Checklist" available to consumers only in Chicago and Boston, and otherwise ignored the remainder of the United States.

12.     The revenue from the Safe Rides Fee exceeds the amount that Uber spends on "efforts to ensure the safest possible platform for Uber riders and drivers," if any, by a significant amount.  As a consequence, by assessing and charging consumers the Safe Rides Fee, Plaintiffs have been, and will continue to be, damaged.

13.     Uber's assessment of the Safe Rides Fee for services that it fails to provide, or that are funded by Uber drivers and not through the Safe Rides Fee, constitutes an unlawful and unfair business practice and breach of implied contract. Uber's assessment of an undisclosed fee likewise constitutes, among other things, an unlawful and unfair business practice.

14.     Uber's uniform conduct is equally applicable to the class.  Plaintiffs bring this class action against Uber for: (1) breach of implied contract; (2) violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) violations of the unlawful prong California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL");  (4) violations of the unfair prong of the UCL; (5) violations of California's False Advertising Law Cal. Bus. & Prof. Code § 17500, *et seq.* (the "FAL"); and (6) violations of the Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq.*  Plaintiffs seek an order requiring Uber to, among other things: (1) cease the false or misleading misstatements, misrepresentative advertising, or representations; (2) cease the unlawful assessment and collection of the Safe Rides Fee; (3) conduct a corrective advertising campaign; and (4) pay damages and restitution to Plaintiffs and Class members.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.  The number of members of the proposed class is in the aggregate greater than 100 and more than two-thirds of the class members reside in states other than the state in which Defendants are citizens.

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

16.     This Court has personal jurisdiction over Defendants because they are headquartered in San Francisco, California, they conduct business in California and a substantial portion of the acts complained of took place in San Francisco, California.

17.     Venue is proper in the Northern District of California (San Francisco Division) because Defendants are headquartered in this District, conduct business in this District and many of the acts complained of occurred in this District.

18.     Intra district Assignment: Pursuant to Civil Local Rules 3-2(c) a substantial part of the events or omissions giving rise to this action occurred in San Francisco County; therefore, it is appropriate to assign the action to the San Francisco Division.

19.     The wrongful practices alleged herein occurred or were conceived, reviewed, approved and otherwise controlled from Uber's headquarters in San Francisco, California.  The misrepresentations and omissions alleged herein were contained on and transmitted from Uber's website and smartphone application, which are maintained in California.  The transactions entered into by Plaintiffs and the class with Defendants utilized those platforms and their payments were processed by Defendants' California servers.

## **PARTIES**

20.     Plaintiff Matthew Philliben is an individual and a resident of Michigan.  Plaintiffs Byron McKnight and Julian Mena are individuals and residents of California.  Plaintiffs Todd Schreiber and Ernesto Mejia are individuals and residents of Illinois.  Plaintiff Nate Coolidge is an individual and a resident of Massachusetts.

21.     Defendant Uber Technologies, Inc. ("Uber") is a Delaware corporation with its principal place of business located in San Francisco, California.

22.     Defendant Rasier, LLC ("Rasier") is a Delaware Limited Liability Company and a subsidiary of Uber Technologies, Inc.

/ / /
/ / /
/ / /

4

## FACTUAL ALLEGATIONS

### Background

23.     Uber operates a "ride sharing" service, commonly known as "Uber," which provides transportation services to consumers in cities throughout the United States.  Defendants operate their ride sharing service through the Uber App.  The Uber App allows users to summon a vehicle to transport them much in the way a taxicab would.  Users download the Uber App, create an account, enter payment information, and are able to press a button to call for a ride.

24.     Payment for rides using the Uber App is automatic: the user must place a credit card, debit card or PayPal account on file through the Uber App before being allowed to obtain transportation.  At the end of the ride, Uber automatically charges the user's credit/debit card or PayPal account and the user is e-mailed a receipt for the transaction.  Uber retains a portion of every fare.

### Uber's Safety Representations

25.     Uber makes a number of representations in order to convey the message that Uber takes every measure possible to ensure the safety of its riders.

26.     Uber's "Safety" webpage (www.uber.com/safety) states: "Wherever you are around the world, Uber is committed to connecting you with the safest ride on the road."  "That means setting the strictest safety standards possible, then working hard to improve them every day.  The specifics vary, depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security - and what we're doing in the US is an example of our standards around the world."

27.     The "Safety" webpage also describes Uber's background checks.  Until on or about October 2014, beneath a headline of "BACKGROUND CHECKS YOU CAN TRUST," Uber stated: "Every . . . driver is thoroughly screened through a rigorous process we've developed using industry-leading standards.  This includes a three-step criminal background screening for the U.S. - with county, federal and multi-state checks that go back as far as the law allows - and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

28.     On or about November 2014, the words "industry-leading" on Uber's "Safety" webpage were changed to "constantly improving."

29.     A link entitled "read more" beneath the section on background checks previously took users to a blog post dated April 25, 2014 (http://blog.uber.com/driverscreening) attributed to Lane Kasselman, Uber's Head of Communications for the Americas (the post has since been removed). Until at least December 2014, that page stated that "Uber ridesharing and livery partners must go through a rigorous background check that leads the industry." Moreover, even though the phrase "leads the industry" was no longer present, at least as of December 2014, Uber still maintained that its background checks "are often more rigorous than what is required to become a taxi driver."

30.     In June 2014, Lane Kasselman was quoted in NBCBayArea.com news as stating: "We're confident that every ride on the Uber platform is safer than a taxi." (http://www.nbcbayarea.com/investigations/SF-DA-Wants-Stricter-Rules-for-Rideshare-Companies-261754071.html).

31.     As of May 2015, the opening section of the Lane Kasselman blog post stated: "All Uber ridesharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard. These checks go back 7 years, the maximum allowable by the Fair Credit Reporting Act. We apply this comprehensive and new industry standard consistently across all Uber products, including UberX. Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver . . . . Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers, and cities are just the beginning. We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road." Uber also advertises that it "is committed to setting the bar for safety and continuing to raise it," that the ride sharing application leads to "Safe Rides, Safer Cities," and allows for "Safe Pickups . . . . No more waiting alone on a dark street hoping you can hail a taxi."

32.     Uber has also represented that it has "Background Checks that Exceed any Local or National Standard."

33.     Throughout all of its representations to its customers and would-be customers, Uber reinforces the message that Uber's platform does everything possible to ensure rider safety.  For example, Uber states under the heading of "RIDER SAFETY":

        a.     "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind;"

        b.     "We believe deeply that, alongside our driver partners, we have built the safest transportation option in 260 cities around the world;"

        c.     "From before the start of your trip until after it's finished, safety is built into every step of the Uber experience;" and

        d.     "Of course, no background check can predict future behavior and no technology can yet prevent bad actions.  But our responsibility is to leverage every smart tool at our disposal to set the highest standard in safety we can.  We will not shy away from this task."

34.     Such safety related representation and statements are false and/or misleading.

35.     Uber has also misrepresented the scope of its background check process.  For example, in a blog entitled "Details on Safety" ("Joe Sullivan Blog") Uber's Joe Sullivan falsely represents that:

        a.     Uber's background checks go back "the maximum allowable by the Fair Credit Reporting Act;"

        b.     Uber checks the National Sex Offender Registry and disqualifies applicants who appear on the Registry; and

        c.     "Verifying potential criminal records at the source - the courthouse records - helps ensure the records match the identity of the potential driver."

36.     The Joe Sullivan Blog also misstates that California law limits private background check companies to a "lookback" period of seven years, and that this period of time "strikes the right balance between protecting the public while also giving ex-offenders the chance to work and rehabilitate themselves."

37.     Uber does not check the National Sex Offender Registry, and therefore Uber's claims that it "prohibits drug or alcohol offenses, severe traffic violations, and sexual offenses" and that its background check process includes a "lifetime" disqualification for sex offenders are false or misleading.  Uber further misleads the public when it states that the Live Scan process flags innocent people and impacts minorities in particular.

38.     Uber has made numerous other false or misleading statements regarding its safety.  For example, Uber falsely claims that its safety measures "always exceed what is required of local taxi companies" and that its background check is better than the FBI fingerprint check and Live Scan.[1]

39.     Uber's representations and statements regarding the safety features of the Uber service impact consumers' decisions to use the Uber App and any of Uber ride options since Uber does not differentiate between different service options when making safety related representations such as Uber has the "safest rides on the road" or it employs "industry leading" background checks.

40.     Uber has consistently opposed and resisted the various state and local regulations regarding safety which are applied to other transportation services, such as taxis and other commercial car service companies.

### The Safe Rides Fee

41.     Uber reinforces the message about its efforts to ensure customer safety and the quality of its background checks when it charges customers on certain of its ride options, such as UberX, a "Safe Rides Fee," which is depicted on the rider's electronic receipt that is sent by Uber after the ride is completed.  Next to the phrase "Safe Rides Fee" is a link to a webpage with a purported explanation of the fee.  The link appears in the form of a small question mark.

---

[1]     Live Scan fingerprinting refers to both the technique and the technology used by law enforcement agencies and private facilities to capture fingerprints and palm prints electronically, without the need for the more traditional method of ink and paper.  In the United States, most law enforcement agencies use live Scan as their primary tool in the recognition of human individuals. Live Scan is commonly used for criminal booking, sexual offender registration, civil applicant and background check. Live Scan results can be verified and returned to the source within 72 hours of transmission.

8

42.     Through October, 2014, the "question mark" hyperlink connected to a webpage which stated that the Safe Rides Fee was used to support, among other things, "an industry-leading background check process."

43.     On or about October 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check process."  As of December 2014, however, the page continued to state that the fee "supports continued efforts to ensure the safest possible platform for Uber riders and drivers . . . ."

44.     On or about November 1, 2015, Uber changed the description on this webpage to read "The Safe Rides Fee supports the operation of the Uber platform, including a background check process, development of safety features in the app, incident response, and other operational costs."

45.     The aforementioned representations made by Uber are false and/or misleading.  These representations are likely to mislead consumers into the belief that Uber takes exhaustive safety precautions, when the background check process that Uber describes as "industry-leading" and "more rigorous than what is required to become a taxi driver" does not even take steps to ensure that applicants are who they represent themselves to be.

46.     Unlike many background checks, Uber's process does not utilize fingerprints or even require the applicant to appear in person.  Uber simply requires applicants to submit information such as name, address, driver's license number, and social security number through a webpage.  Uber then provides this information to third party companies such as Hirease, Inc. and/or Checkr, who actually perform the background checks.  Thus, because Uber does not obtain any unique identifying information, such as a fingerprint, companies such as Hirease provide a disclaimer with each back ground check stating that "[f]inal verification of an individual's identity and proper use of report contents are the user's responsibility."

47.     Thus, Uber never verifies the actual driver's true identity.

48.     In contrast, most commercial car services, such as taxis, require and employ a fingerprint identification technology such as Live Scan, which ensures that the person who is applying to be a driver is actually who he or she claims to be.  Indeed, Hirease, one of Uber's third party background check providers during the relevant period, touts the superiority of fingerprint-based

background checks, stating: "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."

49.     Uber's statements and representations concerning its background checks are false and/or misleading.  For example, Uber's background checks do not lead the industry and are not more rigorous than what is required to become a taxi driver.

50.     While disseminating such false and misleading representations, Uber has steadfastly resisted any attempts by regulators to subject Uber drivers to the same types of background checks undergone by other commercial providers of transportation.  For example, the New York Times documented Uber's "aggressive" efforts to fight background check legislation "in statehouses across the country."  (http://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-driverscomes-under-scrutiny.html?ref=technology).

51.     Uber's other "safety" measures also fall well short of established industry standards.  For example, Uber does not verify the actual identity of the driver and instead of performing actual inspections of drivers' vehicles, Uber allows drivers to simply send photographs of the vehicles and the inspection form to the company.

52.     Uber's driver training is also substandard.  Uber drivers receive minimal – if any – training on safe driving and are never subjected to any review by Uber as to the standards of their driving.

53.     Uber has also disseminated misleading statements about its background checks in response to a series of incidents involving its drivers.[2]

---

[2]     On or about February 12, 2014, it was reported that Uber was expanding its background checks after a series of incidents, including where an Uber driver, with a previous reckless driving conviction, hit and killed a six-year-old girl, and another where an Uber driver with a felony record assaulted a passenger. (http://blog.sfgate.com/techchron/2014/02/12/uber-to-vet-drivers-more-thoroughly/).  Uber issued a statement on its blog in which it expressed its commitment "to improving the already best in class safety and accountability of the Uber platform."  These "expanded" background checks remained below industry standards, despite Uber's statements to the contrary.

An investigation by NBC's Detroit affiliate reported that Uber hired a woman on probation for burglary and assault after she completed Uber's online application.  Also, a number of local Uber drivers had questionable driving records, including suspended licenses, speeding tickets, citations for

*Uber Charges A Safe Rides Fee Ostensibly To Provide "Industry-Leading Background Checks"*

*And Other Safety-Related Services For The Benefit Of Consumers*

54.     On or about April 2014, Uber began to charge consumers of some of its Uber service options, such as UberX, a mandatory "Safe Rides Fee."  This fee was originally $1, and now varies by city, sometimes exceeding $2.

55.     Uber did not clearly and conspicuously disclose, if at all, the Safe Rides Fee to consumers.  For example, the Safe Rides Fee is not disclosed when consumers obtain a "Fare Estimate."



_____

no proof of insurance, and driving vehicles registered to other people.  In response, an Uber spokesperson issued a statement claiming that Uber "work(s) every day to connect riders with the safest rides on the road and go above and beyond local requirements in every city we operate.  Uber only partners with drivers who pass an industry-leading screening that includes a criminal background check at the county, federal and multi-state level going back as far as the law allows. . . . For more information on what makes Uber the safest rides on the road, please see our website: https://www.uber.com/safety." (http://www.clickondetroit.com/news/local-4-defenders-is-uberx-safe/26944252).

      In an April 29, 2014 article describing Uber drivers with criminal backgrounds, including one on probation for nearly beating a woman to death, and another with a 2012 DUI conviction who had been accused of sexually assaulting a passenger, Lane Kasselman is quoted as telling the author by e-mail "Uber's industry-leading background checks help connect consumers with the safest ride on the road. . . . Our driver partner background checks are more thorough than those of taxi in most cities . . . We continue to improve and are always working hard to tighten our policies and processes to ensure that Uber remains the safest transportation option available." (http://mashable.com/2014/04/29/uberxpassengers-risk/).

56.     The Uber App's Fare Estimate feature expressly states that the estimate "does not include discounts or promotions" but does not disclose or in any way refer to the Safe Rides Fee.

57.     Instead, before a consumer requests that an Uber driver pick the consumer up, the Safe Rides Fee is only disclosed to a consumer on the Uber App if the consumer pushes the uberXL, uberX or PLUS (*etc.*) symbols to trigger a pop-up screen that discloses the Safe Rides Fee as follows:

  

58.     After a ride has been completed, the Safe Rides Fee is separately itemized on an electronic receipt sent to the customer via the Uber App and email.  Next to the words "Safe Rides Fee" on the receipt is a question mark that hyperlinks to an explanation of the Safe Rides Fee (as described above)**.**



59.     However, several Plaintiffs never saw or relied on the hyperlink that appears on the electronic receipts.  Because Plaintiffs and Class members receive and review Uber's electronic receipt on their mobile phones, the miniscule size of the font and light grey color used by Uber to itemize the Safe Rides Fee is so small that it is virtually illegible to many consumers without a magnifying glass, as is evident from the following screen shot which is equivalent in size to the screen of an iPhone 5s.

60.     In addition, charging the Safe Rides Fee as a separate line item is itself misleading because it bolsters consumers' expectations that they should be receiving the safest ride possible and that Uber does everything it can to ensure this.



61.     Beginning with Uber's April 2014 introduction of the Safe Rides Fee and continuing through October 2014, Uber explained that the Safe Rides Fee was assessed to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, [and] development of safety features in the app . . . ."

62.     On or about April 24, 2014, Uber explained the Safe Rides Fee on its website as follows:[3]

## What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road. Our new Safe Rides Fee is a $1 fee added to uberX fares in United States cities with uberX ridesharing. This Safe Rides Fee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

63.     On or about October 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check."  Uber also changed the words "and insurance" to "and more."  As of January 2015, Uber explained the Safe Rides Fee as follows:[4]

## What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road.  The Safe Rides Fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD.

---

[3]     *See* http://web.archive.org/web/20140424014638/http://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).
[4]     *See* https://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

14

1    In addition, Uber advised consumers that "The Safe Rides Fee is a fee added to uberX fares on

2    behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing."[5]  However, Uber

3    advises its drivers that Uber retains the Safe Rides Fee entirely: "Rider fees are fees charged to the

4    rider by Uber directly.  They include the *safe rides fee*, airport tolls, and fare split fees, if applicable.

5    *Uber receives rider fees in full*."[6]

6    64.    Uber continues to charge the Safe Rides Fee purportedly to support "continued efforts

7    to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local

8    background check process, regular motor vehicle checks, driver safety education, development of

9    safety features in the app, and more."[7]

10    ***Uber Does Not Provide Or Pay For "Industry Leading" Background Checks***

11    65.    Uber does not, and has never, provided consumers with an "industry-leading"

12    background check process.

13    66.    To the contrary, Uber's background check process does not use fingerprint

14    identification and therefore cannot ensure that the information obtained from a background check

15    actually pertains to the Uber driver that submitted the information.

16    67.    Instead of using fingerprints, Uber's background check process relies upon drivers to

17    submit personal identifiers (name, address, driver's license number and state, and social security

18    number) through an online webpage.  Uber, in turn, provides this information to third parties, such as

19    Hirease, Inc. and/or Checkr, to perform the background checks.

20    68.    This process cannot ensure that the information in the background check report is

21    actually associated with the applicant since it does not use a unique biometric identifier such as a

22    fingerprint.  In fact, the sample report Hirease posts on its website has a disclaimer stating, "Final

23    verification of an individual's identity and proper use of report contents are the user's responsibility."[8]

24    _____

25    [5]    *See id.*

26    [6]    *See* http://uberwest.weebly.com/payment-statements.html (last visited Jan. 6, 2015).

27    [7]    *See* Uber App, "What is the Safe Rides Fee?"; see also https://support.uber.com/hc/enus/
      articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

28    [8]    *See* http://cdn2.hubspot.net/hub/212230/file-417622326-pdf/docs/Sample_report.pdf?t=
      1408638373271 (last visited Jan. 6, 2015).

69.     Uber does not employ Live Scan, which is employed by many commercial car service regulators, such as taxis, to perform criminal background checks with scanned fingerprint identification.  Live Scan fingerprinting in California, for example, occurs at a facility designated by the California Department of Justice.  The fingerprints allow a biometric search of the California Department of Justice's criminal history databases and the option to obtain a search of the Federal Bureau of Investigation's database of multistate criminal history information.  The process of using a biometric identifier to search government databases is the gold or leading standard for a background check process.

70.     Because of the unique identifying characteristics of fingerprints, the Live Scan Process provides assurance that the person whose criminal history has been run is, in fact, the applicant.  This would ensure that a registered sex offender could not use his law-abiding brother's identification information to become an Uber driver.  It would also ensure that a convicted burglar could not borrow his cousin's identification information to become an Uber driver in order to case the empty homes of customers he takes to the airport.

71.     Uber's background check process does not provide the level of security provided by the fingerprint-based Live Scan Process employed for performing background checks on commercial and taxi drivers in the most populous cities of the United States.

72.     Notably, as reported by the New York Times, while touting its "industry leading" background checks and collecting the Safe Rides Fee from consumers, "in statehouses across the country, Uber has fought against legislation requiring background checks as strong as those demanded of traditional taxis."[9]  "In Colorado, the company helped persuade lawmakers to ease drivers' background checks in a bill that legalized ride-sharing companies.  In Illinois, after a lobbying push, Gov. Pat Quinn vetoed a bill that would have forced Uber to strengthen those checks.  And in California, Uber and other companies like it helped kill a law that would have required drivers to undergo a background check by the state's Justice Department, as is required of taxi drivers."[10]

---

[9]     *See* http://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comesunder-scrutiny.html (last visited Jan. 6, 2015).
[10]    *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

### *Uber's Failure To Provide Industry Leading Background Allows Drivers With Criminal Records To Become Uber Drivers*

73.     In January 2014, in an article entitled "Uber driver accused of assault had done prison time for a felony, passed background check anyways," online news site PandoDaily.com reported that an Uber driver in San Francisco, who had been accused of verbally and physically assaulting a passenger, had passed Uber's background check even though he had a significant criminal history – including felony and misdemeanor charges, and at least one felony conviction involving prison time – that should have disqualified him from becoming an Uber driver.[11]  In June 2014, Forbes.com reported that the driver had been on probation for a battery conviction when Uber hired him in October 2013. Uber claimed that the driver "had a clean background check in October."

74.     On December 31, 2013, an Uber driver struck and killed a six-year-old girl while driving in San Francisco.[12]  The San Francisco Business Times subsequently reported that the driver had been convicted of reckless driving in Florida in September of 2004.[13]

75.     In February 2014, the Chicago Tribune reported that a 24-year-old Uber driver had a felony conviction for residential burglary in 2010, a misdemeanor conviction for criminal damage to property in 2009, and another misdemeanor conviction in 2008 for breaking into a car to steal a GPS and satellite radio receiver.[14]  The same Uber driver had received numerous speeding tickets and had his driving license suspended twice in 2008.  In response, Uber posted an apology on its website: "[W]e have already taken steps to prevent this from happening again, by expanding our background check process to set new industry-leading standards. . . . We are sincerely sorry for this error, and want to assure all riders that we are taking the necessary steps to fix it and build the safest option for

---

[11]     *See* http://pando.com/2014/01/06/exclusive-uber-driver-accused-of-assault-passed-zero-tolerancebackground-check-despite-criminal-history/ (last visited Jan. 6, 2015).
[12]     *See* http://www.latimes.com/local/lanow/la-me-ln-uber-driver-girl-dead-20141209-story.html (last visited Jan. 6, 2015).
[13]     *See* http://www.bizjournals.com/sanfrancisco/blog/2014/01/uber-uberx-sofia-liu.html?page=all (last visited Jan. 6, 2015).
[14]     *See* http://articles.chicagotribune.com/2014-02-14/news/ct-rideshare-background-checks-met-20140214_1_background-checks-ride-sharing-drivers (last visited Jan. 6, 2015).

17

consumers."

76.     Two months later, on April 24, 2014, an NBC television affiliate in Los Angeles aired an investigative report about Uber's driver background checks in which the station enlisted a woman to apply to become an Uber driver.[15]   She was on felony probation for making criminal threats (willfully threatening to commit a crime which will result in death or great bodily injury to another person), and during the broadcast described the conduct leading to her arrest: "I pulled a girl out of a car and almost beat her to death."   On March 3, 2014, Uber sent the woman an email notifying her that she passed her background check.   According to the NBC report, Uber would not respond to the station's request for comment about this case.   Instead, Uber spokesperson Lane Kasselman sent an email explaining Uber's background screening policy.   The email ended with, "We're confident that every ride on Uber is safer than a taxi."

77.     On November 17, 2014, as reported by the Chicago Sun Times, an Uber driver allegedly drove an inebriated passenger to his apartment on Chicago's Northwest Side, raped her and then told her, "I made you happy."[16]

78.     On December 17, 2014, the Boston Globe reported that an Uber driver pleaded not guilty to charges of rape, assault to rape, kidnapping, and two counts of assault and battery following the Uber driver's violent assault against a young female Uber customer.[17]   Uber confirmed that the alleged rapist had passed Uber's background check.   In the same article, the Boston Globe reported that two additional women in the Boston area had reported indecent assaults by an Uber driver on a single day in December 2014.

/ / /

/ / /

/ / /

---

[15]     *See* http://www.nbclosangeles.com/news/local/Risky-Ride-Uber-Investigation-256604571.html (last visited Jan. 6, 2015).

[16]     *See* http://chicago.suntimes.com/news-chicago/7/71/247604/will-ubering-anybody-judge-saysdriver-charged-raping-woman (last visited Jan 6, 2015).

[17]     *See* http://www.bostonglobe.com/metro/2014/12/17/uber-driver-accused-rape-kidnappingcustomer/KYnOQczKFqggfbnri2FpGL/story.html (last visited Jan 6, 2015).

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

*Uber Does Not Pay For The Other Safety-Related Services*

*It Claims Are Supported By The Safe Rides Fee*

79.     Upon information and belief, Uber does not use enough of the revenue it generates from the Safe Rides Fee to provide for "regular motor vehicle checks" and "driver safety education."

80.     Uber does not use enough of the Safe Rides Fee for "regular motor vehicle checks" of Uber drivers' vehicles.  Many Uber drivers pay for the annual inspection of their own vehicles.  By way of example, the list of potential inspection locations available to Uber drivers in California includes numerous repair shops that offer inspections for a fee that averages approximately $20.[18] Because many Uber drivers had difficulty scheduling an inspection in 2014, Uber partnered "with YourMechanic.com" to provide Uber drivers with the opportunity to have a mechanic "come to you (usually your home address) at a time of your choosing . . . [to] . . . complete an on-site Uber vehicle inspection AND oil change for $50."[19]  Some Uber drivers are offered free inspections provided they spend a set amount in repairs.

81.     Uber does not use enough of the Safe Rides Fee to provide Uber drivers with "driver safety education."  Uber only requires Uber drivers to participate in minimal mandatory driver safety education.  Uber also advises Uber drivers that if they want to learn how to be good drivers, they can pay anywhere from $40 to $65 for a class that will provide "detailed reviews" of a particular city's "neighborhoods and key routes, as well as driver professionalism tips and basic safety concepts for commercial drivers."

/ / /

/ / /

/ / /

---

[18]     *See* http://uberwest.weebly.com/vehicle-inspection.html (last visited Jan 6, 2015); see also http://www.weebly.com/uploads/2/8/4/2/28420371/ca_inspection_locations_september_2014.pdf (last visited Jan. 6, 2015).

[19]     *See* http://uberwest.weebly.com/vehicle-inspection.html (last visited Jan. 6, 2015).

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

82.     For example, in Washington, D.C., Uber drivers are offered the following "training class."[20]

## WASHINGTON DC DRIVER TRAINING CLASS

The Driver Training Class given by 7x7 Executive Transportation introduces beginning and experienced Uber partners to lessons and techniques designed to improve their driving and customer service skills. Lecture topics include detailed reviews of Washington DC neighborhoods and key routes, as well as driver professionalism tips and basic safety concepts for commercial drivers. Class discussion on each of these topics is encouraged, and another module includes discussion of common customer service issues and how to address them. A major focus of the class is how drivers can improve their ratings from Uber users. The class lectures are supplemented by video clips, map displays, white board drawings, written course materials as well as a final exam.

All classes are held at the University of Phoenix. University of Phoenix is a trade name and registered trademark of the Apollo Education Group, Inc. Any use by 7x7 Executive Transportation to identify the event location is not intended to imply affiliation with, sponsorship or endorsement of the event by The University of Phoenix, Inc. or Apollo Education Group, Inc.

The address for the class is 25 Massachusetts Ave NW, Washington, DC 20001.  The nearest Metro station is Union Station.  Free parking is available by validation if you park in the garage in the basement of 25 Massachusetts Ave NW. (Validation is availabe ONLY from the Instructor and is not available for any other parking location.)  Go to the elevator lobby and you will be directed to the University of Phoenix lobby area and from there information on the classroom number will be available.  PLEASE DO NOT GO TO THE UNIVERSITY OF PHOENIX EXCEPT ON THE DAY OF YOUR CLASS. THERE WILL BE NO ONE THERE FROM 7X7 TO HELP YOU. IF YOU NEED TO CONTACT US, PLEASE USE THE CONTACT INFORMATION AT THE BOTTOM OF THIS WEB PAGE.

The class will start on time. Please arrive 15 minutes early to allow time for registration. If you are more than 10 minutes late for the class you will not be able to come in and will need to sign up for another class. You must pay for the class online using a major credit card. We will accept Visa, Master Card, American Express, and Discover. Please follow the prompt after signing up to pay now. Please dress professionally as if you are working and bring your personal phone (NOT Uber phone) with you.

## CLICK ON A DATE IN THE CALENDAR BELOW:

| Choose Appointment | Your Info | Confirmation |

Returning? Log in

7x7 Washington DC Driver Training Class
4 hours @ $65.00

83.     In an October 10, 2014 article entitled "Uber Skimps On Driver Training, Then Charges Drivers $65 For Basic Driver Skills Course," Forbes reported that new Uber drivers are not required to engage in any safety training whatsoever:

> When Michael Coe, 38, signed up to be an Uber driver in Washington, D.C. a few weeks ago, he was shocked to find that once his driver's license and identity paperwork had cleared, he was asked to come in to pick up a phone — then put on the road with no training except a 13- minute video on how to use the Uber app. "When I got to one of the onboarding sessions at a local hotel, it was like, 'Here's your papers, go to the other room, get your phone, and great — get on the road and drive,'" Coe told Forbes. No one from Uber had more than a passing conversation with him before he was set to give what the company calls "the world's safest, most reliable ride." Uber never looked at his car either, though he did have to provide proof of a recent Virginia state car inspection."[21]

---

[20]    *See* https://dctraining.7x7executive.com/ (last visited Jan. 6, 2015).

[21]    *See* http://www.forbes.com/sites/ellenhuet/2014/10/08/uber-skimps-on-driver-training-then-chargesdrivers-65-for-basic-driver-skills-course (last visited Jan. 6, 2015).

84.     Upon information and belief, Uber has not used enough of the revenue generated by the Safe Rides Fee for the "development of safety features in the app."

85.     Since the April 2014 introduction of the Safe Rides Fee, Uber has not introduced *any* city-specific safety features for the Uber App in most locations where it operates.

86.     In late December 2014, Uber made a "Safe Ride Checklist" available only to Uber App users in Chicago and Boston in response to high-profile sexual assault accusations against Uber drivers in those two cities.  An Uber driver in each city was charged in December 2014 with raping a female customer.[22]

87.     The Safe Ride Checklist available in Chicago and Boston is a relatively straightforward, single page that recommends that passengers confirm they're getting in the right car and that the in-app driver photo matches up:



---

[22]     *See* http://chicago.suntimes.com/news-chicago/7/71/251756/uber-adds-safety-checklist-app-driverscharged-sex-assault (last visited Jan. 6, 2015).

88.     Although Uber charged and collected the Safe Rides Fee from consumers throughout the United States, it has not made the "safe ride checklist" – such as it is – available to Uber App users throughout the United States.[23]  Consumers in cities other than Chicago and Boston have, thus, received no benefit whatsoever from Uber's development of this Uber App so-called safety feature.

***The Safe Rides Fee Is A Profit Center For Uber, Not A Genuine Fee Used To Obtain Background Checks And Fund Other Programs That Benefit Consumer Safety***

89.     Upon information and belief, Uber generates far more revenue from the assessment and collection of the Safe Rides Fee than it spends on effective efforts to provide safe rides for the consumers that pay the Safe Rides Fee.  To the extent Uber believes that its spends money collected from Safe Rides Fees on valid expenditures, such expenditures are not adequately disclosed or appropriate.

90.     As of 2013, Uber was estimated to provide 800,000 completed rides per week.[24]  Of that amount, approximately 528,000 of the completed rides are UberX rides.  Thus, for a one-year period Uber provided approximately 27,456,000 completed rides.  Given that Defendants charge the Safe Rides Fee for each of those 27,456,000 completed rides, Uber's imposition of the Safe Rides Fee generated $27,456,000 in annual revenue (at $1 per Safe Rides Fee).  Since 2013, Uber has experienced rapid growth and the number of rides and Safe Rides Fees generated have increased dramatically.

91.     Upon information and belief, Defendants spend significantly less on background checks than they collect in Safe Rides Fees.

***Uber's Download and Registration Process Obscures its Unconscionable Terms & Conditions***

92.     Plaintiff Philliben downloaded the Uber App and created an Uber account in approximately August 2014.  Plaintiff McKnight downloaded the Uber App and created an Uber account in approximately late 2013 or early 2014.  Plaintiff Julian Mena downloaded the Uber App

---

[23]     *See* http://www.vocativ.com/money/business/ubers-rape-chicago/ (last visited Jan. 6, 2015).

[24] *See* Leaked: Uber's Internal Revenue and Ride Request Numbers, available at http://valleywag.gawker.com/leaked-ubers-internal-revenue-and-ride-request-number-1475924182 (last visited Jan. 6, 2015).

and created an Uber account in approximately October 2013.  Plaintiff Todd Schreiber downloaded the Uber App and created an Uber account in approximately May 2014.  Plaintiff Nate Coolidge downloaded the Uber App and created an Uber account in approximately February 2014.  Plaintiff Ernesto Mejia downloaded the Uber App and created an Uber account in approximately October 2014.

93.     Plaintiffs followed the registration process for creating an account.  This process is conducted within the app itself, on the screen of the smartphone.

94.     During the registration process, an electronic keyboard obscures the lower portion of the screen as information is inputted into the required fields for registration: email address, mobile telephone number, password, name, and credit card payment information.

95.     Throughout the registration process, the lower half of the screen remains obscured by the electronic keyboard.

96.     At the last step of the process, the app displays a screen on which a hyperlink to Uber's "Terms & Conditions and Privacy Policy" appears at the bottom.

97.     At no step during the registration process were the "Terms & Conditions" or "Privacy Policy" displayed to Plaintiffs.

98.     Uber's registration process never required Plaintiffs to access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

99.     Each new Uber user must register and create an Uber account using the same steps and viewing the same screens as Plaintiffs.

100.    Uber's un-displayed and inconspicuously linked "Terms & Conditions" are unconscionably one-sided and purport to contract away all possible legal obligations from Uber to its riders, including any obligation to provide a safe vehicle, or a safe driver, all while retaining its right to payment regardless of whether a given ride is even completed.

101.    Uber's "Terms & Conditions" contain a complete disclaimer of warranties, which disavows substantially every basis upon which a reasonable user would rely in using the app and Uber's service:

> The company makes no representation, warranty, or guaranty on the reliability, timeliness, quality, suitability, availability, accuracy, or completeness of the service or         application... The service and

23

> application is provided to you strictly on an "as is" basis. All conditions,
> representations and warranties, whether express, implied, statutory or
> otherwise, including, without limitation, any implied warranty of
> merchantability, fitness for a particular purpose, or non-infringement of
> third party rights, are disclaimed to the maximum extent permitted by
> applicable law . . . .
> You acknowledge and agree that the entire risk arising out of your use of
> the application and service, and any third party services or products
> remains solely with you, to the maximum extent permitted by law.

102.    Uber's "Terms & Conditions" contain a "no refund" policy, which applies to "[a]ny fees that the Company may charge you . . . ." This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, or any reason whatsoever."

103.    Uber's "Terms & Conditions" contain a complete Liability Disclaimer, wherein Uber purports to absolve itself of any and all liability that may arise out of the use of its app or service.

104.    Despite Uber's representations about safety, Uber disclaims "any and all liability . . . in any way related to the third party transportation provider . . ."

105.    Despite its representations about its background check process, Uber disclaims any responsibility to "assess the suitability, legality or ability of any" of its drivers.

106.    Uber disavows any responsibility for the rider's safety. "You understand, therefore, that by using the application and the service, you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or otherwise objectionable, and that you use the application and the service at your own risk."

107.    One of Uber's more controversial practices is to charge "surge pricing," wherein fees for transportation rise significantly during times of higher demand. In contrast to its inconspicuous link to its "Terms & Conditions", Uber goes out of its way to ensure that it has the customer's informed consent before charging such prices. In contrast to the Safe Rides Fee, Uber conspicuously discloses the amount of the surcharge, and requires the customer to type the surcharge into a separate field, ensuring that the customer is expressly consenting to the fee.

108.    Uber's purpose for this process is to ensure that the terms of its surge pricing are "clear and straightforward" such that its customers "won't be surprised" by the terms of the contract.

---

24

*Plaintiffs' Transportation*

109.    On or about October 11, 2014, Plaintiff Philliben used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff Philliben paid $18.52 for the trip, including the $1.00 Safe Rides Fee.  Plaintiff Philliben has subsequently used other Uber ride options.

110.    On or about May 20, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $10.56 for the trip, including the $1.00 Safe Rides Fee.  On May 20, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $10.56 for the trip, including the $1.00 Safe Rides Fee.  On September 30, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $13.14 for the trip, including the $1.00 Safe Rides Fee.  On October 1, 2014, Plaintiff McKnight used the Uber App to obtain UberX transportation; as reflected on his electronic receipt, Plaintiff McKnight paid $14.17 for the trip, including the $1.00 Safe Rides Fee.  Plaintiff McKnight has subsequently used other Uber ride options.

111.    Uber did not disclose the Safe Rides Fee to Plaintiffs Philliben and McKnight before they paid for their rides and they were not aware of the Safe Rides Fee.

112.    Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiffs Philliben and McKnight before they paid for their rides.

113.    Plaintiffs Philliben and McKnight did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts they received following each UberX ride.

114.    On or about October 13, 2013, Plaintiff Mena used his iPhone 4 to download the Uber App.  Plaintiff Mena used the Uber App on his iPhone 4 to obtain an Uber account. Plaintiff Mena did not see Uber's Terms and Conditions at the time that he obtained his account.

115.    After he had used the Uber App to obtain an Uber Account, Plaintiff Mena received an email from Uber with the subject line "Welcome to Uber!" (the "Welcome Email.")  The Welcome Email included several representations, including the following:

•    Just request a pickup, and in minutes a car will be curbside and ready to take you wherever you need to go.

25

- • Order a Car: Use the iPhone or Android app, or visit m.uber.com to request a ride.
- • Your Driver Comes to You: Sit back and relax. We'll text you when your Uber arrives.
- • Hop in & Hop out: After arriving at your destination, we'll charge your credit card on file and email you a receipt.

116.   The Welcome Email also represented that Plaintiff Mena could obtain a "fare estimate" as follows: "You can get a fare estimate for your trip right in the app by following the instructions at t.uber.com/fare estimate."

117.   The Welcome Email did not disclose that Uber would charge Plaintiff Mena's credit card for any fees, including the Safe Rides Fee.

118.   Plaintiff Mena relied on the representations and omissions in the Welcome Email.

119.   Plaintiff Mena used the Uber App to obtain UberX transportation on numerous occasions before and after the Safe Rides Fee was implemented.

120.   For example, on May 6, 2014, Plaintiff Mena used the Uber App to obtain UberX transportation. Defendants did not disclose the Safe Rides Fee to Plaintiff Mena before he paid for the ride and Plaintiff Mena was not aware of the Safe Rides Fee.  As reflected on his electronic receipt, however, Plaintiff Mena paid $7.63 for the trip, which included the $1.00 Safe Rides Fee.  Plaintiff Mena has subsequently used other Uber ride options.

121.   Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Mena before he paid for the ride, and Plaintiff Mena was not aware of the Safe Rides Fee.

122.   Plaintiff Mena did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

123.   On or about May 11, 2014, Plaintiff Schreiber used his Samsung Galaxy S4 to download the Uber App.  Plaintiff Schreiber used the Uber App to obtain an Uber account.  Plaintiff Schreiber did not see Uber's Terms and Conditions at the time that he obtained his account.

124.   Following Defendants' April 2014 introduction of the Safe Rides Fee, Plaintiff Schreiber used the Uber App to obtain UberX transportation on numerous occasions.

125.   For example, on October 24, 2014, Plaintiff Schreiber used the Uber App to obtain UberX transportation.  Uber did not disclose the Safe Rides Fee to Plaintiff Schreiber before he paid

for the ride and Plaintiff Schreiber was not aware of the Safe Rides Fee.  As reflected on his electronic receipt, however, Plaintiff Schreiber paid the $4.79 cost for the trip, which included the $1.00 Safe Rides Fee.  Plaintiff Schreiber has subsequently used other Uber ride options.

126.    Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Schreiber before he paid for the ride, and Plaintiff Schreiber was not aware of the Safe Rides Fee.

127.    Plaintiff Schreiber did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

128.    On or about February 2014, Plaintiff Coolidge used his smartphone to download the Uber App.  Plaintiff Coolidge used the Uber App to obtain an Uber account.  Plaintiff Coolidge did not see Uber's Terms and Conditions at the time that he obtained his account.

129.    Following Uber's April 2014 introduction of the Safe Rides Fee, Plaintiff Coolidge used the Uber App to obtain UberX transportation on numerous occasions.

130.    For example, on April 30, 2014, Plaintiff Coolidge used the Uber App to obtain UberX transportation.  Defendants did not disclose the Safe Rides Fee to Plaintiff Coolidge before he paid for the ride and Plaintiff Coolidge was not aware of the Safe Rides Fee. As reflected on his electronic receipt, however, Plaintiff Coolidge paid $19.26 cost for the trip, which included the $1.00 Safe Rides Fee.  Plaintiff Coolidge has subsequently used other Uber ride options.

131.    Uber did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Coolidge before he paid for the ride, and Plaintiff Coolidge was not aware of the Safe Rides Fee.

132.    Plaintiff Coolidge did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

133.    On or about October 24, 2014, Plaintiff Mejia used his iPhone 5 to download the Uber App.  Plaintiff Mejia used the Uber App on his iPhone 5 to obtain an Uber account.  Plaintiff Mejia did not see Uber's Terms and Conditions at the time that he obtained his account.

134.    Following Defendants' April 2014 introduction of the Safe Rides Fee, Plaintiff Mejia used the Uber App to obtain UberX transportation on numerous occasions.

135.    For example, on November 21, 2014, Plaintiff Mejia used the Uber App to obtain UberX transportation.  Defendants did not disclose the Safe Rides Fee to Plaintiff Meija before he paid

for the ride and Plaintiff Mejia was not aware of the Safe Rides Fee.  As reflected on his electronic receipt, however, Plaintiff Mejia paid $25.00 for the trip, which included the $1.00 Safe Rides Fee. Plaintiff Mejia has subsequently used other Uber ride options.

136.    Defendants did not clearly and conspicuously disclose the Safe Rides Fee to Plaintiff Mejia before he paid for the ride, and Plaintiff Mejia was not aware of the Safe Rides Fee.

137.    Plaintiff Mejia did not notice the Safe Rides Fee hyperlink that appears on the electronic receipts he received following each UberX ride.

## **CLASS ALLEGATIONS**

138.    Plaintiffs bring this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

All persons residing in the United States or its territories who, from January 1, 2013 until the date that notice of this class action is disseminated to the Class, have used the Uber smartphone application or website, in the United States or its territories, to obtain service from one of Uber's Rideshare Services.  Excluded from the Class are (a) all persons who are employees, directors, officers, and agents of Uber Technologies, Inc. and Raiser, LLC; (b) governmental entities; and (c) the Court, the Court's immediate family, and Court staff. Uber means the companies, incorporated in the State of Delaware as Uber Technologies, Inc. and Rasier, LLC, who operate the ride shares service commonly known as Uber.  Uber's Rideshare Services means all transportation services that are arranged through Uber's smartphone application or website, regardless of type of ride or service that is requested (such as UberX, UberSUV, UberBlack, UberPool, *etc.*).

139.    Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

140.    All rides on an Uber platform are subject to Uber's false or misleading statements about safety.

141.    Numerosity.  Fed. R. Civ. P. 23(a)(1).  Upon information and belief, there are millions of riders who have taken a ride on one or more Uber platforms, making joinder of all class members impracticable.  The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

142.    Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  The principal common issues include:

    a.    Whether or the extent to which Uber represented on its website and other marketing materials that it conducts "industry leading" background checks on its drivers;

    b.    Whether or the extent to which Uber represented that its service is "safer than a taxi";

    c.    Whether or the extent to which Uber's background checks are or were "industry leading";

    d.    Whether or the extent to which Uber is or was "safer than a taxi";

    e.    Whether or the extent to which Uber's statements and representations about safety, background checks, and the Safe Rides Fee are or were false or misleading;

    f.    Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to provide "regular motor vehicle inspections";

    g.    Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to provide "driver safety education";

    h.    Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to "develop safety features for the app";

    i.    Whether or the extent to which Uber uses revenue generated by the collection of the Safe Rides Fee to support other efforts to ensure consumer safety;

    j.    Whether Uber breached an implied contract with consumers;

    k.    Whether Uber violated Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq.*;

    l.    Whether Uber's conduct is unfair or unlawful in violation of the Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*;

    m.    Whether Uber's conduct constitutes untrue or misleading statements within the meaning of California Business and Professions Code § 17500, *et seq.*;

    n.    The nature of the relief, including equitable relief, to which Plaintiffs and the class are entitled.

143.     Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the Class they seek to represent.  Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Uber's unlawful conduct.

144.     Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Further, Plaintiffs' counsel is competent and experienced in litigating class actions.

145.     Superiority.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiffs and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Uber, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Uber's misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

146.     Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

147.     Class certification is also appropriate under Rule 23(b)(2), as Uber has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## FIRST CAUSE OF ACTION

### Breach of Implied Contract

### (On behalf of Plaintiffs Mena and McKnight and the Nationwide Class, or, Alternatively, The California Class – under the law of the State of California)

148.     Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

149.     An implied-in-fact contract was formed between Plaintiffs and Class members on the

30

one hand and Uber on the other with respect to the Safe Rides Fee and the safety features of Uber's service as represented by Uber (the "Safe Rides Fee Agreement").

150.    At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement when it demanded payment of the Safe Rides Fee from Plaintiffs and other Class members to support its safety efforts.

151.    At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the Safe Rides Fee from Plaintiffs and other Class members.

152.    Plaintiffs and other Class members accepted Uber's offer by paying the Safe Rides Fee. Through their payment of the Safe Rides Fee, Plaintiffs and other Class members performed all conditions, covenants and promises required of Plaintiff and other Class members in accordance with the Safe Rides Fee Agreement.

153.    Uber breached the Safe Rides Fee Agreement in at least the following respects:

    a.    Uber did not use the Safe Rides Fee to provide an industry-leading background check process;

    b.     Uber did not use enough of the Safe Rides Fee to provide regular motor vehicle checks;

    c.    Uber did not use enough of the Safe Rides Fee to provide "driver safety education";

    d.    Uber has not used enough of the Safe Rides Fee to develop safety features on the Uber App for the vast majority of consumers in the United States; and

    e.    Upon information and belief, Uber has retained considerable portions of the revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for consumers.

154.    No express contract exists between Plaintiffs and Class members on the one hand and Uber on the other with respect to the imposition and collection of the Safe Rides Fee.

155.    Uber's breaches were willful and not the result of mistake or inadvertence.

156.    As a result of Uber's breach of the Safe Rides Fee Agreement, Plaintiffs and other Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Breach of Implied Contract

**(On behalf of Plaintiffs Schreiber and Mejia and the Nationwide Class, or, Alternatively, The Illinois Class – under the law of the State of Illinois)**

157.     Plaintiffs Schreiber and Mejia incorporate all preceding factual allegations as if fully set forth herein.

158.     An implied-in-fact contract was formed between Plaintiffs Schreiber and Mejia and Class members on the one hand and Uber on the other with respect to the Safe Rides Fee (the "Safe Rides Fee Agreement").

159.     At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement when it demanded payment of the Safe Rides Fee from Plaintiffs Schreiber and Mejia and other Class members to support its safety efforts.

160.     At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the Safe Rides Fee from Plaintiffs and other Class members.

161.     Plaintiffs Schreiber and Mejia and other Class members accepted Uber's offer by paying the Safe Rides Fee.  Through their payment of the Safe Rides Fee, Plaintiffs Schreiber and Mejia and other Class members performed all conditions, covenants and promises required of Plaintiffs and other Class members in accordance with the Safe Rides Fee Agreement.

162.     Uber breached the Safe Rides Fee Agreement in at least the following respects:

a.     Uber did not use the Safe Rides Fee to provide an industry-leading background check process.

b.     Uber did not use enough of the Safe Rides Fee to provide regular motor vehicle checks;

c.     Uber did not use enough of the Safe Rides Fee to provide "driver safety education";

d.     Uber has not used enough of the Safe Rides Fee to develop safety features on the Uber App for the vast majority of consumers in the United States; and

e.     Upon information and belief, Uber has retained considerable portions of the

32

revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for consumers.

163.    No express contract exists between Plaintiffs Schreiber and Mejia and Class members on the one hand and Uber on the other with respect to the imposition and collection of the Safe Rides Fee.

164.    Uber's breaches were willful and not the result of mistake or inadvertence.

165.    As a result of Uber's breach of the Safe Rides Fee Agreement, Plaintiffs Schreiber and Mejia and other Class members have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**Breach of Implied Contract**

**(On behalf of Plaintiff Coolidge and the Nationwide Class, or, Alternatively, The Massachusetts Class – under the law of the State of Massachusetts)**

166.    Plaintiff Coolidge incorporates all preceding factual allegations as if fully set forth herein

167.    An implied-in-fact contract was formed between Plaintiff Coolidge and Class members on the one hand and Uber on the other with respect to the Safe Rides Fee (the "Safe Rides Fee Agreement").

168.    At all times relevant, Uber offered to enter into the Safe Rides Fee Agreement when it demanded payment of the Safe Rides Fee from Plaintiff and other Class members to support its safety efforts.

169.    At all time relevant, Uber offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the Safe Rides Fee from Plaintiff and other Class members.

170.    Plaintiff and other Class members accepted Uber's offer by paying the Safe Rides Fee. Through their payment of the Safe Rides Fee, Plaintiff and other Class members performed all conditions, covenants and promises required of Plaintiff and other Class members in accordance with the Safe Rides Fee Agreement.

171.    Uber breached the Safe Rides Fee Agreement in at least the following respects:

    a.    Uber did not use the Safe Rides Fee to provide an industry-leading background

1   check process;

2          b.      Uber did not use enough of the Safe Rides Fee to provide regular motor vehicle

3   checks;

4          c.      Uber did not use enough of the Safe Rides Fee to provide "driver safety

5   education";

6          d.      Uber has not used enough of the Safe Rides Fee to develop safety features on

7   the Uber App for the vast majority of consumers in the United States; and

8          e.      Upon information and belief, Uber has retained considerable portions of the

9   revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for

10  consumers.

11         172.    No express contract exists between Plaintiff and Class members on the one hand and

12  Uber on the other with respect to the imposition and collection of the Safe Rides Fee.

13         173.    Uber's breaches were willful and not the result of mistake or inadvertence.

14         174.    As a result of Uber's breach of the Safe Rides Fee Agreement, Plaintiff and other Class

15  members have been damaged in an amount to be determined at trial.

16                          **FOURTH CAUSE OF ACTION**

17         **Violation of Consumers Legal Remedies Act – California Civil Code § 1750, *et seq.***

18       **(On behalf of Plaintiffs Mena and McKnight and the Nationwide Class and, alternatively, the**

19                      **California Class – under the law of California)**

20         175.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

21         176.    This cause of action is brought pursuant to the Consumers Legal Remedies Act,

22  California Civil Code § 1750, *et seq.* (the "CLRA") because Uber's actions and conduct described

23  herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

24         177.    Plaintiffs are consumers as defined by California Civil Code § 1761(d).

25         178.    The Products are services within the meaning of Civil Code § 1761(a).

26         179.    Uber violated the CLRA in at least the following respects:

27         a.      In violation of Cal. Civ. Code § 1770(a)(5), Uber, by use of the untrue or

28  misleading statements set forth and alleged in this complaint, represented that services have

                                        34

characteristics or benefits which they do not have;

        b.     In violation of Cal. Civ. Code § 1770(a)(7), Uber, by use of the untrue or misleading statements set forth and alleged in this complaint, represented that services are of a particular standard of quality when they are of another;

        c.     In violation of Cal. Civ. Code § 1770(a)(8), Uber, by use of the untrue or misleading statements set forth and alleged in this complaint, disparaged the services or business of another by false or misleading representation of fact;

        d.     In violation of Cal. Civ. Code § 1770(a)(9), Uber advertised its transportation services (as requiring an automatic payment only of the fare) with the intent not to sell them as advertised (because Uber intended to, and did, automatically charge both the fare and the Safe Rides Fee to the consumer's credit card, debit card or PayPal account on file with Uber).

        e.     In violation of Cal. Civ. Code § 1770(a)(14), Uber represented that a transaction involves obligations (by assessing and charging the Safe Rides Fee and itemizing it on each consumer's receipt), which it does not have or involve, or which are prohibited by law (because Uber charged the Safe Rides Fee to consumers without clearly and conspicuously disclosing the fee and without the consumers' express, informed consent to pay the fee).

        f.     In violation of Cal. Civ. Code § 1770(a)(16), Uber represented that the subject of a transaction has been supplied in accordance with a previous representation (that only the fare will be automatically charged to the consumer's credit card on file with Uber) when it was not (because Uber automatically charged both the fare and the Safe Rides Fee to the consumer's credit card, debit card or PayPal account on file with Uber).

180.    Uber knew, or should have known, that its representations and advertisements about the Safe Rides Fee, safety, background checks, and other topics were false or misleading.

181.    On April 10, 2015, Plaintiffs notified Uber in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations.

182.    Uber's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public.

**FIFTH CAUSE OF ACTION**

**Unlawful Business Practices In Violation of Cal. Bus. & Prof. Code § 17200,** *et seq.*

**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, The California Class – under**

**the law of California)**

183.     Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

184.     Uber's conduct constitutes unlawful business acts or practices under California's Unfair

Competition Law, California Business & Professions Code § 17200, *et seq.* (the "UCL").

185.     Uber's business practices are unlawful because, as detailed above, they constitute (1) a

breach of the implied contract between Plaintiffs and Class members on the one hand and Uber on the

other, (2) a violation of the CLRA, and (3) because Uber has been unjustly enriched.

186.     As a result of Uber's unlawful business acts and practices, Plaintiffs and other Class

members have suffered injury in fact and lost money or property.

187.     Plaintiffs request that the Court issue sufficient equitable relief to restore Class

members to the position they would have been in had Uber not engaged in unfair competition,

including by ordering restitution of all funds that Uber may have acquired as a result of its unfair

competition and an injunction prohibiting the charging of fees that are called the Safe Rides Fee.

**SIXTH CAUSE OF ACTION**

**Unfair Business Practices In Violation of Cal. Bus. & Prof. Code § 17200,** *et seq.*

**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, The California Class – under**

**the law of California)**

188.     Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

189.     The UCL proscribes unfair business acts or practices.

190.     A business act or practice is "unfair" under the UCL if the reasons, justifications and

motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.  A

business act or practice is also "unfair" under the UCL if Uber's conduct practice is immoral,

unethical, oppressive, unscrupulous or substantially injurious to consumers.  A business act or practice

is also "unfair" under the UCL where the consumer injury is substantial; the injury is not outweighed

by any countervailing benefits to consumers or competition; and the injury is one that consumers

CONSOLIDATED CLASS ACTION COMPLAINT (CASE NO. 4:14-CV-05615-JST)

themselves could not reasonably have avoided.

191. Uber's conduct as detailed herein constitutes unfair business acts and practices.

192. Uber charged and collected a Safe Rides Fee for "industry leading background checks" but did not provide "industry leading background checks."

193. Uber charged and collected a Safe Rides Fee "to support . . . driver safety education" but did not use enough of the revenue generated from the collection of the Safe Rides Fee to provide driver safety education for Uber drivers. Instead, Uber offered Uber drivers an optional "driver training class" at a cost between $40 and $65, which would be paid by the Uber driver, and not by revenue generated from the Safe Rides Fee.

194. Uber charged and collected a Safe Rides Fee "to support . . . regular motor vehicle inspections" but did not use enough of the revenue generated from the collection of the Safe Rides Fee to provide regular motor vehicle inspections for all Uber drivers. The vast majority of Uber drivers pay the costs for their own motor vehicle inspection. Other Uber drivers are offered free inspections provided they spend a set amount in repairs.

195. Plaintiffs and other Class members had no way of reasonably knowing that Uber would not use the Safe Rides Fee for the purposes for which they paid that fee. Nor did Plaintiffs and other Class members have a means to reasonably know that Uber was overcharging Plaintiffs and other Class members for the safety-related services that were not provided or not sufficiently provided.

196. The consequences of Uber's conduct as detailed herein outweigh any justification, motive or reason for Uber's conduct. Uber's conduct is and continues to be unlawful, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and members of the Class. Uber's conduct has caused substantial injury to Plaintiffs and other Class members (because it results in a windfall for Uber estimated to be in excess of $20,000,000), that injury is not outweighed by any countervailing benefits to consumers (because Uber does not use the Safe Rides Fee revenue for the purposes for which it was collected) and Plaintiffs and Class members could not have avoided such injury since the assessment and collection of the Safe Rides Fee was mandatory and automatic, and was not clearly and conspicuously disclosed.

197. As a result of Uber's unfair business acts and practices, Plaintiffs and other Class

members have suffered injury in fact and lost money or property.  Plaintiffs request that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Uber not engaged in unfair competition, including by ordering restitution of all funds that Uber may have acquired as a result of its unfair competition and an injunction prohibiting the charging of the Safe Rides Fee, and by requiring Uber to correct its labeling and to engage in a corrective advertising campaign.

### SEVENTH CAUSE OF ACTION

**Violation of the Illinois Consumer Fraud Act, 815 ILCS 502/2, *et seq.***

**(On behalf of Plaintiffs Schreiber and Mejia and the Illinois Class – under the law of Illinois)**

198.    Plaintiffs Schreiber and Mejia incorporate all preceding factual allegations as if fully set forth herein.

199.    In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 502/2, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.

200.    In the course of conducting business, Uber committed unfair or deceptive acts and practices by concealing, suppressing, or omitting material facts, as set forth more fully herein.

201.    Uber intended that Plaintiffs Schreiber and Mejia and each of the other members of the Illinois Class would rely upon its conduct, and a reasonable person would in fact be misled by this conduct.

202.    In addition, Uber's conduct showed malice and recklessness such that an award of punitive damages is appropriate.

### EIGHTH CAUSE OF ACTION

**False Advertising In Violation of Cal. Bus. & Prof. Code § 17500, *et seq*.**

**(On behalf of Plaintiffs and the Nationwide Class or, alternatively, The California Class – under the law of California)**

203.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

204.    Beginning at an exact date unknown to Plaintiffs, but in any event within three years of the filing of the first complaint in this case, and continuing to the present, Uber, with the intent to

perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before Plaintiffs and the putative class statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Uber knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500, *et seq.*  Such statements include but are not limited to all of the representations set forth and discussed in the previous paragraphs of this complaint, all of which are incorporated herein by this reference.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the class of similarly situated individuals, request the Court to:

(a)  Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as representatives of the class and designate counsel of record as class counsel;

(b)  Order Uber to provide actual damages and equitable monetary relief (including restitution) to Plaintiffs and class members and/or order Uber to disgorge profits they realized as a result of their unlawful conduct;

(c)  Order Uber to pay punitive damages, as allowable by law, to Plaintiffs and class members;

(d)  Order Uber to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and class members;

(e)  Declare Uber's conduct unlawful and enter an order enjoining Uber from continuing to engage in the conduct alleged herein;

(f)  For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g)  For costs of the proceedings herein;

(h)  For reasonable attorneys' fees as allowed by statute; and

(i)  Award such other relief as the Court deems appropriate under the circumstances.

1    DATED:  January 7, 2015                 Respectfully submitted,

2                                   **AHDOOT & WOLFSON, PC**

3                                   By:  /s/ Robert Ahdoot

4                                   Robert Ahdoot
                                  rahdoot@ahdootwolfson.com

5                                   Tina Wolfson
                                  twolfson@ahdootwolfson.com

6                                   Meredith S. Lierz
                                  mlierz@ahdootwolfson.com

7                                   1016 Palm Avenue

8                                   West Hollywood, California 90069
                                  Tel: 310-474-9111

9                                   Fax: 310-474-8585

10                                  *Attorneys for Plaintiffs*,
                                 Julian Mena, Todd Schreiber, Nate Coolidge, and

11                                  Ernesto Mejia

12

13                                  **ARIAS, SANGUINETTI, STAHLE &**
                                 **TORRIJOS, LLP**

14

15                                  By:  /s/ Mike Arias

16                                    Mike Arias
                                  mike@asstlawyers.com

17                                   Alfredo Torrijos
                                  alfredo@asstlawyers.com

18                                   6701 Center Drive West, Suite 1400
                                  Los Angeles, California 90045-7504

19                                   Tel: 310-844-9696; Fax: 310-861-0168

20                                  **LIDDLE & DUBIN, P.C.**

21

22

23                                  By:  /s/ Steven D. Liddle
                                  Steven D. Liddle (admitted *pro hac vice*)

24                                   sliddle@ldclassaction.com
                                  Nicholas A. Coulson (admitted *pro hac vice*)

25                                   ncoulson@ldclassaction.com
                                  975 E. Jefferson Avenue

26                                   Detroit, Michigan 48207
                                  Tel: 313-392-0015; Fax: 313-392-0025

27                                  *Attorneys for Plaintiffs*,

28                                  Matthew Philliben and Byron McKnight

# EXHIBIT 2

1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  BYRON MCKNIGHT, JULIAN MENA,
    TODD SCHREIBER, NATE COOLIDGE, and
11  ERNESTO MEJIA, individually and on behalf
    of all others similarly situated,
12
13              Plaintiffs,
14        v.
15  UBER TECHNOLOGIES, INC., a Delaware
    Corporation, RASIER, LLC, a Delaware
16  Limited Liability Company
17              Defendants.
18

CASE NO. 3:14-cv-05615-JST

**AMENDED STIPULATION OF
SETTLEMENT**

Hon. Jon S. Tigar, Presiding

19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

I.      RECITALS ..................................................................................................... 1

II.     DEFINITIONS ............................................................................................... 7

III.    SUBMISSION OF THE SETTLEMENT TO THE COURT FOR REVIEW AND APPROVAL ............................................................... 14

IV.     THE SETTLEMENT CONSIDERATION .................................................. 17

V.      DISTRIBUTION OF THE SETTLEMENT FUND .................................... 20

VI.     NOTICE OF THE SETTLEMENT .............................................................. 27

VII.    ATTORNEYS' FEES AND EXPENSES AND CLASS REPRESENTATIVE SERVICE AWARDS ............................................. 31

VIII.   RELEASES AND DISMISSAL OF ACTION ............................................ 32

IX.     ADMINISTRATION OF THE SETTLEMENT ......................................... 34

X.      OBJECTIONS AND OPT-OUTS BY CLASS MEMBERS ........................ 40

XI.     SCOPE AND EFFECT OF CONDITIONAL CERTIFICATION OF THE CLASS SOLELY FOR PURPOSES OF SETTLEMENT ....................... 42

XII.    MODIFICATION OR TERMINATION OF THE SETTLEMENT ............ 42

XIII.   SETTLEMENT NOT EVIDENCE AGAINST PARTIES ........................... 44

XIV.    BEST EFFORTS ............................................................................................ 45

XV.     MISCELLANEOUS PROVISIONS ............................................................ 46

1

## EXHIBIT LIST

**Exhibit A**:          [Proposed] Final Order

**Exhibit B**:          [Proposed] Final Judgment

**Exhibit C**:          Payment Election Form

**Exhibit D**:          [Proposed] Preliminary Approval Order

**Exhibit E**:          Long Form Notice

**Exhibit F**:          Settlement Administration Protocol

**Exhibit G**:          Summary Notice

**Exhibit H**:          Publication Notice and Banner Advertisements

**Exhibit I**:          Declaration of the Settlement Administrator

1       Plaintiffs[1] Nate Coolidge, Byron McKnight, Ernesto Mejia, Julian Mena, Todd Schreiber,

2   and Defendant Rasier, LLC and Uber Technologies, Inc., by and through their respective counsel, in

3   consideration for and subject to the promises, terms, and conditions contained in this Amended

4   Stipulation of Settlement, hereby stipulate and agree, subject to Court approval pursuant to Rule 23

5   of the Federal Rules of Civil Procedure, as follows:

6   **I.   RECITALS**

7       WHEREAS, on or about December 23, 2014, plaintiffs Matthew Philliben and Byron

8   McKnight filed a putative class action lawsuit, on behalf of themselves and others similarly

9   situated, against Uber Technologies, Inc. and Rasier, LLC, in the United States District Court for

10   the Northern District of California, Case No. 4:14-cv-05615 ("*McKnight*")[2], which asserted causes

11   of action for alleged violations of California's False Advertising Law (Cal. Bus. & Prof. Code

12   § 17500 *et seq.*) and California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*)

13   and which alleged, *inter alia*, that Defendants made misrepresentations and omissions regarding

14   their "Safe Rides Fee," their safety measures, and the nature and character of their background

15   checks, on behalf of a putative nationwide class of consumers (*McKnight*, ECF Docket ("Dkt.") 1);

16       WHEREAS, on or about January 6, 2015, Andrea Pappey filed a putative class action

17   lawsuit, on behalf of herself and others similarly situated, against Uber Technologies, Inc., in the

18   United States District Court for the Northern District of California, Case No. 3:15-cv-00064

19   ("*Mena*").  On or about April 13, 2015, (i) the Complaint filed in *Mena* was amended to, among

20   other things, add Plaintiffs Julian Mena, Todd Schreiber, Nate Coolidge, and Ernesto Mejia as

21   representative Plaintiffs, and (ii) Andrea Pappey withdrew from the *Mena* lawsuit as a plaintiff.

22   The *Mena* lawsuit asserted causes of action for Breach of Implied Contract (pursuant to California,

23   Illinois, and Massachusetts law), alleged violations of California's Consumers Legal Remedies Act

24

25   [1]       Unless otherwise defined, all capitalized terms used herein shall have the same meaning and

26   effect as defined in Section II of this Amended Stipulation of Settlement, entitled "Definitions."

27   [2]       On May 18, 2017, a Stipulation of Partial Dismissal of Matthew Philliben was filed

dismissing all claims related to Matthew Philliben without prejudice.  This matter is hereafter

28   referred to herein as *McKnight, et al v. Uber Technologies, Inc.* et al. *McKnight*, Dkt. 122.

1    (Cal. Civ. Code § 1750 *et seq.*), California's Unfair Competition Law (Cal. Bus. & Prof. Code

2    § 17200 *et seq.*), California's False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), and

3    Illinois Consumer Fraud Act (815 ILCS 502/2, *et seq.*) and which alleged, *inter alia*, that

4    Defendants made misrepresentations and omissions regarding their "Safe Rides Fee," their safety

5    measures, and the nature and character of their background checks, on behalf of a putative

6    nationwide class, or in the alternative, a California, Illinois, and Massachusetts class of consumers.

7    (*Mena* Dkt. 28);

8         WHEREAS, on or about February 16, 2015, the Parties filed a Stipulation and [Proposed]

9    Order Relating Cases.  The Court granted this stipulation on or about February 18, 2015 (*McKnight*,

10   Dkt. 23; *Mena*, Dkt. 19), and ordered that *Mena* and *McKnight* are related;

11        WHEREAS, on or about March 20, 2015, in response to the complaint filed in *McKnight*,

12   Defendants filed a Motion to Stay Proceedings Pending Arbitration (*McKnight*, Dkts. 25 to 29). The

13   *McKnight* plaintiffs filed their response in opposition to this Motion on or about May 14, 2015

14   (*McKnight*, Dkt. 37) and Defendants filed their Reply on or about May 26, 2015 (*McKnight*, Dkts.

15   38 to 39);

16        WHEREAS, on or about May 4, 2015, Defendants filed an Administrative Motion To

17   Determine Whether Cases Should Be Related seeking to relate *Mena* and *McKnight* to a lawsuit

18   entitled *L.A. Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc. et al.*, Case No. 3:15-cv-01257,

19   filed on or about March 18, 2015 in the United States District Court for the Northern District of

20   California ("*L.A. Taxi*") (*McKnight*, Dkts. 34 to 35). The Court granted this Motion on or about

21   May 12, 2015 (*McKnight*, Dkt. 36);

22        WHEREAS, on or about May 4, 2015, in the response to the first amended complaint filed

23   in *Mena*, Defendant, Uber Technologies, Inc. filed a Motion to Stay Proceedings Pending

24   Arbitration (*Mena*, Dkts. 31 to 36). The *Mena* plaintiffs filed their response in opposition to this

25   Motion on or about May 13, 2015 (*Mena*, Dkts. 37 to 38) and Defendants filed their Reply on or

26   about May 26, 2015 (*Mena*, Dkts. 39 to 41);

27        WHEREAS, on or about June 1, 2015, the *Mena* plaintiffs filed an Objection To And

28   Motion To Strike Reply Evidence Re Defendant's Motion To Stay Proceedings Pending

1   Arbitration, Or In The Alternative, Request For A Surreply (*Mena*, Dkt. 42).  On or about June 2,

2   2015, the Court granted the *Mena* plaintiffs leave to file a Surreply and continued the hearing on

3   Defendant's Motion to Stay from June 11, 2015 to July 2, 2015. (*Mena*, Dkt. 43);

4       WHEREAS, on or about June 9, 2015, the *Mena* plaintiffs filed a Surreply In Opposition To

5   Defendant's Motion To Stay Proceedings Pending Arbitration (*Mena*, Dkt. 45).  On or about June

6   10, 2015, the *Mena* plaintiffs also filed a Statement of Recent Decision In Support of Plaintiffs'

7   Opposition To Defendant's Motion To Stay Proceedings Pending Arbitration (*Mena*, Dkt. 46);

8       WHEREAS, on or about June 29, 2015, the Parties filed a Stipulation With Proposed Order

9   For A Temporary Stay Pending Mediation (*Mena*, Dkt. 48; *McKnight*, Dkt. 48);

10      WHEREAS, on or about July 29, 2015, the Parties filed a Stipulation With Proposed Order

11  For A Second Temporary Stay Pending Mediation (*Mena*, Dkt. 52; *McKnight*, Dkt. 51);

12      WHEREAS, on July 29, 2015, the Parties filed a Stipulation and Protective Order (*Mena*

13  Dkt. 49; *McKnight* Dkt. 50), which was entered by the Court on August 3, 2015 (*Mena* Dkt. 51;

14  *McKnight* Dkt. 52);

15      WHEREAS, on or about August 24, 2015, the Parties attended an in-person mediation

16  session with the Honorable Carl J. West (Ret.) of JAMS;

17      WHEREAS, on or about September 17, 2015, the Parties filed a Joint Stipulation And

18  Proposed Order Updating The Court On Settlement Discussions And Requesting Extension Of

19  Temporary Stay Pending Further Mediation (*Mena*, Dkt. 56; *McKnight*, Dkt. 57);

20      WHEREAS, on or about October 2, 2015, the Parties attended a second in-person mediation

21  session with the Honorable Carl J. West (Ret.) of JAMS;

22      WHEREAS, on or about October 30, 2015, the Parties attended a third in-person mediation

23  session with the Honorable Carl J. West (Ret.) of JAMS;

24      WHEREAS, on or about November 16, 2015, the Parties filed a Stipulation and Proposed

25  Order Updating the Court on the Settlement Discussions and Requesting Extension of Temporary

26  Stay;

27

28

WHEREAS, on or about December 14, 2015, the Parties filed a Stipulation and Proposed Order Updating the Court on the Parties' Settlement in Principle and Requesting that Arbitration Hearing be Vacated;

WHEREAS, on or about January 7, 2016, Plaintiffs filed a Consolidated Class Action Complaint, which asserted causes of action for Breach of Implied Contract, alleged violations of California's Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), California's False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), and Illinois Consumer Fraud Act (815 ILCS 502/2, *et seq.*) and which alleged, *inter alia*, that Defendants made misrepresentations and omissions regarding their "Safe Rides Fee," their safety measures, and the nature and character of their background checks, on behalf of a putative nationwide class, or in the alternative, a California, Illinois, and Massachusetts class of consumers (*McKnight,* Dkt. 67);

WHEREAS, on or about February 11, 2016, Plaintiffs and Defendants entered into a Stipulation of Settlement that was filed with the Court on February 11, 2016 ("First Stipulation") (*McKnight*, Dkt. 74);

WHEREAS, on February 11, 2016, Plaintiffs filed a Motion for Preliminary Approval of Class Action Settlement (*McKnight*, Dkt. 75-3);

WHEREAS, on August 30, 2016, the Court issued an Order Denying Motion for Preliminary Approval of Class Action Settlement (*McKnight*, Dkt. 98);

WHEREAS, following the August 30, 2016 Order denying preliminary approval of the First Stipulation, the Plaintiffs and Defendants began discussions and negotiations regarding a new settlement;

WHEREAS, the Parties agreed upon a new mediator, Robert J. Kaplan, Esq. of Judicate West, to assist in these negotiations, and participated in three (3) in-person mediations on October 5, 2016, November 22, 2016, and January 5, 2017.  The Parties also met in-person on December 7, 2016 and conducted numerous telephonic discussions and negotiations both among themselves and with the new mediator;

1    WHEREAS, on March 7, 2017, the Parties attended a settlement conference before Chief

2    Magistrate Judge Joseph C. Spero;

3    WHEREAS, before entering into the First Stipulation and this Amended Stipulation of

4    Settlement, Plaintiffs, by and through their respective counsel, conducted a thorough examination,

5    investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the

6    claims and potential claims to determine the strength of liability, potential remedies, and all

7    defenses thereto;

8    WHEREAS, Plaintiffs, by and through their respective counsel, conducted an extensive

9    investigation into the facts and law relating to the matters alleged in their respective Complaints,

10   including (i) the extent, nature and quality of Defendants' safety procedures during the Class

11   Period; (ii) Defendants' representations and disclosures regarding the safety of Defendants' ride

12   share services; (iii) Defendants' representations and disclosures regarding the Safe Rides Fee; (iv)

13   financial data relating to Defendants' safety related expenditures and revenues; (v) the size and

14   composition of the Class; and (vi) data relating to the Class' use of Defendants' ride share services.

15   This investigation included obtaining and reviewing documents and written responses from

16   Defendants, detailed inspections and testing of Defendants' ride share App among various operating

17   system platforms, consultations with experts, numerous interviews of witnesses (including ten (10)

18   current and former high level employees and executives of Defendants), drivers, and putative class

19   members, the evaluation of documents and information related to other litigations against

20   Defendants (including updated productions since the date of the First Stipulation), as well as

21   extensive factual and legal research as to arbitration issues relating to this Action, and the

22   sufficiency of the claims and appropriateness of class certification;

23   WHEREAS, the First Stipulation and this Amended Stipulation of Settlement were reached

24   as a result of extensive arms'-length negotiations between the Parties and their counsel, occurring

25   over the course of many months and six separate, in-person mediation sessions with respected

26   mediators, the Honorable Carl J. West (Ret.) of JAMS and Robert J. Kaplan of Judicate West.

27   Following the sixth in-person mediation, the Parties continued to engage in extensive settlement

28   discussions with the assistance of both Mr. Kaplan and The Honorable Joseph C. Spero, Chief

1    Magistrate Judge for the United States District Court of the Northern District of California, and

2    amongst each other, until a final settlement was reached.  Before and during these settlement

3    discussions and mediations, Defendants provided voluminous documents and information to the

4    Plaintiffs.  This arms'-length exchange provided Plaintiffs and their counsel with sufficient

5    information to evaluate the claims and potential defenses and to meaningfully conduct informed

6    settlement discussions;

7            WHEREAS, Plaintiffs, as class representatives, believe that the claims settled herein have

8    merit, but they and their counsel recognize and acknowledge the expense and length of continued

9    proceedings necessary to prosecute the claims through trial, appeal, and ancillary actions.  Plaintiffs,

10   and their counsel, have also taken into account the uncertain outcome and risk of any litigation, as

11   well as the difficulties and delay inherent in such litigation, and they believe that the settlement set

12   forth in this Amended Stipulation of Settlement confers substantial benefits upon the Class

13   Members.  Based upon their evaluation, they have determined that the settlement set forth in this

14   Amended Stipulation of Settlement is in the best interest of the Class;

15           WHEREAS, based upon their review, investigation, and evaluation of the facts and law

16   relating to the matters alleged in the pleadings, Plaintiffs, and Class Counsel, on behalf of Plaintiffs

17   and the other members of the proposed Class, have agreed to settle the Action pursuant to the

18   provisions of this Amended Stipulation of Settlement, after considering, among other things: (i) the

19   substantial benefits to the Class Members under the terms of this Amended Stipulation of

20   Settlement; (ii) the risks, costs, and uncertainty of protracted litigation, especially in complex

21   actions such as this, as well as the difficulties and delays inherent in such litigation; and (iii) the

22   desirability of consummating this Amended Stipulation of Settlement promptly in order to provide

23   effective relief to the Class Members;

24           WHEREAS, Defendants have vigorously denied and continue to dispute all of the claims

25   and contentions alleged in the *Mena, McKnight,* and the consolidated action, and deny any and all

26   allegations of wrongdoing, fault, liability or damage of any kind to Plaintiffs and the putative class.

27   Defendants further deny that they acted improperly or wrongfully in any way, and believe that these

28   actions have no merit.  Defendants have also considered the risks and potential costs of continued

1   litigation of the lawsuit, on the one hand, and the benefits of the proposed settlement, on the other

2   hand, and desire to settle the Action upon the terms and conditions set forth in this Amended

3   Stipulation of Settlement;

4        WHEREAS, as part of the First Stipulation and this Amended Stipulation, Defendants agree

5   that they will no longer call any fee that they charge for their services as the "Safe Rides Fee."

6   Instead, Defendants may charge a "booking fee," which may be described as "a separate flat fee

7   added to every trip that helps support safety initiatives for riders and drivers as well as other

8   operational costs."

9        WHEREAS, Defendants agree to class action treatment of the claims alleged in this Action

10  solely for the purpose of compromising and settling those claims on a class basis as set forth herein

11  and for no other purpose.

12       WHEREAS, on May 18, 2017, a Stipulation of Partial Dismissal was filed dismissing all of

13  Plaintiff Matthew Philliben's claims, without prejudice. (*McKnight,* Dkt. 122).

14       NOW, THEREFORE, it is hereby STIPULATED AND AGREED, by and between the

15  Parties, through their respective counsel, that: (a) the Action be fully and finally compromised,

16  settled, and released upon final settlement approval by the Court after the hearings as provided for

17  in this Amended Stipulation of Settlement; and (b) upon such approval by the Court, a Final Order

18  and Final Judgment, substantially in the form attached hereto as Exhibits "A" and "B," respectively,

19  be entered dismissing the Action with prejudice upon the following terms and conditions.

20                       **II.    DEFINITIONS**

21       As used in this Amended Stipulation of Settlement and the attached exhibits, the following

22  terms have the following meanings, unless this Stipulation of Settlement specifically provides

23  otherwise:

24       1.    "Actions" or "Action" means the civil actions entitled *Mena et al. v. Uber*

25  *Technologies, Inc*., No. 3:15-cv-00064-JST (N.D. Cal.), *McKnight et al. v. Uber Technologies, Inc.*

26  *et al.,* No. 3:14-cv-05615-JST (N.D. Cal.), and the consolidated action under the *McKnight* case

27  number.

28

2.     "Account-Funded Class Member" means those Class Members who either did not submit a valid Payment Election Form or who submitted a valid Payment Election Form where the Class Member has elected to receive the Settlement Share by payment to the Class Member's Uber Rider Account.

3.     "Additional Per Ride Allocation" means an amount equal to the quotient of (i) the Settlement Fund Net Balance and (ii) the Uber Rides Total less the total number of Class Members [*Additional Per Ride Allocation = Settlement Fund Net Balance / (Uber Rides Total – Total Number of Class Members)*]

4.     "Amended Stipulation of Settlement" means this Amended Stipulation of Settlement and its Exhibits, attached hereto and incorporated herein, including all subsequent amendments agreed to in writing by the Parties and any exhibits to such amendments.

5.     "Attorneys' Fees and Expenses" means such funds as may be awarded by the Court to Class Counsel to compensate Class Counsel for their fees and expenses in connection with the Action and the Settlement, as described in Paragraphs 89 to 93 of this Amended Stipulation of Settlement.

6.     "Class" means all persons who, from January 1, 2013 to January 31, 2016, used the Uber App or website to obtain service from one of the Uber Ride Services With A Safe Rides Fee in the United States or its territories.  "Uber Ride Services With A Safe Rides Fee" means all transportation services that were arranged through Defendants' website or the Uber App where a Safe Rides Fee was paid (such as UberX, *etc.*).  "Uber App" means the Uber smartphone application by which riders may request Uber Rideshare Services.  "Uber Rideshare Services" means all transportation services that are arranged through Defendants' website or the Uber App, regardless of type of ride or service that is requested.  "Uber" means the companies, incorporated in the State of Delaware as Uber Technologies, Inc. and Rasier, LLC, who operate the ride share service commonly known as Uber.  Excluded from the Class are (a) all persons who are employees, directors, and officers of Uber Technologies, Inc. and Raiser, LLC; and (b) the Court and Court staff.  "Employees" means any person whose Uber account email address ended with "@uber.com" as of May 8, 2017.

7.     "Class Counsel" means Robert Ahdoot and Tina Wolfson of Ahdoot & Wolfson, PC; Mike Arias and Alfredo Torrijos of Arias, Sanguinetti, Stahl & Torrijos, LLP; and Nicholas Coulson of Liddle & Dubin, P.C.

8.     "Class Member(s)" means any member of the Class who does not elect exclusion or opt out from the Class pursuant to terms and condition for exclusion set out in this Amended Stipulation of Settlement, Paragraphs 119 to 124 and the Class Notice.

9.     "Class Notice" shall mean the Long Form Notice and Summary Notice provided to the Class as provided herein and directed by the Court.

10.     "Commercial Advertising" means any print advertisements, television or radio advertisements, online advertisements, in-app advertisements, or any mass e-mails or other written or electronic communications from Defendants to consumers made for the purpose of influencing consumers to buy Defendants' services.  To constitute Commercial Advertising, the advertisement must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within Defendants' industry.  Commercial Advertising includes advertorials but does not include statements to the news media.

11.     "Complaints" shall mean, collectively, the (i) Complaint filed by Matthew Philliben and Byron McKnight on December 23, 2014 (*McKnight,* Dkt. 1); (ii) Complaint filed by Andrea Pappey on January 6, 2015 (*Mena,* Dkt. 1); (iii) First Amended Complaint filed by Julian Mena, Nate Coolidge, Ernesto Mejia, and Todd Schreiber on April 13, 2015 (*Mena,* Dkt. 28); and (vi) Consolidated Class Action Complaint filed by Plaintiffs on January 7, 2016 (*McKnight*, Dkt. 67).

12.     "Court" means the United States District Court for the Northern District of California and the Judge assigned to the Action (the Honorable Jon S. Tigar).

13.     "Defendants" shall mean and include Uber Technologies, Inc., a Delaware Corporation, and Rasier, LLC, a Delaware Limited Liability Company, collectively.

14.     "Defense Counsel" means the law firm of Irell & Manella LLP.

9
AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

15.   "eCheck" means an electronic check used to pay a Class Member's Settlement Share, which will be sent to the email address provided by the Class Member in his or her valid Payment Election Form.

16.   "Effective Date" means the date on which the Final Order and Final Judgment in the Action become "Final."  As used in this Amended Stipulation of Settlement, "Final" means one (1) business days after all of the following conditions have been satisfied:

(a)   the Final Order and Final Judgment have been entered; and

(b)(i)   if reconsideration and/or appellate review is not sought from the Final Order and Final Judgment, the expiration of the time for the filing or noticing of any motion for reconsideration, appeal, petition, and/or writ; or

(b)(ii)   if reconsideration and/or appellate review is sought from the Final Order and Final Judgment: (A) the date on which the Final Order and Final Judgment are affirmed and are no longer subject to judicial review, or (B) the date on which the motion for reconsideration, appeal, petition, or writ is dismissed or denied and the Final Order and Final Judgment are no longer subject to judicial review.

17.   "Electing Class Members" means those Class Members who submit a valid Payment Election Form wherein the Class Member has elected to receive the Settlement Share by payment to the Class Member's Uber Rider Account, PayPal Account or bank account via eCheck, if applicable.

18.   "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of: (a) entering the Final Order and Final Judgment and dismissing the Action with prejudice; (b) determining whether the Settlement should be approved as fair, reasonable, and adequate; (c) ruling upon an application for Service Awards by the Plaintiffs; (d) ruling upon an application by Class Counsel for Attorneys' Fees and Expenses; and (e) entering any final order awarding Attorneys' Fees and Expenses and Service Awards.  The Parties shall request that the Court schedule the Fairness Hearing for a date that is in compliance with the provisions of 28 U.S.C. § 1715(d).

19. "Final Order and Final Judgment" means the Court's order and judgment fully and finally approving the Settlement and dismissing the Action with prejudice, substantially in the form attached hereto as Exhibits "A" and "B."

20. "Initial Settlement Payment Amount" means an amount equal to Twenty-Five Cents ($0.25) times the total number of Class Members.

21. "Long Form Notice" means the long form notice of settlement, substantially in the form attached hereto as Exhibit "E."

22. "Notice Date" means the first date upon which the Class Notice is disseminated.

23. "Parties" means Plaintiffs and Defendants, collectively, as each of those terms is defined in this Amended Stipulation of Settlement.

24. "Payment Election Deadline" means the final time and date by which a Payment Election Form must be received by the Settlement Administrator in order for a Class Member to timely elect to receive the Settlement Share by payment to the Class Member's Uber Account, PayPal Account or bank account via eCheck, if applicable.

25. "Payment Election Form" means the form substantially in the form attached hereto as Exhibit "C," which may be modified to meet the requirements of the Settlement Administrator, pursuant to which Class Members can elect to receive the Settlement Share by payment to the Class Member's Uber Rider Account, PayPal Account or bank account via eCheck, if applicable.

26. "Payment Election Period" means the time period from the Notice Date through the Payment Election Deadline, which is the time period that Class Members will have to submit a Payment Election Form to indicate that the Class Member elects to receive the Settlement Share by payment to the Class Member's Uber Rider Account, PayPal Account or bank account via eCheck, if applicable. The Payment Election Period shall run for a period of time ordered by the Court, and last at least sixty (60) days from the Notice Date.

27. "PayPal Account" means a Class Member's account with PayPal, as identified by the Class Member in his or her valid Payment Election Form, that will be paid the Class Member's Settlement Share.

28. "Plaintiffs" means Nate Coolidge, Byron McKnight, Ernesto Mejia, Julian Mena, and Todd Schreiber.

29. "Preliminary Approval Order" means the order preliminarily approving the Settlement and proposed Class Notice and notice plan, substantially in the form attached hereto as Exhibit "D."

30. "Release" means the release and waiver set forth in Paragraphs 94 to 100 of this Amended Stipulation of Settlement and in the Final Order and Final Judgment.

31. "Released Claims"

(a) "Released Claims" means and includes all manner of action, causes of action, claims, demands, rights, suits, obligations, restitution, debts, contracts, agreements, promises, liabilities, damages, charges, penalties, losses, costs, expenses, and attorneys' fees, of any nature whatsoever, known or unknown, in law or equity, fixed or contingent, which Plaintiffs and Class Members have or may have arising out of or relating to any allegations made in the Action, or any legal theories that could have been raised based on the allegations in the Action. The Released Claims include, but are not limited to, any claim arising out of or relating to Defendants' representations or omissions regarding background checks, safety, or the Safe Rides Fee. Notwithstanding any other provision of this Amended Stipulation of Settlement, "Released Claims" do not include, and Plaintiffs and Class Members are not releasing, any action, causes of action, claims, demands, rights, suits, obligations, restitution, debts, contracts, agreements, promises, liabilities, damages, charges, penalties, losses, costs, expenses, and attorneys' fees, of any nature whatsoever, known or unknown, in law or equity, fixed or contingent, arising out of or relating to personal injuries.

32. "Released Parties" shall include and mean:

(a) Uber Technologies, Inc., Uber USA, LLC, Rasier-CA, LLC, and Rasier, LLC, and each of their past, present, and future employees, assigns, attorneys, agents, consultants, officers, and directors; and

(b) All of Uber Technologies, Inc.'s, Uber USA, LLC's, Rasier-CA, LLC, and Rasier, LLC's, past, present, and future, parents, subsidiaries and affiliates, joint-ventures, brokers,

1   distributors, representatives, partners, members, divisions, predecessors, and successors and each of

2   their respective employees, assigns, attorneys, agents, servants, resellers, officers, shareholders,

3   administrators, insurers, assigns and directors.

4         33.     "Releasing Parties" means Plaintiffs and all Class Members, and each of their heirs,

5   guardians, executors, administrators, representatives, agents, attorneys, partners, successors, and

6   assigns, as well as any other person or entity purporting to claim on their behalf.

7         34.     "Settlement" means the settlement embodied in this Amended Stipulation of

8   Settlement, including all attached Exhibits (which are an integral part of this Amended Stipulation

9   of Settlement and are incorporated in their entirety by reference).

10        35.     "Settlement Administrator" means the qualified third party administrator and agent

11  agreed to by the Parties and approved and appointed by the Court in the Preliminary Approval

12  Order to administer the Settlement, including providing the Class Notice.  The Parties agree to

13  recommend that the Court appoint Epiq Systems, Inc. as Settlement Administrator to: (a) design,

14  consult on, and implement the Class Notice and related requirements of this Amended Stipulation of

15  Settlement; and (b) implement the Class Notice, the settlement website

16  (www.RideShareSettlement.com), the submission and review of Payment Election Forms, and

17  related requirements of this Amended Stipulation of Settlement, subject to the Court's approval.

18        36.     "Settlement Administration Protocol" means the protocol attached hereto as

19  Exhibit "F."

20        37.      "Settlement Fund" means the Thirty-Two Million Five Hundred Thousand Dollars

21  and No Cents ($32,500,000.00) that Defendants will pay, pursuant to Paragraphs 52 to 53 of this

22  Amended Stipulation of Settlement, as part of the consideration for the release of all claims as

23  provided in this Amended Stipulation of Settlement.

24        38.     "Settlement Fund Balance" means the balance remaining in the Settlement Fund

25  after payment of (a) costs of notice and administration, (b) the service awards to the Plaintiffs as

26  approved by the Court ("Service Award(s)"), and (c) the Attorneys' Fees and Expenses.

27        39.     "Settlement Fund Net Balance" means an amount equal to the Settlement Fund

28  Balance less the Initial Settlement Payment Amount.

40.    "Settlement Share" means the amount of each Class Member's share of the Settlement Fund Balance allocated pursuant to Paragraphs 55 to 60 of this Amended Stipulation of Settlement.

41.    "Summary Notice" means the summary notice, publication notice, and banner advertisements of the proposed class action settlement, substantially in the form attached hereto as Exhibit "G" and Exhibit "H," respectively.

42.    "Uber App" means the Uber smartphone application by which riders may request Uber Rideshare Services.

43.    "Uber Payment Account" means a default U.S. credit card, U.S. debit card, PayPal account, or other payment method linked to each Class Member's Uber Rider Account.

44.    "Uber Rider Account" means the account each Class Member created when he or she electronically registered to use Uber's Rideshare Services.

45.    "Uber Ride Services With A Safe Rides Fee" means all transportation services that were arranged through Defendants' website or the Uber App where a Safe Rides Fee was paid (such as UberX, *etc.*).

46.    "Uber Rideshare Services" means all transportation services that are arranged through Defendants' website or the Uber App, regardless of type of ride or service that is requested.

47.    "Uber Rides Total" means the total number of instances that Class Members used the Uber Ride Services With A Safe Rides Fee.

### III.    SUBMISSION OF THE SETTLEMENT TO THE COURT
### FOR REVIEW AND APPROVAL

48.    As soon as is practicable following the signing of this Amended Stipulation of Settlement, Class Counsel shall apply to the Court for entry of the Preliminary Approval Order (substantially in the form attached as Exhibit "D"), for the purpose of, among other things:

(a)    Approving the Class Notice, substantially in the form set forth at Exhibits "E" and "G";

(b)    Finding that the requirements for provisional certification of the Class have been satisfied, appointing Plaintiffs as the representatives of the Class and Class Counsel as counsel

1    for the Class, and preliminarily approving the Settlement as being within the range of

2    reasonableness such that the Class Notice should be provided pursuant to this Amended Stipulation

3    of Settlement;

4       (c) Scheduling the Fairness Hearing on a date ordered by the Court, provided in

5    the Preliminary Approval Order, and in compliance with applicable law, to determine whether the

6    Settlement should be approved as fair, reasonable, and adequate, and to determine whether a Final

7    Order and Final Judgment should be entered dismissing the Action with prejudice;

8       (d) Determining that the notice of the Settlement and of the Fairness Hearing, as

9    set forth in this Amended Stipulation of Settlement, complies with all legal requirements, including

10   but not limited to the Due Process Clause of the United States Constitution;

11      (e) Preliminarily approving the form of the Final Order and Final Judgment;

12      (f) Appointing the Settlement Administrator;

13      (g) Directing that Class Notice shall be given to the Class as provided in

14   Paragraphs 82 to 87 of this Amended Stipulation of Settlement;

15      (h) Providing that Class Members will have until the Payment Election Deadline

16   to submit Payment Election Forms;

17      (i) Providing that any objections by any Class Member to the certification of the

18   Class and the proposed Settlement contained in this Amended Stipulation of Settlement, and/or the

19   entry of the Final Order and Final Judgment, shall be heard and any papers submitted in support of

20   said objections shall be considered by the Court at the Fairness Hearing only if, on or before the

21   date(s) specified in the Class Notice and Preliminary Approval Order, such objector submits to the

22   Court a written objection, and otherwise complies with the requirements in Paragraph 119 of this

23   Amended Stipulation of Settlement;

24      (j) Establishing dates by which the Parties shall file and serve all papers in

25   support of the application for final approval of the Settlement and in response to any valid and

26   timely objections;

27      (k) Providing that all Class Members will be bound by the Final Order and Final

28   Judgment dismissing the Action with prejudice unless such Class Members timely file valid written

1   requests for exclusion or opt out in accordance with this Amended Stipulation of Settlement and the

2   Class Notice;

3          (l)      Providing that Class Members wishing to exclude themselves from the

4   Settlement will have until the date specified in the Class Notice and the Preliminary Approval Order

5   to submit a valid written request for exclusion or opt out to the Settlement Administrator;

6          (m)     Providing a procedure for Class Members to request exclusion or opt out

7   from the Settlement;

8          (n)      Directing the Parties, pursuant to the terms and conditions of this Amended

9   Stipulation of Settlement, to take all necessary and appropriate steps to establish the means

10  necessary to implement the Settlement;

11         (o)      Pending the Fairness Hearing, staying all proceedings in the Action, other

12  than proceedings necessary to carry out or enforce the terms and conditions of this Amended

13  Stipulation of Settlement and the Preliminary Approval Order; and

14         (p)      Pending the Fairness Hearing, enjoining Plaintiffs and Class Members, or any

15  of them, from commencing or prosecuting, either directly or indirectly, any action in any forum

16  (state or federal) asserting any of the Released Claims.

17      49.    Following the entry of the Preliminary Approval Order, Class Notice shall be given

18  and published in the manner directed and approved by the Court.

19      50.    At the Fairness Hearing, the Parties shall seek to obtain from the Court a Final Order

20  and Final Judgment in the form substantially similar to Exhibits "A" and "B," respectively.  The

21  Final Order and Final Judgment shall, among other things:

22         (a)      Find that the Court has personal jurisdiction over all Class Members, the

23  Court has subject matter jurisdiction over the claims asserted in the Action, and that venue is

24  proper;

25         (b)      Finally approve this Amended Stipulation of Settlement and the Settlement

26  pursuant to Rule 23 of the Federal Rules of Civil Procedure;

27         (c)      Certify the Class for purposes of settlement;

28

1           (d)      Find that the notice to the Class complied with all laws, including, but not

2 limited to, the Due Process Clause of the United States Constitution;

3           (e)      Incorporate the Release set forth in this Amended Stipulation of Settlement

4 and make the Release effective as of the date of the Final Order and Final Judgment;

5           (f)      Issue the injunctive relief described in Paragraph 54 of this Amended

6 Stipulation of Settlement;

7           (g)      Authorize the Parties to implement the terms of the Settlement;

8           (h)      Dismiss the Action with prejudice; and

9           (i)      Retain jurisdiction relating to the administration, consummation, validity,

10 enforcement, and interpretation of this Amended Stipulation of Settlement, the Final Order, Final

11 Judgment, any final order approving Attorneys' Fees and Expenses and Service Awards, and for

12 any other necessary purpose.

13       51.      Based upon the Declaration of the Settlement Administrator, attached hereto as

14 Exhibit "I," the Parties agree that the notice plan contemplated by this Amended Stipulation of

15 Settlement is valid and effective, that if effectuated, it would provide reasonable notice to the Class,

16 and that it represents the best practicable notice under the circumstances.

17                       **IV.**      **THE SETTLEMENT CONSIDERATION**

18 **A.**      **Settlement Fund**

19       52.      In consideration for the Release contained in this Amended Stipulation of

20 Settlement, and without admitting liability for any of the alleged acts or omissions, and in the

21 interest of minimizing the costs inherent in any litigation, Defendants, jointly and severally, will pay

22 the total sum of Thirty-two Million Five Hundred Thousand Dollars and No Cents ($32,500,000.00)

23 to create the Settlement Fund for the benefit of the Class pursuant to the terms of this Amended

24 Stipulation of Settlement. The Parties agree that the Settlement Fund and Defendants' payment of

25 Thirty-two Million and Five Hundred Thousand Dollars and No Cents ($32,500,000.00) is the full

26 extent of Defendants' cash payment obligation under this Amended Stipulation of Settlement. In no

27 event shall Defendants be liable for payment of any costs, expenses, or claims beyond their deposit

28

1   or payment of the Settlement Fund into the Escrow Account.  There will be no reversion to

2   Defendants of the settlement monies once the Settlement becomes final.

3         53.    Defendants' joint and several payment obligation of the Settlement Fund shall be

4   subject to and proceed as follows:

5         (a)    <u>Initial Deposit</u>:  Within ten (10) days after the entry of the Preliminary

6   Approval Order as contemplated by Paragraph 48 herein, Defendants shall pay the sum of Three

7   Hundred Seventy-Five Thousand Dollars and No Cents ($375,000.00) (the "Initial Deposit") to the

8   Settlement Administrator for the initial notice and administration expenses that will be incurred to

9   provide notice to the Class.  This deadline may be extended by mutual consent of the Parties.

10         (b)    <u>Balance Payment</u>:  No later than fourteen (14) days after the Effective Date,

11   Defendants shall pay an amount equal to the Settlement Fund less the sum of the Initial Deposit (*i.e.*

12   Thirty-Two Million One Hundred and Twenty-Five Thousand Dollars and No Cents

13   ($32,125,000.00) into an escrow bank account (the "Escrow Account"), to be created and

14   administered by the Settlement Administrator pursuant to the terms of this Amended Stipulation of

15   Settlement.  The Escrow Account shall be held in a Qualified Settlement Fund (defined below) in

16   interest bearing bank account deposits with commercial banks with excess capital exceeding One

17   Hundred Million Dollars and No Cents ($100,000,000.00), with a rating of "A" or higher by S&P

18   and insured by the FDIC.  All funds in the Escrow Account shall be deemed to be in the custody of

19   the Court and shall remain subject to the jurisdiction of the Court until such time as the funds shall

20   be distributed or returned to the persons paying the same pursuant to this Settlement and/or further

21   order of the Court.  Interest earned on money in the Escrow Account, less any taxes owed thereon

22   (if any), will be added to the Settlement Fund for the benefit of the Class.

23         (c)    The Parties hereto agree that the Settlement Fund is intended to be a

24   "qualified settlement fund" ("Qualified Settlement Fund") within the meaning of Treasury

25   Regulation § 1.468B-1 and that the Settlement Administrator, within the meaning of Treasury

26   Regulation § 1.468B-2(k)(3), shall be responsible for filing tax returns for the Gross Settlement

27   Amount and paying from the Settlement Fund any taxes owed with respect to the Settlement Fund.

28   The Parties hereto agree that the Settlement Fund shall be treated as a "qualified settlement fund"

1    from the earliest date possible, and agree to any relation-back election required to treat the

2    Settlement Fund as a "qualified settlement fund" from the earliest date possible.  Defense Counsel

3    agree to provide promptly to the Settlement Administrator the statement described in Treasury

4    Regulation § 1.468B-3(e).  All taxes shall be paid out of the Settlement Fund, shall be paid out of

5    the interest earned on the Settlement Fund, be considered to be a cost of administration of the

6    Settlement, and be timely paid by the Settlement Administrator without prior order of the Court, and

7    under no circumstance shall Defendants have any liability related thereto.

8    **B.    Injunctive Relief**

9          54.    In consideration for the Release contained in this Amended Stipulation of

10   Settlement, and without admitting liability for any of the alleged acts or omissions, and in the

11   interest of minimizing the costs inherent in any litigation, within thirty (30) days after execution of

12   this Amended Stipulation of Settlement, if not before, each of the Defendants will implement the

13   following changes in connection with their actions and Uber's Rideshare Service, and thus agree to

14   the following stipulated injunctive relief:

15          (a)    Defendants will not describe or title any fee that they charge for their

16   services, including any charge for Uber's Rideshare Services, as the "Safe Rides Fee."

17          (b)    In any Commercial Advertising, Defendants will not make the following

18   representations regarding their background checks:

19                 (i)    Defendants shall not list any offense type that does not result in

20   automatic disqualification as a driver during the initial screening process without explaining the

21   disqualification criteria; and

22                 (ii)   Defendants shall not represent that they screen against arrests for any

23   instances where Defendants actually screen only against convictions.

24          (c)    In any Commercial Advertising regarding background checks, Defendants

25   shall identify the time period covered by the background check report Defendants use to screen

26   potential drivers or, if shorter, any time period used for disqualification purposes.

27          (d)    In any Commercial Advertising, Defendants shall not use the terms "best

28   available," "industry leading," "gold standard," "safest," or "best-in-class" in connection with their

1    background checks.

2              (e)      In any Commercial Advertising, Defendants shall not use the following

3    phrases to describe Uber's Rideshare Services:  "safest ride on the road," "strictest safety standards

4    possible," "safest experience on the road," "best in class safety and accountability," "safest

5    transportation option," "background checks that exceed any local or national standard," or "safest

6    possible platform."

7              (f)      Before any person or entity may initiate any court proceeding alleging that

8    Defendants have breached the injunctive relief set forth above, that person or entity must serve

9    written notice on Defense Counsel (with copy to Class Counsel) stating with specificity the basis for

10   this allegation.  Defendants will then have thirty (30) days from receipt of notice to cure any alleged

11   breach.  No person or entity may initiate any court proceeding alleging that Defendants have

12   breached the injunctive relief set forth above until this thirty (30) day period has expired.  If

13   Defendants have cured the alleged breach within thirty (30) days, then Defendants shall not be

14   deemed to have breached the injunctive relief set forth above.

15   **C.      Distribution Costs**

16            In consideration for the Release contained in this Amended Stipulation of Settlement, and

17   without admitting liability for any of the alleged acts or omissions, and in the interest of minimizing

18   the costs inherent in any litigation, Defendants, jointly and severally, will pay for the costs

19   associated with distribution of the Settlement Shares to Class Members' Uber Rider Account and/or

20   Uber Payment Account in accordance with and subject to the terms and conditions hereto.

21                          **V.      DISTRIBUTION OF THE SETTLEMENT FUND**

22            55.      Subject to the terms and conditions of this Amended Stipulation of Settlement, the

23   Settlement Fund shall be used for the payment of: (a) the costs and expenses paid to the Settlement

24   Administrator that are associated with disseminating the notice to the Class, including, but not

25   limited to, the Class Notice; (b) the costs and expenses paid to the Settlement Administrator that are

26   associated with administration and effectuation of the Settlement; (c) the Settlement Share to Class

27   Members; (d) the costs of making payments to Electing Class Members' *via* PayPal or eCheck; (e)

28   the distribution of the Residual Funds (the term "Residual Funds" is defined below), if any,

1 pursuant to this Amended Stipulation of Settlement; (f) the Service Award to the Plaintiffs as

2 approved by the Court; and (g) the Attorneys' Fees and Expenses to Class Counsel as approved by

3 the Court.  The Parties must approve any payment of costs or expenses under subsections (a) and

4 (b) of this paragraph, and such approval shall not be unreasonably withheld.  Approval and payment

5 of the Settlement Share to Class Members under subsection (c) of this paragraph shall be in

6 accordance with the terms of this Settlement (*e.g.* Paragraphs 55 to 60) and the Settlement

7 Administration Protocol attached hereto as Exhibit "F."

8      56.    All Class Members are eligible for relief from the Settlement Fund.  The Settlement

9 Fund Balance shall be allocated as Settlement Shares to each Class Member in accordance with

10 Paragraphs 55 to 60 herein.

11      57.    The Settlement Administrator will calculate each Class Member's Settlement Share

12 as follows: each Class Member's Settlement Share shall be equal to (i) twenty-five cents ($0.25)

13 plus (ii) the Additional Per Ride Allocation, times one less than the number of instances that a given

14 class member has used Uber Ride Services With A Safe Rides Fee, if any.  For example, if the

15 Additional Per Ride Allocation is $.05 (five cents), and a Class Member took ten (10) trips on an

16 Uber Ride Service, that Class Member would receive $.70 (seventy cents).  [*$.25 + (Additional Per*

17 *Ride Allocation * (number of Uber Ride Services With A Safe Rides Fee taken by the Class Member*

18 *– 1))*]

19      58.    Within fifteen (15) days after the Effective Date, the Settlement Administrator shall

20 calculate the Settlement Fund Balance by deducting the following from the Settlement Fund: (i) the

21 total Settlement Administrator costs and expenses related to this Settlement (as calculated pursuant

22 to Paragraph 60 herein); (ii) the costs of making payments to Electing Class Members *via* PayPal or

23 eCheck (iii) the Service Award to Plaintiffs awarded by the Court; and (iv) the Attorneys' Fees and

24 Expenses approved by the Court.

25      59.    The Settlement Administrator shall calculate the total number of Class Members, by

26 subtracting the number of persons who submitted a timely, valid opt-out request pursuant to

27 Paragraph 121 herein, from the total number of individuals who fall within the definition of the

28 Class, provided by Defendants pursuant to Paragraph 85(a) herein.

60.     The Settlement Administrator shall calculate the total Settlement Administrator costs and expenses to be deducted from the Settlement Fund, to determine the Settlement Fund Balance pursuant to Paragraph 58 herein, as the sum of the following: (i) the Settlement Administrator's costs and expenses incurred by the Settlement Administrator as of the Effective Date; and (ii) the future Settlement Administrator costs and expenses estimated to be incurred by the Settlement Administrator related to this Settlement.

61.     Within twenty (20) days after the Effective Date, the Settlement Administrator shall provide the Parties with:

(a)     the results of all calculations set forth in Paragraphs 55 to 60 herein; and

(b)     a list of all Class Members in a useable computer format, which will include the following information for each Class Member: (i) the unique identifier set by Defendants; (ii) first and last name; (iii) the e-mail address to which the Summary Notice was sent; and (iv) whether the Class Member submitted a valid Payment Election Form wherein the Class Member elected to receive the Settlement Share by payment to the Class Member's Uber Rider Account, PayPal Account or bank account via eCheck, if applicable.

62.     Distribution to Class Members shall be made by payment to the Class Members' PayPal Account, bank account via eCheck, if applicable, or by payment to their Uber Rider Account as set forth below.  The payment of each Settlement Share, whether by payment to the Class Members' PayPal Account, bank account via eCheck, if applicable, or by payment to their Uber Rider Account, shall have the identical legal effect under this Amended Stipulation of Settlement.

**A.     Distribution By PayPal Account or Bank Account Via eCheck**

63.     Electing Class Members will receive the Settlement Share by payment in amount equal to the Settlement Share to each of their PayPal Accounts, bank accounts via eCheck, or Uber Rider Account pursuant to their selection on the Payment Election Form.

64.     In the event an Electing Class Member chooses payment of the Settlement Share through their Uber Rider Account, payment shall be issued pursuant to Paragraphs 67 to 73 herein and that Class Member will henceforth be considered an Account-Funded Class Member.  PayPal and eCheck payments will be made by Epiq within forty-five (45) days of the Effective Date.

65.     In the event a payment to a PayPal Account or bank account via eCheck, if applicable, is rejected, for any reason, that Class Member's Settlement Share will be issued through a payment to the participating Class Member's Uber Rider Account pursuant to Paragraphs 67 to 73 herein, and that Class Member will henceforth be considered an Account-Funded Class Member, except that the URA Payment set forth in Paragraph 68 will not be made until thirty (30) days after the Settlement Adminitrator provides the affidavit set forth in Paragraph 66.

66.     Within one hundred and thirty (130) days after the Effective Date, the Settlement Administrator will provide Class Counsel and Defendants an affidavit under penalty of perjury containing the following information: (i) a list in a useable computer format of all Electing Class Members (including, the unique identifier set by Defendants, name and e-mail address) for whom the Settlement Administrator was able to successfully make the PayPal Account or bank account via eCheck payment, if applicable; and (ii) a list in a useable computer format of all Electing Class Members (including, the unique identifier set by Defendants, name and email address) for whom the Settlement Administrator's attempt to make the PayPal Account or bank account via eCheck payment, if applicable, was rejected.

**B.     Distribution to The Uber Rider Account**

67.     Account-Funded Class Members will receive the Settlement Share by payment to the Class Member's Uber Rider Account.

68.     Within forty-five (45) days of the Effective Date ("Payment Date"), Defendants will issue a payment equal to the Settlement Share to the Uber Rider Account of each Account-Funded Class Member ("URA Payment").  Defendants agree to process and pay for any and all costs and expenses associated with the effectuation of the URA Payment.  The URA Payment will be non-transferable.  The URA Payment will be applied to the first Uber Rideshare Service billed in the United States (Defendants will decrease the total amount charged for the Uber Rideshare Service by the amount of the URA Payment) to the Account-Funded Class Member's Uber Rider Account after the date the URA Payment becomes available on the Uber Rider Account of Class Members ("URA Payment Date").  In the event a Class Member does not utilize the Uber Rideshare Service within three hundred and sixty-five (365) days from the Payment Date (the "Last Use Date"), the URA

23
AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

Payment will no longer be available on the Account-Funded Class Member's Uber Rider Account and will not be applied to any future Uber Rideshare Services, but instead will be distributed by a single attempt to pay the URA Payment via his or her U.S. credit card, U.S. debit card, PayPal account or other payment linked to the Account-Funded Class Member's Uber Payment Account, as set forth in Paragraphs 76-77.  In the event an Account-Funded Class Member, as of the Payment Date, no longer has an Uber Rider Account, then his or her Settlement Share will be considered Residual Funds as defined in Paragraph 80 herein.

69.     If by the Last Use Date, payment to a Class Member's Uber Payment Account is rejected or cannot be made, for any reason, then that amount will be considered Residual Funds as defined in Paragraph 80 herein.

70.     Every thirty (30) days following the date on which Defendants issue the URA Payments to the Uber Rider Account of each Account-Funded Class Member, Defendants will provide Class Counsel and the Settlement Administrator an affidavit, under penalty of perjury, containing a list in a useable computer format identifying all Account-Funded Class Members (including, the unique identifier set by Defendants, name and e-mail address) whose URA Payment was applied towards Uber Rideshare Services billed to the Account-Funded Class Member's Uber Rider Account during the prior thirty (30) day period (the "Monthly Usage Report").  Defendants will provide Class Counsel and the Settlement Administrator a final Monthly Usage Report (the "Final Monthly Usage Report") no later than thirty-five (35) days after the Last Use Date.

71.     Within seven (7) days of receipt of the Monthly Usage Report from Defendants, the Settlement Administrator shall: (i) confirm that all persons listed in the Monthly Usage Report is a Account-Funded Class Member; (ii) confirm that the URA Payment of all Account-Funded Class Members listed in the Monthly Usage Report was not previously applied towards Uber Rideshare Services billed to the Account-Funded Class Member's Uber Rider Account; and (iii) calculate the aggregate total of the URA Payments applied towards Uber Rideshare Services during the prior thirty (30) day period.

72.     Within fourteen (14) business days of receipt of the Monthly Usage Report from Defendants, the Settlement Administrator shall provide the Parties with the following information:

(i) a list of persons, if any, listed in the Monthly Usage Report who are not an Account-Funded Class Member; (ii) a list of Account-Funded Class Members, if any, listed in the Monthly Usage Report whose Settlement Share was previously applied towards Uber Rideshare Services billed to the Account-Funded Class Member's Uber Rider Account; and (iii) the aggregate total of the Settlement Shares applied towards Uber Rideshare Services during the prior thirty (30) day period. The Parties will meet and confer, in good faith, to resolve any inconsistencies and discrepancies. No Class Members will receive payment to his or her PayPal Account, bank account via eCheck, if applicable, or URA Payment more than once.

73.     Within twenty-one (21) days of receipt of the Monthly Usage Report from Defendants, the Settlement Administrator will wire transfer to Defendants, from the Escrow Account, an amount equal to the aggregate total of the Settlement Shares applied towards Uber Rideshare Services during the prior thirty (30) day period.

**C.     Final Distribution to Account-Funded Class Members**

74.     Within fifteen (15) days after receiving from Defendants the Final Monthly Usage Report, the Settlement Administrator shall provide the Parties with a list identifying all Account-Funded Class Members (including, the unique identifier set by Defendants, name and e-mail address) whose URA Payment to the Uber Rider Account was not applied towards Uber Rideshare Services by the Last Use Date (the "Final Distribution Report").

75.     Within five (5) days after sending the Final Distribution Report, the Settlement Administrator will wire transfer to Defendants, from the Escrow Account, an amount equal to the total aggregate URA Payment of all Account-Funded Class Members identified in the Final Distribution Report, less the total estimated transaction cost of making these payments.

76.     Within ten (10) days after receiving the Final Distribution Report from the Settlement Administrator, Defendants will cause a payment, in the amount of the URA Payment less the average amount (or best estimated amount available) charged by Defendants' merchant service provides for the payment attempt ("Net URA Payment") to be issued to the Uber Payment Account of each Account-Funded Class Member identified in the Final Distribution Report.

77.     In the event the Net URA Payment to an Account-Funded Class Member identified

1  in the Final Distribution Report is rejected or cannot be made, for any reason, Defendants will

2  (within thirty (30) days of such rejection) pay an amount equal to the aggregate of such rejected or

3  unmade Net URA Payments to the Settlement Administrator to be deposited in the Escrow Account.

4          78.     Within twenty (20) days after receiving the Final Distribution Report from the

5  Settlement Administrator, Defendants will provide Class Counsel and the Settlement Administrator

6  an affidavit containing the following information: (i) a list in a useable computer format of all

7  Account-Funded Class Members identified in the Final Distribution Report (including, the unique

8  identifier set by Defendants, name and e-mail address) for whom Defendants were able to

9  successfully issue the Net URA Payment to their respective Uber Payment Account; (ii) the total

10 amount of successful Net URA Payments; (iii) a list in a useable computer format of all Account-

11 Funded Class Members identified in the Final Distribution Report (including, the unique identifier

12 set by Defendants, name and email address) for whom Defendants' attempt to issue the Net URA

13 Payment to their Uber Payment Account was rejected; (iv) the total amount of unsuccuessful Net

14 URA Payments; and (v) the total amount charged by Defendants' merchant services providers for

15 the payment or attempted payment of the Net URA Payment to the Uber Payment Account of each

16 Account-Funded Class Member identified in the Final Distribution Report.

17         79.     Within twenty-five (25) days after receipt of the Final Distribution Report, the

18 Settlement Administrator shall pay, from the Escrow Account, to each of the merchant services

19 providers identified in the affidavit referred to in Paragraph 78 herein, an amount equal to the

20 amount charged by those providers for processing the payment or attempted payment of the Net

21 URA Payment.

22 **D.     Distribution of the Residual**

23         80.     In the event the entire amount of the Settlement Fund Balance is not paid to Class

24 Members' bank accounts via eCheck, if applicable, or by their PayPal Accounts, Uber Payment

25 Accounts or Uber Rider Accounts, including, but not limited to, any funds remaining of the

26 Settlement Fund Balance after all payments described in this Amended Stipulation of Settlement

27 have been paid (the "Residual Funds"), the Settlement Administrator shall distribute the Residual

28 Funds, subject to the Court's approval, to the following non-profit organization: National Consumer

1    Law Center.

2        81.     The Residual Funds will not be returned to Defendants.

3               **VI.**     **NOTICE OF THE SETTLEMENT**

4        82.     Defendants shall comply with 28 U.S.C. §1715 ("CAFA"). No later than ten (10)

5    days after this Agreement is filed with the Court, Defendants shall mail or cause the items specified

6    in 28 U.S.C. §1715(b) to be mailed to each State and Federal official, as specified in 28 U.S.C.

7    §1715(a). All notification duties imposed by 28 U.S.C. §1715, including the corresponding

8    expenses, shall be separate and in addition to any other obligation imposed herein. Any and all cost

9    or expense related to, either directly or indirectly, Defendants' compliance with CAFA shall be paid

10    separately by Defendants, jointly and severally, in addition to the Settlement Fund and shall not be

11    deducted from the Settlement Fund.

12        83.     Notice of the Settlement to the Class Members shall comply with Federal Rules of

13    Civil Procedure and any other applicable statute, law, or rule, including but not limited to, the Due

14    Process Clause of the United States Constitution.

15        84.     The Parties shall jointly recommend and retain Epiq Systems, Inc. to be the

16    Settlement Administrator. Following the Court's preliminary approval of this Amended Stipulation

17    of Settlement and the Court's appointment of the proposed Settlement Administrator, the Settlement

18    Administrator shall disseminate the Class Notice as provided for herein and in the Declaration of

19    the Settlement Administrator, attached hereto as Exhibit "I," as specified in the Preliminary

20    Approval Order and in this Amended Stipulation of Settlement, and in order to comply with all

21    applicable laws, including, but not limited to, the Due Process Clause of the United States

22    Constitution.

23        85.     Dissemination of the Class Notice:

24           (a)     *Class Member Information*: No later than ten (10) days after entry of the

25    Preliminary Approval Order, Defendants shall provide the Settlement Administrator with the name,

26    e-mail address, number of trips on an Uber Safe Ride Service taken by the Class Member during the

27    class period, and a unique identifier to be agreed upon by Defendants and the Settlement

28    Administrator (collectively, "Class Member Information") of each reasonably identifiable Class

1  Member that Defendants possess. No later than ten (10) days after entry of the Preliminary

2  Approval Order, Defendants shall also provide the Settlement Administrator with their best estimate

3  of the number of individuals who are Class Members and for whom Defendants do not have Class

4  Member Information.

5           (i)      Defendants warrant and represent that they will provide the most

6  current Class Member Information for all Class Members.

7         (b)    *Internet Website*: Prior to the dissemination of the Class Notice, the

8  Settlement Administrator shall establish an Internet website, www.RideShareSettlement.com, that

9  will inform Class Members of the terms of this Amended Stipulation of Settlement, their rights,

10  dates and deadlines and related information.  The website shall include, in .pdf format, the

11  following: (i) the Long Form Notice; (ii) the Payment Election Form; (iii) the Preliminary Approval

12  Order; (iv) this Amended Stipulation of Settlement (including all of its Exhibits), (v) the

13  Consolidated Class Action Complaint filed on January 7, 2016; and (vi) any other materials agreed

14  upon by the Parties and/or required by the Court.  The Internet website shall provide Class Members

15  with the ability to complete and submit the Payment Election Form electronically.  The Internet

16  website shall also make the Payment Election Form available for download.  Banner ads on the

17  Internet, if any, shall direct Class Members to the website.

18         (c)    *Toll Free Telephone Number*: Prior to the dissemination of the Class Notice,

19  the Settlement Administrator shall establish a toll-free telephone number, through which Class

20  Members may obtain information about the Action and the Settlement and request a mailed copy of

21  the Long Form Notice and/or the Payment Election Form, pursuant to the terms and conditions of

22  this Amended Stipulation of Settlement.

23         (d)    *Electronic (E-mail) and Publication*: Within thirty (30) days after the entry of

24  the Preliminary Approval Order and to be substantially completed not later than sixty (60) days

25  after entry of the Preliminary Approval Order, and subject to the requirements of this Amended

26  Stipulation of Settlement and the Preliminary Approval Order, the Parties will coordinate with the

27  Settlement Administrator to provide notice to the Class as follows:

28           (i)      E-mailing the Summary Notice, to all Class Members identified by

1  Defendants pursuant to Paragraph 85(a) herein and as specified in the Preliminary Approval Order

2  and as set forth in the Declaration of the Settlement Administrator, attached hereto as Exhibit "I";

3                 (ii)     Publishing the Publication Notice and Banner Advertisements

4  (attached hereto as Exhibit "H") in print publications and via Internet advertising, pursuant to the

5  Preliminary Approval Order and as set forth in the Declaration of the Settlement Administrator,

6  attached hereto as Exhibit "I";

7                 (iii)    Publishing, on or before the Notice Date, the Long Form Notice on

8  the settlement website (www.RideShareSettlement.com), as specified in the Preliminary Approval

9  Order and as set forth in the Declaration of the Settlement Administrator, attached hereto as

10  Exhibit "I"; and

11                 (iv)    Providing the Internet address, in the Long Form Notice and the

12  Summary Notice, to the settlement website (www.RideShareSettlement.com).

13         86.    The Long Form Notice:  The Long Form Notice shall be in a form substantially

14  similar to the document attached to this Amended Stipulation of Settlement as Exhibit "E" and shall

15  comport to the following:

16            (a)    General Terms:  The Long Form Notice shall contain a plain and concise

17  description of the nature of the Action and the proposed Settlement, including information on the

18  definition of the Class, the identity of Class Members, how the proposed Settlement would provide

19  relief to Class Members, what claims are released under the proposed Settlement, and other relevant

20  information.

21            (b)    Opt-Out Rights:  The Long Form Notice shall inform Class Members that

22  they have the right to opt out of the Settlement.  The Long Form Notice shall provide the deadlines

23  and procedures for exercising this right.

24            (c)    Objection to Settlement:  The Long Form Notice shall inform Class Members

25  of their right to object to the proposed Settlement and appear at the Fairness Hearing.  The Class

26  Notice shall provide the deadlines and procedures for exercising these rights.

27            (d)    Fees and Expenses:  The Long Form Notice shall inform Class Members that

28  fees and expenses related to the Settlement Administrator will be deducted from the Settlement

Fund, the maximum amounts to be sought by Class Counsel as Attorneys' Fees and Expenses and individual Service Awards to Plaintiffs, and shall explain that the fees and expenses awarded to Class Counsel, and Service Awards to Plaintiffs, in addition to amounts being made available for relief to Class Members, will be deducted from the Settlement Fund and be paid out of the Settlement Fund.

(e)      Payment Election Form:  The Long Form Notice shall include the Payment Election Form, both of which shall inform the Class Member: (i) that he or she can elect to receive the Settlement Share by payment to the Class Member's PayPal Account, bank account via eCheck, if applicable, or by payment to the Uber Rider Account; (ii) that in order to receive the Settlement Share by payment to the Class Member's PayPal Account or bank account via eCheck, if applicable, the Class Member must fully complete and timely submit the Payment Election Form prior to the Payment Election Deadline; and (iii) that if the Class Member elects to receive the Settlement Share by a payment to the Class Member's PayPal Account or bank account via eCheck, if applicable, it is the responsibility of the Class Member to ensure that the payment information in the Class Member's Payment Election Form is current until such time as the payment of the Settlement Share has been issued.

87.     The Summary Notice:  The Settlement Administrator shall have the e-mailing and publication of the Summary Notice substantially completed pursuant to this Amended Stipulation of Settlement, the Preliminary Approval Order, and as described in the Declaration of the Settlement Administrator, attached hereto as Exhibit "I," and in such other method and manner as shall be agreed upon by the Parties.  The form of Summary Notice agreed upon by the Parties is in the form substantially similar to the one attached hereto as Exhibit "G."

88.     Reminder Notice to Account-Funded Class Members:  Three (3) days prior to the payment of the Net URA Payment to the Account-Funded Class Members' Uber Payment Account, the Settlement Administrator will email a reminder notice to all Account-Funded Class Members identified in the Final Distribution Report.  The Reminder Notice shall inform all Account-Funded Class Members identified in the Final Distribution Report: (i) that because the payment of the URA Payment was not applied towards Uber Rideshare Services billed to the Account-Funded Class

Member's Uber Rider Account by the Last Use Date, a single attempt to pay the URA Payment to the Account-Funded Class Member's Uber Payment Account will be made; (ii) that in order for the Account-Funded Class Member to receive payment of the Settlement Share *via* his or her Uber Payment Account, the Account-Funded Class Member must ensure that a default U.S. credit card, U.S. debit card, PayPal account, or other payment method linked to the Account-Funded Class Member's Uber Rider Account is current and accurate; and (iii) how to update the default U.S. credit card, U.S. debit card, PayPal account, or other payment method linked to the Account-Funded Class Member's Uber Rider Account.

VII.    **ATTORNEYS' FEES AND EXPENSES AND CLASS REPRESENTATIVE SERVICE AWARDS**

89.    In recognition of the time and effort the representative Plaintiffs expended in pursuing this action and in fulfilling their obligations and responsibilities as class representatives, and of the benefits conferred on all Class Members by the Settlement, Class Counsel, may ask the Court for the payment of a Service Award from the Settlement Fund to each of the representative Plaintiffs.  The Service Award payments as awarded by the Court shall be deducted from the Settlement Fund and paid by the Settlement Administrator from the Escrow Account within seventeen (17) days after the Effective Date or within three (3) business days after the Court has entered an order awarding any Service Award to the representative Plaintiffs, whichever is later.

90.    Class Counsel will make an application to the Court for an award of Attorneys' Fees and Expenses in the Action incurred up to the submission of the application to the Court prior to the Fairness Hearing.  The amount of the Attorneys' Fees and Expenses will be determined by the Court, and in no event shall Defendants be obligated to pay any amount in excess of the Settlement Fund.

91.    Any Attorneys' Fees and Expenses awarded by the Court shall be deducted from the Settlement Fund and paid by the Settlement Administrator from the Escrow Account.  Such payment will be in lieu of statutory fees Plaintiffs and/or their attorneys might otherwise have been entitled to recover from Defendants.  This amount shall be inclusive of all fees and costs of Class Counsel to be paid by Defendants and/or the Settlement Fund in the Action.  Plaintiffs and Class

1  Counsel agree that Defendants shall not pay, or be obligated to pay, in excess of any award of

2  Attorneys' Fees and Expenses by the Court, and that in no event shall Defendants be obligated to

3  pay any amount in excess of the Settlement Fund.

4        92.    Any Attorneys' Fees and Expenses awarded by the Court shall be paid from the

5  Settlement Fund within seventeen (17) days after the Effective Date or within three (3) business

6  days after the Court has entered an order awarding any Attorneys' Fees and Expenses, whichever is

7  later.  Class Counsel shall have the sole and absolute discretion to allocate the Attorneys' Fees and

8  Expenses amongst Class Counsel and any other attorneys for Plaintiffs.  Defendants shall have no

9  liability or other responsibility for allocation of any such Attorneys' Fees and Expenses awarded,

10  and, in the event that any dispute arises relating to the allocation of fees, Class Counsel agree to

11  indemnify and hold Defendants harmless from any and all such liabilities, costs, and expenses of

12  such dispute.

13        93.    The procedure for and the allowance or disallowance by the Court of any application

14  for attorneys' fees, costs, expenses, or reimbursement to be paid to Class Counsel are not part of the

15  settlement of the Released Claims as set forth in this Amended Stipulation of Settlement, and are to

16  be considered by the Court separately from the Court's consideration of the fairness,

17  reasonableness, and adequacy of the settlement of the Released Claims as set forth in this Amended

18  Stipulation of Settlement.  Any such separate order, finding, ruling, holding, or proceeding relating

19  to any such applications for attorneys' fees and expenses, or any separate appeal from any separate

20  order, finding, ruling, holding, or proceeding relating to them or reversal or modification of them,

21  shall not operate to terminate or cancel this Amended Stipulation of Settlement or otherwise affect

22  or delay the finality of the Final Order and Final Judgment or the Settlement.

23             **VIII.   RELEASES AND DISMISSAL OF ACTION**

24        94.    ***Release from Plaintiffs and Class Members to Defendants***.  Upon the Effective

25  Date, the Releasing Parties shall be deemed to have, and by operation of the Final Order and Final

26  Judgment shall have, fully, finally and forever released, relinquished, and discharged all Released

27  Claims against the Released Parties.

28        95.    With respect to the Released Claims, Plaintiffs and Class Members expressly waive

1   and relinquish the provisions, rights and benefits of section 1542 of the California Civil Code and

2   any analogous law, statute, or rule.  Section 1542 states:

3
        A  GENERAL  RELEASE  DOES  NOT  EXTEND  TO  CLAIMS
4       WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO
        EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING
5       THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST
        HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT
6       WITH THE DEBTOR.

7   Representative Plaintiffs fully understand that the facts in existence at the time this Amended

8   Stipulation of Settlement is executed and entry of the Preliminary Approval Order may be different

9   from the facts now believed by representative Plaintiffs to be true and expressly accept and assume

10  the risk of this possible difference in facts and agree that this Amended Stipulation of Settlement

11  remains effective despite any difference in facts.  In connection with such waiver and

12  relinquishment, representative Plaintiffs hereby acknowledge that they are aware that they or their

13  attorneys may hereafter discover claims or facts in addition to or different from those that they now

14  know or believe exist with respect to the Released Claims, but that it is their intention to hereby

15  fully, finally, and forever settle and release all of the Released Claims known or unknown,

16  suspected or unsuspected, that they have against the Released Parties.  In furtherance of such

17  intention, the Release herein given by Plaintiffs and the Class Members to the Released Parties shall

18  be and remain in effect as a full and complete general release notwithstanding the discovery or

19  existence of any such additional different claims or facts.  Representative Plaintiffs expressly

20  acknowledge that they have been advised by Class Counsel of the contents and effect of Section

21  1542, and with knowledge, each of them hereby expressly waive whatever benefits they may have

22  had pursuant to such section.  Further, Plaintiffs and the Class Members agree that this waiver is an

23  essential and material term of this release and the Amended Stipulation of Settlement that underlies

24  it and that without such waiver Defendants would not have accepted or agreed to the Amended

25  Stipulation of Settlement.  Notwithstanding any provision of this paragraph, Plaintiffs and Class

26  Members are not releasing any claims for personal injuries.

27      96.   ***Release from Defendants to Plaintiffs***.  Upon the Effective Date, Defendants, on

28  behalf of themselves, their heirs, executors, administrators, predecessors, successors and assigns,

shall release, forever discharge the Plaintiffs, Class Counsel, and their attorneys from and shall be forever barred from instituting, maintaining, or prosecuting the Defendants' Released Claims. "Defendants' Released Claims" means any and all claims, causes of action, cross-claims, counter claims, liens, demands, actions, causes of action, obligations, damages or liabilities of any nature whatsoever against Plaintiffs, Class Counsel and  their attorneys, known or unknown, whether arising under any international, federal, state or local statute, ordinance, common law, regulation, principle of equity or otherwise, that arise out of or relate in any way, to the institution, filing, prosecution, or settlement of the Action.

97.     Members of the Class who have opted out of the Settlement by the date set by the Court do not release their claims and will not obtain any benefits of the Settlement.

98.     The Court shall enter an order retaining jurisdiction over the Parties to this Amended Stipulation of Settlement with respect to the enforcement and future performance of the terms of this Amended Stipulation of Settlement.  In the event that any applications for relief are made, such applications shall be made to the Court.

99.     Upon the Effective Date: (a) this Amended Stipulation of Settlement shall be the exclusive remedy for any and all Released Claims of Plaintiffs and Class Members; and (b) Plaintiffs and the Class Members stipulate to be and shall be permanently barred and enjoined by Court order from initiating, asserting, or prosecuting against the Released Parties in any federal or state court or tribunal any and all Released Claims.

100.     Notwithstanding anything to the contrary in this Amended Stipulation of Settlement, nothing in this Amended Stipulation of Settlement shall release any claims that Defendants or any of the Released Parties have against their insurers, including, without limitation, under any policy issued to, or on behalf of, or for the benefit of, Defendants or any of the Released Parties.

### IX.     ADMINISTRATION OF THE SETTLEMENT

101.     Because the names of Class Members and other personal information about them will be provided to the Settlement Administrator for purposes of providing cash benefits and processing opt out requests, the Settlement Administrator will execute a confidentiality and non-disclosure agreement with Defendants and Class Counsel and will ensure that any information

1   provided to it by Class Members will be secure and used solely for the purpose of effecting this

2   Settlement.

3         102.    In fulfilling its responsibilities in providing Class Notice, the Settlement

4   Administrator shall be responsible for, without limitation, consulting on and designing the notice to

5   the Class, including implementing the notice program set forth in the Declaration of the Settlement

6   Administrator attached as Exhibit "I."  In particular, the Settlement Administrator shall be

7   responsible for:  (a) arranging for the publication of the Summary Notice and dissemination of the

8   Class Notice as set forth in the Declaration of the Settlement Administrator attached hereto as

9   Exhibit "I" and pursuant to the requirements of this Amended Stipulation of Settlement;

10  (b) designing and implementing notice to the Class by various means as set forth in the Declaration

11  of the Settlement Administrator attached hereto as Exhibit "I" and pursuant to the requirements of

12  this Amended Stipulation of Settlement; (c) responding to requests from Class Counsel and/or

13  Defense Counsel; and (d) otherwise implementing and/or assisting with the dissemination of the

14  notice of the Settlement as set forth in the Declaration of the Settlement Administrator attached

15  hereto as Exhibit "I" and pursuant to the requirements of this Amended Stipulation of Settlement.

16        103.    The Settlement Administrator also shall be responsible for, without limitation,

17  dissemination of Class Notice as set forth in the Declaration of the Settlement Administrator

18  attached hereto as Exhibit "I" and implementing the terms of the payment election process and

19  related administrative activities that include communications with Class Members concerning the

20  Settlement, the payment election process, and their options thereunder.  In particular, the Settlement

21  Administrator shall be responsible for:  (a) printing, e-mailing, mailing or otherwise arranging for

22  the mailing of the Class Notice in response to Class Members' requests; (b) making any mailings

23  required under the terms of this Amended Stipulation of Settlement; (c) establishing a settlement

24  website (www.RideShareSettlement.com) that contains the Payment Election Form; (d) establishing

25  a toll-free voice response unit with message and interactive voice response (IVR) capabilities to

26  which Class Members may refer for information about the Action and the Settlement; (e) receiving

27  and maintaining any Class Member correspondence regarding requests for exclusion to the

28  Settlement; (f) forwarding inquiries from Class Members to Class Counsel for a response, if

1   warranted; (g) establishing an e-mail address and  post office box for the receipt of Payment

2   Election Forms, exclusion requests, and any correspondence; (h) reviewing Payment Election

3   Forms according to the review protocols agreed to by the Parties and set forth in this Amended

4   Stipulation of Settlement and the Settlement Administration Protocol, attached hereto as

5   Exhibit "F"; and (i) otherwise implementing and/or assisting with the Payment Election Form

6   review process and the payment of Settlement Shares to Class Members.

7         104.   The Settlement Administrator shall administer the Settlement in accordance with the

8   terms of this Amended Stipulation of Settlement (including, but not limited to, the Settlement

9   Administration Protocol attached as Exhibit "F") and, without limiting the foregoing, shall:

10              (a)     Treat any and all documents, communications and other information and

11   materials received in connection with the administration of the Settlement as confidential and shall

12   not disclose any or all such documents, communications or other information to any person or entity

13   except as provided for in this Amended Stipulation of Settlement or by court order;

14              (b)     Receive requests for exclusion or opt out requests from Class Members and

15   provide to Class Counsel and Defense Counsel a copy thereof within three (3) days of receipt.  If

16   the Settlement Administrator receives any requests for exclusion or opt out request after the

17   deadline for the submission of such requests, the Settlement Administrator shall promptly provide

18   Class Counsel and Defense Counsel with copies thereof; and

19              (c)     Receive and maintain all correspondence from any Class Member regarding

20   the Settlement.

21         105.   The Settlement Administrator shall be reimbursed from the Settlement Fund up to

22   the amount specified in the Declaration of the Settlement Administrator, attached hereto as

23   Exhibit "I" toward reasonable costs, fees, and expenses of providing notice to the Class and

24   administering the Settlement in accordance with this Amended Stipulation of Settlement.

25         106.   Each Class Member may submit a Payment Election Form.  Class Members must

26   follow and abide by the instructions set forth in the Payment Election Form.  When requested in the

27   Payment Election Form, the Payment Election Form shall include an attestation, substantially in the

28   following form: "I declare under penalty of perjury that the information provided above is true and

accurate."  Payment Election Forms will be: (a) included on the settlement website

(www.RideShareSettlement.com) to be designed and administered by the Settlement Administrator;

and (b) made readily available from the Settlement Administrator, as provided in the Preliminary

Approval Order.  In the Summary Notice that will be emailed pursuant to the Parapraph 85(d)(i)

herein, each Class Member shall be provided a unique individualized number, referred to as a Claim

Number.  In the event a Class Member does not have his or her Claim Number, that Class

Member's Payment Election Form must include proof(s) of purchase for each Uber Ride Service

With A Safe Rides Fee that the Class Member claims compensation for pursuant to the terms and

conditions of this Settlement.

107.    Payment Election Forms that do not meet the requirements set forth in this Amended

Stipulation of Settlement and in the Payment Election Form instructions shall be rejected.  Where a

good faith basis exists, the Settlement Administrator may reject a Class Member's Payment

Election Form for, among other reasons (including those set forth in the Settlement Administration

Protocol, attached hereto as Exhibit "F"), the following:

(a)    Failure to fully complete and/or sign the Payment Election Form;

(b)    Illegible Payment Election Form;

(c)    The person submitting the Payment Election Form is not a Class Member;

(d)    The Payment Election Form is fraudulent;

(e)    The Payment Election Form is duplicative of another Payment Election

Form;

(f)    The person submitting the Payment Election Form requests that payment be

made to a person or entity other than the Class Member for whom the Payment Election Form is

submitted;

(g)    Failure to submit a Payment Election Form by the Payment Election

Deadline; and/or

(h)    The Payment Election Form otherwise does not meet the requirements of this

Amended Stipulation of Settlement.

108.     The Settlement Administrator shall determine whether a Payment Election Form meets the requirements set forth in this Amended Stipulation of Settlement.  Each Payment Election Form shall be submitted to and reviewed by the Settlement Administrator, who shall determine (in accordance with this Amended Stipulation of Settlement and the Settlement Administration Protocol, attached hereto as Exhibit "F") the extent, if any, to which the election shall be allowed.

109.     Payment Election Forms that do not meet the terms and conditions of this Amended Stipulation of Settlement shall be promptly rejected by the Settlement Administrator.  The Settlement Administrator shall have ten (10) days from the Payment Election Deadline to exercise the right of rejection.  The Settlement Administrator shall notify the Class Member using the contact information provided in the Payment Election Form of the rejection.  Class Counsel and Defense Counsel shall be provided with copies of all such notifications to Class Members.  If any Class Member whose Payment Election Form has been rejected, in whole or in part, desires to contest such rejection, the Class Member must, within ten (10) business days from receipt of the rejection, transmit to the Settlement Administrator by e-mail or U.S. mail a notice and statement of reasons indicating the  grounds for contesting the rejection, along with any supporting documentation, and requesting further review by the Settlement Administrator, in consultation with Class Counsel and Defense Counsel, of the denial of the Payment Election Form.  If Class Counsel and Defense Counsel cannot agree on a resolution of the Class Member's notice contesting the rejection, the disputed Payment Election Form shall be presented to the Court or a referee appointed by the Court for summary and non-appealable resolution.

110.     No person shall have any claim against Defendants, Defense Counsel, Plaintiffs, Class Counsel, the Class, and/or the Settlement Administrator based on any eligibility determinations, distributions, or awards made in accordance with this Amended Stipulation of Settlement.  This provision does not affect or limit in any way the right of review by the Court or referee of any disputed Payment Election Forms as provided in this Amended Stipulation of Settlement.

111.     Any Class Member who fails to submit a Payment Election Form by the Payment Election Deadline shall become an Account-Funded Class Member and will receive the Settlement

Share by payment to the Class Member's Uber Rider Account.  A Payment Election Form may be submitted electronically at the settlement website (www.RideShareSettlement.com) to be designed and administered by the Settlement Administrator.  The Payment Election Form shall be deemed to have been submitted when it is actually received by the Settlement Administrator.

112.    Class Counsel and Defense Counsel shall have the right to inspect the Payment Election Forms and supporting documentation received by the Settlement Administrator at any time upon reasonable notice.

113.    Any Class Member who, in accordance with the terms and conditions of this Amended Stipulation of Settlement, does not seek exclusion from the Class will be bound together with all Class Members by all of the terms of this Amended Stipulation of Settlement, including the terms of the Final Order and Final Judgment to be entered in the Action and the releases provided for herein, and will be barred from bringing any action in any forum (state or federal) against any of the Released Parties concerning the Released Claims.

114.    Not later than fourteen (14) days before the date of the Fairness Hearing, the Settlement Administrator shall file with the Court a document: (a) containing a list of those persons who have opted out or excluded themselves from the Settlement; (b) stating the total estimated number of Class Members, and (c) the details regarding the number of valid Payment Election Forms received and processed by the Settlement Administrator.

115.    The Settlement Administrator may retain one or more persons to assist in the completion of its responsibilities.

116.    If the Settlement is not approved or for any reason the Effective Date does not occur, no payments or distributions of any kind shall be made pursuant to this Amended Stipulation of Settlement, except for the costs and expenses of the Settlement Administrator, which shall be paid out of the Escrow Account, and for which Plaintiffs and/or Class Counsel are not responsible.  In the event the Settlement Administrator fails to perform its duties, and/or makes a material or fraudulent misrepresentation to, or conceals requested material information from, Class Counsel, Defendants, and/or Defense Counsel, then the party to whom the misrepresentation is made shall, in addition to any other appropriate relief, have the right to demand that the Settlement Administrator

1   immediately be replaced.  No party shall unreasonably withhold consent to remove the Settlement

2   Administrator.  The Parties will attempt to resolve any disputes regarding the retention or dismissal

3   of the Settlement Administrator in good faith, and, if they are unable to do so, will refer the matter

4   to the Court for resolution.

5          117.    The Settlement Administrator shall coordinate with Defense Counsel to provide

6   notice as required by 28 U.S.C. § 1715, and all costs associated thereto shall be paid by Defendants,

7   in addition to Defendants' obligation to create/pay the Settlement Fund.

8          118.    Defendants and the Released Parties are not obligated to (and will not be obligated

9   to) compute, estimate, or pay any taxes on behalf of any Plaintiff, any Class Member, Class

10  Counsel, Class Counsel, and/or the Settlement Administrator.

11                 **X.      OBJECTIONS AND OPT-OUTS BY CLASS MEMBERS**

12         119.    Any written objection to the Settlement must (i) clearly identify the case name and

13  number; (ii) be submitted to the Court by filing the written objection through the Court's Case

14  Management/Electronic Case Files ("CM/ECF") system, by mailing the written objection to the

15  Class Action Clerk for United States District Court for the Northern District, or by filing the written

16  objection in person at any location of the United States District Court for the Northern District of

17  California; and (iii) be filed or postmarked on or before the objection deadline provided in the

18  Court's Preliminary Approval Order.  Only Settlement Class Members who do not Opt-Out may file

19  objections.  To the extent a timely objection is withdrawn before final approval, such an objection

20  shall be treated as though no objection has been made.

21         120.    The Parties shall request that the Court allow any interested party to file a reply to

22  any objection, no later than seven (7) days before the Fairness Hearing, or as the Court may

23  otherwise direct.

24         121.    Members of the Class may elect to opt out of the Settlement, relinquishing their

25  rights to benefits hereunder.  Members of the Class who opt out of the Settlement will not release

26  their claims pursuant to this Amended Stipulation of Settlement.  Class Members wishing to opt out

27  of the Settlement must send to the Settlement Administrator by U.S. mail (to the address provided

28  in the Class Notice) a letter including (a) their full name; (b) the email address and/or telephone

1  number associated with their Uber Rider Account; (c) a clear statement communicating that they

2  elect to be excluded from the Class, do not wish to be a Class Member, and elect to be excluded

3  from any judgment entered pursuant to the Settlement; (d)  the case name and case number

4  (*McKnight et al. v. Uber Technologies, Inc. et al.*, No. 3:14-cv-05615-JST); and (e) their signature.

5  Any request for exclusion or opt out must be postmarked on or before the exclusion or opt out

6  deadline provided in the Court's Preliminary Approval Order.  The date of the postmark on the

7  return-mailing envelope shall be the exclusive means used to determine whether a request for

8  exclusion has been timely submitted.  Members of the Class who fail to submit a valid and timely

9  request for exclusion on or before the date specified in the Court's Preliminary Approval Order

10  shall be bound by all terms of this Amended Stipulation of Settlement and the Final Order and Final

11  Judgment, regardless of whether they have requested exclusion from the Settlement.

12       122.  Any member of the Class who submits a timely request for exclusion or opt out may

13  not file an objection to the Settlement and shall be deemed to have waived any rights or benefits

14  under this Amended Stipulation of Settlement.

15       123.  The Settlement Administrator shall promptly provide copies of all requests for

16  exclusion, objections, and/or related correspondence from Class Members to Class Counsel and

17  Defense Counsel.  Not later than three (3) business days after the deadline for submission of

18  requests for exclusion or opt out, the Settlement Administrator shall provide to Class Counsel and

19  Defense Counsel a complete opt out list together with copies of the opt out requests.

20       124.  On the date set forth in the Preliminary Approval Order, a Fairness Hearing shall be

21  conducted to determine final approval of the Settlement.  A motion in support of final approval of

22  the Settlement shall be filed no later than seven (7) days before the Fairness Hearing.  A motion for

23  Service Awards to the Plaintiffs and an award of Attorneys' Fees and Expenses to Class Counsel

24  shall be filed no later than fourteen (14) before deadline to object or opt-out of the Settlement.

25  Upon final approval of the Settlement by the Court at or after the Fairness Hearing, the Parties shall

26  present the Final Order and Final Judgment, substantially in the form attached to this Amended

27  Stipulation of Settlement as Exhibits "A" and "B," and a final order approving the Attorneys' Fees

28  and Expenses and the Service Awards, to the Court for approval and entry.

XI.   **SCOPE AND EFFECT OF CONDITIONAL CERTIFICATION OF THE CLASS SOLELY FOR PURPOSES OF SETTLEMENT**

125.   For purposes of settlement only, the Parties agree to seek provisional certification of the Class. The Parties further agree that the Court should make preliminary findings and enter the Preliminary Approval Order (substantially in the form attached at Exhibit "D") granting provisional certification of the Class subject to final findings and ratification in the Final Order and Final Judgment, and appointing the representative Plaintiffs as the representatives of the Class and Class Counsel as counsel for the Class.

126.   Defendants do not consent to certification of the Class for any purpose other than to effectuate the Settlement of the Action. Defendants' agreement to conditional certification does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to Plaintiffs or any of the putative class members.

127.   If this Amended Stipulation of Settlement is terminated pursuant to its terms, disapproved by any court (including any appellate court), and/or not consummated for any reason, or the Effective Date for any reason does not occur, the order certifying the Class for purposes of effectuating this Amended Stipulation of Settlement, and all preliminary and/or final findings regarding that class certification order, shall be automatically vacated upon notice of the same to the Court, the Action shall proceed as though the Class had never been certified pursuant to this Amended Stipulation of Settlement and such findings had never been made, and the Action shall return to the procedural status quo in accordance with this paragraph.  Class Counsel shall not refer to or invoke the vacated findings and/or order relating to class settlement in the event this Amended Stipulation of Settlement is not consummated and the case is later litigated and contested by Defendants.

XII.   **MODIFICATION OR TERMINATION OF THE SETTLEMENT**

128.   The terms and provisions of this Amended Stipulation of Settlement may be amended, modified, or expanded by written agreement of the Parties and approval of the Court; provided, however that, after entry of the Final Order and Final Judgment, the Parties may by written agreement effect such amendments, modifications, or expansions of this Amended

42

1    Stipulation of Settlement and its implementing documents (including all exhibits hereto) without

2    further notice to the Class or approval by the Court if such changes are consistent with the Court's

3    Final Order and Final Judgment and do not materially alter, reduce or limit the rights of Class

4    Members under this Amended Stipulation of Settlement.

5            129.    In the event the terms or conditions of this Amended Stipulation of Settlement, *other*

6    *than* terms pertaining to the Attorneys' Fees and Expenses and/or Service Awards, are materially

7    modified by any court, either party in its sole discretion to be exercised within fourteen (14) days

8    after such a material modification may declare this Stipulation of Settlement null and void (with the

9    exception of Paragraphs 101, 104(a), 126, 127, 131, 132, 152, and 154 herein).  In the event that a

10   party exercises his/her/its option to withdraw from and terminate this Amended Stipulation of

11   Settlement, then the Settlement proposed herein shall become null and void (with the exception of

12   Paragraphs 101, 104(a), 126, 127, 131, 132, 152, and 154 herein) and shall have no force or effect,

13   the Parties shall not be bound by this Amended Stipulation of Settlement, and the Parties will be

14   returned to their respective positions existing immediately before the execution of this Amended

15   Stipulation of Settlement.  Notwithstanding the foregoing Paragraph 129, in the event this Amended

16   Stipulation of Settlement is not approved by any court, or the Settlement set forth in this Amended

17   Stipulation of Settlement is declared null and void, or in the event that the Effective Date does not

18   occur, Class Members, Plaintiffs, and Class Counsel shall not in any way be responsible or liable

19   for any costs of notice and administration associated with this Settlement or this Amended

20   Stipulation of Settlement, except that each Party shall bear its own attorneys' fees and costs and

21   Defendants' future payment obligations shall cease.

22           130.    Notwithstanding any other provision of this Stipulation of Settlement, if more than

23   five percent (5%) of the Class opt out of the Settlement, Defendants, in their sole discretion, may

24   rescind and revoke the entire Settlement and this Stipulation of Settlement, thereby rendering the

25   Settlement null and void in its entirety (with the exception of Paragraphs 101, 104(a), 126, 127, 131,

26   132, 152, and 154 herein), by sending written notice that Defendants revoke the settlement pursuant

27   to this paragraph to Class Counsel within five (5) business days following the date the Settlement

28   Administrator informs Defendants of the number of members of the Class who have requested to

1   opt out of the Settlement pursuant to the provisions set forth above.  If Defendants rescind the

2   Settlement pursuant to this paragraph, they shall have no further obligations to pay the Settlement

3   Fund and shall be responsible for only the fees and expenses actually incurred by the Settlement

4   Administrator, which will be paid out of the Escrow Account, and for which Plaintiffs and their

5   Counsel are not liable.

6   **XIII.   SETTLEMENT NOT EVIDENCE AGAINST PARTIES**

7        131.    The Parties expressly acknowledge and agree that this Amended Stipulation of

8   Settlement and its Exhibits, along with all related drafts, motions, pleadings, conversations,

9   negotiations, information exchanged, and correspondence relating thereto, constitute an offer of

10  compromise and a compromise within the meaning of Federal Rule of Evidence 408, the mediation

11  privilege, and any equivalent state law or rule.  In no event shall this Amended Stipulation of

12  Settlement, any of its provisions or any negotiations, statements or court proceedings relating to its

13  provisions in any way be construed as, offered as, received as, used as, or deemed to be evidence of

14  any kind in the Action, any other action, or in any judicial, administrative, regulatory or other

15  proceeding, except that this Amended Stipulation of Settlement is intended to be admissible and

16  subject to disclosure for the purpose of carrying out the Settlement, in a proceeding to enforce this

17  Amended Stipulation of Settlement or the rights of the Parties or their counsel, and by Defendants

18  in connection with any claim or action relating to Defendants' insurance coverage for the

19  Settlement.  Without limiting the foregoing, neither this Amended Stipulation of Settlement nor any

20  related negotiations, statements, or court proceedings shall be construed as, offered as, received as,

21  used as or deemed to be evidence or an admission or concession of any liability or wrongdoing

22  whatsoever on the part of any person or entity, including, but not limited to, Defendants, the

23  Released Parties, Plaintiffs, or the Class, or as a waiver by Defendants, the Released Parties,

24  Plaintiffs, or the Class of any applicable privileges, claims or defenses.

25       132.    The provisions contained in this Amended Stipulation of Settlement are not and shall

26  not be deemed a presumption, concession, or admission by Defendants of any default, liability or

27  wrongdoing as to any facts or claims alleged or asserted in the Action, or in any actions or

28  proceedings, nor shall they be interpreted, construed, deemed, invoked, offered, or received in

44
AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

1   evidence or otherwise used by any person in the Action, or in any other action or proceeding,

2   whether civil, criminal or administrative, except that Defendants may file this Amended Stipulation

3   of Settlement or the Final Judgment in any action that may be brought against any Released Parties

4   in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel,

5   release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or

6   issue preclusion or similar defense or counterclaim.  Defendants expressly deny the allegations in

7   the Action.  Defendants do not admit that they or any of the Released Parties have engaged in any

8   wrongful activity or that any person has sustained any damage by reason of any of the facts

9   complained of in the Action.  Defendants do not consent to certification of the Class for any

10  purpose other than to effectuate the Settlement of the Action.

11              **XIV.  BEST EFFORTS**

12          133.   Class Counsel shall take all necessary actions to accomplish approval of the

13  Settlement, the Class Notice, and dismissal of the Action.  The Parties (including their counsel,

14  successors, and assigns) agree to cooperate fully and in good faith with one another and to use their

15  best efforts to effectuate the Settlement, including without limitation in seeking preliminary and

16  final Court approval of this Amended Stipulation of Settlement and the Settlement embodied herein,

17  carrying out the terms of this Amended Stipulation of Settlement, and promptly agreeing upon and

18  executing all such other documentation as may be reasonably required to obtain final approval by

19  the Court of the Settlement.  In the event that the Court fails to approve the Settlement or fails to

20  issue the Final Order and Final Judgment, the Parties agree to use all reasonable efforts, consistent

21  with this Amended Stipulation of Settlement and subject to Paragraph 129, to cure any defect

22  identified by the Court.

23          134.   Each Party will cooperate with the other party in connection with effectuating the

24  Settlement or the administration of claims thereunder. Any requests for cooperation shall be

25  narrowly tailored and reasonably necessary for the requesting Party to recommend the Settlement to

26  the Court, and to carry out its terms.

27

28

## XV.   **MISCELLANEOUS PROVISIONS**

135.    The Parties agree that the recitals are contractual in nature and form a material part of this Amended Stipulation of Settlement.

136.    This Amended Stipulation of Settlement and its accompanying Exhibits set forth the entire understanding of the Parties.  No change to or termination of this Amended Stipulation of Settlement shall be effective unless in writing and signed by Class Counsel and Defense Counsel. No extrinsic evidence or parol evidence shall be used to interpret this Amended Stipulation of Settlement.

137.    Any and all previous agreements and understandings between or among the Parties regarding the subject matter of this Amended Stipulation of Settlement, whether written or oral, are superseded and hereby revoked by this Amended Stipulation of Settlement.  The Parties expressly agree that the terms and conditions of this Amended Stipulation of Settlement will control over any other written or oral agreements.

138.    This Settlement may not be changed, altered, or modified, except in writing and signed by the Parties and approved by the Court.  This Settlement may not be discharged except by performance in accordance with its terms or by a writing signed by the Parties.

139.    All of the Parties warrant and represent that they are agreeing to the terms of this Amended Stipulation of Settlement based upon the legal advice of their respective attorneys, that they have been afforded the opportunity to discuss the contents of this Amended Stipulation of Settlement with their attorneys and that the terms and conditions of this document are fully understood and voluntarily accepted.

140.    The waiver by any Party of a breach of any term of this Amended Stipulation of Settlement shall not operate or be construed as a waiver of any subsequent breach by any party. The failure of a Party to insist upon strict adherence to any provision of this Amended Stipulation of Settlement shall not constitute a waiver or thereafter deprive such Party of the right to insist upon strict adherence.

141.    The Parties represent, covenant, and warrant that they have not directly or indirectly, assigned, transferred, encumbered, or purported to assign, transfer, or encumber to any person or

1  entity any portion of any claims, causes of action, demands, rights, and liabilities of every nature

2  and description released under this Settlement.

3      142.    This Settlement will be binding upon and will inure to the benefit of the Parties and

4  their respective heirs, trustees, executors, administrators, successors and assigns.

5      143.    The headings in this Amended Stipulation of Settlement are inserted merely for the

6  purpose of convenience and shall not affect the meaning or interpretation of this document.

7      144.    Any exhibits to this Amended Stipulation of Settlement are hereby incorporated and

8  made a part of this Amended Stipulation of Settlement.

9      145.    This Amended Stipulation of Settlement shall be governed and construed in

10  accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of

11  California.

12      146.    All agreements made and orders entered during the course of the litigation of the

13  Actions relating to the confidentiality of information shall survive this Amended Stipulation of

14  Settlement.

15      147.    All reference to "days" in this Amended Stipulation of Settlement shall refer to

16  calendar days, unless otherwise specified, provided that if a deadline provided for in the Amended

17  Stipulation of Settlement falls on a weekend or holiday, that deadline shall be the next day that is

18  not a weekend or holiday.

19      148.    This Amended Stipulation of Settlement may be executed with facsimile signatures

20  and in counterparts, each of which shall be deemed an original and all of which, when taken

21  together, shall constitute one and the same instrument.  The date of execution shall be the latest date

22  on which any Party signs this Amended Stipulation of Settlement.

23      149.    This Amended Stipulation of Settlement has been negotiated among and drafted by

24  Class Counsel and Defense Counsel.  Plaintiffs, Class Members, and Defendants shall not be

25  deemed to be the drafter of this Amended Stipulation of Settlement or of any particular provision,

26  nor shall they argue that any particular provision should be construed against its drafter or otherwise

27  resort to the *contra proferentem* canon of construction.  Accordingly, this Amended Stipulation of

28  Settlement should not be construed in favor of or against one Party as to the drafter, and the Parties

1  agree that the provisions of California Civil Code § 1654 and common law principles of construing

2  ambiguities against the drafter shall have no application.  All Parties agree that counsel for the

3  Parties drafted this Amended Stipulation of Settlement during extensive arms' length negotiations.

4  No parol or other evidence may be offered to explain, construe, contradict, or clarify its terms, the

5  intent of the Parties or their counsel, or the circumstances under which this Amended Stipulation of

6  Settlement was made or executed.

7       150.    Defendants represent and warrant that the individual(s) executing this Amended

8  Stipulation of Settlement are authorized to enter into this Amended Stipulation of Settlement on

9  behalf of Defendants.  The signatories to this Settlement hereby represent that they are fully

10  authorized to enter into this Settlement on behalf of themselves or their respective principals.

11       151.    Any disagreement and/or action to enforce this Amended Stipulation of Settlement

12  shall be commenced and maintained only in the Court in which this Action is pending.

13       152.    Whenever this Amended Stipulation of Settlement requires or contemplates that one

14  of the Parties shall or may give notice to the other, notice shall be provided by e-mail and/or next-

15  day (excluding Saturdays, Sundays and Legal Holidays) express delivery service as follows:

16            Upon Class Counsel at:

17                  Robert R. Ahdoot
18                  rahdoot@ahdootwolfson.com
                    Tina Wolfson
19                  twolfson@ahdootwolfson.com
                    AHDOOT & WOLFSON, PC
20                  1016 Palm Avenue
                    West Hollywood, CA  90069
21
22                  Mike Arias
                    mike@asstlawyers.com
23                  Alfredo Torrijos
                    alfredo@asstlawyers.com
24                  ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP
                    6701 Center Drive West, 14th Floor
25                  Los Angeles, CA  90045

26

27

28

Upon Defense Counsel at:

    Andra B. Greene
    agreene@irell.com
    Alvin Matthew Ashley
    mashley@irell.com
    IRELL & MANELLA, LLP
    840 Newport Center Drive, Suite 400
    Newport Beach, CA 92660

153.    The Parties reserve the right, subject to the Court's approval, to agree to any reasonable extensions of time that might be necessary to carry out any of the provisions of this Amended Stipulation of Settlement.

154.    The Court has jurisdiction over the Parties to this Stipulation of Settlement and the Class.

155.    The Parties believe that this Amended Stipulation of Settlement is a fair, adequate, and reasonable settlement of the Action, and they have arrived at this Settlement through arms'-length negotiations, taking into account all relevant factors, present and potential.

1    IN WITNESS WHEREOF, the Parties hereto, by and through their respective attorneys, and

2  intending to be legally bound hereby, have duly executed this Amended Stipulation of Settlement as

3  of the date set forth below.

4

5                                          **PLAINTIFFS**

6

7  Dated: _____    _____

8                                          Nate Coolidge
                                           Plaintiff
9

10 Dated: _____    _____

11                                         Byron McKnight
                                           Plaintiff
12

13 Dated: _____    _____

14                                         Ernesto Mejia
                                           Plaintiff
15

16 Dated: _____    _____

17                                         Julian Mena
                                           Plaintiff
18

19

20 Dated: _____    _____

21                                         Todd Schreiber
                                           Plaintiff
22                                         **DEFENDANTS**

23

24 Dated: _____    _____

25                                         Uber Technologies, Inc.

26

27                                         By:
                                           Its:
28

50
AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

1       IN WITNESS WHEREOF, the Parties hereto, by and through their respective attorneys, and

2  intending to be legally bound hereby, have duly executed this Amended Stipulation of Settlement as

3  of the date set forth below.

4

5                                **PLAINTIFFS**

6

7  Dated: _____            _____

                                     Nate Coolidge

8                                    Plaintiff

9

10  Dated:   June 1, 2017         _____

                                    Byron McKnight

11                                    Plaintiff

12

13  Dated: _____            _____

                                    Ernesto Mejia

14                                    Plaintiff

15

16

17  Dated: _____            _____

                                    Julian Mena

18                                    Plaintiff

19

20  Dated: _____            _____

                                    Todd Schreiber

21                                    Plaintiff

22                                    **DEFENDANTS**

23

24

25  Dated: _____            _____

26                                    Uber Technologies, Inc.

27                                    By:

28                                    Its:

1    IN WITNESS WHEREOF, the Parties hereto, by and through their respective attorneys, and

2  intending to be legally bound hereby, have duly executed this Amended Stipulation of Settlement as

3  of the date set forth below.

4

5                                    **PLAINTIFFS**

6

7  Dated: _____          _____

8                                   Nate Coolidge
                                    Plaintiff
9

10  Dated: May 31, 2017            _____

11                                  Byron McKnight
                                    Plaintiff
12

13  Dated: _____         *Ernesto Mejia*

14                                  Ernesto Mejia
                                    Plaintiff
15

16
   Dated: _____          _____
17
                                    Julian Mena
18                                  Plaintiff

19
   Dated: _____          _____
20
                                    Todd Schreiber
21                                  Plaintiff

22                                  **DEFENDANTS**

23

24
   Dated: _____          _____
25
                                    Uber Technologies, Inc.
26
                                    By:
27                                  Its:

28

1      IN WITNESS WHEREOF, the Parties hereto, by and through their respective attorneys, and

2   intending to be legally bound hereby, have duly executed this Amended Stipulation of Settlement as

3   of the date set forth below.

4

5                                    **PLAINTIFFS**

6

7   Dated: _____                 _____

8                                    Nate Coolidge
                                    Plaintiff

9

10   Dated: _____                _____

11                                    Byron McKnight
                                    Plaintiff

12

13   Dated: _____                _____

14                                    Ernesto Mejia
                                    Plaintiff

15

16

17   Dated: _____                _____
                                    Julian Mena
                                    Plaintiff

18

19

20   Dated: _____                _____

21                                    Todd Schreiber
                                    Plaintiff

22

23                                    **DEFENDANTS**

24

25   Dated: _____                _____

26                                    Uber Technologies, Inc.

27                                    By:
                                    Its:

28

1        IN WITNESS WHEREOF, the Parties hereto, by and through their respective attorneys, and

2    intending to be legally bound hereby, have duly executed this Amended Stipulation of Settlement as

3    of the date set forth below.

4

5                                               **PLAINTIFFS**

6

7    Dated: _____     _____

8                                             Nate Coolidge
                                         Plaintiff

9

10   Dated: _____     _____

11                                            Byron McKnight
                                         Plaintiff

12

13   Dated: _____     _____

14                                            Ernesto Mejia
                                         Plaintiff

15

16

17   Dated: _____     _____

                                         Julian Mena

18                                            Plaintiff

19   Dated: 5/31/.17     _____

20                                            Todd Schreiber

21                                            Plaintiff

22                                            **DEFENDANTS**

23

24   Dated: _____     _____

25

26                                            Uber Technologies, Inc.

27                                            By:
                                         Its:

28

1    IN WITNESS WHEREOF, the Parties hereto, by and through their respective attorneys, and

2  intending to be legally bound hereby, have duly executed this Amended Stipulation of Settlement as

3  of the date set forth below.

4

5                                                    **PLAINTIFFS**

6

7  Dated: _____    _____
                                              Nate Coolidge
8                                              Plaintiff

9

10 Dated: _____    _____
                                              Byron McKnight
11                                             Plaintiff

12

13 Dated: _____    _____
                                              Ernesto Mejia
14                                             Plaintiff

15

16 Dated: _____    _____
                                              Julian Mena
17                                             Plaintiff

18

19

20 Dated: _____    _____
                                              Todd Schreiber
21                                             Plaintiff

22                                                    **DEFENDANTS**

23

24 Dated: _____    _____s/ Gautam Gupta_____

25
                                              Uber Technologies, Inc.
26

27                                            By:   Gautam Gupta
                                              Its:   Head of Finance
28

1

2

3  Dated: _____              _s/ Gautam Gupta_____

4                                      Rasier, LLC

5                                      By:   Gautam Gupta
                                       Its:    Head of Finance
6

7                                      **CLASS COUNSEL**

8

9  Dated: _____

10                                     By:  Robert Ahdoot
                                       **AHDOOT & WOLFSON, PC**
11                                     Attorneys for Plaintiffs and the Class

12

13

14

15  Dated: _____

16                                     By:  Alfredo Torrijos
                                       **ARIAS, SANGUENETTI, STAHLE & TORRIJOS,**
17                                     **LLP**
                                       Attorneys for Plaintiffs and the Class
18

19

20

21

22  Dated: _____

23                                     By:  Nicholas Coulson
                                       **LIDDLE & DUBIN, PC**
24                                     Attorneys for Plaintiffs and the Class

25

26

27

28

1

2

3    Dated: _____        _____

4                                 Rasier, LLC

5                                 By:
                                  Its:
6

7                                        CLASS COUNSEL

8

9    Dated: 6-1-17                 _____

10                                 By:  Robert Ahdoot
                                   **AHDOOT & WOLFSON, PC**
11                                 Attorneys for Plaintiffs and the Class

12

13

14

15   Dated: _____        _____

16                                 By:  Alfredo Torrijos
                                   **ARIAS, SANGUENETTI, STAHLE & TORRIJOS,**
17                                 **LLP**
                                   Attorneys for Plaintiffs and the Class
18

19

20

21

22   Dated: _____        _____

23                                 By:  Nicholas Coulson
                                   **LIDDLE & DUBIN, PC**
24                                 Attorneys for Plaintiffs and the Class

25

26

27

28

                                        51
            AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

Dated: _____          _____

Rasier, LLC

By:
Its:

**CLASS COUNSEL**

Dated: _____          _____

By:  Robert Ahdoot
**AHDOOT & WOLFSON, PC**
Attorneys for Plaintiffs and the Class

Dated: June 1, 2017          _____

By:  Alfredo Torrijos
**ARIAS, SANGUENETTI, STAHLE & TORRIJOS, LLP**
Attorneys for Plaintiffs and the Class

Dated: _____          _____

By:  Nicholas Coulson
**LIDDLE & DUBIN, PC**
Attorneys for Plaintiffs and the Class

51
AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

1

2

3    Dated: _____          _____

4                                    Rasier, LLC

5                                    By:
                                     Its:
6

7                                    **CLASS COUNSEL**

8

9    Dated: _____          _____

10                                   By:  Robert Ahdoot
                                     **AHDOOT & WOLFSON, PC**
11                                   Attorneys for Plaintiffs and the Class

12

13

14

15   Dated: _____          _____

16                                   By:  Alfredo Torrijos
                                     **ARIAS, SANGUENETTI, STAHLE & TORRIJOS,**
17                                   **LLP**
                                     Attorneys for Plaintiffs and the Class
18

19

20

21

22   Dated: 6/1/17                   _____

23                                   By:  Nicholas Coulson
                                     **LIDDLE & DUBIN, PC**
24                                   Attorneys for Plaintiffs and the Class

25

26

27

28

                                    51
            AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

1

2

3    Dated:  6/1/17

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENSE COUNSEL**

By:  Alvin Matthew Ashley
**IRELL & MANELLA, LLP**
Attorneys for Defendants, Uber Technologies, Inc. and
Rasier, LLC

AMENDED STIPULATION OF SETTLEMENT (CASE NO. 3:14-cv-05615-JST)

# EXHIBIT 3

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

```
┌─────────────────────────┐
│         FILED           │
│                         │
│      DEC 22 2022        │
│                         │
│   MOLLY C. DWYER, CLERK │
│   U.S. COURT OF APPEALS │
└─────────────────────────┘
```

BYRON MCKNIGHT; et al.,

             Plaintiffs - Appellees,

  v.

ROBERT HUDSON,

             Objector - Appellant,

  v.

UBER TECHNOLOGIES, INC., a
Delaware Corporation; RASIER, LLC, a
Delaware Limited Liability Company,

             Defendants - Appellees.

No. 21-16626

D.C. No. 4:14-cv-05615-JST
U.S. District Court for Northern
California, Oakland

**MANDATE**

The judgment of this Court, entered November 30, 2022, takes effect this

date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

Costs are taxed against the appellant in the amount of $191.40.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Howard Hom
Deputy Clerk
Ninth Circuit Rule 27-7

# EXHIBIT 4

FILED
San Francisco County Superior Court

JUN 22 2023

CLERK OF THE COURT
BY: _R. Michael Dela_
Deputy Clerk

E-SERVICE
70246919
Jun 22 2023
03:51PM
File & ServeXpress

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550] | Case No. CJC-21-005188 JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5188 |
| IN RE UBER RIDESHARE CASES | ORDER ON DEFENDANTS UBER TECHNOLOGIES, INC. AND RASIER, LLC'S DEMURRER TO PLAINTIFFS' MASTER LONG-FORM COMPLAINT |

Defendants Uber Technologies, Inc. and Rasier, LLC's Demurrer to Plaintiffs' Master Long-Form Complaint came on for hearing on June 15, 2023. Having considered the papers and pleadings on file in the action, and the arguments of counsel presented at the hearing, the Court hereby sustains Uber's demurrer as to Plaintiffs' vicarious liability claims (sixth through tenth causes of action), fraud and misrepresentation claims (third, fourth, thirteenth, and sixteenth causes of action), and strict products liability claims (fourteenth and fifteenth causes of action) without leave to amend. The Court sustains Uber's demurrer as to the negligent infliction of emotional distress claim (fifth cause of action) with leave to amend.

- 1 -

**BACKGROUND**

By order dated December 9, 2021, the Court (Hon. Andrew Y.S. Cheng) granted the petition for coordination with respect to 86 cases originally filed in San Francisco, Sacramento, Santa Clara, Kern, and Los Angeles counties. Since that time, over 1,200 additional cases were the subjects of add-on orders from this Court. On January 23, 2023, the Court granted Uber's Motions to Stay or Dismiss Based on *Forum Non Conveniens*. Over 360 California cases remain in this JCCP. (Opening Brief, 13 fn. 1.)

On March 7, 2023, Plaintiffs filed a Master Long-Form Complaint ("Complaint" or "Compl.") against Defendants Uber Technologies, Inc. and Rasier, LLC (together, "Uber"). Plaintiffs allege sixteen causes of action: (1) general negligence; (2) common carrier negligence; (3) negligent misrepresentation; (4) intentional misrepresentation; (5) negligent infliction of emotional distress ("NIED"); (6) intentional infliction of emotional distress ("IIED"); (7) vicarious liability/liability for the torts of Uber drivers; (8) vicarious liability for sexual assault; (9) vicarious liability for sexual battery; (10) vicarious liability for false imprisonment; (11) negligence by misfeasance; (12) negligence by nonfeasance; (13) intentional concealment; (14) strict product liability – design defect; (15) strict product liability – failure to warn; and (16) fraud. (Compl. ¶¶ 164-348.) Plaintiffs generally allege as follows.

Plaintiffs "are individuals who were raped, sexually assaulted, sexually battered, sexually harassed, falsely imprisoned, kidnapped, physically assaulted, and/or otherwise assaulted and/or harassed by their Uber driver." (*Id.* ¶ 6.) Uber is a transportation company that uses its app ("Uber App") to "connect riders looking for transportation to independent transportation providers…looking for rides." (*Id.* ¶¶ 1, 21-22.) Uber "drivers are largely nonprofessional, untrained individuals who use their own vehicles." (*Id.* ¶ 44.)

As early as 2014, Uber became aware that its drivers were engaging in sexual misconduct or sexual assault against its passengers. (*Id.* ¶¶ 3, 166; see *id.* ¶¶ 27, 244.) Uber has "publicly acknowledged this sexual assault crisis." (*Id.* ¶ 4; see *id.* ¶¶ 29, 121, 147, 149; see, e.g., *id.* ¶ 122 [approximately 250 reported sexual assaults per month in 2017 and 2018].) However, Uber "has actively chosen not to report instances of sexual assault that occur on the UBER App to the authorities" or other

-2-

ridesharing companies. (*Id.* ¶¶ 84-86, 88, 134.) In addition, Uber does not proactively cooperate with law enforcement investigating cases passenger victims report to the police or participate in transportation network company ("TNC") safety hearings. (*Id.* ¶¶ 89-94, 116-120, 172.) Moreover, after a victim reports a sexual assault, Uber often erases the victim's complaint and disables the victim's account, which precludes the victim from accessing pertinent information such as the driver's name, driver's photo, make and model of the vehicle, ride time, ride distance, and route. (*Id.* ¶¶ 94-95, 100, 102.)

Despite marketing itself as a safe and better alternative to other transportation methods, Uber continues to hire drivers without conducting adequate background checks and screening procedures, allows culpable drivers to keep driving for Uber, and fails to adopt and implement reasonable monitoring and investigation procedures to protect passengers. (*Id.* ¶¶ 4, 24-25, 28, 30-31, 112-114, 131-133, 152-153, 157, 167-169, 171, 173-180, 195-196, 198, 204, 221-226, 232-238, 245-247, 262, 267, 295, 301, 316, 332-333; see, e.g., *id.* ¶¶ 33-43, 66-83, 130 [Uber Safe Rides Fee was a revenue source rather than a fund for implementing background checks, vehicle checks, driver safety education, development of safety features, and insurance], 329-330; but see *id.* ¶ 111 [the Uber App now includes an emergency button that allows a passenger to call 911].) Due to Uber's failure to implement changes, passengers continue to be victims of sexual assaults. (*Id.* ¶¶ 28, 127.)

Uber now demurs to the third through tenth and thirteenth through sixteenth causes of action, which fall into four categories of claims: vicarious liability (fifth through tenth causes of action), fraud and misrepresentation (third, fourth, thirteenth, and sixteenth causes of action), NIED (fifth cause of action), and strict products liability (fourteenth and fifteenth causes of action). (Demurrer, 2-4; Opening Brief, 14.) Plaintiffs oppose the demurrer.[1]

## **LEGAL STANDARD**

A demurrer lies where "the pleading does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.10(e).) A demurrer admits "all material facts properly pleaded, but not

---

[1] Plaintiffs' Request for Judicial Notice of state trial court rulings is denied. Written trial court rulings have no precedential value. (*Bolanos v. Superior Court* (2008) 169 Cal.App.4th 744, 761 [denying request for judicial notice]; see also, e.g., *Santa Ana Hospital Medical Center v. Belshe* (1997) 56 Cal.App.4th 819, 831.) Uber's extensive reliance on such rulings throughout its briefing is misplaced for the same reason.

contentions, deductions, or conclusions of fact or law." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)
The complaint is given a reasonable interpretation, reading it as a whole and its parts in their context.
(*Id.*)  The Court accepts as true, and liberally construes, all properly pleaded allegations of material fact,
as well as those facts which may be implied or reasonably inferred from those allegations; its sole
consideration is whether the plaintiff's complaint is sufficient to state a cause of action under any legal
theory. (*O'Grady v. Merchant Exchange Prods., Inc.* (2019) 41 Cal.App.5th 771, 776-777.)

## DISCUSSION

### I.      Uber Cannot Be Held Vicariously Liable For The Tortious Acts Of Its Drivers.

Plaintiffs seek to hold Uber vicariously liable for IIED, sexual assault, sexual battery, and false
imprisonment. (Compl. ¶¶ 250-292.) Uber contends that, as a matter of law, it cannot be held vicariously
liable for the alleged sexual assaults committed by its drivers because such conduct falls outside the scope
of employment. (Demurrer, 2; Opening Brief, 14-19.)[2]  The Court agrees.

"California deems employers to be vicariously liable for the torts committed by their employees
if, but only if, *the employee is acting within the scope of employment*." (*Musgrove v. Silver* (2022) 82
Cal.App.5th 694, 707 (emphasis in original).)  "Under certain circumstances, the employer may be subject
to this form of vicarious liability even for an employee's willful, malicious, and criminal conduct."
(*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 491.)  "The nexus required for respondeat
superior liability—that the tort be engendered by or arise from the work—is to be distinguished from 'but
for' causation.  That the employment brought the tortfeasor and victim together in time and place is not
enough." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 298.)  That is, "the
incident leading to injury must be an outgrowth of the employment; the risk of tortious injury must be
inherent in the working environment or typical of or broadly incidental to the enterprise the employer has
undertaken." (*Id.* (cleaned up).)

California courts use two tests to regarding the "scope of employment under the respondeat

---

[2] For purposes of the demurrer, Uber accepts Plaintiffs' allegations regarding Uber drivers' status as employees.  (Demurrer, 2; but see Reply, 10 fn. 1 ["As the demurrer made clear, the independent drivers are not Uber employees in any event."].)

-4-

1    superior doctrine." (*Marez v. Lyft, Inc.* (2020) 48 Cal.App.5th 569, 577.)  Under the first test, "the

2    employer is liable if the activities that caused the employee to become an instrument of danger to others

3    were undertaken with the employer's permission and were of some benefit to the employer, or in the

4    absence of proof of benefit, the activities constituted a customary incident of employment." (*Id.*, quoting

5    *Moreno v. Visser Ranch, Inc.* (2018) 30 Cal.App.5th 568, 577.)  Under the second test, "an employee's

6    conduct is within the scope of his or her employment if (1) the act performed was either required or

7    incident to his duties or (2) the employer's misconduct could be reasonably foreseen by the employer in

8    any event." (*Marez*, 48 Cal.App.5th at 577, quoting *Halliburton Energy Services, Inc. v. Dept. of*

9    *Transportation* (2013) 220 Cal.App.4th 87, 94.)  "Whether an employee was acting within the scope of

10   employment is a question of fact, unless 'the facts are undisputed and no conflicting inferences are

11   possible.'" (*Doe v. Uber Technologies, Inc.* (N.D. Cal. 2016) 184 F.Supp.3d 774, 784, quoting *Mary M.*

12   *v. City of Los Angeles* (1991) 54 Cal.3d 202, 213.)

13         Uber asserts *Lisa M.* is directly on point because "[i]f a hospital cannot be vicariously liable for a

14   sexual assault carried out by an employee who was permitted to perform physical examinations on

15   vulnerable patients alone in a confined space, then Uber certainly cannot be vicariously liable for a sexual

16   assault carried out by an independent driver whose 'job' was providing rides to users of the Uber App."

17   (Opening Brief, 17; see *id.* at 16.)  In *Lisa M.*, the plaintiff, a nineteen-year-old pregnant woman, was

18   injured in a fall at a movie theater and sought medical treatment. (*Lisa M.*, 12 Cal.4th at 294.)  The

19   plaintiff underwent an ultrasound imaging examination during which the ultrasound technician molested

20   the plaintiff. (*Id.* at 295.)  Thereafter, the plaintiff filed suit against the ultrasound technician and the

21   hospital for professional negligence, battery, IIED, and NIED. (*Id.* at 296.)  The Court found the

22   "injurious events were causally related to Tripoli's employment as an ultrasound technician in the sense

23   they would not have occurred had he not been so employed.  Tripoli's employment as an ultrasound

24   technician provided the opportunity for him to meet plaintiff and to be alone with her in circumstances

25   making the assault possible." (*Id.* at 299.)  However, the Court found:

26         a sexual tort will not be considered engendered by the employment unless its motivating emotions
         were fairly attributable to work-related events or conditions.  Here the opposite was true: a
27         technician simply took advantage of solitude with a naive patient to commit an assault for reasons

28

unrelated to his work. Tripoli's job was to perform a diagnostic examination and record the results. The task provided no occasion for a work-related dispute or any other work-related emotional involvement with the patient. The technician's decision to engage in conscious exploitation of the patient did not *arise out* of the performance of the examination, although the circumstances of the examination made it possible.

(*Id.* at 301 (emphasis in original).) The Court concluded that the "flaw in plaintiff's case for Hospital's respondeat superior liability is not so much that Tripoli's actions were personally motivated, but that those personal motivations were not generated by or an outgrowth of workplace responsibilities, conditions or events." (*Id.* at 301-302.) "Although the routine examination Tripoli was authorized to conduct involved physical contact with Lisa M., Tripoli's assault on plaintiff did not originate with, and was not a generally foreseeable consequence of, that contact." (*Id.* at 303.) The same reasoning applies here.

Plaintiffs generally allege Uber drivers engaged in sexual misconduct within the scope of their employment. (Compl. ¶¶ 11, 251, 257, 261, 264, 277, 284, 290.) Plaintiffs also allege "[t]he sexual assault and/or rape of intoxicated and unaccompanied women who have been placed in an improperly screened UBER driver's car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers." (*Id.* ¶ 264; see, e.g., *id.* ¶¶ 121-127 [5,981 sexual assaults in 2017 and 2018].) However, these allegations are insufficient as a matter of law. Plaintiffs do not allege Uber drivers were not acting solely for personal gratification or that the sexual assaults were engendered by their alleged employment. Rather, being in close proximity to passengers, in a confined environment, "brought the tortfeasor and victim together in time and place," which is insufficient to impose vicarious liability on Uber. (*Lisa M.*, 12 Cal.4th at 298.)

California appellate courts routinely find sexual assaults are beyond the scope of employment, and hence employers may not be held vicariously liable for such misconduct. (*John Y. v. Chaparral Treatment Center, Inc.* (2002) 101 Cal.App.4th 565, 575; see, e.g., *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992; *Roe v. Hesperia Unified School Dist.* (2022) 85 Cal.App.5th 13, 25; *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438; *Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899; *Maria D. v. Westec Residential Sec., Inc.* (2000) 85 Cal.App.4th 125; *Debbie Reynolds Prof. Rehearsal Studios v. Superior Court* (1994) 25 Cal.App.4th 222; *Kimberly M. v. Los Angeles Unified*

- 6 -

1    *School Dist.* (1989) 215 Cal.App.3d 545; *Jeffrey E. v. Central Baptist Church* (1988) 197 Cal.App.3d

2    718; *Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453; *Alma W. v. Oakland Unified*

3    *School Dist.* (1981) 123 Cal.App.3d 133.)

4    > In those decisions, vicarious liability was rejected as a matter of law because it could not be
5    > demonstrated that the various acts of sexual misconduct arose from the conduct of the respective
6    > enterprises.  In particular, the acts had been undertaken solely for the employees' personal
     > gratification and had no purpose connected to the employment.  Moreover, the acts had not been
7    > engendered by events or conditions relating to any employment duties or tasks; nor had they been
     > necessary to the employees' comfort, convenience, health, or welfare while at work.

8    (*Farmers Ins. Group*, 11 Cal.4th at 1007.)

9            The sole exception is *Mary M.*, where the Court found that when "a police officer on duty misuses

10    his official authority by raping a woman whom he has detained, the public entity that employs him can be

11    held vicariously liable."  (*Mary M.*, 54 Cal.3d at 221.)  Plaintiffs contend that this case is similar to *Mary*

12    *M.* because "Uber drivers abused their position of power to benefit [off] of Plaintiffs' vulnerabilities."

13    (Opposition, 17.)  However, as Uber points out, *Mary M.*'s holding is limited to sexual assaults by on-

14    duty police officers, as the Supreme Court itself has expressly recognized.  (See, e.g., *Farmers Ins.*

15    *Group*, 11 Cal.4th at 1006-1007 ["except where sexual misconduct by on-duty police officers against

16    members of the public is involved, the employer is not vicariously liable to the third party for such

17    misconduct."]; *Lisa M.*, 12 Cal.4th at 204 ["We expressly limited our holding [in *Mary M.* to] the unique

18    authority vested in police officers.  Employees who do not have this authority and who commit sexual

19    assaults may be acting outside the scope of their employment as a matter of law."]; *Z.V. v. County of*

20    *Riverside* (2015) 238 Cal.App.4th 889, 891 ["there is considerable doubt that *Mary M.* has any

21    applicability beyond the narrow context of an arrest performed by a uniformed, armed police officer in the

22    normal course of that officer's duties."]; *M.P. v. City of Sacramento* (2009) 177 Cal.App.4th 121, 124

23    [*Mary M.*'s holding "is, at best, limited to such [sex crime] acts by an on-duty police officer and does not

24    extend to any other form of employment, including firefighting."].)

25            In the interest of completeness, the Court notes that it has identified one other appellate decision

26    (which neither party cited) that applies these principles, although it does not advance Plaintiffs' position

27    here.  In *Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, the court reversed the trial

28                                                              - 7 -

court's order granting an acute psychiatric hospital's motion for nonsuit on causes of action asserted by former patients alleging the hospital bore vicarious liability for sexual assaults on them committed by a mental health worker. While the court recognized the general rule that "an employer is not liable under the doctrine of respondeat superior for sexual assaults committed by an employee," it found that there was sufficient evidence for a jury to conclude the mental health worker was acting within the scope of his employment under the narrow exception recognized in *Lisa M.*: "a sexual tort will be considered to be within the scope of employment if 'its motivating emotions were fairly attributable to work-related events or conditions.'" (*Id.* at 107-108, quoting *Lisa M.*, 12 Cal.4th at 301.) The court's conclusion was informed by the unique relationship between mental health workers and psychiatric patients:

> The duties of a mental health worker include helping patients with daily living activities. The workers are personally involved with the patients over an extended period of time. The patients are vulnerable; they may suffer from impaired judgment or other cognitive impairments. Sexual exploitation of the patients by employees is a foreseeable hazard arising from the circumstances of the job. That hazard was exponentially increased by [the hospital's] policies, including allowing male workers 20 minutes alone with patients and providing inadequate training on worker-patient boundaries.

(*Id.* at 108.) The court observed that in *Lisa M.*, the ultrasound technician's interaction with the victim was "brief" and his duties were "technical," and the circumstances of employment therefore were "highly unlikely to engender a personal relationship that might result in sexual exploitation." (*Id.*) In contrast, it observed, the mental health worker "becomes sexually involved with a patient as a result of mishandling the feelings predictably created by the therapeutic relationship." (*Id.*, quoting *Lisa M.*, 12 Cal.4th at 303.)[3] Thus, *Samantha B.* recognizes a narrow exception to the general rule precluding vicarious liability for sexual torts, one that plainly does not apply here: Uber's drivers are not therapists or mental health workers, their interactions with their passengers typically are brief and technical and do not involve physical contact, and any sexual assaults they may engage in are not fairly attributable to work-related events or conditions.

---

[3] As an alternative ground for its holding, the court found that there was substantial evidence from which a jury could have determined that the hospital ratified the worker's act by failing to investigate his actions because it was on notice that his reputation among other employees was so bad that he had earned the nickname "Rapey Juan." (*Id.* at 109.) Plaintiffs make no claim here that Uber ratified its drivers' alleged intentional torts.

- 8 -

1   Plaintiffs argue the number of sexual assaults that have occurred and Uber's knowledge of the

2 sexual assaults render sexual assault a predictable outcome.  (Opposition, 15-16.)  However, "in

3 determining whether a risk is unusual or startling for respondeat superior purposes, the inquiry should be

4 whether the risk was one that may fairly be regarded as typical of or broadly incidental *to the enterprise*

5 *undertaken by the employer*.  Thus, it is not enough that a risk be neither unusual nor startling as a general

6 matter; rather, the risk must be evaluated in the context of the employer's particular enterprise."  (*Farmers*

7 *Ins. Group*, 11 Cal.4th at 1009 (cleaned up); see also, e.g., *id.* at 1010 ["applying the same type of

8 approach in other contexts, we would be forced to conclude, in direct conflict with *John R.*, *supra*, 48

9 Cal.3d 438, and numerous other California and out-of-state decisions, that sexual molestation by teachers

10 and clergy is an inherent risk of schools and religious institutions simply because of the frequency with

11 which such misconduct is claimed."].)  Plaintiffs' allegations are insufficient to establish sexual assault is

12 "typical of or broadly incidental" to ridesharing services.

13   Plaintiffs' reliance on *Doe v. Uber Technologies, Inc.* (N.D. Cal. 2016) 184 F.Supp.3d 774, is

14 unpersuasive.  (See Opposition, 18.)  In *Doe*, the plaintiffs brought a similar action against Uber for

15 sexual assaults by Uber drivers alleging claims for battery, assault, false imprisonment, and IIED under a

16 theory of respondeat superior.  (*Id.* at 779-780.)  Uber moved to dismiss, arguing "it cannot be vicariously

17 liable because, it claims, sexual assault falls outside the scope of an employee's duties."  (*Id.* at 781.)  The

18 court could not determine "that as a matter of law sexual assault by Uber driver is always outside the

19 scope of employment, if the drivers are in fact ultimately found to be employees.  The California Supreme

20 Court has left this question open."  (*Id.* at 785.)  However, after *Doe*, California voters approved

21 Proposition 22, the Protect App-Based Drivers and Services Act, which classifies app-based drivers as

22 independent contractors rather than employees.  (See *Castellanos v. State of California* (2023) 89

23 Cal.App.5th 131, 142-145; Bus. & Prof. Code §§ 7448-7467.)  Therefore, *Doe* is not directly applicable to

24 the instant action.  In any event, other federal court decisions have criticized its holding and have reached

25 a different conclusion.  (E.g., *Doe v. Uber Technologies, Inc.* (N.D. Cal. Nov. 22, 2019) 2019 WL

26 6251189, *5 ["This Court respectfully disagrees that such a holding can be squared with *Lisa M.* and the

27 test it applies to sexual assault by employees on third parties."]; see also *Doe v. Uber Technologies, Inc.*

28

(N.D. Cal. May 1, 2020) 2020 WL 2097699, *2 [granting Uber's motion to dismiss false imprisonment, assault, and battery claims, following *Lisa M.*]; *Doe v. Uber Technologies, Inc.* (D.Md. June 9, 2021) 2021 WL 2382837, *4 [same, applying Maryland law]; *Murray v. Uber Technologies, Inc.* (D.Mass. 2020) 486 F.Supp.3d 468, 477 [same, applying Massachusetts law: "as a matter of law, sexual assault necessarily falls outside the scope of employment"].)

Uber's potential status as a common carrier does not alter the vicarious liability analysis. "Both California and federal cases consistently hold that, under California law, a common carrier relationship exists and a corresponding 'heightened standard of care applies to a passenger while in transit' with a common carrier . . ., and, under certain circumstances, for brief windows of time immediately before and/or after the passenger is in transit with the carrier." (*Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 420-421, quoting *Churchman v. Bay Area Rapid Transit Dist.* (2019) 39 Cal.App.5th 246, 250-251 (cleaned up); see also *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 216 [common carrier-passenger relationship is a special relationship that gives rise to an affirmative duty to protect]; *Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1128 [common carriers are subject to a heightened duty of care].) A common carrier is "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." (Civ. Code § 2168.) The Public Utilities Code also defines common carrier as:

> . . . every person and corporation providing transportation for compensation to or for the public or any portion thereof, except as otherwise provided in this part. "Common carrier" includes: . . . Every railroad corporation; street railroad corporation; dispatch, sleeping car, dining car, drawing-room car, freight, freight line, refrigerator, oil, stock, fruit, car-loaning, car-renting, car-loading, and every other car corporation or person operating for compensation within this state.

(Pub. Util. Code § 211(a).)

Plaintiffs sufficiently allege Uber, as a ride-sharing company, is a common carrier because it provides transportation to the public (anyone can download the app and order a ride) in exchange for compensation. (Compl. ¶¶ 19-21, 190-191; see also *id.* ¶¶ 294-300; see, e.g., *Doe*, 2019 WL 6251189, at *6 ["Uber's status as an app-based transportation network does not preclude it as a matter of law from being held liable as a common carrier"]; *Doe*, 184 F.Supp.3d at 787 ["Plaintiffs have alleged sufficient

- 10 -

1    facts to plausibly claim that Uber is a common carrier.").)[4]

2        Plaintiffs point to *Berger v. Southern Pac. Co.* (1956) 144 Cal.App.2d 1, a 1956 appellate decision

3    that long predates *Lisa M.* and the body of cases discussed above, asserting that because Uber is a

4    common carrier, "the scope of employment of the driver is immaterial to whether Uber can be held liable

5    for these torts." (Opposition, 11; see also *id.* at 12 [same].) As Plaintiffs acknowledged at the hearing,

6    however, they do not rely upon *Berger* to establish that Uber is vicariously liable for torts committed by

7    its drivers, but rather for the distinct proposition that as a common carrier, it owed them a duty of care to

8    prevent their injuries.[5] In *Berger*, the court found that a common carrier

9        is liable for acts of assault and battery upon the part of its employees resulting in injury to those it

10       has agreed to transport upon its facilities. This liability extends not only to cases where the assault
     was in the line of the employee's duty, but also to those instances where the act was merely that of

11   an individual and entirely disconnected with the performance of the agent's duties, as where the
     conductor of a train kisses a female passenger against her will. … The liability of a common

12   carrier for an assault by one of its employees on a passenger is not dependent on the question as to
     whether the employee was acting within the scope of his authority or in the line of his duty, but is

13   based upon its broad duty as a common carrier to protect its passengers from assault.

14   (*Berger*, 144 Cal.App.2d at 7; see also *Lisa M.*, 12 Cal.4th at 306 ["Although, as we have concluded,

15   [employee's] criminal acts were not engendered by or broadly incidental to his work so as to render

16   Hospital vicariously liable, Hospital's duty of due care to its patient obliged it to take all measures

17   dictated by ordinary prudence to protect against even such unusual sources of injury."].)[6] Because Uber

18   has not demurred to Plaintiffs' common carrier negligence cause of action, whether the Complaint states a

19   cause of action for breach of a common carrier's duty to its passengers is not an issue currently before the

20   Court.

21       Thus, *Berger* does not support Plaintiffs' contention that a common carrier may be held

22

23   ---
     [4] Uber does not challenge Plaintiffs' second cause of action for common carrier negligence or Plaintiffs'
     eleventh and twelfth causes of action for negligence by misfeasance and negligence by nonfeasance,

24   respectively, which are premised on Uber's alleged common carrier status.
     [5] In a later case, the California Supreme Court cited *Berger* in connection with a claim alleging "a breach

25   of the common law duty of an employer to exercise due care in the employment and supervision of an
     employee who inflicted intentional harm on her." (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 745.)

26   [6] Similarly, *Lopez v. Southern California Rapid Transit Dist.* (1985) 40 Cal.3d 780 involved a negligence
     action in which the Court found that the defendant transit district owed a duty to protect passengers

27   aboard its buses from assaults by fellow passengers. The district was the sole defendant, and the opinion
     did not address any issue of vicarious liability.

28   - 11 -

1  vicariously liable for intentional sexual torts of its employees or agents committed *outside* the scope of

2  their employment, nor does it constitute "binding precedent" on that subject. (Opposition, 11-12.)

3  Accordingly, Uber's demurrer to Plaintiffs' vicarious liability claims is sustained without leave to amend.

4  **II.  Plaintiffs Do Not Allege Sufficient Facts To State Fraud And Misrepresentation Claims.**

5       Plaintiffs seek to state four causes of action based on fraud and misrepresentation: (1) negligent

6  misrepresentation (third cause of action); (2) intentional misrepresentation (fourth cause of action); (3)

7  intentional concealment (thirteenth cause of action); and (4) fraud (sixteenth cause of action).  Uber

8  argues Plaintiffs fail to plead their fraud and misrepresentation claims with particularity. (Opening Brief,

9  22.)[7]  The Court agrees.

10      "The essential elements of . . . intentional misrepresentation are: (a) misrepresentation (false

11  representation, concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to

12  defraud, i.e., to induce reliance; (d) actual and justifiable reliance; and (e) resulting damage." (*Berry v.*

13  *Frazier* (2023) 90 Cal.App.5th 1258, 307 Cal.Rptr.3d 778, 789.)  The elements of fraud are the same,

14  except only justifiable reliance must be alleged rather than actual and justifiable reliance. (*Amiodarone*

15  *Cases* (2022) 84 Cal.App.5th 1091, 1109.)  In addition, the elements of negligent misrepresentation are

16  the same, except no scienter or intent to defraud is required. (*Nissan Motor Acceptance Cases* (2021) 63

17  Cal.App.5th 793, 823.)  The elements of intentional concealment are: "(1) the defendant must have

18  concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact

19  to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent

20  to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as

21  he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or

22  suppression of the fact, the plaintiff must have sustained damage." (*RSB Vineyards, LLC v. Orsi* (2017)

23

24  [7] Uber also argues the sixteenth cause of action for fraud alleges the same facts and theory of liability as
    the intentional misrepresentation cause of action, therefore, it should be dismissed as duplicative.

25  (Opening Brief, 22.)  The Court disagrees.  Although similar, the two causes of action are not the same.
    (Compare Compl. ¶¶ 232-234 [Uber made false representations regarding safety of app, rides, and

26  experience as well as properly screened driver backgrounds] with *id.* ¶¶ 329-330 [Uber made false
    representations that it was taking steps to ensure its rides were safe and reliable (e.g., the Safe Rides Fee),

27  it properly screened drivers using background checks that were "often more rigorous" than the taxi
    industry, and held itself out as safe for young women].)

28                                                          - 12 -

1  15 Cal.App.5th 1089, 1096-1097, quoting *Bank of America Corp. v. Superior Court* (2011) 198

2  Cal.App.4th 862, 870.)

3       Fraud must be pled with particularity, which "necessitates pleading *facts* which show how, when,

4  where, to whom, and by what means the false representations were made." (*State ex rel. Edelweiss Fund,*

5  *LLC v. JPMorgan Chase & Company* (2023) 90 Cal.App.5th 1119, 307 Cal.Rptr.3d 750, 766, quoting

6  *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 (internal quotations omitted).)  General and

7  conclusory allegations are insufficient. (*Amiodarone Cases*, 84 Cal.App.5th at 1109.)

8       **A.    Plaintiffs Do Not Sufficiently Plead Reliance**

9       Uber contends reliance is "highly individualized and specific to each Plaintiff," therefore,

10  generally alleging reliance is insufficient. (Opening Brief, 23-25.)  The Court agrees.

11      "To allege actual reliance on misrepresentations with the required specificity for a fraud count, the

12  plaintiff must plead that he believed the representations to be true … and that in reliance thereon (or

13  induced thereby) he entered into a transaction." (*Chapman v. Skype, Inc.* (2013) 220 Cal.App.4th 217,

14  231-232, quoting *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1063 (cleaned up); see *Small v. Fritz*

15  *Companies, Inc.* (2003) 30 Cal.4th 167, 184 [negligent misrepresentation must also be pled with

16  specificity]; *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1193 ["A plaintiff

17  establishes [actual] reliance when the misrepresentation or nondisclosure was an immediate cause of the

18  plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or

19  nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other

20  transaction." (cleaned up)].)  The plaintiff must show that the reliance was reasonable by showing that (1)

21  the matter was material in the sense that a reasonable person would find it important in determining how

22  he or she would act and (2) it was reasonable for the plaintiff to have relied on the misrepresentation. (*Id.*

23  at 1194.)

24      Plaintiffs allege that by "getting into the UBER, Plaintiffs reasonably relied on UBER's

25  representations that it would get them safely to their intended destination." (Compl. ¶ 226; see *id.* ¶ 238.)

26  Plaintiffs also allege that by "trusting and relying on Uber's representations, Plaintiffs were placed in a

27  uniquely vulnerable position that was taken advantage of by an UBER[] employee, an UBER driver." (*Id.*

28                                            - 13 -

¶ 227; see *id.* ¶ 239.)  Plaintiffs further allege they "actually and reasonably relied on the representations made by Defendant UBER when they agreed to utilize UBER's services after being informed that UBER stringently screened its drivers and took measures to ensure it provided passengers safe transport." (*Id.* ¶ 237; see *id.* ¶¶ 331-333.)  As to fraud in particular, Plaintiffs allege they "were justified in relying on Defendants' misstatements [because] UBER took advantage of information asymmetries.  That is, UBER was in a much better position than Plaintiffs to know whether UBER was adequately training, screening, and supervising drivers and what steps it had taken and was taking to make UBER rides safe." (*Id.* ¶ 334.)

These allegations are insufficient to plead reliance for all 362 individual Plaintiffs.  (See Opening Brief, 23-25; Reply, 22-24.)  It is implausible, to state the obvious, that every one of those individual Plaintiffs actually saw and relied on each and every one of the statements and other representations alleged in the Complaint.[8]  Plaintiffs do not identify the specific representations each Plaintiff relied upon and when those representations were made.  The purpose of the long-form complaint is to set forth the causes of action as applied "to each plaintiff within the JCCP . . . except to the extent that a particular plaintiff has pled otherwise in a Short-Form Complaint." (Apr. 14, 2022 Joint Case Management Statement, 6-7.)  However, by filing a long-form complaint that applies to all Plaintiffs, Plaintiffs are not relieved of their obligation to plead fraud claims with particularity.  (See, e.g., *Murphy v. BDO Seidman* (2003) 113 Cal.App.4th 687, 690, 698 ["Although the complaint is long, with numerous allegations, dozens of paragraphs, and more than 100 plaintiffs," the plaintiffs sufficiently alleged reliance].)  Therefore, to allege fraud and misrepresentation claims, Plaintiffs must plead with particularity, as required, to place Uber on notice of "certain definite charges which can be intelligently met" and "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." (*Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 838, quoting *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217 (cleaned up).)  The short-form complaints serve the purpose of providing the

---

[8] Plaintiffs' reliance on *Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235 (Opposition, 20), a class action, is misplaced.

- 14 -

1    specific factual allegations as to each individual Plaintiff.[9]

2        **B.    Plaintiffs Inadequately Plead False Statements By Uber**

3        Uber argues Plaintiffs do not "allege with specificity the how, when, where, and to which specific

4    plaintiff any specific misrepresentation was made." (Opening Brief, 25.) Uber contends Plaintiffs allege

5    "a laundry list of allegedly false statements, none of which is connected to any specific plaintiff." (*Id.*)

6    Again, the Court agrees. Plaintiffs allege that beginning in 2014, Uber engaged in an active and

7    aggressive marketing campaign regarding the safety of its services. (Compl. ¶ 66.) Plaintiffs allege that

8    this marketing campaign, which continues to this day, includes "email messages sent to every UBER

9    customer, including Plaintiffs." (*Id.*) Plaintiffs' allegations set forth specific statements regarding safety

10   made by Uber "to its customers, including Plaintiffs, on its website." (*Id.* ¶ 67.) However, as a threshold

11   matter, Plaintiffs do not plead that all Plaintiffs saw the purported misrepresentations either by email or on

12   Uber's website. In addition, "when a plaintiff asserts fraud against a corporation, the plaintiff must

13   'allege the names of the persons who made the allegedly fraudulent representations, their authority to

14   speak, to whom they spoke, what they said or wrote, and when it was said or written.'" (*Cansino v. Bank*

15   *of America* (2014) 224 Cal.App.4th 1462, 1469, quoting *Tarmann v. State Farm Mut. Auto. Ins. Co.*

16   (1991) 2 Cal.App.4th 153, 157.) No such allegations are pled in the Complaint.

17       Accordingly, Uber's demurrer as to Plaintiffs' fraud and misrepresentation claims is sustained

18   without leave to amend. Should any individual Plaintiffs seek to plead fraud and misrepresentation

19   claims, those Plaintiffs are granted 30 days leave to amend the short-form complaints with the

20   particularity required by California law, and Uber is granted 30 days to respond to those amended short-

21   form complaints.

22

23

24   [9] Uber raises the issue of the class action settlement in *McKnight v. Uber Techs., Inc.*, No. 4:14-cv-05615

25   (N.D. Cal. June 1, 2017), as it relates to misrepresentations. (Opening Brief, 26 fn. 12.) Uber states that
     it cannot determine which plaintiffs are in the *McKnight* class based on the operative pleading here. In
     particular, the Long-Form Complaint does not include the date Plaintiffs began using the Uber App and

26   the date of the alleged incident. This information should be readily available in Plaintiffs' short-form
     complaints such that Uber can determine whether a plaintiff is included in the *McKnight* class. The Court

27   declines to order Plaintiffs to plead facts as to each individual Plaintiffs' initial date of using the Uber
     App and date of the alleged incident in the long-form complaint.

28                                                    - 15 -

III.    **NIED**

Uber contends, and Plaintiffs concede, California does not recognize a separate tort for negligent infliction of emotional distress because it is simply the tort of negligence.  (Opening Brief, 31; Opposition, 24.)  The Court agrees.  (*Downey v. City of Riverside* (2023) 90 Cal.App.5th 1033, 307 Cal.Rptr.3d 666, 673 ["The negligent causing of emotional distress is not an independent tort, but the tort of negligence."].)  Uber asserts that because the fifth cause of action for NIED is duplicative of and subsumed by the negligence claims, it should be dismissed.  (*Id*.)  Plaintiffs oppose dismissal, denying that the allegations regarding the NIED claim are duplicative.  (Opposition, 24.)  However, Plaintiffs request leave to amend to consolidate Plaintiffs' negligence allegations.  (*Id*.)

The Court declines to sustain Uber's demurrer on the ground the NIED claim is duplicative of Plaintiffs' other negligence claims.  Although similar, they are not identical.  Uber's demurrer is sustained with leave to amend to allow Plaintiffs to consolidate the negligence allegations.

IV.    **Plaintiffs Cannot State A Cause Of Action For Strict Products Liability.**

Uber asserts Plaintiffs' strict products liability claims fail as a matter of law because Plaintiffs do not plead facts to establish that the Uber App is a "product."  (Opening Brief, 32-36.)  Rather, Uber argues Plaintiffs plead the Uber App provides a service.  (*Id*.)

"'Products liability' refers to tort liability imposed on 'those who supply goods or products for the use of others to purchasers, users, and bystanders for losses of various kinds resulting from so-called defects in those products.'"  (*Sharufa v. Festival Fun Parks, LLC* (2020) 49 Cal.App.5th 493, 502, quoting *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 478.)  "However, products liability does not reach a party who is delivering a service to the consumer rather than supplying the product at issue."  (*Sharufa*, 49 Cal.App.5th at 502; see *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 453; *Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 640; *Hennigan v. White* (2011) 199 Cal.App.4th 395, 403.)  Therefore, "[a]s a condition precedent to maintaining a strict products liability claim, a plaintiff must show the transaction in which she obtained the product was one in which the transaction's primary objective was to acquire ownership or use of a product, and not one where the primary objective was to obtain a service."  (*Hennigan*, 199 Cal.App.4th at 403; *Brooks v. Eugene Burger Management*

- 16 -

*Corp.* (1989) 215 Cal.App.3d 1611, 1625 [plaintiffs "must show that the object or instrumentality claimed to be defective was in fact a 'product' as defined or contemplated by the Restatement of Torts, legislation or case law."].) "Although the primary objective inquiry turns on the particular facts of each case, determining whether something is properly considered a 'product' is a gatekeeping function that controls the availability of a products liability cause of action. It is therefore a question of law for the court." (*Sharufa*, 49 Cal.App.5th at 502; see *Brooks*, 215 Cal.App.3d at 1626.)

"A 'product' is broadly defined to include any 'tangible personal property distributed commercially for use or consumption." (*Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 31, quoting Rest.3d Torts, Products Liability § 19(a).) There are two exceptions where intangible property is considered a product for purposes of strict liability. (Rest.3d Torts, Products Liability § 19 cmt. d.) The first type of intangible property is information in media such as books, maps, and navigational charts. (*Id.*) The second type is the transmission of intangible forces such as electricity and x-rays. (*Id.*) These intangible properties are considered products when their use and distribution are similar to the use and distribution of tangible personal property. (*Id.*)

Here, Plaintiffs allege Uber "designs, manufactures, produces and/or distributes a smart phone application" (the Uber App), which is "available to anyone to download onto a smart phone" at no cost. (Compl. ¶ 21; see *id.* ¶¶ 314, 321.) Plaintiffs also allege the Uber App "is a product designed, patented, and/or distributed by UBER in San Francisco, California. It is a product, designed and intended to 'connect riders looking for transportation to independent transportation providers…looking for riders.'" (*Id.* ¶ 22.)

Based on the face of the Complaint, the Uber App is intangible property. Plaintiffs argue the Uber App is tangible property because it fits the Black's Law Dictionary definition of "capable of being touched and seen." (Opposition, 28; *Tangible*, Black's Law Dictionary (11th ed. 2019).) However, this argument is unpersuasive. It is not the app that is being touched and seen, it is the phone. Indeed, the Uber App itself is software that is not capable of being touched and seen and, therefore, is intangible. (See, e.g., *Lucent Technologies, Inc. v. Board of Equalization* (2015) 241 Cal.App.4th 19, 42 ["the fact that placing a computer program on storage media physically alters that media does not thereby

- 17 -

1  transmogrify the software itself into tangible personal property; the media is tangible, the software is

2  not."].)

3        Even assuming the Uber App is a product, when a transaction involves both a service and a

4  product, courts will look to the defendant's dominant role in the transaction, as well as the primary

5  objective or essence of the transaction.  (*Murphy v. E.R. Squibb and Sons, Inc.* (1985) 40 Cal.3d 672, 677;

6  *Hernandezcueva v. E.F. Brady Co. Inc.* (2015) 243 Cal.App.4th 249, 259.)  First, if Uber is considered to

7  be a TNC, it is defined by the California Legislature as "providing prearranged transportation services."

8  (Pub. Util. Code § 5431; see also *Uber Technologies Pricing Cases* (2020) 46 Cal.App.5th 963, 968,

9  citing *Goncharov v. Uber Technologies, Inc.* (2018) 19 Cal.App.5th 1157, 1161 ["Uber provides

10  transportation services to the public for a fee by connecting consumers to its 'partner drivers' through the

11  use of a GPS-enabled smartphone application"].)  Uber's dominant role in creating and providing the app

12  is to provide transportation services.  Second, Plaintiffs allege the Uber App's primary purpose or

13  objective is "to connect riders looking for transportation to independent transportation providers . . .

14  looking for riders."  (Compl. ¶ 22.)  Further, the Uber App is free for all users, and it is responsible for

15  tracking the rides and processing payments.  (*Id.*)

16        Therefore, a customer's primary objective when downloading and using the Uber App is to

17  request a ride in a car and get paired with a driver who is dispatched to pick up and drive the customer to

18  their destination in exchange for a fee.  (*Id.* ¶ 21.)  Customers do not purchase the App, nor is it in any

19  meaningful sense the object of their transaction with Uber, but merely the mechanism by which that

20  object—securing a ride to their destination—is accomplished.  The Uber App is no more a "product" for

21  these purposes than is a telephone that a customer uses to call a taxi.  The Uber App is incidental to the

22  transportation service provided.  (See, e.g., *Murphy*, 40 Cal.3d at 679 [holding a pharmacist's dominant

23  role is selling prescription drugs and his service of giving advice is a subsidiary role]; *Ferrari v. Grand

24  Canyon Dories* (1995) 32 Cal.App.4th 248, 258 [holding defendants who sponsored and conducted a

25  rafting trip were not liable for injuries to the plaintiff because the primary objective of the transaction was

26  providing a service of transportation down a river rather than providing the raft as a product].)  It is

27  essentially a means of obtaining a service, not a product in and of itself.  (See, e.g., *Jane Doe No. 1*, 79

28

- 18 -

Cal.App.5th at 419 ["As to the strict liability cause of action, the [trial] court concluded the Uber app was not a product, and thus a products liability theory of recovery was not legally viable."]; *Hennigan*, 199 Cal.App.4th at 403 [finding the plaintiff's primary objective in patronizing the defendant's salon was to obtain a service, affixing permanent makeup to her eyebrows and eyelids, not to purchase a bottle of pigment to apply to her face]; *Ziencik v. Snap, Inc.* (C.D. Cal. Feb. 3, 2023), 2023 WL 2638314, *4 [finding plaintiffs' products liability claims failed because non-tangible objects such as the Snapchat app cannot be a "product" for purposes of strict products liability as "Snapchat is more like a service than a product."]; *Jackson v. Airbnb, Inc.* (C.D. Cal. Nov. 4, 2022) ___ F.Supp.3d ___, 2022 WL 16752071, *9-*10 ["Airbnb is a platform that connects users; it is more akin to a service than to a product."].)

## CONCLUSION

For the foregoing reasons, the Court sustains Uber's demurrer as to Plaintiffs' vicarious liability claims (sixth through tenth causes of action), fraud and misrepresentation claims (third, fourth, thirteenth, and sixteenth causes of action), and strict products liability claims (fourteenth and fifteenth causes of action) without leave to amend. The Court sustains Uber's demurrer as to the negligent infliction of emotional distress claim (fifth cause of action) with leave to amend. Plaintiffs are granted 30 days leave to amend. Individual Plaintiffs who have filed short-form complaints are granted 30 days leave to amend those complaints to plead claims for fraud and misrepresentation, and Uber shall have 30 days to respond to such amended short-form complaints.


IT IS SO ORDERED.

Dated: June 22, 2023

Ethan P. Schulman
Judge of the Superior Court

- 19 -

| In Re Uber Rideshare Cases | Case No:  CJC-21-005188 |
|---|---|

## CERTIFICATE OF ELECTRONIC SERVICE
### (CCP §1010.6 & CRC §2.251)

I, R. Michael Diles, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am over the age of 18 years, employed in the City and County of San Francisco, California and am not a party to the within action.

On June 22, 2023, I electronically served the attached **Order on Defendants Uber Technologies, Inc. and Rasier, LLC's Demurrer to Plaintiffs' Master Long-Form Complaint.** via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated: June 22, 2023

Brandon E. Riley, Clerk of the Court

By:  _R. Michael Diles_

R. Michael Diles, Deputy Clerk

**Exhibit 5**

| | Incident State | Plaintiff | Current Case Number | U.S. District Court Where Complaint was Originally Filed | Date of Alleged Incident | Consented to TOU Containing COL Provision[1] |
|---|---|---|---|---|---|---|
| 1 | NY | A.H.M. | 3:23-cv-03482 | N.D. Cal. | 11/22/2018 | No |
| 2 | NY | R.T. | 3:23-cv-04301 | N.D. Cal. | 11/6/2019 | Yes |
| 3 | NY | Jane Doe LS 231 | 3:23-cv-04367 | N.D. Cal. | July 2019 | No |
| 4 | NY | Jane Doe LS 155 | 3:23-cv-04374 | N.D. Cal. | 2/1/2018 | No |
| 5 | NY | A.I. | 3:23-cv-04740 | N.D. Cal. | 9/17/2020 | Yes |
| 6 | NY | E.E. | 3:23-cv-04744 | N.D. Cal. | 9/30/2018 | Yes |
| 7 | NY | Jane Doe LS 66 | 3:23-cv-05414 | N.D. Cal. | 1/22/2020 | No |
| 8 | NY | L.E. | 3:23-cv-05567 | N.D. Cal. | 8/23/2023 | No |
| 9 | NY | Jane Doe LS 302 | 3:23-cv-05577 | N.D. Cal. | November 2021 | No |
| 10 | NY | S.E. | 3:23-cv-05869 | N.D. Cal. | 1/14/2022 | Yes |
| 11 | NY | Millicent Moore | 3:24-cv-00482 | N.D. Cal. | 2/9/2014 | No |
| 12 | NY | Maria Gacovino | 3:24-cv-00501 | E.D.N.Y.[2] | 6/15/2019 | Yes |
| 13 | NY | Amber Moye | 3:24-cv-00695 | E.D.N.Y.[3] | 12/30/2018 | No |
| 14 | NY | M.C. | 3:24-cv-01347 | N.D. Cal. | 3/27/2021 | Yes |
| 15 | NY | B.C. | 3:24-cv-01917 | N.D. Cal. | 11/25/2022 | No |
| 16 | NY | S.M. | 3:24-cv-01920 | N.D. Cal. | 5/29/2023 | No |
| 17 | TX | A.G. | 3:23-cv-02071 | N.D. Cal. | 8/1/2018 | No |
| 18 | TX | S.D. | 3:23-cv-03852 | N.D. Cal. | 11/7/2021 | Yes |

[1] *See* Declaration of Peter Sauerwein in Support of Uber's Motion to Dismiss Ex. A.
[2] Complaint was originally filed in the Supreme Court of the State of New York and subsequently removed to the United States District Court for the Eastern District of New York
[3] Complaint was originally filed in the Supreme Court of the State of New York and subsequently removed to the United States District Court for the Eastern District of New York

**Exhibit 5**

| | Incident State | Plaintiff | Current Case Number | U.S. District Court Where Complaint was Originally Filed | Date of Alleged Incident | Consented to TOU Containing COL Provision[1] |
|---|---|---|---|---|---|---|
| 19 | TX | Jane Doe LS 293 | 3:23-cv-04364 | N.D. Cal. | 10/17/2021 | No |
| 20 | TX | Aundreya Rollo | 3:23-cv-05105 | S.D. Tex. | 4/6/2021 | Yes |
| 21 | TX | Jane Doe LS 35 | 3:23-cv-05233 | N.D. Cal. | 11/17/2017 | No |
| 22 | TX | Jane Doe LS 253 | 3:23-cv-05236 | N.D. Cal. | 5/12/2018 | No |
| 23 | TX | Jane Doe LS 241 | 3:23-cv-05413 | N.D. Cal. | 8/14/2020 | No |
| 24 | TX | Katie Espinosa | 3:23-cv-05417 | N.D. Tex. | 8/6/2021 | Yes |
| 25 | TX | A.M.[4] | 3:23-cv-05807 | N.D. Cal. | 10/8/2021 | Yes |
| 26 | TX | Jane Doe LS 185 | 3:23-cv-05922 | N.D. Cal. | 3/26/2020 | No |
| 27 | TX | Bronwyn Mouton | 3:23-cv-06429 | N.D. Cal. | 9/25/2017 | Yes |
| 28 | TX | Courtney Wilson | 3:24-cv-00203 | N.D. Cal. | 6/3/2023 | Yes |
| 29 | TX | Angela Springs | 3:24-cv-00535 | N.D. Cal. | 5/7/2023 | Yes |
| 30 | TX | P.K. | 3:24-cv-00572 | N.D. Cal. | 8/15/2019 | Yes |
| 31 | TX | K.D. | 3:24-cv-01006 | N.D. Cal. | 10/13/2023 | Yes |
| 32 | TX | N.A. | 3:24-cv-01042 | N.D. Cal. | 2/24/2022 | Yes |
| 33 | TX | Damien Milhouse | 3:24-cv-01201 | N.D. Cal. | 3/25/2022 | Yes |
| 34 | FL | Jane Doe LS 237 | 3:23-cv-03973 | N.D. Cal. | 10/2/2019 | Yes |
| 35 | FL | E.C. | 3:23-cv-04299 | N.D. Cal. | 3/14/2019 | No |
| 36 | FL | A.P. | 3:23-cv-04308 | N.D. Cal. | 11/11/2020 | No |
| 37 | FL | Jane Doe LS 249 | 3:23-cv-04369 | N.D. Cal. | 1/27/2017 | Yes |
| 38 | FL | Jane Doe LS 203 | 3:23-cv-04371 | N.D. Cal. | 3/11/2018 | Yes |
| 39 | FL | Jane Doe LS 164 | 3:23-cv-04373 | N.D. Cal. | 1/12/2018 | Yes |

---

[4] Plaintiff A.M., case number 3:24-cv-01732, appears to be the same plaintiff with the same factual allegations as Jane Roe CL 10, 3:23-cv-06149.

**Exhibit 5**

| | Incident State | Plaintiff | Current Case Number | U.S. District Court Where Complaint was Originally Filed | Date of Alleged Incident | Consented to TOU Containing COL Provision[1] |
|---|---|---|---|---|---|---|
| 40 | FL | Jane Doe LS 251 | 3:23-cv-05187 | N.D. Cal. | 3/25/2021 | No |
| 41 | FL | Jane Doe LS 384 | 3:23-cv-05292 | N.D. Cal. | 2/9/2022 | Yes |
| 42 | FL | Jane Doe LS 76 | 3:23-cv-05319 | N.D. Cal. | 2/8/2018 | No |
| 43 | FL | Jane Doe LS 264 | 3:23-cv-05322 | N.D. Cal. | 5/23/2020 | Yes |
| 44 | FL | Jane Doe LS 365 | 3:23-cv-05328 | N.D. Cal. | 7/13/2020 | No |
| 45 | FL | Jane Doe LS 388 | 3:23-cv-05346 | N.D. Cal. | June 2016 | No |
| 46 | FL | Jane Doe LS 244 | 3:23-cv-05372 | N.D. Cal. | 12/17/2020 | Yes |
| 47 | FL | Jane Doe LS 265 | 3:23-cv-05377 | N.D. Cal. | 4/4/2021 | Yes |
| 48 | FL | Jane Doe LS 98 | 3:23-cv-05412 | N.D. Cal. | 3/4/2016 | No |
| 49 | FL | X.Y. | 3:23-cv-05679 | N.D. Cal. | 2/14/2022 | No |
| 50 | FL | C.W. | 3:23-cv-05795 | N.D. Cal. | 4/18/2018 | No |
| 51 | FL | H.K. | 3:23-cv-05812 | N.D. Cal. | 12/23/2021 | Yes |
| 52 | FL | Jane Doe EB 2 | 3:23-cv-05870 | N.D. Cal. | 12/4/2022 | Yes |
| 53 | FL | F.W. | 3:23-cv-05898 | N.D. Cal. | 7/1/2023 | Yes |
| 54 | FL | Jane Doe LS 245 | 3:23-cv-05944 | N.D. Cal. | 1/8/2021 | No |
| 55 | FL | Jane Doe LS 308 | 3:23-cv-05945 | N.D. Cal. | 11/27/2020 | No |
| 56 | FL | Jane Doe LS 273 | 3:23-cv-05946 | N.D. Cal. | 8/1/2018 | No |
| 57 | FL | H.B. | 3:23-cv-05949 | N.D. Cal. | 10/13/2023 | Yes |
| 58 | FL | Jane Roe CL 7 | 3:23-cv-06149 | N.D. Cal. | 12/3/2019 | Yes |
| 59 | FL | N.A. | 3:24-cv-01520 | N.D. Cal. | 10/22/2022 | No |
| 60 | FL | M.Y. | 3:24-cv-01821 | N.D. Cal. | 8/5/2021 | No |
| 61 | FL | A.M. | 3:24-cv-01829 | N.D. Cal. | 1/7/2024 | No |

**Exhibit 5**

| | Incident State | Plaintiff | Current Case Number | U.S. District Court Where Complaint was Originally Filed | Date of Alleged Incident | Consented to TOU Containing COL Provision[1] |
|---|---|---|---|---|---|---|
| 62 | FL | Brandon "Selena" Ortego | 3:24-cv-01914 | N.D. Cal. | 10/27/2023 | No |
| 63 | IL | Katherine Hylin | 3:23-cv-01630 | N.D. Cal. | 3/9/2022 | Yes |
| 64 | IL | Jane Doe LS 75 | 3:23-cv-03805 | N.D. Cal. | 8/12/2017 | Yes |
| 65 | IL | Jane Doe LS 134 | 3:23-cv-03811 | N.D. Cal. | 2/1/2019 | No |
| 66 | IL | Jane Doe LS 250 | 3:23-cv-03995 | N.D. Cal. | 11/24/2020 | Yes |
| 67 | IL | R.M. | 3:23-cv-04302 | N.D. Cal. | 8/13/2020 | Yes |
| 68 | IL | J.C. | 3:23-cv-04723 | N.D. Cal. | 1/30/2023 | No |
| 69 | IL | Heather Worzalla | 3:23-cv-04731 | N.D. Cal. | 9/13/2022 | Yes |
| 70 | IL | Jane Roe CL 1 | 3:23-cv-04772 | N.D. Cal. | 9/18/2021 | Yes |
| 71 | IL | C.S. | 3:23-cv-05115 | N.D. Ill. | 7/8/2018 | Yes |
| 72 | IL | Jane Doe LS 346 | 3:23-cv-05193 | N.D. Cal. | 2/8/2019 | No |
| 73 | IL | Elunda Murphy | 3:23-cv-05224 | N.D. Ill. | 3/23/2018 | No |
| 74 | IL | Jane Doe LS 200 | 3:23-cv-05387 | N.D. Cal. | March 2020 | No |
| 75 | IL | Jane Doe LS 353 | 3:23-cv-05401 | N.D. Cal. | 12/7/2021 | No |
| 76 | IL | Jane Doe LS 311 | 3:23-cv-05406 | N.D. Cal. | 12/11/2020 | No |
| 77 | IL | Jillian Sullivan | 3:23-cv-05418 | N.D. Ill. | 12/29/2017 | Yes |
| 78 | IL | Jane Doe LS 103 | 3:23-cv-05442 | N.D. Cal. | 6/7/2018 | No |
| 79 | IL | Marquita Harris | 3:23-cv-05526 | N.D. Cal. | 3/31/2023 | Yes |
| 80 | IL | Jane Roe CL 5 | 3:23-cv-05647 | N.D. Cal. | 11/18/2021 | No |
| 81 | IL | Jane Roe CL 6 | 3:23-cv-05647 | N.D. Cal. | 2/15/2022 | Yes |
| 82 | IL | J.B. | 3:23-cv-05876 | N.D. Cal. | 3/26/2022 | Yes |
| 83 | IL | L.M. | 3:23-cv-05928 | N.D. Ill. | 9/2/2022 | Yes |

**Exhibit 5**

|  | Incident State | Plaintiff | Current Case Number | U.S. District Court Where Complaint was Originally Filed | Date of Alleged Incident | Consented to TOU Containing COL Provision[1] |
|---|---|---|---|---|---|---|
| 84 | IL | Brianna Craig | 3:23-cv-05932 | N.D. Cal. | 7/22/2023 | Yes |
| 85 | IL | Cecilia Cazares | 3:23-cv-06190 | N.D. Cal. | 12/31/2022 | Yes |
| 86 | IL | A.P. | 3:23-cv-06357 | N.D. Cal. | 12/12/2021 | No |
| 87 | IL | T.H. | 3:23-cv-06533 | N.D. Ill. | 5/11/2023 | No |
| 88 | IL | C.O. | 3:24-cv-00136 | N.D. Cal. | 8/14/2022 | Yes |
| 89 | CA | Jane Doe LSA 340 | 3:23-cv-01165 | N.D. Cal. | 7/31/2019 | N/A |
| 90 | CA | H.D. | 3:23-cv-04617 | N.D. Cal. | 5/17/2021 | N/A |
| 91 | CA | M.F.A. | 3:23-cv-05560 | C.D. Cal. | 6/28/2023 | N/A |
| 92 | CA | Mildred Hunter | 3:23-cv-05622 | N.D. Cal. | 5/23/2017 | N/A |
| 93 | CA | T.R. | 3:23-cv-05625 | N.D. Cal. | 10/6/2022 | N/A |
| 94 | CA | J.B. | 3:23-cv-06692 | N.D. Cal. | 10/1/2017 | N/A |
| 95 | CA | T.M. | 3:23-cv-06705 | N.D. Cal. | 4/1/2018 | N/A |