Volume 1

Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

IN RE: UBER TECHNOLOGIES,      )
INC., PASSENGER SEXUAL ASSAULT )
LITIGATION.                    )
                               )    **NO. 23-MD-3084**
                               )
_____)

San Francisco, California
Friday, March 29, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        PEIFFE WOLF CARR KANE CONWAY & WISE, LLP
        555 Montgomery Street, Suite 820
        San Francisco, California 94111
    BY:  **RACHEL BETH ABRAMS, ATTORNEY AT LAW**


        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
        275 Battery Street - 29th Floor
        San Francisco, California  94111
    BY:  **SARAH R. LONDON, ATTORNEY AT LAW**

    (Appearances continued next page.)

Reported By:     Jennifer Coulthard, CSR No. 14457,
               RMR, CRR, CRC
               Official Court Stenographer

**APPEARANCES (Cont'd):**


For Defendant:

                    PAUL, WEISS, RIFKIND, WHARTON
                     & Garrison LLP
                    1285 Avenue of the Americas
                    New York, New York 10019
        BY:  **JACQUELINE P. RUBIN, ATTORNEY AT LAW**
             **PAUL A. ATKINS, ATTORNEY AT LAW**

                    PAUL, WEISS, RIFKIND, WHARTON
                     & GARRISON
                    535 Mission Street, 24th Floor
                    San Francisco, California 91405
        BY:  **RANDALL SCOTT LUSKEY, ATTORNEY AT LAW**

                    PAUL, WEISS, RIFKIND, WHARTON
                     & GARRISON LLP
                    2001 K Street, NW
                    Washington, D.C.  20006
        BY:  **KYLE N. SMITH, ATTORNEY AT LAW**

                    SHOOK, HARDY & BACON, LLP
                    2049 Century Park East, Suite 3000
                    Los Angeles, California 90067
        BY:  **MICHAEL BRIAN SHORTNACY, ATTORNEY AT LAW**

                    SHOOK, HARDY & BACON, LLP
                    1800 K Street NW, 10th Floor
                    Washington, D.C.  20006
        BY:  **PATRICK LEO OOT, JR., ATTORNEY AT LAW**

PROCEEDINGS

| | |
|---|---|
| 1 | **<u>Friday - March 29, 2024</u>**                                    **<u>11:06 a.m.</u>** |
| 2 | **P R O C E E D I N G S** |
| 3 | --oOo-- |
| 4 | **THE CLERK:**  Calling civil action C23-MD-3084, in Re: |
| 5 | Uber Technologies, Inc., Passenger Sexual Assault Litigation. |
| 6 | Counsel, please state your appearances for the record. |
| 7 | **MS. LONDON:**  Good morning, Your Honor; Sarah London on |
| 8 | behalf of the plaintiffs. |
| 9 | **MS. ABRAMS:**  Good morning, Your Honor; Rachel Abrams |
| 10 | on behalf of the plaintiffs. |
| 11 | **THE COURT:**  Good morning, Ms. Abrams. |
| 12 | **MR. ATKINS:**  If it's the time for the defendants, good |
| 13 | morning, Your Honor; Robert Atkins -- |
| 14 | **THE COURT:**  Good morning. |
| 15 | **MR. ATKINS:**  -- for the Uber defendants. |
| 16 | **THE COURT:**  Good morning. |
| 17 | All right.  So you'll be speaking, Mr. Atkins, on |
| 18 | behalf of Uber? |
| 19 | **MR. ATKINS:**  A number of us will be since there are so |
| 20 | many issues.  I -- maybe just to identify folks who will be |
| 21 | speaking, my partner Jacqueline Rubin, my partner Kyle Smith, |
| 22 | my partner Randy Luskey and then from the Shook Hardy firm |
| 23 | Patrick Oot and Michael Shortnacy. |
| 24 | **THE COURT:**  Okay.  I'm not sure we have all the people |
| 25 | that you've identified, Mr. Atkins.  We don't have two of them. |

PROCEEDINGS

 1    Maybe we're getting them now.

 2            **MR. ATKINS:**  There we go.

 3            **THE COURT:**  Mr. Smith, who else?

 4            **MR. ATKINS:**  Jacqueline Rubin.

 5            **MS. RUBIN:**  Good afternoon, Your Honor.

 6            **THE COURT:**  We have Ms. Rubin.

 7            **MR. ATKINS:**  All right.  Randy Luskey, Patrick Oot.

 8            **THE COURT:**  Oh, yes.  There you are.  The upper

 9    right-hand corner.

10            **MR. LUSKEY:**  Good morning, Your Honor.

11            **THE COURT:**  All right.  Good morning.

12            So I think we have enough, right?

13            **MR. ATKINS:**  I'm pretty sure, Your Honor.

14            **THE COURT:**  Okay.  And I am sitting here with Judge

15    Cisneros in chambers, you know, on the status.

16            Now, let me -- first of all, I've read the joint

17    status report, which of course has both parties' positions in

18    it; some agreement, some disagreement, and I'd like to go

19    through it.

20            My understanding is that there have been approximately

21    240 cases filed in this MDL.  Is that everyone else's

22    understanding, or is there some number that we're capturing in

23    terms of our records?

24            **MS. LONDON:**  Your Honor, we understand there's been a

25    handful, maybe 10 or more cases that were filed this week, so

1   we're operating around 250, I believe, as of today, but give or

2   take 240, 250.

3            **THE COURT:**  Okay.  All right.  Okay.

4            Taking these issues in no particular order except the

5   order I want to take them in, which is particular enough, Uber

6   has asked that they -- raised a question about cross-complaints

7   and, in order to understand it a bit better, I wanted to ask

8   Uber what their experience has been in other litigation

9   involving the same issue with respect to cross-complaints, that

10  is, nationwide approximately -- these are just ballpark

11  numbers -- in how many cases have you actually filed

12  cross-complaints?  And I think we're talking about

13  cross-complaints against drivers, as I understand it, but I

14  also want some clarification on that.  Are there -- are there

15  other potential defendants by category other than drivers?

16           And so why don't you tell me what your experience has

17  been, because I don't think I can get my arms around the issue

18  of cross-complaints until I have a better understanding of what

19  you're talking about.

20           **MS. RUBIN:**  Sure, Your Honor.  Thank you.

21           **THE COURT:**  Ms. Rubin.  Go ahead.

22           **MS. RUBIN:**  Thank you, Your Honor.

23           So yes, we intend to file cross-complaints against the

24  independent drivers.  As for numbers, if you can indulge me,

25  I'd like to talk about the other California cases because

PROCEEDINGS

 1    that's the numbers that I have on hand.

 2            In the JCCP prior to the JCCBA consolidated together,

 3    in those cases there were about 223 cases filed in the

 4    San Francisco courts, and there Uber filed cross-complaints and

 5    there may be more that will get filed, but in about a third of

 6    the cases.

 7            THE COURT:  Okay.  About a third of the cases.  So as

 8    a grouping, using the California experience, it would be about

 9    a third of the cases?

10            MS. RUBIN:  Those -- those -- sorry, I didn't mean to

11    interrupt, but those cases are still obviously -- they're still

12    in the beginning stages, and so there may be more filed, so

13    this is just, you know, as of -- as of now, and there may be

14    more and there are likely to be more.

15            THE COURT:  Second question:  When you talk about

16    cross-complaints, are you talking about anybody else other than

17    the drivers?

18            MS. RUBIN:  In those cases I was speaking about the

19    independent drivers.  There are cases of which I am aware

20    across the country where Uber has, indeed, filed

21    cross-complaints against others.

22            Here -- and those others would be parties such as

23    restaurants or bars, and others -- you know, other independent

24    actors that had played some role in the cases.  Obviously here,

25    given where we are in discovery, I don't have -- I don't have a

**PROCEEDINGS**

1  list yet as to who might be those parties here.

2        **THE COURT:**  Okay.

3        Okay.  Are you -- when you talk about

4  cross-complaints, what is it that you want me to do with

5  respect to cross-complaints?

6        **MS. RUBIN:**  At the moment, Your Honor, there's nothing

7  that we are asking you to do.  We just wanted to give you

8  situational awareness, let you know that these were coming.

9        **THE COURT:**  And doing nothing.  Good.

10        Okay.  Let me move on -- let me move on to the second

11  thing on my list.

12        There has now been fully briefed -- I think fully

13  briefed the terms of use motion, right?

14        **MR. ATKINS:**  Your Honor, Robert Atkins.  It will be

15  fully briefed as of Tuesday.

16        **THE COURT:**  The terms of use?

17        **MR. ATKINS:**  Yeah, that's right.  Our reply brief is

18  due April 2nd.  It may have -- we may have moved it slightly by

19  agreement of the parties, but we'll be done by Tuesday.

20        **THE COURT:**  Okay.  It will be filed by Tuesday in any

21  event; maybe earlier or maybe not, but by Tuesday it will be

22  filed.

23        Okay.  I want to set a hearing date.  The hearing date

24  I want to set is April 12th in the morning.  And I want to -- I

25  want to -- I think it's a serious motion and I want -- I think

 1   you -- I want you to be present.  Everybody else doesn't have

 2   to be present, but the people who are arguing the motion I want

 3   to be present, okay?

 4        **MR. ATKINS:**  As the movant we'll be present.

 5        I just have a question for my group.  We are -- as

 6   happened before, I believe we have a IDC in -- across the

 7   street with Judge Schulman.  I'm afraid I don't know the time

 8   of that, but certainly we could do both on the same day if the

 9   times don't conflict.

10        **THE COURT:**  Yeah.  And, by the way, I'll accommodate

11   Judge Schulman.

12        **MR. ATKINS:**  Thank you, Your Honor.

13        **THE COURT:**  Whatever -- it's not going to be -- you

14   just tell me -- I mean I don't want to do it at 4:00 in the

15   afternoon on --

16        **MR. ATKINS:**  Nor I.

17        **THE COURT:**  But let's figure it out.  Unless you know,

18   Mr. Smith do you know what time it is or --

19        **MR. SMITH:**  I believe that the IDC is in the

20   afternoon, so the morning is pretty clear.

21        **THE COURT:**  All right.  Then let's do it in the

22   morning.  Let's do it in the morning.  Okay.  That's great.

23        Your Rule 12 motions, the other motions, these are --

24   as I understand it, you have selected essentially five of the

25   jurisdictions, though there are many more -- or more -- but

1  these five are sort of like the payoff jurisdictions, that is,

2  they -- they have a substantial number of people who are

3  involved in the lawsuits are coming out of these five

4  jurisdictions; is that correct?

5          MR. ATKINS:  Yes, it is, Your Honor.

6          THE COURT:  Okay.  So -- and that is going to be filed

7  by Tuesday -- is that right? -- as well?

8          MR. ATKINS:  Actually Monday.

9          THE COURT:  Oh.  Monday.  All right.  I'm going to

10  look at that and then -- because I have to read it first -- and

11  then I may or may not adjust the response date, okay?  And the

12  response date is some way time out in May.  I don't know what

13  you people are doing.  Clearly I do know what you're doing.

14  What you're doing is you're arguing about every single detail

15  of every single protocol.  That's what you're doing.  I'm not

16  saying that's -- that that's not what you should be doing, but

17  that's what you're doing, so I'm moving ahead.  Judge Cisneros

18  is certainly moving ahead issuing orders on these protocols

19  and -- but we're going to walk and talk at the same time, so

20  don't get all comfortable in the next coming month that you're

21  not going to be working on this stuff because this -- I

22  understand how protocols are important and so forth, but so are

23  these other issues.  And the problem is unless we get these

24  other issues identified and decided, we have no real sense of

25  the case.

PROCEEDINGS

```
 1            Now, I know that there's another aspect of the case,
 2   which is the size of the case and the component parts of the
 3   case, and I appreciate that.  I understand that.  But I can do
 4   a couple things at the same time but not everything, and if one
 5   thing is going to have a substantial impact on the other thing,
 6   I like to decide the things that are going to have substantial
 7   impact.  So we don't want to waste all of your very valuable
 8   time in going down rabbit holes and issues and so forth that,
 9   by virtue of some ruling of the Court, you'd never have to look
10   at, okay?  So that's my priority.  That's the way I'm
11   approaching the problem.  And therefore -- therefore, my
12   sarcasm aside, therefore I am going to take a look at the
13   motion, Mr. Atkins.  And then if I think I don't have to make
14   an adjustment, I don't say anything and -- but if I do think
15   so, I will, okay?
16            MR. ATKINS:  Your Honor --
17            THE COURT:  Yes?
18            MR. ATKINS:  -- Your Honor, I just want to flag
19   something for you.
20            There was a pending motion to dismiss in one of the
21   cases that happens to be in Maryland that was -- the motion was
22   made, not fully briefed, before the transfer.  It's sort of one
23   of a kind.  The case arises out of an incident in the United
24   Arab Emirates, so there are a set of issues regarding the
25   dismissal of that particular claim.
```

 1          THE COURT:  Well, I can certainly look at that.

 2          MR. ATKINS:  Yes.

 3          THE COURT:  I'll look at them both at the same time.

 4          MR. ATKINS:  Okay.  We're going to renotice it, if

 5     that -- I think that makes sense to Your Honor.

 6          THE COURT:  I think that's right.

 7          MR. ATKINS:  Okay.  Thank you.

 8          THE COURT:  Motion to transfer cases.  As I understand

 9     it, the basis of the motions which you intend to make or have

10     been -- or have been made previously before the MDL

11     consolidated the actions is not a jurisdictional motion, it's

12     based upon a -- essentially a forum non conveniens; is that

13     correct, or have I missed something here?

14          MR. ATKINS:  Well, there's kind of a stutter step

15     before, which is in our view -- and this may be resolved if

16     we're successful on the terms-of-use motion.  Many of the

17     plaintiffs have forum selection clauses, so we think that's

18     tied up, obviously, with the terms-of-use enforcement motion,

19     but ultimately the question is going to arise as to whether the

20     cases that were filed in the Northern District of California

21     are properly venued there.

22          So yes, ultimately it's a -- it may resolve itself

23     through a 1404(a) motion or motions.

24          THE COURT:  Okay.  But they're not -- they're not what

25     I call the pure jurisdictional issues.  They are -- they are

PROCEEDINGS

 1    forum non conveniens or forum selection?

 2              **MR. ATKINS:**  That's correct, Your Honor.

 3              **THE COURT:**  Okay.  And as to that, let's see how these

 4    other motions go.  Let's just see how these other motions go,

 5    yeah.  Maybe I reach them, maybe I don't reach them, I don't

 6    know, but I'd only point out that what you've said or what one

 7    says in 1404(a) motions is true in so many MDL cases.

 8              I mean, after all, MDL is sort of the antithesis of

 9    forum selection at the beginning because everybody selected

10    therefore or the plaintiffs have selected therefore and it's

11    not here.  So I got that, I understand that, and of course I'll

12    address it, but I don't want to address it now --

13              **MR. ATKINS:**  Thank you, Your Honor.

14              **THE COURT:**  -- because the argument the other way is

15    that's what MDLs always do.  They always take actions in other

16    forums and put them in this forum.  And if the answer was

17    always, well, at the outset forum selection or 1404(a)

18    considerations dictated, then you don't have an MDL or at least

19    you don't have an MDL of cases in which there's no forum

20    selection process.  And since I've done 13 of them, I haven't

21    ever seen that argument to succeed.  That doesn't mean that's

22    not an argument and it doesn't mean that it's -- that it can be

23    ignored; to the contrary, it can't be ignored.  It is an

24    argument and the question is when is it decided.

25              **MR. ATKINS:**  And Your Honor, I'll -- you know, I'll

1    obviously save our argument for the papers and for argument.  I

2    just would note that I think there are two features of this

3    that I think are distinct to this MDL.  One is the terms of use

4    and the nonconsolidation agreement that we seek to enforce and

5    Your Honor will reach, and the other ties up with the

6    cross-complaints about the drivers where the claims that were

7    brought here and are pending here are going to impair our

8    ability to -- at least in these actions -- bring

9    cross-complaints and to seek party discovery from the drivers.

10   So, like I said, I'll save that, but I think that's a

11   consideration of importance to our -- to us and --

12        **THE COURT:**  Well, I also think it -- I also think it

13   certainly would be -- it certainly would impact the nature of

14   discovery, the ease of discovery, the nature of discovery and

15   so forth, so it has to be decided.

16        **MR. ATKINS:**  Thank you, Your Honor.

17        **THE COURT:**  At least it has to be decided -- it has to

18   be addressed.  It has to be addressed.  I got it.  I

19   understand.  I agree with you completely.

20        **MR. ATKINS:**  Thank you.

21        **THE COURT:**  Now let me get to where we are today on

22   the plaintiffs' fact sheet because it was a little unclear.  I

23   was trying to figure out exactly what -- what you were saying

24   to me.

25        Here we have roughly 240 cases, and that would be

1   roughly 240 plaintiffs' fact sheets, and I'm trying to figure

2   out -- given what has been produced today and what is being

3   debated today -- how many of those plaintiff fact sheets are,

4   in the defendants's views, noncompliant with the court order to

5   produce A, B, C, and D, you know, produce this receipt -- the

6   best -- or explain why the receipt can't be produced and the

7   other stuff that goes along with it.  It's not just that one

8   question.

9          But reading through the -- reading through the joint

10  conference statement, it seemed to me that initially there

11  were -- and I'm making this number up, I think, but somehow

12  it's in my mind -- 30, and then it got down to 8.  So what are

13  the numbers?

14         I actually am asking you the number of today how many

15  of these plaintiff fact sheets that have been produced to you

16  are deficient, in your mind?  And that would be from the

17  defense.  How many?  Eight?  Thirty?  A hundred?  200?  What

18  are -- what's the number?

19         **MS. RUBIN:**  Hello, Your Honor; Jackie Rubin again.

20         **THE COURT:**  Okay.  Good.  Okay.  Ms. Rubin, they're

21  giving you the easy ones.  Go ahead.

22         **MS. RUBIN:**  So we've been focusing on the

23  substantiation of the rides.  So I want to be clear when we're

24  talking about deficiencies at the moment what we've been

25  talking about is on the deficiencies of substantiating a ride,

1  so there may be other -- other portions of the fact sheet, but

2  we're not -- that is not what we have been focusing on here and

3  before Your Honor right now.

4        So when we're talking about the 30, we were --

5        **THE COURT:**  What number are you talking about?

6        **MS. RUBIN:**  I am talking about -- I'm talking about

7  30, although the number is changing.

8        **THE COURT:**  Well, what is the number now as of this

9  hearing?

10        **MS. RUBIN:**  It's about 30.  And I say it's changing

11  because we've had multiple meet and confers.

12        **THE COURT:**  That's good and I'm encouraging that.

13  That's great.  That's exactly what you should be doing.  But

14  let me define a little bit more what I mean.

15        **MS. RUBIN:**  Sure.

16        **THE COURT:**  I'm trying to find out what you mean.

17  When you say "substantiating a ride," are you saying

18  identifying the ride, or are you saying producing the evidence

19  that substantiates that the ride identified was the ride in

20  question in which the alleged misconduct occurred?

21        **MS. RUBIN:**  So, at the moment, what we're looking at

22  is whether we can match the information that we're being

23  provided from the plaintiff a ride that meets or generally

24  meets the description of what we are being given.  So it's not

25  trying to -- it's this first threshold issue.  Can we come up

1  with an account and a ride that looks like what it is that we

2  have been given.  So it's a very threshold question.

3        And so we are working with the plaintiffs to try and

4  get more information in the cases in which the plaintiff

5  actually does not provide enough information to get more

6  information.  Is there a different account name?  Is there a

7  different account number?

8        **THE COURT:**  I got that.  Okay.  Now, this is what

9  I'm -- I'm looking at the numbers and let me see whether this

10  is correct.

11        So if we start out with the proposition -- let's --

12  that there were 230 plaintiffs and that 30 have not complied,

13  that means that 200 have, I think.  And if 200 have, that means

14  roughly 85 percent have.  So you now have 85 percent, roughly,

15  of the plaintiffs' identifications or first threshold

16  discovery.  Okay.  So I've got that in mind.

17        And it seems to me that, number one, the process is

18  working because it's working in at least 85 percent of the

19  cases.  And that's -- that, to me, is -- that's good.  That's

20  great.  It means that you people are talking and it means that

21  are you complying.

22        And the second thing is, do I need to do anything

23  right now?  And my instincts are no, I don't need to do

24  anything right now.  I'll keep furnishing the information.

25        I know the plaintiffs would like me to accelerate this

1    or that or something else, but no.  It seems to me that that

2    aspect of it is working fine, even though there's a lot of --

3    probably a lot of meetings back and forth.  But any meeting

4    that you have that I'm not at or Judge Cisneros is not at,

5    that's fabulous because we don't bill by the hour.

6         So that's great.  We don't need to do it and keep the

7    process going.  I don't think there should be any delay in that

8    process as envisioned.

9         And the next -- the biggest question is -- and a

10   substantial amount of the status conference was directed to a

11   suggested schedule, essentially, of discovery, pretrial

12   discovery; experts, you know, plaintiffs, this person, that

13   person.  I've got to tell you that's all premature.  I'm

14   delighted that you're thinking about it and talking about it

15   and seeing whether you can arrive at an agreement, but, in my

16   view, that's -- that's premature other than some voluntary --

17   you know, you come up with, look, we want to take Smith's

18   deposition, everybody agrees, you take it.  Fine.  I'll let you

19   take it.  But I don't want to unleash the horses at this point

20   in terms of that type of discovery.  So I don't know who

21   this -- I don't know who gets the advantage out of that.

22        In my view nobody does except me, and this is all

23   about me, so it's important, in my view, to work in a

24   particular order, particular process, and make particular

25   decisions in as quick -- as rapidly as possible, consistent

1    with giving everybody a fair hearing on it.

2              So I'm not going to address any of those subjects.

3    Thank you very much for doing that, but we're going to put that

4    on a middle burner.

5              And meanwhile, Judge Cisneros is addressing issues of

6    protocols for discovery.  We're not postponing that.  We've got

7    to get all that hammered out before you go on your happy way of

8    deposing people, whomever they may be.  So that's being worked

9    on right now as we sit here.  That's being worked on.  But

10   scheduling, which is always the key to everything, is not going

11   to be worked on right now other than scheduling certain motions

12   that I think are ready.

13             The issue -- it's a recurring theme, moving on to

14   another topic, cutoff dates for complaints.  And I was -- you

15   know, I'm trying to figure out in my mind a little bit more

16   about the status of the state court stayed proceedings, if

17   that's what they are, because we're now in 2024.  There's a

18   whole group of -- host of complaints just sort of sitting in

19   limbo somewhere between Golden Gate Avenue and McAllister

20   Street, and that's appropriate because the Court of Appeals is

21   between the two.  So the question is do we know anything about

22   that and, perhaps more importantly, if the Court -- if the

23   Court of Appeal -- and I don't know where the California

24   Supreme Court fits in any of this, but if they reverse Judge

25   Schulman, that would mean that all of those cases that are

1   sitting out there, which I think are somewhere in the

2   neighborhood of 800 or whatever that number was, if they

3   reverse, then maybe they'd proceed by way of state court

4   proceedings and then maybe, getting to my -- getting to where

5   you want me to be but figuring out how to get there, maybe when

6   I hear that I then impose some deadlines.  You decide.  Do you

7   want to go to state court?  Do you want to go to federal court?

8   Make up your mind.  I'll give you 30 days to make up your mind.

9   So we see the contours of the case here and you see the

10  contours of the case there.  You see both contours and then

11  you -- then you know what you're dealing with.

12          But I don't even see how I get to that point if, in

13  fact, the State of California hasn't ruled yet, the appellate

14  process hasn't achieved some sort of decision in that.  That's

15  what I call the practical problem, you know, and every case

16  presents different kinds of practical problems.  That I think

17  is a practical problem.

18          Now, look, I'm not going to hold Uber hostage to the

19  state court's vicissitudes on timelines as to how they're going

20  to decide things, so at some point -- at some point I do

21  something.  I got that.  I'm not at that point today, unless

22  you tell me the state court has, you know, done something that

23  indicates they're just not going to decide it within a year or

24  so, you know, and then maybe I can be -- then, in fairness to

25  Uber, maybe I can try to put some deadlines on all of this.

 1   But I don't -- we're not there today.  And I'm trying to

 2   explain to you the reasons why I think we're not there today,

 3   but we'll get there.  It could be -- we'll get there one way or

 4   the other.  We'll either get there because they will have

 5   decided something or I'll get there on my own because they're

 6   not going to decide what they're going to do.  Okay?  That's

 7   all I can say about that.  If somebody has something they want

 8   to say on that issue, you can.

 9           MR. SMITH:  Your Honor, Kyle Smith --

10           THE COURT:  Go ahead.

11           MR. SMITH:  -- for the Uber defendants.

12           THE COURT:  Yeah.

13           MR. SMITH:  If I may just address the status of the

14   appeal, your Honor's impression is correct as to where that

15   appeal stands.  It was fully briefed in the Court of Appeal as

16   of the middle of February.  The parties are awaiting an oral

17   argument date.  We can't predict precisely when it will be.  We

18   expect to receive notice of that and then we'll argue it, and

19   assuming the typical practice occurs, there will be a decision

20   within 90 days of the argument.

21           And I might suggest we submit a status report to Your

22   Honor on that in something like 45 days to let you -- let Your

23   Honor know if anything's changed on that.

24           THE COURT:  Well, what I'm going to do -- I appreciate

25   that.  What I'm going to do is I'm going to set -- I want

1    monthly status conferences we can do by Zoom and it may be that

2    we'll have a motions conference that will -- I mean a motions

3    hearing that will substitute for the status conference, but I

4    do want monthly status conferences.

5            I think if I can be so bold as to suggest that we're

6    all spending -- that is you guys and Judge Cisneros -- a lot of

7    time -- I've got to choose my words somewhat carefully.  You

8    know, the word always comes to my mind "nitpicking," but that

9    has a pejorative sound to it, so detail-driven disagreements,

10   sure.  Some are important, some are less important, but all of

11   them constitute some form of delay, and so I'm not -- I'm not

12   really happy when I, you know, that it takes so long to argue

13   about things that ought not to be argued about.

14           Now, that's in the eye of the beholder.

15           I know when I say I don't know why you're arguing

16   this, you do have a reason for arguing it, but be selective

17   because, as we know, we're all guided by Aesop's Fable --

18   right? -- the wolf.  So that was just engrained in us when we

19   were five years old.  So don't call it too often because when

20   it shows up, we're not going to be paying attention to you --

21   you know? -- but I don't need to tell you guys that.  I mean,

22   you're very sophisticated lawyers.  But just be aware that we

23   see a different side of it.  How does it hit us?  And it hits

24   us that if there's an important issue, sure, of course, that's

25   why we're here.  If it's an unimportant issue and you should

PROCEEDINGS

1   have worked it out yourselves, you should have worked it out

2   yourselves and somebody's being unreasonable.

3           And the problem with the hearings is it has a way of

4   disclosing to us who is being unreasonable.  You see, it's not

5   like a settlement conference where the trier of pact won't know

6   who's being unreasonable.  There.  That's my caveat.

7           Well, everybody, that's my list.  If I haven't

8   addressed anything, it's because I don't want to address it,

9   all right?  See you soon.  Have a good weekend.  Bye-bye.

10          (Concluded at 11:38 a.m.)

11                              --oOo--

12

13

14                   **CERTIFICATE OF REPORTER**

15          I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18

19   _Jennifer Coulthard_                      March 29 2024

20   JENNIFER L. COULTHARD, RMR, CRR                DATE
     Official Court Reporter
21   CA CSR#14457

22

23

24

25