# Exhibit A

Exhibit A

[Submitting Counsel below]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC. PASSENGER SEXUAL ASSAULT LITIGATION | **MDL No. 3084 CRB** |
| This Document Relates to: ALL ACTIONS | **DECLARATION OF DOUGLAS FORREST IN SUPPORT OF PLAINTIFFS' POSITION FOR THE PARTIES JOINT DISCOVERY LETTER** |

## <u>DECLARATION OF DOUGLAS FORREST</u>

I, Douglas Forrest, state and declare as follows:

1.      I am the Senior Vice President, eDiscovery Analytics & Strategy, at International Litigation Services ("ILS"), which is located in Irvine, California (www.ilsteam.com). I have been retained as a consultant for the Plaintiffs in this action for my knowledge relating to Electronically Stored Information ("ESI") as it relates to creating an ESI Order. The facts stated in this Declaration, except as otherwise explicitly noted, are within my own personal knowledge and, if called as a witness to testify, I could and would competently testify to the facts contained in this Declaration.

2.      This is my second declaration in this matter. The first was the Declaration of Douglas Forrest (February 12, 2024), submitted as Exhibit 6 to Plaintiffs' Brief in Support of Proposed ESI Order (Case 3:23-md-03084-CRB, Document 261, Filed 02/12/24).

Exhibit A

3.      I make this Declaration in support of Plaintiffs' Position in the Joint Discovery Letter, dated April 12, 2024 ("Letter"). I am familiar with the issues raised in the Letter and have participated in several meet and confers with the parties. I have reviewed, *inter alia*:

    a.   Pretrial Order No. 9: Order on ESI Protocol Disputes (ECF No. 345) ("PTO No. 9").

    b.   Letter, K Smith to R Luhana et. al, dated January 16, 2024 ("Uber Data Sources Letter").

    c.   Letter, K Smith to R. Luhana et. al, dated February 22, 2024.

    d.   Plaintiffs' Brief in Support of Proposed ESI Order (ECF No. 261), dated February 12, 2024.

    e.   Plaintiffs Proposed ESI Order (ECF No. 261-2), dated February 12, 2024.

    f.   Defendants' Brief in Support of Proposed ESI Order (ECF No. 262), dated February 12, 2024.

    g.   Defendants' Proposed ESI Order (ECF No. 262-2), dated February 12, 2024.

    h.   Declaration of Phillip Favro ("Favro Decl.") (ECF No. 262-8), dated February 12, 2024.

    i.   Declaration of Jason Alsobrook ("Alsobrook Declaration") (ECF No. 262-9), dated February 12, 2024.

    j.   Declaration of Sam Yang ("Yang Decl."), *In re: Meta Pixel Healthcare Litigation*, No. 22-cv-0358-WHO (VKD), ECF. No. 265 (N.D. Cal. June 1, 2023)

    k.   Declaration of Jamie Brown ("Brown Decl."), *In Re: Meta Pixel Healthcare Litigation*, No. 22-cv-0358-WHO (VKD), ECF No. 266 (N.D. Cal. June 1, 2023).

    l.   Email, J Wikler to M Sweet et. al., dated April 9, 2024, at 9:44:38 PM EDT ("Wikler Email").

## I.      QUALIFICATIONS

4.      I am a graduate of Stanford Law School, where I was a Note Editor of the Law Review. I was admitted to the bar in 1977 (I currently have retired status), and, after practicing law at Breed, Abbott & Morgan and Cravath, Swaine & Moore, I developed expertise in computer

Exhibit A

technology and software design, programming, and implementation, both generally and with respect to litigation support and e-discovery.

5.      As an attorney at Cravath, I relied on *Aquarius*, the first large-scale implementation of computerized litigation support, which was implemented on the IBM antitrust cases.

6.      As Director of Litigation Services at Legal Information Technology, Inc. ("LIT"), I was instrumental in introducing imaging, coding, and search technology for discovery to Am Law 200 law firms, and I pioneered the practice of integrating imaging with legacy search systems such as BRS.

7.      As a systems architect, application designer and programmer, I created case management, litigation support and document repository systems and applications (including *WIDE*, and *LIT CaseWorks for Lotus Notes*, developed for LIT), SaaS (Software as a Service) knowledge management applications (including *LexisNexis Total Alerts* and *LexisNexis Clipper* developed for Ozmosys (https://www.ozmosys.com/)), and e-discovery and production operation systems for Doar (https://www.doar.com/). The software that I designed, programmed, and implemented to produce *LexisNexis Total Alerts*, *LexisNexis Clipper, LexisNexis Legal Industry Monitor, Thompson Elite Daily Docket, and Institutional Investors' Mutual Fund Daily, Hedge Fund Daily and Compliance Daily*, traversed thousands of web sites and extracted thousands of URLS from those sites daily.

8.      At ILS, I direct e-discovery analytics and strategy, providing technical advice, expertise and drafting and other assistance to counsel.

9.      I have advised, consulted, or acted as a declarant or affiant with respect to ESI in many cases, including:

    a.  *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047 (N.D. Cal.);

    b.  *In Re: StubHub Refund Litigation*, Case No. 4:20-md-02951-HSG (N.D. Cal.);

    c.  *In Re: Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (N.D. Cal.);

    d. *In Re: Philips Recalled CPAP, Bi-Level Pap, and Mechanical Ventilator Products Litigation*, MDL No. 3014 (W.D. Pa.);

    e. *Nichols v. Noom Inc.,* No. 20-CV-3677 (LGS) (KHP), 2021 WL 948646, (S.D.N.Y.);

    f. *In re: Ethiopian Airlines Flight ET 302*, Lead Case: 1:19-cv-02170 (N.D. Ill.) (Boeing 737 Max Crashes);

    g. *In Re: 3M Combat Arms Earplug Product Liability Litigation*, MDL No. 2885 (N.D. Fla.) ("3M Combat Arms MDL");

    h. *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2672 (N.D. Cal.) ("VW Clean Diesel MDL");

    i. *In Re: Intel Corp, CPU Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2828 (D. Or.);

    j. *In Re: Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2777 (N.D. Cal.);

    k. *Lafferty v. Alex Jones* (Conn. Super. Ct.);

    l. *Soto v. Bushmaster Firearms International* (Conn. Super. Ct.) (Sandy Hook parents);

    m. *In Re: Takata Airbags Product Liability Litigation*, MDL No. 2599 (S.D. Fla.);

    n. *In Re: Testosterone Replacement Therapy Products Liability Litigation*, MDL No. 2545 (N.D. Ill.);

    o. *In Re JCCP 4771, Zoloft Birth Defect Cases*, (Cal. Super. Ct.);

    p. *Da Silva Moore v. Publicis Groupe & MSL Group,* No. *11* Civ. 1279 (ALC)(AJP) (S.D.N.Y.) (seminal TAR case).

10. I have served as a speaker or panelist on many CLE webinars including *Balancing the Needs of Requesting and Producing Parties: Getting E-Discovery Right* (RAND Institute for Civil Justice Conference, October 3-4, 2023) ("RAND Conference"), *An Analysis of Today's Mass Tort Landscape Agenda* (HarrisMartin MDL Conference, March 27, 2019), *Current Mass Torts from E-Discovery Through Exit Strategies – Navigating "Game-Changing" Dynamics* (HarrisMartin MDL Conference, November 26, 2018), *The Mass Tort Litigation Landscape – A Critical Analysis Agenda* (HarrisMartin MDL Conference, September 26, 2018), *The State of E-*

*Discovery in 2018: Analysis & Review* (West LegalEdCenter, September 27, 2018), *Lessons Learned from Recent eDiscovery Disasters* (West LegalEdCenter, February 26, 2018), and *Top ESI Mistakes Made in Mass Tort Disputes* (West LegalEdCenter, September 14, 2017).

11.     Along with Uber's expert Dr. Maura Grossman, I was an advisor on and assisted in setting up the RAND Conference.

12.     I am a member of the drafting team for forthcoming commentary of the Sedona Conference Working Group 1 (https://thesedonaconference.org/wgs/wg1) on *Conducting eDiscovery of Modern Communication and Collaboration* and was on the panel presenting the *Drafting Team Report: Discovery of Modern Communications and Collaboration Platforms* at the Sedona Conference Working Group 1 Annual Meeting in October 2023.

## II.     OPINIONS

A.     *Questions Addressed*

13.     In PTO No.  9, the Court stated:

"[I]n recognition of the challenging nature of hyperlinks, Uber shall direct an employee with knowledge and expertise regarding Google Vault and Uber's data and information systems to investigate in detail the extent to which Google Vault's API, macro readers, Metaspike's FEC or other programs may be useful to automate, to some extent, the process of collecting the contemporaneous version of the document linked to a Gmail or other communication within Uber's systems, whether the email or communication is stored in Google Vault, or outside. This investigation shall not be limited to documents referenced by URL or hyperlinks in emails or Google documents stored in Google Vault, but shall also include other cloud-based messages such as Slack. Uber's designated employee may consult with Uber's e-discovery experts. Likewise, Plaintiffs shall also more thoroughly investigate these potential solutions."[1]

---

[1] ECF No. 345 at 21.

Exhibit A

14.     In this Declaration, I describe the steps undertaken for Plaintiffs by ILS under my direction to investigate potential solutions and the conclusions that I reached with respect to them.

B.     *Background Circumstances*

15.     My understanding is that:

      a.   Uber uses Google Workspace, including native Google documents[2] in Google Drive, Google Mail and Google Vault.

      b.   Uber deletes Google Mail not subject to a legal hold after six months.

      c.   Uber's Google Drive data has been, and continues to be, preserved indefinitely.

      d.   Uber preserves at least some Google Drive documents and Google Mail with Google Vault.

16.     When a Google Vault document is exported from Google Vault, the current version of that document is exported as the corresponding Microsoft document type, e.g., Google Docs documents are exported as Microsoft Word documents.

17.     Uber's vendor Lighthouse has received separate collections of Google email and Google Drive documents exported from Google Vault. These exported documents are not the native Google documents, with links to prior revisions, and Google mail as they exist within Google Workspace but rather versions of those documents converted into the corresponding Microsoft file types. These documents are then processed and loaded into *Relativity.*

18.     Lighthouse has a Google Parser which can identify hyperlinks which include Google DocumentIDs. Lighthouse then runs a script to determine if documents with those DocumentIDs are in the collection of exported documents and creates metadata to associate any documents found with their parent Google emails.

C.     *The Parties' Positions*

---

[2] Google Docs, Google Sheets, etc. Unless otherwise noted, all references to Google Drive documents in this declaration refer to Google native file types.

Exhibit A

19.     Uber's Google email exists in two buckets. Bucket one is emails preserved in Google Vault ("Google Vault Email") which, depending on age, may or may not still exist in Uber's active Google email environment. Bucket two is undeleted Google emails in Uber's workspace, i.e., emails sent or received within the last six months and going forward which have not been deleted under Uber's retention policy ("Active Google Email").

20.     The linked documents also exist in two buckets, Bucket one is Google Drive documents preserved in Google Vault ("Google Vault Documents"). Bucket two is undeleted documents in Google Drive ("Google Drive Documents").

21.     The parties do not have a disagreement with respect to instances where the current versions of documents as exported to Lighthouse are in fact the most recent versions extant when an email was sent. i.e., when the date of an exported (current) version is before the date of its parent email.

22.     The Google Vault Search interface provides a way to manually retrieve, if it exists, of the most recent version of a document dated before the date of an email with a link to it. Plaintiffs' understanding is that Uber has proposed using this manual method but has not specified, in writing or otherwise, precisely what those steps are or how long it would take someone experienced in their process to retrieve a contemporaneous version.

23.     Plaintiffs propose a solution constituted by three components.

24.     The first component, for Active Google Email is using Metaspike's *Forensic Email Collector* ("FEC"),  a program which can retrieve active Google email and the contemporaneous versions of linked Google Drive documents. FEC is a proven program which has been used for years by organizations and governmental entities such as Paul Weiss, PriceWaterhouseCoopers, the Office of the California Attorney General, FTI Consulting, Deloitte, Grant Thornton, Clifford Chance, Stroz Friedberg, Winston & Strawn, the Federal Trade Commission, the Norwegian Tax Administration, and the Australian Federal Police.

25.     The second component addresses links to Google Drive documents in Google emails that have been deleted from Google email and thus cannot be retrieved using FEC.

Exhibit A

Plaintiffs propose that these contemporaneous documents be retrieved programmatically using the Google Drive API. Plaintiffs have created a proof of concept program ("POC"), described in more detail at Paragraphs 29-38 below which demonstrates that such a program can be written. ILS is continuing the development of this program to make it production ready, again just to demonstrate that a production ready version could be developed quickly.

26.     The third component, for any documents which cannot be retrieved programmatically, either using FEC (to the extent that the linking emails are still active) or the ILS program, is to use Uber's manual method (once it has been sufficiently described in writing). The number of documents to be so retrieved should be significantly and substantially reduced, as it will not include any documents retrieved by FEC or the production ready version of the ILS program.

D.     *Plaintiffs' Thorough Investigation*

27.     Following the issuance of PTO No. 9, Plaintiffs thoroughly investigated "in detail the extent to which Google Vault's API, macro readers, Metaspike's FEC or other programs may be useful to automate, to some extent, the process of collecting the contemporaneous version of the document linked to a Gmail or other communication within Uber's systems."

28.     Plaintiffs' investigation proceeded on two tracks. One track was attempting, through multiple meet and confers and written questions to Uber, to find out what Uber had attempted or discovered through their investigation. I participated in both meet and confers with Uber on March 27 and April 2, 2024.  Another track was ILS's investigation into the Google Vault API and macro recorders as well as other programs such as the Google Drive API which could be useful to automate the process.

a.     *ILS's Program to Collect Contemporaneous Versions of Google Drive Documents Using the Google Drive API*

29.     Despite Uber's adamant position that it was not possible to create a program that collected the contemporaneous versions of Google Drive documents from links in their parent

Exhibit A

emails, I knew that it was possible to create such a program because Metaspike had already done it with FEC.

30.     However,  FEC  works only on live Gmail collected by FEC, which was not possible here with respect to Gmail which had already been deleted and existed, if at all, only in Google Vault.

31.     I reasoned that Metaspike must be using the Google Drive API to retrieve the correct contemporaneous Google Drive documents contained in the parent Google emails that it processed.

32.     Therefore, I knew that ILS could also use the Google Drive API for the same purpose but using Google Drive link data that had been extracted from Google Vault exports instead of from live emails. What I didn't yet know, despite extensive research, was how to do this.

33.     On the morning of April 2, 2024, the date of Plaintiffs' last meet and confer with Uber, I found a post[3] in Stack Overflow ("Stack Overflow post"), a well-known and widely used forum for developers, that set out a method to programmatically retrieve  a date-specific revision of a Google Drive Google native document identified by its DocumentID.

34.     Later that day, using the methodology set out in the code in the Stack Overflow post that I had found and working under my direction, , an ILS programmer created a Proof of Concept program ("POC")  which demonstrated that the following operations could be executed programmatically without manual intervention[4]:

        a.   Loading service account credentials;

        b.   Impersonating a user based on their email address and generating appropriate access credentials with the service account;

---

[3] https://stackoverflow.com/questions/77467875/revert-to-specific-version-of-google-sheets-with-respect-to-specific-date-using#:~:text=This%20sample%20script%20is%20for%20Drive%20API%20v3,%60No%20revisions%20in%20%24%7Bdate%7D.%60)%3B%0A%20%20%7D%0A%7D

[4] A one-time log in into the Google API website is required to acquire service account credentials.

c.  Using those credentials, retrieving the revision list of a specific Google Drive document identified by its DocumentID;

d.  Iterating through the revision list and identifying the most recent revision before a specific date;

e.  Downloading that revision as its corresponding Microsoft file type.

35.     Development and testing of this program was completed on April 3, 20245.

36.     Based on this development and testing, I drafted Plaintiffs Proposed Methodology for Retrieving Google Drive Documents Linked to Within Google Emails ("Plaintiffs Proposed Methodology"), which set forth a complete step-by-step methodology by which Uber could do just that, based upon the Stack Overflow post methodology  referenced in the proposal. It is my opinion that  Plaintiffs Proposed Methodology is viable, feasible, and not unduly burdensome. The steps are set forth below:

a.  First, Uber's vendor, Lighthouse, would extract the links to Google Drive documents from Google Mail using Google Parser which does this extraction while preserving the metadata establishing the relationship of each extracted link to its parent Google email.

b.  Second, using the extracted links identified supra, Lighthouse would identify: (1) the Google Drive documents in its possession which correspond to those links and (2) the links for which Lighthouse does not have a corresponding Google Drive document.

c.  Third, if Lighthouse has a corresponding linked Google Drive document, Lighthouse would compare the date and time of the linked Google Drive document against the sent date and time of the Gmail using Google parser or SQL queries in the SQL database.   If the document date and time is less than or equal to the Gmail sent date and time, then the Google Drive

Exhibit A

document is the correct contemporaneous one and Lighthouse will provide metadata that will enable the documents to be linked as family groups for production.

d.  Fourth, if Lighthouse does not have the linked Google Drive document in its possession, or if the copy is not contemporaneous, it would be added to a "Missing List" which should include metadata fields including: (1) the ID (BegBates) of the Gmail which contained the link, (2) the Sent Date and time of that email, (3) the sender of the email, including email address, (4) the recipients of the email, including email addresses, and (5) the link URL for the Google Drive document.

e.  Fifth,  a programmer with Google Drive API expertise and appropriate access to Uber's Google Workspace environment, will, using the Stack Oversight post code as a foundation, create a program that cycles through the Missing List and for each link extracts the Google DocumentID and then retrieves its revision list recording whether the retrieval was successful or failed, with any error codes if it failed.  Next, if the retrieval of the revision list was successful, cycle through the revision list and compare the listed revisions from latest to earliest until the latest listed revision preceding the parent email's sent date and time is identified as the revision of the correct contemporaneous document. If no such revision can be located, record that failure and proceed to process the next link in the Missing List.  Lastly, if the correct revision is located, convert the file to its Microsoft equivalent and download it along with appropriate metadata. If that operation fails, record that failure, and proceed to process the next link in the Missing List.

f.  Sixth, Lighthouse would link each retrieved document with its metadata to its parent email for production.

Exhibit A

    g.  Seventh, Lighthouse will produce responsive non-privileged emails along with corresponding Google Drive documents and metadata linking the documents to its parent email.  Metadata for these documents will include an additional "Non-Contemporaneous" metadata field which will contain the value "Y" if a document was not the correct contemporaneous document.

    h.  Lastly, to record the production status of missing family members, the produced metadata for the parent email identified supra will include an additional metadata field "Missing Google Drive Attachments" which will include the links to all Google Drive documents which could not be retrieved.

37.    Summing up, ILS' POC demonstrates that it is possible to do exactly what is necessary here: to programmatically retrieve the versions of linked Google Drive documents that are contemporaneous with the Google emails that contain those links.

38.    ILS has continued to develop this program to make it production ready, again just to demonstrate that a production ready version could be developed quickly.

*b.  Defendant's Objections to the ILS Program Are Groundless*

39.    Uber's criticisms and objections to Plaintiffs Proposed Methodology are groundless.

40.    First, as discussed above in paragraphs 29-37, ILS's POC demonstrates that such a program can be written.

41.    Second, with respect to document links in undeleted emails, there already is such a program, viz., FEC as discussed in paragraphs 72-76 *infra*.

42.    Third, ILS is continuing the development of this program to make it production ready, again just to demonstrate that a production-ready version could be developed quickly.

43.    Fourth, both the POC and the production ready version handle Uber's enumerated failure points through standard error capture and logging without manual intervention.

Exhibit A

44.     Fifth, capturing revision id data, which the program would have at the time of retrieval, as metadata fields which would be included in a load ready production is a trivial task. This is basically the same sort of process as Lighthouse does with the Google DocumentIDs that it extracts with its Google Parser. *See* Alsobrook Declaration, Paragraphs 10-11.

c.   *The ILS Contemporaneous Google Drive Document Program Will Work With Other Types of Parent ESI*

45.     PTO No. 9 states that Uber's "investigation shall not be limited to documents referenced by URL or hyperlinks in emails or Google documents stored in Google Vault, but shall also include other cloud-based messages such as Slack.[6]"

46.     My understanding is that Defendant has not proposed any methodology for extracting links to Google Drive documents from Slack channels or direct messages, or for preserving the relationship of those links to their parent Slack messages, or for retrieving any versions, current or contemporaneous, of the Google Drive documents so linked.

47.     Plaintiffs' proposal for retrieving Google Drive documents from Gmail would also work for links to documents in Uber's Google Drive extracted from Slack channels and direct messages where the author's  email address is available.

48.     The Uber Data Sources Letter also lists additional platforms, systems, and applications such as Google Chat, uChat[7], and HipChat messaging systems, Bliss and Zendesk customer support systems, the PureCloud and LiveOps phone systems, as well as the JIRA ticketing system.

49.     It is my understanding that some of these additional platforms, systems and applications may also include links to Uber Google Drive documents.

50.     It is also my understanding that Uber has not proposed any methodology for extracting links to Google Drive documents from these additional platforms, systems, and

---

[6] ECF No. 345 at 21.

[7] uChat is an internally developed Uber messaging application that was in use from February 2017 to 2020. Uber Data Source Letter, p. 6.

Exhibit A

applications, or for preserving the relationship of those links to their parents, or for retrieving any versions, current or contemporaneous, of the Google Drive documents so linked.

51.     Plaintiffs' proposal for retrieving Google Drive documents from Gmail would also work for links to documents in Uber's Google Drive in any of these Uber platforms, systems, and applications where the author's email address is available.

### d.   Uber's Use of Links to Google Drive Documents

52.     It is my understanding that Uber's vendor *Lighthouse* has received and processed separate exports of unspecified collections of Gmail and Google Drive documents from Google Vault and loaded the processed ESI, including extracted text, into its litigation support platform *Relativity* and its underlying SQL database.

53.     *Lighthouse*'s Google Parser can extract links to Google Drive documents from Gmail. It is my opinion that there is no reason that *Lighthouse* could not easily[8] extract all other links, e.g., to documents in Box, from Gmail as well.

54.     It is my understanding that Uber has thus far refused to disclose how many exported Gmails and Google Drive documents have been provided to *Lighthouse* and what *Lighthouse* and Uber know about the prevalence and composition of the links to Google Drive and other document repositories in those exports.

55.     The Wikler Email provides some estimates of the prevalence of Google email links to Google Drive documents in "tens of millions of documents":

> *f.*   7% of emails have links to Google Drive documents/.
>
> *g.*   There were an average of 2 links to Google Drive documents in Google emails that contained links.
>
> *h.*   20% of the Google Drive documents were contemporaneous with the Gmail that linked to them.

---

[8] As noted in paragraph 9 *supra,* I designed, programmed, and implemented the software to produce LexisNexis Total Alerts, LexisNexis Clipper, LexisNexis Legal Industry Monitor, Thompson Elite Daily Docket, and Institutional Investors' Mutual Fund Daily, Hedge Fund Daily and Compliance Daily. This software traversed thousands of web sites and extracted thousands of URLS from those sites daily. Link extraction is a common task, and not a difficult one.

Exhibit A

56.   The flip side of the 20% estimate of contemporaneous documents is that 80% of the linked Google Drive documents were not contemporaneous with the Gmail that linked to them.

57.   Doing the math on a per million documents basis works out to 70,000 emails with links to Google Drive Documents (7%), 140,000 links (70,000 x 2 links per email), 28,000 contemporaneous documents (20% of 140,000 links), and 80,000 (140,000 – 28,000) non-cotemporaneous, post-dated documents.

.

58.   These metrics are important in at least two ways. First, the volume of documents is a consideration in proposing methods to address them. Second, even the estimated volumes make plain the pervasive and integral role played by hyperlinks to Google Drive documents. The family relationships established by such links will be critical evidence in tying specific Uber custodians to knowledge of the linked documents and their contents.

   e.   *Uber's Proposed Method of Retrieving Contemporaneous Versions of Google Drive Documents Linked to Gmail*

59.   Uber's stated position[9] is "Uber would have to perform a manual review using the information from the specific email to locate the Google Drive document. Uber would then need to conduct a manual search in the revision history of that Google Drive document to locate the "last version saved before 12:00 AM on the specified date" of the specific email at issue."  Favro Decl. ¶ 22.[10]

60.   Uber has maintained this same position – that Uber can only manually pull contemporaneous hyperlinked documents one-by-one – during the two meet and confers that I attended..

---

[9] Uber also stated that "Plaintiffs' request for historic 'versions' of documents is premised on the assumption that all such documents were modified after emails referencing them were sent. ECF No. 262 at 14. Google Vault exports only the current versions of Google Drive documents, therefore any exported version of a Google Drive document with a last modified date before the sent date of a parent Gmail would be the correct contemporaneous version and no further search for a historic version would be necessary.
[10] ECF No. 262 at 13 (footnote omitted).

Exhibit A

61.     During the meet and confers, Uber's counsel was unwilling to document the specific steps necessary in the manual process.

62.     This refusal is continued in the Wikler letter which states that "We talked at length about Uber's practical experiences in trying to collect particular versions of Google Drive documents and the obstacles they have encountered. We also discussed in our conferrals the investigation Uber has performed to identify a programmatic solution. Not only did we provide this information during our call and discuss the investigations Uber has conducted, but we explained why this process that requires manual intervention has not been automated."

63.     Regardless of how long Defendant and its counsel and vendors may have talked during the meet and confers, neither in their talking nor in prior writing nor in the Wikler email has Defendant set out the specifics of any of this.

64.     I note that even manual processes can be scaled up by using additional resources. Consider a typical manual document review using contract attorneys who can review on average 400 documents a day. Parties ensure that such reviews are completed within a reasonable time simply by hiring sufficient contract attorneys. This same concept would be true here.

  *f. Uber's Investigation*

65.     It is my understanding that Plaintiffs submitted over 20 questions to Uber seeking written responses to ascertain what steps Uber took to investigate the Court's directives, and what answers they were able to gather. Joint Letter, Exhibit G.

66.     These questions would not only help Plaintiffs understand what steps Uber had taken, but also help Plaintiffs in creating additional proposed solutions to Uber in order to accomplish this Court's goal.

67.     Uber was only willing to discuss the answers to some of these questions generally on the meet and confers that I participated in and it is my understanding that Uber would not provide anything specific in writing.

68.     It is my understanding that Uber's position with respect to retrieving linked documents from Google Drive has not changed.

Exhibit A

69.     Uber never offered any solution other than their original position.

70.     I have not seen any indication that Uber seriously investigated using FEC on undeleted active email in Google mail in Uber's environment, e.g., by hiring a consultant with FEC expertise.

g.   *The Google Vault API and Macro Readers*

71.     Upon further and extended investigation by ILS after entry of PTO No. 9, I concluded that as of now[11] neither the Google Vault API nor macro recorders, which would be employed within Google Vault's search interface, appeared to provide a framework for a programmatic solution to retrieving the contemporaneous version of a Google Drive document.

h.   *Metaspike's Forensic Email Collector*

72.     Metaspike's *Forensic Email Collector* ("FEC") does provide a programmatic solution for "collecting the contemporaneous version of the document linked to a Gmail"[12]:

---

[11] Just as Google only very recently (on December 8, 2023) added the capability to collect the current versions of Google Drive documents when Google emails that link to them are collected through the Google Vault search interface, Google may at some point add a capability to Google Vault to collect the contemporaneous versions of such documents either through the Google Vault API or the Google Vault search interface.

[12] https://docs.metaspike.com/article/46-acquiring-google-drive-attachments-of-emails (last accessed on April 7, 2024).



73.      FEC could be used on a subset of Uber's Google mail, viz., the portion that is still active in Uber's Google mail environment, i.e., at a minimum the last 6 months of email which has not been deleted under Uber's retention policy. It could also be used going forward on future Uber Google emails before Uber deletes them.

74.     I discussed FEC in my earlier declaration, where I stated:

70.     *Forensic Email Collector* has been used for years by demanding organizations. Prominent FEC users, including users in government and law enforcement, and in prominent firms in the Am Law 100, the accounting Big 3, and litigation support and forensic services, include Paul Weiss, PriceWaterhouseCoopers, the Office of the California Attorney General, FTI Consulting, Deloitte, Grant Thornton, Clifford Chance,

Stroz Friedberg, Winston & Strawn, the Federal Trade Commission, the Norwegian Tax Administration, and the Australian Federal Police.[13]

71.     Defendants have objected to the use of *Forensic Email Collector* on some general grounds including that they are concerned about scale, security about using a third-party vendor and did not believe it can access emails that are stored in Google Vault (Uber's document retention system) and thus will be incapable of retrieving emails/linked documents that are only accessible in Vault (which would be the case for older emails).

72.     In response, I note the following:

a. *Forensic Email Collector*'s inability to access emails stored in Google Vault does not affect its ability to collect and process emails and documents that are *not* in Google Vault and would not have affected its ability to do the same earlier when documents that now exist only in Google Vault still existed outside it in Google Drive.

b. If Uber has not already tested or used *Forensic Email Collector*, any security concerns that Uber has could be resolved in the same way that Uber usually tests any other third-party software that Uber has introduced to run on its system. Moreover, Uber has decided to use a platform, [Google Workspace], which is run by third party vendors and may be subject to data leaks and security breaches, versus maintaining their information in-house on applications run internally on a physical server.

c. Scalability issues can be caused by many different factors, including misconfiguration or sub-optimal application of a program, network configuration and congestion and throttling imposed by Google. Defendants' counsel have not provided any details – how many email accounts, how many copies of Forensic Email Collector deployed, network

---

[13] (Battle-Tested Software, https://www.metaspike.com/forensic-email-collector/#customers (last accessed on March 7, 2021).

Exhibit A

and internet configuration, etc. – about the specific deployments of Forensic Email Collector with which they had issues. I note that ILS has reached out to Metaspike and were informed that multiple copies of Forensic Email Collector can be deployed and that it was aware of instances where Forensic Email Collector was faster than Google Vault.

75.     I stand by this earlier discussion and conclude that FEC is a viable programmatic solution for collecting the contemporaneous versions of Google Drive documents linked to Gmail.

76.     During the meet and confers after PTO No. 9, Uber did not offer any further specific detail on its objections to FEC[14], and none of Uber's declarants cited in PTO No. 9 disputed that FEC could indeed collect the contemporaneous version of a document linked to a Gmail.

   *i.   Google Vault vs. Lighthouse's Google Parser*

---

[14] During the second meet and confer, Uber counsel admitted that Defendant's only consultation with Google was a call to Google's general public support desk. I note that with respect to throttling by Google, Google provides specific procedures for an organization to request that Google quotas which are slowing an organization's interactions with Google Workspace, i.e., throttling, be raised. https://support.google.com/a/answer/6301355?hl=en%20(Last%20accessed%20April%208.%202024#:~:text=Increase%20the%20quota,to%20be%20approved. (Last accessed April 10, 2024). )

77.     Since December 8, 2023, Google Vault has had the capability to retrieve the current

versions of Google Drive documents attached via links in Gmail[15]:



78.     Lighthouse's Google Parser does not have this capability as it does not access the

live Google Workspace environment and does not make any use of the Google Vault API or the

Google Drive API.

---

[15] https://workspaceupdates.googleblog.com/2023/12/google-vault-export-hyperlinked-drive-content-from-gmail-
messages.html (accessed on April 7, 2024) (cropped).

Exhibit A

79.     My understanding is that Lighthouse itself has had no access to Uber's Google Workspace and that its Google Parser works on exports of Gmail and Google Drive documents from Google Vault.

80.     I haven't seen any written specifications or representations of critical details about the operation of Google Parser; for example, (i) does it extract the complete URLs or just the Google DocumentID segments of the Google Drive attachment links in Gmail, and (ii) what other information is extracted or recorded from the parent Gmail so that the relationship of that parent Gmail to a retrieved current version of Google Drive document may be preserved.

81.     My understanding is Uber has not specified what Gmail and Google Drive documents were and are in Lighthouse's possession.

82.     My understanding is the Google Drive exports received by Lighthouse represent separate collections of as yet unspecified (i) Google Gmail and (ii) Google Drive documents. This raises the possibility that there may be links in the collected Google Gmail to Google Drive documents that are in Google Vault but weren't included in the Google Vault Google Drive exports being processed by Lighthouse. This issue should not arise if Google vault's capability to export linked Google Drive document when exporting parent Google emails is utilized.

83.     My understanding from the meet and confers with Uber in which I was a participant is that Uber has not seriously considered any use of this Google Vault capability, which has been in production for over three months.

*j.*   *Links to Documents in Box*

84.     Box[16] is a well-known and widely used cloud-based corporate document repository.

85.     The Uber Data Source Letter states that "Uber employees are also allowed to obtain access to a Box account affiliated with their company email address and may use Box to store, share, and collaborate on files.[17]"

---

[16] https://www.box.com.
[17] Uber Data Sources Letter, p. 6.

Exhibit A

86.     Uber admits that Box documents "can be placed on a legal hold" but Uber hasn't done so[18].

87.     Box has an API[19], which includes functionality to retrieve prior versions of a document so that contemporaneous versions can be retrieved[20]. Some Box functionality, apparently including version tracking, may be available only for Premium accounts21. It is my understanding that Defendant has not disclosed what Box license(s) it holds.

88.     My further understanding is that Defendant has not proposed any methodology for extracting links to Box documents from Gmails or from any of Uber's other platforms, systems, or applications, or for preserving the relationship of linked Box documents to the parents that contain the links, or for retrieving the linked Box documents.

E.     *Metadata Issues*

89.     It is my understanding, from the Wiler Email, that Uber has withdrawn its objections to the inclusion of ParticipantPhoneNumbers and OwnerPhoneNumbers fields.

90.     Plaintiffs agree to Uber dropping the Rfc822MessageID field so long as the Rfc822MessageID value will be provided in the MSGID field. Wikler Email.

91.     Uber has agreed to include the Account field, but would limit it to only 'the e-mail address associated with the single custodian whose data survives the de-duplication process." Wikler Email.

92.     As so limited, email addresses associated with duplicate responsive documents, would be suppressed, and Plaintiffs therefore object. A custodian may have multiple Google email addresses used for different functions. Suppressing a custodian's email address on documents produced from another custodian would strip Plaintiffs of their ability to breakdown that custodian's documents by which email account it belonged to.

---

[18] Uber Data Sources Letter, p. 6.
[19] https://www.box.com/platform.
[20] *See, e.g., https://developer.box.com/reference/get-files-id-versions-id/* (last accessed on April8, 2024).
[21] Ibid.

Exhibit A

93.     Uber has continued to object to producing the LINKGOOGLEDRIVEURLS field which is defined as  a "One-to-many field containing the URLS for any Google Drive linked documents referenced within a given Gmail document. If a Google Drive linked document has been produced, the URL will be suffixed by a space and the corresponding BEGBATES in square brackets ([ ])."

94.     As Lighthouse's Google Parser already extracts those Google Drive URLs, Defendant's burden issue would appear to be solely with suffixing the URLs with the Bates numbers forof those Google Drive documents which have been produced.

95.     The reason for adding the suffixed Bates numbers was to identify which Google Drive documents, if any and for whatever reason, had not been produced. The URLs of these unproduced documents would be identifiable because they wouldn't have a suffixed Bates numbe, an absence which would also establish that they hadn't been produced.

96.     Plaintiffs deem this to be a "compelling justification" but are open to alternate approaches which would provide the same information. One alternative would be adding the metadata field "Missing Google Drive Attachments" which would include the links to all linked Google Drive documents which could not be retrieved. This field, and another added metadata field "Non-Contemporaneous," which would contain the value "Y" if a produced Google Drive document was not the contemporaneous version, were both described by Plaintiffs in Plaintiffs Proposed Methodology for Retrieving Google Drive Documents Linked to Within Google Emails (Paragraphs 7, 8).

97.     Additionally, Plaintiffs seek clarification of Uber's ALLCUSTODIAN metadata field which is defined in Appendix 2 of Uber's proposed ESI protocol in relevant part as follows: "Name(s) of person(s) or other data source (non-human) from where documents/files are produced." When there are multiple custodians of a document, Plaintiffs will not be able to determine from which custodian or other data source the produced instance was collected. To resolve this issue, Plaintiffs request clarification that the custodian or data source from whom the produced version of a document was collected must be listed first in the ALLCUSTODIAN field.

Exhibit A

98.     The Meta Pixel Declarations and Order

99.     In PTO No. 9, the Court, referring to the Parties' description of programs such as Metaspike's *Forensic Email Collector* ("FEC") and *Google Vault*, stated that  in "other complex litigation, more detailed information has been requested and provided to explain why such tools are not feasible," citing two declarations and an order from *In re: Meta Pixel Healthcare Litigation* (No. 22-cv-03580-WHO (VKD))[22] and quoting from the order's ruling ("the commercially available tools plaintiffs suggest may be used for automatically collecting links to non-public documents have no or very limited utility in Meta's data environments or systems").

100.     None of the complexities addressed by the Meta Pixel declarations and order are present here.

101.     Meta's declarant Sam Yang, an internal Meta forensic resource, dismisses the use of FEC,  a tool for Google Mail environments that can collect Google Mail links to Google Drive documents,   n Meta's environment, which uses Microsoft platforms along with Meta's extensive proprietary internally-developed platforms, and a non-Microsoft email archiving system. Yang Decl. ¶¶ 10-11, 16-17, 20. I do not disagree with Mr. Yang's conclusions in this regard.

102.     Mr. Yang also notes that FEC does not collect linked documents from platforms other than Google Workspace. Yang. Decl. ¶ 18. Again, I do not disagree with Mr. Yang's conclusions in this regard.

103.     Mr. Yang does not claim experience with FEC or comment about its suitability and capability when used, on live Google email and Google Drive documents.

104.     The very reasons that Mr. Yang cites for FEC's unsuitability in Meta's environment are the very reasons that FEC is appropriate for use here: unlike Meta, Uber *does* use Google Mail which have links to Google Drive documents, the exact circumstances for which FEC was designed.

---

[22] Declaration of Sam Yang, In re: Meta Pixel Healthcare Litigation, No. 22-cv-03580-WHO (VKD), Dkt. No. 265 (N.D. Cal. June 1, 2023); id., Declaration of Jamie Brown, In re: Meta Pixel Healthcare Litigation, No. 22-cv-03580-WHO (VKD), Dkt. No. 266 (N.D. Cal. June 1, 2023); Third Order re Dispute re ESI Protocol, In re: Meta Pixel Healthcare Litigation, No. 22-cv-03580-WHO (VKD), Dkt. No. 267 (N.D. Cal. June 2, 2023).

Exhibit A

105.     Mr. Yang's declaration goes on at length about the complexities and intricacies of Meta's data environment[23], see, e.g., ¶¶ 8, 10-11, 20, the incompatibility of Microsoft's collection tool eDiscovery Purview (Premium) with Meta's unique environment and the disruptions which would occur with it use by Meta, ¶¶ 20-21, and the absence of tools which work across unrelated platforms, i.e., where the documents which contain links and the linked documents are in different platforms.

106.     Again, this is not the case here with respect to links to active Google Drive documents in active Google emails.

107.     Meta's declarant James Brown is a Senior Vice President at Lighthouse, Meta's vendor in Meta Pixel and also Uber's vendor here. Mr. Brown's declaration focuses exclusively on the technical challenges of developing and implementing a program to collate metadata, such as senders, etc., from in-thread emails into consolidated metadata fields to be produced for the "Last in Time" emails which contain the in-thread emails. There is no need or requirement for such a program here.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: April 12, 2024                          /s/Douglas Forrest
                                               Douglas Forrest
                                               Senior VP, eDiscovery
                                               International Litigation
                                               Services, Inc.
                                               dforrest@ilsteam.com

---

[23] One such intricacy raised by Mr. Yang is Meta's use of multiple tools to shorten the URLs of linked documents. Yang Decl. ¶ 11. Uber has not raised such an issue in the meet and confers held in response to this Court's directive or in the Data Sources Letter.