[Submitting counsel below]

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S MASTER LONG-FORM COMPLAINT** |
| This Document Relates to:<br><br>All Cases | Judge:  Honorable Charles R. Breyer<br>Date:    TBD<br>Time:    TBD<br>Ctrm.:   6-17th Floor |

1

## TABLE OF CONTENTS

2

|  | Page |
|---|---|

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 4

    A.   Uber created a revolutionary transportation model and App, both entirely within its control. ................................................................................................... 4

    B.   An elevated risk of sexual assault was always a foreseeable consequence of Uber's transportation model. ........................................................................... 5

    C.   From the outset, Uber could have but did not address or prevent sexual assault. ......................................................................................................... 6

    D.   At all times, Uber prioritized the growth of the business, not safety. ..................... 7

        1.   Uber promised it would take responsibility for transporting passengers safely. ................................................................................. 7

        2.   Uber targeted vulnerable populations. .......................................... 9

    D.   Uber prioritized a steady supply of drivers, not safety. ......................................... 9

    E.   When Uber learned its riders were being sexually assaulted, it promoted the appearance of safety, not safety. ................................................................... 12

    F.   Uber designs its product (the App) to maximize user engagement, and make Uber rides seem safe, while refusing to adopt design choices or warnings that would actually promote safety ........................................... 13

    G.   Uber has been monumentally successful. .................................................... 16

LEGAL STANDARDS .............................................................................................. 16

ARGUMENT ............................................................................................................ 18

I.    Plaintiffs adequately plead several independent bases for vicarious liability. ................. 18

    A.   Florida and Texas TNC statutes do not preclude vicarious liability. ..................... 18

        1.   Florida ......................................................................................... 18

        2.   Texas .......................................................................................... 19

    B.   As a common carrier, Uber owes its passengers a nondelegable duty of safe carriage and protection, and it is thus liable for assaults that its drivers commit upon its passengers (California, Florida, Illinois after 1/1/24, Texas). ....................................................................................................... 20

        1.   Nondelegable duties give rise to vicarious liability that does not depend on employment status or the scope of employment. ................. 21

        2.   Common carriers owe nondelegable duties to protect passengers against sexual assault. ....................................................... 24

        3.   Uber is a common carrier that owes a nondelegable duty to safely transport its passengers and protect them from sexual assault. ................. 25

            a.   California ....................................................................... 26

            b.   Florida .......................................................................... 32

               i.   The Florida TNC statute does not eliminate Uber's common carrier duties. .................................................... 32

**TABLE OF CONTENTS**
(continued)

Page

ii. As a common carrier in Florida, Uber is liable for its drivers' assaults. ................................................................. 34

c. Illinois after January 1, 2024 ............................................... 35

d. Texas ................................................................................... 36

i. The Texas TNC statute does not eliminate Uber's common carrier duties. ................................................ 36

ii. As a common carrier in Texas, Uber is liable for its drivers' sexual assaults. ........................................... 39

C. Uber is vicariously liable under principles of respondeat superior because its drivers were employees and their torts were within the scope of employment (California, Illinois). ...................................................... 40

1. California ............................................................................. 41

2. Illinois ................................................................................. 46

D. Uber is vicariously liable because it ratified its drivers' torts by failing to adequately investigate or respond to reports of sexual misconduct. ..................... 48

1. California ............................................................................. 48

2. Florida ................................................................................. 50

3. Illinois ................................................................................. 52

4. New York ............................................................................ 54

5. Texas ................................................................................... 55

E. Uber is vicariously liable for its drivers' sexual assaults under principles of apparent agency. ..................................................................................... 56

1. California ............................................................................. 59

2. Florida ................................................................................. 61

3. Illinois ................................................................................. 62

4. New York ............................................................................ 63

5. Texas ................................................................................... 64

II. Plaintiffs adequately plead fraudulent misrepresentations and omissions. ..................... 65

A. The *McKnight* settlement did not release any claims asserted here. ..................... 65

B. Plaintiffs plead actionable statements and omissions. ......................................... 67

1. Plaintiffs' fraud claims are based on Uber's decade-long barrage of misrepresentations about safety. ...................................................... 69

2. The idea that safety representations can never support a fraud claim is wrong. ........................................................................................... 72

3. Plaintiffs plead false or misleading statements of fact. ...................... 73

4. Plaintiffs' fraud claims are not based on puffery. ............................... 75

C. Plaintiffs adequately plead fraudulent omissions ............................................... 79

1. Uber failed to disclose material facts. ................................................ 79

**TABLE OF CONTENTS**
(continued)

Page

2. Uber owed a duty to disclose. ................................................................. 79

    a. California ............................................................................................ 79

    b. Florida ............................................................................................... 81

    c. Illinois ............................................................................................... 82

    d. New York ........................................................................................... 84

    e. Texas ................................................................................................. 85

D. Plaintiffs are not required to plead Plaintiff-specific facts to sufficiently allege false statements, omissions, and reliance. ................................................. 86

III. Plaintiffs adequately plead negligent infliction of emotional distress (California, Florida, Illinois, and New York) ...................................................................... 89

    1. California, Illinois, and New York ........................................................ 89

    2. Florida ................................................................................................... 90

IV. Plaintiffs adequately plead negligent entrustment. ............................................ 90

    1. California ............................................................................................... 91

    2. Florida ................................................................................................... 91

    3. Illinois ................................................................................................... 92

    4. New York ............................................................................................... 92

    5. Texas ..................................................................................................... 92

V. Plaintiffs adequately plead strict products liability. ........................................... 92

A. The Uber App is a product. .................................................................... 94

    1. The Uber App is tangible. .................................................................... 94

    2. The distribution and use of the Uber App is analogous to the distribution and use of personal property ..................................................... 95

    3. Public policy warrants treating the Uber App as a product. ................. 96

B. TNC statutes do not preclude a finding that the Uber App is a product. ............. 96

    1. California ............................................................................................... 97

    2. Florida ................................................................................................... 97

    3. Illinois ................................................................................................... 98

    4. New York ............................................................................................... 98

    5. Texas ..................................................................................................... 99

C. As a product designer, Uber is subject to strict liability. ............................... 99

    1. California ............................................................................................. 100

    2. Florida ................................................................................................. 102

    3. Illinois ................................................................................................. 103

    4. New York ............................................................................................. 103

    5. Texas ................................................................................................... 104

**TABLE OF CONTENTS**
**(continued)**

| | | | Page |
|---|---|---|---|
| | D. | Plaintiffs adequately allege product defects and necessary warnings. | 105 |
| | E. | Plaintiffs adequately allege causation at this stage. | 106 |
| VI. | | Plaintiffs adequately plead UCL claims. | 106 |
| | A. | Plaintiffs plead unlawful, fraudulent, and unfair conduct. | 106 |
| | B. | Plaintiffs assaulted outside of California can maintain UCL claims based on conduct in California. | 109 |
| VII. | | Plaintiffs adequately plead claims for injunctive relief. | 110 |
| | A. | Plaintiffs lack adequate legal remedies. | 110 |
| | B. | Plaintiffs have standing to seek injunctive relief. | 111 |
| VIII. | | Plaintiffs adequately plead entitlement to punitive damages. | 115 |
| | A. | California | 115 |
| | B. | Florida | 116 |
| | C. | Illinois | 118 |
| | D. | New York | 118 |
| | E. | Texas | 120 |
| IX. | | Uber's choice-of-law arguments are premature. | 120 |
| | | CONCLUSION | 122 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A. Terzi Prods., Inc. v. Theatrical Protective Union*,
2 F. Supp. 2d 485 (S.D.N.Y. 1998)............................................................................ 54, 55

*A.M. by & through Malcolm v. Bayfront HMA Med. Ctr., LLC*,
2022 WL 17417011 (M.D. Fla. Dec. 5, 2022)........................................................ 102, 118

*Abazari v. Rosalind Franklin Univ. of Med. & Sci.*,
40 N.E.3d 264 (Ill. App. 2015) .................................................................................. 83, 84

*Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*,
2020 WL 3893395 (E.D. Cal. July 10, 2020) .................................................................. 107

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005) ............................................................................................. 84

*Ahern v. Apple, Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) ....................................................................... 73, 81

*Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*,
936 F. Supp. 2d 933 (N.D. Ill. 2013) ............................................................................... 83

*Albano v. Shea Homes Ltd. P'ship*,
634 F.3d 524 (9th Cir. 2011)............................................................................................ 17

*Alfeo v. I-Flow, LLC*,
2012 WL 442981 (S.D. Fla. Feb. 10, 2012)................................................................... 117

*Allam v. Meyers*,
906 F. Supp. 2d 274 (S.D.N.Y. 2012)........................................................................... 119

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ............................................................................... 73

*Alma W. v. Oakland Unified Sch. Dist.*,
123 Cal. App. 3d 133 (Ct. App. 1981)............................................................................. 45

*Am. Honda Motor Co., Inc. v. Milburn*,
668 S.W.3d 6 (Tex. App. 2021)....................................................................................... 78

*Am. Med. Distr. v. Macdonald Tuskey*,
2018 WL 1478301 (S.D.N.Y. 2018)................................................................................ 85

*Amazon.com, Inc. v. McMillan*,
625 S.W.3d 101 (Tex. 2021)........................................................................................... 104

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................... 66

*Amusement Indus., Inc. v. Stern*,
693 F. Supp. 2d 301 (S.D.N.Y. 2010) ........................................................................... 119

*Anderson v. Elliott*,
24 A.D. 3d 400 (N.Y. App. 2005)........................................................................... 119, 120

*Anunziato v. eMachines, Inc.*,
402 F. Supp. 2d 1133 (C.D. Cal. 2005) ........................................................................... 76

*Apostal v. Oliveri Constr. Co.*,
678 N.E.2d 756 (Ill. App. 1997) ...................................................................................... 23

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021).......................................................................................... 75

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Armiger v. Associated Outdoor Clubs, Inc.*,
48 So. 3d 864 (Fla. App. 2010)..................................................................... 24

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001)........................................................... 113, 115

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 16

*Aslin Beer Co., LLC v. BrewFab, LLC*,
2023 WL 3931973 (M.D. Fla. June 9, 2023)........................................... 117

*Aubin v. Union Carbide Corp.*,
177 So. 3d 489 (Fla. 2015).................................................. 94, 96, 106

*Axis Reinsurance Co. v. Telekenex, Inc.*,
913 F. Supp. 2d 793 (N.D. Cal. 2012) .................................................... 122

*Bain v. Jockey Club Tech. Servs., Inc.*,
2007 WL 9706994 (S.D. Fla. Oct. 2, 2007)............................................... 91

*Bank Saderat Iran v. Telegen Corp.*,
30 F. App'x 741 (9th Cir. 2002) ............................................................ 122

*Baptist Mem'l Hosp. Sys. v. Sampson*,
969 S.W.2d 945 (Tex. 1998).................................................. 56, 57, 59, 64

*Barham v. Royal Caribbean Cruises Ltd.*,
556 F. Supp. 3d 1318 (S.D. Fla. 2021) .................................................... 73

*Baxter-Armentrout v. Lyft, Inc.*,
No. 50-2021-CA-013917 (Fla. Cir. Ct. Aug. 29, 2022) ........................... 98

*Begay v. Medicus Healthcare Sols., LLC*,
2015 WL 13650107 (D.N.M. Nov. 18, 2015)........................................... 77

*Beliveau v. Caras*,
873 F. Supp. 1393 (C.D. Cal. 1995) ................................................. 43, 46

*Bennevendo v. Houston Transit Co.*,
238 S.W.2d 271 (Tex. App. 1951)...................................................... 24, 39

*Benson v. Stafford*,
941 N.E.2d 386 (Ill. App. 2010)............................................................... 82

*Berger v. S. Pac. Co.*,
144 Cal. App. 2d 1 (1956)................................................................ passim

*Bergeron v. Select Comfort Corp.*,
2016 WL 155088 (W.D. Tex. Jan. 11, 2016)............................................ 85

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
572 S.W.3d 213 (Tex. 2019)..................................................................... 85

*Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*,
277 F.3d 936 (7th Cir. 2002).................................................................. 118

*Briggs v. Kennett*,
8 Misc. 264 (N.Y. Com. Pl. 1894) ............................................................ 64

*Brookes v. Lyft, Inc.*,
2022 WL 19799628 (Fla. Cir. Ct. Sept. 30, 2022)................... 96, 97, 98, 103

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Brown v. DirecTV, LLC,*
    562 F. Supp. 3d 590 (C.D. Cal. 2021) ...................................... 49

*Brown v. Martinez,*
    2023 WL 5036369 ................................................................. 117

*Burlington Industries, Inc. v. Ellerth,*
    524 U.S. 742 (1998) ................................................................. 22

*Burshan v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
    805 So. 2d 835 (Fla. App. 2001) ........................................ 91, 92

*C.R. v. Tenet Healthcare Corp.,*
    169 Cal. App. 4th 1094 (2009) ................................................ 48

*Caboara v. Babylon Cove Dev., LLC,*
    54 A.D.3d 79 (N.Y. App. 2008)............................................... 99

*Camenzind v. Cal. Expo. & State Fair,*
    84 F. 4th 1102 (9th Cir. 2023) ................................................. 17

*Campbell v. Security Pac. Nat. Bank,*
    62 Cal. App. 3d 379 (1976)...................................................... 31

*Carr v. WM. C. Crowell Co.,*
    28 Cal. 2d 652 (1946) .............................................................. 43

*Cash Am. Int'l Inc. v. Bennett,*
    35 S.W.3d 12 (Tex. 2000)......................................................... 37

*Cason v. Fla. Dep't of Mgmt. Servs.,*
    944 So. 2d 306 (Fla. 2006) ................................................. 33, 98

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ........................................................... 108

*Centerpoint Builders GP, LLC v. Trussway, Ltd.,*
    496 S.W.3d 33 (Tex. 2016) .................................................... 104

*Checker Cab Ops., Inc. v. Miami-Dade Cnty.,*
    899 F.3d 908 (11th Cir. 2018)................................................. 33

*Chrisman v. Electrastart of Houston, Inc.,*
    2003 WL 22996909 (Tex. App. Dec. 23, 2003) ...................... 55

*City Nat'l Specialty Co. v. Ashley Furniture Indus., LLC,*
    2022 WL 2918121 ................................................................. 120

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)...................................................113, 114, 115

*City of Sterling Heights Policy & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC,*
    587 F. Supp. 3d 56 (S.D.N.Y. 2022)........................................ 77

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .............................................................. 113

*Clark Equip. Co. v. Wheat,*
    92 Cal. App. 3d 503 (1979)...................................................... 60

*Clark v. State Farm Mut. Auto. Ins. Co.,*
    231 F.R.D. 405 (C.D. Cal. 2005) .......................................... 116

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*,
357 So. 3d 703 (Fla. App. 2023) ........................................................ 117, 118

*Cnota v. Palatine Area Football Ass'n*,
592 N.E.2d 196 (Ill. App. 1992) ................................................................. 53

*Cohen v. Off. Depot, Inc.*,
184 F.3d 1292 (11th Cir. 1999) ................................................................ 118

*Colangelo v. Champion Petfoods USA, Inc.*,
2020 WL 777462 (N.D.N.Y. Feb. 18, 2020) ............................................... 84

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011) ............................................................. 79, 81

*Commodore Cruise Line, Ltd. v. Kormendi*,
344 So. 2d 896 (Fla. App. 1977) ............................................................... 52

*Consumer Advocates v. Echostar Satellite Corp.*,
113 Cal. App. 4th 1351 (2003) ................................................................. 78

*Cove Mgmt. v. AFLAC, Inc.*,
986 N.E.2d 1206 (Ill. App. 2013) .............................................................. 53

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) .................................................................... 82

*D'Attomo v. Baumbeck*,
36 N.E.3d 892 (Ill. App. 2015) ................................................................. 83

*Dart v. Yellow Cab, Inc.*,
401 S.W.2d 874 (Tex. App. 1966) ............................................................. 39

*Davidson v. Kimberly-Clark Corp.*,
889 F. 3d 956 (9th Cir. 2018) ........................................... 111, 112, 113, 115

*Davila v. Yellow Cab Co.*,
776 N.E.2d 720 (Ill. App. 2002) ............................................................... 48

*Delux Cab, LLC v. Uber Techs., Inc.*,
2017 WL 1354791 (S.D. Cal. Apr. 13, 2017) ............................................. 76

*Dennis v. Pace Suburban Bus Serv.*,
19 N.E.3d 85 (Ill. App. 2014) ................................................................... 36

*Dep't of Toxic Substances Cntrl. v. Rossi*,
2022 WL 19355 (N.D. Cal. Jan. 3, 2022) .................................................. 34

*Detwiler v. Bristol-Myers Squibb Co.*,
884 F. Supp. 117 (S.D.N.Y. 1995) .................................................... 103, 104

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*,
929 F. Supp. 2d 231 (S.D.N.Y. 2013) ....................................................... 74

*Dickinson v. Cosby*,
37 Cal. App. 5th 1138 (2019) ............................................................. 48, 49

*Disney Enters., Inc. v. Esprit Fin., Inc.*,
981 S.W.2d 25 (Tex. App. 1998) ............................................................... 56

*Doe 1 v. Univ. of S.F.*,
2023 WL 5021811 (N.D. Cal. Aug. 4, 2023) .............................................. 67

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Doe v. Boy Scouts of Am.*,
66 N.E.3d 433 (Ill. App. 2016) ................................................................ 83

*Doe v. Cath. Bishop of Chicago*,
82 N.E.3d 1229 (Ill. App. 2017) ............................................................ 118

*Doe v. Celebrity Cruises*,
145 F. Supp. 2d 1337 (S.D. Fla. 2001) .................................................... 23

*Doe v. Celebrity Cruises, Inc.*,
394 F.3d 891 (11th Cir. 2004) .................................................... 23, 25, 34

*Doe v. CVS Pharmacy, Inc.*,
982 F.3d 1204 (9th Cir. 2020) .............................................................. 108

*Doe v. Hagee*,
473 F. Supp. 2d 989 (N.D. Cal. 2007) .................................................. 114

*Doe v. Lyft, Inc.*,
176 N.E. 3d 863 (Ill. App. 2020) .................................................... 36, 48

*Doe v. Match.com*,
789 F. Supp. 2d 1197 (C.D. Cal. 2011) ...................................... 114, 115

*Doe v. Roe*,
2013 WL 2421771 (N.D. Ill. Jun. 3, 2013) ............................................ 47

*Doe v. Sanchez*,
52 N.E.3d 618 (Ill. App. 2016) ........................................................ passim

*Doe v. Uber Technologies, Inc.*,
2019 WL 6251189 (N.D. Cal. Nov. 22, 2019) ........................................ 43

*Doe v. Uber Technologies, Inc.*,
No. 2322-CC01288 (Mo. Cir. Ct. Mar. 13, 2024) .................................. 95

*Doe v. Uber Techs., Inc.*,
184 F. Supp. 3d 774 (N.D. Cal. 2016) ............................................. passim

*Doe v. Uber Techs., Inc.*,
2020 WL 2097599 (N.D. Cal. May 1, 2020) .......................................... 60

*Doe v. Uber Techs., Inc.*,
551 F. Supp. 3d 341 (S.D.N.Y. 2021) ............................................. passim

*Doe v. Virgin Am., Inc.*,
2018 WL 5291987 (N.D. Cal. Oct. 22, 2018) .................................. 43, 46

*Doe v. YUM! Brands, Inc.*,
639 S.W.3d 214 (Tex. App. 2021) .......................................................... 64

*Durham Transp., Inc. v. Valero*,
897 S.W.2d 404 (Tex. App. 1995) .................................................... 37, 38

*Durk v. Daum Trucking, Inc.*,
2008 WL 4671721 (N.D. Ill. Oct. 22, 2008) .......................................... 89

*Ebby Halliday Real Est., Inc. v. Dugas*,
2019 WL 1529174 (Tex. App. Apr. 9, 2019) .......................................... 74

*Edwards v. Thomas*,
229 So. 3d 277 (Fla. 2017) ..................................................................... 33

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Ehret v. Uber Techs., Inc.,*
68 F. Supp. 3d 1121 (N.D. Cal. 2014) .......................................................................... 109, 110

*Eli v. Murphy,*
39 Cal. 2d 598 (1952) .......................................................................................................... 27

*Ellington Credit Fund, Ltd. v. Select Portfolio Serv., Inc.,*
837 F. Supp. 2d 162 (S.D.N.Y. 2011) ................................................................................. 84

*Est. of Alex ex rel. Coker v. T-Mobile US, Inc.,*
313 F. Supp. 3d 723 (N.D. Tex. 2018) .............................................................................. 104

*Estate of Scott,*
2020 WL 2736466 (Tex. App. May 27, 2020) ..................................................................... 85

*Esurance Prop. Cas. & Ins. Co. v. Vergara,*
2021 WL 2955962 (S.D. Fla. June 29, 2021) ................................................................. 33, 98

*Fajardo v. United States,*
792 F. App'x 481 (9th Cir. 2020) ................................................................................... 43, 46

*Falk v. Gen. Motors Corp.,*
496 F. Supp. 2d 1088 (N.D. Cal. 2007) ............................................................................... 80

*Farmers Ins. Grp. v. County of Santa Clara,*
11 Cal. 4th 992 (1995) ............................................................................................. 41, 44, 45

*Farrell v. United States Olympic & Paralympic Comm.,*
567 F. Supp. 3d 378 (N.D.N.Y. 2021) ................................................................................ 89

*Farrer v. U.S. Fidelity & Guar. Co.,*
809 So. 2d 85 (Fla. App. 2002) ........................................................................................... 18

*Fearrington v. Boston Sci. Corp.,*
410 F. Supp. 3d 794 (S.D. Tex. 2019) .............................................................................. 120

*Ferrari v. Grand Canyon Dories,*
32 Cal. App. 4th 248 (1995) ............................................................................... 99, 100, 101

*Flier v. FCA US LLC,*
2022 WL 16823042 (N.D. Cal. Nov. 8, 2022) .............................................................. 80, 87

*FM Props. Operating Co. v. City of Austin,*
22 S.W.3d 868 (Tex. 2000) ................................................................................................. 38

*Frankenmuth Mut. Ins. Co. v. Magaha,*
769 So. 2d 1012 (Fla. 2000) ............................................................................................... 52

*Fusco v. Uber Technologies, Inc.,*
2018 WL 3618232 (E.D. Pa. July 27, 2018) ....................................................................... 72

*Garrett v. Howmedica Osteonics Corp.,*
214 Cal. App. 4th 173 (2013) ........................................................................................... 106

*Gelboim v. Bank of Am. Corp.,*
574 U.S. 405 (2015) ........................................................................................................... 17

*Gilbert v. Sycamore Mun. Hosp.,*
156 Ill. 2d 511 (1993) ........................................................................................................ 62

*Gomez v. Jelly Belly Candy Co.,*
2017 WL 8941167 (C.D. Cal. Aug. 18, 2017) .................................................................. 110

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Goosehead Ins. Ag'y LLC v. William Ins. & Consulting, Inc.,*
533 F. Supp. 3d 367 (N.D. Tex. 2020)................................................................... 122

*Gradia v. Baptist Hosp., Inc.,*
345 So. 3d 385 (Fla. App. 2022)........................................................................... 61

*Green v. ADT, LLC,*
2016 WL 3208483 (N.D. Cal. June 10, 2016) ....................................................... 100

*Green v. Carlinville Comm'ty Unit Sch. Distr. No. 1,*
887 N.E.2d 451 (Ill. App. 2008) ....................................................................... 24, 36

*Guerrero v. Lyft, Inc.,*
2023 WL 9228975 (Cal. Super. Ct. May 25, 2023)................................................. 102

*Hadley v. Kellogg Sales Co.,*
273 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................. 78

*Hakim v. Safariland, LLC,*
410 F. Supp. 3d 862 (N.D. Ill. 2019) .................................................................... 106

*Hale v. Teledoc Health, Inc.,*
2021 WL 1163925 (S.D.N.Y. Mar. 25, 2021) ........................................................ 55

*Haq v. United Airlines, Inc.,*
1996 WL 426814 (S.D. Fla. Apr. 16, 1996) ........................................................... 51

*Hardin v. PDX, Inc.,*
227 Cal. App. 4th 159 (2014) .............................................................................. 102

*Hawkins v. Nestle U.S.A. Inc.,*
309 F. Supp. 3d 696 (E.D. Mo. 2018)................................................................... 112

*Henderson v. Tarver,*
123 So. 2d 369 (Fla. App. 1960)........................................................................... 35

*Hernandezcueva v. E.F. Brady Co.,*
243 Cal. App. 4th 249 (2015) .............................................................................. 100

*Herron v. Best Buy Co. Inc.,*
924 F. Supp. 2d 1161 (E.D. Cal. 2013)................................................................. 81

*Hesse v. Sprint Corp.,*
598 F.3d 581 (9th Cir. 2010)................................................................................ 67

*Hinckley v. Palm Beach Cnty. Bd. of Cnty. Comm'rs,*
801 So. 2d 193 (Fla. App. 2001) .......................................................................... 34

*Hinman v. Westinghouse Elec. Co.,*
2 Cal. 3d 956 (1970) ........................................................................................... 45

*Hodgers-Durgin v. de la Vina,*
199 F.3d 1037 (9th Cir. 1999).............................................................................. 114

*Holland v. Thompson,*
338 S.W.3d 586 (Tex. App. 2010)......................................................................... 85

*Huggins v. Santos,*
(Fla. Cir. Ct. Aug. 31, 2023)................................................................................ 19

*Huynh v. Quora, Inc.,*
508 F. Supp. 3d 633 (N.D. Cal. 2020) .................................................................. 111

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re 5-hour ENERGY Mktg. & Sales Pracs. Litig.,*
2014 WL 5311272 (C.D. Cal. Sept. 4, 2014)................................................ 108

*In re Adobe Sys., Inc. Privacy Litig.,*
66 F. Supp. 3d 1197 (N.D. Cal. 2014) ........................................... 108, 109

*In re Ambry Genetics Data Breach Litig.,*
567 F. Supp. 3d 1130 (C.D. Cal. 2021) ................................................. 113

*In re BHP Billiton Ltd. Sec. Litig.,*
276 F. Supp. 3d 65 (S.D.N.Y. 2017)...................................................... 72

*In re BP p.l.c. Sec. Litig.,*
852 F. Supp. 2d 767 (S.D. Tex. 2012) ................................................... 75

*In re Coca-Cola Prods. Mktg. & Sales Pracs. Litig. (No. II),*
2021 WL 3878654 (9th Cir. Aug. 31, 2021)............................................ 112

*In re Digitek Prods. Liab. Litig.,*
2009 WL 2433468 (S.D. W. Va. Aug. 3, 2009) ....................................... 87

*In re Engle Cases,*
2012 WL 4771237 (M.D. Fla. Oct. 5, 2012) ........................................... 117

*In re Gamble,*
676 S.W.3d 760 (Tex. App. 2023)................................................... 22, 24

*In re iPhone 4S Consumer Litig.,*
2013 WL 3829653 (N.D. Cal. July 13, 2013)..................................... 109, 110

*In re JUUL Labs, Inc. Mktg. Sales Pracs. & Prods. Liab. Litig.,*
609 F. Supp. 3d 942 (N.D. Cal. 2022) .................................................. 70

*In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.,*
2022 WL 1601418 (N.D. Cal. Apr. 29, 2022) ..................................... 77, 88

*In re JUUL Labs, Inc. Mktg., Sales Pracs., & Prods. Liab. Litig.,*
No. 19-md-2913 (N.D. Cal. Dec. 19, 2022)............................................ 66

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods.
Liab. Litig.,*
91 F.4th 174 (4th Cir. 2024) ........................................................... 67

*In re Marriage of Jackson,*
534 N.E.2d 687 (Ill. App. 1989) ....................................................... 54

*In re MyFord Touch Consumer Litig.,*
46 F. Supp. 3d 936 (N.D. Cal. 2014) ................................................... 80

*In re Nuvaring Prods. Liab. Litig.,*
2009 WL 4825170 (E.D. Mo. Dec. 11, 2009) ......................................... 86

*In re OnStar Contract Litig.,*
600 F. Supp. 2d 861 (E.D. Mich. 2009)............................................... 121

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
1997 WL 109595 (E.D. Pa. Mar. 7, 1997).............................................. 86

*In re Propulsid Prods. Liab. Litig.,*
208 F.R.D. 133 (E.D. La. 2002)........................................................ 17

*In re Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.,*
2023 WL 7524912 (N.D. Cal. Nov. 14, 2023)................................... passim

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Takata Airbag Prods. Liab. Litig.*,
2017 WL 775811 (S.D. Fla. Feb. 27, 2017)...................................................... 81

*In re Takata Airbag Prods. Liab. Litig.*,
462 F. Supp. 3d 1304 (S.D. Fla. 2020) ........................................................ 75

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ............................................................................ 110

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...................................................... 80

*In re Trasylol Prods. Liab. Litig.*,
2009 WL 577726 (S.D. Fla. Mar. 5, 2009) .................................................. 86

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021) ........................................................ 74

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*,
349 F. Supp. 3d 881 (N.D. Cal. 2018) .................................................. 87, 88

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .............................................. 68, 88

*In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*,
2012 WL 3582708 (N.D. Ill. Aug. 16, 2012).............................................. 17

*In re Zofran (Ondansetron) Prods. Liab. Litig.*,
2017 WL 1458193 (D. Mass. Apr. 24, 2017) .............................................. 86

*In re: Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
2001 WL 1266317 (D.N.J. Sept. 30, 1997) .............................................. 88

*In re: Uber Rideshare Cases*,
CJC-21-5188 (Cal. Super. Ct. June 22, 2023) .......................................... 89

*In re: Uber Techs., Inc. Passenger Sexual Assault Litig.*,
No. 23-3445 (9th Cir. Nov. 10, 2023)...................................................... 66

*In re: Zantac (Ranitidine) Prods. Liab. Litig.*,
546 F. Supp. 3d 1192 (S.D. Fla. 2021) .................................................... 121

*Index Newspapers LLC v. United States Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020)................................................................ 114

*Jana L. v. West 129th St. Realty Corp.*,
22 A.D.3d 274 (N.Y. App. 2005)........................................................ 84, 85

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)............................................................................ 19

*John R. v. Oakland Unified Sch. Dist.*,
48 Cal. 3d 438 (1989) ........................................................................ 45

*John Y. v. Chaparral Treatment Center, Inc.*,
101 Cal. App. 4th 565 (2002) .............................................................. 23

*Jones v. Patrick & Assocs. Detective Agency, Inc.*,
442 F.3d 533 (7th Cir. 2006)................................................................ 47

*Kaplan v. Coldwell Banker Residential Affiliates, Inc.*,
59 Cal. App. 4th 741 (1997) ............................................................ 59, 60

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Kitchen v. K-Mart Corp.*,
  697 So. 2d 1200 (Fla. 1997) ............................................................................... 18, 33, 97

*Kulp v. Munchkin, Inc.*,
  678 F. Supp. 3d 1158 (C.D. Cal. 2023) ................................................................... 79

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*,
  114 F. Supp. 3d 852 (N.D. Cal. 2015) ..................................................................... 76

*LaDuke v. Nelson*,
  762 F.2d 1318 (9th Cir. 1985) ................................................................................ 114

*Lancer Ins. Co. v. Garcia Holiday Tours*,
  345 S.W.3d 50 (Tex. 2011) ...................................................................................... 20

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003) .................................................................................. 74

*Lemmon v. Snap, Inc.*,
  2022 WL 1407936 (C.D. Cal. Mar. 31, 2022) ....................................................... 102

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ......................................................................... 93, 102

*Levine v. Sears Roebuck & Co.*,
  200 F. Supp. 2d 180 (E.D.N.Y. 2002) ............................................................ 103, 104

*Lieberson v. Johnson & Johnson Consumer Cos., Inc.*,
  865 F. Supp. 2d 529 (D.N.J. 2011) ......................................................................... 106

*Lilly v. Ford Motor Co.*,
  2002 WL 84603 (N.D. Ill. Jan. 22, 2002) ................................................................ 82

*Lindstrom v. Hertz Corp.*,
  81 Cal. App. 4th 644 (2000) .................................................................................... 91

*Lisa M. v. Henry Mayo Newhall Memorial Hosp.*,
  12 Cal. 4th 291 (1995) ..................................................................................... passim

*Loitz v. Remington Arms Co.*,
  563 N.E.2d 397 (Ill. 1990) ..................................................................................... 118

*Lopez v. Southern Cal. Rapid Transit Dist.*,
  40 Cal. 3d 780 (1985) ......................................................................................... 30, 31

*Lopez v. Zarbee's, Inc.*,
  2023 WL 210878 (N.D. Cal. Jan. 17, 2023) ...................................................... 16, 30

*Lowrie v. City of Evanston*,
  365 N.E.2d 923 (Ill. App. 1977) ........................................................................ 94, 96

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ................................................................................. 108

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................... 113

*Luna v. Uber Techs., Inc.*,
  No. 22STCV10806 (Cal. Super. Ct. Sept. 27, 2022) ............................................. 101

*Lydon v. Eagle Food Ctrs., Inc.*,
  696 N.E.2d 1211 (Ill. App. 1998) ............................................................................ 53

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Maher v. U.S. Xpress Enters., Inc.*,
   688 F. Supp. 2d 95 (N.D.N.Y. 2010) ................................................................. 119

*Mallory v. O'Neil*,
   69 So. 2d 313 (Fla. 1954) ............................................................................ 50, 51

*Maloney v. Rath*,
   69 Cal. 2d 442 (1968) ....................................................................................... 23

*Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*,
   193 So. 3d 902 (Fla. App. 2015) ....................................................................... 82

*Martin v. Wendy's Int'l, Inc.*,
   183 F. Supp. 3d 925 (N.D. Ill. 2016) ................................................................ 75

*Matter of Eighth Jud. Dist. Asbestos Litig.*,
   129 N.E.3d 891 (N.Y. App. 2019) .................................................................... 94

*McAllen Hosps., L.P. v. Gonzalez*,
   566 S.W.3d 451 (Tex. App. 2018) ..................................................................... 23

*McCall v. Safety Consultant Servs., Inc.*,
   2010 WL 3399892 (Cal. App. Aug. 31, 2010) ................................................. 49

*McClure v. Greater San Antonio Transportation Co.*,
   2009 WL 10670097 (W.D. Tex. Mar. 24, 2009) ......................................... 37, 60

*McKenzie v. United States Tennis Assoc. Inc.*,
   2024 WL 665102 (M.D. Fla. Feb. 16, 2024) ............................................. 50, 52

*McKnight v. Uber Techs., Inc.*,
   2017 WL 3427985 (N.D. Cal. Aug. 7, 2017) .................................................... 66

*McKnight v. Uber Techs., Inc.*,
   No. 14-5615 (N.D. Cal. Jan. 25, 2018) ......................................... 65, 66, 67, 80

*McNerney v. Allamuradov*,
   84 N.E.3d 437 (Ill. App. 2017) ..................................................... 36, 58, 63

*Medo v. Superior Ct.*,
   205 Cal. App. 3d 64 (1988) ............................................................................ 116

*Mejia v. Cmty. Hosp. of San Bernardino*,
   99 Cal. App. 4th 1448 (2002) ........................................................................... 59

*Mendez v. Selene Fin. LP*,
   2017 WL 1535085 (C.D. Cal. Apr. 27, 2017) ............................................... 107

*Mercury Cab Owners Ass'n v. Jones*,
   79 So. 2d 782 (Fla. 1955) ................................................................................. 61

*Mikojczyk v. Ford Motor Co.*,
   901 N.E.2d 329 (Ill. 2008) ............................................................................... 94

*Miller v. Towne Services, Inc.*,
   665 S.W.2d 143 (Tex. App. 1983) .................................................................... 40

*Missouri, K. & T. Ry. Co. of Texas v. Brown*,
   135 S.W. 1076 (Tex. Civ. App. 1911) ............................................................. 39

*Mobil Oil Corp. v. Bransford*,
   648 So. 2d 119 (Fla. 1995) ............................................................................... 61

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Mogensen v. Body Cent. Corp.*,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014) ..................................................... 75

*Moro-Romero v. Prudential-Bache Sec., Inc.*,
    1991 WL 494175 (S.D. Fla. Aug. 26, 1991) ........................................ 61, 62

*Morton v. De Oliveira*,
    984 F.2d 289 (9th Cir. 1993) .......................................................... 21, 22, 24

*Mullen v. GLV, Inc.*,
    488 F. Supp. 3d 695 (N.D. Ill. 2020) ..................................................... 84

*Myers v. Gulf Coast Minerals Mgmt. Corp.*,
    361 S.W.2d 193 (Tex. 1962) ................................................................. 24

*N. Miami Gen. Hosp., Inc. v. Goldberg*,
    520 So. 2d 650 (Fla. App. 1988) ......................................................... 102

*Nadeau v. Costley*,
    634 So. 2d 649 (Fla. App. 1994) ........................................................... 34

*Nazareth v. Herndon Ambulance Service, Inc.*,
    467 So. 2d 1076 (Fla. App. 1985) ................................................ 24, 32, 33, 34

*Nazemi v. Specialized Loan Servicing, LLC*,
    637 F. Supp. 3d 856 (C.D. Cal. 2022) ................................................. 107

*New Texas Auto Auction Servs., L.P. v. Gomez De Hernandez*,
    249 S.W.3d 400 (Tex. 2008) .......................................................... 94, 104

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ......................................................... 68, 75

*Norman v. Uber Techs., Inc.*,
    No. 21STCV35632 (Cal. Super. Ct. Mar. 8, 2022) ................................ 101

*O'Donnell v. K-Mart Corp.*,
    100 A.D.2d 488 (N.Y. App. 1984) ....................................................... 54

*Old Rep. Ins. Co., Inc. v. Fuller*,
    919 S.W.2d 726 (Tex. App. 1996) ........................................................ 56

*Orlando Exec. Park, Inc. v. P. D. R.*,
    402 So. 2d 442 (Fla. App. 1981) ........................................................... 61

*Orlando Exec. Park, Inc. v. Robbins*,
    433 So. 2d 491 (Fla. 1983) .............................................................. 57, 61

*Orlando Reg'l Med. Ctr., Inc. v. Chmielewski*,
    573 So. 2d 876 (Fla. App. 1990) ........................................................... 61

*Paneson v. Zubillaga*,
    753 So. 2d 127 (Fla. App. 2000) ...................................................... 50, 52

*Panoyan v. Regalo Int'l LLC*,
    2019 WL 8758897 (C.D. Cal. Oct. 25, 2019) ........................................ 115

*Parlato v. Equitable Life Assur. Soc. of U.S.*,
    299 A.D.2d 108 (N.Y. App. 2002) ..................................................... 58, 63

*Paulson v. Abbott Labs.*,
    2017 WL 11886538 (N.D. Ill. Mar. 15, 2017) ....................................... 103

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Payas v. Adventist Health Sys./Sunbelt, Inc.*,
238 So. 3d 887 (Fla. App. 2018) ................................................................. 24

*Peralta v. United States*,
475 F. Supp. 3d 1086 (C.D. Cal. 2020) ...................................................... 46

*Perez v. Bath & Body Works, LLC*,
2023 WL 3467207 (N.D. Cal. May 15, 2023) ........................................... 112

*Perkins v. Emps. Mut. Cas. Co.*,
507 F. Supp. 3d 1172 (D. Ariz. 2020) ........................................................ 52

*Petrash v. Biomet Orthopedics, LLC*,
2019 WL 8013939 (N.D. Cal. June 6, 2019) ............................................. 116

*Pickens v. Mercedes-Benz USA, LLC*,
2021 WL 5050289 (N.D. Ill. Nov. 1, 2021) ................................................ 76

*Pirozzi v. Apple, Inc.*,
966 F. Supp. 2d 909 (N.D. Cal. 2013) ....................................................... 108

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
227 F.3d 489 (5th Cir. 2000) ................................................................. 75, 77

*Plooy v. Paryani*,
657 N.E.2d 12 (Ill. App. 1995) ............................................................. 62, 63

*Porter v. Rosenberg*,
650 So. 2d 79 (Fla. App. 1995) ................................................................ 102

*Prentice v. R.J. Reynolds Tobacco Co.*,
338 So. 3d 831 (Fla. 2022) ....................................................................... 74

*Prisco v. New York*,
804 F. Supp. 518 (S.D.N.Y. 1992) ........................................................... 54

*Privette v. Superior Court*,
5 Cal. 4th 689 (1993) ............................................................................... 23

*Prunty v. Ark. Freightways, Inc.*,
16 F.3d 649 (5th Cir. 1994) .................................................................. 55, 56

*Pyne v. Witmer*,
543 N.E.2d 1304 (Ill. 1989) ..................................................................... 46

*R.J. Mgmt. Co. v. SRLB Dev. Corp.*,
806 N.E.2d 1074 (Ill. App. 2002) ............................................................. 83

*Ramsay v. Frontier, Inc.*,
2020 WL 4557545 (D. Colo. July 30, 2020) ............................................ 115

*Rees v. PNC Bank, N.A.*,
308 F.R.D. 266 (N.D. Cal. 2015) ............................................................ 116

*Reillo v. Alternate Health USA, Inc.*,
2020 WL 6701625 (M.D. Fla. Nov. 13, 2020) .......................................... 51

*Rice v. Univ. of Rochester Med. Ctr.*,
46 A.D.3d 1421 (N.Y. App. 2007) .......................................................... 119

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012) ...................................................... 72

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Robinson v. Wieboldt Stores, Inc.*,
   433 N.E.2d 1005 (Ill. App. 1982) ................................................................. 52, 54

*Rodriguez v. FCA US LLC*,
   2023 WL 3150075 (C.D. Cal. Mar. 21, 2023) ................................................. 111

*Rodriguez v. Uber Techs., Inc.*,
   No. 2020-CA-1823 (Fla. Cir. Ct. Aug. 9, 2021) ............................................... 90

*Rowell v. Holt*,
   850 So. 2d 474 (Fla. 2003) .............................................................................. 90

*Rudisill v. McDonough*,
   144 S. Ct. 945 (2024) ...................................................................................... 19

*Rush Univ. Med. Ctr. v. Sessions*,
   980 N.E.2d 45 (Ill. 2012) ................................................................................ 98

*S. Cent. Bell Tel. Co. v. Barthelemy*,
   643 So. 2d 1240 (La. 1994) ............................................................................. 95

*Samantha B. v. Aurora Vista Del Mar, LLC*,
   77 Cal. App. 5th 85 (Cal. App. 2022) ......................................................... 43, 49

*Sanchez v. Mbank of El Paso*,
   792 S.W.2d 530 (Tex. App. 1990), *aff'd*, 836 S.W.2d 151 (Tex. 1992) ............ 22, 40

*Scheman-Gonzalez v. Saber Mfg. Co.*,
   816 So. 2d 1133 (Fla. App. 2002) .................................................................... 94

*Schrager v. N. Cmty. Bank*,
   767 N.E.2d 376 (Ill. App. 2002) ..................................................................... 83

*Scurlock v. Pennell*,
   177 S.W.3d 222 (Tex. App. 2005) ................................................................... 92

*Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd.*,
   345 F. Supp. 3d 515 (S.D.N.Y. 2018) ............................................................ 119

*Serna v. Pettey Leach Trucking, Inc.*,
   110 Cal. App. 4th 1475 (2003) ....................................................................... 30

*Shafer-Isaac v. C.R. Bard Inc.*,
   2021 WL 1196754 (E.D. Tex. Feb. 26, 2021) ................................................... 20

*Shaw v. Superior Ct. of Contra Costa Cnty.*,
   78 Cal. App. 5th 245 (2022) ........................................................................... 97

*Sheffield v. Cen. Freight Lines, Inc.*,
   435 S.W.2d 954 (Tex. App. 1968) ............................................................... 40, 56

*Shroyer v. New Cingular Wireless Servs., Inc.*,
   622 F.3d 1035 (9th Cir. 2010) ....................................................................... 107

*Simon v. Smith & Nephew, Inc.*,
   990 F. Supp. 2d 395 (S.D.N.Y. 2013) ............................................................ 106

*Skinner v. Ken's Foods, Inc.*,
   53 Cal. App. 5th 938 (2020) ........................................................................... 74

*Smith v. Aqua-Flo*,
   23 S.W.3d 473 (Tex. App. 2000) .................................................................... 106

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Smith v. I-Flow Corp.*,
753 F. Supp. 2d 744 (N.D. Ill. 2010) .................................................. 122

*Snyder v. S. Cal. Edison Co.*,
44 Cal. 2d 793 (1955) .................................................................... 21

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........................................................... 111

*Speed Boat Leasing, Inc. v. Elmer*,
124 S.W.3d 210 (Tex. 2003) .......................................................... 36, 37

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*,
376 F.3d 664 (7th Cir. 2004) ........................................................... 54

*Srithong v. Total Inv. Co.*,
23 Cal. App. 4th 721 (1994) ............................................................ 24

*St. Joseph Hosp. v. Corbetta Const. Co.*,
316 N.E.2d 51 (Ill. App. 1974) ........................................................ 74

*State Farm Mut. Auto. Ins. Co. v. LaForet*,
658 So. 2d 55 (Fla. 1995) .............................................................. 19

*Stein v. S. Cal. Edison Co.*,
7 Cal. App. 4th 565 (1992) ............................................................ 101

*Stiles v. Int'l BioResources, LLC*,
726 F. Supp. 2d 944 (N.D. Ill. 2010) ................................................. 98

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ............................................................ 66

*Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*,
662 F. Supp. 2d 623 (S.D. Tex. 2009) ................................................. 85

*Swader v. Golden Rule Ins. Co.*,
561 N.E.2d 99 (Ill. App. 1990) ........................................................ 53

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ........................................................... 16

*Taboas v. Mlynczak*,
149 F.3d 576 (7th Cir. 1998) ........................................................... 41

*Takahashi-Mendoza v. Coop. Regions of Organic Producer Pools*,
673 F. Supp. 3d 1083 (N.D. Cal. 2023) ................................................ 73

*Taleshpour v. Apple Inc.*,
2021 WL 1197494 (N.D. Cal. Mar. 30, 2021) ......................................... 87

*Tallahassee Furniture Co. v. Harrison*,
583 So. 2d 744 (Fla. App. 1991) .................................................... 61, 62

*Taylor v. Elliott Turbomachinery Co., Inc.*,
171 Cal. App. 4th 564 (2009) .......................................................... 94

*Taylor v. Torbert*,
644 S.W.3d 637 (Tex. 2022) ...................................................... 19, 37, 99

*Texas Mut. Ins. Co. v. Ruttiger*,
381 S.W.3d 430 (Tex. 2012) ........................................................... 38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Thomas v. Regents of the Univ. of Cal.*,
  97 Cal. App. 5th 587 (2023) ............................................................ 48, 49

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)............................................................... 75

*Toral v. Uber Techs., Inc.*,
  No. 20STCV02030 (Cal. Super. Ct. L.A. Cnty. Apr. 14, 2021)...................... 94

*Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr.*,
  831 P.2d 724 (Wash. 1992)............................................................... 76

*Trejo v. Johnson & Johnson*,
  13 Cal. App. 5th 110 (2017) ............................................................ 106

*U.S. Sec. Servs. Corp. v. Ramada Inn, Inc.*,
  665 So. 2d 268 (Fla. App. 1995)........................................................ 22, 23

*Valley View Health Care, Inc. v. Chapman*,
  992 F. Supp. 2d 1016 (E.D. Cal. 2014)................................................ 110

*Verhelst v. Michael D's Restaurant San Antonio, Inc.*,
  154 F. Supp. 2d 959 (W.D. Tex. Aug. 2, 2001)...................................... 55

*Victoria v. Superior Court*,
  40 Cal.3d 734 (1985) ..................................................................... 30

*Wagner v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
  2018 WL 6258891 (C.D. Cal. Mar. 8, 2018) ........................................ 107

*Wang v. Tesla, Inc.*,
  2021 WL 3023088 (E.D.N.Y. July 16, 2021) ........................................ 119

*Wash. Mut. Bank, FA v. Sup. Ct.*,
  24 Cal. 4th 906 (2001) ................................................................... 122

*Watkins v. Harlem Ctr. for Nursing & Rehab., LLC*,
  2021 WL 4443968 (S.D.N.Y. Sept. 28, 2021) ...................................... 119

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
  579 F. Supp. 2d 334 (E.D.N.Y. 2008) ................................................ 84

*White v. Cnty. of Orange*,
  166 Cal. App. 3d 566 (1985)............................................................. 60

*Willis v. Gami Golden Glades, LLC*,
  967 So. 2d 846 (Fla. 2007)............................................................... 90

*Wisniewski v. Diocese of Belleville*,
  943 N.E.2d 43 (Ill. App. 2011) ......................................................... 83

*Worsdale v. City of Killeen*,
  578 S.W.3d 57 (Tex. 2019)............................................................... 19

*Wrap-N-Pack, Inc. v. Kaye*,
  528 F. Supp. 2d 119 (E.D.N.Y. 2007) ................................................ 119

*Wright v. Georgia S. and F. Ry. Co.*,
  63 So. 909 (1913)......................................................................... 34

*Wyndham Hotel Co. v. Self*,
  893 S.W.2d 630 (Tex. App. 1994)...................................................... 58, 64, 65

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Xue Lu v. Powell,*
  621 F.3d 944 (9th Cir. 2010).................................................................. passim

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.,*
  214 F. Supp. 3d 179 (E.D.N.Y. 2016) ........................................................ 78

*Z.M.L. v. D.R. Horton, Inc.,*
  2021 WL 3501099 (M.D. Fla. June 11, 2021) ............................................ 35

*Z.V. v. Cnty. of Riverside,*
  238 Cal. App. 4th 889 (2015) ................................................................... 46

*Zeiger v. WellPet LLC,*
  526 F. Supp. 3d 652 (N.D. Cal. 2021) ............................................. 110, 111

*Zhang v. Royal Caribbean Cruises, Ltd.,*
  2019 WL 8895223 (S.D. Fla. Nov. 2019)................................................... 73

### STATUTES

625 Ill. Comp. Stat. 57/10-30................................................................... 98

625 Ill. Comp. Stat. 57/5.......................................................................... 98

Cal. Bus. & Prof. Code § 17200 ............................................................. 106

Cal. Civ. Code § 2100 ........................................................ 24, 26, 29, 109

Cal. Civ. Code § 3294 ..................................................................... 115, 116

Cal. Civil Code § 2300 ....................................................................... 58, 59

Cal. Civil Code § 2317 ............................................................................. 59

Cal. Civil Code § 2334 ............................................................................. 59

Cal. Pub. Util. Code § 5431(c) ................................................................. 97

Cal. Pub. Util. Code § 5440(a) ................................................................. 97

Fla. Stat. § 627.748 ........................................................................... passim

Fla. Stat. § 768.72 ........................................................................... 116, 118

Tex. Civ. Prac. & Rem. Code § 150E.002 .................................... 18, 19, 38

Tex. Civ. Prac. & Rem. Code § 150E.003 .................................................. 20

Tex. Civ. Prac. & Rem. Code § 41.001...................................................... 120

Tex. Civ. Prac. & Rem. Code § 41.003...................................................... 120

Tex. Ins. Code § 1954 .............................................................................. 20

Tex. Ins. Code § 1954.051(c) .................................................................... 20

Tex. Occ. Code § 2402.001 ...................................................................... 99

Tex. Occ. Code § 2402.101 ...................................................................... 20

Tex. Occ. Code § 2402.112 ...................................................................... 99

Tex. Transp. Code § 5.001(a)................................................................... 38

### COURT RULES

Fed. R. Civ. P. 15(a)(2) ............................................................................ 16

Fed. R. Civ. P. 54(c) .............................................................................. 112

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Fed. R. Civ. P. 8 ...................................................................................................... 118

Fed. R. Civ. P. 9(b) ................................................................................................... 16

**TREATISES**

53 A.L.R.2d 720 ........................................................................................................ 25

66 A.L.R. 7th Article 2.............................................................................................. 25

Black's Law Dictionary (11th ed. 2019) ................................................................... 51

Restatement (Second) of Agency § 214 ............................................... 21, 24, 25, 28

Restatement (Second) of Agency § 219 .................................................................... 22

Restatement (Second) of Agency § 267 ........................................................ 57, 59, 64

Restatement (Second) of Torts § 314A ........................................................ 24, 25, 31

Restatement (Second) of Torts § 409 ........................................................................ 23

Restatement (Third) of Torts: Products Liability...................................................... 94

Restatement (Third) of Torts: Products Liability § 19(a) ................................ 94, 95, 96

Restatement of Torts § 429 ........................................................................................ 59

**OTHER AUTHORITIES**

CACI No. 1620 .......................................................................................................... 89

CACI No. 3709 .................................................................................................... 59, 60

*Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry*,
Decision 13-09-045 (Cal. Pub. Util. Comm'n Sept. 19, 2013)................................. 109

Lawrence B. Solum & Minn Chung, *The Layers Principle: Internet Architecture and the Law*,
79 Notre Dame L. Rev. 815, 817 (2004) .................................................................. 93

Tao Zhang et al., *Apps Can Quickly Destroy Your Mobile's Flash: Why They Don't and How to Keep It That Way*,
MobiSys '19: Proceedings of the 17th Ann. Int'l Conf. on Mobile Sys., Applications, & Servs., June 2019 ................................................................................................................. 93

Uber, *Investor Update* (Feb. 2024)
https://s23.q4cdn.com/407969754/files/doc_financials/2024/sr/uber-investor-update.pdf ......... 1

## __INTRODUCTION__

Uber revolutionized transportation in this country and around the world. It took something that had long been considered dangerous—entering a random stranger's private vehicle—and normalized it into something millions of people do every day.

To grow its start-up transportation business as fast as possible and dominate competitors, Uber decided it must quickly obtain as much as possible of what it candidly labels "supply" (drivers).[1] The premise of Uber's business model is that when a person uses the product (the App) to request a ride, a driver and car will be quickly available (measured in minutes). As a result, drivers are "the engine of" Uber's "growth."[2] If the supply of drivers is limited, then the fundamental value of Uber's service is compromised. So Uber has powerful incentives to ensure that the minimum qualifications to drive for Uber are never too rigorous or thorough.

Uber also works to maximize demand—the number of passengers willing to use its App. It is crucial for Uber that passengers be willing to enter into random strangers' cars every day, something unthinkable until companies like Uber entered the market. To accomplish this goal, Uber preemptively overcame people's natural reluctance to ride in a car with a stranger by reassuring them that Uber is safe and that taking an Uber is a responsible choice. It did so through a blizzard of messaging communicating that Uber took responsibility for making its product safe, and that passengers are riding *with Uber*, not with random drivers.

Uber's reassurance messages reach people ubiquitously and relentlessly, including directly on their phones, and are interwoven into every App feature. Uber has also installed purported safety features in its App, like allowing passengers to share their ride information with a friend, and displaying a driver's star rating, which communicate that Uber is making safety a priority, but do little to make the product actually safe. These messages and the design of the App effectively reassure passengers that Uber—a big, multinational corporation—is in charge of the experience, will safely transport its passengers, and will help solve problems if they arise.

Uber's safety assurance efforts have been overwhelmingly successful. Today, Uber is very

---

[1] Uber, *Investor Update* (Feb. 2024), at 22, https://s23.q4cdn.com/407979754/files/doc_financials/2024/sr/uber-investor-update.pdf
[2] *Id.* at 24.

much a part of people's daily lives. That success translates to profit—Uber keeps substantial percentages of each ride fare, reflecting its value added to the system. In 2023, Uber reported $70 billion in gross bookings[3] and held nearly three-quarters of the U.S. market. Uber's market cap is over $144 billion, unlocking gigantic compensation packages for its executives.

To be clear, there is nothing inherently wrong with innovation or profit. The problem is that, when something goes wrong—like when a driver sexually assaults a passenger—Uber removes itself from the equation. What was an Uber ride becomes a third-party transaction, with the driver solely responsible for his own conduct. What was "ride with Uber" becomes "you're on your own." When there is money to be made, Uber places the focus on itself to ensure maximum passenger buy-in. When there is liability to be allocated, Uber abdicates responsibility. But Uber cannot transform the essential facts to avoid liability. Uber pretends it is not in the car. But Uber is central to everything about the ride, from the decals on the outside that associate the driver and the service with Uber, to the App on passengers' phones.

This litigation is about one of those things that goes wrong, one that happens repeatedly on Uber's platform: sexual assault. From the outset, Uber knew that its transportation model, by placing often vulnerable people in isolated, contained environments with random strangers, created a foreseeable and substantial risk of sexual assault. All along, Uber alone has possessed the information and tools to protect passengers from that risk. But Uber has never taken responsibility for preventing those assaults. Uber floods the market with poorly-screened drivers and refuses to adopt simple policies or design choices—like cameras in cars or algorithms that pair drunk women riding late at night only with the most established and trustworthy drivers— that it knows would reduce the incidence of assault.

Instead, Uber places the responsibility for avoiding assaults on its drivers, and, worse, on passengers themselves. Uber makes it difficult for its passengers to report sexual assault. It has a history of reinstating drivers even after complaints of sexual misconduct. It gives riders falsely reassuring information about individual drivers. And, Uber does not report assaults to law enforcement, even though it knows that such assaults are notoriously underreported.

---

[3] *Id.* at 21.

Being innovative and new and successful does not immunize a corporate actor from the standards that have governed liability for a century or more. Instead, Uber is subject to the same rules as anyone else. Companies that provide widely-available transportation—"common carriers"—undertake a responsibility to keep passengers safe, a responsibility that cannot be delegated to so-called "independent drivers." Companies that promise safety as part of their essential value proposition must deliver on that promise. And product manufacturers are responsible for the design and warnings of their products, whether their products emanated in the industrial age or the digital one.

Uber's motions to dismiss the Master Complaint are wide-ranging and target most of the claims asserted. But it bears emphasis that Uber does not move against Plaintiffs' negligence claims (excepting NIED and entrustment). That means that Uber accepts, at this stage, that sexual assault is a foreseeable problem and that it owes some duty to prevent such assaults in its vehicles. Uber could hardly maintain otherwise—it tries to take credit for conducting background checks (even though those checks are demonstrably inadequate) and publishing (skewed, incomplete, and belated) summary statistics in its limited "Safety Reports."

Uber's motions to dismiss should be denied. This brief proceeds through Uber's arguments claim by claim: nondelegable common carrier duties (Section I.B); respondeat superior (Section I.C), ratification (Section I.D), apparent agency (Section I.E), fraudulent misrepresentation and omission (Section II), NIED (Section III), negligent entrustment (Section IV), strict products liability (Section V), UCL (Section VI), injunctive relief (Section VII), and punitive damages (Section VIII).

Although the relevant legal standards often do not vary significantly between states, for the most part Plaintiffs have respected Uber's choice to analyze each state separately and have responded accordingly (with a consequence being some inevitable redundancy). At places, Uber's arguments or the laws of the relevant states are so overlapping that Plaintiffs address them concurrently. Plaintiffs withdraw three claims: respondeat superior in Florida (Claim G-4); vicarious liability based directly on Cal. Pub. Util. Code § 3534 (Claim G-4); and NIED claims under Texas law (Claim D). In addition, for the states at issue in these motions, Plaintiffs rely

only on the nondelegable duties owed by common carriers (Claim E) and not on other potentially-applicable nondelegable duties (Claim F).

One organizational note. Uber relies on state statutes regulating "Transportation Network Companies" (aka "TNC Statutes") in several different places. In particular, in Florida and Texas, Uber cites these statutes as bases to: (1) eliminate vicarious liability entirely; (2) bar common carrier liability; and (3) rule out strict products liability. Accordingly, those two statutes are addressed in Sections I.A, I.B.3.b.i, I.B.3.d.i, and V.B.

Finally, Uber attached to each of its motions a coda: that any "amendment would be futile" and so leave to amend should be denied across the board. *See, e.g.*, ECF 384 at 30. Uber's attempt to bypass the permissive standard of Fed. R. Civ. P. 15(a)(2) should be denied.

Plaintiffs respectfully request that Uber's motions to dismiss the Master Long-Form Complaint be denied, or that leave to amend be granted to cure any deficiencies.

## **BACKGROUND**

### A.   **Uber created a revolutionary transportation model and App, both entirely within its control.**

In 2009, when Uber was founded, the general public considered it unreasonably dangerous for a young woman (or any solo traveler for that matter) to enter a complete stranger's car in order to reach her destination. MC ¶ 1. That would have been considered hitchhiking. A foreseeable risk of hitchhiking was the potential for sexual assault. *Id.* It was considered reasonably safe to hail a licensed taxi, but taxis were strictly regulated, in particular regarding who could become a taxi driver. *Id.* ¶ 2.

At first, Uber did not disrupt this paradigm. For several years, Uber provided passengers only with licensed, professional drivers, who in turn worked with regulated, licensed charter-party carrier businesses. *Id.* ¶¶ 3-4. But in 2012, inspired by a new, upstart competitor (the company later known as Lyft), Uber identified a new way to make money—a lot more money. In 2013, Uber started offering a novel form of application-supported transportation, where Uber would connect people who needed rides with individuals who had a driver's license, access to a car, and willingness to drive. *Id.* ¶¶ 5-7.

Uber has unparalleled knowledge and comprehensive control with respect to every aspect of its transportation model, including those that determine whether rides are safe or unsafe. *Id.* ¶¶ 70, 122, 130-34. It controls the design of the App, the starting point, ending point, and route of the ride, and the selection and matching of the passenger and the driver. *Id*. ¶¶ 51-71. Uber controls the working environment, terms, and business of its Uber drivers. *Id.* ¶¶ 72-111. Uber alone handles and decides the outcome of all complaints and grievances regarding rides. *Id.* ¶ 68. Uber alone chooses what information to share with riders about its drivers. *Id.* ¶ 71. Uber tracks drivers and riders using GPS, and has the capability to intervene in real time when it detects unusual activity during a ride. *Id.* ¶¶ 92, 103-07.

### B. An elevated risk of sexual assault was always a foreseeable consequence of Uber's transportation model.

Reasonably careful and responsible businesses adopt a "think before you act" way of doing business. *Id.* ¶ 112. They think about whether their business will put people at risk, including the risk of crime, and they think about how to reduce any such risk before making business decisions. *Id.* This principle applies with particular force to transportation companies, which maintain, as their inherent operating premise, that they can be trusted to safely transport someone from one place to another. *Id.* ¶ 113. Riders who get in a plane, train, taxi, or Uber implicitly trust the company will keep them safe. *Id.* This principle also applies particularly to innovative companies that create new and disruptive businesses. Because such companies cannot rely on how their predecessor companies identified and approached foreseeable risks, they must take extra care to do so themselves. *Id.* ¶ 115.

When Uber introduced so-called "peer-to-peer" transportation, this innovation foreseeably carried an elevated risk of sexual assault. *Id.* ¶ 117. Uber's transportation model involved aggressively recruiting large numbers of random people who just happened to have a driver's license, a car, and time on their hands, and then learning little about them and requiring virtually no up-front investment (in some cases, even partnering with rental car companies to make rental cars available to prospective drivers). *Id.* ¶¶ 117, 169. A driver's license is not even a minimal guarantee of a safe or trustworthy driver. *Id.* ¶ 118. Using its App, Uber then paired these random

people with random passengers, including vulnerable populations like young women; intoxicated riders (to whom Uber specifically advertises); inexperienced riders (by definition all new riders—there is no Uber passenger training); and riders who fall asleep during a trip. *Id.* ¶ 119.

The risks of pairing essentially random people in a closed, isolated environment were obvious, particularly with regards to sexual assault. So, at the threshold of transforming transportation in this country, Uber had a choice. It could have acknowledged those risks, evaluated how its new business model and App needed to mitigate or eliminate those risks, and then—and only then—begin to grow.

### C. From the outset, Uber could have but did not address or prevent sexual assault.

Uber chose rapid growth at all costs. *Id.* ¶ 10. When Uber launched its new transportation model, it did not hire any safety experts or spend a single minute thinking about how to prevent sexual assault. *Id.* ¶ 16. Before flooding the country with "UberX" rides, Uber did not think about, talk about, or study the risk of sexual assault on its platform. *Id.* ¶ 125. It did not conduct studies, focus groups, or user testing for the purpose of preventing sexual assault. *Id.* It did not devote money or resources to that goal. *Id.* ¶ 126. Uber did not assign accountability to any employee for the issues of safety, identifying or addressing potential risks to Uber's riders, or preventing sexual assault. *Id.* ¶ 127. Uber did not hire safety engineers, certified safety professionals, or any other personnel with expertise in safety, crime prevention, or sexual assault prevention. *Id.* Uber did not build the Uber App, nor design its transportation model, nor adopt measures or policies, in a way aimed at preventing, mitigating, or effectively responding to sexual assault. *Id.* ¶ 128.

In 2017 and 2018, when Uber finally began appointing employees to positions ostensibly focused on sexual violence prevention, it did not require any expertise or background in safety fields. *Id.* ¶ 129. Personnel at Uber whose job titles involved safety were tasked with protecting Uber's reputation rather than ensuring the safety of its riders. *Id.* In 2021, the New York Times reported that Uber's team of purported "investigators" typically had "little to no background in trauma response… They are given scripts to read to often-upset passengers and drivers, and strict

company policies prohibit the agents from reporting the incidents to the police, even when perpetrators acknowledge their actions." *Id.* ¶ 256. To this day, Uber prohibits its agents from reporting sexual assault incidents to police. *Id.*

Uber could have dramatically and effectively reduced—if not eliminated—sexual assault on its platform if it had designed its transportation system with that goal in mind. *Id.* ¶ 130. When companies that operate daycare centers, schools, and business offices engage in evidence-based research on situational sexual violence prevention, they are usually able to dramatically and successfully reduce or eliminate these crimes. *Id.*

    **D.**    **At all times, Uber prioritized the growth of the business, not safety.**

In order to build this new transportation model quickly, Uber needed to make the acquisition of drivers and riders as cheap and frictionless as possible. *Id.* ¶ 11. Anything that discouraged riders or drivers from using the product would hurt the bottom line. *Id.*

    **1.**    **Uber promised it would take responsibility for transporting passengers safely.**

To grow its business, Uber had to change the public's attitude towards getting into a private car driven by a random person. *Id.* ¶ 12. Uber did so by assuring passengers that Uber would provide safe rides: the "safest rides on the road," "a ride you can trust," and a service that was "created to ensure reliable access to safe rides." *Id.* Uber has never presented itself to the public as a mere technology company or broker of transportation services. *Id.* ¶ 196. It has always advertised itself as a transportation company that uses its product to provide reliable and safe rides. *Id.* For example, in 2017 and 2018, its website said "Wherever you're headed, count on Uber for a ride" and "Ride with Uber." *Id.* Today, when people view the Uber App in an app store, they see the tagline, "Ride with Uber." *Id.* ¶ 199. This ubiquitous messaging assured passengers that they could count on Uber—not merely random drivers—to keep them safe. *Id.* ¶ 12. It removed the friction that would otherwise prevent people from using Uber's product. *Id.*

In this way, Uber instilled in the public's mind the universal understanding that an Uber ride is not a ride with a stranger; it is a ride *with Uber*, arranged and procured *by Uber*, in cars operated by vetted and approved *Uber drivers*, and with trip planning, monitoring,

communications, and fare management exclusively within the *Uber App. Id.* ¶ 13. It is the imprimatur of a legitimate and responsible corporation—Uber—overseeing virtually every aspect of the ride that gives passengers the necessary sense of safety and security to get into the car with an Uber driver. *Id.* Uber's own metrics show that passengers are largely motivated by perceptions of safety when choosing Uber's services. *Id.*

In the past, Uber gained riders' trust by fraudulently advertising "the safest ride on the road," and saying that it sets "the strictest standards possible" and that it "aims to go above and beyond local requirements" with "gold standard" and "industry leading" background checks. *Id.* ¶¶ 20, 206-08. Beginning in 2014, Uber charged a "Safe Ride Fee," which it told the public "support[ed] our continued efforts to ensure the safest possible platform for Uber riders." *Id.* ¶ 203. In reality, the "Fee" was never earmarked for safety, but was just profit margin. *Id.* ¶ 204.

Even after it paid more than $50 million to settle lawsuits based on this fraudulent marketing, Uber never told riders the truth. *Id.* ¶¶ 20, 206-08. Instead, Uber changed its safety representations to be increasingly vague but to still communicate the same essential proposition, such as: "At Uber, Safety Never Stops." *Id.* ¶¶ 20, 211-17. Its in-App welcome screen long continued to promise prospective customers, "Safe, reliable rides in minutes." *Id.* To this day, Uber's website advertises "Ride with confidence—The Uber experience was built with safety in mind," describes how Uber is "Designing a safer ride" and its "features to keep you safe," and proclaims that safety is its "top priority." *Id.* ¶¶ 218-23.

Uber has saturated the public with safety-oriented marketing directed to every single Uber customer. *Id.* ¶ 188. Uber promotes its safety message through advertising in bars, stores, and other public places, as well as online in search engines, social media, and direct email- and App-based communications. *Id.* App'x A (samples of safety-based marketing).

Safety is an essential value proposition of the Uber product. *Id.* ¶ 189. This is due not only to Uber's representations, but also to the inherent nature of the product. *Id.* Because Uber requires people to voluntarily enter into an enclosed environment controlled by a random stranger, Uber's passengers are relying on Uber's express and implied promise to transport them safely. *Id.* To induce riders to get into these drivers' vehicles, Uber knows that it must cultivate a reputation for

1   safety and transfer that reputation to Uber drivers. *Id.* ¶ 193. When Uber sends a driver to a rider,

2   and the driver shows up at the specified time and place in a vehicle bearing Uber's trademarked

3   decal or otherwise matching the expectations Uber established, Uber intends the Uber decal and

4   other matching features to reassure the prospective passenger: "This is not just a random

5   stranger's car. It is an UberX and it is safe to get in." *Id.* ¶ 191; *see also id.* ¶¶ 192-93.

### 2. Uber targeted vulnerable populations.

7       Uber knows that its transportation system is particularly high risk for intoxicated riders,

8   especially intoxicated women. *Id.* ¶¶ 21, 229-31. Nonetheless, Uber's advertising

9   disproportionately targets these groups.

10      Uber targets women with dedicated ad campaigns and webpages devoted to "driving

11  women's safety forward." *Id.* ¶ 21. Its marketing photos and videos predominantly feature

12  smiling women riding in Ubers. *Id.* ¶¶ 21, 225. To this day, Uber has a webpage exclusively

13  devoted to "Driving women's safety forward." *Id.* ¶ 227. The page describes "safety features built

14  into every ride." Until recently this page advertised, "Uber is committed to help stop incidents

15  before they happen." *Id.*

16      Uber also specifically markets its rides as a safe, smart transportation option for

17  intoxicated riders. *Id.* ¶¶ 22, 233-35. In 2015, Uber partnered with Mothers Against Drunk

18  Driving to promote that "The Uber App was created to ensure reliable access to safe rides," that

19  "Uber is a better late[-]night option," and that people "trust Uber to take their drunk friend home

20  safely." *Id.* ¶ 233. Uber heavily promotes its rides on New Year's Eve and other holidays as a

21  safe way to get home after an evening of drinking. *Id.* ¶¶ 22, 236. This marketing is broadly

22  targeted, appearing in such innocuous places as Safeway grocery stores. *Id.* ¶ 22. Uber engages in

23  joint marketing with alcohol manufacturers and local bars, telling women that it is okay to have

24  another drink and be assured they have a ride home. *Id.* ¶¶ 22, 237.

### D. Uber prioritized a steady supply of drivers, not safety.

26      Uber had many tools at its disposal for reducing sexual assault, including: rigorous

27  screening of drivers; prompt termination of drivers who engage in sexual misconduct; in-App

28  tools such as panic buttons with prompt responses from Uber and coordination with law

enforcement; surveillance for unusual conduct (such as lengthy stops) during rides; training drivers and communicating to them that there will be strict penalties and accountability; diligently investigating allegations of sexual assault; mandatory installation of cameras that could not be deactivated during trips; and so forth. *Id.* ¶ 131. But Uber did none of this. *Id.* ¶¶ 472-73.

The problem with those tools was that they would limit the pool of drivers (what Uber accurately labels "supply"). The premise of the Uber experience is that a ride will arrive within minutes of being called. To meet that goal, Uber needed a huge supply of drivers; correspondingly, the company's incentive was to never make the minimum qualifications necessary to drive too stringent.

Uber reassures riders that it uses "multi-step safety screening" of drivers, along with regular review of driver's histories. But, from the beginning of "UberX," the company made the decision to make driving for Uber easily accessible. Uber aggressively marketed that it was easy to become an Uber driver, with emails offering sign-up bonuses and promising approval within 20 minutes. *Id.* ¶ 148. The company did not (and still does not) interview drivers, meet with them, require any prior experience, solicit references, do any drug or alcohol testing, or require any tests. *Id.* ¶¶ 147, 167-68.

The most Uber does is a cursory and ineffective background check, through a background check company that promises to vet drivers within 36 hours (sometimes Uber enrolls drivers before the check is even complete). *Id.* ¶¶ 17, 145, 165. Unlike the taxi industry, the company does not fingerprint drivers, use any biometric data, or run applicants against gold-standard criminal justice databases. *Id.* ¶¶ 17, 142. Instead, Uber uses a fast and shallow name-based background check, with a short look-back period, and spotty coverage. *Id.* ¶ 143. Name-based background checks of the sort Uber uses present systemic, fundamental problems, including fraud, false positive, and false negatives. *Id.* ¶ 144. When certain states performed their own fingerprint-based background checks, 12-15% of drivers who were eligible under Uber's standards flunked the background checks. *Id.* ¶¶ 17, 152-53. Indeed, as a result of San Francisco, Los Angeles, and Colorado investigations, it is clear that Uber has known for more than a decade that its security screening procedures are inadequate. *Id.* ¶¶ 150, 154.

Every decision Uber made was informed by its foundational choice to adopt a business model that required as many drivers as possible. For example, Uber had the ability to require drivers to use inward-facing cameras that would record whenever a passenger was in the vehicle. *Id.* ¶ 132. Uber had the ability to design these cameras to remain operational until both the driver and rider confirmed that the trip was over. *Id.* For years, Uber has known that mandatory cameras would effectively deter sexual assault. *Id.* ¶ 25. But it also knows that requiring cameras would slow onboarding of new drivers, discourage some drivers from signing up, and jeopardize Uber's argument that it lacks control over its "independent" drivers. *Id.* Cameras would also make it more difficult to recruit passengers because they would be reminded, contrary to Uber's messaging, that Uber's product carries dangerous risks. *Id.*

Uber does not adequately monitor drivers' safety performance, as doing so would risk shrinking the pool of drivers, jeopardizing the business. *Id.* ¶ 26. Uber makes it hard for riders to report sexual assault, since it does not want to disclose the true safety risks to regulators or the public. *Id.* When a rider gives a low rating to a driver, Uber presents a menu with at least 44 different options (e.g., "fast driving," "unpleasant car smell," "talked too much," "didn't follow map") but the menu does not include sexual misconduct, sexual harassment, or sexual assault. *Id.* By impeding reports of sexual assault, Uber fails to protect riders from drivers it should terminate. *Id.* Uber also deprives itself of the true data on sexual assault, preventing it from meaningfully studying prevention. *Id.*

Uber does not protect riders from drivers who have shown themselves to be a threat. *Id.* ¶ 28. For most of its years in business, Uber's official policy has been to require more than one sexual assault complaint before terminating a driver. *Id.* Depending on how much money a particular driver was making for Uber, Uber would sometimes tolerate three or four sexual assaults before terminating the driver. *Id.* It is unknown how many of these drivers who received "free passes" for one, two, or three sexual assaults are still driving for Uber. *Id.*

The result is a near-ideal environment for predatory drivers. Drivers know that they can drive for Uber with minimal screening. They know they can be paired, late at night, with vulnerable, intoxicated women exiting bars, and get these women alone in their cars with no

cameras and no witnesses. They know there is little risk an assault will be reported to law enforcement or result in any real consequences.

### E.   When Uber learned its riders were being sexually assaulted, it promoted the appearance of safety, not safety.

Even though sexual assault is underreported, and even though Uber discourages reporting, thousands of women have come forward to say they were sexually assaulted during Uber rides. *Id.* ¶ 29. Uber refuses to take any responsibility for allowing these assaults to occur, instead blaming the "independent" driver or worse, the victim herself. *Id.* ¶¶ 29, 32-33. But Uber's legal position is starkly different from how it markets its product to passengers. *Id.* ¶ 30. From a passenger's perspective, Uber takes responsibility for the safety of its rides. *Id.*

By 2014, less than a year after Uber started onboarding non-professional drivers, it started receiving reports of sexual assault committed by Uber drivers against riders. *Id.* ¶ 258. It has continued receiving these reports from 2014 to the present. *Id.* Uber did not publicize what it was learning, because its goal was not safety but rather the appearance of safety. *Id.* Uber did not publicize anything about sexual assault until forced to do so by national outrage and federal and state investigations. *Id.* ¶¶ 240-41. In response, Uber took the position that sexual assaults on its platform were merely a reflection of a society-wide problem, and not of Uber's transportation system or business practices. *Id.* ¶¶ 268-70. And Uber adopted only the minimal transparency necessary to support its public relations campaign. *Id.* ¶¶ 271-280.

When Uber learns of driver misconduct, it puts riders at risk to protect its product and reputation. For example, Uber makes it artificially difficult for a rider to indicate sexual misconduct as the reason for a low-star review. *Id.* ¶¶ 283-87. When a rider gives a low rating, Uber presents a menu of forced-choice rationales for the rating. *Id.* ¶ 284. There are, by design, no options relating to anything like "sexual assault," "sexual misconduct," or "sexual harassment." *Id.* ¶¶ 285-87.

Until at least 2019, it was Uber's policy that, if a rider reported sexual assault by a driver, the driver would be allowed to maintain his driving privileges unless it was a second, third, or fourth sexual assault on Uber's platform or if there was "conclusive" evidence of the assault

1  (namely a criminal conviction, admission of fault, or video or photographic evidence). *Id.* ¶ 297.

2  In effect, this meant that virtually no initial allegations of sexual assault—even those supported

3  by the same GPS evidence Uber uses as part of its product—were considered sufficient to revoke

4  a driver's privileges. *Id.* ¶¶ 297, 303. Uber took no action to warn or protect riders from drivers

5  with a known history of sexual assault. *Id.* ¶ 302.

6  　　　　Unbeknownst to riders, Uber does not report drivers' criminal sexual assaults to law

7  enforcement. *Id.* ¶ 304. Uber claims that its policy not to contact law enforcement is victim-

8  centric and designed to empower the sexual assault survivor to decide whether to press charges.

9  *Id.* ¶ 305. However, even if the driver admits the crime to Uber in a recorded call, potentially

10  allowing the criminal justice system to protect the public without imposing on the victim, Uber

11  still will not report to law enforcement. *Id.* Furthermore, Uber deceives riders into thinking that

12  Uber will convey reports of misconduct to law enforcement. *Id.* ¶ 306. Uber tells riders that it has

13  a "law enforcement response team" that will work with law enforcement, but does not explain to

14  riders that this will occur if and only if the rider first self-reports the crime to law enforcement. *Id.*

15  Uber does not encourage riders to report to law enforcement, nor empower them to do so. *Id.* ¶¶

16  307-310. Uber knows that sexual assault survivors rarely report to law enforcement on their own.

17  *Id.* ¶¶ 241-42.

18  　　　　Uber through its App misleads riders by displaying each driver's purported overall rating

19  (out of five stars) next to the driver's total number of trips. *Id.* ¶ 27. But the driver's star ratings

20  actually reflect only the past 500 trips, not a complete track record. *Id.* Moreover, Uber does not

21  tell passengers that it drops some low reviews from the rating. *Id.*

**F.** **Uber designs its product (the App) to maximize user engagement, and make Uber rides seem safe, while refusing to adopt design choices or warnings that would actually promote safety.**

24  　　　　The key to Uber's transportation business is its product—the Uber App. The App is a

25  mobile application installed on passenger's phones. *Id.* ¶¶ 446-47. The App controls every aspect

26  of the transportation experience, including which driver is paired with which passenger, how

27  drivers and passengers communicate, the terms and amount of payment, and the receipt of

28  feedback and complaints. *Id.* ¶¶ 60-71. Uber, in turn, controls every aspect of the App, including

its design and (lack of) warnings. *Id.* And the App gives Uber incredible amounts of data, including real-time GPS tracking of passengers and drivers, and unlimited capability to capture and analyze patterns in the data, such as indicia of driver bad behavior. *Id.* ¶ 65.

The Uber App is not a phone book or a dispatch service; it determines every facet of the transportation. Uber's algorithm pairs a passenger with a driver. *Id.* ¶ 87. Then the App tells the driver exactly which route to take, and communicates the same to the passenger. *Id.* ¶ 92. Everything is done through Uber and through the Uber App. The App tells the driver where the passenger is and vice versa. *Id.* ¶ 58. The App gathers "massive" amounts of data about drivers and passengers and uses that data when and how Uber chooses.[4] When a passenger wants to communicate with a driver before the ride begins, the passenger does so via in-App messaging, sending a message to Uber, who then relays it to the driver. *See id.* ¶¶ 67-69. Payment, driver ratings, feedback—everything happens through the App and through Uber. *Id.* ¶¶ 90, 94, 293-94, 462. The driver is merely a component of Uber's system. Uber, and Uber alone, decides when and how to use its data and its App to shape the transportation experience.

Uber could use its product—the App—to promote safety. Instead, everything about the App is designed to keep riders riding and drivers driving. The App ensures that passengers associate rides with the Uber brand and the promises of safety attached to it. The App itself promotes this reassurance messaging in two ways. First, the App, armed with the massive amounts of data collected, targets passengers with advertising via phone alerts. *Id.* ¶ 188. Second, the App includes design features that promote the appearance of safety rather than actual safety.

To maintain a false sense of security, Uber builds low-cost features into its App that superficially and superfluously address safety and shift the burden to passengers to protect themselves, such as a button to call emergency responders. *Id.* ¶ 24. (Never mind the ease of simply pressing "9-1-1" on one's phone.) Uber knows that many of its passengers (1) did not order the ride themselves and therefore cannot use this feature, (2) have dead cell phone batteries, or cannot find their cell phones; or (3) are intoxicated and unable to properly navigate the App feature. *Id.* Uber claims that it "[d]esign[ed] a safer ride" with "features to keep you safe," *id.*

---

[4] *Investor Update* at 16 ("massive data sets").

¶¶ 219, 221, but refuses to take meaningful steps readily available to it as a resource-rich tech company with complete control over the ride environment and experience to prevent assaults from happening and intervene when suspicious activity occurs. *Id.* ¶¶ 473, 487.

Uber assures users its GPS tracking capabilities and emergency button will keep them safe, but these features provide a false sense of security. *Id.* ¶¶ 24, 473, 487, 497. Uber uses GPS tracking to maximize its own profits by matching drivers with nearby riders and estimating arrivals to the minute—so it can arrange the next ride. *Id.* ¶¶ 65. It does not use this feature to alert police when there is a route deviation. *Id.* ¶¶ 473, 487, 497. Instead, it is up to users to unlock their phone, navigate to the App, and press the emergency button—apparently while in the process of being assaulted. *Id.* ¶ 24.

Uber failed to code its App to incorporate preexisting functionalities on mobile devices, including biometric reading and video recording. *Id.* ¶¶ 473, 487. Uber grew its market share by emphasizing the safety of its product, but failed to take even the simplest steps in developing its product to guard against the risk of sexual assault—screening out individuals with a criminal history and monitoring rides with video cameras. *Id.*

Uber claimed to have support systems and mechanisms to prevent dangerous drivers from using its product, but these claims are not borne out. *Id.* Uber's reporting system is not effective or focused on safety but instead, is focused on shielding Uber from liability or loss of customers. *Id.* ¶ 473, 487. There is no functionality to flag dangerous predators for immediate removal— traumatized passengers may only rate their assailant on a 5-star scale. *Id.*

Uber promotes its "star rating" system as a means of making riders feel safe, but declines to design that system to better collect data on inappropriate behavior. *Id.* ¶¶ 26-27, 283-87. Uber's App could also modify the algorithm to ensure that drivers with reports of bad behavior are precluded from driving for Uber, or require a driver to establish a track record for safety before picking up women late at night. Uber does not do so.

Uber does not warn users that its product poses a risk of sexual assault, harassment, or misconduct. *Id.* ¶¶ 474-76. In fact, it uses safety as a marketing tool by emphasizing the various "safety" features it developed that had no practical impact with respect to the safety of users. *Id.*

¶ 497. Meanwhile, Uber fails to warn users that by downloading the App and engaging with Uber's matching algorithm, they may be matched with a sexual predator who will do them harm. *Id.* ¶¶ 474-76. It similarly fails to warn users of the limitations of its purported "safety" features, including that Uber will not use its GPS tracking feature to notify law-enforcement or otherwise act in the event a driver takes them off route. *Id.* ¶ 497.

### G.      Uber has been monumentally successful.

Uber's choices of how to design its product and run its transportation model have paid off handsomely. Uber has become an essential part of transportation in this country, dominating nearly three-quarters of a gigantic market.[5] Uber earns $70 billion a year in ride bookings, and its market cap has risen to more than $144 billion.[6] That success has unlocked remarkable compensation packages for its executives—compensation tied to business growth and business growth only, not to any safety metrics.[7]

### LEGAL STANDARDS

**Rules 8, 9, and 12**. A complaint must plead only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When "evaluating a motion to dismiss, the Court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Lopez v. Zarbee's, Inc.*, 2023 WL 210878, at *2 (N.D. Cal. Jan. 17, 2023). Under Fed. R. Civ. P. 9(b), "allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charges so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). If the Court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).

---

[5] Catherine Thobecke, *How Uber left Lyft in the dust*, CNN, Mar. 29, 2023.

[6] Greg Andrews, *Uber Hits $120B Valuation, Unlocking Huge Equity Grant for CLO Tony West*, Law.com, Feb. 29, 2024.

[7] Greg Andrews, *Uber Hits $120B Valuation, Unlocking Huge Equity Grant for CLO Tony West.*

1        ***Erie* predictions**. The claims asserted in the Master Complaint all arise under state law. In

2    "determining the law of the state for purposes of diversity, a federal court is bound by the

3    decisions of the highest state court." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th

4    Cir. 2011). If the state's highest court has not decided an issue, federal courts sitting in diversity

5    predict "how the state high court would resolve it." *Id.* Absent "controlling authority from the

6    state supreme court, a federal court must predict how the highest state court would decide the

7    [state law] issue using intermediate appellate court decisions, decisions from other jurisdictions,

8    statutes, treatises, and restatements as guidance." *Camenzind v. Cal. Expo. & State Fair*, 84 F. 4th

9    1102, 1114 (9th Cir. 2023).

10       **The Master Complaint**. The Master Complaint does not include an exhaustive

11   recounting of the facts relevant to every individual plaintiff, because it is an "administrative

12   device," MC at p. 1, "not meant to be a pleading with legal effect but only an administrative

13   summary of the claims brought by all the plaintiffs." *Gelboim v. Bank of Am. Corp.*, 574 U.S.

14   405, 413 n.3 (2015); *see also In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 140-41 (E.D.

15   La. 2002) ("[T]he master complaint should not be given the same effect as an ordinary complaint.

16   Instead, it should be considered as only an administrative device to aid efficiency and

17   economy."). While the Master Complaint "defines the scope of common discovery in this

18   multidistrict litigation" and "permit[s] the Court to address certain common legal issues," it does

19   not, by definition, "include every Plaintiff-specific fact." MC at p. 1.

20       The Court has already explained that the parties should focus on "common issues, or

21   issues that might [] help the parties and the Court [] manage the litigation at this relatively early

22   stage," and, for now, avoid spending time and resources on facts that "might be better sought

23   later, when individual cases are being worked up for trial." ECF 348 (Fact Sheet Implementation

24   Order) at 1-2; *see also, e.g.*, *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 2012 WL

25   3582708, at *3-4 (N.D. Ill. Aug. 16, 2012) ("[T]he Master Complaint cannot be expected to

26   include specific factual matter for claims that require plaintiff-specific proof. The proper court to

27   hear dispositive motions concerning the sufficiency of plaintiff-specific allegations is the

28   transferor court, … or this court when it considers exemplar cases.").

## ARGUMENT

### I.      Plaintiffs adequately plead several independent bases for vicarious liability.

Plaintiffs assert several independent bases for vicarious liability: nondelegable common-carrier duties (Claims E & F—California, Florida, Illinois after January 1, 2024, and Texas); respondeat superior (Claim G.1—California and Illinois); ostensible/apparent agency (Claim G.2—all states); and ratification (Claim G.3—all states).

#### A.      Florida and Texas TNC statutes do not preclude vicarious liability.

Uber argues that two laws—Fla. Stat. § 627.748(18) and Tex. Civ. Prac. & Rem. Code § 150E.002-003—preclude any vicarious liability for drivers' acts. ECF 386 at 6; ECF 387 at 6. They do not. Both statutes concern only motor vehicle accidents, not driver sexual assault.

##### 1.      Florida

The Florida statute provides that "a TNC is not liable … for harm to persons or property which results or arises out of the use, operation, or possession of a motor vehicle operating as a TNC vehicle" *only* if certain circumstances are met. Fla. Stat. § 627.748(18)(a). Those circumstances include where "[t]he TNC is not the owner or bailee of the motor vehicle that caused harm to persons or property." *Id.* § 627.748(18)(a)(3). Accordingly, the section applies only where it was the "*motor vehicle* that caused harm to persons or property," not, as here, where the *driver* otherwise caused harm to passengers. In Florida, "a statute will not displace the common law unless the legislature expressly indicates an intention to do so." *Kitchen v. K-Mart Corp.*, 697 So. 2d 1200, 1207 (Fla. 1997) (citation omitted). As applied to sexual assault liability, this statute does not.

This is confirmed by the statute's legislative history. *See* H.R. Staff Final Bill Analysis, H.B. 1039 (4/3/2020) (explaining that the provision aimed only at levelling the field as between TNCs and rental car companies by limiting TNC liability under the "dangerous instrumentality doctrine"); *see also Farrer v. U.S. Fidelity & Guar. Co.*, 809 So. 2d 85, 88, 95 (Fla. App. 2002) (interpreting similar "arising out of the ownership, maintenance, use, or entrustment of [a vehicle]" language in an insurance policy, and finding it did not encompass sexual assault because "[w]hile the assault occurred within the auto, it did not arise out of the inherent nature of

-18-

1    the vehicle" and "did not itself produce the injury").[8]

2         In any event, even if the statute did apply to sexual assault, it became effective only on

3    June 23, 2020, and so would not apply to assaults before that date. *See, e.g.*, *State Farm Mut.*

4    *Auto. Ins. Co. v. LaForet*, 658 So. 55, 61 (Fla. 1995) ("[A] substantive statute will not operate

5    retrospectively absent clear legislative intent to the contrary," and even then not "if the statute

6    impairs vested rights.").

7              **2.      Texas**

8         Similar to Florida's statute, the Texas law applies only where "the claim … arises out of

9    the ownership, use, operation, or possession of a network vehicle[.]" Tex. Civ. Prac. & Rem.

10   Code § 150E.002.[9] In ordinary language, a person would not describe a sexual assault as "arising

11   out of" the "use" or "operation" of a "vehicle." To interpret the statute otherwise would "run[]

12   counter to bedrock statutory construction principles" by affording the statute an "unreasonable

13   meaning" that is "inconsistent with a realistic assessment of what the legislature ought to have

14   meant." *Worsdale v. City of Killeen*, 578 S.W.3d 57, 73 (Tex. 2019) (internal quotation marks

15   omitted); *see also Rudisill v. McDonough*, 144 S. Ct. 945, 958 (2024) (rejecting construction of a

16   statute where language "would be an odd way" to phrase that meaning); *Jennings v. Rodriguez*,

17   583 U.S. 281, 293-94 (2018) ("[W]hen confronted with capacious phrases like 'arising from,' we

18   have eschewed 'uncritical literalism' leading to results that 'no sensible person could have

19   intended.'"). Under "Texas law, statutes purporting to abrogate common-law principles must do

20   so either expressly or by necessary implication." *Taylor v. Torbert*, 644 S.W.3d 637, 649 (Tex.

21   2022). As applied to sexual assault claims, the TNC statute does neither.

22         The legislative history confirms that the bill was concerned with persons "injured *by a*

23   *vehicle* providing a ride on a [TNC] platform" and associated "frivolous lawsuits against [TNCs]

24   for damages that seek to take advantage of the required liability insurance coverage of these

25   _____

26   [8] Uber cites *Huggins v. Santos*, No. 2021-CA-011450 (Fla. Cir. Ct. Aug. 31, 2023) (ECF 386-1, Ex. 5), but that case "ar[ose] out of an automobile collision," and so fell within the statute. *Id.* ¶ 1.

27   [9] This statute, enacted in 2023 and located in the Civil Practice and Remedies Code, is distinct from Texas's general TNC statute, enacted in 2017 and located in Chapter 2402 of the Occupations Code.

28

companies." Tex. Bill Analysis, 2023 Reg. Sess., H.B. 1745 (May 5, 2023) (emphasis added).[10]

The insurance referred to is equivalent only to "personal automobile insurance," Tex. Ins. Code

§ 1954.051(c)—that is, unrelated to torts like sexual assault.[11] Accordingly, the law "provide[d]

for a limitation on a [TNC's] vicarious liability for damages" to "ensure that *auto accident claims*

*are not clogging up the courts and can be paid out as quickly as possible*." Tex. Bill. Analysis

(emphasis added); *see also Lancer Ins. Co. v. Garcia Holiday Tours*, 345 S.W.3d 50, 56 (Tex.

2011) ("For liability to 'result from' the use of a motor vehicle" under an insurance policy, "there

must be a sufficient nexus between its *use as a motor vehicle* and the accident or injury.")

(emphasis added).

In any event, even if the statute did apply to sexual assault, its limitations on vicarious

liability do not apply where "the claimant [] prove[s] by clear and convincing evidence that the

company was grossly negligent with respect to the subject claim." Tex. Civ. Prac. & Rem. Code

§ 150E.003(a)(1). Uber does not move to dismiss Plaintiffs' negligence claims, which plausibly

allege gross negligence as well. *See, e.g.*, *Shafer-Isaac v. C.R. Bard Inc.*, 2021 WL 1196754, at

*2 (E.D. Tex. Feb. 26, 2021) ("In order to state a claim for gross negligence, a plaintiff must

allege facts indicating that the defendant knew about the peril, but its acts or omissions

demonstrate that he did not care.") (internal quotation marks omitted). In addition, as Uber

acknowledges, the statute became effective on September 1, 2023, and does not apply to claims

arising before that date. ECF 387 at 6.

> **B.**  **As a common carrier, Uber owes its passengers a nondelegable duty of safe carriage and protection, and it is thus liable for assaults that its drivers commit upon its passengers (California, Florida, Illinois after 1/1/24, Texas).**

Plaintiffs plead Uber's vicarious liability for drivers' sexual misconduct based on the

nondelegable duty of care and protection it owes its passenger as a common carrier (Claim E)

under the laws of California, Florida, Illinois (after January 1, 2024), and Texas. While Plaintiffs

also pleaded other, non-common-carrier, nondelegable duties (Claim F), for purposes of this

motion, they proceed only under a common carrier theory.

---

[10] https://capitol.texas.gov/tlodocs/88R/analysis/html/HB01745E.htm

[11] The TNC statute's insurance requirement (Tex. Occ. Code § 2402.101) incorporates by reference Tex. Ins. Code § 1954.

Uber, as a carrier who owes its passengers a nondelegable duty of care and protection, is vicariously liable for its drivers' sexual assaults of Uber's passengers. This is true whether those drivers are employees or independent contractors, and whether or not they are acting within the scope of their employment or agency. This is a function of the "widely adopted rule that common carriers owe [] an absolute duty to their passengers." *Morton v. De Oliveira*, 984 F.2d 289, 292 (9th Cir. 1993) (holding cruise line vicariously liable for its crew member's alleged rape of a passenger based on the "general rule" that "a carrier is liable to its passengers for assaults by employees prompted by purely personal motives.") (citation omitted).

This section proceeds as follows: (1) identifying relevant principles applicable to nondelegable duties generally; (2) discussing principles applicable to common carriers specifically; and (3) applying the principles and addressing Uber's arguments under the laws of each state.

### 1.    Nondelegable duties give rise to vicarious liability that does not depend on employment status or the scope of employment.

Under traditional common law principles, followed in California, Florida, Illinois, and Texas,[12] a nondelegable duty gives rise to vicarious liability distinct from respondeat superior liability. Such liability arises because, even though a defendant who owes a nondelegable duty may delegate a task to an independent contractor or employee, it may not delegate the attendant liability:

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

Restatement (Second) of Agency § 214. California acknowledges these principles: "Where the law imposes a definite, affirmative duty upon one by reason of his relationship with others… such persons cannot escape liability for a failure to perform the duty thus imposed by entrusting it to an independent contractor." *Snyder v. S. Cal. Edison Co.*, 44 Cal. 2d 793, 800 (1955). Florida is in accord:

---

[12] The Master Complaint does not assert common carrier duties in the State of New York, which is therefore excluded from this discussion. New York is one of a small handful of states that do not follow the majority common law principles described here.

> [T]he law has always permitted a person to hire an employee or an independent contractor to perform a non-delegable duty owed by that person to third parties …; the law only precludes such person from escaping, by that devise, vicarious responsibility for the proper performance of that nondelegable duty.

*U.S. Sec. Servs. Corp. v. Ramada Inn, Inc.*, 665 So. 2d 268, 270-71 (Fla. App. 1995) (citation and emphasis omitted). Illinois and Texas also follow the principles described in the Restatement (Second) of Agency § 214. *See Doe v. Sanchez*, 52 N.E.3d 618, 629-30 (Ill. App. 2016); *In re Gamble*, 676 S.W.3d 760, 785-86 (Tex. App. 2023). A few general principles apply across the board.

**Not limited to scope of agency or employment**. This liability is not confined to acts within the scope of agency or employment. *See* Restatement (Second) of Agency § 219 ("A master is not subject to liability for the torts of his servants acting outside the scope of their employment, *unless* … the conduct violated a non-delegable duty of the master.") (emphasis added); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758 (1998) (recognizing that, under the common law principles expressed in section 219, "agency principles impose liability on employers even where employees commit torts outside the scope of employment").

**Intentional torts, not just negligence**. Accordingly, a defendant who owes a nondelegable duty is liable for intentional, not only negligent, breaches of that duty. In other words, the relevant question in assessing whether an act constitutes a breach of a duty is the scope of the duty, not some artificial distinction based on egregiousness of the act. *See Morton*, 984 F.2d at 292 (rape); *Sanchez v. Mbank of El Paso*, 792 S.W.2d 530, 531-32 (Tex. App. 1990), *aff'd*, 836 S.W.2d 151 (Tex. 1992) (when a creditor bank hired a recovery service, as an independent contractor to repossess an auto, and where the recovery service "willfully breached the peace," a criminal misdemeanor, the defendant bank was vicariously liable for these criminal actions since, by statute, it owed a nondelegable duty not to breach the peace in the course of repossessing its collateral). For example, Florida law acknowledges that common carriers "owe a non-delegable duty to protect their passengers from crew member assaults and thereby safely transport their [] passengers" which presents an "exception" to "the general rule [] that the assault and rape of a plaintiff by the defendant's employee is considered to be outside the scope of

1    employment and, therefore, insufficient to impose vicarious liability on the employer." *Doe v.*

2    *Celebrity Cruises, Inc.*, 394 F.3d 891, 913 (11th Cir. 2004); *accord Doe v. Celebrity Cruises*, 145

3    F. Supp. 2d 1337, 1345 (S.D. Fla. 2001); *Doe v. Sanchez*, 52 N.E.3d at 630 (Illinois law).

4         **Not limited to acts committed by employees**. Liability based on nondelegable duties is

5    not confined to the acts of employees but also includes the acts of independent contractors and

6    agents. The Restatement of Torts makes this clear, providing that an employer is "not liable" for

7    the "act[s] or omission[s]" of independent contractor "*[e]xcept* as stated in §§ 410-419"—the

8    sections of the Restatement setting out nondelegable duties. Restatement (Second) of Torts § 409

9    (emphasis added); *see also id.* Div. Two, Ch. 15, Topic 2, Intro. Note ("Such a 'non-delegable

10   duty' requires the person upon whom it is imposed to answer for it that care is exercised *by*

11   *anyone, even though he be an independent contractor*, to whom the performance of the duty is

12   entrusted.") (emphasis added). So, as the California Supreme Court has explained:

13        > Unlike strict liability, a nondelegable duty operates, not as a substitute for liability
             based on negligence, but to assure that when a negligently caused harm occurs, the
14           injured party will be compensated by the person whose activity caused the harm
             and who may therefore properly be held liable for the negligence of his agent,
15           *whether his agent was an employee or an independent contractor.*

16   *Maloney v. Rath*, 69 Cal. 2d 442, 446 (1968) (emphasis added).[13] Florida, Texas, and Illinois are

17   the same. *See, e.g.*, *U.S. Sec. Servs.*, 665 So. 2d at 270-71; *McAllen Hosps., L.P. v. Gonzalez*, 566

18   S.W.3d 451, 457 n.3 (Tex. App. 2018); *Apostal v. Oliveri Constr. Co.*, 678 N.E.2d 756, 760-61

19   (Ill. App. 1997).

20        **Vicarious liability**. These nondelegable duties create liability that is truly vicarious, in

21   that it is not satisfied by the principal's use of due care.

22        > [O]ne may have a duty to see that due care is used in the protection of another, a
             duty which is not satisfied by using care to delegate its performance to another but
23           is satisfied if, and only if, the person to whom the work of protection is delegated

24   _____

[13] *Abrogated on other grounds by Privette v. Superior Court*, 5 Cal. 4th 689 (1993). An
25   intermediate appellate case in California suggests (contrary to Restatement) that, when the acts of
     employees rather than independent contractors are at issue, nondelegable duties do not displace
26   the respondeat superior analysis. *See John Y. v. Chaparral Treatment Center, Inc.*, 101 Cal. App.
     4th 565, 579-580 (2002). However, the fact that California follows the Restatement, and the
27   expression of the California Supreme Court in *Maloney,* indicate that California's highest court
     has not so limited the nondelegable duty doctrine, nor would it do so. The court's reasoning in
28   *John Y.* is also inconsistent with the principle discussed above that nondelegable duties, by their
     very nature, may not be delegated *to anyone.*

is careful in giving the protection. In this third class, the duty of care is non-delegable.

Restatement (Second) of Agency § 214, cmt. a; *accord Srithong v. Total Inv. Co.*, 23 Cal. App. 4th 721, 726-27 (1994); *Doe v. Sanchez*, 52 N.E.3d at 630; *Gamble*, 676 S.W.3d at 785-86. Florida courts apply nondelegable duties in the same way, but, as a matter of semantics, say that the nondelegable duty rule creates "direct" liability, since it is premised on a breach of the *principal's* duty, rather than a duty of the agent.[14]

### 2.   Common carriers owe nondelegable duties to protect passengers against sexual assault.

A common carrier's nondelegable duty of care is one of the most widely recognized of the nondelegable duties. *See* Restatement (Second) of Torts § 314A; Cal. Civ. Code § 2100; *Nazareth v. Herndon Ambulance Service, Inc.*, 467 So. 2d 1076, 1078 (Fla. App. 1985); *Green v. Carlinville Comm'ty Unit Sch. Distr. No. 1*, 887 N.E.2d 451, 456 (Ill. App. 2008); *Bennevendo v. Houston Transit Co.*, 238 S.W.2d 271, 273 (Tex. App. 1951), *writ refused, n.r.e.*[15] The Ninth Circuit has observed that this nondelegable duty does not trace to "obsolete concepts" but is a "widely adopted rule" which has a "meaningful basis" grounded in the "duty of protective care that [the principal] may not delegate." *Morton*, 984 F.2d at 291-92 (citing state law cases).

Relative to vicarious liability arising from other nondelegable duties, the scope of a common carrier's liability for both negligent and intentional torts is exceptionally broad. This is because the scope of liability hinges on the nature and scope of the nondelegable duty (rather than on, e.g., the scope of employment, scope of authority, the carrier's own wrongdoing, or a driver's

---

[14] Florida courts have declined to use the term "vicarious liability" because "a cause of action for the breach of a nondelegable duty and a cause of action for vicarious liability have different legal rationales. …. Under vicarious liability, one person, although entirely innocent of any wrongdoing and *without regard to the duty*, is nonetheless held responsible for harm caused by the wrongful act of another." *Armiger v. Associated Outdoor Clubs, Inc.*, 48 So. 3d 864, 874-75 (Fla. App. 2010) (emphasis in original). This distinction is a matter of semantics, and one more confusing than helpful. As in other states, in Florida, a defendant who owes a nondelegable duty may be "liable for the acts of an independent contractor." *See Payas v. Adventist Health Sys./Sunbelt, Inc.*, 238 So. 3d 887, 892 (Fla. App. 2018). In that sense, the liability is vicarious or indirect. However, the duty belongs to the principal rather than the independent contractor, *Armiger*, 48 So. 3d at 874, and the liability is direct as it is premised on a breach of the principal's duty, rather than an independent duty of its agent.

[15] In the Texas appellate system, a writ refused "n.r.e." (no reversible error) is an approval on the merits, with the Texas Supreme Court "adopt[ing] the opinion in each case as its own." *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

degree of culpability). *See* Restatement (Second) of Agency § 214, cmt. a ([T]he extent of this liability depends upon the duty assumed."). The nature and scope of a common carrier's nondelegable duty owed to its passengers is "to take reasonable action … *to protect them against unreasonable risk of physical harm.*" Restatement (Second) of Torts § 314A (emphasis added). When a common carrier delegates this work to drivers who are independent contractors or employees, it is liable for their negligent failure to protect passengers, and all the more liable for their attacks on the very passengers they are supposed to protect. As the A.L.R. explains:

> [U]nder its broad duty of an implied contractual nature of carrying its passengers safely to their destinations, a common carrier will be held liable for willful, wanton, malicious, or intentional assaults by its employees, and therefore liability is not dependent upon the doctrine of respondeat superior, but is entailed whether the assault was in the discharge of the employee's duties or prompted by the latter's personal reasons and entirely disconnected with the performance of such duties.

53 A.L.R.2d 720.

Because a common carrier owes its passengers a nondelegable duty of protection, it is vicariously liable for sexual assaults that its delegees perpetrate on its passengers. *See generally* 66 A.L.R. 7th Art. 2 ("The following authority held or recognized that a common carrier is vicariously liable for a sexual assault upon a passenger by an employee of the common carrier … and the fact that the sexual assault was beyond the scope of employment was no bar to liability."); *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 787 (N.D. Cal. 2016) (under California law, Uber liable for driver's sexual assault); *Doe v. Celebrity Cruises*, 394 F.3d 891 (under Florida law, common carrier liable for crew member's sexual assault); *Doe v. Sanchez*, 52 N.E.3d at 628 (under Illinois law, private transportation company liable for bus driver's sexual assault).

### 3.  Uber is a common carrier that owes a nondelegable duty to safely transport its passengers and protect them from sexual assault.

The Master Complaint alleges: "Uber was a common carrier because it was, and held itself out to the public as, a business that undertook (whether directly or indirectly) to transport passengers by motor vehicle, and did in fact provide transportation by motor vehicle, offering these services to the general public indiscriminately and in exchange for compensation." MC ¶ 388; *see also id.* ¶¶ 390-91. Plaintiffs further allege in detail that Uber created a system of transportation, that it accepted the plaintiffs as passengers, that it undertook to transport them, and

1    that it was therefore under a duty to transport them with due care for their safety and protection.

2    *See id.* ¶¶ 1-35, 51-71, 187-239.

3           Uber delegated to its drivers the tasks of actually taking custody of riders, transporting

4    them, and protecting them—the very things which Uber owed its passengers a duty to perform

5    with due care. Uber is of course entitled to delegate these tasks, but it remains liable when its

6    delegees (the drivers) breach Uber's duty. When a driver to whom Uber has delegated the task of

7    safely transporting and *protecting* a rider, instead does the polar opposite and *assaults* the rider,

8    this is a clear breach of Uber's duty.

9           For purposes of this motion, Uber does not dispute that, as a factual matter, its status as a

10   common carrier is adequately pleaded under the laws of these four states. In **Florida** and **Texas**,

11   it argues that TNC statutes nevertheless eliminate its common carrier liability. ECF 386 at 8, 10;

12   ECF 387 at 8, 10. Only in **California** does Uber substantively argue that, even if it is a common

13   carrier, its liability does not extend to the circumstances alleged here. ECF 384 at 6-8. In **Florida**,

14   **Illinois**, and **Texas**, it makes that argument only in passing. Each of these arguments should be

15   rejected.

16          In **Illinois**, Uber argues that Plaintiffs pleaded the wrong date—that their claims are valid

17   after January 1, 2024, not August 11, 2023. ECF 388 at 8, 10. Plaintiffs agree: the correct date is

18   January 1, 2024, and the Master Complaint can be amended to so reflect.

19          Finally, in each state, Uber makes arguments (under the heading "Plaintiffs Fail to State a

20   Claim for 'Non-Delegable Duties'") targeting *other* theories of nondelegable duties (i.e., those

21   pleaded in Claim F, not the common carrier theory pleaded in Claim E). *See, e.g.*, ECF 384 at 10-

22   12. As noted above, Plaintiffs proceed here only on common carrier theories, so those arguments

23   are inapposite.

24                                   a.    <u>California</u>

25          Uber does not dispute for the purposes of this motion that it is a common carrier under

26   California law. ECF 384 at n. 3 ("Although Uber does not ask that it be resolved on this Motion,

27   Uber is not a common carrier."). Because Uber is a common carrier, it owes a nondelegable duty

28   to safely transport its passengers and to protect them from assault. *See* Cal. Civil Code § 2100;

1   *Doe v. Uber Techs.*, 184 F. Supp. 3d at 787. Uber's liability in this regard is "not dependent on

2   the question as to whether the employee was acting within the scope of his authority or in the line

3   of his duty." *Berger v. S. Pac. Co.*, 144 Cal. App. 2d 1, 6-7 (1956).

4         It is well-established in California that a common carrier such as Uber is subject to

5   nondelegable duties that create vicarious liability. *See Eli v. Murphy*, 39 Cal. 2d 598, 599-600

6   (1952) (affirming trial court judgment holding interstate carrier vicariously liable for injuries

7   caused by independent contractor). The California Supreme Court has explained that

8   nondelegable duties exist in large part to "protect the public" from common carriers avoiding

9   liability "by engaging independent contractors." *See id.* ("[B]oth to protect the public from

10  financially irresponsible contractors, and to strengthen safety regulations, it is necessary to treat

11  the carrier's duties as nondelegable."). Respectfully, Judge Schulman's contrary holding, where

12  he stated "Uber's potential status as a common carrier does not alter the vicarious liability

13  analysis," *In re Uber Rideshare Cases*, JCCP No. 5188, at 10 (June 22, 2023) (*JCCP Order*),

14  cannot be squared with this California Supreme Court authority.

15        This nondelegable duty extends to protecting passengers from sexual assault. Consistent

16  with the majority approach among the states, California courts long ago recognized that a

17  common carrier has a "*broad duty as a common carrier to protect its passengers from assault*."

18  *Berger*, 144 Cal. App. 2d at 6-7 (emphasis added). In *Berger*, the plaintiff, a passenger in a

19  Southern Pacific train's sleeping car, was sexually assaulted by a porter working for the defendant

20  Southern Pacific while she slept under the influence of a sedative medication. *Id.* at 5. She sought

21  to hold Southern Pacific liable for the porter's assault. *Id.* The court noted that it was not aware of

22  any prior California appellate decisions involving a sexual assault by an employee of a common

23  carrier or sleeping car company. *Id.* at 7-8. Relying on a survey of case law in other states, it

24  joined the majority in holding that an assault by a carrier's "agents or employees" is a breach of

25  the common carrier's nondelegable duty of protection:

26          A contract of transportation implies protection to the passenger against acts of
            personal violence by the agents or employees of the carrier. Accordingly, a carrier

27          is liable for acts of assault and battery upon the part of its employees resulting in
            injury to those it has agreed to transport upon its facilities.

28

*Id.* at 6. The carrier's liability for such assaults does not pivot on the scope of employment, but on the scope of the underlying nondelegable duty. *See* Restatement (Second) of Agency § 214 cmt. a ("the extent of this liability depends upon the duty assumed"). Thus, as *Berger* explained, such liability is not dependent on whether the conduct occurred in the course and scope of employment, but extends to conduct entirely disconnected with the performance of the agent's duties:

> This liability extends not only to cases where the assault was in the line of the employee's duty, but also to those instances where the act was merely that of an individual and entirely disconnected with the performance of the agent's duties, as where the conductor of a train kisses a female passenger against her will. The liability of a common carrier for an assault by one if its employees on a passenger is not dependent on the question as to whether the employee was acting within the scope of his authority or in the line of his duty, but is based upon its broad duty as a common carrier to protect its passengers from assault.

144 Cal. App. 2d at 6-7.[16]

Berger remains good law although, from the time *Berger* was published in 1956 until the recent uptick in common carrier sexual assault cases related to Uber and Lyft, there has been a dearth of cases applying California law to sexual assaults committed by common carriers' delegees (perhaps because such nondelegable duties had the intended deterrent effect). Uber uses the mere absence of cases to argue that *Berger* either is not good law or does not mean what it says. However, the absence of contrary authority since *Berger* confirms that it accurately states the law.

Moreover, recently, in *Doe v. Uber Techs.*, Judge Illston applied *Berger's* holding to sexual assaults by Uber drivers. 184 F. Supp. 3d 774. The court denied Uber's motion to dismiss two passengers' claims that Uber was vicariously liable for its drivers' sexual assaults committed against them. *Id.* The plaintiffs argued that "[a]s a common carrier, [Uber] is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment." *Id.* at 786. The court agreed, holding that, under

---

[16] Although Uber does not, in this motion, contest its common carrier status in California, it bears noting that the duty is not even dependent on strict "common carrier" definitions. Even though, in *Berger*, defendant Southern Pacific railroad was "not technically a common carrier," it was nonetheless bound to "observe the same degree of care toward its passengers as a common carrier." *Id.* at 6.

California law as expressed in *Berger*, the course and scope of employment analysis did not apply "when the assailant is the common carrier's own employee." *Id.* at 787. Uber argued that *Berger* was at odds with other California cases that required evidence of notice or negligence on the part of a carrier. *Id.* at 786-787. But the court distinguished the latter cases as "addressing negligence or passenger-on-passenger assault" *Id.* In other words, these were not cases where vicarious liability was at issue.

Uber's counter-arguments under California law should be rejected.

**Claiming common carrier liability equates to strict liability**. *First*, Uber argues that "common carrier claims are negligence based, not some form of strict liability for the intentional torts committed by employees *outside the scope of their employment*." ECF 384 at 6 (emphasis in original). Uber misunderstands the duty. Uber may delegate to a driver the task of safely carrying its passenger, but it may not delegate to the driver the attendant nondelegable duty to "use the utmost care and diligence for [passengers'] safe carriage," nor to "exercise to that end a reasonable degree of skill." Cal. Civil Code § 2100. Uber is liable for *any* breach of this duty, *whether that breach is committed by Uber itself or by its delegee.*

This is not strict liability. It is as if Uber itself is sitting in the driver's seat, bound to safely transport its passengers and to protect them from sexual assault. If an Uber driver acts with due care but accidentally injures a passenger, there is no breach of duty and no liability. Similarly, if the driver acts with due care in safely transporting and protecting the passenger, but, due to an unforeseeable third-party attack (by another rider for example), the passenger is nonetheless injured, neither the driver nor Uber will be liable. If, on the other hand, the driver negligently fails to exercise due care in protecting a passenger from a third-party sexual assault, then Uber will be liable for this breach of its duty of care. And finally, if the driver goes to the opposite extreme and instead of fulfilling Uber's duty to *protect* the passenger, directly breaches it himself by *assaulting* the passenger, this is a clear and direct breach of Uber's duty of protection. This is the distinction Judge Illston made when she said that "a different analysis is required when the assailant is the common carrier's own employee," as opposed to a third-party passenger. *Doe v.*

1     *Uber Techs.*, 184 F. Supp. 3d. at 787.[17]

2         **Dismissing *Berger***. *Second*, Uber contends that *Berger* "makes no mention of vicarious

3     liability" and should not be read as a decision about vicarious liability. ECF 384 at 7-8. Incorrect.

4     *Berger* is precisely a case about vicarious liability. The court was blunt: "There is no evidence of

5     negligence whatsoever." *Berger*, 144 Cal. App. 2d at 5. After finding that the trial court erred in

6     submitting the question of negligence to the jury, the appellate court discussed vicarious liability

7     at length and concluded: "it was proper for the trial court in the instant case to withdraw the issue

8     of scope of employment from the jury and to instruct the jury that [the porter's] conduct '*shall be*

9     *deemed by you to have been the conduct of the corporation.*'" *Id.* at 9 (emphasis added). That

10     sentence is, of course, describing vicarious liability. Uber's interpretation is at odds with *Berger*'s

11     plain language.

12         Neither of the cases cited by Uber compels a different conclusion. Contrary to Uber's

13     claims, *see* ECF 384 at 8 n. 5, *Victoria v. Superior Court*, 40 Cal.3d 734 (1985) and *Lopez v.*

14     *Southern Cal. Rapid Transit Dist.*, 40 Cal. 3d 780 (1985), do not "make clear that *Berger* stands

15     for the proposition that common carrier liability is a form of direct liability for a common

16     carrier's breach of its duty of care." Instead, *Victoria v. Superior Court* merely acknowledges in

17     passing "the common law duty of an employer to exercise due care in the employment and

18     supervision of an employee who inflicted intentional harm on her," and references *Berger* with

19     the signal "*see*." 40 Cal. 3d at 745. It does not discuss *Berger* at all, even parenthetically. *Id.* As

20     that cursory citation implies, *Berger did* address a carrier's direct liability for its own actions. *See*

21     *Berger*, 144 Cal. App. 2d at 5 (discussing the absence of evidence that the sleeping car company

22     directly breached its duty of care). But *Berger also* addressed vicarious liability. *Id.* at 6-9. That

23     the former is true does not negate the latter. Uber's other cited case, *Lopez*, does not even mention

24     *Berger* nor a carrier's liability for the conduct of its delegees, and its discussion is confined

25

---

26 [17] As explained above, it is irrelevant whether the driver is an employee or an independent contractor. *See, e.g.*, *Serna v. Pettey Leach Trucking, Inc.*, 110 Cal. App. 4th 1475, 1486 (2003).

27 The court in *Doe* used the term "employee," but it was not distinguishing between assaults by employees versus independent contractors, but between assaults by the common carrier's delegees (there employees) versus assaults by passengers or other third parties. 184 F. Supp. 3d.

28 at 786-87.

1   instead to a carrier's duty to protect against assaults by third parties. 40 Cal. 3d at 791 (finding

2   that carrier, acting through its driver, had no duty to prevent an unforeseeable assault by a *third-*

3   *party passenger* upon the plaintiff). Neither case undermines *Berger*'s holding regarding

4   vicarious liability.[18]

5          **Reliance on arguments not about common carriers**. Uber also makes various

6   arguments regarding other (not common-carrier) nondelegable duties. ECF 384 at 10-11. As

7   noted above, Plaintiffs here proceed only on common carrier theories and so these arguments are

8   inapposite. For example, Uber argues that it did not "delegate its *own* alleged duties to drivers,"

9   *id.* at 10, but the basis for the duty is Uber having acted as a common carrier. As such, safely

10  transporting people is Uber's duty, no matter who is sitting behind the wheel. Some special

11  additional act of delegation is not required.

12         Similarly, Uber argues a breach of a nondelegable duty must be "intimately connected

13  with the work authorized." *Id.* at 11. But while that inquiry may be relevant to duties imposed on

14  the basis of an activity being inherently dangerous, it is not with respect to common carrier duties.

15  With respect to inherently dangerous activities, the scope of the duty will necessarily vary by the

16  nature of the activity at issue. With respect to common carriers, passenger safety is *the* core

17  obligation of a common carrier, and scope-of-employment considerations do not apply. *See*

18  Restatement (Second) of Torts § 314A. When Uber's delegees attack rather than safely transport

19  riders, their conduct is diametrically opposed to Uber's duty, and is the quintessential breach of

20  that duty.

21         Finally, Uber argues that nondelegable duties do not apply to intentional torts, ECF 384 at

22  11, but for this proposition it cites only *Campbell v. Security Pac. Nat. Bank*, 62 Cal. App. 3d 379

23  (1976). That case did not involve a common carrier's duty, but instead nondelegable duties based

24  on inherently dangerous activities. *See id.* at 386-87 (basing decision on Restatement sections

25  concerning *other* nondelegable duties). With regards to common carriers, the many cases

26  discussed above control.

27  _____

28  [18] The *JCCP Order* states that "Plaintiffs acknowledged at the hearing … [that] they do not rely
    upon *Berger* to establish that Uber is vicariously liable for torts committed by its drivers …." By
    contrast, Plaintiffs here rely upon California law, including *Berger*, for exactly that.

1    Whether Uber is liable for a particular act does not depend on the egregiousness of the

2   contractor's conduct, but on the nature of Uber's duty in the first instance. Once the duty is

3   defined, it follows that Uber is liable for any breach of its duty by its delegees, whether those

4   delegees are employees or independent contractors, and whether they act negligently or

5   intentionally.

6            **b.    Florida**

7    Under Florida law, a common carrier owes a nondelegable duty by virtue of "an implied

8   contract between the victim-passenger and the carrier for safe passage, free from attack by the

9   carrier's employees." *Nazareth*, 467 So. 2d at 1079. The source of this duty "is in part the nature

10  of the carrier's undertaking whereby the passenger must entrust his or her bodily safety to the

11  care and control of the carrier's vehicle and employees." *Id.* Thus, under Florida law, Uber is a

12  common carrier that owes its passengers a nondelegable duty of protection.

13           **i.    The Florida TNC statute does not eliminate Uber's
                     common carrier duties.**

14

15   Uber argues that it is not a common carrier under Florida law because Florida's TNC

16  statute states that "[A] TNC or TNC driver is not a common carrier, contract carrier, or motor

17  carrier and does not provide taxicab service." Fla. Stat. § 627.748(2); ECF 386 at 8. But, as

18  Florida courts have explained, whether a company is a common carrier for purposes of the

19  regulatory schemes applied to such entities is a distinct question from whether a company owes a

20  common carrier's heightened duty for tort liability purposes. Statutes like the TNC statute affect

21  Uber's regulatory classification, but not the scope of tort liability toward passengers.

22   For example, in *Nazareth*, 467 So. 2d 1076, the court held an ambulance business was

23  "properly characterized as that of a 'common carrier' for purposes of establishing liability for

24  willful torts committed by an employee." *Id.* at 1080. The court explained that the exclusion of

25  ambulances from the statutory definition of "common carrier" was for regulatory purposes only

26  and did not affect common law tort liability:

27       This exclusion was apparently designed to exempt certain classes of motor carriers
         from regulation by the Public Service Commission because they were more
28       appropriately regulated by local governmental agencies. Taxis and local buses are
         also excluded by the same provision that excludes ambulances. Their exclusion

from Chapter 323 *does not* mean such vehicles are not common carriers for tort liability purposes.

*Id.* at 1080 (emphasis in original);

The same is true with respect to Uber. *See Esurance Prop. Cas. & Ins. Co. v. Vergara*, 2021 WL 2955962, at *6 (S.D. Fla. June 29, 2021), *report and recommendation adopted*, 2021 WL 2955947 (S.D. Fla. July 14, 2021) (explaining the TNC statute is "regulatory" and rejecting reliance on its provisions in determining whether Uber is a "public or livery conveyance" for purposes of resolving an insurance dispute); H.R. Staff Final Bill Analysis, H.B. 1039 (4/3/2020) (noting that the purpose of the TNC statute was to provide a "regulatory framework" for TNCs); *Checker Cab Ops., Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 913 (11th Cir. 2018) (noting the primary purpose of the TNC statute was to preempt local laws regulating TNCs' "market entry").

Principles of statutory interpretation further support the conclusion that the TNC statute does not limit common carrier tort liability. In Florida, "a statute will not displace the common law unless the legislature expressly indicates an intention to do so." *Kitchen*, 697 So. 2d at 1207 (citation omitted). Given its regulatory focus, Section 627.748 does not reflect an express intention to displace common law common carrier liability.

In addition, as discussed above in Section I.A.1 above, while the TNC statute when enacted in 2017 did not refer to tort liability at all, in 2020 the legislature added the provision extinguishing, in some circumstances, a TNC's "vicarious liability" for *motor vehicle accidents*. Fla. Stat. § 627.748(18)(a) (limiting liability for "harm … which results or arises out of the use … of a motor vehicle"). So when the Florida legislature wanted to limit Uber's tort liability, it knew how to do so expressly. *See Cason v. Fla. Dep't of Mgmt. Servs.*, 944 So. 2d 306, 315 (Fla. 2006) (rejecting statutory construction where "language in other states [] show[s] that the Legislature knows how to accomplish what it has omitted in the statute in question") (internal quotation marks omitted). In addition, if the legislature had meant to eliminate common carrier liability categorically, then there would have been no point to a separate sub-section restricting vicarious liability for car accidents. *See Edwards v. Thomas*, 229 So. 3d 277, 284 (Fla. 2017) ("[A] basic rule of statutory construction provides that the Legislature does not intend to enact useless

provisions, and court should avoid readings that would render part of a statute meaningless.")
(citation omitted).

### ii. As a common carrier in Florida, Uber is liable for its drivers' assaults.

Uber argues only in passing that the liability of a common carrier is limited to drivers'
torts within the scope of employment. ECF 386 at 8 (arguing only that Plaintiffs' position "is not"
the law).[19]

Uber fails to develop the argument for good reason: For more than 100 years, Florida
common law has provided that "[a] passenger is entitled to protection against violence, abuse, or
an assault or battery upon the person of the passenger by the agents of a carrier, though such acts
may be unauthorized by the carrier and prompted by vindictiveness on the part of the agent or
servant." *Wright v. Georgia S. and F. Ry. Co.*, 63 So. 909, 912 (1913). Consequently, "Florida
has long recognized vicarious liability on the part of a carrier-employer for torts of employees …
without regard to whether they were committed within the scope of employment." *Nazareth*, 467
So. 2d at 1078.

Florida courts have repeatedly applied this principle in cases involving battery and sexual
assaults of carriers' passengers. *See, e.g., id.* at 1077-79 (EMT's sexual assault of patient was
breach of ambulance company's nondelegable "duty to protect," and to provide "safe passage,
free from attack by the carrier's employees"); *Hinckley v. Palm Beach Cnty. Bd. of Cnty.
Comm'rs*, 801 So. 2d 193, 194 (Fla. App. 2001) (contracted driver's sexual assault of disabled
passenger was breach of county's nondelegable duty "to provide a safe environment" for
passengers); *Doe v. Celebrity Cruises,* 394 F.3d at 914-15 (crew member's sexual assault of
cruise ship passenger, even though they were on shore and he was technically "off duty," was
breach of "the non-delegable duty owed by a common carrier to protect its passengers from crew
member assaults during the cruise"); *Nadeau v. Costley*, 634 So. 2d 649, 652 (Fla. App. 1994)
(cruise ship, as common carrier, was vicariously liable for crew member's sexual harassment of

---

[19] Arguments made only in passing need not be analyzed. *See, e.g.*, *Dep't of Toxic Substances
Cntrl. v. Rossi*, 2022 WL 19355, at *2 (N.D. Cal. Jan. 3, 2022) ("[I]t is [] well established that
simply raising an issue in a brief—but failing to develop it with supporting argument—is
insufficient.").

1    cruise ship passenger); *Henderson v. Tarver*, 123 So. 2d 369, 371 (Fla. App. 1960) (taxi driver's

2    intentional shooting of passenger was a breach of taxi company's nondelegable duty to "safely

3    carry those whom they take into their coaches or cars").

4          Uber does make various arguments regarding *other* (not common-carrier) nondelegable

5    duties. ECF 386 at 10-11. As noted above, Plaintiffs here proceed only on common carrier

6    theories and so these arguments are inapposite. For example, Uber argues that it did not "delegate

7    its *own* alleged duties to drivers," *id.* at 11, but the basis for the existence of the duty is Uber's

8    having acted as a common carrier. As such, safely transporting people is Uber's duty, no matter

9    who is sitting behind the wheel. Some special additional act of delegation is not required.

10         Similarly, Uber argues that the nondelegable duty doctrine "is not meant to apply to

11   intentional torts beyond an independent contractor's authorized work." *Id.* at 11. But whatever the

12   applicability of this idea to an inherently dangerous activity, it plays no role in a common carrier

13   analysis. Passenger safety is *the* core obligation of a common carrier, and therefore scope-of-

14   employment considerations do not apply and, as the cited cases above make clear, a common

15   carrier's duties extend to intentional torts. Finally, Uber cites *Z.M.L. v. D.R. Horton, Inc.*, 2021

16   WL 3501099 (M.D. Fla. June 11, 2021), but that case involved duties based on inherently

17   dangerous activities (there, extending to dangers inherent in "home maintenance work"), not the

18   duties related to a common carrier's duty to protect passengers' physical well-being. *Id.* at *4. For

19   that reason, the court distinguished the facts before it from common carrier liability. It noted that,

20   "*unlike common carriers* … none of the Plaintiffs were confined to, nor forced to remain in, their

21   home as a condition of the repair work" *and* the "scope of repair work did not include caring for

22   the [plaintiffs'] bodily safety and thus the victims were not uniquely at the mercy of the tortfeasor

23   for their well-being." *Id.* at *3 (emphasis added).

### c.    <u>Illinois after January 1, 2024</u>

25         Uber's only argument in Illinois is that Plaintiffs named the wrong date: the relevant

26   statute became effective on January 1, 2024, not August 11, 2023. Plaintiffs agree. The Master

27   Complaint can be rectified on amendment.

28         Apart from that, Uber argues only in passing that the scope of its common carrier duties in

Illinois is limited to torts within the scope of employment. ECF 388 at 8 (arguing only that plaintiffs' position "is not" the law). As with Florida, Uber fails to develop the argument for good reason. In Illinois, it is well established that a common carrier owes an "affirmative duty to aid or protect against an unreasonable risk of physical harm from third parties, including one's agents or employees" such that "a common carrier may be held vicariously liable for its agent's intentional tort against a passenger even if the agent's conduct, such as sexual assault, falls outside the scope of the agency or employment relationship." *Doe v. Lyft, Inc.*, 176 N.E. 3d 863, 871 (Ill. App. 2020) (finding no common carrier liability only because of statute later repealed as of 1/1/24); *Green*, 887 N.E.2d at 456 (holding that school district may be liable for bus driver's sexual assault of minor because "[u]nder [] long-standing Supreme Court of Illinois precedent, a common carrier could be liable for the sexual assault of one of its passengers by one of its employees."); *McNerney v. Allamuradov*, 84 N.E.3d 437, 456 (Ill. App. 2017) (because of "the carrier's unique control over its passengers' safety," taxi company liable for driver's sexual assault of passenger); *Doe*, 52 N.E.3d at 628 (company may be "liable for the sexual assault of a student by its employee who is transporting the student, even though sexual assault, by its very nature, is outside the scope of employment" because bus company was acting as a common carrier); *Dennis v. Pace Suburban Bus Serv.*, 19 N.E.3d 85, 93 (Ill. App. 2014) (bus company liable for sexual assault of passenger by driver even though assault took place in driver's home and not on the bus).

### d.    Texas

#### i.    The Texas TNC statute does not eliminate Uber's common carrier duties.

Under Texas common law, a common carrier is "a person who engages in the transportation of persons or things from place to place for hire and holds himself or herself out as ready and willing to serve the public in the branch of transportation in which he or she is engaged." *Speed Boat Leasing, Inc. v. Elmer*, 124 S.W.3d 210, 212 (Tex. 2003) (citation omitted). In determining whether someone is a common carrier, Texas courts "look to their primary function." *Id.* at 213. It "must be determined whether the *business* of the entity is public

1    transportation or whether such transportation is 'only incidental' to its primary business. *Id.*

2    (emphasis in original). Uber meets the common law definition of a "common carrier." MC ¶¶

3    388-91.

4        Uber argues that the Texas TNC statute, by providing that TNCs "and drivers … are not

5    common carriers, contract carriers, or motor carriers," Tex. Occ. Code. § 2402.002, eliminates

6    Uber's common carrier tort liability. ECF 387 at 8. It does not. Texas courts explain that whether

7    an entity is a "common carrier for regulatory purposes is not necessarily determinative of the

8    company's common law status and resulting standard of care." *Durham Transp., Inc. v. Valero*,

9    897 S.W.2d 404, 409 (Tex. App. 1995). In *Durham*, although school buses were included in the

10   regulatory statute's definition of "common carrier," that was not determinative of whether the bus

11   company owed common law duties. *Id.* The court held that because the school bus did not

12   transport members of the general public and did not collect a fare, it was not a common carrier for

13   purposes of tort liability, the statutory definition notwithstanding. *Id.*

14       Similarly, in *McClure v. Greater San Antonio Transportation Co.*, 2009 WL 10670097

15   (W.D. Tex. Mar. 24, 2009), the court found that a taxicab company was a common carrier for tort

16   liability purposes despite city ordinances that the company argued "expressly envisioned and

17   authorized" its status as a non-common-carrier. *Id.* at *4, 9. The court explained that the

18   ordinances were "merely regulatory in nature and have no bearing on tort liability," and what

19   mattered instead was whether the company met the common law definition of "common carrier."

20   *Id.* at *5-6, 10.

21       If there were any doubt, controlling principles of statutory interpretation preclude the

22   statute from obliquely extinguishing common law liability. Under "Texas law, statutes purporting

23   to abrogate common-law principles must do so either expressly or by necessary implication."

24   *Taylor*, 644 S.W.3d at 649; *accord Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000)

25   ("A statute that deprives a person of a common-law right will not be extended beyond its plain

26   meaning or applied to cases not clearly within its purview. Abrogating common-law claims is

27   disfavored and requires a clear repugnance between the common law and statutory causes of

28   action.") (internal quotation marks and citations omitted).

This principle applies with particular force in the context of carrier regulation, where a statute provides that "[u]nless otherwise provided by this code or other law, the duties and liability of a carrier in this state and the remedies against the carrier are the same as prescribed by the common law." Tex. Transp. Code § 5.001(a). In *Durham*, the court relied on a materially similar predecessor statute, noting that "[t]he statute explicitly reserves the issues of the duties and liabilities of carriers for the common law except where otherwise provided," and observing that the school bus provision at issue "does not state the duty owed by a covered motor bus company to its passenger." *Durham Transp. Inc.,* 897 S.W.2d at 409. *Cf. Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 450-51 (Tex. 2012) (finding that a statutory scheme extinguished a common law cause of action only where the statute provided alternative remedies, "avenues for immediate relief that the Legislature painstakingly built into the law").

More generally, the legislative history of the TNC statute confirms it is exclusively regulatory in nature, and does not purport to regulate common law tort liability. The statute was intended to address the "patchwork of regulations across the state" which, prior to the statute's enactment, were "making it difficult for these companies to maintain uniform policies and procedures," and therefore the Texas legislature sought to "remedy this situation by implementing uniform requirements and operational standards for these companies statewide." Tex. Transp. Comm. Rep., 2017 Tex. H.B. 100 (Apr. 3, 2017); *see also* Tex. State Affairs Comm. Rep., 2017 Tex. H.B. 100 (Apr. 20, 2017) ("[N]o consistent and predictable statewide regulation of TNCs exists in Texas. This has resulted in an inefficient and confusing patchwork of rules across local jurisdictions.").

Indeed, at the time of enactment, the TNC statute included zero references to tort liability at all. Six years later, the legislature added the car-accident vicarious liability provision in Tex. Civ. Prac. & Rem. Code § 150E.0002 (discussed above in Section I.A.2). This addition only confirms that the reference to "common carrier" in the 2017 statute does not affect tort liability. It shows that when the Texas legislature meant to limit common law liability, it knew how to do so expressly. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 884-85 (Tex. 2000) (noting that another statutory section shows "the Legislature knows how to" accomplish a goal

expressly).

### ii.    As a common carrier in Texas, Uber is liable for its drivers' sexual assaults.

Uber argues only in passing that the scope of its common carrier duties in Texas is different than what Plaintiffs alleged. ECF 388 at 8 (arguing only that "it is not" the law). Yet again, Uber fails to develop the argument for good reason: under Texas law, a carrier, by virtue of accepting freight or passengers, owes a nondelegable duty of care, which extends to intentional acts. This liability flows from the carrier's duty to "protect its passengers, 'so far as is possible by the exercise of a high degree of care, from violence and insults of other passengers and strangers, and from dangers created by the wrongful acts of third persons.'" *Bennevendo*, 238 S.W.2d at 273. That this duty establishes the carrier's liability for intentional acts outside the scope of any employment has been established for more than a century: it applies even where "the act bears no connection or relation with or to the duties of such servant to the carrier," but is instead "one of private retribution …, actuated by personal malice towards the passenger." *Missouri, K. & T. Ry. Co. of Texas v. Brown*, 135 S.W. 1076, 1078 (Tex. Civ. App. 1911) (train company could be vicariously liable for porter's intentionally pushing passenger off a train to his death, notwithstanding that this was outside the scope of his duties and employment).[20]

Uber also echoes the arguments it makes regarding other states' laws about *other* (not common-carrier) nondelegable duties. ECF 387 at 10-11. As noted above, Plaintiffs here proceed only on common carrier theories and so these arguments are inapposite. For example, Uber argues that "Texas courts have recognized very few non-delegable duties with respect to non-employees." *Id.* That may be so, but common carrier *is* one of those recognized duties. Uber argues that it did not "delegate its *own* alleged duties to drivers," *id.* at 11, but the basis for the existence of the duty is Uber's having acted as a common carrier. As such, safely transporting people is Uber's duty, no matter who is sitting behind the wheel. A special additional act of

---

[20] *Dart v. Yellow Cab, Inc.*, 401 S.W.2d 874 (Tex. App. 1966) is not contrary authority. In *Dart*, the court held that, because a taxi driver's assault was not authorized by the employer, defendant Yellow Cab was not liable for it. However, the discussion was limited to respondeat superior liability, and it appears that no party raised, nor did the court consider, the duties of a common carrier nor any other nondelegable duties.

1    delegation is not required.

2         Uber argues that "the imposition of a non-delegable duty does not make a principal liable

3    for every negligent act of an independent contractor." ECF 387 at 11. But each case cited

4    involved nondelegable duties arising from inherently dangerous activities (which duties are

5    necessarily defined in relation to the particular danger at issue). By contrast, common carriers'

6    nondelegable duties arise from a duty of protection that broadly extends to all threats to

7    passengers' safety that arise in connection with the transportation service.

8         Finally, Uber cites *Miller v. Towne Services, Inc.*, 665 S.W.2d 143, 145 (Tex. App. 1983)

9    for the proposition that nondelegable duties of "motor carriers" do not extend to "harm resulting

10   from intentional torts." ECF 387 at 11-12. But *Miller* involved a *freight* carrier. The court

11   expressly distinguished "the non-delegable duty applied to the *carrier of passengers*, who [was]

12   held to a higher degree of care in protecting its passengers from injury by either third person or

13   the carrier's own employees," and therefore *was* responsible for employees' intentional torts,

14   from the duties of a "carrier of goods," which *Miller* held did not extend to intentional torts. 665

15   S.W.2d at 145 (emphasis added). Indeed, Texas law makes it clear that nondelegable duties may

16   extend to create vicarious liability for intentional torts. *See Sanchez*, 792 S.W.2d at 531-32.

17   **C.    Uber is vicariously liable under principles of respondeat superior because its
18        drivers were employees and their torts were within the scope of employment
         (California, Illinois).**

19        Plaintiffs plead respondeat superior under the laws of two of the five states: California and

20   Illinois. For the purposes of this motion, Uber does not contest that its drivers are employees in

21   California and Illinois, but does argue that sexual assault is per se outside the scope of any

22   employment. ECF 384 at 3-6; ECF 388 at 6-8.

23        Under the laws of both states, Uber's position that sexual assault *never* falls within scope

24   of employment must be rejected. Uber argues that sexual assaults fall outside respondeat superior

25   liability because "sexual assault generally is not within the authority granted to an employee, does

26   not further an employer's business, and is not performed for the accomplishment of the object for

27   which the employee was employed." ECF 386 at 7. But this statement is nothing more than an

28   observation of the obvious—crimes, like sexual assaults and false imprisonments are never

legitimate or authorized. That alone is not dispositive. *See Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) (in California, "an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment, even though the employer has not authorized the employee to commit crimes or intentional torts"); *Taboas v. Mlynczak*, 149 F.3d 576, 583 (7th Cir. 1998) (noting that "[a]lthough the suggestion has been made that malice, bad faith, or self-interested motivation necessarily places conduct outside the scope of employment [], this is not the prevailing approach in Illinois"). Uber's oversimplified statements, in effect, seek a ruling that *all* sexual assaults and kidnappings are per se outside the scope of employment.

There is no bright-line rule on what falls within the scope of employment, and the fact that conduct is criminal or unauthorized is not determinative. For example, the following facts (not atypical of Uber assault cases) situate assaults closer to drivers' job duties:

- The assault also constitutes kidnapping or false imprisonment, using the tools of the job (the vehicle) to transport the person to an unauthorized location;

- The assault occurs within the vehicle, using the physical requirements of the job (an enclosed environment without an avenue for escape); or

- The assault involves a particularly vulnerable person (e.g., an intoxicated person), exploiting a power disparity inherent to the employment.

### 1. California

Uber incorrectly asserts that in California "the test is whether the sexual assault was part of the assailant's job responsibility." ECF No. 384 at 4 (citing *Farmers Ins. Grp. v. County of Santa Clara,* 11 Cal. 4th 992 (1995)). This makes no sense. As discussed above, sexual assaults are never part of an employee's job responsibility. But that does not dictate a per se rule that eliminates liability for criminal or unauthorized conduct. Uber's own case citation admits as much. *See Farmers,* 11 Cal. 4th at 1019 n.18 (declining "to adopt a bright line rule that all sexual harassment falls outside the scope of employment as a matter of law under all circumstances").

Instead, California imposes respondeat superior liability where there is a "nexus … between the employment and the tort" for example when the tort is "generally foreseeable." *Xue Lu*, 621 F.3d at 948 (citing *Lisa M. v. Henry Mayo Newhall Memorial Hosp.,* 12 Cal. 4th 291, 302 (1995)). This rule "reflects the central justification for respondeat superior [liability]: that losses

1    fairly attributable to an enterprise—those which foreseeably result from the conduct of the

2    enterprise—should be allocated to the enterprise as a cost of doing business." *Id.*

3         Here, the Master Complaint adequately alleges sexual assaults and false imprisonments

4    were the foreseeable risks of Uber's enterprise. MC ¶¶ 112-334. Uber's business model

5    intentionally targeted vulnerable passengers, encouraging them to entrust their safety to an Uber

6    driver and get into a vehicle from which they had limited opportunities to escape; these rides were

7    often procured when passengers were intoxicated, during late hours of the evening, and alone,

8    with drivers controlling the passenger's ability to exist the vehicle. *Id.* ¶¶ 187-239, 423(l), 424.

9    Further, Uber's policies and procedures created the risks by failing to adequately screen,

10   supervise, train, report, and discipline bad drivers, and by failing to implement procedures that

11   would prevent and inhibit assaults. *See, e.g.*, *id.* ¶¶ 135-86, 240-334, 364-65, 473. Indeed, the

12   Master Complaint lays out a detailed history and narrative of how Uber created an environment

13   that jettisoned safety in favor of profits, and at almost every turn sought to shortcut employee

14   screenings and reviews. In fact, sexual assaults were so foreseeable that they became an

15   anticipated cost of Uber's business. *Id.* ¶ 279 n. 79 (citing Uber's 2020 Annual Report, in which

16   Uber's lists driver sexual assaults as "Risks Related to Our Business").

17        Plaintiffs' allegations align with cases holding that sexual assault was generally

18   foreseeable, and thus potentially within the scope of employment, including a case which dealt

19   with sexual assault by Uber drivers. In *Doe v. Uber Techs.*, 184 F. Supp. 3d 774, the district court

20   found similar facts to be sufficient and noted, "the Court cannot determine—as Uber effectively

21   argues—that as a matter of law sexual assault by Uber drivers is always outside the scope of

22   employment[.]" *Id.* at 785. The court reasoned, "[a]ssaults of this nature are exactly why

23   customers would expect taxi companies to perform background checks of their drivers" and "may

24   be incidental to the operation of the business." *Id.* at 785-86. Thus, "[a]t the very least, the

25   pleadings present a close enough call that the Court finds no reason to deviate from the ordinary

26   rule that 'the determination whether an employee has acted within the scope of employment

27

28

presents a question of fact[.]" *Id.* at 786;[21] *see also Xue Lu*, 621 F.3d at 949 (asylum officer's

sexual assault of asylum applicants within the scope of employment because the officer abused

his powers for his own benefit); *Fajardo v. United States*, 792 F. App'x 481, 482 (9th Cir. 2020)

(Special Agent's sexual assault of interviewee during passport fraud investigation within the

scope of employment); *Doe v. Virgin Am., Inc.*, 2018 WL 5291987, at *4 (N.D. Cal. Oct. 22,

2018) (business associate's sexual assault during work trip stated claim for respondeat superior

liability); *Beliveau v. Caras*, 873 F. Supp. 1393, 1400-01 (C.D. Cal. 1995) (resident manager's

sexual assault of tenant stated a claim); *Carr v. WM. C. Crowell Co.*, 28 Cal. 2d 652, 655, 657

(1946) (physical assault of a co-worker foreseeable and within the scope of employment where

defendant building contractor's enterprise "required an association of employees with third

parties, attended by the risk that someone might be injured. The risk of such associations and

conditions were risks of the employment."); *Samantha B. v. Aurora Vista Del Mar, LLC*, 77 Cal.

App. 5th 85, 108 (Cal. App. 2022) (hospital employee's sexual assaults of psychiatric patients

foreseeable and within the scope of employment where patients were vulnerable, sexual

exploitation of patients by employees was a foreseeable hazard arising from the circumstances of

the job, and that hazard "was exponentially increased by [defendant's] policies, including

allowing male workers 20 minutes alone with patients and providing inadequate training on

worker-patient boundaries").

To be sure, there are cases that cut both ways. But, as one court noted, "the line-drawing

in the subset of respondeat superior cases involving sexual assaults and batteries is highly fact-

specific" and thus attempts to make definitive factual parallels are often not helpful. *Beliveau v.

Caras*, 873 F. Supp. 1393, 1400 (C.D. Cal. 1995) (declining to make "artificial distinctions"

based on fact-specific cases at the pleading stage). In other words, while principles and lessons

can be derived from other decisions, one-to-one comparisons do not exist. Thus, Uber's sweeping

---

[21] Another case involving Uber and sexual assault, *Doe v. Uber Technologies, Inc.*, 2019 WL 6251189 (N.D. Cal. Nov. 22, 2019), disagreed with the court's reasoning in *Doe*, 184 F. Supp. 3d at 784. Plaintiffs respectfully submit that the 2019 *Doe* decision failed to consider how the drivers' employment (unlike, for example, the hospital work in *Lisa M.*) inherently involves an isolated custodial environment, i.e., assaults *can* "ari[se] from [an] assailant's job to drive Plaintiff to her chosen designation." 2019 WL 6251189, at *4.

1    argument that because sexual assaults were found to be outside the scope of employment in one

2    context, the same is true in all contexts, is unfounded.

3         In particular, the facts of this case are unlike those in *Farmers* or *Lisa M.* Here, Plaintiffs

4    do not allege the mere prevalence of sexual assault in the entire taxi industry is enough to hold

5    Uber accountable. *See Farmers*, 11 Cal. 4th at 1009. Nor do Plaintiffs attempt to impose liability

6    on Uber merely because Uber brought the "tortfeasor and victim together in time and place[.]"

7    *Lisa M.*, 12 Cal. 4th at 298. Rather, Uber is liable because Uber *itself* created a business model

8    that attracted assailants to become drivers, and then it went further in enabling drivers to carry out

9    their crimes. Plaintiffs allege that Uber created optimal conditions for assault to occur: isolation,

10   anonymity, and opportunity. MC ¶ 10. Uber rushes potential drivers through an inadequate

11   screening process with promises of connecting them with passengers who sacrifice their

12   autonomy and freedom of movement in exchange for a ride. These passengers get into drivers'

13   private vehicles, often late at night, alone and intoxicated. And potential predators know that Uber

14   does not require cameras or report complaints to law enforcement, and that most survivors do not

15   and will not report to police.

16        Moreover, Uber intentionally carved its business from circumstances that are commonly

17   recognized to be fraught with risk of physical harm and abuse. A foreseeable harm of getting into

18   a car with a stranger is sexual assault. This is the very basis for the adages of "don't hitchhike"

19   and "don't get into cars with strangers." Society recognizes the foreseeable risks in such

20   circumstances, especially to women. These are the very same risks that Uber accepted as part of

21   the cost of doing business. And these are the very same risks that Uber tried to mask, using its

22   brand recognition to convey legitimacy and safety so that riders would not feel that they were

23   getting into a car with a stranger, but into "an Uber." Thus, Uber did not just bring Plaintiffs and

24   drivers together in time and place; Uber knowingly brought them together under conditions ripe

25   for abuse. And like the employee in *Xue Lu*, drivers did in fact leverage and abuse the powers

26   inherent in the work conditions Uber created. In this context, sexual assaults and false

27   imprisonments are "not so unusual or startling that it would seem unfair to include the loss

28   resulting from it among other costs of [Uber's] business." *Farmers*, 11 Cal. 4th at 1003. Stated

another way, the "criminal acts were [] engendered by or broadly incidental" to an Uber driver's employment. *Lisa M.*, 12 Cal. 4th at 306.

In addition to general foreseeability, California courts consult three policy goals in analyzing respondeat superior liability: "preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably[.]" *Id.* at 304. Here, these considerations weigh in Plaintiffs' favor. Uber has unparalleled knowledge regarding the risks of its transportation system, including reams of data on riders, drivers, ride pairing, and safety incidents; along with comprehensive control over its system. *See* MC at ¶¶ 70, 122, 130-34. Holding Uber accountable will incentivize Uber to correct its deficient screening, prevention, reporting, and response procedures thereby preventing future injuries. Holding Uber accountable will also ensure adequate compensation to victims. And it will equitably allocate losses by requiring the one with the profits, knowledge, and control, to also accept the attendant risk. As laid out in the Master Complaint, Uber operates a business model that prioritizes profits over people and, in doing so, effectively deems sexual assaults to be the cost of doing business. It should therefore bear that cost. *See Hinman v. Westinghouse Elec. Co.*, 2 Cal. 3d 956, 960 (1970) ("[H]aving engaged in an enterprise which will, on the basis of past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that [the employer], rather than the innocent injured plaintiff, should bear them[.]").

In this respect, Uber's cited cases are distinguishable because those courts found policy goals lacking due to the unique circumstances of the enterprise at issue. For example, holding hospitals and schools liable could divert educational funds, increase insurance costs, and decrease quality of healthcare and education.[22] Likewise, in *Farmers*, the court found liability would be unlikely to deter sexual harassment or give assurance of compensation to victims because FEHA and Title VII already permitted direct liability against the employer. 11 Cal. 4th at 1015. None of

---

[22] *See, e.g. Lisa M.,* 12 Cal. 4th at 304-305 (liability may drastically increase insurance); *Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 144 (Ct. App. 1981) (refusing an outcome that would "divert limited educational funds to create a new compulsory insurance fund"); *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 451 (1989) (finding vicarious liability in the educational context may have unintended consequence of deterring districts from authorizing legitimate extracurricular and/or one-on-one contacts between teachers and students).

1   those circumstances are present here. There is no similar policy goal justifying immunizing Uber

2   from vicarious liability.

3       With respect to the *JCCP Order*, Plaintiffs respectfully submit that the JCCP erroneously

4   imposed a bright-line rule on respondeat superior liability that is not supported by California case

5   law (discussed above).[23] Moreover, the order fails to address the policy considerations pivotal to

6   the analysis. *See Lisa M.*, 12 Cal. 4th at 304; *Xue Lu v. Powell*, 621 F.3d at 949 (finding

7   California's policy considerations formed the basis of *respondeat superior* liability: "[t]o

8   compensate [] victims, spread the loss, and stimulate the government to greater vigilance in

9   controlling aberrant behavior, California law makes the United States bear the cost of [the asylum

10  officer's] conduct, unauthorized but incidental to the asylum system").[24] This Court should

11  follow the principles set out by the Ninth Circuit in *Xue Lu*, as well as the persuasive authority of

12  other district court decisions which recognize that the scope of employment analysis cannot be

13  rigidly applied across the board, but is instead fact dependent, with considerable weight to the

14  foreseeability of the conduct, as well as the policy considerations of California. *See Doe v. Uber

15  Techs.*, 184 F. Supp. 3d at 784-85 (assault by Uber driver); *Doe v. Virgin Am.*, 2018 WL

16  5291987, at *4 (assault by business associate during work trip); *Peralta*, 475 F. Supp. 3d at 1096

17  (correctional officer's assault of inmate); *Beliveau*, 873 F. Supp. at 1400 (resident manager's

18  sexual assault of tenant).

19          **2.    Illinois**

20      In Illinois, conduct is "not within the scope of employment if it is different in kind from

21  that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose

22  to serve the master." *Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989) (citation omitted). That

23  said, the fact that personal business may be commingled with that of the employer, that the

---

[23] The Court should reject Uber's attempt to extend the *JCCP Order* across all jurisdictions,
including Illinois. *See* ECF No. 388 at 23-24. The *JCCP Order* does not address the nuances of
Illinois law, which, as discussed here, permit Plaintiffs to proceed on their claims.

[24] While a California intermediate appellate decision has questioned the reasoning in *Xue Lu* (*see
Z.V. v. Cnty. of Riverside*, 238 Cal. App. 4th 889 (2015)), it nonetheless remains binding Ninth
Circuit authority. *See Peralta v. United States*, 475 F. Supp. 3d 1086, 1096 (C.D. Cal. 2020)
("The fact that *Xue Lu* has been criticized by one California Court of Appeal does not make its
scope of employment holding-which has never been overturned-any less binding on this Court");
*accord Fajardo v. United States,* 792 F. App'x 481, 482 (9th Cir. 2020).

1    employee was not immediately and single-mindedly pursuing the employer's business at the time

2    of misconduct, or that the conduct was not authorized, does not necessarily take the employee out

3    of the scope of employment. *Id.* at 361. The standard is "somewhat flexible, … indefinite[,] and

4    malleable." *Jones v. Patrick & Assocs. Detective Agency, Inc.*, 442 F.3d 533, 535 (7th Cir. 2006)

5    (citation omitted).

6          With respect to whether the conduct was of a kind that was authorized, this analysis looks

7    to whether the employee's actions initiating the misconduct, rather than the sexual assault itself,

8    were an authorized kind of conduct. For example, in *Doe v. Roe*, 2013 WL 2421771, at *4 (N.D.

9    Ill. Jun. 3, 2013), the court held that it was not implausible to conclude that a police officer was

10   acting within the scope of his employment when he stopped plaintiff, told her to get in his car,

11   drove her to a secluded area and sexually assaulted her. In doing so, the court declined to cabin its

12   analysis to the sexual assault, instead looking to the conduct that led up to the assault to determine

13   whether it was of the kind that was authorized. *Id*. In *Jones*, a private security guard gained access

14   to a police station holding cell and beat up two teenagers. 442 F.3d at 535-36. The Seventh

15   Circuit, applying Illinois law, held that the security guard's conduct was not undisputedly outside

16   the scope of employment. *Id.* at 536. The Seventh Circuit reasoned that the unique facts of each

17   case must be considered and found compelling and, among other things, that the security guard's

18   position enabled him to have access to the teenagers. *See id.* (noting that "it's doubtful that [the

19   security guard] would have been able to talk his way back there if he were anything other than a

20   security in uniform").

21         Applying these principles here, the sexual assaults were all initiated through an Uber ride,

22   conduct authorized and enabled by the drivers' employment. Of particular note, in many

23   instances, driver misconduct includes the act of driving Plaintiffs to different locations to carry

24   out the assaults—the transportation of passengers is clearly a task that is of the kind drivers are

25   authorized to do. Under these circumstances, it is plausible that the drivers' misconduct was

26   within the scope of employment. *See Jones*, 442 F.3d at 536 (holding that, even where the facts

27   "push the boundaries of what could be expected from a security guard," the matter should still be

28   one for the jury "not a judge on summary judgment"); *Doe v. Roe*, 2013 WL 2421771 at *4

(citing favorably to the Seventh Circuit's decision in *Jones*, and stating "[t]his court will heed that same advice and will not resolve the issue of respondeat superior liability at the motion to dismiss stage of this case"); *Davila v. Yellow Cab Co*., 776 N.E.2d 720, 728-29 (Ill. App. 2002) (same, where battery occurred while cab driver was transporting a passenger).[25]

### D.   Uber is vicariously liable because it ratified its drivers' torts by failing to adequately investigate or respond to reports of sexual misconduct.

Under widely accepted legal principles, a principal is liable for an agent's wrongful act if, even where the act was outside the scope of the agent's actual authority, the principal ratifies the wrongful act. Plaintiffs' ratification claims are based on how Uber reacted to sexual assaults that occurred in connection with its transportation system: it "failed to respond adequately to reports of sexual misconduct, failed to adequately investigate reports of sexual misconduct, failed to report sexual misconduct to law enforcement, and reinstated drivers after complaints of sexual misconduct." MC ¶ 438. These allegations support ratification-based claims under the laws of each of the five states.

#### 1.   California

Under California law, the test for ratification is broad and fact-bound: "A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent or to adopt the act may be fairly inferred, including conduct which is inconsistent with any reasonable intention on his part, other than he intended approving and adopting it." *Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1158 (2019) (internal quotation marks omitted).

The "theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery." *Thomas v. Regents of the Univ. of Cal.*, 97 Cal. App. 5th 587, 618-19 (2023) (citation omitted). In particular, "[a] principal's failure to discharge an agent after learning of his wrongful acts may be evidence of ratification." *Dickinson*, 37 Cal. App. 5th at 1158; *C.R. v. Tenet Healthcare Corp.*,

---

[25] Uber's citation to *Doe v. Lyft* does not warrant a different conclusion on the scope of employment analysis. In that case (unlike here), plaintiff did not dispute that the conduct fell outside the scope of employment. 176 N.E.3d at 870.

1   169 Cal. App. 4th 1094, 1110-11 (2009) ("The failure to discharge an employee who has

2   committed misconduct may be evidence of ratification."); *Samantha B. v. Aurora Vista Del Mar,*

3   *LLC*, 77 Cal. App. 5th 85, 109 (sufficient evidence where employer knew of employee's bad

4   "reputation," but "failed to undertake any investigation").[26]

5          Just so here: Plaintiffs allege that Uber "failed to investigate or respond to charges,"

6   *Thomas*, 97 Cal. App. 5th at 618-19, and "fail[ed] to discharge" drivers it knew had been accused

7   of sexual misconduct. Uber demands that Plaintiffs point to "a specific agent's specific alleged

8   misconduct." ECF 384 at 9. But Uber's cited jury instructions and cases do not preclude pleading

9   ratification based on Uber's knowledge of an epidemic of sexual assault in its transportation

10  system, and its pervasive pattern of gross indifference to that misconduct. *See* MC ¶¶ 240-316

11  (discussing how Uber tried not to learn about sexual misconduct, concealed and downplayed the

12  problem, and refuses to act upon specific reports of sexual assaults).

13         To the extent more Plaintiff-specific information is required, that is information

14  exclusively in Uber's possession. And the parties are already at work identifying it: the Defendant

15  Fact Sheet will show which drivers were the subject of prior misconduct reports, whether they

16  were permitted back on the platform after both those prior reports and following the sexual

17  assaults, and whether they were paid for the rides in question. *See* ECF 348 at Ex. 2.

18         The one (unpublished, noncitable) case Uber cites involving misconduct affecting

19  multiple victims—*McCall v. Safety Consultant Servs., Inc.*, 2010 WL 3399892 (Cal. App. Aug.

20  31, 2010)—came on appeal after trial on a full record where that the evidence showed the

21  defendant "knew nothing of [the agent's] misconduct toward [the plaintiff]." *Id.* at *6. Here, in

22  contrast, the Master Complaint's allegations plausibly allege that Uber's actual or inquiry

23  knowledge of what happened to Plaintiffs was far more than "nothing." To the extent Uber means

24  that to defeat the motion the Master Complaint must allege "what any specific drivers allegedly

25  did to the specific Plaintiffs," ECF 384 at 9, it misunderstands the point of the pleading. Even if,

26

27  ───────────────
    [26] Although cases speak of "employers" and "employees," an employment relationship is not a
    prerequisite to finding ratification. *See, e.g., Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 610
28  (C.D. Cal. 2021) (cable company ratified third-party collections agent's intentional torts);
    *Dickinson*, 37 Cal. App. 5th at 1158-59 (attorney ratified client's intentional tort).

1   ultimately, knowledge of and a reaction to a specific assault must be proven, the Master

2   Complaint makes it plausible many Plaintiffs could make exactly that showing. The Master

3   Complaint, by recounting in detail Uber's knowledge and reckless disregard of sexual assault,

4   plausibly alleges that Uber would have known about each of the alleged assaults and would have

5   applied its standard policies in response.

6          **2.    Florida**

7          Plaintiffs' allegations support ratification liability under Florida law. For example, in

8   *McKenzie v. United States Tennis Assoc. Inc.*, 2024 WL 665102 (M.D. Fla. Feb. 16, 2024), the

9   court found a triable question of fact as to whether a youth sports association ratified a coach's

10  sexual assault of a tennis player. *Id.* at *11. The court found sufficient evidence that "Defendants'

11  officers, directors, and managers knowingly condoned, ratified, or consented to the conduct" by

12  "resisting policies that restrict relationships between [coaches and players] for years and seeking

13  to silence victims of sexual misconduct." *Id.* In addition, the court noted that the defendants'

14  failure to respond adequately to the coach's previous misconduct and their overall approach to

15  sexual misconduct "would have led [the coach] (or any other [] coach) to believe he could make

16  sexual advances … without severe consequences." *Id.* Similarly, here, Plaintiffs allege that Uber

17  permitted a "culture of sexual misconduct" to exist and failed to adequately respond to reports of

18  such misconduct. If that was sufficient to go to trial in *McKenzie*, it suffices on the pleadings

19  here.

20         Uber makes several arguments otherwise; none should be accepted. *First*, Uber argues

21  that Florida ratification claims must be dismissed because "a criminal act committed outside the

22  scope of the servant's authority cannot be ratified." ECF 386 at 8 (quoting *Mallory v. O'Neil*, 69

23  So. 2d 313, 314-15 (Fla. 1954)). Uber over-reads *Mallory*. That case confirmed that ratification

24  liability may "be applied to a criminal act where it has been alleged and proven that the act

25  complained of was incident to *or* was done in the scope of the servant's or agent's employment."

26  *Mallory*, 69 So. 2d at 314 (emphasis added); *see also Paneson v. Zubillaga*, 753 So. 2d 127, 129

27  (Fla. App. 2000) (finding triable question of fact on ratification theory even if the plaintiff

28  ultimately could not prove that the "intentional torts were committed during the course or within

the scope of the business of the partnership").The *Mallory* court, rather than exempting criminal acts outside the scope of employment entirely from ratification liability, simply found that, on the (sparsely recounted) facts of that case, "[t]he appellant has not alleged sufficient facts to show that the shooting was incident to or was done in the scope of [the shooter's] employment." 69 So. 2d at 314. Here, even if sexual assault was not "in the scope of" drivers' employment, it plausibly was "incident to" that employment. *See* Black's Law Dictionary (11th ed. 2019) ("incident to employment" means "[a] risk that is related to or connected with a worker's job duties"). Sexual assault is a known risk "related to" Uber drivers' duties of exercising control over passengers' safety and liberty, and spending time in an isolated, unsupervised, setting, with vulnerable and often-intoxicated passengers.

*Second*, Uber argues that Plaintiffs must plead "that Uber approved what any specific driver allegedly did to any specific Plaintiff." ECF 386 at 9; *see also id.* ("[N]owhere does Plaintiff allege such knowledge relating to a specific alleged assault of any specific Plaintiff by any specific driver."). But the Master Complaint, by recounting in detail Uber's knowledge and reckless disregard of sexual assault, gives rise to the plausible inference that Uber knew about each of the alleged assaults, and applied its standard policies in response. Uber's citations to cases reciting the general rule that ratification requires "full knowledge of all material facts and circumstances," *id.*, only beg the (fact) question of what Uber knew.

*Third*, Uber cites cases stating that that in Florida (unlike in California) a mere "failure to discipline" an employee is not enough to support a ratification theory. *E.g.*, *Reillo v. Alternate Health USA, Inc.*, 2020 WL 6701625, at *6 (M.D. Fla. Nov. 13, 2020). But here, Plaintiffs allege that maximizing the number of active drivers was essential to Uber's business model even if that meant attracting, onboarding, and retaining predatory drivers. *See* MC ¶¶ 142-69 (explaining how, in order to create a large and ready supply, Uber opened its platform to dangerous drivers). This is categorically different than failing to discipline a one-off, rogue employee committing sexual harassment or assault against other employees. *Reillo*, 2020 WL 6701625, at *3; *Haq v. United Airlines, Inc.*, 1996 WL 426814, at *8-9 (S.D. Fla. Apr. 16, 1996).

*Fourth*, Uber argues that Florida law is "clear" in requiring that the "original act under

1  scrutiny [] be done on behalf of the employer" to support a ratification theory. ECF 386 at 9. But

2  Uber cites only dicta from a 1977 intermediate appellate case for this purportedly "clear"

3  proposition. *See Commodore Cruise Line, Ltd. v. Kormendi*, 344 So. 2d 896, 898 (Fla. App.

4  1977) (explaining that the plaintiff never "allege[d]," "prove[d]," or "attempted" the "theory of

5  ratification"); *see also, e.g.*, *Perkins v. Emps. Mut. Cas. Co.*, 507 F. Supp. 3d 1172, 1179 (D.

6  Ariz. 2020) (rejecting reliance on "a snippet of arguable dicta from ... intermediate court" in

7  making *Erie* prediction).

8       It is much more likely that Florida law does not include such a requirement. No Florida

9  Supreme Court case articulating the elements of ratification includes it. *See Frankenmuth Mut.*

10 *Ins. Co. v. Magaha*, 769 So. 2d 1012, 1021-22 (Fla. 2000) (surveying supreme court and

11 intermediate appellate authority regarding the elements of ratification). And other cases approve

12 ratification theories in fact patterns lacking any allegation that an act was done "on behalf of" the

13 ratifier. In *McKenzie*, there was no argument that the coach's sexual assault was committed "on

14 behalf of" the sports association. 2024 WL 665102, at *1-3. Similarly, in *Paneson*, 753 So.2d

15 127, the court found a triable question of fact as to whether a physician group had ratified sexual

16 assault committed by a doctor on his patients, where there was evidence that the defendants

17 learned about the incidents, but merely "discussed their concerns with the [offending doctor] and

18 advised him that he should have a female chaperone in the examination room." *Id.* at 128. The

19 court found this sufficient to permit a finding that the defendants "knew about and condoned this

20 conduct," even though physician sexual assault was not done on behalf of the partnership. *Id.* at

21 128-29.

22            **3.    Illinois**

23       Plaintiffs' allegations plausibly state ratification claims under Illinois law. For example, in

24 *Robinson v. Wieboldt Stores, Inc.*, 433 N.E.2d 1005 (Ill. App. 1982), a security guard physically

25 restrained and falsely imprisoned a shopper. *Id.* at 1007-1008. The court affirmed a verdict

26 finding that the store ratified the security guard's tort when it failed to respond to the plaintiff's

27 report of the assault, and then "show[ed] no attempt to alter its procedures in regard to situations

28 such as the one encountered by plaintiff." *Id.* at 1109. Just so here: Uber allegedly failed to

1    adequately respond to reports of sexual assault, and made minimal or no attempts to prevent

2    future such incidents.

3           Uber also argues that ratification requires "full knowledge of the act." ECF 388 at 8

4    (citation omitted). But the extent of Uber's knowledge of any given sexual assault is a fact

5    question, as Uber's cases confirm. *See Cove Mgmt. v. AFLAC, Inc.*, 986 N.E.2d 1206, 1215 (Ill.

6    App. 2013) (finding a lack of knowledge where the "unchallenged affidavits" required a finding

7    of "no knowledge."); *Swader v. Golden Rule Ins. Co.*, 561 N.E.2d 99, 103 (Ill. App. 1990)

8    (upholding verdict of ratification where evidence was sufficient to find the defendant was "aware

9    of the situation").[27]

10          Uber argues that ratification requires a showing that "Uber adopted or confirmed what [a]

11   specific driver allegedly did to [a] specific Plaintiff." ECF 388 at 8. But Uber cherry-picks one

12   part of Plaintiffs' ratification theory—that Uber was "aware of the scope and scale of sexual

13   assaults," MC ¶ 437—and ignores the central allegations about Uber's *conduct* accepting such

14   high rates of sexual assault as a cost of doing business.

15          To the extent a Plaintiff-specific showing is necessary, the Master Complaint, by

16   recounting in detail Uber's knowledge and reckless disregard of sexual assault, supports the

17   plausible inference that Uber knew about the alleged assaults, and applied its standard policies in

18   response. Assuming Illinois law requires such a specific showing, it is plausible that numerous

19   Plaintiffs can make it. Uber cites *Cnota v. Palatine Area Football Ass'n*, 592 N.E.2d 196, 203-04

20   (Ill. App. 1992), but the court there found—on a full record—that the defendant was a "total

21   stranger" to the event in question, a gathering it did not authorize and of which it was not even

22   aware. *Id.* Here, the Master Complaint adequately pleads Uber's awareness and acceptance of

23   sexual assaults in its vehicles.

24          Finally, Uber argues that a ratifier must "obtain[] a benefit" from an act done "on his

25   behalf." ECF 388 at 9. But while language like this does appear in Illinois ratification decisions, it

26   must be understood in the context of the typical transaction-based fact pattern that gives rise to

27

28   [27] Uber's last case—*Lydon v. Eagle Food Ctrs., Inc.*, 696 N.E.2d 1211 (Ill. App. 1998)—did not
     turn on knowledge at all, but instead on evidence "indicat[ing] that [the defendant] disavow[ed],"
     rather than ratified, the action in question. *Id.* at 1216.

1  those cases, where the principal's ratification means accepting the benefits of the contract the

2  non-agent entered into. *See, e.g.*, *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664,

3  677 (7th Cir. 2004) (discussing "the benefits of an allegedly unauthorized transaction") (citation

4  omitted). Indeed, the one case Uber cites for this proposition—*In re Marriage of Jackson*, 534

5  N.E.2d 687 (Ill. App. 1989)—did not involve any agency issues at all, but instead concerned

6  whether a former wife "ratified" her ex-husband's refusal to pay child support by not suing him

7  over it for several years. *Id.* at 688.

8         To the extent a "benefit" element exists for cases sounding in tort, not contract, the

9  requirement is not that Uber "benefited" from a particular instance of sexual assault. Such a rule

10 would have doomed the claim in *Robinson*, where there was no "benefit" to the store from the

11 security guard assaulting a random customer. 433 N.E.2d at 1009. Here, Plaintiffs plead that Uber

12 benefitted from opening its ranks to dangerous drivers and retaining them even after reports of

13 misconduct. That is sufficient.

14                    **4.    <u>New York</u>**

15        Plaintiffs' allegations are sufficient to show ratification in New York. *See O'Donnell v. K-*

16 *Mart Corp.*, 100 A.D.2d 488, 491 (N.Y. App. 1984) (upholding verdict that K-Mart ratified

17 assault where it "took no action against" either employee that committed the assault, and instead

18 communicated an "admonition" that "he should 'cover' himself").

19        Uber's ratification arguments in New York mirror those it offers in other states. Uber says

20 that ratification requires "full knowledge of all material facts," ECF 385 at 10. Uber's knowledge

21 of sexual assaults in general and Plaintiffs' assaults in particular are questions of fact. Uber cites

22 *Prisco v. New York*, 804 F. Supp. 518 (S.D.N.Y. 1992), but that case found a triable question on

23 ratification where there was evidence that authorities learned about "environmental violations" at

24 a landfill but "decided … to keep it open." *Id.* at 523-24. Just so here: Uber allegedly learned

25 about drivers committing sexual assaults but kept them on the platform anyway.[28]

26 ───────────────

[28] Uber cites *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485 (S.D.N.Y.
27 1998), but that case applied a New York rule unique to cases involving labor unions, under
   which, in order to prove a union ratified a member's misconduct, a plaintiff must show that "each
28 and every one of [the union's] members had full knowledge of the alleged "acts." *Id.* at 492. Even

Uber repeats its argument regarding "what any specific driver allegedly did to any specific Plaintiff." ECF 385 at 10. As in other states, the Master Complaint's allegations regarding Uber's business model, pattern of conduct, and standard practices makes such a showing, if required, plausible for each Plaintiff. Uber cites *Hale v. Teledoc Health, Inc.*, 2021 WL 1163925 (S.D.N.Y. Mar. 25, 2021), but there the plaintiff failed to allege that the defendant "knew or should have known" about the misconduct or to include any "factual allegations about [the defendant] and its manifestations or conduct." *Id.* at *6. Here, the Master Complaint is replete with allegations about Uber's knowledge of sexual assault and its actions regarding the same.

### 5. **Texas**

Uber's alleged actions here of recruiting drivers en masse, turning a blind eye to evidence of misconduct, and ensuring that drivers with previous accusations would be placed with passengers are sufficient to plead ratification under Texas law. In *Verhelst v. Michael D's Restaurant San Antonio, Inc.*, 154 F. Supp. 2d 959 (W.D. Tex. Aug. 2, 2001), for example, the court, while noting that "[n]either the mere retention of an employer or denial of liability establish ratification," found a triable question where an employer was "informed" of an employee's misconduct, "took steps to ensure" the plaintiff remained in peril, and stated "he did not want to hear anything else about it." *Id.* at 966.

Uber argues that ratification requires "knowledge of all material facts of a *specific* agent's *specific* misconduct." ECF 387 at 8. Again, the Master Complaint's allegations regarding Uber's business model, pattern of conduct, and standard practices makes such a showing, if required, plausible for each Plaintiff. Uber cites *Chrisman v. Electrastart of Houston, Inc.*, 2003 WL 22996909 (Tex. App. Dec. 23, 2003), but there "the record reflect[ed] … that [the defendant] was *not* told the details of [the misconduct.]" *Id.* at *5 (emphasis added). Here, what the record will show is yet to be seen, but the pleadings—which the Court should accept as true—establish a basis for Uber's knowledge. The other case Uber cites—*Prunty v. Ark. Freightways, Inc.*, 16 F.3d 649 (5th Cir. 1994)—found *sufficient* evidence of ratification where the defendant "was aware of

---

if this high bar could ever be cleared, the complaint in *A. Terzi* did not even try: "plaintiffs have not alleged that [the union's] members had any knowledge." *Id.*

the sexual harassment" but "took no action to remedy the situation." *Id.* at 654-55.[29] This pair of cases only underscores that the requisite knowledge is generally, as it is here, a fact question.

Uber suggests that Plaintiffs must show "an intention to ratify," ECF 387 at 9 (citation omitted), but Uber misunderstands the element: "A party's intent is indeed important in determining the question of ratification, but not because the party must possess intent to ratify. Rather, the party must perform a voluntary, intentional act which is inconsistent with an intention of avoiding" the prior act. *Old Rep. Ins. Co., Inc. v. Fuller*, 919 S.W.2d 726, 728 n.1 (Tex. App. 1996).

Finally, Uber argues that "to establish liability through ratification, the original act must have been done in the employer's interest or been intended to further some purposes of the employer's." ECF 387 at 9 (citation and alternations omitted). But the Fifth Circuit has explained that Texas law includes no such requirement. Rather, "in some cases, an employer's retention of an employee who has committed a tort may constitute ratification" where the employer "(1) knows about the employee's acts, (2) recognizes that the employee's acts will continue if he is retained, (3) does nothing to prevent the ongoing tortious acts, and (4) chooses to retain the employee." *Prunty*, 16 F.3d at 653-54. The rule and holding of *Prunty* are irreconcilable with any "employer's interest" requirement. Uber cites to a 1968 intermediate appellate decision (*Sheffield v. Cen. Freight Lines, Inc.*, 435 S.W.2d 954, 956 (Tex. App. 1968)) that has never been cited by the Texas Supreme Court, includes language that does not generally appear in Texas ratification decisions, and cannot overcome the Fifth Circuit's clear explication of Texas law.

### E. Uber is vicariously liable for its drivers' sexual assaults under principles of apparent agency.

Apparent agency "is based on the notion of estoppel, that is, a representation by the principal causing justifiable reliance and resulting harm." *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998). This doctrine prevents a principal, whose own acts created the impression of agency, from later disclaiming liability when third parties rely on that impression

---

[29] Uber's argument that ratification applies to specific acts and does not otherwise create an agency relationship, ECF 387 at 9 (citing *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App. 1998)), is correct, but beside the point. Plaintiffs here allege ratification of specific acts of sexual assault.

and suffer harm as a result. Plaintiffs allege that, because Uber represented that Uber drivers were its agents and because drivers with bad intentions used that apparent authority to get the plaintiffs alone with them in their cars, Uber is estopped from maintaining now that passenger safety was the responsibility of the drivers, not Uber. MC ¶¶ 427-35. While Plaintiffs use the term "apparent agency" for these claims, "[m]any courts use the terms ostensible agency, apparent agency, apparent authority, and agency by estoppel interchangeably. As a practical matter, there is no distinction among them." *Baptist Mem'l Hosp.*, 969 S.W.2d at 947 n.2.

For purposes of the motions to dismiss, Uber does not dispute the existence of an apparent agency relationship between Uber and its drivers. However, in New York and Texas, Uber argues that its drivers' sexual assaults are outside the scope of their apparent agency. ECF 385 at 8; ECF 387 at 6. In its other motions, under the laws of California, Florida, and Illinois, Uber only mentions agency in passing and neither mentions nor analyzes apparent agency. *See* ECF 384 at 1, 3; ECF 386 at 1, 6; ECF 388 at 1, 6. Nevertheless, out of an abundance of caution, Plaintiffs address the scope of apparent agency under the laws of every state, even though Uber only contested it in two states.

In New York and Texas, Uber's entire argument regarding apparent agency is that, under Restatement (Second) of Agency § 267, cmt. b ("Comment b"), the rules "stating what acts are within the scope of employment" apply equally to apparent agency. Using Comment b, Uber then appropriates the case law regarding the scope of employment and applies it to vicarious liability based on apparent agency.

In the sections that follow, Plaintiffs address each state's law regarding apparent agency and show that each state either does not follow, or would be unlikely to follow, Comment b, and would not apply a "scope of employment" requirement to apparent agency. In each state, apparent agency liability arises when a principal has created the appearance that someone is its agent or employee, and when that appearance of agency is linked, by reasonable reliance, to a resulting injury.[30]

---

[30] *See, e.g.*, *Orlando Exec. Park, Inc. v. Robbins,* 433 So. 2d 491, 494 (Fla. 1983) (in Florida, apparent agency liability requires "a change of position by a third person in reliance upon such

As these cited cases demonstrate, the focus is on the connection between the tort and injury, on the one hand, and the reasonable reliance on the principal's representation, on the other hand. For that reason, courts in many states have outright rejected any attempt to import "scope of employment" considerations into apparent agency analyses. *See e.g., Wyndham Hotel*, 893 S.W.2d at 634 ("In Texas, the plaintiff may dispose with the fiction of defining the terms of a relationship that does not exist in reality. Under this formulation of the theory, actions beyond the scope of any hypothetical agency are addressed in terms of whether the party's belief and consequent reliance were reasonable and justified."); *Parlato*, 299 A.D.2d at 114 (in New York, "[b]y contrast [with respondeat superior liability], where … the asserted basis for the principal's liability is apparent authority, there is no requirement that the tortious act be committed in furtherance of the principal's business.").

In states (such as California) that have neither expressly rejected nor accepted a "scope of employment" limitation, the reasoning expressed in *Wyndham Hotel* and *Parlato* is compelling. This is so because respondeat superior and apparent agency derive from distinct common law doctrines and rest on starkly different rationales. The doctrine of respondeat superior looks at whether a tort had "a causal nexus to the employee's work." *Lisa M.*, 12 Cal. 4th at 297-98. But, under an estoppel-based theory like ostensible agency, liability does not arise from the *nature or scope of the work* but from the *foreseeable consequences of reasonable reliance on the principal's representations*. Thus, it makes no sense to look to the actions and motivations of the alleged agent and situate them within the functions and needs of an employment relationship that need not even exist. Nor to analyze the impact of work-related events and conditions on an apparent agent who did not in fact work for the enterprise, and perhaps had no exposure to "work-

representation to his detriment."); *McNerney v. Allamuradov*, 84 N.E.3d 437, 453 (Ill. App. 2017) (in Illinois, apparent agency liability requires that an "innocent third party has reasonably relied on such appearance to his or her detriment."); *Parlato v. Equitable Life Assur. Soc. of U.S.*, 299 A.D.2d 108, 113 (N.Y. App. 2002) (In New York, apparent authority liability attaches when an "innocent third person suffers a loss as the result of an agent's abuse … of the third person's reasonable reliance on the apparent authority with which the principal has invested the agent."); *Wyndham Hotel Co. v. Self*, 893 S.W.2d 630, 634 (Tex. App. 1994) (in Texas, "agency by estoppel" liability arises based on the plaintiff's "detrimental reliance on [the principal's] representation of authority"); Cal. Civil Code § 2300 (apparent agency occurs where a principal "causes a third person to believe another to be his agent who is not really employed by him.").

PLS.' OPP'N TO DEF.'S MOTS.
TO DISMISS LONG-FORM COMPLAINT
CASE NO. 3:23-MD-03084

related" events and conditions. Instead, the scope of ostensible agency is driven by the relationship between reasonable reliance and injury, not the workplace and injury. The focus is not on the allocation of risk in a workplace setting, but on "prevent[ing] injustice and protect[ing] those who have been misled." *Baptist Mem'l*, 969 S.W.2d at 948 n.2. Accordingly, the principal is liable for injury that results from reliance on a false appearance the defendant wrongfully created.[31]

### 1.      California

In California, the elements of apparent agency are defined by statute. *See* Cal. Civil Code §§ 2300, 2317, 2334. The elements are: (1) Uber intentionally or carelessly created the impression that the driver was Uber's employee/agent, (2) the plaintiff reasonably believed that the driver was Uber's employee/agent, and (3) the plaintiff reasonably relied on that belief. CACI No. 3709. There is no separate "scope" element. *Id.*

While Uber has not explicitly raised any argument about ostensible agency in its California briefing, presumably any such argument (like those it makes under Texas and New York law) would hinge on Comment b. In California, however, Comment b is inapplicable since ostensible agency is defined by statute rather than common law standards. *See Mejia v. Cmty. Hosp. of San Bernardino*, 99 Cal. App. 4th 1448, 1453 fn.2 (2002) ("Many courts based ostensible agency on Restatement Second of Agency, section 267, or Restatement of Torts, section 429. … Because ostensible agency is defined by statute in California (Civ. Code § 2300), we need not and will not attempt to interpret the Restatement sections.").

And, in California, as in other states, the logic of apparent agency is incompatible with any inquiry into scope of employment: "Liability of the principal for the acts of an ostensible agent rests on the doctrine of 'estoppel,'" which places the focus on "justifiable reliance by a third party[] and a change of position from such reliance resulting in injury." *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 747 (1997) (citation omitted); *see also*

---

[31] Even if Comment b were applicable, it makes clear that scope-of-employment considerations do not apply where "there is a non-delegable duty." Restatement (Second) of Agency § 267, cmt. b. So, even if Uber were right about apparent agency in general, these claims would still move forward by virtue of Uber's common carrier duties. *See* Section I.B, supra.

1    *Clark Equip. Co. v. Wheat*, 92 Cal. App. 3d 503, 521 (1979) (In the context of apparent agency,

2    "[i]t is immaterial that the principal receives no benefits from the transaction."); *White v. Cnty. of*

3    *Orange*, 166 Cal. App. 3d 566, 571 (1985) (liability for an apparent agent's fraud does not

4    depend on whether "the agent was acting for his own purposes.").

5           There is one contrary opinion from the Northern District of California. *See Doe v. Uber*

6    *Techs., Inc.*, 2020 WL 2097599, at *1 (N.D. Cal. May 1, 2020). There, Judge Corley noted that

7    respondeat superior liability is limited to torts "engendered by" or which "arise from" the

8    employment. *Id.* (citing *Lisa M.*, 12 Cal. 4th at 298). She applied this same limitation to apparent

9    agency because "there is nothing in the statutes—or the case law—which suggests that an

10   employer's liability for acts of its ostensible agent are greater than its liability for the acts of its

11   employee or agent." *Id.* at *2. Respectfully, Judge Corley was asking the wrong question. The

12   question should not be whether the case law and statutes impose a *greater* scope of liability for

13   the acts of an apparent agent, but whether they impose a *different* scope of liability for the acts of

14   an apparent agent. As demonstrated in CACI No. 3709, *Clark*, *White*, and *Kaplan*, the scope of

15   apparent agency liability is *different* from, rather than greater than, that of respondeat superior

16   liability. *See, e.g.*, *Kaplan*, 59 Cal. App. 4th at 747 (key question in apparent agency case is

17   whether injury results from a "change of position from such reliance"). Torts that arise from the

18   work may be within the scope of employment and within not the scope of apparent agency,

19   whereas torts enabled by reliance on the principal's misrepresentation may be in the scope of

20   apparent agency but not in the scope of employment. When, for example, an Uber driver

21   negligently strikes a pedestrian, if the plaintiff establishes that the driver was Uber's employee,

22   the negligent driving is clearly within the scope of employment for respondeat superior purposes.

23   But the pedestrian cannot rely on apparent agency to establish liability since the injury did not

24   result from reliance on an appearance of agency. But when a rider gets into a driver's car because

25   she trusts that the driver is working for Uber, and where the driver abuses that trust to attack her,

26   the driver's conduct is clearly enabled by reliance on Uber's representations, whether or not it is

27   otherwise work-related.

28

2. **Florida**

Even though Florida has adopted section 267 of the Restatement (Second) of Agency, *see Mercury Cab Owners Ass'n v. Jones*, 79 So. 2d 782, 784 (Fla. 1955), it does not follow Comment b nor import any "scope of employment" requirement into apparent agency doctrine. Florida acknowledges that apparent agency, unlike actual agency, is based on estoppel. *Gradia v. Baptist Hosp., Inc.*, 345 So. 3d 385, 389 (Fla. App. 2022).

The Florida Supreme Court describes the three elements of apparent agency as (1) the principal's representation that the apparent agent is its agent or employee, (2) reliance on that representation by a third person, and (3) a change of position by a third person in reliance upon such representation to his detriment. *See Orlando Exec. Park, Inc.,* 433 So. 2d at 494;[32] *see also Orlando Exec. Park, Inc. v. P. D. R.*, 402 So. 2d 442, 450 (Fla. App. 1981) (it was a jury question whether franchisor hotel chain was liable, on apparent agency theory, for motel's negligent security that allowed assault on guest).

The key connection is between the injury and the reliance, not between the injury and the scope of any employment. *See Orlando Reg'l Med. Ctr., Inc. v. Chmielewski*, 573 So. 2d 876, 879-880 (Fla. App. 1990) (explaining that the same evidence may show both reliance and detriment).[33] Here, Plaintiffs allege that Uber held out its drivers as its employees or agents (MC ¶¶ 428-31, 434), that plaintiffs reasonably relied on that representation by getting into private cars driven by the Uber drivers (MC ¶ 431, 433), and that plaintiffs were injured because of that reliance (MC ¶¶ 433, 416, 418). That is sufficient under Florida law.

There is one contrary authority in Florida: an intermediate appellate case which seems to suggest that "scope of employment" limitations apply to apparent agency. *See Tallahassee Furniture Co. v. Harrison*, 583 So. 2d 744, 758 (Fla. App. 1991) ("To recover under a theory of vicarious liability such as actual or apparent agency, it must be shown that the agent or apparent agent's conduct was motivated, at least in part, by the purpose of serving the employer."). However, as the Southern District of Florida recognized in *Moro-Romero v. Prudential-Bache*

---

[32] *"Receded from" on other grounds, Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995).

[33] *Abrogated on other grounds, Boulis v. Fla. Dep't of Transp.*, 733 So. 2d 959 (Fla. 1999)

*Sec., Inc.*, although *Tallahassee Furniture* used "apparent agency" language, its analysis was limited to respondeat superior liability. *See Moro-Romero*, 1991 WL 494175, at *2 n. 24 (S.D. Fla. Aug. 26, 1991) (noting that *Tallahassee Furniture* cited the Restatement section regarding respondeat superior, not apparent agency, and that its holding was limited to respondeat superior); *Tallahassee Furniture Co.*, 583 So. 2d at 759 ("[W]e hold only that under the facts of this case, the doctrine of respondeat superior is inapplicable.").

In *Moro-Romero*, the court examined defendant Prudential's claim that "the agent must benefit the employer by acting within the 'scope of the agent's apparent authority.'" *Id.* at *2. After surveying Florida law, the court disagreed: "Prudential's argument, of course, collapses apparent authority into scope of employment. However, even if this logic were doctrinally consistent, neither Florida nor eleventh circuit precedent sustains it." *Id.* Under Florida law, "the principal is not relieved from liability even if the agent acted entirely for the agent's own purpose." *Id.* at *3.

### 3.    Illinois

The Supreme Court of Illinois has adopted the following principle: "[I]t is settled that an apparent agency gives rise to tort liability *where the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency.*" *Gilbert v. Sycamore Mun. Hosp.*, 156 Ill. 2d 511, 524 (1993) (emphasis added). This is the sole limitation Illinois places on the scope of apparent agency. There is no separate scope requirement borrowed from respondeat superior liability.

Illinois courts have applied this principle to intentional torts, including sexual assault. In *Plooy v. Paryani*, 657 N.E.2d 12, 16-18 (Ill. App. 1995), two women got into a taxi whose color scheme they recognized. Following a fare dispute, the taxi driver "verbally abused and cursed" the women, refused to let them out of the cab, then (when they escaped) chased them, grabbed one woman by the hair and dragged her back to the taxi, repeatedly slamming her body against the side of the taxi. *Id.* The trial court "held that [the driver's] apparent agency had been proven" as a matter of law and gave an instruction stating that the driver was, as a matter of law, the agent of the taxi color scheme. *Id.* at 18. The appellate court held that the question of apparent agency

1    should have been submitted to the jury, as the *existence of* an apparent agency relationship was

2    not so clear as to be undisputed. *Id.* at 22. But the court did not suggest that the taxi driver's

3    assault might somehow fall outside the "scope" of ostensible agency. Instead, it indicated that the

4    proper question was whether the plaintiff's injury *resulted from justifiable reliance* on the

5    apparent agency: "An apparent agency gives rise to tort liability where the injury would not have

6    occurred but for the injured party's justifiable reliance on the apparent agency." *Id.*

7         Similarly, in *McNerney*,, 84 N.E.3d 437, 442 (Ill. App. 2017), the "plaintiff contacted 303

8    Taxi, L.L.C. (303) to arrange transportation, and a taxicab marked with 303's logo, telephone

9    number, and distinctive colors arrived." After the plaintiff got into the taxi, the driver sexually

10   assaulted her. *Id.* at 444. The trial court granted summary judgment to 303. *Id.* at 447. The

11   appellate court reversed, finding that there was "sufficient evidence in the record to create a

12   genuine issue of material fact as to the existence of apparent agency." *Id.* at 457. It held: "The

13   purported principal … may have created the appearance that [the driver] was its agent, and an

14   innocent third party … *potentially relied on the apparent agency and was harmed as a result*. …

15   Summary judgment in favor of 303 was thus improper with respect to any apparent agency

16   claim." *Id.* (emphasis added). Plaintiffs adequately allege the same.

17              **4.      New York**

18        New York case law has expressly distinguished the standard for apparent agency from that

19   for respondeat superior liability. *See Parlato*, 299 A.D.2d at 113-14 ("it is important to

20   distinguish the doctrine of apparent authority, which is at issue in this action, from the distinct

21   and separate doctrine of respondeat superior."). In New York, there is no "scope of employment"

22   limitation in the apparent agency context: "[W]here, as here, the asserted basis for the principal's

23   liability is apparent authority, there is no requirement that the tortious act be committed in

24   furtherance of the principal's business. The plaintiff suing on the basis of apparent authority is

25   required, however, to prove that the principal created an appearance of authority on which the

26   plaintiff reasonably relied, thereby enabling the agent to successfully perpetrate the tort." *Id.* at

27   113-14. As in other states, this outcome is compelled by base principles: ostensible agency "rests

28   upon the doctrine of estoppel" and "imposes a liability upon the principal in a case *where injury*

1    *has resulted through reliance* placed upon such ostensible agency." *Briggs v. Kennett*, 8 Misc.

2    264, 265 (N.Y. Com. Pl. 1894), *aff'd*, 43 N.E. 986 (N.Y. 1896) (emphasis added).

### 5.   Texas

4    Although it has favorably cited the Restatement (Second) of Agency § 267, Texas does

5    not reference "scope of employment" as a limit on vicarious liability for the actions of an

6    ostensible agent. "Ostensible agency in Texas is based on the notion of estoppel, that is, a

7    representation by the principal causing justifiable reliance and resulting harm." *Baptist Mem'l*,

8    969 S.W.2d at 947-48. Under the doctrine of ostensible agency, a defendant may be "liable for

9    the conduct of one who is not its agent at all or who, although an agent, has acted outside the

10   scope of his or her authority." *Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 237, 238 (Tex. App.

11   2021) (in a case involving sexual assault by pizza delivery person, upholding grant of summary

12   judgment because there was no more than "a scintilla of evidence" establishing that the

13   defendants engaged in affirmative conduct holding the delivery person out as an agent, or that the

14   plaintiff "justifiably relied on any representation of authority.")

15   In *Wyndham Hotel*, 893 S.W.2d at 632-633, the Texas Court of Appeals did a deep dive

16   contrasting the scope of actual agency with the scope of apparent agency. In that case, a tour

17   operator that appeared to be affiliated with the Wyndham Hotel, and which usually offered boat

18   tours from the hotel's pier, made a change of plans and took some guests, including the plaintiff,

19   off premises in a private vehicle that it entrusted to a third-party driver. The driver crashed,

20   injuring the plaintiff. *Id.* at 633. At trial, the jury found that Wyndham was vicariously liable for

21   the negligence of the tour operator, as its apparent agent. *Id.* at 633, 638-39.

22   On appeal, Wyndham contended that the trial court erred in omitting an "instruction on

23   the scope of any ostensible agency." *Id.* at 633. The court of appeals disagreed, holding that "a

24   cause of action based on agency by estoppel does not necessarily require a separate finding that

25   the ostensible agent was acting within the scope of apparent authority." *Id.* at 634. The court

26   described the fundamental problem with trying to blend the two doctrines. "[A]n *ostensible*

27   agency relationship is not a *true* agency relationship with a predefined scope." *Id.* Thus, "[i]n

28   Texas, *the plaintiff may dispense with the fiction of defining the terms of a relationship that does*

1    *not exist in reality*." *Id.* (emphasis added). Instead, ostensible agency liability is hemmed in by the

2    relationship of injury to reliance. As the court concluded, the "jury's determinations of whether

3    the party's belief in the agency was reasonable and whether the party's reliance on that belief was

4    justifiable subsumes the scope-of-agency issue." *Id.* In other words, in Texas, "actions beyond the

5    scope of any hypothetical agency are addressed in terms of whether the party's belief and

6    consequent reliance were reasonable and justified." *Id.*

7    **II.     Plaintiffs adequately plead fraudulent misrepresentations and omissions.**

8          Plaintiffs' fraud claims are based on Uber's express and implied claims regarding its

9    drivers and the safety of its rides. Uber argues (1) Uber's 2017 class settlement in the *McKnight*

10   litigation released some of Plaintiffs' fraud claims;[34] (2) Plaintiffs fail to plead actionable

11   misrepresentations;[35] (3) Plaintiffs fail to plead actionable omissions;[36] and (4) that the Master

12   Complaint should plead Plaintiff-specific facts.[37] Each argument fails.

13   **A.     The *McKnight* settlement did not release any claims asserted here.**

14         Uber argues that fraud claims based on certain representations were released as part of its

15   2017 consumer fraud settlement in *McKnight v. Uber Techs., Inc.*, No. 14-5615 (N.D. Cal. 2018).

16   This argument is meritless. *McKnight* was a garden variety consumer fraud settlement that

17   resolved nationwide economic-injury claims for $32.5 million. The *McKnight* settlement did

18   not—and could not have—released personal injury claims like those asserted here.

19         The *McKnight* settlement specifically excluded claims for personal injury. The settlement

20   agreement was crystal clear on this point:

21         Notwithstanding any other provision of this Amended Stipulation of Settlement,
         "Released Claims" do not include, and Plaintiffs and Class Members are not
22         releasing, any action, causes of action, claims, demands, rights, suits, obligations,
         restitution, debts, contracts, agreements, promises, liabilities, damages, charges,
23         penalties, losses, costs, expenses, and attorneys' fees, of any nature whatsoever,
         known or unknown, in law or equity, fixed or contingent, *arising out of or relating
24         to personal injuries.*

25   _____

26   [34] ECF 384 at 15-17; ECF 385 at 15-17; ECF 386 at 15-18; ECF 387 at 15-17; ECF 388 at 15-18.

27   [35] ECF 384 at 17-19; ECF 385 at 17-19; ECF 386 at 18-19; ECF 387 at 18-19; ECF 388 at 18-19.

     [36] ECF 384 at 19-22; ECF 385 at 19-21; ECF 386 at 19-22; ECF 387 at 19-22; ECF 388 at 19-21.

28   [37] ECF 384 at 12-14; ECF 385 at 12-14; ECF 386 at 12-15; ECF 387 at 12-15; ECF 388 at 12-15.

Am. Stip. of Settlement at ¶ 31, *McKnight v. Uber Techs., Inc.*, No. 14-5615 (N.D. Cal. June 1, 2017), ECF No. 125 (emphasis added);[38] *see also id.* at ¶ 95 ("Notwithstanding any provision of this [Cal. Civ. Code § 1542] paragraph, Plaintiffs and Class Members are not releasing any claims for personal injuries.").

Uber acknowledges this clear language only in a footnote, and there distorts it. ECF 384 at 16 n. 13. Uber says that, because the personal-injury carve-out in ¶ 31 "immediately follows" the release, it "applies only where the claim relates to something other than" the topics of the release. *Id.* But the release language Uber cites comes from the definition of "Released Claims," and the settlement makes clear that "Notwithstanding *any* other provision of" the settlement, 'Released Claims' do *not* include" personal injury claims. Settlement ¶ 31 (emphasis added).[39]

The parties expressly relied on this exclusion in their approval papers. *See* Mot. for Final Approval at 8, *McKnight v. Uber Techs., Inc.*, No. 14-5615 (N.D. Cal. Jan. 25, 2018), ECF No. 162 ("Claims for personal injury are excluded."). Judge Tigar clearly understood that to be the case. Class resolution of personal injury claims (let alone sexual assault claims) is notoriously difficult and controversial and, correspondingly, rare. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 (3d Cir. 2011) (Scirica, J., concurring).[40] Yet Judge Tigar's orders approving the *McKnight* settlement give zero indication he understood that to be the task at hand. *See McKnight v. Uber Techs., Inc.*, 2017 WL 3427985, at *3, *7 (N.D. Cal. Aug. 7, 2017) (noting, for example, that "individual questions related to the existence or extent of injury are handled mechanically during the allocation process," a process based solely on the number of "Safe Rides Fee[s]… paid").

---

[38] https://www.ridesharesettlement.com/Content/Documents/Settlement%20Agreement.pdf

[39] The language in the *McKnight* settlement is typical of class action settlement agreements. Uber's position, if accepted, would mean that all kinds of economic-loss settlements that exclude personal injury claims actually release those claims. *See, e.g.*, Class Settlement Agreement at ¶ 1.29, *In re JUUL Labs, Inc. Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 19-md-2913 (N.D. Cal. Dec. 19, 2022), ECF No. 3724-2 ("Released Claims do not include … personal injury claims.").

[40] Uber's newfound position that common questions predominate with respect to Plaintiffs' fraud claims (such that they could be resolved in the *McKnight* class settlement) is difficult to square with its argument that there are literally no common questions that would justify coordinated proceedings here. *See* Pet. for Writ of Mandamus, *In re: Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 23-3445 (9th Cir. Nov. 10, 2023).

Even if, against all evidence, the class settlement purported to release personal injury claims, it could not have done so. A class settlement can preclude only those claims "based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010). Unsurprisingly, the plaintiffs in *McKnight* asserted only economic-loss consumer fraud claims. Consol. Class Action Compl., *McKnight v. Uber Techs., Inc.*, No. 14-5615 (N.D. Cal. Jan. 7, 2016), ECF No. 67. Accordingly, a class settlement based on that complaint could not release personal injury claims. *See, e.g.*, *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 91 F.4th 174, 184 (4th Cir. 2024) (holding that a class settlement "did not settle claims premised on bodily injury or wrongful death" where "consumer protection claims" and "personal injury … claims" are "not likely to depend upon the very same set of facts" and "the class representatives notably failed to allege that any member of the class had experienced bodily injuries") (citation omitted).

For these same reasons, Uber's request to dismiss or strike allegations regarding Uber's "Safe Rides Fee," ECF 384 at 17, should be denied. The *McKnight* settlement does not preclude such allegations from "support[ing] any misrepresentation or omission claims." *Id.* Even if it did, such allegations are relevant to evaluation of Uber's intent and course of conduct in connection with the safety of its rides. Courts strike allegations as "immaterial or impertinent … only where it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Doe 1 v. Univ. of S.F.*, 2023 WL 5021811, at *5 (N.D. Cal. Aug. 4, 2023) (internal quotation marks omitted). Where, as here, "there is any doubt whether the allegations … might be relevant to the action," "a court must deny the motion to strike." *Id.* (internal quotation marks omitted).

### B.      Plaintiffs plead actionable statements and omissions.

Uber's argument regarding actionable statements and omissions rests on the false premise that representations about "safety" are *always* too subjective to form the basis for a fraud claim. In that light, it cherry picks several representations from the Master Complaint and holds them up, one-by-one, for inspection. *See, e.g.*, ECF 384 at 17-19. But Uber ignores all-important context,

including the duration (more than a decade) and pervasiveness (high) of Uber's

misrepresentations. It also ignores that its more generalized representations came on the heels of,

and reinforced rather than negated, the pre-*McKnight* falsehoods. It ignores the crucial role that

these safety-related representations played in growing its business. It ignores the stark contrast

between its safety representations and reality. And finally, Uber ignores the overwhelming

evidence that its customers actually relied on, and continue to rely on, its safety representations.

The total information available to consumers matters, because the pivotal question is

whether the statements are ones on which a reasonable consumer would rely. *See Newcal Indus.,*

*Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008). Plaintiffs' fraud claims are not about

isolated sentences, but about a decade-long torrent of representations both general and specific,

clear and vague, express and implied, and all in the context of a business whose very existence

depends on passengers believing in and relying on those representations.

The business context also matters, because "[w]hat might be innocuous 'puffery' or mere

statement of opinion standing alone may be actionable as an integral part of a representation of

material fact when used to emphasize and induce reliance upon such a representation." *In re*

*Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *17

(N.D. Cal. Jan. 4, 2017) (Breyer, J.).

The Master Complaint explains that, absent safety reassurances, Uber's revolutionary

product would never have gotten off the ground. MC ¶¶ 187-89. Uber has known all along that its

existence and growth depend on riders trusting the safety of its product. *Id.* ¶ 12. So Uber

advertised safety for over a decade. *See id.* ¶ 188, 196. And that effort has been successful, *id.* ¶

13, with Uber growing to a global transportation juggernaut. In other words, Uber has tens of

millions of riders, bringing it over $70 billion in annual revenue, precisely because those millions

of riders believed Uber's safety representations. And now, Uber wants this Court to say that those

safety representations—the ones that millions of people are relying on today—are so vague that

*no reasonable person* could rely on them.

Across each of Uber's motions, it makes substantially similar arguments that the false and

misleading representations identified in Plaintiffs' Master Complaint are not actionable because,

according to Uber, Plaintiffs do not plead facts showing these statements are false, the statements are not "falsifiable" (because they do not pertain to past or existing material facts), the statements are mere puffery.[41] Each of Uber's arguments fails.

In the sections that follow, Plaintiffs first put their fraud claims in context, then show that representations about safety can sometimes be actionable, and then respond to each of Uber's arguments.

### 1. **Plaintiffs' fraud claims are based on Uber's decade-long barrage of misrepresentations about safety.**

Plaintiffs' fraud claims are grounded in Uber's express and implied representations that Uber—not merely its drivers—would ensure its passengers were transported safely. This was always an essential part of Uber's business model; absent assurances of safety, passengers would be reluctant to get into a private vehicle driven by a random layperson. MC ¶ 12. Uber's own metrics show that passengers are largely motivated by safety when choosing Uber's services. *Id.* ¶ 13. Uber had to create that reassurance and constantly maintain it through carefully-designed marketing messages pushed to individual users using Uber's wealth of data (enabling it to target based on demographics and other traits).

From the beginning, in 2013, Uber "built its brand and business by aggressively marketing safety." *Id.* ¶ 201. Uber peppered its marketing with representations like: "safest rides on the road," "a ride you can trust," a service "created to ensure reliable access to safe rides." *Id.* ¶ 12. In 2014, Uber imposed a "Safe Rides Fee," purportedly to "support[] our continued efforts to ensure the safest possible platform for Uber riders and drivers." *Id.* ¶ 203. In reality, the Fee was never earmarked for safety, but was "pure margin." *Id.* ¶ 204.

In 2017, in response to the *McKnight* litigation and government investigations, Uber agreed to stop charging the "Safe Rides Fees" and stop using certain "phrases" in its marketing, including "best available," "industry leading," "gold standard," "safest," or "best-in class" in connection with background checks, or the more general phrases "safest ride on the road," "strictest standards possible," "safest experience on the road," "best in class safety and

---

[41] ECF 384 at 17-19; ECF 385 at 17-19; ECF 386 at 18-19; ECF 387 at 18-19; ECF 388 at 18-19.

accountability," "safest transportation option," or "safest possible platform." MC ¶¶ 207-08.

But that did not stop Uber from saturating the public with safety marketing that avoided those specific phrases, yet still communicated the same core safety message. MC ¶ 188; *see also, e.g.*, *In re JUUL Labs, Inc. Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 989 & n.38, 1007 (N.D. Cal. 2022) (admitting expert testimony that marketing campaigns "convey[ed] a similar message or [unique selling proposition]" that a product could be used "in a safe and healthy manner … despite variations in words, themes, or target audiences"). Since then, Uber has advertised:

- "From start to finish, a ride you can trust."

- "Safe rides for everyone: Whether riding in the backseat or driving up front, every part of the Uber experience is designed around your safety and security."

- "Uber is dedicated to keeping riders and drivers safe on the road."

- "We want you to feel safe riding with Uber."

- "Trip Safety, Our Commitment to Riders"

MC ¶¶ 211-214. Uber promotes this "essential value proposition" through every medium possible, including "bars, stores, and other … public places, as well as … search engines, social media, and direct email and app-based communications to Uber customers." *Id.* ¶ 188. *see also id.* App'x A (many more examples of safety-based advertising).

Today, Uber's "values" and "mission statement" page maintains that "[f]rom drivers with background checks to real-time verification, safety is a top priority every single day," "Safety never stops," and that:

> We embed safety into everything we do. Our relentless pursuit to make Uber safer for everyone using our platform will continue to make us an industry leader for safety. We know the work of safety never stops, yet we can and will challenge ourselves to always be better for the communities we serve.

Uber, *We are Uber*.[42] Uber's website tells passengers: "Ride with confidence. The Uber experience was built with safety in mind," and "we're dedicated to helping you move safely." MC ¶ 30; *see also id.* ¶¶ 218-21 (discussing other current representations). Uber puts out these messages because it knows that "[t]o induce riders to get into [] drivers' vehicles Uber [] must

---

[42] https://www.uber.com/us/en/careers/values/

1    cultivate a reputation for safety and transfer that reputation to Uber drivers." *Id.* ¶ 193.

2          Despite the *McKnight* settlement, Uber has continued misrepresenting its background

3    checks. From 2020 to the present, Uber has advertised (with minor variations): "Before anyone

4    can drive with Uber, they must undergo a multi-step safety screen, including being checked for

5    driving violations, impaired driving, violent crime, and other checks. In addition, Uber rescreens

6    drivers every year and uses technology to look for issues in between." *Id.* ¶ 215. Uber described

7    these background checks as "part of our commitment to help keep you safe when you request a

8    ride with Uber." *Id.* Uber has never disclosed to riders the many limitations of its background

9    checks, but instead falsely represented those checks are comprehensive, and made it sound as

10   though anyone with any criminal history would be precluded from driving for Uber. *Id.* ¶ 216.

11         Uber also misrepresents the qualities of its drivers in other ways. When a passenger

12   requests an Uber, Uber presents her each driver's purported "star" rating next to the driver's total

13   number of trips. *Id.* ¶ 27. Uber does not disclose that the star rating reflects only the past 500

14   trips, not a complete track record. *Id.* Uber also drops some low reviews from the star rating, but

15   does not tell riders this information is incomplete and inflated. *Id.* Uber also gives passengers

16   access to a "driver's profile," which includes "achievement badges" and "compliments."[43] Uber

17   omits from this "profile" any negative comments, including reports of inappropriate behavior or

18   assault.

19         None of Uber's messaging conveyed the true risks associated with using the Uber App,

20   nor the ways in which its own conduct compromised safety. *Id.* ¶ 373. Uber's ubiquitous

21   advertising never disclosed: the inadequacy of its background checks; that its priority was growth

22   of ridership and the appearance of safety, not actual safety; nor the true extent of the sexual

23   assault on its platform. *Id.* ¶¶ 372-74. Uber also failed to disclose that it: does not respond

24   adequately to reports of sexual misconduct; does not adequately investigate such reports; does not

25   report sexual misconduct to law enforcement; and reinstated drivers after complaints of sexual

26   misconduct. *Id.* ¶ 438.

27

28

---

[43] https://www.uber.com/us/en/ride/how-it-works/driver-profiles/

2. **The idea that safety representations can never support a fraud claim is wrong.**

As a threshold matter, the Court should reject the crux of Uber's argument—that "safety" is too subjective a concept to ever form the basis of a fraud claim. Context matters when evaluating whether statements or omissions are plausibly fraudulent. The Master Complaint explains that, absent safety reassurances, Uber's revolutionary product would never have gotten off the ground. MC ¶¶ 187-89. The public's default presumption was that, whatever the scope of reasonable disagreement about what was "safe," getting into a stranger's car was not included, for the specific reason that the stranger might pose a danger to the passenger. *Id.* ¶¶ 1, 12. To overcome that hesitation, Uber had to create the impression that it had taken concrete steps to successfully solve that problem and to protect passengers from drivers, and then maintain that impression even after the *McKnight* settlement precluded certain statements. *Id.* ¶¶ 187-224; *see, e.g.*, *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012) ("repeated assertions" were not mere puffery); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) ("[E]ven if some of the statements are general enough that, had they been made in isolation, they might not be actionable, we cannot ignore the fact that defendants allegedly made these representations about BHP's commitment to safety over and over and over. …. By touting its commitment to safety to such a degree, BHP put the topic 'at issue'."). The significance of this messaging is particularly acute in the context of vulnerable populations—like intoxicated women—that Uber specifically targeted with express and implied messaging encouraging them to view Uber as a safe option for late night rides home alone. MC ¶¶ 225-39.

So, Uber's argument—that "safety" does not "promis[e] any specific standard of safety or guarantee[] absolute safety"—misses the point. ECF 384 at 19. The "safety" required to popularize Uber's product is not "absolute safety"—no one gets into a car and thinks they are immune from auto accidents.[44] The concept refers to a specific risk—being assaulted by a the

---

[44] This is the flaw in the reasoning of *Fusco v. Uber Technologies, Inc.*, 2018 WL 3618232 (E.D. Pa. July 27, 2018). The *Fusco* court thought a fraud claim based on Uber's safety marketing necessarily was premised on the promise of "absolute safety." *Id.* at *8. But no one thinks an Uber ride is free from "random traffic accidents." *Id.* And the risks that Uber downplayed were not, as *Fusco* states it, "erratic attacks by strangers." *Id.* Such attacks are attendant to the

1   driver acting on Uber's behalf with the aid of a closed environment—that Uber had to reassure

2   passengers it would mitigate or eliminate in order to entice them to use the product. *See Allegheny*

3   *Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 217-18 (E.D. Pa. 2021)

4   ("Courts have held statements regarding safety to be material in industries carrying high safety

5   risks, and where the safety of the business is therefore related to the success of the business. …

6   Defendants' statements about safety implied an underlying prioritization of resources and

7   attention.").[45]

8          And the "standard of safety" is sufficiently objective because it is one well above what

9   Uber's alleged practices reflect. *See Takahashi-Mendoza v. Coop. Regions of Organic Producer*

10  *Pools*, 673 F. Supp. 3d 1083, 1097 (N.D. Cal. 2023) ("[A] reasonable consumer could find

11  Defendant's claim about its 'commitment to the highest … animal care practices' is misleading

12  because consumers could plausibly expect that such practices would not include the early

13  separation of mother and calf."); *Barham v. Royal Caribbean Cruises Ltd.*, 556 F. Supp. 3d 1318,

14  1326-27 (S.D. Fla. 2021) (finding "a general promise of safety" actionable where "there was a

15  specific reason that Defendant shouldn't have made these promises" and "some of the alleged

16  misrepresentations here are more specific than general promises of safety"); *Ahern v. Apple, Inc.*,

17  411 F. Supp. 3d 541, 557 (N.D. Cal. 2019) ("The alleged claim that Apple products underwent

18  'rigorous testing methods …' arguably promises that Apple subjected its products to *some form of*

19  *testing* and is therefore" not puffery.). An advertisement that is mere opinion in one context (say,

20  using the term "ice cold" to describe a cool beverage), might be actionably false in another (using

21  the same term to describe a piping hot beverage).

22          **3.      Plaintiffs plead false or misleading statements of fact.**

23          Uber argues that some (cherry-picked) statements are true, such as that Uber does have

---

24  hitchhiking model that Uber normalized. Uber convinced passengers to use its product by leading

25  passengers to believe drivers were *not* random "strangers," but appropriately vetted and approved
    agents of Uber.

26  [45] Uber's citation to *Zhang v. Royal Caribbean Cruises, Ltd.*, 2019 WL 8895223 (S.D. Fla. Nov.
    2019), illustrates the point. There, the court found that a cruise company's "general promise of a

27  'safe, reliable, licensed, excursion' was not actionable where the plaintiff was injured on a "shore
    excursion" when "the bus hit a pothole." *Id.* at *2, *6. There were no allegations that protection

28  from routine auto incidents was part of the essential reason cruise passengers would go on the
    excursion.

1   "safety features built into every ride." ECF 384 at 17. Uber ignores, for example, all of its pre-

2   *McKnight* statements such as the claim that it used "the strictest standards possible" (statements

3   that any Plaintiff who used Uber before the settlement became effective was plausibly exposed

4   to). MC ¶ 20. But even Uber's selected statements are actionable. Statements "literally true on

5   their face may nonetheless be misleading when considered in context," including "[c]ircumstance,

6   setting, and even manner of presentation." *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670

7   (N.D. Cal. 2021) (internal quotes omitted).[46] Here, Uber knew both that sexual assault was

8   widespread on its platform and that its preventative and responsive measures were (at least

9   recklessly) inadequate. MC ¶¶ 258-281. It also knew that safety was a primary motivation for

10  people, especially women, to use Uber. *Id.* ¶ 13 ("Based on Uber's own metrics, passengers are

11  largely motivated by safety when choosing Uber's services."). And Uber made statements like

12  "safety features built into every ride" in the context of its overall advertising message

13  emphasizing safety. *Id.* ¶¶ 227-28. So when a passenger sees "safety features are built into every

14  ride," it is plausible that she understands that message to mean that such "safety features" are

15  designed to be and are, in fact, effective. A "perfectly true statement couched in such a manner

16  that it is likely to mislead or deceive the consumer … is actionable." *Skinner v. Ken's Foods, Inc.*,

17  53 Cal. App. 5th 938, 949 (2020) (citation omitted).

18      The same is true of claims by Uber that its drivers "undergo a multi-step safety screen,"

19  ECF 384 at 18, which Uber cites as "part of our commitment to help keep you safe when you

20  request a ride with Uber." MC ¶ 215. It is plausible that, as the Master Complaint alleges,

21  passengers would understand that statement to mean Uber's background checks are robust and

22  comprehensive, and would find the information Uber omitted (the many known limitations of its

23  background checks) to be material. *Id.* ¶ 216. *See, e.g.*, *Prentice*, 338 So. 3d at 838 ("Fraud

24  liability can also be premised on statements that are misleading because they omit other material

---

25  [46] *See Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 510 (2003) (noting that an

26  advertisement that is literally true can "nevertheless [be] deceptive and misleading in its
    implications"); *Ebby Halliday Real Est., Inc. v. Dugas*, 2019 WL 1529174, at *5 (Tex. App. Apr.

27  9, 2019) (similar); *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 238-39
    (S.D.N.Y. 2013) (similar); *Prentice v. R.J. Reynolds Tobacco Co.*, 338 So. 3d 831, 837 (Fla.

28  2022) (similar); *St. Joseph Hosp. v. Corbetta Const. Co.*, 316 N.E.2d 51, 71 (Ill. App. 1974) ("[A]
    half-truth is sometimes more misleading than an outright lie.").

PLS.' OPP'N TO DEF.'S MOTS.
TO DISMISS LONG-FORM COMPLAINT
CASE NO. 3:23-MD-03084

information. Indeed, the common law has long recognized that the representation underlying a fraud claim can be communicated through myriad forms of conduct. … What matters is that the defendant intend to induce the plaintiff's reliance by creating a false impression in the plaintiff's mind.").

### 4.    Plaintiffs' fraud claims are not based on puffery.

Next, Uber argues that some of the challenged statements are "not falsifiable," in that they are mere opinion, predictions, or puffery. ECF 384 at 18. In this argument, Uber ignores its factual claims regarding background checks and driver ratings, discussed above, and about omissions, discussed below, so the fraud claims should proceed regardless. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 801-04 (S.D. Tex. 2012) (otherwise non-actionable puffery can support an omissions claim where "it is the very vagueness of the statements that makes them misleading").

In any event, the Master Complaint includes numerous statements that are not puffery. A "statement is considered puffery" only "if the claim is extremely unlikely to induce consumer reliance." *Newcal*, 513 F.3d at 1053. Conversely, a statement is "actionable" if it is "reasonably interpreted as a statement of objective fact." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021) (citation omitted).[47]

As discussed above, context matters. Statements that might be considered puffery in one context can be actionable in another, especially when defendants allegedly knew of or recklessly disregarded facts contradicting their statements. *See, e.g.*, *In re Takata Airbag Prods. Liab. Litig.*, 462 F. Supp. 3d 1304, 1318 (S.D. Fla. 2020) ("Although the marketing of safety features may be

---

[47] This standard is fairly uniform across the relevant states. *See also Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) ("[N]on-actionable 'puffery' comes in at least two possible forms: (1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion."); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) ("Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language."); *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 934 (N.D. Ill. 2016) ("[E]xaggerated terms that no consumer would rely on them as truthful, … or that make a general claim of superiority so vague as to be incapable of being proved or disproved, are known as 'puffery.'"); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014) (defining puffery as "generalized, non-verifiable, vaguely optimistic statements").

1    construed as 'puffery' when viewed in isolation, such marketing can 'cross the line from mere

2    puffery to active misrepresentations' when statements about safety are read next to allegations

3    that an automotive manufacturer had actual knowledge of the alleged safety defect.").[48]

4         Taken "in context, 'safe' and 'safest' have been found to constitute factual claims, not

5    puffery." *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) (citation omitted).

6    This is clearly true as to Uber's pre-*McKnight* advertising, which routinely used comparator terms

7    like "safest," touted Uber's background checks as "gold standard" and "industry leading," and

8    imposed a "Safe Ride" fee. MC ¶¶ 204-07; *see Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d at 368

9    ("Uber's statement in an advertisement that its company offers the 'safest rides on the road'—

10   without any aspirational language—and its statement that it will 'set[] the strictest safety

11   standards possible' could convey to a reasonable consumer the message that Uber offers safety

12   standards and rides better than competitors that a consumer might choose to use in lieu of

13   Uber."); *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. 2015)

14   ("A reasonable consumer reading these statements in the context of Uber's advertising campaign

15   could conclude that an Uber ride is objectively and measurably safer than a ride provided by a

16   taxi or other competitor service, i.e., it is statistically most likely to keep riders from harm.");

17   *Delux Cab, LLC v. Uber Techs., Inc.*, 2017 WL 1354791, at *5 (S.D. Cal. Apr. 13, 2017) (same).

18       The Court should reach the same conclusion with respect to the sanitized, post-*McKnight*

19   marketing. For example, the Master Complaint includes statements that, while phrased at a higher

20   level of generality, are factual and refer to current or historical descriptions of the *product*, not

21   mere "expressions of company pride and esteem." ECF 384 at 18. For example: "Every part of

22   the Uber experience is designed around your safety and security" is a falsifiable statement about

23   how the "experience" of riding with Uber is "designed." MC ¶ 211; *see, e.g.*, *Anunziato v.*

24   *eMachines, Inc.*, 402 F. Supp. 2d 1133, 1140 (C.D. Cal. 2005) (finding the phrase "most stringent

25   quality control tests" actionable, "not mere puffery"); *Touchet Valley Grain Growers, Inc. v. Opp*

26   *& Seibold Gen. Constr.*, 831 P.2d 724, 731 (Wash. 1992) (same, "carefully checked by our

27

28   [48] Uber cites *Pickens v. Mercedes-Benz USA, LLC*, 2021 WL 5050289 (N.D. Ill. Nov. 1, 2021),
     but in that case the plaintiff failed to allege that the defendant knew of the allegedly omitted facts.
     *Id.* at *4.

quality control department"). For example, in *City of Sterling Heights Policy & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56 (S.D.N.Y. 2022), the court found the statement that "each product has been designed with the intent of being a lower potential for abuse and misuse than the previous products on the market" actionable because it did not "describ[e] a forward-looking goal or an aspiration," and in reality "the safety rationales supporting" the product "were devised after the fact." *Id.* at 91.

To the extent some of Uber's statements are aspirational, they appear close to (and as part of the same advertising strategy as) statements that incorporate more factual elements. For example, Advertisement 6 in Appendix A touts Uber's "commitment to safety" but does so in conjunction with "the creation of new standards to the development of technology with the aim of reducing incidents." MC App'x A at 4. The implication being that Uber has developed "new standards" and "technology" that had the specific goal of "reducing incidents," and materially advance the purported safety mission. *See Pizza Hut*, 227 F.3d at 501 (finding slogan misleading for purposes of the Lanham Act, agreeing that "the statement must be considered in the overall context in which it appears," and explaining that "a reasonable consumer would understand the slogan, *when considered in the context of the comparison ads*, as conveying" a falsifiable "message") (emphasis in original); *Begay v. Medicus Healthcare Sols., LLC*, 2015 WL 13650107, at *7 (D.N.M. Nov. 18, 2015) (rejecting puffery challenge upon finding that defendant's statement that it performed "thorough" background checks became "sufficiently specific when read in conjunction with that statement about [physicians having] unrestricted medical licenses").

Uber's history and intent also matter in determining what kinds of statements are material to its users. Uber's strategy from the beginning was to induce passengers to view Uber as a safe alternative to other forms of transportation. MC ¶¶ 187-207. The post-*McKnight* advertising was designed to accomplish the same goal—reassuring passengers that Uber was safe—while avoiding the specific phrases precluded by the class settlement. *Id.* ¶¶ 208-215. It is plausible that these carefully-designed messages, intended to induce reliance, were in fact specific enough to do just that. *See In re JUUL*, 2022 WL 1601418, at *5 (denying summary judgment on fraud claims and rejecting defendant's puffery arguments in part based on defendant's "own documents

demonstrating the intent and purpose of those materials").[49]

At bottom, whether Uber's safety reassurance messaging was specific enough to garner and justify reliance should not be decided on a motion to dismiss. Judge Koh's opinion in *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052 (N.D. Cal. 2017), is instructive. There, the plaintiff challenged cereal package marketing using the phrases "wholesome, "nutritious," and "essential nutrients." *Id.* at 1082. Judge Koh acknowledged that "it is difficult to measure whether a product contains 'essential' nutrients, is nutritious, or is wholesome" and that the challenged advertising "are general statements because they do not have specific, concrete meanings." *Id.* at 1082-83. But, she explained, the plaintiff alleged that "each of these statements implies that the product is healthy or provides health benefits when these statements are placed on the packaging for a food product." *Id.* And that was enough to withstand a motion to dismiss: "the Court cannot conclude as a matter of law that no reasonable consumer would rely on these statements." *Id.* at 1083. Here, too, Plaintiffs plead plausible reliance on safety-oriented messaging because of the context in which the messaging appeared: entering a stranger's car.[50] Through its safety representations, Uber took what would otherwise be hitchhiking and transformed it, in the eyes of the public, into "taking an Uber."

---

[49] Uber cites *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016), where the court rejected a false advertising suit against Uber by one of its competitors. But while *XYZ* found statements that included "aspirational terms" such as "committed to," "aim to," and "believe deeply" to be puffery, *id.* the Master Complaint here also cites statements involving present statements of fact, such as how Uber is "[d]esigning" its product" and what "features to help keep you safe" it is currently offering. MC ¶ 219. *XYZ* also rejected claims based on statements like the "strictest safety standards possible," 214 F. Supp. 3d at 184, but other courts have explained why those statements, from the perspective of vulnerable passengers, are *not* puffery. *See, e.g.*, *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d at 369. Finally, *XYZ* also found non-actionable statements about Uber's background checks, but for unique case-specific reasons: it found that the allegedly false portion of the statements did not apply in the local market at issue. 214 F. Supp. 3d at 184. Uber also cites *Am. Honda Motor Co., Inc. v. Milburn*, 668 S.W.3d 6 (Tex. App. 2021), but in that contribution cross-claim action, the passenger (who did not herself bring a fraud claim) disclaimed any reliance on specific Uber safety messaging. *Id.* at 33.

[50] *Cf. Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003) (in case cited by Uber, finding representations puffery on a full record, in part because "Defendants produced evidence that consumers who bought the system did not believe that they were deceived, … but instead found that the system was a good one, or a good-enough one, despite some problems," evidence the court found "highly relevant").

**C.**     **Plaintiffs adequately plead fraudulent omissions.**

With respect to Plaintiffs' omissions claims, Uber makes two arguments. *First*, uniformly across states, it argues that Plaintiffs have failed to plead material facts that Uber failed to disclose. ECF 384 at 19-20; ECF 385 at 19; ECF 386 at 20; ECF 387 at 20; ECF 388 at 19-20. *Second*, in each state, Uber argues Plaintiffs have failed to plead a duty to disclose. Plaintiffs take the arguments in turn.

**1.**     **Uber failed to disclose material facts.**

Uber says that Plaintiffs fail to allege material facts omitted or concealed, but this is not true. A fact is "material … if a reasonable consumer would deem it important in determining how to act in the transaction at issue." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256, 259 (2011). Plaintiffs allege that Uber conceals, for example, the inadequacy of its background checks, the frequency of sexual assault on its platform, that it reinstated drivers after complaints of sexual misconduct, that it does not respond adequately to or appropriately investigate reports of sexual misconduct, and that it will not report assaults to law enforcement unless the rider first self-reports. MC ¶¶ 216, 306, 372-74, 438. Plaintiffs point out, for example, that Uber used the language "sign up to ride" as opposed to "sign up to connect with rides, which may or may not be safe, offered by random drivers whom we don't know and can't vouch for other than to say they passed our cursory background check." *Id.* ¶ 198. Uber either ignores these allegations or disregards them, without support, as "derogatory characterizations of Uber." ECF 384 at 20. Uber cites no cases requiring material facts be pleaded with any more specificity.

**2.**     **Uber owed a duty to disclose.**

**a.**     **California**

As relevant here, California recognizes a duty to disclose where "the defendant had exclusive knowledge of material facts," where "the defendant makes partial representations but also suppresses some material facts," or where "the defendant actively conceals a material fact from the plaintiff." *Kulp v. Munchkin, Inc.*, 678 F. Supp. 3d 1158, 1169 (C.D. Cal. 2023) (citation omitted).

*First*, as discussed above in Section II.B.1, Plaintiffs allege widespread partial

representations regarding safety, none of which disclosed the realities of Uber's sexual assault problem. For example, when pairing a driver with a rider, Uber discloses information about the driver's star ratings and prior feedback, but omits negative feedback. MC ¶ 27. Uber also advertises its background checks on drivers as a core safety feature, without disclosing the material information described above, such as that its background checks use names instead of biometrics, and do not coordinate with criminal justice databases. MC ¶¶ 142-69.

*Second*, these same facts support a duty to disclose based on active concealment, especially given Uber's ongoing campaign to downplay the extent and causes of sexual assault. *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007) (finding active concealment where the defendant "tried to gloss over the problems with its speedometers by replacing broken ones with the exact same model of speedometer, thereby giving the impression that any defects were unique cases"). Uber argues that it "affirmatively and voluntarily disclosed data about sexual assaults on the Uber App," ECF 384 at 21, but the Master Complaint explains how those "Safety Reports" are outdated, incomplete, and misleading. MC ¶¶ 273-74, 279-80.

*Third*, Plaintiffs adequately plead that Uber had exclusive knowledge of the material facts surrounding the incident of sexual assault on its platform, the causes of that problem, and its responses to it. Uber argues that it did not have exclusive knowledge, based on media reports, the *McKnight* litigation, and Uber's Safety Reports. ECF 384 at 20-21. But California does not require that knowledge be literally exclusive: "it is generally sufficient to plead that defendants have *superior* knowledge, and that the information was not reasonably discoverable by the plaintiffs." *Flier*, 2022 WL 16823042, at *5 (emphasis added, internal quotation marks omitted); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) (noting that "the presence of information online does not automatically defeat exclusive knowledge" and that "exclusivity is analyzed in part by determining whether the defendant has superior knowledge"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1192 (C.D. Cal. 2010) ("While Toyota shared some information regarding [the defect] with NHTSA and eventually with consumers, Toyota remained in a superior position of knowledge. While prospective customers could have been tipped off to

1    the possibility of [the defect manifesting] by researching past complaints filed with NHTSA,

2    many customers would not have performed such a search, nor would they be expected to."). In

3    addition, Uber's disclosures changed over time, so, for example, the first Safety Report

4    (December 5, 2019) has no relevance to the fraud claims asserted by someone who was assaulted

5    before that date.

6         Uber cites *Ahern*, 411 F. Supp. 3d at 575-76, but in that case, the plaintiffs alleged that the

7    manufacturer disclosed its knowledge of a specific computer defect "in its user manuals,"

8    communications directed to every plaintiff which put them on inquiry notice. Here, by contrast,

9    Plaintiffs plead specifically that Uber has gone to great lengths to never disclose to its passengers

10   the true frequency of sexual assault during its rides, and has affirmatively concealed the

11   inadequacy of its safety mechanisms. MC ¶¶ 258-81.

12        Uber also cites *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249 (2011), but it is not clear

13   why. That case found adequate allegations that "eMachines knew of this defect while plaintiffs

14   did not, and, given the nature of the defect, it was difficult to discover," especially where the

15   defendant issued "corporate directives to continue selling the defective computers" and engaged

16   in a "customer service campaign designed to preclude consumer discovery." *Id.* at 594. The

17   allegations here—that Uber knew of the inadequacy of its protections against and responses to

18   sexual assault, as well as its "corporate directives to continue" indiscriminate driver recruitment

19   and "customer service campaign[s]" to conceal the risk of sexual assault—are strikingly parallel.

20   Finally, Uber relies on *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161 (E.D. Cal. 2013), but in

21   that case the allegedly concealed fact was both discrete—the existence of one particular test—and

22   clearly disclosed on the defendant's website. *Id.* at 1175.

23               **b.**   **Florida**

24        Like other states, Florida "imposes a duty to disclose on a defendant if that defendant's

25   failure to speak would render the defendant's own prior speech misleading or deceptive." *In re

26   Takata Airbag Prods. Liab. Litig.*, 2017 WL 775811, at *4 (S.D. Fla. Feb. 27, 2017) (internal

27   quotation marks omitted). Uber acknowledges this duty only in a footnote. ECF 386 at 22 n.19. It

28   is adequately pleaded for the reasons explained above. *See In re Takata Airbag*, 2017 WL 775811

at *4. ("Plaintiffs have alleged that Ford had a duty to disclose the Inflator Defect because it 'made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.'"). Uber cites *Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902 (Fla. App. 2015), but that case decided the duty issue on a full record, not on the pleading, and found duty lacking only because the plaintiff did not offer evidence of any statements by the defendant at all. *Id.* at 908.

### c.   **Illinois**

As in other states, "a duty to disclose may arise under Illinois law if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Crichton v. Golden Rule Ins. Co*., 576 F.3d 392, 397-98 (7th Cir. 2009) (citation omitted). Uber ignores this basis for duty. For the reasons explained above regarding California, this duty is adequately pleaded here.

In Illinois, a duty to disclose can also arise where the "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Benson v. Stafford*, 941 N.E.2d 386, 918 (Ill. App. 2010) (citation omitted). This is a basis for duty distinct and different from a "fiduciary relationship." *Id. Lilly v. Ford Motor Co.*, 2002 WL 84603 (N.D. Ill. Jan. 22, 2002) is instructive. In *Lilly*, the Court found that plaintiffs adequately pled their fraudulent omission claims, and that Ford had a duty to disclose safety information to plaintiffs:

> While Plaintiffs have not alleged that they were in a fiduciary relationship with Ford, they have adequately pled that they placed trust and confidence in Ford and that Ford was in a position of influence and superiority over them. The complaint alleges that Ford designed and manufactured the TFI modules and made the decisions about their placement on the engine. Furthermore, the complaint alleges that Ford allegedly withheld information about the safety of the TFI modules …. These allegations reasonably support the inference that Ford had the best access to the information and that Plaintiffs would not have been able to obtain this information through diligence. Moreover, the complaint alleges that Ford engaged in an advertising campaign that emphasized the safety of Ford vehicles. This allegation supports the inference that Ford was aware of Plaintiffs' reliance on it when they made their purchasing decision.

*Id.* at *9 (citation omitted). Just so here: Uber was solely responsible for the design of its business, including the drivers hired and the safety mechanisms used (or not used), and Plaintiffs

allege that Uber "withheld information about the safety" of the rides. *See also Schrager v. N. Cmty. Bank*, 767 N.E.2d 376, 386 (Ill. App. 2002) (finding special trust relationship with duty to disclose existed "because defendants' superior knowledge and experience … placed defendants in a position of influence over" the plaintiff). More than that—through its marketing and branding, Uber encouraged Plaintiffs to put their trust in it to keep them safe from predatory drivers. MC ¶¶ 187-239; *see also Wisniewski v. Diocese of Belleville*, 943 N.E.2d 43, 75 (Ill. App. 2011) (finding duty to disclose because evidence "established that [plaintiff] placed his trust and confidence in the Diocese and that the Diocese not only accepted that trust and confidence but encouraged and promoted it"); *Doe v. Boy Scouts of Am.*, 66 N.E.3d 433, 457 (Ill. App. 2016) (holding a jury could find a duty to disclose because a vulnerable plaintiff put his trust in an allegedly responsible party leading to sexual abuse).

Uber cites two cases, neither helpful. In *R.J. Mgmt. Co. v. SRLB Dev. Corp.*, 806 N.E.2d 1074 (Ill. App. 2002), the court analyzed only whether there was a fiduciary relationship, not the trust-and-confidence duty alleged here. *Id.* at 1083-84. And in *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933 (N.D. Ill. 2013), the parties were both sophisticated corporations and there was no "indicia of disparity in experience or knowledge" between them. *Id.* at 946-47.

Finally, Uber argues that Plaintiffs "could … have discovered the truth through reasonable inquiry or inspection," ECF 388 at 20 (citation omitted), but never explains how passengers, using a New York Times article and inadequate Safety Reports, were supposed to discover the entire truth about Uber's lax approach to safety and the foreseeable consequences of it. *See Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 268, 277 (Ill. App. 2015) (reversing decision dismissing fraudulent omission claim where, even though the plaintiff learned of the "shortage of residency slots available," it was reasonably inferable that he "could not have known when he enrolled that the discrepancy was increasing so rapidly, whereas [the defendant] likely had superior knowledge in this respect").[51] In any event, in Illinois, "a plaintiff's failure to

---

[51] Uber cites cases that are clearly distinguishable. *See D'Attomo v. Baumbeck*, 36 N.E.3d 892, 913-14 (Ill. App. 2015) (sophisticated condominium buyer represented by counsel claimed

investigate the reliability of the defendant's representations is not fatal where such inquiries are inhibited by statements creating a false sense of security." *Id.* at 277. Here, the Master Complaint alleges in detail how Uber intentionally cultivated just that sense. MC ¶¶ 187-239.

### d. New York

In New York, a duty to disclose arises either "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge … or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005) (internal quotation marks and citations omitted). For the reasons argued above regarding other states, both duties are adequately alleged here. *See, e.g.*, *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 352 (E.D.N.Y. 2008) ("Defendants are alleged to have made a partial and ambiguous representation of their minimum fees to customers. They had superior and exclusive knowledge of the actual charges …. Without knowledge …, customers can be expected to act on the misleading impressions."); *Colangelo v. Champion Petfoods USA, Inc.*, 2020 WL 777462, at *14 (N.D.N.Y. Feb. 18, 2020) (denying motion to dismiss fraudulent omission claim: "Plaintiffs allege that Defendants had extensive knowledge of the BPA and heavy metals in their products …, and that Champion knew that consumers relied on the mistaken belief that the products did not contain BPA and heavy metals in making their purchases …. These allegations are sufficient to allege a duty to disclose at this stage.").

Uber cites *Ellington Credit Fund, Ltd. v. Select Portfolio Serv., Inc.*, 837 F. Supp. 2d 162 (S.D.N.Y. 2011), but in that case the plaintiffs did not identify any "materially incomplete" statements. Uber also relies on *Jana L. v. West 129th St. Realty Corp.*, 22 A.D.3d 274 (N.Y. App. 2005), but even though that case did involve an assault victim, she did not bring a fraud claim. Rather, the fraud cross-claim in that case arose between two sophisticated commercial entities, such that the court found the cross-plaintiff had "a duty to inquire" into the allegedly concealed

---

ignorance of amendment to condo rules); *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 709-10 (N.D. Ill. 2020) (prominent public information about a specific person's "history of sexual abuse").

-84-

1  information at the time of the transaction. *Id.* at 278. There is no valid comparison between the

2  facts in *Jana L.* and those here, where Uber possesses a massive informational advantage over its

3  passengers.[52]

4          **e.**        **Texas**

5       Like other states, Texas recognizes a duty to disclose from half-truths: where "the

6  defendant: (1) discovered new information that made its earlier representation untrue or

7  misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily

8  disclosed some information, creating a duty to disclose the whole truth." *Bombardier Aerospace*

9  *Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019). Uber acknowledges

10 this duty only in passing, ECF 387 at 21-22; for the same reasons discussed with respect to other

11 states, it is pleaded adequately under Texas law.

12      Uber repeats its argument that because "safety issues were part of the public record,"

13 Plaintiffs cannot establish ignorance of the facts. *Id.* at 21. But Uber cites only cases where the

14 fraud claimant had the opportunity (and indeed, the commercial obligation) to discover the whole

15 truth. *See Estate of Scott*, 2020 WL 2736466, at *5 (Tex. App. May 27, 2020) (life insurance

16 company claimed ignorance of a beneficiary's death when it "had internal procedures in place to

17 discover this very type of information"); *Holland* v. *Thompson*, 338 S.W.3d 586, 598 (Tex. App.

18 2010) (royalty owner had obligation to check "[d]ocuments on file with the [Railroad]

19 Commission" concerning his lease). Where, as here, the full picture of the truth was not revealed,

20 Texas recognizes a duty to disclose. *See, e.g.*, *Suzlon Wind Energy Corp. v. Shippers Stevedoring*

21 *Co.*, 662 F. Supp. 2d 623, 649-51 (S.D. Tex. 2009) ("The information that Suzlon Wind did not

22 disclose was necessary to provide a full picture of the dangers involved in doing the hot work …

23 and would be important to an individual or entity undertaking such work.").[53]

---

24 [52] *Am. Med. Distr. v. Macdonald Tuskey*, 2018 WL 1478301, at *3 (S.D.N.Y. 2018), turned on the

25 same considerations.

[53] Uber also cites *Bergeron* v. *Select Comfort Corp.*, 2016 WL 155088 (W.D. Tex. Jan. 11, 2016),

26 but that case applied the elements of fraudulent concealment tolling, not fraud by omission. The former "requires … awareness of the public record and reasonable investigation of red flags." *Id.* at

27 *5. Fraud by omission, in contrast, requires only that the plaintiff lack "an equal opportunity" as that of the defendant. *Bombardier*, 572 S.W.3d at 219-20. In any event, in *Bergeron*, the alleged defect

28 was fully disclosed through a "website created by Defendants … for the express purpose of informing consumers of the possibility of mold." 2016 WL 155088, at *7.

**D.**       **Plaintiffs are not required to plead Plaintiff-specific facts to sufficiently allege false statements, omissions, and reliance.**

Uber says that Plaintiffs must plead "specific facts, based on each Plaintiff's specific individual experiences, supporting that each saw or heard specific representations by Uber and that those specific representations induced her to arrange a ride through the Uber App or enter a vehicle arranged through the App." ECF 384 at 13; *id.* at 13-14 (asserting the need to plead "to which specific Plaintiff a specific misrepresentation was made"); *see also* ECF 385 at 14; ECF 386 at 14-15; ECF 387 at 14-15; ECF 388 at 14-15. These arguments are essentially identical across the five motions.

As is typical in MDLs, the Court should not require Plaintiff-specific facts to deny the motion to dismiss the fraud claims. Here, the Master Complaint articulates why, as a general matter, it is plausible that Plaintiffs relied on Uber's representations and omissions concerning safety. MC ¶¶ 189-90, 194, 377-379. That is sufficient at this stage. *See, e.g.*, *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *7 (D. Mass. Apr. 24, 2017) ("Here, the master complaints allege generally that plaintiffs and their physicians relied on the misrepresentation …. In this context, at least, that is sufficient…. Whether a particular physician did, in fact, rely on the representations in the labeling is of course a question of fact that cannot be resolved on the pleadings."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1997 WL 109595, at *2 (E.D. Pa. Mar. 7, 1997) (declining to decide motions "tailored to the specific facts of an individual plaintiff's case" and leaving such issues for the "transferor court").[54]

The Master Complaint pleads facts that make it plausible that these claims, as a category, are live and defensible, and applicable to large segments of the cases pending (or that will be pending) in the MDL. *See Doe v. Uber Techs.*, 551 F. Supp. 3d at 369-72 ("Plaintiff sufficiently alleges that Uber's statements about the safety of its rides were misrepresentations that concealed safety risk…. Plaintiff has also sufficiently alleged that her reliance on Uber's misrepresentations

---

[54] *See also, e.g.*, *In re Nuvaring Prods. Liab. Litig.*, 2009 WL 4825170, at *2 (E.D. Mo. Dec. 11, 2009) ("Like other MDL judges before me, I find such case-specific rulings are neither the purpose, nor the forte, of a court presiding over a multi-district litigation.") (internal quotation marks and alteration omitted); *In re Trasylol Prods. Liab. Litig.*, 2009 WL 577726, at *8 (S.D. Fla. Mar. 5, 2009) (similar).

1  caused the loss she suffered—her assault. Plaintiff alleges that she relied on Uber's campaigns
2  which included the safety claim …. Absent this reliance, Plaintiff may have chosen not to make
3  the 40-to-45 minute trip home at a late hour while intoxicated. Or, she may have been more
4  vigilant—as she might have been in another form of transportation—and remained awake during
5  the ride.").

6      The Master Complaint explains how safety-oriented messaging permeated Uber's
7  communications to Plaintiffs (including via the App store and App, which by definition reached
8  every single Plaintiff) and provides many examples of the messaging at issue. MC ¶¶ 30, 199,
9  App'x A. Further, the Master Complaint alleges why Uber's false and misleading statements can
10  be inferred as central to every passenger's decision to use Uber. *Id.* ¶¶ 187-224 (explaining how
11  Uber convinced the public and Plaintiffs to trust Uber to offer safe rides).

12      The Master Complaint also explains how Plaintiffs' claims are based on omissions, which
13  by definition appear in *every* communication. *Id.* ¶¶ 368-80. The "particularity standard is
14  lowered … as to pleading the time, place, and specific content of the fraudulent omission." *Flier*
15  *v. FCA US LLC*, 2022 WL 16823042, at *3 (N.D. Cal. Nov. 8, 2022) (Breyer, J.) (internal
16  quotation marks omitted). And "[p]leading reliance on an omission is not a particularly difficult
17  burden." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 349 F.
18  Supp. 3d 881, 918 (N.D. Cal. 2018) (Breyer, J.) (applying the laws of six states). Especially
19  where, as here "an omission is material, the fact that one would have behaved differently can be
20  presumed, or at least inferred." *Taleshpour v. Apple Inc.*, 2021 WL 1197494, at *11 (N.D. Cal.
21  Mar. 30, 2021) (finding plaintiffs pleaded reliance where they "allege[d] that they visited the
22  Apple website prior to purchasing or becoming owners of their laptops") (citation omitted).

23      By describing the content, mediums, and reach of Uber's false and misleading messaging,
24  the Master Complaint "provides [Uber] adequate notice of the claims pled against [it]." *In re*
25  *Digitek Prods. Liab. Litig.*, 2009 WL 2433468, at *8-9 (S.D. W. Va. Aug. 3, 2009) (denying
26  motion to dismiss in light of "[t]he administrative nature of a master complaint and its focus on
27  facilitating management of the litigation, as opposed to being a primary operative pleading"). And
28  the Master Complaint meets its burden of justifying coordinated discovery into Uber's

PLS.' OPP'N TO DEF.'S MOTS.
TO DISMISS LONG-FORM COMPLAINT
CASE NO. 3:23-MD-03084

1   representations and omissions (discovery that would be relevant under Plaintiffs' negligence

2   claims in any event).

3       In arguing otherwise, Uber relies primarily on a nearly three-decade old case—*In re: Ford*

4   *Motor Co. Ignition Switch Prods. Liab. Litig.*, 2001 WL 1266317 (D.N.J. Sept. 30, 1997)—where

5   the court held that a complaint "fail[ed] to describe with any particularity how plaintiffs relied

6   upon the alleged material misrepresentations and omissions of defendant." *Id.* at *8. But that case,

7   while an MDL, was really a class action: the MDL included only "twelve cases," all of which

8   were formally consolidated into a "Consolidated First Amended Class Action Complaint …,

9   which sets forth all causes of action raised by the MDL plaintiffs." *Id.* at *1. So, in contrast with

10  Plaintiffs' complaint here, the master complaint in *Ford* court did not purport to set out all facts

11  and all claims for all Plaintiffs. In addition, Uber fails to note that the court in *Ford* found that the

12  plaintiffs there *had* "alleged with adequate particularity the knowing misrepresentations and

13  omissions of material fact by defendants" where they "described with some particularity the

14  nature of Ford's alleged misrepresentations to the public and the mediums through which these

15  statements were made …, as well as the contexts and means through which Ford allegedly

16  concealed or suppressed or omitted to report the facts Ford allegedly knew." *Id.* at *7.

17      Uber also cites this Court's decision in *Volkswagen Clean Diesel*, where the Court

18  dismissed fraud claims based on affirmative misrepresentations because "Plaintiffs do not allege

19  that any of the named plaintiffs actually saw and relied on these advertisements" (as noted above,

20  the Court did find the omissions-based claims adequately pleaded). 349 F. Supp. 3d 881 at 917-

21  18. But *Clean Diesel*, like *Ford Motor*, while an MDL, was a class action. *See id.* at 889. The

22  premise of a class action complaint is that the essential elements of the claims presented can be

23  decided, for the named plaintiffs and later by extension to the absent class members, based on the

24  allegations in that pleading. An MDL personal injury master complaint is simply different. *See In*

25  *re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1601418, at *2 (N.D.

26  Cal. Apr. 29, 2022) (in MDL, following common discovery, deciding "reliance and causation"

27  questions regarding fraud claims in context of summary judgment in individual case being

28  worked up for trial).

1

Finally, Uber cites the JCCP demurrer order, *In re: Uber Rideshare Cases*, CJC-21-5188 (Cal. Super. Ct. June 22, 2023) (*JCCP Order*). That court elected, as a case management technique, to require individual fraud allegations at the initial pleading stage. *Id.* at 15 (requiring immediate amendment of short-form complaints). Plaintiffs submit it does not make sense to do so here, and instead the Court should follow the well-trodden path of other MDLs grappling with similar issues.

### III. Plaintiffs adequately plead negligent infliction of emotional distress (California, Florida, Illinois, and New York)

Plaintiffs plead negligent infliction of emotional distress claims, alleging the standard elements permitting such liability even in the absence of physical harm that would typically support an ordinary negligence claim (elements that are not pleaded under the ordinary negligence claim). MC ¶¶ 381-85 (alleging, for example, that Uber "owed a duty because it should have realized that its conduct involved an unreasonable risk of causing emotional distress," where such "distress might result in illness or bodily harm").

#### 1. California, Illinois, and New York

Uber moves to dismiss the California, Illinois, and New York NIED claims as duplicative of Plaintiff's negligence claims. But the factual elements that must be pleaded for the two claims are different, and, if Plaintiffs maintain those claims to trial, so are the jury instructions. *See* CACI No. 1620; Ill. Pattern Jury Instr. No. 30.01, Notes on Use; N.Y. Pattern Jury Instr.—Civil No. 2:284, Comment. It makes sense to set them out separately in the Master Complaint. *See Farrell v. United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 393 (N.D.N.Y. 2021) (denying motion to dismiss NIED claim where plaintiff also alleged negligence claims); *Durk v. Daum Trucking, Inc.*, 2008 WL 4671721, at *3 (N.D. Ill. Oct. 22, 2008) (denying motion to dismiss NIED claim as duplicative, and explaining that "a 12(b)(6) motion is not the stage at which to address this type of concern," and "[a]t this stage in the pleadings, all plaintiffs must do is plead sufficient facts to suggest plausibly that the plaintiff is entitled to relief") (internal quotation marks omitted). And other states do recognize a distinct cause of action for NIED. It would not be efficient to require the Master Complaint to subsume these allegations within the

negligence claims for some states and not others. But, should the Court dismiss these claims,

Plaintiffs request that the Court grant leave to amend in that way.

### 2.   Florida

Uber moves to dismiss the Florida NIED claims because such claims require that a third

party be injured. ECF 386 at 22-23. But Florida also recognizes NIED claims where the victim

suffers any type of physical "impact," even if such impact is "rather slight." *Willis v. Gami*

*Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007) (citation omitted) ("The essence of impact

… is that the outside force or substance, no matter how large or small, visible or invisible, and no

matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body.")

(citation omitted). For many or most Plaintiffs, NIED claims will be available based on physical

impact.

For those lacking physical impact, it is still likely that the Florida Supreme Court would

recognize a claim for NIED. That court has explained that "[t]he impact rule is not … an

inflexible, unyielding rule of law, so sacred that it might be followed without regard to context"

and has recognized "[e]xceptions to the rule" based on "the foreseeability and gravity of the

emotional injury involved, and lack of countervailing policy concerns." *Rowell v. Holt*, 850 So.

2d 474, 478 (Fla. 2003). One category of exceptions is where there is a "special professional duty

created by the relationship between" the parties. *Id.* at 479. Here, Plaintiffs plead NIED claims

based on special relationships, allegations Uber does not challenge in its motion. MC ¶ 383; *see*

*also id.* ¶ 363(j) (listing special relationships).[55]

### IV.   Plaintiffs adequately plead negligent entrustment.

Plaintiffs plead claims for negligent entrustment based on Uber permitting drivers to use

its chattel, the Uber product and trademarks. MC ¶ 363(n). That chattel is physical, tangible, and

moveable, including both "Uber-branded decals and signage for use in [] vehicles." *Id.* ¶ 78. Uber

has acknowledged that these marks and names are symbols of Uber's "goodwill" and that "the

fame and reputation of Uber is of such a nature that a connection with Uber would be presumed

---

[55] Uber cites *Rodriguez v. Uber Techs., Inc.*, No. 2020-CA-1823 (Fla. Cir. Ct. Aug. 9, 2021), but that case involved a poorly-written complaint "which causes significant confusion for the reader" and did not appear to argue either impact or special relationship applied. *Id.* at 2, 7.

when" a person uses those trademark-bearing decals and signage. *Id.* ¶ 192. Uber knows that its riders recognize, are familiar with, and trust its famous transportation brand, and that they do not recognize, know, or automatically trust Uber drivers. *Id.* at ¶ 193. These items were not just decorative flair but means to associate drivers and their vehicles with Uber, to reassure passengers that they were riding, not with a random stranger, but "*with Uber.*" *Id.* ¶ 13. By granting random drivers "the imprimatur of a legitimate and responsible corporation," Uber gave "passengers the necessary sense of safety and security to get into the car with an Uber driver." *Id.* It transferred its reputation to Uber drivers. *Id.* ¶ 193.

### 1.   California

Uber argues that its product and trademarks are "intangible items" that cannot constitute "dangerous chattels" or "instrumentalities." ECF 384 at 23. But Uber cites no case saying so. And things like Uber's trademarked decals and signage to hang on vehicles *are* tangible items.

Uber also argues that Plaintiffs "do not allege that any [] driver negligently used the Uber App or Uber's trademarks or that any such alleged negligent use proximately caused a particular Plaintiff's injury." ECF 384 at 23. But Plaintiffs allege that provision of Uber's product and trademarks gave drivers that Uber knew or should have known were dangerous the opportunity to sexually assault Plaintiffs. MC ¶¶ 142-69.[56] The proximate cause of any particular assault is a Plaintiff-specific question not suitable for resolution on the Master Complaint.

### 2.   Florida

In Florida, Uber says that "software" or "trademarks" are "intangible property" excluded from the definition of "chattel." ECF 386 at 22-23. But the two cases cited concerned bank accounts, truly intangible items. *See Bain v. Jockey Club Tech. Servs., Inc.*, 2007 WL 9706994, at *4 (S.D. Fla. Oct. 2, 2007); *Burshan v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 805 So. 2d 835, 846 (Fla. App. 2001). And the latter case affirmed the expansive definition of "chattel" under Florida law: "Every species of property, movable or immovable, which is less than a

---

[56] Uber cites *Lindstrom v. Hertz Corp.*, 81 Cal. App. 4th 644 (2000), but in that case, decided on summary judgment, there was "no evidence that defendant knew or should have known that the driver was … incompetent." *Id.* at 648-51. Here, the pleadings lay out in detail what Uber knew or should have known.

freehold.… Personal chattels are properly things movable, which may be carried about by the owner; such as animals, household stuff, money, jewels, coin, garments, and everything else that can be put in motion and transferred from one place to another." *Burshan*, 805 So. 2d at 846 (citation omitted). That definition comfortably includes Uber's decals and signage, which not only "can be put in motion and transferred from one place to another," *id.*, but have, as their essential purposes, being carried about on vehicles branded as Uber.

Uber also argues that Plaintiffs fail to allege how use of the chattels harmed Plaintiffs, ECF 386 at 23; but, as set out above, those general facts are adequately alleged, and Plaintiff-specific facts are not ripe.

### 3. Illinois

For Illinois, Uber repeats its arguments made in California. But decals and signage are not "intangible." ECF 388, at 22. And Plaintiffs' allegations connecting the use of Uber chattels to their injuries are sufficient at this stage.

### 4. New York

Uber says that "[n]egligent entrustment claims in New York apply only to chattels that are moveable or transferable physical property," ECF 385 at 22, but decals and signage are both moveable and transferable. And Plaintiffs' allegations connecting the use of Uber chattels to their injuries are sufficient at this stage.

### 5. Texas

Uber says that "[n]egligent entrustment claims in Texas apply only to chattels that are moveable or transferable physical property," ECF 387 at 22, but decals and signage are both moveable and transferable. The case Uber cites—*Scurlock v. Pennell*, 177 S.W.3d 222 (Tex. App. 2005)—held only that "[n]egligent entrustment" does not apply to "real property." *Id.* at 226. And Plaintiffs' allegations connecting the use of Uber chattels to their injuries are sufficient at this stage.

### V. Plaintiffs adequately plead strict products liability.

Plaintiffs' products liability claims are based on the design and warnings choices readily available to Uber, such as using its software and App to identify potentially problematic drivers

and limit the types of passengers they could transport, or using the GPS data it already collects to send automatic alerts to law enforcement. The "applicability of products liability torts to the digital world" presents "novel questions of law." *In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2023 WL 7524912, at *20 (N.D. Cal. Nov. 14, 2023). Accordingly, it is not sufficient to rely, as Uber does, on the "labels" the manufacturer or a pleading applies to a product: "it is the *functionalities* of the alleged products that must be analyzed." *Id.* (emphasis supplied).[57]

Uber's core argument is that it provides services, not a product, and so is exempt from strict products liability. But Plaintiffs allege that Uber's conduct in this case involves *both* services *and* a product. Plaintiffs allege that Uber's business model is built around hybrid product-services transactions involving a product (the App) placed in the stream of commerce through which users could obtain services (Uber rides). MC ¶¶ 51, 445, 449, 451-53, 477, 480, 491, 494. To use the App, passengers must download a computer program consisting of data that takes up space in, and exerts force on, the corporeal world. *Id.* ¶ 447.[58]

Uber disregards these allegations, ignoring both its dual role as product supplier and service provider and the physical quality of the App. Rather than grapple with the "functionalities" of its App, Uber relies on "labels" and cites distinguishable cases that do not concern defendants' dual roles as product suppliers and service providers or otherwise do not arise out of the technical design of the mobile application.[59] Where, as here, such claims are pleaded, they are permitted to proceed. *See*, *e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021).

---

[57] To the extent the Court entertains Uber's labels-based argument, it is notable that Uber itself refers to the Uber App as a product. MC ¶ 111 n.18. The Master Complaint's use of the terms "product" and "services" is consistent with Plaintiffs' position that the Uber *App* is a product and the Uber *rides* are services.

[58] The inherent physicality of the digital world is well established. *See*, *e.g.*, Lawrence B. Solum & Minn Chung, *The Layers Principle: Internet Architecture and the Law*, 79 Notre Dame L. Rev. 815, 817 (2004). Further, the data comprising mobile applications takes up physical storage space. *See* Tao Zhang et al., *Apps Can Quickly Destroy Your Mobile's Flash: Why They Don't and How to Keep It That Way*, in MobiSys '19: Proceedings of the 17th Ann. Int'l Conf. on Mobile Sys., Applications, & Servs., June 2019, at 217.

[59] ECF 384 at 24; ECF 385 at 24; ECF 386 at 24; ECF 387 at 24; ECF 388 at 24.

**A.**     **The Uber App is a product.**

The Uber App is a product under the laws of all five states. Something can be classified as a product in three ways: (1) if it is "tangible personal property distributed commercially for use or consumption"; (2) "when the context of [its] distribution and use is sufficiently analogous to the distribution and use of tangible personal property"; or (3) when "the public policies behind the imposition of strict liability" justify treatment as a product. Restatement (Third) of Torts: Products Liability § 19 (a) & Reporters' Note, cmt. a.[60] Here, Plaintiffs plead all three.

**1.**     **The Uber App is tangible.**

Contrary to Uber's assertions that Plaintiffs failed to allege the Uber App is "tangible personal property distributed commercially for use or consumption," ECF 384 at 23; ECF 385 at 23; ECF 386 at 23; ECF 387 at 23; ECF 388 at 23, Plaintiffs allege the Uber App is tangible. Plaintiffs allege when users download the "Uber app onto their mobile devices, they download a computer program or software package which then must be installed on their mobile device." MC ¶ 447; *see also id.* ¶¶ 445-48. The Uber App has a tangible form that exists and takes up space in the physical world. *Id*. Users interact with the interface of the Uber App on their phone screen, but all features are directly and necessarily controlled by Uber's proprietary algorithm and code existing on its "backend," stored as data in physical form. *Id.* Uber ignores these allegations. ECF 384 at 24; ECF 385 at 24; ECF 386 at 24; ECF 387 at 24; ECF 388 at 24. Of the cases cited by Uber, not one addresses the physical aspects of mobile applications. Others do not even allege the app was a product in the first place.[61]

Downloadable code or data *is* tangible. For example, Judge Chen explained in *Beyer v.*

---

[60] California, New York, and Texas adopted the Restatement (Third) of Torts: Products Liability. While Florida and Illinois have not, courts in both states find it instructive. *See Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1139 (Fla. App. 2002); *Mikojczyk v. Ford Motor Co.*, 901 N.E.2d 329, 352 (Ill. 2008). In *Social Media*, the court used the Restatement (Third) for all states. 2023 WL 7524912, at *22. The Court should do the same here. In addition, every state considers public policy as noted in the Reporters' Note. *See Taylor v. Elliott Turbomachinery Co., Inc.*, 171 Cal. App. 4th 564, 576 (2009); *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510 (Fla. 2015); *Lowrie v. City of Evanston*, 365 N.E.2d 923, 928 (Ill. App. 1977); *Matter of Eighth Jud. Dist. Asbestos Litig.*,129 N.E.3d 891, 897-98 (N.Y. App. 2019); *New Texas Auto Auction Servs., L.P. v. Gomez De Hernandez*, 249 S.W.3d 400, 404 (Tex. 2008).
[61] *See, e.g., Toral v. Uber Techs., Inc.*, No. 20STCV02030 (Cal. Super. Ct. L.A. Cnty. Apr. 14, 2021).

2972299.11

*Symantec Corp.*, that "computer software … may be characterized as tangible property" because it "takes up space" and "constitutes a corporeal body." 333 F. Supp. 3d 966, 979 (N.D. Cal. 2018) (citing *S. Cent. Bell Tel. Co. v. Barthelemy*, 643 So. 2d 1240, 1246 (La. 1994)). *South Central* is instructive as to the crossover between the physical and digital worlds:

> [S]oftware … is physically manifested in machine readable form by arranging electrons, by use of an electric current, to create either a magnetized or unmagnetized space … The computer reads the pattern of magnetized and unmagnetized spaces … This machine readable language or code is the physical manifestation of the information in binary form.

643 So. 2d at 1246. In short, machine-readable code requires physical elements to operate. As outlined in the Master Complaint, the Uber App consists of code that is downloaded onto phones as an app package. MC ¶¶ 445-47, 457, 478, 492. It is a tangible thing, distributed in the stream of commerce through various app stores. *Id.* ¶¶ 446, 478, 492.[62]

## 2.  The distribution and use of the Uber App is analogous to the distribution and use of personal property.

The Uber App is a "product" for the alternative reason that "context of [its] distribution and use is sufficiently analogous to the distribution and use of tangible personal property." Restatement (Third) of Torts: Products Liability § 19(a). Just last year, Judge Gonzalez Rogers recognized that the distribution and use of mobile applications is sufficiently comparable to the distribution and use of tangible personal property to support the application of strict products liability. *In re Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 2023 WL 7524912 at *30-34 (N.D. Cal. Nov. 14, 2023) (reasoning that the absence of screen-time limitations and parental controls were analogizable to timers already present on smartphones and child-safety locks, respectively). If Instagram can satisfy this test, then so does the Uber App. *See Doe v. Uber Technologies, Inc.*, No. 2322-CC01288, at 7 (Mo. Cir. Ct. Mar. 13, 2024) (denying motion to dismiss upon finding that "the Uber app is sufficiently analogous to the distribution and use of tangible personal property"). For example, Plaintiffs allege the App is defective because it lacks

---

[62] In *Social Media*, Judge Gonzales Rogers rejected arguments that social media platforms were tangible where the plaintiffs' tangibility arguments were premised on user interactions (i.e., visual effects, vibrations, and the like). 2023 WL 7524912, at *25. By contrast, Plaintiffs here alleged that the Uber app *itself* has material elements that take up space in the physical world. *See* MC ¶¶ 445-48.

1 adequate audio or video recording functionalities, and does not use GPS tracking to identify route

2 deviations; both of these functionalities are present in tangible personal property. MC ¶¶ 472-73.

3 **3.    Public policy warrants treating the Uber App as a product.**

4 The relevant public policy rationales are substantially similar across jurisdictions: "[T]he

5 purpose of strict products liability is 'to insure that the costs of injuries resulting from defective

6 products are borne by the manufacturers that put such products on the market rather than by the

7 injured persons who are powerless to protect themselves.'" *Lowrie*, 365 N.E.2d at 929 (citation

8 omitted); *see also Aubin*, 177 So. 3d at 510 ("The important aspect of strict products liability …

9 remains true today: the burden of compensating victims of unreasonably dangerous products is

10 placed on the manufacturers, who are most able to protect against the risk of harm, and not on the

11 consumer injured by the product."); *see also* Restatement (Third) of Torts: Products Liability

12 § 19, Reporters' Note, cmt. a (listing policy considerations).

13 Public policy warrants application of strict liability against Uber. *Brookes v. Lyft, Inc.*,

14 2022 WL 19799628, at *4-5 (Fla. Cir. Ct. Sept. 30, 2022) ("[T]he designer of … the Lyft

15 application placed into the stream of commerce to derive a profit, is in the best position to protect

16 the user and innocent bystander against the risk of harm associated with any design defect.").

17 First, Uber derived considerable benefits from supplying the App to consumers; the App is

18 integral to Uber's business model. MC ¶¶ 445, 477, 480, 491-92. Second, Uber designed the

19 product and placed it in the stream of commerce, meaning Uber alone exercises control over the

20 product, its features, and its availability to consumers. *Id.* Uber alone has the power to protect

21 users by making design choices to modify the App's functionalities—but chose not to. MC

22 ¶¶ 131-32, 472-73. Finally, the App was always involved in the provision of services, given that

23 Uber's entire business is built around its App.

24 **B.    TNC statutes do not preclude a finding that the Uber App is a product.**

25 Uber argues that various states' TNC statutes prohibit classification of the Uber App as a

26 product. But these regulatory and licensing schemes say little or nothing about Uber's tort

27 liability. And, to the extent the statutes reference Uber's "services," they do not purport to

28 regulate the company's "product." None of the statutes govern the technical design of any mobile

1    application (including its algorithm or code) nor any warnings users must be given.

2    **1.    California**

3    The California Public Utilities Code defines a TNC as "an organization … that provides

4    prearranged transportation services for compensation using an online-enabled application or

5    platform to connect passengers with drivers using a personal vehicle." Cal. Pub. Util. Code

6    § 5431(c). This statute says nothing about whether the "application or platform" that helps

7    provide the "services" is a product. Uber cites "legislative findings" that repeat the term

8    "services," but again say nothing about whether an App through which those "services" are

9    obtained is subject to strict products liability principles. *See id.* §§ 5440(a), (c), (d). In California,

10   as in other states, "[a] statute will be construed in light of common law decisions, unless its

11   language clearly and unequivocally discloses an intention to depart from, alter, or abrogate the

12   common-law rules concerning the particular subject matter." *Shaw v. Superior Ct. of Contra*

13   *Costa Cnty.*, 78 Cal. App. 5th 245, 258 (2022) (internal quotations omitted). This public utility

14   regulation does not.

15   **2.    Florida**

16   The Florida TNC statute, Fla. Stat. § 627.748, et seq., defines a TNC's "digital network,"

17   but says nothing about whether a regulated company can provide *both* services and a product, or

18   whether the company's application constitutes a product for the purpose of strict products

19   liability. *See, e.g.*, *Kitchen*, 697 So. 2d at 1207 ("Under our rules of statutory construction, a

20   statute will not displace the common law unless the legislature expressly indicates an intention to

21   do so.") (citation omitted).

22   One recent and well-reasoned Florida decision explains that reliance on the TNC statutes

23   "is misplaced as it relates to [the] argument that [the] application is not a product." *Brookes*, 2022

24   WL 19799628, at *5. The court explained:

25   > The TNC statute does not make any mention of product liability claims. There is
   > no indication whatever in the statutory text of any intent to insulate [TNCs] from

26   > product liability claims associated with the design of its application. … [T]his does
   > not make a digital application a service and not a product for purposes of product

27   > liability law. [The] argument runs contrary to clear statutory text of the TNC statute.
   > … The TNC statute cannot possibly be read as an approval of the design of [the]

28   > application.

1   *Id.*; *see also Esurance*, 2021 WL 2955962, at *6 (explaining the TNC statute is "regulatory" and

2   rejecting reliance on its provisions in determining whether Uber is a "public or livery

3   conveyance" for purposes of resolving an insurance dispute).[63] In addition, where the Florida

4   legislature intended this statute to affect tort liability, it did so expressly. *See* Fla. Stat. §

5   627.748(18) (limiting vicarious liability for motor vehicle accidents); *see also Cason*, 944 So. 2d

6   at 315 (rejecting argument based on statutory implication where "language in other statutes …

7   show[s] that the Legislature knows how to accomplish what it has omitted in the statute in

8   question") (internal quotation marks omitted).

9                            **3.    Illinois**

10      The Illinois TNC statute defines a TNC to mean "an entity … that uses a digital network

11   or software application service to connect passengers to transportation network company

12   services." 625 Ill. Comp. Stat. 57/5. But it does not say that a "software application" cannot also

13   be a product. *See Rush Univ. Med. Ctr. v. Sessions*, 980 N.E.2d 45, 51 (Ill. 2012) ("The implied

14   repeal of the common law is not and has never been favored."). The statute is concerned

15   principally with insurance, discrimination, and fare requirements, 625 Ill. Comp. Stat. 57/10-30. It

16   includes no references to tort liability in general or strict products liability in particular. *See Stiles*

17   *v. Int'l BioResources, LLC*, 726 F. Supp. 2d 944, 952 (N.D. Ill. 2010) (In Illinois, "courts will

18   conclude that a statute abrogates a common-law action only when the statute expressly abrogates

19   the common-law right or when abrogation is necessarily implied by the statute.").

20                            **4.    New York**

21      The New York TNC statute is a regulatory and licensing statute that does not apply in the

22   tort context. *See Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d at 355-56 (holding that Uber can be a

23   common carrier for purposes of tort liability despite the statute saying that "[a] TNC … shall not

24   be deemed a common carrier," and explaining that the statute "is intended to apply only to

25   regulation of TNC licensing and insurance matters"). Because the statute does not limit tort

26

27   _____

[63] Uber cites only *Baxter-Armentrout v. Lyft, Inc.*, No. 50-2021-CA-013917, at 5 (Fla. Cir. Ct.
Aug. 29, 2022), but that order assumed, without support or analysis, that the Florida legislature
28   intended for the TNC statute to preclude application of strict products liability. The Court should
follow the better-reasoned *Brookes* decision in predicting Florida law on this point.

1   liability generally, it by definition does not preclude strict products liability specifically. *See id.* at

2   356 ("The only references to liability are made in connection with ensuring that the TNC and/or

3   the driver has the appropriate automobile liability insurance."). As in other states, this conclusion

4   is compelled by the principle of New York statutory interpretation that "[t]he Legislature is

5   presumed to be aware of the law in existence at the time of an enactment and to have abrogated

6   the common law only to the extent that the clear import of the language of the statute requires."

7   *Caboara v. Babylon Cove Dev., LLC*, 54 A.D.3d 79, 83 (N.Y. App. 2008).

8               **5.    Texas**

9        The Texas TNC statute defines a "digital network" as an "online-enabled application,

10  website, or system offered or used by a transportation network company that enables the

11  prearrangement of rides between passengers and drivers." Tex. Occ. Code § 2402.001(2). The

12  statute does not classify "digital networks" as services. *Id.* Rather, the statute invokes "services"

13  to explain what TNCs are *not*, *id.* § 2402.001(5), and in the nondiscrimination context concerning

14  service refusal (and service animals), *id.* §§ 2402.112-.113. Even in this limited

15  nondiscrimination context, the TNC statute never classifies mobile applications as services. As

16  with the TNC statutes of the other at-issue states, nowhere does the Texas Legislature regulate the

17  technical design of any mobile application nor the warnings to be provided to end users regarding

18  the features of such an application. *See Taylor*, 644 S.W.3d at 649 ("[S]tatutes purporting to

19  abrogate common-law principles must do so either expressly or by necessary implication.").

20           **C.    As a product designer, Uber is subject to strict liability.**

21       Uber argues that even if the Uber App is a product, Plaintiffs' strict products liability

22  claims fail because the Uber App's "predominant purpose" is providing services.[64] While Uber

23  cites the "predominant purpose" test across the board, this test is used by California alone.

24  *Ferrari v. Grand Canyon Dories*, 32 Cal. App. 4th 248, 258 (1995). Where this test applies,

25  Plaintiffs allege sufficient facts to establish that the predominant purpose of the hybrid product-

26  service transaction is to engage with Uber's technology. In the remaining states, Plaintiffs allege

27  sufficient facts under the applicable standards to establish that strict products liability applies.

28

---

[64] ECF 384 at 23-26; ECF 385 at 23-26; ECF 386 at 23-26; ECF 387 at 23-26; ECF 388 at 23-26.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.  <u>California</u>

Under the predominant purpose test, courts consider whether the "service aspect predominates and any product sale is merely incidental to the provision of the service." *Hernandezcueva v. E.F. Brady Co.*, 243 Cal. App. 4th 249, 258 (2015). Where a transaction involves both products and services, "liability will often depend upon the defendant's role." *Ferrari*, 32 Cal. App. 4th at 258. Courts consider to whether the defendant "derived a considerable benefit from supplying the products," had a "role in the stream of commerce relating to the products," or was "in a position to … improve product safety." *Hernandezcueva*, 243 Cal. App. 4th at 263 (internal quotation marks omitted). These considerations are evaluated "in light of the policies underlying the doctrine of strict liability." *Id.*

Under these principles, companies like Uber who occupy dual roles as product suppliers *and* service providers are typically subject to strict products liability. For example, in *Green v. ADT, LLC*, the defendant moved to dismiss the plaintiff's strict products liability claims, arguing that the plaintiff's acquisition of a product in connection with home security services was merely incidental to those services. 2016 WL 3208483, at *1-2 (N.D. Cal. June 10, 2016). The court disagreed, explaining, unlike cases where the defendant was merely "the last link in [the] distribution chain," the security company both designed the alarm and provided the services connected to it, such that it "occupies a dual role not seen in the cases it relies on; it is simultaneously the manufacturer and provider of products and related services." *Id.* at *3. As in *ADT*, Uber is "one in the same: manufacturer and provider." *Id.* at *4; *see also Hernandezcueva*, 243 Cal. App. 4th at 261-62 (applying strict products liability where the defendant contractor's bids "always encompassed the materials necessary for the project," such that it was more than an "occasional" seller of the products and derived benefit from supplying the products in conjunction with its services).

By contrast, Uber inaptly compares itself to service providers that were not in the business of supplying products. In *Ferrari*, the defendant was a white-water rafting company that did not design or sell the at-issue products (the rafts) it used while providing services. 32 Cal. App. 4th at

258. The company was not part of the distribution chain for the rafts, but merely purchased the rafts from a third party and utilized them in its business. *Id.*

The remaining cases cited by Uber, most of which consist of trial court orders, assume that because the Uber App can be used to acquire a service, providing a service is necessarily its primary purpose.[65] These cases, for the most part, identify the existence of services and end the analysis there. But California law requires courts to examine the "defendant's role" in connection with the product. *Ferrari*, 32 Cal. App. 4th at 258. In the rideshare context, analysis of the defendant's role is significant and distinguishes Uber, which both designs the product and provides the service, from traditional car services. *See Social Media*, 2023 WL7524912, at *24 n.36 (rejecting reliance on some of the cases Uber cites as having "minimal, if any rationale" or "no meaningful analysis").

Uber relies heavily on the *JCCP Order*. But, respectfully, that court's reasoning is inconsistent with California law and does not withstand scrutiny. The JCCP concluded that the primary purpose of the Uber App was provision of services based on the TNC statute and the $0 price for the App. *JCCP Order* at 18. As explained above, the TNC statute cannot be read to preclude strict products liability. And the JCCP's zero-price reasoning is inconsistent with California appellate precedent, which does not require a sale to establish strict liability (and, of course, the App requires payment to use). *See Stein v. S. Cal. Edison Co.*, 7 Cal. App. 4th 565, 570-71 (1992). The JCCP also compared the Uber App to a "telephone that a customer uses to call a taxi." *JCCP Order* at 18. This analogy is inapt. While a taxi company does not design, manufacture, sell, or distribute phones in addition to providing taxi services, Uber designed and manufactured the Uber App in addition to providing services in conjunction with it. MC ¶¶ 11, 480, 494. Moreover, the services Uber provides are intertwined with the Uber App, whereas a phone can be used to contact anyone, and has no inherent connection to taxi services. Finally, Uber is "in the business" of mobile application development and distribution (in addition to

---

[65] *See, e.g.*, *Luna* v. *Uber Techs., Inc.*, No. 22STCV10806 (Cal. Super. Ct. Sept. 27, 2022). Uber relies on other distinguishable cases, such as those involving distracted driving cases in which drivers looked at their cell phones rather than the road while providing services to the plaintiffs or otherwise where courts viewed the product at issue as the driver's car—not the Uber App. *See, e.g.*, *Norman v. Uber Techs., Inc.*, No. 21STCV35632, at 6-7 (Cal. Super. Ct. Mar. 8, 2022).

transportation), whereas a taxi company cannot be said to be in the business of phone services.

Contrary to the cases Uber cites, numerous California cases examined whether mobile application companies and similar entities were subject to strict products liability based on their role as app or software designers and concluded that they were. *See Guerrero v. Lyft, Inc.*, 2023 WL 9228975, at *4 (Cal. Super. Ct. May 25, 2023); *Lemmon*, 995 F.3d at 1092 (holding products liability allegations springing from app manufacturer's "distinct capacity as a product designer" were not subject to dismissal); *Lemmon v. Snap, Inc.*, 2022 WL 1407936, at *6 (C.D. Cal. Mar. 31, 2022) ("[g]uided by the Ninth Circuit's focus on the design of the … app," concluding plaintiffs sufficiently alleged app designer was liable as product manufacturer); *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170 (2014) (permitting products liability claims to proceed where plaintiffs alleged software program was defective product).

For example, in *Guerrero*, the court characterized the transaction as a "sale-service hybrid transaction," in which liability depends "upon the defendant's role." 2023 WL 9228975, at *5 (citation omitted). The court explained that the Lyft App requires the user to purchase the product component, after which service commences via transportation. *Id.* Further, "licensing and sale of the Lyft App product is an integral component of the service transaction." *Id.* Here, too, Uber's product is an integral component of the service transaction, in that acquisition of services occurs *through* the product and Uber is both the manufacturer of the product and provider of the services.

### 2.  **Florida**

Uber invokes the "predominant purpose" test to challenge Plaintiffs' claims under Florida law. ECF 386 at 24. But Florida's use of the "predominant purpose" test is limited to professional services, specifically in healthcare. *Porter v. Rosenberg*, 650 So. 2d 79, 81 (Fla. App. 1995); *N. Miami Gen. Hosp., Inc. v. Goldberg*, 520 So. 2d 650, 652 (Fla. App. 1988). Here, Plaintiffs plead that Uber provides "non-professional" services (and Uber is not a healthcare provider). MC ¶¶ 14, 120, 137, 142, 258, 408. Even if the "predominant purpose" test applies under Florida law, it is satisfied. While the defendants in *Porter* and *North Miami* provided services, they did not design the products used. 650 So. 2d at 81; 520 So. 2d at 652. By contrast, Uber did both. MC ¶¶ 11, 24,

116, 187, 464, 480-81, 494.

The true test in Florida depends on the public policy factors underlying the doctrine of strict liability. In *Brookes*, the court permitted the strict liability claims to proceed over arguments that the Lyft app provided services. 2022 WL 19799628, at *4 (cited approvingly in *Social Media*, 2023 WL 7524912, at *29-30). The court reasoned that public policy supported the finding that strict liability applied to rideshare applications because the policy "is to protect the user and innocent bystanders" and Lyft designed the app and placed it into the stream of commerce to derive a profit, putting Lyft "in the best position to protect the user and innocent bystander." *Id.* at *5. Further, Lyft "designed, distributed, and mass marketed" the product. *Id.* The court contrasted this with circumstances (like healthcare services) in which "service providers provide an individualized service for customers, and have not designed, or marketed the product." *Id.*

### 3.   **Illinois**

Uber does not cite any authority for the proposition that Illinois follows the predominant purpose test in strict products liability cases. To the contrary, Illinois courts rely on public policy to guide decisions as to whether a defendant should be subject to strict products liability. *See Paulson v. Abbott Labs.*, 2017 WL 11886538, at *3 (N.D. Ill. Mar. 15, 2017). Because Uber designed the App and has sole control over its proprietary algorithm and code, the public policy of the state of Illinois supports a finding that the App is a product subject to strict products liability claims under Illinois law. *Id.*

### 4.   **New York**

In support of its contention that Plaintiffs "need to establish that their transaction with Uber was to purchase a product rather than obtaining a service," Uber cites *Levine v. Sears Roebuck & Co.*, 200 F. Supp. 2d 180 (E.D.N.Y. 2002), and *Detwiler v. Bristol-Myers Squibb Co.*, 884 F. Supp. 117 (S.D.N.Y. 1995). ECF 385 at 39. Neither of the cited cases stands for this proposition. In *Levine*, the plaintiffs did not deny that the subject product was "designed and manufactured by a different company." 200 F. Supp. 2d at 190. In *Detwiler*, the court explained that "a physician cannot be liable in strict products liability for a defective product he administers

1    when his provision of the product is incidental to the medical services." 884 F. Supp. at 121. But

2    there, the plaintiffs alleged that the physician had pharmaceutically altered the medical product

3    before injecting it such that he had "processed" the product and the court permitted the plaintiffs

4    to *add* their strict products liability claims. *Id.* As in *Levine* and *Detwiler*, where a defendant is

5    involved in the manufacture or processing of a product *as well as* the services, they may be liable

6    in strict products liability, but where the defendant merely provides services disconnected from

7    products they processed or manufactured, they are not. Here, as in *Detwiler*, Uber both designed

8    the Uber App and created its code *as well as* provided services in connection with the product.

9               **5.    Texas**

10   Texas courts do not follow the "predominant purpose" test. Instead, Texas law considers

11   whether the sale of a product is "incidental." *New Texas*, 249 S.W.3d at 404. The "reason for this

12   limitation arises from the justifications for strict liability itself, namely: (1) compensating injured

13   consumers, (2) spreading potential losses, and (3) deterring future injuries." *Id.* Businesses that

14   play only an incidental role in a product's placement in the stream of commerce are not subject to

15   liability. *Id.* These justifications do not apply to Uber, which designed the Uber App and placed it

16   into the stream of commerce. MC ¶¶ 51, 445, 449, 451-53, 477, 480, 491, 494. Products liability

17   claims involving the functions or lack thereof in mobile application software have been allowed

18   to proceed against software designers in Texas. *See Estate of Alex ex rel. Coker v. T-Mobile US,*

19   *Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018).

20   Uber cites only cases involving sellers of products manufactured by third parties. *See*

21   *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 107-08 (Tex. 2021) (products that Amazon did

22   not design or manufacture); *Centerpoint Builders GP, LLC v. Trussway, Ltd.*, 496 S.W.3d 33, 40-

23   41 (Tex. 2016) (trusses not manufactured by the general contractor defendant). Here, Uber is not

24   only in the business of distributing a particular product (the Uber App), MC ¶¶ 480, 494, but also

25   designs and controls every aspect of the product at issue. *Id.* ¶¶ 51, 445, 449, 451-53, 477, 480,

26   491, 494. Under Texas law, Plaintiffs' claims are properly pleaded. *See Estate of Alex through*

27   *Coker*, 313 F. Supp. 3d at 732.

28

1

**D.**     **Plaintiffs adequately allege product defects and necessary warnings.**

2

Uber asserts that Plaintiffs fail to allege "any" defect in the Uber App or that the Uber

3

App requires warnings to users or consumers.[66] Not so. Plaintiffs meticulously document the

4

defects in the design of the Uber App, as well as the warnings that Uber should have provided to

5

users.

6

Plaintiffs plead, among other things, that Uber made design choices, including using its

7

code, algorithm, and data to "match" riders with drivers, establish a "rating" system, and facilitate

8

the exchange of "complaints" in natural language. MC ¶¶ 458-63. Plaintiffs further allege that

9

Uber made affirmative design choices *not* to integrate certain functionalities, such as using its

10

code, algorithm, and data to engage with cameras, microphones, and other technology. *Id.* ¶¶ 457-

11

64. These design choices placed Plaintiffs at risk of harm to an extent beyond that contemplated

12

by the ordinary consumer who purchases or downloads the Uber App. *See, e.g.*, *id.* ¶¶ 483-84.

13

Plaintiffs allege implementation of reasonable alternative designs would reduce those risks, and

14

provide examples. *Id.* ¶¶ 487-88. Finally, Plaintiffs allege that Uber had a duty to warn Plaintiffs

15

that the features of the Uber App placed them at risk of sexual harassment, assault, or other

16

injuries while using the Uber App, and that it failed to do so. *See, e.g.*, *id.* ¶¶ 497-504.

17

These allegations are plausible standing on their own, but even more so considering that

18

Uber *does* implement design choices purportedly targeting safety, but that in reality are part of

19

Uber's reassurance strategy to make riders *feel* safe. *See id.* ¶ 24 (discussing the emergency

20

responder call button). The fact that Uber modifies the App when helpful to keep riders riding

21

demonstrates it could modify the App to keep riders safe.

22

Uber also disregards the standards governing design defect or failure to warn claims. Uber

23

fails to appreciate the distinction between design defect and manufacturing defect claims. It

24

argues that Plaintiffs' design defect claims fail because they did not allege a "glitch or bug" in the

25

Uber App.[67] But Uber cites no authority that a design defect claim requires a plaintiff to establish

26

27

---

[66] ECF 384 at 25; ECF 385 at 24; ECF 386 at 25; ECF 387 at 24; ECF 388 at 24.

28

[67] ECF 384 at 25; ECF 385 at 24; ECF 386 at 25; ECF 387 at 24; ECF 388 at 24.

PLS.' OPP'N TO DEF.'S MOTS.
TO DISMISS LONG-FORM COMPLAINT
CASE NO. 3:23-MD-03084

1  the existence of a "glitch."[68] None exists. Uber confuses *design* defects with *manufacturing*

2  defects. To establish a design defect, a plaintiff must establish that a defect in the intended design

3  of the product renders the product unreasonably dangerous. *See, e.g.*, *Trejo v. Johnson &*

4  *Johnson*, 13 Cal. App. 5th 110, 128 (2017).[69] By contrast, a manufacturing defect exists where

5  the product does not conform to the design. *See, e.g.*, *Garrett v. Howmedica Osteonics Corp.*, 214

6  Cal. App. 4th 173, 191 (2013). A "glitch" in Uber's algorithm or code would go to a

7  manufacturing defect, not a design defect. *See, e.g.*, *Lieberson v. Johnson & Johnson Consumer*

8  *Cos., Inc.*, 865 F. Supp. 2d 529, 543 (D.N.J. 2011).

9      **E.      Plaintiffs adequately allege causation at this stage.**

10      Plaintiffs allege the defective design of the Uber App and Uber's failure to warn users of

11  the risks directly and proximately caused their injuries. *Id.* ¶¶ 474, 487-89, 502-04. Uber argues

12  that Plaintiffs did not include plaintiff-specific causation allegations for "all 200+ alleged

13  incidents" comprising the cases consolidated in this MDL.[70] As explained above in the fraud

14  section (Section II.D, supra), the Master Complaint properly does not include plaintiff-specific

15  facts. To the extent the Court evaluates causation now, the Master Complaint's extensive

16  allegations of the design and (lack of) warnings of the Uber App make it plausible that safety

17  features or warnings would have made a difference in many individual cases.

18  **VI.    Plaintiffs adequately plead UCL claims.**

19      Plaintiffs assert claims for injunctive relief under the Unfair Competition Law, Cal. Bus.

20  & Prof. Code § 17200 et seq., based on Uber's on-going failure to adequately protect against

21  sexual assault in its rides. MC ¶¶ 506-13.

22      **A.      Plaintiffs plead unlawful, fraudulent, and unfair conduct.**

23      The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus.

24  & Prof. Code § 17200. Plaintiffs adequately plead all three prongs.

25  _____

26  [68] Uber's cited cases merely state the test used by each state to determine whether there is a design defect or failure to warn.

27  [69] *See also Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 493-94 (Fla. 2015); *Hakim v. Safariland, LLC*, 410 F. Supp. 3d 862, 869 (N.D. Ill. 2019); *Simon v. Smith & Nephew, Inc.*, 990

28  F. Supp. 2d 395, 403 (S.D.N.Y. 2013); *Smith v. Aqua-Flo*, 23 S.W.3d 473, 477 (Tex. App. 2000).
[70] ECF 384 at 26; ECF 385 at 25; ECF 386 at 26; ECF 387 at 26; ECF 388 at 25.

-106-

**Unlawful**. Uber's conduct was "unlawful" because it violated the company's various duties of care. MC ¶ 507. Uber cites a case holding that "common law claims such as negligence cannot form the basis of an unlawful prong claim under the UCL." *Mendez v. Selene Fin. LP*, 2017 WL 1535085, at *6 (C.D. Cal. Apr. 27, 2017). But *Mendez* relied on a Ninth Circuit decision (that Uber also cites) that held only that "breach of contract is insufficient." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010). As later decisions have explained, even "a breach of contract claim" can be enough "if flanked by allegations the conduct is *also* unlawful." *Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*, 2020 WL 3893395, at *7 (E.D. Cal. July 10, 2020) (breach of duty of good faith and fair dealing adequate) (emphasis added); *see also, e.g.*, *Nazemi v. Specialized Loan Servicing, LLC*, 637 F. Supp. 3d 856, 865 (C.D. Cal. 2022) (noting that UCL "unlawful" prong requires "a violation of another statute *or common law*") (emphasis added); *Wagner v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6258891, at *3 n.1 (C.D. Cal. Mar. 8, 2018) ("Wagner's UCL claim remains intact to the extent it is predicated on the common law duty of good faith.").

Even assuming that an "ordinary" negligence claim standing alone could not support a UCL "unlawful" claim (no case says so), Plaintiffs' allegations go far beyond ordinary negligence. They include allegations of wanton, reckless conduct, as well as violations of higher duties of care under common carrier and other non-delegable duty theories (analogous to the good faith violation found sufficient in *Aerojet*). These are sufficient to support a UCL "unlawful" claim.

**Fraudulent**. Uber concedes that if Plaintiffs' fraud claims survive (which, as explained above in Section II, they do), then their claim under the UCL's "fraudulent" prong does as well. ECF 384 at 27. Even this overstates Plaintiffs' pleading burden: unlike common law fraud, a UCL claim "does not require a showing of intent, scienter, actual reliance, or damage." *Nazemi*, 637 F. Supp. 3d at 863.

**Unfair**. Uber says that Plaintiffs fail to plead an "unfair" claim, but in doing so, cites only one way in which the prong can be violated. While it is true that Plaintiffs do not allege "an incipient violation of an antitrust law," they do plead that Uber's practices are "immoral,

1    unethical, oppressive, unscrupulous or substantially injurious to consumers" as well as that "the

2    practice's impact on the victim outweighs the reasons, justifications, and motives of the alleged

3    wrongdoer." *Id.* at 864 (quoting *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir.

4    2020); MC ¶¶ 1-35 (summarizing how Uber assured passengers that riding with Uber was safe

5    while its business model foreseeably increased the risk of sexual assault, and refused to take steps

6    to reduce that risk). In particular, Plaintiffs have "adequately pleaded the harm to [them] from

7    [Uber's] alleged conduct; for its part, [Uber] offers nothing in the way of reasons, justifications,

8    or motives, or utility of its conduct, to weigh against the alleged harm." *Pirozzi v. Apple, Inc.*, 966

9    F. Supp. 2d 909, 922 (N.D. Cal. 2013) (internal quotation marks omitted).

10        Uber argues that Plaintiffs must plead "some actual or threatened impact on competition"

11   or a tie "to some legislatively declared policy," ECF 384 at 27 (citation omitted), but ignore that

12   those requirements apply only where "a plaintiff … claims to have suffered injury from a *direct*

13   *competitor's* 'unfair' act or practice." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.

14   4th 163, 186-87 (1999) (emphasis added); *see also Lozano v. AT&T Wireless Servs., Inc.*, 504

15   F.3d 718, 735-36 (9th Cir. 2007) (reviewing California decisions on the issue, affirming that the

16   balancing test remains applicable in consumer cases, and rejecting the need to show that a

17   violation was "tethered to some legislatively declared policy or proof of some actual or threatened

18   impact on competition") (citation omitted).[71]

19        In any event, Plaintiffs' allegations are grounded in "public policy" sufficiently "tethered

20   to specific … statutory [and] regulatory provisions." *In re Adobe Sys., Inc. Privacy Litig.*, 66 F.

21   Supp. 3d 1197, 1226 (N.D. Cal. 2014) (citation omitted). It is California public policy that TNCs

22   like Uber prioritize the safety of its passengers. Specifically, the California Public Utilities

23   Commission has "broad authority to protect public safety and specifically to regulate charter-

24   party carriers like Uber pursuant to the Public Utilities Code." ECF 259-3 (Uber-CPUC

25   settlement) at 11. Those safety regulations extend specifically to sexual assault in Uber vehicles.

26   *See id.* at Ex. A (discussing the CPUC's demand for Uber to provide information regarding sexual

27

28   [71] Uber cites *In re 5-hour ENERGY Mktg. & Sales Pracs. Litig.*, 2014 WL 5311272 (C.D. Cal. Sept. 4, 2014), but that case declined "to decide what definition of 'unfair' conduct applies here, because the [complaint] satisfie[d]" any standard. *Id.* at *26.

assaults). Indeed, when the CPUC first regulated Uber, it emphasized: "Because Uber is profiting from this service it should also be held responsible if the driver is negligent or not applying Uber safe practices." *Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry*, Decision 13-09-045, at 17 (Cal. Pub. Util. Comm'n Sept. 19, 2013).[72] More generally, it is California's public policy that common "carrier[s] of persons … use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." Cal. Civ. Code § 2100. This is sufficient. *See Adobe*, 66 F. Supp. 3d at 1227 (denying motion to dismiss UCL unfair prong claims where statutes "collectively reflect California's public policy of 'protecting customer data'").

### B.  Plaintiffs assaulted outside of California can maintain UCL claims based on conduct in California.

Uber argues that Plaintiffs who were assaulted outside of California may not assert UCL claims given the "presumption against extraterritoriality" that attaches to the statute. ECF 385 at 26 (citation omitted).[73] But "the critical question presented by Plaintiff[s'] complaint is whether application of the UCL … in the circumstances alleged actually entails an extraterritorial application of those statutes." *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1130 (N.D. Cal. 2014). As many courts have recognized, "state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." *In re iPhone 4S Consumer Litig.*, 2013 WL 3829653, at *7 (N.D. Cal. July 13, 2013) (standing to pursue UCL claims based on "false advertising that originated in California"); *Ehret*, 68 F. Supp. 3d at 1130-32 (same, and collecting cases).

In a footnote, Uber says that "there is no factual allegation of misconduct occurring in California" and "the misconduct giving rise to Plaintiffs' claims indisputably occurred outside of the state." ECF 385 at 27 n.20; *see also* ECF 386 at 27 n.21; ECF 387 at 27 n.22; ECF 388 at 26 n.22. This ignores the allegations. Plaintiffs plead that Uber's actions, including the design of its App, its policies concerning selection and screening of drivers, and its uniform advertising

---

[72] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M077/K192/77192335.PDF.

[73] *See also* ECF 386 at 26; ECF 387 at 26; ECF 388 at 26.

1   messaging, "were coordinated at, emanate from and are developed at its California headquarters."

2   *iPhone 4S*, 2013 WL 3829653, at *7; *see also* MC ¶¶ 142-56 (alleging how Uber's business

3   model and policies were designed by California-based leadership); *id.* at ¶¶ 196-99, 218-23

4   (discussing representations on Uber's website and App, which by definition are approved by

5   corporate decision-makers in California). To the extent the Court determines the Master

6   Complaint should more expressly plead that each of these actions emanated from "critical

7   decisions … made within the state," *Ehret*, 68 F. Supp. 3d at 1131 (citation omitted), at Uber's

8   California headquarters, the Master Complaint can be easily amended to do so.

9        This general rule is particularly applicable here, where Plaintiffs' UCL claims seek only

10   injunctive relief (and not, for example, damages under the Consumer Legal Remedies Act). MC

11   ¶ 513. That form of relief focuses "on the defendant's conduct, rather than the plaintiff's

12   damages, in service of the statute's larger purpose of protecting the general public against

13   unscrupulous business practices." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). To the

14   extent that the challenged conduct occurs in multiple states, the Court can fashion any injunction

15   to be consistent with the territorial limits of the UCL.

16   **VII.   Plaintiffs adequately plead claims for injunctive relief.**

17        Plaintiffs seek injunctive relief to change Uber's policies regarding driver screening,

18   sexual assault prevention, and sexual assault response in order to improve their safety in future

19   Uber rides. MC ¶¶ 350-59.

20        **A.      Plaintiffs lack adequate legal remedies.**

21        Uber argues that Plaintiffs may not seek injunctive relief because they fail to plead a lack

22   of an adequate remedy at law. But the proposed relief, by targeting conduct affecting *future* Uber

23   rides to reduce or eliminate the risk of Plaintiffs being sexually assaulted, by definition cannot be

24   redressed with money damages. *See, e.g.*, *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 687 (N.D.

25   Cal. 2021) (finding "that monetary damages for past harm are an inadequate remedy for … future

26   harm"); *Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1042 (E.D. Cal. 2014)

27   ("If there is the possibility of future wrongful conduct, a legal remedy is inadequate.") (citation

28   omitted); *see also Gomez v. Jelly Belly Candy Co.*, 2017 WL 8941167, at *1 (C.D. Cal. Aug. 18,

2017) (noting that plaintiffs need only plead "some facts suggesting that damages are insufficient to make them whole" to pursue claims for equitable relief).

None of the cases Uber cites compel otherwise. In *Rodriguez v. FCA US LLC*, 2023 WL 3150075 (C.D. Cal. Mar. 21, 2023), "the gravamen of Plaintiff's [complaint] is that he seeks reimbursement for costs he incurred in repairing his vehicle that he contends should have been covered by … warranty," a "claim for relief [that] is routinely addressed through legal remedies, namely monetary damages." *Id.* at *4. Here, Plaintiffs seek injunctive relief to prevent future injury, not redress past ones. In *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), the plaintiff, on the eve of trial, affirmatively disclaimed her legal claims for damages and sought to move forward only with equitable claims for restitution "to compensate her for the same past harm." *Id.* at 837, 844. Because she sought "the same amount of money for the exact same harm," she could not show a lack of an adequate remedy at law. *Id.* at 844. Here, Plaintiffs seek an injunction to prevent distinct injuries, not restitution to compensate the same. *See Zeiger*, 526 F. Supp. 3d at 687 (distinguishing *Sonner*, and explaining the distinction between a "damages," which are "retrospective," and an "injunction," which is "prospective").

Finally, in *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633 (N.D. Cal. 2020), a data breach case decided at summary judgment, the plaintiff sought an injunction requiring the defendant to modify its data security practices, but failed to "provide evidence demonstrating that Defendant's failure to change its practices … could produce [future] harm"; instead, her evidence related only to what the "Defendant should have" done in the past. *Id.* at 662-63. *Huynh* stands only for the proposition that Plaintiffs must demonstrate entitlement to injunctive relief as the litigation progresses; it says nothing about the adequacy of the pleadings now.

## B.   Plaintiffs have standing to seek injunctive relief.

Uber argues that Plaintiffs lack standing to pursue injunctive relief. In the Ninth Circuit, consumers generally have standing to seek injunctive relief in connection with "a product's misleading representation" where they "face[] an actual and imminent threat of future injury because [they] may be unable to rely on the defendant's representations in the future, or because the plaintiff may again purchase the mislabeled product." *Davidson v. Kimberly-Clark Corp.*, 889

F. 3d 956, 968 (9th Cir. 2018). That is exactly what Plaintiffs allege here. Plaintiffs "reasonably expect to be able to use Uber's product in the future" (some must do so because "third parties … utilize Uber[] to transport clients to medical or rehab[] appointments," or they are otherwise disabled). MC ¶¶ 352-55, 58. Their inability to "purchase Uber's product as advertised," *id.* ¶ 357 constitutes the type of actual and imminent harm found sufficient in *Davidson*.

Uber argues that *Davidson* permits only "claims seeking to enjoin future advertising." ECF 384 at 29 n.21. But correcting false advertising and modifying underlying conduct to make advertising no longer false are two sides of the same coin. *See Davidson*, 889 F.3d at 970 (explaining plaintiffs have standing if they "may reasonably, but incorrectly, assume the product was improved"). *Cf. In re Coca-Cola Prods. Mktg. & Sales Pracs. Litig. (No. II)*, 2021 WL 3878654, at *2 (9th Cir. Aug. 31, 2021) (distinguishing *Davidson* where "[n]one of the plaintiffs in this case allege a desire to purchase Coke *as advertised*, that is, free from what they believe to be artificial flavors or preservatives"). That either action would ameliorate Plaintiffs' future injuries does not diminish the probable existence of those injuries. *See Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 707 (E.D. Mo. 2018) (denying motion to dismiss claims for injunctive relief where plaintiff "alleges that Defendant continues to sell slack-filled candy boxes, *i.e.*, the unlawful practice is ongoing").

In any event, even if the appropriate injunction targets Uber's representations rather than its practices, the motion to dismiss should still be denied. The Court is not limited to the precise injunctive relief requested in the pleadings; rather, a court must grant "the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). Accordingly, it is, at best, "premature to dismiss the request for injunctive relief …. At the conclusion of the case, if Plaintiff[s are] entitled to injunctive relief, the Court is required to fashion an appropriate injunction at that time. It is not restricted to the exact language requested in the operative complaint." *Perez v. Bath & Body Works, LLC*, 2023 WL 3467207, at *6 (N.D. Cal. May 15, 2023).

Uber argues that Plaintiffs may not seek to modify Uber's practices because the risk of future misconduct is too remote. Not so. *First*, Plaintiffs plead that the widespread existence of

1    sexual assault on Uber's platform "deters Plaintiffs from using the product and thus restricts their

2    access to transportation," MC ¶ 358, itself an injury-in-fact, and one more far more significant

3    and actual than the inability to buy one particular brand of "flushable wipes." *Davidson*, 889 F.3d

4    at 961; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("[W]e have found

5    standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to

6    reasonably incur costs to mitigate or avoid that harm.").

7          *Second*, Plaintiffs plead that sexual assault is a well-accepted part of Uber's business

8    model—that the steady flow of drivers requires that screening never be too rigorous, and that

9    Uber avoids other safety mechanisms, such as cameras, to maximize revenue. MC ¶¶ 124-34,

10    142-69. This adds up to a "substantial risk of future harm to Plaintiffs." *Id.* ¶ 354; *see also*

11    *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (explaining that an "injury is likely to

12    recur" where it "stems from" a "written policy" or "where the defendants have repeatedly

13    engaged in the injurious acts in the past").[74] Whether that risk is sufficiently high is a fact

14    question not appropriate for resolution now. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

15    561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the

16    defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations

17    embrace those specific facts that are necessary to support the claim.") (internal quotation marks

18    omitted); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1140-41 (C.D. Cal.

19    2021) (denying motion to dismiss in data breach case where plaintiffs sought "injunctive relief

20    requiring Defendants to 'implement and maintain reasonable security measures,'" and explaining

21    that defendants' ongoing retention of plaintiffs' "private information" and refusal to make

22    "changes to [their] … security practices" made a "data breach … sufficiently likely to recur such

23    that injunctive relief will redress Plaintiffs' injuries").

24          Uber relies on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), but that case is

25    inapposite. *Lyons* was decided on a full record, where the burden to show standing is higher. *See*

26    *Lujan*, 504 U.S. at 561. And it involved materially different facts, in that a premise of the claim

27    was that the plaintiff would engage in future criminal conduct. Specifically, while the plaintiff

28

---

[74] *Abrogated on other grounds*, *Johnson v. California*, 543 U.S. 499 (2005).

"alleged that the City authorized the use of the control holds in situations where deadly force was not threatened, [he] did not indicate why [he] might be realistically threatened by police officers who acted within the strictures of the City's policy," for example if that policy extended only to "resistance to an arrest." *Lyons*, 461 U.S. at 106; *see also Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (en banc) (distinguishing *Lyons* as based on legality of plaintiffs' conduct). In addition, the *Lyons* Court found significant "the absence of 'any [record] evidence showing a pattern of police behavior' suggestive of an unconstitutional application of the chokehold." *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) (quoting *Lyons*, 461 U.S. at 110 n.9).

Here, Plaintiffs allege they "realistically" will ride in Uber—a legal and reasonable activity—and will encounter drivers who are poorly screened and set out to drive without sufficient protections against sexual assault. MC ¶¶ 142-169; *see also, e.g.*, *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 825-26 (9th Cir. 2020) (distinguishing *Lyons* where plaintiffs' claims were based on an "ongoing, sustained pattern of conduct"). And the Master Complaint lays out in details the "pattern of [driver] behavior" that puts Plaintiffs at risk.

It does not matter that not every Uber driver is a sexual assault threat; the risk still comes from Uber's policies. In *Doe v. Hagee*, 473 F. Supp. 2d 989 (N.D. Cal. 2007), for example, two high school students sued the Marine Corps, alleging that they had been sexually assaulted by marine recruiting officers, and seeking injunctive relief to reform the Corps' training and supervision polices. *Id.* at 992-93. The court denied a motion to dismiss for lack of standing, explaining that "[w]hile plaintiffs have not alleged that all Marine recruiters always sexually assault recruits, they have alleged that the Marines condoned the practice of sexually assaulting recruiters sufficient to overcome defendants' motion to dismiss." *Id.* at 997 (noting that *Lyons* was "at the procedural stage at which a motion for injunction was before the court and factual records had been developed for that purpose").[75]

---

[75] Uber also cites *Doe v. Match.com*, 789 F. Supp. 2d 1197 (C.D. Cal. 2011), but in that case plaintiff "presented no evidence that she plans to use Defendant's services to meet other users" in the future. *Id.* at 1200. Here, the Master Complaint seeks injunctive relief for Plaintiffs who intend to use Uber's services in the future. MC ¶ 352. Judge Wilson went on to say that the

**VIII.   Plaintiffs adequately plead entitlement to punitive damages.**

Plaintiff plead entitlement to punitive damages based on Uber's intentional, reckless, wanton, malicious, or fraudulent acts. MC ¶ 340. Specifically, even though "Uber was aware of widespread sexual misconduct" on its platform, "Uber and its executive officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them." *Id.* ¶¶ 344. Uber's decisions to forego reasonable safety precautions were "driven by Uber executives' desire for rapid expansion and increased profits." *Id.* ¶¶ 345. Uber also "misrepresented the safety of its rides." *Id.* ¶ 349.

**A.   California**

Plaintiffs' allegations plausibly support awards of punitive damages in California. *See* Cal. Civ. Code § 3294(a) (punitive damages available upon a showing of "oppression, fraud, or malice"). Plaintiffs plead both malice and fraud. Malice includes "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1). The Master Complaint recounts in detail how Uber knew of the widespread risk of sexual assault to its passengers but persisted (and persists) in refusing to take essential safety precautions. MC ¶¶ 258-316. Uber says Plaintiffs have failed to plead malice, but simply ignores the allegations of the Master Complaint. Fraud means "an intentional misrepresentation, deceit, or concealment of a material fact." Cal. Civ. Code § 3294(c)(3). Plaintiffs plead exactly that. *See* Section II, supra.

Uber argues that "[a] plaintiff seeking punitive damages must satisfy a heightened pleading standard." ECF 384 at 29-30. Not so. California's "heightened pleading requirement on claims for punitive damages is irrelevant" here "because such a requirement conflicts with federal procedural law." *Panoyan v. Regalo Int'l LLC*, 2019 WL 8758897, at *3 (C.D. Cal. Oct. 25,

---

plaintiff's allegations also failed because her "claim depends on such a chain of speculative contingencies." *Doe v. Match.com*, 789 F. Supp. 2d at 1201. But *Doe* gave no indication the plaintiff alleged an ongoing and repeated pattern of misconduct, as Plaintiffs allege here. Nor did *Doe* cite *Davidson* or any of the Ninth Circuit's cases distinguishing *Lyons*. Uber also cites *Ramsay v. Frontier, Inc.*, 2020 WL 4557545 (D. Colo. July 30, 2020), but that case emphasized that "there are no allegations of any greater likelihood of sexual assault compared to any other airline." *Id.* at *17. Here, Plaintiffs have alleged that sexual assault is an inherent problem in Uber's innovative business model, and that they have specific reason to use Uber's services—as opposed to some other form of transportation—again. MC ¶¶ 350-53.

2019) (citation omitted); *see also Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 273 (N.D. Cal. 2015) ("[S]ection 3294 is a state procedural rule not implicated in federal court.… Although Section 3294 provides the governing substantive law for punitive damages, California's heightened pleading standard irreconcilably conflicts with Rules 8 and 9 of the Federal Rules of Civil Procedure—the provisions governing the adequacy of pleadings in federal court.") (internal quotation marks omitted). Under federal standards, it is sufficient for a plaintiff to "include a short and plain prayer for punitive damages that relies entirely on unsupported and conclusory averments of malice or fraudulent intent." *Petrash v. Biomet Orthopedics, LLC*, 2019 WL 8013939, at *5 (N.D. Cal. June 6, 2019) (internal quotation marks omitted). Plaintiffs easily clear that low bar (and meet a heightened pleading standard in any event).[76]

Uber also argues that "an award of punitive damages it not permissible where the plaintiff's injuries were caused by a third party." ECF 384 at 30. But Plaintiffs plead that *Uber*'s conduct contributed to their injuries, and Uber may properly be assigned punitive damages even if a third party's conduct also contributed. No case says otherwise (including the one case Uber cites). *See Medo v. Superior Ct.*, 205 Cal. App. 3d 64, 68 (1988).

### B.   Florida

Plaintiffs sufficiently allege a basis for punitive damages under Florida law. That state permits punitive damages where a defendant is "guilty of intentional misconduct" or "gross negligence." Fla. Stat. § 768.72(2). Plaintiffs plead both. The Master Complaint alleges that Uber had "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to [Plaintiffs] would result" and "intentionally pursued that course of conduct" anyway. *Id.* § 768.72(2)(a); *see also* MC ¶¶ 124-34, 258-81 (Uber knew that sexual assault was a widespread problem, but intentionally decided against robust safeguards); Section II, supra (Uber intentionally misrepresented and concealed material facts). And the Master Complaint alleges that Uber's "conduct was so reckless or wanting in care that it constituted a conscious disregard to the … safety … of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b); *see also* MC ¶¶ 240-

---

[76] Uber cites *Clark v. State Farm Mut. Auto. Ins. Co.*, 231 F.R.D. 405 (C.D. Cal. 2005), but that case affirmed that federal pleading standards, not the California statute, govern pleading challenges in federal court. *Id.* at 406-07.

81 (Uber tried not to learn about sexual misconduct and then concealed and downplayed the problem).

Uber does not even cite the relevant Florida statute, but argues that its conduct did not rise to the level of "gross negligence." ECF 386 at 30.[77] But gross negligence is supported by allegations of a defendant's "actual knowledge of a danger followed by a failure to warn of that danger"—exactly what Plaintiffs allege here. *Alfeo v. I-Flow, LLC*, 2012 WL 442981, at *2 (S.D. Fla. Feb. 10, 2012).

Uber argues that "Plaintiffs cannot state a claim for punitive damages simply by reiterating their allegations of ordinary negligence." ECF 386 at 30. To start, this ignores all of the allegations of intentional and reckless conduct replete throughout the Master Complaint. But more to the point, whether misconduct constitutes only "ordinary negligence" or instead intentional misconduct or gross negligence is a fact question. *See, e.g.*, *Brown v. Martinez*, 2023 WL 5036369, at *9 (S.D. Fla. Aug. 8, 2023) ("Whether [the defendant's] acts and omissions are factually enough to warrant an award of punitive damages is an inquiry not suited for determination at the motion-to-dismiss stage.") (citation omitted); *In re Engle Cases*, 2012 WL 4771237, at *2 (M.D. Fla. Oct. 5, 2012) (allegations supporting "strict liability and negligence claims …, if proven, could show that Defendants' alleged misconduct was intentional or was so reckless that it constituted" gross negligence); *Aslin Beer Co., LLC v. BrewFab, LLC*, 2023 WL 3931973, at *4 (M.D. Fla. June 9, 2023) (denying motion to dismiss punitive damages claim where, "[a]lthough it appears quite unlikely that this claim will support punitive damages, the Court cannot conclusively state that such claim does not involve … gross negligence") (internal quotation marks omitted).

Uber cites one case—*Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*, 357 So. 3d 703 (Fla. App. 2023)—that applied Florida's procedural requirement that, before pleading punitive damages, a plaintiff must provide "evidence in the record … which would provide a

---

[77] Uber says that gross negligence is not sufficient for punitive damages, ECF 386 at 30, but cites only cases predating the modern Florida punitive damages statute (first enacted in 1986, last amended in 1999).

1  reasonable basis for recovery of such damages." *Id.* at 706 (quoting Fla. Stat. § 768.72(1)). This

2  procedural rule conflicts with Rule 8 and does not apply in federal court. *Cohen v. Off. Depot,*

3  *Inc.*, 184 F.3d 1292, 1298 (11th Cir. 1999)[78]; *accord, e.g.*, *A.M. by & through Malcolm v.*

4  *Bayfront HMA Med. Ctr., LLC*, 2022 WL 17417011, at *2 (M.D. Fla. Dec. 5, 2022).

5  ### C.   Illinois

6  Plaintiffs adequately plead bases for punitive damages under Illinois law. Illinois allows

7  such damages where "torts are committed with fraud, actual malice, deliberate violence or

8  oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a

9  wanton disregard of the rights of others." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277

10  F.3d 936, 946 (7th Cir. 2002) (citation omitted). Plaintiffs' allegations of fraud and reckless

11  indifference easily satisfy this standard.

12  Uber says that Plaintiffs' "allegations of ordinary negligence" are insufficient. ECF 388 at

13  30. To start, this ignores all of the allegations of willful, reckless, and fraudulent misconduct. In

14  addition, "[a]though [Uber] is correct that punitive damages require proof beyond that needed for

15  a basic negligence claims, the same set of facts could support both a finding of negligence and an

16  award for punitive damages." *Doe v. Cath. Bishop of Chicago*, 82 N.E.3d 1229, 1233-34 (Ill.

17  App. 2017) (citation omitted). The only case Uber cites—*Loitz v. Remington Arms Co.*, 563

18  N.E.2d 397 (Ill. 1990)—involved a determination as to the sufficiency of the evidence after a

19  "jury trial," and says nothing about pleadings. *Id.* at 398-99.[79]

20  ### D.   New York

21  Plaintiffs adequately plead bases for punitive damages under New York law. To start,

22  because punitive damages are merely a remedy and not a cause of action, "the trend among courts

23  applying New York law seems to be to deny attempts to dismiss prayers for punitive damages at

24  the motion to dismiss stage because it is not even clear that there is a requirement that a complaint

25  seeking punitive damages must plead specific facts that would support an award of such

---

[78] *Vacated in part on other grounds*, 204 F. 3d 1069 (11th Cir. 2000).

[79] In a footnote, Uber repeats its arguments that Illinois does not permit vicarious liability. ECF 388 at 30 n.25. Because the Master Complaint adequately pleads a basis for punitive damages based on Uber's own conduct, the Court need not decide at this time whether punitive damages based on vicarious liability may be recovered.

damages." *Wang v. Tesla, Inc.*, 2021 WL 3023088, at *5 (E.D.N.Y. July 16, 2021) (internal quotation marks omitted); *see also, e.g.*, *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010) ("[I]n rejecting attempts to dismiss demands for punitive damages, courts have not undertaken a detailed analysis of whether the factual allegations of the pleading support such a demand.") (collecting cases).

In any event, Plaintiffs' allegations are sufficient. As "a general rule, under New York law punitive damages are appropriate in cases involving gross, wanton, or willful fraud, or other morally culpable conduct." *Wrap-N-Pack, Inc. v. Kaye*, 528 F. Supp. 2d 119, 123-24 (E.D.N.Y. 2007) (internal quotation marks omitted). This test is "an intensely factual one, and is ill suited for dismissal this early in the litigation." *Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 533 (S.D.N.Y. 2018) (internal quotation marks omitted). As Uber concedes, Plaintiffs' fraud claims, if adequately pleaded, support requests for punitive damages. ECF 385 at 30. Plaintiffs also plead that Uber's conduct "evince[d] a high degree of moral culpability" and "reckless disregard for the rights of [Plaintiffs]." *Allam v. Meyers*, 906 F. Supp. 2d 274, 291 (S.D.N.Y. 2012) (citation omitted); *see also* MC ¶¶ 163, 231, 243-48, 299 (alleging that Uber intentionally or recklessly prioritized profits over passenger safety).

Uber says that "Plaintiffs cannot state a claim for punitive damages simply by reiterating their allegations of ordinary negligence." ECF 385 at 30. This ignores all of the allegations of willful, reckless, and fraudulent misconduct. In addition, whether actions constituting negligence also meet the higher standards for punitive damages is a question of fact. *See, e.g.*, *Maher v. U.S. Xpress Enters., Inc.*, 688 F. Supp. 2d 95, 106 (N.D.N.Y. 2010) (permitting a "claim of punitive damages" that "derives from the same set of operative facts as the claim for negligent hiring, training, and supervision"); *Watkins v. Harlem Ctr. for Nursing & Rehab., LLC*, 2021 WL 4443968, at *14 (S.D.N.Y. Sept. 28, 2021) ("Plaintiffs … may seek punitive damages in connection with their surviving negligence claim[s]."). Uber cites *Rice v. Univ. of Rochester Med. Ctr.*, 46 A.D.3d 1421 (N.Y. App. 2007) and *Anderson v. Elliott*, 24 A.D. 3d 400 (N.Y. App. 2005), but those cases, without reciting much about the facts at issue, determined that the alleged acts "r[o]se only to the level of ordinary negligence," *Rice*, 46 A.D.3d at 1423, or did not

1    "demonstrate[] such a high degree of moral culpability," *Anderson*, 24 A.D.3d at 402. Here,

2    Plaintiffs allege intentional and reckless acts driven by calculated decisions to place profits over

3    safety. *See, e.g.*, *City Nat'l Specialty Co. v. Ashley Furniture Indus., LLC*, 2022 WL 2918121, at

4    *4-5 (explaining that punitive damages are available when "the defendant is aware of and

5    consciously disregards a substantial and unjustifiable risk," and that "punitive damages do not

6    necessarily demand the heightened level of advance notice suggested by Defendant and, in fact,

7    may be awarded under New York law where the defendant wantonly disregards the '*potential* for

8    fire hazards'") (citations omitted); *id.* at *4 ("Defendant's argument also ignores that the TAC

9    repeatedly alleges that Defendant knew its products caused or were alleged to have caused

10   fires.").

11        **E.     Texas**

12        Plaintiffs adequately plead entitlement to punitive damages under Texas law. That state

13   authorizes such damages in three circumstances: (1) fraud; (2) malice; and (3) gross negligence.

14   Tex. Civ. Prac. & Rem. Code § 41.003(a). Uber concedes that if Plaintiffs' fraud claims are

15   adequately pleaded, then so are their requests for punitive damages. ECF 387 at 30. And Uber

16   ignores "gross negligence" entirely. As in other states, Plaintiffs' allegations about Uber's

17   reckless disregard for incidents of sexual assault satisfy the standard for gross negligence. *See*

18   Tex. Civ. Prac. & Rem. Code § 41.001(11) ("'Gross negligence' means an act or omission …

19   which … involves an extreme degree of risk … and … of which the actor has actual, subjective

20   awareness of the risk involved, but nevertheless proceeds with conscious indifference to the

21   rights, safety or welfare of others."); *see also, e.g.*, *Fearrington v. Boston Sci. Corp.*, 410 F. Supp.

22   3d 794, 808-09 (S.D. Tex. 2019) (denying motion to dismiss punitive damages requests, where

23   "Defendant failed to adequately research or anticipate the possible risks and dangers [its product]

24   would have, and … downplayed or omitted those risks despite knowledge that they would cause

25   catastrophic injuries in some individuals such as Plaintiff").

26   **IX.    Uber's choice-of-law arguments are premature.**

27        The Court should resolve the state-law issues presented in Uber's motion without deciding

28   any choice-of-law questions at this time. Uber selected the laws of five states to move under

1    against the Master Complaint. ECF 352. In four of those motions, Uber has identified the cases

2    pending in the MDL that it contends are subject to the laws of the particular state.[80] Uber bases

3    these arguments in part on the allegations of where a Plaintiff was assaulted, and in part on

4    choice-of-law and forum-selection provisions in Uber's Terms of Use. *E.g.*, ECF 387 at 3 n.2 &

5    at 5. None of these facts appears in the Master Complaint that the motions target. *See In re:*

6    *Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1192, 1215 (S.D. Fla. 2021) (declining to

7    "conduct a choice-of-law analysis" in deciding motions "based on the facts alleged in the [Master

8    Personal Injury Complaint]").

9           There are several reasons for the Court to decline to decide choice-of-law at this time.

10   *First*, such a determination is not required to resolve the motions. Plaintiffs agree deciding the

11   adequacy of the Master Complaint's pleading under the identified states' laws would advance the

12   adjudication of common issues in this MDL. *See In re OnStar Contract Litig.*, 600 F. Supp. 2d

13   861, 865 (E.D. Mich. 2009) ("conclud[ing] that a choice-of-law analysis would be premature at

14   this juncture" and instead deciding pleading challenges under the laws of various states). This

15   Court should decide the motions, putting for another day the effect of those rulings on individual

16   Plaintiffs' cases. Uber does not move to dismiss the claims of any Plaintiff in their entirety, so

17   there is no urgency in converting a potential ruling to a judgment.

18          *Second*, choice-of-law requires, for many Plaintiffs, analysis of the forum-selection or

19   choice-of-law clauses in Uber's Terms of Use. The forum selection clause, if valid, might dictate

20   which state's choice-of-law rules apply. That issue is pending (as applied to some Plaintiffs) in

21   Uber's Terms of Use Motion. ECF 257, 341, 393. The choice-of-law clause, if valid, would

22   require application of the chosen state's law (to the extent that state would enforce the clause at

23   all). Assessing whether the choice-of-law clause applies requires, for each Plaintiff (1)

24   determining whether the Plaintiff assented to a version of the TOU containing the choice-of-law

25   clause, and did so before she filed a lawsuit;[81] (2) if so, ascertaining whether the selected state's

26

---

[80] ECF 385 at 3-6; ECF 386 at 3-6; ECF 387 at 3-6; ECF 388 at 3-5.

27   [81] The Court should not uncritically accept Uber's word regarding which Plaintiffs assented to

28   which terms. For example, in the Terms of Use motion, Uber asserted that 29 Plaintiffs assented
     to non-consolidation and forum selection clauses, but then belatedly acknowledged "differing fact
     patterns" and withdrew its Terms of Use Motion with respect to 3 Plaintiffs. ECF 393 at 6 n.7.

1    law would deem the TOU provision controlling in light of the timing of the Plaintiff's assault and

2    the novelty of designing a choice-of-law provision to depend on the circumstances of a tort

3    (rather than specifying a particular jurisdiction). These questions are not ripe: they are

4    inadequately addressed by Uber's motion; will be informed by the Court's ruling on the pending

5    Terms of Use motion; and are tangential to the merits issues presented in Uber's motions to

6    dismiss.

7           *Third*, it is not yet apparent whether and to what extent there are conflicts between

8    potentially applicable state laws. Uber's position is that the identified claims fail under each of

9    the five states' laws at issue. Absent an extant material conflict, there is no need to evaluate

10   choice-of-law. *See, e.g.*, *Axis Reinsurance Co. v. Telekenex, Inc.*, 913 F. Supp. 2d 793, 800 (N.D.

11   Cal. 2012).

12          *Fourth*, choice-of-law is not a monolith, but instead requires "a separate conflict of laws

13   inquiry … with respect to each issue in the case." *Wash. Mut. Bank, FA v. Sup. Ct.*, 24 Cal. 4th

14   906, 920 (2001); *see also e.g.*, *Goosehead Ins. Ag'y LLC v. William Ins. & Consulting, Inc.*, 533

15   F. Supp. 3d 367, 384-85 (N.D. Tex. 2020) (noting that, under Texas choice-of-law rules, "courts

16   consider each issue separately," even where the analysis includes consideration of a "choice-of-

17   law provision"); *Bank Saderat Iran v. Telegen Corp.*, 30 F. App'x 741, 743-45 (9th Cir. 2002)

18   (affirming "decision to apply California law" to "breach of fiduciary duty claim," but holding that

19   "New York law" governed "punitive damages," and noting states' "interest in deterring [in-state

20   defendants]"); *Smith v. I-Flow Corp.*, 753 F. Supp. 2d 744, 747-48 (N.D. Ill. 2010) (applying

21   Illinois choice-of-law rules, and holding that, although "[t]he injury in this case occurred in

22   Michigan, where the [plaintiffs] live," California punitive damages law applied because the

23   defendant's "decisions regarding marketing and distribution … and its activities [plaintiffs]

24   contend warrant imposition of punitive damages, took place in California, where [the defendant]

25   is headquartered").

26                                    **CONCLUSION**

27          For these reasons, Plaintiffs respectfully request that Uber's motions to dismiss the Master

28   Complaint be denied.

1

2    Dated: April 30, 2024                    Respectfully submitted,

3
                                             By: */s/ Sarah R. London*
4                                                Sarah R. London (SBN 267083)

5                                            **LIEFF CABRASER HEIMANN &**
                                             **BERNSTEIN, LLP**
6                                            275 Battery Street, 29th Floor
                                             San Francisco, CA 94111-3339
7                                            Telephone: (415) 956-1000
                                             Facsimile: (415) 956-1008
8                                            slondon@lchb.com

9
                                             By: */s/ Rachel B. Abrams*
10                                               Rachel B. Abrams (SBN 209316)

11                                           **PEIFFER WOLF CARR KANE**
                                             **CONWAY & WISE, LLP**
12                                           555 Montgomery Street, Suite 820
                                             San Francisco, CA 94111
13                                           Telephone: (415) 426-5641
                                             Facsimile: (415) 840-9435
14                                           rabrams@peifferwolf.com

15
                                             By: */s/ Roopal P. Luhana*
16                                               Roopal P. Luhana

17                                           **CHAFFIN LUHANA LLP**
                                             600 Third Avenue, 12th Floor
18                                           New York, NY 10016
                                             Telephone: (888) 480-1123
19                                           Facsimile: (888) 499-1123
                                             luhana@chaffinluhana.com
20
                                             *Co-Lead Counsel*
21

22

23

24

25

26

27

28