1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION _____/ This Order Relates To: ALL ACTIONS | MDL No. 3084 CRB **PRETRIAL ORDER NO. 15: ORDER ON TERMS OF USE MOTION** |

This motion asks a simple question, the answer to which will have a profound impact on litigation throughout the United States: Can parties to a contract nullify the judiciary's ability to manage litigation currently pending in the federal courts? To be more precise, do parties have the right to agree that some federal lawsuits cannot be coordinated with other federal lawsuits, notwithstanding a finding by a panel of federal judges that the lawsuits share common issues of fact and that coordination would result in the just and efficient conduct of the litigation? This Court concludes that such an agreement cannot be enforced in light of the Congressional mandate set forth in 28 U.S.C. § 1407, which created the Judicial Panel on Multidistrict Litigation. The reasons are set forth below.

\*\*\*

In an initial scheduling order, this Court directed Uber to file "any pretrial motion raising arguments about its Terms of Use Agreement(s) and their effect on Plaintiffs' ability to bring their claims in a coordinated or consolidated proceeding" by February 9, 2024. Pretrial Order No. 5 (dkt. 175) at 5. It was clear, both from Uber's arguments

before the Judicial Panel on Multidistrict Litigation ("JPML" or "the Panel") and the positions it has taken before this Court, that Uber might argue that its Terms of Use Agreement precluded Plaintiffs from pursuing their claims in these centralized proceedings.  If such arguments were to be raised, their prompt and early resolution was necessary, since they could profoundly affect the nature of this multidistrict litigation ("MDL").

Uber timely filed its motion, which argues that Plaintiffs are contractually barred from pursuing their claims in these centralized proceedings and before this Court.  Uber asks that the cases either be dismissed without prejudice or transferred to the districts where it says they should have been filed.  The arguments are based on two contract provisions: a "Non-Consolidation Clause," which purports to prevent plaintiffs from "participating" in any "coordinated or consolidated proceeding," and a Forum Selection Clause, which states that claims like Plaintiffs' must be litigated in the districts where they allege that the underlying incidents occurred.  The Court held a hearing on the motion on April 12, 2024.

After careful consideration, the Court denies the motion.  First, enforcement of a waiver of the right to participate in "coordinated" or "consolidated" proceedings would profoundly undermine the interests that Congress sought to advance when it enacted 28 U.S.C. § 1407.  The Non-Consolidation Clause is not like the other kinds of litigation-shaping contract provisions to which Uber compares it.  Unlike certain other procedural options available to litigants—filing suit on behalf of a Rule 23 class, choosing the forum in which to file one's case, choosing arbitration over litigation—coordination and consolidation are primarily the prerogative of the judiciary rather than of litigants.  Thus, unlike an arbitration clause, a forum-selection clause, or a class-action waiver, the primary effect of the Non-Consolidation Clause is to impinge upon the judiciary's ability to manage the cases before it.  The judiciary's case management powers, including those enabled by Section 1407, ultimately serve not only the parties' interests, but the public interest in the efficient and effective use of judicial resources.  In this respect, the Non-

Consolidation Clause substantially interferes with the public interests that Congress sought to advance—and the means by which it sought to advance them—when it enacted the MDL statute. So the clause is unenforceable.

Second, the Court does not reach the parties' arguments about whether and how to enforce the Forum Selection Clause. The reason is that the clause cannot actually affect "Plaintiffs' ability to bring their claims in a coordinated or consolidated proceeding." Pretrial Order No. 5 (dkt. 175) at 5. Assuming that the cases filed in this district ought to have been filed elsewhere, any transfer order by this Court would be immediately undone by the JPML, which would transfer the cases back under the MDL statute. Nothing would be accomplished except pointless expense and delay. Uber will have the chance to seek enforcement of the Forum Selection Clause at the appropriate time, but that time is not now. It should await the resolution of common issues of fact as directed by the JPML.

## I.      BACKGROUND

### A.      Procedural History

On October 4, 2023, the JPML created MDL No. 3084, centralizing 22 actions in this Court for coordinated pretrial proceedings. In re Uber Techs., Inc., Passenger Sexual Assault Litig., No. MDL 3084, 2023 WL 6456588 (J.P.M.L. Oct. 4, 2023) ("Transfer Order"). In opposing transfer, Uber had argued before the JPML that certain provisions in its Terms of Use barred plaintiffs from proceeding in coordinated or consolidated proceedings, or (to the extent there is a difference) that the terms barred the JPML from coordinating or consolidating a proceeding. The JPML's initial transfer order rejected this argument as a basis for denying transfer. The Panel wrote:

> The Panel is not bound by Uber's Terms of Use, and Section 1407(c) grants the Panel the authority to centralize civil cases upon its own initiative. Moreover, plaintiffs suggest they will challenge the enforceability of Uber's Terms of Use. Centralization thus will allow for streamlined briefing on this common issue.

Id. at *2. As the JPML noted, the enforceability of the Terms of Use as a bar to case coordination is a common issue in these cases. Accordingly, in  an early case management

United States District Court
Northern District of California

order, the Court instructed Uber to file "any pretrial motion raising arguments about its Terms of Use Agreement(s) and their effect on Plaintiffs' ability to bring their claims in a coordinated or consolidated proceeding."  Pretrial Order No. 5 (dkt. 175) at 5.

Defendants timely filed a "Motion Regarding Uber's Terms of Use" on February 9, 2024.  The parties later stipulated to an extension of the original briefing schedule, and under the revised schedule, briefing was completed on April 2.  The Court heard argument on the motion on April 12.

Uber's motion is "limited for the time being to 29 of the Plaintiffs in this [MDL]" about whom Uber had, at the time of filing the motion, "sufficient information to allow Uber to demonstrate their assent to Uber's Terms of Use dated January 18, 2021."  Defs.' Mot. Regarding Uber's Terms of Use ("Mot.") (dkt. 257) at 8.  (The Terms of Use dated January 18, 2021, are the first that contain the relevant "Non Consolidation Clause" and "Forum Selection Clause" that are at the core of Uber's motion.)  Of course, if Uber's motion were successful as to these 29 plaintiffs, it would likely be entitled to the same result to any other plaintiffs whom it could show had assented to the same terms.

### B.      Uber's Terms of Use

When a user registers for an Uber account, the user cannot proceed to use the Uber App until she indicates her assent to Uber's Terms of Use that are then in effect. Sauerwein Decl. (dkt. 257-2) ¶ 6.  Uber periodically updates its Terms of Use, and users are likewise required to indicate their assent to the new terms in order to use the Uber App. Id. ¶ 7.  The updated agreement is presented to users in the form of a clickwrap agreement. Upon opening the Uber App, a blocking pop-up screen tells users that the terms have been updated and states, in large type: "We encourage you to read our Updated Terms in full." Id. ¶ 10.  The pop-up contains hyperlinks to both the updated Terms of Use and Uber's Privacy Notice, and if the links are clicked, the user is taken to a page on the Uber website that displays the current version of each document.  Id.  Within the Uber App, the user cannot proceed past the pop-up screen unless she checks a box, next to which is text reading: "By checking the box, I have reviewed and agree to the Terms of Use and

4

acknowledge the Privacy Notice." Id.  After the box is checked, the user may click "Confirm" and proceed to use the App.  Id.; see also Sauerwein Decl. Ex. B (displaying an image of this pop-up screen).  Uber asserts that each of the 29 Plaintiffs created an Uber account prior to January 18, 2021—the first date on which the relevant provisions appeared in the terms—but subsequently agreed to updated versions of the Terms of Use in the manner just described.  Id. ¶¶ 8–9.

Uber's Terms of Use contain an arbitration clause that, by its terms, applies to most claims that a rider might bring against Uber.  See Uber Terms of Use dated Jan. 17, 2023, § 2, Sauerwein Decl. Ex. E (dkt. 257 2 at 37–62) (hereinafter "Terms of Use").[1]  But certain types of claims are excepted from this arbitration clause.  These include "individual claims brought in small claims court," "individual claims of sexual assault or sexual harassment occurring in connection with your use of the Services," and certain intellectual property claims seeking injunctive or equitable relief.  Id. § 2(b).  But while these types of claims are not subject to mandatory arbitration, the Terms of Use nevertheless purport to limit the manner in which a plaintiff may proceed in bringing them.  The Court will refer to these limitations as the "Non-Consolidation Clause."  The relevant language is as follows:

> Such claims may be brought and litigated in a court of competent jurisdiction by you on an individual basis only. On an individual basis means that you cannot bring such claims as a class, collective, coordinated, consolidated, mass and/or representative action against Uber. For the avoidance of doubt, this precludes you from bringing claims as or participating in any kind of any class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber and no action brought by you may be consolidated or joined in any fashion with any other proceeding.

Id. (emphasis added).  Uber argues that, pursuant to this provision, "Plaintiffs'

---

[1] While there are several versions of Uber's Terms of Use that contain the provisions relevant to Uber's motion, the provisions relevant to this order did not change over the years, except cosmetically.  For simplicity's sake, this order exclusively cites to and quotes from the version of the Terms of Use dated January 17, 2023, unless otherwise noted.  It refers to this version of the terms generically as the "Terms of Use."

United States District Court
Northern District of California

participation in any coordinated or consolidated action is explicitly barred and constitutes a breach of the Agreement by Plaintiffs." Mot. at 10.

The Terms of Use also contain a forum selection clause. It reads as follows:

> Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to these Terms, shall be brought exclusively in the state or federal courts in the state in which the incident or accident occurred, notwithstanding that other courts may have jurisdiction over the parties and subject matter, and except as may be otherwise provided in the Arbitration Agreement in Section 2 or in Supplemental Terms applicable to your region, to the extent permitted by law.

Terms of Use § 8. Uber argues that, pursuant to this provision (the "Forum Selection Clause"), any plaintiffs whose claims are based on incidents that took place outside of California are "preclude[d] . . . from being litigated here," in the Northern District of California. Mot. at 11.

In short, Uber asserts that the Non-Consolidation Clause and the Forum Selection Clause, either together or in combination, bar Plaintiffs from pursuing their claims in this MDL before this Court. Uber asks that the Court either dismiss Plaintiffs' cases or transfer them to the forums selected in the Forum Selection Clause.

## II.     DISCUSSION

### A.     Coordination and Consolidation in Multidistrict Litigation

Uber's motion argues that Plaintiffs' actions may not be litigated on anything but an "individual basis," meaning they cannot be "coordinated" or "consolidated" with other proceedings. It will be useful to begin by considering what it means for an action to be "coordinated" or "consolidated" in multidistrict litigation.

The system of multidistrict litigation is authorized by 28 U.S.C. § 1407. The law created a panel of Article III judges, the Judicial Panel on Multidistrict Litigation, with the discretion to transfer "civil actions involving one or more common questions of fact [that] are pending in different districts . . . to any district for coordinated or consolidated pretrial

6

proceedings." 28 U.S.C. § 1407(a).  A Section 1407 transfer can only be made by the Panel, and only upon the Panel's determination that that transfer would serve "the convenience of parties and witnesses" and "promote the just and efficient conduct of such actions."  Id.

Multidistrict litigation as such begins when the JPML issues an initial transfer order that centralizes two or more actions in a transferee court.  See In re Phenylpropanolamine (PPA) Products Liability Litigation, 460 F.3d 1217, 1230 (9th Cir. 2006) ("A transfer is effective when the order of transfer is 'filed in the office of the clerk of the district court of the transferee district.'  When the transfer becomes effective, 'the jurisdiction of the transferor court ceases and the transferee court has exclusive jurisdiction.'") (quoting Manual for Complex Litigation, Fourth, § 20.131 (2004)); see also Rule 1.1(e), R.P.J.P.M.L. ("'MDL' means a multidistrict litigation docket which the Panel is either considering or has created by transferring cases to a transferee district for coordinated or consolidated pretrial proceedings pursuant to Section 1407.").  Subsequently, the JPML will transfer "tag-along" actions that are filed in districts other than the transferee district and that concern the same common questions of fact as the originally transferred action.  See Rule 1.1(h), R.P.J.P.M.L.  But not every individual action that will be coordinated with multidistrict litigation will ever be subject to a transfer under Section 1407.  Some actions will already be pending in the transferee court at the time of the JPML's initial transfer order, so no transfer will be required.  Other actions may subsequently be filed in the transferee court itself.[2]

---

[2] Courts sometimes distinguish between cases that would have been filed in the transferee court even in the absence of an MDL and those cases that would have been filed elsewhere but for the MDL.  Transferee courts have sometimes called the former "local cases," and the latter "direct filed cases."  See In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig., No. 3:09-MD-02100-DRH, 2011 WL 1375011, at *5 (S.D. Ill. Apr. 12, 2011);  See Looper v. Cook Inc., 20 F.4th 387, 390–91 (7th Cir. 2021) (discussing MDL direct filing procedures).  Sometimes this distinction has legal significance—for example, in relation to choice of law issues.  See Looper, 20 F.4th at 390–91; Wahl v. Gen. Elec. Co., 786 F.3d 491, 498–99 (6th Cir. 2015).  For purposes of this order, though, the only relevant distinction is between cases that were filed in the Northern District of California and those cases that were transferred to this district by the JPML under Section 1407.

United States District Court
Northern District of California

When a case is subject to a JPML transfer order under Section 1407, it is sent to the transferee district in much the same way as an action transferred under 28 U.S.C. § 1404 or § 1406, and it is assigned to the transferee judge selected by the JPML.  But cases filed in the transferee district in the first instance "do not require Panel action."  Rule 7.2, R.P.J.P.M.L.  Instead, the Panel's Rules of Procedure provide that, for such actions, "[a] party should request assignment of such actions to the Section 1407 transferee judge in accordance with applicable local rules."  Id.  In the Northern District of California, the applicable rule is Local Rule 3-12.  A large number of cases in this MDL ended up before the undersigned through the procedures prescribed by that rule.  See Order Relating Cases (dkt. 8); Order Relating Cases (dkt. 13); Order Relating Cases (dkt. 22); Order Relating Cases (dkt. 26); Order Relating Cases (dkt. 42); Order Relating Case (dkt. 58); Order Relating Cases (dkt. 180).

In short, then, centralization before an MDL transferee judge is not a procedurally uniform process.  Actions filed in other districts will be sent to the MDL transferee court by the JPML under Section 1407.  But actions filed directly in the transferee court will be put before the transferee judge by more pedestrian tools of judicial management, such as local rules authorizing the consolidation of related cases before a single judge.  Nor do individual cases, once coordinated with other MDL cases, take on "some new and distinctive . . . character."  Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 37 (1998).  Instead, "[c]ases consolidated for MDL pretrial proceedings ordinarily retain their separate identities."  Gelboim v. Bank of Am. Corp., 574 U.S. 405, 413 (2015).  What is distinctive about multidistrict litigation is not so much the fact of coordination or consolidation—these are routine tools of judicial management available outside of the MDL context.  See, e.g., Fed. R. Civ. P. 42(a).  Instead, what is distinctive is the ability of the JPML to centralize cases from multiple districts for coordinated or consolidated treatment, as well as the more active judicial management that is necessitated by such proceedings.  See, e.g., In re Uber Techs., Inc., Passenger Sexual Assault Litig., No. MDL 3084, 2024 WL 41889 at *1 n.1 (J.P.M.L. Jan. 4, 2024) ("In practice, centralization is the

first step in a process of coordination and consolidation that continues with the transferee judge.  After centralization, the transferee judge determines how best to conduct pretrial proceedings given the unique features of the cases before him or her."); In re Regents of U. of California, 964 F.2d 1128, 1134 (Fed. Cir. 1992) ("[T]he transferee court is expected to tailor the pretrial program to fit the issues and parties, and to avoid subjecting any party to unrelated discovery or other procedures.  The transferee court may cause pretrial proceedings on issues unique to a particular action to proceed on separate tracks concurrently with common pretrial proceedings, and has the power to provide that no party need participate in proceedings unrelated to that party's interests.") (citing In re Aviation Prods. Liab. Litig., 347 F. Supp. 1401, 1403–04 (J.P.M.L. 1972); In re Cuisinart Food Processor Antitrust Litig., 506 F.Supp. 651, 655 (J.P.M.L. 1981)).

### B.     The Non-Consolidation Clause

With this background in mind, the Court turns to Uber's Non-Consolidation Clause. Uber's basic position is straightforward.  They say that Plaintiffs are bound by the Terms of Use, which is an enforceable "clickwrap" agreement.  Under the Terms of Use, Plaintiffs agreed that they would not "participat[e] in any . . . coordinated, consolidated, [or] mass . . . action against Uber and [that] no action brought by [them] may be consolidated or joined in any fashion with any other proceeding."  Terms of Use § 2(B). But Plaintiffs' actions have nevertheless been centralized in this Court, and Plaintiffs are now "participating" in these consolidated proceedings.  More than that, some of the plaintiffs actually "took affirmative steps to coordinate and consolidate their actions when they filed a motion before the [JPML]."  Mot. at 13; see also 28 U.S.C. § 1407(c) ("Proceedings for the transfer of an action under this section may be initiated by— . . . motion filed with the panel by a party in any action in which transfer for coordinated or consolidated pretrial proceedings under this section may be appropriate.").  So, Uber says, Plaintiffs are in breach of the Terms of Use, and the Court should dismiss their claims or, where applicable, transfer their cases back to the courts where they were originally filed. Uber characterizes the Non-Consolidation Clause as no different from other kinds of

agreements that circumscribe the way in which claims may be litigated, like arbitration clauses, forum selection clauses, choice of law clauses, and class or collective action waivers.

But the Non-Consolidation Clause is not like these other kinds of provisions.  The Non-Consolidation Clause's primary effect is to strip courts of well-established procedural tools for managing their dockets—tools that are essential to complex and mass litigation as well as run-of-the-mill case management.  This concern does not accompany any of the other litigation-shaping contract provisions to which Uber compares the Non-Consolidation Clause.  Parties can generally choose where their disputes must be brought, but having chosen a federal forum, they cannot pick and choose which rules of procedure apply to their cases.  Parties may be able to bargain away their right to bring actions on behalf of others, but they cannot bargain away a court's power to manage a large number of individual cases before it.  Nor can they effectively bargain away the power granted by Congress to the JPML to create multidistrict litigation in the first instance.  In short, there are limits to the ways in which parties may contractually shape the way their disputes are litigated.  The Non-Consolidation Clause exceeds these limits, and it is therefore unenforceable.

## 1. Law Governing Enforceability of the Non-Consolidation Clause

As far as can be discerned, the enforceability of a provision like the Non-Consolidation Clause in the MDL context is a matter of first impression.  No other MDL transferee courts appear to have considered the issue, and the parties have not pointed to any decisions enforcing, or declining to enforce, anti-coordination provisions in other contexts.  In opposition to enforcement of the Non-Consolidation Clause, Plaintiffs raise a variety of contract defenses under California law, including the argument that the terms are void as against public policy.[3]  They also argue that, under federal law, a "private contract

---

[3] Plaintiffs argue that Uber has failed to show that most of the Plaintiffs at issue actually assented to the Non-Consolidation Clause, although it is uncontested that at least some of the relevant plaintiffs did assent to the Terms.  The Court's analysis here assumes without deciding that all of the plaintiffs have assented to the Terms of Use.

like the TOU cannot provide a rule of decision that displaces the federal statutory command of 28 U.S.C. § 1407."  Opp'n at 18.

The Court begins, and ends, by considering the Plaintiffs' argument that the Non-Consolidation Clause is unenforceable because it offends public policy.

### 2.    Legal Standard

Plaintiffs have framed their contract defenses, including their public policy defense, in terms of California law.  Uber has not argued that any other body of law should apply. (Indeed, Uber's briefing offers no direct response to Plaintiffs' argument that the Non-Consolidation Clause is unenforceable on grounds of public policy.)  Under California law, it is a generally applicable contract defense that "a law established for a public reason cannot be contravened by a private agreement."  McGill v. Citibank, N.A., 393 P.3d 85, 94 (Cal. 2017) (quoting Cal. Civ. Code. § 3513).  The California Supreme Court has elaborated the relevant inquiry as follows: "a party may waive a statutory provision if a statute does not prohibit doing so, the statute's public benefit . . . is merely incidental to its primary purpose, and waiver does not seriously compromise any public purpose that intended to serve."  Id. (cleaned up) (quoting DeBerard Properties, Ltd. v. Lim, 976 P.2d 843, 849 (Cal. 1999)); see also Kashani v. Tsann Kuen China Enter. Co., 13 Cal. Rptr. 3d 174, 179 (Cal. App. 2d Dist. 2004) ("The law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced, or at least will not be enforced fully, if found to be contrary to public policy.") (citing 15 Corbin on Contracts (2003) § 79.1, p. 1).  For purposes of the unenforceability analysis, "California law includes federal law. … Thus, a violation of federal law is a violation of law for purposes of determining whether or not a contract is unenforceable as contrary to the public policy of California."  Kashani v. Tsann Kuen China Enter. Co., 118 Cal. App. 4th 531, 543 (2004); see also People v. Sischo, 144 P.2d 785, 791–92 (Cal. 1943) ("The Constitution of the United States and all laws enacted pursuant to the powers conferred by it on the Congress are the supreme law of the land (U.S. Const. art. VI, cl. 2) to the same extent as though expressly written into every state law.").  The Court applies

11

this analysis below.

Before doing so, however, it is worth commenting on the source of the law that governs the public policy analysis.  The Court assumes that state law should supply the rule of decision here because no one has argued otherwise.  And the Court accepts that California law is the appropriate state law because Plaintiffs argue that it is, and Uber has not carried its burden to show (nor has it even suggested) that some other law applies to plaintiffs' contract defenses.  But, here, the Non-Consolidation Clause affects a procedural mechanism created by federal law that is, naturally, applicable only to cases in the federal courts.  The use of state law may well be correct, since state law is generally assumed to fill gaps in federal law.  See, e.g., Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1458 (9th Cir. 1986).  But this is not always so.  In these proceedings, the enforcement of the Clause would primarily affect federal rights (i.e., the Plaintiffs' rights to litigate actions that have been coordinated or consolidated with other actions) and federal interests (i.e., the public interests that Congress sought to advance when it passed Section 1407 and, more generally, the interests that federal courts have in coordination and consolidation as case management tools).  At least superficially, it would seem odd if the enforceability of waivers that could profoundly affect those interests turned on state law.  The oddity would come not so much from the fact that state law affected federal interests—that is not unusual—but because a difficult situation would result if such clauses got different treatment under the laws of different states.  In that case, the state law that governed a given contract could determine whether a dispute could be handled on a coordinated or consolidated basis in federal court.  That unevenness would itself undermine the federal interests in avoiding the duplicative effort and clogged federal dockets that the MDL system is supposed to avoid.  See Parts II(B)(4)–II(B)(5) below.  And it would likely encourage forum-shopping or the insertion of choice-of-law clauses designed to guarantee that the consolidation waiver was enforced.

These are the sort of concerns that sometimes prompt federal courts to articulate a uniform federal rule governing the enforceability of a waiver or otherwise displacing state

12

law.  See U.S. v. Kimbell Foods, Inc., 440 U.S. 715, 728–29 (1979); Wheeler v. City of Santa Clara, 894 F.3d 1046, 1056 (9th Cir. 2018); Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1458 (9th Cir. 1986) ("In the absence of some clear congressional intent, a court must also decide whether formulating a federal rule would be appropriate as a matter of judicial policy under the three-part test established by Kimbell Foods.  Under that test, a court must determine the following: (1) whether the issue requires 'a nationally uniform body of law'; (2) 'whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether 'application of a federal rule would disrupt commercial relationships predicated on state law.'") (quoting Kimbell Foods, 440 U.S. at 728–29).  Courts have adopted this approach to, for example, consider whether a release of certain federal rights is unenforceable as against public policy.  See, e.g., Town of Newton v. Rumery, 480 U.S. 386, 392 (1987) (applying federal law to decide whether a release of a § 1983 claim in a plea agreement was enforceable in light of federal public policy); U.S. v. Northrop Corp., 59 F.3d 953, 960–62 (9th Cir. 1995) (fashioning federal common law rule that waivers of pre-litigation releases of qui tam actions entered into without the government's consent are unenforceable as against public policy); Davies v. Grossmont Union High Sch. Dist., 930 F.2d 1390, 1396 (9th Cir. 1991) ("The question whether the waiver of federal constitutional rights is enforceable is a question of federal law, which we resolve by the application of federal common law."); accord, e.g., U.S. ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161 (10th Cir. 2009) (applying federal common law to evaluate the enforceability of a pre-litigation qui tam release).

The parties have not briefed this issue, and it would be imprudent to wade too deeply into this complex area of law where it is not strictly necessary.  The Court does note, however, that under a federal rule of decision, it seems that the analysis would likely follow the test set out in Rumery and Davies, under which "a promise [will be found] unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."  Northrop, 59 F.3d at 958 (quoting Rumery, 480 U.S. at 392).  That test is in turn based on the Restatement (Second)

of Contracts.  See Rumery, 480 U.S. at 392; Restatement (Second) of Contracts § 178(1) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."); see also U.S. ex rel. Ubl v. IIF Data Sols., 650 F.3d 445, 451 (4th Cir. 2011) ("When applying federal common law to contract issues, courts generally look to the Restatement for guidance.").  The Rumery/Davies test is, in substance, not much different from the California courts' approach to evaluating whether a contract provision is unenforceable as against public policy.  Some California courts have used Section 178 of the Restatement as guidance.  See Kashani, Cal. Rptr. 3d at 180–81; Bovard v. Am. Horse Enterprises, Inc., 247 Cal. Rptr. 340, 344–45 (Cal. App. 3d Dist. 1988).  Accordingly, the substance and outcome of the Court's enforceability analysis would not differ if it applied the federal Rumery/Davies test rather than solely California law.

### 3.  Does Section 1407 Bar Enforcement of the Non-Consolidation Clause?

As an initial matter, the Court asks whether anything in Section 1407 prohibits a consolidation waivers like that contained in the Terms of Use.  See McGill, 393 P.3d at 94; see also Northrop, 59 F.3d at 958.  Obviously, if in passing Section 1407 Congress expressed an intent to prohibit waivers like the Non-Consolidation Clause, that would be the end of the inquiry.  But the statute's text is silent as to MDL transferee courts' enforcement of consolidation waivers.  And it is especially unclear how Section 1407's express language would govern a consolidation waiver asserted in cases that, like those subject to Uber's motion, were not actually transferred under Section 1407, but instead were filed directly in the transferee district and added to the MDL via the Local Rules. The text of Section 1407 itself does not expressly address the issue before the Court.

In this connection, it is worth addressing Plaintiffs' argument, based largely on Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct., 571 U.S. 49 (2013), that a "private contract like the TOU cannot provide a rule of decision that displaces the federal statutory command of

28 U.S.C. § 1407." Opp'n at 18.  In <u>Atlantic Marine</u>, the Supreme Court considered the effect of a forum-selection clause on the ordinary federal venue statute, 28 U.S.C. § 1391. Specifically, the Court considered whether a party could "enforce a forum-selection clause by seeking dismissal of the suit under § 1406(a) and Rule 12(b)(3)," which is to say by seeking dismissal for "wrong" or "improper" venue." <u>Id</u>. at 55.  The Court held that it could not.  A private agreement could not, by itself, make venue improper.  Instead, "the federal venue provisions . . . alone define whether venue exists in a given forum," and the language of the venue statute "cannot reasonably be read to allow judicial consideration of other, extrastatutory limitations on the forum in which a case may be brought." <u>Id</u>. at 56. The Court reached this conclusion first by looking to the text of Section 1391.  It noted that the statute provides that "[e]xcept as otherwise provided by <u>law</u> . . . this section <u>shall</u> govern the venue of <u>all civil actions</u> brought in district courts of the United States." <u>Atlantic Marine</u>, 571 U.S. at 55 (quoting 28 U.S.C. § 1391(a)(1)) (emphasis in <u>Atlantic Marine</u>).  The Court went on to observe that Section 1391 sets forth criteria for determining whether venue is proper in a given district, and none of those criteria has anything to do with "[w]hether the parties entered into a contract containing a forum-selection clause[.]" <u>Id</u>. at 56.  Second, the Court looked to "[t]he structure of the federal venue provisions," which it said "reflect Congress' intent that venue should always lie in some federal court whenever federal courts have personal jurisdiction over the defendant." <u>Id</u>. at 56–57 (discussing 28 U.S.C. § 1391(b)).  That intent was inconsistent with taking forum-selection clauses into account, since such clauses could point to foreign or state tribunals, which would mean that venue would not be proper in any federal district.  <u>See</u> <u>id</u>. at 57.  In short, parties could not make venue improper by agreement: venue was proper precisely where Congress had provided that it would be.  Instead, the parties' agreement as to the proper forum could be enforced only through motions to transfer under Section 1404(a), where Congress included private-interest factors among the relevant

considerations.[4]  That last point follows from <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22 (1988), a decision that also supports Plaintiffs' point—namely, that where a procedural statute is "sufficiently broad to control" an issue about which parties have reached a private agreement, the parties' agreement is not entitled to dispositive consideration, but only the amount of consideration contemplated by the statute.  See <u>Stewart</u>, 487 U.S. at 29, 24, 30–31.

The problem with this line of argument is that unlike the courts in <u>Atlantic Marine</u> and <u>Stewart</u>, this Court is not being asked to decide whether and how the parties' private agreement affects the analysis under an applicable procedural statute.  Transferee courts do not make transfer determinations under Section 1407(a), and they certainly are not empowered to independently reevaluate the JPML's conclusions about whether transfer was appropriate.  <u>See</u> 28 U.S.C. § 1407(e) (review of transfer decisions only by extraordinary writ in the court of appeals having jurisdiction over the transferee court).  Perhaps Section 1407(a) is "sufficiently broad to control" the issue of what effect, if any, Uber's Non-Consolidation Clause should have on the Section 1407(a) analysis.  Some of the Court's subsequent analysis about the structure of the statute may even lend support to Plaintiffs' view of this question.  But it is not the question at hand.  Instead, the question is whether the Non-Consolidation Clause is enforceable by <u>this Court</u> in the way that Uber asks.  Answering that question in the affirmative might have a significant effect on the MDL process, including the JPML's ability to carry out its statutory mandate.  But that's the core public policy issue, which is different from the issue of how to apply the Section 1407(a) factors.

---

[4] <u>Atlantic Marine</u> also clarifies that under Section 1404(a), the parties' valid contractual choice of forum should be "given controlling weight in all but the most exceptional circumstances."  <u>Id.</u> at 60.  But this is just a matter of interpreting the language of Section 1404(a), not elevating the parties' agreement above it.  The Court also considered the argument of an <u>amicus</u> that "a defendant in a breach-of-contract action should be able to obtain dismissal under Rule 12(b)(6) if the plaintiff files suit in a district other than the one specified in a valid forum-selection clause," and expressly declined to rule on it.  <u>Id.</u> at 61.  At any rate, none of the cases in this MDL are "breach-of-contract action[s]."

United States District Court
Northern District of California

### 4.     The Public Policy Underlying Coordination and Consolidation in Multidistrict Litigation

The Court next considers whether multidistrict litigation's "public benefit . . . is merely incidental to its primary purpose." McGill, 393 P.3d at 94.  The place to begin is with the policy interests that multidistrict litigation is supposed to serve.

Congress "[e]nacted [28 U.S.C. § 1407] in 1968 in response to a growing number of complex but related cases filed in multiple districts." Gelboim v. Bank of Am. Corp., 574 U.S. 405, 410 (2015).  In doing so, it created a procedural mechanism that drew on the experience of federal courts adjudicating complex, geographically dispersed, but related cases.  See Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3861.  The purpose of the MDL process is to "'promote the just and efficient conduct' of 'civil actions involving one or more common questions of fact [that] are pending in different districts[.]'"  In re Korean Air Lines Co., Ltd., 642 F.3d 685, 698–699 (9th Cir. 2011) (quoting 28 U.S.C. § 1407(a)).  Section 1407 is designed to accomplish this aim through centralization—that is, "by permitting . . . transfer to a single district for 'coordinated or consolidated pretrial proceedings.'"  Id.  The theory behind the MDL process is that centralized judicial management tends to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts."  Gelboim, 574 U.S. at 410 (quoting Manual for Complex Litigation § 20.131, p. 220 (4th ed. 2004)).  Congress worried that without such a procedure to manage certain kinds of complex litigation, "'conflicting pretrial discovery demands for documents and witnesses" might 'disrupt the functions of the Federal courts,'" leading to "'multiplied delay, confusion, conflict, inordinate expense and inefficiency.'"  In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1230 (9th Cir. 2006) (quoting In re Plumbing Fixture Cases, 298 F. Supp. 484, 495 (J.P.M.L. 1968)); see also H.R. Rep. No. 1130, 90th Cong., 2d Sess., p. 2 (1968) ("The objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the 'just and efficient conduct' of such actions.  The committee believes that the possibility for conflict and duplication in

discovery and other pretrial procedures in related cases can be avoided or minimized by such centralized management.").

In short, the statute aims to conserve resources and avoid conflicting rulings. Parties are among the intended beneficiaries of the MDL process, and Section 1407 has an eye to their interests: one part of the determination that the JPML must make under Section 1407(a) is that transfer "will be for the convenience of parties[.]"  28 U.S.C. § 1407(a).  But, as the foregoing discussion illustrates, Section 1407 is centrally concerned with a wider array of interests that far exceed the parties' private concerns: there are the interests in the conservation of judicial resources, the interests in saving the time and effort of non-party witnesses, the interests in avoiding conflicting rulings, and so forth.  These are all matters that relate to the core "functions of the Federal courts[.]"  In re Phenylpropanolamine, 460 F.3d at 1230 (quoting In re Plumbing Fixture Cases, 298 F. Supp. at 495).

Of course, many matters of federal procedure are aimed at striking some balance between the interests of the parties and the interests of justice.  See, e.g., 28 U.S.C. § 1404(a).  But Section 1407 is different in the way that it strikes this balance and— importantly—in the way it allocates the power to decide whether and when centralization is appropriate.  Unlike many other procedural mechanisms, Section 1407 largely removes decisions about where pretrial proceedings should take place, and whether those proceedings will be coordinated or consolidated, from the control of the parties.  Instead, decisions about consolidation are entrusted to the JPML.  Section 1407 is structured to give the JPML wide discretion to order centralization, to provide for limited appellate review of such decisions, see 28 U.S.C. § 1407(e), and to give the Panel control over when centralization begins and ends.  The Panel may initiate proceedings to transfer actions "upon its own initiative."  28 U.S.C. § 1407(c)(i).  The Panel alone is tasked with selecting the judge or judges to whom the cases are assigned and, accordingly, the district to which the cases are transferred.  See id. § 1407(b).  The Panel can and does transfer actions where both parties object to transfer, and it also declines to transfer cases where both parties

desire it.  See, e.g., In re: Equinox Fitness Wage and Hour Empl. Practices Litig., 764 F.

Supp. 2d 1347 (J.P.M.L. 2011).  Of course, the Panel makes these decisions on a

principled basis according to the factors set out in Section 1407(a)—but even so, transfer

decisions are discretionary, as evidenced by the statute's use of the word "may."  28

U.S.C. § 1407(a).  However one looks at it, it is part of the MDL process that parties

facing centralization lose a degree of control over where and how their cases are litigated

pre-trial.[5]  The traditional deference to a plaintiff's choice of forum, or to the parties'

private interests as expressed in a forum-selection clause, gives way to the Panel's

determination about where pretrial proceedings should take place.  One can go a bit further

and note that in providing that transfers under the statute could be to "any district," 28

U.S.C. § 1407(a), Congress deprived defendants, insofar as pretrial proceedings are

concerned, of the protection of the existing venue statutes.  See LeRoy v. Great W. United

Corp., 443 U.S. 173, 183–84 (1979) ("In most instances, the purpose of statutorily

specified venue is to protect the defendant against the risk that a plaintiff will select an

unfair or inconvenient place of trial.").[6]

        These are features of Section 1407, not bugs.  Congress was clearly aware of

parties' interests in having their disputes litigated in a forum of their choosing, since the

statute expressly protects a parties' ability to have their case remanded to the transferor

court at the conclusion of the centralized pretrial proceedings.  See Lexecon, 523 U.S. at

40.  Congress nevertheless enacted Section 1407, which impinges on the parties' forum-

related interests insofar as pretrial proceedings are concerned.  Congress was also likely

aware that in some instances parties might prefer not to have their cases transferred or

centralized.  It nevertheless enacted Section 1407, which gives the JPML the power to

---

[5] Importantly, Section 1407 and Lexecon protect the parties' rights to have their cases tried
in the forum appropriately selected by the parties.  See Lexecon, 523 U.S. at 40.
[6] It is also well established that the JPML may transfer actions without regard to the
transferee court's personal jurisdiction over the parties, in the sense that "the transferee
court can exercise personal jurisdiction to the same extent as the transferor court could."
In re Delta Dental Antitrust Litig., 509 F. Supp. 3d 1377, 1379 (J.P.M.L. 2020); accord
Shambaugh & Son, L.P. v. Steadfast Ins. Co., 91 F.4th 364, 373 (5th Cir. 2024); In re
Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 297 n.11 (3d Cir. 2004).

1     initiate transfer proceedings without any action by the parties—a power that can only be

2     explained by the need to shepherd recalcitrant (or at least indifferent) litigants into

3     centralized proceedings.  28 U.S.C. § 1407(c)(1).

4              These aspects of the MDL system are not arbitrary impositions on litigants.

5     Instead, they reflect a legislative policy judgment.  The judgment is that, for certain kinds

6     of civil cases sharing common issues of fact, some traditional prerogatives of the parties

7     should be subordinated to public concerns about the efficient and effective functioning of

8     the federal courts.  Litigants, and the public writ large, are the intended beneficiaries of this

9     choice.  See In re Air Crash Disaster at Fla. Everglades on December 29, 1972, 549 F.2d

10    1006, 1012 (5th Cir. 1977) ("[C]ourt resources and capacities are finite.  We face the hard

11    necessity that, within proper limits, judges must be permitted to bring management power

12    to bear upon massive and complex litigation to prevent it from monopolizing the services

13    of the court to the exclusion of other litigants.  These considerations are at the heart of

14    steps to create procedures for handling complex litigation.").  These public interests are

15    anything but "incidental" to multidistrict litigation.  McGill, 393 P.3d at 94.  They are

16    essential to it.

17             In this connection, it is worth observing that Section 1407 is not entirely sui generis;

18    it is an extension of existing judicial techniques of case consolidation and coordination for

19    an era of mass litigation.  See In re Phenylpropanolamine, 460 F.3d at 1229–30; In re

20    Plumbing Fixture Cases, 298 F. Supp. 484 (J.P.M.L. 1968); Wright & Miller, 15 Fed. Prac.

21    & Proc. Juris. § 3861 (4th ed.).  For example, while Section 1407 dates to 1968, the

22    judicial prerogative to "coordinate" or "consolidate" cases for efficiency's sake is much

23    older.  See Hall v. Hall, 584 U.S. 59, 67 (2018) (explaining that "Lord Mansfield

24    pioneered the consolidation of related cases in England" in the eighteenth century, and that

25    Congress passed a statute in 1813 that authorized the newly formed federal courts, when

26    confronted with "causes of like nature, or relative to the same question" to "make such

27    orders and rules concerning proceedings therein as may be conformable to the principles

28    and usages belonging to courts for avoiding unnecessary costs or delay in the

administration of justice" and to "consolidate[ ]" the causes when it "shall appear reasonable.").  At least under the original federal consolidation statute and under its successor, Fed. R. Civ. P. 42, consolidation has been a judicial prerogative.  See Mut. Life Ins. Co. v. Hillmon, 145 U.S. 285, 293 (1892) (stating that the "defendants might lawfully be compelled, at the discretion of the court, to try the cases together" under the pre-Rule 42 consolidation statute); In re Air Crash Disaster, 549 F.2d at 1013 ("A court may order the consolidation of cases [under Rule 42] despite the opposition of the parties").  Rule 42 is not immediately at issue here.  But it is relevant to the extent that it shows that the notion that courts' "managerial power is especially strong and flexible in matters of consolidation" has a long pedigree.  In re Air Crash Disaster, 549 F.2d at 1013.  One would not expect Section 1407 to be different, nor should one regard it as anomalous. (Plus, under the broad language of Uber's Non-Consolidation Clause, it is hard to see how it would not implicate consolidation under Rule 42.)

As noted above, tag-along cases filed directly in the transferee district are added to MDL proceedings using the procedures for reassignment set forth in the Local Rules of the transferee court.  See Rule 7.2(a), R.P.J.P.M.L.  It appears that all of the cases that are specifically the subject of Uber's motion—which were all filed in this district—were added to the MDL in this way.  So it is worth noting that Local Rule 3-12 evinces a similar policy treating matters of coordination and consolidation as matters of judicial management that serve the interests of judicial efficiency.  Under Local Rule 3-12, cases may be reassigned to a single judge where "[i]t appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges."  Local Rule 3-12(a), N.D. Cal.  Like Section 1407 and Rule 42, the process favors judicial management over party preference, and does not require the parties' action or assent.  See id. 3-12(b) (parties are required to file an "Administrative Motion to Consider Whether Cases Should be Related" whenever the party "knows or learns that an action, filed in or removed to this district is . . . related to an action which is or was pending in this District") (emphasis added); Local Rule 3-12(c)

21

(judges may issue <u>sua sponte</u> referrals for the purpose of determining whether two cases are related).  Here again, case coordination is a matter of judicial case management—not pure party choice—evidently in service of a policy of judicial efficiency.

### 5. The Waiver Would Seriously Compromise the Public Purpose that Section 1407 Is Intended to Serve

The Court must next consider the degree to which enforcement of the Non-Consolidation Clause would compromise the public purpose embodied in Section 1407. <u>See</u> <u>McGill</u>, 393 P.3d at 94; <u>Cariveau</u>, 99 Cal. Rptr. 2d at 132; <u>Northrop</u>, 59 F.3d at 958.

While Uber argues that the Non-Consolidation Clause prevents Plaintiffs' cases from being litigated on a coordinated or consolidated basis, its motion is directed at a subset of cases that were coordinated with this litigation, pursuant to the JPML's Rules, under the Local Rules of this Court.  Uber asks that those cases be transferred to other districts (the district selected in its Forum Selection Clause) or dismissed without prejudice to refiling.  In effect, Uber asks that those cases be decentralized and forced to proceed independently of this MDL.[7]

Enforcing the waivers in this way would undermine the public policy interests that Congress sought to advance when it passed Section 1407 and, arguably, upend the statutory scheme that it established to advance those interests.  There are two basic reasons that this is so.  The first is straightforward.  If Section 1407 aims to use centralization to avoid conflicting rulings, "conflicting pretrial discovery demands for documents and witnesses," the duplication of effort, and otherwise to protect "the functions of the Federal courts,'" from "multiplied delay, confusion, conflict, inordinate expense and inefficiency," then decentralizing the cases will undermine those aims.  <u>In re Phenylpropanolamine</u>, 460 F.3d at 1230.  Numerous individual actions pending in different courts would, obviously, increase the risk of inconsistent rulings, conflicting demands for discovery material related

---

[7] There are a host of practical difficulties with the relief that Uber asks for, not the least of which is that it is unclear what would authorize this Court to dismiss Plaintiffs' cases just because they were in breach of a non-consolidation clause.  Uber doesn't specify any such procedural mechanism in its motion.  For purposes of this discussion, though, the Court sets these difficulties aside.

to common issues of fact, and so forth.  And it would require multiple judges to expend

their finite resources deciding pretrial issues that are common to the cases.  Multidistrict

litigation comprises a very large percentage of the civil docket of the federal courts: using

the most recent data, about 70 percent of federal civil actions were managed in

multidistrict litigation in 2023.[8]  If enforcement of such waivers became common, the

consequences for the judiciary as a whole could be momentous.  MDL defendants are

almost certain to be sophisticated parties, and at least some who could insert such clauses

---

[8] Some notes about where this figure comes from and how it should be interpreted.  The most recent available data concerning the total federal civil docket is from March 31, 2023.  According to those figures, there were then 583,543 total civil cases pending in the federal courts (including cases where the United States is a party).  See Administrative Office of the U.S. Courts, Federal Judicial Caseload Statistics 2023 Tables, Table C-1 (Mar. 31, 2023), available at https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2023-tables.  According to data from the JPML, there were 392,374 actions pending in 180 MDLs on September 30, 2022.  On September 30, 2023, there were 417,137 actions pending in 171 MDLs.  See U.S. J.P.M.L., Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407, FY 2022, at 3 (Dec. 9, 2022) ("JPML Statistical Analysis, FY 2022"); U.S. J.P.M.L., Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407, FY 2023, at 3 (Nov. 29, 2023) ("JPML Statistical Analysis, FY 2023"), available at https://www.jpml.uscourts.gov/statistics-info?field_type_value_1%5B%5D=Fiscal+Year.  If the September 2022 MDL statistics are used, MDL cases represented about 67% of the federal civil caseload; if the September 2023 MDL statistics are used, MDL cases represented about 72% of the federal civil caseload.  Because the JPML and the AO's reporting dates do not align, the percentage figures are only approximate.

One has to be cautious in interpreting these figures.  First, one or two MDL dockets can have an outsize effect on the case data.  During the relevant period, a single MDL in the Northern District of Florida, In re 3M Combat Arms Earplug Products Liability Litigation, MDL No. 2885, included an average of about 249,000 pending cases.  See JPML Statistical Analysis, FY 2022, at 38; JPML Statistical Analysis, FY 2023, at 35.  But even if the In re 3M cases are excluded entirely, the percentage of MDL cases is still high.  Non-3M MDL cases represent about 42% of the total non-3M federal civil docket using the JPML's FY 2022 data, and about 51% using the FY 2023 data.  (For context, the second largest MDL in 2022 contained 37,515 cases, and in 2023 it contained 52,886 cases.  See JPML Statistical Analysis, FY 2022, at 17; JPML Statistical Analysis, FY 2023, at 16.  On the other end of the spectrum, several MDLs in each year contained fewer than ten cases, and even more had case numbers in the double or triple digits.  See generally id.)

Second, the number of cases pending in an MDL is only one measure of the burden that those cases place on the courts and, accordingly, of the potential consequences of undermining the MDL process.  Some MDLs that contain only a handful of cases might be equally complex.  For example, MDLs may contain multiple Rule 23 class actions.  They may involve parties with different interests and different claims to relief that nevertheless concern common issues of fact.  Or they may simply involve overlapping cases that tend to be more factually and legally complex—antitrust or patent cases, for example.  Where an MDL has some of those attributes, the efficiency costs of de-centralization could be far out of proportion to the mere number of actions in the MDL.

23

1   in their commercial or consumer contracts would be likely do so.[9]

2         Second, enforcement of the Non-Consolidation Clause would, in effect, arrogate to

3   private parties a decision that Congress entrusted to the JPML.  As discussed above,

4   Section 1407 reflects a policy decision to entrust the JPML with a degree of control over

5   where pretrial proceedings take place in a given case.  But enforcing Uber's Non-

6   Consolidation Clause would mean that the parties' private preferences displaced the

7   JPML's discretion to centralize cases under Section 1407.  Perhaps the starkest way to put

8   is as follows.  If all of the parties potentially subject to a Section 1407 transfer order

9   entered a stipulation that their cases should be centralized in a particular district, nothing in

10  Section 1407 would require the JPML to abide by that stipulation.  See 28 U.S.C. §

11  1407(b).  Similarly, if the parties potentially subject to a Section 1407 transfer order

12  entered a stipulation that their cases should be centralized, nothing in Section 1407 would

13  require the JPML to honor that election.  In re: Equinox Fitness Wage and Hour Empl.

14  Practices Litig., 764 F. Supp. 2d 1347 (J.P.M.L. 2011).  A stipulation against centralization

15  would similarly be ineffective.  So why should a prelitigation contract to the same effect

16  fare any differently?  Note that the point here is not about what the JPML can or should

17  consider in its Section 1407(a) analysis—that issue is not before the Court.  Rather, the

18  point is about the way Congress sought to advance the public policies embodied in Section

19  1407, a core part of which is the issue of who decides whether centralization occurs.  If

20  this Court could enforce a consolidation waiver in the way that Uber suggests,

21  centralization would ultimately be the parties' choice, notwithstanding any action of the

22  JPML.  That would be antithetical to the system Congress established when it enacted

23

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [9] It is worth noting that not all MDL defendants resist centralization, and conversely, not
25  all plaintiffs welcome it.  In some multidistrict litigation, there are plaintiffs who would
    prefer to litigate independently rather than have their cases sent to the transferee court.
26  Consider the consequences if non-consolidation provisions were enforceable and both the
    plaintiff and defendant agreed not to centralize their cases.  Under those circumstances,
27  prospective plaintiffs could enter into non-consolidation agreements with the MDL
    defendant before suing, effectively opting out of the MDL.  That would fundamentally
28  compromise the framework created by Section 1407, which depends on cases being
    centralized in a single court.

Section 1407.

### 6.    Uber's Interests in Enforcement and the Limits of Customized Procedure

The core of Uber's arguments in support of the Non-Consolidation Clause's enforceability is that the clause is no different from other kinds of litigation-shaping agreements that courts routinely enforce.  Uber points out, correctly, that parties can use pre-litigation contracts to tailor their experience of litigation—and limit the risk that they will face certain types of suits—in a variety of ways.  For example, parties can generally choose the forum where their disputes must be heard.  See Atl. Marine, 571 U.S. at 63–64 (2013) ("A valid forum-selection clause represents the parties' agreement as to the most proper forum, and will generally require a court to transfer a case to the selected forum absent a strong public interest in denying transfer.") (quotation marks omitted).  Parties can choose not to litigate their disputes at all and to arbitrate them instead.  See 9 U.S.C. § 2; AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011).  And, depending on state choice of law rules, parties in diversity actions can generally choose the law that will govern their disputes.  See, e.g., Hatfield v. Halifax PLC, 564 F.3d 1177, 1182 (9th Cir. 2009) (choice of law clauses ordinarily enforced under California choice of law rules).  Courts usually honor these choices, although none is without limitations.  Similarly, parties can sometimes waive substantive or procedural rights in prelitigation agreements or in stipulations reached during litigation.  So, for example, parties can waive the right to certain evidentiary protections.  See, e.g., U.S. v. Mezzanatto, 513 U.S. 196 (1995).  Sometimes, courts enforce waivers of the right to seek class or collective relief.  See, e.g., Benedict v. Hewlett-Packard Co., No. 13-CV-00119-BLF, 2016 WL 1213985, at *4 (N.D. Cal. Mar. 29, 2016).  Generally speaking, the interest in enforcing such provisions is that of protecting the parties' legitimate, bargained-for expectations, see Atl. Marine, 571 U.S. at 62, and perhaps in otherwise allowing parties to maximize the rights that they have to "sell" in bargaining, see Mezzanatto, 513 U.S. at 206.  Here, where Uber has not otherwise articulated its interests in the enforcement of the Non-Consolidation Clause, the Court

25

presumes that its interests are similar.

But there are limits to parties' ability to customize their experience of litigation through contract.  At some point, parties' efforts to dictate how their litigation will occur impinges upon courts' prerogative to efficiently and effectively manage the cases before it.  Consider the following examples.  Parties can choose arbitration, but they cannot choose a federal forum on condition that the district judge follows the rules of the American Arbitration Association or the German Zivilprocessordnung.  See Agfa-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1525 (7th Cir. 1989) ("Suppose the parties had agreed that any dispute over the contract would be litigated under New York's Civil Practice Act.  It is most unlikely that Illinois courts would enforce such a provision but even if they would the federal courts in Illinois would not have to follow suit.  Parties cannot by contract require a court to follow procedures unfamiliar to it.") (citing In re Air Crash Disaster, 821 F.2d at 1159).  Parties can agree to waive certain evidentiary rules, but they could not agree that in any action between them, Rule 11 would not apply and the parties would be free to lie to the court and the jury.[10]  Or consider a hypothetical contract provision that barred Plaintiffs' "participation in litigation in which any fully briefed motions are pending for more than three days."  Such a provision, which would effectively hold the plaintiffs' claims hostage in an effort to get their case decided on an expedited basis, would certainly not be enforceable.  The principle is not limited to the trial courts: it also seems quite unlikely that parties could agree that they were barred from "participating in any appeals that were consolidated for hearing or decision with one or more other cases."

Some of these are extreme examples, but they illustrate the basic point that there are limits to the parties' ability to dictate how courts will manage their cases.  The Non-

---

[10] See also U.S. v. Josefik, 753 F.2d 585, 588 (7th Cir. 1985) (Posner, J.) ("Rule 23(b) allows the parties to stipulate to trial by a jury 'of any number less than 12'; and of course the defendant can if he wants waive all right to a jury trial, see Rule 23(a).  No doubt there are limits to waiver; if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept.").

United States District Court
Northern District of California

Consolidation Clause crosses that line because it effectively restricts the judiciary's prerogative to manage its dockets using the procedural mechanisms authorized by Congress.  In this way, the Non-Consolidation Clause is nothing like an arbitration clause, a forum-selection clause, or a choice-of-law clause.  Arbitration clauses are ways of opting out of litigation in favor of other forms of dispute resolution.  But, in this context, the greater doesn't imply the lesser: the power to avoid litigation altogether does not entail that parties who do choose litigation can dictate how their cases are managed.  (Also, enforcement of valid arbitration agreements is the express policy of Congress, see 9 U.S.C. §§ 2 et seq., while the same obviously cannot be said about non-consolidation agreements.) Forum-selection clauses are ways of choosing where and before whom a dispute is litigated; they do not purport to restrict how a judge may manage a case once it gets there. Choice-of-law clauses merely answer a question that arises in any diversity case—namely, which law should apply—and only in exceptional cases do they impose any kind of unusual burden on the court.  More often they alleviate a burden by avoiding the need for a choice-of-law analysis.

Probably the closest analogue to the Non-Consolidation Clause is a waiver of the right to seek class or collective relief.  At oral argument, Uber relied heavily on this comparison in response to the Court's questioning about the effect of its Non-Consolidation Clause on courts' case management powers.  There are some similarities between Rule 23 class actions and centralized proceedings under 28 U.S.C. § 1407 (as well as, to a lesser extent, other kinds of consolidated or coordinated proceedings).  Both, for example, are designed in part to "promote efficiency and economy of litigation." Abdullah v. U.S. Sec. Associates, Inc., 731 F.3d 952, 964 (9th Cir. 2013) (discussing class actions). And the Court is certainly not blind to the fact that, in the mass tort context, some MDLs can take on a quasi-class action character—at least in the sense that multiple claims are moved forward together, the court often appoints counsel to manage the litigation on behalf of the plaintiffs, and so forth.  Cf., e.g., In re Diet Drugs, 582 F.3d 524, 547 (3d Cir. 2009) (quoting In re Air Crash Disaster, 549 F.2d at 1012) ("Each case in the consolidated

case was private in its inception.  But the number and cumulative size of the massed cases created a penumbra of class-type interest on the part of all litigants and of public interest on the part of the court and the world at large.  The power of the court must be assayed in this semi-public context.").  For purposes of this discussion, the Court assumes the premise of Uber's argument—that Rule 23 class action waivers are usually enforceable even when they are not contained in an arbitration clause—although this does not appear to be a settled question.[11]

But past a certain point, comparing Rule 23 with Section 1407 reflects a misconception about the aims of multidistrict litigation and, especially, the means Congress used to achieve those aims.  The core difference is that multidistrict litigation is, by design, not primarily a procedural tool for parties to use or not use at their whim.  A party can always elect not to have her claims decided on a class basis by simply not suing on behalf of a purported class, and by opting out of any other class that might be certified.  See Fed. R. Civ. P. 23(a) (a prerequisite to a class action is that "[o]ne or more members of a class . . . sue or be sued as representative parties"); id. 23(c)(2) (class notice must provide for manner of requesting exclusion from the class).  A court cannot decide sua sponte that a given claim is suitable for class treatment and conscript the plaintiff into being a class representative.[12]  In other words, bringing an action on behalf of a class (or against a class) is a prerogative belonging to plaintiffs.  But, as discussed above, the same is simply not true of case consolidation and case coordination, including under Section 1407.  So while

_____

[11] Compare In re Marriott Int'l Customer Data Sec. Breach Litig., 345 F.R.D. 137, 143–146 (D. Md. 2023) (holding class action waiver unenforceable and distinguishing various cases upholding them in the arbitration context because "where the parties agree to resolve their case in a non-judicial forum, the Federal Rules have limited applicability"), with Crews v. TitleMax of Delaware, Inc., No. 1:22-CV-00168, 2023 WL 2652242 at *3–*4 (M.D. Pa. Mar. 27, 2023) (enforcing class action waiver in non-arbitration context). The Court does not take a position on these issues.

[12] For the sake of precision, the Court notes that under some circumstances, a judge may make a class certification decision sua sponte—in some circuits she is required to do so if the parties don't address the issue themselves.  See, e.g., Shipp v. Memphis Area Off., Tennessee Dep't of Empl. Sec., 581 F.2d 1167, 1170 (6th Cir. 1978).  But the obligation to do so arises from Rule 23(c)(1)(A), and it is only triggered where the plaintiff first "sues or is sued as a class representative."  Id.  It is the parties who decide, in the first instance, whether to seek class treatment.

both Rule 23 and Section 1407 are intended to serve ends of judicial efficiency to some degree, the way each procedure is designed to do is vitally different. Fundamentally, whether to "participate" in an MDL is not a choice Congress committed to litigants, so it is not clear how litigants could bind themselves <u>not</u> to "participate" in an MDL in a pre-litigation contract. <u>Cf.</u> <u>Atlantic Marine</u>, 571 U.S. at 62 ("Because plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations), we have termed their selection the 'plaintiff's venue privilege.' But when a plaintiff agrees by contract to bring suit only in a specified forum—presumably in exchange for other binding promises by the defendant—the plaintiff has effectively exercised its "venue privilege" before a dispute arises."); <u>Sutherland v. Ernst & Young LLP</u>, 726 F.3d 290, 297 (2d Cir. 2013) ("Even assuming Congress intended to create some 'right' to class actions, if an employee must affirmatively opt in to any such class action, surely the employee has the power to waive participation in a class action as well.") (quoting <u>Owen v. Bristol Care, Inc.</u>, 702 F.3d 1050, 1055 (8th Cir. 2013)). One could imagine an alternative MDL process that was purely voluntary—perhaps the role of the JPML would be more limited, and cases could only be centralized if a moving party bore the burden of showing the transferor court that consolidation was appropriate. In that case, it might make sense to allow parties to waive the right to "opt in" to coordinated proceedings. But that is not the MDL process that Congress enacted.[13] Instead—as discussed at length above—the scheme it adopted looks more like a tool of judicial case management designed to serve, in large part, the ends of judicial efficiency and effectiveness.

Another difference between class action waivers and purported consolidation

---

[13] This reasoning applies with even more force to distinguish waivers of certain statutory collective action mechanisms, which are the subject of one of the cases that Uber relies on its briefing. Courts that have enforced such waivers outside the context of arbitration agreements have done so in part on the grounds that employees must "affirmatively opt in" to such collective actions, which implies that "the employee has the power to waive participation in a [collective] action as well." <u>Benedict v. Hewlett-Packard Co.</u>, No. 13-CV-00119-BLF, 2016 WL 1213985, at *4 (N.D. Cal. Mar. 29, 2016) (quoting <u>Owen v. Bristol Care, Inc.</u>, 702 F.3d 1050, 1052–53 (8th Cir. 2013)).

United States District Court
Northern District of California

1   waivers is the likely effect of denying class relief on court dockets.  Aside from more

2   efficiently adjudicating numerous claims, part of the rationale for class actions is that they

3   enable the litigation of numerous small claims that might not otherwise be worth pursuing.

4   See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617 (1997) ("The policy at the very

5   core of the class action mechanism is to overcome the problem that small recoveries do not

6   provide the incentive for any individual to bring a solo action prosecuting his or her rights.

7   A class action solves this problem by aggregating the relatively paltry potential recoveries

8   into something worth someone's (usually an attorney's) labor.") (quoting Mace v. Van Ru

9   Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).  While not all class actions involve

10  small-dollar claims, many do, and courts often inquire into the feasibility of proceeding

11  individually as part of the Rule 23(b)(3) superiority analysis.  See, e.g., Seijas v. Republic

12  of Argentina, 606 F.3d 53, 58 (2d Cir. 2010) (the superiority prong was satisfied where

13  "the district court correctly determined that proceeding individually would be prohibitive

14  for class members with small claims"); In re Methyl Tertiary Butyl Ether ("MTBE") Prod.

15  Liab. Litig., 209 F.R.D. 323, 350 (S.D.N.Y. 2002) ("The most compelling rationale for

16  finding superiority in a class action [is] the existence of a negative value suit.").  So while

17  in some circumstances allowing a class action waiver might lead to multiple similar

18  actions, in many circumstances it might actually lead to less litigation.  Where the claims

19  subject to the waiver are small, without class relief, the claims may not be litigated at all.[14]

20  With multidistrict litigation, by contrast, the idea is to centralize pretrial proceedings in

21  cases that would otherwise be litigated individually—and which will eventually be tried

22  individually, if the cases are not terminated during pretrial proceedings.  See Lexecon, 523

23  U.S. at 40.  In other words, the point is not to create a mechanism for aggregating claims,

24  but to create a mechanism for centralizing cases that "retain their separate identities" but

25  are amenable to coordinated or consolidated pretrial treatment.  See Gelboim, 574 U.S. at

26

27  _____

28  [14]  To be clear, the point is not that making it infeasible to bring small claims is a good thing.  The point is just that, from the perspective of judicial efficiency, consolidation waivers and class waivers raise different concerns.

413.  A consolidation waiver affecting MDLs would by definition lead to a proliferation of individual cases, which would clearly undermine the efficiency interests that Section 1407 is supposed to serve.

At the hearing, Uber pointed to <u>Nat'l Conv. Services, LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.</u>, No. 15CV7063 (JGK), 2019 WL 3409882 (S.D.N.Y. July 27, 2019), a case in which Judge Koeltl declined to certify a class in part because some number of the potential class members had signed class action waivers.  For the reasons discussed above, the analogy between a class waiver and a consolidation waiver is not a persuasive one.  At any rate, on closer inspection, it isn't clear how this case supports Uber's position—if anything, it probably undermines it.  Judge Koeltl did not treat the class waivers as displacing the Rule 23 analysis—the parties' agreement that there would be no class action did not mean that Rule 23 became irrelevant.  Instead, Judge Koeltl considered the existence of the class action waivers as one factor among several others that made the case unsuitable for class certification under Rule 23(b)(3).  <u>See id.</u> at *3–*4.  Judge Koeltl did not even reach any conclusion about the waivers' enforceability.  Instead, he reasoned that having to decide the enforceability issue would require an "individualized inquiry into which class members agreed to" to the class action waiver.  <u>See id.</u> at *4 ("[I]f a class were certified, the parties and the Court would then have to determine which class members were properly a part of this case. . . . And, to the extent that the forum selection and class action waiver clauses are applicable and enforceable, the Court would be required to dismiss class members from the case.  Such an undertaking is especially unnecessary where the potential recovery for the individual plaintiffs is large and the putative class members have an interest in litigating individually.").  The case does not compel the Court to any different conclusion.

### 7.        The Non-Consolidation Clause is Unenforceable

The Court concludes that the Non-Consolidation Clause's enforcement would undermine the express public policy of Congress embodied in Section 1407.  Under the inquiry prescribed by <u>McGill</u> and Cal. Civ. Code § 3513, the parties' waiver of the ability

to "participate" in consolidated or coordinated proceedings seriously compromises the public purposes that the MDL process is intended to serve. See McGill, 393 P.3d at 94. To the extent that the inquiry under the Restatement applies, the Court also finds that any interest in enforcement of the consolidation waiver is "clearly outweighed in the circumstances by a public by a public policy against the enforcement of such terms." See Cariveau, 99 Cal. Rptr. 2d at 420–21; Restatement (Second) of Contracts § 178(1); Rumery, 480 U.S. at 392.

The MDL process accords the judiciary with a greater than usual degree of managerial power, both at the time of centralization and after the fact. The justification was well expressed by the Fifth Circuit in the seminal In re Air Crash Disaster case:

> Managerial power is not merely desirable. It is a critical necessity. The demands upon the federal courts are at least heavy, at most crushing. Actions are ever more complex, the number of cases greater, and in the federal system we are legislatively given new areas of responsibility almost annually. Our trial and appellate judges are under growing pressure from the public, the bar, the Congress and from this court to work more expeditiously. In most instances these pressures reflect fully justified societal demands. But court resources and capacities are finite. We face the hard necessity that, within proper limits, judges must be permitted to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants. These considerations are at the heart of steps to create procedures for handling complex litigation.

In re Air Crash Disaster at Fla. Everglades on December 29, 1972, 549 F.2d 1006, 1012 (5th Cir. 1977); see also id. at 1013 ("The trial court's managerial power is especially strong and flexible in matters of consolidation."). This is Congress's design, and it would severely undermine that design if parties could privately curtail courts' powers to centralize, consolidate, and coordinate cases. That prospect significantly outweighs any interest in enforcing the Non-Consolidation Clause.

## C.     The Forum Selection Clause

Finally, there is Uber's Forum Selection Clause. Uber argues that the Forum Selection Clause "precludes Plaintiffs' claims, which admittedly occurred outside of

California, and which were brought in the Northern District of California, from being litigated here." Mot. at 11. Accordingly, Uber asks the Court to transfer the plaintiffs' cases to other districts under 28 U.S.C. § 1404(a).

The Court will not do so now for two related reasons. First, Uber's Terms of Use Motion was supposed to concern the effect of the Terms on "Plaintiffs' ability to bring their claims in a coordinated or consolidated proceeding." Pretrial Order No. 5 ¶ 9(A). But the forum-selection clauses cannot ultimately affect the inclusion of the subject cases in these centralized proceedings. That is so because, second, any transfer of the cases at this juncture would be largely, if not entirely, pointless. Any actions that this Court transferred to other districts would be immediately flagged as a tag-along action by the JPML. See Rule 7.1(a), R.P.J.P.M.L. (requiring that parties or counsel in any actions previously transferred under Section 1407 notify the Panel of any potential tag-along actions in which the party is named or counsel appears). The cases—which all involve the same common issues of fact as the other cases in this MDL—would then be transferred back here by the Panel. Very little would be accomplished except the expenditure of administrative and judicial resources to ping-pong dozens of cases between districts and have them end up back where they started.[15]

Importantly, even if this Court enforced the Forum Selection Clauses by transferring the cases away, Uber could not use the clauses to oppose the inevitable JPML's inevitable re-centralization of the cases via Section 1407. That is because the JPML regards forum selection clauses as irrelevant to its own transfer decisions under Section 1407. Its most thorough discussion of this issue is as follows:

> In opposing transfer, Royal Caribbean principally argues that transfer of Aleman and Mullen to the Western District of Washington would run afoul of forum selection clauses in plaintiffs' cruise ticket contracts, which specify that any litigation related thereto must commence in Miami, Florida. We respectfully disagree with this argument. When civil

---

[15] For similar reasons, MDL transferor courts frequently wait to adjudicate venue objections until the end of pretrial proceedings. See Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3866.1 (4th ed.).

actions satisfy the criteria set forth in 28 U.S.C. § 1407(a), the statute authorizes the Panel to centralize those actions (as well as any subsequently identified tag-along actions) in "any district."  "[C]ontractual forum selection clauses [thus] do not limit the Panel's authority with respect to the selection of [a] transferee district," or, by the same token, our authority to transfer tag-along actions to an existing MDL. . . . It also bears noting that because Section 1407 transfer is for pretrial purposes only, our denial of this motion to vacate in no way precludes Royal Caribbean from seeking enforcement of the forum selection clauses for purposes of trial.

In re Park W. Galleries, Inc., Mktg. and Sales Practices Litig., 655 F. Supp. 2d 1378, 1379 (J.P.M.L. 2009) (citations omitted) (some alterations in original).  The JPML has reiterated this principle on several occasions.  See In re Qualcomm Antitrust Litig., 273 F. Supp. 3d 1373, 1376 n.3 (J.P.M.L. 2017) ("Apple's contract with Qualcomm contains a forum selection clause specifying that this action be tried in the Southern District of California. Such forum selection clauses do not limit the Panel's authority under Section 1407."); In re Medical Resources Sec. Litig., 1998 U.S. Dist. LEXIS 15832, *3 (J.P.M.L. Oct. 7, 1998) ("[C]ontractual forum selection clauses do not limit the Panel's authority with respect to the selection of the transferee district.").  Uber argues that the Park West decision has no bearing here, because the JPML states that its order "in no way precludes Royal Caribbean from seeking enforcement of the forum selection clauses" in the transferee court.  See Reply at 18.  But Uber's partial quotation from Park West is misleading: the JPML said that the defendant could seek enforcement of the clauses "for purposes of trial."  In re Park W. Galleries, 655 F. Supp. 2d at 1379 (emphasis added).  The implication is that, in conjunction with the parties' rights under Lexecon, the party seeking to enforce the forum selection clause can do so not during the centralized pretrial proceedings but after they are complete.

That leads to a second point.  After the JPML re-transferred Plaintiffs' cases under Section 1407, the cases would be here to stay for the duration of pretrial proceedings.  That is because, for any cases that have been subject to a Section 1407 transfer, Lexecon likely does not permit the transferee court to grant transfers under Section 1404(a).  Although Lexecon specifically concerned the practice of "self-transfer" by MDL transferee judges

under Section 1404(a), <u>Lexecon</u>'s reasoning is not limited to that practice.  In <u>Lexecon</u>, the

Supreme Court read Section 1407 to permit only two fates for a case transferred for

centralized pretrial proceedings under the MDL statute: the case can be terminated by the

transferee court, or it can be remanded to the transferor court by the Panel.  <u>Lexecon</u>, 523

U.S. at 35.  Transfer to another district by the transferee court—which would frustrate the

JPML's obligation to remand the case pursuant to Section 1407—is not among these

options.  Indeed, the Supreme Court described its own holding as follows: "that the

statutory language of § 1407 precludes a transferee court from granting any § 1404(a)

motion."  <u>Lexecon</u>, 523 U.S. at 41 n.4; <u>see also</u> <u>id.</u> at 39 ("[O]n any view of § 1407(a), if

an order may be made under § 1404(a), it may be made after remand of the case to the

originating district court).  Other courts have read <u>Lexecon</u> the same way.  <u>See, e.g., In re</u>

<u>Asbestos Prods. Liab. Litig. (No. VI)</u>, 965 F. Supp. 2d 612, 622 (E.D. Pa. 2013)

("Succinctly put, <u>Lexecon</u> does not allow an MDL transferee court to transfer a case back

to itself for trial; nor does <u>Lexecon</u> leave room for the MDL transferee court to transfer

MDL cases to other districts directly."); <u>see also</u> Ann. Manual Complex Lit. § 20.132

n.663 (4th ed.) (noting that under <u>Lexecon</u>, "MDL transferee judges may not use section

1404(a) to transfer to any district at all, neither to a third district or back to the section

1407 transferor district").[16]

All of that goes to show that transfer at this juncture would not ultimately affect the

inclusion of the cases in this MDL—nor would it accomplish much of anything.[17]  To be

---

[16] Recall that the actions subject to Uber's motion were all filed directly in this Court and have, therefore, not been subject to any Section 1407 transfer.  For that reason, the Court could likely transfer those actions to other districts, <u>Lexecon</u> notwithstanding.  It's just that the cases would be sent back by the JPML, and once they were, they could not go elsewhere except by a remand order from the Panel.

[17] At the hearing (and in a footnote in its reply brief), Uber suggested that Plaintiffs' cases could simply be dismissed under Rule 12(b)(6), rather than transferred, as a result of the plaintiffs' decision to file in this district.  Although the Ninth Circuit has not explicitly approved the practice, some circuits allow defendants to use Rule 12(b)(6) motions to seek dismissal of claims based on forum selection clauses, and some Ninth Circuit district courts have endorsed this practice.  <u>See RJ v. Cigna Health and Life Ins. Co.</u>, 625 F. Supp. 3d 951, 968–69 (N.D. Cal. 2022) (collecting cases); <u>see also</u> <u>Claudio-De Leon v. Sistema Universitario Ana G. Mendez</u>, 775 F.3d 41, 46 (1st Cir. 2014) ("In this Circuit, we treat a motion to dismiss based on a forum selection clause as a motion alleging the failure to

United States District Court
Northern District of California

clear, that doesn't mean that a valid forum selection clause is useless in a case that is included in an MDL.  For cases that have been transferred under Section 1407, Uber can raise the issue of the forum selection clause "after remand of the case to the originating district court," which will ensure that trial and any remaining pretrial proceedings take place in the proper forum.  <u>Lexecon</u>, 523 U.S. at 39.  For cases that were filed directly in this district, the Court will adjudicate motions to transfer at the appropriate time—likely at the conclusion of the proceedings.  To be sure, it is possible that addressing the Forum Selection Clauses at an earlier stage may be necessary.  For example, the validity and enforceability of the clauses will likely have an impact on choice-of-law issues, as Plaintiffs acknowledge in their opposition to Uber's motions to dismiss.  <u>See</u> Omnibus Opp'n to Mot. to Dismiss (dkt. 518) at 144.  But the briefing before the Court is not tailored to the clauses' effect on that issue, and it is limited to a small subset of the plaintiffs.  Other plaintiffs may have different arguments about whether they assented to the relevant terms, different state-law arguments about the validity of the clauses, and so forth.[18]  Plus, it may be possible to adjudicate the validity and enforceability of the clauses as a way of answering the choice-of-law questions without actually transferring the cases, given the waste of time and resources that would entail.  For both reasons, adjudicating the motions to transfer in the interests of the choice-of-law analysis does not make sense at this juncture.

---

state a claim for which relief can be granted under Rule 12(b)(6).");  <u>Smith v. Aegon Companies Pension Plan</u>, 769 F.3d 922, 934 (6th Cir. 2014) (affirming dismissal under Rule 12(b)(6) for violation of forum selection clause).  Here, Uber did not mention that it was seeking Rule 12(b)(6) dismissals except in its reply brief.  More importantly, even if the Court were to dismiss the Plaintiffs' cases under Rule 12(b)(6), the ultimate result would be the same as if the cases were transferred: the cases would end up right back here.  Any dismissals based on the forum selection clause would be without prejudice.  <u>See, e.g.</u>, <u>Claudio-De Leon</u>, 775 F.3d at 49.  So the plaintiffs would just refile their actions in other district courts, at which point the cases would be transferred here by the JPML.  Again, the main result would be pointless expense and delay.

[18]  "[S]tate law governs the <u>validity</u> of a forum-selection clause just like any other contract clause," while "the <u>enforceability</u> of a forum-selection clause in a federal court is a well-established matter of federal law[.]"  <u>Lee v. Fisher</u>, 70 F.4th 1129, 1142, 1143 (9th Cir. 2023) (emphasis added) (quoting <u>DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.</u>, 28 F.4th 956, 963–64, 962 (9th Cir. 2022)).

United States District Court
Northern District of California

Accordingly, Uber's motion to transfer based on the Forum Selection Clause is denied without prejudice to raising the issue at a later time.

**III.  CONCLUSION**

For the foregoing reasons, Uber's Terms of Use Motion is denied.

**IT IS SO ORDERED.**

Dated: May 20, 2024



CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

37