# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| | **JOINT CASE MANAGEMENT CONFERENCE STATEMENT AND PROPOSED AGENDA** |
| This Document Relates to: | Date: May 31, 2024 |
| ALL ACTIONS | Time: 10:30 a.m. |
| | Judge: Hon. Charles R. Breyer |
| | Courtroom: G – 15th Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT STATUS CONFERENCE STATEMENT**

In advance of the status conference set by the Court in this action for Friday, May 31, 2024 at 10:30 a.m. via Zoom videoconference, Plaintiffs, Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC (collectively, "Defendants" or "Uber") (jointly, "the Parties"), submit this Joint Status Conference Statement. On disputed items, the party that seeks to raise an issue has presented their position first.

**PROPOSED AGENDA**

    1.    **Status of Case Filings**

    2.    **Coordination with JCCP**

    3.    **Motions**

    4.    **Discovery**

    5.    **Case Schedule**

    6.    **Special Settlement Master**

    7.    **Administrative Matters**

**I.**    **STATUS OF CASE FILINGS**

**Number of Case Filings**

As of May 24, 2024, there are 297 cases pending in this MDL, and 395 cases involving California incidents pending in the JCCP.

**JCCP Forum *Non Conveniens* Appeal**

Argument in the JCCP forum *non conveniens* appeal has been rescheduled to June 14, 2024. Pursuant to the California Constitution, the Court of Appeal's decision on the appeal is due to be rendered within 90 days of oral argument, which would mean the decision is due to be issued no later than September 12, 2024.

    1.    **Defendants' Request For a Filing Cut-Off**

**Defendants' Position:** At the last case management conference, the Court deferred a decision on a filing cut-off deadline. The Court expressed an interest in knowing when the state Court of Appeal would decide the Forum *Non Conveniens* issue because that decision will determine whether 900+ non-California plaintiffs will dismiss their cases, proceed in state court,

or file in federal court. If practical, this Court wanted more certainty regarding the timing of the Court of Appeal's decision before determining a cut-off deadline. As noted above, the Court of Appeal has now scheduled oral argument for the June calendar and a decision will be made within 90 days of argument. By the time of the Court of Appeal's decision, the MDL will have been pending for 11 months and the parties will be proceeding with discovery. Defendants believe it is appropriate at this time to set a filing cut-off which would be triggered by the date of the decision and not to exceed 60 days thereafter. The parties will promptly notify this Court of the Court of Appeal's decision on this issue. Defendants strongly dispute Plaintiffs' suggestion that "imposing a cutoff now would inevitably lead to an 'Uber MDL 2' – a needless sequel, with myriad inefficiencies." The opposite is true. Establishing a cut-off on the proposed timeline will incentivize the filing of existing claims and, thereby, will create efficiencies and help shape discovery and potential resolution of this matter. By Plaintiffs' logic, this MDL will never end, thus defeating the purpose of an MDL. To the extent Plaintiffs argue that the MDL must remain open to new claims because survivors are only now learning of this type of litigation against Uber, this is inconsistent with the facts, as the JCCP case, which has been the source of national news attention, has existed since December, 2021. Setting a filing cut-off deadline in relation to the Forum *Non Conveniens* appeal is both sensitive to survivors and makes practical sense.

**Plaintiffs' Position:** Plaintiffs do not agree that this topic warrants a discussion at this conference and continue to oppose Defendants' premature filing cutoff request for the reasons stated in prior Case Management Conference Statements. ECF Nos. 207, 356. This MDL, while moving apace, is still in its early stages. Establishing a cut-off for filings *for inclusion in an initial trial pool* makes sense and should be addressed at an upcoming status conference. Plaintiffs' Counsel continue to anticipate a large number of cases filed in this MDL. As expected, the pace of filings has increased following the issuance of PTO No. 10. In discussions among counsel, Uber acknowledged that imposing a cutoff now would inevitably lead to an "Uber MDL 2" – a needless sequel, with myriad inefficiencies. Imposing an arbitrary cutoff for filings in the MDL is not only impractical, but also offensive to assault survivors. Filing a lawsuit is not an easy decision for anyone; but for a sexual assault survivor, it requires multiple re-traumas. As many

1    states have recognized in extending or removing statutes of limitations for claims arising from

2    sexual assault, summoning the psychological strength to file an action and fully participate in

3    discovery and trial—knowing it means reliving the trauma and the risk of not being believed—

4    takes time and emotional labor. As survivors learn about the MDL proceedings, they find it easier

5    to come forward—as one of many. Undoubtedly at some point this MDL should wind down—

6    most practically after common discovery has concluded, common issues have been decided, and

7    resolution or remand efforts are underway.

8    **II.**    **COORDINATION WITH JCCP**

9         The parties are continuing to confer regarding a deposition protocol and coordination with

10    the JCCP, and will be prepared to provide an update in conjunction with the discovery status

11    conference set for June 11, 2024 before Judge Cisneros.

12    **III.**    **MOTIONS**

13         **1.**    **Rule 12 Motions.**

14         On April 1 2024, Defendants filed five motions to dismiss, which addressed all claimants

15    whose alleged incidents took place in the five states with the largest volume of cases – New York,

16    Florida, California, Illinois, and Texas. A hearing on the motions to dismiss pursuant to

17    California and Texas law is set for June 7, 2024. A hearing on the other three motions will be set

18    at a later date.

19         **2.**    **Cross Complaints & Motions to Transfer**

20         **Defendants' Position:** In the Court's Order on the Terms of Use motion, the Court stated

21    its inclination to refrain from taking forum selection clause issues until after the centralized

22    pretrial proceedings in the MDL are complete, but also recognized that "addressing the Forum

23    Selection Clauses at an earlier stage may be necessary." ECF No. 543 at 36. For the following

24    reasons, Uber believes the Forum Selection Clause issue should be briefed and resolved in short

25    order, and in any case, prior to the end of proceedings.

26         After the Court decides the motions to dismiss, Uber will begin filing cross-complaints

27    against independent drivers.[1] In most of the actions that are part of this MDL (approximately 250

28

---

[1] Uber has already filed cross-complaints in the JCCP action.

1   out of the 297 cases in the MDL), the cases were filed in the Northern District of California, but

2   the underlying incident occurred in a different state and the independent driver who is alleged to

3   have committed criminal acts resides in that state (or otherwise outside California). This scenario

4   raises serious issues because the drivers are likely to assert that the Northern District of California

5   - - the court in which those approximately 250 actions were filed - - cannot exercise personal

6   jurisdiction. Thus, once the pleadings move on to the next phase, and answers and cross-claims

7   are filed, drivers will very likely proceed to seek dismissal from the case on the basis that this

8   Court lacks personal jurisdiction.

9           But, a different and less contentious option is for the Court to decide the proper forum for

10  these 250 cases now. That would avoid unnecessary motion practice about personal jurisdiction

11  that would otherwise inevitably arise. As the Court noted in its Terms of Use decision, the MDL

12  court can exercise personal jurisdiction only so far as the original case filing location. ECF No.

13  543 at 19 n.6 ("It is well established that the JPML may transfer actions without regard to the

14  transferee court's personal jurisdiction over the parties, in the same sense that 'the transferee

15  court can exercise personal jurisdiction to the same extent as the transferor court could.' *In re*

16  *Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1379 (J.P.M.L. 2020); *accord Shambaugh &*

17  *Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 373 (5th Cir. 2024); *In re Auto. Refinishing Paint*

18  *Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004)").

19          Without an initial determination of the proper forum in which the action should have been

20  brought, and will be tried, the MDL Court likely will need to resolve motions challenging

21  personal jurisdiction over the drivers. Thus, even though this second option of determining the

22  proper forum for trial will not change the fact that the cases continue to be litigated in the

23  Northern District of California for pretrial purposes, it will obviate the personal jurisdiction issues

24  as to the drivers. Further, this issue should be timely resolved so Defendants can include in the

25  litigation all relevant parties so that discovery can be completed, because without the drivers, we

26  have an incomplete understanding of the incidents that form the basis of Plaintiffs' complaints - -

27  these incidents are not the result of Uber's alleged actions or inactions alone. Moving

28  meaningfully forward requires all parties. Uber therefore requests that the Court set a schedule for

briefing the question of the proper forum for trial for cases involving incidents that took place in other states, before it is time to file and serve cross-complaints.

Plaintiffs' argue at length as to why they think some Plaintiffs may have arguments to resist enforcement of the Forum Selection Clause in the Terms of Use. Though there are significant problems with their position, that is what motions to transfer will address. In any event, Plaintiffs' position ignores that transfer will be based not only on the Forum Selection Clause (where it was agreed to) but also based on the principles of *forum non conveniens* embodied in 28 U.S.C. § 1404(a). Under those very principles, and regardless of the Forum Selection Clause, Judge Schulman ruled that cases involving incidents outside California should be transferred to those venues for pretrial and trial proceedings. *See* Order on Defendants and Cross-Complainants Uber Technologies, Inc. and Raiser LLC's Motion to Stay or Dismiss Based on *Forum Non Conveniens, In re Uber Rideshare Cases*, No. CJC-21-005188, at 15 (Cal. Super. Jan. 23, 2023) ("Allowing Plaintiffs' case to remain in California, although they will likely be governed by the regulatory and tort laws . . . [in] the states where the Plaintiffs were allegedly injured, would undermine th[e] interest [in avoiding unnecessary conflicts of laws]."); *id.* ("In general, California courts have little or no interest in litigation involving injuries incurred outside of California by nonresidents (citation omitted)). Plaintiffs also do not accurately present the record of evidence embodied in the Terms of Use motion regarding evidence of assent to and enforceability of the contract. Uber showed in its motion, and then again in its reply, a thorough evidentiary record of assent and enforceability. Plaintiffs dispute the legal conclusions that flow from that evidence, and the Court will need to resolve that dispute. But the need for such resolution is exactly why a process for motions to transfer, including based on the Forum Selection Clause, should be established sooner than the conclusion of pretrial proceedings.

Plaintiffs hypothesize an "en masse" transfer motion against "hundreds of Plaintiffs at once," but that is not at all what Uber is proposing. The JCCP court, for instance, recognized - - "[i]t seems to me that before I start dealing with issues like a master complaint, like short form complaints, like fact sheets and like merits discovery, we need to know what cases are going to be here and what cases are not going to be here." JCCP CMC Tr. 18:15-19. Based on this, the JCCP

court established a procedure whereby Uber would move in two individual actions with fact patterns resembling those of a broader array of cases. Uber filed those two motions in individual cases, the parties made their record in individual cases, and the JCCP court adjudicated those facts and legal arguments promptly. The parties then stipulated that the Court's analysis and conclusions would be the subject of an order applying to other cases with substantially similar fact patterns for purposes of the transfer issues. That procedure, or a similar one, would be entirely appropriate here. In any event, there is not a proposal for an "en masse" or "global" motion, as these are individual cases (not a class action). A conversation about the precise details of how and when transfer motions will be litigated is warranted now, not down the road after the Court and the parties are embroiled in litigation as to the MDL court's ability to exercise personal jurisdiction over cross-defendant drivers.

**Plaintiffs' Position:** In its order denying Uber's Terms of Use Motion, the Court indicated it would "adjudicate motions to transfer" cases filed in the Northern District of California "at the appropriate time—likely at the conclusion of the proceedings." ECF 543 at 36. Less than a week later, Uber asks the Court to revisit that conclusion and decide now the proper trial forum for 250+ cases. Uber does not justify that use of the Court's or the parties' time.

*First*, the Court should be hesitant to hear any transfer motions directed at cases en masse. When Uber filed its TOU motion, it confidently told the Court that "[t]here can be no doubt" that 29 Plaintiffs affirmatively and unambiguously assented to a version of the TOU containing a forum selection clause. ECF 257 at 2. In response, the 29 Plaintiffs pointed out that most of them had been assaulted, and several had put Uber on notice of their intent to sue, before the clause was added to the TOU. ECF 341 at 7. In addition, for 24 of the 29, Uber had failed to establish that they had assented to a revised TOU before filing California lawsuits. *Id.* Nor did Uber acknowledge the uncomfortable fact that Plaintiffs are required to access their Uber App to comply with Court-ordered discovery, hardly voluntary assent. *Id.*

On reply, it turned out there was in fact some "doubt." Remarkably, in a footnote, Uber withdrew its motion as to three (3) Plaintiffs with respect to whom it "determined … have differing fact patterns." ECF 393 at 6 n.7. Uber did not elaborate on what kinds of "differing fact

patterns" it apparently concedes materially affect the enforceability of the forum selection clause. Then, in response to some of Plaintiffs' assent arguments, Uber, for the first time on reply, argued some Plaintiff assented to forum selection for their sexual assault claims by ordering food through "UberEATS." *Id.* at 7. That the TOU for one App unambiguously can govern claims arising from use of another App is hardly self-apparent and simply assumed.

Uber also argued that the TOU by their terms apply retroactively, but ignored entirely Plaintiffs' explanation of how those facts (such as when a person was assaulted, and whether they sent Uber a pre-filing notice letter) play into the Court's evaluation of the clause under the "fundamental fairness" test. *Id.* at 7-8. Indeed, Uber did not even acknowledge the relevant legal standards courts apply to such clauses, including fairness, overreach, "affected by fraud," or bad faith, or discuss the cases Plaintiffs cited on this point. *See* ECF 341 at 17-20 (Plaintiffs discussing this analysis in depth).

The point is this: Uber tried to move cases en masse and it did not work. Uber's "no doubt" approach to assent raised more questions than answers under even modest scrutiny. In response to arguments for why the clause was unenforceable—arguments that, depending on how the Court views them, may yield different outcomes in different cases—Uber simply ignored facts and controlling legal authority it did not like. Uber does not explain why the Court should entertain another attempt at this dubious approach. Worse, after failing to support its claims for 29 Plaintiffs, Uber now (apparently) intends to move against hundreds at once. How this makes sense is never explained.

*Second*, Uber says the court should decide a global motion to transfer now because Uber wants to sue third-party drivers and some of those drivers might file personal jurisdiction motions. To start, Uber's position rests on speculation: that it can find drivers, that it can serve them, that, once served, those drivers will object to jurisdiction here, and that Uber will actually find it worthwhile to sue likely judgment-proof individuals. More to the point: even accepting Uber's hypotheticals as certain, nothing prevents Uber from filing third-party complaints in appropriate venues and then tagging those cases with the JPML for inclusion here for pretrial purposes. Whether a driver's location affects where a trial should occur is not at issue yet, and

may never be at issue. *See, e.g.*, *Andrade v. Station Casinos LLC*, 2021 WL 4441990, at *2 (N.D. Cal., Mar. 22, 2021) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.") (citation omitted). That the Court may face some unspecified number of (simple) personal jurisdiction motions does not alone justify spending time and resources on hearing a global motion to transfer.

The upshot is that the Court should hear motions to transfer in individual case(s) if and when Uber makes a showing that doing so is necessary. That may be, as the Court predicted, at the conclusion of the proceedings. The Court may order some subset of cases worked up as initial trial candidates. Or Uber may make some actual showing of need in a given case. Uber's approach—move against all cases at once, ignore inconvenient facts, and brush aside legal standards that require application of those facts—did not work the first time and is unlikely to be any better the second.

## IV.   DISCOVERY

### 1.   Third Party Discovery

As of April 19, 2024, Plaintiffs have served thirty (30) subpoenas on third parties who Plaintiffs argue have information that is relevant to the claims and defenses in this case. These subpoenas are directed to entities that fall into five general categories: (1) lobbying groups and law firms, (2) plaintiff attorneys, (3) contractors that worked with Uber, (4) sexual violence advocacy organizations, and (5) Lyft. After reaching an impasse, the Parties filed a joint administrative motion seeking the Court's guidance on the format and schedule to raise disputes over the third-party subpoenas. ECF No. 562. The Parties further agreed and believe that third parties are not governed by PTO 8 and are thus not subject to PTO 8.

### 2.   Defendants' Discovery

#### a.   Privilege Issues

Uber has produced documents in response to PTO 5's directive that Uber produce documents that Uber previously produced (1) in response to government inquiries related to sexual assault; and (2) in other sexual assault litigations. Before producing those documents in this litigation, Uber made new redactions based on "scope" and personal identifying information

(PII) (including names of drivers) that were not included when Uber originally produced the documents to the respective government entities or in the prior litigation. The parties have conferred regarding these redactions. After numerous requests from Plaintiffs, Uber has produced additional metadata that it purports identify each of the redacted documents. Plaintiffs are presently assessing this information. Additionally, Plaintiffs are awaiting confirmation of Uber's previous and intended practices of redacting driver names and personal identifying information, but anticipate bringing this issue to the Court.

In April and May, the parties met and conferred regarding redactions in the documents produced under PTO 5. During those discussions, Uber confirmed on multiple occasions that despite the presence of redactions those documents, Uber had not produced any privilege logs in the underlying litigations. However, on May 16, 2024, Uber's counsel reported that, in conjunction with reviewing documents that Plaintiffs specifically identified to Uber as containing redactions, Uber had become aware of privilege logs produced in seven underlying litigations, but had not produced them to Plaintiffs pursuant to PTO 5 because Uber was unaware of them at the time of production. Uber produced these logs on May 21, 2024 in the form of 14 separate documents that cumulatively include around 500 pages. The meet and confer process is expected to continue after Plaintiffs complete their review of those logs.

Additionally, on May 10, 2024, Uber sent Plaintiffs a clawback letter asserting that five documents Uber inadvertently produced pursuant to PTO 5 are protected under attorney-client privilege and the work product doctrine. Uber represents that these documents were in fact *not* produced by Uber in the underlying litigation, and the court presiding over that prior sexual assault matter, after *in camera* inspection, determined that the five documents were in fact privileged. Plaintiffs assert that, while these documents are listed on a privilege log produced to Plaintiffs on May 21, 2024, Uber has not provided Plaintiffs with any information regarding the underlying court's order. Uber claims that it identified for Plaintiffs in Uber's privilege claw back letter all of the indicia of privilege on the inadvertently produced documents, including that the documents' first page contains the words "WITHHELD FOR PRIVILEGE" on them. Uber also asserts that it pointed out the numerous attorneys reflected as sending and receiving

1   communications in the documents. Plaintiffs will provide their position regarding what Uber

2   refers to as "indicia of privilege" at the appropriate time in conjunction with the clawback process

3   under PTO 14 or should the Court desire to address this issue at the May 31 status conference.

4   Further, Uber states that Plaintiffs waited seven days to even respond to Uber's notification.

5   Uber's position is that it expects Plaintiffs will preserve metadata of anyone accessing these

6   privileged documents during the challenge period where Plaintiffs have agreed to sequester the

7   documents. Plaintiffs have provided notice to Uber that they have sequestered the documents

8   pursuant to PTO 14, and that Plaintiffs are challenging the privilege claim. The parties are

9   currently working through the clawback process, and Plaintiffs await Uber's response to their

10  notice of clawback challenge. While these documents are listed on a privilege log produced to

11  Plaintiffs on May 21, 2024, Uber has not provide Plaintiffs with any information regarding the

12  underlying court's order. If necessary, the issue will be presented to the Court no later than June

13  11, 2024.

14              **b.**      **PTO 5 – Government Investigations**

15          On March 1, 2024 and subsequently on March 15, 2024, the Court ruled on Plaintiffs'

16  Motion to Enforce PTO 5 related to Government Investigation Documents. After Uber's most

17  recent production on April 12, 2024, the parties held many meet and confers regarding the scope

18  of PTO 5 under this Court's order, and are continuing to confer. Specifically, it is Plaintiffs'

19  position that all documents produced to the CPUC and any other regulatory entity that were

20  produced to that entity either in response to or arising as a result of that entity's inquiry or

21  investigation must be produced here (for example, Uber's annual reporting to the CPUC). Uber's

22  position is that documents provided to regulators to satisfy a legal requirement, such as general

23  annual reporting requirements, are not documents produced "in connection with government

24  investigations or inquiries." PTO 5 § 6B. Following numerous meet and conferrals and written

25  communications to Plaintiffs, Uber has committed by May 31 to provide a further explanation of

26  documents produced to governmental or regulatory bodies that Uber represents are not responsive

27  to PTO 5 and is therefore withholding from production.

28

c.      **PTO 5 – Discovery Deadlines**

On December 28, 2023, this Court issued Pretrial Order No. 5. Among other deadlines, PTO 5 set September 1, 2024 as the deadline for Uber to substantially complete production of non-privileged responsive documents in response to the Plaintiffs' First Set of Requests for Production. On February 28, 2024, Plaintiffs served their First Requests for Production, which consists of 202 Requests. After numerous meet and confer discussions, Plaintiffs consented to Uber's request to extend their deadline to respond from March 28, 2024 to June 27, 2024.[2] However, because a 90-day extension put Uber's ability to meet the September 1 deadline at risk, Plaintiffs agreed to this extension only on the condition that Uber agree to certain milestones to ensure that the preliminary steps (including agreement on search terms and custodians) would be resolved in sufficient time for Uber to meet the September 1 deadline.

Uber committed on May 10 to meeting milestone deadlines, including providing clear assurance to Plaintiffs that it would meet the September 1 deadline set forth by the Court in PTO 5. *See* **Exhibit A**. The milestones require informal information sharing including providing Plaintiffs with: (1) a list of specific requests that Uber expects to object to in full, and the basis for such objections; (2) a list of the thematic objections made to multiple requests, and the specific requests that are subject to these thematic objections; (3) a list of Plaintiffs' requests that Uber claims are satisfied by productions made by Uber to JCCP Plaintiffs; and (4) identification of Plaintiffs' requests that Uber claims are satisfied by productions already made by Uber in this Action, including as part of defense fact sheets. The parties dispute whether the information Uber has provided to date indicates good faith efforts to comply with the agreed-upon milestones but are continuing to meet and confer about these topics.

i.      **Custodians**

On April 26, 2024, Uber provided Plaintiffs a custodian list containing 29 employees and former employees (comprised almost entirely of the group of custodians that were agreed upon in

---

[2] Uber initially requested a 30-day extension of time to respond to Plaintiffs' First RFPs, to which Plaintiffs consented, making Uber's responses due April 29, 2024. Shortly before that deadline, on March 21, counsel for Uber sought Plaintiffs' consent to an additional 60-day extension of time to respond to the First RFPs, to May 29.

the JCCP many months ago). Uber asserts that in proposing the initial custodians, Uber assessed each custodians' role and job duties, and the time periods covered, and put the custodians forward because they could have comprehensive and proportional information responsive to Plaintiffs' discovery requests. However, Plaintiffs note that 27 of the 29 custodians Uber proposed were custodians that were agreed upon through the meet and confer process in the JCCP litigation, and it is Plaintiffs' understanding that the plaintiffs in the JCCP (and not Uber) initially identified and proposed these 27 custodians. On May 3, 2024, Plaintiffs provided Uber with a list of 100 employees and former employees that Plaintiffs identified as an initial set of custodians, reserving the right to request documents from additional custodians should discovery indicate that need. A large portion of Plaintiffs' proposed initial custodians had also been identified months ago as priority custodians by the JCCP plaintiffs (and not by Uber).

**Plaintiffs' Position:** Since Plaintiffs sent their custodian list on May 3, the parties have met and conferred regarding custodians and other discovery milestones five (5) times. Additionally, the parties have exchanged upwards of 10 emails on subjects related to the discovery milestones. During a meet and confer on May 10, Uber confirmed that it agreed to the milestones as set forth in **Exhibit A.** Additionally, during each meet and confer conference since May 3, Plaintiffs have asked Uber to provide their feedback on Plaintiffs' custodian list. Each time, Uber responded that it was continuing to review Plaintiffs' list and was not in a position to provide its response even though Uber only has full access to information about these custodians.

At no point during the first four of these five meet and confers or numerous emails did Uber inform Plaintiffs that the only way it could meet the September 1 deadline is to limit its production to Uber's list of 29 custodians (essentially the same list that has been at issue and subject to discovery in the JCCP since late 2023). Indeed, Uber continued to produce assurance that it would meet the September 1 discovery deadline even after it received Plaintiffs' custodial list.[3] Instead, Plaintiffs first learned of this position when Uber provided its portion of this

---

[3] Moreover it is very surprising that the 29 custodians Uber has proposed are 27 out of 29 custodians selected by JCCP counsel. These custodians were already selected before Defendants received Plaintiffs' discovery in the MDL. Yet Uber maintains that these are the only custodians needed to respond to Plaintiffs' First Requests for Production to meet the Court's September 1, 2024 deadline.

Statement on May 22. The parties discussed Uber's position on May 24, however, Uber has not committed to producing documents by September 1 for any custodians other than the 29 it proposed. Plaintiffs have agreed to further meet and confer on this topic but intend to raise this issue with the Court through the PTO 8 process by June 6, 2024, pursuant to the agreed-upon milestones.

**Defendants' Position:** As Plaintiffs state, there have been multiple emails and conferrals of counsel referencing custodians, and Uber has provided Plaintiffs a list of 29 proposed custodians on April 26. This list, at Plaintiffs' request, included more information about the custodians than required by the ESI Protocol. As Uber explained to Plaintiffs on April 29, May 3, and May 10, Uber's custodian list was developed by Uber to provide thematic and temporal coverage to respond to Plaintiffs' Requests for Production in a reasonable and proportional manner. When Uber requested during the Parties' conferrals information about Plaintiffs' basis for proposing their list of 100 custodians, Plaintiffs replied, as above, that only Uber has information about these employees. Uber just received from Plaintiffs their basis for proposing their custodians on May 23, 2024.

Plaintiffs assert above that some of these custodians were "selected by JCCP counsel." That is a misrepresentation. The custodians selected in the JCCP were largely the product of negotiation between the Parties. To the extent Uber's proposed custodians here overlap with the custodians selected in the JCCP, that accurately reflects the similarity in claims and defenses in the two Actions, which are nearly identical.[4] In fact, the similarities between the two Actions highlight the fact that the custodians and search terms need not be too different. The additional

---

[4] While there are undoubtedly differences between the JCCP and MDL long form complaints, such as the more specific discussion of non-delegable duties and vicarious liability in the MDL complaint, the two are largely the same. In fact, the only claim that is in the MDL and not in the JCCP complaint is a claim for a violation of the Unfair Competition Law.

custodians Uber proposed in this Action are employees with national scope of responsibilities to reflect the broader geographic scope here.

Uber notes that it can meet the current September 1, 2024 substantial completion deadline outlined in PTO 5 using the current set of 29 custodians and operative search terms (also agreed in the JCCP many months ago), but that deadline will need to be changed if it is required to include additional search terms and custodians, many of whom are duplicative to custodians that Uber has already proposed, as a result of Plaintiffs' demands. It strains credulity for Plaintiffs to suggest as they do here, that Uber should agree *today* to substantially complete productions by September 1 targeted against an unknown, constantly moving, and impossibly broad set of documents keyed to search terms (including the term "ride!") that Plaintiffs are seeking and as yet agreed custodians (including more than 100 in addition to the 29 custodians Uber has already put forward).

### ii.     <u>Search Terms</u>

Plaintiffs provided their initial proposed search terms to Uber on April 19, 2024. Per the ESI Protocol (ECF No. 524), Uber provided its list of search terms on May 10, 2024 and also provided hit reports on that date. The parties have conferred regarding search terms on multiple occasions and continue to confer in an effort to reach agreement.

### iii.     <u>Non-custodial files that can be produced without the use of search terms.</u>

**Plaintiffs' Position:** Pursuant to the agreed-upon milestones, Uber agreed to identify non-custodial files that it could produce without the use of search terms. Uber provided a list on May 6, however, that list is incomplete and consisted solely of incident-specific documents that Uber is producing in conjunction with its Defendant Fact Sheets. Uber's list did not contain any further policies or procedures, centralized non-custodial files, or any data regarding reports of sexual assault or sexual misconduct that it collected, analyzed, and categorized in conjunction with its Safety Reports. Plaintiffs believe that Uber is capable of producing these files without the use of search terms. The parties agreed on May 20 that they have reached an impasse with regard to

1   Uber's production of sexual assault and sexual misconduct data and intend to raise this under the

2   PTO 8 process in to be addressed during the June 11 Discovery Conference. The parties are

3   continuing to meet and confer regarding production of non-custodial sources, including policy

4   and procedure files without the use of search terms.

5          **Defendants' Position:** Uber provided Plaintiffs a preliminary list of types of files that

6   could be produced without use of search terms on May 6. However, Plaintiffs mischaracterize this

7   list as consisting "solely" of the robust discovery into the incidents giving rise to this litigation

8   being produced as part of the Defense Fact Sheets. In truth, this list also included the voluminous

9   discovery Uber is providing Plaintiffs under PTO 5, as well as data from several non-custodial

10  data sources. Uber is investigating and will keep Plaintiffs updated.

11                        **iv.**    **Objections to Requests for Production**

12         Pursuant to the agreed-upon milestones, and in an effort to utilize the meet and confer

13  process to narrow or resolve disputes prior to formal response and objections being served by

14  Uber, Uber agreed to provide preliminary objections to Plaintiffs' First RFPs, identifying

15  objections that would result in the withholding of large portions of documents (*i.e.*, objections

16  made to multiple requests) and RFPs that Uber objects to in full. The parties have reached an

17  impasse with regard to Uber's objection to producing any documents prior to 2013 and Plaintiffs

18  anticipate raising this issue through the PTO 8 process in the coming weeks. The parties are

19  continuing to meet and confer about Uber's remaining objections but Plaintiffs expect to seek

20  Court intervention with regard to additional objections.

21                        **v.**    **Other Written Discovery**

22         Plaintiffs served their First Interrogatories and First Requests for Admission on March 27,

23  2024. Uber has committed to serving initial objections and responses on May 29, 2024 and final

24  objections and responses on June 20, 2024.

25                        **vi.**    **Defense Fact Sheets**

26         The parties met and conferred on a number of occasions, including with BrownGreer

27  regarding Fact Sheet productions in MDL Centrality. Fact Sheet productions have commenced

28  with the Fact Sheet productions for cases filed on or before March 26, 2024 due May 29, 2024,

the Wednesday following Memorial Day. Plaintiffs have also asked Uber to make Fact Sheet productions in ILS, which Uber has agreed to address after May 29.

### 3. **Plaintiffs' Discovery**

#### a. **Defendants' Request to Take Written Discovery of Plaintiffs**

**Defendants' Position:** Under the Court's current orders, discovery is entirely one sided. Plaintiffs have been able to propound limitless discovery on Uber, but Uber has been restricted from taking any discovery of Plaintiffs. Plaintiffs have served ***202 document requests***, ***76 interrogatories***, and ***137 requests for admissions***, but Uber has been prevented from serving ***any*** discovery requests on Plaintiffs. That is unfair and inefficient. Uber requests the Court lift the stay preventing Defendants from taking discovery from Plaintiffs, and third-parties, beginning June 1, 2024.

The large majority of Plaintiffs and Defendants Fact Sheets are due on May 29, 2024, and the next natural step in discovery is to allow Defendants to take written discovery from Plaintiffs and third-parties, including but not limited to requesting records from third parties via the authorization forms Plaintiff submit as part of their Plaintiff Fact Sheets. Defendants need to utilize written discovery tools to further explore Plaintiffs' claims and evaluate the Fact Sheets in the first place. Otherwise, Defendants are at a significant disadvantage in developing case strategy and moving these cases towards resolution or trial.

In another case, the *Volkswagen* MDL, this Court correctly observed that nothing should prevent Defendants from utilizing discovery to obtain evidence from Plaintiffs in addition to what is provided in the Fact Sheets: "The PFS [Plaintiff Fact Sheet] process is designed to streamline the production of relevant information and documents, but that process in no way limits any party from seeking additional information and documents from any plaintiff that completes a PFS through other discovery requests under the Federal Rules of Civil Procedure." Pretrial Order No. 9 § 4(E)(iii), *In re Volkswagen "Clean Diesel" Mktg., Sales, Pracs. & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB (N.D. Cal. Feb 25, 2016), ECF No. 1252. Similarly, in the *Social Media* MDL, the court lifted the discovery stay at the same time that it ordered the parties to meet and confer to develop fact sheets and an implementation order. Case Management Order No. 6 §§ IV

and V, *In re Social Media Adolescent Addiction/Personal Injury Products Liab. Litig.*, No. 4:22-md-03047-YGR (N.D. Cal. Nov. 21, 2023), ECF No. 451 ("The discovery stay is VACATED and discovery is now open." *Social Media* MDL Case Management Order No. 6 does not limit the lifting of the discovery stay to bellwether cases). These cases show that nothing about the Fact Sheet process should limit Defendants' ability to serve discovery on Plaintiffs and third parties. In any event, the Fact Sheet process will have essentially concluded by the time of the upcoming case management conference, and Defendants should be permitted to commence taking discovery.

Contrary to Plaintiffs' arguments below, Uber does not seek discovery on Plaintiffs with the aim to present to the Court "a thousand presentations of each [case] being individualized." *See* 11/3/23 Hearing Tr. at 7. Similarly, Uber is very sensitive to the emotional, physical, and psychological harm victims of sexual assault experience, and nothing in the litigation process is meant to "re-traumatize" these individuals. Plaintiffs chose to bring suit against Uber and part of the process of choosing to participate in litigation is participating in discovery. Uber merely wants the equal opportunity that Plaintiffs have in this case, which is to explore their adversary's claims, evaluate the Fact Sheets, and further develop case strategy. The Fact Sheets will provide *some* relevant and useful information, but they do not provide nearly enough to enable Defendants to adequately understand and analyze Plaintiffs' claims, and for Defendants to defend themselves.

**Plaintiffs' Position:** Plaintiffs do not agree that this issue warrants a revisit. The Court denied recently Defendants' request to open discovery on all Plaintiffs beyond the Ride Information (PTO No. 5) and Plaintiff Fact Sheets (PTO No. 10) at the March Case Management Conference: "a substantial amount of the status conference was directed to a suggested schedule, essentially, of discovery, pretrial discovery; experts, you know, plaintiffs, this person, that person. I've got to tell you that's all premature…[O]ther than some voluntary [] we want to take Smith's deposition, everybody agrees, you take it. Fine. I'll let you take it. But I don't want to unleash the horses at this point." 3/29/25 Tr. at 17:16-20. Defendants are wrong that they are restricted from taking any discovery from Plaintiffs. Plaintiffs have been diligently preparing their fact sheets to produce to Defendants through MDL Centrality. As the Court and Defendants know, these fact

sheets contain questions regarding details about the ride, personal background information about Plaintiffs, and detailed information about Plaintiffs' damages. Furthermore, these fact sheets require production of off-app communications with drivers as well as any photo or video of the subject incident within Plaintiff's possession. Finally, these fact sheets include various releases that allow Defendants to begin to obtain records from third parties such as law enforcement and medical providers. Nothing prevents Defendants from seeking those records now.

As outlined in Plaintiff's Fact Sheet Brief (ECF No. 235) and again in the March Case Management Statement, MDL courts routinely adopt staggered plaintiff-specific discovery plans that prioritize core and easily-identified relevant matters first, while deferring highly individualized issues such as causation, credibility, and damages for a narrower set of claims in connection with trial settings, as is being done here.[5] This is what Judge Gonzales-Rogers ordered in the *Social Media* MDL: Defendants could engage in expanded discovery beyond the PFS *only* for bellwether trial cases. *In re Social Media Adolescent Addiction/Personal Injury Products Liab. Litig.*, No. 4:22-md-03047-YGR (N.D. Cal. April 23, 2024), ECF No. 780 ("The Court ADOPTED the nine surviving proposed PI bellwethers . . . and discovery commences as to those nine cases."). Defendants' reference to *Volkswagen* is misplaced. Plaintiffs were class representatives bringing economic damages claims in the midst of ongoing parallel settlement negotiations; the stipulated order providing for the possibility of more discovery than the fact sheet was both uncontested and ultimately moot, as no one expected any such discovery to actually proceed (and it did not).

Plaintiffs are eager to discuss a schedule for bringing cases to trial and will meet and confer with Defendants regarding additional discovery for those individual Plaintiffs. But at this

---

[5] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2151 (C.D. Cal. July 20, 2010) (establishing phased discovery to allow parties to develop more narrowly tailored discovery in subsequent phases); *In re Zofran (Ondansetron) Products Liab. Litig.*, No. MDL 1:15-MD-2657-FDS, 2018 WL 2761849, at *1 (D. Mass. May 17, 2018) (five phases of discovery, with individual causation and Plaintiff damages discovery occurring at the final phase for cases selected for trial); *In re Juul Labs, Inc.*, No. 3:19-md-02913-WHO, Dkt. No. 1455 (N.D. Cal.) (narrower discovery for all Plaintiffs followed by more detailed discovery for those phased for trial); *In Re American Medical Systems, Inc., Pelvic Repair Systems Products Liability Litigation*; No. 2:12-md-02325, Dkt. No. 302 (S.D. W.Va.) (plaintiffs completed short form initially and more detailed form for later-phased discovery).

1   time, Plaintiffs see no change in circumstances that would warrant opening additional discovery

2   on all individual Plaintiffs so that this Court would hear "a thousand presentations of each [case]

3   being individualized." *See* 11/3/23 Hearing Tr. at 7. The burden on Plaintiffs to engage in highly

4   individualized discovery outside of the fact sheet is especially relevant here given the re-

5   traumatization that occurs each time these survivor Plaintiffs are forced to relive their

6   experiences.

7                    **b.      Plaintiffs' Ride Receipts**

8           **Defendants' Position:** There is still a significant problem of around 30 Plaintiffs in this

9   MDL having failed to substantiate their claims. In those cases, the Plaintiffs have failed to

10  provide sufficient information for Uber to locate their alleged trips, possibly because these trips

11  were never arranged through the Uber App in the first place. The parties have met and conferred

12  about each of these cases, in certain instances multiple times - - but Plaintiffs' deficient showing

13  remains unremedied and the cases remain unsubstantiated. Finding a trip matching Plaintiffs'

14  allegations that is connected with the Uber App - - and determining as a threshold issue whether

15  any such trip even occurred - - is a critical part of the investigation of these cases for both parties,

16  and it requires the parties to work together. The parties will continue to collaborate after

17  submission of the Plaintiff Fact Sheets in order to reduce the number of cases where a matching

18  trip has not been located. If Plaintiffs fail to remedy these deficiencies promptly, Uber intends to

19  make an application to the Court for an order compelling the Plaintiffs to substantiate their trip in

20  accordance with deadlines to be established by the Court, or otherwise dismiss their cases.

21          **Plaintiffs' Position:** Since the Court's order regarding ride receipt discovery, Plaintiffs

22  have produced hundreds of ride receipts substantiating their rides. For Plaintiffs who are not in

23  possession of a ride receipt, they have produced Ride Receipt Forms that provide information

24  regarding the subject ride as required by the Court in an effort for Defendants to locate ride

25  substantiation on their end or otherwise serve in place of a receipt if one cannot be located.

26  Individual Plaintiffs' counsel has been diligently meeting and conferring with Defendants in an

27  effort for them to substantiate rides, but it will only be made apparent to Plaintiffs how many of

28  these rides have been substantiated by Defendants upon production of Defense Fact Sheets, which

will occur for most Plaintiffs on May 29, 2024. As the Court indicated in the most recent CMC, this ride receipt process appears to be working. Plaintiffs will continue to produce receipts, if located, or fill out ride receipt forms to produce to Defendants as new cases are filed. Plaintiffs are dubious that motion practice or orders to show cause would be appropriate based on Uber's claimed inability to substantiate a particular ride, but will nevertheless meet and confer with Defendants regarding a process and schedule for motion practice related to a particular Plaintiff's compliance with PTO 5.

## V.   CASE SCHEDULE

Plaintiffs and Defendants look forward to continuing the conversation regarding the case schedule, including expert discovery and trials. Defendants believe that a status conference on these topics is still "all premature." 3/29/24 Hearing Tr. at 17:13.

## VI.   SPECIAL SETTLEMENT MASTER

On November 15, 2023 (ECF No. 88), the Parties jointly submitted a narrowed list of two suggested candidates for Special Settlement Master: Hon. Gail Andler and Hon. Shelley Chapman, and they remain open to considering additional candidates. The Parties welcome the Court's guidance on appropriate next steps in arranging for appointment of a Special Settlement Master.

## VII.   ADMINISTRATIVE MATTERS

Plaintiffs have engaged Rubris to manage common benefit time and expenses, and filed a proposed Second Amended Pretrial Order No. 12 reflecting vendor-specific information for those submissions. ECF No. 535.

Dated: May 24, 2024

Respectfully submitted,

By: */s/ Robert Atkins*
    Robert A. Atkins
    **PAUL, WEISS, RIFKIND,**
    **WHARTON & GARRISON LLP**
    1285 6th Avenue
    New York, NY 10019
    Telephone: (212) 373-3000
    ratkins@paulweiss.com

By: */s/ Randall S. Luskey*
    **PAUL, WEISS, RIFKIND,**
    **WHARTON & GARRISON LLP**
    535 Mission Street, 24th Floor
    San Francisco, CA 94105
    Telephone: (628) 432-5100
    Facsimile: (628) 232-3101
    rluskey@paulweiss.com

*Attorneys for Defendants*

By: */s/ Sarah R. London*
    Sarah R. London
    **LIEFF CABRASER HEIMANN &**
    **BERNSTEIN**
    275 Battery Street, Fl. 29
    San Francisco, CA 94111
    Telephone: (415) 956-1000
    slondon@lchb.com

By: */s/ Rachel B. Abrams*
    Rachel B. Abrams
    **PEIFFER WOLF CARR KANE**
    **CONWAY & WISE, LLP**
    555 Montgomery Street, Suite 820
    San Francisco, CA 94111
    Telephone: (415) 426-5641
    rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
    Roopal P. Luhana
    **CHAFFIN LUHANA LLP**
    600 Third Avenue, Fl. 12
    New York, NY 10016
    Telephone: (888) 480-1123
    luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*