RANDALL S. LUSKEY (SBN: 240915)
  rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
  **& GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

ROBERT ATKINS (*Pro Hac Vice* admitted)
  ratkins@paulweiss.com
CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
  cgrusauskas@paulweiss.com
ANDREA M. KELLER (*Pro Hac Vice* admitted)
  akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
  **& GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.;
RASIER, LLC; and RASIER-CA, LLC

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| | **JOINT STATUS REPORT FOR JUNE 11 2024 HEARING** |
| This Document Relates to: | Judge:        Hon. Lisa J. Cisneros |
| ALL ACTIONS | Courtroom:  G – 15th Floor |

**JOINT STATUS REPORT**

In advance of the hearing set by the Court in this action for Tuesday, June 11, 2024 at 2:00 p.m. via Zoom video conference, Plaintiffs, Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC (collectively, "Defendants" or "Uber") (jointly, "the Parties"), submit this Joint Status Report to "set[] forth the status of discovery, the parties' progress in meeting discovery deadlines, any issues or challenges to discovery that the parties have encountered that may impact the discovery schedule."  ECF No. 526.

## I.      DISCOVERY MILESTONES

On December 28, 2023, Judge Breyer issued Pretrial Order No. 5. Among other deadlines, PTO 5 set September 1, 2024 as the deadline for Uber to substantially complete production in response to the Plaintiffs' First Set of Requests for Production. On February 28, 2024, Plaintiffs served their First Requests for Production, which consists of 202 Requests. Plaintiffs consented to Uber's request to extend their deadline to respond from March 28, 2024 to June 27, 2024, contingent upon Uber's agreement to meet certain milestones to ensure that the preliminary steps (including agreement on search terms and custodians) would be resolved in sufficient time for Uber to meet the September 1 deadline.  The milestones require informal information sharing including providing Plaintiffs with: (1) a list of specific requests that Uber expects to object to in full, and the basis for such objections; (2) a list of the thematic objections made to multiple requests, and the specific requests that are subject to these thematic objections; (3) a list of Plaintiffs' requests that Uber claims are satisfied by productions made by Uber to JCCP Plaintiffs; and (4) identification of Plaintiffs' requests that Uber claims are satisfied by productions already made by Uber in this Action, including as part of defense fact sheets.

## II.     PTO 5 AND DISCOVERY DEADLINES

### a.   Custodians

**Plaintiffs:** On April 12, 2024, Uber provided Plaintiffs with a list of proposed custodians. However, rather than fulfill its duty to identify custodians with relevant documents, Uber merely

proposed the same list of 26 custodians agreed upon in the JCCP. After Plaintiffs objected, Uber provided an updated custodian list on April 26, however, Uber simply removed one of the prior 26 custodians and added four other custodians (three of which had also been identified in the JCCP but ultimately not prioritized for discovery there).

Not only is this list of 29 plainly insufficient (particularly in light of the thousands of litigation holds that Uber placed in November 2023 related to this MDL), but it does not reflect Uber's reasonable investigation into the sources of discoverable information. Rather, it is Plaintiffs' understanding that the plaintiffs in the JCCP (and not Uber) initially identified and proposed 28 of the 29 custodians. Therefore, Uber has independently identified only one custodian.

On May 3, 2024, Plaintiffs provided Uber with a list of 100 employees and former employees that Plaintiffs identified as an initial set of custodians, based on litigation hold information, dates of employment, and their roles within the company, reserving the right to request documents from additional custodians should discovery indicate that need (and with the understanding that any additional custodians beyond the 100 would not be subject to the September 1 deadline).  100 custodians is an appropriate number based on the timeframe of this litigation (2009-Present), the number of employees Uber has put under litigation hold (more than 5,500 just related to this litigation), Uber's document destruction policies, and that Uber maintains it has "a safety operation involving hundreds of employees." (ECF No. 538 at p. 1). During meet and confers on May 7, May 10, May 16, and May 20, Plaintiffs asked Uber for its position on Plaintiffs' custodians. Although Uber would like the Court to believe that Plaintiffs declined to engage in any discussion on the relevance or proportionality of Plaintiffs' proposed custodians, the reality is that Plaintiffs repeatedly attempted to engage discussion on Plaintiffs' custodian choices on those dates, Uber's position during each conference was that it was still reviewing Plaintiffs' custodian list and was unprepared to provide a

position on any of the custodians.[1] Per the milestones Uber agreed to, Uber was required to provide its position on Plaintiffs' custodians by May 10.

On May 16, Plaintiffs asked Uber to provide the rationale for its 29 custodians, as required by the ESI Order (ECF 524 at 6). Only then, in response to Plaintiffs' request, did Uber ask Plaintiffs to provide Plaintiffs' rationale for their selection of 100 custodians. Plaintiffs advised that Uber has superior information about Uber's custodians than Plaintiffs, but Plaintiffs nonetheless agreed to provide their rationale by May 23. As agreed, Plaintiffs provided rationales for their custodian selections on May 23, including information about each custodian's role within the company and connection to this litigation, based on documents produced in this litigation to date, as well as information from the JCCP and publicly available information. To date, Uber has not provided its position on any of Plaintiffs' custodians and instead insists on continuing to meet and confer. A month has passed since Plaintiffs provided Uber with its custodial list but Plaintiffs have not received any feedback from Uber. Unfortunately, Uber has taken the position that it only intends to produce documents for the 29 custodians on its list and using the search terms agreed-upon in the JCCP by September 1 per the PTO 5 deadline set in this matter. Therefore, Plaintiffs advised Uber that the Parties were at an impasse on custodians on May 24, after Uber took the position in the May 24 Case Management Conference Statement. Plaintiffs sent Uber a PTO 8 letter on this topic on June 3 and the Parties' positions will be before the Court on June 7.

Although Uber claims that it has offered to provide additional rationale for its custodian proposals and that Plaintiffs have "rebuffed" such offers, this is simply not true. To be sure, nothing has prevented Uber from acting on its claimed offer to provide additional information and if it did so, Plaintiffs would consider any additional information in good faith. However, Uber's hollow "offer" came only after the agreed-upon deadline to meet and confer regarding custodians and search terms

---

[1] The parties' communications on these topics will be available for the Court to review in conjunction with the PTO 8 letter brief that is forthcoming on this subject.

had passed, after Uber unilaterally took the position in the May 24 Case Management Statement that Uber would only produce documents for Uber's proposed 29 custodians by the September 1 deadline, and after Plaintiffs advised that they intended to raise this issue to the Court under PTO 8. Providing additional information is meaningless if Uber is not willing to engage in negotiation about custodians—which Uber has told this Court that it will not do, at least not before PTO 5's September 1 deadline.

**Uber:**   On April 12, 2024, Uber provided a preliminary list of custodians likely to contain relevant information. Per the agreed milestones and prior to the entry of the ESI Protocol, on April 26, 2024, Uber provided Plaintiffs a custodian list containing 29 employees and former employees. Uber provided this list to Plaintiffs in anticipation of Plaintiffs providing their own proposed custodian list on May 3, 2024. It was also a first step in good-faith conferrals towards the goal of an agreed-upon final custodian list.

Additionally, in the same spirit, Uber's custodian list voluntarily included information beyond what was required in the ESI Protocol as entered, such as prior job titles and date of each employee's first legal hold related to a sexual assault matter.

As Uber explained to Plaintiffs during the April 29, May 3, and May 10, 2024 meet-and-confers, in proposing Uber's initial custodian list, Uber assessed each custodians' role and job duties for time periods covered by the employee's tenure to ensure qualitative coverage for Plaintiffs' requests for production and other written discovery. Further, Uber put forth these custodians because they could have comprehensive and proportional information responsive to Plaintiffs' discovery requests. While Uber's initial proposed custodians do overlap significantly with those negotiated and selected by the parties in the JCCP, this is logical given the overwhelming similarities in claims and defenses between the two nearly identical Actions. These similarities highlight the fact that the custodians and search terms need not be materially different either. The additional custodians Uber proposed in this Action are employees with a scope of responsibilities that are nationwide to reflect

5

the broader geographic scope of the MDL.

On May 16, 2024, after several meet-and-confers with Plaintiffs declining to engage in substantive discussion of the merits of any custodian, Plaintiffs asked Uber to supplement Uber's proposed custodian list with further rationales for its selection. Uber agreed to do so, and provided Plaintiffs this supplement on May 20, 2024. To date, Plaintiffs rebuffed any attempt by Uber to explain the merits of these proposed custodians, and Uber has not received any substantive feedback from Plaintiffs about the custodians. Furthermore, rather than engaging in a cooperative negotiation to seek agreement on a compromise list of custodians, on May 30, 2024, Plaintiffs' emailed Uber requesting Uber to produce documents from every custodian it proposed; as well as some additional, yet undetermined number of custodians. This was the first time Uber learned of Plaintiffs' expectations.

On the evening of May 3, 2024, Plaintiffs provided Uber with a list of 100 employees and former employees that Plaintiffs identified as their initial set of custodians, one of which was previously proposed by Uber. In support of Plaintiffs' list of 100 custodians, Plaintiffs incorrectly pointed to the number of legal holds issued by Uber. In doing so, Plaintiffs wrongly equate broad legal holds with an admission that every legal hold recipient actually has relevant information and that Uber has an obligation to produce custodial files for many multiples of custodians beyond what is proportional to the needs of this case.

As for Plaintiffs' list of 100 custodians, when Uber requested additional information about Plaintiffs' basis for proposing their list, Plaintiffs conceded the information they provided to Uber was largely just from publicly available LinkedIn profiles and declined to engage in any discussion on Plaintiffs' argument as to why each of their proposed custodians was relevant or proportional. Plaintiffs also merely reiterated their previous claims that Uber "has full access to information about these custodians."[2] To date, Plaintiffs have not provided Uber any further information about these

---

[2] See, e.g. May 24, 2024 Joint Conference Status Statement (ECF 563), at 12.

proposed custodians, or engaged in any substantive discussion about the relevance of any single custodian Plaintiffs have proposed.

As Uber represented in the May 24, 2024 Joint Status Conference Statement (ECF 563), Uber is prepared to meet the current September 1, 2024 substantial completion deadline (which Plaintiffs initially proposed to the Court) outlined in PTO 5 using Uber's proposed 29 custodians and operative search terms. However, the deadline will need to be changed if Uber is required to include additional search terms and custodians[3] as a result of Plaintiffs' demands. Uber cannot be expected to substantially complete productions by September 1 targeted against an unknown, constantly moving, and impossibly broad set of documents keyed to search terms (including a variant of the term "ride!") sought by Plaintiffs compounded by the fact that custodians have still not been agreed upon (including more than 100 in addition to the 29 custodians Uber has already put forward).

### b.  Search Terms

On April 19, 2024, Plaintiffs provided their initial proposed search terms to Uber. Per the ESI Protocol (ECF No. 524), on May 10, 2024, Uber provided its list of search terms as well as hit reports. Thereafter, on May 15, 2024, Uber sent a revised list of proposed search terms with hit reports. After receiving Defendants' revised search terms, Plaintiffs sent Defendants another draft on May 22, 2024. Since sending those, the Parties have met and conferred both via phone and email on several occasions. Between May 23 and June 3, 2024, Plaintiffs and Defendants exchanged over a dozen emails to resolve issues that arose during searches and to add additional terms. On June 3, 2024, Uber sent Plaintiffs hit counts for Plaintiffs' latest proposed search terms, though Plaintiffs have not yet received Uber's counterproposal. Uber is analyzing those hit counts and working on a proposed set of revised terms in response. The Parties continue to meet and confer.

### c.  Non-Custodial Sources/Files

---

[3] Uber understands that Plaintiffs are now seeking 79 total custodians.

**Plaintiffs:**  Pursuant to the agreed-upon milestones, Uber agreed to identify noncustodial files that it could produce without the use of search terms. Uber provided a list on May 6, however, that list is incomplete and consisted solely of incident-specific documents that Uber is producing in conjunction with its Defendant Fact Sheets. Uber's list did not contain any centralized non-custodial files, further policies or procedures, or any data regarding reports of sexual assault or sexual misconduct that it collected, analyzed, and categorized in conjunction with its Safety Reports. Plaintiffs believe that Uber should produce these files without the use of search terms.

On May 17, Plaintiffs sent Uber an email covering the parties' May 16 meet and confer over this matter.  Specifically, Plaintiffs went to great lengths to direct Uber to the location of policies within Uber's own system, which members of Plaintiffs' counsel are aware of from other litigations involving Uber. While Uber characterizes these litigations as unrelated to this litigation, the documents at issue are relevant here and do in fact exist (or have recently existed). For example, Uber maintains hundreds of policies known as Knowledge Base Policies on an internal database. The Knowledge Base system is designed to provide Uber Support Staff with Policies and instructional articles that assist Uber Support Staff in managing all Driver and/or Rider issues.   On May 29, Plaintiffs followed up with Uber regarding this matter, seeking Uber's confirmation whether Uber intended to produce a Knowledge Base Index of Policies and the Knowledge Base Policies that Plaintiffs requested on May 17.  As of May 31, Uber was still reviewing Plaintiffs' requests. The parties are continuing to meet and confer regarding production of non-custodial sources, including centralized files and policy and procedure files without the use of search terms.  However, Uber should be able to provide to Plaintiffs a complete list of non-custodial files and sources as it was required to do per the Milestones on April 26.

Separately, the parties agreed on May 20 that they have reached an impasse with regard to Uber's production of sexual assault and sexual misconduct data and are raising this under the PTO 8 process to be addressed during the June 11 Discovery Conference.

**Uber:**  On May 6, 2024, Uber provided Plaintiffs a preliminary list of types of files that could be produced without use of search terms. This list included robust discovery into the incidents giving rise to this litigation, which is being produced as part of the Defense Fact Sheets; the voluminous discovery Uber is providing Plaintiffs under PTO 5; and data from other non-custodial data sources such as team Google Drives.

Plaintiffs provided Uber with a list of policies and procedures previously produced in unrelated litigations, along with a demand to produce these policies here as well as provide an index of all company policies and procedures that may have existed over time, regardless of topic or scope. Uber's position is that it is not appropriate to provide such an index, to the extent such an index exists. Furthermore, Uber's position is that Uber should and will produce policies that are responsive to the specific discovery requests in this case, and is unconvinced that policies relating to, e.g. pets or child car seats are relevant or should be included in any list. Uber is continuing to investigate both the relevance and sourcing of relevant policies.

### d.  Plaintiffs' RFPs and Uber's Objections

Pursuant to the agreed-upon milestones, and in an effort to utilize the meet and confer process to narrow or resolve disputes prior to formal response and objections being served by Uber, Uber agreed to provide preliminary objections to Plaintiffs' First RFPs, identifying objections that would result in the withholding of large portions of documents (i.e., objections made to multiple requests) and RFPs that Uber objects to in full. Uber preliminarily objects, subject to further meet and conferring, to producing (1) any documents prior to 2013; (2) any documents seeking information related to activities and events occurring outside of the U.S.; (3) portions of documents Uber asserts implicate the privacy right of non-parties; (4) any documents related to Uber's lobbying efforts; (5) any documents related to Uber's campaigns or business initiatives unrelated to sexual misconduct or sexual assault. The parties continue to meet and confer about Uber's remaining objections but Plaintiffs expect to seek Court intervention with regard to each of these categories of objections.

9

### e.   Other Written Discovery

Plaintiffs served their First Interrogatories and First Requests for Admission on March 27, 2024. Uber served initial objections on May 29, 2024 and intends on serving final objections and responses on June 20, 2024. The parties will work to attempt to resolve disputes over the objections but Plaintiffs anticipate the need for Court involvement on Uber's objections.

### f.   Uber's Compliance with PTO 5 Production Obligations

#### i.   Redactions

**Plaintiffs:**  This Court has stated and reiterated that (by March 8, 2024) "except for vehicle registration and inspection paperwork, and non-incident related trip receipts and Uber app log in history, Uber shall produce 'all documents Defendants produced in any other Uber sexual assault cases, including arbitrations, and any other cases about the 'Safe Rides Fee,' including any associated privilege logs."  ECF No. 321, citing ECF No. 175.  The Court's Order made no allowance for any other limitation or modification of those re-productions.

Despite the Order, Uber has improperly redacted its PTO 5 productions.  Uber has provided four reasons in an attempt to justify its redactions: (1) the document was redacted for undisclosed reasons when it was previously produced to a government entity (black boxes); (2) the document includes personal identifying information of third parties (including drivers) Uber believes should be redacted pursuant to PTO 14, Dkt. No. 321 (white boxes added for this MDL); (3) the document includes information Uber believes exceeds the scope of PTO 5 (black or white boxes); or (4) the document was redacted for privilege when previously produced to a government entity ("REDACTED-PRIVILEGE").

There are, at least, three problems with Uber's approach here. First, Uber has provided Plaintiffs no way to differentiate among identical redactions made for different reasons (i.e. black boxes indicate that *either* a document was redacted when produced in an underlying litigation *or* for scope when it was produced in this MDL.).  Second, except for personal identifying information of

10

third-party plaintiffs and vehicle registration and inspection paperwork, scope redactions under PTO 5 are improper. And third, it is improper to redact personal identifying information of drivers (as opposed to passengers).

On May 31, Uber provided Plaintiffs with its final answers on these topics.   The parties are at an impasse on these topics and will submit a joint statement to the Court.

**Uber**: PTO 5 requires the production of two categories of documents: (1) documents produced "in connection with government investigations or inquiries … with respect to sexual assault, including attempted assaults" in § 6B; and (2) documents produced in "any other Uber sexual assault cases" in § 6C.  ECF 175 at 3-4.  As clarified by the Court's March 15 Order, PTO 5 requires the production of those documents that "concern (a) sexual assault, (b) the 'Safe Rides Fee,' or (c) any alleged systemic failures to warn or to address sexual assault due to inadequate safety measures, such as defective background checks."  ECF 344.

In response to PTO 5, Uber redacted from the documents it re-produced (1) privileged information, (2) "all personal identifying information ["PII"]" per ECF 321, and (3) information provided to regulators outside the scope of PTO 5 for documents produced under § 6B.  Because PTO 5 requires producing documents that had been previously produced in other contexts, some documents inevitably contain redactions from when the documents were previously produced.

Plaintiffs' claim that they have "no way to differentiate among identical redactions" is flatly incorrect. Uber provided detailed information on what redactions were applied to which production volumes, including electronic files that identify for Plaintiffs the precise pages on which redactions were made in the MDL for the vast majority of documents.  All redactions made for privilege are so labeled on their face. PII redactions either state that they are for PII or they are obvious from the context of the document (e.g., where the numbers in a date of birth are redacted following the header "Date of Birth").  Moreover, this Court ordered that "[w]hen producing all documents, Uber shall redact any personal identifying information, including name … ."  ECF 321, at 13. Uber further

identified volumes where Uber applied scope redactions—documents produced in February and early March–long before any ESI Protocol existed.

Plaintiffs asked Uber to unredact independent drivers' names.  In the spirit of compromise, Uber agreed to unredact independent drivers' names in PTO 5 productions.  Uber will continue to redact PII for third party plaintiffs and non-drivers as required by ECF 321 (and the redactions will be labeled on their face as redacted on the basis of PII). The Court's Order also provides further protection for independent drivers in the form of vehicle registrations and inspection paperwork–documents with driver PII (e.g., addresses).  In doing so, Uber will reproduce several volumes of documents, and redacted documents will have labels designating the reason for the redactions.

Plaintiffs object that Uber applied scope redactions to documents Uber previously provided to the CPUC (and other regulators) and re-produced to Plaintiffs under § 6B.  Those redactions are consistent with this Court's clarification to PTO 5, which orders Uber to produce documents that "concern (a) sexual assault, (b) the 'Safe Rides Fee,' or (c) any alleged systemic failures to warn or to address sexual assault due to inadequate safety measures, such as defective background checks."  ECF 344. Uber has not redacted information responsive to PTO 5.  Regulators request information related to multiple topics, usually tied to different complaints, in the same request.  For example, a regulator may ask about an incident where a driver used a different car than the car registered on Uber's platform. As such, information not related to sexual assault or misconduct, such as motor vehicle incidents and non-sexual assault incidents, is not required by the plain language of PTO 5.

Uber has only applied scope redactions to documents produced under PTO 5 § 6B.  Uber informed the Court and Plaintiffs it was doing this in February, explaining that certain excel spreadsheets (originally provided to the CPUC) in Uber's February 28, 2024 production contain redactions for items unrelated to sexual assault or sexual misconduct—like traffic violations.  Feb. 29, 2024 Hearing Tr. 13:17-25 ("We're undertaking an effort to try to filter out some of the irrelevancy, like traffic violations or what have you, amongst the data.").  Those excel spreadsheets contain tens of

12

thousands of cells about traffic violations and other issues that are not related to sexual assault or sexual misconduct; thus not within the plain language of PTO 5 or the subject of this case.  All cells with information about alleged sexual assault or sexual misconduct are provided, and those cells with information unrelated to sexual assault or sexual misconduct have been redacted.  This case is about sexual assaults of riders, not improperly registered vehicles.

### g.   Plaintiff and Defense Fact Sheets and Ride Receipts

#### i.   Plaintiff Fact Sheets and Ride Receipts

**Plaintiffs:** Since the Court issued PTO 5 requiring ride receipt discovery, approximately 245 Plaintiffs have produced ride receipts substantiating their rides and continue to do so on a rolling basis. Approximately 59 Plaintiffs who are not in possession of a ride receipt have produced Ride Receipt Forms as required by the Court. In a small percentage of cases Plaintiffs have been working with Uber to substantiate rides, including for instances where Uber never sent the Plaintiff a receipt or where the Plaintiff did not personally order the ride – meaning a receipt would never have been in Plaintiff's possession in the first place. Individual Plaintiffs' counsel has been diligently meeting and conferring with Defendants in an effort for them to substantiate rides. Plaintiffs will continue to produce receipts, if located, or fill out ride receipt forms to produce to Defendants as new cases are filed.

Uber's suggestion that a failure to provide a ride receipt—a document created by Uber and be definition in its possession—would support a motion to dismiss should be rejected out of hand. Furthermore, Plaintiffs have and continue to produce Plaintiff Fact Sheets on a rolling basis. No specific deficiencies have been brought to Plaintiffs' attention at this time. Plaintiffs will meet and confer with Defendants if and when problems arise.

**Uber:**  Approximately 30 Plaintiffs in this MDL have deficient ride receipts. In those cases, Plaintiffs provide insufficient or deficient information for Uber to locate their alleged trips, possibly because these trips were never arranged through the Uber App in the first place. The parties met and conferred about each of these cases, in certain instances on multiple occasions, but Plaintiffs' deficient

13

showing remains unremedied and the cases remain unsubstantiated. Finding a trip connected with the Uber App to match  Plaintiffs' allegations - - and determine  as a threshold issue whether any such trip even occurred - - is a critical part of the investigation of these cases for both parties, and it requires the parties to work together.

Now that Plaintiffs have submitted most of their Fact Sheets, the parties will continue to collaborate to reduce the number of cases where a matching trip has not been located. If Plaintiffs fail to remedy these deficiencies, Uber intends to make an application to the Court for an order compelling Plaintiffs to substantiate their trip in accordance with deadlines to be established by the Court, or otherwise dismiss their cases.

In addition, as Uber has begun reviewing and evaluating the Plaintiff Fact Sheets, it is clear there are deficiencies that will need to be remedied.  Uber anticipates bringing these deficiencies to Plaintiffs attention in short order, and that Plaintiffs will work with Uber to provide full and complete Plaintiff Fact Sheets.  Should Plaintiffs fail to remedy the deficiencies, Uber intends to  bring any issues to this Court's attention.

### ii.    Defense Fact Sheets

Plaintiffs are in receipt of approximately 247 Defense Fact Sheets. Plaintiffs are in the process of reviewing these fact sheets and the accompanying productions. Upon an initial review, there appear to at least be deficiencies in document production (for example, missing Tax Summaries, Activation Histories and JIRA forms for cases where the Plaintiff reported her ride, etc.).  Plaintiffs will meet and confer with Uber once these deficiencies are identified, involving the Court if and when necessary.

Furthermore, Plaintiffs have requested clarification regarding Uber's interpretation of the Court's DFS order regarding past tickets involving alleged inappropriate driver behavior so that Plaintiffs may determine if production for each Defendant driver is complete. Plaintiffs seek confirmation that Uber has provided all tickets (Bliss messages, Zendesk Messages, Jiras, or other communications) related to Uber's Safety Taxonomy as required by questions 26 and 27 of the

14

Defendant Fact Sheet.  These communications are ongoing, with Plaintiffs currently awaiting Uber's response. If needed, Plaintiffs will seek the Court's intervention.

### III.    PRIVILEGE

**Plaintiffs:**

#### a.  Privilege logs

Plaintiffs first raised the issue of PTO 5 related privilege logs during a meet and confer on March 21, 2024, and in a follow up e-mail on March 22, 2024. Document redactions were specifically discussed during a meet and confer on March 26, 2024 based on numerous exemplar, redacted documents Plaintiff identified in Uber's PTO 5 productions. On that date, Uber agreed to provide sufficient information to allow plaintiffs to determine whether redactions in Uber's document productions pursuant to PTO 5 were redacted by Uber at the time those documents were produced to government entities or in this MDL.

Throughout the meet and confer process related to PTO 5 redactions  Uber repeatedly told Plaintiffs it produced no privilege logs in any underlying litigation subject to PTO 5. That was not true. After Plaintiffs provided exemplar, redacted documents Uber long later stated, for the first time it would "provide a privilege log for two redactions re-produced in this litigation containing privilege redactions." Even later, Uber said it had identified an additional seven underlying PTO 5 cases in which privilege logs had been produced.  On May 21, 2024, Uber produced those logs – containing approximately 500 documents -- to Plaintiffs.  Plaintiffs are evaluating those logs, and awaiting additional information related to those logs, particularly in light of additional log information provided by Uber on May 30 related to documents Uber seeks to claw back.

#### b.  Notice of Clawback

Following Plaintiffs' provision of exemplar, redacted documents (discussed above) Uber served a Notice of Clawback with respect to five purported privileged documents. Plaintiffs served a Notice of Clawback Challenge, timely under PTO 14, on May 20, 2024.  Uber responded seven

business days later on May 30, 2024, with newly provided information and requested a meet and confer on Monday, June 3 or June 4.  On June 3, Plaintiffs asked for clarification regarding a never before seen privilege log produced with Uber's May 30 letter that appeared after months of reassurances that no such logs existed and a day before a confirmation of a log list that did not include the attachment.    Plaintiffs await Uber's response, will meet and confer, and intend to submit the dispute to the Court no later than June 21, 2024 in accordance with PTO 14.

**Uber:**

PTO 5: 5 Inadvertently Produced Privileged Documents Subject to Clawback

On May 10, 2024, Uber informed Plaintiffs of its intent to clawback five privileged documents that were inadvertently produced on March 8. Uber explained these privileged documents were <u>never</u> produced in previous litigations; thus fall outside the scope of PTO 5. Uber also explained, after *in camera* inspection, that the trial court in the underlying litigation, *Jane Doe v. UTI* (Case No. 2020-67824 (Harris Cnty. D. Ct. Tex.), upheld Uber's claims under attorney-client privilege and the attorney work product doctrine for four of the five documents (the fifth document in this set was not subject to the Texas Court's ruling).  Further, as produced in the  MDL, these inadvertently produced documents conspicuously bear privilege labels as well as other indicia from the *Doe* case production, including the first page of each document containing the words "WITHHELD FOR PRIVILEGE." The documents detail communications between Uber's employees and Uber's in-house legal counsel seeking advice on policies and commenting on the impact of those policies  on pending or potential litigations against Uber.

In response, Plaintiffs issued a Notice of Clawback Challenge simply stating that the privilege assertions are "insufficient." On May 30, 2024, Uber responded to the Notice of Clawback Challenge providing its basis for the privilege assertions as well as evidence that the inadvertently produced documents were never produced and provided the trial court's transcript on a contested motion where the Texas court stated its basis for upholding Uber's claims of privilege.

16

Uber expects Plaintiffs will preserve metadata of anyone accessing these privileged documents during the challenge period where Plaintiffs have agreed to sequester the documents.

Plaintiffs refused to meet and confer on June 3 and 4 due to an alleged informational need over a document filed in that case – a non-issue easily disposed of in the meet and confer process.  For clarity, the document provided contains entries from privilege logs provided to Plaintiffs.

PTO 5: Privilege Logs Produced in Sexual Assault Litigations

The inadvertently produced documents called to Uber's attention the possibility that a privilege log responsive to PTO 5 had not been produced.  Until that time, Uber was unaware of privilege logs previously produced to any entities pursuant to PTO 5, further establishing Uber's repeated explanation to Plaintiffs that there is not a repository where all previously produced documents are held.  After it  became aware of one privilege log that had not been produced in the MDL, Uber undertook renewed efforts to search for other potential privilege logs served in the cases responsive to PTO 5.  On May 16, 2024, Uber preliminarily reported that it had identified seven previous litigations where a privilege log had been produced, and it produced the privilege logs on May 21, 2024.

After reviewing the logs, Plaintiffs requested more information about four of them on May 29, 2024.  Uber provided information on three logs by May 31, 2024, and it is working to resolve the remaining informational request.

IV.    THIRD PARTY DISCOVERY

**Plaintiffs:**   On the week of April 16, 2024, Plaintiffs served subpoenas on thirty non-parties. These subpoenas fall into five general categories of entities: (1) lobbying firms and law firms, (2) plaintiff attorneys handling other cases against Uber, (3) contractors that worked with Uber in varying capacities, (4) sexual violence advocacy organizations, and (5) Lyft.

After meeting and conferring with Uber, the Parties jointly filed an Administrative Motion concerning the briefing format and schedule for the third-party subpoenas. The Court ordered briefing on four exemplar subpoenas. (ECF No. 574). The Parties are in the process of meeting and conferring

17

with the four third parties and among themselves regarding the four exemplars to be submitted for briefing to the Court. The Parties have agreed that these entities will include Checkr (a background check company), Sara Peters (a member of the PSC and an attorney from another case brought against Uber involving sexual assault), 7x7 (a company that made training videos for Uber drivers), and Lyft. There are no sexual violence advocacy organizations or lobbying firms that met the Court's criteria ("that the subpoenas in which the Northern District of California is both the issuing court and the court authorized to enforce the subpoena." (ECF 574, p.1.) Further, Plaintiffs plan to submit both the report, as well as the joint letter mentioned in the Court's Order.

Finally, Plaintiffs are undertaking efforts to have any disputes concerning third-party subpoenas, including motions to compel and motions to quash, transferred to the MDL and will continue to update the Court about the progress of these efforts.

**Uber:** Plaintiffs issued and began serving subpoenas on 30 different recipients. The subpoena recipients fall into the following categories: (1) lobbying firms and law firms (14 subpoenas); (2) background check companies (3 subpoenas); (3) driver safety software and training companies (5 subpoenas); (4) non-profit organizations (and one business) who performed work related to Uber's Sexual Misconduct and Violence Taxonomy (5 subpoenas); (5) Plaintiffs' attorneys who have litigated cases against Uber (2 subpoenas); and (6) Lyft. The subpoenas each demand from the recipients "all documents" and "all communications" sent to or from Uber—with no limitation on time, scope, topic, or subject matter (the only exception being the subpoenas to plaintiffs' attorneys, which required "all documents You received from Uber in connection with litigation in which Uber was a party"—without limitation).

On May 31, the Court issued an order addressing the format and timing of the briefing (ECF 574). The Court stated that it would "consider an initial sample of disputes . . . consist[ing] of up to four subpoenas." (*Id.*) Those four subpoenas "must be subpoenas in which the Northern District

of California is both the issuing court and the court authorized to enforce the subpoena." Under Rule 45, subpoena enforcement is performed by "the court for the district where compliance is required." *See* Fed. R. Civ. P. (d),(f),(g). Only four recipients that have been served with a subpoena are located in and required to comply in the Northern District of California: 7x7 Experience (a company that provides certain training to independent drivers), Sara Peters (a plaintiffs' attorney), Checkr (a background company), and Lyft (a competitor ride-share company).

It is possible that the Court's briefing structure set forth in the May 31 Order may not achieve full participation of the subpoena recipients. While third parties may move to quash, Rule 45(d)(2)(B) does not require such a motion when a subpoena recipient has timely objected. Rather, the issuing party is required to seek and obtain a motion to compel. *See, e.g.*, *Exp. Dev. Canada v. E.S.E. Elecs., Inc.*, No. 17-MC-80003-MEJ, 2017 WL 2500906, at *2 (N.D. Cal. June 9, 2017); *Robertson v. Qadri*, No. C06 04624 JF HRL, 2007 WL 2221075, at *1 (N.D. Cal. Aug. 2, 2007). While the sample subpoena recipients may file a brief seeking to quash the subpoena, some may believe they are entitled under the rules to rest on their objections, and respond to a motion to compel. *See, e.g. Exp. Dev. Canada*, 2017 WL 2500906, at *2 (stating that motions to compel subpoena compliance are subject to Local Rule 37-2, which require the moving party to "detail the basis for the party's contention that it is entitled to the requested discovery and must show how the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied"). The May 31 order does not contemplate motions to compel by Plaintiffs. To encourage full participation by third parties, the Court might consider amending the May 31 Order to provide for motions to compel that Plaintiffs may file to carry their burden of showing that their subpoena requests are relevant and proportional and that their requested relief protects the recipients "from significant expense resulting from compliance,"

19

Fed. R. Civ. P. 45(d)(2)(B)(ii), and then give the recipients the opportunity to respond to such motions.

## V.   COORDINATION WITH JCCP

**Plaintiffs:**   Coordination with the JCCP is addressed in Plaintiffs' Proposed Deposition Protocol, filed contemporaneously with this Status Report. In summary, the parties to the MDL will use their best efforts to coordinate with the JCCP litigants to schedule and take depositions, including the cross-noticing of depositions that are common to the proceedings. Leadership in the MDL and the JCCP have met and conferred with Uber to discuss a Coordination Order. Unfortunately, a critical hurdle has been that while Uber only wants to produce its witnesses once for deposition, it refuses to produce complete custodial files for the witness against the MDL and JCCP search terms before the deposition.

Judge Schulman has communicated that he has set aside the summer of 2025 for a trial in the JCCP litigation and on December 23, 2023, set a January 15, 2025 cutoff for discovery. Following that schedule, the JCCP will begin depositions of nine priority custodians in September 2024, the JCCP will begin depositions of nine priority custodians and will proceed thereafter with the remaining corporate witnesses to meet JCCP pretrial and trial deadlines. Ideally, the MDL and the JCCP should be able take these nine priority custodian depositions in September, provided Uber timely produces complete custodial files and relevant documents for these custodians in both Courts, as well as the documents for the post-September corporate witness depositions in a sufficient time thereafter. To meaningfully coordinate with the MDL and the JCCP, Uber must resolve outstanding discovery issues sufficiently in advance of the September deadlines or face the prospect of a second deposition in the MDL after Uber produces the additional documents based on, *inter alia*, the negotiated MDL search terms.

**Uber:**   The parties continue to confer regarding a deposition protocol and coordination with the JCCP.  While Uber disagrees with some of Plaintiffs' characterizations above, the issues raised by

Plaintiffs are premature as the parties continue to meet and confer.  Further, MDL Plaintiffs recently added language to the proposed coordination order that custodial files must be substantially complete as defined by both JCCP and the new to-be-determined MDL search terms for a coordinated deposition to proceed with the benefits of a single deposition.

To resolve this, Uber responded that it would agree to substantial completion defined by the JCCP search terms, but if MDL Plaintiffs insisted on a broad search term scope as defined above, it would risk the agreed-on custodial file rollout schedule in the JCCP and would likely need to extend beyond the September 1, 2024 MDL production target date. Uber offered the following compromise to resolve the complete-custodial-file issue for coordination:

- The parties agree to remove MDL Plaintiffs' newly added language in the coordination order. For completion of the custodial file pursuant to the deposition protocol:

- For these custodians/deponents, MDL Plaintiffs will agree that the completion of the custodial file will be on JCCP Plaintiffs search terms; or

- MDL Plaintiffs' search terms do not increase the review volume more than 20% of the documents produced. Uber estimates the additional 20% will push out the substantial completion schedule another 4 weeks.

The rollout schedule for custodial productions is dependent on agreement with the proposal laid out above and meets the proportionality requirements of Rule 26(b)(1). Fairness also dictates that the parties are protected from an unreasonable search term scope that will upset the schedule in both actions as Rule 26(b)(2)(C) protects parties from discovery that is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive.

## VI.    PTO 8 DISPUTES

There are presently two PTO 8 disputes pending. First, on May 30, 2024, Plaintiffs sent Uber a letter pursuant to PTO 8 regarding a discovery dispute concerning safety data and statistics. The

21

Parties will jointly submit a letter to the Court on this dispute on June 5, 2024. Second, on June 3, Plaintiffs sent Uber a PTO 8 letter regarding a discovery dispute concerning custodians and search terms. The parties will submit a joint letter to the Court regarding this dispute on June 7, 2024. The parties will be prepared to discuss these issues during the June 11, 2024 hearing.

## VII.   PLAINTIFFS' DISCOVERY

**Plaintiffs:**   Plaintiffs' position regarding individual discovery has not changed since the briefing of fact sheets that resulted in the Court's guidance on individual Plaintiff discovery, outlined in Pretrial Order No. 10. Since the Order, Plaintiffs have been diligently preparing their fact sheets to produce to Defendants through MDL Centrality. As the Court and Defendants know, these fact sheets contain questions regarding details about the ride, personal background information about Plaintiffs, and detailed information about Plaintiffs' damages. Furthermore, these fact sheets require production of off-app communications with drivers as well as any photo or video of the subject incident within Plaintiff's possession. Finally, these fact sheets include various releases that allow Defendants to begin to obtain records from third parties such as law enforcement and medical providers.

The positions Defendants assert in this statement have already been considered and rejected by Judge Breyer when he elected not to adopt fact sheets that included Requests for Production to individual Plaintiffs. As outlined in Plaintiff's Fact Sheet Brief (ECF No. 235) MDL courts routinely adopt staggered plaintiff-specific discovery plans that prioritize core and easily-identified relevant matters first, while deferring highly individualized issues such as causation, credibility, and damages for a narrower set of claims in connection with trial settings, as is being done here.[4] Plaintiffs envision

---

[4] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2151 (C.D. Cal. July 20, 2010) (establishing phased discovery to allow parties to develop more narrowly tailored discovery in subsequent phases); I*n re Zofran (Ondansetron) Products Liab. Litig.*, MDL 1:15-MD-2657-FDS, 2018 WL 2761849, at *1 (D. Mass. May 17, 2018) (five phases of discovery, with individual causation and Plaintiff damages discovery occurring at the final phase for cases selected for trial); *In re Juul Labs, Inc. Mktg., Sales Prac. & Prods. Liab. Litig.*, No. 3:19-md-02913, Dkt. No. 1455 (N.D. Cal.) (narrower discovery for all Plaintiffs followed by more detailed discovery for those phased for trial); I*n Re American Medical Systems, Inc., Pelvic Repair Systems*

a time at which some cases will be set for trial, at which juncture Plaintiffs will meet and confer with Defendants regarding additional discovery for those individual Plaintiffs. But at this time, Plaintiffs see no change in circumstances since the fact sheet briefing that would provide a rationale for opening additional discovery on all individual Plaintiffs so that this Court would hear "a thousand presentations of each [case] being individualized." 11/3/23 Hr'g Tr. at 7.

**Uber:**  At the May 31, 2024, Case Management Conference, Uber requested Judge Breyer lift the stay preventing Defendants from taking discovery from Plaintiffs, and third parties, beginning June 1, 2024.  The Court explained that analyzing the parties' Fact Sheets and reviewing his forthcoming opinions on Uber's Motions to Dismiss will be useful to that discovery, and that Uber may make certain discovery decisions based on that information.

While Uber is amenable to starting Plaintiff discovery after it has an opportunity to digest the Plaintiff Fact Sheets and once the Court issues its decision on the Motions to Dismiss, it wants to emphasize to this Court that, under the Court's current orders, discovery is progressing in an entirely one sided manner.  Plaintiffs have propounded limitless discovery on Uber, but Uber has been restricted from taking any discovery of Plaintiffs. To date, Plaintiffs have served 202 document requests, 76 interrogatories, and 137 requests for admissions, while Uber has been prevented from serving Plaintiffs with any discovery requests. That is unfair and inefficient.

The large majority of Plaintiffs and Defendants Fact Sheets were due on May 29, 2024, and thus the next natural step in discovery is to allow Defendants to take written discovery from Plaintiffs and third-parties.  If Defendants are not permitted to engage in this discovery in a timely fashion, Uber will be at a significant disadvantage in assessing these cases, developing case strategy, and moving these cases towards resolution or trial.

---

*Products Liability Litigation*, No. 2:12-md-02325, Dkt. No. 302 (S.D. W.Va.) (plaintiffs completed short form initially and more detailed form for later-phased discovery).

DATED: June 4, 2024

Respectfully submitted,

**SHOOK HARDY & BACON L.L.P.**

By: */s/ Michael B. Shortnacy*
       MICHAEL B. SHORTNACY

MICHAEL B. SHORTNACY (SBN: 277035)
   mshortnacy@shb.com
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Ste. 3000
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (Admitted *Pro Hac Vice*)
   oot@shb.com
**SHOOK, HARDY & BACON L.L.P.**
1800 K St. NW Ste. 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

KYLE N. SMITH (*Pro Hac Vice* admitted)
   ksmith@paulweiss.com
JESSICA E. PHILLIPS (*Pro Hac Vice* admitted)
   jphillips@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP**
2001 K Street, NW
Washington DC, 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

*Attorney for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC


By: */s/ Sarah R. London*
       Sarah R. London (SBN 267083)

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
slondon@lchb.com

By: */s/ Rachel B. Abrams*

24

1

_____
Rachel B. Abrams (SBN 209316)

2

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

3

4

5

6

By: */s/ Roopal P. Luhana*
_____
Roopal P. Luhana

7

8

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

9

10

11

*Co-Lead Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT FOR JUNE 11, 2024 HEARING.                    Case No. 3:23-MD-3084-CRB