# Exhibit A

2017–2018

# US Safety Report



Uber Technologies, Inc.
San Francisco, CA
Published: December 5, 2019

Disclaimer: The data included in this Report is being provided for informational purposes only and reflects incidents report-
ed to Uber in numerous ways, as discussed further herein. The data consists of reported incidents that allegedly occurred in
connection with (as defined here) an Uber-facilitated trip. Given the limitations described herein, the Report does not assess
or take any position on whether any of the reported incidents actually occurred, in whole or in part. Accordingly, no data,
analysis, statement, representation, or other content contained in this Report can be relied upon by any party for any other
purpose. This Report is issued as of the publication date listed above. Uber has undertaken reasonable efforts to ensure that
the data, analysis, statements, representations, and other content contained in this Report are accurate as of the publica-
tion date, and will not update the Report or its contents after such publication date.

# Table of Contents

4       **Terms used in this Safety Report**

6       **Foreword**

8       **An introduction letter**

10      **Executive summary**

20      **Safety investments**

33      **Methodology**

49      **Uber's scale in the United States**

50      **Data insights**

50          Motor vehicle fatalities

57          Fatal physical assaults

58          Sexual assault

71      **Conclusion**

        Appendix I: Why data standards matter

        Appendix II: Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy and the Development of Uber's United States Safety Report (by National Sexual Violence Resource Center, RALIANCE, and Urban Institute)

        Appendix III: An Evaluation of Safety Incident Categorization Capabilities for Uber (by The Chertoff Group)

        Appendix IV: Sexual Misconduct and Sexual Violence Taxonomy

# Terms used in this Safety Report

**Audit function (or audit process)**
Uber's data-quality assurance process, which is designed to ensure data classification accuracy, reliability, and consistency across all safety incident reports.

**FARS**
The Fatality Analysis Review System. Operated by the National Highway Traffic Safety Administration (NHTSA), FARS is a nationwide census of fatal traffic crashes within the 50 states, the District of Columbia, and Puerto Rico.

**Guest rider**
Any rider in an Uber-facilitated trip who is not the rider who requested the trip through their Uber account. Guest riders can accompany rider account holders on trips or take the trip without the rider account holder present.

**NISVS**
The National Intimate Partner and Sexual Violence Survey. Administered through the Centers for Disease Control (CDC), NISVS is an ongoing survey that collects national- and state-level data on intimate partner violence, sexual violence, and stalking victimization in the United States.

**Relevant facts**
During the incident-report review process, safety support agents may gather relevant facts that may aid in the ultimate resolution of a report. These relevant facts may include but are not limited to: GPS information, trip timestamps, and any additional information provided to us, such as dashcam, phone, or audio recordings and screenshots of text conversations. Although these relevant facts can be useful, they are not necessary for an accused party's account to be removed from the platform, and we rely heavily on a survivor's statement of experience.

**Ridesharing (or ridesharing platform)**
For the purposes of this report, the Uber ridesharing platform involves peer-to-peer ride services inclusive of, but not limited to, UberPool, UberX, Uber Black, Uber SUV, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (e.g., New York City).

**Safety support agent(s)**
Customer support personnel at Uber who are tasked with handling and responding to reported safety incidents and actioning user accounts as necessary.

**Sexual assault**
Based on the Sexual Misconduct and Sexual Violence Taxonomy, sexual assault is defined as any physical or attempted physical contact that is reported to be sexual in nature and without the consent of the user. This can include incidents within the taxonomy ranging from Attempted Touching of a Non-Sexual Body Part (e.g., a user trying to touch a person's shoulder in a sexual/romantic way) to Non-Consensual Sexual Penetration. (For further sexual assault categories and their definitions, please see Appendix IV.)

**Sexual misconduct**
The Sexual Misconduct & Sexual Violence Taxonomy defines sexual misconduct as non-physical conduct (verbal or staring) of a sexual nature that happens without consent or has the effect of threatening or intimidating a user against whom such conduct is directed. This can include incidents within the taxonomy ranging from Staring/ Leering to Verbal Threat of Sexual Assault. (For further sexual misconduct categories and their definitions, please see Appendix IV.)

**Statement of experience**
During the case-review process, specialized safety support agents aim to speak directly with the victim or survivor to obtain a firsthand account on the details of their reported incident. In cases where a survivor is not able or willing to provide that statement of experience, Uber considers all other relevant facts obtained during the review.

**Taxonomy**
A system used for incident categorization. Uber's Safety Taxonomy is used to categorize safety incidents for proper agent routing, support protocol design, data tracking, and other purposes.

**Third party**
Any person who is not a driver, rider account holder, or guest rider involved in a reported safety incident.

**User**

Any person using the Uber platform. For the purposes of this report, it pertains specifically to drivers and riders.

**Victim/Survivor**

We've learned from experienced advocates that people impacted by sexual violence may identify in many different ways, which can be deeply personal to the individual. In an effort to be inclusive and to ensure that all people impacted by sexual violence can identify with the language used in this report, Uber has chosen to use the terms victim and survivor throughout this report. Both terms are intended to refer to a person who has experienced any type of sexual misconduct or sexual assault.

# Foreword

## From Karen Baker, Chief Executive Officer, National Sexual Violence Resource Center



As an advocate who has been working in the movement to end sexual violence for the past 20 years, I welcome this unprecedented report, which provides an opportunity to shed light on how this information-sharing emboldens our work for a safer future.

When the National Sexual Violence Resource Center (NSVRC) began working with Uber and the Urban Institute two years ago to create a classification system for unwanted behaviors, we didn't anticipate how much we would learn about informing and enhancing the way industries and corporations enact meaningful change, and how those changes contribute to efforts to prevent and end all forms of sexual violence.

The publication of this report is a bold step that builds off of that effort and sets a new bar for corporate responsibility and transparency. Never before have we seen a company disclose this level of information proactively. As experts in this field, we know first-hand that sexual harassment and abuse occur in all industries because they are a part of our larger society. All too often we have seen institutions respond to this reality by dismissing, denying, and downplaying the data and the broader problem. A 2019 national study found that 81% of women and 43% of men report experiencing some form of sexual harassment and/or assault in their lifetime[1]—the research speaks for itself, and it is irresponsible and unconscionable to deny the pervasive harms experienced by so many.

All too often, victims of sexual assault and rape don't know where to go or how to report, and are silenced by the fear that they won't be believed or that their report won't be taken seriously. This contributes to why sexual assault is such an under-reported crime across society. A recent US Department of Justice study found only 25% of sexual assaults or rape were reported to police.[2] Technology can make it easier for people to come forward, and it has the potential to increase accountability. For example, trip information and tracking in ridesharing apps may make it more likely for riders and drivers to report incidents.

We also know that reporting goes up when people know how to report and feel that their reports will be taken seriously. By releasing this data publicly, Uber is confronting these challenging issues head-on rather than shying away from or minimizing the numbers. In fact, they made the intentional decision to be overinclusive, capturing data by accepting every report at face value, without requiring corroboration; and by placing incidents in the highest possible category of severity, when the descriptions were vague.

More than ever, business leaders have a unique opportunity to play a role in addressing the pervasive problem of sexual assault and harassment. In order to contribute, they need to first accurately assess the nature and scope of sexual misconduct in their context. Second, they must respond appropriately when incidents occur; and third, they must enforce standards of safety and respect to reduce and prevent further occurrences.

---

1. Holly Kearl, "The Facts Behind the #MeToo Movement: A National Study on Sexual Harassment and Assault," February 21, 2018, p. 7, http://www.stopstreetharassment.org/wp-content/uploads/2018/01/Full-Report-2018-National-Study-on-Sexual-Harassment-and-Assault.pdf.
2. Rachel E. Morgan, Ph.D., and Barbara A. Oudekerk, Ph.D., "Criminal Victimization, 2018," Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 2019, p. 8, https://www.bjs.gov/content/pub/pdf/cv18.pdf.

Consistent categorization of reports of sexual harassment, misconduct, and assault make it possible for companies to capture reliable data and to hold themselves accountable to handling reported incidents responsibly.

Sexual assault is not just one company's problem or issue. It is perpetrated in every industry and every form of transportation. If we want to change this reality, we need more data and more companies who are willing to be transparent and accountable.

We are excited to announce the next wave of this work, which will move forward through RALIANCE, a national partnership dedicated to ending sexual violence in one generation. RALIANCE is working with Uber to establish RALIANCE Business: a resource center dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence. This will build momentum to address and reduce sexual violence across industries, and will bring us all closer to our common goal of a future built on safety and respect.

We encourage other companies to follow Uber's lead by bringing sexual violence to light, counting it consistently, and publicly sharing data. This is how we can build on what we know, share best practices, and make every industry safer for everyone.

# Uber

An introduction letter
from the desk of Tony West,
Chief Legal Officer, Uber



Dear Reader,

Nearly 2 years ago, Uber CEO Dara Khosrowshahi convened a dozen of the company's top executives in a room to discuss an important issue: the safety of drivers and riders. The topic was broad: how could Uber—with nearly 4 million trips happening every day in the US alone—become the safest ridesharing app in the world?

It was clear from this conversation that successfully achieving that mission required a deeper understanding of the toughest issues we face as a company, listening to the specific concerns and experiences shared by drivers and riders, and a close examination of how our technology could help us keep people safe.

What began that day was a 21-month effort that has included a review of hundreds of thousands of customer support requests; a complete rethink of how we categorize the most serious safety incidents that happen during Uber trips; an overhaul of how we train our support staff; and an even bigger investment in cutting-edge safety technology.

All of that work culminates in the Safety Report that we are sharing with you, the public, today.

To put US safety challenges in context:

- In 2018, over 36,000 people lost their lives in car crashes in the United States alone[3]
- Approximately 20,000 people were the victims of homicide in 2017[4]
- Nearly 44% of women in the US have been a victim of sexual violence in their lifetime— which means that more than 52 million women live with that experience every day[5]

Every form of transportation is impacted by these issues. For example, the NYPD received 1,125 complaints of sex offenses in the transit system during the same time period covered by this report.[6,7]

In the United States alone, more than 45 rides on Uber happen every second. At that scale, we are not immune to society's most serious safety challenges, including sexual assault. Yet when collecting data for that portion of our report, we found there was no uniform industry standard for counting and categorizing those types of incidents.

That's why, last fall, we partnered with the National Sexual Violence Resource Center and the Urban Institute to create this much-needed classification system—and we made it open source so that other companies can use it to improve safety for their own customers.

Voluntarily publishing a report that discusses these difficult safety issues is not easy.

3. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," (October 2019) p. 1, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.
4. Kenneth D. Kochanek, M.A., et al, "Deaths: Final Data for 2017," National Vital Statistics Reports 68, no. 9 (June 24, 2019): p. 51, https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_09-508.pdf.
5. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1, https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf.
6. "Complaints for Offenses Described in Administrative Code 14–150(g) Occurring in Transit Jurisdiction Calendar Year 2018," New York Police Department (NYPD), n.d., https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/transit-bus-crime-reports/2018/complaints-in-transit-report-cy-2018.pdf.
7. "Complaints for Offenses Described in Administrative Code 14–150(g) Occurring in Transit Jurisdiction Calendar Year 2017," New York Police Department (NYPD), n.d., https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/transit-bus-crime-reports/2017/complaints-in-transit-report-cy-2017.pdf.

# Uber

Most companies don't talk about issues like sexual violence because doing so risks inviting negative headlines and public criticism. But we feel it's time for a new approach. As someone who has prosecuted sex crimes and worked on these issues for more than 25 years, I can tell you that a new approach is sorely needed.

Confronting sexual violence requires honesty, and it's only by shining a light on these issues that we can begin to provide clarity on something that touches every corner of society. And, most importantly, by bringing hard data to bear, we can make every trip safer for drivers and riders alike.

Because we alone cannot meet all of the safety challenges inherent in our industry, we're already working with law enforcement officials, road safety organizations, and more than 200 gender-based violence prevention experts—including the Rape, Abuse & Incest National Network (RAINN), the National Alliance to End Sexual Violence, and the National Network to End Domestic Violence—to innovate on new approaches that will raise the bar on safety in ridesharing.

Because intent alone is not enough, we've tripled the size of our safety team since 2017, with more than 300 professionals now dedicated to safety for our core rides business.

And because we have one of the best technology teams in the world focused on safety, we've also added new safety features like our In-App Emergency Button, more rigorous background checks that continuously look for new criminal offenses, and technology that allows us to check in with customers if we detect a potential crash or unexpected long stop during a trip.

We're constantly pushing to do more on safety. We're rolling out new features that allow riders to verify their driver with a secure PIN code, send a text message directly to 911 operators, and report safety incidents to Uber before their trip is even over.

In some countries, we're testing a feature to give drivers and riders the option to securely record audio during their trip as a safety precaution. We're also committed to sharing the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers.

Of course, this is more than an "Uber thing." Safety should never be proprietary, and it's our intention to make an impact well beyond our own company, encouraging others to be more transparent with their data and to share best practices that can make everyone safer.

To that end, we're teaming up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish RALIANCE Business: a new resource center that will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence that may occur in the workplace or within business operations.

The moment is now for companies to confront it, count it, and work together to end it.

**The moment is now for companies to confront it, count it, and work together to end it.**

Sincerely,

Tony West
Chief Legal Officer, Uber

# Executive summary

This Safety Report, the first comprehensive publication of its kind to be issued by a company, shares details on Uber's safety progress, processes, and data related to reports of the most critical safety incidents on our platform. It represents the latest in a series of actions Uber has taken to continually improve the safety of our platform for all who use it.

We know most companies would not share publicly much of the information we have included here. But even though the decision to do so was hard, we have chosen to produce this report because we believe that for too long, companies have not discussed these issues publicly, particularly those relating to sexual violence. And simply put, we don't believe corporate secrecy will make anyone safer.

People have a right to know about the safety records of the companies and organizations they rely on every day. And we believe that publishing this data will help us develop best practices that will prevent serious safety incidents from occurring in the first place.

The issues in this report are bigger than Uber and impact every corner of society as a whole. The data itself may challenge assumptions. For example, while media coverage of the issue of sexual assault related to Uber has almost entirely portrayed drivers as the alleged offenders, our data shows that **drivers report assaults at roughly the same rate** as riders across the 5 most serious categories of sexual assault. Drivers are victims, too.

> We don't believe corporate secrecy will make anyone safer.

This report includes information about Uber's safety investments and the actions we take as a result of safety-related reports from users. But its primary focus is to share data about reports of serious safety incidents—and to derive insights that help us track our progress, be more accountable, and strengthen safety on our platform and across the industry.

It's important to understand the scale of Uber's business in interpreting this data. This year, nearly **4 million Uber trips** happened every day in the US—more than **45 rides every second**. At such a large scale, Uber's platform ultimately reflects the world in which we operate—both the good and the bad. As the numbers in this report will show, critical safety incidents on our platform are, statistically, extremely rare. But even one critical safety incident is unacceptable because it represents the lived experience of someone in the Uber community.

For the purposes of this report, we examine data from 2017 and 2018—a time frame in which an average of more than 3.1 million trips took place each day in the US. **The vast majority (99.9%) of Uber trips end without any safety-related issue at all**. For example, for the trips in 2017 and 2018:

- **1.4%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback.
- **0.1%** of trips had a support request for a safety-related concern, and the majority of those concerns were about less-severe safety issues such as complaints of harsh braking or a verbal argument.
- **0.0003%** of trips had a report of a critical safety incident,[8] which are the incidents referenced in this report.

The vast majority of the reports that Uber receives are **not** safety related at all. All potential safety-related reports are manually reviewed by teams of specialized agents for proper adjudication. When our support teams receive safety-related reports, they are triaged and classified by agents based on the description given by the reporting party, and appropriate action is then taken on each and every case.

---

8. This percentage includes the 5 categories of sexual assault published in this report, fatal motor-vehicle crashes, and fatal physical assaults reported to occur in 2017 and 2018 in relation to the Uber platform.

# Safety investments

In 2017, Uber kicked off a comprehensive effort across the company to focus on safety. We developed new technology, strengthened background screenings for drivers, launched new safety features, overhauled how we train our support staff, updated our policies, and tripled the size of our safety team.

## Driver background checks and screenings

Every US driver undergoes an annual Motor Vehicle Record (MVR) review[9] and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

Uber's background-check process is very rigorous. During 2017 and 2018, more than **one million prospective drivers**[10] **did not make it through Uber's screening process.** The majority (76%) of the drivers who failed Uber's screening process were disqualified during the MVR check and did not advance to the criminal background check portion of our screening.

Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for certain serious criminal convictions—including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping[11]—at any time in the person's history, the potential driver will be disqualified according to our standards.

> Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process.

Beyond performing annual background check reruns, we were the first US ridesharing company to implement **continuous driver screening technology**, which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can take action to ensure that every driver continues to meet our high standards. Since we launched this technology, more than **40,000 drivers have been removed** from the app due to continuous screening.

## Community Guidelines

Uber's Community Guidelines, which we ask all US users to read and acknowledge, are designed to help users understand the behaviors expected by everyone who uses the Uber app. They are grounded in the principles of treating everyone with respect, helping to keep one another safe, and following the law. Drivers have long been expected to meet a minimum rating threshold, and we strengthened our policies this year so that riders, too, may lose access to Uber if they develop a significantly below-average rating.

## New safety technology

Over the past 2 years, we've launched more safety features than we did in the previous 8 years combined. Some of these features include:



**In-App Emergency Button**
Connects riders and drivers directly to 911 with the simple press of a button. In some cities, trip details and location can be shared automatically with first responders, or riders and drivers can send a text message to 911.



**RideCheck**
Can detect rare events such as unexpected long stops on a trip or possible vehicle crashes. The technology proactively checks in with riders and drivers to see if everything is OK, and the app provides tools that they can use to get help, if needed.

---

9. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission (TLC). The TLC Driver licensing process is separate from the process described here.

10. "Prospective drivers" is defined as drivers who consented to a background check in 2017–2018 as part of the sign–up process to drive on the Uber platform.

11. This section describes Uber's default standards. The criminal offense descriptions may vary based on jurisdiction. Certain localities or states may require rideshare companies to disqualify drivers for additional offenses or pursuant to different lookback periods. In those jurisdictions, individuals cannot drive on the Uber platform if they do not meet our default standards or if they have otherwise been convicted of any disqualifying offense under the applicable jurisdiction's law.



**Share My Trip/Follow My Ride**
Gives riders and drivers the option to share their trip with designated loved ones who can then follow their trip on a map in real time and know when they've arrived.



**Phone number and address anonymization**
When riders and drivers contact each other through the app, their actual phone numbers do not appear. Additionally, we've taken steps to anonymize exact pickup and dropoff addresses in the driver's trip history.



**Driving-hours tool**
Requires drivers to go offline for 6 straight hours after a total of 12 hours of driving[12] to help prevent drowsy driving on the Uber platform.



**Speeding alerts**
Drivers can receive notifications to maintain a speed that's within the posted limits. The speed limit is displayed on the driver's app, and they can be visually or audibly alerted when they go over the limit.



**Real-time ID check**
Prompts drivers to take a live photo of themselves in the Uber app before they can accept rides.[13] The tool then utilizes facial comparison technology to match a driver's real-time photo with their account photo, which helps to verify that the right driver is behind the wheel.

## Sexual assault standards

Uber does not tolerate sexual assault or misconduct from anyone, anywhere, at any time. We take all allegations of sexual assault and sexual misconduct extremely seriously and work to take action quickly and fairly.

In 2017, as a result of input from external experts, drivers, and riders, we created a specialized team to provide customer support to riders and drivers reporting the most serious safety incidents, including sexual assault. The agents receive tailored training on how to address difficult and sensitive situations, and are empowered to make immediate account-access decisions and provide victims with further support.

Uber believes it's important to hear from everyone involved when an incident is reported. When we receive a report of sexual assault,[14] a trained safety support agent begins by identifying the accused party and their associated Uber account. We immediately remove the accused party's access to the Uber app so that they cannot take trips while we complete a review. If the accused party is a guest rider, we attempt to identify whether they have their own Uber account and, if they do, we restrict it. If the guest rider cannot be identified, or if they do not have an Uber account, we may restrict the account holder's access to the Uber app since they are responsible for their guest riders' actions while on a trip. Regardless of the outcome of our case review, we make sure that the involved parties are not paired again in the future on the Uber platform. Importantly, blocking a pairing is not the only action Uber will take on a report, and further action will depend on what the subsequent review finds.

> When we receive a report of sexual assault, we immediately remove the accused party's access to the Uber app while support agents complete a review.

When reviewing an incident report, agents gather information by speaking with all parties involved and examining other relevant facts obtained through the case-review process, such as GPS trip data, photos and/or videos, in-app communications, etc. Based on learnings from experts, we rely heavily on a survivor's statement of experience; it does not require

---

12. Configurations of the driving-hours tool may vary in accordance with state and local requirements.
13. Due to legal restrictions contained in the Illinois Biometric Information Privacy Act, real-time ID check is not yet available in the state of Illinois.
14. Similar protocols are followed for the following urgent categories of sexual misconduct: Indecent Photography/Video Without Consent, Masturbation/Indecent Exposure, and Verbal Threat of Sexual Assault.

conclusivity, corroboration, or survivor "credibility" for us to take action. If a survivor is not able or willing to provide this statement of experience, we rely on any relevant facts obtained through the case-review process.

Violent offenders have no place in the Uber community, and it's our priority to prevent their access to our platform. Uber will ban users from the platform if we are able to obtain a statement of experience from the survivor and/or obtain relevant facts (e.g., GPS data, timestamps, videos/photos, in-app communications). We adhere to this standard for all sexual assault categories described in this report.

## Approach to safety deactivations[15]

This report includes data on the most severe reported cases, but it's important to note that Uber takes every report of a safety incident seriously. Our specialized support team investigates issues and takes appropriate action based on the information available. The types of reports we receive encompass a wide spectrum, and we have a broad range of responses as a result.

A single serious safety incident can result in a rider's or driver's loss of access to the Uber app. However, the vast majority of safety incidents reported to Uber involve less severe or infrequent behaviors that may not warrant being immediately removed or permanently banned from the app. Our systems are constantly evaluating a variety of factors, including user feedback, local driving patterns, fraud signals, and data science to identify patterns of potentially risky behavior. If a pattern of behavior is found, this can trigger further review and result in the accused party's loss of access to the Uber platform.

While data and technology are useful tools for strengthening our safety strategies, safety itself is personal—and people have an essential role to play. Our safety support agents are trained to detect reports that may have alternative intentions—for example, a rider seeking refunds by making identical unsafe driving complaints about multiple drivers. It's important to note that no rider or driver is banned from the Uber app for a safety report without a human review.

## Connecting survivors to third-party advocates

Supporting users who have reported sexual assault or misconduct on our platform is incredibly important to us. Our agents offer survivors resources such as the National Sexual Assault Hotline, which is operated by the [Rape, Abuse & Incest National Network (RAINN)](#). The hotline can provide survivors with confidential support such as crisis counseling, information and options for seeking medical services or reporting to law enforcement, or referrals to longer-term support services in their area.

## Prevention initiatives

From more than 200 expert and advocacy organizations around the world, including women's groups and road safety and crime-prevention organizations, we've consistently heard that education is key in helping prevent unsafe behaviors. That's why we've worked in partnership with the experts to develop prevention, awareness, and education campaigns including:

**Sexual misconduct education**
[Educational modules](#), developed by RAINN for riders and drivers, share information about appropriate behavior while on the app and are sent to a user when they receive an initial report of unwanted behavior.

**Driving Change Initiative**
$5 million initiative to support the sexual violence prevention programs of leading organizations such as [A CALL TO MEN](#), [Casa de Esperanza](#), [National Coalition of Anti-Violence Programs](#), [National Network to End Domestic Violence](#), [NO MORE](#), [RALIANCE](#), [Futures Without Violence](#), [Rape, Abuse, Incest National Network (RAINN)](#), and [Women of Color Network, Inc](#), as well as grassroots rape crisis centers nationally and globally.

[#DontStandBy](#) **Bystander Intervention Campaign**
Key safety education on safe intervention in unsafe situations developed with [NO MORE](#), local law enforcement, local rape crisis centers, and the nightlife community.

---

15. Deactivations or "bans" refer to the specific Uber account that was being used during the safety incident(s) that led to removal. For example, if a driver is flagged by Uber's system and subsequently deactivated for dangerous driving, they may still be allowed to ride with Uber using the Rider app.

**Drunk driving prevention**
We partnered with [Mothers Against Drunk Driving](#) for our [#ReasonsToRide](#) campaign, which reminds people of the dangers of driving under the influence.

**Seat belt safety awareness**
We partnered with the [Governors Highway Safety Association (GHSA)](#) and Volvo to educate users with in-app notifications and emails about the safety benefits of seat belts.

**Bike and scooter safety**
We developed [Bike Lane Alerts](#) to remind riders to look before opening the door when their upcoming dropoff point is near a bike lane or along a bike route.

## What's next for safety at Uber?

This Safety Report is just one part of our commitment to helping drive accountability in our industry. What matters most are the actions we take to raise the bar. Below are some of our newest investments in safety, along with what we're excited to bring to our users in the future.

**Deactivation sharing**
We're committed to finding a way to share the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers. We want companies to be able to use this information to protect their customers.

**Sexual misconduct education for all drivers**
In 2020, Uber will expand sexual misconduct and assault education to all US drivers. We are partnering with RAINN, the nation's largest sexual violence organization, to design this program.

**Verify Your Rides**
Soon we will offer all riders the option to verify each of their rides with a unique, 4-digit PIN that they can verbally provide to their driver, who will have to enter it into their own app in order to start the trip. This helps riders ensure that they're getting into the right car.

**On-trip reporting**
This feature, soon to be available nationally, allows riders to report a non-emergency safety issue during an Uber trip, when it is top of mind, so they don't have to wait until after the trip ends.

**Text to 911**
In select cities, in addition to calling 911 through the app, users are now able to text 911 to discreetly share car information, location, and direction of travel with 911 call-takers.

**Uber Survivor Support Hotline**
In 2020, Uber will partner with RAINN to provide a dedicated survivor hotline that will provide confidential crisis support and specialized services to survivors.

# Methodology

In this report, we are sharing information about 3 categories of critical safety incidents:

- Motor vehicle fatalities
- Fatal physical assault
- Sexual assault (further detailed in 5 subcategories)
  - Non-Consensual Kissing of a Non-Sexual Body Part
  - Attempted Non-Consensual Sexual Penetration
  - Non-Consensual Touching of a Sexual Body Part

- Non-Consensual Kissing of a Sexual Body Part
- Non-Consensual Sexual Penetration

The report includes a comprehensive look at user reports of critical safety incidents that come in to Uber's support centers through more than 10 different reporting channels. From the ability to report through the app to our 24/7 Critical Safety Response Line, our technology means that riders and drivers can get in touch with us quickly, discreetly, and more seamlessly than is possible with many other companies.

## Motor vehicle methodology

In the US, the National Highway Traffic Safety Administration (NHTSA) makes annual traffic fatality information available to the public through the Fatality Analysis Reporting System (FARS). The motor vehicle fatality data in this Safety Report is built off the data standards established by FARS. Each fatal crash in the Uber dataset was reconciled to a fatal crash in the FARS database.

For a fatal motor vehicle crash to be included in this Safety Report, the crash must have involved the vehicle of at least one driver using the Uber platform and the death of at least one person within 30 days of the crash. Fatal crashes are included in this report regardless of whether the deceased party was an Uber user or whether a driver using the Uber platform or their vehicle was the cause of the crash or was carrying the deceased parties.

The Uber-related[16] vehicle miles traveled (VMT) in this report are based on the miles driven during trips and GPS data calculated while a driver was en route to the rider's pickup location.[17] This helps align with national statistics, which use VMT (per 100 million miles) as the denominator in calculating a fatality rate.[18]

## Fatal physical assault methodology

This report includes physical assault incidents that resulted in one or more fatalities. In order for a fatal physical assault incident to be established as Uber-related for the purposes of this report, one or more of the following must be true:

- The incident involved at least one person on an Uber-facilitated trip,[19] not necessarily with parties paired by the Uber app
- The incident occurred between parties that were paired by the Uber app, and it occurred within 48 hours[20] of the trip ending

## Sexual assault methodology

In 2018, we partnered with experts from the National Sexual Violence Resource Center (NSVRC) and the Urban Institute to develop a new taxonomy to better understand the reality of unwanted sexual experiences.[21] Prior to this effort, a standardized tool that corporations could use to consistently classify reports of sexual violence received from their consumers did not exist. The taxonomy has since been made open source for use by other companies and organizations.

> Uber has intentionally adopted broader definitions, particularly in the area of sexual assault, than most jurisdictional criminal codes and research entities.

---

16. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

17. For a small portion of driver miles during 2017, the GPS data is missing during the period when the driver is en route to a rider's pickup location. For the missing data, we have used Uber's best estimate in calculating the mileage.

18. US Department of Transportation (USDOT), "VMT per Capita," February 2, 2016, https://www.transportation.gov/mission/health /vmt-capita.

19. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while en route to the rider's pickup location, this would be included in the dataset.

20. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

21. Chad Sniffen, Julia Durnan, and Janine Zweig, "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," 2018, https://www.nsvrc.org/sites/default/files/publications/2018-11/NSVRC_HelpingIndustries.pdf.

In order for a sexual assault to be established as Uber-related for purposes of data classification for this report, one or more of the following must be true:

- The incident occurred during an active Uber-facilitated trip,[22] not necessarily with parties paired by the Uber app
- The incident occurred between parties that were paired by the Uber app, and it occurred within 48 hours[23] of the trip's completion

The data in this report is derived from incident reports, which reflect the description given by the reporting party, as classified by agents. As a result, it does not necessarily reflect the actual number of occurrences of critical safety incidents, nor does it signal the ultimate disposition of any particular case. Uber uses a survivor-centered approach in our review process for sexual assault reports. Survivors are not required to "prove" their own assault. Because we know that survivors of sexual violence may withdraw their reports or refuse to pursue them further for any number of personal reasons, this report consciously includes data about reports that were later withdrawn (but not disaffirmed) by survivors.

Importantly, we believe that responsible data reporting is critical to improving the safety of the Uber ridesharing platform and the communities we serve. Each of these reported safety incidents is more than just a data point to us. Such incidents can represent serious traumas for real individuals in our communities. This reality leaves little room for error, and we take this responsibility for data accuracy and consistency extremely seriously.

## Data quality

Uber strived for the data included in this report to have measurably high degrees of classification accuracy, reliability, and consistency. In determining which categories of sexual assault were appropriate to include in this report, we prioritized:

1. Including the most serious categories of sexual assault outlined in the taxonomy
2. Maintaining a high degree of confidence and consistency in the quality of the overall dataset
3. Remaining as consistent as possible with the types of sexual assault that are already published in external research and national estimates

This report includes categories of sexual assault which, in aggregate, have at least 85% of auditor classifications aligned with internal Safety Taxonomy experts. We are able to achieve much higher confidence[24] in the auditor classifications for Non-Consensual Sexual Penetration and fatalities. For sexual assault and misconduct in particular, Uber user reports can be interpreted subjectively by safety support agents and auditors, even for the most severe incidents, because of a historical lack of shared and consistent definitions.

## Data auditing process

To prepare for this publication, Uber created a specialized audit team to review and accurately categorize the data contained in this report. This team reviewed approximately hundreds of thousands of user reports, representing a range of safety- and non-safety-related consumer issues to ensure that all necessary information was documented and all incident reports were categorized accurately and comprehensively. In order to gain confidence in the results of the internal audit, we created a curriculum and certification process for auditors and measured their categorization accuracy at a regular cadence.

## Limitations of Uber safety incident data

We recognize that this data and our user base are neither a representative national sample nor, necessarily, a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults in other contexts. Direct comparisons to other datasets are therefore difficult.

---

22. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.

23. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's completion. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

24. Here "confidence" refers to the rate of agreement when 2 auditors are separately shown the same facts and come to the same conclusion on the classification of an incident.

# Data insights

When developing this Safety Report, Uber was intentionally overinclusive in determining which incidents to capture in each category. We have adopted broader definitions—particularly in the area of sexual assault—than most jurisdictional criminal codes and research entities. The data we are releasing encompasses reports of safety incidents, regardless of outcome or fault, as opposed to those that simply meet criminal definitions or that may have resulted in law enforcement action. For more examples and information on how more restrictive data standards may impact the overall dataset for a publication of this nature, see Appendix I: Why data standards matter.

## Motor vehicle fatalities data[25]

While we have tried in this report to align with available methodologies and statistics, we know that drawing direct comparisons to national motor vehicle fatality rates is not easily done. For example, all drivers using the Uber platform[26] must be at least 21 years old and have at least one year of driving history, and their motor vehicle records must be screened before they can drive on the Uber platform.[27] Also, vehicles used on the Uber platform are generally newer than the average light-duty vehicle on US roads (4 years old compared to 10).[28]

- There were 107 total fatalities in 2017 and 2018 across 97 fatal crashes reported in relation to the Uber app.[29]
- The Uber-related motor vehicle fatality rate for 2017 was 0.59 fatalities per 100 million vehicle miles traveled; it was 0.57 fatalities per 100 million miles traveled in 2018. For both years, the Uber data is about half of the national rates.[30]
- Approximately 90% of Uber-related fatal crashes occurred in urban areas.[31]
- 21% (n=22) of the fatalities in this report were drivers using the Uber platform; 21% (n=23) were riders using the Uber platform, and the rest were third parties.[32]
  - 8 of the drivers and riders using the Uber platform were fatally struck while they were outside the vehicle (and therefore counted as pedestrians in FARS).[33]
- 30% of fatal crashes involved a pedestrian, 25% (n=8) of which were drivers or riders using the Uber platform who were outside the vehicle.[34]
- Across 2017 and 2018, pedalcyclists were the deceased party in 2% (n=2) of cases.[35]

## Fatal physical assault data[36]

- Fatal physical assault was reported to occur in about 1 in every 122,000,000 US trips, or approximately 0.000001%[37] of US trips.
- Among the 19 deceased parties in 2017 and 2018 included in this report, 8 were riders using the Uber platform, 7 were drivers using the Uber platform, and 4 were third parties.

---

25. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason, the data presented in this report may change over time. The motor vehicle data presented in this report includes incident reports resolved on or before October 31, 2019. The motor vehicle data in this report reconciled to the 2018 FARS Release published October 22, 2019.

26. United States and rideshare platform only. Drivers 22 years old and under require at least 3 years of license history. Drivers 23 and over are required to have at least 1 year of license history.

27. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission. The TLC Driver licensing process is separate from the process described here.

28. In the US Department of Transportation's 2018 Transportation Statistics Annual Report, a light-duty vehicle is defined by the US Environmental Protection Agency as a passenger car with a maximum Gross Vehicle Weight Rating (GVWR) < 8,500 lbs. (pp. 2–7), https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/browse-statistical-products-and-data/transportation-statistics-annual-reports/Preliminary-TSAR-Full-2018-a.pdf.

29. An additional 22 Uber-related road fatalities either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS (see Methodology). Because these fatal crashes are not in the FARS dataset, they are not included in the data analysis presented in this report.

30. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.

31. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.

32. Ibid.

33. Ibid.

34. Ibid.

35. Ibid.

36. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but this means that the data could change over time. The data presented in this report includes incident reports resolved on or before October 31, 2019.

37. Incident reports as a percent of total trips are rounded.

## Sexual assault data[38]

Sexual violence is all too common in our society. In the US, nearly 44% of women and almost 25% of men will be the victim of sexual violence in their lifetime.[39]

For 2017 and 2018 combined:

- Non-Consensual Kissing of a Non-Sexual Body Part was reported to occur in about 1 in every 2,000,000 completed trips.

- Attempted Non-Consensual Sexual Penetration was reported to occur in about 1 in 4,000,000 completed trips. This category covers a wide range of reports and includes attempted clothing removal and incident reports that are fragmented or incomplete due to memory loss or lack of event recall.

- Instances of Non-Consensual Touching of a Sexual Body Part were reported to occur in about 1 in every 800,000 trips.

- Non-Consensual Kissing of a Sexual Body Part was reported to occur in 1 in every 3,000,000 completed US trips.

- Non-Consensual Sexual Penetration—the most serious sexual assault category—was reported to occur in about 1 in 5,000,000 US trips, or on approximately 0.00002%[40] of US trips.

- Across these 5 categories of sexual assault, riders account for nearly half (45%) of accused parties.

- From 2017 to 2018, Uber saw approximately a 16% decrease in the average incident rate of the 5 most serious sexual assault categories reported.

Based on preliminary estimates for the first half of 2019, the same 5 categories of sexual assault currently reflect a 17–20% decrease when compared to the full year of 2018.[41] However, as Uber invests even more in sexual assault prevention and reporting initiatives (including with the release of this Safety Report), there may be increased reporting of these 5 categories of sexual assault independent of the underlying frequency of occurrence.

# Conclusion

Following this 21-month effort, Uber has put in place stronger safety policies and training for support staff, implemented a new classification system for the most serious safety incidents, and launched more safety features than ever before to protect both drivers and riders.

The data presented in this report shows that the rates of reported sexual assault incidents on the Uber rideshare platform in the US declined year-over-year; that traffic-related fatality rates with Uber are roughly half of the national average[42]; and that 99.9% of trips ended without any safety-related issue at all, no matter how minor. In fact, only 0.0003% of all Uber trips in this time period involved one of the critical safety incidents outlined in this report.

Uber will continue to release a Safety Report every 2 years. But we know that published reports only go so far. We can only make society safer if we all work together. And that requires implementing best practices based on expertise, as well as sharing data that benefits everyone.

> Moving forward, we encourage all organizations—airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report.

---

38. This report reflects audited sexual assault reports that were classified into one of the following categories. Uber occasionally receives notice of a potential sexual assault well after the trip has ended. The sexual assault data presented in this report includes incident reports resolved on or before October 31, 2019, and for this reason may change over time.

39. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1, https://www.cdc.gov /violenceprevention/pdf/2015data-brief508.pdf.

40. Incident reports as a percent of total trips are rounded.

41. DISCLAIMER: Uber is including a preview of estimated 2019 sexual assault data due to the interest our users and communities have in these numbers. These numbers are estimates and have not undergone the same auditing process described in the Methodology, and we expect they may change over time as Uber receives additional, delayed reports of incidents. In addition, the 2019 estimates were not reviewed by the NSVRC and Urban Institute and, as a result, are outside the scope of the validation statement provided in Appendix II. 2019 data is an estimate based on reports as of November 15, 2019.

42. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812826.

Moving forward, we encourage all organizations—airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report.

We've teamed up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish RALIANCE Business: a new resource center that will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence that may occur in the workplace or within business operations.

Uber is taking an important step, but every company has a role to play. We look forward to working together to confront these issues, count them, and make progress toward ending them.

# Safety investments

Transparency about serious incident reports is just one part of our safety commitment. The actions we take to improve the safety of our platform—day in and day out—matter much more. While Uber has the ability to bring new safety benefits to communities through technology, we also have a responsibility to help keep the people we serve safe.

In his first year as Uber's CEO, Dara Khosrowshahi made safety the company's top priority and committed to putting safety at the heart of everything we do. Since then, we've made significant investments in safety technology, strengthened background checks for drivers and accountability for riders, and made major changes to our safety policies and processes.

Uber has built a team of hundreds of people dedicated to keeping riders and drivers safe. This team includes engineers who develop new safety features, data scientists who analyze data for actionable insights, experts who build programs geared toward women's safety, support agents who are specially trained to respond to safety reports, operations specialists who ensure that our safety protocols are being met at every level, and many more. The safety team closely collaborates with other departments across the company to help ensure that safety is built into every element of the Uber experience.

Uber also works with external experts to inform our safety strategy and business decisions. Uber's Safety Advisory Board was created in 2015 to bring expertise, feedback, and counsel to our safety processes, policies, and technology. The Safety Advisory Board is chaired by former US Secretary of Homeland Security Jeh Johnson.

The following chapter outlines the actions we're taking to constantly improve safety for the people and communities we serve.

> "Every day, our technology puts millions of people together in vehicles in cities around the world. Helping keep people safe is a huge responsibility and one we do not take lightly."
>
> Dara Khosrowshahi, Uber CEO

## Driver background checks and screenings

Every US driver undergoes a Motor Vehicle Record (MVR) review[43] and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

Uber's driver screening process also includes several measures to detect fraud, including a review of identity documents such as a driver's license, Social Security number, proof of insurance, vehicle registration, and other personal information. In the US, we also collect and examine a driver's background history through a third-party vendor, accredited by the Professional Background Screening Association.

While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

---

43. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission (TLC). The TLC Driver licensing process is separate from the process described here.

During 2017 and 2018, more than one million prospective drivers[44] did not make it through Uber's screening process.

Given the importance of an individual's driving record, our screening process starts with a thorough MVR check.[45] This includes verification of the individual's license status, a review of their driving history for any violations or crashes, and a check for any driving-related restrictions on their license. Disqualifying violations from the last 7 years include, but are not limited to, driving under the influence, reckless driving, and leaving the scene of a crash (see Table 1). Our process also disqualifies individuals who have been found to be at fault for a fatal crash or have been convicted of vehicular homicide or vehicular manslaughter at any time in their driving history.

## Table 1:  Sample motor vehicle record screening standards[46]

| Minor violations No more than 3 in 3 years | Major violations None in the past 3 years | Severe violations None in the past 7 years | Forbidden violations None ever |
|---|---|---|---|
| Crashes (non-fatal) | Driving on suspended, revoked, or invalid license | DUI or drug-related driving violation | Fatal crashes |
| Traffic-light violations | Driving while uninsured/ insurance suspended, revoked or invalid | Speeding at 100+ mph | Vehicular homicide |
| Speeding violations | | Leaving scene of crash | Vehicular manslaughter |
| Moving violations | | Evading/eluding police | |
| | | Reckless driving | |
| | | Street racing/contest | |

The majority (76%) of the more than one million prospective drivers who failed Uber's screening process were disqualified during the MVR check, meaning they did not advance to the criminal background check portion of our screening.

### Vehicle safety standards
In addition to reviewing violations, we also follow all applicable state and local laws pertaining to the safety and fitness of vehicles used for ridesharing. The average vehicle used to drive on the Uber platform is about 4 years old, while, according to the US Department of Transportation's Bureau of Transportation Statistics, the average light-duty vehicle active on US roads is about 10 years old.[47] Given this difference, vehicles driven on the Uber platform often have updated features that promote greater safety. These features can include rearview cameras, which many automakers made standard as of 2015;[48] electronic stability control, which became standard on all new cars as of 2011;[49] and automatic emergency braking, which high-volume automakers began equipping in more than half of vehicles between 2017 and 2018.[50]

---

44. "Prospective drivers" is defined as drivers who consented to a background check in 2017–2018 as part of the sign-up process to drive on the Uber platform.
45. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission. The TLC Driver licensing process is separate from the process described here.
46. This list of violations is not exhaustive, as some local jurisdictions impose additional MVR screening criteria that may disqualify someone from driving on the Uber platform. The local definitions of each violation can also vary based on jurisdiction.
47. In the US Department of Transportation's 2018 Transportation Statistics Annual Report, a light-duty vehicle is defined by the US Environmental Protection Agency as a passenger car with a maximum Gross Vehicle Weight Rating (GVWR) < 8,500 lbs. (p. 2–7), https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/browse-statistical -products-and-data/transportation-statistics-annual-reports/Preliminary-TSAR-Full-2018-a.pdf.
48. Aaron Turpen, "Affordable Cars with a Standard Backup Camera," Carfax (blog), March 2, 2015, https://www.carfax.com/blog/cars -with-standard-rearview-cameras.
49. "Electronic Stability Control," Safercar.gov, accessed August 6, 2019, https://www.safercar.gov/Vehicle-Shoppers/Safety-Technology/esc.
50. Insurance Institute for Highway Safety (IIHS), "10 automakers equipped most of their 2018 vehicles with automatic emergency braking," March 13, 2019, https://www.iihs.org /news/detail/10-automakers-equipped-most-of-their-2018-vehicles-with-automatic -emergency-braking.

If an individual passes the MVR check, they then proceed to the criminal background check before being approved to drive on the Uber platform. We work with Checkr, a third-party background check provider accredited by the Professional Background Screening Association. Drivers are required to provide their full name, date of birth, Social Security number, and driver's license number, which Uber provides to Checkr. Based on this information, Checkr runs a Social Security trace and checks the potential driver's driving and criminal history in a series of national, state, and local databases and court record repositories. These include the US Department of Justice National Sex Offender Public Website, the federal PACER database, and several databases used to flag suspected terrorists.

Upon identifying a potential criminal record, Checkr sends an individual to review the record in person at the relevant courthouse or, if possible, pulls the record electronically. These screenings use information that is maintained by national, state, and county-level authorities whose processes may vary by jurisdiction. Verifying potential criminal records at the primary source—the courthouse or court database system—helps ensure that we are checking the most up-to-date records available.

Uber will disqualify individuals with any felony convictions in the last 7 years. Uber will also disqualify individuals with violent or other disqualifying misdemeanors in the last 7 years.

Our process also reviews records beyond 7 years, as allowed by law and where those records are made available and reported to us. If we identify a report made at any time in a person's history for certain serious criminal convictions (listed below), the potential driver will be disqualified according to our standards. These convictions are as follows, and include the "attempted" and "conspiracy" crimes associated with each:[51]

- Sexual assault (includes rape, sexual battery, indecent assault, indecent liberties, criminal sexual abuse, forcible sodomy, sexual exploitation, predatory criminal sexual assault, custodial sexual misconduct, sexual misconduct of a person with a disability)
- Sex crimes against children (includes carnal knowledge of a child, carnal knowledge, indecent solicitation of a child, using a computer to seduce/lure/entice a child for sexual purposes, possession/distribution/manufacture of child pornography, patronizing a minor engaged in prostitution, permitting sexual abuse of a child)
- Murder/homicide (includes assault with intent to kill, reckless homicide, and concealment of homicidal death)
- Manslaughter
- Terrorism (includes harboring or concealing terrorists, providing material support to terrorists, providing material support or resources to designated foreign terrorist organizations, receiving military-type training from a foreign terrorist organization)
- Kidnapping (includes abduction, child abduction, false imprisonment, human trafficking, unlawful restraint, unlawful/forcible detention)

## Yearly background reruns and ongoing screenings

Beyond the initial screening, Uber proactively reruns criminal and motor vehicle checks each year. This is a standard practice at Uber, regardless of whether there is a statute or regulation requiring us to do so. This helps ensure that our screening standards are applied consistently and continuously across the country.

Beyond performing annual reruns, we were the first US ridesharing company to implement new technology to further strengthen our screening process. This technology continuously monitors data sources to detect when a driver is involved in a new criminal offense, and it notifies Uber when this is the case. Our screening team then reviews any potentially disqualifying information to evaluate the driver's continued eligibility with Uber, and removes them from the platform if the driver is found to no longer meet Uber's screening criteria and local laws. Since implementing this technology, it has already had a significant positive impact on safety. More than 40,000 drivers have been removed from the app due to continuous checks as of the publication of this report.

---

51. This section describes Uber's default standards. The criminal offense descriptions may vary based on jurisdiction. Certain localities or states may require rideshare companies to disqualify drivers for additional offenses or pursuant to different lookback periods. In those jurisdictions, individuals cannot drive on the Uber platform if they do not meet our default standards or if they have otherwise been convicted of any disqualifying offense under the applicable jurisdiction's law.

## Uber's Community Guidelines

Uber's [Community Guidelines](#) are at the core of our commitment to safety. That's why we ask all users to read and acknowledge them. These Guidelines are designed to help users understand the behaviors expected by everyone who uses the Uber platform. They emphasize 3 simple principles:



**Treat everyone with respect**
Unwanted physical contact, sexual assault and sexual misconduct, threatening and rude behavior, and discrimination are not tolerated by Uber and have no place on our platform.

**Help keep one another safe**
Everyone has a role to play in helping to create a safe environment. That's why we have standards on account sharing and looking out for others on the road such as pedestrians, people on bicycles, and more.

**Follow the law**
Everyone using the Uber platform must follow the law—no matter what. This includes following all traffic laws and not engaging in any criminal activity while on our platform.

Drivers have long been expected to meet a minimum rating threshold, which can vary city to city, and in May 2019 we [strengthened our policies](#) so that riders, too, may lose access to Uber if they develop a significantly below-average rating.

## New safety technology

Our work on safety is never done, and we're constantly working to raise the bar. Over the last 2 years, we have pioneered a number of new safety technologies and features, many of which have now been adopted by other companies in the ridesharing industry.



### Safety Toolkit

In 2018, Uber launched the Safety Toolkit, a single place in the Uber app where riders and drivers can access safety features during a trip. This suite of resources includes access to features like Share My Trip, Follow my Ride, Trusted Contacts, and the In-App Emergency Button, which are described in greater detail later in this chapter. The Safety Toolkit also provides key safety information to riders, including tips built in partnership with law enforcement, driver screening processes, insurance protections, and Community Guidelines.



### Share My Trip, Trusted Contacts, and Follow My Ride

One of our original safety features gives riders and drivers the option to share trip details so loved ones can follow them on a map in real time—something not previously available when traveling traditionally.

In 2018, we enhanced that feature with Trusted Contacts, which allows riders to automatically share trip information with up to 5 friends and family members. Riders can use the Trusted Contacts feature on all trips or just nighttime trips, according to their preference. Follow My Ride is a similar feature available to drivers, enabling them to designate loved ones in advance to share their live location during or in between trips.[52]

---

52. Follow My Ride does not share any rider information with the driver's contacts.



## In-App Emergency Button

Federal regulators estimate that about 10,000 lives could be saved every year if first responders were able to get to 911 callers just one minute faster.[53]  In 2018, based on rider and driver feedback, Uber developed a feature that allows users to connect with 911 directly through the Uber app in the most urgent situations. When a user taps the In-App Emergency Button, they are provided with critical trip details to relay to the dispatcher, including the vehicle's location, the rider's and driver's names, and the vehicle's make, model, color, and license plate information. In more than 250 US cities and counties, we partner with RapidSOS on 911 integration technology to automatically transmit these details to the 911 dispatcher who responds to your call. At least 45% of all Uber-facilitated trips in the US occur in areas with RapidSOS integration, and we will continue to expand as local emergency service providers modernize their systems.

**Case spotlight**

Lauren* is a female driver who experienced a safety incident when an intoxicated male rider entered her vehicle and began harassing and touching her. She persuaded the rider to exit the vehicle, immediately locked the doors, and dialed 911 through the In-App Emergency Button in the Uber app. Moments later, police arrived and arrested the rider, and Uber permanently removed the rider's access to the app.

*Names and details have been changed to protect privacy.



## RideCheck

In 2018, we announced RideCheck, an innovative safety feature that leverages technology in the driver's smartphone to detect potential motor vehicle crashes and other indicators of safety incidents such as unexpected or prolonged stops. While the vast majority of these indicators do not reflect an actual incident (for example, a rider has requested a stop at a convenience store), our goal is to proactively identify potential issues so we can provide support to customers as quickly as possible. When a potential crash or suspicious trip issue is detected, both the rider and the driver will receive a notification asking if everything is OK. They are provided with resources from the in-app Safety Toolkit and can let Uber know that all is well, or can take other actions like dialing 911 through the In-App Emergency Button. Our specialized Safety team can also follow up with a phone call to see if everyone is safe or if additional resources and support are needed.



## Phone number and address anonymization

Protecting driver and rider privacy is a crucial part of our safety commitment. We take issues such as inappropriate contact between a rider and driver very seriously, and have listened closely to experts like the National Network to End Domestic Violence (NNEDV), a leader in survivor privacy and stalking prevention, to inform our privacy features.

Uber offers in-app messaging and calling with phone number anonymization so drivers and riders are able to communicate without sharing their real phone numbers. The app also features address anonymization so that the driver will only be able to see in their trip history the general area where a trip started and ended, not the rider's exact pickup or dropoff address. Riders also have the option to request trips using cross-streets instead of exact addresses for an added layer of privacy.

---

53. Federal Communications Commission, FCC 14-13, https://docs.fcc.gov/public/attachments/FCC-14-13A1.pdf.

## Driving-hours tool

A National Sleep Foundation survey reports that 3% of all US drivers on the road, or nearly 7 million people, admitted to dozing off behind the wheel during a 2-week time frame.[54] To encourage safer, well-rested driving, Uber implemented a policy in 2018 that requires drivers to go offline for 6 straight hours after a total of 12 hours of driving time.[55] This policy is designed to prevent drowsy driving on our platform and to help keep the roads safer for riders, drivers, and other motorists.

## Phone-handling prevention

Researchers have found that handling a cell phone while driving, including dialing and texting, can increase the likelihood of a crash by 12.2 and 6.1 times, respectively.[56] Uber offers drivers discounts on phone mounts and, if we receive complaints about a driver's potential phone handling, we also provide education on the associated safety risks.

> "Our commitment to safety is long term. What you will continue to see from us is ongoing commitment and continuing to launch features based on what we hear from experts and our users."
>
> **Sachin Kansal, Senior Director of Product Management and Head of Safety Product**

## Speed-limit alerts

Speeding is a key road safety risk factor that makes roads less safe for all travelers. According to NHTSA, speeding accounted for more than a quarter (26%) of all traffic fatalities in 2017.[57] With Uber's speed-limit alerts, drivers can receive notifications to maintain a speed that's within the posted limits. The speed limit is displayed on the driver's app by default, and drivers can adjust their settings so they're visually or audibly alerted when they go over the limit.



## Real-time ID check

Uber also offers real-time ID check to help keep our platform reliable, safe, and secure. This feature periodically prompts drivers to take real-time photos of themselves in the Uber app before they can accept rides. It then utilizes Microsoft's facial comparison technology to match the driver's real-time photo with their Uber account photo. If the 2 photos do not match, the driver loses access to the platform while the photo is manually reviewed. Real-time ID check helps ensure that the right driver—who has been vetted and approved by Uber—is behind the wheel, while reducing fraud and account theft risks.[58]

# Sexual assault standards

Uber does not tolerate sexual assault or sexual misconduct from anyone. We take all allegations of sexual assault and sexual misconduct by our users extremely seriously and work to take appropriate action on every report quickly and fairly.

When our Incident Response Team (IRT) receives a report of sexual assault,[59] a trained agent begins by identifying the accused party and their associated Uber account. We immediately remove the accused party's access to the Uber app so that they cannot take trips while we complete a case review. If the accused party is a guest rider, we attempt to identify whether they have their own Uber account and, if they do, we restrict that account. If the guest rider cannot be identified, or if they do not have an Uber account, the account holder may be restricted from the Uber platform since our Community Guidelines state that account holders are responsible for their guest riders' actions while using Uber. Regardless of the outcome of our case review, we make sure that the involved parties are not paired again in the future on the Uber platform. It is important

54. "Sleep Health Index Quarterly Report - Q4 2016," accessed August 6, 2019, p. 1, https://www.sleepfoundation.org/sites/default/files/2019-02/NSF_SHI2016Report.pdf.

55. Configurations of the driving-hours tool may vary, subject to state and local requirements.

56. Thomas A. Dingus et al, "Driver Crash Risk Factors and Prevalence Evaluation Using Naturalistic Driving Data," Proceedings of the National Academy of Sciences 113, no. 10, March 8, 2016, p. 2639, doi: https://doi.org/10.1073/pnas.1513271113.

57. National Highway Traffic Safety Administration (NHTSA), "Speeding," accessed August 6, 2019, https://www.nhtsa.gov/risky-driving/speeding.

58. Due to legal restrictions contained in the Illinois Biometric Information Privacy Act, Real-Time ID check is not yet available in the state of Illinois.

59. Similar protocols are followed for the following urgent categories of sexual misconduct: Indecent Photography/Video Without Consent, Masturbation/Indecent Exposure, and Verbal Threat of Sexual Assault.

to note that this is not necessarily the only action Uber will take on a report, and that further action will depend on what the agent's subsequent review finds.

During the case-review process, agents work to obtain the necessary information to make a determination as to whether the accused party's account should be banned from the Uber app. This may include speaking with the survivor, reporting party, accused party, and any relevant witnesses. Where possible, we also consider any relevant facts that agents gather during the review process—such as GPS information, trip timestamps, and any additional information provided to us. This may include dashcam or audio recordings and screenshots of texts.

Although these relevant facts are useful in the ultimate resolution of a report, they are not necessary for an accused party's account to be removed from the platform. We respect and rely heavily on the survivor's statement of experience, as we know their voice is defining and important in this process. While we understand that trauma can prevent survivors from providing these sometimes painful accounts, the statement of experience is an integral piece that has great impact on reaching the most fair and swift decision possible. In cases where a survivor is not able or willing to provide that statement of experience, we will consider all other relevant facts obtained during the review.

> "Each day I come into work, I'm motivated by and feel fulfilled in knowing that the work we all do here is helping ensure we don't just revolutionize the way people get around their city, but that we're also doing all of this responsibly."
>
> Uber Safety Support Agent

Uber's approach to reports of sexual assault uses the learnings from partnerships built with dozens of gender-based violence advocate groups and experts. It also builds directly off of the Sexual Misconduct and Sexual Violence Taxonomy, developed in partnership with the National Sexual Violence Resource Center (NSVRC) and the Urban Institute. A main hallmark of this approach is to remove the requirements of conclusivity, corroboration, and survivor "credibility" in order to ban an accused party's account from the Uber app.

**Conclusivity**
Uber strives to obtain the most complete and accurate understanding of a reported event. However, we realize that it is not realistic to know exactly what happened between users at any given time. In Uber's review process for sexual assault reports, survivors are not required to "prove" their own assault. Instead, Uber's aim is to gather the most pertinent information from the survivor's statement of experience and relevant facts such as GPS data, timestamps, photos/videos, etc. (where possible) to arrive at a resolution that best protects the safety of the Uber community.

**Corroboration**
We know that it may not always be possible to obtain corroborating information in connection with an incident report of sexual assault. A lack of corroborating information is not an indication that an assault or incident did not occur. Uber can take action against the accused party's account if the information gathered during an agent's review warrants such action.

**Survivor "credibility"**
The issue of "credibility"—and the harm caused by positioning certain populations of survivors as less worthy of trust or plausibility than others—is a subject that has been discussed at length in the gender-based violence field.[60] When it comes to sexual assault, Uber applies the same standard for drivers and riders, both new and tenured, without regard to race, gender identity, socio-economic status, sexual orientation, education level, or app rating or status.

Violent offenders have no place in the Uber community, and it's our priority to prevent their access to our platform. Uber will ban users from the platform if we are able to obtain a statement of experience from the survivor and/or obtain relevant facts (e.g., GPS data, timestamps, videos/photos, in-app communications). We adhere to this standard for all sexual assault categories described in this report.

However, when we receive a report with sparse information, our ability to take further action may be limited. For example, if we receive a report with one single word (e.g., "Rape" or "Touched") and we are unable to speak with or obtain further

---

60. Deborah Tuerkheimer, "Incredible Women: Sexual Violence and the Credibility Discount," University of Pennsylvania Law Review 166, no. 1, p. 13, December 2017, https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=9601&context=penn_law_review.

information from the victim, it becomes difficult to review the report effectively. These types of reports, although troubling, unfortunately do not provide adequate information, such as identifying the accused party or other details that allow us to take further action.

When considering the totality of the circumstances as they are known to us, we make every attempt to avoid assumptions about a report unless we have additional clarifying statements or relevant facts. To that end, agents make numerous attempts to contact the reporting party, victim, or other witnesses to clarify the report, though sometimes these attempts are not successful. In these circumstances, Uber unfortunately may not have enough information to remove an individual account from the app.

**Addressing sexual misconduct**

Unwanted sexual experiences occur on a spectrum, as outlined in the Sexual Misconduct and Sexual Violence Taxonomy. Some sexual misconduct incident reports can include staring or leering, asking personal questions, making inappropriate comments/gestures, or unwanted flirting. While these interactions are inappropriate and troubling, they have a very different impact than sexual assault, where attempted or actual unwanted physical contact has occurred. However, sexual misconduct may be far more prevalent than sexual assault, with one recent survey by Stop Street Harassment finding more than 3 in 4 women (77%) and 1 in 3 men (34%) experiencing verbal sexual misconduct.[61]

Our approach to reported sexual misconduct incidents was formulated in consultation with national advocacy experts, evidence-based best practices in the field of sexual violence prevention and response, and technology to detect potentially risky behavior (see Approach to safety deactivations). Uber's response to these types of incidents focuses on education regarding appropriate boundaries and the precepts of our Community Guidelines (see Sexual misconduct education modules). When we receive a report of potential sexual misconduct, each incident is routed to the appropriate team of specialized agents, classified, and acted on according to factors including the level of severity and user history. If a pattern of behavior is found, this can trigger further review and result in the accused party's loss of access to the Uber platform.

# Approach to safety deactivations

Uber takes a dynamic, comprehensive approach to safety deactivations to help reduce serious interpersonal incident and motor crash rates. Our safety team handles a wide range of incidents, and there is no one-size-fits-all approach to managing them.

A single serious safety incident can be grounds for a rider or driver deactivation.[62] Serious safety incidents, including the ones covered by this report, are quickly routed to our safety response team; from there, an agent will reach out to all parties for a thorough review of the report and to take action on an account, if needed. This may include temporary or permanent deactivation from the app. (See Sexual assault standard and Incident Reponse Teams.)

However, the vast majority of safety incidents reported to Uber involve less severe or infrequent behaviors that may not warrant immediate removal. For example, removal may not be justified when a rider reports a driver for hard braking, or when a driver reports that a rider initiated an argument. Either of these reports, however, could warrant further examination of the user's past behavior and will be noted in the user's account history.

---

61. Holly Kearl, "The Facts Behind the #MeToo Movement: A National Study on Sexual Harassment and Assault," February 21, 2018, p. 7, http://www.stopstreetharassment.org /wp-content/uploads/2018/01/Full-Report-2018-National-Study-on-Sexual-Harassment-and-Assault.pdf.
62. Deactivations or "bans" refer to the specific Uber account that was being used during the safety incident(s) that led to removal. For example, if a driver is flagged by Uber's system and subsequently deactivated for dangerous driving, they may still be allowed to ride with Uber using the Rider app.

In addition, our systems are constantly evaluating a variety of factors, including user feedback, local driving patterns, fraud signals, and data science to identify patterns of potentially risky behavior. If a pattern is flagged, the system will trigger a review of the user's account by a specialized safety agent who examines the user's history and any previous reported issues to take appropriate action. This approach makes Uber more accountable and fair to both drivers and riders. It accounts for the fact that a tenured driver with thousands of trips may have received a proportionately small number of infrequent, minor complaints.

No rider or driver is deactivated from Uber for a safety report without a human review. While data and technology are useful tools for strengthening our safety strategies, safety is personal—and people will always have a role to play.

### Incident Response Teams

Uber's US Incident Response Teams (IRT) respond to and support people who report safety incidents to Uber. Their goal is to quickly respond to every safety report, handle it with care, and gather robust information that helps enable future incident prevention.

Within the IRT, there are multiple teams that address safety incidents. Safety support agents on these teams receive training to re-view, document, and recommend appropriate action to help ensure safety on the platform. These teams are often a rider's or driver's first touchpoint for assistance after a serious crash or interpersonal incident. They assess the situation, take preliminary action (such as account suspension), and determine next steps for response.

Uber created a specialized team within IRT in 2017 to provide specialized customer support to riders and drivers dealing with the most serious and urgent of incidents, such as reports of sexual assault, that require an in-depth review and victim support. They gather data pertaining to an incident report (such as GPS information, timestamps, photos/videos submitted, in-app communications, etc.) and may speak to all involved parties, including reporting parties, potential victims, and accused parties. These agents receive tailored training on how to address difficult, often emotional conversations with precision, empathy, and care. This important team is empowered to make immediate account-access decisions, including user account deactivation, and to provide victims with support resources.

Uber's IRT agents take their responsibilities extremely seriously and share a common mission: to do the right thing for people reporting a safety incident. As with all frontline and crisis-related roles, this is a hard job and Uber is focused on providing agents with ongoing support to help them cope with any possible stress, emotional concerns, and vicarious trauma.

> "We have an amazing opportunity to make a positive impact on the safety of the communities that we are in and I truly enjoy helping people. We are empowered to handle these safety incidents ... and my team values that responsibility."
>
> Uber Safety Support Agent

> "Doing the right thing is a consistent practice here at Uber. I love being committed to something I can be proud of and being part of the Incident Response Team gives me that satisfaction. Having the responsibility of being that hand that reaches out when someone needs it most is an honorable position to be in."
>
> Uber Safety Support Agent

## Connecting survivors to third-party advocates

Supporting users who have reported sexual assault or misconduct on our platform is incredibly important to Uber. That's why, following such a report, our agents offer survivor resources such as the National Sexual Assault Hotline, which is operated by our partner Rape, Abuse & Incest National Network (RAINN). The hotline can provide survivors with confidential support such as crisis counseling, information and options for seeking medical services or reporting to law enforcement, or referrals to longer-term support services in their area. We want to help break down the barriers that survivors may face in seeking the specialized support and services they might need.

**Working with law enforcement**

Uber is committed to working closely with law enforcement officials to promote safety within our communities. That's why, in 2017, we created the Uber law enforcement portal, a website where public safety officials can quickly and securely submit legal process documents to request trip data and other information that may be critical in investigating potential criminal cases.

Uber's 24/7 Law Enforcement Response Team (LERT) handles these data requests and works with investigators to help them get the information they need through valid legal processes. In the US, for example, this team works diligently to provide information requests after receiving subpoenas, court orders, or search warrants. Furthermore, Uber's global Law Enforcement Outreach Team is made up of former law enforcement professionals who work to proactively partner with police and educate them about how Uber can assist during an investigation.

# Prevention initiatives

As we have learned from our expert partners, education can help get to the root of tough safety issues in a way that emergency interventions cannot. That's why we've worked to develop prevention policies and proactive campaigns to address unsafe behavior before it begins.

## Sexual misconduct education (in partnership with RAINN)

Sexual misconduct is all too common in our society, and we're constantly working to prevent it on the Uber platform. As experts tell us, certain forms of sexual misconduct may often escalate to more serious behaviors over time. In our multicultural, multigenerational community, many users may not share the same level of understanding about what behavior is appropriate in a shared space with a stranger.

Uber has teamed up with RAINN (operater of the National Sexual Assault Hotline) to create educational modules to inform riders and drivers about the best ways to respect each other when using the Uber app. This targeted education, which covers various forms of sexual misconduct such as staring or leering, asking personal questions, making inappropriate comments/gestures, or unwanted flirting, is sent to users who receive initial reports of sexual misconduct. This education is designed to foster equality and respect for one another and to help intercept problematic behaviors before they become more serious.

"The best way to change certain behaviors is through education. If someone were to be immediately deactivated without understanding why, they are likely to repeat the offending behavior—just somewhere else. Education, delivered at the right time and in an accessible way, provides both that understanding and the opportunity to become a respectful member of the Uber community. These trainings are bigger than just the interactions that take place during a ride share. Together, RAINN and Uber are taking this conversation beyond the ride, to encourage everyone, including drivers and riders, to create a respectful and safe environment."

Scott Berkowitz, President, RAINN

## Driving Change Initiative

Women experience travel differently and encounter a number of particular safety risks that men are less likely to face. That's why making the platform safer for women and other communities that may face marginalization makes it safer for everyone. In 2017, we established Driving Change, an initiative to help prevent gender-based violence in our global community. Uber committed $5 million in grant funding over 5 years to support the sexual violence prevention programs of local and national organizations.

To date, we have partnered with leading organizations such as A CALL TO MEN, Casa de Esperanza, National Coalition of Anti-Violence Programs, National Network to End Domestic Violence, NO MORE, RALIANCE, Futures Without Violence, Rape, Abuse, Incest, National Network (RAINN), and the Women of Color Network, Inc, as well as grassroots rape crisis centers, both to integrate their expertise into our products and programs and to support their core prevention work in our communities. For example, Driving Change grants have helped A CALL TO MEN create the Institute of Higher Learning, an online education platform providing training modules on healthy masculinity and sexual violence prevention. Futures Without Violence was able to organize a National Youth Summit to encourage teens to engage healthy relationship strategies.

## #DontStandBy Bystander Awareness Campaign

In 2019, Uber teamed up with NO MORE, local law enforcement, local rape crisis centers, and the nightlife community to launch #DontStandBy, a bystander intervention campaign to prevent sexual assault before it starts. Alcohol has been linked to increased vulnerability for potential victims, and it has been used as a tool by offenders to facilitate sexual assault.[63] Working with our partners, we've developed and distributed key safety tips and tools for nightlife staff, drivers, riders, and the general public on how to look out for others and safely intervene in unsafe situations. To date, we have launched #DontStandBy in 4 US cities with 14 law enforcement and advocate partners and 30+ bars and nightlife establishments.

> "Bystander intervention campaigns like #DontStandBy are a crucial part of stopping sexual violence before it starts by spotlighting the important role we all play in keeping each other safe. To address such a deeply embedded social issue, we need to coordinate efforts with companies and services people use every single day."
>
> Pamela Zaballa, Executive Director, NO MORE

## Drunk driving prevention

Even though it's never been easier to get a bus, train, subway, or ride home through Uber, our partner Mothers Against Drunk Driving (MADD) estimates that every 2 minutes someone is injured in a drunk driving crash, and every 51 minutes someone is killed. Through our #ReasonsToRide campaign with MADD, we are reminding the public that there are no excuses for driving impaired when there are so many options available to get you home safely and not endanger others on the roads. Since the company's inception, the Uber platform has served communities as an alternative to impaired driving so that no family has to live through this devastating and preventable loss.



### Seat belt safety awareness

A 2017 survey by the Insurance Institute for Highway Safety (IIHS) found that 4 in 5 adults admitted they don't wear a seat belt when taking short trips or when traveling by taxi or rideshare.[64] Uber and the Governors Highway Safety Association (GHSA) teamed up to launch our Make It Click campaign to help change these behaviors. This initiative educates users with in-app notifications and emails about the safety benefits of seat belts and encourages them to buckle up in every seat and every ride. This year, Uber partnered with GHSA and Volvo to create the first National Seat Belt Day, which also commemorated the 60th anniversary of Volvo's invention of the modern seat belt.

---

63. Rape, Abuse & Incest National Network (RAINN), "Drug Facilitated Sexual Assault," accessed August 6, 2019, https://www.rainn.org /articles/drug-facilitated-sexual-assault.
64. Insurance Institute for Highway Safety (IIHS), "Adults admit to not always using safety belts in the back seat, IIHS survey finds," August 3, 2019, https://www.iihs.org/news /detail/adults-admit-to-not-always-using-safety-belts-in-the-back-seat-iihs-survey-finds.



### Bike and scooter safety

Our commitment to safety extends to road safety and to all travelers on the road, including people on bicycles and scooters. Working with road safety experts and bicycle advocates, Uber developed Bike Lane Alerts. The app uses publicly available mapping data to give riders notifications when their upcoming dropoff point is near a bike lane or along a bike route, reminding them to look before opening the door. Bike Lane Alerts are now available in more than 200 cities in 30 countries, and in nearly 50 different languages around the world, where mapping data is available.

In addition, we've also shared our 'Dutch Reach' awareness video with all riders and drivers in the US and Canada to raise awareness and encourage them to look over their shoulder before opening the door. This is an expert-endorsed tip to help reduce the risk of "dooring" a person passing by on a bike or scooter.

## What's next for safety at Uber?

This Safety Report is one part of our safety commitment to helping drive accountability in our industry. What matters most are the actions we take to raise the bar. Below, you'll find an overview of our newest safety investments and the next wave of product features, policies, and programs we're excited to bring to our users in the future.

> "We want to make sure that we are using technology to be able to implement really smart solutions. We are never in a place to say that we have done enough on safety."
>
> **Sachin Kansal, Senior Director of Product Management and Head of Safety Product**

### Deactivation sharing

We're committed to finding a way to share the names of drivers who have been banned from our platform for the most serious safety incidents with our ridesharing peers. We want companies to be able to use this information to protect their customers.

### Sexual misconduct education

As sexual violence experts tell us, education is key to fostering a community of safety and respect.[65] Uber currently provides sexual misconduct education to riders and drivers when they receive an initial report of sexual misconduct. In 2020, we'll take this a step further by asking all US drivers to proactively complete an education program on preventing sexual misconduct and sexual assault. We'll partner with RAINN to design a program that promotes positive, respectful social interactions, and we'll work to ensure that every driver completes it.

### Verify Your Rides

In 2017, we began improving messaging to riders and the public about ways to check their ride. A key safety tip that we share with people encourages them to check that the driver matches their profile photo and that the car make, model, and license plate number match what's in their app before getting into the vehicle. Earlier this year, we built on this initiative by sending push notifications and in-app reminders to riders before they started a trip. We are going a step further and will begin offering riders the option to verify their ride with a unique, 4-digit PIN they can verbally provide to their driver before they enter the vehicle. The driver must enter this 4-digit PIN into their app in order to start the trip. This helps riders ensure that they're getting into the right car, and it helps drivers ensure that they're picking up the right rider.

65. National Sexual Violence Resource Center (NSVRC) and National Alliance to End Sexual Violence (NAESV), "Rape Prevention & Education Program (RPE)," 2011, p. 2, https://www.nsvrc.org/sites/default/files/Publications_NSVRC_Factsheet_Rape-Prevention-and-Education-Program.pdf.

## On-trip reporting

We are committed to making safety incident reporting as easy as possible because the more information we receive about what went wrong on a trip, the more action we can take. In an emergency, we encourage users to first call 911 and then report the issue to Uber once it's safe to do so. Uber offers a number of ways to report safety issues (e.g., through the app or by calling Uber's Critical Safety Response Line) that are not readily available in the absence of a technology platform. Based on customer feedback, we developed a feature (soon to roll out nationally) that allows riders to report a non-emergency safety issue during an Uber trip, while it is top of mind, so they don't have to wait until after the trip ends. Safety reports are evaluated and routed to our specialized safety support team for a timely response after the trip has concluded.

## Text to 911

Starting in Indiana, Minnesota, and Los Angeles County, riders now have the ability not only to call 911, but also to text 911, all directly from the Uber app. During a trip, riders can access this new feature through the Safety Toolkit, where an auto-populated text message with location, car information, and the intended destination can be sent directly to 911 call centers. We see this as an innovative and powerful safety solution for situations that may require discreet emergency assistance and an accessible option for the 48 million Americans who are deaf or hard of hearing.[66] As more cities and states build the infrastructure to support Text to 911, we will continue working to launch this feature in more markets in the future.

## Uber Survivor Support Hotline (operated by RAINN)

Uber expects the most professional and compassionate conduct toward those who have reported sexual violence on our platform. We currently partner with RAINN to share resources—such as the National Sexual Assault Hotline—with victims. To further ensure that these critical interactions are handled with care and sensitivity, we are again teaming up with RAINN in 2020 to implement a dedicated Survivor Support Hotline operated by qualified RAINN advocates. RAINN will provide confidential individual crisis support and offer services that survivors may need.

## In-app feature awareness

Developing safety features and strong policies is important—as is ensuring that people know how to use them. That's why feature awareness is a key priority as Uber works to make every trip safer. In April 2018, we launched the Safety Center in our in-app Safety Toolkit to make our safety features more accessible and visible to all users. In July 2019, we began sending notifications and messages within the app to raise awareness about key safety features such as the In-App Emergency Button, driver screenings, and phone number anonymization.

## RALIANCE Business

Through our work with advocates to develop the Sexual Misconduct and Sexual Violence Taxonomy and this Safety Report, it has become very clear that companies face unique, longstanding challenges in sexual violence prevention. This report is a step forward to drive transparency and accountability about the hardest safety issues. However, we believe that greater safety for all is only possible when companies are working together to share tools, standards, and best practices, and to issue expertise for the collective benefit of the public. Safety should never be proprietary.

That's why Uber is teaming up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish a resource center to provide companies and organizations with a comprehensive, data-driven approach to addressing and eliminating all forms of sexual misconduct and sexual assault that may occur in the workplace or within business operations. This resource center—RALIANCE Business—will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence. RALIANCE Business will support organizations as they tap into their power to change culture for the better.

It's our hope that the services available through this resource center will prompt more companies to take action and do their part to end sexual violence. To learn more about RALIANCE Business, please visit the RALIANCE website.

Safety remains a long-term priority and a core investment for Uber. We are always learning from our data, our customers, and expert partners about how we can improve. Uber is committed to continuing to do our part in tackling tough issues and taking strong actions that will make our communities safer for all.

---

66. National Association of the Deaf, "Position Statement on Accessible Emergency Management for Deaf and Hard of Hearing People," 2019, https://www.nad.org/about-us /position-statements/position-statement-on-accessible-emergency-management-for-deaf-and-hard-of-hearing -people/.

# Methodology

Quality data is the foundation of Uber's safety efforts. This report includes data on critical safety incidents that were reported to occur in connection with the Uber ridesharing platform[67] in the United States[68] from January 1, 2017, through December 31, 2018.

Every safety incident included in this report is directly linked to a rideshare trip facilitated by the Uber app. This report does not include safety incident data related to other Uber platforms and/or lines of business. The data in this report is based on Uber's Safety Taxonomy (see Overview of Uber Safety Taxonomy).

This report includes categories that represent serious safety incidents reported by riders, drivers, and third parties:

- Motor vehicle crash fatalities
- Physical assault fatalities
- Sexual assault
  - Non-Consensual Kissing of a Non-Sexual Body Part
  - Attempted Non-Consensual Sexual Penetration
  - Non-Consensual Touching of a Sexual Body Part
  - Non-Consensual Kissing of a Sexual Body Part
  - Non-Consensual Sexual Penetration

**Why these categories?**
Uber recognizes the immense importance of quality data, particularly given the serious nature of these incident reports. We strived to provide a clear and accurate reflection of the most serious incidents reported in connection with the US Uber ridesharing platform while recognizing that these incidents can pose unique classification challenges. Uber strived for the dataset included in this report to have measurably high degrees of:

- Classification accuracy
- Reliability
- Consistency in standards to ensure a measurable and repeatable process

These 3 requirements helped inform which categories we felt confident publishing in this report. Aside from being the most serious incidents that occur on our platform, these incident categories were chosen for public release because they appropriately satisfied our standards for overall data quality (see Data auditing process and each issue area methodology further in the chapter).

---

67. For the purposes of this report, the Uber ridesharing platform involves peer-to-peer ride services inclusive of, but not limited to, Uber Pool, UberX, Uber Black, Uber SUV, and UberXL. It also includes ride services in markets where professional rideshare drivers are commercially licensed (e.g., New York City).
68. Excludes US territories.

## Collection of safety incident data

Technology has the ability to help make travel safer than ever before. We use technology to enable our users to submit incident reports quickly and easily. With Uber, incident reporting is seamless and often much easier than with many other companies (including airlines, hotels, and taxi companies). For example, app-based reporting may encourage users to report more often, since they can do so more quickly and discreetly than they can in person or by phone.

Currently, Uber receives and proactively gathers safety incident reports from more than 10 different channels, including:

**User-driven methods**
Post-trip in-app support
On-trip in-app reporting
Uber's website
24/7 Critical Safety Response Line
Uber Greenlight Hubs

**Proactive incident report gathering**
Social media mentions (Twitter, Facebook, etc.)
News media mentions

**Uber outreach after incidents** (see Safety investments)
RideCheck
In-App Emergency Button

**Incoming third-party communications**
Law enforcement (see Working with law enforcement in Safety commitments)
Regulator inquiries
Insurance claims
Other third parties

Because we aggregate safety incident data from many sources, Uber's dataset is likely more comprehensive than other sources of data, both in the transportation industry and more broadly. As a result, it is difficult to compare insights drawn from Uber's dataset to datasets with more limited reporting channels.

## Safety support processes

By design, Uber receives an immense amount of user feedback across a wide range of topics, the vast majority of which are not related to safety issues. To isolate user feedback related to safety, Uber sorts the data using key words and phrases, in addition to our advanced natural language processing technology, to identify reports that may indicate safety concerns. All potential safety-related reports are manually reviewed by teams of safety support agents for proper adjudication. The most serious reports are escalated to a specialized team within Uber's Incident Response Team, which aims to gather additional information on an incident report by speaking with incident parties and gathering necessary data in order to determine what user account action to take. Beyond triaging and adjudicating incidents, support agents are also responsible for the initial classification of the incident within Uber's Safety Taxonomy.[69]

## Overview of Uber's Safety Taxonomy

Uber's Safety Taxonomy is a set of categories used to classify and prioritize incoming safety incidents, apply action on individual reports, and inform Uber's efforts to prevent future incidents. The Safety Taxonomy is the basis for measuring and reporting the data needed to understand and improve safety on our platform.

Uber classifies all incident reports according to the description given by the reporting party, and our agents take action according to the appropriate protocol for the initial classification of the report. This approach to classifying reports according to the description of the reporting party is supported by experts[70] and ensures that reports are categorized with as little subjective assessment as possible.

---

69. The incident's data classification may be updated, if appropriate, as additional facts are developed in the course of the case review and then again by a specialized team of data auditors (see Data auditing process).
70. Chad Sniffen, Julia Durnan, and Janine Zweig. "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," 2018, p. 49,  https://www.nsvrc.org/sites/default/files/publications/2018-11/NSVRC_HelpingIndustries.pdf.

The Safety Taxonomy uses a hierarchical approach, which means that although multiple incidents or injuries can occur simultaneously during a single event, each report is assigned to only the most serious category. A hierarchical approach helps safety support agents provide the most appropriate and immediate response to each case, and it allows Uber to ensure that the most serious experiences are preserved and fully represented in the dataset.

While we have taken every effort to make Uber's Safety Taxonomy exhaustive and comprehensive, it is not intended to be static. For that reason, the taxonomy is open to revision, though any revisions are intended to be narrow so that the taxonomy does not become overly granular or prevent comparisons being made over time.[71]

# Motor vehicle fatalities methodology

Motor vehicle crashes occur across a wide spectrum, from minor incidents with no damage to crashes that result in serious bodily injury or death. While there are many ways of defining the full range of motor vehicle crashes, public reporting standards and methods for motor vehicle fatalities are well established and relatively consistent. For more than 100 years, motor vehicle fatality data has been collected and reported to the public in order to better understand public safety as it relates to travel and transportation. Therefore, rather than having to create a new taxonomy or methodology, Uber's efforts for this Safety Report were focused on aligning to the standards from this mature field of study as best as possible.

## Reconciling to the Fatality Analysis Reporting System (FARS)

In the US, one of the primary sources for motor vehicle fatality data is the Fatality Analysis Reporting System (FARS), operated by the National Highway Traffic Safety Administration (NHTSA). FARS dates back to 1975 and is a nationwide census of fatal traffic crashes within the 50 states, the District of Columbia, and Puerto Rico.[72] While there are other public sources for motor vehicle fatality data, FARS is more frequently referenced by governing entities, academics, and practitioners both in the US and internationally. Additionally, the agency and independent government entities also acknowledge that NHTSA data is rigorous and nationally representative.[73,74]

For methodological purposes of this Safety Report, Uber aligned to FARS data standards as best as possible. Under US Department of Transportation (USDOT) reporting standards, to be included in the FARS dataset, "a crash must involve a motor vehicle traveling on a trafficway customarily open to the public and must result in the death of at least one person (occupant of a vehicle or a non-motorist) within 30 days of the crash."[75]

FARS's definition of "crash" is aligned with the definition for "motor vehicle traffic accident" as defined in the American National Standard Institute (ANSI) D16.1 – The Manual on Classification of Motor Vehicle Traffic Accidents (2007).[76] As such, in order for an incident to be considered a motor vehicle traffic crash for inclusion in FARS, the answer to each of the following must be "Yes":[77]

1. Did the incident include one or more occurrences of injury or damage?

2. Was there at least one occurrence of injury or damage which was not a direct result of a cataclysm?[78]

3. Did the incident involve one or more motor vehicles?

---

71. In some jurisdictions, Uber is required by law to submit periodic reports to certain regulatory bodies with data about safety incidents that occur on the Uber platform. The taxonomy used for those reports and the type of incidents reported may differ from those found in this Safety Report.
72. National Highway Traffic Safety Administration (NHTSA), "Fatality Analysis Reporting System," April 2014, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811992.
73. United States Government Accountability Office, "Status of NHTSA's Redesign of Its Crashworthiness Data System," GAO-15-334 (March 2015), p. 5, accessed November 21, 2019, https://www.gao.gov/assets/670/668900.pdf.
74. National Highway Traffic Safety Administration (NHTSA), "Report to Congress NHTSA's Crash Data Collection Programs," April 2010, p. ii, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811337.
75. National Highway Traffic Safety Administration (NHTSA), "Fatality Analysis Reporting System," April 2014, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811992.
76. National Highway Traffic Safety Administration (NHTSA), "2017 FARS/CRSS Coding and Validation Manual," October 2018, p. 9, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812559.
77. National Safety Council, "ANSI D16.1-2007 Manual on Classification of Motor Vehicle Traffic Accidents," August 2, 2007, p. 42, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/07D16.
78. A "cataclysm" is defined on p. 20 of the ANSI D16.1-2007 Manual on Classification of Motor Vehicle Traffic Accidents as an avalanche, landslide/mudslide, hurricane, cyclone, downburst, flood, torrential rain, cloudburst, lightning, tornado, tidal wave, earthquake or volcanic eruption.

4. Of the motor vehicles involved, was at least one in-transport?[79]

5. Was the incident an unstabilized situation?[80]

6. Did either the unstabilized situation originate on a trafficway or the injury or damage occur on a trafficway?[81]

7. (For incidents involving a railway train in-transport only) Did a motor vehicle in-transport become involved prior to any injury or damage involving the train?

8. Is it true that neither an aircraft in-transport nor a watercraft in-transport was involved in the incident?

Unlike FARS, which collects information on fatal crashes from police, medical, and other source documents maintained by the state, Uber classifies motor vehicle crashes according to the information provided to us by the reporting party, or according to additional information retrieved via insurance claims. For the purposes of data classification, Uber does not act as law enforcement in determining fault or the causal or contributing factors involved in the crash.

By using identifying crash characteristics that Uber has access to (such as a driver's Vehicle Identification Number (VIN), vehicle make and model, location, date, and time), we were able to query the FARS dataset to find and reconcile each fatal crash in the Uber dataset to a fatal crash in the FARS database. As a result, 97 fatal crashes deemed to be Uber-related for the purposes of this report were able to be individually reconciled with FARS. Uber was then able to gather additional contextual data points on Uber-related crashes, such as roadway surface conditions, land use, work zone, etc.

There were 22 Uber-related fatal crashes that either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS. The reasons for this may include, but are not limited to:

- Fatalities occurred more than 30 days after the crash
- Health-related fatalities occurred immediately prior to a crash (death was deemed by official documentation to not be the result of a motor vehicle crash)
- Fatalities occurred that were reported to Uber, but FARS data does not record the vehicle operated by a driver using the Uber app as a party to the crash[82]
- Other fatalities occurred that were reported to Uber to be the result of a motor vehicle crash but that were not deemed by official documentation to be a result of a motor vehicle crash

Because these fatal crashes are not in the FARS dataset, the contextual data points (such as road class, road surface conditions, etc.) obtained from FARS are not available for these 22 fatal crashes. Including these crashes would reduce comparability to FARS.

## Defining a motor vehicle fatality's relation to the Uber platform[83]

In order for a fatal motor vehicle crash to be "Uber-related" for the purposes of this Safety Report, the crash must have involved the vehicle of at least one driver using the Uber platform and involved the death of at least one person (occupant of a vehicle or a non-motorist, regardless of whether they were an Uber user or third party) within 30 days of the crash. Fatal crashes are included in this report regardless of whether the deceased party was an Uber user or whether a driver using the Uber platform or their vehicle was the cause of the crash or was carrying the deceased parties.

Additionally, the fatal crash must have occurred at any time between when the driver accepted the trip request in the app and when the trip was completed (see Fig. 2).

---

79. "In-transport" is defined on p. 14 of the ANSI D16.1–2007 Manual on Classification of Motor Vehicle Traffic Accidents as a term that denotes the state or condition of a transport vehicle that is in motion or within the portion of a transport way ordinarily used by similar transport vehicles. When applied to motor vehicles, "in-transport" means on a roadway or in motion within or outside the trafficway.

80. An "unstabilized situation" is defined on p. 19 of the ANSI D16.1–2007 Manual on Classification of Motor Vehicle Traffic Accidents as a set of events not under human control. It originates when control is lost and terminates when control is regained or, in the absence of persons who are able to regain control, when all persons and property are at rest.

81. A "trafficway" is defined on p. 3 of the ANSI D16.1–2007 Manual on Classification of Motor Vehicle Traffic Accidents as any land way open to the public as a matter of right or custom for moving persons or property from one place to another.

82. Time and location of crash reconciled to FARS data, but driver/driver's vehicle could not be identified in FARS dataset as a party to the crash. An example would be a multi-car pileup where FARS only recorded certain vehicles as party to the fatal incident.

83. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

## Fig. 2: Motor vehicle fatality: What is Uber-related?

| Uber-related (included in report) | Not Uber-related (excluded from report) |
|---|---|
| ✓ Driver has accepted trip request and is en route to rider's pickup location | ✕ Driver offline, not driving on the Uber platform |
| ✓ Driver or rider is actively entering or exiting the vehicle at the rider's pickup location or destination | ✕ Driver online with no trip requests |
| ✓ During trip, en route to rider's destination | ✕ Rider has been safely dropped off at their destination |

| Uber-related: examples & rationales | |
|---|---|
| **Driver has accepted trip request and is en route to rider's pickup location** | |
| **Example**<br>While a driver using the Uber platform is en route to pick up a rider, their vehicle fatally strikes a pedestrian. | **Rationale**<br>The fatal crash involved the vehicle of a driver using the Uber platform while they were en route to pick up a rider; it is therefore considered Uber-related for the purposes of data classification for this report. |
| **Driver or rider is actively entering or exiting vehicle at the rider's pickup location or destination** | |
| **Example**<br>A driver using the Uber platform arrives to pick up their rider and exits their vehicle to help load the rider's luggage into the trunk. A third-party vehicle strikes and fatally wounds the driver while they are outside their vehicle. | **Rationale**<br>The fatal crash occurred while a driver using the Uber platform was exiting their vehicle to assist their rider; this is considered Uber-related for the purposes of data classification for this report. |
| **During trip, en route to rider's destination** | |
| **Example**<br>During a trip, a third party collides with the vehicle of a driver using the Uber platform, fatally wounding the driver and rider. | **Rationale**<br>The fatal crash involved the vehicle of a driver using the Uber platform during an active trip en route to the rider's destination; it is therefore considered Uber-related for the purposes of data classification for this report. |
| During a large multi-vehicle crash, 2 passengers in a third-party vehicle are fatally wounded, and the vehicle of a driver using the Uber platform is struck. Neither the driver who's using the Uber app nor their riders are injured. | For the purposes of data classification for this report, Uber counts any human being that is fatally injured during a motor vehicle crash that also involved the vehicle of a driver using the Uber platform during a trip or while en route to a rider's pickup location. The driver who's using the Uber app does not have to be the cause of the crash, nor carrying the deceased parties. |
| While a driver using the Uber platform is transporting a rider, their vehicle and a third party on a bicycle collide, and the third party on the bicycle is fatally wounded. | For the purposes of data classification for this report, Uber counts any human being that is fatally injured during a motor vehicle crash that also involved the vehicle of a driver using the Uber platform during a trip or while en route to a rider's pickup location. The driver who's using the Uber app does not have to be the cause of the crash, nor carrying the deceased parties. |
| While a driver using the Uber platform is transporting a rider, they collide with another vehicle and are seriously injured. Two weeks after the crash, the driver who was using the Uber app passes away due to injuries sustained. | The fatality occurred within 30 days of a crash involving the vehicle of a driver using the Uber platform, and is therefore considered Uber-related for the purposes of data classification for this report. |

| Not Uber-related: examples & rationales | |
| --- | --- |
| **Example**<br>A third-party vehicle collides with a driver who has an Uber account but is not driving on the Uber platform at that moment. The driver and the third party are both fatally wounded. | **Rationale**<br>Since the incident occurred during a time when the driver was not using the platform, the incident is not considered Uber-related for the purposes of data classification for this report. |
| A driver using the Uber platform drops off a rider at their destination and leaves. The rider walks down the street and is fatally struck by a third-party vehicle. | Since the fatal crash occurred after the driver had safely dropped off the rider at their destination and left the area, the fatality is not considered Uber-related for the purposes of data classification for this report. |
| A driver using the Uber platform writes in to Uber safety support to report that they witnessed 2 third-party vehicles collide, fatally wounding an occupant. | Despite the fact that the driver witnessed the crash, they were not directly involved in it. These fatalities are therefore not Uber-related for the purposes of data classification for this report. |
| Reports with alternative intents | |
| **Example**<br>A rider writes in to Uber safety support describing an alleged fatal crash that is objectively implausible and is clearly a practical joke. | **Rationale**<br>The intent of the safety support interaction was clearly not to report a safety incident, but to carry out a practical joke. Therefore, the situation is not considered Uber-related for the purposes of data classification for this report. |

## Calculating vehicle miles traveled (VMT)

Calculating miles traveled is a common method of calculating for frequency of road fatalities. Indeed, this is the same measure that the US Department of Transportation uses for traffic data counts collected through permanent automatic traffic recorders on public roadways.[84] Therefore, in this report, Uber uses VMT when representing motor vehicle fatality rates. Uber calculates the miles underlying motor vehicle fatality accidents by utilizing GPS data from Uber's ridesharing app used by drivers. The miles included in the calculation encompass miles driven while the driver was en route to the rider's pickup location, and the miles driven during rider trips.[85]

## Data quality measures for motor vehicle fatalities

Fatalities, while extremely tragic, can be classified consistently with a clear outcome. Motor vehicle crashes resulting in non-fatal injuries or damage (e.g., with serious, minor, or no injuries) are more challenging to consistently classify.

As a final check to help ensure data completeness, Uber underwent a reconciliation process where all fatalities reported via Uber safety support channels were cross-referenced with other internal data sources, including insurance-claims data and law-enforcement reports. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases[86] and escalating details that had not otherwise been reported to Uber through other channels. For example, fatalities that occur weeks or more after the vehicle crash are often discovered through the insurance-claims process, rather than through Uber safety support. Uber maintains insurance coverage for passenger trips in the US, so there are strong incentives for users to report incidents to Uber.

# Fatal physical assault methodology

## Selecting physical assault categories for this report

This report includes physical assault incidents that resulted in one or more fatalities. Physical assault incidents that may have resulted in serious, minor, or no injuries were excluded from this report.

---

84. US Department of Transportation (USDOT), "VMT per Capita," February 2, 2016, https://www.transportation.gov/mission/health/vmt-capita.
85. For a small portion of driver miles during 2017, the GPS data is missing during the period when the driver is en route to a rider's pickup location. For the missing data, we have used Uber's best estimate in calculating the mileage.
86. Safety support agents action accounts using consistent policies, regardless of reporting method.

In determining which categories of reported physical assault incidents were appropriate to include in this report, it was necessary to include the most serious reported physical assault incidents while maintaining a high degree of confidence and consistency in the quality of the overall dataset.

Similar to motor vehicle fatalities, fatal physical assaults can be more consistently categorized. Any physical assault category not resulting in a fatality (e.g., with serious, minor, or no injuries) is less objective, making it more difficult to achieve a classification standard that is both accurate and capable of consistent application. The final dataset included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

As a final step to help ensure that the dataset for this report was as comprehensive as possible, Uber underwent a reconciliation process where all fatalities reported via Uber safety support channels were cross-referenced with insurance claims data. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases and/or escalating details on cases that would not otherwise have been present in the safety support dataset. For example, fatalities that occur weeks after the physical assault incident are often discovered through the insurance-claims process, rather than through Uber safety support.

## Defining a fatal physical assault's relation to the Uber platform[87]

In order for a reported fatal physical assault incident to be established as Uber-related for purposes of this report, one or more of the following must be true (see Fig. 3):

- The incident involved at least one person on an Uber-facilitated trip,[88] not necessarily with parties paired by the Uber app

- The incident occurred between parties that were paired by the Uber app, and the incident occurred within 48 hours[89] of trip completion (regardless of whether the parties were still on the app at the time)

There are limited circumstances in which a reported fatality may, on its surface, meet one or both of the preceding qualifying requirements but then, due to additional information from the reporting party, contradict the classification as Uber-related. For example, the reporting party may later disaffirm or refute the accuracy of the original report by stating that the incident was reported to the wrong rideshare company by mistake. Uber also occasionally receives reports where the reporting party's intent is clearly not to report a safety incident (e.g., practical jokes claiming to "test" Uber's response). These incidents were also excluded from the dataset for this report.

---

87. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

88. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while en route to the rider's pickup location, this would be included in the dataset.

89. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of the trip's end. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

## Fig. 3: Fatal physical assault: What is Uber-related?

| Uber-related (included in report) | Not Uber-related (excluded from report) |
|---|---|
| ✓ During trip[90] | ✗ Driver is online with no trip requests |
| ✓ Involves parties matched by app, incident takes place up to 48 hours after trip completion | ✗ Involves parties matched by app, incident takes place more than 48 hours after trip completion |

| Uber-related: examples & rationales | |
|---|---|
| **Incident occurred during an Uber-facilitated trip** | |
| **Example** During an Uber-facilitated trip, a third party outside of the vehicle fatally wounds the rider in the back seat of the vehicle. | **Rationale** Even though the Uber app did not pair the victim and the accused, the incident occurred while at least one of the involved parties was actively on a trip facilitated by the Uber app; it is therefore considered Uber-related for the purposes of data classification for this report. |
| During an Uber-facilitated trip, 2 riders get into a physical altercation and one fatally wounds the other. | This incident occurred during a trip facilitated by the Uber app, and is therefore considered Uber-related for the purposes of data classification for this report. |
| **Incident parties were paired via the Uber app (and incident occurred up to 48 hours after the trip concluded)** | |
| **Example** During an Uber-facilitated trip, the driver and rider get into a physical altercation, and the rider fatally wounds the driver. | **Rationale** The victim and the accused party were paired by the Uber app; the incident is therefore Uber-related for the purposes of data classification for this report. |
| After an Uber-facilitated trip ends, the rider fatally wounds the driver. | Even though the trip had ended, the accused party was initially paired with the victim via the Uber app, and the fatal incident occurred within 48 hours of the trip's conclusion; the incident is therefore Uber-related for the purposes of data classification for this report. |

| Not Uber-related: examples & rationales | |
|---|---|
| **Example** Law enforcement requests data on a rider who took an Uber-facilitated trip to a destination where they fatally wounded third parties. | **Rationale** Since the incident did not occur during an Uber-facilitated trip and did not involve parties paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |
| While a rider using the Uber platform is waiting to be picked up by their driver, a third party robs and fatally wounds them. | Since the incident did not occur during an Uber-facilitated trip and did not involve parties paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |
| **Disaffirmed reports or reports with alternative intents** | |
| **Example** The family member of a driver using the Uber platform reports that the driver was found fatally wounded in their vehicle. However, upon review of the driver's activity, it is determined that the driver was not driving on the Uber platform around the time of their death. | **Rationale** It was determined that this incident did not involve parties paired by the Uber app and did not occur on an Uber-facilitated trip. The incident is therefore not considered Uber-related for the purposes of data classification for this report. |
| A rider on the Uber platform writes in to Uber safety support describing an alleged fatal situation that is objectively implausible and is clearly a practical joke. | The intent of the safety support interaction was clearly not to report a safety incident but to carry out a practical joke. The situation is therefore not considered Uber-related for the purposes of data classification for this report. |

90. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was fatally wounded by a third party while en route to the rider's pickup location, this would be included in the dataset.

# Sexual assault methodology

## Sexual Misconduct and Sexual Violence Taxonomy[91]

In 2018, we partnered with experts from the National Sexual Violence Resource Center (NSVRC) and the Urban Institute to refine the sexual assault and sexual misconduct portions of our Safety Taxonomy in order to better understand the reality of unwanted sexual experiences. Prior to this effort, a standardized tool for corporations to consistently classify reports of sexual violence received from their consumers did not exist.

To develop the Sexual Misconduct and Sexual Violence Taxonomy, the NSVRC and the Urban Institute reviewed 3 rounds of anonymized Uber incident reports, totaling more than 350 reports. Throughout the 3 rounds of review, the NSVRC/Urban team compared classification opinions and developed an initial taxonomy. Uber then met with the NSVRC/Urban team and collaborated with them to refine the taxonomy to more accurately reflect the complexities of reported safety incidents. Uber undertook a course of extensive internal testing in which nearly 100,000 customer reports spanning a wide range of safety- and non-safety-related issue types from trips in 2017 were reviewed by internal Uber auditors using the second draft of the taxonomy. The teams made additional modifications to the taxonomy in response to this testing, which resulted in the final Sexual Misconduct and Sexual Violence Taxonomy implemented at Uber and published by the NSVRC in Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault.

The final taxonomy classifies unwanted sexual experiences into 2 overarching categories—**sexual assault** and **sexual misconduct**—which are further divided into a total of 21 secondary categories (some with tertiary categories) that correspond to behaviorally specific definitions (see Appendix IV: Sexual Misconduct and Sexual Violence Taxonomy).

## Selecting sexual assault categories for this report

Uber strived for the dataset included in this report to have measurably high degrees of classification accuracy, reliability, and consistency. We believe it would be a disservice if data were released on categories where classification quality could not achieve adequate levels of confidence, as this would jeopardize the accuracy of the data presented.

It's important to note that Uber user reports of sexual assault can be interpreted subjectively by safety support agents and auditors, even for the most severe incidents. This is further exacerbated by the lack of shared definitions and inconsistent ways in which sexual assaults are tracked and codified across public and private organizations. Despite operating with defined categories created by national experts and investing in extensive taxonomy training for Uber agents and auditors, classification opinions for sexual assault and misconduct can vary from one auditor to another. This is compounded by the natural limitations in Uber's incoming safety data, which can sometimes lack the critical clarifying details necessary for more precise classification (see Limitations of Uber safety incident data).

---

91. For more information on the development and details of the Sexual Misconduct and Sexual Violence Taxonomy, please see "Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault," a white paper in partnership with the National Sexual Violence Resource Center (NSVRC), Urban Institute, and Uber.

**Difficulty in categorizing unwanted sexual experiences**

Even among experts, and despite the taxonomy's behaviorally specific definitions, auditor interpretations of Uber user reports of sexual assault can be subjective, meaning categorization opinions can differ from one auditor to another.

Some categories within the Sexual Misconduct and Sexual Violence Taxonomy are more challenging to classify than others, particularly those involving non-sexual body parts, 'attempted' sexual assault, or vague descriptions of comments or gestures. With situations involving non-sexual body parts, Uber agents and auditors must determine if the contact was interpreted by the reporting party as being sexual or romantic in nature. This context is not always indicated or evident in the incident report. On the other hand, an incident report detailing the touch of a sexual body part, such as breasts or buttocks, leaves little room for misinterpretation as it is much more objectively sexual in nature. Conversely, touches of non-sexual body parts, such as a rider patting a driver's shoulder while saying thank you, or 2 UberPool co-riders' legs touching in a tight back seat, can be less clear and likely would not indicate sexual assault. It can be even more challenging to categorize when the touch wasn't completed, and Uber agents and auditors must ascertain if attempted touching occurred and whether the attempt was sexual or romantic in nature.

Reports of potential inappropriate comments or gestures can be just as difficult to categorize. For example, it is challenging to differentiate between comments about appearance and flirting, for example. This is why Uber remains focused on investing in improvements to data quality measures and taxonomy training enhancements, in conjunction with the NSVRC and Urban Institute, in order to accurately report on further categories in the future.

In determining which categories of sexual assault were appropriate to include in this report, we prioritized:

1. The most serious categories of sexual assault outlined in the taxonomy

2. Maintaining a high degree of confidence and consistency in the quality of the overall dataset

3. Remaining as consistent as possible with the types of sexual assault that are already published in external research and national estimates

This report includes categories of sexual assault which, in aggregate, have at least 85% of auditor classifications aligned[92] with internal Safety Taxonomy experts (see Data auditing process). Although an aggregate confidence benchmark of 85% for the overall dataset was established, some individual categories had even higher alignment. For example, auditor classification for Non-Consensual Sexual Penetration incident reports aligned with internal Safety Taxonomy subject matter experts more than 99% of the time, indicating an extremely high level of classification reliability and consistency for the most serious sexual assault category. The only individual category of sexual assault in this report that did not reach 85% auditor alignment on its own was Attempted Non-Consensual Sexual Penetration, which reached 78% auditor alignment with Safety Taxonomy experts. Despite this category not reaching the 85% auditor alignment benchmark, Uber felt it was crucial to include it as it is one of the most serious forms of sexual assault that are reported in connection to the Uber platform. Uber continues to work with the NSVRC and Urban Institute to improve auditor alignment for this category and others.

The final dataset included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

Furthermore, the categories of incidents we are reporting align with the forms of sexual assault already collected and reported by the National Intimate Partner and Sexual Violence Survey (NISVS) administered through the Centers for Disease Control (CDC). "NISVS is an ongoing survey that collects the most current and comprehensive national- and state-level data on intimate partner violence, sexual violence, and stalking victimization in the United States" and its data is used to inform

---

92. Here "alignment" refers to the rate of agreement when 2 auditors are separately shown the same facts and come to the same conclusion on the classification of an incident.

policy, programs, and best practices in reducing the occurence of this violence in our communities.[93] While the Sexual Misconduct and Sexual Violence Taxonomy includes more categories for data collection, Uber is reporting on a range of categories that are generally consistent with those reported by NISVS.[94]

As a final check to help ensure data completeness, Uber underwent a reconciliation process where all reports of Non-Consensual Sexual Penetration reported via Uber safety support channels were cross-referenced with other internal data sources, including reports received directly through law enforcement. This additional reconciliation process was not used to invalidate any existing incident reports made through safety support channels. Rather, it allowed Uber to identify new cases and details that had not otherwise been reported to Uber through other channels.

> **Each of these safety incidents is more than just a data point to us. They can represent serious traumas for real individuals in our communities.**

Ultimately, we believe responsible data reporting is critical to improving the safety of the Uber ridesharing platform and the communities we serve. Each of these safety incidents is more than just a data point to us. They can represent serious traumas for real individuals in our communities. This reality leaves little room for error, and we take this responsibility for data accuracy and consistency extremely seriously.

## Defining a sexual assault's relation to Uber's ridesharing platform[95]

Even if an incident is ultimately determined to be unrelated to Uber and not reflected here for the purposes of data classification, Uber's safety support agents still follow all appropriate response protocols and take necessary action when able, up to and including deactivation from the Uber app (see Sexual assault standards in Safety commitments).

Uber sometimes receives reports of potential sexual assault or misconduct that do not have any connection to the Uber ridesharing platform. Thus, it is necessary to clearly define what is in scope for the purposes of Uber's data classification and safety reporting.

Before breaking down this scope, it is important to differentiate between counting an incident for the purposes of public reporting and Uber's work to follow established protocols to take action on a reported incident. Uber has multiple teams of specially trained support agents who review potential safety incidents accurately and quickly in order to recommend the most appropriate actions to protect the safety of the Uber community at large. For example, if Uber is made aware that a driver has been charged with sexual assault stemming from an incident that occurred while they were not driving on the Uber ridesharing platform, Uber safety support agents would still conduct a review of that driver's account. If Uber support agent confirmed a criminal sexual assault charge, then the driver would be removed from the Uber ridesharing platform because the charge would violate our background check standards.

In order for a sexual assault to be established as Uber-related for purposes of data classification for this report, one or more of the following must be true (see Fig. 4):

- The incident occurred during an active Uber-facilitated trip,[96] not necessarily with parties paired by the Uber app
- The incident occurred between parties that were paired by the Uber app, and the incident occurred within 48 hours[97] of trip completion (regardless of whether the parties were still on the app at the time)

---

93. "The National Intimate Partner and Sexual Violence Survey (NISVS)," Centers for Disease Control & Prevention (CDC), June 19, 2019, https://www.cdc.gov /violenceprevention/datasources/nisvs/index.html.
94. NISVS reports data on "contact sexual violence." "Contact sexual violence" is a NISVS combined category that includes rape, being made to penetrate someone else, sexual coercion, and/or unwanted sexual contact. In Uber's taxonomy, this term would encompass (1) Non-Consensual Sexual Penetration, (2) Non-Consensual Kissing of a Sexual Body Part, (3) Non-Consensual Touching of a Non-Sexual Body Part, (4) Attempted Non-Consensual Sexual Penetration, and (5) Non-Consensual Kissing of a Sexual Body Part. However, given the different aims of Uber and the CDC, as well as the limitations of their respective data collections, it is still likely that significant methodological differences in classification may exist.
95. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.
96. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.
97. Incidents between parties paired via the Uber app may occur after the trip has ended. In general, post-trip incidents happen either immediately after the trip has ended or within a few hours of trip completion. For audit consistency, and to err on the side of overinclusion, we determined that 48 hours is an auditable standard and adopted it for the purposes of this report only.

There are limited circumstances in which an incident report may, on its surface, meet one or both of the preceding qualifying requirements but then, due to additional information from the reporting party, contradict the classification as Uber-related. For example, the reporting party may later disaffirm or refute the accuracy of the original report by stating that the incident was reported to the wrong ridesharing company by mistake. In other situations, Uber occasionally receives reports where the reporting party's intent is clearly not to report a safety incident (e.g., practical jokes claiming to "test" Uber's response). These incidents were excluded from the dataset for this report.

In cases of reported sexual assault, Uber understands that survivors may withdraw an incident report due to fear, frustration, or simply not wanting to continue with the reporting process for a number of personal reasons. In cases where a sexual assault report was apparently withdrawn for one of these reasons (and the original details of the incident were not later refuted or disaffirmed by the survivor), these reports were still considered Uber-related. Therefore, we did not exclude these withdrawn reports from the dataset.

### Fig. 4: Sexual assault: What is Uber-related?

| Uber-related (included in report) | Not Uber-related (excluded from report) |
| --- | --- |
| ✓ During trip[98] | ✗ Driver is online with no trip requests |
| ✓ Involves parties paired by the app, incident occurs up to 48 hours after trip completion | ✗ Involves parties paired by the app, incident occurs more than 48 hours after trip completion |

| Uber-related: examples & rationales | |
| --- | --- |
| Incident occurred during an active Uber-facilitated trip | |
| **Example** During an Uber-facilitated trip, a driver touched a rider's buttocks and the rider reported the assault to Uber. | **Rationale** This incident occurred while on an Uber-facilitated trip, so it is considered Uber-related for the purposes of data classification for this report. |
| A man and a woman meet at a club and decide to share a ride home on the man's Uber account. During the trip, the woman falls asleep and the man sexually assaults the woman. The driver observes the incident and reports it to Uber. | Even though the Uber app did not pair the victim and the accused party, the incident occurred while the riders were on an Uber-facilitated trip; it is therefore considered Uber-related for the purposes of data classification for this report. |
| Incident parties were paired via the Uber app (up to 48 hours after the trip concluded) | |
| **Example** During an UberPool trip, one rider non-consensually kisses another rider on the cheek, and the rider who was kissed reports the incident to Uber. | **Rationale** The victim and the accused party were paired on an UberPool trip by the Uber app; therefore, the incident is Uber-related for the purposes of data classification for this report. |
| A rider takes an Uber-facilitated trip. After the driver arrives at the destination and completes the trip, the rider tries to remove the driver's clothes without their consent, and the driver later reports the incident to Uber. | Even though the trip had ended, the accused party was initially paired with the victim by the Uber app, and the assault occurred within 48 hours of the trip's completion; the incident is therefore Uber-related for the purposes of data classification for this report. |

---

98. For the purposes of sexual assault data classification for this report, Uber defines an active trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, an active trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was sexually assaulted by a third party while en route to the rider's pickup location, this would be included in the dataset.

| Not Uber-related: examples & rationales | |
|---|---|
| **Example**<br>A driver using the Uber platform picks up a rider who immediately discloses that their aquaintance attempted to rape them just prior to the trip. The driver reports the disclosure to Uber. | **Rationale**<br>Since the incident did not occur during an Uber-facilitated trip, and because the parties were not paired by the Uber app, this incident is not considered Uber-related for the purposes of data classification for this report. |
| Law enforcement requests data on a rider who took an Uber-facilitated trip to a destination where they sexually assaulted a third party. | Although we would cooperate with law enforcement's request, the incident did not occur on an Uber-facilitated trip and did not involve parties paired by the Uber app, so this assault is not considered Uber-related for the purposes of data classification for this report. |
| A rider and driver are paired for a trip through the Uber app and begin dating. A week or 2 into their relationship, the driver sexually assaults the rider, and the victim reports the incident to Uber. | While the incident parties were paired through the app, the incident occurred more than 48 hours after the trip concluded. Since Uber's taxonomy is intended to capture events that occur as a result of temporary or episodic interactions facilitated through the app rather than prolonged interpersonal relationships, this incident is outside of Uber's scope, and is not Uber-related for the purposes of data classification for this report. |
| **Disaffirmed reports or reports with alternative intents** | |
| **Example**<br>A rider reports that they were kissed by a driver using the Uber platform during an Uber-facilitated trip the night before; they later realize that the incident occurred with another ridesharing company and that they filed the ticket with the wrong company. | **Rationale**<br>The original report's details were disaffirmed, and new information changed the fundamental accuracy of the original report's connection with Uber (i.e., it clarified that Uber did not pair the 2 parties and was not involved in any other way). Therefore, the incident is not Uber-related for the purposes of data classification for this report. |
| A rider writes in to Uber safety support describing an alleged situation that is objectively implausible and is clearly a practical joke. | The intent of the safety support interaction was clearly not to report a safety incident, but to carry out a practical joke. Therefore, the situation is not considered Uber-related for the purposes of data classification for this report. |

# Data auditing process

In preparation for the release of this Safety Report and the implementation of the new Sexual Misconduct and Sexual Violence Taxonomy in 2018, we started the process of auditing historical safety incident data. It was also paramount to keep our frontline support agents focused on their primary responsibility: providing support to reporting parties and collecting user statements and information in relation to potential safety incidents. Although these frontline agents make the initial classification attempt in order to prioritize the report, they are primarily responsible for providing a prompt and sensitive response to individuals reporting concerns, and as such, precise classification of data is not their primary concern. To enhance our data-quality efforts, we created a specialized team dedicated to re-classifying safety incident reports. According to the NSVRC and Urban Institute:

> "It is much more realistic to align this smaller group of data auditors whose sole job is to ensure the quality of data and the alignment with the proposed taxonomy, versus the virtually impossible task of assigning the task to a larger group of frontline agents, whose primary responsibility lies in high-quality response and resolution."[99]

This specialized audit team had 3 main objectives:

1. Ensure all relevant safety incident reports were audited with the necessary data documented
2. Audit to a high standard for quality
3. Update our historical data with the most accurate classification, addressing any discrepancies in auditor opinion

---

99. National Sexual Violence Resource Center and Urban Institute, "Taxonomy & Transparency Workshop Update: The Importance of Consistent Application and Classification," p. 2, June 2019, https://www.nsvrc.org/sites/default/files/publications/2019-06/Taxonomy%20%26%20Transparency%20Workshop%20Update_Final508.pdf.

These 3 goals then translated into the primary phases of our audit process.

## Phase 1: Auditing all potentially relevant safety incident reports and documenting necessary data

We understood that the original classification of safety incident reports may not accurately reflect the updated Sexual Misconduct and Sexual Violence Taxonomy. We also recognized that our new specialized auditor team was better positioned to ensure the accurate classification of historical motor vehicle and physical assault incidents. With this in mind, Uber audited all reports of sexual assault and sexual misconduct, inappropriate post-trip contact, any vehicle crash resulting in bodily injury, and any physical or theft-related altercation resulting in bodily injury. The team reviewed approximately 500,000 user reports, representing a range of safety- and non-safety-related consumer issues to ensure that all necessary information was documented and all incident reports were categorized accurately and comprehensively.

Once we ensured that all relevant incident reports had been audited and classified appropriately, we also documented other useful data points such as the reporting party and the accused party for sexual assaults and fatal physical assault incidents,[100] as well as whether the incident report was Uber-related for purposes of data classification.

## Phase 2: Auditing with a high standard for quality

In order to gain confidence in the results of the internal audit, we needed a robust and rigorous process for measuring the accuracy, reliability, and consistency of our data classifications. The most effective way to do this was to measure auditor performance quality and their Safety Taxonomy comprehension. In particular, it was necessary to measure an auditor's understanding of the Safety Taxonomy at 2 valuable checkpoints:

1. Before an auditor begins the internal classification audits
2. At a regular cadence after starting audits

These quality checkpoints allowed us to understand the baseline for how an auditor was interpreting our Safety Taxonomy, as well as any changes in their performance over time, and how this performance may impact overall data quality.

To measure an auditor's readiness to adequately interpret the Safety Taxonomy and perform classification audits, we created a certification process in which every auditor was required to participate in instructor-led courses, self-study guides, knowledge checks, and various interactive group audit activities. At the end of the training, auditors completed a practical assessment, where they were asked to classify a subset of incident reports. Their classification opinions were then compared to the classifications for the same incident reports (i.e., an "answer key") created by internal subject-matter experts in our Safety Taxonomy. Once the auditor completed the practical assessment, they received a score that determined whether they were ready to begin classification audits or whether additional training would be required.

The process to measure auditor performance quality during the active auditing process was similar. On a regular cadence, all auditors classified a subset of safety incident reports that were compared to the classification answer key prepared by the internal Safety Taxonomy experts. Auditor alignment scores were then aggregated to quantify our classification confidence in the overall issue area (sexual assault, motor vehicle fatalities, and fatal physical assault). This confidence metric was critical as we considered where to invest in additional training to enhance quality, and what data categories contained an appropriate level of confidence for inclusion in this report.

To this end, aggregate classification confidence benchmarks of a minimum of 85% for sexual assault and 99% for all fatalities were set (see each issue-area methodology). Including categories for which auditor classification was measurably less consistent would have jeopardized the confidence of the larger dataset for this report. The final dataset included in this report is Uber's good-faith effort to responsibly report on information with the highest reasonable degree of accuracy, reliability, and consistency.

---

100. Reporting party and accused party are not data points available for motor vehicle fatalities.

**Phase 3: Addressing differences in auditor opinion and updating underlying data**

Our final goal was to change the underlying data classification in Uber's database to ensure that final accuracy aligned with auditor classification opinion. Before doing this, however, we wanted to provide additional review measures in circumstances where classification may have been particularly challenging. We identified 2 potential circumstances for further examination of auditor classification:

1. Circumstances where the auditor classifications differed from the original classification entered by the frontline support agent

2. Proactive escalation from an auditor to their manager on incident reports deemed particularly difficult

In the event that an auditor's classification opinion differed from the original classification by frontline support agents, we built a process that required a second auditor opinion before any underlying data was changed. The second auditor was then able to take into account the incident report itself and the previous classification opinions of other auditors in order to determine the final classification opinion that would be used to update the underlying data.

Lastly, auditors were able to self-identify the incident reports that they felt were particularly challenging to classify, and then escalate these reports to an internal audit manager. These escalated reports facilitated collaborative discussions across the internal audit team. If the team still struggled to identify the appropriate classification, the incident report was than escalated to the internal cross-functional taxonomy experts to evaluate. Once the determination on the correct classification was made, it was used to update the initial classification and was then shared with the audit team, who could then use the learnings from the discussion to improve future auditor training.

While this auditing process was initially developed to prepare for safety reporting, these standards, performance benchmarks, and processes remain active within the Uber business to help achieve higher levels of data quality for all safety incident data analysis moving forward.

# Limitations of Uber safety incident data

The data included in this report is not the result of a nationally random sample, nor is it intended to be a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults nationally beyond Uber. For example, the vast majority of US Uber users are individuals with access to a smartphone and a credit or debit card who use ridesharing services to navigate their geographies. This could cause a sampling bias leaning toward these populations, and may not be representative of the national population. As such, Uber urges caution in comparing the data contained in this report to the findings of national prevalence estimates as significant methodological differences may be present.

In addition, when interpreting the data in this report, one must consider the societal reality of potential under-reporting, particularly for incidents of sexual assault, which has been widely documented in external research.[101] For sexual assault, this is dependent on a number of victim identification factors such as an individual having access to, knowledge, and/or desire to reach Uber reporting channels, and/or those who are able to identify an incident as potentially sexually violent or unwanted. While Uber makes every effort to mitigate under-reporting by increasing reporting mechanisms and reducing barriers to reporting (see Collection of safety incident data), it is important to consider that the data in this report is only based on what is reported to Uber or that Uber became aware of through previously discussed channels.

Incoming Uber data can also be fragmented. Agents and auditors take incident reports at face value when classifying the report. There are times when an initial incident report lacks critical details necessary for auditors to classify the report accurately within the taxonomy. Examples include incident reports that may simply state that a user was sexually harassed or sexually assaulted—both terms encompass many manifestations of experiences and do not provide the necessary details for accurate classification within the Safety Taxonomy. Although frontline support agents will make numerous attempts to contact the reporting party to clarify the report, there are times when further contact is declined or not possible. Incoming requests from law enforcement are primary examples since these requests can often identify the potential crime generally as "sexual assault" with no clarifying details. Due to the sensitive and confidential nature of law-enforcement

---

101. Rachel E. Morgan, Ph.D., and Barbara A. Oudekerk, Ph.D., "Criminal Victimization, 2018," Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 2019, p. 8, https://www.bjs.gov/content/pub/pdf/cv18.pdf

investigations, Uber is not always privy to additional details. Unless we obtain more information on the incident through law enforcement or other channels (e.g., a subsequent report from the victim), these types of reports are unable to be sufficiently classified within Uber's Safety Taxonomy and are therefore classified as "Insufficient Information." All reports of insufficient information were excluded from this report.

Furthermore, auditors focused on alignment across classification, reporting party, and accused party. Uber's audit function was not scoped to document the Uber party (rider account holder, guest rider, driver, etc.) of the potential victim (in cases of sexual assault) or the deceased party (in fatality cases). Although the reporting party is sometimes the potential victim themselves, this is not the case for all incident reports (e.g., loved ones reporting on behalf of a victim or law enforcement requesting data). Therefore, capturing the reporting party is not always adequate in understanding trends on who may experience incidents. To remediate this, a subsequent manual audit was performed in order to collect the party of the potential victim in all Non-Consensual Sexual Penetrations, as well as the deceased party in all fatality cases. As such, this potential victim data is not available for all categories within the sexual assault taxonomy.

Lastly, it is important to note certain limitations on Uber's data related to riders, particularly regarding rider demographics. While Uber collects identity details on drivers through our normal background and identity check processes, these same requirements do not exist for riders using the Uber platform. Therefore, some of the demographic data included in the report is not available for riders unless it was collected through a manual audit of incident reports as in the case of Non-Consensual Sexual Penetration survivors.

# Uber's scale in the United States

Today in 2019, nearly 4 million Uber trips happen every day in the US—that's more than 45 rides every second. At such a large scale, Uber ultimately reflects the world in which we operate—both the good and the bad. This includes difficult, deeply ingrained societal problems like sexual assault, fatal physical assaults, and fatal motor vehicle crashes. As the numbers in this report show, critical safety incidents on our platform are, statistically, extremely rare. However, these numbers are unacceptable because each one represents an experience of a person in the Uber community.

For the purposes of this report, we examine data from 2017 through 2018, a time frame in which an average of more than 3.1 million trips took place daily in the US. These figures provide an important backdrop to understanding the incident rates included in the Data insights chapter of this Safety Report.

## US trips[102]



| 2017 | 2018 |
|---|---|
| 1.0 billion | 1.3 billion |

| 2017–2018 total | 2017–2018 average US trips per day |
|---|---|
| 2.3 billion | 3.1+ million |

## US miles[103]



| 2017 | 2018 |
|---|---|
| 8.2 billion | 10.3 billion |

| 2017–2018 total |
|---|
| 18.5 billion |

## Uber customer support requests

**The vast majority (99.9%) of Uber trips end without any safety-related issue at all.** For example, for the trips in 2017 and 2018:

- **1.4%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback.

- **0.1%** of trips had a support request for a safety-related concern, the majority of which included more minor safety issues, such as complaints of harsh braking or a verbal argument.

- **0.0003%** of trips had a report of a critical safety incident,[104] which are the incidents referenced in this report.

102. US trips are defined as any completed trip facilitated by the Uber ridesharing app within the US (excluding US territories).
103. Miles driven is derived from GPS data from Uber's ridesharing app used by drivers and includes miles driven while the driver was en route to the rider's pickup location, as well as the miles driven during rider trips. We have used Uber's best estimate in calculating the mileage.
104. This percentage includes the 5 categories of sexual assault published in this report, fatal motor vehicle crashes, and fatal physical assaults reported to occur in 2017-2018 in relation to the Uber platform.

# Data insights

In reporting this data, we are intentionally overinclusive. For example, as detailed in the methodology, we have adopted broader definitions of safety incidents—particularly in the area of sexual assault—than most criminal codes and research entities. This report also captures incident reports of physical and sexual assaults that occurred between parties paired by the Uber app, not only during an Uber trip, but within 48 hours of a trip's completion. Motor vehicle fatalities include incidents in which a driver using the Uber app was the victim. Uber shares this data to raise public awareness of safety generally across the rideshare industry.

The data outlined in this section encompasses reports of safety incidents, regardless of the outcome of the safety support agent's review process, as opposed to those that simply meet criminal definitions or that may have resulted in law enforcement action. For more examples and information on how more restrictive data standards may impact the overall dataset for a publication of this nature, see Appendix I: Why data standards matter.

## Motor vehicle fatalities

In 2018 alone, 36,560 people lost their lives in motor vehicle fatalities in the US.[105] While national trends in traffic fatalities have decreased over recent years,[106] too many families are living with these losses.

As stated in the methodology, the data presented in this report is derived from a direct 1:1 reconciliation with the national Fatality Analysis Reporting System (FARS) dataset.[107,108] By using identifying crash characteristics that Uber has access to (such as a driver's Vehicle Identification Number [VIN], vehicle make and model, location, date, and time), Uber was able to query the FARS dataset to find and reconcile each fatal crash in the Uber dataset to a fatal crash in the FARS database. In doing this, Uber was able to obtain additional data points documented in FARS for each fatal crash. The vast majority of the demographic data presented on Uber-related fatal crashes in this report was obtained from the FARS dataset to maintain consistency.

Although we recognize that our user base is not a representative national sample, and that the data in this report is not necessarily a representation of the size or scope of motor vehicle fatalities in other contexts, this 1:1 reconciliation process using publicly available data standards makes it possible for Uber-related data on fatal crashes to be analyzed in context with national data. This same process is not currently possible in the sexual assault or fatal physical assault fields of study since definitions, data standards, and publicly available data either do not exist or are widely inconsistent.

Finally, it's worth noting the data presented here is irrespective of fault. For the purposes of data classification, Uber does not determine fault or the causal or contributing factors involved in the crash. Similarly, FARS does not explicitly document the party at fault for any fatal crash.

In order for a fatal motor vehicle crash to be "Uber-related"[109] for the purposes of data classification for this report, the crash must have involved at least one vehicle of a driver using the Uber platform and the death of at least one human being (occupant of a vehicle or a non-motorist, regardless of whether they were an Uber user or third party) within 30 days of the

---

105. National Highway Traffic Safety Administration (NHTSA), "U.S. Transportation Secretary Elaine L. Chao Announces Further Decreases in Roadway Fatalities," October 22, 2019, https://www.nhtsa.gov/press-releases/roadway-fatalities-2018-fars.
106. Ibid.
107. An additional 22 Uber-related road fatalities either fell outside the scope of the FARS definitions or were otherwise unable to be accounted for in FARS (see Methodology). Because these fatal crashes are not in the FARS dataset, they are not included in the data analysis presented in this report.
108. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason, the data presented in this report may change over time. The motor vehicle data presented in this report includes incident reports resolved on or before October 31, 2019. The motor vehicle data in this report reconciled to the 2018 FARS Release published October 22, 2019.
109. "Relation to the Uber platform" or "Uber-related" is a reference to how the data was classified, and applies for the purposes of this Safety Report only.

crash. For the purposes of determining "Uber-related" data classification, the vehicle of the driver using the Uber platform does not have to be the cause of the crash, nor carrying the deceased parties (see Methodology).

## Table 5: 2017–2018 motor vehicle fatalities by vehicle miles traveled (Uber-related and US rates)[110]

| 2017 | | 2018 | | Uber YoY change |
|---|---|---|---|---|
| Uber rate[111] (per 100 million VMT) | National rate[112] (per 100 million VMT) | Uber rate (per 100 million VMT) | National rate[113] (per 100 million VMT) | Uber rate change[114] |
| 0.59 | 1.17 | 0.57 | 1.13 | –5% |
| **Total miles** | 8.2 billion | 3.2 trillion | 10.2 billion | 3.2 trillion |

## Table 6: 2017–2018 motor vehicle fatalities by trips (Uber-related)[115]

| 2017-2018 | | | 2017 | | 2018 | | Uber YoY change |
|---|---|---|---|---|---|---|---|
| Frequency of rider fatalities (by # of trips) | Frequency of driver fatalities (by # of trips) | Frequency of total fatalities (by # of trips) | # of Uber-related fatalities | % of total trips | # of Uber-related fatalities | % of total trips | % change incident rate[116] |
| ~1 in 100,000,000 | ~1 in 100,000,000 | ~1 in 20,000,000 | 49 | 0.000005% | 58 | 0.000005% | –5% |
| **Total trips** | 2.3 billion | | | 1.0 billion | | 1.3 billion | |

## Rate (per 100 million VMT)

In the 2017–2018 time frame, there were 107 individual motor vehicle fatalities across 97 fatal Uber-related crashes. In 93% (n=90) of Uber-related fatal crashes, one person lost their life.[117] The remaining crashes involved multiple fatalities each.[118]

While NHTSA has published fatality rates of 1.17 per 100 million VMT in 2017 and 1.13 per 100 million VMT in 2018,[119] which are approximately double the rates observed for Uber-related trips (see Table 5), these rates cannot be easily compared to Uber's rate due to methodological differences in the calculation. In particular, the Uber incident rate per 100 million VMT considers crashes that involve a vehicle using the Uber platform, while NHTSA's rate looks at all vehicles on the road. When looking at crashes involving all vehicles, there is no need to assign a fatality to any particular vehicle in a multi-vehicle crash. However, if we consider a rate for a subset of vehicles (such as just those vehicles using the Uber platform), the rate for that population would be overstated unless one assigns each fatality to a particular vehicle.

---

110. Uber occasionally receives notice of a possible safety incident well after when the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason the data may change over time. The data presented in this report is accurate as of October 31, 2019.

111. Uber yearly rates are rounded.

112. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.

113. Ibid.

114. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.

115. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but for this reason, the data presented in this report may change over time. The motor vehicle data presented in this report includes incident reports resolved on or before October 31, 2019. The motor vehicle data in this report reconciled to the 2018 FARS Release published October 22, 2019.

116. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.

117. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.

118. Ibid.

119. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," October 2019, p. 1, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.

For example, suppose that only blue and red vehicles exist on the road. A collision between a red vehicle and a blue vehicle results in one fatality. Using a simple ratio of fatalities involving vehicles of one color divided by the miles traveled by vehicles of that color would result in double counting of fatalities. The incident rate for blue vehicles and the incident rate for red vehicles would both include the example crash; thus, the rate for both subsets could be higher than the "all vehicles" rate because the one fatality involves both vehicles and would be counted twice. One could assign each fatal crash to a single vehicle to avoid double counting when there are multiple vehicles involved. However, that is difficult to do consistently, especially without introducing a concept of fault, which is often disputed. We have therefore not adjusted the rates shown for this effect, even though doing so would lead to a lower fatality rate for Uber-related trips.

There are many other reasons why Uber's motor vehicle fatality rates may differ from the national average. First, anyone under the age of 21 is not allowed to drive on the Uber platform, and all drivers must have at least one year of license history.[120] According to NHTSA, drivers aged 15–20 tend to have higher overall crash rates than older and more experienced drivers.[121] While young drivers between 15 and 20 years old accounted for 5.4% of the total number of licensed drivers in the US in 2017, they made up 8% of all drivers involved in fatal crashes that year.[122]

Second, as discussed in Safety investments, Uber screens every prospective driver's Motor Vehicle Record (MVR) for any violations or crashes, verification of their license status, and any driving-related restrictions on their license.[123] For example, individuals with histories of severe violations such as DUIs, reckless driving, or evading police within the last 7 years are disqualified from driving on the Uber platform and are therefore not represented in our dataset.

And finally, vehicles of drivers using the Uber platform are generally newer than the average vehicle on the road (4 years old compared to 10 years old).[124] According to NHTSA Acting Administrator James Owens, "New vehicles are safer than older ones and when crashes occur, more new vehicles are equipped with advanced technologies that prevent or reduce the severity of crashes."[125]

## Types of fatal crashes

About 65% (n=63) of fatal Uber-related motor vehicle crashes involved one or more motor vehicles, and 31% (n=30) involved a crash with a pedestrian or pedalcyclist. 4% (n=4) represented other types of fatal crashes such as crashes with non-vehicles (e.g., a tree) or fatalities that occurred while the driver or rider was entering or exiting the vehicle (see Fig. 7).

### Fig. 7: Types of fatal crashes (Uber-related)



- Crash with motor vehicle(s)
- Crash with pedestrian/pedalcycle
- Other

4%
31%
65%

120. United States and rideshare platform only. Drivers 22 years old and under require at least 3 years of license history. Drivers 23 and over are required to have at least 1 year of license history.

121. National Highway Traffic Safety Administration (NHTSA), "Young Drivers," p.1, May 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812753.

122. Ibid.

123. In New York City, the MVR screening is conducted through the NYC Taxi and Limousine Commission. The TLC Driver licensing process is separate from the process described here.

124. In the US Department of Transportation's 2018 Transportation Statistics Annual Report, a light-duty vehicle is defined by the US Environmental Protection Agency as a passenger car with a maximum Gross Vehicle Weight Rating (GVWR) < 8,500 lbs. (pp. 2–7), https://www.bts.dot.gov/sites/bts.dot.gov/files/docs/browse-statistical -products-and-data/transportation-statistics-annual-reports/Preliminary-TSAR-Full-2018-a.pdf.

125. National Highway Traffic Safety Administration (NHTSA), "U.S. Transportation Secretary Elaine L. Chao Announces Further Decreases in Roadway Fatalities," October 22, 2019, https://www.nhtsa.gov/press-releases/roadway-fatalities-2018-fars.

About half (n=45) of Uber's total fatal crashes involved 2 motor vehicles.[126] Three motor vehicles were involved in 21% (n=20) of fatal crashes, and 4 or more motor vehicles accounted for nearly 8% (n=8) of fatal crashes.[127] 25% (n=24) of all Uber-related fatal crashes involved only one motor vehicle.[128] These incidents typically involved a crash with a pedestrian.

## Speed limit zones

Fig. 8 shows the speed limit zones for vehicles involved in Uber-related fatalities and vehicles involved in fatalities from the national dataset. Vehicles involved in Uber-related fatalities most frequently occurred in speed limit areas of 30-35 mph, as compared to the national dataset, where vehicles involved in fatalities most frequently occurred in speed limit areas of 50-55 mph.[129]

### Fig. 8: Percent of vehicles in fatal crashes by speed limit[130]



## Roadway surface conditions

Nearly 91% (n=179) of all vehicles involved in Uber-related fatal crashes were on dry roadways.[131] This is slightly higher than the national dataset, where 83% of vehicles involved in fatal crashes were on dry surfaces.[132] Nationally, 12% of vehicles involved in fatal crashes were on wet roadways, while only 7% (n=14) of vehicles involved in Uber-related fatal crashes were on wet surfaces.[133]

---

126. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
127. Ibid.
128. Ibid.
129. Ibid.
130. Figure is based on FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
131. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
132. Ibid.
133. Ibid.

## Land use and route type

Approximately 90% (n=87) of Uber-related fatal crashes occurred in urban areas, while 9% (n=9) occurred in rural areas.[134] This is compared to national FARS data in which 53% of fatal crashes occurred in urban areas, and 46% occurred in rural areas.[135] This disparity is to be expected, as Uber's operations are more concentrated in US cities.

Consistent with land use, only 4% (n=4) of Uber-related fatal crashes occurred on a country road, compared to nearly 13% in the national dataset.[136] Accordingly, 40% (n= 39) of Uber-related fatal crashes occurred on local streets while nationally, only 17% of crashes occurred on local streets.[137] Another large discrepancy is found when analyzing fatal crashes occurring on US highways. Crashes on US highways comprised only 5% (n=5) of Uber-related fatal crashes, while nationally, about 16% of fatal crashes occurred on a US highway.[138,139] Fatal crash rates on state highways among both datasets were similar, each accounting for roughly 30% of fatal crashes.[140]

## Work zone

According to USDOT's Federal Highway Administration, although work zones play a key role in "maintaining and upgrading our nation's roadways," they can also "often create a combination of factors resulting in crashes, injuries, and fatalities."[141] Approximately 2% (n=2) of Uber-related fatal crashes occurred in a work zone, which is generally consistent with national data (1% of all fatal crashes).[142]

## Light condition

Table 9 shows that the majority of Uber-related fatal crashes (49% or 48 crashes) occurred within lighted areas, such as areas lit by streetlights, while it was dark.[143] This differs greatly from national data, where the plurality of fatal crashes (47%) occurred in daylight.[144] Only 20% of crashes in the national dataset occurred in lighted areas while it was dark.[145] This is to be expected and accounted for by Uber's heavy concentration in metropolitan US cities, where most roadways are well lit and in high use on weekend evenings.

## Table 9: Percent of fatal crashes by light condition[146]

|  | Uber-related crashes | National crashes |
|---|---|---|
| Dark - lighted area | 49% | 20% |
| Dark - not lighted area | 22% | 27% |
| Daylight | 27% | 47% |
| Other | 2% | 6% |

134. Ibid.
135. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 5, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.
136. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
137. Ibid.
138. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
139. US highways, interstates, and state highways pulling from 'ROUTE' datafield defined in their codebook: https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812559.
140. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
141. Federal Highway Administration, "FHWA Work Zone Facts and Statistics," March 25, 2019, https://ops.fhwa.dot.gov/wz/resources/facts_stats.htm.
142. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
143. Ibid.
144. Ibid.
145. Ibid
146. Table is based on FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.

## Deceased parties

Table 10 shows a breakdown of deceased parties in Uber-related fatal crashes. In 2017-2018, about 67% (n=72) of Uber-related deceased parties were a motor vehicle occupant, and the remaining 33% (n=35) were non-motor-vehicle occupants (e.g., pedestrians or pedalcyclists).[147]

Of the total number of Uber-related deceased parties, 21% (n=22) were drivers using the Uber platform, and 21% (n=23) were riders using the Uber platform.[148] It's important to note that drivers and riders using the Uber platform are not always inside the vehicle when a fatal crash occurs. In fact, 8 such individuals were fatally struck while outside the vehicle.[149] This can occur when a driver exits the vehicle to assist a rider into the vehicle, or while drivers or riders may be assisting another vehicle on the road. In such cases, FARS considers these to be pedestrian fatalities.[150]

Across 2017 and 2018, 30% (n=32) of Uber-related deceased parties were pedestrians, 25% (n=8) of which were drivers or riders using the Uber platform.[151] In 2018, FARS reported a 3.4% increase in pedestrian fatalities nationally when compared to 2017, and also noted the highest number of total pedestrian fatalities since 1990.[152]

There were 2 pedalcyclists who lost their lives in Uber-related fatal crashes in 2017-2018.[153] FARS reported a 6.3% national increase in pedalcyclists who lost their lives.[154] This concerning national trend reinforces our recent investment in Bike Lane Alerts, a feature that notifies riders when their upcoming dropoff location is near a bike lane or along a bike route. These alerts are examples of critical prevention initiatives aimed at reducing avoidable pedalcyclist tragedies.

Of the total deceased parties in all Uber-related motor vehicle fatalities, 33% (n=35) were third-party motor-vehicle occupants.[155] In particular, 13% (n=14) of total deceased parties were motorcyclists.[156]

## Table 10: Number of deceased parties in Uber-related motor vehicle crashes[157]

| Deceased party | 2017-2018 |
|---|---|
| Occupant | 67% (n=72) |
| Driver using Uber app | 16 |
| Rider using Uber app | 21 |
| Third-party driver | 17 |
| Third-party passenger | 4 |
| Third-party motorcyclist | 14 |
| Other/unknown | 0 |
| Non-occupant | 33% (n=35) |
| Drivers/riders using Uber fatally struck outside vehicle (as pedestrians) | 8 |
| Third-party pedestrians | 24 |
| Pedalcyclists | 2 |
| Other/unknown | 1 |

147. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
148. Ibid
149. Ibid
150. Ibid
151. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
152. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 3, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.
153. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
154. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 3, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812826.
155. FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.
156. Ibid.
157. Table is based on FARS data retrieved from the NHTSA's Query Tool on October 28, 2019, https://cdan.dot.gov/query.

## Alcohol involvement

The National Highway Transportation Safety Administration (NHTSA) estimates that more than 10,000 lives are lost annually in crashes involving alcohol.[158] Since its inception, Uber has served communities as an alternative to drunk driving (see the Safety investments chapter to learn about our drunk driving prevention work with our partner Mothers Against Drunk Driving [MADD]). However, being an alternative to drunk driving also means that Uber trips tend to peak at times when external research says that other intoxicated drivers may be on the road: late at night, on weekends, and during holidays and special events.[159]

Uber recognizes the importance of including this critical data element in a report on road safety. However, this FARS data comes with considerable limitations. "Not Reported," "Unknown," and other reporting inconsistencies occur frequently in the FARS data due to varying reporting standards across different jurisdictions. To account for the missing data, NHTSA implements a statistical method to impute missing values of blood alcohol concentration (BAC).[160] Since Uber's motor vehicle fatality dataset is too small to attempt NHTSA's imputation procedure, the data likely under-represents the frequency of incidents involving the use of alcohol.

However, FARS data is able to show that 29% (n=13) of the fatalities of riders and drivers using the Uber platform involved a third-party driver who was reported as driving under the influence.

---

158. National Highway Traffic Safety Administration (NHTSA), "Drunk Driving," accessed November 20, 2019, https://www.nhtsa.gov /risky-driving/drunk-driving.
159. National Highway Traffic Safety Administration (NHTSA), "Alcohol Impaired Driving," November 2018, p. 4, https://crashstats .nhtsa.dot.gov/Api/Public/ViewPublication/812630.
160. National Highway Traffic Safety Administration (NHTSA), "Transitioning to Multiple Imputation – A New Method to Impute Missing Blood Alcohol Concentration (BAC) values in FARS," October 2002, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication /809403.

# Fatal physical assaults

## Table 11: 2017–2018 fatal physical assaults[161]

| 2017-2018 | | 2017 | | 2018 | |
|---|---|---|---|---|---|
| **Frequency of incident reports** (by # of trips) | | **# of fatalities** | **% of total trips** | **# of fatalities** | **% of total trips** |
| 1 in 122,000,000 | | 10 | 0.000001% | 9 | 0.000001% |
| **Total US trips** | 2.3 billion | 1.0 billion | | 1.3 billion | |

According to the CDC, in 2017 alone, 19,510 people in the US died due to homicides.[162] Uber data on fatal physical assaults cannot be directly compared to those using criminal definitions, since Uber does not aim to and cannot act as the justice system. Furthermore, our agents and auditors do not have the agency, background, or evidentiary information required to determine the "intent and capability of the assailant to cause serious injury," aspects that the National Incident-Based Reporting System (NIBRS) definition for homicide requires.[163] However, our safety support process provides us with sufficient information to validate the level of injury (e.g., fatality) in a given assault.

During 2017 and 2018, there were 19 fatal physical assaults occurring in a total of 18 incidents in relation to Uber,[164] which accounts for approximately **0.000001% of total trips** or 1 in 122,000,000 trips (see Table 11).

As noted in the methodology, Uber considers a fatal physical assault to be Uber-related for the purposes of this report if:

- The incident involved at least one person on an Uber-facilitated trip,[165] not necessarily with parties paired by the Uber app, or;
- The incident occurred between parties that were paired via the Uber app, regardless if the incident occurred during a trip (up to 48 hours after the trip has concluded).

This means that the accused party is not necessarily a party using the Uber platform. In fact, in many of the fatal incidents reported to Uber, it was a third party who was accused of fatally wounding a rider or driver using the Uber app. Additionally, the deceased party is not always a rider or driver using Uber; the deceased party can be a third party if a driver or rider using the Uber platform was otherwise involved (i.e., as the accused party).

Among the 19 deceased parties:
- 8 were riders
- 7 were drivers using the Uber app
- 4 were third parties (such as bystanders outside the vehicles)

---

161. Uber occasionally receives notice of a possible safety incident well after the trip was taken (sometimes years after). This is extremely rare for fatalities, but this means that the data could change over time. The data presented in this report includes incident reports resolved on or before October 31, 2019.
162. Kenneth D. Kochanek, M.A., et al, "Deaths: Final Data for 2017," National Vital Statistics Reports 68, no. 9 (June 24, 2019): p. 51, https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_09-508.pdf.
163. Law Enforcement Support Section Crime Statistics Management Unit, "2019.1 National Incident-Based Reporting System User Manual," July 31, 2018, pp. 21–22, https://www.fbi.gov/file-repository/ucr/ucr-2019-1-nibrs-user-manual.pdf/view.
164. In one incident, 2 deceased parties were identified.
165. For the purposes of fatal physical assault data classification for this report, Uber defines a trip for drivers as beginning when the driver has accepted the trip request in the app and is en route to the rider's pickup location. For riders, a trip begins once they are picked up by their driver. In the exceedingly rare case that a driver was involved in a fatal physical assault incident while en route to the rider's pickup location, this would be included in the dataset.

# Sexual assault

Sexual assault is one of the most pervasive yet under-reported crimes in modern society. While perpetrators are most often known to the victim,[166] sexual assault can happen to anyone, anywhere: in our homes, our schools, our workplaces, our transportation systems, and even our public spaces. According to the National Intimate Partner and Sexual Violence Survey (NISVS), an ongoing survey administered by the Centers for Disease Control, **nearly 44% of US women and nearly 25% of US men** will be the victim of contact sexual violence[167] in their lifetimes.[168] This is an issue that almost 52.2 million women and 27.6 million men live with every single day.[169]

No community is immune. There were approximately 20,500 instances of unwanted sexual contact in 2018 in the military, according to the US Department of Justice's Annual Report on Sexual Assault in the Military.[170] One quarter of undergraduate women say they have been victims of sexual touching or penetration without consent since starting college, according to the latest survey from the Association of American Universities.[171]

Although a direct comparison cannot be made to Uber's data due to substantial methodological differences, Non-Consensual Sexual Penetration incidents, the most serious sexual assault category within the Sexual Misconduct And Sexual Violence Taxonomy, were reported to occur in about **1 in 5,000,000 completed trips during the 2017-2018 time frame**. In other words, these incidents were reported on **0.00002% of trip**s. While these reports are rare, every report represents an individual who came forward to share an intensely painful experience. Even one report is one too many.

For purposes of this report, we have included the 5 most serious categories in the Sexual Misconduct and Sexual Violence Taxonomy (see Table 12).

> Riders account for nearly half of the accused parties across the 5 most serious sexual assault categories.

166. "Preventing Sexual Violence," Centers of Disease Control and Prevention (CDC), March 12, 2019, https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html.

167. "Contact sexual violence" is a NISVS combined category that includes rape, being made to penetrate someone else, sexual coercion, and/or unwanted sexual contact. In Uber's taxonomy, this term would encompass (1) Non-Consensual Sexual Penetration, (2) Non-Consensual Kissing of a Sexual Body Part, (3) Non-Consensual Touching of a Non-Sexual Body Part, (4) Attempted Non-Consensual Sexual Penetration, and (5) Non-Consensual Kissing of a Sexual Body Part. However, given the different aims of Uber and the CDC, as well as the limitations of their respective data collections, it is still likely that significant methodological differences in classification may exist.

168. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1, https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf.

169. Ibid.

170. United States Department of Defense, "Department of Defense Annual Report on Sexual Assault in the Military: Fiscal Year 2018," (April 9, 2019) p. 15, https://int.nyt.com/data/documenthelper/800-dod-annual-report-on-sexual-as/d659d6d0126ad2b19c18/optimized /full.pdf#page=1.

171. Nick Anderson, Susan Svrluga and Scott Clement, "Survey finds evidence of widespread sexual violence at 33 universities," Washington Post, October 14, 2009, https://www.washingtonpost.com/local/education/survey-finds-evidence-of-widespread -sexual-violence-at-33-universities/2019/10/14/bd75dcde-ee82-11e9-b648-76bcf86eb67e_story.html.

## Table 12: 5 categories of sexual assault[172] (2017–2018)[173]

| Subcategory | 2017-2018 Frequency of incident reports (by # of trips) | 2017 # of incident reports | % of total trips[174] | 2018 # of incident reports | % of total trips | YoY incident rate change % change incident rate[175] |
|---|---|---|---|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 2,000,000 | 570 | 0.00006% | 594 | 0.00005% | -16% |
| Attempted Non-Consensual Sexual Penetration | ~1 in 4,000,000 | 307 | 0.00003% | 280 | 0.00002% | -26% |
| Non-Consensual Touching of a Sexual Body Part | ~1 in 800,000 | 1,440 | 0.0001% | 1,560 | 0.0001% | -12% |
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 3,000,000 | 390 | 0.00004% | 376 | 0.00003% | -22% |
| Non-Consensual Sexual Penetration | ~1 in 5,000,000 | 229 | 0.00002% | 235 | 0.00002% | -17% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

## Rate decrease

From 2017 to 2018, **Uber saw approximately a 16% decrease** in the average incident rate across the 5 most serious sexual assault categories reported. Additionally, there were rate decreases across each of the 5 individual categories. These decreases may correlate with Uber's substantial investments in safety over the past 2 years (see Safety commitments), although causation is difficult to determine given the myriad factors that can impact reported sexual assault rates.

We also know these decreases may not always be the trend. Experts and advocates have told us that releasing this type of report may actually lead to an **increase** in the number of reports in the future. That's because, when it becomes clear that Uber is paying close attention to reports of sexual violence and taking action, survivors may feel more comfortable coming forward. For example, external research has shown the number of sexual assaults reported on a college campus tends to increase in relation to the amount of attention focused on addressing sexual assault on that campus.[176] Experts tell us that when high-profile cases of sexual assault hit the news, organizations that support survivors are likely to see sharp increases in call volume or requests for support services. While incident reduction will always be our primary goal in our safety efforts, building and maintaining the trust of our community is an integral step toward gaining the most accurate picture of user experiences.

## A note on "reporting party"

It is important to understand that the party who reports an incident to Uber is not always the victim. For example, a driver may observe and report a sexual assault between riders; a law enforcement officer may report an assault on behalf of a rider; or a rider account holder may report an assault on behalf of a guest rider who took a trip using their account. As noted in the methodology, Uber was able to capture data regarding the party of the potential victim for reports of Non-Consensual Sexual Penetration only. For all other sexual assault and misconduct categories, the reporting party is the closest proxy to

---

172. "Relation to the Uber platform" or "Uber-related" is in reference to data classification for the purposes of this Safety Report only.
173. This report reflects audited sexual assault reports that were classified into one of these categories. Uber occasionally receives notice of a potential sexual assault well after the trip has ended. The sexual assault data presented in this report includes incident reports resolved on or before October 31, 2019, and for this reason may change over time.
174. Incident reports as a percent of total trips are rounded.
175. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
176. Kaitlin M Boyle, Ashley Barr, and Jody Clay-Warner. "The Effects of Feminist Mobilization and Women's Status on Universities' Reporting of Rape." Journal of School of Violence 16, no. 3 (July 11, 2017): pp. 317–30. https://doi.org/10.1080/15388220.2017_1318580.

the potential victim in Uber's dataset (see Limitations of Uber safety data in Methodology).[177] However, the survivor data analysis for Non-Consensual Sexual Penetration shows that approximately 99.4% of rider reports were reporting a rider (either themselves or a guest rider) as the victim, and about 66.7% of driver reports were reporting themselves as the victim.

Therefore, Fig. 13 and Fig. 14 show that the majority of reporting parties are indeed the victims themselves in the cases they report.

### Fig. 13: Victim and reporting party overlap broken down by riders



### Fig. 14: Victim and reporting party overlap broken down by drivers



---

177. As noted in the methodology, Uber's audit function was not initially scoped to document the gender or party (rider, driver, third party, etc.) of the potential victim in cases of sexual assault. While this was later captured for reports of Non-Consensual Sexual Penetration through a subsequent manual audit, this potential victim data is not available for other categories of sexual assault or misconduct.

## The facts about who reports sexual assault

Uber data suggests that both riders and drivers face sexual assault incidents on our platform. According to an analysis of 2,894 media mentions that referenced sexual assault with a possible connection to Uber, the vast majority of references (92%) focused on the driver party as the potential perpetrator, while only 8% highlighted incidents in which the rider party was accused.[178]

**In reality, riders account for nearly half (45%) of the accused parties across the 5 most serious sexual assault categories** (see Fig. 16). Drivers have a right to have their experiences told, and we have a responsibility to stand with them—so that we can create the safest possible environment for drivers and their passengers.

### Fig. 15: Breakdown of 5 categories of sexual assault by reporting party



### Fig. 16: Breakdown of 5 categories of sexual assault by accused party



---

178. During the 2017–2018 time frame of media analysis, a total of 5,120 media mentions were analyzed. 90% of the media mentions referencing riders as the accused party referred to the highly public story of NFL player Jameis Winston sexually assaulting a driver using the Uber platform and subsequently being suspended from games. When removing the outlier of the Winston mentions, the total media mention volume became 2,894.

**Overinclusion of data and under-reporting of sexual assault**

For purposes of this report, Uber has intentionally been overinclusive in determining what incident reports and circumstances to capture within our data standards. For example, as detailed in the methodology, we have adopted broader definitions of sexual assault than most criminal codes and research entities. This report also captures incident reports of sexual assault that occur between parties paired by the Uber app, not only during a trip facilitated by the Uber platform, but within 48 hours after such a trip ends. In the interest of completeness, the data represented here reflects incident reports as classified by agents and auditors based solely on the descriptions provided by the reporting party. The data does not necessarily reflect the ultimate disposition of each incident report, and further proof or evidence from the reporting party is not necessarily required for precise data classification. Because we know that survivors of sexual assault may withdraw their reports for any number of personal reasons, this report intentionally includes reports from survivors that are later withdrawn but not refuted by them.

For more examples and information on how more restrictive data standards may impact the overall dataset for a publication of this nature, see Appendix I: Why data standards matter).

At the same time, sexual assault is also one of the most under-reported crimes in the US generally, with some researchers believing that nearly 3 out of every 4 sexual assaults go unreported to police.[179] In fact, researchers on behalf of the US Department of Justice found multiple reasons why survivors chose not to report to police between 2005 and 2010:[180]

- 20% feared retaliation
- 13% believed the police would not do anything to help
- 13% believed it was a personal matter
- 8% reported to a different official
- 8% believed it was not important enough to report
- 7% did not want to get the perpetrator in trouble
- 2% believed the police could not do anything to help
- 30% gave another reason, or did not cite the reason

Uber encourages users to report safety incidents, which allows us to constantly improve safety on the platform. In fact, the ease and accessibility of reporting an incident to Uber may encourage users to report more often since they can do so more quickly and discreetly than they can in person or by phone. Uber's dataset is likely to be relatively comprehensive, because we aggregate safety incident data from many sources, including in-app reports, online reports, reports via our Critical Safety Response Line, and other sources. As a result, it may be difficult to compare insights drawn from Uber's dataset to datasets with more limited reporting channels.

---

179. Rachel E. Morgan, Ph.D., and Barbara A. Oudekerk, Ph.D., "Criminal Victimization, 2018," Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, September 2019, p. 8, https://www.bjs.gov/content/pub/pdf/cv18.pdf.
180. Michael Planty, Ph.D., et al, "Female Victims of Sexual Violence, 1994–2010," Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, May 31, 2016, p. 7, https://www.bjs.gov/content/pub/pdf/fvsv9410.pdf.

# Non-Consensual Kissing of a Non-Sexual Body Part

Defined as: Without consent from the user, someone kissed, licked, or bit, or forced a kiss, lick, or bite on any non-sexual body part (e.g., hand, leg, thigh) of the user.

**Table 17: Non-Consensual Kissing of a Non-Sexual Body Part (2017-2018)**

| Subcategory | 2017-2018 | 2017 | | 2018 | | YoY incident rate change |
|---|---|---|---|---|---|---|
| | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips[181] | # of incident reports | % of total trips | % change incident rate[182] |
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 2,000,000 | 570 | 0.00006% | 594 | 0.00005% | ~16% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

Incidents of Non-Consensual Kissing of a Non-Sexual Body Part often involve unwanted sexual/romantic kisses on body parts such as the cheek, hands, head, and shoulders. Including this category in this Safety Report poses a unique opportunity, since data on these non-criminal acts of sexual assault are frequently sparse, despite being intrusive, harmful, and potentially just as prevalent.

Through keyword queries, Uber identified that the majority (roughly 60%) of reports in this category involved a person kissing another person's cheek or neck.[183]

## Reporting party

Across 2017 and 2018, the majority of reports of Non-Consensual Kissing of a Non-Sexual Body Part came from drivers, who comprised about 54% (n=628) of reporting parties for this category. Riders accounted for 46% (n=535) of reporting parties for this category.

---

181. Incident reports as a percent of total trips are rounded.
182. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
183. Produced by keyword queries. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

# Attempted Non-Consensual Sexual Penetration

## (Includes clothing removal and attempted clothing removal)

Defined as: Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as 'Attempted Non-Consensual Sexual Penetration.' This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue.

### Table 18: Attempted Non-Consensual Sexual Penetration (2017-2018)

| Subcategory | 2017-2018<br><br>Frequency of incident reports<br>(by # of trips) | 2017<br><br># of incident reports | % of total trips[184] | 2018<br><br># of incident reports | % of total trips | YoY incident rate change<br><br>% change incident rate[185] |
|---|---|---|---|---|---|---|
| Attempted Non-Consensual Sexual Penetration | ~1 in 4,000,000 | 307 | 0.00003% | 280 | 0.00002% | -26% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

Situations included in the Attempted Non-Consensual Sexual Penetration category are the most varied and can therefore be the most difficult to categorize within the taxonomy. It would be incorrect to define this category as "attempted rape." It is in fact comprised of a wide range of circumstances where the incident report may allude to a potential assault but lacks details that would allow it to be categorized more definitively.

According to experts, sexual assault survivors often experience memory loss, fragmented memories, or a complete lack of event recall, which can be attributed to voluntary, coerced, or involuntary substance consumption,[186] or the psychological trauma of the event itself.[187] Therefore, victims do not always recall these events in precise detail. With this in mind, Uber chose to expand the standards for this category in an effort to be as inclusive as possible, without compromising the categorization accuracy of other, more precise categories (such as touching, kissing, or completed penetration).

Accordingly, this category includes but is not limited to the following types of reports:

- The attempted or completed removal or bypassing of clothing to expose a sexual body part of the survivor.
- The use of restraint or force to overcome the victim (e.g., accused party being on top of the victim or holding them down).
- Situations where the potential victim can recall and has a record of being on an Uber-facilitated trip, but is experiencing significant memory loss or fragmentation, and without explanation:
  - Woke up/regained consciousness without clothing; or
  - Woke up/regained consciousness not at their intended destination.

For example, an incident report stating that a rider tried to pull up a female driver's shirt would be classified as Attempted Non-Consensual Sexual Penetration, despite the lack of further details of the incident, since there was an attempt to remove clothing to access the breasts. If an incident report contains any mention of touching or kissing of a sexual body part (including the mouth), this automatically escalates the report to a higher category within the taxonomy.

---

184. Incident reports as a percent of total trips are rounded.
185. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
186. Rape, Abuse & Incest National Network (RAINN), "Drug Facilitated Sexual Assault," accessed August 6, 2019, https://www.rainn.org/articles/drug-facilitated-sexual-assault.
187. James Hopper and David Lisak, "Why Rape and Trauma Survivors Have Fragmented and Incomplete Memories," Time, December 9, 2014, https://time.com/3625414/rape-trauma-brain-memory/.

On average between 2017-2018, approximately 20% of reports in this category included explicit mentions of attempted rape, penetration, or sexual intercourse.[188] Uber can often receive an initial incident report that states the accused party "tried to rape [the reporting party]," but the Uber safety agent is unable to make further contact with the reporting party, after multiple attempts, to obtain a full statement of experience and clarifying details. Uber will still classify those reports as Attempted Non-Consensual Sexual Penetration. It's worth noting that since the term "rape" can involve varying degrees of identification, concepts, and experiences that vary substantially from person to person and in different cultures, it does not always describe specific actions. It becomes even less clear when considering the phrase "tried to rape." There are times when a reporting party's use of the phrase, though based on their valid perception of their safety in the moment, may have an intended meaning other than sexual penetration. Regardless, Uber still considers the reporting party's language at face value when classifying user reports.

## Reporting party

72% (n=423) of reports in this category across both years were made by riders.

---

188. Produced by keyword queries. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

Uber

# Non-Consensual Touching of a Sexual Body Part

Defined as: Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user.

**Table 19: Non-Consensual Touching of a Sexual Body Part (2017-2018)**

| | 2017-2018 | 2017 | | 2018 | | YoY incident rate change |
|---|---|---|---|---|---|---|
| Subcategory | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips[189] | # of incident reports | % of total trips | % change incident rate[190] |
| Non-Consensual Touching of a Sexual Body Part | ~1 in 800,000 | 1,440 | 0.0001% | 1,560 | 0.0001% | -12% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

As noted in Appendix IV, the Sexual Misconduct and Sexual Violence Taxonomy defines sexual body parts as:

- Mouth/lips
- Breasts (in a female-identified user)
- Buttocks
- Genitals

Across the 2017-2018 time frame, roughly half of all Non-Consensual Touching of a Sexual Body Part incident reports involved touching of female breasts, while 15% and 4% of incident reports involved the buttocks and mouth, respectively. Touching of the genitals or the genital area was reported in 46% of user reports of this sexual assault category.[191]

According to the National Sexual Violence Resource Center and other experts, the comfort level of explicitly naming sexual body parts can vary from person to person, especially when a reporting party may feel shame or fear in describing what happened to them. Uber chose to take an expansive view on what kinds of words or phrases are considered sexual body parts for the purposes of data classification.

## Reporting party

Throughout 2017-2018, reporting parties for this category were about even, with slightly more reports (51% or 1,536 incident reports) coming from drivers. Within rider reports of this category, 9% accused another rider. This is of note since it is the sexual assault category (within the 5 categories published in this report) with the highest percentage of riders accusing other riders.

---

189. Incident reports as a percent of total trips are rounded.
190. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
191. Produced through keyword queries. Body-part percentages are non-cumulative. Multiple body parts can be non-consensually touched/kissed in one incident.

# Non-Consensual Kissing of a Sexual Body Part
## (Includes kissing on the mouth)

Defined as: Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue.

### Table 20: Non-Consensual Kissing of a Sexual Body Part (2017-2018)

| Subcategory | 2017-2018 | 2017 | | 2018 | | YoY incident rate change |
|---|---|---|---|---|---|---|
| | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips[192] | # of incident reports | % of total trips | % change incident rate[193] |
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 3,000,000 | 390 | 0.00004% | 376 | 0.00003% | -22% |
| Total US trips | 2.3 billion | 1.0 billion | | 1.3 billion | | |

The Sexual Misconduct and Sexual Violence Taxonomy considers the mouth a sexual body part. Therefore, the vast majority of Non-Consensual Kissing of a Sexual Body Part (approximately 88%) involved non-consensual kissing on the mouth.

## Reporting party

On average, throughout both years, about 75% (n=576) of all reports of Non-Consensual Kissing of a Sexual Body Part were made by riders; about 23% (n=179) of these reports were made by drivers, and 1% (n=11) were made by third parties.

---

192. Incident reports as a percent of total trips are rounded.
193. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.

# Non-Consensual Sexual Penetration

Defined as: Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue.

## Table 21: Non-Consensual Sexual Penetration (2017-2018)

| Subcategory | 2017-2018 | 2017 | | 2018 | | YoY incident rate change |
|---|---|---|---|---|---|---|
| | Frequency of incident reports (by # of trips) | # of incident reports | % of total trips[194] | # of incident reports | % of total trips | % change incident rate[195] |
| Non-Consensual Sexual Penetration | ~1 in 5,000,000 | 229 | 0.00002% | 235 | 0.00002% | -17% |
| **Total US trips** | 2.3 billion | 1.0 billion | | 1.3 billion | | |

The National Intimate Partner and Sexual Violence Survey (NISVS) estimates that 1 in 5 US women have experienced an attempted or completed rape in their lifetime, and 1 in 14 men have been made to penetrate someone else during their life-time.[196] In relation to Uber, Non-Consensual Sexual Penetration occurred in about **1 in 5,000,000 completed trips**. However, since definitions and other methodological points do not precisely align, an exact comparison is not able to be achieved.

## A note on definitions

Non-Consensual Sexual Penetration is the most serious category captured in the Taxonomy. While many may believe this category is equivalent to "rape," Uber's definition is generally more expansive than how many jurisdictional criminal codes and research methodologies define rape or forced sexual penetration. When creating the Taxonomy, the NSVRC and Urban Institute intentionally created a definition for Non-Consensual Sexual Penetration that was as inclusive as possible and did not vary based on the sex or gender of the survivor. The Non-Consensual Sexual Penetration definition encompasses forms of penetrative sex acts beyond sexual intercourse, including:

• Non-consensual digital penetration (of the vagina or anus)

• Non-consensual oral sex (of the genitals or anus)

• Non-consensual penetration with a foreign object (of the vagina or anus)

• Non-consensual anal sex

• Non-consensual vaginal sex

## Survivors

Non-Consensual Sexual Penetration is the only sexual assault category in which data on victims (as opposed to reporting party) is available (see Limitations of Uber safety data in Methodology).[197] Across both years, for Non-Consensual Sexual Penetration, the survivor was the rider in roughly 92% (n= 429) of incident reports, and 25% (n=109) of those were guest riders. Drivers were survivors in about 7% (n=31) of incident reports.

---

194. Incident reports as a percent of total trips are rounded.
195. Uber year-over-year rate change may not sum according to chart. Rate change is based on unrounded yearly rates.
196. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1, https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf.
197. As noted in the methodology, Uber's audit function was not initially scoped to document the gender or party (rider, driver, third party, etc.) of the potential victim in cases of sexual assault. While this was later captured for reports of Non-Consensual Sexual Penetration through a subsequent manual audit, this potential victim data is not available for other categories of sexual assault or misconduct.

External research and prevalence estimates on the topic are clear that females are disproportionately impacted by sexual violence.[198] For example, one study estimates that females account for nearly 94% of victims of completed rape and 91% of victims of attempted rape.[199] These trends are very similarly reflected for Non-Consensual Sexual Penetration in relation to Uber. In fact, women and female-identifying survivors made up 89% of the survivors in the dataset.[200] Still, men and male-identifying survivors comprised about 8% of Non-Consensual Sexual Penetration survivors, and <1% of survivors identified as gender minorities.[201]

It's worth noting that this gender analysis is limited to the Non-Consensual Sexual Penetration category. A core limitation in Uber's data is that gender (and other demographic) information is not collected from riders generally, and victim information is not collected at the incident level. Therefore, an analysis of how victimization by gender may vary across subcategories is not currently available (see Limitations of Uber safety data in Methodology).[202]

## Law enforcement involvement

This category had the highest percentage of third-party reports: about 13% compared to an average of about 1% for other critical sexual assault categories. This is primarily due to reports submitted by law enforcement agencies to Uber's Law Enforcement Response Team (LERT) (see Working with law enforcement in Safety investments). Despite the chronic under-reporting of sexual violence, the most serious types of sexual assault are more likely than other unwanted sexual behaviors within the taxonomy to constitute a criminal offense, and can be pursued by law enforcement.

In fact, law enforcement was reported to be involved in approximately 37% of all Non-Consensual Sexual Penetration incidents reported to Uber. This includes cases where law enforcement reported the incident directly to Uber's law enforcement team, as well as incidents where Uber learned about the involvement of law enforcement through other means, such as the reporting party, victim, or media. Furthermore, in an additional 11% of these reports, reporting parties and/or victims indicated that they intended to involve law enforcement but had not yet initiated the process at the time of their contact with Uber's safety support team. In these cases, Uber's safety support agents are trained to connect law enforcement officials with Uber's law enforcement team so they can obtain Uber data that aids in their investigation.

198. Sharon G. Smith, et. al, "The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release," (November 2018) p. 1, https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf.

199. Rennison, C. M., "Rape and sexual assault: Reporting to police and medical attention, 1992–2000," U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, August 2002, p.1, https://www.bjs.gov/content/pub/pdf/rsarp00.pdf.

200. Uber does not systematically collect information about riders' gender, so for the purposes of analysis for this report, gender was inferred through the safety support agent's notes (through the use of normative pronouns, survivor self-identification, etc.) when speaking with the survivor.

201. The survivor's gender was unknown in <3% of incident reports.

202. As noted in the methodology, Uber's audit function was not initially scoped to document the gender or party (rider, driver, third party, etc.) of the potential victim in cases of sexual assault. While this was later captured for reports of Non-Consensual Sexual Penetration through a subsequent manual audit, this potential victim data is not available for other categories of sexual assault or misconduct.

**Early estimates for 2019 sexual assault data**

While the following 2019 data for the 5 categories of sexual assault are simply early estimates at this time,[203] Uber believes that our users and communities at large have an interest in these numbers. Based on these preliminary estimates, the overall occurrence rate of these 5 categories of sexual assault is averaging a projected 17-20% decrease when compared to rates from full year 2018 (see Table 22).

However, as previously mentioned, this decreasing trend may not always be the case. As Uber invests more and more into sexual assault prevention and reporting initiatives (including with the release of this Safety Report), there may be increased reporting of these 5 categories of sexual assault independent from the underlying frequency of occurence. It's also worth noting that these are indeed estimates, and they are subject to change due to factors such as late reporting and further auditing.

**Table 22: Early 2019 estimates of 5 categories of sexual assault in relation to the Uber rideshare platform[204] (January–June)**

| Subcategory | Frequency of incident reports (by # of trips) | % of total trips | % estimated incident rate change vs. full year 2018[205] |
|---|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | ~1 in 3,000,000 | 0.00003% | [−33%, −30%] |
| Attempted Non-Consensual Sexual Penetration | ~1 in 6,000,000 | 0.00002% | [−37%, −34%] |
| Non-Consensual Touching of a Sexual Body Part | ~1 in 900,000 | 0.0001% | [−14%, −11%] |
| Non-Consensual Kissing of a Sexual Body Part | ~1 in 4,000,000 | 0.00002% | [−20%, −17%] |
| Non-Consensual Sexual Penetration | ~1 in 6,000,000 | 0.00002% | [−11%, −5%] |

---

203. DISCLAIMER: Uber is including a preview of estimated 2019 sexual assault data due to the interest our users and communities have in these numbers. These numbers are estimates and have not undergone the same auditing process described in the Methodology, and we expect they may change over time as Uber receives additional, delayed reports of incidents. In addition, the 2019 estimates were not reviewed by the NSVRC and Urban Institute and, as a result, are outside the scope of the validation statement provided in Appendix II. 2019 data is an estimate based on reports as of November 15, 2019.
204. "Relation to the Uber platform" or "Uber-related" is in reference to data classification for the purposes of this Safety Report only.
205. Uber rate change may not sum according to chart. Rate change is based on unrounded rates for full year 2018 vs. Jan-Jun 2019.

# Conclusion

Following this 21-month effort, Uber has put in place stronger safety policies and training for support staff, implemented a new classification system for the most serious safety incidents, and launched more safety features than ever before to help protect both drivers and riders.

The data presented in this report shows that the rates of sexual assault incidents on the Uber rideshare platform in the US declined year-over-year; that traffic-related fatality rates with Uber are roughly half of the national average;[206] and that 99.9% of trips ended without any safety-related issue at all, no matter how minor. Only 0.0003% of all Uber trips involved one of the critical safety incidents outlined in this report.

Our commitment to you is that we will continuously work to reduce these incident rates, work to make Uber the safest platform on earth, and work to make rideshare an even safer way to travel.

At its core, this report is about more than Uber. It's about taking a new, better approach to an age-old problem that too many in our society normalize and may live with every day. It's about improving safety for women and everyone else. It's about **accountability**—to riders, drivers, and the entire industry.

Uber will continue to release a Safety Report every 2 years. But we know that published reports only go so far. We can make society much safer if we all work together. And that requires implementing best practices based on expertise, and sharing data that benefits everyone.

Moving forward, we encourage all organizations—airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report. People have the right to know.

> We encourage all organizations—airline, taxi, ridesharing, home-sharing, and hotel companies, as well as others—to share their safety records with their customers and exceed this report. People have the right to know.

We've teamed up with RALIANCE, a national partnership dedicated to ending sexual violence in one generation, to establish RALIANCE Business: a new resource center that will be dedicated to helping public and private sector leaders adopt consistent, evidence-based standards and strategies to improve how they measure, respond to, and prevent sexual violence that may occur in the workplace or within business operations.

Uber is taking an important step, but every company has a role to play. We look forward to working together to confront these issues, count them, and make progress toward ending them.

---

206. National Highway Traffic Safety Administration (NHTSA), "2018 Fatal Motor Vehicle Crashes: Overview," p. 1, October 2019, https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/812826.

# Appendix I:

## Why data standards matter

The data in this report could have looked a lot different. It was just as important to Uber to develop overinclusive data standards that govern how we apply the taxonomy as it was for us to implement a clear taxonomy in the first place. These standards have a real and important impact. When it comes to voluntary public safety reporting by companies, these standards are adopted entirely at an individual company's discretion. Therefore, the value a standard taxonomy could bring to an industry is all but lost if not applied and reported on consistently within that industry.

The following must be established to achieve comparable reported results:

1. A taxonomy that is mutually exclusive and collectively exhaustive, with clear definitions and application standards
2. A clear definition for how a safety incident relates to a given company
3. Clear and unambiguous conditions on exactly what is included in public safety reporting

To demonstrate the powerful impact that different data standards can have on results, Uber manually reviewed a random sample of 100 incident reports for 2 categories of sexual assault and classified them using alternative standards, all of which were less inclusive than the standard applied in this report. The results below demonstrate how differences in standards, even when using the same taxonomy, can produce dramatically different outcomes.

### Non-Consensual Sexual Penetration example

In this example, a random sample of Non-Consensual Sexual Penetration incident reports could decrease from 100 to 35, depending on the alternative standard applied (see Exercise 1: Alternative standards A–E).

If Uber then combined and applied **all 5** of these alternative standards to this random sample of 100 incident reports, the cumulative effect on the number of Non-Consensual Sexual Penetration incident reports **would dramatically decrease from 100 incident reports to 10** (see Fig. 23).

### Non-Consensual Touching of a Sexual Body Part example

Even more drastic results occur when repeating the same exercise for a less severe category, such as Non-Consensual Touching of a Sexual Body Part (see Exercise 2: Alternative standards A–E). Again, if Uber then combined and applied all 5 of these alternative standards to this random sample of 100 incident reports, the cumulative effect on the number of Non-Consensual Touching of a Sexual Body Part incident reports **would drop even lower, from 100 incident reports to 3** (see Fig. 24).

# Exercise 1: Sample of 100 Non-Consensual Sexual Penetration Incident Reports



**Alternative Standard A:**
**Incident must be reported against a known Uber account holder (i.e., no third parties, no guest riders)**

Must be accusing an Uber account holder (rider or driver) — 92



**Alternative Standard B:**
**Support agent must have successfully communicated with the victim after initial report**

Support agent communicated with victim following initial report — 74



**Alternative Standard C:**
**Incident must have occurred within an hour of trip completion**

Occurred within an hour of the trip — 66



**Alternative Standard D:**
**Incident report must be corroborated (i.e., third-party witness, other supporting facts)**

Must be corroborated — 66



**Alternative Standard E:**
**Incident report must have confirmed police involvement**

Confirmed police involvement — 35

Why data standards matter

## Exercise 1 (continued): Sample of 100 Non-Consensual Sexual Penetration Incident Reports

Fig. 23: All 5 alternative standards applied to sample set of 100 reports of Non-Consensual Sexual Penetration



# Exercise 2: Sample of 100 Non-Consensual Touching of a Sexual Body Part incident reports



**Alternative Standard A:**
**Incident must be reported against a known Uber rider or driver (i.e. no third parties, guest riders)**

Must be accusing an Uber account holder (rider or driver): 98

**Alternative Standard B:**
**Support agent must have successfully communicated with the victim after initial report**

Support agent communicated with victim following intitial report: 81

**Alternative Standard C:**
**Incident must have occurred within an hour of trip completion**

Occurred within an hour of the trip: 99

**Alternative Standard D:**
**Incident report must be corroborated (i.e. third-party witness, other supporting facts)**

Must be corroborated: 15

**Alternative Standard E:**
**Incident report must have confirmed police involvement**

Confirmed police involvement: 10

Why data standards matter

## Exercise 2 (continued): Sample of 100 Non-Consensual Touching of a Sexual Body Part incident reports

Fig. 24: All 5 alternative standards applied to sample set of 100 reports of Non-Consensual Touching of a Sexual Body Part



# Appendix II

  

## Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy and the Development of Uber's United States Safety Report: Executive Summary

By: Janine Zweig, Chad Sniffen, and Emily Tiry

## Overview

This project set out to assess Uber's integration of the Sexual Misconduct and Violence Taxonomy into its system of receiving and accurately categorizing complaints from platform users — the verification analysis, and Uber's approach to developing the US Safety Report — the systems assessment. Through the data collection and analysis activities we conducted, we learned that Uber has implemented the taxonomy with accuracy, employing strong quality assurance processes to ensure ongoing accuracy. They engage in a robust initial and ongoing training process that focuses on continual categorization alignment among employees who use the taxonomy for both incident response and auditing purposes. These efforts aim to produce reliable data across all categories, and our analyses conclude that the goal has been largely achieved; the sexual assault data in the taxonomy categories included in the US Safety Report are statistically reliable. In general, we found the processes to develop the US Safety Report focused on accuracy and used rigorous data.

## Background and Project Approach

In 2017, Uber Technologies' leadership recognized that their system to categorize users' reports of incidents of sexual harassment, sexual misconduct, and sexual assault could be improved to better help them more fully understand the nature and scope of these problems experienced by users of their platform. The classification system had limited categories and relied heavily on subjective determinations by agents. Without an objective basis, categorization could not be consistently applied. Recognizing the need for outside expertise to create an effective categorization system, Uber's leadership engaged with RALIANCE, the National Sexual Violence Resource Center (NSVRC), and the Urban Institute (Urban) to develop a research-informed categorization system. We published the Sexual Misconduct and Violence Taxonomy in late 2018.[1]

Once the taxonomy was published, Uber began implementing it to categorize all new incidents of sexual harassment, sexual misconduct, and sexual assault reported by platform users going forward. Uber also

retrospectively applied the taxonomy to such incidents reported in 2017 and 2018. The NSVRC/Urban team conducted a project to assess Uber's integration of the taxonomy into its system of receiving and accurately categorizing complaints from platform users, and Uber's approach to developing the Safety Report. The project resulted in a brief report (with the findings summarized below) and had two components:

1. A verification analysis of how Uber agents and auditors categorize user-reported incidents into the taxonomy. This process compared the way Uber's staff categorized user-reported incidents to the way staff from NSVRC and Urban did for two samples of reports.[2] The goal of this comparison was to determine the overall reliability with which Uber staff categorize reports into the taxonomy and the process of auditing these data.

2. A system assessment of Uber's overall integration of the taxonomy into its incident-reporting process, of how taxonomy data are managed and audited, and of how the sexual assault data are to be presented in Uber's forthcoming 2019 US Safety Report. The goal of this assessment was to document the taxonomy data cleaning and processing system, and provide an assessment as to the integrity, objectivity, and rigor with which Uber analyzed sexual assault data and intended to report it in the US Safety Report.

For the first component, NSVRC/Urban staff used the taxonomy to categorize two samples of user-reported sexual misconduct and sexual assault incident reports during the time period being considered for Uber's 2019 US Safety Report (2017 and 2018): a representative, random sample of 383 reports spanning the full range of sexual misconduct and sexual assault incidents and a non-random sample of 200 sexual assault incident reports focused on serious and difficult-to-categorize reports. Our categorizations were assessed for the extent of alignment within our team and compared with Uber's categorization.

For the second project component, and to assess Uber's overall integration of the taxonomy into their incident reporting system and how that integration might contribute to the sexual assault data intended for their 2019 US Safety Report, staff from NSVRC and Urban conducted seven interviews with nine Uber employees (six individual interviews and one three-person interview). Each of these individuals have direct influence over the way that use of the taxonomy is implemented, how incident data categorized by the taxonomy are managed, and how aggregate sexual assault data based on the taxonomy are likely to be disclosed by Uber in its US Safety Report.

## Summary of Findings and Observations

Below, we summarize our findings and observations from both project components for the following topics: the training of customer service agents and incident report auditors; the incident report categorization and alignment process; and the approach to and analytic strategies for sexual assault data intended for the US Safety Report.

- Training of Customer Service Agents and Incident Report Auditors
  - We found that Uber engages in a robust training process that focuses on continual categorization

---

[1] Sniffen, C., Durnan, J., & Zweig. J. (2018). *Helping industries to classify reports of sexual harassment, sexual misconduct, and sexual assault.* Retrieved from the National Sexual Violence Resource Center: https://www.nsvrc.org/helping-industries-classify-reports

[2] This verification comparison was conducted by three NSVRC/Urban staff; two of whom were among the original staff that developed the taxonomy.

alignment between employees who use the taxonomy for both incident response and auditing purposes.

- Incident report categorization and alignment process

  - We found that, overall, Uber has developed a rigorous process to promote the accuracy of incident report categorizations, leading to reliable data being captured by the taxonomy. In addition, Uber has high accountability when processing incident report data. All modifications to an incident report (e.g., a change in taxonomy categorization) are logged as part of that data record.

  - Data categorized in Uber's taxonomy are reliable and reports can be consistently classified across agents. According to common interpretation standards of kappa statistics, our analysis showed almost perfect agreement (0.80-1.00) among the NSVRC/Urban team members in classifying sexual misconduct and assault reports made to Uber, and substantial agreement (0.61-8.0) between Urban/NSVRC staff and Uber staff.

- Approach to and analytic strategies for sexual assault data intended for the US Safety Report

  - During our system analysis, Uber shared that the US Safety Report would include specific taxonomy categories, provided reasons for including such categories, discussed their data cleaning and analysis approach, and provided a snapshot of the internal report review process. In general, we found these processes to be based on careful consideration with a focus on reporting safety information accurately, and using rigorous data.

## About the Organizations

RALIANCE is a national partnership dedicated to ending sexual violence in one generation. RALIANCE partners with a wide range of organizations to improve their cultures and create environments free from sexual harassment, misconduct and abuse. Every day, RALIANCE helps leaders establish safe workplaces and strong communities by advancing research, influencing policy, and supporting innovative programs.

The National Sexual Violence Resource Center (NSVRC) is the leading nonprofit in providing information and tools to prevent and respond to sexual violence. NSVRC translates research and trends into best practices that help individuals, communities and service providers achieve real and lasting change.

The Urban Institute, founded in 1968, is a trusted source for unbiased, authoritative insights that inform consequential choices about the well-being of people and places in the United States. They are a nonprofit research organization that believes decisions shaped by facts, rather than ideology, have the power to improve public policy and practice, strengthen communities, and transform people's lives for the better.

This study was funded by Uber Technologies, Inc. The opinions, findings, conclusions, and recommendations expressed in this document are those of the authors and do not necessarily reflect those of the Urban Institute, National Sexual Violence Resource Center, or RALIANCE, or their trustees or funders.

# Appendix III



## An Evaluation of Safety Incident Categorization Capabilities for Uber

December 3, 2019

The Chertoff Group LLC (TCG) was retained by Uber Technologies, Inc. (Uber) to conduct a strategic-level evaluation of Uber's application of an independently-developed sexual harassment, sexual misconduct, and sexual assault taxonomy to its U.S. rideshare platform incident data set and its classification of incidents of physical assault or theft and robbery that result in fatality ("fatal physical assaults"). Uber undertook this program to help the company and other key stakeholders better understand and address the prevalence of these incidents within its U.S. rideshare platform.

The TCG team was tasked with using its past experience overseeing the normalization and categorization of large incident and criminal justice system data sets to (1) notionally define key project risk and performance factors; and then (2) evaluate the extent to which these factors have been incorporated into and mitigated by the company's approach. In developing criteria, TCG leveraged authoritative U.S. Government strategic requirements and planning guidance for how to translate desired outcomes into supporting capability descriptions, resource components (the ways and means of operationalizing a capability), and evaluative measures (that is, a means of verifying that the capability in question is operating as intended).

In particular, we developed evaluation criteria based on the core resourcing categories that, in our experience, taken together define an effective capability. While all aspects of Uber's program are, of course, important, we determined that the following evaluation factors were of acute significance:

- The extent of leadership's commitment to the taxonomy classification project;
- The adequacy of training and education for the frontline auditors who validated the classification against Uber's larger incident data set; and
- The successful implementation of the technological systems to support the program.

With respect to these critical factors, after a month-long examination of Uber's activities (including review of relevant documents; multiple interviews with Uber personnel; and a literature review) we reached the following conclusions:

- There is a substantial commitment within leadership to the project, reflected both in the level of attention being paid to the taxonomy program by senior management and in the alignment of management performance evaluations with measures of success for the program;

- Training and education were treated as a critical factor by the program managers, resulting in the deployment of meaningful resources to the effort. While this novel taxonomy program is difficult to train for, we found that Uber devoted significant effort to the development of the program; to the creation of an intuitive, usable taxonomy; and to evaluative measures that ensured alignment between auditors and program objectives; and

- Uber devoted significant resources to the creation of an integrated in-house technology system that appropriately supported the classification program. While we observed strong change management controls within technology-level implementation of the taxonomy, we see some residual risk in the need for greater change management controls at the non-technology level (for example, a more rigorous processes to document the consideration, adoption, and deployment of modifications to the taxonomy classification system). While we also see some inherent risk in any in-house software development project, we were impressed by the level of expertise and attention demonstrated by the staff to these issues.

We also observed that Uber's taxonomy effort and its collaboration with the National Sexual Violence Resource Center (NSVRC) and the Urban Institute has several notable similarities to the successful implementation of select large federal incident-based data systems with which we are familiar, strongly suggesting that the processes Uber has adopted are appropriate. Key federal systems-related lessons learned include: the necessity of stakeholder buy-in; development of precise requirements/statement of work; and integration of end-user subject matter experts in all aspects of the process.

In Uber's program we noted that there was: buy-in and resourcing of the effort from Uber executives; recognition of the challenges and opportunities associated with implementing the classification system; establishment of a clear objective for the program; and creation of an integrated team of subject matter experts including Uber staff who would ultimately be the end-users of this taxonomy system. The development process involved several iterations of taxonomy development that were subjected to review by and input from the Uber staff, as well as extensive validation by NSVRC and Urban Institute experts until a version was agreed upon and ultimately put in the operational environment. This integration of subject matter experts from Uber and NSVRC/Urban Institute was, in our view, critical to the successful creation and implementation of the taxonomy, much as it was in the successful creation and implementation of federal incident-based data systems. Lastly, as with related federal systems, Uber's taxonomy was created using a dynamic process and we expect it will continue to grow and improve over time.

In addition, we made the following general observations:

- Uber had a meaningful taxonomy-related doctrine and policy development process, although it requires some greater formality;

- A steering committee and a matrixed safety team provided organizational oversight of the program;

- Adequate and appropriately trained staff were assigned to the special audit program;

- Dedicated funding was in place for the effort; and

- Suitable standards and processes were in place to help ensure the accuracy and calibration of the classification process.

We also made some recommendations to Uber to strengthen their program management. In addition to the need for a more formalized policy process and better change management practices already noted, we recommend: continued human sampling to verify automated natural language processing safety classifications; and the creation of a feedback loop to inform safety classifications by intake customer service representatives.

Based on our examination of Uber's program (and as limited in the next paragraph), **our opinion is that Uber's efforts to apply the taxonomy to its incident data set were reasonable and made in good-faith.** We are further of the opinion that, given the time and resource constraints that necessarily attend any effort to characterize a database of this size, scope, and complexity, the baseline offered by Uber's analysis is a reasonable starting point from which to develop polices and a suitable beginning for the iterative process of further taxonomical development and application to other databases.

*Limitation of Work: Given the limited scope of the review requested by Uber, our opinion is restricted to a qualitative assessment of the taxonomy classification program as of the date hereof to evaluate the reasonableness of Uber's application of the taxonomy to its selected data set and the company's identification of fatal physical assaults as they relate exclusively to the company's U.S. rideshare platform. Uber did not ask us to extend this review to any of its international rideshare platforms, nor did the company ask us to conduct any quantitative analysis of the underlying incident data set or the data as categorized using Uber's methodologies, as we understand that such a review was conducted by the NSVRC and the Urban Institute. Uber also did not ask us to evaluate Uber's substantive efforts to prevent, respond to, or otherwise address sexual harassment, sexual misconduct, sexual assault, and fatal physical assaults – or more general safety risks – in its platform.*

*About The Chertoff Group Team: The Chertoff Group is an internationally recognized leader in security and risk management advisory services and applies its unmatched industry insights around security technology, global threats, strategy and public policy to enable a more secure world. It starts from the proposition that there is no such thing as risk elimination and the firm helps clients understand risk and address the fundamentals of security risk management. Members of The Chertoff Group's assessment team included: **Thomas Bush**, an advisor to The Chertoff Group and former Assistant Director of the Criminal Justice Information Services (CJIS) Division of the Federal Bureau of Investigation (FBI) who spent his entire career designing, managing, and evaluating case management systems, including the design and management of the FBI case management system and N-DEx, the national database of criminal justice data; **Joseph Ford**, an advisor to The Chertoff Group, former Associate Deputy Director of the FBI and former Chief Security Officer for Bank of the West, who has extensive experience in the use of case management systems both in law enforcement and commercial environments; **Adam Isles**, a Principal at The Chertoff Group and former Deputy Chief of Staff at the U.S. Department of Homeland Security (DHS) who works with clients across industries to build security risk management programs and was the principal drafter of the firm's security risk management methodology, which was approved by DHS for SAFETY Act designation in 2017; and **Paul Rosenzweig**, a senior advisor to The Chertoff Group and former Deputy Assistant Secretary for Policy at DHS who has extensive knowledge on data management and has developed policy, strategic plans, and global approaches to homeland security, ranging from immigration and border security policies to avian flue and international rules for data protection. The Chertoff Group report was reviewed by **Michael Chertoff**, the Executive Chairman of The Chertoff Group, a former Secretary of Homeland Security, and federal judge on the U.S. Court of Appeals for the Third Circuit, and **Jayson Ahern**, a Principal at The Chertoff Group and former acting Commissioner of U.S. Customs and Border Protection at DHS.*

# Appendix IV:

## Sexual Misconduct and Sexual Violence Taxonomy

(Ordered from least to most severe)

| Sexual Misconduct | |
|---|---|
| Staring or Leering | Someone gazes at a user in an unpleasant, uncomfortable, prolonged, or sexual manner. Staring or leering is constant and unwavering. This includes viewing both sexual and non-sexual body parts. |
| Comments or Gestures > Asking Personal Questions | Someone asks specific, probing, and personal questions of the user. This would include questions about the user's personal life, home address, contact information (e.g., phone, email, social media), romantic or sexual preferences. |
| Comments or Gestures > Comments About Appearance | Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |
| Comments or Gestures > Flirting | Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. |
| Comments or Gestures > Explicit Gestures | Someone made sexually suggestive gestures at the user. |
| Comments or Gestures > Explicit Comments | Someone described or represented sexual activity or body parts in a graphic fashion. |
| Displaying Indecent Material | Indecent material, including pornography or other sexual images, was seen by the user. |
| Indecent Photography/Video Without Consent | Someone has taken, without consent, an inappropriate photograph of a user's sexual body part (e.g., down shirt, up skirt, etc.). |
| Soliciting a Sexual Act | Someone directly asks for a kiss, displays of nudity, sex, or contact with a sexual body part (breast, buttock, genitals). This could be a direct solicitation or a solicitation in exchange for money or favors. |
| Masturbation/Indecent Exposure | Someone has exposed genitalia and/or is engaging in sexual acts in presence of a user. This excludes public urination where no sexual body part (buttock, penis, breast) was exposed. |
| Verbal Threat of Sexual Assault | Someone directed verbal explicit/direct threats of sexual violence at a user. |

**Sexual Assault**
- Sexual body parts are defined as the mouth, female breasts, buttocks, and genitalia. The phrase "between the legs" is considered to reference a sexual body part. All other body parts are characterized as non-sexual.
- When only a non-sexual body part is involved, either of the following provides context for the 'sexual nature' of the contact/attempted contact:
  - Sexual misconduct of any type
  - Reporter's explicit perception that the contact was either flirtatious, romantic, or sexual

| | |
|---|---|
| Attempted Touching of a Non-Sexual Body Part | Someone attempted to touch, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Kissing of a Non-Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Touching of a Sexual Body Part | Someone attempted to touch, but did not come into contact with, any sexual body part (mouth, breast(s), buttock(s), or genitalia) of the user, and the user perceived the attempt to be sexual. |
| Attempted Kissing of a Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with the mouth, breast(s), or buttock(s) of the user, and the user perceived the attempt to be sexual. |
| Non-Consensual Touching of a Non-Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any non-sexual body part (hand, leg, thigh) of the user. |
| Non-Consensual Kissing of a Non-Sexual Body Part | Without consent from the user, someone kissed, licked, or bit, or forced a kiss, lick, or bite on any non-sexual body part (hand, leg, thigh) of the user. |
| Attempted Non-Consensual Sexual Penetration | Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as Attempted Non-Consensual Sexual Penetration. This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue. |
| Non-Consensual Touching of a Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user. |
| Non-Consensual Kissing of a Sexual Body Part | Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue. |
| Non-Consensual Sexual Penetration | Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue. |

For more information on the Sexual Misconduct and Sexual Violence Taxonomy, please visit the publication from the National Sexual Violence Resource Center, Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault.