# EXHIBIT 10

# PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(202) 223-7407

WRITER'S DIRECT FACSIMILE

(202) 379-4099

WRITER'S DIRECT E-MAIL ADDRESS

ksmith@paulweiss.com

January 16, 2024

**VIA EMAIL**

Roopal P. Luhana, Esq.
Chaffin Luhana LLP
600 Third Avenue
12th Floor
New York, NY 10016
Luhana@chaffinluhana.com

Sarah R. London, Esq.
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street
Suite 2900
San Francisco, CA 94111
slondon@lchb.com

Rachel B. Abrams, Esq.
Peiffer Wolf Carr Kane Conway & Wise LLP
555 Montgomery Stret
Suite 820
San Francisco, CA 94111
rabrams@peifferwolf.com

CONFIDENTIAL

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.   2

Re: MDL 3084 - Uber's Legal Hold and Preservation Information

Dear Counsel:

Pursuant to the Court's January 9, 2024 Order regarding Plaintiffs' motion to enforce PTO No. 2 (ECF 190), we write to disclose information regarding Uber's legal holds and ESI sources.

As an initial matter, we refer Plaintiffs to the deposition transcript (including exhibits), with respect to the deposition of William Anderson, dated September 26, 2023, in the JCCP action. That transcript, and various other documents with information on these topics, were provided to Plaintiffs on January 8, 2024. Mr. Anderson gave testimony as Uber's person most knowledgeable with respect to the following topics:

1. The electronic platforms, programs, databases, and information technology systems (*e.g.,* Slack, the Google Suite of products, Microsoft Office, Zendesk, Bliss) Uber has used from its inception to today. This topic includes, but is not limited to, the dates of use of each platform and what Uber used the platform for.

2. Uber Technologies Inc.'s document/ESI preservation policies and procedures from its inception to today.

3. How and where Uber Technologies Inc. stores and/or maintains electronic information related to sexual assault and sexual misconduct.

4. To the extent not already covered, the communication platforms used by Uber Technologies Inc.

5. Any other programs, platforms, or databases used by Uber Technologies Inc. to report, store, communicate about, or review information related to sexual assaults and incidents of sexual misconduct that occur during Uber rides.

Thus, Mr. Anderson's deposition testimony covers a substantial amount of information relevant to the disclosures required by the Court's January 9, 2024 Order, particularly as to the question of custodial and noncustodial data sources. We also refer you to the various disclosures that were made to the JCCP plaintiffs in written correspondence, which has been produced to you.

We provide additional detail below.

I. **Information Regarding the Approximately 15,500[1] Past and Current Uber Employees Subject to a Legal Hold**

Please refer to Exhibits A and B for the following information regarding the more than 15,000 current and former Uber personnel whose data is presently subject to

---

[1] Exhibit A includes information for over 15,800 accounts. Uber has determined that roughly 250 of these accounts are being preserved for reasons other than a legal hold. Exhibit A provides the name, job title, dates

CONFIDENTIAL

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.                          3

legal hold: (1) dates that the holds were issued; (2) the dates of preserved ESI; (3) the names, job titles, and dates of employment of the recipients of the hold notices; and (4) whether the hold relates to a case or complaint involving allegations of sexual assault or sexual harassment.

The dates of preserved ESI for each individual will generally extend *at least* as far back as before the date of issuance of the first legal hold with respect to email data, and will almost certainly extend back further for other sources of data—*e.g.*, Google Drive documents—as to which no auto-deletion policy was in effect.[2] As we have explained in previous correspondence and the briefing on the Motion to Enforce, when a legal hold is in place, any auto-deletion policies that may have been in effect with respect to email would have been suspended. We therefore expect that, in general, the date of preserved email ESI for each individual will date back to the issuance of the first legal hold. It is possible that if there was a period of time where an earlier hold was lifted but before a later hold went in place, some ESI dating before the latter legal hold may not have been preserved. We do not expect this to have been a common occurrence, but can continue to investigate and discuss with Plaintiffs on an account-by-account basis once the parties narrow to a universe of proposed custodians (*e.g.*, the 143 individuals that the plaintiffs proposed in the JCCP).

II. **Information as to Custodial and Non-Custodial ESI Sources Enumerated in PTO No. 2, Paragraph 3**

In the subsections below, for each custodial and non-custodial ESI source enumerated in PTO No. 2, Paragraph 3, Uber has disclosed: (1) whether each source of ESI was preserved; (2) when each source was preserved; (3) when each source was used; (4) what was each source used for; and (5) the general types of information housed/contained in each source.

1. "Email systems"

Uber has used email systems since the inception of its business. Based on our research, it appears Uber has used Google's email product, Gmail, as its email system company-wide for Uber-related emails sent to or from Uber employees back to around the time of the company's inception (and we have confirmed that it was the email platform used from 2012 onward). The email system stores any emails and related attachments that were sent or received using an Uber email address.

---

of employment of the recipients of the hold notices for each account. Exhibit B includes the date each hold associated with these accounts was issued, as well as whether that hold relates to a case or complaint involving allegations of sexual assault.

[2] Uber attempted to export data from its ESI data sources to show the date range of ESI in each data source—for example, the date range of emails associated with an individual's account. However, we have determined that an export of that information for all 15,000+ accounts is not technologically possible. Should Plaintiffs have questions about the dates of preserved ESI with respect to specific personnel, Uber will continue working with you to answer those questions based on specific personnel rather than for all 15,000+ accounts on hold, as the latter approach is not possible based on what the technology allows.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.       4

Pursuant to Uber's Email, Slack, Messaging & Texting Retention Policy, all emails are generally retained automatically for a period of 24 months.[3] Between September 1, 2015 and January 31, 2023, Uber's policy was that all emails were generally retained automatically for a period of 180 days.[4] We have not located a specific policy that was in place prior to that time, and therefore our understanding is that once the 180-day policy went into effect on September 1, 2015, emails older than March 2015 would have been automatically deleted unless there was an exception to how the retention policy operated for a particular account (*e.g.*, if an account was on legal hold).

As we have described in previous correspondence and the briefing on the Motion to Enforce, Uber has been preserving, and continues to preserve, data stored on email systems in accordance with its legal hold policies. When an employee's email is placed on legal hold, emails that exist in the account at the time the legal hold is issued are preserved while that legal hold (or *any* earlier- or later-issued legal hold) is in effect. Email preservation is specific to each custodian. Exhibit A provides a complete list of the employees currently on legal hold, as well as the time at which that hold went into place, providing information as to when email system data has been preserved for each custodian.[5]

2.   "Mobile device data"

Uber employees use mobile device assets including cell phones, laptops, and, occasionally, tablets. These devices can be either personal devices owned by the employee and used for their work at Uber, or Uber-issued devices given to the employee specifically for their work at Uber.

As we have previously discussed, work performed by Uber employees is generally performed using systems that have cloud-based data storage (*e.g.*, email, Google Drive, various chat platforms). As a result, it is not likely that there is a significant volume of non-duplicative, relevant information on actual mobile devices.

Uber has been preserving, and continues to preserve, Uber-issued mobile devices (*i.e.*, cell phones, laptops, tablets) for many employees placed on legal hold once those devices are no longer in use (either because a new one was issued to the employee, or because the employee turned in their device upon departing the company). Additionally, when a current employee is notified of a legal hold, the employee is informed of their preservation obligations and instructed not to destroy mobile device data. When the employment of an individual on legal hold is terminated, the individual's devices typically are collected and stored or maintained by Uber in a secure storage facility. They would be stored for the duration of any applicable legal holds which apply to the former employee's electronic accounts.

---

[3]   UBER000000308 (produced to MDL Plaintiffs on January 8, 2024).
[4]   UBER000000016 (produced to MDL Plaintiffs on January 8, 2024).
[5]   It is possible in some instances, the preservation of email data will be more expansive than would have been expected based on operation of the company's ordinary course retention policies.

CONFIDENTIAL

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.     5

Uber currently has mobile devices in its possession dating back as far as April 2012. Determining the complete extent of data that is preserved and the exact dates of that preservation would require an individual search of every mobile device in Uber's custody and is not technologically feasible.

### 3. "Text and messaging applications"

For person-to-person communication, the primary forms of communications are email and the various chat platforms Uber has used over time (as described in more detail in No. 4 below). To the extent any business has been conducted via text and messaging applications, Uber does not maintain data from text and messaging applications on its own servers. Thus, there is no uniform, automated methodology of preservation of data sent or received on these applications. However, Uber's Email, Slack, Messaging & Texting Retention Policy requires Uber employees to preserve business-related text messages relating to the matter when they are on a legal hold.[6]

This data may still be maintained on the physical devices retained and preserved by Uber (discussed in No. 2 above). As noted above, determining the extent of the data that is currently retained by Uber would require an individual search of every device in Uber's possession, which is not logistically feasible.

### 4. "Workplace collaboration tools and chat applications, such as Slack and Teams"

Over time, Uber has utilized a variety of chat applications for employees to transmit communications with other employees concerning Uber business. These applications include: Google Chat, Slack, uChat, and HipChat. Those chat platforms are the Uber-approved applications for this purpose. To our knowledge, Uber does not have an enterprise Microsoft Teams system.

Uber currently uses Google Chat and Slack direct messaging applications for internal chats between Uber employees. Uber has utilized Google Chat (formerly known as Hangouts Chat) or some prior version of Google Chat for as long as Uber has utilized Gmail. As of January 31, 2023, Google Chat messages are automatically retained for 90 days.[7] Additionally, Google Chat messages are retained in accordance with the legal hold policies when an employee's Google account is placed on hold.

Uber initiated the use of Slack around January 2020. Slack is currently in use by Uber employees and is managed by Uber Tech Services. Per Uber's January 31, 2023 Email, Slack, Messaging & Texting Retention Policy, Uber-managed Slack channels are generally retained for a period of 24 months (except for messages associated with individuals whose accounts are on legal hold, which are held indefinitely while the legal hold is in place).[8] Direct messages sent between employees on Slack are retained for 90

---

[6] UBER000000309 (produced to MDL Plaintiffs on January 8, 2024).
[7] UBER000000308 (produced to MDL Plaintiffs on January 8, 2024).
[8] Id.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.                    6

days, and are subject to retention under applicable legal holds as with Google Chat messages. Prior to January 31, 2023, Slack channels and direct messages were routinely retained for 90 days.

Uber used an internally-built chat platform called uChat from February 2017 until 2020. When it was in use, uChat had an automatic retention period of 60 days. uChat messages are also preserved in accordance with Uber's legal hold policies, and, as such, Uber has retained the uChat messages of certain custodians between the years of 2017 and 2020. After uChat was deprecated from use by Uber, the uChat data that Uber had at that time was stored and has not been subject to any automatic deletion.

Prior to implementing uChat, Uber used a commercially available application called HipChat. Prior to November 29, 2016, HipChat by default retained the most recent 75 messages in a conversation. Some HipChat conversations had specific retention periods set to 7 days or 75 messages. After November 29, 2016, HipChat's default retention period switched to indefinite retention, so any HipChat conversations using the default retention period were generally preserved indefinitely. HipChat messages were also preserved in accordance with Uber's legal hold policies. As such, Uber has HipChat messages preserved from specific custodians from 2016 to 2017. After HipChat was deprecated from use by Uber, the HipChat data that Uber had at that time was stored and has not been subject to any automatic deletion.

In regard to workplace collaboration tools, Uber primarily uses the Google Suite of products (*e.g.*, Google Docs, Google Sheets, etc.). The Google Suite of products has been used for workplace collaboration since at or near the time of the inception of the company—at least as far back as 2012. As discussed below in No. 6, files associated with an employee's Google Drive are generally retained indefinitely and are not subject to automatic deletion.

Uber employees are also allowed to obtain access to a Box account affiliated with their company email address and may use Box to store, share, and collaborate on files. Uber employees are not automatically given a Box account and instead must ask for one to be created. Therefore, it is not common practice for Uber employees to use Box, and a substantial majority of Uber employees do not have Box accounts. There are no automatic deletion policies that apply with respect to Uber Box accounts, and therefore, files placed in an employee's Box account are generally retained indefinitely unless they were manually deleted. Because of the technological limitations of the Box platform, it is not technologically possible to determine the exact dates for which Uber has preserved Box data without exporting and searching each individual Box account across the company.

In addition to the systematic and automatic retentions listed above, each of these systems can be placed on a legal hold. In the event that an account is placed on legal hold, any automatic deletion of files is halted, and the custodian's files in that data source are retained indefinitely. Exhibit A provides further information on the over 15,500 legal holds currently in place across the company.

CONFIDENTIAL

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.                                7

5.      "Social media accounts"

Uber maintains social media accounts on X (formerly Twitter), Facebook, LinkedIn, YouTube, Instagram, and TikTok. Uber uses these platforms for purposes such as brand publicity, customer outreach, and, in some instances, direct communication with users of the social media platforms. Information stored on these platforms would likely include any public posts made by the Uber accounts and any direct messages sent to or from Uber on the particular social media platform.

Relevant social media data can be accessed through the social media platforms themselves (*i.e.*, data relating to Uber's Facebook account is maintained by Facebook). Uber's social media accounts are publicly accessible, and these public profiles can be reviewed by anyone. Since 2014, Uber has used a third-party tool called Sprinklr that is connected to each social media platform that Uber utilizes. Generally, if a user of one of these platforms "tags" Uber in a post or sends Uber a direct, private message related to an alleged incident or complaint, the post/message is indefinitely retained on Sprinklr's servers and is reported up to Uber's safety team if appropriate. There is generally no automatic deletion of these messages/posts by Uber. While Uber is not aware of any automatic deletion policies instituted by the social media platforms, the best source for information about the platforms' own policies would be the platforms themselves.

Additionally, social media communications related to a particular user complaint or alleged incident are attached to the relevant JIRA ticket. As noted below, JIRA tickets are generally preserved indefinitely, and thus social media data related to incidents (if any) is also generally preserved indefinitely in the ordinary course of Uber's business.

6.      "Unstructured data (e.g., MS Office docs, Google docs)"

Uber primarily uses the Google Suite of products for the creation and storage of unstructured data, for example Google Docs, Google Sheets, etc., which is housed on the employee's Google Drive. Google Drive data is the preferred data system for all of Uber's documents including spreadsheets, word documents, and presentations, and has been used going back to at least 2012, and likely since 2009 when the company was founded. Google Drive data has been, and continues to be, preserved indefinitely, as there is generally no automatic deletion of data on Google Drive. As such, non-custodial unstructured data from the Google Suite of products, with the exception of email, generally has been preserved from the inception of the company and will continue to be preserved.

It is not Uber's ordinary practice to systematically maintain unstructured data deriving from the MS Office Suite of products, other than to the extent such documents are attached to emails (in which case the email storage systems would be the repository for such documents). To the extent that any employees have used the MS Office Suite of products, for example, if a Google Doc file was downloaded onto the computer's hard drive as a Microsoft Word document, that data would not be systematically preserved, though the original copy of the document that was created and stored on Google Drive would be

CONFIDENTIAL

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.                   8

retained indefinitely. However, such MS Office files, in the event that they exist, may be maintained on physical devices retained by the company in accordance with the preservation of mobile device data as described in No. 2 above.

Data from employee Box accounts, to the extent employees have such accounts, is also maintained as unstructured data. The preservation of Box accounts is addressed above in No. 4.

Determining what, if any, additional unstructured data exists on the hard drives of Uber-provided or Uber-maintained devices would require a manual search of each device that Uber has maintained.

7. <u>"Structured data (e.g., Salesforce and Basecamp)"</u>

Uber maintains structured data in external data warehouses that have stored data across the business since the company's inception. Information that is not subject to any formal automatic deletion policy[9] is generally preserved indefinitely in these data warehouses. As such, these warehouses store more than 850 petabytes (850,000 terabytes) of data that has been preserved dating back to 2009.

Within these data warehouses, Uber maintains a number of structured data systems from across the company. Relevant to this litigation, these systems include the Bliss and Zendesk customer support systems, and the PureCloud and LiveOps phone systems, as well as the JIRA ticketing system.

Uber maintains an internal ticketing system called JIRA that stores information relating to support requests across the company. JIRA tickets are created for both internal and external support requests, meaning JIRA tickets contain information ranging from Uber employee tech support requests to customer service requests from users of the Uber Rides platform. JIRA has been in use at Uber since approximately the end of 2016 and remains in use today. When a JIRA ticket is created related to an alleged incident, data is collected from other sources and attached to the JIRA ticket (*e.g.*, GPS data, phone call recordings, social media posts/messages, etc.). As with the other structured data sources discussed below, JIRA tickets are generally **preserved indefinitely** in the ordinary course of business. Mr. Anderson discussed the JIRA ticketing system and related systems at length in his Person Most Qualified deposition at pages 128–172 of the transcript.

Zendesk is a customer support platform, which Uber has used since 2015. While Uber cannot determine with specificity the date on which Zendesk went into operation at Uber, there is no indication that a different customer support platform was used prior to Zendesk and it is likely that the use of Zendesk dates back to around the time of the company's inception. Historically, Zendesk was used to monitor and track a broad range of support requests from users of the Uber application, including communications related to alleged incidents of sexual assault or misconduct committed by independent

---

9   *See e.g.*, User Data Retention and Deletion Policy, UBER000000337 - UBER000000360 (produced to MDL Plaintiffs on January 8, 2024)

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.                     9

drivers against riders. Zendesk is still used today, but not for customer support services related to alleged incidents of sexual assault or misconduct. Information stored on Zendesk would include, among other things, feedback and support requests from individuals who have requested a ride through the Uber application. Zendesk data has generally been preserved indefinitely since Zendesk was first used and continues to be preserved today.

A transition away from the use of Zendesk for customer support services related to alleged incidents of sexual assault and misconduct began around the end of 2016. At that time, customer support services were transitioned to Bliss, another customer support platform. Bliss data would include the same types of information as Zendesk, including customer feedback and support requests. Bliss is still in use by the Uber Rides business today. Like Zendesk, Bliss data is generally preserved indefinitely and continues to be preserved today.

Uber's structured data also includes data from LiveOps, a phone platform that was used by the Uber Rides business for communications with users of the Uber Rides platform. LiveOps was the phone platform used by Uber to communicate with users of the Uber app about incidents related to sexual assault and misconduct until approximately the end of 2016.[10] When a call came in to Uber support on the LiveOps system, the phone call was recorded. Uber generally preserves recordings of LiveOps phone calls indefinitely, and when Uber switched to a new platform (discussed below), Uber transferred the data to an archive for preservation. Searching this archive is very difficult and requires an individual search and review of each of the audio files to determine what files have been retained. However, if a LiveOps recording is related to an incident, it is typically attached to the related JIRA ticket and would be retained along with the JIRA ticket, indefinitely.

Starting around the end of 2016 or beginning of 2017, Uber transitioned to a phone platform called PureCloud Genesys to field inbound calls about, among other things, alleged incidents of sexual assault and misconduct. Phone calls received on the PureCloud system were recorded, and those recordings have generally been preserved indefinitely since Uber began using PureCloud. As with LiveOps recordings, a PureCloud recording related to an alleged incident of sexual assault or misconduct for which a JIRA ticket was created would be attached to the related JIRA ticket and preserved indefinitely in that manner.

Uber maintains data related to its Human Resources department on Workday. Specific information about the retention periods for Human Resource records can be found in the HR Records Retention and Deletion Policy.[11]

Uber's structured data also includes data relating to driver profiles, feedback, and ratings, as well as GPS data related to rides through the Uber application. Specific retention policies for this data can be found in Uber's User Data Retention and Deletion Policy, which was produced to Plaintiffs on January 8, 2024. By way of example,

---

[10] *See* William Anderson Dep. Tr. at 78:9–78:15.
[11] UBER000000181-UBER 000000189 (produced to MDL Plaintiffs on January 8, 2024).

location data for earners, including GPS coordinates, are generally stored for 7 years,[12] and user profile data for earners is generally retained for 7 years after the user's account is closed.[13] Additionally, specific data related to an alleged incident or report of sexual assault or misconduct is linked to the related JIRA ticket, where it is generally retained indefinitely. Thus, the relevant business data for each incident is generally preserved indefinitely in the ordinary course of Uber's business, as an attachment to the JIRA ticket.

Salesforce and Basecamp are not known to have been used by Uber in relation to complaints about, or alleged incidents of, sexual assault, or for any other purposes likely to be relevant to this litigation.

8.  "Wearable devices"

Uber does not provide employees with wearable devices in the ordinary course of business. As such, there generally is not non-custodial wearable device data to be preserved.

9.  "Backup media"

Uber does not maintain physical backup media as Uber's backup data is stored on cloud services. Uber primarily uses Google Cloud storage and Amazon Web Services cloud storage for data backups. These systems contain all types of information that is used across the company. Both of these systems preserve data indefinitely and are not subject to any automatic deletion.

Prior to September 2, 2020, Uber also used a cloud-based backup service, known as CrashPlan, for some employee computers.[14] CrashPlan was used to back up data on Uber-issued laptops in the event an employee needed to restore their device (*i.e.*, if they lost or broke their laptop). If a user was deactivated and had a CrashPlan, their data was retained for a total of 110 days. Users on legal hold were not deactivated and their data was retained while they remained on legal hold. If a user was taken off legal hold, the typical CrashPlan retention policy applied. When Uber stopped using CrashPlan in September 2020, the data stored on CrashPlan as of that time was backed up indefinitely, and remains preserved today.

10.  "External storage media"

Uber does not maintain additional external storage media beyond its data warehouses (discussed in No. 7 above) and its cloud-based backups (discussed in No. 9 above).

Nor do Uber employees have their own external storage devices like hard drives or USB flash drives. In the unlikely event that any such external, company-issued

---

[12] UBER000000350.
[13] UBER000000349.
[14] UBER000000249 (produced to MDL Plaintiffs on January 8, 2024).

storage devices exist, they would generally be preserved in accordance with Uber's maintenance of mobile device data described in No. 2 above.

11. <u>"Voicemail systems"</u>

Uber does not provide employees with Uber-issued phone lines, and there is no Uber voicemail system. Employees use their cell phones for any Uber-related calls, whether those are personal devices or devices provided by Uber. As such, any Uber-related voicemail would go through the employee's phone, not a centralized internal Uber system. Because voicemails are not contained on Uber systems, there are no voicemails for Uber to preserve.

If an Uber employee's phone has been imaged or maintained, the voicemails on that phone may have been preserved in accordance with Uber's preservation of mobile device data (discussed in No. 2 above). To determine what voicemails exist on these devices and are therefore in Uber's custody would require a manual search of each of the devices that Uber has in its possession, which is not technologically feasible.

To the extent Plaintiffs are interested in voice communications between Uber support personnel and individual plaintiffs that may be relevant to particular alleged incidents, those communications generally would have been conducted through the company's centralized voice communication platforms LiveOps and PureCloud (or related systems), and are included in Uber's JIRA ticketing system for each individual incident. As noted above, JIRA tickets are generally preserved indefinitely, and thus the associated voice communications related to an incident, if any such communications exist, are also generally preserved indefinitely in the ordinary course of business.

12. <u>"Video surveillance systems"</u>

Uber maintains physical security monitoring systems for its office facilities globally. The data collected by these systems currently includes video recordings of facilities, adjacencies, employees, vendors, partners, and visitors. The systems capture the dates, times, and locations of the captured data. Videos collected through these systems are automatically deleted after 30 days unless retention is deemed necessary for a legitimate business purpose or is required by applicable law.

There typically are video surveillance systems in place at Greenlight Hub locations. In the United States, videos captured on these systems are retained for 30 days before automatic deletion. However, data may be sent to one of Uber's security teams and retained after this 30-day period if there is a legitimate business reason (*e.g.*, an incident occurred at the Greenlight Hub implicating the video footage).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Roopal P. Luhana, Esq., Sarah R. London, Esq., Rachel B. Abrams, Esq.  12

Sincerely,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s/ Kyle Smith

Kyle Smith
2001 K Street, NW
Washington, DC 20006-1047
(202)223-7407
ksmith@paulweiss.com

cc: Bret Stanley, Esq.
Steven D. Cohn, Esq.
John Eddie Williams, Esq.
Brian Abramson, Esq.
Stephen Estey, Esq.
Celine Cutter, Esq.
Brooks Cutter, Esq.
William Levin, Esq.

CONFIDENTIAL