# EXHIBIT D



1          SUPERIOR COURT OF CALIFORNIA

2           SAN FRANCISCO COUNTY

3     HONORABLE ETHAN P. SCHULMAN, JUDGE

4             DEPARTMENT 304

5        REPORTED REMOTELY VIA ZOOM

6              ---oOo---

7  UBER RIDESHARE CASES [JCCP      )
   COORDINATED PROCEEDINGS]        )
8                                  )
                                   )   CASE NO. CJC-21-005188
9                                  )
   _____)
10

11             ---oOo---

12

13    REPORTER'S TRANSCRIPT OF PROCEEDINGS

14           MAY 17, 2024

```
 1                      REMOTE ZOOM APPEARANCES

 2

 3   A P P E A R A N C E S:

 4   FOR THE PLAINTIFFS:        BRIAN ABRAMSON, ESQ.
                                WILLIAMS HART AND BOUNDAS
 5
     FOR THE DEFENDANTS:        JESSICA PHILLIPS, ESQ.
 6                              JACQUELINE RUBIN, ESQ.
                                PAUL, WEISS
 7
                                MICHAEL SHORTNACY, ESQ.
 8                              PATRICK OOT, ESQ.
                                SHOOK, HARDY AND BACON
 9

10   COURT REPORTER:           AMY GOODING, CSR
                                CERTIFICATE NO. CSR 13386
11

12                          ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1    SAN JOSE, CALIFORNIA                    MAY 17, 2024
```

**PROCEEDINGS**

```
 3

 4         THE COURT:  Good morning, everyone.  I think this

 5    is the first time we've met entirely remotely.  I see all

 6    your faces on the screen.  I suppose I should ask for

 7    purposes of this informal discovery conference to have

 8    counsel who expect to address the Court state your

 9    appearances for the record, please.

10         MR. ABRAMSON:  Good morning, Judge Schulman.

11    Brian Abramson with Williams Hart and Boundas for the

12    Plaintiffs.

13         MS. PHILLIPS:  Good morning, your Honor.  This is

14    Jessica Phillips from Paul Weiss on behalf of the Uber

15    Defendants.  With me is my partner, Jackie Rubin, who will

16    also be addressing the Court.

17         THE COURT:  All right, good.  I'd like to hear

18    some new voices as well.

19         Let's see if I can start with something before we

20    get to the subject of the informal discovery conference.

21    Let me start with something that we can all agree on, I

22    hope.  I have just received in my email this morning a copy

23    of Magistrate Judge Cisneros's order on the ESI protocol in

24    the federal cases.  As I understand it, the parties agreed

25    that substantially that order will govern in this case, and

26    I've been given a proposed order to be entered in this case

27    that I assume effectively, word for word, copies Magistrate

28    Judge Cisneros's order.  Is that what this is?  If so, does
```

1    everybody agree that I should enter it as an ESI order in

2    this case?

3              MR. ABRAMSON:  So, to your first point, it does

4    not match Judge Cisneros's order word for word because there

5    were some issues that were specific to the MDL.  We made

6    those modifications with Uber's counsel.  I'll let Uber

7    speak for themselves, but I believe it is ready to be

8    entered by the Court.

9              THE COURT:  Great.  Ms. Phillips?

10             MS. PHILLIPS:  Thank you, your Honor.

11             I'll actually kick this one to my colleague, Mr.

12   Shortnacy.

13             MR. SHORTNACY:  Michael Shortnacy with Shook,

14   Hardy and Bacon for Uber.  That's correct.  I agree with Mr.

15   Abramson.  I think the parties had to put their heads

16   together on a couple of issues that were unique to the MDL

17   or maybe switching out federal rules with the California

18   Code and so on and so forth, but I understand the agreement

19   has been finalized and submitted.  We are in agreement, your

20   Honor.

21             THE COURT:  Thank you.  I mean, obviously, I

22   notice references, for example, to the Federal Rules of

23   Civil Procedure which don't apply in my courtroom.  I

24   understand there may have been other minor changes.

25             That order will be submitted today.  Thank you for

26   submitting it.

27             Let's move on to more contested issues.  There are

28   two issues that are the subject of the IDC, although there

1    are clearly several others bubbling just below the surface.

2    But let me try and address the issues in the order that they

3    have been raised.

4         The first has to do with Uber's request to take

5    third party witness depositions during the current discovery

6    period, i.e. the discovery period leading up to the Court's

7    scheduled October 31st, 2024 deadline to set the bellwether

8    trial order.  As I understand it, Uber is seeking to take a

9    number of such third party depositions during that period

10   ranging, if I remember correctly, from two to seven in each

11   one of the cases, the designated cases.  Plaintiff's

12   position is that those third party depositions are not

13   necessary for Uber to rank the cases for purposes of the

14   bellwether trial order and that they should be deferred

15   until after that order is entered.

16        Is that a fairly accurate summary of the two

17   parties' or the two sides' positions here?

18        MR. ABRAMSON:  It is, your Honor.

19        MS. PHILLIPS:  Yes, your Honor.  I do agree with

20   that.

21        I will make one small tweak which is that Uber has

22   prioritized.  Of the 18 remaining bellwether cases, Uber has

23   prioritized four of those and reached out and indicated our

24   interest in taking third party depositions in certain cases.

25   You are correct in the four cases we identified, the number

26   of third party depositions we are seeking to take in those

27   cases are two to seven.

28        We are also interested in taking third party

```
 1   depositions in the remaining 14 bellwether cases and, you
 2   know, will be -- that number of course will be different in
 3   those cases because it's dependent, of course, of who the
 4   Plaintiff herself has identified as having that relevant
 5   information.
 6            THE COURT:  What is the significance of Uber
 7   having prioritized, as you put it, four of the remaining 18
 8   cases?  What does that mean?
 9            MS. PHILLIPS:  Sure.  I think it is a way for us
10   to begin pushing forward these third party depositions.  We
11   had to start somewhere.  Internally, we happen to have
12   prioritized these four cases.  Within these four cases,
13   these particular third party fact witnesses.  As I said, we
14   needed to start somewhere, and that's where we started.
15            THE COURT:  What you're telling me, though, is
16   that's where the dispute has arisen, but the dispute is a
17   larger one because Uber's position is that it ought to be
18   able to take third party depositions in all 18 of the cases
19   during the current period.
20            MS. PHILLIPS:  That's correct.
21            THE COURT:  Do you have an estimate at this point
22   as to the number of third party percipient witnesses whose
23   depositions you would be seeking to take in the remaining 14
24   cases that are on the board?
25            MS. PHILLIPS:  I don't have an estimate.  In part,
26   that's because it's dependent upon the Plaintiffs
27   identifying some.  I've certainly had circumstances where we
28   have individuals identified in Plaintiff fact sheets and
```

1 then other individuals identified in answers to written

2 discovery.

3          I am also familiar with the situation when if we

4 depose, when we depose the Plaintiffs in these cases,

5 additional individuals may be identified.  Of course, the

6 number varies in each of those cases.  I don't want to give

7 you an estimate because I don't have a reliable one.

8          THE COURT:  But the two to seven, were these

9 initial for quote unquote priority cases, you've identified

10 as I understand it principally if not exclusively from the

11 individuals whose names have been listed by Plaintiffs and

12 Plaintiffs' fact sheets as having relevant information.

13          MS. PHILLIPS:  That's correct.  It's exclusively

14 from both Plaintiff fact sheets and other written discovery.

15          THE COURT:  Okay.  Well, look.  Let's talk about

16 this issue and let me give you my initial reaction to it and

17 throw it open for discussion.

18          It seems to me where the parties agree, at least

19 initially, is that where Uber ought to be focused is on

20 during this initial period, that is leading up to the

21 bellwether trial order, is on what information it needs in

22 order to propose an order, in order basically to assess

23 these cases and take a position on which ones ought to be

24 tried first.

25          It also seems to me that some third party

26 discovery may well be important to that assessment, and I

27 agree with Uber that nothing in the prior orders that the

28 Court has entered precludes either party from taking third

1   party discovery during this period.

2          On the other hand, I understand the Plaintiffs'

3   concern that there's a lot to be done here during this

4   period of time and that taking a large number of third party

5   depositions during the period of time when the Plaintiffs

6   depositions need to be taken, other discovery needs to be

7   completed, including discovery against Uber, could be very

8   burdensome and eat up a lot of the limited time that you all

9   have available to you for discovery.

10          So, let me add one more thing.  I'm back to the

11   first hand again.  I am concerned that if too much discovery

12   here is pushed until after the Court's order comes out,

13   there's going to be a time crunch between October 31, 2024

14   when the trial order is to issue and January 15, 2025 when

15   fact discovery is to close under the order.  That's really

16   only two and a half months, and over the holiday period at

17   the end of 2024.  So, there's a balance, it seems to me, to

18   be struck here among all of these factors.

19          I don't have a good sense from the letter that you

20   submitted as to how important some of these third party

21   witnesses are, in fact, to the assessment and ranking

22   process that Uber needs to go through.  It seems to me in

23   the abstract -- and this is sort of as far as I can go based

24   on the limited information you've given me in the letter --

25   it seems to me, for example --

26          I assume third party deponents here include the

27   drivers themselves involved in these alleged incidents.

28          Is that right, Ms. Phillips?

1          MS. PHILLIPS:  The drivers are not among the third

2     parties that we have requested to depose, but my

3     understanding is certainly that the Plaintiffs are

4     interested in deposing the driver, and we agree with that,

5     that the drivers should be deposed prior to the ranking

6     deadline.

7          THE COURT:  Right.  Having seen a handful of

8     cross-complaints, in some cases the drivers may no longer be

9     third parties.  They may actually be parties having been

10    named in cross-complaints in certain cases.

11          Is that correct?

12          MS. PHILLIPS:  That's correct.

13          THE COURT:  How many of the drivers have been

14    named and served as parties, whether by Plaintiffs or

15    whether by Uber in a cross-complaint?

16          Do you know the answer to that?

17          MS. PHILLIPS:  I believe the answer to that is we

18    have filed against drivers and have served, I believe, four.

19    Those are tentative numbers, and I can confirm those.

20          THE COURT:  Mr. Abramson from the Plaintiff's

21    side, do you know what the numbers are in terms of drivers

22    who have actually been named and served?

23          MR. ABRAMSON:  I don't know the answer to that,

24    no.

25          THE COURT:  Okay.  Well, where I'm going with

26    this -- let me not hide the ball anymore -- is I wonder

27    whether there's a way to craft a middle course here by

28    focusing on witnesses whose information really is critical

1    to the assessment and ordering process but narrow it down

2    from the number of witnesses who perhaps Uber would ideally

3    like to take during this period of time.  So, let me suggest

4    a couple of things.

5          For example, if there is somebody who is a

6    percipient witness to an actual incident -- let's say that

7    person was either a passenger in the car together with the

8    Plaintiff or observed some kind of interaction between the

9    Plaintiff and the driver when the car stopped -- that person

10    may well be a critical witness, and it would be

11    understandable to me that Uber might want to take that

12    person's deposition earlier rather than later.

13          On the other hand, if, as you suggest to me in the

14    joint letter, the person called an Uber for the Plaintiff,

15    and that's at least the extent of what you told me about

16    that person's involvement, it seems to me that person is

17    pretty far down on the list and their deposition is not

18    going to be -- their deposition is not going to be critical.

19          Now, you know, I recognize that there may well be

20    folks who are in between those extremes.  Let's say that

21    there is an issue about whether the Plaintiff, for example,

22    was under the influence of alcohol or some kind of drug and

23    the third party witness -- and that may bear on her ability

24    to perceive.  It may bear on her credibility or memory or

25    something like that.  I'm making this up, but I have a

26    reasonable basis for inferring that may be an issue in some

27    of these cases.  And let's say the third party didn't

28    observe the incident but observed the Plaintiff at a party

1  shortly before she called the Uber, for example.  That

2  person is kind of in the middle, if you will, of the

3  spectrum that I'm suggesting between a percipient witness

4  who actually witnessed the incident on one hand and somebody

5  whose involvement in this may be much more -- or whose

6  knowledge may be much more peripheral.

7       The middle course I'm suggesting here, maybe it's

8  not that helpful because maybe I need to know more about who

9  these folks are, what their percipient knowledge is and how

10  important they are.  But the principal --

11       The course that I'm suggesting is maybe there's a

12  way of narrowing down the number of third party depositions

13  to focus on those who are really most important to Uber to

14  conduct over this period of time.

15       So, let me turn to Mr. Abramson first and get his

16  reaction to this, and then let me hear from Uber's counsel.

17       MR. ABRAMSON:  Thank you, Judge Schulman.

18       So, let me back up a little bit and broadly kind

19  of expand on our position, if I then can address the

20  specific kind of proposal that you're leaning towards.

21       So, on third party discovery, we agree third party

22  discovery for the trial set cases will need to be done.

23  There's no question about it.  There is a difference,

24  though, between having perfect information at this stage and

25  prioritizing what actually needs to be done in order to get

26  trials ready for the summer of 2025 in your schedule.  These

27  third party depositions are wide ranging.  Of course, they

28  want them, but we can't let perfect be the enemy of good

1    here.  There are tons of third party depositions we want
2    also, not just the driver.  We put this in the letter.  The
3    persons who spoke to the client when they call in to report
4    the incident, the employee at Uber who did the background
5    check, the employee who made the deactivation decision or
6    not, the employee at Uber who may have or may not have
7    discussed the incident with law enforcement.  We will get to
8    all of those.  None of us are working with perfect
9    information.

10            (Whereupon, the court reporter asked the attorney
11   to slow down.)

12            MR. ABRAMSON:  Uber has access to all of those
13   employees that communicated with the Plaintiff that made the
14   decision about the driver.  We don't have that information
15   right now other than through some written form or through
16   documents.  The same holds true for Uber on the other side.
17   They're going to get the deposition of the Plaintiff.  They
18   have a comprehensive fact sheet.  We've done a lot of
19   written discovery.  That is sufficient to rank these
20   Plaintiffs right now.

21            Once the Court decides on which cases will be set
22   for trial in the summer of 2025, it's open season for third
23   party depositions in those cases, and there will be far
24   fewer of them to deal with.

25            The question that I don't think we are giving
26   enough credence to -- and I know the Court has recognized
27   this in the past -- these are sexual assault victims.  Every
28   time they have to not only be deposed -- and they've all

1    agreed to be deposed -- but now we're going to go to their

2    families and relatives and people they may have talked to

3    after the incident.  This is another way to dissuade these

4    women from going forward and having their day in court.  For

5    the ones who are going to trial, we need to do that, but why

6    traumatize 20 women by taking four to five third party

7    depositions right now when we have enough information from

8    both sides, imperfect though it may be, to rank these

9    Plaintiffs, get an order from the Court, and then focus in

10    on full fledged third party discovery.  We're going to have

11    two and half months, but there's only going to be probably

12    six to eight that we're really going to need to work up at

13    that point.

14          There are hundreds of attorneys that are involved

15    in this litigation.  We can handle it.

16          So, with respect to your proposal, I understand

17    there may be a situation where there are some, you know,

18    I'll call it a liability witness as opposed to a damages

19    witness, someone who was actually in the car.  There may be

20    that person.  If they want to talk to us about that person,

21    of course we'll meet and confer and talk about that one

22    deposition.  My suggestion would be let's get these

23    Plaintiffs taken first.  Let's focus on the Plaintiff.

24    After taking the Plaintiff, if there's some reason that they

25    need additional information that they deem relevant, we can

26    ask your Honor for authority to do that.

27          Or it may be the other way.  We may think, hey, we

28    really need the driver or we need this person the Plaintiff

1  say they talked to about the incident.  We may come to you

2  and ask you for that before the deadline.

3          But I feel like we're biting off more than we can

4  chew during this phase.  With corporate discovery severely

5  lacking, the focus is -- we are very concerned that the

6  delay is not necessarily going to be with these third party

7  depositions in getting the specific cases ready, it's going

8  to be with us getting the discovery we need from Uber from a

9  corporate liability perspective to put on our case.

10          THE COURT:  I do want to talk about those issues,

11  but I'm putting them off until later in the hearing.

12          When you list, for example, potential percipient

13  witnesses who are or were Uber employees who, for example,

14  may have fielded a call or a complaint from a Plaintiff, may

15  have communicated with law enforcement or decided not to

16  communicate to law enforcement, whatever the case may be and

17  so on, are you saying that Plaintiffs are agreeing to hold

18  off on any of those percipient depositions until the fall as

19  well?

20          MR. ABRAMSON:  Absolutely.  We can't have it both

21  ways.

22          THE COURT:  I wanted to clarify that.

23          MR. ABRAMSON:  Yes, sir.  The driver, too.  Again,

24  there may be exceptional circumstances on both sides.  After

25  taking the Plaintiff or based on the information provided

26  that would warrant going to your Honor saying these three

27  people on both sides, we really need to take those so we can

28  understand this case so we know where to rank it.

1          That may be fine, but this blanket idea that right

2    now we need to devolve into comprehensive third party

3    discovery is, for us, is an inefficient use of resources and

4    really is potentially harmful to our clients.

5          THE COURT:  Let me throw out another possible

6    approach here and get your reaction to it, and then hear

7    from Ms. Phillips.

8          Another possible approach that occurs to me as we

9    discuss this is to revisit this issue after the individual

10   Plaintiffs' depositions have been taken.  As one of you

11   pointed out, you know, during the course of those

12   depositions Plaintiff may well disclose the existence of

13   somebody who is not listed in a Plaintiff's fact sheet or

14   may clarify the knowledge or role of that person in her

15   testimony, and that may prompt one side or the other to

16   either have more interest or less interest in deposing that

17   person.  Maybe this question of third party depositions is

18   one that we can revisit down the road once the basic

19   Plaintiffs' depositions have been taken and you all have had

20   a chance to absorb what that testimony tells you.

21         What do you think about that, Mr. Abramson?

22         MR. ABRAMSON:  I think that sounds reasonable.  I

23   think that we should focus on the Plaintiff depositions, get

24   those done, and if there are exceptional circumstances that

25   warrant a third party deposition on either side prior to the

26   ranking deadline, we should revisit that with your Honor and

27   seek your guidance on that.

28         THE COURT:  Ms. Phillips?

1          MS. PHILLIPS:  Thank you, your Honor.

2          I do agree with your Honor that there should and

3    can be a middle ground.  I think the right question to ask

4    is what that is.

5          If I may take a step back, I have a few points,

6    obviously, that I would like to respond to here.  These are

7    complex, highly fact-specific cases, and Uber needs to take

8    sufficient discovery in advance of the ranking deadline for

9    us, which is September 28th, to understand exactly what

10   happened before, during and after these rides and how the

11   incident impacted these Plaintiffs.  This is important for

12   precisely for the reason your Honor has recognized, which is

13   to determine the facts and circumstances -- and that is

14   inclusive of damages issues -- are representative of the

15   allegations in the other cases in the JCCP.  I think that's

16   really critical.

17         What the Plaintiffs appear to be trying to set up

18   is what we view to be a real asymmetry of the information

19   prior to that ranking deadline.  The Plaintiffs' counsel

20   have full access to the Plaintiffs in this case.  They've

21   had access to the friends and family members.  They can have

22   conversations.  We understand that in many of those

23   circumstances they are or will be representing those

24   individuals for purposes of the deposition, so those

25   communications are privileged.  Uber knows none of that.

26         So, what the Plaintiffs are suggesting is that

27   information from Plaintiffs themselves in Plaintiffs'

28   depositions without any other depositions to corroborate or

1   contradict that testimony is sufficient for the ranking.
2   And we just don't agree with that, and we don't think that's
3   right.

4            In terms of the first proposal that you made, your
5   Honor, talking about the percipient witnesses, people
6   physically in the car, of the 20 bellwethers there were two
7   cases where that was the situation.  There were individuals
8   in the car during the assault.  As it happens, those are the
9   two cases that the Plaintiffs have unilaterally dismissed.
10  So, I don't believe there are percipient witnesses to the
11  actual alleged assault in any of the 18 remaining bellwether
12  Plaintiffs, which is why I certainly think we have to go
13  broader.  We are interested in understanding when somebody
14  saw a Plaintiff before and after the incident, what they
15  have to say about that.

16           It's particularly important because the third here
17  where many of the Plaintiffs, a large majority of the
18  bellwether Plaintiffs have alleged in their Plaintiff fact
19  sheets that they were severely intoxicated and have memory
20  loss due to the influence of alcohol or drugs.  In those
21  circumstances, third parties filling in those gaps is going
22  to be really critical to our ability to rank these and,
23  frankly, your ability to understand how representative these
24  cases are for purposes of the other cases in the JCCP.

25           THE COURT:  Really?  I mean, if in --

26           You know, if it's a he said she said case as to
27  what happened in the car and you already know that that
28  given Plaintiff was intoxicated and there's no percipient

1  witness to the interaction between the Plaintiff and the

2  driver, what is some third party witness going to tell you

3  other than confirming what you already know, which is the

4  extent of intoxication, for example?

5          MS. PHILLIPS:  Yes, sure.  I'm happy to answer

6  that question, your Honor.

7          (Whereupon, the court reporter asked the attorney

8  to slow down.)

9          MS. PHILLIPS:  I'm sorry.

10          If the individual spoke with someone after the

11  incident and didn't mention the incident, right?  That would

12  be relevant information for purposes of the credibility and

13  the story that the Plaintiff has to tell.

14          Let's take WHEE11, for example.  That is a

15  Plaintiff who alleges she was drinking heavily on the beach.

16  She alleges it is possible that one of the other people we

17  are seeking to depose may have drugged her and may have, in

18  fact, been the person who assaulted her.  What we are trying

19  to understand is what led up to the incident itself, and we

20  think that testimony is very relevant and very important for

21  purposes of our ranking.

22          In terms of your ranking.

23          In terms of other third parties, for example, we

24  are interested in deposing some of the medical providers

25  here, right?  Understanding damages and how representative

26  the damages are is going to be important for that ranking

27  decision and understanding whether there were preexisting

28  conditions and what the differences are in the post incident

1   damages.

2          For that, obviously, we will depose the Plaintiffs

3   but are interested in deposing certain of the medical

4   providers who can get to those before and after an incident.

5          I wanted to respond, if I may, your Honor, to your

6   suggestion --

7          THE COURT:  Hang on a second.

8          MS. PHILLIPS:  Of course.

9          THE COURT:  You all, obviously, are much more

10  focused in on these cases than I am.  Let me just ask a

11  couple more questions to understand kind of the composition

12  of the cases.  Of the 18 remaining cases, how many of them

13  are cases in which there was a report to law enforcement?

14         MS. PHILLIPS:  I believe there are nine of the 18

15  cases where law enforcement third parties will be deposed.

16         THE COURT:  And how many of the 18 cases are cases

17  in which there was a rape kit or other type of forensic

18  medical examination conducted?

19         MS. PHILLIPS:  I don't have that number.

20         THE COURT:  Presumably, it's less than the nine in

21  which there was a report to law enforcement.  It's some

22  subset of the nine.

23         MS. PHILLIPS:  That's correct.

24         THE COURT:  When you're talking about medical

25  providers, you're talking more broadly, I take it, about

26  what?  Therapists who the Plaintiff may have consulted weeks

27  or months after the incident?

28         MS. PHILLIPS:  Yes.

1          THE COURT:  Are you talking about physical pelvic

2    exams?  What are we talking about?

3          MS. PHILLIPS:  The focus, I think, will be

4    predominantly on mental health issues.  In some cases --

5    certainly not all of them -- there are also physical damages

6    alleged.  In those particular cases, we obviously would be

7    interested in exploring the extent and whether any of those

8    physical damages that were claimed after the fact were

9    preexisting conditions.

10          THE COURT:  I interrupted you.  There was more

11    that you wanted to say on this?

12          MS. PHILLIPS:  I just wanted to make a couple of

13    points with regard to time.  One I believe your Honor

14    alluded to.  We have a concern.  There is time now; it's

15    May.  We have until September 28th, which is the ranking

16    deadline.  After your Honor sets the trial order, we will be

17    limited to two and a half months where there will be

18    holidays.  That makes scheduling substantially more

19    difficult.  We think it makes sense to get through some

20    subset of the third party depositions now while we can where

21    neither side is waiting for documents.  We can take the

22    depositions without needing to be concerned about document

23    discovery from those third parties.

24          In the previous IDC where the Plaintiffs were

25    arguing that the Plaintiff depositions should be pushed, we

26    have proposed dates from Plaintiffs in five of the 18 cases.

27    Two of the cases, those dates are in late August.  We just

28    don't think that that provides us with a sufficient amount

1   of time for us to wait for all the Plaintiffs to be deposed

2   and then turn to third party depositions.  We think third

3   party depositions getting started on those while we are also

4   getting started in June, July and August deposing the

5   Plaintiffs themselves, that will help us move toward that

6   January 15th discovery date.

7          This will be my last point on this, your Honor.

8   The January 15th date isn't just for the first, second or

9   third cases that are going to go to trial in summer of 2025.

10  It's all of the bellwether cases.  It's all of the cases.

11  Uber cannot forgo taking important third party depositions

12  prior to that deadline.  We've got to take those.

13         What the Plaintiffs are proposing is to really jam

14  them in in an incredibly condensed time period with the

15  holidays.

16         THE COURT:  You told me at the outset of your

17  remarks that you agree that some kind of middle ground

18  approach here, that is something in between a green light to

19  all third party discovery for both sides and a red light to

20  all third party discovery until October or November, I

21  suppose, is appropriate.  You've now told me that the second

22  idea that I threw out which is that you all come back after

23  the Plaintiffs' depositions is not practical because at

24  least some of those may take place in late August.

25         What are you suggesting by way of a middle ground

26  here?

27         MS. PHILLIPS:  Sure.  I think it probably makes

28  the most sense for Uber and the Plaintiffs to meet and

1  confer on this.  We've always been willing to talk to them.

2  We reached out to them at the outset, and the answer was a

3  flat no.

4          My proposal would be to meet and confer with the

5  other side and see if we can come up with something

6  acceptable.

7          THE COURT:  That's always a tempting answer from

8  counsel, but I don't want it -- I don't want anybody to take

9  away from that that I'm kicking something down the road

10  here.

11          What's your reaction, Mr. Abramson, when you think

12  that combined with my initial reactions here that's likely

13  to be a productive avenue?

14          MR. ABRAMSON:  We're always open to meeting and

15  conferring to try to resolve issues without your guidance.

16  That being said, I think it's more likely than not that

17  we'll be back before you on the same issue in 30 days if we

18  don't at least try to get to this.

19          The problem is there are middle grounds here.  For

20  example, after a Plaintiff is deposed, it doesn't have to be

21  all at one time.  It doesn't have to be for every

22  Plaintiff's deposition that moves forward, and only then can

23  you talk about any third parties.  There are going to be

24  Plaintiffs deposed in June.  After June, if there's a third

25  party witness that either side feels is relevant, let's have

26  some timeframe where we meet and confer after a two-week

27  period to confer after the deposition.  And then we can come

28  to your Honor if we can't come to a resolution as to what

1  additional third parties, if any, need to be deposed.  That

2  seems sensible.

3          The other point that Ms. Phillips made about all

4  fact discovery needs to be on all twenty bellwethers, that's

5  just not how we see it.  I don't think that's necessary.  I

6  think the focus should be once we have trial set cases,

7  discovery for those six to eight, however many your Honor

8  decides, those are the focus until January 15th, and we can

9  kind of put the other 14, 12, whatever they are, to the side

10  for additional third party discovery.

11          The reality is I don't think this advances the

12  ball because doing third party discovery right now before we

13  know which cases really are going to need it, you're going

14  to end up with a bunch of third party depositions that went

15  forward that otherwise did not need to because they're not

16  even trial set.  I just don't understand the purpose of

17  doing that right now when there's so much we need to do on

18  the corporate discovery side and on this side.  Let's focus

19  on that.

20          THE COURT:  Let me say two things here, and let's

21  see if we can move ahead.  Not to preclude Ms. Phillips if

22  you have something additional.

23          First of all, I agree with Mr. Abramson.  I did

24  not contemplate when we set at the parties' suggestion a

25  fact discovery cutoff date of January 15, 2025 that would

26  apply to all of the cases.  What I contemplated was that it

27  would apply to the initial set of bellwether cases that are

28  within the 20, now 18, that the parties have designated.  It

1  certainly doesn't apply to -- what do we have now? -- 340 or

2  something cases.  I don't think that's what you were

3  suggesting, was it?

4          MS. PHILLIPS:  No, no.  My understanding is that

5  the January 15th deadline does apply to all the bellwethers,

6  whether 18, or eventually 20.

7          THE COURT:  Let me suggest this.  Mr. Abramson has

8  in, I think, a pretty creative way melded or combined the

9  two ideas that I threw out as a middle ground here, which is

10 to say in each case within -- fill in the blank, he

11 suggested 14 days -- after the completion of the Plaintiff's

12 deposition, the parties will meet and confer about whether

13 any third party discovery is desirable with the goal of

14 limiting such third party discovery during this initial

15 period prior to the bellwether trial order submissions, the

16 cases that, you know, one party or the other believes are

17 critical to their ranking and assessment of the cases.  And

18 then in the event that parties are unable to agree on that,

19 then you can come back to the court.

20         Mr. Abramson, is that a pretty fair summary of

21 what you suggested?

22         MR. ABRAMSON:  More articulate, but yes.

23         THE COURT:  What do you think, Ms. Phillips?

24         MS. PHILLIPS:  Your Honor, my concern with that is

25 that allows completely unilaterally the Plaintiffs to

26 dictate the order in which the depositions are going do

27 happen.  For example, two of the four cases that we had

28 attempted to take third party depositions in are the

1    depositions of Plaintiffs that have been offered only for

2    late August.  Right off the bat, again this allows the

3    Plaintiffs to dictate.

4           What if, instead of meeting and conferring, what

5    if we said three to five third party depositions in each of

6    the bellwether cases going forward, and obviously we have to

7    find mutually agreeable times for that.  I don't think we

8    have to wait for the Plaintiff depositions here.  The

9    Plaintiffs have identified, in the Plaintiff fact sheets and

10   the written discovery, individuals they have said have

11   important information for the cases.  Those are the

12   individuals that we are most interested in deposing, and our

13   view is that we should go forward now instead of on a

14   schedule unilaterally dictated by the Plaintiffs.

15          THE COURT:  The problem with arbitrarily picking a

16   number, whether it's two to seven or three to five as you

17   just proposed, is I don't have any basis in what you've told

18   me here for knowing how important these depositions are.

19   We've talked in the abstract about what a given witness in

20   some unidentified case might or might not know.  Obviously,

21   I'm not familiar with the individual cases.

22          So, rather than pick an arbitrary number, I'm not

23   ruling out here the parties talking.  You know, for example,

24   in cases where the Plaintiffs' depositions are not going to

25   be taken until late August, talking now and having you

26   calling up Mr. Abramson and saying:  Look, I know we're

27   going to meet and confer in the wake of the Plaintiffs'

28   depositions, but we're concerned about times.  We're going

1    to have 30 days after Plaintiff X's deposition in late

2    August.  Here are one or two third party depositions that I

3    really think are critical, and here's why.

4           I would be more comfortable with the parties

5    proceeding in that way than with the suggestion that we

6    adopt kind of a one size fits all rule of thumb of three to

7    five depositions per case, because I just don't have any

8    basis for knowing that's the appropriate number or why.

9           MS. PHILLIPS:  I mean, I think, your Honor the why

10   is because this is the number of people --

11          THE COURT:  When I'm talking, please don't talk

12   over me.

13          MS. PHILLIPS:  I apologize.

14          THE COURT:  You all may succeed in persuading your

15   friends at the other counsel table that, yes, such and such

16   a person is critical, and here's why.  But all I'm saying is

17   I don't really see a basis for me to say that makes sense in

18   what's before me.

19          Of course, I'm not making any rulings at an IDC,

20   in any event.  I'm trying to assist the parties in reaching

21   some sort of agreement that seems reasonable, but it's

22   informal guidance.  It's not a ruling.  I can't issue a

23   binding ruling unless there's a properly adjudicated motion

24   before me.

25          So, I'm just trying to find a flexible way here of

26   getting you all to guess without a whole series of contested

27   motions.  I don't want to hear, you know, 18 motions in 18

28   different cases about disagreements about whether third

 1    party depositions are or are not critical.  My hope is that

 2    you all can find your way toward a process that would allow

 3    you to agree on a middle ground.  In most cases, it means

 4    talking after the Plaintiff's deposition, but in some cases

 5    if it means talking before them, I don't see why that's not

 6    a reasonable way to proceed.

 7        MR. ABRAMSON:  Judge Schulman, if I could maybe

 8    put a little more color on what you just said and propose

 9    something that I think is in line with what you said and may

10    alleviate some of Uber's concerns.  Maybe the way we can do

11    it is for any Plaintiff deposition that is set before July

12    31st.  They would have, at that point, two months.  Within

13    seven days, ten days, 14 days, whatever the number, both

14    sides should meet and confer about any third party

15    depositions that they wish to take that they deem to be

16    critical.  If we're unable to reach a resolution on those,

17    we can bring it to your Honor.

18        Your Honor made yourself very available to us.  It

19    seems that we could probably get in front of you pretty

20    quickly, depending on your schedule.

21        For any deposition of a Plaintiff set after July

22    31st, let's start that right now.  This isn't gamesmanship

23    or us unilaterally dictating stuff.  These are sexual

24    assault victims, and we're trying to find dates that work

25    for them.  It may be some that are in August.  Admittedly,

26    that will crunch them if we want to run through this process

27    in a fair way.  For anybody we can't give them a date before

28    July 31st for, for those let's meet and confer now for both

1    sides.  If we believe there's a critical Uber witness that

2    we want to take, we'll talk to them about that and vice

3    versa.  We'll try to get those resolved right now so neither

4    party is hamstrung with those Plaintiff depositions.

5              THE COURT:  We're starting to slice this pretty

6    fine.

7              MR. ABRAMSON:  I understand.

8              THE COURT:  Again, just as I don't want to accept

9    a number pulled out of the air for a number of third party

10   depositions, neither do I want to start setting arbitrary

11   deadlines and say, well, the deposition was on July 30th

12   rather than August 1st.

13             Let me suggest that the parties meet and confer as

14   soon as possible, that Uber think seriously about narrowing

15   the number of third party depositions that it wishes to

16   take, and focus on the ones that it really thinks are

17   critical to the assessment process and that that process

18   start now, but to the extent that it's appropriate that you

19   revisit it after a given Plaintiff's deposition and see if

20   you can't reach agreement.  I don't want to start creating

21   out of thin air these hard structured rules that seem fairly

22   arbitrary.

23             I've given you some initial reactions that I hope

24   will allow you all to reach agreement on most, if not all,

25   of these cases.

26             I kind of want to leave it there unless there's

27   something critical that either side wants to add.

28             MS. PHILLIPS:  Not from me, your Honor.  Thank

1    you.

2             THE COURT:  The other issue that you teed up

3    directly here -- and I recognize there are these other

4    issues lurking, but I want to put those off again until the

5    end of our discussion -- relates to the strike process.  As

6    I understand it, there have now been two individual

7    Plaintiffs of Plaintiff's original list of 10 who have been

8    voluntarily dismissed from the pool.  And the latest of

9    those, as I understand it, is that the Plaintiff has become

10   nonresponsive, as it's stated in the letter here.  I'm not

11   sure if Plaintiff's counsel are unable to communicate with

12   her or if she's unwilling to sit as a bellwether Plaintiff

13   at trial.  I'm not sure it matters.  What Uber is suggesting

14   here is that the Court revisit the process that we put in

15   place just a month ago when the first of those Plaintiffs

16   voluntarily dismissed her case.  And then, basically, it

17   allowed Uber to strike one of Plaintiff's selections once a

18   Plaintiff has been voluntarily dismissed.

19             Let me give you an initial and much more

20   clear-edged reaction to this.  Number one, I assume and will

21   continue to assume unless there's some reason for --

22   compelling reason -- for me not to, that these dismissals

23   were made in good faith.  I'm not going to assume that they

24   reflect gamesmanship or something worse on the part of

25   Plaintiff's counsel.

26             Number two, I don't see a need at this point to

27   revisit the process that we agreed on and that I ordered

28   when you were last here on April 12th.  What that process

 1    was was a joint proposal from the parties that in the event

 2    a bellwether case was dismissed, whether by one party and

 3    whether by the Plaintiffs or by the Court, the party that

 4    initially proposed that case may choose a replacement.  And

 5    if that occurred before July 10, then the replacement case

 6    may be considered in the pool for the bellwether ranking.

 7            We're still just a little more than 30 days since

 8    we last discussed that issue.  I'm not inclined to revisit

 9    it now.  Even if I were, frankly, the proposal that Uber has

10    made here strikes me as pushing in the wrong direction,

11    because it would end up with a lopsided group of cases so

12    that now there are 18 cases of which eight are Plaintiff's

13    proposed cases, but you would have me say, well, now there

14    will be only seven proposed Plaintiffs' cases, and if there

15    were a further dismissal that number would decrease.

16            That just seems to me it's unfair on its face.

17    But, in any event, I don't want to spend much time

18    discussing it because I don't think there's a need to do so

19    now.  If we get to the July 10 date and there's a flurry of

20    dismissals thereafter or there's one or more dismissals

21    thereafter, there's a reason for us to talk about that

22    between that date and the September -- I think it's

23    September 30th, actually.  You keep saying September 28th,

24    Ms. Phillips, but I think it's the September 30th deadline

25    for parties to talk about proposals.

26            Go ahead.  Hang on.  There's some echo going on

27    here.  Everybody not speaking, please make sure to mute

28    yourselves.

1          MS. RUBIN:  Let me try again.  I think that's

2   better, right?

3          THE COURT:  Yes.

4          MS. RUBIN:  Terrific, thank you.  Jackie Rubin.

5   And it's nice to see you again, your Honor.

6          I just want to make sure we're talking about the

7   same thing.  First of all, the unilateral dismissals were of

8   choices that Uber had made to the bellwether pool.  So,

9   there are now eight Uber choices.

10         THE COURT:  Okay.  I may have -- I did

11  misunderstand that.

12         MS. RUBIN:  Okay.  So, both of the dismissals that

13  the Plaintiffs have chosen to make were Uber choices.

14         THE COURT:  All right.

15         MS. RUBIN:  So, Uber now has eight, and the

16  Plaintiffs now have ten.

17         THE COURT:  All right.

18         MS. RUBIN:  That's number one.

19         Number two is the process by which -- that we

20  proposed was not to change actually what had been ruled on

21  last time.  It was, instead, to add another aspect to it

22  which is that if the Plaintiffs unilaterally choose, as they

23  did, again to dismiss one of Uber's choices, then Uber has

24  the opportunity to strike one of the Plaintiff's choices.

25  And then both Uber and the Plaintiffs would get the

26  opportunity to choose a replacement for those cases.

27         So, it makes it equal.  Both sides have to choose

28  a replacement for themselves, and thereby makes it fair that

1    if one of the Plaintiffs had gotten rid of one of Uber's
2    choices, we would have the opportunity to get rid of one as
3    well.
4            THE COURT:  I feel like I'm sitting in a room with
5    a bunch of chess competitors, and you all are consulting
6    your game theory handbooks and trying to figure out what
7    approach gives you the best advantage at the end of the day.
8    Recognizing that I made a mistake in my understanding here,
9    Uber, as I understand it, under the prior agreement and
10   order has an opportunity to choose replacements for the two
11   cases that have now been dismissed by the Plaintiffs.
12           MS. RUBIN:  Correct.
13           THE COURT:  Rather than trying to fine tune what
14   we've already done and start monkeying around with it in
15   ways that I'm not sure I have the sophistication to
16   understand how they will affect parties, what I'm telling
17   you is I'm inclined to leave in place the current proposal
18   and the current order.  And if there's a problem down the
19   road, you all let me know about it.  I don't want to keep
20   revisiting issues.
21           So, that's my reaction to that.  I've been pretty
22   blunt about my reaction to that one.  This is not one where
23   I'm feeling my way and see whether there's a middle ground.
24   I don't think it's appropriate at this point.  It may become
25   appropriate down the road.  Let's not anticipate problems --
26           MS. RUBIN:  Understood, your Honor.
27           THE COURT:  -- one we've already solved, at least
28   in the interim.  Everybody okay with that?

```
1              MR. ABRAMSON:  Yes, sir.

2              THE COURT:  All right.  Let me briefly just --

3              Recognizing we kind of directly teed up these

4    issues, let me just briefly explore the other issues that

5    have been raised in the letter here, because they do give me

6    some concern.  And there are at least two that I saw.

7              One is what's been characterized as the slow pace

8    of Uber's production of so-called corporate liability

9    documents.  I do see attached to the letter the so-called

10   hit list which shows me the number of -- gross number of

11   documents -- that apparently have been collected with

12   respect to at least the initial 16 prior custodians, if

13   that's what I understand the 20 million document number to

14   be.

15             MR. SHORTNACY:  Michael Shortnacy speaking.

16   Twenty-six priority custodians, your Honor.

17             THE COURT:  Twenty-six priority custodians but 20

18   million documents, right?

19             MR. SHORTNACY:  Correct.

20             THE COURT:  And then I see the number of hits by

21   category on each of these search strings where, you know,

22   the numbers range from, you know, four figures to five

23   figures to six figures, depending on which category, and in

24   some cases seven figures, more than a million documents

25   depending on which category we're talking about.  I'm being

26   told a very small fraction of the responsive documents have

27   been produced to date.  That concerns me, because as our

28   prior discussion illustrates, we're all concerned about time
```

```
 1    limitations here.
 2            I don't view this as an issue linked to the
 3    Plaintiffs' depositions or the third party depositions
 4    issues that we've been discussing, but it's obviously an
 5    important piece of the larger discovery pie.  I'd like to
 6    get at least some sense at this point, recognizing that it's
 7    not a formal subject for IDC, that this is going to happen
 8    and it's going to happen timely in a way that doesn't
 9    jeopardize the entire schedule.
10            Mr. Shortnacy, you seem to have raised your hand
11    to assure me that's not going to be a problem.  I'd like
12    some detail on that.
13            MR. SHORTNACY:  Certainly, your Honor.
14            As we talked about in the last conference, the
15    corporate documents are certainly voluminous, but Uber has
16    made two productions previously.  I forecasted to your Honor
17    at the conference that we were going to make a production on
18    the 30th.  We did, in fact, make a production.  Mr. Abramson
19    has characterized that as small.  It is small.  And I think
20    I tried to explain this to your Honor last time, but let me
21    try again.
22            This is a complex, highly voluminous review
23    project.  It takes time to get the resources in place in
24    terms of mechanics and processing and collection of the
25    documents.  That sort of power for liftoff, if you think of
26    getting the jumbo jet off the runway, is considerable but
27    once it gets going, it gets going.  There was some delay,
28    because as your Honor can see in the ESI protocol that was
```

1  submitted this morning in section 8, the provisions

2  pertaining to the technology assisted review process, which

3  we sometimes refer to as TAR -- I'm not sure of the page but

4  it's at section 8 and following.

5       The COURT:  I see it.

6       MR. SHORTNACY:  That was just ruled on by Judge

7  Cisneros and entered -- let me step back.

8       There were aspects of those provisions in dispute,

9  and Judge Cisneros ruled on those provisions on the 15th of

10  March.  That sort of locked in place the process for the

11  first time that would be used to apply technology assisted

12  review to the review process.  I'm explaining that to your

13  Honor to explain why there was some delay.  I think it was

14  portrayed in the joint letter and the Plaintiff's position

15  that we've had everything sitting around for six months, and

16  so on and so forth.  That's not the case.

17       The context to that is important.  That March date

18  is important.  We're getting off the ground.  We've made the

19  production on April 30th.  We're intending to make another

20  production tomorrow, the 17th of May.  That again,

21  admittedly, will be relatively small, but we have projected

22  a sort of pipeline and cadence for production that we

23  believe we will be able to get through in June and July and

24  following to be completed substantially by September.

25       Let me pause for a moment and talk about what that

26  corpus looks like.  When we talk about the TAR model and

27  what your Honor is seeing in the hit report, the volumes are

28  quite high, but the computer model which is fed decisions on

1    responsiveness and sort of learns and predicts
2    responsiveness has to reach a point of stability where we
3    can comfortably cut off the review.  That model is telling
4    us that there are about 350,000 more documents to review,
5    and we believe that we will get through those documents by
6    September and that we have planned periodic rolling
7    productions to Plaintiffs in the interim that I can
8    represent to the Court will be much more substantial than
9    they have been before, because, again, that TAR model is put
10   in place.  The processes used are in place.  Those
11   productions will pick up in volume.
12         So, I understand the criticism from Plaintiffs,
13   but I can assure both the Plaintiffs and the Court that the
14   productions will become more voluminous as we get into the
15   next installments.
16         THE COURT:  So, you're telling me the jumbo jet
17   here is barely off the runway, but it is picking up speed
18   and will be at altitude in time, essentially?
19         MR. SHORTNACY:  Essentially, yes, that's right.
20         THE COURT:  I hope you've been in touch with your
21   friends on the other side to let them know that, and I hope
22   you will remain in touch with them to keep them apprised of
23   your progress.  Obviously, that's critical here.  I don't
24   know what more I can do with this.
25         Does somebody on the Plaintiffs' side want to
26   address it?  Mr. Abramson.
27         MR. ABRAMSON:  I would, your Honor.  Thank you.
28         I will tell you that what Mr. Shortnacy is saying,

1   I understand it, but it is frustrating and it threatens our
2   trial.  Let me explain a little bit why.
3           We went through all of this at the CMC in April.
4   We put this in our joint letter.  You asked them point-blank
5   if they were going to substantially be able to produce the
6   documents for the corporate liability side in the next
7   couple of months.  That would be the middle of June.  Now,
8   we're being told September 1st.  That's a very big
9   difference.
10          The problem with this is we cannot take a
11  deposition of an Uber witness custodian until we have their
12  complete custodial file.  But we're being told based on the
13  way the TAR system works -- and I've asked Mr. Shortnacy
14  this several times over the last week or so -- is there a
15  way to prioritize eight or nine of these 26 custodians so we
16  get their complete custodial files in the next 30 days so we
17  can start taking depositions of those people.  And I haven't
18  gotten a response.  I don't know what the answer is.
19          I'm hopeful there's some ability to make progress.
20  Let's assume there's not.  Mr. Smith, when he was involved
21  before, intimated to us that that's not possible.  The way
22  the TAR system runs, it has documents of all 26 custodians
23  in a pot.  It puts them out, but not by custodian but by
24  relevance.
25          So, what Mr. Shortnacy is saying is it won't be
26  until September 1st that we will know that we have a
27  substantially complete custodial file for any Uber corporate
28  witness.  They may dump a bunch of documents on us on August

1  30th.  It takes time to review those documents, which means

2  we won't be able to take a single Uber corporate custodian

3  liability, which is the essence of our case, until late

4  September or October.  That's just untenable.

5        And it is in direct contrast to what he told the

6  Court.  I'm not trying to cast aspersions.  It is what is on

7  the record from him at the April 12th hearing.

8        This is the first time I've heard September 1st.

9  That's why I'm frustrated.  I'm a little bit taken aback.

10        This idea of just because you make a production

11  and saying we're going to get a production just doesn't mean

12  much.  What is the production?  Is the custodial file for a

13  particular Uber witness substantially complete so that we

14  can start taking depositions, which we have to do?

15        THE COURT:  Let me go back a step and ask Mr.

16  Shortnacy.  I'm blessed not to know anything about this

17  technology, so I can ask ignorant questions.  In the

18  abstract, I don't see any reason that you shouldn't be able

19  to prioritize particular custodians.  You just give the --

20  you just run the search on whatever that subset is of

21  documents first, as opposed to running it on the entire

22  database.

23        Am I wrong?

24        MR. SHORTNACY:  That's right.  I think my

25  colleague, Mr. Oot, can speak to that as well.

26        Mr. Oot, why don't you address that, and I want to

27  address the issue Mr. Abramson raised at our last

28  conversation, because that is not what we talked about in

1 terms of substantial completion.  But I want to make sure

2 your Honor's question is answered first.

3    MR. OOT:  Patrick Oot from Shook, Hardy on behalf

4 of Uber Defendants.

5    Just to back it up a little bit, the way the

6 technology works, as Mr. Shortnacy mentioned, a lot of

7 energy kind of goes into building the algorithm that selects

8 the documents that are responsive.  So, the key word search

9 terms are the preliminary gateway that get us through to the

10 use of the technology.  Now, what's happened is through the

11 meet-and-confer with Mr. Abramson, he asked that Plaintiffs

12 obtain the benefit of the search terms from the MDL

13 Plaintiffs.  So, that discussion is going on.  And that

14 discussion will be either resolved or before Judge Cisneros

15 by June 6th.

16    So, what is slowing the process down, I guess --

17 and maybe this is what you're getting at -- is that the

18 additional keyword search term negotiations that are going

19 on with the MDL where we agreed with Mr. Abramson that we

20 would provide those additional documents here in the JCCP as

21 part of the overall coordination is that we have to

22 normalize that first gateway of the keyword search terms,

23 and then the technology applies and there is some human

24 review that helps stabilize that technology.

25    So, getting to your question of can we break out

26 individual custodial files on sort of an ad hoc basis, that

27 is something technically we can do, however, I would caveat

28 that we would be using the JCCP word search terms that we

 1   negotiated with Mr. Abramson, and there may be an issue

 2   where additional documents would be produced beyond an

 3   initial custodial file as a result of the negotiation.

 4            What we're trying to avoid is a circumstance where

 5   we have a different custodial file that Mr. Abramson has

 6   access to than something that is later negotiated by June

 7   6th in the MDL negotiations.  So, we're trying to normalize

 8   that set so the coordination and all of the sort of benefits

 9   of that will apply in this case and the MDL.

10            THE COURT:  Let me try and restate some of that in

11   English to make sure I understood it.  You all are in

12   negotiations in the MDL regarding search terms or search

13   strings, and those are to culminate in an agreement by June

14   6th or 7th, you said?

15            MR. OOT:  That is correct, your Honor.

16            THE COURT:  That means the hit list that I've been

17   given here as Exhibit 3 or whatever to the joint letter is a

18   hit list in these coordinated proceedings based on the

19   search terms or search strings that you've agreed to here.

20            Is that right?

21            MR. OOT:  Correct, your Honor.

22            THE COURT:  So no documents have actually been

23   produced to date in the MDL because of the search protocol?

24            MR. OOT:  Let's kind of back up.  I wouldn't

25   characterize as no documents, because there have been, I

26   think, well over a hundred thousand documents that have been

27   produced, but not what we'll call custodial documents.

28   Again, those custodial negotiations are going on in the MDL

1    as well.

2           THE COURT:  Okay.  Of the roughly hundred thousand

3    documents produced in the MDL, have those been produced to

4    the Plaintiffs in this case?

5           MR. OOT:  Correct, your Honor.  There are

6    different buckets of MDL productions.

7           For example, there are prior litigation

8    productions and productions related to other investigations.

9    Those have all been produced.  So, it's my understanding

10   those documents have been produced to the JCCP as well.

11          I think under the coordination order we are going

12   to have a pathway where all of those productions will go to

13   a single vendor.

14          THE COURT:  If I understood you correctly, the

15   answer is, yes, it's technically possible to prioritize

16   production from specified custodial files so that those

17   productions can be done earlier rather than later, correct?

18          MR. OOT:  Correct, your Honor.  It does add an

19   additional burden aside from the keyword search term

20   discussion, just because in the way the algorithm is set to

21   select the documents, prioritizing custodians doesn't really

22   help us accomplish that goal.

23          THE COURT:  If that's what needs to be done to

24   satisfy the Plaintiff's understandable concern about

25   avoiding further delay, even if it creates some additional

26   burden and maybe it creates additional delay and duplication

27   down the road, it seems to me that's a reasonable request

28   for them to make.  Mr. Abramson says you, plural, haven't

1 responded to that request.  I guess I'm suggesting your

2 response ought to be an affirmative one.

3    Mr. Shortnacy?

4    MR. SHORTNACY:  I would say we will respond with

5 the Court's guidance in mind.  I do think this is an ongoing

6 discussion.  As Mr. Oot was explaining, it's also ongoing

7 with the MDL Plaintiffs and will hopefully be resolved, or

8 if not resolved, put before the MDL Court.

9    And just to touch base on one part, in our last

10 discussion, that, if you remember, was when the issues were

11 more informally linked as between Uber's productions and the

12 depositions.  And I understood your Honor to be asking at

13 that time:  Would Uber, over the course of the summer,

14 produce enough documents to satisfy the Plaintiffs?

15    And I don't think there was the same context and

16 nuance to that discussion.  I wanted to address Mr.

17 Abramson's concern that might leave your Honor with the

18 thought that I wasn't forthright or was backtracking on our

19 prior discussion.  I think those two things are quite

20 different.  I just wanted to clarify that for the Court.

21    THE COURT:  I get the point that the documents are

22 voluminous, that the productions are technically

23 challenging, that there's potential conflict with what's

24 going on in the MDL and what's going on here, but I'm

25 hopeful that you've now heard Mr. Abramson's concern about

26 delay.  You've heard the Court's reaction.  And hopefully

27 that will help streamline things and get you all into the

28 air where you need to be.  I don't know what else to say

1   about that.

2           Mr. Abramson, is there anything else we can

3   usefully talk about at this point?

4           MR. ABRAMSON:  On this issue, your Honor, no.

5   You've addressed it.  I don't need to belabor it.

6           The other issue -- and it's in a footnote 1 in the

7   joint letter.

8           THE COURT:  That's where I'm going next.

9           MR. ABRAMSON:  Then, I'll let you go there.

10          I'm sorry.

11          THE COURT:  That was last on my list, there.  If

12  I'm missing something here, somebody will let me know.

13  Footnote 1 does indicate that the parties, having agreed on

14  26 priority custodians, have reached an impasse as to six

15  additional custodians that Plaintiffs have sought to add.

16  The footnote says the Plaintiffs are seeking permission to

17  file motions to compel production of responsive documents

18  held by those custodians.

19          So I understand this, again, the hit list that I'm

20  looking at here is a hit list on the documents held in the

21  26 custodial files and does not include these additional

22  six.

23          Is that right.

24          MR. ABRAMSON:  That's right.  If I could put a

25  little bit more color on the request, because it is in a

26  footnote.  If you'll remember, we originally -- we, the

27  Plaintiffs -- proposed 143 custodians.  That's a list that

28  we made up, okay?  Over time, because there were these

1  concerns about delay and how voluminous the document

2  productions would be, we agreed to reduce it to these 26

3  priority -- really, it was 18.  And then we had motions to

4  compel in front of your Honor on statistics, on senior

5  executives, and on marketing and lobbying.  Your Honor made

6  certain rulings on those motions to compel.

7      And based on those rulings, we sought to add

8  additional custodians.  The parties agreed to eight of those

9  additional custodians.  We reached an impasse as to six of

10 them.  We've been negotiating these six custodians for a

11 long time.

12     For example, Frank Chang.  He is the head of

13 Uber's data science group.  He is the person who has signed

14 off on documents that have gone to the TPUC.  I'm not going

15 to get into this, because it's not the proper time.

16     But we believe he's directly related to the kinds

17 of documents we would need based on the ruling your Honor

18 gave on the statistics motion.  We'll probably get those in

19 the custodial file.

20     (Whereupon, the court reporter asked the attorney

21 to slow down.)

22     MR. ABRAMSON:  Reason why we asked for Mr. Chang

23 was because in response to your Honor's order on the

24 statistics motion.  The thought was we'd likely get those

25 through a custodial file.  If you still have a problem, come

26 back and see me.

27     So, we said, well, let's add Mr. Chang so the

28 likelihood of us getting those documents goes up

1    substantially.  They pushed back on it.  The other ones are

2    related to marketing communications.

3           All we're asking for right now is a briefing

4    schedule.  The reason why we're raising this now is because

5    of this delay and out concern about how long it's taking,

6    that if we don't do it on a more expedited basis, then by

7    the time we get an order it's going to be too late to get

8    their documents and take depositions of these folks also.

9           MR. OOT:  Your Honor, Mr. Abramson and I have been

10   communicating about this set of custodians.  What I did say

11   to him is that this issue is likely not ripe yet because of

12   the coordination with the MDL.  That NDL discussion is still

13   going on.  June 6th, again, is the date that's going to

14   really identify the custodian set for both cases.  And Mr.

15   Abramson is getting the benefit of that production through

16   the coordination order.

17          So, what I asked him is that can we get through

18   the MDL process, identify where we really do have the

19   disagreements on the custodians so we're not double and

20   maybe even triple briefing this.  So, I think we've been

21   working cooperatively up until now.

22          We understand his position on Frank Chang.  We

23   have a position on duplication with other custodians.  I

24   think we're working that through.

25          Another point.  It's not just the MDL Plaintiffs.

26   The JCCP Plaintiffs have a representation in the MDL as

27   well.  So, they're part of those discussions.  The

28   discussions are ongoing.  If we have a disagreement, that

 1   disagreement on custodians will be brought up with the MDL

 2   Court.

 3            I think what we're asking is to let these

 4   negotiations for coordination for the benefit of all parties

 5   work out so then we could kind of move forward with the

 6   discovery.

 7            THE COURT:  What is the June 6th date in the MDL?

 8   Is that the date for Magistrate Judge Cisneros to rule?  Is

 9   it the final deadline for the parties to complete their

10   negotiations?  What is it exactly?

11            MR. OOT:  If there's a disagreement, your Honor,

12   the Plaintiffs are to submit that agreement to whether it be

13   probably Judge Cisneros under PTO8 in the MDL.  So, those

14   are fast ruled upon under the existing case management order

15   so there wouldn't be a significant amount of delay in the

16   MDL related to the negotiation of keyword search terms and

17   custodians.

18            Again, those discussions are ongoing.  All

19   Plaintiffs in the JCCP and MDL are participating in those

20   discussions.  All I asked Mr. Abramson was we hold off on a

21   briefing schedule while we negotiate the MDL.

22            So, that is the true benefit of the coordination

23   order that we're about to enter, is that both sides get

24   access from the MDL and the JCCP discovery.  It alleviates

25   the burden on Plaintiffs in both cases because they're using

26   one vendor and cooperating on that expense.

27            MR. SHORTNACY:  The parties are also scheduled to

28   be before Judge Cisneros on June 11th.  So, the idea is that

1    those issues would be discussed with the Court on that date

2    as well, which is the June 6th date, as an agreement amongst

3    the parties to try to perfect those issues and tee them up

4    in advance of that case status conference on June 11th.

5    Just to give the Court some additional color.

6         MR. ABRAMSON:  Well, at the risk of taking my own

7    suggestion, let's see.

8         THE COURT:  Let's see if great minds think alike.

9         MR. ABRAMSON:  My suggestion would be this.  I

10   understand the custodians negotiation in the MDL is ongoing.

11   I understand.  I'm also quite certain, based on the fact

12   that I'm in leadership on the MDL, that the idea there's not

13   going to be disagreement on June 6th is far fetched.

14   There's going to be a disagreement.  It's going to go to

15   Judge Cisneros.  She's going to make a ruling.  I don't have

16   her schedule.

17        I would propose let's set a briefing schedule, but

18   make it so that Uber's brief and response is not due until

19   after the time they believe Judge Cisneros will rule.  Make

20   it June 11th.  We'll take the burden of filing a motion to

21   compel.  They don't have to do anything.  We're going to

22   file.  And they won't have to respond to it until after they

23   know whether we've reached a resolution.

24        That way, at least if this falls through, and it's

25   still an issue, we're teed up and ready to go, and we don't

26   have to wait another 30 days.

27        THE COURT:  I was going to suggest a slightly

28   different approach, which is that the motion not be filed

1  until after June 6th or June 11th.  Because of the

2  possibility of that, depending on the negotiations and the

3  MDL, it may become unnecessary or moot, at least to some

4  extent.  June 6th is only three weeks away.

5       So long as Uber's response has a reasonable time

6  after they have a ruling from Judge Cisneros and they can

7  tell me, you know, no, now we don't have a dispute over six

8  custodians, we only have a dispute over three, fine.  That

9  makes sense to me.  I don't have a problem with that.

10      MR. ABRAMSON:  My preference would be for us to do

11  hopefully some unnecessary work so that in the event there's

12  not a resolution, Uber's response deadline is very soon

13  after the time at which Judge Cisneros would rule so we're

14  not wasting any additional time.

15      MR. OOT:  Your Honor, I would just propose to

16  avoid the needless motion, it's still going to be effort on

17  Defendants regardless of Mr. Abramson says he's going to

18  take the burden, that the motion not be filed until June

19  15th which would be after the issue is due to Judge

20  Cisneros.  And, likely, we may even have a ruling from her.

21  And we can revisit the scheduling of Uber's response at that

22  time.

23      THE COURT:  I mean, if the Plaintiffs want to take

24  on an unnecessary burden of filing an early motion which,

25  frankly, I'm not going to read until I have an opposition,

26  that's their lookout.  You can file your motion anytime

27  you're ready to file it, Mr. Abramson.

28      We'll set the opposition date after the expected

```
 1   time of ruling by Judge Cisneros.  It looks June 15th is a
 2   Saturday.
 3            Do you want to set that for the 17th, Mr. Oot?
 4            MR. OOT:  With the caveat that we would hear from
 5   Judge Cisneros first and seek leave of the Court if we
 6   haven't received an order from Judge Cisneros.
 7            THE COURT:  That seems reasonable to me.  In the
 8   interests of having some certainly, let's set a deadline
 9   now.  You'll meet with her, and she'll tell you whether
10   she's going to move quickly or not, presumably.  You know,
11   you can then come back to me or to the clerk by a joint
12   communication by saying we think it makes more sense to
13   extend this by a week or two or whatever it is.  I'm happy
14   to do that.  Makes sense.
15            MR. ABRAMSON:  Thank you, your Honor.
16            MR. OOT:  Thank you, your Honor.
17            THE COURT:  Do we pick a hearing date now?
18            MR. ABRAMSON:  That would be good.
19            THE COURT:  I'd like to see this get resolved
20   sooner rather than later.  What if we pick something as soon
21   as before the July 4th holiday, let's say.
22            MR. ABRAMSON:  That works for us.  If they file
23   their response by June 17th, we'll agree to turn it around
24   by the 21st, if it's okay with your Honor.  If it's possible
25   to have a hearing some time the next week or that week
26   before the fourth, that's good with us.
27            THE COURT:  The 27th.
28            MR. SHORTNACY:  Can I, at the risk of upsetting
```

1    the apple cart here, I understand the approach your Honor is

2    suggesting, and I'm not disagreeable with it.

3            I wanted to raise one timing issue.  If the

4    purpose is to let the MDL discussion play out to tee

5    something up to perfect it for Judge Cisneros and to appear

6    before her on June 11th, discuss those issues, she may

7    require additional briefing or not.  We'll certainly have

8    guidance from her on June 11th.

9            My fear is on the date that we just discussed of

10   an opposition of some four business days later or something,

11   it presupposes we will be working up an opposition in

12   parallel with the discussions and with potential guidance

13   from Judge Cisneros.  So, it's a little bit off kilter from

14   letting that process play out.  I would just ask to push the

15   time for the opposition out a little further so we don't

16   find Uber taking on work that's undisputed after guidance

17   from Judge Cisneros, for example.

18           I want to avoid generating that as well, even

19   though Mr. Abramson is wanting to file the motion.

20           Does that make sense, your Honor, in terms of the

21   timing?

22           THE COURT:  How about this?  The Plaintiffs can

23   file their motion whenever they feel appropriate.  Uber

24   files opposition on the 21st of June.  No reply hearing on

25   the 27th.  Everybody okay with that?

26           MR. ABRAMSON:  That works for us.

27           MR. SHORTNACY:  Your Honor, can we do the hearing

28   over Zoom?

```
 1          THE COURT:  That's fine.  June 27th at 11:00 a.m.
 2   Does that work for everybody?
 3          The only other thing I would say is I would urge
 4   you all -- I'm sure you're having these discussions in the
 5   context of the MDL.  As I recall from the prior motions, at
 6   least one of the issues that's likely to get raised by Uber,
 7   and presumably has already been raised by Uber, is whether a
 8   given custodian is likely to be duplicative of another
 9   custodian or another witness.  I remember there were
10   arguments about, well, gee, do you really need to look at
11   the inbox of so-and-so who is a more senior person when the
12   person who was really in charge of Issue X or Issue Y
13   reported to that person, but you're really getting a
14   superior witness and you're not missing anything if you talk
15   to the person who had the primary responsibility for that.
16   Somebody who is the regional VP for marketing for the
17   Western Hemisphere, it's going to be a small part of their
18   task to be overseeing marketing in the western United States
19   or something to that effect.  I would urge you to keep
20   having those discussions.  If there's a way to narrow down
21   the dispute here from six to four to two or wherever you
22   come out, based on a good faith representation by counsel,
23   where if need be a brief declaration from somebody like that
24   who says:  Yeah, I would have been copied on this stuff, but
25   I don't have anything that my subordinate wouldn't have.
26   Just a way to see if you can see your way through all of
27   this without fighting about everything.
28          MR. ABRAMSON:  We will do that, your Honor.  Thank
```

```
 1    you.
 2              THE COURT:  We haven't set a deadline for the
 3    Plaintiffs' motion.  I suppose we ought to do so just so we
 4    have something on paper.  You want to do it by May 31, a
 5    couple of weeks from now?
 6              MR. ABRAMSON:  Sure, yeah.  We can do it by then.
 7              THE COURT:  Okay, all right.  Have we made at
 8    least some progress and accomplished what we can for the
 9    day?
10              MR. ABRAMSON:  I think so.
11              MR. SHORTNACY:  Your Honor, thank you very much
12    for your time.
13              MS. RUBIN:
14              MS. PHILLIPS:  Thank you, your Honor.
15              THE COURT:  Thank you.  Bye-bye.
16              (Whereupon, court proceedings adjourned.)
17
18
19
20
21
22
23
24
25
26
27
28
```

```
 1   STATE OF CALIFORNIA     )
                             )     SS.
 2   COUNTY OF SANTA CLARA   )

 3

 4

 5          I, AMY GOODING, CSR, HEREBY CERTIFY:

 6          That I was the duly appointed, qualified shorthand

 7   reporter of said court in the above action taken on the

 8   above date; that I reported the same in machine shorthand

 9   and thereafter had the same transcribed through

10   computer-aided transcription as herein appears; and that the

11   foregoing pages contain a true and correct transcript of the

12   proceedings had in said matter at said time and place to the

13   best of my ability.

14          I further certify that I have complied with CCP

15   237(a)(2) in that all personal juror identifying information

16   has been redacted, if applicable.

17          DATED:  May 17, 2024

18

19                          _____
                            Amy Gooding, CSR
20                          CSR Certificate No. 13386

21

22

23   California Government Code section 69954(d) states:

24          "Any court, party, or person who has purchased a
     transcript may, without paying a further fee to the
25   reporter, reproduce a copy or portion thereof as an exhibit
     pursuant to court order or rule, or for internal use, but
26   shall not otherwise provide or sell a copy or copies to any
     other party or person."

27

28
```