

**Sent from:** New York Office

June 5, 2024

<u>Via ECF</u>
Magistrate Judge Lisa J. Cisneros
Phillip Burton Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102

      Re: *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*
          Case No. 3:23-md-03084-CRB

Dear Judge Cisneros:

    Pursuant to Pretrial Order No. 8 ("PTO No. 8") (ECF No. 323), the parties respectfully submit this joint letter regarding their respective positions concerning discovery related to safety data and statistics that Plaintiffs seek from Uber, pursuant to Plaintiffs' Requests for Productions 83 and 84, which seek "[a]ny and all DOCUMENTS RELATED TO YOUR Safety Reports, including ones you have published and/or considered publishing, including drafts," and "[a]ny and all DOCUMENTS RELATED TO YOUR reviews, studies, surveys, or risk or hazard assessments related to SEXUAL MISCONDUCT or SEXUAL ASSAULT of RIDERS," respectively. The parties' respective positions are addressed below.

    I.      **Plaintiffs' Position**

    Plaintiffs seek documents that contain statistics and data regarding the safety-related complaints Uber received in the United States from 2017 to present. These materials are highly relevant, as they go to the heart of what and when Uber knew about the prevalence, severity and patterns of violence on its platform, including sexual assault, and the effectiveness of the purported safety measures that Uber has recently implemented. Uber strains to recharacterize the documents Plaintiffs request as something Uber claims it does *not* have—statistical analysis. But Plaintiffs are not asking Uber to create statistical analyses or reports that do not exist. Rather, Plaintiffs seek the documents and ESI underlying Uber's U.S. Safety Reports ("Reports"); information that Uber unquestionably *does* have—or at least did have at some point. Uber's claim that the information does not exist is belied by its statements in its Reports, by Uber's internal documents, by statements

**New York Office:**
600 Third Ave., 12th Floor
New York, NY 10016  **Pennsylvania Office:**
615 Iron City Drive
Pittsburgh, PA 15205  **West Virginia Office:**
3200 Main St.
Weirton, WV  26062

Chaffin Luhana LLP • Toll Free: (888) 480-1123 • Fax: (888) 499-1123 • ChaffinLuhana.com

Uber makes herein, and indeed, basic common sense. If Uber's claim to have <u>none</u> of this information is to be believed, then one of the following must also be true: either Uber published two extensive Reports totaling over 150 pages total after reviewing "hundreds of thousands of user reports" and create[ing] a specialized audit team to review and accurately categorize the data"[1] but has *no* documents other than the Reports themselves, *or*, Uber had documents but destroyed them.[2]

### A. **Uber has gathered and analyzed safety data and statistics, including sexual-violence, from 2017-Present in connection with its bi-annual U.S. Safety Reports.**

Uber has published two Safety Reports, one covering safety complaints Uber received in the years 2017-2018 and another covering complaints received from 2019-2020. Ex's. A, B. Uber states that it will "continue to release a Safety Report every 2 years." Ex. A at 18. In its Reports, Uber analyzed and categorized more than 800,000 safety complaints over the four-year time period,[3] including sexual violence-related incidents. In conjunction with the Reports, Uber formed an audit team that reviewed sexual assault and misconduct incident reports and placed each incident into one of the 21 categories. *Id*. at 41. The categories were determined by a Sexual Misconduct and Violence taxonomy. *Id*. at App'x IV. Upon information and belief, the data audited is not limited to the type of incident reported, but includes the date and time of the ride, type of ride (*e.g.*, Uber Black or UberX), Driver history, GPS and route data, and Uber's response to the incident report including whether the Driver was suspended, deactivated, or neither.[4]

### B. **The U.S. Safety Reports disclosed only a fraction of the sexual violence complaints received between 2017 and 2020 and did not discuss trends or patterns (for example, when and where violent incidents occurred, type of ride, and ride anomalies, among others).**

Despite auditing complaints against a 21-category Sexual Misconduct and Violence taxonomy, Uber's Reports disclose data for <u>only</u> five categories of sexual assault and sexual misconduct. Uber kept secret the sexual assault and sexual misconduct complaints that it placed into the remaining sixteen (16) categories, including for example, assaults involving masturbation, indecent exposure, attempted touching or kissing of a sexual body part, and photography or video of a sexual body part without consent. Uber did not disclose <u>any</u> of the additional data or trends related to sexual assault or sexual misconduct, for example, the days, times, type of ride, or type of pick-up or drop-off location associated with the reports.

Given that Uber only reported on five of the 21 categories, it unsurprising that Uber's internal documents reveal that the number of sexual assault/misconduct incidents is drastically higher than what Uber disclosed in its Reports. Uber either categorized most reports into the sixteen (16) undisclosed categories or withheld them from reporting altogether on some arbitrary basis. For example, an [REDACTED][5] However, Uber's 2017-2018 Report disclosed only <u>2,936</u> sexual assault/misconduct complaints within a <u>two-year</u> timeframe. This means Uber received, reviewed, and categorized more than 90,000 sexual assault/misconduct

---

[1] 2017-2018 U.S. Safety Report, attached as Ex. A, at 16; *see also* 2019-2020 U.S. Safety Report, attached as Ex. B.
[2] The declaration of Roopal P. Luhana in support of Plaintiffs' position is attached hereto as Exhibit E.
[3] Ex. A. at 46 (Uber audited around 500,000 reports); Ex B at 4 (Uber audited over 350,000 reports).
[4] Ex. A at 29 (Uber "gather[s] any available data pertaining to an incident report (such as GPS information, timestamps, photos/ videos submitted, in-app communications, etc.) and may speak to all involved parties, including reporting parties, potential victims, and accused parties."); *Id*. at 31 ("Where possible, we also consider any relevant facts that agents gather during the review process—such as GPS information, trip timestamps, and any additional information provided to us. This may include dashcam or audio recordings and screenshots of texts.").
[5] UBER-MDL3084-000090245 at UBER-MDL3084-000090256, attached hereto as Exhibit C (under seal).

complaints *for 2017 alone* that it failed to disclose in its Report. In other words, Uber analyzed and audited massive amounts of data that it did not include in its Report—tens of thousands of complaints from 2017 alone *plus* some additional number from 2018 (likely also in the tens of thousands). ███████████████████████████████████████

### C. Plaintiffs are entitled to the safety data for all 21 Uber-audited categories of sexual assault and the underlying trip information that Uber collected from 2017-Present.

Uber disingenuously claims that the requested information does not exist. Uber admits it audited upwards of 800,000 total user incidents, yet Uber reported on fewer than 10,000.[7] Accepting Uber's position means no data or documents on the other 790,000 incidents exists. This is unlikely, particularly in light of Uber's touting that, "[b]ecause we aggregate safety incident data from many sources, Uber's dataset is likely more comprehensive than other sources of data, both in the transportation industry and more broadly." Ex. A at 34. Indeed, Uber confirms herein, "the Reports clearly lay[] out the data and *very extensive* validation and reconciliation process required for data quality measures;" that the Reports included the "incident categories that satisfied Uber's standards for data quality," and that "some of the categories in the safety taxonomy Plaintiffs demand…present inherent data quality problems." *See infra* at 4, 5 (emphasis added). These statements beg two questions: (1) where are the documents and ESI related to this extensive audit, and (2) where are the documents related to the data deemed of too poor quality to include?

The safety data for <u>all</u> twenty-one (21) Uber audited taxonomy categories *as well as* the underlying trip data Uber collected (such as the type of ride, GPS information, trip date and time, etc.) falls squarely within Uber's Rule 26 discovery obligations and is responsive to Plaintiffs' Requests for Production 83 & 84. The number of sexual assaults and instances of sexual misconduct occurring during Uber rides is relevant and goes to the heart of this litigation—specifically, Uber's knowledge of sexual assaults occurring on its platform and what it did or did not do with that information.[8] Indeed, this Court has admonished Uber that it must broadly identify the relevant sources of information here, including sources that "evaluate and analyze passenger complaints about drivers." (ECF 65, at ¶4). Further, the additional data collected with each report (the ride date and time, the type of ride (Uber Black or UberX), information regarding Driver history, GPS and route data, and Uber's response to the incident report) is likely to show patterns associated with sexual assault/misconduct claims that may indicate systemic failures. Indeed, the Court has repeatedly ordered that documents related to investigations and allegations of sexual assault or sexual misconduct of Uber Riders by Drivers are relevant to this litigation, particularly where the documents pertain to the "alleged systemic failure to address patterns of sexual assault against passengers." (ECF 175 at ¶¶ 6B-C; ECF 344 at p. 2). This is precisely what the requested data is likely to show, as it is not limited to the gross number of sexual assaults but includes the above-indicated underlying trip details and data associated with each sexual assault/misconduct report. Uber does not dispute the relevance of this data, only that it cannot be produced without search terms, if it exists at all.[9]

---

[6] Jan. 18, 2024 Declaration of Katherine McDonald, filed in Case No. CJ-21-005188, at ¶ 8, attached hereto as Exhibit D (under seal).
[7] Ex. A. at 51, 57, 63-68; Ex. B at 49, 54, 62-66.
[8] The scope of these Reports is nationwide, as is the scope of this litigation and Plaintiffs' request. While Uber has produced limited information regarding sexual assaults that occurred in California, that does not absolve Uber of the obligation to produce documents and ESI it has related to the U.S. Safety Reports.
[9] Uber has alternatively argued that the data does not exist and that the data can only be produced using search terms. It defies logic that Uber would undertake such an expensive, time-consuming task and keep no records. Additionally, whether or not the information at issue was kept in the ordinary course of business does not define the standard here. There is no dispute that Uber conducted these audits. Data should exist, if it has not been destroyed.

Uber has not denied that documents and data used in or created during their audit of safety complaints in conjunction with their Reports exist, but rather that Uber does not have a statistical analysis of it—which is neither the floor nor ceiling of Plaintiffs' request. Further, Uber's objection that the data is unreliable does not relieve them of their burden to produce it. Uber should be able to produce this information from non-custodial sources without the use of search terms.[10]

## I. Defendants' Position

Plaintiffs ask Uber to generate and compile reports on "nationwide data"[11] that are not available in the form Plaintiffs imagine and are not generally kept in the ordinary course of business, as explained in Plaintiffs' own exhibits. Plaintiffs also want Uber to generate and compile these reports immediately and without applying search terms. Uber, by contrast, has offered to do what is reasonable and proportional–i.e., produce information responsive to the Requests in the form that the data is available. Uber has in fact already produced reports relating to peer-to-peer rideshares in California, which Uber does keep in the ordinary course of business.[12] Plaintiffs' request here amounts to demanding Uber commission an entirely new data analysis for the specific purpose of this litigation, representing the equivalent of creating from scratch a new omnibus Safety Report for each year starting in 2017, and, on top of that, generating new data reports and analyses for sixteen (16) more categories of the safety taxonomy that have less reliable data than the categories Uber collected and analyzed for the Safety Reports. Therefore, Plaintiffs' request should be denied.

### A. The statistics and data Plaintiffs seek are not readily accessible or available to produce, with or without search terms

Plaintiffs fundamentally mischaracterize Uber's data collection and reporting for the Safety Reports, despite the Reports clearly laying out the data and very extensive validation and reconciliation process required for data quality measures. Plaintiffs seek additional data and statistics on a national scope for those categories within the safety taxonomy that Uber did not compile, validate, or reconcile for the U.S. Safety Reports. Outside of the data Plaintiffs already have in the form of the Safety Reports, Uber does not have this information readily available to produce, with or without use of search terms and a validation and reconciliation process would be extraordinarily expensive and time-consuming. Plaintiffs wrongly mischaracterize this position as "destroying" data. Uber does not claim there is no Safety Report related data beyond the published reports. Rather, Uber has explained through sworn testimony that the data does not exist in the form requested by Plaintiffs, and that Uber does not have a statistical analysis of the 16 non-published taxonomy, and finally that the underlying data sought is not aggregated.

Uber did not, as Plaintiffs allege, analyze data related to twenty-one (21) categories of sexual assault and sexual misconduct and keep anything "secret." Plaintiffs confuse the Incident Response Team's process for responding to *individual* complaints, as described in the U.S. Safety Reports[13], with a large-scale data collection that is audited in a way that lends itself to

---

[10] If Uber insists no documents exist, Plaintiffs respectfully request that the Court order Uber to produce a corporate witness to testify on its Safety Reports, including the data collection, auditing, categorization, and storage process.

[11] While Uber welcomes Plaintiffs' narrowing the time scope of these Requests for Production 83 and 84 here to 2017 and later, Plaintiffs did not represent this narrowing to Uber in the parties' extensive conferrals on this issue.

[12] Pursuant to California Public Utilities Commission ("CPUC") reporting obligations, Uber has submitted data on sexual misconduct and sexual assault for peer-to-peer rideshares.

[13] Ex. B at 29 (Uber's Incident Response Team "gather[s] any available data pertaining to an incident report (such as GPS information, timestamps, photos/ videos submitted, in-app communications, etc.) and may speak to all

statistical analysis. Uber, in the course of preparing the U.S. Safety Reports and in consultation with its advocacy partners, collected and analyzed data related to the *five most serious* categories of sexual assault in connection with Uber-facilitated rides, which was compiled for and reported in the U.S. Safety Reports. *See* Ex. A at 12; Ex. B at 16. These categories were selected not only because they are the most serious categories, but also because data for these incident categories satisfied Uber's standards for data quality. Uber and its advocacy partners worked to provide an accurate reflection of these incident categories, including classification accuracy, reliability, and consistency in standards. Ex. A at 33; Ex. B, at 38. Some of the categories in the safety taxonomy Plaintiffs demand Uber produce without search terms present inherent data quality problems. These include "staring" or "flirting" or "comments about appearance." Such categories are inherently subjective, and thus difficult to report with consistency and confidence. Likewise, reporting may be incomplete. For example, a reporting party may use the term "harass" to relate to a broad spectrum of inappropriate conduct outside of sexual misconduct. This makes the data validation and reconciliation process subjective and burdensome. By contrast, reports of the kind compiled and disclosed in the Safety Reports are objectively sexual in nature, easier to identify with confidence, and leave little room for misinterpretation. *See* Ex. A at 42. Creating a report of the nationwide data without the use of search terms is simply impossible. Providing this data over Plaintiffs' proposed time scope would require a time-intensive process of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ Ex. D, at ¶7.

To support their contention that Uber has this data available to produce without search terms, Plaintiffs cite ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ As described in Exhibit C, as well as the 2017 Safety Report section referenced therein, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬[14] Furthermore, these reports were not part of a routine collection of data made in the ordinary course of business. Rather, these reports were specifically collected for use in an audit performed to fine tune Uber's implementation of the taxonomy. Ex. A at 41. This audit resulted in improvements to the taxonomy that allowed Uber to implement its final Sexual Misconduct and Sexual Violence Taxonomy. *Id.* The mere existence of this audit to calibrate Uber's taxonomy simply does not support Plaintiffs' contention that Uber failed to disclose anything.

Plaintiffs similarly mischaracterize ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ from the Feb. 2, 2024 Declaration of Katherine McDonald, Ex. D. This volume of records reflects the broad and over-inclusive approach Uber took to collecting these records. For instance, Uber adopted definitions relating to sexual assault broader than those adopted by most criminal codes or research entities. Ex. A at 17. Additionally, Uber included complaints from both riders and independent drivers; within the five categories of sexual assault analyzed for the U.S. Safety Reports, almost half of the sexual assault complaints analyzed were complaints by independent drivers against riders. Ex A at 18; Ex B at 59. Furthermore, this tally includes "a range of safety- and non-safety-related consumer issues," and not just data related to sexual assault or sexual misconduct. Ex. A at 46. Even the safety-related incidents included in this tally go well beyond sexual assault and sexual misconduct, to include instances of bodily injury resulting from vehicle crashes, physical altercations related to theft, and other physical altercations. *Id.*

---

involved parties, including reporting parties, potential victims, and accused parties."); Ex. A at 31 ("Where possible, we also consider any relevant facts that agents gather during the review process—such as GPS information, trip timestamps, and any additional information provided to us. This may include dashcam or audio recordings and screenshots of texts.").

[14] The last line of Exhibit C, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

5

Similarly, statistical analyses related to the taxonomy categories not covered in the Safety Reports ███████████ Ex. D at ¶3. Providing statistical analyses for the taxonomy categories not covered in the U.S. Safety Reports would require Uber ███████████████████████████████████████████████████████████████ *Id.* at ¶4. Moreover, compiling statistics beyond those provided in the Safety Reports ███████████████████████████████████████████████████████████████ *Id.* at ¶7; *see also* Ex. A at 33; Ex. B at 15-16.

### B. Uber has already agreed to produce available data found in custodial files, and has already produced data and statistics

Contrary to Plaintiffs' assertions, Uber never refused to produce documents responsive to these two Requests during meet-and-confer discussions on this topic. Rather, as part of the discovery milestones process, Uber specifically agreed to produce responsive and non-privileged information found in a custodial search in Uber's preliminary responses to Plaintiffs' Requests for Production, attached hereto as Exhibit F (under seal). These preliminary responses were the subject of meet-and-confer discussions. Uber also provided this commitment to the JCCP Plaintiffs.[15]

Pursuant to this commitment, the custodians Uber has proposed include numerous people involved with the Safety Reports, including Uber's Director of Data Science, who was involved in both Safety Reports. Ex. D at ¶2. Other custodians Uber has proposed who may have such information include: Uber's Public Policy Manager for Safety, and Director of Public Policy. Therefore, Plaintiffs' assertion that Uber refused to produce relevant information is simply untrue. Uber objects only to generating analyses for the purpose of this litigation and providing this information in an unavailable format. Furthermore, Uber has already provided the data and statistics kept in the ordinary course of business to the JCCP Plaintiffs. Specifically, Uber maintains statistical data on sexual assaults and sexual misconduct in California to fulfill CPUC reporting requirements. *Id.* at ¶3. Uber does not maintain this type of data in other jurisdictions, because the CPUC is the only regulatory body that requests this level of reporting. Again, just as in the JCCP, in the MDL, Uber agreed to search for responsive information through searches of custodial files

For these reasons, Uber respectfully requests that this Court deny Plaintiffs' request to order Uber to compile and generate new data in order to produce it for purposes of litigation.

Sincerely,

By: /s/Roopal Luhana
ROOPAL P. LUHANA (*Pro Hac Vice*)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

SARAH R. LONDON (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**

By: /s/ Michael B. Shortnacy
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (*Pro Hac Vice* admitted)
oot@shb.com

---

[15] Jan. 18, 2024 Declaration of Randall S. Luskey, filed in Case No. CJ-21-005188, at ¶ 8, attached hereto as Exhibit G (under seal).

275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: slondon@lchb.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

**SHOOK, HARDY & BACON, L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

RANDALL S. LUSKEY (SBN: 240915)
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

ROBERT ATKINS (*Pro Hac Vice* admitted)
ratkins@paulweiss.com
CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
cgrusauskas@paulweiss.com
ANDREA M. KELLER (*Pro Hac Vice* admitted)
akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

cc:     All counsel of record via ECF

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2024 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

Dated: June 5, 2024                    By: /s/Roopal P. Luhana
                                            Roopal P. Luhana