# EXHIBIT D

**FILED**
San Francisco County Superior Court

FEB 0 5 2024

CLERK OF THE COURT
BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATION PROCEEDING<br>SPECIAL TITLE [RULE 3.550]<br><br>IN RE UBER RIDESHARE CASES | Case No. CJC-21-005188<br>JUDICIAL COUNCIL COORDINATION<br>PROCEEDING NO. 5188<br><br>ORDER ON PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO UBER'S SENIOR EXECUTIVE CUSTODIANS |

Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians came on for hearing on February 2, 2024. Having considered the pleadings and papers on file in the action, and the parties having submitted on the Court's tentative ruling granting the motion in part and denying it in part, the Court's tentative ruling is hereby adopted.

## **BACKGROUND**

On March 7, 2023, Plaintiffs filed a Master Long-Form Complaint against Defendants Uber Technologies, Inc. and Rasier, LLC (together, "Uber"). Plaintiffs alleged sixteen causes of action: (1) general negligence; (2) common carrier negligence; (3) negligent misrepresentation; (4) intentional

- 1 -

misrepresentation; (5) negligent infliction of emotional distress ("NIED"); (6) intentional infliction of emotional distress ("IIED"); (7) vicarious liability/liability for the torts of Uber drivers; (8) vicarious liability for sexual assault; (9) vicarious liability for sexual battery; (10) vicarious liability for false imprisonment; (11) negligence by misfeasance; (12) negligence by nonfeasance; (13) intentional concealment; (14) strict product liability – design defect; (15) strict product liability – failure to warn; and (16) fraud. (Compl. ¶¶ 164-348.) On June 22, 2023, the Court sustained Uber's Demurrer to Plaintiffs' Master Long-Form Complaint. (June 22, 2023 Order, 1, 19.) In particular, the Court sustained Uber's demurrer as to Plaintiffs' vicarious liability, fraud, misrepresentation, and strict products liability claims without leave to amend. (*Id.* at 1, 12, 15, 19.) The Court sustained Uber's demurrer as to the negligent infliction of emotional distress claim with leave to amend. (*Id.* at 1, 16, 19.) On July 24, 2023, Plaintiffs filed a First Amended Master Long Form Complaint ("FAC") alleging causes of action for general negligence, common carrier negligence, negligence by misfeasance, and negligence by nonfeasance. Plaintiffs allege as follows.

Plaintiffs "are individuals who were raped, sexually assaulted, sexually battered, sexually harassed, falsely imprisoned, kidnapped, physically assaulted, and/or otherwise assaulted and/or harassed by their Uber driver." (FAC ¶ 6.) Uber is a transportation company that uses its app ("Uber App") to "connect riders looking for transportation to independent transportation providers…looking for riders." (*Id.* ¶¶ 1, 21-22.) Uber "drivers are largely nonprofessional, untrained individuals who use their own vehicles." (*Id.* ¶ 44.)

As early as 2014, Uber became aware that its drivers were engaging in sexual misconduct or sexual assault against its passengers. (*Id.* ¶ 3; see *id.* ¶ 27.) Uber has "publicly acknowledged this sexual assault crisis." (*Id.* ¶ 4; see *id.* ¶¶ 29, 121, 147, 149; see, e.g., *id.* ¶¶ 121-122 [approximately 250 reported sexual assaults per month in 2017 and 2018].) However, Uber "has actively chosen not to report instances of sexual assault that occur on the UBER App to the authorities" or other ridesharing companies. (*Id.* ¶¶ 84-86, 88, 134.) In addition, Uber does not proactively cooperate with law enforcement investigating cases passenger victims report to the police or participate in transportation network company ("TNC") safety hearings. (*Id.* ¶¶ 89-94, 116-120.) Moreover, after a victim reports a

- 2 -

*In Re Uber Rideshare Cases* JCCP 5188
Order on Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians

sexual assault, Uber often erases the victim's complaint and disables the victim's account, which precludes the victim from accessing pertinent information such as the driver's name, driver's photo, make and model of the vehicle, ride time, ride distance, and route. (*Id.* ¶¶ 94-95, 100, 102.)

Despite marketing itself as a safe and better alternative to other transportation methods, Uber continues to hire drivers without conducting adequate background checks and screening procedures, allows culpable drivers to keep driving for Uber, and fails to adopt and implement reasonable monitoring and investigation procedures to protect passengers. (*Id.* ¶¶ 4, 24-25, 28, 30-31, 112-114, 131-133, 160-161, 164-168, 170-172, 189-190, 192, 209, 214-215, 218; see, e.g., *id.* ¶¶ 34-43, 66-69, 73-83, 130 [Uber Safe Rides Fee was a revenue source rather than a fund for implementing background checks, vehicle checks, driver safety education, development of safety features, and insurance]; but see *id.* ¶ 111 [the Uber App now includes an emergency button that allows a passenger to call 911].) Due to Uber's failure to implement changes, passengers continue to be victims of sexual assaults. (*Id.* ¶¶ 28, 127.)

On September 29, 2023, Plaintiffs provided Uber with a list of seventy custodians whose files it proposed Uber search. (Abramson Reply Decl. ¶ 3.) On October 26, 2023, after the deposition of Uber's person most knowledgeable regarding corporate structure, Plaintiffs provided Uber with an updated list of custodians. (*Id.* ¶ 4.) That list added seventy-three custodians, for a total of 143 custodians. (*Id.*) In response, Uber picked a subset of custodians whose ESI it is willing to search. (*Id.* ¶ 5.) Of the custodians whose ESI Uber is unwilling to search, eighteen are senior executives. (*Id.* ¶ 7.) Plaintiffs now "move to compel discovery from certain of Uber's senior executive custodians" due to their "close involvement in developing Uber and its platform, including Uber's approach and response to rider safety and sexual assault." (Motion, 3.) In particular, the eight custodians are: (1) Travis Kalanick; (2) Dara Khosrowshahi; (3) Ryan Graves; (4) Jill Hazelbaker; (5) Sundeep Jain; (6) Andrew Macdonald; (7) Emil Michael; and (8) Troy Stevenson. (Opening Brief, 1.) Uber opposes the motion as to all custodians, with the exception of Troy Stevenson. (Opposition, 5 & fn. 2.)

**LEGAL STANDARD**

"California law provides parties with expansive discovery rights. Thus, unless otherwise limited by a court order, any party may obtain discovery regarding any matter, not privileged, that is relevant to

- 3 -

the subject matter involved in the pending action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (*Ross v. Superior Court of Riverside County* (2022) 77 Cal.App.5th 667, 672 (cleaned up); see Code Civ. Proc. § 2017.010.) The Civil Discovery Act provides that a "court shall limit the scope of discovery if it determines that the burden, expense, or intrusiveness of that discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence." (Code Civ. Proc. § 2017.020(a).) No California statutory provision or authority limits written discovery directed to a corporate executive.

As Plaintiffs note, Uber "conflates the standards for senior executive 'apex' depositions with the electronic document discovery currently at issue." (Reply, 5.) Under the apex doctrine, a corporate executive "may not be *deposed*" when "there is no showing he or she had any involvement in a lawsuit against the corporation, and prior to the plaintiff's exhaustion of less intrusive means of discovery." *Liberty Mutual Ins. Co. v. Superior Court* (1992) 10 Cal.App.4th 1282, 1284 (emphasis added).) Thus,

> when a plaintiff seeks to depose a corporate president or other official at the highest level of corporate management, and that official moves for a protective order to prohibit the deposition, the trial court should first determine whether the plaintiff has shown good cause that the official has unique or superior personal knowledge of discoverable information. If not, . . . the trial court should issue the protective order and first require the plaintiff to obtain the discovery through less-intrusive methods. These would include interrogatories directed to the high-level official to explore the state of his or her knowledge or involvement in plaintiff's case, the deposition of lower-level employees with appropriate knowledge and involvement in the subject matter of the litigation; and the organizational deposition of the corporation itself, which will require the corporation to produce for deposition the most qualified officer or employee to testify on its behalf as to the specified matters to be raised at the deposition.

(*Id.* at 1289; see also *Contractors' State License Board v. Superior Court* (2018) 23 Cal.App.5th 125, 131 ["The general rule is based upon the recognition that . . . an official's time and the exigencies of his everyday business would be severely impeded if every plaintiff filing a complaint against an agency [or corporate] head, in his official capacity, were allowed to take his oral deposition. Such procedure would be contrary to the public interest, plus the fact that ordinarily the head of an agency [or corporation] has little or no knowledge of the facts of the case." (cleaned up)].)

"[C]ourts have declined to extend the apex doctrine outside the context of depositions, holding that it is not a protective shield that prohibits document discovery from high-ranking officials." (*L.A.*

- 4 -

*Alliance v. City of Los Angeles* (C.D. Cal. Aug. 2, 2023), 2023 WL 5505037, *6; see also *id.* at *5 ["Rule 26 is sufficient to mitigate any such [document] request by requiring that the party seeking discovery establish that the information sought is relevant to its claim or defense and proportional to the needs of the case. Rule 26 further prohibits demands that are cumulative, irrelevant to the resolution of the dispute, or disproportionate to the needs of the case."].)[1] Therefore, the applicable standard here is relevance under the Civil Discovery Act. (See Code Civ. Proc. §§ 2017.010, 2017.020(a).)

As one federal district court has noted, "[r]elatively little legal authority exists on the standards a court should apply when parties are unable to agree on designated ESI custodians and a party seeks to compel another party to designate an additional ESI custodian or custodians." (*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation* (D. Kan. Mar. 15, 2018) 2018 WL 1440923, *2.) The Court finds persuasive the general principles summarized in that opinion. (*Id.*) Two, which cut in different directions, are particularly pertinent here. First, "the party seeking to compel the designation of a particular additional ESI custodian has the initial threshold burden of showing that the disputed custodian's ESI likely includes information relevant to the claims or defenses in the case." (*Id.* (cleaned up).)[2] Second, "mere speculation that one's position as a senior executive might increase the relevance of that individual's files is not a basis for designating that individual as a custodian." (*Id.* (cleaned up).)

## DISCUSSION

### I. Travis Kalanick

"Mr. Kalanick was one of Uber's co-founders and served as CEO from 2010 until June 2017."

---

[1] "Because of the similarity of California and federal discovery law, federal decisions have historically been considered persuasive absent contrary California decisions." (*Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1288.)

[2] Although Uber concurs that this standard applies, it also advocates a higher standard, which would require a showing that "the executive's relevant ESI is unique and would not be available from other designated custodians." (Opposition, 8, 11.) Courts appear to have applied that higher standard primarily in cases where the responding party has already searched the ESI of multiple custodians and the requesting party is seeking to compel it to designate *additional* custodians. (See, e.g., *In re Facebook, Inc. Consumer Privacy User Profile Litigation* (N.D. Cal. Nov. 14, 2021) 2021 WL 10282213, *1 [special master's finding that "requiring a party to compel the designation of additional custodians requires a showing that the disputed custodians possess uniquely relevant information that is not available from the sources already designated."].) Regardless of how it is phrased, the Court finds that the applicable standard is met as to the three custodians as to whom it grants Plaintiffs' motion.

- 5 -

*In Re Uber Rideshare Cases* JCCP 5188
Order on Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians

(Opposition, 14.) Plaintiffs contend that Mr. Kalanick was the key decision maker regarding background checks, including fingerprinting. (Opening Brief, 6.) Plaintiffs assert that Mr. Kalanick not only supported Uber's policy of not reporting sexual violence incidents to law enforcement but also "set the tone for Uber's response to reports of sexual violence." (*Id.*) Uber opposes the designation of Mr. Kalanick as a custodian, arguing that "the likelihood of uncovering uniquely relevant documents from a CEO with widespread and diverse involvement in the company is far outweighed by the burden and expense of collecting, hosting, and searching his files." (Opposition, 14.) Uber also argues that "80% of the incidents alleged in the 20 bellwether cases selected for trial purportedly occurred *after* Mr. Kalanick's departure from the company in June 2017." (*Id.* at 15.) The Court disagrees.

In the Court's June 22, 2023 Order on Uber' Motion to Strike Plaintiffs' Master Long-Form Complaint, "Uber correctly observe[d] that it cannot be held liable for punitive damages unless the person responsible for the wrongful act was 'an officer, director, or managing agent of the corporation.'" (June 22, 2023 Order, 7.) In the FAC, Plaintiffs continue to place Mr. Kalanick's decision making at issue. In particular, Plaintiffs allege that "Travis Kalanick and the managing agents at UBER made it as easy as possible for UBER drivers to sign up." (FAC ¶ 131.) Plaintiffs also allege that "Travis Kalanick made the decision that UBER was going to not fingerprint its drivers, that it was not going to scrub these drivers against FBI records, and that it was going to use a fast and shallow background-check process." (*Id.* ¶ 132; see also *id.* ¶ 144.) Plaintiffs further allege that Travis Kalanick "had actual knowledge that these sexual assaults were going on because the victims of these assaults were reporting them to UBER. But UBER's officers, directors, and managing agents did nothing." (*Id.* ¶ 145; see also *id.* ¶¶ 137, 146.)

Plaintiffs' allegations in conjunction with publicly available information (see, e.g., Opening Brief, 6-9 & fns. 5-24),[3] establish that documents within Mr. Kalanick's former files are likely to be "relevant to the subject matter involved in the pending action . . . or [] reasonably calculated to lead to the discovery of

---

[3] The materials appended to Plaintiffs' motion include a variety of newspaper and magazine articles, book excerpts, and the like. Uber has not lodged evidentiary objections to those materials, which arguably consist largely of inadmissible hearsay. (See *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 83 ["We also conclude the Los Angeles Time newspaper article is hearsay and therefore decline to consider it for its truth."].) As such, the Court has considered them, but it has not given them much weight. (See, e.g., *In re EpiPen*, 2018 WL 1440923, *3 fn. 19 ["In making its findings herein, the Court gives little weight to the New York Times article mentioning [former CEO]."].)

- 6 -

*In Re Uber Rideshare Cases* JCCP 5188
Order on Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians

admissible evidence." (Code Civ. Proc. § 2017.010.) Moreover, that eighty percent of the incidents alleged in the bellwether cases occurred after Mr. Kalanick's departure does not preclude a finding of relevance as he was a key decisionmaker during his tenure at Uber. Furthermore, Plaintiffs assert that "Uber has not agreed to produce a single custodian who held a senior executive role *during* Kalanick's CEO tenure" or "any custodian who served on Uber's [Executive Leadership Team] before March 2022." (Reply, 8 (emphasis in original).) Uber briefly discusses the volume of ESI for other custodians, but fails to articulate the burden and expense associated with the search for and production of Mr. Kalanick's custodial file. (See Opposition, 6 fn. 4.)

Accordingly, Plaintiffs' motion is granted as to Mr. Kalanick.

## II. Dara Khosrowshahi

Mr. Khosrowshahi has been Uber's CEO since 2017 and leads the ELT. (Opposition, 12.) Plaintiffs' briefing demonstrates Mr. Khosrowshahi was brought on as Uber's CEO to repair Uber's image and prioritize safety. Indeed, "[i]n his first year as Uber's CEO, Dara Khosrowshahi made safety the company's top priority and committed to putting safety at the heart of everything we do." (Opening Brief, Ex. 2, Khosrowshahi 9, 20.) Further, Uber's 2017-2018 Safety Report highlighted his central role in convening the company's top executives to address that issue, sparking what it described as "a 21-month effort that has included a review of hundreds of thousands of customer support requests; a complete rethink of how we categorize the most serious safety incidents that happen during Uber trips; an overhaul of how we train our support staff; and an even bigger investment in cutting-edge safety technology," all of which culminated in the Safety Report. (*Id.* at Ex. 2, Khosrowshahi 9, 8.) Plaintiffs' briefing is replete with references to news articles and reports where Mr. Khosrowshahi comments on Uber's planned safety initiatives and evaluations of safety. (Opening Brief, 10-13.)

Uber acknowledges that Mr. Khosrowshahi has publicly commented on safety initiatives such as the Safety Reports. (Opposition, 13.) However, Uber argues that "those initiatives are developed and implemented by those working under Mr. Khosrowshahi," therefore, it is speculative that he possesses unique and relevant information. (*Id.*; see, e.g., *id.* at 13-14 [identifying custodians who made day-to-day decisions].) The Court disagrees.

- 7 -

*In Re Uber Rideshare Cases* JCCP 5188
Order on Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians

Here, the standard the Court applies is not whether Mr. Khosrowshahi possesses unique information (although he may well). Rather, it is whether Mr. Khosrowshahi likely possesses information "relevant to the subject matter involved in the pending action . . . or [] reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc. § 2017.010.) Mr. Khosrowshahi's central involvement in Uber's policies regarding safety is undoubtedly relevant to Plaintiffs' negligence and punitive damages claims in the instant proceeding. (See, e.g., Reply, 7 ["In his attempt to rehabilitate Uber's reputation, Khosrowshahi made safety Uber's 'top priority,' oversaw publication of two U.S. Safety Reports, approved certain (inadequate) safety measures, and publicly admitted Uber's need to rectify past mistakes."].) Uber, again, fails to make any showing that the burden and expense associated with searching for and producing Mr. Khosrowshahi's custodial file would be disproportionate given "the needs of the case, the amount in controversy, and the importance of the issues at stake in the litigation." (Code Civ. Proc. § 2019.030(a)(2).)

Accordingly, Plaintiffs' motion is granted as to Mr. Khosrowshahi.

### III.  Ryan Graves

"Ryan Graves was Uber's first CEO in 2010, and then served as Uber's Senior Vice President of Global Operations from 2011 to September 2017. He also served on Uber's Board of Directors from 2010 to 2019." (Opening Brief, 13.) Plaintiffs cite to a number of articles to support their motion to designate Mr. Graves as a custodian. However, the Court is unpersuaded. None of the articles cited by Plaintiffs establishes a connection between Mr. Graves's role with Uber and any safety or other issues relevant to the instant proceeding. Uber sets forth a list of other individuals, who are appropriate custodians for safety issues within the U.S. market, and whom Uber has agreed to designate as custodians. (Opposition, 16.) Should those or other custodians possess information establishing Mr. Graves's relevance to the instant proceeding, Plaintiffs may raise that issue with Uber or the Court, if need be, at a later date.

Accordingly, based on the record before the Court, Plaintiffs' motion is denied without prejudice as to Mr. Graves.

- 8 -

### IV. Jill Hazelbaker

"Jill Hazelbaker joined Uber in November 2015 as the Vice President of Communications and Public Policy and, in June 2019, she became a Senior Vice President and added Marketing to her portfolio of responsibilities. She serves on Uber's [ELT] and is an Officer of the company." (Opening Brief, 15 (cleaned up).) In the FAC, Plaintiffs allege that Uber "markets itself as a better and safer alternative to taxis and advertises its services as the 'safest ride on the road' and 'a ride you can trust'" while placing an emphasis on rider safety. (FAC ¶ 24; see also id. ¶¶ 25, 66-68.) Plaintiffs allege that "[o]ver the last decade, UBER, including UBER's officers . . . became aware that UBER drivers were sexually assaulting and raping female customers." (Id. ¶ 27.) However, Plaintiffs allege that Uber "does not make clear to its users, particularly young women who have been drinking, . . . that by choosing to ride with UBER after drinking, they are putting themselves in danger from the UBER drivers themselves." (Id. ¶ 26; see also id. ¶ 69.)

Ms. Hazelbaker has publicly commented on Uber's evaluation of safety and the implementation of safety measures. (Opening Brief, 16-17.) Not only has she made public comments, but she is responsible for Uber's safety narrative, suggesting that she is intimately familiar with safety issues. (Id.) Ms. Hazelbaker's purported knowledge regarding safety is relevant to the issues presented in this proceeding. Uber disagrees, arguing that "it has already agreed to designate seven policy-related custodians" and "[t]o the extent Plaintiffs seek to designate Ms. Hazelbaker as a custodian because of interest in non-lobbying public policy activity, Uber has already identified several custodians whose roles are more keenly focused on women's safety issues, sexual assault, and/or sexual misconduct." (Opposition, 17.) However, that Uber has agreed to designate other custodians does not preclude a finding that Ms. Hazelbaker's custodial file likely contains relevant information.

Accordingly, Plaintiffs' motion is granted as to Ms. Hazelbaker.

### V. Sundeep Jain

"Sundeep Jain has served as Uber's Chief Product Officer and Senior Vice President Engineering since 2008." (Opening Brief, 18.) Although Mr. Jain serves as Uber's public spokesperson for new feature or product launches and has overseen the introduction of add-on features to Uber's app, Plaintiffs

- 9 -

do not establish a connection between Mr. Jain's role and this proceeding. (See, e.g., *id.* at 18-19.) Uber argues its person most knowledgeable on corporate structure and governance, Brad Rosenthal, testified that Mr. Fuldner's team is focused on project management regarding the implementation of new safety features and that Uber has agreed to designate Mr. Fuldner as a custodian. (Opposition, 18-19.) Uber also identifies other individuals who worked on product safety features. (*Id.* at 19.) Therefore, should other custodians possess information establishing Mr. Jain's relevance to the instant proceeding, then Plaintiffs may raise that issue with Uber or the Court, if need be, at a later date.

Accordingly, Uber's motion is denied without prejudice as to Mr. Jain.

## VI. Andrew Macdonald

Andrew Macdonald "serves as Uber's Senior Vice President of Mobility and Business Operations, where he is responsible for the company's global rideshare business." (Opening Brief, 19.) Plaintiffs demonstrate that Mr. MacDonald "has been involved in Uber Safety measures and has publicly commented on the implementation of Uber safety measures" such as the panic button on Uber's Chicago mobile app, the "Check Your Ride" campus initiative, and Uber's campaign to empower drivers to be vigilant and report suspicious activity. (*Id.* at 20.) Such a role in safety is relevant to the instant proceeding as Plaintiffs place Uber's safety features or lack thereof at issue. (See, e.g., FAC ¶¶ 35, 109-111, 113-115.) Uber argues Mr. Macdonald's "role and scope are global and go far beyond the operations at issue in the litigation at hand." (Opposition, 19; see *id.* at 20.) Uber asserts that it agreed to designate "the former and current highest ranking U.S.-focused operations leads at the company" as custodians. (*Id.* at 19.) Additionally, Uber identifies "Dennis Cinelli, Rachel Holt, and Camiel Irving as the appropriate custodians to cover the subject matter area(s) in which Plaintiffs seek information from Mr. Macdonald." (*Id.* at 20.) The Court accepts Uber's representation that given the global scope of Mr. Macdonald's responsibilities, these "other custodians' files would provide the parties more comprehensive, targeted, and relevant documents than Mr. Macdonald's files." (*Id.*)

Accordingly, Plaintiffs' motion is denied without prejudice as to Mr. Macdonald.

## VII. Emil Michael

Emil Michael "was the Chief Business Officer (Senior Vice President of Business) from

- 10 -

*In Re Uber Rideshare Cases* JCCP 5188
Order on Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians

September 2013 until June 2017 and a member of the ELT." (Opposition, 21.) Plaintiffs attempt to establish Mr. Michael's relevance by asserting he was "'second in command,' Kalanick's 'right hand,' and part of Kalanick's 'A-Team.'" (*Id.*) However, as Uber argues, the fact that Mr. Michael had a close relationship with Mr. Kalanick does not establish that he is a relevant custodian. (See Opposition, 21.) Plaintiffs do not set forth the connection between Mr. Michael and this litigation. Rather, he appears to have been the driving force of Uber's initial capital campaign and not a decision maker regarding Uber's policies. (See, e.g., Opening Brief, Ex. 7, Michael 2, 2 [helped "Uber raise billions of dollars from major investors."]; Michael 3-4; Michael 5, 2 ["He raised about $15 billion for Uber during his nearly four years at the company."].) Although Mr. Michael "became embroiled in several embarrassing incidents" during his tenure with Uber, Plaintiffs do not even suggest that there is any nexus between those incidents and the issues involved in this proceeding. (*Id.* at Ex. 7, Michael, 2, 2; see, e.g., *id.* at Ex. 7, Michael 3, Michael 5.)

Accordingly, Plaintiffs' motion is denied as to Mr. Michael.

## VIII. Troy Stevenson

Uber agrees to designate Troy Stevenson as an additional custodian. (Opposition, 12.) Accordingly, Plaintiffs' motion is denied as moot as to Mr. Stevenson.

IT IS SO ORDERED.

Dated: February 5, 2024

Ethan P. Schulman
Judge of the Superior Court

- 11 -

*In Re Uber Rideshare Cases* JCCP 5188
Order on Plaintiffs' Motion to Compel Discovery Related to Uber's Senior Executive Custodians

## CERTIFICATE OF ELECTRONIC SERVICE
(CCP 1010.6(6) & CRC 2.260(g))

I, Felicia Green, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On February 5, 2024, I electronically served ORDER ON PLAINTIFFS' MOTION TO COMPEL DISCOVERY RELATED TO UBER'S SENIOR EXECUTIVE CUSTODIANS via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated: FEB 05 2024

Brandon E. Riley, Court Executive Officer

By: _____
Felicia Green, Deputy Clerk