# EXHIBIT E

**FILED**

San Francisco County Superior Court

FEB 0 6 2024

CLERK OF THE COURT

BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550] | Case No. CJC-21-005188 JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5188 |
| IN RE UBER RIDESHARE CASES | ORDER ON PLAINTIFFS' MOTION FOR ORDER COMPELLING MARKETING & LOBBYING DOCUMENTS |

Plaintiffs' Motion for Order Compelling Marketing & Lobbying Documents came on regularly for hearing on February 2, 2024. Having considered the pleadings and papers on file in the action, and the arguments of counsel presented at the hearing, the Court hereby grants the motion in part and denies it in part.

## BACKGROUND

On March 7, 2023, Plaintiffs filed a Master Long-Form Complaint against Defendants Uber Technologies, Inc. and Rasier, LLC (together, "Uber"). Plaintiffs alleged sixteen causes of action: (1) general negligence; (2) common carrier negligence; (3) negligent misrepresentation; (4) intentional

- 1 -

misrepresentation; (5) negligent infliction of emotional distress ("NIED"); (6) intentional infliction of emotional distress ("IIED"); (7) vicarious liability/liability for the torts of Uber drivers; (8) vicarious liability for sexual assault; (9) vicarious liability for sexual battery; (10) vicarious liability for false imprisonment; (11) negligence by misfeasance; (12) negligence by nonfeasance; (13) intentional concealment; (14) strict product liability – design defect; (15) strict product liability – failure to warn; and (16) fraud. (Compl. ¶¶ 164-348.)  On June 22, 2023, the Court sustained Uber's Demurrer to Plaintiffs' Master Long-Form Complaint.  (June 22, 2023 Order, 1, 19.)  In particular, the Court sustained Uber's demurrer as to Plaintiffs' vicarious liability, fraud, misrepresentation, and strict products liability claims without leave to amend.  (*Id*. at 1, 12, 15, 19.)  The Court sustained Uber's demurrer as to the negligent infliction of emotional distress claim with leave to amend.  (*Id*. at 1, 16, 19.) On July 24, 2023, Plaintiffs filed a First Amended Master Long Form Complaint ("FAC") alleging causes of action for general negligence, common carrier negligence, negligence by misfeasance, and negligence by nonfeasance.  Plaintiffs allege as follows.

Plaintiffs "are individuals who were raped, sexually assaulted, sexually battered, sexually harassed, falsely imprisoned, kidnapped, physically assaulted, and/or otherwise assaulted and/or harassed by their Uber driver." (FAC ¶ 6.)  Uber is a transportation company that uses its app ("Uber App") to "connect riders looking for transportation to independent transportation providers…looking for riders." (*Id*. ¶¶ 1, 21-22.)  Uber "drivers are largely nonprofessional, untrained individuals who use their own vehicles." (*Id*. ¶ 44.)

As early as 2014, Uber became aware that its drivers were engaging in sexual misconduct or sexual assault against its passengers.  (*Id*. ¶ 3; see *id*. ¶ 27.)  Uber has "publicly acknowledged this sexual assault crisis." (*Id*. ¶ 4; see *id*. ¶¶ 29, 121, 147, 149; see, e.g., *id*. ¶¶ 121-122 [approximately 250 reported sexual assaults per month in 2017 and 2018].)  However, Uber "has actively chosen not to report instances of sexual assault that occur on the UBER App to the authorities" or other ridesharing companies.  (*Id*. ¶¶ 84-86, 88, 134.)  In addition, Uber does not proactively cooperate with law enforcement investigating cases passenger victims report to the police or participate in transportation network company ("TNC") safety hearings.  (*Id*. ¶¶ 89-94, 116-120.)  Moreover, after a victim reports a

- 2 -

1  sexual assault, Uber often erases the victim's complaint and disables the victim's account, which

2  precludes the victim from accessing pertinent information such as the driver's name, driver's photo,

3  make and model of the vehicle, ride time, ride distance, and route. (*Id.* ¶¶ 94-95, 100, 102.)

4      Despite marketing itself as a safe and better alternative to other transportation methods, Uber

5  continues to hire drivers without conducting adequate background checks and screening procedures,

6  allows culpable drivers to keep driving for Uber, and fails to adopt and implement reasonable monitoring

7  and investigation procedures to protect passengers. (*Id.* ¶¶ 4, 24-25, 28, 30-31, 112-114, 131-133, 160-

8  161, 164-168, 170-172, 189-190, 192, 209, 214-215, 218; see, e.g., *id.* ¶¶ 34-43, 66-69, 73-83, 130 [Uber

9  Safe Rides Fee was a revenue source rather than a fund for implementing background checks, vehicle

10  checks, driver safety education, development of safety features, and insurance]; but see *id.* ¶ 111 [the

11  Uber App now includes an emergency button that allows a passenger to call 911].) Due to Uber's failure

12  to implement changes, passengers continue to be victims of sexual assaults. (*Id.* ¶¶ 28, 127.)

13      On September 19, 2023, Plaintiffs served Requests for Production of Documents ("RFPs"), Set

14  One on Uber. (Cubberly Decl. ¶ 6.) On October 23, 2023, Uber served responses and objections. (*Id.* ¶

15  7.) Plaintiffs now move for an order compelling the production of documents related to Uber's

16  marketing and lobbying. (Opening Brief, 1.) In particular, RFPs Nos. 54, 56-71, 73, 94-95, 103, 106,

17  182-186, 193, 195, 250, 260-262, 294, and 299. (*Id.* at 2-4.) Uber opposes the motion.

18  **LEGAL STANDARD**

19      "Unless otherwise limited by order of the court . . . any party may obtain discovery regarding any

20  matter, not privileged, that is relevant to the subject matter involved in the pending action … if the matter

21  itself is either admissible in evidence or appears reasonably calculated to lead to the discovery of

22  admissible evidence." (Code Civ. Proc., § 2017.010.) "The admissibility of a document bears on its

23  discoverability in the sense that if the document is admissible, it necessarily is discoverable. But the

24  inverse is not necessarily true: the fact that evidence is not admissible does not mean that it is also not

25  discoverable." (*Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1490

26  (cleaned up).) For discovery purposes, information should be regarded as relevant to the subject matter if

27  it "might reasonably assist a party in evaluating a case, preparing for trial, or facilitating settlement

28  - 3 -

1   thereof." (*City of Los Angeles v. Superior Court* (2017) 9 Cal.App.5th 272, 288, quoting *People v.*
2   *Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 989.)

3       A propounding party may file a motion to compel a further response to a request for production of
4   documents when a "representation of inability to comply is inadequate, incomplete, or evasive" or "[a]n
5   objection in the response is without merit or too general." (Code Civ. Proc. § 2031.310(a)(2)-(3).) "A
6   motion to compel further response to a request for production of documents must "set forth specific facts
7   showing good cause justifying the discovery sought by the demand." (*Id.* § 2031.310(b)(1).)

8                                   **DISCUSSION**

9   **I.    Marketing**

10      Plaintiffs seek to compel responses to RFPs Nos. 54, 56-71, 73, 94, 106, 182, and 260-262 related
11  to marketing. (Opening Brief, 2-4.) Plaintiffs argue their allegations regarding negligence "are replete
12  with references to Uber's marketing." (*Id.* at 7.) In particular, Plaintiffs allege that because Uber
13  marketed itself as safe, documents related to marketing are relevant. (*Id.*; see Reply, 1-2.) Plaintiffs also
14  argue that Uber's marketing is relevant to "Uber's status as a common carrier." (Opening Brief, 8; see,
15  e.g., Reply, 1 ["The relationship between a common carrier and its passengers is [] a special relationship.
16  Because Uber is a common carrier – and because Plaintiffs have pleaded that Uber's failure to warn
17  constitutes common-carrier negligence – Uber's" marketing is "relevant to whether Uber fulfilled its duty
18  to warn its passengers of the risk of sexual assault."].) Plaintiffs further argue that Uber's marketing is
19  relevant to their punitive damages claims because "[c]onversations among executives about whether to
20  accurately market Uber's risks to its passengers go to whether Uber acted in conscious disregard of the
21  safety of its passengers." (Opening Brief, 8; see Reply, 2.) Uber disagrees, arguing that its marketing
22  documents are not relevant and would impose undue burden because Plaintiffs' RFPs seek documents
23  relating to the fraud and misrepresentation claims that were dismissed by the Court. (Opposition, 5, 8-
24  11.) Uber also contends that although public statements may be relevant to a common carrier claim, such
25  information is publicly available and does not support broad requests for its marketing documents. (*Id.* at
26  11-12.)

27      In the FAC, Plaintiffs allege that Uber was negligent by, amongst other conduct, representing or

28                                      - 4 -

advertising and marketing itself as a safe form of transportation. (FAC ¶¶ 173, 203 ["safe alternative to driving and encouraging women to take UBER rides . . ."]; see also *id.* ¶¶ 2, 24-25, 66-69, 82, 145.) Although the Court sustained Uber's Demurrer to the Master Long Form Complaint as to the fraud and misrepresentation claims, the FAC continues to place Uber's marketing at issue.

However, Plaintiffs' allegations concerning advertising and marketing that Uber is safe do not open the door to unfettered discovery as to Uber's marketing. Plaintiffs seek to compel further responses to twenty-five RFPs, none of which are geographically limited and seven of which are not temporally limited (RFP Nos. 70, 94-95, 106, and 260-262). Moreover, RFPs related to marketing to potential drivers (RFP Nos. 54 and 56), marketing to women generally (RFP Nos. 58 and 95), all marketing plans (RFP No. 57), all general ledger entries for Uber's marketing expenses (RFP No. 182), general marketing intended for or targeted at college or university students and campuses (RFP Nos. 260 and 261), and general marketing that Uber provides a form of transportation for those consuming alcohol (RFP No. 262) are overbroad in that they are not tailored to the subject matter involved in this proceeding. Furthermore, RFP No. 63 is duplicative of RFP No. 61. Other RFPs readily capture the subject matter involved: safety. (See, e.g., RFP Nos. 59, 61-71, 73, 94, 106.)

Plaintiffs argue that the RFPs listed above are reasonably calculated to lead to the discovery of admissible evidence because Uber's marketing purportedly was tailored to the asserted vulnerability and other characteristics of consumers, including the twenty individual bellwether plaintiffs. For example, Plaintiffs contend it is appropriate to compel the disclosure of documents relating to marketing to women because all of the bellwether plaintiffs are women; that documents relating to marketing to those who consume alcohol are similarly relevant because many of the bellwether plaintiffs consumed alcohol; that two of the bellwether plaintiffs were college students; etc. Plaintiffs argue that these documents could establish that Uber "lured" or misled passengers into taking rides that placed them in danger. As Uber points out, however, these allegations essentially sound in fraud or negligent misrepresentation, yet the Court dismissed those claims in the master long-form complaint with prejudice, finding that Plaintiffs had not adequately pled reliance or false statements with particularity. No individual bellwether plaintiff filed a short-form complaint following that ruling asserting that they were aware of or relied upon any

- 5 -

1  marketing or advertising representations regarding Uber's safety or the tailoring of its platform to female

2  riders, those consuming alcohol, college students, etc.[1]  RFPs focusing on Uber's marketing that sound in

3  fraud are not reasonably calculated to lead to the discovery of admissible evidence.  Nor are they

4  reasonably calculated to lead to the discovery of admissible evidence regarding Plaintiffs' other claims,

5  such as their negligence and common carrier claims.  To be sure, a common carrier has a special

6  relationship with its passengers that gives rise to a duty to protect them from foreseeable harm.  (E.g.,

7  *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785-791 [common carrier owes a duty

8  to protect passengers aboard its buses from assaults from fellow passengers].)  However, that duty exists

9  regardless of how or whether the common carrier markets its services.  In any event, to the extent that

10  Plaintiffs seek to justify their discovery into Uber's marketing by arguing that Uber had a duty to warn its

11  passengers of the risks of sexual assault by its drivers, their requests are vastly overbroad and are not

12  tailored to that topic.

13       Therefore, Plaintiffs' motion is granted as to RFP Nos. 59, 61-62, 64-69, 70 [from 2009 to

14  present], 71, 73, and 94 [from 2009 to present], and is otherwise denied.[2]  Uber's responses to these RFPs

15  shall be geographically limited to California as Plaintiffs have not made a showing of good cause to

16  justify a national scope for discovery into Uber's marketing regarding safety.

17  **II.    Lobbying**

18       Plaintiffs seek to compel responses to RFPs Nos. 103, 183-186, 193, 195, 250, 294, and 299

19

[1] At the hearing, Plaintiffs belatedly asserted that such claims are in fact made by three of the bellwether plaintiffs, referred to as Jane Doe LSA 78, 82, and 49.  However, the Court's demurrer ruling explicitly stated that if any individual plaintiff wished to plead claims for fraud or negligent misrepresentation, they were granted 30 days leave to amend the short-form complaints with the particularity required by California law.  (June 22, 2023 Order, 15.)  The Court's review of the docket confirms that no amended short-form complaints were filed following the Court's demurrer order.  While one of the bellwether plaintiffs in question filed a brief amended short-form complaint *before* that order, it merely adopted the long-form complaint.  (See Amended Short-Form Complaint for Damages of Jane Doe LSA 49 (CGC-21-592321, filed May 12, 2023).)  All three individual plaintiffs' original complaints contain boilerplate fraud allegations substantially identical to those the Court found insufficient in its demurrer ruling.  (See Compl. of Jane Doe LSA 49 (CGC-21-592321, filed June 17, 2021) ¶¶ 149-170; Compl. of Jane Doe LSA 82 (CGC-21-592430, filed June 22, 2021) ¶¶ 149-170; Compl. of Jane Doe LSA 49 (CGC-21-592321, filed June 17, 2021) ¶¶ 149-170; compare June 22, 2023 Order, 12-15.)
[2] At the hearing, Plaintiffs withdrew their motion as to RFP No. 106 [documents about incidents of sexual assault or sexual misconduct created by, sent by, or received by specified categories of Uber officers and employees] in light of the parties' agreement regarding custodial searches.

1   related to Uber's lobbying activities. (Opening Brief, 4-5.) Plaintiffs contend that Uber's lobbying

2   activities are relevant to their negligence claims because Plaintiffs allege Uber spent millions of dollars

3   lobbying against regulations, which resulted in self-enforced hiring standards for drivers. (*Id.* at 8-9.)

4   Plaintiffs argue that they anticipate "that part of Uber's defense will be that Uber has followed the law

5   regarding the screening measures used to hire drivers and safety features present during Uber rides." (*Id.*

6   at 9; see Reply, 3.) Uber opposes on the ground that Plaintiffs' broad RFPs regarding Uber's lobbying

7   activities are not relevant to any form of tort liability. (Opposition, 5.) Uber argues that there is no

8   authority to support discovery of its involvement for advocating for a statute or regulation, none of which

9   are specified by Plaintiffs, because it seeks to show it was in compliance. (*Id.* at 12-15.) Uber further

10  argues that RFPs Nos. 184, 195, and 294 "seek lobbying documents related to the independent contractor

11  status of drivers using the Uber App." (*Id.* at 15.) However, Uber's vicarious liability claims are no

12  longer at issue.

13          In the FAC, Plaintiffs allege that Uber has "spent millions of dollars lobbying against local

14  regulations requiring" fingerprint-based biometric checks. (FAC ¶ 78.) Plaintiffs also allege that Uber

15  "lobbies state and local governments to limit what is required of Uber with respect to driver background

16  checks" [and] "lobbies local government entities to continue allowing Uber to perform its own

17  background checks of its driver applicants, rather than municipalities performing the more stringent

18  screening they do for traditional taxi drivers." (*Id.* ¶ 79.) Indeed, Plaintiffs allege that Uber "has

19  successfully persuaded lawmakers in several states to keep background check requirements for its drivers

20  limited." (*Id.* ¶ 80.) Plaintiffs allege that as a result of Uber's "lobbying efforts, those entities largely

21  self-enforce hiring standards for their drivers." (*Id.* ¶ 81.)

22          The Court is unpersuaded that Plaintiffs' allegations regarding Uber's lobbying activities

23  regarding background checks or sexual assault render their requests for lobbying documents relevant to

24  the issues or reasonably likely to lead to the discovery of admissible evidence. Under the *Noerr-*

25  *Pennington* doctrine, those who petition the government are generally immune from liability. (*People ex*

26  *rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 964.) Although the doctrine was first

27  developed in antitrust law, "the principle applies to virtually any tort, including unfair competition and

28

1    interference with contract." (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 21 fn. 17.) "The

2    principle unquestionably applies to commercial speech and competitive activity—even *anticompetitive*

3    activity." (*Id.* at 23.)[3]

4        California courts have applied the *Noerr-Pennington* doctrine in a wide variety of procedural

5    contexts and to a wide range of types of claims. (See, e.g., *Blank v. Kirwan* (1985) 39 Cal.3d 311, 322-

6    323 [doctrine applied squarely to plaintiffs' allegations that defendants successfully conspired to legalize

7    and monopolize the operation of poker clubs in city in violation of the Cartwright Act]; *Neurelis, Inc. v.*

8    *Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 792-793, 795-797 [petition filed by

9    pharmaceutical manufacturer's competitor requesting FDA to stay approval of manufacturer's epilepsy

10   drug until additional clinical studies could be conducted was protected by *Noerr-Pennington* doctrine];

11   *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th

12   464, 478-479 [*Noerr-Pennington* doctrine barred medical provider's action against workers'

13   compensation insurers disputing bills].) "The *Noerr-Pennington* doctrine has been extended to preclude

14   virtually all civil liability for a defendant's petitioning activities before not just courts, but also before

15   administrative and other governmental agencies." (*People ex rel. Gallegos*, 158 Cal.App.4th at 954.)

16   Thus, Uber's lobbying activities, whether before the state Legislature, cities and counties, or the

17   California Public Utilities Commission, cannot give rise to liability. (*Blank*, 39 Cal.3d at 322

18   ["defendants' efforts, according to the very allegations of the pleading, were directly at influencing

19   government action and as such are squarely within the protection of the *Noerr-Pennington* doctrine."].)

20        Plaintiffs fail to offer any persuasive argument as to how discovery regarding Uber's lobbying

21   activities may be relevant to the issues properly in the case or reasonably calculated to lead to the

22   discovery of admissible evidence. Plaintiffs contend they are seeking discovery on lobbying "(1) to learn

23   what Uber told regulators and politicians about its safety; (2) to understand the aims of those statements;

24   and (3) to attack Uber's potential defense that it did not act unreasonably because it followed rules and

25

26

27

28

---

[3] Although there is a "sham" exception to the doctrine, Plaintiffs do not allege that it applies. Nor could they. (See *Blank*, 39 Cal.3d at 325 ["not only were defendants' efforts genuine, they were also successful—and as such incapable of being deemed a mere sham."].)

- 8 -

1   regulations." (Reply, 3.) Those arguments are entirely unconvincing.[4]  Whatever Uber may or may not

2   have told regulators and politicians about its safety record or practices has no legitimate bearing on

3   Plaintiffs' remaining negligence-related claims.  It cannot be a violation of a party's duty of care to lobby

4   for laws and regulations, which is absolutely protected by the First Amendment.

5        *Mercury Casualty Co. v. Scottsdale Indemnity Co.* (2007) 156 Cal.App.4th 1212, cited by Uber, is

6   closely on point.  There, a primary automobile liability insurer settled an underlying action against its

7   insured arising from an automobile accident, and then sought a declaratory judgment that the defendant

8   excess insurer was required by statute to reimburse it for its share of defense costs.  Similar to Plaintiffs'

9   requests here, the excess insurer served the plaintiff insurer was "a barrage of discovery demands, all

10  designed to ferret out the extent of [its] involvement in the passage" of the statute; the insurer "declined to

11  provide the bulk of this discovery, contending it was not reasonably calculated to lead to the discovery of

12  admissible evidence." (*Id.* at 1216.)  In particular, the excess insurer asked the primary insurer to identify

13  every person involved in the passage of the bill, provide the date of every meeting or consultation within

14  the Legislature regarding the bill, and produce all documents submitted by plaintiff to the Legislature in

15  favor of the proposed legislation, and asked it to admit that it had made various arguments to the

16  Legislature as to why the statute would provide benefits to the public. (*Id.* at 1216-1217 fns. 1, 2.)  After

17  the trial court entered summary judgment in favor of the primary insurer, the excess insurer appealed,

18  contending the court erred in refusing to allow it to take discovery relating to the passage of the Insurance

19  Code provision at issue and defendant's involvement in that process.

20       The Court of Appeal rejected the argument and affirmed, concluding that the fact that a party

21  "may not have been entirely selfless in its lobbying efforts" has no impact on the validity of the

22  legislation. (*Id.* at 1215.)  As the court observed, "If the mixed motives of a legislative proponent,

23

24  ───────────────

    [4] Plaintiffs' reliance on *Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659 is misplaced.  That case
    held that "the *Noerr-Pennington* doctrine shields defendants from liability for their actions in petitioning
25  government officials.  It does not provide a basis for exclusion of evidence of lobbying activities that
    might be relevant to show a defendant's knowledge of the dangerous nature of its product or a failure to
    exercise ordinary care." (*Id.* at 680.)  Thus, the court held, the trial court in an asbestos exposure case had
26  abused its discretion by relying on the *Noerr-Pennington* doctrine to exclude evidence that the defendant
    had successfully lobbied for an exemption to an amendment to the Health & Safety Code banning
27  asbestos spray construction products, which it argued was relevant and admissible to show negligence.
    Plaintiffs do not point to any such evidence here.

28                                                        - 9 -

standing alone, were a basis for overturning legislation, we would have very few laws so it should come as no surprise that we find no authority for this kind of review." (*Id.*) Indeed, the court stated,

> We cannot accept [defendant's] implicit assertion that there would be anything suspicious, let alone sinister, in the fact that [plaintiff] promoted the legislation, or even had a hand in its drafting. "Special interests" have been affecting the context of our laws for as long as our Legislatures have been them, and while reasonable minds can (and do) disagree about whether that effect is too significant to serve the common good, no one contends that our constitutional right to petition the government should be abolished. . . . [Plaintiff] was clearly entitled to petition the Legislature in support of any proposed legislation it chose to favor.

(*Id.* at 1221.) Even if defendant was "the driving force behind passage of the legislation," the court concluded, such involvement is "proper, however, and [defendant's] attempt to spin it into something sinister has never risen above the level of rank speculation and innuendo." (*Id.* at 1226.) The trial court therefore correctly denied the defendant's request for discovery and granted summary judgment. (*Id.*) The same authority conclusively undermines Plaintiffs' novel theory that evidence that Uber advocated for a law or regulation concerning background checks, for example, would enable Plaintiffs to "attack" any defense that Uber complied with it. Moreover, as Uber persuasively argues, allowing discovery into such activities (not to mention admitting evidence of such activities at trial) presents a host of serious practical obstacles to which Plaintiffs offer no solution. (Opposition, 13-14.) In short, Plaintiffs' lobbying theories go nowhere, and no legitimate purpose would be served by allowing discovery on this topic.[5]

IT IS SO ORDERED.

Dated: February 6 , 2024

Ethan P. Schulman
Judge of the Superior Court

---

[5] Moreover, many of Plaintiffs' RFPs related to other lobbying activities are vastly overbroad and irrelevant. (See, e.g., RFP Nos. 184 [driver or employee agent status], 195 [employment status of drivers], 294 [California Proposition 22].) Plaintiffs' argument that "[i]f Uber was telling regulators and politicians that its drivers should be classified as independent contractors and this would do no harm because its drivers were safe" (Reply, 3), is unduly speculative as Plaintiffs do not establish any connection between a driver's employment status with Uber and the instant proceeding. Plaintiffs do not show that independent contractors are vetted any differently than employees.

- 10 -

## CERTIFICATE OF ELECTRONIC SERVICE
(CCP 1010.6(6) & CRC 2.260(g))

I, Felicia Green, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On February 6, 2024, I electronically served ORDER ON PLAINTIFF'S MOTION FOR ORDER COMPELLING MARKETING AND LOBBYING DOCUMENTS via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:        FEB 06 2024

Brandon E. Riley, Court Executive Officer

By: _Felicia Green_____

Felicia Green, Deputy Clerk