1
2  *[Counsel Listed on Signature Page]*
3
4
5
6
7
8
9                          **UNITED STATES DISTRICT COURT**
10                        **NORTHERN DISTRICT OF CALIFORNIA**
11                             **SAN FRANCISCO DIVISION**
12

| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
|---|---|
| | **JOINT STATUS REPORT FOR OCTOBER 23, 2024 DISCOVERY STATUS CONFERENCE** |
| This Document Relates to: ALL ACTIONS | Judge: Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

# JOINT STATUS REPORT

In advance of the discovery status conference set by the Court for Wednesday, October 23, 2024 at 9:30 a.m., Plaintiffs, Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC (collectively, "Defendants" or "Uber") (jointly, "the parties"), respectfully submit this Joint Status Report.

## I.  Custodial Production

The parties have reached final agreement as to the 55 custodians anticipated by the parties' July 8, 2024 agreement, as set forth in the status report filed on October 11 (ECF No. 1744). The parties have also reached a partial agreement regarding hyperlinked documents in that Uber will use best efforts to identify and produce hyperlinked documents referenced within custodial-file collections it is required to produce by the ESI Order (ECF 524), regardless of whether those hyperlinked documents are included in the respective custodians' file. Uber will use best efforts to review its productions to ensure that hyperlinked documents referenced within custodial-file collections that are required for production by the ESI Order are appropriately identified as family members of the document containing the hyperlink in accordance with the ESI Order and produced in accordance with the ESI Order.

Separately, the parties have previously met and conferred regarding hyperlinked documents. Most recently, on October 15, Plaintiffs requested that Uber produce 500 contemporaneous versions of hyperlinked documents per deponent. The parties will meet and confer on this request in an effort to limit the issues for the Court's consideration, and to the extent the parties cannot reach agreement, they will raise any disputes pursuant to the process set forth in PTO 8.

## II.  TAR Validation

Uber will conduct the validation process and provide the metrics and disclosures outlined by the ESI Order (ECF No. 524, pp. 8-12) within 15 days after production of documents is substantially complete for the first 20 custodial files produced, within 15 days after production of documents is complete for the second set of 17 custodial files produced, and within 21 days after the final set of custodial files is produced for the 55 custodians identified pursuant to the parties' October 11

agreement. Barring unforeseen circumstances, Defendants anticipate substantial completion of the first 20 custodial files by October 21, the second set of custodial files by November 26, and the final set by January 20, 2025.

### III. Noncustodial Production

On September 13, the parties filed a joint letter brief regarding Uber's identification of and production of documents from noncustodial data sources. Following that letter, the parties further discussed Uber's production of documents from noncustodial sources and on October 3, Uber agreed to produce documents related to the following areas from noncustodial sources[1]: marketing, safety policies, background checks, driver onboarding, studies and focus group materials related to safety or safety communications, driver deactivation, dashcams, training or education scripts for drivers and employees, and data retention policies. On October 15, Uber represented that it has substantially completed production of these noncustodial documents but for documents being reviewed for privilege or PII. Plaintiffs have also requested production of selected Knowledge Base documents and other policies. Uber will continue to produce a rolling production of Knowledge Base documents and other policies identified and requested by Plaintiffs on October 9, to the extent Uber believes they are relevant. Plaintiffs believe the Knowledge Base documents are critical and have long been outstanding, and therefore Plaintiffs have asked that Uber complete the production of these documents by October 18. Moreover, while Uber has identified the specific page counts of documents produced that it believes is responsive to Plaintiffs' Requests for Production, it has not identified the bates numbers that are responsive to the respective Requests for Production so Plaintiffs can review and assess the completeness of the production. Lastly, the entirety of this production is roughly 31,000 documents; Plaintiffs are skeptical that this is representative of a substantially complete production and intend to meet and confer with Uber regarding the same.

### IV. Status of Uber's Response and Objections to Plaintiffs' Written Discovery

The parties have not been able to reach agreement on Uber's objections to Plaintiffs' Requests

---

[1] Uber has agreed to treat certain folders and/or standalone documents on Google Drive that are used by multiple individuals or teams for certain categories of documents as "non-custodial" for purposes of the ESI protocol, and to search for and identify data (regardless of whether contained in the final, agreed set of 55 custodians (*see* ECF 1744).

for Production that (1) relate to Uber's assault incident data, research, and safety features implemented outside of the U.S. or (2) call for information outside of a time scope 1-year prior to the 1st Complaint. The Parties anticipate raising these issues to the Court shortly under the PTO 8 process. The parties have reached agreement on the following: (1) Uber will produce non-privileged documents collected as a result of search terms being applied to custodial files related to the "safe ride" fee; (2) Uber agrees to update its written responses to confirm that it has not withheld any documents related to its objections based on remedial measures; (3)Uber will amend its responses concerning the production of non-final drafts of public communications regarding executive departures. Additionally, the parties have reached a preliminary agreement by which Uber will search for and provide general (non-privileged) information on how insurance claims are made, subject to amendments to Plaintiffs' requests, and will continue to confer to finalize the details. The parties will continue this conferral process by October 25 to further limit, or avoid, the need for PTO 8 letters.

**V.    Status of the Deposition Schedule**

Updates regarding the status of the deposition schedule, JCCP coordination, and the discovery timeline and the parties' respective positions as to these topics were provided to the Court on October 11, 16, and 17, 2024 (ECF Nos. 1744, 1745, 1746, 1759, 1774).

**VI.    Pending Discovery Matters Awaiting Court Action**

**a.  Discovery Timeline**: the parties have been unable to reach agreement as to Uber's request to extend the discovery deadlines set by the Court's September 10 Order (ECF No. 1629) because the parties have not been able to agree on the process and timeline for resolving privilege log disputes to facilitate coordination in depositions. The parties provided their respective positions to the Court on October 16 and 17 (ECF Nos. 1744, 1745, 1746, 1759, 1774).

**VII.    Other Topics**

**a.  Privilege Disputes:** The parties are conferring regarding the Court's October 9 Order regarding Privilege Log disputes (ECF No. 1732) and will file a joint discovery letter on October 25.

    **b.  Safety Data**

**Plaintiffs' Position:** Plaintiffs still cannot access the data. Although the Safety Data could be produced on a standard hard drive and the Protective Order in this case is robust and adequately addresses Uber's security concerns, Uber insists on producing the data through a third-party vendor. Plaintiffs and their experts have spent significant time working with Uber and Uber's selected third-party vendor (BDO), on a production process and platform in an attempt to address Uber's concerns. Plaintiffs have and remain willing to work with Uber to address its heightened concerns but need to expedite access to this data to limit further discovery delays. Three issues remain as to Uber's production of safety data pursuant to the Court's July 9 and July 18 Orders (ECF No. 683 and 706).

    First, because Uber's proposed process requires Plaintiffs and their experts to access the Safety Data and perform all analysis only within the third-party system, a three-party agreement needs to be entered between BDO, Uber, and Plaintiffs before Plaintiffs can agree to proceed with Uber's proposed process. Plaintiffs need assurance that (a) their work product is secure in an Uber-paid third-party environment and (b) BDO will be responsive to Plaintiffs' service requests. Moreover, Plaintiffs cannot and should not be held liable in the event of a data breach within that third-party environment due to BDO's failure.

    Second, Plaintiffs remain concerned as to whether Uber will fully comply with the Court's Orders by providing data from free-text fields. While Uber has agreed to produce some data through the BDO process, it refuses to produce relevant information from the critical fields in the safety data which its auditors evaluated for the categorization process.  Specifically, the free-text fields contain details of alleged incidents including a rider's side, the driver's side, and the investigators' research, notes, comments, and the reason for their recommendations. Unfortunately, Plaintiffs anticipate the Courts' further involvement on this point.

    Finally, Uber still has not produced certain documents referenced the Safety Reports despite Court orders and its promises to the contrary. These include: 1) Documents sufficient to show training and criteria provided to "frontline" agents to be used in making "initial classification attempt" for sexual assault and sexual misconduct reports, including what systems to use, what fields to use within

5

those systems, and what information to enter into each field; 2) Documents sufficient to show training and criteria provided to the audit team referenced in the Safety Reports that were used in classifying reports based on 21 categories of the taxonomy; 3) the process/criteria set to achieve Uber's "high standard for quality," and the criteria and process for "updat[ing] historical data" and "addressing any discrepancies" referenced in the Reports; and 4) Documents sufficient to show the process, criteria, and polices/procedures for measuring the accuracy of auditors' classification. Although Uber claims to have produced these documents, the documents Uber has identified as responsive are drafts and incomplete portions of training materials that do not show how sexual assault reports were classified by frontline agents or auditors or the criteria that they used, and further do not explain how Uber measured or achieved quality or accuracy of the audits. Despite Uber's statement below that Plaintiffs are raising purported gaps in the production for the first time in this Status Report, Plaintiffs have in fact raised these same issues repeatedly in numerous meet and confers in September, including with Uber's in-house counsel, and Uber assured Plaintiffs that it would search for and produce responsive documents.

**Defendants' Position**: As Defendants have previously explained, and as Plaintiffs have previously acknowledged, the safety data at issue is highly sensitive commercial information that contains information about how Uber runs its business, and more importantly contains information that could reveal the personal identity of non parties to this litigation, some of whom have reported alleged incidents of potential sexual assault or misconduct. ECF 1681, at 5-6.  This information should not just be "produced on a hard drive" with no other protections.  For their part, Defendants have bent over backward to secure a third party (the data forensics arm of a major accounting firm, BDO, at Defendants' cost) to securely host the data.  Defendants then architected a secure hosting environment entirely to Plaintiffs' expert's specifications without material modification.  After a weeks long process of building-to-plaintiffs'-specification, Defendants were able to post the requested U.S. incident data to the agreed upon MDL workspace on September 30, 2024.  It is Plaintiffs who have chosen to create additional hurdles choosing not to move forward with accessing the data (in sharp contrast, the JCCP Plaintiffs, who have moved forward with access to their own separate workspace).

This having been said, following a meet and confer on October 17, 2024 (the first one in which Plaintiffs involved Defendants' counsel on these issues), Defendants understand the remaining contractual terms that Plaintiffs now seek that Plaintiffs assert will give Plaintiffs comfort on data security and a hold harmless provision for actions outside of their and their expert's and agents' control.  Defendants will work in good faith to finalize arrangements that are agreeable to both sides.  But this need not cause delay.  The data has now been ready for Plaintiffs (who up until now professed that they could not wait to get hold of the data) since September 30, 2024.

As to Plaintiffs' second and third points above, as Plaintiffs well know, Defendants have agreed to a technical process of de-identification of personal identifying information in the safety data, and have been working with Plaintiffs and BDO to formulate a technical solution.  Admittedly, the architecture of this process was given a lower priority as the parties focused their significant energies on getting the access to the data off the ground.  Now that the data has been posted to the secure workspace, the parties can turn their attention to executing the de-identification process.  The parties are also continuing their discussion on the relative burdens of performing redactions on text-heavy "free form" fields where attorney-client communications or personal identifying information could be located that cannot be easily auto redacted.  Finally, Defendants have produced many of the documents that Plaintiffs identify, and Defendants continue to search and collect documents through the custodial and non-custodial process. As to certain materials referenced in the Safety Report, Plaintiffs raise purported gaps in this production for the first time here. Uber is investigating, and will supplement as needed.

### c. Third Party Discovery

The Court has stated that it "will address up to four subpoenas in the next batch, with three contested subpoenas selected by Plaintiffs (as the parties seeking discovery) and one selected by Uber."  ECF 1771, pp.6-7. The Court ordered the parties to meet and confer and, by October 24, stipulate to a briefing schedule or "file a joint statement stating their respective proposals, without argument." *Id.* The parties will meet and confer consistent with this order.  The parties also inform the Court that Plaintiffs have withdrawn their subpoenas to Ballard Partners and Mayer Brown LLP.

### d. Defendant Fact Sheets

**Plaintiffs' Position:** With respect to the DFS production, Plaintiffs have identified deficiencies in Uber's production of prior background checks and tax summaries, and apparent deficiencies in Uber's production of evidence regarding drivers' prior incidents. The parties have engaged in, and continue to engage in, a lengthy meet and confer process. While this process has resolved issues regarding some specific cases for which Plaintiffs identified deficiencies, Plaintiffs' priority is to achieve a level of reliability that allows Plaintiffs to rely on the absence of documentation as proof that such documentation does not exist. Plaintiffs have therefore requested that Uber certify its DFS productions as complete once Uber is confident that they are complete. This is necessary in light of the information disparity, where the documents relating to drivers' past records and performance are uniquely in Uber's possession. It is difficult for Plaintiffs to group cases into liability buckets for representative trials until Plaintiffs have additional reassurance that the DFS productions are complete and reliable.

**Uber's Position:**

To date, Uber has produced over 20,000 DFS supporting documents encompassing over 46,000 pages for 512 Plaintiffs whose claims involve a trip that Uber has confirmed occurred, or on average of 40 supporting documents per such Plaintiff.[2] Further, collection of DFS supporting documents is a time-intensive manual process involving multiple systems, as is the process of preparing supporting documents per MDL Centrality's formatting guidelines.

PTO 10 requires DFS (or PFS) productions to be substantially complete, and provides for a process of resolving purported deficiencies that begins with a deficiency notice served through MDL Centrality. (ECF 348 at 6-7.) Plaintiffs' request for "certification" goes beyond the requirements of PTO 10 and is not warranted. Thus far the parties have engaged in productive conferrals and written exchanges of information (most recently from Uber on October 14, 2024) to address Plaintiffs' questions regarding potential gaps in Uber's DFS productions. To date, these conferrals have

---

[2] For perspective regarding the parties' dispute as to Defendant Fact Sheets, as of October 17, 2024, MDL Centrality represents on their homepage to have processed 1,645,174 fact sheets and 4,505,267 documents, or on average about 2.75 supporting documents per fact sheet.

1   proceeded along a good faith, informal track rather than through the deficiency resolution process
2   outlined by the Court in PTO 10. These conferrals have resulted in resolution of many issues,
3   especially those regarding tax summaries and background checks.

      e.  **Plaintiff Fact Sheets**

After several productive meet and confers in which other disputes were resolved, the parties reached an impasse regarding certain PFS-related issues.  The parties have agreed on a schedule for finalizing the joint letter contemplated by Pretrial Order No. 8 and anticipate submitting the letter to the Court on October 28, 2024.

      f.  **Cases Where Uber Has Not Located a Matching Trip**

**Plaintiffs' Position**: This issue is premature for the Court's consideration. To date, Uber has only identified 75 cases to Plaintiffs' Leadership in which Uber claims that, based on the ride information plaintiffs provided, Uber cannot confirm the Incident Ride. The PSC takes all allegations of fraud seriously and appreciates that Uber is continuing to meet and confer with individual plaintiffs' counsel, which is the appropriate first step for addressing Uber's concerns.

**Uber's Position:** As the Court explained during the last discovery status conference, "it's important . . . to ensure that the cases that are moving forward do have substantiated trips associated with them," and attention to the unsubstantiated cases is part of "plaintiffs' lead counsel's management of this mass tort litigation."  Oct. 1, 2024 Disc. Status Conf. 5:5–13.  Uber is continuing to meet and confer with Plaintiffs' firms on an individual basis about cases where the information Plaintiffs have submitted has not enabled Uber to locate a matching trip, which includes a subset of cases where Uber has concerns about the potential fraudulent nature of Plaintiffs' submissions, but Uber continues to believe a more centralized and uniform process would be more efficient and effective.  The issue is one that is growing, not shrinking.  By Uber's latest estimate informed by its initial review of PTO 5 materials, with the inclusion of the recently filed cases where fact sheets have not yet been served, hundreds of Plaintiffs in this MDL will be proceeding on trips that Uber has not been able to confirm occurred.  This is a matter of serious importance to this MDL, and the parties are meeting and conferring to discuss proposals for how it should be handled.

### g. Contacting Former Uber Employees

**Plaintiffs' Position:** Uber has never identified any "rules" Plaintiffs have even arguably violated, nor provided any precedent for its proposed pre-clearance regime under which Plaintiffs must seek Uber's permission to investigate their cases. Plaintiffs have informed Uber that, if Uber will provide a list of former employees that its counsel represents or who worked in Uber's in-house counsel office, Plaintiffs will not contact those individuals.

**Uber's Position:** As the parties described in the last Joint Status Report, filed on September 27, 2024 (ECF No. 1681), Plaintiffs have been contacting former Uber employees (including former in-house counsel) to discuss this case, without first notifying Uber. Uber is concerned that these contacts may violate the attorney-client privilege and the prohibition against contacting represented individuals, especially because Uber currently represents several former employees and plans to represent additional former Uber employees Plaintiffs have contacted. Plaintiffs' conversations with former Uber employees might also violate nondisclosure agreements arising from the confidential nature of their work at Uber.

To ensure these issues do not continue to arise moving forward, on July 24, Uber proposed the parties enter into a stipulation providing for a process to ensure that any reach out to persons formerly employed by or affiliated with Uber only occurs where appropriate under the rules and after providing sufficient notice to Uber. Uber will provide the Court with the proposed stipulation upon request. Thus far, Plaintiffs have rejected this approach. Instead, Plaintiffs have merely offered not to contact two small subsets of former Uber employees – in-house counsel and individuals Uber represents – but they will continue to contact all unrepresented former employees, including those listed as custodians. The parties plan to present this dispute via the PTO 8 process.

### h. Attachments to emails addressed in the parties' clawback dispute:

The parties have reached an agreement and do not seek Court guidance at this time, as addressed in their joint letter filed on October 16 (ECF 1757).

| | | |
|---|---|---|
| 1 | By: /s/Roopal Luhana | By: /s/ Michael B. Shortnacy |
| 2 | ROOPAL P. LUHANA (Pro Hac Vice) | MICHAEL B. SHORTNACY (SBN: 277035) |
| 3 | **CHAFFIN LUHANA LLP** | mshortnacy@shb.com |
| 4 | 600 Third Avenue, Fl. 12 | **SHOOK, HARDY & BACON, L.L.P.** |
| 5 | New York, NY 10016 | 2121 Avenue of the Stars, Suite 1400 |
| 6 | Telephone: (888) 480-1123 | Los Angeles, CA 90067 |
| 7 | Email: luhana@chaffinluhana.com | Telephone: (424) 285-8330 |
| 8 | *Co-Lead Counsel for Plaintiffs* | Facsimile: (424) 204-9093 |
| 9 | | |
| 10 | SARAH R. LONDON (SBN 267083) | PATRICK OOT (*Pro Hac Vice* admitted) |
| 11 | **LIEFF CABRASER HEIMANN &** | oot@shb.com |
| 12 | **BERNSTEIN** | **SHOOK, HARDY & BACON, L.L.P.** |
| 13 | 275 Battery Street, Fl. 29 | 1800 K Street NW, Suite 1000 |
| 14 | San Francisco, CA 94111 | Washington, DC 20006 |
| 15 | Telephone: (415) 956-1000 | Telephone: (202) 783-8400 |
| 16 | Email: slondon@lchb.com | Facsimile: (202) 783-4211 |
| 17 | | |
| 18 | RACHEL B. ABRAMS (SBN 209316) | RANDALL S. LUSKEY (SBN: 240915) |
| 19 | **PEIFFER WOLF CARR KANE** | rluskey@paulweiss.com |
| 20 | **CONWAY & WISE, LLP** | **PAUL, WEISS, RIFKIND, WHARTON &** |
| 21 | 555 Montgomery Street, Suite 820 | **GARRISON LLP** |
| 22 | San Francisco, CA 94111 | 535 Mission Street, 24th Floor |
| 23 | Telephone: (415) 426-5641 | San Francisco, CA 94105 |
| 24 | Email: rabrams@peifferwolf.com | Telephone: (628) 432-5100 |
| 25 | | Facsimile:  (628) 232-3101 |
| 26 | | |
| 27 | | ROBERT ATKINS (*Pro Hac Vice* admitted) |
| 28 | | |

11

JOINT STATUS REPORT FOR OCTOBER 23, 2024 DISCOVERY STATUS CONF. Case No. 3:23-MD-3084-CRB

| | |
|---|---|
| | ratkins@paulweiss.com |
| | CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted) |
| | cgrusauskas@paulweiss.com |
| | ANDREA M. KELLER (*Pro Hac Vice* admitted) |
| | akeller@paulweiss.com |
| | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** |
| | 1285 Avenue of the Americas |
| | New York, NY 10019 |
| | Telephone: (212) 373-3000 |
| | Facsimile: (212) 757-3990 |

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/ Michael Shortnacy