

**Sent from:** New York Office

October 22, 2024

<u>Via ECF</u>
Magistrate Judge Lisa J. Cisneros
Northern District of California
Phillip Burton Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102

  Re: *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*
   Case No. 3:23-md-03084-CRB

Dear Judge Cisneros:

  Pursuant to Pretrial Order No. 8 (ECF No. 323), the Parties respectfully submit this joint letter regarding Uber's objections to the relevant time period for discovery.

  I.  **Plaintiffs' Position**

  Uber refuses to produce discovery prior to 2013 or after November 1, 2023. Those time restrictions should be rejected. In "general, courts allow discovery to extend to events before and after the period of actual liability so as to provide context." *Hatamian v. Advanced Micro Devices*, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015)(collecting cases); *see also, e.g.*, *In re Bofl Holding, Inc. Sec. Litig.*, 2021 WL 1812822, at *5 (S.D. Cal. May 6, 2021)(There is no rule that discovery be constrained to a particular time period beyond the general standard under Rule 26(b)(1) requiring that discovery be relevant and proportionate."). Just so here.

  From its 2009 founding to 2012, Uber offered rides only by professional commercial drivers. MC ¶ 4. In mid-2013, using the same app, Uber began offering rides by non-professional, regular drivers ("rideshare") —notably, without making this change clear to riders. *Id.* ¶ 6. By definition, Uber's foundational decisions, including the design of its app, its safety-oriented marketing, were made before 2013. Similarly, its policies for background checks and driver recruitment, retention, and supervision, would have been initiated more than six months before launch. So, the relevant time period for discovery in this case goes back to 2009. Equally relevant are Uber's current policies: not only does this MDL include cases arising in 2024, but also Uber's current choices and data regarding safety are relevant to the feasibility of policy and design changes that it could have made earlier.

  Uber argues that the relevant time frame should not change "at this at this late stage in the discovery process." The discovery process is not at a "late stage"—no depositions have yet taken place, and Uber has only produced approximately 109,000 documents so far for nine of 55 custodians (while asserting privilege as to 25,735 documents or communications to date).

  **Uber's pre-launch research, design, and policies:** Uber did not launch UberX rideshare, its revolutionary business model, on a moment's notice. Before doing so, it would have conducted market research into the feasibility of the product, research that almost certainly

1

included the safety message that has defined UberX since. *See* MC ¶¶ 187-89. Uber's information gathering, analysis, and deliberations (including whether and how it considered safety) go directly to Uber's knowledge and notice, and Plaintiffs' negligence, misrepresentation, fraud, failure to warn, and reliance claims. Further, before Uber sold rideshare rides through the app, it presumably developed a business plan, and necessarily would have designed the in-app support for "rideshare," as well as the entire transportation infrastructure, including driver onboarding, background checks, safety criteria for drivers, training of drivers or not, oversight of drivers or not, how to match riders and drivers, and whether such rides would be marketed as safe for intoxicated individuals with their heightened vulnerability. Each safety decision, even if made pre-2013, affected safety after that date.

Uber argues that it did not research or create relevant policies or marketing before January 1, 2013, approximately six months before launching the rideshare model. Even if Uber did not do an iota of research on or preparation for rideshare before 2013 (an assertion that defies logic and which Uber has not supported with declaration or other discovery material), such a narrow interpretation of Plaintiffs' discovery requests ignores the point: Uber's primary focus on safety marketing pre-2013 to create brand trust allowed Uber's transition to the rideshare model. Moreover, to the extent that the amount of pre-2013 relevant material is limited, that only serves to reduce Uber's burden. Further, with respect to custodial discovery, only 6 of the 55 agreed custodians (three of whom were proposed by Uber) even worked at the company before 2013. So any burden of reviewing documents from these six people that hit on the negotiated search terms is minimal.

**Uber's knowledge of and failure to institute measures to reduce the risk of sexual assault:** Pre-2013 information also goes to what Uber knew, or should have known, about the risks of sexual assault. From its 2009 launch, Uber collected extensive data from drivers and riders that show how the app was being used, including, among other things, time of day, day of the week, location of drop-off and pick-up, as well as data related to drop-off and pick-up location, like location-specific prostitution- and alcohol-related crime rates. *See* Jose Pagliery, *Uber removes racy blog posts on prostitution, one-night stands*, CNN (Nov. 25, 2014) (discussing the company's 2011 data studies).[1] In fact, in a 2012 blog post, an Uber employee admitted, "[o]ne of the neat things we can do with our data is ask about rider patterns: are there weekend riders that only use Uber post-party?" and explained Uber can track what it called "Rides of Glory," i.e., "anyone who took a ride between 10pm and 4am on a Friday or Saturday night, and then took a second ride from within 1/10th of a mile of the previous nights' drop-off point 4-6 hours later).[2] Uber tracked how riders use Uber for "Rides of Glory" within different cities and around significant days, like Valentine's Day or Tax Day, and by gender. *Id*. Uber's actual or imputed knowledge before 2013 is relevant to evaluating its policy and design choices (whenever those choices were made) and to Plaintiffs' allegations that Uber could have used the data it collected from the app to reduce the risk of sexual assault, for example, through its ride-matching algorithm.[3]

**Post-2023 Discovery:** Discovery after November 1, 2023 is also relevant. This MDL includes more than 40 cases arising from 2024 incidents. Plaintiffs also allege that Uber's failure

---

[1] https://money.cnn.com/2014/11/25/technology/uber-prostitutes/index.html
[2] https://rideofglory.wordpress.com/ (last visited Oct. 15, 2024).
[3] Uber's claim herein that it does not "match" rides is contrary to Uber's plain admissions that the algorithm does just that and specifically, that Uber uses its matching to improve safety: "Matching is a core part of what makes Uber work… Uber may also modify pairings of drivers and riders in certain instances to help maintain a safe platform…" https://www.uber.com/us/en/marketplace/matching/

to adequately vet, train, and monitor its drivers, as well as refusal to implemented basic measures to increase safety, such as cameras and women-to-women pairing, continues to the present. *E.g.*, MC ¶¶ 25, 215. To the extent Uber does modify its safety policies, those actions are relevant to show feasibility and efficacy of measures that could have, but were not, taken earlier. *See* Fed. R. Civ. 407 (evidence of "subsequent measures" is relevant for non-prohibited purposes, including "feasibility of precautionary measures"); *Uber to roll out 'verified' rider badge, trip recording features in US*, Reuters (Sept. 17, 2024).[4] Moreover, Uber's current-day actions (or inaction) are integral to the reprehensibility analysis to support a punitive damages award. *See, e.g.*, *Lopez v. Watchtower Bible*, 246 Cal. App. 4th 566, 592-593 (2016)(post-conduct evidence "may also be relevant on the issue whether [the defendant] acted with the willful and conscious disregard for [the plaintiff's] rights."); *Swinton v. Potomac Corp.*, 270 F.3d 794, 814-15 (9th Cir. 2001) ("remedial conduct" relevant to punitive damages).

Uber argues that the MDL discovery cut-off date should be Nov. 27, 2023 because that is the cut off in the JCCP. Again, the JCCP is not the MDL—the MDL has different claims, a different scope, and there are more than 40 cases filed here arising from assaults that occurred past Nov. 27, 2023. And "robust" DFS productions will not suffice for those cases—Plaintiffs require discovery regarding, *inter alia*, Uber's relevant policies and procedures during this period to prove their claims.

**Burden:** Uber has failed to produce any particularized evidence to substantiate its burden objections. Uber argues the burden here outweighs the amount in controversy. Not so. Evaluating the need for discovery considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Rusoff v. Happy Group, Inc*., 2023 WL 114224, at *2 (N.D. Cal. Jan. 5, 2023). While each factor favors Plaintiffs. the amount in controversy for the more than 1,300 filed sexual assault cases is undisputedly substantial.

Finally, Uber's cost-shifting argument is meritless. Indeed, this Court has already stated that it "is skeptical that this MDL warrants an exception to the ordinary rule that each side bears its own costs associated with discovery." (Dkt. No. 1629.) No such exception is warranted here.

## II.     Uber's Position

Plaintiffs' proposed time scope of discovery begins before Uber's founding and runs forward through the end of this litigation and beyond, without limitation. On May 6, Uber proposed a time scope of Jan. 1, 2014 to Nov. 27, 2023, which predates Uber's entry into the rideshare market as well as the first substantiated trip in the MDL, and extends forward beyond the commencement of this litigation. Uber relied on this time scope while negotiating search terms and custodians. Plaintiffs first requested conferral on time scope on August 2. In compromise, Uber agreed to go back an additional year (to 2013), consistent with the agreed scope in the JCCP. Uber is also producing robust discovery through the DFS process for cases alleging a 2024 trip. Extending the time scope to before 2013, or beyond 2023, at this late stage in the discovery process, after custodians and search terms have been set, is disproportionate and unduly burdensome. Therefore, the Court should adopt Jan. 1, 2013 to Nov. 27, 2023 as the relevant time period for

---

[4] https://www.reuters.com/business/autos-transportation/uber-roll-out-verified-rider-badge-trip-recording-features-us-2024-09-17/#:~:text=Uber%20will%20also%20allow%20its,to%20the%20company%20for%20review.

discovery. Alternatively, pursuant to Rules 26(b)(1) and 26(c)(1)(B), Plaintiffs should bear the costs associated with this new discovery demand. Rule 26(b)(1) requires courts to evaluate the true amount in actual controversy, and here, and in comparison with other MDLs, the number and value of the individual cases requires that some limitations be placed on discovery.[5] *See* Ex. A.

**Plaintiffs' request for Uber's pre-Rideshare research, design, and policies exceeds the bounds of Rule 26(b)(1).** As this Court noted, "The right to discovery, even plainly relevant discovery, is not limitless." (ECF 321 at 6). *See also Auris Health Inc., et al. v. Noah Med. Corp.* 2024 WL 1016077, at *2 (N.D. Cal. Feb. 13, 2024); *Manual for Complex Litigation (Fourth), § 11.41* ("even in complex litigation, discovery does not require leaving no stone unturned."). Rather, discovery is limited to non-privileged information that is both relevant to a claim or defense and proportional under the factors outlined in Rule 26(b)(1). Additional discovery from 2009 to 2013 is not proportional here.

Plaintiffs proclaim Uber's "revolutionary" business model makes pre-2013 discovery proportionate and important to the case. However, Uber did not create the app-based rideshare business model. Rather, in mid-2013 Uber transitioned from "provid[ing] ...a convenient and efficient way to request transportation services from existing transportation providers" who "purchase commercial insurance, and spend thousands of dollars in order to get commercially licensed after going through mounds of red tape." to the rideshare model in order to compete with "new startups… offering transportation services without traditional commercial insurance or licensing pressures."[6] Despite conceding Uber's changes starting mid-2013, Plaintiffs nonetheless assert without basis that Uber created marketing and various policies related to this wholly new group of independent drivers years before that date. That defies common sense. Further, Uber's proposed time scope includes several months before Uber entered the rideshare market, so Plaintiffs will get responsive material, to the extent it exists, leading up to this change to Uber's business model. Plaintiffs also misunderstand the foundation of the Uber App: Uber does not "match" rides. Riders request rides and independent drivers,[7] within certain parameters, accept those rides.

As to Uber's supposed knowledge prior to 2013, Plaintiffs cite a blog post concerning legal activities between consenting adults seemingly chosen more for salaciousness than merit, and speculate based on a 2014 CNN article about a 2011 study that merely states: "people who are located in the San Francisco neighborhoods with the most prostitution, theft, burglary and alcohol-related crimes order the most Uber rides." A 2011 Cnet article about the same study explains the study used public neighborhood crime data as a proxy for *population density*, and it "simply points out that where there are more people, there is also more demand for Uber."[8] These articles do not provide grounds for imposing the burden on Uber of providing discovery for four additional years that predate Uber's entry into the rideshare business.

---

[5] *See, e.g.*, *Lawson v. Spirit AeroSystems, Inc.*, 2020 WL 3288058, at *22 (D. Kan. June 18, 2020), *aff'd*, 2020 WL 6939752, at *19 (D. Kan. Nov. 24, 2020); *McClurg v. Mallinckrodt, Inc.*, 2017 WL 7178745, at *3 (E.D. Mo. Dec. 9, 2016); *U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 2016 WL 7365195, at *1 (N.D. Ga. May 26, 2016). Uber is constrained by PTO 8's page limits, but can provide supplemental proportionality briefing with the Court's leave.

[6] *See* "Uber Policy White Paper 1.0. Principled Innovations: Addressing the Regulatory Ambiguity Rideshare Apps." *available at* https://www.benedelman.org/uber/uber-policy-whitepaper.pdf

[7] In their portion, Plaintiffs erroneously refer to "[Uber's] drivers." Uber does not employ drivers.

[8] https://www.cnet.com/roadshow/news/neighborhoods-with-more-crime-have-more-uber-rides/ (last visited Oct. 20. 2024)

**Discovery Beyond November 27, 2023 is Unduly Burdensome and Unnecessary.** In addition to relevance and proportionality concerns, Plaintiffs' request for discovery without end imposes significant burdens upon Uber. First, JCCP Plaintiffs did not contest Uber's Nov. 27, 2023 date cutoff for collections, and Uber collected data up to that date. For consistency, further custodial collections used the same date cutoff. MDL Plaintiffs' proposed time scope would thus require supplemental collections, and importantly, more time and cost. This additional data would then have to be processed, reviewed, and produced or logged if responsive. Plaintiffs claim Uber's review burden will be minimal if pre-2013 documents are largely irrelevant. However, in reality Uber would have a heightened review burden even if those documents are largely irrelevant to satisfy the requirements set forth in the ESI Protocol. Further, review of 2024 material, apparently "evergreened" and with no date limitation under Plaintiffs' proposal, also necessarily entails heightened privilege scrutiny and privilege review volume, given the obvious overlap with active ongoing litigation relating to these issues. This burden adds cost to Uber, and will likely burden the Court with a significant volume of additional privilege challenges. Second, Plaintiffs imply that Uber should continue to recollect new custodial data throughout the litigation, promising unending cycles of review and production that impose significant time and cost burdens on Uber.

Further, as of Oct. 17, 2024, under 5% of the 1,404 MDL Plaintiffs claim their trip occurred after Uber's proposed Nov. 27, 2023 cutoff. Of those, the Plaintiffs with confirmed trips will receive robust DFS productions without a scope limitation. Further, in lieu of full-blown supplemental custodial productions—all the way to present—Uber offered in compromise to meet and confer on the propriety of targeted searches with a showing of particular relevance or need, but Plaintiffs refused. Therefore, Plaintiffs' request for a scope of discovery starting in 2009 and extending into the future should be denied, and this Court should adopt Jan. 1, 2013 to Nov. 27, 2023 as the relevant time period for discovery as the permissible scope of discovery under Rules 26(b)(1) and 26(b)(2)(C).

By: */s/ Sarah R. London*
Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com

Rachel B. Abrams
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*

By: */s/ Michael B. Shortnacy*
Michael B. Shortnacy (SBN 277035)
**SHOOK, HARDY & BACON L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone: (424) 285-8330
mshortnacy@shb.com

Patrick Oot (Admitted *Pro Hac Vice*)
**SHOOK, HARDY & BACON L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
oot@shb.com

Kyle N. Smith (Admitted *Pro Hac Vice*)
Jessica E. Phillips (Admitted *Pro Hac Vice*)
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
2001 K Street NW
Washington, DC 20006
Telephone: (202) 223-7300
ksmith@paulweiss.com
jphillips@paulweiss.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC