

**Sent from:** New York Office

October 30, 2024

*Via ECF*
Magistrate Judge Lisa J. Cisneros
Northern District of California

     Re: *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*
        Case No. 3:23-md-03084-CRB

Dear Judge Cisneros:

     Pursuant to the Court's October 9, 2024 Discovery Management Order (ECF No. 1732), the Parties submit this joint letter regarding Plaintiffs' challenges to Uber's privilege claims.

    **I.**        **Plaintiffs' Position**
     **Process for Resolving Privilege Disputes**. To date, the process for resolving privilege disputes has been inefficient and ineffective. As of October 24, 2024, Uber has asserted privilege for approximately <u>25,735</u> documents (compared to only ~109,000 documents produced for nine custodians).[1] Assessing these privilege claims has been a game of whack-a-mole.

     The basic problem is that Uber, on the front end, over designates thousands of documents en masse without providing the requisite detailed descriptions, and only on the back end—after Plaintiffs have been forced to review tens of thousands of log entries within 7 days—conducts the type of "investigating and speaking with individuals" actually necessary to support a privilege claim.[2] *See* 10/23/24 H'rg Tr. at 39 (M. Shortnacy describing Uber's process); *see also id.* at 34 ("[T]he quicker that we're putting logs together, the more conservative we need to be, the less we risk waiver…"). When confronted with particular documents that are plainly not privileged, Uber withdraws its privilege claims but takes no steps to apply the lessons more broadly and appropriately to the existing privilege logs. Instead, Uber's unrealistic and inappropriate expectation is that Plaintiffs do Uber's work for it, working through thousands of documents one-by-one.

     After conferring over several selected log entries, Uber has withdrawn or modified its privilege assertions as to approximately <u>*90%*</u> of Plaintiffs' initial privilege selections (covering 13 log samples), <u>*100%*</u> of Plaintiffs' second round selections (covering five log samples), and nearly <u>*80%*</u> of Plaintiffs' third round selections (covering 33 log samples). *See* Ellis Decl. ¶¶ 17-28. And this is on top of the overruled privilege claims in the Court's clawback order. (ECF No. 1727.) In the majority of these cases, Uber fully withdrew its privilege claim; in the remainder, it agreed to

---

[1] Uber sent a new log with 4,865 entries late on October 24 for two custodians, which Plaintiffs are reviewing.

[2] PTO 20 appears to resolve Plaintiffs' request for relief from this schedule in the future that will, *inter alia*, relieve the need for Plaintiffs to challenge all entries at once. Plaintiffs' instant request for relief is focused on Defendants' obligations as to the 25,735 documents on logs for first tranche custodians, and review processes Defendants should apply retroactively per the Court's Order on this dispute and in the future.

produce documents with redactions.[3] Simply put, there is reasonable inference that Uber "has been grossly overbroad on designations" so as to "warrant a comprehensive review of certain categories of documents." 10/23/24 H'rg Tr. at 29. Uber has effectively frustrated the parties' and the Court's goals of resolving privilege disputes in a timely and efficient manner.

To summarize the process to date: On October 15, Plaintiffs sent Uber 18 disputed privilege log entries – nine individual entries, of which six emails were grouped together as a thread for purposes of dispute, and three entries that Plaintiffs deemed representative of categorical disputes. Ellis Decl. ¶ 17. The categorical examples covered: (a) e-mails generated by the ▮▮▮▮ system; (b) documents likely to be similar to those at issue in the clawback dispute; and (c) Google documents over which attorney client privilege was claimed but no attorney name was listed as author or as a commenter. From October 18 to 23, Uber withdrew its privilege claims as to 17 of the entries (de-designating eight documents with redactions), including all categorical examples. *Id.* ¶ 17. Uber maintained privilege in its entirely over single document. *Id.* Uber did not engage with the categorical examples beyond responding to each document individually. *Id.* ¶ 19. In its response to the clawback example, Uber denied that the May 10, 2018 PowerPoint presentation ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was similar to the clawback documents, despite the presence of no attorneys in the document's metadata or on Uber's log entry. As to the ▮▮▮ e-mail, Uber stated it would review Plaintiffs' request to de-designate ▮▮▮ system e-mails with the subject lines ▮▮▮▮▮▮▮▮▮▮. To date, Plaintiffs do not believe that Uber has subsequently de-designated any messages of this type.

On October 21, Plaintiffs sent Uber five additional log entries to review. Ellis Decl. ¶ 23. On October 23, Uber withdrew its claim of privilege over all five documents (it de-designated two documents entirely and agreed to produce the other three with redactions). On October 23, Plaintiffs then sent Uber 33 samples to review including one that was nine emails grouped together. Plaintiff withdrew one challenge when outside counsel (not previously identified by Uber) was identified on the chain.[4] Uber withdrew its privilege claim as to 35 entries, de-designated 15 entries entirely, agreed to produce redacted versions for 21 (including a sample that was a string of 10 emails), and only maintained its claim on six documents.[5]

To no surprise, the documents over which Uber has been erroneously asserting privilege are unquestionably material and important. For example, JCCP_MDL_PRIVLOG007124—which Uber produced as UBER_JCCP_MDL_000913808 after challenge—is ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* **Ex. A**. It is plainly not privileged—on the Log, Uber stated this document was a "[c]onfidential e-mail seeking legal advice from in-house counsel regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ellis Decl. ¶ 8. But no legal advice was sought from the one in-house counsel on the email, which had almost 30 recipients. *Id.* Uber only withdrew the designation after Plaintiffs raised it but Uber refuses to correct the thousands of similar, likely improper, designations.

To move this litigation forward, the Court should order Uber to apply simple bright-line

---

[3] Plaintiffs are awaiting production of many of these now redacted documents, and will review and confer with Uber about them upon receipt.

[4] Plaintiffs withdrew privilege challenges throughout this process when Uber actually provided sufficient information that alleviated Plaintiffs' concerns.

[5] Uber's assertion that Plaintiffs refused to comply with PTO No. 8 is erroneous. Plaintiffs proposed a simultaneous exchange of sections for this letter brief after Uber continuously failed to meet deadlines to provide responsive information to Plaintiffs. As a compromise, and after Plaintiffs did not object to Uber's extension request, Plaintiffs provided their section of the letter on October 26, and Uber provided its section on October 29. PTO 8 does not purport to set out exchange deadlines where the submission date to the Court is set in advance.

rules, including setting deadlines for Uber to do so. The rules should include:

**Rule 1: After resolution of each privilege dispute (whether by concession or by Court order), Uber must apply the lessons learned to all logs already produced, as well as any future logs.** This principle is self-evident, as the Court recognized during the 10/23 discovery status conference and its Minute Order (ECF 1785). Indeed, at that hearing, Uber conceded it was required to apply the Court's clawback order retroactively. But it goes beyond Court orders: Uber must do the same with respect to documents that are challenged and as to which Uber withdraws its privilege assertions. Plaintiffs request the Court set a reasonable deadline (10 days) for Uber to do so following resolution of this dispute.

**Rule 2: Absent individualized analysis and conclusion of privilege, documents should be produced.** At the 10/23/24 status conference, Uber was candid: given the production deadlines, it was taking a "conservative" approach to privilege, "reserving" Uber's need to "do a little investigating and speaking with individuals in many cases" for later stages. 10/23/24 H'rg Tr. at 39. Uber explained this was to avoid "waiver." *Id.* at 34. But this is *not* how a privilege review is supposed to work. Under PTO 14, the order regarding Fed. R. Evid. 502(d) and privileged material, there is no waiver for inadvertently produced privileged documents. ECF 396. Instead, there is a clawback procedure. *Id.*

**Rule 3: If an e-mail chain or thread includes a third party, it cannot be designated as privileged unless that document (or category of documents) absent a detailed explanation of the basis for the privilege assertion, including the role of the third party.** When a third party is included in correspondence that might otherwise be privileged, the attorney client confidentiality ordinarily is waived. As described below, JCCP_MDL_PRIVLOG019255 is a 10/3/2019 with the subject line "███ ██████" from Gus Felder to two individuals outside of Uber ████████████████████████████████████████ Yet, Uber has maintained its claim of attorney client and work product privilege over this document in its entirety. Designations involving third parties must be supported by particularized justification.

**Rule 4: Uber should individually review (and re-review) all privilege log entries where no attorney authors the document or is listed in the "to" or "from" fields.** As described below, two of the documents that Uber claims are privileged are not authored by attorneys, nor were they sent to or from attorneys. While Uber has indicated that attorneys had "access" to one these documents as google collaborators and lists those attorneys' names as privileged, Uber has not provided any information to determine whether those individuals reviewed, provided comments, or even opened those documents. *See* JCCP_MDL_PRIVLOG014830. The other document entitled ████████████████████████████ and authored by Gus Feldner includes no attorney name or indication anywhere on the privilege log, yet Uber has maintained it is attorney-client privileged. *See* JCCP_MDL_PRIVLOG019282, *infra.*

Following submission of this letter, Plaintiffs propose a 1-2 day in person, *in camera* review process during which the Court can review samples and issue rulings from the first tranche of custodians.

**Specific Documents.** As to privilege claims still at issue per the Court's October 9, 2024 Order, Uber has not met its burden showing that these documents are privileged.[6] Plaintiffs are not challenging communications made solely with outside counsel or communications that objectively share or discuss attorney advice.[7] Rather, per Uber's limited description as to each communication or document at issue, each appears to have been either (i) created primarily for business purposes

---

[6] The applicable legal standards are stated in the Court's October 8, 2024 Order regarding clawed-back documents (ECF No. 1727) and the parties' joint letter regarding claw back challenges. (ECF No. 664.)

[7] Uber often does not identify an attorney name in its privilege logs, but simply indicates "legal department." The fact that Uber cannot identify any attorney by name calls into question its privilege assertions.

(as opposed to a legal purpose), (ii) does not appear to seek, convey, or discuss legal advice, or (iii) was sent to a third party (and privilege was therefore waived).

Uber's detailed document descriptions which it provides *infra* prove Plaintiffs point. "If a party withholds material as privileged ... it must produce a privilege log that is sufficiently detailed for the opposing party to assess whether the assertion of privilege is justified." *Prado v. Equifax Info. Servs. LLC*, 2019 WL 88140, at *3 (N.D. Cal. Jan. 3, 2019). Uber's privilege log contains sparse descriptions of withheld documents; only in this letter does Uber actually, and for the first time, provide sufficient details for Plaintiffs to access these privilege assertions. This process is untenable. When Plaintiffs challenge privilege claims based on the limited information Uber provides in the logs, Uber withdraws its privilege claims to approximately 90% of the documents.

Below are six privilege log entries that Plaintiffs have selected from those documents that were fully withheld:[8]

### JCCP_MDL_PRIVLOG019255

This is a September 3, 2019 email with the subject ████████ that Uber claims as work product and attorney-client privileged. Uber argues it is a "confidential e-mail seeking legal advice from in-house counsel and prepared in anticipation of litigation regarding ████████████ ████████████" This email was sent by Uber employee Gus Fuldner (who was Uber's Vice President of Safety and Insurance at the time of the email) to three individuals with a ████████ email address, presumably employees of a third party that Uber does not claim are outside counsel. There are no names designated as attorneys in any field on the log.  And this email appears to be related to responding to media inquiries, rather than pending or future litigations, so its primary purpose is business related.[9]

### JCCP_MDL_PRIVLOG006370

This is a July 8, 2016 document with the title ████████ that Uber claims as attorney-client privilege. Uber asserts this is a "draft confidential document prepared at the direction of in-house counsel regarding ████████████████" Jill Hazelbaker, Uber's Chief Marketing Officer, was the author of this document and no attorney was identified as a "Google Collaborator." Based on the limited information available, Plaintiffs believe this document has a dominant business purpose relating to media relations and marketing.

### JCCP_MDL_PRIVLOG007393

This is a July 24, 2017 document titled "████████████" that Uber claims as attorney-client privilege. Uber argues this is a "confidential document prepared at the direction of in-house counsel regarding ████████████████" Jill Hazelbaker, Uber's Chief Marketing Officer, was the author of this document and no attorney was identified as a "Google Collaborator." Plaintiffs believe this document has a dominant business purpose relating to the drafting of Uber's Safety Report.

### JCCP_MDL_PRIVLOG007396

This is a July 25, 2018 document titled "████████████" that Uber claims as attorney-client

---

[8] Until drafts of this letter were exchanged, Plaintiffs' information about these documents was limited to that provided on the logs, *see* **Ex. B**, in contrast to the level of detail Uber has now produced. *See* **Ex. C**.

[9] ████████████████████████████████████████

privilege. Uber claims this is a "confidential e-mail seeking legal advice from in-house counsel regarding ███████████████████████████" This is a stand-alone google document, not an email, was authored by Gus Fuldner (who was Uber's Vice President of Safety and Insurance at the time), and includes eight (8) google collaborators, only one of which is noted as an attorney. While two other attorney names are noted on the log, it is not known if or how these people interacted with this document or whether any google collaborator reviewed, commented upon, or even opened the document. This compliance update regarding Uber's internal policies and practices appears to have a dominant business purpose and does not appear privileged.

**JCCP_MDL_PRIVLOG014830**

This is a November 15, 2019 document titled "███████████████████████████" that Uber claims as attorney-client privilege. Uber states this is a "confidential PowerPoint prepared at the direction of in-house counsel regarding ███████████████████████████ This PowerPoint was created by Gus Fuldner and certainly appears to be unrelated for business purposes (related to ████████████, not legal purposes. Although in-house are listed as "Google Collaborators," Uber is unable to provide if any in-house counsel reviewed, edited, commented on, or even opened the document. Based on the information provided by Uber on the log this document appears substantially similar to the documents at issue in the clawback dispute and a similar analysis should apply to it.

**JCCP_MDL_PRIVLOG019282**

This is a September 24, 2019 email from Gus Fuldner with the subject line on the log shown as "███████████████████████████" The email was sent to the following:"████████████████████████████████████████████████████████████████". Uber failed to identify any attorney or holder of privilege on the log entry. Uber claims attorney-client privilege and argues this is a "confidential document providing legal advice from in-house counsel regarding ███████████████████████████████████" Again, no legal advice is apparent from the description provided by Uber and this email appears to have a dominant business purpose related to ███████████████████████████.

Below are four privilege log entries that Uber has selected:

**JCCP_MDL_PRIVLOG005897**

This is an April 29, 2019 email with the subject "████████████████████████████████████████████████████████" Uber states this is a "Confidential e-mail thread seeking and providing legal advice from in-house counsel regarding ██████████████████████████" No attorney is on this email chain, and no attorney is identified as providing legal advice. Further, this report's primary purpose appears to be business related (███████████████████████████████████ and not legal advice), and not related to any litigation.

**JCCP_MDL_PRIVLOG013948**

This is an August 31, 2017 email with the subject "████████████████████████████████████" Uber asserts this email is a "██████████████████████ provided for purposes of seeking legal advice from in-house counsel regarding ███████████████████████████████████" While in-house counsel are cc'ed on the email, the primary purpose of this email appears business related concerning Uber's internal policies and procedures. *See IP Co., LLC v. Cellnet Tech., Inc.*, 2008 WL 3876481, at *3 (N.D. Cal. Aug. 18, 2008) ("[I]t is well settled that merely copying an attorney on an email does not establish that the communication is privileged."). Moreover, an "█████████████" contains underlying facts and not legal advice, and therefore would not be privileged.

**JCCP_MDL_PRIVLOG008375**

This is a September 21, 2018 email notification for Nick Silver (Uber's Head of Marketing) that

Lizzie Ross (Uber's Safety Product Marketing manager at the time) left a comment on a document. Uber claims attorney client privilege and argues this is a "confidential e-mail providing legal advice from in-house counsel regarding ███████████████████████" From its face, this appears to be a comment made by a non-attorney that does not provide legal advice from an attorney with a business purpose focus.

**JCCP_MDL_PRIVLOG009844**

This is an August 13, 2018 email notification with subject line "A/C Privileged - ... - ████████ ██████████████████████" The email is from "Tracey Breeden (Google Docs) ███████████████████████████████████████████" to Roger Kaiser. Breeden was Uber's Head of Global Women's Safety & Gender-Based Violence. Kaiser was Uber's Director, Community Operations at the time of the email. "Uber claims this is a "Confidential e-mail providing legal advice from in-house counsel regarding ██████████ ████████████ This email appears to be a notification sent to Kaiser that Breeden left a comment on a google document and does not appear legal advice was being provided. While Scott Binnings is indicated on the log as a related privileged name, there is no indication that any attorney interacted with the document.

## II.     Uber's Position

"The attorney-client privilege has been a hallmark of Anglo-American jurisprudence for almost 400 years. *Mitchell v. Superior Ct.*, 691 P.2d 642, 645–46 (Cal.1984). Its "fundamental purpose … is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters." *Id.*; *see also, e.g., Cohen v. Middletown Enlarged City Sch. Dist.*, 2007 WL 631298, at *1 (S.D.N.Y. Feb. 28, 2007). Uber has a fundamental due process right to maintain the confidentiality of documents protected by the attorney-client privilege.

While the discovery in this litigation is vast and proceeding on expedited time frame, Uber utilizes a team of attorneys to review documents for responsiveness and privilege. No document has been logged as privileged without individualized review and quality control. *See* M. Shortnacy Decl., ¶ 27. Review on this enormous scale cannot be perfect, but Plaintiffs' suggestion that Uber has failed to conduct "individualized analysis and conclusion of privilege" before logging documents has no basis in fact. Individualized review is necessary because, in reality and under the law, privilege determinations are fact-specific. The individualized nature of privilege claims does not mean that broader lessons cannot be learned from Court rulings, de-designations, or challenge withdrawals. Uber has applied the Court's guidance, *see* 10/23/24 Hr'g Tr. at 12-14, 27-28, and will continue to apply its guidance and lessons learned in order to continue winnowing the privilege disputes here (just as Plaintiffs must do). Plaintiffs' accusation that Uber "takes no steps to apply the lessons more broadly and appropriately to the existing privilege logs" is simply false.

Many of the "bright line" rules Plaintiffs seek to impose are both illusory and flatly contrary to black-letter privilege law. Take Plaintiffs' suggestion that "[i]f there's a third party, then it cannot be attorney-client privilege because then that's waived." *See id.* at 26. While the attorney-client privilege may not attach to communications made in the presence of a third party when the third party has *no interest* in the matter, *see, e.g., Zurich American Ins. Co. v. Superior Court*, 155 Cal. App. 4th 1485, 1496 (2007), it is not waived when disclosure to the third party "is reasonably necessary to further the purpose of the legal consultation," or because the communication is made through an agent of the client or attorney. *Id.* at 1496, 1500-02. Plaintiffs' categorical challenges here seem to assume that no privilege can exist for anyone with a non-"@uber.com" email address. But this is not true, factually or legally, as this Court has recognized. *See* 10/23/24 Hr'g Tr. at 28-29 ("[T]here might be multiple different ways in which a third party was engaged [by Uber], and some of which might be privileged."). Plaintiffs' proposal for some sort of heightened standard for

privilege log entries for emails including "third parties" is misguided.   Uber provided logs explaining the basis for its privilege claims; if Plaintiffs believe there are any deficiencies, they can raise the issue with Uber.[10]

Similarly, Plaintiffs' extensive discussions of the scope of Uber's privilege assertions and its de-designations in this conferral process miss the mark, especially in light of Plaintiffs' own withdrawals of privilege challenges.   Plaintiffs assert that Uber has asserted privilege for around 25,735 documents.   This number fails to account for duplicative log entries for privileged email "threads" or "chains"--each email within a single thread has a separate log entry, consistent with the ESI Protocol (ECF 524), resulting in counting a single privilege claim many times over.   In reality, for the 11 priority custodians' privilege logs, Uber has asserted privilege for 9,303 unique email threads, not over 25,000.   Likewise, Plaintiffs' "percentages" of de-designations by Uber in this conferral process are misleading.   Plaintiffs rely heavily on selections for which Uber has *maintained* its privilege claim over a document, but has agreed to redact the document. Contrary to Plaintiffs' point, this *confirms* that Uber accurately determined that a document was privileged, but re-assessed whether it was feasible to segregate privileged portions with redactions.   For their part, Plaintiffs withdrew their privilege challenges in full for 43% of Uber's selections (3 out of 7).[11]   *See* M. Shortnacy Declaration, ¶¶ 3-13.   Regardless, the documents hand-picked by Plaintiffs are not a randomly-selected, representative sample of Uber's privilege claims—undermining the idea that de-designations in this conferral shows any systemic issue with Uber's privilege claims.   Refining privilege claims and privilege challenges is the point of this process, not an indication that it is broken.

### Plaintiffs' Challenges

A major category of Plaintiffs' challenges are documents they assume have a primary business purpose.   But this assumption is often based on speculation from a document title or email subject line, many times disregarding the information provided by Uber about counsel's involvement.   "[P]rivilege can still obtain even where a business decision is implicated," *Staley v. Gilead Scis., In*c., 2021 WL 4318403, at *2 (N.D. Cal. July 16, 2021) (collecting cases),  so long as its primary purpose is to seek or provide legal advice, *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021).   Naturally, the matters on which Uber will seek legal advice from its in-house counsel are business matters, but legal advice regarding business information is still protected. *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).

A related issue is Plaintiffs' blanket challenge to documents who do not have an attorney listed as the "author" or in the email "to" and "from" fields in the metadata—asking the Court to mandate an exhaustive re-review of all such documents.   This proposal is deeply misguided.   The

---

[10] Contrary to Plaintiffs' inaccurate assertions, Uber's privilege-log descriptions are consistent with what other courts have agreed is sufficiently detailed.  *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 2024 WL 3381029, at *3-7 (N.D. Cal. July 10, 2024); *Spilker v. Medtronic, Inc.*, 2015 WL 1643258, at *6 (E.D.N.C. Apr. 13, 2015); *Vaughan v. Celanese Ams. Corp.*, 2006 WL 3592538, at *3-4 (W.D.N.C. Dec. 11, 2006); *see also* The Sedona Conference, *Commentary on Privilege Logs*, 25 Sedona Conf. J. 221, 310 (2024). Notably, preparing these privilege descriptions is widely recognized as a potentially unduly burdensome process, leading many parties to do away with document-by-document descriptions altogether in favor of categorical or metadata-only privilege logs.  *See* The Sedona Conference, *Commentary on Privilege Logs*, 25 Sedona Conf. J. at 252, 255-57, 263.

[11] Plaintiffs' statement that they "withdrew privilege challenges throughout this process when Uber actually provided sufficient information that alleviated Plaintiffs' concerns" is incomplete, at best.   Plaintiffs withdrew their challenges to 4 documents (3 of Uber's 7 selections and 1 of their own selections, *see* M. Shortnacy Declaration, ¶¶ 3-13).   The only withdrawal arguably based on new information was their withdrawal of their own selection, apparently because an outside counsel's email address was not marked with an asterisk on the privilege log.  *See id.* ¶ 13.

"author" field will generally list only the single person who uploaded or initially created a document, but this does not necessarily mean that the "Author" actually drafted the document from scratch or created all of its content. Such documents may relay legal advice or may be revised or drafted by counsel in large part. *See AdTrader, Inc. v. Google LLC*, 405 F. Supp. 3d 862, 865 (N.D. Cal. 2019). In a business context, teams often work with their attorneys–often in the "virtual conference room" of collaborative applications like Google Docs–to draft, discuss, and revise documents based on their attorneys' advice or in furtherance of obtaining legal advice.

Plaintiffs' suggestion that communications without an attorney in the "to" or "from" field are presumptively unprivileged is also wrong. It is unrealistic to assume, as a blanket rule, that sending an email to an attorney using the "cc" field rather than the "to" field means there is no privilege or that "cc" recipients are less important to a communication. Of course, copying an attorney by itself does not automatically make a communication privileged; indeed, Uber has produced numerous communications with attorneys copied. It has also claimed privilege over some documents with attorneys in the "cc" field after individually reviewing those documents for privilege. An "attorney being in the CC, rather than the To or From, column is *not* prima facie evidence that the email is *not* privileged." *Heartland Consumer Prods. LLC v. DineEquity, Inc*., 2018 WL 3861648 (S.D. Ind. Aug. 14, 2018) (emphases added); *see also, e.g.*, *Bartholomew v. Avalon Capital Grp, Inc*., 278 F.R.D. 441, 448 (D. Minn. 2011). A communication can be privileged even if it does not directly involve counsel, such as legal advice being sent or discussed between non-lawyers within a business, communications between non-lawyers about seeking legal advice, information compiled or documents sent for the purpose of seeking or facilitating legal advice. *See OwLink Tech., Inc. v. Cypress Tech. Co., Ltd*, 2023 WL 4681543, at *2 (C.D. Cal. June 29, 2023); *United States ex rel. Schmuckley v. Rite Aid Corp*., 2023 WL 425841, at *3 (E.D. Cal. Jan. 26, 2023); *Dolby Laboratories Licensing Corporation v. Adobe Inc*., 402 F.Supp.3d 855, 865 (N.D. Cal. 2019); *In re CV Therapeutics, Inc*. Sec. Litig., 2006 WL 2585038, at *3 (N.D. Cal. Aug. 30, 2006); *AT&T Corp. v. Microsoft Corp.*, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003). What matters is whether the communication sought or facilitated legal advice from a lawyer.

### *Uber's Proposal for Process Moving Forward*

The Court's October 30, 2024 order (ECF 1808) addresses the next steps for briefing privilege disputes, providing seven days between selections of privilege claims to brief and the submission of the PTO 8 joint letter brief. Uber asks that the Court should make clear that the deadlines for exchanging briefs and supporting materials under PTO 8 must be followed absent agreement by both sides. For *this* letter brief, despite the Court stating in its October 9 order that this "joint letter shall be consistent with Pretrial Order No. 8, except that it may be up to ten pages" (ECF 1732, p.2). But Plaintiffs flatly refused to comply with the PTO 8 process and timeframe for exchanging draft briefs—both before and after the Court extended the filing deadline, prejudicing Uber's ability to prepare its response. *See* M. Shortnacy Decl., ¶¶ 14-26. Plaintiffs now take the position that "PTO 8 does not purport to set out exchange deadlines where the submission date to the Court is set in advance," despite this Court expressly stating that PTO 8 applied to this submission (ECF 1732), which had a submission date set in advance.[12]

---

[12] Plaintiffs' inaccurate statement that "Uber continuously failed to meet deadlines to provide responsive information to Plaintiffs" is a red herring and irrelevant to Plaintiffs' refusal to comply with PTO 8. Uber provided responses to Plaintiffs' first set of selections in less than 3 days, with sufficient time to confer on the third day.

*Specific Documents*[13]

**JCCP_MDL_PRIVLOG005897:**  This document is a confidential email chain in which Uber employees requested and received legal advice from Uber counsel regarding ██████ ████████  Multiple emails within the chain begin with a privilege indication and contain legal advice from the legal director for marketing and advertising (Amanda Rinkoff) and an in-house counsel for safety (Nicole Benincasa).  One attorney email stated that legal review and approval will be necessary because of ████████████████████████, and asks for legal input from a particular in-house attorney, Ms. Benincasa, and another asks for legal input from additional Uber attorneys, Emily Schuman and Tracey Merwise.  It includes direct and express legal advice from Ms. Benincasa, which explains that the advice is based on a discussion between her and other Uber counsel, including the head of Safety Legal, Scott Binnings.

**JCCP_MDL_PRIVLOG013948:**  This document consists of two confidential emails from Uber counsel providing legal advice to Uber employees. The first email was sent by an Uber regulatory counsel (Lisa Tse), and the second email was also sent by Uber counsel, Gail Levine.  Both emails are marked as privileged and confidential.  The emails contain legal advice from them, as well as from another Uber counsel (Curtis Scott), about ████████████████████ ████████ and the legal implications thereof.

**JCCP_MDL_PRIVLOG009844:**  This document is a confidential email containing the content of a comment string in which Uber counsel provided and an Uber employee requested legal advice regarding a ████████████████.  Among the three individuals in this comment chain was associate general counsel Scott Binnings to whom an Uber employee assigned these comments to address.  Mr. Binnings provided legal advice on ████████████████████ based on his legal analysis of the legal implications and risks implicated by ████████.  Mr. Binnings and other attorneys provided legal advice regarding ████████████████. At the end of the comment chain, an Uber employee commented that ████████████ was approved so long as "legal" approved, mentioning Mr. Binnings in that comment.  *See* Binnings Decl. ¶ 5.

**JCCP_MDL_PRIVLOG008375:**  This document is a confidential email containing the content of a comment string in which Uber employees requested and Uber counsel provided legal advice regarding a draft communication.  The discussion in the comment string began with, and related to, Uber counsel's (Daniel Kolta) comment providing feedback on certain language in the draft communication.  In the comments, Uber employees requested Mr. Kolta's legal advice and approval of the draft language.  In Mr. Kolta's comments, he expressly stated that his input was related to the legal concerns implicated by the language as drafted.  *See* Kolta Decl. ¶ 4.

**JCCP_MDL_PRIVLOG019255:** This is an email from Gus Fuldner to ████████████ ████████ copying in-house counsel Kathleen Waitzman (Uber's current VP and Chief Deputy General Counsel) and ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████  Courts regularly hold that communications with third-party claims administrators are privileged.  *See, e.g., Montes v. State Farm Mut. Auto. Ins. Co.,* 2023 WL 639706, at *2 (C.D. Cal. Aug. 2, 2023) (collecting cases).  The email discussed ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Gus Fuldner was aware that the subject matter of this email carried legal risk based on the advice of Uber in-house counsel and his email ████████████ was informed by and based on that advice from Uber counsel.  Because

---

[13] Uber will lodge the specific documents at issue in this brief with the Court for *in camera* review.  Uber's intent in describing the documents at issue here, and in its supporting materials, is not to reveal any privileged information or to effect any waiver as to any specific document or as to subject matter.

██████████████████████████████████████████████████████, this email related to a matter with significant legal risk, and a communication that carried legal risk, and the email was in furtherance and at the advice of Uber's in-house counsel, this email is protected by attorney-client privilege. *See* Frangopolous Decl. ¶¶ 4-7.

**JCCP MDL PRIVLOG006370**: This is a confidential draft communication to a media organization. The draft communication is marked "A/C privilege" at the top. Three Uber counsel were among the collaborators on this document in order to provide their legal advice. The subject matter of the communication, and the draft communication itself, posed legal risk, which is why Uber counsel were involved with drafting the draft communication. In practice, drafts like this document that are marked as privileged reflect and incorporate legal advice and work product provided by Uber counsel. Drafts like this document, especially with regard to issues that pose legal risk, are also routinely used to seek legal advice from Uber's in-house counsel so that they can be revised based on that legal advice. *See* Binnings Decl. ¶ 7. A non-lawyer's intent to seek legal advice need not be express. *Gramercy Grp., Inc. v. D.A. Builders, LLC*, 2017 WL 5179530, at *3 (D. Haw. Nov. 8, 2017); *see also Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, 2010 WL 727220, at *2 (N.D. Cal. Mar. 1, 2010).

**JCCP MDL PRIVLOG007393**: This is a confidential draft communication about safety at Uber. The draft communication is marked "ATTORNEY CLIENT PRIVILEGE" at the top and was drafted by, edited by, and contains comments from Uber counsel, including Salle Yoo (then-Chief Legal Officer), Matt Burton (in-house counsel), and another in-house counsel. Communications like this draft communication require legal advice and entail legal risk. The attorney comments in the draft relate, both directly and indirectly, to the legal issues implicated by the draft communication on safety and the legal risk entailed by various statements in the draft. For example, one comment by Salle Yoo expressly discusses ██████████ ██████████ Similarly, another comment discusses ████████████████████ In practice, drafts like this document that are marked as privileged reflect and incorporate legal advice provided by Uber's in-house counsel and are used to obtain legal advice from counsel. *See* Binnings Decl. ¶ 6. Contrary to Plaintiffs' "business purpose" argument, legal advice related to safety issues, communications about safety, and Uber's U.S. Safety Reports is still privileged. The fact that a document or communication *relates* to business does not mean it is unprivileged. *See, e.g., Staley*, 2021 WL 4318403, at *2.

**JCCP MDL PRIVLOG007396**: This document is a confidential draft internal communication regarding ███████████████ to be sent from Gus Fuldner. The document ███████ ████████████████████. The draft communication is marked as privileged at the top. Associate General Counsel Scott Binnings was a part of the team that drafted and revised the communication. He was part of a working group that ████████████████ ████████████████████████████████. The draft references discussion with Uber's Legal Department and contains ████████████████████ made based on legal advice from Uber's in-house counsel. Mr. Binnings provided legal advice on the communication and the recommendations therein. *See* Binnings Decl. ¶ 3.

**JCCP MDL PRIVLOG014830**: This document is a confidential internal presentation regarding ████████████████████ The presentation is marked as privileged and at least five Uber in-house counsel were included on the presentation to provide legal advice. The presentation contains legal advice from Uber's in-house counsel about ████████████████████████████████

████. It also contains ████████████ based on legal advice from Uber's in-house counsel. *See* Binnings Decl. ¶ 4.

**JCCP MDL PRIVLOG019282**: This document is a confidential email chain, including the content of a comment string on a draft communication to a media organization, with various individuals discussing a proposed part of the draft communication ████████. ████. One of the commenters in the discussion in the comment string was then Director for Safety & Insurance litigation (now Senior Legal Director) for Uber, Maureen Frangopoulos. The subject of the discussion was a matter which entails legal risk. Likewise, Uber's public-facing communications about ████████ carries legal risk, which is why legal advice from in-house counsel is regularly sought on such communications. The other commenters in the document were aware that Ms. Frangopolous was a part of the team drafting and revising the document and used the comments to seek her input from a legal perspective, which she provided in light of her assessment of the legal implications of the communication. *See* Frangopoulos Decl. ¶ 3; *see also Gramercy Grp.*, 2017 WL 5179530, at *3; *Karl Storz.*, 2010 WL 727220, at *2.

Respectfully submitted,

By: */s/Michael B. Shortnacy*
MICHAEL B. SHORTNACY
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON L.L.P.**
2121 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (Admitted *Pro Hac Vice*)
oot@shb.com
**SHOOK, HARDY & BACON L.L.P.**
1800 K St. NW Ste. 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

KYLE N. SMITH (*Pro Hac Vice* admitted)
ksmith@paulweiss.com
JESSICA E. PHILLIPS (*Pro Hac Vice* admitted)
jphillips@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington DC, 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420

*Attorney for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

By: */s/Roopal P. Luhana*
ROOPAL P. LUHANA (*Pro Hac Vice*)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

SARAH R. LONDON (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: slondon@lchb.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

*Co-Lead Counsel for Plaintiffs*

11

cc:     All counsel of record via ECF

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.


Dated: October 30, 2024                         By: */s/Roopal P. Luhana*
                                                    Roopal P. Luhana