RANDALL S. LUSKEY (SBN: 240915)
    rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
    **& GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

ROBERT ATKINS (*Pro Hac Vice* admitted)
    ratkins@paulweiss.com
JACQUELINE P. RUBIN (*Pro Hac Vice* admitted)
    jrubin@paulweiss.com
CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
    cgrusauskas@paulweiss.com
ANDREA M. KELLER (*Pro Hac Vice* admitted)
    akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
    **& GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Judge:        Hon. Charles R. Breyer<br>Courtroom:  6 – 17th Floor<br><br>Date:   November 6, 2024<br>Time:   11:00 a.m. |

- 1 -

## JOINT CASE MANAGEMENT STATEMENT

Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC (collectively "Uber"), and Plaintiffs' Co-Lead Counsel (collectively referred to herein as "the Parties"), respectfully provide this Joint Case Management Conference Statement and Proposed Agenda in advance of the Case Management Conference scheduled for November 6, 2024.

### Proposed Agenda

    **1.**    **Status of Case Filings and Request to Set a Case Filing Cut-Off Date**

    **2.**    **Motions to Dismiss**

    **3.**    **Plaintiffs' Request for Trial Dates**

    **4.**    **Motions to Transfer**

    **5.**    **Additional Discovery Requests**

    **6.**    **General Discovery Updates**

    **7.**    **Discovery Coordination Order**

    **8.**    **Order Regarding Time Period for Discovery**

    **9.**    **Cases Where Plaintiffs' Counsel Withdrew**

    **10.**    **Special Settlement Master**

    **11.**    **Next Case Management Conference**

**I.**    **Status of Case Filings and Setting a Case Filing Cut-Off Date**

**1.**    **Number of MDL Case Filings**

As of November 4, 2024, there are currently 1,425 cases in this MDL. Since the Parties submitted the Joint Case Information Chart to the Court on September 30, 2024, four complaints have been amended, and 94 new cases have been filed.[1]

**2.**    **Status of JCCP**

There are approximately 496 cases involving California incidents pending in the JCCP.

---

[1] The newly filed cases allege incidents across 29 states. The Parties can provide promptly a supplement to the Court with an updated chart.

1    **Plaintiffs' Position**:  A list of other proceedings known to Plaintiffs is attached as **Exhibit**

2    **A**.  Consistent with Defendants' obligations pursuant to Pretrial Order No. 19, and to promote

3    coordination and facilitate discovery of other related incidents, Plaintiffs request that Uber

4    maintain and provide at each status conference a current list of all non-JCCP state court and non-

5    MDL federal proceedings involving allegations that an Uber driver engaged in sexual assault or

6    misconduct with a passenger.  Likewise, to facilitate discovery of relevant information without

7    the need to send requests, Plaintiffs request that Uber maintain and provide at each status

8    conference a current list of regulatory and governmental actions and investigations related to

9    sexual assault on the Uber platform.  It is needlessly burdensome for Plaintiffs to continuously

10   search and update this list when the information is easily available to Uber.

11   **Defendants' Position**:  The Court should not order Uber to create, manage, and update a

12   list that tracks the details of each and every publicly available litigation where Uber is a defendant

13   in a sexual assault case around the country.  Nothing in Pretrial Order 5, let alone any other

14   Pretrial Order in this MDL, requires this list.  The relevant cases to track for purposes of

15   managing the instant MDL are the cases currently pending before this Court and the JCCP state

16   court proceedings.  By virtue of the centralized MDL proceedings that Plaintiffs sought, and the

17   JPML ordered, this Court is aware of and actively managing all relevant federal litigations.  As to

18   non-JCCP (*i.e.*, non-California) state court litigation, Plaintiffs have not shown how a list that

19   tracks other state court proceedings in other states outside California would benefit the Parties or

20   the Court.

21   **3.    Defendants' Request For a Filing Cut-Off**

22   **Defendants' Position**:  Defendants believe it is appropriate at this time to set a cut-off

23   deadline for the filing of any additional complaints to be included in this MDL.

24   As Defendants have expressed previously, a cut-off date is necessary so the Court and the

25   Parties know the parameters of this MDL, including the size and composition of the body of

26   cases. That, in turn, will guide the Court and the Parties in determining the nature and timing of

27   additional motion practice and deciding what discovery is necessary and proportionate to the

28   number and type of cases involved in the MDL.  Absent a defined endpoint for filing additional

cases, the boundaries and scope of this MDL will remain unclear which, among other things, will make the resolution of the litigation, whether contested or compromised, difficult to achieve.

The time to impose such a cutoff is now. This Court previously has expressed that resolution of the *forum non conveniens* issue in the state court proceedings would serve as an important milestone in this regard, and, in accordance with that, imposed a deadline for all cases affected by that decision to file in this MDL. That deadline has now come and gone, resulting, as expected, in the largest influx of cases into this MDL. The total number of cases in this MDL now approximates the number of cases Plaintiffs' counsel initially estimated for the Court over a year ago. And with the Court's rulings on the first tranche of motions to dismiss, it would inhibit progress if new claims, involving potentially different and additive state laws, continue to be filed. As such, at this time the benefits of allowing filings to continue without end is outweighed by the benefits that will follow from imposing a filing deadline and allowing each side to understand the parameters of this litigation. Doing so now makes facilitating resolution more likely.

**Plaintiffs' Position**: Uber makes its oft-repeated plea for an arbitrary "cut-off" on new filings in this MDL. Uber now cites the resolution of the *forum non conveniens* issue in the JCCP, as well as this Court's rulings on the first motions to dismiss, as reasons to set a cut-off date. But Uber continues to fail to explain why a cut-off date would facilitate resolution, just as it fails to ground its ask in past practice in other MDLs or the procedural posture of this one, or grapple with the undeniable fact that sexual assault survivors find it difficult to file cases and should not face premature deadlines for doing so absent compelling circumstances.

In reality, this MDL is still in its early stages, with Uber not having yet even substantially completed production in response to Plaintiffs' First RFPs (production that was supposed to be done by September 1), the Magistrate Judge addressing crucial common discovery issues, and the Court having just begun resolving common legal issues raised in the Master Complaint. Uber cites no MDL that ever has imposed a cut-off under those circumstances, and does not articulate why this Court should be the first.

- 4 -

At some point, after the pretrial common legal and discovery issues are resolved, including but not limited to Rule 702/*Daubert* issues related to general liability, and it likely will make sense to wind down the MDL. But now is not that time. Much remains to be done and the parties—both sides—have much to gain from efficiency. For example, Uber has insisted that the MDL and JCCP coordinate depositions of its employees. If a cut-off is entered prematurely, Uber faces the prospect of hundreds or even thousands of depositions managed by courts across the country.

## II.    Motions to Dismiss

On September 30, 2024, the Parties filed a Joint Case Information Chart pursuant to the Court's August 29, 2024 Order. *See* ECF No. 1685.

On October 7, 2024, the Court issued Pretrial Order No. 18 (Order on Motions to Dismiss Pursuant to Florida, Illinois, and New York Law). ECF No. 1719.

### 1.    <u>Clarification of Vicarious Liability Claims Remaining Under Florida and Illinois Law</u>

**Defendants' Position**: The Court's October 7, 2024 Order states that "Claim G" under the laws of Florida and Illinois is dismissed "in part." Order at 9. Plaintiffs' longform complaint titled "Claim G" as "Vicarious Liability for Drivers' Torts" and asserted three theories: (1) *respondeat superior*, (2) apparent agency, and (3) ratification.

It is clear from the Court's Order that none of those three theories survived Uber's motions to dismiss under the laws of Florida and Illinois. First, Plaintiffs withdrew the *respondeat superior* theory under Florida law, and the Court dismissed the *respondeat superior* theory on the merits under Illinois law. Order at 2, 7–9. Second, the apparent agency theory was dismissed under Florida law pursuant to Plaintiffs' concessions, and dismissed on the merits under Illinois law. *Id.* Third, the ratification theory was dismissed under Florida and Illinois law, pursuant to Plaintiffs' concessions. Order at 2.

Accordingly, none of the three theories asserted under "Claim G" is viable and/or being pursued under the laws of Florida and Illinois. Uber respectfully requests that the Court issue an order clarifying that "Claim G" is dismissed in its entirety.

**Plaintiffs' Position**:  Plaintiffs believe the Court's order was clear. Plaintiffs agree that Claim G was dismissed under the laws of Florida, Illinois, and New York, but note that the dismissal of the ratification theories should be with leave to amend, and also that common carrier vicarious liability (though not, as a formal matter, pleaded under Claim G) remains available in both states subject to the temporal limitations imposed by state TNC statutes that the Court identified. *See* ECF 1719 at 4 (noting that Florida's vicarious liability limitation became effective only on June 23, 2020); *id.* at 5 (noting that Florida's common carrier limitation became effective only on July 1, 2017); *id.* (noting that Illinois's common carrier limitation was repealed January 1, 2024).

### 2. Next Steps for Motions to Dismiss

#### a. Next Round of Motions to Dismiss

**Defendants' Position**:  Uber proposes that the next round of Motions to Dismiss should be based on the laws of the five states with the most numerous incidents of the remaining states: Georgia, Nevada, Pennsylvania, Virginia and Arizona.  As discussed in the Parties' September 30, 2024 joint letter to the Court, Uber's position is that the incident state's law is the applicable law.  As to the form of the next round of Motions to Dismiss, Uber is prepared to either conduct a full briefing schedule or submit position papers applying the Court's legal analysis in prior orders, depending on the Court's preference.

The Court's August 15, 2024 Order on Motions to Dismiss Pursuant to California and Texas Law granted Uber's motions to dismiss Plaintiffs' fraud claims and product liability claims on the basis that Plaintiffs failed to include individualized pleadings.  As the Court concluded, "it is not possible to assess any of the fraud claims without knowing what representations a particular person saw and relied on."  Order at 36.  As to product liability, the Court explained that Plaintiffs' claims must be dismissed because of "the absence of individual allegations that make the causation allegations plausible."  Order at 47.  Plaintiffs' September 13, 2024 position paper on the motions to dismiss under the laws of Florida, Illinois, and New York acknowledged the defect in their pleadings, and conceded that their fraud and product liability claims should be dismissed with leave to amend.  Plaintiffs' Position Paper at 3, 5.  The Court's October 7, 2024

1  Order accordingly dismissed those claims.  Consistent with the Court's reasoning and Plaintiffs'

2  concessions, Uber proposes that the Parties stipulate that Plaintiffs' fraud and product liability

3  claims should be dismissed under the laws of Georgia, Nevada, Pennsylvania, Virginia, and

4  Arizona (and all other states).

5        The Parties should also stipulate to the dismissal of Plaintiffs' claims for injunctive relief.

6  Plaintiffs' claims for injunctive relief are based on California's Unfair Competition Law, and the

7  theory (which Uber has disputed) that the UCL has extraterritorial applicability to incidents that

8  occurred outside of California.  Because the Court dismissed Plaintiffs' UCL injunctive relief

9  claims on the basis that Plaintiffs lack standing, that decision should apply equally to the cases

10  involving incidents in Georgia, Nevada, Pennsylvania, Virginia, and Arizona (and all other

11  states).

12        **Plaintiffs' Position**:  The Court has indicated its intent to continue resolving cross-cutting

13  legal issues presented by the Master Complaint. If that remains the Court's priority, Plaintiffs

14  agree that proceeding on the five states identified by Uber (Georgia, Nevada, Arizona,

15  Pennsylvania, and Virginia) would be a reasonable next step. Plaintiffs submit that standard

16  briefing, rather than position papers, is the most sensible way to present the issues to the Court.

17  Plaintiffs suggest an interim deadline for the parties to meet and confer on the claims pleaded in

18  those five states to stipulate where possible and avoid unnecessary briefing.

19        Plaintiffs agree that the issues the Court identified as individualized—fraud, strict

20  products liability, ratification, and injunctive relief—require dismissal with leave to amend under

21  the laws of every state.

22          **b.**    **Amendment of Dismissed Claims**

23        **Defendants' Position**:  In parallel to the next round of Motions to Dismiss, all plaintiffs

24  seeking to revive dismissed claims must amend their pleadings.  As discussed above, certain of

25  Plaintiffs' claims—*e.g.*, fraud and product liability—were dismissed for pleading deficiencies

26  common across all plaintiffs' pleadings, rather than any state-specific grounds.  As the Parties

27  continue to move through additional rounds of Motions to Dismiss, those claims remain in limbo

28  so long as Plaintiffs do not amend their pleadings.  There is no reason to delay the Court's

1    determination of the viability of those claims.

2            At the August 29, 2024 case management conference, the Court indicated that amendment

3    of the pleadings can be addressed after further discovery has been completed.  At this juncture,

4    Uber has produced over 1.5 million pages of documents consisting of approximately 240,000

5    corporate discovery documents from custodial and non-custodial data sources, 101,000

6    documents from prior litigations and investigations pursuant to PTO 5, 21,400 Defense Fact Sheet

7    records, and 2,300 incident reports underlying Safety Report data.  Uber substantially completed

8    production for all Tranche 1 custodians on September 15, all Tranche 2 custodians on October 21,

9    and will substantially complete production for the 17 Tranche 3 custodians by November 26, as

10    set forth in PTO 20.  Further, the Court indicated that amendment can wait until the Court makes

11    further rulings based on its view of the law.  At the time, Uber's motions to dismiss pursuant to

12    the laws of New York, Florida, and Illinois were outstanding.  Since then, those motions have

13    been resolved, and the appropriate time for Plaintiffs to amend their pleadings is now.

14            Plaintiffs' position is that they should only be required to amend the complaints of

15    bellwether trial candidates.  First, as Uber explains below, it is inappropriate to narrow the

16    bellwether pool at this juncture.  But even if narrowing the bellwether pool was appropriate at this

17    time—which it is not—Plaintiffs' proposal is counterproductive and will hinder any potential for

18    global resolution of the claims because the Parties will not, and may never, have a holistic sense

19    of what claims are at issue in this MDL.

20            **Plaintiffs' Position**:  The Court should identify and move forward with initial trial

21    candidates, with amending those candidates' complaints being the natural next step after the cases

22    are identified, and after Uber verifies its DFS productions are complete and disputes are resolved.

23    Uber objects to that proposal, and instead proposes amending every single plaintiff complaint in a

24    very short amount of time.  This will accomplish little: Uber does not intend on filing hundreds of

25    case-specific motions to dismiss, nor is it efficient for the Court to review and decide hundreds of

26    motions at this time.  And Plaintiffs will always be able to rely on the liberal Rule 15 standards

27    should they choose to amend at a later date.  There is also no urgent reason to do this.  Uber

28    concedes that the scope of the common discovery does not depend on the remaining pleading

- 8 -

1    issues.  And every Plaintiff, at least presumptively, has live claims including the negligence

2    claims that Uber has not challenged and requests for punitive damages that the Court has found

3    adequately pleaded in the states it has examined.  Finally, any amendment deadline should be

4    tethered to Uber's substantial completion of common discovery, as well as resolution of disputes

5    over the scope and completeness of the DFS productions.  The parties continue to meet and

6    confer over deficiencies in the productions, and Uber has continued to supplement case-specific

7    productions.

8        **III.    Plaintiffs' Request for Trial Dates**

9        **Plaintiffs' Position**:  With common discovery underway, now is an optimal time to begin

10    discussing setting trial dates.  Moving toward trials will push this litigation forward, provide

11    focus and purpose to the schedule and proceedings, and respect both sides' needs for resolution

12    and closure.  While there are several options for choosing which cases to prioritize, the most

13    streamlined process would involve advancing first those cases that can be tried in this venue.  For

14    example, there are at least 16 cases over which it is undisputed this Court may try the claim (*e.g.*,

15    cases in which an out-of-state plaintiff was assaulted in California).  Another subset of cases will

16    be those for which Uber stipulates the amended TOU/forum selection clause does not apply.

17    Plaintiffs propose that within 14 days, the parties propose joint or if necessary competing

18    proposals for a scheduling order that includes an initial trial date and interim deadlines, such as

19    verifications that each DFS production is accurate and complete, a procedure for selecting which

20    cases will comprise the first wave of trial cases, amended complaints, responsive pleadings, and

21    discovery deadlines for the first wave of cases.

22        Setting trial dates now will facilitate discussions over which cases to try, and how to get

23    from here to there.  While Uber correctly points out the parties are busy with common discovery

24    depositions (and will be likely through the summer of 2025), laying the groundwork *now* for what

25    comes next (and what must be double- or even triple-tracked) is essential for moving this MDL

26    along.  If the Court intends to try any cases by the end of 2025 or early 2026, the time is now to

27    get that process underway to ensure adequate time for the Court to resolve case-specific motion

28    practice and discovery.  Punting decisions about trial dates and case selection until some vague

1  date in the future (as Uber would have it, after full Plaintiff discovery for all cases) will only

2  cause inefficiency and delay and push any trial into 2027—long beyond the trajectory this Court

3  has set for this matter.  The PFS and DFS are designed to provide the parties with core, material

4  information about the claims so they may sort them into categories for trial.  There is nothing like

5  a trial date to focus the mind —on both sides—to make sure those devices are functioning as they

6  should, and that any issues are addressed.  As the Court indicated at the outset of these

7  proceedings, finding a perfectly representative "bellwether" case may be an elusive and

8  ultimately pointless exercise.

9          Uber's continued request to transfer nearly all cases out of this MDL reinforces why it

10  makes sense for the Court and the parties to focus on the cases this Court indisputably will or

11  could try.  Endless procedure and navel gazing will only delay resolution for these plaintiffs, and

12  trying these cases will have myriad efficiencies and benefits for all plaintiffs, including rulings on

13  objections to corporate witness testimony and generally applicable *motions in limine*.

14          **Defendants' Position**:  Plaintiffs take the position that the Parties should, within 14 days,

15  propose joint or competing proposals for a scheduling order that includes initial trial dates and

16  interim deadlines.  Plaintiffs further casually request that the Court prematurely and immediately

17  narrow the potential bellwether cases to those in which an out-of-state plaintiff alleges

18  misconduct in California and cases for which Uber stipulates that the amended Terms of Use

19  and/or Forum Selection Clause do not apply.  Plaintiffs' proposals for selecting bellwether

20  candidates and setting trial dates are both premature and inappropriate.

21          Narrowing the bellwether pool should result from a thoughtful process involving

22  conferral, discussion, and negotiation between the Parties, not an *ad hoc* and unilateral proposal

23  from Plaintiffs.  Uber is prepared to meet and confer with Plaintiffs in advance of the next case

24  management process with the goal of identifying reasonable proposals for a bellwether process, to

25  commence after further Motions to Dismiss and once appropriate discovery from the Plaintiffs

26  can be taken.  Thus, if the Court is inclined to proceed with entertaining a bellwether process in

27  the near future, it should only do so after the Parties confer and discuss the issues and make

28  submissions dedicated to this topic.

1    Further, the ill-conceived nature of Plaintiffs' *ad hoc* California-specific bellwether

2    proposal is evident in Plaintiffs' attempts to narrow the potential bellwether candidates to cases

3    that (they believe) will be tried in California under California law.  But this MDL consists of over

4    1,400 cases alleging incidents in 48 different states, as well as Washington, D.C.  Picking only

5    one state for bellwether candidates is the antithesis of the purpose of a bellwether process:  to

6    inform and encourage global resolution of the claims by providing valuable information through

7    the trial of cases that are representative of the broader pool of cases.  As just one example of why

8    Plaintiffs' proposal fails to further the purpose of a bellwether process, the related JCCP action,

9    which has approximately 496 cases, all of which allege incidents in California, recently set four

10   cases for bellwether trials beginning in summer 2025.[2]  Plaintiffs' proposal for a bellwether pool

11   would narrow the cases to almost entirely those that would similarly apply California law.[3]

12   When this Court selects cases for bellwether trials, it should do so with a view towards cases that

13   will assist the Parties and the Court with global resolution, including by providing valuable, new

14   information for the Parties—and should not embrace Plaintiffs' haphazard suggestion to

15   immediately advance California cases that will provide information similar to cases already set

16   for bellwether trials in the JCCP action.

17    Even if focusing all of the Parties' and Court's effort on cases in one state made sense—

18   which it does not—Plaintiffs' contention that the number of cases that will be tried in this venue

19   is currently known is incorrect.  Plaintiffs erroneously assume that Uber's Motions to Transfer are

20   limited to issues involving the Terms of Use or Forum Selection Clause.  But there are other

21   arguments that Uber is likely to make in the Motions to Transfer, including (as was successfully

22   argued in the JCCP, and affirmed on appeal there) that California is an inappropriate forum for

23

24   ―――――――――――――
     [2] As another example, even accepting Plaintiffs' erroneous contentions about the Terms of Use
25   cases, those cases by definition involve either incidents from many years ago, or so-called "guest
     riders," and thus are not likely to be representative of the overall pool and/or will present unique
26   issues.

27   [3] As became evident in the first tranche of motions to dismiss, California state law differs in
     important ways from the state laws of some of the other states with the most numerous alleged
28   incidents.

most cases involving non-California incidents because witnesses, evidence, and other relevant parties (namely, the independent driver alleged to have perpetrated misconduct against the plaintiff) are located outside California. Since the number of cases that are likely to be tried in this venue will not be known until Motions to Transfer are resolved (both in cases that involve the Terms of Use, and those that do not), Plaintiffs' proposal is premature.

Plaintiffs casually assert that representativeness "may be an elusive and ultimately [a] pointless exercise." But without all Parties' buy-in that the bellwether candidates and selected cases serve at least some level of representativeness across the MDL, the bellwether process itself is a pointless exercise. And, as Defendants have described herein, it is impossible for the Parties or the Court to know whether the cases Plaintiffs suggest for the bellwether pool are representative at this juncture. Representativeness cannot be determined while cases are still being actively filed, as additional cases could significantly change the makeup of the MDL itself. Therefore, any proposal for narrowing the bellwether pool cannot be responsibly accomplished before a cut-off date for filing new cases has been set and has expired. Further, significant information-gathering through the initial submission of Plaintiff and/or Defendant Fact sheets, which will bear on any potential bellwether case's representativeness, is ongoing for approximately 371 cases. Without even this basic information, the Parties and the Court cannot appropriately determine representativeness with respect to potential bellwether cases. Put simply, the Parties and the Court are not yet in a position to assess even basic representativeness with respect to bellwether case selection and any proposal to narrow the bellwether pool at this juncture is premature.

Rather, as described in this Case Management Statement, there is much for the Parties and Court to accomplish before setting a—thoughtfully conceived—bellwether procedure or trial dates. In light of the need for resolution on the motions to transfer and additional motions to dismiss, the ongoing discovery process, and the need for Uber to take additional discovery from Plaintiffs (as discussed below), more is to be done before the Parties and the Court have a sufficiently comprehensive view of the litigation to determine an appropriate procedure for selecting bellwether trials.

An exercise in attempting to select trial cases and establish trial dates now would do no more than serve as a distraction and impediment to the work the Parties are conducting now. Rather, the Parties and the Court should focus efforts on developing the relevant claims at issue in this case through amendment and additional motion practice, finishing corporate discovery, and beginning Plaintiff-specific discovery. These efforts will not only provide the Parties and the Court with valuable information that will likely inform the best bellwether selection process, but also will continue to take the full effort of the Parties in the coming months.

In short, the uncertainty with respect to representativeness and the known non-representative qualities of Plaintiffs' proposed bellwether pool will remain until Motions to Transfer have been resolved, the pleadings have been amended, further Motions to Dismiss have been adjudicated, and discovery from Plaintiffs as to the facts of their cases has proceeded. These uncertainties illustrate why it is premature for the Parties or the Court to propose trial dates or narrow the bellwether pool at this time.

### IV.    Motions to Transfer

**Defendants' Position**:  Defendants believe it is appropriate at this time for the Court to also decide the proper forum of the MDL cases—specifically, for the Court to make this determination for cases where the alleged underlying incident occurred in a state other than California, and where the independent driver who is alleged to have committed criminal acts resides in that state (or otherwise outside California).[4]  Determining the proper forum for cases at this juncture equips the Parties with necessary information to move these proceedings towards resolution and will spare the Court from grappling unnecessarily with thorny personal jurisdiction issues involving the drivers.

---

[4] Plaintiffs suggest that Uber is asking this Court to "decide now the proper trial forum for 1,400 cases."  Not so.  As stated, Uber's request is limited to a more limited subset of cases in which the alleged incident took place outside of California and the independent driver also resides outside of California.

1    Without an initial determination of the proper forum in which the action should have been

2  brought, and will be tried, the Court likely will need to resolve motions challenging personal

3  jurisdiction over the drivers against whom Uber has or will file cross-complaints.

4    Additionally, determining the proper forum for all cases is a necessary gating item before

5  additional steps in the litigation, such as identifying a narrowed pool of cases that should proceed

6  first toward trial, can proceed.  Prior to the eventual selection of bellwether cases (at the

7  appropriate time), the Parties must have an understanding of where cases will be tried and what

8  laws will apply.  Only then will the Parties and the Court be in a position to assess the

9  representativeness of potential bellwether selections in terms of the cases that will be tried in this

10  venue (if any), and the cases that will be tried in their proper home forums—and to determine

11  how those cases will be selected to facilitate broader resolution of the MDL.  Thus, Plaintiffs get

12  it exactly backwards when they suggest that the Court should "resolve venue questions" in those

13  cases already selected by the Court as trial candidates.  Questions about forum and applicable law

14  are prerequisites to selecting representative trial cases, not something to be determined *after* their

15  selection.  As such, the forum question should be resolved across all cases involving alleged

16  incidents which occurred in states other than California and where the alleged driver resides

17  outside California.  And Uber believes that now is the time for the Court to address the proper

18  forum of the MDL cases via motions for entry of an order of transfer to the proper trial forum

19  pursuant to 28 U.S.C. § 1404(a).

20    Plaintiffs' further argue at length as to why they think some Plaintiffs may have

21  arguments to resist enforcement of the Forum Selection Clause in the Terms of Use.  Though

22  there are significant problems with their position, that is what Motions to Transfer will address.

23  In any event, Plaintiffs' position ignores that transfer will be based not only on the Forum

24  Selection Clause (where it was agreed to) but also based on the principles of *forum non*

25  *conveniens* embodied in 28 U.S.C. § 1404(a).  Under those very principles, and regardless of the

26  Forum Selection Clause, Judge Schulman ruled that cases involving incidents outside California

27  should be transferred to those venues for pretrial and trial proceedings. See Order on Defendants

28  and Cross-Complainants Uber Technologies, Inc. and Raiser LLC's Motion to Stay or Dismiss

1   Based on *Forum Non Conveniens*, *In re Uber Rideshare Cases*, No. CJC-21-005188, at 15 (Cal.

2   Super. Jan. 23, 2023) ("Allowing Plaintiffs' case to remain in California, although they will likely

3   be governed by the regulatory and tort laws . . . [in] the states where the Plaintiffs were allegedly

4   injured, would undermine th[e] interest [in avoiding unnecessary conflicts of laws]."); *id.* ("In

5   general, California courts have little or no interest in litigation involving injuries incurred outside

6   of California by nonresidents (citation omitted)).

7          Plaintiffs also do not accurately present the record of evidence embodied in the Terms of

8   Use motion regarding evidence of assent to and enforceability of the contract.  Uber showed in its

9   motion, and then again in its reply, a thorough evidentiary record of assent and enforceability.

10  Plaintiffs dispute the legal conclusions that flow from that evidence, and the Court will need to

11  resolve that dispute.  But the need for such resolution is exactly why a process for motions to

12  transfer, including based on the Forum Selection Clause, should be established sooner than the

13  conclusion of pretrial proceedings.

14         Plaintiffs hypothesize an "en masse" transfer motion against "hundreds of Plaintiffs at

15  once," but that is not at all what Uber is proposing.  The JCCP court, for instance, recognized -

16  "[i]t seems to me that before I start dealing with issues like a master complaint, like short form

17  complaints, like fact sheets and like merits discovery, we need to know what cases are going to be

18  here and what cases are not going to be here." JCCP CMC Tr. 18:15-19.  Based on this, the JCCP

19  court established a procedure whereby Uber would move in two individual actions with patterns

20  resembling those of a broader array of cases. Uber filed those two motions in individual cases, the

21  Parties made their record in individual cases, and the JCCP court adjudicated those facts and legal

22  arguments promptly.  The Parties then stipulated that the Court's analysis and conclusions would

23  be the subject of an order applying to other cases with substantially similar fact patterns for

24  purposes of the transfer issues. That procedure, or a similar one, would be entirely appropriate

25  here.  In any event, there is not a proposal for an "en masse" or "global" motion, as these are

26  individual cases (not a class action).  A conversation about the precise details of how and when

27  transfer motions will be litigated is warranted now, not down the road after the Court and the

28

1  Parties are embroiled in litigation as to the MDL court's ability to exercise personal jurisdiction

2  over cross-defendant drivers.

3      **Plaintiffs' Position**: The Court should reject Uber's request to adjudicate nearly 1,400

4  motions to transfer,[5] and instead resolve venue issues in selected trial candidates, and otherwise at

5  the conclusion of the MDL proceedings.

6      In its order denying Uber's Terms of User Motion, the Court indicated it would

7  "adjudicate motions to transfer" cases filed in the Northern District of California "at the

8  appropriate time—likely at the conclusion of the proceedings." ECF 543 at 36. With nothing

9  material changed, Uber asks the Court to revisit that conclusion and decide now the proper trial

10  forum for 1,400 cases. Uber does not justify that use of the Court's or the parties' time.

11      *First*, the Court should be hesitant to hear any transfer motions directed at cases en masse.

12  When Uber filed its TOU motion, it confidently told the Court that "[t]here can be no doubt" that

13  29 Plaintiffs affirmatively and unambiguously assented to a version of the TOU containing a

14  forum selection clause. ECF 257 at 2. In response, the 29 Plaintiffs pointed out that most of

15  them had been assaulted, and several had put Uber on notice of their intent to sue, before the

16  clause was added to the TOU. ECF 341 at 7. In addition, for 24 of the 29, Uber had failed to

17  establish that they had assented to a revised TOU before filing California lawsuits. *Id.* Nor did

18  Uber acknowledge the uncomfortable fact that Plaintiffs are required to access their Uber App to

19  comply with Court-ordered discovery, hardly voluntary assent. *Id.*

20      On reply, it turned out there was fact some "doubt." Remarkably, in a footnote, Uber

21  withdrew its motion as to three Plaintiffs with respect to whom it "determined … have differing

22  fact patterns." ECF 393 at 6 n.7. Uber did not elaborate on what kinds of "differing fact

23  patterns" it apparently concedes materially affect the enforceability of the forum selection clause.

24  Then, in response to some of Plaintiffs' assent arguments, Uber, for the first time on reply, argued

25  some Plaintiff assented to forum selection for their sexual assault claims by ordering food through

26  "UberEATS." *Id.* at 7. That the TOU for one App unambiguously govern claims arising from

27

---

28  [5] The vast, vast majority of claims involve out-of-state plaintiffs whose assaults also occurred out
of state.

- 16 -

1  use of another App is simply assumed, but hardly self-apparent.

2       Uber also argued that the TOU by their terms apply retroactively, but ignored entirely

3  Plaintiffs' explanation of how those facts (such as when a person was assaulted, and whether they

4  sent Uber a pre-filing notice letter) play into the Court's evaluation of the clause under the

5  "fundamental fairness" test. *Id.* at 7-8. Indeed, Uber did not even acknowledge the relevant legal

6  standards courts apply to such clauses, including fairness, overreach, "affected by fraud," or bad

7  faith, or discuss the cases Plaintiffs cited on this point. *See* ECF 341 at 17-20 (Plaintiffs

8  discussing this analysis in depth).

9       The point is this: Uber tried to move cases en masse and it did not work. Uber's "no

10  doubt" approach to assent raised more questions than answers under even modest scrutiny. In

11  response to arguments for why the clause was unenforceable—arguments that, depending on how

12  the Court views them, may yield different outcomes in different cases—Uber simply ignored

13  facts and controlling legal authority it did not like. Uber does not explain why the Court should

14  entertain another attempt at this dubious approach.

15       *Second*, Uber says the court should decide a global motion to transfer now because Uber

16  wants to sue third-party drivers and some of those drivers might file personal jurisdiction

17  motions. To start, Uber's position rests on speculation: that it can find drivers, that it can serve

18  them, that, once served, those drivers will object to jurisdiction here, and that Uber will actually

19  find it worthwhile to sue likely judgment-proof individuals. Indeed, to date, Uber has not filed

20  claims against *any* drivers in *any* MDL cases, even though there is no impediment to doing so.

21  More to the point: even accepting Uber's hypotheticals as certain, nothing prevents Uber from

22  filing third-party complaints in appropriate venues and then tagging those cases with the JPML

23  for inclusion here for pretrial purposes. Whether a driver's location affects where a trial should

24  occur is not at issue yet, and may never be at issue. *See, e.g.*, *Andrade v. Station Casinos LLC*,

25  2021 WL 4441990, at *2 (N.D. Cal., Mar. 22, 2021) ("It has long been the rule that it is not

26  necessary for all joint tortfeasors to be named as defendants in a single lawsuit.") (citation

27  omitted). That the Court may face some unspecified number of (simple) personal jurisdiction

28  motions does not alone justify spending time and resources on hearing a global motion to transfer.

1    Instead, the Court should hear motions to transfer in individual cases only at the
2    appropriate time.  That may be, as the Court predicted, at the conclusion of the proceedings.  Or,
3    if the Court selects trial candidates filed here but arising from incidents in other states, then it will
4    make sense to resolve venue questions for those.  Or, Uber may make some actual showing of
5    need in a given case.  Uber's approach—move against all cases at once, ignore inconvenient
6    facts, and brush aside legal standards that require application of those facts—did not work the
7    first time and is unlikely to be any better the second.

8    **V.    Additional Discovery Requests**

9    **Defendants' Position**:  Uber respectfully requests that the Court lift the current prohibition
10   set forth in Pre-Trial Order 5 on seeking discovery from Plaintiffs beyond the Plaintiff Fact
11   Sheet.  Uber requests that the Court amend Pre-Trial Order 5 to allow Uber to serve written
12   interrogatories on individual plaintiffs in order to appropriately explore the claims brought against
13   it and to develop its defenses to those claims.  Uber anticipates that these interrogatories would
14   request information such as a further explanation of Plaintiffs' alleged damages and a summary of
15   communications Plaintiffs had regarding their alleged incidents, among other requests.

16   Additionally, or in the alternative, Uber requests that the Court allow for Uber to seek
17   additional discovery from Plaintiffs through a supplement to the Plaintiff Fact Sheet, requiring
18   Plaintiffs to provide limited additional information and to produce relevant documents that may
19   exist based on Plaintiffs' responses to questions in the existing Plaintiff Fact Sheet.  For example,
20   these documents may include, among others, social media posts that Plaintiff made regarding the
21   incident (which Plaintiffs were required to report the existence of as part of Plaintiff Fact Sheet
22   Question 29), or communications notifying Uber, law enforcement, healthcare professionals, or
23   mental health professionals about the incident (which Plaintiffs were required to report as part of
24   Plaintiff Fact Sheet Question 25).

25   Instead of addressing Uber's request for additional discovery from Plaintiffs, Plaintiffs
26   attempt to deflect by discussing their complaints about Uber's discovery.  Regardless, to Plaintiffs'
27   note about the PFS authorizations, Uber actually is in the process of executing on those
28   authorizations.  In fact, the additional discovery from Plaintiffs that Uber is requesting here would

- 18 -

be tremendously helpful in prioritizing and executing that process. To date, Uber has received PFSs from only 951 of the 1,425 Plaintiffs (66.7%), and many of those PFSs are deficient. But even if all Plaintiffs were to provide complete PFSs, the additional discovery is needed to help prioritize selections not only for pursuing records via authorizations but also for potential bellwether selections or even for case-resolution purposes.

Finally, many of Plaintiffs' claims were filed several years ago. With the passage of time, document preservation becomes increasingly difficult, particularly for individuals who may not be familiar with typical litigation requirements. Allowing for the production of additional limited documents relating to information Plaintiffs have already provided in the Plaintiff Fact Sheet would ameliorate this document preservation concern, in addition to providing Uber appropriate information regarding the claims being brought against it.

**Plaintiffs' Position**: Uber requests that the Court open full-blown case-specific discovery for all cases at once. But Uber has struggled and failed to meet even existing deadlines for common discovery. The Court ordered the September 1, 2024 deadline for substantial completion of documents in response to Plaintiffs' First Set of RFPs back on December 28, 2023. ECF No. 175. Judge Cisneros has had to grant Uber multiple extensions with regards to custodial productions in response to First RFPs. *See, e.g.*, ECF 1629. This follows Uber missing the deadline for its PTO 5 "off the shelf" productions by several months: the Court ordered both sets of productions done by February 8, but Uber did not complete those productions until May 31 (and then littered those productions with unauthorized redactions requiring wasteful briefing, and after court order, reproduction). *See* ECF No. 767. The parties have plenty to do right now without conducting additional written discovery in 1,400 cases (especially considering the information Uber is already getting from the PFS). Indeed, the parties are continuing to meet and confer over many deficiencies in *Uber's* DFS productions, leaving Plaintiffs still without much of the basic, core information in each case.

Uber's alternative proposal to seek additional discovery through a supplement to the Plaintiff Fact Sheet would not ameliorate the issues caused by allowing individualized discovery to proceed in 1,400 cases. Producing social media posts or sensitive communications in all

individual cases would do nothing to move this litigation forward.  Moreover, all plaintiffs who indicate they disclosed their assault to health providers or law enforcement are required to produce signed authorizations to release health and law enforcement records, so Uber is already able to obtain much of the information it claims to now seek.  Yet, to date, it does not appear that Uber has endeavored to obtain any of these records.  Uber's concerns about document preservation likewise fall flat.  As is true in any litigation, Plaintiffs' counsel understand the obligation to preserve relevant documents, and will do so regardless of whether such documents are produced to Uber now or at a later date.  The most practical solution to Uber's concerns is to move a set of cases forward to trial and open discovery on those cases.  In the meantime, the parties can and should continue to meet and confer and resolve or involve the court in disputes over deficiencies in PFS and DFS productions (recognizing that both sides have granted extensions on a number of cases).

**VI.    General Discovery Updates**

The Parties were before Judge Cisneros for a discovery status conference on October 23, 2024. *See* ECF Nos. 1785 (Minute Entry summarizing topics discussed), 1777 (10/18/24 Joint Discovery Status Report).

The Parties also filed a joint letter brief on October 28, 2024 regarding Uber's global objections related to PFS issues, including timing of verifications, questions in the PFS that seek third-party contact information, and notations that the Plaintiff will supplement certain responses. ECF No. 1803.

**Plaintiffs' Position**:  One issue that has arisen involves the voluminous number of purportedly privileged documents Uber has withheld from the custodial files for witnesses set for deposition.  Some privilege log entries range from 30%-70% of the custodial file produced. Unfortunately, and in part due to the large number of documents withheld, the parties have not been able to resolve their disputes or fully present them to Judge Cisneros for ruling in time for the JCCP-noticed depositions of these witnesses.  This issue, in turn, has impaired MDL Plaintiffs' ability to coordinate. On October 30, 2024, Judge Cisneros issued Pretrial Order No.

20 setting production and privilege dispute deadlines for the second, third, and fourth[6] tranches of Uber custodians. ECF No. 1808. PTO 20 anticipates that depositions of Tranche 4 custodians will begin by approximately March 24, 2025 and may be completed by April 24, 2025. *Id.* at 10. Though this Court originally ordered Uber to complete substantial production of documents in response to Plaintiffs' first set of requests for production by September 1, 2024, the deadline for the last tranche of custodial production is now January 3, 2025. *Id.* at 9.

Plaintiffs take all allegations of fraud seriously, and the PSC is committed to conferring with Uber to take action if indeed there are any such incidents in this MDL. Contrary to its claim below, Uber has not provided the PSC with hundreds of instances where it cannot find record of the trip where the alleged sexual assault occurred. To date, that number appears to be relatively small, and the PSC and individual counsel are conferring with Uber to address the issues where possible. At this stage, there is no request for the Court to take any action on these issues.

**Defendants' Position**:  First, one issue that has arisen is the number of Plaintiffs whose purported Uber rides remain unsubstantiated. In these cases, Plaintiffs have not provided information that has enabled Uber to locate a matching trip. This includes a subset of cases where Uber has concerns about the potential fraudulent nature of Plaintiffs' submissions. This issue is one that is growing, not shrinking. Uber estimates that hundreds of Plaintiffs in this MDL will have unsubstantiated Uber rides. This is a matter of serious importance as it impacts the Parties' ability to move this litigation forward. The Parties are meeting and conferring to discuss proposals for how it should be handled.

Second, Plaintiffs assert that Uber has sought or been granted multiple extensions for document productions, but decline to provide the Court essential context for substance and timing, nearly all which was at Plaintiffs' behest. Though Uber does not wish to re-hash issues long resolved, it does want an accurate record. As an initial matter, Uber complied with the production

---

[6] The parties filed a joint letter brief regarding a sample of disputed privilege log entries from the first tranche on October 30, 2024. ECF No. 1812. PTO 20 notes that deadlines related to this tranche of custodians will be addressed in the Court's order resolving that dispute. ECF No. 1808 at 6.

deadline for PTO 5 and produced 101,300 documents from 87 prior litigations and government investigations within a seven-day time period on March 8, 2024. Further, with regard to the Court's September 1, 2024 date for substantial completion, the Parties were still negotiating custodians beyond that date, and the custodians were finalized only recently on October 11, 2024. Further, Judge Cisneros ordered Uber to complete custodial productions for the first nine agreed custodians by September 15, 2024. As additional custodians have been agreed upon and dates for depositions scheduled, Uber has met each of its production and privilege log deadlines set by the Court or otherwise stipulated between the Parties.

Uber disagrees with Plaintiffs' characterizations regarding the volume of documents on privilege logs, which does not provide any context or acknowledgement, for example, that the custodians for whom privilege logs have been provided are some of those most likely to have interacted with counsel. *See* Oct. 23, 2024 Discovery Status Conf. Tr. At 13:21-15:1. Moreover, Uber has not withheld the percentages of documents Plaintiffs represent. There is no custodian for whom Uber is withholding nearly 70% of their responsive documents. In any event, there is never an expectation in litigation that all privilege disputes must be resolved before a deposition can occur. Indeed, JCCP Plaintiffs' counsel who are also on MDL Plaintiffs' leadership are receiving the same privilege logs and are proceeding with taking and scheduling depositions in the JCCP without first resolving these privilege disputes.

### VII.    Discovery Coordination Order

**Defendants' Position**: Coordinating discovery in this MDL with the JCCP for overlapping document production and cross-noticed depositions will save significant resources and align with the principles of Federal Rule of Civil Procedure 1. Coordination between related actions involving similar allegations is important given the complexities of witness scheduling and the need to balance the disruption to the daily lives of the deponents with the requirements of the litigation. Further, MDL courts commonly enter coordination orders to avoid unnecessary duplication of efforts and to promote the efficient and speedy resolution of the litigations. *See, e.g.*, Case Management Order No. 9: Joint Coordination Order, *In re Juul Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:19-md-02913-WHO (N.D. Cal. May 20, 2020) (Dkt. 572); Pretrial

Order No. 13: Coordination Order, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB (N.D. Cal. Feb. 25, 2016) (Dkt. 1256).

Since May of this year, the Parties have been working on a proposed order that supports coordination between the MDL and JCCP. JCCP Plaintiffs conveyed to Judge Schulman their agreement on the overall principles of coordination and cooperation, including a single deposition for Uber employees deposed in both the MDL and JCCP. *See* Feb. 2, 2024 JCCP Informal Discovery Conf. Tr. at 83:11-18 ("It would be in the best interest of all of the plaintiffs and Uber to be more coordinated . . . . We need to have one deposition per side."). In the MDL, the Parties have endorsed coordination through multiple joint status reports and during conferences with the Court. *See, e.g.*, Aug. 30, 2024 Discovery Status Conf. Tr. at 20:17-21:1 ("**And I think that will help us streamline the approach and get things done in time for -- for these depositions, which are important to coordinate." "It is important to all parties including the JCCP to coordinating and get this, you know, moving towards deposition.**"); Oct. 1, 2024 Discovery Status Con. Tr. at 9:6-12 ("Just to provide you an update in terms of coordination on depositions, I believe there are eight deposition[s] that have been scheduled to date, and out of those eight depositions six -- **we're going to coordinate on all the depositions**, . . . **So we are coordinating with the JCCP on these depositions**.").[7] And Judge Cisneros stated in August the Court's desire for the Parties to hash out any issues regarding the draft coordination order. *See* Aug. 8, 2024 Discovery Status Conf. Tr. at 26:21-28:4. Judge Cisneros has also issued multiple orders that support coordination and aligning schedules with the JCCP, including a recent order setting out a schedule for document production. *See, e.g.*, ECF Nos. 771, 866, 1747, 1808 ("To determine how to advance discovery in this MDL, the Court has considered the parties' proposals, as well as how to maximize the opportunity for coordinated depositions between this MDL and the JCCP. Coordination will reduce the likelihood of duplicative depositions, and in general discovery of

---

[7] *See also, e.g.*, ECF Nos. 1746 (dated October 11, 2024), 1774 (dated October 17, 2024); Jan. 19, 2024 Case Management Conf. Tr. at 22:10-13 ("Leadership on the plaintiffs' side for the MDL and the JCCP have started coordinating their efforts with respect to ESI to avoid duplication on how that process goes about").

1    custodial records should be completed before a custodian is deposed.").

2            The last step is to enter the related proposed coordination orders in the MDL and JCCP.

3    The Parties have met and conferred on multiple occasions over many months related to these

4    companion orders, but Plaintiffs have refused to acknowledge agreement on the final terms and

5    entry of an order, even though Uber accepted all of the terms that Plaintiffs proposed many months

6    ago.  And MDL Plaintiffs have refused to even submit the current coordination proposal, which

7    encompasses all those terms, to the Court in the joint status reports.

8            Plaintiffs' new excuse that privilege disputes should delay entry of a discovery coordination

9    order rings hollow.   Privilege disputes are not uncommon in MDLs and do not provide a

10   justification to continue kicking the can down the road on entering a discovery coordination order,

11   the contours of which have been in place since May.  Further, contrary to Plaintiffs' suggestion

12   otherwise, MDL courts regularly enter discovery coordination orders when the litigations being

13   coordinated "are at various stages of progress." *See, e.g.*, Joint Coordination Order, *In re New*

14   *Motor Vehicles Canadian Export Antitrust Litig.*, No. 2:03-md-01532-DBH (D. Me. Apr. 28, 2004)

15   (Dkt. 110).

16           Uber requests that the Court order a deadline of November 8, 2024 for the Parties to submit

17   a proposed coordination order.  If the Parties cannot reach agreement on the exact terms of the

18   coordination order, the Parties should be ordered to submit competing versions of the proposed

19   coordination order by this deadline.

20       **Plaintiffs' Position**:  Uber's demand for joint or competing proposed orders on

21   coordination by November 8 is inappropriate, premature and an end-run around the process

22   already underway before Judge Cisneros.

23           Coordination issues are not new; since the inception of this MDL, the JCCP discovery

24   deadlines were well-known to all parties.  To facilitate taking depositions together, the PSC has

25   made best efforts to move discovery along, and Judge Cisneros has resolved numerous disputes

26   and even supervised in-person sessions to expedite resolution of issues that rarely involve judicial

27   involvement, such as number and identity of custodians.  This process remains underway and

28   under Judge Cisneros' close supervision, the PSC anticipates it will be able to coordinate certain

1   depositions going forward, consistent with the Deposition Protocol, PTO 16 at 8.

2           While coordination is useful, it takes best efforts from both sides, and is only appropriate

3   if it does not prejudice either party. MDL Plaintiffs continue to have significant concerns about

4   prejudice, especially given the numerous disputes over the custodial files of Uber's witnesses. For

5   example, the Parties currently dispute Uber's over-designation of privileged materials in the

6   custodial files of deponents. MDL Plaintiffs cannot agree to take single depositions of Uber's

7   witnesses when they maintain that Uber is withholding relevant documents in advance of these

8   depositions. Judge Cisneros is capably addressing these disputes, including a recent order setting

9   new deadlines for production and privilege review of custodial files. ECF 1808. Until these issues

10  are resolved, a coordination order is premature and improper.

11          The differing timelines and schedules in the MDL and JCCP make this case very different

12  from the *Juul* and *Volkswagen* MDLs, where the litigations began at the same time. The PSC

13  understands that the parties in the JCCP may agree to extend their discovery cut-off past January

14  15,[8] which, along with the accelerated privilege dispute deadlines ordered by Judge Cisneros, could

15  make coordination more feasible and appropriate. But MDL Plaintiffs should not be jammed into

16  taking depositions before they have the full custodial files to which they are entitled under this

17  Court's Pretrial Orders.

18          **VIII.   Order Regarding Time Period for Discovery**

19          On October 31, 2024, Magistrate Judge Cisneros issued a discovery order expanding the

20  time scope of custodial discovery that Plaintiffs may seek against Uber, but declining to identify

21  dates for either the start or end of the discovery period. *See* ECF 1816. Uber is evaluating that

22  Order and may seek the Court's review.

23          **IX.    Cases Where Plaintiffs' Counsel Withdrew**

24          **Defendants' Position**: The Court has granted several motions to withdraw as counsel for

25  various Plaintiffs, as shown in the chart below. When the Court granted these motions, it ordered

26  Uber to send the order to the relevant Plaintiff and explained that if Plaintiffs did not, within "28

27
28  _____
    [8] JCCP Liaison Counsel has advised that Uber has not agreed to the JCCP leadership's proposals
    for extensions nor provided any proposals for an extension.

days of this order," "file a notice indicating whether they intend to pursue the action with new counsel or representing themselves," the Court would dismiss their case. Uber complied with the Court's orders and the deadlines for these Plaintiffs to file notice have passed without any such filings. Therefore, the Court should dismiss these cases at this time.

| Plaintiff Pseudonym | MDL Case Number | Order ECF Number | Order Date | Uber Declaration ECF Number | Deadline for Filing Notice |
|---|---|---|---|---|---|
| **M.H.** | 3:23-cv-06200 | 1649 | 9/16/2024 | 1665 | 10/14/2024 |
| **K.H.** | 3:24-cv-02840 | 1675 | 9/26/2024 | 1709 | 10/24/2024 |
| **Z.W.** | 3:24-cv-02844 | 1675 | 9/26/2024 | 1709 | 10/24/2024 |
| **S.A.** | 3:24-cv-02845 | 1675 | 9/26/2024 | 1709 | 10/24/2024 |

Additionally, in *A.P.* v. *Uber Technologies, Inc.*, No. 3:23-cv-06357-CRB, the Court ordered counsel to refile its motion to withdraw on the main MDL case docket, and that motion was refiled on September 30, 2024, ECF 1683. The motion has not yet been granted.

In *T.S.* v. *Uber Technologies, Inc.*, No. 3:24-cv-00635-CRB, the Court granted counsel's motion to withdraw on May 6, 2024. The Court neither ordered Uber to provide the order to Plaintiff nor indicated whether the case would be dismissed after a 28-day period if Plaintiff did not file notice of their intent to proceed. Nevertheless, Uber attempted to send Plaintiff T.S. the Court's order in both July and August and has not received a response. Uber requests that the Court either dismiss the case for failure to prosecute or enter an order compelling T.S. to file notice of Plaintiff's intent to proceed within 28 days or face dismissal.

There are other motions to withdraw pending on the Court's docket—ECF 1806 and 1807— and Plaintiffs' counsel has advised Uber that several additional motions may be forthcoming. Given the increasing number of withdrawal applications that Plaintiffs' counsels are submitting to the Court, Uber believes a more uniform and centralized process would be to the Parties' and the Court's benefit. The Parties have been meeting and conferring regarding such a process for counsel to withdraw in the future, and Plaintiffs' leadership suggested a Stipulation and Proposed Order. Plaintiffs' leadership has since retreated and now expresses the view that a global

process is not needed. Uber continues to believe Plaintiffs' leadership's original suggestion of an orderly process for addressing these issues is a good one. Uber has made a few slight revisions to the papers Plaintiffs sent and has attached clean versions of the proposal at **Exhibit B**, as well as a redline against Plaintiffs' initial version at **Exhibit C**. Uber respectfully requests that the Court adopt **Exhibit B** and Plaintiffs' leadership's initial proposal for all cases where counsel wishes to withdraw moving forward.

**Plaintiffs' Position**: The Court should not adopt Uber's proposal. While the Court has indicated it would dismiss non-responsive plaintiffs' cases *without* prejudice (*e.g.*, ECF 1675), Uber's proposal would dismiss such cases with prejudice. Although the Parties had discussed a global procedure for unresponsive plaintiffs, the Court has been handling motions to withdraw on an individualized basis. If the Court is satisfied with this process, Plaintiffs believe this procedure is working efficiently and does not require alteration through stipulation. There is no evident benefit to implementing a new global procedure. The PSC has been advising Plaintiffs' counsel regarding the procedure and providing guidance and resources as needed.

Plaintiffs would welcome the Court's guidance concerning the resulting *pro se* plaintiffs, and are willing to continue to meet and confer with Uber over the same. In particular, Plaintiffs believe—as the Court specified in its orders on the motions to withdraw, *see* ECF 1649, 1675— that dismissals after counsel withdrawals should be without prejudice and with a long grace period. Such procedure is appropriate in these cases brought by sexual assault survivors, who may become temporarily unresponsive as they grapple with the trauma resulting from the subject incidents. If Uber can agree to these terms, and the Court would prefer a PTO to cover this process, Plaintiffs will work with Uber to enter a proposed order promptly.

## X.    Special Settlement Master

On November 15, 2023 (ECF No. 88), the Parties jointly submitted a narrowed list of two suggested candidates for Special Settlement Master: Hon. Gail Andler and Hon. Shelley Chapman, and they remain open to considering additional candidates. The Parties welcome the Court's guidance on appropriate next steps in arranging for appointment of a Special Settlement Master.

## XI.    Next Case Management Conference

The Parties look forward to discussing the Court's availability for the next case management conference.

Dated: November 5, 2024

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: /s/ Randall S. Luskey
    ROBERT ATKINS
    RANDALL S. LUSKEY
    KYLE N. SMITH
    JACQUELINE P. RUBIN
    JESSICA E. PHILLIPS
    CAITLIN E. GRUSAUSKAS
    ANDREA M. KELLER

**SHOOK, HARDY & BACON L.L.P.**

By: /s/ Michael B. Shortnacy
    MICHAEL B. SHORTNACY
    PATRICK OOT
    JEREMIAH S. WIKLER

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

Dated: November 5, 2024

By: /s/ Sarah R. London
Sarah R. London (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com

By: /s/ Rachel B. Abrams
Rachel B. Abrams (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, Floor 12
New York, NY 10016
Telephone: (888) 480-1123
luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*

1

## **FILER'S ATTESTATION**

2

     I, Randall S. Luskey, am the ECF User whose ID and password are being used to file this

3

document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories

4

identified above has concurred in this filing.

5

6

Dated:  November 5, 2024            By:    */s/ Randall S. Luskey*

7

                                            Randall S. Luskey

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28