RANDALL S. LUSKEY (SBN: 240915)
    rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

ROBERT ATKINS (*Pro Hac Vice* admitted)
    ratkins@paulweiss.com
JACQUELINE P. RUBIN (*Pro Hac Vice* admitted)
    jrubin@paulweiss.com
YAHONNES CLEARY (*Pro Hac Vice* admitted)
     ycleary@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

*[Additional Counsel Listed on Following Page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>——————————————<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS**<br><br>Judge:        Hon. Charles R. Breyer<br>Courtroom:   Courtroom 6 – 17th Floor |

KYLE N. SMITH (*Pro Hac Vice* admitted)
    ksmith@paulweiss.com
JESSICA E. PHILLIPS (*Pro Hac Vice* admitted)
    jphillips@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
    **& GARRISON LLP**
2001 K Street, NW
Washington DC, 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS         Case No. 3:23-md-3084-CRB

## JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS

Pursuant to the Court's oral ruling at the November 6, 2024 Case Management Conference ("CMC"), Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC ("Uber") and Plaintiffs' Co-Lead Counsel, respectfully submit this joint submission on the bellwether selection process.

### I.    PLAINTIFFS' POSITION

Plaintiffs' proposal is the only one that aligns with the Court's intention to get to trial in 2025. To summarize, the parties will select 10 Plaintiffs from a pool of cases that: (1) this Court can try; and (2) where fact sheets have been exchanged. Each side can strike up to four cases for any reason, including unwillingness to participate as a bellwether plaintiff or outlier facts. The remaining 12 Plaintiffs will amend their complaints and the parties will advocate which cases should advance first, and then case-specific discovery will proceed in waves, leading up to the first trial in December 2025. This process is straightforward, efficient, and capitalizes on the effective case management procedures already in place.

By contrast, Uber's proposal misses the mark and is covered in red tape. It imposes layers of unnecessary and counterproductive process with no practical way to get to trial in 2025, including a random selection of 50 cases for additional discovery and amendment before any trial selections are made. Among those, Uber insists, should be cases where it maintains *Lexecon* rights. Whatever concerns Uber has about representativeness and attrition, its proposals frustrate, rather than address.

Plaintiffs' respectfully request the Court adopt their proposed process and schedule as set out below.

<u>Bellwether selection pool</u>. The bellwether selection pool should consist of cases that either are filed in the Northern District of California originally, or indicated in their short form or amended short form complaint that they would have filed in the Northern District of California in the absence of direct filing, as of January 31, 2025. The pool should be limited to cases where a PFS and DFS have been exchanged, also as of January 31, 2025.

Uber proposes virtually no limitation on bellwether eligibility for the initial pool, including *Lexecon* cases. As the Court has recognized, some narrowing of the initial selection pool makes sense. *See* 11/6/24 Hearing Tr. at 21:24-21:24 (suggesting *Lexecon* cases should not be included). Limiting the initial batch of trials to the cases that this Court can oversee is the best way to keep this litigation moving apace, eliminating unhelpful variables and the risk of conflicting rulings. Given the relatively small number of cases that have *Lexecon* issues, it doesn't make sense to let the tail wag the dog and consume the parties' and Court's resources now on working up cases with no guarantee for prompt trial settings elsewhere.

Additionally, Uber's approach — random selection from all cases regardless of whether a PFS or DFS has been submitted — undermines the Court's and the parties' ability to tailor the selections to meet the goals for this litigation. This pool would be both over- and under- inclusive, since it would include cases about which the parties have very little information and would also needlessly narrow the pool from which both sides can advocate for the trial cases. By design, the PFS and DFS provide ample and sufficient information for the parties to make their selections, and choosing among those cases with PFS and DFS exchanged by January 31 avoids a second step in the process that would merely cause delay. Indeed, Uber does nothing more than pretend this process would allow for a trial in 2025.

Bellwether proposals. On February 14, 2025, the parties should exchange memoranda identifying and advocating for 10 cases per side from the bellwether selection pool. On February 19, 2025, the parties may strike up to 4 cases selected by the opposing side. By February 28, 2025, the parties should submit to the Court a stipulation and proposed order with the final list of 12 bellwether cases: six (6) selected by Plaintiffs, and six (6) selected by Uber. The Court should set a March 14, 2025 deadline for the bellwether plaintiffs to file amended complaints in accordance with any Orders on Uber's motions to dismiss that the Court has issued as of that time, including to incorporate case-specific allegations.

Uber's proposal to randomly narrow the pool to 50 before narrowing again is counterproductive. Not only will it cause unnecessary delay, but it also will detract from Uber and Plaintiffs' goals in prioritizing cases with key variables that will advance resolution. For example,

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS    Case No. 3:23-md-3084-CRB

if Uber wants to ensure a range of injuries in the bellwether trial wave, why artificially narrow what the parties can choose from? Or if the Court or parties view the incident timing as an important organizing tool, why not have the full range of incidents to select from? *See* 11/6/24 Hearing Tr. at 18:3-21. Imposing a randomization funnel robs both sides of their flexibility and freedom to select appropriate cases, and needlessly constricts Plaintiffs, who carry the burden of proof. Other MDL courts have determined that random selection frustrates rather than advances the goals of ensuring major variables are represented. *See, e.g.*, *In re Yasmin & Yaz (Drospirenone) Marketing, Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, No. 09-MD-02100, 2010 WL 4024778, at *2 (S.D. Ill. Oct. 13, 2010) ("Most modern plans seem to disfavor random selection in order to have better control over the representative characteristics of the cases selected. . . . The Court finds that the process that will provide the best sampling of cases will be one that allows both sides of this litigation to have a role in selecting cases."); *see also* Fallon, *supra* at 2348 ("If cases are selected at random, there is no guarantee that the cases selected to fill the trial-selection pool will adequately represent the major variables."); *see also In re General Motors LLC Ignition Switch Litig.*, 14-md-02543, Order No. 25 (S.D.N.Y. Nov. 19, 2014) (Dkt. 422) (**Ex. A**); *see also In re: Testosterone Replacement Therapy Prod. Liab.* (MDL 2545) (**Ex. B**) (Tr. of 11/30/2017 case management conference) (Judge Kennelly recognized: "Random doesn't mean representative. Random means random. Coin can come up heads six times in a row. That's random. It's not representative.").

Further, random selection ensures rather than protects against attrition. Choosing many cases randomly — and therefore without the benefit of Plaintiffs' counsel involvement — will undoubtedly lead to some cases dropping out. That is the nature of any bellwether selection process and particularly so in a high profile case involving sexual assault, where serving as the tip of the spear would be uniquely public and emotionally taxing. Plaintiffs' proposal is superior, because after the parties select 10 cases each, Plaintiffs' counsel can investigate whether Uber's picks are willing to proceed, and if not, can strike those cases from the pool. If more than four cases are unwilling to proceed, the parties can address this with a streamlined replacement process.

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS          Case No. 3:23-md-3084-CRB

Bellwether pretrial schedules. To meet the Court's goal of trying a case in 2025, case-specific pleading, discovery, and motion practice should be conducted in waves, such that the parties are only engaged in expansive case-specific discovery for up to four cases at any given time. A wave process will also mitigate the risk of discovery going stale and minimize the need for supplemental depositions (of fact witnesses, including treaters, or the Plaintiff) closer to the time that a particular case is tried. This is particularly important in this litigation given the particularized and heightened risk of re-trauma for survivors in undergoing serial depositions.

Further, to maximize efficiency and elicit as much data from each trial as possible, the end goal for this process should be three or four trial settings for multi-plaintiff trials, as discussed in more detail below.

On April 1, 2025, the parties should file letter briefs, not to exceed 5 pages, with their positions as to which cases should be assigned to which wave, detailing why certain cases should be grouped together (e.g. date of incident, similar state laws on common carrier liability, or other criteria to streamline the trial and limit the risk of confusion). On April 15, 2025, discovery for Wave 1 bellwether plaintiffs should commence.

To illustrate, below is a proposed pretrial schedule:

| PROPOSAL | Deadline (non-case specific) | Deadline (BW Trial Pool only, i.e. 12 cases) | Deadline (Wave 1 only, i.e. 4 cases) |
|---|---|---|---|
| Parties to submit joint or competing proposals to select Trial Pool Selection | | 12/4/2024 | |
| *Initial Bellwether Selection Pool Closes*—to be included in the bellwether selection pool, complaint must designate ND CA as venue & PFS and DFS exchanged. | 1/31/2025 | | |
| *Parties' identification of proposed BW Trial Pool* (contemplate 10 per side, strike up to 4 each) | | 2/14/2025 | |
| *Parties' simultaneous strikes* | | 2/19/2025 | |

| | | | |
|---|---|---|---|
| **Selection of Bellwether Trial Pool:** Parties select 12 (6+6) | | 2/28/2025 | |
| **Deadline to Amend Complaint or Add Parties:** BW Trial Pool This is to address MTD rulings up to this date | | 3/14/2025 | |
| **Selection of Plaintiffs assigned to each wave:** the parties should file letter briefs with their positions as to which cases should be assigned to which wave | | 4/1/2025 | |
| **Wave I Discovery opens:** immediately following Court Ruling on above letter briefs assigning waves *(contemplated no later than 4/15/25).* | | | 4/15/2025 |
| Rule 12 Motion (Bellwether Trial Pool) due. | | 4/15/2025 | |
| Rule 12 Motion Oppositions (Bellwether Trial Pool) due. | | 5/15/2025 | |
| Rule 12 Motion Reply (Bellwether Trial Pool) due. | | 6/2/2025 | |
| Substantial Completion of case specific discovery (Wave I only) | | | 6/16/2025 |
| Substantial Completion of party fact and third-party discovery | 7/15/2025 | | |
| Expert Reports Due (simultaneous exchange) | 08/01/2025 | | |
| Case-specific Expert Reports Due (Wave I only) - simultaneous exchange. | | | 8/8/2025 |
| Rebuttal Expert Reports Due (simultaneous exchange) | 9/1/2025 | | |
| Case-specific Rebuttal Expert Reports Due (Wave I only) -simultaneous exchange. | | | 9/8/2025 |
| Expert Depositions completed by and close of discovery. | 09/15/2025 | | |
| Case Specific Expert Depositions (Wave I only) completed by and close of discovery | | | 9/22/2025 |

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS          Case No. 3:23-md-3084-CRB

| | | | |
|---|---|---|---|
| *Daubert* and Dispositive Motions (to be filed no later than) | 10/1/2025 | | |
| Wave I Case Specific Daubert and Dispositive Motions (to be filed no later than) | | | 10/08/2025 |
| Response to Daubert and Dispositive Motions | 11/3/2025 | | |
| Response to Wave I Case Specific Daubert and Dispositive Motions | | | 11/10/2025 |
| Reply to Daubert and Dispositive Motions | 11/17/2025 | | |
| Reply to Wave I Case Specific Daubert and Dispositive Motions | | | 11/24/2025 |
| ***Wave I Trial: Final pretrial conferences and hearing on motions in limine*** | | | 12/01/2025 |
| **Wave I Trial** | | | 12/08/2025 |

Uber's proposal contains an additional step wherein 50 cases are randomly chosen from the bellwether selection pool and required to undergo some largely unspecified "targeted discovery." This is essentially a repackaging of Uber's oft-repeated (and oft-rejected) request for the Court to open plaintiff discovery wholesale. This procedure is unnecessary given the extensive information and document production the parties are exchanging through the PFSes and DFSes (including whether a Plaintiff is seeking lost wages). Uber's claim that it requires more information from plaintiffs before selecting bellwethers rings hollow given that, to date, Uber has not ordered any medical records despite being permitted to do so through the PFS. This also undercuts Uber's argument that any process other than random selection is inherently unfair to Uber because of an information disadvantage. A more productive path would be for the parties to focus on resolving PFS and DFS deficiencies so that both sides have the complete information contemplated under PTO 10.

More importantly, collecting social media files, employment records, and other communications from such a large number of plaintiffs as a predicate to moving forward with trial selections will only cause delay, making it impossible to satisfy the Court's goal of beginning trials

in 2025. Under Uber's plan, the parties would be engaged in case-specific discovery without a bellwether list until some unspecified date in Fall 2025. Uber's proposed trial date is totally out of sync with its schedule. The Court's initial inclination to comprise a bellwether list in the ballpark of 20 cases, 11/6/24 Hearing Tr. at 16:15-22, is more reasonable given the timeframe.

For the same reasons that it made little sense to require amendment of 1500 complaints to add case-specific allegations, it is similarly unhelpful to require amendment of up to 50. *See* ECF No. 1823 at 8-9 (detailing Plaintiffs' argument against mass individual amendments, including that plaintiffs would rely on Rule 15 to amend again once common discovery is complete). Also, Uber does not plan to move to dismiss 50 cases at once, so there is no clear purpose to this exercise. Further, while Uber contends it needs to know what claims each case will plead (i.e. fraud, ratification, product liability), it concedes it need not have a ruling on any motions regarding those claims before it can make trial selections, and the scope of case-specific discovery likely will not change much because of the overlap with claims that are already pled. Regardless, Plaintiffs' leadership is willing to share information with Uber in advance of bellwether selection regarding the nature and extent of anticipated amendments to pursue these claims among the bellwether selection pool.

Uber's proposed schedule, again, front loads motions to transfer. The Court has already declined to advance such motions, and has noted that the parties should let *forum non conveniens* motions dictate selections. *See* 11/6/24 H'rg Tr. at 23:18-20 *("I don't think you ought to go through the selective process based upon the assumption that a forum non conveniens motion will be granted.").*

Multi-plaintiff trials. The same common questions of fact that supported consolidated pretrial proceedings—Uber's conduct and knowledge regarding sexual assault on its platform— support consolidated bellwether trials. Evidence relating to Uber's liability will involve the same Uber witnesses and Plaintiffs' experts. There will also be overlap in damages evidence, as Plaintiffs intend to put on experts to teach the jury about the nature of sexual assault and its short and long-term effects. Setting multiple cases at once is also practical and addresses Uber's concern about attrition: if one or more cases resolves for any reason before trial, the parties and the Court

can maintain the trial date and conserve resources. Thus, consistent with the purpose of this MDL, consolidated trials would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

Other courts overseeing rideshare sexual assault proceedings have elected to utilize multi-plaintiff trials. *See, e.g.* **Ex. C** (setting joint trial of three plaintiffs in Lyft JCCP for April 28, 2025); Exs. **D, E, F** (setting three related Lyft cases for trial on April 13, 2026). Under Uber's proposal, there is no safeguard against the risk that the parties and the Court spend months working up a single case, with the Court reserving precious time on its calendar, only for the trial to be vacated shortly before due to settlement, dismissal, or other circumstance unique to that plaintiff. Indeed, after setting individual cases in the Uber JCCP, Judge Schulman commented at a recent hearing that perhaps consolidation is the best way to ensure that trials move forward, even if one or more cases resolve before the trial date. **Ex. G**.

Uber's objection to multi-plaintiff trials ignores the reality that such a procedure is common MDL practice. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 2384 (3d ed. 1998) (collecting cases and noting that consolidation is "frequently" ordered in MDLs and cases involving "a common product"). Federal Rule of Civil Procedure 42 permits consolidation for trial of actions involving a common question of law or fact. Fed. R. Civ. P. 42(a)(1). The decision to consolidate is "within the broad discretion of the district court." *In re Adams Apple, Inc*., 829 F.2d 1484, 1487 (9th Cir. 1987). In determining whether consolidation is appropriate, the court "weighs the saving of time and effort consolidation would produce against any inconvenience, delay, or expense that it would cause." *Huene v. United States*, 743 F.2d 703, 704 (9th Cir. 1984). Any risk of confusion resulting from consolidation can be mitigated through jury instructions and trial management. *See Baron v. Galactic Co., LLC*, 2023 WL 8358368, at *3 (E.D. Cal. Dec. 1, 2023). For these reasons, district courts are "urged to make good use of Rule 42(a) in order to expedite the trial and eliminate unnecessary repetition." *Eghnayem v. Bos. Sci. Corp*., 873 F.3d 1304, 1314 (11th Cir. 2017); *see also Campbell v. Bos. Sci. Corp*., 882 F.3d 70, 76 (4th Cir. 2018) (stating that the "substantial savings of time and money that consolidation offers" is a boon to "both plaintiffs and defendants," as well as the judiciary and the jury); *Blount*

-8-

*v. Boston Scientific Corporation*, 2019 WL 3943872, *2 (E.D. Cal. Aug. 21, 2019) ("Typically, consolidation is a favored procedure.").

Finally, should the Court have doubts about ordering consolidation now, Plaintiffs request the opportunity to brief the issue at a later stage. When submitting their bellwether proposals, Plaintiffs could move to consolidate some but not all cases, depending on their commonalities. *See, e.g., In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig*., 2016 WL 10719395, at *1-2 (N.D. Tex. Jan. 8, 2016) (consolidating for trial five of ten cases initially selected as bellwether cases); *In re 3M Combat Arms Earplug Prods. Liab. Litig*., 2021 WL 773018, at *2 (N.D. Fla. Jan. 5, 2021) (consolidating three of five cases for trial and trying remaining two individually).

## II.    DEFENDANTS' POSITION

Uber proposes that the initial bellwether pool should comprise 50 cases - - about 3% of the total universe of MDL cases - - to be identified through random selection by January 2025.  The parties would then use the period between January and June to engage in limited discovery for cases in the initial bellwether pool.  This additional, focused exchange of information, as well as any amendments of those 50 Plaintiffs' short form complaints, would allow the parties to provide the Court with their tentative bellwether lists of 10 cases each by June 1, 2025.  At that time, the parties would begin full discovery, including depositions, and prepare to provide the Court with proposed trial rankings of the tentative bellwether cases by Summer to Fall 2025.  The Court would then set the trial order, with the first bellwether trial to commence in December 2025.  Although the Court need not decide the issue now, Uber rejects Plaintiffs' suggestion that multi-plaintiff trials are appropriate as premature, prejudicial, and at odds with the goals of bellwether trials.

The following outlines Uber's proposal for an efficient and fair bellwether selection process.

### A. Bellwether Eligibility

Plaintiffs contemplate several eligibility criteria for the initial bellwether pool involving the application of *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), the status of fact sheet submissions, and the application of the Court's rulings on Uber's motions

to dismiss.  For the reasons that follow, none of these criteria are necessary or appropriate for selecting the initial bellwether pool.  Rather, the initial pool should be selected from all 1459 cases coordinated in this proceeding.

***Lexecon***.  Plaintiffs take the position that *Lexecon* waivers would be necessary for certain cases to proceed as bellwether trial cases.   At the November 6, 2024 Case Management Conference, the Court expressed skepticism that any cases implicating *Lexecon* issues should be included in the mix of bellwether cases.  *See* Nov. 6, 2024 CMC Tr. at 21:24 –21:25 ("I don't think you would include any [*Lexecon* cases] in the bellwether.").  Uber respectfully submits, however, that including these "*Lexecon* cases" would promote the goals of bellwether trials and would provide the parties with useful data for reaching broad resolution of all these cases, if possible.

The cases in this proceeding can be divided into four categories: (1) *Lexecon* cases that were filed in other districts and subsequently transferred to this proceeding by the JPML (27 cases); (2) *Lexecon*-transfer cases that were directly filed in this district and are accompanied by short form complaints that designate other forums as the forums where the cases would have been brought but not for the direct filing procedure (436 cases); (3) other transfer cases alleging incidents that occurred outside of California but were filed in this district and are accompanied by short form complaints that designate (improperly in Uber's view) this district as the proper forum (977 cases); and (4) cases alleging incidents in California (25 cases).  Cases falling in all four categories may be appropriate bellwether trial candidates, regardless of whether the parties are willing to waive *Lexecon.*

| Category | Description | # of Cases |
|----------|-------------|------------|
| 1 | Cases filed elsewhere and transferred by JPML | 27 |
| 2 | Cases directly filed in this district with short form complaints designating other forums | 436 |
| 3 | Cases alleging non-California incidents with short form complaints designating N.D. Cal. | 977 |
| 4 | Cases alleging California incidents | 25 |

-10-

The fact that a case may be transferred or remanded to another forum for trial does not reduce its value as a bellwether trial case. On the contrary, the trial of any case can function and serve the same purpose as a bellwether, including cases tried elsewhere: "Individual cases proceeding through trial, verdict, and appeal *in a variety of jurisdictions* gradually reveal the behavior of juries and judges, clarify the applicable rules of law, and render expected value of individual claims more predictable. . . . In this way, the litigator acquires an increasingly solid empirical foundation for his estimates of claim values." Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective*, 80 Cornell L. Rev. 941, 959 (1995) (emphasis added).

In fact, limiting bellwether trials to a single venue and to a single jury pool in the coordination court is not the best system for establishing settlement values. The "informational output" from bellwether trials is improved by conducting trials in "different locations . . . before different jury pools." Eldon E. Fallon, *Bellwether Trials*, 89 UMKC L. Rev. 951, 955–56 (2021) (referring to bellwether trials in multidistrict litigation). A case requiring transfer under *Lexecon* would, therefore, provide meaningful data on how cases are resolved in their home forums and would be an asset to the parties for their efforts in reaching a global resolution for *all* cases coordinated in this MDL. In fact, remand of select bellwether cases is considered a "best practice":

> Instead of the transferee judge handling all bellwether trials dependent upon obtaining appropriate Lexecon waivers, the judge should consider remanding representative cases back to the transferor districts for trial. Not only would this practice mitigate the risk of a single transferee judge exerting outsized influence on the proceedings, but it also would provide a wider range of information on the strength and weaknesses of individual cases adjudicated by juries and judges in different jurisdictions. Moreover, these bellwether trials would better reflect the jurisdictional variations in underlying substantive law.

*See* Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices for Large and Mass-Tort MDLs* 22 (2d Ed. 2018) [hereinafter *Mass-Tort MDLs Guidelines and Best Practices*].

Moreover, Uber's forthcoming transfer motion concerning the third category of cases (i.e., those alleging a non-California incident but designating this district as the proper forum) needs to be resolved regardless of which cases ultimately end up in the initial bellwether pool. If the transfer motion is granted, then the vast majority of cases remaining in the MDL will fall in the first two categories of *Lexecon* cases, which necessarily must be included in the bellwether pool. If the

transfer motion is denied, then some cases alleging non-California incidents must be tried in this district, and can be prepared for trial alongside the cases that ultimately will be remanded.  In any event, cases that ultimately will be remanded or transferred to courts in other jurisdictions comprise a significant portion of the MDL and, accordingly, should not be categorically ignored during a bellwether process which is meant to facilitate litigation-wide resolution.

Uber's proposed bellwether selection process and timeline align well with the consideration and resolution of transfer and remand motions.  These motions can be fully briefed and adjudicated over the coming months in  parallel with the exchanges of information that will lead to the initial bellwether Plaintiffs amending their short form complaints, and well before the parties select cases for their tentative bellwether trial lists in early June 2025.  The Court and the parties can then address when to remand the first two categories of *Lexecon* cases in the bellwether pool in the weeks leading up to the tentative bellwether submissions.[1]

In sum, the parties should be moving forward to resolve cases falling in all four categories, and all cases should therefore be eligible for the initial bellwether pool.  Uber's bellwether selection proposal allows for the simultaneous resolution of those issues - - including transfer and remand - - that can and should inform which cases should ultimately be selected for bellwether trials.

**Status of Fact Sheets**.  To the extent Plaintiffs assert that only those cases with fully completed Plaintiff and Defense Fact Sheets should be considered, Uber disagrees.  Pursuant to the deadlines outlined in Pretrial Order No. 10, 324 Plaintiff Fact Sheets and 760 Defense Fact Sheets are not yet due and accordingly have yet to be exchanged.  Hundreds of these fact sheets, however, are due within the next few months.  In fact, the parties will have exchanged the vast majority (more than 98%) of outstanding fact sheets by March 21, 2025, giving the parties multiple months to identify and cure any deficiencies before tentative bellwether lists are due.  Moreover, the Court recently resolved global Plaintiff Fact Sheet disputes, ordering Plaintiffs to remedy

---

[1] The Court may decide to consider summary judgment, *Daubert*, and other motions for these cases or remand the cases earlier in order to allow home courts to address these issues in any *Lexecon* cases selected for the parties' tentative bellwether lists.

deficiencies by December 18, 2024.  Although Uber anticipates that several deficiencies may not be resolved by that time, the parties will have sufficient time to resolve any additional fact sheet disputes following the selection of the initial bellwether pool.

**B.  The Incident Classification Taxonomy**

Plaintiffs allege individualized experiences of sexual misconduct that vary widely in severity - - from inappropriate comments and questions to nonconsensual penetration.  Plaintiffs' attempt to minimize the import of the wide-ranging types of misconduct alleged as useful only for determining a "monetary value for each type."  On the contrary, the type of specific and highly individualized conduct alleged implicates several critical and case-dispositive issues including (but not limited to) breach of duty, causation, foreseeability, and damages.  Accordingly, the classification of a case is a crucial data point for understanding an individual case and will be helpful in valuing and resolving Plaintiffs' claims.  For this reason, it is imperative that the bellwether trial cases are selected from a representative pool that includes numerous types of alleged conduct.

When completing their Plaintiff Fact Sheets, each Plaintiff sorts her own case in one or more of 18 categories of sexual misconduct and assault, which are listed and defined in Defendants' Appendix A.  This classification system - - the incident taxonomy, already used in the Uber Rideshare JCCP (the "JCCP") - - was developed by the National Sexual Violence Resource Center ("NSVRC")[2] and the Urban Institute, in partnership with Uber.  *See* National Sexual Violence Resource Center & Urban Institute, Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault: A Joint Project of the National Sexual Violence Resource Center and the Urban Institute, https://www.nsvrc.org/sites/default/files /publications/2018-11/NSVRC_HelpingIndustries.pdf (2018).  "The taxonomy is built to categorize the customer reports [Uber] receive[s], using the behaviors described by the reporter."

---

[2] The NSVRC, a non-profit funded by the Centers for Disease Control and Prevention's Division of Violence Prevention, is the "leading nonprofit in providing information and tools to prevent and respond to sexual violence. " National Sexual Violence Resource Center, About the National Sexual Violence Resource Center, https://www.nsvrc.org/about/national-sexual-violence-resource-center (last visited Nov. 24, 2024).

*Id.* at 9.

To date, Plaintiffs have submitted Plaintiff Facts Sheets in 1031 cases. The below chart reflects the distribution of cases across the taxonomy categories for all 1031 of those cases. The classification of each case is based on Plaintiffs' own responses to Question 21 of the Plaintiff Fact Sheet, with several like-classifications combined to help illustrate the mix of cases coordinated in this MDL. For example, all four categories involving the touching or attempted touching of a sexual body part have been combined.[3] A more detailed chart providing a full breakdown of the taxonomy classifications selected by the 1031 Plaintiffs is appended to this submission as Defendants' Appendix B. For this submission, where a Plaintiff selected more than one category, Uber has used the most severe category selected.



As shown above, the cases coordinated in this proceeding involve conduct distributed across the taxonomy. As further discussed below, a relatively large, randomly selected initial bellwether pool will help provide an appropriate mix of representative cases involving the many

---

[3] Uber has also grouped Lewd and/or Inappropriate Comments or Questions or Gestures with Verbal Threats of Sexual Assault to represent lower severity conduct that does not involve physical contact. As reflected in Defendants' Appendix B, there are only five Kidnapping cases (less than 1% of all cases), and Kidnapping is not part of the NSVRC taxonomy, so it is therefore not presented on this chart. Finally, there are 15 cases for which Uber could not discern a clear taxonomy classification based on the Plaintiff Fact Sheets, and those cases have also been omitted from this chart.

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS          Case No. 3:23-md-3084-CRB

taxonomy categories that characterize and meaningfully differentiate the cases in this proceeding.

### C.  Identifying The Initial Bellwether Pool

For the reasons that follow, Uber submits that the initial bellwether pool should comprise 50 cases selected through a randomized process to be agreed upon by the parties by January 10, 2025, and executed by January 17, 2025.  *See* McKinsey's Tribal Pl. Bellwether Protocol at 1, *In re: McKinsey & Co., Inc. National Prescription Opiate Consultant Litigation*, No. 21-MD-02996 (N.D. Cal. Apr. 28, 2023), ECF No. 539 [hereinafter McKinsey Tribal Bellwether Order] (adopting McKinsey's proposal for the parties to "work cooperatively to agree on a method for random selection to select" 48 tribal bellwether plaintiffs).[4]

**<u>Size</u>.**  This MDL comprises 1459 cases involving claims governed by the law of 46 states and a wide range of alleged conduct spanning the taxonomy and damages.  An initial bellwether pool of 50 cases (about 3% of the coordinated cases) substantially narrows the universe of cases while still providing a representative mix of the different claims and various states' laws at issue. It provides the parties with a manageable number of cases to focus their additional fact-gathering and disclosure efforts and provides Plaintiffs with a manageable number of cases for which they can assess individualized allegations and amend their short form complaints, if they intend to.

This proposal also accounts for the likelihood that several cases will be removed from the initial bellwether pool after that pool is identified, and reduces the risk that the parties and the Court will be left with fewer, and perhaps unrepresentative, options when it comes to select their proposed cases for bellwether trials.  Between selection of the initial bellwether pool and submission of tentative bellwether lists in June, cases may be voluntarily dismissed, as has happened in the JCCP.  Plaintiffs whose cases are selected may decide not to pursue their claims. Plaintiffs' counsel may also have difficulty getting in contact with certain Plaintiffs and may move

---

[4] Uber proposes that random selection should be conducted through the use of a randomizing software.  To facilitate use of the software, each case should be assigned a unique number 1 through 1459, or whatever the number of coordinated cases is at the time of random selection.  At a predetermined time, the parties would use the randomizing software to generate 50 unique numbers.  Cases assigned to those generated numbers would then become part of the initial bellwether pool.  *See, e.g.*, Pretrial Order No. 18: Initial Selection of Plaintiffs for Discovery and Trial Pool at 3, *In re: Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. 05-MD-01699 (N.D. Cal. Nov. 17, 2006), ECF No. 751 [hereinafter Bextra & Celebrex Bellwether Order].

to withdraw as counsel for that reason or other reasons, as has happened in the JCCP. The parties may also discover new facts that make a case unsuitable for a bellwether trial. Thus, there are several ways - - beyond the control of the Court, Uber, or Plaintiffs' counsel - - in which the initial bellwether pool could shrink. A larger pool of initial cases mitigates the risk that the bellwether process will suffer as a consequence.

These risks are not hypothetical. In the JCCP, four of Uber's ten bellwether selections and both of the replacement cases it selected were dismissed or otherwise removed from bellwether trial consideration (i.e., plaintiffs' counsel moved to withdraw as counsel). Two of these cases were withdrawn from consideration less than three weeks before the parties were set to submit their final bellwether rankings to the JCCP court, leaving Uber and the court without sufficient time to identify appropriate replacement cases. Because Uber only had six cases remaining by the time the parties submitted their rankings, JCCP plaintiffs also only ranked six of their selections, leaving the JCCP court with only twelve cases as trial candidates, instead of 20. Of those twelve, the JCCP court and the parties identified, based on information gathered during discovery, at least three cases which were outliers and not suitable bellwether trial cases. As a result, the JCCP court was left with less than half of the intended number of potential trial cases to choose from. An initial pool of 50 cases, together with the time after this selection for limited discovery, communication by counsel with these chosen plaintiffs, and individualized motions to dismiss would protect against unpredictable dismissals, withdrawals from the pool, and unrepresentative bellwether choices, thereby better ensuring a robust and representative set of cases from which bellwethers can be chosen.

Finally, and as the Court instructed at the November 6, 2024 Case Management Conference, the parties and the Court should take a "balanced approach" to identifying the initial bellwether pool and the cases ultimately selected for bellwether trials by choosing cases that raise claims governed by the laws of several states and falling within the jurisdiction of several federal circuit courts. *See* Nov. 6, 2024 CMC Tr. at 15:8–15:21. As discussed above, the bellwether cases must also account for the wide variety of alleged conduct across the taxonomy. The best way to obtain an appropriate and representative (i.e., balanced) choice of cases - - including cases with a

mix of taxonomy categories, incident states, and incident dates - - is to select a sufficiently large initial bellwether pool.  Starting with 12 (or even 20) initial bellwether cases, as Plaintiffs suggest, is insufficient to capture the diversity of cases in this MDL, particularly if such cases are hand-selected by the parties.

In sum, an initial bellwether pool of 50 cases narrows the MDL cases in a way that is manageable while still being sufficiently large enough to reflect the diversity of the MDL cases and to provide the parties and the Court with suitable options when selecting the cases that will proceed to trial.

**Random Selection**.  Random selection of cases for inclusion in the initial bellwether pool allows for an efficient and fair bellwether selection process.  Instead of the parties spending valuable time and resources identifying the cases each believes is the best from their perspective, random selection allows the parties to quickly narrow the universe of potential trial cases and move forward in a targeted fashion.  Not only do both sides currently have imperfect and incomplete information from which to base any assessment of which cases would be best or most representative, there is an enormous information asymmetry arising from the fact that Plaintiffs' counsel have access to their clients and detailed information about their claims in a way unavailable to Uber.  Moreover,  Plaintiffs are receiving numerous documents in connection with the Defendant Fact Sheets and through corporate discovery, whereas Uber's discovery into Plaintiffs' claims has been limited completely to their Plaintiff Fact Sheets, submitted ride receipts, and some third-party records, which Uber is in the process of obtaining.  Thus, Uber would be at a decided disadvantage if the parties were to select their own cases for inclusion in the initial bellwether pool.  In fact, one empirical analysis of bellwether litigation found that "a party selection process disadvantaged the defense disproportionately and undermined the fairness needed" because "plaintiffs' selections were significantly more likely to result in bellwether plaintiffs whose claims were much stronger than a random sample" whereas "defense selections were comparable to the random selections." *See* Loren H. Brown, Matthew A. Holian & Arindam Ghosh, *Bellwether Trial Selection in Multi-District Litigation: Empirical Evidence in Favor of Random Selection*, 47 Akron L. Rev. 663, 690 (2014).

Random selection for initial bellwether pools has been used before, including in this Court. *See, e.g.*, McKinsey Tribal Bellwether Order at 1; Bextra & Celebrex Bellwether Order at 2; Order re: Bellwether Trial Selection, *In re Prempro Prods. Liab. Litig.*, No. 03-cv-01507 (E.D. Ark. June 20, 2005), ECF No. 671 (selecting a bellwether trial cases by "randomly draw[ing] from a hat (literally) fifteen cases" from a narrowed pool after which discovery was to "commence 'full speed ahead'"); Pretrial Order No. 89, *In re Baycol Prods. Litig.*, MDL No. 1431 (D. Minn. Jul. 18, 2003) (establishing a process that included "all cases filed in the District of Minnesota involving a Minnesota resident plaintiff plus a minimum of 200 additional cases selected at random from all MDL filed cases"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 1996 WL 571536, at *1 (E.D. Tex. Aug. 13 1996) ("[f]ollowing random selection of the twenty-five bellwether trial plaintiffs . . . ."). As noted in § 22.315 of the Federal Judicial Center's Manual for Complex Litigation (Fourth), "To obtain the most representative cases from the available pool, a judge should direct the parties to select test cases randomly or limit the selection to cases that the parties agree are typical of the mix of cases." (citing *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997)). The benefits of random selection are maximized when the bellwether pool is not unduly restricted in size: "To yield meaningful bellwether results, random selection should include cases that do not overly favor either side and that allege injuries that are widely represented in the docket as a whole (which should occur naturally if the random sample is sufficiently large) . . . ." Brown, Holian & Ghosh, *supra*, at 684.

Party selection of initial bellwether cases and subsequent party strikes, on the other hand, are unlikely to result in an appropriate and representative collection of cases, as the parties may be inclined to pick cases concentrated at one end of the severity spectrum or cases that otherwise fit into one or two categories that the parties deem beneficial to their side. *See id.* at 690 ("If the parties believe that the cases that are selected are outliers, then the information-gathering purpose of a bellwether process is impaired significantly. Any verdicts are not likely to be accepted as generalizable to the remainder of the docket and may have little or no value in the resolution process."). In the JCCP, for example, five out of the six cases the plaintiffs chose to submit for trial were penetration cases, despite the fact that only 22% of the cases in the JCCP involved

penetration allegations.[5]  Moreover, because Plaintiffs' counsel can communicate with individual Plaintiffs and gauge their willingness to participate in the bellwether process, more of Plaintiffs' selected cases would likely remain in the bellwether pool.  As discussed above, six of Uber's JCCP selections were unilaterally removed from bellwether trial consideration.  Conversely, although the JCCP plaintiffs ultimately submitted six cases for ranking, all ten of their bellwether selections remained at the time of ranking and were eligible to be ranked.  JCCP plaintiffs thus unilaterally selected which six cases (of their ten) to present to the court for ranking.  Specific selection of cases in this MDL could very well lead to similarly unfair results.  *See Mass-Tort MDLs Guidelines and Best Practices* at 26 ("The transferee judge should adopt rules that will minimize the risk that parties will attempt to 'game' the bellwether trial-selection process to result in test trials of cases that are not representative of the entire case pool.").

Random selection not only puts the parties on an even playing field, it also prevents the parties from intentionally or inadvertently selecting a homogenous and thus unrepresentative set of cases reflecting only a small portion of the cases.  Random selection would also permit the parties to quickly identify the initial bellwether pool and allow them to focus resources on a limited set of cases.

**D.  Narrowing the Bellwether Pool**

As discussed, random selection will allow the parties to focus efforts on further developing potential trial cases over the next several months.  Uber proposes that engaging in targeted discovery and amending short form complaints for cases in the initial bellwether pool will allow the parties to maximize this time and obtain the information necessary to evaluate which cases are appropriate bellwether cases and which should be included in the June 1 tentative bellwether lists. Full discovery, including depositions, should begin following the identification of the tentative bellwether cases and should be reserved for only those cases.

**Targeted Discovery**.  Some degree of discovery beyond the Plaintiff Fact Sheets is warranted to help overcome the information asymmetry which currently exists.  Specifically, Uber

---

[5] Of the original ten cases that the JCCP plaintiffs selected for inclusion in the bellwether pool, seven were penetration cases.

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS          Case No. 3:23-md-3084-CRB

proposes that the parties engage in exchanges of information to clarify and develop issues raised in the Plaintiff Fact Sheets and related document productions.  Targeted discovery in the form of interrogatories concerning case-specific issues and subpoenas for select third-party records related to individual Plaintiffs' claims also is appropriate.  This limited discovery on only 3% of Plaintiffs is warranted and not burdensome.

This discovery not only will provide the parties with relevant information about the Plaintiffs, their claims, and their alleged damages, it will require the potential bellwether Plaintiffs to meaningfully engage in the litigation and will help determine which Plaintiffs are willing to prosecute their claims all the way through trial.  It may also encourage Plaintiffs to crystalize their claims.  In the JCCP, for example, at least four of the bellwether candidate Plaintiffs who initially indicated that they were claiming lost earnings ultimately dropped those claims following written discovery and related document productions.  Moreover, if the parties were to wait until after June 1, 2025 to conduct all discovery for the bellwether cases, it would be difficult if not impossible to complete discovery in time to hold trials beginning next year.

During this period, the parties also will have the ability to engage in whatever additional information-sharing is needed to allow the Plaintiffs in the initial bellwether pool to amend their short form complaints.

**Short Form Complaints**.  Before the parties can provide the Court with their tentative bellwether lists, it is important that they understand the universe of claims at issue in the coordinated cases.  As contemplated by the Court at the November 6, 2024 Case Management Conference, Uber believes that Plaintiffs in the initial bellwether pool will be prepared to amend (or not) their short form complaints with individualized allegations, as necessary, by April.  Uber proposes a deadline of April 11, 2025 for these amendments, which will leave the parties several weeks to evaluate the cases remaining in the initial bellwether pool and give Uber the opportunity to conduct additional limited discovery related to those amendments.

Uber would then have the opportunity to file additional motions to dismiss related to the amended complaints.  Any such motions could be briefed and adjudicated in the months between the filing of the amended complaints and final bellwether selections, which will be selected from

the tentative bellwether lists following fuller discovery, which itself will provide valuable information for a litigation-wide resolution.

### E. Tentative Bellwether Lists and Trial Preparation

With the targeted discovery described above and Plaintiffs' amended short form complaints, the parties will have sufficient information to determine which of the remaining cases in the initial bellwether pool are most likely to comprise an appropriate and representative mix of bellwether trial cases. Uber believes that each party should select 10 cases for their tentative lists, resulting in a total of 20 potential trial cases. Starting on June 1, 2025, the parties would begin full discovery and trial preparation for the cases in this narrowed bellwether pool, including Plaintiff depositions, key third party depositions, and additional written discovery, document productions, and third-party subpoenas.[6] At this time, the parties should also submit proposals for outstanding case management deadlines and trial dates.

Later in Summer to Fall 2025, the parties would submit rankings of the cases from the tentative bellwether lists with key details about each case, arguments for why certain cases are particularly well- or ill-suited for bellwether trials, and any other information that would be helpful to the Court in selecting cases for trial.[7] Following this ranking, the Court would set the trial order, and the parties would prepare for the scheduled trials, with the first trial commencing in December 2025.

### F. Multi-Plaintiff Trials

Plaintiffs' suggestion that the Court should consider the possibility of multi-plaintiff bellwether trials in "waves" is premature and need not be resolved at this time. There is more than sufficient time in the schedule for the Court to later determine this issue, but now is not that time. Nor need it be.

---

[6] Plaintiffs' concern about "stale" discovery is unfounded. Uber's proposal to conduct Plaintiff depositions for only a narrowed subset of the bellwether pool starting in the summer of 2025 greatly reduces the chance that a prolonged period of time will pass between a Plaintiff's deposition and the trial of her case.

[7] Uber proposes that if any of the 20 cases in the narrowed bellwether pool are subsequently dismissed or otherwise deemed unable to proceed to trial, the party that submitted that case to the Court may select a replacement case from those remaining in the initial bellwether pool, so long as the replacement case is identified well before the parties' ranking deadline.

Multi-plaintiff trials will be highly prejudicial to Uber, and of limited value. First, including multiple plaintiffs with different alleged incidents, different alleged injuries, under different facts and circumstances, involving different drivers, in a single case would be profoundly prejudicial to Uber, which we suspect is the purpose of the proposal. *See, e.g.*, Irwin A. Horowitz & Kenneth S. Bordens, *The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence*, 85 J. Applied Psychol. 909 (2000) (finding that a defendant was more likely to be judged as liable as the number of plaintiffs increased); Matthew A. Reiber & Jill D. Weinberg, *The Complexity of Complexity: An Empirical Study of Juror Competence in Civil Cases*, 78 U. Cin. L. Rev. 929 (2010) (finding that juror comprehension declines as complexity from the presence of multiple parties increases). Indeed, lead MDL counsel has acknowledged that these are "individual cases," and "the details and severity of the cases widely vary."[8] And as the Court stated during the first status conference on November 3, 2023, "each Plaintiff has a different story to tell." Nov. 3, 2023 Status Conference Tr. at 7:6–7:7; *see also id.* at 19:25–20:3 ("In this case it seems to me that damages are sort of highly individualized. One person's sexual assault may be very different from another person's sexual assault. It may be different in kind and it may be different in effect."). Maintaining the individualized nature of these matters is essential for fair and impartial trials. *See In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation." (citation omitted)).

Multi-plaintiff trials are especially improper in the context of a bellwether trial process as it would become difficult to draw any reliable lessons about particular types of cases - - which is the whole point of bellwether trials. *See, e.g., Mass-Tort MDLs Guidelines and Best Practices* at 25 ("Cases should generally not be consolidated for trial. At the bellwether stage, the goal should

---

[8] *Uber Faces Mounting Sexual Assault, Harassment Lawsuits in San Francisco*, KRON4 (June 30, 2021), https://www.kron4.com/news/bay-area/uber-faces-mounting-sexual-assault-harassment-lawsuits-in-san-francisco.

be to achieve valid tests, not to resolve large numbers of claims.  Consolidation can tilt the playing field, undermining the goal of producing representative verdicts.").  Consolidated trials pose a serious risk of jury confusion and conflation of critical and case dispositive issues, opening the door for uncertainty about the informative value of a verdict.  Although Plaintiffs assert that consolidated cases can be grouped in "waves" by certain "criteria" to limit jury confusion, that assertion is particularly unconvincing when working in the abstract with yet-to-be-identified bellwether cases.

Consolidated trials are also not necessary to account for the risk that a selected bellwether case is worked up but then resolved prior to trial.  Each individual bellwether case, regardless of how it is tried, will require the parties and the Court to expend time and resources in the lead up to trial.  Moreover, staggered, individual trials do not mean that the Court and the parties will only be making progress on one case at any given time.  Uber anticipates each bellwether trial to last just a few weeks and to begin shortly after the conclusion of the prior trial.  Simultaneous preparation of multiple, individual bellwether cases will permit the parties to move subsequently scheduled trials up or, if rescheduling is not possible, will ensure that any delay caused by late vacated trials is relatively minor.  The inherent unpredictability of litigation is no reason to infringe on the fairness and usefulness of the bellwether process.[9]

For these reasons, Uber maintains that to accomplish the true goals of the bellwether process in an efficient and streamlined way, bellwether trials should be limited to single plaintiff cases.[10]  In any event, as Plaintiffs themselves recognize, this issue need not be resolved at this

---

[9] Plaintiffs mischaracterize the discussion of consolidated trials at the last JCCP hearing. Although Judge Schulman expressed willingness to hear any issues raised by the parties, he stated: "[T]he received wisdom is that these cases are -- like personal injury cases, generally are individual and should be tried as such."  Defs. Ex. A, Excerpt of JCCP Oct. 22, 2024 Hr'g Tr. at 15:3–15:5. Notably, the JCCP parties are currently in the process of negotiating amendments to the operative scheduling order, and neither side's proposal contemplates multi-plaintiff trials.

[10] For these reasons, other courts have routinely insisted that bellwether trials proceed on an individual basis.  *See, e.g.*, *In re: Testosterone Replacement Therapy*, MDL No. 2545, No. 14-cv-1748, Dkt. 1787 (N.D. Ill. Mar. 15, 2017) (selecting seven plaintiffs for seven bellwether trials); *In re: Xarelto (Rivaroxaban)*, No. 14-md-2592, Dkt. 3856 (E.D. La. Aug. 18, 2016) (selecting two plaintiffs for two bellwether trials); *In re: Cook Medical, Inc.*, MDL. No. 2570, No. 14-ml-2570-RLY-TAB, Dkt. 2107 (S.D. Ind. July 19, 2016) (selecting three plaintiffs for three bellwether

1   time.  To the extent the Court is inclined to consider the idea of multi-plaintiff bellwether trials at

2   some point, it would make far more sense to consider the issue in the context of specific tentative

3   bellwether cases with full briefing, rather than in the abstract without the benefit of fully developed

4   arguments.  Thus, if the Court desires, the parties can make further submissions on this issue in

5   connection with the tentative bellwether lists in June or the subsequently filed bellwether ranking

6   submissions.

7       **G. Proposed Schedule**

8       Uber proposes the below schedule for the bellwether selection process and related filings,

9   and further submits that proposed pre-trial and trial schedules should be filed with the parties'

10  tentative bellwether lists on June 1.  Plaintiffs' complicated proposed schedule for "waves" of

11  cases with staggered schedules will not materially advance this MDL toward trial but rather will

12  impose unnecessary and counterproductive complication upon the case-specific discovery process.

13  Uber's proposed schedule, on the other hand, is a straightforward, streamlined, and effective way

14  to prioritize discovery and work up cases for trial: the pool is narrowed to 50 cases by January,

15  with targeted discovery also commencing then; the pool is further narrowed to 20 cases in early

16  June for full discovery; and the parties provide the Court with rankings from which to select trial

17  cases in the summer to fall - - with discovery correspondingly becoming more targeted as the

18  applicable universe of cases narrows.

19

20

21  trials); *In re: Propecia Finasteride*, MDL No. 2331, No. 12-md-2331, Dkt. 295-1 (E.D.N.Y. Mar.
    16, 2016) ("The initial bellwether trial will consist of one plaintiff."); *In re: Zimmer NexGen Knee*
22  *Implant*, MDL No. 2272, No. 11-cv-5468, Dkt. 1826 (N.D. Ill. Mar. 11, 2016) (selecting four
    plaintiffs for four bellwether trials); *In re: Fresenius Granuflo/Naturalyte Dialysate*, MDL. No.
23  2428, No. 13-md-2428, Dkt. 583 (D. Mass. Apr. 8, 2014) ("Any cases that are ultimately tried
    shall be tried individually, with a single Plaintiff per trial."); *In re Hydroxycut Mktg. & Sales*
24  *Practices Litig.*, MDL No. 2087, No. 3:09-md-2087-BTM(KSC), Dkt. 1441 (S.D. Cal. June 29,
    2012) ("The selection of *individual* plaintiffs by the parties with oversight from the court is similar
25  to approaches taken by other courts in designating representative bellwether cases for trial.")
    (emphasis added); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 644 (E.D. La. Oct. 19
26  2010) (noting that six bellwether trials of individual plaintiffs were conducted during the course
    of litigation); *In re Yasmin & Yaz*, MDL No. 2100, No. 3:09-md-02100-DRH-PMF, Dkt. 1329
27  (S.D. Ill. Oct. 13, 2010) (providing that plaintiffs for inclusion in the bellwether pool "must be
28  selected . . . *individually*") (emphasis added).

| Step of Bellwether Selection Process | Uber's Proposal |
|---|---|
| Identification of random selection process for initial bellwether pool | January 10, 2025 |
| Initial bellwether pool randomly selected | January 17, 2025 |
| Transfer motions due | February 7, 2025 |
| Transfer oppositions due | February 21, 2025 |
| Transfer replies due | February 28, 2025 |
| Hearing on transfer motions | March 21, 2025 |
| Amended short-form complaints for initial bellwether pool | April 11, 2025 |
| Tentative bellwether list(s) and proposed trial schedule(s) due to Court | June 1, 2025 |
| Parties begin full discovery and trial work up of bellwether trial candidates | June 1, 2025 |
| Proposed bellwether rankings due to Court and trial order selection | Summer to Fall 2025 |
| First bellwether case ready for trial | December 2025 |

Dated: December 4, 2024

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
By: */s/ Robert Atkins*
ROBERT ATKINS
RANDALL S. LUSKEY
JACQUELINE P. RUBIN
YAHONNES CLEARY

*Attorney for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

Dated: December 4, 2024

By: */s/ Sarah R. London*
Sarah R. London (SBN 267083)
**LIEFF CABRASER HEIMANN
& BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com

By: */s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)
**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, Floor 12
New York, NY 10016
Telephone: (888) 480-1123
luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*

**Defendants' Appendix A**

**1.    <u>Lewd and/or Inappropriate Comments or Questions or Gestures</u>**: This category is defined to include, but is not limited to, the following: asking specific, probing, and personal questions of the user; making uncomfortable comments on the user's appearance; making sexually suggestive gestures at the user; and asking for a kiss, displays of nudity, sex, or contact with a sexual body part.

**2.    <u>Verbal Threat of Sexual Assault</u>**: This category is defined to include directing verbal explicit/direct threats of sexual violence at a user.

**3.    <u>Masturbation and/or Indecent Exposure</u>**: This category is defined to include exposing genitalia and/or engaging in sexual acts in the presence of a user.

**4.    <u>Attempted Touching of a Non-Sexual Body Part</u>**: This category is defined to include, without consent from the user, attempting to touch, but failing to come into contact with, any non-sexual body part (hand, leg, thigh) of the user.

    **a.    <u>Over the Clothes</u>**: This category is defined to include any attempted touch over any piece of clothing on the user (e.g., pants, shirt, bra, underwear) as well as any attempted touch on an area that in no way has clothing covering it (e.g., parts of the thigh when wearing shorts).

    **b.    <u>Under the Clothes</u>**: This category is defined to include any attempted touch on a part of a user's body which is covered by clothing. It does not include an attempted touch on an area that does not have clothing covering it in the first instance (e.g., parts of the thigh when wearing shorts).

**5.    <u>Attempted Kissing of a Non-Sexual Body Part:</u>** This category is defined to include, without consent from the user, attempting but failing to kiss, lick, or bite any non-sexual body part (e.g., hand, leg, thigh) of the user.

**6.    <u>Attempted Touching of a Sexual Body Part Not Involving Penetration</u>**: This category is defined to include, without explicit consent from the user, attempting to touch, but failing to come into contact with, any sexual body part (i.e., breast, genitalia, mouth, buttocks) of the user. It does not include attempts at penetration.

    **a.    <u>Over the Clothes</u>**: Same definition as 4(a).

    **b.    <u>Under the Clothes</u>**: Same definition as 4(b).

**7.    <u>Attempted Kissing of a Sexual Body Part</u>**: This category is defined to include, without consent from the user, attempting but failing to kiss, lick, or bite on either the breast or buttocks of the user. This also includes attempts to kiss on the lips and attempts to kiss while using tongue.

**8.    <u>Touching of a Non-Sexual Body Part</u>**: This category is defined to include, without explicit consent from the user, touching or forcing a touch on any non-sexual body part (e.g., hand, leg, thigh) of the user.

JOINT STATEMENT ON THE BELLWETHER SELECTION PROCESS                Case No. 3:23-md-3084-CRB

**a.** **Over the Clothes**: This category is defined to include any touch over any piece of clothing on the user (e.g., pants, shirt, bra, underwear) as well as any touch on an area that in no way has clothing covering it (e.g., parts of the thigh when wearing shorts).

**b.** **Under the Clothes**: This category is defined to include any touch under clothing which causes contact with the user's skin. It does not include a touch on an area that does not have clothing covering it in the first instance (e.g., parts of the thigh when wearing shorts).

**9.** **Kissing of a Non-Sexual Body Part**: This category is defined to include, without consent from the user, any kiss, lick, or bite, or forced kiss, lick, or bite on any non-sexual body part (e.g., hand, leg, thigh) of the user.

**10.** **Attempted Sexual Penetration Including Oral Copulation**: This category is defined to include, without explicit consent from a user, attempting but failing to penetrate, no matter how slight, the vagina or anus of a user with any body part or object. This includes attempted penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing and attempted kissing with tongue.

**11.** **Touching of a Sexual Body Part Not Involving Penetration**: This category is defined to include, without explicit consent from the user, touching or forcing a touch on any sexual body part (i.e., breast, genitalia, mouth, buttocks) of the user. It does not include penetration.

**a.** **Over the Clothes**: Same definition as 8(a).

**b.** **Under the Clothes**: Same definition as 8(b).

**12.** **Kissing of a Sexual Body Part**: This category is defined to include, without consent from the user, any kiss, lick, or bite, or forced kiss, lick, or bite on either the breast or buttocks of the user. This also includes kissing on the lips and kissing while using tongue.

**13.** **Sexual Penetration Including Oral Copulation**: This category is defined to include, without explicit consent from a user, penetration, no matter how slight, of the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue.

**14.** **Kidnapping**: This category is defined to include abduction, child abduction, false imprisonment, human trafficking, unlawful restraint, and unlawful/forcible detention.[11]

---

[11] "Kidnapping" is a unique category that resulted from Plaintiffs' references to kidnapping in their Master Long Form Complaint and is not part of the taxonomy developed by the NSVRC and the Urban Institute.

**Defendants' Appendix B**

| Taxonomy Category | Count | %[12] |
|---|---|---|
| **Lewd/Inappropriate Comments/Questions/Gestures/Verbal Threats** | **85** | **8%** |
| *Lewd and/or Inappropriate Comments or Questions or Gestures* | *41* | *4%* |
| *Verbal Threat of Sexual Assault* | *44* | *4%* |
| **Masturbation and/or Indecent Exposure** | **51** | **5%** |
| **Touching of a Non-Sexual Body Part** | **257** | **25%** |
| *Attempted Touching of a Non-Sexual Body Part: Over the Clothes* | *17* | *2%* |
| *Touching of a Non-Sexual Body Part: Over the Clothes* | *205* | *20%* |
| *Attempted Touching of a Non-Sexual Body Part: Under the Clothes* | *1* | *0%* |
| *Touching of a Non-Sexual Body Part: Under the Clothes* | *34* | *3%* |
| **Touching of a Sexual Body Part** | **343** | **34%** |
| *Attempted Touching of a Sexual Body Part Not Involving Penetration: Over the Clothes* | *8* | *1%* |
| *Touching of a Sexual Body Part Not Involving Penetration: Over the Clothes* | *233* | *23%* |
| *Attempted Touching of a Sexual Body Part Not Involving Penetration: Under the Clothes* | *5* | *1%* |
| *Touching of a Sexual Body Part Not Involving Penetration: Under the Clothes* | *97* | *9%* |
| **Kissing** | **86** | **8%** |
| *Attempted Kissing of a Non-Sexual Body Part* | *2* | *0%* |
| *Kissing of a Non-Sexual Body Part* | *15* | *1%* |
| *Attempted Kissing of a Sexual Body Part* | *2* | *0%* |
| *Kissing of a Sexual Body Part* | *67* | *7%* |
| **Sexual Penetration Including Oral Copulation** | **190** | **18%** |
| *Attempted Sexual Penetration Including Oral Copulation* | *3* | *0%* |
| *Sexual Penetration Including Oral Copulation* | *187* | *18%* |
| **Kidnapping** | **5** | **1%** |
| **Other/To Be Supplemented/Unknown** | **14** | **1%** |
| **Total** | **1031** | **100%** |

---

[12] For simplicity, these figures have been rounded up or down to the nearest whole percentage point.