# EXHIBIT B

1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

3

|   |                              |                     |
|---|------------------------------|---------------------|
| 4 |                              | )  Docket No. 14 C 1748 |
|   |                              | )                   |
| 5 | IN RE:                       | )                   |
|   | TESTOSTERONE REPLACEMENT     | )                   |
| 6 | THERAPY PRODUCTS LIABILITY   | )                   |
|   | LITIGATION                   | )                   |
| 7 |                              | )  Chicago, Illinois |
|   |                              | )  November 30, 2017 |
| 8 |                              | )  11:30 o'clock a.m. |

9

| | |
|---|---|
| 10 | TRANSCRIPT OF PROCEEDINGS - MOTION |
| | BEFORE THE HONORABLE MATTHEW F. KENNELLY |
| 11 | |

12

|    |              |                                   |
|----|--------------|-----------------------------------|
| 13 | APPEARANCES: | SEEGER WEISS LLP                  |
|    |              | BY:  MR. CHRISTOPHER SEEGER       |
| 14 |              | 77 Water Street                   |
|    |              | New York, NY  10005               |

15

|    |                                          |
|----|------------------------------------------|
| 16 | SCHACHTER, HENDY & JOHNSON, P.S.C.        |
|    | BY:  MR. RONALD E. JOHNSON, JR.          |
| 17 | 909 Wright's Summit Parkway, Suite 210   |
|    | Ft. Wright, KY  41011                    |

18

19

20

21

22

23

|    |                 |                                        |
|----|-----------------|----------------------------------------|
| 24 | Court Reporter: | MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR |
|    |                 | Official Court Reporter                 |
| 25 |                 | 219 S. Dearborn Street, Suite 2102      |
|    |                 | Chicago, Illinois  60604                |
|    |                 | (312) 435-5639                          |

1  APPEARANCES CONTINUED:

2

3                          PAUL WEISS
                           BY:  MR. DAVID M. BERNICK
4                          1285 Avenue of the Americas
                           New York, NY  10019

5

6                          KAYE SCHOLER LLP
                           BY:  MR. ANDREW K. SOLOW
7                          250 West 55th Street
                           New York, NY  10019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (The following proceedings were had in open court:)

2   THE CLERK:  Case No. 14 C 1748, In Re:  Testosterone

3   Replacement Therapy Products Liability Litigation.

4   THE COURT:  All right.  Welcome to all of those who

5   are on the phone.

6   The meeting we had in chambers, which is identified

7   on the docket by an order I entered yesterday, took longer

8   than I thought.  So for those of you who aren't here and might

9   be listening in, which I suspect for each of these is a

10  dwindling number of people, I try to draw a balance in these

11  things between efficiency and transparency.  Obviously, the

12  things that happen in open court are more transparent because

13  everybody can listen to them.  Sometimes they are less

14  efficient.  And so I'm trying to draw a balance.

15  Nothing that happens in our meeting in chambers is in

16  the least bit private, and everybody is free to talk about it

17  as much as they want.  So the plaintiffs' steering committee

18  folks who are there can disseminate it however they want to.

19  Same is true on the defense side.

20  So I got very detailed proposals from both sides,

21  which I greatly appreciate.  I just want to talk -- and we

22  have talked about a good deal of this back in the pre-meeting

23  meeting that we had.  So I want to just talk generally so that

24  there is a record of it about a couple of sort of big picture

25  items.

1    So first of all, on the question of enhancement of

2  the plaintiffs' fact sheet, I'm sensitive to the fact that a

3  good deal of information is already included in the existing

4  plaintiffs' fact sheet as part of case management order 9, and

5  there's more information that's required as part of what I

6  directed in connection with the mixed-use case management

7  order.  I am blanking on the number of that.  It's in the 70s

8  somewhere.

9    I don't want to make people have to re-provide

10  information that they have already provided.  That's just make

11  work, and there's certainly, as I said in the order that I

12  entered that gave rise to today's conference, part of what I

13  think is appropriate to do once we have reached this point in

14  the litigation is, you know, do things that will result in

15  winnowing of cases or defendants in cases, but I don't want to

16  make somebody just do make work for the purpose of having a

17  hoop to jump through that some people aren't going to jump

18  through.

19    So we had a discussion in chambers about the

20  differences between what each side has proposed in terms of a

21  fact sheet and what's already existing and on the table.

22    And we had a discussion also about -- from the

23  defense side what the defense considers to be big gaps, I

24  guess, in terms of information gathering.  And two of the

25  things that were identified by the defendants that are missing

1  from the current regime, the case management order 9 regime,

2  if you will, is information regarding the amount of product

3  that was dispensed -- in other words, by a pharmacy -- and

4  information regarding the amount of product that was used.  In

5  at least one of the bellwether trials that we have had, there

6  was -- maybe more than one, there was testimony about the

7  person not using the whole amount, what was prescribed, so I'm

8  certainly cognizant that those are issues.

9         I think where I draw the line at this point, I mean,

10  I do think that it's appropriate to require the plaintiffs to

11  include the dispensing information, including documents; in

12  other words, make the plaintiffs, as part of the fact sheet

13  process or, for existing cases, the supplemental fact sheet

14  process, go out and get the pharmacy records.

15         I am not prepared yet to require information about

16  exact usage.  I think that's a much more complicated thing,

17  particularly when you're talking about something that's

18  effectively an interrogatory answer.  I think that's something

19  that's more appropriately done during the discovery process

20  for cases that are picked out.

21         So what I was -- what I was suggesting or what I'd

22  like to see as part of the -- what I'd like to see done is

23  going forward, we're going to have -- the plaintiffs' fact

24  sheet regime is going to be essentially what already existed

25  in case management order 9, plus whatever we added on for the

1   mixed-use case cases, plus, if it's not included in one of

2   those places, which it may be, a requirement to go get the

3   dispensing -- or the pharmaceutical record -- the pharmacy

4   records regarding the amount of drug dispensed.  I

5   communicated to the lawyers that I thought that we really

6   needed to have a form because there's still significant

7   numbers of cases coming in.  I think I got somewhere

8   between 30 and 50 this month.

9           So we need to have a form that includes everything,

10  and then -- but more importantly, because of the bigger number

11  of cases, at least in the short term, we need to have some

12  sort of document or something that the lawyers or that the

13  parties in the existing cases can execute to say either, I've

14  already provided all of this, you know, and cite their prior

15  disclosures, or, here's the information.  And I agree with the

16  defendants that this is something that ought to be signed by

17  the plaintiff, not just by the lawyer.  My view on that is

18  that that will likely enhance the likelihood that the

19  disclosures will be meaningful and accurate.  It's going to

20  require more work, but that's part of what happens when you

21  file a lawsuit.

22          So in terms of the contents of that, of the

23  enhancement of the fact sheet, that's what I think ought to

24  happen.

25          The one thing we did not talk -- and if anybody wants

1   to say anything about that, feel free.

2          The one thing we didn't talk about in the back was

3   the -- what I'll call the enforcement process.  So I guess I

4   would like to hear a little bit of argument about that.

5          So currently -- and, again, I'm kind of painting in

6   broad strokes here.  Currently, the way it works is you have a

7   deadline to provide a fact sheet.  It's X number of days after

8   you file the lawsuit.  If you don't do that, there's a letter

9   that goes out, I think, from the defendant saying, you're not

10  in compliance.  There's sort of a cure period.  And then

11  there's -- if it's not cured during the cure period, then the

12  defendant can file a motion to dismiss.

13         Is that basically right?  I don't know what the dates

14  are.

15         And, honestly, the way that I have dealt with these,

16  and it's not surprised anybody, I haven't had a huge number of

17  those motions generally, but the way I have tended to deal

18  with them is that even when the motion gets filed, if the

19  party then comes into compliance, I deny the motion to

20  dismiss.  I think -- I may have not done that in one or two

21  cases, but that's been my practice.

22         I don't think I said this in so many words in the

23  order that gave rise to today's meeting, but I guess part of

24  what I was trying to communicate is I'm at the point where I'm

25  inclined to be a bit less generous and maybe a lot less

1   generous with that, at least on the last part.  In other

2   words, I'm going to -- you know, the universe is going to

3   consist of what's filed as of the deadline, and I guess what I

4   had in mind is, frankly, even contracting the process before

5   that.  I certainly understand -- I mean, you know, I was a

6   practicing lawyer too, and I preside over any number of cases,

7   and I know that it's not always easy to get clients to sign

8   off on stuff and so on.  But, again, they're parties in

9   lawsuits, who filed lawsuits, and I think that process needs

10  to be shortened, and I think it needs to be simplified, and

11  what I mean by "simplified" is maybe a step taken out of it.

12  So -- but I'd like to hear your thoughts on that.

13          Since it's really more of a defense issue, why don't

14  you talk first, and I'll let the plaintiffs talk after that.

15          MR. BERNICK:  David Bernick for the AbbVie

16  defendants.

17          I think that the part of the existing process that's

18  most problematic is that it invites -- indeed, it requires --

19  kind of a back-and-forth communication --

20          THE COURT:  Right.

21          MR. BERNICK:  -- in order to try to resolve issues

22  before they come to the Court's attention.  And what this

23  means is you get, you know, emails back and forth, and let's

24  go talk to the client, and stuff like that.

25          And so what we proposed is to try to make this more

1  routinized by simply -- we take the burden, of course, in

2  going through everything and finding where the non-compliance

3  is, and then we simply submit a chart of the non-compliant

4  forms --

5          THE COURT:  Submit it to me.

6          MR. BERNICK:  -- to the Court.

7          THE COURT:  Yeah.

8          MR. BERNICK:  That's correct.

9          And then it's at that point --

10         THE COURT:  Then I issue some sort of an order to

11  show cause or something like that.

12         MR. BERNICK:  Exactly.  And then the plaintiffs can

13  come back and cure or respond or do whatever.

14         My sense also is -- this is an editorial comment, is

15  that based upon the experience that we've had so far with the

16  enhanced -- you know, the additional questions for

17  mixed-use --

18         THE COURT:  Yeah.

19         MR. BERNICK:  -- there really is a very substantial,

20  you know, in the sense, dropout rate at this point.  You know,

21  our preliminary review says there are many, many cases that

22  are going to be dismissed or people haven't supplemented.  And

23  so there really is a winnowing process that's taking place,

24  and it doesn't require, in a sense, much to make it happen.

25  People are not really interested in pushing the case or not

1   really interested in providing the information.  It surfaces

2   pretty readily and that process hasn't taken an awful long

3   time.

4          So I really think that it probably is the right time

5   to say if it's non-compliant, it should just come to the

6   Court.  If it's going to be cured or if there's going to be an

7   objection to it, let that be the process that does --

8          THE COURT:  In other words, you submit the thing to

9   me, and it's -- there's a case management order that says that

10  once that's submitted, the person has 28 days or 21 days or

11  whatever it is to show cause why the case shouldn't be

12  dismissed, and that's basically the cure process.

13         MR. BERNICK:  That's exactly right.

14         THE COURT:  Your thoughts?

15         MR. SEEGER:  I mean, so we are a representative

16  committee.  You have law firms here that have a number of

17  cases, you have law firms that have a handful.

18         THE COURT:  Right.

19         MR. SEEGER:  And they really kind of fall into

20  different buckets.  I mean, one lawyer may be somewhat less

21  engaged than I am, obviously, in this litigation, and I hate

22  to see a client hurt because somebody didn't -- you know,

23  because we have now condensed that cure period and he is

24  trying -- he or she is trying --

25         THE COURT:  Give this to me in practical,

1   what-happens-on-the-ground terms.

2          MR. SEEGER:  Yeah.  That's what I'm trying to make an

3   effort to do.  There are different -- I'm trying to say this

4   tactfully.  I mean, you have different quality of lawyers with

5   different resources, frankly, that pay, you know, different

6   levels of attention to this stuff.

7          I wouldn't have a problem with a show cause process

8   that occurred after the cure.  If we could keep the cure

9   process in place so at least when you do -- if and when you do

10  dismiss a case, we're pretty satisfied it's because the client

11  either didn't comply or the lawyer -- but we can satisfy

12  ourselves that something occurred between the lawyer and the

13  client, and that's my concern; that if we start condensing the

14  time frames, we're going to have -- you're going to find --

15  you're going to have some clients probably writing letters

16  saying, you know what?  I wasn't told, nobody contacted me,

17  nobody said this, nobody said that.

18         THE COURT:  Yeah.

19         MR. SEEGER:  I understand -- let me give you one

20  example of where I think this has worked.  I mean, Mr. Stanley

21  for Eli Lilly has used his authorizations, has sent letters to

22  almost everybody where there's mixed-use issues, and he's

23  gotten a number of people to voluntarily either dismiss him

24  from the case in mixed-use case examples or to just simply

25  say, we got it wrong.

1  So -- there are also -- on the defense side, there
2  are also different levels of enforcement and really trying to
3  sort of --

4  THE COURT:  I know that.  I know I get more motions
5  from some defendants than others.  And there hasn't been a
6  huge volume of them.

7  So, look, I mean, I get all of that, but I guess I
8  have to, at some level -- and, again, this isn't a brand new
9  MDL.  It's three and a half years old.  Okay?  It's three and
10  a half years old.  And it has -- you know, the number is north
11  of 7,500 cases that got filed, and I think currently pending,
12  there are about 6100, the biggest chunk of the dismissals
13  being the Pfizer cases.

14  So people have filed lawsuits.  Okay?

15  So if we never had an MDL, the way the plaintiffs'
16  fact sheet process would be happening is that part of it would
17  be 26(a) disclosures, which nobody has had to do in this case,
18  part of it would be interrogatory answers, which nobody has
19  had to do in this case, and the plaintiffs' fact sheet is
20  essentially a -- is a compressed or a condensed version of
21  those things.  I mean, it's less information than people would
22  have to provide if there was no MDL and they were just
23  prosecuting their lawsuit.  And I don't think it's in the
24  least bit unfair, too onerous or inappropriate to expect
25  people to do that, whether they got two lawyers at their firm

1 | or 20 lawyers at their firm, whether they got 20 cases or
2 | they've chosen to file 250 cases.

3 | And, obviously, I'm concerned about the clients too.
4 | I have been extremely stingy about letting lawyers withdraw
5 | from cases, as I'm sure at least some of you know if you have
6 | been following it.  I almost always make them come in.  Some
7 | of the motions to withdraw have been withdrawn because of what
8 | I -- all of the hoops I make people jump through.  And part of
9 | the reason I do that is that I certainly know, because I've
10 | heard it in this case, that, you know, sometimes I have
11 | lawyers who have never met with the clients and then basically
12 | come in and move to withdraw saying, well, my client never
13 | contacted me.  Like, did you ever contact them?

14 | So the people that I have allowed to withdraw,
15 | they've tended to be situations where I've got an affidavit
16 | that shows really in most cases beyond any shadow of a doubt
17 | that the client has just completely gone off the grid, and so
18 | it's really a client problem, not a lawyer problem.  And
19 | that's been deliberate on my part; I want to make sure that
20 | it's a client problem, not a lawyer problem.  Now, that's
21 | withdrawals, not fact sheets, but there's not a whole lot of
22 | difference between the two.

23 | You know, we've reached a point here where I need to
24 | be thinking about not just -- and we all need to be thinking
25 | about not just getting information, but also how does this

1   case advance towards some ultimate conclusion.  And I just

2   think that being more onerous -- and honestly, it's less

3   onerous than it would be in an individual lawsuit prosecuted

4   in federal court or in most state courts -- being more onerous

5   in terms of requiring people to provide information, giving

6   them less second, third, and fourth chances, is part of it.

7           So I appreciate what you're saying and I obviously

8   understand the folks who are here in the room are talking in a

9   representative capacity, and, you know, I get that, but I

10  think I'm -- we can talk about the time period, but I think

11  the defendants' proposal is the way to go on this.  I'm -- I

12  want to take out that middle step, the middle step being the

13  back and forth.  So that's going to come out.

14          And we can talk about -- I mean, the end result of

15  today, which is going to happen in about 15 minutes, 14 and a

16  half, is going to be you need to get together really fast and

17  draft an order.  But, you know, see if you can agree on a date

18  for that show cause process and exactly how it's going to

19  happen.  But if you can't, just let me know, and I'll resolve

20  it for you.

21          So that's plaintiffs' fact sheet.

22          The second kind of big picture thing is how that all

23  works in connection with the selection of more cases.  And

24  what I said is that -- what I said to the lawyers in the back

25  is after having read both sides' proposals -- and the

1  plaintiffs' proposal in very broad terms was to do, I guess,

2  limited individual case discovery in a large number of cases,

3  use those to select a smaller number of cases, and then those

4  would be the additional trial cases -- the defendants have it

5  happening in waves, I guess.

6          But the other big difference is the defendants didn't

7  want the proposal of selecting additional trial cases to start

8  until after the plaintiffs' fact sheets had been enhanced.

9          And so what I said, and my intention is, I want to

10 have at least eight more cases beyond what we're already

11 anticipating that are going to be trial ready as of

12 August 1st.  So when I say "beyond what we're already

13 anticipating," what we're already anticipating are the cases

14 that have already been selected and the mixed-use cases.  So

15 it's eight more beyond that that are ready -- that are going

16 to be ready for trial as of August the 1st of this year -- I

17 know that involves a lot of work, a point I'll return to in a

18 moment -- and then a greater number than that of additional

19 cases ready for trial as of the first of next year, and a

20 greater number than that ready for trial as of, let's say, the

21 middle of next year, July 1st.

22         I'm not in a position to be specific on those

23 numbers.  I'm going to leave that to people to propose in

24 advance.  I think what you should assume is that the

25 likelihood is that I am going to be farming some things out or

16

1   trying to farm things out to other judges or we will be doing

2   multiple plaintiff cases. I have not made a decision on that,

3   and the final version of the order is going to say that's just

4   still an option on the table that I'll decide later and I've,

5   you know, thought about and continuing to think about what

6   both sides have submitted on that topic.

7          So how that fits in with the plaintiffs' fact sheet

8   thing is -- for the additional cases for the end of this year,

9   it's just not practical; there's not enough time to do an

10  enhancement of the supplementation of the plaintiffs' fact

11  sheet before those cases get picked because you are going to

12  have to start doing the work on them quicker.

13         I think as a practical matter, the wave two and later

14  waves are going to be cases that -- where the fact sheet will

15  have already been enhanced at that point because of just the

16  timing of when I do that, but for the first set, no.

17         Then we get to the -- kind of the big kahuna --

18  "kahuna," I believe, is spelled k-a-h-u-n-a; I think that's

19  the official spelling of "kahuna." So -- and that is how the

20  cases get picked.

21         So my -- and both sides made very detailed

22  submissions on this, and I completely understand where both

23  sides are coming from.

24         So the plaintiffs' idea was we should pick

25  everything. I get why -- I get the rationale for it. There

1   is a certain amount of sense to it.  And I'm certainly

2   cognizant of the issue of not overburdening particular law

3   firms.  I just don't think that has the appearance of

4   fairness, and maybe not actual fairness, so I'm not willing to

5   do that.

6         On the defendants' side, the proposal was random

7   selection.  And I've said this before:  Random doesn't mean

8   representative.  Random means random.  Coin can come up heads

9   six times in a row.  That's random.  It's not representative.

10  So I don't agree with that either.

11        I wish I had the idea to tell you, do it this way.  I

12  don't.  I'm sorry.  I don't.  I think that it's conceivable,

13  and I made this suggestion, that for this initial group of

14  cases, that you might be able to pull additional cases from

15  the mixed-use cases where you've already got, at least in

16  theory, the enhanced fact sheets, which I think were due this

17  past Monday.  We've got a little bit more information about

18  those which, you know, could allow some intelligent thing -- I

19  mean, I think, honestly, if we can't come up with something

20  else, the default is going to be we do some sort of 50/50

21  thing if you can't agree to something, because that's just --

22  you know, that's what Solomon does when Solomon can't -- when

23  the parties can't do it.  You just chop the baby in half, or

24  at least threaten to do so.

25        In terms of the proportions, what I said is that I

1   think that the proportions of cases should mirror the overall

2   proportions of cases that each defendant has in the MDL, with

3   the exception of the extra ones we are putting in for this

4   year.  For those cases, Actavis and Endo are further behind,

5   and so they should be left out of the extra ones for this

6   year.

7          And so the proportions should be whatever the

8   proportions are for -- AbbVie's obviously got the most,

9   AbbVie, Auxilium, and Lilly.  And then for the cases that

10  you're doing next year, you sort of equalize the proportions.

11         A big issue, though, is when lexicon happens, when

12  lexicon gets dealt with.  I think really what this boils down

13  to is, ideally, lexicon waivers would be solicited, and nobody

14  has to waive lexicons; you know, people have a choice whether

15  or not to do that.  Lexicon waivers would be solicited towards

16  the front end, the concern being that if it happens towards

17  the back end and there's, you know, less than optimal

18  percentage of lexicon waivers, you have to assume that's

19  what's going to happen, so you have to put more cases in on

20  the front, which is more work for everybody.

21         Again, I don't have any precise answers as to how

22  that should be done, but you guys are all very smart, and

23  you've done this before, and I think you ought to be able to

24  come up with something.

25         I do want to preserve the thing that, you know, a

1    non-waiver of lexicon doesn't get you out of the mix, and

2    that's just -- frankly, it's in there, it's in there as a --

3    for want of a better word is you don't get a free pass. I

4    mean, it's one little way of preventing people from gaining

5    it, so that somebody understands that even if they don't waive

6    lexicon, the case is still going to have to work up because

7    there's other ways I can deal with that. I can remand it, I

8    can ask to be assigned to another district to go try it there.

9    So -- and I don't want people to be able to think, oh, all I

10    have to do to get out of the system is just refuse to waive

11    lexicon. So that should be kept in.

12           And I think I've pretty much covered all of the

13    points I wanted to cover. Let me just go through my notes

14    really quickly here.

15           And so my -- I guess my two closing comments is

16    that -- and these are also both things that I said in our

17    meeting prior to the case management conference, all of the

18    current trial dates are set in stone until I say they aren't;

19    but I am not prepared to or willing to say that the 2018

20    schedule is what it is and everything else comes after that.

21    As I said, we're going to have more cases ready for trial

22    later in this year. Some of the dates that are set for later

23    in this year -- and I'm talking about the -- when I say "this

24    year," I mean 2018, and when I say "2018," I really mean the

25    second half of 2018 -- we've got some dates in some of the

1   case management orders.  Those might end up being changed.  As

2   I've said in the order that set today's conference, there's,

3   you know, at least some significant possibility that there may

4   be multiple trials going on in front of different judges at

5   the same time, and that includes state cases, obviously.

6          And, basically, the bottom line is this is going to

7   involve a lot more work for everybody; myself included, but

8   I'm not, you know, going to complain about that.  I'm the one

9   that's imposing the extra work.

10         The fact is it's a very large MDL.  It's got 7,000 --

11  like I said, north of 7500 cases filed, north of 6100 still

12  pending.  In an ideal world, these things don't last forever,

13  and I need to find ways to kind of move it towards moving it

14  toward a conclusion, I think is the best way I can put that.

15         So I would like to get -- I guess, ideally, I would

16  like to have a draft order from you all by a week from today,

17  the idea being that I sign it a week from tomorrow, or I tweak

18  it and sign it a week from tomorrow, and then we go on from

19  there.

20         So what do people want to ask or say?

21         MR. BERNICK:  Yeah.  The scope of the order that you

22  want us to submit?

23         THE COURT:  Yeah.  Maybe it's more than one order,

24  honestly.  Maybe it's one order for the fact sheet thing and

25  it's a different order for the picking cases and so on.

1　　　　　And I will add that I think on some of the

2　defendants, the idea was to pick cases from an existing list

3　or an existing pool.  I'm -- absolutely, that's -- that is an

4　appropriate way to do it, but if there's disagreement about

5　that, I'll obviously have to adjudicate it and just make sure

6　that it gets teed up for me.

7　　　　　So I think it probably ought to be more than one

8　order.  I think we ought to have an order on the fact sheet

9　thing that's cleaner, and I think we ought to have an order --

10　and maybe it's more than one order.  I mean, I would like to

11　have -- just because it's easier for me to grasp what's going

12　on, I know that I got separate orders for AbbVie, Endo,

13　Actavis, Auxilium, and Lilly.  I would frankly prefer to have

14　all of those in different sections in one order.

15　　　　　MR. BERNICK:  I think you've given -- another option

16　might be fact sheet, maybe an order for 2018 trials, and

17　then --

18　　　　　THE COURT:  That's fine too.

19　　　　　MR. BERNICK:  -- more for 2019 trials --

20　　　　　THE COURT:  That's fine too.  That's fine too.  Yeah,

21　that's fine.

22　　　　　MR. BERNICK:  Okay.  I just had three questions.

23　　　　　THE COURT:  Sure.

24　　　　　MR. BERNICK:  One, just so we can at least predict or

25　have some notion of where you're -- when do you think you

22

 1   might be involving other judges?

 2   THE COURT:  I don't -- so just realistically, I don't

 3   expect it to be -- this is why I'm talking about second half

 4   of 2018.  That's when.

 5   MR. BERNICK:  Okay.  Okay.

 6   THE COURT:  That's when.

 7   MR. BERNICK:  Second --

 8   THE COURT:  I have a sales job to do, so it takes a

 9   while.

10   MR. BERNICK:  With respect to the timing for the --

11   for the PFS supplements --

12   THE COURT:  Yeah.

13   MR. BERNICK:  -- I take it from what you have said is

14   that that's a forget it in connection with the trials in

15   2018 --

16   THE COURT:  Correct.

17   MR. BERNICK:  -- but should we be thinking about the

18   timing of when those need to be submitted?

19   THE COURT:  Well, so what I --

20   MR. BERNICK:  In part by 2019.

21   THE COURT:  What I would say is for the existing

22   cases, I think what ought to happen is there ought to be

23   some -- you know, just to be general about it -- reasonable

24   time period from whenever I enter the order, that it's going

25   to have to be supplemented or somebody is going to have to

1   say, I've already provided this information; one of the two.

2   I don't know exactly what that time period is.  Maybe it's 60

3   days, maybe it's 90 days.  I don't know.  I'll leave that for

4   you to negotiate.

5         MR. BERNICK:  Okay.  The last thing that I just -- by

6   way of information, maybe to draw a distinction that may be

7   helpful to your Honor, so if we're thinking about populating

8   the eight additional cases to be trial ready by the -- by

9   August of 2018, you've said, you know, expanding mixed-use may

10  be a way to go.

11        If we're working within the confines of the 100 that

12  were selected where we now have -- you know, people have

13  gotten --

14        THE COURT:  Yeah.

15        MR. BERNICK:  Based at least upon our predictions

16  right now or our estimate right now, it looks like there will

17  be a substantial enough volume of those cases -- that is, at

18  least from AbbVie's point of view -- that will be -- that

19  we'll have done the submission and complied with the

20  submission, to pick more cases from that.  And that might be,

21  you know, a helpful thing to deal with.

22        THE COURT:  Do you have any thoughts on that?

23        MR. JOHNSON:  I don't think at this point -- I'm

24  sorry, your Honor.

25        THE COURT:  Do you know?

1     MR. JOHNSON:  Ron Johnson for the PSC.

2     THE COURT:  Yeah.

3     MR. JOHNSON:  We don't want to necessarily -- until

4  we know what that looks like, I don't want to limit ourselves

5  to that.

6     THE COURT:  Yeah.  That's fine.  I mean, I did

7  suggest -- and I think I maybe neglected to say it out here --

8  I did suggest when I had our meeting that using those cases

9  might be a way of getting kind of a leg up on adding some more

10  cases on.  I don't intend for that to be sort of, okay, it's

11  got to come from those, but, you know, those would be cases at

12  least where you've got additional information at this point

13  where you don't have to then tell somebody to go back and do

14  more.  But I'm not going to impose that.

15     So it's certainly an option to consider.  And, you

16  know, maybe -- you know, maybe if what we end up as a default

17  is that the plaintiffs are picking half and the defendants are

18  picking half -- because you're picking your half --

19     MR. JOHNSON:  Right.

20     THE COURT:  -- the defendants are picking their half

21  from that because you know more about those cases.

22     MR. BERNICK:  One, experts.  If we're going to be

23  gearing up for a significant number of additional new trials

24  at the back end of the year, we may have to involve, you know,

25  additional experts.

1    THE COURT:  Yep.  And this -- and these orders should

2    include the schedules for all of that kind of stuff.

3    MR. BERNICK:  Okay.  And then the last thing is that

4    random selection, so we have the selection of the cases that

5    are to be worked up for trial, and I know that random is off

6    the table for that, but what about kind of getting the cases

7    from which we can make our recommended selection?

8    So, for example, we had the 100 cases for the

9    bellwethers, we have the 100 cases for the mixed-use cases,

10    and those were all random selection as opposed to the parties

11    going back over the pool as a whole where you know the

12    arguments back and forth --

13    THE COURT:  Yeah, we had this discussion before.  I

14    am just going to short-circuit this.  I'm not going to do what

15    I did with the original AbbVie pool, which is where I

16    basically said, okay, we're going to randomly pull a subset so

17    you have a smaller chunk to look at.  I mean, you are free to

18    do that on your own, if you want, but I am not going to impose

19    that.  That's the bottom line.

20    MR. BERNICK:  Okay.

21    THE COURT:  Been there, done that.  Okay.

22    Anything on the plaintiffs' side you want to raise?

23    Mr. Solow?

24    MR. SOLOW:  Andrew Solow for Auxilium and Endo, your

25    Honor.

1        Just one quick item.  With the eight additional cases

2   and going forward in the future, if your Honor is leaving it

3   to the parties to decide what the selection method is going to

4   be, so we can get some guidance, is it clear that there will

5   be some ability within the process, in your mind's eye, of

6   arguments of non-representative?  I know you dealt with this

7   previously --

8        THE COURT:  Yeah, sure, of course.  Right.  I mean,

9   people are going to be able to come in and say, don't let this

10  case go to trial.  It's an outlier.  Absolutely.  I mean, I

11  don't want -- I want to have cases to try.  I don't want them

12  to be complete oddball cases on either side.

13       So, yeah, sure, of course.

14       MR. SOLOW:  With that guidance, we will hopefully be

15  able to negotiate.  Thank you, your Honor.

16       THE COURT:  I mean, you know, honestly, I want to

17  have -- as I have before, I want to have some input in this is

18  the case that's going to trial and so on.  And it's

19  particularly true if I'm, to use a Chicago term, Lujacking

20  these things to other people.

21       All right.  Thank you for coming in today.  See you

22  in a few weeks.

23       MR. JOHNSON:  Thank you, Judge.

24       MR. SEEGER:  Thank you, Judge.

25    (Which were all the proceedings had in the above-entitled
      cause on the day and date aforesaid.)

27

       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

    _____          _____
    Carolyn R. Cox                    Date
    Official Court Reporter
    Northern District of Illinois

    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR