*[Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br>**JOINT STATUS REPORT FOR DECEMBER 19, 2024 DISCOVERY STATUS CONFERENCE**<br><br>Judge:     Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

# JOINT STATUS REPORT

In advance of the discovery status conference set by the Court for Thursday, December 19, 2024 at 9:30 a.m., Plaintiffs, Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC (collectively, "Defendants") (jointly, "the parties"), respectfully submit this Joint Status Report.

## I. Safety Data

**Plaintiffs' Position:** Despite two Orders dating back to July requiring Uber to produce data and documents about Uber-related sexual assault and sexual misconduct incidents, Uber has not complied. (ECF 683, 706). Plaintiffs request guidance from the Court on enforcing these Orders. First, although Uber recently agreed on December 13 to produce all except one of the numerous fields of data it has refused to produce since July, Uber still refuses to produce the data contained in the "Comments" field. This field contains Uber's internal discussion of the event and Uber's response to it, and is critical to Plaintiffs' review. Second, although the Court ordered Uber to produce data for *all* sexual assault incidents regardless of the reporting party, Uber refuses to produce *any* data for rider on driver assaults or assaults involving third parties, despite Plaintiffs' insistence since July that Uber do so.[1] Third, Uber has not fully produced documents to show how frontline agents were instructed to categorize reports or how auditors were instructed to conduct their review. Additionally, Uber insists on producing the data through a third-party vendor who provides limited, controlled access to the data. Despite Uber's representations that the data has been available to Plaintiffs since September, Plaintiffs still today cannot begin to meaningfully analyze the data because the third-party vendor still has not properly provisioned the system with the tools and functionality agreed upon months ago. Even if these issues are corrected, review of the data will be slowed due to limitations not agreed to nor anticipated when Plaintiffs agreed to the third-party host. Plaintiffs and their experts have spent hundreds of hours as a result of the involvement of this third party, whose involvement is unnecessary given the robust protective order in place.

**Defendants' Position**: As Plaintiffs have previously acknowledged, incident data is highly sensitive commercial information, and perhaps more importantly contains information that could

---

[1] As noted by the Court more recently, evidence pertaining to risks to drivers is not as distinct from the issue of risk to passengers. (ECF 1920 at *2-3)

reveal sensitive personal details about nonparties to this litigation. ECF 1681, at 5-6. Defendants went to great lengths and expense to secure a third party data host not otherwise affiliated with the litigation (the data forensics arm of Big Five accounting firm BDO) and worked closely with Plaintiffs for weeks to architect a secure hosting environment *entirely to Plaintiffs' expert's specifications without material modification*. On September 30, Defendants posted the agreed U.S. incident data. JCCP leadership was given access to a parallel space the same day, and began working in it on October 2nd. MDL Plaintiffs, however, chose not to review this data and instead created an unnecessary delay through months-long negotiations of contractual addenda, including directly with BDO and its counsel. Plaintiffs finally deemed their confidentiality agreement with BDO complete by sending BDO a unilaterally executed copy on December 12. Plaintiffs first raised perceived issues with provisioning of services by BDO to Defendants on December 13. Due to confidentiality agreements between Plaintiffs and BDO (entered at Plaintiffs' insistence), Defendants have very limited ability to intercede. Defendants are advised by BDO that it is working diligently to resolve any technical issues and the Court should be assured that BDO has the technical acumen to do so.

Further, the parties have been involved in an active negotiation regarding the scope of additional productions. The parties also continue to discuss the "Comments" field, which often includes privileged communications, and rider- or third party-on-driver incident data. These issues are not ripe for Court intervention, as the parties acknowledged on a December 13 meet-and-confer.

Lastly, Defendants have produced documents showing how frontline agents were instructed to categorize reports and how auditors were instructed to conduct their review.[2] Defendants provided Plaintiffs with a list of Bates numbers for such documents on September 9, over three months ago.

II.   **Noncustodial Production**

**Plaintiffs' Position**: Despite numerous Orders from this Court and requests from Plaintiffs that have remained unchanged since first issue, Uber has yet to complete production of non-custodial

---

[2] These documents include: several Knowledge Bases specifically related to the taxonomy, the 2017 audit, and Jira field standardization instructions; training decks for agents and auditors related to topics including use of reporting tools such as Bliss and Jira, categorization of incidents per the taxonomy, and information to obtain from callers to improve the accuracy of reports slide decks related to the 2017 audit process; as well as evaluation materials for agents and auditors to gauge accuracy in categorizing incident reports.

documents. *See, e.g.*, ECF 706, 1629. 164, 1777. First, Uber has yet to produce a single complete policy for all dates it was effective. Plaintiffs spent months and hundreds of attorney hours reviewing Uber's document productions in an attempt to identify policies[3], and have met and conferred extensively. Uber committed to substantially complete production of non-custodial documents by October 15, 2024 (ECF 1643); however, it has failed to do so. Although Uber produced some policy-related documents, neither Plaintiffs nor Uber can yet identify specific documents that when pieced together, constitute a policy or practice as it existed from the time it was instituted[4] until the present (or time that it was discontinued) for any given topic. To attempt to focus the issue for Uber, Plaintiffs specifically identified at least 123 policies significant to this litigation that Uber has omitted from production *in their entirety*. The noncustodial documents at issue are at the center of this litigation, for example, policies on background checks, driver deactivation, and investigations. Additionally, although Uber committed to produce all marketing documents targeted to riders, Uber produced documents from just one source, an email blast system, which does not include even the most basic, moreover the scope of, marketing documents that Plaintiffs are entitled to obtain. Moreover, Uber's production omits critical metadata, which prevents meaningful use of the documents. Plaintiffs request guidance from the Court on enforcing the prior Orders and intend to seek sanctions, if necessary.

**Defendants' Position:** Defendants have complied with the Court's Orders. Plaintiffs inaccurately characterize Defendants' productions, for example, originally asserted Defendants "omitted" "Serious Interpersonal Conflict" policies even though a policy titled "[Live] Global Serious Interpersonal Conflict Standard."[5] appears *three times* on a list of policies in certain productions that Defendants provided Plaintiffs upon request. This illustrates the disconnect between Defendants' actual productions and Plaintiffs' representations thereof. Further, Plaintiffs' "123 policies significant to this litigation" includes at least one related to scooter rentals. These "123 policies" come from a list

---

[3] Uber recently differentiated "policies" from "Knowledge Base" documents for the first time, stating that Knowledge Base documents are provided to front line agents to operationalize policies.

[4] Further, review of Uber's current production shows significant production gaps for documents prior to 2016. Plaintiffs have raised this issue to Uber but Uber has not committed to correcting these gaps.

[5] UBER_JCCP_MDL_000366699, UBER_JCCP_MDL_000366712, UBER_JCCP_MDL_000366728. Plaintiffs also falsely assert above that "Serious Interpersonal Conflict" is "the phrase Uber uses to categorize sexual assault." This term includes sexual assault, but is broader and also includes, e.g. theft.

of 860 purported policies from Plaintiffs, which includes documents that are neither policies nor Knowledge Bases, e.g., documents called "Transition Document" and "Past Women's Safety Strategies," non-Rideshare documents (e.g., logistics, scooters, new verticals), and documents of questionable-at-best relevance (e.g., work-from-home guidelines, spam callers, falsified fares, Prop 22, EU privacy regulations, car seats, ride requests from outside the US or Canada, or animals in vehicles).

In addition, Plaintiffs continue to add voluminous new requests. On December 12, Plaintiffs added a whole new set of requests for "playbooks," which are custodial documents, and marketing documents in addition to the above-referenced production, which was specifically requested by Plaintiffs and comprises almost 70,000 pages. The parties continue to confer about all these new requests. There are no disputes ripe to bring before the Court related to these new requests.

### III.    TAR Validation

**Plaintiffs' Position:** Uber was to provide the metrics and disclosures required by the ESI Protocol for the first and second sets of custodial files by November 6 and December 12, respectively. (ECF 1777). Uber belatedly produced metrics for the first set on November 20 and has not produced metrics for the second set or provided a date that they will do so. The November 20 metrics triggered Plaintiffs' right to review a validation set under the ESI Protocol, but Plaintiffs have not been able to begin that review because, until December 13, Uber insisted that review must be done in person, rather than remotely as permitted by the ESI Protocol. (ECF 524 at 10). Although Uber now agrees to remote review, Uber has not given a date by which they will provide access.

**Defendants' Position:** While the ESI Protocol does not require validation to occur until the completion of the TAR process, Defendants conducted an interim validation process for the first two custodial Tranches. As Defendants informed Plaintiffs on November 20, Defendants arranged for Plaintiffs to review the TAR validation sample in person, as expressly contemplated by the ESI Protocol. Plaintiffs refused. The TAR validation sample is especially sensitive because it contains,

5

by definition, non-discoverable, irrelevant, non-responsive documents about Defendants' business. But to avoid raising an unnecessary dispute with the Court Defendants agreed Plaintiffs could conduct the validation review remotely with appropriate safeguards. On December 13, Plaintiffs requested the terms of the remote review, which Defendants provided that same day. Plaintiffs have not yet accepted those terms or provided the required information. Plaintiffs will have remote access shortly after they do so. As for further validation, the Parties recently reached agreement expanding the scope of discovery. This subject matter expansion affects every custodial tranche and requires additional training of the TAR model. Defendants cannot provide meaningful or useful validation metrics for additional custodial tranches while the model is still learning how to incorporate the new responsiveness criteria.

### IV.  Custodial Production

**Plaintiffs' Position**: Plaintiffs are concerned that Uber is improperly withholding documents from certain custodians for whom Uber has represented production is substantially complete. For example, Uber produced fewer than 1100 documents for Kalanick and under 700 documents for Khosrowshahi, yet represents those productions are complete despite previously representing to Plaintiffs that search terms would yield exponential results. Plaintiffs have asked Uber to produce hit counts for these custodians based on MDL search terms but Uber has not agreed to do so.

**Defendants' Position:** Defendants' productions for the identified custodians are substantially complete. Last Friday, December 13, Plaintiffs for the first time requested unspecified "hit reports." But during search term negotiations, Plaintiffs took the position that the terms should be broader than typical, acknowledging that many of the documents hitting on those terms would be non-responsive but that TAR would hone in on the responsive documents. Thus, hit counts from these overbroad and imprecise terms were designed to substantially exceed production volumes, and would not be probative of any purported issues. Further the parties have not yet met and conferred on this recent request. This issue is therefore not ripe for the Court's consideration.

### V.  Privilege Disputes

**Plaintiffs' Position**: Despite five rounds of privilege log challenges totaling more than half of Uber's approximately 40,000 Tranche 1 and Tranche 2 privilege log entries, numerous meet and confers, Uber reversing course on the vast majority potential samples raised during those exchanges, and at least five Court Orders,[6] Uber has withdrawn privilege on just 399 log entries and produced only 132 with redaction. On December 12, 2024, Uber represented it would withdraw claims related to an additional 3,380 entries and produce an additional 1,571 entries. Uber belatedly provided a digest of third party *domains* over which it claims privilege[7] without identifying specific individuals or log entries associated with those domains. By asserting privilege over entities in their entirety, no matter the party to the communication, Uber seeks to improperly shift the burden to Plaintiffs.

**Defendants' Position**: Through December 3, Defendants produced nearly 540,000 documents, and withheld or redacted for privilege 57,607, with *each* document undergoing independent privilege review. Defendants continue to revisit documents to apply lessons learned through QC, meet and confers, privilege log challenges, and Court guidance to determine if responsive content can be produced with privilege redactions or if the privilege assertion can be withdrawn. Defendants note that neither the number of documents logged, nor the number of documents with amended or withdrawn privilege claims paints a complete picture, since each instance of a privileged email thread may need to be logged (or, conversely removed from the log), at Plaintiffs' insistence to include all iterations of email threads. Defendants served the Third Party Digest on Saturday, December 13, as ordered. For their part, Plaintiffs continue to misleadingly assert that challenged privilege claims they cherry-picked for conferrals are representative of the broader set of privilege disputes. Plaintiffs criticize Uber for not de-designating more documents, while failing to make any changes to their en masse categorical privilege challenges that lack an individualized basis—such as challenging thousands of documents solely because an attorney appears to be in the "cc" field in the version contained on the log rather than the "to" field (even though this is often caused by how Gmail processes replies reverting all participants to the cc field).

### VI. Uber's Pre-2013 Document Production

---

[6] *See* ECF Nos. 396; 866; 1732; 1908; and 1908.
[7] This digest includes common domains such as gmail.com, icloud.com, me.com, and yahoo.com.

**Plaintiffs' Position:** On November 18, the Court ordered Uber to produce pre-2013 custodial documents within 14 days, or by December 2. (ECF 1879). Uber has not complied and instead, has unilaterally given itself an additional month to complete this production despite the Court's Order to do so by December 2.[8] Uber should be ordered to produce these documents immediately.

**Defendants' Position**: ECF 1879 requires Defendants to produce documents consistent with their representations in the Parties' joint letter dated November 14, in which Defendants stated they would begin producing documents by November 26 and continuing on a rolling basis through January 3, 2025. Defendants began producing pre-2013 custodial documents on November 19, have continued making rolling productions, and expect to complete that production by January 3, 2025.

### VII.  JCCP Coordination

**Plaintiffs' Position:** MDL Plaintiffs have repeatedly expressed that they are happy to coordinate with the JCCP on depositions provided that certain parameters are met, including substantial completion of custodial file production and resolution of privilege and validation issues. Many of these issues have been addressed by this Court, including PTO 20, which established production and deposition timelines for the different tranches of custodians. MDL Plaintiffs intend to coordinate deposition dates with the JCCP to the extent possible, including for the depositions of Tracey Breeden; Gus Fuldner; and Carley Lake. Additionally, on December 13, per PTO 16 the Deposition Protocol, MDL Plaintiffs notified Uber that they would like to depose 18 additional custodians and provided three dates Plaintiffs are available to take each of those depositions. MDL Plaintiffs look forward to receiving Uber's response by December 23.

**Defendants' Position:** Defendants believe Plaintiffs are not complying with the Deposition Protocol's requirement that they coordinate, and seek the Court's guidance, particularly to ensure that witnesses are deposed once across the cases. At the December 10 JCCP Informal Discovery Conference, Judge Schulman informed the parties that this Court had contacted him about the prospect of coordinating the MDL and the JCCP. Judge Schulman further stated that he had a call scheduled

---

[8] Plaintiffs recognize that productions for two of the six custodians affected by the Order are not due until January 3, however, complete production for the other four were due on October 21 and November 26. Per the Court's Order, Uber should have completed pre-2013 production for these four custodians by December 2.

with Judge Breyer to discuss such coordination. Defendants continue to proceed in a fashion that permits fully coordinated discovery. Of note, in the spirit of cooperation, Defendants have already produced all corporate documents produced to MDL Plaintiffs to the JCCP Plaintiffs, and vice versa. For their part, Plaintiffs appear to be manufacturing discovery disputes to avoid coordinating depositions, as Plaintiffs accompany many of their discovery demands with threats regarding deposition coordination. Plaintiffs' "parameters" to coordinate depositions have been a constantly moving target and are far afield of the requirements outlined in PTOs 16 and 20. Notably, these purported issues have not prevented JCCP Plaintiffs, which include a member of MDL Plaintiffs' leadership, from taking multiple depositions using the same information available to MDL Plaintiffs.

### VIII. Compliance Deadlines

**Plaintiffs' Position**: Uber's failure to fully comply with Court Orders was a serious problem; with Judge Breyer's December 12 Order, it is now untenable. Fact discovery will be substantially complete by June 16, 2025 and bellwether expert reports are due August 8, 2025. (ECF 1950). Depositions must start in mid-January, meaning productions long-ago ordered must be completed before then. Plaintiffs request that the Court set hard deadlines for the complete production of all documents in non-custodial sources ordered or agreed to as a result of the first RFPs of **January 6, 2025**, with Uber expressly on notice that any failure to meet that deadline will result in sanctions. This must include:
- All current, historical, and draft policies that fall into the categories the parties have agreed Uber will produce including Knowledge Base materials and other noncustodial documents related to marketing, safety policies, background checks, driver onboarding, studies and focus group materials related to safety or safety communications, driver deactivation, dashcams, training or education scripts for drivers and employees, and data retention policies, as well as complete metadata as required by the ESI Protocol.
- The safety data subject to the Court's July 9, 2024 order. ECF 683.
- All marketing documents related targeted to riders, without limitation to whether they are related to sexual assault, as Uber has previously agreed to produce.

**Defendants' Position**: Plaintiffs' proposed January 6 deadline has not been raised in conferrals, and contradicts the agreements reached the weeks of November 18 and 25 when the Parties agreed to substantial completion of the aforementioned discovery by January 31. This request represents yet another attempt by Plaintiffs to make an end run around the conferral process and PTO

9

8, and prematurely bring unripe issues before the Court. Plaintiffs' request is not warranted, extreme, and misrepresents prior agreements of the parties. As discussed above, Plaintiffs' requests are an ever-moving target, in terms of subject matter as well as scope. For instance, following the conferral process, Defendants expanded, at Plaintiffs' insistence, the geographic scope of its searches to include certain information outside of the United States, and substantially complete production by January 31, 2025. Further, the Court recently provided guidance regarding time scope of discovery, which includes a stipulation or joint letter due to the Court after this Status Conference.

### IX. Defendant Fact Sheets

**Plaintiffs' Position:** Uber incorrectly states that Plaintiffs have not served a single DFS deficiency when in fact the parties have conferred at length about more than 100 individual DFS deficiencies. Although this has resolved some deficiencies, Plaintiffs' priority is to achieve a process that allows Plaintiffs to rely on the absence of documentation as proof that such documentation does not exist. Plaintiffs have therefore requested that Uber certify the completeness of its DFS productions, given that documents relating to drivers past records and performance are uniquely in Uber's possession. Further, Uber continues to update DFS productions on a rolling basis, which hampers Plaintiffs' ability to recognize gaps and assure finality. Plaintiffs cannot analyze cases for representative trials until Plaintiffs have assurance that the DFS productions for individual Plaintiffs are complete and reliable. Additionally, Plaintiffs' representative case analysis is further hampered by Uber's failure to serve several DFSs entirely.

**Defendants' Position:** Plaintiffs' request for Defendants to "certify" DFS productions goes beyond the requirements of PTO 10 and is not warranted. PTO 10 requires DFS (or PFS) productions to be substantially complete, and provides for a process of resolving purported deficiencies that begins with a deficiency notice served through MDL Centrality. (ECF 348 at 6-7.) Notably, Plaintiffs have not served Defendants a single DFS deficiency notice to date. Thus far, the Parties have engaged in productive conferrals and written exchanges of information (most recently on November 7) to address Plaintiffs' questions regarding Uber's DFS productions.

### X. Plaintiff Fact Sheets

**Plaintiffs' Position:** Plaintiffs' counsel has continued to meet and confer with Uber regarding PFSs in individual cases. This process has resolved numerous alleged deficiencies and Plaintiffs have amended PFSs as warranted. On November 18 the Court gave Plaintiffs 30 days—until December 18—to amend any deficient PFS productions. (ECF 1877). Plaintiffs have been diligently amending PFSs in compliance with the order. Individual Plaintiffs' counsel continue to meet and confer with Uber regarding specific issues in their cases. Due to the holidays, the substantial number of Plaintiffs impacted by the order, and counsel's ability to communicate with every Plaintiff within a short timeframe, some Plaintiffs have requested extensions.[9] While Uber has alleged deficiencies beyond those discussed in the November 18 Order, that is not an issue for the Court at this time as these relate to one law firm (Levin Simes, LLP) and are being addressed individually. Plaintiffs' position is that the process is working, and there is no need for Court intervention at this time.

**Defendants' Position:**

a. **Overdue Plaintiff Fact Sheets**

Dozens of Plaintiffs have failed to submit timely fact sheets. Defendants and Levin Simes LLP are submitting a PTO 8 letter brief to the Court on December 18, 2024 concerning nearly 100 of these cases, wherein Defendants seek an additional order compelling Plaintiffs to produce verified, substantially complete Plaintiff Fact Sheets within two weeks, and providing that should any Plaintiff fail to meet this deadline as well, Defendants may make an application for dismissal of that Plaintiff's case with prejudice. These Plaintiffs are not the only Plaintiffs who have failed to submit timely fact sheets. Defendants are prepared to request judicial relief through additional PTO 8 letter briefs should other Plaintiffs continue withholding Court-ordered discovery.

b. **Plaintiff Fact Sheets with Deficiencies**

On November 18, 2024, the Court issued an Order resolving the parties' disputes concerning

---

[9] Uber states that it sent letters to several Plaintiffs' firms identifying over 500 Plaintiffs who had yet to cure the deficiencies identified in the Court's Order, but the deadline to cure deficiencies is not until December 18.

Plaintiffs' obligations under PTO 10 (ECF 1877). Last week, Defendants sent letters to several Plaintiffs' firms identifying over 500 Plaintiffs who had yet to cure the deficiencies identified in the Court's Order. Defendants will be prepared to share with the Court the number of Plaintiffs who disregarded the Court's deadline during the status conference. Defendants will also be prepared to seek judicial relief through PTO 8 letter briefs requesting orders compelling any non-compliant Plaintiffs to conform their deficient PFS productions with the Court's November 18 Order and providing that Uber may seek dismissal with prejudice of the case of any Plaintiff who continues to violate the Court's directives.[10]

## XI. Future Discovery Status Conferences

In light of Judge Breyer's Order that sets the close of fact discovery for June 16, 2025, Plaintiffs request that the Court set monthly status conferences in the coming months. Defendants defer to the Court. However, if the Court is inclined to set monthly status conferences, Defendants respectfully request the Court to set a complete schedule for such conferences.

---

[10] There are many deficiencies in Plaintiffs' fact sheet productions beyond those discussed in the November 18 Order such as completely unanswered questions or withheld documents. Defendants are prepared to raise these deficiencies in Plaintiffs' PFS productions to the Court through PTO 8 letter briefs as well should Plaintiffs continue violating PTO 10's requirement that each Plaintiff submit a substantially complete PFS.

| | | |
|---|---|---|
| 1 | | |
| 2 | By: /s/Roopal Luhana | By: /s/ Michael B. Shortnacy |
| | ROOPAL P. LUHANA (Pro Hac Vice) | MICHAEL B. SHORTNACY (SBN: 277035) |
| 3 | **CHAFFIN LUHANA LLP** | mshortnacy@shb.com |
| | 600 Third Avenue, Fl. 12 | **SHOOK, HARDY & BACON, L.L.P.** |
| 4 | New York, NY 10016 | 2049 Century Park East, Suite 3000 |
| | Telephone: (888) 480-1123 | Los Angeles, CA 90067 |
| 5 | Email: luhana@chaffinluhana.com | Telephone: (424) 285-8330 |
| | *Co-Lead Counsel for Plaintiffs* | Facsimile: (424) 204-9093 |
| 6 | | |
| | SARAH R. LONDON (SBN 267083) | PATRICK OOT (*Pro Hac Vice* admitted) |
| 7 | **LIEFF CABRASER HEIMANN &** | oot@shb.com |
| | **BERNSTEIN** | **SHOOK, HARDY & BACON, L.L.P.** |
| 8 | 275 Battery Street, Fl. 29 | 1800 K Street NW, Suite 1000 |
| | San Francisco, CA 94111 | Washington, DC 20006 |
| 9 | Telephone: (415) 956-1000 | Telephone: (202) 783-8400 |
| | Email: slondon@lchb.com | Facsimile: (202) 783-4211 |
| 10 | | |
| 11 | RACHEL B. ABRAMS (SBN 209316) | RANDALL S. LUSKEY (SBN: 240915) |
| | **PEIFFER WOLF CARR KANE** | rluskey@paulweiss.com |
| 12 | **CONWAY & WISE, LLP** | **PAUL, WEISS, RIFKIND, WHARTON &** |
| | 555 Montgomery Street, Suite 820 | **GARRISON LLP** |
| 13 | San Francisco, CA 94111 | 535 Mission Street, 24th Floor |
| | Telephone: (415) 426-5641 | San Francisco, CA 94105 |
| 14 | Email: rabrams@peifferwolf.com | Telephone: (628) 432-5100 |
| | | Facsimile: (628) 232-3101 |
| 15 | | |
| | | ROBERT ATKINS (*Pro Hac Vice* admitted) |
| 16 | | ratkins@paulweiss.com |
| | | CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted) |
| 17 | | cgrusauskas@paulweiss.com |
| | | ANDREA M. KELLER (*Pro Hac Vice* admitted) |
| 18 | | akeller@paulweiss.com |
| | | **PAUL, WEISS, RIFKIND, WHARTON &** |
| 19 | | **GARRISON LLP** |
| | | 1285 Avenue of the Americas |
| 20 | | New York, NY 10019 |
| | | Telephone: (212) 373-3000 |
| 21 | | Facsimile: (212) 757-3990 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/  Roopal P. Luhana