UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES. | Case No. 23-md-03084-CRB  (LJC)<br><br>**ORDER REGARDING SECOND SET OF CHALLENGES TO UBER'S PRIVILEGE CLAIMS**<br><br>Re: Dkt. No. 1952 |

## I.  INTRODUCTION

In accordance with the process previously set by the Court, the parties have filed a joint letter addressing a sample of disputed privilege log entries. Dkt. No. 1952. The Court resolves the parties' disputes as follows.

## II.  LEGAL STANDARD

"[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. California law therefore applies to issues of privilege in this multi-district litigation, at least absent any showing that the law of some other state should apply. *See Holley v. Gilead Scis., Inc.*, No. 18-cv-06972 JST (JSC), 2021 WL 2371890, at *2 (N.D. Cal. June 10, 2021) (applying California choice-of-law rules to conclude that California privilege law applied in a case with "factual connections to multiple states," where no party introduced evidence of a conflict of laws or another state's governmental interest in applying its own law).

Under California law, the attorney-client privilege is governed by statute and applies to confidential communications between client and lawyer during the course of the attorney-client relationship. *See* Cal. Evid. Code §§ 911, 954, 952. "The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise." *Costco Wholesale*

1  *Corp. v. Superior Ct.*, 47 Cal. 4th 725, 733 (2009).  "Once that party establishes facts necessary to
2  support a prima facie claim of privilege," then the privilege is presumed to apply, and "the
3  opponent of the claim of privilege has the burden of proof to establish the communication was not
4  confidential or that the privilege does not for other reasons apply."  *Id.*

5  "[T]o determine whether a communication is privileged, the focus of the inquiry is the
6  dominant purpose of the relationship between the parties to the communication."  *Clark v.*
7  *Superior Ct.*, 196 Cal. App. 4th 37, 51 (2011).  Where the "dominant purpose of the relationship
8  between the parties to the communication was one of attorney-client, the communication is
9  protected by the privilege."  *Id.*  "[T]he relevant inquiry is not the content of the communication
10 but is instead the relationship of the communicators."  *Id.* at 52.  If "the communications were
11 made during the course of an attorney-client relationship"—as opposed to a relationship with
12 some other "dominant purpose"—then "the communications, including any reports of factual
13 material, would be privileged, even though the factual material might be discoverable by some
14 other means."  *Costco*, 47 Cal. 4th at 740.  Even when an attorney-client relationship is
15 established, however, "the inquiry turns on . . . the link between the content of the communication
16 and the types of communication that the attorney-client privilege was designed to keep
17 confidential.  In order for a communication to be privileged, it must be made for the purpose of the
18 legal consultation, rather than some unrelated or ancillary purpose."  *L.A. Cty. Bd. of Supervisors*
19 *v. Superior Ct.*, 2 Cal. 5th 282, 297 (2016) (adopting the reasoning of a concurring opinion in
20 *Costco*).

21 California courts have recognized that "that in order to implement the advice of lawyers,
22 the advice must be communicated to others within the corporation," and "[i]t is neither practical
23 nor efficient to require that every corporate employee charged with implementing legal advice
24 given by counsel for the corporation must directly meet with counsel or see verbatim excerpts of
25 the legal advice given" as a condition of maintaining privilege.  *Zurich Am. Ins. Co. v. Superior*
26 *Ct.*, 155 Cal. App. 4th 1485, 1498 (2007).  A communication between non-lawyer employees that
27 conveys privileged attorney advice remains privileged so long as sharing that information with the
28 recipient "further[s] the interest of the client in the consultation or . . . is reasonably necessary for

1   the transmission of the information or the accomplishment of the purpose for which the lawyer is

2   consulted." *Id.* at 1503 (quoting Cal. Evid. Code § 952).

> There are additional relevant limitations on the attorney-client privilege. It is established that otherwise routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is "copied in" on correspondence or memoranda. In addition, [a party] may not shield facts, as opposed to communications, from discovery. Any relevant fact may not be withheld merely because it was incorporated into a communication involving an attorney. In addition, [i]t is settled that the attorney-client privilege is inapplicable where the attorney merely acts as a negotiator for the client, gives business advice or otherwise acts as a business agent.

*Zurich Am. Ins.*, 155 Cal. App. 4th at 1504 (cleaned up); *see also, e.g.*, *Chi. Title Ins. Co. v. Superior Ct.*, 174 Cal. App. 3d 1142, 1151 (1985).

Applying federal law, courts have held that "[n]o privilege can attach to any communication as to which a business purpose would have served as a sufficient cause, i.e., any communication that would have been made because of a business purpose, even if there had been no perceived additional interest in securing legal advice." *Wisk Aero LLC v. Archer Aviation Inc.*, No. 21-cv-02450-WHO (DMR), 2023 WL 2699971, at *4 (N.D. Cal. Mar. 29, 2023) (quoting *McCaugherty v. Siffermann*, 132 F.R.D. 234, 238 (N.D. Cal. 1990), and citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)) (alteration in original). Under that standard, communications involving in-house counsel "warrant[] heightened scrutiny because in-house counsel may act as integral players in a company's business decisions or activities, as well as its legal matters." *Id.* (N.D. Cal. Mar. 29, 2023) (cleaned up). Although federal law does not govern the scope of privilege in this litigation, the Court funds that principle consistent with California law recognizing that privilege does not attach to communications where an attorney provides business advice rather than legal advice, or where an attorney is merely "copied in" on internal business communications. *See Zurich Am. Ins.*, 155 Cal. App. 4th at 1504.

### III.   APPLICATION TO PARTICULAR DOCUMENTS

Uber has submitted thirteen documents for in camera review. The Court addresses those as follows.

### A. JCCP_MDL_PRIVLOG028868

This document is a notification email generated by Google Docs containing comments, responses, and suggested changes by various Uber employees on a collaboratively edited document. Plaintiffs argue that it is not privileged because its is a "notification to Matt Baker (Uber's Community Operations Manager) notifying him that Margalit Kluger, (Uber's Senior Operations Manager), left a comment on a document titled 'US&C Safety Ops - Safety Media Business Standard,'" and neither Baker nor Kluger are attorneys. Dkt. No. 1952 at 3 (footnote omitted). Plaintiffs contend that Uber's privilege log does not make clear the role of the two attorneys listed in the "Privileged Name(s)" column, Daniel Kolta and Jennifer Handley, with respect to this document.[1] *Id.*

Uber argues that the "underlying document was shared with . . . Handley and . . . Kolta for the collaboration and for the purpose of seeking their legal advice concerning the potential legal risks of [media inquiry] policies and of any public statements that may be made based on them," and that the comments included in this email include legal advice by those attorneys and requests for such advice. Dkt. No. 1952 at 8.

This document is best understood as containing multiple distinct communications. Uber is correct that some comments seek or provide legal advice. Other comments, however, are specifically directed from non-lawyers to non-lawyers, and do not appear to seek, convey, or discuss legal advice. Uber must therefore produce a version of this email with privileged comments redacted and non-privileged comments unredacted. *Cf.* Dkt. No. 1908 at 6 (requiring Uber to produce a collaboratively edited document with redactions to privileged margin notes). Uber is further ordered to do the same for other comment-notification emails that contain both privileged and non-privileged comments.

---

[1] This Court's Order addressing a previous set of privilege disputes required Uber to include more detail in its privilege logs regarding this sort of notification email going forward. Dkt. No. 1908 at 9. The Court recognizes that Uber may not have been required to implement that Order as to this log entry by the time that this dispute was submitted, but expects that compliance with that previous Order's requirements regarding log entries—and with this Order's requirement below for redactions—to reduce the number of disputes raised as to comment-notification emails.

### B.     JCCP_MDL_PRIVLOG029996

This document is an email from Uber's then-Regional Operations Manager Katherine Gaspar to a fellow non-lawyer Uber employee, Corey Freivogel, with in-house counsel Laura McAdams and Jennifer Handley cc'd. As Uber explains in its portion of the joint letter, this email is part of a conversation that began with Gaspar specifically seeking legal advice from Handley. Handley added McAdams to share her advice as well, and Gaspar added Freivogel to discuss potential courses of action with the two attorneys. The conversation as a whole took place in the context of an attorney-client relationship for the purpose of seeking and sharing legal advice. The document is privileged.

Some confusion here appears to have stemmed from Uber initially listing the attorneys in the "Email BCC" column of its privilege log rather than the "Email CC" column, and later updating the privilege log to list the same two attorneys in both of those columns. *See* Dkt. No. 1952 at 3. If any of Plaintiffs' remaining challenges concern log entries where attorneys appear in the "Email BCC" column but no attorneys appear in the "Email From," "Email To," or "Email CC" columns, Uber is ordered to re-review those entries to ensure that they are accurate and that its claims of privilege are appropriate.

### C.     JCCP_MDL_PRIVLOG036737

Although this email was sent from non-lawyer Tracey Breeden to non-lawyer Steffi Bryson, with three lawyers and one other employee cc'd, it is part of (and includes) a thread that began with an email from in-house counsel Lauren Shapiro providing advice regarding communications with potential claimants.

Plaintiffs' primary basis for challenging this document appears to be the fact that attorneys appeared only on the "cc" line of the top-level email. Dkt. No. 1952 at 3–4. Plaintiffs offer no particular reason to doubt the explanation on Uber's privilege log that this is a "thread discussing legal advice from inhouse counsel regarding reports of driver sexual assault or sexual misconduct." *See id.*; Dkt. No. 1952-2 at 1.

In the joint letter, Uber characterizes the proposed language under consideration as "proposed communications with potential claimants to be made by a third-party claims

5

administrator." Dkt. No. 1952 at 8. It is not clear whether Uber's characterization is entirely accurate: the proposed language appears on its face to have been contemplated as a communication to be made by *Uber* with potential claimants, *regarding* the role of the third-party administrator. Either way, however, it concerned a matter for which Shapiro was employed to provide legal advice, and the advice she provided here was informed by her legal judgment. The other emails in the thread consist of non-attorney employees discussing Shapiro's advice and suggesting alternatives or modifications, while seeking feedback from the group as a whole, which included Shapiro and two other attorneys. The Court is satisfied that Uber's privilege log entry is accurate (even if its characterization in the joint letter might not be entirely accurate), and that this document is therefore privileged.

### D.     JCCP_MDL_PRIVLOG039363

This document is a set of notes prepared by Uber's then-CEO Travis Kalanick regarding safety considerations at Uber. As Uber notes in the joint letter, the document begins with the line: "<u>Document Prepared for Legal Analysis: attorney/client privileged</u>," and was accessible on Google Docs only to Kalanick. Dkt. No. 1952 at 9. Uber asserts that it has no further information about the purposed of this document because Kalanick left Uber in 2017. Based on that note at the top of the document, the fact that Kalanick was the only person who had access, and the subject matter of the document (including sporadic references to the Uber legal department), however, Uber contends that "*[a]ll available evidence* leads to the conclusion that it was prepared for the purpose of facilitating legal advice." *Id.*

Both parties cite the Western District of New York's decision in *Clark v. Buffalo Wire Works Co.*, 190 F.R.D. 93, 95–96 (W.D.N.Y. 1999), where the court held that notes a witness had taken were protected by attorney-client privilege. Although *Clark* applied federal privilege law, *see id.* at 95 n.3, neither party argues that California law materially differs. Uber contends that Kalanick's notes here are analogous to the witness's notes in that case, and that *Clark* stands for the proposition that "[p]ersonal notes made for the purpose of seeking legal advice are privileged, even if never read by an attorney." Dkt. No. 1952 at 9. Plaintiffs argue that *Clark* is distinguishable because that court relied on an affidavit by the witness as to his intent in preparing

6

the notes. *Id.* at 4 n.14.

The Court agrees with Plaintiffs that the witness's affidavit in *Clark* was material to the court's finding that the notes were privileged. The witness in that case provided a sworn statement asserted that his "entire purpose of keeping notes . . . was to provide these notes to [his] counsel to assist them in representing [him]." *Clark*, 190 F.R.D at 94. *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2009 WL 2905898, at *2 (N.D. Cal. Sept. 10, 2009) (relying specifically "upon the declaration of" the author that notes were prepared "in response to an instruction from counsel, and in order to facilitate his communication with counsel," to conclude in "a close question" that the notes were privileged). As an additional consideration not addressed by either party, the witness in *Clark* also provided the notes to his attorneys, 190 F.R.D. at 95, which Kalanick apparently did not do here. Although an undelivered communication that was intended for counsel can still be privileged, *People v. Gardner*, 106 Cal. App. 3d 882, 887 (1980), the actual delivery of the notes in *Clark* lends circumstantial support to the affidavit that they were always intended to be delivered.

In this case, there is neither a clear statement that Kalanick intended his notes to be shared with or otherwise communicated to counsel, nor any actual delivery of the notes to counsel. There is only Kalanick's unexplained and unsworn note that the document was "Prepared for Legal Analysis" (by whom, it is not clear—perhaps Kalanick himself) and "attorney/client privileged." As has been demonstrated in this litigation, even experienced counsel can disagree as to the scope of attorney-client privilege. A non-lawyer CEO's mere label of a document as privileged is not sufficient to satisfy Uber's burden to withhold this document from production. The content of the document also does not support an inference that it is privileged, as it appears largely to describe aspects of Uber's operations and strategic planning. Uber must produce this document.

The Court further notes Uber's assertion in its privilege log that this document was "prepared at the direction of in-house counsel," Dkt. No. 1952-2 at 1, which is not reflected in Kalanick's heading, supported by any other evidence, or pursued in Uber's arguments for privilege. The Court's previous Order regarding privilege disputes identified a potentially systemic misuse of log entries asserting documents were prepared at the direction of counsel, and

7

required Uber to "review all entries that assert a document was prepared at the direction of counsel to determine whether they are accurate." Dkt. No. 1908 at 15. The deadline set by that Order may not have required Uber to revise this entry before the current joint letter was filed. The Court expects, however, that this issue will not recur in future privilege log entries submitted for the Court's review.

### E.   JCCP_MDL_PRIVLOG039270

This document is an email, which Plaintiffs assert is not privileged because it was sent from Kalanick to non-lawyer employee Betsy Masiello, and attorneys appear only in the "cc" field. Dkt. No. 1952 at 4. Kalanick is responding to an earlier email that Masiello sent to the group, which specifically requests and relays legal advice. Masiello's email is privileged and may be redacted. Kalanick's email, however, does not request, relay, convey, or discuss legal advice. It discusses goals for a group that includes both lawyers and non-lawyers, and next steps logistically in preparing Uber's Safety Report. Uber's assertion that Kalanick "provided additional information that in-house counsel would have used to provide the requested legal advice," *id.* at 9, is not reflected in the document. Kalanick's email must be produced.

### F.   JCCP_MDL_PRIVLOG039202

This is a guide prepared by in-house counsel Maureen Frangopoulos to advise employees responsible for responding to and logging incident reports using the Jira platform. Dkt. No. 1952 at 9; Dkt. No. 1952-6 (Frangopolous Decl.) ¶ 4. The document is a communication of legal advice from an in-house attorney to other employees, and is therefore privileged.

### G.   JCCP_MDL_PRIVLOG034111

This document is an email chain among several Uber employees regarding a driver minimum age policy, with in-house counsel Scott Binnings cc'd. Binnings states that a participant in the conversation, Danielle Sheridan (at the time, Danielle Portugal), had asked him for his advice on the policy and related issues, and that he was included on the emails so that he would have information necessary to render that advice. Dkt. No. 1952-4 (Binnings Decl.) ¶ 3. Binnings does not assert, however, that the participants in the conversation were working at his direction, or that the purpose of their analysis was specifically to obtain legal advice, rather than to inform

1    business decisions for which Binning's legal advice would be only one relevant component. *Id.*
2    Sheridan's email that began the chain requests information from the team to support analysis of
3    the policy in question. Although Sheridan labeled her first email "A/C Privilege," that email did
4    not specifically request or refer to review by Binnings, nor did any subsequent email.

5        The thread includes one email from Binnings providing advice related to the issues
6    discussed. That email, as well as the first two sentences of the subsequent email by Sheridan that
7    respond to and reference Binnings's advice, may be redacted. Otherwise, however, Uber has not
8    shown that the dominant purpose of this email conversation among non-lawyer employees was to
9    request or provide legal advice. It appears instead to have been focused on conducting data
10   analysis to inform a business decision. Uber must therefore produce this document.

### H.  JCCP_MDL_PRIVLOG039352

This is an internal presentation regarding the preparation of Uber's Safety Report. Uber asserts that "[t]he bottom row in slide 12 contains the legal advice that Mr. Binnings and other in-house counsel provided regarding a qualitative assessment of the Safety Report vis-a-vis pending and future litigation," and that it is "willing to produce a redacted version of this presentation" with that information redacted. Dkt. No. 1952 at 10; *see* Dkt. No. 1952-4 (Binnings Decl.) ¶ 4. The Court agrees that the bottom row of slide 12 conveys legal advice, albeit in a general sense. Uber may redact that information, but must produce the remainder of the presentation.

It is not clear why Uber did not produce a redacted copy of this document before the issue was submitted to the Court.

### I.  JCCP_MDL_PRIVLOG039431

This document is a Google Docs comment notification email. It includes comments by attorney Scott Binnings and non-attorney Kate Parker that seek, convey, and discuss legal advice. It is therefore privileged, and need not be produced.

### J.  JCCP_MDL_PRIVLOG039488

This document is an email among non-lawyer employees discussing a potential public statement, but stems from a thread including several in-house attorneys, who provide legal advice throughout the conversation. As Uber states in the joint letter, "[t]he final, top-level email in the

chain does not include [the attorneys], but relays the legal advice to four recipients and continues to discuss the legal advice." Dkt. No. 1952 at 11.  Uber's characterization of the document is accurate as confirmed by the Court's in camera review.  Plaintiffs' arguments that the final email includes no attorneys and that Scott Binnings (on whose declaration Uber relies) was not personally familiar with the document, *see id.* at 5 & n.22, do not rebut the fact Uber's explanation of its privilege claim is accurate and valid.  The document is privileged, and need not be produced.

### K.     JCCP_MDL_PRIVLOG039513

This document is a Google Docs comment notification email containing a large number of comments by different employees.  Some comments by or directed to attorneys (including Jennifer Handley, Maureen Frangopoulos, Tracey Merwise, and Monique McNellie) plainly seek or convey legal advice.  Other comments by and directed to non-lawyers that do not relate to legal advice, like a comment discussing the design department's opinion on the flow of a proposed layout.  As with the document ending in 28868 discussed above, Uber must produce a redacted version of this document that redacts only comments that are themselves privileged.

### L.     JCCP_MDL_PRIVLOG033799

This document is a chain of two emails regarding efforts to prevent sexual assault.  The parties' arguments indicate that the document was produced with redactions.  *See* Dkt. No. 1952 at 6, 11.  The Court's understanding is that the top-level email from non-attorney Kate Parker to non-attorney Danielle Portugal was (properly) not redacted, and the original email below that was redacted in its entirety.  *See* Dkt. No. 1952-4 (Binnings Decl.) ¶ 7.  Although it is not dispositive, the Court notes that neither email was contemporaneously labeled attorney/client privilege.

The original email was from Parker to Tony West (Uber's Chief Legal Officer, Senior Vice President, and Corporate Secretary) and non-attorney Meghan Verena Joyce, with several other attorneys cc'd, as well as non-attorney Gus Fuldner.  Parts of that email convey legal strategy and advice, or plans for obtaining such advice, and are therefore privileged and may be redacted.  Other parts, however, set forth business and outreach plans, communicated by a non-lawyer employee (Parker) and apparently directed to another non-lawyer employee (Joyce), and to some extent also to West in his capacity as an executive and surrogate for Uber (e.g., discussing

10

West's role in "evangeliz[ing]" for Uber). As one example, the portion of a section titled "Summary of Asks" that is specifically directed to West is effectively a request for legal advice. On the other hand, other parts of the email discuss business and public relations strategies, like the portion of the same "Summary of Asks" section specifically addressed to Joyce. Those portions are not privileged, and must be produced.

In the Court's view, the permissible redactions are as follows:

(1) The portion of the "Summary of Asks" section addressed to West;

(2) The first bullet point under the heading "1. Education"; and

(3) The second bullet point under the heading "2. Community Guidelines."

If Uber believes any other portion of this document warrants redaction, it must file a letter brief no later than January 3, 2025 presenting arguments for such redactions, and need not produce the document until the Court resolves that issue. Plaintiffs may respond with their own letter, filed no later than January 7, 2025. Neither letter is to exceed three pages.

The Court is concerned that although Uber's descriptions of this document on its privilege log, in the joint letter, and in Scott Binnings's declaration accurately reflect the privileged portions of the document regarding West's provision of legal advice, they fail to disclose that significant portions of the document discussing public relations and business operations efforts apparently intended to be undertaken by both Joyce and West. Absent in camera review, only the subject line of the email ("Sexual Assault Prevention: Business Plan / Next Steps") and Joyce's inclusion as a recipient tend to suggest that it might have had purposes unrelated to legal advice. The difficulty of discerning the non-privileged nature of much of this document without reviewing it underscores the need for careful and accurate privilege review by Uber's attorneys.

### M.  JCCP_MDL_PRIVLOG039242

This document is a 2022 email chain discussing the release of Uber's second U.S. Safety Report. Uber redacted substantially all of the first email in this chain on the basis that attorney Jennifer Handley asked non-attorney Andrew Hasbun to send the email on her behalf to convey her legal advice concerning the release of Uber's Safety Report. Dkt. No. 1952-5 (Handley Decl.) ¶¶ 4–5. As revealed in an unredacted portion, however, the email ends with the signature

11

"Andrew on behalf of Emilie, Kristin, Katy, Elise, and Jen." Uber does not claim that all of the other attributed authors besides Handley are attorneys. More importantly, even if Handley drafted the entirety of the email, it does not convey legal advice, but instead states a goal "to create a quick, controlled news cycle focusing on the topline data leading into the extended 4th of July weekend," provides bullet points of data included in the report, and discusses outreach plans regarding media and advocacy groups.

In a case not discussed by the parties, a California appellate recognized that "[t]here may be situations in which an attorney's use of a public relations consultant to develop a litigation strategy or a plan for maneuvering a lawsuit into an optimal position for settlement would make communications between the attorney, the client, and the consultant reasonably necessary for the accomplishment of the purpose for which the attorney was consulted," suggesting that public relations is sometimes a component of litigation strategy. *Behunin v. Superior Ct.*, 9 Cal. App. 5th 833, 849–50 (2017). But the court construed that potential avenue for claiming privilege narrowly:

> In arguing his and Steiner's communications with Levick were reasonably necessary to accomplish the purpose of Steiner's representation because the negative publicity would help get the Schwabs to the settlement table, Behunin extends the privilege too far. [Citations, generally for the principle that privilege must be narrowly construed.] To be sure, maximizing a client's negotiating position and increasing the prospects for a favorable settlement are important parts of representing a client in litigation. All kinds of strategies could conceivably put pressure on the Schwabs to settle with Behunin, such as hiring away employees of the Schwabs or their company, lobbying governmental officials to enact regulations adverse to the Schwabs' investment business, and creating a competing brokerage business to take away the Schwabs' clients. Such strategies might help get the Schwabs to settle the Sealutions litigation on favorable terms. But that does not mean Behunin's or Steiner's communications with headhunters, lobbyists, and lenders who might finance a competing company would be privileged. Without some explanation of how the communications assisted the attorney in developing a plan for resolving the litigation, Behunin would not be able to show such communications were reasonably necessary to accomplish Steiner's purpose in representing Behunin.

*Id.* at 850–51.[2]

---

[2] As this Court discussed in a previous Order, *Behunin* considered the somewhat distinct question of when disclosure to a third-party public relations consultant waives privilege. Dkt. No. 1727 at

12

Managing public relations could always have downstream effects on litigation, but the sort of core public relations strategy at issue here—focusing attention on positive developments while limiting attention on potentially less favorable information—is not legal advice. Handley's conclusory assertion that she "assessed various legal issues, including the implications the report, and public statements about the report, may have on pending and future litigation," Dkt. No. 1952-5 (Handley Decl.) ¶ 5, suggests that she merely sought to avoid negative publicity for Uber. That goal is the opposite side of the same coin invoked and rejected in *Behunin*, where a plaintiff sought to foment negative publicity regarding defendants in order to pressure them to settle—without even as clear a connection to any particular litigation as in that case.

Uber's privilege log entry for this document, characterizing it as an "e-mail thread seeking legal advice from in-house counsel regarding preparation and drafting of Uber's Safety Report," is simply inaccurate, and Uber does not attempt to defend that characterization of the document in the joint letter or its supporting declarations. *See* Dkt. No. 1952-2 at 4. Handley's description of the document is not as inaccurate as the privilege log, but still obscures its substantial non-legal content in much the same was as discussed above with respect to the previous document.

As far as the Court can discern, one parenthetical phrase in the email immediately following the words "PDF of final report" conveys legal advice and may be redacted. The remainder of the email is not privileged and must be produced.

## IV.  OTHER ISSUES

### A.  Plaintiffs' Arguments Regarding Systemic Over-Designation

Plaintiffs assert, and Uber does not dispute, that Uber withdrew its privilege claims in whole or in part for more than seventy percent of the documents Plaintiffs identified for potential inclusion in this joint letter during the meet-and-confer process. Plaintiffs argue that such a high rate of erroneous privilege claims suggests that there may be thousands of improperly designated

---

6 n.2; *see also* Dkt. No. 1908 at 12. Its analysis of how public relations relate to the purpose of an attorney's retention nevertheless informs the Court's analysis here of whether an in-house counsel's public relations work falls within the scope of privilege or is best understood as non-privileged "business advice" or conduct "as a business agent." *See Zurich Am. Ins.*, 155 Cal. App. 4th at 1504.

documents in the tranche of production at issue. Uber contends that the documents Plaintiffs selected are not a representative sample, because they are the documents Plaintiffs considered most likely to have been wrongfully withheld. Both parties make valid points: the rate of reversals raises concerns that Uber is over-designating documents as privileged, but the sample at issue is likely not representative.

The parties are therefore ORDERED to meet and confer and agree to a process to select twenty documents at random from the 5,611 documents Plaintiffs challenged in this tranche, excluding documents already addressed in the meet-and-confer process, no later than two business days from the date of this Order.[3] The parties shall meet and confer regarding Uber's privilege claims and Plaintiffs' challenges as to those documents. No later than January 14, 2024 (at the same time as their joint letter addressing Tranche 3 custodians), the parties shall file a joint status report addressing the disposition of documents from the random sample where either Plaintiffs agreed to withdraw their challenges or Uber agreed to withdraw its privilege claims in whole or in part. The parties shall file a joint letter by the same deadline, consistent with Pretrial Order No. 8 except that it may not exceed ten pages, addressing any unresolved disputes from that sample. Any documents submitted for in camera review must be lodged by the same deadline.

The parties are additionally ORDERED to add ten randomly selected documents from Plaintiffs' privilege challenges for Tranche 3 documents to the pool of documents at issue in their ongoing meet-and-confer process for that tranche of production, and to address the disposition of the challenges to Uber's privilege claims to those ten documents in their joint status report due January 14, 2024.

Depending on the outcome of the randomly selected documents and other Tranche 3 privilege disputes, the Court will consider whether a more comprehensive re-review of documents designated as privileged is necessary.

---

[3] The parties are free to *agree* that some other sampling method—e.g., randomly selecting five documents from one type or category of documents at issue, and the remaining fifteen from outside that category—is more likely to be representative than an entirely random sample from the full universe of challenged documents. If the parties do not agree to a representative sampling method, however, they shall randomly select documents from within the challenged documents that have not yet been specifically addressed.

14

### B. Withdrawal of Plaintiffs' Privilege Claims

Uber contends that "Plaintiffs have not meaningfully revised their . . . privilege challenges," which number in the thousands, in response to the meet-and-confer process and this Court's previous Order. Dkt. No. 1952 at 7. To address an asymmetry in the parties' current obligations, the Court now ORDERS that the deadlines set forth in Pretrial Order No. 20 for Uber to de-designate documents in response to Court orders and the meet-and-confer process also apply to Plaintiffs withdrawing any challenges that no longer appear warranted in light of lessons learned from this process.

### C. Timing of Production of De-Designated Documents

The Court has separately resolved Plaintiffs' request that Uber produce de-designated documents soon after serving a revised privilege log. *See* Dkt. No. 1954.

## V. CONCLUSION

The parties shall comply with the timelines set forth at page 7 of Pretrial Order No. 20 to implement the rulings set forth above, except to the extent modified by more specific directives in this Order.

**IT IS SO ORDERED.**

Dated: 12//21/2024

LISA J. CISNEROS
United States Magistrate Judge

15