# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No..: 3:23-MD-03084 CRB<br><br>**JOINT LETTER REGARDING PLAINTIFFS' REQUEST FOR MARKETING MATERIALS**<br><br>Judge:      Hon. Lisa J. Cisneros<br>Courtroom:   G – 15th Floor |

      Pursuant to Pretrial Order No. 8 (ECF 323), and the Court's Order following the December 19, 2024 Status Conference (ECF 1996), the Parties respectfully submit this joint letter regarding Uber's production of marketing materials in response to Plaintiffs' Requests for Production of marketing materials, RFPs 6, 40, 55, 98-105, 107, 145 and 162-163. Plaintiffs ask that Uber be required to adhere to its prior agreement to produce marketing documents targeted at riders from January 1, 2012 to December 1, 2024 (for now until a firm end date is established), related to Uber's rideshare services (not related to Uber Eats).

By: */s/Roopal Luhana*
ROOPAL P. LUHANA *(Pro Hac Vice)*
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

SARAH R. LONDON (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: slondon@lchb.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

By: */s/ Michael B. Shortnacy*
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (*Pro Hac Vice* admitted)
oot@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

RANDALL S. LUSKEY (SBN: 240915)
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

ROBERT ATKINS (*Pro Hac Vice* admitted)
ratkins@paulweiss.com
CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
cgrusauskas@paulweiss.com
ANDREA M. KELLER (*Pro Hac Vice* admitted)
akeller@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

**I.     Plaintiffs' Position**

Plaintiffs move to compel production on RFPs 6, 40, 55, 98-105, 107, 145 and 162-163. In September 2024, the Parties reached agreement on these RFPs and Uber committed to producing all marketing documents targeted at riders. *See* Luhana Decl., ¶¶ 5-6. Uber has long delayed compliance with that agreement, feigning confusion as to the scope of the discovery, and unilaterally limiting production to a single, deficient noncustodial source ("Exact Target"). And Uber only provided addition information at the 11th hour of this filing. To date, Uber has produced one substantial production of noncustodial marketing documents from Exact Target. But this production is without metadata or other information to allow Plaintiffs to determine when content was created, disseminated, or even *what* content was in fact distributed to riders and potential riders. Exs. A-D. Months after agreement was reached (and ten months after discovery was first propounded), Uber identified, for the first time on the evening of December 23, 2024, documents that it purports to be some marketing materials Plaintiffs seek from a single additional source outside Exact Target that may include push-notification marketing to Uber App users, social media marketing, video/YouTube Marketing, web based marketing, marketing plans, budgets, and/or advertising campaigns, and/or documents that show how marketing was developed and disseminated over time and what the finished communications included. Plaintiffs have yet to review this information, but initial analysis indicates just 433 documents are dated between 2012 and 2017 and there are just ~370 after 2019.

Uber's delayed attempt to partially fulfill the Parties' agreement reflects a pattern of delay and obfuscation. Marketing lies at the core of many claims and defenses in this action including Uber's messaging about safety. The documents should be produced, as agreed. Plaintiffs are further prejudiced as they expected these productions to be substantially complete about two months ago and must now return again to the starting line or work within Uber-determined deadlines that will prevent Plaintiffs from prosecuting their case.

**A.  Plaintiffs' Marketing Discovery is Core to the Allegations in this Litigation**

On February 28, 2024, Plaintiffs served RFPs 6, 40, 55, 98, 99-105, 107, 145, 162, and 163 seeking Uber's marketing documents, communications, strategies and analysis, and budgets (the "Marketing Materials") including discovery directed to riders about safety including the "Safe Rides Fee", directed to riders who may have consumed alcohol, riders who are under the age of 18 or their families, and seeking communications about sexual assault and sexual misconduct and analysis or assessments about safety marketing, along with the underlying metadata to confirm when the content was created and marketed to riders and how. Far from asking for "everything" (as Uber has claimed), these RFPs are each tied to allegations in the complaint and limited to either the product at issue, a specific demographic, or specifically related to safety. *See* ECF 269, Master Compl. ¶¶ 203, 206-207, 223, 225-228 233-236 (marketing re: safe ride fee, "safest rides on the road," "strictest standards possible," "we aim to go above and beyond local requirements," and depicting images of young women and riders after a night out); Master Compl. Appx. A (marketing examples); Luhana Decl., ¶ 2 (listing full RFPs). Uber now seeks to renege on or postpone compliance with its prior agreement to produce this highly relevant discovery.

1.   The Agreement is Appropriately Tailored to Obtain Relevant Marketing Materials

The RFPs are clear on their face, and the parties discussed this issue for months before reaching agreement that Uber would produce Marketing Materials as they relate to the rideshare app. *See* Luhana Decl., ¶¶ 2-5.[1] This includes marketing in-app, online, print, video, and any other

---

[1] Plaintiffs pointed Uber to dozens of interrogatories as examples of types of Marketing Materials sought. *See* Luhana Decl., ¶ 12 (for example, "Uber is the smartest way to get around," "Safe, reliable rides in minutes," "Ride with confidence. The Uber experience was built with safety in mind," "commitment to safety," "setting the strictest standards possible," "designed from the ground up with your safety in mind," "gold standard," "safe rides around the clock").

3

media or medium used. *See id.* at ¶ 5. Simply put, Uber well knew what it was agreeing to, when it agreed to it, and should not now be permitted to renege on that position or postpone its compliance. *See* ECF 1698, Order on Mot. to Compel Custodians, at 22 (holding that it is crucial to enforce the parties' discovery-related agreements); *see Soto v. Commerical Recovery Sys., Inc.*, 2011 WL 1298697, at *2 (N.D. Cal. Apr. 4, 2011) ("[d]efendant should not be permitted to renege on a compromise of a discovery dispute").

In any event, the current agreement is appropriate. *First,* the agreement does not override the existing limits of each RFP, which track the allegations in the complaint. *See, e.g.*, RFP 55 (limited to "safe ride fees"); RFPs 100, 101 (limited to "safe" or "safety-related" documents); RFP 98, 99, and 102, 103 (limited to demographics*, e.g.,* male, female, riders who consume alcohol, under 18, respectively). Uber's characterization that Plaintiffs are seeking "everything" is therefore an overexaggeration. *Second,* the volume of anticipated discovery is necessary and relevant. A central allegation is this case is Uber's aggressive and pervasive messaging which, individually and collectively, fostered Uber's corporate reputation as a safe rideshare. Relevant discovery is therefore not merely about producing an exemplar of a marketing document, but also about the volume of that messaging and how it was reinforced across varied advertising mediums. *See, e.g.,* Master Compl., ¶ 188 (alleging Uber saturated market with advertising on almost every platform to foster its corporate reputation as a safe rideshare); *id.* at Appx. A (providing sample in-app, online, print, video marketing); *see also id.* at ¶¶ 187-257. Likewise, documents analyzing marketing campaigns, and related to Uber's budget and finances on marketing, are directly relevant to issues of liability and corporate intent. Plaintiffs have also clarified that they do not need duplicative production (*i.e.*, every instance of the same message in the same medium).

    2. <u>Uber's Proposed Deadline for Additional Productions from Non-Custodial Sources is Unreasonable</u>

Until today Uber sought to limit production of certain Marketing Materials to *one* noncustodial source—Exact Target[2] —a digital marketing tool that allowed Uber to disseminate communications through e-mail, mobile, social media, and website. This is blatantly improper. It is undisputed that Exact Target is not the only relevant source of marketing materials, which appears to only house "email templates." The Exact Target productions do *not* include the vast majority of the responsive documents at issue, *e.g.,* finished marketing, in all mediums (*e.g.,* online, traditional print media, television ads, emails, in-app messaging, or otherwise), nor does it include analysis of Marketing Materials by Uber's safety marketing department (*e.g.,* RFP 101), or budget information (*e.g.,* RFP 104). Moreover, because Exact Target was deprecated in 2021, it does not contain responsive materials for any subsequent years. Further, and as discussed below, the materials that have been produced from this source were provided in a manner that does not allow Plaintiffs to so much as connect e-mail headers to the content of any email or know the date of any particular document. *See* Luhana Decl., ¶ 10, Exs. A-D.[3] Thus, as Uber has now conceded, limiting production to this single source is unreasonable.

The Parties are now approaching the *fifth month* of meet and confers on Marketing Materials for RFPs that were served almost *ten months* ago. The source of Marketing Materials from which Uber has gathered documents has been discussed throughout. Plaintiffs have asked repeatedly for the identification of materials that were produced from sources other than Exact Target but, until the date of this filing, were provided with an incomplete response that identified

---

[2] According to Salesforce, "Marketing Engagement is the evolution of ExactTarget platform that was acquired by Salesforce. Marketing Engagement has greatly expanded on the original ExactTarget features and functionalities and incorporates additional messaging, data integrations, channels, and AI capabilities." https://www.salesforce.com/marketing/engagement/ (last accessed December 22, 2024).

[3] Defendants have requested that certain exhibits be filed under seal. By agreement of the Parties, these documents will be filed December 24, 2024 on a supplemental basis.

just 74 documents regarding marketing to drivers and just 207 customer communications (which includes multiple copies of the U.S. Safety Report). Plaintiffs do not concede that the materials Uber has today or will identify from its production are fully responsive to Plaintiffs' requests but, based on initial analysis, suspect they are not. Uber agreed on December 23 to conduct additional searches in custodial and non-custodial sources and proposed a February 14, 2025 substantial completion deadline of production from those sources. This is too late and inhibits Plaintiffs ability to prepare for and take numerous depositions prior to that date.[4] Plaintiffs propose that these additional searches and productions be completed in their entirety by January 15, 2025.

### 3. Uber Should Be Required to Cure the Deficiencies in its Exact Target Product

Uber's Exact Target production omits critical metadata, *e.g.,* sending email address, message author, email title, and subject line, as required by the ESI Protocol. *See, e.g.,* ECF 524, ESI Protocol, at §§ 16-17, Appx. 2; Luhana Decl. at ¶ 10, Exs. A-D. Moreover, the production provides no way to determine whether these templates were part of broader marketing plans, or to confirm whether these email templates were ever used by Uber *at all and if they were, when*. In addition, the Exact Target production does not allow for association of family relationships. *See, e.g.* ESI Protocol at §§ 16, 17(a), *supra*; *see also id.* at § 17(b) ("[p]roducing party shall make all reasonable efforts to maintain and preserve the relationship between any message or email and any cloud hosted document hyperlinked or referenced"). As such, it is impossible for Plaintiffs to determine which email templates (*e.g*., banners or other marketing text) relate to any finished email. The net result is that Uber omitted critical contextual information regarding these templates that make it difficult, if not impossible, to meaningful review and understand the productions. Uber must cure these deficiencies by January 10 through the provision of additional information, including precisely what communications information will be provided as part of any potential bellweather case.

Plaintiffs will continue to meet and confer with Uber regarding the scope of future collections and additional information promised by Uber first the first time today.

## II.     Defendants' Position

There is no dispute ripe for the Court's consideration. Defendants have and continue to devote significant time and resources to the identification and production of marketing documents, and those efforts continue. With further alignment following many discussions with Plaintiffs' counsel, including discussions in recent days, Defendants are now able to offer to conduct additional searches and to fully resolve the issues surrounding Plaintiffs' marketing-related discovery.

To date, Defendants have produced approximately 40,000 documents from custodial and noncustodial sources relating to the various marketing topics addressed in Plaintiffs' RFPs. *See* Gromada Decl., ¶ 2. Defendants' productions have included documents relating to various aspects of Defendants' marketing sourced from custodians with relevant responsibilities. The productions are the result of many discussions with Plaintiffs and company employees regarding the specific topics of interest. The list of custodians selected for production, including their priority for production, was determined with extensive input from Plaintiffs, including several custodians specifically selected by Plaintiffs and numerous other custodians Uber identified

---

[4] At least two of the proposed deponents that Plaintiffs have proposed for January (that Uber separately proposed later dates for) are directly engaged in Uber's marketing and communications activities.

with responsibilities relating to marketing, policy, communications, and related topics. These productions are ongoing, but are already voluminous.

The parties reached an agreement in September 2024 regarding data sources for supplemental productions on various topics, of which only marketing is currently before the Court. *See* ECF No. 1643.[5] Defendants then agreed to and produced additional documents from Exact Target and MailChimp, noncustodial sources that captured email campaigns from Uber to users of its platform, which was specifically requested by Plaintiffs' counsel by name. *See* Gromada Decl., ¶ 3. As Defendants have previously advised Plaintiffs, Exact Target is a deprecated system and is no longer used by the company. It is a deprecated system and contains templates of marketing materials that form the basis of emails, rather than emails, as Plaintiffs misconstrue. Because they are not emails, the metadata Plaintiffs claim Defendants omitted never existed, and the ESI protocol only requires production of metadata to the extent it exists. Following the September 2024 agreement, the parties continued to confer on the scope of marketing discovery, including time limitations and topics to be addressed in additional searches. *See* Gromada Decl., ¶ 5. Despite these efforts, the parties reached an impasse on certain areas of discovery. Though discussions were ongoing, Plaintiffs sought the Court's intervention.

Since the Discovery Status Conference on December 19, Plaintiffs have provided additional insight on marketing discovery they believe is still owed and on what they perceive as technical issues that exist with respect to Exact Target data. While on December 20, they insisted that they expected Defendants to produce "everything" related to marketing, they have since changed their position. *See* Gromada Decl., ¶ 6. The information Plaintiffs have now provided allowed Defendants to better understand the scope of Plaintiffs' requests. Defendants have also identified for Plaintiffs more than 2,000 documents collected from Google Drive that relate to marketing topics, which have been in Plaintiffs' possession before they sought the Court's intervention. *See* Gromada Decl., ¶ 7. As a result of these conversations, Defendants have offered to compromise with Plaintiffs as to the issues raised in their brief. Specifically:

Defendants agree to conduct additional searches for non-privileged documents responsive to the marketing-related RFPs Plaintiffs identified in their brief. Defendants agree to conduct these searches in Google Drive and other relevant data sources.

- Defendants will supplement its production to provide additional data relevant to marketing to users.
- Defendants agree to conduct searches for Plaintiff-specific, in-app communications during the Bellwether phase of discovery.
- Defendants will endeavor to complete these additional searches and productions on a rolling basis by February 14, 2025.

Plaintiffs suggest that production by February 14, 2025, would inhibit preparation for depositions scheduled in January, however, the deadline for fact discovery in the JCCP was

---

[5] Apart from the need to supplement marketing productions that were subject to ongoing and active negotiations and conferral, Defendants have substantially complied with its agreement.

extended to May 30, 2025 (*see* ECF No. 2012-1), and the January depositions will soon be rescheduled.

Defendants will endeavor to complete these additional Google drive and email/in-app push notification template searches and productions on a rolling basis by February 14, 2025. Defendants have been and will continue to meet and confer with Plaintiffs on any specific area of inquiry to avoid the need for the Court's intervention.

Encls.

cc:    All counsel of record via ECF