ROBERT ATKINS (Admitted Pro Hac Vice)
ratkins@paulweiss.com
CAITLIN E. GRUSAUSKAS (Admitted Pro Hac Vice)
cgrusauskas@paulweiss.com
ANDREA M. KELLER (Admitted Pro Hac Vice)
akeller@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000

RANDALL S. LUSKEY (SBN: 240915)
rluskey@paulweiss.com
MARC PRICE WOLF
mpricewolf@paulweiss.com (SBN: 254495)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100

Attorneys for Defendants
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**JOINT STATUS REPORT FOR JANUARY 23, 2025 DISCOVERY STATUS CONFERENCE**<br><br>Judge:       Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

**JOINT STATUS REPORT**

In advance of the discovery status conference set by the Court for Thursday, January 23, 2025 at 10:30 a.m. (ECF 1996), Plaintiffs and Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Defendants") (jointly, "the parties"), respectfully submit this Joint Status Report.

### I.   Safety Incident Report Data

As reported to the Court on Dec. 23, 2024 (ECF 2011) and Jan. 13, 2025 (ECF 2067), the Parties reached agreements to resolve their outstanding disputes related to Defendants' production of incident report data. Defendants' production pursuant to the Dec. 23 agreement and the Court's corresponding Dec. 24 Order (ECF 2016) was made on Jan. 17. However, Defendants determined through their QC of the data that approximately 130,000 data cells (representing 0.01 percent of the data set) would require additional analysis to de-identify the cells (i.e., not simply redact PII, but through computer processing, tie a piece of personal information together with a unique de-identified numerical value). The parties met and conferred on this issue on Jan. 16 and Jan. 17, and agreed that Defendants would produce the unimpacted data on Jan. 17 with placeholders in place of de-identification codes in the affected cells, and Defendants did so. The Parties further agreed that Defendants will endeavor to make a full re-production containing de-identified values by Jan. 21, and would stay in communication while the de-identification process for the remaining cells completes.

### II.   Noncustodial Productions

**1.   *Policies and Knowledge Bases*:**

Per the Court's Order (ECF 1996), Plaintiffs timely provided Defendants a list of documents Plaintiffs identified as "40 policies of particular importance to the case." Defendants timely identified the underlying documents and produced or withheld for privilege the available versions of these documents on January 10, 2025. Additionally, Defendants provided Plaintiffs an attorney letter setting forth a timeline of the operative versions of each policy per the Court's Order, as well as a decoder to tie Plaintiffs' requests to the titles of these documents as stored by Defendants. Defendants have committed to producing the policies Plaintiffs have selected thus far and related Knowledge Bases by

1    Jan. 31, per the Court's Order.

2    **Plaintiff's Position:** Each of the policies Uber produced on January 10 contain embedded
3    operational guidelines for customer service representatives to assist in making policy implicated
4    decisions. However, Uber did not produce **any** of the related operational guidelines to these Policies,
5    despite being ordered to produce these operational guidelines (ECF 1996 at 2) by January 10. Uber
6    has committed to producing the documents associated with these links by January 31. 2025.  Plaintiffs
7    requested that Uber identify operational guidelines that Uber plans to produce for each Policy, but
8    Uber declined to identify which guidelines from which policies would be produced claiming undue
9    burden. Plaintiffs request that Defendants are ordered to complete the Declaration contemplated by
10   the Court in its Dec. 19, 2024 Order, ECF 1996. Uber also withheld two policies for privilege that the
11   Plaintiffs intend to challenge once Uber updates its privilege log.  Plaintiffs also request that
12   Defendants be ordered to comply with existing order and produce the operational guidelines associated
13   embedded in the Polices on Plaintiffs' list be produced.

14   **Defendants' Position:**  On Jan. 10, Defendants complied with the Court's Order by making
15   a production of 572 documents comprising almost 7,300 pages, and withholding versions of two
16   requested documents for privilege, consistent with the Court's guidance.[1] Plaintiffs' statement that
17   Defendants did not produce "any of the related operational guidelines" is patently false and
18   Defendants are disappointed that Plaintiffs would make such a representation to this Court.
19   Defendants in fact did produce related operational guidelines to requested policies relating to subject
20   areas such as, e.g., background checks, interpersonal conflict, and safety risk assessments.

21   Plaintiffs' 40 requests consisted of the text of hyperlinks not only from documents produced
22   in this litigation, but also from exhibits to subpoenaed depositions in other unrelated old litigation.
23   Identifying the correct documents required manual searching, as well as conferral with Plaintiffs for
24   clarification as to documents sought in the case of hyperlinks in old documents outside Defendants'
25   MDL productions. These requests also included documents related to app feature development and
26   safety strategies–clearly not "policies." Nevertheless, in the spirit of compromise and cooperation

---

[1] One of the requested policies Defendants withheld is substantially similar to JCCP_MDL_PRIVLOG039202, which the Court confirmed is privileged. See ECF 1952 at 8.

Defendants agreed to produce these documents. Some of the requested documents were bookmarks to sections within a larger document. Defendants produced the documents containing those portions in full. Plaintiffs' interpretation of the Court's order as calling for the collection, review, and production of all documents embedded via hyperlink within the priority documents, a burdensome undertaking for 572 documents that were themselves links requiring manual interpretation and collection, is unreasonable, and inconsistent with the Order for Defendants to complete additional policy and Knowledge Base related productions by Jan. 31. Defendants are on track to complete production of the remaining policies and Knowledge Bases by Jan. 31, 2025, per the Court's Order.

**2.**    *Marketing Documents*

The Parties continue to engage in conferrals regarding scope of marketing discovery. Following the Parties' Jan. 14, 2025 submission to the Court (ECF 2086), on Jan. 15, Uber identified additional marketing related documents that have already been produced, which Plaintiffs are reviewing. Defendants have also affirmed their commitment to the Jan. 21 supplemental production deadline. In addition, on Jan. 17 Plaintiffs provided Uber with the name of a "sample" Plaintiff for whom a communications log, including content, may be provided for conferral purposes in anticipation of the bellwether phase. The Parties hope to file a joint status report on Jan. 29, per the Court's Order (ECF 2095), that confirms that all outstanding issues are resolved.

**Plaintiffs' Position:** Nearly a year after Plaintiffs issued their first marketing Requests for Production, Uber still has not completed production of responsive documents. Plaintiffs have repeatedly raised this issue with Uber and with the Court but still do not have information or answers from Uber. Although Defendants have agreed to provide the "sample" Plaintiff results (including dates/times of communication and content) as well as fields available to report from the "Flow" portion of Uber's "Bloc and Flow" push communications repository, the parties are continuing conferral on these topics and no date certain has been set yet for production of these items. In light of PTO 21 and the trial schedule set by Judge Breyer, Plaintiffs seek to resolve marketing disputes promptly to ensure complete documents are available for upcoming depositions. Further, these marketing documents are significant to individual plaintiffs' ability to amend their complaints by the March 14 deadline set by

1  Judge Breyer. To the extent any disputes remain following the Parties conferrals those disputes will
2  be raised through a PTO 8 dispute letter by January 29, 2025. In the event there are unresolved
3  disputes, Plaintiffs note that the Court's Order regarding policy-related documents outlines a process
4  that may be helpful in this context.

**Defendants' Position:** Plaintiffs interpret their requests so broadly as to swallow every company document about and constituting marketing or advertising in any form, making the untenable argument that all is relevant and proportional to the needs of the case. To illustrate, Plaintiffs assert all documents relating to Defendants' sponsorships of U.S. Women's soccer are somehow relevant and should be produced without any tie, even tangential, to this litigation. Against this backdrop, on Jan. 16, Defendants provided Plaintiffs a list of over 41,000 marketing related documents that Defendants produced from custodial files and custodian-agnostic Google Drive documents. Including Defendants' marketing template production, Defendants have already produced over 60,000 specifically collected, marketing-related documents to Plaintiffs. Additionally, per agreement and Court Order (ECF 2013, 2015), on Jan. 21, Defendants are producing supplemental custodian-agnostic Google Drive documents and additional marketing templates including email and in-app push notifications. In addition to these supplemental productions, Defendants have agreed to search for and produce documents including final marketing materials and some additional reporting related to marketing. Further, Defendants have continued to remind Plaintiffs that additional plaintiff-specific marketing discovery may be appropriate as part of bellwether productions or for specific cases in which Plaintiffs now claim such documents are required for amended pleadings.

### III. TAR Validation

Pursuant to the parties' Dec. 23 agreement (ECF 2009), Defendants have produced (and Plaintiffs have reviewed) two sample sets consisting of approximately 4,350 documents. The parties are in the process of resolving categorical areas of dispute about document responsiveness and Defendants have committed to promptly implement remedial measures to the TAR model using the information learned from this process and produce additional responsive documents identified after these remedial measures are implemented.

**Plaintiffs' Position:** Although the parties were able to agree to a process for TAR validation, this should not be understood as Plaintiffs' condonation of Uber's failure to timely and properly apply TAR as anticipated by the ESI Order. Plaintiffs are highly prejudiced by Uber's improper implementation of TAR to date, which has deprived Plaintiffs of a significant portion of custodial documents that will not be produced before upcoming custodian depositions. To date, the numbers show that even after initial remediation measures, the TAR model as Uber built and trained it continues to miss more than 62% of responsive documents per Uber's review. Per Plaintiffs' review, it misses at least 83% of responsive documents. The prejudice to Plaintiffs of an improperly trained TAR model cannot be remedied without a significant extension of the discovery schedule, beyond the June 16, 2025 cutoff for fact discovery, which is not in the best interests of the individual plaintiffs in this case. Plaintiffs will continue to suffer prejudice despite this agreement because Plaintiffs will be forced to take depositions in January through April without complete document production.[2] Nonetheless, in the interest of their clients, Plaintiffs must manage Uber's failures to Plaintiffs' detriment in order to continue with discovery while trying to fix the TAR model along the way.

**Defendants' Position:** Defendants maintain that interim validation of the TAR model is highly unusual, contrary to the ESI Protocol, and likely to create unhelpful and misleading statistics that are not reflective of what the end-product will be. Nevertheless, Defendants continue to work cooperatively with Plaintiffs in the TAR validation review pursuant to the Parties' agreements. In particular, Defendants are working with Plaintiffs to address categories of documents where the scope of discovery has evolved and continues to evolve during the course of litigation, such as documents from outside the United States (which the Court has said Defendants may withhold from discovery, *see, e.g.*, ECF 683), documents that do not involve allegations against a driver, documents that are not related to sexual assault or sexual misconduct, etc.

Further to this point, Plaintiffs' claimed statistics about relevant documents being "left behind" above are fanciful because, for example, to generate their reported "statistic," Plaintiffs have marked

---

[2] Per PTO 20 (ECF No. 1808), Uber should have completed document production by January 3. Under this agreement document production will not be completed until April 30, 2024 or later (ECF 2009).

numerous documents in the sample as responsive that have nothing to do with this litigation (e.g., documents about riders leaving property behind in vehicles; documents about interviewing candidates for corporate positions; spam emails; etc.). In essence, they are trying to lay the groundwork for crying foul, by making incorrect calls about documents that are clearly not responsive, nor at the core of any issue in the case. Thus, Plaintiffs' arguments about responsiveness and the TAR process must be read in the context of these type of responsiveness calls and in the context of Plaintiffs' statement elsewhere in this Joint Status Report that they believe every single document about the rideshare business is relevant, an obviously incorrect position at odds with the Federal Rules of Civil Procedure and plain common sense. In any event, to the extent a highly responsive document that Plaintiffs need to support their claims is produced through this process, Plaintiffs may make a showing of good cause to depose the witness about that document as Defendants have previously represented, and thus Plaintiffs' assertion of prejudice is meritless. Moreover, Defendants believe that the Parties can cooperatively work through these issues as they have agreed to do.

### IV. Custodial Production

**Plaintiffs' Position**: In the December 16, 2025 Status Report (ECF 1957), Plaintiffs raised concern that Uber is improperly withholding documents from certain custodians for whom Uber has represented production is substantially complete. With Uber's custodial productions now complete (aside from post-2023 documents for a portion of custodians and de-designated documents previously withheld for privilege), Plaintiffs concerns are heightened, particularly in light of the TAR metrics Uber provided in November and the results of the first round of TAR validation review, as described above. Further, although Uber was ordered to produce pre-2013 documents for six custodians dating back to the beginning of their employment (ECF 1897), Uber produced only about 300 responsive documents. This is particularly surprising because these six custodians were at Uber for a combined total of nearly 9.5 years before 2013 and Uber's only operations during that time were rideshare (and therefore, every pre-2013 document in these custodians' files is relevant to rideshare).

Plaintiffs' concern is highlighted by the document productions Uber has made for its two highest-raking Executives, Travis Kalanick and Dara Khosrowshahi. Although Uber has represented

that its custodial production is substantially complete, Uber produced barely 1300 documents for Kalanick and under 800 documents for Khosrowshahi. These productions constitute just 0.04% of Kalanick's custodial file and 0.24% of Khosrowshahi's custodial file. Pursuant to the Court's directive during the December 20 status conference, Uber produced hit report counts for these Uber executives on December 23. Those reports show that Uber produced just 0.16% of Kalanick's documents that hit on MDL search terms and just 0.66% of Khosrowshahi's. Uber has made similarly scant productions for many other custodians. Uber's claim that Plaintiffs have not attempted to meet and confer on this issue is false. Plaintiffs raised these concerns to Uber by letter on November 8, 2024 conferred by video conference on November 22, during which Plaintiffs asked that Uber produce hit counts for all custodians based on MDL search terms. Uber has refused to do so.

Second, although Uber was ordered to produce pre-2013 documents for six custodians dating back to the beginning of their employment (ECF 1897), Uber has produced only about 300 responsive documents. This is particularly surprising because these six custodians were at Uber for a combined total of nearly 9.5 years before 2013 and Uber only had the rideshare business during those years (and therefore, every pre-2013 document in these custodians' files is relevant to rideshare and this litigation).

Given the sparseness of these productions, Plaintiffs request that Uber be ordered to provide hit counts based on MDL search terms, providing the number of documents that hit on search terms separated by year, for each of the 55 agreed-upon custodians.

**Defendants' Position:** Plaintiffs raised this same issue in the last Joint Status Report, the Court then ordered Defendants to produce hit reports for Mr. Kalanick and Mr. Khosrowshahi (the same custodians Plaintiffs again identify here), and Defendants complied with that order. Plaintiffs have not requested to meet and confer on this topic since, which they do not dispute.

As Defendants noted previously when the Court heard and resolved this issue the first time, Plaintiffs insisted on the use of search terms that Plaintiffs acknowledged are broader than typical, based on Plaintiffs' position that many of the documents hitting on those terms would be non-responsive but that TAR would hone in on the responsive documents. Thus, hit counts from these

overbroad and imprecise terms were designed (by Plaintiffs) to substantially exceed production volumes, and would not be probative of any purported issues with production. Further, Plaintiffs' argument must be read in the context of their obviously incorrect assertion that every single document from before 2013 is relevant to this litigation. This shocking assertion is emblematic of Plaintiffs' scorched-earth approach to discovery in this litigation, as Plaintiffs disregard all notions of relevance and proportionality in their quest for production of every shred of paper created by Defendants.

In any event, it is inappropriate for Plaintiffs to include this topic, about which they have not requested to meet and confer. This issue is therefore not ripe for the Court's consideration. This is not the first time Plaintiffs have ambushed Defendants through the Joint Status Report process in lieu of meeting and conferring as required. *See, e.g.*, ECF 1681 at 10; ECF 1957 at 3, 5, 6, 9-10. The Court has the power to curb Plaintiffs' conduct and should exercise it. Further, Plaintiffs' decision to raise this issue here is effectively seeking another bite at the same apple. Defendants have already provided Plaintiffs the hit reports ordered by the Court. The Court should not entertain further demands on this repeat of the same issue on which Plaintiffs have not so much as requested to meet and confer.

## V. Case-Specific Concerns

### 1. *DFS Certification*

**Plaintiffs' Position**: Judge Breyer has ordered that the parties select Plaintiffs to be included in the bellwether process by February 14, 2025. (ECF 1950). To select representative cases, Plaintiffs need complete information from Defendants. However, Plaintiffs have identified numerous deficiencies in Uber's DFS production including, but not limited to, prior background checks, tax summaries, and evidence regarding drivers' prior incidents. Uber has continued to update DFS productions on a rolling basis, which hampers Plaintiffs' ability to recognize what may be missing or whether there may be further DFS productions coming. The parties have engaged in a lengthy meet and confer process that has resolved some issues, Plaintiffs need to be able to rely on the absence of documentation as proof that such documentation does not exist. Plaintiffs have therefore requested that Uber certify its DFS productions as complete once Uber is confident that they are complete. This is necessary in light of the information disparity, where the documents relating to drivers past records

and performance are uniquely in Uber's possession. It is difficult for Plaintiffs to analysis cases for representative trials until Plaintiffs have assurances that the DFS productions for individual Plaintiffs are complete and reliable.

**Defendants' Position:** Thus far, the Parties have engaged in productive conferrals and written exchanges of information (most recently on Jan. 20) to address Plaintiffs' questions regarding Defendants' DFS productions. Plaintiffs' request for Defendants to "certify" DFS productions goes beyond the requirements of PTO 10 and is not warranted. PTO 10 requires DFS (and PFS) productions to be substantially complete. Defendants have provided substantially complete DFS supporting document productions. PTO 10 provides for a process of resolving purported deficiencies, beginning with a deficiency notice served through MDL Centrality. (ECF 348 at 6-7.) Plaintiffs first served Defendants DFS deficiency notices on Jan. 17, 2025, when a single firm filed 4 such notices. Further, Plaintiffs have been updating PFS productions on a rolling basis, and Defendants have not requested any separate certification from Plaintiffs above and beyond what Judge Breyer ordered in PTO 10.

2.   ***Case-Specific Deposition Protocol***: In entering PTO No. 16: Stipulated Deposition Protocol, the Court recognized the need for a subsequent order addressing case specific depositions including depositions of Plaintiffs and other plaintiff-specific witnesses and any Uber employees or other individuals involved in the incident at issue (ECF 866). Judge Breyer set case specific discovery to open for Bellwether Cases on March 14, 2025 (ECF 1950). In light of this, the parties anticipate working together to submit a draft order (or any remaining disputes) for case-specific depositions including number, time length and any other related issues before or soon after the February Discovery Status Conference, so that a protocol will be in place before case-specific discovery begins.

## VI. Custodial Witness Depositions

To date, Plaintiffs have requested deposition dates for 45 custodial witnesses. Pursuant to the Court's Jan. 14 Order (ECF 2085), the parties have agreed to deposition dates for 20 custodians. The parties agree to a Jan. 31 deadline for setting dates for the remaining 25 custodians.

## VII. Hyperlinks

**Plaintiffs' Position:** As highlighted in the September 27, 2024 Joint Status Report (ECF 1681),

Plaintiffs have identified a number of instances in which Uber has produced documents that include hyperlinks but either has not produced the corresponding hyperlinked documents (neither a contemporaneous version or otherwise), or has not produced the metadata required under the ESI Order (ECF 524) necessary to identify the hyperlinked document within the production. Uber claims that the parties have not met and conferred on this topic, yet admits that the parties in fact met and conferred on this topic on October 1. The issue is that Uber has not followed through on its commitment following the October 1 discussion. Although Uber committed on October 1 to audit its production and remedy these issues, these problems persist within the document production. Uber does not dispute this. Instead, Uber's response below attempts to shift Uber's burden to ensure its compliance with the ESI Order to Plaintiffs, requiring Plaintiffs to find each instance of Uber's noncompliance and report it back to Uber. During the original meet and confer on this issuer, Plaintiffs provided Uber with examples of documents with these issues, but continuing to do this is not Plaintiffs' responsibility. Nonetheless, Plaintiffs will provide additional examples on January 21. It is critical that this issue be resolved promptly as depositions begin within the next few weeks. Plaintiffs therefore request that the Court order the parties to conduct a final meet and confer on this issue by January 24 and file a joint letter by January 29 addressing either their agreement or any remaining disputes.

**Defendants' Position:** As noted in the Sept. 27, 2024 Joint Status Report (ECF 1681), Plaintiffs had not identified these purported instances to Defendants. Immediately after the Oct. 1, 2024 Discovery Status Conference, Defendants reached out to Plaintiffs to ask for identification of these purported issues. The Parties conferred that same day, and Plaintiffs identified only a few documents, none of which presented any issues. Predictably, given Plaintiffs' prior conduct, Plaintiffs have not so much as mentioned this purported issue since October (which they do not dispute), and Defendants are still unaware of any issues.

This section is therefore inappropriate. Plaintiffs have once again made an end run to the Court on an issue about which they have not asked Defendants to meet and confer. Then, less than an hour before this filing was due, Plaintiffs revised their section above (1) to state that they will finally provide examples of this purported issue today and (2) to improperly request to upend the PTO 8 timing.

Plaintiffs base their request on upcoming depositions, but it is Plaintiffs who chose not to so much as mention this purported issue since October 2024, and who still have not identified any issues to Defendants. Any alleged timing concern is one of Plaintiffs' own creation. The parties must follow PTO 8's timing to the extent they reach an impasse on this issue to afford Defendants their due process rights.

By: /s/ Roopal Luhana
ROOPAL P. LUHANA (Pro Hac Vice)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com
Co-Lead Counsel for Plaintiffs

SARAH R. LONDON (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: slondon@lchb.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

By: /s/ Michael B. Shortnacy
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (Pro Hac Vice admitted)
oot@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

RANDALL S. LUSKEY (SBN: 240915)
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101

ROBERT ATKINS (Pro Hac Vice admitted)
ratkins@paulweiss.com
CAITLIN E. GRUSAUSKAS (Pro Hac Vice admitted)
cgrusauskas@paulweiss.com
ANDREA M. KELLER (Pro Hac Vice admitted)
akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990