# EXHIBIT 2

```
1   RANDALL S. LUSKEY (SBN: 240915)
         rluskey@paulweiss.com
2   PAUL, WEISS, RIFKIND, WHARTON
         & GARRISON LLP
3   535 Mission Street, 24th Floor
    San Francisco, CA 94105
4   Telephone: (628) 432-5100
    Facsimile:  (628) 232-3101
5
    ROBERT ATKINS (Pro Hac Vice admitted)
6        ratkins@paulweiss.com
    CAITLIN E. GRUSAUSKAS (Pro Hac Vice admitted)
7        cgrusauskas@paulweiss.com
    ANDREA M. KELLER (Pro Hac Vice admitted)
8        akeller@paulweiss.com
    PAUL, WEISS, RIFKIND, WHARTON
9        & GARRISON LLP
    1285 Avenue of the Americas
10  New York, NY 10019
    Telephone: (212) 373-3000
11  Facsimile:  (212) 757-3990

12  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.,
13  RASIER, LLC, and RASIER-CA, LLC

14  [Additional Counsel Listed on Following Page]
```

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**SUPPLEMENTAL DECLARATION OF JAMIE BROWN**<br><br>Judge:     Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

-2-

MICHAEL B. SHORTNACY (SBN: 277035)
    mshortnacy@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (*Pro Hac Vice* admitted)
    oot@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

KYLE N. SMITH (*Pro Hac Vice* admitted)
    ksmith@paulweiss.com
JESSICA E. PHILLIPS (*Pro Hac Vice* admitted)
    jphillips@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP**
2001 K Street, NW
Washington DC, 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

I, Jamie Brown, declare under penalty of perjury as follows:

1. I am a Vice President of Strategic Consulting Services at Lighthouse, which provides eDiscovery services to Uber Technologies, Inc. ("Uber"), a Defendant in the above captioned matter. I previously set forth my qualifications in a declaration provided in support of Uber's ESI protocol on April 12, 2024 [ECF 499-6], which are incorporated herein.

2. I submit this declaration at Defendant Uber's request and as a supplement to my April 12 declaration, in which I set forth the challenges with collecting and producing certain documents that contain reference links (which are frequently referred to as "reference linked documents" or "hyperlinks"). I am familiar with the facts contained herein and am prepared to competently testify to the extent required.

3. My April 12, 2024 declaration was in response to Plaintiffs' request that Uber collect and produce the contemporaneous "version" of a reference linked document **shared by email,** as opposed to the last-in-time or current-in-time "version" of the document at the time of collection, which Uber agreed to produce. In my April 12 declaration, I explained that the collection of contemporaneous "versions" is not feasible at scale given the technology that exists today. [*See* ¶¶ 9-16, ECF 499-6]. In its April 23, 2024 Order Resolving Outstanding ESI Protocol Disputes [ECF 511], the Court stated it was "satisfied by Uber's showing . . . that no technological solution is currently readily available to automate the process when it comes to collecting contemporaneous "versions" of hyperlinked documents" [Pg. 6].

4. I have reviewed Plaintiffs' position in the Parties' Joint Letter Regarding Uber's Production of Hyperlinked Documents dated January 29, 2025, in which Plaintiffs describe four topics:

    a. Issue #1: Links to Non-Google Drive Documents

    b. Issue #2: Links within Non-Gmail Documents

    c. Issue #3: Gmail Metadata for Links

    d. Issue #4: Email Threading

-4-

5. The purpose of this declaration is to explain that Plaintiffs' demands set forth in the January 29 Joint Letter are (a) inconsistent with the ESI Order, (b) inconsistent with industry standards, and (c) not technically feasible. My declaration also explains how Plaintiffs' demands here would constitute an extraordinary practice within e-discovery that would be extremely burdensome, time-consuming and costly. I will address Issues #1 and 2 together, followed by #3 and #4 separately.

**Issues 1 (Links to Non-Google Drive Documents) and 2 (Links within Non-Gmail Documents)**

**Overview**

6. Plaintiffs first contend (Issue #1) that Uber should produce linked files not only to Google Drive documents, but to *any documents residing on Uber's internal systems.* Plaintiffs next argue (Issue #2) that Uber should produce not only documents linked to Gmail (which Uber has been doing all along), but also *documents linked to other non-Gmail documents*, such as Sheets (Google's equivalent to Microsoft Excel) or Slides (Google's equivalent to Microsoft PowerPoint).

7. In my April 12, 2024 declaration, I explained that Uber uses Google Workspace for Gmail (for email) and Google Drive (for file storage and collaboration); Google Workspace includes a tool called Google Vault ("Vault") that supports, among other things, the retention, preservation, collection, search and export of Google data. [Para 4-6]. Google Vault is Uber's system-of-record for Google Documents.

8. I also explained that, for the past five years, Uber adopted a practice of collecting and producing the last version of a document shared by email using Vault's native capabilities (which can only search for files stored in Google applications, such as Gmail and Drive, i.e., Google Documents); in addition, Lighthouse developed a parser for Uber ("Google Parser") that links the Gmail with the Google Document to create a family relationship. In doing so, Uber went over-and-beyond what was required or what other companies did as it relates to the collection and production of Google data. [Para 18-20].

**Assumptions**

9. The current scope of e-discovery in this litigation includes data from 55 custodians, including email and documents that are subject to and governed by the Court's May 3, 2024 Order Governing the Production of ESI and Hard Copy Documents [ECF 524] ("ESI Order"). For these custodians, the following is a summary of relevant metrics for purposes of this declaration:

| Total Custodial Gmails Produced | 517,609 |
|---|---|
| Total Custodial Non-Gmail Docs Produced | 93,602 |

Note that there is no automated way with current technology to determine the total number of links that exist within these documents (hence the identification and collection challenge explained below).

**ESI Order**

10.  I have reviewed the ESI Order [ECF 524] governing this matter, and specifically, Section 17 (Cloud Stored Documents), subsection (a) (Metadata Preserved):
> Uber shall preserve the metadata relationship between email messages with links to files on Google Drive to the extent feasible with existing technology.

Within the same section, subsection (b) (Hyperlinked/URL-Referenced Documents) states:
> Producing party shall make all reasonable efforts to maintain and preserve the relationship ***between any message or email*** and any cloud-hosted document hyperlinked or referenced within the message or email.  Thus, for instance, where a ***collected email*** links to or references by URL a document on Google Drive (or housed within Google [V]ault), the metadata for that message or email shall include the URLs and Google Document ID of all hyperlinked documents. (emphasis added).

11.  Appendix 1 sets forth the Production Format specifications  This is the section of the ESI Order most important to the Lighthouse processing team, as it provides the detailed specifications that the team follows to ensure all data it receives from Uber is processed and produced in a way that complies with the court's order.  Section 1(e) provides:
> Attachments (as previously defined herein) should be consecutively produced with their parent (***in the case of hyperlinked attachment,*** only one copy of the attachment will be produced with all agreed-upon metadata ***referencing the attachment to any linked emails…*** (emphasis added).

12.  Appendix 2 sets forth the Metadata Fields that Lighthouse must include in the production set.  <u>Notably, all fields relate to links between Gmail and Google Drive documents</u>. This means, notwithstanding the technical infeasibility of Plaintiffs' arguments addressed below, there is no designated field to capture any other link-related metadata.

**Industry Standards**

13. Lighthouse is a provider of e-discovery services to companies and law firms. We have been in the e-discovery business for more than 30 years and are considered a leading provider.

14. The collection, processing and linking of email to non-Google or non-Microsoft documents (Issue #1) is not a routine or customary practice. Similarly, the collection, processing and linking of files contained in documents (not otherwise linked to an email or message) (Issue #2) is also not a routine or customary practice. Although there are certain occasions where this might be done, this scenario would typically occur as a "one off," such as when a specific need arises related to a single or small group of related documents. In contrast, this is not a practice performed routinely against an entire data set. Accordingly, Lighthouse does not have a "workflow" to support this practice at scale.

15. Lighthouse benchmarks with clients and peers to ensure it is delivering industry-leading technology and services. Lighthouse does not have any clients who request (a) the linking of Gmail messages to non-Google Drive documents (Issue #1) or (b) the linking of documents within non-Gmail Documents (Issue #2) as part of its standard e-discovery workflow. I am also unaware of any peer vendors who support this workflow routinely.

16. Ultimately, Lighthouse follows the specifications contained in a client's ESI Order as it relates to Production Format and Metadata Fields. These specifications align not only with the needs of a given matter, but also with existing technology of the parties and their vendors (including Lighthouse). In this case, the Metadata Fields include every conceivable field Plaintiffs could have requested. But again, all fields in the ESI Order involving linkage relate to those between Gmail and Google Drive documents.

17. Moreover, the notion that a company like Uber is collecting as a matter of course all linked documents that might exist is completely out of line with the industry. This was not common practice before the advent of cloud-based technology, and it is certainly not now, despite the prevalence of links in cloud-based systems. There is no technology that would facilitate this

1  type of collection – not within Google, Microsoft or using a third-party tool. It simply does not
2  exist.

3  **Technological Challenges**

4  Identification and Collection

5  18. For Issue #1, Plaintiffs argue Uber should produce linked files not only to Google
6  Drive documents, but to any documents residing on Uber's internal systems. For Issue #2, they
7  argue Uber should produce not only documents linked to Gmail (which Uber has been doing all
8  along), but also documents linked to other non-Gmail documents. Plaintiffs do not explain how
9  Uber is expected to do this, nor can they, because (a) this is not an option within Vault, which (i)
10 only offers the ability to collect linked documents as part of an email collection, and (ii) is limited
11 to Google Drive documents;[1] and (b) this is not an option using any other third-party tool. In the
12 absence of such a tool, the identification and collection efforts would be entirely manual and
13 require a document-by-document exercise to identify and collect the linked documents referenced
14 within the over 611,000 produced custodial Gmails and documents (assuming it is even accessible
15 using the link).

16 19. Even if the identification and collection of these documents was technically possible,
17 which it is not, Uber would have needed to undertake this effort at the time it collected the
18 custodian data for the entirety of the ever-expanding custodian population, which now sits at 55
19 custodians. But, collection efforts have concluded, and all data has been processed and has been
20 hosted in Relativity, where review is underway. Note that I have reviewed the declaration of Will
21 Anderson setting forth Uber's current collection capabilities and can confirm the steps he describes
22 are consistent with my understanding of how Google Vault works today.

23 20. Aside from the technology limitations within Google Vault, there are also challenges
24 within the Relativity review platform identifying a complete list of links that exist within the

---

[1] The same is true for Microsoft Purview. To be clear, both Vault and Purview offer features to facilitate the collection of linked documents *as part of a message collection*. But neither extend that option to non-email linked documents, or documents residing outside their platform.

1 custodial data population and confirming if the linked document exists.[2]  And, there is no third-party tool that could identify these links.  In the absence of a tool, Uber would need to manually review every document to identify the links then attempt to collect them from wherever they exist (also a manual process, per the above).

Processing

21. Even if Uber could identify and collect all the requested linked documents, which it cannot, there are additional challenges creating the linkage (or the family relationship) between and among these documents.

22. Lighthouse's Google Parser leverages available metadata (i.e., metadata contained in the Vault export) to create an association between two or more documents based upon a set of defined assumptions.  As previously stated in my April 12, 2024 declaration [Para 20], Lighthouse spent considerable time and effort developing this parser to address a very specific use case Uber had several years ago to create a family relationship between Gmails and Google Drive documents.  To be clear, and as I stated in my April 12, 2024 declaration, ECF 499-6 [Para. 23] this was and is primarily an email parser that cannot support the linkage of non-Google Drive documents.

---

[2] If it does not exist, Uber would then need to collect it within Vault, subject to the technical infeasibility described above.

-9-

SUPPLEMENTAL DECLARATION OF JAMIE BROWN

Case No. 3:23-md-3084-CRB

**Issue #3: Gmail Metadata For Links**

23. Plaintiffs contend that, for some links contained in a Gmail, Uber is not producing certain metadata (i.e., LinkBegBates) that would allow them to retrieve the linked document, citing to emails Plaintiffs are unable to identify the linked documents because they do not have the LinkBegBates field.

24. For Gmails containing linked Google Drive documents, the ESI Order requires Uber to produce two metadata fields that are relevant for this discussion: the LinkGoogleDriveDocumentIDs (which is the field containing the Google Document IDs for any Google Drive linked documents referenced within a given Gmail document) and the LinkBegBates (which is the field used to identify the beginning Bates number for any Google Drive linked documents referenced within a given Gmail). Note that these are *custom* metadata fields that Lighthouse generated using scripts; in contrast, the fields do not include extracted metadata that is naturally existing within the Google Drive documents or the Gmails.

25. The custom nature of these fields means that the values will change over time as documents are produced. Given the iterative nature of document collection, search and review (and the rolling production deadlines in this case), these fields will continue to be updated on a continual basis until production is complete. Lighthouse provides updates with this information (which it refers to as overlays) periodically to address this issue.

26. To be clear, Uber has produced both metadata fields for all Gmail containing linked documents ***to the extent the metadata was parsed and/or available at the time of production***. Contrary to Plaintiffs' assertions, no metadata was "omitted."

**Issue #4: Email Threading**

27. Plaintiffs contend (i) Uber is producing links contained in only the topmost portion of the email thread, as opposed to links that appear anywhere within the thread; and (ii) that Uber is not producing non-responsive emails.

28. Email threading refers to a process for organizing individual emails into a single "thread" or conversation. Some parties agree to produce only the most inclusive thread (i.e., one single email containing the complete conversation), whereas other parties agree to produce every email comprising the thread.

Links in Topmost Portion of Email

29. The two factors that determine whether a linked document gets identified and produced are (a) whether it was collected and metadata was available to link that document; and (b) the process for parsing the data and whether the link was present in the topmost portion of the email. The same is true for traditional attachments and, in this sense, the process is consistent.

30. Plaintiffs appear to take issue with the fact that only links appearing in the topmost portion of a Gmail are being produced. But, this is how Lighthouse's Google Parser works, and this process was discussed with Plaintiffs in multiple meet and confers. In addition, Lighthouse provided a declaration almost one year ago describing this in detail. [See Jake Alsobrook Declaration, para 10] [ECF 262-9]. Specifically, Mr. Alsobrook states:

> The Google Parser works once a given collection of Gmail and Google Drive data has been collected and ingested into the Lighthouse processing tool. At this point, the Google Parser scans the text of ***the top-most portion of an email*** in order to identify information about the Google Drive hyperlink in the email. In particular, the Google Parser in scanning for the Google Document ID associated with the hyperlink in the email, which is recorded for use during review. The data will subsequently be loaded into Relativity, where Lighthouse will run a script to identify where the linked Google Document IDs are present within the population. (emphasis added).

31. Plaintiffs never raised an issue with Lighthouse's Parser, despite several meet and confers with the parties' eDiscovery experts where this was discussed, including January 9 or February 12, 2024, or upon receipt of Mr. Alsobrook's Declaration submitted in support of Uber's Proposed ESI Protocol [ECF 262-9], where he specifically describes this feature within the Google

Parser [Para. 10 ("the Google Parser scans the text of *the top-most portion of an email* in order to identify information about the Google Drive hyperlink in the email")].

32. In addition, I also described how the Google Parser works in greater detail in my April 12, 2024 declaration [ECF 499-6, Para. 23], including a description of how the parser impacts the identification and retrieval of links that might appear in the lower part of an email. [Para. 24]. Pertinent portions of those paragraphs are below:

> 23. The Lighthouse Google Parser is unique in a few ways.
>     a. ***It only looks for links that appear in the top portion of the message*** (if it identified links embedded in earlier portions of the email thread, there could be numerous linked documents shared by other email participants that may not be custodians in the matter; if the participant is a custodian, then in theory, the messages contained in the thread, and any links shared, would be collected by Vault so long as they are within the relevant timeframe).
>    . . .
> 24. Even with a parser designed to identify links and create an association between a message and the shared document, not all documents will be located. ***For example, in some cases, a sender may forward a message containing a link that appears lower in the email chain (where the Google Parser only identifies links near the top of the message for the reasons stated above).***

33. Upon reading my April 12 declaration, if Plaintiffs had concerns about the Google Parser or its impact on the retrieval of linked documents, they could have raised it but did not.

<u>Non-Responsive Emails</u>

34. Paragraph 13 of the ESI Order states that:
> No email may be withheld from production because it is included in whole or in part in a more inclusive email, although Parties may use email threading for their own internal review and other internal processes.

35. Uber is not producing *only* the most inclusive emails, rather, they are producing every responsive iteration from the email thread from the 55 custodian's data population – precisely what is required under the ESI Order. For example, an email thread that contains five responsive emails will be produced as five individual documents. In fact, as soon as a responsive email appears within any email thread, that iteration of the thread and all subsequent iterations will be produced as individual documents.

36. But, the ESI Order does not require Uber to produce wholly non-responsive emails, and in fact expressly permits Uber to withhold non-responsive documents from production. [ECF 524, Para. 8(c)(2)] For example, if the original email in a thread is not responsive, that stand-alone non-responsive document will not be produced (which is consistent with the ESI Order and how parties review and produce emails in cases where email threading is not permitted). But, if the next email in the thread is responsive, that iteration of the thread and all subsequent iterations of the email thread will be produced as individual documents (and will all include the original nonresponsive email).

37. To provide an example, imagine Employee A emails Employee B to ask if Employee B wants to go to lunch and, in that email, Employee A provides a link to a Google Document she has created called "My Top 10 Lunch Spots." That email is non-responsive, and Uber will not produce it. But then imagine that Employee B responds to Employee A to accept the lunch invite and, in that response email, says something relevant to the claims in this litigation. Uber will produce that iteration of the email thread (including the prior exchange about lunch), as well as every subsequent iteration of that email thread (assuming the conversation continues and the email thread grows). And, in this hypothetical, each of those responsive iterations of the email thread will be produced individually, all consistent with the requirements of the ESI Order.

I affirm under penalty of perjury of the laws of the State of New York that the foregoing statement is true and correct. Executed on January 30, 2025 in New York, New York.

/s/ *Jamie Brown*
Jamie Brown