*[Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br>**JOINT STATUS REPORT FOR FEBRUARY 27, 2025 DISCOVERY STATUS CONFERENCE**<br><br>Judge:     Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

# JOINT STATUS REPORT

In advance of the discovery status conference set for Thursday, February 27, 2025 at 10:30 a.m. (ECF 1996), Plaintiffs and Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Defendants") (jointly, "the parties"), respectfully submit this Joint Status Report.

## I. Safety Incident Report Data

**Plaintiffs' Position**: Plaintiffs have spent hundreds of attorney and expert hours seeking to enforce the Court's Orders on Uber's production of safety data. Yet seven months after the Court's first Order (ECF 683), Uber still has not produced the data in a usable format. As reported on Dec. 23 (ECF 2011), Jan. 13 (ECF 2067), and Jan. 23 (ECF 2115), Uber's final, complete production was due by Jan. 17. Although Uber produced data on Jan. 23 (belatedly), serious problems remain, as described more fully below. Plaintiffs and their experts still cannot use the data to analyze even the most basic questions, like how many incidents were reported to Uber in a given year, whether those incidents were reported against drivers, riders, or third parties, and how Uber categorized each incident.

Uber agrees to re-produce corrected data (for a fourth time) and conduct additional investigation to attempt to address data issues. Plaintiffs agree to have a final meet and confer on Feb. 25. However, if all remaining issues are not resolved by Feb. 27, Plaintiffs will request that Uber be ordered to produce the data on a hard drive by Mar. 6, without anonymization (hashing) of already anonymized identification fields for riders and drivers.[1] Additionally, regardless of the outcome of additional conferral, Plaintiffs ask that Uber be ordered to certify under oath by Mar. 6 that (1) Uber has produced the data from all database fields used for 2017-2022 rideshare sexual assault and sexual misconduct incidents reported to Uber and (2) the apparent errors and mislabeling Plaintiffs have identified are present in the original data and not introduced in the production.

Three categories of problems persist. First, Uber produced the data in eleven separate files without explaining how the files can be pieced back together to recreate the data as it existed in Uber's

---

[1] Plaintiffs have attempted to address these issues with Uber for months, not just since Feb. 18. Although Uber has ostensibly appeared to work cooperatively to resolve their errors, the reality is that each time one problem is resolved, a new problem is exposed. Plaintiffs cannot afford to waste more time accessing this data. Even if production on a hard drive does not resolve all data issues, working in the BDO system introduces delay that would be relieved by a hard drive production.

systems, for example, what data is intended to be in each file or how the data within a file relates to the other data in that file or with the data in other files. Second, Uber insisted on hashing (anonymizing) driver, rider, and trip IDs, even though these were already anonymized codes containing no personal identifying information. It appears that Uber improperly hashed the data. For example, multiple drivers seem to be associated with a single trip and numerous trips list the same hashed ID for both the driver and the rider of that trip. Third, although Uber was to produce a certification identifying all fields in the Jira and Bliss database (ECF 2011), Uber did not produce a certification for the Bliss. Further, both the certification and the production omit 42 fields that Uber previously identified in response to this Courts' Order (ECF 706 at 3-4) as being used in Jira. Additionally, Uber produced data for 40 fields for which it has not provided a decoder, as required by the Court's Order. *Id*. This is why Plaintiffs previously asked and ask again that Uber declare, under oath, that it has produced all data.

**Defendants' Position:** Plaintiffs would like the Court to believe that exporting rideshare-related reports related to allegations of sexual misconduct or sexual assault from 2017 to 2022 is a simple exercise. However, the opposite is true. This export likely represents the single largest export of data to a third party in Defendants' history, and is an enormously complex undertaking. Defendants have been transparent with Plaintiffs about the burdens and challenges associated with providing this incident report data, and have worked to accommodate Plaintiffs' every request, except when Plaintiffs' requests would compromise the security of this sensitive nonparty data involving alleged survivors of sexual misconduct or sexual assault incidents.

Plaintiffs' requested relief regarding the fields used is duplicative of the signed certifications regarding Jira that Defendants have already provided, and signed certification regarding Bliss fields that Defendants have already agreed to provide. Plaintiffs' further requests (*i.e.*, potential production via a hard drive and removal of de-identification of certain PII) make no sense, because they have no relationship to the purported issues Plaintiffs have raised. This complete disconnect mandates denial of the request. If the Court is considering granting either form of relief – despite this requested relief having no relationship to the purported issues – Defendants request the opportunity for PTO 8 briefing.

As Plaintiffs concede, moving this highly sensitive data from a secure platform that the Parties

have agreed to use to a markedly less secure hard drive would not impact, let alone resolve, a single one of Plaintiffs' claimed issues. Doing so would only remove the security safeguards protecting this sensitive nonparty data. Defendants, their counsel, and their vendors have expended hundreds upon hundreds of hours to provide this highly sensitive nonparty data to Plaintiffs on a platform they demanded, in collaboration with Plaintiffs' expert, to the exact specifications outlined by Plaintiffs' expert, at great cost. There is no reason to abandon the BDO platform.

Likewise, because Plaintiffs' speculation that "Uber improperly hashed the data" is wrong, removing the hashing would not only be inappropriate (as it would reveal the PII of countless nonparties, including survivors of sexual assault and sexual misconduct) but also would not address anything. Contrary to Plaintiffs' assertions, a universally unique identifier ("UUID"), like a SSN or a credit card number, can be used to identify a specific individual. Thus, de-identifying UUID PII is necessary to protect these nonparties' identities. Defendants expended substantial time and money to de-identify the PII of the countless non-parties, including UUIDs, while still allowing Plaintiffs to track individuals across all the data through the use of unique hash values. Plaintiffs' proposal to unmask this PII would also make it more, not less, difficult for them to track a given user through the data, because the hash not only applies to the UUID but also ties to a customer name with a common hash value. Defendants are investigating the issue of instances of apparent multiple drivers for the same trip (which Plaintiffs raised only recently), but as explained to Plaintiffs and their expert on Feb. 21, that issue is unrelated to de-identification of PII.

Defendants are also mystified by Plaintiffs' assertion that Defendants have not explained "what data is intended to be in each file or how the data within a file relates to the other data in that file or with the data in other files." In fact, Defendants provided Plaintiffs the fields that link the Bliss communications, Jira tickets, and Jira comments, and on Feb. 21 promptly responded to Plaintiffs' further inquiries about the contents of the Bliss files. Regardless, this issue is moot because, even though Plaintiffs only recently requested (on Feb. 18) that Defendants consolidate the files, the Parties have already agreed that Defendants will repackage the files into four files for Plaintiffs' convenience.

**II.    Custodial Productions**

**Plaintiffs' Position**: Plaintiffs have repeatedly raised concern that Uber is improperly withholding documents. These concerns are amplified by Uber's production of hit counts, which show Uber is producing tiny fractions of the documents hit on by search terms. Plaintiffs request the Court's assistance on the following issues:

1. *Hyperlinks*: Plaintiffs previously raised that Uber has not produced required metadata. (ECF 2194 at 2). On Feb. 11, Uber produced hyperlink-related metadata for more than 116,000 documents originally produced as far back as Aug. 2024. Some of this metadata is new (Uber has not previously produced it) and some had already been produced. However, Uber will not identify which or how much of the metadata is new. This is problematic because the metadata impacts thousands of documents for custodians Plaintiffs have already deposed or are deposing in the coming days and weeks. For example, the metadata impacts nearly 4300 documents from Freivogel's custodial file (deposed Feb. 6) and nearly 5200 of Parker's documents (deposed Feb. 14). Without further information from Uber, Plaintiffs will have to review each of these 116,000 documents to determine whether new metadata has been provided for previously-reviewed documents (including the 4300 Freivogel and 5200 Parker documents to determine whether there is a need to reopen these depositions), rather than simply reviewing the documents that have new metadata. Indeed, Uber seems to admit herein that this metadata is in large part for custodial documents produced under PTO 20, and the production suggests the same.[2] Thus this metadata should have been produced between October and January 3 (ECF 1808). Plaintiffs therefore ask that Uber be ordered to by Mar. 6 to (1) identify by Bates number, the documents for which the Feb. 11 production provides new metadata, and (2) certify that it has produced all hyperlink-related metadata required by the ESI Order for documents produced on or before Feb. 28.

2. *Missing emails*: Since the Jan. 31 filing (ECF 2194 at 2), Plaintiffs have identified numerous additional instances where, in contravention of the ESI Order (ECF 524 at ¶13) Uber has not produced relevant earliest in thread emails (which often contain unproduced hyperlinks). Plaintiffs

---

[2] Less than a fifth of this metadata was produced after PTO 20's Jan. 3 final deadline, suggesting much of this metadata is to link documents produce before Jan. 3 to each other (rather than to link documents timely produced after Jan. 3 to each other or to documents produced before Jan. 3).

did not agree to allow Uber to withhold relevant, responsive emails. Plaintiffs therefore ask that Uber be ordered to produce by Mar. 6, all emails within email threads that Uber has produced in part and all hyperlink metadata in those emails, and to certify that it has done so in full compliance with the ESI Order. Contrary to Uber's unsupported claims, this does not require new technology.

3.  ***Untimely Productions and Inadequate Production Letters***: Despite numerous requests by Plaintiffs that Uber provide information to determine what documents are contained within a given document production, Uber refuses to do so. Instead, Uber's production letters typically indicate only that they are responsive generally to MDL search terms. Considering the frequency of Uber's documents productions (often numerous productions in a single day), this results in significant unnecessary legwork for Plaintiffs to track down whether Uber has complied with production. As an example, the production letter accompanying Uber's Feb. 14 production of more than nearly 8400 documents indicates only that that is responsive to MDL search terms and contains documents from the files of all 55 custodians (whose productions were due between Oct. 2024 and Jan. 3 (ECF 1808)). Uber suggests that these documents are solely post-Nov. 2023 documents (though this only accounts for fewer than 900 of the documents), and that the rest are the result of TAR negotiations. But Uber will not go on record that all 8400 documents fall in one of these two categories. Plaintiffs therefore ask the Court to Order Uber to certify, by Mar. 6, that it has completed production of non-privileged documents from custodial files pursuant to PTO 20 (other than documents that will be de-designated).

**Defendants' Position:**

1.  **Metadata Overlay**. There is no dispute that overlays for hyperlink metadata must be provided *after* document productions. ECF 2194, 5; ECF 2194-10, ¶25. Overlays are not document productions (the document productions were completed per the PTO 20 deadlines), but rather overlays simply provide a metadata update for previously produced documents. For example, a Drive document produced in Aug. 2024 will need to have its metadata updated if a subsequently produced Gmail contains a hyperlink to that document. Further, Plaintiffs *already* had the information from the overlay within the produced documents – the overlay merely provides this *same* information to Plaintiffs again, but as metadata fields.

**2.    Email Threads.** First, Defendants are *not* using email threading, and, pursuant to Rule 26(b)(1) and the ESI Order, Plaintiffs are *not* entitled to wholly nonresponsive emails. ECF 524, ¶8(c)2; ECF 2194-10, ¶¶ 34-37. Contrary to Plaintiffs' assertion, Defendants are producing all non-privileged, *relevant* custodial earliest-in-thread emails, and Plaintiffs have not identified any instances demonstrating otherwise. Second, the produced metadata relates to Google Drive hyperlinks that appear within the topmost Gmail in a thread – that is simply how the technology works, which Defendants explained to Plaintiffs several times over a year ago. ECF 262-9, ¶¶10, 12; ECF 499-6, ¶¶ 23-24. Plaintiffs had no objection whatsoever. Instead, Plaintiffs waited until after Defendants had substantially completed the collection, processing, review, and production of these documents to demand (for the first time at the end of Jan. 2025) that Defendants try to create a new technology to do all of that work in a different way.[3] As addressed in the Parties' Jan. 31 filing, Plaintiffs' request that Defendants restart the entire discovery process must be denied.

**3. Custodial Document Productions.** Defendants met the custodial-document production deadlines. Defendants have answered Plaintiffs' questions about the substance of document productions (even when Plaintiffs' questions are already answered by the production letters, as has happened repeatedly).[4] As Plaintiffs know, Defendants have continued to produce custodial documents for a number of reasons (*e.g.*, OUS documents, privilege downgrades, post-2023 documents). Plaintiffs also requested, and Defendants agreed to produce, additional categories of custodial documents through the TAR validation negotiations.[5] Plaintiffs cannot be surprised to receive the very documents they requested.

**III.    Apex Doctrine Briefing and Custodian Depositions:**

Defendants have indicated that they (or separate counsel for certain custodians) intend to seek

---

[3] Plaintiffs suggested that Defendants' vendor could "modify" its existing technology. ECF 2194-8, ¶19. Not only are Defendants not required to try to create new technology, but Plaintiffs' suggestion came over a year after Defendants explained the technology and Plaintiffs did not object.

[4] While production letters are not required, Defendants have provided detailed multi-page letters for each of the nearly 200 productions sent over the last year, providing custodians, Bates numbers, orders or agreements relating to the productions, charts containing privilege-log numbers or MDL Centrality ID numbers, production volumes, overlays, etc.

[5] Defendants already explained to Plaintiffs that the Feb. 14 custodial production contains (1) post-11/27/23 documents (contrary to Plaintiffs' misstatement, considerably more than 900 such documents) and (2) documents produced as a result of the TAR validation process.

protective orders for 11 of the 55 custodians. The parties are working towards an agreement on the form of omnibus briefing of these issues, under which, if an agreement is reached, any motion by Defendants will be filed by February 28; Plaintiffs' response will be filed by March 21; Defendants' reply will be filed by March 28.

**Plaintiffs' Position**: Despite the parties' representation to the Court that deposition dates would be set for all custodians by January 31 (ECF 2115 at 10), dates have yet to be set for eight custodians. Five of these eight are subject to the intended motions for protective orders. Presently, Uber has offered an April deposition date for only one of these 11 individuals and proposes that the remainder be deposed in May or June. With fact discovery to be substantially completed by June 16, this schedule is not workable for Plaintiffs, who have already agreed to take seven depositions in May and anticipate conducting 30(b)(6) depositions in May as well. Plaintiffs therefore request that Uber be ordered to provide deposition dates in April for at least three of these 11 witnesses, which should not be problematic given that six of the 11 are current Uber employees.

**Defendants' Position:** There are currently seven depositions that have not yet been confirmed, and one deponent for whom Defendants have offered to reschedule to ensure a workable date for one of the seven witnesses that needs to be scheduled. Three of the deponents (Barnes, Marshall, Sullivan) are not represented by Defendants' counsel, and Defendants provided contact information for these individuals to Plaintiffs on Jan. 16. With respect to the five other deponents, Defendants: (i) offered May 21 or 22 as placeholder dates (pending motion practice) for Hazelbaker; (ii) offered to reschedule Akamine's deposition (and the JCCP deposition of Page) to facilitate holding Hazelbaker's deposition in May; (iii) provided multiple deposition dates in March and May for Kaiser, which Plaintiffs rejected and requested dates in April instead; and (iv) provided dates in May for Khosrowshahi and Kalanick, which Plaintiffs rejected and then asked for dates in June.[6]

Plaintiffs' request for an order forcing the scheduling of additional depositions in April is unnecessary because Defendants are already asking Kaiser and Akamine for their availability to sit for

---

[6] Fact discovery in the JCCP ends on May 30, 2025. Accordingly, Kalanick's and Khosrowshahi's depositions, should they proceed at all, must occur before June so that they can proceed on a coordinated basis.

a deposition in April. With those depositions scheduled in April, May is the better month to schedule remaining depositions so as to avoid unnecessarily overloading the month of April with depositions.

**Noncustodial Productions**

1. *Policies and Knowledge Bases*:

**Plaintiffs' Position:** On January 23, the Court recognized that "[d]espite the repeated instances in which the parties have argued over the production of policy documents, and the multiple orders that the Court has issued, there remains a lack of clarity regarding what policies and procedures have existed at Uber." (ECF 2138). This remains true today. Although the Court ordered Uber to ensure that its production of these documents and any operational guidelines is complete (see ECF 1996 at 2), Uber will not provide clarity as to whether they have produced the operational guidelines associated with and referenced by hyperlinked throughout many of the policies they have produced. Uber's Knowledge Base platform and policy programs are a web of interconnected policies and documents, which Uber still has not explained. Additionally, Plaintiffs continue to seek relevant policies and operational guidelines beyond the 40 identified pursuant to Court Order but cannot do so with assurance that the productions will be complete without a more fulsome understanding of the systems in which they are housed. Therefore, Plaintiffs request, pursuant to Fed. R. Civ. P. 34(a)(2), an inspection and corresponding sampling of Uber's Knowledge Base/policy electronic system. Plaintiffs first raised this suggestion to Uber months ago and again recently, having exhausted efforts for a fulsome production of these vital documents rather than the piecemeal productions to date.

**Defendants' Position:** Defendants have already exceeded their obligations under Rule 34 to provide responsive documents on policies and operational guidelines, producing over 7,500 current and historical versions of relevant policies and related operational guidelines, and even going so far as synthesizing and explaining their sources and storage methods through numerous conferrals, attorney letters, and a declaration from Defendants' Manager of eDiscovery. Yet Plaintiffs, continue to demand more without making any effort to identify any responsive materials they claim they are owed.

After Defendants have expended countless hours and resources to walk Plaintiffs' counsel through this topic, Plaintiffs astoundingly claim that Defendants "still ha[ve] not explained" its

policies and platforms. Plaintiffs' counsel continue to demand more even though they have the opportunity in depositions to ask relevant witnesses for whatever explanations counsel believe will be necessary to prosecute their claims. When asked during conferrals, Plaintiffs' counsel were unable or unwilling to identify which of the referenced hyperlinks they believe they are owed, even though Defendants have described their comprehensive efforts to identify and collect related operational guidelines by subject matter. Despite that, Plaintiffs are now pivoting to the heavy-handed step of demanding an inspection of Defendants' systems.

Defendants have complied with their obligations on this topic and with the orders of the Court. To the extent Plaintiffs believe they are entitled to anything more, they must put forward their claimed dispute through the PTO 8 process, as Plaintiffs themselves claimed to want when they reopened this topic on February 14 and asserted, "This issue is ripe for PTO 8 escalation." But yet again, Plaintiffs seek to make an end-run around the processes established by this Court to hear discovery disputes. Defendants are entitled to be heard on this new demand, including on the significant burden created by a hyperlink-by-hyperlink production or inspection. Defendants are prepared to seek a protective order, if necessary, given the grossly disproportionate nature of Plaintiffs' demands.

2. *Marketing Documents*

**Plaintiffs' Position:** On February 14, after eight months of conferrals, Uber produced 86,758 marketing documents. But the documents lack metadata identifying the author, date sent, audience, and reach of each of these documents. They also lack metadata sufficient for Plaintiffs to link each document to a particular marketing campaign or the templates Uber produced from its direct-to-consumer marketing systems (Mail Chimp, Exact Target, and Bloc & Flow). The missing template identification makes it impossible for Plaintiffs to link the February 14 documents to the plaintiff-specific communications logs that Uber produced for a sample plaintiff. The inadequate production will pose the same problem for plaintiff-specific logs to be produced "promptly" once case-specific discovery begins. (ECF 2320 at 2). Plaintiffs ask the Court to (1) order Uber to provide the information missing from the metadata either in an overlay to be produced no later than March 7, 2025, or in its forthcoming declaration regarding marketing as ordered by the Court on February 10 (ECF 2310); and

(2) deem Uber's production of national marketing materials authenticated, even if Uber cannot fill in the missing metadata because it has not maintained the same.

**Defendants' Position:** As explained in the February 7 Marketing JSR (ECF 2306), as well as the Declaration Defendants provided on February 21, Defendants, in the course of continuing diligent investigations, identified for review a Box folder containing certain marketing materials, and, in the spirit of cooperation and transparency, and even though these materials were not associated with any of the 55 agreed custodians, offered these materials to Plaintiffs. These materials were timely produced as ordered by the Court. ECF 2320. Defendants produced these materials with all available metadata, per the ESI Order. ECF 524, at 24. The metadata Plaintiffs seek is not "missing"–it simply does not exist, and likely never did. Notably, Plaintiffs do not claim any actual deficiency in the production under the ESI Order. Lastly, as for any authentication, that issue is not ripe for this JSR as Plaintiffs have never previously mentioned that request to Defendants and, at any rate, is premature given that Plaintiffs have not asked a single witness about these materials.

### IV.    TAR Disputes

Pursuant to the parties' December 23 agreement, implementation of remedial measures for additional TAR learning is contingent upon the Court's ruling on the parties' relevance disputes. (ECF 2009-1). The parties' initial relevance disputes were submitted on January 28 (ECF 2166) and argued on February 3. The parties await the Court's ruling so that they may implement any necessary remedial measures in light of pending discovery deadlines.

### V.    Case-Specific Concerns

The parties will submit a draft order (or any remaining disputes) for case-specific depositions by March 7 so that a protocol will be in place before case-specific discovery begins.

By: /s/ Roopal Luhana
ROOPAL P. LUHANA (*Pro Hac Vice*)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

SARAH R. LONDON (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: slondon@lchb.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

By: /s/ Michael B. Shortnacy
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

PATRICK OOT (*Pro Hac Vice* admitted)
oot@shb.com
**SHOOK, HARDY & BACON, L.L.P.**
1800 K Street NW, Suite 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

RANDALL S. LUSKEY (SBN: 240915)
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

ROBERT ATKINS (*Pro Hac Vice* admitted)
ratkins@paulweiss.com
CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)
cgrusauskas@paulweiss.com
ANDREA M. KELLER (*Pro Hac Vice* admitted)
akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's consent and have authorized the filing.

Dated: February 24, 2025

By: /s/  Roopal P. Luhana

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/  Roopal P. Luhana