1    ROBERT ATKINS (Admitted *Pro Hac Vice*)
     ratkins@paulweiss.com
2    JACQUELINE P. RUBIN (Admitted *Pro Hac Vice*)
     jrubin@paulweiss.com
3    CAITLIN E. GRUSAUSKAS (Admitted *Pro Hac Vice*)
     cgrusauskas@paulweiss.com
4    ANDREA M. KELLER (Admitted *Pro Hac Vice*)
     akeller@paulweiss.com
5    **PAUL, WEISS, RIFKIND, WHARTON**
     **& GARRISON LLP**
6    1285 Avenue of the Americas
   New York, NY 10019
7    Telephone: (212) 373-3000

8    RANDALL S. LUSKEY (SBN: 240915)
     rluskey@paulweiss.com
9    MARC PRICE WOLF (SBN: 254495)
     mpricewolf@paulweiss.com
10    **PAUL, WEISS, RIFKIND, WHARTON**
     **& GARRISON LLP**
11    535 Mission Street, 25th Floor
   San Francisco, CA 94105
12    Telephone: (628) 432-5100

13    *Attorneys for Defendants*
   UBER TECHNOLOGIES, INC.,
14    RASIER, LLC, and RASIER-CA, LLC

15    [*Additional Counsel Listed on Following Page*]

16

           **UNITED STATES DISTRICT COURT**

17

           **NORTHERN DISTRICT OF CALIFORNIA**

18

           **SAN FRANCISCO DIVISION**

19

20    IN RE: UBER TECHNOLOGIES, INC.,     Case No. 3:23-md-03084-CRB (LJC)
   PASSENGER SEXUAL ASSAULT
21    LITIGATION                     **DEFENDANTS UBER TECHNOLOGIES, INC.,**
                               **RASIER, LLC, AND RASIER-CA, LLC'S**
22                                     **MOTION FOR A PROTECTIVE ORDER**

23    This Document Relates to:
                              Judge:       Hon. Lisa J. Cisneros
24    ALL MATTERS                     Date:        March 26, 2025
                              Time:        10:00 a.m.
25                                Courtroom:   G – 15th Floor

26

27

28

KYLE SMITH (Admitted *Pro Hac Vice*)
  ksmith@paulweiss.com
JESSICA PHILLIPS (Admitted *Pro Hac Vice*)
  jphillips@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
  **& GARRISON LLP**
2001 K Street, NW
Washington, D.C. 20006
Telephone: (202) 223-7300

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

DEFENDANTS' MOTION FOR PROTECTIVE ORDER                    Case No. 3:23-md-03084-CRB

1
2
3
4
5
6
7
8
9

**<u>NOTICE OF MOTION FOR A PROTECTIVE ORDER</u>**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on March 26, 2025 at 10:00 a.m., or as soon thereafter as counsel may be heard, before the Honorable Lisa J. Cisneros in Courtroom G on the 15th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber") will, and hereby do, move this Court for a protective order against the depositions of Dara Khosrowshahi, Travis Kalanick, Jill Hazelbaker, Sachin Kansal, Frank Chang, Sarfraz Maredia, Rachel Whetstone, Ryan Graves, and Joseph Sullivan in this action.

This Motion is brought pursuant to Federal Rule of Civil Procedure 26 and is based on this Notice of Motion; the attached Memorandum of Points and Authorities; the concurrently filed Declarations of Dara Khosrowshahi, Travis Kalanick, Jill Hazelbaker, Sachin Kansal, Frank Chang, Sarfraz Maredia, Rachel Whetstone, Ryan Graves, and Randall S. Luskey, and the exhibits attached thereto; all evidence, pleadings, and papers filed herewith; the entire file in this coordinated action; any Reply that may be filed in support of this Motion; and any other arguments or evidence that may be presented to the Court in support of this Motion.

Dated: February 28, 2025

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Randall S. Luskey*
ROBERT ATKINS
RANDALL S. LUSKEY
JESSICA E. PHILLIPS
KYLE SMITH
JACQUELINE P. RUBIN
CAITLIN E. GRUSAUSKAS
MARC PRICE WOLF
ANDREA M. KELLER

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

1

<u>**TABLE OF CONTENTS**</u> Toc191678319

2    SUMMARY AND BACKGROUND ........................................................................ 1

3    ARGUMENT .......................................................................................................... 4

4    I.    The Apex Doctrine Prohibits Depositions Of Senior Company Officials Who
           Do Not Possess Unique Knowledge. .......................................................... 4

5
6    II.   The Court Should Issue A Protective Order Against The Depositions Of The
           Senior Executives. ...................................................................................... 7

7          A.    The Senior Executives do not possess unique personal knowledge. ...... 7

8                1.    Dara Khosrowshahi ................................................................ 7

9                2.    Travis Kalanick ................................................................... 12

10               3.    Jill Hazelbaker.................................................................... 14

11               4.    Rachel Whetstone ............................................................... 17

12               5.    Sachin Kansal..................................................................... 18

13               6.    Frank Chang........................................................................ 19

14               7.    Sarfraz Maredia.................................................................. 21

15               8.    Ryan Graves ....................................................................... 22

16         B.    Plaintiffs have not exhausted any less-intrusive means of discovery. .... 23

17   III.  The Court Should Issue A Protective Order Against The Deposition Of Joseph
           Sullivan. .................................................................................................... 24

18
     CONCLUSION ..................................................................................................... 24

19
     CERTIFICATE REGARDING MEET AND CONFER ........................................ 25

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR PROTECTIVE ORDER                Case No. 3:23-md-03084-CRB

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                 **Page(s)**

*Affinity Credit Union* v. *Apple Inc.*,
   2024 WL 3859802 (N.D. Cal. Aug. 16, 2024) ........................................................................ 21

*Affinity Labs of Texas* v. *Apple, Inc.*,
   2011 WL 1753982 (N.D. Cal. May 9, 2011) ................................................................ 5, 6, 10

*Baine* v. *General Motors Corp.*,
   141 F.R.D. 332 (M.D. Ala. 1991) ........................................................................................ 19

*Celerity Inc.* v. *Ultra Clean Holding, Inc.*,
   2007 WL 205067 (N.D. Cal. Jan. 25, 2007) ................................................................... *passim*

*Conforto* v. *Mabus*,
   2014 WL 12560881 (S.D. Cal. Sept. 24, 2014) .................................................................... 13

*Davis* v. *Pinterest, Inc.*,
   2021 WL 11117688 (N.D. Cal. May 27, 2021) .................................................................... 14

*Doble* v. *Mega Life & Health Ins. Co.*,
   2010 WL 1998904 (N.D. Cal. May 18, 2010) .............................................................. 4, 5, 6, 9

*Groupion, LLC* v. *Groupon, Inc.*,
   2012 WL 359699 (N.D. Cal. Feb. 2, 2012) ................................................................... *passim*

*Icon-IP Pty Ltd.* v. *Specialized Bicycle Components, Inc.*,
   2014 WL 5387936 (N.D. Cal. Oct. 21, 2014) .................................................................. 6, 23

*Lauris* v. *Novartis AG*,
   2016 WL 7178602 (E.D. Cal. Dec. 8, 2016) ........................................................................ 21

*M.H.* v. *Cnty. of Alameda*,
   2013 WL 5497176 (N.D. Cal. Oct. 3, 2013) .......................................................................... 6

*Rembrandt Diagnostics, LP* v. *Innovacon, Inc.*,
   2018 WL 692259 (S.D. Cal. Feb. 2, 2018) ........................................................................... 13

*Robertson* v. *McNeil-PPC Inc.*,
   2014 WL 12576817 (C.D. Cal., Jan. 13, 2014) ...................................................... 11, 14, 18

*Schmidt* v. *Levi Strauss & Co.*,
   2006 WL 8459745 (N.D. Cal. May 31, 2006) ........................................................................ 6

*Schneider* v. *Chipotle Mexican Grill, Inc.*,
   2017 WL 4127992 (N.D. Cal. Sept. 19, 2017) ............................................................. *passim*

*Somers* v. *Digital Realty Trust Inc.*,
   2016 WL 7157505 (N.D. Cal. Dec. 8, 2016) .......................................................................... 5

*Symantec Corp.* v. *Zscaler, Inc.*,
   2019 WL 8331428 (N.D. Cal., Sept. 19, 2019) ................................................................... 10

*In re Yosemite Nat'l Park Hantavirus Litig.*,
   2017 WL 2861162 (N.D. Cal. July 5, 2017)................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 26(b)(2)(C) ........................................................................................... 4, 24

Fed. R. Civ. P. 26(c).......................................................................................................... 4

Fed. R. Civ. P. 30(b)(6)...................................................................................................... 3

**MEMORANDUM OF POINTS AND AUTHORITIES**

**SUMMARY AND BACKGROUND**

This motion concerns Plaintiffs' request to take unnecessary and duplicative depositions of Uber's highest-ranking current and former executives, including Uber's Chief Executive Officer ("CEO") Dara Khosrowshahi; former CEO Travis Kalanick; Chief Marketing Officer ("CMO") and Senior Vice President, Communications & Public Policy Jill Hazelbaker; Chief Product Officer ("CPO") Sachin Kansal; Vice President of Applied Science Frank Chang; Vice President, Head of Americas Delivery Sarfraz Maredia; former CEO and Senior Vice President of Global Operations Ryan Graves; and former Senior Vice President for Communications and Public Policy Rachel Whetstone (collectively, the "Senior Executives").  This motion also Plaintiffs' request to take an unnecessary deposition of Joseph Sullivan.

As for the Senior Executives, a protective order preventing the depositions of these Senior Executives is warranted at this stage of the case.  "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Celerity Inc.* v. *Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007).  "For that reason, parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and (2) that other less intrusive means of discovery, such as interrogatories and depositions of other employees, have been exhausted without success." *Groupion, LLC* v. *Groupon, Inc.*, 2012 WL 359699, at *2 (N.D. Cal. Feb. 2, 2012).  Neither prong is satisfied here.

*First*, the Senior Executives lack unique knowledge of the relevant issues in this lawsuit. Sitting at the highest levels of Uber's corporate hierarchy, the Senior Executives are (or were) responsible for overseeing a corporation that now consists of more than 31,000 employees, operates in over 70 countries in various segments, and has created apps used by tens of millions of independent drivers, riders, consumers, merchants, shippers, and carriers.  As some of the highest-ranking executives of the corporation, the Senior Executives are (or were) responsible for overseeing Uber's business on a global basis, including, for example, Uber's freight and delivery

-1-

1   operating segments, which are irrelevant to Plaintiffs' claims.

2         Consequently, the Senior Executives do not have "unique, non-repetitive, firsthand

3   knowledge of the facts at issue in the case." *Id.*  Plaintiffs assert claims arising from purported

4   instances of sexual misconduct by independent drivers against Plaintiffs and allege that Uber is

5   liable because it purportedly failed to implement policies that adequately address risks of harm to

6   riders or failed to disclose those risks.  Other Uber employees have knowledge of and are (or were)

7   directly involved in developing, overseeing, and implementing Uber's safety practices, policies,

8   and technologies; handling rider safety; investigating alleged incidents of sexual assault or

9   misconduct; and Uber's communications.  It is those employees who possess unique, first-hand

10   knowledge of the issues relevant to this case and whom Plaintiffs are already scheduled to depose.

11         Indeed, setting aside the Senior Executives (and Mr. Sullivan), Plaintiffs have deposed or

12   plan to depose at least 30 current and former Uber employees, including a member of Uber's

13   Executive Leadership Team ("ELT")—the highest level of management at Uber and equivalent to

14   Uber's "C-suite"—and other high-ranking officials within Uber.  These witnesses include, among

15   others:  Gus Fuldner (Senior Vice President of Safety & Core Services and a member of Uber's

16   ELT), who is Uber's senior executive responsible for safety and customer support, among other

17   things at Uber; Roger Kaiser (Senior Director, Global Head of Safety Operations), who leads the

18   global safety operations team within Safety & Core Services; Brooke Anderson (Senior Director,

19   Product Communications and former Head of Global Safety Communications) and Andrew Hasbun

20   (Director, Communications (Safety)), members of Uber's communications team responsible for

21   Uber's public communications on safety matters; Katy McDonald (Director of Data Science), who

22   has primary responsibility for maintaining safety incident data at Uber and worked on the Safety

23   Reports; and Rachel Holt (former Regional General Manager for U.S. & Canada and member of

24   Uber's ELT), who was responsible for overseeing operations for the Mobility segment in the U.S.

25   and Canada.  As discussed below, these are just a few examples of the members of the Senior

26   Executives' reports and teams from whom Plaintiffs will be able to obtain any knowledge that the

27   Senior Executives might have on the relevant issues.

28         *Second*, a protective order is necessary because Plaintiffs have not exhausted less intrusive

discovery methods to obtain the discovery needed.  On the contrary, the parties recently started the deposition phase of discovery and Plaintiffs have completed only some of the depositions of the individuals at Uber who have first-hand knowledge of the relevant issues.  Plaintiffs have not taken any Rule 30(b)(6) depositions, much less served Rule 30(b)(6) notices.  Only after completing those depositions can the parties, and this Court, begin to assess and determine whether Plaintiffs have exhausted less intrusive means of discovery, and whether the depositions of Uber's highest-ranking officials are necessary.

For these reasons, the Superior Court of California recently issued a protective order with respect to depositions of five of the Senior Executives sought in the parallel state court proceedings (the "JCCP").[1]  In that case, plaintiffs claimed that those five depositions were necessary because "the litigation 'directly concerns executive-level decisions about whether to implement particular safety practices, policies, or technologies'" and the executives had "personally issued directives, guided the development and implementation of Uber's safety measures and how those measures and Uber's claims of safety would be disclosed (or not disclosed) to the public, [and] were ultimate decision-makers regarding safety measures Uber decided not to implement."  Feb. 28, 2025, Declaration of Randall S. Luskey ("Luskey Decl.") Ex. 1, Order at 7.  The court granted Uber's "apex" motion because there were still many outstanding depositions, including depositions of Uber's corporate representatives and "employees who are likely to have more direct personal knowledge of the issues at stake than the Senior Executives, such that the completion of those depositions may obviate the need for Plaintiffs to take certain Senior Executives' depositions, or at least narrow the scope (and associated burden) of those depositions."  *Id.* at 9.  The court therefore issued a protective order without prejudice to Plaintiffs seeking to lift the protective order after completion of "depositions of Uber's persons most knowledgeable on key topics and of lower-level Uber employees."  *Id.* at 10.

Plaintiffs' requests for depositions of the highest-ranking members of Uber's corporate

---

[1] The Superior Court issued a protective order preventing the depositions of all of the Senior Executives at issue in the JCCP: Dara Khosrowshahi, Travis Kalanick, Jill Hazelbaker, Sachin Kansal, and Frank Chang.  The Court also ordered protection for Michael Akamine.  As explained below, however, Uber will make Mr. Akamine available for deposition, notwithstanding his senior status.

DEFENDANTS' MOTION FOR PROTECTIVE ORDER              Case No. 3:23-md-03084-CRB

hierarchy should be prohibited.  The Senior Executives do not have unique knowledge of relevant information that Plaintiffs will not be able to obtain through the depositions of the current and former Uber employees—including senior executives and managers—that were directly responsible for the portions of Uber's business that are relevant to this litigation.  Accordingly, this Court should issue a protective order.

The Court should also issue a protective order with respect to Plaintiffs' request to depose Joseph Sullivan.  Plaintiffs likely seek to depose Mr. Sullivan so they can question him about his prior criminal conviction in an effort to taint the company.  Indeed, Mr. Sullivan's conviction has already been raised in depositions in the JCCP.  That conviction arises from events wholly irrelevant to this litigation.  And any appropriate questioning of Mr. Sullivan would only be duplicative of the depositions of the other witnesses on Plaintiffs' list.  The Court should issue a protective order with respect Mr. Sullivan in addition to the depositions of the Senior Executives.

## ARGUMENT

## I.   The Apex Doctrine Prohibits Depositions Of Senior Company Officials Who Do Not Possess Unique Knowledge.

Under Federal Rule of Civil Procedure 26(c)(1), a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Under this rule, the trial court may enter a protective order "forbidding the disclosure or discovery," "specifying terms" of the deposition, or "limiting the scope of disclosure or discovery to certain matters."  *Id.* 26(c)(1)(a)-(b), (d).  Rule 26(b)(2)(C) further provides that "[o]n motion . . . the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."

These rules "protect[] an entity when it faces an 'apex' deposition."  *See Doble* v. *Mega Life & Health Ins. Co.*, 2010 WL 1998904, at *1 (N.D. Cal. May 18, 2010) (collecting cases).  Under the apex doctrine, a party is entitled to a protective order prohibiting the taking of a high-ranking employee's deposition.  *See id.*  "Where a high-level decision maker 'removed from the

daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper.  This is especially so where the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue." *Celerity*, 2007 WL 205067, at *3 (internal citations omitted).  Accordingly, "parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and (2) that other less intrusive means of discovery, such as interrogatories and depositions of other employees, have been exhausted without success." *Groupion*, 2012 WL 359699, at *2; *accord Affinity Labs of Texas* v. *Apple, Inc.*, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011).

As to the first requirement, "an essential component of the standard for an apex deposition [is] *unique* personal knowledge by the high corporate official, *unavailable from less intrusive discovery*." *Celerity*, 2007 WL 205067, at *4 (emphasis added).  It is not enough that the apex executives have personal knowledge of relevant facts.  Their knowledge must be "unique," such that there are no other representatives with knowledge of the same facts.  *See id.*; *Schneider* v. *Chipotle Mexican Grill, Inc.*, 2017 WL 4127992, at *3 (N.D. Cal. Sept. 19, 2017) ("The evidence cited to by Plaintiffs confirms that [the CMO] has knowledge, but does not necessarily show that he had unique knowledge."); *Somers* v. *Digital Realty Trust Inc.*, 2016 WL 7157505, at *2 (N.D. Cal. Dec. 8, 2016) (holding that "even if [the executive] had first-hand information . . . the Court is not persuaded that [he] has *unique* knowledge" because "Plaintiff can depose individuals who were directly involved" or "notice a Rule 30(b)(6) deposition" (emphasis in original)).

Accordingly, the fact that an apex executive oversaw or approved decisions relevant to the case does not justify their deposition if other representatives can speak to those decisions.  *See, e.g.*, *In re Yosemite Nat'l Park Hantavirus Litig.*, 2017 WL 2861162, at *3 (N.D. Cal. July 5, 2017) (preventing deposition of an apex deponent who was "involved in the decision-making" in issue because other employees were "the key decision makers"); *Schneider*, 2017 WL 4127992, at *2 (granting protective order notwithstanding plaintiffs claim that CMO participated in "key meetings and decision-making"); *Doble*, 2010 WL 1998904, at *3 (evidence of "pure high-level

DEFENDANTS' MOTION FOR PROTECTIVE ORDER          Case No. 3:23-md-03084-CRB

1    management" does not "demonstrate[] the unique personal knowledge required to compel a

2    deposition of a CEO."); *M.H.* v. *Cnty. of Alameda*, 2013 WL 5497176, at *2 (N.D. Cal. Oct. 3,

3    2013) ("The mere fact of [the CEO's] signature on a contract to which [defendant] is a party does

4    not establish that [the CEO 'has unique first-hand, non-repetitive knowledge of the facts at issue'

5    regarding the obligations under that contract, or how they were performed.")

6         Likewise, an apex executive's inclusion in email chains or other documents that bear on the

7    dispute does not warrant a deposition if other employees have equal or superior direct knowledge

8    about the documents. *See In re Yosemite*, 2017 WL 2861162, at *3 (holding that email exchanges

9    by which lower-level employees kept an apex representative "informed" and "abreast" of relevant

10   matters did not justify an apex deposition); *Schneider*, 2017 WL 4127992, at *3 (CMO's inclusion

11   on emails "does not suggest unique knowledge given the other individuals who were on the e-

12   mails").

13        Nor do an executive's actions as the "public face of the company"—including making

14   "public statements" about the matters in issue—entitle the opposing party to an apex deposition.

15   *Doble*, 2010 WL 1998904, at *4; *see also Affinity Labs of Texas*, 2011 WL 1753982, at *16;

16   *Schmidt* v. *Levi Strauss & Co.*, 2006 WL 8459745, at *2 (N.D. Cal. May 31, 2006) (preventing

17   deposition of the defendant's CEO about a press release in which he opined on the merits of the

18   case).

19        Turning to the "exhaustion" requirement, "the second prong of this conjunctive test"

20   requires that the party seeking the deposition "has exhausted other means of obtaining th[e]

21   information, such as interrogatories and depositions of lower-level employees." *Icon-IP Pty Ltd.*

22   v. *Specialized Bicycle Components, Inc.*, 2014 WL 5387936, at *2 (N.D. Cal. Oct. 21, 2014);

23   *accord Groupion*, 2012 WL 359699, at *2.  Using these methods, the party seeking the apex

24   deposition "must make a good faith effort to extract the information it seeks." *Celerity*, 2007 WL

25   205067, at *5.  That party may not seek an apex deposition unless and until this good faith effort

26   "prove[s] inadequate." *Id.*  The deposing party does not satisfy the exhaustion requirement simply

27   by "scheduling the depositions of [apex executives] after the depositions of the lower level

28   employees." *Id.*

## II.    The Court Should Issue A Protective Order Against The Depositions Of The Senior Executives.

The Court should issue a protective order prohibiting the depositions of the Senior Executives. Each of these individuals is (or was) a senior Uber executive and responsible for Uber's various business segments on a global scale. These individuals do not possess unique knowledge of the facts that Plaintiffs seek to explore. Most of their knowledge comes from others in the company who report to them, many of whom are executives and senior business managers in their own right and whom Plaintiffs have deposed or plan to depose. Plaintiffs are not entitled to depose the Senior Executives because Plaintiffs cannot show that (1) the Senior Executives have unique personal knowledge of relevant information, and (2) Plaintiffs have exhausted all less intrusive discovery methods.

### A.    The Senior Executives do not possess unique personal knowledge.

#### 1.    <u>Dara Khosrowshahi</u>

Mr. Khosrowshahi is Uber's CEO and, as such, sits at the "highest level or 'apex' of [Uber's] corporate management." *Celerity*, 2007 WL 205067, at *3. Mr. Khosrowshahi has been Uber's CEO since 2017 and leads Uber's ELT. Feb. 24, 2025, Declaration of Dara Khosrowshahi ("Khosrowshahi Decl.") ¶¶ 3, 5. As CEO, Mr. Khosrowshahi oversees all of Uber's operating and reportable segments, including those outside Mobility. *Id.* ¶ 4. Across these segments, Uber has approximately 31,100 employees and operates in over 70 countries and more than 15,000 cities around the world. *Id.* It maintains apps used by tens of millions of independent drivers, riders, consumers, merchants, shippers, and carriers. *Id.* As Uber's most senior executive, all other ELT members report directly to Mr. Khosrowshahi on all aspects of these numerous facets of Uber's business. *Id.* ¶ 5.

As Uber's top executive, Mr. Khosrowshahi is the leader of the company. He is responsible for leading the vision and strategy for the entire business, including by setting company-wide goals. *Id.* And given the size of Uber's operations, Mr. Khosrowshahi cannot possibly be involved in every aspect of the day-to-day work of each Uber team, including those whose work is relevant to this litigation. Although Mr. Khosrowshahi sets high-level goals for Uber, he is not directly or

-7-

uniquely responsible for creating and implementing the policies at issue. *Id.* ¶ 6. Lower-level employees handle those responsibilities, and most of Mr. Khosrowshahi's knowledge of that work is based on reports from those employees. *Id.*

Given his role, Mr. Khosrowshahi does not have the requisite "unique first-hand, non-repetitive knowledge" of information relevant to Plaintiffs' claims. *Groupion*, 2012 WL 359699, at *2. This lawsuit arises from alleged instances of sexual assault or misconduct by independent drivers against Plaintiffs, and Plaintiffs allege that Uber is liable because it failed to implement policies and measures that would adequately address such risks of harm. *See generally* Master Long-Form Compl. For Damages and Demands for Trials by Jury, ECF No. 269 ("Compl."). Mr. Khosrowshahi was not directly or uniquely involved in the events underlying Plaintiffs' cases and does not have the requisite unique personal knowledge that would justify his deposition.

*First*, Mr. Khosrowshahi has no first-hand knowledge of the alleged incidents of sexual misconduct. He was not involved in driver background checks, decisions regarding rider or driver account deactivations, or in responding to or investigating incidents of any kind, let alone incidents involving Plaintiffs. Khosrowshahi Decl. ¶ 8.

*Second*, Mr. Khosrowshahi does not have unique, non-repetitive knowledge of the safety policies and practices that Plaintiffs allege are inadequate. As CEO, Mr. Khosrowshahi is neither directly nor uniquely involved in the development, implementation, or execution of safety practices, technologies, and other measures. *Id.* ¶ 9. Those responsibilities are delegated to and performed by other Uber employees, including senior business leaders, who have been or will be deposed in this matter.

Plaintiffs will depose Gus Fuldner, Senior Vice President of Safety & Core Services. Mr. Fuldner has worked at Uber since 2013 and joined the company's ELT in 2021. *See id.* ¶ 10. Mr. Fuldner has served in multiple safety-related roles and is the senior executive at Uber who has been responsible for safety during Mr. Khosrowshahi's tenure. *Id.* He leads the organizational unit that, among other things, has primary oversight over safety and customer support, the group responsible for responding to and investigating alleged incidents. *Id.*; Luskey Decl. Ex. 2, Rosenthal Tr. 193:4–20.

DEFENDANTS' MOTION FOR PROTECTIVE ORDER                    Case No. 3:23-md-03084-CRB

1    Plaintiffs will also depose Roger Kaiser, Head of Safety, who is Mr. Fuldner's direct report

2    and leads the safety operations team within the Safety & Core Services unit that is dedicated to

3    safety.  Khosrowshahi Decl. ¶ 10.  In that role Mr. Kaiser's responsibilities include oversight on

4    safety risks, reporting to Uber's senior executives on safety matters, and leading teams responsible

5    for implementation of measures and policies to address safety risks.  *See* Luskey Decl. Ex. 3, Kaiser

6    Tr. 14:3–15:3.

7    In addition to Messrs. Fuldner and Kaiser, Plaintiffs have deposed and will depose

8    numerous current and former employees who are (or were) directly responsible for the subject

9    matters involved in this action, including, among others: Cory Freivogel, Head of Safety, U.S. &

10    Canada; Rachel Holt, former Regional General Manager for U.S. & Canada; Danielle Sheridan,

11    former Senior Manager, Head of Safety & Standards; Katy McDonald, Director of Data Science;

12    Valerie Shuping, former Global Safety Program Manager; Jenny Luu, Senior Manager, Central

13    Operations; Catherine Gibbons, Senior Director, Head of Platform Safety, Identity, Risk &

14    Payments, Community Operations; and Michael Sullivan, Senior Director, Trust & Security,

15    Global Public Safety.  Khosrowshahi Decl. ¶ 11.  Mr. Khosrowshahi does not possess unique

16    knowledge that cannot be obtained from these deponents.

17    On this point, it is telling that none of the Uber employees who were deposed in this

18    litigation and the JCCP have testified that Mr. Khosrowshahi, or anyone of the other Senior

19    Executives, has unique knowledge of information relevant to Plaintiffs' claims, *i.e.*, information

20    that no other person can provide.  Courts look for such testimony when determining whether an

21    apex deposition is warranted.  *See, e.g.*, *In re Yosemite*, 2017 WL 2861162, at *3 (preventing

22    deposition of corporate president partly because prior deponent "did not state that [the president

23    was] the only individual[]" who was "involved in the decision-making" in issue).

24    Plaintiffs may claim that they are entitled to depose Mr. Khosrowshahi because, as CEO,

25    he made certain safety-related decisions on behalf of the company and has made public statements

26    relating to safety, such as "[h]elping keep people safe is a huge responsibility and one [Uber does]

27    not take lightly."  *See* Compl. ¶¶ 156, 213, 270.  But acting as the "public face of the company"

28    does not subject a CEO to a deposition.  *Doble*, 2010 WL 1998904, at *3.  "The mere fact that [the

DEFENDANTS' MOTION FOR PROTECTIVE ORDER                Case No. 3:23-md-03084-CRB

CEO] made public statements, even on issues that [Plaintiffs] consider[] relevant to [their] claims, are insufficient to justify his deposition.  Courts have repeatedly denied apex depositions even on a showing that the executive made public statements on relevant issues." *Affinity Labs*, 2011 WL 1753982, at *16.  Again, it is not enough to show that an "apex" employee has some knowledge, it must be established that the knowledge is unique and cannot be obtained from any less-intrusive source.  *See Celerity*, 2007 WL 205067, at *3.  Plaintiffs cannot do so here given they will depose multiple high-ranking employees who are or were responsible for both the creation and the implementation of Uber's safety policies and measures, and for Uber's communications relating to safety.  *See* Khosrowshahi Decl. ¶¶ 10–13.

This Court's decision in *Schneider*, 2017 WL 4127992, is instructive.  In that case, the plaintiffs sought to depose the defendant's CMO in a class action in which the plaintiffs alleged that the defendant misled consumers by advertising its products as using "[o]nly non-GMO ingredients." *Id.* at *1–2.  The plaintiffs argued that the apex doctrine did not bar the deposition because the CMO was "closely involved overseeing the development and implementation of the [Non-GMO] campaign that is the heart of this lawsuit" and that other deponents, "all of whom worked at [the CMO's] direction," testified that the CMO was the "ultimate decision-maker." *Id.* at *2.  This Court denied plaintiffs' request to depose the CMO because they "failed to identify any unique personal knowledge by [the CMO]." *Id.* at *3.  The court held that even if the CMO did have knowledge of the facts at issue in the lawsuit, Plaintiffs could not explain why the CMO had "*unique* personal knowledge of the facts." *Id.* (emphasis in original).  Indeed, the court considered multiple facts demonstrating that the CMO had no unique, non-repetitive knowledge to overcome application of the apex doctrine:  other deponents testified that they made decisions along with the CMO, the CMO received "guidance and revisions" from other deponents, and there were "a number of e-mails that [the CMO] was a part of" but which included several other deponents who had already testified to the facts. *Id.*

Likewise, in *Symantec Corp.* v. *Zscaler, Inc.*, 2019 WL 8331428 (N.D. Cal. Sept. 19, 2019), a defendant sought to depose the plaintiff's "Interim President and CEO" to inquire "about the meaning of his statements made on a May 2019 quarterly earning call." *Id.* at *1.  The plaintiff

DEFENDANTS' MOTION FOR PROTECTIVE ORDER          Case No. 3:23-md-03084-CRB

opposed the deposition under the apex doctrine.  Notwithstanding the defendant's intent to question the CEO about his own statements, the court barred the deposition, reasoning that statements from an earnings call "about a general trend in the company's business, a trend that any number of people could testify to, are not enough to justify an apex deposition."  *Id*.  The defendant could not "demonstrate the need for an apex deposition because [the CEO's] statements concern subjects that by definition would be known by multiple persons within a large corporation."  *Id*. at *2.

Similarly, in *Robertson* v. *McNeil-PPC Inc.*, 2014 WL 12576817 (C.D. Cal. Jan. 13, 2014) the district court reversed a magistrate's denial of a motion for a protective order filed on behalf of the "former Worldwide Chairman of Johnson & Johnson's Consumer Group" in a wrongful death and products liability action filed against Johnson & Johnson.  *Id*. at *1, *15.  In that case, the apex witness had previously testified before Congress regarding investigations that were relevant to the products at issue in the lawsuit and had "personal knowledge of certain relevant issues, including the alleged quality control problems."  *Id*. at *18.  Despite the fact that the executive had "some level of personal knowledge of material issues," the court held that the plaintiffs could not depose the executive.  *Id*. at *19–20.  It explained that "courts 'generally refuse to allow the immediate deposition of high-level executive[s], the so-called 'apex deponents,' *before* the depositions of lower level employees with more intimate knowledge of the case.'  Because [d]efendants have produced the names of a number of employees with at least as much knowledge as [the apex witness] with respect to the manufacture of [the] [d]efendants' products and their recall, [the] [p]laintiff has not shown that she cannot obtain the evidence that she seeks from those employees."  *Id*. at *20 (internal citations omitted; emphasis in original).  The court held that the deposition could proceed only after plaintiffs established that they "engaged in reasonable, alternative methods of discovery" and upon further showing "that it is reasonably likely that [the apex witness] possesses the additional information."  *Id*.

Finally, *In re Yosemite*, 2017 WL 2861162, is to similar effect.  There, the plaintiffs unsuccessfully sought to depose the defendant's corporate president in an action alleging that the defendant had failed to adopt adequate "corrective measures" to address a Hantavirus outbreak in its resort.  *Id*. at *1.  The plaintiffs argued that the apex deposition was warranted because the

president: (i) reviewed and approved construction plans that allegedly contributed to the outbreak; (ii) personally toured the resort during the same months when the California Department of Public Health had "assessed studies revealing a significant density of Hantavirus-infected rodents" in the resort area; (iii) received "immediate[]" and "lengthy" updates about the outbreak from other employees; (iv) received advice from the defendant's Director of Risk Management on what to review during his trips to the resort in order to collect information on the virus; and (v) briefed the National Park Service director and Congress on the outbreak. *Id*. at *2. The district court rejected this argument because whatever knowledge the president had of the relevant facts was not unique. His approval of construction plans had "little bearing on the design and implementation" of those plans, for which lower level employees were chiefly responsible. *Id*. at *3. Further, evidence that the president kept "abreast of the hantavirus issue" by requesting information about it and presenting on it to the National Parks Service director and Congress "only demonstrate[d] that he was involved, not that he was a 'key player'" for whom a deposition was necessary. *Id*.

As these cases demonstrate, corporate officers are not subject to depositions merely because they were parties to correspondence, or made public statements or high-level decisions that may be relevant to a lawsuit given their role as leaders of a business. Rather, they must possess unique, non-repetitive knowledge, which is typically in the possession of lower-level employees. The same is true here. The Court should issue a protective order with respect to Mr. Khosrowshahi's deposition because as CEO of a multinational company he does not possess unique knowledge of relevant facts that cannot be obtained through depositions of other employees at the company.

## 2. Travis Kalanick

A deposition of Mr. Kalanick is unwarranted for many of the reasons applicable to Mr. Khosrowshahi. Mr. Kalanick was Uber's CEO from 2010 until June 2017 and oversaw all of the company's operations. Feb. 28, 2025, Declaration of Travis Kalanick ("Kalanick Decl.") ¶¶ 3–4. He had no primary focus on any particular facet of Uber's business—let alone safety—and he was not directly involved in creating or implementing the vast majority of Uber's policies. *Id*. ¶ 4. Whatever knowledge he had of that work is largely based on information that others reported to him. *Id*.

1   As former CEO, Mr. Kalanick's potential knowledge of any facts relevant to this case is

2   neither unique nor non-repetitive of the knowledge of Uber employees who were or have been

3   involved in Uber's day-to-day operations.  Plaintiffs intend to depose multiple current and former

4   employees who are knowledgeable about the relevant topics and who are available for depositions.

5   For example, Plaintiffs have deposed Meghan Joyce and will depose Rachel Holt and William

6   Barnes.  Each of these individuals worked in operations based roles during Mr. Kalanick's tenure.

7   *Id.* ¶ 8.  Ms. Holt oversaw the United States and Canada.  *Id.*  Plaintiffs also deposed Nairi

8   Hourdajian, who had direct responsibility for Uber's communications.  *Id.* ¶ 10.  There was also

9   the deposition of Phillip Cardenas in the JCCP.  Id. ¶ 9.  And Plaintiffs have deposed or will depose

10  Gus Fuldner, Roger Kaiser, Cory Freivogel, Katy McDonald, Andi Pimentel, Valerie Shuping, and

11  David Richter, who each worked at Uber during Mr. Kalanick's tenure as CEO.  *Id.* ¶ 11.  Mr.

12  Kalanick possesses no information that Plaintiffs cannot obtain from those individuals or others

13  that will be deposed.

14      Plaintiffs may claim that they are entitled to depose Mr. Kalanick because, as Uber's former

15  CEO, he made certain safety decisions at issue here.  But, as with Mr. Khosrowshahi, Plaintiffs

16  cannot show that any knowledge Mr. Kalanick has of those decisions is unique, such that an apex

17  deposition is warranted.  *See Schneider*, 2017 WL 4127992, at *3 (preventing deposition of CMO

18  who oversaw the marketing campaign in issue because his knowledge about the campaign was not

19  unique); *In re Yosemite*, 2017 WL 2861162, at *3 (preventing deposition of president who signed

20  off on relevant plans, received immediate and lengthy updates on the subject matter of the case,

21  and briefed the federal government on relevant issues, since there were other key players).

22      To the extent Plaintiffs argue that the apex doctrine does not apply to Mr. Kalanick because

23  he is no longer associated with Uber, multiple courts in this Circuit have rejected such an argument

24  and the Court should reject it here.  "Executives and high-ranking officials continue to be protected

25  by the apex doctrine even after leaving office." *Conforto* v. *Mabus*, 2014 WL 12560881, at *7 (S.D.

26  Cal. Sept. 24, 2014); *accord Rembrandt Diagnostics, LP* v. *Innovacon, Inc.*, 2018 WL 692259, at

27  *7 (S.D. Cal. Feb. 2, 2018).  "Depositions of witnesses at this level in the company who have no

28  unique knowledge of the facts are an undue burden for the company, the witnesses, and counsel,

-13-

DEFENDANTS' MOTION FOR PROTECTIVE ORDER                    Case No. 3:23-md-03084-CRB

and that is no less true for . . . former executives who are no longer at [the company] because those depositions will have outsized importance to the company as well." *Davis* v. *Pinterest, Inc.*, 2021 WL 11117688, at *1 (N.D. Cal. May 27, 2021). Put plainly, that an executive is no longer employed by the defendant-company does not prevent the apex doctrine from applying to that former executive with equal force. *See Robertson*, 2014 WL 12576817, at *17 ("Courts have found that former executives . . . are covered by the apex doctrine."). The apex doctrine recognizes that at all times, regardless of their current duties, former senior executives are at the mercy of the "tremendous potential for abuse and harassment" that the apex doctrine aims to prevent. *Id.* Accordingly, Mr. Kalanick's status as a former CEO does not deprive him of the protections of the apex doctrine. In addition, the application of the doctrine "is also supported by the evidence that [Mr. Kalanick] 'continues to actively pursue a number of business endeavors.'" *Id.* Mr. Kalanick is the CEO of City Storage Systems and its subsidiary CloudKitchens, which has global operations and a large workforce. Kalanick Decl. ¶ 13.

### 3. Jill Hazelbaker

Ms. Hazelbaker is an apex corporate officer who does not possess unique first-hand knowledge of the facts Plaintiffs seek to discover. She is Uber's Chief Marketing Officer and Senior Vice President, Communications & Public Policy, and a member of Uber's ELT. Feb. 21, 2025, Declaration of Jill Hazelbaker ("Hazelbaker Decl.") ¶ 3. In that role, Ms. Hazelbaker oversees the company's global marketing, communications, and public policy efforts and reports directly to Uber's CEO, Mr. Khosrowshahi. *Id.* ¶¶ 3, 5. Ms. Hazelbaker is responsible for numerous teams which comprise a substantial number of employees globally. *Id.*

Given her position, Ms. Hazelbaker does not possess "unique, first-hand, non-repetitive knowledge of the facts at issue in the case." *Schneider*, 2017 WL 4127992, at *2. She is not involved in driver background checks or responsible for responding to or investigating alleged incidents of sexual misconduct. Hazelbaker Decl. ¶ 7. She also does not make decisions regarding rider or driver account deactivations. *Id.* She is also not responsible for the development, implementation, or execution of the safety measures and practices that are the focus of Plaintiffs' lawsuits. *Id.*

DEFENDANTS' MOTION FOR PROTECTIVE ORDER                 Case No. 3:23-md-03084-CRB

To the extent Plaintiffs seek Ms. Hazelbaker's deposition because they would like to discover facts about Uber's statements and representations relating to safety, those matters are at most peripheral to this litigation, as the Court has dismissed Plaintiffs' claims predicated on alleged fraud and misrepresentations in Uber's safety-related statements.  See ECF No. 1044 at 35–37; ECF No. 1719 at 9.  Therefore there is no justification for deposing Uber's CMO, especially when Plaintiffs plan to depose multiple Uber employees, both current and former, who were directly responsible for those matters and/or reported to Ms. Hazelbaker.  Hazelbaker Decl. ¶¶ 8–10.  Those are the individuals who possess the information that Plaintiffs seek.

Plaintiffs have deposed or plan to depose multiple members of the communications team that sits under Ms. Hazelbaker.  This includes Brooke Anderson, Senior Director, Product Communications and former Head of Global Safety Communications, who was directly involved in the communications strategy for Uber's First Safety Report and had responsibility for Uber's public communications concerning safety.  *Id.* ¶ 9.  In addition to Ms. Anderson, Plaintiffs will depose Andrew Hasbun (Director, Communications (Safety)), Tracey Breeden (who served in Safety Communications roles and as the Head of Global Women's Safety and Gender-Based Violence programs), and Kayla Whaling (former Manager, Safety & Privacy Communications), and Plaintiffs have deposed Nairi Hourdajian (former Director of Corporate Communications).  *Id.* ¶ 10.  All of these individuals hold or held direct responsibility for Uber's safety communications.

In addition, Jodi Kawada Page will be deposed in the JCCP litigation.  Ms. Page joined Uber in 2016 and previously served as a Communications Manager, Safety and Senior Manager, Communications, before transitioning to her current role as Chief of Staff to the Chief Legal Officer.  Ms. Page worked on, and is knowledgeable about, Uber's safety communications and the Safety Reports.  Luskey Decl. Ex. 2, Rosenthal Tr. 239:10–16, 242:12–15, 242:23–243:7.  Plaintiffs can depose Ms. Page.

Likewise, Plaintiffs have deposed, or will depose, multiple individuals with direct responsibilities for Uber's marketing efforts, including those relating to safety.  These individuals include Kate Parker, former Director of Safety Marketing; Carley Lake, former Global Product Marketing Director, Trust & Safety; Jordan Burke, former Director, Research & Insights, and Head

1  of Consumer & Market Research; and Abbie Ding, who has held multiple marketing roles at Uber.

2  Hazelbaker Decl. ¶ 11.

3          Ms. Hazelbaker's potential knowledge of relevant facts would not differ from that of the

4  foregoing individuals, who were directly responsible for Uber's communications and marketing

5  efforts.  *Id.* ¶¶ 9–11.  To be sure, Ms. Hazelbaker might have been party to correspondence or

6  participated in "key meetings and decision-making" with respect to Uber's communications and

7  marketing efforts.  *Schneider*, 2017 WL 4127992, at *2.  But that alone is insufficient to establish

8  that Ms. Hazelbaker has *unique* knowledge of these matters that cannot be obtained through

9  depositions of the individuals who were directly responsible for that work.  *Id*. at *3.

10          Indeed, this is the very reason this Court blocked the deposition of Chipotle's CMO in

11  *Schneider*, 2017 WL 4127992.  Notwithstanding the plaintiffs' argument that the CMO was

12  "closely involved overseeing the development and implementation of the [Non-GMO] campaign

13  that is the heart of th[at] lawsuit," the Court denied plaintiffs' request to depose the CMO because

14  they "failed to identify any unique personal knowledge by [the CMO]."  *Id*. at *2–*3.  The court

15  held that even if the CMO did have knowledge of the facts at issue in the lawsuit, Plaintiffs could

16  not explain why the CMO had "*unique* personal knowledge of the facts," especially given the

17  presence of other deponents with relevant knowledge.  *Id*. at *3 (emphasis in original).

18          Thus, claiming that Ms. Hazelbaker was the "ultimate decision-maker" or "point[ing] to a

19  number of e-mails that [Ms. Hazelbaker] was a part of . . . does not suggest unique knowledge"

20  because Plaintiffs will depose Ms. Hazelbaker's reports, who were involved in these matters.  *Id.*

21  Such evidence shows only that "[Hazelbaker] worked with other individuals, many of whom were

22  [or will be] deposed by Plaintiffs."  *Id*.  It "does not suggest unique knowledge given the other

23  individuals who were on the e-mails, several of whom were [or will be] deposed by Plaintiffs."  *Id*.

24          Plaintiffs cannot establish that Ms. Hazelbaker, who oversees the work of her large

25  department, would have knowledge that is unique when compared to the knowledge of those

26  deponents who handled the communications and marketing work that fell under Ms. Hazelbaker's

27  domain.  As Ms. Hazelbaker has no unique personal knowledge that cannot be obtained from those

28  employees the apex doctrine applies and prevents her deposition.

4.    <u>Rachel Whetstone</u>

For many of the reasons that apply to Ms. Hazelbaker, a protective order for Ms. Whetstone is justified under the apex doctrine.  Ms. Whetstone served as Uber's Senior Vice President for Communications and Public Policy from 2015 to 2017 and reported directly to Uber's CEO.  Feb. 28, 2025, Declaration of Rachel Whetstone ("Whetstone Decl.") ¶¶ 3–4.   In that role, Ms. Whetstone oversaw the global teams responsible for the company's communications and public policy efforts and its communications strategy across Uber's operations worldwide.  *Id*.

Ms. Whetstone does not have unique knowledge of the facts at issue in Plaintiffs' cases. She was not involved with background checks; she was not responsible for responding to or investigating safety incidents between drivers and riders; and she also was not responsible for the development, implementation, or execution of the safety measures and practices that are the focus of Plaintiffs' lawsuits.  *Id*. ¶ 6.

As is the case with Ms. Hazelbaker, Plaintiffs presumably seek Ms. Whetstone's testimony given her role as the leader of Uber's communications teams.  But, again, Uber's statements and representations relating to safety are peripheral to this litigation given the dismissal of Plaintiffs' misrepresentation claims.  And Plaintiffs have deposed and will depose employees on those teams who were directly responsible for the work performed under Ms. Whetstone's purview during her brief tenure at the company, which lasted less than two years. *Id*. ¶¶ 7, 3.  Plaintiffs deposed Nairi Hourdajian, who had direct responsibility for Uber's corporate communications and reported to Ms. Whetstone in her role as Director of Corporate Communications.  *Id*. ¶ 9.  Plaintiffs will have also deposed Brooke Anderson and Kayla Whaling, who, as discussed above, have held direct responsibility for safety communications and were members of the communications teams during Ms. Whetstone's tenure.  *Id.* ¶ 10.

Furthermore, Plaintiffs have deposed or plan to depose several other current and former employees who are knowledgeable or directly responsible for issues relating to Uber's communications related to safety.  *Id*. ¶ 11.

Collectively and individually, these current and former employees have direct knowledge of Uber's communications related to safety during Ms. Whetstone's tenure.  Ms. Whetstone lacks

-17-

unique and non-repetitive knowledge that cannot be obtained from individuals who were directly responsible for this subject matter. *See Schneider*, 2017 WL 4127992, at *3. And like Mr. Kalanick, her status as a former executive of the company does not undermine the application of a protective order. *See Robertson*, 2014 WL 12576817, at *17 (applying apex doctrine to former employee). Indeed, Ms. Whetstone continues to hold similar responsibilities as head of communications at Sierra AI. Whetstone Decl. ¶ 13.

### 5.    Sachin Kansal

Mr. Kansal sits at the "highest level or 'apex' of [Uber's] corporate management." *Celerity*, 2007 WL 205067, at *3. He is Uber's CPO, a member of the ELT, and reports directly to Uber's CEO. Feb. 28 2025, Decl. of Sachin Kansal ("Kansal Decl.") ¶ 3. Mr. Kansal oversees the global teams, comprising a large amount of people, that are responsible for app management, design, and operations in the Delivery and Mobility segments. *Id.* ¶ 4. He also oversees work relating to some of Uber's new initiatives. *Id.* Prior to serving as CPO, Mr. Kansal served in other high-ranking positions at Uber in which his responsibilities included interfacing with the ELT and supervising the work of the teams responsible for innovating and delivering apps to market. *Id.* ¶ 5.

As a high-level executive at Uber, Mr. Kansal has "no unique personal knowledge of the facts at issue." *Celerity, Inc.*, 2007 WL 205067, at *3; Kansal Decl. ¶ 7. He does not have personal knowledge of the events underlying and related to Plaintiffs' cases. *Id.* ¶ 7. He also does not possess unique personal knowledge about Uber's safety measures and practices that Plaintiffs allege were inadequate. *Id.* Plaintiffs presumably seek Mr. Kansal's deposition because they would like to learn more about safety features. But Mr. Kansal's knowledge of those matters is not unique when compared to that of the employees involved in Uber's day-to-day work, several of whom are being made available for depositions.

For instance, Rebecca Payne, former Group Product Manager, will be deposed in the JCCP. From 2018 to 2023, Ms. Payne reported to Mr. Kansal for most of this time and served in multiple roles in which she was directly responsible for the consideration, development, or implementation of safety features in Uber's Mobility segment for both drivers and riders. Kansal Decl. ¶ 8 Ms. Payne has significant knowledge about Uber's safety features. Furthermore, Plaintiffs can

1  participate in the deposition of Andi Pimentel, Product Manager, who is also being deposed in the

2  JCCP and works on in-app features.  *Id*. ¶ 9.

3      Uber has also agreed to make Michael Akamine available for deposition, notwithstanding

4  he is a senior executive in his own right.  Mr. Akamine is the Director of Product Management and

5  has led teams dedicated to app design and management that were responsible for innovating and

6  delivering apps to market and for creating and implementing various features.  *Id.* ¶  10.  Mr.

7  Akamine reports directly to Mr. Kansal and participated in meetings with members of the ELT on

8  at least a monthly basis.  *Id.*

9      In addition to these individuals, Sunny Wong, Senior Manager, Applied Science, will be

10  made available for deposition in the JCCP.  Mr. Wong joined Uber in 2018 and, given his roles, is

11  knowledgeable about data science and analytics relating to safety issues and features that were

12  considered or developed to identify and mitigate safety risks.  *Id*. ¶ 11.  Mr. Wong will be offered

13  to testify as a representative of Uber about certain categories of testimony related to those matters.

14  *Id*.

15      Given these individuals' direct knowledge, as well as the numerous other employees whose

16  roles focus heavily on safety-related issues—such as Gus Fuldner, Roger Kaiser, Cory Freivogel,

17  Catherine Gibbons, among others (*id*. ¶ 12–13)—Plaintiffs cannot "show that Mr. [Kansal] has

18  unique, non-repetitive [knowledge] that would warrant a deposition."  *Schneider*, 2017 WL

19  4127992, at *3.  They cannot "establish[] that the information necessary cannot be had from [other

20  employees] . . . or the corporate deposition[s]."  *See Baine* v. *General Motors Corp.*, 141 F.R.D.

21  332, 335 (M.D. Ala. 1991) (cited by *Celerity, Inc.*, 2007 WL 205067, at *3).

22          6.    Frank Chang

23      Mr. Chang works at the apex of Uber's organizational chart.  He is Vice President of

24  Applied Science and supervises the global teams, comprising a large amount of people located in

25  different countries, that develop the technology and science supporting the Global Core Services

26  Team, which covers work that extends far beyond the issues relevant to this litigation.   Feb. 26,

27  2025, Declaration of Frank Chang ("Chang Decl.") ¶¶ 3–6.  Mr. Chang sits immediately below

28  Uber's ELT, reports directly to Mr. Fuldner, and frequently participates in meetings with ELT

members.  *Id.* ¶ 7  A substantial portion of his responsibilities includes interfacing with Mr. Fuldner and the ELT, including Uber's CEO.  *Id.*

Given his position, and the broad scope of his supervisory responsibilities, Mr. Chang does not possess unique knowledge of the issues presented by Plaintiffs' lawsuits.  *Id.* ¶ 9.  Plaintiffs will depose Ms. McDonald, one of Mr. Chang's direct reports whose involvement in relevant matters is co-extensive to, and in fact, far more encompassing and granular than Mr. Chang's involvement. *Id.* ¶¶ 10–12.  As Director of Data Science, Ms. McDonald is directly and primarily responsible for maintaining and working with Uber's safety incident data on a global basis, and was intimately involved in the development of Uber's Sexual Misconduct and Sexual Violence Taxonomy and managing relationships with Uber's partners who helped prepare the taxonomy.  *Id.* ¶¶ 10–11.  She also led data collection and auditing processes for, and was involved in authoring, Uber's Safety Reports.  *Id.* ¶¶ 11–12.

Plaintiffs will also depose Mr. Fuldner and can depose Sunny Wong.  As a member of Uber's ELT, Mr. Fuldner possesses the same knowledge as Mr. Chang with respect to work streams and communications occurring at the executive level that did not include Ms. McDonald.  *Id.* ¶ 13. Mr. Wong, one of Mr. Chang's direct reports, can testify about data science and analytics relating to safety issues and features that were considered or developed to identify and mitigate safety risks. *Id.* ¶ 14.  Accordingly, there can be no argument that Mr. Chang's potential knowledge of facts relevant to this case differs from that of these three individuals or any other deponent.  *See Groupion*, 2012 WL 359699, at *1–5.

Any attempts by Plaintiffs to rely on this Court's prior ruling on Plaintiffs' motion to compel custodial discovery would be misplaced.  *See* ECF No. 1698.  To be sure, the Court did order production of Mr. Chang's custodial file, but that analysis was based on a standard that has no application in this context.  This Court's prior ruling invoked a standard that asks whether "disputed custodian's ESI likely includes information relevant to the claims or defenses in the case." *Id.* at 4.  Thus, any reliance on a ruling that speaks to whether a custodian possesses relevant documents misses the mark by ignoring that the apex doctrine requires a showing of unique personal knowledge.  Indeed, courts in this district and elsewhere hold that a request for production of

-20-

documents is materially distinct from a request for a deposition and is judged by a different standard because "[d]epositions of 'apex witnesses' merit extra guardrails in part because of the time required to prepare for and attend depositions, the cost to the company and to productivity writ large, and the potential for abuse." *Affinity Credit Union* v. *Apple Inc.*, 2024 WL 3859802, at \*2 (N.D. Cal. Aug. 16, 2024); *see also Lauris* v. *Novartis AG*, 2016 WL 7178602, at \*3 (E.D. Cal. Dec. 8, 2016) ("Plaintiffs are not seeking to take depositions of high level employees, but are seeking e-discovery on the knowledge [of] the corporation.").

#### 7. Sarfraz Maredia

Mr. Maredia is the Vice President and Head of Americas Delivery for Uber.  Feb. 26, 2025, Declaration of Sarfraz Maredia ("Maredia Decl.") ¶ 3.  In that role, he is responsible for overseeing Delivery operations across the United States, Canada, and Latin America, as well similar global workstreams.  *Id*.  His present oversight responsibilities involve the management of personnel and operations larger than many business organizations in their entirety; Mr. Maredia manages a massive team of employees that is responsible for Uber's Delivery business operations in multiple countries.  *Id*. ¶ 4.  As Vice President, Mr. Maredia reports directly to a member of Uber's ELT and spends a substantial amount of time interfacing with the ELT and the CEO.  *Id*. ¶ 5.  He frequently participates in meetings with the ELT members.  *Id*.

While Mr. Maredia previously worked in Uber's Mobility operating segment, he does not possess unique knowledge of the issues presented by Plaintiffs' lawsuits that cannot be obtained from other deponents in this matter.  *Id.* ¶ 8.  Indeed, Plaintiffs plan to depose multiple individuals who worked in operations and covered the same regions for which Mr. Maredia was responsible.  *Id.* ¶ 9.  These individuals include Rachel Holt, who oversaw operations for the United States and Canada; Meghan Joyce, who held responsibilities for the East and then the United States and Canada; and William Barnes, who was responsible for the West Coast.  *Id*.  For certain periods of time, Mr. Maredia reported to both Ms. Joyce or Ms. Holt.  *Id.*

Plaintiffs also plan to depose Danielle Sheridan, former Central Operations Lead and Director, Head of U.S. City Operations, and previously requested the deposition of Vaibhav Rikhye, former Senior Director, Strategy & Planning.  *Id*. ¶ 10.  Both Ms. Sheridan and Mr. Rikhye

DEFENDANTS' MOTION FOR PROTECTIVE ORDER    Case No. 3:23-md-03084-CRB

1   reported to Mr. Maredia while he worked in operations in Uber's Mobility segment.  *Id.*

2          There is simply no need to burden Mr. Maredia with a deposition where his testimony would

3   not provide any unique facts that cannot be obtained from these individuals or any of the other

4   myriad employees Plaintiffs have deposed or will depose and are more knowledgeable about Uber's

5   safety policies, procedures, and incidents in the Mobility segment.  *Id.* ¶¶ 8–13.

6                            8.   <u>Ryan Graves</u>

7          Mr. Graves sat at the apex of Uber's organization during his entire tenure at Uber.  He

8   initially served as its CEO, before taking on the role of Senior Vice President of Global Operations

9   reporting directly to the CEO.  Feb. 28, 2025, Declaration of Ryan Graves ("Graves Decl.") ¶ 3.

10  Mr. Graves was also a board member from 2010 to 2019.  *Id.*

11         Mr. Graves oversaw Uber's operations and did not have a primary focus on any single

12  function of the business.  *Id.* ¶ 4.  His responsibilities were varied and global in scale, including

13  supervising and overseeing the teams responsible for various aspects of the company's business.

14  *Id.*  To execute and implement the company's initiatives in these varied areas, Mr. Graves relied

15  on senior leadership and Uber's employees.  *Id.* ¶ 5.  He neither created nor implemented the vast

16  majority of policies relevant to this litigation, and his knowledge of that work is largely based on

17  information that was reported to him by others.  *Id.*

18         Accordingly, Mr. Graves does not possess unique, non-repetitive personal knowledge about

19  the issues relevant to this litigation, nor the facts and circumstances underlying Plaintiffs' individual

20  claims.  Mr. Graves was not involved with individual background checks, nor was he responsible

21  for responding to or investigating incidents between drivers and riders, including Plaintiffs' alleged

22  incidents of sexual misconduct.  *Id.* ¶ 7.  Mr. Graves did not make decisions regarding individual

23  rider or driver account deactivations.  *Id.*  Mr. Graves was not uniquely involved in the

24  development, implementation, or execution of the safety measures and practices that are the focus

25  of Plaintiffs' lawsuits.  *Id.*

26         By contrast, Plaintiffs intend to depose employees who are knowledgeable about, and are,

27  or were, responsible for the subject matters involved in this action and reported to Mr. Graves

28  during his tenure.  *Id.* ¶ 8.  For instance, Plaintiffs plan to depose Rachel Holt, Meghan Joyce, and

DEFENDANTS' MOTION FOR PROTECTIVE ORDER          Case No. 3:23-md-03084-CRB

William Barnes, who were members of the operations team that reported to Mr. Graves and held responsibilities for regions across the United States. *Id.* ¶ 9. Ms. Holt, herself a former member of Uber's ELT, also held responsibility for the marketing and customer support teams at various points in her tenure. *Id.*

These future deponents are in addition to other current and former employees that Plaintiffs have already deposed, or plan to depose, who are or were directly responsible for the subject matters involved in this action, including, among others: Phillip Cardenas, Jeff Marshall, Gus Fuldner, Roger Kaiser, Katy McDonald, Cory Freivogel, Carley Lake, and Valerie Shuping. *Id.* ¶ 10–12.

Mr. Graves's knowledge of any facts relevant to this case is thus not unique as compared to the knowledge of any of the foregoing deponents or any other Uber employees involved in Uber's day-to-day operations. Graves Decl. ¶ 13. Plaintiffs cannot show that a deposition of Mr. Graves is warranted. For the reasons stated above with respect to Mr. Kalanick, the fact that Mr. Graves no longer works at the company does not undermine the application of the apex doctrine. *See* supra at 13–14. This is especially true because Mr. Graves continues to serve in an apex role as CEO of Saltwater Capital. Graves Decl. ¶ 14.

## B.    Plaintiffs have not exhausted any less-intrusive means of discovery.

The Court should enter a protective order at this juncture because Plaintiffs have failed to exhaust less intrusive means of discovery. Indeed, "[t]he Court need not determine at this time whether [any one of the Senior Executives] possesses unique, nonrepetitive, first-hand knowledge of the facts at issue in this case, because [Plaintiffs] ha[ve] failed to meet the second prong of this conjunctive test. That is, [Plaintiffs] have not demonstrated that [they] ha[ve] exhausted other means of obtaining this information, such as interrogatories and depositions of lower-level employees." *Icon-IP Pty Ltd.*, 2014 WL 5387936, at *2. Under this second prong, Plaintiffs "must make a good faith effort to extract the information [they] seek[] from … depositions of lower-level [Uber] employees." *Celerity*, 2007 WL 205067, at *5. They may not seek an apex deposition unless and until this good faith effort "prove[s] inadequate." *Id.*

Plaintiffs have not even come close to exhausting less intrusive discovery measures. As noted above, Plaintiffs are scheduled to take depositions of key employees that are (or were)

directly responsible for matters that are relevant to Plaintiffs' lawsuits, including the development, implementation, and execution of Uber's policies and procedures relating to safety and Uber's safety-related communications and marketing.  By the time this motion is fully briefed, there will still be many outstanding depositions, including the depositions of Uber's corporate representatives.  Without having taken those depositions, Plaintiffs cannot claim that they have exhausted less intrusive methods for obtaining the discovery they seek and it is entirely premature for Plaintiffs to seek the depositions of Uber's Senior Executives.

**III. The Court Should Issue A Protective Order Against The Deposition Of Joseph Sullivan.**

Plaintiffs likely seek the deposition of Joseph Sullivan so they can use his criminal conviction to tarnish the company.  Indeed, Plaintiffs in the JCCP have already begun to do so.  *See* Luskey Decl., Ex. 4, Parker Tr. 27:12–21, 37:2–5  ("Q. And Joe Sullivan is the gentleman we just talked about who was convicted for conduct he committed while at Uber, correct? A. I -- yes.").  Mr. Sullivan's criminal case, which stemmed from a cybersecurity incident, has zero relevance to this litigation.  *See United States v. Joseph Sullivan*, U.S. Atty's Office, N.D. Cal., https://www.justice.gov/usao-ndca/case/united-states-v-joseph-sullivan.  Plaintiffs' efforts to tar the company and Mr. Sullivan with testimony about his unrelated conviction is improper.  To the extent Plaintiffs' claim they need to depose him with regard to facts concerning Uber's safety policies and practices, they have access to at least 30 deponents who are well versed in the issues relevant to this case, including the deposition testimony of Phillip Cardenas, former global head of safety and Sullivan's direct report, who was deposed in the JCCP.  *See* Luskey Decl., Ex. 4, Parker Tr. 27:3–10.  Thus, the benefit of any appropriate questioning of Mr. Sullivan is outweighed by the burden and expense of preparing for and proceeding with that deposition.  The Court "must limit" discovery if its "burden or expense . . . outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C).

## <u>CONCLUSION</u>

For the foregoing reasons, Uber respectfully requests that the Court grant Uber's Motion and prohibit the depositions of the Senior Executives and Joseph Sullivan.

///

///

-24-

Dated: February 28, 2025

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ Randall S. Luskey*
    ROBERT ATKINS
    RANDALL S. LUSKEY
    JESSICA E. PHILLIPS
    KYLE N. SMITH
    JACQUELINE P. RUBIN
    CAITLIN E. GRUSAUSKAS
    ANDREA M. KELLER

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

## CERTIFICATE REGARDING MEET AND CONFER

I hereby certify that on February 26, 2025, the parties met and conferred in good faith to discuss the issues raised by this motion via video conference pursuant to this Section E.1. of this Court's Standing Order for Magistrate Judge Lisa J. Cisneros.

Dated: February 28, 2025

By:    */s/ Randall S. Luskey*
        Randall S. Luskey

DEFENDANTS' MOTION FOR PROTECTIVE ORDER         Case No. 3:23-md-03084-CRB