ROBERT ATKINS (Admitted *Pro Hac Vice*)
    ratkins@paulweiss.com
JACQUELINE P. RUBIN (Admitted *Pro Hac Vice*)
    jrubin@paulweiss.com
CAITLIN E. GRUSAUSKAS (Admitted *Pro Hac Vice*)
    cgrusauskas@paulweiss.com
ANDREA M. KELLER (Admitted *Pro Hac Vice*)
    akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
    **& GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000

RANDALL S. LUSKEY (SBN: 240915)
    rluskey@paulweiss.com
MARC PRICE WOLF (SBN: 254495)
    mpricewolf@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
    **& GARRISON LLP**
535 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

[*Additional Counsel Listed on Following Page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL MATTERS | Case No. 3:23-md-03084-CRB (LJC)<br><br>**DECLARATION OF RANDALL S. LUSKEY IN SUPPORT OF DEFENDANTS' MOTION FOR PROTECTIVE ORDER**<br><br>Judge:       Hon. Lisa J. Cisneros<br>Courtroom:   G – 15th Floor |

1  KYLE SMITH (Admitted *Pro Hac Vice*)
     ksmith@paulweiss.com
2  JESSICA PHILLIPS (Admitted *Pro Hac Vice*)
     jphillips@paulweiss.com
3  **PAUL, WEISS, RIFKIND, WHARTON**
     **& GARRISON LLP**
4  2001 K Street, NW
   Washington, D.C. 20006
5  Telephone: (202) 223-7300

6  *Attorneys for Defendants*
   UBER TECHNOLOGIES, INC.,
7  RASIER, LLC, and RASIER-CA, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RANDALL S. LUSKEY IN SUPPORT OF
DEFENDANTS' MOTION FOR PROTECTIVE ORDER          Case No. 3:23-md-03084-CRB

## DECLARATION OF RANDALL S. LUSKEY

I, Randall S. Luskey, declare pursuant to 28 U.S.C. § 1746:

1.      I am over 18 years of age, of sound mind, and competent to make the statements in this declaration.  I am an attorney at law duly licensed to practice before all courts of the State of California and a partner at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP attorneys of record for Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC in the above-captioned matter.  I have personal knowledge of the facts set forth herein, except where stated upon information and belief, and if called as a witness to testify, I could and would competently testify as to the truth of the same if requested to do so.

2.      I submit this declaration in support of Defendants' Motion for Protective Order, filed on February 28, 2025.

3.      Attached hereto as **Exhibit 1** is true and correct copy of the Order on Uber's Motion to Quash and For Protective Order, dated January 9, 2025, entered in the litigation captioned, *In Re: Uber Rideshare Cases*, Case No. CJC-21-005188 (Cal. Super. Ct. S.F. Cnty.) ("the JCCP").

4.      Attached hereto as **Exhibit 2** are true and correct copies of excerpts from the transcript of the October 24, 2023, deposition of Brad Rosenthal, taken in the JCCP.

5.      Attached hereto as **Exhibit 3** are true and correct copies of excerpts from the transcript of the November 19, 2024, deposition of Roger Kaiser, taken in the JCCP..

6.      Attached hereto as **Exhibit 4** are true and correct copies of excerpts from the transcript of the December 3, 2024 deposition of Kate Parker, taken in the JCCP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 28, 2025 in San Francisco, California.

_____*/s/ Randall S. Luskey*_____
Randall S. Luskey

DECLARATION OF RANDALL S. LUSKEY IN SUPPORT OF
DEFENDANTS' MOTION FOR PROTECTIVE ORDER          Case No. 3:23-md-03084-CRB

# EXHIBIT 1

**FILED**

San Francisco County Superior Court

JAN **0 9** 2025

CLERK OF THE COURT

BY: _Edward f. L._

Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550] | Case No. CJC-21-005188 JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5188 |
| IN RE UBER RIDESHARE CASES | ORDER ON UBER'S MOTION TO QUASH AND FOR PROTECTIVE ORDER |

Defendants Uber Technologies, Inc. and Rasier, LLC's (together, "Uber") motion to quash and for protective order came on for hearing on January 9, 2025. The Court circulated a tentative ruling in advance of the hearing, and the parties submitted on the tentative ruling, which is hereby adopted.

## **BACKGROUND**

On March 7, 2023, Plaintiffs filed a Master Long-Form Complaint against Defendants Uber Technologies, Inc. and Rasier, LLC (together, "Uber"). Plaintiffs alleged sixteen causes of action: (1) general negligence; (2) common carrier negligence; (3) negligent misrepresentation; (4) intentional misrepresentation; (5) negligent infliction of emotional distress ("NIED"); (6) intentional infliction of

- 1 -

emotional distress ("IIED"); (7) vicarious liability/liability for the torts of Uber drivers; (8) vicarious liability for sexual assault; (9) vicarious liability for sexual battery; (10) vicarious liability for false imprisonment; (11) negligence by misfeasance; (12) negligence by nonfeasance; (13) intentional concealment; (14) strict product liability – design defect; (15) strict product liability – failure to warn; and (16) fraud. (Compl. ¶¶ 164-348.) On June 22, 2023, the Court sustained Uber's Demurrer to Plaintiffs' Master Long-Form Complaint. (June 22, 2023 Order, 1, 19.) In particular, the Court sustained Uber's demurrer as to Plaintiffs' vicarious liability, fraud, misrepresentation, and strict products liability claims without leave to amend. (*Id.* at 1, 12, 15, 19.) The Court sustained Uber's demurrer as to the negligent infliction of emotional distress claim with leave to amend. (*Id.* at 1, 16, 19.) On July 24, 2023, Plaintiffs filed a First Amended Master Long Form Complaint ("FAC") alleging causes of action for general negligence, common carrier negligence, negligence by misfeasance, and negligence by nonfeasance. Plaintiffs allege as follows.

Plaintiffs "are individuals who were raped, sexually assaulted, sexually battered, sexually harassed, falsely imprisoned, kidnapped, physically assaulted, and/or otherwise assaulted and/or harassed by their Uber driver." (FAC ¶ 6.) Uber is a transportation company that uses its app ("Uber App") to "connect riders looking for transportation to independent transportation providers…looking for riders." (*Id.* ¶¶ 1, 21-22.) Uber "drivers are largely nonprofessional, untrained individuals who use their own vehicles." (*Id.* ¶ 44.)

As early as 2014, Uber became aware that its drivers were engaging in sexual misconduct or sexual assault against its passengers. (*Id.* ¶ 3; see *id.* ¶ 27.) Uber has "publicly acknowledged this sexual assault crisis." (*Id.* ¶ 4; see *id.* ¶¶ 29, 121, 147, 149; see, e.g., *id.* ¶¶ 121-122 [approximately 250 reported sexual assaults per month in 2017 and 2018].) However, Uber "has actively chosen not to report instances of sexual assault that occur on the UBER App to the authorities" or other ridesharing companies. (*Id.* ¶¶ 84-86, 88, 134.) In addition, Uber does not proactively cooperate with law enforcement investigating cases passenger victims report to the police or participate in transportation network company ("TNC") safety hearings. (*Id.* ¶¶ 89-94, 116-120.) Moreover, after a victim reports a sexual assault, Uber often erases the victim's complaint and disables the victim's account, which

precludes the victim from accessing pertinent information such as the driver's name, driver's photo, make and model of the vehicle, ride time, ride distance, and route. (*Id.* ¶¶ 94-95, 100, 102.)

Despite marketing itself as a safe and better alternative to other transportation methods, Uber continues to hire drivers without conducting adequate background checks and screening procedures, allows culpable drivers to keep driving for Uber, and fails to adopt and implement reasonable monitoring and investigation procedures to protect passengers. (*Id.* ¶¶ 4, 24-25, 28, 30-31, 112-114, 131-133, 160-161, 164-168, 170-172, 189-190, 192, 209, 214-215, 218; see, e.g., *id.* ¶¶ 34-43, 66-69, 73-83, 130 [Uber Safe Rides Fee was a revenue source rather than a fund for implementing background checks, vehicle checks, driver safety education, development of safety features, and insurance]; but see *id.* ¶ 111 [the Uber App now includes an emergency button that allows a passenger to call 911].) Due to Uber's failure to implement changes, passengers continue to be victims of sexual assaults. (*Id.* ¶¶ 28, 127.)

By order filed February 5, 2024, this Court granted Plaintiffs' motion to compel discovery in part, ordering Uber to produce documents from three senior executive custodians and denying their request as to four others. (Feb. 5, 2024 Order.)

Uber now moves to quash the deposition subpoena for Travis Kalanick and seeks a protective order against Plaintiffs' deposition notices of Dara Khosrowshahi, Travis Kalanick, Jill Hazelbaker, Sachin Kansal, Mike Akamine, and Frank Chang (collectively "Senior Executives"). Plaintiffs oppose the motion.

## LEGAL STANDARD

"Before, during, or after a deposition, any party, any deponent, or any other affected natural person or organization may promptly move for a protective order . . . . to protect any party, deponent, or other natural person or organization from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense." (Code Civ. Proc. § 2025.420(a), (b).) The protective order may direct, among other things, "[t]hat the deposition not be taken at all" or that it "be taken at a different time." (*Id.* § 2025.420(b)(1), (2).) Further, a party or witness has the right to move to quash a deposition subpoena served on a third party, and the court "may make an order quashing the subpoena entirely, modifying it, or

1  directing compliance with it upon those terms or conditions as the court shall declare, including protective

2  orders." (*Id.* § 1987.1(a), (b)(1), (2).)

3      "California law provides parties with expansive discovery rights." (*Ross v. Superior Court of*

4  *Riverside County* (2022) 77 Cal.App.5th 667, 679 (cleaned up).)  Unless otherwise limited by a court

5  order, "any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject

6  matter involved in the pending action . . . , if the matter either is itself admissible in evidence or appears

7  reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc. § 2017.010.)

8      "Despite the otherwise broad availability of discovery, the general rule in California and federal

9  court is that agency heads and other top governmental executives are not subject to deposition absent

10  compelling reasons." (Ross, 77 Cal.App.5th at 679-680 (cleaned up).)  The same rule, often referred to as

11  the "apex" doctrine, also applies to "corporate president[s] or other official[s] at the highest level of

12  corporate management." (*Liberty Mutual Ins. Co. v. Superior Court* (1992) 10 Cal.App.4th 1282, 1284.)

13  "The general rule is based upon the recognition that . . . an official's time and the exigencies of his

14  everyday business would be severely impeded if every plaintiff filing a complaint against an agency [or

15  corporate] head, in his official capacity, were allowed to take his oral deposition.  Such procedure would

16  be contrary to the public interest, plus the fact that ordinarily the head of an agency [or corporation] has

17  little or no knowledge of the facts of the case." (*Contractors' State License Board v. Superior Court*

18  (2018) 23 Cal.App.5th 125, 131 (cleaned up).)   As the court explained in the seminal California case, "it

19  would seem sensible to prevent a plaintiff from leap-frogging to the apex of the corporate hierarchy in the

20  first instance, without the intermediate steps of seeking discovery from lower-level employees more

21  involved in everyday corporate operations." (*Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1287.)  Further,

22  apex depositions, "when conducted before less intrusive discovery methods are exhausted, raise a

23  tremendous potential for discovery abuse and harassment." (*Id.*)

24      "An exception will be made to this rule only when the deposing party makes two showings.  First,

25  the deposing party must show that the [corporate] official has direct personal factual . . . information

26  pertaining to material issues in the action.  Second, the deposing party must also show the information to

27  be gained from the deposition is not available through any other source." (*Ross*, 77 Cal.App.5th at 680

28  - 4 -

1  (cleaned up).) "The rule applies regardless of whether the official is a named defendant or a third party,

2  or whether the official gained the information sought while in his or her present position or while serving

3  in prior, lower ranking positions at the agency." (*Id.*)

4       Thus, "when a plaintiff seeks to depose a corporate president or other official at the highest level

5  of corporate management, and that official moves for a protective order to prohibit the deposition, the trial

6  court should first determine whether the plaintiff has shown good cause that the official has unique or

7  superior personal knowledge of discoverable information.  If not, as will presumably often be the case in

8  the instance of a large national or international corporation, the trial court should issue the protective

9  order and first require the plaintiff to obtain the necessary discovery through less-intrusive methods."

10  (*Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1289.)  Such methods may include "interrogatories directed to

11  the high-level official to explore the state of his or her knowledge or involvement in plaintiff's case; the

12  deposition of lower-level employees with appropriate knowledge and involvement in the subject matter of

13  the litigation; and the organizational deposition of the corporation itself, which will require the

14  corporation to produce for deposition the most qualified officer or employee to testify on its behalf as to

15  the specified matters to be raised at the deposition.  Should these avenues be exhausted, and the plaintiff

16  make a colorable showing of good cause that the high-level official possesses necessary information to

17  the case, the trial court may then lift the protective order and allow the deposition to proceed." (*Id.*)

18

19  **DISCUSSION**

20  Plaintiffs seek to take the depositions of six of Uber's current and former executives:

21  - Dara Khosrowshahi, Uber's CEO, a position he has held since August 2017;

22  - Travis Kalanick, Uber's former CEO, who served in that role from 2010 until June 2017;

23  - Jill Hazelbaker, Uber's Chief Marketing Officer and Senior Vice President,

24    Communications & Public Policy;

25  - Sachin Kansal, Uber's Chief Product Officer;

26  - Michael Akamine, Uber's Director of Product Management; and

27  - Frank Chang, Uber's Vice President of Applied Science.

28

1  Each of these Senior Executives is (or was) either a member of Uber's Executive Leadership Team

2  ("ELT"), which represents the highest level of management at Uber and is equivalent to Uber's "C-Suite,"

3  or reports directly to it or to the CEO.

4      At the outset, Plaintiffs rely on federal cases for the proposition that it is Uber that bears the

5  burden on the instant motion, asserting that "[t]he party seeking to avoid an apex deposition bears the

6  burden of showing good cause for why the deposition should not be allowed." (Opposition, 3.) However,

7  California authority is to the contrary: "the burden is on the deposing party to show that compelling

8  reasons exist for permitting the deposition." (*Ross*, 77 Cal.App.5th at 680 (cleaned up); accord,

9  *Contractors' State License Bd.*, 23 Cal.App.5th at 132, citing *Liberty Mutual Ins. Co.*, 10 Cal.App.4th at

10  1289.)[1]  Nor does California law support Plaintiffs' assertion that apex protection is reserved for

11  "extraordinary circumstances." (Opposition, 2-3, 20.)[2]

12      Further, Plaintiffs' reliance on the Court's February 5, 2024 Order on Plaintiffs' motion to compel

13  discovery related to Uber's senior executive custodians (Opposition, 11, 18) is misplaced.  While that

14  Order addressed discovery related to the custodial files of three of the Senior Executives at issue here

15  (Kalanick, Khosrowshahi, and Hazelbaker), it explicitly noted that "[c]ourts have declined to extend the

16  apex rule outside the context of depositions, holding that it is not a protective shield that prohibits

17  discovery from high-ranking officials." (Feb. 5, 2024 Order, 4 (cleaned up).)  Rather, the Court applied a

18  different standard to the document discovery sought by that motion, pursuant to which Plaintiffs had "the

19  initial threshold burden of showing that the disputed custodian's ESI likely includes information relevant

20  to the claims or defenses in the case." (*Id.* at 5 (cleaned up); compare *id.* at fn. 2 [declining to adopt

21  higher standard which would require a showing that the executive's relevant ESI is unique and would not

22

23  _____

24  [1] To be sure, the Court acknowledges that "[b]ecause of the similarity of California and federal discovery law, federal decisions have historically been considered persuasive absent contrary California decisions." (*Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1288.)  Here, however, there *are* contrary California

25  decisions, which are binding on this Court.
  [2] Because decisions in this area turn on the facts of individual cases and the status of discovery in those

26  cases, it is not persuasive, much less dispositive, that another court may have found the apex standard satisfied in a given case, such as the securities case against Uber cited in Plaintiffs' papers. (Opposition, 1

27  [contending that "the Northern District of California federal court recently recognized that these same witnesses don't warrant apex protection."].)

28                                    - 6 -

1   be available from other designated custodians].)[3]  That "likely relevance" standard is far less demanding

2   than the "unique or superior personal knowledge" standard that applies here.  The Court finds that

3   Plaintiffs have not met their burden at this stage of the litigation to justify the apex depositions they seek

4   to take, although it intends to leave the door open to the parties to revisit these issues after the completion

5   of substantial deposition discovery.

6        Each of the Senior Executives who are the subject of Uber's motion has submitted a declaration

7   stating, in substantially similar language, that in their current (or former) position, they are "not directly or

8   uniquely involved in the development, implementation, or execution of the safety policies or practices,

9   technologies, or other measures that are the focus of Plaintiffs' lawsuits." (E.g., Khosrowshahi Decl. ¶ 9.)

10  Declarants assert further that they do not possess unique or superior personal knowledge concerning the

11  issues presented by Plaintiffs' lawsuits, such as driver background checks, alleged incidents of sexual

12  misconduct, rider or driver account deactivations, and that to the extent they do have knowledge of those

13  matters, "it is information that would have been reported to me by other executives or others directly

14  responsible for those matters." (*Id.*; see also Kalanick Decl. ¶¶ 4, 6; Hazelbaker Decl. ¶ 7; Kansal Decl.

15  ¶¶ 7, 12; Akamine Decl. ¶¶ 7, 11; Chang Decl. ¶ 9.)  On its face, this showing would appear to be

16  adequate to satisfy the first prong of the apex test in California.[4]

17       Plaintiffs take issue with Uber's showing, asserting that "Uber's documents and witness testimony

18  prove these individuals personally issued directives, guided the development and implementation of

19  Uber's safety measures and how those measures and Uber's claims of safety would be disclosed (or not

20  disclosed) to the public, were ultimate decision-makers regarding safety measures Uber decided not to

21  implement . . . , are percipient witnesses, and have unique knowledge that is unavailable from another

22  source." (Opposition, 1.)  They explain that the litigation "directly concerns executive-level decisions

23  about whether to implement particular safety practices, policies, or technologies." (*Id.* at 8.)  And they

---

[3] For similar reasons, the Court is unpersuaded that Judge Cisneros's order in the MDL litigation directing Uber to produce Chang's custodial file (Opp. (Dec. 30, 2024), 2) warrants a different conclusion. That order, too, applied a "likely [to have] relevant information" standard. (*Id.*)

[4] The Court disagrees with Plaintiffs' contention that it should disregard the Senior Executives' declarations as "conclusory." (Opposition, 7; see *Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1290 ["we do not agree . . . that a high-level official's protestation of ignorance of a lawsuit is self-serving and automatically suspect"].)

assert that the limited number of depositions of Uber employees they have taken to date demonstrate that the Senior Executives "have personal knowledge of facts relevant to this litigation, were directly involved and served as ultimate decision-makers about key initiatives and decisions about safety, and the information is specific and unique to each of them." (*Id.* at 9.) Uber, for its part, responds that Plaintiffs' showing establishes only that "the Senior Executives have some knowledge of some relevant topics by virtue of being copied on documents, communicating with their reports, or making public statements—all of which could be said of almost any apex witness." (Reply, 6.)[5] Uber also asserts that none of Plaintiffs' voluminous exhibits points to the Senior Executives as "the only witnesses with the facts to answer Plaintiffs' questions or, at least, as witnesses with greater knowledge of those facts." (*Id.* at 7.)

The Court declines to second-guess the Senior Executives' sworn statements that they lack unique or superior personal knowledge of discoverable information. Further development of discovery in this case, such as by PMK depositions or depositions of lower level employees, may well shed light on that issue. Each of the Senior Executives lists multiple other high-ranking Uber employees or former employees who had direct personal involvement in and responsibility for the pertinent subject matters. (Khosrowshahi Decl. ¶ 10 [listing ten such employees]; Kalanick Decl. ¶ 7 [listing the same ten employees]; Hazelbaker Decl. ¶ 8 [listing six employees responsible for Uber's communications and marketing efforts relating to safety issues]; Kansal Decl. ¶¶ 8-11 [listing two employees responsible for safety measures as well as nine additional employees with knowledge and responsibility for safety-related issues]; Akamine Decl. ¶¶ 8-10 [similar]; Chang Decl. ¶¶ 10-15 [listing seven Uber employees responsible for Uber's data science and analytics relating to safety issues, Uber's Safety Reports, and related issues].) Many of those employees' depositions have yet to be taken.

At this stage of the case, the Court is not persuaded that it would be appropriate to allow Plaintiffs to take these high-level corporate officers' depositions without first requiring Plaintiffs to exhaust other avenues available to them. That should be feasible, given the current status and timing of discovery.

---

[5] See *Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1287 [rejecting argument that "the mere act of copying the chief executive officer with a few pieces of correspondence creates 'constructive notice' justifying the deposition."]; see also *Brown v. Google, LLC* (Apr. 4, 2022) 2022 WL 2289059, *2 [apex standard not satisfied as to Google's CEO where magistrate judge found only that "[a] few documents establish that specific relevant information was communicated to, and possibly from, [the CEO]." (cleaned up)].

1   When Uber's motion was filed, the January 15, 2025 deadline to complete fact discovery was fast

2   approaching, although Plaintiffs had proposed extending that deadline by thirty days to February 28,

3   2025. (Opposition, 8-9; Abramson Decl. ¶ 5.)  By stipulation of the parties, however, the Court recently

4   extended the fact discovery cut-off date until May 30, 2025. (Dec. 23, 2024 Order.)  To date, a relatively

5   modest number of depositions of Uber employees (11, of 25 individual witnesses noticed by Plaintiff)[6]

6   have been taken, and Plaintiffs have yet to commence the persons most knowledgeable depositions of

7   Uber on a long list of topics.  Further, many of the outstanding depositions are of employees who are

8   likely to have more direct personal knowledge of the issues at stake than the Senior Executives, such that

9   the completion of those depositions may obviate the need for Plaintiffs to take certain Senior Executives'

10  depositions, or at least narrow the scope (and associated burden) of those depositions.  Thus, as Uber

11  suggests, there is sufficient time left in the schedule for the Court "to postpone the apex depositions until

12  and if Plaintiffs can demonstrate that other less intrusive discovery methods are inadequate." (Reply, 9

13  (cleaned up).)

14          For the foregoing reasons, the Court declines to issue an order directing that the depositions of the

15  Senior Executives "shall not be taken at all in this matter." (Uber's Proposed Orders.)  Rather, it believes

16  a definitive decision on whether some or all of those depositions should go forward should be deferred

17  until after Plaintiffs have conducted the PMK depositions and a substantial number of depositions of

18  lower-level Uber employees. (See *Liberty Mutual Ins. Co.*, 10 Cal.App.4th at 1288-1290 [citing with

19  approval cases which "permit deferment of the depositions of higher executives until subordinates with

20  supposedly equal or greater knowledge have been deposed" (cleaned up)].)  At that point, the parties and

21  the Court will be in a better position to ascertain whether the Senior Executives possess unique

22  information that is not available from other sources.  If so, upon "a colorable showing of good cause that

23  the high-level official possesses necessary information to the case," Plaintiffs may request the Court to lift

24  the protective order and allow the depositions to proceed. (See *id.* at 1289.)

25

26

27  ---
    [6] Plaintiffs' December 20, 2024 Supplement indicates that they have deposed two additional Uber
    witnesses since submitting their initial opposition to Uber's motion, when they represented that nine such
    depositions had been taken. (Supp., 3; Opposition, 8.)

28                                                - 9 -

## **CONCLUSION**

For the foregoing reasons, the Court grants Uber's motion to quash and for protective order in part. The depositions of the Senior Executives are to be deferred, without prejudice to Plaintiffs seeking to lift the protective order upon a showing of good cause after the parties have completed depositions of Uber's persons most knowledgeable on key topics and of lower-level Uber employees.

IT IS SO ORDERED.

Dated: January 9, 2025

Ethan P. Schulman
Judge of the Superior Court

- 10 -

## CERTIFICATE OF ELECTRONIC SERVICE
(CCP 1010.6(6) & CRC 2.260(g))

I, Edward Santos, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On January 9, 2025 , I electronically served:

ORDER ON UBER'S MOTION TO QUASH AND FOR PROTECTIVE ORDER

via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:

JAN 0 9 2025

Brandon E. Riley, Court Executive Officer

By: _____
        Edward J. 8_
        Edward Santos, Deputy Clerk

# EXHIBIT 2

Brad Rosenthal CONFIDENTIAL - October 24, 2023

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO

COORDINATION PROCEEDING       §CASE NO. CJC-21-005188
SPECIAL TITLE (RULE 3.550)    §
                              §(ASSIGNED TO THE HON. ETHAN
                              §P. SCHULMAN)
IN RE:  UBER RIDESHARE        §
CASES                         §
                              §
THIS DOCUMENT RELATES TO:     §
                              §
ALL CASES                     §
_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SUBJECT TO PROTECTIVE ORDER

*  *  *  *  *

ORAL AND VIDEOTAPED DEPOSITION OF

BRAD ROSENTHAL

OCTOBER 24, 2023

REPORTED REMOTELY
_____

          ORAL AND VIDEOTAPED DEPOSITION OF BRAD
ROSENTHAL, produced as a witness at the instance of
Plaintiffs, and duly sworn, was taken in the
above-styled and numbered cause on the 24th of October,
2023, from 11:48 a.m. to 8:31 p.m., Central Standard
Time, before Lisa D. Sanchez, CSR in and for the State
of Texas, reported by machine shorthand, via Zoom Video
Conferencing, pursuant to C.C.P. 2025.010 et seq., and
the provisions stated on the record.

Brad Rosenthal CONFIDENTIAL - October 24, 2023

1    within Ms. Yoo's purview when she was at the company?

2                    MR. SMITH:   Objection to the form of the

3    question.

4        A.    I don't know if the whole time that was the

5    case.   We had someone else named Joe Sullivan, who, I

6    believe, was our chief security officer.   I can't

7    remember his exact title.

8        Q.    (BY MR. ABRAMSON)   Okay.

9        A.    But he was at the company for a period of time

10   and oversaw a lot of our engineering security work.

11       Q.    Okay.   Let's separate out security compliance

12   then.   The compliance team, was Ms. Yoo responsible for

13   the compliance team when she was at the company?

14       A.    Yeah, I believe so.

15       Q.    And then the security team that Mr. West

16   currently oversees, at some point in time that was

17   overseen by Joe Sullivan, right?

18       A.    Yeah, I believe so.

19       Q.    When Mr. Sullivan left the company, did that

20   team at that point move within Mr. West's organization?

21       A.    I can't remember exactly when Joe left; but I

22   think Joe was still here while Dara joined, for a period

23   of time, not that long.   So, yeah.   Then -- then --

24   presuming that team would have moved under Tony.

25       Q.    And other than Mr. Sullivan and Mr. West, who

Brad Rosenthal CONFIDENTIAL - October 24, 2023

1    complaint comes in.  The first place it goes to at Uber
2    is the incident investigation team, right?
3        A.    That's right.
4        Q.    So, today -- when was -- when was the incident
5    investigation team created?
6        A.    I don't know specifically.  That team's been
7    around for a while, though; and as I said, that team
8    just reads the -- the keywords and then just sends it
9    off in another direction.  I'm not sure exactly when
10   that team was -- was founded, though.
11       Q.    Okay.  Was it before or after T.K. left the
12   company?
13       A.    I don't know specifically.
14       Q.    Okay.  Who is -- today, who oversees the
15   incident investigation team?
16       A.    So, I don't -- I don't know specifically where
17   it's that team, but it falls within Gus' organization.
18       Q.    Where Gus has 17,000 employees in his
19   organization, right?
20       A.    Okay.  So, it rolls up to Troy Stevenson.
21       Q.    Okay.  Can you go any deeper to understand who's
22   heading up the incident investigation team?
23       A.    Let's see here.  So, there's a couple of
24   people -- actually, no, I don't know who oversees the
25   I.I.T.

Brad Rosenthal  CONFIDENTIAL - October 24, 2023

1    company who managed relationships with certain --

2    certain organizations.  But for the most part, it was

3    Emilie Bowman, who managed these relationships; but

4    there was no formal P.O.C., from my understanding, for

5    these specific relationships.

6        Q.    Which Uber team was responsible for drafting

7    Uber's initial safety report?

8        A.    My understanding is that was the safety team in

9    conjunction with the comms and policy team.

10       Q.    Which people at Uber drafted the first safety

11   report?

12       A.    So, Brooke Anderson.

13       Q.    Okay.

14       A.    Brittany Anthony, Katy McDonald and Jodi Page.

15       Q.    Brooke Anderson, Brittany Anthony, Jodi Page?

16       A.    And Katy McDonald.  Katy McDonald.

17       Q.    Did Mr. West have a role in drafting the first

18   safety report?

19       A.    He was a reviewer of the report, yeah.  He had a

20   note in one of the pages, one of the first several

21   pages, if I recall correctly.  Yeah, he -- he was on --

22   he was -- he was involved, yeah.

23       Q.    How about Gus Fuldner, was he involved in

24   preparation or drafting Uber's first U.S. Safety Report?

25       A.    Yep.

Brad Rosenthal CONFIDENTIAL - October 24, 2023

1      A.    That's correct.
2            MR. ABRAMSON:  And we can mark that as
3    exhibit -- what are we on here?  20?
4            THE REPORTER:  I think we're on 21.
5            MR. SMITH:  21.
6            MR. ABRAMSON:  Are we?  Yep, we are.
7    You're right.  21.  And this is Uber's second U.S.
8    Safety Report.
9      Q.    (BY MR. ABRAMSON)  Do you recognize this
10   document?
11     A.    I do.
12     Q.    Which Uber employees were responsible for
13   drafting the second U.S. Safety Report?
14     A.    The primary people involved in it were Katy
15   McDonald, Jodi Page and Emilie Bowman.
16     Q.    Which Uber team was responsible for auditing the
17   sexual assault and sexual misconduct data set forth in
18   Uber's second U.S. Safety Report?
19            MR. SMITH:  Objection to the question to
20   the extent it calls for information outside the scope of
21   the notice topics.
22     A.    I don't know who is responsible for auditing.
23     Q.    (BY MR. ABRAMSON)  And which Uber team was
24   responsible for communicating to the public about Uber's
25   second U.S. Safety Report?

Brad Rosenthal CONFIDENTIAL - October 24, 2023

1           MR. SMITH:  Objection to the question to

2    the extent it's calling for testimony outside the notice

3    topics.

4       A.    Our communications team.

5       Q.    (BY MR. ABRAMSON)  And which people specifically

6    led that team or that effort?

7       A.    Jodi Page.

8       Q.    Anybody else?

9           MR. SMITH:  Same object -- same objection

10   to the question.  Same objection to the question that's

11   just been posed.

12      A.    Jodi was the primary lead on it.

13      Q.    (BY MR. ABRAMSON)  Is Uber currently working on

14   a third U.S. Safety Report?

15           MR. SMITH:  Object -- objection to the

16   question to the extent it calls for testimony outside

17   the scope of the notice topics.

18           And I'll also caution the witness not to

19   reveal any information he's learned through counsel or

20   discussions with counsel.

21      A.    I don't know.

22      Q.    (BY MR. ABRAMSON)  Which Uber team is

23   responsible for collecting the sexual assault and sexual

24   misconduct data covering the years 2021 and 2022?

25      A.    What do you mean responsible for covering it?

Brad Rosenthal  CONFIDENTIAL - October 24, 2023

1          Certified to by me this 9th day of
2    November, 2023.
3
4
5
6
7
8    _____
     Lisa D. Sanchez
9    Texas CSR No. 4766
     Expiration Date:  7-31-24
10   MONARCH REPORTING, INC.
     Firm Registration No. 314
11   Expiration Date:  5-31-25
     1280 Blue Heron Street
12   Hitchcock, Texas 77563
     Phone:  (832) 618-1234
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION


COORDINATION PROCEEDING          |  No. CJC-21-005188
SPECIAL TITLE (Rule 3.550)       |
                                 |
In Re:  Uber Rideshare Cases     |
_____  |
                                 |
This document relates to:        |
                                 |
ALL ACTIONS                      |
_____  |



CONFIDENTIAL EXCERPTS

UNDER PROTECTIVE ORDER

VIDEO DEPOSITION OF ROGER KAISER

VOLUME 1 - PAGES 1-241

TUESDAY, NOVEMBER 19, 2024

SAN FRANCISCO, CALIFORNIA



Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

1          SPECIAL INDEX TO PROTECTED MATERIAL

2          Pursuant to protective order, the following

3     portions of the deposition transcript shall be

4     designated as CONFIDENTIAL:

5          13:18 - 13:21; 14:3 - 15:3; 18:8 - 18:10;
           19:7 - 19:15; 20:8 - 20:14; 22:9 - 24:19;
6          27:3 - 28:12; 29:8 - 29:13; 34:15 - 37:3;
           39:7 - 39:24; 40:20 - 43:3; 43:12 - 47:8;
7          48:1 - 51:13; 53:5 - 54:23; 55:6 - 56:18
           57:1 - 64:6; 65:6 - 69:16; 69:21 - 70:8;
8          70:16 - 85:3; 88:4 - 89:24; 90:10 - 96:5;
           96:12 - 96:18; 99:17 - 100:23; 101:5 - 109:3;
9          110:22 - 115:11; 115:21 - 129:6; 131:7 - 135:11;
           135:17 - 137:10; 138:5 - 145:4; 145:16 - 146:16;
10         147:1 - 149:13; 149:23 - 155:17; 161:20 - 165:6;
           165:14 - 168:5; 168:16 - 173:10; 174:10 - 176:13;
11         177:6 - 179:9; 179:15 - 181:9; 181:14 - 183:25;
           184:8 - 185:12; 185:20 - 186:19; 186:24 - 188:4;
12         188:11 - 189:5; 189:20 - 190:1; 191:19 - 193:3;
           193:8 - 194:12; 194:17 - 196:21; 197:4 - 200:13;
13         207:4 - 208:11; 208:20 - 209:20; 210:1 - 212:4;
           212:11 - 215:5; 215:9 - 215:24; 216:3 - 218:1;
14         218:7 - 220:10; 221:1 - 222:17; 222:22 - 224:20;
           225:4 - 226:12; 231:15 - 231:17; 232:2 - 233:24;
15         236:3 - 238:8.

16

17         Pursuant to the above-referenced protective
      order, the following portions of the deposition
18    transcript shall be designated as HIGHLY CONFIDENTIAL
      - ATTORNEYS' EYES ONLY:
19

20         96:22 - 99:16; 155:22 - 161:14; 189:15 - 189:19;
           190:2 - 191:15; 234:3 - 235:22.
21

22

23         Additionally, 226:20-231:8 and 231:18-232:1 has been
      wholly redacted in all versions.
24

25

1          SPECIAL INDEX TO PROTECTED MATERIAL (CONT.)

2          In addition, the exhibits to Mr. Kaiser's
   deposition are each designated as CONFIDENTIAL
3  (consistent with the designation made at the time of
   production), with the following exceptions:

4

5          • Exhibit 407 has been designated Highly

6          Confidential - Attorneys' Eyes Only

7          • Exhibit 438 has been designated Highly

8          Confidential - Attorneys' Eyes Only

9          • Exhibit 436 shall also be wholly

10         redacted in all versions

11

12                        *    *    *

13          (Appearances moved to end of transcript.)

14                        *    *    *

15

16

17

18

19

20

21

22

23

24

25

Page 14

```
 1                                                        09:32

 2                                                        09:32

 3        Q.   And what are your duties as the head of    09:32

 4   safety operations?                                   09:32

 5        A.   My job is to ensure that the senior        09:32

 6   executives at Uber have the best understanding of our 09:32

 7   material safety risks on the platform.  So think of  09:32

 8   the types of safety incidents that can or could occur, 09:33

 9   things like auto car crashes interpersonal conflict.  09:33

10   And to also ensure that they have -- the senior      09:33

11   leadership has options and recommendations to invest 09:33

12   in ways to mitigate or to try to control for those   09:33

13   types of risks, as well as a responsibility to       09:33

14   operationalize some of those controls once they're   09:33

15   decided upon.                                         09:33

16        Q.   When you say "operationalize," what do you 09:33

17   mean?                                                 09:33

18        A.   So the decision is made to create a control 09:33

19   or proceed with an investment; then my team oftentimes 09:33

20   supports rolling those out or putting them into place, 09:33

21   monitoring them, continuously improving them, things 09:33

22   like that.                                            09:33

23        Q.   And you said "interpersonal conflict."  What 09:33

24   does that mean?                                       09:33

25        A.   So that can be any type of interpersonal   09:33
```

Page 15

```
 1   conflict, from physical assault to sexual assault,        09:33
 2   from nonviolent or like nonphysical interaction to        09:33
 3   through contact.                                          09:34
 4                                                             09:34
 5                                                             09:34
 6                                                             09:34
 7                                                             09:34
 8                                                             09:34
 9                                                             09:34
10                                                             09:34
11                                                             09:34
12                                                             09:34
13                                                             09:34
14                                                             09:34
15                                                             09:34
16                                                             09:34
17                                                             09:34
18                                                             09:34
19                                                             09:34
20                                                             09:35
21                                                             09:35
22                                                             09:35
23                                                             09:35
24                                                             09:35
25                                                             09:35
```

Roger Kaiser Volume I Highly Confidential
November 19, 2024

```
 1   STATE OF CALIFORNIA      )
                              )  SS.
 2   COUNTY OF SAN FRANCISCO  )

 3        I, MARILYNN HOOVER, CSR No. 8841 for the State of

 4   California, do hereby certify:

 5        That prior to being examined, the witness named

 6   in the foregoing deposition was duly sworn to testify

 7   the truth, the whole truth, and nothing but the truth;

 8        That said deposition was taken down by me in

 9   shorthand at the time and place therein named, and

10   thereafter reduced by me to typewritten form; and that

11   the same is a true, correct, and complete transcript

12   of the said proceedings.

13        Before completion of the deposition, review of

14   the transcript [X] was [ ] was not requested.  If

15   requested, any changes made by the deponent (and

16   provided to the reporter) during the period allowed

17   shall be appended hereto.

18        I further certify that I am not interested in the

19   outcome of the action.

20        Witness my hand this 20th day of November 2024.

21

22

23   _____

24   Marilynn Hoover, RPR

25   California CSR No. 8841
```

# EXHIBIT 4

Kate Parker Volume I Highly Confidential
December 03, 2024

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

---oOo---

COORDINATION PROCEEDINGS )
                          )
In Re:  Uber Rideshare Cases        )No. CJC-21-005188
_____)


*** HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF KATE PARKER

VOLUME I (Pages 1 - 431)

December 3, 2024

9:13 a.m.


101 McInnis Parkway

San Rafael, California  94903


Reported by:

Natalie Y. Botelho

CSR No. 9897

Kate Parker Volume I Highly Confidential
December 03, 2024

| | | |
|---|---|---|
| 1 | facts and can judge for themselves," correct? | 09:32:45 |
| 2 | A.        Correct, that -- yes, that's what it says. | 09:32:52 |
| 3 | Q.        "Getting people from point A to point B | 09:32:53 |
| 4 | safely and reliably is the single most important | 09:32:57 |
| 5 | thing Uber does.  It's why we have a dedicated Trust | 09:33:00 |
| 6 | and Safety team, overseen by Joe Sullivan (whose | 09:33:04 |
| 7 | entire career has been focused in this field, first | 09:33:07 |
| 8 | as a federal prosecutor and then at eBay, Facebook, | 09:33:09 |
| 9 | and now Uber) and run by Phil Cardenas."  Do you see | 09:33:13 |
| 10 | that? | 09:33:16 |
| 11 | A.        Yes. | 09:33:17 |
| 12 | Q.        And Mr. Sullivan, after this e-mail, was | 09:33:17 |
| 13 | federally charged for obstruction of justice, | 09:33:21 |
| 14 | correct? | 09:33:23 |
| 15 | A.        I believe so, although I don't know the | 09:33:24 |
| 16 | specifics of his particular case. | 09:33:27 |
| 17 | Q.        And he was convicted by a jury, correct? | 09:33:29 |
| 18 | A.        I believe so, but I don't actually know. | 09:33:32 |
| 19 | Q.        Of lying to the federal government, | 09:33:34 |
| 20 | correct? | 09:33:35 |
| 21 | A.        I believe so. | 09:33:36 |
| 22 | Q.        "This team exists to reduce safety | 09:33:36 |
| 23 | incidents, and its success is judged on that one | 09:33:41 |
| 24 | metric."  Do you see that? | 09:33:44 |
| 25 | A.        Yes. | 09:33:48 |

Kate Parker Volume I Highly Confidential
December 03, 2024

| | | |
|---|---|---|
| 1 | Sullivan, Jill Hazelbaker, and Tim Collins. | 09:42:53 |
| 2 | Q.        Thank you.  And Joe Sullivan is the | 09:42:57 |
| 3 | gentleman we just talked about who was convicted for | 09:42:58 |
| 4 | conduct he committed while at Uber, correct? | 09:43:01 |
| 5 | A.        I -- yes. | 09:43:04 |
| 6 | Q.        And Jill Hazelbaker is still with Uber, | 09:43:05 |
| 7 | correct? | 09:43:07 |
| 8 | A.        I believe so, but I do not actually know | 09:43:07 |
| 9 | for sure. | 09:43:09 |
| 10 | Q.        Who is Tom Collins (sic)? | 09:43:10 |
| 11 | A.        I do not know. | 09:43:13 |
| 12 | Q.        I'm sorry.  Tim Collins. | 09:43:14 |
| 13 | A.        I do not know. | 09:43:15 |
| 14 | Q.        Okay.  Thank you. | 09:43:16 |
| 15 |          All right.  Let's go to the next document. | 09:43:17 |
| 16 | Ma'am, I'm going to mark this as Exhibit 603 to your | 09:43:21 |
| 17 | deposition. | 09:43:24 |
| 18 |          (Whereupon Exhibit 603 was marked for | 09:43:25 |
| 19 |          identification.) | 09:43:25 |
| 20 |          MR. CUBBERLY:  And Dianne, this is ending | 09:43:37 |
| 21 | in 1145811. | 09:43:38 |
| 22 |          THE TRIAL TECH:  I'm sorry.  Can you | 09:44:11 |
| 23 | repeat the last Bates numbers, please? | 09:44:13 |
| 24 |          MR. CUBBERLY:  Yeah, I'm sorry.  1145811. | 09:44:15 |
| 25 | This might be the e-mail I was unable to find, | 09:44:22 |

Kate Parker Volume I Highly Confidential
December 03, 2024

```
1   STATE OF CALIFORNIA )
                        )    ss.
2   COUNTY OF ALAMEDA   )

3           I, Natalie Y. Botelho, a Certified

4   Shorthand Reporter, do hereby certify:

5           That prior to being examined, the witness

6   in the foregoing proceedings was by me first duly

7   sworn to testify to the truth, the whole truth, and

8   nothing but the truth;

9           That said proceedings were taken before me

10  at the time and place therein set forth and were

11  taken down by me in shorthand and thereafter

12  transcribed into typewriting under my direction and

13  supervision.

14          I further certify that I am neither

15  counsel for, nor related to, any party to said

16  proceedings, nor in any way interested in the

17  outcome thereof.

18          IN WITNESS WHEREOF, I have hereunto

19  subscribed my name.

20

21  Dated:  December 11, 2024

22

23  Natalie Y Botelho

24  _____

    NATALIE Y. BOTELHO
25  CSR NO. 9897
```