RACHEL B. ABRAMS (SBN 209316)
ADAM B. WOLF (SBN 215914)
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415.766.3544
Facsimile: 415.840.9435
Email: rabrams@peifferwolf.com
Email: awolf@peifferwolf.com

TIFFANY R. ELLIS (*Admitted PHV*)
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
2229 Trumbull St.
Detroit, MI 48216
Telephone: 313.210.1559
Facsimile: 415.840.9435
Email: tellis@peifferwolf.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br><br><br>This Document Relates to:<br><br>*Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Case 3:23-md-03084-CRB<br><br>MDL No. 3084<br><br>Honorable Charles R. Breyer<br><br>JURY TRIAL DEMANDED<br><br>**REDACTED** |

## <u>AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the

Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form

Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault*

*Litigation*, No. 23-md-3084 (N.D. Cal.).

I.    **DESIGNATED FORUM**[1]

    1.    Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

II.    **IDENTIFICATION OF PARTIES**

    A.    **PLAINTIFF**

    2.    *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: Jaylynn Dean.

    3.    At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Muskogee, Muskogee County, Oklahoma

    B.    **DEFENDANT(S)**

    4.    Plaintiff names the following Defendants in this action.

        ☑ UBER TECHNOLOGIES, INC.;[2]

        ☑ RASIER, LLC;[3]

        ☑ RASIER-CA, LLC.[4]

    C.    **RIDE INFORMATION**

    5.    Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in Maricopa County, Arizona on November 15, 2023.

    6.    Plaintiff was the owner of the Uber account used to request the relevant ride.

    7.    Plaintiff had been celebrating her impending graduation from flight attendant training.

    8.    She was intoxicated so she ordered an Uber, which she thought was the responsible thing to do.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

1       9.      The driver was named ███████████ .

2       10.     When the ride began, the driver immediately asked if the man who helped Plaintiff

3   into the car was her boyfriend and if they had had sex that night.

4       11.     Plaintiff was exhausted and ask the driver to hurry to the destination.

5       12.     The driver continued to make lewd and inappropriate comments which Plaintiff

6   ignored.

7       13.     While Plaintiff's eyes were closed, the driver said he had to stop the vehicle.

8       14.     About five minutes after the ride began, and before reaching the intended

9   destination, the driver stopped his vehicle in a remote location.

10      15.     At that location, which was not near any buildings, the driver unilaterally marked

11  the trip as completed using Uber's driver app. This information was contemporaneously available

12  to Uber.

13      16.     For the next twenty minutes, the GPS data that Uber was collecting in real time

14  indicated that the rider and the driver were still together at that remote location.

15      17.     Uber did not take any action.

16      18.     At that time and place, the driver entered the back seat, and forced himself on top

17  of Plaintiff.

18      19.     Plaintiff tried to fight him off but was unable to.

19      20.     The driver raped Plaintiff.

20  ████████████████████████████████████████

21  ████████

22  ████████████████████████████████████

23  ██████████████████████████████████████

24  ████

25  ████████████████████████████████████████

26  ████████████████████████████████████

27  ████████████████████████████████████████

28  ██████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    29.    The conduct described in the Master Long-Form Complaint and herein was a

26 substantial factor in causing Plaintiff to suffer economic and non-economic harm.

27

28

AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:23-CV-06708

## III.    CAUSES OF ACTION ASSERTED

30.    The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☐ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☑ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☑ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☐ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☑ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☐ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS |

## IV.    ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

31.    Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

32.    **Assault**. The driver intended to cause harm or offensive contact with Plaintiff or to cause Plaintiff apprehension of an immediate harmful or offensive contact. The driver caused Plaintiff apprehension of an immediate harmful or offensive contact.

33.    **Battery**. The driver intended to cause a harmful or offensive contact with Plaintiff or to cause Plaintiff apprehension of an immediate harmful or offensive contact. The driver caused a harmful or offensive contact with Plaintiff.

34.    **False Imprisonment**. The drive acted intentionally to restrain Plaintiff to an area within the driver's control. The driver acted without lawful authority and without Plaintiff's consent. The driver's acts resulted in the direct restraint of Plaintiff's liberty or freedom of movement, either by actual force or from Plaintiff's fear of force. The driver's acts would have

caused a reasonably prudent person in the same situation as the Plaintiff to believe that he was restrained. Plaintiff was aware of and was harmed by the restraint.

## V.    ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM

35.    **Driver Fraud.** When Plaintiff requested the Uber ride, Uber communicated to her, through the App, that the driver was a dad and that he had previously worked at a domestic violence shelter for women.

36.    Plaintiff was comforted by these messages; they made her feel safe.

37.    The App also included standard information about the driver, including his identity, his picture, and his "star rating." Plaintiff would have seen these messages too, given that she saw the messages described above.

38.    Indeed, the App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing messages Uber conveys through the App, to every passenger, about the driver, including the driver's identity, the driver's photo, and the driver's "star rating."

39.    If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving.

40.    In fact, the App prompts passengers to look at the App after they order the ride, including specifically the messages regarding the driver, by sending notifications when a driver is selected, when the driver is nearby, and when the driver has arrived.

41.    In communicating to Plaintiff about the driver, Uber did not disclose ██████████ ████████████████████████ described above.

42.    The concealed information was in Uber's possession and not otherwise available to Plaintiff.

43.    Uber's failure to disclose █████████ made the information it conveyed about the driver materially incomplete.

1    44.    Had Plaintiff known about ████████████████, she would not have taken the

2    Uber ride.

3    45.    **Designated Driver Fraud**. Before her assault, Plaintiff regularly received

4    messages promoting Uber as a safe, responsible option for people who had been drinking.

5    46.    Plaintiff received email messages from Uber saying: "Stay safe tonight. Use

6    Uber." Uber can easily locate these emails as it has Plaintiff's email address.

7    47.    Plaintiff also was targeted on social media with frequent messages from Uber

8    about staying safe when drinking by using Uber.

9    48.    Because she heard these ads, Plaintiff believed that Uber was a safe option for

10    people who had been drinking.

11    ████████████████████████████████

12    ████████████████████████████████████

13    ████████████████████████████████

14    ██████████████████████████████████████

15    ████████████████████████████████████████

16    ██████████████

17    51.    The concealed information was in Uber's possession and not otherwise available

18    to Plaintiff.

19    52.    Uber's failure to disclose the risks about riding drunk with Uber made its

20    marketing materially misleading and incomplete.

21    53.    Had Plaintiff known ████████████████████████

22    ██████████████████████████████████

23    ████████████████████████████████████████, she would

24    not have ordered the Uber on November 15, 2023.

25    **VI.    ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY
      CLAIMS**

26

27    ██████ **Safe Ride Matching**. ████████████████████████

28    ████████████████████████████████████████

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:23-CV-06708

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████

3    ████████████████████████████████████████████

4 █████████████████████████████████████████████████

5 █████████████████████████████████████████████████.

6    ████████████████████████████████████████

7 ██████████████████████████████████

62.    **Gender Matching**. The Uber App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers.

63.    Uber tracks the rates of sexual misconduct and assault committed by its drivers against its passengers and collects data on the gender of the driver and passenger involved in those incidents. At all relevant times, ████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████. The risk of sexual assault associated with such pairings, while known to Uber based on its internal data collection and analysis, was beyond that contemplated by the ordinary user or consumer.

64.    Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

65.    Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

66.    Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

67.     Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

68.     **App-Based Ride Recording**.  The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through using the camera already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

69.     The presence of cameras serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

70.     Uber is aware that the presence of cameras serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or sexual misconduct committed by drivers against passengers.

71.     For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

72.     In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law enforcement, or any third party without the express authorization of the driver.

73.     The result is that in-app video recording does not have any deterrent effect on sexual assault or sexual misconduct by drivers against passengers because drivers exercise absolute control over whether recording happens, and because drivers know that, even if the technology is on, third parties cannot access the recordings.

74.     Had the Uber App included automatic video monitoring of rides, by definition that feature would have been engaged on Plaintiff's ride.

75.     Automatic video monitoring would have deterred the driver from assaulting Plaintiff.

76.     **GPS Route Discrepancy Alerts**. Using its own internal data, Uber was aware at all relevant times that the risk of sexual assault or sexual misconduct was greatest when a driver goes off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in proximity after a ride has concluded. The increased risk of sexual assault associated with these route deviations as well as the prevalence of their occurrence, were risks beyond those contemplated by the ordinary user or consumer, who lacked access to Uber's internal data or analytics.

77.     The Uber App is designed to receive, track, and monitor GPS data from riders and drivers at all times while they are using the Uber App, and shortly after they stop using the Uber App. Uber monitors GPS data from both driver and rider phones. Specifically, while in use, the Uber App ingests GPS location information and telematics data from driver and rider phones, which its algorithm uses to Uber uses these data to, for example, automatically direct the driver to the rider's location, and monitor the speed, braking, and other driving maneuvers, as well as to predict route times.

78.     The data Uber collects give it the capability to detect when a ride has deviated from the expected route, including when a driver goes off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in proximity after a ride has concluded.

79.     Uber could have, and should have, designed the App to use the GPS technology that it already built into the app to automatically trigger safety alerts in the event of route deviations, unusually long stops, early ride termination, stops or early ride termination in remote locations, or excessive time spent with a passenger at the beginning or end of a route.

80.     An appropriately-designed GPS Alert feature would have flagged Plaintiff's ride due to the stop during which the driver assaulted Plaintiff.

1    81.    An appropriately-designed GPS Alert function would have prevented or lessened

2    the severity of Plaintiff's assault, including by deterring the driver from engaging in the assault in

3    the first place or summoning an intervention.

4    **WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic

5    and non-economic compensatory and punitive and exemplary damages, together with interest,

6    costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time,

7    Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as

8    appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

9    <u>**JURY DEMAND**</u>

10    Plaintiff demands a trial by jury as to all claims in this action.

11    Dated: March 14, 2025                          /s/ *Rachel B. Abrams*
                                                     RACHEL B. ABRAMS (SBN 209316)
12                                                   ADAM B. WOLF (SBN 215914)
                                                     **Peiffer Wolf Carr**
13                                                   **Kane Conway & Wise, LLP**
                                                     555 Montgomery Street, Suite 820
14                                                   San Francisco, CA 94111
                                                     Telephone: 415.766.3544
15                                                   Facsimile: 415.840.9435
                                                     Email: rabrams@peifferwolf.com
16                                                   Email: awolf@peifferwolf.com

17                                                   TIFFANY R. ELLIS (*Admitted PHV*)
18                                                   **Peiffer Wolf Carr**
                                                     **Kane Conway & Wise, LLP**
19                                                   2229 Trumbull St.
20                                                   Detroit, MI 48216
                                                     Telephone: 313.210.1559
21                                                   Facsimile: 415.840.9435
                                                     Email: tellis@peifferwolf.com
22
                                                     *Attorneys for Plaintiff*
23

24

25

26

27

28

1

## FILER'S ATTESTATION

2      I am the ECF User whose ID and password are being used to file this document. In

3  compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this

4  filing.

5

6  Dated: March 14, 2025                 By:   */s/ Annie M. Wanless*

7                                                  Annie M. Wanless

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:23-CV-06708