*[Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br>**JOINT STATUS REPORT FOR MARCH 27, 2025 DISCOVERY STATUS CONFERENCE**<br><br>Judge:     Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

**JOINT STATUS REPORT**

In advance of the discovery status conference set for Thursday, March 27, 2025 at 9:00 a.m., Plaintiffs and Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Defendants") (jointly, "the parties"), respectfully submit this Joint Status Report.

## I. Deposition Scheduling

Two depositions remain unscheduled: Travis Kalanick and Abbie Ding.

**Plaintiffs' Position**: Although Plaintiffs requested deposition dates for Travis Kalanick on January 19, Uber still has not complied with PTO 16 and no date has been agreed upon.[1] With respect to Abbie Ding, the parties had agreed that her deposition would occur on April 3. On March 18, Uber advised Plaintiffs that Ms. Ding will be on leave as of that time and will not be returning until after June 16, but did not offer alternative dates and has not responded to Plaintiffs' request to do so.

**Defendants' Position**: Mr. Kalanick, a non-party witness, has provided two alternative dates (May 23 or 27) for his deposition. Plaintiffs rejected both days without justification. Their only excuse now is that two other depositions are scheduled for the week of May 19 (Akamine, Hazelbaker) and one deposition is scheduled on the week of May 26 (Khosrowshahi). That is not an excuse for rejecting otherwise acceptable dates. Uber will continue to assist with the scheduling of Mr. Kalanick's deposition, but the focus should be on Mr. Kalanick's availability, not Plaintiffs' counsel's preferences. With respect to Ms. Ding, Uber informed Plaintiffs on March 18 that Ms. Ding will not be available for her April 3 deposition because she is on leave, which was unexpected and unknown to counsel. Uber has offered to reschedule her deposition upon her return, which is after the June 16 deadline for substantial completion of fact discovery, or to discuss an alternate witness Plaintiffs may wish to depose before that deadline. Plaintiffs followed up on Uber's proposal today. It is premature to raise this minor scheduling matter for the Court's consideration given the parties are actively working through the matter.

## II. Plaintiffs' February 26, 2025 Written Discovery Requests

Plaintiffs served their second set of interrogatories and second set of requests for production to Defendants on February 26, 2025. The Parties agree to continue to meet and confer regarding Defendants' objections to this discovery. If the Parties cannot reach a resolution, Defendants intend to seek protection from the Court regarding these requests. In lieu of a joint letter, Plaintiffs propose that

---

[1] Uber offered one proposed date on Jan. 27, rather than two dates as required by PTO 16 (ECF 866 at 3) and did not provide a second alternative until Feb. 6. Neither date works for Plaintiffs. Although Plaintiffs have requested alternative dates since Feb. 12, Uber has not provided alternative dates.

Defendants will file any motion for relief by March 28, Plaintiffs' response will be due on April 4, and no Reply shall be filed. Defendants propose that Defendants will file any motion for relief by April 4, with Plaintiffs' response due on April 11, and Defendants' Reply by April 18.

### III.  Safety Incident Report Data

**Plaintiffs' Position**: More than eight months ago, this Court ordered Uber to produce safety incident data. (ECF 683). Despite raising issues about the production of this data on a near-monthly basis since, it is still uncertain whether Uber has fully and accurately produced the data. On Feb. 27, the Court Ordered Uber to certify the completeness of its production by Mar. 6 in a certification that the parties were to negotiate and agree upon. 2/27/25 H'rg Tr. at 33:17-19 (directing Uber to provide a certification that the parties "have agreed is appropriate."). Despite Plaintiffs' immediate request that day to discuss the remaining issues and Uber's certification (and multiple requests between), Uber refused to engage in any discussion on these issues until Mar. 12. Instead, Uber unilaterally sent a certification on Mar. 6 that does not comply with either Plaintiffs' requests or the Court's instruction.[2]

Plaintiffs' request was that Uber certify that (1) Uber has produced the data from all database fields used for 2017-2022 rideshare sexual assault and sexual misconduct incidents reported to Uber and (2) the apparent errors and mislabeling Plaintiffs have identified are present in the original data and not introduced in the production. (ECF 2380). Although Uber's counsel indicated that Uber was "amenable to providing a certification along the lines of what [Plaintiffs' counsel] is asking for…". (2/27/25 H'rg Tr. at 32:17-200, the certification Uber provided does not establish either of these requests. Rather than certifying that all data for all reports had been produced, Uber's certification notes that "[r]eports in connection with sexual assault and sexual misconduct incidents allegedly occurring between January 1, 2017 and December 31, 2022 have been extracted from the Company's

---

[2] Uber claims that Plaintiffs, not Uber, refused to confer on this issue. While the record clearly shows otherwise, Uber objected to Plaintiffs' inclusion of the record here, claiming that "[n]o exhibits are permitted in the JSR." Regardless, despite Uber's commitment to provide the updated, corrected safety data by Mar. 3, Uber did not produce the data until 6:22 pm PT on Mar. 6 followed by its certification an hour later. Uber's 11th hour production prevented any possibility of a meaningful discussion about the contents of the certification. Nonetheless, Plaintiffs had previously provided Uber with ample notice of what information Plaintiffs expected to be in the declaration (including in the record Uber objected to attaching here). Further, Uber's claim that Plaintiffs could have asked these questions "months ago" is incredible, considering Plaintiffs have been asking these questions for months.

Bliss and Jira business data systems…". Additionally, the certification's statements that "[t]he Company undertook reasonable and diligent quality control to verify that the above incident reports and related communications were in fact located within the business data systems, extracted from those systems, and exported for production in the litigation," and "I believe with reasonable certainty… that this represents a complete production of the data specified above at the time it was extracted from these business systems," do not provide confidence that all data has been produced or that apparent errors are in the original data and not introduced during export or production.

Without verified, specific answers about the data from Uber, Plaintiffs remain unable to rely on the information that has been produced. Therefore, Plaintiffs ask the Court to set March 28 as a deadline for the parties to conduct a final meet and confer on these issues and an April 2 deadline for the parties to file a joint status report to the Court on these matters. The following issues remain:

1. Uber has not produced complete data in the form it is held in their internal systems and Databases, has instead manipulated it for production, and refuses to explain how it was taken from the systems and manipulated for production so that this data may be relied upon. Plaintiffs have repeatedly asked Uber to fully describe the process by which it identified, collected for export, exported, and produced the data to Plaintiffs, for example, did Uber do anything to filter, enrich, or otherwise change or modify the data. Uber states that it provided the "high level" explanation Plaintiffs' expert requested, however, Uber's explanation does not provide the process Uber used to identify the data to be produced or extract it from Uber's systems, or explain why the data produced is in a different format than it would had have been maintained in Uber's systems.

2. Uber has purposefully confused and complicated data that allows identification of the unique drivers, riders, and trips associated with the safety reports (driver_uuid, rider_uuid, and trip_uuid). "UUID"s are Uber-created unique combinations of letters and numbers that represent drivers, riders, and trips in Uber's systems. When information is represented in this form it is has been "hashed." When it produced safety data to Plaintiff, Uber "re-hashed" these unique identifiers, assigning each trip, rider, and driver a new unique combination of letters and numbers.  Re-hashing was unnecessary because the original fields, as stored in Uber's systems, were already anonymized and did not contain

personal identifying information. In fact, Uber has produced thousands of documents containing driver, rider, and trip UUID numbers in their document production—undermining their claims that this data needs to be protected.[3] Rather, the only reason for re-hashing is seemingly to prevent Plaintiff from track any driver, rider, or trip through Uber's documents discussing specific incidents using the trip UUID or driver UUID. Additionally, the ability to track a driver or rider through the data produced (so to determine whether there are multiple reports involving that driver or rider) depends on whether Uber accurately hashed the UUIDs, and Plaintiffs have no confidence that the hashing is accurate given mistakes Uber has previously made in hashing this data.

    3.   When Uber produced the data, it added what Uber's counsel referred to as an "inferred logic" field to indicate the party against whom an individual report was made. Uber has indicated that the data in that field is essentially a guess, based on Uber's determination of which party was the first to file a report (driver, rider, or third party). Uber represents that the data in the inferred logic field comes from the file names of the original 11 files it produced, but does not tell the Court that those file names were based on the same assumption, i.e., which party was the first to report. Plaintiffs' experts need to be able to rely on this data and not risk challenges that the data is not accurate. Plaintiffs therefore seek a stipulation that Uber will not challenge Plaintiffs' use of this data based on the accuracy or not of the data in the inferred logic field.

    **Defendants' Position:** On Feb. 27, the Court ordered Defendants to provide Plaintiffs a "certification regarding the completeness of its safety data production by March 6, 2025" (ECF 2407, at 1), and Defendants duly complied with the Court's Order. Plaintiffs now misrepresent the meet-and-confer history. After the Feb. 27 status conference, Defendants agreed to confer *and* proposed times for doing so. It was Plaintiffs who refused, stating their unwillingness to confer until after they had reviewed the incident-report production.[4] Plaintiffs then waited until after Defendants certified the

---

[3] Uber claims broadly, without support, that Driver and Rider UUID's contain PII. Plaintiffs disagree, but even if Uber was correct, there is no basis for re-hashing trip_UUID.

[4] At 9:05 pm PT on the night of filing, Plaintiffs raised for the first time their intention to attach correspondence between counsel. Defendants objected to this last-minute move, noting that Plaintiffs previously refused Defendants' request to attach documents to a Joint Status Report.

production to ask new questions Plaintiffs could have asked months ago.[5] Nevertheless, Defendants have responded to all of Plaintiffs' subsequent questions. Defendants are therefore at a loss as to what else Plaintiffs want. Multiple times since Mar. 12, Defendants have offered to confer again, and Plaintiffs have not responded. Defendants request that to facilitate any final conferral on this topic, Plaintiffs provide in writing three business days in advance of the conferral the *specific* information Plaintiffs believe addresses the specific issues that Plaintiffs claim in the section above still "remain."

    1.    Defendants have produced a complete production (and certified the same). Plaintiffs never asserted otherwise in conferrals. Rather, Plaintiffs' expert acknowledged that Defendants obviously had to export the data out of its systems to produce it in the manner Plaintiffs requested. Plaintiffs now try to frame this as "manipulating" the data, despite their expert simply saying that this is just how it must be done. In any event, Plaintiffs' expert asked for a high-level explanation of the export and production of the data, which Defendants have now provided, resolving this issue.

    2.    Despite the Court's admonition to Plaintiffs for raising "requests for relief that had not been the subject of sufficient efforts to meet and confer" (ECF 2470, at 4), Plaintiffs have not so much as mentioned this incorrect speculation that there is an issue with the anonymization of personal identifying information ("hashing") to Defendants since the Feb. 27 status conference. Plaintiffs' new assertions are wrong at every step. The hashing is correct, and Plaintiffs have provided no evidence otherwise. Plaintiffs' ability to use the data is identical to how it would be without hashing, so there would be no benefit to removing the protection. The hashed information includes the PII of countless nonparties, including survivors of sexual assault, contained in universally unique identifiers (akin to SSNs), which Defendants addressed at length in the previous joint status report. ECF 2380, at 4:7-19. Plaintiffs cannot unmask these individuals' identities.

    3.    Lastly, Defendants did not "add" an "inferred logic" field to the data. Rather, starting on Sept. 30, 2024, Defendants produced incident data for trips possibly reported against drivers and subsequently, per the Parties' Dec. 23, 2024 agreement (ECF 2011), produced the remainder of the

---

[5] Significantly, Defendants discussed the certification on the phone with Plaintiffs' counsel the day before Defendants provided the certification, and Plaintiffs did not request then anything they now seek.

incident data. Those productions consisted of 11 files, which Defendants later combined into 4 files at Plaintiffs' request. Defendants included the original file names as a new "field" in these consolidated files so that Defendants could relate the 4 files back to the original 11 files. Defendants are unclear how Plaintiffs intend to use this field, which again simply reflects the file names for Defendants' original delivery.

### IV. Access to Uber Company Documents

**Defendants' Position:** Defendants bring to the Court's attention a very serious issue: Plaintiffs' Leadership Counsel's attempt to <u>directly</u> access an internal Uber company document. Unfortunately, Plaintiffs' counsel have refused even to disclose the extent of the issue, let alone assure Defendants that Plaintiffs' counsel will take appropriate remedial steps.

Specifically, Plaintiffs' counsel, Roopal Luhana, admits that she took a series of affirmative steps, in circumvention of the Federal Rules and discovery mechanisms in this case, to try to access an internal Uber company document.[6] Ms. Luhana stated that she identified a hyperlink within a produced Uber document for which Defendants had not produced the hyperlinked document.[7] At this point, Ms. Luhana took matters into her own hands. Notably, the links in the produced document itself are not interactive (i.e., "live"). Rather, Ms. Luhana had to take several affirmative steps to try to improperly directly access the document: open the extracted text of the document in Plaintiffs' review platform, search within the extracted text for the URL associated with the link, and then follow that URL outside of Plaintiffs' discovery vendor's document review platform to a web browser. All the more alarming, counsel was using her personal Gmail (i.e., not her business email) account. In this instance, in executing these steps, Ms. Luhana's direct-access attempt hit a security firewall, noting that Ms. Luhana does not have access to that document. Instead of stopping after her first attempt to directly access the document failed, Ms. Luhana then took yet another affirmative step of clicking the "Request access" button on that page, which immediately sent an email to a

---

[6] Ms. Luhana did not reach out to Defendants regarding this issue. Rather, Defendants caught the issue internally, and only in response to Defendants' outreach did Ms. Luhana admit to her conduct. This is significant for several reasons, including because Defendants have no way of catching every instance of Plaintiffs' counsel attempting to directly access internal Uber company documents.

[7] Of course, the production status does not impact this issue. Plaintiffs' counsel may not try to directly access produced and non-produced internal Uber company documents alike.

represented Uber employee and deponent in this litigation, asking that employee to give Ms. Luhana direct access to that internal Uber company document.

There can be no reasonable confusion here. Ms. Luhana has acknowledged that she understood and believed the document she attempted to access was in fact an internal Uber company document.[8] Further, it has been discussed ad nauseam that Defendants' internal company documents include Google Drive documents, which Plaintiffs know they may not surreptitiously (or otherwise) access or attempt to access. Beyond the fact that it is never appropriate for an attorney to try to directly access an opposing party's internal documents, if Ms. Luhana had succeeded, she would have had access to a live internal Uber company document, which she could have altered, even if inadvertently.

Despite Defendants' repeated asks, Ms. Luhana has refused to tell Defendants whether she has directly accessed or requested direct access to any other internal Uber company documents or information.[9] Contrary to Plaintiffs' misrepresentation, Defendants have offered to confer further with Plaintiffs, but Ms. Luhana refuses to answer this basic question to facilitate those discussions. Ms. Luhana has further refused to agree that she will not directly access or attempt to directly access internal Uber company documents and information in the future. When Defendants requested the above assurances, Ms. Luhana not only refused, but tried to minimize her conduct and, incredibly, blame Defendants for *her* actions. Ms. Luhana's response has been shocking and is inconsistent with her professional obligations. Moreover, Ms. Luhana's response fails to provide Defendants with the information they need to address this issue.

Likewise, Plaintiffs' Leadership have refused to provide Defendants with these basic assurances. Plaintiffs have refused to issue an instruction to *everyone* working with Plaintiffs or at

---

[8] Ms. Luhana inexplicably now tries to say the opposite. But when Defendants first raised this issue with her, she stated in writing (1) that she located the link in an Uber-produced document; (2) that the document linked within the produced document is one that Plaintiffs believe Defendants should have produced; and (3) that the linked document is "easily accessible" to Defendants because it is a Google Document. This can only mean that counsel admittedly knew at that time that the document was an internal Uber document.

[9] Ms. Luhana has sidestepped this question multiple times, stating only that this was "the first time" she requested access to an internal Uber company document. She has refused, for example, to say whether she ever made direct-access attempts after "the first time."

Plaintiffs' direction who have access to Uber's document production. Plaintiffs' Leadership have also refused to instruct those same individuals not to attempt to directly access internal Uber company documents. Significantly, just a few days ago and nearly two weeks *after* Defendants notified Plaintiffs' counsel of this issue, *yet another Plaintiffs' counsel* tried to directly access an internal Uber company document. This direct-access attempt also came *after* Plaintiffs' Leadership assured Defendants that they were willing to provide instructions (short of what Defendants requested) not to do this very thing. This recent direct-access attempt highlights that Plaintiffs' Leadership's minimal efforts have plainly been insufficient, leaving important questions unanswered and the issue unresolved.

While reserving all rights to seek additional relief, Defendants request that the Court order the following, as this issue is most definitely not resolved:

1. That Ms. Luhana certify in writing to Defendants and the Court that, beyond the one access request discussed by the Parties, she (i) has not directly accessed or attempted to directly access any other internal Uber company documents or information; and (ii) will not directly access or attempt to directly access any internal Uber company documents or information in the future;

2. Plaintiffs' Leadership certify in writing to Defendants and the Court that they have instructed everyone working on Plaintiffs' behalf with access to Defendants' produced documents that (i) they must not directly access or attempt to directly access internal Uber company documents; and (ii) that if they have directly accessed or attempted to directly access internal Uber company documents, they must notify Plaintiffs' Leadership immediately. If Plaintiffs' Leadership is aware or becomes aware of such direct access or attempted direct access, they must notify Defendants' counsel of the same immediately or at least within 24 hours of receiving such notice; and

3. Plaintiffs' Leadership provide Defendants a list of Gmail accounts and any other accounts used in association with Google for everyone working with Plaintiffs or on Plaintiffs' behalf with access to Defendants' produced documents, so that Defendants may investigate and

1      address all requests for direct access to internal Uber company documents.

2      **Plaintiffs' Position:** Uber makes a mountain out of a molehill. As has been exhaustively
3 detailed before this Court, Uber documents, especially its policies, frequently contain "hyperlinks"
4 to other documents. Sometimes Uber produces those, sometimes Uber does not (even despite Court
5 Order). Uber does not produce hyperlinks to "external sources," 2/27/25 H'rg Tr. at 14-22;
6 sometimes Uber withholds hyperlinks without notice, *see* ECF 2439-6 (refusing to disclose which
7 links were produced and which withheld); and sometimes Uber withholds hyperlinks as privileged
8 but does not indicate as much in any reasonably ascertainable way, *see* ECF 2458. Indeed, Uber
9 *expects* Plaintiffs to copy portions of the URLs of its hyperlinks in order to identify the "google doc
10 ID" to determine if a document was withheld as privileged. *See id.*

11      Plaintiffs are not interested in clicking on hyperlinks or pursuing the URLs of documents that
12 Uber has withheld. Doing so is a waste of Plaintiffs' time. But Uber's haphazard and inadequate
13 production, paired with its failure to reasonably communicate the scope of its production and
14 withholdings, has made it inevitable that Plaintiffs might sometimes misunderstand Uber's
15 productions. Indeed, Uber did not provide Plaintiffs the necessary information to know whether a link
16 is to an internal Uber document until *after* the parties discussed the incident at issue here.

17      All that occurred here is an inconsequential misunderstanding. One of Plaintiffs' counsel,
18 while investigating Uber's production (or not) of a hyperlinked document in an Uber policy and
19 preparing Plaintiffs' Motion to Compel, clicked on the URL of a link contained in an Uber document.
20 Uber misrepresents the facts (apparently intentionally). Uber represents to the Court that Plaintiffs'
21 counsel "acknowledged that she understood and believed the link she attempted to access was in fact
22 an internal Uber company document." But Plaintiff's counsel has repeatedly told Uber's counsel, both
23 orally and in multiple writings, that she did *not* know that the link was to an internal Uber document.
24 She was not attempting to access anything internal to Uber. Upon clicking the link, she was presented
25 with a Google "request access" page that did not indicate that it was associated with Uber in any way.
26 She clicked a "request access" button, unaware that the Google platform was associated with Uber.
27 She did not access any document. Uber says that the request came from her personal Gmail account
28

10

1   as if this is some incriminating fact. But that just reflects that, when a person is logged into their Gmail
2   account, Google automatically logs them into the greater Google ecosystem, i.e., if a person clicks on
3   a Google-associated link (calendar, docs, etc.), the page will treat them as logged into the same Gmail
4   account.

5       The above notwithstanding, Plaintiffs appreciate Uber's expressed concerns. So, at Uber's
6   request, Plaintiffs sent a message to all PSC counsel, using the exact language Uber asked Plaintiffs
7   to use, reminding them of the prohibition on accessing Uber internal documents, cautioning them to
8   be careful when using hyperlinks to avoid accessing URLs associated with Google Docs, and to report
9   to Co-Lead Counsel if they had previously accessed or requested access to internal company
10  documents. There were three responses. One attorney reported that, sometime in the past year, she
11  clicked on a link that directed to an "access denied" landing page. She did not recall any additional
12  details, nor was she able to find anything related in her records. One attorney reported that she may
13  have clicked on hyperlinks while reviewing documents, thinking links would go to public
14  documents. She does not believe she ever requested access. Finally, one attorney reported clicking on
15  a link and requesting access. She did not realize the request would go to Uber.

16      The bottom line is that no Plaintiffs' counsel has improperly accessed or attempted to access
17  Uber internal documents. Co-Lead Counsel has distributed appropriate precautionary language to
18  prevent similar incidents in the future. This matter should be resolved. Indeed, when Plaintiffs
19  advised Uber that Plaintiffs sent Uber's desired language to PSC counsel and shared the responses
20  noted above, Plaintiffs asked to set up further discussion if Uber felt the issue was not resolved. Uber
21  has not responded to Plaintiffs' requests and has chosen to raise this matter to the Court instead.

22
23

24  By: /s/ Roopal Luhana                         By: /s/ Michael B. Shortnacy
    ROOPAL P. LUHANA (Pro Hac Vice)              MICHAEL B. SHORTNACY (SBN: 277035)
25  **CHAFFIN LUHANA LLP**                       mshortnacy@shb.com
    600 Third Avenue, Fl. 12                     **SHOOK, HARDY & BACON, L.L.P.**
26  New York, NY 10016                           2121 Avenue of the Stars, Suite 1400
    Telephone: (888) 480-1123                    Los Angeles, CA 90067
27  Email: luhana@chaffinluhana.com              Telephone: (424) 285-8330
    *Co-Lead Counsel for Plaintiffs*             Facsimile: (424) 204-9093
28

| | |
|---|---|
| SARAH R. LONDON (SBN 267083)<br>**LIEFF CABRASER HEIMANN & BERNSTEIN**<br>275 Battery Street, Fl. 29<br>San Francisco, CA 94111<br>Telephone: (415) 956-1000<br>Email: slondon@lchb.com | PATRICK OOT (*Pro Hac Vice* admitted)<br>oot@shb.com<br>**SHOOK, HARDY & BACON, L.L.P.**<br>1800 K Street NW, Suite 1000<br>Washington, DC 20006<br>Telephone: (202) 783-8400<br>Facsimile: (202) 783-4211 |
| RACHEL B. ABRAMS (SBN 209316)<br>**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**<br>555 Montgomery Street, Suite 820<br>San Francisco, CA 94111<br>Telephone: (415) 426-5641<br>Email: rabrams@peifferwolf.com | RANDALL S. LUSKEY (SBN: 240915)<br>rluskey@paulweiss.com<br>**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>535 Mission Street, 24th Floor<br>San Francisco, CA 94105<br>Telephone: (628) 432-5100<br>Facsimile: (628) 232-3101 |
| | ROBERT ATKINS (*Pro Hac Vice* admitted)<br>ratkins@paulweiss.com<br>CAITLIN E. GRUSAUSKAS (*Pro Hac Vice* admitted)<br>cgrusauskas@paulweiss.com<br>ANDREA M. KELLER (*Pro Hac Vice* admitted)<br>akeller@paulweiss.com<br>**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3990 |

## ATTESTATION

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's consent and have authorized the filing.

Dated: March 24, 2025

By: /s/ *Michael B. Shortnacy*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/ *Michael B. Shortnacy*