# FILED UNDER SEAL

## A.R.2 AMENDED BELLWETHER COMPLAINT

RACHEL B. ABRAMS (SBN 209316)
ADAM B. WOLF (SBN 215914)
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415.766.3544
Facsimile: 415.840.9435
Email: rabrams@peifferwolf.com
Email: awolf@peifferwolf.com

TIFFANY R. ELLIS
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
2229 Trumbull St.
Detroit, MI 48216
Telephone: 313.210.1559
Facsimile: 415.840.9435
Email: tellis@peifferwolf.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB <br><br> MDL No. 3084 <br><br> Honorable Charles R. Breyer <br><br> JURY TRIAL DEMANDED <br><br> **FILED UNDER SEAL** |
| This Document Relates to: <br><br> *A.R. v. Uber Technologies, Inc., et al.*, No. 3:24-cv-07821 | |

## AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL

Under PTO 21 (ECF 1950), Plaintiff A.R. [hereafter referred to as A.R.2] files this Amended Bellwether Complaint against the Defendants named below. Plaintiff incorporates the

allegations set out in the Master Long-Form Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 23-md-3084 (N.D. Cal.).

## I. DESIGNATED FORUM[1]

1. Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

## II. IDENTIFICATION OF PARTIES

### A. PLAINTIFF

2. *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: A.R.

3. At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Philadelphia, Philadelphia County, Pennsylvania

### B. DEFENDANT(S)

4. Plaintiff names the following Defendants in this action.

☑ UBER TECHNOLOGIES, INC.;[2]

☑ RASIER, LLC;[3]

☑ RASIER-CA, LLC.[4]

### C. RIDE INFORMATION

5. Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in San Francisco County, California on August 10, 2023.

6. The driver goes by Michael Le. His legal name is Hung Quang Le.

7. Plaintiff was the owner of the Uber account used to request the relevant ride.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

8. When the driver arrived, he asked if Plaintiff wanted to sit in the front. Plaintiff did so.

9. Partway through the ride, the driver used Uber's Driver App to indicate that the ride had ended.

10. Plaintiff was worried but stayed calm to avoid provoking the driver.

11. The driver drove about 3 or 4 blocks down the road and pulled over.

12. The location where the driver pulled over was about 1.6 miles from Plaintiff's requested destination.

13. The driver then reached over and kissed Plaintiff on the lips twice.

14. Plaintiff unlocked the door, exited the vehicle, and called a friend to come pick her up.

15. Mr. Le had applied to be an Uber driver on July 22, 2022.

16. Uber had onboarded Mr. Le as a driver on July 25, 2022.

17. When Uber onboarded Mr. Le to drive for Uber, Mr. Le had a criminal record.

18. Mr. Le was found guilty of forgery in 1996.

19. Mr. Le was found guilty of speeding, improper lane changing, and failure to maintain control of his vehicle in 1996.

20. Mr. Le pled guilty to assault, kidnapping, and illegal use of a weapon in 1998. He served one year of jail time.

21. In 2009, Mr. Le was ticketed for speeding.

22. In 2012, he was indicted for felony aggravated assault of a family member, as well as invasive visual recording. During the pendency of the case, a restraining order was granted against Mr. Le. The case was subsequently dismissed.

23. In 2015, a domestic violence prevention case was filed against Mr. Le, and a restraining order was entered against him.

24. In 2016, another domestic violence prevention case was filed against Mr. Le, and a restraining order was entered against him.

25. Before Plaintiff was assaulted, Uber received at least one report of sexual misconduct concerning Mr. Le.

26. On June 18, 2023, a rider reported to Uber, in Chinese, that the vehicle felt unsafe. When prompted, in Chinese, with the question, "Why did the vehicle feel unsafe" she responded with one word (in English): "rapist."

27. Uber responded to the June 18, 2023 sexual misconduct report with a request, in English, for more information. In a separate message, it asked the rider, in Chinese, if she still needed help with her lost property report. It otherwise did not act on her report. It did not try to call the rider. It did not interview the driver. It did not review GPS data.

28. The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

### III. CAUSES OF ACTION ASSERTED

29. The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☑ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☑ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☑ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☑ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☑ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☐ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS |

### IV. ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

30. Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

31. **Assault**. The driver acted intending to cause harmful or offensive contact. Plaintiff reasonably believed that she was about to be touched in a harmful or an offensive manner. Alternatively, the driver threatened to touch Plaintiff in a harmful or an offensive manner. It reasonably appeared to Plaintiff that driver was about to carry out the threat. Plaintiff did not consent to the driver's conduct. Plaintiff was harmed.

32. **Battery**. The driver touched Plaintiff with the intent to harm or offend her. Plaintiff did not consent to the touching. Plaintiff was harmed and offended by the driver's conduct. A reasonable person in Plaintiff's situation would have been offended by the touching.

33. **False Imprisonment**. The driver intentionally deprived Plaintiff of her freedom of movement by use of force, threats of force, and menace. The restraint compelled Plaintiff to stay somewhere for some appreciable time. Plaintiff did not knowingly or voluntarily consent. Plaintiff was harmed.

## V. ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM

34. When ordering Uber rides, Plaintiff regularly looked at messages Uber conveyed about the driver, including the driver's identity, the driver's photo, and the driver's "star rating."

35. Indeed, the App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing messages Uber conveys through the App, to every passenger, about the driver, including the driver's identity, the driver's photo, and the driver's "star rating."

36. If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving.

37. In fact, the App prompts passengers to look at the App after they order the ride, including specifically the messages regarding the driver, by sending notifications when a driver is selected, when the driver is nearby, and when the driver has arrived.

38. In communicating to Plaintiff about the driver, Uber did not disclose any information about Mr. Le's criminal background nor the previous rider report of driver misconduct described above.

39. The concealed information was in Uber's possession and not otherwise available to Plaintiff.

40. Uber's failure to disclose Mr. Le's criminal background, and its failure to disclose the rider report of misconduct, made the information it conveyed about the driver materially incomplete.

41. Had Plaintiff known about Mr. Le's criminal background or the rider report of misconduct, she would not have taken the Uber ride.

**VI.   ADDITIONAL ALLEGATIONS IN SUPPORT OF RATIFICATION CLAIM**

42. Uber did not deactivate Mr. Le, even after Plaintiff filed a lawsuit on November 8, 2024.

**VII.  ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS**

43. **Safe Ride Matching**. Uber had the capability to, and did, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

44. At all relevant times, the Uber App automatically collected data on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Uber had the capability to use data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

45. Uber was aware that ███████████████ ████████████████████████████ To that end, Uber ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

46. Uber could have, but did not, ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████

47. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████

48. Uber's failure to a███████████████████████████████████ fact that Uber █████████████████████████████████████████████████ ████████████████████████████████████ Had Uber ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

49. Had ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Plaintiff would not have been sexually assaulted.

50. Alternatively, the Uber App should have warned Plaintiff ████████ ████████████████████████ a high risk of sexual assault.

51. **Gender Matching**. The Uber App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an

algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers.

52. Uber tracks the rates of sexual misconduct and assault committed by its drivers against its passengers and collects data on the gender of the driver and passenger involved in those incidents. At all relevant times, Uber was aware that the risk of sexual misconduct or assault is greater during Uber rides in which the driver is male and the passenger is female, like the ride between the driver and Plaintiff. The risk of sexual assault associated with such pairings, while known to Uber based on its internal data collection and analysis, was beyond that contemplated by the ordinary user or consumer.

53. Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

54. Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

55. Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

56. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

57. **App-Based Ride Recording**. The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through using the camera already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

58. The presence of cameras serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

59. Uber is aware that the presence of cameras serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or sexual misconduct committed by drivers against passengers.

60. For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

61. In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law enforcement, or any third party without the express authorization of the driver.

62. The result is that in-app video recording does not have any deterrent effect on sexual assault or sexual misconduct by drivers against passengers because drivers exercise absolute control over whether recording happens, and because drivers know that, even if the technology is on, third parties cannot access the recordings.

63. Had the Uber App included automatic video monitoring of rides, by definition that feature would have been engaged on Plaintiff's ride.

64. Automatic video monitoring would have deterred the driver from assaulting Plaintiff.

65. **GPS Route Discrepancy Alerts**. Using its own internal data, Uber was aware at all relevant times that the risk of sexual assault or sexual misconduct was greatest when a driver goes off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in proximity after a ride has concluded. The increased risk of sexual assault associated with

these route deviations as well as the prevalence of their occurrence, were risks beyond that contemplated by the ordinary user or consumer, who lacked access to Uber's internal data or analytics.

66. The Uber App is designed to receive, track, and monitor GPS data from riders and drivers at all times while using the Uber App. Uber monitors GPS data from both driver and rider phones. Specifically, while in use, the Uber App ingests GPS location information and telematics data from driver and rider phones, which its algorithm uses to Uber uses these data to, for example, automatically direct the driver to the rider's location, and monitor the speed, braking, and other driving maneuvers, as well as to predict route times.

67. The data Uber collects give it the capability to detect when a ride has deviated from the expected route, including when a driver goes off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in proximity after a ride has concluded.

68. Uber could have, and should have, designed the App to use the GPS technology that it already built into the app to automatically trigger safety alerts in the event of route deviations, unusually long stops, or excessive time spent with a passenger at the beginning or end of a route.

69. An appropriately-designed GPS Alert feature would have flagged Plaintiff's ride due to the driver terminating the ride early via the Driver App and/or stopping on the side of the road at a location other than the destination.

70. An appropriately-designed GPS Alert function would have prevented or lessened the severity of Plaintiff's assault, including by deterring the driver from engaging in the assault in the first place or summoning an intervention.

**WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic and non-economic compensatory and punitive and exemplary damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time, Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

# JURY DEMAND

Plaintiff demands a trial by jury as to all claims in this action.

Dated: March 14, 2025

/s/ *Rachel B. Abrams*

RACHEL B. ABRAMS (SBN 209316)
ADAM B. WOLF (SBN 215914)
**Peiffer Wolf Carr**
**Kane Conway & Wise, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415.766.3544
Facsimile: 415.840.9435
Email: rabrams@peifferwolf.com
Email: awolf@peifferwolf.com

TIFFANY R. ELLIS
**Peiffer Wolf Carr**
**Kane Conway & Wise, LLP**
2229 Trumbull St.
Detroit, MI 48216
Telephone: 313.210.1559
Facsimile: 415.840.9435
Email: tellis@peifferwolf.com

*Attorneys for Plaintiff*

# **FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.

Dated: March 14, 2025       By:   */s/ Annie M. Wanless*
                                   Annie M. Wanless