# FILED UNDER SEAL

## B.L. AMENDED BELLWETHER COMPLAINT

**WAGSTAFF LAW FIRM**
Sommer D. Luther, CO 35053
940 Lincoln Street
Denver, CO 80203
Tel: (303) 263-8949
Fax: (303) 376-6361
sluther@wagstafflawfirm.com

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB <br><br> MDL No. 3084 <br><br> Honorable Charles R. Breyer <br><br> JURY TRIAL DEMANDED <br><br> **FILED UNDER SEAL** |
| This Document Relates to: <br><br> *B.L. v. Uber Technologies, Inc., et al.*, No. 24-cv-7940 | |

**AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL**

Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 23-md-3084 (N.D. Cal.).

**I.   DESIGNATED FORUM**[1]

1. Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

**II.   IDENTIFICATION OF PARTIES**

   **A.   PLAINTIFF**

2. *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: B.L.

3. At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Austin, Travis County, Texas

   **B.   DEFENDANT(S)**

4. Plaintiff names the following Defendants in this action.

   ☒ UBER TECHNOLOGIES, INC.;[2]

   ☒ RASIER, LLC;[3]

   ☒ RASIER-CA, LLC.[4]

   **C.   RIDE INFORMATION**

5. Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in San Jose, California, on August 12, 2022.

6. Plaintiff was the owner of the Uber account used to request the relevant ride.

7. Plaintiff called an Uber from her aunt's house at about 3:30 a.m.

8. Plaintiff was emotional and intoxicated.

9. The driver was Edwin Castaneda Orozco.

10. Mr. Castaneda Orozco had been driving for Uber for approximately one and a half months.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

1    11.    When Mr. Castaneda Orozco had applied to drive for Uber, he had only been living in the United States for less than three years. He had only had a driver's license for less than two years. He was, as Uber knew, 47 years old. Therefore, Uber did not have access to any records related to potential criminal activity during 26 years of his 29-year adulthood.

12.    During the ride, Plaintiff told the driver she had had a hard night and was very intoxicated.

13.    During the ride, the driver reached into the back seat and touched Plaintiff under her clothes.

14.    The driver put his hand inside Plaintiff's vagina.

15.    Plaintiff was alarmed but she froze.

16.    The driver kept driving, but at red lights he kept putting his hands inside Plaintiff and groping her.

17.    When the car arrived at the destination (an apartment complex), the driver parked.

18.    Plaintiff tried to open the door, but it was locked.

19.    The driver walked around the car to where Plaintiff was sitting, and opened the door.

20.    The driver moved to give Plaintiff a hug. In her intoxicated state, she thought that he was offering a hug because she was so emotional.

21.    Plaintiff hugged the driver back as she stood in the car doorway.

22.    When Plaintiff released the hug to move away, the driver continued holding her.

23.    The driver was bigger than she was.

24.    The driver laid Plaintiff down in the back seat of the car.

25.    The driver groped Plaintiff under her clothes, pulled her pants down, moved her bathing suit to the side, and raped her. He inflicted vaginal and anal injuries, including an anal fissure and hemorrhoid.

26.    Plaintiff was in shock and scared and did not move, hoping it would end soon.

27.    Plaintiff was also worried the driver would hurt her if she moved too much.

28.    The driver ejaculated inside of Plaintiff.

29. The driver took a half step back, and Plaintiff pushed him aside.

30. Plaintiff took off running into the apartment complex and did not look back.

31. From the time the driver arrived at the destination, at about 4:01 a.m., until he departed from that location at about 4:10 a.m., Uber was receiving GPS pings from the driver's phone and the Plaintiff's phone showing that they were still together at the same location. Uber did not act on this information.

32. The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

### III. CAUSES OF ACTION ASSERTED

33. The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☑ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☑ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☑ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☐ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☑ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☐ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS |

### IV. ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

34. Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

35. **Assault**. The driver acted intending to cause harmful or offensive contact. Plaintiff reasonably believed that she was about to be touched in a harmful or an offensive manner. Alternatively, the driver threatened to touch Plaintiff in a harmful or an offensive manner. It

reasonably appeared to Plaintiff that driver was about to carry out the threat. Plaintiff did not consent to the driver's conduct. Plaintiff was harmed.

36. **Battery**. The driver touched Plaintiff with the intent to harm or offend her. Plaintiff did not consent to the touching. Plaintiff was harmed and offended by the driver's conduct. A reasonable person in Plaintiff's situation would have been offended by the touching.

37. **False Imprisonment**. The driver intentionally deprived Plaintiff of her freedom of movement by use of force, threats of force, and menace. The restraint compelled Plaintiff to stay somewhere for some appreciable time. Plaintiff did not knowingly or voluntarily consent. Plaintiff was harmed.

## V. ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM

38. Before taking the August 12, 2022 Uber ride, Plaintiff regularly heard and saw ads promoting Uber as a safe and responsible option for people who had been drinking.

39. As early as 2010, Plaintiff saw Uber advertisements placed in venues and establishments where drinking was popular.

40. Before 2021, Plaintiff heard advertisements on Austin, TX radio advertising Uber as a safe alternative to drunk driving. She recalls that these ads included language such as: "Don't drink and drive. Call an Uber." Plaintiff was impressed with the advertising, because she is an advocate against drinking and driving and was happy Uber provided a solution to the problem.

41. In 2021, Plaintiff heard ads on Austin radio station KUT that advertised Uber as a safe alternative to drunk driving. She recalls that these ads included language such as: "Don't drink and drive. Call an Uber."

42. Because she saw and heard Uber's ads promoting its service as safe transportation for people who were intoxicated, Plaintiff believed that Uber was a safe option to use if she needed a ride after a night of drinking.

43. Indeed, before she was assaulted, in her work as an event planner, Plaintiff used to recommend Uber to people who had been drinking during events she had planned.

44. Uber's marketing to Plaintiff did not disclose that drunk people, especially women, are at a significantly elevated risk of being sexually assaulted by Uber drivers.

45. Uber's marketing to Plaintiff did not disclose that Uber lacked sufficient information about its drivers (including Mr. Castaneda Orozco) to determine whether its drivers could be trusted to provide safe transportation to a drunk female rider traveling alone late at night.

46. Uber especially lacked sufficient information about Mr. Castaneda Orozco since Uber only conducted a background check within the United States and Mr. Castaneda Orozco had spent the majority of his adult life living outside the United States.

47. The concealed information was in Uber's possession and not otherwise available to Plaintiff.

48. Uber's failure to disclose the risks about riding drunk with Uber made its marketing materially misleading and incomplete.

49. Had Plaintiff known that Uber lacked sufficient information about its drivers to vouch for them as safe drivers of intoxicated women late at night and/or known that taking an Uber while intoxicated created a significantly elevated risk of being sexually assaulted, she would not have ordered the Uber on August 12, 2022. She would have found another way to get to her destination, such as asking her brother to pick her up.

## VI. ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS

50. **Safe Ride Matching.** Uber had the capability to, and did, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

51. At all relevant times, the Uber App automatically collected data on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Uber had the capability to use data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮r

52. Uber was aware ▮▮▮. To that end, ▮▮▮

53. Uber could have, but did not, ▮▮▮

54. ▮▮▮.

55. Uber's failure to ▮▮▮ is evident by the fact that Uber ▮▮▮. Had Uber ▮▮▮

56. Had ▮▮▮ Plaintiff would not have been sexually assaulted.

57. Alternatively, the Uber App should have warned Plaintiff that ▮▮▮ a high risk of sexual assault.

58. **Gender Matching**. The Uber App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers.

59. Uber tracks the rates of sexual misconduct and assault committed by its drivers against its passengers and collects data on the gender of the driver and passenger involved in those incidents. At all relevant times, ==Uber was aware that the risk of sexual misconduct or assault is greater during Uber rides in which the driver is male and the passenger is female, like the ride between the driver and Plaintiff.== The risk of sexual assault associated with such pairings, while known to Uber based on its internal data collection and analysis, was beyond that contemplated by the ordinary user or consumer.

60. Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

61. Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

62. Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

63. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

64. **App-Based Ride Recording**. The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time

1  period immediately around them, whether through using the camera already installed on a
2  driver's cell phone during Uber trips, or through an external device linked to the App.

3  65. The presence of cameras serves a deterrent function that significantly reduces and
4  prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a
5  deterrent function that significantly reduces and prevents sexual assault and misconduct.

6  66. Uber is aware that the presence of cameras serves as a deterrent function that can
7  and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored
8  the use of recording functionalities for the Uber App. But these recording functionalities (even if
9  they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or
10 sexual misconduct committed by drivers against passengers.

11 67. For example, Uber developers modified the code of the Uber App on the back end
12 to allow in-app video recording by the driver. That is, when toggled on by the driver, this
13 functionality allowed drivers to record internal footage of Uber trips using their phone's camera
14 as a dash camera.

15 68. In addition to making the feature optional, rather than automatic, Uber coded its in-
16 app video recording functionality so that all recordings are encrypted in the Uber App and locally
17 stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law
18 enforcement, or any third party without the express authorization of the driver.

19 69. The result is that in-app video recording does not have any deterrent effect on
20 sexual assault or sexual misconduct by drivers against passengers because drivers exercise
21 absolute control over whether recording happens, and because drivers know that, even if the
22 technology is on, third parties cannot access the recordings.

23 70. Had the Uber App included automatic video monitoring of rides, by definition that
24 feature would have been engaged on Plaintiff's ride.

25 71. Automatic video monitoring would have deterred the driver from assaulting
26 Plaintiff.

27 72. **GPS Route Discrepancy Alerts**. Using its own internal data, Uber was aware at all
28 relevant times that the risk of sexual assault or sexual misconduct was greatest when a driver goes

1 off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in
2 proximity after a ride has concluded. The increased risk of sexual assault associated with these
3 route deviations as well as the prevalence of their occurrence, were risks beyond those
4 contemplated by the ordinary user or consumer, who lacked access to Uber's internal data or
5 analytics.

6       73.    The Uber App is designed to receive, track, and monitor GPS data from riders and
7 drivers at all times while using the Uber App. Uber monitors GPS data from both driver and rider
8 phones. Specifically, while in use, the Uber App ingests GPS location information and telematics
9 data from driver and rider phones, which its algorithm uses to Uber uses these data to, for
10 example, automatically direct the driver to the rider's location, and monitor the speed, braking,
11 and other driving maneuvers, as well as to predict route times.

12       74.    The data Uber collects give it the capability to detect when a ride has deviated from
13 the expected route, including when a driver goes off route, when a driver stops for an unusual
14 amount of time, or when the driver and rider stay in proximity after a ride has concluded.

15       75.    Uber could have, and should have, designed the App to use the GPS technology
16 that it already built into the app to automatically trigger safety alerts in the event of route
17 deviations, unusually long stops, or excessive time spent with a passenger at the beginning or end
18 of a route.

19       76.    An appropriately-designed GPS Alert function would have triggered an alert during
20 Plaintiff's ride due to the excessive time spent in proximity with the driver at the conclusion of
21 the ride.

22       77.    An appropriately-designed GPS Alert function would have prevented or lessened
23 the severity of Plaintiff's assault, including by deterring the driver from engaging in the assault in
24 the first place or summoning an intervention.

25       **WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic
26 and non-economic compensatory and punitive and exemplary damages, together with interest,
27 costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time,
28

1  Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as
2  appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims in this action.

Dated: March 14, 2025

/s/ *Sommer D. Luther*
**WAGSTAFF LAW FIRM**
Sommer D. Luther, CO 35053
940 Lincoln Street
Denver, CO 80203
Tel: (303) 263-8949
Fax: (303) 376-6361
sluther@wagstafflawfirm.com

*Attorney for Plaintiff*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.

Dated: March 14, 2025                    By:    */s/ Annie M. Wanless*
                                                Annie M. Wanless