*[Counsel Listed on Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br>**JOINT STATUS REPORT FOR APRIL 24, 2025 DISCOVERY STATUS CONFERENCE**<br><br>Judge:     Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

**JOINT STATUS REPORT**

In advance of the discovery status conference set for Thursday, April 24, 2025 at 8:30 a.m., Plaintiffs and Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Defendants") (jointly, "the parties"), respectfully submit this Joint Status Report.

## I. 30(b)(6) Deposition Scheduling

Plaintiffs served 30(b)(6) deposition notices on March 19 and March 21, 2025. Uber provided initial proposals for witnesses and dates on April 18 and the parties will meet and confer about Uber's proposals.

**Plaintiffs' Position:** To ensure these depositions proceed promptly and in consideration of the June 16 fact discovery deadline, the parties should agree to a deadline for resolving matters related to 30(b)(6) depositions. Plaintiffs propose that the parties should finalize negotiations and agree on dates for 30(b)(6) depositions by May 2. Any disputes will be submitted to the Court by May 5.

**Defendants' Position**: Defendants will meet and confer with Plaintiffs regarding (i) Defendants' initial proposals regarding witnesses and dates provided to Plaintiffs on April 18 and (ii) additional proposals Defendants expect to provide to Plaintiffs this week. Defendants will continue to work with Plaintiffs in good faith on these issues, but given the number of notices and topics, the need for coordination with JCCP witnesses with respect to some topics, and the early stage of the parties' negotiations, it is premature to set a deadline for bringing disputes to the Court.

## II. Clawback Procedure

**Plaintiffs' Position**: At an increasing frequency and scale, Uber attempts to claw back hundreds of documents through improper processes. Recently, Uber has delivered clawbacks informally on the eve of depositions to one or a small group of attorneys involved in the depositions,[1] during depositions, or in letters lacking necessary details.[2] Documents Uber seeks to claw back include documents that have never appeared on Uber's privilege logs, others that have appeared on Uber's privilege logs for months, and many others that have been a part of the Court's established review process upon which Plaintiffs have relied. Uber's recent practices are troubling because Uber's informal clawback notices, provided shortly before or during depositions, have not routinely been followed by formal, complete clawback communications. As a result, Plaintiffs do not, to date, have

---

[1] Well over a hundred documents were clawed back on the eve of a single JCCP deposition without notice to MDL Plaintiffs.
[2] Uber has served JCCP and MDL Plaintiffs seven formal "Notices of Clawback" since the beginning of March.

a record of all documents over which Uber has asserted a clawback. The clawbacks have been made without consideration to and separate from the parties' ongoing privilege conferrals and exchanges. Particularly concerning is that Uber has recently issued clawback notices for at least 30 documents over which Uber previously *withdrew* privilege assertions and/or were subject to Plaintiffs' challenges that Plaintiffs subsequently withdrew based on Uber's earlier redactions. In addition to these improperly timed clawbacks, Uber's formal clawback notices do not provide requisite information for Plaintiffs to assess and potentially challenge the clawback, and Uber has failed to timely respond, or at all, to Plaintiffs' Clawback Challenges.

Plaintiffs have sought to meet and confer on this issue for nearly two weeks and although Uber finally agreed on April 21 to provide Plaintiffs an audited list of all documents subject to outstanding clawback notices by April 22 and to provide privilege descriptions of all documents subject to outstanding clawback notices by April 25, the parties have not been able to reach agreement on a process to work through Uber's clawbacks and Plaitniffs' challenges in a timely manner before depositions are completed. Plaintiffs therefore ask the Court to set an April 28 deadline to submit any disputes to the Court.

**Defendants' Position:** As a preliminary matter, to the extent Plaintiffs take issue with the privilege assertion as to any clawed back document, those disputes should be submitted for resolution by Special Master Jones, on a schedule set by Special Master Jones, as provided by Judge Breyer's February 6, 2025 Order, ECF 2289. ("The Master shall assist the Court with all disputes relating to privilege logs and the assertion of attorney client and work product privileges in this MDL . . . The Master shall have authority to set the date, time, and place for all hearings, to preside over hearings, to take evidence, to conduct telephonic conferences to resolve disputes arising during depositions"). Defendants have expressed their willingness to confer with Plaintiffs regarding the timing and procedure for resolving any disputes before the Special Master.

Moreover, Defendants strongly disagree with Plaintiffs' outright mischaracterizations of Defendants' notice and the status of clawed back documents. As Plaintiffs well know, Defendants have served particularized, formal notice letters pursuant to the governing ESI orders. To date, Defendants have produced more than 1.5 million documents, totaling approximately 4.5 million pages.

Defendants have done so under extraordinarily tight deadlines. As in all cases of this size and complexity, the relevant PTOs contemplate (as does Fed. R. Evid. 502) that privileged materials may be produced inadvertently. For the same reasons, the PTOs also contemplate that it is possible that an inadvertently produced privileged document might come up during a deposition. The PTO provides a mechanism for dealing with that rare circumstance, which occurred recently during the deposition of a witness in the JCCP. When the privileged documents were used, Defendants objected pursuant to the PTO, which provides a process for adjudicating those objections. Defendants have at all times complied with provisions outlined in the JCCP Protective Order, entered March 6, 2025, and pre-trial orders 14 and 16 of this Court, as applicable.

The parties are meeting and conferring regarding concerns Plaintiffs recently raised over Defendants' clawback notices. In particular, Uber is preparing an omnibus list of all documents clawed back to date and updated privilege log entries corresponding to the documents, as Plaintiffs requested on April 18, including highlighting the documents for which Plaintiffs have never raised any objection.

### III. Defendants' Production of Safety Data

**Plaintiffs' Position**: As the Court is well aware, for nearly a year, Plaintiffs have been seeking production of documents and data related to Defendants' categorization of safety incidents. Plaintiffs have sought the Court's intervention on this issue numerous times and having still not received complete information as of February 2025,[3] Plaintiffs served additional interrogatories on this issue. Although Plaintiffs worked with Uber to reach an agreement on Uber's objections to Plaintiffs' second set of Interrogatories and the production of the remaining data (ECF 2713), Uber has not honored that agreement. Pursuant to that agreement, Uber was to provide by April 17, the number of Sexual Violence Incidents that Uber categorized into each of the 21 categories of Uber's Sexual Misconduct and Sexual Violence Taxonomy as well as the "Insufficient Information" and "Parent Category Usage Tracking" categories, by month, for the years 2017 through 2022. Uber also agreed to produce a 30(b)(6) witness on this information on April 24 and understood that the deposition could not proceed unless Uber provided complete information by April 17.

---

[3] Uber's claim that Plaintiffs have had this data since September is blatantly false. Although Uber began making productions around October, Uber's productions were wrought with errors which have required numerous corrected productions, the most recent being April 9, 2025.

Prior to reaching this agreement, the parties met and conferred numerous times, in part so that Uber had a complete understanding of the information Plaintiffs seek. Yet the information Uber provided on April 17 is not what the parties agreed Uber would produce and is of limited or no value to Plaintiffs. Instead of providing information on a one-to-one basis (the singular, final category Uber classified for each reported incident), Uber included *each* time it categorized or re-categorized an incident, noting that some incidents were re-categorized up to 4 times. Further, Uber did not provide any information that would allow Plaintiffs to determine which months include a trip that was also categorized in another category, how many reports within a particular month were also categorized in another category, or the number of individual trips reflected by the data. As such, Plaintiffs cannot determine for any month of any year, how many incidents Uber acknowledges that it received and confirmed per its criteria.

Plaintiffs' request was simple—how many incidents did Uber classify into Uber's taxonomy? Uber has this information but provided it in a way that is intentionally deceptive, likely so that their witness(es) cannot be tied down to any specific numbers. Based on the safety incident data that Uber has produced to Plaintiffs, it is clear to Plaintiffs that Uber can easily produce this information in the way that Plaintiffs requested, so that it is meaningful and useful in this litigation. Without having Uber's numbers that Uber verifies as final and accurate, Uber's witnesses have refused to testify about Uber's counting and categorization of incident data, particularly for taxonomy categories outside of those reported in Uber's Safety Reports, and will likely continue to evade testimony on this subject. In order for the deposition to proceed on April 25 and not cause further delay of discovery on this issue, on April 18, Plaintiffs requested Uber to provide the following information by April 23. As of the time of this filing, Uber has not agreed to provide this information and Plaintiffs therefore seek the Court's guidance.

1) The number of unique trips for which Uber received a report of a Sexual Violence Incident for each month of the years 2017 through 2022 (regardless of whether Uber ultimately categorized that trip into more than one category, and regardless of whether Uber received more than one report for that trip);

2) For each category of each month from 2017 through 2022, the number of unique trips within

that category that Uber also counted in another category or categories;

3) Which categories of the taxonomy have been audited, for which months and years.

**Defendants' Position:** Defendants have already complied with the agreement to provide Plaintiffs with information regarding Defendants' categorization of alleged safety incidents. Plaintiffs' new requests (which were raised for the first time on Friday, April 18) improperly demand documents and analyses that do not currently exist, seek information that can be derived from the raw data already at Plaintiffs' disposal, and threaten to upend the Parties' carefully negotiated schedule for a 30(b)(6) deposition on this topic later this week.

On April 4, the Parties agreed that Defendants would provide "numbers, with caveats," by 5 days before a Rule 30(b)(6) deposition on categorization of the incident report data, relating to the following question:

> "For each month in the year[s 2017-2022], specify by category, the number of Sexual Violence Incidents in the United States that YOU categorized into each of the 21 categories in Uber's Sexual Misconduct and Sexual Violence Taxonomy or categorized as 'Insufficient Information' or 'Parent Category Usage Tracking.'"

Defendants did exactly that, specifying by category, for each month in the years 2017-2022, the number of incident reports Defendants classified into each of those categories. In accordance with the parties' agreement, Defendants provided this information on April 17, 8 days before the Rule 30(b)(6) deposition scheduled for this Friday. Plaintiffs are now demanding that Defendants provide (i) the number of "unique trips" for which Uber received a report, regardless of whether the trip fell into multiple categories or received more than one report; (ii) the number of unique trips for each category that Uber also counted in another category; and (iii) which categories of the Taxonomy have been audited such that all reports have a single categorization. These are precisely the kind of "statistical analyses or reports that do not exist" that Plaintiffs originally made clear they did *not* seek when they filed their original motion to compel production of the raw incident report data. ECF 592, at 1. As Plaintiffs point out, the Parties participated in many meet-and-confers regarding this agreement, and Plaintiffs <u>never</u> mentioned <u>any</u> of the three requests they now include in this Joint Status Report.

Although Plaintiffs now suggest that Defendants have a "singular, final category … for each

reported incident" and "re-categorize" incidents, that is not true. As is evident from the raw data that has long been in Plaintiffs' possession, a single *incident* may give rise to *multiple separate reports*, as additional reports are received and as Defendants follow up with witnesses.[4] For example, an unwanted comment may be reasonably interpreted as "Asking Personal Questions," "Flirting," or "Comments About Appearance," depending on the way the conduct was described by reporting parties, reported against parties, and/or third parties, and the interpretation of the agent. Such classifications are not "re-categorizations" of the incident. Rather, safety agents use the information in front of them to categorize *that individual report*. Similarly, as discussed at length in the U.S. Safety Reports and multiple filings, Defendants audited user reports, not incidents. (*See, e.g.* 2017-2018 U.S. Safety Report, at 45-46.) That the data compilation provided to Plaintiffs does not include a single, harmonized categorization for every incident reported to Defendants is simply a reflection of that long-known fact. Plaintiffs should not be permitted to ignore information present in data available to them since September in an eleventh-hour effort to distract Defendants from preparing their witness and upset a long-negotiated deposition schedule.

## IV. TAR Update

The Parties continue to work together through the TAR validation process. To date, Defendants have produced nearly 1.4 million custodial documents for the 55 custodians. Defendants produced nearly 700,000 of those documents (totaling over a million pages) since March 3, 2025, as a result of the TAR validation process, which involved review of documents Defendants previously marked non-responsive but ultimately agreed to produce (without conceding their responsiveness) during TAR negotiations, as well as a small set of documents that were subject to the TAR dispute that resulted in the Court's March 6 Order (ECF 2443). On April 11, 2025, alone, Defendants produced over 105,000 documents covering each of the 55 custodians.

The Parties are currently engaging in the last round of TAR validation, reviewing a sample set of approximately 4,500 documents from Tranche 1-4 custodians. Pursuant to ECF 2718, to the extent this process results in any dispute to be raised to the Court, the Parties' PTO 8 submission will be filed

---

[4] Contrary to Plaintiffs' suggestion, Defendants have not stated that the September data production contains every piece of information that Defendants subsequently produced in response to Plaintiffs' additional requests, but rather that Plaintiffs could tell from *even the September production* that a single incident may have multiple reports associated with it, which are categorized differently.

by May 19, 2025.

## V. Scheduling Depositions of Bellwether Plaintiffs

The parties anticipate filing a PTO 8 letter addressing their dispute on the timing of depositions of Bellwether Plaintiffs. To date, no Bellwether Plaintiff has been scheduled or deposed.

**Plaintiffs' Position:** Given that this dispute will be submitted to the Court under the PTO 8 process, Plaintiffs maintain it is an inefficient use of the Court's time to argue the parties' position in this status report, but Uber insists on raising the issue here. Uber is insisting that *all* bellwether plaintiffs' depositions proceed immediately, even though (1) Uber's DFS certification is not due until April 30, (2) Uber's bellwether case-specific discovery responses are outstanding, (3) the Bellwether Deposition Protocol has not been entered and is currently in dispute before this Court (ECF 2655), and (4) Judge Breyer entered PTO No. 24 proposing bellwether trial waves which may alter the timing of bellwether plaintiffs' depositions, particularly for bellwether plaintiffs not in Wave 1. The parties intend their bellwether proposals to the Court on April 23. Those proposals will include plans to stagger the schedule for different waves where the plaintiffs' depositions will be staggered accordingly. Nonetheless, Plaintiffs have provided dates for several bellwether plaintiffs and have requested that Uber expedite the necessary bellwether discovery, but Uber has refused.

**Defendants' Position**: Case-specific fact discovery opened for the Bellwether cases on March 14, 2024 (ECF No. 1950), and Defendants requested deposition dates for each Plaintiff on April 4, 2025. Plaintiffs refused to provide deposition dates and instead, through Plaintiffs' leadership, objected that Defendants' requests for dates were "premature" and "improper" and demanded Defendants "retract" their request.

Pursuant to the Parties' agreement and an uncontested provision in the Proposed Deposition Protocol, Plaintiffs were due to provide proposed deposition dates within five business days of request – *i.e.*, by April 11, 2025. *See* ECF No. 2738-1 (memorializing agreement to provide deposition dates within five business days). *Only one* Plaintiff provided deposition dates by that agreed deadline, and that one Plaintiff provided dates at the end of May and in June. The handful who have since provided dates at Defendants' ongoing urging and meet-and-confer efforts provided dates on or after May 20, 2025, less than a month before discovery is currently due to be substantially complete under Judge

Breyer's orders. Other Plaintiffs stated a litany of objections to providing deposition dates, including: (1) arguing they were excused from providing a deposition date because the deposition protocol had not yet been entered by the Court, and (2) demanding delay of depositions until 10 days after Uber completes its document production.

Plaintiffs have attempted to justify their delay in providing deposition dates on the ground that Defendants' document productions in response to recently served requests are not yet complete, but there is no legitimate reason to tie the two together. The parties never agreed that one must be completed before the other begins. In any event, Defendants' DFS productions were substantially complete in each Bellwether case long ago, and Defendants are on track to meet this Court's April 30 deadline to certify completion of those productions.

Judge Breyer's assignment of bellwether cases to waves in PTO 24 may affect the deadlines by which discovery in certain cases must be substantially complete, but it does not excuse Plaintiffs from timely sitting for their depositions. The parties are meeting and conferring regarding the Bellwether discovery schedule (including the timing of Plaintiffs' depositions) and expect to submit their positions to Judge Breyer on April 23, 2025, in the event an agreement is not reached.

### VI. Record Release Authorizations

On April 4, 2025, Defendants served requests for production on all 20 MDL bellwether plaintiffs seeking records release authorizations beyond those contemplated by the PFS, including medical, mental health, insurance, pharmacy, employment, tax, disability, and academic records. Defendants also reserve the right to request authorizations for additional records. Defendants requested these authorizations to be signed and produced on an expedited basis given that fact discovery is due to be substantially complete by June 16, 2025. The parties are conferring over the scope and applicability of these releases in individual cases.

### VII. Plaintiffs' Responses to Defendants' Discovery Requests

**Plaintiffs' Position:**

Uber states that at least 450 MDL plaintiffs have alleged PFS deficiencies or failed to provide a PFS at all. Unfortunately, this is the first time Plaintiffs' Leadership has learned about Uber's recent PFS concerns, and thus Plaintiffs lack any information regarding the accuracy of Uber's assertions

and even the extend and import of these alleged deficiencies. Plaintiffs have repeatedly expressed to Uber that raising new issues through the JSR process is improper and inefficient.

Uber states that "the parties and the Court would benefit from the implementation of a defined process for addressing and dispelling … the plaintiff discovery deficiencies plaguing the docket." PTO No. 10, the Fact Sheet Implementation Order, does just that- it sets forth the process for alleged PFS deficiencies. (ECF 348). Further, Uber has previously raised alleged PFS deficiencies and failure to produce PFSs and/or verifications and this Court addressed them and issued an Order Resolving Dispute Regarding Obligations Under Pretrial Order No. 10. (ECF 1877). Defendants should follow the Court-ordered process to address individual PFS deficiencies instead of improperly raising these disputes through the JSR.

**Defendants' Position:** As of April 14, 2025, the number of cases pending in the MDL has now exceeded 2,000, with 72 new cases being filed in the preceding two weeks alone, and Defendants have served almost 500 PFS deficiency notices. Moreover, as counsel for Plaintiffs previously represented to Judge Breyer during the Court's February 28, 2025 Case Management Conference, the rate at which new cases will be filed is only expected to increase, and a significant number of individuals who have retained a lawyer have yet to file a lawsuit.

As plaintiffs file more cases and the MDL docket continues to grow, so too does the number of Plaintiffs who have yet to comply with basic PFS Court-ordered form discovery. Many MDL plaintiffs have either provided a deficient Plaintiff Fact Sheet ("PFS") or have not provided a PFS at all. These deficiencies make it unduly burdensome and unlikely that Defendants can substantiate many plaintiffs' claims. As company MDL discovery approaches completion and case-specific discovery begins, it is Defendants' position that the parties and the Court would benefit from the implementation of a defined process for addressing discovery deficiencies in a just, speedy, and efficient process. The parties will meet and confer and should the parties not reach agreement on a protocol for docket management, the parties will seek guidance from the court PTO 8.

**VIII.   Issues Pending Before the Court**

1.     <u>Proposed Bellwether Deposition Protocol</u>: The parties filed letters raising three disputes related to the Bellwether Deposition Protocol on April 9, 2025 (ECF 2745, 2738). The Court

has resolved the dispute about the number of third-party depositions (ECF 2749, 2754). Disputes about production of Defendants' company documents and motion practice on authentication issues are pending the Court's decision (ECF 2767).

**2.** <u>Safety Lens</u>: The parties' PTO 8 letter addressing their dispute about whether Defendants should be required to produce snapshots of the Safety Lens user interface in conjunction with Defendant Fact Sheets, filed on April 17, 2024 (ECF 2796), is pending the Court's decision.

By: <u>/s/ Roopal Luhana</u>
ROOPAL P. LUHANA *(Pro Hac Vice)*
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

SARAH R. LONDON (SBN 267083)
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: slondon@lchb.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

By: <u>/s/ Alycia A. Degen</u>
ALYCIA A. DEGEN

**KIRKLAND & ELLIS LLP**
ALLISON M. BROWN
JESSICA DAVIDSON
LAURA VARTAIN

**SHOOK, HARDY & BACON L.L.P.**
MICHAEL B. SHORTNACY
PATRICK L. OOT, JR.
CHRISTOPHER V. COTTON
ALYCIA A. DEGEN

**O'MELVENY AND MYERS LLP**
SABRINA H. STRONG
JONATHAN SCHNELLER

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

## ATTESTATION

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's consent and have authorized the filing.

Dated: April 21, 2025

By: /s/ Roopal P. Luhana

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/ Roopal P. Luhana