UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION**<br><br>This Document Relates to:<br> All Cases | No. 3:23-md-03084-CRB<br><br>**ALL PLAINTIFFS' NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC**<br>Judge: Honorable Charles R. Breyer |

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, all Plaintiffs will take the deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") through one or more of their designees on the topics listed below. This deposition will be taken before a duly qualified Notary Public, at the time and place specified, and continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of all Plaintiffs. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony by audio and video technology in addition to the stenographic method.  Notice is hereby given that the video is intended for use at trial.

| | |
|---|---|
| **WITNESS:** | Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC |
| **DATE:** | TBD |
| **TIME:** | 9:00 a.m. Pacific Time |
| **LOCATION:** | TBD |

Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on which each person will testify. And if Uber intends to have a custodian whose deposition is already scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs request that Uber provide notice of the same at least ten (10) business days in advance of that witness' deposition.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce and permit inspection and copying of the documents and/or tangible things specified in Attachment

A to this notice at the time and place of deposition.

## INSTRUCTIONS

1. For purposes of interpreting or construing the scope of this Notice, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual topic or request. This includes, without limitation, the following:

   a. The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

   b. The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

   c. Construing the singular form of the word to include the plural and the plural form to include the singular;

   d. Construing the masculine to include the feminine, and vice-versa;

   e. The use of any tense of any verb shall also include all other tenses of that verb;

   f. A term or word defined herein is meant to include both the lower and uppercase reference to such term or word;

   g. Any Bates number referenced herein shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members;

   h. Construing the term "including" to mean including but not limited to.

2. Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3. In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4. Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

**DEFINITIONS**

1. "ACTIONS" include steps, behaviors, actions, programs, protocols, procedures, technologies, products, and services including but not limited to screening tools, screening measures, gathering biometric data, conducting fingerprint based background checks using the FBI's database, using psychometric data, Cerebro, Cerebral, checking driver references, interviewing drivers, S-RAD, RideSense, Safety Dispatch Model, SDM, S-RAD, Safety Risk Assessed Dispatch, Driver Deactivations, RIDECHECK, RideCheck+, INDUSTRY INFORMATION SHARING, Women2women, WOMAN TO WOMAN MATCHING, audio recording, video recording, reporting to law enforcement, sharing information with other rideshare companies, warning riders.

2. "BRAND IMPACT" or "BUSINESS IMPACT" means the effect and/or impact on Uber's reputation, popularity, number of Riders, number of Rides, revenue, and/or profits.

3. "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

4. "CONSIDERED" means discussed, analyzed, presented on, RESEARCHED, did cost projections, solicited quotes and/or bids, ran a pilot program.

5. "DEACTIVATE" or "DEACTIVATION" means, for a Driver, to permanently block their use of the Driver App to offer Rides.

6. "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that

person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form. The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original. The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

7. "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

8. "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

9. "FAILURE MODE" means a way in which something may fail to function as designed or intended.

10. "INDUSTRY INFORMATION SHARING" means any program, plan, policy, agreement, contract, or practice of sharing information, and/or asking that information be shared, by and between Uber, Lyft, and other TRANSPORTATION NETWORK COMPANIES.

11. "LOCATION DATA" includes coordinates, GPS data, satellite data, and latitude-longitude data.

12. "PERSONAL TRANSPORTATION" means transportation of people in passenger vehicles.

13. "RATE" refers to all of the following: the absolute number, frequency, incidence, as well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly category of Ride is specified, for that category of Ride).

14. "RESEARCH" means observation, focus groups, testing, reliability testing, usability testing, analyses, root cause analyses, hazard assessments, failure mode and effects analyses, surveys, studies, experimentation, pilot programs, and the collection, interpretation, and evaluation of data, including data from use of Uber's Transportation Network in particular regions or countries.

15. "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

16. "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

17. "RIDECHECK" means any program for using LOCATION DATA to identify and/or act on UNPLANNED STOPS, ROUTE DEVIATIONS, and/or UNPLANNED RIDER-DRIVER PROXIMITY. RIDECHECK includes the programs Uber calls "RideCheck" and "RideCheck+" as well as any former, subsequent, or alternative versions of those programs, including GPS anomaly detection and any other such programs, whether those programs were merely CONSIDERED or implemented.

18. "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

19. "RIDER APP," "UBER APP," "UBER APPLICATION," "UBER APP," or "APP" means Uber's mobile device application that is used by Drivers and Riders to coordinate, provide, or order Uber Rides, including apps used by both DRIVER or RIDER, and including the Uber Driver Application.

20. "RISK SENSITIVE MATCHING" means Uber's matching of RIDERS and/or particular RIDES with DRIVERS, where the risk of a SAFETY INCIDENT is a factor in determining who is matched with whom and/or whether the match occurs. This includes S-RAD (aka Safety Risk Assessed Dispatch), Geo Fencing, and all other prior, subsequent, and/or alternative versions of S-RAD.

21. "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

22. "ROUTE DEVIATIONS" means any deviation or detour from a planned route for a RIDE, which is for an abnormal period of time (i.e. a period of time that is not consistent with a reasonable alternative route to the intended destination).

23. "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

24. "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

25. "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

1    26.    "SAFETY INTERVENTION" means anything Uber did in an attempt to prevent or reduce the risk, duration, and/or severity of SEXUAL ASSAULT OR SEXUAL MISCONDUCT in connection with a specific RIDE, including but not limited to sending push notifications, otherwise communicating with the DRIVER and/or RIDER, contacting Law Enforcement, and/or contacting a security company or other third party.

27.    "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

28.    "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

29.    "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

30.    "TRANSPORTATION SYSTEM" or "TRANSPORTATION NETWORK" refers to the entire system for providing and/or facilitating Rides, between Riders and Drivers. The Transportation System may include but is not limited to Driver recruitment, Driver screening, Driver training, instructions for Drivers, policies and guidelines that apply to Drivers, Rider recruitment, Rider screening, Rider training, instructions for Riders, policies and guidelines that apply to Riders, the way in which a Rider requests a Ride, or someone else may request a Ride on behalf of a Rider, the way in which Drivers are matched with Riders via the Uber App, the way in which a Driver accepts a Ride, where and how Drivers and Riders are instructed to meet one another, the way in which Drivers and Riders and directed to identify one another and confirm that identity, the trade dress or other markings used to help identify Drivers' vehicles, maps and driving instructions, ways in which destinations can be changed, stops can be added, additional Riders can be added, where and how a Driver drops a Rider off, what components of the Ride are supported by technology, devices, or services external to the Uber App, what Fares are charged, the amount of the Fares, the way in

1  which Fares are charged, how much of the Fare is shared with the Driver, what the Driver and Rider
2  each are told about the Fare(s), discounts if any provided, customer support or other services
3  provided before during and after a Ride, devices hardware and software that supports the Ride,
4  safety buttons, features to share a Ride with a third party, GPS and/or other monitoring by Uber of a
5  Ride, automation to detect unusual or unwanted activity during a Ride, video and/or audio recording
6  during a Ride, and/or the lack of any of these things or features.

7  　　　　31.　　"TRANSPORTATION NETWORK COMPANY" means what the California Public
8  Utilities Commission defines as a Transportation Network Company.

9  　　　　32.　　"UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber
10  Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their parents, divisions,
11  departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors,
12  owners, members, partners, principals, agents, employees, contractors, subcontractors,
13  administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other
14  Persons acting or purporting to act on its behalf that have Documents and information in their
15  possession, custody, or control responsive to the request herein.

16  　　　　33.　　"UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA
17  indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period
18  of time, when a Ride is no longer in progress.

19  　　　　34.　　"UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a
20  DRIVER have stopped at a location other than the intended destination, for an abnormal period of
21  time (i.e. a period of time that is not consistent with a typical stoplight, stop sign).

22  　　　　35.　　"USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state
23  machine, decision tree, information architecture, interaction model, UI state map, and user interface,
24  including the menus, screens, buttons, options, visuals, and words, and options that a Rider may
25  interact with.

26  　　　　36.　　"WOMAN TO WOMAN MATCHING" means any product, software, or program for
27  matching women (and/or nonbinary, transgender individuals, and/or those with inferred female
28  gender) with other women (and/or nonbinary, transgender individuals, and/or those with inferred

female gender). This includes what Uber refers to as Women2Women or W2W and any former, subsequent, or alternative versions of that program.

**DEPOSITION TOPICS**

1. The process by which Uber originally designed its Transportation System (including but not limited to whether and how it considered Rider safety; performed safety testing and analysis; considered potential failure modes, including the potential that sexual misconduct and/or sexual assault would occur; considered alternative designs; and whether it established functional safety objectives, goals, and/or specifications with regard to Rider safety).

2. Uber's overall strategy for protecting Riders against Sexual Misconduct and Sexual Assault by Drivers (including each change to that strategy from 2012 to the present).

3. Whether Uber could take Actions that, either together or in isolation, could prevent Drivers from sexually assaulting Riders (including any Research Uber performed on the topic).

4. What Uber did, if anything, to identify the root causes of Sexual Misconduct and/or Sexual Assault committed by Drivers against Riders (including but not limited to the timeline from 2012 to the present of Uber's budget devoted to these efforts, the types and identities of experts Uber hired or contracted with for these efforts, and especially its use of safety engineers, human factors experts, security experts, experts in criminology, and any others with expertise in identifying and addressing the root causes of safety issues).

5. What Uber did, if anything, to identify potential Actions it could take to stop Sexual Assault and/or Sexual Misconduct committed by Drivers against Riders (including but not limited to, from 2012 to the present, Uber's budget devoted to these efforts, the types of experts Uber hired or contracted with for these efforts, and especially its use of safety engineers, human factors experts, security experts, experts in criminology, and any others with expertise in identifying effective safety Actions).

6. All Actions Uber considered taking, but did not take in the United States, to protect Riders against Sexual Misconduct and/or Sexual Assault by Drivers (including but not limited to, for each such Action, the timing, leaders involved, personnel involved, analyses performed, Research performed, nature of the action, feasibility, cost, efficacy, and rationale for not taking the action).

7. Uber's knowledge regarding the potential Business Impact of Actions it could have taken or took to protect Riders against Sexual Misconduct and Sexual Assault (including any cost projections, quotes, bids, focus groups, or reputation analysis related to any Actions).

8. All Actions Uber took in the United States to protect Riders against Sexual Misconduct and/or Sexual Assault by Drivers (including but not limited to, for each such Action, the timing, leaders involved, personnel involved, analyses performed, Research performed, nature of the action, feasibility, cost, efficacy, and rationale for taking the action).

9. For each Action Uber took to protect Uber Riders against Sexual Misconduct and/or Sexual Assault by Uber Drivers, any and all Research Uber did regarding the Safety Impact (either Actual or Projected) of that Action.

10. For each Action that Uber took to protect Uber Riders against Sexual Misconduct by Uber Drivers, any and all Research Uber did regarding the Brand Impact (either Actual or Projected) of that Action.

11. The impact of Uber's Safety Toolkit and each of its components (including but not limited to the impact of the Safety Toolkit and each of its components on Uber's Safety Brand, their impact on ridership numbers, as well as their efficacy, usability, reliability, and impact on preventing Sexual Assault and Sexual Misconduct).

12. Risk Factors that indicate a particular Ride involves an elevated risk of a Safety Incident (including but not limited to factors that appear in Uber's data related to the Driver, the Rider, the Ride/Trip, as well as factors linked to Sexual Misconduct or Sexual Assault in particular).

13. Risk-Sensitive Matching of Riders and Drivers (including but not limited to the timeline of when Uber considered and then adopted Risk-Sensitive Matching; what decision-makers were involved at Uber; their rationales; the Research conducted regarding Risk-Sensitive Matching; the actual and/or potential efficacy of Risk-Sensitive Matching in preventing Sexual Assault and/or Sexual Misconduct; as well as the algorithms Uber use(d) to calculate risk, its scoring methodology, and any thresholds it set for maximum tolerable risk).

14. RideCheck (including but not limited to the timeline of when Uber had access to Location data, the specific Driver and Rider Location data it had access to and for what duration, when it considered and adopted RideCheck; what interventions RideCheck included and when, the number of minutes Uber decided to wait before intervening, whether it coordinated with law enforcement and/or a security contractor, and its use of direct messaging to Drivers and/or Riders; the decision-makers involved and the rationales for

Uber's decisions; the Research conducted regarding RideCheck; the actual and/or potential efficacy of RideCheck in preventing Sexual Assault and/or Sexual Misconduct).

15. Safety Interventions based on Risk Factors (including but not limited to the timeline of when Uber considered and adopted such Safety Interventions; the minimum criteria for Uber deploying the Safety Interventions, the timing of when the Safety Interventions were deployed relative to when Uber received data regarding Risk Factors, Uber's use of push notifications and other means to communicate to Drivers and/or Riders; the decision-makers involved and the rationales for Uber's decisions; the Research conducted regarding these Safety Interventions; the actual and/or potential efficacy of these Safety Interventions in preventing Sexual Assault and/or Sexual Misconduct).

16. Uber's storage of Driver and Rider data, including Location data and other data, where the data is stored, how it is organized, how it is accessed, and how long it is retained.

17. Deactivation of Drivers (including but not limited to, from 2012 to the present, Uber's Research related to Deactivation, its decisions, policies, templates, and scripts regarding Deactivation, the decision-makers involved and rationales for Uber's decisions; as well as Uber's Research about the safety impact of Deactivating or failing to Deactivate Drivers, especially those who had been credibly accused of Sexual Assault or Sexual Misconduct).

18. Standards, criteria, or other metrics used by Uber to determine when a Driver should be suspended (and for how long); waitlisted, given a warning, or otherwise adversely affected; the dates those standards, criteria, or metrics, were used; the bases for those standards, criteria, or metrics; and the reason(s), if any, they were changed, if they were.

19. Standards, criteria, or metrics used by Uber to determine when a suspension of a driver's account should be lifted or a deactivated driver reactivated; and the dates those standards, criteria, or metrics, were used; the bases for those standards, criteria, or metrics; and the reason(s), if any, they were changed, if they were.

20. Reporting Drivers to Law Enforcement (including but not limited to, from 2012 to the present, Uber's Research related to Reporting Drivers to Law Enforcement, its decisions, policies, templates, and scripts regarding Reporting Drivers to Law Enforcement, the decision-makers involved and rationales for Uber's decisions; as well as Uber's Research about the safety impact of Reporting Drivers to Law Enforcement).

21. Industry Information Sharing (including but not limited to, from 2012 to the present, Uber's Research related to Industry Information Sharing, its decisions and policies regarding Industry Information Sharing, the decision-makers involved and rationales for Uber's

decisions; as well as Uber's Research about the safety impact of Industry Information Sharing).

22. Audio Recording (including but not limited to, from 2012 to the present, Uber's Research related to Audio Recording; its decisions and policies regarding Audio Recording, including whether, when, and how to have automatic Audio Recording, how to preserve and access such recordings, and what to tell Riders and Drivers about such recordings; the decision-makers involved and rationales for Uber's decisions; as well as Uber's Research about the safety impact of Audio Recording).

23. Video Recording (including but not limited to, from 2012 to the present, Uber's Research related to Video Recording; its decisions and policies regarding Video Recording, including whether, when, and how to have automatic Video Recording, how to preserve and access such recordings, and what to tell Riders and Drivers about such recordings; the decision-makers involved and rationales for Uber's decisions; as well as Uber's Research about the safety impact of Video Recording).

24. Providing a Woman-to-Woman Matching Option (including but not limited to, from 2012 to the present, Uber's decisions and policies regarding Woman-to-Woman Matching; the decision-makers involved and rationales for Uber's decisions; as well as Uber's Research about the safety impact of a Women-to-Woman Matching Option).

## SCHEDULE B

## DOCUMENTS TO BE PRODUCED

1. Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

2. All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

3. The custodial file of the deponent, to the extent s/he is not already a custodian.

4. The witness must bring to the deposition a laptop or other computer capable of logging into Uber's platform(s) for storing current and past policies (including but not limited to playbooks, operational guidelines, protocols, and scripts), such that the witness is able to demonstrate the architecture of the platform(s), and the way in which the policies are organized, linked, accessed, viewed, and interacted with.

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the undersigned caused a copy of the foregoing to be served via electronic mail on February 26, 2025, to counsel for Defendants Uber Technologies, Inc., Rasier LLC and Rasier-CA, LLC, at the following email addresses:

jphillips@paulweiss.com
ratkins@paulweiss.com
ksmith@paulweiss.com
rluskey@paulweiss.com
cgrusauskas@paulweiss.com
akeller@paulweiss.com
mtriana@paulweiss.com
mamaru@paulweiss.com
mpricewolf@paulweiss.com
lmurray@paulweiss.com
ksmith@paulweiss.com
jrubin@paulweiss.com
cray@paulweiss.com
mshortnacy@shb.com
oot@shb.com
jhaider@shb.com
vgromada@shb.com
jwikler@shb.com
rlewis@shb.com
bhooper@shb.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*