1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
|---|---|
| This Document Relates to:<br> All Cases | **ALL PLAINTIFFS' NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC**<br><br>Judge: Honorable Charles R. Breyer |

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, all Plaintiffs will take the deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") through one or more of their designees on the topics listed below. This deposition will be taken before a duly qualified Notary Public, at the time and place specified, and continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of all Plaintiffs. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony by audio and video technology in addition to the stenographic method.  Notice is hereby given that the video is intended for use at trial.

> **WITNESS:** **Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC**
>
> **DATE:** **TBD**
>
> **TIME:** **9:00 a.m. Pacific Time**
>
> **LOCATION:** **TBD**

Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on which each person will testify. And if Uber intends to have a custodian whose deposition is already scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs request that Uber provide notice of the same at least ten (10) business days in advance of that witness' deposition.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce and permit inspection and copying of the documents and/or tangible things specified in Attachment

1    A to this notice at the time and place of deposition.

2                                    **INSTRUCTIONS**

3           1.      For purposes of interpreting or construing the scope of this Notice, the terms shall be

4    given their most expansive and inclusive interpretation unless otherwise specifically limited by the

5    language of an individual topic or request. This includes, without limitation, the following:

6           a.   The terms "each," "every," "any," and "all" are synonymous with one another and with

7                "each and every" and "any and all;"

8
9           b.   The connectives "and" and "or" are used inclusively and not exclusively and shall be

10               construed either disjunctively or conjunctively as to require the broadest possible

11               response;

12          c.   Construing the singular form of the word to include the plural and the plural form to

13               include the singular;

14          d.   Construing the masculine to include the feminine, and vice-versa;

15
16          e.   The use of any tense of any verb shall also include all other tenses of that verb;

17          f.   A term or word defined herein is meant to include both the lower and uppercase

18               reference to such term or word;

19
20          g.    Any Bates number referenced herein shall be construed to refer not only to the specific

21               page number identified but to the entirety of the document associated with that Bates

22               number, including any family members;

23          h.   Construing the term "including" to mean including but not limited to.

24          2.       Unless otherwise indicated, the name of any Person, party or business organization

25   shall specifically include all past and present employees, officers, directors, agents, representatives,

26   general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or

27   business organization.

28

3.      In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4.      Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

## DEFINITIONS

1.      "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

2.      "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs.  The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form.  The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original.  The term also includes information stored

3

1    in, or accessible through, computer or other information retrieval systems (including any computer

2    archives or back-up systems), together with instructions and all other materials necessary to use or

3    interpret such data compilations.

4        3.    "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier

5    who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose

6    of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include

7    potential or prospective Drivers.

8        4.    "DRIVER APP" means Uber's mobile phone application that is used by Drivers to

9    offer Rides.

10       5.    "LOCATION DATA" includes coordinates, GPS data, satellite data, and latitude-

11   longitude data.

12       6.    "PERSONAL TRANSPORTATION" means transportation of people in passenger

13   vehicles.

14       7.    "RATE" refers to all of the following: the absolute number, frequency, incidence, as

15   well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a

16   particularly category of Ride is specified, for that category of Ride).

17       8.    "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to

18   UBER.

19       9.    "RESEARCH" means observation, testing, surveys, experimentation, and the

20   collection, interpretation, and evaluation of data.

21       10.   "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a

22   taxi or Charter Party Carrier.

23       11.   "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride

24   was coordinated through the Uber Application and regardless of whether the Rider was the person

25   who ordered the ride or owner of the account used to order the ride.

26       12.   "RIDER APP," "UBER APP," "UBER APPLICATION," "UBER APP," or "APP"

27   means Uber's mobile device application that is used by Drivers and Riders to coordinate, provide, or

28

1  order Uber Rides, including apps used by both DRIVER or RIDER, and including the Uber Driver

2  Application.

3       13.    "RISK FACTORS" mean factors that are associated, in the data available to UBER,

4  with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited

5  to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough

6  background check, gender, age, driving patterns, patterns of aggressive driving, patterns of

7  inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY,

8  patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving

9  at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-

10  star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request

11  (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants),

12  attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating

13  UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE

14  DEVIATION(S)).

15       14.    "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT,

16  INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

17       15.    "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports,"

18  the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and

19  the third of which covered 2021 and 2022.

20       16.    "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is

21  sexual in nature and without the consent of the Rider, including but not limited to all acts addressed

22  in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

23       17.    "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as

24  verbal or staring) of a sexual nature that is without consent or has the effect of threatening or

25  intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and

26  RALIANCE's Sexual Misconduct taxonomy.

27       18.    "TRANSPORTATION SYSTEM" or "TRANSPORTATION NETWORK" refers to

28  the entire system for providing and/or facilitating Rides, between Riders and Drivers. The

1    Transportation System may include but is not limited to Driver recruitment, Driver screening, Driver

2    training, instructions for Drivers, policies and guidelines that apply to Drivers, Rider recruitment,

3    Rider screening, Rider training, instructions for Riders, policies and guidelines that apply to Riders,

4    the way in which a Rider requests a Ride, or someone else may request a Ride on behalf of a Rider,

5    the way in which Drivers are matched with Riders via the Uber App, the way in which a Driver

6    accepts a Ride, where and how Drivers and Riders are instructed to meet one another, the way in

7    which Drivers and Riders and directed to identify one another and confirm that identity, the trade

8    dress or other markings used to help identify Drivers' vehicles, maps and driving instructions, ways

9    in which destinations can be changed, stops can be added, additional Riders can be added, where and

10   how a Driver drops a Rider off, what components of the Ride are supported by technology, devices,

11   or services external to the Uber App, what Fares are charged, the amount of the Fares, the way in

12   which Fares are charged, how much of the Fare is shared with the Driver, what the Driver and Rider

13   each are told about the Fare(s), discounts if any provided, customer support or other services

14   provided before during and after a Ride, devices hardware and software that supports the Ride,

15   safety buttons, features to share a Ride with a third party, GPS and/or other monitoring by Uber of a

16   Ride, automation to detect unusual or unwanted activity during a Ride, video and/or audio recording

17   during a Ride, and/or the lack of any of these things or features.

18        19.    "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber

19   Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions,

20   departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors,

21   owners, members, partners, principals, agents, employees, contractors, subcontractors,

22   administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other

23   Persons acting or purporting to act on its behalf that have Documents and information in their

24   possession, custody, or control responsive to the request herein.

25        20.    "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA

26   indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period

27   of time, when a Ride is no longer in progress.

28

21.     "UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a DRIVER have stopped at a location other than the intended destination, and/or otherwise deviated or detoured from a planned route for a RIDE, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign, or slight temporary route deviation).

22.     "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a Rider may interact with.

## DEPOSITION TOPICS

1.  The timeline of Uber's knowledge regarding Uber Drivers engaging in Sexual Misconduct and/or Sexual Assault of Uber Riders (including, from 2012 to the present, what, when, and how it learned about reports of Sexual Misconduct and/or Sexual Assault).
2.  For each year, from 2012 to the present, the numbers and classifications of Sexual Misconduct and Sexual Assault incidents reported to Uber by Riders.

3.  Uber's knowledge that Sexual Assault and Sexual Misconduct are underreported (including but not limited to the timeline of Uber's knowledge; any Research Uber conducted, experts Uber hired, and/or data Uber collected, related to the reporting rate; the factors that Uber understood contributed to underreporting; and whether Uber understood that those factors applied to Rider Reports of Sexual Assault and/or Sexual Misconduct to Uber).
4.  The true Rate of Sexual Assault and Sexual Misconduct on Uber's platform, after accounting for underreporting.

5.  The timeline of Uber's efforts, if any, to make sure that, when a Driver committed Sexual Assault or Sexual Misconduct of a Rider, Uber found out about it (including, from 2012 to the present, what Uber did and when; how it tried to make sure those efforts were effective; who was in charge of those efforts; who was involved in those efforts; and how those efforts were documented).

6.  The complete version history, from 2012 to the present, for the Uber App's User Experience for a Rider who, when prompted by the App at the end of a Ride to leave feedback regarding the Driver, wanted to report a Sexual Assault or Sexual Misconduct.

7. The product development process, from 2012 to the present, for the Uber App's User Experience for a Rider who, when prompted by the App at the end of a Ride to leave feedback regarding the Driver, wanted to report Sexual Assault or Sexual Misconduct.

8. Everything Uber did, from 2012 to the present, to encourage (or discourage) Riders who had experienced Sexual Assault or Sexual Misconduct to report it to Uber (including but not limited to everything Uber did to make it easy or difficult for Riders to report; how much money Uber spent doing so; who was in charge of these efforts (and what expertise they had; how much Uber spent on these efforts; and what reliability and user testing Uber conducted).

9. Riders' one-star ratings of Drivers (including but not limited to Uber's Research regarding the association between one-star ratings and unreported Sexual Assault and Sexual Misconduct; its knowledge that one-star ratings were associated with unreported Sexual Assault and Sexual Misconduct; its decision-making about whether to follow up on one-star ratings; why it did not follow up on one-star ratings; and the User Experience designed for Riders who gave one-star ratings).

10. Unplanned Rider-Driver Proximity (including but not limited to Uber's gathering and/or monitoring of Location Data, its gathering and/or monitoring of data about Unplanned Rider-Driver Proximity, its decision-making about whether to investigate incidents or patterns of Unplanned Rider-Driver Proximity, its attempts if any to investigate Unplanned Rider-Driver Proximity, Uber's Research regarding whether Unplanned Rider-Driver Proximity is associated with Sexual Assault and Sexual Misconduct; Uber's knowledge that Unplanned Rider-Driver Proximity is associated with Sexual Assault and Sexual Misconduct; why Uber did not investigate Unplanned Rider-Driver Proximity).

11. Unplanned Stops (including but not limited to Uber's gathering and/or monitoring of GPS data, its gathering and/or monitoring of data about Unplanned Stops, its decision-making about whether to investigate incidents or patterns of Unplanned Stops, its attempts if any to investigate Unplanned Stops, Uber's Research regarding whether Unplanned Stops are associated with Sexual Assault and Sexual Misconduct; Uber's knowledge that Unplanned Stops are associated with Sexual Assault and Sexual Misconduct; why Uber did not investigate Unplanned Stops).

12. Uber's process for investigating reported Sexual Assault and/or Sexual Misconduct, including each version thereof, from 2012 to the present (including but not limited to scripts, flowcharts, policies, channels of communication (e.g., phone interviews, in-App messages), organizations involved, management structure involved, personnel involved (their job

Case No. 3:23-MD-3084-CRB

requirements, job descriptions, and expertise or lack thereof), software platforms used, classification systems used, and documentation).

13. Uber's quality assurance related to its investigation of Sexual Assault and/or Sexual Misconduct (including quality assurance related to timing, response rate, follow-up, use of telematics, use of other resources and data, and incident classifications; and including what policies, experts, leaders, and processes Uber used in its quality assurance).

14. Uber's Safety Reports (including but not limited to why Uber published its Safety Reports, what it said about its Safety Reports, how and why it chose which data to report, how it assured the quality of that data and reporting, and what impact the Safety Reports had on Uber's reputation).

15. Uber's knowledge, from 2012 to the present, that certain Risk Factors are associated with an elevated rate or risk of Sexual Assault and/or Sexual Misconduct (including what it knew and when).

## SCHEDULE B

### DOCUMENTS TO BE PRODUCED

1. Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

2. All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

3. The custodial file of the deponent, to the extent s/he is not already a custodian.

4. Documents reflecting any and all versions, from 2012 to the present, of the Uber App's User Experience for a Rider who wanted to report a Sexual Assault or Sexual Misconduct.

5. Documents reflecting the product development process, from 2012 to the present, for the (Uber App) User Experience for a Rider who wanted to report Sexual Assault or Sexual Misconduct. (This includes the design description document, product requirements document, documents reflecting the software development life cycle, documents reflecting the project management system).

6. The witness must bring to the deposition a laptop or other computer capable of logging into the platform(s) that Uber's investigators use when they are investigating a reported Safety Incident, such that the witness is able to demonstrate the architecture of the platform(s), and the way in which the investigator's resources are organized, linked, accessed, viewed, and interacted with.

9

7.  The witness must bring to the deposition a laptop or other computer capable of logging into Uber's platform(s) for storing current and past policies (including but not limited to playbooks, operational guidelines, protocols, and scripts), such that the witness is able to demonstrate the architecture of the platform(s), and the way in which the policies are organized, linked, accessed, viewed, and interacted with.

Case No. 3:23-MD-3084-CRB

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the undersigned caused a copy of the foregoing to be served via electronic mail on March 19, 2025, to counsel for Defendants Uber Technologies, Inc., Rasier LLC and Rasier-CA, LLC, at the following email addresses:

jphillips@paulweiss.com
ratkins@paulweiss.com
ksmith@paulweiss.com
rluskey@paulweiss.com
cgrusauskas@paulweiss.com
akeller@paulweiss.com
mtriana@paulweiss.com
mamaru@paulweiss.com
mpricewolf@paulweiss.com
lmurray@paulweiss.com
ksmith@paulweiss.com
jrubin@paulweiss.com
cray@paulweiss.com
mshortnacy@shb.com
oot@shb.com
jhaider@shb.com
vgromada@shb.com
jwikler@shb.com
rlewis@shb.com
bhooper@shb.com

By: */s/ Roopal P. Luhana*

Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

11

Case No. 3:23-MD-3084-CRB