RACHEL B. ABRAMS (SBN 209316)
ADAM B. WOLF (SBN 215914)
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415.766.3544
Facsimile: 415.840.9435
Email: rabrams@peifferwolf.com
Email: awolf@peifferwolf.com

TIFFANY R. ELLIS (*Admitted PHV*)
**Peiffer Wolf Carr Kane Conway & Wise, LLP**
2229 Trumbull St.
Detroit, MI 48216
Telephone: 313.210.1559
Facsimile: 415.840.9435
Email: tellis@peifferwolf.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>*Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Case 3:23-md-03084-CRB<br><br>MDL No. 3084<br><br>Honorable Charles R. Breyer<br><br>JURY TRIAL DEMANDED<br><br>**REDACTED** |

**AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL**

Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 23-md-3084 (N.D. Cal.).

-1-    AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:23-CV-06708

I. **DESIGNATED FORUM**[1]

1. Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

II. **IDENTIFICATION OF PARTIES**

A. **PLAINTIFF**

2. *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: Jaylynn Dean.

3. At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Muskogee, Muskogee County, Oklahoma

B. **DEFENDANT(S)**

4. Plaintiff names the following Defendants in this action.

☑ UBER TECHNOLOGIES, INC.;[2]

☑ RASIER, LLC;[3]

☑ RASIER-CA, LLC.[4]

C. **RIDE INFORMATION**

5. Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in Maricopa County, Arizona on November 15, 2023.

6. Plaintiff was the owner of the Uber account used to request the relevant ride.

7. Plaintiff had been celebrating her impending graduation from flight attendant training.

8. She was intoxicated so she ordered an Uber, which she thought was the responsible thing to do.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

9. The driver was named Hassan Turay.

10. When the ride began, the driver immediately asked if the man who helped Plaintiff into the car was her boyfriend and if they had had sex that night.

11. Plaintiff was exhausted and ask the driver to hurry to the destination.

12. The driver continued to make lewd and inappropriate comments which Plaintiff ignored.

13. While Plaintiff's eyes were closed, the driver said he had to stop the vehicle.

14. About five minutes after the ride began, and before reaching the intended destination, the driver stopped his vehicle in a remote location.

15. At that location, which was not near any buildings, the driver unilaterally marked the trip as completed using Uber's driver app. This information was contemporaneously available to Uber.

16. For the next twenty minutes, the GPS data that Uber was collecting in real time indicated that the rider and the driver were still together at that remote location.

17. Uber did not take any action.

18. At that time and place, the driver entered the back seat, and forced himself on top of Plaintiff.

19. Plaintiff tried to fight him off but was unable to.

20. The driver raped Plaintiff.

21. Before Plaintiff was assaulted, Uber had received several reports of Mr. Turay's misconduct.

22. On July 16, 2018, a rider reported, "Pieces of the car were literally on the floor board in the back. When I asked him if he knew, he said it happens all the time. I felt very unsafe."

23. On March 24, 2019, a female rider reported "I took this ride with my bf from the pick up the driver complemented me stating i was beautiful although appreciated i have a very jealous bf that was on the ride with me the driver continued to flat out ignore the fact that my bf was there and that was very unprofessional and dis respectful…."

24.     On January 7, 2023, a rider reported "My driver drove dangerously" and further explained "My driver was very rude…. He yelled at me…. He ran numerous lights driving 50 miles an hour down 7th avenue…." She followed up and said, "[I] was really scared for my life I'm not going to lie to you," and "We value our lives …it's not fair that he's driving erratically yelling at his passengers, it's very uncalled for, [] very unprofessional…. [T]hat guy needs a lot of help with professionalism cuz he is not professional at all. [A]nd from here on out I'm not sure if I'm going to be using Uber anymore. … I don't want to die on someone's time…."

25.     On April 4, 2023, a rider reported "The driver was fine. But showed up in another car and made me uncomfortable. He also kept asking me where we were going. Everything is fine."

26.     On April 18, 2023, a rider reported "My driver touched me sexually and then kissed me calling me a black [N word] bitch. I demand a full refund and I demand all my money back this driver sexually assaulted me and called me names please refund me my money." She followed up saying "My driver touched me in a sexually mannose [sic] and kissed me. He violated me sexually and called me a [N word] bitch I demand a refund immediately this isn't right. I was called names and degraded because I'm black. Uber was supposed to protect me. I demand a full refund immediately."

27.     In response to the report of sexual assault and racial slurs on April 18, 2023, Uber placed Mr. Turay's Uber driver account on hold, but reactivated him on April 22, 2023.

28.     In addition, it appears that, before the November 15 sexual assault of Plaintiff, Uber may have already banned Mr. Turay's rider profile, and had "actioned" two other "related accounts." It will become apparent in discovery whether or not Uber had additional disqualifying information about Mr. Turay that led Uber to ban and/or otherwise action other accounts affiliated with him.

29.     The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

### III. CAUSES OF ACTION ASSERTED

30. The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☐ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☑ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☑ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☐ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☑ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☐ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS |

### IV. ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

31. Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

32. **Assault**. The driver intended to cause harm or offensive contact with Plaintiff or to cause Plaintiff apprehension of an immediate harmful or offensive contact. The driver caused Plaintiff apprehension of an immediate harmful or offensive contact.

33. **Battery**. The driver intended to cause a harmful or offensive contact with Plaintiff or to cause Plaintiff apprehension of an immediate harmful or offensive contact. The driver caused a harmful or offensive contact with Plaintiff.

34. **False Imprisonment**. The drive acted intentionally to restrain Plaintiff to an area within the driver's control. The driver acted without lawful authority and without Plaintiff's consent. The driver's acts resulted in the direct restraint of Plaintiff's liberty or freedom of movement, either by actual force or from Plaintiff's fear of force. The driver's acts would have

caused a reasonably prudent person in the same situation as the Plaintiff to believe that he was restrained. Plaintiff was aware of and was harmed by the restraint.

### V. ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM

35. **Driver Fraud.** When Plaintiff requested the Uber ride, Uber communicated to her, through the App, that the driver was a dad and that he had previously worked at a domestic violence shelter for women.

36. Plaintiff was comforted by these messages; they made her feel safe.

37. The App also included standard information about the driver, including his identity, his picture, and his "star rating." Plaintiff would have seen these messages too, given that she saw the messages described above.

38. Indeed, the App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing messages Uber conveys through the App, to every passenger, about the driver, including the driver's identity, the driver's photo, and the driver's "star rating."

39. If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving.

40. In fact, the App prompts passengers to look at the App after they order the ride, including specifically the messages regarding the driver, by sending notifications when a driver is selected, when the driver is nearby, and when the driver has arrived.

41. In communicating to Plaintiff about the driver, Uber did not disclose the previous rider reports of driver misconduct described above.

42. The concealed information was in Uber's possession and not otherwise available to Plaintiff.

43. Uber's failure to disclose the rider reports made the information it conveyed about the driver materially incomplete.

44. Had Plaintiff known about the driver's prior reports, she would not have taken the Uber ride.

45. **Designated Driver Fraud**. Before her assault, Plaintiff regularly received messages promoting Uber as a safe, responsible option for people who had been drinking.

46. Plaintiff received email messages from Uber saying: "Stay safe tonight. Use Uber." Uber can easily locate these emails as it has Plaintiff's email address.

47. Plaintiff also was targeted on social media with frequent messages from Uber about staying safe when drinking by using Uber.

48. Because she heard these ads, Plaintiff believed that Uber was a safe option for people who had been drinking.

49. Uber's marketing to Plaintiff did not disclose that Uber lacked sufficient information about its drivers (including Mr. Turay) to determine whether its drivers could be trusted to provide safe transportation to a drunk female rider traveling alone late at night.

50. Uber's marketing to Plaintiff also did not disclose that drunk people, especially women, and especially late at night, are at a significantly elevated risk of being sexually assaulted by Uber drivers.

51. The concealed information was in Uber's possession and not otherwise available to Plaintiff.

52. Uber's failure to disclose the risks about riding drunk with Uber made its marketing materially misleading and incomplete.

53. Had Plaintiff known that Uber lacked sufficient information about its drivers to vouch for them as safe drivers of intoxicated women late at night and/or known that taking an Uber while intoxicated created a significantly elevated risk of being sexually assaulted, she would not have ordered the Uber on November 15, 2023.

VI. **ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS**

54. **Safe Ride Matching**. Uber had the capability to, and did, identify sets of factors that, when present, predict a substantially higher likelihood of sexual assault occurring during an

1  Uber ride. Those predictive factors include: [Proprietary Factors]
2  [redacted]
3  [redacted] and [redacted].

4     55.    At all relevant times, the Uber App automatically collected data on trips, riders,
5  and drivers and ingested that data into its algorithm which is then used to, among other things,
6  adjust pricing and trip times in the surrounding area. Uber had the capability to use data on riders,
7  drivers, and trips—including specifically data correlated with predictive factors including [redacted]
8  [Proprietary Factors]
9  [redacted], and [redacted]—to
10  block trip pairings in the presence or one or more high-risk factor predictive of sexual assault.

11     56.    Uber was aware that the presence of certain factors related to driver, rider, or trip
12  characteristics increased the risk of sexual misconduct or assault. To that end, Uber launched a
13  feature that purported to flag high risk trips and down-rank those trips, so that riders would be
14  less likely to be paired with a flagged driver. This feature was inadequately designed to reduce the
15  risk of sexual assault during Uber rides. First, the predictive modeling used by Uber failed to
16  adequately flag high risk trips. Second, even when high risk trips were identified, this feature did
17  not block high risk pairings, such that riders were often still paired with drivers for risky trips.

18     57.    Uber could have, but did not, design the Uber App to entirely block identified high
19  risk pairings like the one between Plaintiff and the driver by modifying its matching algorithm on
20  the backend to block any and all pairings between riders and drivers in the presence of a sufficient
21  number of high-risk factors predictive of sexual assault.

22     58.    The high-risk factors attendant to Plaintiff's ride and known to Uber included: [redacted]
23  [Proprietary Factors], and [redacted]
24  [redacted].

25     59.    Uber's failure to adequately design its risk-based dispatch feature is evident by the
26  fact that Uber matched Plaintiff and the driver for an Uber trip despite the presence of several
27  high-risk factors predictive of sexual assault during Uber rides. Had Uber adequately designed the
28

1  Uber App and, in particular, a predictive modeling function to control risk factors predictive of
2  sexual assault, such trips would not just be "down ranked" or "flagged" but entirely blocked.

3        60.    Had such a function been coded into the Uber App, to block trips in the presence
4  of a sufficient number of high-risk factors predictive of sexual assault, the driver would not have
5  been assigned to the ride called for Plaintiff and Plaintiff would not have been sexually assaulted.

6        61.    Alternatively, the Uber App should have warned Plaintiff that its algorithm
7  identified her ride as carrying a high risk of sexual assault.

8        62.    **Gender Matching**. The Uber App was in a defective condition unreasonably
9  dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an
10 algorithm that matched female passengers with male drivers and had no modification to allow
11 female passengers the option to be matched only with female drivers.

12       63.    Uber tracks the rates of sexual misconduct and assault committed by its drivers
13 against its passengers and collects data on the gender of the driver and passenger involved in
14 those incidents. At all relevant times, Uber was aware that the risk of sexual misconduct or
15 assault is greater during Uber rides in which the driver is male and the passenger is female, like
16 the ride between the driver and Plaintiff. The risk of sexual assault associated with such pairings,
17 while known to Uber based on its internal data collection and analysis, was beyond that
18 contemplated by the ordinary user or consumer.

19       64.    Uber could have, but did not, modify its matching algorithm on the backend to
20 give female passengers the option to select female drivers. Such a modification is feasible
21 because Uber has made such modifications in markets outside of the United States, such as Saudi
22 Arabia. Uber has not modified the code of the matching algorithm on the backend for the version
23 of the Uber App available in the United States market to allow for female Uber passengers,
24 including Plaintiff, to choose gender-matched rides.

25       65.    Uber knew that a gender-matching option would have prevented assaults like the
26 one suffered by Plaintiff.

27       66.    Had a gender-matching functionality been available, Plaintiff would have toggled
28 it on for the ride in question.

67. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

68. **App-Based Ride Recording**. The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through using the camera already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

69. The presence of cameras serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

70. Uber is aware that the presence of cameras serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or sexual misconduct committed by drivers against passengers.

71. For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

72. In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law enforcement, or any third party without the express authorization of the driver.

73. The result is that in-app video recording does not have any deterrent effect on sexual assault or sexual misconduct by drivers against passengers because drivers exercise absolute control over whether recording happens, and because drivers know that, even if the technology is on, third parties cannot access the recordings.

74.     Had the Uber App included automatic video monitoring of rides, by definition that feature would have been engaged on Plaintiff's ride.

75.     Automatic video monitoring would have deterred the driver from assaulting Plaintiff.

76.     **GPS Route Discrepancy Alerts**. Using its own internal data, Uber was aware at all relevant times that the risk of sexual assault or sexual misconduct was greatest when a driver goes off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in proximity after a ride has concluded. The increased risk of sexual assault associated with these route deviations as well as the prevalence of their occurrence, were risks beyond those contemplated by the ordinary user or consumer, who lacked access to Uber's internal data or analytics.

77.     The Uber App is designed to receive, track, and monitor GPS data from riders and drivers at all times while they are using the Uber App, and shortly after they stop using the Uber App. Uber monitors GPS data from both driver and rider phones. Specifically, while in use, the Uber App ingests GPS location information and telematics data from driver and rider phones, which its algorithm uses to Uber uses these data to, for example, automatically direct the driver to the rider's location, and monitor the speed, braking, and other driving maneuvers, as well as to predict route times.

78.     The data Uber collects give it the capability to detect when a ride has deviated from the expected route, including when a driver goes off route, when a driver stops for an unusual amount of time, or when the driver and rider stay in proximity after a ride has concluded.

79.     Uber could have, and should have, designed the App to use the GPS technology that it already built into the app to automatically trigger safety alerts in the event of route deviations, unusually long stops, early ride termination, stops or early ride termination in remote locations, or excessive time spent with a passenger at the beginning or end of a route.

80.     An appropriately-designed GPS Alert feature would have flagged Plaintiff's ride due to the stop during which the driver assaulted Plaintiff.

81. An appropriately-designed GPS Alert function would have prevented or lessened the severity of Plaintiff's assault, including by deterring the driver from engaging in the assault in the first place or summoning an intervention.

**WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic and non-economic compensatory and punitive and exemplary damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time, Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims in this action.

Dated: March 14, 2025

/s/ *Rachel B. Abrams*
RACHEL B. ABRAMS (SBN 209316)
ADAM B. WOLF (SBN 215914)
**Peiffer Wolf Carr**
**Kane Conway & Wise, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: 415.766.3544
Facsimile: 415.840.9435
Email: rabrams@peifferwolf.com
Email: awolf@peifferwolf.com

TIFFANY R. ELLIS (*Admitted PHV*)
**Peiffer Wolf Carr**
**Kane Conway & Wise, LLP**
2229 Trumbull St.
Detroit, MI 48216
Telephone: 313.210.1559
Facsimile: 415.840.9435
Email: tellis@peifferwolf.com

*Attorneys for Plaintiff*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.

Dated: March 14, 2025    By:   /s/ *Annie M. Wanless*
                                Annie M. Wanless