1  Sarah R. London
   **GIRARD SHARP LLP**
2  601 California St., Suite 1400
   San Francisco, CA 94108
3  Telephone: (415) 981-4800
   slondon@girardsharp.com
4
   Tiseme G. Zegeye
5  **LIEFF CABRASER**
   **HEIMANN & BERNSTEIN, LLP**
6  275 Battery Street, 29th Floor
   San Francisco, CA 94111
7  Telephone: (415) 956-1000
   tzegeye@lchb.com
8
9  *Attorneys for Plaintiff*

10
                    UNITED STATES DISTRICT COURT
11
                   NORTHERN DISTRICT OF CALIFORNIA
12
                         SAN FRANCISCO DIVISION
13

14

15 | IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB |
16 | | MDL No. 3084 |
17 | | Honorable Charles R. Breyer |
18 | | JURY TRIAL DEMANDED |
19 | | **REDACTED** |
20 | This Document Relates to: | |
21 | *LCHB128 v. Uber Technologies, Inc., et al.*, No. 3:24-cv-7019 | |
22

23             **AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL**

24        Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the

25 Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form

26 Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault*

27 *Litigation*, No. 23-md-3084 (N.D. Cal.).

28

**I.     DESIGNATED FORUM**[1]

1. Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

**II.     IDENTIFICATION OF PARTIES**

    **A.     PLAINTIFF**

2. *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: LCHB128.

3. At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Phoenix, Maricopa County, Arizona

    **B.     DEFENDANT(S)**

4. Plaintiff names the following Defendants in this action.

        ☑ UBER TECHNOLOGIES, INC.;[2]

        ☑ RASIER, LLC;[3]

        ☑ RASIER-CA, LLC.[4]

    **C.     RIDE INFORMATION**

5. Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in Maricopa County, Arizona on June 28, 2024.

6. Plaintiff was the owner of the Uber account used to request the relevant ride.

7. Plaintiff ordered an Uber ride to take her home from work, approximately a 22 minute trip.

8. The driver's name was Felix Perez Rodriguez.

9. Plaintiff initially got into the back seat. The driver suggested Plaintiff move to the front seat because her bags were taking up space in the back seat.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

10. Plaintiff agreed.

11. The driver pulled over, and Plaintiff moved into the front seat.

12. The driver then continued the ride, proceeding onto the freeway.

13. Once on the freeway, the driver touched Plaintiffs' thighs, breasts, and genitals (through her clothing).

14. The driver asked Plaintiff "is this okay?"

15. Plaintiff answered "no," but the driver continuing groping her until they arrived at the destination.

16. Mr. Perez Rodriguez had applied to be an Uber driver on October 31, 2017 at 9:47 p.m. The entire application process with Uber took only two minutes. Uber finished its background check and made him an active driver on October 31, 2017 at 9:49 p.m.

17. Before Plaintiff was assaulted, Uber received multiple reports of misconduct by Mr. Perez Rodriguez.

   a. On January 17, 2018, a male rider reported about Mr. Perez Rodriguez: "Driver was high and would not let me out of the car." He clarified that the vehicle had smelled like marijuana when he got in. The rider said he had asked Mr. Perez Rodriguez to stop multiple times but Mr. Perez Rodriguez had continued to drive until he reached the drop-off address.

   b. On June 26, 2022, a male rider reported that Mr. Perez Rodriguez had asked inappropriate questions about whether the rider "liked boys" and that "Driver was being very sexual. Asking me to do him favors and parking at different places without my consent." He also said "Driver asked me to do sexual favors." Uber waitlisted Mr. Perez-Rodriguez while it investigated the charge. The rider gave an interview to Uber, explaining that the driver asked the rider to give oral sex. Mr. Perez Rodriguez also gave an interview, denying the charges and counter-accusing the rider of engaging in sexual misconduct. On June 30, 2022, Uber concluded its communications with the rider by saying, "We've already restricted this user's [meaning Mr. Perez Rodriguez'] access to the Uber app and are using the information you provided in order to take appropriate action with your report." That same day, Uber reactivated Mr. Perez Rodriguez.

c. On October 29, 2022, a rider reported that Mr. Perez Rodriguez "drove fast with sudden braking."

d. On March 13, 2023, a rider reported that "Driver had warped rotors on car – making stopping very questionable/unsafe. Vehicle shook when applying brakes and he had a broken exhaust making 1hr trip almost unbearable on our ears."

e. On July 12, 2023, a rider reported that the driver used a racial slur (the "N" word) to refer to the rider.

18. The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

### III. CAUSES OF ACTION ASSERTED

19. The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☐ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☑ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☑ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☐ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☑ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☐ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS |

### IV. ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

20. Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

21. **Assault**. The driver intended to cause harmful or offensive contact with Plaintiff or to cause Plaintiff apprehension of an immediate harmful or offensive contact. The contact would

offend a reasonable person. The driver caused Plaintiff apprehension of an immediate harmful or offensive contact.

22. **Battery**. The driver intended to cause harmful or offensive contact with Plaintiff or to cause Plaintiff apprehension of an immediate harmful or offensive contact. The contact would offend a reasonable person. The driver caused a harmful or offensive contact with Plaintiff.

## V. ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM

23. When ordering Uber rides, Plaintiff regularly looked at messages Uber conveyed about the driver, including the driver's identity, the driver's photo, and the driver's "star rating."

24. Indeed, the App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing messages Uber conveys through the App, to every passenger, about the driver, including the driver's identity, the driver's photo, and the driver's "star rating."

25. If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving.

26. In fact, the App prompts passengers to look at the App after they order the ride, including specifically the messages regarding the driver, by sending notifications when a driver is selected, when the driver is nearby, and when the driver has arrived.

27. In communicating to Plaintiff about the driver, Uber did not disclose the previous rider reports of driver misconduct described above.

28. The concealed information was in Uber's possession and not otherwise available to Plaintiff.

29. Uber's failure to disclose the rider reports made the information it conveyed about the driver materially incomplete.

30. Had Plaintiff known about the driver's prior reports, she would not have taken the Uber ride. Indeed, when ordering earlier Uber rides, at times Plaintiff declined a ride when a driver had a low star rating.

## VI. ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS

31. **Safe Ride Matching**. Uber had the capability to, and did, identify sets of factors that, when present, predict a substantially higher likelihood of sexual assault occurring during an Uber ride. Those predictive factors include: [Proprietary Factors] ▮▮▮▮▮, and ▮▮▮▮▮.

32. At all relevant times, the Uber App automatically collected data on trips, riders, and drivers and ingested that data into its algorithm which is then used to, among other things, adjust pricing and trip times in the surrounding area. Uber had the capability to use data on riders, drivers, and trips—including specifically data correlated with predictive factors including ▮ [Proprietary Factors] ▮▮▮▮▮, and ▮▮▮▮▮—to block trip pairings in the presence or one or more high-risk factor predictive of sexual assault.

33. Uber was aware that the presence of certain factors related to driver, rider, or trip characteristics increased the risk of sexual misconduct or assault. To that end, Uber launched a feature that purported to flag high risk trips and down-rank those trips, so that riders would be less likely to be paired with a flagged driver. This feature was inadequately designed to reduce the risk of sexual assault during Uber rides. First, the predictive modeling used by Uber failed to adequately flag high risk trips. Second, even when high risk trips were identified, this feature did not block high risk pairings, such that riders were often still paired with drivers for risky trips.

34. Uber could have, but did not, design the Uber App to entirely block identified high risk pairings like the one between Plaintiff and the driver by modifying its matching algorithm on the backend to block any and all pairings between riders and drivers in the presence of a sufficient number of high-risk factors predictive of sexual assault.

35. The high risk, predictive factors attendant to Plaintiff's ride and known to Uber included: [Proprietary Factors] ▮▮▮▮▮, and ▮▮▮▮▮.

36. Uber's failure to adequately design its risk-based dispatch feature is evident by the fact that Uber matched Plaintiff and the driver for an Uber trip despite the presence of several high-risk factors predictive of sexual assault during Uber rides. Had Uber adequately designed the Uber App and, in particular, a predictive modeling function to control risk factors predictive of sexual assault, such trips would not just be "down ranked" or "flagged" but entirely blocked.

37. Had such a function been coded into the Uber App, to block trips in the presence of a sufficient number of high-risk factors predictive of sexual assault, the driver would not have been assigned to the ride called for Plaintiff and Plaintiff would not have been sexually assaulted.

38. Alternatively, the Uber App should have warned Plaintiff that its algorithm identified her ride as carrying a high risk of sexual assault.

39. **Gender Matching**. The Uber App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers.

40. Uber tracks the rates of sexual misconduct and assault committed by its drivers against its passengers and collects data on the gender of the driver and passenger involved in those incidents. At all relevant times, Uber was aware that the risk of sexual misconduct or assault is greater during Uber rides in which the driver is male and the passenger is female, like the ride between the driver and Plaintiff. The risk of sexual assault associated with such pairings, while known to Uber based on its internal data collection and analysis, was beyond that contemplated by the ordinary user or consumer.

41. Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

42. Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

43. Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

44. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

45. **App-Based Ride Recording**. The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through using the camera already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

46. The presence of cameras serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

47. Uber is aware that the presence of cameras serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or sexual misconduct committed by drivers against passengers.

48. For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

49. In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law enforcement, or any third party without the express authorization of the driver.

50. The result is that in-app video recording does not have any deterrent effect on sexual assault or sexual misconduct by drivers against passengers because drivers exercise absolute control over whether recording happens, and because drivers know that, even if the technology is on, third parties cannot access the recordings.

51. Had the Uber App included automatic video monitoring of rides, by definition that feature would have been engaged on Plaintiff's ride.

52. Automatic video monitoring would have deterred the driver from assaulting Plaintiff.

**WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic and non-economic compensatory and punitive and exemplary damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time, Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims in this action.

Dated: March 14, 2025

/s/ *Sarah R. London*
Sarah R. London
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

Tiseme G. Zegeye
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
tzegeye@lchb.com

*Attorneys for Plaintiff*

# **FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.

Dated: March 14, 2025                              By:    */s/ Annie M. Wanless*
                                                                Annie M. Wanless