John Eddie Williams, Jr.
Brian Abramson
Margret Lecocke
Walt Cubberly (SBN 325163)
Batami Baskin
Myles Shaw
WILLIAM HART & BOUNDAS, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: jwilliams@whlaw.com
Email: babramson@whlaw.com
Email: mlecocke@whlaw.com
Email: wcubberly@whlaw.com
Email: bbaskin@whlaw.com
Email: mshaw@whlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB |
| | MDL No. 3084 |
| | Honorable Charles R. Breyer |
| | JURY TRIAL DEMANDED |
| This Document Relates to: | **REDACTED** |
| *WHB 1898 v. Uber Technologies, Inc., et al.*, No. 3:24-cv-05027 | |

## AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL

Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 23-md-3084 (N.D. Cal.).

I.    **DESIGNATED FORUM**[1]

1.    Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

II.    **IDENTIFICATION OF PARTIES**

A.    **PLAINTIFF**

2.    *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: WHB 1898

3.    At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Lawrence, Essex County, Massachusetts

B.    **DEFENDANT(S)**

4.    Plaintiff names the following Defendants in this action.

☑ UBER TECHNOLOGIES, INC.;[2]

☑ RASIER, LLC;[3]

☑ RASIER-CA, LLC.[4]

C.    **RIDE INFORMATION**

5.    Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in Middlesex County, Massachusetts on August 5, 2022.

6.    Plaintiff was the owner of the Uber account used to request the relevant ride.

7.    Shortly before 10:50 p.m., Plaintiff requested a ride from Lowell Beer Works to her home approximately 20 minutes away.

8.    Uber matched Plaintiff with a driver named Fulgencio Hernandez Gonzalez.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

9.     Mr. Hernandez Gonzalez had been an Uber driver for less than two months, since June 13, 2022.

10.     When Uber onboarded him in June 2022, Mr. Hernandez Gonzalez had only had a driver's license for 2 months, since April 12, 2022.

11.     When Uber onboarded him in June, 2022, Uber did not interview Mr. Hernandez Gonzalez or check his references. Uber's background check was mainly[5] limited to U.S. records. Since Mr. Gonzalez, per public records, had only lived in the United States since 2019, Uber effectively could only access information about 3 years, and not the other 49 years of his 52-year lifetime.

12.     When Uber matched Mr. Hernandez Gonzalez with Plaintiff, it knew very little about him.

13.     The pickup occurred at about 10:56 p.m.

14.     The driver looked Plaintiff up and down, and told her she smelled really good.

15.     The driver then began asking Plaintiff personal questions like where Plaintiff was from and if Plaintiff had a romantic partner.

16.     The driver told Plaintiff that, if they were partners, he would never leave her alone.

17.     The driver also said Plaintiff's legs were "so nice."

18.     The route required driving on a long and dark road.

19.     After Plaintiff exited the vehicle at her house, the driver further intimidated her by waiting outside her house.

20.     The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

**III.     CAUSES OF ACTION ASSERTED**

21.     The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

---

[5] The exception is Uber's "global watchlist search" which consists primarily of terrorists, international criminals, and countries' "most wanted" lists.

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☐ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☑ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☐ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☐ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☑ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☐ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☐ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☑ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS [Alternate Massachusetts-specific common law claims] |

## IV.    ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

22.    Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

23.    **Assault**. The driver's objectively menacing conduct put Plaintiff in reasonable apprehension of imminent harmful or offensive contact.

24.    **False Imprisonment**. The driver's conduct constituted intentional and unjustified confinement of Plaintiff. Plaintiff was conscious of, and harmed by, the confinement.

25.    **Intentional Infliction of Emotional Distress**. The driver engaged in extreme and outrageous conduct, without privilege, causing Plaintiff severe emotional distress.

## V.    ADDITIONAL ALLEGATIONS IN SUPPORT OF RATIFICATION CLAIM

26.    Plaintiff reported the incident to Uber in September 2022. However, Uber permitted the driver to remain on the platform until this lawsuit came to Uber's attention in July 2024.

## VI.    ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS

### A.    Massachusetts-Specific Claim: Breach of Implied Warranty

27.    Defendants manufactured and sold the Uber App, which eventually injured Plaintiff.

28.     The Uber App had the defects or otherwise unreasonably dangerous conditions described below, such that it was unsuited for the ordinary use for which it was sold.

29.     Defendants failed to warn of the defects or otherwise unreasonably dangerous conditions described below.

30.     Plaintiff used the product as intended by Defendants or in a manner that was at least foreseeable to Defendants.

31.     The defects or unreasonably dangerous conditions described below were a legal cause of Plaintiff's injury.

**B.**     **Product Defects**

32.     **Safe Ride Matching.** Uber had the capability to, and did, identify sets of factors that, when present, predict a substantially higher likelihood of sexual assault occurring during an Uber ride. Those predictive factors include but are not limited to: Proprietary Factors ███████████████████████████████████████████████████████████████████████████████, and ███████.

33.     At all relevant times, the Uber App automatically collected data on trips, riders, and drivers and ingested that data into its algorithm which is then used to, among other things, adjust pricing and trip times in the surrounding area. Uber had the capability to use data on riders, drivers, and trips—including but not limited to data correlated with predictive factors including Proprietary Factors █████████████████████████████████████████████, and █████████████ —to block trip pairings in the presence or one or more high-risk factor predictive of sexual assault.

34.     Uber could have, but did not, design the Uber App to prevent high-risk pairings like the one between Plaintiff and the driver by modifying its matching algorithm on the backend to block pairings between riders and drivers in the presence of sufficient numbers of high-risk factor predictive of sexual assault.

35.     The high-risk, predictive factors attendant to Plaintiff's ride and known to Uber (notwithstanding that the ride was ordered by a third party) included but were not limited to: █

Proprietary Factors ████████████████████████████████

████████████████████████████████████████████████████, and █

████████████████████████████████ .

36.    Had Uber modified its matching algorithm on the backend to prohibit driver-rider pairings where sufficient high-risk factors predictive of sexual assault were present, the ride between Plaintiff and the driver would have been automatically blocked by the algorithm, the driver would not have been assigned to the ride called for Plaintiff, and Plaintiff would not have been subjected to sexual misconduct.

37.    Had Uber designed the App to avoid high-risk matches, then the driver would not have been assigned to the ride called for Plaintiff, and Plaintiff would not have been subjected to sexual misconduct.

38.    **Gender Matching**. The Uber App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers.

39.    Uber tracks the rates of sexual misconduct and assault committed by its drivers against its passengers and collects data on the gender of the driver and passenger involved in those incidents. At all relevant times, Uber was aware that the risk of sexual misconduct or assault is greater during Uber rides in which the driver is male and the passenger is female, like the ride between the driver and Plaintiff. The risk of sexual assault associated with such pairings, while known to Uber based on its internal data collection and analysis, was beyond that contemplated by the ordinary user or consumer.

40.    Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

41.    Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

42.    Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

43.    Use of the gender-matching option would have prevented Plaintiff being subjected to sexual misconduct by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

44.    **App-Based Ride Recording**.  The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic audio and video recording of rides and the time period immediately around them, whether through using the camera and microphone already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

45.    The presence of recording devices serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

46.    Uber is aware that recording serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual misconduct committed by drivers against passengers.

47.    For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

48.    In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and

locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law enforcement, or any third party without the express authorization of the driver.

49.    The result is that in-app video recording does not have any deterrent effect on sexual assault or sexual misconduct by drivers against passengers because drivers exercise absolute control over whether recording happens, and because drivers know that, even if the technology is on, third parties cannot access the recordings.

50.    Had the Uber App included automatic video and audio monitoring of rides, by definition that feature would have been engaged on Plaintiff's ride.

51.    Automatic audio monitoring would have deterred the driver from engaging in sexual misconduct toward Plaintiff.

**WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic and non-economic compensatory and punitive and exemplary damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time, Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury as to all claims in this action.

1  Dated: March 14, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ *Walt Cubberly*

John Eddie Williams, Jr.
Brian Abramson
Margret Lecocke
Walt Cubberly (SBN 325163)
Batami Baskin
Myles Shaw
WILLIAM HART & BOUNDAS, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: jwilliams@whlaw.com
Email: babramson@whlaw.com
Email: mlecocke@whlaw.com
Email: wcubberly@whlaw.com
Email: bbaskin@whlaw.com
Email: mshaw@whlaw.com

*Attorneys for Plaintiff*

AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:24-CV-05027

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.


Dated: March 14, 2025                                    By:    */s/ Annie M. Wanless*
                                                                                        Annie M. Wanless

AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:24-CV-05027