TRACEY B. COWAN (SBN 250053)
tcowan@clarksonlawfirm.com
ZARRINA OZARI (SBN 334443)
zozari@clarksonlawfirm.com
Clarkson Law Firm, P.C.
95 3rd Street, 2nd Floor
San Francisco, CA 94103
Telephone: (213) 788-4050

RYAN J. CLARKSON (SBN 257074)
rclarkson@clarksonlawfirm.com
OLIVIA E. DAVIS (SBN 353041)
odavis@clarksonlawfirm.com
Clarkson Law Firm, P.C.
22525 Pacific Coast Hwy.
Malibu, CA 90265
Telephone: (213) 788-4050

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB <br><br> MDL No. 3084 <br><br> Honorable Charles R. Breyer <br><br> JURY TRIAL DEMANDED |
| This Document Relates to: <br><br> *C.L. v. Uber Technologies, Inc., et al.*, No. 3:23-cv-04972 | |

## AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL

Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form

Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 23-md-3084 (N.D. Cal.).

## I. DESIGNATED FORUM[1]

1. Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

## II. IDENTIFICATION OF PARTIES

### A. PLAINTIFF

2. *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: C.L.

3. At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Frederick, Frederick County, Maryland.

### B. DEFENDANT(S)

4. Plaintiff names the following Defendants in this action.

☑ UBER TECHNOLOGIES, INC.;[2]

☑ RASIER, LLC;[3]

☑ RASIER-CA, LLC.[4]

### C. RIDE INFORMATION

5. Plaintiff was sexually assaulted, harassed, battered, or otherwise attacked by an Uber driver in connection with an Uber ride that began at Washington Dulles International Airport at the border of Loudon County and Fairfax County, Virginia and ended in Frederick County, Maryland on August 28, 2023.

6. Plaintiff was the owner of the Uber account used to request the relevant ride.

7. Plaintiff was picked up by the Uber from Dulles airport around 9:14 AM.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

8. The Uber App identified the driver as Mohammad Omar Popalzai.

9. Mr. Popalzai resided, at all relevant times, in Prince William County, VA.

10. During the ride, which began in the State of Virginia and ended in the State of Maryland, the driver started moaning and rubbing himself before reaching into the backseat and touching Plaintiff between her legs under a blanket that was on her lap.

11. When Uber hired Mr. Popalzai on May 10, 2022, he had a history of convictions for driving infractions, including following too closely (2017), improper driving (2017), and speeding (2019).

12. Uber received at least five complaints concerning Mr. Popalzai's misconduct before the August 28, 2023 incident:

    a. On February 15, 2023, a rider reported: "My Uber driver was drunk and heavily under the influence. I felt extremely unsafe as he swerved and almost crashed multiple times. He kept falling asleep at red lights and caused me to feel extremely unsafe. His eyes were red and I could smell liquor on him."

    b. On March 3, 2023, a rider reported: "The man yelled at me and forced me to leave him a tip in cash."

    c. On April 13, 2023, a rider reported: "My driver made an unrequested stop. This man smacked my phone with his phone repeatedly, drove with hazard lights on, and I never made it to my destination, I need a complete refund this was awful…[he] basically threatened me with body language as if I'm his freaking wife or something…then proceeds to yell at me…"

    d. On July 6, 2023, a rider reported: "I was sexually harassed and have filed a police report. Please call me." Uber responded to the ride: "We understand that you would like to speak on the phone about this concern. Though we are not able to provide phone support right now, I'll be happy to work with you via email to fully resolve your issue as quickly as possible." The rider did not further respond prior to the subject incident. Uber did not try to call the rider as requested, nor interview Mr. Popalzai about the incident, nor did it take any further action before the subject incident.

       e.      On August 11, 2023, a rider reported that the driver did not match the driver profile on the App.

       f.      In addition, while he was an Uber driver, in September 2022, Mr. Popalzai was convicted of driving-related infractions for speeding.

13. At some point, Uber banned Mr. Popalzai's rider account. Information Uber has produced suggests that this happened before Plaintiff was assaulted (meaning the driver account remained active), but discovery will confirm either way.

14. The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

### III. CAUSES OF ACTION ASSERTED

15. The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☑ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION [Maryland law] |
| ☑ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE [Virginia law] |
| ☑ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY [Virginia law] |
| ☑ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT [if Maryland law governs products liability claims] |
| ☐ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☑ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS [Alternate Virginia-specific common law claims if Virginia law governs products liability claims] |

### IV. ADDITIONAL ALLEGATIONS IN SUPPORT OF VICARIOUS LIABILITY CLAIMS

16. Plaintiff alleges that Defendants are vicariously liable for the following intentional torts committed by the driver in addition to being vicariously liable for the driver's negligence.

17.     **Assault**. The driver's actions constituted an intentional threat to physically harm Plaintiff without her consent. The driver's actions also constituted acts intended to put Plaintiff in reasonable fear of imminent physical injury. It appeared to Plaintiff that the driver had the present ability to carry out the threat of physical harm, and Plaintiff was put in reasonable fear of imminent harm.

18.     **Battery**. The driver's actions constituted the intentional touching of Plaintiff without justification, excuse, or her consent. The touching was offensive because it offended Plaintiff's reasonable sense of personal dignity.

## V.     ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM

19.     Plaintiff does not have personal recollection of seeing information about the driver when she ordered the Uber ride. But she very likely saw messages from Uber about the driver, including his identity, his picture, and his "star rating."

20.     The App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing messages Uber conveys through the App, to every passenger, about the driver.

21.     These standard messages include: the driver's identity, the driver's photo, and the driver's "star rating."

22.     If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving.

23.     In fact, the App prompts passengers to look at the App after they order the ride, including specifically the messages regarding the driver, by sending notifications when a driver is selected, when the driver is nearby, and when the driver has arrived.

24.     Passengers are particularly likely to look at the App at the airport, where typically there is a large number of people waiting for a large number of Uber or Lyft rides, so it is very difficult to assume that any given vehicle is the one assigned to any particular person.

25. In communicating to Plaintiff about the driver, Uber did not disclose the previous rider reports of driver misconduct described above.

26. The concealed information was in Uber's possession and not otherwise available to Plaintiff.

27. Uber's failure to disclose the rider reports made the information it conveyed about the driver materially incomplete.

28. Had Plaintiff known about the driver's prior reports, she would not have taken the Uber ride.

VI. **ADDITIONAL ALLEGATIONS IN SUPPORT OF RATIFICATION CLAIM**

29. On August 28, Plaintiff reported the incident to Uber using the Uber App.

30. Uber waitlisted the driver but returned him to active status the next day, August 29.

31. Uber communicated to the driver: "Hi Mohammad, Thank you for your patience while we investigated this report. After careful review of this information available, your account has been reactivated."

32. On September 27, 2023, Plaintiff filed her lawsuit.

33. Uber deactivated the driver on October 5, 2023.

VII. **ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS**

   A. **Alternate Virginia-Specific Common Law Claims**

34. Plaintiff incorporates by reference the allegations in the Master Complaint pleaded under Claim H.

35. If the Court determines that Maryland law applies to product liability claims, Plaintiff pleads a strict product liability design defect claim. If the Court determines that Virginia law applies to product liability claims, Plaintiff pleads, in the alternative, the following common law claims under Virginia law:

36. **Breach of Implied Warranty.** The Uber App was defective because it was unreasonably dangerous for the use to which it would ordinarily put or some other reasonably

1  foreseeable purpose. The App left Defendants' control in a defective condition, that is, the App
2  was defective at the time it was made available to users or consumers in various app stores.

3  37.  **Negligent Design Defects.** Defendants had a duty to use reasonable care in
4  designing the Uber app at the time it was produced so as to eliminate unreasonable risks of harm
5  or injury that were reasonably foreseeable. Defendants knew, or reasonably should have known,
6  of the App's propensity for harm due to the risk of sexual misconduct or assault faced by users,
7  including Plaintiff, interacting with the App, as designed. The App contained a defect which
8  rendered it unreasonably dangerous for ordinary or foreseeable use, which existed at the time the
9  App was made available to users or consumers in various App stores. App users were at risk of
10 sexual misconduct or assault when using the Uber App and these risks were the result of design
11 choices made by Defendants. The risk of sexual assault or misconduct to users of the App was
12 foreseeable and existed at all relevant times when the App was available in the stream of
13 commerce. The foreseeable risk of sexual misconduct or assault to users interacting with the App
14 could have been reduced or avoided by the adoption of reasonable alternative designs, such as
15 those described below.

16  **B.  Product Defects**

17  38.  **Gender Matching**. The Uber App was in a defective condition unreasonably
18 dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an
19 algorithm that matched female passengers with male drivers and had no modification to allow
20 female passengers the option to be matched only with female drivers.

21  39.  Uber tracks the rates of sexual misconduct and assault committed by its drivers
22 against its passengers and collects data on the gender of the driver and passenger involved in
23 those incidents. At all relevant times, Uber was aware that the risk of sexual misconduct or
24 assault is greater during Uber rides in which the driver is male and the passenger is female, like
25 the ride between the driver and Plaintiff. The risk of sexual assault associated with such pairings,
26 while known to Uber based on its internal data collection and analysis, was beyond that
27 contemplated by the ordinary user or consumer.

28

40. Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

41. Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

42. Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

43. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

44. **App-Based Ride Recording**.  The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through using the camera already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

45. The presence of cameras serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

46. Uber is aware that the presence of cameras serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or sexual misconduct committed by drivers against passengers.

47. For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this

functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

48. In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law enforcement, or any third party without the express authorization of the driver.

49. The result is that in-app video recording does not have any deterrent effect on sexual assault or sexual misconduct by drivers against passengers because drivers exercise absolute control over whether recording happens, and because drivers know that, even if the technology is on, third parties cannot access the recordings.

50. Had the Uber App included automatic video monitoring of rides, by definition that feature would have been engaged on Plaintiff's ride.

51. Automatic video monitoring would have deterred the driver from assaulting Plaintiff.

**WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic and non-economic compensatory and punitive and exemplary damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time, Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims in this action.

Dated: March 14, 2025

/s/ *Tracey B. Cowan*
TRACEY B. COWAN (SBN 250053)
tcowan@clarksonlawfirm.com
ZARRINA OZARI (SBN 334443)
zozari@clarksonlawfirm.com
Clarkson Law Firm, P.C.
95 3rd Street, 2nd Floor
San Francisco, CA 94103
Telephone: (213) 788-4050

RYAN J. CLARKSON (SBN 257074)
rclarkson@clarksonlawfirm.com

OLIVIA E. DAVIS (SBN 353041)
odavis@clarksonlawfirm.com
Clarkson Law Firm, P.C.
22525 Pacific Coast Hwy.
Malibu, CA 90265
Telephone: (213) 788-4050

*Attorneys for Plaintiff*

-10-

AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:23-CV-04972

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.

Dated: March 14, 2025          By:   */s/ Annie M. Wanless*
                                     Annie M. Wanless