| | |
|---|---|
| 1 | D. Douglas Grubbs *(Admitted PHV)* |
| 2 | Adam K. Pulaski *(Admitted PHV)* |
| | **PULASKI KHERKHER, PLLC** |
| 3 | 2925 Richmond Avenue, Ste 1725 |
| | Houston, TX 77098 |
| 4 | Telephone: 713-664-4555 |
| | Facsimile: 713-664-7543 |
| 5 | Email: dgrubbs@pulaskilawfirm.com |
| | Email: adam@pulaskilawfirm.com |

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB<br><br>MDL No. 3084<br><br>Honorable Charles R. Breyer<br><br>JURY TRIAL DEMANDED |
| This Document Relates to:<br><br>*J.E. v. Uber Technologies, Inc., et al.*, No. 3:24-cv-03335 | |

**AMENDED BELLWETHER COMPLAINT AND DEMAND FOR JURY TRIAL**

Under PTO 21 (ECF 1950), Plaintiff files this Amended Bellwether Complaint against the Defendants named below. Plaintiff incorporates the allegations set out in the Master Long-Form Complaint filed at ECF 269 in *In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 23-md-3084 (N.D. Cal.).

## I. DESIGNATED FORUM[1]

1. Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: Northern District of California.

## II. IDENTIFICATION OF PARTIES

### A. PLAINTIFF

2. *Injured Plaintiff:* Name of the individual sexually assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom they were paired while using the Uber platform: J.E.

3. At the time of the filing of this Amended Bellwether Complaint, Plaintiff resides at: Tory, Oakland County. Michigan

### B. DEFENDANT(S)

4. Plaintiff names the following Defendants in this action.
   - ☒ UBER TECHNOLOGIES, INC.;[2]
   - ☒ RASIER, LLC;[3]
   - ☒ RASIER-CA, LLC.[4]

### C. RIDE INFORMATION

5. Plaintiff was sexually assaulted, harassed, battered, and/or otherwise attacked by an Uber driver in connection with an Uber ride in Macomb County, Michigan on December 7, 2022.

6. Plaintiff was the owner of the Uber account used to request the relevant ride.

7. Plaintiff requested an Uber ride to take her to work.

8. The driver's name was Faris Halata.

9. During the ride, Mr. Halata started asking inappropriate questions, including asking whether Plaintiff had a boyfriend and whether a boyfriend lived with her.

---

[1] *See* PTO No. 6, at II(C) (ECF 177).
[2] Delaware corporation with a principal place of business in California.
[3] Delaware corporation with a principal place of business in California.
[4] Delaware corporation with a principal place of business in California.

10. Soon after, the driver reached back, touched Plaintiff's knee and leg, and started asking sexual questions.

11. When the car arrived at Plaintiff's destination, the driver got out of the vehicle and sat with Plaintiff in the back seat.

12. The driver started kissing Plaintiff and forced her hand down his pants to touch his penis.

13. The driver put his hands inside Plaintiff's shirt and touched her breast.

14. Plaintiff got out of the car and ran away.

15. Mr. Halata had applied to be an Uber driver on May 11, 2017 at 5:50 p.m. Uber had finished its background check and made him an active driver by May 11, 2017 at 8:37 p.m., less than three hours later. Even though most of Mr. Halata's adult life had been spent living in countries other than the United States, and he had only apparently been living in the United States for less than 3 years, Uber limited the scope of its background check to records within the United States.

16. Before Plaintiff was assaulted, Uber received reports of misconduct, including at least two reports of sexual misconduct, by Mr. Halata.

    a. On November 4, 2017, a rider reported that Mr. Halata "Smoked pot before we got in. Whole car smelled like weed. It was freezing out and had the windows rolled down. Crossed a double yellow."

    b. On November 12, 2017, a rider reported that Mr. Halata "made me feel unsafe." She said "as soon as I walked into the cab he started asking me a ton of questions about myself including whether or not I was from China. Then at the end of the ride he asked if I had a boyfriend and said he was single and that he liked me. It was the most uncomfortable ride of my life. I was also alone in the Uber because my friends ditched me so I felt very uncomfortable."

    c. On February 17, 2019, a rider reported that Mr. Halata "was very rude to me and didn't let my cousin get in the car. He was driving recklessly…."

    d. On February 27, 2019, a female rider reported: "he kept asking me if I had a boyfriend and if I was married and if I lived alone and then he asked me to look at a sexy video

on YouTube of a artist I said I liked on the radio the whole ride I was nervous and uncomfortable."

   e. On March 31, 2019, a rider reported to Uber: "My driver drove dangerously," saying "Smelt alcohol and he was driving very fast I have never experienced anything like this riding with Uber I would hate to use Lyft safety is everything."

  17. The conduct described in the Master Long-Form Complaint and herein was a substantial factor in causing Plaintiff to suffer economic and non-economic harm.

**III. CAUSES OF ACTION ASSERTED**

  18. The following Causes of Action asserted in the Master Long-Form Complaint, including all allegations in support, are adopted in this Amended Bellwether Complaint by reference:

| Check if Applicable | Cause of Action Number | Cause of Action |
|---|---|---|
| ☑ | I | CLAIM B - NEGLIGENCE (excluding entrustment theory) |
| ☑ | II | CLAIM C - FRAUD AND MISREPRESENTATION |
| ☐ | III | CLAIM E - COMMON CARRIER'S NON-DELEGABLE DUTY TO PROVIDE SAFE TRANSPORTATION |
| ☐ | VI | CLAIM G.1 - VICARIOUS LIABILITY– EMPLOYEE |
| ☐ | VI | CLAIM G.2 - VICARIOUS LIABILITY– APPARENT AGENCY |
| ☐ | VII | CLAIM G.3 - VICARIOUS LIABILITY–RATIFICATION |
| ☑ | VIII | CLAIM H - STRICT PRODUCTS LIABILITY – DESIGN DEFECT |
| ☐ | IX | CLAIM H - STRICT PRODUCTS LIABILITY – FAILURE TO WARN |
| ☑ | X | CLAIM H - STRICT PRODUCTS LIABILITY – PRODUCTS LIABILITY ACTS [Alternate Michigan-specific common law claims] |

**IV. ADDITIONAL ALLEGATIONS IN SUPPORT OF FRAUD AND MISREPRESENTATION CLAIM**

  19. While Plaintiff does not have a specific memory of reviewing information about Mr. Halata, she used the Uber App to help her identify the correct vehicle when it arrived.

  20. As standard practice, Uber communicates to each passenger information about the driver, including his identity, his picture, and his "star rating."

-4- AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:24-CV-03335

1  21.  The App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing these standard messages Uber conveys through the App to every passenger.

22.  If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving.

23.  In fact, the App prompts passengers to look at the App after they order the ride, including specifically the messages regarding the driver, by sending notifications when a driver is selected, when the driver is nearby, and when the driver has arrived.

24.  Thus, when Plaintiff was using the Uber app to identify the correct vehicle on December 7, 2022, she would have necessarily seen information Uber communicated about the driver.

25.  In communicating to Plaintiff about the driver, Uber did not disclose the previous rider reports of driver misconduct described above.

26.  The concealed information was in Uber's possession and not otherwise available to Plaintiff.

27.  Uber's failure to disclose the rider reports made the information it conveyed about the driver materially incomplete.

28.  Had Plaintiff known about the driver's prior reports, she would not have taken the Uber ride.

V.  **ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS**

   A.  **Michigan-Specific Claims**

29.  **Breach of Implied Warranty**. The Uber App was not reasonably fit for the use or purpose anticipated or reasonably foreseeable by defendants. The App left Defendants' control in a defective condition, that is, the App was defective at the time it was made available to users or consumers in various app stores.

30. The Uber app was not reasonably fit for the use or purpose anticipated or reasonably foreseeable by Defendants at the time it left Defendants' control.

31. **Negligent Design Defect**. Defendants had a duty to use reasonable care in designing the App so as to eliminate unreasonable risks of harm or injury that were reasonably foreseeable. Defendants knew, or reasonably should have known, of the App's propensity for harm due to the risk of sexual misconduct or assault faced by users, including Plaintiff, interacting with the App, as designed. App users were at risk of sexual misconduct or assault when using the Uber App and these risks were the result of design choices made by Defendants. The risk of sexual assault or misconduct to users of the App was foreseeable and existed at all relevant times when the App was available in the stream of commerce. The foreseeable risk of sexual misconduct or assault to users interacting with the App could have been reduced or avoided by the adoption of reasonable alternative designs, such as those described *infra*.

B. **Product Defects**

32. **Gender Matching**. The Uber App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Uber app was designed with an algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers.

33. Uber tracks the rates of sexual misconduct and assault committed by its drivers against its passengers and collects data on the gender of the driver and passenger involved in those incidents. At all relevant times, Uber was aware that the risk of sexual misconduct or assault is greater during Uber rides in which the driver is male and the passenger is female, like the ride between the driver and Plaintiff. The risk of sexual assault associated with such pairings, while known to Uber based on its internal data collection and analysis, was beyond that contemplated by the ordinary user or consumer.

34. Uber could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Uber has made such modifications in markets outside of the United States, such as Saudi Arabia. Uber has not modified the code of the matching algorithm on the backend for the version

of the Uber App available in the United States market to allow for female Uber passengers, including Plaintiff, to choose gender-matched rides.

35. Uber knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff.

36. Had a gender-matching functionality been available, Plaintiff would have toggled it on for the ride in question.

37. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

38. **App-Based Ride Recording**. The Uber App was defective in its design because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through using the camera already installed on a driver's cell phone during Uber trips, or through an external device linked to the App.

39. The presence of cameras serves a deterrent function that significantly reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

40. Uber is aware that the presence of cameras serves as a deterrent function that can and does significantly reduce sexual assault and sexual misconduct and, to that end, has explored the use of recording functionalities for the Uber App. But these recording functionalities (even if they were available during Plaintiffs' ride) are inadequately designed to address sexual assault or sexual misconduct committed by drivers against passengers.

41. For example, Uber developers modified the code of the Uber App on the back end to allow in-app video recording by the driver. That is, when toggled on by the driver, this functionality allowed drivers to record internal footage of Uber trips using their phone's camera as a dash camera.

42. In addition to making the feature optional, rather than automatic, Uber coded its in-app video recording functionality so that all recordings are encrypted in the Uber App and

AMENDED BELLWETHER COMPLAINT
MDL NO. 3084 CRB, CASE NO. 3:24-CV-03335

1  locally stored on the driver's cell phone, meaning that recordings cannot be obtained by Uber, law
2  enforcement, or any third party without the express authorization of the driver.

3      43.    The result is that in-app video recording does not have any deterrent effect on
4  sexual assault or sexual misconduct by drivers against passengers because drivers exercise
5  absolute control over whether recording happens, and because drivers know that, even if the
6  technology is on, third parties cannot access the recordings.

7      44.    Had the Uber App included automatic video monitoring of rides, by definition that
8  feature would have been engaged on Plaintiff's ride.

9      45.    Automatic video monitoring would have deterred the driver from assaulting
10  Plaintiff.

11  **WHEREFORE**, Plaintiff prays for relief and judgment against Defendants for economic
12  and non-economic compensatory and punitive and exemplary damages, together with interest,
13  costs of suit, attorneys' fees, and all such other relief as the Court deems proper. At this time,
14  Plaintiff does not seek injunctive relief, but reserves all rights to later seek such relief as
15  appropriate under Fed. R. Civ. P. 15(b)(2) and Fed. R. Civ. P. 54(c).

### JURY DEMAND

17  Plaintiff demands a trial by jury as to all claims in this action.

18  Dated: March 14, 2025

/s/ *D. Douglas Grubbs*
D. Douglas Grubbs (*Admitted PHV*)
Adam K. Pulaski (*Admitted PHV*)
**PULASKI KHERKHER, PLLC**
2925 Richmond Avenue, Ste 1725
Houston, TX 77098
Telephone: 713-664-4555
Facsimile: 713-664-7543
Email: dgrubbs@pulaskilawfirm.com
Email: adam@pulaskilawfirm.com

*Attorneys for Plaintiff*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatory above has concurred in this filing.

Dated: March 14, 2025                By:    */s/ Annie M. Wanless*
                                            Annie M. Wanless