1    [Submitting counsel below]

2

3

4                          UNITED STATES DISTRICT COURT

5                        OF NORTHERN DISTRICT OF CALIFORNIA

6                             SAN FRANCISCO DIVISION

7

8    **IN RE: UBER TECHNOLOGIES, INC.,**          No. 3:23-md-03084-CRB
     **PASSENGER SEXUAL ASSAULT**
9    **LITIGATION**                               **PLAINTIFFS' OPPOSITION TO**
                                                  **DEFENDANTS' MOTION TO DISMISS**
10
                                                  Judge:  Honorable Charles R. Breyer
11   This Document Relates to:                    Date:   TBD
                                                  Time:   TBD
12   *A.R.1 v. Uber Techs., Inc.*,                Ctrm.:  6-17th Floor
     No. 24-cv-01827
13
     *D.J. v. Uber Techs., Inc.*,
14   No. 24-cv-07228

15   *A.G. v. Uber Techs., Inc.*,
     No. 24-cv-01915
16
     *A.R.2 v. Uber Techs., Inc.*,
17   No. 24-cv-07821

18   *B.L. v. Uber Techs., Inc.*,
     No. 24-cv-7940
19
     *C.L. v. Uber Techs., Inc.*,
20   No. 23-cv-04972

21   *J.E. v. Uber Techs., Inc.*,
     No. 24-cv-03335
22
     *Jane Doe QLF 0001 v. Uber Techs., Inc.*,
23   No. 24-cv-08783

24   *Jaylynn Dean v. Uber Techs., Inc.*,
     No. 23-cv-06708
25
     *K.E. v. Uber Techs., Inc.*,
26   No. 24-cv-05281

27   *Amanda Lazio v. Uber Techs., Inc.*,
     No. 24-cv-08937
28

1   *LCHB128 v. Uber Techs., Inc.*,
    No. 24-cv-07019

2
    *T.L. v. Uber Techs., Inc.*,
3   No. 24-cv-9217

4   *WHB 318 v. Uber Techs., Inc.*,
    No. 24-cv-04889

5
    *WHB 407 v. Uber Techs., Inc.*,
6   No. 24-cv-05028

7   *WHB 823 v. Uber Techs., Inc.*,
    No. 24-cv-4900

8
    *WHB 1486 v. Uber Techs., Inc.*,
9   No. 24-cv-4803

10  *WHB 1876 v. Uber Technologies, Inc., et al.*,
    No. 3:24-cv-05230

11
    *WHB 1898 v. Uber Techs., Inc.*,
12  No. 24-cv-05027

13  *Jane Roe CL 68 v. Uber Techs., Inc.*,
    No. 24-cv-06669

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3    INTRODUCTION ............................................................................................................ 1

4    LEGAL STANDARDS.................................................................................................... 3

     ARGUMENT ................................................................................................................... 4

5    I.    Plaintiffs LCHB128, Dean, B.L., A.R.2, C.L., J.E., and A.G. adequately plead

6          fraud. .................................................................................................................... 4

7          A.    Plaintiffs Dean, B.L., and A.G. adequately plead "Designated Driver
                 Fraud."......................................................................................................... 4

8                1.    Uber's designated driver promotions are statements of fact
                       susceptible to reliance, not generalized vague assertions or matters

9                      of opinion. .......................................................................................... 5

10               2.    Whether Plaintiffs reasonably relied on Uber's omissions from its
                       designated-driver advertising is a question of fact.................................... 7

11         B.    Plaintiffs LCHB128, Dean, A.R.2, C.L., and J.E. adequately plead "Driver

12               Fraud."........................................................................................................ 11

13               1.    Uber had a duty to disclose its drivers' previous reported
                       misconduct or criminal records.................................................................. 12

14                     a.    Uber had a duty to disclose based on materially incomplete
                             representations.................................................................................... 12

15                     b.    Alternatively, Uber had a duty to disclose based on its
                             exclusive knowledge of material facts. ........................................... 14

16               2.    Plaintiffs relied on concealed driver information. ................................... 16

17               3.    Plaintiffs sufficiently plead intent to defraud......................................... 17

18   II.   Plaintiffs adequately plead strict products liability or state-law equivalents. ................. 19

19         A.    "Safe Ride Matching" and "Gender Matching" are defects in Uber's
                 product, not merely issues with its services. ............................................ 20

20               1.    The Uber App was defective due to Uber's failure to incorporate a
                       "Safe Ride Matching" function into its algorithm. ................................... 20

21               2.    The Uber App was defective due to Uber's failure to incorporate a
                       "Gender Match" feature. ........................................................................... 21

22         B.    Plaintiffs A.G., K.E., A.R.2, and Dean adequately allege that the "App-

23               Based Ride Recording" defect contributed to their injuries................................. 23

24         C.    Plaintiffs adequately plead products claims in Michigan, Massachusetts,
                 North Carolina, and Virginia. ................................................................... 23

25   III.  Plaintiffs sufficiently assert vicarious liability theories. ............................................... 24

26         A.    Plaintiff A.G. adequately alleges respondeat superior and apparent agency
                 liability under Oregon law. ........................................................................ 25

27         B.    Plaintiffs WHB 318 and WHB 823 adequately allege breaches of a

28               common carrier's non-delegable duty under North Carolina law......................... 27

**TABLE OF CONTENTS**
(continued)

Page

C.    Plaintiffs A.R.2, C.L., and WHB 1898 adequately allege ratification. ................ 29

IV.    Plaintiffs WHB 1876, WHB 1898, WHB 407 adequately allege tort claims. ................. 31

A.    Plaintiffs WHB 1876, WHB 1898, and WHB 407 may maintain negligence or vicarious liability claims for emotional distress. ............................................. 31

1.    WHB 407's Georgia claims are adequately pleaded.............................. 32

a.    In Georgia, Uber is vicariously liable for emotional distress and intentional torts.................................................................. 32

b.    Alternatively, Georgia courts would recognize emotional-distress claims arising from forced confinement. ....................... 33

2.    Under Massachusetts law, WHB 1898 can bring tort claims for her emotional distress................................................................................ 33

a.    Massachusetts abandoned the impact rule. .................................. 33

b.    Even absent impact, Uber is liable as a common carrier for emotional distress and intentional torts........................................ 34

3.    The Court should predict that under Illinois law, WHB 1876 can bring emotional-distress claims.................................................................... 37

B.    Plaintiffs WHB 1898 and WHB 407 can plead strict products liability claims (or state-law substitutes) without physical impact or harm. ..................... 39

V.    As Uber knows, Plaintiff Jane Roe CL 68 suffered a physical assault. ........................... 40

CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*1440 Sports Mgmt. Ltd. v. PGA Tour, Inc.*,
2023 WL 7280444 (N.D. Cal. Oct. 5, 2023)........................................................................ 13, 17

*5504 Reuter L.L.C. v. Deutsche Bank Nat'l Trust Co.*,
2014 WL 7215197 (Mich. App. Dec. 18, 2014) ......................................................................... 19

*A.H. v. Church of God in Christ, Inc.*
831 S.E.2d 460 (Va. 2019)........................................................................................................... 30

*A.M. v. Omegle.com, LLC*,
614 F. Supp. 3d 814 (D. Or. 2022) .............................................................................................. 21

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) ..................................................................................... 6, 12

*Albano v. Shea Homes Ltd. P'ship*,
634 F.3d 524 (9th Cir. 2011).......................................................................................................... 3

*Altaa Invests., LLC v. Production Cap., LLC*,
2023 WL 4155374 (C.D. Cal. May 31, 2023) ............................................................................. 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................................ 3

*Axis Reinsurance Co. v. Telekenex, Inc.*,
913 F. Supp. 2d 793 (N.D. Cal. 2012) ........................................................................................... 4

*Back v. Wickes Corp.*,
378 N.E.2d 964 (Mass. 1978) ...................................................................................................... 23

*Baptist v. Robinson*,
49 Cal. Rptr. 3d 153 (Cal. App. 2006) ......................................................................................... 29

*Barrera v. Samsung Elecs., Am.*,
2018 WL 10759180 (C.D. Cal. Dec. 7, 2018) ............................................................................... 6

*Berger v. S. Pac. Co.*,
300 P.2d 170 (Cal. App. 1956) ..................................................................................................... 28

*Blessing v. Sandy Spring Bank*,
2021 WL 653161 (Md. App. Feb. 19, 2011) ............................................................................... 19

*Boeken v. Philip Morris, Inc.*,
26 Cal. Rptr. 3d 638 (Cal. App. 2005)....................................................................................... 9, 10

*Branford v. Wash. Cnty.*,
2019 WL 1957951 (D. Or. May 2, 2019) ..................................................................................... 27

*Brown v. DirecTV, LLC*,
562 F. Supp. 3d 590 (C.D. Cal. 2021) ......................................................................................... 30

*C.R. v. Tenet Healthcare Corp.*,
87 Cal. Rptr. 3d 424 (Cal. App. 2009)......................................................................................... 29

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Camenzind v. Cal. Expo. & State Fair,*
84 F. 4th 1102 (9th Cir. 2023) ............................................................ 4

*Carlton v. Goodyear Tire & Rubber Co.,*
413 F. Supp. 2d 583 (M.D.N.C. 2005)................................................ 24

*Caruthers v. Underhill,*
287 P.3d 807 (Ariz. App. 2012)............................................................ 9

*Chacanaca v. Quaker Oats Co.,*
752 F. Supp. 2d 1111 (N.D. Cal. 2010) ................................................ 7

*Chamberlain v. Chandler,*
5 F. Cas. 413 (C.C.D. Mass. 1823) ...................................................... 34

*City of Los Angeles v. Sup. Ct.,*
109 Cal. Rptr. 365 (Cal. App. 1973).................................................... 29

*Clark v. Children's Mem'l Hosp.,*
955 N.E.2d 1065 (Ill. 2011) ................................................................ 38

*CLM Props., Inc. v. SimmonsCooper LLC,*
2008 WL 11422124 (C.D. Cal. Jan. 8, 2008) ...................................... 7

*Cochran v. Securitas Sec. Servs. USA, Inc.,*
93 N.E.3d 493 (Ill. 2017).............................................................. 38, 39

*Cole v. Atl. & W.P.R. Co.,*
31 S.E. 107 (Ga. 1897)........................................................................ 32

*Com. v. Delgado,*
326 N.E.2d 716 (Mass. 1975) ............................................................ 35

*Com. v. Musgrave,*
649 N.E.2d 784 (Mass. App. 1995) .................................................... 35

*Conley v. Romeri,*
806 N.E.2d 933 (Mass. App. 2004) .................................................... 36

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.,*
911 F.2d 242 (9th Cir.1990)................................................................ 6

*Cooper v. Empower U, Inc.,*
603 F. Supp. 3d 1317 (S.D. Fla. 2020) .............................................. 36

*Crites v. Delta Air Lines, Inc.,*
341 S.E.2d 264 (Ga. App. 1986)......................................................... 33

*Dagi v. Delta Airlines, Inc.,*
961 F.3d 22 (1st Cir. 2020)................................................................. 36

*Dennis v. Pace Suburban Bus. Serv.,*
196 N.E.3d 85 (Ill. App. 2014)........................................................... 28

*Dias v. Nationwide Life Ins. Co.,*
700 F. Supp. 2d 1204 (E.D. Cal. 2010).......................................... 8, 9

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Dix v. Nova Benefit Plans, LLC*,
2015 WL 12859221 (C.D. Cal. Apr. 28, 2015) ................................................. 10

*Doe #1 v. Bd. of Educ. of Somerset Cnty.*,
2023 WL 375189 (D. Md. Jan. 24, 2023) ......................................................... 30

*Doe v. Holy See*,
557 F.3d 1066 (9th Cir. 2009) ............................................................... 25, 26

*Dziokonski v. Babineau*,
380 N.E.2d 1295 (Mass. 1978) ......................................................................... 33

*Eley v. Fedee*,
869 S.E.2d 566 (Ga. App. 2022) ..................................................................... 32

*Enovative Grp., Inc. v. Advanced Conserv. Tech. Distr., Inc.*,
2014 WL 13130386 (C.D. Cal. No. 12, 2014) ................................................... 9

*Evans v. Nacco Materials Handling Grp., Inc.*,
810 S.E.2d 462 (Va. 2018) ............................................................................... 24

*Fearing v. Bucher*,
977 P.2d 1162 (Or. 1999) ..................................................................... 25, 26, 27

*Fleck v. Titan Tire Corp.*,
177 F. Supp. 2d 605 (E.D. Mich. 2001) ........................................................... 23

*Flier v. FCA US LLC*,
2022 WL 16823042 (N.D. Cal. Nov. 8, 2022) ................................................. 14

*Foley v. Polaroid Corp.*,
508 N.E.2d 72 (Mass. 1987) ............................................................................. 37

*Friedman v. AARP, Inc.*,
855 F.3d 1047 (9th Cir. 2017) ......................................................................... 10

*Friedman v. Mercedes Benz USA LLC*,
2013 WL 12086788 (C.D. Cal. Apr. 9, 2013) ................................................. 17

*Gagne v. Bertran*,
275 P.2d 16 (Cal. 1954) ................................................................................... 17

*Gallant v. Gorton*,
581 F. Supp. 909 (D. Mass. 1984) ................................................................... 35

*Garcia ex rel. Martin v. Clovis Unified Sch. Dist.*,
627 F. Supp. 2d 1187 (E.D. Cal. 2009) ........................................................... 30

*Ginsberg v. Blacker*,
852 N.E.2d 679 (Mass. App. 2006) ................................................................. 35

*Greyhound Corp. v. Graham*,
26 S.E.2d 371 (Ga. 1943) ......................................................................... 25, 32

*Hairston v. Atl. Greyhound Corp.*,
18 S.E.2d 166 (N.C. 1942) ............................................................................... 29

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hendricks v. Leslie Fay, Inc.*,
  159 S.E.2d 362 (N.C. 1968) .................................................................................. 28

*Hoffman v. 162 N. Wolfe LLC*,
  175 Cal. Rptr. 3d 820 (Cal. App. 2014) ................................................................ 14

*Hosmane v. Univ. of Maryland*,
  2019 WL 4567575 (Md. App. Sept. 20, 2019) ...................................................... 19

*Howell v. Enter. Pub. Co.*,
  893 N.E.2d 1270 (Mass App. 2008), *rev'd on other grounds*, 920 N.E.2d 1 (Mass.
  2010) ...................................................................................................................... 36

*Hughes v. Apple, Inc.*,
  723 F. Supp. 3d 693 (N.D. Cal. 2024) .............................................................. 39, 40

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
  999 F.3d 534 (8th Cir. 2021) .................................................................................... 4

*In re MyFord Touch Consumer Litig.*,
  291 F. Supp. 3d 936 (N.D. Cal. 2018) ..................................................................... 8

*In re Social Media Adolescent Addiction Pers. Inj./Prod. Liability Litig.*,
  702 F. Supp. 3d 809 (N.D. Cal. 2023) ............................................................... 21, 22

*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
  753 F. Supp. 3d 849 (N.D. Cal. 2024), *appeal pending* (9th Cir. No. 24-7312) ..... 6, 7

*In re Takata Airbag Prod. Liab. Litig.*,
  462 F. Supp. 3d 1304 (S.D. Fla. 2020) ..................................................................... 6

*In re Volkswagen "Clean Diesel" Mktg. Sales Prac. & Prods. Liab. Litig.*,
  349 F. Supp. 3d 881 (N.D. Cal. 2018) ................................................................. 7, 17

*Jackson v. Airbnb, Inc.*,
  639 F. Supp. 3d 994 (C.D. Cal. 2022) .................................................................... 22

*Jackson v. Old Colony St. Ry. Co.*,
  92 N.E. 725 (Mass. 1910) ....................................................................................... 34

*Jacobs v. Meta Platforms, Inc.*,
  2023 WL 2655586 (Cal. Super. Mar. 10, 2023) ..................................................... 22

*Jacques v. Childs Dining Hall Co.*,
  138 N.E. 843 (Mass. 1923) ..................................................................................... 37

*Jerman v. Woolsey Oper. Co.*,
  2021 WL 4622509 (Ill. App. Oct. 7, 2021) ............................................................. 38

*Kitani v. New York City Transit*,
  2022 WL 874781 (S.D.N.Y. Mar. 24, 2022) .......................................................... 36

*Lee v. Gore*,
  472 S.E.2d 164 (Ga. App. 1996) ............................................................................ 39

*Lombardo v. Albu*,
  14 P.3d 288 (Ariz. 2000) ........................................................................................ 15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Longworth v. United States,*
2022 WL 4587520 (E.D.N.C. Sept. 29, 2022) ................................................. 27

*Lopez v. Winchell's Donut House,*
466 N.E.2d 1309 (Ill. App. 1984) ................................................. 38

*Lopez v. Zarbee's, Inc.,*
2023 WL 210878 (N.D. Cal. Jan. 17, 2023) ................................................. 3

*Lourim v. Swenson,*
977 P.2d 1157 (Or. 1999) ................................................. 26

*Lynchburg Commc'ns Sys. Inc. v. Ohio State Cellular Phone Co.,*
2003 WL 1247053 (Va. Cir. Ct. Jan. 22, 2003) ................................................. 19

*M.N.O. v. Magana,*
2006 WL 559214 (D. Or. Mar. 6, 2006) ................................................. 27

*Mann v. Va. Dare Transp. Co.,*
198 S.E.2d 558 (N.C. 1973) ................................................. 28

*Maynard v. Snapchat, Inc.,*
870 S.E.2d 739 (Ga. 2022) ................................................. 39

*McClean v. Univ. Club,*
97 N.E.2d 174 (Mass. 1951) ................................................. 34

*McNeil v. Carter,*
742 N.E.2d 1277 (Ill. App. 2001) ................................................. 38

*Minnis v. Oregon Mut. Ins. Co.,*
48 P.3d 137 (Or. 2002) ................................................. 26

*Moncada v. Allstate Ins. Co.,*
471 F. Supp. 2d 987 (N.D. Cal. 2006) ................................................. 17

*Montell v. Diversified Clinical Servs., Inc.,*
757 F.3d 497 (6th Cir. 2014) ................................................. 36

*Morton v. De Oliveira,*
984 F.2d 289 (9th Cir. 1993) ................................................. 28

*Murray v. Uber Techs., Inc.,*
486 F. Supp. 3d 468 (D. Mass. 2020) ................................................. 35

*Parker v. Brush Wellman, Inc.,*
377 F. Supp. 2d 1290 (N.D. Ga. 2005) ................................................. 33

*Pavlik v. Kornhaber,*
761 N.E.2d 175 (Ill. App. 2001) ................................................. 38

*Perry v. Emory Healthcare Servs. Mgmt., LLC,*
911 S.E.2d 229 (Ga. App. 2025) ................................................. 39

*Persson v. Smart Inventions, Inc.,*
23 Cal. Rptr. 3d 335 (Cal. App. 2005) ................................................. 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Peterson v. McCavic*,
277 P.3d 572 (Or. 2012)..................................................................................... 9

*Pinshaw v. Metro. Dist. Com'n*,
604 N.E.2d 1321 (Mass. App. 1992) ................................................................ 30

*Public Emps. Ret. Sys. v. Moody's Invstrs. Serv., Inc.*,
172 Cal. Rptr. 3d 238 (Cal. App. 2014) ........................................................... 18

*Rindlisbacher v. Steinway & Sons, Inc.*,
2019 WL 4767009 (D. Ariz. Aug. 9, 2019) ..................................................... 14

*Robinson v. AirTran Airways, Inc.*,
2009 WL 3822947 (N.D. Ga. Nov. 13, 2009) .................................................. 32

*Rodriguez v. Mondelez Global LLC*,
703 F. Supp. 3d 1191 (S.D. Cal. 2023)............................................................. 10

*Rogriguez v. Cambridge Hous. Auth.*,
823 N.E.2d 1249 (Mass. 2005) ......................................................................... 33

*Rojas v. Cigna Health & Life Ins. Co.*,
2018 WL 4759775 (S.D.N.Y. Sept. 29, 2018) .................................................. 18

*Roots Ready Made Garments v. Gap Inc.*,
2007 WL 3045999 (N.D. Cal. Oct. 18, 2007) .................................................. 13

*S. Ry. Co. v. Grubbs*,
80 S.E. 749 (Va. 1914) ...................................................................................... 30

*Samantha B. v. Aurora Vista Del Mar, LLC*,
292 Cal. Rptr. 3d 324 (Cal. App. 2022)...................................................... 30, 31

*Schmidt v. Archdiocese of Portland in Oregon*,
234 P.3d 990 (Or. App. 2010) ........................................................................... 27

*Seeger v. Odell*,
115 P.2d 977 (Cal. 1941) .................................................................................... 9

*Sena v. Com.*,
629 N.E.2d 986 (Mass. 1994) ........................................................................... 35

*Shepherd v. Costco Wholesale Corp.*,
441 P.3d 989 (Ariz. App. 2019) ........................................................................ 19

*Skinner v. Switzer*,
562 U.S. 521 (2011) ........................................................................................... 24

*Sloan v. Gen. Motors LLC*,
2020 WL 1955643 (N.D. Cal. Apr. 23, 2020) .................................................. 18

*Social Media Cases*,
2023 WL 6847378 (Cal. Super. Ct. Oct. 13, 2023) .......................................... 22

*Sondag v. Pneumo Abex Corp.*,
55 N.E.3d 1259 (Ill. App. 2016) ....................................................................... 39

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Soni v. Wespier*,
239 F. Supp. 3d 373 (D. Mass. 2017) ........................................................................... 36

*St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*,
742 P.2d 808 (Ariz. 1987) ............................................................................................... 9

*Sullivan v. Bos. Gas. Co.*,
605 N.E.2d 805 (Mass. 1993) ....................................................................................... 34

*Sw. Non-Profit Hous. Corp v. Nowak*,
322 P.3d 204 (Ariz. App. 2014) ..................................................................................... 9

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) .......................................................................................... 3

*Tassoudji v. Club Jenna, Inc.*,
2011 WL 2176237 (Ariz. App. May 24, 2011) ........................................................... 19

*Taupier v. Davol, Inc.*,
490 F. Supp. 3d 430 (D. Mass. 2020) ........................................................................... 23

*Terpin v. AT&T Mobility LLC*,
118 F. 4th 1102 (9th Cir. 2024) .................................................................................... 13

*Tershakovec v. Ford Motor Co.*,
546 F. Supp. 3d 1348 (S.D. Fla. 2021), *aff'd in part on other issues*, 79 F. 4th 1299
(11th Cir. 2023) ......................................................................................................... 7, 10

*Tristan v. Bank of Am.*,
2023 WL. 4417271 (C.D. Cal. June 28, 2023) .............................................................. 6

*U.S. Nat'l Bank of Ore. v. Fought*,
630 P.2d 337 (Or. 1981) ................................................................................................ 15

*Van Duesen v. Snead*,
441 S.E.2d 207 (Va. 1994) ............................................................................................ 15

*Vulcan Metals Co. v. Simmons Mfg. Co.*,
248 F. 853 (2d Cir. 1918) ............................................................................................... 6

*Wash. Mut. Bank, FA v. Sup. Ct.*,
15 P.3d 1071 (Cal. 2001) ................................................................................................ 4

*Wasylow v. Glock, Inc.*,
975 F. Supp. 370 (D. Mass. 1996) ................................................................................ 40

*Watson v. Crumbl LLC*,
736 F. Supp. 3d 827 (E.D. Cal. 2024) ..................................................................... 10, 15

*White v. Norfolk & S.R. Co.*,
20 S.E. 191 (N.C. 1894) ................................................................................................ 29

*Williams v. Gill*,
29 S.E. 879 (N.C. 1898) ................................................................................................ 29

*Williams v. J.P. Morgan Chase Bank, N.A.*,
704 F. Supp. 3d 1020 (N.D. Cal. 2023) ....................................................................... 19

- ix -

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES**

15 U.S.C. § 1681(b) ............................................................................................ 16

47 U.S.C. § 230 ................................................................................................... 22

Ga Code. § 51-1-11 ............................................................................................ 39

**RULES**

Fed. R. Civ. P. 15(a)(2) ........................................................................................ 3

Fed. R. Civ. P. 9(b) ......................................................................................... 3, 18

**OTHER AUTHORITIES**

Anheuser-Busch, *Responsible Drinking: Decide to Ride* ..................................... 5

Restatement (Second) of Torts (1977) ..................................... 11, 12, 14, 15, 23, 36

Uber, *Decide to Ride* ........................................................................................... 5

Uber, *Driving safety forwards* ........................................................................... 18

Uber, *Understanding ratings* ............................................................................ 12

1

## **INTRODUCTION**

2          The takeaways from PTOs 17 and 18 (the motion-to-dismiss orders) were clear: (1) fraud

3   claims require individualized allegations identifying statements, omissions, and reliance; (2)

4   respondeat superior claims are viable in states that do not place dispositive emphasis on the

5   employee's motives; (3) apparent agency claims are viable where such acts would be within the

6   scope of employment; (4) where a state recognizes traditional common carrier duties (and has not

7   exempted Uber from those duties by statute), Uber, as a common carrier, may be vicariously

8   liable for its drivers' torts; (5) ratification claims require individualized facts concerning Uber's

9   knowledge of and response to specific incidents; and (6) products liability claims require

10  individual allegations of defect and causation. ECF 1044, 1719.

11         The Bellwether Plaintiffs strictly adhered to the Court's orders. *See* Pls. App'x A.1 (each

12  Plaintiff's non-negligence claims). The seven Plaintiffs who plead fraud identify the

13  particularized statements and omissions at issue. The six Plaintiffs who plead respondeat superior

14  or apparent agency do so only in states that, like California, permit liability for conduct not

15  intended to serve the employer's interests. The three Plaintiffs who assert ratification plead that

16  Uber knew about their assaults but permitted the drivers to remain on the platform. The eight

17  Plaintiffs who advance common-carrier vicarious-liability claims do so only in those states that

18  recognize such duties and have not foreclosed them by statute. Finally, the nineteen Plaintiffs

19  who plead products liability articulate five specific defects and associated chains of causation.

20         In moving to dismiss, Uber applies incorrect legal standards and contorts fact questions

21  into matters of law:

22         **Fraud (§ I)**. Although Uber scatters its arguments at various elements of Plaintiffs' fraud

23  claims (statement, duty, reliance, etc.), the core contention is that Plaintiffs did not justifiably rely

24  on Uber's incomplete disclosure of driver information or on Uber's encouragements to drink and

25  ride with Uber; that they could not have expected Uber to disclose its drivers' past reported

26  misconduct or the significant risks of riding intoxicated with Uber. Those are disputed questions

27  of fact. Uber asks the Court to find Plaintiffs' reliance unreasonable as a matter of law by

28  applying a hypothetical "reasonable consumer" standard. This rule derives from statutory fraud

1   schemes and has no application to the common law fraud claims advanced here.

2       **Products Liability (§ II)**. Uber argues that certain defects ("Safe Ride Matching" and

3   "Gender Matching") reflect inadequate service, not defects in its App. But Uber disregards the

4   Court's explanation of Uber's dual role as product designer and service provider (as evidenced by

5   Uber's repeated reliance on cases and arguments the Court already rejected in finding the App

6   could be a product). Both theories specifically and appropriately allege a defect in Uber's

7   product. Uber also argues that four Plaintiffs fail to allege causation from a lack of in-App

8   recording functions, but ignores the allegations concerning how the absent function would work.

9   Finally, Uber contends that Plaintiffs from states that do not recognize strict products liability fail

10  to substantiate substitute state-law claims, but those claims are adequately supported by the same

11  facts alleged in support of claims under strict liability regimes.

12      **Respondeat Superior/Apparent Agency (§ III.A)**. Uber acknowledges that Oregon (like

13  California) allows employer liability even where an employee's act was not in the employer's

14  interest (such as in sexual tort cases). Uber argues that Oregon requires a type of "fiduciary

15  relationship" for liability to attach, but Oregon law has no such requirement.

16      **Common Carrier (§ III.B)**. Uber contends that common-carrier claims in North Carolina

17  must be dismissed for failure to allege torts within the scope of employment (Uber spills

18  considerable ink attacking respondeat superior claims in North Carolina, but Plaintiffs did not

19  plead those claims). Uber is wrong: North Carolina applies the same principles in common-carrier

20  cases that the Court identified in analyzing California and Illinois law. In a footnote, Uber

21  suggests that Georgia common-carrier claims are "inconsistent" with the parties' stipulation on

22  Georgia law (ECF 1932), but that stipulation expressly preserved such claims. In any event,

23  Georgia recognizes the same legal principles as California and Illinois do.

24      **Ratification (§ III.C)**. Uber asserts that Plaintiffs do not plead enough about Uber's

25  actions or inaction after learning of their assaults, but nothing in Rule 8 or the cases supporting

26  ratification liability requires more specificity (such information being in Uber's exclusive

27  possession regardless). Each Plaintiff alleges that Uber learned about their assaults, but let the

28  drivers keep driving for Uber (and some allege more). That is sufficient to raise questions of fact.

**Emotional Distress Cases (§§ IV, V)**. Uber argues that four cases do not allege physical impact or physical harm. But, as Uber knows, one of those Plaintiffs (Jane Roe CL 68), although she did not amend her complaint, asserts physical impact in her Plaintiff Fact Sheet. The other three were injured in states that either abandoned the impact rule (Massachusetts) or would not apply it in cases, like those here, involving breaches of common carrier duties (Georgia, Massachusetts) or drivers' intentional torts (Georgia, Massachusetts, Illinois).

*       *       *

With minor exceptions (C.L.'s apparent agency claims; Jane Roe CL 68's claims dismissed by PTO 17; and WHB 1876's strict products claims), Uber's motion to dismiss should be denied, or leave to amend granted to cure any deficiencies. *See* Pls. App'x A.2 (claim-by-claim disposition).

## LEGAL STANDARDS

**Rules 8, 9, and 12**. A complaint must plead only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When "evaluating a motion to dismiss, the Court must … draw all reasonable inferences in favor of the nonmoving party." *Lopez v. Zarbee's, Inc.*, 2023 WL 210878, at *2 (N.D. Cal. Jan. 17, 2023). Under Fed. R. Civ. P. 9(b), "allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charges so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). If the Court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).

***Erie* predictions**. The claims asserted in the Bellwether Complaints all arise under state law. In "determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011). Absent "controlling authority from the state supreme court, a federal court must

1    predict how the highest state court would decide the [state law] issue using intermediate appellate

2    court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as

3    guidance." *Camenzind v. Cal. Expo. & State Fair*, 84 F.4th 1102, 1114 (9th Cir. 2023).

4        **Choice of Law**. Where Uber's motion distinguishes between states' laws, Uber posits that

5    each Plaintiffs' claims are governed by the law of the state or states in which they were assaulted.

6    As a formal matter, this is not how California's choice-of-law analysis works.[1] Absent an extant

7    material conflict, there is no need to evaluate choice-of-law, for California law applies. *See, e.g.*,

8    *Axis Reinsurance Co. v. Telekenex, Inc.*, 913 F. Supp. 2d 793, 800 (N.D. Cal. 2012). But where

9    Uber makes state-specific arguments, Plaintiffs respond accordingly. Plaintiffs do not concede

10   that every element of every claim (damages, in particular) is governed by the incident-state's law.

11                                    **ARGUMENT**

12   I.    **Plaintiffs LCHB128, Dean, B.L., A.R.2, C.L., J.E., and A.G. adequately plead fraud.**

13       Plaintiffs plead two fraud claims, arising from omissions from (1) Uber's marketing of its

14   product to intoxicated people, especially women, and (2) Uber's statements about its drivers.[2]

15   Although Uber cites the Rule 9(b) standard, it does not challenge these claims for lack of

16   particularity, but rather only on the merits. And, although Uber supplies the Court with several

17   appendices purporting to state applicable legal principles in each relevant state, Uber does not

18   argue that those standards vary (with the exception of one duty to disclose, but Uber is wrong

19   there). Accordingly, although Plaintiffs below and in their responsive Appendices address each

20   state's law, Uber establishes no conflict, so the Court should resolve the fraud claims under

21   California law. *See, e.g.*, *Wash. Mut. Bank, FA v. Sup. Ct.*, 15 P.3d 1071, 1080 (Cal. 2001).

22       A.    **Plaintiffs Dean, B.L., and A.G. adequately plead "Designated Driver Fraud."**

23       Uber has long marketed its product as a safe choice for people, especially women, too

---

[1] Sixteen Plaintiffs indicate N.D. Cal. as their chosen venue, requiring application of California's choice-of-law rules. *See, e.g.*, *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 999 F.3d 534, 538 (8th Cir. 2021). The alternative venues picked by four Plaintiffs do not implicate any choice-of-law issues arising from this motion.

[2] Uber says that claims related to Uber's "Safe Rides Fees" are barred by the *McKnight* class settlement. Mot. at 14 n.25. Although the allegations in the Master Complaint concerning Uber's overall safety messaging, including its Safe Rides Fees, are relevant, the Court need not rely on those allegations to deny the motion, and so does not need to reach any *McKnight* issues. Regardless, as Plaintiffs previously explained, Uber's position is meritless. ECF 65 at 65-66.

intoxicated to drive. MC ¶¶ 232-38; *see, e.g.*, *id.* ¶ 234 ("A safe ride home is always just a tap

away."); *id.* ¶ 235 ("Need a late-night ride and can't drive yourself? Request a ride with Uber.").

Uber partners with alcohol companies to promote drinking, bars, and riding drunk with Uber. *Id.*

¶ 237; *see also* Anheuser-Busch, *Responsible Drinking: Decide to Ride*[3] (discussing a "coalition"

between "Anheuser-Busch, Mothers Against Drunk Driving (MADD), and Uber"); Uber, *Decide*

*to Ride*[4] ("Got me home safe when no one else would!"). Uber intends that passengers see and

rely on this marketing. In 2015, Uber touted that "93% of people would recommend Uber to a

friend if they have been drinking. Not only would people take Uber themselves—they would trust

Uber to take their drunk friend home safely." MC ¶ 233.

But Uber's marketing never disclosed that intoxicated people, especially women, and

especially late at night, are at significantly elevated risk of being sexually assaulted by Uber

drivers. *E.g.*, Dean Compl. ¶ 50. Uber also never disclosed that Uber lacked sufficient

information about its drivers to determine that they could be trusted to provide safe transportation

to a drunk woman passenger alone late at night. *E.g.*, *id.* ¶ 49. Each Plaintiff pleads that they saw

Uber's designated-driver advertising and would not have taken the rides at issue had they known

the concealed facts.[5]

### 1.    Uber's designated driver promotions are statements of fact susceptible to reliance, not generalized vague assertions or matters of opinion.

Uber contends that its designated-driver ads are "nothing more than general descriptive

statements as opposed to verifiable statements of fact." Mot. at 14 (citation omitted). But the

statements Plaintiffs identify were specific encouragements to intoxicated women to use Uber.

*See* Dean Compl. ¶ 46 ("Stay safe tonight. Use Uber"); B.L. Compl. ¶¶ 40-41 ("Don't drink and

drive. Call an Uber."); A.G. Compl. ¶ 30 (same). Uber contradicts itself, in one breath claiming

that "[t]he statements contain *no* quantifiable, potentially misleading factual claims," and in the

---

[3] https://www.anheuser-busch.com/community/decide-to-ride?uclick_id=9c381d0f-96c4-44d5-8cff-371e5808d024 (last visited Apr. 4, 2025).

[4] https://www.uber.com/us/en/u/reasons-to-ride/ (last visited Apr. 4, 2025). The Court should take judicial notice of these websites because they are discussed in the Master Complaint (and the Master Complaint could be easily amended, if necessary, to include this content). The Anheuser-Busch website is not cited in the Master Complaint, but the Uber website that is cited links to it.

[5] Dean Compl. ¶¶ 45-53; B.L. Compl. ¶¶ 38-49; A.G. Compl. ¶¶ 30-38.

next asserting that "[a] reasonable consumer would understand them to represent that requesting a ride via the Uber app is a way to avoid the safety risks associated with driving drunk, not as a representation about the measures Uber does or not does take to combat sexual misconduct by [] drivers." Mot. at 14 (emphasis added). So, Uber must acknowledge that the marketing *did* contain statements of fact; these are not "kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity." *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918) (Hand, J.). The disputes are whether those statements were rendered misleading by the omission of material facts, and whether Plaintiffs reasonably relied on the omissions.

Compare the statements found wanting in the cases Uber cites; each reflects the kind of "outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir.1990). In *Barrera v. Samsung Elecs., Am.*, 2018 WL 10759180 (C.D. Cal. Dec. 7, 2018), the court identified "broad, nonactionable phrases like 'durable,' 'reliable,' or 'high performance.'" *Id.* at *4. Similarly, in *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 556 (N.D. Cal. 2019), the court dismissed claims that statements describing "clear and remarkably vivid," "highest quality," or "most advanced, most brilliant" computer screens reflected measurable claims that the screens would not "smudge." *Id.* at 550, 556. And in *Tristan v. Bank of Am.*, 2023 WL 4417271 (C.D. Cal. June 28, 2023), the defendant marketed its product as "simple," "fast," and "safe" without elaboration. *Id.* at *4. None of these cases involved messaging conveying a specific factual message like the advertising here.

Indeed, courts permit fraud claims based on statements far less specific and directed, especially where, as here, "the defendant knows facts that makes the at-issue statement deceitful or makes the statement in a context that renders it deceitful." *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 890 (N.D. Cal. 2024), *appeal pending* (9th Cir. No. 24-7312); *see also, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1318 (S.D. Fla. 2020) (marketing of safety features can "cross the line from mere puffery to active misrepresentation" when the speaker has "actual knowledge of the alleged safety defect") (citation omitted). For example, a motion to dismiss was denied where a company

characterized its product's "negative impact on teens as … 'quite small,'" but "some of [its] own researchers … determined its average net impact on *all users* was negative." *Social Media*, 753 F. Supp. 3d at 891 (emphasis in original). Similarly, courts find the term "wholesome" actionable when a product "allegedly" includes "dangerous additives." *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1126 (N.D. Cal. 2010).

It also matters that these messages were targeted at people, like Plaintiffs, making decisions about whether to go out and consume alcohol and how to get home. Indeed, two of the three Plaintiffs alleging this claim received designated-driver messages in their individual email inboxes and social media feeds. *See* Dean Compl. ¶¶ 46-47; A.G. Compl. ¶ 31. (What Uber knew about Dean and A.G., their social habits, and Uber use patterns, and why Uber directed those messages to them, are, of course, questions of fact.) When "advertisements target a particularly sensitive audience … what is puffery must be measured by impact to the subgroup, and not to the public as a whole to whom it was not targeted." *CLM Props., Inc. v. SimmonsCooper LLC*, 2008 WL 11422124, at *3 (C.D. Cal. Jan. 8, 2008); *accord, e.g. Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348, 1360-61 (S.D. Fla. 2021), *aff'd in part on other issues*, 79 F. 4th 1299 (11th Cir. 2023) (denying summary judgment on claims arising from auto manufacturer's use of the terms "track-capable" and "track-ready," and noting that "Ford knew race-track enthusiasts were the [vehicles'] target audience").

## 2.   Whether Plaintiffs reasonably relied on Uber's omissions from its designated-driver advertising is a question of fact.

As Uber acknowledges, partial omissions that render a representation materially misleading support a duty to disclose under the laws of each of the relevant states. *See* Mot. at 16; Uber App'x D.5. And, "pleading reliance on an omission is not a particularly difficult burden." *In re Volkswagen "Clean Diesel" Mktg. Sales Prac. & Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 918 (N.D. Cal. 2018). Here, Plaintiffs plead that the partial representations were misleading because, had Uber disclosed to them the risks of women using Uber while drunk and its own failure to mitigate those risks, Plaintiffs would have made alternative choices.[6] That establishes reliance in

---

[6] Dean Compl. ¶¶ 52-53 ("would not have ordered the Uber"); B.L. Compl. ¶¶ 48-49 ("would

1    each of the relevant states. *See id.* (explaining that "[u]nder California law, a plaintiff may do so

2    simply by alleging that had the omitted information been disclosed, one would have been aware

3    of it and behaved differently," and finding "no authority suggesting that more is required to plead

4    an omission under the laws of the other states at issue," including Arizona and Oregon).

5        Uber argues that Plaintiffs' reliance was not justifiable or reasonable, because the

6    messages at issue must be understood as *only* a comparative claim between drunk driving and

7    Uber (as if that is the universe of options available to people) and "[n]o reasonable consumer

8    would interpret Uber's anti-drunk-driving advertisements to represent anything about the risks of

9    sexual assault." Mot. at 17. But that is not how Plaintiffs understood it. Nothing in their

10   complaints says they chose between using Uber and driving drunk; instead, they relied on Uber's

11   messaging and its failure to disclose the risk of sexual assault to choose to use Uber for a

12   particular purpose—getting a ride home late, alone, after drinking—as an alternative to *any* other

13   option. Which options in particular were available to them is a matter for discovery; at this stage,

14   Plaintiffs are entitled to inferences in their favor. Outside of "rare cases," *Dias v. Nationwide Life*

15   *Ins. Co.*, 700 F. Supp. 2d 1204, 1218 (E.D. Cal. 2010), "justifiable reliance is a fact-specific

16   question that is usually appropriate for jury resolution," *In re MyFord Touch Consumer Litig.*,

17   291 F. Supp. 3d 936, 978 (N.D. Cal. 2018). Every state at issue agrees.[7]

18       Uber, relying on cases applying California consumer protection laws, distorts the inquiry

19   into one that can and must be resolved on the pleadings by citing the incorrect legal standard.

20   Uber says that the Court must apply a "reasonable consumer test," under which Plaintiffs must

21   "plausibly allege 'members of the public are *likely* to be deceived,'" including "a probability 'that

22   a significant portion of the general consuming public or of targeted consumers, acting reasonably

23   in the circumstances, could be misled.'" Mot. at 13 (emphasis in original). But this test applies

24   where a plaintiff seeks to substitute an inference or presumption of reliance for a showing of

25   actual, individual reliance; typical in a statutory fraud cause, not normally germane to the

26   common law context. Courts do not apply this test to common law fraud claims, let alone dismiss

27

28   have found another way to get to her destination, such as asking her brother to pick her up"); A.G.
     Compl. ¶¶ 37-38 ("would not have asked her ex-husband to order the Uber for her").
     [7] Pls. App'x B.4.

1  such claims for failure to meet it.[8]

2      For good reason: "In determining reasonableness, the question is not whether the

3  hypothetical 'reasonable person' would have acted in reliance, but rather whether the plaintiff

4  was justified in believing the misrepresentation in light of his *own* knowledge and experience."

5  *Enovative Grp., Inc. v. Advanced Conserv. Tech. Distr., Inc.*, 2014 WL 13130386, at *3 (C.D.

6  Cal. No. 12, 2014) (emphasis added). Whether "reliance is reasonable in an intentional fraud case

7  is not tested against the 'standard of precaution or of minimum knowledge of a hypothetical,

8  reasonable man.'" *Boeken v. Philip Morris, Inc.*, 26 Cal. Rptr. 3d 638, 658 (Cal. App. 2005)

9  (quoting *Seeger v. Odell*, 115 P.2d 977, 980-81 (Cal. 1941)). Even "[e]xceptionally gullible or

10  ignorant people have been permitted to recover from defendants who took advantage of them in

11  circumstances where persons of normal intelligence would not have been misled. No rogue

12  should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." *Id.*

13  (quoting *Seeger*).[9] (This, of course, goes both ways—a particularly sophisticated or

14  knowledgeable plaintiff may be unable to prove justifiable reliance even on a misrepresentation

15  that was likely to deceive a reasonable person.)

16      The few common law cases cited in Uber's Appendix D.2 do not undermine the point.

17  Instead, they deny fraud claims where the evidence (not the pleadings) show that reliance was

18  *impossible* because the omitted information *was* disclosed. *See, e.g.*, *Caruthers v. Underhill*, 287

19  P.3d 807, 815 (Ariz. App. 2012); *see also* Pls. App'x B.1. This merely reflects the principle that a

20  person "may not put faith in representations … which are shown by facts within his observation

---

[8] Uber's Appendix D.3, which purports to support dismissal on this basis, is unhelpful. The four California cases, one of the Arizona cases, and the sole Oregon case all involved statutory claims, not common law claims. Pls. App'x B.2. The other Arizona case dismissed a negligent misrepresentation claim for lack of duty, not for any reason relevant here. *See Sw. Non-Profit Hous. Corp v. Nowak*, 322 P.3d 204, 208-10 (Ariz. App. 2014).

[9] *See also, e.g.*, *Dias*, 700 F. Supp. 2d at 1218 ("Although Melvin's belief about the stock market may be 'naïve,' that is simply one piece of evidence for the jury to consider in determining whether reliance on Pena's misrepresentation was 'justifiable.' It does not tip the scale to the point that the Court can rule that reliance was unreasonable as a matter of law."); *Peterson v. McCavic*, 277 P.3d 572, 581 (Or. 2012) ("[W]hether reliance is reasonable requires examination of the totality of the circumstances, including the sophistication of the party asserting fraud."); *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 817 (Ariz. 1987) ("To determine whether one party to a transaction was justified to rely on the other party's representations depends on the complaining party's own information and intelligence.").

1  to be so patently and obviously false that he must have closed his eyes to avoid discovery of the

2  truth." *Boeken*, 26 Cal. Rpt. 3d at 659 (quoting *Seeger*); *see also Dix v. Nova Benefit Plans, LLC*,

3  2015 WL 12859221, at *7 (C.D. Cal. Apr. 28, 2015) (finding reliance unjustifiable only because

4  of the presence of "unambiguous disclaimers").

5        To be sure, reliance has an objective component, in that a plaintiff must show "the matter

6  was material in the sense that a reasonable person would find it important in determining how he

7  or she would act." *Altaa Invests., LLC v. Production Cap., LLC*, 2023 WL 4155374, at *7 (C.D.

8  Cal. May 31, 2023) (citation omitted). But that is not the same as some hypothetical "reasonable

9  consumer" finding a statement misleading. And the materiality standard "generally" presents "a

10 question of fact unless the fact misrepresented is … obviously unimportant." *Watson v. Crumbl*

11 *LLC*, 736 F. Supp. 3d 827, 847 (E.D. Cal. 2024). Here, the significantly increased risk of sexual

12 assault attendant to intoxicated Uber rides, as well as Uber's lack of sufficient information to

13 vouch for its drivers in those circumstances, are plainly material facts.

14       In any event, even the statutory-fraud reasonable-consumer standard that Uber cites

15 "raises questions of fact that are appropriate for resolution on a motion to dismiss only in rare

16 situations." *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017) (internal quotation

17 mark omitted); *see also Tershakovec*, 546 F. Supp. 3d at 1360 (Even at summary judgment,

18 "[t]hat is a tall task."). It hardly strains imagination that a reasonable person could understand

19 Uber's messaging to vouch for the overall propriety of riding with Uber after drinking, as least as

20 related to factors within Uber's exclusive control, such as the selection of drivers. An apt analogy

21 may be the implied warranty of fitness for a particular purpose. Uber cultivated the market for

22 this specific use of its product; it should have disclosed the risks. The deception here is certainly

23 more plausible than the one approved of in *Rodriguez v. Mondelez Global LLC*, 703 F. Supp. 3d

24 1191 (S.D. Cal. 2023), a case featured in Uber's Appendix D.2. There, the court found actionable

25 the phrases "SIMPLE DARK CHOCOLATE" and "GET BACK TO HUMAN" for failing to

26 disclose the inclusion of "unsafe levels of toxic heavy metals." *Id.* at 1211-12.

27       Uber asks the Court to accept, as a matter of law, that all reasonable people were supposed

28 to receive and act on the message that Uber is less likely to result in a crash than driving

-10-

intoxicated, but also instinctively know and accept that riding with Uber after drinking is much more likely to result in sexual assault than any of the myriad other options available to them—staying home, drinking less, finding alternative transportation, etc. Safer is safer; not safer from one thing but less safe as to others.

Finally, Uber argues that it "owed no duty to disclose the widely recognized risks inherent in becoming intoxicated." Mot. at 17-18. But Plaintiffs do not seek disclosure of "widely recognized risks" from drinking, but instead the *specific* risks of riding "intoxicated" *with Uber*, risks that were in Uber's exclusive possession and that Uber's marketing deliberately sought to dissuade Plaintiffs from appreciating. Uber claims the withheld facts were "patent," but the complaints allege otherwise (*e.g.*, Dean Compl. ¶ 51), and, in any event, the Restatement comment Uber cites concerns a different duty to disclose altogether. *See* Restatement (Second) of Torts § 551, cmt. K (1977) (relating only to clause (e)).

**B.**    **Plaintiffs LCHB128, Dean, A.R.2, C.L., and J.E. adequately plead "Driver Fraud."**

Plaintiffs allege that Uber described and vouched for its drivers, but omitted reported prior misconduct, red flags, or failures in Uber's background checks. When a passenger books a ride, the App displays information about the driver, including his name, his photo, and his "star rating." MC ¶¶ 66, 27; *see also, e.g.*, LCHB128 Compl. ¶¶ 23-26. Sometimes, Uber communicates even more information, such as affirmations of the driver's character. *See* Dean Compl. ¶ 35 ("Uber communicated … that the driver was a dad and that he had previously worked at a domestic violence shelter for women."). But Uber does not disclose reports of prior driver misconduct or criminal histories.[10]

Uber intends that passengers see these messages and rely on them. The App makes it exceedingly difficult to order an Uber, identify the vehicle, and enter the car without seeing the messages about the driver. *E.g.*, C.L. Compl. ¶ 20. If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when

---

[10] *See, e.g.*, LCHB128 Compl. ¶ 17.a (Report: "Driver … would not let me out of the car."); *id.* ¶ 17.b (Report: "Driver asked me to do sexual favors."); Dean Compl. ¶ 23 (lewd comments); *id.* ¶ 26 (sexual assault; racial slurs); A.R.2 Compl. ¶¶ 17-24 (criminal record); *id.* ¶ 26 ("rapist"); C.L. Compl. ¶ 12.d (sexual harassment); J.E. Compl. ¶ 16 (propositioning).

1    the driver would arrive, or what car he drove. *Id.* ¶ 22. In fact, the App prompts passengers to

2    look at the App, especially at the driver information, by sending notifications when a driver is

3    assigned and when he is nearby. *Id.* ¶ 23. Uber also intends driver messages to cultivate a sense of

4    safety—this is why Uber includes star ratings. Uber itself says that star ratings "help keep riders

5    and drivers safe." MC ¶ 289; *see also id.* ("[G]et to know your driver before you step into their

6    car;"[11] Uber, *Understanding ratings* ("We aim to provide a safe and enjoyable environment for

7    everyone. Drivers and riders rate each other after a trip to maintain this standard.").[12] The

8    inclusion of a star rating communicates that Uber has conveyed all material facts about the

9    driver's qualifications to provide safe transportation. In at least some cases, Uber provides

10   additional character affirmation, too. *See* Dean Compl. ¶ 35. Including the star rating on top of

11   purely factual information contributes to the overall impression that Uber has provided what a

12   passenger needs to know to evaluate whether to get in that Uber with that driver, so that the

13   passenger can "get to know [her] driver before [she] step[s] into their car." MC ¶ 289.

14         **1.    Uber had a duty to disclose its drivers' previous reported misconduct
                    or criminal records.**

15

16         **a.    Uber had a duty to disclose based on materially incomplete
                   representations.**

17         Uber acknowledges a duty to disclose where necessary "to prevent [] partial or ambiguous

18   statement of the facts from being misleading." Mot. at 15 (quoting Restatement § 551(2)). Uber

19   argues, however, that "no reasonable consumer would be misled by the driver-identifying

20   information and star ratings Uber provided." *Id*. Uber is wrong as to both rule and application.

21         *First*, Uber gestures towards puffery, but the statements here are clearly not puffery. Uber

22   cites cases dismissing statutory claims where "[a]lleged omissions" arose in the context of

23   "generic sales talk" or "representations" that were "too general for Defendants to incur a duty to

24   disclose." *Ahern*, 411 F. Supp. 3d at 562 (citation omitted). Even assuming those standards apply

25

26   ───────────────
     [11] Uber, *Driving safety forwards* ("Get to know your driver before you step into their car. You can
27   see their rating, how many trips they've completed, how long they've been driving, compliments
     from previous riders, and more."), https://www.uber.com/ae/en/ride/safety/ (last visited Apr. 3,
     2025).

28   [12] https://help.uber.com/driving-and-delivering/article/understanding-ratings?nodeId=9e240708-
     a894-43d7-b19d-13061a4fbe5a (last visited Apr. 3, 2025).

in the same way to common law fraud claims, Uber's driver-statements are not "generic sales talk." Uber concedes that these statements convey specific, concrete messages. *See, e.g.*, Mot. at 17 (setting out Uber's view of what a star rating communicates). The company just disputes whether those messages were misleading due to omission of other facts.

*Second*, Uber repeats its contention that "[t]he reasonable consumer test remains the touchstone[.]" Mot. at 16. Again, Uber cites no common law fraud cases applying such a test, let alone dismissing a claim on the pleadings for failing to satisfy it. *See* § A.2, *supra*; Pls. App'x B.1 & B.2. In reality, as discussed above, "the issue is whether the person who claims reliance was justified in believing the representations in light of his own knowledge and experience," not that of some hypothetical consumer. *Roots Ready Made Garments v. Gap Inc.*, 2007 WL 3045999, at *3 (N.D. Cal. Oct. 18, 2007) (Breyer, J.) (citation omitted); *see also* Pls. App'x B.3. And "whether reliance is justified is generally a question of fact." *Roots Ready*, 2007 WL 3045999, at *3; *see also 1440 Sports Mgmt. Ltd. v. PGA Tour, Inc.*, 2023 WL 7280444, at *16 (N.D. Cal. Oct. 5, 2023) (citing "expert testimony" and the plaintiff's "experience" in finding a genuine dispute of material fact as to whether reliance was reasonable); Pls. App'x B.4.[13]

*Third*, even under Uber's "reasonable consumer" standard, the motion to dismiss should be denied. Uber says that no reasonable person would rely on a "star rating" because "[c]omposite star ratings are a ubiquitous feature of the online economy," and cannot possibly be understood to convey anything other than "an average of volunteered overall satisfaction ratings from other riders on a fixed scale." Mot. at 17 (citation wanting). This argument relies on facts outside of the complaints, depends on inferences in Uber's favor, and contradicts Uber's own public statements about star ratings.[14] *See* § I.A, *supra*. At this stage, it is a non-starter. The only authority Uber cites is *Terpin v. AT&T Mobility LLC*, 118 F. 4th 1102 (9th Cir. 2024), but in that case, the plaintiff alleged that AT&T concealed the risk of his phone being hacked, but pleaded his way out of court: "AT&T told him his account would be 'much *less likely* to be subject to

---

[13] As with the designated-driver claims, materiality (the objective component of reliance) is easily satisfied here: drivers' previously reported misconduct or crimes would be important information to a reasonable person.

[14] The comparison between Uber ratings and Amazon or Yelp reviews is specious; unlike those companies, Uber does not allow passengers to see individual reviews that go into the rating.

SIM swap'" and "separately disclosed that it 'cannot guarantee' its security measures will prevent a breach." *Id.* at 1111. Neither the complaints nor Uber's extra-record contentions demonstrate that Uber disclosed the information to which Plaintiffs say they were entitled.

### b.   Alternatively, Uber had a duty to disclose based on its exclusive knowledge of material facts.

Uber acknowledges a duty to disclose where one party has superior knowledge of material facts. Mot. at 18. This standard is not demanding: "superior" does not require "exclusive knowledge" so long as "the information was not reasonably discoverable by the plaintiffs," *Flier v. FCA US LLC*, 2022 WL 16823042, at *5 (N.D. Cal. Nov. 8, 2022) (Breyer, J.); and, as noted above, "a fact is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," *Persson v. Smart Inventions, Inc.*, 23 Cal. Rptr. 3d 335, 352 (Cal. App. 2005) (internal quotation marks omitted).

Uber intimates that other states, applying Restatement § 551, adopt a more stringent standard than California does. But California courts cite the Restatement section too. *See, e.g.*, *Hoffman v. 162 N. Wolfe LLC*, 175 Cal. Rptr. 3d 820, 828 n.11 (Cal. App. 2014). And Uber's Appendix D.6 itself states the generally applicable standard: "defendant … has superior or exclusive knowledge of objectively material facts not known to plaintiff." Uber App'x D.6.

Uber argues that Plaintiffs must make a showing akin to unconscionability: conduct "shocking to the ethical sense of the community, and … so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware." Mot. at 18 (quoting *Rindlisbacher v. Steinway & Sons, Inc.*, 2019 WL 4767009, at *2 (D. Ariz. Aug. 9, 2019)). This language, colorful as is, does not reflect the law of any state at issue. Instead, it comes from one district court quoting a 50-year-old Restatement comment, but omitting the cautionary caveat in that same comment:

> There are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transaction may be expanding and the duty to use reasonable care to disclose the facts may be increasing somewhat. This Subsection is not intended to impede that development.

Restatement § 551 cmt. l.

No other case in Arizona (or any of the other states at issue) recites this comment without

1    caveat;[15] and no case available on Westlaw cites to *Rindlisbacher* itself or its sparse reasoning.

2    Instead, Arizona, like other states, applies the familiar test of asking whether an omitted fact is

3    material and known to one party but not the other. *See Lombardo v. Albu*, 14 P.3d 288, 290 (Ariz.

4    2000) ("[W]here a seller knows of facts materially affecting the value of the property and knows

5    that the facts are not known to the buyer, the seller has a legal duty to disclose such facts.").

6         Next, Uber contends that Plaintiffs fail to allege that Uber knew any of them "accepted a

7    ride under the mistaken belief that her driver had no previous rider complaints." Mot. at 19. But

8    that is established by the alleged (really, undisputed) facts that passenger complaints were in

9    Uber's exclusive knowledge. By definition Plaintiffs did not know about the previous reports of

10   misconduct. Uber appears to be saying that it had a duty to disclose only if it *knew* Plaintiffs

11   *relied* on that lack of knowledge. But Uber cites no case from the relevant states imposing such a

12   requirement, because there is no such requirement.[16] The duty is triggered by the omission of

13   "material" facts, an objective standard, known to one party but not the other. *See, e.g.*, *Lombardo*,

14   14 P.3d at 290 ("knows that the facts are not known to the buyer"); *Van Duesen v. Snead*, 441

15   S.E.2d 207, 209 (Va. 1994) ("knows is unknown to the other party").

16        Under the correct legal standard, Plaintiffs adequately plead a duty to disclose. Passengers

17   had no way of knowing about reported misconduct or criminal histories, and those facts, such as

18   allegations of improper comments, sexual assault, and serious criminal history, are certainly "not

19   so obviously unimportant" to foreclose testing through discovery. *Watson*, 736 F. Supp. 3d at

20   847. Materiality here, as usual, is a "question of fact." *Id*.[17]

21        Uber challenges the specific facts of only one Plaintiff (A.R.2) whose driver pulled over

22

23   [15] *See U.S. Nat'l Bank of Or. v. Fought*, 630 P.2d 337, 345 n.14 (Or. 1981) (suggesting this
24   language must be understood against the authors' intent to convey lesser protection in cases
     implicating only pecuniary interests, and not "in matters respecting the plaintiff's interest in the
     security of his person").

25   [16] Uber derives its rule from language in the Restatement concerning "mistake of fact." But the
     Restatement confirms that a duty is avoided only where "the defendant has *no* reason to think that
26   the plaintiff is acting under a misapprehension," i.e., when the facts are not material. Restatement
     § 551, cmt. k. Uber also cites an unpublished Ninth Circuit case applying Nevada law, a case that
27   has never been cited by any other court.

     [17] Uber says "[i]t's important to note that a ride is requested and accepted by a rider prior to Uber
28   providing any information regarding a driver." Mot. at 19 n.33. But passengers can always cancel
     a ride or just refuse to enter the car with an evidently dangerous person.

and assaulted her. A.R.2 Compl. ¶¶ 8-13. She avoided a worse sexual assault only by escaping the vehicle on the side of a random road more than a mile from her destination. *Id.* ¶ 14. Her driver had a lengthy criminal record, including indictments for felony aggravated assault of a family member and invasive visual recording, and three domestic violence restraining orders. *Id.* ¶¶ 22-24. Once he started driving for Uber, a passenger reported to Uber, in Chinese, that she felt unsafe. *Id.* ¶ 26. When prompted, in Chinese, "Why did the vehicle feel unsafe?" she responded, in English: "rapist." *Id.* Uber messaged the passenger, in English, asking for more information, but did not otherwise try to contact her, talk to the driver, or review GPS data. *Id.* ¶ 27.

Uber contends that it had no duty to disclose this serious history and concerning report, but its arguments fail. Uber says that the Fair Credit Reporting Act prohibits it from disclosing to passengers the results of driver criminal background checks. Mot. at 19-20. Uber does not cite any FCRA provision imposing such a prohibition; there is none.[18] Indeed, Uber promotes its product as safe based on those very same background checks. It would be bizarre for a federal statute to give Uber immunity to falsely advertise while concealing the negative information it learns about drivers from its customers. MC ¶ 215.

Finally, Uber says that it did not need to disclose "a subjective and unverified report of discomfort" under risk of "defamation liability." Mot. at 20. But whether Uber should have disclosed a charge of "rapist" that it (at best) failed to investigate adequately should be assessed on a full factual record that shows everything Uber knew (or knew it did not know) and did (or did not do) about that incident. There is no defamation here: that a passenger accused the driver is a true fact, and the only reason the report was "unverified" was that Uber failed to investigate it (which it could have and should have disclosed as well).

## 2.    Plaintiffs relied on concealed driver information.

Uber argues that Plaintiffs cannot plead reliance because some of them, unsurprisingly, do not recall looking at the driver information for the specific ride in question.[19] This is incorrect.

---

[18] Uber cites only 15 U.S.C. § 1681(b)'s limitation on the "permissible purposes" for which a "consumer report" may be disclosed. Uber omits that those limitations, with exceptions not relevant here, apply only to "consumer reporting agenc[ies]," of which Uber is not. *Id.*

[19] This argument cannot apply to Dean, who saw messages vouching for her driver's character, Dean Compl. ¶ 35, or to J.E., who used the App to identify the vehicle, J.E. Compl. ¶ 19.

Pleading "reliance on an omission is not a particularly difficult burden," requiring only that "had the omitted information been disclosed, one would have been aware of it and behaved differently." *Volkswagen*, 349 F. Supp. 3d at 918 (internal quotation marks omitted) (permitting claims under many states' laws, including California, Arizona, Maryland, and Virginia). Plaintiffs plead in detail why they "would have been aware" had the driver information "been disclosed." Indeed, Uber makes it nearly impossible not to see this information. If a passenger ordered a ride, and then never again looked at the App, she would have no way of knowing when a driver was selected, when the driver would arrive, or what car he was driving. LCHB128 Compl. ¶ 25. Moreover, Uber prompts passengers to look at the App after they order the ride, specifically the driver information, by sending phone notifications when a driver is selected, when the driver is nearby, and when the driver has arrived. *Id.* ¶ 26. Based on this, the jury can find that each Plaintiff saw the driver information omitting the prior history.

If that weren't enough, four of these five Plaintiffs plead additional facts establishing their exposure to Uber's messaging. *See* LCHB128 Compl. ¶ 30 ("[W]hen ordering earlier Uber rides, at times Plaintiff declined a ride when a driver had a low star rating."); C.L. Compl. ¶ 24 (ride originated from the airport, where typically the large number of people waiting for rides make it difficult to assume any given vehicle is the one assigned without checking the App); J.E. Compl. ¶ 19 ("Plaintiff … used the Uber App to help her identify the correct vehicle when it arrived."); Dean Compl. ¶¶ 35, 37 (Plaintiff saw messages "that the driver was a dad and [] previously worked at a domestic violence shelter," and so necessarily saw the driver information as well).[20]

### 3.    Plaintiffs sufficiently plead intent to defraud.

Uber contends that Plaintiffs cannot plead reliance because they do not allege "intent to deceive." Mot. at 22. What is required is only "intent to defraud, i.e., to induce reliance." *1440 Sports Mgmt.*, 2023 WL 7280444, at *16; *see also Gagne v. Bertran*, 275 P.2d 16, 20 n.5 (Cal. 1954) ("intent to induce action"); Pls. App'x B.5. Intent to defraud "may be alleged generally,"

---

[20] Neither case Uber cites (at 21) supports its motion. In *Friedman v. Mercedes Benz USA LLC*, 2013 WL 12086788 (C.D. Cal. Apr. 9, 2013), the plaintiff "concede[d] that [he] never saw the MBUSA advertisement" and based a statutory fraud claim on someone else's reliance. *Id.* at *3. *Moncada v. Allstate Ins. Co.*, 471 F. Supp. 2d 987 (N.D. Cal. 2006), did not involve fraud claims.

Fed. R. Civ. P. 9(b), and "normally [is a] question[] of fact properly reserved for the jury." *Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at *17 (N.D. Cal. Apr. 23, 2020); *accord Public Emps. Ret. Sys. v. Moody's Invstrs. Serv., Inc.*, 172 Cal. Rptr. 3d 238, 258-59 (Cal. App. 2014) (stating "[i]ntent to induce reliance is usually a question of fact for the jury," and finding sufficient evidence that the defendants "intended through their ratings to influence [the plaintiff] to enter into … transactions") (citation omitted).

Because "there is usually no direct evidence of fraudulent intent," "[c]ourts routinely allow parties to rely on circumstantial evidence and legitimate inferences therefrom." *Rojas v. Cigna Health & Life Ins. Co.*, 2018 WL 4759775, at *9 (S.D.N.Y. Sept. 29, 2018). Even at the proof stage, plaintiffs may meet their burden through "evidence of the defendants' motive and opportunity to commit fraud or conscious misbehavior or recklessness." *Id.* (internal quotation marks omitted). In *Sloan*, for example, the court denied summary judgment based on evidence of motive and opportunity:

> GM may have been motivated to withhold information about the [defect] because of a desire to make a profit. Specifically, the company was aware that many GM customers rated "Reliability/Durability" as the most important factor in their decision about which vehicle to purchase. Thus, GM might have concluded that releasing information about engine defects would have reduced customers' perceptions about the reliability and durability of their vehicles and reduced sales.

2020 WL 1955643, at *17 (citation omitted).

Here, there are ample allegations to support an inference that Uber intended the package of driver information to "influence [plaintiffs] to enter into … transactions." *Public Emps. Ret. Sys.*, 172 Cal. Rptr. 3d at 258-59. Uber knows that "passengers are largely motivated by safety when choosing Uber's services." MC ¶ 13. This is why the company's tagline, communicated to every person who downloads the App is "ride with Uber." *Id.* ¶ 199. The package of driver information, including star ratings, is an important part of Uber's mission to induce a sense of safety precisely *because* Uber knows that *every* passenger *will* see it. Uber presents driver information with "star ratings" in order to engender that sense of safety and trust, and to cultivate the impression that Uber appropriately screens and vouches for its drivers. MC ¶ 289 ("[G]et to know your driver before you step into their car."); Uber, *Driving safety forwards* ("You can see

their rating, how many trips they've completed, how long they've been driving, compliments from previous riders, and more."); *Id.* ("help keep riders and drivers safe"); Uber, *Understanding ratings* ("We aim to provide a safe and enjoyable environment for everyone. Drivers and riders rate each other after a trip to maintain this standard."). The centrality of these assurance messages to Uber's business model easily supports an inference that Uber was motivated to conceal information incongruent with the trust structure the company sought to establish.[21] Uber's argument that it had good reasons to conceal this information, Mot. at 22-23, only raises questions to be explored through discovery.

## II.    Plaintiffs adequately plead strict products liability or state-law equivalents.

The Court previously dismissed Plaintiffs' products liability claims with leave to amend, and with two instructions. *First*, the Court explained that Plaintiffs must plead defects in Uber's product, not just inadequate provision of services, though the Court acknowledged the "distinction" was "sometimes fine." PTO 17 (ECF 1044) at 46. *Second*, the Court directed that Plaintiffs plead individualized causation, i.e., "how the absence of a given feature caused any particular assault." *Id.* at 48. Plaintiffs did exactly what the Court required: they plead five discrete defects, each of which reflects a failure with Uber's product, not merely a breach of its duties as a service provider, and each of which plausibly contributed to each Plaintiff's assault.[22]

---

[21] The cases Uber cites involved no allegations of fraudulent intent at all or are otherwise distinguishable. **No allegations**: *Williams v. J.P. Morgan Chase Bank, N.A.*, 704 F. Supp. 3d 1020, 1026 (N.D. Cal. 2023); *Shepherd v. Costco Wholesale Corp.*, 441 P.3d 989, 994 (Ariz. App. 2019); *Blessing v. Sandy Spring Bank*, 2021 WL 653161, at *6 (Md. App. Feb. 19, 2011). **Otherwise distinguishable**: *5504 Reuter L.L.C. v. Deutsche Bank Nat'l Trust Co.*, 2014 WL 7215197, at *5 (Mich. App. Dec. 18, 2014) (no duty to disclose because no alleged representations by the defendant at all); *Tassoudji v. Club Jenna, Inc.*, 2011 WL 2176237, at *4 (Ariz. App. May 24, 2011) (no "direct contact" between parties); *Hosmane v. Univ. of Maryland*, 2019 WL 4567575, at *7 (Md. App. Sept. 20, 2019) (no "connection between the unspecified risk of lawsuits" and any "intent to mislead"); *Lynchburg Commc'ns Sys. Inc. v. Ohio State Cellular Phone Co.*, 2003 WL 1247053, at *2 (Va. Cir. Ct. Jan. 22, 2003) (no intentional statements or omissions at all).

[22] Unlike Plaintiffs, Uber resists the Court's previous conclusions, including that "[a]t this stage, the Uber app would be considered a product under the Restatement" notwithstanding that Uber also provides services. *Id.* at 41-45. As before, Uber "cite[s] a handful of decisions (almost all unpublished cases from state trial courts)," *id.* at 41, for the proposition that "[m]any courts across the count[r]y have refused to apply product-liability to Uber's services as offered via the Uber App," Uber App'x D.7. Uber cites unpublished state trial court decisions from six states—only three of which bellwether claims arise from—based on scant (if any) analysis. Pls. App'x B.6. Other courts, including this one, have reached different conclusions.

1

2

A.       **"Safe Ride Matching" and "Gender Matching" are defects in Uber's product, not merely issues with its services.**

Uber concedes that "Ride Recording," "GPS Route Discrepancy Alerts," and "Age-Gating" are product defects. Uber argues that "Safe Ride Matching" and "Gender Matching" concern only "problems with Uber's services." Mot. at 24-25. These arguments fail.

3

4

5

6

1.       **The Uber App was defective due to Uber's failure to incorporate a "Safe Ride Matching" function into its algorithm.**

7

8

9

Nine Plaintiffs assert that Uber the App is defective because it did not incorporate a "Safe Ride Matching" function that automatically blocks certain rider-driver pairings based on certain predictive factors.[23]

10

11

12

13

14

15

16

Uber's sole challenge to these claims is that "Safe Ride Matching is "indistinguishable" from a defect the Court "already rejected." Mot. at 25. Not so. Uber compares some language from the Court's prior order (""failing … to detect known patter[ns] of sexual assault' was not a defect." *Id.* (quoting PTO 17 with omissions)) with a single sentence of Plaintiffs' amended complaints (Uber "had the capability to, and did, identify sets of factors that, when present, predict a substantially higher likelihood of sexual assault occurring during an Uber ride," *Id.* (quoting, *e.g.*, A.R.2 Compl. ¶ 43).

17

18

19

20

21

22

23

24

25

26

A comprehensive reading renders the distinction clear. Uber omits crucial language from the Court's order. The Court did not hold that failure "to detect known patter[ns] of sexual assault" necessarily reflected a service problem rather than a product defect; rather, it held that "failing to *appropriately monitor* rides to detect known patter[ns] of sexual assault" did not establish a product defect. PTO 17 at 46 (emphasis added). Monitoring is key. Having employees monitor rides in real time, including with GPS, goes to Plaintiffs' negligence claims, but not to the functioning of Uber's App. Plaintiffs' "Safe Ride Matching" defect, on the other hand, has nothing to do with monitoring rides. Instead, the "Safe Ride Matching" defect concerns a function that operates before rides occur in the first place to block high-risk rider-driver pairings automatically; no monitoring involved.

27

28

[23] A.R.1 Compl. ¶¶ 32-39; A.R.2. Compl. ¶¶ 43-50; B.L. Compl. ¶¶ 50-57; Jane Doe QLF0001 Compl. ¶¶ 26-31; Dean Compl. ¶¶ 54-61; LCHB128 Compl. ¶¶ 31-38; T.L. Compl. ¶¶ 30-37; WHB 1876 Compl. ¶ 19; WHB 1898 Compl. ¶¶ 32-37.

Uber ignores allegations explaining why this defect reflects a functional App failure, not service provision. The App uses an algorithm to match riders and drivers for trips based on proximity. MC ¶¶ 454, 461, 488. Uber should have modified its matching algorithm with a "Safe Ride Matching" function that ingests the data on riders, drivers, and trips (data the App already collects) into a predictive model to assess the risk of sexual assault. *E.g.*, A.R.2. Compl. ¶¶ 44-46. Where the algorithm identifies such a risk, pairings should be automatically blocked. *Id.* Indeed, at some point, Uber *did* install some variation of a function to ingest data and adjust pairings based on predictive risk modeling (as pleaded in the complaints reflecting later-in-time incidents), but that function was inadequately designed to block Plaintiffs' pairings.[24]

This function, or lack thereof, fits comfortably within the Court's framework for identifying product defects in the App. The defect concerns the backend "functionality of the app," including automatic data collection, predictive modeling, and blocking features. The defect also targets a "functional[y]" that can be "analogized … to tangible products." PTO 17 at 43, 46. In particular, "Safe Ride Matching" is akin to an automatic shutoff valve in an industrial setting, which stops systems from running if certain safety parameters (such as heat) are above a certain level. *See In re Social Media Adolescent Addiction Pers. Inj./Prod. Liability Litig.*, 702 F. Supp. 3d 809, 850 (N.D. Cal. 2023) ("failure to implement default protective limits" is "analog[ous] to … physical timers and alarms"). The "real-world" shutoffs "are undeniably products, so their app-based analogues are too." PTO 17 at 32; *see also A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 820-21 (D. Or. 2022) (defects in matching algorithm supported products liability claim).[25]

### 2.   The Uber App was defective due to Uber's failure to incorporate a "Gender Match" feature.

Uber argues that the "Gender Matching" defect alleged by fifteen Plaintiffs "challenges Uber's provision of services, not a defect in the app." Mot. at 25. To start, Uber ignores that this defect concerns the lack of an "option" in the app "to allow female passengers … to be matched

---

[24] A.R.1 Compl. ¶¶ 34-35; B.L. Compl. ¶¶ 52-53; Dean Compl. ¶¶ 56-57; LCHB128 Compl. ¶¶ 33-34.
[25] Although *Omegle* was a Section 230 case, the court in *Social Media* found its reasoning "instructive" in concluding that "products claims focused on the design of digital platforms … may be cognizable." 702 F. Supp. 3d at 847.

PLS.' OPP'N TO DEFS.' MOT. TO DISMISS
CASE NO. 3:23-MD-03084

only with female drivers." *E.g.*, B.L. Compl. ¶ 58. Lack of an *in-App option* by definition concerns a "functionality of the app[.]" PTO 17 at 46. Indeed, PTO 17 expressly anticipated this claim: "For example, if a plaintiff was assaulted by someone of the same gender—or would not have selected a driver of the same gender even if able to do so—then Uber's failure to design that feature into the app did not cause their injury." *Id.* at 47-48.

Even accepting Uber's myopic focus on the defect's connection to Uber's algorithm, "Gender Matching" still sufficiently concerns a product defect, not a service problem. The claim is based on a fully automated matching and blocking infrastructure, not the "service" of "[r]ecommending a transaction between two third parties." Mot. at 25. First of all, Uber does not "recommend" matches; it makes them. But whether matches are recommended or made, that service can be accompanied by a product that passengers use to ride with drivers. This is exactly how a hybrid product-service provider operates. *See* PTO 17 at 45 (holding Uber not only "provides a service, but it also provides a product"). In this case, the service Uber provides is rides, but the means through which it provides them (the App) is defective, including because the algorithm that automatically pairs riders with drivers for trips cannot be modified to block matches between female and male drivers to reduce the risk of sexual assault and the App lacks a tool for passengers to select that option.

Uber relies on *Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994 (C.D. Cal. 2022), but that case reasoned that platforms could *never* be products because they are "more akin to a service than a product." *Id.* at 1011. This Court held to the contrary in PTO 17, even though Uber relied on *Jackson* there too. *See* ECF 384 at 24 n.18 (citing *Jackson*); *see also Social Media*, 702 F. Supp. 3d at 843 n.36 (criticizing *Jackson* as lacking any "meaningful analysis"). *Jackson* also did not discuss matching algorithms of any kind, and had no occasion to: the case involved a website where customers searched for and selected rental listings on their own. 639 F. Supp. 3d at 1011.[26]

---

[26] Uber cites two cases finding social media platforms not to be products. *Social Media Cases*, 2023 WL 6847378, at *16 (Cal. Super. Ct. Oct. 13, 2023); *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *4 (Cal. Super. Mar. 10, 2023). This Court already rejected that argument. *See also Social Media*, 702 F. Supp. 3d at 839 n. 28 (noting *Jacobs* lacked "meaningful analysis"). Uber also cites *Social Media* with a "cf." for the proposition that 47 U.S.C. § 230 "immunizes

1

**B.**    **Plaintiffs A.G., K.E., A.R.2, and Dean adequately allege that the "App-Based Ride Recording" defect contributed to their injuries.**

2

3

Uber argues that these four plaintiffs cannot show that lack of App-Based Ride Recording

4

was a substantial factor in causing their injuries because the drivers in those cases ended the ride

5

on the App before committing the assault. As an initial matter, it's not clear that even happened

6

with K.E.: her driver indicated he would "take her home for free," but the complaint does not

7

specify he ended the ride on the App, and the Court should not grant Uber the inference. K.E.

8

Compl. ¶ 12. Regardless, all four Plaintiffs allege that the App was defective because it "was not

9

designed to trigger automatic video recording of rides *and the time period immediately around*

10

*them*."[27] That is, a properly designed "App-Based Ride-Recording" function would have captured

11

(and so deterred) the driver's conduct both before, during, and after the trips, regardless of

12

whether the assaults took place after the driver ended the trip on the App. *E.g.*, Dean Compl.

13

¶¶ 69, 75; *see also* MC ¶¶ 92, 96, 487-88 (allegations that the App is always collecting data,

including driver and passenger data, even when trips are not in progress).

14

**C.**    **Plaintiffs adequately plead products claims in Michigan, Massachusetts, North Carolina, and Virginia.**

15

16

Several states do not recognize strict products liability claims as a formal matter, but

17

permit functionally equivalent substitute claims. *See Back v. Wickes Corp.*, 378 N.E.2d 964, 968-

18

69 (Mass. 1978) ("[T]he legislature has transformed warranty liability into a remedy intended to

19

be fully comprehensive as the strict liability theory of recovery that has been adopted by a great

20

many other jurisdictions."); *Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 445 (D. Mass. 2020)

21

(facts that support breach of warranty claim also suffice for negligent design claim); *Fleck v.*

22

*Titan Tire Corp.*, 177 F. Supp. 2d 605, 619 (E.D. Mich. 2001) ("Although Michigan courts tend

23

to avoid the terminology, implied warranty imposes 'strict' liability on the manufacturer and

24

vendors of a product. In fact, Michigan's implied warranty cause of action is more generous to

25

plaintiffs than the strict liability standard stated in Section 402A of the Restatement (Second) of

26

Torts, as it only requires that the product be unfit for its ordinary purpose, not that it in fact be

27

---

user-matching and algorithmic content promotion." Mot. at 26 n.42. This case does not involve any third-party content within the ambit of § 230.

28

[27] K.E. Compl. ¶ 25; A.G. Compl. ¶ 39; A.R.2 Compl. ¶ 57; Dean Compl. ¶ 68 (emphases added).

'unreasonably dangerous.'") (citations omitted); *id.* at 613 (noting that "when used to attack design and warning defects," warranty and negligent-design "theories may effectively require the same elements and proofs"); *Carlton v. Goodyear Tire & Rubber Co.*, 413 F. Supp. 2d 583, 588-90 (M.D.N.C. 2005) (discussing elements of negligence and warranty claims under North Carolina law); *Evans v. Nacco Materials Handling Grp., Inc.*, 810 S.E.2d 462, 469 (Va. 2018) (same, under Virginia law). Although pleading "precise legal theor[ies]" is not typically required, *Skinner v. Switzer*, 562 U.S. 521, 530 (2011), Plaintiffs whose claims may arise under the laws of these states identified the applicable claims in their amended complaints.[28]

Uber argues that there are "no supporting facts" for these claims. Respectfully, this argument is frivolous. Each Plaintiff incorporated by reference the Master Complaint, including the negligence allegations under Claim B and the products liability allegations under Claim H. Uber does not argue that these allegations fail to establish the elements of any claim under any of these states' laws. Instead, Uber says that the Master Complaint lacks "individual allegations that make the causation allegations plausible." Mot. at 28. But those "individual allegations" are pleaded in the amended complaints, in the sections helpfully titled "ADDITIONAL ALLEGATIONS IN SUPPORT OF PRODUCTS LIABILITY CLAIMS" and sub-sections titled "Product Defects." Uber makes no argument for why these state-specific claims have more demanding defect or causation standards, or why those standards are not met.

**III.    Plaintiffs sufficiently assert vicarious liability theories.**

Several Plaintiffs plead that Uber is vicariously liable for its drivers' negligence or intentional torts under theories of common carrier non-delegable duties (B.L., A.R.2, T.L., WHB 407, WHB 1898, C.L., WHB 318 and WHB 823), respondeat superior and apparent agency (LCHB128, Dean, B.L. C.L.,[29] A.G.), or ratification (A.R.2, WHB 1898, C.L.).

Before diving into the disputes, a note on the common-carrier claims, about which Uber feigns confusion. In a footnote discussing Georgia law, Uber suggests that common-carrier claims do not support vicarious liability (although it concedes the parties stipulated those Georgia claims

---

[28] C.L. Compl. ¶¶ 38-51; J.E. Compl. ¶¶ 32-45; WHB 318 Compl. ¶¶ 25-38; WHB 823 Compl. ¶¶ 18-25.

[29] Plaintiff C.L.'s apparent agency claims were pleaded in error and should be dismissed.

could proceed). Mot. at 29 n.49.[30] Then, in another footnote, Uber says that the North Carolina

Plaintiffs did not plead vicarious liability under a common-carrier theory because, in the Master

Complaint, common-carrier is "Claim E" and "vicarious liability" is "Claim G." Mot. at 30 n.51.

But as Plaintiffs explained in opposing the motion to dismiss the Master Complaint, Plaintiffs'

common-carrier claims advance *both* direct (heightened duty) and vicarious (non-delegable duty)

liability. *See* PTO 17 at 11. The Court agreed under California and Illinois law; the same is true

under Georgia law (as the parties stipulated) and North Carolina law (briefed below).

## A. Plaintiff A.G. adequately alleges respondeat superior and apparent agency liability under Oregon law.

Uber moves to dismiss Plaintiff A.G.'s respondeat superior and apparent agency claims

under Oregon law on the basis that its driver acted outside the scope of employment.[31] The Court

previously held that sexual assault could be within the scope of employment under California law

because (1) "California does not follow the traditional common law rule that intentional torts can

only be considered 'within the scope of employment' where the employee acts to serve the

employer's interests" and (2) "California has expressly declined to … declare [sexual] torts *per se*

outside the scope of employment." PTO 17 at 15-16. Both principles apply in Oregon too.

Oregon typically applies the traditional three-part test, requiring that: "(1) the conduct

must have occurred substantially within the time and space limits authorized by the employment;

(2) the employee must have been motivated, at least partially, by a purpose to serve the employer;

and (3) the act must have been of a kind that the employee was hired to perform." *Fearing v.

Bucher*, 977 P.2d 1162, 1166 (Or. 1999) (citation omitted). But Oregon applies a different "test

specifically applicable to intentional torts." *Doe v. Holy See*, 557 F.3d 1066, 1082 (9th Cir. 2009).

---

[30] Uber says that T.L. and WHB 407's Georgia common-carrier claims "appear to be at odds" with the parties' earlier stipulation on Georgia law. Mot. at 29 n.49. But that stipulation sasy clearly that Georgia common carrier claims should not be dismissed. ECF 1932. Appropriately so. *See, e.g.*, *Se. Greyhound Corp. v. Graham*, 26 S.E.2d 371, 373 (Ga. 1943). Uber derides Plaintiffs' claims as not "traditional" vicarious liability, but the Court has explained that common carrier liability as Plaintiffs allege it reflects "traditional common law principles." PTO 17 at 32.

[31] Uber asserts without citation that its Oregon drivers are not employees. That is incorrect. *See* Advisory Opinion of the Commissioner of the Bureau of Labor and Industries of the State of Oregon, Bureau of Labor and Statistics, Oct. 14, 2015, *available at* https://media.oregonlive.com/commuting/other/101415%20Advisory%20Opinion%20on%20the%20Employment%20Status%20of%20Uber%20Drivers.pdf.

1   Under that test, "an intentional tort is within the scope of employment, and can support

2   respondeat superior liability … if conduct that was within the scope of employment was 'a

3   necessary precursor to the' intentional tort and the intentional tort was 'a direct outgrowth of …

4   conduct that was within the scope of … employment." *Id.* at 1083 (quoting *Fearing*, 977 P.2d at

5   1163); *see also Minnis v. Oregon Mut. Ins. Co*., 48 P.3d 137, 145 (Or. 2002) ("the focus properly

6   is directed at whether … conduct the employee was hired to perform … arguably *resulted in* the

7   acts that caused plaintiff's injury") (citation and alteration omitted).

8          Applying this test, Oregon courts, like California ones, conclude that sexual assault can be

9   within the scope of employment. *See Lourim v. Swenson*, 977 P.2d 1157, 1160 (Or. 1999) (sexual

10  assault within boy scout volunteer's scope of employment where "performance of his duties as

11  troop leader … was a necessary precursor to the sexual abuse[, ] the assaults were a direct

12  outgrowth of and were engendered by conduct that was within the scope of Swensen's

13  employment[, and] Swensen's contact with plaintiff was the direct result of the relationship

14  sponsored and encouraged by the Boy Scouts"); *Fearing*, 977 P.2d at 1168 (similar, sexual abuse

15  by priest); *Doe*, 557 F.3d at 1083 (similar). Just so here: the driver's job responsibilities included

16  ensuring the safety of and exercising authority over an intoxicated woman by transporting her in a

17  confined space. MC ¶ 424. Those acts culminated in her rape. A.G. Compl. ¶¶ 11-17.

18         Uber argues that Oregon requires, in addition to the above, that the "assailant must bear a

19  'position of authority' or 'fiduciary position' toward plaintiff." Mot. at 32. The Oregon Court of

20  Appeals disagrees:

21         In defendant's view, *Chesterman* and *Fearing* have drawn a narrow exception
           around a general rule that sexual assaults are not within the scope of employment
22         and that, in order to give rise to a triable question of fact as to vicarious liability,
           the record must contain evidence of a pattern of grooming over a lengthy period
23         of time or that the defendant used or manipulated a position of trust to ingratiate
           himself with the plaintiff or to create an opportunity for sexual abuse. We reject
24         that contention. Although the court held in *Fearing* that such facts would be
           *sufficient* to establish the connection between the employment and the abuse, we
25         do not think that the case stands for the rule that an employment connection is
           established *only* by such conduct. The necessary employment connection is
26         established by evidence that acts within the defendant's employment resulted in
           the acts that caused the plaintiff's injury.
27

28

-26-

1    *Schmidt v. Archdiocese of Portland in Oregon*, 234 P.3d 990, 993 (Or. App. 2010) (citations

2    omitted; emphasis in original).

3       None of Uber's cited cases supports a different rule. In *M.N.O. v. Magana*, 2006 WL

4    559214 (D. Or. Mar. 6, 2006), the court explained that liability could apply where "tortfeasors …

5    actively *used* their positions to make the misconduct possible," with no reference to "trust

6    relationships." *Id*. at *17. And in *Branford v. Wash. Cnty.*, 2019 WL 1957951 (D. Or. May 2,

7    2019), a patrol sergeant entered a co-worker's home (not a suspect's or a regular citizen's) home

8    and assaulted her. *Id.* at *3, *22. Nothing about the job of a patrol sergeant required traveling to a

9    coworker's home.[32] Regardless, A.G.'s driver *was* in a "position of authority." Due to his

10    employment, he had the exclusive power to direct the vehicle in which A.G. was confined, and he

11    abused that power in driving past her destination, entering the back seat, and assaulting her. A.G.

12    Compl. ¶¶ 11-17. This is not a case where the employment merely "brought the tortfeasor and

13    victim together in time and place;" rather, the assault was "engendered by conduct that was

14    within the scope of [the driver's employment]." *Fearing*, 977 P.2d at 1168.

15       **B.**     **Plaintiffs WHB 318 and WHB 823 adequately allege breaches of a common**
16               **carrier's non-delegable duty under North Carolina law.**

17       Although WHB 318 and WHB 823 do not allege respondeat superior claims, Uber moves

18    to dismiss their common-carrier vicarious liability claims under North Carolina law "for lack of

19    alleged action within the scope of any employment relationship." Mot. at 30 n.51. But the only

20    North Carolina case cited—*Longworth v. United States*, 2022 WL 4587520 (E.D.N.C. Sept. 29,

21    2022)—did not involve common carriers or any non-delegable duties; it was a straightforward

22    respondeat superior case. In North Carolina, as in other states, a common carrier's duty is non-

23    delegable, meaning that liability for breach cannot be avoided by delegating the task to an

24    employee, an independent contractor, or anyone else.

25       In addressing Plaintiffs' claims under California law, the Court explained "that Uber's

26    status as a common carrier gives rise to an independent basis for vicarious liability." PTO 17 at

27    32: The Court said:

---

28    [32] *Branford* also did not recite the legal standard as set out by *Fearing*, *Minnis*, and *Doe*.

1
2
3
4
5
6

> Under traditional common law principles, common carriers have duties to safely transport passengers. The Supreme Court of California has described common carriers' duties as nondelegable. Instead, the carrier's duty is only satisfied if its agent *actually does* exercise the requisite level of care. .... It is axiomatic that, where a duty is nondelegable, one cannot avoid liability by claiming that discharge of the duty was somebody else's responsibility. .... So here, Uber, as a common carrier, must use the utmost care and diligence for passengers' safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill. If instead of exercising the utmost care and diligence for passengers' safe carriage, a driver assaults the passenger, then Uber's non-delegable duty has been breached.

7    *Id.* (citations, quotation marks, and alterations omitted). This means that "[t]he liability of a

8    common carrier for an assault by one of its employees on a passenger is not dependent on the

9    question as to whether the employee was acting within the scope of his authority or in the line of

10    his duty, but is based upon its broad duty as a common carrier to protect its passengers from

11    assault." PTO 17 at 33 (quoting *Berger v. S. Pac. Co.*, 300 P.2d 170, 173 (Cal. App. 1956)); *see*

12    *also id.* at 35 ("[T]hat is just a reflection of the fact that common carriers have non-delegable

13    duties, while most other employers do not."). The Court later determined the same under Illinois

14    law: "This duty extends to 'the intentional acts of its employees, even if those acts are committed

15    outside the scope of employment.'" PTO 18 (ECF 1719) at 6 (quoting *Dennis v. Pace Suburban*

16    *Bus. Serv.*, 196 N.E.3d 85, 92 (Ill. App. 2014)); *see generally Morton v. De Oliveira*, 984 F.2d

17    289, 291-92 (9th Cir. 1993) (noting that "the rule regarding absolute liability for crew members'

18    assaults cannot be traced to obsolete concepts" but instead "is a widely adopted rule").

19    　　Like California and Illinois (and the majority of states), North Carolina assigns common

20    carriers like Uber a non-delegable duty to transport passengers safely, a duty that gives rise to

21    vicarious liability whether or not the breach was done by an employee at all, let alone by one

22    within the scope of employment. *See Mann v. Va. Dare Transp. Co.*, 198 S.E.2d 558, 569 (N.C.

23    1973) ("Transportation Company, a common carrier, could not delegate to Coach Company [an

24    independent contractor] its duty to use the highest degree of care to provide safe buses for its

25    passengers. Under these circumstances, therefore, if Transportation Company was operating a bus

26    with pre-existing defect in the steering mechanism which Coach Company should have

27    discovered, the negligence of Coach Company was primary and that of Transportation Company

28    was secondary."); *see also Hendricks v. Leslie Fay, Inc.*, 159 S.E.2d 362, 365-68 (N.C. 1968) (in

case cited by *Mann*, explaining that breach of a non-delegable duty based on conduct of a "contractor" creates "vicarious liability").

The North Carolina Supreme Court makes this clear: "Since the carrier owes a high duty to a passenger to protect him from assault from any source, a malicious or wanton assault committed on a passenger by an employee while on duty, whether within the line of his employment or not, constitutes a breach of duty directly imposing liability." *Hairston v. Atl. Greyhound Corp.*, 18 S.E.2d 166, 170 (N.C. 1942); *accord, e.g.*, *Williams v. Gill*, 29 S.E. 879, 879 (N.C. 1898) ("Indeed, where the relation of carrier and passenger exists, the conduct of an employé of the carrier in inflicting violence on the passenger, though the act be outside of the scope of his authority, or even willful and malicious, subjects the carrier to liability in damages just as fully as if the carrier had encouraged the commission of the act."); *White v. Norfolk & S.R. Co.*, 20 S.E. 191, 192-93 (N.C. 1894) ("Whether this wrongful act was done by the engineer while acting within the scope of his employment is of no moment. The doctrine of respondeat superior is not involved.").

**C.    Plaintiffs A.R.2, C.L., and WHB 1898 adequately allege ratification.**

Plaintiffs allege that Uber, despite learning that Plaintiffs had been assaulted, permitted the drivers to remain on the company's platform. A.R.2 Compl. ¶ 42 (did not deactivate driver even after plaintiff filed a lawsuit); C.L. Compl. ¶¶ 29-33 (after assault reported, Uber waitlisted driver for one day, then reactivated, only deactivating permanently after C.L. filed lawsuit); WHB 1898 ¶ 26 (after assault reported, Uber did not deactivate driver until lawsuit filed).

The "theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery." *C.R. v. Tenet Healthcare Corp.*, 87 Cal. Rptr. 3d 424, 437 (Cal. App. 2009) (citation omitted). The "failure to discharge an employee who has committed misconduct may be evidence of ratification." *Baptist v. Robinson*, 49 Cal. Rptr. 3d 153, 169 (Cal. App. 2006); *see also, e.g.*, *C.R.*, 87 Cal. Rptr. 3d at 437 ("[R]atification may occur when an employer learns of misconduct and fails to discharge an agent or employee."); *City of Los Angeles v. Sup. Ct.*, 109 Cal. Rptr. 365, 367 (Cal. App. 1973) ("[A]n employer … may … incur liability for willfully continuing to

employ an individual of known violent propensities.").[33] Generally, "ratification is a question of fact." *Samantha B. v. Aurora Vista Del Mar, LLC*, 292 Cal. Rptr. 3d 324, 342 (Cal. App. 2022).[34]

Uber relies on *Garcia ex rel. Martin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187 (E.D. Cal. 2009), but that case illustrates why the allegations here are sufficient. In *Garcia*, the court stated the legal standard outlined above: "ratification may be inferred from the fact that the employer, after being informed of the employee's actions, does not fully investigate and fails to repudiate the employee's conduct by redressing the harm done and repudiating or discharging the employee." *Id.* at 1202 (citation omitted). The court then dismissed the ratification claims only because the defendant "removed the [tortfeasor] from the classroom after [the plaintiff] complained …. In other words, [the defendant] changed the status quo." *Id. Garcia* stands only for the principle that where an employer takes action to "effectuate change and punish" the offender, it does not necessarily need to "terminate an employee in order to avoid ratification." *Id.* at 1203. Here, the pleadings show that Uber learned about the assaults but permitted the drivers to keep driving for Uber anyway. What other actions Uber may have taken to effectuate change or to punish the drivers are matters for discovery.[35]

Indeed an employer can be liable for ratification even where it *does* terminate the employee but drags its feet first. For example, in *Samantha B.*, the court found a triable question of fact where the employer did eventually "terminat[e]" the employee, "[b]ut a jury could reasonably determine that [the employer] should have acted to investigate sooner, when it first

---

[33] An employment relationship is not a prerequisite to finding ratification. *See, e.g.*, *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 607, 610 (C.D. Cal. 2021).

[34] *See also Pinshaw v. Metro. Dist. Com'n*, 604 N.E.2d 1321, 1324 (Mass. App. 1992) ("Among other factors which may be considered evidence of ratification on the part of a superior [is] a failure to investigate and discipline an employee… and failure to disavow an employee's unauthorized action and to mitigate the harm caused once the facts are ascertained.") (citation omitted); *Doe #1 v. Bd. of Educ. of Somerset Cnty.*, 2023 WL 375189, at *5 (D. Md. Jan. 24, 2023) (failure to investigate and discharge teacher after allegations of sexual abuse sufficient).

[35] Uber also cites *A.H. v. Church of God in Christ, Inc.* 831 S.E.2d 460, 478 n.20 (Va. 2019) for the proposition that mere "failure to discharge" is not enough for ratification. But in the case *A.H.* cited for that point, "the evidence as to the plaintiff's conduct and also as to that of the [employee] [was] conflicting" and so the employer could not be faulted for failure to discharge. *S. Ry. Co. v. Grubbs*, 80 S.E. 749, 750 (Va. 1914). Here, if Uber maintains it had good reason to retain the drivers, it may develop that "evidence" in discovery. (In *A.H.* itself, the plaintiff alleged only that the defendant "should have done something" in advance "to protect her," not that the defendant, with full knowledge, failed to act after the fact. 831 S.E.2d at 478.) In any event, if Virginia law is more restrictive, Plaintiff C.L.'s claims arise under Maryland law as well.

1    learned of [the employee's] reputation." 292 Cal. Rptr. 3d at 342. An "employer is not relieved of

2    liability for ratification simply because it eventually terminates the employee." *Id.*

3          Uber's arguments as to each Plaintiff fail to support dismissal. A.R.2's allegation that

4    Uber did not deactivate the driver after a lawsuit was filed plausibly supports an inference that

5    Uber learned of the assault but took no action. Especially because A.R.2's allegations of assault

6    were particularly credible given her driver's extensive criminal record and previous report of

7    "rapist." A.R.2 Compl. ¶¶ 15-27. Uber criticizes WHB 1898 for not "specify[ing] what she

8    reported to Uber," Mot. at 35, but Rule 8 does not demand any more, especially because Uber's

9    internal communications about each incident are in Uber's exclusive possession. Finally, with

10   respect to C.L., Uber's "investigation" of reported misconduct (concerning a driver who was the

11   subject of at least *five* previous complaints) apparently lasted a single day. C.L. Compl. ¶¶ 12, 30.

12   **IV.**      **Plaintiffs WHB 1876, WHB 1898, WHB 407 adequately allege tort claims.**

13       **A.**      **Plaintiffs WHB 1876, WHB 1898, and WHB 407 may maintain negligence or**
     **vicarious liability claims for emotional distress.**

14

15         Uber moves to dismiss the negligence claims of three Plaintiffs whose drivers made

16   aggressive sexual solicitations, but did not touch them. This is category error: these are

17   intentional tort cases. Uber's drivers aggressively sexually propositioned these women while

18   holding them hostage in a confined vehicle. One Plaintiff asked to be let out of the car, but the

19   driver refused and kept driving. WHB Compl. ¶¶ 12-14. Another was driven "on a long and dark

20   road" while the driver told her "if they were partners, he would never leave her alone" and then

21   "intimidated her by waiting outside her house" after he finally permitted her to exit the vehicle.

22   WHB 1898 Compl. ¶¶ 14-20. The third, WHB 1876, was subject to the driver's gross sexual

23   fantasizing involving her and other passengers, rendering her unnerved and disconcerted to the

24   point she felt unsafe even trying to speak up for herself. WHB 1876 ¶¶ 12-16. Uber derides these

25   cases as involving only "lewd comments," like mere catcalls. But, when these women were

26   trapped in a stranger's vehicle, they did not know whether they would be kidnapped, raped, or

27   even murdered.

28         None of the three states at issue require physical impact or physical harm stemming from

intentional torts like these. In two of the three states (Georgia and Massachusetts), Uber, as a common carrier, is vicariously liable for those torts (on top of being vicariously liable for conduct causing passengers' emotional distress generally). In the third (Illinois), Uber cites no cases requiring physical impact where the defendant's negligence was its failure to prevent injuries stemming from another actor's foreseeable intentional tort. That would make no sense—if the policies underlying the impact rule are not implicated when an intentional tort is involved, then they are no more affected just because another actor's negligence causes that same harm.

### 1.    WHB 407's Georgia claims are adequately pleaded.

#### a.    In Georgia, Uber is vicariously liable for emotional distress and intentional torts.

Plaintiff WHB 407 alleges, and Uber does not challenge, that the driver's conduct toward her constituted assault, false imprisonment, and IIED. WHB 407 Compl. ¶¶ 17-20. In Georgia, there is no impact rule for intentional torts. *See Eley v. Fedee*, 869 S.E.2d 566, 571 (Ga. App. 2022) (no "impact rule" where conduct is "malicious, willful, or wanton") (citation omitted). And, as a common carrier, Uber is vicariously liable for its driver's intentional misconduct. *See, e.g., Se. Greyhound Corp.*, 26 S.E.2d at 373.[36] Indeed, specific torts aside, a common carrier's non-delegable duties are breached by conduct causing mental or emotional harm: "The carrier's liability is not confined to assault committed by its servants, but it extends also to insults, threats, and other disrespectful conduct," for example "indecency, rudeness, or brutality" such as "to render the passage comfortless, by a continued series of vexation, misery, and torment." *Cole v. Atl. & W.P.R. Co.*, 31 S.E. 107, 107 (Ga. 1897); *see also Se. Greyhound*, 26 S.E.2d at 373 ("The unprovoked use of opprobrious words and abusive language by a conductor of a common carrier (or driver of the bus of a common carrier) tending to humiliate the passenger or subject him to shame and mortification, gives the passenger a right of action."). As the Georgia Court of Appeals explained more recently, "[a] common carrier … has a duty to protect a passenger from insults, abuse, and ill treatment" because "[i]t is bound to provide not only safe but also

---

[36] Uber cites *Robinson v. AirTran Airways, Inc.*, 2009 WL 3822947 (N.D. Ga. Nov. 13, 2009), but that case did not involve any intentional misconduct, only negligence (failure to prevent assault by passenger). *See* PTO 17 at 33-34 (noting the difference in a common carrier's duty as between assaults by its own agents and assaults by third parties).

comfortable passage." *Crites v. Delta Air Lines, Inc.*, 341 S.E.2d 264, 266-67 (Ga. App. 1986).

In a footnote, Uber says that WHB 407's "vicarious liability claims … must be dismissed" and cites the parties' stipulation on Georgia law. Mot. at 38 n.58 (citing ECF 1932). But that stipulation expressly *preserved* Georgia common-carrier claims, as Uber itself acknowledges in a different footnote 11 pages earlier. *Id.* at 29 n.49 (citing ECF 1932).

### b.    Alternatively, Georgia courts would recognize emotional-distress claims arising from forced confinement.

Even putting aside WHB 407's intentional-tort claims, Georgia courts would exempt her case from the impact rule. Georgia courts evince "openness to engage in limited departures and/or flexible applications of the 'impact rule' in especially compelling cases" where "narrow departures from the strictest application of the impact rule d[o] not implicate the concerns of speculative claims and 'floods' of litigation that the rule was crafted to avoid." *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1300-01 (N.D. Ga. 2005). Here, this case involves forced physical confinement: in response to the driver's harassment, WHB 407 asked to be let out of the car, but the driver refused and kept driving. WHB 407 Compl. ¶¶ 12-14. Permitting a claim in those narrow circumstances of actual physical restraint avoids the risk of excessive or fraudulent claims. *Compare Parker*, 377 F. Supp. 2d at 1301 (declining to permit a claim that would allow "*any* Georgia resident … to bring a suit for emotional distress").

### 2.    Under Massachusetts law, WHB 1898 can bring tort claims for her emotional distress.

### a.    Massachusetts abandoned the impact rule.

Uber says that Massachusetts does not recognize claims for "exclusively nonphysical harm," Mot. at 36, but that is not true. *See Dziokonski v. Babineau*, 380 N.E.2d 1295, 1296 (Mass. 1978) ("At the heart of the plaintiffs' claims is the argument that this court should abandon the so called 'impact' rule … which denies recovery for physical injuries arising solely from negligently caused mental distress. We agree that the rule … should be abandoned.").

To be sure, in emotional-distress cases, Massachusetts requires plaintiffs to "corroborate their mental distress" with "objective evidence of harm." *Rogriguez v. Cambridge Hous. Auth.*, 823 N.E.2d 1249, 1253-54 (Mass. 2005) (citation omitted). But that showing can "include

1  symptoms that could be classified as more 'mental' than 'physical." *Id.* (citation omitted); *see*

2  *also Sullivan v. Bos. Gas. Co.*, 605 N.E.2d 805, 810 (Mass. 1993) ("Medical experts … need not

3  have observed an actual, external sign of physical deterioration."). Massachusetts courts also rely

4  on "the nature of the incident that caused the plaintiffs' alleged mental distress" to "corroborat[e]

5  the genuineness of their claims." *Id.* at 811 (permitting claims arising from "witness[ing] the

6  destruction of the plaintiffs' home, an occurrence which the American Psychiatric Association

7  lists as one of the most common causes of posttraumatic stress disorders"). Here, whether

8  Plaintiff can present such evidence is a fact question.

9       **b.**  <u>**Even absent impact, Uber is liable as a common carrier for**</u>
<u>**emotional distress and intentional torts.**</u>

10     Even if Massachusetts required physical impact or harm for ordinary negligence claims (it

11  does not), here Uber is liable as a common carrier. In Massachusetts, as in other states, a common

12  carrier breaches its duties when it or its delegees cause passengers emotional distress. *See*

13  *McClean v. Univ. Club*, 97 N.E.2d 174, 178, 180 (Mass. 1951) (explaining that an "innkeeper"

14  was obligated "not [to] interfere with the convenience and comfort of the plaintiff, its guest, nor

15  abuse nor insult him, nor engage in any conduct which would subject him to mental distress or

16  personal injury," and noting that the same rule applies "as between a common carrier … and an

17  insulted and abused passenger"); *see also Jackson v. Old Colony St. Ry. Co.*, 92 N.E. 725, 727

18  (Mass. 1910) ("The carrier's obligation is to carry his passenger safely and properly and to treat

19  him respectfully, and if he entrusts the performance of this duty to his servants, the law holds him

20  responsible for the manner in which they execute the trust. The law seems to be now well settled

21  that the carrier is obliged to protect his passengers from violence and insult, from whatever source

22  arising.") (citation omitted); *Chamberlain v. Chandler*, 5 F. Cas. 413, 414 (C.C.D. Mass. 1823)

23  (Story, J.) (The relationship between passengers and carrier requires "a stipulation, not for

24  toleration merely, but for respectful treatment, for that decency of demeanor, which constitutes

25  the charm of social life, for that attention, which mitigates evils without reluctance, and that

26  promptitude, which administers aid to distress.").

27     General duty aside, Uber's common-carrier status makes it vicariously liable for its

driver's intentional torts. *See Murray v. Uber Techs., Inc.*, 486 F. Supp. 3d 468, 475-76 (D. Mass. 2020); *Gallant v. Gorton*, 581 F. Supp. 909, 910 n.1 (D. Mass. 1984) ("It is clearly the law in Massachusetts that one held to the duty of care of a common carrier is liable for the intentional torts of its employees, including assault upon passengers.").

Here, Uber's driver, while Plaintiff was confined in his vehicle late at night on "a long and dark road," made threatening and harassing comments ("he would never leave her alone") and then, after letting her out of the car, "intimidated her by waiting outside her house." WHB 1898 Compl. ¶¶ 13-19. Uber argues that this conduct does not constitute assault, IIED, or false imprisonment, but Uber is wrong.

**Assault**. Assault requires conduct "placing another in reasonable apprehension that force may be used." *Com. v. Delgado*, 326 N.E.2d 716, 719 (Mass. 1975). In Massachusetts, "words may create liability for assault when uttered together with other acts or circumstances that put the other in reasonable apprehension of an imminent harmful or offensive contact with his person." *Ginsberg v. Blacker*, 852 N.E.2d 679, 683 n.7 (Mass. App. 2006). Even in the criminal context, all that is required is "intentionally menacing conduct." *Com. v. Musgrave*, 649 N.E.2d 784, 787 (Mass. App. 1995). Here, Uber does not acknowledge the context of the driver's menacing words: a woman alone, in a closed vehicle, on a long, dark road, late at night. It is plausible that Plaintiff was placed in reasonable apprehension of sexual assault.[37]

**Intentional Infliction of Emotional Distress**. In Massachusetts, IIED requires "extreme and outrageous conduct" that is "beyond all bounds of decency and utterly intolerable in a civilized society." *Sena v. Com.*, 629 N.E.2d 986, 994 (Mass. 1994) (internal quotation marks omitted). While "[l]iability cannot be founded upon mere insults, threats, or annoyances," *id.*, the aggressive propositioning here in a confined space under the driver's control and accompanied by the implied threat that the driver would assault Plaintiff, goes well beyond "insult" or "annoyance." Contrary to Uber's arguments, words can constitute IIED. *See Howell v. Enter.*

---

[37] If necessary, Plaintiff seeks leave to amend to add additional facts: During the course of the nearly 21-minute ride, Plaintiff was terrified to the point that she recorded the driver, texted her husband about what was happening, and shared her location with her husband. Her actions, followed by a prompt report to Uber, demonstrate her reasonable apprehension of sexual assault.

1    *Pub. Co.*, 893 N.E.2d 1270, 1275, 1283-84 (Mass App. 2008) (publication of eleven newspaper

2    articles), *rev'd on other grounds*, 920 N.E.2d 1 (Mass. 2010); *Cooper v. Empower U, Inc.*, 603 F.

3    Supp. 3d 1317, 1323 n.3 (S.D. Fla. 2020) ("The Court also disagrees that verbal abuse must

4    always be accompanied by offensive physical harassment in order to support an IIED claim under

5    Florida law," which, like Massachusetts, follows the Restatement). Especially where, as here, the

6    driver knew that Plaintiff was in a vulnerable position—in a stranger's car, late at night, and

7    alone. *See* Restatement § 46 cmt. f ("The extreme and outrageous character of the conduct may

8    arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by

9    reason of some physical or mental condition or peculiarity.").

10        None of the cases Uber cites compels dismissal of WHB 1898's IIED claim. *Conley v.*

11    *Romeri*, 806 N.E.2d 933, 937-38 (Mass. App. 2004), involved a person entering a romantic

12    relationship under false pretenses, hardly comparable to unwelcome sexual solicitations from a

13    stranger with physical power over the victim. *Soni v. Wespier*, 239 F. Supp. 3d 373, 390 (D.

14    Mass. 2017) involved comments denigrating a person's professional qualifications. And *Montell*

15    *v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 502 (6th Cir. 2014), involved workplace

16    harassment, without elements of confinement and physical control that are present here.

17    Moreover, courts following the Restatement, as Massachusetts does, are "particularly reluctant to

18    allow IIED claims in employment cases" given the frequency of interpersonal disputes in such a

19    setting and the variety of other potentially applicable claims. *Kitani v. New York City Transit*,

20    2022 WL 874781, at *11 (S.D.N.Y. Mar. 24, 2022) (internal quotation marks omitted).

21        **False Imprisonment**. Plaintiff was sexually propositioned by a stranger while trapped in

22    his car "on a long and dark road" very late at night. WHB 1898 Compl. ¶¶ 14-18. This is

23    sufficient to state a claim for false imprisonment, an "intentional and unjustified confinement of a

24    person directly or indirectly of which the person confined is conscious or is harmed by such

25    confinement." *Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 29 (1st Cir. 2020) (citation and

26    alterations omitted).

27        Uber argues that its driver's conduct did not constitute "the use or threat of physical

28    force." Mot. at 37. But But Massachusetts recognizes that threats need not overtly or even

implicitly invoke physical force, but can be more subtle and preying on human emotion and reaction: "If a man is restrained of his personal liberty by fear of a personal difficulty, that amounts to a false imprisonment." *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 90 (Mass. 1987) (citation omitted). For example, in one case discussed in *Foley*, a plaintiff stated a false imprisonment claim where she felt unable to leave a restaurant after an employee accused her of not paying her dining companion's bill. *Jacques v. Childs Dining Hall Co.*, 138 N.E. 843, 843 (Mass. 1923). The court explained: "[T]he plaintiff's 'honesty and veracity had been openly and repeatedly challenged. If she had gone out before exoneration, her departure well might have been interpreted by the lookers on as an admission of guilt, or of circumstances from which guilt might be inferred.'" *Foley*, 508 N.E.2d at 91 (quoting *Jacques*, 138 N.E. at 843). The court allowed the claim even though "no threats of public exposure or of arrest were made, and no physical restraint of her person was attempted." *Jacques*, 138 N.E. at 844-45.

Here, Plaintiff was subjected to verbal abuse, carrying with it the implicit threat of sexual assault, while trapped in a moving vehicle late at night in the dark. Her voluntary presence in the car was premised on the provision of transportation; once the driver changed the purpose of the ride to sexual solicitation, her consent was exceeded and the confinement became unlawful. It is plausible that, even if she could have asked the driver to stop the car and let her out, she was "restrained" from doing so "by fear of a personal difficulty"—either the danger of exiting a vehicle on a long, dark road after 11 P.M. or the fear of triggering the driver to move beyond words to violent actions. That suffices to state a claim for false imprisonment.

### 3. The Court should predict that under Illinois law, WHB 1876 can bring emotional-distress claims.

Although Uber is not vicariously liable under Illinois law before 2024, WHB 1876's injuries still arise from the driver's intentional torts that Uber negligently caused. Illinois would not apply the impact rule under these circumstances. To the contrary, Illinois applies the rule only where "the claim of emotional distress is freestanding and not anchored to any other tort against the plaintiff," because freestanding claims implicate "concerns regarding the possibility of fraudulent claim[s] or frivolous litigation." *Jerman v. Woolsey Oper. Co.*, 2021 WL 4622509, at

1    *5 (Ill. App. Oct. 7, 2021) (internal quotation marks omitted); *see also, e.g.*, *Clark v. Children's*

2    *Mem'l Hosp.*, 955 N.E.2d 1065, 1087 (Ill. 2011) (wrongful birth); *Cochran v. Securitas Sec.*

3    *Servs. USA, Inc.*, 93 N.E.3d 493, 502 (Ill. 2017) (tortious interference with human remains).

4        Here, the driver's sexual propositioning of Plaintiff while she was trapped in his vehicle

5    constituted assault, false imprisonment, and IIED.[38] **Assault**. It is plausible, under the

6    circumstances, that the driver's actions placed Plaintiff in "reasonable apprehension of an

7    imminent battery" as required for an assault claim. *McNeil v. Carter*, 742 N.E.2d 1277, 1281 (Ill.

8    App. 2001). **IIED**. In Illinois, an IIED claim can arise from "frequent, unwelcome, and offensive

9    sexual advances." *Pavlik v. Kornhaber*, 761 N.E.2d 175, 186 (Ill. App. 2001) (permitting IIED

10    claim arising from). **False Imprisonment**. The driver took advantage of Plaintiff's confinement

11    in his vehicle to solicit sexual favors rather than for its intended purpose of transportation, and so

12    exceeded her consent to be in the vehicle. *See Lopez v. Winchell's Donut House*, 466 N.E.2d

13    1309, 1311-12 (Ill. App. 1984) ("Unlawful restraint may be effected by words alone, by acts

14    alone or both."). Due to the driver's actions, Plaintiff was uneasy the whole ride and was on the

15    verge of tears. [and] did not feel comfortable confronting the driver or speaking up for herself,"

16    let alone demanding the ride end. WHB 1876 Compl. ¶¶ 16-17. This suffices to plead "restraint

17    against the plaintiff's will." *Lopez*, 466 N.E.2d at 1312.

18        Because Plaintiff's injuries arose from a "distinct and independent tort that has a settled

19    place in Illinois jurisprudence," her claim for emotional distress does not implicate the concerns

20    that motivate Illinois courts to apply the impact rule. *Cochran*, 93 N.E.3d at 502. To be sure,

21    Plaintiff's Illinois law claims seek to hold Uber liable for negligence, not vicariously liable for

22    intentional torts. But the point is that, as the Illinois courts said in *Cochran*, *Clark*, and *Jerman*,

23    where the emotional injury was caused by an underlying distinct tort, the policy concerns

24    underlying the impact rule are inanimate, and the claim can proceed.

25        This includes negligent product design and warning claims. Uber cites one intermediate

26

---

27    [38] Plaintiff did not expressly plead intentional tort claims because she does not allege vicarious liability. But nothing prevents the Court from assessing whether the driver's conduct nevertheless

28    satisfies the prerequisites to exempt the case from the impact rule. If necessary, Plaintiff seeks leave amend to clarify this legal theory.

appellate court decision stating that the "physical harm" requirement applies to products liability claims sounding in negligence, *Sondag v. Pneumo Abex Corp.*, 55 N.E.3d 1259 (Ill. App. 2016), but the Illinois Supreme Court has never said so. Instead, that court has endorsed the idea that negligence claims in general can seek emotional distress, where, as here, the injury arises from a distinct tort. *Cochran*, 93 N.E.3d at 502; *Clark*, 955 N.E.2d at 1087.

### B.  Plaintiffs WHB 1898 and WHB 407 can plead strict products liability claims (or state-law substitutes) without physical impact or harm.

**WHB 408 (Georgia)**. Uber says that Georgia strict products liability claims require physical impact and physical harm but cites no case saying so. The only citation in Uber's Appendix D.8 is *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739 (Ga. 2022), a case that did not involve claims for emotional distress absent physical impact. All that *Maynard* said is that a products liability plaintiff must "suffer[] injury to his person or property." *Id.* at 745 (quoting Ga Code. § 51-1-11). Nothing in *Maynard* or the statute says that "injury to his person" excludes emotional distress. To the contrary, Georgia courts apply the two-year statute of limitations applicable to "actions for injuries to the person" to IIED claims. *Perry v. Emory Healthcare Servs. Mgmt., LLC*, 911 S.E.2d 229, 231 (Ga. App. 2025). *Cf. Lee v. Gore*, 472 S.E.2d 164, 167-68 (Ga. App. 1996) (in defamation case, explaining that plaintiff failed to allege "emotional distress or humiliation," only "injuries to his reputation" and so could not convert his "claims for slander … into injuries to his person"). In the absence of contrary state authority, the Court should predict the Georgia Supreme Court would permit these claims. As Judge Chhabria explained in making a similar prediction under California law:

> There is also cause for skepticism that California courts would categorically bar product liability recovery for pure emotional distress injury. Imagine a manufacturer sells a virtual reality headset designed for meditation. And imagine that a product defect causes the headset to glitch, resulting in the display of violent and disturbing images that cause serious anxiety for the user. If all the other elements for a products liability claim were present, it is difficult to believe that tort recovery would be barred.

*Hughes v. Apple, Inc.*, 723 F. Supp. 3d 693, 710 & n.7 (N.D. Cal. 2024).

**WHB 1898 (Massachusetts)**. Uber similarly has no authority for the proposition that Massachusetts would preclude products liability claims for lack of physical impact. The best Uber

has in Appendix D.8 is one thirty-year-old case referring generally to the Restatement but not discussing emotional harm at all. *See Wasylow v. Glock, Inc.*, 975 F. Supp. 370 (D. Mass. 1996). Absent contrary authority, and especially given Massachusetts' acceptance of emotional-distress claims in the negligence context, the Court should predict the Supreme Judicial Court would permit such claims for negligent design and warranty claims (the commonwealth's substitutes for strict products liability) claims as well. *See Hughes*, 723 F. Supp. 3d at 710 & n.7.

**WHB 1876 (Illinois)**. Plaintiffs concede that Illinois courts have stated that physical harm is required for strict products liability, so WHB 1876's strict liability claims must be dismissed. As discussed above, she can continue to pursue negligent products liability claims.

## V.    As Uber knows, Plaintiff Jane Roe CL 68 suffered a physical assault.

Uber moves to dismiss Plaintiff Jane Roe CL 68's negligence claims because, Uber says, she "alleges physical harm in only conclusory and disjunctive terms." Mot. at 36 n.55. As an initial matter, Uber cites no cases for the proposition that allegations that "Plaintiff was sexually assaulted, harassed, battered, or otherwise attacked" are insufficient—there is no particularity requirement for allegations of physical harm. But regardless, Jane Roe CL 68 *did* suffer a physical attack, as detailed in her Plaintiff Fact Sheet served on Uber in January 2025. A PFS is of course not a complaint; but it is a waste of time for Uber to move to dismiss on grounds that it knows are factually inaccurate. If necessary, Jane Roe CL 68 can amend her complaint to further allege physical impact and harm. (Plaintiffs agree that Jane Roe CL 68's entrustment, NIED, fraud, common-carrier, other non-delegable duty, respondeat superior, ratification, and UCL claims were dismissed by PTO 17.)

## CONCLUSION

For these reasons, except C.L.'s apparent agency claim, WHB 1876's strict liability claims, and Jane Roe CL 68's non-negligence claims, Uber's motion to dismiss the Bellwether Complaints should be denied, or leave to amend granted to cure any deficiencies.

Dated: May 15, 2025

Respectfully submitted,

By: /s/ Sarah R. London
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: /s/ Rachel B. Abrams
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: /s/ Roopal P. Luhana
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

## FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated:  May 15, 2025

By:     /s/ Andrew R. Kaufman
Andrew R. Kaufman