*[Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**PLAINTIFFS' LETTER REGARDING DEFENDANTS' RESPONSES TO PLAINTIFFS' BELLWETHER DISCOVERY REQUESTS**<br><br>Judge:     Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

Dear Judge Cisneros:

Pursuant to the Court's order at the May 22, 2025 Case Management Conference, Plaintiffs respectfully submit this letter regarding Defendants' deficient responses to BW discovery.

I. **Time Is of the Essence**

The first case-specific 30b6 deposition is anticipated to begin on June 5. The first bellwether plaintiff deposition (of B.L.) is set for June 9. The Uber drivers' depositions have been noticed to start the week of June 16. It is essential that Plaintiffs' counsel have time to review Uber's complete production relating to the Plaintiff, the driver, and the subject ride before those dates.

II. **Brief History: Uber Agreed to Fully Respond to Discovery No Later than May 16**

In late March, Plaintiffs served case-specific document requests and interrogatories. At the end of the 30-day response period, Defendants did not produce any documents. Defendants also refused to answer a single interrogatory based solely on their objection that Plaintiffs served some unspecified number of "compound" interrogatories. On April 28, Plaintiffs immediately requested to meet and confer with Defendants regarding their deficient responses. Only after extensive meet and confer discussions over a two-week period, and after Plaintiffs sent a draft PTO 8 letter, did Defendants agree to produce meaningful discovery responses. Defendants agreed to produce complete and responsive documents to all but one of Plaintiffs' RPDs (including producing supplemental RPD responses that identified, by Bates range, the documents actually responsive to each RPD), and to answer all served interrogatories, by **no later than May 16**.

Unfortunately, as set out below, Defendants did not do so. Defendants' document production and interrogatory answers are still glaringly deficient.[1] Defendants have not even produced a response to the requests for production, making it difficult for Plaintiffs to decipher exactly what is being withheld, which documents correspond with which requests, and what is yet to be produced.

III. **Interrogatories: Uber's Failure to Identify Relevant Advertising Campaigns**

Four of the Wave 1 bellwethers were intoxicated at the time of the subject incident. In those cases, there is a factual issue regarding the impact of Uber's advertisements that it was a safe option for intoxicated people who needed a ride home. For example, in her amended complaint (Doc. 2501), B.L. alleged: "38. Before taking the August 12, 2022 Uber ride, Plaintiff regularly heard and saw ads promoting Uber as a safe and responsible option for people who had been drinking. 39. As early as 2010, Plaintiff saw Uber advertisements placed in venues and establishments where drinking was popular. 40. Before 2021, Plaintiff heard advertisements on Austin, TX radio advertising Uber as a safe alternative to drunk driving."

---

[1] As noted in the May 19, 2025 JSR (ECF No. 3033), in addition to deficiencies identified here, the parties have a substantive dispute as to the interrogatory concerning third-party reporters of misconduct (Rog. 10), which Plaintiffs expect will be the subject of an upcoming PTO 8 letter. This interrogatory seeks: "For any Rider who, before the date of the Subject Incident, reported Sexual Assault and/or Sexual Misconduct against the Subject Driver, which did not result in permanent Deactivation, Identify the Rider by name, email address, physical address, and phone number." Uber objected to the interrogatory in full for each BW Plaintiff, citing purported vagueness and privacy concerns.

In these four cases, Plaintiffs propounded a first interrogatory: "identify all drinking-related Marketing Campaigns or Advertising Campaigns that ran … in the following Cities within the following date ranges: [Listing cities where that specific plaintiff lived and the dates for each residence.] These interrogatories are essential for refreshing Plaintiffs' recollection and preparing for deposition. But Uber objected and responded: "Responding Party directs Plaintiff to its response to MDL Plaintiffs' Request for Production No. 102." Request No. 102, in turn, is a general request for documents regarding alcohol-related marketing to all riders, and is not limited to a particular geographic area or date range. Moreover, Uber did not identify by Bates range any documents in response to Request No. 102. In short, **Uber has completely evaded these critical interrogatories**.

### IV.    Interrogatories: Uber's Failure to Decode Account History Data and Location Data (Rogs No. 12 and 13[2])

**Rog No. 12:** Uber produced short (1 or 2 page) account status logs for the subject drivers that show the timeline of when a driver first applied and was activated, and also any occasions when he was subsequently deactivated, waitlisted, or reactivated. But it is hard to tell if a driver was waitlisted for a benign reason, such as needing to update a background check, or a serious reason, such as an incident or arrest. Accordingly, Plaintiffs asked Uber: "For every status change in the Subject Driver's Account History, please identify the reasons for the status change …." (Rog. 12.)

Uber's supplemental interrogatory response is non-committal, saying that "Generally, these status changes may relate to renewals of background checks, vehicle information, or other such reasons. These changes are often automated…." Uber then offers to produce a corporate representative on the topic. **Uber needs to provide direct responses that actually apply to the subject driver, instead of noncommittal ones, in order to narrow the issues for, allocate time appropriately to and enable Plaintiffs to more efficiently prepare for imminent corporate representative depositions.**

**Rog. No 13:** The location data for Plaintiffs' subject rides is replete with "mobile events" written in code speak, such as: ████████████████████████████████████████

Plaintiffs asked Uber: "For any acronyms or terms of art that appear in Uber's Location Data related to the Subject Ride (including the Chronicle data and maps, Voyager data and maps, and/or Fractal data and maps) describe what each acronym or term of art means." Uber's supplemental response is "Responding Party is available to meet and confer regarding any specific questions Propounding Party may have regarding specific "acronyms" or "terms of art" used by Responding Party." In meet and confer discussions, Plaintiffs asked Uber to either respond or provide a "data dictionary" (an existing decoder that Uber employees use). A data dictionary is preferred at this point, since Plaintiffs also need Uber's data dictionary to understand the communications and trip logs (also excel printouts filled with code language in lieu of plain-language communications). While Uber's counsel acknowledged this issue, Uber has yet to produce a supplemental response or data dictionary.

### V.    Interrogatories: If Uber Does Not Promptly Amend Its Responses to Other Interrogatories, the Court Should Impose Rule 37 Sanctions

---

[2] *See* Exhibit 1, Excel Spreadsheet outlining BW Plaintiffs RFPs and Interrogatories. The numbers referred to herein are, unless otherwise specified, a universal number Plaintiffs' counsel assigned to each request for ease of reference. The specific number in a specific case may vary.

Many of Plaintiffs' interrogatories were designed to narrow the issues, learn what contentions Uber is making, what facts Uber intends to rely on, and whether Uber intends to rebut Plaintiffs' claims with contrary evidence. In response, Uber was evasive. Plaintiffs respectfully request an order mandating that Uber respond to the following interrogatories within a matter of days, and that its failures to provide concrete, specific responses should result in FRCP Rule 37 sanctions limiting the issues and evidence at trial. The requests at issue are as follows:

- **Rog. 4: Requesting facts in support of Uber's contention, if any, that Plaintiff violated Uber's Community Guidelines or Terms of Use.** (Uber should be precluded from arguing that Plaintiff violated its guidelines or terms of use if it does not meaningfully respond.)
- **Rog. 5: Requesting facts in support of Uber's contention, if any, that pre-incident reports of misconduct against the Subject Driver were made by riders with low credibility.** ▮

  Uber should be precluded from justifying its inaction on prior reports by claiming the reporting parties were non-credible account holders, unless it identifies such facts now.)
- **Rog. 6: Requesting, if Uber applied a "Low Credibility" designation to Plaintiff, the date it did so, and the facts that designation was based on.** (Uber should be precluded from offering evidence that each Plaintiff complained too often, asked for too many refunds, etc. unless Uber identifies such evidence now.)
- **Rog 7: Requesting, if Uber contends that data in its possession (dash cam footage, GPS data, app data) contradicts Plaintiff's account regarding the subject incident, the facts supporting Uber's contentions.** (If Uber does not produce such data now, it should be precluded from introducing it later for any purpose.)
- **Rog. 8: Asking whether Uber contends (based on the facts it now has in its possession) that Plaintiff bears any fault for the incident.** (Uber said this was premature since depositions of the plaintiffs have not yet taken place. Uber may amend its responses but should respond now based on information already in its possession. Any facts now in its possession indicating that Plaintiffs were at fault, which it does not identify, should be excluded.)
- **Rog. 9: Requesting, if Uber contends Plaintiff bears fault for the incident, the facts in support.** (See No. 8.)
- **Rog. 14: Requesting that Uber identify, for each safety tool in Uber's toolkit, the date the tool became available to Plaintiff and the dates, if any, when Plaintiff used that tool.** (Plaintiffs anticipate that Uber will argue that Plaintiffs were not safety conscious given that they did not use "Safety toolkit" tools Uber offered. Rather than respond to this interrogatory, Uber pointed generally to the communication logs with Plaintiffs, which do not specify when any safety tools became available or were offered to Plaintiffs, nor – as far as Plaintiffs can tell – do these logs state whether or not Plaintiffs were using certain tools. Uber should meaningfully respond or be precluded from arguing that Plaintiffs failed to use tools that were made available to them.)
- **Rog. 15. Requesting that Uber identify with specificity Uber's communications, if any, to Plaintiff, identifying what if anything Plaintiff needed to do or refrain from doing in order to have a safe ride.** (If Uber does not promptly identify responsive communications, it should be taken as established pursuant to Rule 37(b)(2) (A)(i) that there were no such communications.)
- **Rog. 16. Requesting that Uber identify with specificity Uber's communications, if any, to Plaintiff, instructing or encouraging the Plaintiff to remain vigilant and not let her guard down during rides.** (If Uber does not promptly identify responsive communications, it should

be taken as established pursuant to Rule 37(b)(2) (A)(i) that there were no such communications.)
- **Requests that Uber identify with specificity Uber's communications, if any, to Plaintiff regarding (Rog. 17) the risk of sexual assault or sexual misconduct, (Rog. 18) the risk of sexual assault /sexual misconduct for female riders paired with male drivers, (Rog. 19) the particular risk factors known to Uber regarding the subject driver or subject trip, (Rog. 21) Uber's knowledge regarding the subject driver's history and/or background checks or incompleteness thereof.** (If Uber does not promptly identify responsive communications, it should be taken as established pursuant to Rule 37(b)(2) (A)(i) that there were no such communications.)
- **Rog 20. Requesting, if Uber contends that Plaintiff did not view the "offer card" (the information Uber sends to a rider about a driver that Uber is dispatching), any facts in support of this contention.** (Uber's response is that it was not physically present. This is a nonsensical response in light of Uber's app data about what an app user clicked on or viewed. If Uber does not promptly identify responsive facts, it should be precluded from offering any later.)
- **Rog. 22 (for Jaylynn Dean and B.L.): Requesting, if Uber contends that it communicated risks of taking Uber while intoxicated, that it identify any such communications.** (If Uber does not do so promptly and with specificity, it should be precluded from offering any such communications into evidence later.)

## VI.   Requests for Production: Uber's Failure to Amend Its (Pleading) Responses

Uber has not produced amended responses to RPDs. Without meaningful responses to RPDs that actually identify which documents are responsive to the requests for the propounding individual, Plaintiffs are working blind. To add insult to injury, Defendants are producing documents in large, mismatched document dumps for multiple BW Plaintiffs in a single BW's production, leaving Plaintiffs to guess which documents go to which case. Identification responsive documents by bates in supplemental responses eliminates this issue, which should not exist in the first place. Furthermore, without identification of responsive documents, Plaintiffs must guess whether Uber is intentionally withholding documents, making "rolling productions," or asserting that no responsive documents exist. Uber has had ample opportunity to meet and confer on RPDs and has assured Plaintiffs that scope issues for all but one RPD have been resolved and that documents would be produced by May 16. To the extent Uber now raises new scope and burden issues, it is apparent that weeks of meeting and conferring were disingenuous.

## VII.   The Size of Uber's Production Is Not Burdensome

Uber will likely claim that its production has been voluminous. Even for the six Wave 1 cases, most of Uber's production is made up of raw, unprocessed excel reports extracted from Uber's vast database it collects on its users. Plaintiffs' counsel sought this data (for example, GPS data about Plaintiffs' movements) because they anticipate Uber will use it in this litigation. The large spreadsheets reflect that Uber did less work (rather than more), since it is easier to produce the data in its entirety as it is stored. In any event, the fact that Uber produced large spreadsheets does not excuse its failure to produce other essential, and now overdue, information.

## VIII.   Uber's Failure to Produce Documents

Uber has the following admittedly relevant documents but has not produced them.
- **RPD 4, 5, 6, 7, 8, and 9: Documents related to applications, screening, and background

4

- **checks for the subject drivers (including application materials, application communications, screening materials, screening communications, background checks, and background check adjudication criteria).** Uber produced high-level reports issued by its contractors, but not any actual background checks. Even if Uber does not have access to those, there is clearly information in Uber's possession regarding what adjudication criteria it applied (for the subject drivers). Uber has produced case-specific adjudication criteria in other cases, but not here. In addition, clearly the drivers must have filled out a form, or answered some questions, when they applied to drive. No such documents have been produced.
- **RPD 15[3]: Documents reflecting the minimum rating, maximum cancellation rate, and any other thresholds drivers needed to maintain to keep driving in the particular city where each subject ride occurred.** (Uber's response identifies MDL RPD No. 66, which does not identify any documents by Bates and is not City-specific.)
- **RPD 18 and 19: Documents reflecting unplanned stops, unplanned rider-driver proximity, and route deviations for the subject driver, including those that resulting in telematics triggers, before the subject incident.**
- **RPD 27: Information Uber has about the cell phones used by the subject driver (including phone number, make, model, IP address.)** (Uber agreed to produce this but still has not done so.)

Plaintiffs' counsel believe Uber likely has the following documents, which it has not produced:
- **RPD 54: The offer card (at least the underlying data, if not the graphics) showing what Uber told the Plaintiff about the subject driver on the date of the incident when it sent the subject driver to pick her up.** Nothing has been produced.
- **RPD 11: For each status change in the subject driver's account history, all documents and communications that explain or relate to that status change.** Other than the JIRA tickets that explain some status changes, Uber has not identified or produced documents that give context for other status changes (for example, policies regarding automatic deactivation when a background check cannot be performed).
- **RPD 14 and 15: Documents reflecting what metrics Uber kept track of for the Subject rider, including that driver's cancellation rate and rating.**
- **RPD 25: Ticket-related documents, including location data, for the subject drivers' prior tickets that involved allegations of sexual misconduct.** Uber has produced several Voyager screenshots stating that the Voyager map was unable to load, but it has not produced the GPS data for prior rides. (For Wave 1,
- **RPD 56 (for Jaylynn Dean and B.L.): Documents reflecting drinking related communications from Uber to Plaintiff (RPD 56).** While there are some communications in Uber's communications log spreadsheet, they are written as lengthy strings of code, with the

---

[3] As with the interrogatories, these numbers refer to universal numbering Plaintiffs assigned, even though the served requests are numbered differently for different Plaintiffs, as set out in Exhibit 1.

user-facing English hidden inside the code. They do not look anything like their original format, where they likely were part of an ad campaign and were displayed with graphics and photos. If Uber has responsive communications in a usable format, it should produce them.

- **RPD 57 (for Jaylynn Dean and B.L.): Documents reflecting drinking-related advertisements and/or marketing by Uber or its contractors which were identified in special interrogatories as having run in the geographic areas where Plaintiff lived during the years she lived there**. Uber has not complied.

Uber has not identified the Bates ranges of responsive documents for the following requests:

- **RPD 1 and 2: Requesting each agreement between Uber and the subject driver (RPD 1) and Uber and the Plaintiff (RPD 2)**. While Uber produced a log of agreements, it has not identified by Bates numbers where Plaintiffs can find those agreements (for the correct place and time) in the MDL production.
- **RPD 52: Requesting all documents Uber provided to law enforcement related to the subject incident**. Uber has likely already produced these, but since some documents are free-standing and not attached to a communication, it is impossible for Plaintiffs to tell which documents were produced to law enforcement.

For the following Requests for Production, there may be nothing else to produce, but Uber must confirm that, after a diligent search, it has no responsive documents, or that its only responsive documents are those produced at a specified Bates range.

- **RPD 16: Materials related to deactivation of the subject driver.**
- **RPD 17: Training materials regarding the subject driver.**
- **RPD 21: For rides where the subject driver received 1 or 2 star ratings, any context Uber has about the reasons for that rating.**
- **RPD 23: All safety lens documents for the subject driver**
- **RPD 24: All tickets for subject driver.**
- **RPD 51: All communications with Plaintiff regarding the subject ride.**
- **RPD 45: All ▓▓▓▓▓▓ data regarding the subject ride.**
- **RPD 51: Uber's communications regarding the subject ride.**

Finally, for the following Requests for Production, Uber may have already produced everything it has (it is hard to know without an actual RPD response), but if not, then Plaintiffs would respectfully request evidentiary sanctions/issue sanctions excluding any later-produced documents:

- **RPD 28: Any photographs, surveillance, video, or audio recordings of Plaintiff.**
- **RPD 29: All information in Uber's possession about the Plaintiff, including all information Plaintiff provided to Uber in connection with her Uber accounts.**
- **RPD 31: All JIRA investigations for Plaintiffs' account.**
- **RPD 40: Any ticket-related documents for any tickets involving the Plaintiff and allegations of sexual assault.**
- **RPD 41: Documents supporting Uber's "low credibility" determination re Plaintiff.**
- **RPD 48: Any photographs, video, or audio recordings capturing the subject ride.**

Respectfully submitted,

By: */s/ Roopal P. Luhana*
ROOPAL P. LUHANA (Pro Hac Vice)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

SARAH R. LONDON (SBN 267083)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: slondon@girardsharp.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

*Co-Lead Counsel for Plaintiffs*

**FILER'S ATTESTATION**

I, Roopal P. Luhana, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

Dated: May 26, 2025

                                                By: /s/ *Roopal P. Luhana*
                                                         Roopal P. Luhana