# EXHIBIT A

Sarah R. London (SBN 267083)
Simon Grille (SBN 294914)
Maya Kalonia (SBN 359755)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Email: slondon@girardsharp.com
Email: sgrille@girardsharp.com
Email: mkalonia@girardsharp.com

Elizabeth J. Cabraser (SBN 083151)
Tiseme Zegeye (SBN 319927)
Annie Wanless (SBN 339635)
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Email: tzegeye@lchb.com
Email: ecabraser@lchb.com
Email: awanless@lchb.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | Case No. 3:23-md-03084-CRB |
| | Judge: Honorable Charles R. Breyer |
| This Document Relates to: | |
| *LCHB128 v. Uber Technologies, Inc., et al.*, Case No. 3:24-cv-7019 | **PLAINTIFF LCHB128's FIRST SET OF SPECIAL INTERROGATORIES TO DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC** |

**PROPOUNDING PARTY:**       **Plaintiff LCHB128**

**RESPONDING PARTIES:**       **Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC**

**SET:**       **1 (One)**

**DATE OF SERVICE:**       **March 27, 2025**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff C.L., through her counsel, propounds this First Set of Special Interrogatories to Defendants UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC (collectively hereinafter "Uber"). Responses to these Interrogatories shall be served within 30 days from service of this document.

## **INSTRUCTIONS**

The following instructions and definitions apply to each of the Interrogatories set forth below and are deemed to be incorporated therein:

1.      If You make any assumption of fact or law in responding to any request, state each assumption and the basis for each assumption.

2.      If the response to any document request consists, in whole or in part, of any objection(s), state with specificity the full objection(s) and the particularized basis for each objection. You must also state whether any responsive materials or information are being withheld on the basis of any objection(s). To the extent that You object to any portion of a document request, You must respond to the remaining portion of the request to which You do not object.

3.      If You object to an Interrogatory on the basis of any claim of privilege, then You  must produce any and all information required by the Privilege Order for this matter.

4.      Each request is considered continuing. You are required to timely supplement Your responses when appropriate or necessary under the Federal Rules of Civil Procedure to make them correct or complete. If, after responding to these Interrogatories, additional responsive information become available to You, You are required to produce such additional information. For purposes of interpreting or construing the scope of these requests, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual request. This includes, without limitation, the following:

   a.   The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

   b.   The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

c.   Construing the singular form of the word to include the plural and the plural form to include the singular;

d.   Construing the masculine to include the feminine, and vice-versa;

e.   The use of any tense of any verb shall also include all other tenses of that verb;

f.   A term or word defined herein is meant to include both the lower and uppercase reference to such term or word.

g.   Any Bates number referenced in these Interrogatories shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members.

h.   Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

5.   In construing these requests, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning. If You are unsure about the definition of a particular term or word, use the definition that You believe to be the most accurate and state that definition in Your response. If, in responding to any of these requests, you encounter any other ambiguity in construing either the request or an instruction, then set forth the matter You deem ambiguous and the construction You use in answering the request.

## **DEFINITIONS**

In this set of Interrogatories, the following words and terms shall bear the meanings as identified below. For any undefined term, the standard dictionary definition of the term applies

1.   "ACCOUNT HISTORY" means the INFORMATION that UBER maintains about a DRIVER's account status, including but not limited to the Driver's name, status, status note, whether the status is current, the date and time the status began, the date and time the status ended, and the flow type.

2.   "ADVERTISING" and "ADVERTISEMENT" refer to COMMUNICATIONS via any COMMUNICATIONS CHANNELS aimed at promoting a product, service, or idea to a target audience.

3.    "AGREEMENT" means any Document that states the commitments, expectations, agreements, contracts, terms, and/or conditions between two or more entities and/or people. It includes but is not limited to Terms of Use and Community Guidelines.

4.    "ALL ACCOUNTS" means all Uber accounts and what Uber calls "flow types" associated with or linked to, a given Rider or Driver at any time, including but not limited to Uber Black accounts, Eat accounts, Freight accounts, Rider accounts, Driver accounts, or any other flow types or accounts possessed by, linked to, or affiliated with the Driver

5.    "BACKGROUND CHECK" means any search, survey, review, evaluation, downloading, and/or summarizing, of databases and/or court records, police records, law enforcement records, arrest records, department of motor vehicle records, and/or other official records, performed at any time and for any reason, to learn about a person's background and/or determine whether that person meets the minimum criteria to be a DRIVER.

6.    "APP STORE LISTING" refers to the page or section in an APP STORE that is dedicated to a specific application, in this context the UBER APP. The APP STORE LISTING includes but is not limited to the name displayed for the UBER APP, the icons, images, photos, screenshots, and graphics displayed; the description of the UBER APP, its purpose, features, and benefits; Developer information, including information about Uber, its brand, logo, name, and description of what UBER does; and pricing information.

7.    "CAMPAIGN" with respect to MARKETING and ADVERTISING means a coordinated series of messages, activities, and/or initiatives, potentially involving a mix of COMMUNICATION CHANNELS designed to promote something.

8.    "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

9.    "COMMUNICATIONS CHANNEL" means to a medium or method through which information is transmitted from a sender to a receiver. Communications Channels include but are not limited to face-to-face, poster, billboards, press releases, ads, websites, letters, catalogues, APP STORE

LISTINGS, COMMUNICATIONS within the UBER APP, push notifications, blogs, social media direct messaging, social media ADVERTISEMENTS, newspapers, periodicals, events, text messages, and phone calls.

10.    "CRIMINAL HISTORY" means any history of infractions, violations, misdemeanors, felonies, or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

11.    "DATE OF UBER'S SAFETY TAXONOMY IMPLEMENTATION" as used herein shall refer to the date by which UBER had fully implemented its Sexual Misconduct and Violence Taxonomy (which implementation is described in Uber's 2018 Safety Report as occurring sometime in late 2018).

12.    "DEACTIVATE" or "DEACTIVATION" includes any action that prevents someone from using either the DRIVER APP or UBER APP to offer RIDES or request RIDES and includes waitlisting, applying a safety lock, blocking, and deactivating, whether permanent or temporary.

13.    "DISPLAYED STAR RATING" means the numerical rating, out of a maximum rating of 5, that UBER displayed as a RIDER or DRIVER's rating, usually next to an icon of a star.

14.    "DISQUALIFY" "DISQUALIFIED" or "DISQUALIFYING" mean determining that a person does not meet the minimum criteria to be or continue to be a DRIVER.

15.    "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control.  Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail;

ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form.  The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original.  The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

16.    "DRINKING-RELATED COMMUNICATIONS" are COMMUNICATIONS regarding alcohol, alcoholic beverages, the holidays, parties, celebrations, "Celebrate responsibly," "Celebrate safely," the "Safe Rides Pledge," "Stand Up, Don't Stand By," becoming a "Designated Rider," joint advertising by UBER and Mothers Against Drunk Driving (MADD), joint advertising by UBER and any alcohol-related brand, and any other COMMUNICATIONS that relate to the concept of getting home safely after drinking, whether that concept is conveyed through words, hashtags, or images.

17.    "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

18.    "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

19.    "HIGH RISK DRIVER" means someone who, if they are allowed to become a Driver, poses an elevated risk of committing SEXUAL ASSAULT, SEXUAL MISCONDUCT, or causing an INTERPERSONAL CONFLICT connected with a RIDE.

20.    "INCIDENT" means the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT that Plaintiff alleges she experienced in connection with a RIDE, and includes the immediate circumstances of that SEXUAL ASSAULT and/or SEXUAL MISCONDUCT.

21.    "INFORMATION" means data, information, DOCUMENTS, and facts, that exist and/or are transmitted in any form whatsoever including text, images, audio, video, electronic, or otherwise.

22.    "INTERPERSONAL CONFLICT" means any event or incident that UBER classifies or classified as an "IPC" or "interpersonal conflict," including but not limited to SEXUAL ASSAULT, SEXUAL MISCONDUCT, arguments, altercations, rude behavior or words, and/or discriminatory behavior or words.

23.    "INTOXICATED RIDERS" are RIDERS who are under the influence of alcohol.

24.    "KNOWLEDGE," when referring to UBER's knowledge, means all information, data, notice, RESEARCH, and Research findings that had been developed by UBER, discovered by UBER, COMMUNICATED to UBER, and/or otherwise come to UBER's attention.

25.    "INVESTIGATION" means all actions UBER and/or its CONTRACTORS take in response to events or conduct reported to UBER involving one or more RIDER and/or DRIVER. Investigation includes but is not limited to COMMUNICATIONS, interviews, internal discussions, classifications, DEACTIVATION, reactivation, and review of INFORMATION.

26.    "LOCATION DATA" means coordinates, GPS data, satellite data, and/or latitude-longitude data.

27.    "LOCATION TRACKING" means monitoring the location and movement of cellular devices, other devices, people, and/or vehicles.

28.    "LOW CREDIBILITY" refers to a determination that a particular RIDER or DRIVER lacks or may lack credibility. This includes but is not limited to a determination that a RIDER and/or DRIVER gives an unusual number of low ratings, engages in "over escalation," copies and pastes the same complaints repeatedly, or is otherwise flagged as showing abnormal patterns of reporting.

29.    "MARKETING" refers to the efforts to promote and/or sell something, including RESEARCH regarding customer/client/Rider preferences, behavior, and trends; relationship-building with potential or actual customers/clients/Riders; product development and design aimed at fulfilling customer/client/Rider preferences; and/or COMMUNICATIONS with a target audience through various COMMUNICATIONS CHANNELS to promote and/or sell something.

30.    "MATERIALS" mean any DOCUMENT, DATA, physical object, audio recording, video recording, or other item or material of any nature whatsoever.

31.    "MINIMUM REQUIREMENTS FOR A RIDER TO SAFELY RIDE WITH UBER" mean everything that Uber required of RIDERS, expected of RIDERS, and/or instructed RIDERS to do or not do, which instructions, requirements, and/or expectations RIDERS needed to follow in order to have a SAFE RIDE.

32.    "MINORS" mean people under the age of 18.

33.    "MISCONDUCT" means, for TICKETS that post-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, conduct that relates to any of the following categories from Uber's Safety Taxonomy: (1) Sexual Assault, (2) Vehicle Crash or Claim, (3) Theft or Robbery, (4) Sexual Misconduct, (5) Physical Altercation, (6) Verbal Altercation, (7) Substance Abuse, (8) Inappropriate Post-Trip Contact, (9) Law Enforcement / Regulatory, (10) Potential Safety Concern. "MISCONDUCT" means, for TICKETS that pre-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, TICKETS initiated by a RIDER or by a third party on the RIDER's behalf, that relate to any form of misconduct or inappropriate behavior involving the Driver, including driving under the influence and complaints of interpersonal conflict (e.g., verbal altercations, theft, sexual misconduct, sexual assault, etc.), as well as speeding and other forms of unsafe driving.

34.    "OFFER CARD" means the complete INFORMATION presented to a RIDER about a DRIVER who is matched with the RIDER, including the complete USER EXPERIENCE that a RIDER viewing that INFORMATION would see. The OFFER CARD includes but is not limited to the DRIVER's name displayed, photograph displayed, the DRIVER's tier within the Uber Pro rewards program such as Uber Pro Diamond, the DISPLAYED STAR RATING, badges, compliments, biographical information, the DRIVER's number of trips, number of months or years spent as a DRIVER, and any other INFORMATION displayed (or which might be displayed if the RIDER clicks on a link).

35.    "PLAINTIFF" means the specific Plaintiff propounding these requests or, in the case of a minor, on whose behalf these requests are propounded.

36.    "RELIANT" or "RELYING" mean depending on, looking to, and/or expecting that another will provide a SAFE RIDE, and/or letting one's guard and defenses down because of that expectation and belief.

37.    "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

38.    "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

39.    "RIDECHECK" means any program for using LOCATION DATA to identify and/or act on UNPLANNED STOPS, ROUTE DEVIATIONS, and/or UNPLANNED RIDER-DRIVER PROXIMITY. RIDECHECK includes the programs Uber calls "RideCheck" and "RideCheck+" as well as any former, subsequent, or alternative versions of those programs, including GPS anomaly detection and any other such programs, whether those programs were merely CONSIDERED or implemented.

40.    "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

41.    "RIDE LOG" means the INFORMATION UBER maintains about each RIDE a DRIVER provides, which log includes but is not limited to the following information: Driver Name, Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback, for the whole time period when the Subject Driver was Active.

42.    "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride

(e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S), riding in the front seat).

43.    "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

44.    "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

45.    "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

46.    "SAFETY LENS" means the software, program, and/or set of DOCUMENTS that UBER calls the "safety lens." It includes the entire family or universe of tabs, views, menus, popups, pulldowns, dropdowns, and buttons, and all the data, INFORMATION, DOCUMENTS and views that are linked together within, and accessible from Safety Lens.

47.    "SAFETY TOOLKIT" means the set of features and resources that are part of the Uber App and/or Driver App and relate to safety during RIDES. The SAFETY TOOLKIT includes but is not limited to the "Share My Trip," "Emergency Assistance," In-App Reporting, live Help, and text 911 features.

48.    "SCREEN" or "SCREENING" refers to interactions, actions, and information gathering in order to decide whether or not to allow an applicant to become a Driver.

49.    "SCREEN OUT" or "SCREENING OUT" means to determine that a person is DISQUALIFIED for a position or job.

50.    "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

51.    "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a

Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

52.     "STAR RATING" means the number of stars a RIDER assigns to a DRIVER, out of maximum of five, when leaving feedback after a RIDE.

53.     "SUBJECT DRIVER" means the DRIVER who is alleged to have committed the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT in this matter.

54.     "SUBJECT RIDE" means the RIDE that PLAINTIFF alleges was connected with the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT she experienced.

55.     "TELEMATICS" means LOCATION TRACKING; LOCATION DATA; collecting, monitoring, transmissions, and/or analysis of LOCATION DATA and patterns within LOCATION DATA; including the use of TRIGGERS, and notifications regarding LOCATION DATA and patterns.

56.     "TELEMATICS TRIGGER" means a specific event or condition detected by a TELEMATICS system that prompts a notification, response, alert, or action. A TELEMATICS TRIGGER may include speed alerts, harsh braking alerts, geofencing alerts, and/or alerts based on proximity

57.     "TICKET" means a customer support interaction or series of related customer support interactions, as well as DOCUMENTS used by UBER to track and/or manage those interactions and resulting investigations and/or dispositions. TICKET includes but is not limited to TICKETS sent, received, tracked, or organized via Uber's Zendesk software, JIRA software, Bliss software, or another software program.

58.     TICKET-RELATED DOCUMENTS means all INFORMATION and DOCUMENTS attached or linked to the Ticket, including without limitation the Chronicle map snapshot, Chronicle animation, Voyager data, Voyager animation, comments, names of Uber personnel reflected in the tickets, and all Communications connected with the ticket, including the entire set of COMMUNICATIONS, tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, evidence, LOCATION DATA, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET. TICKET-RELATED DOCUMENTS include

the entire USER EXPERIENCE that an agent and/or investigator who works for UBER would be able to see and/or access with regard to a specific investigation.

59.    "TRUSTING" means having confidence in, depending on, expecting, and/or relying on a person or business entity, to provide a RIDE that is free from harm, danger, and/or risk.

60.    "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

61.    "UBER APP," "UBER APPLICATION," "RIDER APP," or "APP" means Uber's mobile device application that is used by Riders to coordinate, or order Uber Rides.

62.    "UBER PRO" refers to UBER's "Uber Pro" rewards program for DRIVERS.

63.    "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period of time, when a Ride is no longer in progress.

64.    "UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a DRIVER have stopped at a location other than the intended destination, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign).

65.    "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a user may interact with.

66.    "USER INTERACTIONS" mean all forms of engagement with an application's interface, including clicking buttons, swiping, tapping, scrolling, and any other actions that involve manipulating the app's elements.

67.    "VIGILANT" means observant, careful, alert, on guard, taking precautions, ready to take action, defensive.

68.    "VOYAGER DATA" means INFORMATION from UBER's Voyager software, including both the raw LOCATION DATA, and the analyses and presentations of that INFORMATION conducted by the Voyager software.

69.    "WOMAN" as used herein should be interpreted broadly to include anyone who identified herself as having a female (or nonbinary) gender, and also anyone whose inferred gender (based on, e.g., name) is female and who did not otherwise identify their gender.

70.    "WOMAN TO WOMAN MATCHING" means any product, software, or program for matching women (and/or nonbinary, transgender individuals, and/or those with inferred female gender) with other women (and/or nonbinary, transgender individuals, and/or those with inferred female gender). This includes what Uber refers to as Women2Women or W2W and any former, subsequent, or alternative versions of that program.

## **INTERROGATORIES**

1.    If You contend Plaintiff's MDL action is subject to a forum selection clause or a choice-of-law clause, identify (1) the effective date of each version of Uber's Terms of Use that You contend the Plaintiff agreed to; (2) the date You contend that Plaintiff assented to each version; (3) the actions You contend Plaintiff took that constituted assent; and (4) all facts supporting those contentions, including but not limited to whether the alleged assent occurred in connection with Uber rides, Uber Eats, or some other service and a complete description of "electronic records" of the sort discussed in ECF 393-1, ¶ 6.

2.    If You contend Plaintiff's MDL action is subject to a forum selection clause or a choice-of-law clause, identify the dates on which You became aware of potential litigation against You on behalf of the Plaintiff, including but not limited to (1) communications from the Plaintiff to You regarding the Incident; (2) communications from a third party (e.g., police) to You regarding the Incident; or (3) communications from attorney(s) representing the Plaintiff. For each date, describe the notice.

3.      If You contend Plaintiff violated Your Community Guidelines or Your Terms of Use in connection with the Subject Ride, identify all facts in support of that contention, including but not limited to (1) the details of Plaintiff's actions that You contend were a violation of the Community Guidelines or Terms of Use, (2) the operative version of the Community Guidelines or Terms of Use, (3) the specific provision of the Community Guidelines or Terms of Use that You contend Plaintiff violated.

4.      If you contend that any pre-Incident reports of Misconduct against the Subject Driver were by Riders with Low Credibility, please state in detail all facts that contention is based on. If Uber ever applied any Low Credibility designation to Plaintiff, please identify (1) the date of any such Low Credibility designation(s), (2) the title/nature of such Low Credibility designation(s), and (3) all facts any such Low Credibility designation was based on.

5.      If You contend that any Information or Data (including but not limited to any Uber App data, dash cam footage, and/or Location Data) contradicts Plaintiff's statements about the Subject Ride and/or Incident (including any statements Plaintiff made directly to Uber, and any statements in Plaintiff's most recent amended complaint), please specifically identify the contents and source of such Information or Data.

6.      Do You contend that Plaintiff bears any fault for the Incident?

7.      If You contend that Plaintiff bears any fault for the Incident, please state all facts that contention is based on.

8.      For any Rider who, before the date of the Subject Incident, reported Sexual Assault and/or Sexual Misconduct against the Subject Driver, which did not result in permanent Deactivation, Identify the Rider by name, email address, physical address, and phone number. (Plaintiff invites Uber to meet and confer regarding a process for allowing these Riders to opt into or out of having their identities shared.)

9.      For any Woman Rider who gave the Subject Driver a one-star rating and did not indicate why, please identify the Rider by name, email address, physical address, and phone number. (Plaintiff invites Uber to meet and confer regarding a process for allowing these Riders to opt into or out of having that informed shared through this process.

10.    For every status change in the Subject Driver's Account History, please identify the reasons for the status change including (1) identify the date and title of the status change, (2) identify the policy or program that governed the status change, if any (2) identify any events or deadlines that triggered the status change, (4) if the status was the result of any Information Uber learned about the Subject Driver, any report by anyone regarding the Subject Driver, or any action or inaction of the Subject Driver, describe such Information, actions, and/or events.

11.    For any acronyms or terms of art that appear in Uber's Location Data related to the Subject Ride (including the Chronicle data and maps, Voyager data and maps, and/or Fractal data and maps) describe what each acronym or term of art means.

12.    Please identify, for every safety tool in Uber's Safety Toolkit (e.g. Share My Ride), (1) the date that tool became available to Plaintiff, and (2) the dates if any when Plaintiff used that tool.

13.    Identify (by date, content of the Communications, Communications Channel used, and Bates numbers of supporting Documents) any Communications from Uber to Plaintiff, from 2012 to the present, regarding any of the Minimum Requirements for a Rider to have a Safe Ride with Uber.

14.    Identify (by date, content of the Communications, Communications Channel used, and Bates numbers of supporting Documents) any Communications from Uber to Plaintiff, before the Incident, where Uber attempted to make Plaintiff more Vigilant and less Reliant on or Trusting of Uber during Rides (including but not limited to Communications to Plaintiff, using any words, that Plaintiff was Riding at her own risk; that Plaintiff was doing business with an independent Drivers rather than with Uber when she took a Ride; that Plaintiff should make an independent judgment regarding whether to Trust a particular Driver; that Uber had never met or interviewed its Drivers; that Uber had incomplete information about Drivers; and/or that Uber was not responsible for Plaintiff's Safety during Rides).

15.    Identify (by date, content of the Communications, Communications Channel used, and Bates numbers of supporting Documents) any Communications from Uber to Plaintiff, before the Incident, related to any risk of Sexual Assault and/or Sexual Misconduct.

16.     Identify (by date, content of the Communications, Communications Channel used, and Bates numbers of supporting Documents) any Communications from Uber to Plaintiff, before the Incident, related to the risk of Sexual Assault and/or Sexual Misconduct for Female Riders Matched with Male Drivers.

17.     Identify (by date, content of the Communications, Communications Channel used, and Bates numbers of supporting Documents) any Communications from Uber to Plaintiff, before the Incident, related to Risk Factors, including but not limited to Risk Factors present during the Subject Ride and/or Risk Factors related to the Subject Driver.

18.     If You contend that Plaintiff did not view the entire Offer Card in connection with the Subject Ride, identify all facts in support of that contention including (1) what specific Information in the Offer Card Plaintiff did not view, and (2) the Documents, Data, and/or Information on which You base that contention.

19.     Identify (by date, content of the Communications, Communications Channel used, and Bates numbers of supporting Documents) any Communications from Uber to Plaintiff conveying negative information about the Subject Driver, including but not limited to (1) limitations of, or incompleteness of, Uber's Screening and/or Background Check(s) for the Subject Driver; (2) Reports of Misconduct Uber received about the Subject Driver; (3) Risk Factors Uber was aware of about the Subject Driver.

20.     Identify the version of RideCheck, if any, that was used during the Subject Ride, including (1) the Bates numbers for any Documents that describe that version of Ridecheck, (2) which Telematics Triggers were in place at the time of the Subject Ride, and (3) after how many minutes of an Unplanned Stop would there be a Telematics Trigger, (4) after how many minutes of an Unplanned Stop would Uber take any action, (5) what actions, if any, was Uber to take (under its policies) after how many minutes of an Unplanned Stop, and (6) what actions did Uber in fact take.

Dated: March 27, 2025                    By _____

Sarah R. London (SBN 267083)
Simon Grille (SBN 294914)
Maya Kalonia (SBN 359755)

**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Email: slondon@girardsharp.com
Email: sgrille@girardsharp.com
Email: mkalonia@girardsharp.com

Elizabeth J. Cabraser (SBN 083151)
Tiseme Zegeye (SBN 319927)
Annie Wanless (SBN 339635)
**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Email: tzegeye@lchb.com
Email: ecabraser@lchb.com
Email: awanless@lchb.com

*Counsel for Plaintiffs*

17

**PROOF OF SERVICE**

I, Rachel Park, hereby declare as follows:

I am employed by Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, California 94108.  I am over the age of eighteen years and am not a party to this action.  On March 27, 2025, I caused a copy of the foregoing document to be served *via electronic mail* on the following:

**PLAINTIFF LCHB128's FIRST SET OF SPECIAL INTERROGATORIES TO DEFENDANTS**

on:

Randall s. Luskey
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
**& GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101

Robert Atkins
ratkins@paulweiss.com
Caitlin E. Grusauskas
cgrusauskas@paulweiss.com
Andrea M. Keller
akeller@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
**& GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for Defendants Uber Technologies, Inc.,*
*Raiser, LLC, and Raiser-CA, LLC*

I declare under penalty of perjury that the above is true and correct.  Executed on March 27, 2025, at El Cerrito, California.

Rachel Park

18