LAURA VARTAIN (SBN: 258485)
  laura.vartain@kirkland.com
**KIRKLAND & ELLIS LLP**
555 California Street, 30th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625

ALLISON M. BROWN (Pro Hac Vice admitted)
  allison.brown@kirkland.com
JESSICA DAVIDSON (Pro Hac Vice admitted)
  jessica.davidson@kirkland.com
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

*[Additional Counsel Listed on Following Pages]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB<br><br>**DEFENDANT UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S LETTER BRIEF REGARDING BELLWETHER WRITTEN DISCOVERY** |

Defendants submit this response to Plaintiffs' May 26, 2025 letter brief.

### I. Plaintiffs Caused Unnecessary Delay By Propounding Disproportionate, Cookie-Cutter Bellwether Discovery.

This Court asked Plaintiffs to "be thoughtful about what's proportionate under Rule 26, and be selective" and warned against "an inclination just to ask for the sun and the moon and the stars…." See, **Ex. 1**, May 13, 2023 Transcript, at 33:6-15. Unfortunately, Plaintiffs[1] continue to pursue exactly the type of discovery the Court warned against. Plaintiffs routinely served more than the twenty-five interrogatories permitted when subparts were counted as required. Fed. R. Civ. P. 33(a)(1). Each Plaintiff served over fifty requests for production. Plaintiffs' requests include dozens of lengthy and vague definitions that often contain several other defined terms.[2] And this discovery was nearly identical across the Bellwether Plaintiffs. As a result, Defendants lodged proper objections. Defendants also did their best to respond.

If Plaintiffs truly wanted to frame the issue for the Court, they would have included Defendants' responses and summarized the objections in the chart attached to their letter brief. Tellingly, they did not. A chart reflecting both the discovery requests *and the responses* along with Defendants' response to the deficiency Plaintiffs allege, is attached. See, **Ex. 2**, Gromada Dec. at Exs. A-C.[3]

Defendants provided substantive responses and lodged appropriate objections to Plaintiffs' requests. Even where they objected, Defendants worked with Plaintiffs to understand, narrow, and respond to requests. These efforts continue. Defendants are preparing additional information for production while briefing this dispute-and the separate issue Plaintiffs initiated briefing on-all of which distracts from efforts to produce information. Thus, while Defendants' responses were proper as explained below, any delay resulted from Plaintiffs' disproportionate requests.

Plaintiffs claim deficiencies regarding eighteen interrogatory answers and thirty-five requests for production responses. Defendants properly objected and provided substantive responses. Plaintiffs: (a) incorrectly claim Defendants' responses are insufficient; (b) want information they already have in a different format; (c) want an identification of specific Bates numbers (even though this Court has already ruled that this is not required and Defendants provide a description of each production's contents in the transmittal letter); and, (d) want Defendants certify that no other responsive documents exist. Plaintiffs' arguments are unsupported by the law.

### II. Defendants Have Substantially Complied with Discovery Commitments.

Defendants produced over 1.7 million documents in corporate discovery responsive to many of Plaintiffs' requests. Of course, Defendants did not rest on that production. Instead, Defendants produced an additional 2,100 documents in response to Plaintiffs' individual requests and interrogatories, some of which would comprise, if printed, over 20,000 printed pages. Defendants have gone so far as to *engineer new data exports* in an attempt to respond to Plaintiffs' broad requests including for "[a]ll Information Uber has concerning cellular phones used by the Subject Driver (including but not limited to cell phone number(s), make and model of cell phone(s), and IP addresses used by the Subject Driver)."

---

[1] Defendants will refer to the twenty Bellwether Plaintiffs as "Plaintiffs" in this letter brief.
[2] For reference, Plaintiff B.L.'s Requests for Production (containing 92 defined terms and 57 requests) and Second Set of Interrogatories are attached. Ex. 2, Gromada Dec. at Exs. A & B.
[3] Plaintiffs' chart included many requests for which there is no dispute. Defendants omit these.

2

     Despite these efforts, and as they have on other issues, Plaintiffs declared a premature impasse and claim they do not have time to wait. ECF 2320 at 3:16-17 (noting a dispute "has not been addressed sufficiently through the meet and confer process"). For most issues, no dispute exists. In other instances, Plaintiffs are simply not entitled to what they seek. For example, Defendants never agreed to identify the Bates numbers of all documents responsive to Plaintiffs' requests and they are not required to do so. Similarly, courts have routinely held that parties are not required to provide assurances that no additional documents exist. *Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.*, 222 F.R.D. 594, 598 (E.D. Wis. 2004); *Dobbs v. Costle*, 559 F. Supp. 238, 242 (N.D. Ill. 1983). Federal Rule of Civil Procedure 26(g) already requires that counsel certify, after a reasonable inquiry, that discovery responses are complete and correct as of the time they are made. No additional certification is required, as this Court found with respect to another issue. ECF 2320 at 3:15-16 ("In the Court's view, the itemized list Plaintiffs seek to include in Uber's declaration is not required by Rule 34, may be unduly burdensome…."). Defendants have assured Plaintiffs that they have produced responsive documents identified using the negotiated custodians and search terms, as well as conducting the custodian-agnostic and other searches as agreed to by the parties or ordered by this Court.

     Contrary to Plaintiffs' assertions, Defendants met their agreed-upon May 16 deadline and produced documents and supplemental interrogatory responses. Plaintiffs acknowledge that Defendants' production included extensive data sets and logs individualized to each Plaintiff.

### III. Plaintiffs' Alcohol Related Advertising and Communication Requests Are Plainly Disproportionate And Plaintiffs Already Have Responsive Information.

     Plaintiffs' requests seeking all alcohol-related (e.g., 'don't drink and drive') advertising and communications illustrate the objectionable breadth of the requests. For example, several Plaintiffs who claim they were *not* intoxicated at the time of their ride request this advertising material *spanning a ten-year period*.[4] Even for Plaintiffs who alleged they were intoxicated, the requests are overly broad, unduly burdensome, and disproportionate when considering the "importance of the discovery in resolving the issues," the burden of searching for this information, and the cumulative nature of the information sought.

     Certain Plaintiffs allege they saw alcohol related advertising. As to these Plaintiffs, Defendants have already produced vast swaths of national advertising including advertising related to themes of 'don't drink and drive." Yet, Plaintiffs want Defendants to search for all geographic-specific (supposedly targeted to their hometowns) alcohol related advertising[5] "in print, on billboards, at bus stops, on the internet, on any social media" including without limitation "YouTube, Instagram, Facebook, SnapChat, on in-app Banners, television, on the radio, by any other electronic medium" over *time periods up to twelve years sometimes ranging to the present* for specific geographic regions including small towns- including for Plaintiffs who do not allege to have seen the material.[6] Despite Plaintiffs' request for production being objectionable, and despite the fact that responsive documents would already be contained in the corporate production that Plaintiffs can search,

---

[4] For example, Jane Roe CL 68's Interrogatory Answers state she did not consume alcoholic beverages within twelve hours of the alleged incident yet she requested all alcohol related advertising in Austin, Texas from 2012 through September 2022.

[5] Plaintiffs' definition of "Drinking Related Communications" included communications related to "the holidays," "parties," "celebrations," and others that "relate to the concept of getting home safely after drinking…" Defendants properly objected to these vague and broad definitions.

[6] For example, Plaintiff Lazio sought advertising for Johnston, Iowa "between 2022 and today" in addition to advertising for "Council Bluffs, Iowa, between 2012 and 2024" and other regions.

Defendants are searching for responsive documents where Plaintiffs alleged they were intoxicated. It is unlikely these searches will yield any results because, to the extent historical advertising related data still exists, it is not maintained in a way that makes the search Plaintiffs' want-targeting hyper-specific geographic regions (i.e., "hometown-specific") -feasible. Defendants have already produced a log of all of the in-app and email marketing ("push") communications sent to each Plaintiff and Driver. There is no basis for ordering Defendants to respond to these objectionable requests (RPD 56, 57; Int. 1).

**IV. Defendants Properly Objected and Responded to Plaintiffs' Interrogatories.[7]**

**A. Defendants Answered Interrogatories Requesting That They "Decode" Account History (Rog. 12).**

Plaintiffs' letter brief repeatedly fails to quote entire requests and interrogatories obscuring the breadth of their discovery. For example, the interrogatory related to status changes does not just ask "the reasons for the status change" (Pltf.'s Ltr. at 2:11-12) but instead seeks: "the reasons for the status change including (1) identify the date and title of the status change, (2) identify the policy or program that governed the status change, if any (2) identify any events or deadlines that triggered the status change, (4) if the status was the result of any Information Uber learned about the Subject Driver, any report by anyone regarding the Subject Driver, or any action or inaction of the Subject Driver, describe such Information, actions, and/or events."

Interrogatory No. 12 is overly broad, disproportionate, and unduly burdensome. Despite this, Defendants answered. For example:

> Responding Party directs Plaintiff to the Account Status Log Produced in answer to Defendant Fact Sheet Request 24 for this action. To the extent not self-evident from the face of the Account Status Log, Responding Party responds as follows: As shown in the Account Status Log produced at UBER-MDL3084- DFS00061347, the independent third-party driver referenced in this Interrogatory applied to accept Rides (flow type P2P) on the Uber platform on June 23, 2022, and this individual's status changed from active to waitlisted four (4) times between June 27, 2022 and August 13, 2022. Generally, these status changes may relate to renewals of background checks, vehicle information, or other such reasons. These changes are often automated, and noted as reflected in the Account Status Log. This individual was deactivated on January 25, 2025, for safety reasons, as a result of new information provided to Responding Party and subsequent investigations. Further answering, Responding Party refers Propounding Party to the corporate representative deposition topic regarding the Subject Driver's status history with Uber. Responding Party will produce a corporate representative to testify regarding this topic.

Defendants also produced a log for the independent driver for each Plaintiff showing status changes (e.g., active, inactive). Defendants properly objected to this Interrogatory, but responded in good faith nevertheless.

---

[7] Defendants' objection that Plaintiffs exceeded Rule 33's numerical limitation based on the number of compound requests and discrete interrogatory subparts was correct. For example, Plaintiff B.L.'s Interrogatory 21 contains six discrete subparts. Ex. 2, Gromada Dec., Ex. B (Int. 21). This was the third time Plaintiffs exceeded Rule 33's numerical limit without adhering to Local Rule 33-3 after twice doing so in corporate discovery. Still, to keep this matter moving, Defendants agreed to answer once Plaintiffs agree the objection was not waived.

**B. Defendants Offered to Explain Any Terms or Acronyms Plaintiffs Identified (Rog. 13).**

Plaintiffs asked Defendants to define every acronym or term of art appearing in several data sources regardless of its relevance. Defendants therefore objected but offered to meet and confer regarding any questions related to specific acronyms or terms. Defendants also noted corporate testimony on this issue would be provided. Plaintiffs' demand for individualized narrative responses would require time-intensive, duplicative reviews not proportional to the needs of the case. Yet, rather than identifying the terms they cared about, Plaintiffs declared an impasse by filing. Plaintiffs' complaints are particularly hollow where they demanded the raw data they now want further explanation for. Plaintiffs cannot fault Defendants for producing raw data Plaintiffs specifically requested.

**C. Interrogatories 4, 5, 7, 8, 9, and 20 are Premature and Overly Broad Contention Interrogatories.**

Interrogatories 4, 5, 7, 8, 9, and 20 are broad contention interrogatories that are plainly improper under well-established law. Because the purpose of contention interrogatories is to narrow issues rather than discover information, "courts tend to deny" them until discovery is substantially complete. *In re eBay Seller Antitrust Litig.*, 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008) ("In fact, courts tend to deny contention interrogatories filed before substantial discovery has taken place, but grant them if discovery almost is complete."); *Tennison v. City & Cnty. of San Francisco*, 226 F.R.D. 615, 618 (N.D. Cal. 2005) (contention interrogatories appropriate where "discovery is nearly complete..."); *Former S'holders of Cardiospectra, Inc. v. Volcano Corp.*, 2013 WL 5513275, at *2 (N.D. Cal. Oct. 4, 2013).

Here, Defendants have not even taken the Plaintiffs' depositions. Asking Defendants whether they contend that Plaintiff "bears any fault for the incident" (Rog 9), "violated Your Community Guidelines" (Rog 4), or "did not view the entire Offer Card," before that Plaintiff has even been deposed is not permitted. It is no answer for Plaintiffs to say Defendants can amend their responses. Courts recognize that requiring parties to continually update contention interrogatory answers as discovery proceeds would be a waste of time. That is precisely why they "tend to deny contention interrogatories" until "discovery almost is complete." 2008 WL 5212170, at *1.

In addition to being premature, Defendants properly objected to the scope of these Interrogatories. *Volcano Corp.*, 2013 WL 5513275, at *2 ("While contention interrogatories are permitted, they 'are often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses.'"); *Haggarty v. Wells Fargo Bank, N.A.*, 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012); *Mancini v. Ins. Corp. of New York*, 2009 WL 1765295, at *3 (S.D. Cal. June 18, 2009); *Bovarie v. Schwarzenegger*, 2011 WL 719206 *1 (S.D. Cal. Feb. 22, 2011) (an interrogatory "seeking every fact that underlies every affirmative defense is unduly burdensome").

Here, in many cases, the Interrogatories not only seek "all facts" related to a contention-which is objectionable in itself-they also seek *more* information. For example: "If You contend Plaintiff violated Your Community Guidelines or Your Terms of Use in connection with the Subject Ride, identify all facts in support of that contention, including but not limited to (1) the details of Plaintiff's actions that You contend were a violation of the Community Guidelines or Terms of Use, (2) the operative version of the Community Guidelines or Terms of Use, (3) the specific provision of the Community Guidelines or Terms of Use that You contend Plaintiff violated." As in this example, Plaintiffs' contention interrogatories are overly broad, unduly burdensome, and disproportionate in addition to being premature. Defendants properly objected to Interrogatories 4, 5, 7, 8, 9, and 20.

**D. Defendants Provided Substantive Answers to Interrogatories 6, 14, 15, 16, 17, 21 and 22.**

Interrogatories 6, 14, 15, 16, 17, 21 and 22 are overly broad and disproportionate. Defendants properly objected. However, Defendants also answered, often identifying responsive information by Bates number. For example, in one answer to Interrogatory No. 14, Defendants stated: "Responding Party refers Plaintiff to Responding Party's response to Plaintiffs' Request for Production No. 18. Responding Party refers Propounding Party to the mobile events log produced at UBER-MDL3084-BW-00006317." In one answer to Interrogatory 6, Defendants stated: "to the extent any such reports reflecting the credibility of Plaintiff exist, *e.g.*, in Jira Tickets or Bliss communications provided to Plaintiffs in the Defendant Fact Sheet, and productions of other Jira Tickets and Bliss communications related to Plaintiff, the documents and records as provided to Plaintiffs in the Defendant Fact Sheet, regarding such reports speak for themselves. Responding Party otherwise refers to its document production in response to Defendant Fact Sheet questions…"

Defendants properly objected yet attempted to provide information. If Plaintiffs sought still more information, it should have been addressed in a meet and confer rather than by prematurely marching to court and seeking sanctions.

**V. Defendants' Properly Objected And Responded To Plaintiffs' Document Requests.**

The vast majority of Plaintiffs' production requests are overly broad, disproportionate, vague, and otherwise objectionable. Nevertheless, Defendants endeavored to respond. Defendants already produced documents individualized to particular Plaintiffs in connection with Defendants Fact Sheets. Therefore, Defendants referenced that production in many responses. Defendants also produced additional individualized documents in response to Plaintiffs' discovery requests including by generating custom reports in a filterable and searchable format. In sum, Defendants have produced numerous documents individualized to each Plaintiff detailed in the supporting declaration. Ex. 2, Gromada Dec. at pars. 21-22. Further productions, which Defendants were able to gather after meet and confers in which requests were narrowed and explained, are forthcoming.

**Requests 1, 2, 16, 17, 21, 23-24, 45, 51, 28-29, 31-33, 40-41, 48, 52:** In these instances, Plaintiffs want Defendants to "confirm that….it has no responsive documents" or that its "only responsive documents" are produced at a specified Bates range. Similarly, Plaintiffs' chart identifies some deficiencies as "need confirmation there are no other responsive documents" while others note that Defendants may have produced "everything it has" but they are not sure. Defendants conducted reasonable searches aimed at locating responsive documents. That is what the Federal Rules require. The Federal Rules do not require an additional certification. *Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.*, 222 F.R.D. 594, 598 (E.D. Wis. 2004) ("Rule 26(g) does not require counsel to certify the truthfulness of the client's factual responses to discovery."); *Dobbs v. Costle*, 559 F. Supp. 238, 242 (N.D. Ill. 1983) ("The federal rules do not require a party to prove a negative, i.e., that no additional responsive documents exist.")

Nor do the rules require Defendants to identify the Bates numbers of referenced documents. This Court has recognized as much. ECF 2320 at 3:15-16. Nevertheless, Defendants have often identified the relevant Bates numbers. Ex. 2, Gromada Dec., Exs. E-H. For example, in a May 14, 2025 transmittal letter, Defendants identified the Bates range for "Driver and Rider rating and feedback documents, identified by MDL Centrality ID." *Id*. Plaintiffs' complaint about "mismatched" batches is groundless. Defendants produced materials identified by MDL Centrality ID, as requested by Plaintiffs, and counsel are available to clarify any questions.

**Requests 4-9:** These requests relate to the application and background check process. Defendants properly objected to these Requests on multiple grounds. Nevertheless, the background check adjudication criteria was produced in corporate discovery and Plaintiffs admit Defendants provided the background check documents in their possession.

**Request 11:** Defendants objected but identified responsive documents in conformance with Rule 33(d)(1). Plaintiffs admit documents that "explain some status changes," were produced but complain Defendants "have not produced documents that give context for other status changes…." This is not required.

**Requests 14 & 15**: Defendants objected and have produced responsive information to the best of their understanding. The information sought is available as maintained in the ordinary course of business and was provided in the "Feedback and Ratings" reports that Defendants custom tailored to be responsive to Plaintiffs' requests. Defendants identified the corporate discovery request to which responsive documents were produced and produced additional documents identified by Bates range in the May 14, 2025 transmittal letter as "Driver and Rider rating and feedback documents, identified by MDL Centrality ID."

**Requests 18 & 19**: Defendants objected and have produced responsive information to the best of their understanding. There is no such thing as "Voyager Data," which is what these Requests seek. Defendants produced GPS and speed related data for the subject trip with the Defendant Fact Sheet. On May 15, 2025, Defendants produced "mobile events" logs custom compiled for the independent drivers for 24 hours before and after the subject trip.

**Request 25**: Ticket-related documents, including location data, for the subject drivers' prior tickets that involved allegations of sexual misconduct. Uber has produced several Voyager screenshots stating that the Voyager map was unable to load, but it has not produced the GPS data for prior rides. (For Wave 1).

**Request 27**: As Plaintiffs admit, Defendants agreed to produce this information. Searching for "all information" Defendants have about a driver's cell phone is incredibly burdensome and Defendants could have properly refused. There are technical limitations to extracting this information, which has not been previously produced in the granular detail requested by Plaintiffs. Defendants are devoting significant engineering effort to developing, validating and exporting the queries and estimate it will be produced in three weeks.

**Request 54**: The data that would have appeared on the Offer Card has been produced. Plaintiffs are seeking information in a form that does not exist.

**VI. Plaintiffs' Suggestion for Rule 37 Sanctions Is Baseless and Improper.**

Defendants were (and are) actively trying to understand and narrow the remaining requests. There is no place for Rule 37 sanctions in this process, especially where Plaintiffs only raised the prospect of any sanction improperly (and for the first time) through this filing, and for the first time in this filing offer to narrow the scope of some requests but have refused to discuss others.

Moreover, despite the Court denying Plaintiffs' prior improper request for sanctions, Plaintiffs have wholly ignored Local Rule 7-8 which applies to sanctions requests "regardless of the source of authority invoked…" ECF 2545 at 7:1-2 (denying request for sanctions without prejudice to raising it "in a separate motion consistent with Civil Local Rule 7-8"). Plaintiffs' failure to comply with the Local Rules ends the inquiry and the request for sanctions must be denied, as due process also requires. Plaintiffs' request is also entirely unfounded. Plaintiffs' suggestion that sanctions under Rule 37(b)(2)(A) could be appropriate is groundless. Pltf. Ltr. at 3-4. By its plain language, that rule applies

only to a party's "failure to comply with a court order." Violation of a court order is a "condition precedent" to sanctions under that section. *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 390 (N.D. Cal. 2012); *In re Rubin*, 769 F.2d 611, 616 (9th Cir. 1985) ("The bankruptcy court struck Rubin's answer under Rule 37(b) of the Federal Rules of Civil Procedure, a rule applicable only to cases in which a party has disobeyed a court order.") Plaintiffs cite no specific order Defendants have violated. Plaintiffs' reference to sanctions is substantively and procedurally improper and must be denied.

DATED: May 29, 2025                     Respectfully submitted,

**SHOOK HARDY & BACON L.L.P.**

By: */s/ Michael B. Shortnacy*
    MICHAEL B. SHORTNACY

**KIRKLAND & ELLIS LLP**
LAURA VARTAIN
ALLISON M. BROWN
JESSICA DAVIDSON

**O'MELVENY AND MYERS LLP**
SABRINA STRONG
JONATHAN SCHNELLER

**SHOOK, HARDY, & BACON, LLP**
PATRICK OOT (Admitted *Pro Hac Vice*)
    oot@shb.com
1800 K St. NW Ste. 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

ALYCIA A. DEGEN (SBN: 211350)
    adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
    mshortnacy@shb.com
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (Admitted *Pro Hac Vice*)
    ccotton@shb.com

MARIA SALCEDO (Admitted *Pro Hac Vice*)
msalcedo@shb.com
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

*Attorney for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC