UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates To:<br>ALL CASES. | Case No. 23-md-03084-CRB (LJC)<br><br>**ORDER RESOLVING JOINT DISCOVERY LETTER REGARDING REQUESTS TO BELLWETHER PLAINTIFFS**<br><br>Re: Dkt. No. 3050 |

The parties filed a joint discovery letter, Dkt. No. 3050, which concerns certain written discovery requests served by Uber in connection with the bellwether cases. The Court previously resolved disputes included in that letter regarding medical records and rideshare usage, and now resolves the remaining disputes regarding social media. The Court presumes the parties' familiarity with the facts of the cases and the applicable law, and rules as follows.

**A.  Interrogatory No. 12**

Uber's Interrogatory No. 12 asks a bellwether plaintiff[1] to:

> Identify ALL social media AND social networking accounts, INCLUDING but not limited to Facebook, Instagram, X (formerly known as Twitter), MySpace, SnapChat, BeReal, TikTok, Threads, Bluesky, Mastodon, LinkedIn, YouTube, Twitch, Reddit, Tumblr, Pinterest, SoundCloud, MixCloud, Blogger, Yelp, Quora, AND Nextdoor, that YOU have set up OR used from 5 years prior to the ALLEGED INCIDENT to the present, INCLUDING as applicable, the username, account name, alias, AND/OR social media handle associated with each account.

Dkt. No. 3050-1 at 18–19.

Plaintiffs object to the scope of the request and contends that private social media

---

[1] The set of interrogatories the parties have provided is directed to Plaintiff A.R. in case number 24-cv-01827, but the Court infers from the parties' arguments that Uber has served substantially identical requests on all bellwether plaintiffs.

information and content must have a meaningful connection to the claims in the case. The burden of simply identifying social media accounts is limited, and at least some such accounts should already have been disclosed. *See* Dkt. No. 524 at 5–6 ("The parties will disclose a preliminary list of . . . (b) custodial and non-custodial data sources likely to contain potentially relevant Documents and ESI, . . . [which] may include, without limitation . . . (5) social media accounts . . . ."). But to ensure that the scope of social media discovery is proportionate to the needs of the cases, the Court narrows the time period for such discovery from beginning five years before the date of the incident to begin instead two years before the date of the incident.

The terms "social media" and "social networking" are also potentially ambiguous in scope. The examples Uber has provided suggest that Uber is using broad enough definitions of those terms that some plaintiffs reasonably might not think of some such services as "social media" or "social networking" (e.g., Yelp, a platform primarily used for reviewing restaurants and other businesses),[2] or might not be able to recall the complete list of such services they have used. The Court therefore limits Interrogatory No. 12 to the specific services Uber has listed.

Social media content may be relevant to a range of issues in these cases, and account holders have flexibility regarding the content of their posts and how they engage with the platforms. Merely identifying accounts will generally only allow Uber to review content that Plaintiffs have chosen to share publicly. Plaintiffs also assert that the request is overbroad for seeking accounts that they have "used" rather than merely accounts that they created. The Court agrees with Uber that whether Plaintiffs used a particular account is more likely to be relevant than whether they created it.[3] The Court therefore declines to set criteria for or narrow the scope of social media and social networking accounts that Plaintiffs must identify, except as specified

---

[2] That is not to say that Uber's use of the term is incorrect, only that reasonable minds might differ, thus rendering the interrogatory unduly vague.

[3] The Court understands that this request would potentially include accounts that were also used by other people, so long as the responding plaintiff used the account during the relevant time period. If there are special circumstances where such accounts are unlikely to be relevant, the parties are encouraged to meet and confer, and the Court expects that they will reach reasonable compromises. For example, if a plaintiff used her employer's social media accounts as part of her job, and did not share information about herself on those accounts, it may not be necessary for her to identify those accounts specifically.

above.

**B.    RFP Nos. 16 and 17**

Uber's Request for Production No. 16 seeks:

> ALL DOCUMENTS AND COMMUNICATIONS on SOCIAL MEDIA that YOU posted, sent, directed, received AND/OR were tagged in OR mentioned in, from five (5) years prior to the ALLEGED INCIDENT to the present that depict, describe, or RELATE TO
>
> (a) YOU attending social gatherings, public OR private, with people YOU know or with strangers;
>
> (b) YOU practicing hobbies of ANY kind whether done alone OR with people;
>
> (c) alcohol OR drug use; AND/OR
>
> (d) use of UBER, Lyft, OR ANY other ridesharing service,
>
> regardless of whether the information is publicly available OR requires a password AND login to access.

Dkt. No. 3050-1 at 8 (line breaks added).

Request No. 17 seeks the same scope of social media content regarding:

> . . . ANY mental OR emotional state OR condition of YOURS, INCLUDING but not limited to those RELATED TO
>
> (a)  ANY mental health diagnosis,
>
> (b) ANY traumatic experience,
>
> (c) ANY nonsexual assault OR battery,
>
> (d) depression,
>
> (e) anxiety,
>
> (f) PTSD,
>
> (g) difficulty falling asleep AND/OR staying asleep,
>
> (h) stress-related gastrointestinal disturbances,
>
> (i) hypoactive sexual desire,
>
> (j) suicidal ideation AND/OR planning,
>
> (k) stress,
>
> (l) headaches AND/OR migraines,

3

>>(m) difficulty concentrating,
>
>>(n) trauma, AND/OR
>
>>(o) emotional pain AND suffering,
>
>regardless of whether that information is publicly available OR requires a login AND/OR password access.

Dkt. No. 3050-1 at 11 (line breaks added).

### 1.     Scope of the Requests: Relevance and Burden

Taken as a whole, those requests would seem to sweep in much of a typical social media user's activity. Most social media posts or messages could likely be said to relate in some way to a hobby of some kind, *or* a social gathering of some kind, *or* any sort of mental or emotional state.

In response to those very broad requests, Plaintiffs seek to limit their production to only "posts they made that discuss the subject incident, their injuries caused by the subject incident and posts about Uber/Lyft/Rideshare that they have made since the subject incident." Dkt. No. 3050 at 7.

Neither side's position meaningfully addresses the fact that, as this litigation enters the case-specific discovery phase, it will sometime require case-specific inquiries as to relevance and burden.[4] Some of Uber's requests may be relevant to plaintiffs claiming particular harms after their alleged assault or harassment—like a loss of interest in hobbies or social interaction, increased drug or alcohol use, reduced sexual desire, stress-induced headaches or gastrointestinal distress, or the like. But for plaintiffs not claiming those particular injuries, and whose cases do not otherwise implicate those issues, such as drug or alcohol use, many of Uber's inquiries go toward inherently private subjects that may have nothing to do with that plaintiff's case. A plaintiff's claimed injuries, or other reasonable grounds for inquiry into specific topics, might sometimes be discernable from Plaintiff Fact Sheets required by Pretrial Order No. 10. *See* Dkt. No. 348-1 at 13–15. Plaintiffs have also provided interrogatory responses further elaborating on

---

[4] Where possible, the parties are encouraged to reach compromises that might allow for uniform discovery across multiple bellwether cases. To the extent the Court's intervention in these disputes is necessary, however, Rule 26's proportionality requirement may require tailoring discovery to the circumstances of specific cases.

1  their injuries, ECF No. 3050-2, and Uber could perhaps serve additional discovery if necessary to
2  determine the relevant areas of inquiry into Plaintiffs' social media.  "The party moving to compel
3  bears the burden of demonstrating why the information sought is relevant and why the responding
4  party's objections lack merit."  *Bluestone Innovations LLC v. LG Elecs. Inc.*, No. C-13-01770,
5  2013 WL 6354419, at *2 (N.D. Cal. Dec. 5, 2013).

6  The parties are strongly encouraged, however, to resolve this matter cooperatively without
7  need for further written discovery to resolve these threshold issues of relevance.  To that end, the
8  parties are ORDERED to meet and confer in person or by videoconference no later than two
9  business days after the date of this order in an effort to identify which of the topics listed in RFP
10  Nos. 16 and 17 are relevant to each of the Wave 1 bellwether cases.

11  In some cases, social media document production may end up being an iterative process.
12  Supplemental discovery requests might (or might not) be appropriate after reviewing an initial
13  production or taking a plaintiff's deposition, and subsequent document production might (or might
14  not) warrant reopening a plaintiff's deposition.  Plaintiffs who would prefer to avoid such an
15  outcome are encouraged to err on the side of production in the first instance.

16  To guide this meet and confer process and subsequent productions, the Court sets the
17  following additional parameters.  Requests for production "must describe with reasonable
18  particularity" the items sought.  Fed. R. Civ. Pro. 34(b)(1)(A).  Uber's demand for "ALL" social
19  media documents and communications "RELATED TO" to an enumerated topic are
20  impermissible under Rule 34 because it "require[s] the respondent to either guess or move through
21  mental gymnastics which are unreasonably time-consuming and burdensome to determine which
22  of many [posts and other social media information] may conceivably contain some detail, either
23  obvious or hidden, within the scope of the request."  The Sedona Conference, *Primer on Crafting
24  eDiscovery Requests with "Reasonable Particularity*," 23 SEDONA CONF. J. 331, 352 (2022).
25  The plaintiff shall produce social media communications and documents that depict or describe
26  the topics that are determined to be relevant to the plaintiff's case.

27  Above, the Court narrowed the scope of social media discovery for Interrogatory No. 12
28  from beginning five years before the date of the incident to begin instead two years before the date

United States District Court
Northern District of California

of the incident. To ensure proportionality with respect to the production of social media content, the scope of discovery for Requests for Production Nos. 16 and 17 are also narrowed to begin two years before the date of the incident.

The Court further finds that Uber's request for posts related to "ANY mental OR emotional state OR condition" (including *but not limited to* more specific categories) is overbroad, or at least sufficiently vague that it is amenable to overly broad interpretations. As an example, merely responding "lol" to another person's post or message arguably expresses an "emotional state" of amusement, but such a response is unlikely to be relevant to this litigation, at least where the message to which it responds is not relevant. On the other end of the spectrum, posts expressly discussing a mental health condition like depression are very likely to be relevant. In the meeting required above, the parties must attempt to reach an agreement on the scope of relevant posts about plaintiffs' emotional state for the cases where that is at issue—likely most if not all cases in this MDL.

The parties shall file a further joint letter no later than two business day after that meeting for any remaining disputes about the scope of relevance of *specific topics* to *specific cases*, or a joint statement indicating that all such disputes have been resolved. The parties shall similarly meet and confer before raising such disputes with respect to bellwether cases beyond Wave 1, but need not do so by the same deadline.

### 2. Validating Production

Once the topics for which Plaintiffs will produce documents are resolved, Uber has also raised a legitimate concern that relevance and responsiveness is to some degree in the eye of the beholder, and production therefore should not be limited to Plaintiff's unilateral determination of what may be reasonably calculated to lead to the discovery of admissible information. Dkt. No. 3050 at 4 (quoting *Bass ex rel. Bass v. Miss Porter's Sch.*, No. 3:08cv1807 (JBA), 2009 WL 3724968, at *1 (D. Conn. Oct. 27, 2009)). Of course, the ultimate selection of what documents are *responsive* to a request is normally left to the producing party, after any question of the appropriate scope of the request is resolved by the parties' negotiations or by a court. Under the circumstances of this case, however, the responsiveness of social media information may

sometimes be a subjective question.

As a starting point, Plaintiffs' counsel must review Plaintiffs' social media content for responsiveness (and oversee the gathering of such content for review) rather than relying on Plaintiffs themselves to self-select responsive documents.

Some degree of validation is also warranted. The parties have separately agreed to a procedure for Plaintiffs' counsel to audit defense counsel's assessments of responsive documents as part of Uber's TAR production process. A corresponding, albeit not identical, validation process is appropriate here. Absent an agreement by the parties to engage in an alternate validation process or particular social media review and production process that they negotiate and agree upon, Plaintiffs must produce complete samples of their social media activity, whether or not publicly available, for three weeks per year (with those weeks, which need not be consecutive, to be selected by Uber), for up to three social media accounts (also to be selected by Uber).[5] *See* The Sedona Conference, *Primer on Social Media*, 20 SEDONA CONF. J. 1, 62 (2019) (discussing the review and production of social media content, including sampling and inspection). Plaintiffs must indicate which posts and messages in the sample they consider responsive and would have produced notwithstanding the sampling process. The parties shall meet and confer as to appropriate next steps if their views of responsiveness differ meaningfully. Even absent a disagreement as to responsiveness, such samples might also provide sufficient grounds for supplemental requests for production of documents not previously requested.

**IT IS SO ORDERED.**

Dated: June 2, 2025

LISA J. CISNEROS
United States Magistrate Judge

---

[5] As perhaps should go without saying, if these validation samples include privileged material, Plaintiffs may withhold that material and produce a privilege log in the same manner as for any other document production.

7