1   [Submitting counsel below]

2

3

4                 UNITED STATES DISTRICT COURT

5              OF NORTHERN DISTRICT OF CALIFORNIA

6                    SAN FRANCISCO DIVISION

7

8   **IN RE: UBER TECHNOLOGIES, INC.,**          No. 3:23-md-03084-CRB
    **PASSENGER SEXUAL ASSAULT**
9   **LITIGATION**                               **PLAINTIFFS' OPPOSITION TO**
                                                 **DEFENDANTS' MOTION TO TRANSFER**
10  ─────────────────────────────
                                                 Judge:  Honorable Charles R. Breyer
11  This Document Relates to:                    Date:   TBD
                                                 Time:   TBD
12  *A.R.1 v. Uber Techs., Inc.*,                Ctrm.:  6-17th Floor (zoom)
    No. 24-cv-01827
13                                               **REDACTED**
    *A.G. v. Uber Techs., Inc.*,
14  No. 24-cv-01915

15  *C.L. v. Uber Techs., Inc.*,
    No. 23-cv-04972
16
    *J.E. v. Uber Techs., Inc.*,
17  No. 24-cv-03335

18  *Jaylynn Dean v. Uber Techs., Inc.*,
    No. 23-cv-06708
19
    *LCHB128 v. Uber Techs., Inc.*,
20  No. 24-cv-07019

21  *T.L. v. Uber Techs., Inc.*,
    No. 24-cv-9217
22
    *WHB 318 v. Uber Techs., Inc.*,
23  No. 24-cv-04889

24  *WHB 407 v. Uber Techs., Inc.*,
    No. 24-cv-05028
25
    *WHB 823 v. Uber Techs., Inc.*,
26  No. 24-cv-4900

27  *WHB 1486 v. Uber Techs., Inc.*,
    No. 24-cv-4803
28
    *WHB 1876 v. Uber Technologies, Inc., et*

1    *al.*, No. 3:24-cv-05230

2    *WHB 1898 v. Uber Techs., Inc.*,
    No. 24-cv-05027

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Uber's Terms of Use ..................................................................................... 3

    B.    The thirteen Plaintiffs at issue in this motion. ........................................... 5

ARGUMENT ...................................................................................................................... 5

I.    The forum-selection clause is unenforceable. ....................................................... 6

    A.    To be enforceable, forum-selection clauses must be reasonable under the circumstances and fundamentally fair. ......................................................... 6

    B.    The clause is unreasonable under the circumstances of sexual assault cases. ........ 8

    C.    Uber did not reasonably communicate the forum-selection clause. .................... 10

    D.    The clause reflects bad faith. ...................................................................... 12

    E.    The clause is the result of improper overreach. ......................................... 13

II.    At minimum, the forum-selection clause is unenforceable against eleven Plaintiffs. ...... 15

    A.    It is unreasonable to apply the clause retroactively to Plaintiffs WHB 407, WHB 1876, and WHB 823 who were assaulted before they ever assented to the clause, especially to WHB 823, who filed a lawsuit before assenting. ........ 15

    B.    Uber did not reasonably communicate the forum-selection clause to Plaintiffs Dean, T.L., WHB 1898, A.R.1, or WHB 1486. ................................... 16

        1.    Uber's records indicate these Plaintiffs assented only through Uber Eats. ..................................................................................... 16

        2.    Uber did not reasonably communicate that using Uber Eats would determine venue for a future sexual assault claim arising from an Uber Ride. ...................................................................................... 18

    C.    Plaintiff A.R.1 was a minor and could not assent to the clause. ......................... 20

    D.    As to Plaintiffs C.L. and WHB 318, the clause is too vague to be enforced. ....... 20

III.    The forum selection clause does not encompass the claims asserted by Plaintiff A.G., who did not call her own ride. ............................................................... 21

IV.    Even if the forum selection clause is valid, the motion to transfer should be denied. ...... 23

    A.    The burden on the courts weighs against transfer. ................................................ 23

    B.    California has significant interest in local trial of these cases. ............................. 24

CONCLUSION ................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allred v. Innova Emer. Med. Assocs., P.C.*,
2018 WL 4772339 (N.D. Cal. Oct. 1, 2018)................................................................. 8

*AQuate II LLC v. Myers*,
100 F.4th 1316 (11th Cir. 2024) ................................................................................... 7

*Atlantic Marine Construction Co. v. United States District Court*,
571 U.S. 49 (2013).................................................................................................. 7, 23

*Ayeni v. Verizon Wireless, LLC*,
2024 WL 36103 (D.N.M. Jan. 3, 2024) ....................................................................... 7

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*,
2019 WL 2017541 (E.D. Va. May 7, 2019) ............................................................... 23

*Benson v. Casa de Capri Enters, LLC*,
980 F.3d 1318 (9th Cir. 2020)..................................................................................... 22

*Brown v. Comcast Corp.*,
2016 WL 9109112 (C.D. Cal. Aug. 12, 2016)............................................................ 22

*Cal-State Bus. Prods. & Servs., Inc. v. Ricoh*,
16 Cal. Rptr. 2d 417 (Cal. App. 1993) .......................................................................... 9

*Campbell v. Princess Cruise Lines Ltd.*,
2021 WL 75663 (N.D. Cal. Jan. 8, 2021) ..................................................................... 7

*Canters Deli Las Vegas, LLC v. Banc of Am. Merchant Servs., LLC*,
2019 WL 3017662 (D. Nev. July 10, 2019) ............................................................... 10

*Carnival Cruise Lines, Inc. v. Shute*,
499 U.S. 585 (1991) ..................................................................................... 1, 6, 8, 9, 12

*City of Santa Barbara v. Sup. Ct.*,
161 P.3d 1095 (Cal. 2007) ............................................................................................. 9

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006)..................................................................................... 22

*Congdon v. Uber Techs., Inc.*,
291 F. Supp. 3d 1012 (N.D. Cal. 2018) ...................................................................... 11

*D&S Consulting, Inc. v. Kingdom of Saudi Arabia*,
961 F.3d 1209 (D.C. Cir. 2020) .................................................................................... 9

*Doe 1 v. AOL LLC*,
552 F.3d 1077 (9th Cir. 2009)..................................................................................... 10

*Eclipse Consulting, Inc. v. BDO USA, LLP*,
2018 WL 6735085 (D. Or. Nov. 13, 2018) ........................................................... 21, 22

*Firexo, Inc. v. Firexo Grp. Litg.*,
99 F.4th 304 (6th Cir. 2024) ....................................................................................... 21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gemini Techs., Inc. v. Smith & Wesson Corp.*,
931 F.3d 911 (9th Cir. 2019).............................................................................. 7

*Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*,
601 U.S. 65 (2024)................................................................................. 1, 6, 7, 8

*Hofer v. Emley*,
2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) ......................................... 23

*Huddleston v. John Christner Trucking, LLC*,
2017 WL 4310348 (E.D. Cal. Sept. 28, 2017) ............................................ 6

*Hunt v. Sup. Ct.*,
97 Cal. Rptr. 2d 215 (Cal. App. 2000)...................................................... 10

*In re Bavaria Yachts USA, LLLP*,
575 B.R. 540 (Bankr. N.D. Ga. 2017) ...................................................... 12

*In re Clorox Consumer Litig.*,
894 F. Supp. 2d 1224 (N.D. Cal. 2012) .................................................... 24

*In re Verisign, Inc., Derivative Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) .................................................... 15

*In re Vistaprint Ltd.*,
628 F.3d 1342 (Fed. Cir. 2010)........................................................... 23, 24

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
957 F.3d 1038 (9th Cir. 2020)................................................................... 11

*Intelligent Bus. Innovations, LLC v. All. Computing, Inc.*,
2016 WL 4524722 (E.D. Mich. Aug. 29, 2016) ....................................... 20

*Kooiman v. Siwell, Inc.*,
2021 WL 899095 (C.D. Cal. Jan. 4, 2021) ................................................. 5

*Kramer v. Toyota Motor Corp.*,
705 F.3d 1122 (9th Cir. 2013).................................................................. 22

*Lassko v. Xerox Corp.*,
566 F. Supp. 2d 1018 (C.D. Cal. 2008) ...................................................... 6

*Lee v. Fisher*,
70 F. 4th 1129 (9th Cir. 2023) ............................................................... 6, 8

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972)....................................................................... 6, 7, 8, 10

*Marshall v. Hipcamp Inc.*,
735 F. Supp. 3d 1283 (W.D. Wash. 2024).................................................. 21

*Masry v. Lowe's Companies, Inc.*,
2024 WL 3228086 (N.D. Cal. June 28, 2024) ........................................... 10

*McKee v. Audible, Inc.*,
2017 WL 4685039 (C.D. Cal. July 17, 2017)............................................ 19

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Mezyk v. U.S. Bank Pension Plan*,
2009 WL 3853878 (S.D. Ill. Nov. 18, 2009) ........................................................................... 16

*Murphy v. Schneider Nat'l, Inc.*,
362 F.3d 1133 (9th Cir. 2004).................................................................................................. 13

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006).................................................................................................... 8

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019) ..................................................................................... 13

*O'Callaghan v. Uber Corp. of Cal.*,
2018 WL 3302179 (S.D.N.Y. July 5, 2018) ............................................................................ 15

*Olinick v. BMG Ent't*,
42 Cal. Rptr. 3d 268 (Cal. App. 2006)....................................................................................... 7

*Omega IM Grp., LLC v. Louidar, LLC*,
2018 WL 1069446 (S.D. Fla. Feb. 16, 2018)........................................................................... 20

*Paper Exp. Ltd. v. Pfankuch Machinen GmbH*,
972 F.2d 753 (7th Cir. 1992)...................................................................................................... 9

*Person v. Google Inc.*,
456 F. Supp. 2d 488 (S.D.N.Y. 2006)......................................................................................... 7

*Peters v. C21 Invs., Inc.*,
520 P.3d 920 (Or. App. 2022).................................................................................................. 22

*Petersen v. Boeing Co.*,
715 F.3d 276 (9th Cir. 2013).......................................................................................... 13, 15, 17

*Reutov v. Tananca Health Care Plan*,
2021 WL 4167869 (D. Or. June 9, 2021) .................................................................................. 8

*Richards v. Centripetal Networks, Inc.*,
709 F. Supp. 3d 914 (N.D. Cal. 2024) ..................................................................................... 11

*Rodriguez v. PepsiCo Long Term Disability Plan*,
716 F. Supp. 2d 855 (N.D. Cal. 2010) ....................................................................................... 7

*Sanfilippo v. Tinder, Inc.*,
2018 WL 6681197 (C.D. Cal. Dec. 18, 2018) ......................................................................... 15

*Santiago v. Philly Trampoline Park, LLC*,
291 A.3d 1213 (Pa. 2023) ........................................................................................................ 20

*Silvis v. Ambit Energy, L.P.*,
90 F. Supp. 3d 393 (E.D. Pa. 2015) ......................................................................................... 23

*Stewart Org., Inc. Ricoh Corp.*,
487 U.S. 22 (1988)..................................................................................................................... 23

*Testa v. Becker*,
2010 WL 1644883 (C.D. Cal. Apr. 22, 2010) ......................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Thomas v. Facebook, Inc.*,
   2018 WL 3915585 (E.D. Cal. Aug. 15, 2018) ........................................................... 6

*Todorobic v. Liquid Labs, Inc.*,
   2018 WL 2209506 (S.D.N.Y. May 14, 2018) .......................................................... 12

*TradeComet.com LLC v. Google, Inc.*,
   435 F. App'x 31 (2d Cir. 2011) ............................................................................. 16

*Trudeau v. Google LLC*,
   349 F. Supp. 3d 869 (N.D. Cal. 2018) ................................................................... 15

*Uber Techs., Inc. v. JPML*,
   131 F.4th 661 (9th Cir. 2025) ............................................................................ 4, 9

*Walker v. Carnival Cruise Lines*,
   107 F. Supp. 2d 1135 (N.D. Cal. 2000) ................................................................... 9

*Walters v. Famous Transps., Inc.*,
   488 F. Supp. 3d 930 (N.D. Cal. 2020) ................................................................... 22

*Wiswell v. Medval, LLC*,
   2019 WL 13201955 (N.D. Cal. Apr. 19, 2019) ..................................................... 1, 13

*Wu v. Uber Techs., Inc.*,
   2024 WL 4874383 (N.Y. Nov. 25, 2024) .............................................................. 16

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
   901 F.3d 1081 (9th Cir. 2018) ............................................................................ 7, 8

*Young v. Holland Am. Line, N.V.*,
   2016 WL 7451563 (N.D. Cal. Dec. 28, 2016) ...................................................... 10, 21

*ZPC 2000, Inc. v. SCA Grp., Inc.*,
   86 F. Supp. 2d 274 (S.D.N.Y. 2000) ..................................................................... 20

**STATUTES**

28 U.S.C. § 1391 ........................................................................................................ 7

28 U.S.C. § 1404 ........................................................................................................ 7

28 U.S.C. § 1404(a) .................................................................................................... 5

28 U.S.C. § 292(b) ..................................................................................................... 23

28 U.S.C. § 292(d) ..................................................................................................... 23

**OTHER AUTHORITIES**

Br. of Chamber of Commerce as Amicus Curiae, *Atl. Marine Constr. Co. v. J-Crew Mgmt., Inc.* (U.S. 12-929), 2013 WL 3208678 (June 24, 2013) ................................ 5

*Election*, Merriam-Webster.com ................................................................................ 11

Linda Chiem, *Uber Vows to Drop Arbitration Push for Sex Assault Claims*, Law360, May 15, 2018 ................................................................................................................. 3

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Paul M. Fischer, *Science and Subpoenas: When do the courts become instruments of manipulation?*, 59 Law & Contemp. Probs. 159 (1996) ............................................................. 13

Samuel Becher & Esther Unger-Aviram, *The Law of Standard Form Contracts: Misguided Intuitions and Suggestions for Reconstruction*, 8 DePaul Bus. & Com. L.J. 199 (2010) ........................................................................................................................... 14

Sara O'Brien et al., *CNN Investigation: 103 Uber drivers accused of sexual assault or abuse*, CNN, Apr. 30, 2018 ............................................................................................... 3

Stephen E. Sachs, *Five Questions After* Atlantic Marine, 66 Hastings L. J. 761 (2015) ................. 7

Thomas J. Maronick, *Do Consumers Read Terms of Service Agreements When Installing Software? A Two-Study Empirical Analysis*, 4 Int'l J. of Bus. & Soc. Res. 137 (2014) ........... 14

Uber Techs., Inc., Form 10-K (Feb. 14, 2025) ............................................................................. 18

Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention to Standard Form Contracts*, 43 J. of Legal Studies 1 (2014) ........................................................................ 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Uber's motion to enforce its forum-selection clause should be denied. The clause is contradicted by other provisions in Uber's Terms of Use; is the product of bad faith and overreach; and does not meet minimum standards of reasonableness and fairness. Indeed, Uber does not even recite the correct test: forum-selection clauses are not enforced where "doing so would be unreasonable under the circumstances." *Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 71 (2024) (internal quotation marks omitted). In particular, forum-selection clauses in "form … contracts" like those here "are subject to judicial scrutiny for fundamental fairness." *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991); *see also Wiswell v. Medval, LLC*, 2019 WL 13201955, at *2 (N.D. Cal. Apr. 19, 2019) ("A forum-selection clause is presumptively enforceable *unless* it violates fundamental fairness or is the result of fraud or overreaching.") (emphasis added). The "circumstances" here are unique: there is no precedent enforcing a forum-selection clause that looks anything like this one or that carries the baggage this one does.

Since the seminal decision in *Carnival Cruise*, form contracts requiring litigation proceed in a venue convenient to the company, usually its headquarters jurisdiction, have become commonplace. Uber's clause is novel: it directs cases to the state in which victims will be assaulted. The term "forum-selection clause" is a misnomer; the clause does not "select" any "forum." Instead, the clause sets out a formula for determining venue based on the facts of a hypothetical outrageous intentional tort.

How did we get here? Uber is a champion of sexual assault survivors' voice and agency—when convenient. In 2018, when Uber's IPO plans were threatened by a deluge of public criticism, the company released sexual assault survivors from its secret arbitration process. To burnish its reputation and keep riders riding, Uber made big promises. In an announcement titled "Turning the Lights On," Uber claimed that "we have learned it's important to give sexual assault and harassment survivors control of how they pursue their claims." Ex. 1 (Tony West, *Turning the Lights On*, Uber (May 15, 2018)) at 2. Uber promised its passengers that "survivors will be free to choose to resolve their individual claims in the venue they prefer." *Id.* And "[w]hatever

1    they decide, they will be free to tell their story wherever and however they see fit." *Id.* at 2. The

2    commitment to "transparency, integrity, and accountability," *id.* at 1, was a key component of

3    Uber's ███████████████████████████████████████████████████████████

4    ████████████████████████    Ex. 2 at 67467. And this pledge was enshrined in Uber's 2019

5    Terms of Use, in which Uber repeated that when a Plaintiff "elect[s] to bring [] claims in a court,

6    … Uber agrees to honor your election of forum." Ex. 3 § 2.

7         So much for that. When Uber realized that the California lawsuits against it were likely to

8    be swept into a JCCP, the company revised its TOU to say that cases could not be "coordinated"

9    and to add a "Choice of Forum" section setting out a novel forum-selection clause. Sauerwein

10   Decl., Ex. A §§ 2(b), 7. Mindful of the reputational and commercial benefits to the company from

11   *Turning the Lights On*, Uber did not delete its promise that, where "claims are brought … in a

12   court of competition jurisdiction," Uber would "honor your election." *Id.* Uber merely excised the

13   words "of forum."

14        Why the change? Because Uber's litigation strategy is to divide and conquer. Its conceded

15   plan is to convince individual judges in individual cases to limit discovery into its conduct on

16   proportionality or other grounds. *See* 2/4/24 H'rg Tr. at 21:19-22:9. Piecemeal proceedings also

17   limit the resources any given plaintiff can marshal. This allows Uber to keep the full picture of its

18   conduct hidden from victims and the public, discourage lawsuits, evade liability, and conduct

19   business as usual by paying a "sexual assault tax" on undervalued cases.

20        Uber's motion reflects the worst kind of forum shopping. Uber modified its TOU in a

21   naked attempt to manipulate the way that a deluge of sexual-assault litigation would be handled.

22   In so doing, Uber contradicted its commitments to honor survivors' choice of how and where to

23   litigate their cases, commitments that were a key part of the company's safety-oriented marketing.

24   Even today, in defending its refusal to produce documents in this MDL, Uber relies on its

25   victims' "taking back power" by exercising "agency over how and when they get to tell their

26   story." 2/22/24 H'rg Tr. at 22:7-14.

27        When considering the bellwether Plaintiffs, the unenforceability of Uber's forum-selection

28   clause becomes even more apparent. Three Plaintiffs were assaulted, and one even filed a lawsuit,

before ever agreeing to Uber's revised Terms of Use. For five Plaintiffs, Uber's evidence of assent shows only that they agreed to the TOU through Uber Eats. It is not fair or reasonable to hold a rape victim to a forum-selection clause she supposedly agreed to when ordering dinner, nor in those circumstances was such a clause reasonably communicated. One Plaintiff was a minor. Two more were assaulted across state lines. And, as to all, the clause is unreasonable because it selects venue based on the location of an outrageous intentional tort unforeseeable to Plaintiffs.

The Court need not reward Uber's hypocrisy and gamesmanship. Forum-selection clauses must be clearly communicated, reflect good faith, avoid overreach, and be reasonable and fundamentally fair. This clause flunks every test. To save its business, Uber promised that survivors could seek justice "wherever and however they see fit." This Court should hold Uber to its word. The motion should be denied.

## BACKGROUND

### A.    Uber's Terms of Use

For years, Uber denied even the existence of sexual misconduct on its system. *See* MC at ¶¶ 187-224, 240-81. Crucial to this strategy was the funneling of sexual assault claims into arbitration. Under that regime, not only would the magnitude and character of Uber's sexual assault problem avoid public airing, but survivors could never receive fulsome discovery, and Uber's dirty laundry would never see the light of day.

Uber changed this policy in 2018, but not because of any legitimate concern for victims' rights or public transparency. Instead, Uber exempted sexual assault cases from arbitration only after a CNN investigation sparked widespread criticism of Uber's sexual assault problem and its efforts to conceal that fact. *See* Sara O'Brien et al., *CNN Investigation: 103 Uber drivers accused of sexual assault or abuse*, CNN, Apr. 30, 2018; Linda Chiem, *Uber Vows to Drop Arbitration Push for Sex Assault Claims*, Law360, May 15, 2018 ("The move comes as scandal-plagued Uber works hard to rehabilitate its public image …."). To rescue its business and salvage plans for an IPO, ███████████████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 2 at 67497-98, 67507.

A key part of this strategy was promising passengers that they could choose their forum to

1   sue Uber. Uber pledged it was "[t]urning the lights on" and that sexual assault and harassment

2   survivors would "be free to choose to resolve their individual claims *in the venue they prefer*…."

3   Ex. 1 at 2 (emphasis added). Uber assured riders that, would they be assaulted, "they will be free

4   to tell their story wherever and however they see fit." *Id.* This promise was enshrined in Uber's

5   TOU: "Uber agrees to honor your election of forum with respect to your individual sexual assault

6   or sexual harassment claim." Ex. 3 § 2.

7        But a new problem arose. In 2020, victims suing Uber's competitor Lyft successfully

8   petitioned the California courts to coordinate their cases in a JCCP. *See In re: Lyft Assault Cases*,

9   JCCP No. 5061, Order Granting Pet. for Coord. (Cal. Sup. Ct. Jan. 17, 2020). In its ruling, the

10  California court rejected arguments essentially identical to those Uber would later make in

11  opposing both a JCCP and this MDL. *See id.* at 7. There were already cases pending against Uber

12  in California state courts (and Uber knew of many other sexual assaults that could result in

13  lawsuits), so the company knew a successful JCCP petition was inevitable.

14       So, Uber amended its TOU on January 18, 2021 to add two procedural tools to prevent

15  any coordinated or consolidated litigation in California, its home state. First, Uber added the

16  "non-consolidation clause" requiring cases be handled individually. PTO 15 (ECF 543) at 5.

17  Second, Uber added a "Choice of Forum" section. Sauerwein Decl., Ex. A § 7. The new clause

18  required that "personal injury (including but not limited to sexual assault or harassment claims)"

19  cases—and only those cases—"be brought exclusively in the state and federal courts in the State

20  in which the incident or accident occurred." *Id.* And what of Uber's promise to "honor your

21  election of forum?" Easy. While the 1/18/21 TOU retained Uber's promise to "honor your

22  election," Uber removed the words "of forum." *Id.* § 2.b.

23       The forum-selection clause targeted sexual assault victims just as much as the non-

24  consolidation clause was. Uber knew, of course, that its novel non-consolidation clause did not

25  have much chance of solving its JCCP or, later, MDL, problems. No court had ever enforced such

26  a thing. And clear statutes, in both the state and federal systems, authorized coordinated litigation.

27  *See Uber Techs., Inc. v. JPML*, 131 F.4th 661, 673-74 (9th Cir. 2025). The forum-selection clause

28  provided a crucial backstop aiming to keep cases out of centralized fora.

1    While forum-selection clauses are commonplace, this clause was novel. Typically,

2  companies prefer that cases against them be filed in their home jurisdiction—this reduces

3  litigation costs, ensures a jury pool that appreciates the company's contributions to the local

4  community and economy, and avoids any perceived risk of "home-town" judging in a distant

5  forum. *See, e.g.*, Br. of Chamber of Commerce as Amicus Curiae, *Atl. Marine Constr. Co. v. J-*

6  *Crew Mgmt., Inc.* (U.S. 12-929), 2013 WL 3208678, at *9-11 (June 24, 2013) (emphasizing that

7  forum-selection clauses reduce litigation costs by moving lawsuits to companies' home

8  jurisdictions). Uber's clause was unique, requiring that personal-injury cases be filed in the state

9  where the incident arose (and requiring any *non*-personal-injury cases "be brought exclusively in

10  the state and federal courts of California"). Sauerwein Decl., Ex. A § 7. On December 16, 2021,

11  Uber again modified the TOU to require that all lawsuits (not just personal injury cases) be filed

12  where the case arose or incident occurred. Ex. 4 § 7. Otherwise, the relevant terms have remained

13  materially consistent since.

14    **B.**    **The thirteen Plaintiffs at issue in this motion.**

15    Plaintiffs' Appendix shows, for each Plaintiff: (1) the date Uber's exhibits purport to show

16  TOU assent; (2) the date of their assault; (3) the date they first filed a lawsuit in state and federal

17  court; (4) whether Uber's exhibits show only assent through Uber Eats; (5) whether they were not

18  the owner of the account that ordered the ride; (6) whether they were a minor; and (7) whether

19  they were assaulted on rides that crossed state lines. Kaufman Decl. ¶ 2.

20    **ARGUMENT**

21    When considering a motion to transfer based on a forum-selection clause, courts

22  undertake a two-step process. First, the court must determine if the clause is "valid and

23  enforceable [and] encompasses the claims at issue." *Kooiman v. Siwell, Inc.*, 2021 WL 899095, at

24  *2 (C.D. Cal. Jan. 4, 2021). Second, if a valid and enforceable clause exists, the court must

25  evaluate the relevant factors under 28 U.S.C. § 1404(a). *Id.*

26

27

28

1    **I.      The forum-selection clause is unenforceable.**

2        **A.      To be enforceable, forum-selection clauses must be reasonable under the circumstances and fundamentally fair.**

3            As a general matter, under *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972),

4    forum-selection clauses "made in an arm's-length negotiation by experienced and sophisticated

5    businessmen" are enforceable in federal court. *See Lee v. Fisher*, 70 F. 4th 1129, 1142 & n.11

6    (9th Cir. 2023) (en banc) (enforcing a clause in a derivative case). But courts must always ensure

7    that enforcement is not "unreasonable under the circumstances," *Great Lakes Ins. SE*, 601 U.S. at

8    71 (internal quotation marks omitted). Where, as here, the clause is contained in a form consumer

9    contract, the analysis is particularly searching.

10            This derives from the Supreme Court's decision in *Carnival Cruise Lines*. There, the

11    Court confronted how to apply the principles articulated in *M/S Bremen* "to account for the

12    realities of form passage contracts" that are not the subject of negotiation. 499 U.S. at 593. While

13    the Court rejected the idea that form contracts could never include enforceable forum-selection

14    clauses, the Court made clear that judicial review of such clauses is more exacting: "It bears

15    emphasis that forum-selection clauses contained in form passage contracts are subject to judicial

16    scrutiny for fundamental fairness." *Id.* at 595. The Court enforced the clause at issue there

17    because there was no evidence of "bad-faith motive" or "fraud or overreaching" and the plaintiffs

18    "conceded that they were given notice of the forum provision." *Id.*

19            Courts routinely recognize that forum-selection clauses in form contracts are subject to

20    heightened scrutiny as outlined in *Carnival Cruise*. *See Thomas v. Facebook, Inc.*, 2018 WL

21    3915585, at *2 (E.D. Cal. Aug. 15, 2018) ("Forum selection clauses are also scrutinized for

22    'fundamental fairness,' and may be deemed unfair if inclusion of the clause was motivated by bad

23    faith, or if the party had no notice of the forum provision."); *Huddleston v. John Christner

24    Trucking, LLC*, 2017 WL 4310348, at *3 (E.D. Cal. Sept. 28, 2017) (same); *Lassko v. Xerox

25    Corp.*, 566 F. Supp. 2d 1018, 1021 (C.D. Cal. 2008) ("Under federal law, a forum selection clause

26    is presumptively valid. … However, in cases of form contracts, forum selection clauses are

27

28

subject to judicial scrutiny for fundamental fairness.").[1]

Remarkably, Uber's motion does not even cite *Carnival Cruise*, the seminal case on forum-selection clauses in consumer contracts. *See Person v. Google Inc.*, 456 F. Supp. 2d 488, 496 (S.D.N.Y. 2006) ("Any review of a forum selection clause for 'fundamental fairness' must begin with the seminal case of *Carnival Cruise Lines*.") (citation omitted). Instead, Uber relies primarily on the Supreme Court's decision in *Atlantic Marine Construction Co. v. United States District Court*, 571 U.S. 49 (2013). But in *Atlantic Marine*, the parties agreed the clause was valid and enforceable; the only question was how those facts affected the venue analysis under 28 U.S.C. §§ 1391 and 1404. *Atlantic Marine* did not displace the *Carnival Cruise* analysis. Instead, the Court made clear that its "analysis presuppose[d] a contractually valid forum-selection clause." *Atl. Marine*, 571 U.S. at 62 n.5; *see also, e.g.*, *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 914-15 (9th Cir. 2019) (agreeing that *Atlantic Marine* does not provide "the law for determining the validity and enforceability of a forum-selection clause"); *AQuate II LLC v. Myers*, 100 F.4th 1316, 1323-24 (11th Cir. 2024) (same, and collecting cases).[2] Indeed, the Supreme Court just last year, citing both *Carnival Cruise* and *M/S Bremen*, reiterated that "forum-selection clauses" must not be "'unreasonable' under the circumstances." *Great Lakes Ins. SE*, 601 U.S. at 71.[3]

Uber also relies on the Ninth Circuit's decision in *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081 (9th Cir. 2018), *holding modified by Lee*, 70 F. 4th 1129, for the suggestion that forum-selection clauses are always enforceable absent "three" specified "exceptional scenarios." Mot. at 10. But *Yei A. Sun* applied Supreme Court precedent, specifically *M/S Bremen*, which held that forum-selection clauses will not be enforced where "enforcement is shown … to be 'unreasonable' under the circumstances." 407 U.S. at 10. Because *Yei A. Sun*, like

---

[1] *Ayeni v. Verizon Wireless, LLC*, 2024 WL 36103, at *8 (D.N.M. Jan. 3, 2024) (same).*Campbell v. Princess Cruise Lines Ltd.*, 2021 WL 75663, at *4 (N.D. Cal. Jan. 8, 2021) (same); *Rodriguez v. PepsiCo Long Term Disability Plan*, 716 F. Supp. 2d 855, 858 (N.D. Cal. 2010) (same).

[2] *See generally* Stephen E. Sachs, *Five Questions After* Atlantic Marine, 66 Hastings L. J. 761, 766 (2015) ("The Court assumed, without deciding, that the clause before it was enforceable.").

[3] California law reflects the same principles. *See, e.g.*, *Olinick v. BMG Ent't*, 42 Cal. Rptr. 3d 268, 274 (Cal. App. 2006) ("unfair or unreasonable") (citation omitted).

1   *M/S Bremen*, did not involve a consumer adhesion contract (instead a $2.8 million stock purchase

2   agreement between sophisticated commercial investors), the court looked to the same factors the

3   Supreme Court identified in *M/S Bremen* as potentially relevant in that case: fraud, public policy,

4   and extreme inconvenience. 901 F.3d at 1088.

5          The Ninth Circuit had no reason to discuss ways in which a clause could be

6   "unreasonable" under other "circumstances," in particular the consumer-contract context that the

7   Supreme Court has identified as calling for a more exacting inquiry. *See Lee*, 70 F. 4th at 1142

8   (enforcing forum-selection clause in derivative action, and explaining that "unlike cruise ship

9   passengers, who have no mechanism by which to change their tickets' terms and conditions,

10  stockholders retain the right to modify the corporation's bylaws") (citation omitted). The Ninth

11  Circuit's decision cannot be reasonably read as discarding the holistic analysis endorsed time and

12  again by the Supreme Court, including just last year. *See Great Lakes SE*, 601 U.S. at 71.[4]

13         Under controlling Supreme Court precedent, the "circumstances" drive the Court's

14  analysis of what is "unreasonable." Where, as in *Yei A. Sun*, a contract was "made in an arm's-

15  length negotiation by experienced and sophisticated businessmen," *M/S Bremen*, 407 U.S. at 12,

16  one party's subjective "bad-faith motive" is not relevant in the way it is when a contract is not

17  negotiated. *Carnival Cruise*, 499 U.S. at 595. Nor can one party credibly claim it did not receive

18  adequate "notice" of the clause. *Id.* But where, as here and as in *Carnival Cruise*, the clause is

19  contained in an adhesion contract, those types of factors are potentially relevant.

20         **B.     The clause is unreasonable under the circumstances of sexual assault cases.**

21         While *Carnival Cruise* identified specific red flags to consider (bad faith, fraud,

22  overreach, notice), at bottom courts ask whether enforcement of the clause would be

23  "unreasonable under the circumstances." *Great Lakes Ins. SE*, 601 U.S. at 71 (internal quotation

24  marks omitted); *accord Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1287 (9th Cir. 2006)

25  ("unreasonable and unjust") (citation omitted); *Walker v. Carnival Cruise Lines*, 107 F. Supp. 2d

26

---

27  [4] *See also, e.g.*, *Allred v. Innova Emer. Med. Assocs., P.C.*, 2018 WL 4772339, at *4 (N.D. Cal.
    Oct. 1, 2018) (asking whether a "forum selection clause" is "unreasonable and unjust") (citation
28  omitted); *Reutov v. Tananca Health Care Plan*, 2021 WL 4167869, at *3 (D. Or. June 9, 2021) (
    "fundamental fairness").

1135, 1140 (N.D. Cal. 2000) (noting that "the evaluative standard chosen by the [*Carnival Cruise*] Court, 'fundamental fairness,' strongly suggests that the Court did not intend to limit the scope of judicial scrutiny to the three situations there described").

This clause is unreasonable. Courts enforce forum-selection clauses that reflect "the parties' settled expectations." *D&S Consulting, Inc. v. Kingdom of Saudi Arabia*, 961 F.3d 1209, 1213 (D.C. Cir. 2020) (citation omitted); *see also, e.g.*, *Cal-State Bus. Prods. & Servs., Inc. v. Ricoh*, 16 Cal. Rptr. 2d 417, 425 (Cal. App. 1993) (clause must be "within the reasonable expectations of the party against whom it is being enforced," citing *Carnival Cruise*).

This is not one of those clauses. Uber's clause does not have "the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended." *Carnival Cruise*, 499 U.S. at 593-94. The clause does not point lawsuits against Uber to a particular forum. It instead selects the forum where the passenger will be sexually assaulted. But sexual assault is not a feature of daily life, like a disputed cable bill, that people bake into their contractual expectations. *See Uber Techs.*, 131 F. 4th at 677 (rejecting Uber's reliance on contractual expectations where "th[is] kind of mass litigation … is," to the passengers, "by its nature, unforeseeable and extraordinary"). No one can be presumed to make a reasoned decision to sue in the state where they are sexually assaulted because their baseline assumption is that they will not be sexually assaulted. *Cf. City of Santa Barbara v. Sup. Ct.*, 161 P.3d 1095, 1104 n.20 (Cal. 2007) (noting the widely accepted principle that contracts may not exonerate intentional torts). Uber does not cite a single court, anywhere, enforcing a clause where the selected forum depended on the site of tortious conduct, let alone conduct both outrageous and completely unforeseeable to the victim (while being entirely foreseeable to Uber).

No Plaintiff could read this clause and evaluate how its inclusion should affect her decision to ride with Uber. Nor does the clause provide the objective economic value that courts cite in enforcing forum-selection clauses. The whole idea is premised on the presumption that the customer benefits from lower prices "reflecting the savings that the [company] enjoys by limiting the fora in which it may be sued." *Carnival Cruise*, 499 U.S. at 594; *see also, e.g.*, *Paper Exp. Ltd. v. Pfankuch Machinen GmbH*, 972 F.2d 753, 758 (7th Cir. 1992) (other party was

"presumably compensated" for the forum-selection clause). But this clause does not "limit[] the fora" in which Uber "may be sued;" it instead requires that Uber "be sued" all over the country. In providing that forum-selection clauses are generally enforceable, the Supreme Court explained that "much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur." *M/S Bremen*, 407 U.S. at 13. Here, Uber's clause requires the same "uncertainty" and "possibly great inconvenience" that the Supreme Court identified as harms that standard forum-selection clauses seek to avoid.

### C.    Uber did not reasonably communicate the forum-selection clause.

A "party seeking to enforce a forum-selection clause must have reasonably communicated the clause to the adverse party." *Canters Deli Las Vegas, LLC v. Banc of Am. Merchant Servs., LLC*, 2019 WL 3017662, at *5 (D. Nev. July 10, 2019); *see also Young v. Holland Am. Line, N.V.*, 2016 WL 7451563, at *4 (N.D. Cal. Dec. 28, 2016) (finding clause not "reasonably communicat[ed] where it "came on the eighth page of the document," and explaining that "Plaintiffs could have generally agreed to accept terms or to form a contract and still not have been given reasonable notice of the forum-selection clause" because "[t]hat term, not the existence of a contract generally, is the relevant question here.").[5]

Uber's clandestine editing of its Terms of Use to insert a forum-selection clause resulted in contradictory terms that are, at best, ambiguous as to whether the clause controls in a sexual assault case. As discussed above, Uber's TOU retained the company's promise to honor a sexual assault victim's "election." Section 2(b) of the TOU (part of the "Arbitration Agreement") reads: "[C]laims of sexual assault or sexual harassment occurring in connection with your use of the Services…may be brought and litigated in a court of competent jurisdiction." It continues: "Where your claims are brought and litigated to completion…in a court of competent jurisdiction, *Uber agrees to honor your election*." Sauerwein Decl., Ex. A § 2(b) (emphasis added). The

---

[5] Although the enforceability of a forum-selection clause is a question of federal law, *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009), to the extent adequate notice is a matter of state contract law, the same principles apply. *See Masry v. Lowe's Companies, Inc.*, 2024 WL 3228086, at *5-6 (N.D. Cal. June 28, 2024) (denying enforcement of forum-selection clause); *Hunt v. Sup. Ct.*, 97 Cal. Rptr. 2d 215, 219 (Cal. App. 2000) ("[T]the clause provided adequate notice to the defendant that he was agreeing to the jurisdiction cited in the contract.").

1    forum-selection clause then appears in Section 7—but that section states that personal injury

2    claims "shall be brought exclusively in the state and federal courts in the State in which the

3    incident or accident occurred … *except as may be otherwise provided in the Arbitration*

4    *Agreement above*." *Id.* at § 7 (emphasis added). So, the Section 2 language controls over the

5    Section 7 language.

6         Under a plain reading, Uber's contractual promise to "honor your election" means just

7    what it says: Sexual assault victims can choose where to sue Uber. When "the meaning a

8    layperson would ascribe to contract language is not ambiguous," the court must apply that

9    meaning. *Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1021 (N.D. Cal. 2018) (quotation

10   omitted). The word "election" means "choice." *See Election*, Merriam-Webster.com (defining

11   "election" as "the right, power, or privilege of making a choice"). Section 2 of TOU makes clear

12   that this "choice" refers to plaintiff's decision to sue in "court of competent jurisdiction." And

13   Section 7 makes clear that the *plaintiff*'s choice in Section 2 supersedes *Uber*'s choice in the

14   forum-selection clause. Sauerwein Decl., Ex. A §§ 2(b), 7. Uber will argue that it meant to

15   "honor" plaintiff's "election" of court over arbitration, but that is not what the TOU says. No

16   reasonable person would read a promise to "honor your election" to mean that Uber will

17   *generally* honor a plaintiff's choice of a court of competent jurisdiction, but fight tooth and nail

18   over *which* court of competent jurisdiction hears the claim.

19        Other contract-interpretation principles buttress this conclusion. First, "specific terms

20   control over general ones." *Richards v. Centripetal Networks, Inc.*, 709 F. Supp. 3d 914, 920

21   (N.D. Cal. 2024) (citation omitted). Section 7's forum-selection clause applies to all personal-

22   injury lawsuits (and, after December 2021, all lawsuits); Section 2 reflects a commitment

23   pertaining specifically to sexual-assault cases. Second, at best, the conflicting provisions create

24   ambiguity, and "ambiguous contract provisions should be construed against the drafter," here

25   Uber. *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020).

26        To be sure, Uber undoubtedly *tried* to impose a forum-selection clause limiting the rights

27   of sexual assault survivors. But in making that choice it assumed a burden to reasonably

28   communicate the clause. Editing the TOU to add the clause while retaining the public-relations

1  campaign promising to "honor" survivors' "election" leaves things, at best, ambiguous. Any

2  ambiguity must be resolved against Uber, not clarified by reference to the company's subjective

3  motivations.

4      **D.    The clause reflects bad faith.**

5      But those subjective motives *are* an independent basis to deny enforcement of the clause.

6  This is not a standard forum-selection clause. Courts routinely recognize the reasonableness of

7  companies' desire to reduce litigation costs and increase efficiencies by centralizing litigation in

8  home jurisdictions. *See Carnival Cruise*, 499 U.S. at 595 (finding "any suggestion of [] bad-faith

9  motive … belied by two facts: Petitioner has its principal place of business in Florida, and many

10 of its cruises depart from and return to Florida ports"). Uber adopted a different and novel clause

11 only in response to the specific risks it perceived from coordinated sexual assault litigation.

12     The evidence demonstrates that the clause was adopted "as a means of discouraging []

13 passengers from pursuing legitimate claims," *Id.* at 595, or at least to tilt the prosecution of such

14 claims to Uber's advantage (which in effect discourages claims). The fact that the company

15 abruptly changed its TOU in response to the accumulation of sexual assault lawsuits against it in

16 California is telling. *See Testa v. Becker*, 2010 WL 1644883, at *3 (C.D. Cal. Apr. 22, 2010)

17 ("[W]e agree the frequent and unexplained FSC modifications raise at least a colorable inference

18 of forum-shopping."). Uber's clause does not decrease litigation costs; it increases them by

19 scattering litigation all over the country. *See In re Bavaria Yachts USA, LLLP*, 575 B.R. 540, 563

20 (Bankr. N.D. Ga. 2017) ("Neither party should want to multiply litigation and increase the costs

21 of litigation unless one party perceives that to be to its advantage because the other party cannot

22 afford the increased costs or inconvenience."). And the fact that Uber required personal injury

23 claims, and only those claims, to be filed outside of California shows that the company

24 appreciated the generally accepted advantages of steering litigation to its home forum, but

25 disregarded them in pursuit of other, presumptively improper, motives. *Cf. Todorobic v. Liquid*

26 *Labs, Inc.*, 2018 WL 2209506, at *2 (S.D.N.Y. May 14, 2018) (enforcing forum selection clause

27 because the fact that the defendant was "headquartered in … the city to which it seeks transfer …

28 indicates that the forum-selection clause was not inserted with nefarious intent").

1    Perhaps the company's thinking was just what it almost admitted to this Court: that

2    scattering cases would better shield evidence of corporate misconduct. Or maybe the company's

3    motives were more nefarious: that individual litigation would attract less-well-resourced

4    adversaries, allowing the company to "run up plaintiffs' attorneys' fees in a war of attrition." Paul

5    M. Fischer, *Science and Subpoenas: When Do the Courts Become Instruments of*

6    *Manipulation?*, 59 Law & Contemp. Probs. 159, 166 (1996) (citations omitted). Or maybe Uber

7    simply wanted to reduce the odds that its California-based executives could be subpoenaed to

8    testify at deposition or trial in federal court. Regardless of the theory, the Court should find bad

9    faith and deny enforcement of the clause.

10    **E.    The clause is the result of improper overreach.**

11    "Overreaching" is a "a potential ground short of fraud" for invalidating a forum-selection

12    clause. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1141 (9th Cir. 2004). In evaluating

13    whether a clause is the result of overreach, courts consider whether the drafting party took "undue

14    advantage" of the other party's "vulnerable position." *Petersen v. Boeing Co.*, 715 F.3d 276, 282

15    (9th Cir. 2013) (finding triable question on overreach); *see also Wiswell*, 2019 WL 13201955, at

16    *3 ("undue influence[] or overweening bargaining power").

17    Here, Uber manipulated and took advantage of its superior position to impose the forum-

18    selection clause. Uber's superior position is that it has exclusive control over which messages go

19    into its public statements that reach people and influence their behavior, and which are tucked

20    into pages of legalese that it knows no one reads. Uber holds all the cards. It abused that power

21    disparity by promoting its business on the pledge that sexual assault victims could sue Uber "in

22    the venue they prefer" and "tell their story wherever they see fit," but then surreptitiously

23    modifying the TOU to attempt to require the opposite.

24    Uber knows, as everyone knows, that consumers do not read terms and conditions. *See,*

25    *e.g.*, *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 264 (E.D.N.Y. 2019) ("Consumers do not

26    read boilerplate."); Yannis Bakos et al., *Does Anyone Read the Fine Print? Consumer Attention*

27    *to Standard Form Contracts*, 43 J. of Legal Studies 1 (2014) (finding that only one or two of

28    every thousand internet retail software shoppers chose to access license agreements, and that the

1   cost of reading and comprehending the contracts are key factors).[6] They especially do not

2   compare versions of such documents to identify and evaluate the changes.

3        Under prevailing law, the fact that no one reads Uber's TOU is no obstacle to contract

4   formation. But it does place an obligation on Uber not to take unfair advantage of its customers

5   by contradicting those same terms and conditions in its public statements that it knows passengers

6   *do* see and *do* rely on.

7        Uber knows that passengers care about safety. *Turning the Lights On* was a key part of

8   Uber's safety-oriented messaging. Leading up to *Turning the Lights On*, Uber ▓▓▓▓▓▓

9   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ It found that "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10  ▓▓▓" with "▓▓▓▓▓▓▓▓▓▓▓▓" as "▓▓▓▓▓▓▓

11  ▓▓▓▓▓▓▓" Ex. 5 at 1 (emphasis omitted). In response, recognizing that "▓▓▓▓

12  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13  ▓▓▓" Ex. 2 at 67465, 67473. Uber set out to "▓▓▓▓▓▓▓▓

14  ▓▓▓▓▓▓▓" *Id.* at 67467.

15       To change the "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16  ▓▓" *Id.* at 67507. That meant ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* at 67497-98.

18  *Turning the Lights On*, issued in May 2018, was a key part of engendering those "▓▓▓

19  ▓▓" *Turning the Lights On* echoed those key themes:

20       We do the right thing, period. Accomplishing that requires three key
21       elements: transparency, integrity , and accountability.

22  Ex. 1 at 1. So, when Uber touted that "we have learned it's important to give sexual assault and

23  harassment survivors control of how they pursue their claims," including "the venue they prefer,"

24  *id.* at 2, (representations that appear on Uber's website even today), that was safety marketing just

25  as much as was advertising about background checks or designated driving. That is why Uber

26

<hr>

[6] *See also* Thomas J. Maronick, *Do Consumers Read Terms of Service Agreements When
27  Installing Software? A Two-Study Empirical Analysis*, 4 Int'l J. of Bus. & Soc. Res. 137, 144
(2014); Samuel Becher & Esther Unger-Aviram, *The Law of Standard Form Contracts:*
28  *Misguided Intuitions and Suggestions for Reconstruction*, 8 DePaul Bus. & Com. L.J. 199, 220-
21 (2010).

accompanied these promises with a reassuring image of young women happily and trustingly

riding in an Uber:



Ex. 1 at 1. And why Uber's CEO used this exact same image to promote "safety features." *See*

Ex. 9. By trying to obviate that public commitment in secret, Uber took advantage of passengers'

"vulnerable position." *Peterson*, 715 F.3d at 283. Accordingly, the clause is the result of

overreach and is unenforceable.

## II.    At minimum, the forum-selection clause is unenforceable against eleven Plaintiffs.

### A.    It is unreasonable to apply the clause retroactively to Plaintiffs WHB 407, WHB 1876, and WHB 823 who were assaulted before they ever assented to the clause, especially to WHB 823, who filed a lawsuit before assenting.

Three Plaintiffs were assaulted before they ever assented to a forum-selection clause

(indeed, two of the three were assaulted in 2019, well before Uber added the clause to the TOU).

Pls.' App'x.[7] Each processed her experience and evaluated her legal options against the backdrop

of Uber's promise—at the time unambiguously captured in the TOU—that they could file

lawsuits in the forum of their choice. It is neither reasonable nor fundamentally fair to apply a

forum-selection clause retroactively to sexual assault victims.

In support of the argument that the Court should apply the clause retroactively, Uber cites

cases involving arbitration clauses.[8] But arbitration clauses, retroactive or not, are almost always

enforced due to the "express policy of Congress" embodied in the Federal Arbitration Act. PTO

---

[7] Uber's motion acknowledges that WHB 1876 and WHB 823 were assaulted before the date of assent. Mot. at 9. So was WHB 407. *Compare* WHB 407 Compl. ¶ 5 (assaulted August 30, 2021) *with* Sauerwein Decl., Ex. N (earliest assent April 8, 2022).

[8] *See O'Callaghan v. Uber Corp. of Cal.*, 2018 WL 3302179, at *8 n.11 (S.D.N.Y. July 5, 2018); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 878 (N.D. Cal. 2018); *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007); *Sanfilippo v. Tinder, Inc.*, 2018 WL 6681197, at *5 (C.D. Cal. Dec. 18, 2018). PTO

1    15 at 27. Forum-selection clauses are subject to judicial review for fairness and reasonableness;

2    no statute says otherwise. The only case Uber cites applying a forum-selection clause

3    retroactively is an unpublished Second Circuit decision involving a commercial dispute between

4    an advertiser and Google. *See TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31 (2d Cir.

5    2011). And the court in that case acknowledged it could not find authority "addressing the

6    'retroactive' application of a forum selection clause." *Id.* at 34.

7        At a minimum, the clause cannot apply to WHB 823, who retained out-of-state counsel

8    and filed a state-court complaint on March 18, 2022, nearly four months before Uber says she

9    assented to a forum-selection clause. Pls.' App'x; Sauerwein Decl., Ex. P.[9] It is not reasonable

10   and reflects bad faith and inadequate notice to apply a forum-selection clause retroactively to a

11   pending lawsuit. *See Mezyk v. U.S. Bank Pension Plan*, 2009 WL 3853878, at *4 (S.D. Ill. Nov.

12   18, 2009) (finding forum-selection clause unreasonable where "plaintiffs have presented evidence

13   that they were not notified of [the clause] … until after this litigation began").[10]

14   **B.    Uber did not reasonably communicate the forum-selection clause to Plaintiffs
15          Dean, T.L., WHB 1898, A.R.1, or WHB 1486.**

16   **1.    Uber's records indicate these Plaintiffs assented only through Uber
            Eats.**

17       Uber's records indicate these five Plaintiffs assented to the forum-selection clause through

18   "eats." *See* Sauerwein Decl., Exs. E, H, K, L, M. For some people, there is only one assent in

19   Uber's records, and that one assent refers to "eats." Here is what this looks like for Plaintiff Dean:

20
| | Signup Timestamp UTC | Signup Method | Consent Timestamp UTC ▲ | Consent Type |
|---|---|---|---|---|
| 1. | Apr 14, 2023, 2:00:47 AM | eats_iphone | Apr 14, 2023, 2:00:48 AM | initial_signup_checkbox |

21   Sauerwein Decl., Ex. H. For others, Uber's records show multiple assents; the first assent is

22   identified as "eats;" and subsequent assents are identified only as "post_sign_up_checkbox"

23   without indicating whether the "checkbox" was offered through Eats or Rides. This is what is

24

25   _____
     [9] The docket is inconsistent as to whether this case is identified as WHB 8**23** or WHB 8**32**.

26   Regardless, the moniker refers to case number 24-4900.
     [10] Uber may cite *Wu v. Uber Techs., Inc.*, 2024 WL 4874383 (N.Y. Nov. 25, 2024), which

27   enforced an arbitration clause agreed to after the initiation of a personal-injury action. But that
     case turned on the fact that the arbitration agreement included a delegation clause, meaning that

28   any arguments about the unenforceability of the arbitration clause were required, under the
     Federal Arbitration Act, to be resolved by the arbitrator. *Id.* at *9-10.

looks like for Plaintiff T.L:

| | Signup Timestamp UTC | Signup Method | Consent Timestamp UTC ▲ | Consent Type |
|---|---|---|---|---|
| 1. | Jul 10, 2019, 1:59:08 PM | eats_iphone | Jul 10, 2021, 9:39:16 PM | post_signup_checkbox |
| 2. | Jul 10, 2019, 1:59:08 PM | eats_iphone | Feb 20, 2022, 2:41:37 AM | post_signup_checkbox |
| 3. | Jul 10, 2019, 1:59:08 PM | eats_iphone | Jan 23, 2023, 2:38:02 AM | post_signup_checkbox |

Sauerwein Decl., Ex. M.

  Uber's declarant does not explain what any of this means; he says only that each Plaintiff assented through "the Uber App." Sauerwein Decl. ¶¶ 6-7, 30. This is apparently all the evidence Uber has of these passengers' assents. After Uber relied on Uber Eats assent last time it moved to enforce the forum-selection clause, *see* ECF 393 at 7, Plaintiffs sought discovery regarding when and how Plaintiffs allegedly assented to a forum-selection clause. Kaufman Decl. ¶ 3. Uber refused to produce any documents or information other than the documents attached to the Sauerwein Declaration here, and represented to Plaintiffs that those documents were sufficient to determine which service Plaintiffs used when assenting to TOU. *Id*. ¶ 4. It seems likely that Uber has no idea whether a "post_signup_checkbox" indication in its data refers to Rides or Eats. *See* ECF 393 at 7 (in reply in support of previous motion to transfer, asserting that "Plaintiffs used the Uber App to request a ride or order UberEATS"); ECF 393-1 at Ex. 2 (evidence of assent limited to "post_signup_checkbox"). Based on this record, the only permissible finding is that any assent by these Plaintiffs came in connection with Uber Eats.[11]

  To be clear, while Uber's records affirmatively associate these five Plaintiffs with "eats," nowhere do the records actually make clear that *anyone* assented through "rides." Instead, the records associate assent with things like "iphone" or "android." Plaintiffs understand Uber to be representing that the remaining Plaintiffs, other than these five, assented through Rides, not Eats. If that is inaccurate (or if Uber does not know), Uber must correct the record.

---

[11] Absent findings for Plaintiffs on this point, the best Uber could get on this record is an evidentiary hearing. *See Peterson*, 715 F.3d at 282-83 (finding abuse of discretion in granting motion to enforce forum-selection clause "without convening an evidentiary hearing" where the "evidence submitted … create[d] a trial issue of fact as to whether the forum selection clause at issue here is enforceable").

1

2.    **Uber did not reasonably communicate that using Uber Eats would determine venue for a future sexual assault claim arising from an Uber Ride.**

2

3    To the public and to passengers, Uber Eats and Uber Rides are different and separate

4    things. They have separate webpages. *See* Ex. 6; Ex. 8. And, they have different Apps offering

5    distinct services:

6

    

7

8

9    Kaufman Decl., ¶ 15; *see also* Uber Techs., Inc., Form 10-K, at 5 (Feb. 14, 2025) (referring to

10    "the Uber and Uber Eats apps").

11    Here is how Plaintiffs were supposed to know that, when they ordered a burrito, they

12    consented to venue for a future claim of sexual assault during an Uber ride:

13    ## 1. Contractual Relationship

14    These Terms of Use ("Terms") govern your access or use, from within the United States and its

15    territories and possessions, of the multi-sided digital marketplace platform ("Uber Marketplace Platform") and any related content or services (collectively, the "Services," as more fully defined below in Section 3) made available in the United States and its territories and possessions by Uber

16    Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber"). PLEASE READ THESE TERMS CAREFULLY, AS THEY CONSTITUTE A LEGAL AGREEMENT

17    BETWEEN YOU AND UBER. In these Terms, the words "including" and "include" mean "including, but not limited to."

18    …

19

20    ## 3. The Marketplace Platform & Services

21    Uber operates a multi-sided digital marketplace platform that is offered in a number of forms, including mobile and/or web based applications ("Applications"). Among other things, the Uber

22    Marketplace Platform enables you to receive: (i) services rendered by Uber that facilitate your connection to independent third party providers, including drivers and restaurants ("Third Party Providers"), for the purchase of services or goods, such as transportation, logistics and/or delivery

23    services from those Third Party Providers; and (ii) any related content or services, including

24    payment processing and customer support. The Uber Marketplace Platform and the Uber content or services described in this Section are collectively referred to as "the Services". Unless otherwise

25    agreed by Uber in a separate written agreement with you, the Services are made available solely for your personal, noncommercial use.

26    Sauerwein Decl., Ex. A §§ 1, 3.

27    But Uber does not market its rides as part of a "multi-sided digital marketplace." Instead,

28    when a person goes to Uber.com, they are told they can "Go anywhere with Uber." Ex. 5. If they

1    click "How Uber works," they are told they can "[u]nderstand[] how Uber connects riders and

2    drivers …" Ex. 7. The only overt references to "Uber Eats" are a subtle button at the top of the

3    page (that connects to the separate Uber Eats website) and a "Suggestions" box that includes,

4    among other options "Food: Order delivery from local restaurants with Uber Eats." *Id*; Kaufman

5    Decl. ¶ 11. In that box is a clickable "Details" button that, again, links to the freestanding Uber

6    Eats website. *Id.*

7        Uber's marketing reflects common sense; from the user's perspective "Rides" and "Eats"

8    are entirely different. With "Rides," one purchases a service provided *by Uber* (hence the tagline

9    "Ride with Uber")—the analogy is a taxi driver. With "Eats," one purchases food provided by a

10   restaurant that, everyone knows, has nothing to do with Uber—the analogy is pizza delivery. The

11   two experiences are also different in every way that matters for this case: when a person orders

12   food delivery, they do not have risk their safety by entering a stranger's car (and, by opting for

13   food drop-off, do not need to interact with a person at all). Until now, Uber has acknowledged

14   that Uber Eats has nothing to do with this case. *See, e.g.* ECF 2545 at 2 (noting Uber withheld

15   documents relating to Uber Eats as not "relevant").

16       It is not reasonable to expect Plaintiffs to disregard how Uber markets its own products

17   and their own common sense and instead absorb legalese about a "multi-sided digital marketplace

18   platform" and "services rendered by Uber that facilitate [their] connection to independent third

19   party providers, including drivers and restaurants" to conclude that Uber Eats and Uber Rides

20   were one and the same. Uber ignores this problem. Uber highlights that the "Choice of Forum"

21   section is "standalone," Mot. at 7-8, but that does not solve the difficulty of a person having no

22   reason to think that using "Uber Eats" imposed forum restrictions for a lawsuit arising out of

23   something happening with "Uber Rides." *See McKee v. Audible, Inc.*, 2017 WL 4685039, at *11

24   (C.D. Cal. July 17, 2017) (refusing to enforce arbitration clause for claims against Audible, an

25   Amazon affiliate, where plaintiff entered arbitration agreement with Amazon that included

26   Amazon's "affiliates," and explaining that "[t]he Court is unwilling to hold that a reasonable

27   consumer signing into Amazon would believe he or she is also waiving the right to sue several

28   additional corporations"). There is no bold, standalone heading stating clearly that accepting

1    Terms of Use for Uber Eats will control the passenger's future rides with Uber.

2        **C.        Plaintiff A.R.1 was a minor and could not assent to the clause.**

3        Plaintiff A.R.1 was a minor on every date Uber's evidence shows assent to TOU. *See*

4    Uber Ex. L. She remained a minor when she ordered the ride and was assaulted. A.R.1 Compl.

5    ¶ 7. In Pennsylvania, "minors lack capacity to contract." *Santiago v. Philly Trampoline Park,*

6    *LLC*, 291 A.3d 1213, 1224 (Pa. 2023) ("Minors lack the capacity to agree to an arbitration

7    agreement or any other contract in their own right."). Accordingly, the forum-selection clause is

8    unenforceable as to A.R.1.

9        **D.        As to Plaintiffs C.L. and WHB 318, the clause is too vague to be enforced.**

10        To be enforced, a forum-selection clause must select a forum with sufficient particularity

11    to constitute reasonable notice. *See Omega IM Grp., LLC v. Louidar, LLC*, 2018 WL 1069446, at

12    *7 (S.D. Fla. Feb. 16, 2018) ("[F]orum selection clauses that do not apply to an ascertainable

13    forum undermine the goals of predictability and certainty and for that reason, are not enforced by

14    courts."); *Intelligent Bus. Innovations, LLC v. All. Computing, Inc.*, 2016 WL 4524722, at *4

15    (E.D. Mich. Aug. 29, 2016) (refusing to enforce forum-selection clause that specified only a

16    county and city and did "not give any direction as to the appropriate court or level of court");

17    *ZPC 2000, Inc. v. SCA Grp., Inc.*, 86 F. Supp. 2d 274, 277 (S.D.N.Y. 2000) ("The NDA's 'Forum

18    Choice' provision refers obliquely to the 'Court of New York' and does not distinguish between

19    state and federal courts, or between districts within the state.").

20        Plaintiffs C.L. and WHB 318 were assaulted during rides that crossed state lines: C.L. in

21    Virginia and Maryland; and WHB 318 in North Carolina and South Carolina. C.L. Compl. ¶ 5;

22    WHB 318 Compl. ¶ 5. The forum-selection clause requires disputes "be brought exclusively in

23    the state and federal courts in the State in which the incident or accident occurred." Sauerwein

24    Decl., Ex. A § 7. But for these two Plaintiffs, there is no single "State in which the incident …

25    occurred." Uber proposes that the Court cure this deficiency by permitting CL to "elect" between

26    D. Md. and E.D. Va. (Uber ignores WHB 318 altogether). Mot. at 3 n.3. But writing a clear

27    forum-selection clause was Uber's job. Plaintiffs elected to sue in Uber's home jurisdiction;

28    absent a clear and enforceable contract provision to the contrary, that decision controls.

1

### III.    The forum selection clause does not encompass the claims asserted by Plaintiff A.G., who did not call her own ride.

Plaintiff A.G. did not order the ride during which she was assaulted; her ex-husband did. A.G. Compl. ¶¶ 6-7. It should be self-evident that any TOU applicable to A.G.'s Uber accounts did not govern her ride. Uber cites the TOU's language that its terms govern "services rendered by Uber that facilitate your connection to independent third-party providers, including drivers .... for the purchase of services or goods, such as transportation ...." Mot. at 9 n.7. Uber does not explain how this language reasonably communicates that the consumer will be bound to a forum-selection clause in a ride ordered by someone else. It does not. For one obvious reason, A.G. did not "purchase … transportation;" her ex-husband did for her. Even if some tortured reading could contort these terms to cover A.G.'s ride, that would not constitute reasonable communication of the forum-selection clause. *See Young*, 2016 WL 7451563, at *3 (no enforcement where "the existence of the forum-selection clause was not conspicuous").

Uber also argues that A.G. is bound by "the forum-selection clause in her ex-husband's Terms of Use" under principles of equitable estoppel because she "claimed the benefits" of the contract. Mot. at 9 n.7. But Uber has not presented any evidence that A.G.'s ex-husband assented to a forum-selection clause or the circumstances of such alleged assent (Uber Eats, etc.).

Even assuming such a clause exists, equitable estoppel does not apply. To start, there is no evidence that Oregon would recognize estoppel under these circumstances.[12] No Oregon decision endorses "direct benefits" estoppel as espoused by California courts. *See Marshall v. Hipcamp Inc.*, 735 F. Supp. 3d 1283, 1292 (W.D. Wash. 2024) ("Oregon courts have not addressed whether a nonsignatory could be bound to arbitrate by a signatory"). The only case Uber cites—*Eclipse Consulting, Inc. v. BDO USA, LLP*, 2018 WL 6735085 (D. Or. Nov. 13, 2018)—did not apply "Oregon law" as Uber says it did. Rather, the Court (perhaps because it was applying the Federal Arbitration Act) cited only federal cases, none of which purported to apply Oregon law. *Id.* at *6-

---

[12] Equitable estoppel is probably a question of contract formation (governed by state law), not a question of enforceability (governed by federal law). *See Firexo, Inc. v. Firexo Grp. Litg.*, 99 F.4th 304, 326 (6th Cir. 2024). In addition, although there is no evidence in the record concerning which TOU, if any, A.G.'s ex-husband assented to, Uber's TOU generally include a choice-of-law provision selecting the law of the state-of-incident. *See* Ex. 10 (current TOU) § 9.

9; *see also Peters v. C21 Invs., Inc.*, 520 P.3d 920, 925 (Or. App. 2022) (citing no Oregon authority, noting that "courts of other jurisdictions have held that, *in limited circumstances*, forum-selection provisions may be enforced by or against non-signatories," and not listing direct-benefit as one of those "circumstances") (emphasis in original). Direct-benefits estoppel is not general common law that can be presumed to exist in every state. *See Benson v. Casa de Capri Enters, LLC*, 980 F.3d 1318, 1330-33 (9th Cir. 2020) (certifying question to Arizona Supreme Court on application of direct-benefits estoppel).

Finally, even under the California law Uber cites, estoppel does not apply here. Under those principles, "parties should only be estopped if their own conduct renders assertion of those rights contrary to equity." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1133 (9th Cir. 2013) (internal quotation marks omitted). The "linchpin for equitable estoppel is fairness." *Id.*[13] Accordingly, direct-benefit estoppel requires that the non-signatory "knowingly seek[] and obtain[] direct benefits from the contract." *Walters v. Famous Transps., Inc.*, 488 F. Supp. 3d 930, 936 (N.D. Cal. 2020). This does not mean that every person who uses someone else's service is automatically bound by that third-party's agreements with the service provider, even where they benefit in a factual sense. *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1102 (9th Cir. 2006) (no estoppel where the plaintiff was "simply a participant in trusts managed by others for his benefit"); *Brown v. Comcast Corp.*, 2016 WL 9109112, at *7 (C.D. Cal. Aug. 12, 2016) (staying at third-party's residence and using cable services not enough; plaintiff "was a passive participant in a service managed by [the third-party] and Defendant [cable company]").

Here, Plaintiff was "simply a participant" in an Uber ride ordered by somebody else "for [her] benefit." *Comer*, 436 F.3d at 1102. She was intoxicated when she entered the Uber. A.G. Compl. ¶ 8. There are no allegations or evidence that she "knew about or inquired into the agreement between" her ex-husband and Uber. *Brown*, 2016 WL 9109112, at *7. Equitable

---

[13] Uber's own case warns that "expanding estoppel to apply just as easily against nonsignatories as to signatories would threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Eclipse Consulting*, 2018 WL 6735085, at *6 (citations and alterations omitted).

PLS.' OPP'N TO DEFS.' MOT. TO TRANSFER
CASE NO. 3:23-MD-03084

1    estoppel does not apply.[14]

2    **IV.    Even if the forum selection clause is valid, the motion to transfer should be denied.**

3           Even where a valid and enforceable forum selection clause exists, courts will evaluate a

4    motion to transfer under the "public-interest factors of systemic integrity and fairness that, in

5    addition to private concerns, come under the heading of 'the interest of justice.'" *Stewart Org.,*

6    *Inc. Ricoh Corp.*, 487 U.S. 22, 30 (1988). Although "exceptional cases" in which public-interest

7    considerations alone justify a denial of a transfer motion are "uncommon," they exist. *Atl.*

8    *Marine*, 571 U.S. at 64; *see also BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*,

9    2019 WL 2017541, at *7 (E.D. Va. May 7, 2019) ("As the *Atlantic Marine* Court noted, public

10   interest may call for refusing to honor the choice of forum clause. Even though such cases may be

11   rare, the Court did not foreclose the possibility that public interest could be so compelling as to

12   warrant retaining jurisdiction."); *Silvis v. Ambit Energy, L.P.*, 90 F. Supp. 3d 393, 398-99 (E.D.

13   Pa. 2015) (denying transfer given local interest in the controversy).

14          **A.    The burden on the courts weighs against transfer.**

15          The factor weighing most heavily against transfer is the burden on the courts and

16   considerations of judicial efficiency. *See, e.g.*, *In re Vistaprint Ltd.*, 628 F.3d 1342, 1344-45 (Fed.

17   Cir. 2010) (approving order denying transfer based on "judicial economy considerations" even

18   when "all of the convenience factors clearly favor transfer"). This Court has stated it will oversee

19   trial in each of the bellwether cases, no matter where that trial occurs. 2/28/25 H'rg Tr. at 10:6-

20   11:14. It is significantly easier for the Court and its staff to try these cases here. Trial here also

21   avoids the procedural steps necessary to authorize out-of-district designations. *See* 28 U.S.C.

22   §§ 292(b), (d).

23          Uber cites general case disposition statistics as if these cases were newly filed in this

24   District. But they are not—fact discovery is nearly complete. And, the Court has indicated that

25   _____

26   [14] Uber cites *Hofer v. Emley*, 2019 WL 4575389 (N.D. Cal. Sept. 20, 2019), but in that case the
     plaintiff and the signatory rented a car together and travelled together; it was happenstance that
     one person rather than the other signed the agreement. *Id.* at *6 ("The complaint suggests that [the

27   plaintiff] was an active participant in renting the car."); *id.* (noting that the complaint alleged
     duties owed by the defendant "to renters of its vehicles and their passengers" and described "*the*

28   *car it rented to Brian and Jonathan*") (emphasis in original). This joint venture is not comparable
     to A.G.'s ex-husband ordering an Uber ride for her.

other Northern District judges may be available to help shoulder the load, making this district uniquely fit for the first wave of bellwether trials. 4/18/25 H'rg Tr. at 12:8-22. No case Uber cites arises in these unique circumstances of a mature MDL where the presiding judge has indicated intent to try (or to ensure someone else can promptly try) each of the bellwethers. *See Vistaprint*, 628 F.3d at 1344-45 (explained that judicial economy justified denial of transfer motion because the district court "had substantial experience" with the facts at issue "based on prior litigation involving the plaintiff," and because "there was also a second, co-pending case before the court between the plaintiff and another defendant … pertaining to the same underlying technology, and involving similar accused services.").

### B.    California has significant interest in local trial of these cases.

Additionally, California has a significant interest in local adjudication of these cases. This is litigation about a company headquartered in California making decisions in California that put women at increased risk of sexual assault. There is a strong local interest in regulating those centralized policies and representations formed in California, notwithstanding that their effects are felt nationwide. *Cf. In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237-38 (N.D. Cal. 2012) (applying California law to out-of-state consumers because "Clorox conducts substantial business in California and has its principal place of business and corporate headquarters in the state, decisions regarding the challenged representations were made in California, Clorox's marketing activities were coordinated at its California headquarters, and a significant number of class members reside in California."). Plaintiffs plead and will prove that the cruxes of this litigation are Uber's choice to create and popularize an innovative business model and product while failing to adequately address the risks of sexual assault that model would create; Uber's choice to prioritize the acquisition of drivers and riders over safety; and Uber's choice to promote its product as safe to vulnerable populations (such as intoxicated women) while concealing its true risks. All those choices were made in California.

### CONCLUSION

For these reasons, Uber's motion to transfer should be denied.

1

Dated: June 13, 2025                          Respectfully submitted,

2

3                                             By: /s/ Sarah R. London
                                                   Sarah R. London (SBN 267083)
4

5                                             **GIRARD SHARP LLP**
                                              601 California St., Suite 1400
6                                             San Francisco, CA 94108
                                              Telephone: (415) 981-4800
7                                             slondon@girardsharp.com

8                                             By: /s/ Rachel B. Abrams
                                                   Rachel B. Abrams (SBN 209316)
9

10                                            **PEIFFER WOLF CARR KANE
                                              CONWAY & WISE, LLP**
                                              555 Montgomery Street, Suite 820
11                                            San Francisco, CA 94111
                                              Telephone: (415) 426-5641
12                                            Facsimile: (415) 840-9435
                                              rabrams@peifferwolf.com
13

14                                            By: /s/ Roopal P. Luhana
                                                   Roopal P. Luhana
15

16                                            **CHAFFIN LUHANA LLP**
                                              600 Third Avenue, 12th Floor
                                              New York, NY 10016
17                                            Telephone: (888) 480-1123
                                              Facsimile: (888) 499-1123
18                                            luhana@chaffinluhana.com

19                                            *Co-Lead Counsel*

                            **FILER'S ATTESTATION**
20

21      I am the ECF User whose ID and password are being used to file this document. In

22 compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated:  June 13, 2025                         By:     /s/ Andrew R. Kaufman
23                                                     Andrew R. Kaufman

24

25

26

27

28