IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br>_____/ | MDL No. 3084 |
| This Order Relates To: | **PRETRIAL ORDER NO. 28: ORDER ON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' BELLWETHER COMPLAINTS** |
| <u>A.R. v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-01827-CRB | Re: Dkt. No. 2791 |
| <u>D.J. v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-07228-CRB | |
| <u>A.G. v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-01915-CRB | |
| <u>A.R. v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-07821-CRB | |
| <u>B.L. v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-07940-CRB | |
| <u>C.L. v. Uber Technologies, Inc., et al.</u>, No. 3:23-cv-04972-CRB | |
| <u>J.E. v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-03335-CRB | |
| <u>Jane Doe QLF 0001 v. Uber Technologies, Inc., et al.</u>, No. 3:24-cv-08387-CRB | |
| <u>Jaylynn Dean v. Uber Technologies, Inc., et al.</u>, No. 3:23-cv-06708-CRB | |

United States District Court
Northern District of California

1  K.E. v. Uber Technologies, Inc., et al., No.
2  3:24-cv-05281-CRB

3  Amanda Lazio v. Uber Technologies, Inc.,
No. 3:24-cv-08937-CRB

4
5  LCHB128 v. Uber Technologies, Inc., et
al., No. 3:24-cv-07019-CRB

6
7  T.L. v. Uber Technologies, Inc., et al., No.
3:23-cv-09217-CRB

8
9  WHB 318 v. Uber Technologies, Inc., No.
3:24-cv-04889-CRB

10
11  WHB 407 v. Uber Technologies, Inc., et
al., No. 3:24-cv-05028-CRB

12
13  WHB 823 v. Uber Technologies, Inc., No.
3:24-cv-04900-CRB

14
15  WHB 1486 v. Uber Technologies, Inc., et
al., No. 3:24-cv-04803-CRB

16
17  WHB 1876 v. Uber Technologies, Inc., et
al., No. 3:24-cv-05230-CRB

18  WHB 1898 v. Uber Technologies, Inc., et
al., No. 3:24-cv-05027-CRB

19
20  Jane Roe CL 68 v. Uber Technologies Inc.,
et al., No. 3:24-cv-06669-CRB

21

22  **I.    BACKGROUND**

23        **A.    Procedural Background**

24        On October 4, 2023, the Judicial Panel on Multidistrict Litigation ("JPML" or "the

25  Panel") created MDL No. 3084, centralizing 22 actions in this Court for coordinated

26  pretrial proceedings.  In re Uber Techs., Inc., Passenger Sexual Assault Litig., No. MDL

27  3084, 2023 WL 6456588 (U.S. Jud. Pan. Mult. Lit. Oct. 4, 2023) ("Transfer Order").

28        The Court established a case management plan under which Plaintiffs were to file a

Master Long-Form Complaint ("MC") and Uber would file motions to dismiss under the laws of five states of its choosing. The MC alleges the following eight claims (which Plaintiffs listed alphabetically beginning with "B"):

- Claim B: Negligence (including Negligent Hiring, Retention, Supervision, and Entrustment)
- Claim C: Fraud and Misrepresentation
- Claim D: Negligent Infliction of Emotional Distress
- Claim E: Common Carrier's Non-Delegable Duty to Provide Safe Transportation (Certain States Only)
- Claim F: Other Non-Delegable Duties to Provide Safe Transportation (Certain States Only)
- Claim G: Vicarious Liability for Drivers' Torts (Employee, Retained Control, Apparent Agency, Ratification, California Public Utilities Code)
- Claim H: Strict Products Liability (Failure to Warn and Design Defect)
- Claim I: California Unfair Competition Law[1]

Uber timely filed motions under the laws of California, Texas, Illinois, New York, and Florida. The Court then issued an order granting in part Uber's motions to dismiss pursuant to the law of Texas and California, see PTO 17 (dkt. 1044),[2] followed shortly thereafter by a separate order granting in part Uber's remaining motions to dismiss under the laws of Florida, Illinois, and New York, see PTO 18 (dkt. 1719). Plaintiffs were given leave to amend under both orders where their pleadings were plausibly curable with additional allegations. See PTO 17 at 11. The Court then entered the parties' stipulation applying the two motion to dismiss orders to the laws of Arizona, Georgia, Nevada, Pennsylvania, and Virginia. See dkt. 1932. A summary of the outcomes of the dismissal orders and stipulation can be found in Appendices B & C of Uber's Motion. See dkt. 2791-1 at 4–7.

The parties then proceeded to the bellwether plaintiff stage of the litigation, with the

---

[1] See MC (dkt. 269) ¶¶ 360–513.

[2] A more fulsome recitation of the factual background of this case leading up to Uber's motions to dismiss, as well as a summary of the allegations comprising Plaintiffs' Master Complaint, can be found in that order. See PTO 17 at 1–8.

United States District Court
Northern District of California

Court ordering Uber and Plaintiffs to each select ten representative bellwether cases.  See PTO 21 (dkt. 1950).  The parties accordingly submitted their twenty combined selections. See dkts. 2373, 2375.  Nineteen of those Plaintiffs filed amended bellwether complaints,[3] proceeding under the following state's laws: Illinois; Arizona; Georgia; Pennsylvania; Virginia; Indiana; Iowa; Massachusetts; Maryland; Michigan; North Carolina; South Carolina; and Oregon.  Each bellwether plaintiff incorporated some, if not all, of the claims from the MC while also pleading "Additional Allegations In Support" in an effort to remedy the deficiencies identified by the Court's previous dismissal orders.  See, e.g., J.E., Am. Compl. ¶¶ 19–28 ("Additional Allegations in Support of Fraud and Misrepresentation Claim").  Uber filed for dismissal of the bellwether complaints on April 15, 2025.  See Mot. (dkt. 2791).  Plaintiffs timely filed their Opposition, see Opp'n (dkt. 3002), and Uber responded with its Reply, see Reply (dkt. 3212).

Having received the parties' positions, the Court now decides Uber's Motion to Dismiss the Bellwether Complaints.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  Id.

While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555, 570.  In deciding whether the plaintiff has stated a claim upon which relief can

---

[3]  Plaintiff Jane Roe CL 68 elected to proceed without amendment.  See dkt. 2629.

be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

## III. DISCUSSION

### A. Fraud and Misrepresentation Claims

Seven bellwether plaintiffs bring claims for fraud and misrepresentation (Claim C).[4] "To plead a common law fraud claim, a plaintiff must allege misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance, and resulting damages."[5] In re McKinsey & Co., Inc. Nat'l Prescription Opiate Consultant Litig., 2023 WL 4670291, at *6 (N.D. Cal. July 20, 2023) (quoting Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1132 (9th Cir. 2013)). Under Rule 9(b), allegations of fraud must be pled with particularity and "accompanied by the who, what, when, where, and how of the misconduct charged." Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (quotation omitted). "'[U]nadorned references to [an] advertising campaign and marketing materials' do not meet these requirements." In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig., 349 F. Supp. 3d 881, 914 (N.D. Cal. 2018) (quoting Yastrab v. Apple Inc., 173 F. Supp. 3d 972, 978 (N.D. Cal. 2016)).

Plaintiffs do not allege that Uber made any affirmative misrepresentations. See Opp'n at 4; Reply at 1. Instead, their fraud claims arise from alleged omissions by Uber falling into two distinct groups: "(1) Uber's marketing of its product to intoxicated people, especially women, and (2) Uber's statements about its drivers," in particular its notifications and "star rating" system. Opp'n at 4. To succeed on their fraudulent omission claims, Plaintiffs must show that Uber "concealed or suppressed a material fact

---

[4] These claims are asserted by A.R.2, A.G., B.L., C.L., J.E., Jaylynn Dean, and LCHB128.
[5] The parties agree that there are no material differences in the law governing Plaintiffs' fraud claims across the relevant jurisdictions. See Mot. at 11 n.16; Opp'n at 4.

United States District Court
Northern District of California

1    [Uber] had a duty to disclose to [Plaintiffs]." Terpin v. AT And T Mobility LLC, 118

2    F.4th 1102, 1110 (9th Cir. 2024) (citation omitted)).  The Court considers the two

3    purported omissions in turn.

### 1.    Designated Driver Marketing

5        Plaintiffs' first set of fraud allegations arise from two advertisements by Uber that

6    warned against the dangers of drunk driving and offered Uber rides as an alternative form

7    of transportation: "Don't drink and drive, call an Uber" and "Stay safe tonight.  Use Uber."

8    Mot. at 12; see also Jaylynn Dean, Am. Compl. ¶¶ 45–53; A.G., Am. Compl. ¶¶ 30–38;

9    B.L., Am. Compl. ¶¶ 38–49.  Both ads were part of Uber's "Designated Driver" marketing

10   campaign as it is referred to by the parties.[6]  Plaintiffs contend that these statements were

11   rendered misleading by Uber's omission of the material facts that "intoxicated people,

12   especially women, and especially late at night, are at significantly elevated risk of being

13   sexually assaulted by Uber drivers" and "that Uber lacked sufficient information about its

14   drivers to determine that they could be trusted to provide safe transportation to a drunk

15   woman passenger alone late at night."  Opp'n at 5; see also Deteresa v. Am. Broad.

16   Companies, Inc., 121 F.3d 460, 467 (9th Cir. 1997) (listing the "four circumstances in

17   which nondisclosure or concealment may constitute actionable fraud," including "when the

18   defendant makes partial representations but also suppresses some material facts" (citation

19   omitted)).

20       Uber argues in response that it had no duty to disclose because "[n]o reasonable

21   consumer would interpret Uber's anti-drunk-driving advertisements to represent anything

22   about the risks of sexual assault."  Mot. at 17; see also Reply at 2 ("By claiming Uber's

23   anti-drunk-driving advice required accompanying disclosures about alleged risks unrelated

24   to drinking and driving, Plaintiffs would impose an all-encompassing duty to warn of

25   every imaginable risk whenever a company makes a safety-related statement.").  "Alleged

---

[6]  Had Uber published a standalone "Stay safe tonight.  Use Uber." ad removed from the context of its broader Designated Driver marketing, Plaintiffs would have a more colorable argument that it constituted an actionable partial omission.

omissions are actionable if they are likely to deceive reasonable consumers." <u>Ahern v. Apple Inc.</u>, 411 F. Supp. 3d 541, 562 (N.D. Cal. 2019).[7]  Uber tries to draw a distinction between ads with "specific factual messages," which have the capacity to be objectively misleading, and ads like its Designated Driver marketing, which consist of "promotional, descriptive phrases courts have held are non-actionable."  Reply at 3; <u>see also</u> <u>Azoulai v. BMW of N. Am. LLC</u>, 2017 WL 1354781, at *8 (N.D. Cal. Apr. 13, 2017) ("Generic sales talk . . . is not actionable even if a consumer subjectively believes it means something more specific.").

Generally, whether a reasonable consumer would be deceived by a fraudulent misstatement or omission is a question of fact best left to the jury.  <u>See</u> <u>In re MyFord Touch Consumer Litig.</u>, 291 F. Supp. 3d 936, 978 (N.D. Cal. 2018) ("[J]ustifiable reliance is a fact-specific question that is usually appropriate for jury resolution.").  There are circumstances, however, in which "the court may determine, as a matter of law, that the alleged violations . . . are simply not plausible."  <u>Swetala v. Quten Rsch. Inst., LLC</u>, 2025 WL 950627, at *3 (E.D. Cal. Mar. 28, 2025); <u>see also</u> <u>Ahern</u>, 411 F. Supp. 3d at 555 ("Whether a statement is puffery or a representation of fact is a question of law that can be properly decided on a motion to dismiss.").  Therefore, for these claims to survive Plaintiffs must show "more than a mere possibility" that Uber's Designated Driver advertisements "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner," but rather demonstrate a "probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."  <u>Ebner v. Fresh, Inc.</u>, 838 F.3d 958, 965 (9th Cir. 2016)

---

[7]  Plaintiffs assert that the "reasonable consumer" test is only applicable to statutory fraud claims, not the common law claims at issue here.  <u>See</u> Opp'n at 8–9.  But courts have generally held that the reasonable consumer "standard also applies to common law fraud." <u>Swetala v. Quten Rsch. Inst., LLC</u>, 2025 WL 950627, at *3 (E.D. Cal. Mar. 28, 2025); <u>see also</u> <u>Freeman v. Time, Inc.</u>, 68 F.3d 285, 289 (9th Cir. 1995) ("[T]he reasonable person standard is well ensconced in the law in a variety of legal contexts in which a claim of deception is brought." (citation omitted)); <u>Girard v. Toyota Motor Sales, U.S.A., Inc.</u>, 316 F. App'x 561, 562 (9th Cir. 2008) ("[J]ustifiable reliance cannot be established if reasonable consumers would not rely on the purported misrepresentation.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (quotations omitted).

2      Plaintiffs have not met that burden. The Court is not convinced that a reasonable

3  consumer could believe the two ads at issue—"Don't drink and drive, call an Uber" and

4  "Stay safe tonight. Use Uber."—conveyed anything more than a generic encouragement to

5  take an Uber ride rather than drive while drunk. Indeed, Uber's Designated Driver

6  marketing is directly analogous to the types of language other courts have readily

7  identified as non-actionable puffery. See Azoulai, 2017 WL 1354781, at *8 (finding

8  statement that BMW soft close automatic feature would "safely" close the door to be

9  nonactionable puffery); Vitt v. Apple Comput., Inc., 469 Fed.Appx. 605, 607 (9th Cir.

10  2012) (holding that "durable," "reliable," and "high performance" descriptors for computer

11  were not actionable); Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1068 (9th Cir. 2001)

12  (finding statement that defendant "was a reputable cruise line and that

13  passengers . . . would be safely and adequately served" was "devoid of any meaningful

14  specificity, amounting at most to a general recommendation . . . akin to mere puffing");

15  Ahern, 411 F. Supp. 3d at 556 ("[S]tatements that Apple computer screens are 'clear and

16  remarkably vivid' do not say anything about specific characteristics or components—or

17  even how clear or vivid the screens actually are.").[8]

18      Plaintiffs argue that the ads do in fact constitute "specific factual message[s]," but

19  saying does not make it so. Opp'n at 6. Neither Designated Driver ad is a "specific and

20  measurable claim" that is "capable of being proved false." Ahern, 411 F. Supp. 3d at 555;

21  see also Azoulai, 2017 WL 1354781, at *8 ("[T]here is nothing 'specific and measurable'

22  about the word 'safely.'" (citation omitted)). "Don't drink and drive, call an Uber" is more

23  akin to a public service announcement regarding the dangers of impaired driving than a

24

25

26  [8] Plaintiffs' comparison to Rodriguez v. Mondelez Global LLC, 703 F. Supp. 3d 1191
   (S.D. Cal. 2023), is inapposite because that case concerned an allegedly deceptive food
27  label, which carries unique concerns of misrepresentation given that "the entire point of
   [the] label is likely to induce consumer reliance." Andrade-Heymsfield v. NextFoods,
28  Inc., 2023 WL 3880076, at *2 (S.D. Cal. June 5, 2023). The same importance cannot be
   ascribed to the two isolated digital media advertisements at issue here.

quantifiable assertion regarding Uber's service.[9]  And "Stay safe tonight.  Use Uber." is comparable to AT&T's nonactionable statement in <u>Terpin v. AT And T Mobility LLC</u>, 118 F.4th 1102 (9th Cir. 2024).  There, the Ninth Circuit determined that AT&T's assertion that a six-digit passcode would provide extra account security "in no way suggest[ed] that the heightened security would prevent <u>all</u> fraud."  <u>Terpin</u>, 118 F.4th at 1111 (emphasis added).  Similarly, Uber's Designated Driver marketing did not guarantee passengers' absolute safety from <u>all</u> possible risks associated with taking an Uber ride while drunk, but rather only the risks associated with the passenger driving themselves.  Plaintiffs' subjective, unreasonable understanding of Uber's advertisements cannot change that reality.  <u>See, e.g.</u>, <u>In re iPhone 4S Consumer Litig.</u>, 637 Fed.Appx. 414, 415–16 (9th Cir. 2016) ("Failure to meet Plaintiffs' undefined expectations . . . does not render [defendant's] representations misleading.").

Plaintiffs' other arguments are similarly unconvincing.  They contend that statements which would otherwise be nonactionable puffery may give rise to fraud claims where "the defendant knows facts that makes the at-issue statement deceitful or makes the statement in a context that renders it deceitful."  <u>In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.</u>, 753 F. Supp. 3d 849, 890 (N.D. Cal. 2024), <u>appeal pending</u> (9th Cir. No. 24-7312).  But unlike in that case, Plaintiffs have not adequately alleged that Uber had actual knowledge of a defect related to the core message of its Designated Driver marketing materials: that taking an Uber ride reduces the dangers associated with driving while drunk.  <u>Compare id.</u> at 891 (finding plaintiffs adequately alleged that Meta possessed actual knowledge of the dangerous effects of Instagram use, transforming its public statements on platform safety into "a deceptive scheme by Meta to obfuscate the risks of serious harm stemming from platform use"); <u>Chacanaca v. Quaker Oats Co.</u>, 752 F. Supp. 2d 1111 (N.D. Cal. 2010) (finding use of "wholesome" on label actionable where defendant was allegedly aware of dangerous food additives in product).

---

[9]  Uber has produced a variety of marketing materials in this vein as part of its partnership with Mothers Against Drunk Driving (MADD).  <u>See</u> MC ¶ 233; Reply at 2 n.3.

United States District Court
Northern District of California

United States District Court
Northern District of California

Whatever knowledge Uber is alleged to have about the increased risk of sexual assault for female passengers or its lack of effective vetting for drivers is distinct from the narrow meaning of the actual ads at issue.

Plaintiffs also claim that the capacity for Uber's Designated Driver marketing to mislead must be judged in the context of Uber targeting "'a particularly sensitive audience'" of people "making decisions about whether to go out and consume alcohol and how to get home." Opp'n at 7 (quoting CLM Props., Inc. v. SimmonsCooper LLC, 2008 WL 11422124, at *3 (C.D. Cal. Jan. 8, 2008)). But Plaintiffs make no effort to explain why this supposed subgroup is particularly sensitive as compared to victims of securities fraud targeted by advertisements for experienced attorneys in that field, see id. at 4, or racing enthusiasts who possess a uniquely objective understanding of the term "track capable," Tershakovec v. Ford Motor Co., 546 F. Supp. 3d 1348, 1360–61 (S.D. Fla. 2021), aff'd in part on other issues, 79 F. 4th 1299 (11th Cir. 2023).

Because Plaintiffs have failed to allege actionable fraudulent omissions related to Uber's Designated Driver marketing, the fraud claims on these grounds are dismissed.

### 2.    Driver Notifications

The second category of Plaintiffs' fraud claims stem from the information that Uber provides to passengers both within the app and through notifications once a ride has been booked, including the driver's name, photo, car make and model, and a "star rating."[10] Plaintiffs allege that these "Driver Notifications" constitute a fraudulent partial omission because "Uber does not disclose reports of prior driver misconduct or criminal histories" alongside the other information. Opp'n at 11. Uber argues that these claims must be dismissed because (1) Uber had no duty to augment its Driver Notifications with the drivers' reported misconduct or criminal records, (2) Plaintiffs did not adequately allege reliance on the Driver Notifications, and (3) Plaintiffs failed to allege that Uber had an intent to defraud consumers through the alleged omission.

---

[10] See LCHB128, Am. Compl. ¶¶ 23–20; Jaylynn Dean, Am. Compl. ¶¶ 35–44; A.R.2, Am. Compl. ¶¶ 34–41; C.L., Am. Compl. ¶¶ 19–28; J.E., Am. Compl. ¶¶ 19–28.

United States District Court
Northern District of California

### a.    Actionable Omission

Unlike the claims grounded in Uber's Designated Driver marketing, Plaintiffs' Driver Notifications allegations are sufficient to present a question of fact as to whether the alleged omission of drivers' reported misconduct was "likely to deceive reasonable consumers."[11]  Ahern, 411 F. Supp. 3d at 562; see also Swetala, 2025 WL 950627, at *3 ("Whether a reasonable consumer would be deceived . . . is generally a question of fact not amenable to determination on a motion to dismiss." (quotation omitted)).  Uber argues that no reasonable consumer would view the drivers' "star ratings" as "a comprehensive appraisal for every given driver," but would instead treat them as "an average of volunteered overall satisfaction ratings from other riders on a fixed scale."  Mot. at 17.

The Court is not so readily convinced.[12]  As Plaintiffs point out, Uber itself has stated that its Driver Notifications are designed "so that the passenger can 'get to know [her] driver before [she] step[s] into their car.'"  Opp'n at 12 (quoting MC ¶ 289).  The star rating in particular is marketed as a way to "help keep riders and drivers safe."  MC ¶ 289.  There are also times when Uber goes beyond the star rating to provide users with individualized, positive anecdotes about their drivers.  See Opp'n at 12 n.11 (Driver Notifications information can include "'compliments from previous riders'" (quoting Uber, Driving safety forwards, https://www.uber.com/ae/en/ride/safety/)); Dean, Am. Compl. ¶ 35 (alleging that "Uber communicated to her, through the App, that the driver was a dad and that he had previously worked at a domestic violence shelter for women").  Considering these statements "as a cohesive whole," the Court finds that Plaintiffs have adequately alleged that Uber's selective omission of information in its Driver Notifications

---

[11]  The Court agrees with Uber that requiring the company to publish the results of A.R.2's driver's criminal background check would force Uber to violate the Fair Credit Reporting Act.  See Mot. at 19–20; Reply at 7.  Therefore, A.R.2's Driver Notifications fraud claim survives only insofar as it is based on Uber's alleged omission of prior complaints against the driver.

[12]  Even if Uber is correct that only the latter interpretation of the Driver Notifications is legitimate, there is a more than colorable argument that a reasonable consumer would expect user misconduct reports against a driver to fall within the scope of "overall satisfaction ratings from other riders."

1    could "form a deceptive scheme . . . to obfuscate the rusks of serious harm stemming

2    from" women accepting rides from drivers with histories of reported misconduct.  In re

3    Social Media, 753 F. Supp. 3d at 891 (denying motion to dismiss fraud claims where

4    plaintiffs alleged "a yearslong course of conduct replete with numerous public statements

5    regarding user safety varying widely in character and degree of deceit").

6        Uber urges the Court to exercise "common sense" in finding that "virtually every

7    online consumer understands star ratings to be "composites of consumer-assigned

8    satisfaction scores."  Reply at 5–6.  But the cases cited by Uber concern consumers with

9    facially unreasonable interpretations of the defendant's statements.  See Weiss v. Trader

10   Joe's, 838 F. App'x 302, 303 (9th Cir. 2021) (finding that "the phrase 'ionized to achieve

11   the perfect balance' clearly refers to the water itself being balanced," not that the product

12   would balance the consumer's own pH levels); Terpin, 118 F.4th at 1110 (finding that

13   promise of increased security, when combined with disclosure that defendant "'cannot

14   guarantee' its security measures will prevent a breach," did not suggest that security

15   feature "would prevent all fraud" (emphasis added)).  It is not outlandish for Uber riders to

16   expect that the Driver Notifications, purportedly designed to help them stay safe and "get

17   to know their driver," would include relevant negative information about a driver that

18   might help a rider make an informed decision about whether to accept a ride.  Plaintiffs'

19   allegations thus establish a "probability that a significant portion of the general consuming

20   public or of targeted consumers, acting reasonably in the circumstances, could be misled"

21   by the omission of past complaints of misconduct.  Ebner, 838 F.3d at 965 (quotations

22   omitted).  Therefore, the Driver Notifications constitute an actionable partial omission.[13]

23              **b.    Reliance**

24       Reliance is a "necessary element[] to support a common law fraud claim."  In re

25   McKinsey, 2023 WL 4670291, at *7.  Uber argues that Plaintiffs cannot establish reliance

26   on the Driver Notifications because "[n]o Plaintiff alleges that she ever 'actually saw and

27   _____

28   [13]  Because Uber has a duty to disclose on these grounds, the Court need not reach
     Plaintiffs' "exclusive knowledge" theory.  See Opp'n at 14–16.

*United States District Court*
*Northern District of California*

relied upon' a notification with her driver's information and star rating."  Mot. at 20 (quoting PTO 17 at 37) (emphasis in original).  According to Uber, "[b]ecause Plaintiffs do not allege they actually ever looked at the 'star ratings' and driver information on the night of incidents alleged, they cannot plead 'actual reliance' on any omission to disclose additional information alongside the 'star ratings' and driver information."  Id. at 21.

It is certainly odd for Plaintiffs to take such a roundabout approach to pleading reliance, and their apparent lack of certainty may ultimately prove fatal to their fraud claims at a later phase of the litigation.  At the motion to dismiss stage, however, "[a] court must draw all reasonable inferences in favor of the nonmoving party."  Boquist v. Courtney, 32 F.4th 764, 773 (9th Cir. 2022) (quotation omitted).  Each bellwether plaintiff bringing a Driver Notifications fraud claim pleads at the very least that they ordered their own ride from the Uber app, and that "Uber makes it nearly impossible not to see" the driver star rating and other information when doing so.  See, e.g., Dean, Am. Compl. ¶¶ 8, 38–40; Opp'n at 17.  For any of the Plaintiffs to have identified and entered the correct car for their ride, it is exceedingly likely that they would have needed to look at the driver information page at least once.  The design of the Uber app means that Plaintiffs' assertion that they saw the Driver Notifications rises above a purely "speculative level" at this stage.  Reply at 9 (quotation omitted).

The case law cited by Uber does not change this conclusion.  In Friedman v. Mercedes Benz USA LLC, the plaintiff conceded that they never saw the advertisements at issue, instead basing their claim on a third-party's reliance.  See 2013 WL 12086788, at *3 (C.D. Cal. Apr. 9, 2013).  Plaintiffs here have pled that it would have been essentially impossible for them to not see the Driver Notifications even if they do "not recall" it specifically years later.[14]  Opp'n at 16.  The plaintiffs in Moncada v. Allstate Ins. Co.

---

[14]  Because Plaintiffs identify the "specific advertisements" underlying their fraudulent partial admission claims—the information contained in the Driver Notifications—Tabler v. Panera LLC, 2020 WL 3544988, at *7 (N.D. Cal. June 30, 2020) is also inapposite.  See id. (dismissing fraud claim in part because plaintiff alleged they saw only one unidentified ad out of "a number of representative" advertisements).

United States District Court
Northern District of California

failed to demonstrate "that they were aware of any of the documents [at issue] or that they even had access to most of them."  471 F. Supp. 2d 987, 997 (N.D. Cal. 2006).  There is no dispute that Plaintiffs had access to the Driver Notifications, and they have alleged sufficient facts at this stage to infer they were aware of the information.  Statements posted without fanfare on a website or within a company's internal documents are readily distinguishable from information sent directly to a rider's phone that is essential for completing the transaction between Uber and its riders.  See id.  And unlike the plaintiffs in Hammerling v. Google LLC, Plaintiffs here allege that they were very likely exposed to the Driver Notifications prior to agreeing to begin the ride.  615 F. Supp. 3d 1069, 1083–84 (N.D. Cal. 2022) (finding that plaintiffs' failure to allege whether they relied on Google's statement "before or after their purchases" was "critical[]" to dismissing their fraud claims).

The more appropriate comparison is Beyer v. Symantec Corp., 333 F. Supp. 3d 966 (N.D. Cal. 2018).  There, the plaintiff only alleged that they reviewed the product page for the defendant's software, not that they had actually seen the allegedly misleading statement.  See id. at 980.  Even so, Judge Chen determined that it was "reasonable to infer for purposes of the motion to dismiss from the fact that [the plaintiff] reviewed the product page that he saw the [misleading] statement on the page."  Id.  Here, too, it is reasonable to infer from Plaintiffs' allegations, as well as the design of the Uber app, that the Plaintiffs saw the Driver Notifications information, including the star rating, before beginning their rides.

### c.    Intent to Defraud

Finally, Uber argues that the Driver Notifications fraud claims should be dismissed because Plaintiffs' complaints "lack even conclusory allegations" that Uber withheld information regarding past reports of driver misconduct with an "intent to defraud."  Mot. at 22 (citing Quackenbush v. Am. Honda Motor Co., Inc., 650 F. Supp. 3d 837, 845 (N.D. Cal. 2023).  Plaintiffs respond that they need only allege that Uber had intent to induce reliance; in other words, that Uber "intended the package of driver information to

'influence [plaintiffs] to enter into . . . transactions.'"  Opp'n at 18 (quoting Pub. Emps. Ret. Sys. v. Moody's Invstrs. Serv., Inc., 172 Cal. Rptr. 3d 238, 258–59 (Cal. App. 2014)). Uber apparently does not dispute Plaintiffs have successfully done just that.  Instead, Uber argues that an intent to induce reliance "is not enough" without a more specific showing of purposeful deception.  Reply at 10.

Courts are less clear on the distinction between "intent to defraud" and "intent to induce reliance" than Uber claims, as evidenced by the cases cited in the parties' briefing. See Williams v. J.P. Morgan Chase Bank, N.A., 704 F. Supp. 3d 1020, 1025 (N.D. Cal. 2023) (listing "intent to induce reliance" as element of fraud claim); Pemberton v. Nationstar Mortg. LLC, 331 F. Supp. 3d 1018, 1047 (S.D. Cal. 2018) ("Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission." (quotation omitted)); All. Mortg. Co. v. Rothwell, 10 Cal. 4th 1226, 1239 (Cal. 1995) (listing "intent to defraud (i.e., to induce reliance)" as element of fraud claim).  The distinction is not essential here, as under either framing Uber's intent is a question of fact best left up to the jury.[15]  See Pub. Emps., 172 Cal. Rptr. 3d at 258 ("Intent to induce reliance is usually a question of fact for the jury." (quotation omitted)).  Given the law's predisposition against dismissal, and because the intent element of a fraud claim "may be alleged generally," Fed. R. Civ. P. 9(b), a jury could reasonably infer that Uber intentionally withheld certain negative information from its Driver Notifications that would have dissuaded "passenger [] largely motivated by safety [from] choosing Uber's services."  Opp'n at 18 (quoting MC ¶ 13); see also MC ¶ 378 ("Uber intended that every passenger rely on its safety marketing."); Rojas v. Cigna Health & Life Ins. Co., 2018 WL 4759775, at *9 (S.D.N.Y. Sept. 29, 2018) (explaining that "[c]ourts routinely allow parties to rely on circumstantial evidence and legitimate inferences" to show intent to defraud).

Accordingly, Uber's motion to dismiss Plaintiff's fraud claims stemming from the

---

[15]  Uber claiming that it actually withheld the information regarding its driver's criminal records and complaint histories due to fear of potential civil liability illustrates the factual nature of this dispute and why such questions are not appropriate for consideration at the motion to dismiss stage.  See Mot. at 22–23.

United States District Court
Northern District of California

1    Driver Notifications allegations is denied.

2        **B.    Product-Liability Claims**

3            **1.    Whether the Challenged Features Are Products**

4            Uber moves to dismiss some of Plaintiffs' strict products liability claims for

5    targeting Uber in its role as a service provider.  See Mot. Appx. B at 4–5.  The Court

6    previously held that the Uber app is a product, and that Uber could be held liable for any

7    defects proven to exist within the app.  See PTO 17 (dkt. 1044) at 45.  But because Uber is

8    simultaneously a rideshare service provider, the key question for evaluating plaintiffs'

9    products liability claims becomes whether "the alleged 'defects' [are] really defects in the

10   Uber app, or are they just problems with Uber's services (or with some other aspect of its

11   business model)?"  Id. at 46; see also In re Soc. Media Adolescent Addiction/Pers. Inj.

12   Prods. Liab. Litig., 702 F. Supp. 3d 809, 848–855 (N.D. Cal. 2023) (adopting a "defect-

13   specific approach" to analyzing strict product liability claims for apps).  Uber argues that

14   two features in particular—"Safe Ride Matching" and "Gender Matching"—are the latter.

15           **a.    Safe Ride Matching**

16           Several plaintiffs allege as a product defect Uber's failure to employ "Safe Ride

17   Matching," a "function that automatically blocks certain rider-driver pairings based on

18   certain predictive factors."[16]  Opp'n at 20.  Uber argues that these allegations go towards

19   Uber's "quintessential service of matching users with specific independent drivers" rather

20   than the functionality of the app itself.  Reply at 11.  Uber claims that the Safe Ride

21   Matching allegations are "indistinguishable" in that way from allegations that Uber

22   "[f]ail[ed] to appropriately monitor rides to detect known patterns of sexual assault, . . .

23   including by using Uber's GPS technology."  Mot. at 25.  The Court previously held such

24   allegations to be directed at Uber's provision of services, and thus not a product defect.

25   See PTO 17 at 46.

26           While the distinction between product and service here is "fine," the Court

27   ─────────────

28   [16]  Safe-Ride Matching claims are asserted by Plaintiffs A.R.1, A.R.2, Jane Doe QLF
     0001, T.L., WHB 1898, B.L., LCHB128, Jaylynn Dean, and WHB 1876.

United States District Court
Northern District of California

ultimately agrees with Uber.  Id.  The Safe Ride Matching allegations target Uber's algorithm for matching riders and drivers.  See, e.g., WHB 1898, Am. Compl. ¶ 34 ("Uber could have, but did not, design the Uber App to prevent high-risk pairings like the one between Plaintiff and the driver by modifying its matching algorithm on the backend to block pairings between riders and drivers in the presence of sufficient numbers of high-risk factors predictive of sexual assault." (emphasis added)).  But the actual Uber ride, which Plaintiffs concede is a service, see Omnibus Opp'n (dkt. 518) at 93, is inextricably linked with Uber's matching algorithm; the former cannot exist absent the latter.  Indeed, Uber has differentiated itself from typical taxi companies in large part through its capacity to efficiently pair riders and drivers based on proximity, requested route, and other factors.

Following Judge Gonzalez Rogers' "real-world" comparison approach to analyzing whether specific app features are products, see In re Soc. Media, 702 F. Supp. 3d at 29–34, the Court finds convincing Uber's analogization of its matching algorithm "to a dispatcher who sends drivers to riders based on convenience, thereby performing a service."[17]  Reply at 12 n.17.  What data inputs Uber considers on the "backend" of its matching algorithm, and whether those inputs are sufficient to ensure Uber's ride assignments effectively reduce the risk of sexual assault, are "question[s] of Uber's level of care with respect to its services, not with the design or functionality of the app."  PTO 17 at 46; see also Rodgers v. Christie, 795 F. App'x 878, 880 (3d Cir. 2020) (denying product defect claim related to "'algorithm' . . . using various factors to estimate defendant's risk of absconding or endangering the community."); Social Media Cases, 2023 WL 6847378, at *16 (Cal. Super. Oct. 13, 2023) (finding "algorithms . . . [that] tailor the user's experience to the individual consumer" are not a product).

Plaintiffs' reliance on the word "monitor," and their attempt to distinguish oversight by actual Uber employees from its matching algorithm, is misplaced.  See Opp'n at 20–21.

---

[17]  Plaintiffs' analogy to an automatic shutoff valve is distinguishable because Safe-Ride Matching would not "stop [the ride matching] system[] from running" entirely, but instead alter the output depending on a variety of potential risk factors.  Opp'n at 21.

United States District Court
Northern District of California

The word "monitor" does not necessarily implicate the involvement of human reviewers, particularly in 2025 and particularly here where the defendant is a highly sophisticated technology company.  See, e.g., In re Soc. Media, 702 F. Supp. 3d at 833 (finding that "[w]hether [the action] was done by an algorithm or an editor" was irrelevant to the court's analysis).  Plaintiffs do not provide any justification for their narrow construction of the term, and the Court declines to adopt such a limitation.  The real "key" to the analysis is whether "the 'context of [the feature's] distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules' of strict liability."  PTO 17 at 42 (quoting Restatement (Third) of Torts: Prods. Liab. § 19).  Unlike the Uber app itself, the ride pairing algorithm does not fit within that conception of product liability.  Therefore, Plaintiffs' product liability claims related to Safe Ride Matching are dismissed.

### b.    Gender Matching

Conversely, Plaintiffs' "Gender Matching" allegations identify a feasible product defect subject to strict liability.[18]  Unlike Safe Ride Matching, which would target the way Uber goes about its service of pairing riders and drivers for rides, Gender Matching would give riders the "option" to choose if they wanted to only be matched with drivers of the same gender.  Opp'n at 21–22.  The Court agrees with plaintiffs that the "[l]ack of an in-app option [for Gender Matching] by definition concerns a 'functionality of the app.'"  Id. at 22 (quoting PTO 17 at 46) (emphasis in original).

The absence of Gender Matching is best analogized to the lack of parental controls and the barriers to account deletion that were found to be product defects in the ongoing Social Media MDL.  See In re Soc. Media, 702 F. Supp. 3d at 849, 851.  "These defects are . . . more akin to user interface/experience choices," such as "real world" parental locks, than defendants' decisions regarding their provision of services more broadly.  Id. at

---

[18]  Gender Matching Claims are asserted by Plaintiffs A.R.2, Jane Doe QLF 0010, B.L., Jaylynn Dean, K.E., T.L., WHB 318, A.R.1, C.L., D.J., J.E., LCHB128, WHB 407, and WHB 1486.

849; see also PTO 17 at 43 ("The real-world parental locks are undeniably products, so their app-based analogues are too."). Like parental controls, Gender Matching is a "user-directed process" that would allow an individual to control how they experience the Uber app. In re Soc. Media, 702 F. Supp. 3d at 851. And while Safe Ride Matching would fundamentally alter the inner workings of Uber's algorithm, and by extension its ride service, Gender Matching only provides an optional filter of the algorithm's end results for certain users. This distinction between who and what the feature is targeting is decisive in finding that Gender Matching relates to a "functionality of the [Uber] app" and thus subject to strict liability. PTO 17 at 46.

### 2. Causation

Uber also argues that Plaintiffs' fraud claims related to the alleged lack of "App-Based Ride Recording" by plaintiffs A.G., K.E., A.R.2, and Jaylynn Dean fail because Plaintiffs do not plausibly allege the feature would have prevented their alleged assaults. See Mot. at 26–27. Uber notes that each Plaintiff alleges that the driver ended the ride, and thus the in-ride recording, before the alleged assault occurred. See A.G., Am. Compl. ¶ 12 (alleging "[t]he driver turned off the app" and drove to a different location prior to raping plaintiff); K.E., Am. Compl. ¶¶ 10–14 (alleging that driver took plaintiff to and entered her home after completing initial ride); A.R.2, Am. Compl. ¶¶ 9–11 (alleging that driver "used Uber's Driver App to indicate that the ride had ended" prior to "dr[iving] about 3 or 4 blocks down the road" and assaulting plaintiff); Jaylynn Dean, Am. Compl. ¶¶ 15–16 (alleging that "driver unilaterally marked the trip as completed" before raping plaintiff sometime within "the next twenty minutes").

Plaintiffs claim the exact timing of when the rides were completed is not dispositive as to causation because they allege "the App was defective because it was not designed to trigger automatic video recording of rides and the time period immediately around them." Opp'n at 23 (citation omitted) (emphasis in original). Plaintiffs do not define what "the time period immediately around them" means in practice. Are they alleging that Uber should have automatic video recording remain on for seconds after a ride concludes? Or is

the alleged defect that the recording does not continue for minutes (or even hours) afterward?  Plaintiffs offer no clarity in either direction.  Nor do they allege that the video recording would have actually been operational at the time of the alleged assaults in these four specific cases.

Despite Plaintiffs' lackluster arguments, however, it would not be appropriate to dismiss the App-Based Ride Recording claims at this stage.  Uber asserts that Plaintiffs "allege[] no facts supporting an inference that in-app recording would have prevented an assault allegedly occurring <u>after</u> the App was shut off."  Mot. at 27 (emphasis in original).  But one can imagine circumstances where such in-ride recording would prevent the alleged assaults even if the recording stopped before the incidents purportedly occurred.  For example, a bad actor driving for Uber may behave differently if they are aware that their actions during a ride are logged and could one day be used to corroborate the accounts of their potential victims.  Even if the assault itself was not captured, a recording of the lead-up would provide invaluable evidence in any criminal or civil proceeding.  A reasonable jury could find that Plaintiffs' drivers would have acted differently with App-Based Ride Recording given that increased risk of liability and other repercussions.  Accordingly, Uber's Motion to Dismiss is denied on these grounds.

### 3.    Negligent Design and Breach of Warranty

Some Plaintiffs, whose claims arise in jurisdictions that have not adopted strict products liability, instead bring comparable claims for breach of implied warranty and negligent design defect.[19]  Uber argues that these claims should be dismissed because "[a]ll five relevant Plaintiffs plead nothing more than essentially identical, boilerplate legal conclusions of the claims' purported elements."  Mot. at 28.  Plaintiffs assert that they pled sufficient individual allegations to state a claim in the subsections of their Amended Complaints titled "Product Defects."  Opp'n at 24.  The Court agrees that the individual allegations contained in those sections are sufficient for Plaintiffs' alternative products

---

[19]  These alternative products liability claims are asserted by C.L., J.E., WHB 318, WHB 823, WHB 1898, and D.J. (alleging design defect only).

1    liability claims to survive at this stage.[20]  Uber's motion to dismiss is denied on these

2    grounds.[21]

3        **C.    Vicarious Liability Claims**

4            **1.    Scope of Employment**

5                **a.    Oregon**

6        Plaintiff A.G. brings vicarious liability claims against Uber under Oregon law.  See

7    A.G., Am. Compl. ¶ 24.  Like California, see PTO 17 at 15, Oregon has crafted its own

8    standards for when an employer may be liable for its employee's intentional tort.  "An

9    intentional tort is within the scope of employment, and can support respondeat superior

10   liability for the employer, if conduct that was within the scope of employment was 'a

11   necessary precursor to the' intentional tort and the intentional tort was 'a direct outgrowth

12   of . . . conduct that was within the scope of . . . employment.'"  Doe v. Holy See, 557 F.3d

13   1066, 1083 (9th Cir. 2009) (quoting Fearing v. Bucher, 977 P.2d 1163, 1166 (Or. 1999)).

14   Uber asserts that "the assailant must [also] bear a position of authority or fiduciary position

15   toward plaintiff," Mot. at 32 (citations omitted), or that there must exist a "pattern of

16   extended grooming over a lengthy period" for there to be vicarious liability, Reply at 14.

17   Uber attempts to distinguish the Uber driver-rider relationship from the so-called "trust

18   relationships" from which courts have previously found vicarious liability for intentional

19   torts under Oregon law, such as between a boy scout leader and his troop or a priest and

20   his parishioners.[22]  Mot. at 32–33.

21

22   [20]  Uber's argument that Plaintiffs' "Product Defects" allegations should be ignored
     because Plaintiffs "should have pleaded incorporation by reference" is unconvincing.  The
23   Ninth Circuit takes a liberal approach to the incorporation by reference doctrine, "even if a
     plaintiff failed to attach [those] referenced materials to the complaint."  Anderson v. Intel
24   Corp. Inv. Pol'y Comm., 579 F. Supp. 3d 1133, 1145 (N.D. Cal. 2022), aff'd, 137 F.4th
     1015 (9th Cir. 2025).  Under that standard, allegations within the same complaint that
25   directly follow the state-specific claims at issue are clearly appropriate for the Court to
     consider.  See, e.g., WHB 318, Am. Compl. ¶¶ 22–38.
26   [21]  Plaintiff WHB 1898's breach of implied warranty claim is dismissed on other grounds.
     See supra Section III.D.2.
27   [22]  In this section of its motion, Uber also cites to M.N.O. v. Magana, which concerns
     sexual assaults committed by police officers in the course of their duties, for the
28   proposition that an official power dynamic of some sort is required for vicarious liability
     for intentional torts under Oregon law.  2006 WL 559214, at *5 (D. Or. Mar. 6, 2006) ("It

The Court is not entirely convinced that Oregon law is so limited.  "Although the court held in Fearing that such facts [regarding a "trust relationship" or pattern of grooming] would be sufficient to establish the connection between the employment and the abuse . . . we do not think that the case stands for the rule that an employment connection is established only by such conduct."  Schmidt v. Archdiocese of Portland in Oregon, 234 P.3d 990, 993 (Or. 2010) (citation omitted) (emphases in original);[23]  see also Minnis v. Oregon Mut. Ins. Co., 48 P.3d 137, 145 (Or. 2002) ("[C]ourt[s] must determine whether tortious conduct by a tortfeasor, acting within the time and space limits of employment, was sufficiently connected to the employer's purpose to support the employer's vicarious liability.").  But even if a "position of authority" is indeed a requirement for vicarious liability stemming from an intentional tort, a jury could reasonably find that such power imbalance existed here between A.G. and her driver.  Plaintiffs are right that "[d]ue to [A.G.'s driver's] employment, he had the exclusive power to direct the vehicle in which A.G. was confined."  Opp'n at 27.  While the relationship between an Uber driver and rider may not be as emotionally intimate as those at issue in the cases cited by Uber, see Mot. at 33, during a ride a driver has total control over where their passengers go and when they can exit the vehicle.  For that specific window in time, riders like A.G. place significant trust in Uber drivers to deliver them to their destination safely, as they have little recourse in the moment should a driver act dangerously.  In possessing such direct control over A.G.'s life and wellbeing during the ride, a reasonable jury could find that A.G.'s driver occupied a position of authority over her for that period.

A.G.'s driver was undoubtedly operating "within the time and space limits of

_____

is clear that but for the power of authority Magana possessed by virtue of his uniform and patrol vehicle, he would not have been able to stop M.N.O. to initiate the alleged assaults."), on reconsideration in part on other grounds, WL 1313374 (D. Or. May 3, 2006).  But the portion of the opinion Uber cites concerns a federal § 1983 claim, not a state law vicarious liability claim, and is thus inapplicable.

[23]  While Uber is correct that Schmidt is "not 'controlling authority,'" Reply at 14 n. 21 (quoting Camenzind v. Cal. Expo. & State Fair, 84 F.4th 1102, 1114 (9th Cir. 2023)), "a federal court must predict how the highest state court would decide the state law issue using intermediate appellate court decisions" in instances where such authority is unavailable, Camenzind, 84 F.4th at 1114 (citation omitted) (cleaned up).

1   employment," as the assault is alleged to have occurred in his car following a sanctioned

2   Uber ride.  <u>Minnis</u>, 48 P.3d at 145; <u>see also</u> <u>Doe v. Congregation of the Priests of the</u>

3   <u>Sacred Heart, Inc.</u>, 2024 WL 5186640, at *7 (D. Or. Dec. 20, 2024) (finding that defendant

4   priest acted "within the time and space limits of employment" because the alleged

5   activities "took place in church areas—such as the confessional and on the altar—where

6   [defendant] conducted his employment duties"); <u>A.G.</u>, Am. Compl. ¶¶ 7–16.  The driver

7   "actively <u>used</u> his position[]" with Uber "to make the misconduct possible," as his role as

8   an Uber driver was the sole reason A.G. entered his car.  <u>M.N.O. v. Magana</u>, 2006 WL

9   559214, at *17 (D. Or. Mar. 6, 2006), <u>on reconsideration in part on other grounds</u>, WL

10  1313374 (D. Or. May 3, 2006).  And a jury could reasonably find that A.G.'s driver "was

11  motivated, at least partially and initially, by a desire to serve his employer[]" in accepting

12  A.G.'s ride request and allowing her to make an additional stop along her route.  <u>Priests of</u>

13  <u>the Sacred Heart</u>, 2024 WL 5186640, at *7; <u>A.G.</u>, Am. Compl. ¶¶ 7, 11.  On the basis of

14  these factors, "[a] jury reasonably could infer that [A.G.'s driver's] performance of

15  his . . . duties with respect to [A.G.] were a necessary precursor to the sexual abuse and

16  that the assault[] thus [was] a direct outgrowth of and [was] engendered by conduct that

17  was within the scope of [his] employment."  <u>Fearing</u>, 977 P.2d at 1168.

18          As a matter of law, the Court cannot say based on the allegations before it that the

19  alleged assault was not committed within the scope of the driver's employment with Uber;

20  this is an issue of fact best left up to a jury.  <u>See</u> <u>Magana</u>, 2006 WL 559214, at *17.

21  Therefore, Uber's Motion to Dismiss A.G.'s vicarious liability claims is denied.

22                          **b.      North Carolina**

23          Plaintiffs clarified in their Opposition that WHB 318 and WHB 832 "did not plead"

24  respondeat superior claims in North Carolina, and instead bring common-carrier claims.

25  Opp'n at 2.  Accordingly, Uber conceded that "the Court need not address vicarious

26  liability on a respondeat superior, agency, or ratification theory under North Carolina law."

27  Reply at 15.  Uber also appears to have dropped its argument for dismissal of Plaintiffs'

28  North Carolina common-carrier claims, which it halfheartedly raised in its original motion.

United States District Court
Northern District of California

See Mot. at 30 n. 51. Rightly so, as the Court agrees with plaintiffs that "[l]ike California and Illinois (and the majority of states), North Carolina assigns common carriers like Uber a non-delegable duty to transport passengers safely, a duty that gives rise to vicarious liability whether or not the breach was done by an employee at all, let alone by one within the scope of employment." Opp'n at 28; see also Hairston v. Atl. Greyhound Corp., 18 S.E.2d 166, 170 (N.C. 1942) ("Since the carrier owes a high duty to a passenger to protect him from assault from any source, a malicious or wanton assault committed on a passenger by an employee while on duty, whether within the line of his employment or not, constitutes a breach of duty directly imposing liability."). Uber's Motion to Dismiss the North Carolina common carrier claims is denied.

## 2. Ratification

Plaintiffs A.R.2, C.L., and WHB 1898 claim that Uber ratified its drivers' intentional torts and is therefore vicariously liable for them (Claim G.3). See A.R.2, Am. Compl. ¶¶ 25–27, 42; C.L., Am. Compl. ¶¶ 12–13, 29–33; WHB 1898, Am. Compl. ¶ 26. Specifically, Plaintiffs allege that Uber ratified the drivers' purported assaults because "despite learning that Plaintiffs had been assaulted, [Uber] permitted the drivers to remain on the company's platform." Opp'n at 29. "[R]atification may be inferred from the fact that the employer, after being informed of the employee's actions, does not fully investigate and fails to repudiate the employee's conduct by redressing the harm done and punishing or discharging the employee." Garcia ex rel. Marin v. Clovis Unified Sch. Dist., 627 F. Supp. 2d 1187, 1202 (E.D. Cal. 2009). The Court previously explained that to state a claim for vicarious liability through ratification, plaintiffs must allege facts "support[ing] a plausible inference that Uber knew about [the] incident . . . [and] permit[ing] inferences about what actions Uber took with respect to particular drivers." PTO 17 at 30.

Uber contends that "the standard [for finding ratification] is high—Plaintiffs must allege conduct 'deliberately indifferent to [Plaintiffs'] complaints.'" Mot. at 34 (quoting Garcia, 627 F. Supp. 2d at 1202). Therefore, Uber argues, "'an employer need not always terminate an employee in order to avoid ratification.'" Id. (quoting Garcia, 627 F. Supp.

23

2d at 1202) (emphasis added).  But Uber's analysis is flawed for three reasons.  <u>First</u>, <u>Garcia</u> is distinguishable.  That case concerned the unique issue of whether to hold a school district vicariously liable for the sexual misconduct of its teachers, something that the court was particularly wary to do.  <u>See Garcia</u>, 627 F. Supp. 2d at 1203 ("At this point, it is unclear if ratification may be applied [at all] when the sexual misconduct of a teacher is involved.").  <u>Second</u>, the "deliberately indifferent" standard was actually used in that case to evaluate the plaintiff's Title IX sexual harassment claim—not ratification.  <u>See id.</u> at 1196.[24]  And <u>third</u>, while Uber's failure to discharge their drivers may not <u>necessitate</u> a finding of ratification, it certainly <u>could</u> support such a determination.  <u>See, e.g.</u>, <u>Baptist v. Robinson</u>, 49 Cal. Rptr. 3d 153, 169 (Cal. App. 2006) ("[F]ailure to discharge an employee who has committed misconduct may be evidence of ratification.").  Whether or not it does in these circumstances presents a reasonable question of fact best decided by a jury.  <u>See</u> <u>Samantha B. v. Aurora Vista Del Mar, LLC</u>, 292 Cal. Rptr. 3d 324, 342 (2022) ("Generally, ratification is a question of fact."), <u>as modified on denial of reh'g</u> (Apr. 26, 2022).

Uber also argues that "[n]o Plaintiff alleges that Uber responded with deliberate indifference after gaining knowledge of a complaint against an independent driver."  Mot. at 35; <u>see also</u> Reply at 16.  Based on its review of the Amended Complaints, however, the Court disagrees.  Plaintiff C.L. alleges that Uber's "careful review" of her incident report was resolved within a day and her driver was allowed to remain on the platform.  <u>C.L.</u>, Am. Compl. ¶¶ 29–31.  One could reasonably conclude that such a rapid investigation was insufficient given the severity of the allegations, even if Uber did eventually deactivate the driver's account after C.L. filed her lawsuit.  <u>See id.</u> ¶¶ 32–33; <u>Samantha B.</u>, 292 Cal. Rptr.

---

[24]  The Court agrees with Plaintiffs that <u>A.H. v. Church of God in Christ, Inc.</u> is also inapposite, as the plaintiff there did not plead that the defendant had actual knowledge of the specific sexual assault at issue.  <u>See</u> 831 S.E.2d 460, 478 (Va. 2019) ("At best, A.H. alleges that the church defendants knew or should have known that Don Billups was likely to abuse her just as he had allegedly abused another child in 2002."); Opp'n at 30 n. 35. All three Plaintiffs bringing ratification claims have pled Uber's actual knowledge or their alleged assaults.  <u>See</u> <u>A.R.2</u>, Am. Compl. ¶ 42; <u>C.L.</u>, Am. Compl. ¶ 29; <u>WHB 1898</u>, Am. Compl. ¶ 26.

United States District Court
Northern District of California

3d at 342 (holding that an "employer is not relieved of liability for ratification simply because it eventually terminates the employee").

Plaintiff A.R.2 alleges that Uber did not deactivate her driver's account after she filed her lawsuit.  A.R.2, Am. Compl. ¶ 42.  While the Court agrees with Uber that "immediate termination" is not a "requirement to avoid ratification," Reply at 16 (emphasis added), a jury could still find that Uber's failure to do so constituted ratification in this instance, particularly because Uber did deactivate the accounts of the drivers involved in the other two cases once it received notice of the lawsuits.  See C.L., Am. Compl. ¶¶ 32–33; WHB 1898, Am. Compl. ¶ 26.

Finally, Plaintiff WHB 1898 alleges that she reported her assault to Uber in September 2022, and that the driver was not removed from the platform until July 2024. WHB 1898, Am. Compl. ¶ 26.  Uber claims this allegation is "conclusory."  Mot. at 35. Not so.  WHB 1898 alleges that Uber was informed of the driver's purported actions via direct user report, and that Uber then failed to remove the driver for more than a year afterwards.  These details are sufficiently concrete to state a plausible claim of ratification at this stage; forcing WHB 1898 to recall the exact language she used in her user report prior to discovery would artificially heighten her burden under Rule 12(b)(6) beyond what the law requires.

### D.    Plaintiffs WHB 1876, WHB 1898, WHB 407, and Jane Roe CL 68

Uber moves to dismiss in full the amended complaints of Plaintiffs WHB 1876, WHB 1898, WHB 407, and the original complaint of Jane Roe CL 68.  See Mot. at 36, 39. Uber contends that because these Plaintiffs "allege exclusively nonphysical harm, . . . their [Claim B] negligence, [Claim E] common-carrier, and [Claim H] product-liability claims must be dismissed."[25]  Id. at 36.  Additionally, Uber argues that WHB 1898 failed to allege underlying tortious conduct by her driver, necessitating the dismissal of her vicarious

---

[25]  Jane Roe CL 68's common carrier claim has already been dismissed pursuant the Court's order on Plaintiffs' Texas law claims.  See PTO 17 at 31; Opp'n at 40.  WHB 1876 has not pled a common carrier claim.

1    liability claim.  See id. 37–38.

2           **1.     WHB 1876**

3           WHB 1876 did not plead a claim for common carrier liability, and Plaintiffs

4    concede that she has not alleged the requisite physical harm to state a claim for strict

5    products liability under Illinois law.  See Opp'n at 40.  Thus, the only remaining question

6    for the Court to address is whether WHB 1876's negligence claim grounded in exclusively

7    nonphysical harm may survive.

8           The answer is no.  Illinois law has adopted the "impact rule," meaning that

9    "'[p]hysical harm' is an essential element of any action for products liability . . . regardless

10   of whether the action sounds in negligence . . . or strict liability."  Sondag v. Pneumo Abex

11   Corp., 2016 IL App. (4th) 140918, ¶ 23 (citing Restatement (Second) of Torts §§ 388,

12   402A (1965)); see also Benton v. Little League Baseball, Inc., 2020 IL App. (1st) 190549,

13   ¶ 77 (holding that plaintiffs "must satisfy the 'impact rule'" to state a claim for negligent

14   infliction of emotional distress under Illinois law).  "Under the 'impact rule,' a direct

15   victim can recover damages if [she] suffered emotional distress and a contemporaneous

16   physical injury or impact, requiring actual physical contact of some sort."  Benton, 2020 IL

17   App. (1st) 190549, ¶ 77 (citing Schweihs v. Chase Home Fin., LLC, 2016 IL 120041, ¶¶

18   31, 38) (emphasis added).  As Uber notes in its Motion, see Mot. at 36, WHB 1876 does

19   not claim any "actual physical contact" occurred between herself and her driver, see WHB

20   1876, Am. Compl. ¶ 12–14 (describing driver's purely verbal harassment of Plaintiff).

21          In response, Plaintiffs assert that the impact rule is not applicable where the alleged

22   mental and emotional harms are just one element of damages stemming from a "'distinct

23   and independent tort that has a settled place in Illinois jurisprudence,'" as opposed to a

24   freestanding claim of emotional distress.  Opp'n at 38 (quoting Cochran v. Securitas Sec.

25   Servs. USA, Inc., 2017 IL 121200, ¶ 24).  Plaintiffs argue that WHB 1876 has sufficiently

26   pleaded that her driver committed such "distinct and independent torts" against her,

27   namely: assault, false imprisonment, and intentional infliction of emotional distress.  See

28   id.  But WHB 1876's allegations relate to intentional torts purportedly committed by the

26

United States District Court
Northern District of California

driver, <u>not Uber</u>.  <u>See id.</u>  All of the cases cited by Plaintiffs concern whether a party "is entitled to recover damages for the mental suffering that is proximately caused <u>by the defendant's misconduct</u>," not that of an independent third party.  <u>Cochran</u>, 2017 IL 121200, ¶ 24 (emphasis added); <u>see also</u> <u>Jerman v. Woolsey Operating Co., LLC</u>, 2021 IL App. (5th) 210007-U, ¶ 32 (discussing cases "in which emotional distress was simply an element of plaintiff's damages because they were already injured <u>by the defendant's action</u>" (emphasis added)); <u>Clark v. Children's Mem'l Hosp.</u>, 2011 IL 108656, ¶ 92 ("In the wrongful-birth context, the nature of the harm is not that the defendant caused the child's condition, but that <u>the defendant</u> deprived the parents of the opportunity to make an informed decision." (emphasis added)).  WHB 1876 only alleges injuries caused by the driver's misconduct.  <u>See</u> Opp'n at 38 ("Here, the <u>driver's</u> sexual propositioning of Plaintiff while she was trapped in his vehicle constituted assault, false imprisonment, and IIED." (emphasis added)).  And Plaintiffs concede that Uber is "not vicariously liable for intentional torts" by its drivers under Illinois law.  <u>Id.</u>  Because WHB 1876 has not pled that Uber committed or is vicariously liable for any intentional tort against her, her negligence claim does not fall under the limited exception to Illinois's impact rule.[26]

Accordingly, WHB 1876's claims are dismissed in full.  Plaintiffs are ordered to select a new bellwether case within 14 days of this Order to fill the position vacated by WHB 1876.  Uber is ordered to identify a replacement case from the existing bellwether pool for Trial Wave 1 within 14 days of this Order.

---

[26] This conclusion is in line with the holding in <u>Sondag</u> that "'[p]hysical harm" is an essential element of any action for products liability" under Illinois law, including negligence.  2016 IL App. (4th) 140918, ¶ 23.  While not a binding decision, <u>Sondag</u> is reflective of the history of the impact rule and the difference between claims sounding in products liability and the types of torts Illinois courts have found exceptions for in the past.  <u>See</u> <u>Jerman</u>, 2021 IL App. (5th) 210007-U, ¶ 32 (distinguishing case where "neither [the defendant], nor anyone else . . . incurred a physical injury, and his sole injury was emotional distress" from cases involving torts "such as a wrongful-birth claim, tortious interference with a deceased's remains claim, defamation claim, conversion claim, or misappropriation of identity claim, in which emotional distress was simply an element of plaintiff's damages because they were already injured by the defendant's actions" where the impact rule did not apply).

### 2.    WHB 1898

WHB 1898's negligence and breach of implied warranty claims brought against Uber under Massachusetts law fail for much the same reason as WHB 1876's claims grounded in products liability.  See Wasylow v. Glock, Inc., 975 F. Supp. 370, 377 (D. Mass. 1996) ("Massachusetts warranty law has been interpreted as congruent in nearly all respects with the strict liability principles in the Restatement (Second) of Torts § 402A (1965)," which requires physical harm).  Plaintiffs are correct that the Supreme Judicial Court has technically "abandon[ed] the so-called 'impact' rule" for negligence claims. Dziokonski v. Babineau, 380 N.E.2d 1295, 1296 (Mass. 1978).  But as Uber explains in its Reply, "[t]he Supreme Judicial Court . . . 'did not eliminate the physical harm requirement'" in Dziokonski.  Reply at 18 (quoting Rodriguez v. Cambridge Hous. Auth., 823 N.E.2d 1249, 1253 (Mass. 2005)).

Instead, Massachusetts "merely expanded the range of symptoms that may provide the type of objective evidence to prove physical harm to include symptoms that could be classified as more 'mental' than 'physical.'"  Rodriguez, 823 N.E.2d at 1253 (citation omitted); see also Migliori v. Airborne Freight Corp., 690 N.E.2d 413, 415 (Mass. 1998) ("While no longer considering attendant physical harm as a necessary condition of a cognizable claim for the negligent infliction of emotional injuries, we still required objective corroboration of the emotional distress alleged." (citation omitted)).  In Rodriguez, the Supreme Judicial Court held that the plaintiffs were entitled to recovery for negligent infliction of emotional distress based on their allegations of resultant PTSD, major depression, suicidal thoughts, insomnia, and dissociative episodes.  See 823 N.E.2d at 1254–55.  WHB 1898 makes no such claims of "physical harm manifested by objective symptomatology."  Id. at 1253.  Her lone allegation that the driver's verbal harassment "intimidated her" is insufficient to support a NIED claim.  WHB 1898, Am. Compl. ¶ 19; see also Sullivan v. Bos. Gas Co., N.E.2d 805, 809–10 (Mass. 1993) ("A successful negligent infliction of emotional distress claim . . . must do more than allege mere upset, dismay, humiliation, grief and anger." (citation omitted)).  Therefore, Uber's Motion to

28

Dismiss WHB 1898's negligence and breach of implied warranty claims is granted.

Unlike WHB 1876, however, WHB 1898 also pleads common carrier and vicarious liability claims.[27]  "It is clearly the law in Massachusetts that one held to the duty of care of a common carrier is liable for the intentional torts of its employees, including assault upon passengers." Gallant v. Gorton, 581 F. Supp. 909, 910 & n.1 (D. Mass. 1984); accord Jackson v. Old Colony St. Ry. Co., 92 N.E. 725, 727 (Mass. 1910) ("If this [common carrier] duty to the passenger is not performed, if its protection is not furnished, but on the contrary the passenger is assaulted and insulted, through the negligence or the willful misconduct of the carrier's servant, the carrier is necessarily responsible." (citation omitted)).  WHB 1898 asserts that her driver committed three intentional torts against her—assault, false imprisonment, and intentional infliction of emotional distress (IIED)— for which Uber is vicariously liable as a common carrier.  See Opp'n at 35–36; WHB 1898, Am. Compl. ¶ 22–25.

There is no dispute that Uber is a common carrier under Massachusetts law. Instead, Uber argues that WHB 1898 has not adequately pled underlying tortious conduct by the driver.  Mot. at 37–38; see also Snyder v. Collura, 812 F.3d 46, 52 (1st Cir. 2016) (explaining that a "plaintiff is . . . required to prove an underlying tort" to impose vicarious liability under Massachusetts law).  While Uber is correct regarding the IIED claim, WHB 1898 has plausibly alleged that the driver's conduct constituted assault and false imprisonment such that her common carrier claim survives at this stage.

### a.    Assault

WHB 1898 claims her driver committed assault by placing her "in reasonable apprehension of imminent harmful or offensive contact" through his harassing comments and by lingering outside her house after the ride ended.  WHB 1898, Am. Compl. ¶¶ 14– 19, 23.  "[A]n assault is defined as either an attempt to use physical force on another, or as a threat of use of physical force." Com. v. Gorassi, 733 N.E.2d 106, 110 (Mass. 2000).  In

---

[27] For discussion of WHB 1898's ratification vicarious liability claim, see supra Section III.C.2.

1   cases centered on allegations of verbal harassment, it is well established "that words may

2   create liability for assault when uttered 'together with other acts or circumstances . . . [that]

3   put the other in reasonable apprehension of an imminent harmful or offensive contact with

4   [her] person.'"  Ginsberg v. Blacker, 852 N.E.2d 679, 683 n.7 (2006) (quoting Restatement

5   (Second) of Torts § 31 (1965)).

6        Uber attempts to diminish the severity of the driver's actions, arguing that WHB

7   1898 did not establish that the driver's "innuendos" towards her were objectively

8   menacing.  Reply at 20.  But when one considers the circumstances surrounding those

9   comments—a woman stuck in a car, alone at night and in a secluded area, with a strange

10   man who told her that "he would never leave her alone" before proceeding to lurk outside

11   her home—it is certainly plausible that WHB 1898 was put in reasonable apprehension of

12   imminent sexual assault or other offensive contact.  WHB 1898, Am. Compl. ¶¶ 13–19.

### b.    False Imprisonment

14        WHB 1898 also alleges that the driver's actions "constituted intentional and

15   unjustified confinement of Plaintiff" within the driver's car rising to the level of false

16   imprisonment.  WHB 1898, Am. Compl. ¶ 24.  "If a man is restrained of his personal

17   liberty by fear of a personal difficulty, that amounts to a false imprisonment within the

18   legal meaning of such term."  Jacques v. Childs Dining Hall Co., 138 N.E. 843, 843 (Mass.

19   1923) (citation omitted); Coblyn v. Kennedy's, Inc., 268 N.E.2d 860, 861 (Mass. 1971)

20   (same).  Uber contends that a false imprisonment claim requires actual or threatened

21   physical force, which WHB 1898 does not allege in her SFC.  See Mot. at 37 ("Plaintiff's

22   allegations of inappropriate looks and comments do not state a claim for . . . false

23   imprisonment.").  The Court finds that such a narrow understanding of false imprisonment

24   is not justified by Massachusetts case law.  Take the Jacques case as an example.  There,

25   the Supreme Judicial Court determined that "[t]he restraint or duress imposed by" the

26   restaurant employees investigating whether a patron had paid their check constituted false

27   imprisonment "even if no threats of public exposure or of arrest were made, and no

28   physical restraint of her person was attempted."  Jacques, 138 N.E. at 845.

1    Here, Plaintiffs are correct that a jury could reasonably find WHB 1898 was

2    similarly restrained despite the lack of an explicit threat based on "either the danger of

3    exiting a vehicle on a long, dark road after 11 P.M. or the fear of triggering the driver to

4    move beyond words to violent actions."  Opp'n at 37.  The fact that WHB 1898 was a

5    single woman coming off a night at the bar when she called her Uber, see WHB 1898, Am.

6    Compl. ¶ 7, makes her "fear of personal difficulty" that much more credible, see Coblyn,

7    268 N.E.2d at 861 (considering the plaintiff's old age and heart condition as factors

8    weighing in favor of false imprisonment).[28]

9                                c.    **IIED**

10    Finally, WHB 1898 claims that the driver's "extreme and outrageous conduct"

11    towards her constituted intentional infliction of emotional distress.  WHB 1898, Am.

12    Compl. ¶ 25.  "The standard for making a claim of intentional infliction of emotional

13    distress is very high."  Soni v. Wespiser, 239 F. Supp. 3d 373, 390 (D. Mass. 2017).

14    "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"

15    alone cannot support an IIED claim.  Id.  Plaintiffs urge that "words can constitute IIED,"

16    and the alleged harassment by the driver is undoubtedly reprehensible.  Opp'n at 35.  Even

17    so, the allegations in WHB 1898's Amended Complaint "simply do not rise, as a matter of

18    law, to [the] high standard" for IIED claims.  Montell v. Diversified Clinical Servs., Inc.,

19    757 F.3d 497, 510 (6th Cir. 2014) (rejecting IIED claim related to extended of plaintiff

20    sexual harassment by her direct supervisor); see also Freeman v. Holy Cross Hosp., 2011

21    WL 1559208, at *2 (N.D. Ill. Apr. 25, 2011) (rejecting IIED claim where defendant

22    allegedly "made comments of a sexual nature, asked her out on dates, sent sexually

23

24    [28] The cases cited by Uber do not counsel otherwise.  See Reply at 20.  In Foley v.
       Polaroid Corp., the court determined that "an employee at will who relinquishes his right
25     to move about in return for continued employment, to which he is not entitled, is not
       imprisoned."  508 N.E.2d 72, 77 (Mass. 1987).  An employee's "free choice" regarding
26     whether to maintain their at-will employment is not comparable to a woman reasonably
       fearing sexual assault or other physical harm should the situation escalate.  Id.  And in
27     Sweeney v. F.W. Woolworth Co., the plaintiff "could have left the store, so far as appears,
       without any interference whatever."  142 N.E. 50, 51 (Mass. 1924).  Whereas here, WHB
28     1898 would have required the cooperation of her driver in order to exit a moving vehicle
       late at night.

United States District Court
Northern District of California

1   suggestive and explicit links to her personal email account, treated her differently than

2   other employees, failed to investigate her harassment claims, attempted to grab her

3   buttocks, and rubbed his hands on her thighs").  Additionally, WHB 1898 only makes one

4   conclusory allegation regarding extreme emotional distress, which is a required element of

5   an IIED claim.  See WHB 1898, Am. Compl. ¶ 25; Sena v. Com., 629 N.E.2d 986, 994

6   (Mass. 1994) (listing elements of IIED claim).  That falls well short of alleging emotional

7   distress that is "severe and of a nature that no reasonable man could be expected to

8   endure."  Agis v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976) (quotations

9   omitted).

10      Accordingly, WHB 1898's vicarious liability and common carrier claims are

11  dismissed to the extent they seek to impose liability on Uber for the driver's purported

12  intentional infliction of emotional distress.  The Motion is otherwise denied as to Uber's

13  potential liability for the driver's alleged torts of assault and false imprisonment.

### 3.   WHB 407

15      WHB 407 brings claims for negligence, strict products liability related to a design

16  defect, and common carrier liability under Georgia law.  See WHB 407, Am. Compl. ¶ 16.

17  The parties have stipulated against dismissal of the Georgia common carrier claim.  See

18  Dkt. 1932; Reply at 19 n.27.  Therefore, the Court need only evaluate the first two claims.

### a.   Negligence

20      Georgia has adopted the impact rule for negligence claims.  See Lee v. State Farm

21  Mut. Ins. Co., 533 S.E.2d 82, 84 (Ga. 2000) ("In a claim concerning negligent conduct, a

22  recovery for emotional distress is allowed only where there is some impact on the plaintiff,

23  and that impact must be a physical injury." (citation omitted)).  Plaintiffs do not dispute

24  that WHB 407 does not allege her driver made "a physical impact to the plaintiff."  Brock

25  v. Atlanta Airlines Terminal Corp., 857 S.E.2d 74, 77 (Ga. App. 2021) (emphasis in

26  original).  They instead point to Uber's status as a common carrier and argue that the

27  company's correspondingly heightened duties were breached by the driver inflicting

28  emotional distress on WHB 407.  See Opp'n at 32.  Under Georgia law, however, "all

32

1   negligence claims, regardless of their standard of care, are subject to the physical impact

2   rule." Robinson v. AirTran Airways, Inc., 2009 WL 3822947, at *3 (N.D. Ga. Nov. 13,

3   2009) (holding that because the plaintiff had not suffered a physical injury, the defendant

4   was "entitled to summary judgment with respect to her common carrier claim" for NIED),

5   aff'd, 384 F. App'x 899 (11th Cir. 2010).[29]   Therefore, Uber's common carrier obligations

6   do not shield WHB 407's negligence claim from the impact rule.

7           In the alternative, Plaintiffs rely on Parker v. Brush Wellman, Inc., 377 F. Supp. 2d

8   1290 (N.D. Ga. 2005), aff'd sub nom. Parker v. Wellman, 230 F. App'x 878 (11th Cir.

9   2007), for the proposition that "Georgia courts[ are] open[] to engage in limited departures

10  and/or flexible applications of the 'impact rule' in especially compelling cases." Id. at

11  1301; see also Opp'n at 33.  Plaintiffs argue (without elaboration) that the "forced physical

12  confinement" allegedly experienced by WHB 407 qualifies as such a compelling case. See

13  Opp'n at 33.  But close inspection of Parker reveals that it cannot carry the weight

14  Plaintiffs place upon it.  In his opinion, Judge Story emphasized the "strong inclination" of

15  the Georgia Supreme Court to maintain the impact rule as a "bright line" test for NIED

16  recovery. Parker, 377 F. Supp. 2d at 1300.  He then went on to identify "manifestations of

17  physiological injury" in the plaintiff as being the commonality between cases which

18  departed from the strictest application of the impact rule. Id.  WHB 407 alleges no such

19  physiological injury resulting from their driver's harassment. See WHB 407, Am. Compl.

20  ¶¶ 8–15 (alleging only that the driver's "conduct caused Plaintiff severe emotional

21  distress").  Based on these allegations, there is no compelling justification for overcoming

22  Georgia's "strong inclination" towards the impact rule.  Therefore, WHB 407's negligence

23  claim is dismissed due to lack of alleged physical injury.

24                          **b.      Products Liability**

25          Plaintiffs argue that Georgia case law does not explicitly apply the impact rule to

26

27  _____

    [29]  The Court agrees with Uber that Plaintiffs' discussion of the potential intentional torts

28  committed by the driver against WHB 407 are only relevant to Uber's potential vicarious
    liability as a common carrier, not its own potential negligence resulting from the breach of
    a heightened duty. See Reply at 17.

                                            33

1   strict products liability actions in the same way that it does for negligence claims.  See

2   Opp'n at 39.  In light of that purported vacuum, they urge the Court predict that the

3   Georgia Supreme Court would allow products liability claims based solely on emotional

4   distress injuries to proceed.  See id.  Plaintiffs cite to Hughes v. Apple, Inc. in support of

5   their request, which found "cause for skepticism that California courts would categorically

6   bar product liability recovery for pure emotional distress injury."  723 F. Supp. 3d 693,

7   710 & n.7 (N.D. Cal. 2024).

8        But the circumstances here are readily distinguishable, as that case concerned the

9   economic loss rule, not the impact rule.  See id. at 710 ("[E]motional harm and physical

10  harm are equally distinct from economic harm, so the economic loss rule should have

11  nothing to say about whether a plaintiff can recover for emotional harm in a strict products

12  liability case.").  And unlike California, Georgia has adopted a robust version of the impact

13  rule for cases sounding in product liability.  While Plaintiffs claim otherwise, there is in

14  fact "contrary state authority" suggesting that the impact rule applies to all forms of

15  products liability actions.  Opp'n at 39; see also, e.g., Bishop v. Farhat, 489 S.E.2d 323,

16  325–26 (Ga. App. 1997) (holding in "complex products liability action" that "the impact

17  which will support a claim for damages for emotional distress must result in a physical

18  injury" (citation omitted)); Malibu Boats, LLC v. Batchelder, 819 S.E.2d 315, 318 (Ga.

19  App. 2018) (applying impact rule to negligence claim stemming from products liability

20  action).  Accordingly, WHB 407's strict products liability claim is dismissed for the same

21  reasons as her negligence claim.

22                    **4.    Jane Roe CL 68**

23       In a brief footnote, Uber argues that Jane Roe CL 68's negligence claim should be

24  dismissed because she alleges "physical harm in only conclusory and disjunctive terms."

25  Mot. at 36 n.55.[30]  Physical harm is a requirement for a negligence claim under Texas law.

26  See Sanchez v. Balderrama, 546 S.W.3d 230, 238 (Tex. App. 2017) ("A plaintiff who

27

28  ---
    [30]  The parties agree that all of Jane Roe CL 68's other non-negligence claims were
    dismissed by PTO 17.  See Mot. at 39; Opp'n at 40.

United States District Court
Northern District of California

proves some physical injury may recover damages for past mental anguish." (emphasis added)).   And Jane Roe CL 68's Complaint, which states only that she "was sexually assaulted, harassed, battered, or otherwise attacked by an Uber driver," is indeed too conclusory to effectively allege physical harm.  Jane Roe CL 68, Compl. ¶ C.1.

In response, Plaintiffs claim Jane Roe CL 68 "did suffer a physical attack, as detailed in her Plaintiff Fact Sheet served on Uber in January 2025."  Opp'n at 40 (emphasis in original).  But Plaintiffs concede that a "PFS is of course not a complaint." Id.  To rectify this deficiency, Uber's Motion to Dismiss Jane Roe CL 68's negligence claim is granted with leave to amend.  Jane Roe CL 68 is ordered to submit an amended complaint within 14 days of this Order that contains the specific allegations regarding the alleged physical harm suffered to support their negligence claim.

## IV.    CONCLUSION

For the forgoing reasons, the Court orders as follows:

Uber's Motion to Dismiss Plaintiffs' Fraud and Misrepresentation Claim C is GRANTED insofar as the claims are rooted in "Designated Driver" marketing allegations. Uber's Motion to Dismiss Plaintiffs' Claim C is DENIED insofar as the claims are rooted in "Driver Notifications" allegations related to previous reports of driver misconduct.

Uber's Motion to Dismiss Plaintiffs' Products Liability Claim H is GRANTED insofar as the claims are rooted in "Safe Ride Matching" allegations.  Uber's Motion to Dismiss Plaintiffs' Claim H is DENIED insofar as the claims are rooted in "Gender Matching" or "App-Based Ride Recording" allegations.  Uber's Motion to Dismiss Plaintiffs' Claim H is also DENIED insofar as Uber seeks to dismiss Plaintiffs' alternative products liability claims (except for WHB 1898's breach of implied warranty claim).

Uber's Motion to Dismiss Plaintiffs' Vicarious Liability Claims G.1 and G.2 under Oregon and North Carolina law is DENIED.

Uber's Motion to Dismiss Plaintiffs' Ratification Claim G.3 is DENIED.

Uber's Motion to Dismiss Plaintiffs' Common Carrier Claim E under North Carolina law is DENIED.

35

1    Uber's Motion to Dismiss WHB 407, WHB 1876, and WHB 1898's Negligence

2    Claim B and Claim H is GRANTED.  Uber's Motion to Dismiss WHB 407 and WHB

3    1898's Claim E and WHB 1898's Claim G.3 is DENIED.  Because WHB 1876's amended

4    complaint is dismissed in full, Plaintiffs are ORDERED to select a new bellwether case

5    within 14 days of this Order to fill the open position.  Uber is ORDERED to identify a

6    replacement case from the existing bellwether pool for Trial Wave 1 within 14 days of this

7    Order.

8    Uber's Motion to Dismiss Jane Roe CL 68's Claims C, D, E, F, G.1–3, H, and I is

9    GRANTED.  Defendants' Motion to Dismiss Jane Roe CL 68's Claim B is GRANTED

10    with leave to amend. Jane Roe CL 68 is ORDERED to submit an amended complaint

11    within 14 days of this Order in support of their negligence claim.

12    Dismissal is without leave to amend unless otherwise specified.  The parties shall

13    file a chart identifying Plaintiffs' remaining claims by July 23, 2025 as part of their joint

14    status statement for the July 25 CMC.

16    **IT IS SO ORDERED.**

17    Dated: July 8, 2025

18    CHARLES R. BREYER
     United States District Judge

United States District Court
Northern District of California