# EXHIBIT 4

Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Lisa C. Cisneros, Magistrate Judge

IN RE: UBER TECHNOLOGIES,      )
INC., PASSENGER SEXUAL ASSAULT )  MDL NO. 23-MD-03084 CRB (LJC)
LITIGATION                     )
_____)

                            San Francisco, California
                            Thursday, December 19, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    PEIFFER WOLF CARR KANE CONWAY & WISE
                    555 Montgomery Street, Suite 820
                    San Francisco, California 94111
              BY:   **RACHEL B. ABRAMS, ATTORNEY AT LAW**
                    **SARA B. CRAIG, ATTORNEY AT LAW**

                    PEIFFER WOLF CARR KANE CONWAY & WISE
                    2229 Trumbull Street
                    Detroit, Michigan 48216
              BY:   **TIFFANY R. ELLIS, ATTORNEY AT LAW**


                    LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                    275 Battery Street, 29th Floor
                    San Francisco, California 94111
              BY:   **SARAH R. LONDON, ATTORNEY AT LAW**


                    JOHNSON LAW GROUP
                    2925 Richmond Avenue, Suite 1700
                    Houston, Texas 77098
              BY:   **BRET D. STANLEY, ATTORNEY AT LAW**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1   **APPEARANCES:**  (CONTINUED)

2   For Defendants Uber Technologies and Rasier, LLC:
                         SHOOK HARDY & BACON LLP
3                        2121 Avenue of the Stars, Suite 1400
                         Los Angeles, California 90067
4                   BY:  **MICHAEL SHORTNACY, ATTORNEY AT LAW**

5                        SHOOK HARDY & BACON LLP
                         1800 K Street, NW, Tenth Floor
6                        Washington, D.C. 20006
                    BY:  **PATRICK OOT, JR., ATTORNEY AT LAW**
7                        **VERONICA HAYES GROMADA, ATTORNEY AT LAW**

8                        PAUL, WEISS, RIFKIND, WHARTON &
                           GARRISON LLP
9                        535 Mission Street, 24th Floor
                         San Francisco, California 94105
10                  BY:  **RANDALL S. LUSKEY, ATTORNEY AT LAW**
                         **MARC PRICE WOLF, ATTORNEY AT LAW**

11
                         PAUL, WEISS, RIFKIND, WHARTON &
12                         GARRISON LLP
                         2001 K Street, NW
13                       Washington, D.C. 20006
                    BY:  **KYLE SMITH, ATTORNEY AT LAW**
14
                         PAUL, WEISS, RIFKIND, WHARTON &
15                         GARRISON LLP
                         1285 Avenue of the Americas
16                       New York, New York 10019-6064
                    BY:  **ROBERT R. ATKINS, JR., ATTORNEY AT LAW**
17                       **CHRISTINE MULLEN RAY, ATTORNEY AT LAW**

18

19   Also Present:           **Yasi Sedghani, Uber Technologies, Inc.**
                             **Alexandra Tipton, Law Clerk**
20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - December 19, 2024**                               **9:31 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:** Good morning, everyone.  We are |
| 5 | calling Civil Matter 23-MD-03084, In Re:  Uber Technologies, |
| 6 | Inc. |
| 7 | Counsel making their appearances, please come to the |
| 8 | podium, and we will start with the plaintiffs for appearances. |
| 9 | **MS. LONDON:**  Good morning, Your Honor.  Sarah London |
| 10 | on behalf of the plaintiffs. |
| 11 | **THE COURT:**  Good morning. |
| 12 | **THE CLERK:**  Defense? |
| 13 | **MR. SHORTNACY:**  Good morning, Your Honor.  Michael |
| 14 | Shortnacy appearing for the Uber defendants. |
| 15 | **THE COURT:**  Okay.  Good morning. |
| 16 | **MR. SMITH:**  Good morning, Your Honor.  Kyle Smith for |
| 17 | the Uber defendants as well. |
| 18 | **MS. ABRAMS:**  Good morning, Your Honor.  Rachel Abrams |
| 19 | for the plaintiffs. |
| 20 | **THE COURT:**  Okay.  Great.  However you want to |
| 21 | introduce yourselves.  I don't know if the cards were gathered. |
| 22 | **MS. ELLIS:**  Good morning.  Tiffany Ellis for the |
| 23 | plaintiffs. |
| 24 | **MR. STANLEY:**  Good morning, Judge.  Bret Stanley for |
| 25 | the plaintiffs. |

 1          **THE COURT:**  Okay.

 2          **MS. CRAIG:**  Good morning, Your Honor.  Sara Craig for

 3    the plaintiffs.

 4          **MR. OTT:**  Good morning, Your Honor.  Patrick Ott for

 5    the Uber defendants.

 6          **MS. GROMADA:**  Good morning, Your Honor.  Veronica

 7    Gromada for Uber.

 8          **THE COURT:**  Okay.  Great.

 9          **MS. LONDON:**  And, Your Honor, Ms. Luhana and

10    Ms. Wilkins are available remotely, but we are prepared to

11    argue if the Court is not set up for that argument.

12          **THE COURT:**  Okay.

13          **MS. LONDON:**  Thank you.

14          **THE COURT:**  All right.  That's fine.

15    So, yes.  We're up here.  I just thought it would make it

16    easier.  I'm usually in Courtroom G, but to avoid you-all

17    having to schlep from the 15th floor up to 17, I thought --

18    Judge Breyer and I agreed it would make sense just to have the

19    status conference and the hearing here.

20          So we've got the discovery status conference as well as

21    the hearing on the privilege log disputes.  And there's so much

22    to cover in the discovery status conference that I actually

23    feel that we should spend the bulk of our time there.

24          There was also a joint letter that was filed yesterday.

25    It wasn't noticed for hearing today, but I wanted to ask about

1    it.  Plaintiffs' signature is not on it, but it was represented

2    as a joint letter.  Maybe that was just an oversight.

3         **MR. SMITH:**  Yes, Your Honor.  Kyle Smith for the Uber

4    defendant.

5         I think it's fair to say that was an oversight that the

6    signature was not on it.  We exchanged emails with plaintiffs'

7    counsel immediately before filing.  Everyone was agreed that

8    the final letter was the joint letter that was authorized to go

9    to the Court.

10        **THE COURT:**  Okay.  Can plaintiffs just represent on

11   the record that they're agreeing with Mr. Smith's

12   representation?

13        **MS. LONDON:**  Your Honor, this is a law firm specific

14   joint letter with the Levin Simes law firm, and I don't have

15   any information one way or the other about it, but we're happy

16   to reach out to Mr. Levin and ask him.

17        **THE COURT:**  And he's not here today?

18        **MS. LONDON:**  No, not this morning, Your Honor.

19        **THE COURT:**  Okay.  Well --

20        **MR. SMITH:**  Your Honor, I do have a copy of the email

21   from Mr. Levin, the email exchange documenting this.  I'm happy

22   to submit that to the Court.  I apologize for the oversight on

23   the signature.

24        **THE COURT:**  Okay.  And they can always file an

25   objection too.  But I'll probably put something on the docket

1    to just prompt them on it.

2            **MR. SMITH:**  And if Your Honor might allow, I might try

3    to reach out to Mr. Levin right now.  Maybe we could refile it

4    with his signature added.

5            **THE COURT:**  Okay.

6            **MR. SMITH:**  We'll propose to do that.

7            **THE COURT:**  That would be fine too.

8            **MR. SMITH:**  Thank you, Your Honor.

9            **THE COURT:**  A corrected version of the letter by the

10   end of the day would be great.

11       Okay.  So let's start with the discovery status

12   conference.

13           **MS. ABRAMS:**  Your Honor, we were just told that the

14   courtroom is muted on Zoom.  So those on the Zoom can't hear

15   what's happening.

16           **THE COURT:**  Oh, whoops.

17           **THE CLERK:**  There's no Zoom.

18           **MS. ABRAMS:**  For the public hearing.

19           **THE CLERK:**  There's no Zoom.

20           **MS. ABRAMS:**  Oh, there's no camera at all?

21           **THE CLERK:**  No, there's no camera at all.  It's an

22   in-person hearing.  So if anyone in the public wanted to view

23   today's hearing, they would need to come in person.  This

24   wasn't set as a hybrid hearing.  So they're welcome to get a

25   transcript after the hearing, which counsel normally does.

1            **THE COURT:**  It's possible Judge Breyer -- I think it's

2    likely that Judge Breyer will have it on Zoom.  So if that's a

3    concern for the other co-leads, let me know for this

4    conference, but I'd like to proceed.

5         Okay.  All right.  So whoever is going to address the

6    discovery status conference, let's start with that.

7         So, first of all, I'm going to deal with these issues a

8    little bit out of order from how they're presented in the joint

9    status report.

10            **MR. SHORTNACY:**  I'm going to be fielding some of them,

11    Your Honor, so I'll stand ready, but I may defer to --

12            **THE COURT:**  Okay.  Yeah.

13            **MR. SHORTNACY:**  -- some of my colleagues.

14            **MS. LONDON:**  Same, Your Honor.

15            **THE COURT:**  Okay.  That's fine.

16         So there's a request to move up the compliance deadlines.

17    There was a meet and confer in November to address Uber's

18    productions across a range of categories, and January 31st

19    was -- at least Uber represents that January 31st was the

20    deadline that everyone agreed to, but plaintiffs are seeking to

21    move that deadline up to January 6th.  And this covers the

22    safety data, the policy documents, the marketing data.

23         So some things have happened since then.  So it's like, do

24    we really need to shift from what the parties agreed to back in

25    November and move up the deadline by a month?

1    I'm open to it, frankly, because some of this information

2    I ordered back in July.  So I'm very open to moving it up,

3    especially in light of the bellwether order, the depositions

4    that are trying to kick off; but I don't know the particulars

5    of what's going on in January such that it needs to be moved up

6    that much that quickly.

7            MS. GROMADA:  If I may, Your Honor, with respect to

8    the January 31st deadline, that is a part of an agreement that

9    the parties agreed to with respect to OUS discovery, or

10   discovery outside of the U.S.

11       So at the plaintiffs' insistence, really, the parties met

12   and conferred to talk about the scope of a number of discovery

13   topics that relate to the use of dashcams, video recording.

14   There were a number of safety initiatives around which the

15   plaintiffs sought discovery.

16       The plaintiffs wanted discovery to extend beyond the U.S.

17   if there had been certain strategies that were maybe piloted

18   outside of the U.S.  The parties, I thought, had a very

19   fruitful meet and confer over a number of weeks and ultimately

20   came up with an agreement whereby Uber agreed to extend the

21   scope of the discovery to include eight international markets,

22   so documents pertaining to certain safety initiatives,

23   et cetera, for eight global markets.

24       Uber also agreed, Your Honor, to unredact prior redactions

25   regarding OUS.  We immediately did that and began to not only

have rolling productions of unredacted OUS information, but we immediately ceased -- even before the parties finalized their agreement, we immediately ceased on a go-forward basis OUS redactions.

And so it seems that -- you know, it's a bit surprising to now be before Your Honor discussing this issue when we've really agreed to do more than we had previously agreed when we were before you previously and now that somehow seems to be being used against my client.

And if I may, Your Honor, you also -- when we were before you previously back during the summer, I believe as you stated in July, you also indicated that you would expect, with respect to policies and knowledge bases, for the plaintiffs to be reasonable because not every policy and knowledge base is going to be relevant.

And I think that there has been a little bit of, I will say, scope creep, if you will, in the focus of the discovery. And some of the policies that we've been requested include things like music --

**THE COURT:** Well, I was going to ask about that. I mean, there's a representation that plaintiffs are asking for policies about car seats and something else. I mean, I wasn't sure that that was an accurate representation. So I'll just let plaintiffs address that.

I mean, are there requests for policies related to scooter

 1  rentals and car seats?

 2          **MS. LONDON:**  Yeah.  Thanks, Your Honor.

 3      I just want to focus -- well, the short answer to that

 4  question is that the -- we're talking about the minutia of what

 5  we're looking for.  Right?  They've produced some leaves but

 6  not the branches and not the tree, and it's making it

 7  impossible for us to assess these policies without the larger

 8  scope.  So it's not a question of us fighting over potentially,

 9  you know, more attenuated leaves on this tree.  We're trying to

10  get the tree.  We're trying to get the branches.  And it has

11  been an endless and exhausting process, to say the least, just

12  trying to get what Your Honor has ordered.

13      And, you know, that is what this compliance deadline piece

14  is all about.  It's not necessarily focused on the OUS issue or

15  walking back any of that.  We're talking about orders that

16  Your Honor has entered.

17          **THE COURT:**  Yeah.  And I think what I'm hearing from

18  Ms. Gromada is, okay, there were some trade-offs that were made

19  because the scope of discovery that plaintiffs wanted in

20  November broadened in some manner.

21      But I think at the end of the day when I was reading

22  through this, my reaction was, I ordered this stuff a long time

23  ago to be produced.  I know that my January order on safety

24  data was high level in regards to how that dispute was teed up.

25  So issues related to sort of exactly what is contained in this

1   body of data weren't argued or disputed because Uber just

2   didn't want to turn over any data associated with the safety

3   reports, the two safety reports.

4        But since then, I haven't gotten any discovery letters

5   regarding the particulars of how that production would happen.

6   It's represented in the discovery status report as being not

7   ripe for me to resolve.  I feel that it is overripe and we need

8   to advance with the production.

9        And so there may be some granular issues around data

10  fields, comment, but those issues haven't been teed up.  And so

11  much time has passed since my original order that it feels --

12  it strikes me as a flagrant disregard, although there's

13  obviously a lot going on in discovery and negotiations around

14  how that phases out and proceeds.

15       But I don't think that something like the comment field,

16  from example -- I mean, there's a clawback provision.  Is there

17  a concern that there's a lot of attorney communication in these

18  comment fields?  We're talking about thousands of, probably,

19  tickets.  To me it seems like -- I don't see a good reason,

20  based on what I read in the status report, to delay it so much

21  further.

22            **MR. SHORTNACY:**  Sure.  Michael Shortnacy.  I'll try to

23  address those concerns, Your Honor.

24       And I also want to try to allay your concerns about the

25  compliance with the July order.  Since that time, the parties

1    engaged in the conferral process to try to set up a third-party

2    vendor that would house the data.

3         **THE COURT:**  Yeah, and it sounds like that's become a

4    bit of a quagmire.

5         **MR. SHORTNACY:**  Can I address that question?

6         **THE COURT:**  Go ahead.

7         **MR. SHORTNACY:**  I understand the Court's concern.

8         The issue is the JCCP plaintiffs, who also were given

9    access to the same data through the same platform, have been

10   working in that workspace since October 3rd.  So the issues

11   that are unique to the MDL plaintiffs and the agreements that

12   they sought to reach with the vendor, with BDO, the accounting

13   firm, in the confidentiality provisions and the architecture of

14   the structure, it was all for the MDL plaintiff specifications.

15        We did everything -- we said:  What do you want?  How do

16   you want to build it?  We will do it.  And that's what we did.

17   And it took some time.

18        And so I think there was reports in the status report

19   about some hiccups with BDO.  Those are being resolved.

20        So, Your Honor, from our perspective, from Uber's

21   perspective, the data was up and available, and the JCCP

22   plaintiffs have been working away in their own sandbox, in

23   their work product space since October.  And so these delays --

24   and I'm not -- I will say it in a very neutral way because I

25   don't think it's necessarily relevant to provoke an argument

1  about why there were those delays.

2      But the point is, Your Honor, the data is ready for the

3  plaintiffs.  They have now finally accessed the data.  They're

4  working through whatever technical issues that may be present

5  with BDO, which is a Big Five accounting firm.  It's not,

6  you know, My Cousin Vinnie's Hosting Shop.  They are

7  professionals and they will resolve these issues.  So I think

8  that -- Your Honor, I hope, should not be concerned that any of

9  this delay was on the part of Uber.  It very much was not.  And

10  it has been available for plaintiffs.

11      And I think -- I would just make one final point.  I want

12  to avoid the situation where plaintiffs, who have the direct

13  access to the vendor at this point -- because we're walled off,

14  appropriately so.  They have their workspace where they're

15  going to work with their experts.  It's difficult for us to

16  intervene and try to help troubleshoot with the vendor or take

17  any real active role in those very specific things.  And so I

18  wanted to sensitize the Court that that sets up an incentive

19  structure for plaintiffs to find problems and then say, "Well,

20  the whole thing can't work."  And we have no ability to sort of

21  cross-check that because we're shut out of the process.

22      So I just offer that for the Court to give some assurance

23  that we are taking very concrete steps to get this done and

24  working collaboratively with plaintiffs as best we can, but

25  there are some limits as to what we even know about the

 1    technical issues.  And so I would just say, Your Honor, we're

 2    trying and it's available.

 3         **MS. ELLIS:**  Your Honor, Tiffany Ellis on behalf of the

 4    plaintiffs.

 5         I want to talk a little bit about the perspective and the

 6    background that got us to this point just briefly.

 7         Plaintiffs have said from the beginning the protective

 8    order in this case was sufficient for this information and that

 9    it should have been produced to us in the normal course of

10    business, whether that be on a hard drive or through an

11    exchange of a virtual file, whatever it may be.

12         At defendants' insistence, we agreed to use their third

13    party.  Because we are putting our expert work product into it,

14    we needed to have certain protections, and we needed to know

15    the environment would be one that we could work in and our

16    experts would be able to have the tools at their availability

17    to use that they need to analyze this information.

18         In order to get to that point, we spent five months of

19    negotiations and hundreds of hours doing things that we believe

20    could have been achieved in about six hours had we been just

21    given the information.

22         As for the JCCP, I can't speak to what they have done with

23    or without protections; but I will just say for the MDL, that

24    is our position.

25         At this point in time, there are two issues.  Number one

is the "how" and how we access it.  And we have continued to

work with this third-party provider to get access to it.

Sitting here today and talking to my experts just this morning,

I know that there are still access issues that took over

two weeks to even get into the data on the eve of Thanksgiving

and now, once we've been into it, to be able to do the things

that we've asked for in this environment with the tools that we

need.

There's also a "what" question with the data that we have

been given access to.  There were at least 35 fields that were

missing from the production.  These included important details

like the riders' reports of what happened, the drivers' reports

of what happened.

While we believe that we have reached agreement with Uber

on many of these issues at this point and that the information

will be produced in full, as it should have been originally,

comments are one area that that has not been agreed to; and

Uber has not agreed to give us that information, although we

believe that it is something that we are entitled to.

Almost if not more importantly, your order said that Uber

was required to produce all sexual assault data, not limited to

rider sexual assaults; and Uber has not produced, along with

this information that we've spent months and months and

hundreds of hours trying to access, any details about sexual

assaults that occurred on drivers or on third parties.  And

1    this is all vital to plaintiffs' ability to understand what

2    Uber was doing about this very prominent issue that they were

3    facing.

4         **THE COURT:**  Okay.  So the fact that Uber's enlisted a

5    third party to make the production doesn't mean that it can

6    abdicate its responsibilities to produce under Rule 26.  I

7    mean, it's Uber's responsibility to produce or any requesting

8    party's responsibility to produce the relevant non-privileged

9    information under Rule 26.  And just because you enlist some

10   third party and then there becomes technical issues or whatever

11   challenges arrive doesn't mean that there's no failure to

12   comply with Rule 26 obligations.

13       So I think --

14       **MR. SHORTNACY:**  Your Honor --

15       **THE COURT:**  -- that, to me, is neither here nor there

16   because at the end of the day, this has to be produced.

17       And if it's -- it's not BDO's problem; it's Uber's issue

18   to resolve.  So --

19       **MS. ELLIS:**  Your Honor, if I may, just one -- just

20   maybe give a solution.

21       We will continue to work with BDO, but we would ask that

22   it just be produced to us in hard drive format at this point.

23       **THE COURT:**  So getting rid of the third party?

24       **MS. ELLIS:**  Well, we'll continue along both paths, but

25   we need a stopgap; we need a fallback to know that we have all

 1  the information there.

 2      **THE COURT:**  Well, if the third-party vendor is not

 3  working, then it seems like that's the only solution.  Just

 4  produce it.

 5      **MS. ELLIS:**  Yes.

 6      **MR. SHORTNACY:**  Your Honor, if I can just respond to a

 7  couple of points.

 8      What Ms. Ellis says is not correct.  We did not withhold

 9  fields without telling the plaintiffs we were doing that,

10  because we were engaged in a discussion with them about the

11  free text in those specific fields.

12      That discussion has progressed, and we have reached

13  agreement and are going to provide all of those fields except

14  for one, which is the comments field Your Honor mentioned,

15  which the parties both agree has attorney-client privileged

16  information in it and requires redaction.  We may need to tee

17  that specific dispute up for Your Honor.  But we've agreed to

18  produce all of the fields, and we did not withhold them without

19  telling them that we were doing so because we needed to

20  negotiate the burden for each type of field.

21      The freeform, where people can type, where people can pull

22  a drop-down with a yes/no, those were all part of active

23  discussions with plaintiffs.  And so for Ms. Ellis to say that

24  we withheld the fields is incomplete.

25      With respect to the BDO question, we've -- MDL plaintiffs

```
 1    have suggested they've spent a number of hours.  Uber has spent
 2    a number of hours and many, many thousands of dollars to try to
 3    architect this exactly the way plaintiffs want.
 4           THE COURT:  This has been said a couple of times, and
 5    a lot of this is in the status report.
 6           So I don't see any reason why there shouldn't be a
 7    backstop if this isn't resolved by a date certain,
 8    January 10th, that the data not just be produced directly,
 9    without BDO, without a third-party vendor.  And if you want to
10    file a letter regarding the comments on Monday, then we'll
11    address that.
12           I mean, one approach I thought was simply -- I mean,
13    there's so many incidents.  I could imagine that probably very
14    few of these actually have attorneys that are, like, typing
15    into the -- do attorneys even have access, in-house counsel
16    have access to this whole system where the tickets --
17           MR. SHORTNACY:  Yes.
18           THE COURT:  -- are?
19           MR. SHORTNACY:  Yes.  And in the comments field, that
20    is correct.  And plaintiffs acknowledge that.  There actually
21    is not a dispute about that.
22           THE COURT:  Okay.  But how --
23           MR. SHORTNACY:  How much.  How burdensome.
24           THE COURT:  How many incident tickets are actually
25    affected by this?
```

1          **MS. ELLIS:**  Your Honor, we don't know.  And this is

2    information -- this is, again, about the "what" they produced.

3    We had asked for information about how information --

4          **THE COURT:**  Is this something where we're talking

5    about thousands of attorney entries?  Do you have a way of

6    identifying them?

7          **MR. SHORTNACY:**  We --

8          **THE COURT:**  So is this going to create a lot of delay

9    in terms of even -- you're going to have to individually go and

10    review each comment bubble?  So did you start that process --

11          **MR. SHORTNACY:**  Your Honor --

12          **THE COURT:**  -- already in the summer after I ordered

13    it, or what?

14          **MR. SHORTNACY:**  We were engaged with plaintiffs in the

15    negotiation and give-and-take and trading about what was

16    important for them and what the relative burdens were in order

17    to produce the information.  That was an active discussion with

18    plaintiffs.  And I'm sorry Ms. Luhana and others are not here

19    to speak to that because I think that they would confirm that

20    that's what happened.

21          To address your specific question, in-house counsel does

22    have access.  They do frequently put in the comments fields,

23    which is just sort of, if you imagine, a text box with freeform

24    text and different people pop in and make entries and pop out.

25    We know this because we've printed out tickets as a part of the

1    DFS process.  And so there are numerous examples of that that

2    plaintiffs have, and they understand the evidence of

3    attorney-client privilege.

4         And to Your Honor's question, we will have to review that

5    individually, which is why we were negotiating with plaintiffs:

6    Would you be okay with these columns over here if we reserve

7    this over here?  Because it's really not relevant to what

8    they're trying to do.  And we've engaged with them on that

9    conversation.

10         **THE COURT:**  This all sounds -- I mean, if we were

11    having this conversation in October, at the latest, but it's

12    January -- it's approaching, effectively, January.  We're at

13    the cusp of --

14         **MR. SHORTNACY:**  I agree, Your Honor.

15         **THE COURT:**  -- the holidays.

16         **MR. SHORTNACY:**  And I --

17         **THE COURT:**  So that's why I'm feeling --

18         **MR. SHORTNACY:**  I sense your frustration, Your Honor.

19         **THE COURT:**  -- frustrated.

20         **MR. SHORTNACY:**  I do.  I do.

21         And I can just -- all I can say is JCCP was ready to go in

22    October.  These have -- there have been unique issues here that

23    we're remediating.  And if Your Honor is inclined to set a date

24    by which BDO shall resolve these issues lest -- you know,

25    without that, there is a fallback position that the Court

```
 1   imposes, I understand that, Your Honor.

 2       I would just ask that Uber be permitted to be involved in

 3   those discussions because I'm fearful, Your Honor, that if you

 4   set a date and say these things must be done with BDO, if we,

 5   Uber, cannot participate in any way --

 6           THE COURT:  That was Uber's choice to enlist BDO.

 7           MR. SHORTNACY:  No.  No.

 8           THE COURT:  You assumed some risk.

 9           MR. SHORTNACY:  Your Honor, however, what I was

10   speaking of, Uber is -- yes, of course it was our choice.  We

11   wanted to choose an accounting firm and someone who knows what

12   they're doing, yes.

13       What I'm speaking of is that because of agreements that

14   the plaintiffs have insisted entering directly with BDO to

15   ensure their own confidentiality, it shuts Uber out of that

16   part of the technical aspect.  And so if Your Honor is inclined

17   to order these technical issues be resolved by a date certain,

18   what I'm representing to you is that at present, Uber's not

19   permitted to be at that table, and I think we really need to be

20   there to make sure those issues are resolved.

21       And I understand Your Honor is frustrated.  If there's a

22   date by which that can't be done, then so be it.  But we have a

23   right to be at that table, and right now we're shut out.

24           MS. ELLIS:  Your Honor, if I may just briefly.

25           THE COURT:  Yes, why don't you address that concern.
```

 1          **MS. ELLIS:**  Certainly, Your Honor.

 2      Again, we are in a situation at defendants' insistence,

 3  and we are protecting our expert work product and our

 4  confidentiality of that product.

 5      If defendants want to be at the table with BDO in a

 6  limited circumstance, I think that we would be agreeable to

 7  that; but we would want -- we would want the data produced

 8  today in full with all third parties, with drivers, with

 9  fields, and an exact plan for how the comment field will be

10  addressed by a date certain.

11          **THE COURT:**  The data produced today?

12          **MS. ELLIS:**  Yeah, the data produced today.

13          **THE COURT:**  In some sort of hard drive or something?

14          **MS. ELLIS:**  In some sort of hard drive.  Your July 9th

15  order said that all safety data and documents, regardless of

16  the reporting party.  This has not been produced and it is now

17  December.

18          **MR. SHORTNACY:**  Your Honor, I would just say, what is

19  happening here in this courtroom is not reflective of the

20  conversations that counsel have had over these last many

21  months.  It just isn't.

22          **THE COURT:**  What I'm focused on is the order that I

23  issued back in July, that there hasn't been a production yet.

24  You had to produce it to BDO.

25          **MR. SHORTNACY:**  But there --

1          **THE COURT:**  So there's no burden in taking whatever,

2     flash drives --

3          **MR. SHORTNACY:**  That was done --

4          **THE COURT:**  -- passing that over to plaintiffs with

5     the protective order, and the backstop being open that up --

6     plaintiffs would be allowed to access that data on January 10th

7     if these issues with BDO haven't been resolved.

8          And plaintiffs' counsel just made a representation that

9     Uber can sit at the table -- provided that their own experts'

10    work product is not introduced into the conversation, that Uber

11    can be at the table with plaintiffs' counsel and BDO to resolve

12    the technical issues.

13         **MR. SHORTNACY:**  So two quick things, Your Honor.

14         First, Uber did produce the data to, first, BDO, who had

15    to process it and stage it and then architect it according to

16    plaintiffs' desires, and then produced it to the JCCP

17    plaintiffs on October 3rd.  So the production has been made.

18         The question now is access.  And the plaintiffs have,

19    through negotiations of their own accord, delayed their own

20    access to data that is already sitting, waiting for them.

21         You know, the need to put it on a hard drive effectively

22    in escrow is unnecessary.  If the Court orders --

23         **THE COURT:**  Well, there's no burden.  I just don't see

24    that there is -- there's a protective order.  It's been

25    packaged for delivery to the vendor.  There's no burden there.

1    And then it ensures that this process is going to move forward

2    if your vendor, BDO, doesn't work this out.  I mean, it doesn't

3    seem to me like there's a burden there, and there's no question

4    that this is relevant.  So --

5            **MR. SHORTNACY:**  Your Honor, it's --

6            **THE COURT:**  And you keep pointing to the JCCP, but

7    that is difficult for me to consider because I don't know the

8    particulars of how the JCCP are using the data and what's

9    different about what the MDL plaintiffs' counsel's strategy is

10   and what their experts are focused on.  And they may

11   strategically have made a decision that they're going to pursue

12   certain information that the JCCP plaintiffs just aren't

13   interested in or decided not to pursue.

14       So I do wonder.  I mean, the JCCP has it.  So to me, it

15   just all strikes me as that's all the more reason why some of

16   these issues -- if you don't want to produce comments and there

17   was a dispute there, then that should have been briefed up to

18   me and brought to my attention much earlier.

19           **MS. ELLIS:**  Your Honor, I just want to clarify one

20   thing.  The driver and third-party sexual assault data has been

21   produced to no parties.  That is not included in the safety

22   data.

23           **THE COURT:**  And my order didn't carve that out.  I

24   mean, my order was:  Produce sexual assault data and related

25   documents.  And if Uber wanted to clarify that and pull out the

cases involving drivers who were assaulted by riders, then

there was plenty of time to do that.

    But I just don't think at this point introducing that

makes any sense.  You can challenge that in looking at what's

relevant in the expert reports or not.  There's lots of ways to

deal with that but --

        **MR. SHORTNACY:**  Well, Your Honor, that poses a

problem.  I mean, is the order, then, of the Court regarding

what has been provided to BDO?  Because that is what ostensibly

could be put together.  The data that you're talking about

packaged up to BDO, I mean, that is what's -- it seems like

that's what's at issue.

    **MS. ELLIS:**  Your Honor, plaintiffs want what we're

entitled to under your July 7th order, which is all sexual

assault data as it's kept in the course of business.  They

should be able -- if they want to give it to us as it was

produced to BDO, if that was incomplete, they need to give us

the rest.

    And I want to add one thing, Your Honor.  We will continue

to do this dual path with BDO in the environment that Uber

insists upon, and we will have them in the conversation in a

limited form that does not, like, violate our work product.

But this environment we know already is adding significant time

to our experts' ability to even manipulate and work with this

data, which is increasing the cost and expense and everything

1    else to plaintiffs and what could have been something that

2    could happen very quickly in an environment outside of this

3    that Uber has insisted upon.

4         **THE COURT:**  Okay.

5         **MR. SHORTNACY:**  Your Honor, I would just say, again,

6    we have gotten to this point through the product of

7    negotiation, and what's being represented here does not reflect

8    that, and it's just incredibly frustrating, Your Honor.

9         To alleviate the Court's concerns, if Your Honor is

10   inclined to compel a date by which the BDO issues must be

11   resolved and Uber is permitted to be at the table, we

12   understand that and we will work and comply with that and we

13   will get those issues resolved.

14        But what's being discussed here and represented to

15   the Court is just simply not correct.  We didn't withhold

16   fields without telling them.  We negotiated and architected

17   this.

18        **THE COURT:**  Well, are you saying that you didn't know

19   that they were --

20        **MS. ELLIS:**  Your Honor, we have negotiated with them

21   from our position that they were required to provide us all of

22   the safety data, regardless of party, on July 7th.  At every

23   point when they've come back and said "We'll provide you this

24   and only this and only this," we've engaged in a negotiation.

25        And we came here today -- and, I think, put this in the

1    joint statement -- looking for guidance from Your Honor on how

2    we should proceed from here, whether it should be a motion to

3    compel.

4        We are in the exact same sort of questioning position that

5    I believe Your Honor finds herself in.  We think that this is

6    ripe.  We think that they should produce it, as they were

7    required to do in July, and we don't think that it should be

8    limited.  And we think -- we will continue to work in this

9    third-party environment, but we need to have it outside of it

10   if that fails.

11       **THE COURT:**  Mm-hmm.  Okay.  So on Monday, if there is

12   a dispute about producing the comments field, then that needs

13   to be teed up for my resolution.  Or meet and confer, and

14   whatever you can't resolve as to how that data will be produced

15   can go in the discovery letter that's filed on Monday.

16       I am going to order that the safety data be produced by

17   January 10th, and you can seek relief from that if there's some

18   technical issue.  But I think in the meantime, by Monday you

19   should also turn over a copy of the data that was given to BDO

20   and it's held in escrow somehow.  Plaintiffs can't open it

21   except by court order.

22       **MR. SHORTNACY:**  Your Honor, BDO effectively is the

23   escrow agent in that case.  I mean, I can't imagine plaintiffs

24   want physical possession of the hard drive.

25       If Your Honor is going to order production, you know,

1    certainly BDO will comply with that order.  I just want to

2    avoid creating a security risk of a hard drive and the effort

3    to do that.

4         If that is the order of the Court, it will be complied

5    with or we'll seek relief.  But I just respectfully suggest

6    that we don't need to have the kind of vesting of the escrow

7    agent because it, in fact, already really resides in one and so

8    we don't need to go through that.

9         There's no question if the Court orders that, access will

10   be granted.  So I don't think we need to keep a locked hard

11   drive in Ms. London's office, waiting till midnight of

12   January 10th.  I think that just creates risk for the security

13   of the data, which is highly sensitive with personal

14   information of survivors on it.

15        **MS. ELLIS:**  Your Honor, the escrow that it's in has

16   been ineffective, and we are unable to access the information

17   in the way that we need through it.

18        **THE COURT:**  Well, you wouldn't be able to open it

19   until --

20        **MS. ELLIS:**  Right.  And so our experts --

21        **THE COURT:**  -- January 10th --

22        **MR. SHORTNACY:**  They have access now.

23                  (Simultaneous speaking.)

24      (Stenographer interrupts for clarification of the record.)

25        **THE COURT:**  So, I mean, I see plaintiffs' counsel

```
 1   might not want the security risk of having it in their office

 2   until January 10th when they can't even open it and access it

 3   because they're still trying to work out the issues with BDO

 4   and having that be an effective process.

 5        So on January 10th, you are going to get the data either

 6   through BDO or because BDO is going to take what they have and

 7   drop it off at lead counsel's office.

 8        MS. ELLIS:  Thank you, Your Honor.  I'd just like to

 9   clarify that that will include all safety data for third

10   parties and drivers as well.

11        THE COURT:  The order doesn't exclude that, and I

12   don't have any kind of letter that's asked for a carve-out.

13        MS. ELLIS:  Thank you, Your Honor.

14        THE COURT:  And I don't think the briefing that I have

15   in this status report is --

16        MR. SHORTNACY:  Your Honor, we --

17        THE COURT:  -- going to give me reason to narrow it.

18        MR. SHORTNACY:  We -- we --

19        THE COURT:  So BDO -- what BDO has might not have that

20   data, so --

21        MS. ELLIS:  It does not.

22        THE COURT:  Well, then you're going to have to chase

23   that down, and I'm not going to order it today.

24        MS. ELLIS:  Your Honor --

25        MR. SHORTNACY:  So, Your Honor --
```

1        **MS. ELLIS:** -- then I will just say, we'll be filing a

2   motion to compel on that.

3        **THE COURT:** Include that in the letter on Monday.

4        **MS. ELLIS:** Okay.

5        **MR. SHORTNACY:** Okay.

6        **THE COURT:** All right. So the non-custodial

7   documents -- so plaintiffs said they're not asking for scooter

8   rentals and car seat policies.

9        There's a statement in the status report to the effect

10  that Uber is differentiating between policies and knowledge

11  base documents.

12       Ms. Gromada?

13       **MS. GROMADA:** Yes. Your Honor, we have a written

14  request from plaintiffs in early October that has a list of

15  860 specific requests for what has been referred to as policy

16  requests. It is a combination of policies, knowledge bases,

17  but even other documents that don't fall into either of those

18  categories.

19       And, if necessary, we can go back at some point and

20  present that letter to the Court; but it does, in fact, call

21  for the production of documents regarding scooters, music, and

22  other -- even work-from-home policies that definitely would not

23  apply to any independent drivers, et cetera. And so there are

24  a number of categories of documents on that list that have no

25  bearing on any of the issues in this case.

1          Even beyond that, Your Honor, this October request from

2    plaintiffs and even subsequent requests has been further

3    complicated by the fact that they're asking for all versions of

4    these documents for more than a ten-year period of time.  So

5    once you get into getting each and every version, then I think

6    it is correct what plaintiffs' counsel said earlier.  We're

7    focused on trees -- I'm sorry -- on the leaves and not the

8    trees.  We would prefer to focus on the trees.

9          I've asked for plaintiffs to cull down that list of 860 so

10   we can first prioritize those trees, then deal with the leaves.

11   Deal with core issues first.  Get those issues resolved first.

12   Then if there's some tangential issues plaintiffs would like,

13   we can look into them.

14         But to begin to research and try to produce, both from

15   three databases for the knowledge bases, plus Google Drive for

16   the actual policies -- which, technically, are custodial

17   records -- and to do that and then deal with the versioning

18   issue, all of that is compounding everything, and that's a part

19   of why the parties have not yet made maybe as much progress as

20   the Court would like.

21         However, I can go through specific numbers of thousands of

22   documents that have gone out the door, and supplemental

23   productions have been made as plaintiffs have gone back and

24   done what the Court ordered, review the list of knowledge bases

25   and policies that we provided.  We've been working through that

 1  list.

 2      **THE COURT:**  I'm concerned about what remains to be

 3  produced.  So if there are core policies that haven't been

 4  produced, why is that production still outstanding?  We've been

 5  talking about this since July.

 6      **MR. STANLEY:**  Judge, Bret Stanley on behalf of the

 7  plaintiffs.

 8      As you know, you ordered on July 18th the indexes, home

 9  pages, and those documents that put them into operation.  In

10  the wake of that, we finally got some of the home pages and

11  list of documents from Uber, and I supplied them with a list of

12  860 policies from those -- their documents.

13      After that, Uber only questioned relevance on four of

14  those policies in an email to us.  So we haven't heard this

15  from them.

16      Some of the policies do have overlap of multiple issues,

17  and it may include something about seat belts -- or car safety

18  seats or something else, but we haven't asked for a Jump

19  only -- and Jump is the scooter operation that Uber does.  We

20  haven't asked for that only.  Right?

21      These policies are what direct drivers and what direct

22  riders to do.  This is what they use with their customer

23  service agents on how to make choices and decisions.

24      We've seen, in the past weeks, Uber file multiple

25  third-party complaints against drivers.  All of these are

1    relevant as to the control that Uber has over drivers and how

2    they treat riders.

3        And so we're not hearing from discussion, "Oh, well, you

4    have two policies on here about scooters."  That has not been

5    in the discussion.

6        We want these produced and think they should have been

7    produced in connection with your July 18th order, and they

8    haven't.

9        Uber has produced 239 policies or identified to us

10   239 policies in the production.  Amongst those, there are over

11   30 that cover background checks.  And so that gives you an idea

12   of the scope.  When you're looking at 860 documents that have

13   been requested specifically by name that are included in these

14   home pages, when you have 30-plus that consist of just

15   background checks, the number's going to be very big.  And it's

16   across multiple lines of different groups that Uber has for

17   their customer support -- global safety, dangerous driving --

18   things like that that are indicators, according to the

19   documents, that we look at for safety metrics and that we look

20   at for safety policies.  And beyond that, it goes to the

21   employment status question that we have for the Uber drivers.

22       And so we've seen dragging of feet on this in a way when

23   we've provided by name things for them to produce and they're

24   not producing it.

25           **MS. GROMADA:**  Your Honor, I think that there's

1    definitely a disconnect here.

2        You know, it's definitely correct that Uber has made some

3    significant productions.  So I appreciate Mr. Stanley for

4    acknowledging that.  However, we do indeed have a list that

5    includes questions about devices, profiles, payment, single one

6    words that really don't actually describe a specific policy or

7    don't relate to a particular policy or knowledge base.  And

8    we've been trying continually to educate plaintiffs on that so

9    they can have an appreciation for the fact that there are not

10   the type of significant gaps that they believe that we have.

11       For example, plaintiffs, in the joint submission to

12   the Court, indicated that Uber failed to produce the serious

13   interpersonal conflict standard.  We provided to them a list

14   with Bates numbers that actually included three documents with

15   that name on it.

16       So I think that there is a bit of a disconnect here about

17   what has been produced, what hasn't been produced, and actually

18   what exists.  And there are still additional documents that the

19   plaintiffs will be getting as a part of the custodial

20   productions because those documents are contained within the

21   Google Drive repositories for specific custodians and those

22   continue to roll out in addition to the additional efforts that

23   Uber has made to make these productions as we continue to work

24   with the plaintiffs to refine the scope of what they want.  And

25   we've been supplementing them over time.

```
 1            THE COURT:  So I think the issues here may be, one, a
 2    question of focus; and, two, what exists, given that this --
 3            MS. GROMADA:  Exactly.
 4        THE COURT:  -- MDL involves a very large time span of
 5    over a decade; and maybe what was called a policy in one era
 6    was called something different in a different era,
 7    blah-blah-blah.
 8        So I want the plaintiffs to focus and identify by Monday
 9    the 40 policies that you think are most important and that you
10    are concerned and want to prioritize getting complete
11    production on.  And I'm not going to be overtechnical about
12    what I mean by "policy," but we obviously understand what
13    the core issues are in the case.  What was Uber's policy with
14    regards to background check, so on and so forth.
15        So figure out what is most important, 40 policies, and
16    then take that to Uber; and then Uber will be responsible for
17    providing complete production of those policies and any
18    guidelines that operationalize those policies.
19        So this whole differentiation between policies and text
20    that operationalize -- I said in July both, policies and any
21    internal operating procedures or guidelines.  There's a lot of
22    way organizations describe those things.  But current, past,
23    historical versions of those 40 policies produced by
24    January 10th.
25            MR. STANLEY:  Judge, is there a way that we can push
```

the number above 40?  Because there are -- when you're talking

about just background checks, there are multiple versions of

different types of -- not "versions" -- multiple different

policies just on background checks.  And then there are

12 other safety taxonomy categories that have this waterfall

under them.  And so 40 is limiting us in a way that is very

difficult because of all the different types of policies that

exist that are relevant to this matter.

I could take our policy list that we gave them and tranche

them out.

**THE COURT:**  Yeah, because it was, like, 800 policies?

**MR. STANLEY:**  It was 800.  And I know that that number

sounds shocking, but when you look at their internal documents

and how they work -- and on that index that I gave them, I did

identify where in the production that these names of the

policies came from by Bates label.  And so I didn't just send

them to look willy-nilly through all kinds of documents.  So I

did identify where these were located and where I found the

name that's in the indexes.

But because each of these policies have links that they

inform the customer service relation rep to follow to get the

concern to ground, to run it to ground, to find an answer, it

does flow through multiple different documents, because each of

these policies have links and they say "If this, go here.  If

that, go there."  And so it's a ladder of documents.

1          So to have only 40 is going to be difficult.  That's not

2    going to get to --

3          **THE COURT:**  But what I'm saying is identify those

4    policies that are most important and then they've got to

5    produce all of the associated versions of that policy, plus the

6    internal operating procedures, guidelines that operationalize

7    those policies.  If they link something else, then they've got

8    to produce that.

9          But what are the -- I'll give you 60.  What are the

10   60 most important policies?  Then associated guidelines that

11   operationalize those elements and whatever document that those

12   60 policies link.

13         **MS. GROMADA:**  Your Honor, I've been trying not to

14   interrupt; but, you know, I think we're getting -- we'll

15   quickly end up right back at 860.

16         Remember prior conferences, we've discussed the whole

17   nesting doll effect, and you open up one and there's more;

18   there's more; there's more.  Maybe a better analogy would be

19   sort of this spiderwebbing effect.

20         And what's happening is with every additional document

21   that Uber produces, there are embedded links; and then

22   plaintiffs want all of those other documents too, which is why

23   I think we do begin to get a bit more creep from the core

24   issues in this case and what are most relevant.

25         And I would ask Your Honor if we could start with the 40,

1  get that, see what's there, see what that yields before we then

2  begin to open it up even further yet again, because it's

3  constantly been a moving target.

4      And dare I say, even some of the documents on this list of

5  860 truly are not either policies or knowledge bases.  They

6  include individual documents from an individual user preparing

7  for specific transitions on his or her team.

8      Now, plaintiffs had them, so they obviously were already

9  produced.  We're not withholding those documents.  We get that

10  they are relevant and responsive.  But I think, again, this

11  conflation between what's a policy and what's not is what's

12  contributing to this.

13          THE COURT:  Well, this is --

14          MS. GROMADA:  And a lot of this plaintiffs will get,

15  regardless, as a part of the custodial productions.

16          THE COURT:  The other piece of what I was thinking

17  about was having Uber provide plaintiffs with some kind of

18  declaration as to what is the history of Uber's policy keeping

19  system and how are those policies operationalized from a

20  historical vantage point, in case the handbooks have changed

21  names, in case where they're stored have changed names.  Are

22  they on the website?  Are they on this, that, or the other?

23  And that might help plaintiffs start to cabin and focus.

24          MR. STANLEY:  Judge, the semantics of "policy" or

25  "instructional document" is not coming from our side.  We've

```
 1   identified these.  They inform and instruct employees on how to
 2   deal with riders and drivers, and so they're relevant.  They
 3   need to be produced.
 4       They could have started this production in July.  We
 5   provided them with names of these.  And so -- and to -- it's
 6   difficult to think that the plaintiffs can be penalized based
 7   on Uber's system because we're not getting the documents but
 8   Uber set the system up this way.  And it's discoverable, and
 9   so -- and we've identified by name.
10       So we've gone down the path of providing additional
11   information, and it's Uber's way of keeping these documents, at
12   least after 2018 or so.  So it's difficult for us that these
13   could have been produced along the way and haven't, and now
14   we're being limited on what we can get when this is how their
15   system is set up.
16           THE COURT:  Do you want a declaration?
17           MS. GROMADA:  Your Honor -- I'm sorry.  I didn't mean
18   to interrupt you, Your Honor.
19       What I was going to say, Your Honor, is a lot of this has
20   already been set out for plaintiffs -- right? -- including in
21   writing, in our conferrals.  I don't think that there's much
22   more that we can share with them via declaration.
23       But I will say that I want to make it very clear.  Me
24   saying that there's a bit of confusion between what's a policy
25   and what's not is not an attempt to try to limit the scope of
```

 1    what's being provided.

 2         What I am saying, however, is I do believe that

 3    Your Honor's suggestion of coming up with a list of 40 or so

 4    and focusing there is going to give the plaintiffs what they

 5    want categorically, by topic, because to your point,

 6    Your Honor, we can then go from that list of 40 and find all of

 7    the interrelated documents to the extent that they relate to

 8    the Court's order.

 9         But this list of -- of 60-plus or 860, whatever it is, is

10    going to be virtually impossible to work through in a

11    reasonable period of time; and the yield on getting the

12    documents from those types of categories of requests are just

13    not going to yield the type of probative information that

14    I think is really being sought.

15         So I like the idea of us being able to focus.

16         **MR. STANLEY:**  I have spent more time on these

17    documents in other litigation than most, and I know that the

18    yield is good and they're relevant.

19         If we can provide 40 categories of -- or 60 categories of

20    documents to produce from this list, then we'll do that.

21         A declaration would be nice because I think that your

22    definition of a policy more aligns with what we believe a

23    policy is, and I think that definition is different than what

24    Uber is supplying here today.  And so that would be nice to

25    have a declaration on what they consider is responsive in

1    connection with your July 18th order.

2        And we can provide categories of production for them to

3    produce these knowledge base documents, policies, and

4    instructions, and then we'll see what they produce.  But the

5    production has been lacking so far.

6        **THE COURT:**  Okay.  So after the status conference

7    today, I'll issue an order on what we're going to do about the

8    policy documents.

9        Let's move on to -- but I'm not going to give it from the

10   bench right now.

11       **MS. GROMADA:**  Thank you, Your Honor.

12       **THE COURT:**  TAR validation.  So we need an interim

13   schedule.  I mean, obviously, there were deadlines that were

14   set out and the parties agreed to in the October 18th, 2024,

15   status conference.  Those deadlines were missed.

16       So what are the next steps for interim validation?

17       **MR. OTT:**  Good morning, Your Honor.  Patrick Ott.

18       **THE COURT:**  Good morning.

19       **MR. OTT:**  So related to validation, we actually have

20   provided initial validation information.  We were negotiating

21   the actual review of the validation for the Waves 1 and 2

22   custodians.  That -- I believe it was on the 21st of November

23   where the parties agreed to a hosted environment to host the

24   validation data itself for Waves 1 and 2.

25       The issue, Your Honor, that we're facing is the scope has

1    now changed.  So we have a compromise related to documents that

2    reference outside U.S. information, as you know.  So what we're

3    going to essentially spend a lot of time and energy and money

4    on is working forward with a validation approach that is

5    meaningless because we have to go forward with an additional

6    validation process with both dealing with the documents

7    referencing outside U.S. subject matters.  And, of course,

8    we're still in negotiations related to the date cutoff.

9        So you can imagine, Your Honor, spending a lot of time and

10   money for Uber on what will be a useless exercise is wasteful.

11   And I think that pursuant to 26(b)(2)(C), we are protected.

12   The Court's required to protect a party from cumulative and

13   what is duplicative and, what I would say, useless discovery.

14   Also 26(b)(2)(C)(ii), if the discovery is available from other

15   sources.

16       We're agreeing to move forward with the validation

17   process, Your Honor.  There's no -- even though it's our

18   position under 26(b)(2)(C)(iii) that this is discovery on

19   discovery, we are agreeing to move forward, to follow the

20   validation process.

21       All we're saying, Your Honor, is where we could be on the

22   date schedule is, in dealing with the updated outside

23   United States information, the validation schedule will be

24   updated for Tranches, I believe, 1 through 4 by February 15th.

25   So we can get that done.

1      Now, we're still going to have the issue of the date

2   cutoff.  So we're going to have to negotiate with plaintiffs'

3   counsel to determine how we're going to manage, you know,

4   documents that would be within the validation pool outside of

5   that cutoff issue.  So I think once we have that resolved, then

6   we will have an update related to that.

7      But if we move forward -- which, again, I think is going

8   to be duplicative and cumulative because it's not going to be

9   the sort of true scope of the production.  But if we move

10  forward with the Waves 1 through 4, including the OUS data, we

11  can have that available by February 15th.

12          **THE COURT:**  Thank you.

13          **MS. ELLIS:**  Your Honor, Tiffany Ellis on behalf of the

14  plaintiffs.

15      We don't know why Uber chose to, like -- deemed things

16  that were outside the U.S. irrelevant.  We don't think that

17  that was proper, and they've now reversed course on that.

18      But we have an issue right now with approaching

19  depositions for, you know, these custodians that we have been

20  tranched out.  We have a suspicion, a strong suspicion that

21  validation is going to be informative for us to determine

22  whether Uber has been coding documents as nonresponsive that

23  should have been responsive.  This is based on search term

24  reports that were given to us early that contained millions of

25  documents for certain custodians and then only hundreds of

1  documents or maybe thousands of documents are ultimately what

2  were produced to us.  That's exactly why the TAR process is in

3  place.

4      On the current schedule, Uber's next set of validation

5  metrics is due for the next 17 custodians on the 12th of

6  December -- or was due, rather.

7      And so we're hopeful that we can work these issues out

8  with them about the virtual access to the documents that are

9  going to go through the validation process, but we may need to

10  raise that with the Court as well.

11      I guess all of this is to say, Your Honor, any further

12  delay in this process is one that will negatively impact

13  plaintiffs' ability to prosecute this case through our

14  depositions of these custodians.

15      **MR. OTT:**  So, Your Honor, just to address a couple of

16  things.

17      Related to OUS, in a status conference I believe over the

18  summer, you even said, "Plaintiffs, what's wrong with that?"

19  related to our redactions limited to OUS.  And separately,

20  there was another issue that came up in that conference too.

21  So we had a good faith reason related to 26(b)(1) not to

22  produce information that was related to subject matters outside

23  the United States.  So that shift, that has happened in just

24  the past few weeks and we're accommodating that.

25      And we're -- as we talked about, I believe, in the

October 1st status conference, Your Honor, 26(g) is the standard, and we are meeting that standard of validation. A certification under 26(g) is usually done at the end of the case, sort of the end of discovery production, and that's why we're constantly blocking and tackling on these issues. So if we're producing what is going to amount to a population of documents that include nonresponsive documents, documents outside the scope of 26(b)(1), we're constantly going to be shifting.

So that's why we're suggesting that the validation process be done at the end of discovery pursuant to 26(g). But, however, out of compromise --

**THE COURT:** Is that really different from what the position was earlier when we -- I thought we all agreed that there should be some interim validation effort measures because if you wait to share the validation or do the validation at the end of discovery and you realize that TAR was handled incorrectly, then you don't learn till the close of fact discovery. So I just didn't think that anyone saw this as being controversial, and Uber was willing to do it.

I know the scope of discovery is shifting a bit in some regards, but if we learn from interim validation that things were missed, then that's a yellow flag. I mean, I think it's useful, even though the scope of discovery is not identical, because then it gives you -- lets Uber know and everyone

```
 1    involved know, okay, there needs to be some attention because
 2    the process is not working with the level of effectiveness that
 3    is needed.
 4            MR. OTT:  And, Your Honor, that's why we offered a
 5    compromise.  You know, we will accommodate the OUS issue.  We
 6    will have Tranches 1 through 4 reupped and revalidated on
 7    February 15th.  We'll provide access in a hosted environment,
 8    as they request, because we originally were going to do this as
 9    in person and we had the right to do that under the ESI
10    protocol.  We, again, compromised, provided the access to them
11    remotely.
12        So we are moving forward with this process where we will
13    have the Tranche 1 through 4 validation available to them.
14    They can code the documents and tell us what they think is
15    responsive and not responsive.  We can meet and confer about
16    that.
17        But we're still going to have the date cutoff issue that
18    we're going to be negotiating.  I'm hoping that we can resolve
19    that so it can be kind of a one-and-done approach and maybe
20    some cleanup after the fact between that February 15th date
21    and --
22            THE COURT:  The concern about February 15th is that
23    depositions are starting in -- have already started and then
24    there's more in January, so sooner rather than later.  And the
25    original dates were much -- they were blown.
```

1    So let's just get the validation taken care of, the

2    interim validation, by January 15th, in the middle of the

3    month.

4         **MR. OTT:**  Well, Your Honor, first, the dates weren't

5    blown.  We did provide the information, and we were negotiating

6    the access to the information.

7         Secondly, we can't be ready by January 15th.

8         **THE COURT:**  The whole negotiation of remote versus

9    in-person, it just -- I know there was some ambiguity in the

10   protocol as to how to resolve disputes as to where the

11   validation review takes place, in person or remote; but it just

12   doesn't seem like that was so difficult of an issue that it

13   should have added a whole lot of delay here.

14        Is there some reason why this interim validation process

15   can't be undertaken by January 15th rather than February 15th?

16        **MR. OTT:**  So, Your Honor, the issue, again, was

17   related to the access of the information.  We had the

18   information available to plaintiffs.  We were negotiating.

19   They didn't want it that way.  They didn't want to do an

20   in-person review.  Uber has issues specifically related to

21   nonresponsive issue outside the scope of 26(g)(1) --

22        **THE COURT:**  Is there some reason why January 15th

23   isn't a viable --

24        **MR. OTT:**  It can't be --

25        **THE COURT:**  -- feasible date rather than

1   February 15th?

2        **MR. OTT:**  We are in the process of reviewing the

3   information that contains the OUS information.  So if you were

4   to go forward with a January 15th that doesn't contain any OUS,

5   I don't think that that's going to have a lot of value.

6        I think there's much more value in waiting the extra

7   30 days until February 15th so we can have a broader scope so

8   we're not bickering over documents that are in or out.

9        **THE COURT:**  I just said a few minutes ago that I think

10  that there is some value because you know, according to the

11  original scope of discovery, that there were already some

12  problems as far as getting the level of effectiveness in the

13  TAR system that you need.  So that can carry over to how you

14  deal with TAR with the broader scope, even though it's not an

15  identical body.  I mean, it will send up some yellow flags, if

16  there are any.

17       **MR. OTT:**  So --

18       **THE COURT:**  I don't know.  I mean, unless -- if you

19  think it's going to be useful to have it on February 15,

20  then --

21       **MS. ELLIS:**  Your Honor, we have a substantial close of

22  discovery on June 16th.  If we wait until February 15th to do

23  this validation, our hope for, one, completing the four or five

24  depositions that are scheduled in January and not having to

25  come back and ask for those depositions again after validation

1    is not great.  So we do think that an interim validation right

2    now is the appropriate path forward.

3            **MR. OTT:**  So, Your Honor, to answer your question,

4    January 15th, we could probably do Tranche 1 through -- I would

5    say 1 through 3.  We could provide validation information on

6    that.

7            If we -- I would suggest, Your Honor, that we would go

8    through that exercise for Tranche 1 through 3 and then have a

9    later final validation to avoid wasting resources.  I think

10    we're protected under 26(b)(2)(C), Your Honor; but, again, out

11    of compromise, we will agree to a final validation after that,

12    maybe after a feedback session.

13            Plaintiffs can code the documents.  They can tell -- call

14    balls and strikes and what's responsive and what's not.  They

15    can provide that list to us based upon document numbers in the

16    database, and we can have that meet and confer after.

17            But just the shifting and the moving is really what's

18    causing the problem, and that's why we have never done it this

19    way.  In my 20 years of practice, Your Honor, we've never

20    provided interim validation reporting.

21            We agreed to do it here because of the Court's request,

22    plaintiffs' request.  We said we'd give it a shot.

23            **THE COURT:**  It just seems common sense.  The whole

24    purpose of validation is to know:  Are you using TAR

25    effectively?  And why would we want to wait until the close of

discovery to figure that out?  I mean, then it's -- then we're

in a position of, okay, are we going to extend discovery to go

back and redo TAR?  That sounds a lot more difficult to do

rather than doing it earlier.

Maybe it hasn't been ordered.  I mean, TAR, overall,

people are learning how to work with it.  I mean, obviously,

you-all are more experienced and expert in that regard but --

**MR. OTT:**  So, Your Honor, it's really just stabilizing

the model.  When we're throwing a bunch of new information into

stabilizing the model, then that causes a problem and we have

to sort of redo our work.  We're trying to avoid the

duplicative work.

But if we do one -- if Your Honor's suggestion is that

from January 15th, we do a tranche from 1 to 3, we will do

that.  We will start that exercise now.

I believe we are in the final negotiations with plaintiffs

on access to the data in a hosted environment.  They can code.

We'll put up a schedule where they have to code the information

and get feedback to us in a short amount of time, and then we

can have the discussions over specific issues.

**MS. ELLIS:**  Your Honor, I will just point out that

their metrics for Tranche 3 were due December 12th.  That

production -- so it's overdue at this point.  So talking

through January deadlines, although that's good, we're already

past the schedule.

1    As I mentioned before, we are still working with

2    defendants on some access issues.  They've asked that it be

3    limited to six people, like individual people, not even, like,

4    just the plaintiffs' leadership law firms, which poses some

5    logistical issues in terms of, whether and if we need to brief

6    this to the Court, how we're going to be able to use that and

7    how we would use the challenged documents.

8    We're hopeful that we can work those through with

9    defendants.  But if we do have the interim validation on the

10   15th for 1 through 3, we'd also like a date certain by which 4

11   is account- -- Tranche 4 is accounted for, as well as the OUS

12   updates, if you will, that defendants said that they're working

13   on.

14   **MR. OTT:**  So, Your Honor, to be clear, they did

15   receive validation statistics.  It's access to the underlying

16   documents that has not happened yet.  So that's what's being

17   negotiated.

18   And the reason for the protection of the -- some

19   limitation on the number of users is that this is nonresponsive

20   information.  It's something that's outside the scope of

21   26(b)(1) and something that wasn't really contemplated that

22   documents would be -- nonresponsive documents would be produced

23   in litigation.  But, again, out of compromise, we're moving

24   forward with this.

25   And Your Honor's instruction on Waves 1 through 3, we can

```
1   get that done by January 15th.  We still need to -- I would
2   like to bundle the OUS issue and the date cutoff issue into the
3   final wave.  We just don't want to do it again.  It's
4   expensive; it's time consuming.  We have to do a review of a
5   review.  And, you know, we just want to get to the end of it
6   and -- and be done.  And that's -- once having a stabilized
7   model would make the most sense.
8        But, again, we hear you, Your Honor.  We understand
9   January 15th for Waves 1 to 3, and we could move forward with
10  the final phase.
11            THE COURT:  Yeah.  And then February 15th for the
12  fourth tranche.
13            MR. OTT:  For the fourth tranche with OUS, but we
14  still have that date issue that we're going to have to
15  navigate.  So I would like to be -- to combine those two
16  things.
17            THE COURT:  Okay.
18            MR. OTT:  But we're still collecting documents on the
19  date issue.  But we could do February 15th for OUS and then
20  figure out what to do with the date issue, because we're still
21  collecting the information on that.
22            THE COURT:  The cutoff date is what you're referring
23  to?
24            MR. OTT:  Correct.
25            THE COURT:  Can you resolve that?
```

1          **MS. ELLIS:**  Your Honor, we can confer with them on

2     that.

3          **THE COURT:**  Okay.  We're coming up on 10:45, and I

4     want to give the court reporter a break before you have to

5     appear in front of Judge Breyer.  So hold on a second here.

6          This is turning to the custodial documents.  We just don't

7     have very much time, so I'm going to order Uber to provide hit

8     counts.  I just don't see that there's a burden there.  And

9     Uber is still free to argue that the hit counts aren't

10    probative.  But there was concern on the part of plaintiffs

11    that they didn't have hit counts, and then Uber's response,

12    well, that's not going to be very probative as to whether or

13    not the production's complete.  But those hit counts need to be

14    provided by tomorrow, the 20th.  Let's just keep this moving.

15         And then for the pre-2013 documents, I know certain

16    custodians are in later tranches so that affects the time frame

17    for when their pre-2013 records would be produced.  But my

18    order set a 14-day time period, and I think we are well past

19    that 14-day time period.  So for the custodians whose documents

20    have already been produced, their pre-2013 documents need to be

21    produced by December 23rd.

22         **MR. OTT:**  So, Your Honor, for clarification, for --

23    first, on the hit count report, I don't think we can get that

24    done by tomorrow just in a logistic --

25         **THE COURT:**  I'm sorry?

 1          **MR. OTT:**  I don't think we can provide a hit count per

 2    custodian by tomorrow just because of the mechanics that goes

 3    into it.

 4          **THE COURT:**  Okay.

 5          **MR. OTT:**  But if you were to, please, Your Honor --

 6          **THE COURT:**  December 23rd, then.

 7          **MR. OTT:**  Thank you, Your Honor.

 8       And then, separately, to clarify, the pre-2013 documents

 9    from the custodians by December 23rd, are you referring to --

10    which tranche are you referring to?

11          **THE COURT:**  So there were certain custodians whose

12    documents have already been produced.  So those are the earlier

13    tranches; right?  Tranche 1, Tranche 2 has already been

14    produced.  And then I issued an order that said, okay, pre-2013

15    records are discoverable.  But my understanding is that the

16    pre-2013 documents have not been produced at all.

17          **MR. SHORTNACY:**  Your Honor, Michael Shortnacy for

18    Uber.

19          **THE COURT:**  Okay.

20          **MR. SHORTNACY:**  That's not correct, Your Honor.  We

21    have produced that.

22       So Your Honor absolutely correctly did make that order,

23    and the order said start producing it consistent with the

24    submission, the joint submission.  And when you granted that

25    order, we met that; we complied with that; they have been

```
 1   produced on a rolling basis, and so that has happened.  They
 2   will be completely finished by, I think, January 3rd.  So
 3   they've been rolling out since right after Thanksgiving.  I
 4   don't have the compliance date off the top of my head.
 5   Apologies.  But in compliance with the Court's order, those
 6   documents from pre-2013 were produced --
 7              THE COURT:  Okay.
 8         MR. SHORTNACY:  -- and continue to be produced and
 9   will be complete by January 3rd.
10         MR. STANLEY:  Plaintiff suggested that it be complete
11   by December 23 or by January 3rd, whatever your order is.
12              THE COURT:  By January 3.
13         MR. STANLEY:  Well, I --
14         MR. SHORTNACY:  January 3rd.  If I may speak for --
15         MR. STANLEY:  Sure.
16         MR. SHORTNACY:  -- Mr. Stanley, I think he's saying
17   plaintiffs would be okay and not dispute that those documents
18   will be complete by January 3rd, if I may.
19         MR. STANLEY:  January 3rd works for the plaintiffs.
20              THE COURT:  Okay.  All right.  January 3rd.
21         MR. STANLEY:  And the last thing is the marketing
22   documents, Judge.  We're hopeful to get marketing production on
23   emails that go out to drivers and riders for marketing, exact
24   target messaging, commercials, YouTube, social media, in-app
25   direct messages, influencer marketing, things like these.  We'd
```

1    like you to address this in an order and order production of

2    these documents.

3             **THE COURT:**  Okay.

4             **MS. GROMADA:**  Your Honor, with respect to exact target

5    documents, that was a very discrete, specific request by

6    plaintiffs, and we've complied with that.  We have produced

7    exact target marketing documents.  And that's a part of the

8    email campaign that the company uses.  And those have been

9    provided to plaintiffs.

10        With respect to other documents, the parties do continue

11   to meet and confer with respect to that.  Some of the

12   conversations that we have related to whether we are going to

13   produce specific in-app communications to specific

14   individuals -- namely, the plaintiffs -- or whether we're going

15   to produce something more broad, try to find a way to collect

16   and produce all in-app communications from a certain date

17   forward.

18             **THE COURT:**  Okay.  Ms. Gromada, Counsel, we're out of

19   time.  So whatever the marketing dispute is that's not

20   resolved, you've got to brief that up and submit it by Monday,

21   and then I'll resolve it --

22             **MS. GROMADA:**  Thank you, Your Honor.

23             **THE COURT:**  -- based on that.

24             **MR. STANLEY:**  Thank you.

25             **THE COURT:**  We didn't get to JCCP coordination, but

 1  that can be addressed with Judge Breyer.

 2      In terms of the privilege log disputes, I'll get an order

 3  out promptly.  But I am going to do some small, randomized

 4  selection of Uber's privilege log entries and have review of

 5  that.  I don't -- because of the assertions of systemic abuse

 6  of the privilege logs, I'm not convinced that there is yet, but

 7  I think a small, randomized selection process will help --

 8          **MR. SHORTNACY:**  Your Honor --

 9          **THE COURT:**  -- figure that out.

10          **MR. SHORTNACY:**  -- could I comment on that?

11      If the Court is inclined to do that, I would respectfully

12  suggest that we focus on the latest-in-time logs or the logs

13  that have the benefit of the Court's teachings from prior

14  orders, from revisions and de-designations that we have made.

15  I think that would be more instructive.

16          **THE COURT:**  Okay.  I'll consider that and then address

17  it in my order.

18          **MR. SHORTNACY:**  Thank you, Your Honor.

19          **MS. ELLIS:**  Your Honor, that's fine.  I was just going

20  to say they issued a revised log to us.

21      I just wanted to ask also for clarification on the TAR.  I

22  wanted a clarification that they produce the sample sets to us

23  now and not wait until the 15th to do that.

24          **MR. OTT:**  Your Honor, Patrick Ott.

25      The updated validation set on 1 to 3, that will be its own

1    unique validation set.  So we will be hosting that in the

2    environment that we've negotiated with Ms. Wilkins, and that

3    will be provided on January 15th.  So that pool of documents

4    needs to be redefined for Tranche 1 to 3, and then we will

5    provide those documents, along with the statistics, access to

6    those documents on January 15th.

7              THE COURT:  Okay.  What about the underlying -- you're

8    referring, though, to the validation information that was

9    provided -- produced already.  But you didn't get the

10   underlying documents --

11             MS. ELLIS:  Right.

12             THE COURT:  -- so you can't really --

13             MS. ELLIS:  The sample set to prepare for the 15th.

14             THE COURT:  Yeah.  Is there any reason why Uber cannot

15   produce that tomorrow or Monday, the underlying --

16             MR. OTT:  So we were in the process of discussing that

17   with Ms. Wilkins, but what I -- again, going back to, the

18   better exercise and the better use of time would be to provide

19   the updated that's not just Waves 1 and 2 but actually includes

20   Wave 3 as well.

21             MS. ELLIS:  We would ask that we get it before the

22   15th, Your Honor.

23             THE COURT:  Before January 15th?

24             MS. ELLIS:  Yes.

25             MR. OTT:  It's just we need to do the work.  You know,

```
 1    that's --

 2           THE COURT:  How about January 3rd, then, to get the

 3    underlying documents?

 4           MR. OTT:  We need to get the work done.  So I've been

 5    texting while I walked away from the podium, Your Honor, to see

 6    if we can actually get this done.

 7           THE COURT:  Okay.

 8           MR. OTT:  And --

 9           THE COURT:  Well, maybe you can work out, I mean, some

10    sort of schedule; and if you don't work out a schedule, put it

11    in the Monday letter and I'll set a schedule.

12           MS. ELLIS:  Yes, Your Honor.

13           THE COURT:  Because they do need time --

14           MS. ELLIS:  Understood.

15           THE COURT:  -- to do it.

16           MS. ELLIS:  We're happy to conference with them on

17    that.

18           THE COURT:  Okay.  All right.

19           MS. ELLIS:  And back to privilege, we're happy to

20    abide by whatever process Your Honor would like.  The log is

21    currently up to about 57,000 entries, as I understand, and

22    we've challenged a significant number of them.

23           THE COURT:  Mm-hmm.  I'm aware of that, but thank you.

24    Okay.

25           MS. ELLIS:  Thank you, Your Honor.
```

1          **THE COURT:**  All right.  So we're done and everyone

2    gets a break, five minutes.

3          **ALL:**  Thank you, Your Honor.

4          **THE CLERK:**  Court is adjourned on this matter.

5              (Proceedings adjourned at 10:51 a.m.)

6                      ---o0o---

7

8                  <u>**CERTIFICATE OF REPORTER**</u>

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:  Friday, December 20, 2024

13

14

15

16

17   _____

18          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

19          CSR No. 7445, Official United States Reporter

20

21

22

23

24

25