# EXHIBIT 7

CAUSE NO. 2022-CI-11011

| | | |
|---|---|---|
| **IVAN SMITH** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **57TH JUDICIAL DISTRICT** |
| **UBER TECHNOLOGIES, INC.;** | § | |
| **PORTIER, LLC; RASIER, LLC;** | § | |
| **CARLA REYES TREVINO; JOSHUA** | § | |
| **ALDANA; RUBEN MALDONADO JR.** | § | |
| **and ALBERT ANGEL REYES TREVINO** | § | |
| *Defendants.* | § | **BEXAR COUNTY, TEXAS** |

**PLAINTIFF'S FIFTH SET OF REQUESTS FOR PRODUCTION TO UBER
TECHNOLOGIES INC.**

---

**TO:** **DEFENDANT UBER TECHNOLOGIES, INC.** ("Defendant"), through attorneys of record, Katherine Bell-Moss, Angela Angotti, and Paige Cheung, BOWMAN AND BROOKE LLP, 2901 Via Fortuna Dr., Ste. 500, Austin, Texas 78746.

      Plaintiff Ivan Smith serves these Requests for Production on Defendant Uber Technologies, Inc., as allowed by Texas Rule of Civil Procedure 196. Uber Technologies, Inc., must respond to each request separately, fully, in writing, and within 30 days after service.

      Pursuant to Texas Rule of Civil Procedure 193.5, these Requests are continuing in nature and require supplementation reasonably promptly after the responding party discovers the necessity for such a response.

                                              Respectfully submitted,

                                              JOHNSON LAW GROUP

By:    */s/ Bret Stanley*
              Bret Stanley, SBN 24075116
              2925 Richmond Avenue, Suite 1700
              Houston, TX 77098
              Telephone: (210) 404-4878
              Facsimile: (210) 610-1134
              Bstanley@johnsonlawgroup.com
              ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on all Defendants' Counsel of Record on this **17th Day of April via** electronic service.

BOWMAN AND BROOKE LLP
Angela L. Angotti- SBN: 24112893
Katherine E. Bell-Moss- SBN: 00785690
Paige L. Cheung- SBN: 24116193
2901 Via Fortuna Dr., Ste. 500
Austin, Texas 78746
Tel: (512) 874-3804
Fax: (512) 874-3801
Email: Katherine.bell-moss@bowmanandbrooke.com;
angela.angotti@bowmanandbrooke.com;
brianna.leo@bowmanandbrooke.com
paige.cheung@bowmanandbrooke.com;
sara.margo@bowmanandbrooke.com;
jamie.giron@bowmanandbrooke.com
**Attorney for Uber Technologies, Inc, Portier, LLC d/b/a Uber Eats and Rasier, LLC**

DORSETT, JOHNSON & SWIFT, LLP
C. Roberts Dorsett, Jr. – SBN: 24029524
Jessica A. Putonti- SBN: 24041295
Abagail Carrier- SBN: 24116170
3503 Wild cherry Dr., Bldg. 6
Austin, Texas 78738
Tel: (512) 600-4365
Fax: (512) 266-3655
Email: acarrier@dorsettjohnson.com
Service Email: eservice@dorsettjohnson.com
**Attorney for Defendant Joshua Aldana**

GOLDMAN & PETERSON, PLLC
Larry J. Goldman- SBN: 08093450
Michael F. Aguilar – SBN: 24117936
10100 Reunion Place, Suite 800
San Antonio, Texas 78216
Tel: (210) 340-9800
Fax: (210) 340-9888
Email: larry@ljglaw.com;
michael@ljglaw.com

Service Email: mail@ljglaw.com
**Attorney for Defendant Carla Reyes Trevino & Ruben Maldonado Jr.**

HANNA & PLAUT, L.L.P.
David L. Plaut
State Bar No. 16066030
Eva M. C. DeLeon
State Bar No. 24074774
211 East Seventh Street, Suite 600
Austin, Texas 78701
Telephone: (512) 472-7700
Facsimile: (512) 472-0205
Email: dplaut@hannaplaut.com;
edeleon@hannaplaut.com;
sflores@hannaplaut.com
**Attorneys For Defendant Albert Angel Reyes Trevino**

*/s/ Bret Stanley*

**INSTRUCTIONS**

The following instructions and definitions apply to each of the Requests set forth below and are deemed to be incorporated therein:

1.  With respect to each Request for Production, You are required to provide all Documents in Your possession, custody, or control that are known or that You can locate or discover through reasonably diligent efforts.

2.  Documents should be produced as they are maintained in the normal course of business.

3.  If responsive material exists in a software program or application that does not allow all responsive material to be exported, or which exports some or all of the responsive material in a different format than the format in which it is used and/or viewed, then Uber shall (in addition to using whatever export options are available) take screenshots of all responsive material. Uber must click on hyperlinks, scroll, click on new tabs, open popups, expand menus, and/or otherwise navigate to additional screens, pages, tabs, and views, as necessary, until all responsive material has been captured.

4.  If Documents are Electronically Stored Information (ESI), and/or maintained in electronic form, they should be produced in electronic form and in accordance with the ESI Order governing the format of production of documents in this matter.

5.  Hard copies of Documents shall be produced as they are kept in the usual course of business. All hard copies of Documents shall be produced with a copy of the file folder, envelope, or other container in which the Documents are kept or maintained. All hard copy Documents shall be produced intact in their original files, without disturbing the organization of Documents employed during the conduct of the ordinarily course of business and during the subsequent maintenance of the Documents. To the extent a hard copy responsive Document has been electronically scanned (for any purpose), that Document must be produced in a readable and accessible electronic format in accordance with the ESI Order governing the format of production of documents in this matter, with the opportunity provided to review the original Document(s).

6.  You are not required to organize and label responsive Documents to correspond to the

categories in any request, but each Response shall identify the Documents responsive to that Request by Bates label/number

7. When producing Documents:
    a. indicate the Request, including paragraph and subparagraph, to which a produced Document or thing is responsive;

    b. furnish Documents or things within Your control, regardless of whether such Documents or things are possessed directly by You or Your representatives; and

    c. if any requested Documents or things cannot be produced in full, produce to the extent possible, specifying each reason for Your inability to produce the remainder and stating whatever information, knowledge or belief You do have concerning the portion not produced.

8. Each document request shall be construed to include Documents within the knowledge, possession, or control of the Defendant, its attorneys, investigators, agents, owners, officers, employees, or other representatives of the party and/or its attorneys, as of the date of the answers given to those document requests and any supplemental information, knowledge, data, Documents, or Communication responsive to these document requests which is subsequently obtained or discovered.

9. If, to Your knowledge, a responsive Document was never in Your possession, custody, or control but has been in the possession, custody, or control of any other Person or entity, You shall Identify such Person or entity.

10. If any responsive Document was formerly in Your possession, custody, or control but is no longer available, whether because it was lost, destroyed, transmitted, or discarded, or is unavailable for any other reason, You shall submit a written statement as follows:

    a. Describe in detail the nature of the Document and its contents;
    b. Identify the Person or Persons who authored, prepared, or edited the Document any Person or Persons to whom the Document was sent or shared;

    c. List all dates when the Document was created or modified;

    d. List all dates when the Document was lost, destroyed, or made unavailable;

    e.   State any reason(s) the Document was lost, destroyed, or made unavailable;

    f.   List all Persons known or reasonably believed by YOU to have or formerly have had possession of the Document or have had knowledge of its contents;

    g.   State the name and address of each person who destroyed or made the document unavailable; and

    h.   State the name and address of each person who directed or approved of destroying the document or making it unavailable.

11. If You make any assumption of fact or law in responding to any request, state each assumption and the basis for each assumption.

12. If the response to any document request consists, in whole or in part, of any objection(s), state with specificity the full objection(s) and the particularized basis for each objection. You must also state whether any responsive materials are being withheld on the basis of any objection(s), and if so identify which objection(s) and the basis for withholding responsive materials. To the extent that You object to any portion of a document request, You must respond to the remaining portion of the request to which You do not object.

13. If You object to a request for production on the basis of any claim of privilege, then You must produce a privilege log.

14. If any Documents or information cannot be produced in full, You are required to specify, to the extent possible, the reasons for Your inability to produce the remainder, and the approximate date when You expect to produce such Documents, if at all.

15. If no Documents responsive to a particular Request exist, you must state that no responsive Documents exist.

16. You are required to timely supplement Your responses when appropriate or necessarily under the New Jersey's Rules of Court to make them correct or complete. If, after producing Documents or information responsive to these Requests, additional responsive information or Documents become available to You, You are required to produce such additional Documents or information.

17. Each request is considered continuing, if You obtain information that renders any response

incomplete or inaccurate, You are obligated to serve amended answers and/or Documents on the undersigned.

18. For purposes of interpreting or construing the scope of these requests, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual request. This includes, without limitation, the following:

    a.    The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

    b.    The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

    c.    Construing the singular form of the word to include the plural and the plural form to include the singular;

    d.    Construing the masculine to include the feminine, and vice-versa;

    e.    The use of any tense of any verb shall also include all other tenses of that verb;

    f.    A term or word defined herein is meant to include both the lower and uppercase reference to such term or word.

    g.    Any Bates number referenced in these Requests shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members.

    h.    Construing the term "including" to mean including but not limited to.

19. Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

20. In construing these requests, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning. If You are unsure about the definition of a particular term or word, use the definition that You believe to be the most accurate and state that definition in Your response. If, in responding to any of these requests, You encounter any other ambiguity in construing either the request or an instruction, then set out the

matter You deem ambiguous and the construction You use in answering the request.

21. Unless otherwise indicated, the relevant time period for the information sought is from **January 1, 2022** through the present time.

## DEFINITIONS

In this Request for Production of Documents the following words and terms shall bear the meanings as identified below. For any undefined term, the standard dictionary definition of the term applies

1. "ACCOUNT HISTORY" means the INFORMATION that UBER maintains about a DRIVER or DELIVERY PERSON's account status, including but not limited to the DRIVER or DELIVERY PERSON's name, status, status note, whether the status is current, the date and time the status began, the date and time the status ended, and the flow type.

2. "ACTIVE" with respect to the DRIVER, DELIVERY, or UBER APP means that a person has an active account on that App and is authorized to use the App to either offer or request RIDES.

3. "ACTIVE DRIVER" means someone with an active DRIVER or DELIVERY UBER APP account who is authorized to use the DRIVER or DELIVERY UBER APP to offer RIDES or DELIVERIES.

4. "ACTIVE RIDER" means someone with an active UBER APP account who is authorized to use the UBER APP to request RIDES.

5. "ADJUDICATION CRITERIA" are criteria for deciding, based on a Background Check, whether or not a person is eligible to be or continue to be a Driver or Delivery Person.

6. "ADVERTISING" and "ADVERTISEMENT" refer to COMMUNICATIONS via any COMMUNICATIONS CHANNELS aimed at promoting a product, service, or idea to a target audience.

7. "AGREEMENT" means any Document that states the commitments, expectations, agreements, contracts, terms, and/or conditions between two or more entities and/or people. It includes but is not limited to Terms of Use and Community Guidelines.

8.  "ALL ACCOUNTS" means all Uber accounts and what Uber calls "flow types" associated with or linked to, a given Rider, Driver, or Delivery Person at any time, including but not limited to Uber Black accounts, Eat accounts, Freight accounts, Rider accounts, Driver / Delivery accounts, or any other flow types or accounts possessed by, linked to, or affiliated with the Driver / Delivery Person.

9.  "BACKGROUND CHECK" means any search, survey, review, evaluation, downloading, and/or summarizing, of databases and/or court records, police records, law enforcement records, arrest records, department of motor vehicle records, and/or other official records, performed at any time and for any reason, to learn about a person's background and/or determine whether that person meets the minimum criteria to be a DELIVERY PERSON.

10. "BACKGROUND CHECK CONTRACTOR" means any business entity that Uber paid to conduct BACKGROUND CHECKS.

11. "BACKGROUND CHECK FINDINGS" means information related to potential infractions, violations, and/or crimes, including but not limited to tickets, arrest, prosecutions, convictions, and plea deals.

12. "BACKGROUND CHECK PROCESS" means all the steps taken related to conducting a BACKGROUND CHECK, including information gathered from the DRIVER or Delivery Person, information provided to the BACKGROUND CHECK CONTRACTOR, instructions to the BACKGROUND CHECK CONTRACTOR; information provided to UBER by the BACKGROUND CHECK CONTRACTOR, the geographic and temporal scope of the BACKGROUND CHECKS, the databases queried as part of the BACKGROUND CHECKS, the ADJUDICATION CRITERIA used as part of the BACKGROUND CHECKS, and the SCREENING decisions made and the process by which they were made).

13. "BIOMETRICS" means biological data, including but not limited to fingerprints and face recognition.

14. "PSYCHOLOGICAL SCREENING" means use of psychological and/or personality testing and/or questionnaires in its SCREENING of APPLICANTS. It includes but is not limited to the

programs called "Cerebral," "Cerebro," and "Usights,"  and any former, subsequent, or alternative versions of those programs.

15. "CANCELLATION  RATE" means the percentage of ride requests that a DRIVER  or DELIVERY PERSON cancels compared to the total number of Uber requests the DRIVER or DELIVERY PERSON receives.

16. "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form  of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

17. "CHECKING  REFERENCES" means contacting prior employers and/or other acquaintances of an APPLICANT to gather information from them about an APPLICANT.

18. "CHRONICLE" means Uber's internal system, program, and/or platform used by Uber and Uber Support staff millions of times a day to provide trip / delivery information and support to Uber Users.

19. "CONSIDERED" means discussed, analyzed, presented on, RESEARCHED, did cost projections, solicited quotes and/or bids, ran a pilot program.

20. "CONSUMER" means an UBER EATS user who uses the Uber Application to order food, goods, or services.

21. "CRIMINAL  HISTORY" means any history  of infractions, violations, misdemeanors, felonies, or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

22. "DATE OF UBER'S SAFETY TAXONOMY IMPLEMENTATION" as used herein shall refer to the date by which UBER fully implemented its Global Safety Eats Taxonomy.

23. "DEACTIVATE" or "DEACTIVATION" includes any action that prevents someone from using either the DRIVER or DELIVERY APP or UBER APP to offer RIDES, offer DELIVERIES,

request RIDES, request DELIVERIES and includes waitlisting, applying a safety lock, blocking, and deactivating, whether permanent or temporary.

24. "DELIVERY APP" means Uber's mobile phone application that is used by Uber Eats Delivery Persons to make deliveries through the Uber phone application.

25. "DELIVERY PERSON" means a person who utilizes the Uber Application to make UBER Eats Deliveries.

26. "DISPLAYED STAR RATING" means the numerical rating, out of a maximum rating of 5, that UBER displayed as a RIDER or DRIVER or DELIVERY PERSON's rating, usually next to an icon of a star.

27. "DISQUALIFY" "DISQUALIFIED" or "DISQUALIFYING" mean determining that a person does not meet the minimum criteria to be or continue to be a DRIVER or DELIVERY PERSON.

28. "DOCUMENT(S)" shall mean and include "writings" as defined in Texas Rule of Civil Procedure 192.3(b) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control.   Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from  another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by

translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form. The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, making, or information not on the original. The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all "DRIVERS" or "DELIVERY PERSONS" means anyone other than a taxi driver, limo driver, or charter party chauffeur who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" or "DELIVERY PERSON" shall be interpreted to also include potential or prospective Drivers or DELIVERY PERSONS.

29. "DELIVERY APP" means Uber's mobile phone application that is used by DELIVERY PERSONS to deliver Uber Eats Requests.

30. "DRIVER UUID" means UUID **71aaf102-23df-4a2f-9f08-79481c752bb3** or any other UUID assigned to Defendant Joshua Aldana on any Uber Eats account or Uber Eats Duplicate Account of Joshua Aldana.

31. "EARNER" means anyone who uses or at any time has used the Uber Application to be connected by Uber with Trips or Deliveries, including an Uber DELIVERY PERSON or DRIVER.

32. "FAILURE MODE" means a way in which something may fail to function as designed or intended.

33. "INDUSTRY INFORMATION SHARING" means any program, plan, policy, agreement, contact, or practice of sharing information, and/or asking that information be shared, by and between Uber, Lyft, and other TRANSPORTATION NETWORK COMPANIES.

34. "INFORMATION" means data, information, DOCUMENTS, and facts, that exist and/or are transmitted in any form whatsoever including text, images, audio, video, electronic, or otherwise.

35. "INVESTIGATION" means all actions UBER and/or those directed by Uber take in response to events or conduct reported to UBER involving one or more RIDER and/or DRIVER/

DELIVERY PERSON. Investigation includes but is not limited to COMMUNICATIONS, interviews, internal discussions, classifications, DEACTIVATION, reactivation, and review of INFORMATION.

36. "INVESTIGATION DOCUMENTS" refer to all DOCUMENTS and INFORMATION related to UBER's INVESTIGATION of conduct, misconduct, an accident, incident, collision, or something else reported against a CONSUMER, RIDER or a DRIVER / DELIVERY PERSON. INVESTIGATION DOCUMENTS include TICKETS (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS), and the entire set of tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS).

37. "LAW ENFORCEMENT" means police departments, sheriff's departments, other law enforcement agencies, officers, detectives, sheriffs, FBI agents, federal, state, or other law enforcement officials, and/or District Attorneys or other prosecutors, and their staff.

38. "LOCATION DATA" means coordinates, GPS data, satellite data, and/or latitude-longitude data.

39. "LOCATION TRACKING" means monitoring the location and movement of cellular devices, other devices, people, and/or vehicles.

40. "LOW CREDIBILITY" refers to a determination that a particular RIDER or DRIVER / DELIVERY PERSON lacks or may lack credibility. This includes but is not limited to a determination that a RIDER and/or DRIVER / DELIVERY PERSON gives an unusual number of low ratings, engages in "over escalation," copies and pastes the same complaints repeatedly, or is otherwise flagged as showing abnormal patterns of reporting.

41. "MARKETING" refers to the efforts to promote and/or sell something, including RESEARCH regarding customer/client/Rider preferences, behavior, and trends; relationship-

building with potential or actual customers/clients/Riders; product development and design aimed at fulfilling customer/client/Rider preferences; and/or COMMUNICATIONS with a target audience through various COMMUNICATIONS CHANNELS to promote and/or sell something.

42. "MATERIALS" mean any DOCUMENT, DATA, physical object, audio recording, video recording, or other item or material of any nature whatsoever.

43. "METRIC" means a quantifiable measurement.

44. "NUDGE" means a message sent to an Uber App Delivery Partner or Driver through the app, by email, or other electronic means to provide information to the Uber App Partner or request compliance with Uber internal policies.

45. "PERSONAL TRANSPORTATION" means transportation of people in passenger vehicles.

46. "PLAINTIFF" means the specific Plaintiff or Plaintiffs propounding these requests or, in the case of a minor, on whose behalf these requests are propounded.

47. "PUBLIC INFORMATION" means information that is available by googling or otherwise searching online, including but not limited to news stories, blogs, personal websites, and social media.

48. "RATE" refers to all of the following: the absolute number, frequency, incidence, as well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly category of Ride is specified, for that category of Ride).

49. "RESEARCH" means observation, focus groups, testing, reliability testing, usability testing, analyses, root cause analyses, hazard assessments, failure mode and effects analyses, surveys, studies, experimentation, pilot programs, and the collection, interpretation, and evaluation of data, including data from use of Uber's Transportation Network in particular regions or countries.

50. "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

51. "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Chauffeur.

52. "RIDECHECK" means any program for using Facial Recognition, LOCATION DATA to identify and/or act on UNPLANNED STOPS, ROUTE DEVIATIONS, UNPLANNED RIDER-DRIVER / DELIVERY PERSON PROXIMITY, and/or ACCOUNT SIGN-IN. RIDECHECK includes the programs Uber calls "RideCheck" and "RideCheck+" as well as any former, subsequent, or alternative versions of those programs, including GPS anomaly detection and any other such programs, whether those programs were merely CONSIDERED or implemented.

53. "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

54. "UBER APP," "UBER APPLICATION," "RIDER APP," or "APP" means Uber's mobile device application that is used by Riders to coordinate, or order Uber Rides.

55. "RIDE LOG" means the INFORMATION UBER maintains about each trip a DRIVER / DELIVERY PERSON provides, which log includes but is not limited to the following information: Driver / Delivery Person Name, Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback, for the whole time period when Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Active.

56. "RISK FACTORS" means factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER / DELIVERY PERSON PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip,

from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

57. "RISK SENSITIVE MATCHING" means Uber's matching of RIDERS and/or particular RIDES with DRIVERS, where the risk of a SAFETY INCIDENT is a factor in determining who is matched with whom and/or whether the match occurs. This includes S- RAD (aka Safety Risk Assessed Dispatch), Geo Fencing, and all other prior, subsequent, and/or alternative versions of S-RAD.

58. "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver / DELIVERY PERSON (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER / DELIVERY PERSON PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

59. "ROUTE DEVIATIONS" means any deviation or detour from a planned route for a RIDE, which is for an abnormal period of time (i.e. a period of time that is not consistent with a reasonable alternative route to the intended destination).

60. "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

61. "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g.

through reducing the incidence or severity of harm to Riders.

62. "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

63. "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

64. "SAFETY LENS" means the software, program, and/or set of DOCUMENTS that UBER calls the "safety lens." It includes the entire family or universe of tabs, views, menus, popups, pulldowns, dropdowns, and buttons, and all the data, INFORMATION, DOCUMENTS and views that are linked together within, and accessible from Safety Lens.

65. "SAFETY TOOLKIT" means the set of features and resources that are part of the Uber App and/or Driver / Delivery App and relate to safety during RIDES. The SAFETY TOOLKIT includes but is not limited to the "Share My Trip," "Emergency Assistance," In-App Reporting, live Help, and text 911 features.

66. "SCREEN" or "SCREENING" refers to interactions, actions, and information gathering in order to decide whether or not to allow an applicant to become a Driver / DELIVERY PERSON.

67. "SCREEN OUT" or "SCREENING OUT" means to determine that a person is DISQUALIFIED for a position or job.

68. "SCREENING MEASURES" refers to ways, means, tools, resources, and/or actions (potential or actual) for SCREENING an applicant. They include but are not limited to gathering resumes, use of application forms, conducting interviews, CHECKING REFERENCES, googling someone or otherwise reviewing PUBLIC INFORMATION, BACKGROUND CHECKS, using psychometrics like CEREBRAL, and using biometrics.

69. "STAR RATING" means the number of stars a RIDER assigns to a DRIVER / DELIVERY PERSON, out of maximum of five, when leaving feedback after a RIDE.

70. "SUBJECT INCIDENT" refers to the Uber Eats Trip that resulted in the collision with Plaintiff Ivan Smith.

71. "TELEMATICS" means LOCATION TRACKING; LOCATION DATA; collecting, monitoring, transmissions, and/or analysis of LOCATION DATA and patterns within LOCATION DATA; including the use of TRIGGERS, and notifications regarding LOCATION DATA and patterns.

72. "TELEMATICS TRIGGER" means a specific event or condition detected by a TELEMATICS system that prompts a notification, response, alert, or action. A TELEMATICS TRIGGER may include speed alerts, harsh braking alerts, geofencing alerts, and/or alerts based on proximity

73. "THIRD PARTIES" are entities or people other than Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) and UBER.

74. "TICKET" means a customer support interaction or series of related customer support interactions, as well as DOCUMENTS used by UBER to track and/or manage those interactions and resulting investigations and/or dispositions. TICKET includes but is not limited to TICKETS sent, received, tracked, or organized via Uber's Zendesk software, JIRA software, Bliss software, or another software program.

75. TICKET-RELATED DOCUMENTS means all INFORMATION and DOCUMENTS attached or linked to the Ticket, including without limitation the Chronicle map snapshot, Chronicle animation, Voyager data, Voyager animation, comments, names of Uber personnel reflected in the tickets, and all Communications connected with the ticket, including the entire set of COMMUNICATIONS, tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, evidence, LOCATION DATA, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET. TICKET-RELATED DOCUMENTS include the entire USER EXPERIENCE that an agent and/or investigator who works for UBER would be able to see and/or access with regard to a specific investigation.

76. "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

77. "UBER PRO" refers to UBER's "Uber Pro" rewards program for DRIVERS or DELIVERY PERSONS.

78. "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period of time, when a Ride is no longer in progress.

79. "UNPLANNED STOPS" refers to LOCATION DATA indicating that DRIVER / DELIVERY PERSON has stopped at a location other than the intended destination, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign).

80. "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a user may interact with.

81. "USER INTERACTIONS" mean all forms of engagement with an application's interface, including clicking buttons, swiping, tapping, scrolling, and any other actions that involve manipulating the app's elements.

82. "VERY FAST BIKE" or "VFB" describes Uber's detection that a Bicycle Delivery Partner is traveling twenty-five (25) miles per hour or at a consistent high speed above twenty-five (25) miles per hour, during an Uber App Delivery.

83. "VOYAGER" means Uber's internal program and/or platform that uses location services

on a mobile phone to pinpoint a User's location.

84. "VOYAGER DATA" means INFORMATION from UBER's Voyager software, including both the raw LOCATION DATA, and the analyses and presentations of that INFORMATION conducted by the Voyager software.

# DOCUMENT REQUESTS

Uber is reminded to please carefully read all instructions above in responding to these Requests for Production.

1. Each Agreement between Uber and the Joshua Aldana (Earner with UUID **71aaf102-23df-4a2f-9f08-79481c752bb3"** (including sufficient information to identify the effective date of each).

2. Each Agreement between Uber and the Plaintiff (including sufficient information to identify the effective date of each).

3. For the period of January 1, 2022 to present, every Bliss Communication, e-mail communication, phone recording, or other writing received by Uber from Joshua Aldana (Earner with UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

4. For the period of January 1, 2022 to present, every Bliss Communication, e-mail communication, phone recording, or other writing received by Uber concerning Joshua Aldana (Earner with UUID **71aaf102-23df-4a2f-9f08-79481c752bb3). For avoidance of doubt, this request includes any message or recording received by Uber concerning Joshua Aldana from any source, including consumers, Uber Eats Orderers, police, law enforcement, or any third party.**

5. For the period of January 1, 2022 to present, every Bliss Communication, e-mail communication, phone recording, or other writing received by Uber concerning Joshua Aldana (Earner with UUID **71aaf102-23df-4a2f-9f08-79481c752bb3). For avoidance of doubt, this request includes any message or recording received by Uber concerning Joshua Aldana from any source, including consumers, Uber Eats Orderers, police, law enforcement, or any third party.**

6. For the period of January 1, 2022 to present, every Bliss Communication, e-mail communication, phone recording, slack message, or other writing between Uber or Uber Customer Service Representatives concerning Joshua Aldana (Earner with UUID **71aaf102-23df-4a2f-9f08-79481c752bb3). For avoidance of doubt, this request includes any message or recording transmitted between Uber employees, Uber Contractors, or Uber Customer Service Representatives**

**concerning Joshua Aldana** (UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

7. For the period of January 1, 2022 to present, produce all requests made to Uber from any source received by the Law Enforcement Response Team (LERT) or through Uber Public Safety Response Portal concerning **Joshua Aldana** (UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

8. For the period of January 1, 2022 to present, produce all responses by Uber's Law Enforcement Response Team (LERT) in connection to any request made through the Uber Public Safety Response Portal concerning **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

9. For the period of January 1, 2022 to present, produce all documents sent to any law enforcement agency or other source by the Law Enforcement Response Team (LEFT) in connection to any request made through the Uber Public Safety Response Portal concerning **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

10. Produce the JIRA that was completed by Uber in connection with the vehicle collision between Plaintiff Ivan Smith and Defendants Joshua Aldana, Carla Reyes Trevino, and Angel Reyes Trevino.

11. Produce all investigative material associated with the JIRA that was completed in connection with the vehicle collision between Plaintiff Ivan Smith and Defendants Joshua Aldana, Carla Reyes Trevino, and Angel Reyes Trevino. Included with this response, produce all of the following JIRA Investigative Materials:
    - Attachments to the JIRA including any voice recordings, photos, notes, or other documents.
    - All Tickets.
    - All emails.
    - The Trip Link and associated Voyager Map.
    - The Driver / Delivery Person Side outbound messages and response.
    - Any witness outbound messages or responses.
    - Recap of Driver / Delivery Person Conversation
    - Recap of consumer or Eats Requester conversation.
    - Result

- Recap of Final Resolution
- All other documents associated to the JIRA that forms the bases of this claim in Uber's possession, custody and control.

12. For the period of January 1, 2022 to present, produce every Offer Card for every trip that Uber offered Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) to make Uber Eats Deliveries.

13. For the period of January 1, 2022 to present, produce a table indicating every trip accepted by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) to make Uber Eats Deliveries. Included with this table, produce the location of Joshua Aldana at the time of the accepted trip, the location of the Uber Eats Pickup, the destination of the Uber Eats Delivery, the estimated time for delivery, the estimated miles for delivery, the estimated payment for the delivery to Uber, the estimated payment for delivery to the restaurant, and the estimated payment for delivery to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) to make Uber Eats Deliveries.

14. For the period of January 1, 2022 to present, produce any and all JIRAs associated with **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

15. Produce all documents concerning the Deactivation of **Joshua Aldana's (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)** Uber account**.**

16. Produce screen grabs of the Safety Lens page and all tabs to the Safety Lens page associated **Joshua Aldana's Uber Eats Account (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

17. Produce all reports from any Uber Eats consumer about **Joshua Aldana's (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)** Uber Eats account**.**

18. For the period of January 1, 2022 to present, produce all documents that evidence any notations and/or strikes that were issued by Uber to **Joshua Aldana's (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3).**

19. Produce the automated Voyager Map that tracks movements on the map related

to the Uber Eats Delivery that **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)** was on at the time of the collision that forms the bases Plaintiff Smith's claim. Included with this response, the automated map should provide:

- Movements of Joshua Aldana's device
- Location Pings that include trip acceptance, trip status updates, and the like.
- Mobile events
- Telematics, such as speed, direction, breaking.

20. Produce the automated Chronicle Trip map that tracks movements on the map related to the Uber Eats Delivery that **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)** was on at the time of the collision that forms the bases Plaintiff Smith's claim. Included with this response, the automated map should provide:

- Movements of Joshua Aldana's device
- Location Pings
- Mobile events
- Telematics, such as speed, direction, breaking.

21. Concerning the collision that forms the bases of this claim, produce all communications made to **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)** by Uber after the point of accepting the Uber Eats Delivery and two hours after the collision. Included with this response send any NUDGES and any message sent to Joshua Aldana due to Uber's Telematics system being triggered.

22. Any and all Materials reflecting Uber's Screening of **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)**. (This includes but is not limited to Documents reflecting the Screening-related User Experience for **Joshua Aldana (**UUID **71aaf102-23df-4a2f-9f08-79481c752bb3)**, including Uber's instructions to, offers to, statements to, requests of, and/or questions to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3).)

23. Any and all Materials reflecting Information Uber and/or its Contractors received from Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) in connection with Screening Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-

79481c752bb3) (including but not limited to address history, social security number, name, date of birth, image of driver's license, driver's license information, insurance information, vehicle information).

24. Any and all Materials reflecting the Background Check Process(es) for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), including for All Accounts (including but not limited to Uber's policies, protocols, and/or instructions to its Background Check Contractor(s), interactions between Uber and its Background Check Contractor(s), Information the Background Check Contractor(s) made available to Uber, including the Background Check itself, any Background Check Findings, and conversations and decisions about the Background Check Findings).

25. Any and all Communications, including with Third Parties or Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), related to Screening Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) (including but not limited to Communications with the Background Check Contractor(s) about the Background Check).

26. Any and all Documents reflecting any Screening Uber performed on Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) other than a Background Check (including but not limited to any Documents indicating that Uber or its Contractor(s) had Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) fill out an application, interviewed the Driver / DELIVERY PERSON, checked Joshua's Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) references, searched Public Information about the Driver / DELIVERY PERSON, and/or conducted Psychological Screening).

27. Every set of Background Check Adjudication Criteria that applied, at any time, to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), including the Adjudication Criteria that applied in each City and State where the Driver / DELIVERY PERSON was authorized to offer Rides, and for each time period when the Driver / DELIVERY PERSON was authorized to offer Rides or Deliveries.

28. The complete up-to-date Account History for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), including for All Accounts.

29. For any status change in Joshua Aldana's (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) Account History, all Documents and Communications that explain or relate to that status change.

30. The complete up-to-date Ride Log for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), for the whole time period when Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Active.

31. All Documents reflecting Joshua Aldana's (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) Uber Pro status (including each change to the Uber Pro status, Communications to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) about his status, and the timing of each change in status, for the time period during which Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Active).

32. All Documents reflecting Metrics Uber kept track of related to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), including but not limited to Joshua Aldana's (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) Cancellation Rate, and Displayed Star Rating, including the timing of changes to those Metrics.

33. All Materials reflecting any thresholds or minimums for any Metrics, such as minimum Displayed Star Rating, Cancellation Rate, that at the time of the SUBJECT INCIDENT Uber required Drivers / Delivery Persons to maintain in the City where the Subject Ride / Delivery occurred.

34. All Materials related to any Deactivation of Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), including but not limited to all Communications concerning Joshua Aldana's (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) participation in quality improvement aimed to improve Joshua Aldana's (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) chances of reactivation.

35. Materials reflecting training Uber required Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) take at any time.

36. All Voyager Data for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) that resulted in a Telematics Trigger on any Ride at any time prior to and/or on the date of the Incident (including any Documents reflecting a

Telematics Trigger, alerts, and/or notification).

37. All Location Data, including Voyager Data, reflecting Unplanned Stops and/or Route Deviations for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) at any time prior to and/or on the date of the Incident, whether or not there was a resulting Telematics Trigger.

38. All Chronicle Trip Data, including the Chronicle Trip animated map that shows on a moving map each Period the Driver / DELIVERY PERSON is in concerning the Subject trip, including Period 1, Period 2, and Period 3. Additionally, the speed, direction, and movement of the vehicle during the Subject Trip. Finally, the point of time in which the Offer of the trip was made, the acceptance of the trip was made, if any.

39. Produce all communications sent to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) sixty (60) minutes prior to the SUBJECT INCIDENT.

40. Produce all communications sent to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) 1 year after the SUBJECT INCIDENT.

41. All Materials reflecting Communications, at any time prior to or on the date of the Incident, between Uber and Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) related to any Telematics Triggers.

42. For any trip where Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was given a Star Rating of 1 or 2 stars, any Documents related to why Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) received that rating (including but not limited to any attempts by Uber to find out why Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) received that rating, and/or anything Uber learned about why Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) received that rating).

43. For any trip where Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was given a Star Rating of 0 stars, any Documents related to why Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) received that rating (including but not limited to any attempts by Uber to find out why

Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) received that rating, and/or anything Uber learned about why Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) received that rating).

44. For All Accounts for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), All Safety Lens Documents (including the Safety Lens landing page and all associated Information, data, documents, and views linked together within Safety Lens).

45. All Tickets for All Accounts for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3).

46. For All Accounts for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3), all Ticket-Related Documents or Materials (including but not limited to Location Data and Voyager Data) for any Tickets that involved allegations of any breaches of Uber's Global Safety Taxonomy Categories. For avoidance of doubt, produce all documents concerning any allegations of any violation of Uber's Global Safety Taxonomy for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) regardless of the Line of Business (Rides, Eats, or any other Line of Business) in which Joshua Aldana has accepted Trip / Eats requests through any Uber application.

47. For any Uber Eats consumer who gave the Driver / DELIVERY PERSON a 1-star, 2- star, or 3-star and/or reported any breaches against the Driver / DELIVERY PERSON of Uber's Eats Global Safety Taxonomy Categories and/or any Interpersonal Conflict against the Driver / DELIVERY PERSON before the SUBJECT INCIDENT, produce every incident report or ticket, every JIRA form, and all internal communications and investigative material concerning these incidents.

48. For any Uber Eats consumer who gave the Driver / DELIVERY PERSON a 1-star, 2- star, or 3-star and/or reported any breaches against the Driver / DELIVERY PERSON of Uber's Eats Global Safety Taxonomy Categories and/or any Interpersonal Conflict against the Driver / DELIVERY PERSON after the SUBJECT INCIDENT, produce every incident report or ticket, every JIRA form, and all internal communications and investigative material concerning these incidents.

49. Produce the Communication Log or Comm Log for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) for the period of 2 years prior to the Subject Incident and six (6) months after the Subject Incident.

50. All Information Uber has concerning cellular phones used by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) (including but not limited to cell phone number(s), make and model of cell phone(s), and IP addresses used by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3).

51. For the period of January 1, 2022 to present, produce all Tax Summaries issued by Uber to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3).

52. For the period of January 1, 2022 to present, produce all instances in which Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Waitlisted.

53. For the period of January 1, 2022 to present, produce all messages, reports, investigations, or other documents received that resulted in Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) to be Waitlisted.

54. For the period of January 1, 2022 to present, produce documents identify when Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Waitlisted and when Joshua Aldana's account was placed from Waitlisted Status back to Active.

55. For the period of January 1, 2022 to present, produce all instances in which Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Deactivated.

56. For the period of January 1, 2022 to present, produce all messages, reports, investigations, or other documents received that resulted in Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) to be Deactivated.

57. For the period of January 1, 2022 to present, produce documents identify when Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) was Deactivated and when Joshua Aldana's account was changed from Deactivated Status back to Active, the extent they exist.

58. For the period of January 1, 2022 to present, produce any appeal submitted by

Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) concerning Joshua Aldana's account being moved from active to Waitlisted. Included with this response, produce all reports, investigations, communications, or the like received about Joshua Aldan, from Joshua Aldana, or sent by Uber or any representative of Uber to Joshua Aldana concerning the account status being Waitlisted.

59. For the period of January 1, 2022 to present, produce any appeal submitted by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) concerning Joshua Aldana's account being moved from active to Deactivated. Included with this response, produce all reports, investigations, communications, or the like received about Joshua Aldan, from Joshua Aldana, or sent by Uber or any representative of Uber to Joshua Aldana concerning the account status being Deactivated.

60. For the period of January 1, 2022 to present, produce any notifications concerning Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) made through the Industry Sharing Safety Program. Included with this response, provide all documents and information sent to HireRight through the Industry Sharing Safety Program, any response received form HireRight, and the outcome that resulted from Uber sharing information about Joshua Aldana through the Industry Sharing Safety Program.

**Incident Location Data**

61. All Location Data and Voyager Data reflecting Joshua Aldana's (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) movements from the time Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) accepted the Subject trip until two hours after the Subject Ride.

62. All Information from Uber's Fractal program concerning the Subject Ride.

63. The Chronicle Trip map animation that shows the movement of Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) on the map from the time the Subject delivery was offered to the Driver / DELIVERY PERSON through one hour after the collision.

**Other Data Maintained by Uber about this Litigation**

64. All photographs, surveillance, video recordings, and/or audio recordings that captured any part of the Subject Incident or Subject delivery.

65. Documents reflecting the time, date, and contents of all User Interactions by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) related to the Subject Incident. (This includes but is not limited to delivery acceptance, trip started, trip ended, any in-app messaging, responses to Telematic Triggers, and any other inputs).

66. All Documents provided to Law Enforcement that relate to the Subject Incident in Uber's possession.

67. All e-mails, Exact Target Messages, Zendesk messages, Bliss Messages, text messages and/or any type of electronic message sent to the Driver from January 1, 2022 to Present.

68. All Materials reflecting Uber's Investigation of the Subject Incident, including the complete, up-to-date Ticket and Ticket-Related Documents.

69. All exhibits, documents, or data intended by Uber to be used at Trial in this matter.

**Very Fast Bike**

70. Produce documents that indicate Uber's system flagged Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) as making VERY FAST BIKE deliveries.

71. Produce the report relating to each of the Uber Eats Deliveries made by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) that show the following:
   • Dominant Ticket ID
   • Eater Request Timestamp Local
   • Driver UUID
   • Driver Flow
   • Country Name
   • Mega Region
   • First Completed Trip Timestamp
   • Label Trips Car

- Label Trips motorcycle
- Label Trips Scooter
- Label Trips Electric Bike
- Label Trips Pedal Bike
- Label Trips
- VFB (Very Fast Bike) Ratio
- Manuel Review
- Link Mutombo
- Jira Link

72. Produce every NUDGE Uber sent to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3). Included with this production, produce the contents of the Nudge, the time the Nudge was sent, the method the Nudge was sent, and whether the Nudge resulted in an impression in Uber's system that it was seen by Joshua Aldana.

73. Produce every NUDGE Uber sent to Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) concerning "Very Fast Bike" or "VFB". Included with this production, produce the contents of the Nudge, the time the Nudge was sent, the method the Nudge was sent, and whether the Nudge resulted in an impression in Uber's system that it was seen by Joshua Aldana.

**HEURISTICS**

74. For the period of January 1, 2022 to present, produce all Heuristic information and audio records captured by Uber concerning Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3). Included with this production, produce the audio captured by Uber, the Mobile Event Details captured by Uber such as Event Name, Value Map, Heuristic Checks, Safety Audio Recording State, Active Recorder Type, Safety Audio Recorder Audio Encryption, Safety Media Chunk Post Status, Safety Media Chunk Saved, and all Event Names tagged to the Safety Audio.

75. For the period of January 1, 2022 to January 1, 2024, Produce any Knowledge Base Article, google document, or email containing the terms "Heuristic(s)", "SuperFlurry", or "In_App_Recording".

**FACIAL RECOGNITION OF DELIVERY PARTNER**

76. For the period of January 1, 2022 to present, produce documents that indicate Uber's Facial Recognition Software (MUTUMBO) identified Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) as the Delivery Partner who was in fact the user of the Uber Eats Driver App that accepted the offered delivery.

77. Produce all profile pictures submitted by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) in Uber's Realtime ID Check program. Included with the production, identify the date and time the photograph was submitted by Joshua Aldana.

78. Produce all selfies submitted by Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) in connection with Uber's Realtime ID Check feature. Included with production, identify the date and time that the selfie was submitted by Joshua Aldana.

79. Concerning Uber's Realtime ID Check, produce data for Joshua Aldana (UUID 71aaf102-23df-4a2f-9f08-79481c752bb3) concerning the following metrics tracked by Uber in its Realtime ID Check program:

   • Account Sharing Rate
   • Trip Count
   • Supply Hours
   • Verification Success Rate
   • Submission Times
   • Suspicious Drivers or Delivery People
   • Deactivations

**KNOWLEDGE BASE OR uKNOWLEDGE ARTICLES / POLICIES**

80. Produce each of the Knowledge Base or uKnowledge Articles / Policies identified in **Exhibit A** to these requests applicable at the time of the Subject Incident.

81. Produce the prior two (2) to versions of each of the Knowledge Base or uKnowledge Articles / Policies identified in **<u>Exhibit A</u>** that were in effect prior to the Subject Incident.

82. Produce the subsequent (2) to versions of each of the Knowledge Base or uKnowledge Articles / Policies identified in **<u>Exhibit A</u>** that were in effect after the Subject Incident.

EXHIBIT A - PLAINTIFF'S FIFTH REQUEST FOR PRODUCTION



EXHIBIT A - PLAINTIFF'S FIFTH REQUEST FOR PRODUCTION



EXHIBIT A - PLAINTIFF'S FIFTH REQUEST FOR PRODUCTION



EXHIBIT A - PLAINTIFF'S FIFTH REQUEST FOR PRODUCTION

