# EXHIBIT 9

John Eddie Williams, Jr. (pro hac vice)
Brian Abramson (pro hac vice)
Margret Lecocke (pro hac vice)
Walt Cubberly (SBN 325163)
Batami Baskin (pro hac vice)
Myles Shaw (pro hac vice)
Joseph C. Melugin (SBN 279439)
**WILLIAMS HART & BOUNDAS, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: jwilliams@whlaw.com
Email: babramson@whlaw.com
Email: mlecocke@whlaw.com
Email: wcubberly@whlaw.com
Email: bbaskin@whlaw.com
Email: mshaw@whlaw.com
Email: jmelugin@whlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC.,** **PASSENGER SEXUAL ASSAULT** **LITIGATION** | No. 3:23-md-03084-CRB<br><br>Judge: Honorable Charles R. Breyer |
| This Document Relates to:<br><br>WHB 832 v. Uber Technologies, Inc., et al., 3:24-cv-04900 | **PLAINTIFF WHB 832's FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC** |

**PROPOUNDING PARTY:**     **WHB 832**

**RESPONDING PARTIES:**     **Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC**

**SET:**     **1 (One)**

**DATE OF SERVICE:**     **March 26, 2025**

1

Pursuant to Federal Rules of Civil Procedure Rules 26 and 24, Plaintiff WHB 832, through her counsel, propounds this First Set of Requests for Production of Documents to Defendants UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC (collectively hereinafter "Uber"). Responses to these Requests for Production of Documents shall be served within 30 days from service of this document.

## INSTRUCTIONS

The following instructions and definitions apply to each of the Requests set forth below and are deemed to be incorporated therein:

1.     With respect to each Request for Production, You are required to provide all Documents in Your possession, custody, or control that are known or that You can locate or discover through reasonably diligent efforts.

2.     Documents should be produced as they are maintained in the normal course of business.

3.     If responsive material exists in a software program or application that does not allow all responsive material to be exported, or which exports some or all of the responsive material in a different format than the format in which it is used and/or viewed, then Uber shall (in addition to using whatever export options are available) take screenshots of all responsive material. Uber must click on hyperlinks, scroll, click on new tabs, open popups, expand menus, and/or otherwise navigate to additional screens, pages, tabs, and views, as necessary, until all responsive material has been captured.

4.     If Documents are Electronically Stored Information (ESI), and/or maintained in electronic form, they should be produced in electronic form and in accordance with the ESI Order governing the format of production of documents in this matter.

5.     Hard copies of Documents shall be produced as they are kept in the usual course of business. All hard copies of Documents shall be produced with a copy of the file folder,

envelope, or other container in which the Documents are kept or maintained. All hard copy Documents shall be produced intact in their original files, without disturbing the organization of Documents employed during the conduct of the ordinary course of business and during the subsequent maintenance of the Documents. See Fed. R. Civ. P. 34(b)(2)(E). To the extent a hard copy responsive Document has been electronically scanned (for any purpose), that Document must be produced in a readable and accessible electronic format in accordance with the ESI Order governing the format of production of documents in this matter, with the opportunity provided to review the original Document(s).

6.      You are not required to organize and label responsive Documents to correspond to the categories in any request, but each Response shall Identify the Documents responsive to that Request by Bates label/number

7.      When producing Documents:

    a.   indicate the Request, including paragraph and subparagraph, to which a produced Document or thing is responsive;

    b.   furnish Documents or things within Your control, regardless of whether such Documents or things are possessed directly by You or Your representatives; and

    c.   if any requested Documents or things cannot be produced in full, produce to the extent possible, specifying each reason for Your inability to produce the remainder and stating whatever information, knowledge or belief You do have concerning the portion not produced.

8.      Each document request shall be construed to include Documents within the knowledge, possession, or control of the Defendant, its attorneys, investigators, agents, owners, officers, employees, or other representatives of the party and/or its attorneys, as of the date of the answers given to those document requests and any supplemental information, knowledge, data,

Documents, or Communication responsive to these document requests which is subsequently obtained or discovered.

9.     If, to Your knowledge, a responsive Document was never in Your possession, custody, or control but has been in the possession, custody, or control of any other Person or entity, You shall Identify such Person or entity.

10.     If any responsive Document was formerly in Your possession, custody, or control but is no longer available, whether because it was lost, destroyed, transmitted, or discarded, or is unavailable for any other reason, You shall submit a written statement as follows:

   a.   Describe in detail the nature of the Document and its contents;

   b.   Identify the Person or Persons who authored, prepared, or edited the Document any Person or Persons to whom the Document was sent or shared;

   c.   List all dates when the Document was created or modified;

   d.   List all dates when the Document was lost, destroyed, or made unavailable;

   e.   State any reason(s) the Document was lost, destroyed, or made unavailable;

   f.   List all Persons known or reasonably believed by YOU to have or formerly have had possession of the Document or have had knowledge of its contents;

   g.   State the name and address of each person who destroyed or made the document unavailable; and

   h.   State the name and address of each person who directed or approved of destroying the document or making it unavailable.

11.     If You make any assumption of fact or law in responding to any request, state each assumption and the basis for each assumption.

12.     If the response to any document request consists, in whole or in part, of any objection(s), state with specificity the full objection(s) and the particularized basis for each objection. You must also state whether any responsive materials are being withheld on the basis of any objection(s), and if so identify which objection(s) are the basis for withholding responsive materials. To the extent that You object to any portion of a document request, You must respond to the remaining portion of the request to which You do not object.

13.     If You object to a request for production on the basis of any claim of privilege, then You must produce any and all information required by the Privilege Order for this matter.

14.     If any Documents or information cannot be produced in full, You are required to specify, to the extent possible, the reasons for Your inability to produce the remainder, and the approximate date when You expect to produce such Documents, if at all.

15.     Whenever a Document is not produced in full, or is produced in redacted form, then said Document must be produced in accordance with the Privilege Order for this matter.

16.     If no Documents responsive to a particular Request exist, you must state that no responsive Documents exist.

17.     You are required to timely supplement Your responses when appropriate or necessary under the Federal Rules of Civil Procedure to make them correct or complete. If, after producing Documents or information responsive to these Requests, additional responsive information or Documents become available to You, You are required to produce such additional Documents or information.

18.     Each request is considered continuing, if You obtain information that renders any response incomplete or inaccurate, You are obligated to serve amended answers and/or Documents on the undersigned.

19.     For purposes of interpreting or construing the scope of these requests, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual request. This includes, without limitation, the following:

a.   The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

b.   The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

c.   Construing the singular form of the word to include the plural and the plural form to include the singular;

d.   Construing the masculine to include the feminine, and vice-versa;

e.   The use of any tense of any verb shall also include all other tenses of that verb;

f.   A term or word defined herein is meant to include both the lower and uppercase reference to such term or word.

g.   Any Bates number referenced in these Requests shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members.

h.   Construing the term "including" to mean including but not limited to.

20.     Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

21.     In construing these requests, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning. If You are unsure

about the definition of a particular term or word, use the definition that You believe to be the most accurate and state that definition in Your response. If, in responding to any of these requests, You encounter any other ambiguity in construing either the request or an instruction, then set forth the matter You deem ambiguous and the construction You use in answering the request.

22.     Unless otherwise indicated, the relevant time period for the information sought is from January 1, 2009 through the present time.

## DEFINITIONS

In this Request for Production of Documents the following words and terms shall bear the meanings as identified below. For any undefined term, the standard dictionary definition of the term applies

1.     "ACCOUNT HISTORY" means the INFORMATION that UBER maintains about a DRIVER's account status, including but not limited to the Driver's name, status, status note, whether the status is current, the date and time the status began, the date and time the status ended, and the flow type.

2.     "ACTIVE" with respect to the DRIVER APP or UBER APP means that a person has an active account on that App and is authorized to use the App to either offer or request RIDES.

3.     "ACTIVE DRIVER" means someone with an active DRIVER APP account who is authorized to use the DRIVER APP to offer RIDES.

4.     "ACTIVE RIDER" means someone with an active UBER APP account who is authorized to use the UBER APP to request RIDES.

5.     "ADJUDICATION CRITERIA" are criteria for deciding, based on a Background Check, whether or not a person is eligible to be or continue to be a Driver.

6.     "ADVERTISING" and "ADVERTISEMENT" refer to COMMUNICATIONS via any COMMUNICATIONS CHANNELS aimed at promoting a product, service, or idea to a target audience.

7.     "AGREEMENT" means any Document that states the commitments, expectations, agreements, contracts, terms, and/or conditions between two or more entities and/or people. It includes but is not limited to Terms of Use and Community Guidelines.

8.     "ALL ACCOUNTS" means all Uber accounts and what Uber calls "flow types" associated with or linked to, a given Rider or Driver at any time, including but not limited to Uber Black accounts, Eat accounts, Freight accounts, Rider accounts, Driver accounts, or any other flow types or accounts possessed by, linked to, or affiliated with the Driver

9.     "BACKGROUND CHECK" means any search, survey, review, evaluation, downloading, and/or summarizing, of databases and/or court records, police records, law enforcement records, arrest records, department of motor vehicle records, and/or other official records, performed at any time and for any reason, to learn about a person's background and/or determine whether that person meets the minimum criteria to be a DRIVER.

10.     "BACKGROUND CHECK CONTRACTOR" means any business entity that Uber paid to conduct BACKGROUND CHECKS.

11.     "BACKGROUND CHECK FINDINGS" means information related to potential infractions, violations, and/or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

12.     "BACKGROUND CHECK PROCESS" means all the steps taken related to conducting a BACKGROUND CHECK, including information gathered from the DRIVER, information provided to the BACKGROUND CHECK CONTRACTOR, instructions to the BACKGROUND CHECK CONTRACTOR; information provided to UBER by the BACKGROUND CHECK CONTRACTOR, the geographic and temporal scope of the BACKGROUND CHECKS, the databases queried as part of the BACKGROUND CHECKS, the

ADJUDICATION CRITERIA used as part of the BACKGROUND CHECKS, and the SCREENING decisions made and the process by which they were made).

13.    "BIOMETRICS" means biological data, including but not limited to fingerprints and face recognition.

14.    "PSYCHOLOGICAL SCREENING" means use of psychological and/or personality testing and/or questionnaires in its SCREENING of APPLICANTS. It includes but is not limited to the programs called "Cerebral," "Cerebro," and "Usights," and any former, subsequent, or alternative versions of those programs.

15.    "CANCELLATION RATE" means the percentage of ride requests that a DRIVER cancels compared to the total number of RIDE requests the DRIVER receives.

16.    "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

17.    "CHECKING REFERENCES" means contacting prior employers and/or other acquaintances of an APPLICANT to gather information from them about an APPLICANT.

18.    "CONSIDERED" means discussed, analyzed, presented on, RESEARCHED, did cost projections, solicited quotes and/or bids, ran a pilot program.

19.    "CONTRACTOR(S)" refers to any entities UBER paid to perform services or provide products.

20.    "CRIMINAL HISTORY" means any history of infractions, violations, misdemeanors, felonies, or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

21.    "DATE OF UBER'S SAFETY TAXONOMY IMPLEMENTATION" as used herein shall refer to the date by which UBER had fully implemented its Sexual Misconduct and Violence Taxonomy (which implementation is described in Uber's 2018 Safety Report as occurring sometime in late 2018).

22.     "DEACTIVATE" or "DEACTIVATION" includes any action that prevents someone from using either the DRIVER APP or UBER APP to offer RIDES or request RIDES and includes waitlisting, applying a safety lock, blocking, and deactivating, whether permanent or temporary.

23.     "DISPLAYED STAR RATING" means the numerical rating, out of a maximum rating of 5, that UBER displayed as a RIDER or DRIVER's rating, usually next to an icon of a star.

24.     "DISQUALIFY" "DISQUALIFIED" or "DISQUALIFYING" mean determining that a person does not meet the minimum criteria to be or continue to be a DRIVER.

25.     "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form.  The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the

original.  The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

26.    "DRINKING-RELATED COMMUNICATIONS" are COMMUNICATIONS regarding alcohol, alcoholic beverages, the holidays, parties, celebrations, "Celebrate responsibly," "Celebrate safely," the "Safe Rides Pledge," "Stand Up, Don't Stand By," becoming a "Designated Rider," joint advertising by UBER and Mothers Against Drunk Driving (MADD), joint advertising by UBER and any alcohol-related brand, and any other COMMUNICATIONS that relate to the concept of getting home safely after drinking, whether that concept is conveyed through words, hashtags, or images.

27.    "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

28.    "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

29.    "FAILURE MODE" means a way in which something may fail to function as designed or intended.

30.    "HIGH RISK DRIVER" means someone who, if they are allowed to become a Driver, poses an elevated risk of committing SEXUAL ASSAULT, SEXUAL MISCONDUCT, or causing an INTERPERSONAL CONFLICT connected with a RIDE.

31.    "INCIDENT" means the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT that Plaintiff alleges she experienced in connection with a RIDE, and includes the immediate circumstances of that SEXUAL ASSAULT and/or SEXUAL MISCONDUCT.

32.    "INDUSTRY INFORMATION SHARING" means any program, plan, policy, agreement, contract, or practice of sharing information, and/or asking that information be shared, by and between Uber, Lyft, and other TRANSPORTATION NETWORK COMPANIES.

33.    "INFORMATION" means data, information, DOCUMENTS, and facts, that exist and/or are transmitted in any form whatsoever including text, images, audio, video, electronic, or otherwise.

34.    "INTERPERSONAL CONFLICT" means any event or incident that UBER classifies or classified as an "IPC" or "interpersonal conflict," including but not limited to SEXUAL ASSAULT, SEXUAL MISCONDUCT, arguments, altercations, rude behavior or words, and/or discriminatory behavior or words.

35.    "INVESTIGATION" means all actions UBER and/or its CONTRACTORS take in response to events or conduct reported to UBER involving one or more RIDER and/or DRIVER. Investigation includes but is not limited to COMMUNICATIONS, interviews, internal discussions, classifications, DEACTIVATION, reactivation, and review of INFORMATION.

36.    "INVESTIGATION DOCUMENTS" refer to all DOCUMENTS and INFORMATION related to UBER's INVESTIGATION of conduct, misconduct, an accident, incident, SEXUAL MISCONDUCT, SEXUAL ASSAULT, collision, or something else reported against a RIDER or a DRIVER. INVESTIGATION DOCUMENTS include TICKETS (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS), and the entire set of tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS).

37.    "LAW ENFORCEMENT" means police departments, sheriff's departments, other law enforcement agencies, officers, detectives, sheriffs, FBI agents, federal, state, or other law enforcement officials, and/or District Attorneys or other prosecutors, and their staff.

38.    "LOCATION DATA" means coordinates, GPS data, satellite data, and/or latitude-longitude data.

39.     "LOCATION TRACKING" means monitoring the location and movement of cellular devices, other devices, people, and/or vehicles.

40.     "LOW CREDIBILITY" refers to a determination that a particular RIDER or DRIVER lacks or may lack credibility. This includes but is not limited to a determination that a RIDER and/or DRIVER gives an unusual number of low ratings, engages in "over escalation," copies and pastes the same complaints repeatedly, or is otherwise flagged as showing abnormal patterns of reporting.

41.     "MARKETING" refers to the efforts to promote and/or sell something, including RESEARCH regarding customer/client/Rider preferences, behavior, and trends; relationship-building with potential or actual customers/clients/Riders; product development and design aimed at fulfilling customer/client/Rider preferences; and/or COMMUNICATIONS with a target audience through various COMMUNICATIONS CHANNELS to promote and/or sell something.

42.     "MATERIALS" mean any DOCUMENT, DATA, physical object, audio recording, video recording, or other item or material of any nature whatsoever.

43.     "METRIC" means a quantifiable measure.

44.     "MISCONDUCT" means, for TICKETS that post-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, conduct that relates to any of the following categories from Uber's Safety Taxonomy: (1) Sexual Assault, (2) Vehicle Crash or Claim, (3) Theft or Robbery, (4) Sexual Misconduct, (5) Physical Altercation, (6) Verbal Altercation, (7) Substance Abuse, (8) Inappropriate Post-Trip Contact, (9) Law Enforcement / Regulatory, (10) Potential Safety Concern. "MISCONDUCT" means, for TICKETS that pre-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, TICKETS initiated by a RIDER or by a third party on the RIDER's behalf, that relate to any form of misconduct or inappropriate behavior involving the Driver, including driving under the influence and complaints of interpersonal conflict (e.g., verbal altercations, theft, sexual misconduct, sexual assault, etc.), as well as speeding and other forms of unsafe driving.

45. "OFFER CARD" means the complete INFORMATION presented to a RIDER about a DRIVER who is matched with the RIDER, including the complete USER EXPERIENCE that a RIDER viewing that INFORMATION would see. The OFFER CARD includes but is not limited to the DRIVER's name displayed, photograph displayed, the DRIVER's tier within the Uber Pro rewards program such as Uber Pro Diamond, the DISPLAYED STAR RATING, badges, compliments, biographical information, the DRIVER's number of trips, number of months or years spent as a DRIVER, and any other INFORMATION displayed (or which might be displayed if the RIDER clicks on a link).

46. "PERSONAL TRANSPORTATION" means transportation of people in passenger vehicles.

47. "PLAINTIFF" means the specific Plaintiff propounding these requests or, in the case of a minor, on whose behalf these requests are propounded.

48. "PUBLIC INFORMATION" means information that is available by googling or otherwise searching online, including but not limited to news stories, blogs, personal websites, and social media.

49. "RATE" refers to all of the following: the absolute number, frequency, incidence, as well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly category of Ride is specified, for that category of Ride).

50. "RESEARCH" means observation, focus groups, testing, reliability testing, usability testing, analyses, root cause analyses, hazard assessments, failure mode and effects analyses, surveys, studies, experimentation, pilot programs, and the collection, interpretation, and evaluation of data, including data from use of Uber's Transportation Network in particular regions or countries.

51. "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

52. "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

53. "RIDECHECK" means any program for using LOCATION DATA to identify and/or act on UNPLANNED STOPS, ROUTE DEVIATIONS, and/or UNPLANNED RIDER-DRIVER PROXIMITY. RIDECHECK includes the programs Uber calls "RideCheck" and "RideCheck+" as well as any former, subsequent, or alternative versions of those programs, including GPS anomaly detection and any other such programs, whether those programs were merely CONSIDERED or implemented.

54. "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

55. "UBER APP," "UBER APPLICATION," "RIDER APP," or "APP" means Uber's mobile device application that is used by Riders to coordinate, or order Uber Rides.

56. "RIDE LOG" means the INFORMATION UBER maintains about each RIDE a DRIVER provides, which log includes but is not limited to the following information: Driver Name, Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback, for the whole time period when the Subject Driver was Active.

57. "RISK FACTORS" means factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

58.     "RISK SENSITIVE MATCHING" means Uber's matching of RIDERS and/or particular RIDES with DRIVERS, where the risk of a SAFETY INCIDENT is a factor in determining who is matched with whom and/or whether the match occurs. This includes S-RAD (aka Safety Risk Assessed Dispatch), Geo Fencing, and all other prior, subsequent, and/or alternative versions of S-RAD.

59.     "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

60.     "ROUTE DEVIATIONS" means any deviation or detour from a planned route for a RIDE, which is for an abnormal period of time (i.e. a period of time that is not consistent with a reasonable alternative route to the intended destination).

61.     "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

62.     "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

63.     "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

64.     "SAFETY INTERVENTION" means anything Uber did in an attempt to prevent or reduce the risk, duration, and/or severity of SEXUAL ASSAULT OR SEXUAL MISCONDUCT in connection with a specific RIDE, including but not limited to sending push notifications, otherwise communicating with the DRIVER and/or RIDER, contacting Law Enforcement, and/or contacting a security company or other third party.

65.     "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

66.     "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

67.     "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

68.     "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

69.     "SAFETY LENS" means the software, program, and/or set of DOCUMENTS that UBER calls the "safety lens." It includes the entire family or universe of tabs, views, menus, popups, pulldowns, dropdowns, and buttons, and all the data, INFORMATION, DOCUMENTS and views that are linked together within, and accessible from Safety Lens.

70.     "SAFETY TOOLKIT" means the set of features and resources that are part of the Uber App and/or Driver App and relate to safety during RIDES. The SAFETY TOOLKIT includes but is not limited to the "Share My Trip," "Emergency Assistance," In-App Reporting, live Help, and text 911 features.

71.     "SCREEN" or "SCREENING" refers to interactions, actions, and information gathering in order to decide whether or not to allow an applicant to become a Driver.

72.     "SCREEN OUT" or "SCREENING OUT" means to determine that a person is DISQUALIFIED for a position or job.

73.     "SCREENING MEASURES" refers to ways, means, tools, resources, and/or actions (potential or actual) for SCREENING an applicant. They include but are not limited to gathering resumes, use of application forms, conducting interviews, CHECKING REFERENCES, googling someone or otherwise reviewing PUBLIC INFORMATION, BACKGROUND CHECKS, using psychometrics like CEREBRAL, using CJIS, and using biometrics.

74.     "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

75.     "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

76.     "STAR RATING" means the number of stars a RIDER assigns to a DRIVER, out of maximum of five, when leaving feedback after a RIDE.

77.     "SUBJECT DRIVER" means the DRIVER who is alleged to have committed the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT in this matter.

78.     "SUBJECT RIDE" means the RIDE that PLAINTIFF alleges was connected with the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT she experienced.

79.     "TELEMATICS" means LOCATION TRACKING; LOCATION DATA; collecting, monitoring, transmissions, and/or analysis of LOCATION DATA and patterns within LOCATION DATA; including the use of TRIGGERS, and notifications regarding LOCATION DATA and patterns.

80.    "TELEMATICS TRIGGER" means a specific event or condition detected by a TELEMATICS system that prompts a notification, response, alert, or action. A TELEMATICS TRIGGER may include speed alerts, harsh braking alerts, geofencing alerts, and/or alerts based on proximity

81.    "THIRD PARTIES" are entities or people other than the SUBJECT DRIVER and UBER.

82.    "TICKET" means a customer support interaction or series of related customer support interactions, as well as DOCUMENTS used by UBER to track and/or manage those interactions and resulting investigations and/or dispositions. TICKET includes but is not limited to TICKETS sent, received, tracked, or organized via Uber's Zendesk software, JIRA software, Bliss software, or another software program.

83.    TICKET-RELATED DOCUMENTS means all INFORMATION and DOCUMENTS attached or linked to the Ticket, including without limitation the Chronicle map snapshot, Chronicle animation, Voyager data, Voyager animation, comments, names of Uber personnel reflected in the tickets, and all Communications connected with the ticket, including the entire set of COMMUNICATIONS, tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, evidence, LOCATION DATA, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET. TICKET-RELATED DOCUMENTS include the entire USER EXPERIENCE that an agent and/or investigator who works for UBER would be able to see and/or access with regard to a specific investigation.

84.    "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all

other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

85.    "UBER PRO" refers to UBER's "Uber Pro" rewards program for DRIVERS.

86.    "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period of time, when a Ride is no longer in progress.

87.    "UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a DRIVER have stopped at a location other than the intended destination, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign).

88.    "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a user may interact with.

89.    "USER INTERACTIONS" mean all forms of engagement with an application's interface, including clicking buttons, swiping, tapping, scrolling, and any other actions that involve manipulating the app's elements.

90.    "VOYAGER DATA" means INFORMATION from UBER's Voyager software, including both the raw LOCATION DATA, and the analyses and presentations of that INFORMATION conducted by the Voyager software.

91.    "WOMAN" as used herein should be interpreted broadly to include anyone who identified herself as having a female (or nonbinary) gender, and also anyone whose inferred gender (based on, e.g., name) is female and who did not otherwise identify their gender.

92.    "WOMAN TO WOMAN MATCHING" means any product, software, or program for matching women (and/or nonbinary, transgender individuals, and/or those with inferred female gender) with other women (and/or nonbinary, transgender individuals, and/or those with inferred female gender). This includes what Uber refers to as Women2Women or W2W and any former, subsequent, or alternative versions of that program.

## DOCUMENT REQUESTS

Uber is reminded to please carefully read all instructions, and especially Instruction No. 3, above.

**Agreements**

1. Each Agreement between Uber and the Subject Driver (including sufficient information to identify the effective date of each).

2. Each Agreement between Uber and the Plaintiff (including sufficient information to identify the effective date of each).

3. If Uber contends that Plaintiff's lawsuit against Uber is subject to a forum selection clause or a choice-of-law clause, all Documents supporting that contention.

**Driver Screening**

4. Any and all Materials reflecting Uber's Screening of the Subject Driver. (This includes but is not limited to Documents reflecting the Screening-related User Experience for the Subject Driver, including Uber's instructions to, offers to, statements to, requests of, and/or questions to the Subject Driver.)

5. Any and all Materials reflecting Information Uber and/or its Contractors received from the Subject Driver in connection with Screening the Subject Driver (including but not limited to address history, social security number, name, date of birth, image of driver's license, driver's license information, insurance information, vehicle information).

6. Any and all Materials reflecting the Background Check Process(es) for the Subject Driver, including for All Accounts (including but not limited to Uber's policies, protocols, and/or instructions to its Background Check Contractor(s), interactions between Uber and its Background Check Contractor(s), Information the Background Check Contractor(s) made available to Uber, including the Background Check itself, any Background Check Findings, and conversations and decisions about the Background Check Findings).

7. Any and all Communications, including with Third Parties or the Subject Driver, related to Screening the Subject Driver (including but not limited to Communications with the Background Check Contractor(s) about the Background Check).

8. Any and all Documents reflecting any Screening Uber performed on the Subject Driver other than a Background Check (including but not limited to any Documents indicating that Uber or its Contractor(s) had the Subject Driver fill out an application, interviewed the Driver, checked the Subject Driver's references, searched Public Information about the Driver, and/or conducted Psychological Screening).

9. Every set of Background Check Adjudication Criteria that applied, at any time, to the Subject Driver, including the Adjudication Criteria that applied in each City and State where the Driver was authorized to offer Rides, and for each time period when the Driver was authorized to offer Rides.

**Driver History**

10. The complete up-to-date Account History for the Subject Driver, including for All Accounts.

11. For any status change in the Subject Driver's Account History, all Documents and Communications that explain or relate to that status change.

12. The complete up-to-date Ride Log for the Subject Driver, for the whole time period when the Subject Driver was Active.

13. All Documents reflecting the Subject Driver's Uber Pro status (including each change to the Uber Pro status, Communications to the Subject Driver about his status, and the timing of each change in status, for the time period during which the Subject Driver was Active).

14. All Documents reflecting Metrics Uber kept track of related to the Subject Driver, including but not limited to the Subject Driver's Cancellation Rate, and Displayed Star Rating, including the timing of changes to those Metrics.

15. All Materials reflecting any thresholds or minimums for any Metrics, such as minimum Displayed Star Rating, Cancellation Rate, that at the time of the Incident Uber required Drivers to maintain in the City where the Subject Ride occurred.

16. All Materials related to any Deactivation of the Subject Driver, including but not limited to all Communications concerning the Subject Driver's participation in quality improvement aimed to improve the Subject Driver's chances of reactivation.

17. Materials reflecting training Uber required the Subject Driver take at any time.

18. All Voyager Data for the Subject Driver that resulted in a Telematics Trigger on any Ride at any time prior to and/or on the date of the Incident (including any Documents reflecting a Telematics Trigger, alert, and/or notification).

19. All Location Data, including Voyager Data, reflecting Unplanned Stops, Unplanned Rider-Driver Proximity, and/or Route Deviations for the Subject Driver at any time prior to and/or on the date of the Incident, whether or not there was a resulting Telematics Trigger.

20. All Materials reflecting Communications, at any time prior to or on the date of the Incident, between Uber and the Subject Driver related to any Telematics Triggers.

21. For any Ride where the Subject Driver was given a Star Rating of 1 or 2 stars, any Documents related to why the Subject Driver received that rating (including but not limited to any attempts by Uber to find out why the Subject Driver received that rating, and/or anything Uber learned about why the Subject Driver received that rating).

22. For any Ride where the Subject Driver was given a Star Rating of 0 stars, any Documents related to why the Subject Driver received that rating (including but not limited to any attempts by Uber to find out why the Subject Driver received that rating, and/or anything Uber learned about why the Subject Driver received that rating).

23. For All Accounts for the Subject Driver, All Safety Lens Documents (including the Safety Lens landing page and all associated Information, data, documents, and views linked together within Safety Lens).

24. All Tickets for All Accounts for the Subject Driver.

25. For All Accounts for the Subject Driver, all Ticket-Related Documents or Materials (including but not limited to Location Data and Voyager Data) for any Tickets that involved allegations of Sexual Assault and/or Sexual Misconduct.

26. For any Rider who gave the Driver a 1-star rating and/or reported Sexual Assault, Sexual Misconduct, and/or an Interpersonal Conflict against the Driver before the Subject Incident, if Uber determined the Rider had Low Credibility, all Materials supporting that determination.

27. All Information Uber has concerning cellular phones used by the Subject Driver (including but not limited to cell phone number(s), make and model of cell phone(s), and IP addresses used by the Subject Driver).

**Information about the Plaintiff**

28. All photographs, surveillance, video recordings, and/or audio recordings of the Plaintiff.

29.          All Information in Uber's possession related to the Plaintiff including, for All Accounts for the Plaintiff, any and all Information provided to Uber by Plaintiff.

30. Any and all Documents reflecting Background Checks and/or Criminal History for the Plaintiff, for All Accounts.

31. Any and all Documents reflecting Investigations (including but not limited to all JIRA Tickets) for All Accounts for the Plaintiff.

32. All Communications between the Plaintiff and Uber, for All Accounts for Plaintiff.

33. A complete communications log for the Plaintiff, including the date, time, Trip ID, and contents for all Communications made within the Uber App or Driver App with Drivers or with Uber.

34. The complete Account History for the Plaintiff, including for All Accounts.

35. A complete log of all Rides (including Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback) for every Ride where the Plaintiff was a Rider, for the whole time period when Plaintiff was Active.

36. All Documents reflecting any categories, descriptors, or account types that Uber assigned to the Plaintiff, and the dates for each. This includes but is not limited to the Plaintiffs membership in any rewards programs and paid memberships.

37. All Documents reflecting Metrics Uber kept track of related to the Plaintiff, including but not limited to the Plaintiff's Cancellation Rate and Displayed Star Rating, including the timing of changes to those Metrics.

38. Documents related to any Deactivation or Waitlisting of Plaintiff, including the reasons for any Deactivation or Waitlisting.

39. For All Accounts for the Plaintiff, All Safety Lens Documents (including the Safety Lens landing page and all associated Information, data, documents, and views linked together within Safety Lens).

40. For All Accounts for the Plaintiff, all Ticket-Related Documents and/or Materials (including but not limited to Location Data and Voyager Data) for any Tickets that involved allegations of Sexual Assault and/or Sexual Misconduct.

41. If Uber determined the Plaintiff had Low Credibility (including but not limited to if Uber ever found a contradiction between a statement by the Plaintiff and any other Information, or if Uber ever determined Plaintiff communications reflecting "over escalation"), all Documents related to that determination.

42. All Documents (for All Accounts) related to any occasion(s) when the Plaintiff received a "Strike" from Uber. (This includes but is not limited to Communications related to the strike and Investigation Documents related to the Strike.)

**Incident Location Data**

43. All Location Data and Voyager Data reflecting the Subject Driver's movements and/or proximity to the Rider from the time the Subject Driver accepted the Subject Ride until two hours after the Subject Ride.

44. All Location Data and Voyager Data reflecting the Plaintiff's movements and/or proximity to the Driver from the time the Subject Rider requested the Subject Ride until two hours after the Subject Ride.

45. All Information from Uber's Fractal program concerning the Subject Ride.

46. The Chronicle Trip map animation that shows the movement of the Driver on the map from the time the Subject Ride was offered to the Driver through completion of the Ride or one hour after Ride completion if the latter data is available.

47. All Location Data for the Plaintiff for the period from 12 hours prior to 12 hours after the Subject Ride (including but not limited to Location Data for any other Ride taken by the Plaintiff during that time period).

**Other Incident Information**

48. All photographs, surveillance, video recordings, and/or audio recordings that captured any part of the Subject Incident or Subject Ride.

49. Documents reflecting the time, date, and contents of all User Interactions by the Subject Driver related to the Subject Ride. (This includes but is not limited to ride acceptance, trip started, trip ended, any in-app messaging, responses to Telematic Triggers, and any other inputs).

50. Documents reflecting the time, date, and contents of all User Interactions by the Plaintiff related to the Subject Ride. (This includes but is not limited to ride request, pickup location input, drop-off location input, trip cancellation, interactions with the Offer Card, use of any Safety Toolkit features

51. All Communications (in any form whatsoever, including audio recordings, and made at any time) related to the Subject Ride, including but not limited to Communications with the Rider, Communications with third parties, third party witness statements,

Communications with the Driver, Communications with Law Enforcement, Ride Receipts, Communications regarding refunds, and Communications regarding appeasements, excluding attorney-client privileged Communications).

52. All Documents provided to Law Enforcement that relate to the Subject Incident.

53. All Materials reflecting Uber's Investigation of the Subject Incident, including the complete, up-to-date Ticket and Ticket-Related Documents. (Ticket Related Documents includes but is not limited to the Documents accessible via the hyperlinks shown in Appendix A.)

**Offer Cards**

54. The Offer Card for the Subject Driver as it appeared on the day of the Incident.

55. All Documents reflecting any occasions when the Plaintiff cancelled a Ride after being matched with a Driver (including but not limited to the dates and times of any such cancellations, the reason(s) given if any for the Cancellations, and the Offer Card(s) for the Driver(s) for those

**Designated Driver Marketing**

56. All Drinking-Related Communications from Uber to Plaintiff whether by text, email, or Communications within the Uber App.

57. All Documents reflecting Drinking-Related Advertisements and/or Marketing by Uber or its Contractor(s), which are identified by Uber in response to Plaintiff's Special Interrogatory 1.

Dated: March 26, 2025                    Respectfully Submitted,

                                         **WILLIAMS HART & BOUNDAS, LLP**
                                         /s/Walt Cubberly
                                         John Eddie Williams, Esq.
                                         Brian Abramson, Esq.
                                         Margret Lecocke, Esq.
                                         Walt Cubberly, Esq.
                                         Batami Baskin, Esq.
                                         Myles Shaw, Esq.
                                         ***Attorneys for Plaintiff***

**PROOF OF SERVICE**

I, the undersigned, am at least 18 years old and not a party to this action. My business address is Williams Hart & Boundas, LLP, 8441 Gulf Freeway, 6th Floor, Houston TX 77017.

On the date set forth below, I caused the following document(s):

**PLAINTIFF WHB 832 FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC**

to be served by providing a true copy thereof addressed to each of the persons named below:

| | |
|---|---|
| Robert Atkins, Esq. | *Attorneys for Defendants* |
| Randy Luskey, Esq. | |
| Kyle Smith, Esq. | Email: ratkins@paulweiss.com |
| Jacqueline Rubin, Esq. | rluskey@paulweiss.com |
| Jessica Phillips, Esq. | ksmith@paulweiss.com |
| Yahonnes Cleary, Esq. | jrubin@paulweiss.com |
| Marc Wolf, Esq, | jphillips@paulweiss.com |
| Caitlin Grusauskas, Esq | cgrusauskas@paulweiss.com |
| Claire Abbadi, Esq. | cabbadi@paulweiss.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION: I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such document(s) is/are to be served at the email address(es) shown above, as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did not receive an email response upon sending such email indicating that such email was not delivered.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 26, 2025

       /s/Walt Cubberly_____
       Walt Cubberly