# EXHIBIT 13

Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LISA J. CISNEROS, MAGISTRATE

IN RE: UBER TECHNOLOGIES, INC.,      )
PASSENGER SEXUAL ASSAULT             ) No. 23 MD 03084 CRB (LJC)
LITIGATION                           )
                                     )  San Francisco, California
                                     )  Tuesday
                                     )  October 1, 2024
_____     )  10:30 a.m.

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE**

**APPEARANCES:**

For Plaintiffs:          CHAFFIN LUHANA, LLP
                         600 Third Avenue
                         12th Floor
                         New York, New York 10016
                  BY:  **ROOPAL LUHANA, ESQ.**


                         PEIFFER WOLF CARR KANE CONWAY & WISE
                         555 Montgomery Street
                         Suite 820
                         San Francisco, California 94111
                  BY:  **RACHEL ABRAMS, ESQ.**


                         NIGH GOLDENBERG RASO & VAUGHN
                         14 Ridge Square NW
                         Third Floor
                         Washington, DC 20016
                  BY:  **MARLENE GOLDENBERG, ESQ.**


           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
              *Official Reporter - US District Court*
              *Computerized Transcription By Eclipse*

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Uber Technologies and Rasier, LLC:
                          SHOOK HARDY & BACON LLP
 3                        2121 Avenue of the Stars
                          Suite 1400
 4                        Los Angeles, California 90067
                     BY:  MICHAEL SHORTNACY, ESQ.
 5

 6                        SHOOK HARDY & BACON, LLP
                          1800 K Street NW
 7                        10th Floor
                          Washington, DC 20006
 8                   BY:  PATRICK OOT, JR., ESQ.
                          VERONICA HAYES GROMADA, ESQ.
 9

10                        SHOOK HARDY & BACON, LLP
                          2555 Grand Boulevard
11                        Kansas City, Missouri 64108
                     BY:  JEREMIAH WIKLER, ESQ.
12

13                        PAUL WEISS RIFKIND WHARTON & GARRISON
                          1285 Avenue of the Americas
14                        New York, New York 10019
                     BY:  LOUIS MURRAY, ESQ.
15

16                        PAUL WEISS RIFKIND WHARTON & GARRISON
                          535 Mission Street
17                        24th Floor
                          San Francisco, California 94105
18                   BY:  MARC PRICE WOLF, ESQ.

19                            -   -   -

20

21

22

23

24

25
```

```
 1  Tuesday - October 1, 2024                    10:39 a.m.

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4        THE CLERK:  We are calling 23-MD-03084, In Re Uber

 5  Technologies, Inc.

 6      Counsel, please state your appearances for the record, and

 7  we'll start with plaintiffs' counsel.

 8        MS. LUHANA:  Good morning, Your Honor.  Roopal

 9  Luhana, Chaffin Luhana, for the plaintiffs.

10        THE COURT:  Good morning.

11        MS. ABRAMS:  Good morning, Your Honor.  Rachel

12  Abrams, Peiffer Wolf, for the plaintiffs.

13        THE COURT:  Good morning.

14        MS. GOLDENBERG:  This is Marlene Goldenberg for the

15  plaintiffs.

16        THE COURT:  Hello.

17        THE CLERK:  And defense.

18        MR. SHORTNACY:  Good morning, Your Honor.  Michael

19  Shortnacy of Shook Hardy and Bacon appearing today for the Uber

20  defendants.

21      And with me I have Veronica Gromada, Patrick Oot and

22  Jeremy Wikler also from the Shook Hardy firm.

23      And Marc Wolf and Louis Murray of the Paul Weiss firm also

24  speaking potentially, depending on what Your Honor would like

25  to address, for the Uber defendants.
```

1          **THE COURT:**  Okay.  Thank you.  Good morning,

2    everyone.

3          So I have reviewed the joint status report that you all

4    filed a few days ago and I figured over the next half hour that

5    we can walk through the issues that you all do want me to

6    engage with.  I know that there's several issues that you

7    pointed out where the parties aren't seeking any kind of Court

8    intervention, so I won't focus on those.

9          But to start with, as far as the custodians are concerned,

10    I've got the extensive briefing on that.  I do plan to issue an

11    order today under seal on the matter, and the parties will have

12    time to propose redactions before I post a public version after

13    I decide what kind of redactions are appropriate.

14          The order is going to resolve many, but not all, of the 18

15    custodians that plaintiff proposed and those custodians

16    proposed by Uber.  In effect, you're going to get a sample of

17    rulings from me, and then what I'm thinking is that I'll give

18    you three days to meet-and-confer about any of those custodians

19    that aren't ruled upon and negotiate an agreement, I hope, as

20    to the rest of those custodians.

21          I think that's going to be the best approach in terms of

22    using the Court's time and resources and, also, given the

23    general views and, you know, the parties, to the extent

24    possible, should be able to negotiate and figure out what

25    discovery is appropriate under Rule 26.  So that's my update on

1    the custodians piece.

2          As far as the unsubstantiated cases go, I saw what the

3    parties' positions were on that.  I really see this issue --

4    and I think it may have come up briefly at a prior status

5    conference.  I really see this issue kind of as a matter of,

6    like, hygiene as far as lead -- plaintiffs' lead counsel's

7    management of this mass tort litigation and, you know, there

8    were earlier in the litigation hundreds of cases filed and now

9    we're up to, you know, well over a thousand that are part of

10   the MDL.

11         So I think it's important just to ensure that the cases

12   that are moving forward do have substantiated trips associated

13   with them.  You know, Judge Breyer set up a process for that or

14   a framework for that in PTO 5.  And based on what I read in the

15   status report, I don't have any concerns at this point.

16         I think there was -- like I said, you know, well over a

17   thousand cases and it sounds like there's potentially 60 to 100

18   cases that are of concern, but that are -- the parties are

19   aware of them, and you all can meet-and-confer and figure out

20   what kind of substantiated -- substantiation is still needed

21   for them.

22         So I'm not troubled by this issue because I think that you

23   all will be able to work through it, but I appreciate the

24   update on that front.

25         Discovery for -- discovery on plaintiffs, this has come up

```
1    several times.  You know, Judge Breyer set the parameters for

2    that.  If there's -- if he issues some kind of order that opens

3    the door for that, then -- and there are disputes that arise,

4    then I'll address it at that point.

5         On the clawback piece, you know, that's a priority for me

6    at this point along with resolving the custodians, so I will

7    focus on that.

8         And then somewhat related to that are the issues

9    percolating around the privilege logs, and at this point it's

10   really not -- I don't know how much you want to discuss what

11   those disputes are at this point.  I think to dig into it I'll

12   need, you know, a Rule 8 letter.  I'll need, you know, specific

13   arguments to address it.

14        But what I was thinking is that we should take -- given

15   the number of potential disputes, that I should take some

16   sampling approach with privilege log disputes, because I have

17   been inundated with disputes about the custodians, and I don't

18   want -- I want to take a more measured approach for the

19   privilege disputes when you all feel ready to tee them up for

20   me and present a PTO 8 letter.

21        Does anybody want to speak to that in greater detail?

22             MR. SHORTNACY:  Michael Shortnacy speaking for Uber.

23        I appreciate the Court's recommended approach.  I will,

24   from my perspective, say that we're trying to work through some

25   issues through the meet-and-confer process that's contemplated
```

1    in the deposition protocol, which has a shortened time frame

2    for responding to challenges and, also, to work through the

3    de-designation process in a shortened time frame.  And so we're

4    trying to, you know, adhere to that process.

5        I think that we've had at least two meet-and-confers with

6    plaintiffs that I think have been productive in terms of

7    explaining some perceived deficiencies.  Plaintiffs may have a

8    different take on this, but, you know, instances where things

9    appear to be blank for a document title, to take an example,

10   but those documents are actually chats.  They don't have a

11   document title.  So we're working with plaintiffs on some

12   potential remediations for that.

13       There may be other fields that we could point to that can

14   provide that information.  And so we're trying to work through

15   those issues collaboratively with plaintiffs.  I do think it's

16   fair to say that we will have some disputes over substance; but

17   as a practical matter, our approach has been really, especially

18   in light of the depositions that are coming up, to try to work

19   through a lot of the mechanical issues that are present in the

20   log or that appear to be present, to try to remediate those

21   issues as best we can and, also, engage with plaintiffs on the

22   substance where they have questions about business versus legal

23   advice or had requested some additional information from Uber

24   to set forth the privilege claim.

25            **MS. LUHANA:**  Judge, Roopal Luhana for the plaintiff.

1      I agree with Mr. Shortnacy that the parties have been

2   working together to address the privilege log disputes.

3   However, there are many disputes; right?

4      So we're focused on, as we raised in the joint status

5   report, the defendants just simply complying with ESI and

6   privilege orders that are in place.  And so we listed a litany

7   of things that are there that there isn't compliance on, and

8   we're working through that.

9      So we need to do that first before we can address the

10   issues and tee up these issues for Your Honor per PTO 8, which

11   is the next steps on substance.

12      And we agree a sampling approach would be appropriate to

13   tee up some of these disputes, to get your guidance on, your

14   thinking, and that should apply across the board to other

15   privilege log entries that the defendants are making.  So we

16   are working with the defendants and we'll be able to tee up

17   disputes soon.

18         **THE COURT:**  Okay.  Kind of related to the timing

19   question and -- of what Mr. Shortnacy raised about how this

20   impacts deposition.  There wasn't a lot of detail in the status

21   report on the coordination of depositions with the JCCP.

22      I would like to do what I can to ensure that there's as

23   much -- as much coordination as possible.  I will do my level

24   best to help with that, but is there -- do you have any

25   thoughts that you would like to share as far as, like,

1    prioritization for the Court, things to focus on in terms of

2    the resolution of the privilege log disputes so that

3    depositions do happen according to a schedule that works best

4    for the MDL and the JCCP?

5              **MS. LUHANA:**  Judge, Roopal Luhana for the plaintiff.

6         Just to provide you an update in terms of coordination on

7    depositions, I believe there are eight deposition that have

8    been scheduled to date, and out of those eight depositions

9    six -- we're going to coordinate on all the depositions,

10    however, two of them are not necessarily back-to-back dates,

11    whereas the other six will be back to back.  So we are

12    coordinating with the JCCP on these depositions.

13         What we're going to raise, and I'm sure Mr. Shortnacy is

14    going to address, is the defendants' request for an extension

15    to produce some of the custodial files as well as the privilege

16    logs.

17         So we are working with the defendants to come up with

18    dates that we can all agree on because they have stated that

19    they will be unable to meet this October 1st date that you set

20    for them to produce for the 37 custodians' custodial files.

21         So we will address that, but a critical issue is

22    validation.  And we have been raising -- raising this with the

23    defendants repeatedly because, as you can appreciate, TAR is

24    being used here, right, and so that's AI.  And validation is

25    necessary and a large part of the ESI protocol incorporates

1    validation parameters.

2         So, for example, it is important to know that the

3    documents are appropriately being coded relevant or not

4    relevant; right?  And there's -- there's a validation process

5    to ensure that they are being coded correctly because that's

6    going to train the rest of the AI and may taint the pool of

7    documents if things aren't coded correctly.

8         So we have been asking for validation parameters.  For

9    example, defendants have represented that they have completed

10   production for, I believe, at least nine of the key custodians.

11   Yet, we haven't received documents to review, non-privileged

12   documents that we're supposed to review in the process as part

13   of the ESI protocol.  So validation has to be addressed in

14   terms of the privilege log disputes.

15        There is a timeline set out with the deposition protocol

16   and we're working toward that timeline, but in order for us to,

17   as I said, tee these issues up for you, we need to have -- have

18   the defendants comply with the ESI protocol and priv order for

19   the privilege log entries so we can know that, hey, we are

20   addressing the substance here, not these other -- for example,

21   if they are not providing sufficient details on the privilege

22   logs, we won't know if we can raise that as an issue for Your

23   Honor.

24        So these -- this is housekeeping that needs to be done,

25   and we are conferring with the defendants on these issues.

1            **MR. OOT:**  Your Honor, it's Patrick Oot on behalf of

2    the Uber defendants.

3        I'll address briefly the validation approach.  Typically

4    in these reviews the validation is completed after the review

5    and not on a custodian-by-custodian basis.  The reasoning for

6    that, as you can imagine, it would be an additional 3,000

7    documents that you're reviewing over and over again and adding

8    onto the pile.

9        So we have offered, and I'm hoping plaintiffs have agreed,

10   that for the first 20 custodians we will execute a validation

11   exercise pursuant to the ESI protocol.

12       Also, flagging that we've addressed in the

13   meet-and-confer, we may be pivoting from the relativity

14   platform to a different platform.  Again, it's -- we're

15   discussing that with plaintiffs.  The reasoning for that, Your

16   Honor, is the sheer volume of the documents that are in the

17   platform are affecting the ability to meet the deadlines.

18       So we have met-and-conferred with plaintiffs about this.

19   We will continue to meet-and-confer with them, but the proposal

20   that we put forward is we really need to focus in on getting

21   the review complete.  And if we have to stop and validate,

22   which we don't think was contemplated by the ESI protocol on a

23   custodian-by-custodian basis, then that will affect the

24   schedule even further.

25           **THE COURT:**  The principal defense specific, as far as

 1   custodian-by-custodian validation or -- or doing validation

 2   with a different set of custodial files.

 3           **MR. OOT:**  I'm sorry, Your Honor?

 4           **THE COURT:**  I don't have a question.  I was just -- I

 5   don't think the -- as much as detail as there was in the ESI

 6   protocol, I don't remember that the -- there were validation

 7   parameters that were that specific as far as, oh, this has to

 8   be done for each -- each time you produce a custodial file it

 9   needs to be validated, as opposed to taking some other

10   approach.

11           **MR. OOT:**  So, Your Honor, I can speak to how

12   traditionally this is done, and then also how we're

13   interpreting the ESI protocol is traditionally at the end of

14   discovery, almost like a 26(g) certification, that's when you

15   would validate the production.  So after you're through with

16   the various custodians.

17       We do understand plaintiffs' request for validation and

18   that's why we felt that if we focus on the first 20 custodians

19   first, it is an additional effort that we're going to have to

20   undertake to go and kind of stop the presses, validate that,

21   put a different team on that, to provide those materials.

22       And, in fact, we -- somebody on our team just sent over a

23   step-by-step process to plaintiffs on the -- the process that

24   we're following to validate.  And that just went over this

25   morning.  And I'm sure there is some more opportunity to

1    meet-and-confer about that as well.

2            **THE COURT:**  Okay.

3            **MS. LUHANA:**  Judge, Roopal Luhana for the plaintiffs.

4        I'll just -- I have one thing to add to what Mr. Oot is

5    saying.  You know, each TAR protocol and validation is done

6    differently, and we have an ESI protocol here which allows the

7    plaintiffs' attorneys, a designated group of attorneys, to

8    review non-privileged documents in a validation sample.

9            So that's part of the requirement of what needs to be done

10   to ensure that TAR and AI are being utilized appropriately.

11   And so we need to begin that process, especially since already

12   the defendants have represented that they have produced the

13   majority of the documents from 20 custodians.

14           And you are correct that the ESI protocol doesn't break it

15   down custodian by -- like, that validation needs to be done

16   with each custodial file, but since there are these

17   requirements of review that are ongoing, it's necessary to

18   begin the process to assure that we're getting the relevant

19   documents that are needed in discovery.

20           **MR. OOT:**  Just to respond to that, Your Honor,

21   briefly.  As we've discussed, the model is always changing as

22   you are reviewing documents.

23           So we want a sufficient population -- so rather than, for

24   example, the ESI protocol has a set number of documents that

25   are included in the validation as opposed to a statistical

1    representation of the documents, the -- the reasoning for doing

2    this, again, after a specific point in time just makes sense

3    based upon the current ESI protocol.

4        So we're not in disagreement that we have to validate the

5    process under the ESI protocol.  While we disagree with the

6    process that plaintiffs have to review documents as part of it,

7    it's -- you know, that's water under the bridge and we are

8    moving forward with that approach.

9        So I don't think that there's any dispute here other than

10   timing.

11           **THE COURT:**  Okay.  Yeah.  Well, I think that the

12   validation being withheld til the end of review of all

13   documents being produced, because then that's rather late in

14   the game as far as validation.  Because if there is some sort

15   of problem, that means that that hasn't been identified

16   until -- until a late point in time.

17       But it sounds like Uber's proposal was let's get 20

18   custodians' files collected and reviewed and do a validation at

19   that point, which, to me, sounds like an interim -- a proposal

20   that's not waiting til the very end, but doing it at a later --

21   excuse me, at an earlier point of, time which seems entirely

22   appropriate.

23       I don't know if it needs -- it makes sense to add another

24   point in time, you know, but it sounds -- at one point

25   Ms. Luhana was describing this as, really, some housekeeping

1    issues that need to be addressed in terms of dealing with these

2    documents -- these document productions and -- and sorting

3    through the validation process.

4        So I trust that you all are able to work it out, but you

5    know my view is that, you know, if there was ever -- if there

6    were ever cases where the validation was done at the very end

7    of a massive production of ESI, then, to me, that sounds

8    potentially problematic because that would mean that the

9    validation happens at a milestone that is late in the game, and

10   I think it ought to happen earlier.

11       So how many times it needs to happen, I'm sure it's

12   probably a fact intensive and depends on the case, depends on

13   the MDL, all these other things.  So I'll leave it to you all

14   to sort out.

15            **MS. LUHANA:**  Your Honor, just one additional point.

16   In terms of coordinating depositions, another critical issue

17   that has come up is hyperlinked documents, and I will defer to

18   Ms. Goldenberg to address the issue.

19            **THE COURT:**  I think Mr. Shortnacy wanted to say

20   something before maybe we pivot off this topic.

21            **MR. SHORTNACY:**  Thank you, Judge.

22       I did want to discuss one thing that Ms. Luhana had

23   mentioned previously, which is that the parties today expect to

24   file a joint stipulated request for extension of time.  So the

25   Court's order at ECF 1629.

1    That's the order Your Honor entered setting forth certain

2    deadlines.  October 1 being the first deadline for production

3    of certain custodial files, and then there were some additional

4    dates into November.

5    And I -- you know, to give credit where credit is due, we

6    raised with plaintiffs' leadership counsel as soon as the order

7    was entered that we didn't expect that we would be able to

8    comply with the order as entered, and we worked collaboratively

9    with plaintiffs through a number of issues and I think have

10   aligned jointly on some modest extensions to request of the

11   Court, recognizing it's a request, to vary from the Court's

12   order.  It's not that we just, you know, agreed and think we

13   can change the Court's order.  This is a request.

14   But just to give context, and you'll see the full filing

15   today, but it's moving from October 1st to October 21 on one of

16   the deadlines, and November 1st to November 26.  There are

17   other deadlines that are -- would be more complicated to get

18   into in the oral proceedings here, but my point is only that

19   it's a fairly modest, I think, request to push some dates out

20   into the future that we think will move heaven and earth to

21   comply with, but that can be done.  And so we would just

22   respectfully request the Court consider that when it's on file.

23        **THE COURT:**  Thank you.

24        **MS. LUHANA:**  I would like to add, in terms of working

25   with the defendants to come to an agreement for the stipulation

1    that's going to be filed later today, what plaintiffs have

2    represented to defendants is we're willing to give the

3    extension, provided some of these issues are resolved relating

4    to validation, relating to privilege logs in terms of complying

5    with the ESI protocol and privilege order, the hyperlinked

6    document issue, which is going to become so much larger and

7    needs to be addressed immediately, as well as complete

8    personnel files that are produced per the deposition protocol.

9         And I would just like to turn over to Ms. Goldenberg to

10   address the hyperlinked issue.

11        **MS. GOLDENBERG:**  Which I know is your favorite.

12        So one is -- I guess both of these are just issues that we

13   wanted to flag for the Court and I think, you know, we'll

14   probably have this fleshed out more fully in very short days to

15   come, but we've noticed a couple issues.

16        Number one, in the *Social Media* litigation, which I

17   believe is one of the cases that Your Honor relied on in

18   finalizing the ESI protocol and ordering how many hyperlinks --

19   or how many different documents we were able to ask for all the

20   versions of the hyperlinks on, that order has now been amended

21   and the plaintiffs get, I believe, 200 hyperlinked documents a

22   week, not total.

23        And we were really hoping that we wouldn't need a ton of

24   these, but as we're going through the production and preparing

25   for depositions, we can easily envision a situation where you

1    put a document in front of a witness and say, you know:  Is

2    this the document that you drafted at the time that this email

3    was sent?  And the answer from the witness would be:  Well, I

4    don't know.  Right?  This is the finished version.

5        And so certainly we're going through documents right now.

6    We're attempting to make sure that when we go take depositions,

7    we only have to take them once and that we are going to get

8    good answers from witnesses, but we wanted to preview for Your

9    Honor that we anticipate that this is going to come up and we

10   may be back in front of you with that issue.

11       **THE COURT:**  When I set a benchmark to start with, I

12   felt that that was very much a preliminary benchmark in large

13   part because I didn't really have enough information -- or much

14   information in the record that really explained to you what's

15   entailed when it comes to tracking down a hyperlinked document

16   that was contemporaneous with the message that was sent,

17   whether it was an email or a chat message or whatever

18   communication method was used.

19       So I felt that I was in the dark, but I just thought to

20   start out with I would do what I've seen in other Court orders

21   and then we could further address the issue at a later point in

22   time.

23       I knew at that point that the contemporaneous hyperlinked

24   documents couldn't be produced on any sort of automated

25   scalable way, but we're also living and working in the world of

```
 1  fast evolving technology around ESI.

 2       So I just -- I mean, if anybody wants to speak to how easy

 3  it is to get these links, maybe I can -- I can look at that

 4  Social Media case, but there must -- I imagine in that case

 5  there must have been something that was presented to Judge Kang

 6  to -- and I believe it's Judge Kang's case -- to show that this

 7  level of production using hyperlinks is reasonable, is not

 8  unduly burdensome for whatever responding party is producing

 9  it.

10            MR. WIKLER:  Your Honor, if I could respond briefly?

11  This is the first I've heard this request or this proposal, and

12  we're happy to discuss any of this with plaintiffs' counsel in

13  a meet-and-confer.

14       But, I mean, you know, of course there have been a number

15  of decisions that have come out since our decision, too.  In Re

16  Insulin, the In Re Stub Hub Litigation in the Northern District

17  of California that said that the parties don't need to produce

18  any hyperlinked documents.

19       And my suspicion -- and I'm not familiar with the Social

20  Media case decision that Ms. Goldenberg referenced, but my

21  suspicion is that that's -- you know, the party is not

22  producing hyperlinked documents already and then, you know,

23  it's just the contemporaneous issue.

24       I'm guessing that's 200 period a week, whereas Uber is

25  already producing thousands and thousands of hyperlinked
```

1    documents already, which is more than any of these Courts that

2    I've seen, certainly this year, that are required.

3        But in any event, you know, we're hearing that for the

4    first time here and happy to discuss.

5        **THE COURT:**  The thing about the hyperlinked documents

6    that are produced and the way that they are produced from the

7    Google G Suite is in some instances what's produced may not be

8    at all sort of reflective of what was actually communicated at

9    the time that was -- the message was sent because if the -- the

10   document iterated a lot of different times since then, then

11   what you've produced is -- isn't meaningful in terms of

12   understanding the message that was communicated at that point.

13       So, you know, I understand that Uber is producing a lot

14   given the methodology that is currently automated and readily

15   available, so a lot is being produced by Uber using that

16   available technology, but it doesn't mean that it's all

17   naturally truly responsive.  If it's an attachment or a

18   moderate attachment, hyperlink, whatever word you use, it's

19   something that is -- it's in no way connected to that message

20   that was sent at that particular time.

21       So anyways, this is an issue that I really kind of dug

22   into months ago, but you know my thinking on it.

23       What hasn't been clear to me is just what is the burden.

24   What are the logistical steps to actually producing a

25   contemporaneous document.  And I'll go back and look at the

1    *Social Media* case.  I know this needs to be addressed promptly.

2        You can negotiate it based on what I'm sharing today and

3    by looking at the cases that have been decided more recently,

4    but not -- not just the *Social Media* case that plaintiffs are

5    pointing to, but anything else that Uber may also think is

6    relevant.  My hope is that you negotiate it and figure it out.

7            **MS. GOLDENBERG:**  We will do our level best.

8        And I'll just say that the *Social Media* decision did

9    consider burden, but I'll speak with Mr. Wikler offline and see

10    if we can work something out before we tee up any disputes in

11    front of you.

12        The other hyperlink issue that we wanted to flag is that

13    we've identified numerous documents, and so has the JCCP, where

14    hyperlinked documents are not being listed as family members or

15    they're just not being produced in the metadata for the

16    documents that we have.

17        The JCCP sent Uber some examples just to give them an idea

18    of what this looks like, but our concern is that Uber seems to

19    be taking the position that they are only going to fix this if

20    we identify every document where there's a problem and that's

21    not our burden.  They have an ESI protocol that tells them how

22    to produce things.

23        And certainly if we see issues, we will raise them; but

24    what we don't want to have happen is have this burden shifted

25    back to us to audit their entire production, identify any

1    documents that are missing, and then wait for them to be

2    produced.  We would like Uber to go back and do an audit of

3    their own production and make sure that they have complied with

4    the order.

5          And, you know, if we're forced to do that, that's time and

6    money that our attorneys have to spend.  That takes away from

7    deposition prep right now.  And certainly we want to make sure

8    the depositions can move forward and be coordinated, but we

9    can't do that if we are spending all our time auditing what

10   Uber was supposed to do.

11         **MR. WIKLER:**  Your Honor, if I can address this.

12         One is whatever this issue is that was referenced in the

13   joint status report and is being referenced now has not been

14   presented to us.  I don't know what the basis is for this

15   assertion and we can't assess what this.

16         But at the same time the reference to what the JCCP

17   plaintiffs provided, my understanding was not that that was an

18   example, was that that was the issue they had identified and

19   is -- has been corrected in part, is being corrected.  The

20   documents will be produced that they identified.

21         The MDL plaintiffs haven't specifically said anything in

22   particular that we can correct.  But I think, just to cut

23   through that, like -- I'd like to get on the phone with

24   Ms. Goldenberg and hear what this is.

25         And I agree that we are expecting -- we aren't going to

1    intentionally do something wrong in the production and then sit

2    on our hands and wait to see if plaintiffs catch it.  But I

3    want to hear what the issue is.  I want to be able to address

4    it.  I want to be able to talk to my vendor and talk to our

5    people on our team who are more knowledgeable about this and

6    then address it and make sure that it's addressed going forward

7    so that this isn't an issue.

8         **THE COURT:**  Thank you, Mr. Wikler.

9         Let me help.  I'm directing plaintiff and Uber to talk

10   after this status conference is done to promptly address this

11   issue, figure out the extent of any kind of gaps in the

12   production or, you know, errors and what the plan is to address

13   them quickly in a scale.  Okay?

14        **MR. WIKLER:**  Thank you, Your Honor.

15        **MS. GOLDENBERG:**  Thank you, Your Honor.

16        Mr. Wikler I just re-forwarded you our conversation that

17   began on January 6th about this -- sorry, September 6th.

18        **MR. WIKLER:**  Okay.  And to correct the record there,

19   there's nothing in there that says that you were missing

20   documents.

21        **THE COURT:**  All right.  Let's -- let's refocus.  But

22   I do think it was helpful to talk about the hyperlinks issue,

23   but I think we've discussed it enough and you know what to do

24   next.  Thank you.

25        So the coordination of -- this is somewhat back to the

```
 1   issue, the question that I had earlier, because I don't think
 2   I've got the clarity that I need, or perhaps you said
 3   everything that you want to say about the coordination of
 4   depositions, but is there something that the parties need
 5   prioritized on the Court's end in terms of the timely
 6   resolution of discovery disputes to ensure that these --
 7   whatever depositions you have scheduled stay on schedule and
 8   that there's maximum coordination?
 9              MR. SHORTNACY:  Judge, it's Michael Shortnacy
10   speaking.
11        I think the parties, as we started working through the
12   issues, I think we expect there may be some issues to get teed
13   up sooner rather than later.
14        I do want to just clarify one thing so the Court is fully
15   aware.  The dates that are on calendar now have been
16   coordinated.  I think, as Ms. Luhana said, in two instances I
17   think the MDL leadership will take a second day, and so there
18   will be sort of parallel depositions.  But the others, I think,
19   will be coordinated into a single deposition sitting between
20   JCCP and MDL.  So I just wanted to make sure that that was
21   clear.
22        And the last thing I'll say about that is that the dates
23   that we're also going to present to this Court about extensions
24   of time for production of documents and so forth are also
25   coordinated and agreed, I guess, is maybe not the right word,
```

1   but that the JCCP leadership is also aware of those dates and

2   sort of complies with their concept of how the depositions will

3   be scheduled and rolled out in that proceeding.  So I wanted to

4   provide that context to Your Honor.

5           **THE COURT:**  Or if I grant the extensions that you all

6   stipulate to, will it put any of the parties, either in the MDL

7   or the JCCP, in a position of having to do depositions without

8   all of the documents that they need to review?

9           **MR. SHORTNACY:**  Well, Judge, I guess I would say that

10  the plaintiffs' leadership of both proceedings have agreed to

11  the dates, I think understanding that we do have some issues to

12  resolve, and some of them have spilled out into this conference

13  with hyperlinks and privilege and so on.

14       But I don't foresee that those dates will cause any issues

15  and they are agreed at this point.

16          **MS. LUHANA:**  Judge, Roopal Luhana for the plaintiffs.

17       The dates may cause some issues for the JCCP because I

18  believe their discovery cut-off is sometime January 15th, and

19  some of the dates that are proposed as part of the extension

20  for the disputed custodians' custodial files are, I believe,

21  January 10th, and then in terms of the privilege logs

22  January 31st, I believe.

23       And, also, what I expressed previously still holds true in

24  terms of -- the MDL plaintiffs agreed to these extensions

25  provided that the privilege log disputes are handled, provided

1    that the validation issues are addressed, and importantly the

2    hyperlink document issue is addressed as well.  So that's

3    imperative for us to agree to this extension.

4          **MR. SHORTNACY:**  Judge, I would just say, as you know,

5    as you've directed, the parties are going to meet-and-confer

6    about those issues.

7          There's one issue, Judge, I wanted to just raise.  I know

8    we're over time, but I do think it's important for you to hear

9    it because it pertains to the depositions that are coming up.

10         Ms. Luhana had mentioned a complete personnel file, and I

11   foresee that we may need the Court's assistance on this one.

12   So for a deponent, what Uber has provided in advance of the

13   deposition is a printout of the job titles and dates of

14   employment and the dates in which the employee or former

15   employee held a specific title over the course of their tenure

16   at the company.

17         We've agreed to provide a C.V. for the deponents and to

18   the extent there's not one available, if there is a LinkedIn

19   profile, to be -- to produce that and to facilitate the

20   efficient handling of the deposition in terms of covering an

21   employee's work history and educational background.  We

22   understand that that moves that process along swiftly in a

23   deposition.

24         I think the issue we're having, Judge, is what else the

25   plaintiffs are asking for and have a need for because, as the

1    Court I'm sure is aware, there is sensitive personal

2    information inside of a personnel file, like undisclosed

3    disabilities, compensation, emergency family contact

4    information.  There's a number of things, and those are

5    protected under the California Constitution and the right to

6    privacy.

7        And so the issue is that there is a -- there is a dispute

8    as to what that means and what the showing of need is of

9    plaintiffs to have anything more than the information we've

10   provided to facilitate the deposition.

11       **THE COURT:**  Does plaintiff need a complete personnel

12   file that shows the custodians who are current or former Uber

13   employees?

14       **MS. LUHANA:**  Judge, what we've requested is what's

15   typically produced in other cases and is included in the

16   personnel file:  The C.V., as Mr. Shortnacy represented,

17   performance evaluations or -- performance evaluations and

18   reviews.  Background checks that are done on the employees, as

19   well as compensation.  Documents that show the employee's or

20   former employee's compensation.

21       So those are the four things we've raised that the

22   defendant should produce in the personnel file.

23       **MR. SHORTNACY:**  Judge, for our part we don't believe

24   any of those things are relevant.  None of the employees'

25   conduct is at issue in this case.  And there are a number of

```
 1   Courts who have acknowledged the right to privacy of employees,
 2   including Judge Corley in the *Music Group* case at 2015 Westlaw
 3   2170121.  And the *Hatamian* case, 2015 Westlaw 7180662.
 4       And there Judge Corley found that unless there's some
 5   specific showing of need or where that -- the conduct or
 6   background of a specific employee is at issue, that information
 7   should be protected under the Constitution, the California
 8   State Constitution.
 9           THE COURT:  I don't think an across-the-board
10   requirement that Uber produce the performance evaluations,
11   background check and compensation for every Uber employee,
12   current or former, who is a custodian -- deposed, excuse me, is
13   necessary for this case.
14       If there's some specific particular individuals where you
15   think that there -- "you" being plaintiffs think that there's
16   some overlap between what is going on with respect to their
17   performance evaluation or their background that somehow layers
18   onto their handling of work at issue that are directly relevant
19   to the claims in the case, then maybe for certain individuals
20   that might be an appropriate discovery request; but I think
21   across the board for all of them, I don't -- that appears to me
22   overbroad.
23       So if there's a handful that you think that this is really
24   needed, then do it, but --
25           MS. LUHANA:  Judge, there are --
```

1          **THE COURT:**  Go ahead.

2          **MS. LUHANA:**  I would just say there are some

3   employees, some former employees that spoke out against Uber's

4   policies.  And so if that's noted in a performance evaluation

5   and evaluated, that's something that's critical and relevant

6   discovery here.  And so in those situations we would think it's

7   important.

8       In addition to that --

9          **THE COURT:**  There you're pointing out a specific

10  overlay, but identify those current or former employees where

11  you think that there is a specific nexus.

12         **MS. LUHANA:**  Sure.  We're happy to do that.

13         **THE COURT:**  But a categorical requirement for all of

14  these individuals is overbroad.  And I'm talking specifically

15  about performance evaluations, background checks and

16  compensation.  I mean, you can ask them at the deposition:  How

17  much did you make?

18         **MS. LUHANA:**  Well, background checks are slightly

19  different, because we do want to compare the background checks

20  in this litigation, what Uber does for its employees versus

21  what it's doing for the drivers.  And so it takes on different

22  meaning in this litigation.

23         **THE COURT:**  Well, I think you could explore that

24  issue, but to do that by asking for background check

25  information on every current and former employee that Uber has

1    as part of its personnel file, it seems like an overreach as

2    far as the specific issue that you flagged, what you're trying

3    to accomplish in terms of learning about it and what -- the

4    discovery that you're demanding.

5            MS. LUHANA:  Understood.  But we're operating in a

6    vacuum here because we are unclear as to the contents of Uber's

7    personnel files.

8        So what we have requested is they give us a list of what's

9    in the file and what they are objecting to producing, and then

10   we can have a conversation.  But at this point --

11           THE COURT:  I want to speed up this process.

12           MS. LUHANA:  Sure.

13           THE COURT:  So I just don't -- I'm not seeing an

14   across-the-board categorical connection or need between the

15   background checks and giving each deponent's background checks

16   that's in their personnel file, if that exists at all.  So Uber

17   doesn't need to produce that.

18       But if you've got some particular employees where you

19   think there's a nexus between particular performance problems

20   or their background and the issues that are at the forefront of

21   this case, then maybe there's some isolated employees where

22   that's an appropriate discovery request, but not for all of

23   them.  Okay?

24       So if there's anything -- okay.  The third-party

25   discovery, I want to -- and that's the last issue I think that

```
 1   we need to address.  So Ballard and Chertoff is fully briefed.

 2        On the horizon you've got a few other third-party

 3   discovery disputes, one of which is -- relates to Bret Stanley,

 4   who is counsel?

 5             MS. GOLDENBERG:  That's right.

 6             THE COURT:  So I don't see why that would be a

 7   dispute.  I ruled on Sarah Peters' subpoena.

 8             MS. GROMADA:  Your Honor --

 9             THE COURT:  Go ahead.

10             MS. GROMADA:  I'm sorry, Your Honor.  I didn't mean

11   to interrupt you.  I'm Veronica Gromada for Uber.

12        Your Honor, Bret Stanley is distinct from Sarah Peters in

13   part because Sarah Peters's litigation files that were at issue

14   are of the same type that were a part of the PTO 5 rulings;

15   right?  So those were other allegations of the same nature of

16   this litigation.

17        Whereas, Mr. Stanley's files that are at issue are a

18   completely different type of matters.  They were

19   employee-related matters that were arbitrated and did not

20   relate to driver -- independent driver earner or rider type of

21   legal disputes.  And so they are very distinct.

22        Further, a lot of what Mr. Stanley has contained in those

23   files that plaintiffs indicated they wanted relate back to the

24   policies, knowledge bases, et cetera, which, you know, we've

25   spent quite a bit of time with Your Honor going through that
```

1   process to identify the types of documents and information that

2   plaintiffs were hoping to seek and had even made an offer to

3   plaintiffs that to the extent there are other discrete requests

4   you would like -- that they would like us to entertain, that

5   we're open to doing the same.

6          MS. GOLDENBERG:  May I respond on that, Your Honor?

7          My understanding is Mr. Stanley wasn't able to be on the

8   hearing today.  So while I haven't been seen his documents, I

9   can tell you that my understanding of what exists are things

10  that are actually quite relevant and, in fact, Ms. Gromada just

11  identified a couple of them.  And what better way to reduce the

12  burden on Uber than to get documents that we already have.

13         So, you know, first -- first, that would be very helpful

14  there.

15         Second, it is very difficult to tell any attorney,

16  especially one on our leadership team, that he can know one

17  thing in one case and not in another.  That makes it rather

18  difficult.

19         But, thirdly, these cases are -- even though the subject

20  matter was slightly different in that it was an

21  employee/independent contractor issue, that's one of the big

22  defenses that Uber is raising in our case, and we also have to

23  be able to address that.

24         So in our mind -- I mean, unless Uber is going to say here

25  on the record today, Your Honor, we're not going to make this

1    employee/independent contractor thing an issue for you at all

2    at trial, then all of these issues are quite relevant and all

3    we're asking for -- I mean, this isn't an issue where we're

4    trying to reduce a burden on a third party.  This is a third

5    party who says:  I have these documents.  I'd just like to be

6    able to know what I know in Case A in Case B.

7              **MS. GROMADA:**  Your Honor, if I may add another point

8    of distinction.

9         We also need to appreciate that these protective orders

10   that are in place in these cases are in place for a reason.

11   Just as Your Honor made a ruling here in this case to protect

12   certain private information of Uber employees, we're also

13   talking about other litigation involving Uber employees, and

14   there are documents and information that should remain private,

15   confidential, et cetera, in that litigation, distinct from this

16   litigation.

17        Again, if Mr. Stanley, who is a part of the leadership

18   team for plaintiffs, wants to make specific discovery requests,

19   I think we can deal with those discretely.

20        But in -- but to basically allow all of the discovery that

21   took place in that case to be produced and shared with the

22   plaintiffs in this case I believe is improper and violates the

23   protective order that's in place in that employment litigation.

24             **THE COURT:**  Well, I can tee up the issue from my

25   review, but my preference would be that there is some sort of

negotiated resolution to the dispute.  You know, it's entirely

possible that he has some information that relates to this case

from a prior case that he -- that he's aware of it.

You know, we've gone over this knowledge-based policy

issue.  And forgive me if my verbiage is slightly off in

describing it, but at the core, you know, he's got a view and

plaintiffs are trying to figure out what were Uber's policies

and practices in certain areas.  And if that information is

readily available through the subpoena tool, there's no burden

or other -- you know, question as to relevancy and any other

concerns are sufficiently addressed that would be implicated by

a subpoena, then you all should be able to work it out.

Maybe it's not that he turns over -- appropriate for him

to just take wholesale what Uber's production was, but to

identify pieces of it and that do cross over, including not

just the policies but, you know, what -- what is Uber's

treatment of these -- of these drivers as far as their

employment status versus their independent contractor status

that can tie in with vicarious liability or other claims here.

It does seem to be like a pretty prominent issue.

So I think -- you know, I'm supposed to conduct discovery

in a way that maximizes efficiency and economy, and this seems

like one very reasonable approach to take.  And it doesn't --

so long as it's relevant and not unduly burdensome or it

violates Rule 26 in some other way, it seems like some of this

1    should be disclosed.

2        And then making plaintiffs go through the formality of a

3    discovery request under other rules of procedure that we have,

4    I just -- I think it elevates form over substance in a way that

5    is -- undercuts the demands for efficiency that we have, so --

6    and economy.

7        So that's how I see this.  Meet-and-confer on it.  I know

8    Mr. Stanley is not here today to address it.  I'm sure he would

9    be probably full throated in his advocacy, but why don't you

10   take that time and energy and just focus on brokering a

11   solution, because there's plenty of other issues that I am

12   going to have to address for the parties.

13       **MS. GROMADA:**  Your Honor, and so if I understand,

14   we're still going to end this conferral, try to broker a deal

15   that's consistent with Rule 26, which does not allow cloned

16   discovery.  So we can broker a deal that is specific for and

17   proportional to the needs of this case.

18       So I just want to make sure as I understand the Court's

19   guidance.

20       **THE COURT:**  It's not cloned discovery in that you're

21   not obligated to just produce a copy of every production you've

22   ever done in prior litigation.

23       You know, in other cases where I've handled this issue,

24   even where you're talking about two antitrust cases, I still

25   parse through what the claims are in the respective cases and

1   what the -- what the discovery disputes -- or what the

2   discovery is that's requested to make sure that it's not as

3   simple as copy and dump.

4       Okay?  I hope that's enough guidance.

5           **MS. GROMADA:**  Understood, Your Honor.  Thank you.

6           **THE COURT:**  Okay.

7       So that was what I wanted to discuss with respect to the

8   third-party subpoenas.  We're at an hour, which I think is more

9   than enough time for today's discovery status conference.  I

10  hope it was helpful.

11          **MR. SHORTNACY:**  Yes.  Thank you, Your Honor.

12          **MS. LUHANA:**  Thank you, Your Honor.

13          **THE COURT:**  Okay.  All right.  Thank you everyone.

14  Take care.  Bye-bye.

15          **THE CLERK:**  Court is now adjourned.

16      (Proceedings adjourned.)

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, October 2, 2024