# EXHIBIT 4

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CIVIL PART
                              MERCER COUNTY
                              DOCKET NO. MER-L-000360-24
                              APP. DIV. NO. _____
       _____
       CHAYA LORD and BRANDON    :
       LORD,                     :
                                 :
              Plaintiffs,        :
                                 :
           v.                    :
                                 :
       UBER TECHNOLOGIES, INC.,  :
       RASIER, LLC, JUAN R.      :           TRANSCRIPT
       ESCOBAR, JOHN DOES 1-10   :               OF
       (fictitious designations),:       MOTION HEARING
       and ABC COMPANIES 1-10    :
       (fictitious designations) :
                                 :
              Defendants.        :
       _____
```

                          Place:  Mercer County
                                  Civil Courthouse
                                  (Heard via Zoom)

                          Date:   July 9, 2025

BEFORE:

    HONORABLE DOUGLAS H. HURD, P.J.Cv.

TRANSCRIPT ORDERED BY:

    BRUCE H. STERN, ESQ. (Stark & Stark, P.C.)

APPEARANCES:

    BRUCE H. STERN, ESQ. (Stark & Stark, P.C.)
    Attorney for Plaintiffs Chaya Lord and Brandon
    Lord

        Transcriber:   Sarah Fetz, AD/T 626

        Agency:        KLJ Transcription Service, LLC
                       P.O. Box 352
                       Oakland, NJ 07436
                       (201) 703-1670
                       (201) 703-5623

                       Digitally Recorded
                       Operator - Zaire Mitchell

APPEARANCES, (CONTINUED):

      BRET D. STANLEY, ESQ. (Johnson Law Group, LLC)
      (Admitted *Pro Hac Vice*)
      Co-Counsel for Plaintiffs Chaya Lord and Brandon
      Lord

      CHRISTOPHER R. CARTON, ESQ. (Bowman & Brooke, LLP)
      Attorney for Defendants Uber Technologies, Inc.
      and Rasier, LLC

      MATTHEW P. KESSLER, ESQ. (Zarwin Baum DeVito
      Kaplan Schaer Toddy, P.C.)
      Attorney for Defendant Juan Escobar

I N D E X                          3

PROCEEDING                                    PAGE

Motion Hearing                                 4

DEFENDANT UBER'S MOTION FOR RECONSIDERATION....4

        Arguments
          By Mr. Carton                         4
          By Mr. Stern                         10,15
          By Mr. Stanley                       13

        Judge's Decision                       18

PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF
DR. BENOFF'S RAW DATA.........................29

        Arguments
          By Mr. Stern                         29,31
          By Mr. Kessler                       30,33

        Decision Reserved                      38

PLAINTIFF'S MOTION TO COMPEL RESPONSES TO NOTICE
TO PRODUCE....................................40

        Arguments
          By Mr. Stanley      40,46,51,53,63,67,69,72
          By Mr. Carton     43,48,52,54,56,59,64,68,71
          By Mr. Stern                 49,58,66,69,70

        Judge's Decision                       74

DEFENDANT UBER'S CROSS-MOTION TO APPOINT A
SPECIAL MASTER................................75

        Arguments
          By Mr. Carton                        75
          By Mr. Stern                         76

        Judge's Decision                       76

Colloquy / Argument                          4

1     (Proceedings commenced at 3:06 p.m.)
2          THE COURT:  Good afternoon, Counsel.  We are
3     on the record here.  This is docket 360-24.  Can you
4     state your appearances, please?
5          MR. STERN:  Good afternoon, Your Honor.
6     Bruce Stern, the law firm of Stark and Stark on behalf
7     of the plaintiffs, and let me introduce Your Honor to
8     Mr. Stanley, who's also my co-counsel.
9          THE COURT:  Good afternoon.
10         MR. CARTON:  Good afternoon, Your Honor.
11    Chris Carton from Bowman and Brooke for defendants Uber
12    Technologies, Inc. and Rasier, LLC.
13         THE COURT:  Very good.  And who are we
14    missing here?
15         MR. STERN:  Mr. Kessler.
16         THE COURT:  Okay.  So he's -- let me just
17    see.  Which motion is he on?
18         MR. STERN:  He was on the neuropsychological
19    motion.
20         THE COURT:  All right.  So why don't we move
21    on with the other ones, then?  Why don't we start with
22    the Motion for Reconsideration, if that's okay?  So Mr.
23    Carton, this is your motion.  You can go ahead.
24         MR. CARTON:  Yeah.  Thank you, Your Honor.
25    And this relates, Your Honor, as you recall, to the

Argument                              5

1     depositions of two -- two pers -- two matters, one
2     person, Erin O'Keefe, and -- and the specific company
3     witnesses in -- in two -- two separate matters.
4          Your Honor's instincts originally when we
5     argued this were correct, I believe, and I think the
6     papers have since borne this out in that there's
7     something inherently wrong and you -- the Court does
8     not have the power to just enter an order producing
9     documents that have protected in orders of --
10    protective orders, confidentiality orders, entered by
11    other courts in other jurisdictions.
12         And -- and as Your Honor knows, those
13    protective orders are not just done ever at the request
14    of one party; they are always done either joint --
15    jointly or court-ordered by a court and they can be
16    requested by a plaintiff or they can be requested by a
17    defendant.  And when things are marked confidential,
18    particularly depositions, that's not just to protect a
19    defendant and its documents, it's oftentimes a lot to
20    do with the person being deposed or the aspects of the
21    plaintiff in the lawsuit.
22         So it's a -- the simple issue is whether or
23    not depositions that were subject to protective orders
24    are subject to production.  Your Honor originally said
25    no and then on some -- on reconsideration by Mr. Stern,

Argument                                    6

1   based upon some of the actions stayed in the MVL court
2   but that are not Third-Circuit that are not New Jersey
3   law, Your Honor found that that -- you were presented
4   with evidence to suggest it -- it can be done.
5          And so we've moved for reconsideration, Your
6   Honor, specifically now directing the Court to what we
7   think is more apt case law and precedent, precedent
8   meaning specifically New Jersey Supreme Court in the
9   Hammock by Hammock decision, but -- that's been cited
10  favorably and then up in the Third Circuit, which is
11  the district in which we sit.  And I know that that's
12  not binding and -- on Your Honor.  However, they -- the
13  Court there is, in the cases we've cited, applying New
14  Jersey law and even remarking that -- that they believe
15  this is how it would be done in -- in New Jersey,
16  basically.
17
18         And the cases which are the Third Circuit
19  Court of Appeals District of New Jersey, District of
20  Delaware, and -- and the New Jersey Supreme Court, as I
21  mentioned, basically say that when you're -- the
22  procedure, the proper procedure to effect a protective
23  order entered by a different court is for the person
24  that wants to upset that protective order or receive
25  those materials to intervene or to make an application

Argument                                    7

1   to the Court that issued the protective order and have
2   it evaluated under the context of the case in which it
3   was issued and have a decision made, but not to come to
4   a collateral court such as Your Honor's and ask Your
5   Honor to effect an order.
6          Now, plaintiff has argued that this isn't
7   upsetting or this isn't -- this isn't in any way mo --
8   seeking to modify a protective order, but it absolutely
9   is, Your Honor.  If a deposition's marked
10  confidentiality -- confidential pursuant to a
11  protective order in a separate matter in some other
12  court and Mr. Stern and his client would like to upset
13  that -- they want to receive that document and they're
14  not parties that have received it from parties in that
15  case, if you'll recall here, Mr. Stern recounted that
16  he went to Kline and Specter for the Sauerwein
17  deposition and they told him they can't produce it,
18  it's subject to a protective order, we can't give it to
19  you.
20         So the procedure, Your Honor, is to -- that
21  is modification of a protective order.  You're --
22  what's being asked here is that documents that were
23  marked "confidential" pursuant to a protective order be
24  produced.  And the question is whether Your Honor has
25  the authority to produce it or the court that entered

Argument                                8

1   the protective order.  And the case law that's relevant
2   from the Third Circuit interpreting New Jersey law and
3   from the New Jersey Supreme Court suggest that the --
4   filing a motion to intervene in the court that issued
5   the protective order, that's the proper procedure to
6   seek to alter it.  It is alteration of a protective
7   order because you are carving a document out that was
8   protected and producing it to strangers in a different,
9   unrelated litigation.
10          And so, Your Honor, I'm happy to discuss the
11  cases but they were specifically the Dart Industries
12  matter from the District of Delaware, 1970; the Pano --
13  Patopaque Products Liability Litigation from the
14  District of New Jersey, 1995; Inventio AG v.
15  ThyssenKrupp, District of Delaware, 2009; Pansy v
16  Stroudsburg, that's the Third Circuit 1994; and the
17  Hammock decision I mentioned, Supreme Court of New
18  Jersey, 1995.
19          So in light of that case law, Your Honor,
20  which I just will say again, it -- it actually jives
21  with Your Honor's original instincts completely and
22  suggests that the proper way, if they would like
23  protected orders of Erin O'Keefe's depositions or the
24  depositions of the company representatives in the two
25  other matters, it's to proceed to those courts and

Argument                                9

1   either ask the parties to sign the inter -- the
2   protective order to voluntarily permit or to go to the
3   court itself.
4          But respectfully, Your Honor, we believe that
5   this -- this case law does indicate that this Court,
6   respectfully, does not have the power and should not,
7   on the basis of comity and for a lot of other reasons,
8   order the, basically, modification of a protective
9   order to produce those documents.  So that's why we
10  sought reconsideration.  Just on the standard, Your
11  Honor, there's something -- the standard -- right?
12  This always happens.  When you want reconsideration,
13  you say a court can reconsider interlocutory orders
14  whenever they want.  When you don't, you cite the thing
15  that says you have 20 days to do it.  We all know that
16  game.  Here, we're talking about an interlocutory
17  order.  Your Honor absolutely has the power, for good
18  cause, to reconsider.
19          And the only final thing I'll add, Your
20  Honor, is just to remind this Court, we gave the
21  plaintiffs every single deposition that Erin O'Keefe
22  has done in New Jersey: seven.  As a corporate
23  representative, is -- under which every single one, the
24  issues of "control" that are allegedly the issue in
25  this case are -- are discussed and addressed.  The two

Argument                                10

1   ex -- the proportionality aspects to expand beyond that
2   alone mitigate against giving those.  But the proper
3   procedure is for plaintiffs to either voluntarily have
4   those parties modify the protective orders or seek it
5   from the courts themselves.
6           THE COURT:  Thank -- thank you, Mr. Carton.
7   Mr. Stern or Mr. Stanley?
8           MR. STERN:  Thank you, Your Honor.  I think
9   in looking at this -- this motion, one has to first
10  step back.  And that is, we've requested the
11  depositions of Erin O'Keefe, Peter Sauerwein and in the
12  moving papers, I've called them the corporate
13  representative or corporate designee in the Razak
14  matter.  It's now my understanding that the corporate
15  representatives in Razak were a Mr. Rosenthal and a Mr.
16  Baker.
17          But the first step is they argue well,
18  they're covered by a protective order, yet they've
19  never provided Your Honor with a protective order.  Not
20  one.  I've invited them to produce a protective order
21  multiple times and they, I guess for strategic reasons,
22  haven't produced any.  So before one can say hey, can I
23  be compelled to produce a deposition transcript that's
24  covered by a protective order, Your Honor needs to see
25  the protective order.

Argument                                11

1           I have attached three protective orders  in
2   our moving papers and reply brief.  One of them is in
3   Razak.  In Razak, the order specifically states that
4   the party whose documents are being sought continues to
5   have control over those -- those documents.
6           So Uber has control of its own corporate
7   designee transcript.  In the Robertson case where I'd
8   requested a copy of Mr. Sauerwein's deposition, I
9   previously indicated that I believed that there was a
10  protective order in that case.  I did initially, way
11  back, reach out to Ms. Lawless from Kline and Specter
12  asking for a copy of Peter Sauerwein's deposition
13  transcript.  She said she could not send it to me
14  because there was a confidentiality agreement, which I
15  presumed meant there was a protective order.
16          I have -- my partner and I, Joe Cullen,
17  independently have gone through the -- I'll call it e-
18  filing in the City of Philadelphia.  There is no
19  protective order on the court's website for the entry
20  of a protective order in the Robertson case.  I'm going
21  to have to therefore assume that there's only a
22  confidentiality agreement between Kline and Specter and
23  Uber's counsel in that case, which is not Bowman and
24  Brooke.  But there is no protective order that I could
25  find.  And I -- I said Mr. Cullen and I both

Argument                    12

```
 1   independently went through that.  And I presumed, in
 2   response, if there was a protective order, then Mr.
 3   Carton would have supplied it.
 4           Third, Your Honor, I've supplied Your Honor
 5   with -- as I said, with a number of -- protective
 6   orders, I think two of them, and previously --
 7   submitted the MDL protective order.  All three of them
 8   give Uber control of its own documents.  So the
 9   protective orders do not bar Uber from turning over its
10   own corporate designee transcripts.
11           THE COURT:  And -- and I'm sorry to interrupt
12   you, but I mean, in Razak, you know, which Mr. Carton
13   cites to that the language that says all confidential
14   information obtained by any person shall be maintained
15   carefully so as to preclude access by persons who are
16   not entitled to receive such information.
17           MR. STERN:  I'll find your paragraph, Your
18   Honor.
19                (Brief pause/dead air.)
20           MR. STERN:  So if you go to -- I'll get the
21   -- on this one order.  This is in --
22           THE COURT:  -- paragraph 5 in the Razak?
23           MR. STERN:  Yeah.  This is in Razak,
24   paragraph under number 3, designation.  It says,
25   "Nothing contained in this stipulation shall affect the
```

Argument                    13

```
 1   right of a party to use or disclose information that
 2   such a -- that such a party has designated confidential
 3   as such party sees fit."  It's Uber that wants it to be
 4   confidential, number one.  So they have the authority
 5   to do as they want with their own documents that have
 6   been marked "confidential".  And for Mr. Carton to
 7   suggest that there's some reason why a plaintiff would
 8   want Uber's corporate designee to be marked as
 9   confidential just doesn't bear credibility.
10           And I have Mr. Stanley here, who is involved
11   in the Razak case if there's any question as to the
12   legitimacy or illegitimacy of that remark.
13           THE COURT:  Yeah.  I mean, I -- I'm just -- I
14   mean, it says here as well, other than at a trial or
15   deposition related to this proceeding, court filing or
16   hearing or conference regarding any motion in this
17   proceeding, confidential information may not be
18   disclosed or made available by a recipient of such
19   information.
20           MR. STANLEY:  Judge, if I may, may I make a
21   comment here?  This is Bret Stanley, Johnson Law Group.
22   Every protective order that -- that I've ever been
23   involved in with Uber, including the Razak matter,
24   other protective orders and arbitrations that I've
25   tried and the protective order in MDL all have some
```

Argument                        14

1    portion in it that allows for production pursuant to
2    court order.  And -- and the Razak matter does at the
3    bottom of page 10.  If a receiving party is served at
4    any time during or after the pendency of this matter, a
5    subpoena or court order seeking disclosure of
6    information produced in the proceeding, the receiving
7    party shall immediately notify the producing party.
8          And so it contemplates production pursuant to
9    court order, such that if you order or have ordered
10   these productions, it's on the onus to notify the
11   producing party, give them the option to come to you.
12   But it -- it contemplates productions can occur and do
13   occur subject to protective orders.  Indeed, in MDL,
14   3084, we were ordered, I was ordered to produce
15   documents that I had obtained previously subject to a
16   subpoena and court order in that -- in that litigation
17   for efficiency's sake.  And Uber came to those hearings
18   and understood that they argued against that and the
19   judge says well, the protective order itself
20   contemplates production if a court order comes into
21   play.
22          THE COURT:  That's -- I mean, is that the
23   court order of the court that entered the protective
24   order?
25          MR. STANLEY:  So they sought protection from

Argument                        15

1    a different court, actually, from -- from the -- well,
2    in -- in MDL 3084, they sought protection because that
3    request was made to that judge.  And so it was a little
4    different procedurally as you say.  They didn't go back
5    to prior arbitration and certainly didn't go back to
6    Judge Baylson in the (indiscernible) of Pennsylvania to
7    get permission for production.
8          MR. STERN:  The second, Your Honor, is we
9    attached a protective order, and I believe it's the
10   Golightly case.  There, there was a sharing agreement
11   in which it specifically contemplated that counsels
12   could share the protected documents with outside
13   counsel as long as outside counsel was willing to sign
14   the protective or -- you know, agreed that they would
15   be covered by the protective order.
16          And also, we cited Your Honor to a third
17   decision.  Again, similarly, I believe it's the Cortijo
18   case, which again indicated that the -- any documents
19   that were marked confidential belonged to the party
20   that marked them.  That's -- Cortijo case that had the
21   sharing agreement in Golightly.  There was the
22   discussion with regard to if it was your documents that
23   were marked confidential, you had the ability to -- to
24   turn them over.  That would be paragraph 10 in
25   Golightly on page 4 of the case text.  It said, first,

Argument                                    16

1    nothing contained in this protective order will affect
2    or restrict the rights of any person with respect to
3    its own documents or information produced in this
4    action.
5            And then again, nothing in this protective
6    order will prevent any person subject to it from
7    producing any confidential discovery material in its
8    possession in response to a lawful subpoena or other
9    compulsory process or if required to produce by law or
10   by any government agency having jurisdiction.
11           So we've produced to Your Honor multiple
12   protective orders which permit Uber to provide these
13   documents to us.  Uber has, as has -- has been in the
14   case in every motion, has never produced one
15   certification or one explanation from Uber as to why it
16   could.
17           The other thing I would just like to
18   highlight, Your Honor, is Mr. Carton is fond of
19   discussion and arguing proportionality, and I just want
20   to remind the Court that New Jersey's Rule 4:10-2(g),
21   which is the proportionality part of our rules, is much
22   narrower than the federal rule.  And the Court when
23   considering proportionality is to look at the
24   importance of the issues, the relevancy of the
25   discovery, the amount in controversy, and each party's

Decision                                    17

1    resources.
2            And obviously it's important to us in terms
3    of savings that Uber has made in the past with regard
4    to control.  It's certainly relevant.  Thi -- my client
5    sustained a significant traumatic brain injury in this
6    crash, and -- and we can't -- no one can argue that
7    Uber doesn't have the resources; they're a $58 billion
8    international corporation.  So Mr. Carton's fond of
9    arguing proportionality, but when we're talking about
10   proportionality, we have to look at the four factors
11   and see how and whether they actually apply and -- and
12   how they fall, plaintiff versus defendant.
13           THE COURT:  Yeah.  I mean, just let me ask.
14   I mean, isn't it -- under the cases cited by Mr.
15   Carton, isn't it appropriate, though, for you to go
16   back to those courts that actually entered those
17   orders?
18           MR. STERN:  Well, many of those decisions
19   cited by Mr. Carton, I think almost all of them,
20   including Hammock, have to do with public interest
21   groups looking to obtain information, not by
22   plaintiff's counsel or defendant's counsel seeking
23   transcripts.  And we've supplied Your Honor with
24   decisions from other courts, that specifically bold
25   that the Court has the power to order, which is why

Decision                                18

1   Your Honor granted my motion for reconsideration.
2          THE COURT:  Okay.  Well, listen.  I mean, you
3   know, I -- I hate to go back and forth on this, but I
4   do agree with Mr. Carton.  I mean, I -- I've, you know,
5   two or three times now gone through every case that was
6   -- was cited to me.  Mr. Carton is correct.  My initial
7   instincts when I didn't have all these cases was
8   correct.  And, you know, I understand your position,
9   Mr. Stern, and I -- you know, I apologize for kind of
10  switching back and forth here, but under the Lawson
11  case, the Court does have the ability in the interest
12  of justice, to reconsider an interlocutory like --
13  order like this.
14          So, you know, when you read these cases, and
15  of course, they're distinguishable on the facts and for
16  various procedural reasons, but when you read the
17  language of these cases, Inventio, I'm not pronouncing
18  these -- Panotoco (sic), I have the IBM case.  And the
19  IBM case was Second Circuit case where the Second
20  Circuit reversed the trial court for -- for, you know,
21  agreeing to release this information.  The Pansy case,
22  that's a Third Circuit case, DVL, District of New
23  Jersey.  The Harper case, which is the Eastern District
24  of Pennsylvania.  You know, the courts are clear that
25  if I was to or -- it would offend notions of comity.

Decision / Colloquy                     19

1   And that the appropriate avenue is to make application
2   to those courts that have entered those orders or have
3   considered their confidential information as part of an
4   agreement between counsel to seek relief there.
5          So, you know, I -- I understand, you know,
6   your point.  I -- it's a unique issues that's -- that's
7   new to me here, which is why I -- I've kind of -- kind
8   of gone back and forth on this and I apologize for
9   that, but having read these cases and read them
10  multiple times, it's the unmistakable conclusion that
11  Mr. Carton is correct on this.  So I'll -- I'll enter
12  his order --
13          MR. STERN:  Your Honor, if I could just
14  inquire as to Mr. Sauerwein's deposition, because there
15  is no protective order in that case.  So there's not an
16  issue of you -- of Your Honor overruling or some other
17  court having entered an order.
18          THE COURT:  Mr. Carton, do you want to
19  address that?
20          MR. CARTON:  Yeah.  Just the -- I need to
21  confirm that, Your Honor, that there is not.  I know
22  it's not reflective of the record on this motion, but
23  if there is, I would ask that it be subject to the
24  Court's order.  And if not, Your Honor, and if Your
25  Honor's inclined to produce it, I would ask that it

Colloquy                          20

```
 1    only be done so a protective -- once a protective order
 2    is entered in this case.
 3            If you recall, Your Honor had -- even your
 4    order producing these depositions before this
 5    reconsideration motion provided it's subject to a
 6    protective order in this case, and there's still not
 7    one.  We've -- we've provided counsel with a basic -- a
 8    basic protective order, just like the one we were just
 9    looking at a moment ago, that's pretty -- pretty
10    common, but counsel refused to sign it because he -- my
11    understanding is he would only agree to protect and
12    allow us to mark confidential these depositions and not
13    documents like you do in the cases like this; when you
14    produce information, it's up to the party to decide
15    what's confidential, what's not.  There's a dispute
16    process and protective order if counsel feels that
17    something's marked improperly.
18            So I would -- so I'd like to confirm there's
19    no protective order in that case, Your Honor, and if
20    there is, that it be subject to Your Honor's order.  If
21    not, I'd like that it be conditioned upon a protective
22    order in this case.
23            THE COURT:  Okay.  Well, I guess we -- we
24    don't have the answer is the point.  If -- if it is
25    subject to a confidential protective order, then
```

Colloquy                          21

```
 1    obviously it would be subject to the decision I just
 2    made.  But, you know, if not, I -- and Mr. Carton, are
 3    you referring to my April 3rd order?
 4            MR. CARTON:  No.  Your -- your
 5    reconsideration -- your May -- I think it was May 9 --
 6    the second -- the May 9 order, Your Honor, or May --
 7            THE COURT:  Okay.
 8            MR. CARTON:  When Your Honor did order these
 9    produced based on Mr. Stern's --
10            MR. STERN:  Just let me clarify, Your Honor.
11    When Your Honor granted my motion for reconsideration
12    and said that the transcripts would be produced
13    pursuant to a protective order, that was fine.  What
14    Mr. Carton and Mr. Meyer -- I think it was Mr. Meyer
15    that sent it to me, I don't know who prepared it, but
16    that -- what they sent me went well above and beyond a
17    protective -- Your Honor ordered a protective order on
18    the transcripts.  They wanted to enter an order making
19    everything confidential, and I said no, draft a
20    protective order pursuant to the Court's ruling and
21    I'll sign it.  They never did.
22            THE COURT:  Okay.  Yeah.
23            MR. STERN:  I know that's not in front of
24    you, but I just want the record to be clear.
25            THE COURT:  Okay.  I -- I understand your
```

Colloquy                                    22

1    point.  So Mr. Carton, then, I mean, if -- I guess -- I
2    mean, if you're saying -- I mean, I don't know.  This
3    -- this issue of Mr. Sauerwein isn't in front of me
4    because the April 3rd order that all this started from
5    was -- that was Ms. O'Keefe.  Part -- part of that was
6    Ms. O'Keefe, but then deposition transcripts subject to
7    confidentiality agreements or protective orders do not
8    have to be produced.  So --
9                MR. CARTON:  Right.  It was the May 9th
10   order, Your Honor.  The next one, when Mr. Stern moved
11   for reconsideration and Your Honor ordered -- it was
12   pursuant to a protective order in that time.  And I
13   think Your Honor -- I think in oral argument, actually,
14   last time believed one was in place, but if we look at
15   that -- I was looking at that transcript yesterday.
16   And in fact, they're just not, Your Honor.  So --
17               THE COURT:  Well, I --
18               MR. CARTON:  -- clearly.  And so I'd ask
19   this, that we -- Your Honor's order -- if Sauerwein's
20   not subject to a protective order in that <u>Robertson</u>
21   case, I would just ask that it simply says it must be
22   produced purs -- you know, upon execution of a
23   protective order in this case.  And we'll hopefully do
24   that by consent, Your Honor, or hopefully maybe the
25   Court -- we could put one to the Court.  I mean, ARBIS

Colloquy                                    23

1    did not deviate very much from the one that's in the
2    appendix of the court rules.
3                THE COURT:  Just one second.  So the order
4    you submitted with this motion says the defendant's
5    motion for reconsideration is granted.  The May 9 order
6    is vacated.  Okay?  So that's what you submitted with
7    this motion that we -- I just decided.  So by vacating
8    the May 9th order, that means that the April 3rd is now
9    the operative order.  Understand?  Okay.  So the April
10   3rd order, you know, just mentioned that Ms. O'Keefe's
11   deposition transcript had to be produced, and then that
12   any deposition transcripts subject to confidentiality
13   agreements or protective orders do not have to be
14   produced.  So I -- you know, so -- so what happens is
15   the April 3rd order doesn't reference the condition of
16   any production to a confidentiality order or protective
17   order, unless I missed --
18               MR. STERN:  Your Honor, if -- I'm more than
19   happy, if you'll give -- if Mr. Carton will give me Mr.
20   Sauerwein's transcript, it can -- it will be subject to
21   the same -- it will be subject to confidentiality.  I
22   don't have a problem with that.
23               THE COURT:  Okay.
24               MR. STERN:  I'm just not going to sign a
25   blanket --

Colloquy                          24

1      MR. CARTON:  Okay.  If we -- as long as -- as
2   long as Your Honor, there is some situation where even
3   if we come to just terms with Mr. Stern on that
4   deposition, that that be confidential, that's fine.
5   We'll work that out.  I just -- I just don't want the
6   order to say we've got to launch it tomorrow if --
7   without anything in place at all.
8      THE COURT:  Yeah.  Like I said, your -- your
9   order just vacates the May 9th order, which means the
10  April 3rd order goes back into effect.  Okay.  So --
11     MR. STERN:  Judge, that takes me to my
12  motion.
13     THE COURT:  Correct.  Correct.
14     MR. STERN:  So Your Honor ordered them to
15  produce the O'Keefe April 3rd and here we are July 9th
16  and I still don't have any of them.
17     THE COURT:  Okay.  So -- I mean, that -- the
18  order says Uber/Rasier has 30 days from this date to
19  make inquiry regarding the production of copies of all
20  of Erin O'Keefe's deposition transcripts, regardless of
21  whether they were taken in New Jersey or other states.
22  So what -- what's the status of that, Mr. Carton?
23     MR. CARTON:  Your Honor, the -- the -- there
24  are dozens of depositions of Erin O'Keefe.  The process
25  -- what's held up the process is trying to determine


Colloquy                          25

1   which of those -- individual action because it requires
2   an actual individual contact with the parties to see
3   whether or not they were -- there was a protective
4   order in the case and whether the deposition made it
5   to, you know, to be a -- a protective order.
6      So what the -- the -- the order -- the April
7   order did not require production of the depositions, it
8   was the inquiry and where we're at is that there are
9   literally dozens and we're trying to weed through which
10  ones are protected and which ones were not.  So, I
11  mean, if we could -- I'm trying to think if there's a
12  way, Your Honor, we could mutually sort of somehow --
13  if we could put a number on it and we could find -- you
14  know, find the ones that are -- so we're not looking
15  through, you know, dozens and dozens to try to -- this
16  process is taking a massive amount of work and time to
17  just try to figure out which ones are -- are subject to
18  or not subject to a protective order.  If there could
19  be some limit or something that would -- we could
20  either agree with Mr. Stern on.  I mean, -- got seven
21  in New Jersey.  We need dozens more for the purposes of
22  this case, this Lord case.  So --
23     THE COURT:  Mr. Stern, what are your
24  thoughts?
25     MR. STERN:  Well, I don't know how many

Colloquy                          26

```
 1    transcripts there are out there, number one.  All I
 2    know is we argued this motion.  Your Honor entered an
 3    order.  You gave over 30 days.  Now we're 90 days and
 4    they haven't complied with your Court's order.  That's
 5    all I know.  That -- they were given 30 days prior,
 6    Your Honor, to do what Mr. Carton's now asking.
 7            At least as I read the protective orders,
 8    transcripts are supposed to be marked "Confidential".
 9    So it's not that difficult to open up a PDF and see
10    whether it says "Confidential" or not.
11            THE COURT:  I mean, I'm not sure that -- Mr.
12    Carton, I mean, there's no doubt you're not in
13    compliance with the order, but -- I mean, do you have
14    an idea how much longer it's going to take, or --
15            MR. CARTON:  I would just ask for the -- that
16    30-day, Your Honor.  With the reconsideration and
17    everything changing, it -- it just changed the -- the
18    landscape.  If we could just go back to the April 3rd
19    and now say 30 days, I would request that the Court
20    respectfully do that.
21            THE COURT:  Thirty days -- an additional 30
22    days to make inquiry?
23            MR. CARTON:  To give Mr. Stern a number of
24    how many would -- there would be.  Right.  And then we
25    hopefully could work out some agreement on, you know,
```

Colloquy                          27

```
 1    maybe -- if the case is in some -- if it's just
 2    O'Keefe, it could be a case about anything.  So
 3    hopefully -- I'm hopeful that as a sub-process, we
 4    could sort of talk and agree these are the -- bases in
 5    which somebody was actually in -- an injury-type case.
 6    So yeah, 30 days for the inquiry and then we can
 7    hopefully have the number -- number generated and then
 8    we can hopefully come to some agreement on what -- what
 9    the actual ones Mr. Stern would like.
10            THE COURT:  Mr. Stern, any thoughts?
11            MR. STERN:  I'm all right with most of that.
12    My -- my big concern is, you know, Mr. Carton keeps
13    going well, he -- he gave me seven.  I think of the
14    seven, four or five of the seven were so inaccurate
15    that they barely even scratched the surface.  You know,
16    one of the things as I've said to Your Honor, and I've
17    said this before, is you don't know what you don't
18    know.  So if you're deposing somebody from Uber and you
19    don't know the documents exist, if you don't know that
20    they have -- what the algorithms are -- you know, just
21    to give you an example here, they turned over initially
22    only documents with regard to the rides that Mr.
23    Escobar gave in 2022.  I did have checkered background
24    searches that they provided, but I didn't know what
25    they meant.  And then when I served this most recent
```

Colloquy                                28

1    Notice to Produce, all of a sudden, I find out that Mr.
2    Escobar had been suspended by Uber, had been -- when he
3    reapplied, he had been rejected once by Uber.  So if
4    you don't have the documents, the point being you can't
5    take a good deposition.  So they say seven that they
6    gave me, five were -- only two were -- were good and
7    those were the ones taken by my partner, so.
8             THE COURT:  All right.  Well --
9             MR. STERN:  I'm happy to try to resolve the
10   issue with Mr. Carton.
11            THE COURT:  Okay.  I would agree.
12            MR. STERN:  -- we're going to move on it.
13            THE COURT:  Yeah.  No.  I -- you -- you've
14   been patient and, you know, Mr. Carton, this 30 days
15   has to be complied with.  Okay?  I mean --
16            MR. CARTON:  Understood, Your Honor.
17            THE COURT:  Yeah.  I'm not sure why it's
18   taking so long.  So what I'll do is -- you know, I
19   won't award sanctions, but I will say that the April
20   3rd order is modified to allow for an additional 30
21   days for the inquiry.  Okay?
22            MR. CARTON:  Thank you, Your Honor.
23            THE COURT:  All right.
24            MR. STERN:  We do have Mr. Kessler here, Your
25   Honor.

Argument                                29

1             THE COURT:  Oh.  He is?
2             MR. KESSLER:  Yeah.  I -- I apologize,
3    everybody.  I've been without power for about an hour
4    and a half now.  It's about 92 degrees, so I -- I
5    apologize for that.
6             THE COURT:  Okay.  No problem.  Okay.  Why --
7    why don't we deal with, then, the motion dealing with
8    Dr. Benoff?  Mr. Stern, you can go ahead.
9             MR. STERN:  Yes, Your Honor.  I quite frankly
10   expected more opposition.  If I'd known what the
11   opposition was going to be, my brief would have been
12   much shorter.  There seems to be a disconnect between
13   Mr. Kessler and myself, because he talks about attorney
14   work product.  I'm not looking for any notes between
15   Dr. Benoff and Mr. Kessler.  Right?  That would be
16   protected.  When I referenced "notes", normally when a
17   neuro-psychologist or his or her technician administers
18   testing, they take notes talking about the emotions of
19   the testee, reactions, do they appear tired; just
20   general comments that -- especially because Dr. Benoff
21   doesn't -- it's my understanding does not administer
22   the tests.  So notes from his technician to him
23   regarding the tests would be helpful.
24            But again, like, even though he didn't raise
25   it, what -- as I said in my moving papers is they

1  raised the same argument with regard to the raw data as
2  defense and neuro-psychologist raised in DiFiore.  It's
3  the same issue.  They allege oh, you know, it's all
4  protect -- and I entered into a protective order with
5  Mr. Kessler with regard to video recording of Dr.
6  Benoff's exam and I'm willing to enter into the same
7  protective order with regard to the raw data.  That's
8  really all I have to say.  My brief is pretty
9  extensive.
10          THE COURT:  Thank you.  Mr. Kessler, you can
11  go ahead.
12          MR. KESSLER:  Yeah, Judge.  I -- you know,
13  there may have been a time where -- discovery tools
14  that are available to him to make a request and I have
15  -- objection to it.  I -- I don't know.  It doesn't
16  exist yet.  So, you know, whatever it is that he's
17  requesting, I mean (indiscernible) filing a Motion to
18  Compel about (indiscernible).  Once this -- once the
19  examination is conducted, and Bruce and I have had
20  cases with Dr. Benoff before.  It's not usually an
21  issue.  We usually come to an agreement
22  (indiscernible).
23          Once -- once this exam takes place and once
24  Dr. Benoff utilizes whatever tools, you know, he wants
25  to utilize, you know, and then, you know, if that's a

1  proper discovery (indiscernible), then I can respond to
2  the proper discover.  I'm -- I'm really only responding
3  to a Motion to Compel (indiscernible) items to compel
4  at this point.  If it's not produced, it doesn't exist,
5  it's not in existence.  And there's no, you know,
6  direct discovery demands to make.
7          You know, that -- that said, I think -- issue
8  is now.  If Bruce wants to reiterate these requests, I
9  guess we'll call them requests, once the deposition --
10  once this IME goes forward, I mean, I -- then I can
11  address it.  I don't know what's (indiscernible).  What
12  Bruce says is right; there's commonly notes
13  (indiscernible), particularly the other side.  I need
14  to see what is actually created before I can really
15  respond substantively, and -- and so, you know, if --
16  if we want to follow the proper channels, then we --
17  you know, that's what we should do.
18          I -- I think this is premature and to compel
19  him to produce stuff that's not in existence within a
20  certain date when, you know, when we've not violated
21  any discovery requirements up to this point, I don't
22  think there's really (indiscernible) for that.
23          MR. STERN:  Your Honor, Mr. Kessler has
24  requested a neuro-psych evaluation.  My client's -- I
25  think it's scheduled for later this month.  When she's

1   examined, she's going to be given tests and she's going
2   to give answers.  Those answers are the raw data.  So
3   it's not like I'm asking her something that's not going
4   to be existing; it's going to exist.  I've been through
5   this with Dr. Benoff and his partner, Dr. Masur,
6   multiple times.  They're go -- there's raw data that's
7   going to be created.  It's like saying plaintiff's
8   going for a defense MRI and I'm saying well, I just
9   want you to send me the MRI once the test is done.  Dr.
10  Benoff will score that test.  They -- he has a form
11  called a Scoring Summary Sheet.  I want that sheet.
12          He gives the MMPI.  It's a 300 and some
13  true/false questionnaire.  I believe he scores it by
14  hand.  Some people send it to Puritan to have it scored
15  electronically.  In the event that it's -- that's what
16  Dr. Benoff does, that's what I want.  Dr. Benoff knows
17  exactly what I'm re -- what I'm requesting.
18          Whether I take now -- I filed these motions
19  now because normally, I'm like, if you're not going to
20  give it to me, I'm not producing my client because the
21  clock ticks on discovery.  If I get Dr. Benoff's
22  report, then I request the same thing I'm requesting
23  now, now we're another month down the road and then
24  we're two or three more -- because once I have the raw
25  data, I'm going to hire experts to bar him and it's

1   just going to push the time.  So the sooner I get these
2   documents, the faster we can process this.
3           THE COURT:  Anything else, Mr. Kessler?
4           MR. KESSLER:  Yeah, Judge.  I -- I have no --
5   I understand why he wants stuff that -- he --
6   apparently, he goes to Dr. Benoff (indiscernible).
7   Right?  But -- but it hasn't happened yet, so to -- to
8   jump the line -- discovery demands -- and you know,
9   quite frankly, look.  It -- when proper discovery
10  demands do come out, I'm -- I may accept that.  I mean
11  (indiscernible) relies on AI MRIs that haven't --
12  they're not -- there's no possible way for people to --
13  to review (indiscernible).  So -- it's a little bit odd
14  that, you know, this is -- that I'm getting here when
15  -- when I make the request of Dr. Greenwald (phonetic),
16  the response is going to be well, we -- we can't get
17  access to that.
18          But I'm -- I'm -- you know, I'm putting that
19  cart before the horse because that's not -- the
20  question here is can the -- can this person be
21  compelled to produce something that doesn't exist now
22  without any discovery demand being made?  And -- and I
23  think the answer is -- is no.  Like, how could that
24  possibly be?
25          So if there's a bigger question to address,

1  then we can address that at the appropriate time, like
2  when I violate a discovery demand, but there is
3  no discovery demand made.  You know, I -- I don't know,
4  you know, perhaps Dr. Benoff's methods have changed.  I
5  -- I don't (indiscernible) right to review what my
6  expert has and produce it in -- in accordance with
7  discovery demands.  This is -- this is (indiscernible).
8           MR. STERN:  Well, I did request it and you
9  said no.
10          MR. KESSLER:  What exact date was this?
11          MR. STERN:  Well, you put in the -- in your
12 protective order with regard to the video that I
13 couldn't have the -- the raw data.  I said I'm not
14 signing that portion.
15          MR. KESSLER:  No.  We (indiscernible) a
16 protective order that you said change this word to this
17 and sent back, and we just sent it to you about 10
18 minutes ago.  (Indiscernible) or we can address that,
19 but you never raised any issue with my (indiscernible).
20          MR. STERN:  Well, I did on the original one,
21 but be that as it may, I mean, it makes no sense,
22 Judge, for my client to get deposed -- I mean, dete --
23 examined in two or three weeks and I make the same
24 request I'm making now, I'm filing the same motion, and
25 we're back in front of Your Honor.

1           THE COURT:  But I -- I mean -- I mean, this
2  is a bit unusual, but -- you know, I'm -- I'm just
3  trying to wrap my head around it.  So I mean, it says
4  in your papers that the examination is July 14th, so,
5  you know, that's just -- just next week.  But, I mean,
6  you know, so after the examination, then, you know,
7  this information will be created: the raw data, scoring
8  summer sheet -- summary sheet, office notes.  Then, Mr.
9  Stern, you could make a request and Mr. Kessler would
10 then review it.  Right?  I mean, isn't -- isn't that
11 the normal course?  Like, why -- why would I order
12 something to be produced that hasn't been complied with
13 yet?
14          MR. STERN:  Your Honor, I've requested it in
15 advance.  They haven't agreed to provide it to me when
16 it's created, so I filed a motion so that once it's
17 done, I get it.
18          THE COURT:  No.  I -- I can understand that,
19 but I guess I understand Mr. Kessler's viewpoint, too,
20 that shouldn't he have a chance to look at whatever's
21 created --
22          MR. STERN:  He can't look at it.  That's the
23 whole -- that's the whole point of this, is Dr.
24 Benoff's -- argument is lawyers aren't allowed to have
25 the raw data.  So Dr. Benoff is not going to give it to

1    Mr. Kessler voluntarily, either.
2         MR. KESSLER:  Judge, I don't -- I don't think
3    -- I don't think Mr. Stern can really -- can make that
4    representation to the Court.  He doesn't know what Dr.
5    Benoff is going to do --
6         MR. STERN:  Oh, I do.  I do.  Because I've
7    had other cases where Dr. Benoff says lawyers are not
8    allowed to have the raw data.
9         MR. KESSLER:  That's not this --
10        MR. STERN:  -- short of a court -- short of a
11   court order.  So he's not giving Mr. Kessler the raw
12   data.
13        MR. KESSLER:  I -- Your Honor, I don't know
14   how you could accept that representation.  I mean,
15   there's -- there's no -- you know, there's nothing
16   before the Court that -- that says --
17        MR. STERN:  This isn't my first rodeo with
18   Dr. Benoff.
19        MR. KESSLER:  I understand that.
20        THE COURT:  And, you know, I -- obviously, I
21   respect Mr. Stern and his representations.  He's not
22   going to make that lightly in front of me, you know, so
23   I -- I know there's a basis for him to say that.  So --
24   but I mean, the -- the form of order says raw data,
25   scoring summary sheet, and office notes.  So, you know,

1    the raw data, I can understand.  The other two items,
2    I'm not sure I understand.
3         MR. STERN:  Well, Dr. Benoff will score the
4    test.  So my client takes the test.  That's raw data.
5    So if next week, my client's being tested, as soon as
6    she leaves the office, there's a pile of documents.
7    That's the raw data.
8         Now, Dr. Benoff then has to score those
9    tests.  So he scores them and then he interprets the
10   results.  Oftentimes, Dr. Benoff and other neuro-
11   psychologists mis-score the tests, so I need -- and
12   sometimes they'll put in reports, this is a T score,
13   this is a whatever score.  But I need to know what his
14   scores are so I can see whether or not he properly
15   scored the test.  So that's the scoring sheet.  It's a
16   one-page document.
17        And then I don't know if there are notes or
18   not.  If there are no notes, there are no notes.
19        THE COURT:  How -- how quickly does he score
20   the raw data?
21        MR. STERN:  Excuse me?
22        THE COURT:  How quickly does -- does the raw
23   data get scored?
24        MR. STERN:  I -- that, I don't know.
25   Sometimes it takes months before I get a report.  But I

Colloquy                    38

1  don't know how quickly he actually scores the test or
2  not.  That, I don't -- I don't know.
3              THE COURT:  -- 10 days.
4              MR. STERN:  I mean, he can give me the raw
5  data and the scoring sheet when he sends me the report.
6  I just want to -- I just don't want to go months down
7  the road.
8              THE COURT:  Why -- why don't I do this?
9              MR. KESSLER:  Judge, I --
10             THE COURT:  Yeah.  Go ahead.
11             MR. KESSLER:  I just want -- a motion to
12 compel, I mean, an order to compel is just
13 inappropriate at this time.  I -- I think it's a non-
14 issue.  I think we would be able to handle this.  It's
15 just that at this time, it's -- it's inappropriate.
16             THE COURT:  Why -- why don't I do this, and I
17 -- I hate to do this because, you know, I like to get
18 stuff decided when I'm dealing with it, but I'm going
19 to adjourn this to August 15th is -- is a motion day
20 and let this play out.  But I -- you know, I -- I
21 understand Mr. Stern's point.  I -- I don't want to
22 have him, you know, have to re-do this all again and
23 submit a motion if -- if he's not going to supply this
24 information, but I respect your position, Mr. Kessler,
25 that you kind of need to -- to see this information

Colloquy                    39

1  before you can produce it.
2              So I'll just adjourn the motion to August
3  15th and hopefully it's resolved by then.  If it's not,
4  then we'll deal with it at that point and I think well
5  all have more information to make a decision.  I -- you
6  know, my -- my two-second editorial is that it seems
7  like Mr. Stern would be entitled to this information,
8  but -- you know, so to the extent, Mr. Kessler, you
9  know, your client is inclined to not produce it, you
10 know -- my initial thoughts, but I think you should
11 have the opportunity to look at it before I order it.
12 Okay?  So -- the motion to August 15th.  All right?
13             So we have one more motion, which has a whole
14 bunch of issues in it.  So -- so I don't know, you
15 know, I've read the papers.  I don't know if you've
16 spoken since, but we need to be very specific with this
17 because the papers were kind of general.  So Mr. Stern,
18 we -- we can take one issue at a time.
19             MR. STERN:  I'm going to have Mr. Stanley ma
20 -- argue, Your Honor.  I just want to make one
21 introductory comment, and that is in Mr. Meyer's
22 opposition, he says the first time they learned of what
23 I claim their deficiencies were when I filed this
24 motion.  That's not accurate.
25             Just by way of background, on May 30th -- so

Colloquy / Argument                    40

1   Friday -- late Friday afternoon, Mr. Meyer called me
2   and said I'm going to be sending you the documents --
3   the -- in -- responsive to the Notice to Produce later
4   this evening.  We're going to produce our response,
5   written response, next week, being the week of June
6   2nd.
7          He did send me the documents on May 30th, so
8   I was clearly aware of what they were sending me and
9   what they were not sending me.  In -- the following
10  Monday, I sent Mr. Meyer and Mr. Carton a letter
11  listing the deficiencies.  They never responded to that
12  letter.  But I did res -- advise them of the
13  deficiencies as of June 2nd.  But I'll now turn it over
14  to Mr. Stanley, who can address specifically the Notice
15  to Produce.
16         THE COURT:  Okay.  And you know what?  It
17  might make sense to go each specific issue by issue.
18  Okay?  But go ahead, Mr. Stanley.
19         MR. STANLEY:  Good afternoon, Your Honor.  So
20  the documents that we seek are all kept in the normal
21  course of business by Uber.  Some of the documents are
22  triggered through Uber's systems automatically, whether
23  it's by telematics or AI or algorithm.  Some of the
24  documents we seek are subject to the customer support
25  representatives who follow these policies and

Argument                    41

1   procedures to then deal with a driver or deal with a
2   rider or deal with a delivery person on their system.
3          We are seeking deactivation materials that
4   exist that haven't been produced.  We're seeking a trip
5   animation that is always created in the normal course
6   of business by Uber to -- to do an investigation on a
7   collision like this.  We're seeking Safety Lens data
8   from Safety Lens.  There's a platform, and this is in
9   Request number 25.  It's a platform that -- that the
10  driver's account is on that will show different
11  violations of Uber's policies and procedures and also
12  issues of dangerous driving or -- or other altercations
13  that occur on the system.
14         We're looking for all of the correspondence
15  that would have come into Uber from the driver, and
16  these are called tickets.
17         THE COURT:  I'm sorry to interrupt you.  I --
18  we just need to go through one specific issue at a
19  time.
20         MR. STANLEY:  Perfect.  Okay.  Thank you.
21  So, first of all, the deactivation materials.  What
22  we've received basically is -- is just the
23  communication to the driver saying that he's been
24  deactivated.  But there would have been more to the
25  investigation.

Argument                                        42

1    And in the response from Uber, what we see is
2    is that this was done at the direction of counsel.
3    Well, when -- when Uber is notified of this wreck,
4    customer support service agents follow the procedure
5    that is required.  They pull the GPS, they create the
6    animated map, they use the animated map to see what
7    happened, when -- when the collision might have
8    happened.  They then go to a process where they create
9    something called a JIRA.  That's J-I-R-A.  And that is
10   the final investigative document that decides whether
11   or not this person can stay on the system or not.  It
12   also identifies the investigative material, the people
13   who looked at this investigation and -- and decided on
14   the final outcome.
15          So those documents are not -- have not been
16   produced.  They're not in the record.  So that's --
17   that's the first area of documents that we're seeking.
18          THE COURT:  All right.  And just so I
19   understand you, the specific documents, they're called
20   deactivation materials?
21          MR. STANLEY:  Well, that is the -- the over-
22   arching term, but the specific documents that we're
23   looking for are -- it's the Voyager or Chronicle trip
24   animated map function that takes the GPS material, puts
25   it into their system, and produces a moving car on the

Argument                                        43

1    map that shows speed and when the contact would have
2    happened and what happened on the map.  So that's one,
3    the -- the animated map feature.
4          We're seeking the JIRA, which is the final
5    investigative document that houses and has a summary of
6    -- of all that they did to look at this and when the
7    notice came in and what the outcome was.
8          And we're also seeking Safety Lens material
9    that would fall under the deactivation of this driver.
10   And Safety Lens is basically a -- page platform,
11   internals that we were -- that has all of this
12   suspension or deactivation data in it.  So those are
13   the areas of deactivation that we're seeking, all kept
14   in the normal course, all done when -- when an
15   investigation occurs.
16          THE COURT:  Thank you.  Mr. Carton?  You're
17   muted.
18          MR. CARTON:  Sorry, Your Honor.  I jumped off
19   -- I jumped on the -- argument there.  Your Honor,
20   respectfully to counsel, he's not under oath.  He's not
21   a fact witness.  He's not qualified as -- in any expert
22   capacity here, and he's wrong about most of his
23   certification and the things that -- is saying now.  So
24   highly strange, this situation.
25          This is a motion, Your Honor, about a Notice

1  to Produce with 40 specific requests.  The motion --
2  what the motion does not do, and Uber's position is it
3  has fully complied with all demands for documents,
4  including Notice to Produce number 12, and we've given
5  the detailed, yes, objections, but then followed by see
6  this Bates number, see this, already produced.
7          So everything that is produceable has been
8  produced.  What the motion does not do is go through I
9  any organized way and say number one, this is what we
10  need.  We've got this general certification from
11  Counsel, which is based upon essentially factual
12  testimony about how Uber works, which is not in any way
13  qualified or proper, and we're just shooting these
14  targets.
15          I'll try to deal with it the best I can, Your
16  Honor, but I would suggest the way we go off it is Mr.
17  Stern's conclusion to his actual motion for all the
18  foregoing reasons, plaintiff respectfully requests the
19  Court to enter an order com -- and it's on page 45,
20  compelling defendants Uber Technologies to produce all
21  documents, but not individual agreements, and they're
22  listed.  At least there's some organization there.  But
23  in any event, I'll try to deal with these, Your Honor,
24  in the way that were come up.
25          The Voyager and Chronicle documents that were

1  just referenced, this is the mapping, this is based
2  upon data from GPS and speed.  GPS is longitude,
3  latitude, and speed, Your Honor.  That is the data that
4  is -- exists that Uber maintains.  That's the data has
5  all been produced to the plaintiff long ago in this
6  litigation.  They have all of it.
7          What they're asking for now so they could --
8  they know exactly where Escobar was at any given
9  second.  This -- this information goes to the second
10  increments, Your Honor.  What they're asking for when
11  they say Voyager and Chronicle mapping data, these are
12  internal -- they're called data visualization tools .
13  This is what Uber has created through internal
14  proprietary and trade secret tools that Uber has
15  created that it inputs the data that the plaintiffs
16  have here, GPS and speed, so that Uber can visualize
17  that data on a map.  This is -- and what Uber's
18  position on this is is counsel's not entitled to
19  production in discovery of our tools that we've created
20  to interpret data.
21          Counsel has the data.  Counsel could
22  absolutely go to -- they'll do this for trial, if it
23  was an Uber, go get GPS speed and longitude to a --
24  lots of places that -- and they'll create you the map
25  you're asking for.  But the position of Uber is these

1    data visualization tools are not produceable discovery,
2    Your Honor.  These are proprietary trade secret tools
3    that Uber uses the data.  Counsel has all of the data
4    on which those tools Uber uses in the subject of its,
5    you know, defense of these claims.  So they've got the
6    data.  They can make -- they can create the maps that
7    they're looking for.
8              THE COURT:  Okay.  Mr. Stanley?
9              MR. STANLEY:  I think what you heard from
10   counsel -- I think what you heard from counsel is that
11   Uber creates this in the normal course of
12   investigation, and that's exactly what I said.  It's
13   exactly what -- what they do.  And in -- and it would
14   be the same (indiscernible) car wreck case where a
15   company creates an investigation of what happened, and
16   this is part of the tools that they use to see what
17   happened.  They have this material.  They do it on
18   every car wreck case and it's -- it's -- it's testimony
19   --
20             THE COURT:  Does it --
21             MR. STANLEY:  -- says -- it says corporate
22   representative and witnesses, that I'm aware of, that I
23   proposed.  It says -- on record that they have this
24   material and it's a visualation -- visualization --
25             MR. CARTON:  Right.  We have a tool that we

1    can use, Your Honor.
2              MR. STANLEY:  That is used.
3              MR. CARTON:  It's being represented that we
4    use it --
5              MR. STERN:  Mr. Carton -- let us finish.
6              THE COURT:  It's one at a time, Mr. Carton.
7    I'll let Mr. Stanley finish.
8              MR. CARTON:  Okay.
9              MR. STANLEY:  And -- and so you've heard that
10   it is a tool that is used by Uber, and it is.  And it's
11   used to investigate in the normal course of business.
12   It's part of their investigation tools that they use to
13   see what happened.  And so they have this.  It shows
14   more on it than just lat, long, and -- and speed.  It
15   shows car movements and things like that on an actual
16   map, and it's something that they use in the normal
17   course.  So it's something that is -- it's a business
18   document.  It should be produced.
19             THE COURT:  And then can I just ask, I mean,
20   Mr. Carton's point is that you have all the data you
21   need to create this, you know, animated representation.
22             MR. STANLEY:  The -- the platform itself that
23   they use has more information than just speed.  It --
24   it shows -- it shows where things are moving at certain
25   times, how long a car was stopped at certain places,

Argument                    48

1    where he was going along with that as he went.  And so
2    it's already there and it's one of the main tools they
3    use to investigate.  And so if we put it into a GPS
4    tool, then it's not going to be the same as what Uber
5    has and uses and it's not going to be what they created
6    to investigate this wreck specifically.
7                    THE COURT:  Mr. Carton?
8                    MR. CARTON:  Yeah.  Your Honor, this is
9    entirely improper.  This counsel's offering testimony
10   about what Uber does and he started by trying to say we
11   do it always in every single accident case, and he's
12   now backed off to it's a tool we have available for
13   investigation.  This is a proprietary tool that Uber
14   can use, Your Honor, and it's created itself.
15                   Your Honor's exactly right.  They have the
16   data.  They can create a map that shows the car moving
17   and when it stops, longitude and latitude, and the
18   speed goes to zero, the map will show it stopped.  They
19   can create everything in these tools, Your Honor.  It
20   is not subject to production.  It is not documents kept
21   in the ordinary course of business.  These are
22   litigation -- these are tools created.  They're
23   proprietary.  They are a trade secret that can be used
24   by the client and plaintiff's client has no basis to
25   them, Your Honor, unless maybe they could say that they

Argument                    49

1    actually couldn't produce their own map, which they
2    absolutely could do.
3                    MR. STERN:  So now, Mr. Carton, who's
4    testifying?  Your Honor, Uber has not produced one
5    certification or affidavit from anyone from Uber
6    supporting what Mr. Carton is saying.  Mr. Stanley said
7    based on my experience with Uber, they create this.  We
8    know they have this program.  Do we have any affidavits
9    from Uber saying we didn't do it in this case?  No.  We
10   don't.  We only have Mr. Carton and Mr. Meyer
11   objecting.
12                   If I can, Your Honor, other things that are
13   missing that we requested.  We were provided with
14   background checks that showed in 2017 into 18, there
15   was a customer complaint by a rider about Mr. Escobar.
16   As a result of that complaint, Mr. Escobar's driving
17   privileges for Uber were suspended.
18                   In 2019, Mr. Escobar applied -- reapplied to
19   become an Uber driver.  He was rejected, according to
20   Uber's documents.  There would be and ought to be
21   various texts, emails, or the like between Uber and Mr.
22   Escobar.  In fact, Your Honor, I believe it's exhibit
23   J, which is at the end of our brief.  There are
24   summaries of all the emails and texts that were sent to
25   Mr. Escobar by Uber.  We've requested those.  They

Argument                    50

1   haven't been supplied, just the summary.
2           And when you look at the summary, Your Honor,
3   some of it's in Spanish and we can clearly have that
4   translated.  Some of it looks like there's a colloquy
5   (indiscernible).  I can't make out what it is, but
6   those are just summaries and we want the actual texts
7   and emails.  And Mr. Carton can't say they don't exist
8   because interestingly, they provided us with the
9   initial complaint that was made in 2017.  So they have
10  the complaint but they haven't given us any of the
11  other documents with regard to Mr. Escobar, and that's
12  all covered under driving screening that we requested.
13          We're not provided with any communications
14  between Uber and Checker, other than just we have the
15  background cer -- thing.  We know that Mr. Escobar was
16  involved in multiple motor vehicle accidents prior to
17  this one in 2022.  If there are documents with regard
18  to Uber go and get those police reports to see whether
19  Mr. Escobar was at fault or whether the other driver
20  was at fault, they might have all those documents.
21  Again, none of it was supplied and Uber did not attach
22  a certification saying they didn't have that.
23          As we move to driver history, they've given
24  us a complete driver log --
25          THE COURT:  (Indiscernible.)

Argument                    51

1           MR. STANLEY:  And -- and Judge, can I --
2   getting this from Uber, what they create in the normal
3   course, also shows they're monitoring, oversight of the
4   driver.  I know that also, these -- these maps will
5   show what state or status that the driver is in,
6   whether it's period one, two, or three.  Period one is
7   when he's waiting on a trip to be given to him by Uber.
8   And so it shows oversight as well.
9           And so it goes to the oversight, it goes to
10  control, it goes to the investigative material.  And
11  again, no one's said that they don't have it.  No one's
12  said that it wasn't created in this case, and I believe
13  it is -- normally is, in the normal course, and they
14  have it and it should be produced.
15          THE COURT:  Okay.  Let -- let's just go back
16  to the -- the -- what was called the deactivation
17  materials, the animated wreck, the JIRA, the Safety
18  Lens material.  So Mr. Carton, I'm just going to ask
19  that, you know, you have your client produce a
20  certification, you know, confirming or not what you
21  represented, and that would be provided to the
22  plaintiff in this case.
23          I'm just trying to understand, too, and the
24  certification from your client could clarify.  It -- it
25  sounds like you're saying that all of the factual

Argument                                          52

1    information necessary has been provided and that the
2    underlying software or whatever isn't -- doesn't have
3    any relevance to, you know, moving the ball in one
4    direction or another.  I'm not sure what the trade
5    secret has to do with it.  If it's not relevant, I
6    don't really need to get to the issue of trade secret.
7                So, I was just a little confused about that.
8    But I think the first step is, and I agree with -- with
9    Mr. Stern; I was writing that down before he even said
10   it, that I think we need a certification from you on
11   that, from your client.  Do you understand?
12               MR. CARTON:  I understand, Your Honor and
13   Your Honor is correct and -- and I -- I will make sure
14   -- I believe I understand what you're looking for.  The
15   -- all the data has been produced -- GPS and speed.
16   What has also been produced when Mr. Stanley talks
17   about the trip stopping or whether he's on or off, the
18   -- all -- the entire flow history for Escobar, so --
19   has been produced, from 2017 to -- to the time -- the
20   day of this accident.  Literally, the driver, the
21   status, status note, begin trip status time, end trip
22   status time, for every single trip he has ever taken
23   driving for -- on the Uber app.
24               They have all data for every single trip
25   Escobar has ever taken.  In other words, I'm talking

Argument                                          53

1    about when he's the driver, the time the offer comes
2    in, meaning the person on the app requesting him,
3    whether he accepts, begin trip time, drop time.  So all
4    of that data is -- has all been produced.  But I -- I
5    believe -- I understand on the -- the certification,
6    Your Honor.
7                And the reason I mention it's a proprietary
8    trade secret is it's a tool we made, and if we produce
9    it and are ordered to produce it, it could be
10   recreated, it could be re-engineered, reverse
11   engineered to see what we have.  It's a proprietary
12   tool, Your Honor.
13               So, I understand about the certification and
14   I'll -- I'll be happy to get that, to flesh that out
15   because Your Honor's correct.  All of the data
16   underlying everything in that tool, plaintiffs have.
17   They just want it -- the work of making that map done
18   for themselves.
19               MR. STANLEY:  Judge, that's not -- that's not
20   what we want.  And this material has been ordered to be
21   produced in other cases as well.  This is not novel.
22   What we want is we want Uber's investigative material
23   and that's what this is, created in the normal course
24   of business to look and see what happens.
25               And this has been ordered in other cases that

Argument                              54

1    I've been involved in.  It's not novel.  The
2    proprietary interest is -- is not something that we're
3    going to go spread to the world.  We want it for this
4    case specifically.  And it should be produced because
5    it's created in the normal course of business.  It goes
6    to their investigation and it's not something that's
7    brand new (indiscernible) outside of this litigation
8    that no one's ever gotten to be produced.  -- fight it
9    every time, but it's been ordered many times to be
10   produced.
11           THE COURT:  You say investigative materials,
12   that -- that sounds like factual information to me.
13           MR. STANLEY:  It -- it is.  It is, Your
14   Honor.  What they do is they -- they take this map,
15   they look at it to see what happens.  The customer
16   support reps look at it to see whether or not it goes
17   into the calculus of deactivating the driver.  And so
18   it's part of what they look at to decide whether or not
19   this driver in this position should be deactivated.
20           MR. CARTON:  There's no evidence it was done
21   here, Your Honor.  I'll -- I'll confirm that.  And when
22   we talk about investigation, Your Honor, many of these
23   requests, I'm sure we'll get to it, the -- the
24   investigation in this case, this accident came to light
25   through Bruce -- counsel's -- Mr. Stern's letter of

Argument                              55

1    representation, which was immediately sent to an in-
2    house counsel, which was immediately sent to me.
3    That's the investigation.  So whether or not these --
4    these customer service reps applied this is absolutely
5    not of -- of the record that that was done here in this
6    case at all.
7            So we'll -- I think I understand what the
8    certification Your Honor's looking for, and we can shed
9    some light on this.
10           THE COURT:  Okay.
11           MR. STANLEY:  Judge, I hate to prolong this.
12   Can you tell us what certification you have in mind for
13   this, just so we're all clear what -- what Uber is to
14   include in the certification?
15           THE COURT:  I -- I thought I was clear, but
16   you had asked for the -- as I said, the animated map,
17   the JIRA, the Safety Lens material.  And Mr. Carton's
18   point is that you produced all the factual data related
19   to those requests.  So -- but I need a certification
20   from a professional in his office to confirm that or
21   not, and to also confirm or not whether there was an
22   investigation done.  And if one wasn't done, and if one
23   was done, then that should be, you know, whatever facts
24   came out of that would have to be produced.
25           MR. STANLEY:  Thank you, Judge.

Argument                                56

1        MR. STERN:  Your Honor, going back to driver
2   screening, because you asked us to go -- asked us to go
3   through this.  I know it's item by item, but I want to
4   make clear, we've requested all the specific emails,
5   text messages that were sent by Uber to Mr. Escobar.
6   They've given us a summary so we know every date that
7   something occurred, but we don't have the actual
8   emails, we don't have the actual texts.
9        As I said, Your Honor, we know that Mr.
10  Escobar was suspended before this accident.  We know
11  that he was denied access, he was -- his application
12  was rejected in 2019.  Presumably, there would be some
13  type of communication between Uber and Mr. Escobar.  We
14  requested that.  That's never been produced.
15       MR. CARTON:  May I address that, Your Honor?
16       THE COURT:  Yeah.
17       MR. CARTON:  Your Honor, it's been produced.
18  Every single communication that Uber has ever had with
19  Mr. Escobar has been produced.  There's 300 pages of
20  all -- every message.  What counsel is calling a
21  summary is not.  It is the only textual representation
22  of what remains of what messages were sent to Escobar.
23  It's kept in that -- in the ordinary course of business
24  in that fashion because all these -- this data, Your
25  Honor, that is shot to an application that the driver

Argument                                57

1   sees on the phone.  There's no way to recreate the form
2   that it's received by the driver.  To -- it's not
3   possible to do a screen-shot rebuild of what Escobar
4   saw.
5        What counsel has is not a summary.  Counsel
6   has -- it's just in a text -- in a -- it's -- it comes
7   out like a table that says -- it says the -- what was
8   done, when, and the -- the substance of the full
9   communication is given, whether it was in Spanish or
10  English.  So we have nothing else, Your Honor.  It's
11  not a summary.  Every communication that Uber has ever
12  had with Escobar has been produced, in the only form
13  that it exists.  And we've said that in our Notice to
14  Produce responses and it's just being misrepresented
15  that it's somehow or another, there's something else
16  that exists.  There is not.
17       MR. STERN:  Again, no certification submitted
18  by Uber, just Mr. Carton's testimony here today.
19       MR. CARTON:  Your Honor, what are we
20  certifying to?  This motion did not attack a single
21  discovery response of Uber.  It doesn't say 25 is
22  insufficient, or 32, or 42.  We've got this broad-based
23  -- if you look at five different places, it'll say five
24  different things that aren't produced.  If we go to the
25  conclusion of the motion of what was asked for, what

Argument                           58

1   this motion is supposedly about, it's individual
2   agreements and -- records for Juan Escobar.  This is
3   what was asked to be produced.  Internal adjudication
4   criteria, driver reactivation policies (indiscernible)
5   performance.  So --
6           MR. STERN:  Just by example, Your Honor, if
7   you go to page 623 of our motion, 623 of 698, just by
8   way, as I say, of su -- as an example, where it says,
9   "Content".  This was on December 7th of 2021.  Content:
10  no one can even read what that content is.
11          MR. CARTON:  Your Honor, there is some --
12  there are some symbols that appear in the production
13  because of the conversion from the way it's sent on the
14  app and -- way it's maintained.  You can still read it.
15  It's either in Spanish or in English.
16          The fact of the matter is every communication
17  has been produced.  There's no certification in this
18  motion, Your Honor, because what were you supposed to
19  do, read paragraph for paragraph Mr. Stanley's
20  certification of what he claims we do?  There's no --
21  the motion should say Notice to Produce number 1, this
22  is what is not here.  Number two, this is not workable.
23  And if we're going to sit here and go through and --
24  and I'm going to be accused of not having a
25  certification that I didn't need, a generalized


Argument                           59

1   certification that didn't point to as a single demand
2   as being insufficient but instead, general categories,
3   it's just not going to work.
4           MR. STERN:  Because you don't want it to
5   work.
6           MR. CARTON:  No.  Your Honor, may I just
7   state for the record what we have produced, Your Honor,
8   just so Your Honor gets an idea of, and maybe we could
9   say what's left.
10          MR. STERN:  I agree.
11          MR. CARTON:  We dispute everything --
12  everything --
13          MR. STERN:  (Indiscernible.)
14          MR. CARTON:  -- our --
15          MR. STERN:  -- attached to our brief the
16  documents you --
17          MR. CARTON:  No.  But I -- I'd like the Court
18  to understand the scope of what's been produced.  Your
19  Honor, we've produced everything that Escobar submitted
20  to get on the application.  So his driver's license,
21  insurance, everything that he submitted, they have.
22  Every single background check.  They misrepresent and
23  say these are summaries?  They have the full background
24  checks.  They're not summaries.
25          They fault us and say we don't have any

Argument                    60

1   communications with Checker?  We don't have any
2   communications with Checker.  It's a third party that
3   performed a background check and gave it to them.  We
4   don't have.  So they've got the background checks.
5            They have all speed and GPS data from the --
6   the date of the accident, by the second.  Every
7   communication Uber has ever sent to Escobar, they have.
8   All audio calls to customer service that -- with
9   Escobar regarding this accident, they have.  They've
10  got tape recordings of them.  All communications
11  regarding the one complaint that Escobar ever received,
12  this is the Bliss -- this is called a Bliss tool.  They
13  have it.  It's 100 percent of -- of customer support
14  communications are Bliss, and that was provided.  That
15  was -- the one complaint that a customer registered,
16  and Uber's communication to Escobar about it.  They
17  have -- they have that.  They have all that for every
18  trip he's ever taken since 2017.
19           MR. STERN:  We do not -- we do not have what
20  was sent to Mr. Escobar with regard to the re -- the
21  complaint.  We only have what the complaint.
22           MR. CARTON:  Whatever the Bliss report was
23  where I believe, Bruce, I saw it today, it says Dear
24  Mr. Escobar, we've received the attached complaint from
25  somebody in your vehicle, et cetera.  You have that.

Argument                    61

1   You got the complaint that came in, forwarded.  They've
2   got the average rating data for the dating question and
3   all time for this driver -- every single agreement
4   Escobar has ever agreed to with time stamp, Your Honor.
5   Sixteen agreements in total.  Every single time he had
6   to go on the app and accept an agreement, they have it
7   and it's time-stamped.  And we're being told in these
8   papers and hundreds of pages, they don't.  They do,
9   though.  I don't know what else to say.  And --
10           MR. STERN:  (Indiscernible.)_
11           MR. CARTON:  -- guidelines.  So I --
12  workable, Your Honor, to try to just say that we --
13  Uber has failed to comply, but not to point to a single
14  Notice to Produce response and put --
15           THE COURT:  Okay.
16           MR. STERN:  Your Honor, they -- we asked them
17  for the policies with regard to when they deactivate or
18  suspend a rider (sic).  We've never been supplied by
19  that (sic).  As I've said, we know that Mr. Escobar was
20  suspended once.  We know he was rejected once.  We
21  don't -- we've asked for those policies --
22           THE COURT:  Sorry?  Is there a policy on
23  deactivation?
24           MR. CARTON:  The -- they have everything
25  about his history and I -- if I can -- if counsel would

Argument                                           62

```
 1   point to what request that is specifically, I'd like to
 2   look at their response, Your Honor, because I believe
 3   they've got that as well.
 4             MR. STERN:  We don't have any Uber policies
 5   --
 6             MR. CARTON:  Well, Your Honor, the way that
 7   these policies in this motion appear are knowledge-
 8   based documents.  And what Mr. Stern did is he attached
 9   as exhibit A to his motion a spreadsheet with 856
10   alleged policies.  They -- they have weird -- not full
11   names, no description, that Mr. Stanley I don't -- I
12   don't think had committed to memory, so he obtained
13   that information from the MDL, on which he's the
14   steering committee, and of that 856, 200 of them I
15   believe are policies.  Every single one of those is a
16   policy that is utilized by Uber customer support for --
17   to counsel victims of alleged sexual assault.
18             MR. STANLEY:  Absolutely not true.  That is
19   absolutely not true.  And so what I -- here, Judge --
20             MR. CARTON:  It is true.
21             MR. STANLEY:  No, it's not true, at all.  You
22   haven't looked at it.  You haven't talked to these
23   witnesses.  You don't know what you're talking about in
24   this situation.
25             MR. CARTON:  Well --
```

Argument                                           63

```
 1             MR. STANLEY:  and I'll --
 2             MR. CARTON:  -- know what that document is,
 3   either.
 4             (Parties all speaking over one another.)
 5             THE COURT:  -- at a time.  Okay?  So the
 6   question on the table was is there a deactivation
 7   policy and if so, what request is it to Mr. Carton?
 8             MR. CARTON:  Yeah.  What request?
 9             THE COURT:  And, you know, by the way, I've
10   asked that when you submit motion papers, that you send
11   courtesy copies and -- and I don't really get them in
12   these cases, so I need you to do that in the future.
13   Okay?
14             MR. STERN:  We will, Your Honor.
15             MR. CARTON:  All right, Your Honor.
16             MR. STANLEY:  The activation materials are
17   captured in the knowledge-based request.  And so there
18   are many different deactivation materials and policies
19   that are followed by customer support reps on how to
20   and when to deactivate drivers.  They're located in
21   those requests.  And so the -- Uber knows what those
22   are and no, they're not all pertaining to the sexual
23   assault litigation, they're pertaining to customer
24   service reps and what they're told to do, and how
25   they're told to do it.  And there's thousands and
```

Argument                          64

1   thousands of these articles and policies that instruct
2   customer -- customer service representatives on how to
3   deal with a problem that comes in.
4           All of these go to Uber's control and
5   (indiscernible) Uber has behind the backs of these
6   drivers and the strings that they pull and how they
7   pull them.  And so there are policies all through about
8   deactivation on that.  DACT, D-A-C-T, is a specific
9   category of policies that instruct when, how, and --
10  and how to inform drivers of deactivation.
11          And so the -- to say that all these are
12  subject to the sexual assault litigation is -- is
13  wrong.  Many of these were borne out of prior
14  litigations that I've had before that.  Right?  And
15  it's known that these exist and they are used
16  internally for people to -- to move drivers through the
17  system.  If it's a request, if it's a violation of the
18  rules, if it's some rider saying that a driver did
19  something wrong, all of those on the knowledge-based
20  platform are -- are constructed to what to do in those
21  situations.
22          THE COURT:  Mr. Carton?
23          MR. CARTON:  Your Honor, what -- the Notice
24  to Produce number 30: produce all knowledge-based
25  articles, documents, and policies identified in Exhibit

Argument                          65

1   A attached hereto.  Exhibit A is the document I've
2   referenced, 864 things, let's just say, of which
3   apparently, according to Mr. Stanley, in there are
4   contained policies.  I don't believe all 856 claims are
5   policies, but policies.  And my -- my -- the response
6   from Uber to that was that the -- I'm sorry.  The --
7   those policies all relate to customer service.  They're
8   all available to customer service representatives from
9   Uber to counsel sexual assault victims in sexual --
10  allegations of sexual assault cases, not motor vehicle
11  accidents, not accidents where, such as this, Mr.
12  Escobar is driving without even a passenger and having
13  not even been summoned by a passenger of Uber.  They're
14  not applicable, Your Honor.
15          And so, you know, it's stated on here, this
16  is my point, oh, it's -- as if it was so simple, Mr.
17  Carton hasn't produced activation documents --
18  policies.  Well, the request is to produce 854 in
19  exhibit a, Your Honor, and -- and we've represented
20  those are not related to motor vehicle, so --
21          MR. STANLEY:  That's false.
22          THE COURT:  Okay.
23          MR. STANLEY:  That is false.
24          THE COURT:  Let me just ask.  I mean, is --
25  is there a specific policy or a general policy on how a

Argument                                66

```
 1    driver gets deactivated?
 2              MR. CARTON:  I would ask counsel on the 864
 3    --
 4              MR. STERN:  Just for their number eight, my
 5    request on number 8 was every set of background
 6    check adjudication criteria.  We wanted to know is what's
 7    Uber's policy, this is just with regard to number
 8    eight, specifically with regard to the background check
 9    adjudication criteria when --
10              MR. CARTON:  Yes.
11              MR. STERN:  -- in 2019, they rejected him. In
12    2022, they accepted him.  So one of the claims here is
13    why in 2022 did you accept somebody to drive to take
14    people from number A to point B when you knew they were
15    an unsafe driver and you had rejected them in 2019?
16    Now, we'll get to venture why that happened, but there
17    must have been some criteria or policy that Uber
18    utilizes to determine why are they going to permit
19    somebody to be a driver or not permit somebody?
20              We know they suspended Mr. Escobar.  What's
21    the policy or criteria they used to do that?  There are
22    documents for that.  That's just one small subset of
23    our request.
24              MR. CARTON:  Okay.  But --
25              MR. STERN:  But, you know, you're taking Mr.
```

Argument                                67

```
 1    -- you're not.  Mr. Carton's saying well, believe me,
 2    these are all sexual assault.  I don't know that he's
 3    ever even seen the 800 documents.  Mr. Stanley
 4    certainly has seen them.
 5              (Multiple parties speaking at once.)
 6              THE COURT:  I mean, I understand why you have
 7    to reference a specific, you know, knowledge-based
 8    number.  I mean, Mr. Stern just said do you have any
 9    criteria or policies in writing with respect to
10    deactivation or reactivation?
11              MR. CARTON:  Yeah.
12              MR. STANLEY:  And Judge, this is the problem.
13    When -- when policies are asked for generally, this is
14    the response.  And then when policies are asked for
15    specifically, they don't even look at them or they
16    mischaracterize what they are.  And so that's why the
17    -- the list was provided, so that the specific --
18    specific real documents that are in the system will be
19    produced that go to control and also go to
20    investigation, go to deactivation, go to all these
21    other issues that -- they go to vicarious liability and
22    Uber's negligence in this matter.
23              And so -- so if we ask for them specifically,
24    they don't produce them.  If we ask for them generally,
25    they don't produce them.  And so they are -- they are
```

Argument                                           68

1    very important to all of those issues in this case.
2              THE COURT:  Mm-hmm.  Mr. Carton, do you want
3    to address it?
4              MR. CARTON:  Your Honor, the acti --
5    adjudication criteria in New Jersey that Uber complies
6    mirror -- this is to onboard somebody or to allow them
7    access to the app, are -- they mirror completely the
8    statutory regulations contained in the N.J.S.A. 39:5H-
9    1, which is the -- the T&C regulations in New Jersey.
10   In other words, to be a T&C driver in New Jersey under
11   the statute that I referenced, there are certain things
12   that a driver, if you meet them, you're adjudicated to
13   be qualified to drive.
14             Uber follows that.  So that has been the
15   representation of Uber.  We've done it in responses and
16   -- first.  There is no separate adjudication criteria
17   that is applied to Mr. Escobar in New Jersey.  If a
18   state doesn't have a statute equivalent to a T&C
19   statute that would provide criteria, then Uber has
20   adjudication criteria.  But in this case, it's
21   completely duplicative of the New Jersey statute.  That
22   is the criteria that allows him either to be on or off
23   the app.  And there -- so there is no criteria
24   to produce for adjudication criteria for New Jersey.
25             I can see why counsel, especially Mr.

Argument                                           69

1    Stanley, would want the adjudication criteria for other
2    states.  It's becoming pretty obviously, I think.  But
3    very much so not why they -- be produced in this case,
4    Your Honor.  The adjudication criteria are statutory.
5    Uber does not have them for New Jersey.
6              MR. STERN:  Your Honor, Mr. Carton makes this
7    misrepresentation that this all has to do with the
8    sexual assault, but when you go to exhibit A, I'm just
9    looking at one page.  I'm just looking at number 343
10   through 375, they all have to do with safety.  Safety
11   on -- not allowed to use -- not allowed to have anybody
12   in your car, not allowed to use a different car.
13   There's all kinds of criteria in here which dem -- will
14   demonstrate Uber's control over its drivers.  I mean,
15   you just have to look at the names --
16             MR. STANLEY:  Line -- line 791 houses the
17   United States background check homepage, which has all
18   kinds of different policies about back -- background
19   checks and how to adjudicate them, when they expire,
20   what they do when they get the documents in from a
21   background check, how they send messages out to
22   drivers.  So all -- all of this is -- is -- there's so
23   much information about how Uber takes these drivers on
24   every step of the way, how they respond to drivers and
25   how they are to respond to what drivers say to them.

Argument                    70

1    And if a driver says that I'm owed more money or owed
2    less money or the payment structure or the earning
3    capacity, all of those things are in these policies.
4              MR. STERN:  You know --
5              MR. CARTON:  None of which happened with
6    respect to Mr. Escobar.
7              MR. STERN:  It doesn't matter whether -- it's
8    not whether it applies to -- it applies to him whether
9    they exercised it or not.  If they have the right to it
10   under New Jersey law, if they have the right to control
11   him, that's all that has to be shown.  But I'm talking
12   about the misrepresentation you're making, Mr. Carton,
13   to the Court when you say this all has to do with
14   sexual assault.
15             MR. CARTON:  It's not a misrepresentation.
16             MR. STERN:  Look at 272 to 280, account
17   inactive repository.  Vehicle crash claims.  That has
18   nothing to do with sexual assault.  So for you to say
19   -- but the bottom line, Your Honor, is this is
20   discovery.  They produce the documents to us.  If some
21   of them don't apply, they won't apply.  But to say you
22   can't have them because we don't think they apply isn't
23   what our discovery rules are.  Discovery rules in New
24   Jersey are liberal.  They should produce it.  And then
25   what ultimately is admissible at trial is admissible.

Argument                    71

1    But what -- why don't you want to -- why
2    can't they produce it?  We still haven't had a reason.
3    Why can't you just --
4              MR. CARTON:  -- Your Honor --
5              (Multiple parties speaking at once.)
6              MR. CARTON:  It was produced in the MDL in
7    which that's where this information came from.  It's in
8    our papers, Your Honor.  Your Honor has the letters.
9    Cease and desist letters have been issued and the --
10             MR. STANLEY:  He doesn't have my letter.  He
11   doesn't have my letter.
12             THE COURT:  I'm not worried about --
13             MR. STERN:  (Indiscernible.)
14             THE COURT:  I'm not worried about other
15   litigation, so let's focus on this case.  Mr. Carton,
16   go ahead.
17             MR. CARTON:  Thank you.  The -- so, of the
18   knowledge-based articles, Your Honor, of -- the only
19   ones of the 856, all 856 are not policies.  There's all
20   kinds of things listed here.  The policies at issue of
21   which somewhere along the way, they say they only want
22   200, even though -- that's what they say in their
23   papers even though there's 856 on here and they clearly
24   requested them all.  The policies that are on that
25   document relate to sexual assault claims.  They're not

Argument                                          72

1   relevant to motor vehicle accidents.
2               MR. STANLEY:  Absolutely incorrect.
3               THE COURT:  Well, I mean, Mr. Carton, can't
4   somebody from HR -- I mean -- I mean, I -- you know, I
5   respect what you say, but it seems like there's a
6   dispute here, based upon the names of these policies or
7   -- or documents.
8               MR. STANLEY:  (Indiscernible) driver safety
9   across the -- law enforcement radio -- legal crash
10  claims, driver preferences, such as destination.  All
11  of those are controls that Uber has over these drivers
12  and the way that drivers can use the app.  I've taken
13  the deposition of Matthew Baker in this matter on these
14  policies before, outside of MDL before I even got into
15  MDL.  And so he's the corporate rep -- over these
16  policies.  (Indiscernible.)  He talks about it on the
17  record.  I --
18              THE COURT:  -- certification, Mr. Carton,
19  sent to plaintiff's counsel that if it's your position
20  there's -- or corporate's position that these are all
21  sexual assault documents, put it in a certification.
22  If not, and they have some bearing on control, or the
23  right to control, as Mr. Stern correctly says, they
24  should be produced.  It's not that complicated.  I'm
25  not -- not sure -- does that make sense?

Colloquy                                          73

1               MR. CARTON:  I believe so, Your Honor.
2               THE COURT:  Okay.  What else do we need to
3   address?
4               MR. STERN:  I think that covers most of it.
5   Other than my requested extension of discovery.
6               THE COURT:  Yeah.  That's fine.  Let me just
7   find your order here.  I mean, I'm open to whatever you
8   all want to do.  So, that -- I mean, I see the dates
9   you put in here.  Those are fine with me if they're
10  fine with -- Mr. Carton, are you okay with them?
11              MR. CARTON:  Yes, Your Honor.
12              MR. STANLEY:  Judge, could I ask one more
13  request on the communications?  So the communication
14  log has been produced.  But could we get a
15  certification from Uber that all Bliss communications
16  have been produced?
17              THE COURT:  What's that?
18              MR. STANLEY:  A Bliss communication is a text
19  communication that comes into the app from a rider or
20  from a driver or about a rider and a driver by customer
21  service reps.  There's been 400 trips that this driver
22  performed on the platform.  There have been three or
23  four Bliss communications that have been produced.
24  Historically, Uber can produce and has produced Bliss
25  communications from a driver and about a driver, or

Colloquy / Decision                    74

1   from a rider about a driver.  And oftentimes, those
2   communications have customer support reps that are
3   talking about what to do in certain situations.  And so
4   that's different than a communication log that's 300
5   pages.  A lot of that deals with marketing efforts that
6   are sent to the driver.
7          And so I would like -- I would normally see
8   in these cases far more Bliss communications.  And so a
9   certification from Uber that all Bliss communications
10  about the rider, to the rider -- about the driver,
11  sorry, to the driver, or from the rider about the
12  driver have been produced, because they're really
13  important to the control element.
14         THE COURT:  Mr. Carton, any objection?
15         MR. CARTON:  My understanding is all Bliss
16  communications have been provided, Your Honor, but if
17  Your Honor wants a certification saying that, that's
18  fine.
19         THE COURT:  Yeah.  I'd ask for that.
20         MR. STANLEY:  Thank you.
21         THE COURT:  Okay.  So, you know, the order --
22  I'm just going to say the motion is granted in part,
23  denied in part for the reasons stated on the record.  I
24  -- I think we've addressed everything here.  You know,
25  this conversation's on the record, obviously.  And then

Argument                       75

1   I'll -- I'll enter the -- the discovery extension.
2   Anything else?
3          MR. STERN:  No, Your Honor.
4          MR. CARTON:  Your Honor, the -- we did have a
5   cross-motion, and I would renew it.  We made the
6   argument before.  I think this case, especially with a
7   120-day extension, is just getting started.  It seems
8   unfortunately, it really needs to be managed.  We
9   shouldn't be here on Friday with these types of
10  motions, Your Honor, and counsel's going to say
11  (indiscernible).  It's not.  I have -- at the end of
12  the day, I think that there just -- it needs to be
13  managed and I think it -- it is absolutely within the
14  Court's power to appoint a Special Master.  It doesn't
15  have to be at the request of the parties.  It can be
16  put in place by the Court.
17         And in this -- for -- for example, Your
18  Honor, what happened here, this Notice to Produce with
19  a lousy 40 things on it would have been in front of a
20  Special Master for him or her to deal with and say
21  okay, produce this, this, make a recommendation, Your
22  Honor -- sign off and we don't have to spend all of the
23  Court's time.  I think at this point, we need a
24  protective order in place and we -- I would renew and
25  it is a formal motion that we made here, my request

Argument / Decision                    76

1    that a Special Master be appointed to govern these --
2    these disputes.  They don't seem like they're getting
3    less, Your Honor.
4              MR. STERN:  Well, Your Honor -- Your Honor
5    denied this and Your Honor should deny this request
6    again.  Once Mr. Carton and Uber comply with our
7    requests for -- to compel these documents, we're ready
8    to take depositions.  I don't have any more documents
9    to request.  Everything we've needed is -- we've
10   requested.  That's not to say if we take a deposition
11   of a corporate rep or a deposition of Mr. Baker or one
12   of the other -- two of the other four people, that
13   other documents may not suggest that we need, but I
14   don't have any more Notices to Produce, so I don't
15   think there's anything to manage.  And we took two
16   hours today and we, you know, went through these
17   motions.  I don't know what a Special Master's going to
18   do.
19             THE COURT:  I'm going to deny the request,
20   Mr. Carton.  I mean, you know, the Court can take a
21   look at this as the case goes on and -- and, you know,
22   I can reconsider that issue if -- if we're here every
23   other Friday because I do have 1500 other cases on my
24   docket, so I don't have the time to spend a couple
25   hours every couple of weeks.  So I -- I know you all

Colloquy                          77

1    know that and will do your best to resolve these
2    matters on your own.  But I think I can handle it as of
3    now.  Okay?  Anything else?
4              MR. CARTON:  No, Your Honor.  Thank you.
5              THE COURT:  Yup.  Have a good day.  Take
6    care.
7              MR. CARTON:  You, too.
8              MR. STANLEY:  Take care.
9              MR. STERN:  Bye-bye.
10             (Proceedings concluded at 4:46 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78

<u>CERTIFICATION</u>

    I, SARAH L. FETZ, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings on CourtSmart, Index No. from 3:06:59 to 4:46:05, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings, as recorded.


*/s/ Sarah L. Fetz*                AD/T 626
    Sarah L. Fetz                  AOC Number


KLJ Transcription Service          07/18/2025
    Agency Name                        Date