**EXHIBIT 2**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1    Did I read that correctly?
2    A.  Yes.
3    Q.  Did you discuss this email on any of
4    the calls or videos we saw from your call
5    history with ▇?
6    A.  Yeah, that was when ▇ called me
7    to mention how she was uncomfortable and she
8    felt like sending an email to Sara after her
9    deposition, I believe.
10   Q.  Did ▇ ever tell you whether an
11   email or one substantially similar to this was,
12   in fact, sent?
13   A.  I don't know if she sent it, no.
14   Q.  The middle paragraph here makes
15   reference to "the text ▇ sent to me
16   regarding the litigation."
17       Do you see that?
18   A.  Yes.
19   Q.  Do you have an understanding what
20   text that refers to?
21   A.  I think it was how ▇ had asked
22   ▇ to be a part of the case or like what the
23   involvement would be like after she had said
24   yes, the expectations.
25   Q.  At any point in time did ▇ ever

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 120

1  show you text messages that she exchanged with
2  ▓▓▓▓▓ concerning this case?
3       A.   I don't know if she showed me or if
4  she read them to me, but we certainly talked
5  about it.
6       Q.   And you talked about it in the month
7  of July 2025?
8       A.   Potentially earlier, because I knew
9  my name had been put down, but I wasn't certain
10 like now that I had moved to Texas what my
11 involvement would be like.
12      Q.   Is it your understanding from
13 speaking with ▓▓▓▓ that she has text messages
14 on her own phone exchanged with ▓▓▓▓▓
15 discussing this litigation?
16      A.   I think that -- I think that the text
17 message was maybe a screenshot between Sara and
18 ▓▓▓▓ about what to tell her friends about the
19 deposition.
20      Q.   And do you recall anything more
21 specific about what was the substance of the
22 message in that screenshot?
23      A.   I don't know the substance, but the
24 conversation was around the fact that there
25 wasn't much substance at all, like we were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

1   really unclear how agreeing to speak with
2   ▮▮▮▮ lawyer got us involved in this in the
3   first place.
4       Q.  Did you -- did you actually see that
5   screenshot or have it read to you by ▮▮▮▮?
6       A.  I think it was read to me.  I don't
7   --
8       Q.  Is it your under -- I'm sorry, go
9   ahead.
10      A.  I don't think I saw it, no.
11      Q.  Was it your understanding that ▮▮▮▮
12  had a copy of that screenshot on her own phone?
13      A.  Yes, it's my understanding.
14      Q.  Okay.  In the second sentence of this
15  middle paragraph, ▮▮▮▮ email to you states
16  that, "Specifically, yesterday I was asked not
17  to provide/search for certain documents."
18          Is this something that ▮▮▮▮
19  discussed with you?
20      A.  So this email is not to me.  This
21  email is to Sara, and ▮▮▮▮ sent it to me to
22  proofread it.
23      Q.  Right.
24      A.  And my understanding was that ▮▮▮▮
25  had shared her screen with Sara, and then I

Page 122

1    don't know exactly what she was told, but felt
2    she was told just to not share her screen, and
3    then I don't think it was discussed further, and
4    that made ▮▮▮ very uncomfortable.
5         Q.   Do you have any understanding whether
6    ▮▮▮ conducted a search for documents and files
7    similar to the search you testified that you
8    undertook?
9         A.   I believe she did.  And after she had
10   started sharing her screen and then was told to
11   sort of stop sharing her screen, I don't know
12   that that search was, like, evaluated.
13        Q.   Okay.  Apart from what's reflected on
14   the page in front of you, did ▮▮▮ speak any
15   more specifically about anything from her
16   deposition or related to her deposition that
17   made her feel uncomfortable?
18        A.   Just how little she was prepared, and
19   I think that she was not served, she had just,
20   you know, agreed to meet with Sara because Sara
21   had offered to represent her, and so I think
22   that ▮▮▮ hadn't seen the deposition document
23   request for information up until after that
24   meeting is my understanding, and I think she
25   felt like if Sara was representing her there

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

1    should have been more discussion about, like,
2    what that document fully entailed.
3         Q.   Did ▮▮▮▮ encourage you to get your
4    own counsel for the deposition today?
5         A.   She did not encourage me.  I am
6    Canadian, and when I had heard how uncomfortable
7    she was and I just had, like, a feeling after
8    the conversation with Sara that in order to,
9    like, I don't think in any legal situation, I
10   didn't want to necessarily be taking free help
11   and I didn't trust a lawyer who worked for free.
12        Q.   Is my understanding correct that you
13   don't know one way or the other whether ▮▮▮▮
14   conducted a search of her own electronic and
15   paper files for documents responsive to her
16   Deposition Notice?
17             MS. CRAIG:  Objection,
18        asked and answered.
19        A.   I -- I don't know if she had searched
20   prior to that meeting because she didn't have
21   the document, but I think in the meeting, I
22   think a 30-minute sort of pre-deposition meeting
23   with Sara, I think in that meeting is maybe when
24   she had started to search, and she pulled up her
25   screen to show Sara and then was kind of told