Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Christopher D. Cox (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com
christopher.cox@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

*Attorneys for Uber*

UBER TECHNOLOGIES, INC., RASIER, LLC,
And RASIER-CA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB (LJC)<br><br>**NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF THE PROTECTIVE ORDER**<br><br>Judge:     Hon. Charles R. Breyer<br>Date:      October 3, 2025<br>Time:     10:00 a.m.<br>Courtroom: 6 – 17th Floor |

## NOTICE OF MOTION AND MOTION FOR

## ENFORCEMENT OF THE PROTECTIVE ORDER

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Please take notice that on October 3, 2025 at 10:00 a.m. before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, Uber) will and hereby do move for enforcement of this Court's December 28, 2023 Protective Order.

This motion is made pursuant to the terms of the Court's Protective Order. Uber asks that the Court order each Plaintiffs' counsel subject to the Protective Order to conduct an investigation and to certify that neither their law firms nor any of the firm's attorneys or employees nor their agents nor their clients communicated sealed information protected as confidential under the Protective Order to the *New York Times*.

This motion is based on this notice, the accompanying memorandum of points and authorities, the declarations of Laura Vartain and Mark Premo-Hopkins and their accompanying exhibits, any oral argument the Court may permit, and all pleadings and papers on file in this action and on such other matters as may be presented to the Court at or before the hearing.

A meet and confer certification is being filed herewith in the declaration of Mark Premo-Hopkins.

DATED: August 13, 2025

Respectfully submitted,

*/s/ Laura Vartain Horn*

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Christopher D. Cox (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com
christopher.cox@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

SABRINA H. STRONG (SBN: 200292)
sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
ALYCIA A. DEGEN (SBN: 211350)
adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON, LLP**
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (*Pro Hac Vice*) ccotton@shb.com
**SHOOK, HARDY & BACON, LLP**
255 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

*Counsel for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

2

NOTICE OF MOTION

Case No. 3:23-md-03084-CRB (LJC)

1

2

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.    BACKGROUND ................................................................................................. 2

    A.    THE PROTECTIVE ORDERS IN THIS CASE AND THE JCCP...................... 2

    B.    EMAIL AND SUBSEQUENT ARTICLE FROM THE *NEW YORK TIMES* ....... 2

    C.    COMPARISON OF *NEW YORK TIMES* EMAIL AND ARTICLE TO THE
          PROTECTED MATERIAL ......................................................................... 2

    D.    UBER'S LETTER TO PLAINTIFFS' COUNSEL ................................................. 9

III.   ARGUMENT ................................................................................................. 11

    A.    THE PROTECTIVE ORDER HAS BEEN VIOLATED. ................................... 11

    B.    THE COURT SHOULD REQUIRE THAT EACH MDL PLAINTIFFS'
          COUNSEL CONDUCT THE SAME INVESTIGATION AND PROVIDE THE
          SAME CERTIFICATIONS THAT UBER HAS WITH THIS MOTION. .......... 15

IV.    CONCLUSION ............................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
   No. CV 11-01846 LHK, 2013 WL 9768650 (N.D. Cal. Oct. 2, 2013)...................................15

MOTION FOR ENFORCEMENT OF PROTECTIVE ORDER
Case No. 3:23-md-03084-CRB (LJC)

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

On August 6, 2025, the *New York Times*, in the first sentence of an article about Uber's safety practices, conceded its access to "sealed court records." Ex. 1 to Vartain Decl. Dissemination of the sealed court records to an unauthorized entity, such as a reporter, is a violation of the protective orders entered in both this Court and the JCCP. Exs. 8, 10 to Vartain Decl. It is a violation that threatens to taint the jury pool in the upcoming state and federal trials, and it must be addressed swiftly.

Even before the *New York Times* admitted its access to sealed court records, Uber, due to receipt of questions from the *Times* that revealed an unauthorized disclosure, had raised its concerns on this precise issue to Plaintiffs' counsel on the record in state court, as well as in correspondence. Uber has now matched specific quotes and language from the *Times* article and email to identical quotes and language from at least 28 of Plaintiffs' summary judgment opposition exhibits. Many of these confidential documents are still under seal and some documents—on the topics of S-RAD and dashcams—will likely continue to remain under seal after the JCCP Court issues its final ruling.  But most importantly, these documents were all subject to the Courts' protective orders in both actions at the time of disclosure and deliberate violation of the Courts' orders occurred here.

Uber and its outside counsel investigated this matter and has provided certifications from their relevant agents and employees. Exs. 1–5 to Vartain Decl. Uber has also contacted the *New York Times* and eliminated the possibility that the *Times* received the documents through a File-and-Serve error. Exs. 1–2 to Premo-Hopkins Decl. The New York Times was quite concerned by Plaintiffs' counsel's insinuation that they improperly accessed the records on the Court docket and denied the accusation vehemently via correspondence to Uber. Uber respectfully requests that this Court enforce its Protective Order by requiring each Plaintiffs' Counsel subject to this Court's jurisdiction under the Protective Order to conduct similar investigations and to make the same attached certification concerning this matter. Ex. A to Proposed Order.

## II.    BACKGROUND

### A.    THE PROTECTIVE ORDERS IN THIS CASE AND THE JCCP

The Court entered a Protective Order on December 28, 2023. Ex. 8 to Vartain Decl. The Order prohibits the disclosure of discovery materials marked as confidential ("Protected Material") to parties not involved in the litigation. *Id*. ¶ 7.2; *see also id.* ¶ 7.1 (Protected Material only to be used in connection with prosecuting, defending, or attempting to settle action). The Protective Order does not contain any exception that allows disclosure of Protected Material to members of the media. It also provides that is "*binding upon the Parties to this action, upon their attorneys,* and upon the Parties' [enumerated agents]." *Id.* ¶ 12.4 (emphasis added). "The Parties, their attorneys and employees of such attorneys, and [their agents] each expressly stipulates to the personal jurisdiction of this Court for the purpose of any proceeding brought by a Party to this Action to enforce this Stipulation and Protective Order. *Id.*[1]

### B.    EMAIL AND SUBSEQUENT ARTICLE FROM THE *NEW YORK TIMES*

On July 30, 2025, before the JCCP Court issued its tentative ruling on sealing the JCCP Plaintiffs' summary judgment opposition materials (which, as of this filing, is still tentative pending the parties' meet-and-confer and the court's final ruling on certain issues), Uber received an email from the *New York Times* seeking comment on a story that a reporter was preparing to publish about sexual assault and sexual misconduct involving Uber. Ex. 7 to Vartain Decl. The email included many details that come directly from Protected Material produced by Uber.

On August 6, 2025, the *New York Times* published an article entitled "Uber's Festering Sexual Assault Problem." In the very first sentence, the article makes clear that the reporters had access to *"sealed court records*." Ex.1 to Vartain Decl.

### C.    COMPARISON OF *NEW YORK TIMES* EMAIL AND ARTICLE TO THE PROTECTED MATERIAL

---

[1]    Similar Protective Orders have been entered by the JCCP Court. *See* Ex. 10 to Vartain Decl.

In reviewing the *New York Times* email, Uber determined that there are many instances in which (1) the reporter's language matches exactly with (2) the language in the sealed exhibits filed in connection with Plaintiffs' JCCP summary judgment opposition.[2] And when the *Times* article was actually published, the reporter emphasized she had access to "sealed court records," and that although the Court had tentatively ruled that "some" should be unsealed, "the records have yet to be released." Ex. 1 to Vartain Decl. The chart below shows that comparison:

| Quote from *New York Times* email | Comparison to Plaintiffs' JCCP MSJ Opposition Exhibits | Quote from published *New York Times* article |
|---|---|---|
| Uber received a total of 400,181 reports of sexual assault and misconduct in the United States from 2017 to 2022, according to a summary of internal data – about one every eight minutes | Exs. 48, 188 (providing the same 400,181 total); MSJ Opp'n. at 4 ("From 2017 to 2022, someone experienced an act of sexual violence in connection with an Uber about every eight minutes.") *[3] | Uber received a report of sexual assault or sexual misconduct in the United States almost every eight minutes on average between 2017 and 2022, sealed court records show.... From 2017 to 2022, a total of 400,181 Uber trips resulted in reports of sexual assault and sexual misconduct in the United States. |
| Andrew Hasbun said in an internal message in 2018: "We have a sexual assault problem. Let's stop pretending like we are trying to battle pick pockets and petty crime." | Ex. 184 ("We have a sexual assault problem. Let's stop pretending like we are trying to battle pick pockets and petty crime.") †[4] | |
| A 2021 report about Uber's global safety standards said: "Our purpose/goal is not to be the police - Our bar is much lower and our goal is to protect the company and set the tolerable risk level for our operations." | Exs. 74 & 75 ("Our purpose/goal is not to be the police - Our bar is much lower and our goal is to protect the company and set the tolerable risk level for our operations.") * | "Our purpose/goal is not to be the police...Our bar is much lower and our goal is to protect the company." |

---

[2]   The confidential materials were filed conditionally under seal.

[3]   Exhibits subject to Uber's Motion to Seal are marked with a *.

[4]   Exhibits not subject to Uber's Motion to Seal are marked with a †.

MOTION FOR ENFORCEMENT OF PROTECTIVE ORDER
Case No. 3:23-md-03084-CRB (LJC)

| | | |
|---|---|---|
| By 2016, Uber's data scientists found that safety incidents like sexual misconduct were "predictable." Uber found that sexual misconduct and assault incidents on the platform follow patterns. | Ex. 266 (2016 document with the quotes "safety incidents are rare," "many safety incidents are predictable," and "safety incidents follow patterns"). * | Uber was studying incidents of sexual violence by 2016, and that year data scientists said in a report that safety incidents were rare but predictable…. |
| They usually occur late at night and on the weekend. Incidents involving misconduct against riders typically involve a single female being picked up near a bar by a male driver. The male driver typically has a record of bad ratings and safety complaints. Uber has found that intoxicated riders are a major contributor and are susceptible to opportunistic crimes. | Ex. 275 ("Serious IPC rates are highly concentrated to late-nights and weekends"; "intoxicated riders are a major contributor"; "Riders are susceptible to opportunistic crimes when intoxicated") * <br><br> Ex. 247 ("Sexual assaults are more common late night, on weekend … and near bars. They are also more likely to be caused by males, those with a previous history of safety incidents, and those with higher 1-star rates.") * | Women most often are the victims, whether they are passengers or drivers. The attacks typically occur late at night and on the weekend, with pickups originating near a bar. In the vast majority of cases, the offenders are men — drivers or passengers — with records of sexual misconduct complaints and low ratings, the internal documents show. Intoxicated passengers are especially vulnerable. |
| Weeks after starting as Uber CEO, Mr. Khosrowshahi outlined a vision for a system of networked cameras in Uber cars. He wanted them to be inexpensive, easy to install and record trips by default. | Ex. 236 (opening slide of the documents includes the words "Dara's request," "networked camera," "inexpensive, easy to install" and "records during trip by default") * | Soon after starting as chief executive the next year, Mr. Khosrowshahi outlined a vision for a system of inexpensive, easily installed cameras in Uber cars that would record trips by default. |
| The deal breaker was Uber's independent contractor business model. "The biggest deal breaker as we see it is related to employment law," one Uber employee said | Ex. 102 (Same quoted language: "The biggest deal breaker as we see it is related to employment law.") * | But the company decided not to require cameras in cars, largely because it conflicted with its business model, according to internal communications. |
| A 2017 Uber document titled "Sexual Assault/Misconduct Reduction Strategy" said Uber's business model as presenting a "unique | Ex. 217 (2017 document titled "Sexual Assault / Misconduct Reduction Strategy"; "Uber's business model provides a | One 2017 document titled "Sexual Assault/Misconduct Reduction Strategy" suggested the limits of what Uber would compel its drivers to do, saying that the |

4

| | | |
|---|---|---|
| challenge" to addressing the problem because of "specific constraints in the amount of mandated training and interventions that can be imposed." | unique challenge to solving this problem"; "there are very specific constraints in the amount of mandated training and interventions that can be imposed") * | business model had "very specific constraints in the amount of mandated training and interventions." |
| The model used 43 predictors, including age, gender, "creepy driver" feedback, safety incident history and geographic indicators, like the number of bars near a pickup. | Ex. 267 ("creepy driver"; "43 predictors" including "Age," "Gender," "Safety Incident History," and "Spatial Features (e.g., number of bars near pick-up)") * | The document detailed how forecasts used 43 predictors, such as feedback reporting a "creepy driver," safety incident history and geographic information, including the number of bars near a pickup. |
| Uber tested the system in Los Angeles in 2018 and found it "correctly anticipated 15 percent of sexual assaults." | Ex. 196 (quoted language appears in reference to a 2018 test in Los Angeles) * | The company quietly tested the system in Los Angeles that year, finding that it "correctly anticipated 15 percent of sexual assaults" on trips using Uber's basic ride-hailing option, according to the report. |
| An Uber report in 2018 said S-RAD was potentially the "most effective intervention for preventing sexual assaults." | Ex. 268 (Same quoted language: "most effective intervention for preventing sexual assaults") * | An internal presentation a few months later called the tool potentially the "most effective intervention for preventing sexual assaults." |
| A 2024 report said that S-RAD could flag about 15 percent of serious sexual assault and sexual misconduct incidents. The report identified a problem: Uber dispatched high-risk trips without any intervention. Riders taking those trips never received any warning. | Ex. 195 (2024 document; "S-RAD can flag about 15% of serious sexual assault and sexual misconduct [ ] incidents, but there are still dispatched trips identified as high-risk by SRAD that we are not doing any intervention.") * | But there was a problem, according to a 2024 internal document: The system "still dispatched trips identified as high-risk." |
| For years, Uber has experimented with matching female riders and drivers, and found that the feature could reduce sexual assault incidents by as much as 78.9 percent. One employee said the figure was "eye-popping." | Ex. 3 (Payne deposition quoting document saying "The reductions are eye-popping (78.9%)"). * | |

5

MOTION FOR ENFORCEMENT OF PROTECTIVE ORDER

Case No. 3:23-md-03084-CRB (LJC)

| | | |
|---|---|---|
| Uber delayed introducing it in the United States, because of concerns about culture wars, political blowback and legal costs … "We should also compare 100 million vis a vis what we pay for litigation costs form female users who face sexual assault/sexual misconduct incidents on the platform," Bushra Faiz, a former Uber employee, said in a message to colleagues in March of 2021. | Ex. 273 (March 2021 chat thread including quoted language from Bushra Faiz, that "We should also compare 100 million vis a vis what we pay for litigation costs from female users who face SA/SM incidents on the platform," as well as mentions of political issues) * | Internal communications described concerns about culture wars, political blowback and, importantly, the potential for gender discrimination and other lawsuits, which the company estimated could cost more than $100 million. |
| Days after Donald Trump was elected, executives decided to hold off. "This is not the right environment to launch, and we want to take a beat to assess our timing," one internal message said. | Ex. 79 (Payne deposition quoting document that said "this is not the right environment to launch, and we want to take a beat to reassess our timing") * | "This is not the right environment to launch, and we want to take a beat to assess our timing," an internal document read. |
| Uber documents state that "the future of Uber's growth, both riders and drivers, is women." | Ex. 261 ("the future of Uber's growth, both riders and drivers, is women") † | |
| After negative news stories about sexual assault in 2018, Uber pushed a "steady drum beat of safety messages" to counter the negative stories. | Ex. 263 (Same quoted language: "steady drum beat of safety messages") † | The company deployed a plan to push a "steady drumbeat of safety messages" to drown out some of those stories, according to a 2018 email sent by a marketing manager. |
| Uber kept a list of stories it killed. | Ex. 191 ("H2 Stories Killed") † | |
| Uber employees expressed misgivings about "peddling lies," undermining the credibility of survivors and, at the request of a top executive, hiring a "notorious spin doctor" to help manage communications. | Ex. 192 ("peddling lies") †<br>Ex. 224 ("notorious 'spin doctor'") † | |
| Some employees have said that several of the safety measures | Ex. 77 ("perception of safety") † | |

MOTION FOR ENFORCEMENT OF PROTECTIVE ORDER

Case No. 3:23-md-03084-CRB (LJC)

| | | |
|---|---|---|
| that Uber has introduced create a "perception of safety" rather than reducing incidents. | | |
| Andrew Hasbun told another employee in 2019 message that he had "trashed rape victims" to USA Today … "I used to look after my soul, but I don't know where it is anymore," Mr. Hasbun said…. | Ex. 193 (2019 chat thread; "I trashed rape Victims to usat[o]day"; "I used to look after my soul but I don't know where it is anymore.") † | In 2019, Andrew Hasbun, an Uber spokesman, told another employee that he had "trashed" rape victims to USA Today, … "I used to look after my soul, but I don't know where it is anymore," Mr. Hasbun wrote in an internal message. |
| Uber called the initiative "Project T."… A presentation … said that disclosing the day and time trends could "have serious business implications" including "less users in high peak times" … [and] could "undermine Uber as a safer alternative to driving under the influence." | Ex. 200 ("Project – T Business Decisions" presentation; "serious business implications – may prompt less users in high peak times" and "Could undermine Uber as a safer alternative to driving under the influence") * | One presentation said that revealing day and time trends could have "serious business implications," including "less users in high peak times." |
| A training presentation on sensitive investigations … Agents are told not to apologize on behalf of the company. Agents are instructed to redirect from the question if a person asks how many assaults happen in an Uber every day. Uber has banned agents from proactively providing references to law enforcement and support groups, such as RAINN. "Offering up an outside resource, such as RAINN, might lead a reporting party to take further legal action against the company," one document stated. | Ex. 194 ("Sensitive Investigations" training presentation; directs agents to say "I'm so sorry to hear what you are reporting" rather than "On behalf of the Company, I'm so very sorry that this occurred"; directs agents to redirect if reporter asks "How many sexual assaults happen in UBER every day"; "Offering up an outside resource, such as RAINN, might lead a reporting party to take further legal action against the Company") * | |
| | Ex. 243 ("A world without a/v leaves gaps in our safety ecosystem.") † | "A world without a/v," read a 2016 presentation referring to audiovisual equipment, "leaves gaps in our safety ecosystem." |

MOTION FOR ENFORCEMENT OF PROTECTIVE ORDER
Case No. 3:23-md-03084-CRB (LJC)

| | | |
|---|---|---|
| | Ex. 79 ("Women Driving Women"; "Safety has ranked as one of the top reasons for prospective female drivers to not join Uber, and for current female drivers to not drive during certain hours of the day") * | "Safety has ranked as one of the top reasons for prospective female drivers to not join Uber, and for current female drivers to not drive during certain hours of the day," read one document titled "Women Driving Women" |
| | Ex. 32 (LSA Deposition: "And he was like, Bye. Like, I'm going to come find you. Like, I'm going to message you. Like, I'll find you.") † | When they arrived, he forcibly kissed her before he allowed her to leave, she said in the deposition. "He was like, bye," the woman said. "I'm going to come find you." "I'm going to message you." "I'll find you." |

Numerous non-public, confidential documents quoted in the email and article match *directly* the confidential information from Plaintiffs' JCCP sealed summary judgment opposition, as the article itself concedes. Ex. 1 to Vartain Decl. (conceding "use of sealed court records").

There are additional examples involving Protected Material from deposition testimony or documents produced in discovery.[5] One example relates to the reporter's questions about a July 10, 2024 incident involving a minor, which included details about Uber's internal investigation that are only available in confidential documents subject to the Protective Order. Notably, at the July 23, 2025 deposition of Hannah Nilles (seven days before the *Times* email), Plaintiffs' counsel questioned Ms. Nilles extensively about Uber's investigation into this incident, using a confidential Uber document marked as deposition exhibit 1731. The details that the reporter provided concerning the driver, *e.g.*, the strikes against him, appear to come from another confidential document that was hyperlinked to the exhibit. These documents were not cited in

---

[5] Subject to the Protective Order, Uber is not filing certain discovery materials to maintain their confidentiality but can provide them to the Court in camera upon request.

Plaintiffs' summary judgment opposition filing, and so are subject to the Protective Orders no matter how the JCCP Court rules on the pending motion to seal.[6]

Another example is the statement in the email (and similar statement in the article) that "Uber has known about sexual misconduct on its platform since at least 2012, when Rachel Holt, an executive in Washington at the time, saw a post from someone on a message board saying that '*something had happened to her daughter in an Uber*.'" Ex. 7 to Vartain Decl. The quoted language comes from Ms. Holt's December 12, 2024 deposition, in which she testified, "There was an accusation of -- or there was something that was on a message board in Washington, D.C. in December of 2012 in which an individual or a parent I think of an individual was -- was concerned that *something had happened to her daughter in an Uber* vehicle." Holt Dep. Tr. at 22:19-24 (emphasis added). This page of the deposition is marked confidential. Although page 22 of the deposition was initially included as part of Plaintiffs' summary judgment opposition Exhibit 6, that page was removed when Plaintiffs filed their June 23, 2025 errata exhibits. Accordingly, it is not part of the operative filing, and was also not subject to Uber's JCCP motion to seal. Therefore, it remains subject to protection under the Protective Orders.

In sum, the specific topics and themes described by the reporter are strikingly similar to the topics and themes emphasized by Plaintiffs' counsel, in both the MDL and JCCP litigation as well as in depositions occurring over the past sixty days with Uber corporate representatives (and previous depositions). Moreover, the quoted language exactly matches the sealed Protected Material. And the reporter acknowledges her reliance on "sealed court documents," which documents can only be the JCCP Plaintiffs' summary judgment opposition materials.

### D.    UBER'S LETTER TO PLAINTIFFS' COUNSEL

---

[6]    Similarly, the reporter, in both the email and the article, described an incident occurring in December 2023, again providing confidential details involving Uber's internal investigation. Indeed, in the article, the reporter referenced having access to "a copy of an internal Uber investigation." This investigation is described in confidential documents subject to the Protective Order. UBER_JCCP_MDL_ 005681862; UBER_JCCP_MDL_003028890. These documents were also not attached to or cited in Plaintiffs' summary judgment opposition filing; thus, they continue to enjoy full protection under the Courts' Protective Orders.

Uber raised this issue at a JCCP hearing on July 31, 2025, at which point Judge Schulman directed Uber to confer with Plaintiffs' Counsel concerning the issue. Uber thereafter sent a letter to lead counsel in both the JCCP and the MDL concerning the reporter's email. Exs. 3–4 to Premo-Hopkins Decl. Uber asked counsel to investigate the issue and certify that they were not involved directly or indirectly in disclosing confidential information to the *New York Times*, and have no knowledge of how the *New York Times* came into possession of that information. One attorney responded on behalf of MDL lead counsel, stating, "We take any claim of non-compliance seriously and are looking into the issues you've raised. We are preparing a written response and will send as soon as possible. In the meantime, our team is available to discuss any updates you may have in your investigation, including whether the reporter had access to confidential materials via File&Serve, and whether you've looked into possible disclosures from Uber employees, counsel, and agents." Ex. 5 to Premo-Hopkins Decl. Another attorney responded on behalf of JCCP lead counsel, stating "I've spoken with my co-counsel in the JCCP leadership, and none of us have any personal knowledge of any breach of the Protective Order. If you have any solid evidence, we'll be happy to investigate further." Ex. 6 to Premo-Hopkins Decl.  Neither email responded fully or precisely to Uber's request that counsel provide the requested certification; rather, they were carefully crafted responses that danced around the issue of whether disclosure had occurred directly or to another individual that then disclosed to the NYT. Given the lack of clear responses (which should be easy to do if no disclosure occurred), counsel for Uber sent a follow-up email asking each individual counsel to "please specifically confirm that neither your law firms nor anyone acting at your direction or on your behalf communicated confidential information to the *New York Times*." Ex. 7 to Premo-Hopkins Decl. Some counsel have now responded. Exs. 8–11 to Premo-Hopkins Decl. On August 6, 2025, MDL Counsel sent another carefully crafted response: "***To the best of our knowledge***, the PSC has complied with its obligations under the Protective Order and has not disclosed confidential information to the New York Times." Ex. 10 to Premo-Hopkins Decl. (emphasis added).  Counsel for Uber followed up with MDL and JCCP lead counsel, requesting that each of Plaintiffs' firms with access to the

relevant documents certify that no employee, agent, client, or other person was involved directly or indirectly in disclosing the confidential information. Exs. 14, 15 to Premo-Hopkins Decl. Lead counsel for the MDL have suggested that motion practice is not necessary and that they will modify the language proposed by Uber, but to date they have not provided the certification responsive to Uber's request. Lead counsel also have not confirmed that each plaintiff law firm in the MDL would provide the certification with the language Uber requested. Premo-Hopkins Decl. ¶ 18.

During this period, the *New York Times* article was published. And in the interim, Uber investigated Plaintiffs' claim that the sealed Protected Materials could have come from Uber current or former employees, or Uber attorneys or other agents. Uber focused on the documents that comprise the JCCP summary judgment opposition materials, because based on the documents cited as well as the reference to sealed court documents, it is clear that the *Times* reporter received those documents *as a collection*. The reporter herself has spoken about the volume of information given to her, indicating it was thousands of records. Attached hereto are the certifications of Uber and its relevant agents describing their determinations that no Uber current employees, former employees, attorneys, or agents with access to Plaintiffs' JCCP summary judgment opposition materials sent them to the *New York Times*, either directly or indirectly. Exs. 1–5 to Vartain Decl.

## III.   ARGUMENT

### A.   THE PROTECTIVE ORDER HAS BEEN VIOLATED.

The article's references to "sealed court records" addressed by a "preliminary ruling," and "records [that] have yet to be released"—combined with the extremely close match between the substance of the *New York Times* email and article, on the one hand, and the summary judgment opposition materials, on the other—demonstrate that the vast majority of Protected Material cited in the *Times* email and article came directly from Plaintiffs' JCCP summary judgment opposition filing and exhibits, which are largely under seal. Ex. 1 to Vartain Decl. Moreover, these opposition materials were very likely provided to the *Times* as a single set of sealed, collected documents.[7] If

---

[7]   Further, the fact that a quotation in the *Times* email comes from page 22 of the Holt deposition, which was initially included as part of Exhibit 6 to Plaintiffs' summary judgment

1     for some reason Uber is wrong, it should be very easy for these firms to affirm on the record to the

2     Court that they did not directly or indirectly provide this information to the NYT. The fact that

3     most refuse to do so is concerning. In fact, the Court has already found a member of the Plaintiffs'

4     Steering Committee has violated the Protective Order by sharing Uber's confidential information

5     with lawyers in unrelated litigations. *See* ECF 3692.

6            When Uber raised the issue of the *Times* email at the recent JCCP hearing, Plaintiffs'

7     Counsel suggested that Uber should investigate its own 30,000 employees as potential sources.

8     Ex. 11 to Vartain Decl. at 41:16-21.[8] As an initial matter, nowhere close to "30,000 Uber

9     employees" had access to (1) the collection of summary judgment opposition documents as a set

10    (or significant subset thereof); (2) in particular, several specific documents within that set,

11    including certain of the documents cited by the *Times* article. Only Uber's legal department, a few

12    other select employees, and its outside counsel had access to the set of summary judgment

13    opposition exhibits. Moreover, although some of the various internal Uber documents within the

14    set are available to various Uber employees, certain specific documents within the set (and quoted

15    in the article) are generally unavailable at Uber outside of the legal department. For example, MSJ

16    Opp'n. Ex. 6 discussed above was a deposition transcript (Rachel Holt). So too is MSJ Opp'n. Ex.

17    32 (Plaintiff LSA 78's deposition). Yet another example is MSJ Opp'n. Ex. 48, which was not an

18    Uber document at all, although it was purportedly based on data produced by Uber. This document

19    is instead a ***demonstrative created by plaintiffs' counsel***, used at certain depositions, and then

20    attached to their summary judgment opposition. There can be no doubt that the reporter received

21    an ***exact copy*** of either MSJ Opp'n. Ex. 48 (or a similar demonstrative used as a deposition exhibit).

22    This is because the *Times*-created graphic for the heading of the article includes a slightly altered

23    and cropped version of MSJ Opp'n. Ex. 48:

24

25           opposition, but which page was removed when Plaintiffs filed their June 23, 2025 errata
          exhibits, makes it extremely likely that the *New York Times* was provided with a pre-errata

26          set.

    [8]   In their written response, MDL counsel likewise suggested that the source "could certainly be

27          an employee or a member of Uber's own defense team." Ex. 10 to Premo-Hopkins Decl.

28

(Zoomed in screenshot from the mobile version of the *Times* graphic; zoomed in screenshot of MSJ Opp'n. Ex. 48.) This plaintiff-counsel-created graphic is another document to which only a few Uber employees would have access.

Accordingly, Uber has provided a certification that its current employees, former employees, attorneys, and other agents who had access to the sealed version of Plaintiffs' JCCP Summary Judgment Opposition materials have not shared those materials with the *New York Times*, either directly or indirectly. Ex. 1 to Vartain Decl. Uber's outside counsel Kirkland & Ellis LLP, O'Melveny & Myers LLP, Shook, Hardy & Bacon, LLP, and Paul, Weiss, Rifkind, Wharton & Garrison LLP have also contacted its attorneys and employees, as well as experts retained in this matter, and provided similar certifications. Exs. 2–5 to Vartain Decl.

In MDL Counsel's email and written response to Uber's letter, they also suggested that the *New York Times* may have accessed the Protected Material through File&Serve. This references a period when counsel for the *New York Times* was inappropriately registered for File&Serve and inadvertently received via File&Serve certain confidential JCCP materials (specifically, Uber's motion to seal Plaintiffs' summary judgment opposition materials, which itself attached redacted versions of *some*, but not *all* of those materials). Accordingly, this is neither a satisfactory nor a sufficient explanation, because not all of the materials cited in the *New York Times* email were part of Uber's motion to seal filing, and those materials therefore could not have been disclosed via

File&Serve.[9] In addition, when the lawyer for the *New York Times* discovered that she was receiving apparently sealed material, she sent an email notifying counsel for Uber:

> This afternoon, I started receiving from File and ServeXpress links to several filings in connection with Defendants' motions to seal records and/or filings in connection with the upcoming motion for summary judgment. On review of only one such link and only one paragraph of one exhibit (exhibit G) it became apparent that I was being provided access to both redacted and unredacted versions of exhibits that Defendants are attempting to seal. Upon this discovery, I stopped reviewing any links provided by File and ServeXpress, and will refrain from reviewing or accessing the links until the matter can be resolved. I did not share the links with my client The New York Times Company.

Ex. 12 to Vartain Decl. Uber contacted the *Times* concerning this issue. Ex. 1 to Premo-Hopkins Decl. The Times confirmed its lawyer's account and that the documents were not accessed through File&Serve or the docket. Ex. 2 to Premo-Hopkins Decl. ("I am disappointed that Plaintiffs' counsel would suggest, without evidence, that The Times may have used that system to obtain sealed records. We did not.").

To Uber's knowledge, that leaves only one group who had access to sealed material from Plaintiffs' JCCP Summary Judgment Opposition—Plaintiffs' counsel. Although Uber has given counsel the opportunity to certify to their non-involvement in the disclosure to the *New York Times*, counsel did not take the opportunity to conclusively disclaim any such involvement. *See, e.g.,* Ex. 6 to M. Premo-Hopkins Decl. ("none of us have any *personal knowledge of* any breach of the Protective Order") (emphasis added). Nor did most of the counsel respond to Uber's follow-up request that they provide individual, unequivocal certifications.[10]

---

[9]   As discussed above, a few documents were ***never*** filed with the summary judgment opposition filing. In addition, as part of its motion to seal filing, Uber did not file *any of the exhibits that it was seeking to seal in full*, many of which are quoted by the *New York Times* article, including MSJ Opp'n Ex. 109, a screenshot of which was included in a video accompanying the *Times* article. Nor did Uber refile any documents that *it was not seeking to seal at all*, such as MSJ Opp'n Ex. 32, Plaintiff LSA 78's deposition.

[10]   The fact that Uber's motion to seal summary judgment opposition materials may have been pending in the JCCP at the apparent time of the disclosure provides no justification for sharing materials with the *Times*. The JCCP Protective Order specifies that "[w]hile a motion to seal is pending before the Court has ruled, no Party shall make use in open court, in public, or in

MOTION FOR ENFORCEMENT OF PROTECTIVE ORDER

Case No. 3:23-md-03084-CRB (LJC)

**B.     THE COURT SHOULD REQUIRE THAT EACH MDL PLAINTIFFS' COUNSEL CONDUCT THE SAME INVESTIGATION AND PROVIDE THE SAME CERTIFICATIONS THAT UBER HAS WITH THIS MOTION.**

The Court should require that each individual MDL Plaintiffs' Counsel conduct an investigation and make the same certifications that Uber and its counsel have provided with this motion, *i.e.*, that no one at each counsel's law firm, nor their clients or agents, who had access to the sealed summary judgment opposition materials provided them to the *New York Times*, either directly or indirectly.

Following these investigations and certifications, the Court should also order any further investigations, discovery, or proceedings that it deems appropriate. For example, courts have ordered document production and depositions in investigating the circumstances of a protective order violation. *E.g.*, *Apple Inc. v. Samsung Elecs. Co.*, No. CV 11-01846 LHK, 2013 WL 9768650, at *2 (N.D. Cal. Oct. 2, 2013) (ordering document production and depositions related to apparent protective order violation); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2013 WL 5693759, at *5 (N.D. Cal. Oct. 15, 2013) (affirming discovery order; "In light of the fact that Samsung has been unable to produce satisfactory answers to any questions about the extent and use of the improper disclosures despite having three months to investigate, this Court finds that it was necessary for Magistrate Judge Grewal to order Court-supervised discovery.").

**IV.     CONCLUSION**

Uber respectfully requests that the Court require each MDL Plaintiffs' Counsel to provide the certification attached as Exhibit A to the Proposed Order attached hereto.

---

any way inconsistent with the protections in this order of any Disclosure or Discovery Material that is subject to that motion to seal without the consent of the Designating Party or the permission of the Court." Ex. 8 to Vartain Decl., ¶ 12.5. Uber received the email from the *New York Times* reporter before the JCCP Court had even ruled ***tentatively*** on its motion to seal, and no final ruling has yet issued. Nor did Uber or the JCCP Court give their consent to disclosure during the pendency of the motion to seal. Moreover, under the Court's tentative ruling and order that the parties meet and confer further concerning certain topics, certain materials are likely to remain under seal following the Court's final ruling. And, of course, any Protected Material that was never filed remains subject to the Protective Order in any event.

DATED: August 13, 2025                    Respectfully submitted,

                                          /s/ *Laura Vartain Horn*

                                          Laura Vartain Horn (SBN 258485)
                                          **KIRKLAND & ELLIS LLP**
                                          555 California Street, Suite 2700
                                          San Francisco, CA 94104
                                          Telephone: (415) 439-1625
                                          laura.vartain@kirkland.com

                                          Jessica Davidson (Admitted *Pro Hac Vice*)
                                          Christopher D. Cox (Admitted *Pro Hac Vice*)
                                          **KIRKLAND & ELLIS LLP**
                                          601 Lexington Avenue
                                          New York, NY 10022
                                          Telephone: (212) 446-4800
                                          jessica.davidson@kirkland.com
                                          christopher.cox@kirkland.com

                                          Allison M. Brown (Admitted *Pro Hac Vice*)
                                          **KIRKLAND & ELLIS LLP**
                                          2005 Market Street, Suite 1000
                                          Philadelphia, PA 19103
                                          Telephone: (215) 268-5000
                                          alli.brown@kirkland.com

                                          SABRINA H. STRONG (SBN: 200292)
                                          sstrong@omm.com
                                          JONATHAN SCHNELLER (SBN: 291288)
                                          jschneller@omm.com
                                          **O'MELVENY & MYERS LLP**
                                          400 South Hope Street, 19th Floor
                                          Los Angeles, CA 90071
                                          Telephone: (213) 430-6000
                                          Facsimile: (213) 430-6407

ALYCIA A. DEGEN (SBN: 211350)
adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
**SHOOK, HARDY & BACON, LLP**
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (*Pro Hac Vice*) ccotton@shb.com
**SHOOK, HARDY & BACON, LLP**
255 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

*Counsel for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By:    */s/ Laura Vartain Horn*

Laura Vartain Horn