# M. Premo-Hopkins Decl. Exhibit 4

# KIRKLAND & ELLIS LLP

Mark W. Premo-Hopkins, P.C.
To Call Writer Directly:
+1 312 862 2706
mark.premohopkins@kirkland.com

555 California Street
San Francisco, CA 94104
United States

+1 415 439 1400

www.kirkland.com

Facsimile:
+1 415 439 1500

August 1, 2025

Dear Counsel:

We write regarding a concerning discovery Uber has made which relates to the parties' obligations under the March 6, 2025 Stipulation and Amended Protective Order ("Protective Order") in this proceeding. As detailed below Uber requests that the addressees of this letter ***certify by Monday, August 4 that they, or others at their firm, were not involved in disclosing confidential information to the New York Times and have no knowledge of how the New York Times came into possession of the information referenced***. Uber also requests that the addressees of the letter **conduct an investigation** into this issue and take further action, as detailed below.

On July 30, 2025, before the issuance of the Court's tentative ruling on sealing (which at this time is still tentative), Uber received the attached email from a *New York Times* reporter seeking comment regarding this litigation and related matters. The email contained detailed information from Uber documents that have been produced in this litigation, have been designated as confidential or highly confidential under the Protective Order, and, critically, ***have not otherwise been publicly disclosed***.

As you know, under the Protective Order, confidential information may be used ***only*** within the confines of this litigation and may ***only*** be disclosed to the categories of individuals specifically identified in the Protective Order. *See* Section 7. Plainly, the disclosure of such information to a member of the media would constitute an egregious violation of both the letter and the spirit of the Protective Order.

The specific topics and themes described by the reporter are strikingly similar to the topics and themes emphasized by Plaintiffs' counsel, both in the litigation but in depositions occurring over the past sixty days with Uber corporate representatives. For example, topic headings in the *New York Times* email include Numbers (using the totals that Plaintiffs have derived from Uber's unaudited safety ticket data), Trends (concerning the alleged predictability of assaults), Dashcams, S-RAD, Pairing Women Riders and Women Drivers, Uber Image (quoting the same internal Uber documents that Plaintiffs have repeatedly used at depositions and cited in their summary judgment opposition briefing), and Safety Reports (focusing on Uber's decision to cover only 5 of 21 taxonomy categories). As you are well aware, these are the exact themes that Plaintiffs have highlighted, for example, at the recent deposition of Hannah Nilles, Uber's Director and Head of Safety for the Americas and in their summary judgment opposition briefing. Certain particular similarities are described below.

**KIRKLAND & ELLIS LLP**

August 1, 2025
Page 2

In connection with its further review of the *New York Times* email, Uber determined that there are a number of instances in which the language and details used by the reporter match exactly with the language and details from the conditionally sealed exhibits filed in connection with Plaintiffs' summary judgment opposition. Set out in the table below are just four examples related to dashcams and S-RAD (categories of topics which, following the parties' upcoming meet-and-confer process and, if needed, further consideration by the Court, are likely to remain under seal at least in part). This comparison demonstrates that the reporter used specific words and phrases (and even punctuation) mirroring that contained in confidential Uber documents.

| Quote from New York Times email | Comparison to MSJ Opposition Exhibits |
|---|---|
| The deal breaker was Uber's independent contractor business model. "The biggest deal breaker as we see it is related to employment law," one Uber employee said | The quoted and highlighted language appears in MSJ Opp. Ex. 102. This document was included in Uber's motion to seal. |
| Weeks after starting as Uber CEO, Mr. Khosrowshahi outlined a vision for a system of networked cameras in Uber cars. He wanted them to be inexpensive, easy to install and record trips by default. | The highlighted language appears in MSJ Opp. Ex. 236. Although the NYT reporter did not use quotations in this example, the opening slide of the documents includes the words "Dara's request," "networked camera," "inexpensive, easy to install" and "records during trip by default" |
| By 2017, a team at Uber had started creating a machine learning model to forecast matches between drivers and riders that might lead to an incident of sexual assault. The model used 43 predictors, including age, gender, "creepy driver" feedback, safety incident history and geographic indicators, like the number of bars near a pickup. | The quoted and highlighted language appears in MSJ Opp. Ex. 267. That exhibit also contains nearly identical language concerning the existence of "43 predictors" including "Age," "Gender," "Safety Incident History," and "Spatial Features (e.g., number of bars near pick-up)". This document was included in Uber's motion to seal. |

# KIRKLAND & ELLIS LLP

August 1, 2025
Page 3

| Quote from New York Times email | Comparison to MSJ Opposition Exhibits |
|---|---|
| The result was a system called Safety Risk Assessed Dispatch, or S-RAD, that assessed the safety risk of potential driver-rider pairings. Uber tested the system in Los Angeles in 2018 and found it "==correctly anticipated 15 percent of sexual assaults==." | The quoted and highlighted language appears in MSJ Opp. Ex. 196 in reference to a 2018 test in Los Angeles. This document was included in Uber's motion to seal. |
| An Uber report in 2018 said S-RAD was potentially the "==most effective intervention for preventing sexual assaults==." | The quoted and highlighted language appears in MSJ Opp. Ex. 268. This document was included in Uber's motion to seal. |

These similarities are too great in number and too striking in their nature to be coincidental.

Another example relates to the reporter's questions about a July 10, 2024 incident involving a 12-year old girl. Although aspects of this incident have been reported publicly, the reporter included details about Uber's internal investigation of the incident, which details are only available in confidential documents subject to the Protective Order. Notably, at the July 23, 2025 deposition of Hannah Nilles, Plaintiffs' counsel questioned Ms. Nilles extensively about Uber's investigation into this incident, using a confidential Uber document marked as deposition exhibit 1731. The details that the reporter provided concerning the driver, *e.g.*, the strikes against him, appear to come from another confidential document that was hyperlinked from deposition exhibit 1731. Deposition Exhibit 1731 and the hyperlinked document were not cited in Plaintiffs' MSJ opposition filing, and therefore are and remain subject to the Protective Order. What is most shocking about this inclusion in the reporter's questions is this individual has not put her information or story in the limelight in any way and has made no choice to do so here–yet in a very non-survivor focused way, is being forced into being a focal point of the anticipated story.

Similarly, the reporter described an incident occurring in December 2023, again providing confidential details involving Uber's internal investigation. This investigation is described in confidential documents subject to the Protective Order. UBER_JCCP_MDL_005681862; UBER_JCCP_MDL_003028890. These documents were also not attached to or cited in Plaintiffs' MSJ opposition filing; thus, they are currently under protection of the Court.

Yet another example is the reporter's statement that "Uber has known about sexual misconduct on its platform since at least 2012, when Rachel Holt, an executive in Washington at

## KIRKLAND & ELLIS LLP

August 1, 2025
Page 4

the time, saw a post from someone on a message board saying that 'something had happened to her daughter in an Uber.'" The quoted language comes from Ms. Holt's December 12, 2024 deposition, in which she testified, "There was an accusation of -- or there was something that was on a message board in Washington, D.C. in December of 2012 in which an individual or a parent I think of an individual was -- was concerned that ***something had happened to her daughter in an Uber*** vehicle." Dep. at 22:19-24 (emphasis added). This page of the deposition is marked confidential. Although page 22 of the deposition was initially included as part of Plaintiffs' MSJ opposition Exhibit 6, that page was removed when Plaintiffs filed their June 23, 2025 errata exhibits. Accordingly, it is not part of the operative filing, and was also not subject to Uber's motion to seal. Therefore, it remains subject to protection under the Protective Order.

Given these examples (and others) in which language from Plaintiffs' MSJ opposition and deposition exhibits match exactly with those used by a *New York Times* reporter, we make the following requests:

1. The addressees of this letter (who have acted as lead counsel in this proceeding and the MDL) certify ***by 5:00 PM ET on Monday, August 4*** that they, or others at their firm, were not involved directly or indirectly in disclosing confidential information to the *New York Times*, and have no knowledge of how the *New York Times* came into possession of the information referenced.

2. The addressees of the letter conduct an investigation to determine whether any of their firm's attorneys or staff who have access to confidential Uber documents had any involvement in or knowledge of how the *New York Times* came into possession of the information referenced and, based on such investigation, either (a) provide a supplemental certification indicating no involvement or knowledge was found or (b) comply with the provisions of Section 10 of the Protective Order regarding any disclosure.

Thank you for your immediate attention to this serious matter.

Sincerely yours,

Mark Premo-Hopkins, P.C.

## KIRKLAND & ELLIS LLP

August 1, 2025
Page 5

## DISTRIBUTION

**Uber JCCP Co-Lead and Liaison Counsel**

John Eddie Williams
WILLIAMS HART & BOUNDAS, LLP
Email: jwilliams@whlaw.com

William A. Levin
LEVIN SIMES LLP
Email: wlevin@levinsimes.com

C. Brooks Cutter
CUTTER LAW, P.C.
Email: bcutter@cutterlaw.com

**Uber MDL Plaintiffs' Steering Committee:**

Roopal P. Luhana
CHAFFIN LUHANA LLP
Email: luhana@chaffinluhana.com

Sarah R. London
GIRARD SHARP LLP
Email: slondon@girardsharp.com

Rachel B. Abrams
PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
Email: rabrams@peifferwolf.com

From: **Emily Steel** <emily.steel@nytimes.com>
Date: Wed, Jul 30, 2025 at 7:36 AM
Subject: New York Times - request for comment
To: Andrew Hasbun <andrew.hasbun@uber.com>, Matt Kallman <kallman@uber.com>

Matt and Andrew,

I wanted to seek your comment on a story that I am preparing to publish about sexual assault and sexual misconduct involving Uber rides. The reporting includes information about the number of sexual misconduct reports Uber has received, the patterns behind those incidents and the steps Uber has and has not taken to deter the problem. The reporting shows how Uber has tested a number of solutions that employees found to be statistically significant in deterring sexual misconduct, such as the Safety Risk Assessed Dispatch or S-RAD, video recording and pairing women riders with women drivers. The reporting shows that Uber failed to mandate or delayed implementing many of these programs, concerned about ridership, legal costs and its independent contractor business model.

My reporting is based on thousands of pages of Uber documents, court records and interviews with more than a dozen current and former Uber employees.

I am seeking your comment and on-the-record responses to the following questions and facts detailed below. If I have anything wrong, please let me know what specifically you believe is in error. I request that you please respond to the questions with on-the-record answers by 7:30 a.m. ET, on Friday, August 1.

Don't hesitate to contact me. My cell phone is 347-224-7164.

Many thanks,

Emily

XXXXXXXXXXXXXXXX

**NUMBERS:**

Uber received a total of 400,181 reports of sexual assault and misconduct in the United States from 2017 to 2022, according to a summary of internal data – about one every eight minutes. Reports of serious sexual assault increased from 2023 to 2024. Uber didn't systematically track sexual assaults until 2017. The story is likely to say that these incidents are more pervasive and persistent than what Uber has disclosed. Uber employees are aware that sexual misconduct and sexual assaults are often underreported to the company because of several fears, including that many drivers know riders' home addresses.

Drivers also are victims to attacks by passengers – about half of the time.

Uber has known about sexual misconduct on its platform since at least 2012, when Rachel Holt, an executive in Washington at the time, saw a post from someone on a message board saying that "something had happened to her daughter in an Uber."

Andrew Hasbun said in an internal message in 2018: "We have a sexual assault problem. Let's stop pretending like we are trying to battle pick pockets and petty crime."

A 2021 report about Uber's global safety standards said: "Our purpose/goal is not to be the police - Our bar is much lower and our goal is to protect the company and set the tolerable risk level for our operations."

*QUESTIONS*:

*How many reports of sexual assault and misconduct in the United States did Uber receive in 2023, 2024 and so far in 2025?*

*What does Uber mean when it says that the goal is to: "set the tolerable risk level?" What does Uber consider to be a tolerable risk level for sexual assault?*

*Do Ms. Holt or Mr. Hasbun have any comments?*

**TRENDS:**

By 2016, Uber's data scientists found that safety incidents like sexual misconduct were "predictable." Uber found that sexual misconduct and assault incidents on the platform follow patterns. They usually occur late at night and on the weekend. Incidents involving misconduct against riders typically involve a single female being picked up near a bar by a male driver. The male driver typically has a record of bad ratings and safety complaints. Uber has found that intoxicated riders are a major contributor and are susceptible to opportunistic crimes.

Uber has not shared information about these patterns publicly. In an interview this week, Emilie Boman avoided directly answering questions about what Uber knows about the trends. "Sexual assault is essentially impossible for us to predict," she said. "We can't predict the future, and we don't know when somebody is going to assault someone else."

*QUESTIONS*:

*Why hasn't Uber disclosed these patterns and trends to the public?*

*What advice would Uber give to passengers and drivers if they want to protect themselves from sexual assault and misconduct on the platform?*

*Does Ms. Boman have any comment?*

**KHOSROWSHAHI DECLARATION**

In a court declaration earlier this year, Mr. Khosrowshahi said: "I am not involved with driver background checks. I am not responsible for responding to or investigating incidents of any nature, including Plaintiffs' alleged incidents of sexual misconduct. I do not make decisions regarding rider or driver account deactivations…I am not directly or uniquely involved in the development, implementation, or execution of the safety policies or practices, technologies, or other measures."

*QUESTIONS:*

*Why isn't Mr. Khosrowshahi more involved in these issues, given the numbers of incidents that are reported to the company? Does he have any comment?*

**DASHCAMS:**

Weeks after starting as Uber CEO, Mr. Khosrowshahi outlined a vision for a system of networked cameras in Uber cars. He wanted them to be inexpensive, easy to install and record trips by default. Uber had found that cameras could deter bad behavior. Months later, Uber rolled out dashcam pilot in some U.S. cities. Uber employees found that such a solution was feasible, low cost and effective at reducing "interpersonal conflict."

The deal breaker was Uber's independent contractor business model. "The biggest deal breaker as we see it is related to employment law," one Uber employee said

A 2017 Uber document titled "Sexual Assault/Misconduct Reduction Strategy" said Uber's business model as presenting a "unique challenge" to addressing the problem because of "specific constraints in the amount of mandated training and interventions that can be imposed."

QUESTIONS:

*What is stopping Uber from deploying mandatory video recording on its platform?*

*How has Uber's business model presented challenges in addressing the problem of sexual misconduct?*

**SAFETY RISK ASSESSED DISPATCH (S-RAD):**

By 2017, a team at Uber had started creating a machine learning model to forecast matches between drivers and riders that might lead to an incident of sexual assault. The model used 43 predictors, including age, gender, "creepy driver" feedback, safety incident history and geographic indicators, like the number of bars near a pickup. The result was a system called Safety Risk Assessed Dispatch, or S-RAD, that assessed the safety risk of potential driver-rider pairings. Uber tested the system in Los Angeles in 2018 and found it "correctly anticipated 15 percent of sexual assaults." An Uber report in 2018 said S-RAD was potentially the "most effective intervention for preventing sexual assaults."

Uber later deployed the technology in the United States. A 2024 report said that S-RAD could flag about 15 percent of serious sexual assault and sexual misconduct incidents. The report identified a problem: Uber dispatched high-risk trips without any intervention. Riders taking those trips never received any warning.

QUESTIONS:

*How does Uber now use the S-RAD system?*

*Why does Uber continue to dispatch trips that S-RAD has deemed high-risk? Why doesn't Uber notify riders and drivers about the potential risks of their pairings?*

**PAIRING WOMEN RIDERS AND WOMEN DRIVERS:**

For years, Uber has experimented with matching female riders and drivers, and found that the feature could reduce sexual assault incidents by as much as 78.9 percent. One employee said the figure was "eye-popping."

The company introduced women-matching options in other countries, starting with Saudi Arabia in 2019. Uber delayed introducing it in the United States, because of concerns about culture wars, political blowback and legal costs of more than $100 million for anti-discrimination disputes, according to internal reports and communications. Uber's executive leadership team reviewed the decision multiple times, and some employees expressed frustration about the delays. "We should also compare 100 million vis a vis what we pay for litigation costs form female users who face sexual assault/sexual misconduct incidents on the platform," Bushra Faiz, a former Uber employee, said in a message to colleagues in March of 2021.

Last fall, Uber's executive leadership team greenlit a pilot for a women-matching option in the United States, planned to start in November. Days after Donald Trump was elected, executives decided to hold off. "This is not the right environment to launch, and we want to take a beat to assess our timing," one internal message said. In mid July, Uber announced that it was planning to start testing women-matching on rides in Los Angeles, San Francisco and Detroit. The test is planned to begin in August..

QUESTIONS:

*Why did Uber decide to announce in July that it was starting women-matching options in the United States?*

*Does Ms. Faiz have any comment?*

**UBER IMAGE**

Uber documents state that "the future of Uber's growth, both riders and drivers, is women." In documents, Uber employees discuss the importance that riders and drivers think that Uber is safe. Uber has donated millions of dollars to victim advocacy groups and promoted itself as survivor-centric and a champion of women's safety

After negative news stories about sexual assault in 2018, Uber pushed a "steady drum beat of safety messages" to counter the negative stories. Uber kept a list of stories it killed. Uber employees expressed misgivings about "peddling lies," undermining the credibility of survivors and, at the request of a top executive, hiring a "notorious spin doctor" to help manage communications.

Some employees have said that several of the safety measures that Uber has introduced create a "perception of safety" rather than reducing incidents. Those include RideCheck, an in-app button to call or text 911, and the ability for passengers to share their live location with a friend. Is that an accurate assessment?

Andrew Hasbun told another employee in 2019 message that he had "trashed rape victims" to USA Today, which had recently published a report about how Uber handled reports of sexual assault. "I used to look after my soul, but I don't know where it is anymore," Mr. Hasbun said, adding, "I think it is in Gus' basement, along with the heads of various missing women," referring to Gus Fuldner, Uber's senior vice president of safety. "Our heads will all be in there soon if we don't watch our backs," Mr. Hasbun said.

*QUESTIONS:*

*Why did Uber employees "peddle lies" and undermine the credibility of sexual assault survivors? How do those actions fit with the company's stated value to "Do the right thing. Period."?*

*Some employees have said that several of the safety measures that Uber has introduced create a "perception of safety" rather than reducing incidents. Is that an accurate assessment?*

*Does Mr. Hasbun have a comment?*

**SAFETY REPORTS**

In three reports, Uber has released audited data on serious safety incidents, including sexual assault, on the platform. The reports cover the years 2017 through 2022. Uber limited the incidents of sexual misconduct that it disclosed in the reports to five of the 21 categories of sexual misconduct it tracked. Some employees and victim advocates did not agree with the decisions to limit what information was released. The then-leader of women's safety refused to be part of the public relations push for the project.

Internally, Uber called the initiative "Project T." Uber decided not to include details about the patterns behind when sexual assault often occurs. A presentation on the project said that disclosing the day and time trends could "have serious business implications" including "less users in high peak times." The presentation said the disclosure could "undermine Uber as a safer alternative to driving under the influence."

*QUESTIONS:*

*What are the number of sexual assault and sexual misconduct incidents reported to Uber in all 21 categories for the years 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 and so far in 2025?*

*Why did Uber limit the sexual misconduct incidents it reported to five of the 21 categories?*

*Given what Uber knew about the record of sexual misconduct on its platform, was it an accurate decision to promote itself as a safe ride after a night out?*

**LITIGATION:**

More than 3,000 sexual assault lawsuits in federal and state court have been filed against Uber by passengers who claimed they had been sexually assaulted or harassed by their Uber drivers. Uber has called the suits "a legally baseless attempt to hold Uber liable for the extremely rare and unforeseeable criminal acts" of independent drivers. In some cases, Uber sued the driver accused of assault, asserting that if the allegations were true, the drivers had violated their agreements with the company.

Uber asserts that it "cares deeply about the safety of those who use its technology" and has worked "diligently to reduce incidents that occur in connection with the Uber platform."

In July, Uber reached a comprehensive settlement to resolve more than 100 claims brought by clients of the law firm Estey & Bomberger in both federal and state court.

In discovery requests made in litigation, Uber has requested that plaintiffs turn over medical records and social media details so that the company can investigate their claims of experiencing harm and suffering after being assaulted. In some cases, women said that the sexual assault on Uber was not the only sexual assault that they had experienced, and Uber requested expert medical exams to determine which sexual assault caused them harm. A lawyer for one woman, identified as Jane Doe LSA 78, who is suing the company said during a court hearing that Uber's tactics had retraumatized her after it served subpoenas on her family members, who hadn't been aware of the lawsuit, and her sister, who was 13 years old when the incident happened and didn't know about it.

In litigation, plaintiffs assert that Uber continues to hire drivers without conducting adequate background checks and screening procedures, allowing culpable drivers to keep driving for Uber. Plaintiffs have made allegations that Uber can make the process more difficult if a victim decides to report the incident to the police or pursue litigation. They allege that after a victim reports a sexual assault, Uber often erases the victim's complaint and disables the victim's account, which precludes the victim from accessing pertinent information such as the driver's name.

*QUESTIONS:*

*Uber has said that it has adopted a survivor-centric approach in its safety initiatives. How do these tactics prioritize the needs and well-being of people who have experienced sexual assault or violence?*

*How much money did Uber agree to pay to settle the claims brought by clients of the law firm Estey & Bomberger? What confidentiality agreements does the deal include? What non-disparagement agreements does the deal include?*

*Could Uber do more to screen drivers, monitor them once they are on the platform and deactivate them if something occurs?*

**INCIDENT REPORTING**

A training presentation on sensitive investigations shows how people reporting incidents to Uber are connected with agents who are trained to use specific language that protects the company. Agents are told not to apologize on behalf of the company. Agents are instructed to redirect from the question if a person asks how many assaults happen in an Uber every day. Uber has banned agents from proactively providing references to law enforcement and support groups, such as RAINN. "Offering up an outside resource, such as RAINN, might lead a reporting party to take further legal action against the company," one document stated.

*QUESTIONS:*

*Uber has said that it has adopted a survivor-centric approach in its safety initiatives. Do these tactics prioritize the needs and well-being of people who have experienced sexual assault or violence?*

**SPECIFIC INCIDENTS:**

1) The story is likely to include an incident that was reported to Uber in December 203. The incident date was December 14-15, 2023. The location was Houston, TX. An internal Uber investigation about the incident showed that a woman was picked up at 8:53 p.m. on December 14 near an apartment complex. She requested to be dropped off at a residence about 15 miles away, a trip that was estimated to be about 22 minutes long. The trip deviated from its planned route. At 9:10, the car stopped near a glass factory. At 9:13, the car stopped for 8 minutes near a Shell gas station. Uber sent a long stop notification to check on the woman at that time. She did not respond. The car again deviated from its planned route and stopped near a Motel 6 at 9:29 p.m. Uber sent another long stop notification to the woman at 9:35 p.m. She didn't respond. At 9:39 p.m. Uber tried to contact her via a long stop robocall. She didn't respond. The trip was active, with no movement, until 2:01 a.m. At 5:50 a.m. on Friday, December 15, 2023, the passenger called Uber to report an incident. She said that her Uber driver had "fucking raped her." She said that she was "intoxicated." A man then started talking on behalf of the woman. The man said that the driver was present when she woke up and that "he fled" when "she became more frantic." Uber did not call law enforcement after it did not receive responses from the passenger.

An internal investigation into the incident reported a "concerning fact pattern." It said that the upfront time for the trip was about 22 minutes but that it lasted 5 hours. It said that there was no movement at an unplanned waypoint for about 4.5 hours. The rider received three RideCheck notifications/calls but did not respond to any of them. S-RAD did not evaluate the risk of the trip. The driver had two reports of sexual misconduct on a duplicate account. The driver had three previous dangerous driving reports – reported against.

*QUESTIONS*:

*Could Uber have done more to prevent this incident?*

*Did the driver also receive RideCheck notifications? If so, does Uber have a record of how he did or did not respond?*

*Why was this driver allowed to continue driving for Uber, even after two previous reports of sexual misconduct?*

*What measures does Uber have in place to prevent a bad actor from starting a new account after someone makes a sexual misconduct report against them?*

*How often do drivers have duplicate accounts?*


2) The story is likely to include an incident that happened on July 10, 2024. A driver named RJ Johnson III allegedly forced an unaccompanied 12 year-old girl to perform oral sex on him during an unscheduled stop at a pediatric health care facility. The driver was charged with aggravated assault of a child. The driver made an unplanned stop at a church parking lot for about 7 minutes. The driver had been flagged by Uber's deactivation system on June 16, 2024 for 3 strikes. But he remained active driving for Uber because he had not received a warning prior to his final strike. The driver had one prior inappropriate post-trip contact allegation from March 18, 2024 that resulted in him being banned from Teens trips. Records show that the driver is now incarcerated, with the case pending.

*QUESTIONS:*

*Could Uber have done more to prevent this incident?*

*Why was this driver allowed to continue driving for Uber, even after he had been flagged for deactivation?*

*What are Uber's current policies for deactivating drivers after reports of safety incidents?*

3) The story is likely to include details about the Jane Doe LSA 78 court case. In the suit, she claims: she was an 18-year-old college student in December 2016 and ordered her first Uber ride to take her from the bus station in San Jose to the airport. Once in the car, the driver asked whether she had been drinking. She responded that she had taken a few shots. The driver turned down a dark street, and climbed on top of her, groping her breasts and trying to force his hands down her pants. She said that she tried to push the driver off, but he had restrained her by pulling her hair through the headrest.

*QUESTIONS:*

*Could Uber have done more to prevent this incident?*