# EXHIBIT A

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1    Q.   Did you speak to ▮▮▮▮▮▮▮ about
2  your own upcoming deposition during any of these
3  calls?
4    A.   I spoke to her about whether or not I
5  would be deposed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7           MR. SAGALOWSKY:  Okay.  I
8       want to pull up another call
9       history.  Ellea, this is our Tab 25.
10      It's the Bates number that ends in
11      33.  And we'll introduce this as the
12      next exhibit, please.
13           (Exhibit No. 6 introduced.)
14           MR. SAGALOWSKY:  And could
15      we -- could we scroll down to the
16      second page of this one, please.
17      Thank you.
18   Q.   (BY MR. SAGALOWSKY)  Okay.  So,
19  ▮▮▮▮▮▮▮ is this a similar call history of
20  your phone reflecting calls and videos with
21  ▮▮▮
22   A.   Uh-huh.  Yes, sorry.
23   Q.   So is it fair to say that you -- you
24  had two Facetime calls on July 7th with ▮▮▮?
25   A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 115

1    Q.   Okay.  If we could go back to the
2    first page, please.  It shows a missed FaceTime
3    and then another FaceTime on July 8, 2025,
4    correct?
5    A.   Yeah.
6    Q.   Another Facetime on Saturday,
7    July 19th, correct?
8    A.   Yes.
9    Q.   Okay.  And then a Facetime video this
10   Monday, two phone calls on Wednesday, a phone
11   call on Thursday, two FaceTime videos Friday,
12   and three phone calls yesterday, correct?
13   A.   Uh-huh.
14   Q.   Okay.  Do you recall any specific
15   topics you discussed with ▓▓▓ during any of
16   those calls or videos?
17   A.   ▓▓▓ is also moving to ▓▓▓, so
18   some of it was furniture, just the move, going
19   out to dinner, and then we did discuss, prior to
20   her deposition, just sort of how under-prepared
21   she was feeling for the deposition, and then
22   afterwards we discussed how sort of
23   uncomfortable she had felt with the deposition.
24   Q.   Okay.  And I'm going to follow up on
25   that.  Before I do -- one moment, please.

1           MR. SAGALOWSKY:  Ellea,
2    could we pull up our Tab 21, please.
3    I'm going to -- I'm going to pull up
4    21 and Tab 22.  This is,
5    ▮▮▮▮▮▮▮▮▮ your Bates 22 and the
6    attachment to it is Bates 24.
7           THE WITNESS:  Uh-huh.
8           MR. SAGALOWSKY:  So we'll
9    mark that as one exhibit, please.
10           (Exhibit No. 7 introduced.)
11      Q    (BY MR. SAGALOWSKY)  Okay.  So,
12   ▮▮▮▮▮▮▮▮▮ is this -- well, actually, I don't
13   see it on our screen yet.  Let me wait.  Sorry.
14           So, ▮▮▮▮▮▮▮▮▮ does this appear to
15   you to be an email that was forwarded to you on
16   the 8th of July by ▮▮▮▮?
17      A.   Yes.
18      Q.   Okay.  And you'll see below that,
19   there's a note from Ms. Craig that explains
20   attached is a copy of the Notice of Deposition
21   that was served for ▮▮▮▮▮▮ deposition; is that
22   right?
23      A.   Uh-huh, yes, sir.
24      Q    Okay.  And if we look at the
25   attachment to this email, please, which is the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1    next document in your binder, I think you'll see
2    that's a Deposition Notice that looks
3    substantially similar to the one you and I
4    looked at for your deposition earlier today,
5    correct?
6         A.   Yes.
7         Q.   Okay.  And if we turn to the end of
8    this notice, I believe you'll see that this
9    notice also had -- oh, sorry.  There we go --
10   duces tecum request, document request, correct?
11        A.   Uh-huh.
12        Q.   Okay.  And do you recall ▮
13   sending this along to you?
14        A.   Yes.
15             MR. SAGALOWSKY:  Okay.
16        Now let's pull up, please -- this is
17        Tab 23, which is your Bates number
18        ending in 30.  We'll mark this as
19        the next exhibit, please.
20             (Exhibit No. 8 introduced.)
21        Q    (BY MR. SAGALOWSKY)  Okay.
22   ▮               do you recognize the document
23   that's in front of you now?
24        A.   Yes.
25        Q.   And is this an email that you

Page 118

1  received from ▮▮▮▮ on Tuesday, the 8th of
2  July 2025?
3      A.   Yes.
4      Q.   Okay.  And it states, "Hi Sara, I
5  wanted to follow up regarding my recent
6  deposition in the AR v. Uber Technologies
7  matter.  After some reflection, I'm feeling
8  increasingly uncomfortable with how my
9  involvement in the case was handled.  To be
10 candid, I don't feel I was fully informed about
11 the implications of participating and I now have
12 serious concerns about the way my deposition was
13 managed.  Specifically, yesterday I was asked
14 not to provide/search for certain documents (the
15 text messages I showed you regarding the text
16 ▮▮▮▮ sent to me regarding the litigation) that
17 were directly requested in the deposition
18 notice, which in hindsight feels inappropriate
19 and misleading.  That doesn't sit right with me.
20 Although I've already provided testimony, I no
21 longer wish to be involved in this matter or to
22 have my deposition used in any capacity.  Please
23 let me know what steps can be taken to formally
24 communicate that objection or limit further use
25 of my statements."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1          Did I read that correctly?
2     A. Yes.
3     Q. Did you discuss this email on any of
4  the calls or videos we saw from your call
5  history with ▇▇▇
6     A. Yeah, that was when ▇▇▇ called me
7  to mention how she was uncomfortable and she
8  felt like sending an email to Sara after her
9  deposition, I believe.
10    Q. Did ▇▇▇ ever tell you whether an
11 email or one substantially similar to this was,
12 in fact, sent?
13    A. I don't know if she sent it, no.
14    Q. The middle paragraph here makes
15 reference to "the text ▇▇▇ sent to me
16 regarding the litigation."
17         Do you see that?
18    A. Yes.
19    Q. Do you have an understanding what
20 text that refers to?
21    A. I think it was how ▇▇▇ had asked
22 ▇▇▇ to be a part of the case or like what the
23 involvement would be like after she had said
24 yes, the expectations.
25    Q. At any point in time did ▇▇▇ ever

1  show you text messages that she exchanged with
2  ▆▆▆▆▆▆ concerning this case?
3      A.   I don't know if she showed me or if
4  she read them to me, but we certainly talked
5  about it.
6      Q.   And you talked about it in the month
7  of July 2025?
8      A.   Potentially earlier, because I knew
9  my name had been put down, but I wasn't certain
10 like now that I had moved to ▆▆▆▆ what my
11 involvement would be like.
12     Q.   Is it your understanding from
13 speaking with ▆▆▆▆ that she has text messages
14 on her own phone exchanged with Ms. ▆▆▆▆▆▆
15 discussing this litigation?
16     A.   I think that -- I think that the text
17 message was maybe a screenshot between Sara and
18 ▆▆▆▆ about what to tell her friends about the
19 deposition.
20     Q.   And do you recall anything more
21 specific about what was the substance of the
22 message in that screenshot?
23     A.   I don't know the substance, but the
24 conversation was around the fact that there
25 wasn't much substance at all, like we were

1    really unclear how agreeing to speak with
2    ███████ lawyer got us involved in this in the
3    first place.
4         Q.   Did you -- did you actually see that
5    screenshot or have it read to you by ███████
6         A.   I think it was read to me.  I don't
7    --
8         Q.   Is it your under -- I'm sorry, go
9    ahead.
10        A.   I don't think I saw it, no.
11        Q.   Was it your understanding that ███████
12   had a copy of that screenshot on her own phone?
13        A.   Yes, it's my understanding.
14        Q.   Okay.  In the second sentence of this
15   middle paragraph, ███████ email to you states
16   that, "Specifically, yesterday I was asked not
17   to provide/search for certain documents."
18             Is this something that ███████
19   discussed with you?
20        A.   So this email is not to me.  This
21   email is to Sara, and ███████ sent it to me to
22   proofread it.
23        Q.   Right.
24        A.   And my understanding was that ███████
25   had shared her screen with Sara, and then I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1    don't know exactly what she was told, but felt
2    she was told just to not share her screen, and
3    then I don't think it was discussed further, and
4    that made ▮▮▮▮ very uncomfortable.
5         Q.   Do you have any understanding whether
6    ▮▮▮▮ conducted a search for documents and files
7    similar to the search you testified that you
8    undertook?
9         A.   I believe she did.  And after she had
10   started sharing her screen and then was told to
11   sort of stop sharing her screen, I don't know
12   that that search was, like, evaluated.
13        Q.   Okay.  Apart from what's reflected on
14   the page in front of you, did ▮▮▮▮ speak any
15   more specifically about anything from her
16   deposition or related to her deposition that
17   made her feel uncomfortable?
18        A.   Just how little she was prepared, and
19   I think that she was not served, she had just,
20   you know, agreed to meet with Sara because Sara
21   had offered to represent her, and so I think
22   that ▮▮▮▮ hadn't seen the deposition document
23   request for information up until after that
24   meeting is my understanding, and I think she
25   felt like if Sara was representing her there

1    should have been more discussion about, like,
2    what that document fully entailed.
3        Q.   Did ▓▓▓▓ encourage you to get your
4    own counsel for the deposition today?
5        A.   She did not encourage me.  I am
6    ▓▓▓▓▓▓▓▓ and when I had heard how uncomfortable
7    she was and I just had, like, a feeling after
8    the conversation with Sara that in order to,
9    like, I don't think in any legal situation, I
10   didn't want to necessarily be taking free help
11   and I didn't trust a lawyer who worked for free.
12       Q.   Is my understanding correct that you
13   don't know one way or the other whether ▓▓▓▓
14   conducted a search of her own electronic and
15   paper files for documents responsive to her
16   Deposition Notice?
17              MS. CRAIG:  Objection,
18       asked and answered.
19       A.   I -- I don't know if she had searched
20   prior to that meeting because she didn't have
21   the document, but I think in the meeting, I
22   think a 30-minute sort of pre-deposition meeting
23   with Sara, I think in that meeting is maybe when
24   she had started to search, and she pulled up her
25   screen to show Sara and then was kind of told