# EXHIBIT A

Business & Practice
Manage Newsletters
Exclusive
**Fortress' Billions Quietly Power America's Biggest Legal Fights**
Oct. 16, 2024, 5:01 AM EDT

- Fortress describes litigation finance strategy in depth for first time
- Asset management giant commits $6.6 billion to legal assets, $2.9 billion to IP

The easy explanation for how Fortress Investment Group worked its way to the top of the polarizing, opaque business of litigation funding would be: It has a ton of money.

With about $6.6 billion committed to legal assets, Fortress backs law firms behind some of history's biggest mass tort suits, such as the Roundup cases against Bayer AG and talcum powder litigation against Johnson & Johnson. It funds other litigation funders.

And with another $2.9 billion committed to intellectual property, the asset-management giant claims to be the world's largest institutional investor in patents.

But its secret may be its intensity and a meticulous streak that comes with all of that money.

As an investor in patents, Fortress aggressively pursues alleged infringers in court, making it a thorn in the side of tech giants like Apple Inc. and Intel Corp. In litigation funding, law firms that take money from Fortress have their bank accounts tracked weekly and their cases monitored closely. One litigation funder said he passed on taking money from Fortress because "they choke you to death."

Told that a person in the industry described Fortress as "pirates," the firm's intellectual property lead, Eran Zur, joked to a reporter that he forgot his eye patch that day.

"We're a tough counterparty if you don't do what you say you're gonna do," Jack Neumark, a Fortress managing partner and co-CIO, said during a nearly three-hour interview in which Fortress discussed litigation finance activities in depth for the first time. "We see where funds go. If you do something you're not supposed to do, we're gonna be upset."



Jack Neumark, Managing Partner and Co-CIO.
Photo courtesy of Fortress Investment Group LLC

Once on the fringes of alternative investing, backing lawsuits to get a piece of the outcome has become a multi-billion-dollar, lightly regulated industry. Funders like to keep their activities close to the vest: In 2022, a Fortress-backed patent entity withdrew a $4 billion lawsuit against Intel after a judge ordered it to identify its financial backers.

The occasional huge payoff aside, litigation finance is not an easy way to make money. Funders are at the mercy of the legal system's pace. Some states and judges have tried to force funders to operate more openly. The US Chamber of Commerce has for years fought an industry it views as funding frivolous lawsuits against its members.

Congress has tried at least four times to pass legislation that would regulate the industry. One of the proposed bills could have put Fortress out of the legal assets business.

"I'm continually confused as to why someone decided that this was the most credible threat that they could have come up with," Neumark said.



WATCH: Making Millions Off Others' Lawsuits: How Litigation Finance Works

**Who They Fund**

Fortress has $48 billion in assets under management and recently said it expects to double that. It launched in 1998 as a private equity boutique and moved into credit and real estate. In 2007, it became the first alternative-investment manager to go public. Ten years later, Fortress was acquired for $3.3 billion by Softbank Group Corp., which earlier this year completed the sale of its remaining 90.1% equity to Fortress management and Abu Dhabi's sovereign wealth fund, Mubadala Investment Co.

It's acquired and resold name-brand institutions, many of them in distress, in a variety of industries over the years. Most recently, it acquired Red Lobster and Vice Media out of bankruptcy. Less well known is how it's steadily built its litigation finance business, which has 32 employees making the calls on where to deploy capital. Its intellectual property arm has a separate team of 19 employees.

Burford Capital Ltd., one of two publicly traded funders, is often considered the face of the industry. It backed shareholders who won a $16 billion judgment against Argentina, one of the largest jury awards ever in the Southern District of New York.



Graphic: Jonathan Hurtarte/Bloomberg Law

Burford's life-to-date commitment number for its balance sheet and private funds is around $10.7 billion since its launch in 2009. But it mainly invests directly in commercial litigation, something Fortress rarely does. Burford issues non-recourse commercial funding and focuses on valuing litigation risk, while Fortress has a credit-like approach.

Mass tort firms are a huge part of Fortress' law lending and have emerged as an increasingly popular area for litigation funders.

What started as $5 million to $10 million investments in single commercial cases has grown into loans exceeding $100 million to law firms for their entire caseloads. It's a built-in diversified portfolio that hedges risk.

"When we encounter mass tort law firms, the name we hear frequently as to where they have financed their portfolios today or historically, you'll hear Fortress more often than any other," said David Perla, Burford Capital's vice chair. "They're aggressive, they're smart, they understand the space."

A review of Uniform Commercial Code filings by Fortress over the past decade found seven law firms to which it has provided loans, some of which have terminated. The filings don't specify the amount of the loans or how the money is used but offer a glimpse into how firms do business with Fortress. Fortress wouldn't comment on the transactions.

They include Texas-based Johnson Law Group. The firm's founder, Nick Johnson, also owns a litigation funding company called Armadillo Litigation Funding that has been a Fortress partner. Johnson Law is involved in many major mass tort cases, including talcum powder, Camp Lejeune toxic-water claims, and sexual-assault claims against Uber Technologies Inc.

Nick Johnson and Johnson Law Group didn't respond to requests for comment.

Partners in Napoli Shkolnik are on executive and steering committees for many of the biggest mega-cases, including ones over PFAS water contamination and opioids. Napoli said it no longer has a loan with Fortress but credits the asset manager with putting it on a self-sustaining path.

"Their partnership was critical to our past achievements, and we're grateful for their support," the firm said in a statement.

It also previously loaned to the Smith Law Firm, a co-counsel of Beasley Allen, which has led the J&J talc litigation; St. Louis based OnderLaw; and personal injury firm Weitz & Luxenberg.

Neither Smith Law nor Onder Law responded to requests for comment. Weitz & Luxenberg declined to comment.

In 2020, California-based Dan Johnson Law Group had a lien with Fortress. Dan Johnson said the firm had a small funding effort during the pandemic.

Mike Papantonio of Florida mass tort law firm Levin Papantonio says his firm has a line of credit with Fortress for only operational expenses. He said they don't use any of it for case acquisition.

"They're nothing but a bank to us and we may choose to use their credit line or not," he said.

Fortress has also loaned to firms with specializations other than mass torts, the UCC filings show**.** One is the firm of civil rights lawyer Ben Crump, who represented the families of George Floyd, Trayvon Martin, and Breonna Taylor. Crump Law didn't respond to requests for comment.

When Fortress lends to a law firm, it keeps a close eye on how its money is used.

"There are good lenders and bad lenders, and I think there are some bad loans out there in the mass tort space," Neumark said. "I think one of the major traps that people get sucked into is not having the resources internally to do a thorough review of the files."



WATCH: Billion Dollar Lawsuits: When Litigation Finance Met Mass Torts

**The 'Super Funder'**

In the litigious world of intellectual property, Fortress works with companies that own undervalued patents or acquires patents from companies that are cash poor but invention rich. Then it identifies operating companies allegedly infringing the patents, seeking license payments from those willing to pay or jury verdicts from those who aren't.

"I do believe we pioneered the patent lending business," said Zur, who co-founded RPX, a provider of patent risk management services with a number of the world's biggest tech companies as paying members. "It existed as a concept before we did this, but it wasn't an active investment with large financial institution money behind it."

Fortress first began investing in IP with its General Opportunities Fund, dedicating an $800 million component to the sector. It then raised two closed end funds: $900 million for its first bespoke IP fund and $1.25 billion for its second.

But Zur doesn't consider himself a litigation funder.

"We do not invest passively as opposed to litigation funders. It's private equity. We sit on the board, we advise," Zur said.



Eran Zur, Head of Intellectual Property.
Photo courtesy of Fortress Investment Group LLC

Jonathan Stroud, general counsel at Unified Patents, a membership organization with a mission to deter abusive patent assertions, says Fortress' claim to not be an IP litigation funder is "weird."

"Because you have more control of the entities, it doesn't mean you're not a funder, you're a super funder," he said. "You're funding the case and you're a client."

The likes of Apple and Intel have special animus for entities like Fortress that sue over patents they own but don't use in a product or service. Officially, they refer to them as non-practicing entities. The less flattering term is patent troll.

Ironically, it's a term used in Zur's writing.

In 2015, he co-wrote an article, titled "Why Investment-friendly Patents Spell Trouble for Trolls," that Big Tech opponents have tried to use against him. Intel, in one court brief, used Zur's words to argue how Fortress takes advantage of the court system.

"These oversized awards stem from the sheer complexity of interoperable components and systems sold as part of functional units, if not integrated devices," he wrote. "And because technology invention tends to be incremental, to the extent an individual patent owner can be awarded damages on the price of the entire end product as opposed to their specific patent claim, a litigation incentive arises."

Asked about his foes turning his words against him, Zur joked that he's flattered.

Given the chance to write the article over, he said, he might be more judicious. "But, you know," he said, "I can't take it back."

**Patent Disclosure**

One of Fortress' patent-assertion investments is VLSI Technology LLC, which owns a portfolio of patents that formerly belonged to Dutch chipmaker NXP Semiconductors NV.

VLSI obtained two jury verdicts for patent infringement totaling more than $3 billion against Intel, one of which was partially reversed. In a third case before Delaware District Judge Colm F. Connolly, who often oversees patent cases in one of the most popular venues for that litigation, VLSI was seeking $4.1 billion against Intel.

VLSI brought that case in 2018, four years before Connolly issued a standing order requiring disclosure of litigation finance agreements. The judge nonetheless sought to enforce his mandate. Told to disclose its owners, VLSI said there were 10, describing them as pension, retirement, and sovereign wealth investments, foundations, high net worth individuals, and endowments.

Connolly wanted names and put the case on hold until VLSI complied. A few months later, VLSI dropped the case. Zur declined to say if the case was dropped due to the disclosure requirement.

"Any judge who's asking us 'who are your investors?' I say, okay, but who are Apple's investors? I mean, what's the difference?" Zur said. "Does the identity of the plaintiff or the characteristics of the plaintiff matter in a patent claim?"

Intel declined to comment, and Apple didn't respond to requests for comment.

**The Disclosure Battle**

The Chamber has pressed, with mixed results, for state and federal legislation requiring more disclosure of funding arrangements. Louisiana, Indiana, and West Virginia have passed legislation in various forms, while proposals died in Florida and Kansas.

"We're not fearing disclosure, but I just worry it distracts the judge or delays the case and ultimately results in the defendants being able to create more leverage to slow down a verdict or a settlement that is ultimately going to benefit the plaintiff," Neumark said.

The Chamber has also called litigation funding a national security risk. In 2022, its Institute for Legal Reform published a paper describing how adversaries like China and Russia could fund lawsuits to obtain confidential information on US companies. The paper was largely theoretical and didn't cite examples. But since it was published, Bloomberg Law has identified Russian and Chinese funders that have operated in the US court system. Among them is A1 LLC, a subsidiary of Russia's Alfa Group that has been under US sanctions since September 2023.

Last year, Sens. Joe Manchin (I-W. Va.) and John Kennedy (R-La.) introduced the Protecting Our Courts from Foreign Manipulation Act. The bill would have required disclosure from a foreign person or entity funding litigation in federal courts.

The legislation also would have banned sovereign wealth funds and foreign governments from participating in litigation finance. That would have effectively banned Fortress from the business, given Mubadala's 68 percent ownership. Fortress said it controls its board of directors and balance sheet, and is autonomous in its business operations.

Neumark called the proposed law, which died in committee, a transparent effort to stop lawsuits against corporations. Litigation funding "might be the most inefficient way possible for a foreign entity to try to gain access to confidential information," he said.

Sen. Chuck Grassley (R-Iowa) has twice, unsuccessfully, introduced the Litigation Funding Transparency Act. The latest legislation was introduced in the House by Rep. Darrell Issa (R-Calif.) this month, after the House Judiciary Committee in June held a hearing on litigation finance in the IP space.

In October, the US Judicial Conference's Advisory Committee on Civil Rules agreed to study the rules requiring disclosure of litigation funding.

"As much as 30% of patent litigation could be funded by third parties, and that number could be even higher because there is no uniform disclosure requirement for litigation funding agreements," said Stephen Waguespack, president of the US Chamber of Commerce Institute for Legal Reform. "Without transparency, judges, defendants, and even plaintiffs do not know who is funding or possibly controlling US patent litigation cases, which could undermine US economic and national security. It is time to bring third-party litigation funding out of the shadows."

**Funder Takeovers**

One of the tightly held aspects of Fortress' business is how it funds other litigation funders.

A person with knowledge of investor arrangements, who declined to be named due to confidentiality agreements, said that they're aware of at least four funders who've received capital from Fortress.

Neumark won't confirm that but said Fortress' funding to funders can take the forms of debt, investing in general partners, or partnering on an investment.

One consistent principle is that if Fortress agrees to provide capital to a funder, it will be hands on.

A former employee at a funder Fortress offered to back said it declined because "they choke you to death and then put you out of business." The person asked not to be named because of confidentiality agreements surrounding the conversation.

Neumark and Zur balked at some of the descriptions used by their peers. "I think it's definitely misguided," Neumark said. "I think our biggest borrowers have been with us for years."

Fortress has taken over funders when financing arrangements went sour.

It contributed with other creditors to a loan to Vannin Capital amounting to a total debt of £88 million in 2018, just as the industry was taking shape. Vannin planned to go public that same year, but the IPO fell through, and Fortress told Vannin's founders to kick in more equity or find a buyer. They opted for the latter. Fortress bought Vannin and then let go its US staff, though it retained some employees in Europe and Australia.

Affiniti Capital Management, a UK-based lender to law firms, received a £30 million loan from Fortress in 2020. A year into the deal, Neumark said, Fortress started to lack confidence in Affiniti's reporting and the quality of the underlying portfolio.

"Ultimately we had to pull the trigger and put it into administration and take it over so that we could get closer to the assets," Neumark said.

He says Fortress invested around £25 million or £30 million and will probably get back between 20 and 35 percent of that investment.

"Across Fortress and every asset manager you lose money occasionally, and this is definitely the one that there's a strong chance we're going to lose some money on," he said.

The former CEO of Affiniti, Ian Cunningham, refuted the allegations about the portfolio and said Fortress never mentioned reporting issues.

**What's next?**

Fortress has closed out about 40% of its litigation finance deals, Neumark said. On the deals that haven't fully realized, it's returned a significant amount of capital to investors.

"As long as people are happy with the product, I think there's going to be more and more uptake and so I think the asset class is going to grow for sure over time," he said. "I just don't know how much."

The criticism "does bother me," Neumark said. "There's a lot of defaulting to ambulance chasers or things like that. And when you're talking about big antitrust litigation or big product liability litigation, like, there's really no margin for doing stuff that's frivolous."

In their view, they are Davids. Even with billions of dollars behind them, they reason, the Goliaths have more billions.

But that's as far of a biblical reference as they'll go.

"My business does believe in going and helping those who cannot be funded otherwise," IP lead Zur said. "But no, I don't do God's work here. I don't want to pretend like I am putting on the white hat."

To contact the reporter on this story: Emily R. Siegel at esiegel@bloombergindustry.com

To contact the editors responsible for this story: Bernie Kohn at bkohn@bloombergindustry.com; Chris Opfer at copfer@bloombergindustry.com;

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved