# AUNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB (LJC) |
| | **JOINT PTO 8 LETTER REGARDING OUSTANDING S-RAD ISSUES** |
| This Document Relates to: ALL MATTERS | Judge:        Hon. Lisa J. Cisneros<br>Courtroom:  G - 15th Floor |

Dear Judge Cisneros:

     Pursuant to PTO No. 8 (ECF No. 323), the Parties respectfully submit this joint letter regarding outstanding S-RAD issues as outlined herein.

DATED: September 24, 2025          Respectfully Submitted,

By: /s/ *Rachel B. Abrams*
    RACHEL B. ABRAMS (SBN 209316)
    **PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
    555 Montgomery Street, Suite 820
    San Francisco, CA 94111
    Telephone: (415) 426-5641
    Email: rabrams@peifferwolf.com

    ROOPAL P. LUHANA (*Pro Hac Vice*)
    **CHAFFIN LUHANA LLP**
    600 Third Avenue, Fl. 12
    New York, NY 10016
    Telephone: (888) 480-1123
    Email: luhana@chaffinluhana.com

    SARAH R. LONDON (SBN 267083)
    **GIRARD SHARP LLP**
    601 California St., Suite 1400
    San Francisco, CA 94108
    Telephone: (415) 981-4800
    Email: slondon@girardsharp.com

*Co-Lead Counsel for Plaintiffs*

By: /s/*Kaitlyn Coverstone*
    **KIRKLAND & ELLIS LLP**
    KAITLYN COVERSTONE
    Kaitlyn.coverstone@kirkland.com
    ALLISON M. BROWN (*pro hac vice*)
    Alli.brown@kirkland.com
    JESSICA DAVIDSON (*pro hac vice*)
    Jessica.davidson@kirkland.com
    LAURA VARTAIN
    Laura.vartain@kirkland.com

    CHRISTOPHER C. COTTON (*pro hac vice*)
    **SHOOK, HARDY & BACON L.L.P.**
    2555 Grand Blvd.
    Kansas City, Missouri  64108
    Telephone: (816) 474-6550
    ccotton@shb.com

    **O'MELVENY AND MYERS LLP**
    SABRINA H. STRONG
    sstrong@omm.com
    JONATHAN SCHNELLER
    jschneller@omm.com

**SHOOK, HARDY & BACON L.L.P.**
PATRICK OOT (*pro hac vice*)
ALYCIA A. DEGEN (SBN 211350)
MICHAEL B. SHORTNACY (SBN 277035)

*Counsel for Defendants Uber Technologies,*
*Inc., Rasier, LLC, and Rasier-CA, LLC*

**<u>Plaintiffs' Position:</u>**

Plaintiffs have asked for, deposed Uber representatives, and met and conferred with Uber numerous times about its non-produced and only recently disclosed S-RAD ("Safety Risk Assessed Dispatch") data. Uber collects vast amounts of data about drivers, riders, and trips and has spent years studying which data points are associated with an increased risk of sexual assault or serious sexual misconduct ("SA/SM"). When choosing which driver to dispatch in response to a given rider's trip request, Uber uses a machine learning model (S-RAD) to give each potential driver-rider pairing ("supply plan") a numerical score representing the risk of SA/SM if that driver is dispatched. S-RAD is Uber's one and only tool for taking the risk of SA/SM into account when it chooses which driver to dispatch to a trip request.[1]

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

Uber produced each Bellwether Plaintiff's score and limited information surrounding the trip only days before Sunny Wong's second MDL deposition, after previously implying it did not exist.  Before then and since, Uber refuses to produce (i) contextual information necessary to understand each score, (ii) how the threshold applied was selected, and (iii) how the score and threshold compare to other S-RAD assessed rides. Uber provided certain information responsive to Plaintiffs' questions, but Defendants previously agreed to provide written, verified responses to Plaintiffs' inquiries. Until this briefing it refused to provide basic information Plaintiffs can rely upon or discuss the missing data described below, all of which is discoverable, relevant, and not unduly burdensome to produce.

The data Uber has produced to date is insufficient because it does not allow Plaintiffs to understand the significance of Plaintiffs' S-RAD scores (in terms of probability of SA/SM, or percentile risk relative to other trips). It also does not allow Plaintiffs to see how thresholds may have varied in different locations, and how many incidents of reported violence might have been prevented had Uber prevented "slip-throughs."' Without this data, the produced S-RAD inputs, scores, and thresholds applied to each Bellwether trip are all but meaningless. All that may be deduced from what has been produced thus far is whether S-RAD intervened on that  trip (*i.e.* the trip was within Uber's then-set threshold) and the inputs, but *not* the relative weight assigned to each input as compared to other trips under the same -or different – thresholds at the same moment S-RAD was used to make that determination. Moreover, without knowledge of the "features" Uber tested in beta models of S-RAD, Plaintiffs cannot understand what other information Uber could have used to predict and potentially prevent sexual assaults against these Plaintiffs.

As explained in more detail herein, Plaintiffs respectfully request that Uber be ordered to produce, by September 26, 2025[2]:

---

[1] As discussed below, S-RAD and its tables were not disclosed as non-custodial data sources. Had it, these issues and this dispute would have been raised, and likely resolved, long ago.

[2] Plaintiffs' data expert requires this information to understand and contextualize the S-RAD scores and thresholds produced for the Bellwether trips. If produced, this expert anticipates

1. A written, verified confirmation that: 1) "supply plans" are deleted after 30 days; 2) deletions happen on a rolling basis; 3) this policy, to date, has never been suspended; and 4) this policy has been in effect since S-RAD was operationalized in the U.S.

2. A written, verified response for each S-RAD model version, including all those deployed in Beta and to the present, showing: 1) every input ("feature") in each model; 2) a description of each input ("feature"); 3) the weight assigned to that input ("feature"), in each of its applicable models; 4) the directional impact of that input ("feature") on an S-RAD score in that model (i.e. positive, ambiguous, negative, or any other relative terms employed by Uber); and 5) each city ID (and corresponding specific description of that city ID) where the particular beta/model and its applicable inputs ("features") were/are deployed along with the start and end date of the deployment;

3. A verified written explanation of how Uber calculated the average S-RAD "score" for each Bellwether trip, including whether the calculation was based on all trips or completed trips;

4. S-RAD flagging "thresholds" and "trigger rates" set in U.S. cities from the implementation of S-RAD (in 2022) to the present;

5. S-RAD scores (for trips on which S-RAD ran) *in the produced safety data*[3];

6. The UUID's of all Type 1 and Type 2 "slip-through" trips in the produced safety data and produce data and corresponding information about these trips, including: a) S-RAD "nudges" that were sent as part of these trips, including tables labeled "srad_trip_nudges", and/or b) data relating to "Ride Checks" that were sent and recorded by Uber relating to these trips, including tables labeled secure_safety.ride_check_incident_rider_log; and

7. Provide a date for the 30(b)(6) deposition of Sunny Wong following Uber's verified answers to these questions and production of this data and related information.[4]

       S-RAD was tested extensively starting in 2017 and deployed nationally in the U.S. in July 2022. Documents show that the program has always been a closely guarded secret for Uber and was **never** discussed publicly by the company or disclosed to riders.[5] Similarly, Uber has concealed S-RAD details from Plaintiffs in this litigation. From the date of Uber's first Rule 26(f) letter on January 16, 2024, nor later under Court order to identify its non-custodial sources, Uber did not disclose this program and its (likely) close to 100 related tables –perhaps the most relevant that it has -- as a non-custodial source. In addition, Plaintiffs sought this data and information in their original discovery requests issued more than 18 months ago in February 2024. *See e.g.*, Ptfs' 1st

---

offering a supplemental report to discuss the bellwether scores in comparison to the broader data set – a task that cannot be completed without the data.

[3] Contrary to Uber's assertions, the overlap in time between the dates of the incidents for which safety data was produced and when S-RAD was operational in the United States is a matter of months and does not encompass the entire data set.

[4] Attached as Ex. A is a more detailed description of these requests, and basic information Uber refuses to provide. Attached as Ex. B is a declaration from Plaintiffs' consulting expert explaining the need for this information.

[5] "Uber's Festering Sexual Assault Problem," The New York Times, Aug. 6, 2025 (https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html)(last accessed Sept. 12, 2025). *See also* Uber's record on safety is clear | Uber Newsroom, Aug. 6, 2025 (https://www.uber.com/newsroom/ubers-safety-record/)(last accessed Sept. 12, 2025).

Requests for Production at 29, 53, 64, 79, 80, 81, 82, 84, 139, 144, 155, attached as <u>Ex. C</u>. But it wasn't until the 30(b)(6) testimony of Sunny Wong on July 23, 2025 that Uber disclosed that the data underlying S-RAD is "**readily available in our core S-RAD tables**." *See* <u>Ex. D</u> at 19:2-22:16. Previously Plaintiffs had been told this information was not easily accessible and may not even exist. *See* <u>Ex. E</u> (M. Akamine May 20, 2025, Dep. Excerpt).

  Due to Uber's concealment, Plaintiffs were left to pry what little information document productions revealed about the program from the single purportedly knowledgeable witness - Sunny Wong – the same witness Uber offers now to resolve these matters. The problem with this offer is that, while his previous testimony was lengthy, it was either incomplete, equivocated, or contradictory. *See* <u>Ex. F</u> (6/25/2025 Deposition of Sunny Wong). In answer to questions about the information Plaintiffs seek, Wong refused to answer unless he was presented with a specific document or statement, said he did not know the answer (even though he was designated as the corporate representative), equivocated his statements with "I believe" or other qualifiers, refused to answer all together, repeated Uber's argumentative talking points that SA/SM is "rare," or vaguely referenced "documents" that would include the information. *Id.*[6] This behavior led to the Court's intervention in the deposition to instruct the witness to answer. *See* <u>Ex. G;</u> ECF No. 3343. Likewise, the declaration Uber presents with this brief minces words and facts, attempts to confuse data size with effort, provides little clarity, but clearly indicates an even heightened relevance of this data. Forcing Plaintiffs to consider and rely upon limited S-RAD information alone -- without context and in a vacuum -- is improper and prejudicial.

  Finally, Uber's claim that production of this data is highly burdensome (and its reference to data size) is misleading. Plaintiffs do not seek the entirety of the underlying or related tables but rather seek limited information from the trips/time frames covered by the produced safety data (2017-2022) and related to the Bellwether trips. Of the close to 100 tables Plaintiffs understand relate to S-RAD, Plaintiffs seek data from just a handful. *See* <u>Ex. B</u>.

---

[6] *See e.g.* at 93:21-94:4; 107:15-111:10; 151:5-153:20; 159:9-163:11; 181:2-21; 215:14-216:1; 231:6-15; 254:8-18; 269:4-271:5

## II.    Defendants' Position:[7]

On August 11, long after the substantial completion deadline for fact discovery and months after Uber provided written responses to discovery requests related to S-RAD, Plaintiffs issued these *brand new* discovery requests via email for an unfathomably broad range of supply plan, S-RAD, and even RideCheck data for hundreds of thousands of unrelated trips. Their requests cover every trip in the United States with a report of sexual assault or sexual misconduct made to Uber from 2017 to 2022 (the "Safety Data"). Plaintiffs' requests have no articulable relevance to the bellwether trips at issue. Some data simply does not exist, and other data would be unduly burdensome to produce, especially given the lack of demonstrable relevance. Further, what Plaintiffs seek in the form of verified written responses is already available in corporate testimony that they have obtained, could have obtained, or still can obtain, as well as produced documents.

Far from ever concealing the details of S-RAD, Uber produced thousands of S-RAD documents starting in 2024; provided written responses, per Party agreement, to several RFPs specifically about S-RAD; and produced comprehensive S-RAD data for the trips at issue. Specifically, Uber produced (1) the trips' S-RAD scores; (2) all of the variables ("features") that went into each score; (3) the value assigned to each feature; (4) the applicable daytime and nighttime thresholds during the trips in their respective cities; (5) whether the trip was flagged or actioned by S-RAD; (6) the trigger rates over the 7 preceding days in their respective cities; (7) the average score of *other* trips over the 7 preceding days in their respective cities; and (8) the median 1-star rating of other drivers over the 7 preceding days in their respective cities. Further, Uber produced information about (9) which S-RAD model was running at the time of each trip; (10) the features used in each model; (11) the "weight" of the features in each model; (12) the feature definitions; and even (13) the rationale or motivation for including each feature, where available. All of this was packaged up for Plaintiffs in advance of their 30(b)(6) deposition of Sunny Wong, Uber's representative on S-RAD.

Indeed, Plaintiffs have more than 22 hours of corporate testimony on S-RAD from Mr. Wong, with more to come.[8] And Plaintiffs have been collecting relevant S-RAD testimony from other knowledgeable witnesses since March, including Frank Chang (VP of Applied Science), Mike Akamine (Director of Product Management) and Gus Fuldner (Senior VP of Safety and Core Services). Plaintiffs' claim that they must consider the bellwethers' S-RAD information "in a vacuum" or that they have *only just now* learned about the existence of S-RAD data could not be further from the truth. Yet rather than ask any outstanding questions in the remaining 30(b)(6) deposition day scheduled for September 9, Plaintiffs unilaterally chose to cancel that deposition last minute and demand preemptive written answers and expansive new discovery.

Uber offered to provide additional S-RAD information or calculations to the extent relevant to the bellwether cases and not unduly burdensome.[9] But Plaintiffs insist on a wholesale forensic extraction of S-RAD, supply plan, and even RideCheck records for hundreds of thousands of unrelated trips. Such an endeavor is not reasonable or proportional. *Scherer v. FCA US, LLC*, 538 F. Supp. 3d 1002, 1006 (S.D. Cal. 2021) ("A party seeking discovery of relevant, non-privileged

---

[7] For purposes of this motion, Uber sets aside the inaccuracies in Plaintiffs' summary of how S-RAD works, but reserves its objection to Plaintiffs' characterizations.

[8] Mr. Wong testified for 9.5 hours as the person most knowledgeable about S-RAD in the JCCP proceedings, and another 12.5 hours as the 30(b)(6) general and case-specific S-RAD witness here. Plaintiffs refer to Court intervention that they sought on a single question, which was unrelated to any of the information they request here.

[9] Although Uber has responded to many of Plaintiffs' S-RAD questions over email, Uber never agreed to provide written, verified responses to Plaintiffs' continuing barrage of eleventh-hour inquiries, as Plaintiffs now assert.

information must show, before anything else, that the discovery sought is proportional to the needs of the case."). *See* <u>Ex. H</u>, Declaration of Sunny Wong regarding each requested dataset below.

**1. Supply Plan Data.** Plaintiffs requested the "supply plans" (potential rider-driver pairings that *did not occur*) for every trip in Uber's Safety Data. Uber explained that it only maintains supply plan data for a rolling 30 days. Plaintiffs now seek written verified responses on the unavailability of older data, which they never sought in a Rule 34 document request. But they've already questioned Mr. Wong extensively about supply plan data, and they are free to obtain additional testimony about it during his remaining day of deposition.

**2. S-RAD Models and Features.** Verified written responses about each S-RAD model would be duplicative. Uber already directed Plaintiffs to the documents with information about each model that ever went live in the U.S., along with its feature list, feature importance (i.e. weighting), feature definitions, the rationales for including each feature, and their general directionality (i.e. whether a higher score on a particular feature tends to increase or decrease the overall S-RAD score – a point to which Uber stipulated on the record). Plaintiffs had ample opportunity to question Mr. Wong about the models and features, and can still ask him any lingering questions. He testified about (and provided a document outlining) the dates each model was in effect and where. He also provided the date of the S-RAD rollout in bellwether cities, and which model applied to which trip. (*See, e.g.*, <u>Ex. D</u> at 169:4-13; 225:12-16).

With respect to "beta" versions, Mr. Wong testified that none of the bellwether trips were subject to experimental testing (*Id.* at 34:11-14). Nonetheless, Uber pointed Plaintiffs to a produced document that lists certain features that were considered in experimental versions of S-RAD. As explained in Exhibit H, experimental versions are not all centrally stored and it would be an enormous burden to manually compile hundreds of iterations of S-RAD that were never implemented (and never even tested on the trips at issue).

**3. Average S-RAD Scores.** Verified written responses about how Uber calculated the average S-RAD scores that Mr. Wong provided for each bellwether trip would also be duplicative. Plaintiffs questioned Mr. Wong about that very subject during his deposition. He already explained how the averages were calculated and which trips were included in those calculations (*Id.* at 78:15-79:4). If Plaintiffs have further questions, they may explore them in his remaining deposition day.

**4. Nationwide S-RAD Thresholds and Trigger Rates.** Plaintiffs request all "S-RAD flagging 'thresholds'" and 'trigger rates' set in U.S. cities" over S-RAD's lifetime. Uber already produced the daytime and nighttime thresholds in effect for each of the bellwether trips and offered to discuss a geographically limited production of historical threshold data for the bellwether cities. But Plaintiffs continue to insist on all historical threshold data for every city in the U.S. with no connection to the bellwether cases. This request is overbroad and disproportionate; S-RAD thresholds are calibrated on a city-by-city basis.

With respect to trigger rates, Uber explained that it does not keep historical data on trigger rates in the ordinary course of business. Trigger rates are not trip-specific and are not "set" by Uber. Rather, Uber can retrospectively estimate a trigger rate (i.e. percentage of holdout trips that would have exceeded the S-RAD threshold) during a certain period of time and in a certain geography. Uber provided one such calculation for each of the bellwether trips' cities and times, and offered to discuss alternative versions of that calculation (e.g. beyond 7 days). But the remainder of Plaintiffs' request is nonsensical as that data simply does not exist.

**5. All S-RAD data for hundreds of thousands of trips.** Plaintiffs request "all S-RAD scores" for each of the hundreds of thousands of trips in Uber's Safety Data. Uber has billions of S-RAD records with hundreds of columns of information in each data source, including

information about unrelated projects. Isolating, extracting, and producing this expansive information for each of the hundreds of thousands of specific trips with no relation to the bellwether cases is the epitome of an undue and disproportionate burden.[10] Plaintiffs say they need to compare the bellwether's S-RAD scores with the scores of other trips around the country at different places and times. But S-RAD is a machine learning model that automatically calibrates thresholds on a city-by-city basis given the different environmental risk. Factors that matter in a big city may be entirely inconsequential to a small town. A trip's score in Fortville, Indiana has no relevance or relationship to even the exact same score in San Francisco.

**6. Slip-Throughs, S-RAD Nudges, and Ridecheck Data.** Uber already produced data establishing that none of the bellwether trips were "slip-throughs" (i.e. dispatched trips that exceeded the operative S-RAD threshold). Uber also produced RideCheck data for each of the bellwether trips to the extent it exists, and Uber's corporate RideCheck representative confirmed that RideCheck and S-RAD are entirely separate features and not integrated with each other. (M. Esteves Dep. (7/15/2025) at 103:10-19; 105:13-21; 111:10-112:19). Further, Mr. Wong testified that there were no S-RAD "nudges" (i.e. notifications) in the U.S., for the bellwether trips or otherwise, so that data does not exist. *See* Ex. H. Uber has met its obligations with respect to these cases, and it is wildly disproportionate and improper for Plaintiffs to demand the same (or more) information for every U.S. report of sexual assault or sexual misconduct made to Uber from 2017 to 2022. The Court should deny Plaintiffs' requests.

**7. Deposition.** Uber was prepared to offer Sunny Wong for his final deposition day on September 9th, and Plaintiffs unilaterally cancelled. For the reasons set forth herein, production of additional data is not necessary for that deposition to proceed expeditiously.

---

[10] Given the competitive sensitivity of Uber's proprietary S-RAD model (which Uber considers a trade secret), and the prior leaks of confidential information in this litigation, if the Court grants Plaintiffs' motion, Uber requests an alternative to requiring production of the data with appropriate safeguards, such as onsite inspection.

**FILER'S ATTESTATION**

I, Rachel B. Abrams, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

Dated: September 24, 2025

By: /s/ *Rachel B. Abrams*
RACHEL B. ABRAMS