# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: UBER TECHNOLOGIES, INC.,
PASSENGER SEXUAL ASSAULT
LITIGATION

MDL No. 3084 CRB

### DECLARATION OF SUNNY WONG

I, Sunny Wong, declare under penalty of perjury as follows:

1. I am a Director, Applied Science – Safety at Uber Technologies Inc. ("Uber"), a Defendant in the above captioned matter. I was first employed by Uber in 2018 and previously worked as Senior Manager, Applied Science. In my current role, I am responsible for leading the Safety Science team at Uber, which includes a global team of data scientists and applied scientists, supporting new product and policy development through experimentation, causal inference, modeling, insights, and metrics.

2. As part of my daily work, I am familiar with Uber's Safety Risk Assessed Dispatch ("S-RAD") technology and underlying data.

3. I was designated by Uber as the corporate representative for a wide variety of deposition topics related to the S-RAD technology and underlying data. Between the MDL litigation and the JCCP litigation, I have given more than 22 hours of corporate testimony on the record to date, primarily related to S-RAD.

4. I have personal knowledge of the statements set forth herein and could testify as to the same if called upon to do so.

5. I understand that as part of this litigation, Uber has produced data about reported incidents of alleged sexual assault and sexual misconduct occurring on U.S. trips from 2017 to 2022 (the "Safety Data").

6. The Safety Data contains data related to more than 400,000 trips in the U.S.

7. I understand that Plaintiffs have requested, for each of the 400,000+ trips in the Safety Data, extensive data about S-RAD scores, thresholds, trigger rates, nudges, and slip-throughs, as well as supply plan data and RideCheck data as outlined in the Joint PTO 8 Letter Regarding Outstanding S-RAD Issues, which I have reviewed.

8. I have also reviewed the Declaration of Jonathan Jaffe, filed as Exhibit B to the Joint PTO 8 Letter.

*Beta SRAD Model Features*

9. Uber has already produced documents and information about the features of each of the S-RAD models that ever went live in the U.S., including the ones that applied to the

bellwether trips at issue. I also provided extensive testimony on those features and models during my depositions, along with documents showing the definitions of those features and their relative importance to the associated models.

10. Plaintiffs have now requested the features and weight of the features for each of the "beta," or experimental, versions of all S-RAD models, regardless of whether the models were ever used on the bellwether trips at issue.

11. None of the bellwether trips at issue were included in any experimental versions of S-RAD.

12. Experimental versions of S-RAD did not have any effect on any trip pairings, as they were only look-back analyses of historical trip data (i.e. for trips that were already completed).

13. Uber already produced a file identifying certain features considered in beta or experimental versions of S-RAD.[1]

14. 

15. Uber does not maintain easily identifiable records in the ordinary course of business logging every experimental version of S-RAD that was ever studied or considered. Uber's S-RAD feature data is not specific to any beta version of a model. Uber's data science team continuously researches and develops different features as part of the team's ongoing business, resulting in hundreds of different variations of models with very nuanced differences. These differences and variations are not all stored in a centralized location.

16. While some iterations of old model features and feature importance are accessible by Uber, it is not in a format that Uber can easily download or export. Rather, extracting information about old S-RAD models would require a data scientist to manually copy every single feature and the specifications of those features into a separate sheet for each of the hundreds of model variations. It would also require extensive manual de-duplication and reviews. In addition, for older models, Uber would need to enlist the help of platform engineering teams to extract the data. Uber estimates that this process would take more than 50 hours of work from an internal data scientist and may require hiring outside resources to complete.

---

[1] UBER_JCCP_MDL_001693547.

*S-RAD Scores for All Trips*

17. Plaintiffs request S-RAD scores for each of the 400,000+ trips in the Safety Data. Mr. Jaffe suggests in his declaration that less than 25% of those trips will have calculated S-RAD scores. However, in reality, more than 75% of the trips in the Safety Data have S-RAD feature data. Thus, to the extent Plaintiffs request not only the S-RAD scores but also "all considered S-RAD inputs ('features')" for each of the trips in the Safety Data, responding to Plaintiffs' requests would require Uber to extract data for more than 300,000 trips that are unrelated to the bellwether trips.

18. The S-RAD data contains more than 400 columns of data per trip, and not all fields are related to S-RAD at all, as Uber stores data pertinent to unrelated projects and tools in the same tables.

19. 

20. To provide Plaintiffs with a meaningful comparison between the bellwether Plaintiffs' S-RAD scores and the scores of other trips in a similar environment, Uber already produced the average score of other like trips (i.e. daytime or nighttime) in each bellwether city over the 7 days preceding the bellwether trip.

*S-RAD Threshold Data*

21. Plaintiffs request historical threshold data in all U.S. cities from the implementation of S-RAD to the present.

22. 

*S-RAD Trigger Rates*

23. Plaintiffs request the trigger rates that Uber set in U.S. cities. But Uber does not set trigger rates. This data does not exist in the ordinary course of business.

24. ██████████████████████████████████████████████████████████████████████████████████████████████████████████

25. Uber's S-RAD data does not contain precomputed trigger rates. Calculating the trigger rate for a certain time and geography is a manual process.

26. Uber already provided the Plaintiffs with the trigger rates in each bellwether trip's respective city for the 7 days preceding the trip at issue. It took an Uber data scientist several hours to manually calculate these estimated trigger rates. Requiring Uber to calculate additional variations of trigger rates for different combinations of times and geographies would be a burdensome and manual process.

27. I am familiar with the process that Uber used to calculate the trigger rates for the bellwether trips and can testify about that process if asked about it in deposition.

*Slip-Through Data*

28. ██████████████████████████████████████████████████████████████████████████████████████████████

29. Slip-through data is not found in the same data tables that would show a trip's S-RAD features. Pulling slip-through data for the 400,000+ trips in the Safety Data would require Uber to pull from an entirely separate data source than the one it would need to pull from for the trips' S-RAD features.

30. None of the bellwether trips were slip-throughs. In other words, none of the trips' S-RAD scores exceeded the applicable S-RAD threshold.

*RideCheck Data*

31. RideCheck is a feature entirely separate from S-RAD. While S-RAD relates to pairing (i.e. pre-trip), RideCheck is only active once a trip has already commenced. It sends out notifications to users when it detects certain trip anomalies such as long stops, midway drop-offs, route deviations, and crashes.

32. I understand that Uber has already produced historical RideCheck logs showing all RideCheck notifications that were sent for each of the bellwether trips.

33. RideCheck has no effect on S-RAD, and S-RAD has no effect on RideCheck. Producing RideCheck data for each of the trips in the Safety Data will provide no information relevant to S-RAD.

*S-RAD Nudges*

34. There were no S-RAD "nudges" (notifications) sent in the United States at any time. Therefore, there is no S-RAD "nudge" data to provide for any of the trips that Plaintiffs request.

*Supply Plan Data*

35. "Supply plans" are rider-driver pairings that could have, but did not, occur. Each of Uber's billions of trips per year may have had many different potential rider-driver pairings.

36. Supply plan data is unbelievably voluminous. For example, the U.S. supply plan data for the last 30 days alone contains approximately 100 billion rows.

37. For that reason, Uber does not maintain data about historical supply plans older than 30 days in the ordinary course of business.

*S-RAD Confidentiality*

38. Uber considers its S-RAD technology to be a highly confidential trade secret.

39. The details of the S-RAD technology are unknown to Uber's competitors, and their disclosure would result in a competitive disadvantage to Uber. Uber operates in a highly competitive space, and the time, money, and effort spent in researching and developing proprietary technologies can be used by other companies to harm Uber's competitive advantage. For instance, competitors may use the information they learn about Uber's S-RAD technology and how it works in order to reverse engineer their own similar product.

40. Addressing safety challenges that face the ridesharing industry is a key part of Uber's business, and disclosure of research, processes, and technology that Uber has developed and engaged in would be injurious to Uber's competitive standing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 24, 2025.



Sunny Wong