1  LAURA VARTAIN HORN (SBN: 258485)
       laura.vartain@kirkland.com
2  **KIRKLAND & ELLIS LLP**
   555 California Street, 30th Floor
3  San Francisco, CA 94104
   Telephone: (415) 439-1625
4
   ALLISON M. BROWN (*Pro Hac Vice* admitted)
5      allison.brown@kirkland.com
   2005 Market Street, Suite 1000
6  Philadelphia, PA 19103
   Telephone: (215) 268-5000
7  alli.brown@kirkland.com

8  JESSICA DAVIDSON (*Pro Hac Vice* admitted)
       jessica.davidson@kirkland.com
9  601 Lexington Avenue
   New York, NY 10022
10 Telephone: (212) 446-4723

11 *Counsel for Defendants*
   UBER TECHNOLOGIES, INC.,
12 RASIER, LLC, and RASIER-CA, LLC

13 *[Additional Counsel Listed on Following Pages]*

14
                    **UNITED STATES DISTRICT COURT**
15
                   **NORTHERN DISTRICT OF CALIFORNIA**
16
                      **SAN FRANCISCO DIVISION**
17

18 | IN RE: UBER TECHNOLOGIES, INC., | Case No. 3:23-md-03084-CRB
19 | PASSENGER SEXUAL ASSAULT
   | LITIGATION, | **DECLARATION OF JONATHAN**
20 |           | **SCHNELLER IN SUPPORT OF**
   |           | **DEFENDANTS' MOTION FOR PARTIAL**
21 | This Document Relates to: | **SUMMARY JUDGMENT**

22 | *Jaylynn Dean v. Uber Technologies, Inc.,*
   | *et al.*, No. 3:23-cv-06708 | Judge: Hon. Charles R. Breyer
23 |           | Courtroom: Courtroom 6 – 17th Floor

24

25

26

27

28
   _____
   DECLARATION OF JONATHAN SCHNELLER IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
   SUMMARY JUDGMENT
   CASE NO. 3:23-md-03084-CRB

SABRINA H. STRONG (SBN: 200292)
    sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
    jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

PATRICK L. OOT, JR. (*Pro Hac Vice* admitted)
    oot@shb.com
**SHOOK, HARDY & BACON, LLP**
1800 K Street NW, 10th Floor
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

ALYCIA A. DEGEN (SBN: 211350)
    adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
    mshortnacy@shb.com
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (*Pro Hac Vice* admitted)
    ccotton@shb.com
255 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

DECLARATION OF JONATHAN SCHNELLER IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

1

## **DECLARATION OF JONATHAN SCHNELLER**

2      I, Jonathan Schneller, declare as follows:

3      1.      I am an attorney at law and duly licensed to practice before the U.S. District Court

4    for the Northern District of California. I am a partner at the law firm of O'Melveny & Myers LLP

5    and an attorney of record for Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA,

6    LLC (collectively, "Uber"). I submit this declaration in support of Uber's Motion for Partial

7    Summary Judgment in *Jaylynn Dean v. Uber Technologies Inc., et al.*, No. 23-cv-6708.  I have

8    personal knowledge of the facts set forth in this Declaration and, if called to testify as a witness,

9    could and would do so under oath.[1]

10      2.      Attached to this Declaration as **Exhibit 1** is a true and correct copy of Uber's

11    "Vehicle for Hire Permit" from the Arizona Department of Transportation.

12      3.      Attached to this Declaration as **Exhibit 2** is a true and correct copy of Uber's

13    Platform Access Agreement, dated January 1, 2022, produced by Uber as UBER-MDL3084-BW-

14    00005365 - 00005391.

15      4.      Attached to this Declaration as **Exhibit 3** is a true and correct copy Uber's Fare

16    Addendum, dated April 4, 2022, produced by Uber as UBER-MDL3084-BW-00005514 -

17    00005517.

18      5.      Attached to this Declaration as **Exhibit 4** is a true and correct copy of Uber's U.S.

19    Terms of Use, effective January 17, 2023 produced by Uber as UBER-MDL3084-BW-00001048

20    – 00001073.

21      6.      Attached to this Declaration as **Exhibit 5** is a true and correct copy of excerpts of

22    the July 23, 2025 Deposition of Hannah Nilles.

23      7.      Attached to this Declaration as **Exhibit 6** is a true and correct copy of excerpts of

24    the Expert Report of Bruce Weiner, served by Plaintiff on September 26, 2025.

25      8.      Attached to this Declaration as **Exhibit 7** is a true and correct copy of a publicly

26    available article, titled "Uber's New 'Women Preferences' Program Violates Civil Rights Law,"

27    ─────────────────────

28    [1] Exhibits 22 through 34 are subject to Uber's Motion to Seal.

DECLARATION OF JONATHAN SCHNELLER IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

HERITAGE FOUNDATION COMMENTARY (Aug. 8, 2025), *available at* https://perma.cc/47EW-XHGY.

9.     Attached to this Declaration as **Exhibit 8** is a true and correct copy of excerpts of the June 27, 2025 Deposition of Plaintiff Jaylynn Dean.

10.     Attached to this Declaration as **Exhibit 9** is a true and correct copy of excerpts of the July 22, 2025 Deposition of Scott McLaughlin.

11.     Attached to this Declaration as **Exhibit 10** is a true and correct copy of a Tempe Police Department General Offense Report dated November 15, 2023, produced by the Tempe Police Department as JDean-TempePD-000001 - 000025.

12.     Attached to this Declaration as **Exhibit 11** is a true and correct copy of Plaintiff's November 15, 2023 trip receipt, produced by Uber as UBER-MDL3084-BW-00027901 - 00027902.

13.     Attached to this Declaration as **Exhibit 12** is a true and correct copy of excerpts from Uber's record of Mobile Events for Hassan Turay, produced by Uber in native format as UBER-MDL3084-BW-00006299 and converted to PDF.

14.     Attached to this Declaration as **Exhibit 13** is a true and correct copy of excerpts from the July 15, 2025 Deposition of Greg Brown.

15.     Attached to this Declaration as **Exhibit 14** is a true and correct copy of excerpts from the July 23, 2025 Deposition of Hassan Turay.

16.     Attached to this Declaration as **Exhibit 15** is a true and correct copy of excerpts of the Expert Report of Rajeev Kelkar, served by Plaintiff September 26, 2025.

17.     Attached to this Declaration as **Exhibit 16** is a true and correct copy of excerpts of the July 15, 2025 Deposition of Mariana Esteves.

18.     Attached to this Declaration as **Exhibit 17** is a true and correct copy of screenshots of Plaintiff's phone produced by Plaintiff as BW-DEAN_JAYLYNN_000083 - 000085.

19.     Attached to this Declaration as **Exhibit 18** is a true and correct copy of certain Uber communications with Hassan Turay, dated November 15 and 17, 2023, produced as UBER-

-4-

1  MDL3084-DFS00003701.

2      20.    Attached to this Declaration as **Exhibit 19** is a true and correct copy Uber's record

3  of Hassan Turay's "status and flow," produced by Uber in native format as UBER-MDL3084-

4  BW-00007772 and converted to PDF format.

5      21.    Attached to this Declaration as **Exhibit 20** is a true and correct copy of excerpts of

6  the Expert Report of Veronique Valliere, served by Plaintiffs on September 26, 2025.

7      22.    Attached to this Declaration as **Exhibit 21** is a true and correct copy of an excerpt

8  of the Expert Report of Lacey R. Keller, served by Plaintiffs September 26, 2025.

9      23.    Attached to this Declaration as **Exhibit 22** is a true and correct redacted copy of a

10  background check of Hassan Turay dated December 7, 2016, produced by Uber as UBER-

11  MDL3084-BW-00012056 – 00012058.

12      24.    Attached to this Declaration as **Exhibit 23** is a true and correct redacted copy of a

13  background check of Hassan Turay dated December 22, 2016, produced by Uber as UBER-

14  MDL3084-BW-00012056 – 00012058.

15      25.    Attached to this Declaration as **Exhibit 24** is a true and correct redacted copy of a

16  background check of Hassan Turay dated March 6, 2017, produced by Uber as UBER-MDL3084-

17  DFS00003619 - 00003620.

18      26.    Attached to this Declaration as **Exhibit 25** is a true and correct redacted copy of a

19  background check of Hassan Turay dated January 4, 2018, produced by Uber as UBER-

20  MDL3084-DFS00003615 - 00003618.

21      27.    Attached to this Declaration as **Exhibit 26** is a true and correct redacted copy of a

22  background check of Hassan Turay dated September 10, 2018, produced by Uber as UBER-

23  MDL3084-DFS00003647 – 00003650.

24      28.    Attached to this Declaration as **Exhibit 27** is a true and correct redacted copy of a

25  background check of Hassan Turay dated January 29, 2020, produced by Uber as UBER-

26  MDL3084-DFS00003643 - 0003646.

27      29.    Attached to this Declaration as **Exhibit 28** is a true and correct redacted copy of a

28  

DECLARATION OF JONATHAN SCHNELLER IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

background check of Hassan Turay dated June 3, 2021, produced by Uber as UBER-MDL3084-DFS00003639 - 00003642.

30.     Attached to this Declaration as **Exhibit 29** is a true and correct redacted copy of a background check of Hassan Turay dated May 2, 2022, produced by Uber as UBER-MDL3084-DFS00003633 - 00003364.

31.     Attached to this Declaration as **Exhibit 30** is a true and correct redacted copy of a background check of Hassan Turay dated May 2, 2022, produced by Uber as UBER-MDL3084-DFS00003635 - 00003638.

32.     Attached to this Declaration as **Exhibit 31** is a true and correct redacted copy of a background check of Hassan Turay dated April 4, 2023, produced by Uber as UBER-MDL3084-DFS00003631 – 00003632.

33.     Attached to this Declaration as **Exhibit 32** is a true and correct redacted copy of a background check of Hassan Turay dated April 9, 2023, produced by Uber as UBER-MDL3084-DFS00003627 - 00003630.

34.     Attached to this Declaration as **Exhibit 33** is a true and correct redacted copy of a background check of Hassan Turay dated June 5, 2023, produced by Uber as UBER-MDL3084-DFS00003625 – 00003626.

35.     Attached to this Declaration as **Exhibit 34** is a true and correct redacted copy of a background check of Hassan Turay dated June 6, 2023, produced by Uber as UBER-MDL3084-DFS00003611 - 00003614.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 10, 2025.

/s/ Jonathan Schneller
Jonathan Schneller

DECLARATION OF JONATHAN SCHNELLER IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

# EXHIBIT 1

 **Print Permit**

Statutes and rules regarding licensure and certification can be viewed at www.azdot.gov

<div style="border:1px solid">

## Vehicle for Hire Permit
### Arizona Department of Transportation
### Phone: (602-712-5948)

RASIER LLC
DBA UBER
201 E Washington St
PHOENIX, AZ 85004

Business #43646
Expires on 09/27/2027

| Number | Type |
| --- | --- |
|  | Taxis |
|  | Limousines |
|  | Liveries |

</div>

This Permit must be posted on premises in a manner that provides the department access to the permit during normal business hours.

# EXHIBIT 2

*Platform Access Agreement*

*Updated as of January 1, 2022*

This Platform Access Agreement (this "*PAA*") is by and among you and your company/business ("*you*") and the following entity as applicable, based on the region specified: Uber Technologies, Inc. in California; Rasier-PA, LLC in Pennsylvania; Rasier-DC, LLC in Florida; Rasier- MT, LLC in Montana; Rasier-NY, LLC in New York; and Rasier, LLC in all other U.S. states, territories and possessions (collectively, "*Uber*"). This PAA governs your access to our Platform (defined below) which facilitates your provision of rideshare or peer-to-peer transportation service (collectively, "P2P Service") to account holders seeking to access certain types of P2P Service ("*Riders*") for themselves and/or their guests. For the sake of clarity and depending on the context, references to "Uber," "*we*," "*our*" and "*us*" may also refer to the appropriate Uber- affiliated contracting entity accordingly or Uber collectively.

Access to our technology platform includes access to our technology application (the "*Driver App*") that, amongst other things, facilitates P2P Service between you and Riders; as well as websites and all other associated services, including payment and support services, provided by Uber, its affiliates or third parties (collectively, our "*Platform*").

Your access to our Platform is also governed by the applicable terms found on our website, including without limitation, the Community Guidelines, Referral Policies, other applicable Uber standards and policies (including, without limitation, Uber's safety standards, the accessibility policies and U.S. Service Animal Policy) and, except as provided in Section 12.9 below, any other agreements you have with us (including those related to how you choose to interact with our Platform, the services you choose to provide and where you chose to provide them) (collectively with this PAA, this "*Agreement*"), which are incorporated by reference into this Agreement. By accepting this Agreement, you confirm that you have read, understand and accept the provisions of this Agreement and intend to be bound by this Agreement. This Agreement is effective as of the date and time you accept it.

1.    **Relationship with Uber**

    1.1.    **Contracting Parties.** The relationship between the parties is solely as independent business enterprises, each of whom operates a separate and distinct business enterprise that provides a service outside the usual course of business of the other. This is not an employment agreement and you are not an employee. You confirm the existence and nature of that contractual relationship each time you access our Platform. We are not hiring or engaging you to provide any service; you are engaging us to provide you access to our Platform. Nothing in this Agreement creates, will create, or is intended to create, any

  UBER-MDL3084-BW-00005365

employment, partnership, joint venture, franchise or sales representative relationship between you and us. The parties do not share in any profits or losses. You have no authority to make or accept any offers or representations on our behalf. You are not our agent and you have no authority to act on behalf of Uber.

**1.2.     Your Choice to Provide P2P Service to Riders.** We do not, and have no right to, direct or control you. Subject to Platform availability, you decide when, where and whether (a) you want to offer P2P Service facilitated by our Platform and (b) you want to accept, decline, ignore or cancel a Ride (defined below) request; provided, in each case, that you agree not to discriminate against any potential Rider in violation of the Requirements (defined below). Subject to your compliance with this Agreement, you are not required to accept any minimum number of Rides in order to access our Platform and it is entirely your choice whether to provide P2P Service to Riders directly, using our Platform, or using any other method to connect with Riders, including, but not limited to other platforms and applications in addition to, or instead of, ours. You understand, however, that your Riders' experiences with your Rides, as determined by Rider input, may affect your ability to access our Platform or provide Rides.

## 2.     Our Platform

**2.1.     General**. While using our Driver App, you may receive lead generation and other technology-based services that enable those operating independent business enterprises like you to provide P2P Service requested by Riders ("*Rides*"). Subject to the terms and conditions of this Agreement, Uber hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use our Platform (including the Driver App) solely for the purpose of providing Rides and accessing services associated with providing Rides.

**2.2.     Compliance.**

(a)     You are responsible for identifying, understanding, and complying with (i) all laws (including, but not limited to, the Americans with Disabilities Act and applicable laws governing your collection, use, disclosure, security, processing and transfer of data), rules and regulations that apply to your provision of Rides (including whether you are permitted to provide P2P Service at all) in the jurisdiction(s) in which you operate (your "*Region*") and (ii) this Agreement (collectively, the "*Requirements*"). Subject to applicable law, you are responsible for identifying and obtaining any required license (including driver's license), permit, or registration required to provide any P2P Service that you provide using our Platform. Notwithstanding anything to the contrary in this Agreement, for the avoidance of doubt, your ability to access and use our Platform is at all times subject to your compliance with the Requirements. You agree not to access or attempt to access our Platform if you are not in compliance with the Requirements.

     UBER-MDL3084-BW-00005366

(b)    The Americans with Disabilities Act imposes obligations including the obligation to transport Riders with service animals and does not contain exceptions for allergies or religious objections. We have the right to and you consent to the permanent deactivation of your Driver App account and the permanent termination of your contractual relationship with us if, based on the evidence, we conclude that you knowingly refused a Ride request from a Rider with a service animal, or if we receive plausible reports from Riders of more than one cancellation or refusal by you alleged to be on the basis of the presence of a Rider's service animal.

**2.3.    Your Provision of Transportation Services to Riders.** You represent, warrant and covenant that (a) you have all the necessary expertise and experience to provide Rides in compliance with the Requirements and standards applicable to the P2P Service, (b) your access and use of our Platform, and provision of P2P Service, in your Region is permitted by the Requirements (including any age requirements), and (c) all such access and use of our Platform will be in compliance with the Requirements. You are responsible for, and bear all costs of, providing all equipment, tools and other materials that you deem necessary or advisable and are solely responsible for any obligations or liabilities arising from the Rides you provide.

**2.4.    Accessing our Platform.**

(a)    To provide Rides you must create and register an account. All information you provide to us must be accurate, current and complete and you will maintain the accuracy and completeness of such information during the term of this Agreement. Unless otherwise permitted by us in writing, you agree to only possess one account for providing Rides. You are responsible for all activity conducted on your account. For account security and Rider safety purposes, you agree not to share or allow anyone to use your login credentials or other personal information used in connection with your account, including but not limited to photos of yourself, to access our Platform. If you think anyone has obtained improper access to your account, login credentials or personal information, you are required to notify us and to change your password immediately so that we may take appropriate steps to secure your account. You agree that Uber is not responsible for any losses arising from your sharing of account credentials with a third party, including without limitation phishing. You can visit help.uber.com for more information about securing your account.

(b)    You represent, warrant, and covenant that you have all required authority to accept and be bound by this Agreement. If you are accepting this Agreement on behalf of your company, entity, or organization, you represent and warrant that you are an authorized representative of that company, entity, or organization with the

authority to bind such party to this Agreement.

**2.5.** **Background Checks and Licensing, Vehicle Standards**.

(a)     During your account creation and registration, we will collect, and may verify, certain information about you and the vehicle(s) you use to provide Rides (*"your vehicle"*).

(b)     You will also be required to pass various background, driving record and other checks both prior to the first time you access our Platform and from time to time thereafter during the term of this Agreement; these checks may be facilitated by third parties. You hereby authorize and instruct us to provide copies of such checks to insurance companies, relevant regulators and/or other governmental authorities as needed for safety or other reasons, as described in our <u>Privacy Notice</u>.

(c)     You agree that your vehicle will be properly registered, licensed and suitable to provide Rides in your Region. You represent that at all times during the provision of any Rides your vehicle will be in your lawful possession with valid authority to use your vehicle to provide Rides in your Region. You agree that your vehicle will be in safe operating condition, consistent with safety and maintenance standards for a vehicle of its type in the P2P Service industry. You agree to monitor for and repair any parts that are recalled by your vehicle's manufacturer (as well as anything else the Requirements applicable to your particular Region may require).

**2.6.** **Accepting Ride Requests**.

(a)     Ride requests may appear in the Driver App and you may attempt to accept, decline or ignore them. Accepting a Ride request creates a direct business relationship between you and your Rider in accordance with the terms of the transportation service the Rider has requested through our Platform. The mechanism for accepting or declining Rides may vary depending on your location and the type of Ride-request you accept. You acknowledge upon acceptance of a Ride request, you may incur Uber fees as described in an applicable fare addendum to this PAA.

(b)     You will choose the most effective, efficient, and safe manner to reach the destinations associated with a Ride. Any navigational directions offered in the Driver App are offered for your convenience only; you have no obligation to follow such navigational directions. You agree to transport Riders, or their guests, directly to their specified destination, as directed by the applicable person, without unauthorized interruption or unauthorized stops.

(c)    You may receive Rider information, including approximate pickup location, and you agree that your Rider may also be given identifying information about you, including your first name, photo, location, vehicle information, and certain other information you have voluntarily provided through the Driver App (collectively, "*User Information*"). Without a Rider's consent, you agree to not contact any Rider or otherwise use any of the Rider's User Information except solely in connection with the provision of Rides to that Rider. You agree to treat all Rider User Information as Confidential Information (defined below) received by you under this Agreement. You acknowledge that your violation of your confidentiality obligations may also violate certain laws and could result in civil or criminal penalties.

**2.7.    Use of Uber Branded Materials.**

(a)    Except to the extent necessary to comply with applicable law, you are not required to use, wear or display Uber's name or logo on your vehicle or clothing, or to use signaling lights, stickers, decals, or other such materials displaying Uber's name or logo (collectively "*Uber Branded Materials*").

(b)    Your authorized display of Uber Branded Materials may signify to Riders that your P2P Service is facilitated by our Platform. Uber grants you a limited license to use, wear, or display Uber Branded Materials provided directly to you by Uber ("*Authorized Uber Branded Materials*") when providing Rides solely for the purpose of identifying yourself and your vehicle to Riders as someone selling P2P Service facilitated by our Platform. You agree not to (i) use, wear, or display Uber-Branded Materials that are not Authorized Uber Branded Materials (ii) purchase, accept, offer to sell, sell or otherwise transfer Uber Branded Materials that are not Authorized Uber Branded Materials or (iii) offer to sell or sell, or otherwise transfer Authorized Uber Branded Materials, without Uber's prior written permission, or (iv) display Uber Branded Materials when you are not accessing the Platform.

(c)    The parties expressly agree that your access to, or use of, Uber Branded Materials, whether or not authorized, does not indicate an employment or other similar relationship between you and us. You further agree not to represent yourself as our employee, representative or agent for any purpose or otherwise misrepresent your relationship with us.

(d)    You agree to destroy and discard any Uber Branded Materials if your account is deactivated and/or if you lose access to the Platform.

**2.8.    Crashes, Criminal Offenses, and Other Compliance Obligations.** For the purpose of assisting us with our compliance and insurance obligations, you agree to notify

us within 24 hours and provide us with all reasonable information relating to any incident (including any crash involving your vehicle) that occurs during your provision of a Ride and you agree to cooperate with any investigation and attempted resolution of such incident. Additionally, you agree to notify us within 24 hours if you are arrested for, charged with, or convicted of a criminal offense, for Platform eligibility consideration.

**2.9.    Ratings**. Your Rider may be asked to comment on your services, and you may be asked to comment on your Rider. These comments can include star or other ratings and other feedback (collectively, "*Ratings*"), which we ask all parties to provide in good faith. Ratings are not confidential and you hereby authorize our use, distribution and display of your Ratings (and Ratings about you) as provided in our Privacy Notice, without attribution or further approval. We have no obligation to verify Ratings or their accuracy, and may remove them from our Platform in accordance with the standards in our Community Guidelines. You can find out more about Ratings and how they may affect your ability to access our Platform by visiting our website.

**2.10.    Location Based Technology Services; Communication Consents.**

(a)    Your device geo-location information is required for the proper functioning of our Platform, and you agree to not take any action to manipulate or falsify your device geo-location. You grant us the irrevocable right to obtain your geo-location information and to share your location with third parties, including your Riders, who will see the approximate location of your vehicle in the Rider app before and during their Ride. We may not and will not use this information to attempt to supervise, direct, or control you or your provision of Rides.

(b)    You agree that we may contact you by email, telephone or text message (including by an automatic telephone dialing system) at any of the phone numbers provided by you, or on your behalf, in connection with your account. You also understand that you may opt out of receiving text messages from us at any time, either by replying "STOP" or texting the word "STOP" to 89203 using the mobile device that is receiving the messages, or by contacting us at help.uber.com. Notwithstanding the foregoing, we may also contact you by any of the above means, including by SMS, in case of suspected fraud or unlawful activity by your or on your account.

**3.    Insurance**

**3.1.    Your Auto Liability Insurance for P2P Service.** You will maintain automobile liability insurance on your vehicle that provides protection against bodily injury and property damage to third parties at coverage levels that satisfy the minimum requirements to operate a vehicle on public roads wherever you use your vehicle. You must be listed as an insured or a

UBER-MDL3084-BW-00005370

driver on your automobile liability insurance. You will provide us with a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for your policy, as well as copies of the same upon renewal. You will notify us in writing immediately if the policy you have is cancelled.

**3.2.    Limitations on Your Personal Insurance.** You understand that while you are providing P2P Service your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for you. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility to resolve them with your insurer.

**3.3.    Your Other Insurance for P2P Service.** You will maintain workers' compensation insurance if it is required by applicable law. If allowed by applicable law, you can insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance (and it is at your own risk if you decide not to).

**3.4.    Your Other Insurance for P2P Service.** You will maintain workers' compensation insurance if it is required by applicable law. If allowed by applicable law, you can insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance (and it is at your own risk if you decide not to).

**3.5.    Uber Maintained Insurance.** We may, in our sole discretion, choose to maintain auto insurance related to your Rides, but we are not required to provide you with any specific coverage for loss to you or your vehicle, unless we specifically describe it in an addendum to this PAA. We can change, reduce or cancel insurance that is maintained by us, if any, at any time without notice to you or authorization from you.

**4.    Payments**

    **4.1.    Instant Pay.**

        (a)    **Eligibility for Instant Pay.** You must have a valid and active debit card issued in your name to use Instant Pay. Your ability to use Instant Pay is dependent upon your debit card's acceptance of fast funds; not all debit cards are eligible to accept fast funds, and the card's issuing bank may choose at any time to disable the acceptance of fast funds or enable restrictions. Certain users may not be eligible for Instant Pay, including users that access our vehicle solutions programs, users who are members of a fleet, and those who are subject to garnishments. Your use of Instant Pay may be subject to additional restrictions and fees; more information may be found on our Instant Pay website.

UBER-MDL3084-BW-00005371

(b)     **Availability of Instant Pay**. We are not able to ensure that all payments are deposited instantly. The speed at which you receive payments will depend on your bank and other factors. If your bank rejects a payment, or it fails in our system, the entire amount available for cashout in your account will be routed to your regular bank account at vault.uber.com, and you will receive the payment typically 1-3 business days later. Any Instant Pay funds not cashed out by 4AM (Local time) on Mondays, or the time we identify, which may be subject to change, will be routed to your regular bank account at vault.uber.com. If you do not have access to Instant Pay, you will continue to receive payments as described in this addendum via direct deposit, provided we have your correct banking information. We are not responsible for any fees from your bank in association with your use of Instant Pay. We reserve the right to block access to Instant Pay at any time for any reason, including for improper use of our Platform, account investigation, deactivation, or further review of Rides completed.

(c)     **Third-Party Provider**. The Instant Pay functionality is facilitated by a third-party provider of payments services. By using Instant Pay, you are subject to any additional terms and conditions for payment imposed by the third-party provider, which we recommend you review.

**4.2.**     Payment terms, fare calculations and payment methods are described in a separate fare addendum, which shall form part of this Agreement.

**5.     Term and Termination; Effect; Survival**

**5.1.     Term**. This Agreement is effective as of the date and time you accept it and will continue until terminated by you or us.

**5.2.     Termination by You**. You may terminate this Agreement (a) without cause at any time upon seven (7) days' prior written notice to Uber; and (b) immediately, without notice for Uber's violation or alleged violation of a material provision of this Agreement. You can find out more about how to delete your account by navigating to help.uber.com.

**5.3.     Deactivation**. You consent to and we may temporarily deactivate your account without notice to investigate whether you have engaged in, or your account has been used in, activity that is deceptive, fraudulent, unsafe, illegal, harmful to our brand, business or reputation, or that violates this Agreement (including the policies incorporated herein by reference) (any of the foregoing, a "*Material Breach or Violation*"). You also consent to and we may terminate this Agreement or permanently deactivate your account without notice if we determine in our discretion that a Material Breach or Violation has occurred.

**5.4.    Effect of Termination and Survival**. Upon termination, each party will remain responsible for its respective liabilities or obligations that accrued before or as a result of such termination. Once the Agreement is terminated you will no longer access our Platform to provide Rides. You agree to use commercially reasonable efforts to return any Uber Branded Materials, but excluding promotional materials, to an Uber Greenlight Hub or destroy them. Sections 1, 2.7, 2.10(b), 4, 5.4, 6-9, 12 and 13 shall survive any termination or expiration of this Agreement.

## 6.    DISCLAIMERS

6.1.    WE PROVIDE OUR PLATFORM AND ANY ADDITIONAL PRODUCTS OR SERVICES "AS IS" AND "AS AVAILABLE," WITHOUT GUARANTEE OR WARRANTY OF ANY KIND, AND YOUR ACCESS TO OUR PLATFORM IS NOT GUARANTEED TO RESULT IN ANY RIDE REQUESTS. WE DO NOT WARRANT THAT OUR PLATFORM WILL BE ACCURATE, COMPLETE, RELIABLE, CURRENT, SECURE, UNINTERRUPTED, ALWAYS AVAILABLE, OR ERROR- FREE, OR WILL MEET YOUR REQUIREMENTS, THAT ANY DEFECTS WILL BE CORRECTED, THAT OUR TECHNOLOGY IS FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. WE WILL NOT BE LIABLE FOR ANY SERVICE INTERRUPTIONS OR LOSSES RESULTING FROM SERVICE INTERRUPTIONS, INCLUDING BUT NOT LIMITED TO SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT MAY AFFECT YOUR ACCESS TO OUR PLATFORM.

6.2.    WE PROVIDE LEAD GENERATION AND RELATED SERVICES ONLY, AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE RIDERS WHO MAY REQUEST OR ACTUALLY RECEIVE RIDES FROM YOU. WE DO NOT SCREEN OR EVALUATE THESE RIDERS. SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, SUCH AS THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, AVAILABILITY, SAFETY, SECURITY, AND NON-INFRINGEMENT. WE EXCLUDE ALL WARRANTIES TO THE EXTENT THOSE REGULATIONS ALLOW.

6.3.    IF A DISPUTE ARISES BETWEEN YOU AND YOUR RIDERS OR ANY OTHER THIRD PARTY, YOU RELEASE US FROM LOSSES OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

6.4.    WE MAY USE ALGORITHMS IN AN ATTEMPT TO FACILITATE RIDES AND IMPROVE THE: EXPERIENCE OF USERS AND THE SECURITY AND SAFETY OF OUR PLATFORM; ANY SUCH USE DOES NOT CONSTITUTE A GUARANTEE OR WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED.

### 7.    Information

We may collect and disclose information from or about you when you create an account, interact with our Platform or provide Rides and as otherwise described in our Privacy Notice. Notwithstanding anything herein to the contrary (a) the collection, use, and disclosure of such information will be made in accordance with our Privacy Notice and (b) if you elect to provide or make available suggestions, comments, ideas, improvements, or other feedback or materials to us in connection with, or related to, us or our Platform, we will be free to use, disclose, reproduce, modify, license, transfer and otherwise distribute, and exploit any of the foregoing information or materials in any manner.

### 8.    Confidentiality

**8.1.    Confidential Information**. Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party or third parties ("*Confidential Information*"). Confidential Information includes Rider User Information and the transportation volume, marketing and business plans, business, financial, technical, operational and such other, non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential. Confidential Information does not include any information that: (a) was in the receiving party's lawful possession prior to the disclosure, as clearly and convincingly corroborated by written records, and had not been obtained by the receiving party either directly or indirectly from the disclosing party; (b) is lawfully disclosed to the receiving party by a third party without actual, implied or intended restriction on disclosure through the chain of possession, or (c) is independently developed by the receiving party without the use of or access to the Confidential Information, as clearly and convincingly corroborated by written records.

**8.2.    Obligations**. Each party acknowledges and agrees that: (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third-party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform their obligations under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party; subject to applicable law and our internal record-keeping requirements.

UBER-MDL3084-BW-00005374

**8.3.    Remedies.** The unauthorized use or disclosure of any Confidential Information would cause irreparable harm and significant damages, the degree of which may be difficult to ascertain. Accordingly, the parties have the right to obtain immediate equitable relief to enjoin any unauthorized use or disclosure of Confidential Information disclosed by the other party, in addition to any other rights or remedies described in Section 13, applicable law or otherwise.

## 9.    Intellectual Property

We reserve all rights not expressly granted in this Agreement. The Driver App, our Platform, and all data gathered through our Platform, including all intellectual property rights therein (the "*Platform IP*"), are and remain our property and/or that of our licensors, as applicable. Neither this Agreement nor your use of Uber's or our licensors' company names, logos, products or service names, trademarks, service marks, trade dress, other indicia of ownership, or copyrights ("*Uber Names, Marks, or Works*") or the Platform IP conveys or grants to you any rights in or related to the Platform IP, or related intellectual property rights, including Uber's Names, Marks, or Works, except for the limited license granted above. You shall not, and shall not allow any other party to: (a) license, sublicense, copy, modify, distribute, create, sell, resell, transfer, or lease any part of the Platform IP or Authorized Uber-Branded Materials; (b) reverse engineer or attempt to extract the source code of our software, except as allowed under law; (c) use, display, or manipulate any of Uber Names, Marks, or Works for any purpose other than to provide Rides; (d) create or register any (i) businesses, (ii) URLs, (iii) domain names, (iv) software application names or titles, or (v) social media handles or profiles that include Uber Names, Marks, or Works or any confusingly or substantially similar mark, name, title, or work; (e) use Uber Names, Marks, or Works as your social media profile picture or wallpaper; (f) purchase keywords (including, but not limited to Google AdWords) that contain any Uber Names, Marks, or Works; (g) apply to register, reference, use, copy, and/or claim ownership in Uber's Names, Marks, or Works, or in any confusingly or substantially similar name, mark, title, or work, in any manner for any purposes, alone or in combination with other letters, punctuation, words, symbols, designs, and/or any creative works, except as may be permitted in the limited license granted above; (h) cause or launch any programs or scripts for the purpose of scraping, indexing, surveying, or otherwise data mining any part of our Platform or data; or (i) aggregate Uber's data with competitors'.

## 10.    Third-Party Services

From time to time we may permit third parties to offer their services to users of our Platform. Third-party services may be subject to additional terms (including pricing) that apply between you and the party(ies) providing such services. If you choose to access the third-party services you understand that the providers of the third-party services are solely responsible for

UBER-MDL3084-BW-00005375

liabilities arising in connection with the access and use of such third-party services. While we may allow users to access such services through our Platform and we may collect information about our users' use of such services, we may not investigate, monitor or check such third-party services for accuracy or completeness.

## 11.    Termination of Prior Agreements

**11.1.    Prior TSA.** This Section 11 only applies if you were a party to an effective technology services agreement (a "*Prior Agreement*") with Uber immediately prior to your acceptance of this Agreement. Except as provided in Sections 11.2 and 13 below, you and Uber hereby terminate your Prior Agreement (except as provided in the survival provision of such agreement) and the Deprecated Documents (defined below)(collectively, "*Prior Documents*"), effective as of your acceptance of this Agreement. The parties, respectively, hereby waive any applicable notice requirements with respect to their termination of the Prior Documents.

**11.2.    Other Agreements.** Notwithstanding the termination of your Prior Documents, you hereby (a) ratify, assume and confirm your obligations under any supplements or addenda, except those that are no longer required by the Requirements or applicable to your provision of P2P Service ("*Deprecated Documents*"), accepted in connection with your Prior Agreement that are not expressly superseded by this PAA or documents accepted in connection with the acceptance of this PAA, with such changes as may be required to effectuate the foregoing ("*Continuing Documents*") and (b) acknowledge and agree that as of your acceptance of this Agreement such Continuing Documents are incorporated by reference and form a part of this Agreement. We hereby ratify, assume and confirm our obligations under such Continuing Documents.

## 12.    Miscellaneous

**12.1.    Modification**. You will only be bound by modifications or supplements to this PAA on your acceptance, but if you do not agree to them, you may not be allowed to access our Platform. Such modifications or supplements may be provided to you only via electronic means. From time to time we may modify information hyperlinked in this PAA (or the addresses where such information may be found) and such modifications shall be effective when posted.

**12.2.    Severability**. Invalidity of any provision of this Agreement does not affect the rest of this Agreement. The parties shall replace the invalid or non-binding provision with provision(s) that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

**12.3.   Assignment**. We may freely assign or transfer this Agreement or any of our rights or obligations in them, in whole or in part, without your prior consent. You agree not to assign this Agreement, in whole or in part, without our prior written consent, and any attempted assignment without such consent is void.

**12.4.   Conflicts**. Except with respect to the Arbitration Provision, if there is a conflict between this PAA and any supplemental terms between you and us, those supplemental terms will prevail with respect to the specific conflict if explicitly provided therein, and is in addition to, and a part of, this Agreement.

**12.5.   Interpretation**. In this Agreement, "including" and "include" mean "including, but not limited to."

**12.6.   Notice**. Except as explicitly stated otherwise, any notices to us shall be given by certified mail, postage prepaid and return receipt requested to Uber Technologies, Inc., 1515 3rd Street, San Francisco, CA 94158, Attn: Legal Department. All notices to you may be provided electronically including through our Platform or by other means.

**12.7.   Governing Law**. Except as specifically provided in this PAA, this PAA is governed by the applicable law of the state where you reside (or where your entity is domiciled) when you accepted this PAA (the "*Governing Law*"). The Governing Law shall apply without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.

**12.8.   Entire Agreement**. Except as specifically set forth in Section 12.4 or the Arbitration Provision, this Agreement, constitutes the entire agreement and understanding with respect to the subject matter expressly contemplated herein and therein, and supersedes all prior or contemporaneous agreements or undertakings on this subject matter.

**12.9.   No Incorporation.** Notwithstanding anything herein to the contrary, no agreement, term or other provision relating to your indemnification obligations to us will be considered incorporated by reference, or otherwise a part of, this Agreement.

**12.10.   Existing Documents.** Defined terms in documents accepted in connection with your acceptance of this Agreement that reference a technology services agreement shall be deemed amended to reference analogous terms defined in this Agreement,

including by replacing the term "Technology Services Agreement" with "Platform Access Agreement".

**12.11. Questions**. If you have questions about our Platform, you may contact us by logging on to drivers.uber.com and navigating to the "Contact Us" section.

### 13.    Arbitration Provision

**IMPORTANT: PLEASE REVIEW THIS ARBITRATION PROVISION CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH US ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION, EXCEPT AS PROVIDED BELOW. YOU MAY OPT OUT OF THIS ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS BELOW. THERE ARE AND/OR MAY BE LAWSUITS ALLEGING CLASS, COLLECTIVE, COORDINATED, CONSOLIDATED, AND/OR REPRESENTATIVE CLAIMS ON YOUR BEHALF AGAINST US. IF YOU DO NOT OPT OUT OF THIS ARBITRATION PROVISION AND THEREFORE AGREE TO ARBITRATION WITH US, YOU ARE AGREEING IN ADVANCE, EXCEPT AS OTHERWISE PROVIDED BELOW, THAT YOU WILL NOT PARTICIPATE IN AND, THEREFORE, WILL NOT SEEK OR BE ELIGIBLE TO RECOVER MONETARY OR OTHER RELIEF IN CONNECTION WITH, ANY SUCH CLASS, COLLECTIVE, COORDINATED, CONSOLIDATED, AND/OR REPRESENTATIVE LAWSUIT. THIS ARBITRATION PROVISION, HOWEVER, WILL ALLOW YOU TO BRING INDIVIDUAL CLAIMS IN ARBITRATION ON YOUR OWN BEHALF.**

**13.1.        How This Arbitration Provision Applies.**

(a)    This Arbitration Provision is a contract governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and evidences a transaction involving commerce, and you agree that this is not a contract of employment involving any class of workers engaged in foreign or interstate commerce within the meaning of Section 1 of the Federal Arbitration Act. If notwithstanding the foregoing, the Federal Arbitration Act does not apply to this Arbitration Provision, the law pertaining to arbitration agreements of the state where you reside when you entered into this Agreement shall apply.  Except as it otherwise provides, this Arbitration Provision applies to any legal dispute, past, present or future, arising out of or related to your relationship with us or relationship with any of our agents, employees, executives, officers, investors, shareholders, affiliates, successors, assigns, subsidiaries, or parent companies (each of which may enforce this Arbitration Provision as third party beneficiaries), and termination of that relationship, and survives after the relationship terminates.

(b)    This Arbitration Provision applies to all claims whether brought by you or us, except as provided below.  This Arbitration Provision requires all such claims to be resolved only by an arbitrator through final and binding individual arbitration and not by

UBER-MDL3084-BW-00005378

way of court or jury trial.  Except as provided below regarding the Class Action Waiver and Representative Action Waiver, such disputes include without limitation disputes arising out of or relating to the interpretation, application, formation, scope, enforceability, waiver, applicability, revocability or validity of this Arbitration Provision or any portion of this Arbitration Provision.

(c)    Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes between you and us, or between you and any other entity or individual, arising out of or related to your application for and use of an account to use our Platform and Driver App as a driver, the P2P Service that you provide, background checks, your privacy, your contractual relationship with us or the termination of that relationship (including post-relationship defamation or retaliation claims), the nature of your relationship with us (including, but not limited to, any claim that you are our employee), trade secrets, workplace safety and health, unfair competition, compensation, minimum wage, expense reimbursement, overtime, breaks and rest periods, retaliation, discrimination, or harassment, and claims arising under the Telephone Consumer Protection Act, Fair Credit Reporting Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, 8 U.S.C. § 1324b (unfair immigration related practices), Americans With Disabilities Act, Age Discrimination in Employment Act, Fair Labor Standards Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, federal, state or local statutes or regulations addressing the same or similar subject matters, and all other federal, state or local statutory, common law and legal claims (including without limitation, torts) arising out of or relating to your relationship with us or the termination of that relationship.  This Arbitration Provision also applies to all incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of our Platform and Driver App, regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to this Agreement, and regardless whether you allege that the personal injury was experienced by you or anyone.

### 13.2.    Limitations On How This Arbitration Provision Applies.

(a)    To the extent required by applicable law not preempted by the Federal Arbitration Act, nothing in this Arbitration Provision prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, U.S. Securities and Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs.  Likewise, to the extent required by applicable law not preempted by the Federal Arbitration Act, nothing in this Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision.  To the extent required by applicable law not preempted by the Federal Arbitration Act, this Arbitration Provision also

does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on those claims, even if the claims would otherwise be covered by this Arbitration Provision.

(b)    Where you allege claims of sexual assault or sexual harassment, you may elect to bring those claims on an individual basis in a court of competent jurisdiction instead of arbitration. We agree to honor your election of forum with respect to your individual sexual harassment or sexual assault claim but in so doing do not waive the enforceability of this Arbitration Provision as to any other provision (including but not limited to Section 13.4—Class Action Waiver—which will continue to apply in court and arbitration), controversy, claim or dispute.

(c)    To the extent an Act of Congress or applicable federal law not preempted by the Federal Arbitration Act provides that a particular claim or dispute may not be subject to arbitration, such claim or dispute is excluded from the coverage of this Arbitration Provision.  Likewise, if the Federal Arbitration Act does not apply to a claim or dispute, any claims or disputes that may not be subject to arbitration under applicable state arbitration law will be excluded from the coverage of this Arbitration Provision.

(d)    *Impact on Pending Litigation*: This Arbitration Provision shall not affect your standing with respect to any litigation against us brought by you or on your behalf that is pending in a state or federal court or arbitration as of the date of your receipt of this Arbitration Provision ("*pending litigation*").  Therefore:

- If you are or previously were a driver authorized to use our Platform and Driver App, and at the time of your receipt of this Agreement you were not bound by an existing arbitration agreement with us, you shall remain eligible to participate in any pending litigation to which you were a party or putative class, collective or representative action member regardless of whether you opt out of this Arbitration Provision.

- If, at the time of your receipt of this Agreement, you were bound by an existing arbitration agreement with us, that arbitration agreement will continue to apply to any pending litigation, even if you opt out of this Arbitration Provision.

- If, at the time of your receipt of this Agreement, you were not previously a driver authorized to use our Platform and Driver App, then this Arbitration Provision will apply to covered

UBER-MDL3084-BW-00005380

claims and any pending litigation unless you opt out of this Arbitration Provision as provided below.

(e)     Either party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief on the ground that without such relief the arbitration provided in this Arbitration Provision may be rendered ineffectual.

**13.3.     Governing Rules, Starting The Arbitration, And Selecting The Arbitrator.**

(a)     <u>For claims involving use of the Platform and Driver App in California</u>: The ADR Services, Inc. Arbitration Rules ("*ADR Rules*") will apply to arbitration under this Arbitration Provision; however, if there is a conflict between the ADR Rules and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern. The ADR Rules are available by, for example, searching Google.com to locate "ADR Services, Inc. Rules," or by clicking here: https://www.adrservices.com/services/arbitration-rules/. If, for any reason, ADR Services, Inc. will not administer the arbitration and the parties cannot mutually agree on a neutral arbitration provider, either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in California. Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis. Once an arbitration provider is appointed under 9 U.S.C. § 5, or the parties mutually agree upon a neutral arbitration provider, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider; however, if there is a conflict between the rules of the designated arbitration provider and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern.

(b)     <u>For claims involving use of the Platform and Driver App outside California</u>:  The parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in the state in which the dispute arises.  Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis. Once the parties mutually agree upon a neutral arbitration provider, or an arbitration provider is appointed under 9 U.S.C. § 5, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider; however, if there is a conflict between the rules of the designated arbitration provider and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern.

(c)     Prior to commencing arbitration with the applicable arbitration provider, the party bringing the claim in arbitration must first demand arbitration in writing within the applicable statute of limitations period.  The demand for arbitration shall include identification of the parties (including, if you are bringing the claim, the phone number and email address associated with your driver account, and the city in which you reside), a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought and the amount in controversy.  Any demand for arbitration made to us shall be sent to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, or served upon Uber's registered agent for service of process, c/o Uber Technologies, Inc. (the name and current contact information for the registered agent in each state are available online here).  Any demand for arbitration made to you shall be sent via electronic email to the email address associated with your driver account.

(d)     The parties agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome.  The parties therefore agree that, before the arbitration demand is submitted to the applicable arbitration provider, the party bringing the claim shall first attempt to informally negotiate with the other party, in good faith, a resolution of the dispute, claim or controversy between the parties for a period of 60 days ("*negotiation period*"), unless extended by mutual agreement of the parties.  During the negotiation period, any otherwise applicable statute of limitations shall be tolled.  In connection with informal negotiations during the negotiation period, the parties shall participate telephonically or in person in at least one informal dispute resolution conference. All informal dispute resolution conferences shall be individualized such that a separate conference must be held each time either party intends to commence individual arbitration; multiple individuals initiating claims cannot participate in the same informal dispute resolution conference.  If either party is represented by counsel, that party's counsel may participate in the informal dispute resolution conference, but the party also must appear at and participate in the conference.  Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing individual arbitration.  If the parties cannot reach an agreement to resolve the dispute, claim or controversy within the negotiation period, the party bringing the claim shall submit the arbitration demand to the applicable arbitration provider.

(e)     To commence arbitration following the conclusion of the informal dispute resolution process required by Section 13.3(d), the party bringing the claim must file the written demand for arbitration with the applicable arbitration provider and serve a copy of the demand for arbitration on Uber as set forth in Section 13.3(c) and by email to any counsel who represented Uber in the informal dispute resolution process.  By filing the arbitration demand with the applicable arbitration provider, the party bringing the claim in arbitration certifies that the demand complies with Rule 11 of the Federal

Rules of Civil Procedure and any applicable state law equivalent.

(f)    If the parties reach agreement on an arbitrator not affiliated with the applicable arbitration provider or to use procedures either not specified in or in lieu of the applicable arbitration provider's rules (as modified by this Arbitration Provision), any such agreement shall be memorialized in writing before arbitration is commenced. If the parties are unable to agree upon an arbitrator after a good faith meet and confer effort, then the applicable arbitration provider will appoint the arbitrator in accordance with its rules. The arbitrator will be selected from the applicable arbitration provider's roster of arbitrators. Any arbitrator selected must be either (1) a retired judge or (2) an attorney licensed to practice law in the state where the arbitration is conducted with experience in the law underlying the dispute.

(g)    Delivering a written arbitration demand to the other party will not relieve the party bringing the claim of the obligation to commence arbitration as described above. It shall always be the obligation of the party bringing the claim to commence arbitration.

(h)    <u>Mass arbitration dispute procedure</u>: If 20 or more arbitration demands of a substantially similar nature are initiated against you or us within a 180-day period by the same law firm or collection of law firms that represents the other party ("*mass arbitration demands*"), the following procedure shall apply. At the request of either party, an arbitrator shall be selected pursuant to the applicable arbitration provider's rules for selection of an arbitrator to act as a special master ("*Special Master*") to resolve threshold disputes regarding the propriety of some or all the mass arbitration demands. These threshold disputes may include, but are not limited to:

(1)    any dispute regarding filing fees owed with respect to the mass arbitration demands, including whether claimants have submitted valid fee waivers;

(2)    any dispute regarding whether the applicable arbitration provider has complied with the Arbitration Provision with respect to processing and administering the mass arbitration demands;

(3)    any dispute regarding whether the mass arbitration demands meet the requirements set forth in Section 13.3(c) or (e) above;

(4)    any dispute regarding whether the demands have complied with all conditions precedent to commencing arbitration, including compliance with the informal dispute resolution

process described in Section 13.3(d) above;

(5) any dispute regarding whether claimants have ever had a driver account;

(6) any dispute regarding whether claimants are barred from proceeding with their claims based on a prior settlement agreement or expiration of the statute of limitations;

(7) any dispute relating to representation of the same claimant by multiple law firms;

(8) any dispute regarding whether the mass arbitration demands were filed with the correct arbitration provider;

(9) any dispute regarding whether the mass arbitration demands violate Rule 11 of the Federal Rules of Civil Procedure and/or any applicable state law equivalent; and

(10) any other dispute or issue regarding the equitable and efficient initial case management of the mass arbitration demands, including, but not limited to, the timing and/or sequence of payment of any remaining filing or administrative fees or costs related to the mass arbitration demands.

Any request to appoint a Special Master pursuant to this procedure must be submitted in writing to the applicable arbitration provider, with a copy to the other party, within fifteen (15) days after filing and service (as described in Section 13.3(e)) of any arbitration demand that qualifies as part of the same group of mass arbitration demands within the meaning of this Section 13.3(h) (i.e., 20 or more arbitration demands of a substantially similar nature initiated within a 180 day period by the same law firm or collection of law firms. Mass arbitration demands initiated by a different law firm or collection of law firms shall be considered a separate group of mass arbitration demands and shall be administered separately). For the sake of clarity, the request to appoint a Special Master need not be submitted in response to the first arbitration demand that triggers the mass arbitration dispute procedure (i.e., the 20th demand), and the request is subject only to the limitations set forth in this Section 13.3(h).

Except as provided below, during the fifteen (15) day period following the filing and service of any arbitration demand that qualifies as part of the same group of mass arbitration demands, the arbitration provider shall refrain from further processing of any demands that are part of the same group of mass arbitration demands, and no further payment (i.e., other than amounts required to be paid by the party initiating arbitration at the time the arbitration demand is filed) for filing fees, administrative fees or costs, or Arbitrator fees shall be deemed due with respect to those demands. A party's

decision not to invoke this procedure in response to a particular arbitration demand shall not constitute a waiver of any defense to any arbitration demand. Likewise, a party's decision not to invoke this procedure in response to a particular demand will not preclude the same party from later invoking this procedure in response to any other arbitration demand, including one that qualifies as part of the same group of mass arbitration demands as an earlier-filed demand.

The written request to appoint a Special Master must specify the arbitration demands and threshold disputes that will be submitted to the Special Master.

Upon the request of either party to appoint a Special Master to resolve the foregoing issues, the applicable arbitration provider shall refrain from further processing any of the mass arbitration demands as to which a dispute has been raised. Except for the filing fees, administrative fees or costs, or arbitrator fees that have already been assessed by the arbitration provider at the time the request to appoint a Special Master is made, no payment for filing fees, administrative fees or costs, or arbitrator fees shall be deemed due with respect to any of the mass arbitration demands as to which a dispute has been raised until after the dispute(s) has/have been resolved by the Special Master. Notwithstanding the foregoing, Uber shall be responsible for and agrees to pay the applicable arbitration provider's and Special Master's fees and costs related to the proceedings before the Special Master.

If timely requested by either party, any arbitration demand that is part of the same group of mass arbitration demands and to which a dispute has been raised shall be included as part of the same Special Master matter, even if a Special Master matter is already pending at the time that arbitration demand is filed, except that (i) a demand cannot be included if an arbitrator has already been selected for that individual demand as provided in Section 13.3(f); and (ii) a demand that might otherwise be considered part of the same group of mass arbitration demands that is filed after proceedings before a Special Master have concluded shall be considered part of a different group of mass arbitration demands.

A Special Master appointed pursuant to this procedure may award any party any appropriate remedy to which that party is entitled under applicable law (including, but not limited to, as set forth in Section 13.7) with respect to the issues presented to and decided by the Special Master, but shall have no authority to consolidate cases or decide issues related to the merits of the dispute or any other issue except as specified above. After proceedings before the Special Master have concluded, to the extent any of the mass arbitration demands are permitted to proceed, all such demands shall proceed on an individual basis only, and the applicable arbitration provider must administer

UBER-MDL3084-BW-00005385

them individually in accordance with the applicable arbitration provider's rules and this Arbitration Provision.

(i)    All claims in arbitration are subject to the same statutes of limitation that would apply in court.  The arbitrator (which includes the Special Master, as applicable) shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration, except that the statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by Section 13.3(d).

(j)    Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Provision, including without limitation any claim that all or part of this Arbitration Provision is void or voidable.  An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues.  However, only a court of competent jurisdiction, and not an arbitrator, shall have exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and/or Representative Action Waiver—including, but not limited to, any claim that all or part of the Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, illegal, void, or voidable, or that a breach of either such Waiver has occurred.

### 13.4.    Class Action Waiver.

(a)    **This Arbitration Provision affects your ability to participate in class, collective, coordinated, or consolidated actions.**  Both Uber and you agree that any and all disputes or claims between the parties shall be resolved only in individual arbitration, and not on a class, collective, coordinated, or consolidated basis on behalf of others.  There will be no right or authority for any dispute (whether brought by you or us, or on your or our behalf) to be brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, or consolidated action, or for you or us to participate as a member in any such class, collective, coordinated, or consolidated proceeding.  Neither an arbitrator nor an arbitration provider shall have authority to hear, arbitrate, or administer any class, collective, coordinated, or consolidated action, or to award relief to anyone but the individual in arbitration.

(b)    Notwithstanding any other provision of this Arbitration Provision or the applicable arbitration provider's rules, this Class Action Waiver does not prevent you or us from participating in a classwide, collective, coordinated, or consolidated settlement of claims.

(c)     This Class Action Waiver does not and shall not be construed to preclude the mass arbitration dispute procedure set forth in Section 13.3(h).

(d)     The parties further agree that if for any reason a claim does not proceed in arbitration, this Class Action Waiver shall remain in effect, and a court may not preside over any action joining or consolidating the claims of multiple individuals against Uber in a single proceeding.  If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (1) any class, collective, coordinated, or consolidated action subject to the enforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (2) the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration; (3) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Provision; and (4) the severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Provision or the arbitrability of any remaining claims asserted by you or us.

**13.5.     Representative Action Waiver.**

(a)     **This Arbitration Provision affects your ability to participate in representative actions.**  To the maximum extent provided by law, both Uber and you agree that any and all disputes or claims between the parties shall be resolved only in individual arbitration, and not on a representative basis.  The parties expressly waive their right to have any dispute or claim brought, heard, administered, resolved, or arbitrated as a representative action, or to participate in any representative action, including but not limited to claims brought under any state's Private Attorneys General Act.  The parties also expressly waive their right to seek, recover, or obtain any non-individual relief.  There will be no right or authority for any dispute (whether brought by you or us, or on your or our behalf) to be brought, heard, administered, or arbitrated as a representative action, or for you or us to participate as a member in any such representative proceeding.

(b)     Notwithstanding any other provision of this Arbitration Provision or the applicable arbitration provider's rules, this Representative Action Waiver does not prevent you or us from participating in a representative settlement of claims.

(c)     This Representative Action Waiver does not and shall not be construed to preclude the mass arbitration dispute procedure set forth in Section 13.3(h).

(d)     If there is a final judicial determination that any portion of this Representative Action Waiver is unenforceable or unlawful for any reason, (1) any

representative claim subject to the enforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (2) the portion of the Representative Action Waiver that is enforceable shall be enforced in arbitration; (3) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Provision; and (4) the severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Provision or the arbitrability of any remaining claims asserted by you or us.

(e)    Disputes regarding the nature of your relationship with us (including, but not limited to, any claim that you are an employee of us), as well as any claim you bring on your own behalf as an aggrieved worker for recovery of underpaid wages or other individualized relief (as opposed to a representative claim for civil penalties) are arbitrable and must be brought in arbitration on an individual basis only, as required by this Arbitration Provision.  You agree that any representative claim that is permitted to proceed in a civil court of competent jurisdiction must be stayed pending the arbitration of your dispute regarding the nature of your relationship with us and any claim you bring on your own behalf for individualized relief.

### 13.6.    Paying For The Arbitration.

(a)    Except in the case of offers of judgment (such as under Federal Rule of Civil Procedure 68 or any applicable state law equivalents, which apply to arbitrations under this Arbitration Provision as set forth in Section 13.6(d) below), each party will pay the fees for its, his or her own attorneys and any costs that are common to both court and arbitration proceedings (such as court reporter costs and transcript fees), subject to any remedies to which that party may later be entitled under applicable law.

(b)    Each party shall follow the applicable arbitration provider's rules applicable to initial arbitration filing fees, except that your portion of any initial arbitration filing fee shall not exceed the amount you would be required to pay to initiate a lawsuit in federal court in the jurisdiction where the arbitration will be conducted. To the extent a fee waiver is sought, it must include all information and be submitted in the appropriate form required by applicable law. Except as specified in the mass arbitration dispute procedure set forth in Section 13.3(h), after (and only after) you have paid your portion of any initial arbitration filing fee, we will make up the difference, if any, between the fee you have paid and the amount required by the applicable arbitration provider's rules.

(c)    In all cases where required by applicable law not preempted by the FAA, we will pay the arbitrator's fees, as well as all fees and costs uniquely

UBER-MDL3084-BW-00005388

associated with arbitration (such as room rental).  Otherwise, such fee(s) will be apportioned between the parties in accordance with said applicable law and this Arbitration Provision, and any disputes in that regard will be resolved by the arbitrator (which includes the Special Master, as applicable).  You agree to not oppose any negotiations between the applicable arbitration provider and Uber relating only to our fees.

(d)     At least 10 days before the date set for the arbitration hearing, any party may serve an offer in writing upon the other party to allow judgment on specified terms.  If the offer is accepted, the offer with proof of acceptance shall be submitted to the arbitrator, who shall enter judgment accordingly.  If the offer is not accepted prior to the arbitration hearing or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the arbitration.  If an offer made by Uber is not accepted by you, and you fail to obtain a more favorable award, you shall not recover your post-offer costs and shall pay Uber's costs from the time of the offer.

### 13.7.   The Arbitration Hearing And Award.

(a)     Within 30 days of the close of the arbitration hearing, any party will have the right to prepare, serve on the other party and file with the arbitrator a brief. The arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator.

(b)     The arbitrator shall apply applicable controlling law and will issue a decision or award in writing, stating the essential findings of fact and conclusions of law.

(c)     Under no circumstances is the arbitrator bound by decisions reached in separate arbitrations.  The arbitrator's decision, including any decision by a Special Master (as applicable), shall be binding only upon the parties to the arbitration that are the subject of the decision.

(d)     The arbitrator shall award reasonable costs incurred in the arbitration to the prevailing party in accordance with the law(s) that applies to the case.

(e)     The arbitrator shall be authorized to afford any relief or impose any sanctions available under Federal Rule of Civil Procedure 11 or any applicable state law

equivalent.

(f)     A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.  The arbitrator's findings of fact and conclusions of law shall not be binding or have any preclusive effect on any other arbitration, except as specified in and limited by Section 13.3(h).

**13.8.     Your Right To Opt Out Of This Arbitration Provision**

(a)     Agreeing to this Arbitration Provision is not a mandatory condition of your contractual relationship with us.  If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision (subject to the pending litigation provision in Section 13.2, and the limitations set forth in this Section 13.8).  To do so, within 30 days of the date that this Agreement is electronically accepted by you, you must send an electronic email from the email address associated with your driver account to optout@uber.com, stating your intent to opt out of this Arbitration Provision, as well as your name, the phone number associated with your driver account, and the city in which you reside.

(b)     An email sent by your agent or representative (including your counsel) shall not be effective.  Your email may opt out yourself only, and any email that purports to opt out anyone other than yourself shall be void as to any others.  Should you not opt out of this Arbitration Provision within the 30-day period, you and Uber shall be bound by the terms of this Arbitration Provision.  You will not be subject to retaliation if you exercise your right to opt out of this Arbitration Provision.

(c)     Any opt out of this Arbitration Provision does not affect the validity of any other arbitration agreement between you and us. If you opt out of this Arbitration Provision and at the time of your receipt of this Agreement you were bound by an existing agreement to arbitrate disputes arising out of or related to your use of our Platform and Driver App, that existing arbitration agreement will remain in full force and effect.

(d)     Neither your acceptance of this Agreement nor your decision to opt out of this Arbitration Provision will affect any obligation you have to arbitrate disputes not specified in this Arbitration Provision pursuant to any other agreement you have with us or any of our subsidiaries or affiliate entities.  Likewise, your acceptance of or decision to opt out of any other arbitration agreement you have with us or any of our subsidiaries or affiliate entities shall not affect any obligation you have to arbitrate claims pursuant to this Arbitration Provision.

**13.9.   Enforcement Of This Arbitration Provision**. You have the right to consult with counsel of your choice concerning this Arbitration Provision and to be represented by counsel at any stage during the arbitration process.  Except as provided in Sections 13.2 and 13.8 of this Arbitration Provision, and/or unless this Arbitration Provision is deemed invalid, unenforceable, or inapplicable, this Arbitration Provision replaces prior agreements regarding the arbitration of disputes and is the full and complete agreement relating to the formal resolution of disputes covered by this Arbitration Provision.  In the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.  This Arbitration Provision will survive the termination of your relationship with us, and it will continue to apply if your relationship with us is ended but later renewed.

**By clicking "Yes, I agree," I expressly acknowledge that I have read, understood, and considered the consequences of this Agreement, that I agree to be bound by the terms of this Agreement, and that I am legally competent to enter into this Agreement with Uber.**

UBER-MDL3084-BW-00005391

# EXHIBIT 3

# Fare Addendum

Updated as of April 4, 2022

You entered into a Platform Access Agreement (the "PAA") by and among you and your company/business ("*you*") and the following entity as applicable, based on the region specified: Uber Technologies, Inc. in California; Rasier-PA, LLC in Pennsylvania; Rasier-DC, LLC in Florida; Rasier-MT, LLC in Montana; Rasier-NY in New York; Hinter-NM, LLC in New Mexico; and Rasier, LLC in all other U.S. states, territories and possessions (collectively, "*Uber*"). This is an addendum to the PAA and contains information about fare and payment terms. This addendum is effective as of the date and time you accept it.

Capitalized terms used herein but not defined shall have the meanings ascribed to them in the PAA. For the sake of clarity and depending on the context, references to "Uber", "*we*", "*our*", and "*us*" may also refer to the appropriate Uber-affiliated contracting entity accordingly or Uber collectively.

By clicking "Yes, I agree," you agree to be bound by the additional terms below as of the date of your acceptance. Upon acceptance this addendum is incorporated by reference and a part of the PAA. Except where modified above, the remainder of the PAA shall remain unchanged. This addendum replaces and supersedes any previous addendum that you have accepted related to the subject matter described herein.

**Fares; Gratuity** Uber enables you, through the Driver App, to charge your Rider(s) a "Fare" for each Ride. The Fare may be calculated using a base amount and amounts that are based on the estimated or actual distance and/or time of the Ride. The Fare may (i) include additional fees or a portion thereof paid by a Rider, such as a fee based on certain trip attributes (e.g., wait time fees), and (ii) be adjusted based on marketplace factors, such as supply and demand. Additionally, the Fare does not include fees payable by Riders directly to Uber ("*Direct Fees*") as applicable and does not include certain taxes and fees payable to a governmental entity.  For the avoidance of doubt, on a canceled trip, the Fare may be the cancellation fee or a portion thereof charged to a Rider.

On certain trips, when you receive a Ride request, our Platform may surface a pre-trip Fare. You accept this pre-trip Fare by accepting the Ride request. The pre-trip Fare may be adjusted if the length or duration of the trip deviates from the estimated length

or duration that was used to calculate the pre-trip Fare. If you do not receive a pre-trip Fare, the Fare will be based on rates, which may include per-minute or per-mile rates, that will be made available to you. We will provide you with notice of any changes to these rates and by continuing to accept Ride requests, you are deemed to have accepted those changes.

The Fare is a recommended amount. You shall always have the right to: (i) charge a Fare that is less than the pre-trip Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-trip Fare (each of (i) and (ii) herein, a "*Negotiated Fare*"). Absent a request for a Negotiated Fare, the Fare recommended by Uber shall be the amount used in the transaction. We will consider all such Negotiated Fare requests from you in good faith.

Fares do not include gratuity, and receiving a gratuity is not guaranteed. Rather, Riders may, in their sole discretion, decide to pay you a gratuity. Uber will not take any portion of your gratuity except as described below. If any gratuity is remitted using our application, it shall be included with other monies you may be entitled to receive.

**Driver Payment** Any gratuity paid to you by a Rider is your property and, if remitted using our application, shall be remitted to you along with Fares, estimated tolls, and any taxes or other fees or surcharges that you may be entitled to receive for your Rides (collectively, "*Driver Payment*").

**Promotions** From time to time, you may be offered certain promotions to use our Platform. These promotions will be governed by separate terms and conditions provided to you in connection with those promotion offers.

**Our Service Fees** In consideration for services connecting you to Riders and related services, including payment processing, you will pay us (and/or permit us to collect from the Rider Payment) a service fee ("*Service Fee*"). For the avoidance of doubt, you will not be charged a fee to access our Platform. Unless we indicate to you otherwise, the Service Fee that will be charged to you on a per-Ride basis shall equal the Rider Payment (defined below) minus: (a) the Fare, (b) any gratuity, and (c) other items, including but not limited to, (i) Direct Fees, (ii) applicable estimated taxes, tolls, and surcharges, (iii) fees retained by us, and (iv) any other payments to you included on the per-trip receipt, which may include per-trip promotions ((a)-(c), collectively, "*Service Fee Offsets*").

UBER-MDL3084-BW-00005515

In the event of a Ride where the Fare is greater than the Rider Payment (excluding gratuity, Direct Fees, applicable estimated taxes, tolls, and surcharges, fees retained by us, and any other payments to you included on the per-trip receipt), no Service Fee will be charged for that Ride. In such a case, any excess amounts that you receive will be shown as an adjustment to your Service Fee(s) (or if necessary, as an adjustment to another payment owed to you). In consideration for using Shared Rides options, such as Uber Pool, you agree to pay us a Service Fee on each Rider's Ride within a trip. The Service Fees applicable to a Shared Ride trip may vary within the trip.

The "Weekly Service Fee" for the relevant weekly period shall equal all Rider Payments minus: (a) all Service Fee Offsets; and (b) any other payments to you not included on the per-trip receipt, including but not limited to weekly promotions, cleaning fee payments, and lost item fee payments.

**Rider Payment** Unless we indicate to you otherwise, for each Ride, the Rider will pay an amount that includes the Fare, applicable estimated taxes, tolls and surcharges, Direct Fees, and other fees retained by us, as well as an amount that corresponds to the Service Fee, and if they choose, any gratuity (collectively, the "*Rider Payment*"). The Fare does not include the amount that corresponds to the Service Fee. For more information on how tolls and surcharges are charged to Riders, please see the Tolls and Surcharges Help Page.

**Limited Agency** In order to facilitate the transactions described in this addendum, you hereby appoint us as your limited agent for payment collection for your Rides and we hereby accept such appointment. We will process the Rider Payment on your behalf through our Platform's payment processing functionality. We will use commercially reasonable efforts to remit amounts owed to you at least once a week. The Rider Payment will be treated as if paid to you directly by a Rider, with the exception of Direct Fees. Further, by accepting a Ride, you agree to charge the Rider Payment to the Rider at the amount recommended by us as your limited pricing agent or to charge the Negotiated Fare. Either party may revoke this appointment by terminating this Agreement; such revocation will be effective after final settlement of all outstanding liabilities under this Agreement.

**Deductions; Set-off** You also agree that the Driver Payment and incentives may be used to satisfy a court order of garnishment against you; to reimburse us for citations, tickets, or other administrative penalties or fines assessed by governmental entities or any airport arising from your conduct; to reimburse us for any erroneous overpayment to you; or to pay amounts related to shipping fees, and other product fees.

UBER-MDL3084-BW-00005516

**No Separate Payment Related to Uber Marketing or Rider Promotions** We often separately advertise and market our Platform and other products and services generally (including discounts or promotions) to Riders that reduce what they ultimately pay for a Ride. Our advertising and marketing does not impact your Driver Payment, nor entitle you to any additional payment.

**Adjustments; Disputes** In our good faith discretion, we may adjust or, in more serious situations, cancel or refund in its entirety, any component of the Driver Payment for reasons such as fraud, a failure to properly end a Ride, or your violation of this Agreement, such as a failure to comply with the Requirements. If you believe in good faith that there was an error that requires an adjustment to the Driver Payment, you can report that error by contacting us including by using the Driver app, phone support or visiting us in-person at a Greenlight Hub. You must report errors promptly or you will waive your right to dispute such Driver Payment. Disputed amounts will be paid promptly upon resolution. Amounts owed to you will not include interest and, if permitted by applicable law, will be net of any amounts you owe us.

**Receipts** Our Platform provides you with a system for delivering receipts to your Riders. After completing a Ride, the receipt will be electronically delivered to your Rider on your behalf. It includes certain information about you and that Ride (including your details and a map of the route taken).

**Taxes** You are required to follow applicable law regarding your tax registration, calculation and remittance obligations for your Rides, as well as to provide us with all relevant tax information. You are responsible for taxes on your own income. Based on applicable tax or regulatory considerations, we may choose in our reasonable discretion to collect from the Rider Payment taxes applicable to your Rides and remit such amounts directly to the applicable taxing authority, and may provide any of the relevant tax information you have given us directly to the applicable tax authorities on your behalf or otherwise.

**By clicking "Yes, I agree," You expressly acknowledge that You have read, understood, and considered the consequences of this addendum, that You agree to be bound by the terms of this addendum, and that You are legally competent to enter into this addendum with Uber.**

# EXHIBIT 4

EFFECTIVE DATE 2023-01-17 UBER TERMS

UBER-MDL3084-BW-00001048

Uber                                                    Log in    **Sign up**    ≡

Select jurisdiction:    Select language:

United States ▾         English ▾

Last modified: 1/17/2023

# U.S. Terms of Use

These Terms of Service ("Terms of Service") constitute a legally binding agreement between you and Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber") governing your use of Uber's personalized, multipurpose, digital marketplace platform ("Uber Marketplace Platform") and any related content or services, including mobile and/or web-based applications ("Applications" or the "Uber App," and together with the Uber Marketplace Platform, the "Services").

**IMPORTANT**: PLEASE BE ADVISED THAT THESE TERMS OF SERVICE CONTAIN PROVISIONS THAT GOVERN HOW YOU CAN BRING CLAIMS BETWEEN YOU AND UBER, INCLUDING THE ARBITRATION AGREEMENT IN SECTION 2 BELOW. THESE TERMS OF SERVICE OUTLINE HOW SUCH CLAIMS ARE RESOLVED, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS THAT AROSE OR WERE ASSERTED BEFORE THE EFFECTIVE DATE OF THESE TERMS OF SERVICE. PLEASE REVIEW THE ARBITRATION AGREEMENT IN SECTION 2 CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION, YOU ARE WAIVING YOUR RIGHT TO SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL ON YOUR CLAIMS. BY AGREEING TO THESE TERMS OF SERVICE, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD ALL OF THESE TERMS OF SERVICE AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.

Notwithstanding the foregoing, if you choose, now or in the future, to provide transportation (e.g., ride-hailing), logistics (e.g., freight), delivery (e.g., food, packages, and other goods) and other services (collectively, "Third-Party Services"), these Terms of Service do not supersede or otherwise impact the enforceability of any agreements you may have with Uber or its subsidiaries regarding such Third-Party Services (e.g., the Platform Access Agreement, the Technology Services Agreement and/or any similar agreements). To the extent (but only to the extent) any agreement you may have with Uber regarding Third-Party Services conflicts with

CONFIDENTIAL                                    UBER-MDL3084-BW-00001049

these Terms of Service, those agreements (and not these Terms of Service) will prevail in respect to any disputes arising from your provision of Third-Party Services; otherwise, any relevant provisions in these Terms of Service apply.

# 1. Contractual Relationship; Termination; and Modification

In addition to these Terms of Service, your access to, and use of the Services is also governed by the applicable terms found on our website, including without limitation, the Privacy Notice, which describes how we collect, use and disclose your personal information; the Generated Content Terms; Community Guidelines; Referral Policies; and Uber's other applicable Uber standards and policies (including, without limitation, Uber's safety standards, the accessibility policies and U.S. Service Animal Policy), as well as the ADT Mobile Security Monitoring Terms, which we refer to collectively as the "Supplemental Terms."

Collectively, we refer to these Terms of Service and the Supplemental Terms as the "Terms." These Terms govern your access or use, from within the United States and its territories and possessions, of the Services made available in the United States and its territories and possessions (the "Territory"). If you use the Services in another country, you agree to be subject to Uber's terms of service for that country. PLEASE READ THESE TERMS CAREFULLY, AS THEY CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND UBER. In these Terms, the words "including" and "include" mean "including, but not limited to."

By accessing or using the Services, you confirm your agreement to be bound by these Terms. If you do not agree to these Terms, do not access or use the Services. These Terms expressly govern the use of the Services in the Territory.

**Termination.**

Uber, in its sole discretion, may immediately terminate these Terms or any Services with respect to you, or generally cease offering or deny access to the Services or any portion thereof, at any time for any reason.

**Modification.**

Uber reserves the right to modify these Terms or its policies relating to the Services at any time, effective upon posting of an updated version of these Terms through the Services or Uber's website. You should regularly review these Terms, as your continued use of the Services after any such changes constitutes your agreement to such changes.

# 2. Arbitration Agreement

By agreeing to these Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration

UBER-MDL3084-BW-00001050

Agreement, and not as a class, collective, coordinated, consolidated, mass and/or representative action. You and Uber are each waiving your right to a trial by jury. This Arbitration Agreement will preclude you from bringing any class, collective, coordinated, consolidated, mass and/or representative action against Uber, and also preclude you from participating in or recovering relief in any current or future class, collective, coordinated, consolidated, mass and/or representative action brought against Uber by someone else—except as provided below in Section 2(a)(3)(c). Thus, the parties agree that the Arbitrator shall not conduct any form of class, collective, coordinated, consolidated, mass and/or representative arbitration, nor join, coordinate, or consolidate claims of multiple individuals against Uber in a single proceeding—except as provided below in Section 2(a)(3)(c). For the avoidance of doubt, except as provided below in Section 2(a)(3)(c), this Arbitration Agreement precludes you from bringing or participating in any kind of class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber, other than participating in a classwide, collective, coordinated, consolidated, mass and/or representative settlement of claims.

**(a) Agreement to Binding Arbitration Between You and Uber.**

(1) <u>Covered Disputes</u>: Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to these Terms, and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

(2) <u>Class Action Waiver</u>: Any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration. The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, consolidated, and/or representative action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any class, collective, coordinated, consolidated, and/or representative action, or to award relief to anyone but the individual in arbitration. The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. Notwithstanding anything else in this agreement, this Class Action Waiver does not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims.

UBER-MDL3084-BW-00001051

The parties further agree that if for any reason a claim does not proceed in arbitration, this Class Action Waiver shall remain in effect, and a court may not preside over any action joining, coordinating, or consolidating the claims of multiple individuals against Uber in a single proceeding, except that this Class Action Waiver shall not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims. If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (i) any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (ii) the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration; (iii) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Agreement; and (iv) severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Agreement or the arbitrability of any remaining claims asserted by you or Uber.

(3) Mass Actions:

a. Mass Action Waiver: Any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration. The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a mass action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any mass action or to award relief to anyone but the individual in arbitration—except as provided below in Section 2(a)(3)(c). The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. The parties agree that the definition of a "Mass Action" includes, but is not limited to, instances in which you or Uber are represented by a law firm or collection of law firms that has filed 50 or more arbitration demands of a substantially similar nature against the other party within 180 days of the arbitration demand filed on your or Uber's behalf, and the law firm or collection of law firms seeks to simultaneously or collectively administer and/or arbitrate all the arbitration demands in the aggregate. Notwithstanding anything else in this agreement, this Mass Action Waiver does not prevent you or Uber from participating in a mass settlement of claims.

b. Dispute Procedure: Notwithstanding any provision to the contrary in the applicable arbitration provider's rules, the arbitrator shall be empowered to determine whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver. Either party shall raise with the arbitrator or arbitration provider such a dispute within 15 days of its arising. If such a dispute arises before an arbitrator has been appointed, the parties agree that (i) a panel of three arbitrators shall be appointed to resolve only disputes concerning whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver. Each party shall select one arbitrator from the arbitration provider's roster to serve as a neutral arbitrator, and these arbitrators shall appoint a third neutral arbitrator. If the parties' arbitrators cannot agree on a third arbitrator, the arbitration provider will select the third arbitrator; (ii) Uber shall pay any administrative fees or costs incidental to the appointment of

UBER-MDL3084-BW-00001052

Arbitrators under this provision, as well as any fees or costs that would not be incurred in a court proceeding, such as payment of the fees of the arbitrators, as well as room rental; (iii) the arbitrators shall issue a written decision with findings of fact and conclusions of law; and (iv) any further arbitration proceedings or assessment of arbitration-related fees shall be stayed pending the arbitrators' resolution of the parties' dispute. If the arbitrator or panel of arbitrators determines that you have violated the Mass Action Waiver, the parties shall have the opportunity to opt out of arbitration within 30 days of the arbitrator's or panel of arbitrator's decision. You may opt out of arbitration by providing written notice of your intention to opt out to the arbitration provider and to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158 via USPS Priority Mail or hand delivery. This written notice must be signed by you, and not any attorney, agent, or other representative of yours. Uber may opt out of arbitration by sending written notice of its intention to opt out to the arbitration provider and to you or your attorney, agent, or representative if you are represented. For the avoidance of doubt, the ability to opt out of arbitration described in this Section 2(a)(3)(b) only applies if the arbitrator or panel of arbitrators determines that you have violated the Mass Action Waiver. If the parties proceed with arbitration, the parties agree that arbitrations will be batched as provided in Section 2(a)(3)(c) below.

c. Batching:

i. To increase efficiency of resolution in the event a Mass Action is filed and neither party exercises its right to opt out of arbitration pursuant to Section 2(a)(3)(b) above, the following procedure shall apply. At the request of either party, an arbitrator shall be selected according to the applicable arbitration provider's rules to act as a special master ("Special Master") to resolve threshold disputes regarding the propriety of some or all the arbitration demands submitted in the Mass Action ("Mass Arbitration Demands"). These threshold disputes may include, but are not limited to:

1. Any dispute regarding filing fees owed with respect to the Mass Arbitration Demands, including whether claimants have submitted valid fee waivers;

2. Any dispute regarding whether the applicable arbitration provider has complied with the Arbitration Agreement with respect to processing and administering the Mass Arbitration Demands;

3. Any dispute regarding whether the Mass Arbitration Demands meet the requirements set forth in Section 2(d) below;

4. Whether claimants are barred from proceeding with their claims based on a prior settlement agreement, violation of these Terms, or expiration of the statute of limitations;

5. Any dispute relating to representation of the same claimant by multiple law firms;

UBER-MDL3084-BW-00001053

6. Any dispute regarding whether the Mass Arbitration Demands were filed with the correct arbitration provider;

7. Any dispute regarding discovery common to all claims; and

8. Any disputes regarding legal or factual issues common to all claims.

Any such request shall be made within 15 days following the expiration of the opt-out period described in Section 2(a)(3)(b), and may be made by providing written notice to the arbitration provider. Upon the request of either party to appoint a Special Master to resolve the foregoing issues, the applicable arbitration provider shall refrain from further processing any of the Mass Arbitration Demands to which a dispute has been raised. No further payment for filing fees, administrative costs, or arbitrator fees shall be deemed due with respect to any of the Mass Arbitration Demands as to which a dispute has been raised until after the dispute(s) has/have been resolved by the Special Master. Uber shall be responsible for the applicable arbitration provider's and Special Master's fees and costs related to the proceedings before the Special Master.

A Special Master appointed pursuant to this procedure shall have no authority to consolidate cases.

ii. After proceedings before the Special Master have concluded, to the extent any of the Mass Arbitration Demands are permitted to proceed, the parties shall group the Mass Arbitration Demands into batches of no more than 100 demands per batch by state of residence, and then alphabetically by last name (plus, to the extent there are less than 100 arbitration demands left over after the batching described above, a final batch consisting of the remaining demands), and shall inform the arbitration provider of the batches and their compositions within 14 days of the conclusion of proceedings before the Special Master. The arbitration provider shall treat each batch of claims as one case, with each case having one demand for arbitration, one appointed arbitrator, and one set of administrative documents and administrative and filing fees per batch. The parties shall randomly assign sequential numbers to each batch, and only one batch shall proceed to arbitration at a time in the order of the random sequential numbers. A separate arbitrator will be appointed to, and administrative and filing fees assessed for, each batch as the batch proceeds to arbitration. You agree to cooperate in good faith with Uber and the arbitration provider to implement such a batch approach to resolution and fees. Nothing in this provision shall be construed as limiting the right to object that the filing or presentation of multiple arbitration demands by or with the assistance of the same law firm or organization violates any term of this Agreement.

iii. If any Mass Arbitration Demands were originally processed as individual arbitration demands before this batching procedure was commenced, further proceedings, including the assessment of further arbitration filing or administration fees to either party shall be governed by the procedures set forth in this Section 2(a)(3).

UBER-MDL3084-BW-00001054

(4) <u>Delegation Clause</u>: Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. However, only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable—except that, as stated and pursuant to the procedures provided in Section 2(a)(3)(b), an arbitrator or panel of arbitrators shall have authority to determine whether the party bringing any claim has violated the Mass Action Waiver.

(5) <u>Application to Third Parties</u>: This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third parties, including but not limited to your spouses, heirs, third-party beneficiaries and assigns, where their underlying claims arise out of or relate to your use of the Services. To the extent that any third-party beneficiary to this agreement brings claims against the Parties, those claims shall also be subject to this Arbitration Agreement.

**(b) Exceptions to Arbitration.**

Notwithstanding the foregoing, this Arbitration Agreement shall not require arbitration of the following claims: (i) individual claims brought in small claims court so long as the matter remains in such court and advances only on an individual basis; (ii) individual claims of sexual assault or sexual harassment occurring in connection with your use of the Services; and/or (iii) injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights.

Such claims may be brought and litigated in a court of competent jurisdiction by you on an individual basis only. On an individual basis means that you cannot bring such claims as a class, collective, coordinated, consolidated, mass and/or representative action against Uber. For the avoidance of doubt, this precludes you from bringing claims as or participating in any kind of any class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber and no action brought by you may be consolidated or joined in any fashion with any other proceeding. Where your claims are brought and litigated to completion on such an individual basis in a court of competent jurisdiction, Uber agrees to honor your election.

UBER-MDL3084-BW-00001055

The parties' agreement not to require arbitration in these limited instances does not waive the enforceability of this Arbitration Agreement as to any other provision (including, but not limited to, the waivers provided for in Section 2(a), which will continue to apply in court as well as in arbitration), or the enforceability of this Arbitration Agreement as to any other controversy, claim, or dispute.

**(c) Rules and Governing Law.**

For disputes arising in California, the arbitration will be administered by ADR Services, Inc. ("ADR") in accordance with ADR's Arbitration Rules (the "ADR Rules") in effect at the time that the claim is brought, unless the parties agree otherwise in writing. The ADR Rules are available at www.adrservices.com or by searching for "ADR Arbitration Rules" using a service such as www.google.com or www.bing.com. The arbitration shall be heard by one arbitrator (the "Arbitrator") selected in accordance with the ADR Rules.

For disputes arising outside of California (or for disputes arising in California only if ADR cannot or will not administer the arbitration), the parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in the state in which the dispute arises. Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis as set forth in this Section 2. Once the parties mutually agree upon a neutral arbitration provider, or an arbitrator provider is appointed under 9 U.S.C. § 5, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider, except as designated herein. Once an arbitration provider is agreed upon or appointed, an Arbitrator shall be appointed. The Arbitrator will be either (1) a retired judge or (2) an attorney licensed to practice law in the state where the arbitration is conducted with experience in the law underlying the dispute. The Arbitrator will be selected by the parties from the applicable arbitration provider's roster of arbitrators. If the parties are unable to agree upon an Arbitrator after a good faith meet and confer effort, then the applicable arbitration provider will appoint the Arbitrator in accordance with its rules.

Notwithstanding any choice of law or other provision in these Terms, the parties agree and acknowledge that this Arbitration Agreement evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this Arbitration Agreement, and that the FAA and the applicable arbitration provider's rules shall preempt all state laws to the fullest extent permitted by law. All statutes of limitations that would otherwise be applicable will apply to any arbitration proceeding. If the FAA and applicable

arbitration provider's rules are found to not apply to any issue regarding the interpretation or enforcement of this Arbitration Agreement, then that issue shall be resolved under the laws of the state where you reside when you accept these Terms.

Any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to the Terms, shall be governed by and construed in accordance with the laws of the state in which the incident or accident occurred.

(d) Process.

Pre-Arbitration Dispute Resolution and Notification. The parties agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome. The parties therefore agree that, before either party demands arbitration against the other, we will personally meet and confer, via telephone or videoconference, in a good-faith effort to resolve informally any claim covered by this Arbitration Agreement. Multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference. If you are represented by counsel, your counsel may participate in the conference, but you shall also fully participate in the conference. The party initiating the claim must give notice to the other party in writing of their intent to initiate an informal dispute resolution conference, which shall occur within 60 days after the other party receives such notice, unless an extension is mutually agreed upon by the parties. To notify Uber that you intend to initiate an informal dispute resolution conference, write to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, providing your name, the telephone number(s) associated with your Uber account (if any), the email address(es) associated with your Uber account, and a description of your claim. Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing arbitration, and the Arbitrator shall dismiss any arbitration demand filed before completion of an informal dispute resolution conference. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by this paragraph.

Initiating Arbitration. In order to initiate arbitration following the conclusion of the informal dispute resolution process required by this Section, a party must provide the other party with a written demand for arbitration and file the demand with the applicable arbitration provider, as determined by Section 2(c). A party initiating an arbitration against Uber must send the written demand for arbitration to Uber Technologies, Inc., LLC, Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, or serve the Demand on Uber's registered agent for service of process, c/o Uber Technologies, Inc. (the name and current contact information for the registered agent in each state are available online here). Additionally, a party initiating arbitration against Uber must send an electronic version of the demand for arbitration to the

UBER-MDL3084-BW-00001057

Arbitration Provider, and must send an electronic version of the as-filed demand to filed-arbitration-demands@uber.com.

By signing the demand for arbitration, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that (i) the demand for arbitration is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (ii) the claims and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (iii) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The Arbitrator shall be authorized to afford any relief or impose any sanctions available under Federal Rule of Civil Procedure 11 or any applicable state law for either party's violation of this requirement.

**(e) Location.**

Unless you and Uber otherwise agree, if you reside in the United States, the arbitration will be conducted in the county where you reside. If you do not reside in the United States, the arbitration will be conducted in the county where the dispute arises. Your right to a hearing will be determined by the applicable arbitration provider's rules. Subject to the applicable arbitration provider's rules, the Arbitrator will have the discretion to direct a reasonable exchange of information by the parties, consistent with the expedited nature of the arbitration.

**(f) Offers of Judgment.**

At least 10 days before the date set for the arbitration hearing, any party may serve an offer in writing upon the other party to allow judgment on specified terms. If the offer is accepted, the offer with proof of acceptance shall be submitted to the arbitrator, who shall enter judgment accordingly. If the offer is not accepted prior to the arbitration hearing or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the arbitration. If an offer made by one party is not accepted by the other party, and the other party fails to obtain a more favorable award, the other party shall not recover their post-offer costs and shall pay the offering party's costs from the time of the offer.

**(g) Arbitrator's Decision.**

The Arbitrator will render an award within the time frame specified in the applicable arbitration provider's rules. Judgment on the arbitration award may be entered in any court of competent jurisdiction. The Arbitrator may award declaratory or injunctive relief only in favor of the claimant and only to the extent necessary to provide relief warranted by the claimant's individual claim. An Arbitrator's decision shall be final and binding on all parties.

UBER-MDL3084-BW-00001058

The Arbitrator is not bound by decisions reached in separate arbitrations, and the Arbitrator's decision shall be binding only upon the parties to the arbitration that are the subject of the decision.

The Arbitrator shall award reasonable costs incurred in the arbitration to the prevailing party in accordance with the law(s) of the state in which arbitration is held.

**(h) Fees.**

With the exception of the provisions governing payment of arbitration costs set forth above, your responsibility to pay any filing, administrative, and arbitrator fees will be solely as set forth in the applicable arbitration provider's rules and shall be up to the amount you would be required to pay if you filed a claim in court.

If you have a gross monthly income of less than 300% of the federal poverty guidelines, you are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. If you believe that you meet the requirements to obtain a fee waiver, and your demand for arbitration arises outside of California, then you may request a fee waiver only by submitting to the arbitration provider AO 240, Application to Proceed in District Court Without Prepaying Fees or Costs (found here), or a declaration under oath containing all the information required by AO 240; if your demand for arbitration arises in California, then you must submit a declaration under oath providing your monthly income and the number of persons in your household.

Any and all disputes regarding a party's obligation to pay any arbitration fees or costs that arise after an arbitrator is appointed shall be determined solely by the arbitrator. If such a dispute arises before an arbitrator has been appointed, and if no Special Master has been requested by either party pursuant to Section 2(a)(3)(c)(i) of these Terms, the parties agree that (i) the due date for any disputed fees shall be stayed pending resolution of the parties' dispute, (ii) a panel of three arbitrators shall be appointed to resolve the parties' dispute concerning a party's obligation to pay fees or costs of arbitration, (iii) the panel of arbitrators shall be appointed by each party selecting one arbitrator from the arbitration provider's roster to serve as neutral arbitrators, and these arbitrators shall appoint a third neutral arbitrator. If the parties' arbitrators cannot agree on a third arbitrator, the arbitration administrator will select the third arbitrator, (iv) Uber shall pay any administrative fees or costs incidental to the appointment of a panel of arbitrators under this provision, as well as any fees or costs that would not be incurred in a court proceeding, such as payment of the fees of the arbitrator(s), as well as room rental, and (v) the arbitrator(s) shall issue a written decision with findings of fact and conclusions of law. If two or more fee disputes between a claimant and Uber arise at or around the same time, the disputes may be consolidated for resolution by a single arbitrator or panel of arbitrators either at the agreement of the parties or the election of the party common to all such disputes.

**(i) Severability and Survival.**

UBER-MDL3084-BW-00001059

If any portion of this Arbitration Agreement is found to be unenforceable or unlawful for any reason, (i) the unenforceable or unlawful provision shall be severed from these Terms; (ii) severance of the unenforceable or unlawful provision shall have no impact whatsoever on the remainder of the Arbitration Agreement or the parties' ability to compel arbitration of any remaining claims on an individual basis pursuant to the Arbitration Agreement; and (iii) to the extent that any claims must therefore proceed on a class, collective, consolidated, or representative basis, such claims must be litigated in a civil court of competent jurisdiction and not in arbitration, and the parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

## 3. The Services

The Services enable you and other consumers to find, request, or receive (i) Third-Party Services from third party service providers, including without limitation, merchants, retailers, grocers, restaurants, independent drivers and delivery persons, and autonomous vehicles or autonomous vehicle fleet providers ("Third-Party Providers"); (ii) related personalized content, including features, recommendations and advertisements for products or services tailored to your needs and interests; and (iii) certain supporting services, including providing you the ability to express certain preferences about the Third-Party Services or Third-Party Service Providers, payment processing and customer support. Unless otherwise agreed by Uber in a separate written agreement with you, these Services are made available solely for your personal, noncommercial use.

Once you make a request, Uber notifies Third-Party Providers that an opportunity is available so that the Third-Party Provider may complete your request. It is up to the Third-Party Provider to decide whether or not to offer Third-Party Services to you or at all, and it is up to you to decide whether or not to accept such services from a Third-Party Provider. Please note that once your request for the Services has begun, you may no longer have the option to reschedule or cancel. If Uber is able to reschedule or cancel your request, you may be charged a fee and/or may not be refunded for items that have been purchased on your behalf.

UBER IS NOT A COMMON OR MOTOR CARRIER AND DOES NOT TRANSPORT YOU OR YOUR GOODS. GENERALLY, THE SERVICES ARE ONLY OPEN TO REGISTERED USERS OF THE SERVICES AND NOT TO THE GENERAL PUBLIC. YOUR ABILITY TO REQUEST, AND IF APPLICABLE, OBTAIN THIRD-PARTY SERVICES FROM THIRD-PARTY PROVIDERS IN CONNECTION WITH THE USE OF THE SERVICES DOES NOT ESTABLISH UBER AS A PROVIDER OF ANYTHING OTHER THAN THE SERVICES. INDEPENDENT THIRD-PARTY PROVIDERS ARE NOT ACTUAL AGENTS, APPARENT AGENTS, OSTENSIBLE AGENTS, OR EMPLOYEES OF UBER IN ANY WAY. ANY EFFORT, FEATURE, PROCESS, POLICY, STANDARD OR OTHER EFFORT UNDERTAKEN BY UBER TO FACILITATE YOUR RECEIPT OF THIRD PARTY SERVICES OR IN THE INTEREST OF SAFETY OR SECURITY (WHETHER REQUIRED BY APPLICABLE REGULATIONS OR

UBER-MDL3084-BW-00001060

NOT) IS NOT AN INDICIA OF AN EMPLOYMENT, ACTUAL AGENCY, APPARENT AGENCY, OR OSTENSIBLE AGENCY RELATIONSHIP WITH A THIRD-PARTY PROVIDER.

**Third-Party Services and Content.**

While many Third-Party Services are available in the Uber App, certain Third-Party Services or content are only accessible by exiting the Uber App ("Out-of-App Experiences"). Once you click on a link to access Out-of-App Experiences, you will be subject to the terms and conditions and privacy policy of that website, destination, or Out-of-App Experience provider, which are different from Uber's. Uber will not warn you that you have left the Services or that you are subject to the terms and conditions (including privacy policies) of another website, destination, or Out-of-App Experience provider. You use all links in third-party websites and advertisements at your own risk as these are not part of the Services and are not controlled by Uber. Uber does not endorse such Out-of-App Experience providers and in no event shall Uber be responsible or liable for any products or services of such third-party providers.

Third-Party Services made available to you through the Uber App may be provided by an autonomous vehicle. An autonomous vehicle is a vehicle that is capable of operating at, or is equipped with an automated driving system that will enable the vehicle to operate at SAE Levels 3, 4 or 5 of driving automation as defined in the J3016 April 2021 SAE International specification ("Autonomous Vehicle" or "AV"). Autonomous Vehicles are operated by Third-Party Providers that operate a fleet of one or more AVs and may employ or contract with individuals to manage, monitor, or operate its AVs while such vehicles are in motion (such Third-Party Providers, "Autonomous Vehicle Fleet Providers"). Your access to Third-Party Services provided by AV may be subject to your acceptance of Autonomous Vehicle Fleet Providers' terms.

In the event of a conflict in the terms of any Third-Party Services and these Terms, these Terms shall control with respect to Uber and your agreements with Uber herein, and the limitations of liability set forth in Section 7 shall also apply to the Third-Party Provider. The Arbitration Agreement provisions in Section 2 above shall apply instead of the terms of any Third-Party Services for all purposes except with respect to claims that are solely against the Third-Party Provider.

**App Stores.**

The availability of the Services may be dependent on the third-party from which you received the license to the Uber App, e.g., the Apple iPhone or Android app stores ("App Store"). These Terms are between you and Uber and not with the App Store and Uber is responsible for the provision of Services as described in these Terms. However, if you downloaded the Uber App from the Apple App Store, Apple and its subsidiaries are third-party beneficiaries of these Terms. Upon your acceptance of these Terms, Apple shall have the right (and will be deemed to have accepted the right) to enforce these Terms against you as a third-party beneficiary

thereof. These Terms incorporate by reference Apple's Licensed Application End User License Agreement, for purposes of which, you are the "end-user." In the event of a conflict in the terms of the Licensed Application End User License Agreement and these Terms, these Terms will control.

**Ownership; License; and Restrictions.**

The Services and all rights, title, and interest, including all related intellectual property rights therein are and shall remain Uber's property or the property of Uber's licensors. These Terms are not a sale and do not convey or grant to you any rights in or related to the Services, or any intellectual property rights owned by Uber, except for the limited license granted above.

Subject to your compliance with these Terms, Uber grants you a limited, non-exclusive, non-sublicensable, revocable, non-transferable license to: (i) access and use the Uber App solely in connection with your use of the Services on your personal device; and (ii) access and use any content, information and related materials that may be made available through the Services, in each case solely for your personal, noncommercial use. Any rights not expressly granted herein are reserved by Uber and Uber's licensors. You agree that you will not use Uber's copyrights, trademarks, service marks, or trade dress, aside from use incidental to your use of the Services, without express, written permission from Uber. This prohibition includes use in domain names, websites, and social media accounts. You may not: (i) remove any copyright, trademark or other proprietary notices from any portion of the Services; (ii) reproduce, modify, prepare derivative works based upon, distribute, license, lease, sell, resell, transfer, publicly display, publicly perform, transmit, stream, broadcast or otherwise exploit the Services except as expressly permitted by Uber; (iii) decompile, reverse engineer or disassemble the Services except as may be permitted by applicable law; (iv) link to, mirror or frame any portion of the Services; (v) cause or launch any programs or scripts for the purpose of, or which result in, unduly burdening or hindering the operation and/or functionality of any aspect of the Services; or (vi) attempt to gain unauthorized access to or impair any aspect of the Services or its related systems or networks.

# 4. Accessing the Services

**User Accounts.**

In order to use most aspects of the Services, you must register for and maintain an active personal user Services account ("Account"). You cannot register for or maintain an Account if you have previously been banned from accessing or using the Services. Account registration may require you to submit to Uber certain personal information, such as your name, address, mobile phone number and age, as well as at least one valid payment method that you are authorized to use and is supported by Uber. For more information regarding Uber's use of your personal information, please see our Privacy Notice. You agree to maintain accurate, complete,

and up-to-date information in your Account, including a valid phone number, address and payment method. Except as described below, you must be at least 18 years of age, or the age of legal majority in your jurisdiction (if different than 18), to obtain an Account, unless a specific Service permits otherwise. Unless otherwise permitted by Uber in writing, you may only possess one Account and you may not assign or otherwise transfer your Account to any other person or entity. You are responsible for all activity that occurs under your Account, and you agree to maintain the security and secrecy of your Account credentials at all times.

**Minors.**

Except as described below, the Services are generally not available for use by persons under the age of 18. You may not authorize third-parties to use your Account, and you may not allow persons under the age of 18 to use the Services unless they are accompanied by you or an adult. However, we may offer parents and guardians the ability to create Accounts for their children. If you are a parent or legal guardian, and you allow your child to use the Services, then these Terms apply to you and you are responsible for your child's activity on the Services. If you are under the age to obtain an Account, you must have your parent or legal guardian's permission to use an Account and accept any additional terms required in connection with your access and use of the Services as a minor. Please have your parent or legal guardian read these additional terms with you.

**Network Access and Devices.**

You are responsible for obtaining the data network access necessary to use the Services. Your mobile network's data and messaging rates and fees may apply if you access or use the Services from your device. You are responsible for acquiring and updating compatible hardware or devices necessary to access and use the Services and any updates thereto. Uber does not guarantee that the Services, or any portion thereof, will function on any particular hardware or devices. In addition, the Services may be subject to malfunctions and delays inherent in the use of the Internet and electronic communications. Uber is not responsible for any delays, delivery failures, or damage, loss or injury resulting from such problems.

# 5. User Conduct and Requirements; Communications; and User Content

**User Conduct and Requirements.**

In addition to complying with these Terms, you agree to comply with all applicable laws when accessing or using the Services, and you may only access or use the Services for lawful purposes (e.g., no request for the purpose or intent of transport of unlawful or hazardous materials). You may not access or use the Services to cause nuisance, annoyance, inconvenience, damage, or loss to Uber, the Third-Party Provider, or any other party.

UBER-MDL3084-BW-00001063

If you request a ride option with a child restraint system, neither Uber nor the Third-Party Provider is responsible for the safety of a child restraint system that may be available in the Third-Party Provider's vehicle. It is your obligation to ensure that the child restraint system is installed correctly and that the child is properly secured in the child restraint system. Please refer to your state's laws regarding specific height, age, and weight requirements for using child restraint systems, as well as Uber's policies for child restraint systems, which may be set forth on city-specific web pages. If you request a ride option where a Third-Party Provider agrees to provide you with assistance outside of the vehicle (e.g., Uber Assist), Uber is not responsible for any injury or incident that may arise out of the assistance provided by the Third-Party Provider. In certain instances, you may be asked to provide proof of age, identity or other method of identity verification to access or use the Services, and you agree that you may be denied access to or use of the Services if you refuse to provide proof of age, identity, or other method of identity verification.

Subject to the discretion of a Third-Party Provider, you may be allowed to bring a small animal, such as a dog or cat, on a ride requested through the Services. For such trips, you are responsible for properly securing the animal with a leash, harness, crate / carrier, or through other means. You are also responsible for ensuring that the animal does not cause damage or a mess in the Third-Party Provider's vehicle. You may be subject to a Charge for Repair or Cleaning under Section 6 below for any damage or mess caused by an animal that is transported during a ride requested under your Account. Please note, in accordance with Uber's policies on Service Animals and Assistive Devices, Service Animals are generally permitted to accompany riders without extra charge, regardless of whether it is a Pet Friendly Trip.

For the purpose of assisting us with our compliance and insurance obligations, you agree to notify us within 24 hours and provide us with all reasonable information relating to any incident or accident that occurs during your use of the Services and you agree to cooperate with any investigation and attempted resolution of such incident.

**Communications with Uber.**

By creating an Account, you electronically agree to accept and receive communications from Uber, Third-Party Providers or third parties providing services to Uber including via email, text message, WhatsApp, calls, in-app communications, and push notifications to the telephone number(s) or email addresses you provided to Uber. You may also receive communications generated by automatic telephone dialing systems and/or which will deliver prerecorded messages sent by or on behalf of Uber, and/or Third-Party Providers, including but not limited to communications concerning requests placed through your Account on the Services. Message and data rates may apply. You can learn more about how Uber may contact you by reading our Privacy Notice.

If you do not wish to receive promotional emails, text messages, or other communications from Uber, you may change your notification preferences by accessing Settings in your Account. To opt out of receiving text messages from Uber, you must reply "STOP" from the mobile device receiving the messages. For purposes of clarity, text messages between you and Third-Party Providers are transactional text messages, not promotional text messages. You acknowledge that opting out of receiving all communications may impact your use of the Services. Notwithstanding the foregoing, if we suspect fraud or unlawful activity on your Account, Uber may contact you using any of the contact information you provided in connection with your Account (including via text or voice-recorded message).

**Use of Accounts Owned by Others.**

In the event you use an Uber product or service that enables use of or billing to another person or business, certain information will be shared with that party. This may include information regarding the time and date of services you request, the transportation, logistics and/or delivery requested, and the associated charges for such services. If used to request transportation, we may also share information with such person or business regarding safety-related incidents that occur in connection with such transportation. You acknowledge that such data sharing is a condition of use of any such Uber product or service.

**User Provided Content; Feedback.**

Content that you provide to Uber is governed by Uber's Generated Content Terms, which are incorporated in these Terms by reference. Feedback that you provide to Uber is governed by Uber's Feedback Policy, which are incorporated in these Terms by reference.

# 6. Payment

**Prices & Charges.**

Your use of the Services may result in charges to you for the services or goods you receive from Uber and/or from Third-Party Providers ("Charges"). Prices displayed to you when purchasing goods through the Services may be inclusive of retail prices charged by the Third-Party Provider and fees paid to Uber. Uber will enable your payment of the applicable Charges for services or goods obtained through your use of the Services. Charges will include applicable taxes where required by law. Charges may include other applicable fees such as delivery fees, service fees, product return fees, cancellation fees, government-mandated fees (such as bag fees), estimated or actual tolls, and/or surcharges. Further, Charges applicable in certain geographical areas may increase substantially during times of high demand or due to other marketplace factors.

With respect to Third-Party Providers, Charges you incur will be owed directly to Third-Party Providers, and Uber will collect payment of those charges from you, on the Third-Party

Provider's behalf as their limited payment collection agent, and payment of the Charges shall be considered the same as payment made directly by you to the Third-Party Provider. Payment to a Third-Party Provider of goods or services shall be considered to occur at the moment you submit payment through Uber. You retain the right to request lower Charges from a Third-Party Provider for services or goods received by you from such Third-Party Provider at the time you receive such services or goods. A Third-Party Provider also retains the right to request higher Charges from you for services or goods provided. For example, a Third-Party Provider that is a merchant may collect lower or higher charges where the actual goods provided differ from the products originally requested, including in connection with differences in quantity, weight, or item type. Subject to requests from you to lower such Charges from a Third-Party Provider, you agree to pay such higher or lower Charges associated with such product differences. Uber will consider in good faith any request from a Third-Party Provider to modify the Charges for a particular service or good. This payment structure is intended to fully compensate a Third-Party Provider, if applicable, for the services or goods obtained in connection with your use of the Services.

There also may be certain Charges you incur that will be owed and paid directly to Uber or its affiliates. For the avoidance of doubt, Uber does not charge a fee for you to access the Uber App, but may charge you a fee or any other Charge for accessing Third-Party Services. Even if not indicated in the Uber App, the prices for product or menu items displayed through the Services may differ from the prices offered or published by Third-Party Providers for the same product or menu items, including as may be offered or published at a physical location operated by a Third-Party Provider, and/or from prices available at other third-party websites/mobile applications. Prices for product or menu items displayed through the Services may not be the lowest prices at which the product or menu items are sold. The product or menu item prices displayed through the Services or fees charged by and paid to Uber may vary based on whether you choose to pick up your order or have it delivered.

All Charges and payments will be enabled by Uber using the preferred payment method designated in your Account, after which you will receive a receipt. If your primary Account payment method is determined to be expired, invalid or otherwise not able to be charged, you agree that Uber may use another available payment method in your Account.

As between you and Uber, Uber reserves the right to establish or adjust Charges for any or all services or goods obtained through the use of the Services at any time. Uber will use reasonable efforts to inform you of Charges that may apply, provided that you will be responsible for Charges incurred under your Account regardless of your awareness of such Charges or the amounts thereof.

**Refunds.**

UBER-MDL3084-BW-00001066

Charges paid by you are final and non-refundable, unless otherwise determined by Uber and the Third-Party Provider assessing the Charge. If you have any requests for cancellations, refunds, or returns, or if you think a correction should be made to any Charge you incurred, please visit the "Help" tab in your Account to initiate such requests within 30 days after the Charge took place or Uber will have no further responsibility and you waive your right to later dispute the amounts charged.

**Promotional Offers.**

Certain users may, from time to time, receive promotional offers and discounts that result in different amounts charged for the same or similar services or goods obtained through the use of the Services, and you agree that such promotional offers and discounts, unless also made available to you, shall have no bearing on your use of the Services or the Charges applied to you. Promotional offers and discounts are subject to change or withdrawal at any time and without notice.

**Gratuity.**

Except for amounts provided by you through the Services as part of the "tip" feature, Uber does not designate any portion of your payment as a tip or gratuity to a Third-Party Provider. You understand and agree that, while you are free to provide additional payment as a gratuity to any Third-Party Provider who provides you with services or goods obtained through the Service, you are under no obligation to do so.

**Damage, Cleaning, Lost and Found, and Charges for Violation of Terms.**

Uber may charge you a fee on behalf of Third-Party Providers if, during your use of the Services, you have caused damage to a vehicle or property that requires repair or cleaning ("Repair" or "Cleaning"). The amount of such fee shall be determined, in Uber's sole discretion, based on the type of damage and the severity. Uber reserves the right to verify or otherwise require documentation of damages prior to processing a fee. In the event that a Repair or Cleaning request is verified by Uber in Uber's reasonable discretion, Uber reserves the right to facilitate payment for the reasonable cost of such Repair or Cleaning using your payment method designated in your Account. Such amounts, as well as those pertaining to lost and found goods, will be transferred by Uber to a Third-Party Provider, if applicable, and are non-refundable. Additionally, if you fail to comply with these Terms, you may be responsible for Charges, including without limitation, for transactions that could not be completed properly, arising out of or in connection with your failure to comply with these Terms.

# 7. Disclaimers; Limitation of Liability; and Indemnity.

**Disclaimers.**

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.

UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD-PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD REQUESTED OR OBTAINED FROM THIRD-PARTY PROVIDERS IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

UBER DOES NOT CONTROL, MANAGE OR DIRECT ANY THIRD-PARTY PROVIDERS. THIRD-PARTY PROVIDERS ARE NOT ACTUAL AGENTS, APPARENT AGENTS, OSTENSIBLE AGENTS, OR EMPLOYEES OF UBER. IF A DISPUTE ARISES BETWEEN YOU AND OR ANY OTHER THIRD PARTY, YOU RELEASE UBER FROM LOSSES OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES.

UBER DOES NOT CONTROL, ENDORSE OR TAKE RESPONSIBILITY FOR ANY USER CONTENT OR THIRD-PARTY CONTENT AVAILABLE ON OR LINKED TO BY THE SERVICES. UBER CANNOT AND DOES NOT REPRESENT OR WARRANT THAT THE SERVICES ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

UBER'S USE OF ALGORITHMS IN AN ATTEMPT TO PROVIDE SERVICES OR IMPROVE THE EXPERIENCE OF USERS AND THE SECURITY AND SAFETY OF THE SERVICES DOES NOT CONSTITUTE A GUARANTEE OR WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED.

**Limitation of Liability.**

UBER SHALL NOT BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOST DATA, PERSONAL INJURY, OR PROPERTY DAMAGE RELATED TO, IN CONNECTION WITH, OR OTHERWISE RESULTING FROM ANY USE OF THE SERVICES, REGARDLESS OF THE NEGLIGENCE (EITHER ACTIVE, AFFIRMATIVE, SOLE, OR CONCURRENT) OF UBER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF: (i) YOUR USE OF OR RELIANCE ON THE SERVICES OR YOUR INABILITY TO ACCESS OR USE THE SERVICES; OR (ii) ANY TRANSACTION OR RELATIONSHIP BETWEEN YOU AND ANY THIRD-

PARTY PROVIDER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR DELAY OR FAILURE IN PERFORMANCE RESULTING FROM CAUSES BEYOND UBER'S REASONABLE CONTROL. YOU ACKNOWLEDGE THAT THIRD-PARTY PROVIDERS PROVIDING TRANSPORTATION SERVICES REQUESTED THROUGH SOME UBER SERVICES MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTATION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. YOU ACKNOWLEDGE THAT THIRD-PARTY PROVIDERS ARE NOT OSTENSIBLE AGENTS, APPARENT AGENTS, ACTUAL AGENTS, OR EMPLOYEES OF UBER.

THE SERVICES MAY BE USED BY YOU TO REQUEST AND SCHEDULE TRANSPORTATION, GOODS, OR LOGISTICS SERVICES WITH THIRD-PARTY PROVIDERS, BUT YOU AGREE THAT UBER HAS NO RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY TRANSPORTATION, GOODS OR LOGISTICS SERVICES PROVIDED TO OR NOT PROVIDED TO YOU BY THIRD-PARTY PROVIDERS OTHER THAN AS EXPRESSLY SET FORTH IN THESE TERMS.

UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF LACK OF OR IMPROPER INSTALLATION OR USE OF CHILD RESTRAINT SYSTEMS FOR GUESTS ON RIDES REQUESTED THROUGH THE SERVICES FOR WHOM A CHILD RESTRAINT SYSTEM IS LEGALLY REQUIRED.

THE LIMITATIONS AND DISCLAIMERS IN THIS SECTION DO NOT PURPORT TO LIMIT LIABILITY OR ALTER YOUR RIGHTS AS A CONSUMER THAT CANNOT BE EXCLUDED UNDER APPLICABLE LAW. BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, UBER'S LIABILITY SHALL BE LIMITED TO THE EXTENT PERMITTED BY LAW. THIS PROVISION SHALL HAVE NO EFFECT ON UBER'S CHOICE OF LAW PROVISION SET FORTH BELOW.

### Indemnity.

You agree to indemnify and hold Uber and its affiliates and their officers, directors, employees, and agents harmless from and against any and all actions, claims, demands, losses, liabilities, costs, damages, and expenses (including attorneys' fees), arising out of or in connection with: (i) your use of the Services or services or goods obtained through your use of the Services; (ii) your breach or violation of any of these Terms; (iii) Uber's use of your User Content; or (iv) your violation of the rights of any third party, including Third-Party Providers.

## 8. Other Provisions

### Choice of Law.

These Terms shall be governed by and construed in accordance with the laws of the state in which your dispute arises, without regard to the choice or conflict of law principles of any

jurisdiction, except as may be otherwise provided in the Arbitration Agreement in Section 2 above or in Supplemental Terms applicable to your region. This Choice of Law provision applies only to the interpretation of these Terms, and these provisions shall not be interpreted as generally extending any state's law to you if your dispute did not arise in that state.

Any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to these Terms, shall be governed by and construed in accordance with the laws of the state in which the incident or accident occurred.

**Choice of Forum.**

Any dispute, claim or controversy arising out of or relating to these Terms or the existence, breach, termination, enforcement, interpretation or validity thereof, shall be brought exclusively in the state and federal courts of the state in which the dispute, claim or controversy arose, notwithstanding that other courts may have jurisdiction over the parties and subject matter, except as may be otherwise provided by the Arbitration Agreement above or in Supplemental Terms applicable to your region.

Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to these Terms, shall be brought exclusively in the state or federal courts in the state in which the incident or accident occurred, notwithstanding that other courts may have jurisdiction over the parties and subject matter, and except as may be otherwise provided in the Arbitration Agreement in Section 2 or in Supplemental Terms applicable to your region, to the extent permitted by law.

The foregoing Choice of Law and Choice of Forum provisions do not apply to the Arbitration Agreement in Section 2, and we refer you to Section 2 for the applicable provisions for such disputes.

**Claims of Copyright Infringement.**

Claims of copyright infringement should be sent to Uber's designated agent. Please see Uber's Copyright Policy for the designated address and additional information.

**Notice.**

Uber may give notice by means of a general notice on or through the Services, electronic mail to the email address associated with your Account, telephone or text message to any phone number provided in connection with your Account, or by written communication sent by first class mail or pre-paid post to any address connected with your Account. Such notice shall be

UBER-MDL3084-BW-00001070

deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or at the time of sending (if sent by email, telephone, or on or through the Services). Notwithstanding the foregoing, notice of any modifications to these Terms shall be effective upon posting an updated version of these Terms on Uber's website or through the Services. You may give notice to Uber, with such notice deemed given when received by Uber, at any time by first class mail or pre-paid post to our registered agent for service of process, c/o Uber Technologies, Inc. The name and current contact information for the registered agent in each state are available online at https://www.wolterskluwer.com/en/solutions/ct-corporation/sop-locations. If another provision of these Terms addresses any specific notice (for example, notice of updates to these Terms, or notice of a dispute or arbitration demand), those specific notice provisions shall prevail to the extent there is any conflict or inconsistency between those provisions and this notice provision.

**General.**

You may not assign these Terms without Uber's prior written approval. Uber may assign these Terms without your consent to: (i) a subsidiary or affiliate; (ii) an acquirer of Uber's equity, business or assets; or (iii) a successor by merger. Any purported assignment by you in violation of this Section shall be void. No joint venture, partnership, employment, or agency relationship exists between you, Uber, any Third-Party Provider, or any Out-of-App Experience Provider as a result of these Terms or use of the Services. If any provision of these Terms is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced to the fullest extent under law. Uber's failure to enforce any right or provision in these Terms shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing. This provision shall not affect the Severability and Survivability section of the Arbitration Agreement of these Terms.

# Return to Legal Hub→

Uber

Visit Help Center

UBER-MDL3084-BW-00001071

Do not sell or share my personal information

Google Data Policy

## Company

About us

Our offerings

Newsroom

Investors

Blog

Careers

AI

Gift cards

## Products

Ride

Drive

Deliver

Eat

Uber for Business

Uber Freight

## Global citizenship

Safety

Diversity and Inclusion

## Travel

CONFIDENTIAL

Airports

Cities

English

San Francisco Bay Area

© 2023 Uber Technologies Inc.

Privacy                    Accessibility                    Terms

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-----------------------------------------

IN RE: UBER TECHNOLOGIES, INC.,

PASSENGER SEXUAL ASSAULT LITIGATION

Case no. 3:23-md-03084-CRB

-----------------------------------------

\*\*\* HIGHLY CONFIDENTIAL \*\*\*

VIDEOTAPED DEPOSITION

OF

HANNAH NILLES

Wednesday, July 23, 2025

9:13 a.m.

Hannah Nilles    Highly Confidential
July 23, 2025

```
 1

 2

 3                              DATE:  July 23, 2025

 4                              TIME:  9:13 a.m.

 5

 6

 7

 8         VIDEOTAPED DEPOSITION of HANNAH

 9    NILLES, held at the offices of Greenberg

10    Traurig, LLP, One North Lexington Avenue, White

11    Plains, New York 10601, before Roberta Caiola,

12    a Shorthand Reporter and Notary Public of the

13    State of New York.

14

15

16

17

18

19

20

21

22

23

24

25
```

Hannah Nilles  Highly Confidential
July 23, 2025

```
 1   A P P E A R A N C E S:

 2

 3   Appearing on Behalf of MDL Plaintiffs:

 4   ANAPOL WEISS
          14 Ridge Square, NW, 3rd Floor
 5        Washington, DC 20016
          (771) 224-8065
 6   BY:  ALEXANDRIA WALSH, ESQ.
          awalsh@anapolweiss.com
 7        JOHN COOPER
          jcooper@anapolweiss.com
 8        SYLVESTER REDE
          srede@anapolweiss.com
 9        RAQUEL RONERO
          (via videoconferencing)
10        WILLIAM SMITH, ESQ.
          (via videoconferencing)
11

12   CHAFFIN LUHANA, LLP
          615 Iron City Drive
13        Pittsburgh, Pennsylvania 15205
          (888) 480-1123
14   BY:  BETH WILKINS, ESQ.
          wilkins@chaffinluhana.com
15        (via videoconferencing)
          MICHAEL SWEET, ESQ.
16        (via videoconferencing)

17

     CHAFFIN LUHANA, LLP
18        600 3rd Avenue, 12th floor
          New York, New York 10016
19   BY:  ROOPAL LUHANA, ESQ.
          (via videoconferencing)
20

21   HAUSFELD LLP
          One Marina Park Drive, #1410
22        Boston, Massachusetts 02210
          (617) 207-0600
23   BY:  STEVEN ROTMAN, ESQ.
          srotman@hausfeld.com
24        (via videoconferencing)

25
```

```
 1   A P P E A R A N C E S:

 2

 3   Appearing on Behalf of Uber Defendants
     and the Witness:
 4
     KIRKLAND & ELLIS LLP
 5       333 West Wolf Point Plaza
         Chicago, Illinois 60654
 6       (312) 862-2000
     BY:  MARK PREMO-HOPKINS, ESQ.
 7       mark.premohopkins@kirkland.com

 8

 9   ALSO PRESENT:

10   JOANNE MOON, Uber Technologies
     joanne.moon@uber.com
11
     JOSE RIVERA, Videographer
12
     REBECCA BARNHOLTZ, Legal Assistant
13   Anapol Weiss

14   DIANNE INT-HOUT, Trial Tech
     (via videoconferencing)
15

16

17

18

19

20

21

22

23

24

25
```

Hannah Nilles  Highly Confidential
July 23, 2025

```
 1    making a trip higher risk, right?

 2         A.    Yes.

 3         Q.    Okay.  It then goes on, moving

 4    forward under driver -- risk profile of the

 5    driver, it says:  What can we do to detect and

 6    action against, for example, deactivation,

 7    drivers who we believe are higher risk of

 8    getting into one of these incidents?

 9               Do you see that?

10         A.    Yes, I see that.

11         Q.    It talks about "Example Dig Areas."

12               Do you see that?

13         A.    Yes.

14         Q.    Do you understand what "Example Dig

15    Areas" means?

16               MR. PREMO-HOPKINS:  Object to form.

17         A.    I've never heard that term.

18               MR. PREMO-HOPKINS:  Scope.

19         Q.    Okay.  Under "Non Standard-Related

20    Work," do you see where it says:  "Cancellation

21    rate by gender"?

22         A.    I see that.

23         Q.    Is Uber -- Uber has identified as a

24    risk factor, when it comes to drivers, the rate

25    at which a driver cancels rides based on the
```

Hannah Nilles  Highly Confidential
July 23, 2025

1   gender of the rider?

2          MR. PREMO-HOPKINS:  Object to form.

3      Scope.

4      A.    Well, we don't collect rider gender.

5      Q.    You infer rider gender, though,

6   right?

7      A.    Sometimes, and with varying levels

8   of accuracy.

9      Q.    Okay.  You've done -- Uber's done a

10  lot of work at figuring out how to accurately

11  infer gender, correct?

12         MR. PREMO-HOPKINS:  Object to form.

13     A.    I don't know if I would say a lot of

14  work, but we have done some work.

15     Q.    Okay.  We'll look at some documents

16  about that later.

17     A.    Okay.

18     Q.    Uber has looked at whether a driver

19  who has repeatedly canceled rides upon learning

20  that the -- that the rider is -- is a male

21  rather than a woman, has looked at whether

22  that's a predictor of a driver committing

23  sexual assault, right?

24         MR. PREMO-HOPKINS:  Object to form.

25     A.    I believe someone in the

Hannah Nilles  Highly Confidential
July 23, 2025

```
 1    United States and Canada team years ago might

 2    have looked into that.

 3        Q.    So you're familiar with that?

 4        A.    I think so.

 5        Q.    If you, as the head of safety in the

 6    U.S., were aware that there were a group of

 7    male drivers who repeatedly cancel rides after

 8    seeing that the rider they've been sent to pick

 9    up is a male, would that, if you see a pattern

10    of that happening, would that give you concern

11    about the risk profile of those drivers?

12              MR. PREMO-HOPKINS:  Object to form.

13        A.    I don't think you could ever know

14    whether or not a driver was canceling

15    specifically because somebody was a male.

16        Q.    Okay.  Even if Uber -- others in

17    Uber have collected that information, though,

18    right?

19              MR. PREMO-HOPKINS:  Object to form.

20        A.    I think unless you were inside the

21    mind of the driver, you could never know that.

22        Q.    So my question's a little bit

23    different.  It's not about what was inside the

24    mind of the driver.

25              But Uber collects information about
```

Hannah Nilles  Highly Confidential
July 23, 2025

1      Q.    Okay.  And it -- what's being

2    described in this particular slide, using this

3    ratings criterion and this tenure criterion,

4    this has not been done for any other group of

5    Uber riders, correct, this effort to identify

6    what will hopefully be a safer cohort of

7    riders?

8      A.    We have additional --

9      Q.    Wait.

10          Strike that.

11          I need to -- just let me finish -- I

12    messed up the question, so let me ask it again.

13          What's being described in this

14    particular slide using this ratings criterion

15    and the tenure criterion, this has not been

16    done for any other group of Uber riders, this

17    effort to create a hopefully safer cohort of

18    drivers?

19      A.    I believe we have additional ratings

20    and tenure criteria for delivery trips that

21    include alcohol and Connect trips.

22      Q.    Okay.  So those are for different

23    types of -- of Uber products, right?

24      A.    Yes.

25      Q.    But what about for other groups of

Hannah Nilles  Highly Confidential
July 23, 2025

 1    Uber riders, like, for example, women traveling

 2    late at night?

 3              MR. PREMO-HOPKINS:  Object to form.

 4         A.    Well, as I said, we don't collect

 5    gender, so we wouldn't know or be able to apply

 6    those criteria in a consistent way.

 7         Q.    What about people traveling late at

 8    night?

 9         A.    For people traveling late at night,

10    we have safety preferences that can be

11    automated to turn on late at night or near

12    bars, as we were talking about, and things like

13    that.

14         Q.    I'm asking about this in particular,

15    what's being done here.  This Uber making an

16    effort itself to identify this safer cohort of

17    drivers for people who are ordering rides in

18    that situation.

19         A.    We have not implemented these exact

20    criteria for other cohorts of people.

21         Q.    Has Uber shared this information

22    about how ratings and tenure correlate to the

23    interpersonal conflict incident rate?  Has this

24    been shared with the public?

25              MR. PREMO-HOPKINS:  Object to form.

Hannah Nilles  Highly Confidential
July 23, 2025

```
1         A.    Not to my knowledge.

2         Q.    And what it says here is:

3    "64 percent of drivers in the U.S. would be

4    eligible - corresponds to 77 percent of trips."

5              Right?

6         A.    That's what it says.

7         Q.    So according to this document,

8    36 percent of drivers in the U.S. would not be

9    eligible to drive for UberTeen, correct?

10        A.    Correct.

11        Q.    But they're eligible to drive any

12   other rider who might order an Uber ride,

13   right?

14        A.    They would be eligible if they

15   haven't met the threshold for deactivation

16   policies or any of other our safety flags.

17        Q.    Okay.  You don't let -- strike that.

18              I understand that these additional

19   screening criteria are -- would not be applied,

20   correct?

21        A.    What?

22        Q.    I understand that they would be

23   eligible if they haven't been deactivated or --

24   why else would they not be eligible?

25        A.    I'm getting confused on your
```

Hannah Nilles   Highly Confidential
July 23, 2025

```
 1                    CERTIFICATE

 2

 3   STATE OF NEW YORK  )

 4                      : ss

 5   COUNTY OF BRONX    )

 6

 7           I, ROBERTA CAIOLA, a Certified

 8   Shorthand Reporter, do hereby certify:

 9           That HANNAH NILLES, the witness

10   whose deposition is hereinbefore set forth, was

11   duly sworn by me and that such deposition is a

12   true record of the testimony given by the

13   witness.

14           I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19   set my hand on July 24, 2025.

20

21

22                    ROBERTA CAIOLA

23

24

25
```

# EXHIBIT 6

## EXHIBIT FILED UNDER SEAL

# EXHIBIT 7

   

COMMENTARY **The Constitution**



# Uber's New "Women Preferences" Program Violates Civil Rights Law

**Aug 8, 2025**   4 min read

*Commentary By*



**Hans A. von Spakovsky**
@HvonSpakovsky

Election Law Reform Initiative
Manager, Senior Legal Fellow



**Sarah Parshall Perry**

Former Senior Legal Fellow, Meese
Center



Recently, Uber announced that in the interests of making its "platform better for women," it is implementing a "Women Preferences" pilot program.

d3sign / Getty Images

**KEY TAKEAWAYS**

1

For Uber, it's time to get either new lawyers or new executives, because its new "Women Preferences" policy is obvious sex discrimination that violates the law.

We use cookies on our website. By using our website, you consent to cookies. **Learn More** .   GOT IT   ✕

1   executives, because its new "Women Preferences" policy is obvious sex discrimination that violates the law.

2   California-based businesses that serve the public must treat everyone equally—regardless of their race, religion, sex, or disability.

3   Uber's conduct in "global markets like Saudi Arabia" is blatantly illegal in the United States, regardless of whether it's "well received" or not.

For Uber, it's time to get either new lawyers or new executives, because its new "Women Preferences" policy is obvious sex discrimination that violates the law. If we owned stock in the company, we'd sell it to avoid a loss from the big-dollar lawsuits that are sure to ensue for this ham-fisted "equity" scheme.

Recently, Uber announced that in the interests of making its "platform better for women," it is implementing a "Women Preferences" pilot program that will give women riders "more ways to choose rides with women drivers" and women drivers the option "to request trips with women riders, including during peak earning hours like evenings." In other words, Uber will be empowering its drivers to ignore, that is, discriminate against, male riders. Kind of reminds one of a time when taxi drivers all too often sped up and drove past black residents trying to hail them for a ride. Now, such conduct is prohibited by law.

The only difference between the racist taxi drivers of old and the sexist Uber drivers of new is that the digital "drive-by" discrimination is based on sex instead of race. But both are prohibited under the law.

Uber's announcement claims this new policy is "designed to give women riders and drivers more choice, more confidence, and more flexibility." However, "more choice, more confidence, and more flexibility" does not provide a company with a license to violate state and federal anti-discrimination laws.

>>> **EVENT: Introducing the Third Edition of "The Heritage Guide to the Constitution"**

Uber also brags in its announcement that it started this program in, of all places, Saudi Arabia. You know, one of the world's most discriminatory countries, where women are treated as second-class citizens.

We use cookies on our website. By using our website, you consent to cookies. Learn More .    GOT IT

Uber also brags in its announcement that it started this program in, of all places, Saudi Arabia. You know, one of the world's most discriminatory countries, where women are treated as second-class citizens.

Yes, you read that right. Uber started its "Women Preferences" pilot program in the unenlightened Middle Eastern nation only after Saudi Arabia finally *gave women the right to drive in 2019*. That's a remarkable delay, given that the first woman to be issued a driver's license in the District of Columbia (Anne Rainsford French) received it in 1900. But what more would one expect from a nation that didn't grant women the right to vote for the first time until 2015?

Uber's lawyers seem to need a refresher on the law.

As a company incorporated in California, Uber is subject to the state's Unruh Civil Rights Act, which prohibits discrimination by all business establishments open to the public in California. Among others, it applies to hotels, restaurants, stores, theaters, taxis, and yes, rideshare companies like Uber and Lyft. California-based businesses that serve the public must treat everyone equally—regardless of their race, religion, sex, or disability, among other protected characteristics.

What's more, federal law—the Civil Rights Act of 1964—prohibits discrimination in public accommodations as well. And while sex is not a protected category under Title II of the Civil Rights Act (like race is), Title VII of that same Act prohibits sex discrimination and harassment in employment contexts. That means that male Uber drivers who are not provided with the same sex-selective rider options as their female colleagues may have a claim for discriminatory treatment under that federal law, as well.

This isn't the first time that the rideshare company has been accused of violating civil rights law. In 2017, Uber agreed to pay out $4.4 million in fees to settle a class-action lawsuit charging that the company had failed to adequately address sexual harassment by its drivers against female passengers. The same year, Uber software engineer Susan Fowler wrote a blog post that went viral in which she accused the Silicon Valley-based company of sex discrimination and harassment — both violations of Title VII.

**>>> Partisans Miss the Point by Debating the Unitary Executive: Congress Is the Problem and the Solution**

And in 2021, the U.S. Department of Justice sued Uber, alleging that the company had violated the Americans with Disabilities Act by charging wait time fees to riders with disabilities who took longer to get in Uber vehicles. Uber eventually agreed to settle the lawsuit, and paid millions in compensation to affected riders.

Uber's new policy also allows riders to "select the 'Women Drivers' option when requesting a ride."

We use cookies on our website. By using our website, you consent to cookies. Learn More .

GOT IT

riders with disabilities who took longer to get in Uber vehicles. Uber eventually agreed to settle the lawsuit, and paid millions in compensation to affected riders.

Uber's new policy also allows riders to "select the 'Women Drivers' option when requesting a ride."

If you want to avoid a taxi, bus, train, or airplane because you don't like the race or sex of the driver or pilot, you can do that. While that might evidence questionable moral beliefs, it doesn't violate state or federal law—after all, consumers exercise preference in the market all the time. But the private companies and local governments who own those taxis, buses, trains, and airplanes cannot engage in the same type of discriminatory "preferencing."

Uber is rolling out this program in Los Angeles, San Francisco, and Detroit, and says it is doing so "after extensive testing and feedback from global markets like Saudi Arabia, Germany, and France, where women-only options have been well received."

Uber's conduct in "global markets like Saudi Arabia" is blatantly illegal in the United States, regardless of whether it's "well received" or not.

*This piece originally appeared in The Daily Wire*

## Heritage Offers



### Activate Your 2025 Membership

By activating your membership you'll become part of a committed group of fellow patriots who stand for America's Founding principles.



### The Heritage Guide To The Constitution

Receive a clause-by-clause analysis of the Constitution with input from more than 100 scholars and legal experts.



### American Founders

In this FREE, extensive eBook, you will learn about how our Founders used intellect, prudence, and courage to create the greatest nation in the world.

More on This Issue

We use cookies on our website. By using our website, you consent to cookies. **Learn More** .    GOT IT    ✕



### Activate Your 2025 Membership

By activating your membership you'll become part of a committed group of fellow patriots who stand for America's Founding principles.



### The Heritage Guide To The Constitution

Receive a clause-by-clause analysis of the Constitution with input from more than 100 scholars and legal experts.



### American Founders

In this FREE, extensive eBook, you will learn about how our Founders used intellect, prudence, and courage to create the greatest nation in the world.



More on This Issue

# The Constitution →

COMMENTARY   3 min read

Reagan's Originalist Revolution Changed the Supreme Court Forever

COMMENTARY   3 min read

How "Originalism" Became the Prevailing View at the U.S. Supreme Court

COMMENTARY   4 min read

Trump Has Constitutional Authority To Battle D.C. Crime

About Heritage
Events
Press
Renew
Contact

## Subscribe to email updates

Enter email address    Subscribe

Privacy Policy   Text Messaging Terms   Copyright © 2025, The Heritage Foundation

We use cookies on our website. By using our website, you consent to cookies. Learn More .   GOT IT

# EXHIBIT 8

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    IN RE: UBER TECHNOLOGIES, INC.,    |

     PASSENGER SEXUAL ASSAULT           |Case No.

6    LITIGATION,                        |3:23-md-03084-CRB

     _____|

7                                       |

     This Document Relates to:          |

8    Jaylynn Dean v. Uber Technologies,|

     Inc., et al., 3:23-cv-06708        |

9    _____|

10

11

12

13

14

15       VIDEOTAPED DEPOSITION OF JAYLYNN DEAN

16         TAKEN ON BEHALF OF THE DEFENDANTS

17     ON JUNE 27, 2025, BEGINNING AT 9:21 A.M. CST

18                IN TULSA, OKLAHOMA

19

20

21

22

23

24    VIDEOTAPED BY:  Lauren Kinnebrew

25    REPORTED BY:  D. Luke Epps, CSR, RPR

      Job No. CS7360417

```
                                                    Page 2

 1                      APPEARANCES
 2     On behalf of the PLAINTIFF:
 3     Rachel Abrams, Esq.
       PEIFFER WOLF CARR KANE CONWAY & WISE
 4     555 Montgomery Street, Suite 820
       San Francisco, California 94111
 5     (415) 766-3545
       rabrams@peifferwolf.com
 6
       Ms. Tiffany Ellis, Esq. (Via Zoom)
 7     PEIFFER WOLF CARR KANE CONWAY & WISE
       15 East Baltimore Avenue
 8     Detroit, Michigan 48202
       (313) 572-4727
 9     tellis@peifferwolf.com
10     Ms. Cristine Farah, Esq. (Via Zoom)
       PEIFFER WOLF CARR KANE CONWAY & WISE
11     935 Gravier Street, Suite 1600
       New Orleans, Louisiana 70112
12     (504) 523-2434
       cfarah@peifferwolf.com
13
14
15     On behalf of the DEFENDANTS:
16     Ms. Tara Blake, Esq.
       KIRKLAND & ELLIS
17     609 Main Street
       Houston, Texas, 77002
18     (713) 836-3600
       tara.blake@kirkland.com
19
       Ms. Anitra Clement, Esq. (Via Zoom)
20     SHOOK, HARDY & BACON
       100 North Tampa Street, Suite 2900
21     Tampa, Florida 33602
       (813) 202-7100
22     aclement@shb.com
23
24
25     ALSO PRESENT:  Shivani Kavuluru (Via Zoom)
```

1    on me on my birthday, it was, like, I don't know, I

2    kind of felt done at that point until we got back

3    together, but we weren't broken up.  It was just we

4    weren't really talking and things just weren't the

5    same.

6         Q    You were living with him at the time?

7         A    No.  I was with my grandparents at the

8    time in '23, in July.

9         Q    Okay.  My understanding is from earlier

10   that he cheated on you in July of 2022?

11        A    And '23.

12        Q    He cheated on you on your birthday both

13   years?

14        A    Yes.

15        Q    And so when he cheated on you the second

16   time or you indicated multiple, but that time on

17   your birthday, you stopped talking for a period of

18   time?

19        A    Yeah.  We hadn't really officially broken

20   up, but we weren't -- like I said, things just

21   weren't the same, and we didn't really, you know,

22   say we're going to stop talking, but we didn't talk

23   at that time.

24        Q    How long did you not talk?

25        A    I don't remember.  It was, like, a week,

Page 175

1    week or so.

2         Q    Okay.  And that's when you got on the

3    dating app?

4         A    Yes.

5         Q    And what dating apps did you get on?

6              MS. ABRAMS:  Object to form.

7         Q    (BY MS. BLAKE)  Strike that.  Did you get

8    on more than one dating app?

9         A    No.

10        Q    Which dating app did you get on?

11        A    Tinder.

12        Q    And did you meet anyone when you signed up

13   on Tinder during that July 2023 period?

14        A    No.

15             MS. ABRAMS:  Give me two seconds.

16             THE WITNESS:  Okay.

17        Q    (BY MS. ABRAMS)  So when you got to

18   Arizona for your Mesa Airlines training, did you get

19   on any dating apps?

20        A    Yes.

21        Q    That was Tinder?

22        A    Yes.

23        Q    Did you get on any others?

24        A    Yes.

25        Q    What others?

Page 176

1        A    Bumble and Hinge.

2        Q    Okay.  And which one did you meet Scott

3    McLaughlin on?

4        A    Bumble.

5        Q    Okay.  Did you meet anyone else on either

6    Tinder, Bumble, or Hinge while you were in Arizona?

7             MS. ABRAMS:  Object to form.

8             THE WITNESS:  I had met up with a few

9    people, but none of them were sexual.

10        Q    (BY MS. BLAKE)  How many different people

11    did you meet up with during your time in Arizona

12    from Tinder, Bumble, or Hinge, if you can recall?

13        A    It was, like, three, I think, including

14    Scott.

15        Q    And the other two were not sexual?

16        A    No.

17        Q    Did you -- strike that.  How often did you

18    see the other two individuals?

19        A    Just once.

20        Q    Just once each?

21        A    (Witness nods head.)

22        Q    Okay.  Did you meet them somewhere?

23        A    Yeah.

24        Q    Okay.  Did you meet those individuals

25    before or after you met Scott?

Page 177

1          A     Before.

2          Q     Before.  Okay.  Do you recall about when

3     you first -- is it called matched, matched with

4     Scott McLaughlin?

5          A     It was pretty -- pretty early in the

6     training.

7          Q     Okay.  And tell me about your relationship

8     with Scott McLaughlin.

9          A     We had matched, and he was constantly

10    asking me if I wanted to hang out or come over, but

11    I was so busy with training and stuff, we never

12    really did.  We only hung out a couple of times, but

13    one night he was, like, "Just come over," and I did,

14    but, yeah, it was very casual.

15         Q     Okay.  So how -- can you estimate how many

16    times during your stay in Arizona did you physically

17    see Scott McLaughlin?

18         A     Three.

19         Q     So three times.  Do you recall the first

20    time, about?

21         A     Yes.

22         Q     And when was that approximately?

23         A     I don't remember the day, but, like I

24    said, it was pretty early --

25         Q     Okay.

Page 178

1      A    -- in the training.

2      Q    And did you have a sexual relationship

3    with Scott?

4      A    Yes.

5      Q    Okay.  And did -- strike that.  When did

6    the sexual relationship first start?

7      A    I don't know if it was the first or second

8    time we hung out, but, yeah.

9      Q    And when you saw him three times, were

10   those three times all at the same location?

11     A    Yes.

12     Q    Which was where?

13     A    His apartment.

14     Q    Did he live by himself or have a roommate?

15     A    He lived by himself.

16     Q    Okay.  So we'll get to the night that's

17   the subject of this lawsuit, but the two prior times

18   you saw him both were at his apartment?

19     A    Uh-huh.

20     Q    And to the best of your recollection, you

21   can't recall if it was the first or second time when

22   you started the sexual relationship with him?

23     A    Yeah.

24          MS. ABRAMS:  Object to form.

25     Q    (BY MS. BLAKE)  Apart from Ryan, was this

Page 188

1    and Waymos more?

2         A    Waymo you didn't have a driver.  It was

3    self-driving.  And then Lyft had the woman-only

4    option.

5         Q    Prior to November 15th, 2023, it's my

6    understanding that you had seen or gone to Scott

7    McLaughlin's apartment two prior times; is that

8    right?

9         A    Yes.

10        Q    How -- strike that.  Do you recall how you

11   got to and from Scott McLaughlin's apartment prior

12   to the November 15th, 2023, incident?

13        A    He came and got me one of the times, I

14   believe, and then I used Lyft and Waymo.

15        Q    Okay.  On the prior times that you took

16   Uber prior to November 15th, 2023, do you recall

17   anything about those experiences one way or the

18   other?

19        A    I actually think the night of the assault,

20   that was the first time I took Uber now that I'm

21   thinking about it.  I don't think I took any prior

22   ones.

23        Q    And do you recall -- strike that.  Do you

24   recall how you got to Scott McLaughlin's house that

25   night?

Page 189

```
 1          A     Lyft.
 2          Q     And then you ordered an Uber to get back
 3     to your hotel?
 4          A     Yes.
 5          Q     Do you recall why you chose to use Uber
 6     that night?
 7          A     I wasn't the one who ordered it.
 8          Q     That was from Scott McLaughlin; is that
 9     right?
10          A     Yes.
11          Q     Okay.  Have you used Uber since
12     November 15th, 2023?
13          A     Yes.
14          Q     Do you have any estimation as to how many
15     times?
16          A     Two or three.
17          Q     Okay.  And can you describe -- strike
18     that.  How would you characterize your experience
19     with those drivers?
20          A     The Uber rides after the assault?
21          Q     Yeah.
22          A     I was with my friends.  It was two times.
23     The first time was at OSU -- after an OSU football
24     game, and I was with a big group of my friends, and
25     we just didn't want to walk because it was so hot.
```

1    So it was really quick.  Same thing, the second time

2    was a hockey game in Dallas, and I was with my

3    friend, and it was really quick, but both times were

4    female drivers.

5        Q    And those were when you used the Uber app

6    to call those Ubers?

7        A    Yes.

8        Q    And was there a reason that you used Uber

9    in those instances as opposed to Lyft or Waymo?

10       A    Because there weren't any Lyft drivers

11   in -- weren't any Lyft drivers in Stillwater that I

12   saw, and then Elisa, my friend, she was who I was

13   with at the hockey game, and she just ordered the

14   Uber off my phone because she didn't have the app.

15       Q    When you downloaded -- first downloaded

16   the app in November of 2023, do you recall whether

17   or not you did any research about Uber?

18            MS. ABRAMS:  Object to form.

19            THE WITNESS:  No.  I just -- I heard

20   things about it.  Like I said, I downloaded three

21   ride shape apps.  It was kind of just if I didn't

22   have one, it's like I wanted a backup option, you

23   know, and feel like Uber is a pretty big one, so I

24   just downloaded it.  That's the first one that

25   popped up.

Page 192

1          A     No.

2          Q     Were you aware of the Trusted Contacts

3     feature that allowed riders to automatically use

4     Share My Trip with friends or family members?

5          A     No.

6          Q     Were you aware of the driver profile

7     feature which permits a rider to evaluate the driver

8     before taking the ride?

9          A     Yes.

10         Q     One thing I want to clarify, you stated

11    that Scott McLaughlin is who called the Uber for

12    you; correct?

13              MS. ABRAMS:  Object to form.

14              THE WITNESS:  Yes.

15              MS. BLAKE:  Okay.  I want to go ahead and

16    mark these.  Am I on Exhibit 10?

17              THE COURT REPORTER:  Yes.

18         Q     (BY MS. BLAKE)  These are a series of

19    documents.  I'm not going to ask you about each one,

20    but we can go ahead and just pass them all to you,

21    and these are documents that you produced?

22         (Exhibit 10 marked for identification.)

23         A     Yes.

24         Q     If you turn to page 3, is this a screen

25    image of your phone?

Page 193

1        A    Yes, and I want to clarify whenever I say

2    he ordered it, he did it off of my phone.  It was my

3    account.

4        Q    Okay.

5        A    But he called it.  It was on my phone.

6        Q    Okay.  So he -- just you opened up your

7    phone and then he selected the ride share app?

8        A    Yes.

9        Q    Okay.  Did you tell him to select Uber?

10       A    No.

11       Q    Do you know one way or the other why he

12   selected Uber?

13       A    I think just because it's more well-known

14   than the others and he did it.

15       Q    Okay.  Do you know that for sure or are

16   you just guessing?

17       A    Just guessing.

18       Q    Okay.  I'll come back to that, but you can

19   set it down for now.  I just wanted to clarify that

20   question.

21       A    Okay.

22       Q    Were you aware, prior to taking Uber, of

23   the Real-Time ID Check feature that Uber had that

24   regularly verifies a driver's identity by matching a

25   selfie to the profile picture?

Page 194

1          A      No.

2          Q      Were you aware of the emergency assistant

3   feature that allows a rider to call or, where

4   available, text 911 straight from the app?

5          A      No.

6          Q      Were you aware of the on-trip reporting

7   feature that allows riders to discreetly report a

8   non-emergency safety issue during the ride?

9          A      No.

10         Q      How often since 2023 in a given month do

11  you use a ride share app, if you can estimate?

12         A      Just in the past year alone, I've -- while

13  I've been home, I've used it twice.  Before that, it

14  was a little more frequent.  I finished training the

15  second round in January, and then I only used it for

16  one or two months because I moved in with roommates

17  who had cars, but in the past year I've only used it

18  twice.

19         Q      Okay.  Prior to the incident at issue in

20  the lawsuit on November 15, 2023, had you seen any

21  advertisements for Uber?

22         A      Yes.

23         Q      Can you tell me about those?

24         A      I had seen Instagram posts, Facebook

25  pop-ups, just even like on my app store, I remember

Page 201

```
 1     taking -- taking drinks.
 2          Q    What do you mean by a little bit?
 3          A    It was bottles.  I remember it was, like,
 4     liters of, like, liquor and stuff, and I was just
 5     taking sips.  We didn't have really have shot
 6     glasses or cups.
 7          Q    Okay.  So you took sips?
 8          A    Yes.
 9          Q    Okay.  And you said you only stayed at the
10     pool for 15 minutes or so?
11          A    Yes.
12          Q    Do you recall how many sips you had at the
13     pool?
14          A    No.
15          Q    Okay.  And you texted Scott --
16          A    Yes.
17          Q    -- at that time?
18          A    Yes.
19          Q    Did you leave straight from the pool to go
20     see Scott?
21          A    Yes.
22          Q    Do you know whether or not any of your
23     friends or flight attendant fellow trainees knew
24     that you were leaving to go see Scott?
25          A    Yes.  People at the pool knew.
```

1      Q    Okay.  Do you recall who knew?

2      A    It was a big group of my class.  I don't

3  know specific names, but, yeah, they all knew.

4      Q    Okay.  So is it fair to say that by

5  November 14th, 2023, they -- strike that.  Do you

6  recall telling -- or who do you recall telling about

7  your relationship with Scott in the flight attendant

8  training class?

9      A    The only person who really knew was Jade,

10  Danny, Lydia.  Lydia wasn't in our class.  She was a

11  class below us, but they were the only ones who

12  really, like, knew.  The rest of my classmates just

13  knew I was going to go see a guy, but, yeah.

14      Q    And is Jade, was she your roommate at the

15  time?

16      A    She wasn't my roommate.

17      Q    Who was your roommate when you were in

18  flight attendant training school?

19      A    Her name was Brooke.

20      Q    Brooke.  Okay.  So you texted Scott at the

21  hotel pool and did he tell you to come over?

22      A    Yes.

23      Q    Okay.  And how did you get from the

24  SpringHill Suites to Scott's place?

25      A    With the Lyft.

Page 203

```
 1          Q    And that was the third time you had been
 2     to Scott's apartment?
 3          A    Yes.
 4          Q    Okay.  And do you recall about what time
 5     you got to Scott's?
 6          A    No.
 7          Q    Okay.  Do you recall about how long you
 8     stayed at his house?
 9          A    No.  A couple hours.
10          Q    Okay.  Once you got there that night, what
11     did you and Scott do?
12          A    Watched a movie, you know, we talked, had
13     wine, and then, you know, had sexual intercourse.
14          Q    Okay.  Was anyone else there?
15          A    No.  He lived alone.
16          Q    So you watched a movie, had intercourse,
17     and drank some wine?
18          A    (Witness nods head.)
19          Q    Do you recall how much wine you had?
20          A    It was quite a bit.
21          Q    Okay.  Can you elaborate?  What do you
22     mean by quite a bit?
23          A    I know we finished the bottle.  We also
24     had liquor, and we were drinking that, too.
25          Q    What kind of liquor?
```

Page 204

```
 1        A    I believe whiskey.

 2        Q    Okay.  Do you know how much whiskey you

 3   had?

 4        A    No.

 5        Q    Okay.  At some point, you ultimately left

 6   Scott's.  Why did you decide to leave Scott's?

 7        A    Because I could feel myself, like, feeling

 8   woozy and dozing off.  I didn't want to embarrass

 9   myself in front of him.  I was tired.  I had been up

10   for a really long time.

11        Q    So you were feeling tired and woozy and

12   just wanted to go back to your hotel?

13        A    Yeah.  I could -- I had thrown up, and I

14   could feel myself, like, on the verge of, like,

15   going to sleep, and it's like I didn't -- I didn't

16   want to be around him when I was like that.

17        Q    You mentioned you had thrown up.  When did

18   you throw up?

19        A    Right before I left.

20        Q    Okay.  Had you -- strike that.  Did you

21   have an understanding as to why you were throwing

22   up?

23             MS. ABRAMS:  Object to form.

24             THE WITNESS:  No.

25        Q    (BY MS. BLAKE)  Did you think it was
```

Page 205

1    alcohol-related?  Did you think it was food-related?

2         A    Alcohol-related.

3         Q    Had you thrown up from alcohol before?

4         A    Yes.

5         Q    Okay.  And when do you recall doing that?

6         A    I think when I was with Ryan.

7         Q    Okay.  Had you thrown up, I mean, multiple

8    times?  Just kind of an estimate.

9         A    I think that was the second time.  It

10   wasn't common for me because I don't really drink a

11   whole lot, so I didn't know my limits either, and I

12   was on Lexapro, so -- and I had been mixing stuff

13   all night, too.

14        Q    So you had taken your Lexapro that day?

15        A    Yes.

16        Q    And what was the milligram as you recall?

17        A    I told you I don't remember.

18        Q    Okay.  And when you said mixing, you mean

19   mixing alcohols?

20        A    Yes.

21        Q    Okay.  You said that Scott is the one that

22   got on your phone and called the Uber?

23        A    Yes.

24        Q    Do you recall looking at the app at all

25   before the car pulled up that night?

Page 206

1        A    No.

2        Q    Okay.  I want to hand you what I'm marking

3     --

4             MS. ABRAMS:  Can we take a five-minute

5     break --

6             MS. BLAKE:  Absolutely.

7             MS. ABRAMS:  -- when you get a second?

8     I've been stockpiling water.

9             MS. BLAKE:  Now is a good time.

10            THE VIDEOGRAPHER:  We're off the record.

11    The time is 2:54 p.m.

12      (Break taken at 2:54 p.m., resumed at 3:04 p.m.)

13            THE VIDEOGRAPHER:  We are back on the

14    record.  The time is 3:04 p.m.

15       Q    (BY MS. BLAKE)  We are back after a brief

16    break and still talking about the events and what

17    you did prior to the incident on November 15th,

18    2023.

19       A    Yes.

20       Q    I want to back up for just a moment, still

21    on your supplemental responses to the

22    interrogatories.  You stated that you were in

23    contact with the following individuals in the 24

24    hours before the alleged incident.  You list several

25    people, but the first one is Kenyaun Bagby.  Am I

Page 207

```
 1     saying that name correctly?
 2          A    Yes.
 3          Q    And who is Kenyaun Bagby?
 4          A    He's the receptionist at the hotel I was
 5     staying at.
 6          Q    Okay.  And what was the nature -- can you
 7     describe the nature of your relationship with
 8     Kenyaun Bagby?
 9          A    It was very casual.  He was the front desk
10     guy.  We had been there for a month, and it was kind
11     of like, hi, have a good day at class, just very
12     basic.
13          Q    Okay.  Were you friends outside of just
14     the meet and greet basic receptionist greeting that
15     you just talked about?
16          A    No, we weren't friends.  I was friends
17     with a group of girls, and I know one of them kind
18     of had a crush on him, so we would talk to him a
19     lot, but it was mainly just us going with her so she
20     could talk to him, but we weren't really friends.
21          Q    Okay.  And then you said that you're in
22     contact with Jade Petersen you've spoken to and
23     Danny Smith.  They were in your class --
24          A    Yes.
25          Q    -- for flight attendant training?  Natasha
```

1    Ramos, which is your mom, and then your dad, OJ

2    Ramos, and Brooklyn Filtz; is that right?

3         A    Yes.

4         Q    Do you recall anyone else that you would

5    have been in contact with?

6         A    My classmates.  Is Elisa Gregg on there,

7    too?  Because I spoke to her as well.

8         Q    No.

9         A    She should be on there.  I could have

10   sworn I included her.

11        Q    Okay.  I'm happy for you to -- if you want

12   to take a look.  She may have been added in the

13   second supplemental.

14        A    Is this 24 hours before or after?

15        Q    Before.

16        A    Okay.  So she was after.  Sorry.

17        Q    That's fine.  And then your classmates of

18   approximately 30 people, I believe; is that right?

19        A    Uh-huh.

20        Q    Anyone else that you recall being in

21   contact with the day before?

22        A    No.  I mean, I saw Scott.  Hope, but we

23   weren't really friends.  She was more friends with

24   Jade and just tagged along with us to the mall,

25   but --

1     Q    Okay.  Had you ever spent the night at

2    Scott McLaughlin's residence or apartment?

3     A    No.

4     Q    Okay.  So going back now to the night of

5    the incident, which was early in the morning of

6    November 15th, 2023; is that right?

7     A    Yes.

8     Q    And I believe we were talking about just

9    before we took the break that Scott pulled up your

10    phone and called the Uber; correct?

11     A    Yes.

12     Q    And --

13          MS. ABRAMS:  Object to form.

14     Q    (BY MS. BLAKE)  -- I believe you testified

15    that you hadn't seen anything on the Uber app before

16    the car pulled up; is that right?

17     A    He handed me my phone and I -- it was

18    open, like, on the ride that was ordered, but all I

19    saw was, like, the driver picture, but I didn't

20    really scroll too much on it.

21     Q    Okay.  Can we scroll -- can we pause for a

22    moment?

23          THE COURT REPORTER:  Do you want to go

24    off?

25          MS. BLAKE:  Yes.

Page 210

1        THE VIDEOGRAPHER:  We're off the record.

2   The time is 3:08 p.m.

3     (Break taken at 3:08 p.m., resumed at 3:09 p.m.)

4        THE VIDEOGRAPHER:  We're back on the

5   record.  The time is 3:09 p.m.

6        Q    (BY MS. BLAKE)  Prior to the longer break

7   that we just took a few moments ago, I asked you

8   this question:

9        "Do you recall looking at the app at all

10  before the car pulled up that night?"

11       "Answer:  No."

12       Do you recall giving that answer?

13       A    Yes.

14       Q    Okay.  And is that correct?

15       A    I did give that, but I do remember just

16  having the phone in my hand.  I wasn't really

17  scrolling on it, but the driver profile was pulled

18  up.

19       Q    Okay.  And after taking the break, you've

20  now changed that answer, right, because you didn't

21  mention anything about looking at the driver profile

22  when I asked you that question to begin with?

23       MS. ABRAMS:  Object to form.

24       THE WITNESS:  Okay.  Yes.

25       Q    (BY MS. BLAKE)  Okay.  Do you have any

1    explanation as to why your answer has changed after

2    the break?

3            MS. ABRAMS:  Object to form.

4            THE WITNESS:  I just had to think about

5    it, I guess.  I'm not giving enough time to think

6    about my questions.

7        Q   (BY MS. BLAKE)  That's a very different

8    answer.  You'd agree with me on that; right?

9            MS. ABRAMS:  Object to form.

10           THE WITNESS:  Yes.

11       Q   (BY MS. BLAKE)  Okay.  I'm not asking you

12   what was talked about with your counsel, but when we

13   took that break, did you meet with your counsel in a

14   closed room?

15       A   We went to the kitchen and got a drink.

16   It was more of a pep talk.  I'm tired.  It's a long

17   day, but, yeah, in the kitchen.

18       Q   Okay.  And then after the break, you

19   changed your answer to that question?

20           MS. ABRAMS:  Object to form.

21           THE WITNESS:  Okay.

22       Q   (BY MS. BLAKE)  Is that right?

23       A   Yes.

24       Q   What do you remember about the driver

25   profile now that was pulled up on your phone?

Page 212

1          A    He was a father.  He worked at a domestic

2     violence shelter.

3          Q    Okay.  And you just remembered that just

4     now after the break for the first time?

5               MS. ABRAMS:  Object to form.

6               THE WITNESS:  You also gave me these that

7     also have that information, but --

8          Q    (BY MS. BLAKE)  I haven't given you

9     anything that has that information.

10         A    It has pictures of my driver and stuff and

11    it came back to me, yes.

12         Q    Okay.  Let's look at that then.  Let's

13    look at the pictures that your Uber driver had.  If

14    you can pull up -- I can't remember what --

15    actually, I think it's a different one that I need

16    to give you because I didn't give you that one yet,

17    even though that's apparently what refreshed your

18    recollection.  Handing you what I'll mark as

19    Exhibit 13 -- 12.  Have you seen this before?

20         (Exhibit 12 marked for identification.)

21         A    Yes.

22         Q    Okay.  And is this the Uber profile of

23    your driver on November 15th, 2023?

24         A    Yes.

25         Q    And you mentioned that the profile said he

```
 1     had previously worked at a domestic violence shelter
 2     for women?
 3          A    Yes.
 4          Q    Do you recall just remembering that?  Can
 5     you show me where it says that on his Uber profile?
 6          A    It's not in this screenshot, but it was on
 7     there.
 8          Q    Okay.  Well, this is his Uber profile;
 9     right?
10          A    Yes.
11          Q    So where on the screenshot of the Uber
12     profile that you saw does it say that he was --
13               MS. ABRAMS:  Object to form.
14               THE WITNESS:  There -- there was more on
15     his profile and it did say that.
16          Q    (BY MS. BLAKE)  Okay.  How long did you
17     spend looking at his profile after Scott McLaughlin
18     handed it to you after he called the ride?
19          A    Just briefly.
20          Q    Okay.  And are these -- these screenshots
21     of the Uber driver ones that you took?
22          A    No.  The hotel lobby person took them.
23          Q    Okay.  Why did the hotel lobby person take
24     them?
25               MS. ABRAMS:  Object to form.
```

Page 214

1              THE WITNESS:  Because I couldn't.

2         Q    (BY MS. BLAKE)  Why couldn't you?

3         A    Because I was drunk and I had just been

4    raped and was shaking.  I couldn't even hold my

5    phone.

6         Q    Okay.  Have you seen these documents since

7    then, since that night?

8         A    Yes.

9         Q    Okay.  And when you realized that there's

10   no screenshot indicating that his profile said he

11   previously worked at a domestic violence shelter for

12   women, did you try and add that screenshot or find

13   that screenshot?

14        A    No.  This was just the main one.  I didn't

15   know I needed every little thing on his profile,

16   but, like I said, it did say that.

17        Q    Okay.  So when Scott called the Uber on

18   November 15th -- or the early morning of

19   November 15th, 2023, how were you feeling at that

20   time?

21        A    Tired, out of it.  I was drunk.  I

22   remember I couldn't even walk straight to the car.

23        Q    Okay.  You were tired and out of it and

24   couldn't walk straight to the car, but you scrolled

25   through his Uber profile?

Page 215

1          MS. ABRAMS:  Object to form.

2          THE WITNESS:  I scrolled through it

3     whenever I got to the hotel.  Like I said, he

4     ordered it.  I had it on my phone.  I looked at it.

5     That was it.  I wasn't really scrolling, but, you

6     know, after the fact whenever it happened, I took

7     screenshots and stuff.  It did say that because I

8     did look over his profile.

9          Q    (BY MS. BLAKE)  So you saw that after the

10    Uber ride?

11         MS. ABRAMS:  Object to form.

12         THE WITNESS:  Yes.

13         Q    (BY MS. BLAKE)  Okay.  Not before?

14         A    Yes, but --

15         MS. ABRAMS:  Object to form.

16         THE WITNESS:  -- but, like I said, I did

17    see his picture and I saw this right here.  I wasn't

18    --

19         Q    (BY MS. BLAKE)  I -- I understand.  Sorry.

20    I didn't mean to cut you off.

21         A    It's okay.

22         Q    But just to clarify, you saw that after

23    you got to the hotel?

24         MS. ABRAMS:  Object to form.

25         THE WITNESS:  I didn't really look too

Page 216

1    much into it until I was at the hotel, but I did,
2    like, a glance.
3         Q    (BY MS. BLAKE)  Okay.  And you considered
4    yourself I think you said drunk or intoxicated when
5    you got into the Uber?
6         A    Yes.
7         Q    Okay.  Do you remember, like, what
8    happened just logistically when the Uber pulled up?
9    Was Scott waiting with you outside of his apartment?
10        A    He had to walk me to the Uber.
11        Q    Okay.  He had to walk -- what do you mean
12   he had to walk you to the Uber?
13        A    Because I couldn't walk.  I was stumbling
14   over.
15        Q    Okay.  Did -- do you recall what kind of
16   car he was driving, the Uber driver?
17        A    No.  It was a sedan, I believe.
18        Q    Okay.  Do you remember what side of the
19   car you got in on?
20        A    On the right side.
21        Q    What do you mean right side?  Was that
22   behind the driver's seat or the passenger side of
23   the backseat?
24        A    Passenger side.
25        Q    So you got in the backseat on the

Page 217

1    passenger side?

2        A    Yes.

3        Q    Okay.  Do you recall if -- I mean, did

4    Scott open the door for you?  Did the Uber driver?

5    Did you, if you can remember?

6        A    Scott.

7        Q    Okay.  Do you remember anything about the

8    interior of the car?

9        A    Not really.  It was nighttime.  I didn't

10   see anything.

11       Q    Do you know if there was music playing or

12   --

13       A    No.

14       Q    Do you remember putting your -- strike

15   that.  Do you remember whether or not you put your

16   seat belt on?

17       A    I didn't.

18       Q    You did not put your seat belt on?

19       A    I didn't.

20       Q    Do you recall whether anything stood out

21   from the beginning of the ride as making you feel

22   uncomfortable in one way or the other?

23       A    Yes.

24       Q    And what was that?

25       A    He was on the phone for a little bit

Page 221

1    them a little bit for me?

2        A    Just a plain white shirt and a green -- it

3    was a white shirt and a green skirt.

4        Q    A plain white shirt and a green skirt?

5        A    Yes.

6        Q    Was it a -- what was the length of the

7    skirt?

8        A    It was an athletic skirt, so pretty, like,

9    middy, mid thigh.

10        Q    Okay.  What do you recall -- so after the

11    Uber driver got off the phone, then what do you

12    recall?

13        A    He started driving and he asked me if that

14    was my boyfriend.  Started making comments, asking

15    if we had sex, making comments about my body, and

16    that was the first time he had talked to me or,

17    like, acknowledged me.

18        Q    What kind of comments about your body do

19    you recall?

20        A    Saying I had a good body.  He asked if

21    that was my boyfriend.  Asked if we had sex, and if

22    we did, he was so lucky, like, that happened.  It

23    was just constant, and I remember at that point,

24    like I said, I was so tired.  I kind of, like, laid

25    in the backseat.  Like, it was like a bed because I

1    didn't have my seat belt on, and I started, like,

2    dozing off, and he just kept asking me those

3    questions, like, waking me up and getting my

4    attention while I was dozing off.

5         Q    So when you're saying you laid down, where

6    -- on what side of the car was your head, if you

7    recall?

8         A    The passenger.

9         Q    So your head was on the passenger side and

10   then your feet were, like, on the driver's side in

11   the backseat?

12        A    Yes.

13        Q    Okay.  And apart from telling him you were

14   tired, do you recall saying anything else to him?

15        A    Just that I was tired and wanted to go

16   back to the hotel.  He kept asking me all these

17   questions and he just kept repeating, "Did y'all

18   have sex?  Did y'all have sex?"  And I just said yes

19   just to shut him up, but that was it.  Just him

20   making comments.

21        Q    And then what do you recall happening?

22        A    He started driving.  I could feel him kind

23   of circling the car a little bit, and then I

24   remember him just stopping and he hadn't looked at

25   me the whole time, and then he had just said, "I

Page 223

1    need to stop the car and Uber is going to charge you

2    for this."  I didn't know what he meant by that, and

3    I just remember the car stopping, and he opened the

4    back door of the car, and just got on top of me and

5    held me down and then he started to rape me.  But it

6    was -- it was pretty -- pretty fast.  It's like I

7    didn't have enough time to process what was

8    happening.

9        Q    Are you okay?  Do you need to stop?

10       A    I'm okay.

11       Q    When you say he was raping you, was it

12   vaginal?

13       A    Yes.

14       Q    And do you recall, did he penetrate you

15   with his fingers?  Do you recall one way or the

16   other?

17       A    I don't remember.  I didn't know what was

18   happening, but, yeah.  I know he tried to perform

19   oral sex on me and I tried to push his head away,

20   and he, like, was just holding me down, but I know

21   he penetrated me with his penis.  I don't know about

22   his fingers, though.

23       Q    So when he -- you said he did perform oral

24   sex?

25       A    Yes.  He was trying to.  I remember I kept

Page 224

1    closing my legs and he just pried them open and held

2    my legs down, but it's like I tried to fight him

3    off.  I just couldn't, but he did.

4         Q    When -- do you recall where you were when

5    he stopped and got into the backseat?

6         A    No.

7         Q    You said he got into the backseat and laid

8    on top of you?

9         A    Yes.

10        Q    Do you know whether or not the door was

11   shut?

12        A    I think he shut it because, like I said, I

13   hadn't seen his face, but whenever he opened the

14   back door, I remember it lit up like cars do, and

15   that's whenever I saw his face, but then the lights

16   turned off, so I think he closed the door, but I'm

17   not 100 percent sure.

18        Q    When he was attempting to perform oral

19   sex, was that before or after he penetrated you with

20   his penis, if you can recall?

21        A    I think after.

22        Q    After?

23        A    (Witness nods head.)

24        Q    And was the back door still shut to the

25   car?

Page 240

1       should still have it in your stack.

2           A    Yes, I do.

3           Q    Okay.  After you met with the officers on

4       the morning of November 15th, 2023, what happened?

5       What do you recall happening next?

6           A    I went to the hotel.  I don't really

7       remember timeline-wise, but -- sorry.  I know the

8       first thing I did was shower and I took a nap.

9           Q    And you said Jade was with you?  She took

10      you for the examination?

11          A    She wasn't the one who took me, but she

12      was there with me.

13          Q    Who took you?

14          A    It was a transport service in Arizona.

15          Q    A transport service?

16          A    Yeah.  Whenever we called the cops, they

17      came and they took me to the same exam.

18          Q    And she came just along with you?

19          A    Yes.

20          Q    Okay.  If you could turn to the page which

21      ends in 003, do you see that?  And this is a

22      screenshot of your phone?

23          A    Yes.

24          Q    I believe you said -- or strike that.  Who

25      took this screenshot, if you can recall?

```
 1        A    I believe -- I don't remember.  I know --
 2   I know some of them Kenny took.  This might have
 3   been whenever I was with the police officers.
 4        Q    Okay.  And at the top left, it says 1:49.
 5   Is that 1:49 a.m.?
 6        A    Yes.
 7        Q    So this screenshot was taken at 1:49
 8   a.m. on November 15th, 2023?
 9        A    Yes.
10        Q    And that middle section that says the
11   "Uber RideCheck," do you see that?
12        A    Yes.
13        Q    It says "Your ride ended earlier than
14   expected.  Is everything ok?"  And that was received
15   one hour prior.  Do you recall receiving that when
16   you were in the Uber?
17        A    No.  I didn't get that until I was at the
18   hotel.
19        Q    Okay.  Do you recall where your phone was
20   when the Uber driver got in the backseat?
21        A    No, ma'am.
22        Q    Okay.  Do you have any indication or
23   recollection as to, like, when he pulled over into
24   the parking lot, parked the car, and then got --
25   like, how long that took to then get into the
```

Page 242

1    backseat?

2         A    It was very fast.

3         Q    Okay.  On the document ending in 5, which

4    is like a couple of pages back, do you see that?

5         A    Yes.

6         Q    And is this a screenshot from your phone?

7         A    Yes.

8         Q    And it says 7:30 at the top.  Was that --

9    do you recall, was that 7:30 in the morning of

10   November 15th?

11        A    Yes.

12        Q    Okay.  And do you see that it says "Need

13   help?" question mark, "RideCheck" with a badge.  It

14   says "Your ride ended away from your destination."

15   Do you recall whether or not you saw that on

16   November 15th, 2023?

17        A    Whenever I took this screenshot.

18        Q    Okay.  And so when you got back to the

19   hotel, you said you went to sleep, and was

20   graduation day for your flight attendant training

21   supposed to be the 15th?

22        A    No.  It was customer service day and

23   graduation was the next day.

24        Q    So it was supposed to be the 16th?

25        A    Yes.

Page 243

1          Q    Okay.  And on -- if you could flip to
2    page 6 of this document, and this looks to be -- is
3    this a text communication with you and Jade?
4          A    Yes.
5          Q    Okay.  And this is at 1:22?
6          A    Yes.
7          Q    Do you recall, was this 1:22 a.m. or was
8    this p.m.?  Do you recall one way or the other on
9    November 15th, 2023?
10         A    I don't know if that is an accurate time
11   stamp.  I think that was me going and searching for
12   it later, but this wasn't in the moment.
13         Q    So the time stamp up here, that would be
14   the time that it was when you took the screenshot.
15   That's what I'm looking at.
16         A    Yes.
17         Q    And that's what I'm asking.  Was this,
18   when you took this screenshot, do you recall if it
19   was 1:22 a.m. or 1:22 p.m.?
20         A    P.m., but this screenshot was way later, I
21   believe.
22         Q    Okay.  And do you recall what this
23   communication was in reference to?
24         A    Whenever I was getting questioned and
25   getting my kit done, I was tired.

Page 256

1    response to you was when you reached out through the

2    app?

3         A    I don't remember.

4         Q    Okay.  Did you have a particular response

5    that you wanted from Uber?

6              MS. ABRAMS:  Object to form.

7              THE WITNESS:  I don't remember what was

8    said, but I knew my intentions of reporting it was

9    to get the driver removed.

10        Q    (BY MS. BLAKE)  I asked you earlier about

11   whether or not you were aware of the different

12   safety features that Uber has.  Do you recall those?

13        A    (Witness nods head.)

14        Q    And I believe you testified you didn't --

15   you weren't aware of those?

16        A    Yes.

17             MS. ABRAMS:  Object to form.

18        Q    (BY MS. BLAKE)  In your opinion, should

19   Uber have had different safety features available

20   when you rode in the Uber on November 15th, 2023?

21        A    Yes.

22        Q    And which safety features?

23        A    Cameras, microphones.

24        Q    Any other safety features you think should

25   have been implemented?

1      A    No.  I think -- I know whenever I got that
2    alert, whenever it told me my ride stopped, that was
3    once I was at the hotel talking to the police
4    officers, so I think if that would have come in
5    earlier, or, yeah, because I didn't really know much
6    about the app and the features, but I think mainly
7    cameras, microphones, and that alert coming earlier.
8      Q    So is it that the alert didn't come until
9    you were talking with the police officers or you
10    didn't see it until then?
11      A    It was delayed because it popped up
12    whenever I was talking to them.
13      Q    Okay.  Do you recall what time you met
14    with the police officers?
15      A    No.
16           MS. BLAKE:  Can we go off the record for
17    just -- take a quick break and I'll shuffle through
18    my notes?
19           MS. ABRAMS:  Sure.
20           MS. BLAKE:  Thanks.
21           THE VIDEOGRAPHER:  We're off the record.
22    The time is 4:11 p.m.
23      (Break taken at 4:11 p.m., resumed at 4:26 p.m.)
24           THE VIDEOGRAPHER:  We're back on the
25    record.  The time is 4:26 p.m.

1    Q    (BY MS. BLAKE)  We just took a brief

2    break, and before we were -- we took a break, we

3    were discussing what safety features that you think

4    Uber should have implemented.

5    A    Yes.

6    Q    And one of them is that you said that the

7    alert saying that your ride stopped should have come

8    earlier?

9    A    Yes.

10    Q    Because you said it didn't come at all to

11    your phone until you were meeting with the police?

12    A    Yes.

13    Q    If you would please -- I apologize.  I

14    don't remember the exhibit number.  This is -- it's

15    the exhibit that has the Uber receipt at the

16    beginning of it.

17    A    Sorry.

18    Q    I should have written them down.  That's

19    my fault.  I think it's that one.  And that's

20    Exhibit --

21    A    12.

22    Q    12.  Okay.  Great.  If you could turn to

23    the -- this page.

24    A    Yes.

25    Q    Do you see that?  I think it says the

Page 259

1    Bates -- the bottom has a 4.

2         A    Sorry.

3         Q    It's towards the beginning.  So that one.

4         A    Yes.

5         Q    Yes.  Do you see that?  And is it your

6    understanding that this is a depiction of the route

7    that was taken by the Uber driver --

8         A    Yes.

9         Q    -- on November 15th, 2023?

10        A    Yes.

11        Q    Okay.  And I'm just asking you about this

12   particular document.  So if you see the drive

13   details, it says that you were picked up at 12:33

14   a.m.?

15        A    Yes.  Uh-huh.

16        Q    And that was at 2100 North Scottsdale

17   Road; is that right?

18        A    Yes.

19        Q    And is that where Scott McLaughlin lived?

20        A    I don't remember his address.

21        Q    Okay.  Does that sound accurate to you?

22        A    I don't want to say yes or no because I'm

23   not 100 percent sure.

24        Q    Sure.  We can look at your plaintiff fact

25   sheet if that would be helpful.

Page 260

1          A    Okay.

2          Q    Or I'm sorry.  Your interrogatory

3     responses.  Apologies.  I just lost my place.  We'll

4     get there.

5          A    Okay.

6          Q    I think this may be it.  Here we go.  I

7     will represent to you that one of the exhibits we

8     looked at was your supplemental responses to your

9     interrogatories, and in response to Interrogatory

10    Number 9, you provided -- we went over earlier what

11    you did the 24 hours leading up to the incident, and

12    you have, beginning at line 21 -- I'm sorry, line

13    23, "Spending time with Plaintiff friend Scott at

14    2100 North Scottsdale Road."  Does that refresh your

15    recollection that that's where he lived?

16         A    Yes.

17         Q    Okay.  Great.  So then going back to this

18    exhibit, it says you were picked up, and that would

19    have been at Scott's house at 12:33 a.m. on

20    November 15th?

21         A    Yes, ma'am.

22         Q    And then you were dropped off at 1:08

23    a.m.?

24         A    Yes.

25         Q    And is that the address of the SpringHill

Page 261

1    Suites?

2         A    Yes, ma'am.

3         Q    Okay.  So you -- your total was -- drive

4    was about 34 minutes based on the Uber log?

5         A    Okay.

6         Q    And so you'll agree that you were dropped

7    off at 1:08 a.m.?

8         A    If that's what it says, but I don't

9    remember.

10        Q    Okay.  And then if you could go to the

11   exhibit that had some of your screenshot and texts

12   that we were looking at earlier.  I apologize.

13        A    That's okay.

14        Q    I don't have the number.

15        A    I think it's 11.

16        Q    Yes.

17        A    No.  Or is it this one?

18        Q    It's not that one.  It's a different

19   exhibit.  I believe it might be the one with the

20   gold paper clip.

21        A    No.

22        Q    That one, yes.  Thank you.  What exhibit

23   number is that one?

24        A    10.

25        Q    10.  Thank you so much.  And if you'll


1    look at the fourth page on that exhibit.

2         A    Uh-huh.

3         Q    I think it has Wednesday, November 15th,

4    1:51.  Do you see that?

5         A    Yes, ma'am.

6         Q    Okay.  And do you see that the RideCheck

7    came up in the middle of that screenshot?

8         A    Yes.

9         Q    And it says one hour ago.  Do you see?

10        A    Yes.

11        Q    And so one hour ago from 1:51 would have

12   been about 12:51?

13        A    Yes.

14        Q    So that would have been before you got

15   back to the SpringHill Suites at 1:08 a.m.; right?

16        A    Yes.

17        Q    Okay.  And so the data, the screenshots

18   would indicate that this RideCheck notification

19   about your ride ending earlier came up while you

20   were still in the Uber?

21             MS. ABRAMS:  Object to form.

22             THE WITNESS:  Okay.

23        Q    (BY MS. BLAKE)  Do you agree?

24        A    Yes.

25        Q    Okay.  You can put those down.

Page 263

1          A     Okay.

2          Q     Do you believe -- and we talked about what

3     you believe that Uber should have done with respect

4     to safety features.  Do you believe that Uber should

5     have given you some warning of some kind?

6               MS. ABRAMS:  Object to form.

7               THE WITNESS:  Yes.

8          Q     (BY MS. BLAKE)  Okay.  And what do you

9     believe they should have given you a warning about?

10         A     I think -- I mean, I -- I've never used

11    Uber, so I can't say anything -- well, prior to

12    this, I hadn't used Uber, but like I said, I've used

13    it other times, and I think just kind of warning

14    you.  You know, it's not 100 percent safe.  I've

15    always seen pictures and posts and ads about how

16    it's a safe option, but, I mean, what I went through

17    shows that's not always the case.

18         Q     Have you ever seen an ad that said it was

19    100 percent safe?  You just referenced that, so I

20    wanted to make sure.

21         A     No.  Just saying that it was safe.

22         Q     Okay.

23         A     But I've never seen anything about the

24    potential risks.

25         Q     And do you have any understanding of what

Page 285

1          Q    And it says "Surveillance video was
2     obtained from the SpringHill by Marriott."  That was
3     where you were staying; correct?
4          A    Yes.
5          Q    During your flight attendant school;
6     correct?
7          A    Yes.
8          Q    Okay.  "Review of the video at the
9     SpringHill by Marriott showed Hassan driving the
10    aforementioned vehicle and dropping Jaylynn off at
11    the front entrance of the hotel.  He waits for her
12    to exit the vehicle and then he drives away.
13    Jaylynn can be seen slowly walking through the lobby
14    after being dropped off.  Hassan could be seen
15    pulling over near the front of the driveway entrance
16    to the hotel, exit the vehicle and then crouching
17    down while bringing his hands towards his face."  Do
18    you see that?
19         A    Yes.
20         Q    Did the police officers ever tell you
21    about this video?
22         A    No.
23         Q    Okay.  And just for the record, Hassan is
24    the driver, the Uber driver that raped you; correct?
25         A    Yes.

1          MS. BLAKE:  Objection.

2     Q    (BY MS. ABRAMS)  Now, Uber's counsel asked

3  you some questions about safety features.  Remember

4  that?

5     A    Yes.

6     Q    And one of those safety features that was

7  discussed on Exhibit 10 -- can you pull that up for

8  me so we can talk about it?

9     A    Yes.

10     Q    I'll start my question over.  Okay.

11  Uber's counsel asked you a series of questions about

12  safety features on the Uber platform.  Do you

13  remember that?

14     A    Yes.

15     Q    And one of those features that were talked

16  about was the RideCheck pop-up that is referenced in

17  Exhibit 14 [sic].  Do you see that?

18     A    Yes.

19     Q    Okay.  And I know there were some

20  questions about whether you received that at a later

21  date or during the ride.  Do you remember that --

22  those questions?

23          MS. BLAKE:  Objection.  Form.

24          THE WITNESS:  Yes.

25     Q    (BY MS. ABRAMS)  And you had stated that

Page 287

1    you may have received it while in the vehicle;
2    correct?
3              MS. BLAKE:  Objection.
4              THE WITNESS:  Yes.
5         Q    (BY MS. ABRAMS)  Okay.  And you don't
6    recall seeing this RideCheck pop-up during the Uber
7    ride while you were being assaulted by the driver;
8    correct?
9              MS. BLAKE:  Objection.  Form.
10             THE WITNESS:  No.
11        Q    (BY MS. ABRAMS)  Okay.  And to your
12   recollection, this RideCheck feature was of no help
13   to you that night that you were assaulted by the
14   Uber driver; correct?
15             MS. BLAKE:  Objection.  Form.
16             THE WITNESS:  That's correct.
17        Q    (BY MS. ABRAMS)  Okay.  In fact, you
18   didn't even see the RideCheck pop-up until much
19   later after you had already been raped; correct?
20             MS. BLAKE:  Objection.  Form.
21             THE WITNESS:  Yes, ma'am.
22             MS. ABRAMS:  I'm going to now play two
23   exhibits that the first -- what exhibit number are
24   we on?
25             THE COURT REPORTER:  16.

1        Q    (BY MS. ABRAMS)  I'm going to mark as
2    Exhibit 16 your 911 call; okay?
3            (Exhibit 16 marked for identification.)
4        A    Okay.
5        Q    I have to make sure my tech skills work
6    here.
7                    (Exhibit 16 audio played.)
8        Q    (BY MS. ABRAMS)  That was your reporting
9    to 911 following being raped by an Uber driver?
10            MS. BLAKE:  Objection.  Form.
11            THE WITNESS:  Yes.
12        Q    (BY MS. ABRAMS)  Do you remember making
13    that call?
14        A    A little bit.
15        Q    And who was the other voice on the 911
16    recording?
17        A    Kenny.
18        Q    And Kenny was the hotel clerk; correct?
19        A    Yes.
20        Q    Okay.  Was this the only 911 reporting
21    that you made regarding the sexual assault by the
22    Uber driver?
23            MS. BLAKE:  Objection.  Form.
24            THE WITNESS:  Yes.
25            MS. ABRAMS:  That was Exhibit 16, correct,

1                    CERTIFICATE

2   STATE OF OKLAHOMA   )
                        )  SS:                    Page 301
3   COUNTY OF OKLAHOMA  )

4            I, D. Luke Epps, Certified Shorthand

5   Reporter within and for the State of Oklahoma, do

6   hereby certify that the witness, Jaylynn Dean, was

7   by me first duly sworn to testify the truth, the

8   whole truth, and nothing but the truth, in the case

9   aforesaid; that the above and foregoing deposition

10  was by me taken in shorthand and thereafter

11  transcribed; and that I am not an attorney for nor

12  relative of any of said parties or otherwise

13  interested in the event of said action.

14           IN WITNESS WHEREOF, I have hereunto set my

15  hand and official seal this 1st day of

16  July, 2025.

17

18  _____
                    D. Luke Epps, CSR, RPR
19

20

21

22

23

24

25

# EXHIBIT 9

## EXHIBIT FILED UNDER SEAL

# EXHIBIT 10

## EXHIBIT FILED UNDER SEAL

# EXHIBIT 11





UBER-MDL3084-BW-00027901



UBER-MDL3084-BW-00027902

# EXHIBIT 12

CONFIDENTIAL

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | *Driver* | *Timestamp Local* | *Latitude* | *Longitude* | *Speed MPH* | *Mobile Event Type* | *Mobile Event Name* |
| 2 | Hassan Turay | 11/14/23 12:00:02 AM | 33.45633 | -111.99519 | 42.50 | custom | rider_live_location_map_marker_location_filtered |
| 3 | Hassan Turay | 11/14/23 12:00:04 AM | 33.4565 | -111.99519 | 42.50 | custom | rider_live_location_map_marker_location_filtered |
| 4 | Hassan Turay | 11/14/23 12:00:08 AM | 33.45727 | -111.99517 | 33.55 | impression | safety_speeding_intervention_speeding_restored |
| 5 | Hassan Turay | 11/14/23 12:00:30 AM | 33.45861 | -111.99513 | 17.90 | impression | navigation_route_marker_removed_impression |
| 6 | Hassan Turay | 11/14/23 12:00:30 AM | 33.45861 | -111.99513 | 17.90 | impression | navigation_route_marker_removed_impression |
| 7 | Hassan Turay | 11/14/23 12:00:30 AM | 33.45861 | -111.99513 | 17.90 | impression | navigation_route_marker_added_impression |
| 8 | Hassan Turay | 11/14/23 12:00:30 AM | 33.45861 | -111.99513 | 17.90 | impression | navigation_route_marker_added_impression |
| 9 | Hassan Turay | 11/14/23 12:00:39 AM | 33.45932 | -111.9951 | 22.37 | custom | rider_live_location_map_marker_location_filtered |
| 10 | Hassan Turay | 11/14/23 12:00:40 AM | 33.45941 | -111.9951 | 22.37 | custom | rider_live_location_map_marker_location_filtered |
| 11 | Hassan Turay | 11/14/23 12:00:42 AM | 33.45957 | -111.99509 | 17.90 | custom | rider_live_location_map_marker_location_filtered |
| 12 | Hassan Turay | 11/14/23 12:00:42 AM | 33.45966 | -111.99509 | 20.13 | impression | navigation_route_marker_removed_impression |
| 13 | Hassan Turay | 11/14/23 12:00:42 AM | 33.45966 | -111.99509 | 20.13 | impression | navigation_route_marker_removed_impression |
| 14 | Hassan Turay | 11/14/23 12:00:44 AM | 33.45975 | -111.99509 | 22.37 | custom | rider_live_location_map_marker_location_filtered |
| 15 | Hassan Turay | 11/14/23 12:00:55 AM | 33.46126 | -111.99505 | 40.26 | custom | rider_live_location_map_marker_location_filtered |
| 16 | Hassan Turay | 11/14/23 12:00:56 AM | 33.46143 | -111.99504 | 42.50 | custom | rider_live_location_map_marker_location_filtered |
| 17 | Hassan Turay | 11/14/23 12:00:56 AM | 33.46159 | -111.99504 | 42.50 | impression | safety_speeding_intervention_speeding |
| 18 | Hassan Turay | 11/14/23 12:01:03 AM | 33.46274 | -111.995 | 40.26 | custom | rider_live_location_map_marker_location_filtered |
| 19 | Hassan Turay | 11/14/23 12:01:04 AM | 33.46274 | -111.995 | 40.26 | custom | rider_live_location_map_marker_location_filtered |

CONFIDENTIAL

CONFIDENTIAL

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | *Driver* | *Timestamp Local* | *Latitude* | *Longitude* | *Speed MPH* | *Mobile Event Type* | *Mobile Event Name* |
| 13501 | Hassan Turay | 11/15/23 12:33:19 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13502 | Hassan Turay | 11/15/23 12:33:20 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13503 | Hassan Turay | 11/15/23 12:33:20 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13504 | Hassan Turay | 11/15/23 12:33:20 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13505 | Hassan Turay | 11/15/23 12:33:21 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13506 | Hassan Turay | 11/15/23 12:33:21 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13507 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13508 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13509 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | tap | core_begintrip |
| 13510 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | dx_waittime_intervals_pickup |
| 13511 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_statusassistant_waiting_state |
| 13512 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_docard_peeked |
| 13513 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | safety_audio_reminder_trip_start |
| 13514 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigation_stop |
| 13515 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigation_start |
| 13516 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navsdk_navigation_naviviewset |
| 13517 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigation_auto_navigate |
| 13518 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigation_soundmodeset |
| 13519 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navsdk_navigation_loading_impression |
| 13520 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | guidancechromevisibilitychangeevent |
| 13521 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navsdk_navigation_naviviewset |
| 13522 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | driver_platform_monitoring |
| 13523 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | xplorerextrapolationevent |
| 13524 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | XplorerLocationQualityEvent |
| 13525 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigation_on_job_start |

CONFIDENTIAL

CONFIDENTIAL

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | *Driver* | *Timestamp Local* | *Latitude* | *Longitude* | *Speed MPH* | *Mobile Event Type* | *Mobile Event Name* |
| 13526 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | trip_docard_peeked |
| 13527 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | distant_delivery_blocker_ever_near_destination_clear_cache |
| 13528 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navsdk_navigation_compass |
| 13529 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigate_button_impression |
| 13530 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | XplorerLocationQualityEvent |
| 13531 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | safety_audio_reminder_request_success |
| 13532 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | xplorernavigationresponsesizeevent |
| 13533 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | xplorerrouteresponseevent |
| 13534 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | navsdk_navigation_routeset_impression |
| 13535 | Hassan Turay | 11/15/23 12:33:22 AM | 33.45313 | -111.92682 | 0.00 | custom | driver_platform_monitoring |
| 13536 | Hassan Turay | 11/15/23 12:33:23 AM | 33.45313 | -111.92682 | 0.00 | tap | navex_navigate_button_tap |
| 13537 | Hassan Turay | 11/15/23 12:33:23 AM | 33.45313 | -111.92682 | 0.00 | tap | navsdk_navigation_navigatebutton |
| 13538 | Hassan Turay | 11/15/23 12:33:23 AM | 33.45313 | -111.92682 | 0.00 | custom | navex_navigation_navidefaulted |
| 13539 | Hassan Turay | 11/15/23 12:33:23 AM | 33.45313 | -111.92682 | 0.00 | impression | navex_navigation_navilaunched |
| 13540 | Hassan Turay | 11/15/23 12:33:23 AM | 33.45313 | -111.92682 | 0.00 | impression | navsdk_navigation_naviviewset |
| 13541 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13542 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13543 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13544 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13545 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13546 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13547 | Hassan Turay | 11/15/23 12:33:25 AM | 33.45313 | -111.92682 | 0.00 | impression | navigation_route_marker_added_impression |
| 13548 | Hassan Turay | 11/15/23 12:33:38 AM | 33.45303 | -111.92652 | 13.42 | impression | carbon_current_street_name |

CONFIDENTIAL

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | *Driver* | *Timestamp Local* | *Latitude* | *Longitude* | *Speed MPH* | *Mobile Event Type* | *Mobile Event Name* |
| 13611 | Hassan Turay | 11/15/23 12:36:52 AM | 33.43586 | -111.94283 | 62.63 | impression | navigation_route_marker_added_impression |
| 13612 | Hassan Turay | 11/15/23 12:36:53 AM | 33.43588 | -111.94312 | 62.63 | impression | safety_speeding_intervention_speeding_restored |
| 13613 | Hassan Turay | 11/15/23 12:37:02 AM | 33.43624 | -111.94563 | 51.45 | impression | safety_speeding_intervention_no_contextual_speed_limit |
| 13614 | Hassan Turay | 11/15/23 12:37:02 AM | 33.43624 | -111.94563 | 51.45 | impression | safety_speeding_intervention_who_restored_excessive_speeding |
| 13615 | Hassan Turay | 11/15/23 12:37:19 AM | 33.43644 | -111.94978 | 60.40 | impression | trip_docard_peeked |
| 13616 | Hassan Turay | 11/15/23 12:37:20 AM | 33.43644 | -111.94978 | 60.40 | impression | trip_docard_summary |
| 13617 | Hassan Turay | 11/15/23 12:37:21 AM | 33.43648 | -111.95037 | 60.40 | custom | driver_platform_monitoring |
| 13618 | Hassan Turay | 11/15/23 12:37:21 AM | 33.43648 | -111.95037 | 60.40 | impression | trip_docard_summary |
| 13619 | Hassan Turay | 11/15/23 12:37:21 AM | 33.43648 | -111.95037 | 60.40 | impression | trip_docard_summary |
| 13620 | Hassan Turay | 11/15/23 12:37:21 AM | 33.43648 | -111.95037 | 60.40 | impression | agenda_section_item_add |
| 13621 | Hassan Turay | 11/15/23 12:37:22 AM | 33.43648 | -111.95037 | 60.40 | impression | trip_docard_peeked |
| 13622 | Hassan Turay | 11/15/23 12:37:37 AM | 33.43684 | -111.955 | 60.40 | custom | xploreretaupdateevent |
| 13623 | Hassan Turay | 11/15/23 12:37:39 AM | 33.43693 | -111.95556 | 60.40 | impression | safety_speeding_intervention_speeding_restored |
| 13624 | Hassan Turay | 11/15/23 12:37:39 AM | 33.43693 | -111.95556 | 60.40 | impression | safety_speeding_intervention_contextual_speed_limit |
| 13625 | Hassan Turay | 11/15/23 12:37:52 AM | 33.43776 | -111.95861 | 46.98 | impression | trip_docard_peeked |
| 13626 | Hassan Turay | 11/15/23 12:37:52 AM | 33.43776 | -111.95861 | 46.98 | tap | core_agenda_expand |
| 13627 | Hassan Turay | 11/15/23 12:37:57 AM | 33.43804 | -111.95952 | 35.79 | tap | core_endtrip |
| 13628 | Hassan Turay | 11/15/23 12:37:57 AM | 33.43804 | -111.95952 | 35.79 | impression | distant_dropoff_alert_presentation |
| 13629 | Hassan Turay | 11/15/23 12:38:00 AM | 33.43819 | -111.95993 | 26.84 | tap | distant_dropoff_alert_override_action |
| 13630 | Hassan Turay | 11/15/23 12:38:00 AM | 33.43819 | -111.95993 | 26.84 | tap | carbon_actionable_alerts_button_tapped |
| 13631 | Hassan Turay | 11/15/23 12:38:00 AM | 33.43822 | -111.96003 | 22.37 | custom | loyalty_offlineoverlay_optionalpluginsresolved |
| 13632 | Hassan Turay | 11/15/23 12:38:00 AM | 33.43822 | -111.96003 | 22.37 | custom | earner_session_fetch_started |
| 13633 | Hassan Turay | 11/15/23 12:38:00 AM | 33.43822 | -111.96003 | 22.37 | custom | earner_session_agenda_section_empty |
| 13634 | Hassan Turay | 11/15/23 12:38:00 AM | 33.43822 | -111.96003 | 22.37 | custom | safety_audio_recorder_driver_trip_ended_with_recording |

CONFIDENTIAL

**Document Produced in Native**

CONFIDENTIAL

# EXHIBIT 13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


***CONFIDENTIAL***

VIDEOTAPED 30(b)(6) DEPOSITION OF
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC
GREG BROWN

IN RE: UBER TECHNOLOGIES, INC.,
PASSENGER SEXUAL ASSAULT LITIGATION

MDL No. 3084 CRB

_____


DEPONENT:          GREG BROWN

DATE:              July 15, 2025

TIME:              9:43 a.m.

LOCATION:          NELSON MULLINS
                   CHARLESTON, SC

REPORTED BY:       JESSICA BOLANOS

Greg Brown  Confidential
July 15, 2025

1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS:

3        WALKUP, MELODIA KELLY + SCHOENBERGER
         BY:  SARA M. PETERS, ESQ.
4        BY:  KATHERINE HAZEN
         650 California Street
5        26th Floor
         San Francisco, CA 94108
6        speters@walkuplawoffice.com

7

8    ON BEHALF OF MDL PLAINTIFFS' STEERING COMMITTEE
     (VIA VIDEOCONFERENCE):
9
         JOHNSON LAW GROUP
10       BRET STANLEY, ESQ.
         2925 Richmond Avenue
11       Houston, TX 77098
         bstanley@johnsonlawgroup.com
12

13   ON BEHALF OF MDL PLAINTIFFS:

14       PEIFFER WOLF CARR KANE CONWAY & WISE LLP
         BY:  RACHEL ABRAMS, ESQ.
15       555 Montgomery Street
         Suite 820
16       San Francisco, CA 94111
         rabrams@peifferwolf.com
17

18   -and-

19       ANAPOL WEISS
         BY:  ALEXANDRA WALSH, ESQ. (via videoconference)
20       14 Ridge Square Northwest
         Third Floor
21       Washington, DC 20016
         awalsh@anapolweiss.com
22

23

24

25

Greg Brown  Confidential
July 15, 2025

```
 1    ON BEHALF OF DEFENDANTS:

 2
         KIRKLAND & ELLIS, LLP
 3       BY:  JENNIFER LEVY, ESQ.
         BY:  MAX D. BARTELL, ESQ.
 4       BY:  THERESA BORGE (via videoconference)
         1301 Pennsylvania Avenue Northwest
 5       Washington, D.C. 20004
         jennifer.levy@kirkland.com
 6       max.bartell@kirkland.com
         theresa.borge@kirkland.com
 7

 8
    Also present:     Keven Carvajal, Videographer
 9
                      Will Davis, Document Technician
10
                      Joanne Moon, Uber Senior
11                    Counsel

12                    Shivani Kavuluru, Peiffer Wolf

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Greg Brown  Confidential
July 15, 2025

```
 1         A.  Not to my knowledge, no.

 2         Q.  Ms. Dean got into Mr. Turay's vehicle

 3    with no information about him other than what

 4    Uber had told her, right?

 5         A.  Yes, as far as I know.

 6         Q.  As far as you know, she didn't know him

 7    from before, right?

 8         A.  As far as I know.

 9         Q.  He was a stranger to her?

10         A.  Based on my review of the investigation,

11    I do not believe the two knew each other prior to

12    the trip.

13              MS. PETERS:  Okay.  Let's go to

14    Tab 21, please.

15              THE TECHNICIAN:  You said Tab 21,

16    counsel?

17              MS. PETERS:  Tab 21, which will be

18    Exhibit 1697.

19              (Exhibit 1697 marked for

20    identification.)

21         Q.  Let's go to the bottom of page 5, where

22    the header is Relevant Facts.  That's the Bates

23    number ending in 713.

24         A.  Yes.

25              MS. PETERS:  Thank you, Will.
```

Greg Brown  Confidential
July 15, 2025

```
1          Q.  After Ms. Dean received the information
2    Uber presented to her about Mr. Turay, she got
3    into his vehicle at about 12:31 a.m., right?
4          A.  That's my understanding, yes.
5          Q.  At 12:33 a.m., if we go to the next
6    page, she was in his car moving, right?
7          A.  Yeah.  I would maybe re-characterize the
8    first statement I just agreed to, to say I think
9    what is indicated in the Jira is that the driver
10   arrived in the pickup location at 12:31 and the
11   trip began at 12:33.
12         Q.  Thank you.  Yeah, let me clean that up.
13   So after Ms. Dean received the information that
14   Uber had presented to her about Mr. Turay, he
15   arrived in the designated pickup location at
16   approximately 12:31 a.m., right?
17         A.  Yes, that's my understanding.
18         Q.  And at 12:33 a.m., she was in his
19   vehicle and the trip had begun, right?
20         A.  Yes, that's my understanding.
21         Q.  Five minutes later, at about 12:38 a.m.,
22   the driver took an action in his -- on his phone
23   to mark the trip as completed, right?
24         A.  Yes, that's my understanding.
25         Q.  He did that at an offramp on the side of
```

Greg Brown - Confidential
July 15, 2025

 1    the freeway, right?

 2         A.  Yes, I believe that's correct.

 3         Q.  That was not the destination that the

 4    rider had put in, right?

 5         A.  That's correct.

 6         Q.  And then from Uber's data, they didn't

 7    see any mobile events recorded for a while after

 8    that, right?

 9         A.  Yes, that's my understanding.

10         Q.  In fact, 20 minutes go -- or 19 minutes

11    go by where there is no more mobile event data

12    pinging for Uber, right?

13         A.  Yes, that's my understanding.

14         Q.  And the next thing that Uber could see

15    from its GPS data is that mobile events, in other

16    words, location data, starts appearing again for

17    the rider around her requested destination,

18    right?

19         A.  Yes, that's correct.

20         Q.  And the driver had not at that point

21    come back online, correct?

22         A.  Yes, that's my understanding.

23         Q.  And then just 12 minutes later, the

24    driver appears again in the vicinity of a gas

25    station on the other side of the rider's

Greg Brown  Confidential
July 15, 2025

 1   destination from where he had gone offline,

 2   right?

 3       A.  That's consistent with my understanding,

 4   yes.

 5           MS. PETERS:  Let's take that down,

 6   please, Will.

 7       Q.  That same day, later in the day,

 8   Ms. Dean reported to Uber an incident that had

 9   occurred, right?

10       A.  Yes.

11       Q.  And at first, did Uber talk to her

12   mother and then to her?

13       A.  In my review of the communications

14   associated with this incident, I don't recall a

15   conversation with Ms. Dean's mother being a part

16   of the investigative process here.

17           MS. PETERS:  Let's go to Tab 96.

18   We would like to play the audio of Ms. Dean's

19   report at this time.  Will, should you -- can you

20   do that or this is --

21           THE TECHNICIAN:  Yeah, I can get it

22   up in just a second.

23           MS. PETERS:  Thank you.

24           THE TECHNICIAN:  And this will be

25   1698.

Greg Brown  Confidential
July 15, 2025

```
 1                    MS. PETERS:  Yeah, and we'll go --
 2    we'll start at time stamp 4:43, please.  This
 3    will be 1698.
 4                    (Exhibit 1698 marked for
 5    identification.)
 6                    THE TECHNICIAN:  All right.  Give
 7    me a sec.
 8           And you said 4:43?
 9                    MS. PETERS:  Yes, please.
10                    (Audio-recording played.)
11                    MS. PETERS:  Stop it there, Will.
12    Okay.
13       Q.  So Uber --
14                    THE TECHNICIAN:  You said pause,
15    counsel?
16                    MS. PETERS:  Yeah, we can stop
17    it -- pause there, please.  Thank you.
18       Q.  Was the audio that we just listened to
19    the report that we were referring to by Ms. Dean
20    to Uber of what had happened?
21       A.  Yes, it was.  I believe -- based on my
22    review of the underlying investigation, I believe
23    Ms. Dean also attempted to contact the critical
24    safety line a few hours prior to the call we just
25    listened to as well.  But I believe that was the
```

Greg Brown  Confidential
July 15, 2025

1   successful eventual connection she made with the

2   critical safety line to report the incident to

3   Uber.

4       Q.  All right.  And one of the things that

5   Uber does when it receives a report like

6   Ms. Dean's is it tries to determine whether there

7   are indicia of credibility or whether there are

8   data points that contradict the account, right?

9       A.  I think as part of a wholesome

10  investigation, it will look at all of the

11  available facts and information, including things

12  like GPS, et cetera, to see if there are

13  corroborative, conflicting, confirmatory,

14  et cetera, aspects of Uber's data relative to the

15  reports that it receives.

16      Q.  All right.  And it's looking for

17  corroborative or conflicting or confirmative

18  aspects of Uber's data in order to see whether

19  the report is a credible one or not, right?

20      A.  I don't think the concept of credibility

21  is one that we necessarily anchor on.  I tend to

22  think about it more in terms of whether the

23  information, in accordance with the standard for

24  serious interpersonal conflict, would result in

25  notations counted, you know, against the

Greg Brown  Confidential
July 15, 2025

1    reported-against party.

2        Q.  And after gathering all of the data at

3    its disposal, Uber determined that Ms. Dean's

4    report met the criteria for one where the driver

5    should be deactivated, right?

6        A.  Yes.

7        Q.  And it then not only deactivated his

8    main account, but it banned his related -- or his

9    known linked account, right?

10       A.  That's my understanding.

11       Q.  Some of the corroborative pieces of data

12   that Uber received included its GPS data, right?

13       A.  Yes.

14       Q.  The GPS supported Ms. Dean's account,

15   right?

16       A.  Yes.  I believe the GPS data was

17   consistent with the incident Ms. Dean described.

18       Q.  Ms. Dean's own statement was internally

19   consistent, right?

20       A.  What do you mean by that?  I'm sorry.

21       Q.  She didn't contradict herself, she

22   didn't change her story?

23       A.  No.  Sorry.  Double negative.

24       Q.  Yeah.

25       A.  I believe -- can you re-ask the

Greg Brown Confidential
July 15, 2025

```
 1                  CERTIFICATE

 2              I, Jessica Bolanos, Notary Public

 3   in and for the State of South Carolina, do hereby

 4   certify that the witness in the foregoing

 5   deposition was duly sworn to testify to the

 6   truth, the whole truth and nothing but the truth

 7   in the within-entitled cause; that said

 8   deposition took place before me at NELSON

 9   MULLINS, CHARLESTON, SC.  The testimony of the

10   witness and all objections made at the time of

11   the examination were recorded stenographically by

12   me and were thereafter transcribed by

13   computer-aided transcription.  The foregoing is a

14   full, complete and true record of the testimony

15   of the witness and of all objections made at the

16   time of the examination.

17              I further certify that I am neither

18   related to nor counsel for any party to the cause

19   pending or interested in the events thereof.

20              Witness my hand, I have hereunto

21   affixed my official seal at Charleston,

22   Charleston County, on July 17, 2025.

23

24                   Jessica Bolanos
                     My Commission expires
25                   April 22, 2032
```

# EXHIBIT 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 1

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5   IN RE: UBER TECHNOLOGIES, INC.,  )
    PASSENGER SEXUAL ASSAULT         )
6   LITIGATION                       )
    _____)
7                                    ) Case No.
                                     )3:23-md-03084-CRB(LJC)
8   This Document Relates to:        )
    Jaylynn Dean v Uber Technologies,)
9   Inc., et al.                     )
    (Case No. 3:23-cv-06708)         )
10  _____)

11

12

13

14        VIDEOTAPED DEPOSITION OF HASSAN TURAY

15

                      Mesa, Arizona
16                   July 23, 2025
                       5:11 p.m.

17

18

19

20

21

22

23

    Reported by:
24  SHANNON STEVENSON,
    RPR, CCR
25  Certificate No. 50461       Job No. CS7503627

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 45

1    if it was like she's had any -- I don't really know what

2    was going on.  It just looked like off.  Like the little

3    part that I saw before she stopped me, it looked like

4    something was off.

5             And I told the detective this.  And the reason

6    why I told him this was I said because like when she was

7    doing the rape kit, she might have done the same thing.

8    Because I would assume like, you know, if they're doing a

9    rape kit, you would have to take your clothes off.  Maybe

10   she would show some shyness, you know what I'm saying.

11   Just something.  I was telling the detective like -- and

12   this isn't even like the first time I talked to him.

13   Because I had called him later and I was telling him, I'm

14   like, Detective Lopez, I want you to please look at all

15   of the evidence.  Don't just assume, you know, that I'm

16   guilty.  Because I was really, really -- you know, like I

17   was really scared, you know.  So I'm like please don't

18   just assume that I'm guilty.  Look at all the evidence.

19   I even told him about those buildings that I drove

20   through and I asked him, I'm like maybe there are cameras

21   there.  Like check those cameras, you know, see if you

22   could see anything.  You might be able to see something

23   like she's in the back seat and she's naked.  You know,

24   that wouldn't -- that would, you know, kind of, you know,

25   put a different perspective kind of, but yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 46

1      Q    Yeah.  That's helpful.  I want to digest that

2   and kind of go through that piece by piece, if we can.

3   Okay?

4      A    Okay.  And something else that I do want to say

5   also is that when we were done.  Because when we -- when

6   I pulled off the freeway, when I pulled off the freeway,

7   I told her, I said, I'm going to turn the app off.  I'm

8   going to complete the ride.  Because if it's running, you

9   will be paying for the time that we're having sex.  I

10  mean, I didn't say all that, but I did say if it's

11  running, you would still be charged for the time, you

12  know.  So I'm going to turn the app off, you know.  And

13  when we were done, she had to give me the address of

14  where she was staying for me to drop her off, which she

15  did, you know what I'm saying.  I didn't know where I was

16  taking her, you know.  I also called the detective later

17  and, you know, told him that so...

18     Q    All right.  So let's take a step back.  I guess

19  at a big picture perspective, you are not disputing that

20  you and Ms. Dean had sexual intercourse that night,

21  correct?

22     A    No, I'm not.

23     Q    But from your perspective, Ms. Dean wanted to

24  have sex with you; is that right?

25          MR. PERKINS:  Objection.  Form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 47

1          THE WITNESS:  Yes, from my perspective that was

2     my perspective, yes.

3          Q    BY MR. VIVES:  All right.  So when you went to

4     pick her you up, when she was walking to the car, was she

5     stumbling in any sort of way?

6          A    No.

7          Q    Did she appear visibly intoxicated to you when

8     she got into the car?

9          A    She did not appear visibly intoxicated, but she

10    did say, and I remember this because we had a

11    conversation about it, she did say I am so drunk right

12    now.  She said it like almost verbatim those were the

13    exact words out of her mouth, I am so drunk right now.

14    She said that.  And she talked about throwing up, you

15    know.

16          Something that did strike me as odd, which I

17    didn't even recall until Detective Lopez himself asked me

18    specifically about it.  He said, did you smell alcohol on

19    the rider's breath?  And I thought about it and I

20    realized that I didn't smell any alcohol.  Because if I

21    had -- if I had smelt alcohol, like I would have

22    remembered like, okay, she had a beer breath or she had a

23    whiskey breath, you know.  I don't recall smelling

24    alcohol.  But it slipped my mind totally until when

25    Detective Lopez asked me because he did ask me.  I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

 1    remember smelling alcohol.

 2        Q    And did you and her -- did you kiss her during

 3    this incident?  Did she kiss you?

 4        A    I believe that I did kiss her.  I think I did,

 5    you know.  Or maybe not, but I do know that our faces

 6    were pretty close.

 7        Q    Yeah.

 8        A    You know, to where I should have smelled the

 9    alcohol if she was actually drunk.  I mean, if she had

10    actually been drinking.  You know, I feel like I should

11    have smelt the alcohol, but I don't remember smelling

12    alcohol at all.

13        Q    Okay.  And you said that when she got into the

14    car -- well, strike that.

15             What is the first thing that you recall either

16    you saying to her or her saying to you when she got into

17    the car?

18        A    I believe that's the first thing she said, I'm

19    so drunk right now.

20        Q    Okay.

21        A    Yeah.  And then she started talking about, you

22    know, her boyfriend, and she threw up in his bathtub

23    twice, you know.  And I wonder if, you know, he's going

24    to be mad at me, and, you know, that type of thing.

25        Q    And who was the first person who brought up sex

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 56

```
 1   she's doing her school for the airline and stuff like
 2   that.  So I had suggested to her how about find a motel
 3   that you would spend the night at.  This is before we
 4   talked about sex.
 5        Q    Okay.
 6        A    I believe this is before we talked about sex.
 7   Yeah.
 8        Q    And what did she say in response to your
 9   question?
10        A    Suggest I'm going to a motel, I don't believe
11   that was answered.
12        Q    Okay.
13        A    Yeah.  I don't believe she -- she responded, so
14   I just let it go.
15        Q    All right.  I want to look back at this police
16   report one more time.  If we look there it says, again on
17   that same page, it says, "The Uber driver then told her
18   he was going to pull over to find a place to park and
19   Jaylynn again said okay, quote, in a sarcastic tone at
20   which point the vehicle exited the main roadway and
21   entered an empty parking lot of a business complex later
22   determined to be 1035 West Rio Salado Parkway, Tempe."
23             Do you see that?
24        A    Yeah.
25        Q    And to be clear, Mr. Turay, this is what
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 57

1    Ms. Dean, herself, reported to the police.  You

2    understand that?

3              MR. PERKINS:  Objection.  Form.

4              THE WITNESS:  Uh-huh.

5         Q    BY MR. VIVES:  Is that a yes?

6         A    Yes.

7              MR. PERKINS:  Objection.  Form.

8         Q    BY MR. VIVES:  And so where it says here that

9    Jaylynn again said okay in a sarcastic tone, do you

10   recall any part of this conversation being sarcastic in

11   nature?

12        A    No.

13        Q    If Ms. Dean would have said okay in a sarcastic

14   tone, would you have pulled over?

15             MR. PERKINS:  Objection.  Form.

16             THE WITNESS:  No, I wouldn't have.  And if she

17   hadn't said, you know, you should have sex with me, I

18   wouldn't have -- you know, I wouldn't have none of --

19   like none of that would have happened, you know.

20        Q    BY MR. VIVES:  All right.  So after you stopped

21   the car -- you talked about this earlier, but at some

22   point you stopped the car in this parking lot, right?

23   Right, Mr. Turay?

24        A    Yeah.

25        Q    And you said you ended the Uber ride, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 58

1      A     I ended the Uber ride as I was getting off the

2    freeway.

3      Q     And why did you end the Uber ride?

4      A     Because I didn't want the lady to be charged,

5    you know, while she's -- I didn't want her to end up

6    being charged more than the ride.  Because I'm pretty

7    sure Uber takes into consideration the time that you

8    spend with the driver as well as, you know, the distance

9    of the fair, right.  So I feel like, you know, I didn't

10   want her to end up being charged more than she should

11   have to have paid.

12     Q     Okay.  So then at some point you get in the

13   back seat with Ms. Dean; is that correct?

14     A     Uh-huh.

15     Q     And when you get in the back seat, what was she

16   doing?

17     A     She was laying down on her back, you know.

18   Yeah.

19     Q     Was she fully clothed at that point?

20     A     No, she wasn't.  She didn't have her skirt on.

21   She had her top, a white blouse, but didn't have the

22   skirt on.

23     Q     So the skirt she had removed herself?

24     A     Yes.

25     Q     Did she have any underwear on?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 59

1    A    No.

2    Q    Do you know at what point she removed her skirt

3  and her underwear?

4    A    I believe it was while I was driving at some

5  point she -- I didn't know exactly when she removed it

6  because I'm driving, you know.  But I know definitely by

7  the time I had pulled off the freeway and I was at that

8  light and it was a red light, I was waiting to make a

9  left and I had turned back, she didn't have the skirt on,

10  she didn't have any underwear that I saw, and she was

11  sitting on the seat, her legs were open and she was

12  touching herself.

13    Q    So she was touching herself while you were

14  still driving before you stopped the vehicle?

15    A    Before I even stopped.

16    Q    Was she saying anything to you while she was

17  doing that?

18    A    She was telling me to hurry up so we could have

19  sex and that she's horny.

20    Q    Okay.  And so then you stopped the vehicle, you

21  get in the back seat, she doesn't have underwear, her

22  skirt on.  Do you remove any of her clothing?

23    A    No.  I do attempt to raise up her white blouse

24  because, you know, I wanted to play with her breasts.  I

25  did attempt once and she stopped me, and I attempted to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 87

1              MR. VIVES:  Object.

2              THE WITNESS:  No.

3        Q    BY MR. PERKINS:  The only reason you turned the

4    app off was so she didn't get charged?

5        A    Yeah.  Because if the app was on, Uber still

6    wouldn't have known what I was doing.

7        Q    Uber actually sent you a notice that night.  Do

8    you remember getting that notice on your phone?

9        A    No, I don't.

10        Q    About taking an unusual route?

11              MR. VIVES:  Object to the form.

12        Q    BY MR. PERKINS:  A safety notice that popped up

13    on your phone that you declined?

14        A    At what time?

15        Q    I'm just asking if you remember getting it and

16    declining it and then turning off your app?

17        A    No, I don't remember getting the notice.

18        Q    Really?

19        A    No.

20        Q    Do you know what type of notice I'm talking

21    about?

22        A    I do.

23        Q    You've gotten those before, haven't you?

24        A    Yes.

25              MR. VIVES:  Object to the form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1      Q    BY MR. PERKINS:  And you've declined those

2   notices before saying everything is okay, right?

3      A    Yeah.

4      Q    And that's all you have to do when you get the

5   notice, you just press the button and it goes away,

6   right?

7           MR. VIVES:  Object to the form.

8           THE WITNESS:  Yeah.  Yeah, I think so.

9      Q    BY MR. PERKINS:  Okay.  But you think Uber

10  would have a problem with having sex with passengers?

11     A    I know they would.

12     Q    Why?  If it's consensual, what's the problem?

13     A    Well, it's because I'm at work.  It's not

14  professional.

15     Q    You've had sex with coworkers before?

16     A    That too is not professional.

17     Q    Okay.  So you think that was unprofessional

18  when you did that in the past?

19     A    Yeah.

20     Q    And you think it was unprofessional when you

21  had sex with Ms. Dean on this night, correct?

22     A    Yeah.

23     Q    It was wrong, right?

24     A    Yeah.

25     Q    So your testimony today taking everything that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 89

1   you remember about that night is that you believe

2   Ms. Dean was able to meaningly and fully consent to the

3   sexual encounter that you guys had, correct?

4         MR. VIVES:  Object to the form.

5         THE WITNESS:  Yes.

6     Q    BY MR. PERKINS:  Okay.  Looking back -- let's

7   see.  But you've said today many times and you told the

8   police many times that Ms. Dean had told you she was

9   drunk, correct?

10    A    She did.

11    Q    Okay.  In fact, she didn't just say she was

12  drunk, she said she was very drunk, correct?

13    A    Yeah.

14    Q    She said she was so drunk that just right

15  before you picked her up she was vomiting at the man's

16  house that she was at, correct?

17        MR. VIVES:  Object to the form.

18  Mischaracterizes testimony.

19        THE WITNESS:  It wasn't right before I picked

20  her up because she did say she had a shower, but she said

21  she vomited in his bathtub twice.

22    Q    BY MR. PERKINS:  You don't know how soon before

23  you picked her up that happened, right?

24    A    No, I don't know how soon.

25    Q    You also told the police you saw her stumbling?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 90

1            MR. VIVES:  Object to the form.

2       Q    BY MR. PERKINS:  Do you remember saying that?

3       A    No, I don't.

4       Q    So let's do this:  On a scale of 1 to 10, how

5    drunk was Ms. Dean --

6            MR. VIVES:  Object to form.

7       Q    BY MR. PERKINS:  -- on the night you had sex

8    with her?  1 being the lowest, 10 being the most drunk.

9       A    Maybe she was like a 3.  I don't think she -- I

10   don't think she was drunk really.

11      Q    You think she lied to you when she said she was

12   really drunk?

13      A    I don't know because, like I was saying, I

14   don't remember smelling alcohol on her.

15      Q    Well, the police officer smelled it on her and

16   several hours later her blood alcohol content based on

17   the labs they took was very, very high.

18           MR. VIVES:  Object to the form.  Foundation.

19           Counsel, are you testifying or are you asking

20   questions?

21           MR. PERKINS:  I'm asking questions, Counselor.

22           MR. VIVES:  Okay.

23           THE WITNESS:  I didn't know that.

24      Q    BY MR. PERKINS:  You might have missed the

25   smell on her breath, correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 133

1  STATE OF ARIZONA        )

                           ) ss

2  COUNTY OF MARICOPA      )

3

4      BE IT KNOWN that the foregoing deposition was taken

5  before me, SHANNON STEVENSON, a Certified Reporter in and

6  for the County of Maricopa, State of Arizona; that the

7  witness before testifying was duly sworn to testify to

8  the whole truth; that the questions propounded to the

9  witness and the answers of the witness thereto were taken

10 down by me in shorthand and thereafter reduced to

11 computer-aided transcription under my direction; that the

12 foregoing 132 pages are a true and correct transcript of

13 all proceedings had upon the taking of said deposition,

14 all done to the best of my skill and ability.

15     I FURTHER CERTIFY that I am in no way related to any

16 of the parties hereto, nor am I in any way interested in

17 the outcome hereof.

18 (   )  Signature was requested.

19 (XXX)  Signature was not requested.

20     DATED at Phoenix, Arizona, this 25th day of July,

21 2025.

22                        SHANNON STEVENSON, CR, RPR

23                        Certified Reporter

                          Certificate No. 50461

24                        VERITEXT LEGAL SOLUTIONS

                          Registered Reporting Firm

25                        RRF No. R1061

# EXHIBIT 15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

———————

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

Case No. 3:23-md-03084-CRB

———————

REPORT OF RAJEEV KELKAR, Ph.D.

This Report relates to the following Wave 1 Case:
Case No. 23-cv-6708 (Dean)

SEPTEMBER 26, 2025

The Turay Uber Trip GPS shows the locations of the ride assignment and the pickup. Figure 2 (Bates UBER-MDL3084-BW-00027901) shows the Turay Uber Trip GPS data with the pickup and end locations for the ride. The Driver Mobile Events Log for Mr. Turay shows that the trip was ended at approximately 12:37:57 AM at the Red Mountain Freeway offramp/Sky Harbor Boulevard just east of its intersection with N. Priest Drive.



**FIGURE 2: Turay Uber Trip GPS data showing the locations for the pickup (shown in the upper right quadrant of the map) and end (shown in the lower left quadrant of the map) for the subject ride.**

As can be seen in Figure 2, the Turay Uber Trip GPS does not complete the route seen in Figure 1 to the 1601 W. Rio Salado Parkway destination. The movement of the Turay Uber vehicle was also captured on the Life360 application on Ms. Dean's phone. The Life360 application shows that the Turay Uber headed south on N. Priest Drive and then drove to locations on W. Rio Salado Parkway east of N. Priest Drive, i.e., in the opposite direction to where the SpringHill Suites destination was located. It is during this timeframe, when the Turay Uber vehicle was east of N. Priest Drive, that the sexual encounter occurred.

The Rider Mobile Events Log for Ms. Dean indicates that at 12:39:04 AM (approximately 67 seconds after Mr. Turay had ended the ride) a "trip_control_safety_button" entry is logged. The Rider Mobile Events Log for Ms. Dean also indicates that at 12:57:08 (when Ms. Dean was at or very near the SpringHill Suites destination) a "safety_ridecheck_get_metadata_request_success" entry is logged.

The Driver Mobile Events Log for Mr. Turay indicates that at 12:37:57 AM a "core_endtrip" entry is logged. The Driver Mobile Events Log for Mr. Turay indicates that at 12:37:57 AM (the

very second the "core_endtrip" entry was logged), a "distant_dropoff_alert_presentation" entry is logged. The Driver Mobile Events Log for Mr. Turay indicates that at 12:38:00 AM a "distant_dropoff_alert_override_action" is logged. The Driver Mobile Events Log for Mr. Turay indicates that at the same time (i.e., 12:38:00 AM) a "safety_audio_recorder_driver_trip_ended_with_recording" entry is logged, and a "safety_audio_trip_audio_recorder_remove" entry is logged.

Figure 3 is a composite schematic showing the Turay Uber Trip GPS data and Ms. Dean's Life360 GPS data, and showing the locations where the ride was assigned, the ride pickup occurred, the ride was ended, locations east of N. Priest Drive the Turay vehicle travelled, and the SpringHill Suites destination. It should be understood that the Uber Trip GPS data has greater time resolution than Ms. Dean's Life360 GPS data, and thus the Uber Trip GPS data will track the path and turns better than the Life360 GPS data.



**Figure 3: Composite schematic showing the Turay Uber Trip GPS data (in yellow) and Ms. Dean's Life360 GPS data (in green) after Mr. Turay ended the ride. The ride assignment occurred at the location on the right side of the schematic at the bottom of the yellow vertical segment there. The pickup occurred at the location in the middle of the schematic at the top of the yellow vertical segment there. The ride was terminated on the left side of the schematic at the left end of the yellow near-horizontal segment there. The Life360 GPS in green shows the Turay Uber vehicle east of N. Priest Drive for an extended period of time before it terminates at the SpringHill Suites destination on the left side of the schematic, west of N. Priest Drive.**

From the location at which Mr. Turay ended the trip to the SpringHill Suites destination was approximately 0.9 miles, a distance that could be covered in approximately 2 or 3 minutes under normal traffic conditions. Ms. Dean was dropped off at the SpringHill Suites approximately 15 to 20 minutes after Mr. Turay ended the ride at the Red Mountain Freeway offramp/Sky Harbor Boulevard just east of N. Priest Drive. The Turay Uber GPS comes back online at approximately 1:09 AM, after being turned off at approximately 12:38 AM.

The Turay Uber Trip GPS data was also analyzed to provide a speed versus time profile from the pickup to when the ride was ended by Mr. Turay (Figure 4).



**Figure 4: Chart showing the speed versus time profile for the ride from pickup (at zero seconds) to when the ride was ended (at approximately 275 seconds). The ride was ended while the vehicle was still travelling above 20 mph as it approached N. Priest Drive.**

This report and the conclusions contained in it are provided with a reasonable degree of scientific and engineering certainty, are based upon my education, my experience, and the case-specific material reviewed to date and may be amended or modified should additional relevant information become available.

Yours sincerely,

INSCITECH, INC.

*Rajeev Kelkar*

Rajeev Kelkar, PhD

# EXHIBIT 16

Mariana Esteves
July 15, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE: UBER TECHNOLOGIES,        )

INC., PASSENGER SEXUAL           )   CASE NO. 3:23-MD-03084-CRB

ASSAULT LITIGATION               )


-----------------------------------------------


ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF

UBER TECHNOLOGIES, INC., RAISER LLC,

AND RAISER-CA, LLC, by and through

MARIANA ESTEVES


July 15, 2025

Mariana Esteves
July 15, 2025

1          ORAL AND VIDEOTAPED DEPOSITION OF MARIANA ESTEVES,

2     produced as a witness at the instance of the Plaintiffs,

3     was taken in the above-styled and numbered cause on July

4     15, 2025, from 9:05 a.m. to 4:43 p.m., before Jamie K.

5     Israelow, Certified Shorthand Reporter in and for the

6     State of Texas, Registered Merit Reporter and Certified

7     Realtime Reporter, reported by machine shorthand, with

8     the witness appearing remotely in the City of São Paulo,

9     State of São Paulo Country of Brazil, and the provisions

10    stated on the record or attached hereto; that the

11    deposition shall be read and signed before any notary

12    public.

13

14

15

16

17          REPORTER'S NOTE:  Please be advised that an

18     UNCERTIFIED ROUGH DRAFT version of this transcript

19      exists.  If you are in possession of said rough

20       draft, please replace it immediately with this

21             CERTIFIED FINAL TRANSCRIPT.

22

23

24

25

Mariana Esteves
July 15, 2025

```
 1                    REMOTE APPEARANCES

 2   FOR THE MDL PLAINTIFFS:

 3        Marlene Goldenberg, Esq. (Via videoconferencing)
          Sam Hoefs, Esq. (Via videoconferencing)
 4        NIGH GOLDENBERG RASO & VAUGHN
          14 Ridge Square NW
 5        Third Floor
          Washington, D.C.  20016
 6        202-978-2228
          612-445-0202
 7        mgoldenberg@nighgoldenberg.com
          shoefs@nighgoldenberg.com

 8

 9   FOR THE MDL PLAINTIFFS:

10        Kristen Palumbo, Esq. (Via videoconferencing)
          GIRARD SHARP LLP
11        601 California Street, Suite 1400
          San Francisco, CA  94108
12        866.981.4800
          kpalumbo@girardsharp.com

13

14   FOR THE MDL PLAINTIFFS' STEERING COMMITTEE:

15        Bret Stanley Esq. (Via videoconferencing)
          JOHNSON LAW GROUP
16        2925 Richmond Avenue, Suite 1700
          Houston, TX  77098-3135
17        713.626.9336
          bstanley@johnsonlawgroup.com

18

19

20

21

22

23

24

25
```

Mariana Esteves
July 15, 2025

```
 1   FOR THE DEFENDANTS:

 2        Kaitlyn L. Coverstone, Esq. (Via videoconferencing)
          KIRKLAND & ELLIS LLP
 3        333 W. Wolf Point Plaza
          Chicago, IL  60654
 4        312.862.2000
          kaitlyn.coverstone@kirkland.com
 5        -- and --
          Kate Moyer, Esq. (Via videoconferencing)
 6        KIRKLAND & ELLIS LLP
          555 California Street, 27th Floor
 7        San Francisco, CA  94104
          415.439.1400
 8        kate.moyer@kirkland.com

 9

10   ALSO PRESENT:

11        M.J. Zimdahl, Videographer
          Vince Rosica, Document Technician
12        Jennifer Malanday
          Zoe Anderson Miller
13
          Juan Valdiviesco
14        Senior Counsel at Uber

15

16

17

18

19

20

21

22

23

24

25
```

Mariana Esteves
July 15, 2025

1             MS. GOLDENBERG:  So let's take this notice

2    down, please.

3             MS. COVERSTONE:  Counsel, I'll note, she's

4    also been designated on (d) and (e) for those topics as

5    well.

6             MS. GOLDENBERG:  Sorry about that.  Yes.

7    Q.   (By Ms. Goldenberg)  And, Ms. Esteves, you're

8    prepared to talk about -- to speak on (d) and (e) as

9    well?

10   A.   The screen has gone black.

11            MS. GOLDENBERG:  We can put it back up.

12            (Document displayed.)

13   A.   Communications and -- (Reading).

14            Yes, uh-huh.

15            MS. GOLDENBERG:  Okay.  So let's take that

16   down.

17   Q.   (By Ms. Goldenberg)  And let's talk generally

18   about RideCheck for a minute.  Can you tell me what

19   RideCheck is?

20   A.   Yeah.  And I think my counsel, Kaitlyn, has

21   told you that I have some deposition aids.  I do have

22   the files, the digital version, but I also have a

23   physical copy of the binder.  So I will be going through

24   them throughout the answers.  I don't think I need to

25   tell, like, every single time I'm looking through them,

Mariana Esteves
July 15, 2025

1    but I just wanted you to know this first time, if that's

2    okay.

3        Q.   Yeah.  And if you are referring to your binder,

4    if you want to call out what tab you're looking at, I'll

5    do my best to follow along with you, too.

6        A.   Okay.  I am looking at Tab 8 of Safety

7    Features.  And my -- what I'm looking at is Page 4.

8             So RideCheck is a Uber safety feature that

9    monitors trip data and looks for anything that's --

10   that's going on on that trip that we consider to be an

11   anomaly, like something that's happening that seems to

12   be unplanned.  And in those situations, we send out

13   in-app messages and push notifications to both riders

14   and drivers, offering them different safety channels, in

15   case they need any help.

16       Q.   Okay.  And when was RideCheck first launched in

17   the United States?

18       A.   Oh, so RideCheck was first launched in 2019.

19       Q.   All right.  And when did it become fully

20   available to the US market?

21       A.   Let me just take a look at this.

22             It was 2019.

23       Q.   Okay.  I know it was rolled out piecemeal in

24   some regions, but it was fully rolled out in the United

25   States in 2019?

Mariana Esteves
July 15, 2025

```
 1      A.   Yeah, 2019.

 2      Q.   Okay.  And the purpose of RideCheck is both to

 3   improve how safe passengers feel, but also to actually

 4   make rides safer, right?

 5      A.   Actually, it's to proactively identify those

 6   anomalies, like I mentioned, and to provide them with

 7   the different safety channels, right?  But we don't have

 8   any static data internally that proves that RideCheck

 9   reduces safety incidents.  It's really hard to prove

10   that.  So I think in that sense, we're making sure that

11   we're actively providing those tools to -- to riders and

12   drivers.

13      Q.   Okay.  So Uber's position is that RideCheck

14   doesn't actually make people safer, but that it has the

15   ability to let passengers -- or to give passengers

16   access to safety resources in the event that something

17   might be happening.  Did I understand you correctly?

18              MS. COVERSTONE:  Objection to form.

19      A.   Yeah.  So we can't really say if it does or

20   does not make people safer in -- in -- with -- because

21   we don't have data proving yes or no, like, to -- to

22   that fact.

23              What we can really tell is that we -- our

24   riders and drivers really appreciate the feature, and

25   they're happy that Uber is following along with the
```

Mariana Esteves
July 15, 2025

1    trips and the anomalies and proactively prompting them

2    with different safety aids.  But we cannot say it does

3    make it safer or it does not make it safer.  We don't

4    have the information for that.

5        Q.   (By Ms. Goldenberg)  Okay.  Now, you talked

6    about RideCheck identifying anomalies on trips, right?

7        A.   Yes.

8        Q.   Can you tell me what types of anomalies

9    RideCheck looks for?

10       A.   Yes.  So we look for long stops during a trip,

11   like unplanned long stops.  We look at midway drop-offs,

12   so when a trip is ending far away from the designated

13   drop-off location.  We look at route deviation, if there

14   was any route deviation from the original route.  And we

15   also have crash protection, to identify if there's a

16   potential car accident during the trip.

17       Q.   Okay.  So the focus of what I'm going to ask

18   you about today are those first three anomalies.  And --

19   and, again, those are the long stops, the midway

20   drop-offs and the route deviations.  Okay?

21       A.   Okay.

22       Q.   All right.  Now, what is the reason that Uber

23   wanted to identify long stops, midway drop-offs and

24   route deviations?

25       A.   Yeah.  So those are likely scenarios that can

Mariana Esteves
July 15, 2025

1    occur during a trip that might indicate that something

2    is not going as planned.  We have run, like, different

3    analysis in past trips to understand:  Hey, if there's a

4    long stop, this could be, you know, just traffic, but

5    this can be:  Hey, something is going on that is

6    unplanned, and both riders and drivers, you know, might

7    want some type of help from both Uber or law enforcement

8    or the dedicated safety agents.

9       Q.    All right.  So -- right.  Long stops, midway

10   drop-offs and route deviations can be a signal that

11   something is not going well on a ride, correct?

12      A.    They can be one, or as in this case, like three

13   signals that something is not going well.  There are, of

14   course, other factors that can interfere in something

15   that is not going well, but these are ones that we can

16   identify through GPS and telematics.

17      Q.    Right.

18              And so in the context of sexual assaults,

19   these three things -- long stops, midway drop-offs, and

20   route deviations -- are potential signals that there may

21   be a sexual assault going on on a ride, correct?

22              MS. COVERSTONE:  Objection to form.

23      A.    They're not indicators of sexual assaults.

24   They are indicators that something might be going as

25   unexpected.

Mariana Esteves
July 15, 2025

1    they will dispatch law enforcement, sometimes even

2    dispatching ambulances.

3                    So if Uber has knowledge, like, if the

4    rider has -- or the driver has reached out for support

5    with a Uber safety agent, we will intervene.

6        Q.    (By Ms. Goldenberg)  What else --

7        A.    Safety agent will intervene.  Sorry.  Correct.

8        Q.    And I'm sorry.  I missed part of your answer,

9    and I'm wondering if the court reporter did, too.

10                   What was the last thing you said?

11       A.    I was just correcting myself.  I said the Uber

12   will intervene, but the safety agents will intervene.

13       Q.    Okay.  Now, one of the purposes of tracking

14   drivers with GPS is so that Uber can understand when its

15   drivers are doing things that they should not be doing,

16   right?

17                   MS. COVERSTONE:  Objection to form; vague.

18       A.    Well, the main purpose of checking GPS for

19   drivers is to make the platform available, right?  If we

20   didn't have GPS tracking for drivers, how will you

21   know -- right? -- how -- how long it would take for a

22   driver to arrive at your pickup location?  How will you

23   price different types of trips?

24                   So GPS is very important for a lot of

25   things to make the business run.  It was -- for one of

Mariana Esteves
July 15, 2025

1  the safety team's idea to understand, like, how can that

2  signal that's widely used also help us understand if

3  there's any anomaly happening in that trip and it's --

4  for some reason, it's -- you know, it's going on --

5  something might be going on that is unexpected.

6      Q.    (By Ms. Goldenberg)  Yeah.  So let's talk about

7  RideCheck specifically.

8              One of the reasons that it's important to

9  check -- or to track drivers with GPS data in the

10 context of RideCheck is so Uber can understand if

11 something is going on that might be indicative of

12 safe- -- of a safety incident, right?

13     A.    The reason why we track and the reason why we

14 did the RideCheck, just to make sure we're aligned on

15 that, is that we wanted to notify the users and

16 practically tell them, like:  Hey, it looks like

17 something is going out of the normal, based on the

18 original program of this trip.  Is everything okay?  Do

19 you need any help?

20             And we understand that our overly -- our,

21 in a sense, overcautious and our precision is very low.

22 And we notify riders, and the vast majority of the time,

23 nothing happens; like there's no safety incident

24 associated with those triggers.  So it's not just for a

25 safety -- we don't trigger just in safety cases.  We --

Mariana Esteves
July 15, 2025

1    we overtrigger, basically, to make sure that the riders

2    are okay and drivers are okay.

3        Q.   And when you say "there's no safety

4    incident" --

5        A.   Yes.

6        Q.   -- again, that's just that there's no safety

7    incident reported to Uber, not that Uber knows that

8    there is no safety incident, right?

9        A.   Uber -- there's no incident to Uber's

10   knowledge, right?  Whether it was reported -- sometimes,

11   like I said, it can be reported by a third person.  An

12   incident may be caught on media.  It's Uber's knowledge,

13   right?  It's not on our systems that -- we don't have

14   any knowledge if we don't know.

15       Q.   Right.

16            I want to be clear, though, that when

17   you're saying that precision is low because there are no

18   safety incidents, Uber doesn't know conclusively that

19   there are no safety incidents; it just knows that that's

20   the number of safety incidents reported to Uber, right?

21       A.   No.  It's the number of safety incidents that

22   Uber has knowledge of.

23       Q.   Sure.  But if -- if Uber doesn't know about a

24   safety incident, it's not going to make its way into

25   that metric, as we've already discussed, right?

Mariana Esteves
July 15, 2025

1      A.    Right.

2            If we don't have knowledge, how could we

3  know?  If we knew, it would it be in the metric.

4      Q.    Right.

5            And so Uber doesn't actually know if its

6  precision is, in fact, that number because it doesn't

7  know how many safety incidents actually occurred, right?

8            MS. COVERSTONE:  Objection to form; also

9  asked and answered.

10     A.    We only have knowledge of the incidents that we

11 know of.  So if we don't know -- if we know something,

12 we know something.  If we don't know, we don't know.

13 And we work with internal teams.  In every single

14 country that we operate, we have law enforcement

15 partnerships.  We have a local safety operations team

16 that -- on the ground -- right? -- who understand and

17 make sure that we're capturing everything.

18     Q.    (By Ms. Goldenberg)  And are you aware that

19 several of your colleagues have testified on behalf of

20 Uber that sexual assault is underreported?

21     A.    I don't have knowledge of that.

22     Q.    Okay.  So you're giving me numbers today

23 without having knowledge that Uber's own testimony is

24 that sexual assault is underreported; is that right?

25     A.    The numbers that I'm giving is the numbers that

Mariana Esteves
July 15, 2025

```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                     SAN FRANCISCO DIVISION

3    IN RE: UBER TECHNOLOGIES,    )

4    INC., PASSENGER SEXUAL       )  CASE NO. 3:23-MD-03084-CRB

5    ASSAULT LITIGATION           )

6

7       ---------------------------------------------

8         SUPERIOR COURT FOR THE STATE OF CALIFORNIA
           COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION
9

10   COORDINATION PROCEEDINGS     )

11   SPECIAL TITLE (Rule 3.550)   )   CASE NO. CJC-21-005188

12                                )

13   In re: Uber Rideshare Cases  )

14

15   REPORTER'S CERTIFICATION OF THE ORAL AND VIDEOTAPED

16                30(B)(6) DEPOSITION OF

17          UBER TECHNOLOGIES, INC., RAISER LLC,

18           AND RAISER-CA, LLC, MARIANA ESTEVES

19                     July 15, 2025

20          I, Jamie K. Israelow, a Certified Shorthand

21   Reporter duly commissioned and qualified in and for the

22   State of Texas, Registered Merit Reporter and Certified

23   Realtime Reporter, do hereby certify to the following:

24          That the witness, MARIANA ESTEVEZ, was duly

25   sworn by the officer and that the transcript of the oral
```

Mariana Esteves
July 15, 2025

1    deposition is a true record of the testimony given by

2    the witness:

3            That the original transcript was delivered to

4    Marlene Goldberg, Esq..

5            That a copy of the certificate was served on

6    all parties and/or the witness shown herein on

7    _____.

8            I further certify that pursuant to FRCP Rule

9    30(f)(1) that the signature of the deponent:

10           _X_ was requested by the deponent or a party

11   before the completion of the deposition and that

12   signature is to be before any notary public and returned

13   within 30 days from date of receipt of the transcript.

14   If returned, the attached Changes and Signature Page

15   contains any changes and the reasons therefor;

16           ___ was not requested by the deponent or a

17   party before the completion of the deposition.

18           I further certify that I am neither attorney

19   or counsel for, nor related to or employed by any of the

20   parties to the action in which this deposition is taken,

21   and further that I am not a relative or employee of any

22   attorney or counsel employed by the parties hereto, or

23   financially interested in the action.

24

25

1       That the amount of time used by each party at the

2   deposition is as follows:

3       Marlene Goldenberg, Esq. - 4:18
        Sam Hoefs, Esq. - 0:00
4       Kristen Palumbo, Esq. - 0:00
        Bret Stanley Esq. - 0:00
5       Kaitlyn Covestone, Esq. - 0:06
        Kate Moyer, Esq. - 0:00
6

7       That pursuant to information given to the
    deposition officer at the time said testimony was taken,

8   the following includes counsel for all parties of

9   record:

10      Marlene Goldberg, Esq., Sam Hoefs, Esq., and
    Kristen Palumbo, Esq., Attorneys for MDL Plaintiffs.

11      Bret Stanley Esq., Attorney for MDL
    Plaintiffs' Steering Committee.

12      Kaitlyn Covestone, Esq., and Kate Moyer, Esq.,
    Attorneys for Defendants.

13      CERTIFIED TO BY ME on this 17th day of July,

14  2025.

15  _____
    Jamie K. Israelow, CSR, RMR, CRR

16  Texas CSR 3801
    Expiration Date:   4/30/2027

17  US LEGAL SUPPORT, INC.
    Firm Registration No. 122

18  16825 Northchase Drive, Suite 900
    Houston, Texas   77060

19  713.653.7100

20

21

22

23

24

25

# EXHIBIT 17

1:49



 🏁 **rolling loud california lineup!**    3m ago

## Uber

∧ Show less    ✕

 **TIME SENSITIVE**    1h ago
**RideCheck**
Your ride ended earlier than expected.
Is everything ok?

Leave on Time Sensitive notifications from Uber? This
allows Uber to deliver important notifications
immediately.

| Leave On | Turn Off |

 **TIME SENSITIVE**    1h ago
**Rate your trip**
Thanks for riding with Hassan!
Please rate your trip, and you can
also add a tip.



 **M A Z ‖ L A N A**    34m ago
I love u so much omg, is this real?
@AnneMarie

    

BW-DEAN_JAYLYNN_000083

cricket

**Wednesday, November 15**

1:51

19%
Jaylynn Phone

Uber    ∧ Show less    ✕

**TIME SENSITIVE**    1h ago
**RideCheck**
Your ride ended earlier than expected.
Is everything ok?

Leave on Time Sensitive notifications from Uber? This
allows Uber to deliver important notifications
immediately.

Leave On    Turn Off

**Rate your trip**
Thanks for riding with Hassan!
Please rate your trip, and you can
also add a tip.

BW-DEAN_JAYLYNN_000084



BW-DEAN_JAYLYNN_000085

# EXHIBIT 18

ID: f1dd2a20-fd90-482f-ae9e-195538f8d36f

Title: A message from Uber

User Type: driver

Hi Hassan, We're investigating a report from a trip. Your account has been temporarily restricted while we look into this. Please note that this investigation can only be completed by a member of our Trust and Safety Team. It cannot be resolved using other support channels, including the Greenlight Hub and Critical Safety Response Line. If you have further details about this incident that you would like to share with us in the meantime, please feel free to respond to this message. You should expect to hear from a member of our team soon. Thank you for your patience while we look into this matter.

Christopher Salazar Perez

Wed, 15 Nov 2023 20:40:38 GMT

via agent (external)

Okay.

Hassan Turay

Wed, 15 Nov 2023 21:31:03 GMT

via inappsupport (external)

Your account has been permanently deactivated based on the information we've received. Unfortunately, we're unable to provide additional information at this time. Please note that other Uber support channels are unable to provide additional details. Please don't come into the Uber office, as they're unable to assist with this matter. Our decision is final. Please discard or return any Uber-branded decals or signage that you may have used for your vehicle as outlined in our Community Guidelines.

Greg Watson

Fri, 17 Nov 2023 01:51:25 GMT

via agent (external)

# EXHIBIT 19

**Document Produced in Native**

CONFIDENTIAL

| Driver Name | status | status_note | is_current_status | begin_status_timestamp | end_status_timestamp | flow_type | begin_flow_timestamp | end_flow_timestamp |
|---|---|---|---|---|---|---|---|---|
| Hassan Turay | Applied | IN | FALSE | 2016-12-07 18:20:22 | 2016-12-21 19:00:58 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Wait Listed | Driver was moved from Applied to Waitlisted by stsheriff for: Background check temp suspended, auto-manual-waitlisting driver. Current BGC status: adverse-action  Automatic Driver Movement | FALSE | 2016-12-21 19:00:58 | 2016-12-23 18:06:24 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | | FALSE | 2016-12-23 18:06:24 | 2017-03-03 4:28:03 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved from active to Waitlisted (Auto-Reactivation) by stsheriff for: Driver did not have at least 1 active vehicle  Automatic Driver Movement | FALSE | 2017-03-03 4:28:03 | 2017-03-03 4:28:03 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved from active to Waitlisted (Auto-Reactivation) by stsheriff for: Driver did not have at least 1 active vehicle  Automatic Driver Movement | FALSE | 2017-03-03 4:28:03 | 2017-12-08 22:22:54 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved from Waitlisted (Auto-Reactivation) to active by stsheriff for:  Automatic Driver Movement | FALSE | 2017-12-08 22:22:54 | 2017-12-09 17:05:10 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Applied | IN | FALSE | 2017-12-09 17:05:10 | 2017-12-10 17:30:31 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved from Applied to active by stsheriff for:  Automatic Driver Movement | FALSE | 2017-12-10 17:30:31 | 2017-12-10 17:31:30 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Activated driver in reconsent compliance group. | FALSE | 2017-12-10 17:31:30 | 2018-05-18 21:32:26 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved from active to Waitlisted (Auto-Reactivation) by stsheriff for: Driver did not have at least 1 active vehicle  Automatic Driver Movement | FALSE | 2018-05-18 21:32:26 | 2018-05-19 2:36:04 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved from Waitlisted (Auto-Reactivation) to active by stsheriff for:  Automatic Driver Movement | FALSE | 2018-05-19 2:36:04 | 2018-09-09 5:31:50 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Applied | no reason provided | FALSE | 2018-09-09 5:31:50 | 2018-09-09 6:10:27 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved to ACTIVE by Automatic Driver Movement (Enforcer) | FALSE | 2018-09-09 6:10:27 | 2019-05-19 7:22:16 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved from active to Waitlisted (Auto-Reactivation) by stsheriff for: Driver did not have at least 1 active vehicle  Automatic Driver Movement | FALSE | 2019-05-19 7:22:16 | 2019-06-29 1:42:10 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved from Waitlisted (Auto-Reactivation) to active by stsheriff for:  Automatic Driver Movement | FALSE | 2019-06-29 1:42:10 | 2019-08-15 7:17:49 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved from active to Waitlisted (Auto-Reactivation) by stsheriff for: Driver did not have at least 1 active vehicle  Automatic Driver Movement | FALSE | 2019-08-15 7:17:49 | 2019-09-09 7:45:24 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Applied | asgard - in-app reconsent celery job | FALSE | 2019-09-09 7:45:24 | 2019-09-09 7:45:24 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Applied | asgard - in-app reconsent celery job | FALSE | 2019-09-09 7:45:24 | 2020-09-09 1:26:53 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved to ACTIVE by Automatic Driver Movement (Enforcer) | FALSE | 2020-09-09 1:26:53 | 2021-02-15 7:21:11 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved to WAITLISTED_AUTO_REACTIVATION by Automatic Driver Movement (Enforcer) | FALSE | 2021-02-15 7:21:11 | 2021-02-15 7:24:40 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved to ACTIVE by Automatic Driver Movement (Enforcer) | FALSE | 2021-02-15 7:24:40 | 2021-08-15 7:11:48 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved to WAITLISTED_AUTO_REACTIVATION by Automatic Driver Movement (Enforcer) | FALSE | 2021-08-15 7:11:48 | 2021-08-17 3:57:18 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved to ACTIVE by Automatic Driver Movement (Enforcer) | FALSE | 2021-08-17 3:57:18 | 2023-03-05 7:00:15 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved to WAITLISTED_AUTO_REACTIVATION by Automatic Driver Movement (Enforcer) | FALSE | 2023-03-05 7:00:15 | 2023-03-07 8:20:28 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved to ACTIVE by Automatic Driver Movement (Enforcer) | FALSE | 2023-03-07 8:20:28 | 2023-04-02 7:00:34 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Waitlisted (Auto-Reactivation) | Driver was moved to WAITLISTED_AUTO_REACTIVATION by Automatic Driver Movement (Enforcer) | FALSE | 2023-04-02 7:00:34 | 2023-04-03 9:58:08 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | Driver was moved to ACTIVE by Automatic Driver Movement (Enforcer) | FALSE | 2023-04-03 9:58:08 | 2023-04-18 21:53:07 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Wait Listed | Driver has been automatically waitlisted due to a temporary safety lock. | FALSE | 2023-04-18 21:53:07 | 2023-04-18 21:53:15 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Wait Listed | IN | FALSE | 2023-04-18 21:53:15 | 2023-04-22 2:56:37 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Active | SAFE-3681018 | FALSE | 2023-04-22 2:56:37 | 2023-11-15 20:18:56 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Wait Listed | Safety Incident Reporting Line Escalation DEACTIVATION - DO NOT REACTIVATE: Driver deactivated for safety lock. JIRA: https://jira.uberinternal.com/SAFE-4071034 | FALSE | 2023-11-15 20:18:56 | 2023-11-17 1:48:16 | P2P | | 2016-12-07 18:20:21 IN |
| Hassan Turay | Rejected | | TRUE | 2023-11-17 1:48:16 IN | | P2P | | 2016-12-07 18:20:21 IN |

# EXHIBIT 20

## EXHIBIT FILED UNDER SEAL

# EXHIBIT 21

## EXHIBIT FILED UNDER SEAL

# EXHIBIT 22

## REDACTED VERSION

# Report for Hassan Ibrahim Turay

suspended

California Applicants/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.

Sólo para los Solicitantes/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.

## Personal information

**First Name**

Hassan

**Middle Name**

Ibrahim

**Last Name**

Turay

**Date of Birth**

███████████

**Social Security #**

███████████

**Geo**

phoenix

**Zipcode**

30342

**Driver License**

███████████

**Prior Driver License**

-

**Email**

███████████████

**Phone**

███████████

**Custom ID**

ad49b22a-751c-4df9-ac46-84ecf5a5f946

## Report information

**Package**

mvr

**Created at**

Dec 7, 2016 6:56:20 PM

**Completed at**

Dec 7, 2016 6:56:49 PM

UBER-MDL3084-BW-00012057

Motor Vehicle Record

Driving Privilege

suspended

**Full name**
HASSAN IBRAHIM TURAY

**License Status**
Valid

**License Type**
PERSONAL

**License Class**
C

**Expiration Date**
Oct 25, 2021

**Issued Date**
Oct 25, 2016

**Issued Date (inferred)**
Oct 25, 2016

**First Issued Date**
Oct 25, 2016

## Restrictions

- CORRECTIVE LENSES

**Requester Company:** Uber Eats

**Checkr, Inc.**
2505 Mariposa Street
San Francisco, CA 94110

844-824-3257
https://checkr.com/applicant

UBER-MDL3084-BW-00012058

# EXHIBIT 23

## REDACTED VERSION

# Report for Hassan Ibrahim Turay



California Applicants/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.

Sólo para los Solicitantes/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.

Personal information

First Name

Hassan

**Middle Name**

Ibrahim

**Last Name**

Turay

**Date of Birth**

███████████

**Social Security #**

███████████

**Geo**

atlanta

**Zipcode**

85345

**Driver License**

███████████

**Prior Driver License**

-

**Email**

███████████████████

**Phone**

██████████

**Custom ID**

76921802-11dd-455a-be3e-57aebb08ad1c

## Report information

**Package**

driver_premium

**Created at**

Dec 19, 2016 8:14:16 PM

**Completed at**

Dec 22, 2016 4:13:52 PM

UBER-MDL3084-DFS00003622



SSN Verification

Sex Offender Search                                    clear

Global Watchlist Search                                clear

National Criminal Search                               clear

Federal Criminal Search                                clear

County Criminal Searches                               clear

clear          Fulton, GA

clear          Maricopa, AZ



Motor Vehicle Record                                   clear

**Full name**
HASSAN IBRAHIM TURAY
**License Status**
Valid
**License Type**
PERSONAL
**License Class**
C
**Expiration Date**
Oct 25, 2021
**Issued Date**
Oct 25, 2016
**Issued Date (inferred)**

UBER-MDL3084-DFS00003623

Oct 25, 2016

First Issued Date

Jan 31, 2008

## Restrictions

- CORRECTIVE LENSES

**Requester Company:** Uber

**Checkr, Inc.**
2505 Mariposa Street
San Francisco, CA 94110

844-824-3257
https://checkr.com/applicant

CONFIDENTIAL

# EXHIBIT 24

# REDACTED VERSION

Consumer Report for
Hassan Ibrahim Turay

<span style="color:green">clear</span>

**California Applicants/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Solicitantes/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

## Summary

| | |
|---|---|
| Ssn Trace | <span style="color:green">clear</span> |
| Sex Offender Search | <span style="color:green">clear</span> |
| Global Watchlist Search | <span style="color:green">clear</span> |
| National Criminal Search | <span style="color:green">clear</span> |
| Federal Criminal Search | <span style="color:green">clear</span> |
| County Criminal Searches | <span style="color:green">clear</span> |
| Motor Vehicle Report | <span style="color:green">clear</span> |

UBER-MDL3084-DFS00003619



| | | | |
|---|---|---|---|
| **First Name** | Hassan | **Driver License** | |
| **Middle Name** | Ibrahim | **Previous Driver License** | - |
| **Last Name** | Turay | **Email** | |
| **Date of Birth** | | **Phone** | |
| **Social Security #** | | **Report Package** | no_history |
| **Custom ID** | 76921802-11dd-455a-be3e-57aebb08ad1c | **Report Created at** | Mar 4, 2017 5:23 PM |
| | | **Report Completed at** | Mar 6, 2017 6:55 PM |
| **Geos** | phoenix | | |
| **Zipcode** | 85345 | | |

👤 SSN Verification    `clear`

🔍 Sex Offender Search    `clear`

🔍 Global Watchlist Search    `clear`

🔍 National Criminal Search    `clear`

🔍 Federal Criminal Search    `clear`

🔍 County Criminal Searches    `clear`

`clear`  **Maricopa, AZ**

`clear`  **Fulton, GA**

🚗 Motor Vehicle Report    `clear`

| | |
|---|---|
| **Full name** | HASSAN IBRAHIM TURAY |
| **License Status** | VALID |
| **License Type** | PERSONAL |
| **License Class** | C |
| **Expiration Date** | Oct 25, 2021 |
| **Issued Date** | Oct 25, 2016 |
| **Issued Date (inferred)** | Oct 25, 2016 |
| **First Issued Date** | Oct 25, 2016 |

✳ Restrictions

- CORRECTIVE LENSES



**Checkr, Inc.**
2505 Mariposa Street
San Francisco, CA 94110

844-824-3257
https://applicants.checkr.com

# EXHIBIT 25

# REDACTED VERSION



Report completed on Jan 4, 2018 10:50 PM

Consumer Report for
**Hassan Ibrahim Turay**

Requestor Company
**Uber**

Status
Clear

**California Applicants/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Solicitantes/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

CONFIDENTIAL

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Jan 4, 2018 | Clear |
| Sex Offender Search | Jan 4, 2018 | Clear |
| Global Watchlist Search | Jan 4, 2018 | Clear |
| National Criminal Search | Jan 4, 2018 | Clear |
| Federal Criminal Search | Jan 4, 2018 | Clear |
| County Criminal Searches | | Clear |
| Motor Vehicle Report | Jan 4, 2018 | Clear |

UBER-MDL3084-DFS00003616



**Report information**

Report status  Clear

| First name | Middle name | Last name | Date of birth |
|---|---|---|---|
| Hassan | Ibrahim | Turay | ▓▓▓▓▓ |

| Phone | Zipcode | Email | Social Security # |
|---|---|---|---|
| ▓▓▓▓▓ | 85345 | ▓▓▓▓▓▓▓▓ | ▓▓▓▓▓ |

| Driver license | Previous driver license | Geos | Custom ID |
|---|---|---|---|
| ▓▓▓▓▓ | - | phoenix | 76921802-11dd-455a-be3e-57aebb08ad1c |

| Created at | Completed at |
|---|---|
| Jan 4, 2018 7:44 PM | Jan 4, 2018 10:50 PM |

**SSN Trace**  Clear

**Sex Offender Search**  Clear

**Global Watchlist Search**  Clear

**National Criminal Search**  Clear

**Federal Criminal Search**  Clear

**County Criminal Searches**  Clear

**Fulton, GA**  Clear

**Maricopa, AZ**  Clear

## Motor Vehicle Report

Clear

| | |
|---|---|
| Full Name | HASSAN IBRAHIM TURAY |
| Current License Status | VALID |
| Current License Type | PERSONAL |
| Current License Class | C |
| Current License Expiration Date | Oct 25, 2021 |
| Current License Issued Date | Oct 25, 2016 |
| Current License Issued Date Inferred | Oct 25, 2016 |
| Current License First Issued Date | Oct 25, 2016 |

Restrictions

CORRECTIVE LENSES

# Checkr

One Montgomery Street, Suite 2000, San Francisco, CA 94104
applicants.checkr.com - (844) 824-3257

UBER-MDL3084-DFS00003618

# EXHIBIT 26

## REDACTED VERSION



Report completed on Sep 10, 2018 4:05 PM

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

**California Applicants/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Solicitantes/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

UBER-MDL3084-DFS00003647

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Sep 9, 2018 | Clear |
| Sex Offender Search | Sep 9, 2018 | Clear |
| Global Watchlist Search | Sep 9, 2018 | Clear |
| National Criminal Search | Sep 9, 2018 | Clear |
| Federal Criminal Search | Sep 9, 2018 | Clear |
| County Criminal Searches | | Clear |
| Motor Vehicle Report | Sep 9, 2018 | Clear |

UBER-MDL3084-DFS00003648



**Report information**                                           Report status  [Clear]

First name          Middle name          Last name         Date of birth
Hassan              Ibrahim              Turay             ▮▮▮▮▮▮▮

Phone               Zipcode              Email             Social Security #
▮▮▮▮▮▮▮             85345                ▮▮▮▮▮▮▮▮▮▮         ▮▮▮▮▮▮▮
                                         ▮▮▮▮

Driver license      Previous driver      Geos              Custom ID
▮▮▮▮▮▮▮             licenses             phoenix           76921802-11dd-455a-
                    -                                      be3e-57aebb08ad1c

Created at           Completed at
Sep 9, 2018 6:35 AM  Sep 10, 2018 4:05 PM

**SSN Trace**                                                        [Clear]

**Sex Offender Search**                                              [Clear]

**Global Watchlist Search**                                         [Clear]

**National Criminal Search**                                        [Clear]

**Federal Criminal Search**                                         [Clear]

**County Criminal Searches**                                        [Clear]

**Maricopa, AZ**                                                     [Clear]

**Fulton, GA**                                                      [Clear]

                                    UBER-MDL3084-DFS00003649



## Motor Vehicle Report

Clear

| | |
|---|---|
| License Status | VALID |
| License Type | PERSONAL |
| License Class | C |
| License Expiration Date | Oct 25, 2021 |
| License Issued Date | Oct 25, 2016 |
| License Issued Date Inferred | Oct 25, 2016 |

### Restrictions

CORRECTIVE LENSES

# Checkr

One Montgomery Street, Suite 2000, San Francisco, CA 94104
applicants.checkr.com - (844) 824-3257

UBER-MDL3084-DFS00003650

# EXHIBIT 27

## REDACTED VERSION

# Checkr

Report completed on Jun 29, 2020 5:44 PM UTC

Consumer Report for          Requestor Company          Status
**Hassan Ibrahim Turay**     **Uber**                   Clear

---

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

---

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Jun 27, 2020 | Complete |
| Sex Offender Search | Jun 27, 2020 | Clear |
| Global Watchlist Search | Jun 27, 2020 | Clear |
| National Search | Jun 27, 2020 | Complete |
| Federal Search | Jun 27, 2020 | Clear |
| County Searches | | Clear |
| Motor Vehicle Report | Jun 27, 2020 | Clear |

UBER-MDL3084-DFS00003644



**Report information**  Clear

First name
Hassan

Middle name
Ibrahim

Last name
Turay

Date of birth
████

Phone
████

Zipcode
85345

Email
████

Social Security #
████

Driver license
████

Previous driver
licenses
-

Geos
phoenix

Custom ID
76921802-11dd-455a-
be3e-57aebb08ad1c

Created at
Jun 27, 2020 8:03 AM
UTC

Completed at
Jun 29, 2020 5:44 PM
UTC

**SSN Trace**  Complete

**Sex Offender Search**  Clear

**Global Watchlist Search**  Clear

**National Search**  Complete

**Federal Search**  Clear

UBER-MDL3084-DFS00003645



## County Searches

Clear

**Fulton, GA**

Clear

**Maricopa, AZ**

Clear



## Motor Vehicle Report

Clear

| | |
|---|---|
| License Status | LICENSED |
| License Type | PASSENGER |
| License Class | D |
| License Expiration Date | Feb 14, 2023 |
| License Issued Date | Mar 15, 2017 |
| License First Issued Date | - |

Restrictions

CORRECTIVE LENSES

## Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

CONFIDENTIAL

# EXHIBIT 28

## REDACTED VERSION

# Checkr

Report completed on Jun 3, 2021 12:22 PM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

CONFIDENTIAL

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | May 30, 2021 | Complete |
| Sex Offender Search | May 30, 2021 | Clear |
| Global Watchlist Search | May 30, 2021 | Clear |
| National Search | May 30, 2021 | Complete |
| Federal Search | May 30, 2021 | Complete |
| County Searches | Jun 3, 2021 | Clear |
| Motor Vehicle Report | May 30, 2021 | Clear |

CONFIDENTIAL



## Report information

Clear

**First name**
Hassan

**Middle name**
Ibrahim

**Last name**
Turay

**Date of birth**
████

**Phone**
████

**Zipcode**
85345

**Email**
████

**Social Security #**
████

**Driver license**
████

**Previous driver licenses**
-

**Geos**
phoenix

**Custom ID**
76921802-11dd-455a-be3e-57aebb08ad1c

**Created at**
May 30, 2021 8:49 PM UTC

**Completed at**
Jun 3, 2021 12:22 PM UTC

## SSN Trace

Complete

## Sex Offender Search

Clear

## Global Watchlist Search

Clear

## National Search

Complete

## Federal Search

Complete

UBER-MDL3084-DFS00003641



### County Searches | Clear

**Maricopa, AZ** | Clear

**Fulton, GA** | Clear

**Fairfax, VA** | Clear



### Motor Vehicle Report | Clear

| | |
|---|---|
| License Status | LICENSED |
| License Type | PASSENGER |
| License Class | D |
| License Expiration Date | Feb 14, 2023 |
| License Issued Date | Mar 15, 2017 |
| License First Issued Date | - |

Restrictions

CORRECTIVE LENSES

## Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

# EXHIBIT 29

## REDACTED VERSION

# Checkr

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

### Report Summary

| Motor Vehicle Report | May 2, 2022 | Clear |
|---|---|---|



## Report information

Clear

| First name | Middle name | Last name | Date of birth |
|---|---|---|---|
| Hassan | Ibrahim | Turay | ███████ |

| Phone number | Zipcode | Email | Social Security Number |
|---|---|---|---|
| ███████ | 85345 | ███████ | ███████ |

| Driver license | Previous driver licenses | Geos | Custom ID |
|---|---|---|---|
| ███████ | - | phoenix | 76921802-11dd-455a-be3e-57aebb08ad1c |

| Created at | Completed at |
|---|---|
| May 2, 2022 4:52 AM UTC | May 2, 2022 4:53 AM UTC |



## Motor Vehicle Report

Clear

███████

| License Status | LICENSED |
|---|---|
| License Type | PASSENGER |
| License Class | D |
| License Expiration Date | Feb 14, 2023 |
| License Issued Date | Mar 15, 2017 |
| License First Issued Date | - |

Restrictions

CORRECTIVE LENSES

# Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

CONFIDENTIAL

# EXHIBIT 30

## REDACTED VERSION

# Checkr

Report completed on May 2, 2022 8:41 PM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

UBER-MDL3084-DFS00003635

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | May 2, 2022 | Complete |
| Sex Offender Search | May 2, 2022 | Clear |
| Global Watchlist Search | May 2, 2022 | Clear |
| National Search | May 2, 2022 | Complete |
| Federal Search | May 2, 2022 | Complete |
| County Searches | May 2, 2022 | Clear |

UBER-MDL3084-DFS00003636



## Report information    Clear

| First name | Middle name | Last name | Date of birth |
|---|---|---|---|
| Hassan | Ibrahim | Turay | ▮ |

| Phone number | Zipcode | Email | Social Security Number |
|---|---|---|---|
| ▮ | 85345 | ▮ | ▮ |

| Driver license | Previous driver licenses | Geos | Custom ID |
|---|---|---|---|
| ▮ | ▮ | phoenix | 76921802-11dd-455a-be3e-57aebb08ad1c |

| Created at | Completed at |
|---|---|
| May 2, 2022 4:52 AM UTC | May 2, 2022 8:41 PM UTC |

**SSN Trace**    Complete

**Sex Offender Search**    Clear

**Global Watchlist Search**    Clear

**National Search**    Complete

**Federal Search**    Complete

**County Searches**    Clear

**Maricopa, AZ**    Clear

**Fulton, GA**    Clear

**Fairfax, VA**    Clear

UBER-MDL3084-DFS00003637

# Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

UBER-MDL3084-DFS00003638

# EXHIBIT 31

## REDACTED VERSION

# Checkr

Report completed on Apr 4, 2023 3:34 AM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

██████████

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

**Report Summary**

| | | |
|---|---|---|
| Motor Vehicle Report | Apr 4, 2023 | Clear |

UBER-MDL3084-DFS00003631



## Report information

Clear

| First name | Middle name | Last name | Date of birth |
|---|---|---|---|
| Hassan | Ibrahim | Turay | ███████ |

| Phone number | Zipcode | Email | Social Security Number |
|---|---|---|---|
| ████████ | 85345 | ████████████ | ███████ |

| Driver license | Previous driver licenses | Geos | Custom ID |
|---|---|---|---|
| ████████ | - | phoenix | 76921802-11dd-455a-be3e-57aebb08ad1c |

| Created at | Completed at |
|---|---|
| Apr 4, 2023 3:34 AM UTC | Apr 4, 2023 3:34 AM UTC |



## Motor Vehicle Report

Clear

████████████

| License Status | LICENSED |
|---|---|
| License Type | PASSENGER |
| License Class | D |
| License Expiration Date | Jan 31, 2039 |
| License Issued Date | Mar 2, 2023 |
| License First Issued Date | - |

Restrictions

CORRECTIVE LENSES

## Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

# EXHIBIT 32

## REDACTED VERSION

# Checkr

Report completed on Apr 9, 2023 1:06 AM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

UBER-MDL3084-DFS00003627

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Apr 4, 2023 | Complete |
| Sex Offender Search | Apr 4, 2023 | Clear |
| Global Watchlist Search | Apr 4, 2023 | Clear |
| National Search | Apr 4, 2023 | Complete |
| Federal Search | Apr 4, 2023 | Complete |
| County Searches | Apr 9, 2023 | Clear |

UBER-MDL3084-DFS00003628



## Report information

**Clear**

| First name | Middle name | Last name | Date of birth |
|---|---|---|---|
| Hassan | Ibrahim | Turay | ██████ |

| Phone number | Zipcode | Email | Social Security Number |
|---|---|---|---|
| ██████ | 85345 | ██████████ | ██████ |

| Driver license | Previous driver licenses | Geos | Custom ID |
|---|---|---|---|
| ██████ | ██████ | phoenix | 76921802-11dd-455a-be3e-57aebb08ad1c |

| Created at | Completed at |
|---|---|
| Apr 4, 2023 3:34 AM UTC | Apr 9, 2023 1:06 AM UTC |

**SSN Trace** — Complete

**Sex Offender Search** — Clear

**Global Watchlist Search** — Clear

**National Search** — Complete

**Federal Search** — Complete

**County Searches** — Clear

**Maricopa, AZ** — Clear

**Fulton, GA** — Clear

**Fairfax, VA** — Clear

CONFIDENTIAL

# Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

UBER-MDL3084-DFS00003630

# EXHIBIT 33

## REDACTED VERSION

# Checkr

Report completed on Jun 5, 2023 8:03 PM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

## Report Summary

| Motor Vehicle Report | Jun 5, 2023 | Clear |
|---|---|---|

CONFIDENTIAL



## Report information

**First name**
Hassan

**Middle name**
Ibrahim

**Last name**
Turay

**Date of birth**
█████████

**Phone number**
█████████

**Zipcode**
85345

**Email**
█████████████
█████

**Social Security Number**
█████████

**Driver license**
█████████

**Previous driver licenses**
-

**Geos**
phoenix

**Custom ID**
76921802-11dd-455a-be3e-57aebb08ad1c

**Created at**
Jun 5, 2023 6:15 PM UTC

**Completed at**
Jun 5, 2023 8:03 PM UTC



## Motor Vehicle Report

█████████

| | |
|---|---|
| License Status | LICENSED |
| License Type | PASSENGER |
| License Class | D |
| License Expiration Date | Jan 31, 2039 |
| License Issued Date | Mar 2, 2023 |
| License First Issued Date | - |

**Restrictions**

CORRECTIVE LENSES

## Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

# EXHIBIT 34

## REDACTED VERSION

# Checkr

Report completed on Jun 6, 2023 2:59 AM UTC

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Hassan Ibrahim Turay** | **Uber** | Clear |
| ▬▬▬▬▬ | | |

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

UBER-MDL3084-DFS00003611

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Jun 5, 2023 | Complete |
| Sex Offender Search | Jun 5, 2023 | Clear |
| Global Watchlist Search | Jun 5, 2023 | Clear |
| National Search | Jun 5, 2023 | Complete |
| Federal Search | Jun 5, 2023 | Complete |
| County Searches | Jun 6, 2023 | Clear |

UBER-MDL3084-DFS00003612



## Report information <span>Clear</span>

| First name | Middle name | Last name | Date of birth |
|---|---|---|---|
| Hassan | Ibrahim | Turay | ▮▮▮▮ |

| Phone number | Zipcode | Email | Social Security Number |
|---|---|---|---|
| ▮▮▮▮ | 85345 | ▮▮▮▮ | ▮▮▮▮ |

| Driver license | Previous driver licenses | Geos | Custom ID |
|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | phoenix | 76921802-11dd-455a-be3e-57aebb08ad1c |

| Created at | Completed at |
|---|---|
| Jun 5, 2023 6:15 PM UTC | Jun 6, 2023 2:59 AM UTC |

**SSN Trace** — Complete

**Sex Offender Search** — Clear

**Global Watchlist Search** — Clear

**National Search** — Complete

**Federal Search** — Complete

**County Searches** — Clear

**Maricopa, AZ** — Clear

**Fulton, GA** — Clear

**Fairfax, VA** — Clear

# Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

UBER-MDL3084-DFS00003614