| | |
|---|---|
| 1 | LAURA VARTAIN HORN (SBN: 258485) |
| 2 | laura.vartain@kirkland.com<br>**KIRKLAND & ELLIS LLP** |
| 3 | 555 California Street, 30th Floor<br>San Francisco, CA 94104 |
| 4 | Telephone: (415) 439-1625 |
| 5 | ALLISON M. BROWN (*Pro Hac Vice* admitted) |
| 6 | allison.brown@kirkland.com<br>2005 Market Street, Suite 1000 |
| 7 | Philadelphia, PA 19103<br>Telephone: (215) 268-5000 |
| 8 | alli.brown@kirkland.com |
| 9 | JESSICA DAVIDSON (*Pro Hac Vice* admitted) |
| 10 | jessica.davidson@kirkland.com<br>601 Lexington Avenue |
| 11 | New York, NY 10022<br>Telephone: (212) 446-4723 |
| 12 | |
| 13 | *Counsel for Defendants*<br>UBER TECHNOLOGIES, INC., |
| 14 | RASIER, LLC, and RASIER-CA, LLC<br>*[Additional Counsel Listed on Following Pages]* |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION,<br><br>This Document Relates to:<br><br>*Jaylynn Dean v. Uber Technologies, Inc., et al., No. 3:23-cv-06708* | Case No. 3:23-md-03084-CRB<br>**DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>Judge: Hon. Charles R. Breyer<br>Courtroom: Courtroom 6 – 17th Floor |

1  SABRINA H. STRONG (SBN: 200292)
       sstrong@omm.com
2  JONATHAN SCHNELLER (SBN: 291288)
       jschneller@omm.com
3  **O'MELVENY & MYERS LLP**
   400 South Hope Street, 19th Floor
4  Los Angeles, CA 90071
   Telephone: (213) 430-6000
5  Facsimile: (213) 430-6407

6
   PATRICK L. OOT, JR. (*Pro Hac Vice* admitted)
7      oot@shb.com
   **SHOOK, HARDY & BACON, LLP**
8  1800 K Street NW, 10th Floor
   Washington, DC 20006
9  Telephone: (202) 783-8400
10 Facsimile: (202) 783-4211

11 ALYCIA A. DEGEN (SBN: 211350)
       adegen@shb.com
12 MICHAEL B. SHORTNACY (SBN: 277035)
       mshortnacy@shb.com
13 2121 Avenue of the Stars, Suite 1400
14 Los Angeles, CA 90067
   Telephone: (424) 285-8330
15 Facsimile: (424) 204-9093

16
   CHRISTOPHER V. COTTON (*Pro Hac Vice* admitted)
17     ccotton@shb.com
   255 Grand Boulevard
18 Kansas City, MO 64108
   Telephone: (816) 474-6550
19 Facsimile: (816) 421-5547

20

21

22

23

24

25

26

27

28

-2-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

**DECLARATION OF HANNAH NILLES**

I, Hannah Nilles, declare as follows:

1. I am over the age of 18 years and am a citizen of the United States. I am a resident of the State of New York. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein. I submit this declaration in support of Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC's (collectively, "Uber")'s Motion for Partial Summary Judgment.

2. I am currently employed by Uber Technologies, Inc. as Director and Head of Safety Operations for the Americas. I have been employed by Uber from 2019 to the present.

**I.    The Uber Platform**

3. Uber operates a technology platform that uses a proprietary matching algorithm, accessible via smartphone applications (the "Uber App" or "App") to connect third-party service providers with customers and businesses. Over one billion trips are facilitated using the Uber App in the U.S. each year—over 2.5 million trips per day, almost 30 rides per second. This includes the Rides platform that facilitates the connection of individuals seeking transportation (i.e., riders) with independent third-party drivers offering transportation services. Riders place a ride request via the Uber App, which enables drivers to connect with and, at their own discretion, provide transportation to riders using the drivers' own personal vehicles, which the drivers own, lease, or control. Drivers are not required to use Uber as their exclusive rideshare app. Uber neither owns/leases nor operates the modes of transportation or vehicles used by drivers to transport riders. Additionally (and as a service for which drivers pay a fee to Uber), Uber collects payments from riders on the drivers' behalf.

4. When prospective drivers and riders choose to sign up to use the Uber App, they are prompted to review and agree to a written contract. If they do not agree to the terms, they can decline to move forward with platform access. These arrangements are set forth in agreements between Uber and drivers and riders, respectively. These agreements are the driver Platform

DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

Access Agreement ("PAA"), updated as of January 1, 2022 (Jan. 2022 PAA); and the rider Terms of Use ("TOU"), updated as of January 17, 2023. From time to time, Uber updates the agreements that drivers and riders are prompted to review and agree to in order to access and use the Uber App.

5.  In over 20 states, including Arizona, drivers are statutorily defined as independent contractors and Uber does not have the ability to control or direct the manner in which they perform their work. *See, e.g.*, A.R.S. § 23-1603(A).

## II. Uber's Practices Concerning Background Checks

6.  Uber background checks comply with Arizona's regulations. In Arizona, Uber is regulated as a Transportation Network Company ("TNC") and operates under a permit issued by the Arizona Department of Transportation. *See* A.R.S. § 28-9551 et seq. Attached is a true and correct copy of Uber's operative Arizona permit. *See* Ex. 1 (Ariz. DOT Permit #43646).[1] Arizona has implemented a comprehensive regulatory scheme governing TNCs. *See* A.R.S. § 28-9551 et seq. The scheme imposes specific requirements for driver eligibility, mandating that TNCs conduct local and national criminal background checks, search the national sex offender registry database, and review driving history reports. *See* A.R.S. §§ 28-9507(A); 28-9555.

7.  Every individual who seeks access to the Uber platform as an independent third-party driver must pass a robust national and local criminal background check process.

8.  The first step in the process is verification of the prospective third-party driver's identity. Prospective third-party drivers must submit documentation to facilitate that verification, including a full name, date of birth, social security number, driver's license number, copy of a valid driver's license, profile picture to be cross-referenced for identity validation, proof of vehicle registration, and proof of vehicle insurance. If a prospective third-party driver fails to submit any of this documentation, or if Uber is unable to verify the prospective third-party driver's identity, that individual will not be able to use the Uber platform as a third-party driver.

---

[1] Citations of the form "Ex. __" refer to the concurrently filed declaration of Jonathan Schneller.

-2-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

9. In December 2014, Uber began using a Professional Background Screening Association ("PBSA") accredited background check company called Checkr to conduct criminal and civil background checks. PBSA accreditation recognizes a rigorous and independently validated commitment to compliance with the regulatory landscape governing background checks, including the Fair Credit Reporting Act (FCRA). *See Compliance Overview*, Checkr (Aug. 19, 2025), *available at* https://perma.cc/YN8G-AESK; *see also* PBSA, *PBSA Background Screening Organization Accreditation Program – US Employment Screening Accreditation Standard and Audit Criteria*, *available at* https://perma.cc/4KJJ-3K4B. Checkr is recognized as the industry standard and is trusted and used by more than 100,000 companies. These companies range from large to small, and cover several industries including those, like hospitality and childcare, where there are concerns about sexual assault. *See Why Customers Choose and Stay With Checkr*, Checkr, https://perma.cc/4KJJ-3K4B. The checks conducted by Checkr are industry-standard for rideshare companies. *See* Matthew Feeney, *Is Ridesharing Safe?* 6 (CATO Inst. Pol'y Analysis, No. 767, 2015).

10. If a prospective driver's identity is verified, Uber collects that individual's driving history, called a Motor Vehicle Record, that includes information provided by a state's Department of Motor Vehicles. The Motor Vehicle Record includes the status of the operator's driving privileges, restrictions, license expiration date, license type and class, endorsements, suspensions or revocations, violations, and accidents for the state where the applicant's license was issued.

11. The criminal background check begins with a Social Security Number Trace ("SSN Trace"). The SSN Trace is a credit bureau search, which includes database searches of lending institutions, utilities, schools, and credit card companies. This search identifies any other known name (e.g., maiden names or aliases) and address history associated with the use of a particular social security number. This information helps determine additional jurisdictions and names under which criminal records will be searched to locate information about the prospective third-party driver.

-3-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

12. Uber then initiates an extensive criminal records search which includes searches of the following: the National Criminal Database, federal court records, state court records, federal and state sex offender registries, Checkr's global watchlist, and local court records. These searches identify felonies, misdemeanors, infractions, and charges associated with the third-party prospective driver.

13. The Multi-Jurisdictional Database Search (sometimes referred to as a "National Criminal Database Search" or "Widescreen Plus") is an automated search of thousands of databases that consists of both publicly available and purchased criminal records compiled from a variety of state, county, and other proprietary sources. This search is used to locate records reflecting contact with law enforcement, courts, or corrections departments. Similar to the SSN Trace, records identified in this search serve as lead sources for further investigation where professional court researchers are dispatched to the source of the records to retrieve complete and up to date information. This national search includes, but is not limited to arrest and criminal data from various local, county and state agencies, including: Administrative Office of Courts; Departments of Correction; individual county courts; state-specific criminal records repositories; and criminal records from multiple states. The Multi-Jurisdictional Database Search contains important redundancies to try and ensure a contact with law enforcement is identified. While a specific individual's incarceration details may not be available in the reporting Department of Correction databases, several other contact points throughout the criminal process may still act as a pointer for verification.

14. The Federal Criminal Search is a search of the Public Access to Court Electronic Records ("PACER") database to identify federal criminal records at the trial court level. This search covers all federal jurisdictions in the United States, including its territories.

15. Uber's vendors conduct searches of sex offender registration records from all 50 states, the District of Columbia, and tribal territories. Records from this search are then verified for accuracy and completeness with national and state resources, including the National Sex Offender Public Website.

-4-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

16. The Global Watchlist Search is a search of various United States and international government watchlists, including: FBI Most Wanted Lists, Interpol's Most Wanted Lists, Office of Foreign Asset Control Sanction Lists, Denied Persons Lists, Department of State Sanction Lists, Specially Designated Nationals Lists, as well as various US Drug Enforcement Administration Wanted Fugitive Lists.

17. Uber's vendors dispatch professional researchers to find the most accurate and complete information available at its source. Based on the results of the SSN Trace and the Multi-Jurisdictional Database Search, professional court researchers will search the source of the records (one of the 3,200 counties in the US) to retrieve complete and up to date file information. The search performed will retrieve records that extend back to a minimum of seven years from the date of search for convictions, but may extend back over one's entire adult life.

18. If the background check process identifies any criminal record, no matter how minor, the report is manually reviewed by a trained team of Uber employees. This team is dedicated to reviewing background checks and ensuring that prospective third-party drivers who do not meet Uber's stringent criteria are not able to access its platform as a driver.

19. Under Arizona law, third-party drivers must meet certain eligibility criteria to gain access to the Uber platform. *See* A.R.S. § 28-9555. While Uber complies with Arizona's screening requirements, its internal safety standards go beyond what Arizona law requires. Arizona mandates that TNCs bar drivers that have been convicted of certain serious crimes, including sexual assault, within the preceding seven years. *See* A.R.S. § 28-9555(B)(2); *id.* § 13-706(F). Uber exceeds that statutory minimum and permanently bars drivers with convictions or pending charges for sexual assault, murder, manslaughter, kidnapping, or sex crimes against children, regardless of when the charge or conviction was entered. Additionally, Uber bars drivers with pending charges or convictions within the last seven years for aggravated assault, burglary, and armed robbery. In compliance with A.R.S. § 28-9555(B)(3), Uber likewise bars any prospective third-party driver who is listed in a national sex offender registry database.

20. In addition to passing these initial background checks, third-party drivers with

-5-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

Docusign Envelope ID: D99903AC-6B77-43D4-92EC-542C1B273040

1    access to the Uber App are subject to continuous safety screenings.

2          21.    Uber partnered with Checkr to innovate a first-of-its-kind continuous driver safety screening system.[2] Uber uses its continuous criminal monitoring technology to identify new offenses in real-time. New offense notifications are based on numerous data sources, including proprietary information from Uber's vendors, online criminal databases, and arrest record searches. If a potential criminal record has been identified Uber's vendors investigate whether the information is accurate, up-to-date, and reportable. The criminal offense is reviewed and, if the driver no longer meets Arizona's standards, the driver's access to the Uber App is removed. The driver will remain blocked from the App unless and until the charge is favorably resolved or dismissed. Other major ridesharing companies soon followed Uber's lead, with Lyft implementing a similar system nearly a year after Uber.

      22.    Uber collects a new criminal and driving history about every driver, every year. If new reportable information indicates a driver no longer meets Arizona's Transportation Network driver eligibility criteria, then Uber will restrict or deactivate the driver's access to the platform as they no longer are in compliance with the regulations.

      23.    In addition to that continuous monitoring system, Uber employs dedicated teams of individuals trained to respond to customer complaints and investigate safety incidents, including a highly trained team that responds to sensitive allegations of sexual assault and misconduct. All serious safety incidents and complaints, including every allegation of sexual assault, is investigated for potential deactivation of drivers and riders.

      **III.    Arizona Statutory Compliance**

      24.    Upon information and belief, Uber has, at all relevant times, complied with all relevant Arizona statutes and regulations regulating Transportation Network Companies.

      25.    Among other things, Uber provides notice of its zero-tolerance drug and alcohol policy on its website, including procedures by which a rider can file a complaint about

---

[2] *See* Kyle Wiggers, *Checkr and Uber Built a Service to Monitor Workers' Background Records*, *VentureBeat* (July 13, 2018), *available at* https://perma.cc/Z8JF-M8TB.

-6-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

1  independent drivers who engage in drug or alcohol use, deactivates drivers who violate its zero-
2  tolerance policy, and displays each independent driver's picture and license plate number in the
3  App before a rider enters the vehicle. A.R.S. §§ 28-9507(C)-(E), 28-9554(A)-(C), 28-9553(C).
4  Uber also does not allow an independent driver to operate on its platform if he or she is listed in a
5  national sex offender registry database. A.R.S. § 28-9555(B)(3).

      **IV.**    **Operative Agreements**

7      26.    For the purposes of this declaration, I have reviewed relevant Uber records,
including those records related to the Terms of Use ("TOU") Plaintiff Jaylynn Dean accepted
prior to the alleged incident, along with Platform Access Agreement ("PAA") the accused driver,
Hassan Turay, accepted.

      27.    On January 13, 2022, Hassan Turay executed a PAA updated on January 1, 2022,
which was the operative agreement on November 15, 2023, the date of the subject incident. Ex. 2
(1/1/2022, PAA). The Agreement that Turay executed provides that drivers are granted a limited
license to access the Uber platform to obtain Uber's "lead generation" services. Turay agreed that
the provision of transportation services "creates a direct business relationship between [the
independent driver] and the [rider]." Ex. 2 at § 2.6 (1/1/2022, PAA). The Agreement expressly
defines the relationship between Uber and Turay as "that of independent business enterprises,"
stipulating that Turay is "not an employee," is not Uber's "agent," and has "no authority to act on
behalf of Uber." Ex. 2 at § 1.1 (1/1/2022, PAA). The Agreement further provides that Uber "does
not . . . direct or control" Turay, that Turay retains discretion to "accept, decline, ignore, or
cancel" rides, and that Turay is responsible for maintaining his own vehicle. Ex. 2 at §§ 1.2,
2.5(c) (1/1/2022, PAA).

      28.    On April 7, 2022, Turay executed a Fare Addendum Agreement, which was
operative on the date of the subject incident. Ex. 3 (4/4/2022, Fare Addendum).

      29.    On April 14, 2023, Plaintiff Jaylynn Dean accepted Uber's Terms of Use. When
accepting the Terms, Plaintiff was required to acknowledge that Uber's services enable her to
"find, request, or receive [] Third-Party Services from third party service providers, including . . .

-7-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

independent drivers" that third-party providers are "not actual agents, apparent agents, ostensible agents, or employees of Uber in any way," and that use of such third-party services "does not establish Uber as a provider of anything other than the services." Ex. 4 (1/17/2023, TOU) § 3. It is up to third party providers to decide whether or not to accept a request for services. Plaintiff also acknowledged that "Uber does not guarantee the quality, suitability, safety or ability of third-party providers" and that "the entire risk arising out of [her] use of the services . . . remains solely with [her], to the maximum extent permitted under applicable law." Ex. 4 (1/17/2023, TOU) § 7.

### V. Background Checks

30. Uber conducted thirteen background and motor vehicle checks of Turay between 2016 and 2023.

- Ex. 22 (12/7/2016, Checkr Rep. for Turay);
- Ex. 23 (12/22/2016, Checkr Rep. for Turay);
- Ex. 24 (3/6/2017, Checkr Rep. for Turay);
- Ex. 25 (1/4/2018, Checkr Rep. for Turay);
- Ex. 26 (9/10/2018, Checkr Rep. for Turay);
- Ex. 27 (6/29/2020, Checkr Rep. for Turay);
- Ex. 28 (6/3/2021, Checkr Rep. for Turay);
- Ex. 29 (5/2/2022, Checkr Rep. for Turay);
- Ex. 30 (5/2/2022, Checkr Rep. for Turay);
- Ex. 31 (4/4/2023, Checkr Rep. for Turay);
- Ex. 32 (4/9/2023, Checkr Rep. for Turay);
- Ex. 33 (6/5/2023, Checkr Rep. for Turay);
- Ex. 34 (6/6/2023, Checkr Rep. for Turay).

31. None of the background checks revealed disqualifying criminal history. Prior to the incident, Turay met all the regulatory requirements to gain access and maintain access to the Uber platform. Turay did not have any reports of drug or alcohol use while utilizing the Uber platform.

-8-
DECLARATION OF HANNAH NILLES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 10, 2025.

*Hannah Nilles*
HANNAH NILLES