[Submitting counsel below]

1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION**

This Document Relates to:

*Jaylynn Dean v. Uber Techs., Inc.*, No. 23-cv-06708

No. 3:23-md-03084-CRB

**PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY**

Judge:  Honorable Charles R. Breyer
Date:    January 6, 2026
Time:   10:00 A.M. PT
Ctrm.:  6-17th Floor (zoom)

**PROVISIONALLY FILED UNDER SEAL PURSUANT TO ECF 4332**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

ARGUMENT .................................................................................................................. 4

I.    EXPERT REPORT OF VICTORIA STODDEN ................................................. 4

    A.    Dr. Stodden's ██████████████ opinion is unreliable and irrelevant. .......... 5

        1.    Dr. Stodden did not use reliable statistical methodology to ██████ ████████ .......................................................................... 6

            a.    Dr. Stodden's opinions are unreliable because she compares numbers with incompatible units. .............................. 7

            b.    Dr. Stodden's calculations are unreliable because she did not evaluate statistical significance or uncertainty, or account for variability. ...................................................... 8

            c.    ████████████████████████████ .......................... 11

        2.    Dr. Stodden did not use reliable methodology to ███████ ████████ .......................................................................................... 12

            a.    █████████████████████████ .................................. 13

            b.    ███████████████████████ used by Dr. Stodden ███████████████ ................... 15

        3.    Dr. Stodden's comparison of Dr. Chandler's ██████ ████████████████ are unreliable............... 19

    B.    Dr. Stodden's ████████████████████████ are irrelevant to an Arizona case. ................................................ 19

    C.    Dr. Stodden's ██████████ opinions are unreliable.......................................... 20

    D.    Dr. Stodden's opinions as to ████████████████ are irrelevant and unreliable. ............................... 21

II.    EXPERT REPORT OF VIDA THOMAS ........................................................... 22

III.    EXPERT REPORT OF JASON MORRIS ......................................................... 23

    A.    Mr. Morris's ██████████ opinions are irrelevant and unhelpful because they are not based on any actual industry standards................................ 23

    B.    Mr. Morris's ██████████ opinions are irrelevant because they do not help the jury evaluate the efficacy of Uber's background checks. ................. 25

    C.    Mr. Morris's ██████████ opinions are unreliable.................................. 27

- i -

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| IV. | EXPERT REPORT OF ERIC PIZA | 28 |
| | A. Dr. Piza's opinions about ███████ are unreliable. | 29 |
| | B. Dr. Piza's statements regarding ███████ are outside his expertise and unsupported. | 31 |
| | C. Dr. Piza's testimony regarding ███████ constitutes improper personal opinions. | 34 |
| V. | EXPERT REPORT OF JOSEPH OKPAKU | 34 |
| | A. Mr. Okpaku's opinions ███████ are irrelevant. | 35 |
| | 1. How regulators "treat" Uber and what legislators "intended" are improper and unhelpful legal conclusions. | 35 |
| | 2. How regulators "treat" Uber and what legislators "intended" are irrelevant to whether Uber is a common carrier. | 36 |
| | B. Mr. Okpaku's "███████" opinions are unreliable. | 38 |
| | C. The portions of Mr. Okpaku's "███" opinions ███████ should be excluded. | 40 |
| | 1. Drivers' "motivators" are not relevant to whether they are employees. | 40 |
| | 2. Mr. Okpaku's interpretations of Uber contracts are irrelevant and improper legal opinion. | 41 |
| | D. Mr. Okpaku's ███████ should be excluded. | 41 |
| CONCLUSION | | 42 |

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*BP Prods. N. Am., Inc. v. Grand Petrol., Inc.*,
2021 WL 4482138 (N.D. Cal. Sept. 30, 2021) ........................................................ 35

*Brewer v. BNSF Rwy. Corp.*,
2016 WL 11709319 (D. Mon. Apr. 22, 2016) ........................................................ 36

*Engler v. Gulf Interstate Eng'g, Inc.*,
258 P.3d 304 (Ariz. App. 2011) ........................................................................ 40

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
424 F. Supp. 2d 1229 (E.D. Cal. 2005) ................................................................ 36

*Crow Tribe of Indians v. Racicot*,
87 F.3d 1039 (9th Cir. 1996) .......................................................................... 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................................... *passim*

*Doubt v. NCR Corp.*,
2014 WL 3897590 (N.D. Cal. Aug. 7, 2014) ........................................................... 4

*Grodzitsky v. Am. Honda Motor Co.*, Inc.,
957 F.3d 979 (9th Cir. 2020) ....................................................................... 25, 39

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
254 F.3d 825 (9th Cir. 2001) .......................................................................... 39

*In re Bextra & Celebrex Mktg., Sales Practices, & Prods. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ............................................................ 10, 36

*In re Uber Rideshare Cases*,
2025 WL 2631565 (Cal. Super. Jul. 31, 2025) ......................................................... 38

*In re Uber Rideshare Cases*,
2025 WL 2631568 (Cal. Super. Aug. 29, 2025) ..................................................... 2, 23

*In re: Lipitor (Atorvastatin Calcium) Mkt., Sales Prac. & Prods. Liab. Litig.*,
174 F. Supp. 3d 911 (D.S.C. 2016) ..................................................................... 9

*Jinro Am. Inc. v. Secure Investments, Inc.*,
266 F.3d 993 (9th Cir. 2001) .......................................................................... 32

*Kidwell-Bertagnolli v. Cnty. Of Sonoma*,
2024 WL 1589468 (N.D. Cal. April 10, 2024) ....................................................... 25, 39

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ................................................................. 30

*Kumho Tire v. Carmichael*,
526 U.S. 137 (1999). ................................................................................... 4

*Laumann v. Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015) ................................................................... 8

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Lord Abbett Mun. Income Fund, Inc. v. Asami*,
  2014 WL 3417941 (N.D. Cal. Jul. 11, 2014)........................................................ 22

*Lowrey v. Montgomery Kone, Inc.*,
  42 P.3d 621 (Ariz. App. 2002)........................................................................ 37

*Magallon v. Robert Half Int'l, Inc.*,
  743 F. Supp. 3d 1237 (D. Or. 2024) ............................................................ *passim*

*Moussouris v. Microsoft Corp.*,
  311 F. Supp. 3d 1223 (W.D. Wash. 2018)...................................................... 13

*Murray v. Uber Techs., Inc.*,
  486 F. Supp. 3d 468 (D. Mass. 2020) ............................................................ 38

*Nationwide Transp. Finance v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008)................................................................... 35, 36

*Nunez v. Pro Transit Mgmt. of Tucson, Inc.*,
  271 P.3d 1104 (Ariz. 2012)...................................................................... 35, 37

*O'Connor v. Uber Techs., Inc.*,
  82 F. Supp. 3d 1133 (N.D. Cal. 2015) .......................................................... 40

*Perez v. Circle K. Convenience Stores, Inc.*,
  564 P.3d 623 (Ariz. 2025)........................................................................... 37

*S. Pac. Co. v. Hogan*,
  108 P. 240 (Ariz. 1910)............................................................................. 37

*Santiago v. Phoenix Newspapers, Inc.*,
  794 P.2d 138 (Ariz. 1990)........................................................................ 40, 41

*State Farm Fire &Cas. Co. v. Electrolux Home Prods., Inc.*,
  980 F. Supp. 2d 1031 (N.D. Ind. 2013) .......................................................... 7

*State v. Christian*,
  66 P.3d 1241 (Ariz. 2003)........................................................................ 36, 38

*States v. Diaz*,
  876 F.3d 1194 (9th Cir. 2017).................................................................... 2, 22

*Stephens v. Union Pacific R.R. Co.*,
  935 F.3d 852 (9th Cir. 2019)....................................................................... 28

*United States ex rel. Miller v. ManPow, LLC*,
  2023 WL 9005796 (C.D. Cal. Nov. 22, 2023).................................................. 36

*United States v. Finley*,
  301 F.3d 1000 (9th Cir. 2002)....................................................................... 4

*United States v. Scholl*,
  166 F.3d 964 (9th Cir. 1999)....................................................................... 36

*Wilks v. Manobianco*,
  352 P.3d 912 (Ariz. 2015)........................................................................... 38

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES**

Ariz. Stat. § 28-9552(E) ................................................................................ 7

**RULES**

Federal Rule of Evidence 702 ................................................................ *passim*

**INTRODUCTION**

Plaintiffs move to exclude the expert testimony, or portions thereof, of Uber experts Victoria Stodden, Vida Thomas, Jason Morris, Eric Piza, an Joseph Okpaku for failing to meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

<u>**Victoria Stodden**</u>. Uber offers the testimony of Dr. Stodden, a statistician, to █████████████████████████████████████████████████████████████ *See* Ex. I (Expert Report of Victoria Stodden, dated September 26, 2025). Despite her proffered expertise, Dr. Stodden did not perform reliable statistical analysis. ████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ Her resulting opinions are therefore unreliable. Even if she had used appropriate methodology, her opinions are nonetheless irrelevant to this litigation. ███████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ██████████████████████████████████

<u>**Vida Thomas.**</u> Uber offers the testimony of Ms. Thomas, a lawyer, to opine that █████ █████████████████████████████████████████████ Ex. C (Expert Report of Vida Thomas dated September 26, 2025) at 3. But in doing so, Ms. Thomas applies no methodology whatsoever. Her analysis is merely a rote recitation of the facts and then her personal opinion as to what conclusion should be drawn. Such an opinion does not "amount[] to 'scientific knowledge,

1   [that] constitutes 'good science,'... 'derived by the scientific method." *Daubert,* 43 F.3d 1311,

2   1316 (9th Cir. 1995) (quoting *Daubert,* 509 U.S. at 590, 593). Moreover, her opinion ██████

3   ████████████████████████ is well within the commonsense province and understanding of

4   the jury, for which no expert assistance is needed. *See States v. Diaz,* 876 F.3d 1194, 1197 (9th Cir.

5   2017) (quoting *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) ("'When an expert

6   undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but

7   rather attempts to substitute the expert's judgment for the jury's'")). For this very reason, Ms.

8   Thomas's ████████ opinion was excluded by the JCCP Court in the related Uber proceeding. *See*

9   *In re Uber Rideshare Cases,* 2025 WL 2631568, at *6 (Cal. Super. Aug. 29, 2025) (MIL Order).

10  The same exclusion should apply here.

11      **Jason Morris.** Uber offers the testimony of Mr. Morris, a consultant on background

12  screenings, to ██████████████████████████████████ *See* Ex. D (Expert Report of

13  Jason B. Morris dated September 26, 2025). Mr. Morris opines on ████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████. *Id.,* at 3, 8-9. These opinions are irrelevant and unreliable.

16      **Eric Piza.** Uber offers the testimony of Dr. Piza, a criminologist, to opine on "██████████

17  ████████████████████████████████" Ex. F (Expert Report of Eric L. Piza dated

18  September 26, 2-25), at ¶ 1. His opinions on this matter are largely inadmissible. *First,* Dr. Piza

19  says that ████████████████████████████████████████████████████

20  ████████ But this opinion is based on unreliable methodology. Specifically, while Dr. Piza

21  maintains that ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████ *Second,* Dr. Piza attempts to opine on ████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████

1    ██████ These ██████ opinions should be excluded because Dr. Piza lacks the requisite

2    qualifications and basis for his conclusions. He has no technological experience or expertise

3    ████████████████████████████████████████████████and no industry

4    experience or knowledge █████████████████████████████████████████

5    ████████████

6    **Joseph Okpaku.** Uber offers the testimony of Mr. Okpaku, a lobbyist and former Lyft

7    executive, to opine ████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ██████████████████████████████████████Ex. A (Expert Report

14   of Joseph Okpaku dated September 26, 2025) at 5-6. These opinions consist of improper legal

15   conclusions, unreliable methodologies, and irrelevant commentary. Mr. Okpaku impermissibly

16   interprets statutes and legislative intent, relies on unsupported assertions rather than data or

17   scientific analysis, and offers opinions ██████████████████████████

18   ██████████████████████that either misstate the law or lack any reliable foundation.

19                          **LEGAL STANDARD**

20       Admissibility of expert testimony is governed by Fed. R. Evid. 702, as elucidated by

21   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Expert testimony is

22   admissible only if (1) the expert's scientific, technical, or other specialized knowledge will help the

23   trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on

24   sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4)

25   the expert has reliably applied the principles and methods to the facts of the case. *See* Fed. R. Evid.

26   702; *see also Daubert,* 509 U.S. at 593-94.

27       The Supreme Court in *Daubert* "charged trial judges with the responsibility of acting as

28   gate-keepers to 'ensure that any and all scientific testimony or evidence admitted is not only

relevant, but reliable.'" *United States v. Finley*, 301 F.3d 1000, 1007-08 (9th Cir. 2002) (quoting *Daubert*, 509 U.S. at 593-94). The Court "articulated a two-step inquiry for determining whether scientific evidence or testimony is admissible." *Id*. at 1008. *First*, the trial court must assess reliability by making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. (quoting *Daubert*, 509 U.S. at 592-93). Reliability requires that the testimony be rooted in "a reliable basis of knowledge and experience of the relevant discipline." *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999). *Second*, "the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact." *Finley*, 301 F.3d at 1008. Expert testimony helps the trier of fact "when it provides information beyond the common knowledge of the trier of fact." *Id*.

The proponent of the expert testimony bears the burden of showing admissibility by a preponderance of the evidence. Fed. R. Evid. 702.

## ARGUMENT

Plaintiffs move to exclude the following expert opinions.

## I.    EXPERT REPORT OF VICTORIA STODDEN

If permitted to testify, Dr. Victoria Stodden, Uber's statistics expert, will tell the jury that ███████████████████████████████████████████████████ *See, e.g.,* Ex. I (Expert Report of Victoria Stodden dated September 26, 2025) ("Stodden Report") at § VI; Ex. J (Expert Rebuttal Report of Victoria Stodden dated October 24, 2025) at §VII.B. But Dr. Stodden can only reach this conclusion by disregarding the most basic, fundamental statistical principles. In place of proper methodology, Dr. Stodden instead makes statistically invalid comparisons between public transportation users and Uber users, employing an approach that is riddled with errors and assumptions. Her results are unreliable conclusions that serve only to mislead the trier of fact.

Courts "have repeatedly rejected reliance on statistics where the statistical evidence is based on small or incomplete data sets and inadequate statistical techniques." *Doubt v. NCR Corp.*, 2014 WL 3897590, at *8 (N.D. Cal. Aug. 7, 2014). Here, █████████████████████████████████████████ ████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   Further, Dr. Stodden's opinions are irrelevant to Jaylynn Dean.

17

18

19

20

21   Dr. Stodden's opinions are unreliable and irrelevant and should be excluded.

22   **A.**     **Dr. Stodden's '**⬛⬛⬛⬛⬛**' opinion is unreliable and irrelevant.**

23   In Section VI of her report, Dr. Stodden opines that ⬛⬛⬛⬛⬛

24   ⬛⬛⬛⬛⬛ Stodden Report at § VI, ¶¶ 19-31. To reach this

25   conclusion, Dr. Stodden eschews the most fundamental concepts of basic statistics: selecting a

26   representative sample, testing statistical significance, and calculating measures of confidence or

27   error. Instead, she assembles disparate data sets and then compounds this error by applying

28   unreliable (in fact, blatantly incorrect) methodology to compare the numbers. Dr. Stodden admits

1  that she is *not* using statistics to reach her conclusions and claims instead to use just basic math.

2  But basic math is not reliable methodology to make the comparisons she makes between Uber and

3  public transportation.

4          **1.**      **Dr. Stodden did not use reliable statistical methodology to**

### a. Dr. Stodden's opinions are unreliable because she compares numbers with incompatible units.

An obvious problem with Dr. Stodden's methodology is that she compares two ratios with different units, simply by dividing them by each other, without first converting the units to allow for comparison. Nothing more than basic math is needed to understand that "comparing survey responses to self-reporting responses is inappropriate from a statistical perspective because those fractions are measuring entirely different quantities, with units that cannot be reconciled." *See* Ex. M (Expert Rebuttal Report of John Chandler dated October 24, 2025) ("Chandler Rebuttal Report") ████████████████████████████████████████████████████████████ he California surveys asked whether a respondent had experienced or witnessed sexual assault or rape (which is not a ██████ at all), whereas the █ ████████████████████████████████████████████████████████████

To illustrate this issue, consider comparing 20 miles per hour to 30 kilometers per hour. Dr. Stodden's approach would simply divide 30 by 20, without adjusting the units. Dr. Stodden's approach gives not just the wrong answer (30 kph is 1.5 times faster than 20 mph) but is entirely directionally incorrect—20 mph is actually faster than 30 kph. Without a conversion factor, a reliable comparison is not possible. But this is exactly what Dr. Stodden does, and as a result, it is impossible to determine with any certainty whether the numbers she calculates (as summarized on Tables 1 and 2 of her report are even directionally correct. As explained by Plaintiffs' expert, Dr. John Chandler, the simple truth is that "[t]he municipal Transportation Surveys do not measure ████████████████████████████████████████ Chandler Rebuttal Report at ¶ 33. ████████████████████████████████████████████████████████ Absent such efforts, Dr. Stodden's opinions are unsound, violating a foundational statistical principle in "obscuring the unit of analysis." *Id.; see also State Farm Fire &Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013) ("[w]hen conducting a comparative analysis, to meet the reliability that *Daubert* demands, an expert must 'select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges''").

1    There are statistical tests that can be used to compare rates between two groups, so long as

2    the data is reliably adjusted for comparison. *See* Chandler Rebuttal Report at ¶ 22. But, despite her

3    advanced training in statistics,

4

5    However, arithmetic and statistics are not the same thing.

6    Dr. Stodden's statistics result in absurd findings.

7

8

9

10

11

12

13    Stodden Report at Table 1.

14

15

16    *See* Chandler Rebuttal Report at ¶ 27.[2]

17

18    *See Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 310, 317-20

19    (S.D.N.Y. 2015) (excluding statistics expert whose model yielded "absurd" results").

20              **b.    Dr. Stodden's calculations are unreliable because she did**
              **not evaluate statistical significance or uncertainty, or**
21              **account for variability.**

22    Perhaps the most fundamental teaching of introductory statistics is the concept of measuring

23    certainty and accounting for variability by evaluating statistical significance and confidence. In

24    statistics, certainty analyses evaluate whether a relationship between two or more factors is

25    statistically significant; the level of statistical significance is regularly measured using a confidence

26

27    [2]

28    [3] https://opa.metro.net/MetroRidership/

1  interval. *See, e.g.,* Stodden Dep. at 45:1-50:9; Chandler Rebuttal Report at ¶ 21. Had Dr. Stodden

2  used a statistical modeling method, she would have

3

4

5

6                                                                                                          *See*

7  Stodden Dep. at 259:12-260:18.

8                                                                                                          *See*

9  Chandler Rebuttal Report at ¶ 21; *In re: Lipitor (Atorvastatin Calcium) Mkt., Sales Prac. & Prods.*

10 *Liab. Litig.*, 174 F. Supp. 3d 911, 926 (D.S.C. 2016) (excluding expert opinion where proponent

11 failed to show that use of non-statistically significant "trend" data was generally accepted in the

12 relevant field, supported by peer-reviewed literature, or governed by statistical standards).

13      There are numerous sources of uncertainty in Dr. Stodden's analysis.

14

15

16

17

18

19                                        Stodden Report at ¶ 22. But rather than using the required

20 statistical tools and methods necessary to address these numerous methodological differences

21

22                                        *d.* at ¶ 23.[4]

23      The methodological differences are stark, and Dr. Stodden's failure to address them is fatal.

24

25 _____

26 [4]

27

28

*See* Stodden Dep. at 216:22-217:7.

*See* Stodden Dep. at 234:12-16.

---

[5] The point here is not only is Dr. Stodden's methodology flawed, but she cherry-picked the data she used to reach her opinions. Opinions based on cherry-picked evidence are unreliable. *See In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding opinion that was based on "cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts [it]."



Stodden Rebuttal Report at ¶¶ 8a, 8c, 11, 27; *see also* Chandler Rebuttal Report, at ¶ 25

**c.**

Uber has repeatedly said that such comparisons *should not be done.* In its Safety Reports, Uber admonishes: [a]s a result of our approach, *meaningful comparisons to other data sets are not possible*" (Ex. O, 2019-2020 Uber Safety Report, at 58) (emphasis added)), and *"[w]hile there are many similarities between our data and the national numbers, a direct comparison cannot be made due to demographic and methodological differences."* Ex. P, 2021-2022 Uber Safety Report, at 30 (emphasis added); *see also* Ex. O, 2019-2020 Uber Safety Report, at 47; Ex. N, 2017-2018 Uber Safety Report, at 47.

-11-

1 ████████████████████████████████ Uber's clear position that SA/SM incident

2 report numbers should not be compared to *survey results*. *See* Ex. N, 2017-2018 Uber Safety

3 Report, at 58 (referencing the National Intimate Partner and Sexual Violence Survey, Uber states,

4 *"a direct comparison cannot be made to Uber's data due to substantial methodological*

5 *differences"*) (emphasis added). Similarly, although the 2019-2020 Safety Report and the 2021-

6 2022 Safety Report warn "[i]n addition, COVID-19's impact on how society moved affected how,

7 where, and when people used Uber, which makes yearly comparisons a challenge without

8 contextualizing the safety incident rates of the public at large," █████████████████

9 ██████████████████████████████████████ *See* Ex. O, 2019-

10 2020 Uber Safety Report, at 16; Ex. P, 2021-2022 Uber Safety Report, at 13.

11           **2.      Dr. Stodden did not use reliable methodology to** ████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ██████████████████████████████████████ Dr. Stodden's opinions

15 are unreliable because she failed to ensure her samples were representative, or to account for sample

16 bias. ████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 █████████████████████████████████████ To make this sample

21 to population inference, Dr. Stodden must apply proper statistical inference techniques. ████████

22 ████████████████████████ *See* Stodden Dep. at Ex. 2073, ¶¶ 14-21

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ───────────────
 [7] ████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████ Accordingly, and for the same reasons discussed herein, Dr. Stodden's rebuttal
opinions as to ████████████ are unreliable and should be excluded.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   *See, e.g., Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018)

19   ("Opinions that are derived from erroneous or incomplete data are appropriately excluded.").

20                              **a.**

21

22

23

24                                                                                                because the

25   reports to Uber are not a representative sample of SA/SM incident rates among all Uber users. Just

26   as Uber has admonished against using these numbers to make comparisons to other data sets, Uber

27   also cautioned that the incident report numbers are "neither a representative national sample, nor,

28   necessarily, a representation of the size or scope of sexual assaults," and are "not intended to be a

1  representation of the size or scope of sexual assaults." Ex. P, 2021-2022 Uber Safety Report, at 13;

2  *see also* Ex. O, 2019-2020 Uber Safety Report, at 16, 47; Ex. N, 2017-2018 Uber Safety Report, at

3  16, 47

4  See Stodden Report at ¶¶ 24- 28, Tables 1 and 2.

5

6

7  See Stodden Dep. at 32:20-33:11

8

9  *d.* at Ex. 2073, ¶¶ 14-19; *see also, e.g.,* Chandler Rebuttal Report at ¶¶ 23-25

10  Indeed, Uber itself

11  recognized that because the data in the Safety Reports are "not the result of a nationally random

12  sample," the process of collecting reports this way "*could cause a sampling bias.*" Ex. N, 2017-

13  2018 Uber Safety Report, at 47 (emphasis added).

14

15  The unreliability of

16  is dramatically amplified by the issue of underreporting, a flaw that

17  Uber recognizes:

> [W]hen interpreting the data in this report, one must consider the societal reality of
> potential under-reporting, particularly for incidents of sexual assault, which has
> been widely documented in external research. For sexual assault, this is dependent
> on a number of victim identification factors such as an individual having access to,
> knowledge, and/or desire to reach Uber reporting channels, and/or those who are
> able to identify an incident as potentially sexually violent or unwanted… it is
> important to consider that the data in this report is only based on what is reported
> to Uber or that Uber became aware of through previously discussed channels.

22  Ex. N, 2017-2018 Uber Safety Report, at 47.[8] Despite this issue being expressly flagged by Uber,

23  See Stodden

24  Report at ¶¶ 22-23; Stodden Dep. at 240:17-244:2l; Ex. N, 2017-2018 Uber Safety Report, at 6

25  (stating that sexual violence is underreported by approximately 75% in general); Ex. Q, (Expert

26

27  [8] Uber omitted this admonishment from subsequent Safety Reports (including the 2021-2022 report

28  that Stodden relies on), but there is no reason that it did not continue to apply. The data in later
reports was collected by the same process and suffers the same limitations and biases.

-14-

1   Report of Veronique Valliere dated September 26, 2025) ("Valliere Report") at 7

5   *see* Stodden Dep.  at 240:17-241:2; Valliere Report at 7

6   *See* Valliere Report, at 7

11   Stodden Dep. at 241:19-242:2; *see also id.* at 232:14-234:11. This is an egregious error

12   given that                                                                                    *d.* at 234:2-234:11.

14   are not reliable and will confuse the trier of fact. Her opinions

15   based on those numbers should be excluded.

16          **b.**                                                                  **used by**

17          **Dr. Stodden**

22                              The California public transportation surveys asked riders whether

23   they had experienced or witnessed sexual assault within the previous six to twelve months. *See,*

24   *e.g.,* Stodden Dep. at 16:17-21, 161:11-162:11, 261:12-23. The surveys did not provide information

25   as to how many *rides* occurred within that same time frame.

28   9

*See* Stodden Dep. at 142:22-143:19; 263:17-264:5

*See* Stodden Dep. at 142:22-143:19.

Stodden Rebuttal Report at ¶8b (emphasis added); *see also* Chandler Rebuttal Report, at ¶¶ 12-25.

*See* Stodden Report at Table 1.

This is, of course, exceptionally unlikely, not least because many people taking public transportation one way may want to return. If each rider took just two trips within the survey period (15,520 trips), then only 8.5% of trips experienced or witnessed sexual assault or rape (1,139/15,520=8.5%)—

If each survey respondent took one trip per week (26 trips each over the six-month period, or 201,760 total trips across the 7,760 respondents), the

If each survey respondent took 2 trips per weekday (e.g., to and from work), the figure is

$$\frac{17\%}{0.001436\%} = 118,354 \quad \frac{8.5\%}{0.001436\%} = 60,714 \quad \frac{0.65\%}{0.001436\%} = 4,642 \quad \frac{0.065\%}{0.001436\%} = 467$$

[10]

1   [REDACTED]

2   *See* Stodden Report at Table 2. That

3 survey considered a one-year timeframe and only 5 of 1626 survey respondents indicated that they

4 had experienced sexual assault or rape in that year.[11]

5 [REDACTED] if those survey respondents took just one ride per month during that year[12]

6

7

8

9 [REDACTED] for some, if not all, of the California public transportation systems, ridership numbers are

10 publicly available. For example, LA County Metropolitan Transportation Authority (LACMTA)

11 had 311,253,565 riders during the 2024 survey year,[13] or approximately 155 million riders in the

12 six-month survey period. Conservatively assuming each one of those riders took only 1 ride in

13 2024, [REDACTED]

14

15 [REDACTED] These examples illustrate why it is

16 essential to use reliable statistical methods to infer conclusions about populations—and why Dr.

17 Stodden's opinions, that did not use recognized methods of inferential necessary to draw these

18 conclusions—are unreliable.

19     *Second,* even if the California public transportation survey numbers were reliable proxies

20 fo[REDACTED]hey are nonetheless unreliable because they are based on convenience sampling,[14]

21 [REDACTED]

22

---

23 [11] *Id.*; "BARTStreetHarassmenSurveyResults2024,"
https://www.bart.gov/sites/default/files/2024-11/BARTStreetHarassmenSurveyResults2024.xlsx

24 [12] In fact, 85% of the BART survey respondents reported using BART at least once per month and
25 75% used BART at least one day per week. *Id.* This information comes directly from the data Dr.
Stodden used to reach her opinions, but Dr. Stodden ignores it.

26 [13] *See* Chandler Rebuttal Report, at ¶ 27.

27 [14] The public transportation operators collected survey responses by sending researchers out on
trains and buses and talked to people waiting in stations and at bus stops. *See* Stodden Dep. at
212:11-214:7. Thus, respondents were solicited purely by convenience and proximity, as opposed
28 to collection methodology designed to obtain a representative sample.



Stodden Dep. at Ex. 2073, ¶18; *see also id.* at 40:6-14

*id.* at 40:19-22

*Id.* at Ex. 2073, ¶¶ 19, 21.

some public transportation operators offered monetary incentives for participation (*see* Stodden Dep. at 215:3-12),[15]

---

[15] *See also* Long Beach Transit Safety Survey Final Report, ETC Institute, Feb. 3, 2025, at p. 64 (available at: https://ridelbt.com/wp-content/uploads/2025/02/LBT-State-Safety-Final-Report-Feb-3-2025.pdf).



1

2                                                                           *Id.* at 215:13-216:16. Both factors introduce

3    bias into the sampling—especially if people who have experienced sexual assault are more likely

4    to respond to a survey than people who have not. *See* Chandler Rebuttal Report at ¶¶ 30-32

5

6                                                        (*see* Stodden Dep. at 220:25-222:18; 223:9-

7    225:14);

8                                                (*see id.* at 217:16-21, 218:5-11);

9                                                        *see* Chandler Rebuttal Report at ¶ 25).

10

11

12          *See* Stodden Dep. at 137:13-138:14; 139:2-140:23; 220:10-14.

13

14

15          **3.      Dr. Stodden's comparison of Dr. Chandler's**
                                                                    **are unreliable.**
16

17

18                                          *See* Stodden Rebuttal Report at ¶¶ 60-61, Table 2. Those opinions should

19    be excluded for the same reasons discussed herein.

20          **B.      Dr. Stodden's                                                    are**
21          **irrelevant to an Arizona case.**

22

23

24

25

26

27    ―――――――――――――――
      16

28



Stodden Report at ¶ 19, n.23 (emphasis added).

her opinions are still irrelevant as to Jaylynn Dean's case

**C.    Dr. Stodden's**                    **opinions are unreliable.**

Stodden Report at ¶ 16; Stodden Dep. at 249:21-250:1.

*See* Stodden Report at § V.

But this is not what the Safety Reports say. In fact, Uber's Safety Reports are entirely silent on what the auditor alignment was for any of the 16 nondisclosed categories, for any year.

17

1   Instead, they only indicate, generally, what auditor alignment was reached for the five reported

2   categories. Ex. N, 2017-2018 Uber Safety Report, at 16, 42 (auditor alignment was at least 85% for

3   all four categories except attempted rape, which was 78%); Ex. O, 2019-2020 Uber Safety Report,

4   at 16 (auditor alignment was over 85% for all categories except attempted rape; attempted rape

5   alignment level was not disclosed); Ex. P, 2021-2022 Uber Safety Report (entirely silent on auditor

6   alignment levels for any category, including the five disclosed). Further, none of the Safety Reports

7   represent that any of the 16 categories *did not* reach any particular level of alignment, whether it be

8   78%, 80%, 85%, or any other level. There is simply *no information* about the auditor alignment

9   level for any category outside of the four disclosed. In fact, the Safety Reports do not represent that

10  incidents from the 16 categories underwent auditing at all, ███████████████████████████

11  ███████████████████████████████████████████████████████████████ *See* Stodden

12  Dep. at 245:3-10, 247:23-249:1. ██████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████████████████████████

14  ██████████████████████████ *See* Stodden Report at ¶ 16; Stodden Dep. at 250:21-25.

15      **D.    Dr. Stodden's opinions as to** ████████████████████████████████

                     **irrelevant and unreliable.**

16  █████████████████████████████████████████████████████████████████████████████████

17  █████████████████████████████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████ These ████████████████ re

20  irrelevant and unreliable. ████████████████████████████████████████████████████████

21  █████████████████████████████████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████████████████████████████████

26  █████████████████████████████████████████████████████████████████████████████████

27  █████████████████████████████████████████████████████████████████████████████████

28  █████████████████████████████████████████████████████████████████████████████████

1

2

3

4

5 ██████████████████████████ Stodden Report at ¶ 31, n.61.

6 **II.    EXPERT REPORT OF VIDA THOMAS**

7 Plaintiffs move to exclude opinion 12(b) from the report of Vida Thomas, where she opines

8 that ████████████████████████████████████████ Ex. C

9 (Expert Report of Vida Thomas dated September 26, 2025) ("Thomas Report") at ¶¶ 12b, 44-62.

10 This is an unreliable, subjective lay opinion that is untethered to any scientific methodology and

11 improperly invades the province of the jury. It should be excluded.

12 Ms. Thomas, a lawyer and managing partner of an investigations firm, opines on ███

13 █████████████' for responding to allegations of sexual assault. *See* Thomas Report at ¶¶ 1-12.

14 But her opinion as to whether Uber was '████████████████████████████████████████

15 ████████████████████████████████████████ but rather simply

16 her determination of what ultimate outcome the jury should reach on a limited subset of facts. *See*

17 *id.* at ¶¶ 44-62. In her lead-in to this opinion, Ms. Thomas states only that it is '███████████

18 ████████████████████████████████████████' *Id.* at

19 ¶ 44. She provides no methodology, benchmark, or standard as to how one should approach this

20 question within the context of this case. Instead, she cites ███████████████████████

21 ████████████████████████ *Id.* at ¶¶ 44-62.

22 "'When an expert undertakes to tell the jury what result to reach, this does not aid the jury

23 in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *Diaz*,

24 876 F.3d at 1197. Here, Ms. Thomas instructs the jury on what conclusion they must reach on the

25 facts. She concedes as much in her report: '████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████████████████ Thomas Report

28 at ¶ 44 (emphasis added). Fact-finding is not expert, reliable methodology. *See, e.g., Lord Abbett*

1  *Mun. Income Fund, Inc. v. Asami,* 2014 WL 3417941, at *13 n.8 (N.D. Cal. Jul. 11, 2014)

2  (excluding expert opinion "based upon her interpretation of the evidence" where "her opinion

3  merely summarize[d] the record evidence and gratuitously interpret[ed] it").

4      Exclusion is further warranted because whether Uber was ███████ requires no expertise.

5  It is well within the commonsense province and understanding of the jury. Indeed, the JCCP Court

6  struck this same opinion on this very basis. *See In re Uber Rideshare Cases*, 2025 WL 2631568 at

7  *6 (MIL Order) (excluding Thomas's opinion that Uber was "not on notice" as the "jury is perfectly

8  capable of drawing its own conclusions from the evidence"; "the question of whether Uber was on

9  notice that any of the drivers in question would sexually assault a passenger is 'one of such common

10 knowledge that [people] of ordinary education could reach a conclusion as intelligently as the

11 witness'"). This Court should do the same.

12 **III.    EXPERT REPORT OF JASON MORRIS**

13      The Court should preclude Jason Morris, Uber's background check expert, from offering

14 testimony or opinions as to ████████████████████████████████████████

15 ████████████████████

16      Mr. Morris opines that ████████████████████████████████████

17 ████ (Opinion Nos. 2 and 4). *See* Ex. D (Expert Report of Jason Morris dated September 26,

18 2025) ("Morris Report") at 3, 8-9, 11-13, 15; Ex. E (Expert Rebuttal Report of Jason Morris dated

19 October 24, 2025) ("Morris Rebuttal Report") at 2, 6-7. This testimony is irrelevant and unhelpful

20 because Mr. Morris fails to articulate *any* ████████████████████████████████████

21 ████████████████████████████████████████ And Mr. Morris's

22 opinions ████████████████████████████████████████████

23 ████████████████████████████████████ *See* Morris Report at 8-

24 9, 11-12.

25      **A.    Mr. Morris's ████████████████ opinions are irrelevant and unhelpful

26       because they are not based on any actual industry standards.**

27      Mr. Morris's ████████████████ opinions are irrelevant because they fail to identify any

28 standard beyond merely complying with existing laws. *See* Morris Report at 3-4, 8-11. In addition,

1    they are not helpful, because they do not help the jury evaluate the efficacy of Uber's background

2    checks.

3        Mr. Morris identifies ███████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ██████████ *See* Morris Report at 8–9; *see id.* at Ex. C (materials considered). These '████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████ is unreliable, irrelevant, and unhelpful

10   to the jury. ██████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████ *See Magallon*, 743 F.

17   Supp. 3d at 1250 (excluding "industry standard" testimony where expert "has not articulated

18   relevant industry standards, has explained that essentially there are no industry standards relevant

19   to this dispute, and has generally conceded that "industry standards" are no more than compliance

20   with FCRA"). Yet that is all the PBSA accreditation guidelines do. The PBSA accreditation

21   guidelines focus on "meeting requirements for compliance with the Fair Credit Reporting Act

22   (FCRA) and Driver Privacy Protection Act (DPPA)."[20] Accordingly, these accreditation guidelines

23   require that CRAs "have and follow" policies related to information security, quality assurance,

---

[18] ████████████████████████████████████████████████████████████

[19] PBSA, *PBSA Background Screening Organization Accreditation Program – US Employment Screening Accreditation Standard and Audit Criteria*, https://pubs.thepbsa.org/pub.cfm?id=B4F2C99A-FE77-6374-1FE9-0953F3B2B347 (last accessed Nov. 9, 2025).

[20] PBSA, *Frequently Asked Questions About Accreditation*, "Comparing the U.S. and General Accreditation Programs," https://www.thepbsa.org/accreditation/accreditation-faq/ (last accessed Nov. 9, 2025).

1   and customer education. Beyond specifying that the CRA's policies must "comply with all

2   provisions of all applicable law," the accreditation guidelines do not specify the contents or

3   parameters of these policies.[21] In other words, the "accreditation guidelines" are nothing more than

4   requirements that CRAs establish legally compliant policies.

5   Courts routinely exclude expert testimony on ███████████████ where an expert fails to

6   articulate the industry standards they purport to apply. *See, e.g., Grodzitsky v. Am. Honda Motor*

7   *Co., Inc.*, 957 F.3d 979, 985–86 (9th Cir. 2020) (excluding expert opinion where expert failed to

8   cite industry standards); *Kidwell-Bertagnolli v. Cnty. Of Sonoma*, 2024 WL 1589468, at *14 (N.D.

9   Cal. April 10, 2024) (excluding expert opinion on industry standards where expert failed to

10  "identify these industry standards").

11  Mr. Morris failed to identify the standards applied to Uber, as an employer, or Checkr, as

12  Uber's consumer reporting agency (background check) vendor. *See* Morris Report at 3-4, 8-11. He

13  points to ██████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████ *See*

15  *id.* Nor could he, as the PBSA accreditation guidelines do not establish any practices or standards

16  of conduct to which employers or CRAs should adhere *other than* adopting legally-compliant

17  policies.[22] This is not sufficient. In *Magallon*, the court precluded expert testimony that the

18  defendant "'exceeds' or 'surpasses' industry standards" where the expert but "did not identify any

19  specific 'industry standards' in her report." 743 F. Supp. 3d at 1250. Instead, the expert conceded

20  that industry standards were "no more than compliance with FCRA." *Id.* Because the expert failed

21  to articulate specific industry standards, the court held that such testimony was inadmissible as

22  irrelevant. *See id.* The court should exclude Mr. Morris's '███████████████' testimony on the

23  ████████████ for the same reason.

24  **B.**    **Mr. Morris's ████████████████ opinions are irrelevant because they do not
            help the jury evaluate the efficacy of Uber's background checks.**

25  Even if the PBSA accreditation guidelines were industry standards, they—along with one

26

27  ────────────────────

    [21] PBSA, *PBSA Background Screening Organization Accreditation Program*, supra note 5.
28  [22] *Id.*

referenced SHRM article—are irrelevant to this case and unhelpful to the jury because they do not address key issues related to the *efficacy* of Uber's background checks, such as how to conduct a background check or for how long, beyond legal compliance. Neither the PBSA accreditation guidelines nor the SHRM article concern: the qualifications of employees reviewing records, the databases to search, the lookback period to use, the state's law that governs the applicable lookback period, the methods for retrieving court records, or the categories of records to search (whether arrest, conviction, or civil).[23] Expert testimony must be "relevant to the task at hand" in that it "logically advances a material aspect of the proposing party's case." *Bextra*, 524 F. Supp. 2d at 1171 (quotations omitted). Here, Mr. Morris's opinions lack a valid connection to the "pertinent fit inquiry" (*id.*); namely, ███████████████████████████████████████ ███████ (Morris Report, at 3).

*First*, even if the PBSA accreditation guidelines were deemed ██████████ ███ hey do not establish any safety-related standards. Instead, they contain requirements for policies on information security, customer education, and quality assurance.[24] The purpose of these requirements is *not* to ensure that employers and CRAs are screening out applicants that pose a safety risk, but rather compliance with the FCRA, which is designed to prevent unlawful disclosures of information on job applicants.[25] In other words, the PBSA accreditation guidelines can, at most, be considered standards for how to comply with the laws intended to protect Uber's *drivers*.[26] They do not provide any real guidance on how to accurately identify safety risks posed by employment applicants, which is the heart of the background check issue in this case.[27]

*Second*, even though the SHRM offers substantial guidance on how to identify risky candidates, ████████████████████████████████████████████ ████████ which address steps to take *after* such person has been identified. These recommendations have no bearing on this case where Checkr did not locate criminal records for the drivers here. *See*

---

[23] *Id.*

[24] *Id.*

[25] *Id.*; *see also* PBSA, *Frequently Asked Questions*, supra note 6.

[26] *See id.*

[27] *See id.*

1   Morris Report at 11-17. The SHRM article contains guidance on what to do "when a job candidate's

2   background check reveals a criminal record[.]"[28] Indeed, the recommendations to use a "consistent

3   adjudication matrix designed to reduce bias and ensure legal defensibility," "[i]ndividualized

4   assessment protocols that evaluate the relevance of records to the role," and "[a]utomated, yet

5   auditable workflows to ensure timely and lawful pre-adverse and adverse action notifications"[29] all

6   relate to the steps employers should take *if* and *when* a criminal record is returned to comply with

7   the law. ███████████

8   ███████████████████  *See* Morris Rebuttal Report at 2, 6-7.

9   ███████████████████████████

10  ███████████  The SHRM article does not provide standards as to what employers should do

11  to *locate* records indicative of risk, such as the length of a lookback period to use, the jurisdictions

12  to search, the types of records (convictions, arrests, civil) to review or the qualifications of

13  reviewers.[30]

14          Plaintiffs have not alleged Checkr failed to adequately adjudicate identified criminal records

15  or otherwise failed to provide *drivers* with adequate notice; rather, the allegation is that Checkr

16  failed to locate records indicative of risk in the first instance. The PBSA accreditation guidelines

17  and SHRM article are therefore immaterial to the claims in this case such that opinions based solely

18  on them are irrelevant and should be excluded.

19          **C.     Mr. Morris's "███████████" opinions are unreliable.**

20          Mr. Morris further opines that ███████████████████

21  ███████████  *See* Morris Report at 8-9. Expert opinions are inadmissible unless

22  supported by sufficient facts or data. *See* Fed. R. Evid. 702(b). This requires that an expert "rely on

23  ───────────────────

24  [28] Roy Maurer, *When Background Screens Turn Up Criminal Records* (May 5, 2024),
    https://www.shrm.org/topics-tools/news/risk-management/background-screens-turn-criminal-

25  records (last accessed Nov. 9, 2025).

    [29] *Id.; see also* Morris Report at 9.

26  [30] ███████████████████████████

27  ███████████████████  However, civil records contain pertinent information

    about the safety risk of applicants, including domestic violence records detailing incidents of

28  physical or sexual violence against women.

1  'facts or data in the case that the expert has been made aware of or personally observed,' not merely

2  assumptions and speculation." *Stephens v. Union Pacific R.R. Co.*, 935 F.3d 852, 856-57 (9th Cir.

3  2019) (quoting Fed. R. Evid. 703).

4

5

6

7

8

9

10          This is pure *ipse dixit* and must be excluded.

11  **IV.    EXPERT REPORT OF ERIC PIZA**

12          Uber submits a report from Dr. Eric Piza, a criminologist, to present opinions

13                              But his experience in this regard is nonexistent.

14

15  *See* Ex. G (Deposition of Eric Piza dated October 30, 2025) ("Piza Dep.") at 82:12-19

16

17                                                                              *See*

18  *id.* at 82:12-19. And yet, Uber plans to use him to offer opinions

19                                          *See* Ex. F (Expert Report of Eric

20  Piza dated September 26, 2025) ("Piza Report"). Unsurprisingly, many of Dr. Piza's opinions fall

21  far afield of his qualifications, and are otherwise unsupported by sufficient facts, data, or a reliable

22  methodology.

23          *First*, Plaintiffs move to exclude Dr. Piza's opinion that

24

25                                                                              ' Piza

26  Report at ¶¶ 3(b), 33-46. This opinion has no basis in facts, data, or reliable methodology. *Second*,

27  ─────────
    [31]

28

1   Plaintiffs move to exclude Dr. Piza's opinions regarding ███████████████

2   ████████████████████████ *See id.* at § VI.C, ¶¶ 47-50 Dr. Piza lacks the requisite

3   qualifications to opine on such issues, and the opinions are unreliable as lacking foundation in facts,

4   data, and methodology.

5       A.    **Dr. Piza's opinions about** ████████████████████
            **are unreliable.**

6       Dr. Piza opines that ██████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ██████████████████████████████████ *Id.* at § VI.

11      Dr. Piza's methodology for this opinion consists of ████████

12  ████████████████████████████████████████████████████

13  ████████████████████ Piza Report at ¶ 12. Even if such analysis could be considered reliable,

14  Dr. Piza did not properly apply his own methodology. *See* Fed. R. Evid 702(d) (to be admissible,

15  expert opinion must reflect "reliable application of the principle and methods to the facts of the

16  case").

17  █████████████████████████████████████████████████████

18-28 ████████████████████████████████████████████████████████



*Id.* at ¶ 46. Dr. Piza concedes this analytical gap,

*See Klein v. Meta Platforms, Inc.,* 766 F. Supp. 3d 956, 967 (N.D. Cal. 2025) (noting "there must be a sound foundation in the evidence to support every step on the way to their conclusions").



1

2

3

4

5

6

7

8

9

10

11

12

13    Dr. Piza's opinion regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14    should be excluded.

15    **B.    Dr. Piza's statements regarding** ▮▮▮▮▮▮▮▮▮▮▮▮▮ **are**
      **outside his expertise and unsupported.**

16    Dr. Piza next opines that ▮▮▮▮▮▮▮▮▮

17

18

19

20

21

22

23

24

25

26    ――――――――――――
      32 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In other

28    words, Dr. Piza has no idea how consequences at Uber work and thus his opinions about the
      deterrent effect of any of these features are unreliable.

-31-

1

2

3                                                    These opinions should be excluded because Dr. Piza is

4   not qualified to opine on                                                              and

5   because he does not ground these opinions in sufficient facts or data.

6          Before a witness may come "before the jury cloaked with the mantle of an expert…care

7   must be taken to assure that a proffered witness truly qualifies as an expert" through "knowledge,

8   skill, experience, training, or education." *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993,

9   1004 (9th Cir. 2001). Here, Dr. Piza does not possess any knowledge, skill, experience, training, or

10  education that would qualify him to opine on

11

12

13

14

15

16

17

18                                                                          Dr. Piza identifies no

19  comparable credentials to this separate technology expert, underscoring that these opinions fall well

20  outside his expertise.

21          Likewise, Dr. Piza does not have the requisite qualifications regarding

22

23

24                                             *ee* Piza Report at ¶¶ 1, 4-7; *see also id.* at Ex. A

25  (Curriculum Vitae)

26                  *See* Piza Dep. at 246:15-17, 247:3-7.

27  33

28                                                                  *ee* Piza Dep. at 82:12-13.



1 ▮▮▮▮  Because Dr. Piza is not qualified to opine on ▮▮▮▮▮▮▮▮

2 those portions of his report should be excluded. *See* Piza Report at § VI.C.

3 ▮▮  Even if qualified, Dr. Piza provides no reliable methodology for his ▮▮▮▮ opinions.

1    Dr. Piza is not qualified to opine on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and his attempts

2    to do so lack basis in reliable methodology. Those opinions should be excluded.

3        C.    **Dr. Piza's testimony regarding** ▮▮▮▮▮▮▮▮▮▮▮ **constitutes**
         **improper personal opinions.**

4

5

6

7

8

9

10

11

12

13

14

15                                    Any views Dr. Piza offers regarding these

16

17   therefore reflect only his personal beliefs and are not entitled to the credibility of expert testimony.[34]

18   **V.    EXPERT REPORT OF JOSEPH OKPAKU**

19       Plaintiffs move to exclude the opinions of Uber's lobbyist expert Joseph O. Okpaku. *See*

20   Ex. A (Expert Report of Joseph Okpaku dated September 26, 2025) ("Okpaku Report"). Mr.

21   Okpaku's opinions are based solely on his experience as a member of Lyft's "Government

22   Relations team" from 2010 to 2019. *Id.* at 3. He asserts that his testimony is helpful to the jury

23   because "[d]uring [his] time at Lyft, [he] reviewed every piece of legislation being considered for

24   the ridesharing industry" and "testified … at city or state legislative hearings and regulatory

25   proceedings" and "before Congress." *Id.* And Mr. Okpaku cites his participation in discussing the

26   "economic costs and benefits of the gig economy, the intersection of the gig economy and long-

27   _____
     [34] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

standing employment-related classifications, and the impact of the gig economy on certain

segments of society." *Id.*

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

As set forth below, each opinion should be excluded.

**A.      Mr. Okpaku's opinions** ████████████████████████████ **are irrelevant.**

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ These irrelevant and

improper opinions should be excluded.

**1.      How regulators "treat" Uber and what legislators "intended" are improper and unhelpful legal conclusions.**

Experts may not offer legal opinions because "legal opinions have no place in a jury trial

and usurp the role of the judge and jury." *BP Prods. N. Am., Inc. v. Grand Petrol., Inc.*, 2021 WL

4482138, at *1 (N.D. Cal. Sept. 30, 2021). For that reason, experts may not testify as to the meaning

of statutes or regulatory decisions. *See Nationwide Transp. Finance v. Cass Info. Sys., Inc.*, 523

F.3d 1051, 1058-59 (9th Cir. 2008).

Mr. Okpaku's ████████████ analysis is improper legal opinion ████████████

---

[35] Although briefing is limited to the first bellwether case in Arizona (*see* ECF 4332), because Mr. Okpaku ties together his opinions across the three states, it is necessary to also address his statements about California and North Carolina. Unlike California and North Carolina, Arizona does not assign common carriers non-delegable duties, only a duty of ordinary care. *Compare* PTO 17 at 31-35 (California) *and* PTO 28 at 22-23 (North Carolina), *with Nunez v. Pro Transit Mgmt. of Tucson, Inc.*, 271 P.3d 1104, 1106-09 (Ariz. 2012).

1

2

3

4

5                                            nterpreting rules and statutes is for the Court to do, not an expert. *See,*

6    *e.g., Nationwide Transp.*, 523 F.3d at 1058. Experts "do not testify about the law because the

7    judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform

8    the jury about the law that is relevant to their deliberations." *United States v. Scholl*, 166 F.3d 964,

9    973 (9th Cir. 1999) (citation omitted). While Uber may "use briefing to persuade the Court that

10   [its] interpretation of the law is superior," it may not usurp the Court's role in determining what the

11   law is and instructing the jury on its determinations. *See CFM Commc'ns, LLC v. Mitts Telecasting*

12   *Co.*, 424 F. Supp. 2d 1229, 1236-37 (E.D. Cal. 2005).

13          Mr. Okpaku's opinions regarding

14

15

16          *See, e.g., State v. Christian*, 66 P.3d 1241, 1243 (Ariz. 2003) (noting "the best and most

17   reliable index of a statute's meaning is the plain text of the statute"); *United States ex rel. Miller v.*

18   *ManPow, LLC*, 2023 WL 9005796, at *8-9 (C.D. Cal. Nov. 22, 2023) (excluding expert report "rife

19   with impermissible statutory and regulatory interpretation" including "the definitions and purpose

20   of certain statutory … requirements," the "intent behind certain … regulations," and "even …

21   Congress's intent in designing and enacting" the statute); *Brewer v. BNSF Rwy. Corp.*, 2016 WL

22   11709319, at *2 (D. Mon. Apr. 22, 2016) (excluding testimony concerning "congressional intent

23   in enacting" a statute because "it is the function of the Court to instruct the jury on relevant law").

24          **2.      How regulators "treat" Uber and what legislators "intended"**
                       **are irrelevant to whether Uber is a common carrier.**
25
              In addition to offering improper legal opinions, Mr. Okpaku's opinions are not helpful to
26
     the jury because they are wrong. *See Nationwide Transp.*, 523 F.3d at 1059 (excluding opinions
27
     where "legal conclusions not only invaded the province of the trial judge, but [also] constituted
28

1  erroneous statements of law" and were therefore "not only superfluous but mischievous").

2

3

4

5                                                                                              Okpaku

6  Report at 10, 29-31.

7          The fatal flaw in these opinions is that the TNC statute in Arizona (as well as the one in

8  California which Mr. Okpaku cites to as the ███████ does *not* say that Uber is *not* a common

9  carrier—an inconvenient fact ████████████████████ Okpaku Report at 32, n.83. The

10 Court previously analyzed TNC statutes that expressly exempted companies like Uber from

11 common-carrier status. *See* PTO 17 at 31 & n.11 (Texas); PTO 18 at 5-6 (Florida). The Court

12 explained that "[t]he language is clear and unequivocal, and Plaintiffs ask the Court to read

13 limitations into the statute—such as a distinction between the "regulatory" and "common law"

14 definitions of common carrier—*that are just not there.*" PTO No. 17 at 31 n.11 (emphasis added).

15 Now, the roles are reversed. It is Uber, through Mr. Okpaku, who invites the Court to exclude Uber

16 from common-carrier status based on something that is "just not there" in the statute. *Id.* The Court

17 should again decline the invitation.

18         In Arizona, the definition of a common carrier is determined by common law. *See, e.g.*,

19 *Perez v. Circle K. Convenience Stores, Inc.*, 564 P.3d 623, 629 (Ariz. 2025); *Nunez*, 271 P.3d at

20 1106-09; *see also, e.g.*, *Lowrey v. Montgomery Kone, Inc.*, 42 P.3d 621, 626 n.7 (Ariz. App. 2002)

21 (citing, among others, California, Montana, Illinois, and Alabama law); *S. Pac. Co. v. Hogan*, 108

22 P. 240, 241 (Ariz. 1910) (citing federal common law). Arizona's TNC statute does *not* absolve

23 Uber of liability as a common carrier for purposes of tort liability.

24 *See* Okpaku Report at 32, n.83 ████████████████████

25     ███); Ex. B (Deposition of Josph Okpaku dated November 5, 2025) at 226:10-13

26     ████████████████████████████████████████

27     ████████████████. The statute provides only that "[a] transportation network

28 company shall be regulated pursuant to this article and not as a vehicle for hire." Ariz. Stat. § 28-

9552(E). The "plain text of the statute" evinces a focus on regulatory issues, with no mention of tort liability. *Christian*, 66 P.3d at 1243; *see also, e.g.*, *Murray v. Uber Techs., Inc.*, 486 F. Supp. 3d 468, 475 (D. Mass. 2020) (reaching similar conclusion under similar Massachusetts law). And even if the statute were ambiguous, Arizona courts "interpret statutes with every intendment in favor of consistency with the common law." *Wilks v. Manobianco*, 352 P.3d 912, 915 (Ariz. 2015) (citation omitted). Mr. Okpaku's "expertise" cannot displace cardinal principles of statutory interpretation. Indeed, Judge Schulman in the JCCP rejected the same argument on California law (which, again, Mr. Okpaku cites as the ███████████. As Judge Shulman noted:

> [I]t is significant that the Legislature enacted the TNC statutes in 2014 without amending Civil Code section 2168. Had the legislature intended to exempt rideshare companies from common carrier status for the purpose of tort liability, it easily could have amended Civil Code section 2168 to accomplish this objective. Likewise, Proposition 22, enacted by the voters in the November 2020 election, is silent on the subject of rideshare companies' status as common carrier.

*In re Uber Rideshare Cases*, 2025 WL 2631565, at *9, n.10 (Cal. Super. Jul. 31, 2025) (MSJ Order). This Court should reach a similar conclusion regarding Arizona's statute.

**B.** **Mr. Okpaku's ███████████ opinions are unreliable.**

Mr. Okpaku's ███████ opinions (Opinion Nos. 1 and 2) rest almost entirely on ███████████ as opposed to any discernible methodology. He █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Okpaku Report at 11-14. These are not opinions based on a reliable methodology, but unreliable ███████████████ The ████████████████████████████████████████████████████████████ *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (excluding *ipse dixit* reasoning unsupported by data); *Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1250 (D. Or. 2024).

1      ███ *See Okpaku Dep. at 160:25-161:7* ███████████████

2      ████████████████████████████████████ Okpaku Report,

3 at 5, 14.; *see Grodzitsky*, 957 F.3d at 985–86 (excluding expert opinion where expert failed to cite

4 industry standards); *Kidwell-Bertagnolli*, 2024 WL 1589468 at \*14 (excluding expert opinion on

5 "industry standards" where expert failed to "identify these industry standards"); *Magallon*, 743 F.

6 Supp. 3d at 1250.

7 ██████████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████████████████████████

10 ██████████ *See Okpaku Report at 17-18.* ██████████████

11 ██████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ████████████████████ *Id.* ███████████████████████

14 ████████████████████████████████████████ *Id.*;

15 *see also* Okpaku Dep. at 245:1-4, 174:16-24, 176:17-177:1.

16 ██████████████████████████████████████████████████

17 ██████████ *See id.*, 167:7-8; Okpaku Report at 19.

18      Finally, Mr. Okpaku's claim that ████████████████████ is

19 unsupported by *any* reliable data. *See* Okpaku Report at 19-21; Okpaku Dep. at 183:1-18. Indeed,

20 ██████████████████████████████████████████████████

21 ██████████████████ *See* Okpaku Report at 20; Okpaku Dep. at 237: 23-238:1

22 ██████████████████████████████████████████████████

23 Again, such *ipse dixit* testimony is inherently unreliable and confusing to the jury. It is also

24 irrelevant. ██████████████████████████████████████

25 ████████████████████████████████████ These irrelevant

26 opinions, untethered to actual data, are inherently unreliable and should be excluded. *See, e.g.,*

27 *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (expert testimony may

28 not rest merely on "unsupported speculation and subjective beliefs").

**C.      The portions of Mr. Okpaku's "███████" opinions ███████████ ███████████ should be excluded.**

Mr. Okpaku opines that Uber does not ███████████████████████████ ███████████████████████████████████████████████" Okpaku Report at 21. To begin, the opinion is based on the wrong legal standard: employee status is triggered by the "right to control" regardless of whether the right is exercised. *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 141 (Ariz. 1990) (citation omitted). That problem aside, two portions of Mr. Okpaku's ███ opinion must be excluded.

**1.      Drivers' "motivators" are not relevant to whether they are employees.**

Mr. Okpaku's ███████ opinion is primarily based on ████████████████████ ████ *See, e.g.,* Okpaku Report at 21 ████████████████████████████████████████ (emphasis added). But a person's motivations for pursuing a particular occupation, and subjective perceptions on what is or is not "appealing," have nothing to do with whether they are an employee or an independent contractor for purposes of vicarious tort liability. *Cf. Engler v. Gulf Interstate Eng'g, Inc.*, 258 P.3d 304, 311 (Ariz. App. 2011) ("The reason workers' compensation law is not controlling in a tort action is that workers' compensation law and respondeat superior serve different purposes and, therefore, differ in scope and application.") (citation omitted).

Numerous employment relationships involve freedom and flexibility, but this "does not in itself preclude a finding of an employment relationship." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1152 (N.D. Cal. 2015) (applying similar California law). "The more relevant inquiry is how much control Uber has over its drivers *while they are on duty* for Uber. The fact that some drivers are only on-duty irregularly says little about the level of control Uber can exercise over them when they *do* report to work." *Id.* Nothing in the relevant Arizona law assigns relevance to the worker's ███████████ Mr. Okpaku's opinions on this issue are irrelevant and should be excluded.

1

2.      **Mr. Okpaku's interpretations of Uber contracts are irrelevant and improper legal opinion.**

2

Mr. Okpaku opines that Uber's driver ███████████████████████████████

3

███████████████████████████████████████████████████████████████ ' Okpaku Report at

4

23. This opinion is irrelevant: "Contract language does not determine the relationship of the parties,

5

rather the objective nature of the relationship is determined upon an analysis of the totality of the

6

facts and circumstances of each case." *Santiago*, 794 P.2d at 141. And this opinion is unreliable

7

and unhelpful: "The interpretation of a contract is an issue of law …. Expert testimony is not proper

8

for issues of law." *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1046 (9th Cir. 1996).

9

D.      **Mr. Okpaku's "**███████████████████████████████████

10

███████ **should be excluded.**

11

Mr. Okpaku's opinion that ██████████████████████████████████████

12

██████████████████████████████ (*see* Okpaku Report at 19), merely restates the

13

same faulty legal-minima argument discussed above.

14

███████████████████████████████████████████████████████████

15

█████████████████████████████████████████████████████. Expert

16

testimony that simply equates legal compliance with reasonable care misstates the law, offers no

17

specialized expertise, and risks misleading the jury into believing that the standard of care is defined

18

by the lowest level of regulatory obligation. *See e.g.*, *Magallon*, 743 F. Supp. 3d at 1250 (testimony

19

about "industry standards" is irrelevant if the alleged standards are nothing more than compliance

20

with the law).

21

Mr. Okpaku's opinion ████████████ is also devoid of any methodology. He does not analyze

22

whether ████████████████████████████████████████████████████████

23

███████████████████████████████████████████████████████████████

24

███████████████████████████████████████ *See* Okpaku Report at

25

19; Okpaku Dep. at 175:13-178:17. There is no foundation to his opinion, let alone a reliable one,

26

and it thus fails to meet Rule 702 and *Daubert*.

27

28

## CONCLUSION

For these reasons, the above opinions of experts Victoria Stodden, Vida Thomas, Eric Piza, Jason Morris, and Joseph Okpaku, should be excluded in whole or in part.

Dated: November 10, 2025                                  Respectfully submitted,


By: /s/ Sarah R. London
      Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: /s/ Rachel B. Abrams
      Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: /s/ Roopal P. Luhana
      Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

1

**FILER'S ATTESTATION**

2    I am the ECF User whose ID and password are being used to file this document. In

3    compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

4

5    Dated:  November 10, 2025                By:        /s/ Ellyn Hurd

6                                                        Ellyn Hurd

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28