**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

This Document Relates to:

ALL MATTERS

Case No.: 3:23-MD-03084-CRB

**JOINT LETTER REGARDING THE REBUTTAL REPORT OF LINDSEY D. CAMERON, PH.D.**

Judge: Hon. Lisa J. Cisneros
Courtroom: G – 15th Floor

The Parties respectfully submit this joint letter regarding disputed issues related to the Rebuttal Report of Dr. Lindsey D. Cameron.

DATED: November 14, 2025

By: / *Roopal P. Luhana*
ROOPAL P. LUHANA (*Pro Hac Vice*)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

SARAH R. LONDON (SBN 267083)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: slondon@girardsharp.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

*Co-Lead Counsel for Plaintiffs*

By: / *Laura Vartain Horn*
LAURA VARTAIN HORN
**KIRKLAND & ELLIS LLP**
LAURA VARTAIN
Laura.vartain@kirkland.com
ALLISON M. BROWN (*pro hac vice*)
Alli.brown@kirkland.com
JESSICA DAVIDSON (*pro hac vice*)
Jessica.davidson@kirkland.com

*Counsel for Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC*

Dear Judge Cisneros:

On November 6, 2025, the Court ordered the parties to file a joint statement, pursuant to Pretrial Order No. 8 (ECF No. 323), by November 14, 2025, concerning Uber's request to strike the bulk of the October 24, 2025 rebuttal report of Plaintiffs' expert, Dr. Lindsey D. Cameron ("Cameron Report"). ECF No. 4324 at 1. Below is the parties' joint statement.

**Uber's Position:** Plaintiffs designated Dr. Lindsey D. Cameron as a purported "rebuttal" expert to Uber's expert, Joseph O. Okpaku. However, just ***six*** of the ***sixty*** pages of the Cameron Report respond to Mr. Okpaku. *See* ECF No. 4312-1 at 12-17; *see also* ECF 4357-2, Okpaku Opening Report. The remainder of the report (specifically, Sections IV-IX) does not even mention Mr. Okpaku's name, and instead effectively serves as an opening expert report on how rideshare companies (such as Uber) purportedly exercise "control" over independent third-party drivers who utilize the platform. *Id*. at 17-64. Dr. Cameron's so-called "rebuttal" report is ***nearly identical*** to an opening report she served in a litigation brought against Uber by the Massachusetts Attorney General. *Id*. at 102-158. Dr. Cameron admitted in her deposition that she reused portions of that report in preparing her purported rebuttal to Mr. Okpaku.[1] She also admitted that she was retained by Plaintiffs in 2024;[2] that she spent sixty hours drafting her report prior to August 2025,[3] compared to just ten to twelve hours drafting it after August 2025;[4] and that she formed many of her opinions prior to reading Mr. Okpaku's report.[5] Under Rule 26, Dr. Cameron's opinions in Sections IV-IX should have been disclosed as affirmative opinions by September 26—the deadline for serving opening reports. Moreover, exclusion is the proper remedy because Plaintiffs' disregard of Rule 26 is not substantially justified or harmless under Rule 37(c)(1).

"Rebuttal testimony cannot be used to advance new arguments or new evidence." *Avila v. Ford Motor Co.*, No. 5:22-CV-00542-PCP, 2025 WL 2538722, at *3 (N.D. Cal. Aug. 22, 2025) (citation omitted). "Instead, the sole function of a rebuttal expert is to explain, repel, counteract or disprove evidence of the adverse party." *Tubio v. Adidas Am. Inc.*, No. CV 22-6424 GW (PVCx), 2024 WL 1191051, at *2 (C.D. Cal. Feb. 5, 2024) (citation and quotations omitted). These principles create a "full up-front disclosure duty upon the party with the burden of proof on a given issue." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5572835, at *3 (N.D. Cal. Nov. 15, 2011) (striking reports "attacking each of [defendant's] two opposition reports on damages," including one from plaintiff's original expert and a "new expert who crept out of the woodwork only for this purpose"). Moreover, exclusion of testimony "exceeding the proper scope of rebuttal" is "***automatic*** and ***mandatory*** unless the [proponent of the evidence] can show that its violation . . . was either justified or harmless." *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 4272430, at *2 (citation omitted) (emphasis added). Sections IV-IX of the Cameron Report do not comply with these requirements and should be excluded.

***First***, Sections IV-IX of the Cameron Report do not constitute proper rebuttal. "[T]he role of a designated rebuttal expert is 'solely to contradict or rebut evidence on the same subject matter identified by' the opposing party's expert witness." *Avila*, 2025 WL 2538722, at *3 (citing Fed. R. Civ. P.

---

1 *See, e.g.*, ECF TBD, Cameron Dep. 90:4-12; 91:8-16 (rough). Uber will file its motion to exclude Dr. Cameron later tonight. The deposition will be an exhibit to that filing.

2 *See id.* 21:3-11.

3 *See id.* 21:12-17.

4 *See id.* 23:14-24:2.

5 *See id.* 283:15-284:11; 284:24-285:9.

26(a)(2)(D)(ii)). Sections IV-IX of the Cameron Report do not constitute proper rebuttal because they do not even address Mr. Okpaku's opinions, much less attempt to rebut them. *See Tubio*, 2024 WL 1191051, at *3 (granting motion to strike untimely rebuttal report because "merely opining on the same general subject ma[tt]er does not quality as a rebuttal report if the report does not explicitly rebut and contradict the same evidence relied on by the expert report it seeks to rebut"). Instead, they seek to prop up the allegations from Plaintiffs' Complaint as to why Uber purportedly exercises "control" over independent, third-party drivers who utilize its platform. *See* ECF 269, Compl. ¶¶ 72-111. Because such allegations lie at the heart of Plaintiffs' affirmative theory of the case, they should have been disclosed in a proper opening report.

***Second***, exclusion is the proper remedy for this belated disclosure because it is neither substantially justified nor harmless. Dr. Cameron's new opinions could have been served "prior to the disclosure of" Mr. Okpaku's report. *See In re Toy Asbestos*, No. 19-cv-00325-HSG, 2021 WL 1056552, at *4 (N.D. Cal. Mar. 19, 2021) (finding that "Plaintiffs have not offered any credible reason for the delay" in designating causation expert after defendants served their expert's report). Dr. Cameron's invoices indicate that she billed almost 60 hours to this case between June 2024 and August 2025, all before the initial expert report deadline. *See* **Exhibit 1**, August 26, 2025 Cameron invoice. Indeed, the only conceivable reason why Plaintiffs are seeking to introduce Dr. Cameron's report into this case is to bolster their case-in-chief. "[W]here the purported rebuttal evidence concerns the party's case in chief, as it does here, its failure to timely disclose the expert is 'indefensible.'" *Tubio*, 2024 WL 1191051, at *4. That is particularly true given that Dr. Cameron appears to have largely repurposed an ***opening*** report she recently served in the litigation brought against Uber by the Massachusetts Attorney General. *Compare* ECF No. 4312-1 at 5-64 ¶¶ 36-38 with *id*. at 102-158 ¶¶ 14-16 (nearly identical discussions of "How Organizational Scholars Define Organizational Control and its Importance"). Given that Dr. Cameron had no difficulty espousing these opinions in an affirmative opening report in another case, there is no substantial justification for Plaintiffs' failure to disclose them in a proper opening report.

***Finally***, Plaintiffs also cannot establish that introduction of these new opinions would be harmless. The expert disclosure rules are "designed to forestall 'sandbagging' by a party with the burden of proof who wishes to save its best points for reply, when it will have the last word . . . ." *Oracle*, 2011 WL 5572835, at *3. But that is precisely the upshot of Plaintiffs' tactic in this case because Uber has no meaningful opportunity to rebut what Dr. Cameron is saying in her new report. Moreover, Uber is being denied this fundamental right at a time when Plaintiffs are simultaneously dragging their feet on making their experts available for depositions, undermining Uber's ability to explore the bases of their opinions and prepare for trial. At a minimum, the Court should allow Uber to submit a response to the rebuttal report if it is not stricken.

Plaintiffs argue below that it is irrelevant whether Dr. Cameron "could have advanced some of her opinions in an opening report." However, the law here is clear: "[i]f the purpose of expert testimony is to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one." *Clear-View Techs., Inc. v. Rasnick*, No. 13-cv-02744-BLF, 2015 WL 3509384, at *4 (N.D. Cal. June 3, 2015) (quoting *In re Apex Oil Co*., 958 F.2d 243, 245 (8th Cir. 1992)); *see also Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-06 (9th Cir. 2001) (affirming trial court's exclusion of an expert who was improperly disclosed as a rebuttal expert). Plaintiffs clearly anticipated that issues about organizational control in the ridesharing industry were part of Uber's case-in-chief because they retained Dr. Cameron in 2024 and before Uber served the report of Mr. Okpaku. *See* Cameron Dep. 21:3-11. They cannot now claim that Sections IV–IX are rebuttal opinions.

**Plaintiffs' Position:** Uber's motion should be denied because Dr. Cameron's rebuttal report responds directly to arguments regarding driver autonomy raised by Uber's expert, Joseph Okpaku. *See In re Twitter, Inc. Sec. Litig.*, No. 16-CV-05314-JST, 2020 WL 9073168, at *4 (N.D. Cal. Apr. 20, 2020) (declining to exclude report that responded to subject matter raised by opposing expert). Uber deposed Dr. Cameron regarding her opinions, so her report imposes no undue prejudice. Even if it did, Plaintiffs do not oppose Uber's request to submit a targeted response.

**B. *Dr. Cameron's Report Rebuts the Opinions of Uber's Expert and Causes no Undue Prejudice***

Uber's expert, Joseph Okpaku, opines that Uber lacks control over its drivers, largely because those drivers can choose when and how much to work. ECF 4357-2, "Okpaku Rpt." at 21. Dr. Cameron rebuts those conclusions by identifying flaws in Mr. Okpaku's methodology and demonstrating that his opinions are inconsistent with the relevant scholarship concerning organizational control. ECF No. 4312-1, "Cameron Rbtl." ¶¶ 5-11, 14-24. Dr. Cameron's opinions respond specifically to Mr. Okpaku's arguments, so they are properly asserted in a rebuttal report. *See, e.g.*, *In re Pac. Fertility Ctr. Litig.*, No. 18-CV-01586-JSC, 2021 WL 842739, at *5 (N.D. Cal. Mar. 5, 2021) (analysis in rebuttal was proper because it was limited to responding to the defendant's expert's opinion); *In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2022 WL 1604753, at *8 (N.D. Cal. Jan. 25, 2022) ("A rebuttal expert may cite new evidence and data or introduce new methods of analysis in a rebuttal report so long as the new evidence, data, or method is offered to contradict or rebut the opposing party's expert.").

Each section Uber moves to strike responds directly to flaws in Mr. Okpaku's analytical framework and conclusions. Section IV provides an overview of Dr. Cameron's methodology, which is grounded in her experience as an organizational and management scholar. Cameron Rbtl, ¶¶26-28. This section contrasts the methodological approach of Mr. Okpaku—a lawyer-turned-lobbyist—who relies on personal observation rather than peer-reviewed research. *Id.* ¶ 14. Section V introduces the concept of an on-demand labor company, which Dr. Cameron explains is the proper characterization of Uber's business model. *Id.* ¶ 29-30. This section defines terminology used in Dr. Cameron's report and provides the foundation to rebut Mr. Okpaku's mischaracterization of Uber as a "ride-sharing," rather than "ride-hailing" company. *Id.* ¶ 16. In section VI, Dr. Cameron explains how organizational control is defined in the leading scholarship. *E.g.*, *Id.* ¶ 36. This section addresses Mr. Okpaku's failure to provide any definition of the term "control" in his report. *Id.* ¶ 17. It also notes the importance of organizational control for companies like Uber, who consider its workers to be independent contractors. *Id.* ¶ 38. This discussion rebuts Mr. Okpaku's claim that Uber's form agreements indicate a lack of control because they refer to drivers as "independent contracting parties." Cameron Rbtl., ¶ 38; Okpaku Rpt. at 24.

Section VII explains that Uber's algorithmic management system controls workers while also "obfuscating the companies' intent and inherent power in the platform-worker relationship." Cameron Rbtl., ¶ 42. This section rebuts Mr. Okpaku's opinion that Uber lacks control over its drivers because they are purportedly free to accept or reject rides and set their own schedule. Okpaku at 21, 25-28. Dr. Cameron responds by explaining that these perceived sources of independence are superficial and designed to give drivers a false sense of autonomy while exercising increased control through Uber's algorithmic management. Cameron Rbtl., ¶ 64. For example, the choice to accept rides is intended to "reinforce the idea for drivers that they have choice while leaving organizational control…in the hands of the on-demand organization itself." *Id.* ¶ 65. Similarly, while drivers ostensibly choose when to work, Uber "uses behavioral science to influence when, where, and how long drivers work." *Id.* ¶ 66. Thus, Dr. Cameron responds to Mr. Okpaku's driver flexibility theory by showing that it is "a way for workers to have limited choices in a system that was ultimately designed and controlled by Uber." *Id.* ¶ 69.

Sections VIII and IX further rebut Mr. Okpaku's opinions that "a key appeal of ridesharing for drivers" is that drivers "completely control when they work," "have no boss," "no schedule," and are "free to accept or reject any ride request." Okpaku Rpt. at 21. Section VIII advances the concept of "socio-cultural" narratives such as entrepreneurship and "hustle culture," which Uber promotes so that drivers are more likely to acquiesce to Uber's organizational control. Cameron Rbtl., ¶ 70. Thus, the attributes that Mr. Okpaku identifies as sources of autonomy make Uber drivers "see themselves as entrepreneurs, hustling on their own terms," but the reality is that their schedules are controlled by Uber's "algorithmically managed incentives and nudges," which "strongly encourage workers to drive at times that are most valuable to the platform organization." *Id.* ¶ 76. Dr. Cameron also rebuts Mr. Okpaku's theory that Uber lacks control because drivers can provide rides through both the Uber and Lyft apps. Okpaku Rpt. at 21. Dr. Cameron points to research indicating that "often drivers do not log into multiple apps at the same time" and notes that drivers may only be logged into only one app when completing a ride. Cameron Rbtl., ¶ 77-78.

Section IX refutes Mr. Okpaku's findings by describing the tools Uber uses control its drivers. *Id.* ¶¶ 82, 84-85. Whereas Mr. Okpaku describes the fee split between Uber and its drivers as "a mutually agreed-upon arrangement between two parties" (Okpaku Rpt. at 27), Dr. Cameron retorts that driver fares are "algorithmically determined by Uber" and designed to control drivers by nudging them to behave in a certain way, such as working at certain times and locations. Cameron Rbtl., ¶ 89. She also rebuts Mr. Okpaku's claims of driver autonomy by showing that Uber's loyalty programs control driver behavior by prodding them to work at times that benefit Uber and not cancel too many rides. *Id.* ¶ 90-92. And she reveals how Uber uses incentives to control both the overall number of hours drivers work as well as the time and places where those hours are spent. *Id.* ¶ 93. In addition, Mr. Okpaku argues that customer ratings are not a source of Uber's control because it is the passengers who control the ratings. Okpaku Rpt. at 28. Dr. Cameron rebuts this point by explaining that Uber designs the rating system, sets the threshold for consequences like deactivation, and determines when to issue warnings or deactivate drivers. *Id.* ¶ 95. In other words, Uber is "laundering control," a concept that responds to Mr. Okpaku's erroneous conclusion that customer ratings and complaints cede control to passengers. *Id.* ¶ 95(e).[6]

Uber's focus on the number of times Dr. Cameron references Mr. Okpaku's name is irrelevant. Dr. Cameron rebuts the substance of Mr. Okpaku's conclusions by reference to her extensive knowledge of the relevant scholarship. *See* ECF TBD,[7] "Cameron Dep." at 119:20-120:9 ("I address Mr. Okpaku directly in the first part…the other part of the report, I sort of add in all the reason."); *see also Haskins v.*

---

[6] Uber's authorities do not support exclusion on this record. *See*, *e.g.*, *Avila v. Ford Motor Co.*, 2025 WL 2538722, at *3 (N.D. Cal. Aug. 22, 2025) (excluding opinions that were redundant of opinions offered by a different opening expert and consisted of critiques more appropriate for cross); *Tubio v. Adidas Am. Inc.*, 2024 WL 1191051, at *3 (C.D. Cal. Feb. 5, 2024) (expert made no mention of the report she was purportedly rebutting when describing her assignment and agreed with the opposing expert two of three time she mentioned him); *In Oracle Am., Inc. v. Google Inc.*, 2011 WL 5572835, at *3 (N.D. Cal. Nov. 15, 2011) (striking reply report where party had already submitted a reply report from another expert on the same topic); *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at *3-*4 (N.D. Cal. June 3, 2015) (defendant conceded topics should have been covered in initial expert opinions and expert never reviewed report he was purportedly rebutting); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105 (9th Cir. 2001) (report disclosed "two years after the close of discovery, more than one year after Polzin's report was last supplemented, and just 28 days prior to trial.").

[7] See Note 1.

*First Am. Title Ins. Co.*, No. CIV.A. 10-5044 RMB, 2013 WL 5410531, at *4 (D.N.J. Sept. 26, 2013) ("Paktar's rebuttal is not strictly limited to only the specific items that Strombom raised. As he has done, Paktar may rely upon new evidence and opinions to rebut Strombom's opinions.").

Even if Dr. Cameron could have advanced some of her opinions in an opening report, "there is no bright line rule requiring automatic exclusion of a rebuttal report that contains information that could have been included in an initial expert report." *Leadership Stud., Inc. v. Blanchard Training & Dev., Inc.*, 2018 WL 1989554, at *9 (S.D. Cal. Apr. 27, 2018), *report & rec. adopted*, No. 15-CV-1831-WQH (KSC), 2018 WL 3752373 (S.D. Cal. Aug. 7, 2018). Accordingly, neither Dr. Cameron's early invoices nor her assertion of similar opinions in a different case have any bearing on whether she has asserted rebuttal opinions here. *See Van Alfen v. Toyota Motor Sales, U.S.A., Inc.*, No. 810ML-02151-JVS-FMOx, 2012 WL 12930456, at *6 (C.D. Cal. Nov. 9, 2012) ("Regardless of whether the decision not to present E–GAS opinions in the Antaran's initial report was a tactical one, what matters is whether his rebuttal opinion responds to Toyota's initial expert reports…"); *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (Excluding anything an expert could have included in an opening report "would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material.").

Dr. Cameron had no reason to serve her report before seeing Mr. Okpaku's, so there was no belated disclosure. Uber has deposed Dr. Cameron, and while Plaintiffs do not believe it is necessary, they do not oppose Mr. Okpaku submitting a targeted response to Dr. Cameron's Rebuttal Report.

**CERTIFICATE OF SERVICE**

On November 14, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF. All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/ Laura Vartain Horn*

## ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's consent and have authorized the filing.

DATED: November 14, 2025

*/s/ Laura Vartain Horn*