| | |
|---|---|
| 1 | Laura Vartain Horn (SBN 258485) |
| 2 | **KIRKLAND & ELLIS LLP**<br>555 California Street, Suite 2700 |
| 3 | San Francisco, CA 94104<br>Telephone: (415) 439-1625 |
| 4 | laura.vartain@kirkland.com |
| 5 | Allison M. Brown (Admitted *Pro Hac Vice*)<br>**KIRKLAND & ELLIS LLP** |
| 6 | 2005 Market Street, Suite 1000<br>Philadelphia, PA 19103 |
| 7 | Telephone: (215) 268-5000<br>alli.brown@kirkland.com |
| 8 | Jessica Davidson (Admitted *Pro Hac Vice*) |
| 9 | **KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue |
| 10 | New York, NY 10022<br>Telephone: (212) 446-4800 |
| 11 | jessica.davidson@kirkland.com |
| 12 | *Attorneys for Defendants*<br>UBER TECHNOLOGIES, INC., RASIER, LLC, |
| 13 | And RASIER-CA, LLC |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB (LJC) |
| This Document Relates to:<br><br>*Jaylynn Dean v. Uber Techs., Inc.*,<br>No. 23-cv-06708 | **DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERT LINDSEY CAMERON; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Judge:     Hon. Charles R. Breyer<br>Courtroom: 6 – 17th Floor<br><br>Judge:     Mag. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

**NOTICE OF MOTION AND MOTION TO EXCLUDE**

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Please take notice that on a date and time to be set by the Court, before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber") by and through their undersigned counsel, will and hereby do move the Court for an order, pursuant to Federal Rule of Evidence 702, excluding the opinions of Plaintiffs' Expert Lindsey Cameron.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the pleadings, papers, and records filed in this action, and such further arguments and matters as may be offered at the time of the hearing of this Motion.

Dated November 14, 2025                          KIRKLAND & ELLIS LLP


                                                 By: /s/ *Laura Vartain Horn*
                                                 *Counsel for Uber*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 1

III. STATEMENT OF THE ISSUES TO BE DECIDED .................................................... 3

IV. LEGAL STANDARD .................................................................................................... 3

V. ARGUMENT .................................................................................................................. 3

    A. Dr. Cameron's "Immersion" Methodology Is Subjective And Unreliable. ....... 3

    B. Even If Dr. Cameron's Methodology Were Reliable, Her Opinions Do Not Follow From It. ................................................................................................... 6

    C. Dr. Cameron's Opinions Are Irrelevant And Would Not Aid The Jury. ........... 7

VI. CONCLUSION ............................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ................................................................................................... 5

*Chandler Gas & Store Inc. v. Treasure Franchise Co. LLC*,
   No. CV-23-00400-PHX-KML, 2025 WL 3018829 (D. Ariz. Oct. 29, 2025) ......................... 4

*Coslett v. Hannart*,
   No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023) ......................................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ...................................................................................................... 3, 7, 9

*Davis et al. v. DoorDash, Inc. et al.*,
   No. C20222745 (Ariz. Super. Ct. May 9, 2025) .................................................................... 9

*Engler v. Gulf Interstate Eng'g, Inc.*,
   280 P.3d 599 (Ariz. 2012) ...................................................................................................... 8

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ............................................................................................................... 7

*Klein v. Meta Platforms, Inc.*,
   766 F. Supp. 3d 956 (N.D. Cal. 2025) ................................................................................... 7

*Klosa v. Goldman*,
   No. CV 2019-000428 (Ariz. Super. Ct. Aug. 23, 2022) ........................................................ 9

*Lewis v. Kern Cnty.*,
   No. 1:21-CV-00378-KES-CDB, 2025 WL 821895 (E.D. Cal. Mar. 13, 2025) ..................... 7

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) ....................... 5

*Mamani v. Berzain*,
   No. 07-22459-CIV, 2018 WL 1010582 (S.D. Fla. Feb. 22, 2018) ......................................... 7

*Newkirk v. ConAgra Foods, Inc.*,
   727 F. Supp. 2d 1006 (E.D. Wash. 2010), *aff'd*, 438 F. App'x 607 (9th Cir. 2011) ............. 4

*Santorii v. MartinezRusso, LLC*,
   381 P.3d 248 (Ariz. Ct. App. 2016) ....................................................................................... 8

*United States v. Pryba*,
   678 F. Supp. 1225 (E.D. Va. 1988) ........................................................................................ 4

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd sub nom.*, *Schell v. Volkswagen AG*, No.
  20-17480, 2022 WL 187841 (9th Cir. Jan, 20, 2022)...................................................................4

**Statutes**

A.R.S. § 23-1603 ...........................................................................................................................1, 2, 8

A.R.S. § 23-1603(A)......................................................................................................................8, 9

A.R.S. § 23-1603(A)(1) ......................................................................................................................8

A.R.S. § 23-1603(A)(2) ......................................................................................................................8

A.R.S. § 23-1603(A)(3)(c) .................................................................................................................8

A.R.S. § 23-1603(E)(2).......................................................................................................................8

**Rules**

Fed. R. Evid. 702(a)........................................................................................................................7, 9

Fed. R. Evid. 702(b)............................................................................................................................5

Fed. R. Evid. 702(c)........................................................................................................................3, 5

Fed. R. Evid. 702(d)........................................................................................................................6, 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Dr. Lindsey Cameron, a "structural ethnographer," seeks to testify that third-party drivers' "choices are greatly limited once they are logged into the [Uber] app and subject to algorithmic management and control." Report ¶ 17 (Ex. 1).[1] Dr. Cameron's opinions are inadmissible under Rule 702 for several independent reasons. *First*, the "immersion"-based methodology that Dr. Cameron purports to apply is entirely subjective and therefore unreliable. This is all the more true because Dr. Cameron did not produce the interviews with, and studies of, third-party drivers and riders that she claims to have conducted, making it impossible to test the validity of her purported methods. *Second*, even if the methodology that Dr. Cameron describes were reliable, she does not actually apply it in generating her conclusions. And *third*, Dr. Cameron's opinions are irrelevant because the ways in which Uber's algorithm supposedly influences third-party drivers' behavior would not constitute "control" as a matter of Arizona law. *See* A.R.S. § 23-1603 (defining independent contractor status of "qualified marketplace contractors" based on compensation structure and contractual terms). For all of these reasons, Dr. Cameron's opinions should be excluded.

**II.    BACKGROUND**

Lindsey D. Cameron, Ph.D. is an assistant professor of management at the Wharton School of the University of Pennsylvania. Report ¶ 4. According to her report, she also holds several faculty affiliate or associate positions in the fields of sociology, artificial intelligence, and the confluence of the internet and society. *Id.* Her academic research focuses on "emerging enterprises" such as "on-demand companies," as well as the concept of "algorithmic management" and its impact on workers. *Id.* ¶¶ 5, 8-9. Dr. Cameron received her Ph.D. in management from the University of Michigan in Ann Arbor in 2020. *Id.* ¶ 6.

As a "structural ethnographer," *id.* ¶ 8, Dr. Cameron conducts academic research through qualitative methodologies that are "worker-centered" and that "seriously consider[] workers' experience" in "develop[ing] broader claims about social structures and processes." *Id.* As Dr. Cameron describes it,

---

[1]    Dr. Cameron was designated as a rebuttal expert to Mr. Okpaku, but the vast majority of Dr. Cameron's report is not a rebuttal to Mr. Okpaku at all. Instead, she offers affirmative opinions that should have been disclosed prior to the affirmative expert report deadline of September 26, 2025 and should be stricken for the reasons detailed in Uber's pending submission in support of its motion to strike.

her primary method of gathering data on the subjects she studies is "immersion." *Id.* Dr. Cameron explains in her report that she has previously conducted research on Uber and other "gig economy" companies (e.g., Lyft, Instacart, etc.) using these methods. *Id.* ¶ 9. With regard to her prior research on Uber, Dr. Cameron claims to have "spent approximately one hundred hours applying for, training, and working as a ride-hailing driver for Uber in the Washington, DC metro area," and that she had a research assistant drive on the Uber platform in Detroit, Michigan. *Id.* ¶ 10. Dr. Cameron also conducted interviews of drivers and passengers who have used the Uber platform over a period of "multiple years,"[2] including 138 "semi-structured interviews" of drivers, 112 "conversational interviews" of drivers that she conducted while riding as a passenger (i.e., a "participant observer") on the Uber platform, as well as additional interviews of other passengers who have used the platform. *Id.* She also purports to have conducted "focus groups, archival analysis (e.g., web forums, video logs, and document reviews), surveys," and to have "collect[ed] financial diaries," all relating to Uber and other "gig economy" enterprises. *Id.* ¶ 9.

In her report, Dr. Cameron asserts that "[o]ne core finding across [her] research is how algorithmic management can seemingly grant autonomy, or a sense of choice, to workers, yet this autonomy is minimal because workers' autonomy is confined to the narrow choices afforded by the management system." *Id.* Dr. Cameron opines that Uber exercises "organizational control" over drivers who use the platform through an "algorithmic management system." *Id.* ¶ 3. Dr. Cameron describes such algorithmic control as a means for Uber to influence the behavior of drivers on the platform through the algorithm's "quantification of metrics, instantaneous feedback, [its] interactive nature, and [its] opaqueness," to create a "biased" relationship that favors the interest of the platform and customers. *Id.* ¶ 52. Dr. Cameron identifies several particular features of Uber's so-called algorithmic management system that she claims allow the company to exert influence over driver behavior, including Uber's: (1) matching of drivers and passengers, *id.* ¶ 88; (2) provision of an upfront, real-time pricing (for the passenger) and earning (for the driver) figure for a particular ride, *id.* ¶ 89; (3) driver loyalty programs, *id.* ¶¶ 90-92; (4) incentives, e.g., for drivers to turn on the app at peak times, *id.* ¶¶ 93-94; (5) driver rating system, *id.* ¶ 95; and (6) geo-

---

[2]   Dr. Cameron testified that she used the Uber platform as a driver between 2016 and 2020, and that she conducted interviews with riders and drivers in the United States during the same period. *See* Cameron Dep. 111:5-112:15 (Ex. 2) (rough).

tracking and monitoring of drivers' activities, *id.* ¶ 97. She also asserts that Uber and other "on-demand" organizations utilize broader "cultural narratives," such as encouraging "hustle culture," which glorifies "long hours, [and] being available" to encourage drivers to work when the company wants them to work. *Id.* ¶ 72. Dr. Cameron opines that "Uber is not a true marketplace because workers are managed and controlled by the platform's algorithmic management system." *Id.* ¶ 98.

## III. STATEMENT OF THE ISSUES TO BE DECIDED

1. Have Plaintiffs failed to demonstrate by a preponderance of evidence that Dr. Cameron's proffered testimony satisfies the requirements of qualification, reliability, and relevance that are enumerated in Federal Rule of Evidence 702?

## IV. LEGAL STANDARD

The standard for admissibility under Fed. R. Evid. 702 is set forth in Uber's Motion to Exclude the Opinions of Plaintiffs' Expert Minette Drumwright (ECF No. 4351) and incorporated herein by reference.

## V. ARGUMENT

### A. Dr. Cameron's "Immersion" Methodology Is Subjective And Unreliable.

Dr. Cameron describes herself as a "structural ethnographer" who used qualitative, conversational, and "immersion"-based research, rather than quantitative studies, research or tests, to develop her opinions in this case. *See* Report ¶ 8. Specifically, Dr. Cameron asserts that, in connection with her Ph.D. dissertation, she conducted research that entailed: (1) driving on the Uber platform for approximately 100 hours in the Washington, DC area; (2) working with a research assistant who did the same in Detroit, Michigan; (3) conducting "semi-structured" interviews of other drivers who used the Uber platform; (4) conducting "conversational interviews" of drivers using the Uber platform while herself riding as a passenger; and (5) conducting further interviews with other passengers who used the Uber platform. *Id.* ¶ 10.

These methods cannot form the basis of a reliable expert opinion. *See* Fed. R. Evid. 702(c). Under *Daubert* and Rule 702, whether an expert's methods are reliable turns principally on whether those methods are grounded in accepted scientific practice. "Many factors bear on the inquiry into the reliability of expert testimony, including . . . whether the theory or technique can and has been tested; whether [it]

has been subjected to peer review and publication; whether the known or potential rate of error . . . has been addressed; and whether the theory or technique has a general degree of acceptance in the relevant scientific community." *Newkirk v. ConAgra Foods, Inc.*, 727 F. Supp. 2d 1006, 1014 (E.D. Wash. 2010), *aff'd*, 438 F. App'x 607 (9th Cir. 2011).

Dr. Cameron provides no evidence that her methodology bears any of these indicia of reliability. Rather, Dr. Cameron's purported conclusions about Uber are based on her own, subjective impressions of, and intuitions regarding, her personal experiences and interviews. She did not attempt to follow the scientific method, i.e., by generating a hypothesis and then gathering data to falsify or confirm it. Nor did she undertake any efforts to ensure that her own experiences as a driver or those of her interview subjects were representative, or that the information they provided was unbiased. Indeed, there is no suggestion that she followed any research protocol at all, much less a reliable one that would produce replicable outcomes. Rather, all Dr. Cameron did was gather anecdotes, which courts have repeatedly recognized cannot form the basis of reliable expert conclusions.

In *Chandler Gas & Store Inc. v. Treasure Franchise Co. LLC*, No. CV-23-00400-PHX-KML, 2025 WL 3018829 (D. Ariz. Oct. 29, 2025), for example, an economist sought to opine that alleged system malfunctions at a business did not cause customer harm based on the lack of Google reviews complaining about such technical issues. *Id.* at 4. The court excluded his opinion, holding that the expert "provide[d] no reliable method for extrapolating economic harm from qualitative anecdotal feedback." *Id.* Similarly, in *United States v. Pryba*, the trial court excluded an expert's opinion that was premised on a purported "ethnographical" study regarding adult media consumption. 678 F. Supp. 1225, 1232 (E.D. Va. 1988), *aff'd*, 900 F.2d 748 (4th Cir. 1990). Like Dr. Cameron, the expert had conducted his research through informal surveys and anecdotal conversations, including by visiting bookstores and video stores and talking to employees and customers there. *Id.* The court made clear that such an "unscientific poll" could not form the basis of an admissible expert opinion, explaining that it would be "ludicrous" to allow its results to "masquerade as expert testimony[.]" *Id.* at 1234; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020) (rejecting "free form" and "highly informal" interviews as a proper basis for an expert's opinion, particularly where

interview subjects were not shown to be representative sample), *aff'd sub nom.*, *Schell v. Volkswagen AG*, No. 20-17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022).

Similarly here, the methodology described by Dr. Cameron relies on little more than an "unscientific poll" or "anecdotal feedback" from her conversations with drivers and riders who use the Uber platform, along with entirely subjective data points, such as Dr. Cameron's own personal perceptions and experiences while driving on the Uber platform. Nor does Dr. Cameron come close to demonstrating necessary methodological safeguards to ensure that her sources were representative or her interpretations reliable. To the contrary, Dr. Cameron admits that "reliability" is not a focus of her qualitative research. *See* Cameron Dep. 145:20-147:2. According to Dr. Cameron: "reliability would be, like, could somebody else look at my same data set and produce the same results, and that's not qualitative, that's a quantitative approach." *Id*. 146:20-147:2. She also admits that, in her methodology, "there is no right." *Id*. 75:11-12. Because Dr. Cameron's so-called "structural ethnography" comes nowhere close to an objective, reliable methodology, her opinions should be excluded. *See* Fed. R. Evid. 702(c).

This is particularly true because there is no way to test or repeat Dr. Cameron's methods given that she has not produced any of the data she purportedly collected from her "immersion"-based research, including notes and transcripts from her interviews of drivers and passengers, as well as any notes or recordings of her recollections about working as a driver using the Uber platform.[3] Federal Rule of Evidence 702(b) requires an expert's testimony to be "based on sufficient facts or data." But without access to the raw data that Dr. Cameron collected in the course of her study of Uber, neither Uber nor the Court has the ability to test whether that data sufficiently support Dr. Cameron's conclusions. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 644-45 (S.D.N.Y. 2016) (excluding proposed expert's opinion on the ground that the expert "did not preserve, much less produce, the vast majority of the materials on which he purportedly relied," an "elementary lapse" that made it "impossible for a court or adversary to test – or a jury to assess – [the expert's] methodology, as applied here, for veracity and reliability"), *aff'd*, 720 F. App'x 24 (2d Cir. 2017); *see also Amorgianos v. Nat'l R.R.*

---

[3] These materials all fall within the scope of Uber's Request No. 8 accompanying Dr. Cameron's November 5 Notice of Deposition.

5
DEFS.' MOT. TO EXCLUDE OPINIONS OF PLS.' EXPERT LINDSEY CAMERON

*Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (in assessing admissibility of expert's analysis, "the district court should undertake a rigorous examination of the facts on which the expert relies").

Without Dr. Cameron's notes, Uber, the Court, and the jury are left with only Dr. Cameron's own say-so that the data she collected support her conclusions. That is plainly insufficient to satisfy Rule 702, particularly given that Dr. Cameron conducted her "immersion"-based research from 2016-2020. *See* Cameron Dep. 112:11-15 (admitting that Dr. Cameron has not interviewed any drivers who use the Uber platform in the United States since 2020). As Dr. Cameron herself acknowledges, the "on-demand economy" is an "emerging" and "novel" phenomenon, Report ¶¶ 7-8; as a result, there is good reason to believe that the data she collected at least a half-decade ago, and the sweeping conclusions she purports to have drawn therefrom, may be obsolete. For this reason, too, Plaintiffs cannot carry their burden to demonstrate by a preponderance of the evidence that Dr. Cameron's opinions are the product of a reliable methodology.

**B.     Even If Dr. Cameron's Methodology Were Reliable, Her Opinions Do Not Follow From It.**

Even if the Court were to accept Dr. Cameron's qualitative, "immersion"-based approach as a valid research method, the Court should nevertheless exclude her testimony because Dr. Cameron's conclusions do not actually follow from the methodology she describes in her report. *See* Fed. R. Evid. 702(d).

In the first portion of her report, Dr. Cameron details the methodology described above, which she calls "structural ethnography." *See* Report ¶¶ 8-83. But this does not appear to be the methodology that she actually used to generate the opinions that she advances in her expert report. Indeed, when Dr. Cameron's report turns to her ultimate conclusions about Uber, *id.* ¶¶ 84-98, she abandons those methods entirely. Instead of reporting findings drawn from her conversations with drivers and riders, or her own experiences driving on the Uber platform, she merely offers generalized claims about the "algorithmic control" Uber allegedly exercises over drivers—claims that read more like commentary on Uber's general practices with respect to independent drivers than analysis derived in any way from her fieldwork. In other words, Dr. Cameron makes no attempt to explain how her interviews or experiences driving on the Uber platform informed any of her conclusions about the "control" that Uber supposedly exercises over drivers

on the platform to connect her fieldwork to her opinions, and this failure renders her testimony inadmissible under Rule 702(d), which requires that an expert "reliabl[y] appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Where, as here, there is no apparent connection between an expert's conclusions and the methodology she purports to apply, "[a] court may conclude that there is simply too great an analytical gap" for the expert's opinion to pass muster under Rule 702. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). In addition, the Advisory Committee's Notes accompanying the 2023 amendment to Rule 702 emphasize that amended Rule 702(d) "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Since the 2023 amendment, courts in this District have routinely excluded experts who purport to employ certain methods but then offer conclusions that do not actually follow from those methods. *See, e.g.*, *Lewis v. Kern Cnty.*, No. 1:21-CV-00378-KES-CDB, 2025 WL 821895, at *3 (E.D. Cal. Mar. 13, 2025) (excluding expert who "fail[ed] to connect his opinions with any methodology and fail[ed] to bridge the gap between the literature and his opinions and conclusions"); *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 962-63 (N.D. Cal. 2025) (excluding economist's opinion that was "unsupported by the expert's basis and methodology"); *cf. Mamani v. Berzain*, No. 07-22459-CIV, 2018 WL 1010582, at *4-5 (S.D. Fla. Feb. 22, 2018) (excluding anthropological expert whose report "emphasize[d] the critical importance" of fieldwork but who did not conduct fieldwork to support his proffered opinions).

Dr. Cameron's opinions are inadmissible for the same reason. Her report describes a methodology that relies on interviews and personal observations. But her report goes on to assert conclusions about Uber that are totally disconnected from that methodology. She does not identify specific interviews, observations, or other data from her fieldwork that support her claims about Uber's "control" over drivers, nor does she show how her qualitative opinions about "control" were derived from any of the methods she applies. The Court should therefore exclude her opinions for this reason too.

**C.    Dr. Cameron's Opinions Are Irrelevant And Would Not Aid The Jury.**

Finally, the Court should exclude Dr. Cameron's opinions for the additional and independent reason that they are irrelevant to the issues in this case and therefore unhelpful to the factfinder. *See* Fed.

R. Evid. 702(a). Dr. Cameron opines that various features of Uber's alleged algorithm—including, e.g., its matching feature, upfront pricing, loyalty programs, incentives, and geo-management system—allow Uber to exercise "organizational control" over third-party drivers using the platform. Report ¶¶ 19, 85; *see also id.* ¶¶ 86-98 (detailing aspects of the algorithm that supposedly allow Uber to exercise control). But none of these features bears on the question of "control" as a matter of Arizona law, such that they make it any more or less likely that drivers who use the Uber platform would be considered employees rather than independent contractors. *See* A.R.S. § 23-1603.

Under Arizona law, whether a worker is an employee or independent contractor generally depends on the degree of control exercised by the principal. *See Santorii v. MartinezRusso, LLC*, 381 P.3d 248, 253 (Ariz. Ct. App. 2016) ("Whether an individual is an employee or an independent contractor is fundamentally a question of control."); *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 602 (Ariz. 2012) ("whether the employee is subject to the employer's control or right to control") (internal quotation marks omitted). Importantly, however, "qualified marketplace contractors" working through a "qualified marketplace platform," such as drivers using the Uber platform, are subject to a special statutory definition.[4] *See* A.R.S. § 23-1603. Pursuant to that definition, "[a] qualified marketplace contractor shall be treated as an independent contractor for all purposes" under state law, so long as three conditions are satisfied. A.R.S. § 23-1603(A). First, "[a]ll or substantially all of the payment for the services performed by the qualified marketplace contractor" must be "related to the performance of services[.]" A.R.S. § 23-1603(A)(1). Second, "[t]he services performed by the qualified marketplace contractor" must be "governed by a written contract executed between the qualified marketplace contractor and a qualified marketplace platform," such as Uber. A.R.S. § 23-1603(A)(2). Third, that "written contract" must provide for certain terms, including, as relevant here, that "the qualified marketplace contractor is allowed to work any hours or schedules the qualified marketplace contractor chooses." A.R.S. § 23-1603(A)(3)(c). The statute's legislative history makes clear that Arizona created this test to establish independent contractor

---

[4] A "qualified marketplace platform" is defined as "an organization . . . that both (a) [o]perates a digital website or digital smartphone application that facilitates the provision of services by qualified marketplace contractors to individuals or entities seeking such services[; and] (b) [a]ccepts service requests from the public only through its digital website or digital smartphone application, and does not accept service requests by telephone, by facsimile or in person at physical retail locations." A.R.S. § 23-1603(E)(2). Uber plainly qualifies.

status "for all purposes under state and local laws," A.R.S. § 23-1603(A), specifically in the context of a "business that provides a mobile app that connects passengers with drivers for hire." 2016 Legis. Bill Hist. AZ H.B. 2652, Fiscal Analysis, May 4, 2016 (Ex. 3).

Drivers using the Uber platform clearly satisfy all three prongs of this definition, meaning that they are independent contractors, and are not "controlled" by Uber, as a matter of law. First, all or substantially all the payments to drivers using the platform are related to the performance of services (i.e., driving). Second, drivers on the platform perform services subject to a written contract between them and Uber. Third, that contract fulfills all the statutory criteria, including by providing that drivers may work any hours or schedules they choose. Accordingly, Arizona courts routinely hold that drivers who connect with riders using the Uber app are independent contractors as a matter of law. *See, e.g.*, *Coslett v. Hannart*, No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023) (Ex. 4) (granting summary judgment based on a finding that Uber is a qualified marketplace platform and that a driver using the Uber platform is an independent contractor); *Klosa v. Goldman*, No. CV 2019-000428 (Ariz. Super. Ct. Aug. 23, 2022) (Ex. 5) (granting summary judgment and expressly finding the driver to be an independent contractor with no agency relationship); *see also Davis v. DoorDash, Inc.*, No. C20222745 (Ariz. Super. Ct. May 9, 2025) (finding driver to be independent contractor as a matter of law) (Ex. 6).

Nothing in Dr. Cameron's report has any bearing on this analysis. As Dr. Cameron admits, she did not "consider any legal definitions of control" in forming her opinions in this case. Cameron Dep. 237:20-23. She also admits that her definition of control, unlike the legal definition, "is not yes or no, it's not binary." *Id.* 69:8-10. In any event, the only prong of the statutory control test to which her report could *possibly* be relevant is the question of whether drivers are "allowed to work any hours or schedules" they choose. But Dr. Cameron does not—and cannot—opine that Uber actually controls drivers' hours and schedules. She merely asserts that Uber provides financial incentives for drivers to log onto the platform at peak hours. *See, e.g.*, Report ¶ 93.

Even if everything Dr. Cameron writes is true, the drivers would still be independent contractors under Arizona law. Accordingly, her proffered expert testimony "does not relate to any issue in the case" and is therefore irrelevant and inadmissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *see* Fed. R. Evid. 702(a).

## VI. CONCLUSION

For the foregoing reasons, the Court should grant Uber's Motion and exclude Dr. Cameron's opinions in their entirety.

DATED: November 14, 2025

Respectfully submitted,

*/s/ Laura Vartain Horn*

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, And RASIER-CA, LLC

**CERTIFICATE OF SERVICE**

On November 14, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF. All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/ Laura Vartain Horn*

11
DEFS.' MOT. TO EXCLUDE OPINIONS OF PLS.' EXPERT LINDSEY CAMERON