**<u>Exhibit B</u>**

# EXHIBIT 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3           NORTHERN DISTRICT OF CALIFORNIA
 4
 5    IN RE:  UBER              )Case No.
      TECHNOLOGIES, INC.,       )3:23-md-03084-
 6    PASSENGER SEXUAL          )CRB(LJC)
      ASSAULT LITIGATION        )
 7    _____  )
      This Document Relates     )
 8    to:                       )
      ALL ACTIONS               )
 9    _____  )
10
11
12         REMOTE VIDEOTAPED DEPOSITION OF
13                  BRUCE WEINER
14              New York, New York
15           Tuesday, October 28, 2025
16
17
18
19    Reported By:
20    CATHI IRISH, RPR, CRR, CLVS
21
22
23
24
         Job No. CS7657810
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8                         October 28, 2025
 9                         9:05 a.m.
10
11          Remote videotaped deposition of
12      BRUCE WEINER, with all participants
13      appearing via videoconference, before
14      Cathi Irish, a Registered Professional
15      Reporter, Certified Realtime Reporter,
16      and Notary Public of the State of
17      New York.
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 3

1

2      A P P E A R A N C E S:

3

4          PEIFFER WOLF CARR KANE CONWAY

5          & WISE LLP

6          Attorneys for MDL Plaintiffs

7               1519 Robert C. Blakes Sr. Drive

8               New Orleans, Louisiana 70130

9          BY:  TIFFANY ELLIS, ESQ.

10              SARA CRAIG, ESQ.

11

12         KIRKLAND & ELLIS LLP

13         Attorneys for Defendant

14              1301 Pennsylvania Avenue NW

15              Washington, D.C. 20004

16         BY:  ALEXANDRA CARITIS, ESQ.

17              PAUL COTLER, ESQ.

18

19         HAUSFELD LLP

20         Attorneys for Plaintiffs

21              1 Marina Park Drive

22              Suite 1410

23              Boston, Massachusetts 02210

24         BY:  STEVEN ROTMAN, ESQ.

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 4

1

2      A P P E A R A N C E S: (continued)

3

4          SIMMONS HANLY CONROY LLP

5          Attorneys for Plaintiffs

6              112 Madison Avenue

7              7th Floor

8              New York, New York 10016

9          BY:  ELLYN HURD, ESQ.

10

11         ANAPOL WEISS

12         Attorneys for Plaintiffs

13             60 South 6th Street

14             Suite 2800

15             Minneapolis, Minnesota 55402

16         BY:  HOLLY DOLEJSI, ESQ.

17

18

19     ALSO PRESENT:

20         BAILEY FINNESTAD, videographer

21         CURTIS DELANEY

22         REILLY DUNNE

23         JONATHAN JAFFE

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 5

1

2          THE VIDEOGRAPHER:  Good morning.

3      We're going on the record at 9:05 a.m.

4      Eastern time on October 28, 2025.

5      Please note that this deposition is

6      being conducted virtually.  Quality of

7      recording depends on the quality of

8      camera and Internet connection of

9      participants.  What is seen from the

10     witness and heard on screen is what

11     will be recorded.  Audio and video

12     recording will continue to take place

13     unless all parties agree to go off the

14     record.

15          This is media unit 1 of the video

16     recorded deposition of Bruce Weiner in

17     the matter of In Re Uber Rideshare

18     Technologies Passenger Sexual Assault

19     Litigation, filed in the United States

20     District Court, Northern District of

21     California, San Francisco Division.

22     The case number is 3:23-md-03084-CRB

23     (LJC).

24          This deposition is being

25     conducted remotely using virtual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 6

1

2      technology.

3           My name is Bailey Finnestad

4      representing Veritext Legal Solutions

5      and I'm the videographer.  The court

6      reporter is Cathi Irish from the firm

7      Veritext Legal Solutions.

8           I am not authorized to administer

9      an oath, I'm not related to any party

10     in this action, nor am I financially

11     interested in the outcome.

12          Appearances will be reflected in

13     the stenographic record.

14          Will the court reporter please

15     swear in the witness?

16   B R U C E    W E I N E R,  called as a

17     witness, having been duly sworn by a

18     Notary Public, was examined and

19     testified as follows:

20          MS. ELLIS:  Counsel, before we

21     begin, as I told you before we went on

22     the record, Mr. Weiner has a short

23     notice that he needs to put on the

24     record.

25          MS. CARITIS:  Understood.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 7

```
 1                    WEINER
 2           THE WITNESS:  So all I have to
 3      say here is that the views and
 4      testimony I provide today are my own
 5      and are not related to my employment
 6      at the New York Federal Reserve Bank.
 7      The New York Federal Reserve Bank has
 8      no stance on this litigation.
 9   EXAMINATION
10   BY MS. CARITIS:
11      Q.   Thank you, Mr. Weiner.  I just
12   introduced myself a few minutes ago off
13   the record.  My name is Alex Caritis and I
14   represent Uber in this case.  I will say I
15   am losing my voice or lost it, it's coming
16   back.  I'm going to make it through but if
17   there's ever a time when you can't hear me
18   or understand, it will be the first that
19   someone tells me to speak up, but please
20   do.
21           Same, Cathi, if you can't hear
22   me, please just let me know.
23           So I apologize for any
24   inconvenience but I wanted to make sure
25   you should always feel comfortable to say,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 8

```
1                      WEINER
2       Alex, can you restate that, I can't hear
3       you.
4            A.   Sure.
5            Q.   You already just provided a short
6       statement but could you please introduce
7       yourself to the jury, stating your full
8       name?
9            A.   Sure.  My name is Bruce Weiner.
10      I am technology and product development
11      expert in this case.
12           Q.   And Mr. Weiner, we are conducting
13      this deposition remotely.  And it's my
14      understanding that plaintiff's counsel is
15      in the room with you; is that correct?
16           A.   She's sitting right next to me.
17           Q.   Okay.  Where are you both
18      physically located?
19           A.   We're at a law office and I don't
20      know the exact address.  Do you have that,
21      Tiffany?
22                MS. ELLIS:  112 Madison Avenue.
23      BY MS. CARITIS:
24           Q.   And whose law office is that, is
25      that Ms. Ellis's law office?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 9

1                    WEINER
2            MS. ELLIS:  The law office of
3        Simmons Hanly Conroy.
4    BY MS. CARITIS:
5        Q.   And Mr. Weiner, is there anybody
6    else in the room with you besides
7    Ms. Ellis?
8        A.   At this moment in this conference
9    room there are just the two of us.
10       Q.   And we are talking via screen so
11   I assume you have a computer screen in
12   front of you; is that right?
13       A.   That is exactly correct.
14       Q.   Okay.  And do you have any e-mail
15   or messaging applications up along with
16   the Zoom platform?
17       A.   No, I've used a computer that was
18   provided to me here, which only has Zoom
19   on it.
20       Q.   Great.  And I would just ask that
21   throughout the duration of on-the-record
22   time you please not refer to any e-mails
23   or messaging applications either on the
24   computer you're utilizing or on your cell
25   phone; is that fair?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 10

1                    WEINER

2       A.   Absolutely.  I do have certain

3    documents here printed out.  I assume I

4    can refer to those?

5       Q.   Certainly.  And you just

6    anticipated my next question.  I was going

7    to ask what documents, if any, you have in

8    front of you, so can you please let me

9    know what you have next to you?

10      A.   Sure.  I have my report printed

11   out right here next to me.  We have the

12   ISO standards and IEEE standards that were

13   referred to in my case.  And then we have

14   a couple of documents, I believe counsel

15   informed you of, that were recently

16   de-designated or part of recent

17   depositions as depo aids that I have in

18   the room as well.

19      Q.   Okay.  Can you provide a little

20   more information about what those

21   deposition aids are, please?

22      A.   Sure.  I have a document which is

23   the global feature definition of S-RAD and

24   the U.S. regional additional feature

25   deposition for S-RAD.  I have an S-RAD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 11

```
 1                      WEINER
 2    document called Safety Risk Dispatch.  I
 3    have a baseline S-RAD global model.  I
 4    have a depo aid from Ms. Esteves's
 5    deposition which covers all of the safety
 6    features that she was prepared to speak
 7    about at the 30(b)(6) on deposition.  And
 8    then I have Sunny Wong's deposition aid
 9    that refers to the S-RAD scores for the
10    Wave 1 cases.  I also have the depositions
11    of the Wave 1 defendants.
12         Q.   Sorry, to be clear, you have the
13    depositions of the five Wave 1 plaintiffs?
14         A.   Plaintiffs, plaintiffs, my
15    apologies.
16         Q.   Were any of these materials
17    provided to you after you issued your
18    September 26, 2025 report?
19         A.   The few de-designated documents
20    that I mentioned were made available after
21    they were de-designated, which came after
22    my report, and the Sunny Wong deposition
23    was just last week, I believe.
24         Q.   Did any of the information
25    provided to you in the documents that
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 12

1                    WEINER

2      you're calling de-designated documents and

3      the Sunny Wong deposition that occurred

4      concerning S-RAD more recently change any

5      of your opinions in your September 26,

6      2025 report?

7          A.   No.  As of this document the

8      complete set of my opinions are contained

9      in my report.  As I mentioned at the end

10     of my report I reserve my right to

11     consider additional materials and I am

12     looking at those materials but I have not

13     formed any new opinions based on them at

14     this time.

15         Q.   Sitting here today, I don't even

16     know what date it is, October 28th about

17     9:00 your time, are you anticipating

18     serving a supplemental or rebuttal expert

19     report in these five Wave 1 cases?

20         A.   At this moment I am still

21     reserving the right to submit a

22     supplemental as it relates to some of

23     these de-designated and new depositions,

24     but I have not made that determination yet

25     until I fully consume and understand the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 13

1                    WEINER

2        materials and have viewed if there are any

3        changes to my opinions, which as of this

4        moment I mention there are not.

5             Q.   What's your understanding of when

6        these de-designated documents were

7        produced to plaintiffs?

8             A.   I've seen some of these

9        de-designated documents.  I was actually

10       on retreat after I submitted my report and

11       when I returned, they were made available

12       in Everlaw but I do not know the specific

13       date they were de-designated.

14            Q.   Do you know the dates that

15       Mr. Wong was deposed concerning S-RAD and

16       Wave 1 plaintiffs?

17            A.   I believe that was last week.  I

18       don't have the specific date in front of

19       me but again, as I exited my retreat, that

20       deposition transcript was made available

21       to me.

22            Q.   How did you select which hardcopy

23       documents to have in front of you today?

24            A.   I considered the documents that I

25       have read over the last two weeks and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 14

WEINER

1    asked counsel to print a few documents

2    which I might -- thought might be helpful

3    explainer aids if we get into questions

4    that were relevant.

5         Q.   So are there any other documents

6    that you have physically in front of you

7    today aside from those that you have just

8    referenced for me?

9         A.   I believe I've covered everything

10   in the room.

11        Q.   Did you interview anybody in

12   connection with your report?

13        A.   There have been no interviews in

14   connection with my report at all.

15        Q.   You've been deposed a few times

16   before, that's correct, Mr. Weiner?

17        A.   That is correct.

18        Q.   So I don't want to spend a lot of

19   time talking through some rules but just

20   want to make sure we're clear on a few

21   things.  You're very good in your cadence

22   so I don't anticipate this being a

23   problem.  I talk quickly.  Again, I will

24   try to slow down if you could do the same

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 15

1                     WEINER

2         so that we're giving Cathi a chance to get

3         everything down on the stenographic record

4         that would be great; is that fair?

5              A.    A hundred percent fair.

6              Q.    And as I'm sure Ms. Ellis has

7         talked to you about or you've experienced

8         before, she has the opportunity to object

9         to form objections.  So to allow her an

10        opportunity to interject there, if you

11        could please also pause after I ask my

12        question to provide her an opportunity so

13        that she's not inadvertently speaking over

14        you.  Is that fair?

15             A.    That is absolutely fair.

16             Q.    We'll take regular breaks today,

17        I anticipate about every hour along with a

18        little longer one at the lunchtime.  If

19        you ever need a break for any reason, be

20        that technology or otherwise, please let

21        me know, I'm happy to do that.  I just ask

22        that we answer the pending question before

23        we break.  Is that okay?

24             A.    I appreciate that and that seems

25        very fair.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 16

1                      WEINER

2          Q.    And I know that it is bright and

3     early but I have to ask for purposes of

4     the record, have you had any alcoholic

5     drinks in the past eight hours?

6          A.    I have not had any alcoholic

7     drinks in the past eight hours.

8          Q.    Are you on any medication today

9     that might interfere with your ability to

10    give accurate testimony?

11         A.    I am not on any medication today

12    that might interfere with my ability to

13    give accurate testimony today.

14         Q.    Is there any other reason that

15    you can think of that you are unable,

16    would be unable to give complete and

17    accurate testimony today?

18         A.    I cannot think of any reason I

19    would be unable to give complete and

20    accurate testimony today.

21         Q.    Okay.  Mr. Weiner, when we

22    started this deposition, you opened up

23    with a short disclaimer making it very

24    clear that you're here today to provide

25    your expert opinion totally independent of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 17

1                           WEINER
2        the work you do for your current employer;
3        is that right?
4             A.    That is correct.  That is a
5        statement I'm given by my current employer
6        to give me the authority and approval to
7        participate in these kinds of activities.
8             Q.    Okay.  And when you say these
9        types of activities, you mean litigation
10       consulting; is that right?
11            A.    I mean litigation consulting
12       that's right.
13            Q.    And you are an electrical
14       engineer and a computer scientist by
15       education and training; is that right?
16            A.    That is correct.
17            Q.    And as we just discussed, you
18       currently are employed at the Federal
19       Reserve Bank of New York; right?
20            A.    I am currently employed at the
21       Federal Reserve Bank of New York.
22            Q.    Okay.  You're a full-time
23       employee at the Federal Reserve; is that
24       right?
25            A.    That is correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 18

1              WEINER

2        Q.   You said that they approve of you

3    doing litigation consulting on the side so

4    long as you provide that disclaimer

5    statement first; is that fair?

6        A.   That is correct.

7        Q.   Do they set -- does the Federal

8    Reserve set any rules or guidelines

9    concerning when you are to complete your

10   litigation consulting work as opposed to

11   when you are supposed to be doing your day

12   job for the Fed?

13       A.   I do not mix those two things.

14   My day job is my day job with the Fed and

15   my work in litigation consulting is

16   separate and distinct.

17       Q.   What are your hours at the Fed,

18   what's your workday?

19       A.   My workday is sort of 9 to 5 as

20   official schedule.  Today, for example, I

21   am on a leave day and I am given quite a

22   few leave days throughout the year that I

23   sometimes take to do this litigation

24   consulting work.

25       Q.   Understood.  And when you're on a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 19

```
 1                      WEINER
 2    leave day from your day job at the Fed,
 3    are they still paying you for that day?
 4         A.   Today is actually a paid time off
 5    day, so I am being paid by the Fed as paid
 6    time off.
 7         Q.   Are you a salaried employee at
 8    the Fed or are you paid hourly?
 9         A.   I'm a salaried employee at the
10    Fed.
11         Q.   What's your annual salary?
12         A.   I don't have that at the tip of
13    my fingers.  It is I believe in the high
14    200,000 range.
15         Q.   So approximately you make about
16    200,000 a year with the Fed; is that
17    right?
18         A.   When I say high 200,000 range, I
19    believe it's like 260 something.
20         Q.   So 260K a year for your day job,
21    not litigation consulting for the Fed; is
22    that right?
23         A.   That is correct.
24         Q.   Has your salary been pretty
25    constant?  You've been with the Fed since
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 20

1                    WEINER

2     2012; is that right, Mr. Weiner?

3          A.   My salary has increased every

4     year since 2013, when I joined the Fed.

5          Q.   I'm sorry, so you joined the Fed

6     in 2013?

7          A.   That is correct.

8          Q.   And every year since you've

9     joined you've had incremental salary

10    increases; is that right?

11         A.   Every year since I have joined I

12    have received an incremental increase to

13    my salary.

14         Q.   But as you just told me now, kind

15    of the high end, you're at approximately

16    26,000 a year; fair?

17         A.   260,000.

18         Q.   Sorry.  $260,000 a year is your

19    current approximate salary for your day

20    job at the Fed?

21         A.   That is correct.

22         Q.   You just told us that today

23    you're obviously not at the bank, you are

24    here with us.  The Fed is paying you

25    today; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 21

1                          WEINER

2          A.    It is a paid time-off day.  I am

3      authorized and given by the Federal

4      Reserve a set of time off that I can use

5      for any personal reason at all.  It's

6      not -- I'm not being paid by the Fed to be

7      here today.

8          Q.    And Ms. Ellis and plaintiff's

9      counsel, they are also paying you today;

10     is that right?

11         A.    I am paid on an hourly basis for

12     the work that I'm doing, yes.

13         Q.    And that obviously includes the

14     hours that you spend with me today in this

15     conference room; right?

16         A.    That is correct.

17         Q.    Okay.  For your work at the Fed,

18     are you in an office, do you have

19     work-from-home days?  What's the structure

20     of your work environment?

21         A.    We have recently returned to full

22     time in the office.

23         Q.    You told me before that when you

24     do your litigation consulting work you

25     really try to keep that separate from the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 22

```
 1                    WEINER
 2      work that you do in your day job at the
 3      Fed.  Did I get that right?
 4           A.    Absolutely.
 5           Q.    Do you ever do any of this
 6      litigation consulting work while you were
 7      sitting at your desk at the Fed?
 8           A.    Absolutely not.
 9           Q.    Okay.  So if there are instances
10      where you were working for this case
11      Monday through Friday, 9 to 5, would that
12      be error in your invoice?
13           A.    No, I'm pretty familiar with my
14      invoices and I don't remember any times
15      that match those that I didn't take a paid
16      time-off day.  But no, my husband's office
17      is about one block from the Fed and if and
18      when I needed to do any work during
19      business hours, I would walk over to my
20      husband's office to take a call if there
21      was a quick one.
22           Q.    Would the Fed permit you to do
23      this litigation consulting work at the
24      bank?
25           A.    I would not be permitted to do
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 23

```
 1                    WEINER
 2      this litigation consulting work in the
 3      bank.
 4          Q.   Did you disclose to the Fed
 5      this -- let's talk specifically this case.
 6      I know you've done other litigation
 7      consulting work.  Did you disclose to the
 8      Fed the work that you were specifically
 9      doing today in this Uber Rideshare
10      litigation matter?
11          A.   So the way it worked with the Fed
12      prior to the last few months, I had to
13      disclose any entity that was paying me and
14      then cases that were specific were not
15      reviewed but in the recent times, they
16      have begun reviewing the specific cases
17      that I've gotten involved with.
18          Q.   Okay, so does that mean they have
19      reviewed this specific case?
20          A.   They have reviewed this specific
21      case.
22          Q.   What information did you tell
23      them about the scope of your retention for
24      this case?
25          A.   They asked exactly three things.
```

Page 24

                        WEINER

1

2    They asked who the parties were, they

3    asked that I disclose the opinions that I

4    were giving were not related to my work at

5    the Fed so I have to confirm that the work

6    I was doing was not related to my work at

7    the Fed, and I had to disclose the law

8    firms that were involved in this case.

9        Q.   Okay.  But you didn't have to

10   tell them the particular subject matter

11   that you were speaking to; right?

12       A.   I had to confirm that it was not

13   related to my day job.  They just asked

14   very specifically that I do not testify on

15   monetary policy implementation technology

16   or consumer banking technology as it

17   relates to my day job at the Fed.

18       Q.   Okay.  But this was an easy one

19   because what you're talking about today

20   really has nothing to do with your day job

21   at the Fed; fair?

22       A.   That is exactly correct.

23       Q.   We're not here today to talk

24   about anything that has to do with

25   monetary policy or banking or any subject

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 25

1                    WEINER
2      matter that you've been employed to deal
3      with from 2013 to present; right?
4          A.    That is correct.
5          Q.    And we're going to talk a little
6      bit about kind of I guess, what, you've
7      been at the Fed 12 years now
8      approximately?
9          A.    Approximately.
10             MS. CARITIS:  I just want to talk
11         a little bit about the work that you
12         do and are doing at the Fed to get an
13         understanding of your experience.
14             First off, if we could just for
15         the record, I understand, Mr. Weiner,
16         you have a hardcopy of your report in
17         front of you.  I do, too.  I think it
18         will be easier for us to work here but
19         for the sake of the record I would
20         like to mark as Exhibit 1 Mr. Weiner's
21         expert report dated September 26,
22         2025, and Mr. Delaney, that's tab 1.
23             (Exhibit 1, expert report, marked
24         for identification.)
25      ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 26

```
 1                    WEINER
 2    BY MS. CARITIS:
 3        Q.   Just for the record and so that
 4    we're clear, Mr. Weiner, you see on the
 5    screen here this is the cover page of the
 6    expert report that you submitted on
 7    September 26, 2025 in the Uber Rideshare
 8    litigation.  Do you see that?
 9        A.   That's correct.  That's not
10    incredibly clear but the one in front of
11    me is incredibly clear.
12        Q.   Perfect.  That's why I think it
13    will be best for us to use the paper copy.
14    I'm sure Ms. Ellis has supplied this for
15    you or can show you at break, but you will
16    also have the ability to download any of
17    the documents that Mr. Delaney projects on
18    the screen if you want to confirm
19    completeness or if it's a document that
20    you don't have in front of you, you need
21    to read a little bit better because my
22    eyeballs can barely see that so feel free
23    anytime to pull it down itself.  For
24    purposes of going through your report
25    right now, I'll represent to you that
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                        WEINER

2      Exhibit 1 is a full and complete set of

3      what was served to us on September 26,

4      2025, including your exhibits and some of

5      the appendices, so we'll just be referring

6      to Exhibit 1 as the complete set; is that

7      fair?

8          A.    That is fair.

9          Q.    All right.  So I want to turn in

10     your report to your CV.  And that's,

11     Mr. Delaney, pdf 135.  It's Exhibit A.

12     I'm there.  Let me know when you're there.

13         A.    Sure.  Give me one moment.  I

14     have that up in front of me.

15         Q.    Great.  And it is also on the

16     screen as well.

17              Mr. Weiner, the CV that you

18     included in your expert report, that's an

19     accurate and up-to-date résumé; is that

20     right?

21         A.    That is correct.

22         Q.    You had an opportunity to review

23     it before you submitted it; right?

24         A.    That is correct.

25         Q.    Had an opportunity to add any

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 28

```
 1                      WEINER
 2    relevant experience or skills before you
 3    submitted it in this litigation; is that
 4    fair?
 5         A.   That is correct.
 6         Q.   You would agree that it sets out
 7    your relevant work experience; right?
 8         A.   My curriculum vitae is a
 9    chronological record of the employment
10    that I have in the past.  It is not meant
11    to be a comprehensive document, it is
12    meant to be a chronological record.
13         Q.   Okay.  So you have laid out your
14    key experiences and skills in your
15    LinkedIn profile; fair?
16         A.   Yes, it has experiences at my
17    LinkedIn profile that you took a look at
18    yesterday as I --
19         Q.   That's hilarious.  I did.  You
20    caught me.  Thanks LinkedIn.
21              MS. CARITIS:  If we could just as
22         Exhibit 2 -- Mr. Delaney it's tab 2,
23         it's the LinkedIn profile.
24              (Exhibit 2, LinkedIn profile,
25         marked for identification.)
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 29

```
 1                        WEINER
 2     BY MS. CARITIS:
 3          Q.   We might look at some of these
 4     together so I want to enter them now.  So
 5     we'll put up on the screen, Mr. Weiner,
 6     for you, your LinkedIn profile.  I just
 7     want you to confirm that this looks to be
 8     your profile and ask you a few questions
 9     about it in a bit.  Does this look like
10     the LinkedIn profile that you would have
11     put online?
12          A.   I've never seen this particular
13     format.  If you give me just a second.
14          Q.   Sure.  And I'll represent to you
15     that when you're on LinkedIn and you click
16     download it creates and generates this
17     format but this was pulled directly from
18     the LinkedIn profile.
19          A.   I do believe this is the most
20     current information from LinkedIn from
21     what I'm seeing here.
22          Q.   When is the last time you updated
23     your LinkedIn profile?
24          A.   I made a small adjustment earlier
25     this week to the summary, which I'm
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 30

```
 1                    WEINER
 2      looking at and recognizing.
 3           Q.   Okay, what changes did you make
 4      to the summary?
 5           A.   I added the paragraph in addition
 6      to my public sector leadership, I serve as
 7      a testifying and consulting expert
 8      witness.
 9           Q.   Let's actually look at that whole
10      sentence you wrote.  I serve as
11      a testifying -- sorry about that.
12                I serve as a testifying and
13      consulting expert witness in matters
14      involving software engineering, AI and
15      algorithmic systems, source code analysis,
16      patent and trade secret disputes and
17      complex software project performance.
18                Do you see that?
19           A.   I do.
20           Q.   And you said that you just
21      updated this section recently; is that
22      right?
23           A.   Yes, this case -- just added set
24      of cases to my background and I updated
25      this as well.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 31

1                    WEINER

2          MS. CARITIS:  Okay.  Where is

3       another -- and we're going to get this

4       into the record so we have it handy.

5       I'm going to enter as Exhibit 3,

6       Mr. Delaney, what we have as tab 3.

7             (Exhibit 3, LinkedIn experience

8       page, marked for identification.)

9    BY MS. CARITIS:

10      Q.   And we'll see this in a second,

11   Mr. Weiner.  This will probably look more

12   familiar.  It's literally a screenshot of

13   your experience section as you identified

14   it on LinkedIn.  It's a few pages so

15   Mr. Delaney, if we could just maybe scroll

16   so that Mr. Weiner can take a look and, of

17   course, that will be easier.

18      A.   I'm familiar with this.  This is

19   familiar to me.

20      Q.   Okay, perfect.  And you created

21   this LinkedIn experience section; right?

22      A.   I created and maintain this

23   LinkedIn experience section, correct.

24      Q.   When is the last time you updated

25   or reviewed your experience section on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 32

```
 1                    WEINER
 2      LinkedIn?
 3           A.   There was a change to my title as
 4      chief product owner of the markets
 5      transformation program is the most recent
 6      change that was made to this profile.  I
 7      recently spoke at a conference in Germany
 8      called Sibos 2025 and the ethics
 9      department at the Federal Reserve asked me
10      to use my precise title as it exists in
11      the system of record at the Federal
12      Reserve instead of what I had there, which
13      is more of an anecdotal type.
14           Q.   Can you see that there, along
15      with your specific titles and dates of
16      employment, there's also various sections
17      throughout your profile where you identify
18      relevant skills.  Do you see that?
19           A.   I do.
20           Q.   You selected those relevant skill
21      sets; is that fair?
22           A.   I don't remember how those
23      particular skill sets get selected in
24      particular, no.  But I am definitely sure
25      that I have reviewed those.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 33

1                    WEINER

2         Q.   No one else did it for you, I

3    guess would be a better word.  Perhaps it

4    was automated, but somebody else didn't go

5    in there and suggest that you had skills

6    in IT strategy and e-commerce, for

7    example?

8         A.   I believe it pulled those with

9    the help of its own computer systems but

10   yes, I reviewed those.

11        Q.   You reviewed them and you agreed

12   that those are the relevant skill sets

13   associated with your past experiences?

14             MS. ELLIS:  Objection, form.

15   BY MS. CARITIS:

16        Q.   You may answer, Mr. Weiner.

17        A.   I agree that they are accurate

18   representations but I will also state in

19   no way, shape or form do I attempt to make

20   any comprehensive record on LinkedIn.

21        Q.   The point of LinkedIn, though, is

22   to make it very clear to colleagues or

23   potential employers the key experiences

24   that you've had across your career; right?

25             MS. ELLIS:  Objection, form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 34

```
 1                    WEINER
 2    BY MS. CARITIS:
 3         Q.   You may answer.
 4         A.   The point of LinkedIn is a tool
 5    in social media to share information.
 6         Q.   Why are you sharing the
 7    information?
 8         A.   I am sharing information on
 9    LinkedIn to keep colleagues and friends up
10    to date on the status of my ongoing
11    efforts.
12         Q.   And you wouldn't want to
13    misrepresent your experience or your
14    skills to your colleagues and friends;
15    fair?
16         A.   I do not believe I have
17    misrepresented my skills on LinkedIn.
18         Q.   I'm not suggesting you are.  I'm
19    just confirming you wouldn't do that.  You
20    want to be accurate and complete in
21    describing your experience on LinkedIn?
22         A.   I want to be accurate.  I would
23    not agree with the word complete.  There
24    is no value or benefit to trying to make
25    LinkedIn a complete record other than when
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER

2      attorneys such as yourself want to

3      cross-reference it in depositions to my

4      CV.  So I'm careful to make those aligned.

5          Q.   We'll look at some other times

6      that you market yourself and see how you

7      describe yourself there, but understood on

8      how you are caveating what you have on

9      LinkedIn today.

10              Let's look back at your CV.  So

11     it was in the paper copy so actually -- so

12     Mr. Delaney, we can keep this up here on

13     the screen and we'll take a look at the

14     paper copy of Mr. Weiner's CV.

15              I'd like to start with,

16     Mr. Weiner, you have a summary at the top

17     of your CV and you describe yourself as a

18     technology leader at the Federal Reserve

19     Bank; right?

20         A.   That is correct.

21         Q.   Fair to lead with the Fed, you've

22     been at the Fed since 2012; right?

23         A.   Absolutely.

24         Q.   And you then, your first current

25     experience or your only current

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 36

```
 1                      WEINER
 2      experience, you outline some of the work
 3      that you've done at the Fed.  Do you see
 4      that there on the top kind of first big
 5      chunk under current experience?
 6          A.   That is correct.
 7          Q.   Okay.  We already talked about
 8      this but you would agree with me that the
 9      work that you do and have done since 2012
10      at the Fed is not related to the work
11      we're doing here today in this litigation;
12      right?
13              MS. ELLIS:  Objection, form.
14              THE WITNESS:  I think related to
15          is not a word I can agree with.  As a
16          technology leader at the New York Fed,
17          I am a student of and I use standards
18          and approaches and methodologies that
19          are not specific to my work at the
20          New York Fed in monetary policy
21          implementation and customer banking,
22          but more generically applied to the
23          technology and product development
24          industries.  Those insights that I
25          learn, those conferences that I
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 37

```
 1                        WEINER
 2         attend, that work that I do is not out
 3         of scope of my consideration of the
 4         materials in this case by any means.
 5    BY MS. CARITIS:
 6         Q.   You told me before that the only
 7    reason the Fed let you testify today was
 8    because the scope of your opinion was
 9    not -- and I'll use a different word --
10    not directly related to the work you do at
11    the Fed; fair?
12              MS. ELLIS:  Objection, form.
13              THE WITNESS:  They are very
14         specific and I have a great working
15         relationship with the ethics
16         department and we collaborate quite
17         closely because I've been doing this
18         expert work for 13 years.  The
19         specific request from the New York Fed
20         is that I not speak on any topic of
21         monetary policy or customer banking.
22         They are not trying to manage my
23         knowledge in the industry and my
24         expertise, they are trying to ensure I
25         do not disclose any confidential
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2         information or leverage my work in
 3         monetary policy implementation or
 4         customer banking outside of my role in
 5         the New York Fed.
 6    BY MS. CARITIS:
 7         Q.   Okay.  Throughout your blurb
 8    related to your work at the Fed, you would
 9    agree with me that there is -- the word
10    "safety" is not referenced once; right?
11              MS. ELLIS:  Objection.  What are
12         you referencing?
13              MS. CARITIS:  I'm referencing his
14         CV, the current experience.
15              MS. ELLIS:  It's confusing, is
16         there something on the screen or
17         looking at the paper?  So can we
18         just --
19              MS. CARITIS:  Yep, sure.  I said
20         that before.
21    BY MS. CARITIS:
22         Q.   Mr. Weiner, to be super clear
23    we're going to look at the paper copy of
24    your CV, that's what I've been discussing
25    now.  We have a different document up on
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 39

1                    WEINER

2       the screen because we might compare it in

3       a little bit but for now we're going to

4       look at the paper copy of your CV that's

5       in front of you; is that okay?

6            A.    Absolutely.  This is not -- none

7       of this is intended to be a comprehensive

8       or complete view but yes, the word safety

9       does not appear on the page as it relates.

10      I have elaborated in my report where there

11      are aspects of safety considerations that

12      I made throughout my career, and we can

13      speak to any of those specifically as they

14      appear in my report.

15           Q.    Okay.  And again, just looking at

16      the CV blurb that you included in your

17      report, your CV, the word risk management

18      is not included in your description of

19      your work at the Federal Reserve Bank of

20      New York, just those words; is that right?

21           A.    The title is chief product coder.

22      The word risk management does not appear

23      but I believe if you look at any

24      definition of chief product owner in the

25      public available zone, you'll find that a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 40

```
 1                      WEINER
 2    chief product owner must very actively
 3    consider risk management in the role of
 4    delivering that work.
 5        Q.   Okay.  And the risks that your --
 6    to the extent that your job does involve
 7    managing risk, you're not managing any
 8    sort of risk of bodily safety; is that
 9    right?
10            MS. ELLIS:  Objection, form.
11            THE WITNESS:  In my role at the
12        New York Fed, there's not a particular
13        risk of bodily safety involved in the
14        systems that I develop.  (Inaudible)
15        financial crime compliance.  Financial
16        crime compliance is a criminal aspect
17        that is considered in the risks that I
18        manage but there's no bodily harm in
19        the risks that I manage.
20    BY MS. CARITIS:
21        Q.   So similarly there's no sexual
22    assault or sexual misconduct risk that you
23    particularly are tasked with managing in
24    your role at the Federal Reserve; is that
25    right?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 41

1                    WEINER

2          MS. ELLIS:  Objection, form.

3          THE WITNESS:  I am not currently

4       considering in the products that I

5       develop a specific risk of sexual

6       assault as it relates to the products

7       that I'm developing.  I manage a book

8       of products and a set of risks and I

9       apply industry standards to those

10      risks as I go through the product

11      development lifecycle.

12   BY MS. CARITIS:

13      Q.  You would agree that different

14   risks require different responses?

15          MS. ELLIS:  Objection, form.

16          THE WITNESS:  The way I would

17      state that is that every risk, there's

18      a careful consideration,

19      documentation, analysis and that the

20      exact response to one risk is not the

21      exact response to another risk.

22   BY MS. CARITIS:

23      Q.  So in your experience at the Fed,

24   if you're responding to financial crimes,

25   that risk requires a different response

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      and analysis than a risk of sexual
 3      misconduct; fair?
 4             MS. ELLIS:  Objection, form.
 5             THE WITNESS:  It is true that the
 6          response to financial crime is
 7          different than the response to sexual
 8          assault.
 9      BY MS. CARITIS:
10          Q.   Before you worked at the Federal
11      Reserve, you founded a technology
12      consulting company for loyalty marketing
13      programs and travel-related service
14      organizations; is that right?
15          A.   That is correct.
16          Q.   Just so we're all on the same
17      page, I'm looking now at the second page
18      of your CV.  You note at the top
19      Weiner.net, LLC, you worked there from
20      2008 to 2012; is that right?
21          A.   That is correct.  The entity
22      Weiner.net, LLC was founded before that
23      but I fully focused my efforts on
24      Weiner.net during that time period.
25          Q.   You say that you were focused on
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 43

```
1                    WEINER
2    loyalty and affiliate marketing programs.
3    When you're talking about loyalty
4    programs, those are programs like United's
5    Mileage Plus program, do I have that
6    right?
7           MS. ELLIS:  Objection, form.
8           THE WITNESS:  United's Mileage
9        Plus program is an example of loyalty
10        program.  There are loyalty programs
11        across many industries, like car
12        rental companies, the food service
13        companies have loyalty programs,
14        automobile companies have loyalty
15        programs, they are quite widespread.
16    BY MS. CARITIS:
17        Q.  You would agree though that a lot
18    of your career was focused on the loyalty
19    programs for airlines and car rental
20    companies; is that right?
21           MS. ELLIS:  Objection, form.
22           THE WITNESS:  The
23        characterization of my career that way
24        is something I think I need to just
25        address with a clear clarification and
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 44

```
 1                    WEINER
 2        that is my career over the 37 years
 3        that I've been working has been in
 4        product development technology
 5        leadership and software engineering,
 6        and my opinions, as they have been
 7        enumerated in this report, are based
 8        on that career.  Those industries,
 9        product development for technology
10        companies, have common elements that
11        apply universally and as you've seen
12        are documented in certain ISO
13        standards.  What I have not done in my
14        time at Weiner.net is the specific
15        work in, say, rideshare that you seem
16        to be referring to.
17   BY MS. CARITIS:
18        Q.   Okay, we'll get to all that in a
19   minute.  I understand you want to make
20   sure that you can explain how you're
21   qualified.  I just want to talk literally
22   about what's in your résumé.
23        A.   Okay.
24        Q.   So I'm literally looking at the
25   words on your résumé here.  So when you're
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 45

```
 1                    WEINER
 2      at Weiner.net, still at the top of the
 3      second page, you identify kind of two
 4      bullets that seem to highlight some
 5      accomplishments that you're particularly
 6      proud of.  One, you say the first achieved
 7      a 30 percent reduction in infrastructure
 8      costs for a client.  Do you see that?
 9          A.   I do see that.
10          Q.   Okay.  So this project, you were
11      able to save your client a whole lot of
12      money by negotiating, selecting and
13      managing a cyber security agreement; is
14      that right?
15              MS. ELLIS:  Objection, form to
16          the extent there is some prefacing of
17          the question there that
18          mischaracterizes it.
19              THE WITNESS:  Yes.  And again,
20          what you said is not correct.  I can
21          read it for you if you'd like.
22      BY MS. CARITIS:
23          Q.   Sure.
24          A.   It's a 30 percent reduction in
25      infrastructure costs for a client by
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 46

```
 1                    WEINER
 2     selecting, negotiating and managing a
 3     hosting and cyber security agreement for a
 4     global set of transactional systems.
 5         Q.   Got it.  So you wanted to
 6     emphasize hosting.  Why is that, why was
 7     hosting important for you to emphasize?
 8         A.   This was a Cloud endeavor and
 9     again shows modern technology becoming
10     part of my day-to-day work.
11         Q.   The modern technology, this was
12     in 2012; right?
13         A.   The technology was becoming much
14     more popular in 2008 to 2012, yes.
15         Q.   Here again you've got Weiner.net
16     your experience that predated the Federal
17     Reserve.  Just in this blurb, the words on
18     the page, I don't see the word safety
19     anywhere; is that right?
20         A.   While the word safety does not
21     appear on the page, as the chief
22     information officer for three start-ups,
23     there are times when all sorts of risks
24     need to be considered in the product
25     development lifecycle, some of which, one
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 47

```
 1                     WEINER
 2     in particular, had a safety aspect to it.
 3         Q.   We'll talk about that in a minute
 4     but in your résumé, instead of
 5     highlighting any sort of safety win, you
 6     noted a 30 percent reduction in
 7     infrastructure costs; is that fair?
 8             MS. ELLIS:  Objection, form.
 9             THE WITNESS:  That's exactly what
10         it says on the page in bullet one,
11         that I achieved a 30 percent reduction
12         in infrastructure costs.
13     BY MS. CARITIS:
14         Q.   Okay.  You here noted that you
15     served as a launch CIO.  That's a chief
16     information officer; is that right,
17     Mr. Weiner?
18         A.   That refers specifically to a
19     chief information officer.
20         Q.   Okay, and you noted for three
21     start-ups.  I've seen some references to
22     those start-ups but what were the three
23     start-ups that you're referring to in that
24     second bullet there?
25         A.   Those were confidential client
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 48

1                    WEINER

2    relationships.  I can talk in a general

3    way about the work that I did but I cannot

4    disclose the clients due to

5    confidentiality agreements.

6        Q.   Okay, those confidentiality

7    agreement are still in place despite these

8    engagements being over a decade old?

9        A.   I believe you're familiar with

10   ethics and consulting in management

11   consulting.  My clients' agreements did

12   not have a particular end date to them.

13   They were meant for me to keep

14   confidential the relationships that I had

15   during all of my consulting career.

16       Q.   Are those three start-ups still

17   active today?

18            MS. ELLIS:  Objection, form.

19            THE WITNESS:  None of those

20       current start-ups are currently active

21       start-ups.

22   BY MS. CARITIS:

23       Q.   But it's still your position you

24   can't tell me who they are?

25       A.   I cannot disclose the clients

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                       WEINER

2       that hired me for those start-ups.  I can

3       talk in a general way about the work that

4       I did as it's relevant to the

5       consideration of my expertise in this

6       case.

7           Q.   Okay.  I actually don't want you

8       to caveat it to why it's relevant to the

9       expertise in this case, I just want

10      understand what you can tell me about

11      these three start-ups.  So what was the

12      sector of the three start-ups?

13          A.   One of the start-ups was in the

14      travel and loyalty sector.  One was in the

15      financial services sector.  And one was a

16      recording business that was meant to

17      stream video.

18          Q.   We're going to talk about each of

19      those but for the recording business that

20      was meant to stream video, does that mean

21      it was able to stream video or it was

22      trying to stream video and wasn't able to

23      achieve that?

24          A.   We were successfully able to

25      achieve streaming video but as I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 50

```
 1                    WEINER
 2   mentioned, that business is not in
 3   existence today.
 4        Q.   Where were you streaming video
 5   from?
 6        A.   We were streaming video from
 7   servers that we had in a hosting facility
 8   in New York City to consumers around the
 9   world.
10        Q.   What sort of video were you
11   streaming?
12        A.   These were recorded videos that
13   were published for the sake of being
14   streamed.
15        Q.   Were they for entertainment
16   purposes?
17        A.   The primary purpose can be
18   characterized as entertainment or
19   learning.
20        Q.   It wasn't live streaming, those
21   were prerecorded videos that were stored
22   somewhere and then streamed to an audience
23   elsewhere?
24             MS. ELLIS:  Objection, form.
25             THE WITNESS:  These were videos
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 51

1                      WEINER
2          that were recorded, saved, transcoded
3          and streamed specifically.
4    BY MS. CARITIS:
5          Q.    How -- what was the volume, how
6    many videos are we talking that were
7    stored and streamed?
8               MS. ELLIS:  Objection, form.
9               THE WITNESS:  I'm thinking if I
10         know that number.  If I recollect
11         clearly there were a number of
12         hundreds of videos that were recorded
13         and streamed during the time of this
14         start-up.
15   BY MS. CARITIS:
16         Q.    How long -- you said this
17   start-up that you're referring to is no
18   longer in business.  How long was it in
19   business?
20         A.    If my recollection is clear, I
21   would estimate three years.
22         Q.    And what specifically did you do
23   to assist in the launch of this recording
24   business?
25         A.    I was the chief information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER

2       officer.  My responsibility was standing

3       up the technology.  That technology ranged

4       from office technology, like phone systems

5       and computers, to building relationships

6       with software developers who wrote the

7       software that captured the video and

8       streamed the video on media servers.  The

9       hosting company that housed the servers,

10      the technology providers that provided

11      desktop support to both the users of the

12      service as well as the employees of the

13      company, and I managed and hired the

14      entire technology team that went to

15      continue on after I left my role as the

16      start-up CIO.

17           Q.   How long were you in the role as

18      the start-up CIO?

19           A.   I believe 14 months is the time I

20      was the start-up CIO of that particular

21      entity.

22           Q.   How many employees did that

23      start-up employ?

24           A.   In terms of direct employees, the

25      time that I was there on the technology

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 53

```
                        WEINER
 1
 2      side, I hired a little less than 20
 3      employees.  In terms of the customer
 4      service team, that was considerably larger
 5      and I don't recall the exact number of
 6      those employees.
 7           Q.   You mentioned that one of the
 8      things that you did as the start-up CIO
 9      was you coordinated with the software
10      developers; is that right?
11           A.   I selected, hired, wrote
12      requirement for, project managed and
13      oversaw the delivery of the software
14      development team.
15           Q.   You did not write the software;
16      fair?
17           A.   In that particular case I did not
18      write the software, that is an accurate
19      representation.
20           Q.   So the other few start-ups that
21      you told me you were referencing in this
22      bullet here under Weiner.net, LLC was a
23      travel and loyalty start-up company.  What
24      did that company do?
25           A.   That company served as an online
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 54

```
 1                    WEINER
 2     travel agency.
 3         Q.   So that means that I could go to
 4     their website and get their help in
 5     booking my travel; is that fair?
 6         A.   That is one of the specific
 7     things that company did offer, yes.
 8         Q.   Okay.  Did -- what did you do
 9     specifically for that company, the travel
10     and loyalty company?
11         A.   As with the other company I
12     described, as the launch CIO I was the
13     first technology leader hired by that
14     company.  I had the responsibility for
15     setting up all of the infrastructure which
16     involved selecting phone systems and phone
17     routing systems and mobile technology.  I
18     had the responsibility for securing,
19     educating, writing the requirements for
20     project managing, problem serving, the
21     software development.  I had to negotiate
22     with global distribution systems, systems
23     like Sabre, Amadeus, for the sake of
24     getting access to the global distribution
25     system network for booking travel.  I had
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 55

```
 1              WEINER
 2   to engage an outsourced company for the
 3   sake of being the call center and I had to
 4   make sure that all reporting and financial
 5   systems had integrity and were auditable.
 6       Q.   When you say you were reporting,
 7   did this travel company have any sort of
 8   safety hotline?
 9           MS. ELLIS:  Objection, form.
10           THE WITNESS:  This travel company
11       within themselves did not have a
12       safety hotline.  They did sell
13       insurance, specifically travel
14       insurance, which protected travelers
15       from medical risks when they were
16       abroad.
17   BY MS. CARITIS:
18       Q.   Did you ever tell this company
19   that you were consulting that they should
20   put in place a reporting structure so that
21   individuals that are using their service
22   if they are sexual assaulted on a trip
23   they have some way to report that assault?
24           MS. ELLIS:  Objection, form.
25           THE WITNESS:  The specific answer
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 56

```
 1                    WEINER
 2       to your question is that I did not
 3       ever tell that insurance company they
 4       should set up a sexual assault
 5       reporting system for travelers that
 6       were using our insurance policy, no, I
 7       did not.
 8  BY MS. CARITIS:
 9       Q.   Just to be clear, when you said a
10  travel loyalty program, was that an
11  insurance company or a travel agency?
12       A.   I was at the travel agency.  They
13  hired an insurance company.  The insurance
14  company protected the travelers and in the
15  specific answer to your question, I did
16  not coach or guide that insurance company
17  in setting up a sexual assault hotline or
18  reporting scheme.
19       Q.   I was asking a different
20  question.  Did you counsel the travel
21  agency to set up any sort of sexual
22  assault, sexual misconduct reporting
23  structure?
24       A.   I --
25            MS. ELLIS:  Objection, form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 57

```
 1                        WEINER
 2             THE WITNESS:  I apologize if I
 3        misheard your question.  Now that I
 4        understand it, you're specifically
 5        asking if the travel agency set up a
 6        hotline for reporting sexual assault
 7        and the answer to that question
 8        continues to be that we did not take
 9        that action during that start-up.
10   BY MS. CARITIS:
11        Q.   And there was -- you didn't
12   counsel them to include any sort of
13   mechanism or way for an individual
14   utilizing their travel agency to report an
15   instance of sexual misconduct; fair?
16             MS. ELLIS:  Objection to form.
17             THE WITNESS:  I supported a quite
18        extensive feedback system that was
19        made available to the users of the
20        travel agency that had open-ended
21        feedback available to them during that
22        time that I set it up and in the years
23        that followed.
24   BY MS. CARITIS:
25        Q.   You did not anywhere, though,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 58

```
 1                    WEINER
 2      require or recommend that the travel
 3      agency explicitly include reporting
 4      mechanisms for sexual misconduct, yes or
 5      no, Mr. Weiner?
 6              MS. ELLIS:  Objection to form.
 7              THE WITNESS:  Sexual misconduct
 8          was not a risk that we were
 9          considering in the formation of that
10          travel agency, is the specific answer
11          to your question.
12      BY MS. CARITIS:
13          Q.   Okay.  So sexual assault, sexual
14      misconduct wasn't a risk that you took
15      into account when advising the travel
16      agency; fair?
17              MS. ELLIS:  Object to form.
18              THE WITNESS:  It is accurate to
19          say that we did not consider sexual
20          assault or sexual misconduct a
21          foreseeable risk for this particular
22          travel agency, that is a very accurate
23          statement.
24      BY MS. CARITIS:
25          Q.   Did the travel agency connect
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 59

1                    WEINER
2       people or book people on cruises?
3           A.   Give me one moment while I try to
4       remember.
5           Q.   You're having to go back, I
6       understand.
7           A.   Cruise booking was available on
8       the travel agency.
9           Q.   You're aware that there are
10      reported incidents of sexual misconduct
11      that occur on cruises; right?
12               MS. ELLIS:  Objection, form.
13               THE WITNESS:  I am not personally
14          aware of reports of sexual assault on
15          cruises.  I have not seen an article
16          to that effect.
17      BY MS. CARITIS:
18          Q.   When you were consulting with the
19      travel agency, you didn't look into the
20      risks of sexual assault on cruises, for
21      example?
22               MS. ELLIS:  Objection, form.
23               THE WITNESS:  As I've described,
24          the goal of a product development
25          executive is to consider the risks to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2         their users and the use case of the
 3         product was to book the travel.  We
 4         applied insurance for the sake of
 5         protecting travelers on their travel.
 6         We did not have a product that
 7         specifically looked to their safety on
 8         that travel.  Yes, that is a fair
 9         statement.
10   BY MS. CARITIS:
11         Q.   You would agree that the general
12   premise of a travel agency is that it
13   connects an individual with the trip?
14              MS. ELLIS:  Objection, form.
15              THE WITNESS:  Our goal as travel
16         agency was to make available travel
17         options that travelers could book.
18   BY MS. CARITIS:
19         Q.   And you -- the travel agency, in
20   fact, booked those options for the
21   individual utilizing the travel agency
22   services?
23         A.   The travel agency booked those
24   trips for the travelers, facilitated the
25   financial transaction and made the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 61

```
 1                    WEINER
 2     arrangements.
 3          Q.   So we've talked about two of the
 4     start-ups that you mentioned during your
 5     time at Weiner.net from 2008 to 2012.  The
 6     second one, the one that's left to talk
 7     about is related to financial services.
 8     What was that start-up doing?
 9          A.   The goal of that start-up, which
10     was for a global brand, was to create an
11     online institution that could collect
12     deposits and pay high yields.
13          Q.   I am not a finance person so can
14     you explain to me a little more like
15     practically if I was trying to utilize the
16     services offered by the financial services
17     start-up what I would do?
18          A.   Sure.  I can provide a recent
19     example that might be helpful.  You have
20     an iPhone, I would presume.  On that
21     iPhone you can have an Apple card.  Apple
22     card has a high yield savings account
23     associated with the Apple card where when
24     you spend that money that is reported to
25     you goes into this high-yield savings
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 62

1                  WEINER
2      account or you could move money into your
3      high-yield savings account.  That money
4      earns a high rate of interest and you are
5      paid that interest in that high-yield
6      savings account and then you can use that
7      money for any purpose that you like.
8          Q.   Understood.  Aside from those
9      three start-ups that we just discussed,
10     the travel agency, the financial services
11     organization and the recording business,
12     were there any other clients that you
13     worked with from 2008 to 2012 through
14     Weiner.net?
15         A.   There were quite a few other
16     clients that I worked with during that
17     time period, mostly in the travel and
18     financial services industries.
19             MS. ELLIS:  Counsel, we're coming
20         up on an hour.
21             MS. CARITIS:  That's perfect.
22         Why don't we go off the record.
23             THE VIDEOGRAPHER:  We're going
24         off the record.  This is the end of
25         media unit 1.  The time is 10:04.

Page 63

```
 1                    WEINER
 2          (Recess taken from 10:04 a.m. to
 3       10:15 a.m.)
 4          THE VIDEOGRAPHER:  We are back on
 5       the record.  This is the beginning of
 6       media unit 2.  The time is 10:15.
 7   BY MS. CARITIS:
 8       Q.   Mr. Weiner, before we took a
 9   short break we were discussing the work
10   that you did back in the 2008 to 2012 time
11   frame during your consulting work at
12   Weiner.net.  Do you recall that?
13       A.   Absolutely.
14       Q.   And we've been looking at a
15   variety of documents that explain your
16   relevant experience.  We were just looking
17   at your CV and now I'm going to refer to a
18   paragraph in your report that we've marked
19   as Exhibit 1.  I just want to quickly ask
20   you a few questions about paragraph 15 on
21   page 6 of your expert report.
22       A.   Paragraph 15, one second.  Yes.
23       Q.   Okay.  And I just want to confirm
24   a few things here.  So in this paragraph,
25   you note that during your time at
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 64

```
 1                       WEINER
 2      Weiner.net you helped develop applications
 3      that were included when the Apple app
 4      store and the Android market launched in
 5      2008.  Do you see where you wrote that?
 6           A.    Absolutely.
 7           Q.    Have you developed any apps for
 8      the Fed?
 9           A.    Give me one second.
10           MS. ELLIS:  Objection to form.
11           To the extent you can talk about it.
12           THE WITNESS:  I'm just trying to
13           think if there's anything that is not
14           confidential that I can disclose.
15           For the New York Fed I have not
16           developed any apps.  I have worked on
17           apps over the last 13 years in my
18           personal capacity.
19      BY MS. CARITIS:
20           Q.    Okay.  You said you worked on
21      apps.  When's the last time that you
22      developed an app that was included in the
23      app store either on the Android platform
24      or the Apple platform?
25           A.    There is a team in India working
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 65

1                         WEINER
2       for me now.
3           Q.   Okay.  What do you mean by that?
4       Are you -- do you currently have a
5       consulting business outside of your work
6       for the Fed and outside of your expert
7       consulting firm?
8           A.   I am a board member of a
9       not-for-profit that is building an app.
10          Q.   What is that?
11          A.   The app is a tool for members of
12      a recovery program to hear prerecorded
13      streaming audio, to look for meetings in
14      that recovery program, and to keep a
15      calendar of meetings around the country.
16          Q.   Okay.  You said you're working
17      with a team in India.  What are you
18      specifically doing to develop the
19      application that you just identified for
20      me?
21          A.   As the board member with the most
22      experience in app development, they are
23      leveraging that experience to help define
24      the requirements, problem manage and
25      problem solve as issues or blockers arise.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 66

1                    WEINER
2        Q.    And sorry if I missed this, you
3    said the application were for folks in a
4    recovery program; is that right?
5        A.    That is correct.
6        Q.    Are they individuals that are
7    working through substance abuse, what sort
8    of recovery program?
9        A.    It's a substance abuse program,
10   yes.
11       Q.    What are some risks associated
12   with the application that you're
13   developing for the folks in a substance
14   abuse program?
15            MS. ELLIS:  Objection, form.
16            THE WITNESS:  So the risks that
17       we consider in this particular app
18       which job is to provide streaming
19       audio and a calendar of events are
20       mostly risks around operationalization
21       and continuous availability and the
22       kind of risks that you have with any
23       app to make sure it's generally
24       available and working well.
25   ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 67

1                         WEINER
2      BY MS. CARITIS:
3          Q.   So the risks that you as a board
4      member asked the product development team
5      to consider were related to operational
6      challenges with the app; is that right?
7               MS. ELLIS:  Objection, form.
8               THE WITNESS:  The primary risks
9          that I'm considering in that
10         particular app are operational in
11         nature.  That is a fair
12         characterization of what I just said,
13         yes.
14     BY MS. CARITIS:
15         Q.   Fair to say that many -- that
16     every app is going to have operational
17     risks and challenges?
18         A.   I would both agree with that and
19     highlight that every app is going to have
20     risks.  It is part of product development
21     to manage risks.  Many of them are
22     operational in nature.
23         Q.   When you said that the app that
24     you're working, you're overseeing as a
25     board member is related to providing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 68

1                          WEINER
2          access for videos for folks in the
3          recovery program; is that right?
4              A.    Sorry that was not clear; it's
5          audio recordings.
6              Q.    I could have missed that.  Thank
7          you for clarifying.
8                    What sort of operational
9          challenges has your team had to work
10         through concerning the availability of
11         audio recordings on an app?
12                   MS. ELLIS:  Objection, form.
13                   THE WITNESS:  Because we are on
14             the iPhone and Android marketplace, we
15             make sure to do broad testing with
16             simulators and physical devices where
17             available through alpha and beta
18             programs to ensure the audio streaming
19             was of quality and was useful for the
20             audience.
21         BY MS. CARITIS:
22             Q.    How many individuals are
23         currently -- is the app out in the wild or
24         is it still in development?
25             A.    The app is in beta testing.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 69

```
 1                    WEINER
 2        Q.   And for those of us that aren't
 3    in product development world, what is beta
 4    testing mean, is that like second phase of
 5    a pilot program?
 6        A.   It is fair to characterize it as
 7    the second phase of a pilot program.  The
 8    specific things that I would refer to in
 9    this model are an alpha testing, a beta
10    testing and then a full launch.
11        Q.   When did you all start the alpha
12    testing?
13        A.   We started the alpha testing a
14    little less than a year ago.
15        Q.   When did this idea, the first
16    idea for this app come to be?
17        A.   This --
18             MS. ELLIS:  Objection, form.  Go
19        ahead.
20             THE WITNESS:  Sure.  This app
21        first came into conceptualization a
22        number of years ago.
23    BY MS. CARITIS:
24        Q.   About how many, two, five, what's
25    your guess?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 70

```
 1                      WEINER
 2          A.   I'm trying to remember.
 3               MS. ELLIS:  Objection, form.
 4               THE WITNESS:  I'm going to say
 5          between two and three.
 6     BY MS. CARITIS:
 7          Q.   Okay.  So were you on the board
 8     at this time?
 9          A.   I was on the board at this time.
10          Q.   So as a board member you were
11     presented with an idea to develop an
12     application that allowed for individuals
13     in a recovery program to have access to
14     audio recordings to assist in their
15     recovery; is that right?
16          A.   Exactly correct.
17          Q.   And after kind of the product was
18     thought of, the next step you went into
19     some alpha testing; is that right?
20               MS. ELLIS:  Objection, form.
21               THE WITNESS:  No, I'm sorry.  Let
22          me clarify.  I didn't mean to give
23          that impression.  Our first step as a
24          not-for-profit was to raise the funds
25          to make it possible.  The second step
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 71

```
 1                    WEINER
 2         was to find and secure a development
 3         shop.  The third step was to build the
 4         app.  And the fourth step was to begin
 5         testing in an alpha mode.  So there
 6         were four steps in total before the
 7         alpha.
 8    BY MS. CARITIS:
 9         Q.   Got it.  When did you start the
10    first testing, the alpha mode?
11         A.   The first testing was roughly a
12    year ago.
13         Q.   So fair to say it took about a
14    year, maybe, to go from thinking of the
15    idea to getting ready for alpha testing?
16             MS. ELLIS:  Objection, form.
17             THE WITNESS:  With the funding
18         available to this team and the
19         resources that were able to be applied
20         to it, it is accurate to say it took
21         about a year to go from real
22         requirements throughout the testing.
23    BY MS. CARITIS:
24         Q.   In the alpha testing phase, what
25    did that entail; were there a certain
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 72

```
 1                        WEINER
 2      amount of individuals that were given
 3      access, how did you guys develop or set up
 4      that initial testing program?
 5              MS. ELLIS:  Objection, form.
 6              THE WITNESS:  The alpha testing
 7          program leveraged the Apple App Store
 8          and the Android Play Store features
 9          which allowed for distribution to
10          pre-authorized individuals.  So we
11          solicited volunteers, added them to
12          the Apple App Store and Android store
13          and made the app available to them
14          where they could then make screenshots
15          and videos available through the Apple
16          App Store and the Android Play Store
17          back to the Indian development shop.
18      BY MS. CARITIS:
19          Q.  How many individuals were
20      involved in that kind of pre-approved
21      group?
22              MS. ELLIS:  Objection, form.
23              THE WITNESS:  We have between 20
24          and 30 in the Apple App Store and a
25          few less in the Android -- in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 73

```
 1                    WEINER
 2       Google Play Store.
 3    BY MS. CARITIS:
 4       Q.   These volunteers, were these
 5    people that were actually in the substance
 6    abuse program or were they volunteers that
 7    were just kind of helping out?
 8       A.   I believe all of them were in the
 9    program.
10       Q.   How did you decide which
11    individuals got access to the program
12    initially and how many had to wait?
13            MS. ELLIS:  Objection, form.
14            THE WITNESS:  We selected -- let
15        me answer it this way.  I've been
16        doing product development now for 37
17        years.  When you do an alpha it's
18        really important to get a certain
19        character of person, a person that's
20        going to give you detailed testing,
21        thorough analysis, and not get freaked
22        out by the obvious problems that occur
23        in alpha testing.  And so I used
24        judgment along with the team to select
25        the individuals for the alpha testing.
```

Page 74

```
 1                    WEINER
 2   BY MS. CARITIS:
 3       Q.   Okay.  So you certainly can't
 4   release an alpha test to the entire
 5   broader population, you need to be a
 6   little more narrow; fair?
 7       A.   We made specific choices on each
 8   individual that joined the alpha test.
 9       Q.   Okay.  You said something about
10   the alpha testing.  You said that the
11   folks were able to access some videos and
12   take screenshots and then give them to the
13   folks in India.  Can you explain how that
14   worked, the interplay between the testers
15   and the developers in India?
16       A.   Sure.  Both the Apple App Store
17   and the Google Play Store provide a
18   feature where you can so-called report a
19   bug, and that report a bug feature allows
20   you to take screenshots or select videos
21   that get reported to the development
22   organization.
23       Q.   Understood.  So the alpha testing
24   was a way for folks to uncover and
25   identify bugs and pass on any of those
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2      bugs to the developers that could fix them
 3      in the next iteration?
 4              MS. ELLIS:  Objection, form.
 5              THE WITNESS:  The specific
 6          purpose of the alpha testing was to
 7          find bugs, report them to the
 8          developers and get them fixed so that
 9          the beta experience was smoother.
10          Yes, that is a very good distinction.
11      BY MS. CARITIS:
12          Q.   When did the beta experience
13      start?  So we had about a year between
14      product conceptualization and alpha test.
15      How long did you alpha test before you
16      moved to the beta test?
17          A.   The alpha test was quite short
18      because the product was in quite good
19      shape.  I believe the total alpha test was
20      about four months.
21          Q.   And the beta test, was that
22      released to the general population or was
23      it a smaller selected group?
24          A.   The beta test has been put on the
25      App Store and is available for download if
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 76

```
 1                    WEINER
 2   you know about it and have the link.  Yes,
 3   that is available for beta population.
 4        Q.   How many folks have access to the
 5   application at this time?
 6        A.   It's in the low few hundreds.
 7        Q.   How many audio recordings are
 8   available on the application at this time?
 9        A.   I believe it's less than 200.
10        Q.   Do individuals, can they stream
11   from the cellular LTE network, do they
12   need Wi-Fi, how does it work?
13        A.   They use all of the features of
14   iPhone and Android, which includes
15   streaming over cellular or streaming on
16   Wi-Fi.
17        Q.   I assume when your product
18   development team was putting this app
19   together they had to consider some local
20   or national laws, for instance copyright;
21   is that fair?
22             MS. ELLIS:  Objection, form.
23             THE WITNESS:  The organization
24        has a legal team that supports them
25        with consideration of laws and
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 77

                           WEINER
 1
 2        regulations such that they remain
 3        compliant in the global scene.
 4    BY MS. CARITIS:
 5        Q.   And one of the ways I can think
 6    of is you need to make sure the audio
 7    recordings you're putting on the app are
 8    allowed to be shared with the broader
 9    population; right?
10        A.   Absolutely.  That is an accurate
11    statement.
12        Q.   You mentioned that some of the
13    key risks that you as a board member
14    counseled this nonprofit to consider were
15    mostly operational.  Were there any risks
16    that you considered concerning bodily
17    safety of the individuals that were in the
18    substance abuse community?
19          MS. ELLIS:  Objection, form.
20          THE WITNESS:  I believe it's fair
21       to say that when you're considering a
22       recovery community, the considerations
23       of harm are relevant.  We considered
24       whether or not certain content might
25       be triggering or might in another way,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2       shape or form do harm to the
 3       individuals as we did the product
 4       development lifecycle, yes.
 5   BY MS. CARITIS:
 6       Q.   Did you include a button on the
 7   app that if an individual is having a
 8   trigger event they could immediately
 9   contact 911?
10            MS. ELLIS:  Objection, form.
11            THE WITNESS:  I don't think I've
12       been clear on the scope of the
13       application.  The contacting of 911
14       for being triggered is not included in
15       the app.  The app has a way to contact
16       the support team and we do encourage
17       the individuals to contact their
18       sponsors.
19   BY MS. CARITIS:
20       Q.   You said there's a way to contact
21   a support team.  Would that be for in-app
22   technical support?
23       A.   We encourage folks to reach out
24   to us with anything from in-app technical
25   support, the thought that certain content
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 79

```
 1                    WEINER
 2      might be triggering, the thought that they
 3      might want to add a feature, there's a
 4      broad statement about our availability as
 5      a support team to give input.
 6           Q.   Does the support team have
 7      resources to provide back to an individual
 8      if they reach out and say this video is
 9      very triggering, I'm in need of immediate
10      assistance?
11           A.   I am quite aware that every
12      member of the support team, as are the
13      members of the program, if someone is
14      saying they are in immediate need of
15      assistance, we'll suggest first that they
16      speak about what they are dealing with
17      with their sponsor and if not, seek
18      professional help, either by going to an
19      emergency room or reaching out over 911.
20           Q.   How does the app allow users to
21      contact the support team; is there a phone
22      number, a chat feature, how can people
23      contact support?
24           A.   There is a phone number and an
25      e-mail option.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 80

```
 1                    WEINER
 2        Q.   Okay.  So if I view a video and
 3    it's triggering and I'm having an
 4    emergency, I'm going to have to call in
 5    from a phone number provided or e-mail; is
 6    that fair?
 7              MS. ELLIS:  Objection, form.
 8              THE WITNESS:  This particular app
 9        has those two features, that is an
10        accurate representation.
11    BY MS. CARITIS:
12        Q.   Is the phone line, is it a
13    hotline, a call center or is it a phone
14    line kind of to the nonprofit, I'm going
15    to call it the receptionist?
16        A.   The phone line is a hotline
17    staffed by volunteers across the country
18    who attempt to make the phones available
19    24 hours a day, seven days a week by the
20    phone number being forwarded to their
21    individual phones.
22        Q.   I should have asked you, what's
23    the name of the nonprofit?
24        A.   Crystal Meth Anonymous.
25        Q.   What's that app called?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 81

1                         WEINER
2          A.    CMA app.
3          Q.    Makes it easy.  When does -- I
4      believe you told me it's currently still
5      in beta testing?
6          A.    The app developer is actually
7      presenting at the national conference in a
8      couple weeks, a recommendation based on
9      the beta feedback to do an overhaul.
10         Q.    An overhaul means to kind of fix
11     some things; is that right?
12         A.    The app developer is recommending
13     to rebuild the app with some more modern
14     features, yes.
15         Q.    So does that mean it will go back
16     to alpha testing, how does that work?
17         A.    Once the app is rebuilt it will
18     go back to alpha testing.
19         Q.    Has the team provided an estimate
20     on how long it will take to rebuild?
21         A.    I'm actually waiting for that
22     ahead of the conference to give a written
23     proposal.  The app development lead texted
24     me just two days ago that he owes me a
25     project plan.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 82

1                        WEINER
2        Q.   What are the ones that were
3    identified that require the total rebuild
4    on the app?
5            MS. ELLIS:   Objection, form.
6            THE WITNESS:   There were some
7        technical features that were not
8        implemented, in my opinion, in the
9        smoothest way.
10   BY MS. CARITIS:
11       Q.   Such as what?
12       A.   We are talking about a global
13   organization that has meetings around the
14   world.  The implementation of time zones
15   is something I would like to see improved.
16       Q.   Okay, so do you have a goal for
17   when the app will actually be publicly
18   released more broadly?
19       A.   I have a goal that the app is
20   good and stable and ready for a public
21   release.  As a product development
22   executive working for a not-for-profit,
23   our goals are not timeline related, they
24   are creating the best product for the
25   group.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 83

1                      WEINER

2          Q.   And you would agree that every

3     product development timeline acknowledges

4     the importance of iterating?

5          A.   Absolutely, iterating is very

6     important in the product development

7     lifecycle.

8          Q.   This is a silly question but

9     someone told me about it before, it's

10    called a product development lifecycle

11    because it's a circle, right, it's

12    continuous improvement; is that fair?

13         A.   The best product development

14    lifecycles iterate constantly.  They

15    begin, they develop, they get things in

16    users' hands, they get feedback, they

17    adjust and they continue through that

18    cycle over and over to make the best

19    possible products.

20         Q.   In your work you said you're on

21    the board of -- I'm sorry, can you give me

22    the name again of the organization that

23    you're on the board of that you're helping

24    with this application?

25         A.   Of course, it's Crystal Meth

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 84

```
1                          WEINER
2       Anonymous.
3            Q.   And during your time on the board
4       of Crystal Meth Anonymous, are you aware
5       that -- did you become aware that
6       substance abuser -- people that have
7       substance abuse challenges may also
8       experience unfortunately sexual misconduct
9       or sexual violence?
10           A.   It is known to me that people in
11      recovery programs have a foreseeable risk
12      during their using phase of sexual
13      violence, yes, I am aware of that
14      foreseeable risk.
15           Q.   Have you at any time recommended
16      to the organization, the nonprofit Crystal
17      Meth Anonymous, that it make any sort of
18      rule -- make any sort of recommendation
19      that individuals in the recovery program
20      not utilize the Uber platform?
21               MS. ELLIS:  Objection, form.
22               THE WITNESS:  At no time have I
23           discussed with anyone in the
24           organization a recommendation that
25           they do not use the Uber platform.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 85

```
 1                        WEINER
 2   BY MS. CARITIS:
 3        Q.   Okay.  So we were talking about
 4   apps and you gave me a lot of helpful
 5   information about an app that you've been
 6   working with a nonprofit on for a few
 7   years now that's going back to alpha
 8   testing.  Are there any other apps that
 9   you've worked on developing since 2008?
10             MS. ELLIS:  Objection, form.  To
11        the extent you can disclose.
12             THE WITNESS:  I'm thinking about
13        confidential relationships, if you
14        could give me one second, Counselor.
15   BY MS. CARITIS:
16        Q.   I don't need to even know the
17   name, right, it can be a yes or no at
18   first.  So first off, without disclosing
19   details about the particular application,
20   aside from the Crystal Meth Anonymous
21   application that we just discussed, yes or
22   no, have you ever developed another
23   application since 2008?
24        A.   I have helped develop other
25   applications since 2008 in a unpaid
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 86

```
 1                    WEINER
 2    capacity.  I have not been engaged or
 3    employed during that time period to build
 4    another app.
 5        Q.   I want to make sure I heard you
 6    correctly.  You said that since 2008
 7    you've assisted developing apps in an
 8    unpaid capacity but you have not -- is
 9    that what you said, but you have not
10    developed an app in a paid capacity; is
11    that what you just testified to?  I just
12    couldn't hear you.
13        A.   I'm sorry, I didn't hear you say
14    2008.  Let me be more specific.
15             Since working at the New York
16    Fed, which governs my outside activities,
17    I have not been paid or entered into any
18    sort of contract to work on an app in a
19    paid capacity.
20        Q.   You have, though, worked in
21    unpaid capacities to assist with app
22    development since 2008; is that what
23    you're saying?
24        A.   I do have friends in the app
25    development business who have consulted me
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 87

```
 1                    WEINER
 2    from time to time on development of apps,
 3    absolutely.  I'm very current in my
 4    understanding of the app development
 5    lifecycle.
 6         Q.   Have you personally developed an
 7    application since 2008 aside from the work
 8    that you did on the Crystal Meth Anonymous
 9    application?
10              MS. ELLIS:  Objection, form.
11              THE WITNESS:  You keep jumping
12         between 2008 and 2013, Counselor.
13         2013 is when I started with the Fed,
14         2008 we were talking about apps I
15         worked on in a paid capacity at
16         Weiner.net.  So what I'm trying to
17         answer is in my time at the New York
18         Fed I have not had any outside
19         engagements other than my board
20         position, which like my work today, is
21         approved by the New York Fed that was
22         done in a paid capacity.  The board
23         position is a position approved by the
24         New York Fed as an unpaid board
25         member.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 88

```
 1                    WEINER
 2   BY MS. CARITIS:
 3       Q.   Got it.  I was confusing myself
 4   so thank you for clarifying for me.  So
 5   let me be clear about my time frame.  So
 6   from -- let's see if I can get it this
 7   time.  From 2008 to 2012, what apps did
 8   you develop in a paid capacity?
 9            MS. ELLIS:  Objection to form.
10            THE WITNESS:  So we've talked
11        about a few.  I don't believe we've
12        talked about work that I did in
13        financial services supporting a ATM
14        provider and I don't believe we've
15        talked about work that I did related
16        to payment methods over apps.
17   BY MS. CARITIS:
18       Q.   Okay.  Well, let's talk about
19   those.  Were those in the 2008 to 2012
20   time period or earlier?  I know in your
21   report you talk about some work you did
22   with ATMs earlier in your career.
23       A.   I did work with ATMs much earlier
24   in my career and I did work with ATMs in
25   the 2008 to 2012 time frame that I was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 89

1                    WEINER
2    engaged with Weiner.net.  I have
3    colleagues who I've been working with for
4    many, many years in the ATM business.
5        Q.   Okay.  And was that an app you
6    developed?
7        A.   They had an app that communicated
8    with their ATM.  It was a whole suite of
9    products and services but there was an app
10   that was part of that suite.
11       Q.   And what was your role in that
12   engagement?
13       A.   I was a management consulting and
14   advisor.  I helped advise on requirements.
15   I helped in stand-up meetings where
16   blockers were identified.  I did what I've
17   been doing for my whole career, which is
18   make sure the process moves along in an
19   effective manner.
20       Q.   Okay.  And what exactly did the
21   app that you're referring to for the
22   financial services company do?
23       A.   This financial servicing company
24   was experimenting with their banking app,
25   being able to communicate with an ATM for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 90

1                    WEINER
2       the sake of doing a withdrawal.
3            Q.   Did the app do anything else?
4            A.   The app supported basic banking
5       features like checking your checking
6       account, transferring money, it was a
7       pretty comprehensive app as it related to
8       the banking space.
9            Q.   Any other apps between 2008 to
10      2012?
11           A.   I believe we've now disclosed and
12      discussed all the apps I worked on during
13      that time frame.
14           Q.   Okay.  None of the apps that you
15      personally worked on, so I'm putting aside
16      those where you have friends that might
17      have asked you some questions in an unpaid
18      capacity, none of those apps considered
19      personal safety; is that right?
20                MS. ELLIS:  Objection, form.
21                THE WITNESS:  Are we continuing
22           to talk about sexual assault or
23           personal safety in a broader context?
24      BY MS. CARITIS:
25           Q.   Let's say broad first and then

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 91

```
 1                    WEINER
 2    we'll go more narrow.  So the apps that we
 3    just discussed, those apps did not relate
 4    to personal safety in the broadest
 5    definition of that term?
 6              MS. ELLIS:  Objection, form.
 7              THE WITNESS:  I personally would
 8         consider a person in recovery being
 9         triggered in the realm of personal
10         safety in its broadest description.
11         So I would have to answer that
12         question with a no.
13    BY MS. CARITIS:
14         Q.   So the one app experience that
15    you identified that relates to personal
16    safety is the one we discussed in detail
17    for Crystal Meth Anonymous where you're a
18    board member and you're consulting them on
19    a product that is still in testing phases
20    to provide some audio recordings to
21    patients in a recovery program; right?
22              MS. ELLIS:  Objection, form.
23              THE WITNESS:  That is
24         specifically the app that I am
25         referring to that did have to consider
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 92

```
 1                    WEINER
 2        what I would call a personal safety
 3        risk in the broad set of risks that
 4        are considered in the product
 5        development lifecycle.
 6   BY MS. CARITIS:
 7        Q.   Okay.  And we've already talked
 8   about the safety features that that app
 9   did and did not incorporate; right?
10        A.   It's fair to say we talked about
11   those in detail.
12        Q.   Okay.  Aside from your board work
13   for Crystal Meth Anonymous, no other apps
14   that you've been paid to develop or
15   consult for related to personal safety; is
16   that right?
17        A.   As it relates to mobile apps,
18   that is a fair statement.
19        Q.   You qualified by saying mobile
20   apps.  Are you referring to software
21   applications that might appear on
22   computers, is that why you're caveating
23   with mobile?
24        A.   I am caveating on mobile because
25   as we discussed in my role at the Federal
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 93

```
 1                      WEINER
 2      Reserve, we have talked about financial
 3      crime risk and in the broadest sense,
 4      financial crime risk in my opinion does
 5      include some aspects of safety.
 6           Q.   Does the Federal Reserve have, in
 7      the technological system that you've
 8      utilized have any sort of reporting
 9      mechanism that allows somebody to report
10      that they've been physically assaulted or
11      in any way attacked?
12                MS. ELLIS:  Objection, form.
13                THE WITNESS:  The banking and
14           monetary policy implementation systems
15           that I manage, which are the only ones
16           I can speak to, do not have a method
17           to report being attacked.
18      BY MS. CARITIS:
19           Q.   Do they have a method for
20      reporting anything related to bodily
21      safety?
22                MS. ELLIS:  Objection, form.  To
23           the extent you can speak to any of
24           this, you can answer but I don't want
25           to delve into anything that violates
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 94

```
 1                      WEINER
 2        your agreement with your employer.
 3              THE WITNESS:  Of course.  I think
 4        it's fair to say if we caveat the term
 5        bodily safety, I can competently say
 6        none of the systems I manage at the
 7        Federal Reserve consider a risk of
 8        bodily safety.
 9   BY MS. CARITIS:
10        Q.   The only risk that you've
11   identified would be being a victim of a
12   financial crime; right?
13        A.   I have identified a safety risk
14   of being a victim of a financial crime.
15        Q.   That would be somebody, like,
16   stealing money; right?
17              MS. ELLIS:  Objection, form.
18              THE WITNESS:  Financial crimes
19        are quite a bit broader than that.
20        They involve terrorist financing, anti
21        money laundering, stealing money,
22        there are quite a number of aspects to
23        financial crime complaints.
24   BY MS. CARITIS:
25        Q.   But they are financial related;
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 95

1                         WEINER
2    right?
3         A.   They are all financial related
4    which is why if we are now using the term
5    bodily safety, I can competently say that
6    none of the systems I work in have
7    reporting for bodily safety.
8         Q.   All right.  You have a website
9    that advertises or markets your litigation
10   consulting business; is that right?
11        A.   I have a website that makes
12   available the true facts of my litigation
13   consulting business, yes.
14        Q.   And you also years back had a
15   website that discussed your Weiner.net
16   consulting business; is that right?
17        A.   I'm going to ask to pause a
18   second, Counsel, because we're talking 13
19   years ago, so --
20             MS. CARITIS:  Sure.  Why don't I
21        just show you.  I can make it easier.
22             Mr. Delaney, if we could just
23        please put up tab 8, and I believe
24        that should be Exhibit 4.
25             (Exhibit 4, Weiner.net home page,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                      WEINER
2           marked for identification
3               THE WITNESS:  Yes, I do remember
4           The Wayback Machine.  Yes, very good.
5      BY MS. CARITIS:
6           Q.   So let me set the scene a little
7      bit.  So Mr. Weiner, I'll represent to you
8      that we went back to The Wayback Machine,
9      a way to identify websites from years
10     past, and this is what appeared from 2010
11     when we put in your website.  Does this
12     look generally familiar to you?
13          A.   I remember that picture.  I was
14     so young then.
15          Q.   Fair to say that to the best of
16     your recollection, this is what your
17     website back in approximately 2010 looked
18     like?
19          A.   I cannot -- let me just read it
20     for one second.
21               Yes, this is the representation I
22     can generally remember from 2010.
23          Q.   Okay.  And we talked a little bit
24     about the purpose of LinkedIn.  This is
25     another online way that you can market

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 97

```
 1                    WEINER
 2      yourself and make clear the consulting
 3      experience -- the consulting services that
 4      you can provide; right?
 5          A.   It is a tool to speak to a
 6      particular audience about consulting
 7      services where a client asked if they
 8      could verify on the Internet.
 9          Q.   Sorry, I want to make sure I
10      understand that.  Are you saying that a
11      client asked you to create this, or it was
12      helpful for a client to confirm that they
13      were okay hiring you?  I didn't understand
14      what you just said there.
15          A.   I was speaking to a client who
16      asked if they could see anything on the
17      Internet about the work I was proposing to
18      do for them and I built this particular
19      page for that purpose.
20          Q.   Understood.  So it's your
21      testimony this was created for a
22      particular client?
23          A.   This particular page as I am
24      recollecting it, and please, Counselor,
25      we're talking about 2010 so please accept
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 98

                            WEINER

1

2      I'm doing the best I can recall 2010 that

3      I can, was created for a particular client

4      that asked to verify my business on the

5      Internet.

6          Q.   Understood.  And of course I

7      understand it was a long time ago.  So not

8      a memory test.  What client asked you to

9      make this?

10         A.   As I said earlier, I don't

11     disclose any of my clients in my

12     consulting career due to the nature of the

13     relationships that I have with them.

14         Q.   Did you end up doing work for

15     this client?

16         A.   The client that I recall in this

17     particular case did engage me.

18         Q.   Okay.  I don't know if you had an

19     opportunity to look at the whole document

20     but based on my read, I don't see any

21     references to safety or risk management.

22     You agree with that?

23         A.    It is a fair characterization on

24     the words of the page that they do not use

25     the word safety or the word risk

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 99

1                    WEINER
2        management.
3            Q.   Okay.  We've been spending a lot
4        of talking about your time at Weiner.net.
5        We can speed this up because we have
6        limited time.  Prior to your work at
7        Weiner.net, you were at LogicSourcing
8        which was a subsidiary of Novantas; is
9        that right?
10           A.   That is correct.  That company is
11       and was founded by the partners that I
12       worked for at Booz Allen and Hamilton.  I
13       worked for those same partners at First
14       Manhattan Consulting Group and I worked
15       with those same partners and became a
16       partner when I joined Novantas.
17           Q.   Okay, and I'm now -- we've been
18       all over the place, but I'm looking now at
19       your résumé in your report.
20           A.   Yes.
21           Q.   And there, you identify
22       LogicSourcing as a leading provider of
23       consulting solutions and research services
24       for financial industries.  Do you see
25       that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 100

```
 1                         WEINER
 2        A.   If I can clarify, that tag line
 3    there is specifically referring to
 4    Novantas.  LogicSourcing is separated by a
 5    dash in that headline.
 6        Q.   Understood.  Are you saying that
 7    LogicSourcing was not a leading provider
 8    of consulting solutions and research
 9    services?
10        A.   The leading provider of
11    consulting services and research services
12    for financial services that I'm referring
13    to in that particular point is Novantas,
14    LLC, which was the owner of the business I
15    worked for, which was LogicSourcing, LLC.
16        Q.   Okay.  And for LogicSourcing
17    specifically, fair to say that that was
18    focused on technology consulting for
19    travel industry clients?
20             MS. ELLIS:  Objection, form.
21             THE WITNESS:  I've listed quite a
22        few, four to be specific, of the
23        engagement types that I did underneath
24        the bullets there.  That was a decent
25        chunk of time, 2005 to 2008, there
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 101

1                    WEINER
2          were other clients during that time.
3          They were all technology related in
4          some way, shape or form.  They covered
5          various industries.
6     BY MS. CARITIS:
7          Q.   And in the first bullets for
8     putting a kind of blurb about one of your
9     engagements there, you wrote managed the
10    Sabre due diligence efforts on sale to
11    private investors, which included leading
12    a team of consultants consisting of three
13    partners and 50 professionals in effort to
14    evaluate the plan for revenue growth, cost
15    reduction and technology management.
16              Do you see that there?
17         A.   I wrote those words.
18         Q.   So fair to say that in your
19    experience as a consultant, important to
20    figure out ways to allow companies to
21    achieve revenue growth, one; right?
22              MS. ELLIS:  Objection, form.
23              THE WITNESS:  Revenue growth is
24         an important consideration in the
25         corporate world, that's an absolutely

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 102

```
 1                    WEINER
 2       fair statement.
 3    BY MS. CARITIS:
 4       Q.   Again, in this Novantas
 5    LogicSourcing section of your résumé, I
 6    don't see the word safety anywhere.
 7    That's fair?
 8       A.   It is accurate to represent that
 9    the physical word safety does not appear
10    in the plain language on the page.
11    Absolutely right.  I made it very clear in
12    my report to disclose for the court's
13    consideration the specific work that I
14    have done that has been related to safety.
15    That is found in my report and of course
16    when you get to that, we can go over that.
17       Q.   And we'll talk about it.  I think
18    I found two examples that you identified
19    in your report but we'll talk through
20    that.  There wasn't anything though during
21    your time at Novantas, LogicSourcing that
22    you would identify as a safety-related
23    engagement; correct?
24            MS. ELLIS:  Objection, form.
25            THE WITNESS:  May I refer to my
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 103

1                          WEINER
2          report for a second?  I wanted to
3          check something quickly.
4     BY MS. CARITIS:
5          Q.   Sure thing.
6          A.   Forgive me, Counsel, we're
7     talking now almost 20 years ago so I'm
8     just trying to be precise by finding out
9     which ATM proceeding I referred to in my
10    report.
11              That was at First Manhattan
12    Consulting Group, but yes, it is fair to
13    say I did not disclose in my report any
14    work on ATMs while at LogicSourcing.
15         Q.   And to be clear, you didn't do
16    any work related to ATMs or safety more
17    broadly during your time at LogicSourcing?
18              MS. ELLIS:  Objection, form.
19              THE WITNESS:  At LogicSourcing
20         that client I referred to on ATMs did
21         engage me again in a different role to
22         help them with the contract
23         negotiation of a merchant agreement
24         but I've worked with that client since
25         the ATM time over and over again over

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 104

1                          WEINER
2          the years.
3      BY MS. CARITIS:
4          Q.   I'm not sure I understand your
5      answer.   I asked you that while you were
6      working at -- is it okay if I call it
7      Novantas?   Novantas or LogicSourcing?
8          A.   If you really want to be
9      confused, its current name is Curinos.
10         Q.   All right.   Can I do Novantas and
11     we'll agree we're talking about your work
12     history from 2005 to 2008?
13         A.   I would be pleased to simplify it
14     by calling it Novantas.
15         Q.   All right.   So my question is
16     during your work at Novantas, did you work
17     on any safety-related initiatives?
18              MS. ELLIS:   Objection, form.
19              THE WITNESS:   Counselor, you may
20          have noticed by this point I'm trying
21          to be very, very specific with the
22          word safety so let me just take a
23          second and make sure you and I are
24          being very clear.   Are you referring
25          to physical human safety, as you have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 105

```
 1                    WEINER
 2        in other sections, or are you talking
 3        about the broad risk of safety which
 4        as you know I have described to
 5        include things like financial risk?
 6   BY MS. CARITIS:
 7        Q.   I'm talking specifically about
 8   personal bodily safety.  So have you had
 9   any experience during your time in
10   Novantas related to personal bodily
11   safety?
12             MS. ELLIS:  Objection, form.
13             THE WITNESS:  In the time at
14        Novantas and the consulting
15        engagements at Novantas, I did not
16        have the opportunity to speak
17        specifically to any client that was
18        deemed with a foreseeable risk like
19        personal bodily safety.
20   BY MS. CARITIS:
21        Q.   You mentioned that you did some
22   work on ATMs for a client during your time
23   at Novantas and then you were engaged at
24   another point by that same client.  Did
25   you work on any initiatives for that
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2    client outside of the Novantas time frame
 3    concerning individual personal safety?
 4         A.   Most of the work that I did on
 5    personal bodily safety related to ATMs was
 6    between 1994 and 1998 when I was at First
 7    Manhattan Consulting Group.  As I've
 8    enumerated, I worked for that client on a
 9    number of other occasions and we did from
10    time to time have discussions about that
11    work from the '94 to '98 time, but it's
12    fair to say I was not engaged in a
13    consulting relationship for the sake of
14    working on risks related to bodily safety
15    while at Novantas.
16         Q.   Okay.  After Novantas -- excuse
17    me, I did this backwards so it's my fault.
18              Before Novantas you were at
19    United Airlines; is that right?
20         A.   That is absolutely correct.
21         Q.   And you were at United Airlines
22    from 2002 to 2005 in two different roles;
23    correct?
24         A.   That is exactly correct.
25    United's role changed at the time of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 107

1                          WEINER
2       United's bankruptcy.
3            Q.    But in the first role you were
4       the vice president chief technology
5       officer for UAL Loyalty Services; is that
6       right?
7            A.    That is correct.
8            Q.    Okay.  And you explained in your
9       résumé that that was a spinoff of the
10      Mileage Plus program and United.com; fair?
11           A.    Just to be clear, it never got
12      spinoff.  It was an entity created in the
13      intent to spin out the Mileage Plus
14      program and the United.com and loyalty
15      businesses.  You might remember that time
16      period to unlock the additional value
17      those businesses created, considered to
18      the multiple that you get in value from
19      airline which was considerably low.
20           Q.    At some point you then
21      transitioned to managing director of
22      strategic sourcing; is that right?
23           A.    That is a precise representation
24      of what's on my résumé, yes.
25           Q.    Okay.  And when did that happen?

Page 108

```
 1                      WEINER
 2        A.   At the time of United's
 3   bankruptcy, as I mentioned a few moments
 4   ago.  It's public record but if I'm being
 5   completely honest with you, my memory does
 6   not remember the particular date that that
 7   transition happened.
 8        Q.   I'm pretty positive this
 9   litigation will proceed without us knowing
10   the particular date of that transition, so
11   we're okay, thank you.
12             So in your CV, and I understand
13   that you are telling me you include some
14   additional details in your report but I'm
15   focused solely on your CV.  In the United
16   Airline section of your CV, you do not
17   reference any safety-related products; is
18   that right?
19        A.   Give me one --
20             MS. ELLIS:  Objection, form.
21             THE WITNESS:  -- second, if you
22        don't mind.  I have to turn back to
23        that.
24             You'll note in the first
25        paragraph I refer to a central
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 109

1                         WEINER

2          reservation system.  That central

3          reservation system had features which

4          managed getting pilots and flight

5          attendants to hotels and

6          transportation.  And I do in my report

7          refer to the safety aspects that we

8          considered in that central reservation

9          system so your representation would

10         need some augmentation.

11    BY MS. CARITIS:

12         Q.   Well, my question -- let me ask a

13    better question, thank you.

14              You certainly don't mention the

15    word safety in describing your experience

16    at United on your CV; right?

17         A.   I have not written the word

18    safety on my CV as it relates to my United

19    experience, but as I mentioned provided

20    additional details in my report.

21         Q.   So you, and we'll talk about it

22    in a second, but you just pointed me to

23    the reference in your CV to a central

24    reservation system, right, and we'll talk

25    a little bit about that later, but that's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      the reference that you're pulling out in
 3      your CV related to safety?
 4          A.   The work on the central
 5      reservation system and its features that
 6      supported flight attendants and pilots
 7      getting to hotel rooms after their shifts
 8      in my opinion did have certain
 9      safety-related aspects that we considered
10      in the product development lifecycle for
11      that product.
12          Q.   We'll talk about that in a
13      second.  If we could go -- this is going
14      to challenge my memory.  Go to Exhibit 2,
15      which was your LinkedIn profile.  I just
16      want to take a quick look to confirm that
17      in your LinkedIn profile when you're
18      discussing your United Airline experience,
19      you also don't mention the word safety
20      anywhere in that description, and it's on
21      the page 3 of 5, Mr. Delaney.
22          A.   I can read the page and tell you
23      that I do not see the word safety on the
24      page.  We would have to talk about the
25      additional details I provided to have a
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 111

```
 1                    WEINER
 2      fulsome conversation on safety.
 3          Q.   Great.  If we could now go to
 4      Exhibit 3.  That was the experience
 5      section of your LinkedIn profile.
 6              MS. CARITIS:  Mr. Delaney, it's
 7          page 2 of the United Airlines section.
 8      BY MS. CARITIS:
 9          Q.   And there actually, we briefly
10      talked about, there are section bullets
11      concerning skills and you would agree with
12      me here that the skills you identified
13      under United Airlines include e-commerce,
14      Web software, travel technology, technical
15      leadership and loyalty programs; right?
16              MS. ELLIS:  Objection, form.
17              THE WITNESS:  I can absolutely
18          read the page and you are accurate.
19          You only left off the duplication of
20          e-commerce and the words Web software
21          in the skills.
22      BY MS. CARITIS:
23          Q.   Nowhere in the skills section do
24      you identify safety or risk management;
25      right?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 112

1              WEINER
2        MS. ELLIS:  Objection, form.
3        THE WITNESS:  It is clear on the
4     plain language on the page that the
5     word safety and risk management are
6     not written.  As I pointed out before
7     though, we must look at the overall
8     process of managing a project
9     development lifecycle to understand
10    the experience that I have enumerated
11    in my report related to safety.
12 BY MS. CARITIS:
13    Q.   Going back, prior to United -- we
14 can take that down, Mr. Delaney, thanks so
15 much.
16        Prior to United, you from 2000 to
17 2002 were at Synetro Group; is that right?
18    A.   I was at Synetro Group from 2000
19 as 2002 as enumerated on the CV.
20    Q.   And you would agree that during
21 your two years at Synetro Group, you
22 weren't involved in assisting with the
23 development of any safety-related products
24 or systems; fair?
25        MS. ELLIS:  Objection, form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 113

```
 1                    WEINER
 2           THE WITNESS:  It is both fair to
 3      say that I did not use the word safety
 4      in that description, nor did I provide
 5      any elaboration in my report of safety
 6      work that I did during that time
 7      period, absolutely.
 8  BY MS. CARITIS:
 9      Q.   My question was did you do any?
10  So it is, Mr. Weiner, during your time at
11  Synetro, you did not do any safety-related
12  product or systems work; is that correct?
13           MS. ELLIS:  Objection, form.
14           THE WITNESS:  So Counselor, I'm
15      trying to be as clear as I can so
16      forgive me for one second but I can
17      answer this very simply if I can use
18      the word personal safety, would that
19      be acceptable?
20  BY MS. CARITIS:
21      Q.   Thank you for that clarification.
22      A.   So yes, I can confirm that
23  between 2000 and 2002, none of the work
24  that I did in product development
25  considered the specific risk of personal
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 114

1                    WEINER
2       safety or harm to individuals.
3           Q.   And is the reason that you're
4       providing the helpful caveat there is
5       because since you were working in the
6       financial space, you often did have to
7       take into account financial crime; is that
8       right?
9           A.   You and I are learning a language
10      between ourselves.  That is a very
11      accurate assessment.
12          Q.   Prior to -- we're getting there.
13      Prior to Synetro Group, you were at
14      Brierley+Partners, a direct marketing ad
15      agency focused on loyalty programs; is
16      that right?
17          A.   Or how Brierley is sitting in
18      Dallas wondering about his name, but yes,
19      it is Brierley+Partners.
20          Q.   Sorry about that, Mr. Brierley.
21      And fair to say that during your
22      approximately a year at Brierley+Partners,
23      you did not work on any programs or
24      systems related to safety outside of the
25      financial crime context we've been

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 115

1                        WEINER
2       discussing?
3                MS. ELLIS:  Objection, form.
4                THE WITNESS:  During 1998 and
5           1999, the products that I worked on
6           did not consider the risk of personal
7           safety as a foreseeable risk in those
8           businesses.
9       BY MS. CARITIS:
10           Q.   From '94 to '98 you were at First
11      Manhattan Consulting Group; is that right?
12           A.   Yes I was at First Manhattan
13      Consulting Group from 1994 to 1998.
14           Q.   And in your CV, your résumé
15      that's included in your report, you
16      describe your work at First Manhattan
17      Consulting Group.  You say that you were a
18      management consultant serving financial
19      services customers on issues like loyalty
20      program development, technology
21      development, infrastructure, credit card
22      and banking technology and customer
23      contact center technology.  Do you see
24      that?
25           A.   Yes, those are the words that I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 116

1                    WEINER

2    wrote to describe that time period 30

3    years ago.

4         Q.   And as it's represented on your

5    CV, you did not include any specifics or

6    reference to work during that time period

7    related to personal safety; is that right?

8         A.   As is written on the CV, the only

9    thing related to personal safety that I

10   called out in my report is covered there

11   by the words technology development.

12        Q.   Okay.  So sitting here today,

13   it's your position that when you wrote

14   technology development in your résumé,

15   there you were referring to safety-related

16   features?

17        A.   It is my representation that I

18   have enumerated in my report a piece of

19   work that I did on a safety-related

20   feature during my work on technology

21   development at the First Manhattan

22   Consulting Group.

23             MS. CARITIS:  Mr. Delaney, if we

24        could pop back up Exhibit 3, please,

25        this is the LinkedIn experience page.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER
2       BY MS. CARITIS:
3           Q.   And Mr. Weiner, again just take a
4       quick look at the skills you identified
5       outside of this litigation related to your
6       work at First Manhattan Consulting Group.
7       You said you have skills in e-commerce,
8       technical leadership, Web software and
9       loyalty programs; right?
10              MS. ELLIS:  Objection, form.
11              THE WITNESS:  Can you please show
12          me that on the screen.  I don't
13          remember.
14              MS. CARITIS:  Sorry.
15          Mr. Delaney, it's on the third page at
16          the top.
17              THE WITNESS:  And program
18          recommended these specific skills and
19          I accepted them to describe my time at
20          First Manhattan Consulting Group.
21      BY MS. CARITIS:
22          Q.   And while we have this up,
23      Mr. Weiner, if you could take a quick look
24      at the skills that are associated with
25      your 37 years of experience on your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 118

```
 1                      WEINER
 2      LinkedIn profile and to confirm that
 3      nowhere do those skills reference safety
 4      or risk management?
 5              MS. ELLIS:  Objection, form.
 6              THE WITNESS:  I believe I need to
 7          clarify, as I have done in my report,
 8          that everywhere where it says
 9          technical leadership on the skills on
10          my LinkedIn profile as I've enumerated
11          in my report, I am specifically
12          referring to both safety and risk
13          management and the management of
14          foreseeable risks as part of the
15          product development lifecycle that I
16          have used throughout my entire career.
17          So to be very specific to your
18          question, the word safety does not
19          appear in this skills section on
20          LinkedIn.
21      BY MS. CARITIS:
22          Q.   And to be very clear though, in
23      your report, which we'll get to in a
24      second, you only identified two instances
25      where you did any work related to physical
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 119

```
 1                     WEINER
 2      safety; right?
 3              MS. ELLIS:  Objection, form.
 4              THE WITNESS:  In my report, I
 5          enumerated two specific instances
 6          where I have had the personal
 7          experience of working on what you and
 8          I now agree to call physical safety.
 9      BY MS. CARITIS:
10          Q.   Okay.  So in the American Express
11      example on the screen right now, I think
12      you said technical leadership involved
13      safety.  You never did anything related to
14      physical safety when you were working at
15      American Express; right?
16              MS. ELLIS:  Objection, form.
17              THE WITNESS:  Again, American
18          Express I did technical leadership.
19          Technical leadership involves risk
20          management.  The risks that I was
21          managing at American Express were
22          financial and travel related risks,
23          they did not include personal safety
24          in the product development lifecycle.
25          We also provided an insurance product
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 120

```
 1                    WEINER
 2       as a travel agency to protect people
 3       that had injury as it related to
 4       travel.  So yes, there was some
 5       consideration of personal safety in
 6       the product development lifecycle at
 7       American Express as it relates to
 8       illness and other physical harms that
 9       can happen while traveling.
10  BY MS. CARITIS:
11       Q.   It's certainly not your testimony
12  that a company can simply purchase
13  insurance to cover any risk of bodily
14  injury that occurs through use of its
15  product; right?
16            MS. ELLIS:  Objection, form.
17            THE WITNESS:  I am not testifying
18       today that purchasing insurance
19       protects against foreseeable risks of
20       bodily harm at all, that is a correct
21       observation.
22  BY MS. CARITIS:
23       Q.   Okay.  So you've told us a few
24  times that in your opinion as you're
25  giving it today, that you have additional
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 121

1                         WEINER

2        safety-related experience that you believe

3        falls under technical leadership category.

4        But just to be very clear, in your

5        LinkedIn profile, in your experience

6        section and in your CV you've never

7        explicitly called out experience with

8        safety; is that right?

9                MS. ELLIS:  Objection, form.

10                THE WITNESS:  To answer your

11            question very specifically in my

12            LinkedIn profile, in my CV, I have not

13            used the word safety even once.

14                MS. CARITIS:  Let's look at

15            another --

16                MS. ELLIS:  We've been going

17            about another hour.

18                MS. CARITIS:  This is a good time

19            to break, thanks for the reminder.  We

20            can go off the record.

21                THE VIDEOGRAPHER:  We're going

22            off the record.  This is the end of

23            media unit 2.  The time is 11:19.

24                (Recess taken from 11:19 a.m. to

25            11:29 a.m.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 122

1                    WEINER

2            THE VIDEOGRAPHER:  We are back on

3        the record.  This is the beginning of

4        media unit 3.  The time is 11:30.

5    BY MS. CARITIS:

6        Q.    Mr. Weiner, we've just spent a

7    long time going through your experience

8    and your career.  We talked a little bit

9    about First Manhattan Consulting Group.

10   Just to round it out, you also spent three

11   years at American Express and you spent

12   two years after graduating as an analyst

13   at Booz Allen; is that right?

14       A.    That is exactly right.

15       Q.    And those two experiences at

16   American Express and Booz Allen, those

17   were focused on financial services, again

18   loyalty and travel clients; is that right?

19       A.    That is an accurate

20   representation of my time at Booz Allen

21   and American Express.

22       Q.    We just talked about what I'll

23   call your day jobs but along with your day

24   job, just like we're doing today, you also

25   have a expert consulting business; is that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 123

1                          WEINER
2        right?
3             A.   I have served as a consulting or
4        testifying expert on 25 cases over the
5        last 13 years.
6             Q.   And one way that you market your
7        expert services is through the SEAK expert
8        directory; is that right?
9             A.   I have a profile on the SEAK
10       expert directory.
11                 MS. CARITIS:  And Mr. Delaney, if
12            we could please pull up tab 9 that I
13            will mark as Exhibit 5.
14                 (Exhibit 5, SEAK expert directory
15            page, marked for identification.)
16       BY MS. CARITIS:
17            Q.   And Mr. Weiner, if you could just
18       take a moment again, you have the ability
19       to download this if it would be easier for
20       you, but this is what we pulled directly
21       from the SEAK expert directory related to
22       you but if you can just take a moment, you
23       would agree that this entry is talking
24       about you; right?
25            A.    I am familiar with this entry and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 124

1                       WEINER

2      it is talking about me.

3           Q.    Okay.  You created it?

4           A.    I worked on this entry myself.

5           Q.    And there's a section that says

6      specialties and experience of this expert

7      witness.  Do you see that at the top?

8           A.    Yes, I do.

9           Q.    And in the general specialty

10     section you identify yourself as a

11     specialist in information technology and

12     software engineering; is that right?

13          A.    That is the best categorization

14     that I was able to find using their

15     capabilities, yes.

16          Q.    And then there's also something

17     called keywords and search terms and

18     that's my understanding another kind of

19     filtering mechanism on the SEAK website to

20     allow folks to identify your expert

21     profile.  Is that consistent with your

22     understanding?

23          A.    Yes, those are additional terms

24     which people can search by.

25          Q.    And you selected the terms to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 125

1                    WEINER

2     associate with your profile; right?

3          A.   I did select those terms.

4          Q.   There's then a section on

5     additional information.  You see that?

6          A.   Right now it is blocked --

7          Q.   Sorry, Mr. Weiner, my fault.

8     There's another section called additional

9     information.  You're able to view that

10    section?

11         A.   I can view that section now as

12    well.

13         Q.   There's -- did you draft these

14    three paragraphs that we're looking at on

15    the screen?

16         A.   Those are words that I wrote,

17    yes.

18         Q.   You also identify your litigation

19    consulting services; is that right?

20         A.   That is correct, it says

21    litigation consulting services, and lists

22    some experience.

23         Q.   Okay.  Why don't you just -- if

24    we could go to the second page,

25    Mr. Delaney, please.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 126

1                    WEINER

2          And you here identify your

3    industry experience.  Do you see that

4    section?

5        A.   By industry experience I am

6    referring to certain verticals that I have

7    worked in, yes.

8        Q.   I again am bad at some of these

9    terms.  So verticals, what do you mean

10   when you say verticals?

11       A.   Sure.  In a general sense,

12   industries are categorized in two ways.

13   There are horizontal industries, like

14   software development, like technology

15   leadership, like product development, and

16   there are vertical industries like travel

17   and loyalty and financial services that

18   combine to make the overall map of

19   industries in the American society, for

20   lack of a better description.

21       Q.   Got it, okay.  So when you

22   identify your industry experiences you

23   select three buckets, travel industry;

24   right?

25       A.   Yep.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2        Q.   The loyalty industry?
 3        A.   Yes.
 4        Q.   Second.  And then the third,
 5   financial services; right?
 6        A.   Yes.
 7        Q.   Okay.  You wouldn't classify --
 8   well you don't classify yourself as an
 9   expert in the transportation industry more
10   broadly; right?
11             MS. ELLIS:  Objection, form.
12             THE WITNESS:  I'm afraid we might
13        struggle a bit with transportation
14        industry as it relates to airlines.
15        Are you defining a transportation
16        industry that doesn't include
17        airlines?
18   BY MS. CARITIS:
19        Q.   I guess more broadly it looks
20   here you write travel industry and you are
21   talking about American Express Travel and
22   United.com, which in my mind relate more
23   to the booking side of travel as opposed
24   to does the plane fly in the air.  But if
25   you want to explain the distinction, I was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 128

```
 1                       WEINER
 2       talking about the experiences as you
 3       articulated them on your expert profile.
 4              MS. ELLIS:  Objection, form.
 5              THE WITNESS:  I appreciate that
 6          and I do appreciate the opportunity to
 7          clarify with you.  I would just say
 8          that by travel industry I did mean to
 9          include airlines and by airlines, I do
10          believe they are part of
11          transportation broadly.
12       BY MS. CARITIS:
13          Q.   You're not an expert in
14       rideshare; correct?
15              MS. ELLIS:  Objection, form.
16              THE WITNESS:  By rideshare,
17          you're specifically referring to
18          companies that match people and move
19          them in cars?
20       BY MS. CARITIS:
21          Q.   Would you define rideshare, are
22       you an expert in rideshare?  That's a
23       defining term, that's an industry.
24              MS. ELLIS:  Objection, form.
25              THE WITNESS:  I'm actually not
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 129

```
 1                      WEINER
 2         familiar with an industry designation
 3         of rideshare but I have in certain
 4         Uber documents seen descriptions of
 5         rideshare as companies that match and
 6         move people in automotive vehicles.
 7         If we're talking about the Uber
 8         definition of rideshare, then yes, I
 9         do not have here listed rideshare.  I
10         have not worked on an Uber or Lyft
11         case before.
12     BY MS. CARITIS:
13         Q.   Outside of the Uber definition,
14     is there any other definition of rideshare
15     that you would use?
16             MS. ELLIS:  Objection, form.
17             THE WITNESS:  I would not use a
18         different definition of rideshare.  I
19         struggle a bit with the notion that
20         rideshare as an industry in the
21         broadest sense.
22     BY MS. CARITIS:
23         Q.   Are you aware that rideshares are
24     specifically regulated?
25         A.   I am aware of regulations that
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 130

```
 1                    WEINER
 2   relate to rideshare.  I believe you might
 3   have noticed in my report when I was
 4   talking about the definition of rideshare
 5   under the section on cameras, I enumerated
 6   a number of rideshare companies that are
 7   regulated as it relates to cameras.
 8        Q.   What is the gig economy?  You
 9   don't identify that as an industry in
10   which you have experience; right?
11             MS. ELLIS:  Objection, form.
12             THE WITNESS:  As it relates to
13        horizontal industries, software
14        development, app development,
15        technology development, encompass all
16        aspects of the software development
17        lifecycle and product development
18        lifecycle and yes, I would consider my
19        expertise applies to the gig economy.
20   BY MS. CARITIS:
21        Q.   I'm not asking you if your
22   expertise applies, I'm asking if you have
23   ever worked in the gig economy.
24             MS. ELLIS:  Objection, form.
25             THE WITNESS:  I think I would
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2        need you to be more specific in
 3        defining the gig economy for me to
 4        make sure I'm answering that
 5        correctly.
 6   BY MS. CARITIS:
 7        Q.   This is going to sound sassy and
 8   I don't mean it to but if you don't know
 9   what I mean by gig economy, fair to say
10   you're not an expert?
11             MS. ELLIS:  Objection, form.
12             THE WITNESS:  I would agree that
13        sounded sassy.  However, I'm trying to
14        be incredibly clear and honest because
15        my job here is to explain things to
16        the court and so I want to be really
17        precise for the sake of the people and
18        judges that are going to read this
19        work so when you say gig economy, what
20        jumps to mind are some travel
21        companies that I worked for that do
22        not have broad employees but they
23        allow contractors to use their
24        services for the sake of booking
25        travel and I'm wondering if you would
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 132

1                      WEINER
2          include that in your definition of a
3          gig economy because it does seem very
4          similar.
5     BY MS. CARITIS:
6          Q.   Okay.  So I just want to know how
7     you view yourself so it sound like you're
8     saying that you have experience in travel
9     related context that you view as similar
10    to gig economy; is that right?
11         A.   That is what I'm trying to say,
12    absolutely.
13         Q.   Okay.  In the SEAK profile that
14    we were just looking at, your expert
15    directory profile, you would agree it
16    doesn't include the word safety anywhere;
17    right?
18         A.   I can agree that the physical
19    word safety does not appear in this
20    profile as written.
21         Q.   You also don't identify any risk
22    management expertise in your expert
23    profile; right?
24              MS. ELLIS:  Objection, form.
25              THE WITNESS:  As we discussed a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 133

1                      WEINER
2          few times, technology development
3          inherently involves risk management
4          and therefore I do believe the words
5          technology development include the
6          concept of risk management.
7    BY MS. CARITIS:
8          Q.   Are you aware that the SEAK
9    expert directory explicitly included
10   keywords for risk management safety that
11   you could have selected if you wanted to?
12         A.   I am aware of all of the SEAK
13   options.  They limit me to 20 and I did
14   not pick those in the top descriptors of
15   myself.
16         Q.   So as a top descriptor of your
17   experience for people looking to hire you
18   as an expert, you chose to not include the
19   keyword safety; right?
20              MS. ELLIS:  Objection, form.
21              THE WITNESS:  The keyword safety
22         does not appear in the list of
23         descriptors for me, absolutely.
24   BY MS. CARITIS:
25         Q.   And you made the choice to not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      include safety as a key word associated
 3      with your profile; right?
 4              MS. ELLIS:  Objection, form.
 5              THE WITNESS:  I prioritized other
 6          keywords above the word safety.
 7      BY MS. CARITIS:
 8          Q.   Another keyword that you could
 9      have included in your profile was risk
10      management.  You understand that?
11              MS. ELLIS:  Objection, form.
12              THE WITNESS:  The words risk
13          management on the SEAK profile are
14          available.  I believe by talking about
15          software development and technology of
16          the leadership, people who are looking
17          for my particular skill set would know
18          that I am experienced in risk
19          management as it relates to technology
20          development and software development.
21      BY MS. CARITIS:
22          Q.   But you chose again not to
23      explicitly include the keyword risk
24      management in your SEAK expert witness
25      profile; right?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 135

```
 1                    WEINER
 2          MS. ELLIS:  Objection, asked and
 3       answered like three times already.
 4          MS. CARITIS:  He has not answered
 5       this question.
 6  BY MS. CARITIS:
 7       Q.   Go ahead.
 8       A.   I have not chosen the term risk
 9  management in the top 20 terms I was
10  allowed to choose on the SEAK profile
11  system.
12       Q.   Mr. Weiner, you are testifying
13  for plaintiffs about both safety and risk
14  management; right?
15       A.   My opinions are very well
16  enumerated in this report and the basis
17  for those opinions.  What I have described
18  as my expertise in this report is
19  technology, product development and
20  software engineering.  I have not in any
21  way, shape or form tried to put myself up
22  as experienced outside those areas.
23       Q.   I'm asking a different question.
24  The substance of your opinions relate to
25  Uber's prioritization of safety
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 136

```
 1                    WEINER
 2    priorities; right?
 3         A.   Cover the product development
 4    lifecycle and the prioritization choices
 5    that Uber made as demonstrated in their
 6    artifacts on prioritizing risk management
 7    as it relates to safety issues.
 8         Q.   As you just articulated, it's the
 9    two core components of your expert report
10    in this litigation concerns safety and
11    risk management; right?
12              MS. ELLIS:  Objection, form.
13              THE WITNESS:  I'm sorry, I'm
14         trying so hard to be helpful here but
15         the two, three primary expertises I'm
16         bringing to bear are technology,
17         product development and software
18         engineering.  I worked extremely hard
19         on this report not to stray from my
20         core experience into things like
21         criminology or motivation or crime
22         that I am not presented myself as an
23         expert for.  In my report I've spoken
24         to the practices and industry
25         standards on technology, product
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2        development and software engineering.
 3    BY MS. CARITIS:
 4        Q.   Okay.  I'm not talking about your
 5    expertise, I'm talking about what your
 6    opinions are.  The opinions you are
 7    providing in this litigation are that Uber
 8    did not prioritize safety and it did not
 9    have appropriate risk management; is that
10    correct?
11             MS. ELLIS:  Objection, form.
12             THE WITNESS:  I am struggling
13        with your characterization of my
14        opinions.  If you'd like, we can go
15        through my opinions in my report and
16        try to highlight how I believe they
17        specifically speak to technology,
18        product development and software
19        engineering.
20    BY MS. CARITIS:
21        Q.   I'm literally just asking you
22    high-level questions.  Let me break it
23    down.  I think I'm conflating things.
24             You would agree that one of the
25    opinions that you provide in your report
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 138

```
 1                        WEINER
 2     is that Uber's product did not
 3     appropriately prioritize safety; is that
 4     fair?
 5          A.   Which opinion are you referring
 6     to?
 7          Q.   I am just when I'm reading your
 8     whole report, that's what I take away.  Do
 9     you disagree that you're providing an
10     opinion concerning whether or not Uber
11     properly prioritized safety initiatives in
12     its product?
13               MS. ELLIS:  Objection, form.
14               THE WITNESS:  Give me one second,
15          I think I can be helpful here.
16               My opinion 2 reads Uber failed to
17          incorporate industry standard
18          risk-based practices into its product
19          development lifecycle and instead
20          prioritized growth, cost reduction and
21          competition over the timely
22          implementation of safety-related
23          features.
24               (Computer froze).
25               (Discussion off the record.)
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 139

```
 1                    WEINER
 2            THE VIDEOGRAPHER:  We are back on
 3        the record.  The time is 11:54.
 4    BY MS. CARITIS:
 5        Q.    Mr. Weiner, we took a short
 6    break.  We had some technical challenges
 7    and I believe the last thing that we got
 8    on the record, you were reading for me
 9    your opinion 2 on page 44 of your report,
10    and I'm not trying to be tricky, I just
11    want to make sure I understand kind of a
12    concise statement of Exhibit -- excuse me,
13    opinion 2.  And based on my read, you're
14    saying that Uber failed to incorporate
15    industry standard risk-based practices
16    when it developed its product and instead
17    prioritized growth, cost reduction and
18    competition over the timely implementation
19    of safety features; right?  That's a fair
20    read of the first chunk of your opinion 2?
21            MS. ELLIS:  Objection, form,
22        misstates his report.  I think there
23        was a word into versus when that was
24        substituted.
25    ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 140

```
 1                    WEINER
 2    BY MS. CARITIS:
 3        Q.   That was inadvertent.  I really
 4    just want to try and get an understanding
 5    of your opinion.  It's my understanding of
 6    your opinion that you're saying Uber
 7    didn't take into account some industry
 8    standard risk-based practices that we'll
 9    discuss in a minute and instead
10    prioritized growth, profits, other things
11    instead of prioritizing implementing
12    additional safety features?
13            MS. ELLIS:  Objection, form.
14    BY MS. CARITIS:
15        Q.   Is that your opinion in opinion
16    2?
17        A.   Do you remember my job here is to
18    make my opinions and my bases as clear as
19    possible to you so that you can be
20    informed on what I've written.  What I
21    wrote was that Uber failed to incorporate
22    industry standard risk-based practices
23    into its product development lifecycle and
24    instead prioritized growth, cost reduction
25    and competition over the timely
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 141

1                    WEINER

2      implementation of safety-related features

3      that its own internal studies indicated

4      could mitigate risks of sexual assault and

5      sexual misconduct.

6              What I am doing is applying

7      industry standard practices to review

8      Uber's documents and form an opinion based

9      on what I've laid out here as the basis

10     for my opinion which cites and enumerates

11     the Uber documents that I'm talking about.

12     So what I've done is used my experience

13     and industry standards to write for the

14     court my opinion of what materials I

15     consumed and research I did in the form of

16     this opinion.

17         Q.   Okay.  I think we're talking over

18     each other.  Is it your opinion that Uber

19     should have implemented additional safety

20     features from the time of its inception to

21     present day, yes or no?

22              MS. ELLIS:  Objection, asked and

23         answered.  He literally read his

24         opinion.

25              MS. CARITIS:  The opinion doesn't

Page 142

1                        WEINER
2          answer it.  That's why I'm asking him
3          a very specific question.
4     BY MS. CARITIS:
5          Q.   Mr. Weiner, is it your opinion
6     that from Uber's inception to present day,
7     it should have implemented additional
8     safety features?
9              MS. ELLIS:  Objection, asked and
10             answered.
11             THE WITNESS:  Alex, I'm
12             struggling with the word should.
13             You're asking me to use a word I
14             didn't use.  I do not in any of my
15             opinions use the word should.
16    BY MS. CARITIS:
17         Q.   Okay.  So you are not providing
18    an opinion that from the time of this
19    inception to today Uber should have done
20    anything?
21             MS. ELLIS:  Objection, form.
22             THE WITNESS:  I'm sorry, Alex.
23             What I am opining specifically is that
24             Uber failed to incorporate industry
25             standard risk-based practices into its

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER

 2          product development lifecycle and

 3          instead prioritized growth, cost

 4          reduction and competition over the

 5          timely implementation of

 6          safety-related features that its own

 7          internal studies indicate could

 8          mitigate risks of sexual assault and

 9          misconduct.  I am looking at a

10          preponderance of evidence, which is

11          thousands of documents, tens of

12          thousands of pages and almost 500

13          hours of deposition testimony to allow

14          the court to see that in my opinion

15          they did not, and I'll quote it again,

16          failed to incorporate industry

17          standard risk-based practices.  I

18          don't have an opinion of what they

19          should or shouldn't do.

20      BY MS. CARITIS:

21          Q.   So you have no opinion that Uber

22      should have implemented any additional

23      safety features, you're not providing an

24      opinion on that?

25               MS. ELLIS:  Objection, form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 144

1                    WEINER
2              THE WITNESS:  So let's look at
3         the word should.  What are you trying
4         to mean with the word should?
5    BY MS. CARITIS:
6         Q.   Should they have done it,
7    Mr. Weiner?  Is it your opinion that Uber
8    should have implemented any additional
9    safety features from the time of inception
10   to today?
11             MS. ELLIS:  Objection, form.
12             THE WITNESS:  Perhaps this will
13        -- it is my opinion that if they had
14        not failed to incorporate industry
15        standard risk-based practices, there
16        would have been more safety features.
17   BY MS. CARITIS:
18        Q.   Okay.  So you think Uber should
19   have adopted additional safety features?
20             MS. ELLIS:  Objection, form.
21             THE WITNESS:  I'm really
22        struggling with the word should.
23        Should has a meaning for me.  It's got
24        context to it.  I've been really
25        careful with the words because I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 145

1                    WEINER
2          want to confuse the court or the jury
3          as it relates to my opinions.  Should
4          is not a word that right now in this
5          moment you and I are agreeing what
6          you're asking me to imply with it.
7     BY MS. CARITIS:
8          Q.   So you're not willing today to
9     say one way or the other whether Uber
10    should have done anything; is that right?
11              MS. ELLIS:  Objection, form.
12              THE WITNESS:  If you could be a
13         bit patient with me to clarify with
14         you the word should, I might be able
15         to give you a more clear answer but on
16         the surface I am struggling with that
17         word.
18    BY MS. CARITIS:
19         Q.   Mr. Weiner, you told me earlier
20    that you make $260,000 annually for your
21    day job at the Fed right?
22         A.   That is accurate, yes, I make --
23         Q.   You started billings plaintiffs
24    for your work in this case in May of 2025;
25    is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 146

1                         WEINER
2          A.   That is correct.
3          Q.   You sent plaintiff an invoice in
4     May; right?
5          A.   Yes.
6          Q.   Sent them one in June?
7          A.   Correct.
8          Q.   Sent them one in July?
9          A.   Correct.
10         Q.   Sent them one in August?
11         A.   Correct.
12         Q.   Sent them one in September?
13         A.   I have worked on this case
14    continuously in addition to my job at the
15    New York Fed over those months.
16              MS. CARITIS:  Okay.  So you -- if
17         we could, Mr. Delaney, please mark tab
18         50 as Exhibit 6.
19              (Exhibit 6, invoices, marked for
20         identification.)
21    BY MS. CARITIS:
22         Q.   And Mr. Weiner, Exhibit 6 is a
23    compilation of all of the invoices that
24    plaintiff's counsel produced to us last
25    night and represented were invoices

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1               WEINER

2     submitted in connection with work done in

3     this case.  If you want to just take a

4     quick moment to confirm these are, in

5     fact, the invoices you submitted.  It

6     might be easiest for you to just download

7     them, otherwise Mr. Delaney can click

8     through but they are quite a few pages.

9          A.   I am most familiar with this

10    format.  If Mr. Delaney will just click

11    through I will be able to help.  That

12    looks accurate.  Next one?  Next page.

13    Next page, next page, perfect, next page.

14    Next page.  And the last set.  Next page.

15    Yes.  I can confirm these resemble what I

16    submitted, yes.

17         Q.   Okay.  Let's look at the May

18    invoice.  It's page 1 of the compilation,

19    Mr. Delaney, and this document reflects

20    time billed in the month of May.  If we

21    look on the back, the second page, you

22    were paid $83,750; right?

23         A.   I have been paid for this

24    invoice, that is correct.

25         Q.   Okay.  And that was for one month

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 148

```
1                      WEINER
2     of work; right?
3          A.   That is correct.
4          Q.   And then you submitted another
5     invoice for June for the work you've done
6     in this case.  Mr. Delaney, if you could
7     please go to the third page, there's our
8     June invoice and if we go to the second
9     page of the June invoice, we see that in
10    June you billed an additional $92,375;
11    right?
12         A.   That is correct.
13         Q.   Okay.  Two months.  Now let's
14    look at our third month.  You submitted a
15    July invoice.  Scroll through the next few
16    pages, Mr. Delaney, July, okay.  And in
17    July you were paid $110,250 for your work
18    as an expert in this case; right?
19         A.   That is correct.
20         Q.   So far three months of work you
21    billed a little more than 83,000, a little
22    more than 92,000, and a little more than
23    110,000.
24              Fair to say in those three months
25    you're nearing your annual salary at the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 149

1                        WEINER

2    Fed already?

3         A.   It is true that the sum of those

4    three amounts nears my annual salary at

5    the Fed.

6         Q.   Okay.  You submitted another

7    invoice in August.  This one is even

8    bigger than the July invoice.  It's three

9    pages long and it totaled $124,750 for one

10   month of work on this case; right?

11        A.   This was the month that we worked

12   on the report primarily and as you've

13   seen, my report is extremely detailed and

14   thorough so yes, that is correct.

15        Q.   You were paid $124,750 for that

16   work?

17        A.   Um-hum.

18        Q.   Okay.  Now let's look at the last

19   invoice we have so far so the September

20   invoice.  There you were paid -- now, your

21   report -- let's see.  I see.  This is

22   through -- I can tell by the date, this is

23   through the drafting of the report so I

24   see that your last entry is September 26,

25   2025.  That's the date that the report was

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 150

1                        WEINER
2      served; right?
3           A.   That is correct.
4           Q.   So you were paid $55,400 in the
5      month of September; right?
6           A.   You might recall that the report
7      date shifted a number of times.  We had it
8      materially drafted by the prior report
9      draft date.
10          Q.   I did some math and based on my
11     calculation just adding up the final
12     totals in those five invoices for five
13     months, you were paid by plaintiffs
14     approximately $465,000; is that right?
15          A.   It is accurate to say I have
16     billed plaintiffs for $465,000.  I have
17     not been paid $465,000.
18          Q.   Do you anticipate to be paid the
19     $465,000?
20          A.   I do anticipate to be paid the
21     $465,000.
22          Q.   Again for five months of expert
23     work in this litigation, you made $200,000
24     more than what you get paid at your day
25     job in a year; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 151

1                    WEINER
2        A.   It is truthful that I have been
3    paid more than my base salary at the Fed a
4    total of $200,000 when these invoices are
5    fully paid.
6        Q.   These invoices end September 26
7    as we just said.  We're sitting here
8    today, October 28.  Fair to say that
9    you'll be submitting a sixth invoice to
10   plaintiffs for any work done in connection
11   with this deposition?
12       A.   I have billed on an hourly basis
13   for the work that I do and I have done
14   hourly work in this month.
15       Q.   How did you prepare for today's
16   deposition, did you meet with counsel?
17       A.    My preparation for this
18   deposition involved a set of work that I
19   did to review my work and review the ISO
20   standards and a set of documents.  I also
21   met yesterday with the counsel for
22   plaintiff here in this office in
23   New York City.
24       Q.   Approximately how many hours have
25   you billed, excluding today's deposition,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 152

1                      WEINER
2      so literally the time you're spending
3      today in preparing for your deposition in
4      the month of October?
5          A.   I have not calculated that amount
6      but I could certainly do so if that's
7      something you would like to know.
8          Q.   An approximation would be great.
9      Can you give me an approximation of the
10     amount of time you've billed in October on
11     this case?
12         A.   You've now asked two questions.
13     You've asked what I've done in October and
14     you asked what I've done to prepare for
15     this deposition.  There are two things
16     that have happened in the month of
17     October.  There has been significant
18     de-designation of certain materials that
19     I've been asked to review and there was
20     the deposition I was asked to review.
21     That was not directly preparing for this
22     deposition.  And then there was the time
23     dedicated and spent preparing for this
24     deposition.  Your first question was how
25     much time I have spent preparing for the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 153

1              WEINER
2    deposition.  My guesstimate is in the
3    order of 15 to 20 hours.
4         Q.   What about the first bucket,
5    additional work done on further documents
6    or depositions in the month of October?
7              MS. ELLIS:  Objection, form.  Is
8         there a question there?
9    BY MS. CARITIS:
10        Q.   Yes, how much time have you spent
11   in that first bucket reviewing any
12   additional documents or deposition
13   testimony in October?
14             MS. ELLIS:  Objection, form.
15             THE WITNESS:  I can calculate
16        that on a break.
17   BY MS. CARITIS:
18        Q.   Do you have an approximate?
19        A.   I spent two weeks at a retreat so
20   I was offline for a chunk of it.  I just
21   really wouldn't want to guess and give an
22   impression that isn't accurate.  It seems
23   like a very important number to have right
24   and so with your consideration, I would
25   prefer to get a real number over the lunch

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 154

1                    WEINER
2      break, if that would be acceptable.
3           Q.   Thank you.  Appreciate that.
4      We'll take a look at any additional time
5      spent reviewing materials that came in
6      after your report was submitted but you've
7      said that you are guessing about 15 to 20
8      hours prepping.  Do you charge the same
9      $500 an hour for deposition prep and
10     deposition time?
11          A.   I charge the same sitting on an
12     hourly basis for all the work that I do in
13     my litigation consulting.
14          Q.   Okay.  So let's -- I'll give the
15     lower end.  So if you worked about 15
16     hours to prep for the deposition, 15 times
17     500, about 7,500 additional dollars that
18     you'll be paid in October for prep work;
19     is that right?
20          A.   That is a fair calculation of the
21     15 hours, yes.
22          Q.   And then we have seven hours
23     today, we'll all cross our fingers we
24     don't use it, but you will also bill
25     plaintiff's counsel and be paid $500 for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER

2       every hour we spend in our deposition

3       today; is that right?

4            A.   At the risk of now me being

5       snarky, I find it highly unlikely you

6       won't spend seven hours.

7            Q.   Fair.

8            A.   That said, absolutely I will bill

9       on an hourly basis for the work that I do

10      on this case.  Being completely accurate,

11      detailed and effective in my role trying

12      to explain complex technology issues to a

13      judge and jury are very important to me

14      and as you probably looked at some of my

15      earlier reports, it is something that I

16      take very seriously and spend the time

17      needed to ensure I am portraying both

18      sides of the picture, both the plaintiff

19      and the defendant side so that I am

20      impartial and thorough.  And so I have

21      done an incredible amount of work on this

22      case because over two million documents

23      were produced.  I would read over 10,000

24      pages and almost 400 or 500 hours of

25      depositions, so yes, I have billed for the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 156

1                    WEINER
2    work that I have done.
3         Q.   (Inaudible) report, you identify
4    that you've testified I think you said two
5    dozen times before as an expert witness.
6    Let me be precise and find it.
7         A.   I think I used that number on
8    this conversation, that is an accurate
9    representation.  I have been engaged in
10   two dozen cases, 25 to be exact.
11        Q.   I'm on paragraph 18 of your
12   report.
13        A.   Okay.
14        Q.   You note that as a testifying and
15   consulting expert since 2011, you've
16   served in almost two dozen matters.
17        A.   Yes.
18        Q.   Okay.  In those two dozen matters
19   to the extent that's not looping in
20   everything, in all of your expert work
21   experience, have you ever before been
22   tasked with analyzing whether or not a
23   company complied with industry standards
24   related to their implementation of safety
25   features?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 157

1                    WEINER
2          MS. ELLIS:  Objection, form.
3          THE WITNESS:  I have been
4      employed and recognized by the court
5      as an expert in applying the practices
6      of the product development lifecycle
7      and assessing the risks that occur
8      that are inherent to the particular
9      clients I've evaluated.
10   BY MS. CARITIS:
11       Q.   Okay.
12       A.   Yes, of course I've been doing
13   that most of this career.
14       Q.   Which cases specifically did
15   you -- were you tasked with analyzing a
16   party's product development and
17   determining whether or not they
18   appropriately included risk management,
19   what specific cases are you talking about
20   there?
21          MS. ELLIS:  Objection, form.
22          THE WITNESS:  So on this
23      document, I have only listed a small
24      set of cases.  The product development
25      lifecycle was evaluated in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 158

```
 1                    WEINER
 2        considerable depth in a case not
 3        enumerated on this list but is in the
 4        list of cases which is known as Bank
 5        versus Bank Software Company where
 6        they were being sued for gross
 7        negligence in the implementation of
 8        their software and I was asked to look
 9        at all of the practices of the
10        software development lifecycle,
11        including specifically the risk
12        management practices that they
13        employed in their process.
14   BY MS. CARITIS:
15        Q.   Who were you employed by there --
16   excuse me, retained by there, the
17   plaintiff or the defense?
18        A.   In that particular case, the
19   attorneys for the defense engaged my
20   services.
21        Q.   And what were the allegations?
22   You said that the defendant was being sued
23   for negligence.  What was the specific
24   allegation?
25             MS. ELLIS:  Objection, form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 159

1                          WEINER
2              THE WITNESS:  In the furtherance
3         of their product development
4         lifecycle, they were accused of gross
5         negligence in their execution of that
6         product development lifecycle for the
7         sake of implementing a product for the
8         plaintiff.
9    BY MS. CARITIS:
10        Q.   What product did they implement
11   and what did the plaintiffs say was
12   grossly negligent about their
13   implementation?
14             MS. ELLIS:  Objection, form.
15             THE WITNESS:  This was a
16        confidential arbitration.  I'm not
17        sure those details are something I
18        should be going into.  I can talk in a
19        general way about the case but that
20        was a confidential arbitration under
21        the American Arbitration Association
22        guidelines.
23   BY MS. CARITIS:
24        Q.   Were the gross negligence
25   allocations related to claims of physical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                        WEINER
2       harm?
3                MS. ELLIS:  Objection, form.
4                THE WITNESS:  I feel comfortable
5           saying that the gross negligence
6           claims had nothing to do with physical
7           harm.  They were the management of
8           risks in the software development
9           lifecycle for a product in the banking
10          space.
11      BY MS. CARITIS:
12          Q.   Can you provide me any more
13      details about the product in the banking
14      space or is the rest of that confidential?
15          A.   I feel uncomfortable going much
16      further but again, if you have more
17      specific questions I would consider them.
18      If they would be helpful in understanding
19      the work that I have done, absolutely.
20          Q.   I want to understand the product
21      that you analyzed as through that
22      engagement.  What was the banking product
23      that you were analyzing in that
24      litigation?
25          A.   It's safe to say it was a product

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 161

```
 1                    WEINER
 2    used by a bank to implement banking
 3    services.
 4        Q.   Okay.  And you said that that's
 5    an example you can give me of a time when
 6    your expert experience involved the
 7    product lifecycle and risk management.
 8        A.   Yes.
 9        Q.   The risk management there had
10    nothing to do with personal safety; right?
11            MS. ELLIS:  Objection, form.
12            THE WITNESS:  We specifically
13        referred to ISO 30100 quite a number
14        of times, the ISO standard relating to
15        risk management.  We did not have any
16        considerations related to personal
17        safety.
18    BY MS. CARITIS:
19        Q.   Okay, so that's helpful.  Thank
20    you for bringing in the standard.
21            You were providing me there an
22    instance previously where you've relied on
23    -- is it ISO or I-S-O?
24        A.   ISO.
25        Q.   That's an instance where you
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 162

1                          WEINER
2       relied on the ISO standards that you
3       discuss in this case in a prior expert
4       report; correct?
5            A.    That is, absolutely.  I'll also
6       refer to the ISO standards and the Newport
7       Hotel Group versus InfoFusion case that I
8       was just deposed on earlier this year and
9       I believe we provided you that deposition
10      as well as the ISO standards enumerated in
11      that deposition that I relied on.  They
12      are all spelled out.
13           MS. CARITIS:  I don't believe
14           we've been provided any deposition
15           transcripts so Tiffany, those were
16           requested so if you have them in your
17           possession, we request --
18           MS. ELLIS:  Counsel, we
19           determined based on your deposition
20           notice that it did not qualify for
21           production and is not appropriate for
22           production in the case.
23           MS. CARITIS:  He just referenced
24           it and is relying on it to support his
25           expertise.  I'm happy to talk to you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 163

```
 1                    WEINER
 2        off the record but for the record,
 3        consistent with our notice of
 4        deposition, we would request any
 5        transcripts within Mr. Weiner's
 6        possession concerning his prior
 7        testimony that he just referenced
 8        himself.
 9            MS. ELLIS:  I'm happy to have
10        this discussion off the record but I
11        will represent to you that it's my
12        understanding this was not within the
13        bounds of what was requested in the
14        deposition notice.
15    BY MS. CARITIS:
16        Q.   Mr. Weiner, are you relying --
17    you mentioned it was like the hotel -- is
18    it the Newport Hotel Group versus
19    InfoFusion case?
20        A.   You were asking me about my prior
21    discusses on risk management and I'm not
22    going to disagree with Tiffany on the
23    legal matter but I did refer to ISO
24    standards in that case and I did provide
25    counsel with deposition in that case.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 164

1                    WEINER
2        Q.   So you provided counsel with a
3    transcript of your deposition from the
4    Newport Hotel Group LLC for InfoFusion and
5    you're relying on that prior experience
6    regarding ISO standards; is that fair?
7            MS. ELLIS:  Objection, form.  I
8        think that misstates the evidence.  He
9        simply said that that's a place where
10       he discussed the ISO standards.
11           THE WITNESS:  Yeah, I didn't use
12       the word rely.  I said as an example
13       where you asked a specific question
14       about where I had used risk
15       management, so I did not use the word
16       rely for the sake of this case, no.
17   BY MS. CARITIS:
18       Q.   Plaintiff's counsel has that
19   transcript?
20       A.   It is honest to represent that
21   plaintiff's counsel has that transcript.
22       Q.   Why did you provide that specific
23   transcript to plaintiff's counsel?
24       A.   Plaintiff's counsel had asked if
25   they could see a transcript of a recent

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 165

1           WEINER
2       deposition.  I checked with the attorneys
3       in that case and they gave me that
4       permission.
5           Q.   So that case, you said you relied
6       on the ISO standards there.  Were you --
7       let's see if you told me, were you
8       retained by the Hotel Group or InfoFusion?
9           A.   In that case, I was retained by
10      attorneys representing the Hotel Group.
11      I've never actually been retained by a
12      defendant or a plaintiff.  I've been
13      retained by attorneys to provide expert
14      opinions in cases.
15          Q.   What was the -- what were the
16      allegations in the Newport Hotel Group
17      case?
18              MS. ELLIS:  Objection, form.
19              THE WITNESS:  In the Newport
20          Hotel Group case, InfoFusion was
21          accused of not following standard
22          practices.
23      BY MS. CARITIS:
24          Q.   Regarding what?
25              MS. ELLIS:  Objection, form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 166

```
 1                      WEINER
 2           THE WITNESS:  InfoFusion provided
 3       technology services to Newport Hotel
 4       Group.  Again this was a case where it
 5       is available to see the -- it's in the
 6       Rhode Island public forum for you to
 7       see certain details, but I'm happy to
 8       answer all those questions, but the
 9       Newport Hotel Group was suing
10       InfoFusion over their industry
11       standard practices as a technology
12       service provider.
13   BY MS. CARITIS:
14       Q.   Was InfoFusion providing
15   technology services concerning safety?
16           MS. ELLIS:  Objection, form.
17           THE WITNESS:  I'm going to help
18       both of us by saying InfoFusion was
19       not providing services regarding
20       physical safety.
21   BY MS. CARITIS:
22       Q.   Okay, so I think my question
23   initially was whether in your prior
24   litigation service you've ever utilized
25   the ISO standards to analyze a company's
```

Page 167

```
 1                     WEINER
 2     prioritization of safety.
 3              MS. ELLIS:  Objection, form.
 4     BY MS. CARITIS:
 5         Q.   And if I didn't answer that,
 6     let's just ask it now.
 7         A.   I don't believe that was your
 8     question.
 9         Q.   My fault, my brain.
10              Have you ever in your prior
11     litigation experience utilized ISO
12     standards to evaluate a company's
13     prioritization of safety features?
14         A.   If you will allow me to do this,
15     I will reword that answer.  I have never
16     provided expert testimony on the use of
17     ISO standards as it relates to physical
18     safety features.
19         Q.   Thank you for the clarification.
20              So far we've talked about two
21     cases, prior litigation experience cases,
22     where you have utilized ISO standards.
23     Are there any other of your -- I think you
24     told me 25, about two dozen cases where
25     you've analyzed the ISO standards in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 168

1                     WEINER

2      connection with your expert report or

3      testimony?

4          A.   If you'll bear with me just a

5      second, I'm thinking through 25 things to

6      give you a precise answer.

7               The Newport Hotel Group and the

8      Bank versus Bank Software Company were the

9      two cases where I relied on ISO standards

10     to help augment my professional experience

11     and to explain them so those are the only

12     two.

13              MS. CARITIS:  I will say given we

14          went on and off the record a few

15          times, I have no idea how long we're

16          going so when we're at an hour,

17          Tiffany or other folks, let me know.

18          I completely lost track of time.

19              MS. ELLIS:  We're very close to

20          it now.

21              MS. CARITIS:  I'm happy to take

22          a break if we want to go off the

23          record.

24              THE VIDEOGRAPHER:  We are going

25          off the record.  This is the end of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 169

1                           WEINER

2          media unit 3.  The time is 12:26.

3                 (Lunch recess taken at

4          12:26 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 170

1                    WEINER

2          A F T E R N O O N    S E S S I O N

3              (Time noted:  1:12 p.m.)

4      B R U C E    W E I N E R,    resumed and

5          testified as follows:

6                  THE VIDEOGRAPHER:  We are back on

7          the record.  This is the beginning of

8          media unit 4.  The time is 1:12.

9      CONTINUED EXAMINATION

10     BY MS. CARITIS:

11         Q.   Good afternoon, Mr. Weiner, we're

12     back from our lunch break.  And I want to

13     start by diving in a little bit on some of

14     the specifics in your report so I'm going

15     to be referring to it again.  It's my

16     understanding you have that paper copy in

17     front of you.

18         A.   (Indicating).

19         Q.   Great.  If you could please take

20     a look at paragraph 29.

21         A.   Yes.

22         Q.   Except I'm realizing I got ahead

23     of myself.  Can we please go to 9, please,

24     first?  I'm sorry, I'm going to get it,

25     paragraph 5 on page 2.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 171

1                        WEINER
2        A.    Yes.
3        Q.    Okay.  Mr. Weiner, this morning
4    we talked a lot about your experience, a
5    lot about the litigation work that you've
6    done.  I want to now talk about some of
7    the specifics that you flagged for me a
8    few times.  It starts at the very bottom
9    of paragraph 5 on the page 2 and then it
10   goes to page 3.
11            Curtis, if we could see the top
12   of page 3.  Perfect.
13            All right.  You include the
14   sentence at the end of your paragraph 5,
15   "This included products that incorporated
16   multiple safety-related features,
17   including physical safety (safety from
18   assault) as applicable to this case."
19            So first off, Mr. Weiner, thank
20   you there for kind of giving us that
21   clarity that we're working with
22   throughout.  When we have this discussion,
23   I'm going to be talking about physical
24   safety that I view and understand as
25   distinct from a financial crime or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 172

1                     WEINER
2       something else that could be offensive to
3       an individual that is not physical safety.
4       Is that fair?
5           A.   Yes, I use the term physical
6       safety myself, absolutely.  Happy to do
7       so.
8           Q.   Okay, great.  So I want to now
9       talk about the specific products that you
10      are referring to at the end of paragraph 5
11      and throughout your report that
12      incorporated, quote, multiple
13      safety-related features, including
14      physical safety (safety from an assault).
15               And based on my review of your
16      report, the first time I see you flag one
17      of these physical safety-related features
18      is in paragraph 9.
19          A.   Correct.
20          Q.   In paragraph 9 you're discussing
21      experience from 1994 to 1998 when you
22      worked at the First Manhattan Consulting
23      Group.  Do you see where I am?
24          A.   I do.
25          Q.   And it was -- FMCG was a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 173

```
 1                      WEINER
 2      management consulting firm contracted by
 3      financial services firms; right?
 4           A.   That is right.
 5           Q.   And you identify in the next
 6      sentence in this role, "I worked for a few
 7      banks on software products on features
 8      focused on physical safety of customers
 9      engaging with ATMs especially late at
10      night and in high-risk areas."
11                Do you see where you wrote that?
12           A.   I do.  I see that right here on
13      the page.
14           Q.   What banks did you work for
15      concerning software products with features
16      focused on physical safety?
17                MS. ELLIS:  Objection, form.  To
18                the extent that you can answer and
19                it's not confidential, feel free.
20                THE WITNESS:  As I mentioned it
21                has been a pattern of behavior in all
22                the cases I have worked on that I do
23                not disclose the names of clients and
24                consulting engagements that are under
25                prior confidentiality agreements.  I
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 174

1                    WEINER

2          can say that the three banks that I'm

3          specifically referring to here are

4          large money center banks in the

5          New York area that have large ATM

6          networks around the world.

7    BY MS. CARITIS:

8          Q.    All right.  I understand you're

9    unable to provide specifics but first you

10   defined few as three banks; is that right?

11         A.    This particular term when I said

12   few, I am specifically referring to three.

13         Q.    Okay.  And to the extent they all

14   utilize different software product

15   features, please let me know but I'm going

16   to ask a broader question.

17             Can you please describe the

18   software products with features that

19   focused on physical safety of customers?

20         A.    Sure.  They were different for

21   each one.  As I'm sure you can imagine,

22   the physical safety of customers in an ATM

23   setting is an important inherent risk,

24   foreseeable risk that builders of software

25   for people interacting with ATMs and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 175

```
 1                    WEINER
 2    scheduling resource around ATMs need to
 3    consider.  We're talking about cash, we're
 4    often talking about late at night, we're
 5    talking about sometimes being exposed on
 6    streets in high crime areas.  This is an
 7    area of consideration that is extremely
 8    important for the makers and those who
 9    manage ATM networks.
10             So in one case, we were working
11    on a piece of software whose job it was to
12    schedule security guards and cash
13    operators to pull and feed cash into ATMs
14    and we very much considered safety risks
15    in the development of that software.
16             And another we were working on
17    one of the early cellular-based models for
18    streaming video from an ATM because these
19    were ATMs in locations that did not have
20    hardwired connections for the ATM to
21    stream and communicate information.
22             And then the third case we were
23    dealing with considerations of lighting
24    systems and physical office capabilities
25    and security doors for getting people in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

 1                    WEINER
 2   and out of ATM locations, the kind of
 3   things that were recorded in the vicinity
 4   of the ATM and the lighting systems that
 5   were used to help illuminate the area.
 6        Q.   I want to break that down.  You
 7   say software products with features.  That
 8   would refer to the first product you
 9   identified and that was software that
10   assisted with scheduling of security
11   guards and other individuals that would be
12   physically handling the cash in the ATMs?
13        A.   In that particular case, we were
14   talking about that software, yes.
15        Q.   Okay.  When you were engaged with
16   this client, I understand you can't give
17   me the name, this bank, they already had
18   ATMs in place I assume; is that right?
19        A.   They did have ATMs in place in
20   some locations.  This particular project
21   was about expanding that ATM network.
22        Q.   Okay.  And is it fair to say that
23   you were -- you and your team were tasked
24   with consulting related to the expansion
25   of ATMs beyond kind of the initial ATMs

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 177

1                     WEINER

2      that were already available; is that

3      right?

4           A.    We were looking at the expansion

5      of ATM network, our particular engagement

6      had to do with making sure we took into

7      consideration, and again the term

8      foreseeable risks extending back to that

9      time, foreseeable risks and consumer

10     protections as it related to those ATMs.

11          Q.    I want to make sure I understand

12     the timing.  So were you engaged by the

13     bank?  The bank said hi, we want to put a

14     few more ATMs in the market, what do we

15     need to do?  That's option one.  Or two,

16     did the bank say hi, we're putting some

17     ATMs in, figure out ways to make them

18     safer?  Was one of those the engagement?

19          A.    We need to build software to

20     support expanding our ATM network, we need

21     you to consider everything and help us

22     build the requirements for that software

23     product that will allow us to expand that

24     network.

25          Q.    And along with -- was there ever

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 178

1                    WEINER
2      a suggestion that the bank just not expand
3      their ATMs; if there's a risk of physical
4      injury, just don't expand?
5                MS. ELLIS:  Objection, form.
6                THE WITNESS:  That's '94 and '98.
7           I'm not sure I can recall that
8           particular discussion ever happening.
9           What we found in that engagement to
10          the best of my recollection was there
11          were various types of risks and we
12          came up with various types of
13          mitigants.  And looking holistically
14          at the features, the benefits, the
15          risks and the mitigants, I can tell
16          you they did choose to roll out the
17          network but I cannot remember a
18          specific discussion that was related
19          to maybe we just shouldn't do this.
20      BY MS. CARITIS:
21          Q.   After the software product was
22      implemented, were there still incidents of
23      personal safety concerns?
24                MS. ELLIS:  Objection, form.  To
25          the extent you know.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 179

1                        WEINER

2              THE WITNESS:  Sure.  I'm trying

3          to think.

4                  I can recall an incident at that

5          client after we rolled out the

6          software.

7   BY MS. CARITIS:

8          Q.   Okay.  You said that there was

9   another safety product involved in this

10  engagement with banks concerning lighting

11  systems and other -- I wrote down doors,

12  other security features.  There, can you

13  explain how that's software related?

14         A.   Sure.  The company engaged us and

15  a real estate consultancy, there were two

16  of us working on this together, the real

17  estate consultancy was worried about the

18  physical location and we were worried

19  about evaluating a piece of software that

20  they could buy to control the lights and

21  the doors.  And in the evaluation of that

22  software, we took physical safety risks

23  into consideration in evaluating the

24  products that had been built.

25         Q.   It sounds like the product you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 180

1              WEINER

2      just referenced to lights and safety

3      doors, that's a safety product, those are

4      safety products in of themselves; fair?

5          A.   Lights impact safety, door usage

6      impacts safety, and the software product

7      that we were buying impacts safety.  They

8      are all -- I have worked on products as

9      they relate to all sorts of risks for my

10     whole career.  Safety is something often

11     considered.  I have highlighted those

12     particular examples for the judge in this

13     case where my experience was most like the

14     safety risk that we were looking at in

15     this particular case.

16         Q.   I'm trying to understand, so with

17     Uber, you're looking at a broader product,

18     right, that is the Uber platform, and

19     you're analyzing what they did and didn't

20     do in terms of safety within the broader

21     platform; right?

22              MS. ELLIS:  Objection, form.

23              THE WITNESS:  At Uber I'm looking

24         at the product development lifecycle

25         and the prioritization choices they

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 181

1                    WEINER

2         made and how that impacted the entire

3         set of features, including features

4         specifically designed to prevent

5         against sexual assault.

6    BY MS. CARITIS:

7         Q.   Right.  So it sounds to me like

8    the experience that you're referring to

9    for First Manhattan Consulting Group and

10   the ATMs, there you were tasked with

11   putting into the market a particular

12   product that in and of itself was a safety

13   product.  So you had a scheduling software

14   that would get security guards scheduled

15   at the appropriate time, and then you have

16   something about lights and safety doors.

17             Were you ever involved in

18   developing a broader product like the ATMs

19   on the whole and having to prioritize

20   features that would be rolled out across

21   the broader product?

22             MS. ELLIS:  Objection, form.

23             THE WITNESS:  I think you're

24        asking if I ever was involved in the

25        design of an ATM system.  Is that what

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 182

1                        WEINER
2           you're asking?
3      BY MS. CARITIS:
4           Q.   Yes.
5           A.   Yes, I helped two clients during
6      that time period with the implementation
7      and design of an ATM system where they did
8      not have one before.  I did not list those
9      here because I was listing here those
10     specific to the implementation of the
11     physical locations of the ATMs.  The ATM
12     network that I worked on was looking at
13     the cash management and internal
14     communications to build an ATM network.
15     We did not actually look into the physical
16     locations of those networks.
17          Q.   Okay.  And when you were involved
18     with an ATM, the development of an ATM
19     network, you did not in those situations
20     incorporate any features focused on
21     physical safety of customers?
22               MS. ELLIS:  Objection, form.
23               THE WITNESS:  In the development
24          of the ATM network, we considered
25          reporting features in order to have a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 183

1                    WEINER
2         record of what happened in front of
3         the ATM.  That type of video has been
4         used for many years by law enforcement
5         officers in the event of safety issues
6         that occurred in front of ATMs so I
7         don't know if I could completely agree
8         with your characterization but we did
9         not look at locations or high-risk
10        areas.  We were just looking at making
11        sure the ATMs recorded what happened
12        in front of them.
13    BY MS. CARITIS:
14        Q.   I'll talk a little bit -- I want
15    to talk a little bit about the recording
16    in a second but when you were analyzing
17    the development of an ATM network, you
18    didn't consider whether it was a high-risk
19    area; right?
20             MS. ELLIS:  Objection, form.
21             THE WITNESS:  The work I did on
22        those two particular examples about an
23        ATM network did not consider risks of
24        the locations of the ATMs at all.
25    ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 184

```
 1                    WEINER
 2    BY MS. CARITIS:
 3        Q.   Did you take into account and
 4    consider that individual's use of ATMs
 5    late at night when it is dark outside?
 6        A.    In the three specific examples
 7    that I highlighted earlier that we talked
 8    about two of them in some detail, we very
 9    much had reports on safety issues that
10    happen late at night, absolutely.
11        Q.   I'm talking about the times when
12    you actually developed the ATM network
13    more broadly, not where you were working
14    on the specific safety product features
15    that we discussed.
16            MS. ELLIS:  Is there a question,
17        Counsel?
18            MS. CARITIS:  That's my question.
19        I'm asking him about those instances
20        if he ever took into account that
21        individuals often utilize ATMs late at
22        night when it is dark.
23            MS. ELLIS:  Objection, form.
24            THE WITNESS:  When discussing
25        with the hardware manufacturers the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 185

```
 1                      WEINER
 2         camera capabilities that they were
 3         going to include in the ATM network,
 4         we did have discussions about low
 5         lighting times.  Is that what you're
 6         asking?
 7    BY MS. CARITIS:
 8         Q.   I'm asking in the product
 9    development lifecycle, the whole thing
10    we're here to talk about today, when you
11    were developing the ATM networks, did you
12    take into account that individuals often
13    could use the ATMs at night when it's
14    dark?
15              MS. ELLIS:  Objection, form.
16              THE WITNESS:  When building the
17         software to implement ATM network, we
18         did not have on our radar a
19         foreseeable risk of using the ATMs at
20         night because we were not looking into
21         locations, we were looking at the
22         technology to talk to a physical
23         device.
24    BY MS. CARITIS:
25         Q.   Okay, you said you worked with
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2      three banks and talked about the software
 3      for security, scheduling security, we
 4      talked about light systems and doors, and
 5      I'm sorry, I know you articulated the
 6      third but what was the third product
 7      safety -- excuse me, software product with
 8      features focused on physical safety of
 9      customers engaging with ATMs?
10          A.   Why don't I write them down -- we
11      spent a lot of detail on this a long time
12      ago.
13               Can we go back to what I said
14      before?  Give me a second.
15               The cellular-based streaming
16      video from an ATM was the third.
17          Q.   And what did that product entail,
18      what were you streaming?
19          A.   We were streaming the video from
20      the physical device on the ATM to
21      recording servers at the bank location.
22          Q.   So in layman's terms, there was a
23      camera connected to an ATM that would
24      stream, that would capture footage from
25      the ATM and then stream it to another
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 187

```
1                    WEINER
2    device; did I get that right?
3         A.   To be a little more specific,
4    there was a camera that would capture
5    footage and when the cellular signal
6    allowed, would stream the recorded video
7    to a capture device at the bank.
8         Q.   What was the purpose of that
9    streaming, cellular-based streaming
10   device?
11        A.   This particular bank had had a
12   couple of incidents where the device had
13   actually been destroyed and they had lost
14   access to the footage.  They have built
15   for physical wired devices the capability
16   and were looking at building a capability
17   for devices that could not be physically
18   wired but hope to leverage the cellular
19   networks.
20        Q.   So this was the placement camera,
21   for lack of a better term?
22             MS. ELLIS:  Objection, form.
23             THE WITNESS:  We didn't replace
24        the camera.  This was a new way to get
25        the data back to their headquarters.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 188

```
 1                    WEINER
 2   BY MS. CARITIS:
 3       Q.   How -- it wasn't live stream
 4   though; right?  You said it would stream
 5   it up when the cellular signal allowed?
 6       A.   It was not live streamed most of
 7   the time.  The most common occurrence at
 8   that time was the recording would happen
 9   and when the cellular signal was capable,
10   it would stream immediately after.
11       Q.   What would the banks do, why did
12   they want this footage?
13       A.   This particular bank was reacting
14   to two incidents where the actual ATM
15   device had gotten destroyed and the
16   footage about what happened had got
17   destroyed and they wanted a way to capture
18   the footage.
19       Q.   So for this cellular-based
20   streaming device, that was installed to
21   ensure that the ATM itself was not
22   destroyed or impacted in any way?
23            MS. ELLIS:  Objection, form.
24            THE WITNESS:  The two incidents
25        that triggered this client starting
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 189

1                    WEINER

2         this engagement was someone physically

3         taking and destroying the ATM.

4    BY MS. CARITIS:

5         Q.   So the best of your knowledge,

6    this cellular-based streaming product was

7    not put in place as a result of concerns

8    regarding physical safety for ATM patrons?

9              MS. ELLIS:  Objection, form.

10             THE WITNESS:  In the product

11        development lifecycle we considered

12        many risks, but one of the risks we

13        specifically considered was the risk

14        of physical safety, particularly from

15        theft of the patrons and trying to

16        design this product in a way where

17        there was high-risk areas we had

18        better streaming and better cameras.

19   BY MS. CARITIS:

20        Q.   Mr. Weiner, you just told me that

21   the two incidents that led the bank to ask

22   you all to make this cellular-based

23   streaming camera were when individuals

24   attempted to destroy the ATM itself;

25   right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 190

1                    WEINER

2      A.    Successfully destroyed the ATM.

3      Q.    The two incidents that you're

4  aware of that led the bank to ask you all

5  to create them this cellular-based camera

6  had nothing to do with physical safety;

7  right?

8            MS. ELLIS:  Objection, form.

9            THE WITNESS:  I don't think we

10       know because the devices were

11       destroyed and there was no footage.

12       What I can tell you is as we

13       considered the new product, we took

14       into consideration the safety of the

15       patrons and the overall crime

16       statistics and risks in different

17       areas in designing this software and

18       where to deploy it.

19  BY MS. CARITIS:

20      Q.    I'm a little confused about what

21  you mean by product development lifecycle

22  here.  So Mr. Weiner, you just explained

23  to me that you were asked by a bank to

24  create a product because their current

25  cameras were getting destroyed; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 191

1                          WEINER
2          A.    I was asked by a bank to create a
3     product, and the triggering event that
4     caused them to make that request were two
5     cameras being destroyed.
6          Q.    Okay.  Did the bank ever tell you
7     that they were asking you to make their
8     cellular streaming camera because they
9     were worried about patron safety?
10              MS. ELLIS:  Objection, form.
11              THE WITNESS:  I do not recall the
12         specific conversation where the bank
13         mentioned patron safety.  I'm speaking
14         to my experience in product
15         development and in that case, I
16         personally chose to consider patron
17         safety as a foreseeable risk in the
18         development of the features that led
19         to the product.
20     BY MS. CARITIS:
21          Q.    We talked about the three times
22     that you say that you worked on software
23     products with features focused on physical
24     safety in connection with banks.
25          A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 192

1          WEINER

2          Q.   There's a second reference a

3      little bit later in your report concerning

4      additional products that you say focus on

5      personal safety and that was through some

6      work at United Airlines.  You identify it

7      on paragraph 13.

8          A.   Yes.

9          Q.   Here you say -- well, I guess

10     just to clarify, do you know within your

11     work at First Manhattan Consulting Group

12     when these three banking engagements were?

13     We know they were between 1994 and 1998.

14     Do you have any more specific recollection

15     of when the last engagement of these three

16     would have been?

17         A.   I honestly cannot recall that

18     specific.  I apologize.

19         Q.   But the latest it could have been

20     was 1998; is that fair?

21         A.   It was during that time.

22         Q.   So then you note in paragraph 13

23     of your report that during your time at

24     United Airlines, you "worked on pilot and

25     flight attendant-focused products that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                       WEINER
 2     required balancing feature development
 3     with operational requirements, including
 4     personal safety requirements.  One of
 5     those products matched pilots and flight
 6     attendants with safe and appropriate
 7     transportation and lodging, taking into
 8     account gender matching and locations in
 9     late-night, high-crime areas."
10          Do you see that?
11     A.   I see that.  I wrote that myself.
12     Q.   Okay, I want to talk a little bit
13     about what this product was.
14          First off, I know you were at
15     United in 2002.  Do you recall
16     approximately when you would have worked
17     on this product?
18     A.   I worked on this product when I
19     was managing director of strategic
20     sourcing so that would be in my later time
21     at United.
22     Q.   So it would have been -- when did
23     you leave United?  2005.  So at the
24     latest, it would have been 2005; is that
25     fair?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 194

1                         WEINER

2         A.   It was 2004, 2003 at United.

3    Both in that product, as I mentioned,

4    later at Novantas I continued to work in

5    the launch of the common software platform

6    for the Star Alliance so my engagement

7    with that product lasted probably five

8    years.

9         Q.   So let's talk a little bit about

10   this product.  You said earlier when we

11   were looking at your résumé that this was

12   in connection with a central reservation

13   system; is that right?

14        A.   Yes, the provider of the central

15   reservation system was the provider of the

16   hoteling and transportation system that

17   was provided to flight attendants and

18   pilots.

19        Q.   So just high level, when you have

20   a flight attendant or a pilot that either

21   has a layover or just time before their

22   next trip, the airline provides them

23   accommodations during their layover; is

24   that right?

25        A.   That is.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 195

1                         WEINER

2         Q.   Okay.  And what you were helping

3    design was a central reservation system

4    where these flight attendants and pilots

5    could go in order to book accommodations?

6         A.   Correct.

7         Q.   Is that right?

8         A.   That's correct.

9         Q.   And you note -- you write here

10   that that product took into account

11   operational requirements.  What are you

12   referring to there?

13        A.   We considered quite a number of

14   factors and used rules to do some of the

15   matching, not quite as sophisticated as

16   Uber did but we were using some pretty

17   basic rules to say, one, let's -- when we

18   had to put two people on a hotel room,

19   let's match on the same genders; and two,

20   we collected data throughout the year on

21   crime statistics and looked at hotels that

22   were deemed safer.

23        Q.   Okay.  So maybe I don't

24   understand the complexities of the

25   reservation system so I want to understand

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 196

1                        WEINER
2       a little more.
3                You talked about matching, so am
4       I understanding you correctly that one
5       aspect of this pilot and flight attendant
6       reservation system is that it might pair
7       two pilots, two flight attendants together
8       to be in the same hotel room; is that
9       fair?
10          A.   Depending on the location and the
11      availability, there were times when we
12      would pair flight attendants in hotel
13      rooms.
14          Q.   So when you talk about taking
15      into account gender matching, are you
16      referring to a program that would ensure
17      that two flight attendants or two pilots
18      that were sharing a hotel room were of the
19      same gender?
20          A.   I am specifically recalling an
21      incident where we matched a pilot -- two
22      flight attendants of different genders and
23      we had to build a feature enhancement to
24      ensure that didn't happen again.
25          Q.   Okay.  So again, okay.  So other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 197

```
 1                      WEINER
 2      than building a feature in your
 3      reservation system to ensure two pilots or
 4      flight attendants of different gender
 5      aren't put in the same hotel room, were
 6      there any other instances where you took
 7      into account gender matching as you
 8      identified in your report?
 9               MS. ELLIS:  Objection, form.
10               THE WITNESS:  I'm going to have
11          to say that I don't remember the 2002
12          specifics at that level of detail.  I
13          do personally remember the two flight
14          attendant situation because that one
15          sort of stuck with me.  I cannot
16          specifically recall if we had any
17          other rules related to gender.
18      BY MS. CARITIS:
19          Q.   Were you involved in the initial
20      product development of the central
21      reservation system?
22          A.   No, I came in later in the life
23      of the central reservation system.  I took
24      over the role, as mentioned, director of
25      strategic sourcing with responsibility for
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 198

```
 1                      WEINER
 2      that relationship.
 3          Q.   So fair to say that the first
 4      person wasn't you.  The first person
 5      charged with the product development
 6      lifecycle of the central reservation
 7      system forgot to take into account that
 8      you probably shouldn't match two people of
 9      different genders to sleep in the same
10      hotel room; right?
11              MS. ELLIS:  Objection, form.
12              THE WITNESS:  I do not believe I
13          can assign the responsibility of that
14          mistake that happened to a choice of a
15          human.  I can definitely say that
16          mistake happened.  We learned from it
17          and we improved the product.  That's
18          part of risk management in the product
19          development lifecycle.  You learn new
20          things, you improve, you get better
21          products.
22      BY MS. CARITIS:
23          Q.   Were there any other time
24      instances where you took into account
25      gender matching in your product
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 199

1                        WEINER

2      development work?

3          A.   In my personal product

4      development work, that is the one time

5      that I can recall at this stage.

6          Q.   Why did you decide to emphasize

7      gender matching here?

8          A.   I was considering my past work

9      that might be relevant to someone in the

10     role of a judge considering my expertise

11     and I wanted to highlight a time in my

12     past that I had a particular experience

13     that would potentially resonate.

14         Q.   Okay.  So it's your position that

15     because you realized that airlines

16     shouldn't assign two flight attendants of

17     different genders to the same hotel room,

18     you're qualified to opine on whether or

19     not Uber should or shouldn't utilize a

20     women rider preferred program?

21             MS. ELLIS:  Objection, form.

22             THE WITNESS:  I'm sorry, I'm

23         really struggling with that question.

24         Do you want to try and break it down a

25         bit?  What I can tell you and I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 200

```
 1                    WEINER
 2         believe is responsive is I believe
 3         that the whole of my experience speaks
 4         to 37 years of product development
 5         experience across all sorts of risks
 6         and mitigants, features, development,
 7         prioritization approaches in
 8         industries, in government, in large
 9         corporations, in transportation and
10         financial services, and travel and in
11         loyalty, and in going back through my
12         background, I thought it relevant to
13         highlight a few examples where I had
14         particular relevance in personal
15         safety feature development.  I don't
16         think if I had any it would speak to
17         my ability to opine on personal safety
18         feature development because it's just
19         another risk that happens in the
20         product development lifecycle.  What
21         I'm telling you is that I highlighted
22         these examples because I felt they
23         were particularly relevant.
24    BY MS. CARITIS:
25         Q.   That's what I'm asking.  So you
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      think it's particularly relevant to this
 3      case that in designing a reservation
 4      system for flight attendants, you
 5      determined that you shouldn't match two
 6      flight attendants of different genders to
 7      room in the same hotel room?
 8             MS. ELLIS:  Objection, form.
 9             THE WITNESS:  I think it's
10         relevant that in this time period we
11         were building rules-based systems that
12         took personal safety into
13         consideration.
14      BY MS. CARITIS:
15         Q.   Is it your position that Uber
16      doesn't take personal safety into
17      consideration into the development of its
18      product?
19             MS. ELLIS:  Objection, form.
20             THE WITNESS:  We can go back to
21         my opinions if you like but the
22         specific question you just asked is do
23         I believe Uber does not take into
24         consideration personal safety and my
25         answer to that question as evidenced
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                     WEINER

2          by the personal safety products they

3          developed is they do take into

4          consideration personal safety.

5     BY MS. CARITIS:

6          Q.   You also go on to talk about how

7     you also took into account locations in

8     late-night, high-crime areas when

9     developing the central reservation system.

10    How did you take into account these

11    late-night, high-crime areas?

12         A.   We collected data and used a

13    rules based approach to prioritize or

14    de-prioritize hotels based on the crime

15    statistics that we gathered.

16         Q.   So based on the likelihood of --

17    well, based on the prevalence of crime at

18    or near a particular hotel, you would

19    remove it from the central reservation

20    system; is that right?

21              MS. ELLIS:  Objection, form.

22              THE WITNESS:  We would use a

23         rules based approach to prioritize or

24         de-prioritize it.  We did not always

25         remove it.  Sometimes we left it as a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 203

```
 1                     WEINER
 2       last resort.
 3   BY MS. CARITIS:
 4       Q.  Got it, okay.  So even if a hotel
 5   was found to be riskier than another
 6   hotel, you would leave it as an option but
 7   it would be a lower choice, a lower
 8   option?
 9           MS. ELLIS:  Objection, form,
10       misstates the testimony.
11           THE WITNESS:  What I'm saying is
12       we used a rules-based approach to
13       prioritize and de-prioritize hotels
14       based on data that we collected.  We
15       did not have anything as sophisticated
16       as a machine-learning model.  We used
17       very simple rules to prioritize or
18       de-prioritize based on data that we
19       collected.
20   BY MS. CARITIS:
21       Q.  You could have built a
22   machine-learning model; right?
23           MS. ELLIS:  Objection, form.
24           THE WITNESS:  At the time with
25       the resources that I had, we did not
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 204

1                          WEINER
2          have machine-learning capabilities in
3          the central reservation system.  We
4          had rules-based capabilities.
5     BY MS. CARITIS:
6          Q.   You write in your footnote 2 that
7     United Airlines carried 67 million
8     passengers in 2005 for a total of 114
9     billion mainline revenue passenger miles.
10             Do you see that?
11         A.   I wrote that, yes.
12         Q.   Do you know what United Airlines'
13    profits were back in 2002 to 2005?
14             MS. ELLIS:  Objection, form.
15             THE WITNESS:  I do not have that
16         data point immediately available, no.
17    BY MS. CARITIS:
18         Q.   Do you know how many pilots and
19    flight attendants United Airlines employed
20    at that time?
21             MS. ELLIS:  Objection, form.
22             THE WITNESS:  I cannot recall
23         that number at this time.
24    BY MS. CARITIS:
25         Q.   Do you know how many pilots or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 205

1                       WEINER
2     flight attendants alleged personal safety
3     incidents in connection with their
4     accommodations during layovers?
5          A.   I can recall that that number was
6     smaller than other things that we were
7     looking to, it was a smaller number.
8          Q.   Smaller number than what other
9     things you were looking into?
10         A.   We prioritized all sorts of
11    features in the product development
12    lifecycle.  We prioritized features that
13    got them faster.  We prioritized features
14    that made sure they had a choice of hotel
15    brands.  We prioritized features that
16    focused on getting them to and from the
17    airlines' location quickly.
18              When I say smaller, I can
19    basically say that the personal safety
20    reports that we were dealing with were not
21    as large as those other three issues that
22    I just mentioned.
23         Q.   I understand.  You're saying
24    again your product development lifecycle,
25    you had personal safety issues but then

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 206

1                        WEINER
2        you had other higher priority risks that
3        you all had to consider?
4                MS. ELLIS:  Objection, form.
5                THE WITNESS:  We considered all
6            of the risks and all of the rewards to
7            build the best prioritization that we
8            could considering the product risks
9            and the timeline, and we attempted to
10           always use industry standard
11           approaches.
12       BY MS. CARITIS:
13           Q.   You also note that you worked --
14       one of these products worked to identify
15       appropriate transportation.  What's that
16       referring to?
17           A.   The transportation between the
18       airport and the hotel.
19           Q.   What were some forms of
20       transportation that United relied on to
21       ensure that its pilots and flight
22       attendants got from the airline to the
23       hotel?
24           A.   We had buses and shuttles as the
25       primary vehicles, and in some smaller

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 207

1                        WEINER
2      airports we occasionally refunded taxi
3      fares.
4           Q.   Did you consider incident rates
5      of physical violence that occur on taxis
6      when considering whether to utilize taxis
7      for the central reservation system?
8                MS. ELLIS:  Objection, form.
9                THE WITNESS:  I can recall that
10          we considered taxis riskier than buses
11          and shuttles and had rules to try and
12          minimize their use because we were
13          aware taxis had a higher risk profile
14          than the bus or the shuttle.
15     BY MS. CARITIS:
16          Q.   So we just now talked about your
17     experience working with three banks on
18     software products in connection with ATMs
19     and about your work while you were at
20     United and a little bit with Novantas
21     regarding the central reservations
22     network.
23               Aside from those two buckets of
24     experiences, are there any other
25     experiences that you would identify as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 208

1                    WEINER
2         falling into the products that include
3         personal safety?
4              MS. ELLIS:  Objection, form.
5              THE WITNESS:  As I wrote the
6            words products including physical
7            safety (safety from an assault), those
8            are the specific products that I was
9            calling attention to.  The question
10           was are there any others?
11        BY MS. CARITIS:
12             Q.   Yes.
13             A.   What I'm thinking about is the
14        multitude of products, the hundreds of
15        things that I have worked in over 37
16        years, and while none of them strike me
17        specifically on safety from assaults, the
18        risks that we considered were widespread,
19        had all sorts of different flavors, had
20        all sorts of different priorities and we
21        used industry standard approaches to build
22        those products.
23                 I applied the whole of that
24        experience in evaluating the documents
25        that were provided to me in this case and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                        WEINER
2     in forming my opinions, and I stand on the
3     basis for those opinions that I wrote in
4     this report.
5          Q.    Paragraph 29 you talk to and
6     refer to industry standards.  You have
7     used that term a few times today as well.
8     But industry standards, you're talking
9     about product development industry
10    standards; is that right?
11         A.    I am talking about primarily
12    industry standards related to technology
13    product development and product
14    development lifecycle.  I have referred to
15    a few standards in my report, specifically
16    HAZOP studies industry standard looks at
17    risk-based evaluation and FMEA, Failure
18    Mode and Effects Analysis industry
19    standards, which also look at evaluating
20    critical risks in a product development
21    lifecycle.
22              So yes, I've enumerated all the
23    industry standards I rely on but what I
24    made very clear is that the sum of my
25    experience has built my knowledge on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 210

1                    WEINER
2      industry standards and I'm relying on ISO,
3      IEC and IEEE documents to help the trier
4      of facts understand that it's not just my
5      experience but that standards bodies have
6      written these down and documented them for
7      use.  So I'm basically saying that we have
8      my experience and we have the standards
9      and collectively I have looked at all of
10     them in evaluating the discovery presented
11     to me.
12          Q.   And Mr. Weiner, you're not
13     talking about the rideshare industry or
14     any standard specific to the rideshare
15     industry; right?
16               MS. ELLIS:  Objection, form.
17               THE WITNESS:  You and I are
18          struggling to accept the existence of
19          a rideshare industry but to try and be
20          responsive to your question I'll
21          rephrase it, as I am not providing you
22          information on any experience with the
23          standards at the rideshare companies,
24          Uber, Lyft or any other rideshare
25          company.

Page 211

1                         WEINER
2    BY MS. CARITIS:
3         Q.   The standards that you write you
4    are -- the primary document and
5    international standard you reference is
6    the ISO 31000; is that right?
7         A.   ISO 3100 is the ISO standard
8    entitled Risk Management Guidelines and
9    covers risk management in product
10   development.
11        Q.   Okay, and I want to talk just
12   very briefly about ISO international
13   standards generally.  First off, ISO is
14   not based in the U.S.; right?
15        A.   ISO is not based in the U.S. as
16   its corporate headquarters but many of the
17   experts that opine on their standards are
18   based in the U.S.
19        Q.   Okay.  But just to answer my
20   basic question, ISO is not based in the
21   U.S., it's based in Switzerland; right,
22   Mr. Weiner?
23        A.   The ISO headquarters is in
24   Switzerland.
25        Q.   ISO international standards

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 212

```
 1              WEINER
 2    generally are voluntary; right?
 3              MS. ELLIS:  Objection, form.
 4              THE WITNESS:  ISO standards
 5        document standards in a comprehensive
 6        way.  I think what you're asking me
 7        are companies required to follow them,
 8        and so from my standpoint that is a
 9        legal matter, not a standards matter.
10        So from the standards perspective,
11        they are recommended industry
12        standards.
13    BY MS. CARITIS:
14        Q.   Would it surprise you to learn
15    that ISO itself says that they are
16    voluntary?
17        A.   It would not surprise me for ISO
18    to say it's voluntary.  I can tell you in
19    my personal experience in 37 years, there
20    are companies that require ISO standards
21    to be followed in order to be willing to
22    engage in a contract with a particular
23    entity.  So the fact that ISO considers
24    themselves a body creating voluntary
25    standards isn't particularly applied to
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 213

```
 1                    WEINER
 2   companies' choices and how and when to use
 3   them.
 4           MS. CARITIS:  Okay.  Mr. Delaney,
 5       if we could please put up tab 11, I
 6       have totally lost track.  I think am I
 7       on 7, Exhibit 7?
 8           MR. DELANEY:  Yes, 7.
 9           MS. CARITIS:  Thank you so much,
10       Curtis.
11           (Exhibit 7, document entitled
12       Foreward - Supplementary information,
13       marked for identification.)
14   BY MS. CARITIS:
15       Q.   Exhibit 7 is the Foreward to the
16   ISO International Standards and national
17   law.  I understand you want to give an
18   explanation but I just really want to
19   focus on the top section.
20           It says ISO International
21   Standards and national law.  The very
22   first sentence reads, "ISO international
23   standards and other ISO deliverables are
24   voluntary."
25           Do you see where those words
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 214

1                          WEINER
2      appear on the ISO document?
3          A.   May I ask what document this is,
4      please?
5          Q.   Sure, you can pull it down.  I'm
6      sure Ms. Ellis will assist you in doing
7      that so we don't waste time but you can
8      download it and then take a quick look but
9      this is the foreward from ISO itself.
10     Feel free to take a second to give
11     yourself -- get acclimated with it.
12              MS. ELLIS:  It just appeared in
13          the Box so give us one moment.
14              MS. CARITIS:  Sure.
15              THE WITNESS:  I am not clear what
16          document this is.  This might be a Web
17          page.  Is that an accurate
18          representation of where you pulled
19          this from?
20     BY MS. CARITIS:
21         Q.   Yeah, it was pulled from the
22     Internet, that's right.
23         A.   Okay, so you're telling me that
24     this comes from the ISO website?
25         Q.   Yes.

Page 215

```
1                       WEINER
2          A.   Okay.
3          Q.   Have you reviewed -- let me know
4     when you're done reviewing and I'll ask
5     you some questions so we're not talking
6     over each other.
7          A.   Do you have the URL where this
8     was pulled from?
9          Q.   I can find it at the next break
10    but I'll represent to you that this comes
11    directly from the ISO website.  Have you
12    ever seen this document before?
13         A.   I do not recall ever seeing this
14    specific page before.
15         Q.   Okay.  Do you disagree with the
16    statement that appears on the ISO document
17    that ISO international standards or other
18    ISO deliverables are voluntary?
19         A.   I have no reason to believe that
20    ISO is not being truthful when they say on
21    this Web page that their standards are
22    voluntary.
23         Q.   So we've already referenced this
24    but you would agree then that Uber is not
25    required to take into account ISO in its
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      product development?
 3              MS. ELLIS:  Objection, form.
 4              THE WITNESS:  As written in my
 5          opinions, I have not stated a
 6          requirement to follow ISO standards.
 7          That is your representation.
 8      BY MS. CARITIS:
 9          Q.   The next line here in that top
10      portion again pulled directly from the ISO
11      website, "They do not include contractual,
12      legal or statutory requirements.
13      Voluntary standards do not replace
14      national laws, with which standards users
15      are understood to comply and which take
16      precedence."
17              Do you see that?
18          A.   I do see that and that aligns
19      with my understanding.
20          Q.   Okay.  So fair to say voluntary
21      standards, they don't replace or supplant
22      any national laws that Uber or any company
23      would actually comply with; right?
24          A.   An ISO standard as both stated
25      here and in my experience does not replace
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 217

```
 1                      WEINER
 2     or supersede any laws in any jurisdiction
 3     or country.
 4          Q.   Did you review federal
 5     discrimination laws that may be relevant
 6     to Uber's product development in the
 7     context of your report?
 8               MS. ELLIS:  Objection, form.
 9               THE WITNESS:  I did not review
10          any discrimination laws that are
11          relevant to Uber's business as part of
12          my considerations for this report.
13     BY MS. CARITIS:
14          Q.   Did you review or consider
15     Arizona rideshare regulations in
16     connection with your report?
17               MS. ELLIS:  Objection, form.
18               THE WITNESS:  I did not review
19          Arizona rideshare regulations in
20          consideration for my report.
21     BY MS. CARITIS:
22          Q.   Did you review or consider
23     Arizona discrimination laws in connection
24     with your report?
25               MS. ELLIS:  Objection, form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 218

```
 1                    WEINER
 2          THE WITNESS:  I am not a lawyer
 3       and I can maybe make this easier for
 4       you by saying I did not review any
 5       laws in consideration of my report.
 6    BY MS. CARITIS:
 7       Q.   Okay.  So you also didn't review
 8    or consider Arizona privacy laws; is that
 9    right?
10          MS. ELLIS:  Objection, form.
11          THE WITNESS:  I did not review
12       Arizona privacy laws as in a factor in
13       my report.
14    BY MS. CARITIS:
15       Q.   Do you know why I'm asking you
16    about Arizona?
17       A.   I'm assuming that you're asking
18    me about Arizona due to its relevance in
19    this case.
20       Q.   What do you mean by relevance in
21    this case?
22       A.   I have reviewed in the last 24
23    hours the complaints from Wave 1 cases and
24    I have reviewed the depositions in the
25    Wave 1 cases and I'm familiar that one of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 219

```
 1                      WEINER
 2      them is in Arizona.
 3           Q.   So 24 hours ago you learned that
 4      one of the five bellwether plaintiffs is
 5      alleging an incident that occurred in
 6      Arizona, do I understand that correctly?
 7                MS. ELLIS:   Objection to form,
 8           misstates his testimony.
 9                THE WITNESS:   That's not what I
10           said.   What I said is in the last 24
11           hours I reviewed the complaints and
12           deposition testimony.   I was aware
13           that one of the cases was in Arizona
14           before that.
15      BY MS. CARITIS:
16           Q.   When did you learn one of the
17      cases was in Arizona?
18           A.   I cannot recall the specific date
19      that I learned that one of the cases was
20      in Arizona.
21           Q.   Would it have been before or
22      after you issued your report?
23           A.   I am confident it was before I
24      issued my report.
25           Q.   Okay.   Where are the other
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 220

1                    WEINER
2        bellwether plaintiffs located, where are
3        they alleging their incidents occurred?
4            A.   If you need me to be specific, I
5        have the document here but I do not off
6        the top of my head, other than
7        Philadelphia, recall the other cities
8        specifically.
9            Q.   Okay.  Philadelphia, you might be
10       doing a report for another Uber case.
11           A.   Okay.
12           Q.   But in this one, we're talking
13       about Arizona and we just discussed that.
14       We're talking about North Carolina.  Did
15       you -- you already told me you didn't
16       review any law so fair to say that you
17       didn't look into any rideshare
18       discrimination privacy laws in North
19       Carolina?
20               MS. ELLIS:  Objection, form.
21               THE WITNESS:  Ms. Caritis, I am
22           not a lawyer and I am hopefully making
23           it clear, I did not review any legal
24           laws as it relates to my assessment of
25           the product development lifecycle.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 221

```
 1                        WEINER
 2      BY MS. CARITIS:
 3          Q.   And I know you said this but I
 4      need to make my record and get clear
 5      testimony so that's why I'm asking these
 6      questions although I understand you're
 7      saying you didn't look at anything.
 8              You similarly did not review
 9      rideshare regulations, discrimination laws
10      or privacy laws in California; correct?
11              MS. ELLIS:  Objection, form.
12              THE WITNESS:  My report does
13         highlight a number of rideshare
14         regulations that I did review.  I did
15         not review rideshare regulations in
16         California.
17      BY MS. CARITIS:
18          Q.   So sitting here today, you don't
19      know whether there are any laws or
20      regulations that impacted Uber's product
21      development lifecycle?
22              MS. ELLIS:  Objection, form.
23              THE WITNESS:  I have seen
24         extensive documentation from Uber on
25         what it prioritized and how it
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 222

```
 1                      WEINER
 2          prioritized.  I've also seen
 3          significant redactions when talking
 4          about legal issues so my awareness of
 5          the legal issues due to the redactions
 6          is limited compared to my awareness of
 7          other issues but I have seen a
 8          holistic set of documents that talk to
 9          the prioritization process that Uber
10          follows.
11      BY MS. CARITIS:
12          Q.   You just told me that you didn't
13      review any laws in connection with this
14      report; right?
15          A.   I did not review any laws in
16      connection with this report.
17          Q.   So you can't tell us one way or
18      the other whether there are rideshare,
19      privacy, discrimination or other laws that
20      impacted or would govern Uber's product
21      development.  You don't know if those laws
22      exist?
23               MS. ELLIS:  Objection, form.
24               THE WITNESS:  Here's what I can
25          tell you clearly.  I'm not a lawyer
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 223

```
                              WEINER
 1
 2          and I don't intend or attempt to have
 3          a legal opinion.  I have seen
 4          documents from Uber that were citing
 5          legal reasons for making choices.
 6          Many of those cite those reasons and
 7          then are redacted in terms of the
 8          explanations so my thoroughness was
 9          limited by the data that I was
10          presented in terms of lawyers
11          assessing the laws, which is their
12          skill, versus the prioritization
13          process and product development
14          lifecycle which is my skill.
15     BY MS. CARITIS:
16          Q.   If you were consulting Uber on
17     their product development lifecycle and
18     you learned that a specific product would
19     violate a law, would you recommend they
20     implement it anyways?
21               MS. ELLIS:  Objection, form.
22               THE WITNESS:  The hypothetical
23          where I was a consultant and I had a
24          lawyer at Uber telling me that a
25          product would violate the law, I would
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 224

1                    WEINER
2        not likely proceed to recommend that
3        product without further discussion and
4        further consideration because as
5        stated, I'm not a lawyer and I have
6        long learned to trust and rely upon
7        legal interpretations that come from
8        lawyers.
9            MS. CARITIS:  Thank you for the
10       reminder.  Can we please go off the
11       record, please?
12           THE VIDEOGRAPHER:  We're going
13       off the record.  This is the end of
14       media unit 4.  The time is 2:13.
15           (Recess taken from 2:13 p.m. to
16       2:25 p.m.)
17           THE VIDEOGRAPHER:  We're back on
18       the record.  This is the beginning of
19       media unit 5.  The time is 2:25.
20   BY MS. CARITIS:
21       Q.   Mr. Weiner, we just took a short
22   break.  We were talking a little bit about
23   ISO standards.
24           You would agree with me that
25   there's no ISO standards specific to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 225

1                        WEINER
2        preventing or reducing a sexual assault;
3        correct?
4                MS. ELLIS:  Objection to form.
5                THE WITNESS:  I'm thinking about
6            that for a second.
7                I think the most direct answer to
8            your question is I am not aware of an
9            ISO standard entirely focused on
10           reducing the risk of sexual assault.
11       BY MS. CARITIS:
12           Q.   Okay.  ISO 3100 is a broad risk
13       management standard; correct?
14           A.   Absolutely.  It covers many kinds
15       of risks.  It is a risk management
16       standard, and as I mentioned, it supports
17       my personal experience in helping provide
18       a language for describing standards.  It
19       is not intended to be a definitive
20       document.
21               THE VIDEOGRAPHER:  Mr. Weiner,
22           your audio just is a little bit low.
23           I'm not sure if there's anything
24           sitting on top of your microphone.
25               THE WITNESS:  I put a sticky with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1              WEINER
 2      our colleague's name on it and I think
 3      I put that over the microphone.  I am
 4      sorry, Ms. Caritis.
 5  BY MS. CARITIS:
 6      Q.   Do you know if any other
 7  rideshare company follows ISO 3100 or
 8  other industry standards as you define
 9  them in your report?
10          MS. ELLIS:  Objection, form.
11          THE WITNESS:  I have not
12      personally had the opportunity to see
13      internal documents from another
14      rideshare company.
15  BY MS. CARITIS:
16      Q.   And you've not come across any
17  public materials that have suggested to
18  you that another rideshare company follows
19  ISO 31000 or any of the other standards
20  you reference in this report?
21      A.   I do believe in my research I did
22  see a rideshare company following an ISO
23  standard that I do not refer to in my
24  report.  I just remember generally looking
25  in terms of research on rideshare and ISO,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 227

```
 1                      WEINER
 2     I did see that Lyft does put itself out
 3     there as following a particular data
 4     security standard.
 5          Q.   That's different than the
 6     standard that you told us that you were
 7     primarily focused on and that's ISO 3100;
 8     right?
 9               MS. ELLIS:  Objection, form.
10               THE WITNESS:  Correct.  I did see
11          some fantastic documents within Uber
12          which I enumerate in my report that
13          shows that Uber was both aware of ISO
14          3100 and attempted to consider it in
15          their risk management practices.
16     BY MS. CARITIS:
17          Q.   So you read my mind.  So in your
18     report, you actually identify some
19     documents that you found internally at
20     Uber that reference the ISO standards; is
21     that right?
22          A.   That is correct.
23          Q.   If we could just -- I'll just
24     direct your attention to paragraph 96 of
25     your report.  It's on page 45.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 228

1              WEINER
2          Based on your work for this case,
3     you identify Uber documents that discussed
4     creating an ISO standard for gig economy;
5     right?
6          A.   I did identify a document where
7     Uber executives were talking about a
8     desire to create an ISO standard for the
9     gig economy, as they called it.
10         Q.   Have you -- are you aware of any
11    other rideshare company that has attempted
12    or considered creating an ISO standard for
13    the gig economy?
14              MS. ELLIS:  Objection, form.
15              THE WITNESS:  I have no personal
16         knowledge or access to internal
17         documents that other rideshare
18         companies that would need to have an
19         awareness of their work or lack of
20         work on a gig economy ISO standard.
21    BY MS. CARITIS:
22         Q.   When you were consulting for
23    various organizations or when you were
24    working directly at United, did you
25    personally ever reach out to ISO to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 229

WEINER

1
2      approach them about creating a new
3      standard?
4          A.   Let me think for a second.
5      There's only one time I participated in a
6      panel on creating a new standard and we're
7      going quite a ways back here.  It was
8      during my time at American Express and
9      it's related to a technical standard
10     related to merchant processing.
11         Q.   You also note in your report that
12     "Uber joined the U.S. Technical Advisory
13     Group for the development of an ISO
14     standard on privacy by design."
15              You see where you wrote that in
16     paragraph 96 of your report?
17         A.   I both wrote that in paragraph 96
18     in my report and provided the citation to
19     the document where I saw that.
20         Q.   So Uber proactively joined a
21     technical advisory group to assist in
22     developing an ISO standard; is that right?
23              MS. ELLIS:  Object to form.
24              THE WITNESS:  That is a fact that
25         I have documented in my report,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 230

1                          WEINER
2          absolutely.
3              MS. CARITIS:  Okay.  I'm going to
4          take a look now, it looks like you
5          have a hard copy in front of you which
6          is great, at ISO 3100.  And for the
7          record, Mr. Delaney, if we could
8          please mark tab 14 as Exhibit 8.
9              (Exhibit 8, document entitled
10         Risk management -- Guidelines ISO
11         31000, marked for identification.)
12     BY MS. CARITIS:
13         Q.   Since you have a paper copy in
14     front of you, hopefully we can refer to
15     that but feel free if it would be helpful,
16     Mr. Delaney can kind of scroll through or
17     at least maybe go to the back page to
18     ensure that the exhibit that we've entered
19     as Exhibit 8 is, in fact, the Risk
20     management -- Guidelines ISO 31000.
21         A.   310 2018(E) is the particular one
22     I have in front of me.  I cannot see who
23     that one you're having there is licensed
24     to but I do believe it's not the one
25     licensed to me.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                     WEINER
 2        Q.   You didn't give us those so we
 3   got them ourselves so this is licensed to
 4   someone else.
 5        A.   Got it.
 6        Q.   Okay.  So we see from the cover
 7   page ISO 31000 is a risk management
 8   guidelines; right?
 9        A.   Absolutely.  That is the ISO
10   31000.
11        Q.   Okay.  And it's about a 15-page
12   document.  Does that sound right to you?
13   I see I've got 16 pages, a bibliography,
14   and I would like to first take a look at
15   the introduction page.
16             A few pages in, Curtis, it's
17   intro v.
18             And it says that the -- at the
19   very top, "This document is for use by
20   people who create and protect value in
21   organizations by managing risks, making
22   decisions, setting and achieving
23   objectives and improving performance."
24             You see where the standard
25   articulates that objective?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 232

1                   WEINER

2        A.    Absolutely.  I am well aware of

3    the introduction.

4        Q.    Okay.  And you would agree that

5    this standard, it involves all types of

6    different risks companies can face; right?

7        A.    I would agree that this is the

8    risk management standard covering all

9    types of risks relevant in the product

10   development lifecycle.

11       Q.    In fact, I think of risk I think

12   bad, but ISO 31000 all makes clear that

13   risks can be positive or negative; is that

14   right?

15            MS. ELLIS:  Objection, form.

16            THE WITNESS:  The management of

17       risks can lead to positive and

18       negative outcomes, yes.

19   BY MS. CARITIS:

20       Q.    If we can take a quick look at

21   page 1, Mr. Delaney, of the body of the

22   document, we see a definition of risk.

23   And there it says, risk, effect of

24   uncertainty on objectives, Note 1 to

25   entry:  An event [sic] is a deviation from

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 233

1                      WEINER
2      the expected.  It can be positive,
3      negative or both.  Do you see that?
4          A.   Yes.
5          Q.   So when you're developing a
6      product, you need to consider all of the
7      inputs coming in, the good and the bad; is
8      that fair?
9          A.   As a product development
10     professional with 37 years of experience,
11     I can absolutely agree with you that
12     managing risk takes into account all sorts
13     of positive and negative unexpected
14     events.
15         Q.   We talked a little bit about your
16     time at United.  You've explained to me
17     that during your time at United, you
18     utilized a product development lifecycle;
19     is that fair?
20         A.   We had a product development
21     lifecycle that was specific to the UAL
22     loyalty organization, and then when we
23     joined the main airline, we worked to
24     adapt that product development lifecycle
25     into the airline space more broadly.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 234

1                      WEINER
2          Q.   Okay.  I'm going to talk at a
3     high level at United.  Fair to say that
4     one of the most extreme negative risks
5     that United could face would be a tragic
6     safety event.  That would be one example
7     of a negative risk; fair?
8          A.   It is absolutely fair to say that
9     a tragic safety event like a plane crash
10    is one of the most negative events United
11    has.
12         Q.   Some other events that United
13    could experience would be reputational
14    harm, that's another example.
15         A.   United could consider
16    reputational harm something that it
17    desires to avoid, absolutely.
18         Q.   Another thing that it could take
19    into account and consider as a risk would
20    be fuel prices.
21              MS. ELLIS:  Objection, form.
22              THE WITNESS:  I can tell you that
23         the variability of fuel prices was a
24         risk that we considered at United in
25         our risk management process.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 235

1                    WEINER
2     BY MS. CARITIS:
3          Q.   And the ISO 31000 is intended to
4     arm companies with a plan to map out all
5     types of these risks, the good and the
6     bad; is that right?
7          A.   ISO 3100 sets a standard for
8     managing the risks broadly, absolutely.
9          Q.   And it then allows for strategic
10     decision-making to be made?
11               MS. ELLIS:  Objection, form.
12               THE WITNESS:  The goal of risk
13          management is enumerated here and it
14          covers in paragraph 6 the following
15          steps:  risk identification, risk
16          analysis, risk evaluation, risk
17          treatment, monitoring and review and
18          recording and reporting.
19     BY MS. CARITIS:
20          Q.   Got it.  Okay, I think -- you
21     were talking about section 6?
22          A.   Yes.
23          Q.   But okay.  We'll get back to that
24     in a minute.  You would agree that this
25     standard is a framework that allows

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 236

1                        WEINER
2        companies to best achieve their
3        objectives.
4                MS. ELLIS:  Objection, form.
5                THE WITNESS:  ISO refers to this
6            as a guideline, not a framework.  It
7            is a guideline that can be used to
8            make risk management practices come up
9            to industry standard levels.
10       BY MS. CARITIS:
11           Q.   Let's look at what the standard
12       actually notes.
13                Principles on page 2,
14       Mr. Delaney, we see at the very bottom it
15       says here the purpose of risk management
16       is the creation and protection of value.
17       It improves performance, encourages
18       innovation and supports the achievement of
19       objectives.  Do you see that?
20           A.   Absolutely.
21           Q.   So you would agree with me the
22       principles of risk management includes
23       supporting the achievement of objectives?
24                MS. ELLIS:  Objection, form.
25                THE WITNESS:  I can plainly see

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 237

1                        WEINER
2          the language here that the principle
3          enumerated by ISO encourages
4          innovation and supports the
5          achievement of objectives.
6     BY MS. CARITIS:
7          Q.   Okay.  The standard does not
8     define what a company's objective should
9     be?
10         A.   ISO standard on risk management
11    does not attempt to define the company's
12    objectives, absolutely.
13         Q.   Some companies' objective might
14    be to improve profit; fair?
15         A.   I think most public companies
16    have an objective of improving profit.
17         Q.   And the ISO 3100, it provides a
18    framework but it doesn't dictate the
19    decision that a company should take; is
20    that fair?
21         A.   ISO 3100 outlines a process or
22    framework I guess is a fair word or a
23    guideline upon which proper risk
24    management processes can be modeled.
25         Q.   If we look at page 3 of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 238

1                    WEINER

2       standard, it lays out some elements that

3       should according to the standard be

4       integrated and included in an effective

5       risk management program.  We see on the

6       bottom of the page it looks like there are

7       eight elements.  Do you see where I am,

8       Mr. Weiner?

9            A.   I've got it in front of me.

10           Q.   Okay.  The second element, excuse

11      me, the third element notes that risk

12      management, effective risk management

13      strategies must be customizable.  Do you

14      see that?

15           A.   I agree that effective risk

16      management requires that the risk

17      management strategies be customized,

18      specifically customized and proportionate

19      to the organization's external and

20      internal context related to its

21      objectives.

22           Q.   So again, fair to say the ISO

23      3100 it provides guidelines but it leads

24      with the idea that a company will have to

25      customize its own personal use of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 239

1                    WEINER
2    guidelines based on its own business and
3    objectives?
4              MS. ELLIS:  Objection, form.
5              THE WITNESS:  I agree absolutely
6         that effective risk management
7         requires these particular elements as
8         documented in ISO 31000 which includes
9         customization and proportionality to
10         the internal and external context.
11    BY MS. CARITIS:
12         Q.   Another of the elements that ISO
13    31000 identifies is that the effective
14    risk management should be inclusive, which
15    it describes as "appropriate and timely
16    involvement of stakeholders, enables their
17    knowledge, views and perceptions to be
18    considered.  This results in improved
19    awareness and informed risk management."
20              Do you see that?
21         A.   I am looking at the screen
22    reading along with you as you read part d)
23    of the section on effective risk
24    management.
25         Q.   Are you aware that Uber engaged a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 240

```
 1                      WEINER
 2     safety advisory board to assist in its
 3     product development?
 4              MS. ELLIS:  Objection, form.
 5              THE WITNESS:  I have seen
 6         documents that relate to the safety
 7         advisory board gathered by Uber, both
 8         at the board level and within
 9         management of the safety division.
10     BY MS. CARITIS:
11         Q.   Are you aware of the expertise
12     and experience of the individuals that
13     served on Uber's safety advisory board?
14              MS. ELLIS:  Objection, form.
15              THE WITNESS:  I have seen bios of
16         some of the people on safety advisory
17         board and I have seen bios of the
18         safety engineers at Uber that manage
19         safety practices.
20     BY MS. CARITIS:
21         Q.   Are you also aware that Uber
22     partnered with various experts in sexual
23     assault prevention or victim advocacy?
24              MS. ELLIS:  Objection, form.
25              THE WITNESS:  I have seen
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 241

1                      WEINER
2           documents related to these two
3           organizations that Uber engaged for
4           the purpose of documenting advocacy
5           and standards they spoke to one
6           organization that they work with on
7           their taxonomy for sexual assault and
8           sexual misconduct.
9      BY MS. CARITIS:
10          Q.   Another element that the ISO
11     standard we're discussing emphasizes is
12     the need to be dynamic.  "Risks can
13     emerge, change or disappear as an
14     organization's external and internal
15     context changes."
16              Do you see that?
17          A.   Absolutely.  The dynamic nature
18     of risk management is well known in my
19     experience in the industry.
20          Q.   Okay.  And that's kind of one
21     perfect example of we were talking about
22     for your reservation system.  You had to
23     be dynamic and learn from a risk that
24     later was identified after a product was
25     already released; fair?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2           MS. ELLIS:  Objection, form.
 3           THE WITNESS:  I think I would
 4       highlight that as both dynamic and
 5       best available information.  As better
 6       information became available, you have
 7       to adjust your risk management
 8       practices to meet the needs of your
 9       customer base at the moment in time
10       when the information becomes
11       available.
12   BY MS. CARITIS:
13       Q.  Is it your opinion that Uber's
14   product development lifecycle did not --
15   and priorities did not change over time?
16           MS. ELLIS:  Objection to form.
17           THE WITNESS:  You're asking me if
18       Uber's priorities changed over time.
19       And if you'd like, I can read to you a
20       paragraph where I describe quite
21       literally Uber's priorities changing
22       over time and their allocation of
23       resources changing with them.  So I
24       believe my report clearly states that
25       Uber's priorities changed over time.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 243

```
 1                    WEINER
 2    BY MS. CARITIS:
 3         Q.   You can direct me to that
 4    paragraph.  I'll take a look.
 5         A.   Sure.
 6              (Witness perusing document.)
 7              Here we go.  Paragraph 122.  "We
 8    see Uber shifting its investment of its
 9    total technology resources in the ████
10    ██████████████████████████████████████
11    ██████████████████ between a two-year
12    period from ████████ of its total
13    technology resources to ██████████ of its
14    total technology resources as evidenced by
15    priorities changing."
16         Q.   Okay.  So it's your testimony
17    that Uber invested less in safety in 2020
18    than it did in 2017?
19         A.   My testimony --
20              MS. ELLIS:  Objection, form.
21              THE WITNESS:  -- has nothing to
22         do with safety in this particular
23         case.  What I am speaking to in this
24         particular case is their investment in
25         these core ██████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1              WEINER
 2    ████████████████████  I go on to talk
 3    about safety investments in paragraph
 4    123.
 5  BY MS. CARITIS:
 6    Q.   Okay.  Mr. Weiner, we're focused
 7  today on Uber's safety initiatives so is
 8  it your opinion that in 2020, Uber
 9  prioritized safety less than it did in
10  2017?
11         MS. ELLIS:  Objection, form.
12         THE WITNESS:  What I can read you
13    is the two sentences here.  "My
14    analysis of the data from three
15    resource allocation presentations I
16    discuss in paragraph 22 is that the
17    allocation of resources across Uber to
18    the safety and insurance area was █████
19    ███████████████████████████
20    █████████████████████████████
21    ████████████████████  This shows
22    that safety remained a marginal
23    investment relative to other business
24    drivers."
25    ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2   BY MS. CARITIS:
 3       Q.   Okay.  So I understand you're
 4   saying that Uber allocation of resources
 5   as a -- I guess rate decreased.  Do you
 6   think their prioritization of safety
 7   decreased from 2017 to 2020?
 8            MS. ELLIS:  Objection, form.
 9   BY MS. CARITIS:
10       Q.   And if you say that's not the
11   focus of my report, then that's an answer,
12   too.  I just want to understand the scope
13   of your opinion.
14       A.   As you can tell, I'm trying to be
15   very thorough and precise in my answer to
16   you.  Give me just a second.
17            The allocation to the safety and
18   insurance area stayed within a relatively
19   narrow band of ███████████████
20   ████████████.  So you're asking me
21   if I have stated in my report that they
22   decreased their investment in safety and
23   what I'm saying is the allocations that I
24   was able to gather from their documents
25   show that it went from ████████ to
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 246

```
 1                      WEINER

 2    ███████████████████ for the safety and

 3    insurance area.

 4        Q.   I'm asking a different question.

 5    So I'm not focused on how much money they

 6    spent, okay?  I'm not worried about money

 7    spent.  I'm asking if you think the way in

 8    their product development lifecycle they

 9    prioritized safety features decreased,

10    they prioritized it less in 2020 than they

11    did in 2017.  Do you have an opinion as to

12    that question?

13             MS. ELLIS:  Objection, form.

14             THE WITNESS:  I'm checking.

15         Having just reviewed my seven opinions

16         documented in my report, there is no

17         evidence of an opinion stating that

18         Uber changed its priority between 2017

19         and 2020 on safety.

20    BY MS. CARITIS:

21        Q.   Do you believe that Uber released

22    more safety features after 2017 than it

23    did before 2017?

24             MS. ELLIS:  Objection, form.

25             THE WITNESS:  As you have seen in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 247

```
 1                    WEINER
 2        my report, Uber released safety
 3        features primarily for two reasons.
 4        One, to improve its safety perception
 5        of its riders and drivers which it
 6        deemed critical to its growth; and
 7        two, as it relates to actually
 8        reducing incidents of sexual assault
 9        and sexual misconduct.  Most of the
10        features that I have documented here
11        were introduced after 2017.
12   BY MS. CARITIS:
13        Q.   Okay.  The first part of the
14   answer had nothing to do with my question.
15   My question is not why you think they
16   released safety features, you said
17   perception versus actual incident
18   reduction.  I'm asking just the number of
19   safety features that Uber released.  You
20   would agree with me that they released
21   more features after 2017 than they did
22   from their inception to 2017, you agree
23   with me there?
24        A.   If we look at my Appendix C or
25   Exhibit C, I enumerate the introduction of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 248

```
1                        WEINER
2    safety features and I can confirm your
3    statement that the majority of the safety
4    features were introduced after 2017.
5         Q.   You just gave another opinion
6    concerning perception.  You said that
7    based on your review of the materials, you
8    think that a majority of the safety
9    features that Uber released were released
10   in order to impact consumer perception of
11   safety.  What's your basis for that
12   opinion?
13        A.   Let's read the opinion and then
14   the basis, of course, was documented well
15   in my report.  So the opinion specifically
16   states I reviewed --
17        Q.   Can you let me know where you
18   are?
19        A.   I apologize.
20             Page 119, opinion 7.  It states,
21   "I reviewed Uber's portfolio of safety
22   features, defined as those that were
23   designed to influence rider or driver's
24   perception of safety, which was critical
25   to Uber's growth, or (2) were intended to
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 249

```
 1                    WEINER
 2      provide direct protection against sexual
 3      violence.  Based on Uber's records, only
 4      three features - safety, risk assessed
 5      dispatch, audio and video recording, and
 6      W2W, which I've defined earlier as
 7      Women-to-Women, were supported by internal
 8      analysis for Uber documented reductions in
 9      sexual violence incident rates.  By
10      contrast, other safety features
11      (summarized in Exhibit C) were primarily
12      evaluated against perception-based metrics
13      (such as safety sentiment or feature
14      awareness) rather than measurable
15      reductions in incidents.  It is my opinion
16      that this governance approach reflects a
17      prioritization of perception over
18      prevention, inconsistent with industry
19      standard for product development where
20      foreseeable risks to physical safety
21      exist."
22          Q.   Mr. Weiner -- I'm sorry, I'm
23      sorry, please let me ask a follow-up.
24      That was a long one.  Let me ask some
25      follow-ups and then you can keep talking.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2          Prior to this litigation, when
 3     have you ever measured consumer sentiment
 4     associated with a safety product feature?
 5               MS. ELLIS:  Objection, form.
 6               THE WITNESS:  As we reviewed in
 7          my history, I've worked for the
 8          Brierley+Partners organization which
 9          was an ad agency focused on loyalty,
10          and we reviewed the customer sentiment
11          across many products, one of which was
12          the safety people felt in hotel
13          chains.
14     BY MS. CARITIS:
15          Q.   Is it fair to say, Mr. Weiner,
16     that to come to your opinion 7 that Uber's
17     prioritization of perception over
18     prevention was inconsistent with industry
19     standards for product development where
20     foreseeable risk to physical safety exist,
21     the basis of that opinion was on Uber
22     documents you read; is that right?
23          A.   The basis of that opinion was on
24     Uber documents that I read and other
25     documents which I footnoted in the opinion
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 251

                          WEINER
1
2      which are, for example, the deposition of
3      Hanna Nilles, ISO 94, 9241-11, the
4      deposition of Gus Fuldner and Uber
5      documents plus those additional documents
6      that I mentioned.
7          Q.   Mr. Weiner, can you name for me
8      one safety measure that could serve as
9      direct protection against sexual violence,
10     other than those measures that Uber has
11     implemented or piloted on its platform?
12               MS. ELLIS:  Objection, form.
13               THE WITNESS:  You're asking me to
14          come up with a new safety feature?
15     BY MS. CARITIS:
16         Q.   No, I'm asking you -- you're
17     opining that whether or not Uber's
18     features were intended to provide direct
19     protection against sexual violence.  I'm
20     asking you to tell me, do you have any
21     experience in identifying any way to
22     reliably prevent sexual violence?
23               MS. ELLIS:  Objection, form.
24               THE WITNESS:  I have spent 37
25          years in product development building

Page 252

```
 1                    WEINER
 2        products that achieve all sorts of
 3        outcomes.  I have reviewed extensive
 4        Uber documentation where they focus on
 5        the prevention of sexual violence.  I
 6        have experience in reading and
 7        reviewing reports, looking at internal
 8        studies and coming to opinions based
 9        on prioritization processes.  I have
10        documented those opinions and bases
11        here in my report.
12   BY MS. CARITIS:
13        Q.  We've already talked about this
14   but Mr. Weiner, you've never worked on a
15   product related to safety against sexual
16   misconduct or sexual violence; right?
17             MS. ELLIS:  Objection.
18             THE WITNESS:  We have discussed a
19        series of products that regard
20        physical safety.
21   BY MS. CARITIS:
22        Q.  That wasn't my question.  Please
23   listen to my question.  Have you ever
24   worked on a product --
25             MS. ELLIS:  Counsel, if you could
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 253

```
 1                    WEINER
 2        refrain from cutting off the witness,
 3        he was answering the question, but
 4        we're getting to a point in the day, I
 5        understand it's after lunch, let's
 6        just not cut off the witness, please.
 7             MS. CARITIS:  I totally agree and
 8        I apologize, but Mr. Weiner if you
 9        could please listen to my question and
10        listen to what I'm asking because I
11        understand you want to give a complete
12        and full answer.  I'm asking a little
13        more narrow question so please answer
14        that one.  I'm sure Ms. Ellis will
15        give you an opportunity to talk more
16        if you want later, but please listen
17        to my question and I will respectfully
18        ensure that you have time to answer my
19        question.  Let me ask it again.
20   BY MS. CARITIS:
21        Q.   Mr. Weiner, you have no
22   experience building products related to
23   the prevention sexual violence
24   specifically?
25             MS. ELLIS:  Objection, form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 254

1              WEINER
2          THE WITNESS:  As I have defined
3       sexual violence in my report and
4       described to you the situations where
5       I worked on products that included
6       physical safety, I would not agree
7       with your statement that I have never
8       worked on them.
9    BY MS. CARITIS:
10        Q.   Okay.  I'm not sure if you heard
11   me.  I didn't say physical safety, I said
12   sexual violence.
13        A.   I started with responding to
14   sexual violence.  The first thing I wanted
15   to ground on is the definition of the term
16   sexual violence which I enumerated in my
17   report.  The sexual violence aspects that
18   occurred at United were considerations.
19        Q.   You just changed your testimony,
20   but that's fine.  We'll have those and we
21   can deal with it later.
22          MS. ELLIS:  I move to strike the
23       commentary of counsel on the record.
24   BY MS. CARITIS:
25        Q.   You also talk in this opinion

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 255

```
 1                      WEINER
 2      setting about feature awareness.  Are you
 3      aware of Uber testimony about the
 4      importance of feature awareness in
 5      preventing sexual assault?
 6              MS. ELLIS:  Objection, form.
 7              THE WITNESS:  If you have a
 8          particular document that you're
 9          referring to, or Uber executives have
10          talked about future awareness in
11          preventing sexual assault, I would
12          appreciate the opportunity to see that
13          document.
14      BY MS. CARITIS:
15          Q.   That's exactly what I'm talking
16      about but I'm asking you if you are aware
17      of it.  Are you aware that Uber has
18      discussed in their product development the
19      importance of product awareness in
20      preventing incidents of sexual misconduct,
21      yes or no?
22              MS. ELLIS:  Objection, form.
23              THE WITNESS:  I have seen
24          documents where Uber executives were
25          discussing awareness as having an
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 256

1                        WEINER
2          impact on sexual assault.  I have not
3          seen any documented study that
4          demonstrates those results in an
5          internal study from Uber.
6     BY MS. CARITIS:
7          Q.   Okay.  You would agree that any
8     safety feature, it can only work if people
9     know to use it; right?
10              MS. ELLIS:  Objection, form.
11              THE WITNESS:  I can disagree with
12         that statement because I know one of
13         the most effective safety features
14         that Uber has created to prevent
15         sexual violence is S-RAD which they
16         worked very hard to keep out of public
17         awareness for many years.  So I do not
18         agree the only way that it can be
19         effective is people know about it.
20    BY MS. CARITIS:
21         Q.   Do you agree that the 911 button
22    is a good step that Uber invented in order
23    to keep passengers safe on rides?
24              MS. ELLIS:  Objection, form.
25              THE WITNESS:  I am not, as you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 257

1                    WEINER
2          have gone in great detail to discuss
3          with me, able to opine on the
4          psychology of people or how they make
5          choices about safety and crime.  What
6          I can tell you is what I've reviewed
7          in Uber's documents, which is the 911
8          button had an impact on the perception
9          of both riders and drivers, that it
10         was a feature that made people feel
11         safer.
12     BY MS. CARITIS:
13         Q.   Another way that it could be
14     helpful to deter crime by marketing safety
15     features is because then a driver knows
16     that a rider has the ability to utilize
17     the safety feature on a trip; right?
18             MS. ELLIS:  Objection, form.
19             THE WITNESS:  I have seen studies
20         and reports in Uber that state that
21         driver awareness of safety features
22         has an impact on the perception of
23         safety, absolutely.
24     BY MS. CARITIS:
25         Q.   I'm asking a different question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 258

1                           WEINER
2      So I'm saying that say I'm a driver, I
3      know Uber's marketed to me that my
4      passengers have the ability to push a
5      button and text 911 and send my info.  My
6      driver awareness of that safety feature
7      could deter me from committing a crime?
8                MS. ELLIS:  Objection, form.
9                THE WITNESS:  If you have an Uber
10          document that shows evidence of that
11          effect, I would like to see it and
12          would find it helpful in my
13          understanding of Uber's safety
14          features.
15     BY MS. CARITIS:
16          Q.   Mr. Weiner, is it your opinion
17     that the only safety features Uber should
18     implement are those where they actually
19     have a study confirming its effectiveness?
20                MS. ELLIS:  Objection, form.
21                THE WITNESS:  I have to read you
22          the opinion again because the answer
23          to your question implies we have not
24          communicated clearly.  What I said was
25          "Uber failed to incorporate industry

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 259

```
1                      WEINER
2          standard risk-based practices into its
3          product development lifecycle and
4          instead prioritized growth, cost
5          reduction and competition over the
6          timely implementation of safety
7          features when its own internal studies
8          indicated it could mitigate risks of
9          sexual assault and misconduct."
10             Nowhere in this opinion do I say
11         that safety features that have an
12         impact on perception have no value.
13         That is not what my opinion says.
14    BY MS. CARITIS:
15         Q.   Okay.  So opinion 7 though, you
16    make a big stink about how Uber safety
17    features in your opinion were put in place
18    for perception over prevention.  So is
19    that a bad thing in your opinion or are
20    you not willing to say it's good or bad,
21    you're just saying they implemented
22    features for perception over prevention?
23             MS. ELLIS:  Objection, form,
24         compound, misstates the testimony and
25         improper commentary.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2           THE WITNESS:  What I can say is
 3       what's written in black and white in
 4       my opinion.  It is my opinion that
 5       "this governance approach reflects a
 6       prioritization of perception over
 7       prevention inconsistent with industry
 8       standards for product development
 9       foreseeable risk to physical safety
10       exists."
11           I did not assign a good or bad
12       characterization.  I simply stated my
13       opinion as is factually understood to
14       me.
15   BY MS. CARITIS:
16       Q.   So you're not saying that every
17   time you find that something is
18   inconsistent with industry standard that
19   it's negative?
20           MS. ELLIS:  Objection, form.
21           THE WITNESS:  We seem to be
22       talking past each other a bit.  You
23       are asking me if I find -- I'll
24       restate your question, if I believe
25       that prioritizing perception over
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 261

1                         WEINER
2          protection is good or bad.  What I
3          need to refer to at this time is ISO
4          guide 51 which my colleagues provided
5          to you last night which enumerates
6          quite literally guidance on page 7
7          that I have called the hierarchy of
8          risk.  And in this document on page 7,
9          it enumerates that inherently safe
10         design is the priority.  Guards and
11         protective devices are the second
12         step, and information for use is the
13         third step.  So again relying heavily
14         on industry standards, I am suggesting
15         that coming up with inherently safe
16         design has a higher priority than
17         increasing perception of safety.
18    BY MS. CARITIS:
19         Q.   Okay, so you're saying that it is
20    bad that Uber put perception over
21    prevention, yes or no?
22              MS. ELLIS:  Objection, form.
23              THE WITNESS:  I cannot answer the
24         question bad with yes or no because
25         I'm not talking about bad at all.  I'm

Page 262

```
 1                    WEINER
 2        not talking about good or bad, I'm
 3        talking about -- I'm talking about
 4        standards and my experience.  I'm not
 5        trying to assign good or bad to those
 6        standards and experience.  I'm being
 7        very literal and have written in great
 8        detail in my report my opinions.
 9   BY MS. CARITIS:
10        Q.   Let's look back at -- so getting
11   back to ISO 31000, nowhere does the
12   standard say that a company must implement
13   a specific response to a risk; right?
14        A.   I am not familiar with any
15   statement in ISO 31000 that states that a
16   specific response to a specific risk must
17   be implemented.
18        Q.   ISO 3100 includes risk criteria;
19   right?  I'm on page 10.
20        A.   ISO 3100 covers 6.3 which covers
21   scope, context and criteria of risk.
22        Q.   Okay.  And I'm talking
23   specifically about the defining risk --
24   maybe not.  One sec.
25             I'm talking about 634 defining
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 263

                          WEINER
1
2      risk criteria.  You would agree with me,
3      we have talked about this before, but this
4      sets out the principle that companies
5      can't always eliminate a hundred percent
6      of risk; fair?
7               MS. ELLIS:  Objection to form.
8               THE WITNESS:  I am not aware of
9          any company that has ever eliminated
10         100 percent of risk, to use your
11         words.
12     BY MS. CARITIS:
13         Q.   So when we're defining a risk
14     criteria, the first thing that the ISO
15     standard says is we have to specify the
16     amount and type of risk that an
17     organization can take; right?
18               MS. ELLIS:  Objection, form.
19               THE WITNESS:  This ISO standard
20         enumerates that the organization
21         should specify the amount and type of
22         risk that it may or may not take
23         relative to objectives.
24     BY MS. CARITIS:
25         Q.   Again, ISO standard doesn't tell

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 264

1                    WEINER
2      a company what its objective should or
3      shouldn't be; right?
4          A.    There's no ISO standard in my
5      awareness that tells a company how to set
6      its objectives.
7          Q.    When you were analyzing whether
8      or not Uber complied with industry
9      standards such as ISO 3100, what objective
10     were you using to conduct your analysis?
11         A.    I was looking at the objectives
12     and OKRs enumerated in Uber's documents,
13     specifically heavily relying on the OKRs
14     of the safety and insurance division in a
15     series of communications between Sachin
16     Kansal and one of his deputies on a weekly
17     basis over a four-year period.
18         Q.    I'm looking for a simple answer.
19     What in your mind was Uber's objective?
20             MS. ELLIS:  Objection, form.
21             THE WITNESS:  Uber had almost 50
22         OKRs at any given time.  They did not
23         (inaudible) objective.
24     BY MS. CARITIS:
25         Q.    Do you disagree with any of

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 265

1                    WEINER
2       Uber's objectives?  Do you think their
3       objectives were wrong or do you think just
4       the way they prioritized risk was wrong?
5              MS. ELLIS:  Objection, form,
6          compound.
7              THE WITNESS:  I think, and I'll
8          read it again, it is my opinion that
9          "this governance approach reflected a
10         prioritization of perception over
11         prevention inconsistent with industry
12         standards for a product development
13         where foreseeable risks to the
14         physical safety exists."
15      BY MS. CARITIS:
16         Q.   So the guidelines that we've been
17      talking about, they set a bunch of factors
18      that should be considered to set a risk
19      criteria.  Do you see that in 6.3.4 of the
20      standard, the bullets?
21         A.   I'm very familiar with the
22      criteria in 6.3.4.
23         Q.   Some of the factors that it
24      recommends that organizations take into
25      account are that nature and type of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 266

1                        WEINER
2        uncertainty, the likelihood, time-related
3        and time-related factors.  You agree with
4        taking all those into account when
5        defining risk?
6             A.   I believe I already stated that
7        ISO 31000 is a great description of
8        industry practices in risk management.
9        And yes, that means I agree with the
10       specific elements that it highlights.
11            Q.   That ISO acknowledges that if a
12       risk is rare, a company should take that
13       into account when determining its risk
14       management strategy; right?
15                 MS. ELLIS:  Objection, form.
16                 THE WITNESS:  Are you pointing to
17            a specific sentence in this document?
18                 MS. CARITIS:  I am talking about
19            the risk criteria, likelihood.
20                 MS. ELLIS:  I'm sorry, Counsel,
21            was that a question?  Are you
22            directing him to --
23                 THE WITNESS:  Consequences, both
24            positive and negative and likelihood
25            will be defined and measured.  The

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 267

```
 1                    WEINER
 2        consequence of sexual assault is an
 3        extremely negative consequence and I
 4        agree that both the consequences and
 5        the likelihood have to be considered
 6        in the review of the risk criteria.
 7   BY MS. CARITIS:
 8        Q.   Okay.  So let's talk broadly, not
 9   sexual assault, just a risk, a more broad
10   risk.
11            In your opinion how frequent must
12   a risk occur for it to be included in a
13   risk treatment?
14            MS. ELLIS:  Objection, form.
15            THE WITNESS:  I cannot give you a
16        prescribed answer to that as we have
17        talked today.  I gave you an example
18        where a single risk led to a risk
19        treatment so it basically doesn't even
20        have to happen, it just has to be a
21        risk.  I also believe you must
22        consider the consequences and the
23        likelihood in the relative priority on
24        that risk.
25   ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 268

```
 1                        WEINER
 2    BY MS. CARITIS:
 3         Q.   Are you aware that from 2017 to
 4    2022 0.006 percent of trips in the United
 5    States had a report of sexual assault or
 6    sexual misconduct?
 7              MS. ELLIS:  Objection, form.
 8              THE WITNESS:  I am aware that
 9         when considering sexual assault risk
10         at Uber, it is important to consider
11         both the numerator and denominator
12         that you use.  There are many safe
13         trips on Uber but Uber was well aware
14         of certain conditions where risk was
15         higher.  So I might ask you if you
16         have this data, do you know how many
17         of the sexual assaults occurred in
18         nighttime areas near bars where the
19         sex of the driver and the rider were
20         different, because that number might
21         have a different statistical measure
22         than the one that you just quoted.
23    BY MS. CARITIS:
24         Q.   You're the expert, Mr. Weiner, so
25    you tell me.  What were the statistics
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 269

```
 1                      WEINER
 2     related to that instance that you just
 3     provided, how often is it likely for a
 4     sexual misconduct or sexual assault report
 5     to occur, even in that isolated scenario
 6     you just said, what's the number?
 7              MS. ELLIS:  Objection to form.
 8          It calls for speculation and outside
 9          the terms of his report.
10              MS. CARITIS:  If he wants to say
11          I don't know that's great.  He just
12          asked me.  I'm just asking him if he
13          knows.
14              THE WITNESS:  I asked you if you
15          knew because you quoted a number that
16          seems wildly out of a context using a
17          denominator of all rides.
18     BY MS. CARITIS:
19          Q.   So let's take a step back.  Well,
20     first off, you don't know the statistic
21     you just asked me.  You don't know actual
22     incident -- you're not aware sitting here
23     today of the number of let's just say
24     reported sexual assaults or sexual
25     misconduct that occur late at night at a
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 270

```
1                         WEINER
2       bar; is that right?
3               MS. ELLIS:  Objection to form.
4               THE WITNESS:  What I am aware of
5           and is documented in my report is that
6           sexual assaults and sexual misconduct
7           are underreported on the Uber
8           platform.  And I am also aware that
9           sexual assault and sexual misconduct
10          that occurs late at night in the
11          location of a bar where a male and
12          female are in a car together is higher
13          than the statistic you just provided.
14              MS. ELLIS:  Counsel, we've been
15          going over an hour.  I don't know if
16          you're getting to a point where you
17          want to take a break.
18              MS. CARITIS:  I'll spell you
19          soon.  Give me like five.
20      BY MS. CARITIS:
21          Q.   I lost my train of thought.
22              Okay.  Uber has implemented in
23      their product safety features; correct?
24          A.   My Exhibit C enumerates a number
25      of safety features implemented by Uber
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 271

```
 1                    WEINER
 2      that I was able to identify in their
 3      documents and in their --
 4           Q.   So --
 5                MS. ELLIS:  Counsel, I would just
 6           ask you to stop cutting off the
 7           witness's answer.
 8                MS. CARITIS:  I thought he was
 9           done.  I honestly thought he was done.
10           I apologize.
11      BY MS. CARITIS:
12           Q.   Let's talk about that
13      circumstance you just identified.  I'm a
14      female, I'm at a bar late at night.  I
15      want to talk a little bit about some of
16      the features that Uber did implement in
17      their product based on a understanding
18      that that ride might be more risky than a
19      ride in the middle of the day.
20                If I get in a vehicle late at
21      night at a bar, I have an option to Share
22      My Ride.  You're aware of that,
23      Mr. Weiner?
24                MS. ELLIS:  Objection, form.
25      ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 272

1                    WEINER
2    BY MS. CARITIS:
3        Q.   And if you're not aware you can
4    say not aware.
5        A.   I am aware of that and used that
6    feature on my ride this morning to share
7    with my husband on the way to this
8    deposition.
9        Q.   I do it every time with mine,
10   too.  Not only would I, a female late at
11   night at a bar have the option to share my
12   ride, I would also have an option to make
13   that happen automatically.  You're aware
14   of that product feature that Uber put in
15   place in its product; right?
16       A.   I can tell you that I'm not only
17   aware of that feature but I'm sure your
18   colleagues at Uber can detect that my
19   husband has that feature activated on his
20   Uber account.
21       Q.   Another feature that Uber
22   implemented into the app that I could
23   utilize if I'm out at night late at night
24   at a bar is that I could also request a
25   pin and make sure that I'm getting in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 273

1                    WEINER

2    right vehicle late at night; right?

3    You're aware of the pin verification

4    feature?

5         A.   I can tell you the specific

6    paragraph that I can more generally say I

7    have enumerated the pin feature in my

8    Exhibit C.  Would you like to know the

9    paragraph or is that okay?

10        Q.   No, that's okay.  I'm just

11   talking through some of the safety

12   features that were implemented in the

13   product that I just want to make sure

14   you're aware of.

15             Another feature that Uber did

16   implement in its product developments was

17   phone number anonymization, you're aware

18   of that; right?

19        A.   Phone number anonymization and

20   address anonymization are enumerated as

21   number 6 in my Exhibit C.

22        Q.   That's one example of a product

23   feature that Uber did include in its

24   product development lifecycle; right?

25        A.   Uber absolutely included phone

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 274

1                    WEINER

2      number and address anonymization as

3      enumerated in paragraph 6 of Exhibit C.

4           Q.   So a few other features that Uber

5      did implement in its product development

6      lifecycle would be the emergency button.

7      You're aware of that one; right?

8           A.   I'm both aware of the emergency

9      button and I believe as you have seen in

10     my Exhibit D I have screenshots of the

11     emergency button.  I can give you a page

12     number.

13          Q.   That's okay.  There also was --

14     Uber also implemented in the product

15     development lifecycle a rapid SOS

16     integration; right?  You're aware of that?

17               MS. ELLIS:  Objection, form.

18               THE WITNESS:  You're referring to

19          the ADT integration?  I am aware of

20          the ADT integration sometimes referred

21          to as the rapid SOS integration.

22     BY MS. CARITIS:

23          Q.   There was actually a feature a

24     little earlier in 2018 that was included,

25     but you're right that there was also a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 275

```
               WEINER
 1
 2    live help from ADT later.  Are you aware
 3    of the 2018 rapid SOS integration feature
 4    that Uber implemented in its product
 5    development lifecycle?
 6         A.   Give me one second.  I can refer
 7    beyond my report to Ms. Esteves's
 8    deposition aid covering all safety
 9    features and reflects memory.  Yes, the
10    2018 feature is enumerated on page 1 of
11    Ms. Esteves's deposition aid.
12         Q.   And another feature that
13    hopefully is on there or else you can tell
14    me if you're aware of is 2018 Uber also
15    implemented a feature called RideCheck in
16    its product development lifecycle.  You're
17    aware of that one?
18         A.   I am familiar with and have
19    looked at the RideCheck feature that Uber
20    implemented in 2018.
21         Q.   We talked a little bit earlier
22    about how some features require driver
23    initiation -- excuse me, rider initiation
24    and others don't.  You would agree that
25    RideCheck is a feature that Uber invented
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 276

1                      WEINER
2       and implemented into its product that
3       happens without the rider doing anything;
4       fair?
5              MS. ELLIS:  Objection, form.
6              THE WITNESS:  The RideCheck
7          feature operates on the network and
8          detects patterns of behavior for which
9          it then intervenes with text messages
10         or pop-ups on the rider or driver
11         phone.
12      BY MS. CARITIS:
13      Q.   Okay.  And you're aware is that
14      the RideCheck feature was integrated into
15      the platform in 2018 after Uber did become
16      aware that there were certain instances
17      where there were deviations en route and
18      they wanted to have a solution to detect
19      those deviations, you're aware of that?
20             MS. ELLIS:  Objection, form.
21             THE WITNESS:  Paragraph 15 and 16
22         on page 13 of my Exhibit C enumerate
23         just that.  The feature uses GPS and
24         sensors from the driver's smartphone
25         to identify rare events like

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 277

```
 1                    WEINER
 2      unexpected long stops or possible
 3      crashes, yes.
 4   BY MS. CARITIS:
 5      Q.   Another feature that Uber
 6   implemented in their product development
 7   lifecycle and ultimately rolled out was a
 8   text to 911 feature.  Are you aware of
 9   that one?
10           MS. ELLIS:  Objection to form.
11           THE WITNESS:  The 911 button is
12      covered on page 1 of Ms. Esteves's
13      depo aid and states that it was began
14      as a texting feature in 2019 as a
15      pilot and 2022 as a rolled-out
16      feature.
17   BY MS. CARITIS:
18      Q.   Are you aware of any other
19   transportation -- let me ask a better
20   question.
21           Are you aware of any taxi apps
22   that have created or utilized a text 911
23   button?
24           MS. ELLIS:  Objection, form.
25           THE WITNESS:  I have recently
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 278

```
 1                    WEINER
 2        been in a Lyft and I'm trying to
 3        recall the specific 911 feature that
 4        they had.  I'm afraid I cannot recall
 5        if it allowed texting, so I'm not
 6        certain if the Lyft 911 feature
 7        included texting ability.
 8   BY MS. CARITIS:
 9        Q.   That was Lyft.  I was asking
10   about taxis.
11             What about in taxi fleets, are
12   you aware of any taxi fleets that utilize
13   or integrated in their product development
14   lifecycle a text to 911 button?
15        A.   I can only speak from my personal
16   experience since I have not researched
17   taxi fleets properly, that I have not been
18   in a New York City yellow cab where I was
19   presented with a text to 911 feature.
20        Q.   What about RideCheck feature,
21   have you ever heard of any taxi company
22   that did what Uber did and built a feature
23   that would send a notification if your
24   ride went off course?
25             MS. ELLIS:  Objection, form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 279

1                        WEINER
2            THE WITNESS:  I am not fully
3        aware of everything that Lyft has
4        offered but I can tell you from my
5        personal awareness, I am not aware of
6        a RideCheck feature available on
7        another rideshare platform.
8    BY MS. CARITIS:
9        Q.   Okay.  And I also was asking
10   about taxis, so same answer for taxis that
11   you're not aware of a taxi company that
12   has similarly invented or utilized a
13   RideCheck feature?
14       A.   In my research of safety features
15   in taxis, I did not come across in any
16   peer-reviewed literature, Google Scholar
17   or Google searches a ride check feature.
18           MS. ELLIS:  Counsel, we've been
19       going for 10 minutes.
20           MS. CARITIS:  Thank you for the
21       reminder.  Why don't we go off the
22       record.
23           THE VIDEOGRAPHER:  We're going
24       off the record.  This is the end of
25       media unit 5.  The time is 3:27.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 280

1              WEINER
2         (Recess taken from 3:27 p.m. to
3         3:44 p.m.)
4         THE VIDEOGRAPHER:  We're back on
5         the record.  This is the beginning of
6         media unit 6.  The time is 3:44.
7         MS. CARITIS:  Mr. Weiner, before
8         we went on break, we were talking
9         about, and I believe you were
10        referring to the Mariana Esteves
11        deposition aid, and just so the record
12        is clear, I just sent what I think is
13        the same document you have to
14        Mr. Delaney.
15        Sorry, Curtis, you might have
16        literally just gotten it, but I would
17        like to mark that new document that
18        should have just come in, Curtis, as
19        Exhibit 9, and that is again the
20        Esteves deposition aid that Mr. Weiner
21        brought with him today and was
22        referring to previously, and we'll
23        just take a quick look at a few things
24        on that document.
25        (Exhibit 9, Esteves deposition

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2        aid, marked for identification.)
 3             MS. CARITIS:  Okay.  I think we
 4        can -- Curtis, I have it in front of
 5        me so unless I can -- I'll just keep
 6        going and once you have it to enter --
 7        unless Tiffany or Mr. Weiner, you want
 8        to wait until it's on the screen.
 9             MS. ELLIS:  Let's just confirm
10        this was marked as 1581, the July 15,
11        2025 exhibit -- or deposition?
12             MS. CARITIS:  No.  That's what I
13        -- is that not the one you're
14        referring to?
15             MS. ELLIS:  No, we're referring
16        to safety features from her July 15,
17        2025 Exhibit 1581.
18             MS. CARITIS:  Okay.  Well, let's
19        look at this one.  I like this one,
20        Curtis.  We can take a quick look at
21        this one.
22             THE WITNESS:  Do you have this
23        one?  Yes, we have that one as well.
24             MS. CARITIS:  That would be
25        great.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 282

1                      WEINER

2            MS. ELLIS:  That one is Exhibit

3        1991 to the August 28, 2025.

4            MS. CARITIS:  That's right.  So

5        let's go ahead and mark this as

6        Exhibit 10 [sic], please.

7    BY MS. CARITIS:

8        Q.    Mr. Weiner, I understand you do

9    have a paper copy of this one in front of

10   you.  Was this an additional document that

11   you were provided in connection with your

12   expert report and opinion?

13       A.    I believe I reference this

14   document in my materials considered.  I

15   could check that for you but this is a

16   document that I was aware of before I

17   filed my report.

18       Q.    Okay.  Great.  I'm not suggesting

19   it wasn't.  I can delete it so I don't

20   know off the top of my head.  And you

21   would agree here that this document

22   identifies a variety of safety features

23   that Uber has implemented on its platform

24   along with relevant metrics.

25            Do you see that throughout the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 283

1                      WEINER
2     document?
3          A.   Yes, I'm well aware of all these
4     metrics.
5          Q.   Okay.  I want to talk a little
6     bit about a few of these in regards to the
7     conversation we were having earlier about
8     the distinction between perception and
9     prevention.
10              First, just from a high-level
11    product development standpoint, you would
12    agree with me that there are certain
13    products where it is very challenging to
14    actually and reliably test the
15    effectiveness of that product.  Would you
16    agree with that?
17              MS. ELLIS:  Objection, form.
18              THE WITNESS:  It has been my
19         experience that a properly designed
20         test can be conceived of and executed
21         for almost any product feature in the
22         product development lifecycle.  They
23         are not always easy to test but I
24         think if the motivation is there,
25         finding a way to test them is usually

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 284

1                        WEINER

2        achievable.

3    BY MS. CARITIS:

4        Q.   Okay.  I believe you talk in your

5    report a little bit about S-RAD control

6    group.  Do you know what I'm talking

7    about?

8        A.   I am very familiar with the S-RAD

9    control group.

10       Q.   I actually don't want to get into

11   that.  I just want to talk to you more

12   broadly about the concept of a control

13   group.

14       A.   Okay.

15       Q.   So a control group in my

16   understanding is kind of the on or off.

17   So you have to have a group that isn't

18   being provided the feature so that you

19   have something to compare the group that

20   is utilizing the feature with.  Is that a

21   very basic understanding of a control

22   group?

23            MS. ELLIS:  Objection, form.

24            THE WITNESS:  If you'll allow me

25       to state it in my words, a control

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2       group is the hold back of certain
 3       people to whom a thing is not applied
 4       for the sake of comparing the people
 5       to whom the thing is complied to the
 6       thing that people are not applied.  So
 7       the specific purpose of a hold-back
 8       group is to give you a group of people
 9       to compare against.  What I would just
10       say is that is one of a number of ways
11       to manage tests on effectiveness.
12  BY MS. CARITIS:
13       Q.   And again, I don't want to get
14  deep into the S-RAD criticism.  I just
15  want to kind of stay high level what it
16  is.
17            One of your opinions concerning
18  S-RAD is that you think the control group
19  was too large; is that right?
20       A.   I can be more specific as I've
21  continued to try to be throughout this.  I
22  don't want to restate the opinion and be
23  inaccurate to what I actually wrote.  What
24  I said specifically -- what I said is in
25  my opinion for the safety risk assessed
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER

2      dispatch development and rollout, Uber

3      maintained a larger than necessary holdout

4      group, users excluded from intervention so

5      the model could be evaluated.  That is my

6      specific opinion.

7          Q.   So you talk about some safety

8      features that Uber declined to test

9      because they didn't want to turn off the

10     feature for anybody.  So Share My Trip is

11     on page 2 of the Esteves exhibit that

12     we're looking at that we've marked as

13     Exhibit 10 [sic].  We see that Share My

14     Trip, for example, was launched in 2013

15     and that was rolled out to every single

16     individual that was utilizing the Uber

17     platform.  So there Uber made a decision

18     it didn't want to have a control group.

19     It wanted to give everyone access to the

20     feature.  Do you disagree with Uber's

21     product development decision to roll out

22     Share My Trip so that all riders could

23     utilize it, instead of doing a holdback

24     group that would allow it to actually test

25     the efficacy of that specific feature?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER

2           MS. ELLIS:  Objection, form, to

3       the extent that you're speaking on

4       Uber's behalf and introducing any sort

5       of evidence about why Uber did or did

6       not do anything in particular.  You

7       can answer to the extent you're able.

8           THE WITNESS:  Sure.  In an

9       attempt to be very direct and

10      responsive, I do believe that a

11      holdback group is only one way in

12      which effectiveness can be measured.

13      I do state my opinion that Uber's lack

14      of testing of some features makes them

15      basically be measured as perception

16      features versus features that evidence

17      impact on assault rates because they

18      are not being measured.  And I have

19      stated quite clearly it is my opinion

20      that this governance approach reflects

21      a prioritization of perception over

22      prevention inconsistent with industry

23      standards.  So yes, I personally would

24      like to know the effectiveness of this

25      feature at preventing sexual assaults

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 288

```
 1                      WEINER
 2        to consider it an effective tool for
 3        sexual assault mitigation.
 4    BY MS. CARITIS:
 5        Q.   How would you test it without
 6    utilizing a control group, without turning
 7    it off for some riders?
 8             MS. ELLIS:  Objection, form.
 9             THE WITNESS:  So this is a tool
10        that is essentially optional, as we've
11        described.  So one way to consider its
12        effectiveness would be to look at
13        sexual assault rates of those that
14        have turned it on versus those that
15        have not turned it on.  That is a
16        rough measure that gives you some
17        indication of its effectiveness.
18    BY MS. CARITIS:
19        Q.   If you look at metrics, that's
20    actually a metrics that Uber did utilize;
21    right?  Do you see -- so the last bullet
22    under Metrics, Uber looked at the number
23    of sexual assault, sexual misconduct, IPC
24    and nonsexual assault, sexual misconduct,
25    IPC incidents that had riders tap on the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2    share trip button.  Do you see that?
 3        A.   Yes, again, I'm very familiar
 4    with this exhibit and the statistics.
 5    What I failed to see through my analysis
 6    was an actual study where they measured
 7    and quantified the statistical
 8    significance of this feature as it relates
 9    to preventing sexual assault.  These
10    anecdotal measures are quite nice to see,
11    but what I'm looking for as a product
12    development expert is some measure or
13    metrics ideally with statistical
14    significance that can show that the tool
15    is being effective in preventing sexual
16    assault to help in the prioritization of
17    the feature versus other features that
18    might or might not prevent against sexual
19    assault.
20        Q.   One of the features that you say
21    that Uber should have prioritized was
22    dashcams; right?
23             MS. ELLIS:  Objection, form, to
24        the extent it mischaracterizes his
25        opinion.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 290

```
 1                      WEINER
 2           THE WITNESS:  I can read that
 3        opinion very quickly.  I was very
 4        specific in my dashcam -- what I have
 5        said is --
 6    BY MS. CARITIS:
 7        Q.   It's on page 85.
 8        A.    We have little flags now to help
 9    me speed my process.  We did that during
10    one of our breaks.
11           "By no later than 2020, Uber
12    possessed the technical capacity to deploy
13    mandatory audio and video recording
14    features that its own studies associated
15    with reductions in personal conflict,
16    including sexual assault and misconduct.
17    Uber nonetheless delayed and restricted
18    deployment instead of prioritizing growth,
19    legal and reputational considerations over
20    the timely adoption of safety measures
21    identified in its internal analyses."
22        Q.   Okay.  So you're actually not
23    saying that Uber should have implemented
24    mandatory dashcams, you're just saying
25    they had the technical ability to do so?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 291

1                          WEINER

2          A.   I'm quite literally saying that

3     by no later than 2020, Uber possessed the

4     technical capability to do so.  What I

5     further say in my conclusion, which might

6     be helpful to answering your question, but

7     I didn't flag that page.

8               "Based on my review of Uber's

9     internal documents, deposition testimony,

10    product development records and my

11    professional evaluation against

12    established industry standards, it is my

13    opinion that Uber's product development

14    lifecycle did not align with risk-based

15    prioritization practices expected in

16    environments where human safety is

17    materially at stake including

18    transportation networks that pair drivers

19    with riders."

20              And then the last paragraph of

21    that, "Based on Uber's own documents,

22    internal assessments, the company had the

23    technical capacity to build features that

24    reduce the number of incidents of sexual

25    violence between Uber drivers and riders.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 292

1                          WEINER
2          Its internal studies confirmed these
3          features worked as intended and were
4          associated with lower rates and measured
5          through statistical analysis and call back
6          groups.  As a product development expert,
7          it is my opinion based on review of Uber's
8          documents that Uber's expected outcome
9          would have been fewer sexual assaults and
10         a meaningful reduction would have been
11         expected to occur by Uber's own studies
12         had these features been deployed earlier
13         and at scale."
14              So to be as responsive as I can
15         to your question, the three features that
16         Uber had identified could have a material
17         effect which were mandatory audio and
18         video recording, S-RAD and Women-to-Women
19         could have had the impact of materially
20         impacting sexual assaults.
21         Q.   How do you define material
22         impact?
23         A.    I define it as Uber defined it.
24         Uber's statistics on each of these
25         features is available and so we can look

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 293

1                      WEINER
2    to the statistical measure of Uber's
3    statistical studies to see what the impact
4    would be.  I would almost define a single
5    sexual assault prevention as being an
6    impact that's worth considering.
7         Q.   Uber did consider all of the
8    features you just mentioned; right?
9    There's loads and loads of documents where
10   Uber is considering implementing women
11   rider preferred programs or surveillance
12   programs; right?
13             MS. ELLIS:  Objection, form, to
14        the extent you are characterizing
15        evidence.
16             THE WITNESS:  I have read every
17        document that I could find on these
18        three features and I have enumerated
19        in my report my opinions and the basis
20        for my opinions that there was
21        opportunity to move some of these
22        faster with a different prioritization
23        approach.
24   BY MS. CARITIS:
25        Q.   So you talked before when we were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 294

1                    WEINER
2    talking about Share My Trip on the screen
3    that it was great that Uber looked at
4    these metrics but what you really wanted
5    were statistical significant studies.  Do
6    you remember when you told me that?
7         A.   What I said, and my opinion is
8    very clear in the black and white of my
9    report, is that there are two buckets of
10   safety features, those that Uber designed
11   to influence rider or driver perception of
12   safety, which was critical to Uber's
13   growth, and those that were intended to
14   provide protection against sexual
15   violence.  All that was measured by Uber's
16   own studies.
17        Q.   I asked a different question.  We
18   were talking about things outside of your
19   report, sometimes it's just me talking to
20   you because I want to pick your brain, not
21   just what's on the page.  We were talking
22   about Share My Trip.  Do you remember when
23   you were having that discussion with the
24   document on the screen?
25        A.   I believe we talked about our use

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 295

```
 1                     WEINER
 2      of Share My Trip.
 3          Q.   Great.  And you said that you
 4      were helping me understand a way in which
 5      Uber could test the effectiveness of Share
 6      My Trip at reducing sexual assaults
 7      without a control group by looking at the
 8      percent of sexual assault IPCs for those
 9      that engage the Share My Trip versus -- I
10      messed it up.
11              You said that I should look at
12      the decrease in sexual assault or sexual
13      misconduct just for those that actually
14      engaged the Share My Ride trip.  And I
15      said okay, that's exactly what Uber did.
16      You acknowledged it but then you said what
17      I would really like to see are statistical
18      significant studies.  If you could just
19      answer that question.  Do you remember the
20      statement that you made that what you want
21      to see for Share My Trip are statistical
22      significant studies, do you remember
23      saying that to me?
24              MS. ELLIS:  Objection, form.
25              THE WITNESS:  What I can very
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 296

                            WEINER

1

2          clearly answer that question because I

3          cannot remember that exact sentence,

4          we can go back in the record if you

5          need us to look it up, but what I can

6          state is that the metrics on the

7          safety tool kit document from the

8          Esteves deposition aid and the

9          documents that I have seen on the

10         safety tool kit do not demonstrate

11         Uber putting forward a statistically

12         significant study on the impacts of

13         sexual assault.

14    BY MS. CARITIS:

15         Q.   And another place where Uber was

16    unable to secure statistical significant

17    studies was on the impact of dashcams on

18    violent interpersonal conflict.  Do you

19    agree with that?

20              MS. ELLIS:  Objection, form.

21              THE WITNESS:  I do not recall

22         seeing a study speaking to violent

23         IPC.  I remember seeing a study L3 and

24         L4 IPC.  Is that what you're referring

25         to?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 297

WEINER

1

2     BY MS. CARITIS:

3         Q.   Okay, let's look at -- we're

4     going to run out of time.  Let's look at

5     183, please, of your report, page 89.  You

6     write, by February --

7         A.   183?

8         Q.   Paragraph 183 of Exhibit 1.

9         A.   Yes.

10        Q.   You write, "By February 2020,

11    Uber's dashcam pilot safety analysis

12    documented a 16 percent reduction in

13    verbal IPC associated with the presence of

14    cameras, which Uber characterized as

15    statistically significant; the same study

16    observed a directional reduction in

17    physical IPC, though the result did not

18    reach statistical significance."

19            Do you see that?

20        A.   Absolutely.

21        Q.   So in all of the documents that

22    you've reviewed, you've reviewed tons and

23    tons you told us, you have not seen a

24    single study that found a statistically

25    significant decrease in physical IPC in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 298

1                      WEINER
2       connection with dashcams; correct?
3            A.    Hold on one second.  We have the
4       recently de-designated dashcam document
5       here.  I recall reading something.  Let me
6       see if I can find that number.
7            Q.    If you're using a document, if
8       you could please tell me the Bates because
9       I have no idea what all those documents
10      are.
11           A.    I thought we shared the
12      documents.  This is UBER_JCCP_MDL_
13      000158021.
14                MS. CARITIS:  And Tiffany, if you
15           could please send me a Bates list of
16           all the documents he has with him in
17           the room at the next break, that would
18           be great.
19                MS. ELLIS:  Sure.
20                THE WITNESS:  Let me just find
21           the numbers.
22      BY MS. CARITIS:
23           Q.    If you need to, we can look at a
24      break, Mr. Weiner.
25           A.    That would be helpful, if I could

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 299

```
 1                    WEINER
 2      do this during a break, that would be
 3      fine.
 4          Q.   That would be helpful and again,
 5      the question that's pending that you're
 6      suggest might be in that other document is
 7      a statistically significant study finding
 8      a reduction in physical IPC for the use of
 9      dashcams.  So that's what we're looking
10      for.
11              MS. ELLIS:  Objection to the
12          extent it mischaracterizes testimony.
13              MS. CARITIS:  I was just asking
14          for what he could look for at the
15          break.  I wasn't suggesting that's
16          what he said.  That's what he told me
17          he was looking for.
18              THE WITNESS:  Go ahead.
19      BY MS. CARITIS:
20          Q.   Were you going to say something?
21          A.   No, that's fine.
22          Q.   Okay.  Let's talk a little bit
23      more about the industry standards that you
24      talked about in your report.  We talked a
25      lot about the ISOs and I want to talk now
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 300

1                          WEINER
2       about the other components that you
3       identify kind of as industry standards.
4       So let's see.  I'm going to refer you to
5       paragraph 29 of your report and there
6       you're identifying three broad -- as you
7       write, "broad and generally accepted sense
8       of industry standards to include three
9       categories of benchmarks."
10                   Industry [sic] standards bodies
11      is A.  That one we've chatted about.  I
12      know there's other standards we didn't
13      discuss.  And then B you write,
14      "structured practices from other
15      safety-critical industries such as
16      aviation, finance, and transportation,
17      where technology design decisions have
18      direct consequences for human safety and
19      thus provide relevant comparators for
20      governance rigor."
21                   What other safety critical
22      industries, what companies are you talking
23      about here that you are referring to in
24      your discussion of industry practices
25      throughout this report?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 301

1              WEINER
2          MS. ELLIS:  Objection, form.
3          THE WITNESS:  Let me find the
4      paragraph for you that provides some
5      examples I believe in my opinion 2.
6  BY MS. CARITIS:
7      Q.   Is it at page 113?
8      A.   Hold on.
9      Q.   Paragraph 113?
10     A.   Paragraph 113, yes, okay.  So I
11  refer to three examples in my report.
12  Airbnb publicly stating 150 million to new
13  safety innovations, and that since 2017,
14  the growth rate of safety innovations has
15  outpaced the rate of revenue growth;
16  Southwest Airlines performing fleet wide
17  deployment of Honeywell's Smart Runway and
18  Smart Landing conflict alerting; and the
19  FAA, fiscal year 2025 request for 1.8
20  billion for the Office of Aviation Safety
21  and one billion in 2025 for facility
22  replacement and radar modernization.
23          Those are specific examples that
24  I included in my report.
25     Q.   Are there any other companies or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 302

1                        WEINER
2        comparators that you're including in this
3        section B of industry standards or are
4        they all encompassed in paragraph 113 in
5        your report?
6                MS. ELLIS:  Objection, form.
7                THE WITNESS:  Of course, so as
8            you're aware, my industry experience
9            covers almost 37 years and a whole
10           bunch of verticals.  I considered all
11           of my experience in referring to
12           industry standards.  I enumerated
13           certain ones that I thought were
14           particularly relevant but by no means
15           was it intended to be a comprehensive
16           list.
17       BY MS. CARITIS:
18           Q.   We already talked today at
19       length, Mr. Weiner, right, about the
20       specific experiences throughout your
21       37-year career that you tie directly to
22       concerning physical safety, right, you
23       already talked about all that?
24           A.   I have appreciated your
25       interrogatory on the concept of physical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2    safety, but I will reiterate that I
 3    believe it's clear that my experience
 4    gives me the ability to have opinions on
 5    industry standards beyond those
 6    experiences that just related to physical
 7    safety.
 8        Q.   I hear you.  I just want to make
 9    sure for the millionth time that we've
10    covered all your experience that directly
11    hit on physical safety.  Have we talked
12    about all your experiences that directly
13    related to physical safety?
14        A.   We have talked about all the
15    times that I have enumerated in my report
16    where physical safety was a primary
17    concern in the product development
18    lifecycle that I was engaged in.
19        Q.   Thank you.  Okay, we're going to
20    flip back and forth a little bit here so I
21    apologize but if we could go back to page
22    13, please.  Oh good, we're here, Curtis,
23    perfect.  If we could go to C, so it's
24    your third bucket under your definition of
25    industry standards.  And you note, "peer
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 304

```
 1                        WEINER
 2      practices and benchmarks from large-scale
 3      consumer technology companies,
 4      particularly where they have publicly
 5      reported investment levels, structured
 6      safety programs, or rapid rollouts of
 7      risk-mitigation features."
 8              I want to make sure I understand
 9      the peer practices and benchmark
10      large-scale consumer technology companies
11      you're referring to here.  I have a
12      feeling one of them is Airbnb on page 113.
13         A.   Sorry.
14         Q.   No.  Are there any other aside
15      from the companies listed in paragraph
16      113, are there any other peer practices
17      and benchmarks from large-scale consumer
18      technology companies that you were
19      utilizing in developing your understanding
20      of an industry standard in this case?
21              MS. ELLIS:  Objection, form.
22              THE WITNESS:  Of course.  I have
23          to find that I am a member of the
24          Gartner research program and have
25          access to and am an avid reader of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 305

1                    WEINER

2          peer benchmarks and industry standards

3          in the Gartner research database.  In

4          the course of my time with Gartner I,

5          have read studies of quite a number of

6          consumer technology companies that

7          have been benchmarked from their

8          reported investment levels, structured

9          safety programs, rapid rollouts and

10         risk-mitigation features that I have

11         considered as part of industry

12         standards.  My industry standards, as

13         I've stated a couple of times, are

14         based on the full of my 37 years of

15         experience, which is not just limited

16         to those companies where I worked, but

17         I have researched and studied

18         companies as well.

19     BY MS. CARITIS:

20         Q.   Can you please name me all of the

21     companies that you took into account and

22     viewed as peer practices for your expert

23     report here?

24              MS. ELLIS:  Objection, form.

25              THE WITNESS:  I don't believe I'd

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 306

```
 1                    WEINER
 2        be doing service to your question to
 3        try to list them off the top of my
 4        head, but I can certainly take that
 5        away and get back to you with that
 6        answer.
 7   BY MS. CARITIS:
 8        Q.   Did you cite any other documents
 9   throughout your report that talks about
10   large-scale consumer technology companies
11   that have publicly reported investment
12   levels, safety programs or rapid rollout
13   of risk mitigation features, are there any
14   cited in this report here?
15             MS. ELLIS:  Objection, form.
16             THE WITNESS:  I have taken you to
17        the three I have cited and I have also
18        enumerated my access to the Gartner
19        database and use of it regularly.  To
20        give you a comprehensive listing, I
21        would prefer to do a bit more to get
22        you a comprehensive list.
23   BY MS. CARITIS:
24        Q.   To the extent you're relying on
25   anything else in reaching the opinion
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 307

                            WEINER
1
2       that's not included in your reliance
3       materials, I ask that you do please
4       supplement that.  That would be great.
5               Okay, so let's talk a little
6       bit --
7               MS. ELLIS:  I'll just clarify for
8           the record, I don't think that he said
9           he's relied on anything else that
10          hasn't been enumerated.  He's just
11          saying this is all based on his
12          experience of over 37 years.  And to
13          come up with a very specific list of
14          every single company that he's
15          considered in that 37-year experience
16          would take some time and was not
17          actually material that was considered.
18              MS. CARITIS:  I'm happy to have
19          him explain who they are.  He's
20          replying on peer practices and
21          benchmarks from large-scale consumer
22          technology companies and he's
23          helpfully pointed me to paragraph 13,
24          that's helpful, but I need to know the
25          other ones.  I only have so much time

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 308

```
 1                        WEINER
 2        and to the extent he's going to come
 3        to trial and say that based on my work
 4        or experience working with other
 5        large-scale consumer technology
 6        companies, I need to know who those
 7        are.  So if there is a list that he's
 8        going to utilize and rely upon, then I
 9        ask that he update his relied
10        materials.  Looks like Gartner is like
11        a website.  So if there are additional
12        materials, if not, there aren't.  But
13        he obviously needs to disclose who
14        he's talking about in C, and if he's
15        unable because it's hard to do, I get
16        it, on the spot, I ask that you
17        supplement.
18             MS. ELLIS:  Counsel, I understand
19        your request.  I still think that you
20        mischaracterized his testimony but
21        we'll take it under advisement.
22             MS. CARITIS:  Thank you.
23    BY MS. CARITIS:
24        Q.   In your -- I'm calling it your
25    industry standard paragraph, so paragraph
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                        WEINER

2      29 of your report, do you -- you talk a

3      little bit about how you included

4      structured practices from other

5      transportation industries.  Do you see

6      that in 29 b?

7           A.   Yes, transportation is

8      specifically enumerated and as we have

9      discussed I considered aviation part of

10     transportation.

11          Q.   Another part of the

12     transportation is, of course, the taxi

13     industry; right?

14          A.   Taxi industry is, of course, part

15     of transportation.

16          Q.   And in your report, you actually

17     identify various news articles that you

18     found highlighting some of the risks

19     associated with taxi usage; fair?

20          A.   I did after hearing

21     Mr. Kalanick's deposition testimony, I

22     thought I would attempt myself to look at

23     public media reports in the time frame he

24     was talking about, and within a short

25     period of time was identified three.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 310

1                    WEINER
2          Q.   So let's take a look at page 32
3     of your report.  I think you just beat me
4     to the punch.  You note that in a cursory
5     search you found three articles from
6     San Francisco about sexual violence in
7     taxis and limos that predated the launch
8     of Uber.  You then talk about a taxi
9     driver convicted of murdering a female
10    passenger.  You see that; right?
11         A.   Yes.
12         Q.   And in 2005 you cite an instance
13    where a taxi driver was arrested on
14    suspicion of raping one of his female
15    passengers.  Do you see that?
16         A.   Yes.
17         Q.   And then you also quickly
18    identified a 2008 article concerning an
19    incident involving an illegal limousine
20    with rape of an intoxicated person at
21    11:30 p.m. on a Friday after being picked
22    up at a ballgame.  Do you see that?
23         A.   I am aware.  I found those
24    articles myself.
25         Q.   You also cite in your report in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 311

1                    WEINER
2       footnote 72, so on page 32, a document
3       where Uber is actually discussing the
4       relative risk of Uber versus taxi; right?
5            A.   Yes.
6            Q.   Did you consider in coming to
7       your opinions here whether any taxi
8       company in the United States meets the
9       risk management standards you outline in
10      your report?
11                MS. ELLIS:  Objection, form.
12                THE WITNESS:  So to answer your
13           question indirectly, I have to wonder
14           out loud if you are asking me if I'd
15           expect the taxi industry to live up to
16           the standards of such a
17           transformational technology company as
18           Uber.
19      BY MS. CARITIS:
20           Q.   I'm asking if -- so you would
21      agree that Uber has done a whole lot more
22      than taxi companies have; fair?
23                MS. ELLIS:  Objection, form.
24                THE WITNESS:  I would agree that
25           Uber has more capabilities than the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                    WEINER

2        average taxi company and has used

3        those capabilities over its 10-year

4        period that I reviewed in detail.

5    BY MS. CARITIS:

6        Q.   That includes the day that Uber

7    was publicly available, they had

8    additional safety features and technology

9    that taxis did not have; right?

10            MS. ELLIS:  Objection, form.

11            THE WITNESS:  Uber's mission as I

12        have identified in this report was to

13        transform the taxi business.

14        Mr. Kalanick and his peer were

15        standing outside finding themselves

16        unable to find a taxi and wanted

17        technology to do better.  That is the

18        basis in my report of my opinions in

19        opinions 1 through 7.

20    BY MS. CARITIS:

21        Q.   So I want to -- let's see.  So on

22    kind of the end, paragraph 30, the next

23    paragraph after what I'm calling your

24    industry standard paragraph, paragraph 30

25    in your report, you note collectively

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 313

1                     WEINER
2       these sources, and again they are the
3       three sources we've been discussing, the
4       industry standards, the other safety
5       critical industries and the peer practices
6       and benchmarks.
7              You say, "these sources have
8       established what I mean by industry
9       standards herein:  A combination of
10      codified frameworks and practical
11      benchmarks that, taken together, define
12      the expectation for risk-based governance
13      in software product development where
14      foreseeable human safety risks are at
15      stake?"
16             Do you see that?
17        A.   Yes.
18        Q.   Are you aware -- you don't have
19      any citation to that paragraph; right?
20        A.   I do not have a citation to that
21      paragraph, that is an accurate statement.
22        Q.   Are you aware of any
23      peer-reviewed articles that suggest that
24      the industry standard as you define them
25      in paragraph 29 define the expectations

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 314

```
 1                    WEINER
 2      for risk-based governance in software
 3      product development where foreseeable
 4      human safety risks are at stake?
 5              MS. ELLIS:  Objection, form.
 6              THE WITNESS:  It is my statement
 7          that my 37 years of experience and
 8          review of the materials that I
 9          enumerate as my basis on this report
10          gives me a basis for an opinion on the
11          industry standards as I've quoted them
12          herein.
13      BY MS. CARITIS:
14          Q.   I think earlier in your report
15      you note that one of the main goals of
16      your methodology would be for it to be
17      repeatable.  Do you know what I'm talking
18      about?
19          A.   Absolutely I am aware of that.
20          Q.   Okay.  If you handed the Uber
21      file to a different individual with your
22      experience, how would they go about
23      repeating the process that you did here,
24      what did you do?
25          A.   If I handed the Uber file of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 315

WEINER

1
2      documents that I reviewed to an individual
3      who had my 37 years of experience and
4      industry breadth and specific experience
5      in product development, my positing that
6      they would be able to repeat the process
7      that I went through and I am suggesting
8      likely would come to the same opinions.
9          Q.   Okay, and I want to kind of know
10     specifics.  So I hand them the file.  What
11     do you tell them to do, read documents,
12     look at standards, what do you tell them
13     to do, how do they repeat it, what was
14     your process?
15         A.   Sure.  My methodology is the same
16     methodology I've used in my 37 years of
17     industry experience and 14 years of
18     litigation expert work.  I used this
19     methodology to review Uber's documents,
20     compare its processes to recognized
21     lifecycle standards, and evaluate other
22     features, including those aimed at safety
23     outcomes were tested and measured against
24     their stated objectives once deployed.
25     The approach is consistent with the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                        WEINER
 2       methodology that underlines my analysis.
 3       I would begin by framing questions,
 4       establishing exclusion criteria, gather
 5       documentation comprehensively, organize
 6       findings in relation to those questions
 7       and synthesize conclusions across multiple
 8       sources of information.  I would hand that
 9       new expert the same questions that I was
10       asked, make available to them my 37 years
11       of experience and learnings over that time
12       period, and ask them to put themselves in
13       front of the Everlaw system with two
14       million records, and review the process of
15       answering those questions using this
16       methodology to see if they came to the
17       same conclusion as what I posited, is that
18       it is repeatable.
19            Q.   You still haven't really
20       explained when you say I utilized the same
21       methodology.  I still don't understand
22       what that is.  So what is your
23       methodology, what did you do?
24            A.   Paragraph 24 and 25, I
25       established clear questions, applied
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                        WEINER
 2      experience and recognized frameworks,
 3      gather and reviewed extensive documentary
 4      evidence and measured processes against
 5      articulated goals and standards.  I would
 6      then begin by framing questions, establish
 7      inclusion and exclusion criteria, gather
 8      documentation comprehensively, organize
 9      findings in relation to those questions,
10      and synthesize my conclusions across the
11      multiple sources of information.  I
12      believe I've written my methodology quite
13      specifically.
14           Q.   On 27, you note that "I
15      established explicit criteria to identify
16      relevant documentation.  My inclusion
17      criteria started with my experience in
18      software development for industries that
19      had foreseeable safety risks."
20                And then you identify the two
21      buckets we've already talked about, right,
22      the United Airlines logistics for flight
23      attendants and the banking systems related
24      to ATMs; right?
25           A.   That's correct.  I've been very
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2      specific there.
 3          Q.   How did your experience designing
 4      a software reservation system help you
 5      identify relevant documents related to the
 6      Uber platform?
 7               MS. ELLIS:  Objection, form.
 8               THE WITNESS:  My experience in A
 9          and B combined with my 37 years of
10          experience in product development and
11          the process that I went through
12          allowed me to look in Uber's
13          documentation for product development
14          lifecycle artifacts, TRDs, technical
15          resource documents, evaluation
16          documents on corporate issues, looked
17          at internal studies that I was able to
18          identify, finding success and failure
19          in mitigating sexual assault risk,
20          looked at documents in Uber's file
21          indicating their ability to have an
22          impact on the perception of safety and
23          come to opinions in the context of
24          their overall product development
25          lifecycle of the P1 and P0 priorities
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2        that they set, considered the relative
 3        investment that they made across their
 4        divisions or areas in the artifacts
 5        that were provided on investment
 6        choices and come to the conclusions
 7        and opinions with the specific basis
 8        that I've outlined in my report.
 9   BY MS. CARITIS:
10        Q.   Do you know how much Uber has
11   spent on safety from inception to today,
12   the total amount?
13        A.   On page 22, in footnote 26, I
14   enumerate a set of documents that would
15   have been helpful if I had been given
16   broad access to everything that could have
17   been helpful in this case.  I enumerate I
18   did not have access to safety or other
19   feature business cases, feature level
20   development budgets, resource allocation
21   records or return on investment analyses.
22   These are materials I would normally
23   review when assessing product development
24   governance and prioritization.  I made
25   that statement because the question you
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2    just asked me, if I could know what they
 3    totally spent on these things, I believe
 4    would have been valuable to my analysis
 5    but was not made available.
 6         Q.   So it's just a yes or no, you
 7    don't know in total how much Uber has
 8    spent on safety since its inception to
 9    today; correct?
10          MS. ELLIS:  Objection, asked and
11          answered.
12          THE WITNESS:  I do not have a
13          document that shows me how much Uber
14          has spent under their definition of
15          safety, no, I do not.
16    BY MS. CARITIS:
17         Q.   You also don't know if Lyft has
18    spent more or less than Uber on safety
19    features across Lyft's history; right?
20          MS. ELLIS:  Objection, form.
21          THE WITNESS:  I have not seen a
22          document indicating what Lyft has
23          spent on what I would be willing to
24          guarantee is a different definition of
25          safety from their inception to today
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 321

1                    WEINER

2          either.  That is a fair

3          representation.

4      BY MS. CARITIS:

5          Q.    What do you mean that Lyft would

6      have a different definition of safety,

7      it's also a rideshare company; right?

8          A.    Lyft is a company that is in the

9      business of putting people together in

10     taxicabs for the sake of transportation,

11     but as with Uber they do many, many other

12     things.  The definition of safety in Uber

13     is not only designated by their rideshare

14     activities, but by their Uber Eats

15     activities, their logistics activities,

16     looks to insurance, looks to a whole set

17     of safety types that we have covered in my

18     report.  I do not know that Uber would

19     have the same definition as Lyft in terms

20     of their investment in safety based on the

21     fact that they do different things.

22         Q.    Okay.  And to come to your

23     opinions today, you did not analyze the

24     product development lifecycle for Lyft;

25     fair?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 322

1                    WEINER
2        A.    It is absolutely fair to say that
3    I did not have access to documents to
4    evaluate the product development lifecycle
5    of Lyft.
6        Q.    And you did not take into account
7    whether or not Uber implemented a safety
8    feature before Lyft; right?
9        A.    I have a document or two that
10   compared Uber and Lyft features.  As you
11   may have noted in my opinion 2, I
12   enumerated a document that went through
13   the priorities of Uber's prioritization
14   process.  One of them was on
15   competitiveness and there were a number of
16   documents that talked about when a feature
17   did or did not exist in other rideshare
18   environments before they created it.  So I
19   was aware in quite a bit of detail about
20   where they saw themselves at competitive
21   advantage and competitive disadvantage on
22   features.
23       Q.    I asked a very narrow different
24   question.  Did you take into account and
25   consider whether or not Uber implemented

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 323

1              WEINER
2     safety features before Lyft did, yes or
3     no, did you take that into account?
4              MS. ELLIS:  Objection, form,
5          asked and answered.
6              THE WITNESS:  The specific answer
7          to your question is in the context of
8          the materials I relied on.  One of the
9          materials I relied on was whether or
10         not Lyft had a feature when Uber was
11         developing it.
12    BY MS. CARITIS:
13         Q.  Do you know that Uber invented
14    the RideCheck feature before Lyft?
15             MS. ELLIS:  Objection, form.
16             THE WITNESS:  I do not have that
17         specific detail at my fingertips.
18    BY MS. CARITIS:
19         Q.  Are you aware that Uber invented
20    the text to 911 button before Lyft?
21             MS. ELLIS:  Objection, form.
22             THE WITNESS:  I do not have that
23         specific detail at my fingertips.
24    BY MS. CARITIS:
25         Q.  Do you have any idea how much

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 324

1              WEINER
2    resource allocation it took for Uber to
3    invent the various safety features that
4    are available for every single rider
5    today?
6            MS. ELLIS:  Objection, form.
7            THE WITNESS:  As I have shown you
8        in my paragraph in opinion 2, Uber has
9        spent between ██████████████████████
10   ████████████████████████████████████
11   ███████     investing in features that
12       cover the entirety of safety and
13       insurance, which covers road safety as
14       well as all other insurance aspects.
15       That number strikes me as incredibly
16       low for the scale and scope of the
17       risks that they are managing.
18   BY MS. CARITIS:
19       Q.  Do you know that -- you've given
20   me a percentage.  Do you know how much
21   money they spent, not the percentage, how
22   much money they spent?
23           MS. ELLIS:  Objection to form,
24       asked and answered.
25           THE WITNESS:  The Uber documents

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 325

```
 1                        WEINER
 2        that I have provided simply had
 3        headcount.  They did not turn
 4        headcount into dollars.
 5   BY MS. CARITIS:
 6        Q.   Do you know how much money Uber
 7   spends on background checks annually?
 8             MS. ELLIS:  Objection to form.
 9             THE WITNESS:  I did not
10        personally research the amount of
11        money that usual has spent on
12        background checks.
13   BY MS. CARITIS:
14        Q.   I want to talk a little bit about
15   the public benchmarks that you identify as
16   part of your industry standard discussion
17   on paragraph 113.  We've already talked
18   about it a little bit.
19             Paragraph 113 appears to be
20   talking about capital allocation to the
21   safety.  And you specifically identify
22   Airbnb's public statement concerning
23   allocation of 150 million to new safety
24   innovations.  Do you see that?
25        A.   I see that I specify the 150
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 326

1                    WEINER

2    million and a growth rate that has

3    outpaced the rate of revenue growth.

4        Q.   You would agree that just because

5    somebody says they are going to spend a

6    lot of money on safety, doesn't

7    necessarily mean that the product is safe?

8            MS. ELLIS:  Objection, form.

9            THE WITNESS:  I would state that

10           from my experience, every attempt to

11           make something safe does not lead to

12           making it safe.

13   BY MS. CARITIS:

14       Q.   Do you know why it was that

15   Airbnb publicly stated in 2019 that it was

16   going to dedicate 150 million to new

17   safety innovations, do you know what led

18   to that?

19           MS. ELLIS:  Objection to form.

20           THE WITNESS:  If we can look at

21           my reference number 133, I believe

22           there was some commentary in the trust

23           innovation update protecting host and

24           guest Web page.  I cannot remember

25           that specific at this moment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 327

1                    WEINER
2    BY MS. CARITIS:
3        Q.   Well, 133, the document you cite
4    is from Airbnb.  Did you do any research
5    to determine if there were any other
6    factors that might have been going into
7    Airbnb's decision to publicly announce a
8    large investment in safety, did you look
9    into that?
10            MS. ELLIS:  Objection, form.
11            THE WITNESS:  My research did not
12        include looking into Airbnb's history
13        and trying to come up with a reason
14        that they made that choice, no, I did
15        not.
16    BY MS. CARITIS:
17        Q.   Do you think it would be fair to
18    benchmark Airbnb against Uber if the
19    reason that it was investing 150 million
20    dollars was because it had been receiving
21    significant backlash for its failure to
22    address safety problems in its product?
23            MS. ELLIS:  Objection, form.
24            THE WITNESS:  What I would say is
25        you are focused on the 150 million

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 328

```
 1                    WEINER
 2      dollars and I am focused on a growth
 3      rate of safety investments that has
 4      outpaced the rate of revenue growth.
 5      Looking at the ███████████  that
 6      Uber is spending on the total of
 7      safety and insurance and comparing it
 8      to an organization that has
 9      experienced the growth of Airbnb where
10      the growth rate of safety investments
11      has outpaced the rate of revenue
12      growth is the kind of data point that
13      I was looking for to under how that █
14      ███████████  related to industry
15      public benchmarks.
16   BY MS. CARITIS:
17      Q.    Okay.  What if I'm a very unsafe
18   platform and I realize I need to dedicate
19   tons of money to fixing my platform,
20   right, do you know that that wasn't what
21   was going on with Airbnb?
22           MS. ELLIS:  Objection, form.
23           THE WITNESS:  I do not believe
24      knowing or not knowing that fact would
25      change my opinion in any way.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 329

```
 1                    WEINER
 2    BY MS. CARITIS:
 3        Q.   You said before that you had a
 4    problem with Uber because some of its
 5    safety features were based on perception;
 6    right?
 7             MS. ELLIS:  Object to form and
 8         mischaracterizes his testimony and
 9         report.
10             THE WITNESS:  I am going to
11         reiterate that I don't state anywhere
12         that I have a problem with Uber.  I am
13         a fan of Uber.  What I stated in my
14         report, I can read it again if you'd
15         like but we've done it five times now,
16         and so I'm happy to do that if that
17         would be helpful to you.
18    BY MS. CARITIS:
19        Q.   Do you know whether or not Airbnb
20    decided to invest 150 million because it
21    had a safety reputation problem?
22             MS. ELLIS:  Objection, form,
23         asked and answered.
24             THE WITNESS:  I neither know, nor
25         do I believe that knowing that would
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2        change my opinion, nor do I believe
 3        it's relevant.  The point that I made
 4        in that paragraph, which provided a
 5        basis for my opinion in that section,
 6        that growth rate of safety investments
 7        has outpaced the rate of revenue
 8        growth would have led to a different
 9        outcome at Uber.
10   BY MS. CARITIS:
11        Q.   Couldn't that also mean for
12   Airbnb that it just wasn't a very
13   profitable venture at this time?
14             MS. ELLIS:  Object to form.
15             THE WITNESS:  You're asking a
16        hypothetical that goes beyond the
17        scope of my report.
18   BY MS. CARITIS:
19        Q.   I just want to make sure I
20   understand.
21             You just explained that in your
22   report, you identify Airbnb as a good
23   public benchmark to look at because the
24   growth rate of safety investment has
25   outpaced the rate of revenue growth.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 331

1              WEINER
2         MS. ELLIS:  Objection.
3    BY MS. CARITIS:
4         Q.   Couldn't that also be a function
5    of the fact that they just didn't have a
6    lot of revenue?
7              MS. ELLIS:  Object to form,
8         mischaracterizes the report and his
9         testimony.
10             THE WITNESS:  I am comparing a
11        public statement by Airbnb that its
12        growth rate on safety investments has
13        outpaced the rate of revenue growth.
14        I am aware from my Bloomberg terminal
15        of the growth rate of Airbnb.  I am
16        highlighting as a basis for my opinion
17        in this section public benchmarks show
18        that companies prioritize safety in
19        line with industry standards,
20        consistently allocate visible capacity
21        and capital to safety, and then
22        measure those events against incident
23        reduction.  I believe that the state
24        of my report is very clear.
25    ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 332

```
 1                    WEINER
 2    BY MS. CARITIS:
 3         Q.   You said that you were a fan of
 4    Uber.  How often do you use Uber?
 5         A.   I believe you have access to
 6    those records but I use Uber every day.
 7         Q.   Have you ever had a safety
 8    incident on the Uber platform?
 9              MS. ELLIS:  Objection, form.
10              THE WITNESS:  I have never had a
11         physical violence sexual assault or
12         sexual misconduct on an Uber but I
13         have made a safety report on an Uber
14         before in the last 10 years.
15    BY MS. CARITIS:
16         Q.   And you're able to make a report
17    on the application itself?
18              MS. ELLIS:  Objection to form.
19              THE WITNESS:  I made that safety
20         report on the application itself.  It
21         was in relation to an Uber Eats
22         delivery.
23    BY MS. CARITIS:
24         Q.   Understood.  I think you already
25    mentioned that your husband uses the Uber
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 333

1                          WEINER
2        application as well?
3             A.   My husband uses the Uber
4        application as well and as we discussed
5        earlier, my husband uses the Share My Ride
6        feature on every ride.
7             Q.   We talked a little bit in the
8        very beginning of the deposition that
9        there are five specific cases that your
10       report covers today and they are listed on
11       the front of your report.  I understand
12       that you have read the complaints related
13       to the allegations for these five cases;
14       is that correct?
15                 MS. ELLIS:  Objection, form to
16            the extent that it characterizes the
17            report as covering any case-specific
18            details.
19                 MS. CARITIS:  I just want to know
20            if he read the complaint.
21       BY MS. CARITIS:
22            Q.   Mr. Weiner, I'm trying to
23       understand if you read the complaints for
24       the five plaintiffs that this report
25       covers, B.L., A.R.2, LCHB128, Dean,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 334

```
 1                    WEINER
 2   WHB832.
 3       A.   I have read all five complaints
 4   and I have printed out here in the room
 5   the deposition testimony of the five
 6   individuals.
 7       Q.   Okay.  And you're aware that all
 8   of the five, the letters, the ones that
 9   are at issue right now, they roll 2019 and
10   on, do you understand that?
11       A.   I am aware of the durations of
12   the five bellwethers, yes, absolutely.  I
13   can correct my statement earlier when I
14   was reading one of the bellwethers, she
15   currently lives in Philadelphia but the
16   incident did not happen in Philadelphia.
17   That was the nature of my confusion
18   earlier and I apologize for that mistake.
19       Q.   Thank you for that clarification.
20   You talk a little bit about foreseeable
21   risks throughout your report.  Is it your
22   opinion that any of the five alleged
23   incidents at issue here, specifically
24   those incidents, were foreseeable to Uber?
25            MS. ELLIS:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 335

```
 1                     WEINER
 2        That goes outside the bounds of his
 3        report and his testimony today.
 4             THE WITNESS:  I believe we can
 5        agree reading the complaint does not
 6        give me adequate information to form
 7        an opinion as to whether those
 8        particular events were foreseeable.
 9        As we discussed S-RAD in some detail,
10        the amount of data necessary to have
11        opinions on that would take
12        considerable review.
13   BY MS. CARITIS:
14        Q.   Okay.  So Mr. Weiner, you're not
15   providing an expert opinion on the
16   foreseeability of the case-specific
17   incidents that are in the first wave of
18   the bellwether; correct?
19             MS. ELLIS:  Objection, form,
20        asked and answered.
21             THE WITNESS:  I am providing an
22        opinion on Uber.  My opinions are
23        specifically stated to cover Uber and
24        all of its rides and all of its
25        drivers.  They are not specific to the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 336

1                          WEINER
2          bellwethers.
3      BY MS. CARITIS:
4          Q.   You're not providing an opinion
5      today that had Uber implemented any
6      additional safety feature, that any of the
7      five bellwethers alleged incidents would
8      not have occurred, you're not giving that
9      opinion; correct?
10              MS. ELLIS:  Objection, form.
11              THE WITNESS:  I am not giving a
12          specific opinion that I have analyzed
13          any data that would allow me to come
14          to the conclusion that if Uber had
15          implemented the three features which
16          have an effect on sexual assault and
17          sexual misconduct, these particular
18          cases could have been avoided.  I will
19          reiterate that I have stated quite
20          clearly in my conclusion that there
21          likely would have been less sexual
22          assault and sexual misconduct if those
23          features had been implemented and
24          delivered the results enumerated in
25          Uber's studies.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 337

```
 1                    WEINER
 2    BY MS. CARITIS:
 3         Q.   Okay.  And I think you already
 4    told me this but I just want to be super
 5    clear because it is very important.  You
 6    are not independently analyzing the
 7    effectiveness of any proposed safety
 8    feature or any implemented safety feature,
 9    correct, you didn't run any test yourself
10    to figure out whether S-RAD actually was
11    effective, for example; is that right?
12              MS. ELLIS:  Objection, form.
13              THE WITNESS:  My opinions in this
14         report as stated rely on the testing
15         and analysis done by Uber.  I have not
16         done any independent testing as part
17         of my work on this report.
18    BY MS. CARITIS:
19         Q.   Okay.  So for the three features
20    that in your report you identify as those
21    that Uber says could have decreased sexual
22    misconduct, those are -- that's S-RAD,
23    right, that's the first one.  The next one
24    is women's preference, be that women rider
25    preferred or women driver preferred,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 338

```
 1                    WEINER
 2      that's the second; correct?
 3          A.   I enumerated it as
 4      Women-to-Women.  I didn't enumerate a
 5      specific program.  I enumerated it as
 6      women's ability to select women in either
 7      direction.
 8          Q.   Got it.  And then the third would
 9      be dashcams or audio recording; is that
10      right?
11              MS. ELLIS:  Objection, form,
12          mischaracterizes the testimony and
13          opinions.
14      BY MS. CARITIS:
15          Q.   Just correct me if it's wrong.  I
16      just want to make sure I understand.
17          A.   I enumerated in my opinion on
18      audio and video recording that Uber had
19      the ability as of 2000 -- that's the wrong
20      opinion.  Let me get to the right opinion.
21      Sorry about that.  That Uber had the
22      ability by no later than 2020 to -- they
23      had the technical capacity to deploy
24      mandatory audio and video recording that
25      its own studies associated reductions in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 339

```
 1              WEINER
 2     interpersonal conflict, including sexual
 3     assault and sexual misconduct.  Uber
 4     nonetheless delayed and restricted the
 5     development of prioritizing growth, legal
 6     and reputational considerations over the
 7     timely adoption of safety measures
 8     identified in this internal analysis.  And
 9     as I read in my conclusion I also
10     summarized that if these three features
11     had been more aggressively prioritized,
12     there is a reasonable chance there would
13     have been less sexual assault and sexual
14     violence on the platform.
15         Q.   First off, again at break and
16     we're close to one, at break if you can
17     please take a look at that document to
18     determine if you see anything that defines
19     a statistical significant decrease in
20     physical interpersonal conflict in
21     connection with dashcams.  So that's
22     something we're going to look at so I'm
23     going it put that to the side.  S-RAD
24     was -- it is utilized currently; right?
25         A.   S-RAD is utilized and in my
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 340

1                     WEINER

2     report I highlight a few things, the speed

3     of deployment, the size of the treatment

4     group and the size of the holdback group

5     which my product development experience

6     tells me could have been prioritized

7     differently.

8         Q.   Are you aware of any

9     plaintiffs -- when was S-RAD rolled out,

10    2017, does that sound right to you?

11        A.   No.  Let me find that for you.

12    2017 I believe was the first main pilot.

13    I said that by 2010 and no later than 2017

14    they had the technical ability to identify

15    high-risk pairings.  I'm looking for the

16    year of rollout.  It's not on there.  I

17    know I have it in my report.

18        Q.   That's okay.  I'll take a look at

19    break and can refer you to something.  We

20    don't need to waste the time on that now.

21             In terms of audio recording you

22    would agree in 2021 that became available

23    for all riders and drivers on the

24    platform; correct?

25             MS. ELLIS:  Objection, form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 341

1              WEINER

2         THE WITNESS:  I can agree that

3         voluntary audio recording in the

4         control of the rider and driver was

5         available by that year, but as my

6         report states, I am stating that

7         mandatory audio and video recording

8         has the potential to happen now.

9    BY MS. CARITIS:

10        Q.   Well, in 2021 a rider could have

11   the audio recording on at all times on the

12   ride; right?  That was available in 2021,

13   agree?

14        MS. ELLIS:  Objection, form.

15        THE WITNESS:  Audio recording was

16        available in the United States on the

17        rider app in 2021.

18        MS. CARITIS:  Okay.  Why don't we

19        go off the record.

20        MS. ELLIS:  Before we do, I'm

21        just going to object to your request

22        that Mr. Weiner use the break to do

23        anything with the documents while we

24        previously agreed that I can provide

25        you the Bates numbers for the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 342

1                    WEINER
2        documents.  We've been going for
3        almost over --
4            MS. CARITIS:  That's fine.  I
5        literally don't know what he has.
6        He's saying that he might have
7        something that shows statistical
8        significance.  I'm not aware of that.
9        If you provide me the document, I'm
10       happy to do it.  I need a clear answer
11       on that question and he was suggesting
12       it might be in one of the documents he
13       has in front of him.  So if you send
14       me that list, I'll take a look and
15       that's fine.  I'm not asking him to do
16       more work.  I'm asking him to -- I
17       just need to know what he's talking
18       about.
19           MS. ELLIS:  I will go ahead and
20       get you that list of the couple of
21       Bates number documents that he has in
22       front of him.
23           MS. CARITIS:  Thank you.
24           THE VIDEOGRAPHER:  We're going
25       off the record.  This is the end of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 343

```
 1                    WEINER
 2      media unit 6.  The time is 4:50.
 3            (Recess taken from 4:50 p.m. to
 4      5:15 p.m.)
 5            THE VIDEOGRAPHER:  We're back on
 6      the record.  This is the beginning of
 7      media unit 7.  The time is 5:15.
 8            THE WITNESS:  Ms. Caritis, the
 9      homework assignment I have the basis
10      for my opinion on audio and video
11      recording can be found in paragraph
12      200, footnote 273 which is quoted as
13      proven to work.
14            MS. ELLIS:  Just to clarify, that
15      is in response to an earlier question
16      that was asked and is not the entirety
17      of the basis for your opinion.
18            THE WITNESS:  No, that particular
19      question is the answer to the question
20      on the document that I was referring
21      to.
22      BY MS. CARITIS:
23         Q.   Thanks.  And I'll just quickly
24      follow-up on that.
25               What you just cited to me within
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 344

1                          WEINER

2     paragraph 200 of your report, it says, "It

3     is my opinion, while this opt-in and

4     post-incident submission model provides

5     the benefit Uber measured its internal

6     studies, it does not fully achieve the

7     'bystander intervention' impact that

8     Uber's documents report as 'proven to

9     work.'"

10              Do you see that?

11         A.   I do.

12         Q.   Okay.  And sitting here today, do

13    you know what that document means or is

14    referring to when it says proven to work?

15              MS. ELLIS:  Objection to form.

16              THE WITNESS:  I have what is in

17         the black and white of my report.  If

18         you need us to pull that document and

19         review it again we can.  But what I

20         relied on is that document's statement

21         that Uber had proven this model to

22         work and it went in quite a bit of

23         detail about the bystander impact and

24         how they could build a model that was

25         effective.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 345

```
1                      WEINER
2    BY MS. CARITIS:
3         Q.   Okay.
4         A.   Sorry.
5         Q.   No, I'm sorry.  I was not looking
6    up.  That was my fault.  I didn't realize
7    you were still speaking.
8         A.   No worries.
9         Q.   So this is in connection with
10   in-app video recording.  Sitting here
11   today, you don't recall by proven to work
12   if the document was talking about a
13   decrease in sexual misconduct?
14        A.   I was specifically referring to
15   your question answering my statement that
16   I prefer statistically significant studies
17   where I said that I relied on Uber's
18   posits and opinions and experiments.  And
19   the specific experiment that I was
20   referring to when it discussed video
21   recording was the one referenced by
22   Ms. Esteves where audio and video
23   recording under a bystander model was
24   proven to work.
25        Q.   You don't have any experience in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2       criminology; right, Mr. Weiner?
 3            MS. ELLIS:  Object to form.
 4            THE WITNESS:  I don't want to
 5         debate with you the word experience
 6         but if I can answer it as I have no
 7         training in criminology, that would be
 8         the easiest thing I think I can do.
 9       BY MS. CARITIS:
10         Q.   That's what I meant.  You're not
11       a criminologist by education or training;
12       right?
13         A.   I have no education or training
14       in criminology.
15         Q.   You talked a little bit today
16       about a few projects that incorporated
17       cameras.  In your experience we talked one
18       about the ATM streaming camera that you
19       worked on back in I believe it was the
20       1990s?
21         A.   Yes.
22         Q.   And then you talked a little bit
23       about a app, it's not a camera but it
24       streams video -- excuse me, it streams
25       audio that you're working on through your
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      board work for a nonprofit.
 3             Do you have -- what other
 4      experiences do you have in developing, so
 5      specific to developing camera products?
 6          A.   We talked about my experience at
 7      Weiner.net with a video streaming product.
 8      I believe you asked quite a number of
 9      questions about that project as well.
10          Q.   So other than that, those are the
11      experiences that is come to mind when we
12      talk about video streaming and cameras,
13      the ones that we've already discussed in
14      this deposition today?
15             MS. ELLIS:  Object to form.
16             THE WITNESS:  Those are the
17         personal experiences I have
18         absolutely, but I believe you will
19         find in the basis for my opinion quite
20         a number of references to research
21         that I did both of peer-reviewed
22         articles and public statements that
23         supported my opinion in detail.
24      BY MS. CARITIS:
25          Q.   And I want to distinguish between
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 348

1                        WEINER

2          the technical capability opinion of

3          dashcam and the effectiveness at deterring

4          misconduct problem.  So when I'm asking

5          you questions now I'm talking about the

6          effectiveness of deterring sexual assault.

7               Did you review any studies,

8          peer-reviewed studies that suggest that

9          surveillance cameras of any kind have an

10         impact on violent crime?  I'm talking

11         about peer-reviewed, not Uber studies.

12                  MS. ELLIS:  Object to form.

13                  THE WITNESS:  There was a

14             peer-reviewed study, let me find it.

15                  Speaking to codecs -- I'm sorry,

16             let me find it first and then be

17             clear.  Forgive me.

18                  Okay, in footnote 266, we have a

19             peer-reviewed study from Basel,

20             Switzerland on video codecs and their

21             impact on perception basis.

22         BY MS. CARITIS:

23             Q.   Okay.  But you have not reviewed

24         any studies or literature confirming or

25         discussing the potential deterrence effect

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 349

```
 1                      WEINER
 2      of surveillance cameras on crime; right?
 3          A.   My opinions on the deterrence
 4      effect of video cameras in Ubers are based
 5      on Uber's assertions.
 6          Q.   Were you aware that Uber actually
 7      had a full-time employee that was a
 8      criminal justice researcher?
 9              MS. ELLIS:  Object to form.
10              THE WITNESS:  I was not aware of
11          that fact.  I also did review Uber's
12          rebuttal report from a criminal
13          expert.
14      BY MS. CARITIS:
15          Q.   We'll talk about the reports in a
16      minute but let's focus just first on
17      internal Uber documents.  So you are not
18      familiar with the name Sytske Besemer,
19      you're not familiar with that name?
20          A.   I do not recall reviewing a
21      document from a Sytske Besemer.  If you're
22      affirming that I have one in my materials
23      relied on I can refresh my memory.
24          Q.   To be candid, your list is so
25      long I don't know if it is included in one
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 350

```
1                    WEINER
2      of them.  It was just a different
3      document.  I can put it up on the screen.
4              MS. CARITIS:  Mr. Delaney, can we
5          mark please, tab 60 as our next marked
6          exhibit.  I think we're at 11.
7              (Exhibit 10, e-mail from Sytske
8          Besemer, marked for identification.)
9              MS. CARITIS:  This, Mr. Weiner,
10         is an April 2018 e-mail from Sytske
11         Besemer to other folks at the company
12         discussing her literature review
13         concerning the deterrent impact of
14         cameras on cars.  Take a quick second,
15         it's one page so hopefully you can
16         review it quickly.
17             MS. ELLIS:  I'll just note it
18         looks like we've lost access to Box.
19         I'm going to try to get it back but
20         we'll look at the screen in the
21         meantime.
22             MR. DELANEY:  Alex, just a small
23         correction.  This is Exhibit 10.  We
24         didn't actually have the Exhibit 9
25         earlier when we first attempted.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 351

1                          WEINER
2              MS. CARITIS:   Thank you so much.
3      BY MS. CARITIS:
4         Q.   Mr. Weiner, I'm not going to quiz
5      you on this, but have you had a second to
6      review and familiarize yourself with the
7      document?
8         A.   I have.  What's jumping out at me
9      which is consistent with Ms. Esteves's
10     deposition testimony is the statement from
11     maximum deterrents, the certainty of
12     apprehension, policy is recommended where
13     the camera must be switched on and parties
14     to the interaction should not have the
15     power to turn off the camera.  That is
16     consistent with Ms. Esteves's deposition
17     and my opinion, without having to read it
18     to you in full once again, says that they
19     have the technical capacity to deploy
20     mandatory and audio recording features
21     that its own studies associated with
22     reductions in interpersonal conflicts.
23        Q.   I understand that.  Prior to
24     today, do you remember reviewing this
25     document?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 352

1                         WEINER
2         A.    I do not remember reviewing this
3    document.  I have now reviewed this
4    document and it does not change my
5    opinion.
6         Q.    Okay.  Well, you would agree that
7    it's important to the product development
8    lifecycle to determine the effectiveness,
9    the potential effectiveness of any risk
10   intervention; right?
11        A.    Absolutely, and I reviewed a
12   number of documents like this one which
13   stated that the driver's ability to turn
14   off or dispose of the footage reduced its
15   deterrent effects significantly, including
16   the expert report that you provided as a
17   rebuttal.
18        Q.    You have never developed a
19   in-vehicle, correct, an application that
20   was utilized in a vehicle; is that right?
21            MS. ELLIS:  Object to form.
22            THE WITNESS:  The fact is that
23        some of the apps that I have developed
24        have been used by individuals in
25        vehicles, but I haven't heard about an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 353

```
 1                     WEINER
 2        app that is designed to be an
 3        in-vehicle app.
 4    BY MS. CARITIS:
 5        Q.   That is a better question, thank
 6    you.
 7             You've never developed an app
 8    that was designed with the purpose of
 9    being integrated or utilized in a vehicle;
10    is that fair?
11        A.   That is a fair characterization
12    of my background in app development.
13        Q.   And I understand you're
14    specifically talking about the in-app
15    audio and video recording, but you don't
16    have any prior experience concerning
17    commercial fleet telematics; is that
18    right?
19             MS. ELLIS:  Objection, form.
20             THE WITNESS:  I do not have
21        personal experience in fleet
22        telematics.  I have read quite a
23        number of Uber's documents as it
24        relates to audio and video recording
25        and the studies that they have done in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 354

1                          WEINER
2          considerable detail.
3      BY MS. CARITIS:
4          Q.    You referenced while we were
5      taking a look at Exhibit 10 that in your
6      mind, one of the keys to dashcams is that
7      the driver can't turn it off; is that
8      right?
9          A.    From what I have seen of Uber's
10     documents, the ability of the driver to
11     turn off or discard the footage lowers the
12     deterrent effect.
13         Q.    Based on your product development
14     experience, can you think of a dashcam
15     system where the driver couldn't simply
16     turn off the dashcam?
17             MS. ELLIS:  Objection, form.
18             THE WITNESS:  I am familiar with
19         Uber's experiments in in-app recording
20         where Uber can be aware if the driver
21         stops the recording which has the
22         ability to have a deterrent effect.
23     BY MS. CARITIS:
24         Q.    The basis for your opinion that
25     it has the ability to have a deterrent

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 355

```
 1                    WEINER
 2    effect, you're basing that on what you
 3    read in Uber documents; right?  You don't
 4    have an independent opinion on the
 5    deterrent effect of an in-app recording
 6    feature; right?
 7            MS. ELLIS:  Objection, form.
 8            THE WITNESS:  I have relied on
 9        Uber's documents to assess the
10        deterrent effect of video recording in
11        a car.
12    BY MS. CARITIS:
13        Q.   The in-app recording feature, the
14    pilot with the video and the one that's
15    rolled out for rider's audio, it only --
17            For the in-app recording, video
18    recording, that is triggered when the trip
19    is in process; right?
20        A.   I am not specifically aware of
21    the detailed answer to that question.  I
22    have relied quite heavily on Ms. Esteves's
23    deposition which went into considerable
24    detail on in-app video and recording,
25    which we can refer to if we need to.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 356

1                    WEINER
2        Q.   I'm just trying to figure out,
3    you would agree that if I'm a driver, I
4    have in-app video on, it's mandatory, but
5    if I end the trip, it's going to stop
6    recording.  You would agree?
7            MS. ELLIS:  Object to form.
8            THE WITNESS:  I believe I made
9        statements about that in my document,
10       either that Uber has the ability to
11       know where the rider and the driver
12       are, they certainly could design the
13       feature so that it ended at the end of
14       the ride.  That is a possibility
15       within the realm of technical
16       feasibility.  But they also have the
17       technical feasibility to monitor the
18       rider and driver if they remain in the
19       same location continued to monitor the
20       ride.  So I would not agree that
21       ending a ride necessarily technically
22       ends Uber's ability to monitor the
23       ride.
24   BY MS. CARITIS:
25       Q.   I'm asking about a specific way

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2    to monitor, the video being on.  We just
 3    determined that Uber's documents and your
 4    opinion suggest that the deterrent impact
 5    is increased when the camera can't be
 6    turned off by the driver.  All I'm saying
 7    is even if it's in-app, an Uber driver can
 8    turn off the app, I understand that Uber
 9    might know, but that doesn't physically
10    prevent or technically prevent the driver
11    from turning it off, you would agree?
12              MS. ELLIS:  Object to form.
13              THE WITNESS:  I believe it is
14         fair to say if the Uber driver threw
15         his phone out the window, it would
16         stop recording the car.
17    BY MS. CARITIS:
18         Q.   For any other way that he moves
19    the camera or phone away from the cab of
20    the vehicle; right?
21              MS. ELLIS:  Object to the form.
22              THE WITNESS:  I'd rather not
23         posit hypotheticals on this.  I would
24         rather stick with the facts that have
25         been presented and those facts are
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 358

1                    WEINER
2         that Uber has the technical capability
3         to turn the recording on and off.
4    BY MS. CARITIS:
5         Q.   Right.  But not to ensure that
6    every single interaction between the
7    driver and a passenger is captured; right?
8              MS. ELLIS:  Object.
9              THE WITNESS:  Let me go
10        specifically to the statement I made.
11        That might be helpful.
12             On paragraph 213 is what I'm
13        going to refer now.  "In my opinion,
14        based on my review of Uber's internal
15        documents, combined with my
16        professional experience and knowledge
17        of smartphone capabilities between
18        2020 and 2025, Uber had the technical
19        ability to control camera and audio
20        recording features within its app in
21        response to contextual triggers.  For
22        example, Uber could have used GPS
23        signals to detect when a driver
24        lingered after a trip or when both the
25        Uber driver and a rider remained at a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 359

1                      WEINER
2           location other than the destination.
3           These events could have automatically
4           triggered audio or video recording at
5           Uber's discretion."
6    BY MS. CARITIS:
7           Q.   I understand that.  So let's say
8    it's triggered.  I'm the driver, I have my
9    camera on because it has to be.  Uber puts
10   it on.  I can put my camera down on the
11   seat so that even if Uber is turning it
12   on, it's not recording the criminal
13   conduct that's occurring in the vehicle.
14   Would that be fair?
15          A.   The driver as I posited in the
16   hypothetical of throwing it out the window
17   can stop the recording effect but Uber can
18   also know that and do something about it.
19          Q.   Have you researched or looked
20   into the impact of cellular network speed
21   in a moving vehicle as opposed to in a
22   stationary spot?
23               MS. ELLIS:  Objection, form.
24               THE WITNESS:  I have reviewed and
25          cited opinions about the difficulty

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 360

1                    WEINER
2        and opportunity of connectivity in a
3        moving vehicle.  I have not personally
4        worked on a product that was designed
5        to operate in a moving vehicle.  I
6        have relied on the documents that I
7        cited as evidence.
8    BY MS. CARITIS:
9        Q.   You mentioned that you have
10   reviewed a rebuttal report of a
11   criminologist and I'm not suggesting you
12   should know the terms of what we call
13   these million experts but I want to make
14   sure I understand the reports or
15   depositions of experts that you reviewed.
16            In your report, materials
17   considered, you cite a handful of reports
18   that are actually from a different Uber
19   litigation.
20       A.   The report I was specifically
21   referring to, would you like me to pull up
22   the name of the individual?
23       Q.   That would be great.  I'm trying
24   to find it.
25       A.   Let me look quickly to respond to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      your question.
 3              I can't pull it up quickly.  I'm
 4      sorry.  It was an Uber report of a
 5      criminologist.
 6          Q.   Is it Dr. Piza?
 7          A.   I've officially decided that
 8      Tiffany's computer is slow.
 9          Q.   We can worry about this later.  I
10      don't want us to waste our time.
11              Have you -- and this can be a yes
12      or no and maybe you all can send me a
13      list.  Have you reviewed expert reports
14      that were recently served?
15              There were two different
16      litigations and you cite some from the
17      JCCPs.  I'm trying to find out if you
18      subsequent to your report here reviewed
19      any other expert reports in this
20      litigation.
21          A.   Since returning from my retreat,
22      I have reviewed the Wilson report and I
23      believe I reviewed another report that was
24      served after my report was submitted.
25          Q.   Okay.  I want to talk now in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
1                        WEINER
2       last bit of time we have about your
3       opinion concerning Uber's mechanism for
4       reporting sexual assault or sexual
5       misconduct in the app.
6            A.   Of course.
7            Q.   We talked a little bit about this
8       earlier in connection with some of your
9       early work for a travel agency, but you
10      have no direct experience designing a
11      reporting process related to sexual
12      assault or sexual misconduct; is that
13      right?
14            MS. ELLIS:  Objection, form.
15            THE WITNESS:  As it specifically
16       relates to sexual assault and sexual
17       misconduct, I have not personally had
18       that experience before, correct.
19      BY MS. CARITIS:
20            Q.   I would like to turn to the
21      appendix, what is it, Exhibit D of your
22      report.
23            A.   Okay.
24            MS. CARITIS:  Curtis, it's like
25       super in the back and unfortunately I
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                        WEINER
2          don't know the Bates number, but it's
3          Exhibit D of what we're calling -- we
4          labeled as Exhibit 1.  It says
5          Reporting Sexual Violence in the Uber
6          App.
7               THE WITNESS:  Yes.
8     BY MS. CARITIS:
9          Q.   And I want to just talk a little
10    bit about the flow for reporting as you
11    identify it here.  So at a high level,
12    let's find it because I know you're going
13    to want me to be precise.
14               Your opinion 8 is that "As of
15    September 2025 (the time of this report),
16    Uber rider app still lacks a clear
17    dedicated and intuitive pathway for sexual
18    assault and misconduct, instead requiring
19    riders to use vague categories such as
20    'driver behavior' or 'other.'"
21               That's your opinion 8 of at least
22    the first few sentences and then you
23    continue to elaborate; is that right?
24         A.   Exactly what is written here,
25    yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 364

1                    WEINER

2        Q.   Now, I want to go to what Curtis

3   pulled up for us and that's your Exhibit D

4   which describes the flow for Uber's

5   reporting here.

6             So it looks like you took a

7   screenshot from your own Uber application

8   and you identify on page 3 of this exhibit

9   that at the top of the screen you see a

10  clearly labeled blue icon visible on the

11  upper right-hand corner of the main screen

12  which says Safety.  That's what you

13  included in this page; right?

14       A.   This particular part of the

15  appendix is going over those features that

16  are available during the ride.

17       Q.   Okay.  And there's actually a

18  feature on here that is available before.

19  And if we look at the bottom of your

20  screenshot I see a license plate that

21  starts with T, I see the type of vehicle,

22  I see the driver's name and I see a star

23  rating.  Do you see that at the bottom of

24  page?

25       A.   I see these descriptors of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 365

```
1                    WEINER
2     driver and the vehicle and the car, yes.
3         Q.   And both have the Uber passenger
4     and as an expert in this litigation,
5     you're aware that anytime an individual is
6     matched with a driver, a safety feature
7     that was built into the product is that
8     I'm provided the license plate and the
9     name and rating of the driver.  You're
10    aware of that?
11        A.   I've had the experience of seeing
12    that feature and I have seen Uber's
13    documents describing that as a safety
14    feature.
15        Q.   Okay.  And turning to the next
16    page of your exhibit, and what you're
17    describing here is not only does it say
18    safety at the top of the screen but if you
19    click in, you're actually then provided
20    with some additional in-trip safety
21    features.  Do you see that identified on
22    page 4 of your report?
23        A.   Absolutely.
24        Q.   And the safety features that it
25    immediately brings to your screen are
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2      Contact 911, Record audio, Share trip
 3      status and Report safety issue.  Do you
 4      see that?
 5           A.   I do.
 6           Q.   Looks like then you took some
 7      screenshots of actually clicking in to the
 8      features that are available to all riders
 9      in-app during trip and the first on page 5
10      is the 911 Assistance.  Do you see that?
11           A.   I do.
12           Q.   And it looks like there's two
13      options to trigger this feature.  You can
14      swipe or swipe to call or click button to
15      text.  Do you see that's been included and
16      integrated into the Uber platform?
17           A.   I do.  We talked about those
18      features earlier today.
19           Q.   Okay.  You note in the text above
20      the screenshots, "A rider who is
21      experiencing sexual violence while still
22      on a ride might reasonably select this
23      option if they are able to do so under
24      high stress and traumatic circumstances."
25                Do you see that?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 367

```
 1                    WEINER
 2       A.   I do.
 3       Q.   Okay.  You're not providing an
 4   opinion one way or the other about whether
 5   or not a sexual assault victim would be
 6   more likely or not to be able to utilize
 7   this feature; right?
 8            MS. ELLIS:  Object to form.
 9            THE WITNESS:  I do not have an
10        opinion on whether or not a rider who
11        is experiencing sexual violence while
12        still on the ride might reasonably
13        select this option if they are able to
14        do so under high-stress and traumatic
15        circumstances.  I pulled that
16        particular data point from Uber's own
17        documents.
18   BY MS. CARITIS:
19       Q.   The next page, moving to page 6,
20   you identify additional options that are
21   available during the ride, including Share
22   My Trip, audio recording and others and
23   something that explicitly says report
24   safety issue and direct someone to the
25   previous 911 button option.  Do you see
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 368

1                       WEINER
2       that where you identified those
3       screenshots on page 6?
4            A.   Yes, I took those screenshots in
5       my Uber app on the date enumerated in this
6       section.
7            Q.   And then on page 7, we're still
8       kind of in the during trip features and
9       availability and we see Get more safety
10      check-ins, Use PIN verification, Record
11      audio, Share trip.  This is identifying
12      the ability to automatically initiate
13      various safety features on the Uber
14      application whenever somebody gets in the
15      vehicle; right?
16           A.   As you can see at the bottom in
17      the schedule section, this highlights that
18      you can schedule it for all rides.  I
19      believe pressing that button gives you
20      other options as well.
21           Q.   In fact, Uber actually says that
22      it's recommended to schedule the safety
23      features that it has created for all
24      rides.  Do you see that there at the
25      bottom?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 369

1                    WEINER

2        A.   The word recommended clearly

3    appears on that button, yes.

4        Q.   And as we said, one of the four

5    safety features that you can schedule as a

6    rider is record audio; right?

7        A.   That is true.  The record audio

8    feature can send us a recording to report

9    safety issue.  It will record on the

10   rider's phone in its current

11   implementation.

12       Q.   And because there's the ability

13   to schedule it, there's the functionality

14   for the audio recording to turn on during

15   a trip, even if the rider is unable for

16   whatever reason to initiate the recording

17   by hitting a button; right?

18           MS. ELLIS:  Object to form.

19           THE WITNESS:  As I understand the

20       safety feature, Uber riders have the

21       ability to turn an audio recording as

22       a default option that will record from

23       the start to the end of an Uber ride.

24   BY MS. CARITIS:

25       Q.   Page 8 and 9 talk about another

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                      WEINER
 2      in-app option that Uber has integrated and
 3      actually rolled out through its product
 4      development lifecycle, and that's contact
 5      a safety agent where there's either a text
 6      or a phone call from ADT.  You're aware of
 7      that feature?
 8          A.   I have documented that feature on
 9      page 8 and 9 of this appendix.
10          Q.   You then on pages 10 and 11, you
11      then move on to reporting availability
12      after a trip has ended; is that right?
13          A.   This particular paragraph 10
14      begins the process of post-ride reporting,
15      yes.
16          Q.   Okay.  Do you have an opinion as
17      to -- is it your opinion that Uber should
18      have additional reporting available while
19      they are on trip?
20              MS. ELLIS:  Object to form.
21              THE WITNESS:  The question I was
22          asked and enumerated in my opinion 8
23          was that it still lacks a clear
24          dedicated and intuitive reporting
25          pathway for sexual assault and sexual
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 371

                           WEINER
1
2      misconduct.  That is the only opinion
3      I am positing as to the safety
4      features.
5   BY MS. CARITIS:
6      Q.   Okay.  So you're not specifically
7   opining as to when that clear pathway
8   should exist, it's simply identifying that
9   there is not a clear reporting pathway; is
10  that right?
11          MS. ELLIS:  Form.
12          THE WITNESS:  As of 2025 at the
13      time of this report, Uber's rider app
14      still lacks a clear dedicated and
15      intuitive reporting pathway for sexual
16      assault and misconduct.  It goes on
17      instead requiring riders to use vague
18      categories such as driver behavior or
19      other.  We can refer back to the
20      question I was asked, if that would be
21      helpful earlier in my report.
22  BY MS. CARITIS:
23      Q.   No, this is great.  We can keep
24  going, thank you.
25          So are you defining reporting

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 372

```
1                      WEINER
2      pathway to exclude safety features that
3      report incidents directly to a safety
4      agent or 911?
5               MS. ELLIS:  Object to form.
6               THE WITNESS:  I am not including
7          or excluding any safety feature at
8          all.  The ability to enumerate and
9          call 911 does not constitute, as I was
10         asked, a clear dedicated and intuitive
11         reporting pathway for sexual assault
12         and misconduct.  It gives the --
13     BY MS. CARITIS:
14         Q.   That's --
15         A.   -- ability to call 911.
16         Q.   Well, you also see information
17     that Uber provides ADT and 911.  It
18     provides the vehicle information along
19     with some information concerning the trip.
20     So is it your opinion that the ADT button
21     and the 911 button does not constitute a
22     reporting avenue?
23              MS. ELLIS:  Object to form.
24              THE WITNESS:  So as you know,
25         I've been really precise with this.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 373

1                    WEINER
2         The ability to call a 911 agent or
3         call an ADT key agent is different
4         than a clear dedicated and intuitive
5         reporting pathway for sexual assault
6         and misconduct.  If I'm looking at
7         this ADT button I do not see the words
8         sexual assault, I don't see the words
9         sexual misconduct.  I have seen in
10         other rideshare apps much clearer
11         pathways for reporting these kinds of
12         issues.  Clear pathways does not
13         appear as of my report in the Uber
14         rideshare app.
15    BY MS. CARITIS:
16         Q.   So let's talk a little bit about
17    that because you made a big deal about how
18    there aren't that many people in the
19    rideshare industry, it's really just Uber
20    and Lyft.  So are you suggesting that Lyft
21    has a clearer reporting pathway for sexual
22    assault or sexual misconduct in their app?
23              MS. ELLIS:  Object to form.
24              THE WITNESS:  I do not have
25         documented here in my report the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 374

1              WEINER
2        screenshots that I have seen on the
3        Lyft app at this time.
4    BY MS. CARITIS:
5        Q.   You cut out a little bit.  Can
6    you repeat that?  I'm sorry, Mr. Weiner.
7        A.   Sure.  My review of the Lyft app
8    was not included in my final report so no,
9    I do not have an opinion as to Lyft's app
10    at this time.
11        Q.   What were you referring to when
12    you said you've seen in other rideshare
13    applications clearer reporting structures
14    than Uber's?
15        A.   I've seen the word sexual
16    violence in the Lyft app.
17        Q.   So sitting here today, you're
18    saying that Lyft has a clear reporting
19    structure because you've seen the term
20    sexual violence in their app?
21            MS. ELLIS:  Objection to form,
22        misstates the testimony.
23            THE WITNESS:  If you would like,
24        I can go back and get the Lyft app
25        terms and be very precise.  At this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 375

```
 1                      WEINER
 2       stage and moment, what I'm going to
 3       say is that I was comparing this
 4       process to other rideshare apps and in
 5       a relative basis, this was not as
 6       clear as others that I saw.  I can
 7       give precise answers to your questions
 8       if you would like.
 9            MS. CARITIS:  If you're relying
10       on any other materials including the
11       Lyft application, then I would ask
12       that you please supplement your
13       reliance list and provide those
14       materials because they are not
15       currently stated.
16            MS. ELLIS:  Object to form and
17       mischaracterizes the testimony.
18            THE WITNESS:  I did not say I
19       relied on them, I said I saw them.
20       They are different.  My reliance is
21       entirely documented in this report.
22       This report clearly shows the Uber
23       screens.  Nowhere on the Uber screens
24       do you see the words sexual violence
25       or sexual misconduct in any way, shape
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 376

1                    WEINER
2         or form throughout the reporting
3         process.  The opportunities to make
4         such reports involve driver behavior
5         and other.
6    BY MS. CARITIS:
7         Q.   Okay.  Just to be very clear, I
8    asked you what your basis was for
9    concluding that the Uber structure was not
10   clear and you said it's based on what
11   you've seen in other rideshare
12   applications, to which I asked what are
13   you talking about and you said Lyft.  So
14   that's what I'm talking about.  If you are
15   relying on Lyft, that's great, but I ask
16   that you please produce those documents,
17   or if that's not what you're saying, to
18   clarify so I can understand the basis for
19   your opinion that Uber's reporting
20   structure on its app is some way less
21   clear than in other rideshares, that's
22   what I would like to know.  So if you have
23   basis for that, I would like to know the
24   basis.
25            MS. ELLIS:  Counsel, I'm going to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 377

```
 1                    WEINER
 2         have to object to your entire
 3         soliloquy there.  That is not what his
 4         testimony was.  He did not say he was
 5         relying upon anything that he's seen,
 6         simply mentioning that he'd seen it
 7         and that all of his opinions and the
 8         bases for his opinions are contained
 9         in this report.  And we can have our
10         court reporter read it back.  It's at
11         lines 361-12 to line 361-18 if it's
12         unclear because he did not say he was
13         relying on anything other than what's
14         in his report.
15              THE WITNESS:  Everything I relied
16         on for these opinions is in this
17         report and the opinion does not state
18         a comparison.  It states that the Uber
19         rider app lacks a clear dedicated and
20         intuitive reporting pathway.
21    BY MS. CARITIS:
22         Q.   Okay.  So to come to that
23    opinion, you did not conduct a comparative
24    analysis between the reporting mechanisms
25    or structures in the Lyft platform to come
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 378

1                    WEINER
2      to this opinion, you didn't do a
3      comparative analysis; right?
4           A.    That is correct.  The analysis
5      that I put it is enumerated and documented
6      in the screenshots in the exhibit we were
7      just going through.
8           Q.    Did you ask any rideshare
9      passenger whether they agreed with you
10     that it was unclear that if they had a
11     sexual assault complaint, they should tap
12     driver behavior, did you ask anyone else
13     if they didn't think that wasn't clear?
14               MS. ELLIS:  Object to form.
15               THE WITNESS:  My opinion, like
16          all of my opinions in this report, are
17          based on my 37 years of experience in
18          product development.  Any external
19          data that I used as part of the basis
20          for my opinions is documented in my
21          report.  I did not enumerate, nor did
22          I ask any other individuals for their
23          opinion in order to safely form my
24          opinion that the Uber rider app still
25          lacks a clear, dedicated and intuitive

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 379

```
 1                      WEINER
 2       reporting pathway.
 3    BY MS. CARITIS:
 4       Q.   So it's based on your -- let's
 5    look at this a little more.  On page 12,
 6    let's start actually where is it?  On page
 7    11 of your report, we're after trip now,
 8    and you note that you can rate a trip and
 9    then you're provided options to provide
10    more feedback.
11       A.   That is correct.
12       Q.   Okay.  On page 12, you can
13    identify more trip issues and one is
14    Driver behavior.  Do you see that?
15       A.   That is correct, I see the page
16    13.
17       Q.   And it's your opinion that if
18    somebody is trying to report a sexual
19    misconduct or sexual assault, they are not
20    going to know to click on the term driver
21    behavior?
22            MS. ELLIS:  Object to form.
23            THE WITNESS:  My opinion as
24       written here is that when pressing the
25       more issues option, you are presented
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 380

1                    WEINER
2          a screen with five options but none of
3          the options directly indicate sexual
4          violence.  Driver behavior is listed
5          as the only option that lastly might
6          be selected to make as much a report
7          when considering Dangerous driving,
8          Vehicle, Navigation and Pickup/Dropoff
9          as the other options.
10    BY MS. CARITIS:
11         Q.   Okay.  And the basis for your
12    opinion that it's unclear, that if I'm
13    trying to report a sexual assault or
14    sexual misconduct I should hit driver
15    behavior is your 37 years of experience in
16    product development, that the basis;
17    right?
18              MS. ELLIS:  Objection.
19              THE WITNESS:  The basis of my
20         opinions is clearly documented in my
21         report.  All of the paragraphs that
22         follow on the exhibit collectively
23         represent the basis for my opinion.
24         You may --
25    ///

Page 381

```
 1                    WEINER
 2    BY MS. CARITIS:
 3         Q.   Okay but --
 4         A.   -- have referenced a number of
 5    articles as well in this opinion.  All of
 6    this collectively reflects my opinion.
 7         Q.   Respectfully in Exhibit A there's
 8    not a single citation.  So your opinion
 9    that it's unclear --
10         MS. ELLIS:  Did you misspeak?
11         Exhibit A is the CV.
12    BY MS. CARITIS:
13         Q.   Okay, whatever one, Exhibit D,
14    there are no citations in Exhibit D;
15    correct?
16         A.   The citations I'm referring to
17    directly follow opinion 8.  We have the
18    rider app screen, shots of Exhibit D, the
19    deposition of Hanna Nilles, Uber document
20    ending in 59.  We have ISO 2018, the
21    ergonomics of human system interaction,
22    the documents -- I'm so sorry.  It's
23    getting towards the end of the day.  I
24    will be slower and more clear.
25              I will simply state the entire
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 382

1                    WEINER
2      basis of my opinion is enumerated in the
3      paragraphs and the footnotes that follow
4      opinion 8.
5           Q.   You did not take into account
6      that Uber has many other ways aside from
7      in-app reporting to report sexual assault
8      or sexual misconduct; correct?
9                MS. ELLIS:  Object to form.
10               THE WITNESS:  I was responding to
11          a specific question and enumerated a
12          specific opinion which I've documented
13          herein.  I am very well aware of
14          Uber's ability to report sexual
15          assault and sexual misconduct.  Those
16          were not responsive to the question or
17          the opinion that I gave.
18     BY MS. CARITIS:
19          Q.   Okay.  And the question that was
20     asked to you was posed by plaintiffs'
21     counsel; right?  They asked you to look
22     into a specific question about the in-app
23     reporting options?
24          A.   The questions I was asked as
25     documented in my report was whether Uber's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 383

1                    WEINER
2       post-reporting features, i.e., the
3       features drivers could use to report
4       sexual violence incident during or after
5       trips, together with Uber's use of
6       internal reporting records and its
7       available GPS/telemetry capabilities, were
8       designed, implemented, and governed
9       consistent with recognized product
10      development and software lifecycle
11      standards in risk-sensitive applications.
12          Q.   Did you look at whether or not
13      United has a clear reporting pathway for
14      sexual assault or sexual misconduct?
15              MS. ELLIS:  Object to form.
16              THE WITNESS:  I did not review
17          the current United application in
18          consideration of whether Uber's
19          post-reporting features were
20          consistent with recognized product
21          development and software lifecycle
22          standards, no, I did not.
23      BY MS. CARITIS:
24          Q.   You didn't look at any other
25      company's post-reporting or any reporting

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 384

1                              WEINER
2          mechanisms for reporting sexual assault in
3          coming to your opinion; is that right?
4                    MS. ELLIS:  Object to form.
5                    THE WITNESS:  As I discussed,
6               with my 37 years of experience, my
7               extensive role as a traveler, using
8               almost every travel app that is out
9               there, an active rider on Uber and
10              Lyft, I had information in my brain
11              that was broad and comprehensive.
12              What I relied on to form my opinion is
13              specifically documented in the
14              paragraphs that follow opinion 8.
15                   MS. CARITIS:  Okay.  Could we
16              quickly pull up 33 and 34 and we'll
17              mark those collectively as Exhibit 11,
18              and these reflect current reporting
19              options on United Airlines.
20                   MS. ELLIS:  Can we get a time
21              check when we have a moment?
22                   THE VIDEOGRAPHER:  There's 11
23              minutes left.
24                   (Exhibit 11, form on the United
25              website, marked for identification.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 385

1                    WEINER
2    BY MS. CARITIS:
3        Q.   So Mr. Weiner, what we've just
4    marked as Exhibit 11 is a form on the
5    United website that attempts to allow an
6    individual to report an issue and if we
7    see my colleague Paul went through it the
8    other day, we see he put his confirmation
9    number for his flight and his last name
10   and then he's provided a few options at
11   the bottom.  I don't see a reference to
12   sexual assault anywhere there.  Do you?
13       A.   I do not see a reference to
14   sexual assault or sexual misconduct there.
15   That does not surprise me because the
16   relevant impact and frequency of sexual
17   assault and sexual misconduct on an
18   airplane are not the same as the incidence
19   and impact of a sexual assault in an Uber
20   and I would not expect these two companies
21   to have the same reporting features.
22       Q.   Okay.  Well, would it surprise
23   you to learn that the FBI has put out
24   multiple statements concerning the
25   incidents of sexual assault and sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1                         WEINER
2        misconduct that are occurring on
3        airplanes?
4                 MS. ELLIS:  Object to form.
5                 THE WITNESS:  I did not say that
6            sexual assault and sexual misconduct
7            never occur on airplanes.  I enumerate
8            the relevant risk position as we
9            talked about extensively in ISO 31000
10           that must be taken into consideration
11           when making these assessments.
12       BY MS. CARITIS:
13           Q.   You're assuming that there are
14       less sexual assaults that occur relatively
15       on airplanes than Ubers; right?  You
16       didn't look up statistics concerning
17       sexual assault on airplanes?
18                 MS. ELLIS:  Object to form.
19                 THE WITNESS:  I did not look up
20           current statistics related to sexual
21           assaults on Ubers.  As you're well
22           aware, my experience at United was
23           some time ago but I was aware of all
24           sorts of incidents that occurred on
25           airplanes during my time at United.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1              WEINER
 2         MS. CARITIS:  Curtis, if we can
 3      scroll down a little bit on the
 4      document, we can let Mr. Weiner see
 5      other ways in which -- and if that's
 6      the end of that one, then we can go to
 7      tab 34 which will be Exhibit 12.
 8         (Exhibit 12, document entitled
 9      Customer Care, marked for
10      identification.)
11   BY MS. CARITIS:
12      Q.   This is the customer care form
13   and if you scroll down it says it provides
14   you some options to make some -- make a
15   complaint.  You can click on complaint.
16         When I click on complaint I'm
17   then taken down -- Mr. Delaney, you can
18   scroll down -- to inflight experience.  I
19   guess that's what I would do.  And then
20   you can go to about and you can identify a
21   safety issue.  Do you see that?
22      A.   Yes.
23      Q.   Okay.  And then it takes you to
24   another form where you can keep filling
25   out some information and then it ends up
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 388

```
 1                    WEINER
 2    just providing me at the very bottom an
 3    open answer box where I can provide a
 4    description of what occurred here.  Do you
 5    see that?
 6         A.   I'm seeing that for the first
 7    time now with you.
 8         Q.   Okay.  Seeing it for the first
 9    time because you didn't look at any other
10    reporting processing that other industries
11    or companies have to report safety
12    incidents; is that right?
13              MS. ELLIS:  Object to form.
14              THE WITNESS:  I considered
15         product development standards, not
16         other companies' reactions to the
17         risks that they are given.
18              MS. CARITIS:  Okay.  And let's
19         take a look at 35 and then I promise
20         we're done.  35 we'll mark as Exhibit
21         13.
22              (Exhibit 13, document from United
23         messaging, marked for identification.)
24    BY MS. CARITIS:
25         Q.   This is a different way that you
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 389

1                          WEINER
2       can get in touch with United.  It's one of
3       those chat bots and we put in I was
4       sexually assaulted on a flight and the
5       response was to just send us right to a
6       feedback form.  Do you see that there?
7            A.    I see that in front of me now.
8            Q.    Mr. Weiner, you would agree that
9       based on what we just looked at, United
10      certainly doesn't have a clear reporting
11      structure available on its website for
12      sexual assault or sexual misconduct;
13      right?
14               MS. ELLIS:  Object to form.
15               THE WITNESS:  The United screens
16          that you showed me do not show what I
17          have looked for and characterized in
18          my opinion as a clear, dedicated and
19          intuitive reporting pathway for sexual
20          assault and sexual misconduct, which
21          in my opinion is consistent with the
22          difference in sexual assault risk on a
23          United Airlines flight and in an Uber.
24               MS. CARITIS:  So you said the one
25          that you believe you saw sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 390

1                    WEINER

2          assault reference was Lyft.  We

3          actually were able to find a

4          screenshot of the reporting mechanism

5          there.

6              So Mr. Delaney, if you could pull

7          up the new tab that just came your

8          way, that will be Exhibit 14.

9              (Exhibit 14, document from Lyft's

10         website, marked for identification.)

11             MS. CARITIS:  And it's from

12         Lyft's website.  We'll get it in a

13         second up.

14             MS. ELLIS:  I'm going to object

15         to this entire line of questioning as

16         to its relevance outside the scope of

17         Mr. Weiner's testimony as well as his

18         report.

19             MS. CARITIS:  He has an entire

20         section on reporting sexual violence

21         in the Uber app.

22     BY MS. CARITIS:

23         Q.   Here we see Lyft's reporting and

24     it says something happened during my ride.

25     I have a few options I can pick, Lost and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                       WEINER
 2     found, Accident, Feedback on driver,
 3     Refused service animal, I was refused
 4     service due to a mobility device.  Do you
 5     see those options?
 6          A.   I do.
 7          Q.   Before you thought maybe you had
 8     seen something explicitly mentioning
 9     sexual assault or sexual misconduct.  You
10     would agree here that it doesn't say
11     anything on this document on Lyft's
12     reporting mechanism concerning sexual
13     misconduct or sexual assault?
14          A.   I was not referring to this
15     reporting mechanism.  I have never looked
16     at this reporting mechanism before.
17          Q.   Okay.  Sitting here today, you
18     don't recall one way or the other whether
19     you have seen something on Lyft that
20     explicitly allows you to report sexual
21     assault or you do think you've seen it?
22          MS. ELLIS:  Object to form and
23          the witness has just made clear that
24          he has not looked at this reporting
25          mechanism from the Lyft website before
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 392

1                    WEINER

2          today.

3              MS. CARITIS:  I'm asking about

4          the app.

5      BY MS. CARITIS:

6          Q.   You're saying that you've never

7      seen this website.  Have you ever seen any

8      other Lyft reporting mechanism before?

9          A.   I have seen the Lyft reporting

10     mechanism in-app.

11         Q.   And is it your testimony under

12     oath today sitting here today that you

13     think it says sexual assault on in-app

14     reporting but it doesn't say it on the

15     website?

16             MS. ELLIS:  Object to form.

17             THE WITNESS:  I cannot recall

18         sitting here today.

19             MS. CARITIS:  You can take that

20         down, Curtis, thanks so much.  That's

21         all I've got.  So I don't know if you

22         want to go off the record, Tiffany, or

23         if you want to ask him questions.

24         It's totally up to you what you want

25         to do first.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 393

1                    WEINER

2          MS. ELLIS:  Can we just go off

3       the record for a quick bio break and

4       I'll ask him questions.

5          THE WITNESS:  We're going off the

6       record.  This is the end of media 7.

7       The time is 6:10.

8          (Recess taken from 6:10 p.m. to

9       6:23 p.m.)

10         THE VIDEOGRAPHER:  We are back on

11      the record.  This is the beginning of

12      media unit 8.  The time is 6:23.

13   EXAMINATION

14   BY MS. ELLIS:

15      Q.   Mr. Weiner, you and I have met

16   before and I've been defending you

17   throughout the deposition today, but I'll

18   introduce myself for the sake of the

19   record.

20         My name is Tiffany Ellis and I'm

21   the attorney for the plaintiffs in this

22   matter.  I just have a few follow-up

23   questions to ask you about some of the

24   things you were asked about today; is that

25   okay?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 394

```
 1                    WEINER
 2        A.   Of course.
 3        Q.   You were just asked some
 4   questions about your time -- about United
 5   Airlines and the reporting structure for
 6   potential sexual assaults that occurred
 7   there.  Do you recall that?
 8        A.   I was.
 9        Q.   To your knowledge, is United
10   Airlines in the business of sending a
11   single pilot to provide a one-on-one ride
12   with a single flier?
13        A.   No, they are --
14             MS. CARITIS:  Form.
15             THE WITNESS:  -- not.
16   BY MS. ELLIS:
17        Q.   Mr. Weiner, you also referenced a
18   footnote in your report earlier today,
19   number 2 which is on page 8 of your
20   report, and that states that United
21   Airlines in 2005 provided 67 million
22   passengers, a total of 114 billion
23   mainline passenger miles.  Do you remember
24   that?
25        A.   I do.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 395

```
 1                    WEINER
 2       Q.   You're not aware of the number of
 3    miles or trips United Airlines provided in
 4    any given year now in 2025, are you?
 5       A.   I have not seen that number
 6    recently, no.
 7       Q.   Would you expect that it went
 8    down based on your experience and with
 9    United Airlines in the transportation
10    industry since 2005?
11            MS. CARITIS:  Form.
12            THE WITNESS:  My experience gives
13       me a reason to hypothesize that it has
14       gone up since 2005, having recovered
15       from COVID and having merged with
16       Continental Airlines.
17    BY MS. ELLIS:
18       Q.   You were also asked some
19    questions about the FBI investigating
20    incidents of sexual assaults aboard
21    aircraft in the United States.  Do you
22    recall that?
23       A.   Yes, I was asked by Ms. Caritis
24    about sexual assaults on airlines.
25       Q.   I just was able to look up an
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 396

```
 1                        WEINER
 2       article from FBI.gov dated April 29, 2025
 3       that says that the FBI in 2024
 4       investigated 104 sexual assaults aboard
 5       aircraft cases.  Is that a number from a
 6       product development safety you would be
 7       interested in comparing to the total
 8       number of rides if you were to look at
 9       reporting processes?
10              MS. CARITIS:  Form.
11              THE WITNESS:  So yes, the
12           relative scale of a small hundred
13           number of sexual assaults is not the
14           same scale and impact as I have stated
15           we have seen in the data at Uber and,
16           therefore, I would not expect the same
17           reporting features to be present.
18       BY MS. ELLIS:
19           Q.   You were asked some questions
20       earlier by Uber's counsel positing that
21       from 2017 to 2022 that .006 percent of the
22       trips in the United States have reported
23       sexual assault and misconduct.  Do you
24       remember that?
25           A.   I recall that statement.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 397

1                    WEINER
2       Q.   You are not testifying in this
3    case about the number of reports that were
4    received by Uber, are you?
5       A.    I do not have any opinions that
6    specifically refer to the number of
7    reports received by Uber.
8       Q.   Are you aware, however, from
9    information produced after your deposition
10   or after your report was produced
11   regarding the number of reports that Uber
12   has received of sexual report assaults and
13   misconduct?
14           MS. CARITIS:  Form.
15           THE WITNESS:  I have seen a
16       document which I have in front of me
17       regarding Flack data that has been
18       produced by Uber talking about the
19       total number of reports on the Uber
20       platform in that time period.
21           MS. ELLIS:  We can go ahead and
22       share that document now and I will
23       mark that for the record as Exhibit
24       11.  Hopefully you will be able to see
25       my screen.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
1                        WEINER
2             MS. CARITIS:  I think we marked
3        an 11.  Didn't we already mark an 11?
4             MS. ELLIS:  I only see 10 in the
5        Box.
6             MR. DELANEY:  Yes, the next free
7        exhibit number is 15.
8             MS. ELLIS:  We'll mark this
9        Exhibit 15.
10             (Exhibit 15, document, marked for
11        identification.)
12    BY MS. ELLIS:
13        Q.   Are you aware from your review of
14    this document the number of reports of
15    sexual assault and misconduct that Uber
16    received between 2017 and 2022?
17             MS. CARITIS:  Form, scope.
18             THE WITNESS:  According to this
19        document we are looking at roughly
20        half a million.
21             MS. ELLIS:  I move to admit that
22        as Exhibit 15.
23    BY MS. ELLIS:
24        Q.   Mr. Weiner, you also testified
25    earlier about -- you were asked some
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 399

```
 1                    WEINER
 2     questions about your LinkedIn profile.  Do
 3     you remember that?
 4          A.   I do remember seeing my LinkedIn
 5     profile presented by counsel.
 6          Q.   Can we pull up Exhibit 4 again
 7     for a moment?  Before we get there, let me
 8     just ask you this:  In your LinkedIn
 9     profile, does it include all of the main
10     areas of your experience and expertise
11     that you have earned over the last 37
12     years as a -- in product development?
13          A.   My LinkedIn profile is not
14     intended, nor is it a complete
15     representation of all of the skills and
16     experience I have developed over the last
17     37 years.
18          Q.   Does it reflect your core
19     foundational knowledge and experience?
20          A.   It reflects my work experience as
21     a chronology over the time period since
22     graduating college to date.
23          Q.   Now we can go ahead to Exhibit 4
24     for a moment.
25               Mr. Weiner, when this exhibit was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 400

1                    WEINER
2       pulled up before, I think you made a
3       comment about your photo that you were a
4       little bit younger in that picture.  Do
5       you recall how long ago that was?
6            A.   I believe counsel has posited
7       that this was 2010.  I believe that
8       picture is older than that.
9            Q.   But this Web page as you
10      discussed was from around that time, 2010,
11      over 15 years ago; is that right?
12           A.   That is correct.
13           Q.   And at this time that you had
14      this Web page up you then had 20 years of
15      professional experience; is that right?
16           A.   That is correct.
17           Q.   And was that in areas that we
18      just discussed that are reflected on your
19      LinkedIn pages?
20           A.   That is correct.
21           Q.   We can go ahead and take that
22      down.
23           A.   I love that picture.
24           Q.   You were also asked some
25      questions about paragraph 27 in your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 401

1                     WEINER

2    report and your methodologies.  Do you

3    rely on all of those core experiences even

4    if not articulated exclusively in

5    paragraph 27 of your report in formulating

6    your searches and review of records in

7    this litigation?

8        A.   Absolutely.  As I stated in my

9    report, I've used the sum of my 37 years

10   of experience in forming the criteria to

11   identify relevant documentation.

12       Q.   You were also asked some

13   questions earlier about documents and

14   budgets.  Do you remember that?

15       A.   I was asked if I was aware of the

16   total spending on safety features, yes.

17       Q.   Why is that important to you as

18   an expert in product development and

19   product lifecycles?

20       A.   As I highlighted to counsel,

21   there are certain documents that could be

22   extremely helpful.  Knowing the relative

23   amount of money spent involves the

24   returns.  I highlighted those particular

25   documents in a footnote in my report.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 402

1              WEINER
2       Q.   And why did you highlight that?
3       A.   Because when as a consultant I am
4    often asked to consider the product
5    development lifecycle, I find it helpful
6    to have budgets and PV analysis, return
7    analysis to consider the product
8    development lifecycle overall.
9       Q.   Counsel for Uber also asked you
10   some questions about whether you know the
11   total amount of money that Uber spent on
12   safety initiatives at any point in time.
13   Do you recall that?
14      A.   I do recall that question.
15      Q.   Would it be helpful for you to
16   have Uber's overall budget if you knew
17   that number in order to provide any
18   additional opinions related to those in
19   your report?
20           MS. CARITIS:  Form.
21           THE WITNESS:  Sorry, were you
22      objecting?
23           MS. CARITIS:  I just said form.
24           THE WITNESS:  Sorry, yes.  So
25      yes, as I highlighted in a particular

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 403

1                    WEINER
2         paragraph in my report, the relative
3         spend on safety and investment was
4         between ███████████.  Knowing the
5         total dollar amount spent and the
6         relative proportion of that number in
7         the overall context of Uber's budgets
8         and revenue could be a helpful piece
9         of information to have.
10   BY MS. ELLIS:
11        Q.   Why does that matter?
12        A.   Because we are considering Uber's
13   choices in a product development
14   lifecycle.  Those choices come out in
15   feature prioritization and budgets, and
16   trying to understand the choices that they
17   made to define those features and budgets
18   is important in understanding their
19   overall prioritization process.
20        Q.   Does your assessment of scale
21   have anything to do with that analysis?
22             MS. CARITIS:  Form.
23             THE WITNESS:  The scale of Uber
24        is very relevant to my analysis in
25        terms of the number of humans on the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 404

```
 1                    WEINER
 2       dollars spent on safety features
 3       absolutely.
 4  BY MS. ELLIS:
 5       Q.   You were also asked some
 6  questions about the taxis and Uber
 7  (inaudible)?
 8       A.   Yes, counsel asked a number of
 9  questions about taxis and comparisons to
10  taxis.
11       Q.   You, I think, stated on the
12  record that Uber has more capability than
13  taxis.  Does that surprise you?
14            MS. CARITIS:  Form.
15            THE WITNESS:  I'm neither
16       surprised nor am I in any way modified
17       to change any of my opinions based on
18       the relative scale of Uber and its
19       ability to make technology investments
20       and taxis and their relative ability
21       to make technology investments.
22  BY MS. ELLIS:
23       Q.   I think you referenced paragraph
24  27 of your report to talk about the
25  foreseeability of sexual assaults in
```

Page 405

```
 1                      WEINER
 2    taxis.  Would that have any impact on your
 3    comparison to taxi industry?
 4         A.   Sorry, what paragraph?
 5         Q.   27.
 6         A.   Page 27?
 7         Q.   Paragraph 27.  Perhaps it was
 8    page 27.  We can move on.  I think I've
 9    cited the wrong question about after the
10    wrong paragraph.  But I will ask you again
11    in considering the difference between
12    sexual assault, the possibility of sexual
13    assaults in taxis and -- in taxis versus
14    Uber, does foreseeability enter your
15    equation at all?
16              MS. CARITIS:  Form.
17              THE WITNESS:  The foreseeability
18         of sexual assaults is a risk
19         consideration that must be taken into
20         account in a product development
21         lifecycle by a technology product like
22         Uber.
23    BY MS. ELLIS:
24         Q.   You were also asked some
25    questions about criminology.  Do you
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 406

1                          WEINER
2       recall that?
3            A.   I do recall being asked if I was
4       a criminologist.
5            Q.   While you said that you were not
6       formally trained in criminology, but as a
7       consideration of crimes, that's something
8       that has been a part of your work over the
9       last 37 years?
10                MS. CARITIS:  Form.
11                THE WITNESS:  Absolutely.  As I
12           described in a number of examples, we
13           consider crime risk specifically in
14           financial services as it relates to
15           financial crime compliance.  We
16           consider crimes from industries like
17           travel and travel agency services.  We
18           consider crimes in this particular
19           case quite considerably and I have
20           considered crimes across much of my
21           37-year career.
22       BY MS. ELLIS:
23            Q.   You were also asked some
24       questions about cameras in vehicles
25       including a hypothetical that if a in-app

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

```
 1                    WEINER
 2    recording feature were required by Uber, a
 3    driver could simply put the phone down on
 4    the seat.  Do you recall that?
 5         A.   I do recall that question.
 6         Q.   In that scenario, even if the
 7    picture image was not visible, would audio
 8    still record?
 9         A.   Audio --
10              MS. CARITIS:  Form.
11              THE WITNESS:  Sorry.  Forgive me.
12              Audio recording would continue if
13         the driver put the phone down on the
14         seat in or in a glove compartment.
15    BY MS. ELLIS:
16         Q.   You were asked some questions
17    about Exhibit D to your report.  Do you
18    recall that?  And we can go ahead and flip
19    there.
20         A.   Absolutely.
21         Q.   Starting at paragraph 3, you were
22    asked about the call 911 feature or text
23    911 that is discussed in paragraph 5.  Do
24    you recall that?
25         A.   I do recall that question.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 408

1                    WEINER

2          Q.   So can you explain how many steps

3     would it take if a person, as you say Uber

4     said, was experiencing sexual violence

5     while still on a ride have to go through

6     in the app before they were able to

7     connect with 911 during a sexual violence

8     incident?

9          A.   If we can imagine what Uber has

10    characterized as a high-stress and

11    traumatic circumstance, they would need to

12    hit the safety blue button, they would

13    need to hit the contact 911 button, they

14    would need to choose between the swipe to

15    call 911 or the text 911 button, at which

16    point they would either be connected to a

17    911 operator or begin a text conversation.

18         Q.   And all of the features that are

19    covered in Appendix D to your report are

20    only available if you actually have access

21    to the Uber app online; is that correct?

22         A.   That's correct.

23              MS. CARITIS:  Form.

24              THE WITNESS:  Sorry.  That's

25         correct.  You would need access to the

Page 409

```
 1                    WEINER
 2      Uber app to use these features
 3      enumerated in Exhibit D.
 4  BY MS. ELLIS:
 5      Q.   If a friend called an Uber ride
 6  for me because my phone had died, would I
 7  be able to use those feature during a
 8  ride?
 9           MS. CARITIS:  Form.
10           THE WITNESS:  Those features
11      would not be available during a ride
12      where a phone was dead.
13           MS. ELLIS:  I have no further
14      questions at this time.  Thank you,
15      Mr. Weiner.
16  FURTHER EXAMINATION
17  BY MS. CARITIS:
18      Q.   I just have two quick follow-ups.
19           So on the questions that,
20  Mr. Weiner, Ms. Ellis was just asking you
21  about, are you familiar with the guest
22  ride feature?
23      A.   I am familiar with the guest ride
24  feature in the Uber app.
25      Q.   And on the guest ride feature, I
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 410

```
 1                     WEINER
 2      can, I do it all the time, order a ride
 3      for my mother on my Uber app and then it
 4      will connect with her own phone so that
 5      she's connected directly to the Uber
 6      driver; right?
 7           A.   In the case that your mother's
 8      phone had a battery and signal, she would
 9      be able to connect to the Uber driver.
10           Q.   If she had scheduled for the
11      various safety features we discussed to
12      turn on automatically, is it your opinion
13      that her phone would need to have battery
14      power in order to share her trip with me
15      still?
16              MS. ELLIS:  Object to form.
17              THE WITNESS:  It's a little
18          complicated what you just asked so we
19          can just be really clear.  If you set
20          up a ride for your mother and she was
21          in the vehicle with a dead phone,
22          would she be able to notify you of the
23          in-phone recording or the
24          follow-my-ride feature?
25      ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 411

```
 1                        WEINER
 2      BY MS. CARITIS:
 3          Q.   I'm talking about the instance
 4      that Ms. Ellis just described.  So we have
 5      a guest, so my mother is my guest.
 6          A.   Yes.
 7          Q.   I order her a ride on my
 8      application --
 9          A.   Yes.
10          Q.   -- but I add her info --
11          A.   (Inaudible) -- cell phone.
12          Q.   Exactly.  Exactly.
13          A.   Sorry.
14          Q.   She then is connected -- her app
15      is connected to my ride but her battery is
16      dead.
17          A.   Yes.
18          Q.   Is it your opinion that
19      prescheduled safety features such as Share
20      My Trip would not work and track my
21      mother's ride?
22              MS. ELLIS:  Objection, form and
23          outside the scope of redirect as well
24          as his opinion.
25              MS. CARITIS:  You just asked him
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 412

1              WEINER

2        if there were features, if they would

3        work if the phone was dead.  I'm

4        talking about a scenario where the

5        safety features would still work.

6             MS. ELLIS:  You can answer if

7        you're able.

8             THE WITNESS:  I'm going to do my

9        best.  So you've asked me if your

10       mother's dead phone can record or be

11       tracked on the GPS in her ride as a

12       guest?

13   BY MS. CARITIS:

14       Q.   Would my mother's ride be tracked

15   if she had done share her trip prior to

16   the phone schedule, prior to her phone

17   dying?

18       A.   I must admit I am not precisely

19   clear if your mother's phone or the

20   driver's phone is the one reporting the

21   GPS.  If your mother's phone is the one

22   reporting GPS, it would not work.  If the

23   driver's phone is the one reporting the

24   GPS, it would work.

25       Q.   And one last question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 413

1               WEINER
2          Ms. Ellis opened up with talking
3     about FBI investigations on airplanes and
4     she reported that she had identified a
5     statistic where the FBI had been
6     investigating about a hundred sexual
7     assaults on the airplanes.  You're not
8     aware of statistics concerning total
9     number of sexual assaults reported to
10    airlines; right?
11         A.   I do not have a particular
12    statistic of total number of sexual
13    reports reported to airlines in 2025.
14         Q.   Yes.
15         A.   I have experience while at United
16    and I know that number to be considerably
17    low.
18         Q.   You also are aware that airlines
19    don't have any mandatory reporting
20    requirements and do not publicly report
21    the total number of reported sexual
22    assaults on airlines?
23         A.   I have never --
24              MS. ELLIS:  Object to form.  Go
25         ahead.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 414

1              WEINER

2         THE WITNESS:  I have never seen a

3    United Airlines' report on sexual

4    assault in the public domain.

5         MS. CARITIS:  I have no further

6    questions.  Thank you very much for

7    your patience today with me,

8    Mr. Weiner.  I appreciate it.

9         MS. ELLIS:  Just one last

10   question.  Thank you everyone for your

11   patience.

12  FURTHER EXAMINATION

13  BY MS. ELLIS:

14       Q.   In the situation where a rider's

15  phone is dead and there mandatory

16  recording through the app, would there

17  still be a record of either my ride or

18  Uber counsel's mother's ride?

19       A.   As I have described in my

20  opinion, mandatory audio and video

21  recording which would primarily come from

22  the driver phone, that ride would be

23  recorded.

24       MS. ELLIS:  No further questions.

25       THE VIDEOGRAPHER:  Can I take us

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 415

1                    WEINER
2        off the record?
3            MS. ELLIS:  Yes.
4            THE VIDEOGRAPHER:  We are off the
5        record at 6:45 p.m. Eastern time and
6        this concludes today's testimony given
7        by Bruce Weiner.  The total number of
8        media used was 8 and will be retained
9        by Veritext.
10           (Time noted:  6:45 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 416

```
 1
 2                C E R T I F I C A T E
 3     STATE OF NEW YORK      )
 4                            : ss.
 5     COUNTY OF NASSAU       )
 6
 7          I, CATHI IRISH, a Registered
 8     Professional Reporter, Certified Realtime
 9     Reporter, and Notary Public within and for
10     the State of New York, do hereby certify:
11          That BRUCE WEINER, the witness whose
12     deposition is hereinbefore set forth, was
13     duly sworn by me and that such deposition
14     is a true record of the testimony given by
15     the witness.
16          I further certify that I am not
17     related to any of the parties to this
18     action by blood or marriage, and that I am
19     in no way interested in the outcome of
20     this matter.
21          IN WITNESS WHEREOF, I have hereunto
22     set my hand this 28th day of October,
23     2025.
24
25
                    CATHI IRISH, RPR, CRR, CLVS
```

800-567-8658                                    973-410-4098

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 417

```
1

2      --------------- I N D E X ---------------

3      WITNESS              EXAMINATION BY     PAGE

4      BRUCE WEINER       MS. CARITIS      7, 409

5                         MS. ELLIS      393, 414

6

7      --------------- EXHIBITS ---------------

8      EXHIBIT NUMBER     DESCRIPTION        PAGE

9      Exhibit 1, expert report             25

10     Exhibit 2, LinkedIn profile          28

11     Exhibit 3, LinkedIn experience page  31

12     Exhibit 4, Weiner.net home page      95

13     Exhibit 5, SEAK expert directory     123

14     page

15     Exhibit 6, invoices                  146

16     Exhibit 7, document entitled         213

17     Foreward - Supplementary

18     information

19     Exhibit 8, document entitled Risk    230

20     management -- Guidelines ISO 31000

21     Exhibit 9, Esteves deposition aid    280

22     Exhibit 10, e-mail from Sytske       350

23     Besemer

24     Exhibit 11, form on the United       384

25     website
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 418

1

2      Exhibit 12, document entitled        387

3      Customer Care

4      Exhibit 13, document from United     388

5      messaging

6      Exhibit 14, document from Lyft's     390

7      website

8      Exhibit 15, document                 398

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 419

1
2              *** ERRATA SHEET ***
3      NAME OF CASE:  In Re:  Uber Technologies,
4      Inc., Passenger Sexual Assault Litigation
5      DATE OF DEPOSITION:  October 28, 2025
6      WITNESS:  Bruce Weiner
7
8      PAGE LINE       FROM                TO
9      ____|____|_____|_____
10     ____|____|_____|_____
11     ____|____|_____|_____
12     ____|____|_____|_____
13     ____|____|_____|_____
14     ____|____|_____|_____
15     ____|____|_____|_____
16     ____|____|_____|_____
17     ____|____|_____|_____
18     ____|____|_____|_____
19
20                        _____

                         BRUCE WEINER
21
22
       Witness and sworn to before me
23     this _____ day of _____, 2025.
24

       _____   _____
25      (Notary Public)    My Commission Expires:
       Job No. CS7657810

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 420

1

2    10/28/2025 - In Re:  Uber Technologies,
     Inc., Passenger Sexual Assault Litigation

3

4          ACKNOWLEDGEMENT OF DEPONENT

5       I, Bruce Weiner, do hereby declare

6    that I have read the foregoing transcript,

7    I have made any corrections, additions, or

8    changes I deemed necessary as noted on the

9    errata to be appended hereto, and that the

10   same is a true, correct and complete

11   transcript of the testimony given by me.

12

13   _____    _____

14     BRUCE WEINER                DATE

15

16

17   *IF NOTARY IS REQUIRED

18

19

20   SUBSCRIBED AND SWORN TO BEFORE ME

21   THIS_____ DAY OF_____, 20___.

22

23

24          _____

25          NOTARY PUBLIC

     Job No. CS7657810

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 421

1    TIFFANY ELLIS, ESQ.

2    tellis@peifferwolf.com

3                      October 29, 2025

4    RE:    In Re: Uber Rideshare Cases v.

5        10/28/2025, Bruce Weiner (#7657810)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25