**<u>Exhibit C</u>**

# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

———————————————

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

Case No. 3:23-md-03084-CRB
———————————————

REPORT OF CYNTHIA RANDO, CHFP

This Report relates to the following Wave 1 Cases:
Case No. 24-cv-7940 (B.L.)
Case No. 24-cv-7821 (A.R.2)
Case No. 24-cv-7019 (LCHB128)
Case No. 23-cv-6708 (Dean)
Case No. 24-cv-4900 (WHB 832)

SEPTEMBER 26, 2025

Confidential – Subject to Protective Order

## TABLE OF CONTENTS

I.      Introduction ............................................................................................................... 4

II.     Summary of Qualifications ....................................................................................... 4

III.    Scope of Assignment ................................................................................................ 5

IV.     Summary of Opinions ............................................................................................... 5

V.      My Methodology for this Report .............................................................................. 9

VI.     Core Human Factors and Risk Assessment Principles and Processes ...................... 9

        A.      Human Factors and Risk Analysis Process .................................................. 12

        B.      Human Factors and Safety Control Hierarchy Principle ............................. 13

        C.      Human Factors and Environment of Use Principle ..................................... 15

VII.    Application of Human Factors Principles, Methodologies, and Processes to Uber's In-App Reporting Procedures ........................................................................................ 16

        A.      Risk Assessment: Sexual Assault/Sexual Misconduct on the Uber Platform and underrrporting ........................................................................................... 16

        B.      Mitigation Controls: Reporting Procedures ............................................... 20

                1.      Uber's User Behavior Data Indicates a Preference to Use Ratings and Feedback Pathway to Report Sexual Assault/Misconduct ............................ 26

                2.      Uber Expects Riders to Report Sexual Misconduct Via Channels Other Than the Ratings and Feedback Screen ................................................ 28

        C.      Environment of use and User Testing Deficiencies .................................... 30

                1.      Ratings/Feedback Tags as Safety Signals Requiring Monitoring and Follow-Up .................................................................................................... 52

VIII.   Usability Assessments of Uber's In-App Reporting Procedures ............................ 53

        A.      Summary of Findings from the April 2025 Usability Assessment ............. 54

        B.      Summary of Findings from the July 2025 Usability Assessment ............... 56

        C.      Summary of Findings from the August 2025 Usability Assessment .......... 57

IX.     Conclusion ............................................................................................................. 58

APPENDIX A ................................................................................................................... 59

APPENDIX B ................................................................................................................... 64

APPENDIX C ................................................................................................................... 66

APPENDIX D ................................................................................................................... 67

APPENDIX E ................................................................................................................... 73

APPENDIX F ...................................................................................................................... 102

APPENDIX G ..................................................................................................................... 111

## I.      INTRODUCTION

1.      I, Cynthia Rando, CHFP, am a Human Factors Professional, certified by the Board of Certification in Professional Ergonomics (BCPE). I am the Founder/CEO of Sophic Synergistics, LLC, a human centered design consulting firm.

2.      A summary of my qualifications is provided below and my current curriculum vitae is attached at Appendix A. A list of my work as an expert witness, including deposition and trial testimony history within the past 4 years, is attached at Appendix B.

3.      I have been retained by Plaintiffs' counsel in this matter. My expert fee schedule is provided in Appendix C. My compensation is not dependent on, and in no way impacts, the substance of my statements and opinions in this report. I have no financial interest in the outcome of this case, and my opinions are not contingent on any case outcome.

4.      The materials that I considered for this report are included in Appendix D, some of which are cited as references to this report.

5.      I reserve the right to amend this report and my opinions should additional documentation / information be provided and/or reviewed from the date of this assessment report.

6.      I hold the opinions set forth in this report to a reasonable degree of professional certainty.

## II.      SUMMARY OF QUALIFICATIONS

7.      I possess 20+ years of experience in the field of Human Factors and Human Safety as a Subject Matter Expert and Educator. I have been certified as a Human Factors Professional by the Board of Certification in Professional Ergonomics (BCPE) since 2007. I served as a Director for 8 years for BCPE and held multiple executive positions within the board including Vice President. In addition, my prior experience includes 10+ years of service at NASA's Johnson Space Center, where I was the lead Human Factors Engineer and Human Safety Subject Matter Expert. Since 2015, I have served as the Founder/CEO of Sophic Synergistics, LLC in a full-time capacity.

8.      As a Human Factors and Human Safety Subject Matter expert, I provide consulting services to industry, academia, non-profit organizations, and government, as well as provide expert witness assessments and testimony.

9.      My experience includes working with organizations to design, develop, and implement human factors and human safety programs (which encompasses organizational infrastructure, strategic plans, standards, policies and procedures); hardware and systems; usability and user experience (UX) assessments and improvements; human computer interactions; human factors and human safety requirements, interpretation, and application; and human error and mishap/root cause analysis, testing, verification, and validation.

10.      I hold the following degrees: a B.S. in Psychology, an M.S. in Human Factors, and an M.B.A.

11.      I and my company Sophic Synergistics have extensive experience in the practice of conducting usability assessments. My team and I routinely conduct end-to-end assessments of complex digital systems under simulated use conditions, with a focus on safety-critical tasks, stress-influenced behaviors, and cognitive workload. We apply rigorous, standards-aligned

methodologies, grounded in established ISO standards, such as ISO 9241-210 (human-centered design), ISO 9241-11 (usability metrics), ISO/TS 18152 (human-system interaction), ISO/IEC 25010 (software quality), ISO 31000 (risk management), and ISO/IEC 31010 (risk assessment techniques), ensuring our evaluations not only meet government and regulatory expectations but also align with standards for safeguarding human safety. My expertise includes working with both consumer-facing platforms and regulated technologies, which positions us to be able to assess apps like Uber's with sensitivity to the intersection of usability, trust, and real-world risk. Evaluating applications like the Uber rideshare platform falls squarely within my expertise and standard of practice.

## III.    SCOPE OF ASSIGNMENT

12.    My report has two overarching purposes. **First**, I have been asked to describe some of the basic human factors and systems safety principles that human factors and safety engineering experts apply in a wide range of industries to evaluate potential safety risks that arise in the context of human-technology interactions. The purpose in describing these principles is to provide foundational understanding into what responsible companies designing for human-system interactions should consider and, more specifically, to allow a jury to utilize them in evaluating Uber's business practices.

13.    **Second**, I have been asked to review Uber's design and implementation of its reporting procedures for Sexual Assaults (SA) and Sexual Misconduct (SM), and to provide an opinion as to whether that design and implementation align with the human factors and systems safety principles I identify in the first portion of my report.

## IV.    SUMMARY OF OPINIONS

14.    Human Factors is a scientific discipline that is critical to a company's understanding and application of Human Safety engineering principles and risk mitigation efforts in the design and implementation of human-technology and interaction with interfaces. The integration of Human Factors is a foundational element of safe and effective product design that is essential for aligning technology with real-world human capabilities, limitations, and expectations. Organizations that fail to incorporate Human Factors into their design, risk analysis, and safety strategies are not merely overlooking an optional enhancement they are disregarding baseline standards, compromising safety, and exposing users to preventable harm. As detailed within the first section of my report, Human Factors establishes key principles in human safety and usability and leverages hazard control frameworks (i.e., methods and tools) to ensure risk assessments fully characterize risk and hazard mitigation efforts. In my professional opinion, a responsible organization adheres to established human-factors and safety-engineering frameworks. Failure to do so constitutes a departure from accepted professional practice in the design and deployment of products used in safety-critical contexts.

15.    My in-depth human factors analysis, usability evaluation, and standards-based review of Uber's platform revealed persistent failures to design for safety, usability, and risk prevention in the context of sexual assault and misconduct reporting. Despite widely recognized international standards, accepted engineering practices, and years of public reporting on sexual assault and misconduct risks in ridesharing, Uber has not sufficiently applied human-centered design (ISO 9241-210), usability measurement (ISO 9241-11; ISO/IEC 25022), risk assessment

(ISO 31000; ISO/IEC 31010), or system quality standards (ISO/IEC 25010) to safety-critical workflows.

a. <u>Failure to Account for Environment of Use and Foreseeable Risk</u> (ISO 9241-210:2019; ISO/TS 18152:2010). ISO 9241-210:2019 requires that design be grounded in a documented context of use, including relevant user groups and characteristics, their goals and tasks, and the technical, physical, social, cultural, and organizational environments-followed by iteration and evaluation against user-derived requirements (e.g., Section 7 activities; principles in Clause 5). ISO/TS 18152:2010 (Human-System process model) requires integrating human factors across the life cycle and explicitly addressing human roles, responsibilities, capabilities, and limitations within the human-centered design and integration processes (e.g., HS.2 "Integrate human factors," HS.3 "Human-centred design"). Uber's sexual assault and misconduct reporting workflow did not meet these requirements. Usability assessment results demonstrated that, in realistic scenarios—such as reporting while in motion, in low-light conditions, or while under acute stress, the reporting feature was not persistently visible and required multiple menu navigations before a reporting path was identified as plausible and somewhat matching of the goal of the reporting sexual assault/misconduct. It took as many as 16 actions and could require 20+ minutes to complete the reporting task which could drive task abandonment more often than task completion. These conditions impose excessive cognitive load and delay critical action, contrary to designing for real-world contexts and foreseeable distress.

b. <u>Lack of Risk Identification, Assessment, and Mitigation</u> (ISO 31000:2018; ISO/IEC 31010:2019). ISO 31000:2018 requires risk management to be integrated into organizational activities and defines a risk management process that includes risk assessment (identification, analysis, and evaluation). ISO/IEC 31010:2019 provides guidance on the selection and application of risk assessment techniques (e.g., risk matrix, scenario analysis, FMEA, bow-tie). Usability assessment data revealed hazards-including excessive task steps, multiple decision points, and unclear labeling-that directly impede sexual assault/misconduct reporting No evidence was found that Uber applied these methodologies to evaluate the reporting workflow and user behavior to identify trends in data and signals to support evidence backed prioritization of redesign efforts. For example, a properly scoped FMEA (as described in ISO/IEC 31010) would have identified step count and decision complexity as high-risk failure modes that required mitigation through streamlined task flows and interface redesign.

c. <u>Persistent Usability Failures in Safety-Critical Features</u> (ISO 9241-11:2018; ISO/IEC 25022:2016). ISO 9241-11:2018 defines usability as the extent to which specified users achieve specified goals with effectiveness, efficiency, and satisfaction in a specified context of use. ISO/IEC 25022:2016 provides measurement guidance for quality-in-use (e.g., task completion rate, time-on-task, error rates). Uber's reporting process did not meet these usability requirements. As evidenced within the April 2025 usability assessment,

participants often struggled to locate the reporting path without guidance, were slowed by vague labels such as "Safety Issue," and received no immediate confirmation that their report had been logged. The number of steps and time to completion far exceeded appropriate safety expectations, which call for emergency actions to be completed rapidly with minimal interaction or impedances. The July 2025 assessment demonstrated that a pathway would also be used through the rating pathway and offered Uber data signals through the tags that were potential safety concerns that required further investigation.

d.  <u>Violations of Quality and Safety Requirements in System Design</u> (ISO/IEC 25010). The ISO/IEC 25010 product quality model comprises eight characteristics, including usability/interaction capability, reliability, and security. Relevant usability sub-characteristics include appropriateness recognizability, learnability, operability, and user error protection; relevant security sub-characteristics include non-repudiation and accountability. The reporting process violated multiple characteristics. Operability was compromised by burying the reporting option in nested menus and using icons that were not immediately recognizable under stress. User error protection was weak; users could exit the process without warning and lose progress. Non-repudiation/accountability were undermined by the lack of a persistent, user-accessible record confirming that the report was received. These deficiencies reduce both the reliability and trustworthiness of the reporting process.

e.  <u>Disregard for Control Hierarchy in Hazard Mitigation</u> (ISO/TS 18152:2010; ISO 31000:2018). ISO/TS 18152:2010's human-system processes and work products require explicit treatment of human roles, limitations, and risks across the life cycle, and ISO 31000:2018 requires integrating risk management into decision-making so that high-severity hazards are systematically identified, prioritized, treated, and monitored. Uber did not apply an effective control hierarchy. The design relied on a user locating and interpreting a "Safety Issue" path, rather than embedding persistent, unmistakable access points to sexual-assault reporting directly on the main ride screen. In practice, more minor sexual-misconduct experiences were frequently funneled through the post-trip "rate the driver" pathway using tags. Those tagged ratings function as leading indicators and risk signals that should have triggered structured analysis, thresholds, and escalation for proactive intervention at the driver and system levels. Treating these tags merely as feedback—rather than as monitored hazards requiring mitigation—reflects a reliance on user initiative instead of system-led hazard prevention and conflicts with the standards' intent to prioritize inherent safety, continuous monitoring, and integrated risk treatment.

f.  <u>Misalignment with User Expectations and Mental Models</u> (Norman, 2013; ISO 9241-210:2019). ISO 9241-210:2019 requires that design be driven by user needs and the context of use, with design refined through user-centered evaluation and the process being iterative (principles in Clause 5; activities in Section 7). Drawing on Norman (2013), who emphasizes that critical actions must be readily discoverable through clear signifiers, and Laubheimer (2024), whose tree-testing results show that first-click/directness strongly predicts task

success, emergency and safety functions should be immediately visible, plainly labeled, and reachable in as few steps as possible (ideally one or two). In our usability assessment, participants looked for a clearly labeled "Report Sexual Assault" control on the main ride screen but were hindered by its absence. In practice, more minor sexual-misconduct experiences are more likely routed through the post-trip "rate the driver" pathway using tags; these tags operate as leading indicators that should be integrated with a direct reporting pathway and monitored for escalation. Treating the tags as ordinary feedback—rather than actionable risk signals conflicts with ISO 9241-210's user-centered intent and fragments the reporting experience users reasonably expect. Ambiguous labels and icons increased hesitation and error but also drive a disconnect with being able to track, trend and predict where safety incidents could occur next with a driver or a rider.

g. <u>Failure to Improve Despite Repeated Opportunities and Known Risk History</u>. ISO 9241-210:2019 requires iterative human-centered design driven by user-derived requirements; ISO 9241-11:2018 defines the usability outcomes to achieve in the context of use. Based on my review of Uber documents and deposition testimonies, despite years of public reporting, litigation records, and Uber's own safety data showing riders struggled to report sexual assault and misconduct, Uber did not meaningfully redesign the workflow. The April 2025 usability assessments showed reporting could require an excessive number of steps, with no defined upper bound due to convoluted, non-direct pathways. The July 2025 assessment also found that post-trip tags act as leading risk indicators and should be integrated with a direct reporting path and monitored for escalation, not treated as ordinary feedback. These persistent issues show that known user feedback was not translated into iterative improvements consistent with ISO 9241-210 and ISO 9241-11 for safety-critical functions.

16.    In summary, it is my opinion that Uber failed to implement fundamental Human Factors and Human Safety design standards in its in-app reporting procedures and did not address known issues based on user data it possessed. These omissions reflect a systemic breakdown in applying established, widely used Human Factors and Safety practices to a safety-critical function. Rather than providing a direct, persistent "Report Sexual Assault/Misconduct" entry point, Uber's reporting flow remained obscure and overcomplicated—conditions that predictably depress reporting for a task already prone to underreporting. In parallel, the post-trip "rate the driver" pathway routed sexual assault/misconduct experiences into tagged feedback; those tags are leading indicators that should have been integrated with a direct reporting channel, and monitored for escalation, rather than treated as nominal rating feedback. For comparison, the usability of requesting a ride was prominent, quick, and easy, demonstrating Uber's capability to apply good Human Factors and Human Safety practices when aligned with business-critical priorities; yet the same rigor was not applied to sexual assault/misconduct reporting, which offers no profit advantage.

## V.    MY METHODOLOGY FOR THIS REPORT

17.    As noted above, the first portion of my report establishes the Human Factors and Safety principles that govern sound human factors and human safety design, particularly in electronic in-app reporting systems, and to use them as the evaluative framework for Uber's safety programs, reporting systems, and testimony. The principles reflect my education and training, multi-sector professional and consulting experience (including SaaS/UI), direct work with accepted industry standards, and applicable academic literature. See Appendix D.

18.    For the second portion of my report, I conducted a usability assessment of Uber's reporting options for SA/SM. In doing so, I followed the same methodology that I use in my consulting and advisory work outside of the litigation context, including the application of published ISO usability standards as described in more detail below. My primary source of information for the usability assessments was my own systematic exploration of the user interfaces within the Uber app to identify how an Uber passenger could report an incident of SA/SM to Uber.

19.    A limitation of my usability assessment is that I was only able to review Uber's present day reporting interface (as of April and July 2025). I have been unable to locate records fully documenting Uber's product plans, designs, and version history for other iterations of its in-app reporting pathways. I have requested these documents but was informed that they have not been produced in this litigation. Uber has testified that it does not know how its reporting channels have changed over time:

> Q. So the first set of feedback tags are those which appear on the left, right – or correct, rather?
>
> A. Yes.  I don't know how these feedback tags may have changed or what would have actually launched in the app relative to what is here.  I can speak more confidently looking at a screen today, but no reason to doubt that this would have been an experience launched at one point in time associated with feedback tags.[1]

20.    In addition to reviewing the in-app user flow, I also reviewed Uber documents and depositions that relate to reporting of SA/SM and Uber's application of ISO standards. Some of these documents were provided by Plaintiffs' counsel, and others were retrieved through my own search and review of Uber documents and depositions materials. One of my objectives was to learn how Uber describes its reporting procedures and the design of Uber's reporting pathways over time. Available documents indicate that the interface as it pertains to sexual assault/misconduct reporting was reasonably similar to prior year designs. My assessments of Uber's reporting procedures were based on applying the same human factors standards, which I identify and explain in this report, which are widely used and generally accepted and that I routinely use and have relied on in my practice for the past 20+ years.

## VI.    CORE HUMAN FACTORS AND RISK ASSESSMENT PRINCIPLES AND PROCESSES

21.    Human Factors is a scientific discipline that deals with the human-technology interface, i.e., the intersection of human psychology with technology and engineering. It applies

---

[1] Greg Brown 30(b)(6) Deposition 2025.06.17 at 182:15-24.

scientific research to understanding human limitations in the consideration of design, definition of processes, deployment of operations, conduct of risk analysis and risk prevention, and as part of root cause analysis efforts when accidents or injuries occur. Human Factors also addresses human considerations in the context of maintaining safety and optimized performance, also referred to as usability.[2] According to the International Ergonomics Association, Human Factors is "the scientific discipline concerned with the understanding of interactions among humans and other elements of a system, and the profession that applies theory, principles, data, and methods to design in order to optimize human well-being and overall system performance."[3] As Stanton (2005) describes, "Human Factors (HF) is concerned about the relationship between human and technology with regard to some goal-directed activity. Whereas engineering is concerned with improving technology in terms of mechanical and electronic design and psychology is concerned with understanding human functioning, HF is concerned with adapting technology and the environment to the capacities and limitations of humans with the overall objective of improving performance of the whole human-technology system."[4]

22.    Human Factors is fundamentally a safety discipline, recognized across domains from healthcare to aviation, because it focuses on designing systems that actively reduce error and enhance resilience. Russ (2013) emphasizes that the core goal of human factors science is to "promote efficiency, safety and effectiveness by improving the design of technologies, processes and work systems," underscoring its role in preventing harm through proactive system design rather than faulting individuals. Similarly, Norris (2009) highlights that safety must be "designed in" rather than treated as an afterthought, while Carayon (2013) demonstrates through the SEIPS framework that human factors engineering is central to patient safety and quality outcomes. Together, these validated resources establish human factors not as an adjunct, but as a critical safety domain that ensures systems are built to support human performance and protect against foreseeable risks.

23.    Human Factors has a foundational basis of over seven decades of scientific research, and draws on knowledge from various disciplines, e.g., psychology, physiology, engineering, and human behavior, safety, cognition, and perception. The result is the development of what are now well-established principles and methods applicable across industries that are crucial to designing products and services that will account for human risks and limitations. These principles and methodologies have been codified by the International Organization for Standardization (ISO) Standards,[5] a worldwide international federation of standards bodies that have as a primary purpose to establish and provide guidance to industries through internationally accepted standards, including Human-Centered Design, Safety and Risk Management. ISO standards reflect decades of applied research and global consensus, have widespread adoption across industries, and establish baseline expectations. A broad range of U.S. government and standards-using organizations explicitly anchor their human-centered design/usability and risk

---

[2] Ch. 1, Discipline of Human Factors in Stanton, Human Factors in Nuclear Safety (2005 ed.)

[3] International Ergonomics Association (IEA), *What is ergonomics* (2000). https://iea.cc/about/what-is-ergonomics/

[4] Ibid.

[5] https://www.iso.org/home.html

practices in ISO frameworks.[6] Likewise, U.S. industry bodies have explicitly adopted and promoted ISO standards as the baseline for practice.[7] Of particular note, the User Experience Professionals Association (UXPA)[8] lists ISO 31000 (standards for risk management) and ISO/IEC 31010 (standards for risk assessments) among "commonly used standards," and peer-reviewed UXPA research reports a "clear consensus towards the importance of ISO 9241-11's definition of usability" among practitioners.[9] ISO standards are not obscure or novel.[10] They are broadly utilized across industries, and publicly accessible—placing a clear responsibility on companies, like Uber, to be aware of and apply them, especially given the nature of their platform and the foreseeable risks involved. Where appropriate, I provide the applicable ISO standard which aligns with the discussed Human Factors principles.

24.    The integration of Human Factors is a foundational element of safe, effective product design that is essential for aligning technology with real-world human capabilities, limitations, and expectations. Organizations that fail to incorporate Human Factors into their design, risk analysis, and safety strategies are not merely overlooking an optional enhancement they are disregarding baseline standards, compromising safety, and exposing users to preventable

---

[6] For example, NASA's human-systems standard (NASA-STD-3001, Vol. 2, Rev C) lists ISO 9241-210:2019 in its normative references, signaling alignment of NASA human-system design with ISO HCD process expectations. NIST directs public-safety system designers to ISO 9241-210 principles (effectiveness, efficiency, satisfaction in context) in its *Guide to Public Safety Communications Usability* (NIST HB 161), reinforcing ISO usability concepts as the baseline for government-grade systems. In regulated industry, FDA's human-factors guidance embeds usability within risk management and calls out structured analysis techniques (e.g., Failure Mode and Effects Analysis (FMEA), fault-tree, simulated-use validation), demonstrating the same risk-based evaluation approach codified in ISO/IEC 31010 for selecting and applying risk-assessment methods (this applies to industry as it pertains to seeking FDA approval for gaining ability to commercialize a medical device or software based system).

[7] The American Society of Safety Professionals (ASSP) lists the ANSI/ASSP Z690 series as U.S. adoptions of the ISO risk standards—"Z690.2-2011, Risk Management: Principles and Guidelines (U.S. adoption of ISO 31000:2009)" and "Z690.3-2011, Risk Assessment Techniques (U.S. adoption of IEC/ISO 31010:2009)"—and emphasizes that "the ISO standards on risk management…are intended to help organizations manage all risk, regardless of the source," further noting that risk management "has moved from being considered best practice to expected procedure in larger organizations."

[8]UXPA is an international professional organization for individuals who research, design and evaluate the user experience (UX) of products and services. https://uxpa.org/about-uxpa-international/

[9] Also, the IEEE's Software Engineering Body of Knowledge (SWEBOK v4), widely used by industry, incorporates ISO/IEC 25010 and related SQuaRE standards in the software-quality knowledge area, signaling mainstream engineering uptake. The Institute of Risk Management similarly describes ISO 31000 as the "most generally accepted standard" for risk management in practice.

[10] Uber is aware of ISO standards. Uber, Help, *Business account privacy and security,* https://help.uber.com/en/business/article/business-account-privacy-and-security?nodeId=c5573317-bb81-4db9-b1a2-c392cdc7f802 (stating Uber maintains ISO 27001 certification);        UBER_JCCP_MDL_005137366-UBBER_JCCP_MDL_005137366.30 (referencing ISO 31000:2018-Risk Management).

harm. Such omissions signal a deviation from accepted professional practice in the development and deployment of products in safety-critical contexts.

25.     A fundamental principle of Human Factors and Human Safety is that a company is responsible for engaging in proactive and iterative <u>Risk Assessments</u>—analyzing products and services to determine whether there are foreseeable risks associated with their use and misuse. The company must then identify appropriate <u>Mitigation Controls</u> that would reduce the likelihood of the risk. Human Factors and Safety has established methodologies for both.

### A.     HUMAN FACTORS AND RISK ANALYSIS PROCESS

26.     Human Factors and Safety disciplines provide several methodologies and tools for a company to conduct Risk Analyses and assess hazards responsibly and effectively. This includes: Heuristic Evaluations, Task and Cognitive Analyses, Failure Modes and Effects Analyses (FMEA), Human Modeling, Human-in-the-Loop (HITL) testing, Bowtie Analysis, Scenario-Based Analysis, and Consequence/ Likelihood (Risk) Matrices.[11] The methodologies and tools highlighted provide a way to maintain a structured approach to Risk Analysis to ensure that how products are used and the risks they may introduce are thoroughly examined to understand the nature of the risk and provide insight into ways to reduce the risk associated with the identified hazards. Without adherence to a Risk Analysis process, there is no validated way to ensure that risks have been effectively identified and characterized to determine whether a product is safe and whether there are available controls that could make it safer without increasing the risk of harm in other ways.

27.     Risk analysis should be conducted to assess risks before a product is launched, as well as periodically as part of an ongoing risk management process throughout the time a product is on the market. This is because Human Factors principles dictate that risk management is an iterative process that is both proactive and reactive. These ongoing risk assessments can and should be used by product manufacturers to mitigate risks as soon as they are identified.

28.     A Consequence/Likelihood Matrix is a common tool within the Human Factors and Human Safety discipline to assist in Risk Assessments. Risk Matrices provide a structured method for companies to establish a quantitative and qualitative level of defined risk associated with their products and services and can help guide what options the company should take to mitigate the risk to users.

29.     Risk Matrices are typically adapted and customized from company to company and across industries, but they all have a common foundation: the rankings are based on the likelihood of exposure or the frequency of risk occurring, and the consequence or severity of harm should the risk occur.

---

[11]  ISO/IEC 31010:2019 (codifies risk assessment methodologies, including FMEA, Bowtie Analysis, Consequence/Likelihood (Risk) Matrix, Scenario-Based Analysis, that a responsible company should use to analyze human risks on in its products and services); ISO 31000:2018 (provides a framework for embedding risk management into an organization's culture, processes, and decision-making).

30.     An example is provided in Figure 1 (below). This matrix is called a 5x5 Risk Matrix and a rank of 1 represents the lower recoverable types of risk and the rank of 5 represents the highest and most dangerous unrecoverable risk events. Similarly, a rank of 1 on the likelihood scale indicates a low chance or low rate of frequency of the event occurring while a rank of 5 indicates a high chance or high rate of frequency of the event occurring.

| | | Consequence | | | | |
|---|---|---|---|---|---|---|
| | | Negligible 1 | Minor 2 | Moderate 3 | Major 4 | Catastrophic 5 |
| Likelihood | 5 Almost certain | Moderate 5 | High 10 | Extreme 15 | Extreme 20 | Extreme 25 |
| | 4 Likely | Moderate 4 | High 8 | High 12 | Extreme 16 | Extreme 20 |
| | 3 Possible | Low 3 | Moderate 6 | High 9 | High 12 | Extreme 15 |
| | 2 Unlikely | Low 2 | Moderate 4 | Moderate 6 | High 8 | High 10 |
| | 1 Rare | Low 1 | Low 2 | Low 3 | Moderate 4 | Moderate 5 |

*Figure 1: 5x5 Risk Matrix*

31.     Once a risk level is identified, it is used in conjunction with the Safety Control Hierarchy to determine the appropriate mitigation control. A ranking in the 4 or 5 quadrants indicates that mitigation should be through design controls and that warning controls would be insufficient as standalone controls. When design controls are not an option, one must cautiously consider the remaining controls, guarding against or warning, as they are less effective at mitigating risks and not sufficient to address risks at all levels; particularly, those risks identified to be at the 4th and 5th severity levels (Figure 1).

32.     Risk Matrices can be applied across a spectrum of risks. For example, they can be applied to identify and assess a risk that is broadly implicated across the product and its features, e.g., the risk of SA/SM could be viewed as deriving from various aspects of Uber's products and services. It can also be applied to risks that are much narrower in scope, e.g., the risk of underreporting of SA/SM incidents in a reporting procedure design. While the appropriate Human Factors and Safety assessment tools will vary based on the risk being assessed (from macro to micro), the overall framework remains the same: a prudent company must engage in risk assessments to properly identify risks and corresponding mitigation controls.

## B.     HUMAN FACTORS AND SAFETY CONTROL HIERARCHY PRINCIPLE

33.     Once a risk is identified, a company must implement mitigation controls. A framework that is routinely used for this analysis is the Safety Control Hierarchy (Figure 2).[12] The Safety Control Hierarchy was established by the National Safety Council in 1989 and is a

---

[12] Also referred to as the Safety Hierarchy, Design Control Hierarchy, Hazard Control Hierarchy, Hazard Triangle.

foundational tool in Human Factors safety analysis (Sanders and McCormick, 1993). It defines the accepted approach and most effective methods of risk mitigation and control. The Safety Hierarchy sets out a three-step, prioritized analysis; prioritizing the most effective controls for dealing with risks to end-users in the following order: (1) Design it out, (2) Guard against it, and (3) Warn about it.



Figure 2: Safety Control Hierarchy

34.     Design: The primary and best strategy for controlling a risk is through design. That is, when a company is developing products and services, the standard of practice necessitates that risks are identified, then addressed through design controls first before resorting to second and third-order mitigation tactics, Guard and Warn, which are less successful in protecting the user from harm. If a risk cannot be designed out of the product or service, then a company should move to the second and third tier, Guard and Warn, approaches.

35.     Guard: When a company is unable to design out a risk (e.g., it may be deemed necessary to the intended function of the product), it is imperative that the company provide a mechanism that guards against the risk to users.

36.     Warn: When Design and Guard options are exhausted, the next order of mitigation focuses warnings to the user. Depending on the identified risk, this includes providing clear instructions in the user interface, and/or providing caution and warning information to arm the user with the needed information to understand the risks and methods to protect themselves from harm. However, reliance on instructions and warnings is a less effective strategy because it shifts the responsibility of protection against a known risk from the company to the user who may not have the ability to fully comprehend or avoid the risk. This is why this level of control is at the bottom of the preferred control hierarchy for safety.

37.     To address hazards by designing them out, guarding against them, and/or warning against them, a company must first operate reliable systems to surface and evaluate hazards. Those systems include multiple user-facing reporting channels (e.g., direct safety reports and post-trip rating/tag pathways), operational telemetry, and periodic audits to capture issues comprehensively. A responsible company integrates formal risk assessments into decision-making; prioritizes identification of human risks; selects controls per the hierarchy (eliminate/substitute;

Expert Report of C. Rando                                                         14

engineer/guard; administrative; warning/PPE); and then verifies effectiveness through usability evaluation, validation in the context of use, and field monitoring. Results are documented in a risk register with owners, thresholds, and deadlines; leading indicators (including tagged feedback) are monitored for escalation; and controls are iterated when targets are not met. In short, hazards are systematically identified, mitigated, and continuously re-evaluated to ensure residual risk remains acceptably low.

### C. HUMAN FACTORS AND ENVIRONMENT OF USE PRINCIPLE

38.     Risk Assessments and Mitigation Controls cannot be conducted in a static environment. To be effective, they must be dynamic and must continually evolve to align with circumstances of use and real use data, i.e., the Environment of Use (EoU). EoU refers to the real-world conditions in which users interact with a system: who the users are, what tasks they're performing, the devices and interfaces they use, and the physical, social, organizational, and temporal conditions surrounding the interaction. In ISO 9241-11:2018 this is captured within the "context of use," and ISO 9241-210:2019 requires that design and evaluation be driven by that context throughout iterative development.

39.     EoU, the real-world context of users, tasks, equipment, and physical/social/organizational/temporal conditions, is the foundation for both design and Risk Assessments. ISO 9241-11 defines EoU as the "context of use," and ISO 9241-210 requires that design and evaluation be driven by that context throughout iterative development. Evidence from neural priming shows that prior expectations and repeated exposure facilitate faster, more accurate processing and reduce executive demands; accordingly, aligning critical reporting actions with users' established expectations in the EoU should lower error and abandonment (Ghuman, Bar, Dobbins, & Schnyer, 2008). Integrated with ISO 31000 and IEC 31010, EoU specifies hazard scenarios, exposure, and use conditions that inform initial likelihood/severity ratings and guide feasible control selection for that environment. After release, market surveillance compares real-use evidence to the risk model: if incident frequency exceeds initial ratings, or telemetry/usability data show users abandoning the reporting flow or routing issues through the post-trip rating/tag pathway, the organization must re-rate the risk, treat tags as leading indicators with thresholds for escalation, redesign controls (e.g., persistent entry point, reduced steps, clear language), and re-validate until residual risk is acceptable.

40.     EoU is critical for making sure design controls do not make a problem worse and that a solution effectively mitigates the identified risk (has the impact intended).[13] It is therefore a mandatory step in Risk Assessment and Mitigation Controls.

---

[13] Environment of Use considerations have been codified into ISO standards. See, e.g., ISO 9241-210:2019 (providing requirements for human-centered design principles, which includes the requirement that designs understand and account for real contexts of use and interactive evaluation and design); ISO/TS 18152:2010 (provides a process model for integrating human factors across the lifecycle, which includes requirement that designs be evaluated in context of environment of use).

## VII.  APPLICATION OF HUMAN FACTORS PRINCIPLES, METHODOLOGIES, AND PROCESSES TO UBER'S IN-APP REPORTING PROCEDURES

41.     Below, I apply the above Human Factors Principles, Methodologies and Processes to the design and implementation of Uber's In-App Reporting Procedures. The usability assessments are also based, in part, on the following analysis.

### A.  RISK ASSESSMENT: SEXUAL ASSAULT/SEXUAL MISCONDUCT ON THE UBER PLATFORM AND UNDERRPORTING

42.     In 2013, Uber began its rideshare or "peer to peer" business where people without a professional driving history could provide rides for compensation.[14] Even before Uber received sexual assault/misconduct reports, the nature of its transportation business made SA/SM a predictable risk. Among other considerations, riders are placed in vulnerable, isolated, and captive positions in the car of a stranger, rides may occur late at night, and riders may be intoxicated.[15]

43.     Uber documentation indicates that SA/SM events occur many times per day, on the Uber platform. Uber manager Brooke Anderson testified to the following occurrence statistics:

> 2017: 71,711 sexual violence incidents
>
> 2018: 94,666 sexual violence incidents (about one every 5.5 minutes)
>
> 2019: 101,915 (about one every five minutes)
>
> 2020: 42,741 (about one every twelve minutes)
>
> 2021: 35,418 (about one every fifteen minutes)
>
> 2022: 53,730 (about one every ten minutes)
>
> Total 2017-2022: **400,181** incidents of sexual violence (about one every eight minutes).[16]

44.     In addressing this risk, efficient and effective reporting is a critical component. With reference to the Risk Assessment process, the fact that Uber knows sexual assault and sexual misconduct events are occurring many times per day on its platform places the risk likelihood, i.e. foreseeability, on the higher end of the Risk Matrix range. And because many if not most SA/SM incidents would be deemed on the higher end of unrecoverable risk events, this places it within the

---

[14] Hannah Nilles 30(b)(6) Deposition 2025.06.30 at 11:15-12:14.

[15] Hannah Nilles 30(b)(6) Deposition 2025.06.30 at 240:13-243:16 and Exhibit 1316 (UBER_JCCP_MDL_000252011), "Analyses for sexual misconduct policy," at -2011.0013 (A criminal justice researcher discussed with Uber that one of the "situations Uber creates that might be opportunities for sexual misconduct" was that "anyone can come drive on the platform").

[16] Brooke Anderson Deposition 2025.05.01 at 141:12-147:24 and Exhibit 3206, demonstrative "Summary of Data Produced by Uber to Plaintiffs on January 23, 2025, March 6, 2025, April 7, 2025, April 17 & 23, 2025 pursuant to Court Orders…"; Todd Gaddis 30(b)(6) Deposition 2025.07.11 at 160:2-9 (agreeing that "Uber's internal numbers show that Uber actually had 400,181 reported trips with instances of sexual assault or sexual misconduct").

3 (moderate consequence) to 5 (catastrophic consequence) range. Even if the likelihood were identified to be on the lowest range (rare), the consequence severity would still edge the overall risk assessment into the "moderate" zone particularly for sexual assault concerns, with many cases of sexual assaults ranking at a 4 or 5 depending on level of injury to the victim.

45.    Given this likelihood and severity of potential harm, Uber was responsible for introducing effective controls, starting with design controls ("design it out") as discussed above and illustrated in the Safety Control Hierarchy (Figure 2).

46.    EoU principles guide that, in order to properly adopt and evaluate controls in accordance with established risk management processes and procedures, as outlined within ISO Standards 9241-201 and 16085, Uber needed to conduct a complete Risk Assessment and root cause analysis.

47.    Fundamental to the risk assessment and root analysis process is the need for accurate data. It was imperative that Uber gather accurate, thorough, and reliable data regarding SA/SM implicating their product, service, and drivers. This is necessary so that Uber can reliably assess the scope of the problem, truthfully inform riders and the public about the scope of the problem, design programs and interventions that work, and, once implemented, assess whether they truly work at preventing SA/SM.

48.    Given the nature of the Uber service, Uber's corporate management is not physically "present" during a trip, and Uber does not video or audio record trips. Thus, Uber's ability to identify incidents of SA/SM by a driver during an Uber ride is almost entirely dependent on rider reporting. Uber acknowledges this. A 2016 Uber document states: **"UBER only has data on incidents that are reported to us."**[17] In February 2017, Uber internally published its Sexual Assault/Misconduct Reduction Strategy, recognizing that it is "*critical*" to obtain better information "in order to target sexual misconduct offenders."[18] Thus, obtaining user reports on SA/SM incidents is of significant importance to addressing the macro problem of SA/SM by Uber drivers.

49.    This leads to my second risk identification: the risk of underreporting. Uber documents acknowledge that incidents of SA/SM are underreported on its platform.

---

[17] Exhibit 3131 to Katy McDonald Deposition 2025.04.24, "Sexual Assault and Rape Incident Rate Data Assumptions" (UBER_JCCP_MDL_000032174), emphasis added.

[18] Exhibit 418 to Henry (Gus) Fuldner Deposition 2025.03.27, Sexual Assault/Misconduct Reduction Strategy (UBER_JCCP_MDL_000251111) at -1111.0005, emphasis added; Todd Gaddis 30(b)(6) Deposition, 2025.07.11 at 128:2-9 and Exhibit 1570 (Sexual Assault / Misconduct Reduction Strategy) (UBER_JCCP_MDL_000251111).

50.    For example, in 2016, Uber acknowledged that SA/SM incidents are underreported to Uber due to factors like fear, intimidation, and shame:[19]

> Underreporting
> UBER only has data on incidents that are reported to us. It is likely and we should consider addressing that our numbers are lower than actual incidents due to underreporting--causes of which include fear for safety, intimidation, shame, etc.
>
> On our platform, many drivers have riders' home addresses, which alone could cause significant underreporting.

51.    A 2019 User Experience Study, made similar findings:[20]

## Why no negative feedback?

- ★ Guilt can prevent a low rating or tag because riders don't want to deprive a driver of his livelihood and recognize how hard they work for so little earnings.
- ★ When they'd typically give a lower rating for car smell, riders show pity if they assume the driver lives in her car.
- ★ They will cut the driver some slack if he has a "nice personality" or has an interesting story
- ★ They fear driver (or Uber) retribution (see right)
- ★ At the end of a trip, riders often don't have time or it's inconvenient to stop and report and issue. They may also forget issue details afterwards.

"My driver pulled off on the side of the freeway, but I already had an issue weeks before. And I thought Uber would hold me more accountable than the driver [if she reported it]. I didn't want them to shut me down."    (**J.S.** - rider)

27    - Confidential - Attorney Client Privileged -    

52.    In the same 2019 User Experience Study, Uber described other factors contributing to underreporting: "[M]ost riders we spoke with [] hesitate to add tags to a lower rating, in case

---

[19] Exhibit 3131 to Katy McDonald Deposition 2025.04.24, Sexual Assault and Rape Incident Rate Data Assumptions (UBER_JCCP_MDL_000032174).

[20] Exhibit 1104 to Greg Brown 30(b)(6) Deposition 2025.06.17, Quality/Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews (UBER_JCCP_MDL_000508970) at Slide 27.

drivers lose their livelihood."[21] "They also had no idea how the feedback was delivered and felt anxious that drivers would know who gave it."[22]

53.     Uber documents also acknowledge that its reporting procedures may contribute to underreporting.

54.     In February 2017, in a document titled Sexual Assault/Misconduct Reduction Strategy, Uber recognized that its own reporting systems were contributing to underreporting: "Currently, **we know that there is a high likelihood of underreporting of incidents and behaviors on our platform – due to unintuitive reporting feedback flows**, societal influences, and a prevalent belief that we will not act on the information."[23]

## IV. Early Warnings & Reporting Systems

**Objective:**
Realize improved internal data systems and user-reporting capabilities to enable stronger warning signals for potential offenders.

**Background:**
In order to target sexual misconduct offenders on our platform, it's critical that we're able to obtain more robust signals around unacceptable behaviors that may be occurring on our systems.

Currently, we know that there is a high likelihood of underreporting of incidents and behaviors on our platform — due to unintuitive reporting feedback flows, societal influences, and a prevalent belief that we will not act on the information. For low-level incidents, such as ongoing feedback to a driver's or rider's overall demeanor, the issues of underreporting and data cleanliness are magnified and also suffer from issues of internal routing fails due to volume and data quality.

**Tactics:**
High impact opportunities include:
- Increase awareness around the value of reporting incidents in markets where there is significant under-reporting due to cultural norms.
- Improve ratings / feedback systems to increase data quality and cleanliness for consumer usability.

55.     Uber also recognized that, for low level incidents (i.e. incidents of flirtation, inappropriate comments, leering), underreporting is magnified, and Uber's "internal routing" was

---

[21] Id. at Slide 13.

[22] Id. at Slide 19.

[23] Exhibit 1570 to Todd Gaddis 30(b)(6) Deposition 2025.07.11, Sexual Assault / Misconduct Reduction Strategy (UBER_JCCP_MDL_000251111) at -1111.005; Todd Gaddis 30(b)(6) Deposition 2025.07.11 at 128:2-9.

failing because of volume and data quality.[24] This is notable because the low-level incidents may serve as, to put it in Uber's words from its title above, "**early warnings**."[25]

### B.     MITIGATION CONTROLS: REPORTING PROCEDURES

56.     Given the high consequence of SA/SM events, and the central role of reporting data in detecting and addressing them at the platform (macro) level, combined with the known likelihood of underreporting, the overall risk matrix rating is High: Severity 4 "Major" × Likelihood 3 "Possible" on a 5×5 matrix (Figure 1). As defined by the Safety Control Hierarchy, Uber must therefore prioritize design-led controls (elimination/substitution and engineered usability of the reporting pathway) over weaker administrative or warning measures to mitigate this risk (Figure 2). Uber's own documents reflect awareness of this need, identifying the design and implementation of an effective, usable reporting procedure as the appropriate focus.

57.     Under the "Tactics" heading in the excerpt above, Uber recognized the opportunity to "improve ratings/ feedback systems to increase data quality and cleanliness for consumer usability."[26] Under the "objective" heading, it recognized the need to "realize improved internal data systems and user-reporting capabilities to enable stronger warning signals for potential offenders."[27]

58.     Following this strategic analysis, Uber "committed" to six goals, one of which was realizing "improved internal data systems and user reporting capabilities to enable strong warning signals for violating offenders."[28]

**OBJECTIVES:**

Our plan commits us to the following six goals:

1.  Ensure users with a previous, detectable history of sexual misconduct are restricted from the platform.
2.  Create appropriate awareness of sexual harassment/misconduct guidelines and expectations both within our company and in our company ecosystem.
3.  Reduce and deter opportunities to commit sexual misconduct on the platform.
4.  Realize improved internal data systems and user reporting capabilities to enable strong warning signals for violating offenders.
5.  Ensure a business ecosystem that holds people accountable for their inappropriate behavior.
6.  Be a force for good against domestic violence, human trafficking, child violence and sexual assault within our broader communities.

59.     This was an important, time-critical, safety goal. However, there is no evidence that Uber took meaningful action in service of this goal.

---

[24] Ibid.

[25] Ibid., emphasis added.

[26] Ibid.

[27] Ibid.

[28] Ibid., highlights added.

60.     For example, over five years later, in October 2022, Uber was still talking about its problematic reporting processes. It noted:

> **Accessible**: 60% of drivers, riders, and couriers do not find it easy to get in touch with Uber's support agents when a safety incident occurs (*Uber Safety Deep Dive Report,* Sept 2022) Only ~40% of contacts resolved by a Safety agent are submitted through a Safety support channel (e.g., Safety help node, Critical Safety Line, on-trip support/ADT).[29]

61.     Uber went on to observe that "Fewer than half of riders know where to go to get support, feel that Uber support agents truly care or believe Uber will take action."[30] Uber quoted a rider who said: "Faced with inappropriate behavior of the driver, I made a complaint in customer service and received only an automated response, which did not make me feel confident that the problem would be solved or that action would be taken to prevent it repeating in the future."[31]

62.     Uber has not quantified the size or extent of underreporting of SA/SM on its platform.

> Q.  Can you tell me what Uber has done to understand the under-reporting rate of sexual assaults specifically on Uber?
>
> …
>
> A.  I'm not aware of specific studies or research to study under-reporting of sexual assault on Uber.  That's not to say that teams haven't looked into this over time.
>
> Q.  So it's your testimony, as Uber's corporate representative, that Uber has not specifically studied the sexual assault under-reporting rate on the Uber platform; is that right?
>
> A.  In preparation for this testimony, I'm unaware of a study specifically about the under-reporting of sexual assault on the platform.[32]

63.     In a company PowerPoint, Uber's employees wrote, "We cannot properly address the concerns of our drivers and riders if they do not report all issues."[33] In that same document, Uber recognized that this in turn "can have negative consequences, such as increased safety risks...Without understanding the scope of underreporting, we cannot evaluate its impacts on either the business or our users."[34]

---

[29] October 19, 2022 Incident Response PPT, UBER_JCCP_MDL_002260229, at p. 2.

[30] Id. at Slide 10.

[31] Ibid.

[32] Greg Brown 30(b)(6) Deposition 2025.06.17 at 171:16-172:3; see also id. at 172:21-173:30.

[33] Exhibit 1100 to Greg Brown 30(b)(6) Deposition 2025.06.17, January 2017 Rider/Driver Underreporting (UBER00012899) at -2901.

[34] Ibid.

64.     Uber has a rating/feedback screen at the end of each completed trip. See Appendix F. Based on documentation available, this feature has been around for some time.

65.     In 2013, an Uber representative testified before a Maryland Public Service Commission: "At the end of every, the conclusion of every trip, users have the opportunity to rate the experience that they had with that transportation provider and with the Uber app. That provides Uber feedback to ensure that the transportation providers are consistently keeping a high standard and level of professionalism."[35]

66.     In a 2015 Uber press release, Uber said it had a: "24/7 Feedback Loop: Riders rate and provide comments about their experience at the end of every trip and drivers do the same. Uber constantly monitors that feedback to ensure any issue is addressed immediately."[36]

67.     In 2016, as part of its driver training for EMEA (Europe, Middle East, Africa), Uber explained that the purpose of these post-trip ratings was for Uber to regularly review feedback for safety purposes, and to address issues identified there:[37]



68.     In the same presentation, Uber explained that this feedback screen appeared at the end of every trip: "At the end of each ride the rider will see a screen that allows them to leave a star rating for the partner from 1-5…On this screen the rider can also leave feedback…."[38]

---

[35] Testimony before the Public Service Commission of Maryland, November 7, 2023, UBER_JCCP_MDL_005084050, William Bodenstein Notary Public, at -4052.

[36] Uber Press Release, June 10, 2015, UBER_JCCP_MDL_002530647, at -0649; see also https://www.prnewswire.com/news-releases/uber-launches-in-four-new-kansas-cities-credits-governor-brownbacks-openness-to-innovation-and-economic-development-300071356.html.

[37] Uber, EMEA Driver Training, UBER_JCCP_MDL_004643474, at Slide 4, highlights added.

[38] Id. at Slide 7.

69.    The following is a page from this Uber presentation, along with a screenshot of the rating and feedback screen at that time:[39]



70.    In 2018, Uber acknowledged the need to "understand rider-to-driver feedback tags' design and its values in identifying high-risk drivers and reducing safety incidents."[40] It explained: "Riders are Asked to Submit Feedback Tags after Giving 1~4 Star Ratings to Drivers" and showed the following images of how those feedback tags were intended to work:[41]



71.    Also in 2018, Uber displayed this screenshot of the feedback and rating screen, explaining: "A customer feedback tag is a non-urgent way to surface a bad ride experience with

---

[39] Ibid.

the detail that Uber needs to improve. They are also an opportunity for Uber to improve a negative experience by showing that we're listening by taking action when it matters the most."[42]



72.    In 2019, Uber acknowledged a need to learn "Riders' mental models, attitudes and behaviors around the current feedback options and safety reporting choices" and to learn "What tags could enable drivers to improve while facilitating the identification of high risk drivers and reduction of safety-related incidents."[43]

---

[40] November 2018, Uber Analysis of Rider-to-Driver Feedback Tags (US only), UBER_JCCP_MDL_003273474, at -3476.

[41] Id. at -3480.

[42] Evergreen Programs, Customer Feedback Journey, Feb 2018, UBER000095540, at -5584.

[43] Exhibit 1104 to Greg Brown Deposition 2025.06.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews, (UBER_JCCP_MDL_000508970), at Slide 3.

73.    At that time, in 2019, the existing feedback tags (and rating screen) were as depicted in the figure below:[44]



74.    To this day, the rating and feedback screen remains a core part of the user experience, which pops up at the conclusion of Uber ride. Rebecca Payne, Uber's corporate representative, testified:[45]

> Q. Okay. Star rating and feedback, what is that?
>
> A. So **this is something that you normally see at the end of your Uber ride**. Drivers see the same thing, where you're able to give a one-through-five-star rating of the trip and provide specific feedback for that ride."
>
> Q. Okay. And **has that always been a feature on the Uber app?**
>
> A. I can't speak to day one, but **I feel like it has been a feature from the very beginning.**

75.    Not only is the rating screen one that riders normally see at the end of a ride, it is designed to be a pop-up. This means that it is not one of several on-screen options. Rather, Uber forces this screen into the rider's experience, requiring riders take action on that screen before they can proceed with any other activity. Uber's corporate representative, Greg Brown, testified:

> Q. Well, this [the rating and feedback screen] is the first screen that a rider gets after a ride ends, right?

---

[44] Id. at Slide 51.

[45] Rebecca Payne 30(b)(6) Deposition 2025.04.02 at 82:16-83:1, emphasis added.

**A. This is what pops up in their app at the conclusion of a ride, yes.**

Q. Right. There isn't a popup for a help menu or for the help line or for any of these other channels that you're referring to; this is what they see, right?

**A. Again, this is what pops up in the ratings screen….**[46]

76.    Uber corporate employee Valerie Shuping testified:

Q. And what are feedback tags?

A. Feedback tags are when a rider rates a driver … and [Uber] would offer a few tags underneath that rating for the rider to select if they wanted to provide more information behind their rating.

Q. Okay. **So this pops up on a rider screen after the ride is completed when it asks for a star rating for the driver, right?**

…

**A. Yes.**[47]

77.    If the rider closes out of the ride without giving a rating and feedback, then the next time they open the app, they will be confronted with this pop-up, again requesting a rating and feedback. Uber corporate representative Chad Dobbs testified: "If a rider were to open the app again, there would be a screen that pops up that allows them to rate the driver."[48]

### 1.    Uber's User Behavior Data Indicates a Preference to Use Ratings and Feedback Pathway to Report Sexual Assault/ Misconduct

78.    While Uber might reasonably expect riders who experience rape or severe sexual assault to use buttons labeled with words like "Safety Hotline," "911," "SOS" or "emergency," or to try to get through to the safety hotline or to talk to a support agent, these severe incidents likely do not represent the majority of SA/SM incidents on Uber's platform. Instead, sexual misconduct (things like flirtation, unwanted advances, leering, or sexually inappropriate comments) would be expected to occur more frequently than criminal sexual assault. If the relatively "minor" sexual misconduct events are warning signals that a driver poses a risk to future riders, then this underscores the need for Uber to gather accurate, reliable, and thorough data **about sexual misconduct** specifically.

79.    Given the data that Uber had and the understanding that users were using the pop-up ratings and feedback screen to try to report sexual misconduct events, Uber should have used that as an opportunity to address the design of the UI to better align with user behavior, expectations and goals to report a sexual misconduct act.  There are several reasons why Uber

---

[46] Greg Brown 30(b)(6) Deposition 2025.06.17 at 190:17-191:3, emphasis added.

[47] Valerie Shuping Deposition 2025.04.18 at 369:1-15, emphasis added.

[48] Chad Dobbs 30(b)(6) Deposition 2023.08.01, in the matter of *Campbell v. Uber*, (UBER_JCCP_MDL_000906887) at 976:16-18.

should have anticipated this: (1) that Uber explicitly knew riders were using the feedback and ratings screen to provide safety-related trip feedback to Uber, (2) riders told Uber that they believed the star ratings were the primary indicators of safety, underscoring that they believed in the star rating /feedback tags as meaningful safety-related reporting, and (3) Uber affirmatively presented this screen to riders, as a pop-up, at the conclusion of every trip, making it the path of least resistance (and Uber did not tell them not to report safety issues there, or that they should use a different channel for safety issues).

80.     **First**, as discussed, in 2016 and 2018, Uber expressly acknowledged that riders were providing, via ratings and feedback tags, safety information – that is, information that was useful in trying to maintain a safe environment[49] and reduce safety incidents[50].

81.     **Second**, in 2019, Uber published User Experience research showing riders were, in fact, using ratings from 1-4 stars to reflect "unwanted advances" or "inappropriate comments."[51]



82.     **Third,** it is a basic principle of human factors, including user experience (UX) research, that people generally follow the path of least resistance.[52] Put another way:

---

[49] Uber, 2016 EMEA Driver Training, UBER_JCCP_MDL_004643474, at Slide 4.

[50] November 2018, Uber Analysis of Rider-to-Driver Feedback Tags (US only), UBER_JCCP_MDL_003273474 at -3476.

[51] Exhibit 1104 to Greg Brown Deposition 2025.06.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews, (UBER_JCCP_MDL_000508970), at Slide 26.

[52] Whiteton, Kathryn, *Satisficing: Quickly Meet Users' Main Needs* (March 30, 2014), Nielsen and Norman Group, https://www.nngroup.com/articles/satisficing/.

> Users tend to choose the path of minimum effort. The behaviors discussed in this article represent situations where the user's perceived benefit of taking a better action is too small compared with the perceived cost. The alternative path is considered inefficient (too expensive in terms of user effort) and not worth it. Also, the alternative path may simply be undiscoverable or invisible to the user.[53]

83.    Based on established human factors and behavioral science principles, Uber riders—like most users—can be expected to select the options that are made most obvious in the default user flow, rather than exploring hidden or non-default paths. Research on the default effect demonstrates that individuals overwhelmingly accept default options, even in high-stakes contexts, because they reduce cognitive effort and feel like the natural course of action (Dhingra et al., 2012). This tendency reflects both status quo bias—a preference for the existing or presented option (Samuelson & Zeckhauser, 1988)—and psychological inertia, where people rarely deviate from defaults unless strongly motivated to do so. Empirical studies further show that defaults work by lowering cognitive load and decision friction, thereby channeling users toward the intended path (Dinner et al., 2011). Within the Uber platform itself, field experiments have shown how preset defaults, such as tipping options, measurably influence rider behavior (Saare et. al, , 2020). Taken together, this evidence indicates that when Uber presents a pop-up rating and feedback screen at the end of every trip, riders should be expected to use that default interface to provide feedback, rather than hunting through menus for alternative reporting options.

84.    **Fourth**, Uber's own research showed that its riders believed star ratings were the primary indicators of safety. A 2017 Uber safety strategy document described: "[Star] ratings pull the vast majority of the weight today in ensuring safety perceptions among riders – hugely valuable."[54] The belief that star ratings are meaningful safety indicators is part of the Environment of Use.

85.    This belief will shape how people use the Uber App. When riders want to provide meaningful feedback about a driver, they can be expected to do so in the way they have already learned is meaningful (from prior experience with Uber). In other words, Uber should have expected riders to provide safety information in the familiar form – star ratings and feedback.

### 2.    Uber Expects Riders to Report Sexual Misconduct Via Channels Other Than the Ratings and Feedback Screen

86.    Even though the ratings and feedback screen is a core part of the User Experience and Ride Flow for every trip and the primary mode of obtaining user feedback, it is my understanding that Uber company representatives have maintained that other channels are more appropriate.

87.    At his deposition as Uber's corporate representative, Greg Brown, Uber's Director of Central Safety, testified:

---

[53] Pernice, Kara, *Why Designers Think Users Are Lazy: 3 Human Behaviors* (May 20, 2014), Nielsen and Norman Group, https://www.nngroup.com/articles/lazy-users/

[54] 2017 Uber table listing "Initiatives" with "Resonance and Executional Strategies," UBER_JCCP_MDL_000303417, at -3422.

**[W]e don't consider the feedback or ratings process as a support channel. And so although I think certainly this is the screen that pops up at the conclusion of a trip**, the mechanisms to report any safety incident, including sexual assault or sexual misconduct, the channels for those are available right within the help center in the app, on the website, amongst the other sources of reporting channels. **I don't think it would be Uber's position that this would be a preferred or expected reporting channel for sexual assault specifically.**

….

**I don't think that Uber would take the position that this is how they should report this to us.** We make available a multitude of other reporting channels that are -- I think there are many of them. They include more features than what is available as part of this flow...

….

**Yeah, I think we've established this is not a reporting channel that we are expecting users to use….**

….

**I think our expectation would be that in the vast majority of cases they would be reporting it to us through one of those other channels.**

….

**I would continue to emphasize all of the other support channels that exist and that we have continued to build over time.**

Q. **Well, this is the first screen that a rider gets after a ride ends, right?**

A. **This is what pops up in their app at the conclusion of a ride, yes.**

Q. **Right. There isn't a popup for a help menu or for the help line or for any of these other channels that you're referring to; this is what they see, right?**

A. **Again, this is what pops up in the ratings screen, but again, it's a few clicks away to see the other support options that exist in association with a given trip.**[55]

88.    In the same deposition, Mr. Brown testified:

…I would say, generally speaking, we are -- we provide multiple channels to contact our customer support representatives, including through the app and the help flow, the website, a dedicated critical safety line support

---

[55] Greg Brown 30(b)(6) Deposition 2025.06.17 at 183:14-192:6, emphasis added.

Expert Report of C. Rando                                                    29

number, among them. **And our expectation would be generally that a user reporting sexual assault would utilize one of those channels**.[56]

89.     In my opinion, the testimony relies on unverified assumptions about what users know and will do. A company such as Uber should not rely on expectations that users will discover or use particular reporting channels without evidence. It is the company's responsibility to conduct usability testing and analyze the Environment of Use to ensure that its assumptions align with actual user behavior, goals, and understanding of reporting pathways.[57] I further note that the position presented by Mr. Brown contradicts information that Uber has about rider expectations and experience, which, as noted above, indicates that ratings and feedback is the most likely channel of reporting sexual assault/misconduct.

## C.     ENVIRONMENT OF USE AND USER TESTING DEFICIENCIES

90.     In order to gather accurate, thorough, and reliable data regarding driver SA/SM of riders, it is necessary for Uber to gather Environment of Use data and conduct representative user testing validation, to make sure they are receiving accurate, thorough, and reliable data regarding safety issues pertaining the sexual assault and misconduct reporting.

91.     Reporting systems and other risk identification and mitigation controls cannot simply be chosen and deployed; they must be designed for, and tested and analyzed within, expected Environment of Use conditions.[58] This refers to the physical, social, and organizational context in which a user interacts with a product or systems. Environment of Use analysis requires that, when developing products or services for human use, a company must take into consideration how these products and services will actually be used. This is because context matters. Designing for a use scenario of a bright and serene environment is much different than designing for use in a dark, confined, moving space. A responsible company that is serious about human factors and human safety designs must therefore clearly define the design objective, the intended user, and the circumstances of use. Understanding this intended Environment of Use is a critical consideration in designing safe and usable controls.

92.     Environment of Use analysis also recognizes that user expectations play a significant role in human interactions with design. This is because user behavior is shaped by mental models formed through prior experience (Ghuman, Bar, Dobbins, & Schnyer, 2008), i.e., user expectations and experiences influence the understanding of design, instructions, and labeling. In conducting Environment of Use analysis, it is therefore important to understand and consider typical user behavior in the context of the product and service one is developing.

93.     Mental models shape how an individual thinks about or understands how something or someone does, can, or should function in the world.[59] The importance of mental models has been summarized: "People's views of the world, of themselves, of their own capabilities, and of

---

[56] Greg Brown 30(b)(6) Deposition 2025.06.17 at 194:7-16, emphasis added.

[57] ISO 9241-210:2019 (requiring iterative, human-centered design process that explicitly identifies users, tasks, and environments and refines designs through user-centered evaluation in the actual context of use).

[58] Ibid.

[59] Gentner D, Stevens AL. (editors). *Mental Models*. New York, NY: Psychology Press; (2014).

Expert Report of C. Rando                                                                30

the tasks that they are asked to perform, or topics they are asked to learn, depend heavily on the conceptualizations that they bring to the task."[60] This principle is well known and accepted. For example, Nielsen and Norman Group, an influential user experience (UX) think tank, explains the importance of mental models in user experience design:

> Mental models are one of the most important concepts in human-computer interaction (HCI)…There's great inertia in user's mental models: stuff that people know well tends to stick, even when it's not helpful. … When you come up with a new design pattern, you face an immense challenge: How do you explain the new concept so users will construct a valid mental model of your system?

> In case of a mental model mismatch, you basically have two different options:

> **Make the system conform** to users' mental models – assuming most users' models are similar. This is the approach we usually recommend to fix IA problems: if people look for something in the wrong place, then move it to the place where they look for it.

> **Improve users' mental models** so that they more accurately reflect your system. You can, for example, explain things better and make labels clearer to guide users to form the right model (even though the underlying system remains unchanged).[61]

94. A related concept is the "power law of learning."[62] As Nielsen and Norman Group describes for a UX audience:

> [A] big theme in many of our articles and one of the main principles of user experience [is] consistency. Consistency is one of the original 10 usability heuristics and is a corollary of Jakob's law of Internet use.

> ….

> Items that are practiced a lot acquire a high activation in our memory and are retrieved faster. Whenever we're trying to solve a problem or recall a piece of information, the first things that come to mind are those items in our memory that have a raised activation. Let's say you want to navigate to the homepage of a site. You may have encountered multiple solutions to this problem in the past — for example, clicking the logo or clicking a Home

---

[60] Norman, D. A. (1983). *Some observations on mental models*. In D. Gentner & A. L. Stevens (Eds.), *Mental models* (pp. 7–14). Hillsdale, NJ: Lawrence Erlbaum Associates.

[61] Jakob Nielson (2010), Megan Chan (updated January 26, 2024), *Mental Models*, Nielsen and Norman Group, https://www.nngroup.com/articles/mental-models/.

[62] Newell & Rosenbloom, *Mechanisms of skill acquisition and the law of practice (chapter), in Cognitive Skills and Their Acquisition* (Psychology Press, 1981). Available at: https://www.researchgate.net/publication/243783833_Mechanisms_of_skill_acquisition_and_the_law_of_practice.

link. All these solutions will compete in a "race" in your memory, and you will select the one that gets to the finish line first. But, based on the power law of learning, the one that wins the race is the one that's been practiced most often.[63]

95.    Put another way, a basic human factors principle is that users interacting with any system will form expectations that become part of the Environment of Use considerations in which future interactions take place. Subsequent design decisions must acknowledge the Environment of Use (including user expectations) and influence of design positively or negatively on user goals and ease of task completion.

96.    Finally, Environment of Use mandates ongoing testing and analysis. It is imperative that controls, especially safety-related controls, are evaluated to ensure that they have the intended positive consequences for the user. Indeed, evaluation and configuration of the control is a critical task in designing an effective mitigation control. When products are introduced to the market or changes made, a company has continued responsibility to conduct market surveillance including ongoing Environment of Use analysis. This ensures that the design and Environment of Use matches company expectations for safety. More specifically, did the company accurately characterize the Environment of Use to mitigate risks successfully, and does the real use data match intended outcomes and positively impact the defined risks. Without Environment of Use analysis, a company would not have an accurate understanding of whether a risk was being effectively mitigated or controlled by any options identified by the hazard control hierarchy (Figure 2).

97.    For all these reasons, Environment of Use analysis is a mandatory step in risk analyses and is critical for making sure design controls do not make a problem worse and that a solution effectively mitigates the identified risk (has the impact intended).[64]

98.    In the context of this case, Environment of Use analysis mandates that any feature intended to provide support to a rider during a ride and/or immediately following an incident of SA/SM, would account for environmental constraints like confined space, isolation, limited information about driver, moving vehicle, limited lighting, potential connectivity/service issues, as well as account for user constraints like user stress, fear, anxiety, or, conversely, indifference, low motivation, pity for driver. Environment of Use analysis would also consider whether the user environment will include users who are intoxicated, whose memories are fuzzy, who are fearful of retaliation, or who are fearful of experiencing shame while attempting to utilize reporting procedures. If the Environment of Use includes a variety of user types of use environments, Uber must take each and every foreseeable Environment of Use into account. For example, its reporting systems should be designed to encourage and facilitate reporting of "minor" sexual misconduct – e.g., flirtatious comments – where a user may not think of their experience as safety-related, and

---

[63] Budiu, Raluca, *The Power Law of Learning: Consistency vs. Innovation in User Interfaces* (October 30, 2016), Nielsen and Norman Group, https://www.nngroup.com/articles/power-law-learning/?lm=priming&pt=article.

[64] Environment of Use considerations have been codified into ISO standards. See, e.g., ISO 9241-210:2019 (providing requirements for human-centered design principles, which includes the requirement that designs understand and account for real contexts of use and interactive evaluation and design); ISO/TS 18152:2010 (provides a process model for integrating human factors across the lifecycle, which includes requirement that designs be evaluated in context of environment of use)

may give up if they encounter minor obstacles to reporting given a lower level of motivation. But the reporting systems should also encourage and facilitate reporting of "major" sexual misconduct – for example, traumatic sexual assault and rape – where a user may experience severe emotional distress and require reassurance of safety, respect, and dignity in order to report.

99.     Environment of Use analysis further mandates that in designing any reporting pathway and system, Uber should consider user expectation modeling. In mobile app contexts, riders are conditioned to expect simplicity, immediacy, and clarity; especially in high-stress or emergency situations. This expectation is not incidental—it is shaped by years of exposure to intuitive consumer platforms that prioritize rapid task completion and visible critical functions (Tractinsky, Katz, & Ikar, 2000). According to Jakob Nielsen's Law of the Internet User Experience (Nielsen, 2023), users expect new systems to operate similarly to familiar ones. Thus, for example, users would anticipate that reporting options for safety incidents would be visible and accessible in high-visibility locations (e.g., the main user experience flow, and the mandatory rating screen) and not buried behind layered menus. A design that runs contrary to these expectations would increase cognitive load and reduce the likelihood of successful task completion.

100.     Finally, Environment of Use analysis would mandate that following the implementation of any SA/SM mitigation control, Uber continues evaluating the control (including, of course, through user reporting) to assess its efficacy, usability, and avenues for improvement.

101.     In the context of this case, Uber should be routinely gathering data on usage and efficacy to determine whether its reporting systems are actually helpful and accessible to users, whether they are working as intended, and whether they can be improved upon or reconfigured to better enhance efficacy and usability. Thus, for example, Uber should be evaluating whether reporting options for safety incidents are actually being used, whether users were dropping off at certain points before completing supporting tasks (abandonment rates), and whether use of the feature was or was not achieving the desired goal (i.e., here, informing Uber early and accurately regarding drivers who show a lack of appropriate boundaries, inappropriate behavior, and/or are engaging in sexual assault and sexual misconduct).

102.     Instead, Uber has indicated that it has never studied how users using the app would choose to report a sexual assault.

> Q. Has Uber ever studied how users use the app if they wanted to report a sexual assault?  I understand what you think, but have you ever done a survey of users using the app to see how they would report this issue?
>
> A.  I am not aware of a study, though I can't say that that has not been looked at by another team at Uber.[65]

---

[65] Greg Brown 30(b)(6) Deposition 2025.06.17 at 187:21-188:3.

103.    In its Safety Report, Uber says it receives and proactively gathers safety incident reports from more than 10 different channels.[66] In its interrogatory responses, Uber identified these channels as follows:[67]

| Channel | Dates | Description of Means by Which Reports Were Received from that Channel |
|---|---|---|
| Post-trip in-app support | 2015-present | Users access the "help" menu in the Uber apps to raise a support ticket |
| On-trip in-app reporting | 2020-present | Users can open the safety toolkit in their app and raise a support ticket while a trip is ongoing |
| Uber's website | 2015-present | Users access help.uber.com, select a category (e.g. Safety), and raise a support ticket |
| 24/7 Critical Safety Response Line | 2015-present | Users can place a call and be connected directly with an agent |
| Uber Greenlight Hubs | 2015-present | Earners make appointments or walk in to physical locations to receive in person support |
| Social media mentions (Twitter, Facebook, etc.) | 2009-present | Users can mention or directly message Uber's official social media accounts |
| News media mentions | 2009-present | News media may mention an incident related to the Uber platform |
| RideCheck | 2019-present | Users receive a prompt in the app if a crash or anomaly (long stop, route deviation) is detected; from this prompt, users can raise a support ticket |
| In-App Emergency Button | 2018-present | Users can open the safety toolkit in their app and connect directly with 911 |
| Law enforcement | 2009-present | Law enforcement may request information about an incident related to the Uber platform |
| Regulator inquiries | 2009-present | Regulators can contact Uber regarding incidents on the Uber platform |
| Insurance claims | 2009-present | Claims are raised by emailing claims@uber.com or submitting a request via inquiries.uber.com |
| Other third parties | 2009-present | Third parties can contact Uber directly related to incidents on the Uber platform |

104.    Some of these (news media, law enforcement, regulatory inquiries, other third parties) are not really "channels" (reporting pathways that Uber constructed for users) but are rather a list of third parties who could potentially inform Uber of a sexual assault incident but are

---

[66]    Uber US Safety Report, 2021-2022, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=fa6971b0-58b1-4a06-b465-552c250d2b4e, p. 8.

[67] Exhibit 1573 to Todd Gaddis 30(b)(6) Deposition 2025.07.11, Defendants Uber Technologies, Inc., Rasier LLC and Rasier-CA, LLC's Second Amended Responses to Plaintiffs' Second Set of Interrogatories, at p. 35.

not required or integrated into a joint communication pathway.[68]  Likewise, insurance claims are a way Uber may learn of incidents, but they are not a channel Uber constructed for riders to tell Uber about sexual misconduct. Also, the Uber Greenlight Hubs are listed as an option for "earners" (i.e. drivers) to report incidents to Uber, but they are not a pathway for riders to report SA/SM incidents to Uber.

105.    Thus, from Uber's list above, the channels a rider could use to report a SA/SM incident directly to Uber include:

- **Social media mentions** (Users can mention or directly message Uber's official social media accounts)

- **Uber's website** ("Users access help.uber.com, select a category (e.g., Safety) and raise a support ticket").

- **Post-trip in-app support** ("Users access the 'help' menu in the Uber apps to raise a support ticket")

- **On-trip in-app reporting** ("Users can open the safety toolkit in their app and raise a support ticket while a trip is ongoing")

- **In-App Emergency Button** ("Users can open the safety toolkit in their app and connect directly with 911").

- **24/7 Critical Safety Response Line** ("Users can place a call and be connected directly with an agent")

- **RideCheck** ("Users receive a prompt in the app if a crash or anomaly (long stop, route deviation) is detected; from this prompt, users can raise a support ticket).

106.    As discussed below, none of these channels are integrated into the post-trip ratings and feedback screen riders see after Uber trips. And, apart from RideCheck, Uber does not proactively present these other channels to riders; riders must instead seek out, discover, and interpret these alternatives on their own.

107.    As discussed above, by presenting a post-trip ratings/feedback screen, Uber signals to riders that this is its preferred feedback channel, and Uber's documents appear to confirm that

---

[68] Uber's corporate witness testified that Uber is not aware of any contract, law, or regulation that would require any of these third parties to make a report to Uber if they receive a report of SA/SM involving Uber. Todd Gaddis 30(b)(6) Deposition 2025.07.11 at 147:9-13. Therefore, while Uber *may* receive information from these sources, it should not rely on any third-party reports as a reliable way to learn about incidents where its drivers commit sexual violence toward its riders. Such an approach would not align with the Safey Control Hierarchy, which instructs that responsible companies take affirmative action to design and implement mitigation controls—not passively rely on channels that are not controlled or influenced by Uber or its users. Other concerns regarding this approach include Uber not knowing what percentage or number of reports of sexual assault or sexual misconduct never make their way to Uber. Uber has never conducted a study to understand what percentage of sexual assault or sexual misconduct reports get reported to an external reporting source (one that is not Uber). To that end, Uber also does not understand what the underreporting implications are for sexual assault or sexual misconduct incidents being reported to channels that are external to Uber.

its preference aligns with user expectation. Absent exceptional circumstances, it is not reasonable to expect riders to hunt for alternative paths when the app has explicitly directed them to this one.

108.    In addition to these important human factors considerations, some of Uber's reporting channels appear to be of limited application and do not appear to be channels for use by riders who experienced sexual misconduct (flirtation, unwanted advances, leering) and simply want to convey that feedback to Uber.

### In-App Emergency Button (aka SOS feature or 911 call feature)

109.    The in-App emergency button appears to have been designed only for use during in-progress emergency events. It also does not appear to be a true channel for reporting to Uber, but is rather a way to use the app to contact "911" (external emergency personnel).

110.    My online research for "Uber SOS" resulted in the identification of the following information published by Uber:[69]

## How does the SOS option work?

The SOS feature allows riders to trigger a real-time Safety Emergency Alert in the rare event of an on-ground emergency or incident during an Uber trip. Once triggered, the rider will be given an option to swipe in order to connect with the police via phone call. The users get to see their location and trip details in the app which they can share with the police.

If you wish to speak with the Uber safety team, you can get in touch with our Incident Response team on +91 88006 88666 from your registered mobile number while you're still on a trip or within 30 minutes after your trip ends.

It is advised that all riders ensure their device has the latest upgrade as it helps us provide riders with the one of most reliable forms of transportation in cities across India. Uber's technology brings unprecedented traceability powered by real-time GPS tracking on all rides, mandatory two-way rating system, and 24x7 rider support that ensures recourse with a guarantee that action will be taken.

111.    Corporate representative Greg Brown described the SOS feature as follows:

Q. And so the SoS, what's that referring to?

A. That is sometimes known as the 911 call feature. It's effectively a feature in the app that allows users, **should they choose to dial 911 from within the app**, there's a number of additional features that come with that in terms of connecting them directly to 911 call centers in emergency situations, as well as passing on certain information about the trip, including things like the license plate associated with the vehicle in the trip, the driver's name, as

---

[69] Uber, Help, *How does the SOS Option Work?,* https://help.uber.com/en/riders/article/how-does-the-sos-option-work?nodeId=70365f59-e6f8-475b-827a-e85ecbc9a0f9

Expert Report of C. Rando                                                                          36

well as GPS locations if the 911 call center is enabled with technology to receive that data.[70]

….

Q. So the SoS feature within the app is designed as a – I mean, a 911 proxy? Or what's the purpose of it?

A. **It is to connect users directly with 911**, as well as, where equipped and available, passing along information that could be helpful for law enforcement in that moment to connect with the passenger, driver, whomever else, in whatever emergency context they may be in.[71]

112.    This is not a channel for riders who have experienced sexual misconduct (flirtation, sexual advances, leering) to provide feedback to Uber.

### 24/7 Critical Safety Response Line[72]

113.    The "critical safety response line" (1) does not appear to be a widely used feature for reporting sexual assault and sexual misconduct; (2) is named to sound like another emergency/911 button; (3) is named to sound like a tool for use only in exceptionally severe ("critical") incidents that threaten a user's safety ("critical safety") and require a "response" (emergency aid); (4) discourages use by people reporting past, non-emergent sexual misconduct, and (5) has been "surfaced in various manners" by Uber over the years, thus confusing users.

114.    **First**, the critical safety response line does not appear to be widely used or known, even within Uber. Jill Hazelbaker, Uber's Chief Marketing Officer and Senior Vice President of Public Policy and Communications, whose job it was to ensure Uber's US Safety Report was "factual and accurate," has never heard of a "critical safety response line."[73]

115.    **Second**, Uber corporate representative Greg Brown testified that, in Uber's view, the purpose of the "critical safety response line [as opposed to the in-App SOS or emergency button] is much more about reporting a safety incident that had occurred on the platform after the – any imminent, you know, danger may be over."[74] But he acknowledged "**the possibility that a user may misconstrue the purpose of the critical safety response line** and confuse it with that of, you know, potentially the SoS feature, which is designed for more **emergent real-time support**."[75]

---

[70] Greg Brown 30(b)(6) Deposition 2025.03.13 at 66:2-14, emphasis added.

[71] Id. at 68:14-22, emphasis added.

[72] Exhibit 1104 to Greg Brown Deposition 2025.6.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews, (UBER_JCCP_MDL_000508970) at Slide 20.

[73] Jill Hazelbaker Deposition 2025.06.17 at 243:5-8, 400:14-16.

[74] Greg Brown 30(b)(6) Deposition 2025.03.13, at 68:3-6.

[75] Id. at 68:7-13, emphasis added.

116.    **Third**, in April 2019, Uber conducted "Quality / Safety UX [User Experience] Research" and found that even just the word "safety" carries a different meaning to riders versus Uber. The research showed that "riders think of 'Safety' in terms of 'as needed' action rather than prevention, they did not feel most tools would help them in an emergency and/or easily discernible."[76] The same 2019 Uber analysis found that "riders' mental model of 'safety' relates to just-in-time outreach and resolution" (in other words, an emergency response to an emergency situation), whereas Uber is thinking of safety in terms of "prevention" and "preparation."[77]

117.    In other words, it appears Uber was thinking of a "critical safety" report as anything that might help keep other riders safer in the future ("prevention" and "preparation"). Uber was hoping that a rider who experienced uncomfortable flirtation by a driver would realize, even though they may not have felt unsafe, that the driver's lack of appropriate boundaries was a safety issue, and therefore chosen to go beyond the feedback screen, and make a "critical safety" report to Uber. But, even if Uber thought people might behave this way, its research should have set the record straight. In the same research report, several focus group participants were quoted as saying about the "critical safety response line":[78]



118.    **Fourth**, the hotline itself discourages riders from using it under all but a narrow set of circumstances. If a user calls Uber's safety incident reporting line, the line is answered by an automated prompt that tells the user, in part, "please note that this line is strictly for users who require safety-related assistance."[79] This can create confusion for a passenger who is calling to report a safety incident that has already occurred.[80] Worse yet, when passengers call to report an

---

[76] Exhibit 1104 to Greg Brown Deposition 2025.06.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews (UBER_JCCP_MDL_000508970), at Slide 3.

[77] Id. at Slide 31.

[78] Id. at Slide 20.

[79] Greg Brown 30(b)(6) Deposition 2025.06.17, at 211:2-6.

[80] Id. at 211:1-212:20 (acknowledging "opportunities to clean that up [the in-app help feature]").

incident, at least as of 2022, that passenger would experience multiple touch points with safety support.[81] A passenger might have to go through as many as four different agents just in order to provide a report that would meet Uber's standards to classify the incident as "resolved."[82] Further, some layers of Uber's customer service representative were not properly trained to handle calls involving trauma or sexual abuse.[83] If a passenger does not jump through all of these hoops to report a sexual assault/misconduct, then Uber would not know the sexual assault/misconduct occurred.[84]

119.    **Fifth,** and finally, the way Uber offered the critical safety response line varied over time. Consistency is a core feature of designing usable technology and helping users establish mental models. But the critical support line introduced inconsistency and chaos:

> Q.  And was that [critical support line phone number] that you could initiate a call in the app?  Was there a button for that, or how would you find or initiate that kind of a report?
>
> A.  That has evolved over the years.  **I believe at one point in time there was a phone number that was published either within the help center of the Uber app or potentially on the website with a phone line.  I believe now it is a button in the app that you can press to be connected via that same phone number, but we surface it in -- or have surfaced it in various manners over the years**.[85]

## RideCheck

120.    RideCheck is also not a reliable reporting pathway for sexual misconduct. It involves a "check-in" Uber does with the rider and driver following an especially long stop or detour, detected with GPS.[86] It provides a prompt to the rider, but only under circumstances where GPS reflects a significant anomaly, and there may be an active incident in progress.[87] In my professional opinion, if the GPS anomaly was due to an innocent cause, then it would not be expected to result in a support ticket. If it was due to a kidnapping or sexual assault in progress, then the rider would likely be unable to report in the moment, and the RideCheck prompt itself would not provide a useful reporting channel.

## Email, Website, Social Media, Insurance

121.    Uber offers rides through a mobile app. The entire ride experience is supported through a mobile app. So, absent unusual circumstances, usability standards require making user

---

[81] Id. at 212:21-213:17.

[82] Id. at 213:5-214:22.

[83] Id. at 218:10-219:18.

[84] Id. at 220:11-25.

[85] Greg Brown Deposition 2025.03.13 at 69:8-19, emphasis added.

[86] Mariana Esteves 30(b)(6) Deposition 2025.07.15 at 13:17-16:16.

[87] Ibid.

reporting available within the same channel –the mobile app – that supports Uber's core customer interactions.

122.    These basic principles have been echoed in, e.g., the Niemen and Norman Group guidance for UX designers:

> "Instead of defaulting to email, ask users for feedback in the same channels where their interactions took place. For example, if they interacted with your company via a mobile app, use a push notification after the interaction to ask for feedback."[88]

123.    While there is nothing wrong with allowing riders to contact Uber via social media, Uber's website, email, or insurance claims, riders cannot be expected to know about, discover, or use those channels for purposes of providing feedback about sexual misconduct.

### Contact Support

124.    Although it is not explicitly listed by Uber as one of the support channels for riders to report sexual misconduct, it bears mentioning that Uber has, at times, used "contact support" buttons to link from one part of the user flow in its app to another.

125.    When a rider selected "driving" as the reason for a low-star rating on the feedback/rating screen, Uber made the "contact support" button appear in the feedback screen. There was discussion of adding a "contact support" button to other feedback tags that were more likely to be linked to SA/SM (inappropriate, professionalism), but it does not appear that this was ever implemented. One Uber employee noted: "[It] seems tag 'Driving' has the 'contact support' link but 'Professionalism' does not."[89]

---

[88] Kaley, Anna, *User Feedback Requests: 5 Guidelines* (March 26, 2023), Nielsen and Norman Group, https://www.nngroup.com/articles/user-feedback/

[89] Email "Quick link to submit tickets" dated November 9, 2018, UBER_JCCP_MDL_000022882, at -2884.

126.    Even where that button was used, riders did not notice it or thought it was decorative or non-functional. The following excerpt from Uber's UX research describes rider reactions to the "contact support" button:[90]



## "Contact" issues

In the prototype, tapping a Safety-related tag ("inappropriate") would invoke a "Contact Support" button.

★ Most did not notice the button, thinking it was decorative, non-functional or a heading for Submit

★ Participants were confused about when the button showed up and when it didn't, making them unsure how to make it show up again if they needed it.

★ A few were dissatisfied that it led to the "Report Issue" screen, anticipating an immediate response.

### Post-trip in-app support / reporting

127.    In addition to the pop-up rating and feedback screen (discussed above), Uber has a separate in-app reporting channel. But (1) Uber knows that its in-app reporting "can be confusing to navigate" and (2) unlike the pop-up rating and feedback screen that is familiar to users, the in-app reporting channel is designed such that users must search for and discover its existence.

---

[90] Exhibit 1104 to Greg Brown 30(b)(6) Deposition 2025.06.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews, (UBER_JCCP_MDL_000508970) at Slide 17.

Expert Report of C. Rando                                                                41

128.    An October 19, 2022 analysis by Uber gave an overview of its in-app support options at that time, demonstrating that using these options would require a motivated rider who believed she had experienced a serious safety incident.

129.    **First**, the rider would need to log back into the Uber app after a trip, then go to the menu, and then select a specific trip or the hamburger menu that says "Help with a trip."[91]



---

[91] October 19, 2022 Incident Response PPT, UBER_JCCP_MDL_002260229, at p. 18.

Expert Report of C. Rando                                                        42

130.    After selecting "Help with a trip," the rider would need to select "Report Safety Issue," then scroll past "I was discriminated against by my driver," "my driver was not wearing a face mask," "my driver drove dangerously," "I was involved in an accident," etc. before arriving at "Safety Incident Reporting Line."[92]



131.    Uber recognizes here that the post-trip in-app support tool ("in-app help") is one Uber knows "can be confusing to navigate" and "assumes customers understand what a 'safety issue' is."[93]

132.    In addition, in-app support option is not an option that is part of the default user experience connected with a trip (e.g., the feedback page that appears after every trip). Instead, after a trip, a rider would have to proactively find and select a prior trip or the "Help with a trip" option in the help menu.[94] Already, this raises serious usability questions. Uber could have reasonably assumed that most riders would not go looking outside the default user experience, which includes a feedback screen, for alternative ways to report incidents to Uber. If Uber wanted to prove that, contrary to normal expectations, riders who had experienced an incident would actually go looking for, find, and use this help-menu option to report safety incidents, then Uber should have done a usability study on that topic to gather the evidence to support these assumptions.

133.    And Uber should not have assumed customers "understand what a safety issue is" when Uber had already learned, via focus groups, that its own definition of a "safety issue" differed from riders' understandings. Since the April 2019 UX research, Uber had known that riders

---

[92] October 19, 2022 Incident Response PPT, UBER_JCCP_MDL_002260229, at p. 19.

[93] October 19, 2022 Incident Response PPT, UBER_JCCP_MDL_002260229, at p. 18.

[94] October 19, 2022 Incident Response PPT, UBER_JCCP_MDL_002260229, at p. 18.

thought of safety in terms of immediate safety, whereas Uber defined safety in terms of relevance to future safety decisions.[95]

134.    A core human-factors principle is that systems are designed to fit users—their goals, mental models, and context of use—not the other way around. It is methodologically unsound to assume riders will adapt to obscure or nonstandard workflows; design should align with established expectations, be easily discoverable, and minimize the need for users to change habitual behaviors.

135.    Uber's expectations (that riders would bypass the known, habituated feedback and ratings screen and hunt for an alternative way to report issues to Uber) ignores the research showing that people build mental models that influence their interactions with technology in a manner that supports their specific goals and expectations.

136.    Riders had become habituated to the feedback and ratings screen as the place to provide feedback to Uber, establishing an expectation or mental model centered on that screen as the location to let Uber know of any issues with the ride.

137.    Even though Uber had built a tool that it purportedly wanted riders to use to report safety incidents, it not only did not put that tool in the expected place (the rating and feedback screen). It also did not instruct riders that certain feedback should not be given on the ratings screen.

138.    The fact that Uber has been soliciting feedback from riders via the post-trip rating screen dating back about twelve years is likely to create a strong user expectation that the post-trip rating screen is the place where feedback should be submitted.

139.    Uber has trained riders for years to have a mental model of the ride experience as a step-by-step process: request a ride, meet the assigned driver at the assigned location, ride, provide feedback (and tip) via the rating and feedback screen. A company like Uber cannot expect that simply building another reporting tool (outside the step-by-step process, the ride flow) will cause riders to use that tool. No amount of wishful thinking will make it so.

140.    Uber did not even communicate to riders that they should divert safety incident reports to a different channel other than the ratings and feedback tag.

> Q.  Does it state that anywhere on the [ratings and feedback] screen if you get sexually assaulted, please pick up the phone and call us?
>
> A.  It does not say that on the screen.
>
> ….
>
> Q.  Well, this is the first screen that a rider gets after a ride ends, right?
>
> A.  This is what pops up in their app at the conclusion of a ride, yes.

---

[95] Exhibit 1104 to Greg Brown 30(b)(6) Deposition 2025.06.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews, (UBER_JCCP_MDL_000508970) at Slide 3, 31.

Q.  Right.  There isn't a popup for a help menu or for the help line or for any of these other channels that you're referring to; this is what they see, right?

A.  Again, this is what pops up in the ratings screen, but again, it's a few clicks away to see the other support options that exist in association with a given trip.[96]

141.    It is not reasonable to move sexual assault/misconduct reporting out of the familiar post-trip ratings/feedback screen and into separate in-app support screens—and then expect riders to find and use that path unprompted. Human-centered design requires aligning with users' mental models and primary task flows, making critical actions visible, and minimizing search/navigation cost. If Uber changes the reporting flow, the burden is on Uber to surface a clear, persistent entry point within the core trip journey, use plain labels, and keep the step count low.[97]

142.    A year and a half after Uber said "we know that there is a high likelihood of underreporting of incidents and behaviors on our platform – due to unintuitive reporting feedback flows...."[98] and recognized the need to "realize improved internal data systems and user-reporting capabilities to enable stronger warning signals for potential offenders,"[99] Uber's internal documents continued to describe ongoing problems with Uber's reporting processes.

143.    In particular, Uber knew that feedback submitted via the ratings and feedback tags screen was relevant to SA/SM, and that people reporting SA/SM would have difficulty knowing they were *supposed to* report via a different channel.

144.    An October 30, 2018 internal email from safety employee, Emma Pan, to Dhruv Tyagi (Product Manager, Rating and Tipping) says:

One challeng[e] for rider/driver to give feedback[] to Uber is that **sometimes they don't know where to submit a tic**ket. I saw that there is a "contact support" link on the feedback tag page when some tags are selected. Have you thought of expand[ing] this link to all tags and also link it to ticket submission system?"[100]

---

[96] Greg Brown 30(b)(6) Deposition 2025.06.17 at 182:25-186:12, 189:15-192:6.

[97] Even if a rider did use Uber's preferred route of reporting, the documents produced by Uber demonstrate once again that there is still no option for a user to report a sexual assault or sexual misconduct incident. Greg Brown 30(b)(6) Deposition 2025.06.17 at 188:4-189:4; 207:4-210:13. The best a rider could do is to choose an incorrect feedback tag. Id. at 189:15-190:16. When asked how a user should handle this, Uber's corporate representative suggested that a rider should, after clicking through the entire help flow, select the option to call Uber and speak with a representative. Id. at 207:4-210:13.

[98] Todd Gaddis 30(b)(6) Deposition 2025.07.11 at 128:2-9 and Exhibit 1570.

[99] Exhibit 1570 to Todd Gaddis 30(b)(6) Deposition 2025.07.11, Sexual Assault / Misconduct Reduction Strategy (UBER_JCCP_MDL_000251111) at -1111.005.

[100] Email, Quick link to submit tickets, December 6, 2018, UBER_JCCP_MDL_000108957, at -8961, emphasis added.

She then notes:

> "[It] seems tag 'Driving' has the 'contact support' link but 'Professionalism' does not. What actions will agents take for 'Driving' that cannot be applied to 'Professionalism'? Mr. Tyagi responds: "Hmm Professionalism *should* probably have the link. If it doesn't that's something that I think would be a good addition to the rating flow." Ms. Pan responds: **"Could you add [the link] to "professionalism" ? and to "Conversation" and "Comfort" as well? Data shows these three tags are most likely to lead to Sexual Assault/Misconduct Tickets**."[101]

Mr. Tyagi then adds another Uber employee to the conversation and asks about the best process to add a "Contact Support" link. He adds "**Safety has seen some very compelling data about feedback tags and future behavior**."[102]

Emma Pan added Roger Kaiser and Eric Shroeder to the email thread, explaining to them:

> Roger and Eric, One reason for underreported safety incidents is that some riders do not know how to submit tickets or contact support. There is a 'contact support' link on the rating page (pasted below) that could guide riders to submit a ticket easily. However, this link only shows up when riders select certain tags on the page, e.g., 'driving.' So I suggested Dhruv (PM of this page) to present this link when riders select "professionalism", "conversation" and "comfort" which, according to my analysis, are the top three tags related [to] SA/SM incidents. So riders could submit SA/SM tickets easily. This may increase inbound tickets to Support centers. So I add you two to this loop to see if you have any comments or concerns.[103]

> However, on November 12, 2018, Roger Kaiser responded: "All- **Let's please make sure we are not implementing any changes that can impact volumes without first presenting a business case** and giving IRT around the world time to plan for and incorporate the change."[104] It appears that the conversation stopped there.

145.    In 2020, Uber still knew that its rider reporting processes were problematic. Discussing feedback tags that are given via the rating screen that appears, by default, at the end of every trip, Uber acknowledged that these tags were an important source of safety information:

> **Underreporting:** Allows us to collect information from users who may not take the time to write in a report, while also not increasing support cost.

---

[101] Ibid., emphasis added.

[102] Ibid., emphasis added.

[103] Ibid. at -8959.

[104] Id. at -8957, emphasis added.

**Additional signal**: provides an additional signal for patterns of behavior that may be concerning and warrant removal from the platform.[105]

Uber also acknowledged problems with the feedback tag process:

**Limited Space:** tags are limited in character count, making it difficult to describe the specific feedback sought.

**Lack of Details:** tags are a binary outcome with no additional detail to help understand the user's feedback, including evaluation of the effectiveness of the tag.

**Abuse of Tags**: without context, it is incredibly difficult to separate genuine user feedback from those who use tags for purposes other than feedback.[106]

146.    Uber discussed a number of options including "invest fully to make tags useful for education and action" or "invest in improving tag design which could include requiring more details for safety-related tags." But another option listed was: "Proceed as planned without additional investment…" It appears that Uber opted for this last option.

147.    In 2019, Uber conducted Joint-Driver/Rider Focus Groups and Rider Usability Interviews. Within the report on page 10, Uber indicated that the focus group included 6 drivers whose 1-4 star ratings had included a 'professionalism' tag. In reference to the 'professionalism' tag, Uber noted "**The Safety Data Science team have reported on this (undefined) tag as being a precursor to safety-related incidents. It is being eliminated**."[107] There is no further explanation as to the reason for this change nor any provision of user data supporting the removal of this tag from these focus groups and user interviews. Eliminating a tag that Uber's own Safety Data Science team identified as a *precursor* to safety incidents is not a neutral housekeeping change—it removes an early-warning signal from the system. Making that change without a documented rationale, stakeholder consultation, or impact analysis runs counter to ISO 31000's expectations that risk management be integrated into decision-making, with controls evaluated, monitored, and transparently recorded (integration, risk treatment, monitoring/review, and recording/reporting). It also contradicts ISO/IEC 31010's guidance to use systematic techniques to assess the effectiveness of controls before altering or retiring them. From a human-centered design standpoint (ISO 9241-210), removing a safety-relevant cue without iterative evaluation and user-context validation degrades the organization's ability to detect, triage, and mitigate risk when it matters most. In practical terms, the decision is likely to suppress leading indicators, biases safety metrics, and delays intervention—thereby increasing foreseeable harm to riders and drivers.

148.    From a human-factors and risk-management perspective, once Uber recognized that the 'professionalism' tag yielded predictive information relevant to SA/SM risk, disabling or

---

[105] Pros and Cons of Feedback Tags, 2020 PPT Presentation, UBER_JCCP_MDL_004522493, at Slide 6.

[106] Ibid.

[107] Exhibit 1104 to Greg Brown 30(b)(6) Deposition 2025.06.17, Quality / Safety UX Research, Joint-Driver/Rider Focus Groups & Rider Usability Interviews, (UBER_JCCP_MDL_000508970), at Slide 10, emphasis added.

deprioritizing that tag reduced the system's ability to detect leading indicators, undermining hazard monitoring, trend analysis, and control verification. Good practice is to preserve and integrate such signals into a defined escalation pathway rather than remove them (Leveson, 2015).

149.     The Ratings and Feedback screen suffers from usability issues due to unclear categories (e.g., "Safety Issue" vs. "Driver Behavior" which can be viewed as related or synonymous depending on a user's mental model), lack of confirmation that a report was submitted, and lack of any option appropriate to sexual misconduct. (April 2025 and July 2025 Usability Assessments at Appendices E, F, G). These issues generate excessive task complexity and high cognitive load for a safety-critical function and are all contrary to established human-centric design and usability practices. This is in stark contrast to the prominence, clarity, and ease with which a rider can call an Uber ride, as demonstrated by the August 2025 Usability Assessment. Unlike the complexities of reporting an SA/SM incident, the flow to request an Uber ride is highly visible, clearly labeled, quickly accessible, and provides various avenues of confirmation that users were/had achieved their goal task correctly.

150.     One anticipated outcome of these sorts of usability issues is underreporting. In fact, 59.7% of all Uber trips are given no ratings.[108] Knowing underreporting is occurring yet not adapting workflows reflects a missed obligation to base design on actual context (ISO 9241-210:2019, 5.3) and to evaluate designs against requirements under those conditions (5.6). Demonstrating usability outcomes (effectiveness, efficiency, satisfaction) in the specified context is required by ISO 9241-11:2018 (definition 3.1; measurement guidance Clauses 5–6).

151.     Uber's failure to properly design and review its reporting flow is particularly problematic given the importance of user feedback and reporting to risk identification and assessment. As noted throughout this report, user reporting provides a company with invaluable data and information to accurately identify the level and prevalence of risk, and to monitor and evaluate the efficacy of any design controls that are intended to mitigate those risks. That is, it informs whether and how often the risk is occurring, and whether and to what extent any design controls are actually working to help mitigate that risk. All of which are critical data points for proper human factors and human safety systems design.

---

[108] November 2018, Uber Analysis of Rider-to-Driver Feedback Tags (US only), UBER_JCCP_MDL_003273474 at -3486.

152. The Ratings and Feedback screen does not provide any tag for reporting sexual assault or sexual misconduct (see below screenshot).[109] Per Uber's analysis of feedback tags, this screenshot reflects the tag menu as it existed in 2018.[110]



---

[109] While the app has changed over time, Mr. Brown's testimony matched the screenshots available to me from Uber's documents. As Mr. Brown testified: "I understand that the app has changed a number of times over the years and so it's difficult to parse through exactly what may have existed when." Greg Brown 30(b)(6) Testimony 2025.06.17, at 206:12-15.

[110] November 2018, Uber Analysis of Rider-to-Driver Feedback Tags (US only), UBER_JCCP_MDL_003273474, at -3480.

153.    Below is a complete menu of all feedback tags from 2018:[111]

## Full List of Feedback Tags

| | | | |
|---|---|---|---|
| Driving | Driver Navigation | GPS Route | Traffic |
| Car Quality | Car Smell | Cleanliness | Music |
| Pick up | Walking | Price | Uber App |
| Professionalism | Conversation | Comfort | Other |
| POOL: Co-rider | POOL: Match | POOL: Too many matches | |

☐  Tags always displayed on screen

<span style="color:red">ATTORNEY-CLIENT PRIVILEGED WORK PRODUCT</span>

ENTIAL                                                    UBER_JCCP_MDL_003273482

154.    Uber's corporate representative Greg Brown acknowledged that sexual assault is not one of the options:

> Q.  So just to recap, there is no tag to report a sexual assault anywhere on this flow, right?
>
> A.  That's correct.[112]

155.    Based on the analysis above and established human-factors evidence, riders use the path the app puts in front of them. In Uber, that path is the post-trip ratings and feedback screen. Riders are unlikely to search for separate or hard-to-find channels to report sexual misconduct. If the app does not show a clear "Report Sexual Misconduct" option, most riders will try to use the ratings/feedback screen—often by selecting an indirect tag—or they will not report at all. This aligns with human-centered design principles: match users' mental models, make critical actions obvious, and minimize steps.

156.    Because there is no option for "sexual assault," "sexual misconduct," "driver misconduct," "inappropriate behavior," or "safety issue," the rider who wishes to leave feedback

---

[111]  November 2018, Uber Analysis of Rider-to-Driver Feedback Tags (US only), UBER_JCCP_MDL_003273474 at -3482.

[112]  Greg Brown 30(b)(6) Testimony 2025.06.17 at 187:6-9.

is likely to either (a) give up and submit no rating or no tag, or (b) select the closest available tag. "Professionalism" is a broad category that could encompass sexual misconduct. A driver making flirtatious comments might fall under "conversation." If the rider felt uncomfortable due to the driver's misconduct, they might select "comfort." "Other" is also an option. No other tags on the full menu would be suitable to describe a sexual misconduct incident.

> Q.  And if a driver -- or if a passenger were sexually assaulted, which [feedback tag] should they choose?
>
> A.  I think a really important piece of context missing here is while feedback tags in general, I think, **have proven to provide useful data associated with a rating, generally speaking**, we don't consider the feedback or ratings process as a support channel. ….
>
> ….
>
> Q.  Mr. Brown, no doubt, as an Uber employee, you're intimately familiar with what a user is supposed to do.  But your average user who doesn't work at Uber, what are they going to look at on this screen to understand that this isn't where you report a sexual assault?  Can you show me what tells them what they should do on here?
>
> A.  **I don't think we would provide explicit instructions about reporting a sexual assault in this specific context.**[113]

A few pages later in the same deposition:

> Q.  And so a rider, in order to continue getting through the flow, would just have to choose one of these even though it was the closest thing but it wasn't actually accurate, right?
>
> A.  If a rider were to want to use the feedback tags process in order to report a sexual assault, my assumption is that they would have to choose, as you called it, the closest thing in order to have the contact support button show up as a mechanism to get into the help center, …..
>
> Q.  So really at this point a passenger's options are choose an inaccurate tag or give up, right?
>
> A.  **If the rider were going through this flow specifically as the sole and only means to report, unfortunately, that they had been sexually assaulted, sure, they would have had to click through.**[114]

---

[113] Greg Brown 30(b)(6) Deposition 2025.06.17 at 182:25-186:12, emphasis added.

[114] Greg Brown 30(b)(6) Deposition 2025.06.17 at 189:15-192:6, emphasis added.

157.    One would expect Uber to receive salient safety data in the form of feedback tags. That is exactly what Uber found.[115]



### 1.    Ratings/Feedback Tags as Safety Signals Requiring Monitoring and Follow-Up

158.    From a human-factors perspective, Uber needed a reporting mechanism that produces high-fidelity, low-effort capture of sexual assaults and the misconduct events that precede them. Because effective risk control depends on data quality, the interface should make the reporting path obvious within the core trip flow, minimize navigation and input burden, use plain language, and preserve signals (including ratings/tags) for escalation. Uber also understood that safety hinges on complete and accurate reports; the design therefore should have been engineered to elicit them.

159.    Uber understood that sexual assaults caused by drivers are twelve times more likely to be caused by a river who has previously been reported to Uber for sexual misconduct.[116]

160.    Uber knew as of 2017 that sexual assaults caused by drivers are .[117]

---

[115]    November 2018, Uber Analysis of Rider-to-Driver Feedback Tags (US only), UBER_JCCP_MDL_003273474 at -3495, highlights added.

[116]    Exhibit 1091 to Greg Brown 30(b)(6) Deposition 2025.06.17, Sexual Assaults: Trends + Correlates, (UBER_JCCP_MDL_001687315), at -7322; Greg Brown 30(b)(6) Deposition, 2025.06.17 at 35:22-36:9.

[117]    Exhibit 1092 to Greg Brown 30(b)(6) Deposition 2025.06.17, Changes in Power of Ratings Over Time, (UBER_JCCP_MDL_005389723) ; Greg Brown 30(b)(6) Deposition 2025.06.17, at 41:2-7; see also Greg Brown 30(b)(6) Deposition 2025.06.17, at 62:13-63:2 (Uber's rating system provides a strong signal for safety incidents, including sexual assault and sexual misconduct). Uber was aware that its policies had led to ratings inflation. In a 2018 PowerPoint, Uber states that over the three prior years (2015, 2016, and 2017), the predictive power of its rating system had decreased and had been diluted by 5-star "junk ratings." Exhibit 1092 to Greg Brown 30(b)(6) Deposition 2025.06.17, Changes in the power of Ratings Over Time

161.    Even without a direct reporting path, Uber received indicators of risky driver behavior through the ratings interface and non-specific tags such as "Professionalism," "Comfort," "Conversation," "Other," and "Not_Polite." In practice, riders used these categories to convey sexual misconduct concerns when a dedicated option was not presented. From a human-factors and risk-management perspective, these signals are leading indicators that should be incorporated into hazard monitoring—tracked against thresholds, linked to a defined escalation path, and analyzed for patterns. Until the reporting flow is redesigned with a clear sexual-misconduct option, such tags and ratings should not be discounted; they provide meaningful safety intelligence.

162.    Uber was responsible for conducting follow-up outreach to clarify the nature of the reported misconduct, especially when reports arrived via non-specific ratings/tags. From a human-factors perspective, ambiguous inputs are expected in the environment of use; systems should be error-tolerant and close the loop to turn low-fidelity signals into actionable data. Appropriate outreach (e.g., discreet in-app prompts, message/email/SMS follow-ups, or contact from trained staff) (1) reduces ambiguity and false negatives, (2) lowers memory/recall burden by pre-populating trip details, (3) aligns with users' mental models by keeping the workflow simple and guided, (4) supports trauma-informed reporting by letting users respond on their timeline, and (5) enables severity triage and escalation thresholds. Given the safety-critical nature of SA/SM and known underreporting, failing to follow up on indirect signals undermines hazard detection, risk control, and verification that mitigations are working.

## VIII.    USABILITY ASSESSMENTS OF UBER'S IN-APP REPORTING PROCEDURES

163.    This section analyzes Uber's in-app reporting user flows and is informed by three Usability Assessments that I performed. As set out below, the usability assessments demonstrate that Uber's current in-app reporting procedures fall well below expected usability standards for human systems design, and that the current procedures continue to have usability flaws that were previously flagged—but seemingly never addressed—by Uber (discussed above).

164.    The usability assessments in this case are expert lead Heuristic Evaluations, which is a common and accepted approach in Human Factors to evaluate a product or features' usability prior to conducting costly usability testing with representative users. These assessments provide valuable insights regarding key areas of concern pertaining to the design and usability that will highlight needed design changes early in the design and development process as well as help focus user testing efforts for companies.

165.    For this Human Factors Assessment report, I conducted three Usability Assessments. The first occurred on April 8, 2025 (See Appendix E) and analyzes Uber's in-app reporting flow starting from the home screen (consistent with a user re-opening the app after a trip to submit feedback post-trip). The second occurred on July 15, 2025 (See Appendix F) and analyzes the reporting flow from the "Rate Your Trip" pop-up, which appears immediately after a ride is concluded. The third occurred on August 25, 2025 (See Appendix G) and analyzes the user flow to request a ride on the Uber app.

166.    For each usability assessment, information was compiled by me and a trained and BCPE certified Sophic Synergistics research assistant, who navigated through the respective user

<hr />

(UBER_JCCP_MDL_005389723); Greg Brown 30(b)(6) Deposition 2025.06.17, at 66:14-17; 68:13-23.

interface flows on the Uber app, documented each step through screenshots, and tracked time to goal completion. Where multiple options existed, each relevant user choice pathway was also documented.

167.    Following the above documentation, I conducted a review of the user flows and applied the evaluation structure laid out below.[118]

    a.    <u>Scenario Setup & Context Definition</u>: I began by identifying the starting point in the app, and by defining and noting any environmental condition consideration, e.g., post-trip, high-stress, trauma-affected state. That is, user objectives within the Environment of Use context which includes potential stress inducing events precipitating the task to report.

    b.    <u>Task Analysis & Step-by-Step Observation</u>: The user flow was broken down into discrete task steps, noting required taps, scrolls, and decision points. For each step, I assessed and identified potential usability issues in line with Human Factors standards.

    c.    <u>Cognitive and Emotional Load Evaluation</u>: For each step, I also assessed and identified interface clarity, language specificity, and navigation flow under the Environment of Use considerations. This includes post-trauma stress where appropriate, and consideration of error-prone conditions and the likelihood of abandonment.[119]

    d.    <u>Performance Metrics & Risk Implications</u>: For the overall flow, I assessed and identified total clicks, scrolls, and redirections required to complete task, as well as reviewed overall time-to-completion (or failure point), and potential for task abandonment.[120] This includes evaluation of whether the flow meets standards of usability for effectiveness, efficiency, and satisfaction.

    e.    <u>Standards-Based Benchmarking</u>: I then compared observed usability and safety performance against Human Factors standards, including ISO 9241-11, ISO 9241-210, ISO/IEC 25010, ISO/TS 18152, ISO 31000, and ISO/IEC 31010. This includes evaluation as to whether the flows conformed with standards for (i) clear, explicit sexual assault reporting labels; (2) environment of use/trauma-informed design; and (3) risk controls for foreseeable safety-critical events.

## A.    SUMMARY OF FINDINGS FROM THE APRIL 2025 USABILITY ASSESSMENT

168.    The April 2025 Usability Assessment provides an expert Human Factors evaluation of Uber's in-app reporting user flow post ride and after driver feedback was left. See Appendix E.

169.    The assessment start point was the Uber app home screen and the evaluation focused on users in an Environment of Use context of having experienced either a sexual assault or misconduct event, and thus assumed user had a need to report a sexual assault/misconduct event. Under these use conditions, it was imperative to consider users' mental and emotional states when

---

[118] See also ISO 9241-210 and ISO/TS 18152.

[119] ISO/TS 18152:2010, ISO/IEC 25010:2023

[120] ISO 9241-11:2018, ISO 31000:2018

Expert Report of C. Rando                                                                                         54

assessing ease or difficulty of navigating the user flow in an attempt to accomplish the user goal of reporting a sexual assault or misconduct.

170.    The April 2025 Usability Assessment identified the following usability issues:

a.  Labeling and mental models. The interface did not provide a direct, clearly labeled option to "Report sexual assault." Repeated use of broad phrases such as "Safety issue / Safety incident report" did not align with users' goals or mental models for reporting a serious crime. This undermines usability as defined in ISO 9241-11:2018, Clause 3.1 (effectiveness, efficiency, satisfaction in a specified context of use) and contravenes the human-centered design process in ISO 9241-210:2019—derive requirements from the context of use (5.3), produce design solutions that meet those requirements (5.5), and evaluate the designs against requirements (5.6). A simple, evidence-based method such as card sorting could have been used to validate labels and information architecture with representative users, making critical actions immediately recognizable even under stress (Spencer, 2009).

b.  Long, confusing task flow. The reporting process required trial-and-error navigation (e.g., ~15 steps / 16 taps) and redirected users back to prior screens, creating uncertainty about progress or error state. This indicates poor usability outcomes per ISO 9241-11:2018 (see Clause 3.1 for the definition and Clause 6 for using measures) and conflicts with ISO/IEC 25010:2011 (Clauses 4.1/4.2) usability sub-characteristics—especially appropriateness recognizability, learnability, operability, and user error protection. It also fails to heed ISO/TS 18152:2010, 6.4 (Design for human capabilities), which emphasizes minimizing cognitive load for users in emotionally taxing situations.

c.  Phone call endpoint and feedback. The "call an Uber representative" option lacked context about how the issue would be handled as a sexual-assault report, and the app's prompt to "call 911 first and return" forced deep re-navigation to reach the same point because it didn't appear to desired navigation pathway. The absence of clear confirmations and reliable return paths conflicts with ISO/IEC 25010:2011 (Clauses 4.1/4.2) usability sub-characteristics (operability, user error protection) and with validating designs against user requirements in ISO 9241-210:2019, 5.6.

d.  Excessive time to completion and risk governance. Taking up to ~45 minutes without reaching a clearly labeled sexual-assault reporting option is unreasonable and dangerous in a time-critical context. From a risk-management standpoint, organizations should embed risk management in decision-making (ISO 31000:2018, 5.3 – Integration) and apply appropriate risk-assessment techniques from ISO/IEC 31010:2019, Annex B (e.g., Scenario Analysis, Bowtie, FMEA, Risk Matrix) to identify design-induced failure modes and prioritize mitigations.

171.    In sum, the workflow fails to meet baseline international standards for usability (ISO 9241-11:2018, Clauses 3.1 & 6), human-centered design (ISO 9241-210:2019, 5.3/5.5/5.6), usability sub-characteristics (ISO/IEC 25010:2011, 4.1/4.2), and human-system design for capability limits (ISO/TS 18152:2010, 6.4). The design introduces preventable barriers, increases

error likelihood, and disregards foreseeable use cases involving trauma-affected users. Applying these standards during design and evaluation would have likely identified the design flaws inherent within the app and enabled Uber to better characterize risk and better define and predict actual SA/SM rates occurring on its Platform. This information would have placed Uber in a position to better understand its risk posture and the hazards at hand and consequently what the most impactful design controls would be given the user behavior data and risk analysis. The point of a Risk Assessment is to turn real-world user and incident data into prioritized, testable design controls that drive the interface toward safer default paths and reduce residual risk; Uber missed the point by treating the workflow and reporting data as administrative afterthoughts rather than as the primary inputs for redesigning the app to prevent foreseeable errors and accurately surface SA/SM risk.

### B. SUMMARY OF FINDINGS FROM THE JULY 2025 USABILITY ASSESSMENT

172. The July 2025 Usability Assessment provides an expert Human Factors evaluation on Uber's in-app reporting user flow, immediately following ride beginning at the driver feedback pop-up screen once a ride concludes. See Appendix E.

173. The July 2025 Usability Assessment begins from an interstitial "Rate Your Trip" screen that pops up after a ride is completed. The evaluation focused on users in an Environment of Use context of having experienced either a sexual assault or misconduct event, and thus assumed user had a need to report a sexual assault/misconduct event. Under these use conditions, it was imperative to consider user's mental and emotional states when assessing ease or difficulty of navigating the user flow in an attempt to accomplish the user goal of reporting a sexual assault or misconduct.

174. The July 2025 Usability Assessment identifies the following usability issues:

   a. <u>Lack of clear, discoverable entry point</u>. On the ride-completion screen there is no plainly labeled, readily discoverable option to report a sexual assault or safety issue. Ambiguous prompts (e.g., "Rate" and "Tip") reduce the likelihood that users can achieve the intended goal of reporting a sexual assault or misconduct promptly.

   b. <u>Gating access via star rating.</u> The assessment highlighted that Uber restricted access to reporting unless the rider rated the trip 4 stars or less—meaning riders who selected 5 stars, intentionally or not, had no immediate reporting option. Likewise, a rider who opted not to select any star rating (via a "skip" option) is not presented with an immediate reporting option. In the case of no-rating or 5-star rating, the rider is taken back to the home page (the starting point of my April 2025 Usability Assessment). For users who rate their drivers 4-stars or less, the available reporting flow reveals similar issues as those identified in my April 2025 assessment (see above).

   c. <u>Ambiguous categories and decision load</u>. If a rider rates 4 stars or less, they are shown categories irrelevant to sexual assault/sexual misconduct (e.g. "fast driving," "vehicle cleanliness," "Driver not polite," "Didn't follow map," "Illegal driving"). Additional, but still ambiguous categories, are nested within an option to identify "more issues," which, in turn presents riders with

Expert Report of C. Rando                                                                 56

"Dangerous driving," "Vehicle," "Driver behavior," "Navigation," and "Pickup/Dropoff." Nesting "Driver Behavior" (an ambiguous descriptor) under "More Issues" without an explicit sexual-assault option forces guessing and increases cognitive load. The ambiguities persist even when a rider selects "Driver Behavior," which leads drivers to seven additional options, none of which explicitly state an assault (of any kind) (the most applicable option presented is "Other"). As with the previous step, this increases confusion and stress for the user, increasing time spent in an already stressful and time-sensitive situation

    d.   Insufficient support for environment-of-use scenarios. The flow does not adequately support reporting under stress/duress immediately after an incident.

    e.   No Direct Input or Confirmation. The flow ended with a return to the rating screen and no confirmation or opportunity to elaborate (beyond the selection of "Other" issue), undermining effectiveness and satisfaction.

    f.   Lack of Predictable Recovery. If the wrong star rating or category was chosen, there was no clear recovery path, violating human-centered design expectations for iterative evaluation and refinement.

## C.    SUMMARY OF FINDINGS FROM THE AUGUST 2025 USABILITY ASSESSMENT

175.    The August 2025 Usability Assessment provides a Human Factors expert evaluation of Uber's request a ride user flow. See Appendix G.

176.    The August 2025 Usability Assessment begins from the Uber app's home screen. The evaluation focused on a nominal user Environment of Use case considering an Uber user whose goal includes requesting a ride via the Uber app service.

177.    The August 2025 Usability Assessment demonstrates that the Uber app design applies usability standards positively creating an app that supports ease of use and access, clarity of language, and confirmatory points to reassure users that they were on the correct path as they move through task steps within the app. Additionally, also providing confirmation to users that they had successfully completed the task of requesting an Uber ride. The user flow presents a usable interface that supports ease of use and activity: prompts and icons provide relevant cues at the right moments, supporting efficient, effective, and satisfactory completion under normal conditions. This includes:

    a.   Clarity and Low Effort. The assessment of Uber's in-app request-a-ride process was found to be a straightforward, low-effort sequence. The interface, as inspected, supports task completion with a minimal number of steps (7 were observed, with one step consisting of passively waiting/reading prompts while Uber selected a driver). For example, when selecting a drop off location, a user is provided with multiple confirmation modes, address input along with a map view to confirm. The language used was clear and intuitive, with possible points of ambiguity clarified by explanatory language. For example, should a user be unsure about the available ride options, e.g., UberX, UberX priority, Comfort, Uber provides a easily understandable and short sentence to explain the distinctions in pricing and labeling. The waiting interval was not instrumented

but was on the order of <1 minute, with the total time to request a ride taking roughly 3 minutes (8:39am start time to 8:42am end time).

b. <u>Alignment with User Mental Models</u>. The "request a ride" flow maps to commonly learned patterns from map-based apps (e.g., current location above destination).

c. <u>Low Task Complexity and Decision Load (Expert Judgement).</u> The user flow required 7 actions, with one passive "wait/read" step, app supported decision points and low time on task steps. That is, the flow provides clear labelling, predictable control, and low error propensity in typical conditions. Allowing for ease of navigation with minimal workload concerns such as could be caused by ambiguous language and misalignment with user mental modals that could drive error rates, additional steps and increased time to complete.

## IX.    CONCLUSION

178.    As noted at the outset, I reserve the right to amend this report and my opinions should additional documentation / information be provided and/or reviewed from the date of this assessment report.

Dated: September 26, 2025

Cynthia Rando, CHFP

## APPENDIX A

# Cynthia M. Rando
978-660-2808

HUMAN FACTORS & ERGONOMICS | BUSINESS STRATEGY
cynthiarando@sophicsynergistics.com

*Human Factors & Ergonomics • Human Safety • Business Strategy & Innovation*

Cynthia Rando is the Founder/CEO of Sophic Synergistics, LLC, a consulting firm that is focused on Building Better Businesses by Design™.  She has enjoyed 20+ years in the field of Human Factors including 12+ years at NASA's Johnson Space Center in Houston, TX. During this time she provided extensive leadership to the organization addressing several critical areas in Human Factors and Human Safety in Design including: interface design, ergonomics, medical devices, safety and risk mitigation strategies, usability and user experience, accident investigation and root cause analysis activities.  Additionally, she was instrumental in implementing several culture change initiatives and innovative solutions for the agency including: the U.S. Governments' first use of crowdsourcing as a disruptive business model, the development of the Center of Excellence for Collaborative Innovation and the NASA Human Health and Performance Center, and the transition of the Extravehicular Activities Office to the Extravehicular Activity and Human Surface Mobility Program.

Cynthia is a Certified Human Factors Professional and Vice President of the Board of Certification in Professional Ergonomics (Human Factors). She received her B.S. and M.S. in Human Factors Engineering from Clemson University and an MBA from Northeastern University.  She has also served as an associate professor at University of Houston Clearlake providing instruction in Human Factors, Safety and Ergonomics course material.  Currently, serves as an expert witness in cases involving human safety issues including: Product Liability, Medical, Cautions & Warnings, Slips, Trips, and Falls and Design issues.  She also serves as a Human Factors Advisor to the Texas Medical Center Innovation Incubator's medical device startup cohorts and is a founding member of the Texas Committee for Autonomous Systems.

**Human Factors Engineering • Usability/Human Centered Design • Ergonomics
Cognitive Psychology • Industrial Engineering and Safety Engineering • Expert Witness • Accident Investigation and Root Cause Analysis • Decision Support Development & Process Design •
Adaptive Problem Solving • Business Administration • Strategic Communications • Innovation • Collaboration •
Change Leadership • Entrepreneurship**

### HUMAN FACTORS ENGINEERING & ERGONOMICS EXPERTISE

- Provides comprehensive **human factors and human safety expertise** to many industries including: government, medical, oil and gas, legal, gaming (VR/AR) etc.

- Serves as an expert witness in **injury, driving, perception and performance** and **product liability** related cases including **medical** incidents.

- **Develop and lead research** efforts that guide the design of human interfaces including human health and ergonomic related products and operations.

- Provide human factors **government requirements** development, interpretation and user testing guidance (NASA, MIL STD 1472/882, FDA/ANSI/AAMI STDs etc.)

- Provided **root cause analysis** and **accident investigation** assistance to NASA for various mission events and mishaps.

- Directed stakeholder coordination and interpretation of **human safety** requirements for the Human Systems Integration Requirements document CxP 70024, NASA STD 3000/SSP 50005 and SSP 57000.

- Developed consistant **hazard labeling** approach for NASA and **caution and warning** application for the ISS use within operational procedures.

- Focused on **improving and evolving technology**, equipment and work environments to complement human behavior and capabilities.

- Successfully **implemented and applied human factors** and **safety expertise** in creating innovative solutions for NASA, aimed at enhancing mission capabilities for human spaceflight and reducing risk to the human.

- Provided **consulting support** to NASA for crew procedures by developing a basic understanding of robotics operations **and** provided **valuable feedback** on numerous robotics procedures.

- In-depth practice in hardware and system design, crew evaluations, requirements interpretation, application and verification, International Space Station (ISS) issue mitigation and **program integration**.

## LEADERSHIP & BUSINESS DEVELOPMENT EXPERTISE

- Convey the **"big picture" thinking** strategically throughout the organization empowering employees to produce beyond expected results.

- Demonstrate imagination, insight, and boldness to present challenges that **bring out the best in people** and bring them together around a shared sense of purpose.

- Create a highly dynamic work environment that facilitates innovation and continuous improvement.

- Plan, develop and implement strategic plans for each Business Unit with **a bottom-up and top-down approach** to achieve established objectives with a strong focus on improving shareholder returns.

- Conduct in-depth analysis of business strategy, identifying the best policies for development and the avoidance of foreseeable difficulties with a focus on continuous progress.

- Initiate appropriate actions to **minimize risks** and align performance goals with business targets.

- Institutionalize new strategic **communication models** to effectively convey NASA brand messaging and inspire public action and support

## INNOVATION & STRATEGIC PLANNING EXPERTISE

- Conducted all **market research** and developed the Request for Proposal that defined the **Statement of Work** for Innovation Service Provider government contracts.

- **Researched and recommended** strategic revenue generating opportunities associated with the marketable properties of the organization.

- Supported the Board Executive by **providing strategic direction** based on knowledge of operating business issues, competitive analysis and broader market research data.

- Managed open innovation service provider (OISPs) contracts, schedule and deliverables by directing training, challenge and technical development and posting, including communications and process management efforts between NASA and the OISPs.

## OPERATIONS MANAGEMENT EXPERTISE

- Ensure continuous upgrade of computing and decision technology, including telecommunications and networking systems, to meet operational needs.

- Attract, develop and retain key management staff and strategic partners, ensuring that the company has the talent in place to meet its competency needs in the future.

- Work closely with the Human Capital management teams to develop divisional succession plans.

## PUBLIC OUTPUT EXPERTISE

- Design, implement and evaluate programs for the membership services team and assisted them with initiatives.

- Developed innovative courses to provide career development opportunites for the organization and personnel empowerment

- Instructed college level course in ergonomics and provide on site instructional training and development

## PROFESSIONAL BACKGROUND

**Sophic Synergistics LLC.**                                      **October 2014-Present**
CEO

- Sophic Synergistics is a Houston based consulting firm offering a unique and comprehensive business solution strategy actualized through a human centered approach.  We Build Better Businesses by Design™, focusing on building environments, products, and services that deliver the best in human centered design and user experience outcomes for every industry.

- Specialty areas include: Human Factors, Human Health and Performance, Medical Device and Software Applications Ergonmics, Government Requirements Application, Workplace Assessments, Root Cause Analysis and Expert Witness Assistance

- Director for the Board of Directors for the Board of Certification in Professional Ergonomics

- Human Factors Advisor to the Texas Medical Center Innovation Incubator- Medical Device and Software

- Advisor/Committee member for the Texas Committee for Autonomous Systems

**D.B. Consulting, Inc.** – *Various Positions Held*              **April 2013-November 2015**
SUPERVISOR, STRATEGIC COMMUNICATIONS AND EXTERNAL RELATIONS | *Nov 2013-Present*

- Providing leadership assistance to NASA's External Relations and Public Affairs Office by developing and incorporating strategic communication models.
- Acting as Public Affairs Officer for NASA.
- Identifying and fostering development of collaborative partnerships that support external outreach and internal coordination needs.

*Selected Accomplishments:*

- Developed Agency outreach initiatives and communication campaigns such as "SuitUp" for EVA 50th Anniversary and International Space Station Program's Destination Station.

- Provided oversight to JSC Space Flight Awareness Program Activities, JSC Official Communications, including Press Releases, Media Appearances/Social Media activities and strategies, and VIP guest support.

MANAGER HUMAN SYSTEMS ACADEMY | *April 2013-Nov 2014*

- Manager of the Human Systems Academy at NASA Johnson Space Center.
- Developed the operational and sustainability strategy to support the Human Systems Academy, including course content offerings and communications to support the strategic plan and goals of the HSA.
- Defined data analysis methods to monitor the success and vitality of the HSA and identified opportunities for expansion and collaboration, including media and social media (e.g. Facebook, Twitter, YouTube etc. ) strategies and content in support of astronaut public outreach communications during their missions and personal global outreach campaign
- Identified unique partnership opportunities internal and external to the organization

Expert Report of C. Rando                                                     61

**University of Huston Clearlake** – Houston, TX **Jan 2014-Jan 2015**

ADJUNCT PROFESSOR ERGONOMICS

- Provided course instruction and communications covering topics in human factors and ergonomics, focusing on the biological/engineering principles of design for a safe and efficient workplace environment.
- Instructed in the following areas: human factors, biomechanics, anthropometry, heat and cold stress, vibration, pressure, illumination, work station and tool design and the presentation of visual, auditory and other sensory forms of information.

### EARLIER POSITIONS HELD

**Independent Human Factors Consultant**                    **May 2010-October 2014**

**Wyle, Integrated Science and Engineering Group** – Houston, TX          **May 2010-April 2013**
INNOVATION AND STRATEGY COORDINATOR

**MEI Technologies, Inc.** – Houston, TX                         **Jan 2004-May 2010**
  *Various Positions Held:*
INNOVATION AND STRATEGY COORDINATOR | *Jun 2008-May 2010*
SENIOR HUMAN FACTORS ENGINEER | *Jan 2004-May 2010*

### EDUCATIONAL BACKGROUND & CREDENTIALS

**Certified Human Factors Professional** (CHFP) – Board of Certification in Professional Ergonomics (BCPE)
Director, V.P. of BCPE

——————— *Academic Qualification* ———————

**Master of Business Administration, Specialization in Entrepreneurship and Innovation**
Northeastern University, Boston MA

**Master of Science in Applied Psychology, Human Factors Engineering** – Clemson University, Clemson, SC

**Bachelor of Science in Psychology** – Clemson University, Clemson, SC

### AWARDS

- Recipient of the JSC Center Director's Team Award for Destination Station (*2014*)
- Recipient of the ITAMS Excellance Award (2014)
- Recipient of the JSC Center Director's Innovation team award for NASA@work implementation and management for the agency (*2011*)
- Recipient of an excellence in innovation award from Wyle Integrated Science and Engineering (*2011*)
- Recipient of a certificate of excellence for outstanding contribution to the implementation and success of the NASA@work internal NASA collaboration platform (*2010*)
- Recipient of a certificate of excellence for outstanding contribution to the success of the open innovation service provider pilot activities for NASA (*2010*)
- Certificate of appreciation for the transformation of the International Space Station (ISS) to six person crew capabilities (*2009*)
- Recipient of a NASA Crew and Thermal Systems Division award for exemplary contribution to the development and testing of the Crew Quarters mock-up in support of Critical Design Review (*2008*)
- Recipient of a NASA Bioastronautics Bravo Award for work done to improve cautions and warnings within procedures protecting the safety of the crew (*2007*)
- Recipient of a NASA GEM (Go the Extra Mile) Award for volunteer work with Texas A&M students on testing of a speech recognition device (*2007*)
- Recipient of a NASA Group Achievement Award for work on Exploration Systems Architecture Study (*2006*)

- Recipient of a NASA Special Space Flight Achievement Award for work on the Crew Exploration Vehicle Internal Volume Study Team (*2005*)
- Recipient of a NASA Special Space Flight Achievement Award for work on the NASA-STD 3000 Human Systems Integration Standards for the Crew Exploration Vehicle (*2005*)

## PUBLIC OUTPUT

- Trial Lawyer Nation Podcast: Human Factors: How Space Station Precision Leads to Courtroom Results (2019)
- Generis Medical Summit: Discussin the Value of Human Factors: Addressing Human Error and Risk Mitigation (2019)
- ASSP Seminar: Human Error is a Symptom not a Root Cause: The Critical Link between Human Factors and Human Safety (2019)
- HFES Conference Proceedings Publication-Better Business By Design: Introduction to the SOPHIC Conceptual Model, Austin, Texas (2017)
- InnoCentive Webinar: "Open Innovation and Collaboration-NASA Presents It's Real Life Implementation and Lessons Learned" (2012)
- IAC Conference Proceedings Publication - Open Collaboration: A Problem Solving Strategy That is Redefining NASA's Innovative Spirit, Cape Town, South Africa (2011)
- Panelist Collaborative Innovation Business Cluster Forum IAC Conference - Innovative Problem Solving Challenges, Cape Town, South Africa (2011)
- Panelist Collaborative Innovation Business Cluster Forum IAC Conference - Innovative Problem Solving Results, Cape Town, South Africa (2011)
- Panelist CoDevelopment and Open Innovation Conference - Open Innovation Tools and Methods, Scottsdale, Arizona (2011)
- Panelist WebCom Conference - The Wisdom of the Crowd Goes to Space, Montreal, Canada (2010)
- IAC Conference Proceedings Publication - Investment in Open Innovation Service Providers: NASA's Innovative Strategy for Solving Space Exploration Challenges, Prague, Czech Republic (2010)
- ICES Conference Proceedings Publication - Lunar and Mars Exploration: The Autonomy Factor, San Francisco, CA (2008)
- HFES Conference Proceedings Publication - Use of Cautions and Warnings within International Space Station Procedures: When Too Much Information Becomes Risky, Baltimore, MD (2007)
- HFES Conference Proceedings Publication - Habitability in Space, Orlando, FL (2005)
- IIE Conference Proceedings Publication - Orientation and Position Effects On Wrist Posture in Powered Screwdriver Use, Atlanta, GA (2005)
- AIAA Conference Proceedings Publication - Habitability and Human Factors: Lessons Learned in Long Duration Space Flight, San Diego, CA (2004)
- HFES Conference Proceedings Publication - Differences in Remote Versus In-Person Communications While Performing a Driving Task, Denver, CO (2003)

## <u>APPENDIX B</u>

**Deposition and Trial History as an Expert Witness
(Previous 4 years)**

Cynthia Rando, M.S., M.B.A., CHFP
Human Factors and Human Safety Consultant
Founder/CEO Sophic Synergistics, LLC

<u>2025</u>

- De La Fuente vs. Dantuono & Pilot Trucking Center, Cause No: 236-339659-23
  - Deposition: June 13, 2025
  - Human Factors Assessment Report: May 5, 2025

<u>2024</u>

- McGovern, Pitamber, Drepaul, Masson, Rivera, and West vs. ConAgra Foods Inc., Case No's: 19-L-010439, 21-L-001800, 20-L-001133, 19-L-007478, 21-L-007661,19-L-010453
  - Deposition: February 13, 2025

- Taylor vs. ConAgra Foods Inc., Case No: 2019 L 006733
  - Deposition: November 11, 2024

<u>2023</u>

- Reese et al. vs. ConAgra Foods Inc., Case No: 2019-L-005068
  - Trial Testimony: October 19, 2023
  - Deposition: September 15, 2023

- Russell vs. Black and Decker, Case No: 2021L065066
  - Deposition: June 27, 2023
  - Human Factors Assessment Report: April 17, 2023

- Boutte vs. CenterPoint Energy, Case No: 2019-5641, Div. E
  - Trial Testimony: June 7, 2023
  - Deposition: March 17, 2023
  - Human Factors Assessment Report: March 7, 2023
  - Site Assessment: February 10, 2023

- McNamara vs. Food Lion, Case No: 2020-CP-10-05203
  - Deposition: April 12, 2024
  - Site Assessment: June 29, 2023

Expert Report of C. Rando                                                              64

2022

- Williams vs. Jakes Fireworks, Civil Action No: 6:21-CV-04085
    - Deposition: July 19, 2024
    - Human Factors Assessment Report: June 19, 2024
- Ridgid vs. Johnson, Case No: 1:21-cv-01939
    - Deposition: August 18, 2022
    - Human Factors Assessment Report: June 24, 2022

- Ladner vs. Ochsner Baptist Medical Center et al., Case No: 2019-02673
    - Deposition: June 14, 2024
    - Site Assessment: May 30, 2024
    - Human Factors Assessment Report: February 24, 2022

- Plaintiffs vs. Paraquat Companies, 3:21-md-3004
    - Deposition: December 2, 2022
    - Human Factors Assessment Report: October 14, 2022

2021

- Fammartino vs. Public Service Company of New Mexico, Case No: D-101-CV-2021-01108
    - Deposition: August 24, 2022
    - Site Assessment: May 31st, 2022

- Jane Doe vs. Uber, Case No: 3:19-cv-03310-JSC
    - Deposition: June 30, 2022
    - Human Factors Assessment Report: April 19, 2022

- Conklin vs. Dipamazio, Case No: D-202-CV-2021-03300
    - Deposition: September 14, 2023
    - Human Factors Assessment: November 1, 2022
    - Site Assessment: July 29, 2021

# APPENDIX C



**FEE SCHEDULE 2025**

The following fee schedule is for your information:

| | |
|---|---|
| **Cynthia Rando, M.S., M.B.A., CHFP** | |
| **Retainer (10 hours)** | $5,000 |
| | |
| **Consultation/File review** | $500/hr. |
| | |
| **Deposition/Prep/Reports/** | |
| **Trial Testimony/Travel** | $550/hr. |
| | |
| **Human Factors Case Research** | $250/hr. |
| *(when conducted by Human Factors Research Assistants)* | |
| | |
| **Administrative support** | $150/hr. |
| *(billing, meetings, logistics/travel)* | |

➤ Work will not begin until the retainer is received
➤ $3,000 of this retainer is non-refundable and will serve as a "naming fee."
➤ If site visits, depositions or trial testimony dates are requested to be held and then cancelled, fees will apply
➤ All invoices are due upon receipt. Outstanding accounts must be paid in full before any additional work is performed.

Please make checks payable to: **Sophic Synergistics, LLC.**
        P.O. Box 58471
        Houston, TX 77258

We look forward to working with you.

Sincerely,

Cynthia Rando, M.S., M.B.A., CHFP
Founder/CEO

**Sophic Synergistics, LLC**

Expert Report of C. Rando                                                                 66

## APPENDIX D

### Materials Considered

**Case Complaint**

In re: Uber Technologies, Inc., Passenger Sexual Assault Litigation., Master Long Form Complaint, including Appendix A, Document 269, dated February 15, 2024

**Documents and Depositions**

Michael Akamine Deposition and Exhibits (5/19/25 and 5/20/25)

Brooke Anderson Deposition and Exhibits (05/01/25 and 05/02/25 and 5/6/25)

William Anderson Deposition and Exhibits (9/26/23)

Matthew Baker Deposition and Exhibits (11/13/24)

PMK (Emilie Boman) Deposition and Exhibits (3/5/25 and 4/1/25)

Tracy Breeden Deposition and Exhibits (3/13/25 and 3/14/25)

30(b)(6) (Gregory Brown) Deposition and Exhibits (6/17/25)

30(b)(6) (Gregory Brown) Deposition and Exhibits (7/15-7/16/25 and 8/25-8/26/25)

PMK (Gregory Brown) Deposition and Exhibits (3/13/25 and 3/14/25 and 5/7/25)

30(b)(6) (Jamie Brown) Deposition and Exhibits (August 6, 2025)

Jordan Burke Deposition and Exhibits (3/20/25 and 3/21/25)

Faiz Bushra Deposition and Exhibits (5/13/25)

Philip Cardenas Deposition and Exhibits (2/26/25)

Frank Chang Deposition and Exhibits (5/9/25)

30(b)(6) (Heather Childs) Deposition and Exhibits (6/5/25)

Dennis Cinelli Deposition and Exhibits (3/28/25)

30(b)(6) (Chad Dobbs) Deposition and Exhibits (8/21/25)

30(b)(6) (Mariana Esteves) Deposition and Exhibits (7/15/25 and 8/28/25)

Chadd Fogg Deposition and Exhibits (2/5/25)

Cory Freivogel Deposition and Exhibits (12/10/24 and 2/6/25)

Henry (Gus) Fuldner Deposition and Exhibits (3/26/25 and 3/27/25 and 4/29/25)

30(b)(6) (Todd Gaddis) Deposition and Exhibits (7/11/25)

PMK (Todd Gaddis) Deposition and Exhibits (7/8/25 and 7/9/25 and 7/11/25)

Catherine Gibbons Deposition and Exhibits (6/5/25)

Ryan Graves Deposition and Exhibits (5/13/25)

Andrew Hasbun Deposition and Exhibits (4/10/25 and 4/11/25)

Cassandra Hawk Deposition and Exhibits (4/8/25)

Jill Hazelbaker Deposition and Exhibits (6/17/25)

Rachel Holt Deposition and Exhibits (12/12/24 and 4/9/25)

Jordan Hornback Deposition and Exhibits (3/31/25)

Nairi Hourdajain Deposition and Exhibits (2/7/25)

Meghan Joyce Deposition and Exhibits (2/26/25)

Roger Kaiser Deposition and Exhibits (11/19/24 and 4/22/25)

Travis Kalanick Deposition and Exhibits (7/3/25)

Sachin Kansal Deposition and Exhibits (5/28/25)

Dara Khosrowshahi Deposition and Exhibits (7/1/25)

Carly Lake Deposition and Exhibits (3/20/25 and 3/21/25)

Jenny Luu Deposition and Exhibits (2/27/25)

30(b)(6) (Katherine McDonald) Deposition and Exhibits (4/25/25)

Katherine McDonald Deposition and Exhibits (10/7/24 and 5/7/25)

Katy McDonald Deposition and Exhibits (4/24/25)

30(b)(6) (Hannah Nilles) Deposition and Exhibits (6/30/25)

30(b)(6) (Hannah Nilles) Deposition and Exhibits (7/10/25)

30(b)(6) (Hannah Nilles) Deposition and Exhibits (7/23/25 and 8/7/25)

PMK (Hannah Nilles) Deposition and Exhibits (5/5/25 and 5/14/25 and 5/29/25)

30(b)(6) (Hannah Nilles) Deposition and Exhibits (August 7, 2025)

Jodi Page Deposition and Exhibits (5/21/25)

Katherine Parker Deposition and Exhibits (12/3/24 and 2/14/25)

PMK (Rebecca Payne) Deposition and Exhibits (4/2/25 and 4/3/25 and 5/2/25 and 5/12/25 and 5/13/25)

Andi Pimentel Deposition and Exhibits (10/15/24 and 3/27/25)

Cameron Poetzscher Deposition and Exhibits (6/4/25)

David Richter Deposition and Exhibits (2/24/25)

Brad Rosenthal Deposition and Exhibits (10/24/23)

30(b)(6) (Elizabeth Ross) Deposition and Exhibits (6/11/25 and 6/12/25)

Danielle Sheridan Deposition and Exhibits (5/15/25 and 5/16/25)

Valerie Shuping Deposition and Exhibits (4/17/25 and 4/18/25)

Nicholas Silver Deposition and Exhibits (11/21/24)

Troy Stevenson Deposition and Exhibits (10/21/24)

Joseph Sullivan Deposition and Exhibits (6/25/25)

Michael Sullivan Deposition and Exhibits (3/26/25)

Pat Twomey Deposition and Exhibits (5/29/25)

Kayla Whaling Deposition and Exhibits (2/28/25 and 4/22/25)

30(b)(6) (Sunny Wong) Deposition and Exhibits (6/25/25)

PMK (Sunny Wong) Deposition and Exhibits (4/16/25)

30(b)(6) (Sunny Wong) Deposition and Exhibits (7/23/25)

Defendants' Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC's Responses to Topics 3-15 of All Plaintiffs' Notice of 30(b)(6) Deposition of Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC (Recordkeeping) with Exhibits (7/2/25)

30(b)(6) (Chad Dobbs) Deposition and Exhibits (8/1/23) (*Campbell v. Uber*) (UBER_JCCP_MDL_000906887)

UBER_JCCP_MDL_000022882

UBER_JCCP_MDL_000108957

UBER_JCCP_MDL_000303417

UBER_JCCP_MDL_005137366

UBER_JCCP_MDL_002260229

UBER_JCCP_MDL_002530647

UBER_JCCP_MDL_003273474

UBER_JCCP_MDL_004522493

UBER_JCCP_MDL_004643474

UBER_JCCP_MDL_005084050

UBER000095540

**Other Materials**

Budiu, Raluca. *The Power Law of Learning: Consistency vs. Innovation in User Interfaces* (October 30, 2016), Nielsen and Norman Group, https://www.nngroup.com/articles/power-law-learning/?lm=priming&pt=article.

Carayon, P. (2013). *Human factors systems approach to healthcare quality and patient safety. Applied Ergonomics*, 45(1), 14–25. https://doi.org/10.1016/j.apergo.2013.04.023

Dinner, I., Johnson, E. J., Goldstein, D. G., & Liu, K. (2011). Partitioning default effects: Why people choose not to choose. *Journal of Experimental Psychology: Applied, 17*(4), 332–341. https://doi.org/10.1037/a0024354

Dhingra, N., Gorn, Z., Kener, A., & Dana, J. (2012). The default pull: An experimental demonstration of subtle default effects on preferences. *Judgment and Decision Making,* 7(1), 69–76. https://www.cambridge.org/core/product/identifier/S1930297500001844/type/journal_article

Endsley, M. R. *Situation Models: An Avenue to the Modeling of Mental Models. Proceedings of the IEA/HFES*, (2000) (pp. 1-61).

Gentner D, Stevens AL. (editors). *Mental Models*. New York, NY: Psychology Press; (2014).

Ghuman, A., Bar, M., Dobbins, I. G., & Schnyer, D. M. (2008). The effects of priming on frontal-temporal communication. Proceedings of the National Academy of Sciences (PNAS), 105(24), 8405-8409.

Gould, J. D., & Lewis, C. (1985). *Designing for usability: Key principles and what designers think*. Communications of the ACM, 28(3), 300–311.

International Electrotechnical Commission. (2019). Risk management — Risk assessment techniques (IEC 31010:2019). International Electrotechnical Commission.

International Organization for Standardization (ISO). (2010–2023). ISO 31000:2018, Risk management — Guidelines; ISO 9241-11:2018, Ergonomics of human-system interaction — Part 11: Usability — Definitions and concepts; ISO 9241-210:2019, Ergonomics of human-system interaction — Part 210: Human-centred design for interactive systems; ISO/IEC 25010:2023, Systems and software engineering — Systems and software Quality Requirements and Evaluation (SQuaRE) — Product quality model; IEC 31010:2019, Risk management — Risk assessment techniques; ISO/TS 18152:2010, Ergonomics of human-system interaction — Specification for the process assessment of human-system issues; ISO/IEC/IEEE 16085:2021, Systems and software engineering — Life cycle processes — Risk management. Geneva: ISO. (Jointly published with IEC and IEEE where indicated).Kaley, Anna. *User Feedback Requests: 5 Guidelines* (March 26, 2023), Nielsen and Norman Group, https://www.nngroup.com/articles/user-feedback/

Khan, F., Rathnayaka, S., Ahmed, S. (2015). Methods and models in process safety and risk management: Past present and future. Process Safety and Environmental Protection.

Laubheimer, P. (2024, January 19). *Tree testing part 2: Interpreting the results*. Nielsen Norman Group. https://www.nngroup.com/articles/interpreting-tree-test-results/ Nielsen Norman Group

Leveson, N. G., *A systems approach to risk management through leading safety indicators*. Reliability Engineering & System Safety (2015), 136, 17–34

Loyola University Maryland. *Common Reactions to Sexual Assault,* (2025), Retrieved from https://www.loyola.edu/department/counseling-center/services/students/concerns/sexual-assault/reactions.html

Merriam-Webster. *Dictionary Definition of Assault* (2025), retrieved from https://www.merriam-webster.com/dictionary/assault

NASA, *Spaceflight Human-System Standard Volume 2: Human Factors, Habitability, and Environmental Health*, NASA-STD-3001, Vol. 2, Rev. C., chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nasa.gov/wp-content/uploads/2020/10/2022-04-08_nasa-std-3001_vol_2_rev_c_final.pdf

National Institute of Standards and Technology (NIST*), Guide to Public Safety Communications, Usability*, NST HB 161

Newell & Rosenbloom, *Mechanisms of skill acquisition and the law of practice (chapter), in Cognitive Skills and Their Acquisition* (Psychology Press, 1981). Available at: https://www.researchgate.net/publication/243783833_Mechanisms_of_skill_acquisition_and_the_law_of_practice

Nielsen, Jakob, *Usability 101: Introduction to usability* (January 3, 2012). https://www.nngroup.com/articles/usability-101-introduction-to-usability/

Nielsen, J. (2000, July 22). *End of web design*. Nielsen Norman Group. https://www.nngroup.com/articles/end-of-web-design/ Nielsen Norman Group

Nielsen, J. (2020, September 18). *Jakob's law of internet user experience* [Video]. Nielsen Norman Group. https://www.nngroup.com/videos/jakobs-law-internet-user-experience/

Norman, D. A. (1983). *Some observations on mental models*. In D. Gentner & A. L. Stevens (Eds.), *Mental models* (pp. 7–14). Hillsdale, NJ: Lawrence Erlbaum Associates.

Norris, B. (2009). *Human factors and safe patient care*. Journal of Nursing Management, 17(2), 203–211. https://doi.org/10.1111/j.1365-2834.2009.00975

Russ, A. L. (2013). The science of human factors: Separating fact from fiction. BMJ Quality & Safety, 22(10), 802–808. https://doi.org/10.1136/bmjqs-2012-001450

Saare, M. A., Hussain, A. B., Jasim, O. M., & Mahdi, A. A. (2020). *Usability evaluation of mobile tracking applications: A systematic review*. International Journal of Interactive Mobile Technologies, 14(5), 119–128. https://doi.org/10.3991/ijim.v14i05.13353

Samuelson, W., & Zeckhauser, R. (1988). Status quo bias in decision making. *Journal of Risk and Uncertainty, 1*(1), 7–59. https://doi.org/10.1007/BF00055564

Sanders, M., S. & McCormick, E., J., 1993. *Human Factors in Engineering and Design*. 7th Edition. McGraw-Hill Education.

Spencer, D. (2009). *Card sorting: Designing usable categories*. Rosenfeld Media.

Stanton, Neville A., *Discipline of Human Factors in Stanton, Human Factors in Nuclear Safety* (2005 ed.)

Tractinsky, N., Katz, A. S., & Ikar, D. (2000). *What is beautiful is usable. Interacting with Computers, 13*(2), 127–145.

Uber, Help, *How does the SOS Option Work?,* https://help.uber.com/en/riders/article/how-does-the-sos-option-work?nodeId=70365f59-e6f8-475b-827a-e85ecbc9a0f9

Uber, Help, *Business account and privacy and security,* https://help.uber.com/en/business/article/business-account-privacy-and-security?nodeId=c5573317-bb81-4db9-b1a2-c392cdc7f802

Uber, US Safety Report, 2021-2022, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=fa6971b0-58b1-4a06-b465-552c250d2b4e,

User Experience Professionals Association (UXPA), https://uxpa.org/about-uxpa-international/

Washizaki, H. (Ed.). (2025, May). *Guide to the Software Engineering Body of Knowledge (SWEBOK Guide) (v4.0a).* IEEE Computer Society. https://computer.org/swebok

Wogalter, M. (2019). Hazard Analysis and Hazard-Control Hierarchy. In M. S Wogalter (Ed.), Forensic Human Factors and Ergonomics: Case Studies and Analyses (pp. 17-32). Boca Raton: CRC Press/Taylor & Francis Group.

Young, Stephen, Wogalter, Michael & Brelsford, John. Relative Contribution of Likelihood and Severity of Injury to Risk Perception. *Proceedings of the Human Factors Society 36th Annual Meeting*-1992.

# APPENDIX E

**April 8, 2025 Human Factors Usability Assessment of the Uber Application Feature/Process – Reporting a Sexual Assault/Sexual Misconduct**
**Completed by: Sophic Synergistics LLC**

On April 8, 2025, Sophic Synergistics, LLC conducted a usability assessment of the Uber application to determine the relative ease or difficulty for a rider to report SA/SM. This assessment was completed utilizing an iPhone 12 pro device.

<u>Methodology</u>: For this assessment, we utilized a human-centered evaluation approach in line with ISO 9241-210 and ISO/TS 18152 guidance on task analysis, simulating use cases under stress. The evaluation was structured as follows:

a. Scenario Setup & Context Definition

  i. Defined environmental conditions (post-trip, high-stress, trauma-affected state).

  ii. Specified starting point in the app (either home screen or rating prompt).

  iii. Assumed user had urgent need to report a sexual assault. (ISO 9241-210:2019, Human-centered design activities to understand and specify the context of use — see 7.2.1–7.2.2; ISO/TS 18152:2010, HSI process model practices for research on required system usability and presenting context/constraints — HS.1.1.BP5–BP6).

b. Task Analysis & Step-by-Step Observation

  i. Broke down the process into discrete task steps, noting required taps, scrolls, and decision points.

  ii. Identified Potential Usability Issue Points per step. (ISO 9241-11:2018, usability defined by effectiveness, efficiency, and satisfaction in a specified context of use; ISO 9241-11 Annex A notes alignment with ISO/IEC 25010 product quality sub-characteristics used to support usability).

c. Cognitive and Emotional Load Evaluation

  i. Assessed interface clarity, language specificity, and navigation flow under trauma-impaired decision-making.

  ii. Considered error-prone conditions and likelihood of abandonment. (ISO/TS 18152:2010, outcomes/practices require trials with potential users and assessment of risks to users and from human error — HS.1.2 outcomes & HS.1.2.BP4–BP7; ISO/IEC 25010:2023, product quality "interaction capability" sub-characteristics include appropriateness recognizability, learnability, operability, user error protection).

d. Performance Metrics & Risk Implications

  i. Counted total clicks, scrolls, and redirections required to attempt reporting.

  ii. Recorded time-to-completion (or failure point) and reason for task abandonment.

  iii. Evaluated whether the process met the ISO definition of usability: effectiveness, efficiency, satisfaction. (ISO 9241-11:2018, 4.2 definition and 7.1/7.2 context-of-use components;

Expert Report of C. Rando                                                                                          73

ISO 31000:2018, framework integration — risk management integrated into organizational activities and decision-making.)

e.  Standards-Based Benchmarking

  i.  Compared observed usability and safety performance against international human factors standards including ISO 9241-11, ISO 9241-210, ISO/IEC 25010, ISO/TS 18152, ISO 31000, and ISO/IEC 31010.

  ii.  Identified explicit non-conformances such as:

    1.  Absence of clear, explicit sexual assault reporting labels (ISO 9241-11 usability outcomes; ISO/IEC 25010:2023 "appropriateness recognizability").

    2.  Lack of trauma-informed design (ISO/TS 18152 HSI practices: user trials, risk to users, human-error risk considered in development/operation).

    3.  Inadequate risk controls for foreseeable safety-critical events (ISO 31000 integration/monitoring; ISO/IEC 31010 selection and application of risk assessment techniques including matrices, FMEA, scenario analysis).

<u>Likert-Type Rating</u>:

We used Likert-type rating scales as part of the expert human-factors assessment. Likert-type scales are widely accepted practice for evaluating user interfaces and documenting expert judgments in heuristic/expert reviews because they provide structured, repeatable ratings. This approach is consistent with ISO guidance to measure usability outcomes in context (ISO 9241-11:2018, Clause 6; see also Clause 3.1 for the usability definition) and to evaluate designs against requirements within an iterative, human-centered process (ISO 9241-210:2019, Clause 5.6 and Clause 4). While these standards are instrument-agnostic, the use of Likert-type ratings is standard in human-factors practice for assessing interface usability.

| **Extremely Difficult** | Difficult | Somewhat Difficult | **Neither Easy nor Difficult** | Somewhat Easy | Easy | **Extremely Easy** |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |

***April 8, 2025 Usability Assessment begins on next page***

| Reporting Sexual Assault/Sexual Misconduct Task Steps. | Likert-Type Rating | Potential Areas for Usability Issues |
|---|---|---|
| 1. **Starting from an opened Uber app on the user's mobile device, the user is provided the below User Interface (UI) on the Home Screen. To report an incident of sexual assault/sexual misconduct, a user has two options:**<br><br>  a.  **Press 'Account' or**<br><br>  b.  **Press 'Activity'**<br><br>**(Both circled in Red in the image below)**<br><br>**\*Skip to step 3 if pressed 'Activity'.**<br><br> | 3 – Somewhat Difficult | The design of the Uber app UI Home Screen provides no obvious feature for reporting sexual assault/sexual misconduct. Of the available options, users viewing the Home Screen would likely associate reporting with their ride history and therefore look to an option that would lead them to accessing their past rides. There are two likely, but not clear, options to view past rides: 'Account' and 'Activity.'<br><br>The word 'Activity' is not an obvious and direct link to 'Past Rides.' This could cause confusion and potential error(s) for users, especially if they are novices to the Uber app. Additionally, due to the confusion, extra time is spent to locate the most recent ride in which the incident occurred, adding to the user's cognitive/emotional state, in an already stressful situation (e.g., following an assault). |

| | | |
|---|---|---|
| 2. **Step 1 (above) presented two options to access Past Rides. If the 'Account' icon (option B in step 1) was pressed, the following 'Account' screen was displayed:**<br>　a. **Press 'Activity' (circled in Red)**<br><br> | 2 – Difficult | From this screen there are two possible options to reporting sexual assault/sexual misconduct. The first is to continue the path to past rides through the 'Activity' Icon. This icon (circled in Red) is in the top half of the screen and is easy to locate as it is within the direct line of sight.<br><br>However, similar to the previous step, the word 'Activity' might not be clear to the users. The wording is the same from page to page and does not provide a clear link to the information the user is looking for in the app. The mismatch/ lack of clear direct link between the words 'Activity' (as used by the Uber app) and 'Past Rides' and/or 'Ride History' will likely lead a user towards a path of trial and error. During trial and error, a user will interact with various icons until they have mapped their intended action (to locate their most recent ride) to the choices in the menu. As described in Step 1, this could cause confusion and likely increase potential errors. Additionally, the increased time and effort spent to locate the intended item, could increase the likelihood of the user giving up their efforts, i.e., abandonment.<br><br>The second potential path to sexual assault/sexual misconduct reporting is the 'Help' icon (also circled red). But the 'Help' icon is not an obvious choice as 'Help' typically refers to FAQ or trouble shooting information as it pertains to consumer products (Nielsen Norman Group, https://www.nngroup.com/articles/help-and-documentation/). Further, the iconography does not align with a safety related image and does not signal to the user that this icon pertains to safety assistance. An example of more specific labeling and icon use could include images such as: |



However, they would need to be tested with representative users to validate prior to implementation within design. 'Activity' is therefore the most aligned choice to the task because it is linked to an event based on definition of the word and intent of the user.

| | | |
|---|---|---|
| **3. After selecting 'Activity,' a user is provided past rides while looking for a ride to report. A user may choose a ride by pressing on the ride box (highlighted below in the Red box)**<br><br> | 3 – Somewhat Difficult | As previously stated, the word 'Activity' does not provide a direct link to 'Past Rides' and/or 'Ride History,' making it nondescript and confusing to the user.<br><br>As users read the screen, there is a section that reads 'Past' followed by the information of their most recent ride. While this provides the user with a brief mention to the most recent ride, there is still a lack of indication that interacting with the icon will allow them to report the incident.<br><br>Only two options are readily viewable regarding the most recent ride, 'Rate' and 'Rebook.' Neither of these options provide a direct link to report any sort of issue with the ride. Again, users could be led down a path of 'trial and error,' in which users will interact with various icons until they find the icon that maps their intended action or, worse, quit out of frustration and lack of successful progress. Confusion and error will increase for the user as they progress through the trial and error process. |

| | | |
|---|---|---|
| **4. Once a ride is selected, ride details are shown. A user must scroll down to locate 'Help & safety' (circled in Red)**  | 2 - Difficult | For this step, the 'Help & Safety' text was partially cut off at the bottom of the screen, denoting to the user that there were more options. However, this could be dependent on the phone UI. There is potential for users with different phones to have a different screen UI that does not denote the screen can be scrolled further. Further analysis provided on the following page. |



As described in the previous page, the 'Help & safety' text was partially cut off, denoting that further information could be found if the user were to keep scrolling (repeat note, this cut off could be dependent on user's phone UI, therefore not guaranteed for every user). Under 'Help & safety', there are four options: from: 'Find lost item,' 'Report safety issue,' 'Safety incident report line,' and 'Customer support.'

'Find lost item' is not relevant to the goal of reporting a sexual assault/misconduct, and therefore not chosen as an option in this reporting flow. 'Customer support' is also not a clear choice as it can pertain to many different aspects of support including general difficulties with using the app. The icon also implies that this choice is for support related to questions (not safety complaints) due to question mark icon. It was not chosen as an option in this reporting flow.

'Report safety issue' and 'Safety incident report line' potentially indicate that through these measures, users can report. But both lack a clear direct link, as 'safety issue' does not directly link to a sexual assault/sexual misconduct. The lack of clarity from the options could continue to increase confusion and lead users to spend an increased amount of time attempting to figure out (trial and error) which of the two options is the correct one.

The 'Safety incident report line' option was not chosen in this step. As previously discussed, a user trying to report a sexual assault/misconduct would be looking for the best matching label option to use. Without that choice the user is left to discern which option next best fits their goals. 'Report safety issues' would be most closely aligned. It is not clear what 'Safety incident report line' is specifically as the 'Report safety issues' option has further clarifying menu language that states 'report any safety related

|  |  | issues to us' which indirectly emphasizes this may be the intended reporting avenue. If 'Safety incident report line' was intended to be the immediate access point for users reporting sexual assault/misconduct it shouldn't have been buried several layers deep in the menu. It should have been prominent and available at the top most level of the user interface. |
| --- | --- | --- |

| 5. **'Report safety issue' selected (circled in Red)**  | 3 – Somewhat Difficult | A 'safety issue' can range in meaning, from a potential exposure to a hazard to an assault (e.g., a violent physical or verbal attack). Thus, the language used—a 'safety issue'—can be misleading to the user, causing confusion and stress as they attempt to choose the option that will address their situation. As described in previous steps, as users attempt to choose the adequate option, they will likely follow a path of 'trial and error.' This will lead them to interact with several icons/options until they have found the icon and steps that map their intended action (to report an assault). Confusion and increase of potential errors are not only time consuming but add on to the stress in an already stressful situation. |

| | | |
|---|---|---|
| 6. **Once a user selects 'Report safety issue,' they are presented with the below UI. The user must then review and choose from eleven different options (final two options required scrolling and are depicted on next page).**<br><br>3:19 ⌄<br><br>← <br><br>**Help**<br><br>**Safety**<br><br>▤  Report a serious incident with a driver<br><br>▤  My driver's vehicle was unsafe or broke down<br><br>▤  I was involved in an accident<br><br>▤  I was discriminated against by my driver<br><br>▤  My driver drove dangerously<br><br>▤  My driver didn't match the profile in my app<br><br>▤  Emergency contact information<br><br>▤  My driver's vehicle was different<br><br>▤  Safety Incident Reporting Line<br><br>— | 1 – Extremely Difficult | Based off the options provided, it is not clear which selection is related to reporting a sexual assault/sexual misconduct as none explicitly state/denote that use case.<br><br>After reviewing the eleven options, a user would likely identify as viable options to the following two choices.<br><br>'Report a serious incident with a driver' – as a user could potentially correlate 'serious' with a sexual assault/misconduct. However, this is only a potential option, and the user could still be confused and unsure if they are selecting the correct option.<br><br>'Safety Incident Reporting Line,' is the same option presented in Step 5 and discussed above.<br><br>Both options ultimately lead to the same result (further explained in Step 15). However, users could assume that the two options, even though they have the same name, are different and will lead to individual outcomes if selected. It is unclear why the same option is presented twice in different locations, if there is no different outcome that will yield to the users.<br><br>[Continued on the next page.] |

Expert Report of C. Rando



As noted, the figure to the left is a continuation of the screen/figure above in step 6. The phone UI utilized during the usability assessment cut off the last two options following 'Safety Incident Reporting Line.' This required additional scrolling to view the total of 11 options.

The need to continue scrolling was not obvious or clear. The lack of clear visual indicators that more options are available and/or the ability to fit all the necessary options into one screen is confusing, increasing the difficulty of the task. As noted above, the two likely options ultimately lead to the same outcome, thus extending the list and adding scrolling appears to be an unnecessary addition to the flow.

The next step examines the flow if a user selects 'Report a serious incident with a driver.' Step 15 of the assessment examines the flow if a user selects 'Safety Incident Reporting Line.'

| | | |
|---|---|---|
| 7. **When 'Report a serious incident with a driver' is selected, the user is presented with the following:**  | 1 – Extremely Difficult | After choosing the 'Report a serious incident' option, the user is met with several statements to read and then select the best option. None of the options explicitly state that the options are to report a sexual assault/misconduct. The lack of clear wording continues to increase confusion and stress the user. As described in previous steps, the duo of increased confusion and stress could lead the user towards a path of trial and error and/or abandonment (failure to report). During the trial and error process, users return to the previous screen, searching for the icon that will directly map their intended action (reporting an assault). This process is time consuming and stressful in an already stressful, trauma environment (post-assault). Of additional concern is the number of steps required to get to this point and there is still no clear direct link to activity and option within the app. The most likely option is "I have a different concern about my driver and their vehicle," which is selected in step 8. The other options deal with reporting a rude driver and cancellation fees. [Continued on the next page.] |

Expert Report of C. Rando



The figure to the left, is a continuation of the screen/figure above in step 7.

The first paragraph under the 'Supporting Information Disclaimer' (circled in red) states legal requirements. Nowhere on the screen (further detailed in step 14) is there any form of link or further information provided to the user that details the legal requirements. The lack of clarity for the user adds to the confusion and stress the user feels from the ordeal of being assaulted. This could also create an additional barrier to reporting as it could communicate legal consequences that are not defined. Similarly, the option below stating "I have supporting information…" could also cause abandonment of the reporting process if the user perceived that additional documentation would be required despite it being an optional choice.

| | | |
|---|---|---|
| **8. When 'I have a different concern about my driver' is selected (see above Step 7), the user is shown various options (depicted in the screenshot below)**<br><br>3:37 ◀        ● 5G◢ ▮<br><br>←<br><br>**Help**<br><br>**Give feedback**<br><br>You rode with Tiffany at Apr 08 2025 2:31 PM CST.<br><br>Select the kind of feedback you want to give<br><br>I have positive feedback    ○<br><br>I had an issue with the driver    ○<br><br>I had an issue with the vehicle    ○<br><br>I want to report a safety issue    ○<br><br>**Next** | 1 – Extremely Difficult | The options presented are:<br>- I have positive feedback<br>- I had an issue with the driver<br>- I had an issue with the vehicle<br>- I want to report a safety issue<br><br>Again, these options do not clearly/explicitly state that they are options to report sexual assault/sexual misconduct.<br><br>Thus far, there are a total of 6 clicks, with 3 different times the user would have to scroll down to see the other options (analyzed in Steps 5, 6 , and 7) to attempt to successfully report the issue. Yet, there is still no ability to report a sexual assault/sexual misconduct.<br><br>The lack of clear indication and the correlation of 'safety issue' to have the same meaning as a serious crime (i.e., sexual assault or misconduct), continues to increase the confusion and stress to the user and inability to report a sexual assault/misconduct. Given the multiple false pathways, the likelihood of user abandonment out of frustration and failing to get the aid they need from Uber is high.<br><br>Of the options presented, "I have an issue with the driver" and "I want to report a safety issue," are the most likely to achieving the goal of reporting a sexual assault/misconduct.<br><br>In the next step, the assessment follows the user flow if a user selects "I want to report a safety issue." In step 11, the assessment follows the user flow if the user selects "I had an issue with the driver." |

| | | |
|---|---|---|
| 9. **When 'I want to report a safety issue' selected (see above and circled in Red below), the user is presented with various options provided (shown in the screenshot on the next page).**<br><br> | 1 – Extremely Difficult | Upon clicking 'I want to report a safety issue,' the user is presented with 8 options (see screenshot on next page). Again, the recurring theme in the app is a lack of wording that explicitly states an option for reporting a sexual assault/sexual misconduct.<br><br>As the user continues to go through the steps, confusion and stress accumulates for the user and with each failed step the likelihood of abandonment increases.<br><br>The user, who has just experienced a highly stressful, traumatic situation (e.g., sexual assault or misconduct), must now decipher and use their best judgement (due to the lack of explicit wording) and trust they have selected the best option that will resolve their situation.<br><br>This step marked the 7th click a user would have to complete (assuming a perfect case scenario, where the user does not follow the path of 'trial and error', in which the amount of clicks are unknown). However, this perfect case scenario is unlikely due to the highly stressful and traumatic situation (sexual assault) experienced by the victim, altering their judgement and likely limited patience.<br><br>[Continued on next page.] |

**Options presented after the 'I want to report a safety issue' text was selected.**

3:39

Help

**I want to report a safety issue**

My driver didn't match the profile in my app

My driver drove dangerously

My driver was not wearing a face mask

My driver's behavior made me feel unsafe

My driver's vehicle was different

My driver's license plate was different

I was discriminated against by my driver

Report a serious incident with a driver

Of the available options, "My driver's behavior made me feel unsafe" and "Report a serious incident with a driver" are the most likely options to reporting sexual assault/sexual misconduct. Of those two options, the wording of "Report a serious incident with a driver" best matches the user's goal of reporting a sexual assault/misconduct and represents the most likely option a user would choose and that path will be investigated further in the next step.

| **10. When 'Report a serious incident with a driver' is selected, the user is redirected to 'Report a serious incident with a driver' screen and options (similar to step 7)** | 1 – Extremely Difficult | The redirection to a previous page is extremely confusing and not expected. |
|---|---|---|
| | | The standard mental model of reporting an issue (of any type), expects to see/view unique screens that lead to the issue being resolved/addressed. |
| | | Being redirected to a previous screen with the exact same options, can fluster and distort the user, potentially giving them the impression they have done something wrong. Additionally, the user could become discouraged/prevented from reporting the incident. This is due to the design placing the user in a scenario of impossible success. |

Within the left cell:

3:27

**Help**

**Report a serious incident with a driver**

When drivers sign up to use the Uber platform they agree to a set of Community Guidelines, which prohibit unprofessional behavior, inappropriate physical contact, or verbal aggression.

Drivers also agree to operate vehicles safely at all times. If you experienced anything during your trip that made you feel unsafe, please let us know on this page.

If your driver was rude, please report using the link below

**My driver was rude**

If you have a different concern about your driver or their vehicle, please report using the link below

**I have a different concern about my driver or their vehicle**

If you have a cancellation fee issue, please report using the link below

**Worried about a cancellation fee?**

Please provide specific details about the



| 11. 'Trial and Error' Process during Usability Assessment begins<br><br>**Repeat of steps 6, 7, and 8 (images steps below)**<br><br>This screen appears when a user presses/selects the "Report a serious incident with a driver" from step 6.<br><br> | 1 – Extremely Difficult | Eleven steps into the reporting process and there is still a lack of a clear, explicit option to report Sexual Assault/Sexual Misconduct.<br><br>For this step, the evaluator reverted to a previous step. This is an example of the 'trial and error' state that has been described in previous steps. The continued lack of a clear, direct option to report a sexual assault/misconduct, has led the evaluator to choosing other options that will hopefully lead them to the correct option (to report a sexual assault/sexual misconduct).<br><br>For the user, this 'trial and error' state will lead the user to a process in which they may never get to the right place. It is unlikely that many users will continue attempting to submit the report via the app given the amount of time, confusion, steps and redirects through the menu tree without a point of success. |

**The options presented when the user selects the 'I have a different concern about my driver or their vehicle' option (see step 8 above).**



| | | |
|---|---|---|
| **12. This time, when the 'I had an issue with the driver" was selected, various options presented (see screenshot in Step 13).**<br><br> | 1 – Extremely Difficult | The option "I had an issue with the driver" is not a direct link to reporting the serious crime of sexual assault. An 'issue' can mean a variety of different things, from the user not liking/agreeing with the driver's language, issues with how the driver operated their vehicle to unwanted physical contact from the driver to the rider/user. The option is not specific to the user's goal of reporting a sexual assault/misconduct and it is not clear if this is the correct choice.<br><br>However, given that the previous selection in Step 9 did not lead to the desired outcome, this becomes the second-best option for the user. Keep in mind that there have already been several failed attempts to get to a point of reporting and it is still unclear how to achieve this action. |

| 13. The presented options under "I had an issue with the driver." | 1 – Extremely Difficult | None of the options listed give any indication that this will report a sexual assault/sexual misconduct. Rather it is focused on unprofessional or rude behavior. |
|---|---|---|
|  | | Again, this is extremely confusing to the user and adds stress to the already stressful, traumatic ordeal the user is reporting, further creating a situation where the user is unable to successfully report. |

| | | |
|---|---|---|
| **14. Continuation of 'Trial and Error' Process**<br><br>  **a.** **Given that the options outlined in step 13, did not provide any indication that they are to report a sexual assault, the 'trial and error' process continued or the failure to report and user quits.**<br><br>  **b.** **The evaluator had to press the back button twice (circled in Red in the following two images) to be redirected to step 11, the options that appear when a user selects the "Report a serious incident with a driver" option/text (seen in image in the following page).**<br><br>Screen seen in step 13. The back button (circled in Red) is selected to revert to previous options.<br><br> | 1 – Extremely Difficult | Given that all previous options had been exhausted and lead to nothing, this was the only option via text input to report sexual assault/sexual misconduct.<br><br>The other option is to speak with a representative in the 'Safety Incident Reporting Line.'<br><br>The pattern in the app to report is the lack of clear, explicit wording that denotes a sexual assault/sexual misconduct.<br><br>Additionally, none of the previous steps have allowed the user to report an incident directly, with no guarantee a user can be directed to the option/screen (assuming it exists) or that a direct option will be clear enough to support the reporting correctly. |



**c. The selection of the back button from the previous image, redirects to the following screen below. Scroll down the page to fill in the 'Please provide specific details about the driver's unsafe behavior and upload images (if desired)**

3:28 ✈

←        Help

**My driver was rude**

If you have a different concern about your driver or their vehicle, please report using the link below

**I have a different concern about my driver or their vehicle**

If you have a cancellation fee issue, please report using the link below

**Worried about a cancellation fee?**

**Please provide specific details about the driver's unsafe behavior**

## Supporting Information Disclaimer

By submitting this information I confirm that it was created and/or obtained in compliance with all applicable legal requirements.

I have supporting information to submit to Uber as a part of this incident (ex: photos, audio, video, or



| | | |
|---|---|---|
| **15. Continuation of 'Trial and Error' Process**<br>    **a. As the options outlined in step 14 and 13, did not provide any indication that they are to report a sexual assault, the trial and error process continued.**<br>    **b. The evaluator had to press the back button once (see Step 14) to be redirected to step 6, and the 11 options that appear to Report Safety Issue.**<br>    **c. The 'Safety Incident Reporting Line' option was then selected.** | 1 – Extremely Difficult | Once the "Safety Incident Reporting Line' option was selected, the user is displayed information about the Safety Incident Reporting Line (see screenshot on next page).<br><br>[Continued on next page.] |

3:19

# Help

## Safety

▤  Report a serious incident with a driver

▤  My driver's vehicle was unsafe or broke down

▤  I was involved in an accident

▤  I was discriminated against by my driver

▤  My driver drove dangerously

▤  My driver didn't match the profile in my app

▤  Emergency contact information

▤  My driver's vehicle was different

▤  Safety Incident Reporting Line

—

**d. Screen that appears when a user selects the 'Safety Incident Reporting Line'**



**(Figure 1)**

**(Figure 2)**

The initial explanatory message is confusing. It refers the user to 911 for "immediate police or medical attention." The user may erroneously think that this would also lead to a report with Uber if they were to abandon this reporting process and call solely 911. It tells the user to contact Uber later at the following link, but if the user leaves the app, they will have to recall all the pathways to come back to the link.

When the user selects "Contact Uber's Safety Incident Reporting Line," a call box pops up (see Figure 2). Thus, indicating that this option enables a user to call, and presumably speak with an Uber representative to discuss and report the sexual assault/sexual misconduct.

Again, as with the previous steps, no explicit wording denotes to the user that this option is related to reporting a sexual assault/sexual misconduct. This is likely to continue to leave the user confused, frustrated, and stressed, in an already stressful and traumatic situation. Given the number of failed attempts, it is also unlikely the user will make it this far.

# APPENDIX F

**July 15, 2025 Human Factors Usability Assessment of the Uber Application Feature/Process – Reporting a Sexual Assault/Sexual Misconduct**
**Completed by: Sophic Synergistics LLC**

On July 15, 2025, Sophic Synergistics, LLC conducted a second usability assessment of the Uber application to determine the relative ease or difficulty for a user in reporting a sexual assault/sexual misconduct immediately following the completion of a trip. This assessment was completed on an iPhone 16 pro device. It follows the same methodology set forth in the April 2025 Usability Assessment.

***July 15, 2025 Usability Assessment begins on next page***

| Reporting Sexual Assault/Sexual Misconduct Task Steps: From "Rate your trip" post-ride screen | Likert-Type Rating | Potential Areas for Usability Issues |
|---|---|---|
| 1. Following drop-off by Uber, the user is prompted with a rating and tipping screen (image below). For a user to be able to provide feedback, a user MUST give a rating of 4 stars or less.<br><br> | 1 – Extremely Difficult | Based on the design of the Uber app user interface (UI), it is not obvious that the rating and tip screen was connected to a reporting avenue for sexual assault/misconduct for the ride. This was considered extremely difficult since it required advanced knowledge by the user that this was a possibility. The words 'rate your trip' are not an obvious and direct link to reporting/providing feedback, specifically respect to sexual assault/sexual misconduct.<br><br>Options to provide feedback/describe issues will only be available to the user if they provide a rating of 4 stars or less. However, nothing on the initial rating/tip prompt image denotes this option. If a user were to mistakenly provide a 5-star rating in an effort to just get passed this screen due to stressful conditions (or not provide any rating via the Skip option), they are returned to the Home Screen on the Uber app (see screenshot on next page).[121]<br><br>Given the extremely traumatic event that is a sexual assault, in which victims often have trouble concentrating as well as immense fear and anxiety, there is a high possibility that a user who has experienced assault by an Uber driver may just click anything in an effort to find something that matches their intended action, report a problem/assault, and mistakenly provide a 5-star rating.<br><br>Additionally, for lesser sexual misconduct type events, a user may still not immediately align that this is a pathway to report such concerns or offenses and may encourage the user to go look for another pathway that better aligns with their mental model. This could cause Uber to lose critical data due to increased effort required by the user and abandonment of the task. |

---

[121] See April 2025 Usability Assessment for the reporting flow from the Home Screen.

**Screen, with options that appear if a 5-star rating is chosen.**



| 2. When the user provides a rating of 4 stars or less, the following options (circled in Red) will appear on the screen, allowing the user to select the issue(s).  | 1 – Extremely Difficult | Based off the immediate issue options provided to users, it is not clear which selection is related to reporting a sexual assault/misconduct. None of the options explicitly state/denote a sexual assault or misconduct reporting pathway. This will likely lead a user down a path of trial and error. During trial and error, a user will interact with various icons until they have mapped their intended action to the choices in the menu. As described in the April 2025 Usability Assessment, this could cause confusion and will increase potential errors. Additionally, the increased time and effort spent to locate the intended item, could increase the likelihood of the user giving up their efforts (abandoning the reporting) and not obtaining needed assistance. |

| 3. When 'More issues' (circled in Red) is selected, the user is presented with additional options (screenshot on next page). | 1 – Extremely Difficult | The wording 'More issues' does not provide a clear link that the additional options will refer the user to reporting an assault. Upon clicking 'More issues,' the user is presented with five additional options. [Continued on next page.] |
| --- | --- | --- |



### a. Read the options.



None of the five subsequent options explicitly state/denote a sexual assault/misconduct label. The lack of clarity from the options could continue to increase confusion and lead users to spend an increased amount of time attempting to figure out which of the options is the correct one and waste time or place the user in further danger depending on the circumstances around them if it is a sexual assault scenario.

Of the available options, 'Drive behavior' is the one most likely to be chosen when a user is looking to report a sexual assault/sexual misconduct event to Uber. This is because 'Driver Behavior' is the option most related to reporting an assault, as the assault would likely map to a mental model that an assault is a result of the behavior from the driver. However, even though this appears to be the best option it is a best guess effort from the user, as there was no explicit wording or direct mapping to sexual assault.

| | | |
|---|---|---|
| 4. **When 'Driver Behavior' is selected (circled in Red), the user must read and review various options.**<br><br> | 2 –<br>Difficult | Once the user selects 'Driver Behavior,' they are prompted with seven additional options. None of the options explicitly state an assault or misconduct label (of any kind). As with the previous step, this increases confusion and stress for the user, increasing time spent in a potentially stressful and time-sensitive situation if there was a sexual assault event.<br><br>Of the options available, 'Other' is the most viable next step option. |

| | | |
|---|---|---|
| 5. **Once 'Other' is selected, the reporting flow appears to have concluded with the only further options being 'Done' or 'Back'**<br><br> | 1 – Extremely Difficult | As previously stated, 'Other' is not a clear, direct link to reporting a sexual assault/misconduct. The user, who may have experienced a highly stressful and traumatic situation, must now interpret and use their best judgement (due to the lack of explicit wording) and trust the option they select will lead to their issue being reported. Best judgement under these circumstances may also not be aligned with rational thinking or logic based assumptions due to the high stress situation. Given the number of steps to get to this point for a potentially less severe situation such as sexual misconduct, this may lead to abandonment of the task.<br><br>Additionally, this step provides no confirmation or satisfaction to the user that they have achieved the goal (reporting sexual assault/sexual misconduct). At this step, the UI has only indicated that a 'Driver behavior' issue of 'Other' was lodged, but there is no opportunity for the user to provide context and information about the incident, let alone that it was an incident of sexual assault/sexual misconduct. This is analogous to dropping a user off a cliff in terms of providing a clear ability to report a sexual assault. There is an abrupt end in this pathway. |

| | | |
|---|---|---|
| 6. **Once the user clicks 'Done' from Step 7, the user is prompted to the Rating and Tip screen, to click 'Submit' followed.**<br><br>**Upon clicking 'Submit,' the user is taken back to the Home Screen, concluding the reporting flow available immediately following a ride and from the "Rate your trip" screen.**<br><br> | 1 – Extremely Difficult | Once the user selects their issue, they are redirected to the initial Rating and Tip screen prompt.<br><br>This screen (image to the left) fails to provide any further indication and/or opportunity for the user to elaborate on their experience. The user is left with the option to press 'Submit' at the bottom of the screen, followed by being redirected to the Uber Home Screen.<br><br>The lack of a clear and direct link between 'Other' and reporting an assault or misconduct event, will continue to increase confusion for the user. This confusion adds stress to the user, in an already potentially stressful situation, and as previously stated is only a best guess effort by the user, leading them to assume their issue will be attended to and eventually resolved. |

## APPENDIX G

**August 25, 2025 Human Factors Usability Assessment of Requesting a Ride on the Uber App**
**Completed by: Sophic Synergistics LLC**

On August 25, 2025, Sophic Synergistics, LLC conducted a usability assessment of the Uber application to determine the relative ease or difficulty for a user in requesting a ride within the Uber Rideshare application. This assessment was completed on an iPhone 16 pro device. It follows the same methodology set forth in the April 2025 Usability Assessment.

*** August 25, 2025 Usability Assessment begins on next page***

| Task steps for requesting an Uber Ride from the Home Screen | Likert-Type Rating | Potential Areas for Usability Issues |
|---|---|---|
| 16. **Once the user has located the Uber app on their phone and has opened it, the following screen will appear (image below). To request a ride, the user can complete the two actions circled in red below:**<br><br>• **Locate the 'Where to?' grey shaded icon prompt on the top portion of their screen**<br><br>• **Locate and press the 'Ride' icon, in the 'Suggestions' section in the middle of the screen**<br><br> | 6 - Easy | When a user interface has been designed with the user in mind and benefited from user testing, you will see a strong alignment with user tasks and objectives and prominence of features that support these tasks within in the interface. The Uber app user interface (UI) home screen, requesting a ride is prominently displayed. The 'Where to?' grey shaded icon prompts the user to input their destination's direction/address. This prompt being in the top portion of the screen allows it to be easily located, so that users do not have to search the app to find.<br><br>Using the wording 'Where to?' provides familiar phrases that the users can connect and map to their expectation that this section of the app will allow them to start their process to request a ride. The use of familiar wording and mapping to real-world expectations increases the ease of use of the ability to request a ride.<br><br>The ability to request a ride through two different options (circled in the image to the left) has the potential to increase confusion for the user, specifically novice users. There is a potential for novice users to scan past the 'Where to?' grey shaded icon and select the 'Ride' icon. This could increase the amount of time to request a ride and user frustration. |

| 17. **Once the 'Where to?' box has been selected, the user will be prompted with a screen to enter the desired address or name of their location.**  | 7 – Extremely Easy | To begin officially requesting their ride, the user is prompted to a screen that is similar to a map for example, in which the user's current location is on the top, followed by their destination below it. This design takes advantage of familiarity to other applications, such as way finding apps, increasing the ease of use by taking advantage of previous learned design conventions, and confidence for the user with requesting a ride successfully. It further provides confirmatory paths so that the user can be more assured that they are selecting the correct information, i.e., when indicating the drop-off and pick-up address they can cross-reference location with the map to confirm whether they have the correct information.<br><br>Additionally, for routine Uber app users, a list of previous destinations will appear, in the case the user is traveling to those destinations this could offer convenience and time savings.<br><br>Users are able to view the screen and view the time they are requesting their pickup (the user can schedule now or for a time in the future), as well as who the ride is being requested for (Me- the user). |

| | | |
|---|---|---|
| 18. **Once the user has selected their desired destination, they are prompted with a screen to choose/select from various ride options and fares (pictures of the various ride options below).**  | 7 – Extremely Easy | The user is provided with flexibility to select a ride, based on a variety of different factors, including Type of Uber, Price, and time that Uber will arrive to pick them up.<br><br>Providing these various options and factors gives the user the freedom to select a choice based on their needs, prioritizing the user experience and their personal goals.<br><br>For first time users, being provided with small descriptions on the different ride options (i.e., UberX, Comfort, UberXXL, etc.) ensures the user has the information they need to select the appropriate ride.<br><br>With regards to Payment, a novice user would have had to take additional time to input their pay information, when they were setting up their Uber account (credit and debit cards, PayPal, Venmo, digital wallets (i.e., Apple Pay), and Uber gift cards). Credit and debit cards can be either scanned or inputted manually. Users are also provided the ability to input other payment methods (Venmo, PayPal) by connecting their Uber account and/or allowing Uber permission to access their digital wallets. These tasks were not evaluated for this assessment but would add additional steps/clicks and time for the initial use.<br><br>Frequent/Previous Uber users will not need to create an account, and thus already have their payment method included/automated. This includes the pre-selection of a preferred payment method (if multiple payment options are in their Uber account) when they request a ride (as depicted in the lower portion of the image to the left). |



| 19. **Once a ride is selected, the user is prompted with a screen to confirm their details.**<br> | 7 – Extremely Easy | The confirmation screen is straightforward. On the top of the screen, the UI reminds the user of their desired destination and path of navigation, from start to finish, followed by the type of Uber they chose and price. The action for the user is to confirm their ride, with the wording being 'Confirm UberX' – using words that are familiar to the user, avoiding confusing jargon.<br><br>Again, with regards to Payment, a novice user would have had to take additional time to input their pay information, when they were setting up their Uber account (credit and debit cards, PayPal, Venmo, digital wallets (i.e., Apple Pay), and Uber gift cards).<br><br>Frequent/Previous Uber users will not need to create an account and will already have their payment method included, automating the payment process steps to a certain degree. |
| --- | --- | --- |

| 20. *Potential added step, may vary based off pickup location* <br><br>**Once the user has confirmed their ride, they are prompted to confirm their pickup spot.** <br><br>  | 6 - Easy | A user must select their pickup spot/location, to ensure the Uber driver arrives at the appropriate spot for pickup. <br><br> The word prompts along with the image map reference increase the ease to which the user can decide and choose the correct location. However, there is still a possibility of confusion and increased difficulty for the user if they do not know where they are in relation to the diagram. The imagery provided by Uber can help to decrease confusion but may not fully mitigate it depending on how reflective the imagery is of the actual environment or the familiarity of the use with the location and choices. |

| 21. **Once the ride details and pickup spot have been confirmed, Uber begins the process to confirm the ride with their drivers. The process includes a self-loading screen, which tells the user Uber is confirming their ride, requesting a rider with local drivers, and finally locating a driver.**  | 7 – Extremely Easy | The only action for a user at this point is to wait and read the prompts provided by Uber.<br><br>This portion of the request a ride process is handled solely by Uber, as it is the portion where the driver is selected. However, it demonstrates good usability features in providing user feedback and information to the user (rider) as it completes this process of pairing with the driver. This supports the user in terms of giving confidence that the actions completed had the desired impact. The additional feature of a time passed bar is also very useful to the user to give them an indication of time to complete or progress through these steps. |
|---|---|---|





| | | |
|---|---|---|
| 22. **Once the driver has been located and confirmed by Uber, the pickup details will display for the user to read about their driver.**<br><br> | 7 – Extremely Easy | Once their ride and driver have been confirmed, the user is presented with the primary details/information they need to know immediately on the Uber app UI. This includes:<br><br>- a map (denoting the current location of their driver and their journey as they approach the rider),<br><br>- the estimated pickup time,<br><br>- an estimated time to leave towards the pickup spot to meet their driver,<br><br>- a PIN which the rider will use to confirm their driver,<br><br>- the driver's name and rating (name has been blacked out in this assessment for the purpose of privacy), and<br><br>- the car type and model and license number.<br><br>The user already knows where they are at and where they are going, therefore the most important and useful information to them, after their ride has been confirmed, is driver information and which car to look out for as they are waiting to be picked up, primarily looking for the car type, model, and license plate number, as well as the name of their driver and time to pick-up. Providing this information immediately on the screen for the user prevents the need to scroll or search their screen, saving them time and increasing ease of use with the application. Equally as important, this information is provided in an immediate accessible way increasing the safety of the user. |