**<u>Exhibit I</u>**

# EXHIBIT 2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2             UNITED STATES DISTRICT COURT

3           NORTHERN DISTRICT OF CALIFORNIA

4

5    IN RE:  UBER              )Case No.

     TECHNOLOGIES, INC.,       )3:23-md-03084-

6    PASSENGER SEXUAL          )CRB(LJC)

     ASSAULT LITIGATION        )

7    _____ )

     This Document Relates     )

8    to:                       )

     ALL ACTIONS               )

9    _____ )

10

11

12        REMOTE VIDEOTAPED DEPOSITION OF

13                LACEY KELLER

14              Denver, Colorado

15           Monday, October 27, 2025

16

17

18

19    Reported By:

20    CATHI IRISH, RPR, CRR, CLVS

21

22

23

24

25      Job No. CS7684484

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

```
1
2
3
4
5
6
7
8                    October 27, 2025
9                    11:32 a.m.
10
11          Remote videotaped deposition of
12      LACEY KELLER, with all participants
13      appearing via videoconference, before
14      Cathi Irish, a Registered Professional
15      Reporter, Certified Realtime Reporter,
16      and Notary Public of the State of
17      New York.
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 3

```
 1

 2      A P P E A R A N C E S:

 3

 4          CHAFFIN LUHANA LLP

 5          Attorneys for Plaintiffs and the

 6          Witness

 7              615 Iron City Drive

 8              Pittsburgh, Pennsylvania 15205

 9          BY:  BETH WILKINS, ESQ.

10              MICHAEL SWEET, ESQ.

11

12          KIRKLAND & ELLIS LLP

13          Attorneys for Defendant

14              1301 Pennsylvania Avenue NW

15              Washington, D.C. 20004

16          BY:  JENNIFER LEVY, ESQ.

17              KATIE O'NEILL, ESQ.

18

19          WILLIAMS HART & BOUNDAS

20          Attorneys for Plaintiffs

21              8441 Gulf Freeway

22              Suite 600

23              Houston, Texas 77017

24          BY:  MYLES SHAW, ESQ.

25              STASJA DRECUN, ESQ.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 4

```
 1

 2        A P P E A R A N C E S: (continued)

 3

 4           PEIFFER WOLF CARR KANE CONWAY

 5           & WISE LLP

 6           Attorneys for MDL Plaintiffs

 7                1519 Robert C. Blakes Sr. Drive

 8                New Orleans, Louisiana 70130

 9           BY:  CRISTINE FARAH, ESQ.

10                SARA CRAIG, ESQ.

11                TIFFANY ELLIS, ESQ.

12

13           HAUSFELD LLP

14           Attorneys for Plaintiffs

15                1 Marina Park Drive

16                Suite 1410

17                Boston, Massachusetts 02210

18           BY:  STEVEN ROTMAN, ESQ.

19

20        ALSO PRESENT:

21           LEE BOWRY, videographer

22           BILL CRADDOCK, concierge

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 5

1

2          THE VIDEOGRAPHER:  Good morning.

3     We are going on the record at

4     11:32 a.m. Eastern time on October 27,

5     2025.

6          Please note that this deposition

7     is being conducted remotely using

8     virtual technology.  Quality of

9     recording depends on the quality of

10    camera and Internet connection of

11    participants.  What is seen from the

12    witness and heard on screen is what

13    will be recorded.  Audio and video

14    recording will continuing to take

15    place unless all parties agree to go

16    off the record.

17         This is media unit 1 of the video

18    recorded deposition of Lacey Keller

19    taken by counsel for defendants in the

20    matter of In Re Uber Technologies

21    Passenger Sexual Assault litigation,

22    filed in the United States District

23    Court, Northern District of

24    California, San Francisco Division,

25    case number 3:23-md-03084-CRB (LJC).

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1

2          My name is Lee Bowry representing

3      Veritext Corporate Services and I am

4      the videographer.  The court reporter

5      is Cathi Irish and the concierge is

6      Bill Craddock, also both with

7      Veritext.

8          I am not related to any party in

9      this action, nor am I financially

10      interested in the outcome.  If there

11      are any objections to proceeding,

12      please state them at this time.

13          Hearing none, counsel attending

14      remotely will be noted on the

15      stenographic record.  Will the court

16      reporter please swear in the witness

17      and then counsel may proceed.

18  L A C E Y    K E L L E R,  called as a

19      witness, having been duly sworn by a

20      Notary Public, was examined and

21      testified as follows:

22  EXAMINATION

23  BY MS. LEVY:

24      Q.  Good morning, Ms. Keller.  I am

25  Jenny Levy.  I'm an attorney for Uber.  I

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2     work with Kirkland & Ellis.  I am
 3     currently in Washington, D.C.  It is nice
 4     to see you today.
 5          A.   Same, it's been several years.
 6          Q.   You and I have met in other
 7     litigation; correct?
 8          A.   Yes.
 9          Q.   But it has been a number of
10     years.  And it is nice to see you again
11     this morning.  You understand that you are
12     here testifying under oath today?
13          A.   I do.
14          Q.   And I know that you've been
15     deposed multiple times in the past.  We've
16     done that together in the past so I know
17     that you understand generally how
18     depositions work, but I will ask you when
19     was the last time you had your deposition
20     taken?
21          A.   It was a few months ago.  The
22     date's in my report in my qualifications,
23     the specific date but it's been a few
24     months.
25          Q.   There is -- is there anything
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 8

```
 1                        KELLER
 2      that is preventing you from giving true
 3      and accurate testimony today?
 4           A.    Nothing is preventing me.
 5           Q.    Can we agree that if you do not
 6      understand a question I ask, you will ask
 7      me to clarify the question?
 8           A.    Yes, of course.
 9           Q.    And if you do answer a question,
10      I can assume that you understood the
11      question or are not able to answer it?
12           A.    That makes sense.
13           Q.    Okay.  At any point in time if
14      you would like to take a break, we are --
15      I'm entitled to seven hours on the record
16      but you are the boss here.  So if you need
17      to take a break, I ask you to let's finish
18      my pending question and you give your
19      answer, but then if you need a break, I
20      certainly would be happy to do that at any
21      time.  It is my practice to try to take
22      breaks about every hour, but if you need
23      to get food or to check your e-mail or run
24      to the restroom, let me know and we can
25      take a break at your leisure.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 9

1                    KELLER
2          MS. LEVY:  I'd like to go ahead
3      and mark your expert report in this
4      case as Exhibit 1.  And I think Bill
5      can pull that up.
6              (Exhibit 1, expert report, marked
7      for identification.)
8    BY MS. LEVY:
9          Q.   Ms. Keller, where are you sitting
10   today?
11         A.   I'm in Denver, Colorado.
12         Q.   And where in Denver?
13         A.   In Wagstaff Law Firm.  I don't
14   know exactly the address.
15         Q.   And who is with you today?
16         A.   Beth Wilkins.
17         Q.   Is anybody else with the two of
18   you in the room where you are?
19         A.   No.
20         Q.   Do you have any documents or
21   exhibits that you brought with you today?
22         A.   Yes.
23         Q.   What did you bring with you to
24   the deposition?
25         A.   I brought a complete copy of my

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

```
 1                    KELLER
 2    report, as well as the appendices that
 3    could be printed out.  The ones that were
 4    produced in S3 I did not print out just
 5    because they were voluminous.  And then I
 6    brought a few of the materials from my --
 7    printed out versions of my materials
 8    considered, specifically the interrogatory
 9    responses, the Bliss/Jira field list and
10    my code as to the best it could be printed
11    out.
12         Q.   And do you have notes and
13    personal markings on the copies of the
14    exhibits that you brought with you today?
15         A.   The only thing I've done is add
16    tabs just for easier access to my report
17    but no notes.
18         Q.   There are no notes or markings,
19    if we were to Xerox the exhibits you have
20    with you they would be the same as the
21    ones we have in our possession minus your
22    sticky tabs?
23         A.   Precisely.
24              MS. LEVY:  Thank you.  Bill, the
25         exhibit is showing on the -- I can't
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 11

1                    KELLER

2        see the witness when the exhibit is

3        up.  Is that how it's supposed to be?

4             THE CONCIERGE:  You may be able

5        to adjust your view in your screen.

6             MS. LEVY:  Let me try to pin

7        Lacey.

8    BY MS. LEVY:

9        Q.   So we've marked as Exhibit 1 to

10   your deposition your expert report in this

11   case, page 55, or actually more

12   accurately, yes, 55 contains an electronic

13   signature.  That's your signature;

14   correct?

15       A.   Correct.

16       Q.   Is Exhibit 1 a true and accurate

17   and up-to-date copy of your expert report

18   in this case?

19       A.   This appears to be the main

20   report.  Of course there's other

21   appendices but this is a true and accurate

22   copy of the main report.

23            I also have copies with me of the

24   Uber safety reports.  I just wanted to

25   make sure that that was also part of my

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 12

```
 1                    KELLER
 2     answer of documents that I have in front
 3     of me.
 4          Q.   Do you have any notes or markings
 5     or highlighting on the Uber safety
 6     reports --
 7          A.   No.
 8          Q.   -- that you have with you?  Okay.
 9     Is Exhibit 1 dated September 26, 2025 the
10     most accurate and complete version of your
11     expert report?
12          A.   Yes, this is the most up-to-date
13     copy of my report.
14          Q.   As you sit here today, have you
15     identified any errors in Exhibit 1?
16          A.   Not that I'm aware of, no.
17          Q.   And there's nothing as you sit
18     here today that you've identified that you
19     need to amend or correct in your expert
20     report, Exhibit 1?
21          A.   Not that I'm aware of, no.
22          Q.   Are the opinions that you plan to
23     give at trial in this matter contained in
24     your expert report?
25          A.   Trial is some time away.  I do
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 13

1                        KELLER

2       know that there's been a production of

3       Flack data and we are awaiting a

4       deposition so I reserve my right to issue

5       some opinions based off of that data.

6            Q.   Have you prepared additional

7       opinions already that are not included in

8       this expert report?

9            A.   That data has just recently been

10      produced so I have not had time to review

11      it fully so I do not have opinions

12      formally at this time but I do --

13           Q.   So as you sit here today, all of

14      the opinions that you currently intend to

15      offer subject to that reservation of right

16      are contained in Exhibit 1?

17               MS. WILKINS:  Object to form.

18               THE WITNESS:  Everything that I

19           have an opinion on as far as today is

20           included in Exhibit 1 as well as the

21           appendices that go with Exhibit 1.

22      BY MS. LEVY:

23           Q.   Thank you.  Let's turn to Exhibit

24      C, or Appendix C to Exhibit 1.  And can

25      you tell us what Appendix C is?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 14

```
 1                    KELLER
 2        A.   I think it's a new exhibit.
 3             MS. LEVY:  I'm sorry, Bill, we've
 4        marked that as tab 2.
 5             THE WITNESS:  Do we have toe
 6        refresh each time?  There it goes.
 7             (Exhibit 2, Appendix C, marked
 8        for identification.)
 9    BY MS. LEVY:
10        Q.   Do you have Exhibit 2 in front of
11    you?
12        A.   Yes, but I forgot the question.
13    I'm sorry.
14        Q.   What is Exhibit 2?
15        A.   This is a copy of my
16    qualifications and remuneration.
17        Q.   Did you prepare Exhibit 2
18    yourself?
19        A.   Yes.
20        Q.   Is Exhibit 2 accurate and up to
21    date?
22        A.   Yes.
23        Q.   Is it a complete history of your
24    education and your work experience to
25    date?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 15

1                     KELLER

2          A.   Yes, it is.

3          Q.   Is there anything missing from

4     your qualifications and experience that

5     you're aware of as you sit here today?

6          A.   Nothing.  This is accurate and

7     complete.

8          Q.   Let's start by just turning to

9     page 11.  Is this your CV?

10         A.   It's a résumé, not a CV.  CVs are

11    typically longer but this is my résumé.

12         Q.   If you combine the document, your

13    résumé and the rest of Exhibit C, would

14    you refer to that as your CV?

15         A.   That's a fair representation.

16         Q.   You don't have something

17    different that you use as your CV than

18    what we see here in this Exhibit 2?

19         A.   You broke up.  I think you asked

20    if I have anything different than this,

21    this is what I use, this document and this

22    qualification, this résumé and then the

23    qualifications document.

24         Q.   Okay.  Starting with your

25    education, you got your BA in economics

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 16

```
 1                    KELLER
 2     from Washburn University in 2008; is that
 3     correct?
 4          A.   That's correct.
 5          Q.   And Washburn University is in
 6     Topeka, Kansas?
 7          A.   That's right.
 8          Q.   Are you from Kansas?
 9          A.   I am.
10          Q.   I think I knew that.  And after
11     you graduated from Washburn, what did you
12     do, if anything, between Washburn
13     University and going to The New School in
14     New York?
15          A.   I went straight to graduate
16     school so graduated in May and then
17     started immediately in the fall at The New
18     School.
19          Q.   And how long was the master of
20     arts in economics at The New School, the
21     program you participated in?
22          A.   I completed my master's there.
23     It was a two-year program and I finished
24     in two years.
25          Q.   And The New School is in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 17

```
 1                    KELLER
 2      New York City; correct?
 3           A.   That's right.
 4           Q.   And did you attend the campus in
 5      New York City?
 6           A.   Yeah, campus is a generous word.
 7      It's like many office buildings separated
 8      from one another.
 9           Q.   There's been a recent like really
10      fancy update to The New School, air quote,
11      campus or main building in New York City;
12      is that correct?
13           A.   It's been some time since I've
14      been there but yeah, that main student
15      center was undergoing renovations when I
16      was there.
17           Q.   The New School is now called The
18      New School but at the time you went there
19      it was called The New School for Social
20      Research; is that correct?
21           A.   It's a division.  That's how The
22      New School defines like the college of X,
23      Y and Z, so under The New School is The
24      New School for Social Research, so that's
25      like a division within The New School.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 18

```
 1                    KELLER
 2      Just like Parsons, The New School is the
 3      fashion area that everybody knows from
 4      that television show that was big in 2010.
 5           Q.    Project Runway?
 6           A.    Yes, that's it, Project Runway.
 7           Q.    Just so the record is clear I
 8      think Project Runway is still big.  Is the
 9      economics program of The New School -- is
10      economics under NSSR?
11           A.    Exactly.  So economics is under
12      NSSR, alongside NSSR.  NSSR is like
13      philosophy, political science, economics.
14      Those were kind of the three main areas
15      that were on our floor.
16           Q.    When I was doing research on The
17      New School, my Internet searches indicated
18      that NSSR is widely recognized as a center
19      for heterodox left wing thought.  Does
20      that sound familiar to you, have you heard
21      The New School described like that before?
22                MS. WILKINS:  Form.
23                THE WITNESS:  There's different
24           divisions within The New School and
25           some are more left wing than others I
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 19

```
 1                    KELLER
 2        would say, but I went to that program
 3        because it took -- it allowed me to
 4        take a critical view of all economic
 5        theories that I was learning, not just
 6        orthodox theories which would be like
 7        the neoclassical approaches to
 8        economics, what's known as the
 9        rational man theory but also other
10        approaches to economics that from
11        Keynesian economics to -- to economic
12        theory from including Keynesian or
13        Marxist economics and many others.  So
14        that's the reason I went to that
15        school was because of its critical
16        approach to all forms.
17   BY MS. LEVY:
18        Q.   What does heterodox left wing
19   thought mean, what does that term mean?
20        A.   I don't know.  That's The New
21   School's term.
22        Q.   Okay.  I read on the Internet
23   that The New School has a long history of
24   challenging mainstream intellectual and
25   economic orthodoxies and providing a home
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 20

1                    KELLER
2    for left wing scholars.  Is that true
3    based on your own experience?
4             MS. WILKINS:  Objection to form.
5             THE WITNESS:  That might be true
6        for other programs, maybe in the
7        political science program, but I was
8        in the masters program for economics
9        and so most of my peers were working
10       at institutions like The World Bank
11       and other pretty established entities.
12       I don't know that I would describe the
13       vast majority of them as left wing.  I
14       think a lot of them were just there
15       because of the rigor and the critical
16       approaches to all economic theories.
17   BY MS. LEVY:
18       Q.   Do you agree that the school has
19   a long history of challenging mainstream
20   intellectual and economic orthodoxies; is
21   that true based on your experience?
22            MS. WILKINS:  Object to form.
23            THE WITNESS:  I don't know.
24       Again there's a lot of divisions
25       there.  Some of the professors may

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2         hold themselves out to be more radical
 3         than others.  I mean I went there
 4         because of the rigor of the program.
 5         I'm also a kid from Kansas so the
 6         Washburn University is an excellent
 7         institution and as pretty straitlaced
 8         as you get, so in my experience, I
 9         learned how to think critically and
10         evaluate all theories.  Beyond that I
11         can't really speak to that.
12    BY MS. LEVY:
13         Q.   Is The New School accredited?
14         A.   Yes.
15         Q.   Has it had problems with its
16    accreditation status that you're aware of?
17              MS. WILKINS:  Object to form.
18              THE WITNESS:  I don't know.  I
19         haven't kept up on that.  It hasn't
20         come up.
21    BY MS. LEVY:
22         Q.   Are you aware that The New
23    School's current status is a noncompliance
24    warning status?
25              MS. WILKINS:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                    KELLER

2            THE WITNESS:  I was not aware of

3        that.

4    BY MS. LEVY:

5        Q.    Did you get a communication

6    indicating that there was an accreditation

7    warning status for The New School?

8            MS. WILKINS:  Object to form.

9            THE WITNESS:  No.

10   BY MS. LEVY:

11       Q.    Okay.  Turning to your

12   professional experience, when you

13   graduated from The New School, you went

14   immediately to work at the SEIU; is that

15   correct?

16       A.    That's correct.  I was -- I

17   immediately started there as an intern and

18   then worked through several positions,

19   ultimately being a lead researcher at that

20   institution.

21       Q.    And you were there for about

22   three and a half years, from June of 2010

23   to October 2013?

24       A.    That's correct.

25       Q.    Here on your résumé, you list

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 23

```
 1                     KELLER
 2      some of the areas that you worked on.  Is
 3      this a comprehensive list of all of the
 4      things you worked on or just a sample?
 5           A.   I would say it's maybe the most
 6      notable things that I worked on while at
 7      the union, such as the two reports that I
 8      published while working there and some of
 9      the work that I did at the Walter Reed
10      Medical Center, but it's by no means every
11      single thing that I did over the three and
12      a half years.
13           Q.   The second bullet in this section
14      of your résumé indicates that you
15      developed and executed strategic corporate
16      campaigns by identifying appropriate
17      tactics, relevant research, and necessary
18      resources.
19                What does it mean when you say
20      you developed and executed strategic
21      corporate campaigns, what is that?
22           A.   Kind of a term of art within the
23      industry.  So many times my primary role
24      in that job was to deeply research the
25      history of a company that we were in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 24

1                       KELLER

2        bargaining for so that we would understand

3        its financial position.  So many of these

4        real estate companies would have LLC

5        corporations that owned each building so

6        the main company would have several

7        subsidiaries, and so I'd have to trace all

8        of those subsidiary companies back to the

9        main company as well as review their

10       10-Ks, their DEF-14s for the -- DEF-14s

11       for the executive compensation, review

12       news history as well as any other public

13       filings that I could find about the

14       company to just identify what our

15       strategic position was.  Working in that

16       real estate industry in 2010 following the

17       economic crisis was a particularly

18       difficult time for bargaining, and so

19       understanding the true financial situation

20       of our counterparts to see where they

21       would be able to -- where they would be

22       able to negotiate or maybe they wouldn't,

23       maybe they were hemorrhaging cash and

24       didn't have and we'd have to work together

25       to mitigate costs.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

```
 1                    KELLER
 2       Q.   Work you were doing that you just
 3   described was to help the union be able to
 4   better bargain for its union members;
 5   fair?
 6       A.   I would say having more informed
 7   bargaining position.  Whether it was
 8   better or worse it just helped them know
 9   as much as they could know.
10       Q.   You mentioned in the next bullet
11   that you authored and managed the release
12   of two papers about the conditions of the
13   New York City public school facilities.
14   What was that about?  Just briefly.  I
15   don't need a lot of detail but why was the
16   union interested in condition of school
17   facilities?
18       A.   During that time, it was the era
19   of Michael Bloomberg who said that he
20   would not negotiate with any union and no
21   union would get a contract.  And so it was
22   my directive from the union to identify
23   issues that students and parents would
24   care about alongside the workers.  And so
25   the first report that I authored was about
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

```
 1                      KELLER
 2     the state of the physical plant of the
 3     schools, so did they have appropriate
 4     electrical backgrounds, did they have --
 5     or electrical infrastructure.  Was the
 6     walls like in good physical condition,
 7     were there leaks?  The New York City
 8     School Construction Authority publishes a
 9     number of different data points that I
10     pulled down and analyzed and so I could
11     put together a little report that
12     identified which schools had the lowest
13     scores and highest scores, that sort of
14     thing, and did a comparative analysis.
15             My second report then looked at
16     the racial makeup of the school building
17     that had better or worse conditions based
18     off of those scores and identified
19     patterns that I saw city wide.
20        Q.   I notice that you mention in this
21     bullet about those reports that the second
22     report was widely covered by the local
23     news.
24             Was that -- did you make an
25     effort to get your report covered by the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 27

```
 1                    KELLER
 2    local news?
 3        A.   The union has a communications
 4    department.  I'm not sure what their
 5    approach is.  I was 20 something at the
 6    time so it was the first report that I had
 7    written but I do recall testifying at the
 8    City Council as a result of my report.
 9        Q.   Did you send your report to the
10    local news?
11        A.   Not me personally, no.
12        Q.   Okay.  When you talk about
13    appropriate tactics in the -- in
14    developing appropriate tactics for
15    strategic corporate campaigns, is the work
16    you just described like an example of what
17    you mean by that?
18        A.   Yeah, I think that when people
19    think about labor unions, they think about
20    that ugly rat that they put out in front
21    of buildings when there's a dispute.  And
22    my job was to try to avoid using that rat
23    at any point in time, to use something
24    that was more compelling to the general
25    public, and so those reports are an
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 28

1                    KELLER

2    example of that.  So -- and another

3    example was identifying potential fraud at

4    the National Naval Medical Center and I

5    had done that through open source

6    intelligence research.

7        Q.   Did any of your work at the SEIU

8    involve sexual assault or sexual

9    misconduct?

10       A.   My role is primarily in the

11   corporate side of things so working on

12   reviewing the corporate documents and data

13   around those -- the companies that we were

14   working with.

15       Q.   You don't recall doing any work

16   on the issue of sexual assault or sexual

17   misconduct while you were at the SEIU?

18       A.   Not as a specific -- not as a

19   specific issue area or research area.

20   Again, most of my work was focused on the

21   financials and background of the company.

22       Q.   Did you as -- you're caveating

23   it.  Did you do any work at all, even if

24   it wasn't a specific research area on

25   sexual assault or sexual misconduct while

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 29

1                         KELLER
2       you were at SEIU?
3                 MS. WILKINS:  Object to form.
4                 THE WITNESS:  I'm trying not to
5             caveat, I'm just clarifying that the
6             work that I did was predominantly in
7             those issue areas.  I'm not saying
8             completely because there's three and a
9             half years of work history but as far
10            as that issue specifically, none of
11            our corporate research that I have
12            identified or that I am remembering
13            called upon that specifically.  Is it
14            possible that one executive was
15            accused of malfeasance somewhere and
16            it was in a report?  Possibly but I
17            don't -- I don't recall.
18      BY MS. LEVY:
19            Q.   You actually anticipated my next
20      question.  Did SEIU have a sexual
21      misconduct problem to your knowledge while
22      you were there?
23                MS. WILKINS:  Object to form.
24                THE WITNESS:  I wasn't aware of
25            one.  There wasn't anything that I'm

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                      KELLER
 2        aware of, no.
 3             MS. LEVY:  Can we mark tab 39?
 4             THE WITNESS:  Will we know when
 5        it's ready or do I have to refresh?
 6             MS. LEVY:  I think it will come
 7        up on your screen.  Do you see it now
 8        because I can see it on mine.
 9             THE WITNESS:  I see it now.
10             (Exhibit 3, article titled SEIU
11        Has A Sexual Predator Problem, marked
12        for identification.)
13   BY MS. LEVY:
14        Q.   Can you see it?
15        A.   Yes.
16        Q.   You can or cannot?
17        A.   I can see it.
18        Q.   This is an article from 2021 that
19   postdates your time at SEIU but the writer
20   is writing about -- the title of the
21   article is SEIU Has A Sexual Predator
22   Problem.  Do you see that?
23        A.   Yes, I see that that's what it
24   says on this document.  I've never seen
25   this document before so --
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 31

```
 1                     KELLER
 2        Q.   Yeah, I wouldn't -- question
 3   number 1 was going to be have you seen
 4   this document before and I understand that
 5   you have not.
 6             The article references a number
 7   of sexual misconduct allegations that
 8   occurred previously at SEIU.  My question
 9   to you is:  Were you aware during your
10   time at SEIU that SEIU had a sexual
11   misconduct problem?
12             MS. WILKINS:  Asked and answered.
13             THE WITNESS:  Let me just read
14        this.
15             (Witness perusing document.)
16             So this is an article talking
17        about -- hang on a second.
18             So again, I've not read this
19        before so this is the first time I'm
20        seeing this.  It appears that most --
21        so when we're talking about SEIU you
22        have to remember there's multiple
23        local unions.  There's SEIU the parent
24        organization which at the time was led
25        by Mary Kay Henry.  I'm not sure if
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 32

1              KELLER

2         she's still in charge over there.  And

3         then there was the division so there's

4         different locals.  So I was part of

5         local 32 VJ and our president was --

6         oh my gosh, I'm forgetting his name

7         but he passed away suddenly.  And so

8         the individuals that are -- the only

9         individual that I see here from that

10         union is Pedro Malave.  I don't know

11         who that is.  I never worked with that

12         person.  He appears to be a staff

13         member and not a member of executive

14         leadership so I don't know who that

15         is, where they were in that

16         organization and so really a large

17         organization.  But yeah, that's all I

18         have to say about that.  I was not

19         aware of anything, nor do I know any

20         of the people cited in this article.

21    BY MS. LEVY:

22         Q.   Do you have a reason to deny that

23    what this headline says, SEIU has a sexual

24    predator problem, or you just have never

25    heard of this one way or the other?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 33

1                    KELLER

2            MS. WILKINS:  Object to form.

3            THE WITNESS:  I have not heard of

4         it one way or the other.

5    BY MS. LEVY:

6         Q.   Okay.

7         A.   I don't know even what the

8    Freedom Foundation is.  It's not a

9    publication that I'm familiar with so I

10   can't really say.

11        Q.   We can pull that one down.

12   During your three and a half-ish years at

13   SEIU you were never asked to study data or

14   look into and specifically research

15   anything to do with sexual misconduct or

16   allegations of sexual assault; is that

17   correct?

18            MS. WILKINS:  Asked and answered.

19            THE WITNESS:  Are you asking with

20         regard to the union itself and its own

21         practices or with regard just

22         generally as a topic?

23   BY MS. LEVY:

24        Q.   Both.

25        A.   The answer is the same for both.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

```
 1                    KELLER
 2    My directive was to review corporate
 3    documents and financials as well as the
 4    types of work that I did for the school
 5    system, especially in the last year to two
 6    years of my time being at the union.
 7            MS. LEVY:  Can we mark Exhibit
 8        38, please?  Sorry, tab 38.  It should
 9        be Exhibit 4.
10            (Exhibit 4, article titled
11        Student Sues University Over Response
12        to Sexual Misconduct, marked for
13        identification.)
14    BY MS. LEVY:
15        Q.   Have you ever heard of The New
16    School Free Press?
17        A.   Yeah, I am somewhat familiar with
18    them.
19        Q.   Was The New School Free Press a
20    publication that existed during your time
21    there?
22        A.   I don't remember.  There was an
23    active publication at the time.  I don't
24    know if it was The New School Free Press
25    or something else.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                    KELLER

2        Q.    This article which was posted

3    during your time at New School is dated

4    April 17, 2018.  It refers to a lawsuit

5    brought by a student over the school's

6    response to sexual misconduct claims.  Are

7    you familiar with that situation?

8              MS. WILKINS:  Object to form.

9              THE WITNESS:  Not at all.  This

10        is the first that I'm seeing this.

11    BY MS. LEVY:

12        Q.    Do you -- have you heard of or do

13    you remember at NSSR psychology department

14    co-chair Emanuele Castano, is that

15    somebody you ever encountered?

16        A.    No.  I don't know who that is.

17        Q.    And before today, in this

18    article, you have not heard about any

19    sexual misconduct that happened between

20    this professor and a student or multiple

21    students at The New School?

22              MS. WILKINS:  Object to form.

23              THE WITNESS:  Let me read because

24        you're asking about the background of

25        it but --

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2    BY MS. LEVY:
 3         Q.   I'm just asking if you ever heard
 4    of this issue.
 5         A.   This --
 6              MS. WILKINS:  Object to form.
 7              THE WITNESS:  The issue being the
 8         lawsuit or the issue being the
 9         allegations?
10    BY MS. LEVY:
11         Q.   Either one.
12         A.   I am not aware of either.  I have
13    not heard of this until today so I
14    couldn't say but again, I've not heard of
15    any lawsuit being filed as far as the
16    faculty at The New School while I was
17    there.
18         Q.   When you were at The New School,
19    did the school have a problem with sexual
20    misconduct?
21              MS. WILKINS:  Object to form.
22              THE WITNESS:  Not that I'm aware
23         of.  Again, I went to school, I did my
24         studies, I didn't have any problems
25         and my classmates as far as I was
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 37

```
 1                   KELLER
 2      aware didn't have any problems but I
 3      really don't know.
 4  BY MS. LEVY:
 5      Q.   Okay.  And you don't know whether
 6  the allegations that are referred to in
 7  this article which refers to a lawsuit,
 8  you have no idea anything about the
 9  allegations, whether they are true or
10  false?
11           MS. WILKINS:  Asked and answered.
12           THE WITNESS:  Yeah, this is years
13       after.  When is this dated, April
14       2018, that's eight years after I
15       graduated so I have no idea what this
16       is about.  This is the first time I'm
17       seeing it.
18  BY MS. LEVY:
19      Q.   And do you believe that The New
20  School is immune from sexual misconduct?
21           MS. WILKINS:  Asked and answered,
22       outside the scope of her report.
23       She's not here to talk about The New
24       School and any potential allegations
25       that have been made about it.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

```
 1                    KELLER
 2          THE WITNESS:  I haven't given it
 3       any thought, to be honest.  So this is
 4       the first that these issues have been
 5       brought to me so this is -- I haven't
 6       given it thought before this.
 7   BY MS. LEVY:
 8       Q.   When you left the SEIU, did
 9   you -- while you were at SEIU, did you
10   study any participant in the
11   transportation industry?
12          MS. WILKINS:  Object to form.
13          THE WITNESS:  Boy, you're making
14       me think back almost 20 years.  Most
15       of our studies were on theoretical
16       economics, econometrics and statistics
17       and then my thesis which was based off
18       of pensions.  To the extent that I
19       mean the pensioners that I was
20       studying worked in the transportation.
21       Because that industry is often
22       unionized or sometimes unionized, I
23       should say, I might have overlap there
24       but that's kind of the major areas of
25       study while I was there.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 39

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   Okay.  To ask you a more specific
 4    question, you've never studied safety of
 5    taxis, for example?
 6            MS. WILKINS:  Object to form.
 7            THE WITNESS:  I have looked at
 8        some public datasets a long time ago
 9        relating to public safety for the data
10        availability even of that data, the
11        availability of that data, but I am
12        not offering any opinions on that in
13        my report.
14            MS. LEVY:  And Bill, you can pull
15        down that exhibit.
16    BY MS. LEVY:
17        Q.   Let me make sure I understand
18    your answer.  For purposes of work in this
19    case are you saying you looked for the
20    availability of safety information about
21    taxis?
22        A.   So I'm saying in the past while I
23    was at the AG's office, even for my -- not
24    my graduate, my senior level students that
25    I teach, I think they look at some bike
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 40

1              KELLER

2    share data.  We've looked at

3    transportation data specifically.  I know

4    that when I'm at the AG's office I've

5    looked at a number of datasets that are

6    publicly available.  So I'm not offering

7    opinions on that.  That's not the purpose

8    of my report, so I don't have anything

9    more to say.  But generally, have I ever

10   looked at data?  It's possible.  I looked

11   at a lot of data when I was in previous

12   positions.

13      Q.   For purposes of this report, you

14   haven't made any comparison of the safety

15   of Uber to any other alternative; correct?

16      A.   The purpose of my report was in

17   some ways similar to the purposes of

18   reports that I've done before, and I think

19   you're very familiar with them where

20   showing the data that in the past I would

21   have said known or could have known

22   because we were working with different

23   datasets.  In this litigation the purpose

24   of my report is to show what Uber -- what

25   data Uber had in its possession and the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 41

1                        KELLER

2      knowledge that it had about that data

3      compared to what it was showing the

4      public.  So making comparisons to the taxi

5      industry was not necessary to do to carry

6      out my primary purpose of the report.

7           Q.   So the answer is no, you have not

8      looked at safety data for alternatives to

9      Uber, you've only looked at Uber's data;

10     correct?

11               MS. WILKINS:  Asked and answered.

12               THE WITNESS:  The answer is it

13          was not necessary to carry out my goal

14          which was to show the data that Uber

15          had in its possession, the knowledge

16          that it had about that data and what

17          it was doing with it compared to what

18          it was telling the public.

19     BY MS. LEVY:

20          Q.   Okay.  And given that you have

21     not looked at or studied or provided

22     opinions on the alternatives, I can assume

23     that you don't intend to give opinions in

24     this case about Uber's relative safety

25     compared to other things; is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1                      KELLER
2           MS. WILKINS:  Object to form.
3       Also asked and answered.
4           THE WITNESS:  You're breaking up
5       a tiny bit for me but I think you
6       asked whether I intended to offer any
7       opinions.  Again, the Flack data was
8       just produced a week ago I would say,
9       so I have reserved my right to review
10      that data.  I'm not sure of my
11      opinions that I will offer at this
12      time.
13  BY MS. LEVY:
14      Q.   You are not intending to offer
15  any opinions on the relative safety
16  between Uber and other alternatives to
17  Uber, true or false?
18          MS. WILKINS:  Object to form.
19          THE WITNESS:  Again, the data is
20      still -- has just been produced and I
21      reserve my right to analyze that data
22      so I can't say one way or another.  I
23      don't know.
24  BY MS. LEVY:
25      Q.   Do you think the Flack data has

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 43

```
 1                   KELLER
 2     information about other alternatives to
 3     Uber?
 4        A.   You're asking me if I intend to
 5     offer any opinions about the relative
 6     risk, and to do such a thing would require
 7     analyzing Uber data and I haven't analyzed
 8     that dataset yet and so it is -- I just
 9     don't want to theorize what I might be
10     doing because I haven't given that dataset
11     a full review.
12        Q.   As you sit here today, you have
13     done no research and no looking at other
14     data that's not Uber, alternatives to
15     Uber; is that true?
16             MS. WILKINS:  Asked and answered.
17             THE WITNESS:  My report shows
18         what data Uber has in its possession,
19         what it knows about that data and how
20         it has used that data.  And I compare
21         those facts to what Uber tells the
22         public.  That's what's in my report
23         and that's the opinions that I am
24         currently offering.
25     ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 44

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   When you left the SEIU you went
 4    to work at the New York State Attorney
 5    General's office?
 6        A.   That's correct.
 7        Q.   And you were there for just over
 8    four years from 2013 in October to 2017
 9    November; correct?
10        A.   Yes.
11        Q.   Who was the AG at the time you
12    worked for the AG's office?
13        A.   Eric Schneiderman.
14        Q.   Did you know Attorney General
15    Schneiderman?
16        A.   Yes.
17        Q.   And the work that is listed on
18    your résumé under New York State AG's
19    office, is that a true and accurate
20    summary of the work, the highlights of the
21    work you did during your four years there?
22        A.   Can I pull that back up?
23        Q.   Sure.
24        A.   This is definitely the highest of
25    highlights but there are other cases that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 45

```
 1              KELLER
 2    I discuss in my qualifications document in
 3    text form that also highlight some of my
 4    work at that office.
 5        Q.   While you were in the New York
 6    State AG's office, did you ever study or
 7    research sexual assault and sexual
 8    misconduct specifically?
 9            MS. WILKINS:  Object to form.
10            THE WITNESS:  I'm not sure how
11        you are defining sexual misconduct and
12        here's what else I did work on.  We
13        worked on -- what can I say without
14        violating confidentiality -- I would
15        say I worked on a potential human
16        trafficking case using public datasets
17        and I don't think anything has been
18        disclosed publicly about that case so
19        I think that's about the extent to
20        which I can talk about that.
21    BY MS. LEVY:
22        Q.   Understood.  At a very general
23    level, was that work an investigation of a
24    potential defendant or like a -- let me
25    back up and ask it a different way.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

```
 1                    KELLER
 2          In the past you've described the
 3     gun trafficking dashboard that you
 4     developed while at the AG's office in
 5     New York, and my understanding at a high
 6     level of that work was you took large sets
 7     of data and were attempting to pinpoint
 8     where illegal activity was.  Is that a
 9     fair summary?
10          A.   The gun trafficking dashboard
11     unit was paired with additional
12     investigative work and leads but that
13     dashboard was to provide the public with
14     -- realtime wasn't available, but with the
15     most up-to-date data that we had from ATF
16     on the state of gun trafficking to allow
17     the public to identify the trends and
18     patterns that they found to be of
19     interest.  Many of the reports that ATF,
20     the Bureau of Alcohol, Tobacco and
21     Firearms were putting out at the time were
22     very high level.  They would give overall
23     totals for the whole state which means
24     New York City would be dwarfing the rest
25     of the trends for like Buffalo and
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 47

1                        KELLER
2       Rochester and smaller cities Upstate.  So
3       the tool that we created allowed users,
4       whether it was local leaders or the
5       general public, to drill into specific use
6       cases -- or I'm sorry, specific patterns
7       that they wanted to see.
8            Q.   Was the goal to try to reduce or
9       eliminate illegal gun trafficking?
10           A.   I think the goal was to give --
11      give leaders and decision-makers more
12      information than they ever had previously
13      because that information just was made
14      available in these very aggregated
15      reports.  The specific investigative
16      pieces of those and specific leads, it was
17      public data so I don't think that that --
18      you couldn't go creating leads out of that
19      dataset, that public dashboard, because it
20      was scrubbed public data.  There's a
21      number of other dashboard that we created
22      that was for trafficking investigations,
23      that were law enforcement sensitive.
24           Q.   Has the State of New York been
25      able to eliminate illegal gun trafficking?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 48

```
 1                    KELLER
 2          MS. WILKINS:  Object to form,
 3      outside the scope of her report and
 4      the opinions that she's here to talk
 5      about today as she's offering
 6      information.
 7          THE WITNESS:  I haven't been in
 8      contact with leaders at New York AG's
 9      office about this issue and so I
10      wouldn't be able to say one way or the
11      other.  I know that dashboard is still
12      live and that we continue to work with
13      law enforcement officials nationwide
14      on another gun trafficking platform.
15  BY MS. LEVY:
16      Q.   The New York -- studying an issue
17  and applying data analytics and learning
18  everything you can learn about it, you've
19  done a lot of that in your career.  In
20  fact, you've been on the forefront of some
21  efforts on that in various areas that we
22  see in your résumé; true?
23      A.   The New York Attorney General's
24  office was the first AG's office to hire a
25  data scientist nationwide so I would say
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 49

```
 1                  KELLER
 2   western at the forefront in that division
 3   and that division is really large now.  I
 4   think it's well over 10 people, if I
 5   recall.
 6       Q.   And I assume you would agree with
 7   me that when it comes to safety and trying
 8   to reduce illegal activity, it's a good
 9   thing to hire data scientists and study
10   the issues and try to use data to that
11   end; correct?
12           MS. WILKINS:  Object to form.
13           THE WITNESS:  Our role was
14       revolutionary to the office because we
15       were able to -- and I remember vividly
16       my first report at the office was on
17       Airbnb and they came into
18       New York City and we had received data
19       from that company and I was able to
20       identify where that company was
21       operating -- or not the company, where
22       people were renting out their
23       apartments on that platform and doing
24       so illegally.  The illegality part of
25       that, of course, I needed the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

```
 1              KELLER
 2      assistance of a lawyer for, but my
 3      department was able to do things like
 4      that which would have primarily been
 5      through anecdotes or surveys prior to
 6      my arrival.  And after my arrival they
 7      were able to look at the whole
 8      picture, analyze all of the data that
 9      was obtained through subpoena or
10      through public records.
11  BY MS. LEVY:
12      Q.  And you applied that kind of work
13  to gun trafficking, illegal Airbnb rentals
14  and other issues; right?
15          MS. WILKINS:  Object to form,
16      vague.
17          THE WITNESS:  Because I was the
18      head of the data team we used data to
19      support the investigative or
20      litigation efforts -- I would say
21      investigative would be the -- the
22      investigative, the pre-investigative
23      efforts of the office no matter what
24      the topic was.  So I would work with
25      the Internet Protection Bureau to the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 51

```
 1                    KELLER
 2         Consumer Protection Bureau all the way
 3         to the Labor Bureau.  We would see
 4         just a myriad of different cases
 5         throughout my time there.
 6    BY MS. LEVY:
 7         Q.   Were you ever asked to perform
 8    research, data analytics, data mining on
 9    sets of data relating to sexual assault or
10    sexual misconduct while you worked at the
11    New York State AG's office?
12         A.   So when you say relating to, I'm
13    still thinking of that prostitution/human
14    trafficking case because we did mine a
15    number of data sets including a dataset
16    that was basically a clearinghouse for
17    reviews.  But that's --
18         Q.   Without saying anything at all
19    confidential, we're getting close to it,
20    was that an effort to find a single
21    perpetrator or to identify trends of
22    misconduct or multiple perpetrators?
23         A.   Both.  It was to identify -- if
24    there was a trend, I would say if there
25    were red flags, to borrow from previous
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52

```
 1                    KELLER
 2    work, red flags within an industry that we
 3    were reviewing and then identify actors
 4    worthy of investigation as a next step in
 5    that work.
 6         Q.   As a result of that effort, did
 7    you expect to eliminate all prostitution
 8    or eliminate all human trafficking?
 9              MS. WILKINS:  Object to form.
10              THE WITNESS:  That was -- I don't
11         want to say too much about the
12         industry but we were focused on a
13         particular industry, not human
14         trafficking at large, it was a
15         particular industry.
16    BY MS. LEVY:
17         Q.   Was the State of New York able to
18    fully eliminate prostitution and human
19    trafficking in that industry?
20              MS. WILKINS:  Object to form and
21         again it's outside the scope of the
22         opinions Ms. Keller is offering in her
23         report in this litigation.
24              THE WITNESS:  I cannot say what
25         the outcome of the investigative work
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

1                    KELLER

2        is because it is under

3        confidentiality.  I don't think that

4        anything has been released publicly

5        about that work, unfortunately, so I

6        can't say what the result of that work

7        is.

8    BY MS. LEVY:

9        Q.   Let me ask you more generally as

10   a data scientist who's worked at assisting

11   law enforcement.  Do you agree or disagree

12   that even if you apply the best study and

13   the best research, that does not

14   necessarily mean you can completely

15   eradicate illegal activity, do you agree

16   with that or do you disagree with that?

17            MS. WILKINS:  Object, overbroad,

18        vague.

19            THE WITNESS:  I agree that data

20        provides us with information and we

21        can use data such as how we did at the

22        AG's office to do data-driven law

23        enforcement or policing or another

24        phrase is like evidence-based

25        policing.  Those are key phrases in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 54

1                    KELLER

2        that industry.  Data can help you

3        prioritize resources and that was a

4        really effective use of data for us is

5        when you have limited resources at the

6        AG's office, being able to prioritize

7        your investigative efforts, data

8        allows you to do that.  So it allows

9        you to make informed decisions and use

10        your resources wisely.

11    BY MS. LEVY:

12        Q.   Can data stop criminals from

13    committing crimes?

14            MS. WILKINS:  Object to form.

15        We're really outside of the scope of

16        Ms. Keller's opinions in this

17        litigation.

18            MS. LEVY:  This is like the --

19        I've been trying to be patient with

20        speaking objections.  You can object

21        to form.  We are -- as you know, from

22        the court order you are not allowed to

23        say them.

24            MS. WILKINS:  That is not

25        accurate for expert witnesses.  I'll

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 55

```
1                    KELLER
2         restart.
3              Ms. Levy, what you said is not
4         accurate.  I believe what you are
5         referencing is a court order that was
6         in place for witnesses, custodial
7         witnesses, but doesn't apply to expert
8         witnesses.  I have not made speaking
9         objections.  Objecting to form as
10        being vague or overbroad is proper.
11        Objecting to questions being outside
12        of the scope of the expert's report is
13        also proper.
14              MS. LEVY:  I'm referring to the
15        federal rules.  We can agree to
16        disagree.  If I need more time, we
17        will address that at the back end.
18        You do that at your own risk.
19   BY MS. LEVY:
20        Q.   Ms. Keller, do you know -- let me
21   make sure I got an answer to my last
22   question.  Do you believe, yes or no, that
23   data, reviewing data and studying data can
24   prevent criminals from committing crimes?
25              MS. WILKINS:  Same objections.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 56

```
 1                    KELLER
 2          THE WITNESS:  Data allows law
 3      enforcement officers, advocates, never
 4      studying that area, to make informed
 5      decisions about what that criminal
 6      behavior might be.  If you're looking
 7      for as exemplified in the Airbnb
 8      report, repeat offenders or large
 9      operators of operations within
10      New York City, if you're looking for
11      in the trafficking data those
12      individuals who have purchased a
13      number of guns that did not -- that
14      they did not keep themselves and that
15      they had passed on to others and
16      someone else was in possession of
17      those guns, data allows law
18      enforcement officers or the people who
19      are studying that to make informed
20      decisions, potentially policies,
21      potentially laws about that data.
22   BY MS. LEVY:
23      Q.   And from your observations and
24   what you've seen in the materials you've
25   reviewed for this case, you're aware that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

```
 1                    KELLER
 2    Uber has, in fact, taken -- employed data
 3    scientists and data teams to do exactly
 4    that, to study the issue of sexual assault
 5    and misconduct, you're aware of that;
 6    right?
 7             MS. WILKINS:  Object to form.
 8             THE WITNESS:  I have a number of
 9         opinions in my report about the
10         information that Uber has, what it
11         knew about that information and ways
12         that it has chose to employ that.  One
13         example that comes to mind is the
14         S-RAD program that Uber used and
15         created to, quote, prevent sexual
16         assaults and I offer a number of
17         opinions in my report on that program
18         specifically.
19    BY MS. LEVY:
20         Q.   And S-RAD is a technology that
21    Uber invented from scratch, it doesn't
22    exist before Uber developed it; correct?
23         A.   Like I said, S-RAD was a program
24    that Uber created to, quote, prevent
25    sexual assaults.  They did so starting in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 58

```
 1                    KELLER
 2   2017 using the data that it had been
 3   collecting for a number of years.  And at
 4   the time, I think they looked at over 200
 5   different metrics to include in the model.
 6       Q.   And you don't know of any other
 7   model that's anything like S-RAD to study
 8   this issue, do you?
 9            MS. WILKINS:  Object to form.
10            THE WITNESS:  So S-RAD has a very
11       specific role in Uber.  It's a tool
12       that Uber has at its disposal to -- as
13       part of its pairing algorithm.  I
14       would not describe it fully as a
15       study.  It's something beyond a study.
16   BY MS. LEVY:
17       Q.   Can you point me to any other
18   corporation or any other model that's been
19   developed that you're aware of to study
20   sexual assault and misconduct that's like
21   S-RAD or that's better than S-RAD, have
22   you ever seen anything else like that?
23            MS. WILKINS:  Object to form.
24            THE WITNESS:  So at its core,
25       Uber is a machine-learning algorithm.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 59

```
 1                    KELLER
 2        Companies and corporations have made
 3        their millions and billions off of
 4        machine-learning algorithms.  Netflix
 5        recommends movies to you.  That is a
 6        machine-learning algorithm.
 7        Machine-learning algorithms can be
 8        used wherever Uber has chosen to use
 9        machine learning -- this
10        machine-learning algorithm to prevent
11        sexual -- or in their words to prevent
12        sexual assaults.  And only Uber has
13        the data to do that because it is
14        their own data that they have been
15        collecting on users, trips, drivers,
16        user's phones for a number of years.
17   BY MS. LEVY:
18        Q.   Do you remember my question?
19        A.   I do and I just answered it.
20        Q.   What was the question?
21        A.   Am I aware of any other company
22   that developed -- I can't get the wording
23   exactly right -- a program like S-RAD to
24   study sexual assault.
25        Q.   Let me be more specific because I
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2      don't think you were understanding me.
 3              Can you identify for me any other
 4      company that has developed a complex model
 5      to study sexual assault?
 6              MS. WILKINS:  Object to form,
 7          also asked and answered at least
 8          twice.
 9              THE WITNESS:  S-RAD at its core
10          is a machine-learning algorithm.
11          Companies use them all the time to
12          study -- or not even to study -- to
13          identify and predict a particular
14          outcome.  It would be impossible for
15          me to study every company's algorithms
16          and they probably wouldn't even let me
17          because those are proprietary.  And
18          even Uber was very specific about how
19          I had to access their data due to the
20          sensitive and proprietary natures of
21          such things.  So S-RAD is not unique
22          in that it uses at its core machine
23          learning.  That is something that's
24          available to all companies.
25              MS. LEVY:  I'm going to move to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 61

1              KELLER

2       strike as nonresponsive and if we

3       can't get a straight answer to various

4       straightforward questions we're going

5       to have to get another day of time.

6       So just letting you guys know.

7   BY MS. LEVY:

8       Q.   My question is:  Can you identify

9   any other corporation that has developed a

10  tool to study sexual assault and sexual

11  misconduct, can you identify one, name

12  one?

13          MS. WILKINS:  I'm going to object

14      to the improper motion to strike.  You

15      know it's not allowed in this case and

16      also again to the question as having

17      been asked and answered and it's

18      vague.  You can ask her a more

19      specific question.  I won't object to

20      it.

21  BY MS. LEVY:

22      Q.   Identify the company that has

23  done something like this.

24          MS. WILKINS:  And that's vague.

25          THE WITNESS:  I would be

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 62

```
 1                    KELLER
 2        theorizing if I were to try to
 3        identify a company because all --
 4        companies have at their disposal
 5        machine learning.  And especially with
 6        the advent of AI, machine learning is
 7        becoming more and more democratized to
 8        corporations.  So I would be guessing
 9        if any company had or had not done
10        this exact same thing.  I don't know.
11        And it is not particularly -- and at
12        its core it's machine learning.
13        That's it.
14   BY MS. LEVY:
15        Q.   You can't identify any company
16   that's put more resources and effort to
17   studying the issue than Uber, can you?
18             MS. WILKINS:  Asked and answered.
19        I object to form.
20             THE WITNESS:  That would require
21        me to give an informed response on
22        that, would require me to have done
23        and had access to the same amounts of
24        documents that was produced in this
25        litigation for other companies.  And
```

Page 63

```
 1                    KELLER
 2        we know that that's not how companies
 3        operate.  They don't just open up
 4        every document, every database unless
 5        they are forced to.  So that is just
 6        an impossible thing for me to know.
 7   BY MS. LEVY:
 8        Q.   Thank you.  When you worked at
 9   the New York State Office of Attorney
10   General, you were not asked to analyze
11   other than what you've already testified
12   to about prostitution and human
13   trafficking, you were not asked to analyze
14   datasets about sexual assault and
15   misconduct relating to transportation
16   other than what you've already told us; is
17   that correct?
18             MS. WILKINS:  Object to form.
19             THE WITNESS:  I'm just thinking.
20        I worked on so many issues while I was
21        there and was asked often to research
22        potential areas of investigations.  It
23        is entirely possible that I researched
24        something related to transportation or
25        sexual assault, but I had a number of
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 64

1                    KELLER

2        cases that I was balancing and that my

3        team was balancing at the time.  So I

4        guess that's the best that I can

5        answer that question.

6    BY MS. LEVY:

7        Q.   As part of your work in this

8    case, did you look at or research

9    prevalence of sexual assault and

10   misconduct outside of Uber in places that

11   are not Uber?

12       A.   So my opinions in this case and

13   in my report discuss the information that

14   Uber had, that it knew about, how it used

15   it and what it told the public.  That is

16   my opinion in this matter and that was not

17   a necessary exercise to form the opinions

18   about what Uber knew versus what they told

19   the public.

20       Q.   So no, you did not do that?

21            MS. WILKINS:  Asked and answered.

22            THE WITNESS:  My answer is it was

23        not necessary because that was not

24        part of my opinion.  My opinion was

25        what did Uber know and what did it do

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 65

```
 1                         KELLER
 2          with that information and what did it
 3          tell the public.
 4     BY MS. LEVY:
 5          Q.    And because it wasn't necessary,
 6     you didn't look at that; correct?
 7               MS. WILKINS:  Asked and answered.
 8               THE WITNESS:  Again, same answer.
 9          My report similar to the reports that
10          I have offered in the past shows the
11          information that the entity, in this
12          case Uber, had in its possession and
13          what they did with that information
14          and then in this case what they told
15          the public.
16     BY MS. LEVY:
17          Q.    Did someone instruction you that
18     you can't say yes or no to questions?
19          A.    I'm explaining my answer because
20     a yes or no is not comprehensive of the
21     work that I've done here.  A yes or no is
22     your phrasing of it and so I'm trying to
23     explain where I'm coming from.  I'm a
24     thorough person and I want to give
25     thorough answers.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

```
 1                    KELLER
 2        Q.   So when I ask you if you studied
 3   the rate of sexual misconduct outside of
 4   Uber you can't answer that with a yes or
 5   no?
 6        A.   Because it's not necessary for my
 7   assignment and I'm telling you what my
 8   assignment is to give a complete and
 9   honest answer.
10        Q.   There is no institution that
11   you're aware of, no place unfortunately
12   that is immune from sexual assault and
13   misconduct; do you agree with that?
14             MS. WILKINS:  Object to form.
15             THE WITNESS:  I don't know what
16        this phrase immune to sexual assault
17        means.  What are you asking me?
18   BY MS. LEVY:
19        Q.   Sexual misconduct and sexual
20   assault is a reality in our society; do
21   you agree with that?
22        A.   These are -- I know that Uber
23   says that in its safety reports and it
24   says that to the public.  I don't really
25   have -- yeah, I know that Uber says that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 67

```
 1                   KELLER
 2      in its safety reports.  I know that it's
 3      aware of the underreporting that occurs on
 4      the platform and beyond that, I don't
 5      often opinions on that.
 6           Q.   You can't answer whether Uber --
 7      whether -- excuse me, strike that.
 8                You can't answer the question
 9      whether sexual misconduct is a societal
10      problem in New York, for example, it's a
11      problem in New York?
12                MS. WILKINS:  Object to form.
13                THE WITNESS:  I don't know how
14           you're defining problem, whether what
15           that value term means to you.  What I
16           do know is Uber's own partner says
17           that it's an issue nationwide, that
18           underreporting especially is an issue
19           nationwide and that Uber's internal
20           documents show that underreporting is
21           especially a problem at the company.
22           That's the extent of my opinions on
23           that.
24      BY MS. LEVY:
25           Q.   We'll get to underreporting in a
```

Page 68

```
 1                    KELLER
 2    few minutes but you don't have any reason
 3    to disagree with Uber's statement that
 4    sexual assault, sexual misconduct is a
 5    societal problem, you don't disagree with
 6    that?
 7             MS. WILKINS:  Asked and answered.
 8             THE WITNESS:  The opinions that I
 9        offer in my report, I don't -- if I am
10        talking about that Uber statements
11        specifically, it is in regard to
12        underreporting nationally and with
13        regard to the platform.  I don't have
14        opinions on societal influences or
15        societal problems.  I'm here to talk
16        about the data that Uber had, what it
17        did with that and what it told the
18        public.
19    BY MS. LEVY:
20        Q.   Before we move on from that, you
21    do not have an opinion on whether sexual
22    assault and sexual misconduct is a problem
23    in our society?
24        A.   I'm offering opinions on the data
25    that Uber had, what it knew about that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 69

```
 1                    KELLER
 2    data, what it did with that data, all
 3    S-RAD and other programs, or S-RAD I
 4    should say, and how underreporting
 5    occurred not only nationwide but in the
 6    platform.  That's -- that is examples of
 7    my opinions on this.
 8        Q.   The New York State Office of
 9    Attorney General had a problem with sexual
10    misconduct while you were working there;
11    correct?
12            MS. WILKINS:  Object to form,
13        misstates prior testimony.
14            THE WITNESS:  I don't think we've
15        discussed this.  What are you
16        specifically talking about?
17    BY MS. LEVY:
18        Q.   Did the New York AG's office have
19    a problem with sexual assault and
20    misconduct when you were employed there?
21            MS. WILKINS:  Object to form.
22            THE WITNESS:  Not that I was
23        aware of.
24            MS. LEVY:  Mark tab 41.
25            (Exhibit 5, article from The
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

```
 1                    KELLER
 2        New Yorker, marked for
 3        identification.)
 4            THE VIDEOGRAPHER:  And Counsel,
 5        just while we're waiting for that
 6        document, this is the videographer,
 7        we're about 12 minutes away from
 8        needing to take a short break and
 9        change the media.
10            MS. LEVY:  Thank you, perfect.
11        I'll ask about this document and then
12        we can take a break.
13            THE VIDEOGRAPHER:  Thanks.
14    BY MS. LEVY:
15        Q.  We're marking as Exhibit 5 an
16    article from May of 2018 that is titled
17    Four Women Accuse New York Attorneys
18    General of Physical Abuse, with the
19    subheading, Eric Schneiderman has raised
20    his profile of a voice against sexual
21    misconduct.  Now after suing Harvey
22    Weinstein, he faces a #MeToo reckoning of
23    his own.  Have you read this article
24    before?
25        A.   I believe I read it when it came
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 71

1                      KELLER

2     out but I haven't reviewed it since then.

3         Q.   Can you turn to the next page of

4     this article?  Do you recognize the person

5     pictured here?

6         A.   Yes.

7         Q.   And who is that?

8         A.   That's Eric Schneiderman.

9         Q.   And he was the Attorney General

10    of New York; correct?

11        A.   Yes.

12        Q.   And he resigned as the Attorney

13    General of New York after being accused of

14    sexual misconduct by multiple women;

15    correct?

16            MS. WILKINS:  Object to form.

17            THE WITNESS:  That's my

18        understanding from reading from the

19        news media.  I wasn't at the office at

20        that time.

21    BY MS. LEVY:

22        Q.   You were at the office between

23    2013 and 2017 while he was the Attorney

24    General; correct?

25        A.   That's correct but I wasn't at

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 72

1                        KELLER
2       the office on the day that he resigned or
3       when this article was published.
4           Q.   Okay.  And as you sit here today,
5       you are unable to say whether even the
6       New York Attorney General's office has a
7       problem with sexual assault, had a problem
8       with sexual assault and misconduct?
9               MS. WILKINS:  Object to form.
10              THE WITNESS:  I was -- I was not
11          aware of any of these allegations
12          while working there, nor did my
13          interactions with him ever make me
14          think that there was anything going on
15          to what was brought up in these
16          articles.  So to say that it was a
17          shock when this article came out would
18          be an understatement.
19      BY MS. LEVY:
20          Q.   Do you agree or disagree that
21      even the New York AG's office, highest law
22      enforcement office in the State, is not
23      immune from sexual misconduct?
24              MS. WILKINS:  Object to form.
25      ///

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 73

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   We know that today; correct?
 4            MS. WILKINS:  Object to form.
 5            THE WITNESS:  That office -- I
 6        don't know exactly what there is to
 7        say about that.  This is not something
 8        I really planned on discussing because
 9        it's not part of my report so I
10        just -- yeah, I wasn't really prepared
11        to discuss this.
12            MS. LEVY:  You can pull that
13        down, Bill.
14    BY MS. LEVY:
15        Q.   The next attorney general after
16    Eric Schneiderman was Letitia James.
17    She's still the Attorney General today.
18    Did you know that?
19        A.   Yes.
20        Q.   Even her office is not immune
21    from sexual misconduct; correct?
22        A.   Is there an example that you're
23    referencing?
24        Q.   Are you aware of sexual
25    misconduct that has occurred in the last
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 74

```
 1                    KELLER
 2    few years in the current New York Attorney
 3    General's office?
 4         A.   I don't know what you're talking
 5    about.
 6              MS. LEVY:  Let's mark tab 42.
 7              (Exhibit 6, statement from
 8         Attorney General James, marked for
 9         identification.)
10    BY MS. LEVY:
11         Q.   This is a statement from December
12    of 2022 from the current New York Attorney
13    General Letitia James, and this is a
14    statement I'll represent to you that she
15    made publicly in December of 2022 after
16    dismissing her chief of staff, Ibrahim
17    Khan.
18         A.   This is the first that I'm seeing
19    this.
20         Q.   Okay.  And my question for you is
21    even today, even in Letitia James' office,
22    that office is not immune itself from
23    sexual misconduct?
24              MS. WILKINS:  Object to form.
25         Again, these questions are well
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 75

```
1                         KELLER
2        outside of the scope of Ms. Keller's
3        opinion and her expertise and the
4        reason that she's here to provide her
5        deposition testimony today.
6   BY MS. LEVY:
7        Q.   Do you agree, disagree or have no
8   opinion?
9        A.   I'm not offering any opinions on
10  other industries.  I think I said probably
11  to ad nauseam what I am doing in my
12  report, which is showing what data Uber
13  had, what it did with it and what it told
14  the public.
15       Q.   Just to be very clear, as we sat
16  here this morning and looked at reports of
17  sexual misconduct from all the places on
18  your résumé through 2017, The New School,
19  the SEIU, the New York Attorney General's
20  office --
21            THE VIDEOGRAPHER:  We lost the
22       witness's video.  I think we should go
23       off the record.
24            MS. WILKINS:  Can you hear me,
25       guys?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 76

1                    KELLER
2         MS. LEVY:  I can hear you.  I
3    have one more question and then we can
4    take a break but I don't want to go
5    off the record until we finish this
6    last question.
7         THE VIDEOGRAPHER:  We just --
8    okay.
9         MS. LEVY:  You can pull down this
10   exhibit and let's see if we can get
11   through it --
12        MS. WILKINS:  We just lost audio
13   and actually Lacey lost her connection
14   all together.  So would now be a good
15   time for a break while get reset?
16        MS. LEVY:  Yes, we can take a
17   break.  Will we take 10?
18        MS. WILKINS:  10 should hopefully
19   do it.  We'll check in at least in 10.
20        THE VIDEOGRAPHER:  Going off the
21   record.  The time is 12:59 p.m.
22   Eastern.  This is the end of media
23   unit 1.
24        (Recess taken from 12:59 p.m. to
25   1:13 p.m.)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 77

```
1                    KELLER
2           THE VIDEOGRAPHER:  We're back on
3      the record.  The time is 1:13 p.m.
4      Eastern time.  This is the beginning
5      of media unit 2.
6  BY MS. LEVY:
7      Q.   Ms. Keller, my question to you is
8  after being shown reports this morning of
9  sexual misconduct at The New School, at
10 SEIU, at the New York AG's office, all
11 places where you have spent time in your
12 career, are you unable to say to the jury
13 that you agree that sexual misconduct is a
14 societal problem?
15           MS. WILKINS:  Object to form.
16           THE WITNESS:  I'm not here to
17      talk about that as a societal problem.
18      I'm here to talk about what data Uber
19      had in its possession, what it did
20      with that data and what it told the
21      public.  That's my opinions in this
22      matter.  I'm not offering opinions on
23      society.  I didn't come to -- I didn't
24      come prepared to offer opinions on
25      societal issues.  I've come to talk
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

```
 1                    KELLER
 2        about Uber's data and how they used
 3        it.
 4   BY MS. LEVY:
 5        Q.   And how sexual misconduct related
 6   to the Uber platform compares to the
 7   outside world is not something that you've
 8   looked at or thought about in your work
 9   for this case?
10        A.   That analysis was not necessary
11   to do my analysis which was compare and
12   contrast what Uber had, the volumes of
13   incidents that it had in its possession,
14   what it knew about that data, what it did
15   a with that data and what it told the
16   public.  I was not --
17        Q.   I'm sorry, I didn't mean to cut
18   you off.  You were asked to look at Uber
19   only, not asked to look at Uber in the
20   context of a larger society?
21             MS. WILKINS:  Object to form.
22             THE WITNESS:  I looked at Uber's
23        data in that it collected and it knew
24        it had underreporting issues.
25   ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 79

```
 1                    KELLER
 2   BY MS. LEVY:
 3       Q.   You mentioned underreporting a
 4   few times.  All you know about
 5   underreporting is Uber's own statement
 6   about it; correct?
 7            MS. WILKINS:  Object to form.
 8            THE WITNESS:  I know of documents
 9        that discuss it as well as Uber's
10        statements to the public about
11        underreporting.
12   BY MS. LEVY:
13       Q.   So you personally were not asked
14   to study the issue of underreporting.  You
15   don't know and you didn't tabulate any
16   rate of underreporting.  Is it true or
17   false?  Did you tabulate a rate of
18   underreporting?
19            MS. WILKINS:  Object to form and
20        object to interrupting the witness.
21            THE WITNESS:  That would be a
22        different analysis.  My analysis was
23        that of what Uber had knowing that
24        there was -- so that this is a floor,
25        this is of the data that is
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2        potentially or of -- this is a floor
 3        of the potential issue on the
 4        platform, that is my opinions and
 5        where my opinions center around is
 6        that data.
 7   BY MS. LEVY:
 8        Q.   Today in the five and a half
 9   hours I have left I'm going to ask you a
10   lot of questions about did you do a
11   particular analysis, yes or no, and I need
12   to understand if you did or didn't do it
13   and I really need you to answer that
14   question.  If I can't get you to tell me
15   directly whether you did an analysis or
16   didn't do an analysis.  I'm not asking
17   whether it was necessary, whether it would
18   be different.  I just mean did you do it,
19   that's all I want to know.  And so I'm
20   hopeful that we don't have to waste a lot
21   of time.  But if I can't get you to tell
22   me whether you did it or not did it, we're
23   going to have to get the court to come and
24   listen in because I am entitled to a
25   straight answer to that question.  So let
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 81

1                      KELLER

2      me try it one more time because this isn't

3      even controversial.  Did you, Lacey

4      Keller, tabulate a rate of sexual assault

5      on Uber, yes or no?

6          A.   And I'm saying why I didn't do

7      that because it was not necessary for my

8      analysis.  My analysis compares the data

9      Uber had versus what it told the public.

10          Q.   No, you didn't do that analysis;

11      is that correct?

12              MS. WILKINS:  Asked and answered.

13              THE WITNESS:  Because it was not

14          a necessary step in my analysis.

15      BY MS. LEVY:

16          Q.   Did you look at the rate of

17      sexual assault on the Uber platform versus

18      taxis?

19          A.   I guess this is the same

20      variation of your previous question which

21      I thought I've answered is it's not

22      necessary to do my analysis when my

23      analysis is looking at the data that Uber

24      had versus what it told the public versus

25      what it did with that data internally.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

```
 1                      KELLER
 2       Q.   Did you compare the rate of
 3   reported sexual misconduct on the Uber
 4   platform to any other alternative a person
 5   would have?
 6            MS. WILKINS:  Object to form.
 7            THE WITNESS:  Same answer as
 8       before.
 9   BY MS. LEVY:
10       Q.   The answer is that you did not do
11   that?
12       A.   The answer is that it was not
13   necessary because I did something
14   different and I looked at what Uber knew
15   versus what they told the public versus
16   what they did with that data.
17       Q.   And in connection with your
18   opinions in this case, you are not
19   intending to offer any opinions about
20   safer alternatives to Uber; correct?
21            MS. WILKINS:  Object to form.
22            THE WITNESS:  As I said before
23       today -- as I said before in this
24       deposition today, I reserve my right
25       to offer additional opinions.  I do
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 83

```
 1                    KELLER
 2      not hold those opinions sitting here
 3      today.  I do not have or offer those
 4      opinions sitting here today.
 5   BY MS. LEVY:
 6      Q.   You are not -- you don't intend
 7   to tell the jury a rider could do X, Y or
 8   Z and that would be safer than taking an
 9   Uber?
10           MS. WILKINS:  Object to form.
11           THE WITNESS:  Again, I don't
12      know.  I have reserved my right to
13      offer additional opinions.  I know
14      there was data that was just produced
15      last week.  Sitting here today, I
16      don't know what those opinions are.  I
17      don't offer those opinions in my
18      report as filed today.
19   BY MS. LEVY:
20      Q.   Okay.  You have no opinion on
21   whether Uber is safer than taxis, correct,
22   no opinion on that?
23           MS. WILKINS:  Asked and answered.
24           THE WITNESS:  It's the same
25      answer that I've given dozens of times
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 84

1                    KELLER
2       before so I don't know how else to say
3       it differently.  This was not
4       necessary for my analysis.
5  BY MS. LEVY:
6       Q.   You have no opinion on whether
7  it's safer to take an Uber home or drive
8  drunk, no opinions on that?
9       A.   Same answer as the previous one,
10  it's not necessary to my analysis.
11      Q.   You have no opinion on whether
12  it's safer to take an Uber than to walk
13  home from a bar, for example, no opinions
14  on that either; correct?
15      A.   Same answer as my previous
16  answer, it was not necessary for my
17  analysis.
18      Q.   And the answer would be the same
19  if I asked you have no opinion as to
20  whether Uber is safer than any other
21  alternative, that is not something you've
22  looked into for your opinions in this
23  case; correct?
24           MS. WILKINS:  Object to form.
25           THE WITNESS:  I've looked at

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 85

```
 1                    KELLER
 2        what's been reported to Uber, what
 3        they categorized, what they did with
 4        that data and what they told the
 5        public about it.  That's my opinions.
 6   BY MS. LEVY:
 7        Q.   How did you come to be retained
 8   in this case?
 9        A.   Are you asking about like the
10   specific letter?  What are you
11   specifically referring to?
12        Q.   How did you come to be retained
13   in this case?
14        A.   How did I find out about the
15   case?
16        Q.   Yes.
17        A.   I think it was -- most of my work
18   is referral-based work.  I have worked
19   with some of the attorneys on this matter
20   before -- or with an attorney on this
21   matter before.
22        Q.   Which attorney?
23        A.   Tiffany Ellis.
24        Q.   What matter did you and Ms. Ellis
25   have together previously, or matters?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

1                    KELLER
2        A.   She and I actually were working
3    together on a matter in front of this
4    exact court in the opioids litigation,
5    CT4.
6        Q.   And who retained you to do work
7    in this case?
8        A.   The co-leads of the litigation
9    signed the retention letter.
10       Q.   And that was in June of 2024?
11       A.   The retention letter was before
12   that but it's very likely that work didn't
13   start for some time.  The retention I
14   think was in April of 2024.
15       Q.   When I look at MK Analytics'
16   website, I notice that when you go to
17   MK Analytics' website, can we pull that
18   up?  It's a tab --
19           MS. LEVY:  Hang on one minute.
20       Just give me a second.  When you go to
21       MK Analytic's website, can we pull up
22       tab 4, please, Bill?
23           (Exhibit 7, MK Analytics website
24       page, marked for identification.)
25       ///

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 87

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   Under focus areas, there are
 4    seven different segments listed as focus
 5    areas.  Are you familiar with the website?
 6        A.   It's been awhile.
 7        Q.   I will represent to you that the
 8    last of the seven issues that come up when
 9    we go to MK Analytics website is this
10    page.  This is the 7th of seven and it
11    says Damages For Sexual Assault Victims.
12            Do you see that?
13        A.   Yes, I see that.
14        Q.   Is that one of the areas of focus
15    that has been added to your website?
16        A.   That is an area of focus on our
17    website but refers to different experts'
18    area of expertise.
19        Q.   And is this -- this is like
20    valuing cases for a different purpose.
21    This is not the type of work that you have
22    done in preparation for your report in
23    this case; is that correct?
24        A.   That's a completely different
25    expert -- I'm not particularly versed in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 88

1                    KELLER

2      her methodology but that is not my area of

3      expertise.  If I under -- if I understand

4      it correctly it involves more

5      person-to-person and interview-based work

6      but I'm not really sure.  I always butcher

7      it every time I try to explain what she

8      does.

9          Q.    What expert does this?

10         A.    That would be Cathryn Jones.

11         Q.    And this is not MK Analytics work

12     that you participate in personally;

13     correct?

14         A.    No, I don't oversee that work

15     and, in fact, draw a very clear line that

16     that's not my work to oversee or be

17     involved with.

18         Q.    And do you know what it means to

19     leverage available data and demonstrate

20     the severity of each case by comparing it

21     to previously awarded damages among cases

22     with similar characteristics, do you know

23     what that work is?

24         A.    That's not my area of expertise.

25     That's Cat's area so I don't know what she

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2    means by that.
 3        Q.   You do know that there are
 4    differing levels of severity of conduct
 5    that come under the umbrella of sexual
 6    misconduct; can we agree on that?
 7             MS. WILKINS:  Object to form.
 8             THE WITNESS:  I don't know what
 9         you're defining as severity.  I know
10         how Uber defines it and that's what I
11         have studied for this matter.
12    BY MS. LEVY:
13        Q.   What I really want to know is how
14    MK Analytics defines it.  When MK
15    Analytics says different levels of
16    severity or refers to severity, I'd like
17    to know what your business means by that.
18        A.   You're asking about another area
19    of expertise and I'm not this expert, so I
20    would be theorizing.  This is not my area.
21             MS. LEVY:  So you can bring that
22         down, Bill.
23        Q.   You have looked at the taxonomy
24    that Uber developed in conjunction with
25    outside experts in advance of its original
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2    U.S. safety report, that is something THAT
 3    you looked at and studied; correct?
 4        A.   I'm aware of THE I think the 26
 5    categories, 27 if we look at the Flack
 6    interrogatory response that has data that
 7    Uber uses to categorize its incidences.
 8        Q.   And you believe there's 26 or 27
 9    categories?
10        A.   I say 26 or 27 because there's
11    one category that has all 0s in the Flack
12    interrogatory response but the Bliss and
13    Jira interrogatory response have non-0s.
14    So depending on which interrogatory
15    response you review, you'll see either 26
16    or 27 with data in them.
17        Q.   And those categories include
18    things like flirting, comments on
19    appearance, staring and they also include
20    things like rape; correct?
21        A.   That's correct.
22        Q.   And those different categories
23    have different levels of severity;
24    correct?
25             MS. WILKINS:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              KELLER

2          THE WITNESS:  Uber in its safety

3       report puts those categories in order

4       of a severity with the exception of

5       insufficient information and parent

6       category use tracking.

7    BY MS. LEVY:

8       Q.   And you're not offering any

9    opinion that Uber did that wrong, you have

10   no opinion on that; correct?

11      A.   I am showing the data how Uber

12   filed it into that filing system.  I'm not

13   offering an opinion on how many

14   different -- taking a step back, I'm

15   offering an opinion on what volume of

16   incidents Uber filed into that taxonomy or

17   into that filing system, if you will,

18   that's the extent of my opinion on those.

19      Q.   You are not offering a better

20   taxonomy or better taxonomy that you

21   developed, that's not part of your

22   opinions; correct?

23      A.   That's not an opinion that I

24   offer.  I offer an opinion just on the

25   volumes within that taxonomy and what was

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 92

1              KELLER

2    reported to Uber and how it categorized

3    incidents into those taxonomies versus the

4    categories that it told the public about.

5         Q.   And have you -- as part of your

6    work in this case have you looked at any

7    other taxonomies other than Uber's?

8         A.   What kind of taxonomies are we

9    talking about?  I work with a lot of law

10   enforcement data.

11        Q.   Sexual assault or sexual

12   misconduct taxonomies.

13        A.   Just generally, like the uniform

14   crime reporting like has a rape category.

15   I don't know what you are talking about

16   here.

17        Q.   As part of your work in this

18   case, did you compare Uber's taxonomy to

19   any other taxonomy?

20        A.   I'm offering opinions on the

21   volume of reports within Uber's taxonomy,

22   not comparing and contrasting how to

23   re-categorize them or anything to that

24   matter.  I'm solely looking at what was

25   put into those categories and then what

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 93

```
 1                    KELLER
 2    categories Uber told the public about.
 3         Q.   Do you know as you sit here today
 4    as an expert whether there exists any
 5    superior taxonomy for sexual assault and
 6    sexual misconduct than the one that Uber
 7    has utilized?
 8              MS. WILKINS:  Object to form.
 9              THE WITNESS:  I'm not offering an
10         opinion on that so...
11    BY MS. LEVY:
12         Q.   You're not offering any marketing
13    opinions in this case; correct?
14              MS. WILKINS:  Object to form.
15              THE WITNESS:  I don't know what
16         you mean by marketing.
17    BY MS. LEVY:
18         Q.   You're not an expert in
19    marketing, are you?
20              MS. WILKINS:  Object to form.
21              THE WITNESS:  To the extent that
22         marketing is reflected in the number
23         of Uber trips that people take, I
24         offer opinions on that but outside of
25         that context, I don't offer opinions
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1                    KELLER

2        on marketing.

3    BY MS. LEVY:

4        Q.   Do you consider yourself an

5    expert in marketing?  Simple question.

6        A.   I offer opinions on the data that

7    Uber had in its reports.  That's my area

8    of expertise and more broadly I define

9    that as data mining and analytics or just

10   data analytics.

11            MS. LEVY:  What I want is a yes

12        or no to this question and if we can't

13        one, Beth, we're going to have to

14        unfortunately take a break and get

15        Cisneros on the line.  If I can't get

16        an answer on whether she is an expert

17        or isn't an expert in a particular

18        area, we're going to need to get some

19        help from the court.  I want to know

20        if you're able to say --

21            MS. WILKINS:  (Inaudible) the

22        answers the best she can give it.  I

23        don't know how you define marketing so

24        she's trying to guess at what you mean

25        by marketing and she's giving you the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 95

1                    KELLER
2        best answer that she can.
3    BY MS. LEVY:
4        Q.   Do you consider yourself to be an
5    expert in marketing, that's all I want to
6    know?
7        A.   I'm an expert in data mining and
8    analytics and to the extent that there's
9    data reflecting marketing, I hold myself
10   out as an expert in that context.
11       Q.   Is there data reflecting
12   marketing that you've reviewed?
13       A.   I mean Uber advertises.  One
14   would assume -- I analyze the trip volume,
15   for example, and Uber does marketing.  So
16   if marketing influences, and I'm not
17   saying that it does or doesn't, but in the
18   event that that influences trip volume,
19   then I offer opinions on trip volumes
20   because I calculate data in that data --
21   those data points.
22       Q.   Have you reviewed Uber's
23   advertising?
24            MS. WILKINS:  Object to form.
25            THE WITNESS:  I've reviewed a lot

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 96

```
 1                    KELLER
 2       of internal documents, especially in
 3       part of my S-RAD review.
 4  BY MS. LEVY:
 5       Q.   Are you going to offer any
 6  opinions that there's anything wrong with
 7  Uber's advertising?
 8            MS. WILKINS:  Object to form.
 9            THE WITNESS:  I think it's very
10       clear at this point that my report
11       talks about the data that Uber has,
12       what it did with it and what it told
13       the public.  That's the extent of my
14       opinions at this time.
15  BY MS. LEVY:
16       Q.   Okay.  You do not intend to offer
17  any opinions about safer alternatives to
18  Uber; correct?
19       A.   We've talked about that before.
20  That's not part of my analysis in this
21  report.
22       Q.   You do not intend to offer any
23  opinions about additional technology that
24  Uber could have or should have utilized,
25  that's not opinions or work that you've
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 97

```
 1                        KELLER
 2      prepared for this case; correct?
 3              MS. WILKINS:  Object to form.
 4              THE WITNESS:  I don't know what
 5          you mean by additional technology they
 6          could have used.  What are you talking
 7          about?
 8      BY MS. LEVY:
 9          Q.   That was a bad question.  Let me
10      ask a better question.  You offer no
11      opinions on dash cams, for example?
12          A.   To the effect -- I would say this
13      is similar to the marketing answer.  To
14      the extent that those dash cams may impact
15      the safety report numbers that I analyze,
16      I offer opinions in that context.
17          Q.   What have you studied about how
18      dash cams impact the numbers in the safety
19      report?  Tell me what you know about that.
20          A.   I'm saying if it is reflected in
21      that data, that's what I'm analyzing.
22          Q.   Is it reflected in that data?
23          A.   That's not -- I haven't looked at
24      the causal part of that but if it is
25      reflected in the data, then that's what
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 98

1                    KELLER

2      I'm analyzing.  Uber has a number of

3      safety policies that is enacted.  Whether

4      or not those are reflected in the volumes

5      of the safety data reports, that's the

6      contours of my analysis.

7          Q.   You don't intend to offer any

8      opinions about Uber's safety policies and

9      their content or what Uber should have

10     done, you are limiting your opinions to

11     the data, if I understand you correctly.

12         A.   I think talking about what Uber

13     knew, what it did with that data and what

14     it told the public is core to my opinions.

15     What they should have done I would say is

16     very similar to other cases that we've

17     been in depositions before is not

18     something that I'm offering an opinion on

19     at this time.

20         Q.   You also are not offering an

21     opinion on any kind of standard of care or

22     legal duties; correct?

23             MS. WILKINS:  Object to form,

24         calls for legal opinions.

25             THE WITNESS:  I don't know what

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 99

1                        KELLER
2          you mean by standard of care.  Are we
3          talking about medicine, are we talking
4          about --
5      BY MS. LEVY:
6          Q.   Standard of care that may or may
7      not apply to Uber, you're not offering my
8      opinions on that topic; correct?
9               MS. WILKINS:  Same objections.
10              THE WITNESS:  It's the same
11          answer as the others.  I'm offering
12          opinions on what Uber -- what data
13          Uber had, what it did with that data
14          and what it told the public with that
15          data.  There's a number of contours in
16          my report that discuss that.  That's
17          my opinions.
18      BY MS. LEVY:
19          Q.   In your work prior to today, you
20      have never developed a tool to study
21      sexual assault and sexual misconduct, have
22      you?
23              MS. WILKINS:  Object to form.
24              THE WITNESS:  In many of my
25          cases, in the work that I do, the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 100

```
 1              KELLER
 2        thing that is core is the data that
 3        I'm analyzing.  That's the consistent
 4        piece.  I often, whether it's Airbnb
 5        to gun trafficking to opioids, the
 6        subject matter is part of the data but
 7        the data itself is my expertise.  How
 8        to -- my methodology to analyze it and
 9        that's -- and the tools that I use to
10        analyze it, that's the expertise that
11        I bring.
12   BY MS. LEVY:
13        Q.   The invoices that were produced
14   to us, I don't know if it was last night
15   or this morning, go through I think
16   October of this year.  The last one -- the
17   first one that we have starts in July of
18   2024 and the last invoice that we have is
19   dated October 13, 2025.  Is that the
20   complete set of invoices, if there are
21   monthly invoices in between there?
22        A.   That as far as I'm aware are the
23   complete set.  We bill monthly so the
24   October invoice would reflect time up
25   until the end of September.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 101

1                          KELLER

2          Q.    And there are other individuals

3     besides you that worked on this matter at

4     your directions at MK Analytics; correct?

5          A.    They worked exclusively under my

6     direction.

7          Q.    And how many other individuals do

8     that?

9          A.    We have a large staff that some

10    staff that will come in and out depending

11    on the case.

12         Q.    So what is -- how many

13    individuals have worked on the Uber matter

14    with you?

15         A.    There's probably two to four

16    people that worked on the litigation --

17    that worked on the litigation under my

18    direction for a number of months.  I also

19    asked one or two individuals to review

20    some of the -- some of my code just as a

21    check but that was very limited.

22         Q.    Is all the work done by those

23    individuals reflected in the invoices?

24    That's what I'm getting at.

25         A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 102

1                        KELLER

2        Q.   Okay.   Our totals show that

3     MK Analytics has -- these invoices when

4     you add them up reflect roughly 2600 hours

5     and 1.1 million dollars.   Does that sound

6     about right to you?

7        A.    That sounds right.   We spent a

8     long time going through the numerous

9     productions from Uber on the safety data

10    and the various interrogatory responses.

11    And so going through those productions and

12    noting the inconsistencies that have

13    happened, the incompleteness of some, they

14    are missing fields, that has taken a

15    considerable amount of time.

16       Q.   Is the work reflected in these

17    invoices that is being done at your

18    direction, is that the only work that

19    MK Analytics has been hired to do in

20    connection with the Uber litigation?   Do

21    you understand the question?

22       A.   I do and I'm not sure if I can

23    answer it because I'm not sure if it's --

24    if consulting witnesses count or --

25       Q.   I don't want you -- I don't want

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 103

```
 1                    KELLER
 2   you to tell me any information beyond a
 3   yes or no, but has MK Analytics been hired
 4   to do consulting work in addition to the
 5   work you are doing as a testifying expert
 6   in the litigation?  It's just a yes or no.
 7       A.   So the invoices you see reflect
 8   my time as the consulting expert and
 9   testifying expert on the case.  They don't
10   reflect any other division's work that I
11   don't oversee.
12       Q.   Okay.
13            MS. WILKINS:  I don't think you
14       guys are understanding each other.  I
15       don't want to coach but I think
16       there's a disconnect here.
17            MS. LEVY:  I think you're
18       saying --
19            MS. WILKINS:  I'm not trying to
20       coach Lacey, I really think that you
21       two are having a disconnect on what
22       you're talking about.
23            MS. LEVY:  Yeah, I think
24       (inaudible).
25            MS. WILKINS:  I think you're
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

1              KELLER
2       asking Lacey is there any work in this
3       litigation that's not reflected in
4       these invoice.
5           MS. LEVY:  Yes, that's what I'm
6       trying to decipher.
7           THE WITNESS:  My team's work is
8       reflected in the invoices you have.
9   BY MS. LEVY:
10      Q.   Is there any other work done in
11  this litigation by MK Analytics outside of
12  you and your team?
13      A.   That's the part I don't know if
14  there is consulting.
15          MS. WILKINS:  This is
16      MK Analytics.
17          THE WITNESS:  Yes.  Do the
18      invoices all say data mining and
19      analytics?  What are the headers on
20      them?  My admin sent them so I haven't
21      seen them.
22  BY MS. LEVY:
23      Q.   MK Analytics billed to Peiffer
24  Wolf Carr, project Uber Lacey Keller, it
25  has all different descriptions of people,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

```
 1                    KELLER
 2    so owner is one type of person, engineer
 3    data scientist is another type of person,
 4    and I can see that there are different
 5    levels of employees being billed.  But my
 6    question is:  Is there more work by other
 7    people like MK Analytics that is not on
 8    your team, it's a separate engagement
 9    related to this litigation?
10         A.   And this is the part I'm not sure
11    if I can talk about but I do know that
12    another person was retained for a brief
13    period of time but I don't think those --
14    I don't know -- if you put the invoices
15    up, I can tell you if they are my
16    divisions or hers, but you'll probably see
17    two invoices for the same month if it's
18    her division.  Does that make sense
19    because we bill them separately.
20         Q.   Has the person who does images
21    for sexual assault victims that we were
22    talking about earlier in Exhibit 5, is
23    that person maybe engaged to do a separate
24    analysis for this litigation?
25         A.   I was not privy to that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

1                      KELLER

2     engagement because we draw a clear line so

3     I don't know.

4          Q.   Okay.  And is there -- I assume

5     if I have a set of invoices from July of

6     2024 up through mid October, that that

7     would be a complete set of invoices minus

8     the last couple of weeks which is not

9     reflected here; is that right?

10         A.   Of my group's, yes, and my

11    directed time.

12         Q.   Okay.  Let's see.  Have you ever

13    published any publication with your name

14    on it that relates to sexual assault or

15    misconduct?

16         A.   I have made a number of

17    contributions to the field of data mining

18    and analytics or just data analytics

19    through publications and those are all

20    reflected in my qualifications document.

21         Q.   I don't see anything listed in

22    your qualifications document that includes

23    in the titles anything that says sexual

24    assault or sexual misconduct.  So there

25    was nothing that I saw that appeared to be

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 107

1                    KELLER

2    addressing that specific issue.  Is there

3    something that I'm missing?

4         A.   You have a complete list of my

5    publications in my qualifications

6    document.

7         Q.   Okay.  And as you sit here today,

8    can you think of any publication that I

9    could pull that talks about sexual assault

10   and sexual misconduct?

11        A.   I have a number of publications

12   to my name in the field of data analytics.

13   Some of the subject matters are varied

14   from cannabis research all the way to gun

15   research to generally using data in

16   litigation.  That's the publications that

17   I've offered or that I've published.

18        Q.   And are there -- I think the

19   answer is no, but are there any that you

20   published that address the specific issue

21   of sexual assault and sexual misconduct?

22        A.   The list of publications is in my

23   Appendix C and they -- the core feature of

24   them is data and the subject matters are

25   there.  So it's from data generally in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 108

1                    KELLER

2      litigation and how do use it to cannabis

3      to I think there was even one on drugs on

4      Instagram.

5          Q.   Is the answer to whether there's

6      one that specifically addresses sexual

7      assault, is the answer to that no?

8          A.   I would say the answer is I have

9      a number of publications on data analytics

10     which is my area of expertise and that's

11     what my publications reflect.

12              MS. LEVY:  Can you mark that in

13          the transcript?

14     BY MS. LEVY:

15         Q.   Let's go to -- back to your

16     report, tab 1 for Exhibit 1.

17              If you can in -- I know we're

18     very short on time and so I want to try to

19     be efficient here.  Can you give me an

20     overall description of how you prepared

21     the data, like what work did your team do

22     in this, you know, 2600 hours with the

23     actual date?  Can you just describe in lay

24     person's terms briefly what that looked

25     like?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 109

1                    KELLER

2        A.    Yeah, so are you wanting me about

3    all the data that was produced?  Because

4    of the numerous reproductions of data that

5    might be a fairly lengthy answer.

6        Q.    Good point.  Let me ask a better

7    question.  Backing one step, when I look

8    at Appendix A to your report, we don't

9    need to pull it up but as I'm just going

10   to ask you a general question, we can pull

11   it up if we need to.  But you make a

12   statement there that says, "In my opinion,

13   data mining and analytics often overlaps

14   with data science."

15              That I just want to know what you

16   meant by that sentence.  Is data mining

17   and analytics a subset of data science or

18   are they different areas of expertise that

19   are overlapping, which is what I think the

20   sentence suggests?

21       A.    I view them as areas of expertise

22   that overlap like two concentric circles.

23       Q.    Are you a data scientist?

24       A.    Sometimes, yes, I am a data

25   scientist and sometimes I'm a data

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

```
 1                    KELLER
 2    analyst.
 3        Q.   And this might not be the way
 4    that you say it in your business but and
 5    sometimes you're a data miner?
 6        A.   Data mining is more for like,
 7    especially when I was at the New York
 8    Attorney General's office, when I am doing
 9    investigative leads for something, helping
10    to prioritize the agency's resources.
11        Q.   In this case, is it fair to
12    describe the work that you and your team
13    have done as data analytics?
14        A.   Correct.  Data analytics is the
15    work that I've done in this case and very
16    similar to what I've done in other cases
17    where I've been admitted as an expert in
18    data analytics.
19        Q.   And is it -- would you also say
20    that you have done data science in this
21    case or is that a different thing in your
22    mind?
23        A.   This is more descriptive
24    analytics or data analytics.  I am not
25    building machine-learning algorithms in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 111

1                        KELLER

2       this case which would be I would say

3       similar to the work of a data scientist,

4       but data scientists will often do

5       analytics as part of their job.  So you

6       see how they can be intertwined with one

7       another.  But I have been offered and

8       admitted as an expert in data analytics

9       before and that's similar to the role that

10      I'm playing here.

11          Q.   Thank you, I appreciate that

12      clarification.  And whether you've done

13      data science in this case, maybe, it just

14      depends on how you describe that, is that

15      right, or would you say no to that?

16          A.   It's -- the fields are related.

17      Like data science tools, so I would say

18      people in the world may think of an

19      analyst using Excel spreadsheets.  I

20      employed some of that in my work here but

21      I also used the tools that one might

22      consider to be under a data scientist,

23      which is Python and some high-powered

24      coding so they are related.

25          Q.   But you haven't done data mining

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 112

1                          KELLER

2       in connection with your work for this

3       case?

4            A.    Correct, I am not looking for

5       particular actors.  I'm doing descriptive

6       analytics of the data Uber had in its

7       possession and produced in this

8       litigation.

9            Q.    Moving to your report, do you

10      have it in front of you?

11           A.    Yes.

12           Q.    You describe on page 10 in

13      section IV of your report materials

14      considered and you also list in Appendix G

15      of your report documents and materials

16      considered; correct?

17           A.    Yes, these are -- both are the

18      comprehensive list of materials considered

19      in my report.

20           Q.    And Appendix G of your report is

21      160 pages, a single space list of

22      materials considered; right?

23           A.    Mine must be formatted slightly

24      differently so I don't know the page

25      count.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 113

1                       KELLER

2        Q.   Okay.  My question about that is:

3    Did you review every single document on

4    this list?

5        A.   I did -- I reviewed many

6    documents, probably just a number of

7    documents in this litigation from the

8    defendants -- I'm sorry, not the

9    defendants.  From the plaintiffs' trips

10   and the data that was produced around

11   those drivers and those trips, some of the

12   sampling documents.  I know those were

13   pretty voluminous as well as documents

14   related to S-RAD just to name few.  I know

15   I did a lot of searches on the software

16   that was holding the production because I

17   did have complete access to it.  But just

18   like any search, like some of the

19   documents that I reviewed, I reviewed

20   quickly.  I opened them, it was not

21   relevant and I moved on, but all documents

22   that I considered and reviewed are in that

23   list.

24       Q.   So if a document appears on

25   Appendix G, you've at least looked at it?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1                    KELLER

2        A.   Me or someone from my team, yes.

3        Q.   Thank you.

4             Okay.  And you reviewed all three

5    U.S. safety reports as well; is that

6    correct?

7        A.   Yes, and I have copies of them

8    with me.

9        Q.   Did you review those cover to

10   cover or did you just do keyword searches

11   in those?

12       A.   I've reviewed them a few times.

13   When I first read them and a few times

14   I've read them pretty much cover to cover,

15   especially I would say I was reviewing

16   most closely the sections on sexual

17   assault or the information that Uber

18   produces on sexual assault and the

19   appendices that are relevant to that

20   analysis.

21       Q.   I want to turn to page 17 of your

22   report, paragraph 19.6.  Tell me when

23   you're with me.

24       A.   Okay.

25       Q.   19.6 says, "There are additional

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 115

1                          KELLER

2        analyses pertinent to my opinions that I

3        would like to perform using the SA/SM

4        incident data, however, the data as

5        produced appears incomplete and contains

6        inconsistencies."

7              And then the next sentence says

8        that in order to run those additional

9        analyses, you would have to use your

10       professional judgment to address gaps and

11       inconsistencies.

12             And you go on to say, "It is more

13       appropriate to conduct my analyses on data

14       that is as complete and accurate as

15       possible."

16             What does that -- do those

17       sentences mean?

18          A.   So what I'm referring to there is

19       Uber's production of the Bliss and Jira

20       datasets.  There were fields in that data

21       that were -- that had inconsistencies is

22       the right word, they differed from what

23       they purported to be.  They had some

24       missingness or reflected something other

25       than what Uber had reported that dataset

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 116

1                    KELLER
2       to contain.  And what I wanted to -- what
3       I am reserving the right to here is
4       relating for the Flack data which based on
5       my review of the field list had fields
6       that would remedy some of those
7       assumptions that I would have to make
8       otherwise.
9           Q.   Why is it more appropriate to
10      conduct an analysis on data that's as
11      complete and accurate as possible, why is
12      that?
13          A.   It was clear to me at the point
14      of filing this report that Uber had in its
15      possession data that -- sorry.  It was
16      clear to me at the point in filing this
17      report that based off the field list that
18      there may be something in the Flack data
19      that may assist me in my review of the
20      Bliss and Jira data or replace the Bliss
21      and Jira data.  I'm not sure at this time
22      what methodology I might use or which
23      datasets I might use, but what I'm saying
24      here is there was additional data that it
25      appeared that Uber had in its possession

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 117

1                          KELLER

2       that it had not provided that would fill

3       in those places where I may need to have

4       made assumptions.

5           Q.    In doing any data analytics, it's

6       just common sense that you want the

7       dataset to be as complete and accurate as

8       possible, that's like a fundamental

9       premise of data analytics; correct?

10          A.    When you're working with data you

11      have to understand what's included in the

12      data and what's not included in the data.

13          Q.    And it's better to conduct an

14      analysis on data that's as complete and

15      accurate as possible; right?

16          A.    When you're working with data you

17      have to understand its limitations.  And

18      at the point of filing this report and

19      saying this statement, I'm talking about

20      knowing that there are other fields that

21      Uber had in its possession that may inform

22      my opinions with regard to the data that

23      it had already produced.

24          Q.    I've heard and I think we talked

25      about this in a different litigation,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 118

```
 1                    KELLER
 2     sometimes in data science or data
 3     analytics, you hear garbage in, garbage
 4     out.  The quality of the output, what I
 5     assume in lay person's terms that means is
 6     that the better quality of the data you
 7     put into a dataset, the higher quality of
 8     the output of the study of that data.  Do
 9     you agree with that?
10             MS. WILKINS:  Object to form.
11             THE WITNESS:  So are you talking
12         about a general principle here or are
13         you talking --
14     BY MS. LEVY:
15         Q.   Just generally.
16         A.   So generally you can say
17     different things about data.  Some
18     datasets come with limitations.  Some
19     datasets don't come with limitations.
20     Some datasets are -- it really is case
21     specific when you're talking about data.
22     So that is a phrase I've heard before but
23     I don't know how you're applying it
24     specifically in this litigation.
25         Q.   Paragraph 26 of your report you
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 119

```
 1                      KELLER
 2     say that "The procedures I used are based
 3     on direct and verifiable calculations.  As
 4     such, a potential error rate or confidence
 5     interval is not applicable."
 6               Can you explain to me what you
 7     mean by that?
 8        A.   I mean that I'm doing that and
 9     like addition, subtraction averages, I'm
10     not making estimations, I'm not doing
11     sampling.  That is the type of analysis.
12     I'm not -- that would require confidence
13     intervals.  So when you're doing simple
14     addition or descriptive statistics, that's
15     not applicable here.
16        Q.   Okay.  I appreciate it.  So you
17     tabulated numbers, you averaged numbers
18     that you got out of these different
19     datasets but you haven't done
20     extrapolations or other kind of modeling
21     on the data; is that fair?
22        A.   Similar to the work that I've
23     done in other litigation where I've been
24     deemed an expert, I'm doing the same thing
25     here, is I'm summing, averaging, showing
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 120

```
 1                     KELLER
 2      descriptive analytics, a longitudinal
 3      study -- not longitudinal studies -- time
 4      based analysis, that's a better way to say
 5      that, of the data that was produced
 6      specifically from the Flack interrogatory
 7      response.
 8          Q.   And that takes me back to the
 9      topic of underreporting that we talked
10      about earlier.  This is an example of you
11      did not attempt to extrapolate an actual
12      number of potential assaults from the data
13      that exists, you merely looked at the data
14      that exists; true?
15          A.   I showed the data that Uber had
16      in its possession, how it categorized it
17      and what it produced in this litigation.
18          Q.   If you had attempted to calculate
19      a different number, extrapolated a
20      different number, then you would have
21      needed to do what you said in 26, which is
22      calculate an error rate or a confidence
23      interval; right?
24               MS. WILKINS:  Object to form.
25               THE WITNESS:  That's a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 121

```
 1                    KELLER
 2        theoretical different analysis that I
 3        didn't do, so I don't know what I
 4        would need to do to support an
 5        analysis that I haven't done, so I
 6        would just be guessing of what that
 7        would even look like.
 8   BY MS. LEVY:
 9        Q.   In reading or reviewing the
10   materials that are listed in the Appendix
11   G, did you run across the concept of
12   support abuse or fraud in reporting?
13             MS. WILKINS:  Object to form.
14             THE WITNESS:  Again, I've read a
15        lot of documents as evidenced there.
16        So you're asking me if I read any
17        documents that talk about false
18        reports or --
19   BY MS. LEVY:
20        Q.   Yeah.
21        A.   So based on the documents I've
22   reviewed, I've seen Uber's statements and
23   this is a statement that they made to the
24   public about that not being an issue
25   because they view -- they treat or they --
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

1                   KELLER

2    I think what's the phrase that they use,

3    we believe victims.  And so to the extent

4    that I've read that, I'm not sure if

5    that's what you're trying to get at here.

6        Q.   That's part of it.  If you were

7    to calculate -- let me back up.

8            In the Flack data that you

9    reviewed that you talk about in your

10   opinions, those are reports that came in

11   from complainants; correct?

12       A.   So we're talking about the Flack

13   interrogatory response?

14       Q.   The data that was provided in

15   response to that, yeah.

16       A.   So that, yeah, the data in that

17   response is totaled by month and by

18   category that Uber had put that report

19   into, whatever category it had decided it

20   was appropriate to put into.

21       Q.   And you didn't look at any

22   qualitative analysis of the underlying

23   reports, you didn't look at the individual

24   reports themselves, you just looked at the

25   data compilation; true?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 123

```
 1                    KELLER
 2          MS. WILKINS:  Object to form.
 3          THE WITNESS:  In filing the
 4      charts and figures in this report I
 5      had to tabulate the volumes that were
 6      in that interrogatory response.
 7      However, in my driver response --
 8      driver profiles which discuss the
 9      bellwether plaintiffs trips, as well
10      as some work that I had done
11      preliminarily to review the safety
12      data for its -- in its various
13      productions before, I also did review
14      specific Jira tickets and Bliss
15      messages.
16  BY MS. LEVY:
17      Q.   In order if you were going to --
18      I understand you did not calculate the
19      extent to which sexual assault might have
20      been underreported on Uber, you're taking
21      Uber's statement on that and I understand
22      that.  But if you were to calculate it,
23      you would have to consider underreporting
24      and overreporting or false reporting, you
25      would have to consider both things, would
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    KELLER
 2      you not?
 3              MS. WILKINS:  Object to form.
 4              THE WITNESS:  I'm not offering an
 5          opinion on that so I haven't come
 6          prepared to discuss that so I don't
 7          want to theorize on an opinion that
 8          I'm not offering.
 9      BY MS. LEVY:
10          Q.  But you do understand from that
11      Flack data you looked at are allegations,
12      they are not necessarily litigated or
13      fully investigated or the outcome of
14      investigations, that much you know from
15      the review of the data and the information
16      provided by Uber; true?
17              MS. WILKINS:  Object to form.
18              THE WITNESS:  I'm taking Uber at
19          its word a few times here.  One is
20          that they believe victims and they
21          count every report and that's what
22          they say in the safety report, and
23          two, I'm taking Uber at its
24          representation when I'm calculating
25          using the Flack rog response that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 125

```
 1                         KELLER
 2        these are complete tabulations of the
 3        data that it has received.
 4   BY MS. LEVY:
 5        Q.   Let's flip to opinion 1 on page
 6   19.  This is -- I'm now looking at the
 7   summary of opinion 1 starting with
 8   paragraph 28 -- sorry, 27.  27 A you
 9   note --
10        A.   Sorry, I thought you meant the
11   summary like on page 8.
12        Q.   No, I'm sorry, I meant the
13   heading and the subheading.  Tell me when
14   you're with me.
15        A.   I am there now.
16        Q.   From the Flack data, your
17   subheading A says "From 2017 through 2024,
18   Uber tracked 546,196 incidents of sexual
19   assault and sexual misconduct."
20             You arrived at that number from
21   tabulating individual numbers of incidents
22   from the Flack data; correct?
23        A.   This is from the Flack
24   interrogatory responses, not the Flack
25   data that was produced last week.  That
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 126

1                        KELLER

2      would have not been possible since it was

3      produced last week.  So this is a summary

4      of the Flack interrogatory response that

5      Uber provided prior to filing my report.

6          Q.   And that data according to

7      paragraph 27 covers a time period from

8      2017 through 2024; correct?

9          A.   Uber produced that data broken

10     down by month and by taxonomy like the

11     subcategories what we can refer to that as

12     by month for those years, 2017, so January

13     2017 through December 2024.

14         Q.   And when you use that time

15     period, you're referring to a mix of

16     audited and unaudited data; right?

17         A.   Do you have the interrogatory

18     response so I can review how Uber refers

19     to the audit process?

20         Q.   I do have that and we can pull it

21     up in a minute but the question is:  Do

22     you know as you're sitting here for what

23     period of time that is reflected in

24     paragraph 27, 2017 through 2024, has the

25     data been audited by Uber's auditors, do

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 127

1                    KELLER
2    you know that?
3        A.   The data came with a number of
4    caveats so I would like to refresh my
5    recollection on that response because I
6    remember one dataset had one set of
7    caveats and when they produced the Bliss
8    and Jira data I think related to a certain
9    set of facts and the Flack data related to
10   others.  What the auditing doesn't change
11   the volume of reports that Uber produced
12   in those records.  This is merely -- this
13   is just showing what's in those records,
14   totaled up across all months across all
15   taxonomies.
16       Q.   (Inaudible)?
17            THE WITNESS:  I think you muted
18       yourself somehow.
19   BY MS. LEVY:
20       Q.   Data through 2022 has been
21   subject to an Uber U.S. safety report.
22   Are you aware of that?
23       A.   Yes, I'm aware that Uber has
24   released reports from 2017 to 2018, '19
25   and '20, '21 and '22.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 128

1                    KELLER

2        Q.    But Uber has not released a

3    report for the later data, '23 and '24, at

4    this time; correct?

5        A.    I have not seen a report from

6    Uber yet, and so that is actually the

7    analysis -- part of the analysis that I

8    show in my report is to show what numbers

9    exist since the filing of the last safety

10    report, what has been shown in '23 and

11    '24.

12        Q.    Do you know as you sit here today

13    whether the last two years have been

14    audited in the same way that the 2017

15    through 2022 data was?

16        A.    So again, I know that the Flack

17    data comes with some I would say however

18    caveats that Uber wanted to put on that

19    data, but what doesn't change is the

20    volume of reports that Uber categorized

21    into those categories.  The audit process

22    is Uber holds out as a reason for why it

23    only produces and publishes, I should say,

24    data on a subset of categories, but in

25    reading the appendices of the reports, it

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 129

```
 1                    KELLER
 2    appears that there are a larger volume of
 3    categories that are audited than what are
 4    disclosed in the safety reports.
 5         Q.   The Flack data that is reflected
 6    in your opinion 1 is all of the
 7    categories, it's not a limited set but
 8    it's every single category of every single
 9    incident that Uber classifies under sexual
10    assault and sexual misconduct; is that
11    right?  Do you agree?
12         A.   It reflects all of those that are
13    under sexual assault and sexual
14    misconduct.  There are other categories
15    that I know that Uber has taxonomies on
16    but these are the ones that I understand
17    to be complete for those two categories,
18    sexual assault and sexual misconduct.
19         Q.   And that includes varying levels
20    of severity.  Do you agree?
21              MS. WILKINS:  Object to form.
22              THE WITNESS:  So in the safety
23         reports, Uber lists in order of
24         severity what it thinks are most
25         severe to least severe, with respect
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 130

1                    KELLER

2         to two categories, insufficient

3         information and paired category use

4         tracking.

5    BY MS. LEVY:

6         Q.   Do you disagree that some of

7    these categories are more severe than

8    other categories?

9              MS. WILKINS:  Object to form,

10        asked and answered.

11             THE WITNESS:  I don't offer any

12        opinions on -- I don't offer an

13        opinion on the severity order.  I

14        offer opinions on the data that Uber

15        classified into those categories and

16        what each category shows if shown

17        together, broken out, et cetera as

18        I've demonstrated in my report.

19   BY MS. LEVY:

20        Q.   Did you read any of the

21   underlying incidents that make up these

22   546,000 incidents?

23             MS. WILKINS:  Asked and answered.

24             THE WITNESS:  Again, I think I've

25        said that in reviewing the documents

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 131

1                        KELLER

2          in this litigation specifically, the

3          plaintiffs' trips as well as some of

4          the sampling attachments and other

5          documents, I have read Jira tickets as

6          well as the documents themselves --

7          I'm sorry, the Jira tickets, then the

8          Bliss tickets and documents of those

9          Bliss and Jira tickets.

10     BY MS. LEVY:

11         Q.   But you didn't do any systematic

12     review to categorize them yourself; right?

13              MS. WILKINS:  Object to form.

14              THE WITNESS:  I think we've

15          talked about this before.  I'm using

16          the categories that Uber has applied

17          to this data and specifically in the

18          Flack data, Uber's tabulations and

19          de-duplications of those categories,

20          those incidents under each of those

21          subcategories.

22     BY MS. LEVY:

23         Q.   And you're not offering any

24     opinion that Uber did that incorrectly or

25     got it wrong; correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 132

1                          KELLER

2          A.   What do you mean by got it wrong,

3     like that they misclassified them or that

4     they did the math wrong?

5          Q.   Either.

6          A.   I'm showing what Uber put into

7     those documents or into that interrogatory

8     response, the numbers within those, so I'm

9     taking Uber at its word that they had done

10    that correctly when showing my analysis.

11         Q.   And you understand that some of

12    the incidents that are covered here, in

13    fact, many of the incidents covered here

14    include things like staring, looking at

15    me, giving me a dirty look or making

16    comments or gestures, you're aware of

17    that; right?

18              MS. WILKINS:   Object to form.

19              THE WITNESS:   I'm aware of those

20         incidents being potential precursors

21         which is a word that Uber uses to

22         sexual assault.  And so I have looked

23         at those, all of the incidents because

24         some of those Uber has in its own

25         documents determined to be precursors

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 133

1              KELLER
2      of additional misconduct later on.
3   BY MS. LEVY:
4      Q.   When you talk about precursor,
5   you are relying on a single document that
6   has -- that contains that word that you
7   cite in footnote 85 of this report,
8   correct, paragraph 51?  Heading B?
9      A.   Yes, so the word precursor is
10  from that e-mail but then a number of the
11  inputs that are in that section come
12  directly from Uber internal documents and
13  there's a number of documents that discuss
14  proximity to bars, whether intoxication,
15  the time of day as all potential
16  indicators of sexual assault.  And those,
17  many of those, if not all, are a part of
18  the S-RAD model that it does use to,
19  quote, prevent sexual assaults.
20          MS. LEVY:  Let's pull up tab 45,
21      please.
22  BY MS. LEVY:
23      Q.   And if we go to paragraph 51,
24  you're talking about precursor.  I just
25  want to make sure we're clear about what

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

KELLER
1
2      we're talking about here.  Let's go to 51
3      on page 36 of your report but we can --
4      let me pull that up first.  If you can
5      zoom in a little bit, in the heading you
6      say, Uber identified male drivers and
7      female riders as well as a proximity to
8      the pick-up of a bar as, quote, precursors
9      to sexual assault, and there you cite
10     footnote 85.  Are you with me?
11         A.   Yes.
12         Q.   And for that you cite
13     JCCP_MDL_000356814.
14         A.   Okay.
15              MR. LEVY:  And let's pull that
16         document up.  It's tab 45.
17              (Exhibit 8, document Bates
18         labeled UBER_JCCP_MDL_000356814,
19         marked for identification.)
20     BY MS. LEVY:
21         Q.   And this is the document that is
22     your source for Uber referring to male
23     drivers, female riders and proximity of
24     bars as precursor.  This is where the word
25     precursor comes from, is that correct,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 135

```
 1                    KELLER
 2     this is what you cite?
 3         A.   These inputs -- hang on one
 4     second.  Sorry.
 5             MS. LEVY:  Can you go to the next
 6         page, Bill?
 7         Q.   My first question is:  Is this
 8     the document you're referring to when you
 9     refer to precursor?
10         A.   This is the document where that
11     phrase is utilized by Uber and so that's
12     why it's cited specifically on that word,
13     but these inputs are a number -- these
14     inputs are used in the S-RAD model as well
15     which is the machine-learning algorithm
16     that Uber uses to, quote, prevent sexual
17     assaults.
18         Q.   What does precursor mean to you?
19         A.   Again, if I'm using their term to
20     describe this set of inputs, but these are
21     indicators that Uber have found to be
22     indicative of potential sexual assault as
23     evidenced by even using it in the S-RAD
24     model and well, in other documents in its
25     production.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 136

1                    KELLER

2        Q.   And just to make sure that we're

3    on the same page, it certainly doesn't

4    mean that if a male driver has a female

5    rider in the car, that there's going to be

6    a sexual assault, that's not what it means

7    that it's a precursor?

8        A.   This document shows that they

9    have found patterns, they call it patterns

10   and precursors, among the data Uber has

11   been collecting and this is how Uber -- I

12   can't even remember, one of the engineers

13   or data scientists or analysts, whatever

14   their job title is, what they have found

15   to be in their own sexual assault data,

16   what patterns and precursors is the words

17   that they use.

18       Q.   In the documents that you

19   reviewed, you've seen a lot of documents

20   where Uber data teams are studying the

21   issue of sexual assault; true?  You've

22   looked at many, many, many documents.  In

23   fact, there -- would you guess hundreds or

24   thousands of documents that you've seen

25   that relate to Uber's study of this issue?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

                              KELLER

 1
 2              MS. WILKINS:  Object to form.
 3              THE WITNESS:  I've seen a lot of
 4         documents where Uber has discussed
 5         this internally but I haven't seen
 6         them disclose the types of knowledge
 7         that they know or the types of
 8         information that they have gleaned
 9         from this publicly.  They have chosen
10         to produce that information in just
11         one metric or two metrics if you look
12         at total and per trip volume.
13    BY MS. LEVY:
14         Q.   Do you -- do you understand from
15    your review of all of the documents that
16    you list in Exhibit G what in terms of
17    magnitude, period of time has Uber been
18    studying the issue of sexual assault, for
19    what period of time, how many years?
20              MS. WILKINS:  Object to form.
21              THE WITNESS:  I have seen
22         documents -- I've seen a lot of
23         documents.  I think that earliest ones
24         that I've seen are in reference to
25         these patterns specifically are around

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

```
 1                    KELLER
 2         late 2016, 2017, somewhere around
 3         there.  I would have to look at
 4         specific -- all the specific documents
 5         to be sure but about those years.
 6    BY MS. LEVY:
 7         Q.   And you understand from your
 8    review of the documents in this case that
 9    Uber has devoted many, many scientists and
10    researchers to the effort to study
11    patterns related to sexual assault and
12    sexual misconduct --
13              MS. WILKINS:  Object to form.
14    BY MS. LEVY:
15         Q.   -- that you learned in your
16    review of this case, yes?
17         A.   Many of the documents that I have
18    reviewed tend to focus on the -- tend to
19    be authored or have the same set of
20    individuals.  I don't recall their job
21    titles but what my point in drawing the
22    connections with those data points are is
23    Uber has this knowledge internally and
24    they even use it to put and build S-RAD
25    inputs and then they don't tell the public
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 139

1                      KELLER

2    about any of these particular indicators.

3    The safety report reflects only one subset

4    of that knowledge.

5        Q.   My question to you is not about

6    safety reports -- about the public

7    disclosure.  We're going to talk about

8    that separately.  My question to you is:

9    Do you know how much time, how much

10   resources Uber has devoted to studying the

11   issue of sexual assault and sexual

12   misconduct?

13           MS. WILKINS:  Object to form.

14   BY MS. LEVY:

15       Q.   Is that something you know?

16       A.   The documents that I reviewed

17   talked about the results of those studies

18   and what Uber knew about its own data and

19   that's my opinion about -- and I bring

20   those opinions because I'm contrasting

21   that to what it's telling the public.  I

22   don't recall reading documents that

23   totaled machine-learning hours spent or

24   data scientists, you know, time sheets.

25       Q.   You don't know how much effort

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 140

1              KELLER
2    Uber does put into developing the S-RAD
3    technology, that's not something you were
4    asked to look into; correct?
5         A.    I know Uber has been developing
6    S-RAD for a number of years and only
7    recently released it.
8         Q.    And you also haven't studied the
9    effectiveness of S-RAD, that's not
10   something that you are asked to do as part
11   of your analysis in this case; correct?
12            MS. WILKINS:  Object to form.
13            THE WITNESS:  I offer several
14        opinions on S-RAD and including the
15        volumes of trips that it excludes
16        through holdup backs, which is the
17        groups that it uses and doesn't do any
18        interventions or doesn't do any
19        sorting.  And I also offer opinions on
20        data -- well, offer opinions on what
21        Uber has tabulated to be ██████████
22        which are when the program has not --
23        has dispatched a trip that had a
24        sexual assault -- I'm sorry, I
25        misspoke -- ████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

1              KELLER

2    ██████████████████████████████

3    ████████████████████████, so

4         I offer those opinions on the program.

5    BY MS. LEVY:

6         Q.   So you have not studied how

7    effective the tool is, what incidents

8    S-RAD may be preventing or not preventing,

9    that's outside the scope of the work

10   you've done for this case; correct?

11             MS. WILKINS:  Object to form.

12             THE WITNESS:  I think you might

13        be misunderstanding me.  I'm offering

14        opinions that Uber excludes ████████

15        of trips from its algorithm because it

16        holds them in a hold back group.  I'm

17        offering opinions that Uber excludes

18        on the whole or on average, whatever

19        term we want to use, of ████████████

20        of trips because they are not above

21        the self-inflicted threshold.  And I'm

22        offering opinions that ████████████

23        ████████.  They are above the

24        threshold that Uber set in S-RAD

25        within its, quote, guardrail metrics,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

```
 1                    KELLER
 2       so I do offer those opinions.
 3   BY MS. LEVY:
 4       Q.   And your opinions are limited
 5   just to the numbers that fall in those
 6   categories, that's what's in your report,
 7   as opposed to what Uber should do that or
 8   what a better way to do it would be, that
 9   is not part of your opinions; am I correct
10   about that?
11       A.   A better way to build the model?
12   I'm sorry, I just don't quite understand.
13       Q.   Yes.  You are not offering any
14   better way to build the S-RAD model;
15   correct?
16            MS. WILKINS:  Object to form.
17            THE WITNESS:  I'm offering
18       opinions describing the S-RAD model
19       much like I would teach my students
20       that I teach college -- in college
21       classes.  I'm describing the S-RAD
22       model to the court in a way that it is
23       understandable and that we can
24       understand how it functions.  I am not
25       offering a critique of the model or in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 143

```
 1                  KELLER
 2        a way that it should be built in a
 3        different machine-learning algorithm,
 4        for example.  I'm not offering that
 5        opinion.  I'm offering opinions on
 6        what data points were included and you
 7        can see those in one of my appendices,
 8        but I -- and I'm offering opinions on
 9        what wasn't included but I'm not
10        offering opinions on what Uber should
11        have done, I'm just offering opinions
12        on what could have been the case given
13        the data that was available to Uber.
14   BY MS. LEVY:
15        Q.   Okay.  So it is not part of your
16   opinion -- I need to know what you intend
17   to say at trial.  You're not offering an
18   opinion that Uber should not have holdouts
19   or should set thresholds in a different
20   way.  That's outside of what you're doing
21   in this case; correct?
22        A.   I'm offering opinions on what
23   those holdouts are and what the thresholds
24   were and the implications on trips and
25   some exemplars of what that looks like so
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 144

1              KELLER

2    that the court can understand those

3    concepts.

4         Q.   And you have not formulated

5    opinions and you are not intending to

6    present them at this trial at better

7    thresholds or a better way to operate the

8    model, that's not what you're offering

9    opinions on in this case; true?

10        A.   I'm offering opinions that Uber

11   had knowledge that setting -- they use the

12   term trigger rates which correspond to a

13   threshold, what volume of sexual assaults

14   they would predict, kind of paraphrasing

15   from documents there, I do offer those

16   opinions in my report and that's based off

17   of the knowledge that Uber had.

18        Q.   But again, I want to be very,

19   very clear on this, your analysis of what

20   the data says and what Uber saw, not what

21   it should have done or not the way Lacey

22   Keller believes it should be done

23   different.  The second part is not part of

24   your opinions in this case?  I think you

25   may have said that but I want to be very

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 145

```
1                        KELLER
2      clear about that.
3               MS. WILKINS:  Object to form.
4               THE WITNESS:  I'm offering
5          opinions on the inputs that are in
6          S-RAD as well as datasets that they
7          have or data points that they have
8          that they haven't included in S-RAD as
9          a descriptive, but not offering an
10         opinion on what they should have
11         included in that model or -- I think
12         that's a way to say it is.  I'm
13         describing what they have done, what
14         options were available to them, what
15         they knew about and that's my opinion.
16     BY MS. LEVY:
17         Q.   Now, going back to the heading on
18     page 36 and paragraph 51, just to finish
19     up our discussion on precursor.
20         A.   Yes.
21         Q.   It is certainly not the case that
22     pairing a male driver with a female rider
23     predicts a sexual assault, that's not what
24     it means to be a precursor, do you agree?
25         A.    I think especially in earlier
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 146

```
 1                    KELLER
 2     versions of the model and I'd have -- I
 3     need to look at the global features which
 4     I don't have in front of me, gender, I
 5     know it was in the earlier models but I
 6     need the global features in front of me,
 7     were indicators that Uber found to be
 8     indicative of potential sexual assaults
 9     when developing S-RAD.
10         Q.   So let me just ask some simple
11     questions.
12              Is it your understanding that
13     gender is one of the metrics in S-RAD?
14         A.   Do you have the global feature
15     list in front of you?  I just can't -- I
16     remember some features that come in and
17     out.
18         Q.   It's fine if you don't remember.
19     If you don't remember, you can just say
20     that.  I just want to know if you -- if
21     it's your understanding and if you don't
22     know you can say that, that gender is a
23     metric in S-RAD?
24         A.   I have my appendix here.  I can
25     look it up.  But at one point in time it
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 147

```
 1                    KELLER
 2    absolutely was and I think it still is a
 3    feature in the model.  But again, I would
 4    want to look at the global features list
 5    that was just -- that is in my materials
 6    considered list or the global features
 7    list, either of them.
 8        Q.   There are dozens and dozens of
 9    inputs into the S-RAD model; correct?
10        A.   Yeah, I think it's somewhere
11    around 40-ish inputs.
12        Q.   And if a supply plan or a match
13    had one of those features, that definitely
14    does not mean that a sexual assault or an
15    incident of sexual misconduct will take
16    place, that's not what it means; correct?
17            MS. WILKINS:  Object to form.
18            THE WITNESS:  The features
19         combined create an S-RAD score using
20         machine learning.  And so that machine
21         learning is based on previous incident
22         data as well as S-RAD scores that have
23         been run in shadow mode so that -- or
24         not shadow -- some were done in shadow
25         mode and some were done historically
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 148

1              KELLER
2         looking at the data.  All of those
3         combined create an S-RAD score for
4         each and every individual trip.  So
5         it's one piece of all of the features
6         that Uber uses to categorize a trip.
7    BY MS. LEVY:
8         Q.   And there's not anywhere in this
9    report or in your opinions that tell us
10   what is the S-RAD score that means there's
11   going to be a sexual assault, that's not
12   an analysis that you've done or that even
13   could be done; right?
14        A.   Uber has -- so Uber sets the
15   ███████████████████████████████████████
16   █████████████████████████████████
17   ████████████████████████████████████████
18   ████████████████████  and with the purpose of
19   the program being to prevent sexual
20   assaults.  And so that's what I understand
21   that score to mean, is it's a risk score
22   created by Uber based off of its own data.
23        Q.   And what you've done for purposes
24   of this report is look at Uber's work in
25   this area, but you yourself have not come

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 149

1                    KELLER
2       to an opinion about what a risk, a risky
3       ride is or isn't.  Like what S-RAD score
4       is a risky ride, what S-RAD score is not a
5       risky ride, those aren't opinions you have
6       formed independently; correct?
7               MS. WILKINS:  Object to form.
8               THE WITNESS:  Uber has not
9           produced much of the data even for
10          some of the indicators that it has
11          identified itself as potential risk
12          factors or precursors or whatever term
13          we want to use.  The supply plan data,
14          for example, which is all of the trips
15          that are available and scored by the
16          S-RAD program Uber deletes.  And so
17          those data points would be relevant to
18          look at those risk factors independent
19          of one another in connection with the
20          S-RAD score, but that data has not
21          been produced.
22      BY MS. LEVY:
23          Q.   And we'll talk a little bit more
24      about that, about S-RAD and its inputs in
25      a minute but we can agree, I hope, that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1                    KELLER
2      what we see in Exhibit B, male drivers
3      paired with female riders.  Despite the
4      fact that this heading calls that a
5      precursor to sexual assault, you certainly
6      would not tell the jury that male drivers
7      should not be paired with female riders.
8      In fact, you know that male drivers drive
9      female riders safely hundreds of millions,
10     in fact, billions of times on the Uber
11     platform with no incident at all, you're
12     aware of that; correct?
13              MS. WILKINS:  Object to form and
14          foundation.
15              THE WITNESS:  So I'm aware that
16          Uber's produced data that only tells
17          parts of this story.  Uber's only
18          produced data that shows the total --
19          the sex of the driver or gender of the
20          driver I should say on a yearly basis.
21          I don't and they have not produced
22          which means I don't have data of the
23          gender for each and every safety
24          incident in the data.  They have not
25          produced that data.  And I think I say

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 151

1                         KELLER

2          that very clearly in my report.  So I

3          can't do that analysis because Uber

4          hasn't produced that data, so the next

5          best thing is for me to identify from

6          documents the types of analysis that

7          Uber has done because internally they

8          have that data.

9     BY MS. LEVY:

10         Q.   And it's a great thing that Uber

11    is studying this issue and trying to

12    develop tools like S-RAD to enhance the

13    safety of the platform, that's a great

14    thing that it's doing that; right?

15              MS. WILKINS:  Object to form.

16              THE WITNESS:  Uber has chosen to

17         do a number of things behind closed

18         doors, including developing the S-RAD

19         program and studying these things, but

20         they have told the public nothing

21         about that and so that is why I'm

22         bringing those up in my report.  The

23         value judgment can be your own.  I

24         leave that to the court to decide.

25         I'm just here to tell the facts.

Page 152

1                          KELLER
2       BY MS. LEVY:
3            Q.   You don't think it's wrong or
4       problematic that Uber is studying this
5       issue and attempting to use data as a tool
6       to reduce these incidents, that's exactly
7       the kind of thing that you've done in your
8       prior work as a data scientist; right?
9            A.   I think Uber has been misleading
10      to the public in producing data in the way
11      that it has in the safety reports.  It has
12      not shown the public the risk of sexual
13      assault at night.  It hasn't shown the
14      risk of sexual assault for women versus
15      men, especially at night or even levels of
16      intoxication, even though it has that data
17      internally and has done that analysis.
18           Q.   Do you intend to offer an opinion
19      to the court that Uber has misled the
20      public?
21           A.   I am drawing a distinction
22      between what Uber has told the public
23      versus what they know internally and
24      that's -- you can see that in my report
25      clearly.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 153

1                         KELLER

2         Q.   And have you looked at other

3    participants in the transportation

4    industry and how what they tell the public

5    about incidents on their platforms or in

6    their businesses?

7              MS. WILKINS:  Asked and answered.

8              THE WITNESS:  Again, that's not

9         part of my analysis that I've done

10        here.  That was not necessary for my

11        analysis to show the distinction

12        between what Uber has done versus what

13        -- what Uber has told the public

14        versus what Uber knows internally and

15        what kinds of programs it's operating

16        internally.  Just before we move on to

17        the next question, I think we've been

18        going like an hour and a half and I'm

19        getting pretty hungry.  Can we take a

20        break?

21             MS. LEVY:  Absolutely.  How long

22        do you want to take?

23             THE WITNESS:  I think lunch was

24        delivered a little while ago so maybe

25        we can do 20, 30 minutes?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

1                    KELLER
2          MS. LEVY:  Sure, why don't we
3     come back at -- I'm in a different
4     time zone.  So do you want to come
5     back at 3:30?
6          THE WITNESS:  That works.
7          MS. LEVY:  Okay.
8          THE VIDEOGRAPHER:  Going off the
9     record.  The time is 2:42 p.m.
10    Eastern.  This is the end of media
11    unit 2.
12          (Lunch recess taken at 2:42 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 155

```
 1                    KELLER
 2      A F T E R N O O N   S E S S I O N
 3            (Time noted:  3:20 p.m.)
 4    L A C E Y   K E L L E R,   resumed and
 5         testified as follows:
 6                THE VIDEOGRAPHER:  We're back on
 7         the record.  The time is 3:20 p.m.
 8         Eastern.  This is the beginning of
 9         media unit 3.
10    CONTINUED EXAMINATION
11    BY MS. LEVY:
12         Q.   Welcome back, Ms. Keller.  Going
13    back, before we dive into opinion 1 in
14    your report, I want to go back for one
15    minute to the question that we were
16    talking about about your qualifications
17    and testifying history.
18                Your Appendix C which we've
19    marked as Exhibit 2 to the case, do you
20    have that handy?
21         A.   Yes.
22         Q.   That was 22 depositions that you
23    have given as of the time of this report.
24    I believe that all 22 of those depositions
25    were given in conjunction with the opioid
```


HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 157

1                    KELLER
2        A.    That's as far as depositions
3    concerned, the extent to those.  You know,
4    I'm looking through this and I thought my
5    biography included -- I also was retained
6    by the -- by federal court and it was a
7    district court in the Lackawanna case.
8    It's like Burrell v. Lackawanna County and
9    I was -- my firm was appointed by the
10   court to work with defendants in the
11   defense counsel in that matter to help
12   arrive at a list of individuals at issue
13   in that litigation.  So that I should
14   actually add.  I thought it was on here
15   and I apologize for that not being --
16       Q.    Have you given a deposition in a
17   that matter?
18       A.    I filed a declaration and I
19   thought that that was here but I don't see
20   it so I filed a declaration prior to being
21   retained in that matter.
22       Q.    Got it.  So let me just see if I
23   can blaze through this in a summary
24   fashion.  Of the 22 exhibits --
25   depositions listed in Exhibit 2, Appendix

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

```
 1                    KELLER
 2     C, three of those were nonopioid, 19 of
 3     them were in the opioid case; is that
 4     correct?
 5          A.   That's correct, opioids
 6     litigation, as you probably know, was
 7     pretty all-consuming for several years.
 8          Q.   Yes, it was and all of those
 9     depositions were provided on behalf of
10     plaintiffs in that litigation; correct?
11          A.   Yes, I was working for plaintiffs
12     because it would have been a conflict
13     otherwise.
14          Q.   And with your trial testimony,
15     six of the seven cases were opioid cases
16     and the seventh one was a nonopioid case,
17     the Feindt v. USA case; correct?
18          A.   That's correct.
19          Q.   And all seven of those were on
20     the plaintiff side?
21          A.   That's correct.
22          Q.   And then in the declarations,
23     there are five declarations listed here,
24     were all five of those on the plaintiff's
25     side?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 159

1                    KELLER
2          A.   All five listed there and then
3     the addition for the declaration that I
4     was -- that I filed in the Lackawanna
5     case, I -- I'm actually not sure how you
6     would define who I filed that on behalf
7     of.  I just filed it with the court and
8     then the court appointed me to be -- to
9     work with the defendants.
10         Q.   And in 30 seconds or less, what
11    was the nature of your opinion in that
12    case?
13         A.   I didn't -- I wasn't an expert
14    witness where I would have a final report.
15    I had -- I was -- my task was to combine
16    and aggregate datasets to assist them with
17    identifying effective members.  I think
18    that's a pretty good summary of the work.
19         Q.   Understood.  Okay, turning back
20    to page 19 of your report, opinion number
21    1, tell me when you're with me.
22         A.   I'm getting there.  Okay.
23         Q.   Opinion number 1 states that --
24    and I'm reading subheading A, "From 2017
25    through 2024, Uber tracked 546,196

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 160

1                    KELLER

2     incidents of sexual assault and sexual

3     misconduct."

4          Are you with me?

5          A.   Yes.

6          Q.   And that number I believe you

7     told us you tabulated from the Flack data

8     you received in this case?

9          A.   I'll be very clear that it's the

10    Flack interrogatory response since now

11    there's another production of Flack data

12    separate from that.

13         Q.   In the second production of Flack

14    data you have not fully analyzed and do

15    not address in this report?

16         A.   Because that data was produced

17    just last week or fairly recently, I have

18    not yet analyzed that data and reserve my

19    right.

20         Q.   You've created table 1 on the

21    next page of your report and that is the

22    subcategories from the Flack incident data

23    classified between 2017 and 2024; is that

24    correct?

25         A.   Yes, these are the categories

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 161

1              KELLER

2    that are in that dataset.  You'll see that

3    there are 27 of them that were produced by

4    Uber.  This aggregates to the year and

5    Uber's production had the same categories

6    but at the month and year level.

7        Q.   And this data reflected in table

8    1 on page 20 of your report, it includes

9    all incidents reported against riders,

10   drivers and third parties; correct?

11       A.   That's my understanding of the

12   dataset.  Uber did not break it out in any

13   way that would allow me to separate it by

14   the reporting party or the entity it was

15   reported against.  Uber reported all those

16   values together so that's how I'm showing

17   it here.

18       Q.   And there are documents and

19   there's witness testimony that addresses

20   the percentage of the reports of sexual

21   assault and sexual misconduct that are

22   made by riders versus drivers.  Are you

23   aware of that?

24            MS. WILKINS:  Object to form.

25            THE WITNESS:  I am -- I think I

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 162

1              KELLER

2        even have an image in my report that

3        shows the breakdown of rape incidents.

4        I know it's from 2016 to 2017 data

5        that shows the breakdown of riders

6        versus drivers.  I know Uber also

7        produces information on its safety

8        reports about that breakdown but I

9        believe at an aggregated level, not at

10       the incident level.

11   BY MS. LEVY:

12       Q.   You did not attempt to understand

13   in table 1 which of the incident reports

14   reflected here were reported by drivers

15   versus riders; right?  That was not part

16   of your analysis?

17            MS. WILKINS:  Misstates her prior

18       testimony.

19            THE WITNESS:  Two parts to that.

20       One, the Flack data that was recently

21       produced that I have not had a chance

22       to consider has fields that I think

23       may be relevant to such an opinion,

24       but I have not had the time given that

25       it was most recently produced to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 163

```
 1                    KELLER
 2        review that data.  Secondly, Uber did
 3        not produce this data, the Flack
 4        interrogatory response in a way that
 5        would allow me to aggregate or
 6        disaggregate those incidents.  So with
 7        that said, that's the analysis that I
 8        was able to do with the data that was
 9        produced.
10   BY MS. LEVY:
11        Q.   And you acknowledge in your
12   report, page 27, that the table includes
13   all of these reports regardless of who
14   lodged it, whether it was the driver or
15   the rider, this is the total?
16        A.   This is the total volume of
17   reports, driver or rider, third-party
18   that's included here.
19        Q.   And it's fair to assume that if
20   we were to isolate only reports made by
21   riders of incidents perpetrated by
22   drivers, these numbers would look very
23   different?
24        A.   I'm not going to theorize about
25   the data I haven't fully reviewed yet
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 164

1                       KELLER

2       because there's, and as you can see in the

3       screenshot in my report, there are

4       differences at the category level -- I'm

5       sorry, at the subcategory level and I

6       would be theorizing and I wouldn't want to

7       estimate one way or another what those

8       numbers might be.  What I can tell you

9       here is this is an accurate representation

10      Uber produced to me in that interrogatory

11      response.

12          Q.   And you can agree that the total

13      number of incidents would go down if you

14      isolated just riders reporting; correct?

15          A.   Again, that would be theorizing.

16      I have not considered what the Flack data

17      shows.  The Flack data specifically, that

18      was produced recently, and so I don't want

19      to theorize which way the numbers -- what

20      the numbers might show because I have not

21      yet had a chance to review that data.

22          Q.   In section B below, you take this

23      data and convert it to an average

24      frequency per minute; correct?

25          A.   Yes, it's a time-based analysis

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 165

```
1                    KELLER
2       normalizing the data for time.
3           Q.   But what you don't do is include
4       the number of rides that happen every
5       minute.  Is that something you calculated
6       also?
7           A.   That -- I analyzed the number of
8       rides and the incident rate per ride in a
9       different part of my report.
10          Q.   And so as you sit here today, can
11      you tell us the average number of rides
12      out of every 7.7 minutes for the same time
13      frame?
14              MS. WILKINS:  Object to form.
15              THE WITNESS:  That's an analysis
16          that if you want me to do math on the
17          record, I would be happy to do.  I do
18          a trip-based analysis elsewhere in my
19          report but this analysis focuses on a
20          way to -- focuses on the reported
21          incidents using time as a
22          normalization -- as a normalization
23          method.  This is similar to the type
24          of analysis that other nonprofits in
25          the industry do -- not the industry.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 166

1                    KELLER
2          That's an unfair statement.  That I
3          have seen other nonprofits do with
4          this kind of information.
5    BY MS. LEVY:
6          Q.   In order to know -- for like an
7    individual to know the risk that something
8    is going to happen to them, it would be
9    the denominator in addition to knowing the
10   absolute number of incidents, they would
11   need to know out of how many in order to
12   understand that; correct?
13         A.   I don't know how you're defining
14   risk.  Risk is defined in a number of
15   different ways in this litigation.  If
16   you're speaking to something like what is
17   the rate that something happens, then you
18   need a numerator and a denominator but
19   when you're talking about risk I don't
20   know specifically what you're referring
21   to.
22         Q.   Did you do any analysis to
23   compare this incident by number of minutes
24   to the outside world, did you compare this
25   number to the number of SA/SM incidents

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 167

```
 1                    KELLER
 2   that occur elsewhere in the world?
 3        A.   I understand how this question is
 4   different than what you've asked me
 5   before.  We've talked about I think at
 6   pretty great lengths that my analysis
 7   talks about or discusses and I offer
 8   opinion what data Uber has, what it did
 9   with that data, the knowledge that it had
10   and compares that to what it told the
11   public.
12        Q.   What you haven't done is compared
13   how frequently misconduct of a sexual
14   nature that occurs on Uber, how that
15   compares to other means of transportation,
16   other alternatives to taking Uber or just
17   society in general, that was not part of
18   your analysis, if I understand you
19   correctly?
20             MS. WILKINS:  Asked and answered.
21             THE WITNESS:  You can keep asking
22        me different versions but I think it's
23        the same question here, my report
24        focuses on the Uber platform and what
25        it knew internally versus what it
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 168

1              KELLER
2         disclosed externally and what it did
3         with the data it had internally versus
4         what it disclosed to the public.
5    BY MS. LEVY:
6         Q.    This data in table 1 goes years
7    beyond the data that was published in the
8    first report?
9         A.    Are you talking about the 2017
10   and 2018 safety report?
11        Q.    Yes.
12        A.    This data includes data from 2017
13   to 2024 which matches the dates that Uber
14   produced in its interrogatory response.
15        Q.    And I don't see anywhere in your
16   report where you have taken the first U.S.
17   safety report that covers the time period
18   2017-2018 and identified any numbers in
19   that report that are wrong or incorrect.
20   You haven't done that, have you?
21        A.    I have in my report drawn a few
22   comparisons to the safety reports.  Two
23   that stand out right now that may be
24   relevant to our discussion is a figure,
25   let me get to it -- Figure 7 that draws

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 169

```
 1                    KELLER
 2    the distinction between the safety report
 3    disclosed number and the total number of
 4    incidents in the interrogatory response,
 5    and there's a footnote somewhere where I
 6    talk about -- maybe it's not even a
 7    footnote, it's a paragraph, where I talk
 8    about the safety report data being smaller
 9    than what was in the interrogatory
10    responses for the exact same five
11    categories.
12         Q.   Let's look at Figure 7 since you
13    pointed our attention.  That's page 28 of
14    your report.
15         A.   Okay.
16         Q.   And here in Figure 7, 28, you've
17    charted number of incidents in Flack data,
18    in Flack incident report classification in
19    what I call purple, as the tall part of
20    the bar graph.  Are you with me?
21         A.   Yes.
22         Q.   And you've put in blue the number
23    of incidents in safety reports.  Do you
24    see that?
25         A.   Yes, I'm following.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 170

```
 1                     KELLER
 2       Q.   And that is the number of
 3   incidents in blue represents the five most
 4   serious categories of sexual assault;
 5   true?
 6       A.   The five in blue show what Uber
 7   disclosed in its safety report and the
 8   ones in purple, aubergine, whatever, sorry
 9   to the court reporter for aubergine, are
10   the ones in the interrogatory response and
11   for clarity, they should not be stacked,
12   they should be created independent.  So
13   2936 plus 71080 in 2017 does not reflect
14   the total number of incidents.  71080 is
15   the total volume of incidents so this is
16   drawing a direct comparison between the
17   two.
18       Q.   I understand and the number of
19   incidents reported in the safety report,
20   how did you get that number, how do you
21   know?
22       A.   I read the safety reports and
23   inputted the numbers.
24       Q.   In fact, the safety report itself
25   very clearly states what categories it is
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 171

1                          KELLER

2    putting numbers to and what categories it

3    is not; true?

4         A.    The safety report says that it is

5    including five categories and then in an

6    appendix lists the additional other

7    subcategories.

8         Q.    And that's your source for

9    understanding which categories were

10   included; is that right?

11        A.    So my source for understanding

12   what was included is in Uber's appendix,

13   especially I'm recalling appendix from the

14   2021 to 2022 report that has a historical

15   look back of all the incidents from all

16   the previous reports.

17        Q.    So let's look -- let's go to --

18             MS. LEVY:  Let's mark as an

19        exhibit 11, tab 11, which I think is

20        going to be Exhibit 6.

21             MS. WILKINS:  I think you're on

22        9.

23             MS. LEVY:  All right.  Goodness.

24             (Exhibit 9, 2017-2018 Safety

25        Report, marked for identification.)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 172

1                        KELLER

2    BY MS. LEVY:

3        Q.   My question, while we're pulling

4    it up, Ms. Keller, not only does Uber

5    disclose in the safety report itself what

6    the categories are that it's reporting on

7    but it also says why; right?

8        A.   Uber -- so where are you talking

9    specifically in the safety report because

10   Uber says a lot of things in its safety

11   report.

12       Q.   You've read the safety report or

13   at least looked at the safety report cover

14   to cover, have you not?

15       A.   Yes.

16       Q.   And do you recall Uber describing

17   what specific categories it had included

18   in its numbers?  Do you recall that being

19   in its first U.S. safety report?

20       A.   Yeah, let me just get there,

21   sorry.

22       Q.   To shortcut, one place we're

23   going to go and talk about is page 33 of

24   Exhibit 9.

25       A.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

                                            Page 173

 1                     KELLER
 2        Q.   Did you read the methodology
 3   section of this safety report?
 4        A.   Yes.
 5        Q.   And so you understand that the
 6   third paragraph that leads into the
 7   bullets states, "This report includes
 8   categories that represent serious safety
 9   incidents reported by riders, drivers, and
10   third parties" and it lists those
11   categories.  Do you see that?
12        A.   Yes, I see the page states that.
13        Q.   To the right of that, Uber has in
14   bold, "Why these categories?"  And
15   explains why it chose these categories.
16   Do you see where I am?
17        A.   Yes, in that kind of blue box?
18        Q.   Yes, and Uber explains that it
19   strives to provide a clear and accurate
20   reflection of the most serious incidents
21   reported in connection with the U.S.
22   ridesharing platform while recognizing
23   that these incidents can pose unique
24   classification challenges.
25             Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

1                        KELLER

2          A.   I see that's what the page says.

3          Q.   Do you disagree that the five

4     categories listed on the left are the most

5     serious categories of incidents in the

6     taxonomy or do you have no opinion on

7     that?

8          A.   So what I would say in my report

9     I draw a distinction between the

10    categories that Uber internally in its own

11    KPIs or uses as part of its own KPIs

12    refers to as serious SA/SM incidents, so I

13    draw a few comparisons between what is

14    disclosed in those categories compared to

15    that of the safety report.  I'm not

16    offering an independent judgment call on

17    what might be serious or not serious for

18    those categories but drive the contrast

19    between what Uber internally discloses as

20    serious.  And furthermore, Uber says it

21    takes all reports, I don't know if they

22    use the word seriously or if that's just a

23    word in my head right now because we're

24    saying the word serious, but Uber takes

25    all reports and records them.  So

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 175

```
 1                    KELLER
 2      additionally, I show from Uber's own
 3      analyses the volume of reports that Uber
 4      has tabulated from its internal Flack
 5      system through those tables and figures.
 6          Q.   Back to my question here, I
 7      believe I understand you correctly.  You
 8      are saying there are other serious
 9      categories that Uber recognizes as serious
10      that are not included in the list to the
11      left; correct?
12          A.   Again, I said something slightly
13      different than that, was I'm using Uber's
14      designations of those categories as
15      serious SA/SM, not my own personal
16      judgment and that Uber takes every report
17      in -- I don't know if I want to use the
18      word serious.  I can't remember the word
19      they used on the safety report, but they
20      believe victims so I'm also analyzing
21      those.
22          Q.   But there's nowhere in this
23      safety report that Uber represents we are
24      disclosing all incidents or that we are
25      disclosing all serious incidents, it
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 176

```
 1                    KELLER
 2     doesn't say that, it is saying we're
 3     providing a clear and accurate reflection
 4     of the most serious and it says which ones
 5     those are.  Do you agree with that?
 6               MS. WILKINS:  Object to form.
 7               THE WITNESS:  Are you asking me
 8          if I can read or are you asking me
 9          something different from that?
10     BY MS. LEVY:
11          Q.  I'm asking you if I read that
12     correctly, is that we strive to provide a
13     clear and accurate reflection of the most
14     serious incidents, that's what Uber said;
15     right?
16          A.  Uber said publicly that these are
17     the five that it's showing you.  It also
18     shows a list of 20 some categories.  It
19     doesn't show insufficient information or
20     parent category use tracking, and it
21     doesn't tell that Uber tracks internally a
22     different set that it views to be serious,
23     a set of subcategories that it views to be
24     serious.
25          Q.  It also doesn't say these are the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 177

```
 1                    KELLER
 2    only serious categories there are.  It
 3    doesn't say that anywhere.  You haven't
 4    seen that anywhere in the safety report,
 5    have you?
 6              MS. WILKINS:  Object to form.
 7              THE WITNESS:  It puts these out
 8         as what it views as the most serious
 9         but it doesn't show -- it doesn't tell
10         the public there's another set of
11         eight more that we view internally as
12         serious or there's 20 some other
13         categories that we collect data on and
14         here's the volumes of those datas.
15    BY MS. LEVY:
16         Q.   There's a difference between
17    serious and the most serious, isn't there?
18         A.   These are the terms of art but
19    what I'm telling you is what I've seen in
20    the documents and the list of
21    subcategories that Uber has designated as
22    serious SA/SM and what the numbers would
23    show if it had chosen to show those or
24    what the numbers would show if it had
25    chosen to show to the public all the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 178

```
 1                    KELLER
 2    categories that it collects data on.
 3         Q.   You're switching up the terms,
 4    serious and most serious, and that's the
 5    thing I want to drill down on.
 6              Do you agree saying something is
 7    serious, these categories are serious is
 8    different than saying these categories are
 9    the most serious?
10              MS. WILKINS:  Form.
11              THE WITNESS:  What I'm saying is
12         that there are categories that Uber
13         shows in its report, how it classifies
14         or characterizes those is how it
15         characterizes them and what I'm
16         drawing in comparison is there's
17         another set of eight categories that
18         Uber internally designates as serious
19         SA/SM and I put that in quotes, and
20         then there's all of the categories of
21         data that it collects data on because
22         it says that it believes victims and
23         reports on that data.  So what I'm
24         showing is all three, what Uber shows
25         the public, what they track internally
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 179

```
 1                    KELLER
 2       as serious and all the incidents that
 3       are reported to Uber.
 4  BY MS. LEVY:
 5       Q.   Can you point me to anywhere in
 6  the safety report that Uber represents in
 7  the safety report we are going to give
 8  numbers for all categories, it doesn't say
 9  that, does it?
10       A.   I think that's the -- my report
11  is critiquing that is that it doesn't say
12  that so this is what it is not telling the
13  public about and this is the volume of
14  reports that it's not telling the public
15  about.  And, in fact --
16       Q.   Sorry, I didn't mean to interrupt
17  you.
18       A.   That's okay.  And, in fact, in a
19  block post on its website and I believe
20  one of the first figures in my report,
21  Uber says they are only disclosing
22  3 percent of the reports that it receives
23  on the platform.
24       Q.   Uber is quite clear, quite
25  transparent about the fact that it is not
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 180

```
 1                    KELLER
 2     disclosing all of the incidents; right?
 3              MS. WILKINS:  Object to form.
 4              THE WITNESS:  In this report,
 5          Uber and other reports Uber says what
 6          five it's reporting on.  It also cites
 7          other reasons for not disclosing them,
 8          such as auditing and audit aligner and
 9          we can discuss that methodology at
10          another time but what I'm saying is
11          Uber has admitted to the public that
12          it's only showing 3 percent, that they
13          are showing the tip of the iceberg and
14          knowing when they know that there is
15          an underreporting not only nationwide
16          but on their platform specifically
17          because drivers know where riders live
18          and because of the kind of knowledge
19          that the two parties have of one
20          another in the platform.
21     BY MS. LEVY:
22          Q.   Can you point me to a sentence in
23     the methodology that is not true or is
24     false?
25          A.   What Uber is saying in its
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              KELLER

2     methodology, and I'm looking at a

3     different document than the 2017.  I'm

4     referring to the methodology in the

5     2019-2020 report, if I recall, and in that

6     document it's talking about auditor

7     alignment and in that document, Uber

8     discusses auditor alignment being one of

9     the reasons why they disclose only a

10    subset of incidents.  And in that

11    methodology, the auditor alignment says

12    that within the subset -- within the

13    incidents that they reviewed, which was a

14    random sample and also a targeted sample,

15    that they had piled the alignment within

16    those samples.  I want to say something

17    like 87 percent but I would like to have

18    that in front of me to be more specific.

19         Q.   Can you remember my question?

20         A.   Yes.  And so what I'm saying is

21    Uber cites a number of reasons as why it's

22    choosing these and those appear to be red

23    herrings in a way, I would say red

24    herrings in their process.  They are

25    choosing a set of incidents to report on

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

```
 1                    KELLER
 2     when there's auditor alignment in the
 3     methodology that says there's high level
 4     of agreement and even I think there's one
 5     category that they report on that doesn't
 6     meet the threshold they talk about, and
 7     two, I'm saying that Uber doesn't talk
 8     about what it has internally.  What it
 9     knows also about what they consider
10     internally as serious SA/SM reports and
11     what internally they know to be true about
12     different risk patterns, and that's from
13     them, not from me, about incidents on the
14     platform, whether it's at night or trips
15     near a bar, et cetera.
16          Q.   So we're going to go back to
17     Exhibit 9 and I'm just going to ask you a
18     very simple question.  Can you point me to
19     any statement in this Exhibit 9 that is
20     false, that is not true?
21               MS. WILKINS:  Overbroad.
22               THE WITNESS:  What I'm saying is
23          this is part of the picture.
24     BY MS. LEVY:
25          Q.   It's just a yes or no question,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 183

1                    KELLER

2      can you point me to a statement that is

3      untrue?

4         A.   But it's not a yes or no

5      question.  This is a much more

6      comprehensive issue than what you're

7      making it out to be right now.  There are

8      27 categories of data that Uber produced

9      in the Flack interrogatory response.  This

10     talks about five.  What's the reason --

11     you point me to a place on this page where

12     Uber says why it doesn't include the other

13     incidents in its report.

14        Q.   Where does it says we're

15     including all 27?

16        A.   Just by not saying something is

17     not the same as having a correct or

18     incorrect statement.  Just because they

19     don't say it doesn't make it true.  I may

20     have flipped my words on that.  But

21     they are saying they are reporting five.

22     They are not saying anything about the

23     other 20 some categories that they are not

24     disclosing.  They say they exist but they

25     let the public wonder to themselves what's

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 184

```
 1                        KELLER
 2      in those categories and so it's my role in
 3      this litigation to show the volumes in
 4      those categories that they have excluded
 5      from this report.
 6           Q.   You don't have any problem with
 7      categorizing the five on the left as the
 8      most serious, you don't have a different
 9      list of most serious do you?
10                MS. WILKINS:  This has been asked
11           and answered a number of times.
12                THE WITNESS:  We have a
13           definition for those fives, I think
14           it's the reportable five in my report.
15           That set of entities or subcategories
16           is identified in my report as that
17           reportable five or something to that
18           effect which I specify in contrast to
19           the serious SA/SM incidents that it
20           internally identified.
21      BY MS. LEVY:
22           Q.   Now when Uber published the
23      safety report, this one we're looking at
24      in Exhibit 9, were there other safety
25      reports like this that it was copying or
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 185

```
 1                    KELLER
 2    was this the first of its kind?
 3            MS. WILKINS:  Object to form.
 4            THE WITNESS:  I mean what do you
 5        call a safety report?  I wrote a
 6        report on gun trafficking in the
 7        New York Attorney General's office
 8        that was the first of its kind so you
 9        tell me.
10    BY MS. LEVY:
11        Q.   You're proud of that.  In your
12    résumé you say it was the first of its
13    kind and that's something you're really
14    proud of?
15        A.   Of course.
16        Q.   The safety report was the first
17    of its kind studying sexual assault and
18    sexual misconduct, the first one you've
19    seen?
20            MS. WILKINS:  Object to form.
21            THE WITNESS:  I don't know what
22        you're referring to as safety report.
23        There's other reports that nonprofits
24        have been putting out in the world
25        forever so if Uber wants to call it
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1              KELLER

2       the first of its kind, Uber can call

3       it that.  I'm not opining or giving it

4       any opinion on whether it is the first

5       of its kind and what that means.  I'm

6       opining on what's in it and comparing

7       it to -- what's in it versus what Uber

8       has in its own documents.

9   BY MS. LEVY:

10      Q.   Can you identify any corporation

11  who's ever published a report about sexual

12  assault or sexual misconduct that's done a

13  better job at it than Uber has?

14      A.   That's such a value judgment.  I

15  am not prepared to offer an opinion on

16  pitting one company's report against

17  another.  I'm here to offer an opinion

18  what Uber put in its safety report versus

19  what it knew in its own data.

20      Q.   You've never seen anybody else do

21  it more comprehensively than Uber has done

22  in the safety report and certainly not in

23  that time frame, have you?

24          MS. WILKINS:  Object to form.

25          THE WITNESS:  I don't know how

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 187

```
 1                    KELLER
 2        that's a different question than the
 3        one you just asked me.  It's the same
 4        response.  I'm not here to evaluate
 5        two different reports against one
 6        another.  My role here is to talk
 7        about the data that's in one report,
 8        that's in one -- in the Uber safety
 9        reports compared to the data that it
10        has internally.
11   BY MS. LEVY:
12        Q.   If I understand your testimony
13   correctly, your problem to the extent you
14   have -- do you intend to offer
15   characterizations about the safety report
16   or do the opinions that you have offered
17   in this case and intend to offer in this
18   case, will they be limited to the data?
19   In other words, like what is in and what
20   is not in?
21        A.   The second part is what I intend
22   to do.  What numbers are in, what
23   categories are in, what data is included
24   in the data, that's my opinions referring
25   specifically to the volumes of data in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 188

1                    KELLER

2     safety report as compared to what Uber had

3     internally.

4         Q.    To retreat to our first dance

5     with each other and vernacular in the

6     litigation where we talked about you're

7     not giving the opinion about what someone

8     should have done but what they could have

9     done, do I understand you to be saying

10    that same kind of opinion you're going to

11    be offering here, what Uber could have

12    reported but you will stop short of

13    offering what they should have reported

14    and leave that for others to decide; is

15    that fair?

16        A.    I think that's a fair

17    characterization of my testimony here.

18    It's very similar to that where I've been

19    admitted in other cases.

20        Q.    And I want to be clear because

21    before our lunch break you used the term

22    misleading and that seems like a value

23    judgment to me.  We looked at the lunch

24    break to see if your report says anything

25    about misleading.  We don't see it in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 189

1                          KELLER

2    there.  I think that's outside of the

3    scope of what you intend to offer to the

4    jury, that you're sticking to here are the

5    numbers they had, here are the numbers in

6    the safety report, here are the underlying

7    numbers that appeared.  Do you intend to

8    go further than that and tell the jury the

9    numbers are misleading?

10       A.   So I did not intend for that word

11   to have such value attributed to it.  What

12   I was trying to convey and maybe with a

13   little hungry brain going on there was the

14   volumes of the incidents reported in the

15   safety report are different and less

16   considerably, if we say 97 percent less

17   than what the volume of reports that it

18   has internally.  That's the scope of that

19   opinion.

20       Q.   Okay.  And I appreciate the

21   clarification.  I think that can make our

22   day together more efficient if that will

23   be the limit and that you do not intend to

24   go further and say things like what Uber

25   should have reported, what a duty to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 190

```
 1                    KELLER
 2    report, opining that it is negligent not
 3    to report, opining on the standard of care
 4    or that it was misleading not to do that.
 5    I understood from the four corners of your
 6    report that you would be limiting to the
 7    data and I just want to make sure we're
 8    clear on that.
 9        A.   My report draws the comparisons
10    between internal datasets, whether that's
11    the Bliss and Jira data or the Flack
12    interrogatory responses, the S-RAD systems
13    and the other documents I reviewed in
14    comparison to what is in the safety
15    reports and I draw parallels or contrast
16    those two points from a data perspective.
17        Q.   And you will stop short of
18    offering an opinion that doing that is
19    misleading, violative of law, negligent,
20    unfair, irresponsible, those types of
21    value judgments are outside the scope of
22    your report, you are sticking to the
23    numbers, am I right about that?
24             MS. WILKINS:  Object to form.
25             THE WITNESS:  I will let the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 191

```
 1                    KELLER
 2       court or maybe it's another expert,
 3       I'm not aware of the others, I will
 4       let them attribute the value judgments
 5       as necessary to the information and
 6       facts that I provide in my reports.
 7  BY MS. LEVY:
 8       Q.   Okay, I appreciate that
 9  clarification.
10            Going back to page 28, opinion 1,
11  the Figure 7 is intended to show the blue
12  numbers that are included in the safety
13  report and the purple or chartreuse
14  numbers that are in the Flack data;
15  correct?
16       A.   Yes, I think I heard you
17  correctly, it is to draw a comparison to
18  the two, it should not be added together
19  but compared separate from one another.
20       Q.   You're not offering the opinion
21  that the blue numbers that are listed as
22  appearing in the safety report are wrong
23  numbers, they are not, in fact, the five
24  most serious, in that I don't see that
25  anywhere?
```

Page 192

```
 1                    KELLER
 2         MS. WILKINS:  Object to form.
 3    BY MS. LEVY:
 4         Q.  Do you understand the question?
 5    That was a little worded.
 6         A.  I think I do and I'll say that
 7    I'm taking the safety report numbers here
 8    and showing them as they appear in the
 9    safety reports and in another paragraph, I
10    offer an opinion that there are -- and if
11    you let me -- I can search this.  One
12    second.
13             I offer the opinion that there
14    are additional reports that are within
15    those categories that Uber tabulated in
16    its interrogatory responses that aren't
17    disclosed in those safety reports.  Does
18    that make sense?
19         Q.  Yes.
20         A.  So for the years 2017 through
21    2022 there are additional reports that
22    Uber has not disclosed in its safety
23    reports.
24         Q.  And you have not -- we'll get
25    there.  Tell me what paragraph
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 193

1                          KELLER

2      specifically you're referring to to make

3      sure we're talking about -- I think I know

4      what you're talking about but I want to

5      make sure we're on the same page.

6          A.   Sure thing.  There are two

7      footnotes, 63, 64 that reference those.

8          Q.   So 63, can we go to it on page

9      31, just call that up.

10         A.   And just to be fully

11     comprehensive is there's paragraph 49.

12         Q.   Let's go to 63 first.  Here you

13     say that your tabulation of Flack incident

14     classification includes 68 additional

15     incidents in the five categories not

16     included in the safety report.  In other

17     words, 68 additional on top of the 12,522;

18     right?

19         A.   That's correct, that's what --

20     that's what's in the Flack incident

21     classification data produced by Uber.

22         Q.   Did you do any investigation

23     about why that is?

24         A.   That's not possible, hang on,

25     strike that.  So the Flack incident

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

```
 1                    KELLER
 2    classification was just produced so at the
 3    time of this report I couldn't do that
 4    comparison because I had Bliss and Jira
 5    data and I had Flack interrogatory
 6    responses but I didn't have the link
 7    between the two.  Now that I have the
 8    Flack data that was just produced like
 9    from the raw data we'll call it, I have to
10    evaluate whether that's possible to do but
11    I have not been able to do that analysis
12    yet.
13        Q.   And as part of putting the
14    statement in this footnote, did you look
15    at the timing of when the reports were
16    made?
17        A.   It's the same answer because the
18    timing of the reports I would need the
19    Flack data to do that to understand which
20    incidents Uber was categorizing into these
21    five categories and then trace back to the
22    timing that those were submitted.  The
23    interrogatory responses themselves did not
24    provide the time that those reports were
25    made.  They are just totals so at the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 195

```
 1                    KELLER
 2     point of filing this report, that analysis
 3     was not possible so I reserve my right to
 4     do such analysis with the recently
 5     produced Flack data.
 6          Q.   So I don't know today based on
 7     the work you have done whether those
 8     reports came in later, whether they
 9     represented duplication, whether there was
10     an error in calculation, you just don't
11     know what accounts for the 68?
12          A.   I don't want to theorize about
13     work I haven't been able to do yet.  I
14     want to be able to fully consider that
15     Flack data before making any assessments.
16     What this does is notes the discrepancy
17     between the two sources originating from
18     Uber.
19          Q.   Is there a statistically
20     significant discrepancy if you include
21     these numbers, did you look at that?
22          A.   Include what numbers?
23          Q.   The additional reports, is the
24     discrepancy substantial, is it
25     statistically significant?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 196

```
 1                    KELLER
 2        A.   The reports are I'm noting just
 3    like I do in any of my footnotes when
 4    there is a discrepancy.  The reports are
 5    there.  Whether or not they're
 6    statistically significant is not necessary
 7    for that footnote.  I'm pointing out that
 8    there is a discrepancy.
 9        Q.   That's not something you looked
10    at or calculated?
11        A.   I'm noting the discrepancy
12    between what Uber produced in litigation
13    versus what it's showing to the public.
14        Q.   And again when we go through
15    section B, you've noted here and
16    quantified other serious categories other
17    than the five that Uber calls the most
18    serious and you've attached numbers to
19    those in paragraphs 42 and 43.  Are you
20    with me?  Page 30 and 31?
21        A.   So I think you're talking about
22    the analysis that I did of the Uber safety
23    reports as compared to the categories that
24    they internally review, they refer to as
25    serious SA/SM.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                          KELLER

2          Q.    Correct.

3          A.    Okay, I'm there.

4          Q.    Nowhere in any of the safety

5     reports does Uber say hey, we're reporting

6     all of the serious reports, not just a

7     small portion of them, they don't say that

8     anywhere; correct?

9                MS. WILKINS:  Form.

10               THE WITNESS:  Uber says in its

11          safety reports that it reports the

12          five.  It doesn't say hey, internally

13          we look at another eight and that we

14          build our KPIs off of an additional

15          eight.  They don't say that in the

16          safety report.

17    BY MS. LEVY:

18          Q.    You agree Uber does disclose

19    every category in the taxonomy so it is

20    clear that there are other categories.

21    It's not hiding the fact that there are

22    other categories that exist?

23          A.    I kind of disagree with that.

24    Uber doesn't disclose all of the

25    subcategories.  It doesn't leave in -- it

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 198

```
 1                    KELLER
 2     doesn't disclose insufficient information
 3     and it doesn't disclose parent category
 4     use tracking in the safety reports.
 5          Q.   And other categories that you
 6     think are excluded, information and parent
 7     category, anything else?
 8          A.   Those account for four categories
 9     because there are two within sexual
10     assault, sexual misconduct, so parent
11     category, use tracking and sexual
12     misconduct, and the same for insufficient
13     information.  So those account for four
14     that it doesn't disclose in the safety
15     report but then it produced data on in
16     this litigation.
17          Q.   And what's your understanding for
18     why Uber doesn't disclose or put those
19     categories in the taxonomy, a separate
20     taxonomy category, what do you know about
21     that?
22          A.   Uber does have them in its
23     taxonomy and the category it produced in
24     the interrogatory response.  That's the
25     distinction I'm trying to draw here.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 199

1                    KELLER

2        Q.   So it's your testimony that Uber

3    could have put those additional categories

4    in its master taxonomy that it includes in

5    the appendix to the safety report?

6        A.   It's my testimony that Uber has

7    those categories and disclosed data that

8    was in those categories in its

9    interrogatory responses and those

10   categories are not listed in the safety

11   report.

12       Q.   So let's go to Appendix 6 of

13   Exhibit 9.  I'm sorry, Appendix 4, which

14   is for our tech all the way at the very

15   end of Exhibit 9, the last two pages,

16   second to last page.  You're familiar with

17   the page we have on the screen, are you

18   not, Ms. Keller?

19       A.   Yes, very familiar.

20       Q.   And that is what we refer to as

21   the taxonomy; right?

22       A.   I think that's what you're

23   referring to, yes, and I think that's

24   maybe why we're having some tension is I'm

25   referring to the categories that I see in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 200

```
 1                      KELLER
 2      the Flack interrogatory response.
 3          Q.   So when you say taxonomy, you
 4      mean the category that you've isolated in
 5      table 1 of your report that's your
 6      taxonomy?
 7              MS. WILKINS:  Object to form.
 8              THE WITNESS:  That's Uber's
 9          taxonomy, it's under their taxonomy,
10          so some of it overlaps with this but
11          I'm noting like there are 68
12          categories, 68 reports that are not in
13          this actual -- in the safety report.
14          I'm also noting that there are four
15          categories just as a data scientist,
16          not as a value judgment, just as a
17          data person, this list is different
18          than this list and I'm noting that
19          difference.
20      BY MS. LEVY:
21          Q.   And you have anticipated my next
22      question which is your report and your
23      anticipated testimony is limited to it's
24      not there.  You don't intend to go further
25      and say it should be there, there was a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 201

```
 1                    KELLER
 2     duty to put it there, Uber did something
 3     wrong by excluding it.  Those things are
 4     beyond your report, you are limiting
 5     yourself in this report to the fact that
 6     you are noting that those categories are
 7     not there.  Do I have that correct?
 8               MS. WILKINS:  Object to form.
 9               THE WITNESS:  With one addition,
10          I would say I'm noting the volumes
11          that occur in those categories but
12          that they are not reported in the
13          safety report.
14     BY MS. LEVY:
15          Q.  Understood.  Let's go -- let me
16     -- before we leave this appendix, have you
17     reviewed any of the underlying actual
18     reports in any of the categories listed on
19     this page we're looking at here, starting
20     with steering or leering, have you looked
21     at the content of the reports?
22          A.  I think you have asked me this
23     before.  I was like have I looked at any
24     of the tickets.  Is that the same question
25     or am I misunderstanding?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

```
 1                    KELLER
 2        Q.   Yeah, have you looked at and
 3   you've seen some of the underlying tickets
 4   but you did not do a comprehensive
 5   analysis of those; right?
 6             MS. WILKINS:  Asked and answered.
 7             THE WITNESS:  So I've done a
 8        comprehensive analysis of all the
 9        tickets insofar as they are and I've
10        looked at a number of tickets in the
11        Bliss and Jira data but I'm not
12        offering opinions on that dataset at
13        this point in time and reserve the
14        right to do so depending on my review
15        of the Flack data.
16   BY MS. LEVY:
17        Q.   Percentage of the incidents in
18   the Flack data are complaints that someone
19   stared at me or looked at me?
20        A.   I'm sorry, the first part of your
21   question broke up.  Can you ask it again,
22   please?
23        Q.   Have you analyzed what percentage
24   of the reports fall into complaints that
25   the reporter was stared at our looked at
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 203

```
 1                       KELLER
 2      or leered at or given a dirty look as in
 3      the top category we're seeing here?
 4          A.   I've done a similar analysis to
 5      that and we're already on that table where
 6      I show the volume of reports by
 7      subcategory and year.
 8          Q.   By that you're referring to
 9      table -- I think it's 10.
10          A.   Table 1, first one.
11          Q.   I'm sorry.  And have you looked
12      at -- I don't see any percentages here.
13      Have you done an analysis of what percent
14      of the reports fall in each of these
15      categories?
16          A.   This table shows the numbers.
17      One could create percentages using these
18      numbers.  I show the raw numbers because
19      it's -- what percentage you can't back out
20      to the raw numbers but raw numbers you can
21      always do percentages if you wanted to, so
22      that's the data I've shown here in this
23      figure, or this table I should say.
24          Q.   You could do that but you've
25      chosen to express it this way because it's
```

Page 204

```
 1                    KELLER
 2    easier to convert?
 3        A.   This allows the reader to have
 4    the numerator and the denominator so
 5    that's what's shown in this table or a
 6    denominator if you're comparing it to a
 7    total, but it also gives you the breakdown
 8    of each particular category in the volume,
 9    in a volume expression as opposed to
10    percentage.
11        Q.   And for purposes of your analysis
12    in this whole report, you're using Uber's
13    own definitions of each of these
14    categories, you didn't create new
15    definitions, did you?
16        A.   I'm using Uber's definitions when
17    I'm showing the table.  When I am showing
18    the tables and this is not only their
19    definitions but their categorization of
20    the data.  So I'm taking what they have
21    produced in the litigation through that
22    interrogatory response and aggregating it
23    to the year, for example, in this table.
24        Q.   And you know in your work in this
25    case that Uber worked in experts in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 205

```
 1                     KELLER
 2      field of sexual violence to come up with
 3      the taxonomy, the categories and the
 4      definitions of each category, right,
 5      that's something you're aware of?
 6              MS. WILKINS:  Object to form.
 7              THE WITNESS:  I know that Uber
 8          puts itself out that way but however
 9          they have chosen to file these reports
10          doesn't change the facts of my report.
11          I'm reporting on what's in that filing
12          system.
13      BY MS. LEVY:
14          Q.   So you aren't making any
15      judgments on how the categories are
16      defined or offering any better
17      definitions; right?
18              MS. WILKINS:  Asked and answered.
19              THE WITNESS:  Yeah, I think the
20          same answer as before is I'm showing
21          the data, how Uber produced it to me,
22          or not produced it but produced in
23          this litigation.
24      BY MS. LEVY:
25          Q.   Is that with the exception of the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 206

1                    KELLER

2    most serious category sexual assault,

3    nonconsensual sexual penetration, for that

4    one you sometimes change the term to rape;

5    right?

6        A.   Yes, I use that term rape because

7    that's what the industry and what I'm used

8    to seeing -- not the industry, the sexual

9    assault nonprofit data when I look at

10   their websites and also what the FBI's

11   Uniform Crime Reporting, CompStat, all of

12   those refer to that as rape and so that's

13   what I'm used to reading in my prior work

14   with -- I'm sorry, what I'm used to

15   reading on those sources.

16       Q.   Okay, let me slow down on that.

17   Which -- what are the third-party experts

18   that use the term rape instead of

19   nonconsensual sexual penetration, do you

20   remember?

21       A.   So an example is the FBI uniform

22   crime reporting, I messed up the phrase of

23   that, but that is referred to as rape.

24   New York City's CompStat uses the term

25   rape so that's what I'm used to and in my

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 207

1               KELLER
2    previous work, especially when it overlaps
3    with gun trafficking work, I'm used to
4    looking at datasets in that work so I've
5    seen it referred to that incident as that.
6         Q.   Now, your familiarity with the
7    criminal regulations that you've described
8    from your prior work, you recognize that
9    not all of these categories that are
10   listed in the Flack data or in Uber's
11   taxonomy in Appendix 4 of its safety
12   report, not all of these categories
13   constitute criminal activity, of course;
14   right?
15            MS. WILKINS:  Object to form.
16            THE WITNESS:  I haven't done that
17         specific analysis but for all the
18         categories but that's the -- what I'm
19         drawing here for -- I haven't done
20         that analysis for all categories.
21   BY MS. LEVY:
22        Q.   So like a report, for example,
23   that he stared at me in the mirror, that's
24   not something that somebody could report
25   to the police and have somebody arrested

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 208

```
 1                      KELLER
 2      for; right?
 3             MS. WILKINS:  Calls for
 4          speculation, outside the scope of
 5          Ms. Keller's opinion.
 6      BY MS. LEVY:
 7          Q.   You can answer.
 8          A.    That is not something I provided
 9      an opinion on.  Each case would have to be
10      considered independently and that's not
11      something that I've done or am going to --
12      that I've done so far.
13          Q.   Flirting is one of the
14      categories, sexual misconduct, comments or
15      gestures, category flirting.  Flirting is
16      not something that's a crime in any place
17      you've ever been; right?
18             MS. WILKINS:  Calling for legal
19          opinion, outside the scope of what
20          Ms. Keller is offering opinions on in
21          this litigation.
22             THE WITNESS:  I'm not offering
23          that opinion.  I'm offering an opinion
24          on how many incidents were reported in
25          flirting and I also offer the opinion
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 209

1          KELLER

2       that some of these misconduct

3       incidents are -- according to Uber's

4       own analysis are -- make -- they don't

5       make.  The phrase that Uber uses is a

6       driver is █████████████████████████

7       ████████████████████████

8       ████████████████████████

9       ████████████  and so I'm reporting -- I

10      have both of those pieces of analysis

11      in my report.

12   BY MS. LEVY:

13      Q.  The categories for which Uber

14   collects data are extremely comprehensive

15   and they are overinclusive of what a

16   criminal code would consider criminal

17   activity.  Uber's taxonomy is much more

18   than that, it collects much more than

19   that; right?

20          MS. WILKINS:  Object to the form

21       as vague, also calls for a legal

22       conclusion and is outside the scope of

23       the opinions that Ms. Keller is

24       offering in this litigation.

25          THE WITNESS:  My -- I would just

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 210

KELLER

1                    KELLER
2      say my role here is calculating the
3      volumes of reports that are in these
4      categories and showing them in
5      contrast to what Uber has produced in
6      its public reports and also analyzing
7      the documents because the data hasn't
8      been produced for some of these that
9      have been identified as precursors or
10     other indicia of subsequent sexual
11     assault.
12          I'm needing a break, if that's
13     possible.
14          MS. LEVY:  Certainly.  Do you
15     want to take 10?
16          MS. WILKINS:  Yes.
17          THE VIDEOGRAPHER:  Going off the
18     record.  The time is 4:25 p.m.
19     Eastern.  This is the end of media
20     unit 3.
21          (Recess taken from 4:25 p.m. to
22     4:48 p.m.)
23          THE VIDEOGRAPHER:  We're back on
24     the record.  The time is 4:48 p.m.
25     Eastern.  This is the beginning of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 211

1                        KELLER

2          media unit 4.

3      BY MS. LEVY:

4          Q.    If we could go back to

5      Ms. Keller's report, Exhibit 1.  And we

6      are still looking at Exhibit 1 of your

7      report which I think you have in front of

8      you.  I want to turn to page 21 of the

9      report.

10         A.    Okay.

11         Q.    Are you with me?

12         A.    Yes.

13         Q.    Figure 21 shows your calculation

14     and depiction of the average frequency of

15     SA/SM incidents on an annual basis by

16     number of minutes, and that is based on

17     the incident count in the Flack report;

18     correct?

19         A.    Yes, that's a brief

20     representation of what's in Figure 1.

21         Q.    And what we're now seeing here is

22     what number of rides that happen each --

23     per minute as a denominator for this,

24     that's not reflected in this chart;

25     correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 212

1              KELLER

2      A.   That would be a different

3   analysis.  I analyze rides in a different

4   part of the report.  This is a time-based

5   analysis, I think we've talked about this

6   figure already today, is that this is a

7   way to normalize the data based off of

8   time.  The trip analysis is elsewhere.

9      Q.   So if I wanted to know, for

10  example, what is the chance that someone

11  could experience a sexual assault or

12  sexual misconduct incident as Uber

13  categorizes it on a ride, I don't know the

14  chance of that happening by looking at

15  this chart because I don't know the

16  denominator of the number of rides per

17  minute; right?

18         MS. WILKINS:  Object to form.

19         THE WITNESS:  I don't know what

20      you're -- are you defining chance, can

21      you define chance specifically because

22      I want to make sure.

23  BY MS. LEVY:

24      Q.   I think you said risk.  What is

25  the risk per minute of this happening to a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 213

```
 1                      KELLER
 2     particular individual?  We would need to
 3     know the number of rides to know that;
 4     right?
 5         A.   I think I used the word rape.  If
 6     I said risk, I misspoke.  Rape, and that's
 7     a specific type of rape, so if you're
 8     wanting to do that type of analysis,
 9     that's in a different part of my report.
10         Q.   We don't see that in Figure 1 on
11     page 21; right?
12              MS. WILKINS:  Object to form.
13              THE WITNESS:  That analysis is in
14         Figure 3.
15     BY MS. LEVY:
16         Q.   We'll get to that in just a
17     minute.  We also -- I think you told me
18     earlier that this frequency, you limited
19     the frequency analysis solely to Uber.
20     You have not compared it with the
21     frequency of sexual assault and misconduct
22     in any other context, only Uber; correct?
23         A.   Sorry, I'm feeling a little
24     déjá vu.  I think the same answer applies
25     about the questions or similarly the same
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 214

```
 1              KELLER
 2    question as before, this is an analysis of
 3    what's in Uber and what's in Uber's own
 4    data and specifically to the Flack
 5    interrogatory responses that Uber compiled
 6    for this litigation.
 7        Q.   And the incidents that are
 8    reflected in this chart, they include
 9    flirting, comments, staring, leering, all
10    the incidents, not just the serious or
11    most serious ones; correct?
12        A.   This is of all incidents, all the
13    ones that Uber classified into its 27
14    categories that -- I'm sorry, 26
15    categories that it produced in its
16    interrogatory response.
17        Q.   And I think -- I do think we're
18    on the same page on this but we don't know
19    whether in the outside world in any other
20    context sexual assault and sexual
21    misconduct in these categories happen more
22    frequently or less frequently than they
23    happened on Uber, we don't know that
24    because that's not an analysis you've
25    done; correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 215

```
 1                      KELLER
 2        A.   That would be a different
 3    analysis.  The analysis that I do is
 4    looking at what Uber's data, what is
 5    contained in Uber's data, what Uber did
 6    with that data and what it told the
 7    public.
 8        Q.   The next page 22 of your report
 9    in Figure 2, here you plot the average
10    frequency of rape or attempted rape in
11    hours; correct?
12        A.   Yes, this is the -- in hours
13    so -- (froze).
14             THE VIDEOGRAPHER:  Going off the
15        record.  The time is 4:54 p.m.
16             (Discussion off the record.)
17             THE VIDEOGRAPHER:  We're back on
18        the record.  The time is 4:56 p.m.
19             THE WITNESS:  So I think it's my
20        turn.
21    BY MS. LEVY:
22        Q.   If you don't mind, thanks.
23        A.   The image shows -- I think you
24    were just reading the title, the average
25    frequency of rape or attempted rape in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 216

1                    KELLER

2    hours using the Flack interrogatory

3    responses.

4        Q.   This is the average frequency but

5    not the rate that what Uber calls

6    nonconsensual sexual penetration and what

7    you've put in the heading here as rape

8    occurs or is reported to occur on the

9    platform; right?

10           MS. WILKINS:  Object to form.

11           THE WITNESS:  I think you're

12       asking a similar question to what you

13       did before?

14   BY MS. LEVY:

15       Q.   Yes.

16       A.   Okay.  So with that, I think

17   you're referring to a different chart or

18   different type of analyses.  This takes

19   the rape -- the number I should say of

20   rape or attempted rape in Uber's taxonomy,

21   nonconsensual penetration or attempted

22   nonconsensual penetration and normalizes

23   them to the hour.

24       Q.   And it's not on this chart how

25   many rides occur every hour.  That doesn't

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 217

```
 1                    KELLER
 2     appear on this chart; correct?
 3         A.    That would be a different
 4     analysis.
 5         Q.    The lowest numbers we see on this
 6     chart occur in 2024; correct?
 7         A.    The lowest numbers you're
 8     saying -- you're referring to 14.3 so
 9     there we're seeing one incident every 14
10     hours on average.
11         Q.    And that is lower than any other
12     time that is plotted here; correct?
13         A.    Yes.
14         Q.    I notice in 2020 and 2021 we see
15     higher spikes and you grayed out two and a
16     half years for COVID.  What is the
17     significance of COVID to your analysis and
18     why did you delineate that?
19         A.    So COVID is delineated there by
20     the time in which COVID was present.  I
21     determined that period as Uber's mask
22     policy and that provides context for those
23     numbers.  The world at that time we know
24     that bars weren't as open, we know that
25     people were staying home more so that's
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 218

1                          KELLER

2      just providing some context to the numbers

3      during that period of time.

4           Q.   Did you do any investigation or

5      look behind like why the numbers rose in

6      COVID and why they are falling or are you

7      just reporting the numbers as you see them

8      in the data?

9           A.   This is what is reported in the

10     data and I want to make sure that you're

11     understanding this image correctly.  A

12     rise and a fall of this image, lower is

13     more frequent and higher is less frequent.

14     Unlike other images in the report, higher

15     is more incidents or more reports and so

16     this is in some ways kind of the inverse,

17     if that makes sense.

18          Q.   I understand and I understand why

19     you're confused by my question.  The

20     dotted line in Figure 2, what does that

21     represent?

22          A.   That's the average across all

23     years.

24          Q.   And that average includes every

25     year plotted here, including the COVID

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 219

1                     KELLER

2     averages where there's a greater number of

3     hours per each alleged nonconsensual

4     sexual penetration?

5          A.    I would say this is an average of

6     all the years included in this chart

7     taking into account 2017 where one

8     incident on average and I determined -- I

9     define the term in my report how I

10    calculate this but we'll just use the

11    simple terms in our definition here, every

12    16.3 hours and then during the COVID

13    years, 38.4 hours between incidents on

14    average, if you're normalizing to time.

15    So that bottom line includes all the years

16    that are shown on the graph.

17          Q.    And to make sure I'm clear, I

18    think you've answered this but you didn't

19    do a look behind to try to account for any

20    confounding factors or any reasons why

21    these numbers might be changing; is that

22    right?

23               MS. WILKINS:  Form.

24               THE WITNESS:  So these are -- I'm

25         not quite sure what you mean by that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 220

1                    KELLER
2        because these are off the total volume
3        from Uber so those are reporting the
4        total volume from Uber.
5    BY MS. LEVY:
6        Q.    In other words, it's math.  You
7    looked at the total volume divided by the
8    number of hours in a year?
9        A.    Other way around.  Hours in the
10   year divided by the total incident rate.
11   But yes, math.
12       Q.    You did not, for example, look at
13   the impact of news media or this
14   litigation or attorney advertising on the
15   numbers, on drivers to the numbers, you
16   didn't do any look at those kind of
17   factors, did you?
18       A.    That would be a different
19   analysis.  I did not need to do that for
20   this analysis that I've included here.
21       Q.    Okay.  And you didn't -- you
22   didn't do it for this chart but you didn't
23   do it -- you didn't need to do it and you
24   didn't do it; correct?
25       A.    It being -- so it being the look

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 221

1                          KELLER

2      behind or some sort of informed reason, is

3      that what you're asking me?

4           Q.   Yes, I am.

5           A.   So I took the numbers --

6           Q.   Let me make sure we're clear.

7      What I want to understand is when you say

8      it's not necessary, I want to make sure

9      that's a clean no, like I didn't do it.

10     You said it wasn't necessary for this.  I

11     want to know if you did it for a different

12     purpose.  That's what I'm trying to get

13     to.

14          A.   I see.  So in my report, to do

15     that type of analysis was not necessary

16     because my report looks at the data that

17     Uber had in its possession as opposed to

18     what it disclosed to the public, draw

19     those comparisons and we can also talk

20     about the other things they did with that

21     data, S-RAD, but I think I've been very

22     clear that that's what I'm doing here.

23          Q.   You were not trying to figure out

24     why this was happening, you were simply

25     looking at the numbers that Uber had and

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

1                      KELLER

2      the numbers that it put out; is that fair?

3              MS. WILKINS:  Object to form, it

4          mischaracterizes her prior testimony.

5              THE WITNESS:  I'm a data analyst.

6          I'm looking at the data.

7      BY MS. LEVY:

8          Q.    Okay.  Let's -- I'm sorry.

9          A.    And showing the calculations of

10     that data, I should say.

11         Q.    Now, how you display the bar

12     chart -- let's turn to the next page --

13     strike that.

14              Turn to page 23, please.  Figure

15     3.  Figure 3 shows the rate of sexual

16     assault and misconduct incidents per year;

17     correct?

18         A.    Using the same methodologies that

19     Uber -- methodology but the same type of

20     rate that Uber uses in its safety reports,

21     the per 100 million trips.

22         Q.    And so that -- you've honed in on

23     one of the things I want to ask you about

24     is you actually took the numbers for 2017

25     and you multiplied them by 100 million;

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 223

1                          KELLER

2      right?

3           A.   Yes, because I wanted to

4      replicate what Uber, the same

5      representation that Uber does in its

6      safety reports.

7           Q.   And so when we look at these

8      numbers at the top of the bar charts, for

9      example, 2017, 6,869, that is a much

10     smaller number but multiplied by a hundred

11     million.  That's what we're looking at

12     here?

13               MS. WILKINS:  Object to form.

14               THE WITNESS:  It is a

15          representation following the same

16          methodology that Uber uses or the same

17          representation.  I won't say

18          methodology because that means much

19          broader things.  It follows the same

20          characterization of the numbers that

21          Uber does so I'm trying to show an

22          apples -- if Uber had shown what they

23          had internally in the same way that it

24          presents the numbers in its safety

25          reports in this per 100 million, what

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 224

```
 1                    KELLER
 2       that data would show.
 3    BY MS. LEVY:
 4       Q.   If you looked at how often these
 5    incidents occur per every 10 million
 6    trips, the numbers would shrink; right?
 7       A.   But that's not what Uber shows in
 8    its safety reports so I'm replicating
 9    that.
10       Q.   If you looked at how often these
11    incidents occur per every one million
12    trip, they would shrink even further;
13    right?
14            MS. WILKINS:  Object to form.
15            THE WITNESS:  Again, my -- my
16         intention here was to show the data in
17         the way that Uber shows it in its
18         safety reports but with all the data
19         it had available to it.
20    BY MS. LEVY:
21       Q.   And the incidents that are
22    plotted here in Figure 3, that includes
23    every single incident of every report that
24    Uber collected that you saw in the Flack
25    data including the least serious like
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 225

```
 1                  KELLER
 2     flirting and staring and making a comment,
 3     this is all the incidents; right?
 4              MS. WILKINS:  Object to form.
 5              THE WITNESS:  Uber -- so a few
 6          things.  Uber says it believes victims
 7          so I'm calculating all of the
 8          incidents that are reported to Uber
 9          and I'm doing so on the Uber -- on the
10          calculations that Uber made itself on
11          its own data via the interrogatory
12          responses.
13     BY MS. LEVY:
14          Q.   And it also -- in addition to
15     including every type of incident no matter
16     how serious, it also includes all the
17     reports made by people who weren't riders,
18     this is every report whether it's made by
19     a driver, a rider or a third party; right?
20              MS. WILKINS:  Object to form.
21              THE WITNESS:  My understanding is
22          they are all the reports that are made
23          on the Uber platform but Uber has
24          verified that -- I can't remember the
25          terminology specifically that they use
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

1                    KELLER

2        that it was, for example, a trip that

3        wasn't on the platform.  This includes

4        all of the reports that were made on

5        the Uber platform by riders, drivers

6        and third parties.  That's what Uber

7        has reported the data to be.  Uber has

8        not provided a field in the

9        interrogatory response to break that

10        out by driver or rider.  I will say

11        that, and this is the same answer that

12        or similar answer to what I've given

13        before, the Flack data that was just

14        produced contains additional fields

15        that I am -- will review, haven't had

16        a chance to review, that may shed some

17        light on that breakdown but I have not

18        had a chance to review that yet.

19    BY MS. LEVY:

20        Q.   So the bar graph we're looking at

21    in Figure 3, some of those were reports of

22    driver misconducts, others of these

23    incidents reflected in this figure are

24    reports of rider misconduct and others are

25    reports of third-party misconducts; true?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 227

```
 1                    KELLER
 2      A.   It reflects all of the reports
 3   made to the platform.
 4      Q.   If you isolated only the reports
 5   of drivers engaging in sexual assault and
 6   misconduct against riders, you would
 7   expect those numbers to be smaller than
 8   these; correct?
 9            MS. WILKINS:  Object to form.
10            THE WITNESS:  I have not analyzed
11        that yet so similar to that on table
12        1, I don't want to theorize on
13        something that I haven't analyzed yet.
14   BY MS. LEVY:
15      Q.   If you isolate just one of the
16   three categories you would expect them to
17   go down; true?
18            MS. WILKINS:  Asked and answered.
19            THE WITNESS:  This figure we're
20        talking about is by year so it's not
21        by particular categories, it's all the
22        categories combined.
23   BY MS. LEVY:
24      Q.   And you have not done that
25   analysis; correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 228

1                    KELLER
2        A.    At the time of filing my report,
3    Uber had not produced data that would
4    allow me to do so.  I'm reviewing -- Uber
5    had either -- Uber had not produced data
6    that allowed me to do so, all the
7    interrogatory responses, or I was awaiting
8    data from the Flack system that I was
9    anticipating being -- having fields that
10   might shed light on such an issue.
11       Q.    Let's turn the page and look at
12   Figure 4 on page 24.  This figure
13   illustrates your calculated rate of rape
14   incidents per year; correct?
15       A.    This is what I have calculated
16   using the data that Uber has provided to
17   me using the nonconsensual penetration,
18   also known as rape, divided by the volume
19   of trips that Uber produced in its
20   interrogatory responses.
21       Q.    And the numbers that we're seeing
22   here, the total numbers of reports where
23   the reported incident was nonconsensual
24   sexual penetration, that's the white
25   numbers we see at the top of the bar

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 229

```
1                      KELLER
2    graphs; correct?
3         A.   Those are the reports per 100
4    million trips.  To be clear it's not the
5    raw numbers, it's a rate.
6         Q.   It's ████ out of every hundred
7    million trips; correct?
8         A.   ████
9         Q.   In 2017?
10        A.   In 2017, the rates ████ per 100
11   million trips, we see some fluctuations in
12   the interim years and the final year you
13   see ████ per hundred million trips.
14        Q.   In 2017, for example, I haven't
15   seen the conversion.  That's one out of
16   how many million rides?
17        A.   I haven't done that math.  We
18   would have to move decimal points over to
19   do that analysis and to be honest it's
20   late in the afternoon and I don't want to
21   mess up.  Every time someone asks me to do
22   math on the record I get nervous.  If you
23   want to give me a calculator I'm happy to
24   do it.
25        Q.   You would have to move the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 230

1                           KELLER
2        decimal point over by two decimal places
3        to do one out of a million; right?
4                    MS. WILKINS:  Asked and answered.
5                    THE WITNESS:  We would have to
6              move the decimal place, yes, but this
7              image is reflecting the rates that
8              Uber puts in its safety report which
9              is why I chose that per hundred
10             million trips.
11       BY MS. LEVY:
12            Q.   And for this metric, just like
13       the other metrics we've talked about
14       previously, you were not asked to and did
15       not compare the rate of allegations of
16       nonconsensual sexual penetration on Uber
17       to anything outside of Uber, to how often
18       that happens in the real world or other
19       methods of transportation, you didn't do
20       that analysis; correct?
21            A.   This is the real world.  I love
22       this term.  You and I have got this term
23       in opioids and here it is again.
24                    The real world is this data.
25       These are real incidents.  A Jaylynn Dean

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 231

1                    KELLER

2    incident is a real allegation of rape.  So

3    that is an incident that's in this data.

4    So to the extent that I'm analyzing real

5    reports that happened to Uber or happened

6    on the Uber platform that Uber recorded

7    and is in their dataset, that's what's

8    reflected in my report.

9         Q.   I take your point and I

10   completely agree with you.  I don't

11   disagree with that characterization.  Let

12   me ask it a better way.  You did not

13   compare the rates or the risk of rape

14   occurring on an Uber platform to the risk

15   of it occurring anywhere else in the real

16   world, anywhere else in the world, let's

17   say, take out real?

18        A.   The same answer as previously

19   today.  I did not need to do that analysis

20   to do my analysis which was to compare the

21   data that Uber had in its possession, that

22   it tabulated from these interrogatory

23   responses, that it studied internally,

24   that it made the S-RAD program off of

25   versus what it told the public.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 232

1                      KELLER

2        Q.   And nobody asked you to look and

3    compare these rates to taxis, to walking

4    down the street, to other situations

5    somebody might be in, that is not

6    something that you were asked to do for

7    this case?

8              MS. WILKINS:  This has been asked

9         and answered many times.

10             THE WITNESS:  My assignment was

11        the same answer that I've given

12        before, is to look at the data that

13        Uber had in its possession, what it

14        did with that data and how it

15        presented that data to the public.

16   BY MS. LEVY:

17        Q.   On the next page, 25, paragraph

18   36, here we see the same thing.  We see

19   display of the data per 100 million trips;

20   is that correct?

21        A.   So this, I think you just said

22   the data so just to be clear, this is the

23   rate of the publicly disclosed five so

24   these are the Uber five disclosed

25   categories using per 100 million trips

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233

```
 1                    KELLER
 2      which is the metric that Uber also
 3      utilizes in its safety reports.
 4          Q.   And Uber refers to this as the
 5      five most serious categories as we
 6      discussed before; correct?
 7          A.   That is one characterization of
 8      those five but they are the same five.
 9          Q.   Okay.  And in order to get -- in
10      order to understand how frequently those
11      most five serious incidents occur out of
12      every three million trips, you would have
13      to move the decimal two places over;
14      correct?
15          A.   That would be a different
16      denominator.  I'm using the denominator
17      Uber uses in its safety reports.
18          Q.   Right, but in order to show how
19      frequently those top five events are
20      reported to occur on Uber, you would have
21      to move the decimal place two places?
22          A.   If -- let me make sure I'm
23      understanding.  So if you wanted to show
24      it per one million trips versus 100
25      million trips, you're asking if you move
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1                        KELLER
2       the decimal place correctly?
3           Q.   Yes.
4           A.   Yes, to do that you've done your
5       math correctly but I'm saying I've shown
6       the method in which Uber shows this data
7       in its safety reports.
8           Q.   Now, we've talked a little bit
9       today about your views on underreporting
10      and I think I understand you to say you
11      have not calculated or estimated what
12      might be the rate of underreporting.  That
13      is not something that you've done a
14      calculation of; correct?
15          A.   I've noted that both Uber -- that
16      Uber is aware of underreporting internally
17      and in its statements in safety reports
18      but that's the extent to my opinion on
19      that at this time.
20          Q.   Paragraph 37 of your report cites
21      to a U.S. Department of Justice study
22      about the rate of reporting.  You're not
23      aware of any analysis of internally at
24      Uber or that you've done yourself that
25      compares whether individuals report more

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

1              KELLER

2    frequently to Uber through its reporting

3    channels than they do outside of the Uber

4    platform, you're not aware of any analysis

5    comparing on Uber rates of reporting

6    versus outside of Uber rates of reporting;

7    correct?

8         A.   What I am aware of is that Uber

9    has internal documents that are aware of

10   the underreporting due to the -- I don't

11   know if I want to use the intimate, the

12   closeness of the rider/driver pairings

13   because that driver may know where the

14   rider lives.  I know I've reviewed

15   thousands of tickets that had a keyword

16   phrase similar to that of he knows where I

17   live, they know where I live.  I've done

18   that analysis but that's -- that's what

19   comes to mind sitting here today.

20        Q.   Have you made it part of your

21   work in this case to study whether

22   individuals reporting sexual misconduct

23   are more likely to report strangers or

24   people that they know?

25        A.   That would be a different

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

```
1                   KELLER
2    analysis than what I've done.  What I do
3    know is what Uber has said internally and
4    to the public on the issue, as well as the
5    tickets that I've seen highlighting their
6    fear of retaliation due to the driver
7    knowing where they live.
8        Q.   So I think when you say this has
9    been a different analysis, you mean you
10   didn't look into whether generally in the
11   world reporting of strangers is higher
12   reporting rates or lower reporting rates
13   than reporting sexual misconduct against
14   individuals that someone knows, that's not
15   something that you did as part of your
16   study here?
17           MS. WILKINS:  Asked and answered.
18           THE WITNESS:  I don't know how
19       you're defining the driver someone
20       knows or they are considered a
21       stranger, I don't know how you define
22       that.  My opinions are shown pretty
23       clearly in my report here and those
24       are my opinions.
25   ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              KELLER

2    BY MS. LEVY:

3        Q.    Your assumption just as a matter

4    of common sense is riders and drivers are

5    almost always strangers; right?

6        A.    I don't know.  Yes or no I

7    don't -- Uber operates in small towns, big

8    towns.  I would be totally guessing.  I

9    know personal experience, I know two Uber

10   drivers.  I would be totally guessing what

11   percentage are strangers versus

12   acquaintances.

13       Q.    Moving on to opinion 2 on page

14   26, this opinion is encapsulated in Figure

15   6 on page 27 and here this is actually not

16   something that you created but this is a

17   screenshot from Uber's own blog post in

18   earlier this year; correct?

19       A.    I would say that's not quite a

20   correct representation of my report.  That

21   figure is one basis but there are -- so

22   Figure 6, let's be very specific, is one

23   part of that opinion but opinion 2 spans a

24   number of paragraphs that have that

25   analysis that support it.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 238

1                          KELLER
2          Q.   Okay.  So let's look at Figure 6.
3      Did you recalculate the percentages of
4      most serious and by that I mean the five
5      categories that Uber calls most serious,
6      versus all other categories, did you run a
7      different analysis and get different
8      numbers than Uber has illustrated here in
9      this pie chart?
10         A.   That's discussed in paragraph 39,
11     that comparison.
12         Q.   And what do you think are -- do
13     you agree that the topmost serious as
14     disclosed in Uber's safety reports
15     constitutes 3 percent --
16         A.   That's wrong -- I'm sorry, I
17     talked over you.
18         Q.   I'm sorry, I didn't finish my
19     question.  I was in the middle of a cough.
20     In Figure 6, when Uber represents that the
21     most serious categories, meaning the five
22     most serious categories represent
23     3 percent of its reports in Uber safety
24     reports, do you believe that number is
25     correct or incorrect?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 239

1                    KELLER

2        A.    So I'm saying that my analysis of

3    that image, so I'm putting that image in

4    here, is below in paragraph 39 and so that

5    -- to look at 2017 to 2022, that number

6    would be 12522 divided by the 392828 and

7    put that percentage in there, but that's

8    the analysis that I would do.  I don't

9    have my calculator in front of me.  I have

10    a feeling it's very close to 3 percent.

11        Q.    As you sit here today, you're not

12    saying that 3 percent is wrong, it's a

13    miscalculation?

14        A.    I'm saying my clarification of

15    that figure in paragraph 39.  Sorry, I

16    like to be very specific when I respond.

17    If I haven't done the math and can't check

18    myself I don't want to be certain, but

19    what I'm telling you that if you take

20    12522 divided by 392828 that will arrive

21    at my calculation of that number which

22    based off of the subsequent sentence I

23    assume to be very close to 3 percent.

24        Q.    Okay.  And you further state in

25    paragraph 39 that -- in the bottom of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 240

```
 1                KELLER
 2   paragraph 39, in the last sentence it
 3   says, "Considering the SA/SM incidents
 4   from 2023 to 2024, Uber has currently
 5   disclosed 2.3 percent of all SA/SM
 6   incidents from 2017 through '24."
 7            Do you see where I'm reading
 8   from?
 9        A.   Yes, ma'am.
10        Q.   Here's one weird question.  Right
11   before the 2.3 it says OBJ.  What is that
12   error message?
13        A.   Honestly, I was a little like
14   distracted when I was looking at that.
15   That comes from -- we use Google Docs and
16   when the document gets converted to pdfs,
17   if something doesn't know to look for
18   those, they appear.  They are like from
19   like track changes or something like that
20   so it means nothing other than just
21   something from the computer system, so it
22   doesn't have any special meaning that I'm
23   attributing to.  It's a leftover from that
24   process and I apologize for that.
25        Q.   And so I think is it fair to say
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 241

1                        KELLER

2       that your point here is if Uber

3       extrapolated to what you see in the Flack

4       data all the way through 2024, then the

5       number it has currently disclosed would be

6       2.3 percent of SA/SM incidents in that

7       time frame?

8           A.    I wouldn't use the word

9       extrapolated but what this 2.3 percent is

10      showing the 12,522 it's compared to the

11      total incidents we have at the top of the

12      report that appear in the Flack data that

13      Uber produced and tabulated in this

14      litigation and specifically the

15      interrogatory data, I should say.

16          Q.    There isn't anywhere that Uber

17      has publicly given the wrong number from

18      2023 and 2024, you're just saying it

19      hasn't disclosed the percentage that goes

20      all the way through that time frame?

21              MS. WILKINS:  Mischaracterizes

22          prior testimony.

23              THE WITNESS:  So I answer; right?

24          So what I'm saying is it's 2025,

25          nearing the end of 2025.  To date Uber

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 242

```
 1                    KELLER
 2        has disclosed 12,522 incidents to the
 3        public but it knows of -- I can't
 4        recall the 500,000 incidents that it
 5        disclosed in the Flack data as part of
 6        this litigation.
 7    BY MS. LEVY:
 8        Q.   So the number, the 2.3 percent is
 9    the number actually disclosed as the
10    numerator and the denominator if it had
11    disclosed the number of every single
12    incident; is that fair?
13        A.   That's a little strange because
14    if it had disclosed those incidents it
15    would have disclosed them.  So I think the
16    correct or the way that I'm thinking about
17    this is it's disclosed 12,522 incidents
18    and then I'm looking up in the exhibit
19    here to earlier in my report, there's
20    546,196 incidents in the data that it
21    tabulated from the Flack system from 2017
22    to 2024.  So it has not disclosed -- it's
23    disclosed some of those but not all of
24    those incidents so that's what that number
25    represents.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 243

1                          KELLER
2          Q.   And you do not dispute that Uber
3     never said these are all the categories,
4     it never misrepresented that it is
5     disclosing all the categories, that's not
6     your complaint, your complaint is it could
7     have but did not do that; correct?
8               MS. WILKINS:  Asked and answered.
9               THE WITNESS:  I'm showing the
10              difference between what Uber has
11              disclosed for those five plus the 68
12              that were in those five as -- sorry,
13              that messes up that calculation but
14              what I'm saying is what Uber disclosed
15              as part of the safety reports, 12,522
16              as the numerator and the denominator
17              is the total number of incidents that
18              it received on the platform and that
19              it tabulated in its interrogatory
20              response in this litigation.
21     BY MS. LEVY:
22          Q.   And again, I believe that -- I
23     think I understand your prior testimony to
24     apply here as well, that you do not intend
25     to offer any opinions other than what the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 244

1                    KELLER

2      numbers were disclosed here or the numbers

3      you saw in the Flack, for example, you do

4      not intend to offer the opinion that they

5      should have disclosed more information or

6      that it would have been good or better or

7      helped people or hurt people to disclose

8      more information, you don't intend to go

9      further and offer value judgments, you

10     intend to stick with what we see here,

11     here is the number that was disclosed and

12     here is the number that was not?

13          MS. WILKINS:  Objection, compound

14          nature of the question and also this

15          has been asked and answered.

16          THE WITNESS:  So similarly that

17          I've answered before, what I'm showing

18          here is the data that Uber had in its

19          possession, what it did with that

20          data, program that it created called

21          S-RAD and what it disclosed to the

22          public about that.

23     BY MS. LEVY:

24          Q.   Similar question in Figure 7, the

25     blue that we talked about before, the blue

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 245

1                      KELLER

2      lines are number of incidents in the

3      safety report that contain reporting on

4      the numbers and the purple or chartreuse

5      are numbers that Uber did not include,

6      they represent incidents in categories

7      that Uber did not put numbers to in its

8      safety reports; is that true?

9          A.   Not quite.  So that's why I want

10     to be very clear about what this figure is

11     because I don't want it to be --

12         Q.   I'm still listening.  I'm getting

13     a cough drop.

14         A.   The 71,080, for example, in 2017

15     is inclusive of the five categories that

16     Uber disclosed in its safety report so

17     it's not in addition to the categories

18     that it hasn't disclosed, it's all of the

19     categories so it's a comparison.  Does

20     that make sense?

21         Q.   It absolutely does and I

22     appreciate the clarification.  And again

23     as we discussed earlier, this is an

24     illustration of if Uber had chosen to put

25     numbers in every category it would have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246

1                    KELLER

2    looked like the purple numbers as opposed

3    to the categories it chose which is

4    reflected in the blue numbers; is that

5    fair?

6        A.   If Uber had reported all of the

7    incidents it received and categorized it

8    would be the volume in purple.

9        Q.   And there isn't anywhere and, in

10   fact, Uber didn't ever say we are

11   reporting in every single category, it

12   didn't do that.  It never represented

13   every single one of the numbers, agree?

14           MS. WILKINS:  This has been asked

15        and answered a number of times.

16           THE WITNESS:  I think that's the

17        whole point of this chart is Uber says

18        that it discloses five categories of

19        data.  That's the blue.  Uber

20        acknowledges another set of categories

21        in existence but doesn't disclose the

22        volume in those and with the exception

23        of the insufficient information and

24        pair category use tracking we

25        discussed earlier, the purple shows

Page 247

1                      KELLER
2        those volumes of reports.
3     BY MS. LEVY:
4        Q.    Table 2 on page 29, that is just
5     the underlying numbers that are
6     illustrated in Figure 7 beside it;
7     correct?
8        A.    Yes, it's the underlying numbers.
9     They should line up exactly.  The blues
10    are the second column, the purple column
11    is the third column.  The totals are
12    reflected in the total rows and you'll see
13    there's two totals, one to reflect the
14    safety time period and one to reflect the
15    final years.
16       Q.    Just like Uber has never said
17    hey, we're going to put -- we're going to
18    give numbers for every single category, it
19    also has not ever said our safety reports
20    include numbers from every single serious
21    category, it never said that either;
22    correct?
23            MS. WILKINS:  Object to form.
24            THE WITNESS:  Can you ask that
25        again because I think that's

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 248

```
 1                    KELLER
 2       contradicting something that --
 3    BY MS. LEVY:
 4       Q.   I think we've covered this and
 5    maybe you're misunderstanding me.  The
 6    safety report describes that it is
 7    reporting for the five most serious
 8    categories in Uber's terms; correct?
 9       A.   Yes.
10       Q.   It does not say we are reporting
11    numbers for all categories; right?
12       A.   The same answer as what we just
13    went over for the corresponding figure.
14       Q.   Nor does it say we're reporting
15    numbers for all categories that we
16    consider to be serious, it doesn't say
17    those words either?
18            MS. WILKINS:  Object to form.
19            THE WITNESS:  I'm getting -- are
20         you -- I don't understand because the
21         first part of your question just says
22         Uber's safety reports talks about the
23         five categories it considers to be the
24         most serious, and you're talking about
25         serious again so I think that's maybe
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 249

```
 1                    KELLER
 2        the problem.
 3     BY MS. LEVY:
 4        Q.   Let me clarify because I asked
 5     the question poorly.  I don't want you to
 6     be confused.
 7             Uber never promised that it is
 8     going to report every single category, the
 9     numbers in those, nor did it ever promise
10     that it would be reporting every single
11     serious category, it didn't do those, it
12     didn't say that that's what it would do;
13     right?
14             MS. WILKINS:  Object to form.
15             THE WITNESS:  I don't quite
16         understand how you're defining
17         serious.  I have what Uber refers to
18         as the reportable five and the
19         internal designation of serious SA/SM
20         and then all of the categories.  Uber
21         in its safety reports says that it
22         bullies victims and I just don't
23         understand what you're defining as
24         serious and I don't want to guess
25         because those are three different
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250

```
 1                     KELLER
 2       characterizations of what could be
 3       considered serious.
 4   BY MS. LEVY:
 5       Q.    Yeah, let me see if I can do it
 6   in baby steps.  You have agreed that the
 7   safety report does not represent itself as
 8   reporting on all of the categories, we
 9   agree on that?
10       A.    The safety report reports the
11   five that it claims to report.
12       Q.    And nor does the safety report
13   represent that it is reporting on all
14   serious categories, it simply says the
15   five most serious.  Do you agree?
16       A.    So that is the word serious, I
17   really am not trying to be difficult.  Are
18   you trying to compare -- when I use the
19   term serious, I'm using either the
20   reportable five that Uber has said are the
21   most serious or the internal
22   categorization of serious SA/SM.  So
23   anything outside of that is a new
24   definition to me and I just don't know how
25   to define that and so that's where I'm
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 251

```
 1                    KELLER
 2    struggling.
 3         Q.   I think we've answered this but I
 4    don't see anywhere in your report where
 5    you say hey, the safety report promised
 6    that it was going to give us numbers for
 7    things that it never gave us.  I don't
 8    believe that is one of your opinions.  Am
 9    I right?
10         A.   I'm talking about the numbers
11    that the safety report disclosed.  I'm not
12    talking about safety report promises.
13         Q.   Because you don't see anywhere
14    any safety report promises to disclose
15    numbers for more categories than it does
16    disclose, you have not pointed us to that?
17              MS. WILKINS:  Object to form.
18              THE WITNESS:  So the promise --
19         the safety report does say a lot of
20         forward-looking things and in its
21         statements, I would say, they talk
22         about transparency and make really
23         broad statements about what they --
24         how they are viewing the problem
25         internally.  I am mostly concerned in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 252

```
 1                    KELLER
 2       my report about what Uber has
 3       disclosed numbers wise to the public.
 4  BY MS. LEVY:
 5       Q.   Okay.  In 45 you list some of the
 6  subcategories that Uber has not put --
 7  attached numbers to and you've picked up
 8  nine of them.  Are you with me?
 9       A.   I think there's eight.  Are we
10  talking about the same thing, the eight
11  that are in --
12       Q.   Paragraph 45.  I see 45.1 through
13  45.9 in your list.  Are you with me?
14       A.   I sure am but why does -- hang on
15  one second.  Sorry, I was in paragraph 42
16  and I was looking at a different list.
17  Okay.
18       Q.   Some of these categories,
19  flirting, there could be conduct in
20  flirting that is not sexual misconduct or
21  sexual assault to a law enforcement offer,
22  for example.  Do you agree with that?
23            MS. WILKINS:  Calls for a legal
24       opinion.
25            THE WITNESS:  I don't know how a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 253

1                           KELLER
2           law enforcement officer would
3           categorize those.  What I am
4           calculating is how Uber categorized
5           those incidents in its own taxonomy.
6    BY MS. LEVY:
7           Q.   And have you looked at the -- for
8    each of these categories listed in 45,
9    have you looked at underlying reports to
10   see for yourself whether it's clear from
11   the reported information and how they
12   categorize these things or whether it's
13   difficult and requires subjectivity, was
14   that anything you did for your analysis?
15          A.   So you're asking it was very
16   clear from the data that Uber produced how
17   they categorized the reports because
18   those -- it was either in that category or
19   not, Uber in its interrogatory response
20   made it very clear what category they were
21   putting the tickets into.
22          Q.   And many of the reports in these
23   categories report incidents that aren't
24   typically viewed as sexual assault or
25   sexual misconduct, for example, staring at

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

```
 1                    KELLER
 2     someone in a mirror, is that something
 3     that you thought of before this case as
 4     sexual misconduct, looking in a rear-view
 5     mirror?
 6              MS. WILKINS:  Object to form.
 7              THE WITNESS:  That's not part of
 8          my opinion, what I personally thought.
 9          What my opinion is is what Uber
10          thought that category was and how they
11          categorized that data so my results
12          show that categorization.
13     BY MS. LEVY:
14          Q.   And things like saying someone is
15     pretty or I like your dress or commenting
16     on appearance, you haven't done any look
17     behind to analyze whether the reports that
18     make up these categories involve
19     subjectivity or the severity of the
20     allegation, that's something you did as
21     part of your analysis, right, you're just
22     counting the numbers?
23          A.   For this report because there
24     was -- because there was forthcoming Flack
25     data that is tied to the number of
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 255

1                           KELLER
2       incidents, I had not been able to do that
3       analysis at the time of my report and I
4       don't know what I'm going to opine on
5       given that new data.  Given the
6       interrogatory responses from the Flack
7       data that Uber provided, that type of
8       analysis would not be possible because
9       they produced aggregated numbers off of
10      that dataset.
11          Q.   I think you talked about earlier
12      you've seen in the course of your work a
13      lot of tickets.  You've seen Bliss
14      tickets, you've seen Jira tickets, you've
15      certainly seen tickets that include very
16      innocuous behavior that wouldn't
17      traditionally be considered sexual assault
18      or sexual misconduct.  You've seen tickets
19      like that that are included in these
20      numbers?
21          A.   That's not what I said.  I said I
22      looked at numerous tickets.  I did not put
23      the characterization on them that they
24      were not part of sexual assault or sexual
25      misconduct so I have reviewed tickets to

Page 256

```
 1                    KELLER
 2      see the types of information that were
 3      contained in those tickets.  What the
 4      Flack data in my understanding of it will
 5      provide is some aggregation to a dominant
 6      ticket if there is duplication among
 7      tickets.  So that dominant ticket may be
 8      categorized in a different way by Uber
 9      than the other tickets that are part of
10      it.  So the reason why I am hesitant to
11      make any statements about this is I have
12      not done that analysis to look at those
13      aggregated tickets to the dominant ticket.
14      I've looked at tons of tickets but because
15      that dominant ticket categorization is
16      still outstanding or was outstanding until
17      recently, I'm not offering any opinions on
18      that at this time because I have not done
19      so.
20           Q.   In the ticket you've looked at
21      have you run across tickets that are
22      included in Uber's definition of sexual
23      misconduct in the way that it has
24      constructed its taxonomy that aren't
25      things that you would traditionally
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 257

1                    KELLER

2      consider sexual misconduct, have you run

3      across tickets that fall under that

4      category?

5          A.   So I think I've answered this

6      before.  I'm not making my own taxonomy.

7      I'm following the way that Uber has

8      categorized these, which is why the Flack

9      interrogatory response and ultimately the

10     new Flack fields are important to that

11     analysis because it's how Uber categorizes

12     that.  I'm not independently categorizing

13     them.

14         Q.   You understand that the majority

15     of the incidents that appear in the Flack

16     data involve nonphysical incidents, not

17     touching, is that something you know?

18         A.   That's not an analysis that I've

19     done.  I do know that a number of the

20     comments and misconduct incidents are

21     potential indicators of later assaults.

22     Uber has done that analysis and that's

23     where I'm getting that understanding but

24     that's the extent to the analysis that

25     I've done on the comparison of the two.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

```
 1                        KELLER
 2        Q.   And you haven't made an attempt
 3   to look at the way Uber collects this data
 4   is underinclusive or overinclusive
 5   compared to what other incidents of sexual
 6   assault might be, that's not something
 7   you've done in your work in this case?
 8             MS. WILKINS:  Object to form.
 9             THE WITNESS:  Is this a different
10        question than -- how is this a
11        different question than am I making my
12        own taxonomy or is it a similar?
13   BY MS. LEVY:
14        Q.   I'm not asking if you made a
15   separate Lacey Keller taxonomy.  I'm
16   asking in addition to not doing that, you
17   haven't looked at the things that fall in
18   flirting to see if those kinds of
19   complaints would be considered sexual
20   misconduct or sexual assault in other
21   taxonomies by law enforcement or like a
22   normal vernacular, that's not what you
23   looked at; right?
24        A.   Uber already did that.  Uber
25   already categorized the incidents and they
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 259

```
 1                    KELLER
 2    have a field for that and especially in
 3    the Flack data there's the dominant ticket
 4    which I have not yet considered because
 5    that data has just been produced so Uber
 6    has done that work for me to categorize
 7    them.  I don't need to do that myself.
 8        Q.   If Uber took the very, very broad
 9    approach in what it included in its
10    taxonomy including things like dirty
11    looks, flirting, comments on appearance,
12    Uber took a broad approach to that, do you
13    agree?
14            MS. WILKINS:  Object to form.
15            THE WITNESS:  I don't offer an
16        opinion on whether it was broad or
17        comprehensive.  What I offer an
18        opinion on is the number of incidents
19        that are in those categories and what
20        Uber -- and the volume of that
21        compared to the incidents that it
22        reported to the public.
23    BY MS. LEVY:
24        Q.   And you didn't look to see if the
25    stuff, the incidents that Uber included
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 260

1                        KELLER
2      are things that are normally outside an
3      Uber context considered to be sexual
4      assault, you didn't compare it to anything
5      outside an Uber context; is that true?
6                  MS. WILKINS:  Asked and answered.
7                  THE WITNESS:  I don't understand
8           how that -- I don't understand that
9           question and how that's different from
10          before.  I did not need to do that
11          because I'm looking at information in
12          Uber, what they did with that data and
13          what they told to the public.  And
14          Uber already does the categorization
15          so I don't need to do that.  And those
16          categories are the categories that
17          Uber has, that Uber has produced data
18          on.
19     BY MS. LEVY:
20          Q.   Looking at heading C on 33 where
21     you note that Uber has categorized more
22     than ███████ sexual assault or sexual
23     misconduct incidents as insufficient
24     information, a subcategory that Uber did
25     not disclose in Uber's U.S. safety

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 261

```
 1                    KELLER
 2    reports, have you gone to look at the
 3    reports that make up the insufficient
 4    information category?
 5        A.   So I have looked at a number of
 6    reports.  I am sure that some of them
 7    include insufficient information but my
 8    report looks at the volume that is in that
 9    category and I am not recategorizing the
10    data that Uber has already categorized.  I
11    take the data as Uber has presented it in
12    this litigation and furthermore -- sorry,
13    just one more thing, the Flack data also I
14    think -- I hate to repeat myself -- has
15    fields that also would be part of
16    potential analysis and I reserve the right
17    to do so.
18        Q.   It's not your opinion in this
19    case for those ████████ category of
20    insufficient information that that was not
21    true, that Uber really did have sufficient
22    information, that you have not done the
23    analysis to look at that and you're not
24    offering that opinion; am I right?
25        A.   So to do that next level, I would
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

```
 1              KELLER
 2    need data that is at the ticket level and
 3    then also I need data that looks at the
 4    final categorization.  That missing link
 5    is the Flack data that was just produced.
 6    I'm not sure my opinion of that data
 7    because it was just produced, it was
 8    actually reproduced so I don't want to say
 9    one way or the other at this time if I'm
10    not planning to offer any opinions.  The
11    report that I currently have filed
12    discusses the volume that's been
13    categorized into that field by Uber and
14    that's -- that's the basis of that
15    opinion.
16         Q.   And similarly, with respect to
17    the category of parent category usage
18    tracking that is referenced in paragraph
19    48 of your report, you haven't at this
20    point in time offered any opinions that
21    Uber is wrong about those tickets and that
22    they belong somewhere else, you don't have
23    an opinion as to whether you agree or
24    disagree that this category is made up of
25    tickets and don't have enough detail to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 263

1                     KELLER

2    classify in one of the subcategories,

3    that's not work you've done; correct?

4         A.    I would say the same answer as

5    insufficient information with all the

6    caveats I gave about Flack data and the

7    fields within it might provide some

8    insight.  But at this point in time, my

9    report focuses on the volume because

10   that's the data that was available to me

11   at the time of filing this report.

12        Q.   One last question before we take

13   a break and I'm going to try to address my

14   coughing situation.  I want to talk about

15   one last paragraph rather.  49, I think we

16   talked about earlier that as a result of

17   your analysis of the Flack data, you've

18   identified 68 reports of the 564,000 plus

19   that you identify were not in publicly

20   disclosed in the five most serious

21   categories but that were found in the

22   Flack data; is that correct?

23        A.    Yeah, just a few points.  So the

24   68 are, if you look at the five reportable

25   five categories as I define them which is

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 264

```
 1                        KELLER
 2      the same as the publicly disclosed five --
 3      I'm sorry, reportable five was what I've
 4      using today.  We've used publicly
 5      disclosed five in my report, my apologies.
 6      The publicly disclosed five categories, if
 7      you look at those five categories of data
 8      in the Flack interrogatory response, tally
 9      those up and compare it to the safety
10      reports, you get ███████████████████
11      ███████   specifically are in that rape
12      or -- that rape category.
13           Q.   And that, what we see about those
14      reports in paragraph 49 is the extent of
15      your analysis.  You have not done further
16      analysis on when those were reported, why
17      they might be missing, what we see written
18      here in 49 is the extent of your opinions
19      as you sit here today on that issue?
20                MS. WILKINS:  This has been asked
21           and answered.
22                THE WITNESS:  For the same
23           reasons as insufficient information, I
24           think we covered this earlier, I
25           reserve the right because of the Flack
```

Page 265

```
 1                    KELLER

 2         production that was just recently

 3         made, I have not reviewed that data in

 4         its entirety so at the time of filing

 5         this report, that is the extent of my

 6         opinion on this because the data was

 7         not produced in a way to do any

 8         additional research or analysis, I

 9         should say.

10              MS. LEVY:  Let's take a break.

11         If you guys are amenable to go off the

12         record.

13              MS. WILKINS:  Fine.

14              THE VIDEOGRAPHER:  Going off the

15         record.  The time is 5:55 p.m.  This

16         is the end of media unit 4.

17              (Recess taken from 5:55 p.m. to

18         6:10 p.m.)

19              THE VIDEOGRAPHER:  We're back on

20         the record.  The time is 6:10 p.m.

21         Eastern.  This is the beginning of

22         media unit 5.

23      BY MS. LEVY:

24         Q.  Ms. Keller, before the break we

25      were -- and before we go on to opinion 3,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 266

1              KELLER
2    I want to circle back to something we
3    talked about before the break.  We had
4    talked about a category of data in the
5    Flack data that was called insufficient
6    information and that was -- and you talk
7    about that some in your report in the ways
8    we've discussed earlier; correct?
9         A.   We talked about insufficient
10   information.
11        Q.   You also talk in your report
12   about missingness, the concept of
13   missingness.
14        A.   Where do you talk about that?
15        Q.   Is that a term that you use and
16   think of and have thought about with
17   respect to these reports, missingness?
18        A.   I don't see that I use that term.
19   Can you point me to my report where I use
20   that term?
21        Q.   Yes.  I will do that in just a
22   minute.  And while we're finding that, let
23   me ask you about insufficient information.
24   The incidents that we're talking about
25   that form the basis of the Flack data,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 267

```
 1                    KELLER
 2       these reports of sexual misconduct and
 3       sexual assault, those are reports that
 4       Uber receives from a reporter; correct?
 5                 MS. WILKINS:  Object to form.
 6                 THE WITNESS:  The reports that
 7            it -- that is in the Flack data is --
 8            are representative of the reports that
 9            it has received.
10       BY MS. LEVY:
11            Q.   And they are self reports,
12       meaning they were reports by individuals
13       who are making them and they contain
14       whatever information they contain, nothing
15       more, nothing less.  Do you agree with
16       that?
17                 MS. WILKINS:  Object to form.
18                 THE WITNESS:  So are you -- I'm
19            not quite sure what you mean by like
20            report, if that's the first report.  I
21            know that I've seen in my review of
22            the Bliss and Jira data that there are
23            a number of back and forth messages,
24            communications.  I think we even -- in
25            my report I show this in the driver
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 268

```
 1                    KELLER
 2        profiles, communications with drivers
 3        and the writers as part of that
 4        investigation so there's a lot of
 5        components to those tickets, so I'm
 6        not sure what specifically you're
 7        referring to.
 8   BY MS. LEVY:
 9        Q.   So I'm not trying to be tricky.
10   When Uber receives these reports, it's
11   limited by the information that it
12   receives, it can't analyze or classify
13   information it doesn't have, do you agree
14   with that?
15        A.   That Uber begins an investigation
16   when it gets those reports so it responds,
17   it contacts the driver.  If there's
18   footage to review, it looks at that
19   footage, it looks at data, the GPS data
20   that it collects on the trip, it reviews a
21   number of data sources it has at its
22   disposal.
23        Q.   You raise a very good point.
24   Uber could have chosen to categorize and
25   count incidents only that were
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 269

```
 1                      KELLER
 2      corroborated or only that were
 3      investigated and determined to be
 4      consistent with the reporter, but it
 5      didn't do that.  It classified every
 6      incident taking it at face value.  You
 7      understand that; correct?
 8              MS. WILKINS:  Object to form.
 9              THE WITNESS:  I understand that
10          Uber makes those categorizations and
11          there are many steps along the way
12          where it makes those categorizations.
13          What I'm analyzing is at the time that
14          Uber pulled this data what those
15          characterizations were and what Uber
16          deemed them to be at that point in
17          time.
18      BY MS. LEVY:
19          Q.   In it Uber illustrates, provides
20      an illustration of how the numbers would
21      go down if it only counted corroborated
22      reports or it only counted reports that
23      later were deemed to be true on their
24      faces.  It didn't do that though; right?
25      It included in the Flack data, provided
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

```
 1                    KELLER
 2     all of the incidents whether they were
 3     corroborated or not, it classified and
 4     included all of those; true?
 5             MS. WILKINS:  Object to form.
 6             THE WITNESS:  So you're asking me
 7         to say did Uber say -- what is the
 8         question, did Uber do what they said
 9         they were going to do, did they
10         produce the data that they said they
11         produced or...
12     BY MS. LEVY:
13         Q.   Yeah, let's answer that question.
14     Did Uber categorize all the incidents
15     based on face value as opposed to
16     excluding incidents that were not
17     corroborated or that were later determined
18     to have conflicting responses by the other
19     party, it just includes all of them, not
20     only a portion of them; correct?
21             MS. WILKINS:  Objection to the
22         compound nature of the question and
23         it's vagueness.
24             THE WITNESS:  So I think what I'm
25         struggling with is the term face value
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 271

```
 1                    KELLER
 2        because what the Flack data
 3        interrogatory responses is the
 4        tabulation and I can pull the rog open
 5        if you would let me here because I
 6        have it in cite Uber's words, but if I
 7        recall, it reflects two data pulls and
 8        two dates of data pulls.  It reflects
 9        the data at the time of those pulls.
10        And so it reflects how Uber
11        categorized those, whether an
12        investigation had happened, if they
13        contacted the driver, they received
14        information or if they couldn't make
15        any contacts, it contains all of
16        those, that information.  And so I
17        think I've answered your question.  I
18        think it's the term face value that
19        I'm having trouble with because face
20        value seems much more simplistic than
21        what I know to be in the Bliss and
22        Jira data.  Now I have not
23        independently discussed earlier
24        because the Flack data has the
25        dominant ticket categorization, which
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 272

```
 1                    KELLER
 2        now corresponds to this Flack
 3        production and then that will
 4        correspond to the Bliss and Jira data
 5        or other tickets that are part of it,
 6        so that analysis I haven't had a
 7        chance to do because that data was
 8        just produced.  So I don't know if
 9        that is --
10   BY MS. LEVY:
11        Q.   Let me take a specific example
12   that I think it's -- that I think will
13   make it easier.  If a rider writes in or
14   calls in or makes a complaint, my driver
15   said and does not complete the sentence,
16   Uber is limited in its ability to classify
17   that by a lack of information, do you
18   agree with me?
19             MS. WILKINS:  Objection to the
20        improper hypothetical.
21             THE WITNESS:  So I think it's a
22        little bit more than that because if I
23        recall from the safety reports, Uber
24        classifies reports as sexual assault
25        or sexual misconduct that the reporter
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 273

                              KELLER

1
2           views as they classify them into those
3           categories if the reporter views them
4           as sexual in some nature; right?  So
5           that report, if that's the initial
6           report, I've seen follow-up.  So is
7           there follow-up in your hypothetical?
8           I don't know.
9    BY MS. LEVY:
10          Q.   Is it your understanding, I want
11   to make sure I understand your last
12   answer.  Is it your understanding that
13   Uber -- I think you said Uber categorizes
14   them based how the reporter feels about
15   it.  Is that your understanding of how
16   Uber conducts the classification, trying
17   to understand how the reporter felt,
18   whether it was sexual assault or
19   misconduct?
20          A.   Let me get to the safety report
21   because it's late in the day.  I want to
22   make sure I have a clear recollection of
23   the safety reports here.  If you want I
24   can review that, but what I'm trying to
25   say is that the first report is not always

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274

1                       KELLER

2      the last piece of information that Uber

3      has and so the Flack data represents the

4      data at the time that it pulled it.  So

5      for some reports that might have been the

6      very first report but a lot of this data

7      is from 2024.  It's 2025.  There's been a

8      year for follow-up.  Maybe they were able

9      to obtain follow-up with individuals,

10     maybe they didn't even correspond with

11     drivers or riders, I don't know.  What I'm

12     showing in my analysis in this report

13     because I haven't had the data to do it

14     from the Flack data is the volumes that

15     are in those categories.

16          Q.   I'm asking you a much simpler

17     question.  If no one ever, no one ever,

18     not a question of timing, but if no one

19     provides ever the information to Uber that

20     I was raped, Uber doesn't have that

21     information and therefore can't classify

22     it.  Do you agree with that?

23               MS. WILKINS:  Object to form.

24               THE WITNESS:  So if someone

25          doesn't say I was raped, they can't

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 275

```
 1                    KELLER
 2        make that report, is that your
 3        question?
 4    BY MS. LEVY:
 5        Q.   Yeah, I'm trying to -- this seems
 6    to be a pretty easy proposition.  Uber
 7    cannot classify something as one
 8    particular type or the other unless it is
 9    provided with information about the
10    incident.  That's all I'm trying to make
11    sure that we agree on.
12        A.   Well, I think it's more than that
13    because based off of the data that I've
14    seen in the driver profiles that I've put
15    together, so for the plaintiffs' trips and
16    their drivers, as well as from the
17    attachments, the sampling attachments,
18    there's data that Uber doesn't just
19    receive that's part of its investigation.
20    And I think that's where I'm getting hung
21    up is there's GPS data, there's the
22    Voyager system, there's lots of datasets
23    that Uber is looking, did you get dropped
24    off near your house, were you at the right
25    pickup location, how much time elapsed,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 276

1                    KELLER

2      did the driver go off line after the trip,

3      these are all things Uber uses in an

4      investigation.  So that's what -- there's

5      a lot of data that Uber has and so the

6      report is one piece of that when they are

7      doing their investigations from what I've

8      seen from those attachments.

9          Q.   If Uber receives a report that

10     contains insufficient information, in your

11     view how should it categorize that?

12              MS. WILKINS:  Object to form.

13              THE WITNESS:  I'm not offering

14          that opinion on how it should

15          categorize it.  I'm offering the

16          opinion that incidents are categorized

17          by Uber in that category and this

18          paragraph where we were earlier today

19          isn't the total of those incidents in

20          that category, both in insufficient

21          information and parent category use

22          tracking.

23              (Exhibit 10, Appendix A, marked

24          for identification.)

25      ///

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 277

1                    KELLER
2    BY MS. LEVY:
3        Q.   If we turn to Appendix A, I'm
4    going to move back to this in here,
5    Appendix A of your report which we had
6    marked previously as tab -- or Exhibit
7    5 -- I'm sorry, tab 5, I don't think we
8    used it yet today so I failed to pull up
9    tab 5.  Appendix A is your -- is described
10   by you as your methodology?
11       A.   Yes.
12       Q.   That includes data validation,
13   includes what data you received and how --
14   what you have done as part of your
15   methodology in this case; is that fair?
16       A.   Yes, to process the data, the
17   steps that I took, et cetera.
18       Q.   And for paragraph 41 on Exhibit
19   10, which is your methodology, it's on
20   page 15 of the document?
21       A.   Yes.
22       Q.   And that's where I got the phrase
23   missingness and no value, what I
24   understand that to be from paragraph 41 is
25   just where there was data missing, where

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

1                         KELLER
2        the data did not exist.  Is that right or
3        is there something different about
4        missingness that you meant to capture
5        here?
6             A.   So this is about the -- it's
7        defined as the SA/SM incident data.  Today
8        I've been referring to that as the Bliss
9        and Jira data.  This is my identification
10       of the various pieces of information that
11       are missing or incomplete in those
12       datasets but on the next page, on page 17,
13       I talk about the Flack data and that there
14       are fields in the Flack data that were not
15       produced at the time that I filed this
16       report that potentially may provide
17       insight to some of these missing field in
18       the Bliss and Jira data.
19            Q.   Okay, and that is not an analysis
20       you've yet done; correct?
21            A.   Because the data, the Flack data
22       was just produced and reproduced within
23       the most recent few days.
24            Q.   Back to tab 1, Exhibit 1, your
25       report and opinion 3, we've talked earlier

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 279

```
 1                        KELLER
 2      today about precursors to sexual assault
 3      and sexual misconduct incidents.  You
 4      agree with me that a trip that has what
 5      you're referring to here as a precursor
 6      does not necessarily mean that a sexual
 7      misconduct incident is going to take
 8      place; right?
 9              MS. WILKINS:  This has been asked
10          and answered a number of times.
11              THE WITNESS:  So the precursors
12          are data points that Uber has
13          identified itself and also many of
14          which it's included in its S-RAD
15          algorithm that are potential
16          indicators of sexual assault on a trip
17          and so --
18      BY MS. LEVY:
19          Q.   Excuse me, I thought you were
20      finished.  Keep going.
21          A.   Go ahead.
22          Q.   Even if one or more indicators
23      are present, that doesn't mean an incident
24      of sexual misconduct is going to take
25      place; right?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 280

1                    KELLER

2        A.   Those indicators, Uber developed

3    the S-RAD model, for example, off of

4    previous trip data and trained it off of

5    incidents where sexual assaults did occur

6    and so it created that machine-learning

7    algorithm off those incidents.  So in some

8    cases incidents did occur that had those

9    inputs and in other cases it didn't.  That

10   was part of the training methodology.

11       Q.   You agree with me that just

12   because there's a pickup near a bar, that

13   doesn't mean a sexual assault is going to

14   occur, certainly you agree with that?

15       A.   I have the opinion that Uber

16   knows that to be an indicator of a

17   potential sexual assault in both its

18   internal documents and also as an input to

19   its S-RAD score which scores the riskiness

20   of the trip.

21       Q.   You understand that S-RAD is a

22   tool that Uber has developed to try to use

23   its safety data to reduce the number of

24   sexual misconduct, sexual assault on its

25   platform, that's the purpose of S-RAD;

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 281

```
 1                    KELLER
 2    correct?
 3         A.   I think I say a similar thing in
 4    my report.
 5         Q.   These incidents, you've
 6    quantified the numbers here but you read
 7    the depositions of the data scientists and
 8    the tech developers who developed these
 9    products, you read those depositions as
10    parts of your work in this case and
11    reflected in Appendix G; correct?
12         A.   Yes.
13         Q.   You read Frank Chang's
14    deposition, you read Sunny Wong's
15    deposition?
16         A.   Yes.
17         Q.   You understand that S-RAD, the
18    point of S-RAD is to take -- to study
19    events that are very, very, very rare on
20    the Uber platform and make them even more
21    rare, that's what they are trying to do
22    with S-RAD?
23              MS. WILKINS:  Object to form.
24    BY MS. LEVY:
25         Q.   Do you agree with that?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 282

```
 1                    KELLER
 2        A.    So I characterize the S-RAD
 3    program the way Uber did in those
 4    documents which is it's developing S-RAD
 5    as a way to, quote, prevent sexual
 6    assaults.
 7        Q.    When matches are rated as higher
 8    risk in S-RAD, that can still be
 9    extraordinarily rare, less likely than
10    being hit by lightning; true?
11             MS. WILKINS:  Object to form.
12             THE WITNESS:  You're saying when
13         matches are above -- say that one more
14         time.  I got distracted.
15    BY MS. LEVY:
16        Q.    What is a risky ride in your
17    Lacey Keller opinion?
18        A.    I don't have that opinion.  Uber
19    determines what it determines to be a
20    risky ride because it exceeds a threshold
21    it sets and that threshold is only on the
22    whole ████████      of trips it has viewed
23    and scored to be more risky.  It has
24    scored every single supply plan and how
25    many nights are coming up.  You've got
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 283

```
 1                        KELLER
 2     everybody out, they are taking trips home
 3     on that night, they score every single
 4     plan, but Uber only intervenes in that
 5     matching for a small percentage,
 6     ██████████████ of trips on the whole.
 7          Q.   And you don't have any opinion on
 8     what a better percentage would be, that's
 9     not what you've done in preparation of
10     this report?
11          A.   Uber itself has calculated
12     percentages, what percentage of sexual
13     assaults it could accurately predict I
14     think is the word from their document.  I
15     don't want to mischaracterize those but it
16     has a chart and this was used in Wong's
17     deposition, he brought this as part of his
18     binder, if I recall, a chart that showed
19     if that threshold was -- that trigger
20     rate, that percentage was -- if S-RAD was
21     applied to more trips it would be applied
22     to more sexual assaults or correctly
23     predict more sexual assaults.  And so I'm
24     not offering that opinion independently.
25     I'm offering it based off of what Uber's
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 284

```
1                     KELLER
2    own documents showed.
3         Q.   What you know about S-RAD you've
4    only learned from Uber's own documents and
5    its own witnesses, you haven't done any
6    independent analysis or study or modeling
7    of the S-RAD algorithm; is that true?
8              MS. WILKINS:  Object to form,
9         lacks foundation and assumes facts not
10         in evidence.
11              THE WITNESS:  Uber has not
12         produced the inputs necessary to do
13         that analysis, nor has it produced all
14         supply plans that even for the
15         plaintiffs' trips because it says it
16         deletes those.  So that data was not
17         produced and so that analysis I would
18         love to do some type of analysis but I
19         can't because that data has not been
20         produced.
21    BY MS. LEVY:
22         Q.   How frequently does sexual
23    misconduct in terms of one out of blank
24    rides occur on this Uber platform as a big
25    picture globally, based on all the data
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 285

                              KELLER

1
2       you've looked at?
3           A.   What is that like?  I think we've
4       already covered those images in my report.
5           Q.   It occurs in what percentage of
6       the rides?
7           A.   I've only shown the numbers in
8       the per 100 million so -- go ahead.
9           Q.   Can you agree with me that sexual
10      misconduct is rare on the Uber platform?
11               MS. WILKINS:  Object to form.
12               THE WITNESS:  If you have a
13           percentage, I would be happy to verify
14           that math but rare is kind of a
15           judgment term on those percentages so
16           if you want to do some math together,
17           I'm happy to do that.
18      BY MS. LEVY:
19          Q.   You don't -- do you have -- what
20      is your definition of rare, do you have
21      one?  Have you looked at that in the
22      context of sexual assault and sexual
23      misconduct?
24               MS. WILKINS:  Object to form,
25           object to the compound nature of the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 286

1                          KELLER

2            question and object to the extent that

3            it's outside of the scope of the

4            opinions that Ms. Keller offers in her

5            report.

6       BY MS. LEVY:

7            Q.   You have not compared the rate of

8       sexual misconduct on Uber to other

9       platforms so you will not be offering any

10      opinions about whether sexual assault and

11      sexual misconduct happens more frequently

12      on the Uber platform compared to other

13      places, we've established that; correct?

14               MS. WILKINS:  Object to this

15           having been asked and answered at

16           least 10 times in this deposition.

17               THE WITNESS:  It's the same -- go

18           ahead, I'm sorry.

19      BY MS. LEVY:

20           Q.   I just said am I correct?

21           A.   It's the same answer that I

22      provided before.  I did not need to do

23      that analysis to show what I was intending

24      to show which is the volume of reports

25      that Uber had in its own data, what it did

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 287

```
 1                      KELLER
 2     with those reports, how it analyzed them
 3     internally and compared it to what it
 4     disclosed to the public.
 5          Q.   When you use the term high risk
 6     on page 35 in subheading A, high risk for
 7     sexual assault and misconduct, you have
 8     that in quotes because you're quoting from
 9     an Uber document; correct?
10          A.   That's correct.
11          Q.   And you, Lacey Keller, do not
12     have an opinion as to what is high risk or
13     not high risk, you're simply parroting
14     information you found in the Uber
15     documents; is that right?
16               MS. WILKINS:  Object to form.
17               THE WITNESS:  I am using the term
18          that Uber uses in those documents when
19          describing data inputs.  I would have
20          loved to study the data inputs
21          independent of these documents but
22          Uber did not produce data on the
23          gender of the driver and rider, for
24          example, for every safety incident,
25          nor did they produce the proximity to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 288

1                          KELLER

2          a bar for every incident, so that

3          analysis would not be possible with

4          the data that was produced at the time

5          of filing my report.

6    BY MS. LEVY:

7          Q.   And is it your understanding that

8    S-RAD acts for gender of driver, rider or

9    both?

10              MS. WILKINS:  This has already

11         been asked and answered so I object on

12         that account.

13              THE WITNESS:  So I have a

14         timeline in my report of all the

15         inputs in S-RAD.  I know that they

16         have changed over time.  I would need

17         to conduct that timeline or the

18         current global features or U.S.

19         features inputs from the Wong

20         deposition to note the specifics, but

21         I know at some point in time rider and

22         driver gender were included.  How that

23         has been included in the model in its

24         current form, I would need those

25         sources.  So if you have them, I would

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 289

```
1                      KELLER
2          be happy to look at them but I know
3          that I address that in my report in
4          Appendix F.
5     BY MS. LEVY:
6          Q.   S-RAD in the U.S., in the United
7     States has always been gender agnostic.
8     You're aware of that; right?
9          A.   I don't know how you're defining
10    the U.S. global model.  I have this
11    timeline in my report that looks at the
12    different inputs to the S-RAD model over
13    time that was considered by Uber and I
14    know at one point in time gender was
15    included in a version of the model, if not
16    multiple versions of the model.
17         Q.   As you're sitting here today, can
18    you tell us whether it is your
19    understanding that S-RAD in the United
20    States has always been gender agnostic?
21    Do you agree or disagree without looking
22    at more information?
23              MS. WILKINS:  Objection, asked
24         and answered.  She just answered it
25         and your question is misstating her
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 290

```
 1              KELLER
 2     testimony.  If you would like her to
 3     look at her documents she had offered
 4     to do that.
 5  BY MS. LEVY:
 6     Q.   I want you to quickly tell me if
 7  S-RAD has ever considered gender in the
 8  United States, that's all I want to know.
 9          MS. WILKINS:  Same objection.
10          THE WITNESS:  This is not meant
11     to be a memory test.  I have produced
12     an entire appendix dedicated to the
13     features of S-RAD and I'm happy to
14     consult that.
15  BY MS. LEVY:
16     Q.   I agree with you it's not meant
17  to be a memory test.  If you don't
18  remember and can't tell me without looking
19  in your report, that's fine.  That's all I
20  want to know.  I don't remember sitting
21  here is a fine answer.
22          MS. WILKINS:  You are misstating
23     her testimony.  She has told you what
24     she remembers.
25     ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 291

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   So you agree, I believe, that
 4    based on what your testimony is earlier,
 5    that Uber's attempt to use data to attack
 6    the sexual assault and sexual misconduct
 7    problem, you agree that that's a good
 8    thing for Uber to do; correct?
 9            MS. WILKINS:  Object to form.
10            THE WITNESS:  I think we've
11        answered or I've answered a number of
12        questions about these judgment type
13        calls.  I'm answering what the Uber is
14        doing with the vast amount of data it
15        collects, the GPS data as to whether
16        or not your phone's got low battery,
17        how it uses that information.  I offer
18        those opinions in my report.  I let
19        the court decide what it will do with
20        that information.
21    BY MS. LEVY:
22        Q.   You understand that when
23    individuals working on S-RAD use the term
24    risk or high risk with respect to S-RAD,
25    that's specific to the S-RAD context, you
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 292

```
 1              KELLER
 2    understand that?  Like something that's
 3    high risk in the S-RAD model does not
 4    equate to high risk in absolute terms, it
 5    doesn't mean that the ride is a high risk
 6    to the rider, you agree with that, don't
 7    you?
 8         MS. WILKINS:  Object to form.
 9         THE WITNESS:  So S-RAD is a
10         program that Uber has created to
11         prevent sexual assaults.  And in that
12         program it scores trips according to
13         the risk that its machine algorithm
14         has calculated about that trip for
15         sexual assault.
16    BY MS. LEVY:
17         Q.   And you understand, do you not,
18    that even pairings that are scored as
19    having high risk cannot predict whether a
20    sexual assault will actually occur on an
21    individual trip, you understand that,
22    don't you?
23         MS. WILKINS:  Object, asked and
24         answered.
25         THE WITNESS:  Uber trained this
```

Page 293

```
 1              KELLER
 2      model and continues to train this
 3      model because it ███████████████
 4      of the trips that it is running the
 5      model on.  It trains the model on real
 6      world incidents, whether a sexual
 7      assault did occur or a sexual
 8      misconduct incident did occur or
 9      whether it didn't occur.  They trained
10      it on all of that data.  And on top of
11      that its documents talk about
12      incidents that were above the
13      threshold that were dispatched by the
14      program that slipped through and
15      ultimately resulted in a sexual
16      assault and I -- or a sexual
17      misconduct report.  And I record those
18      volumes in my report as well.
19  BY MS. LEVY:
20      Q.   When Uber uses the term high risk
21  with respect to S-RAD, it doesn't mean
22  that it is more likely than not that a
23  pairing is going to result in a sexual
24  assault, that's not what it means, can we
25  agree on at least that?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 294

```
 1                    KELLER
 2        A.   So the S-RAD score, which is what
 3     it creates for every single rider driver
 4     pairing, and I'm reading this directly
 5     from my report, is it -- a computed
 6     numerical score between ████████████████
 7     ██████████████████████████████████████████
 8     ██████████████████████ for each
 9     potential driver/rider pairing, and that's
10     the risk of a sexual assault occurring on
11     that trip.
12        Q.   And you understand from the
13     testimony you've read on the data and the
14     S-RAD model that even pairings with a
15     higher S-RAD score are very likely to
16     result in sexual misconduct in actuality?
17             MS. WILKINS:  Object to form.
18             THE WITNESS:  So I'm aware, and
19        this is from paragraph 70 in my
20        report, that from 2021, September 2021
21        through April 30 of 2022, ██
22        ████████████████████████████████████
23        ██████████████████████████████████
24        ██████████████████████ And just for
25        context during that same time period,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 295

1                    KELLER
2        there were -- I'm sorry, in addition
3        between July 1, 2022 and December 31,
4        2022, ████████████████
5        ████████████████████████████
6        ████████████    So these are plans that
7        Uber knew were above the threshold,
8        that the S-RAD program identified were
9        above the threshold and remember the
10       threshold is just ██████████ of
11       trips and it was above those
12       thresholds and they still slipped
13       through and an incident occurred.
14  BY MS. LEVY:
15       Q.   And no model can predict human
16  behavior with precision; correct?
17            MS. WILKINS:  Object to the
18       questioning, outside the scope that
19       Ms. Keller's opinions offered in her
20       report and this litigation.
21  BY MS. LEVY:
22       Q.   Let me clarify the question.
23            No model that you've ever seen or
24  heard of can predict whether someone's
25  going to assault somebody else with

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 296

```
 1                    KELLER
 2     accuracy, that's not possible to do in
 3     your knowledge and experience, is it?
 4          MS. WILKINS:  Same objections,
 5          outside the scope.
 6          THE WITNESS:  So when -- if we're
 7          talking generally, when one builds a
 8          model, a machine-learning algorithm,
 9          you develop a confusion matrix which
10          is the term that I'm attributing to
11          it.  It sounds like kind of a crazy
12          term but confusion matrix is what it's
13          called to identify the true positives,
14          the false negatives, the true
15          negatives, et cetera.  It's how you
16          identify the accuracy of your model.
17     BY MS. LEVY:
18          Q.  So, for example, one of the
19     metrics that S-RAD considers is pickups
20     near bars; correct?
21          A.  Specifically I think the
22     proximity to the bars or the number of
23     bars within 50 meters, it's changed a few
24     times but I think it's the proximity
25     within 50 meters or something like that.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 297

1              KELLER
2    There's like a geo fence that they apply
3    around the pickup that they review.
4         Q.    And we can agree that not every
5    pickup within 50 meters of of a bar is
6    going to result in sexual misconduct,
7    that's common sense; correct?
8              MS. WILKINS:  Object to form.
9              THE WITNESS:  It's -- Uber knows
10        that pickups near a bar are more
11        likely to result in a sexual assault.
12   BY MS. LEVY:
13        Q.    That wasn't my question.  Not
14   every pickup near a bar is going to result
15   in a sexual misconduct incident, correct,
16   that is a matter of common sense?
17        A.    But Uber knows that it's more
18   likely to happen which is why it's both in
19   the documents that I cite and in the S-RAD
20   model.
21        Q.    And that's why it's studying it
22   and trying to analyze things like pickups
23   near a bar that it can use to combat those
24   incidents; right?
25              MS. WILKINS:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 298

1                    KELLER

2            THE WITNESS:  Uber has built the

3        S-RAD model using proximity to a bar

4        as one of the inputs.

5    BY MS. LEVY:

6        Q.   And that's a good thing?

7            MS. WILKINS:  Object to form.

8            THE WITNESS:  It is a thing that

9        Uber does.  Whether it's good or bad I

10       leave that value judgment to the

11       court.

12   BY MS. LEVY:

13       Q.   And just because someone gets

14   picked up within 50 meters of a bar

15   doesn't mean they've been to the bar, does

16   it?

17           MS. WILKINS:  Object, outside the

18       scope.

19           THE WITNESS:  Proximity to a bar

20       is one of the inputs to the S-RAD

21       model.  Intoxication which I think is

22       a different input that you're talking

23       about is yet another input that Uber

24       knows to be a precursor or risk factor

25       in sexual assault.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 299

```
 1                    KELLER
 2   BY MS. LEVY:
 3       Q.   And the proximity to a bar input
 4   is going to trigger very differently
 5   depending on what geography you're in in
 6   the United States; right?
 7           MS. WILKINS:  Object to form.
 8           THE WITNESS:  I don't know what
 9       geo fence that Uber puts in.  I know
10       this was discussed at the Wong
11       deposition.  I know exactly what tab I
12       would like to consult to refresh my
13       memory because the tab discloses the
14       distance that they consider.  So
15       without consulting that I wouldn't be
16       able to say one way or the other.
17   BY MS. LEVY:
18       Q.   You would assume as a matter of
19   common sense that more pickups in
20   New York City would be within 50 meters of
21   a bar than a rural place in North Dakota,
22   for example?
23           MS. WILKINS:  Object to form,
24       improper hypothetical.
25           THE WITNESS:  The S-RAD program
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 300

```
 1                      KELLER
 2         is also scored and the thresholds are
 3         set in each city which would normalize
 4         such discrepancies such as that and I
 5         think that's discussed at length in
 6         the Wong deposition.
 7   BY MS. LEVY:
 8         Q.   And you don't have any dispute or
 9   quibble with Uber for normalizing the
10   thresholds by city, that's not a problem
11   with S-RAD in your view, is it?
12              MS. WILKINS:  Object to form.
13              THE WITNESS:  I'm describing why
14         we see different thresholds for the
15         plaintiffs, that's the only dataset
16         that we have on -- the only S-RAD data
17         we have from Uber that was produced in
18         this litigation from Uber about S-RAD.
19         And so from those datasets, we are
20         able to see, I'm able to see that
21         there are different thresholds in
22         different cities and because there are
23         different dates and times, that is
24         opinions that I do offer.
25   ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 301

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   When you calculated dates and
 4    times, I think you mention in paragraph 28
 5    of your methodology, Appendix A that you
 6    added some categories for times.  Do you
 7    know what I'm referring to there?
 8             I'm looking at some in Appendix A
 9    which I think we marked as Exhibit --
10    there we go.  Paragraph 28 you said I've
11    added five fields to the driver trip data.
12    Are you with me?
13        A.   Sorry, just one second.
14             Yes.
15        Q.   Okay.  And in 28.5 when you're
16    discussing daytime category, you have
17    subcategories 1 through 4 of weekend late
18    night hours, weekday late night hours,
19    weekend non-late night hours and weekday
20    non-late night hours.  Where did you come
21    up with these definitions, did you use
22    them from Uber or did you create these
23    yourself?
24        A.   That's cited in footnote 55.
25    Those are Uber's definitions as late night
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 302

1              KELLER

2    as it pertains to the S-RAD program.

3        Q.   And for the weekend hours,

4    non-late night hours, you've used the same

5    definition that Uber uses as set forth in

6    Sunny Wong's deposition?

7        A.   Correct.

8        Q.   And that includes Monday,

9    Tuesday, Wednesday, Thursday from 12 a.m.

10   to 4:59 a.m. for weekday late night hours

11   and Monday through Thursday, 5 a.m.

12   through 11:59 a.m. for weekday non-late

13   night hours; correct?

14       A.   Sorry, you talked so fast and I

15   was trying to follow along.  The

16   definitions that I use are defined in

17   paragraphs 28.5.1 through 28.5.4.

18       Q.   And you don't impose any

19   different definitions or have any problems

20   with the way that Uber's S-RAD model

21   categorizes the time; is that correct?

22           MS. WILKINS:  Object to form.

23           THE WITNESS:  I'm using the

24       categorization that Uber uses.

25   ///

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 303

```
 1                    KELLER
 2    BY MS. LEVY:
 3        Q.   And same with the inputs in the
 4    metrics to the model.  You have not
 5    proposed or generated or modeled your own
 6    alternative metrics; is that true?
 7            MS. WILKINS:  Objection, form,
 8        asked and answered.
 9    BY MS. LEVY:
10        Q.   Do you need me to restate the
11    question?
12        A.   I'm just reviewing a piece of my
13    report.  I apologize.  I may need a
14    refresh on the question, too, but one
15    second.  Can you please -- please state
16    the question?
17        Q.    You haven't done any data or
18    analysis to suggest that the inputs that
19    Uber uses to S-RAD shouldn't be used in
20    S-RAD, that's not an opinion you're
21    offering in this case; right?
22        A.   My Appendix F which I've
23    referenced a number of times -- let me
24    make sure it's Appendix F so I'm not
25    confusing.  Appendix F discusses the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 304

```
 1                    KELLER
 2    opinions that I found in Uber's documents
 3    that it considered as part of the program
 4    over time.  I have -- I don't say whether
 5    those inputs are good or bad, I just
 6    describe Uber's process based off of the
 7    data I've seen.
 8        Q.   Are you going to offer any
 9    opinions in this case that Uber should
10    have changed its inputs or used different
11    inputs, that is not part of your opinions
12    in this case?
13            MS. WILKINS:  Object to form and
14        object to the extent it misstates her
15        prior testimony.
16            THE WITNESS:  I offer opinions
17        what could have been used by Uber or
18        at least could have been done by Uber,
19        whether it's through reporting or
20        setting the trigger rate at a
21        different threshold but I don't offer
22        the opinion that Uber should have done
23        that.
24    BY MS. LEVY:
25        Q.   And you haven't yourself come up
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 305

```
 1                    KELLER
 2    with an alternative better way to set up
 3    S-RAD, that's again you're stopping short
 4    of your opinions of just showing what the
 5    data shows but not building an alternative
 6    yourself or suggesting alternatives
 7    yourself, am I right about that?
 8              MS. WILKINS:  Object to form,
 9         object as asked and answered and
10         object to the extent it
11         mischaracterizes the prior testimony.
12              THE WITNESS:  Uber has not
13         produced data that would be -- that
14         would even allow me to do such an
15         analysis so I would be prohibited from
16         doing that analysis.
17    BY MS. LEVY:
18         Q.   You don't intend to offer an
19    opinion that Uber should not have had a
20    holdout group for S-RAD, that's not part
21    of your opinion in this case that Uber
22    should not have done that?
23              MS. WILKINS:  Object to form.
24              THE WITNESS:  I offer the opinion
25         that Uber does do that and has done
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 306

1                    KELLER
2        that.  The extent to my opinion is
3        encapsulated in my report.
4    BY MS. LEVY:
5        Q.   Okay, we see that in paragraph
6    62.9, Uber ███████████████████ of all
7    potential driver/rider pairings as a
8    control group to study the effectiveness
9    of SA/SM on an ongoing basis.  Is that
10   what you're talking about?
11       A.   Yes.
12       Q.   Okay.  And you're not going to
13   offer an opinion that Uber should not do
14   that and should not continue to study the
15   effectiveness of SA/SM on an ongoing basis
16   that's beyond what you plan to offer in
17   this case; true?
18            MS. WILKINS:  Object to form.
19            THE WITNESS:  The opinions that I
20       have on that are currently in my
21       report.
22   BY MS. LEVY:
23       Q.   And you quote in 64, paragraph 64
24   of your report a quote from Sunny Jeon
25   saying that S-RAD may represent Uber's

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 307

1                   KELLER

2      most effective intervention for preventing

3      sexual assault.

4           Do you see that quote?

5      A.   Yes.

6      Q.   Are you suggesting that that's

7      not true?

8      A.   I'm not saying it's true or not

9      true.  I'm saying what Uber said about its

10     own program, just like I said that -- just

11     like I quoted that it would be used to

12     prevent sexual assaults, this is how Uber

13     characterizes its own program.

14     Q.   You note several places in your

15     report that Uber began developing S-RAD in

16     2017 and deployed it in 2022; right?  You

17     note that in your report.

18     A.   Yes.

19     Q.   I do not see anywhere in your

20     report any opinion that Uber could have or

21     should have deployed S-RAD earlier.  You

22     are not offering the opinion in this case

23     that Uber could have or should have

24     deployed S-RAD earlier than it did, am I

25     right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 308

1                      KELLER
2          MS. WILKINS:  Objection to the
3       extent it mischaracterizes what is in
4       Ms. Keller's report.
5          THE WITNESS:  I'm offering the
6       opinion that Uber began development in
7       2017 and spent several years
8       developing the program and I timeline
9       that to some extent in my report, and
10      then Appendix F chronicles all of the
11      inputs that were along that -- along
12      that journey for Uber as they were
13      testing and deploying the model in
14      various cities around the United
15      States.  And so I don't offer the
16      opinion that Uber should have done
17      that earlier.  I offer the opinion
18      that Uber was testing that program in
19      numerous cities, whether it was in
20      shadow mode or in full semi rollout
21      throughout that time period.
22   BY MS. LEVY:
23      Q.   And just to make sure I'm
24   understanding you, you don't intend to
25   offer any opinion that it should have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 309

```
 1                    KELLER
 2      rolled it out in any different way than it
 3      did?
 4              MS. WILKINS:  Object to form.
 5              THE WITNESS:  I offer the opinion
 6          on what they were doing when they were
 7          doing those things and in what cities
 8          they were rolling out the program and
 9          in what ways.  I don't offer an
10          opinion on what they should have done
11          differently but I do chronicle that
12          timeline in my report.
13      BY MS. LEVY:
14          Q.   Paragraph 66 of your report on
15      page 45 under heading C, heading C states
16      S-RAD dispatches some trips above the
17      flagging threshold.  Are you with me?
18          A.   Yes.
19          Q.   And you do not -- the opinions
20      you intend to offer about S-RAD's
21      dispatching trips above the flagging
22      threshold are contained in the following
23      paragraphs of your report in 76 through
24      71; correct?  Sorry, through 73.
25              MS. WILKINS:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 310

```
 1                  KELLER
 2          THE WITNESS:  So that section,
 3     those are all the paragraphs within
 4     that heading for that section.  Those
 5     paragraphs as well as the images
 6     within those paragraphs are my
 7     opinions that support that statement.
 8   BY MS. LEVY:
 9       Q.   And you're not offering the
10   opinion that Uber should never dispatch
11   trips above a flagging threshold, you're
12   not offering that opinion in this case?
13       A.   I'm offering the opinion that
14   ██████████████████████████████████████
15   ████████████   and hasn't but I'm not offering
16   the opinion that they should ████████████
17   I'm offering the opinion that that's how
18   the model works, that they ████████████
19   ██████
20       Q.   And you have not analyzed
21   flagging thresholds in any particular
22   jurisdiction or across the United States
23   and done any study of whether dispatching
24   trips above the flagging threshold puts
25   riders who call for an Uber in more danger
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 311

```
 1                    KELLER
 2      or less danger than if Uber did not
 3      dispatch trips above a flagging threshold,
 4      that's not part of your analysis in this
 5      case; right?
 6              MS. WILKINS:  Object to form.
 7              THE WITNESS:  I do have the
 8          opinion because I am limited by the
 9          data that Uber has produced to the
10          totals that I have seen in documents.
11          And what I have obtained through
12          documents is that there are incidents
13          that have occurred that Uber calls
14          them a ███████████████████████████
15      ██████████████████████████████████
16      ████████████████████████████████████
17      ███████████████████████████ or --
18          Jesus.
19              MS. WILKINS:  Sorry guys, we just
20          had a huge unexpected thunder boom.
21              MS. LEVY:  Is everything okay?
22              THE WITNESS:  Yeah, it was
23          extremely loud.  It's like really
24          strange weather.
25      ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 312

```
 1                    KELLER
 2   BY MS. LEVY:
 3       Q.   You're also aware, are you not,
 4   Ms. Keller, that ███████████████
 5   ███████████████████████████████████
 6   ███████████████████████████
 7       A.   I'm aware that there are I think
 8   ██████████████████████.   I have asked
 9   for that data but it has not been produced
10   so that I can determine how many of those
11   do result in a sexual assault or
12   misconduct report.
13       Q.   And again, you know there are not
14   ██████████████████ of sexual misconduct;
15   right?
16       A.   We know that there are the
17   reports that Uber has produced in this
18   litigation.
19       Q.   And I think I'm clear on where
20   you're drawing the lines here.  But if the
21   judge or the jury wanted to understand
22   what should Uber do with flagged trips
23   above a threshold, should Uber just never
24   send drivers or should it send drivers and
25   would that be better or worse for what
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 313

1                          KELLER
2        would ultimately happen to people who call
3        those trips, you would need a lot more
4        data than you have or than you looked at
5        to understand and answer that question;
6        right?
7                  MS. WILKINS:  Object to form.
8                  THE WITNESS:  So I think that's a
9              pretty multipart question.  Do you
10             want to ask me something specific?
11       BY MS. LEVY:
12             Q.   You don't understand the way I
13       ask it?
14             A.   No, because it's -- should it
15       consider data, should it be better --
16             Q.   Fair point.  Let me ask you this.
17       A trip above a flagging threshold you
18       agree doesn't necessarily mean that
19       anything bad is going to happen, agree?
20       It might or it might not?
21             A.   I disagree.  There are incidents
22       that I show in my report that have
23       resulted in a sexual assault or sexual
24       misconduct and I highlight those from the
25       documents that I've reviewed.  I would

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 314

1                        KELLER

2      love to do the analysis of the safety data

3      but Uber has not produced the data that

4      would allow me to do that.

5          Q.   And again, you don't know what

6      alternatives to taking an Uber ride under

7      any particular circumstances would be for

8      a rider calling a driver, and you would

9      need to know that to compare the risk of

10     an Uber trip to the risk of a rider's

11     alternatives, wouldn't you?

12              MS. WILKINS:  Object to form, and

13          object that it's outside the scope of

14          Ms. Keller's opinions in this case.

15              THE WITNESS:  So if I wanted to

16          do an analysis of the risk -- I just

17          don't understand your question.  What

18          if I wanted to run my own version of

19          S-RAD, are you asking if I wanted to

20          compare the risk factors like you were

21          talking about earlier?  I'm a little

22          confused of what type of study I would

23          hypothetically be running here.

24     BY MS. LEVY:

25          Q.   If you were trying to analyze

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 315

```
 1              KELLER
 2    whether a rider would be safer taking Uber
 3    with a particular S-RAD score or doing
 4    something different, you would need to
 5    know a lot about what that rider's
 6    alternatives were, wouldn't you?
 7         A.   Well, first I would need to know
 8    the data that's in Uber's own S-RAD score
 9    and Uber has refused to produce that data
10    and says it deletes that data.
11         Q.   You can't form any opinion about
12    the relative safety of a mode of
13    transportation, you can't compare the
14    relative safety of Uber versus any other
15    mode of transportation because you don't
16    have that data, can we agree on that?
17              MS. WILKINS:  Object to form.
18              THE WITNESS:  I'm saying I can't
19         even compare the relative risk of the
20         supply plans on the Uber platform
21         because Uber has refused to produce
22         that data.
23    BY MS. LEVY:
24         Q.   And even when S-RAD scores are
25    elevated or high risk, the incidents of
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 316

1                         KELLER

2      sexual misconduct are still very rare,

3      they happen infrequently, even with

4      elevated S-RAD scores, you understand that

5      from the review you've done in this case;

6      correct?

7              MS. WILKINS:  Object to form,

8          object that this has been asked and

9          answered.

10             THE WITNESS:  So I'm aware of

11         incidents and I discuss them only

12         because I found them in documents, not

13         because Uber has produced data, that

14         allows me to do this analysis that

15         have resulted in sexual assaults and

16         sexual misconducts that have occurred

17         because after the fact, after Uber has

18         allowed that trip to dispatch knowing

19         that it had a risk support above its

20         threshold.

21     BY MS. LEVY:

22         Q.   And how often did that happen,

23     how often do above threshold flags result

24     in sexual assault and misconduct, one out

25     of how many trips?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 317

1                    KELLER

2        A.   I would love to do that analysis.

3    Uber has refused to produce that data that

4    would allow me to do that.

5        Q.   Now looking at paragraph 76 of

6    your report where you talk about S-RAD

7    scores for other plaintiffs, are you with

8    me, table 3?

9        A.   Yes.

10       Q.   There you list the S-RAD score in

11   the first row of data under the heading

12   for the trips for the four plaintiffs

13   listed in the chart; correct?

14       A.   So the first row shows the S-RAD

15   score that Uber gave to those trips for

16   those four individuals.

17       Q.   There's no -- well, you do not

18   intend to offer any opinion about the

19   S-RAD score for these particular drivers

20   other than that which is contained in

21   paragraph 76 and Appendix D; correct?

22           MS. WILKINS:  Object to form,

23       object to the mischaracterization of

24       Ms. Keller's report.

25           THE WITNESS:  The opinions that I

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 318

1                     KELLER

2          can offer about the drivers and the

3          plaintiffs' trips are included in this

4          paragraph and in Appendix D.  I am --

5          because Uber has not produced the

6          supply plan data or all of the driver

7          star rating data or the number of

8          trips that are near a bar, anything

9          like that, I am unable to produce or

10         to put into context these trips and

11         the information contained within the

12         S-RAD scores.

13    BY MS. LEVY:

14         Q.   You don't -- you have not

15    calculated an S-RAD score that you believe

16    Uber should not dispatch rides above,

17    that's not what you've done in this case

18    and not an opinion you intend to offer?

19         A.   I have asked for all the

20    thresholds that Uber has maintained

21    nationwide and continues to maintain.

22    Those have not been produced in this

23    litigation so what I am left with is the

24    information that's in this chart.

25         Q.   And is it your opinion that Uber

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 319

```
 1                    KELLER
 2     should not pick up -- should not have
 3     drivers allow -- let me strike that and
 4     say this in a better way.
 5            Is it your opinion that Uber's
 6     platform should not allow drivers to pick
 7     up riders within 50 meters of a bar?
 8        A.   It's my opinion Uber knows that
 9     to be a risk factor because it includes
10     that in its S-RAD scoring.  It is my
11     opinion that Uber sometimes dispatches
12     those trips despite knowing that that trip
13     is above a threshold that it has set to
14     only apply to less than about ███████
15     of data on average, just to name a few
16     opinions from my report.
17        Q.   And you don't intend to tell the
18     jury or the court that Uber should not
19     dispatch rides or allow pairings when the
20     pickup is near a bar, that is beyond what
21     the opinions are that you're offering in
22     the case, that Uber should not do that?
23            MS. WILKINS:  (Inaudible).
24            THE WITNESS:  I offer the opinion
25        that sometimes they do, whether it's a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 320

1                          KELLER

2          ██████████      or whether it's one of

3          these plaintiffs' trips where they

4          were near bars.  Those trips were

5          dispatched.

6      BY MS. LEVY:

7          Q.   And you're not offering the

8      opinion that by doing a dispatch that is

9      near a bar, Uber is making the rider less

10     safe than the rider would have been in

11     other circumstances, that's not an

12     analysis you have done or an opinion

13     you're going to offer?

14              MS. WILKINS:  Object to form,

15          object to the misstatement of the

16          prior testimony.

17              THE WITNESS:  I offer the opinion

18          that Uber did know that these were

19          indicators of risk for a ride and I

20          offer the opinion that Uber did not

21          disclose such indicators as proximity

22          to a bar or the rate of incidents when

23          the pickup was near a bar in its

24          safety reports, to name a few

25          examples.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 321

```
 1                      KELLER
 2    BY MS. LEVY:
 3        Q.   And is that -- you are not
 4    offering again in this area of allowing
 5    dispatches, you're not offering opinions
 6    what Uber should have done, other
 7    thresholds it should have used or whether
 8    the provision of rides put the rider in a
 9    safer or less safe situation, that's all
10    beyond the scope of what you're going to
11    testify in this case; right?
12            MS. WILKINS:  Object to the
13            compound nature of the question,
14            object that this has been asked and
15            answered.
16            THE WITNESS:  So I offer -- I
17            kind of lost track of your list there.
18            I offer the opinion that that there is
19            information that Uber knows about the
20            risk of a trip through its own
21            internal analyses or from its scoring
22            of the -- through the S-RAD program.
23            I offer the opinion that it doesn't
24            tell the public about those factors
25            and whether or not that would make
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 322

1              KELLER
2       someone safer or less safe, I leave
3       that open to interpretation but I am
4       discussing the pieces of information
5       and the lack of disclosure around that
6       information.
7  BY MS. LEVY:
8       Q.   Have you done any analysis or
9  comparison of what Uber does and doesn't
10 disclose to the public with other forms of
11 public transportation, that's beyond the
12 scope of what you've done; right?
13          MS. WILKINS:  Object, asked and
14       answered many, many, many, many times
15       today.
16          THE WITNESS:  So does Uber
17       disclose in its safety reports its
18       relative risk?  I don't understand the
19       question.
20 BY MS. LEVY:
21       Q.   Does Uber disclose more or less
22 information about sexual assault on its
23 platform than taxi companies disclose?
24          MS. WILKINS:  Same objection.
25          THE WITNESS:  That is not an

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 323

```
 1                    KELLER
 2        analysis that I needed to do to
 3        understand what Uber was saying about
 4        its own platform as compared to what
 5        it knew internally about the number of
 6        reports occurring on the platform and
 7        how it was using that data.
 8   BY MS. LEVY:
 9        Q.   And the same -- you're not
10   offering any opinions about Uber's duty or
11   requirements or regulations about
12   disclosure obligations, that's beyond the
13   scope of opinions you intend to offer in
14   this case; right?
15             MS. WILKINS:  Asked and answered.
16             THE WITNESS:  The same answer
17        that I've given throughout the
18        deposition today, I am offering
19        opinions on what Uber knew internally,
20        what they did with that data and what
21        they told the public.
22   BY MS. LEVY:
23        Q.   Looking at table 76, you have
24   listed S-RAD scores and select feature
25   values for individual plaintiff trips.  On
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 324

1                    KELLER
2     the S-RAD score, you are offering no
3     opinions in this case about what is a safe
4     or appropriate S-RAD score; true?
5              MS. WILKINS:  Asked and answered.
6              THE WITNESS:  I'm offering the
7          opinion of what the score was, what
8          the thresholds that Uber set at that
9          time were because that was the data
10         provided to me and that is what is
11         limiting my opinion on this.  Uber did
12         not produce all the supply plans
13         because it says it deletes that data.
14         Uber did not produce the bar count or
15         other input values for all of the
16         trips, for example, so I am limited to
17         the data it produced for the
18         bellwethers in this spreadsheet.
19    BY MS. LEVY:
20         Q.   And you don't have an opinion on
21    what a safe or a dangerous S-RAD score is,
22    that's beyond the scope of what you've
23    done?
24              MS. WILKINS:  Asked and answered,
25          misstates prior testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 325

1          KELLER
2          THE WITNESS:  I'm offering the
3     opinions on what the inputs were to
4     that trip, what Uber knew those inputs
5     to be.
6  BY MS. LEVY:
7     Q.   And the same -- I'm sorry, I
8  didn't mean to cut you off.
9     A.   Go ahead.
10    Q.   The same answer would be true for
11  all the other feature values that are
12  listed in the table 3 of your paragraph
13  76, same answer for each of the feature
14  values?
15         MS. WILKINS:  Object to form.
16         THE WITNESS:  So I am not able to
17    contextualize those feature values.
18    ████████████████████████████████████
19    ████████████████████████████████████
20    ████████████████████ because Uber has only
21    produced this data for these
22    plaintiffs.  I do not have this data
23    for every trip, I don't have this data
24    for every driver, I don't have this
25    data for every rider because Uber did

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 326

1                          KELLER
2          not produce it.
3      BY MS. LEVY:
4          Q.   You do not have and have not
5      formulated any opinions about whether Uber
6      should or should not have dispatched these
7      trips?
8               MS. WILKINS:  Object to form.
9               THE WITNESS:  I offer the opinion
10         that ███████████████████████.  I
11         offer the opinion that trips that are
12         above a flagging threshold do ██████
13         ██████████████████████ and that
14         I'm able to calculate just from Uber's
15         documents the volume of those trips.
16         Those are two opinions, for example,
17         that I offer related to that topic.
18     BY MS. LEVY:
19         Q.   My question is a little bit
20     different.  You have not stated anywhere
21     in this 55 pages of your report or
22     anywhere I can find in any of your
23     appendices an opinion that Uber should not
24     have dispatched or allowed a pairing
25     between any one of the four plaintiffs

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 327

1                         KELLER

2     listed in table 3 under paragraph 76; is

3     that correct?

4         A.   I offer the opinion that those

5     trips were dispatched and these are the

6     inputs that Uber had about those trips

7     when it dispatched those plaintiff trips.

8         Q.   And again, my question was:  You

9     do not intend to go further and say Uber

10    should have blocked any one of these four

11    pairings, that's beyond what you've looked

12    at?

13        A.   I offer the opinion that they

14    ███████████████████████████████████████

15    ██████████   when operating S-RAD and that's

16    the extent to my opinion on -- that's one

17    opinion on █████████.  I also discuss

18    ████████████  but I think we've discussed

19    that a number of times in my deposition

20    today.

21             MS. LEVY:  Let's turn to -- are

22        you doing okay, do you need a break?

23             THE WITNESS:  I could use a

24        quick.

25             MS. LEVY:  Let's go off the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 328

```
1                      KELLER
2         record.  Take a quick break.
3              THE VIDEOGRAPHER:  Going off the
4         record.  The time is 7:24 p.m.  This
5         is the end of media unit 5.
6              (Recess taken from 7:24 p.m. to
7         7:43 p.m.)
8              THE VIDEOGRAPHER:  We're back on
9         the record.  The time is 7:43 p.m.
10        Eastern time.  This is the beginning
11        of media unit 6.
12    BY MS. LEVY:
13        Q.  Ms. Keller, is it your opinion
14    that Uber should report data even if the
15    data is unreliable?
16              MS. WILKINS:  Object to form.
17              THE WITNESS:  I don't offer an
18        opinion what Uber should report.  I
19        offer opinions on the discrepancy of
20        the hundreds of thousands of tickets
21        that Uber had in its possession and
22        knew about and categorized versus the
23        five categories that it reported on
24        its safety reports.
25    ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 329

```
 1                   KELLER
 2    BY MS. LEVY:
 3        Q.   And you have no opinion on
 4    whether Uber should have reported numbers
 5    of incidents in categories that are
 6    unreliable, offering no opinion on that?
 7        A.   What are categories that you are
 8    defining as unreliable?
 9        Q.   My question isn't that.  My
10    question is:  Are you going to offer the
11    opinion that Uber should release data even
12    if it didn't have reliable data?
13            MS. WILKINS:  Object to form.
14            THE WITNESS:  I'm offering the
15        opinion that Uber did not produce and
16        disclose the reports that it had and
17        categorized in its possession through
18        the -- which I know about through the
19        Flack interrogatory responses and it
20        only disclosed the 15 -- I'm
21        forgetting the number now that it's
22        late in the day but the reports it had
23        in the five reportable categories.
24    BY MS. LEVY:
25        Q.   Are you offering any opinion of
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 330

1                    KELLER

2      which of the 21 or 27 categories -- I

3      think we've got some background noise.

4      Let me start that question over.

5            Have you done any analysis or

6      formed any opinions yourself as to which

7      of the 21 or 27, depending how you count

8      categories in the taxonomy, that Uber did

9      and did not have reliable data on?

10           MS. WILKINS:  Object to form.

11           THE WITNESS:  Are you suggesting

12        that Uber produced unreliable data in

13        this litigation?

14    BY MS. LEVY:

15      Q.  I am asking you -- have you read

16     testimony from Uber's witnesses to the

17     effect that Uber did not release data in

18     other categories because it did not

19     believe that data to be reliable, have you

20     seen that testimony from Uber's witnesses?

21      A.  I don't know if I would

22     characterize that as reliable.  I've seen

23     testimony that I'm recalling about

24     auditing alignment but I don't know if

25     that's the same thing that you're

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 331

```
 1                    KELLER
 2     referring to as reliable.
 3          Q.   And I think what we're referring
 4     to generally is there are categories in
 5     the taxonomy according to Uber's witnesses
 6     that have lower alignment among competing
 7     auditors looking at the same data than
 8     other categories; is that fair?
 9          A.   That is -- what I have in my mind
10     is what I was reviewing this morning which
11     is in the safety reports and in the
12     appendix to the 2019 and 2020 safety
13     report.  I would be happy to pull that up
14     if you don't mind discussing the alignment
15     process.
16          Q.   Yeah, I think I'm going to be
17     really precise in my question.
18               Do you intend to offer any
19     opinion in this case that, in fact, Uber
20     witnesses are wrong and Uber -- that the
21     data that it had in other categories in
22     the taxonomy was just as reliable as the
23     data that it provided incident numbers
24     for?
25               MS. WILKINS:  Object to form,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 332

```
1                      KELLER
2         vague, overbroad.
3              THE WITNESS:  So I'm offering
4         opinions based off of data that Uber
5         has produced in this litigation, that
6         it has represented as accurate in this
7         litigation as far as how I understand
8         interrogatory responses go so my
9         analysis is based off of those
10        representations from the company.  If
11        you are suggesting in some way that
12        Uber has not provided accurate data, I
13        would be interested in knowing
14        specifically what you are talking
15        about.
16   BY MS. LEVY:
17        Q.   You understand that there are
18   categories in the taxonomy that are easier
19   to classify than other categories, do you
20   that, do you agree with that or you don't
21   know?
22              MS. WILKINS:  Object to form.
23              THE WITNESS:  I don't have an
24         opinion because I have not categorized
25         the data itself.  I don't need to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 333

```
 1                    KELLER
 2        because Uber has already done that
 3        categorization for me through the
 4        plaque interrogatory response.
 5   BY MS. LEVY:
 6        Q.   And if hypothetically Uber's
 7   witnesses were to say to you some of the
 8   categorizations that we use and provide we
 9   have a great deal of reliability and
10   others we have less so, would you have any
11   reason to disagree with that statement?
12        A.   Uber has not produced a
13   line-by-line documentation of which
14   categories are reliable in this
15   hypothetical that you have so I would be
16   theorizing what types of things Uber would
17   be saying about its data.  I am making the
18   assumption that Uber has produced reliable
19   data in this litigation when it comes to
20   the Flack interrogatory response and the
21   Flack data that it just recently produced.
22        Q.   Are you making the assumption
23   that the categorization of each of those
24   incident types is equally reliable, is
25   that your assumption?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1                          KELLER

2          A.    I'm using the categorization that

3     Uber has put forth in that data itself.

4          Q.    And you are assuming that Uber's

5     categorization is equally reliable in each

6     level of the taxonomy, is that your

7     assumption?

8          A.    I'm assuming something different.

9     I'm assuming that Uber has produced in a

10    truthful manner the data that it has in

11    its possession and I am taking Uber's

12    representation of that data.

13               An example of that not being

14    complete as its previous productions was

15    Uber's production and reproduction of the

16    Flack data where Uber did not produce

17    fields that it used internally to classify

18    data so I need and have reserved my right

19    to analyze data from that data system

20    because Uber did not produce that data

21    previously.

22          Q.    Have you reviewed Katie

23    McDonald's deposition transcripts in this

24    case?

25          A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 335

```
 1                    KELLER
 2        Q.   Both the April 24th and April
 3   25th transcripts?
 4        A.   Yes.
 5        Q.   And do you have any different
 6   information than Ms. McDonald about Uber's
 7   confidence in the reliability of how it
 8   classified the incidents in the Flack
 9   data?
10           MS. WILKINS:  Object to form.
11           THE WITNESS:  So I am not sure
12        what you are referring to when you say
13        reliability or confidence.  What I'm
14        thinking about is what I read in the
15        safety reports this morning about the
16        auditor process and their reason,
17        their process there.  I would be happy
18        to look at other deposition testimony.
19           Regardless of that, what I do
20        know is the data that I have is how
21        Uber classified it at the time of two
22        data pulls when they produced the data
23        to me.
24   BY MS. LEVY:
25        Q.   I want to turn in our last few
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 336

1                          KELLER

2        minutes to your Appendix D.  The

3        information that you've provided in the

4        appendix to your report, additional

5        information that we haven't already talked

6        about about driver profiles.  Do you have

7        that in front of you?

8            A.   Have we marked that as an exhibit

9        yet?

10               MS. LEVY:  We haven't marked it

11           as an exhibit yet.  I'm trying to

12           figure out what tab it is and pull it

13           up for you.  Give us a minute.

14               We're going to take a minute and

15           e-mail it.  We don't have it in our

16           tabs.  While we're doing that,

17           circling back on some other questions

18           that we discussed earlier.

19       BY MS. LEVY:

20           Q.   S-RAD you agree is a proprietary

21       software that Uber developed, we've

22       discussed that at length today; correct?

23           A.   At its base, Uber is a

24       machine-learning model, but it is using

25       data that only Uber has access to.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 337

```
 1                    KELLER
 2        Q.   And is it your opinion that Uber
 3   has some duty or obligation to disclose to
 4   the public its proprietary technology
 5   tool?
 6        A.   I'm not offering the opinion that
 7   Uber should disclose that tool.  I am
 8   offering the opinion that Uber has not
 9   disclosed that tool and I'm offering
10   opinions to the court describing how that
11   tool was created and what are the inputs
12   that went into it and the broad strokes of
13   how it works and how Uber utilizes that
14   tool to, quote, prevent sexual assaults on
15   the platform.
16        Q.   But you don't intend to offer any
17   opinion in this case that Uber has a duty,
18   obligation or should have disclosed S-RAD
19   publicly?
20             MS. WILKINS:  Asked and answered.
21             THE WITNESS:  Same answer as just
22        before.  I thought the questions were
23        the same.
24   BY MS. LEVY:
25        Q.   And the same would be true for
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 338

1               KELLER

2       other studies or metrics that it looks at

3       in an attempt to combat incidents of

4       sexual assault and misconduct, you're not

5       intending to offer opinions in this case

6       that Uber should have or had any duty or

7       obligation to disclose to the public

8       anything about its study of this issue

9       that it didn't disclose, that's beyond the

10      scope of what you've been asked to do

11      here; correct?

12          A.   I'm offering opinions that Uber

13      has studied those inputs, whether they are

14      the differences in rider driver, gender,

15      proximity to bars or time of day but none

16      of that is disclosed in its safety

17      reports.  Uber chooses to show the rate of

18      assaults on its platform by looking at

19      five categories of data and comparing them

20      to all trips that occur on the platform,

21      as opposed to looking at the volume of

22      incidents that occur in late night trips

23      or near bars similar to the analysis that

24      it has done internally.

25          Q.   And to be very specific, and

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 339

1                    KELLER

2       let's see if you can answer this with a

3       yes or no, you don't intend to offer any

4       opinions about any disclosure, duties or

5       obligations; true?

6                MS. WILKINS:  Asked and answered.

7                THE WITNESS:  I offer opinions on

8           disclosures that have happened but I

9           don't offer opinions on what they

10          should have done differently.  I offer

11          opinions on what they could have shown

12          with the data that they had in their

13          possession as well as the analyses

14          that they were doing internally.

15      BY MS. LEVY:

16          Q.   And I don't see anywhere in your

17      report that you talk about duties or

18      obligations.  That's beyond the opinions

19      you're offering; correct?

20               MS. WILKINS:  Asked and answered.

21               THE WITNESS:  The same answer to

22          disclosures is I offer opinions on

23          what has -- and describe what has

24          occurred and what has been disclosed.

25          I don't offer opinions on what should

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 340

1                           KELLER

2          be disclosed, but instead offer

3          opinions on what they could have

4          disclosed to the public based off of

5          the information that they had studied

6          and held within their possession.

7               (Exhibit 11, Appendix D, marked

8          for identification.)

9     BY MS. LEVY:

10         Q.   Let's pull up the document that

11    we just marked.  I think it's going to be

12    Exhibit 11, which is Appendix D to your

13    expert report.  Tell me when you've got

14    it.

15         A.   Okay.

16         Q.   This appendix is the -- contains

17    your analysis of the individual rides or

18    trips that you've studied that are

19    encompassed by this expert report;

20    correct?

21              MS. WILKINS:  Object to form.

22              THE WITNESS:  So these, the data

23         that's contained in these, this

24         appendix is slightly different than

25         the data that's in the remainder of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 341

1                        KELLER

2          the report or the main report, I

3          should clarify.  As part of the

4          litigation, Uber produced data only

5          for some of the plaintiffs' drivers

6          and trips.  This data was not

7          available for all drivers in their

8          database, nor was it available for all

9          trips in their database so this is

10         only a limited subset of the data that

11         Uber has in its possession but only

12         what it produced as part of the

13         litigation.

14      BY MS. LEVY:

15          Q.   Let's turn to the next page,

16      table of contents here.  For each of the

17      five drivers that are listed in II through

18      VI, you've conducted four different types

19      of analysis, correct, a driver trip

20      profile, an analysis of driver ratings,

21      idle ride notifications and sexual assault

22      and sexual misconduct incident history;

23      true?

24          A.   Yes.

25          Q.   Those four analyses you did using

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 342

```
 1                      KELLER
 2     the same methodology for each of the
 3     drivers that are listed here; is that
 4     right?
 5          A.   For each of the drivers that are
 6     listed here, yes.
 7          Q.   Okay, and you are offering no
 8     opinion again as to Uber's conduct -- let
 9     me ask it in a different way -- strike
10     that.
11               You are not offering the opinion
12     and have not put in Appendix D any opinion
13     that Uber should not have allowed any of
14     these trips to go forward.  That is beyond
15     the scope of what you are going to testify
16     about in this case; correct?
17          A.   I'm offering opinions on what
18     Uber knew about that trip, the types of
19     information that it reviewed as part of
20     its incident review.  I'm offering
21     opinions on what Uber knew about that
22     driver prior to that trip, whether it's
23     through their previous trip incident
24     history or their ratings or their S-RAD
25     score, but I'm not offering opinions on
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 343

```
 1                    KELLER
 2    what Uber should have done with that
 3    information.  I'm just offering opinions
 4    about what Uber knew at the time of that
 5    trip and before that trip.
 6        Q.   And if we skip over --
 7        A.   I'm sorry, I should clarify.  At
 8    the time of the trip and its investigation
 9    of the trip because I believe there are
10    some investigative documents that Uber
11    produced so that would occur, just to be
12    most clear.
13        Q.   Let's turn to page 4 of 43.
14    Looking at table 1, this is your summary
15    of the bellwether driver profiles;
16    correct?
17        A.   Yes.
18        Q.   And in this summary, you list the
19    metrics that you evaluated for each of the
20    five drivers and then analysis or the
21    output of what you looked at is contained
22    in this report; fair?
23             MS. WILKINS:  Object to form.
24             THE WITNESS:  So this table is
25        kind of a summary table of the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 344

1              KELLER

2       information that is -- of the types of

3       information that's contained in each

4       of the subsequent driver profiles.

5   BY MS. LEVY:

6       Q.   If we look at page 5 of 5 of 43

7   where it addresses 1 star ratings, are you

8   with me?

9       A.   Yes.

10      Q.   And here you've tabulated the

11  number of 1 star ratings that you see in

12  this data; is that correct?

13           MS. WILKINS:  Object to form.

14           THE WITNESS:  So for each driver

15      Uber produced all of the rating

16      history for that drivers, no other

17      driver, so just for those five

18      drivers, and using that information I

19      calculated how many were 1 star.

20  BY MS. LEVY:

21      Q.   And did you do any other analysis

22  on 1 star rating; for example, have you

23  formed any opinions on an appropriate

24  absolute number or threshold of a

25  percentage for 1 star ratings or is that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 345

1                        KELLER
2     beyond the work that you've done in this
3     case?
4              MS. WILKINS:  Object to form.
5              THE WITNESS:  I would have loved
6         to do an analysis of all of the
7         drivers' 1 star -- or all of the
8         drivers on the platform, their
9         ratings, all of the drivers on the
10        platform that had sexual assault or
11        misconduct incidents.  Uber did not
12        produce that information in this
13        litigation.  They only processed the
14        files here so the opinions that I am
15        able to offer are limited to counting
16        the number of 1 star ratings that are
17        produced in these five documents.
18    BY MS. LEVY:
19        Q.   You're not intending to offer an
20    opinion, for example, that if a driver
21    receives a 1 star rating, they should be
22    deactivated solely because of the 1 star
23    rating; that's beyond anything that you
24    would offer in this case as an example;
25    correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 346

```
 1                      KELLER
 2          MS. WILKINS:  Object to form,
 3      object to the extent it misstates
 4      Ms. Keller's opinions that are offered
 5      in her report.
 6          THE WITNESS:  I'm offering the
 7      opinion that -- the analysis of these
 8      five drivers' 1 star ratings is the
 9      extent of the opinions that I am able
10      to offer with that data as it stands
11      right now because Uber has not
12      produced data about all drivers.  I am
13      not able to say if six or 160 or 12 1
14      star ratings is a lot, a little, they
15      are in the first -- in the 1
16      percentile, the 99 percentile.
17      Because Uber has not produced that
18      data, I'm not able to contextualize
19      what that means.
20  BY MS. LEVY:
21      Q.  Can you look at page 10 which is
22  the start of your analysis of Hassan
23  Turay?  Are you with me?
24      A.  Yes.
25      Q.  The next page in paragraph 9 you
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 347

```
 1              KELLER
 2    have charted out a graphic depiction of
 3    time of day reflected on the trips that
 4    were driven by Mr. Turay; is that correct?
 5        A.   This image shows when Hassan
 6    Turay is driving.  You can see that the
 7    dark bars are when they're a late night
 8    weekend.  The super dark blue bars are
 9    late night weekend, the light lighter blue
10    bars are weekday late night, and then the
11    weekdays are also shades of orange.  So
12    this is plotting how many trips, not
13    incidents but how many trips he is taking
14    or driving over the course of his time on
15    the platform.
16        Q.   And this analysis and the similar
17    analysis that you did for the other
18    drivers in Appendix D, this is the limit
19    of the late night -- I'm sorry, this is
20    the limit of the analysis that you've done
21    on this issue; in other words, you don't
22    intend to offer any opinions about whether
23    this pattern is good or bad or
24    problematic, that's not work that you've
25    done in this case; correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 348

1                        KELLER
2            MS. WILKINS:  Object to form.
3            THE WITNESS:  The Uber has only
4        produced data for these drivers.  They
5        have not produced trip level data for
6        all of the drivers on its platform,
7        nor have they produced trip level data
8        that would allow me to do a similar
9        analysis for any driver that had a
10       sexual misconduct or sexual assault
11       report.  I am unable to do that
12       analysis because Uber has not produced
13       that data so I am limited by those
14       productions to analyzing the data in
15       this way in my report.
16   BY MS. LEVY:
17       Q.   And you're not suggesting that
18   Uber shouldn't allow drivers to drive
19   during late night hours?
20            MS. WILKINS:  Object to form.
21            THE WITNESS:  I am showing the
22       data in the way, especially on the
23       next image, I believe it's a heat map
24       of the data, how Uber has even
25       analyzed that data internally to the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 349

1                      KELLER
2        extent that I have been given this
3        type of data for these five drivers by
4        Uber.
5    BY MS. LEVY:
6        Q.   For none of the five drivers do
7    you intend to offer value judgments about
8    whether the patterns you see are good or
9    bad or problematic, you don't intend to do
10   that in this case; correct?
11       A.   I offer opinions on what that
12   data show.  I am unable to draw
13   comparisons to other data because Uber did
14   not produce that data and I cannot provide
15   any value judgments to that data.
16       Q.   In paragraph 10 and Figure 3,
17   this is a visual depiction of the percent
18   of Mr. Turay's trips by hour on various
19   days of the week; correct?
20       A.   Correct, it's another way of
21   looking at the same data that we were
22   looking at just recently in Figure 2 but
23   as a percentage and in a heat map.  This
24   image is one that Uber has internally that
25   I've seen in documents.

Page 350

1                       KELLER

2        Q.   And again, the darker images

3    represent a higher percentage of trips;

4    correct?

5        A.   The darker squares I think you

6    mean represent a higher percentage of

7    trips, yes.

8        Q.   So at its highest level for

9    Mr. Turay, it looks like his highest

10    percentage of trips by hour occur

11    Saturdays and Sundays and a little bit on

12    Friday night; correct?

13        A.   It looks like from this we see

14    the red images start or the red shading

15    start Friday at what would be 2100 hours

16    local time so that would be 9 p.m.  Again

17    a similar time frame on Saturday as well

18    extending into the early morning hours --

19    it would be Friday into the early morning

20    hours and then again on Saturday into the

21    early hours of Sunday.  So you can see

22    that carry over from basically 9 p.m. on

23    Friday into nearly 3 a.m. on Saturday and

24    so on and so forth.

25        Q.   Is there anything wrong with a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 351

1                         KELLER

2        driver choosing to drive more on the

3        weekend?

4              MS. WILKINS:  Object to form.

5              THE WITNESS:  I'm not providing a

6           value judgment.  I'm showing the data

7           in a way that I've seen Uber

8           internally look at this data

9           specifically in this way and so that's

10          why I'm presenting this information in

11          this fashion in this table for this

12          figure I should say.

13       BY MS. LEVY:

14          Q.   And that would be for all the

15       drivers, not just Mr. Turay, but you're

16       not providing any value judgment about

17       their patterns for any of these drivers in

18       Appendix D; correct?

19          A.   I am describing the patterns that

20       I am able to see in their data and those

21       are contained in Appendix D.

22          Q.   And table 2 for Mr. Turay breaks

23       down his ratings in four different time

24       slots; correct?

25          A.   This table shows the breakdown of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 352

1              KELLER

2       ratings, whether it was 1 star rating by

3       time of day and those times of day are

4       defined in the same way that we described

5       earlier using the S-RAD definitions as put

6       forward in the Wong deposition.

7           Q.   And if I'm reading this

8       correctly, and making sure I understand

9       what you've done here, for 1 star ratings

10      for Mr. Turay, it looks like he had a

11      higher percentage of 1 star rating on

12      non-late night hours than on late night

13      hours during the weekday; is that true?

14          A.   So it looks like in this table,

15      46.77 percent of Turay's 1 star ratings

16      occurred on weekend non-late night hour

17      trips.

18          Q.   And another 29 percent occurred

19      on weekday non-late night trips; correct?

20          A.   You're reading the chart

21      correctly.

22          Q.   Okay.  And so if you add those

23      together, if we round up the 29 to 30,

24      it's roughly 36 -- I'm sorry, 76 or 75

25      percent of his trips that are 1 star

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 353

1                        KELLER

2    rated, 75 percent of those occurred not

3    during late night hours.  Do you agree?

4         A.    That is the -- that's how that

5    table adds up but I would urge you to

6    remember that late night hours are a small

7    percentage of the hours in the day so

8    keeping that in mind when reviewing this

9    chart is important.

10        Q.    Late night hours are a large

11   percent of Mr. Turay's trips however;

12   right?

13             MS. WILKINS:  Object to form.

14             THE WITNESS:  They are a larger

15        percentage of his trip volume.

16   BY MS. LEVY:

17        Q.    Turning to page 14, idle ride

18   notifications, what you've depicted here

19   is a graphic depiction of idle ride

20   notifications based on the Bates number

21   described in this Exhibit 1605 from the

22   Mariana Esteves deposition; correct?

23        A.    This is another spreadsheet of

24   communications data that Uber maintains

25   and in this dataset, when it detects a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 354

1                    KELLER

2     ride that has been idle for I believe five

3     minutes or longer will send a nudge to the

4     driver and rider to ask basically if

5     everything's okay.  They do that in a

6     number of different messages but that's

7     what the idle notification is so I was

8     asked to identify the volume of those

9     using a few phrases as provided by counsel

10    and the results of that analysis is shown

11    in this figure.

12         Q.   By idle ride notifications, you

13    mean RideCheck; right?  That's the same as

14    what is sometimes referred to as

15    RideCheck?

16         A.   Yes, I think they are the same.

17    It's when someone's -- I know them when

18    you're sitting in the car and there's

19    something -- that car has not moved in a

20    time -- in some time, I think it's five

21    minutes, that Uber sends out a

22    notification to both rider and driver.

23         Q.   And there can be many, many

24    reasons why a RideCheck notification or an

25    idle ride notification would go out that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 355

```
 1                    KELLER
 2      would have nothing whatsoever to do with
 3      sexual assault or sexual misconduct; true?
 4              MS. WILKINS:  Object to form.
 5              THE WITNESS:  Those notifications
 6          are sent out by the platform due to
 7          the car not moving.  Whether that
 8          sexual assault is occurring, which I
 9          know that has been the case for some.
10          In others I understand that sometimes
11          there's just traffic and that car
12          hasn't moved in five minutes, but I do
13          know that those notifications are sent
14          a number of times if the car continues
15          not to move.
16      BY MS. LEVY:
17          Q.   And have you done any other
18      analysis of idle ride notification to
19      RideCheck other than that as reflected in
20      -- for Mr. Turay other than that reflected
21      in paragraph 12?
22              MS. WILKINS:  Object to form.
23              THE WITNESS:  I think I state
24          this in my main report.  I asked for
25          the RideCheck notification data,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 356

1                        KELLER

2          especially as it pertains to the

3          sexual assault incident data or the

4          sexual safety report data.  That has

5          not been provided to me so I am

6          limited by the data that was produced

7          by Uber to being able to analyze the

8          data for these profiles for these

9          drivers.

10    BY MS. LEVY:

11         Q.   And the last paragraph that you

12    included in Exhibit D with respect to

13    Mr. Turay is the figure that we see on

14    page 15 of 43, Figure 5, that is a -- is a

15    screenshot, I believe, of Mr. Turay's

16    safety incident history, sometimes

17    referred to as safety lens.

18         A.   Yes, this is a screenshot from an

19    internal document from Uber.  I have not

20    changed it in any way.

21         Q.   Okay.  And you do not intend to

22    offer any analysis of the safety lens, you

23    do not intend to offer any value judgments

24    about the safety lens, the extent of what

25    you intend to say about Mr. Turay's safety

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 357

```
 1                    KELLER
 2      incident history is contained within this
 3      report; correct?
 4              MS. WILKINS:  Object to the
 5          compound and vague nature of the
 6          question.
 7              THE WITNESS:  I would say I'm not
 8          offering any value judgments about the
 9          safety lens image or the document
10          that's cited here.  It is possible
11          that I'm asked to analyze the numbers
12          that are in that screenshot, the
13          number of incidents that were reported
14          for this individual, and being able to
15          calculate how many those total up to
16          be because that is in my area of
17          expertise.
18      BY MS. LEVY:
19          Q.   And you've calculated that,
20      you've calculated the number of incidents
21      already and provided that in your report;
22      correct?
23              MS. WILKINS:  Object to form.
24              THE WITNESS:  Yes, that's in the
25          table that I think we discussed
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 358

```
1                        KELLER
2          earlier, the number of prior incidents
3          of specifically sexual assault and
4          misconduct incidents are in that
5          table.  The resolution is pretty bad
6          on my end here so I don't know if you
7          can see any better, but I understand
8          that there's other types of data that
9          is reflected here so I don't want to
10         rule out that I would be asked at some
11         point to count these things at some
12         point in time, but I'm not offering
13         value judgments about that similar to
14         the ways I've analyzed the data
15         elsewhere in my report.
16    BY MS. LEVY:
17         Q.   And you're not going to say, for
18    example, that Uber should have taken
19    action against Mr. Turay at a different
20    point in time or Uber didn't act
21    responsibly with respect to a particular
22    actioning of something in the safety lens;
23    that's beyond what you intend to offer
24    with respect to your opinions about these
25    individual drivers; correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 359

```
 1                    KELLER
 2         MS. WILKINS:  Object to form.
 3         THE WITNESS:  So I offer opinions
 4     on the types of data that Uber had in
 5     its possession and the types of
 6     information Uber was aggregating
 7     itself about these data including
 8     through these screenshots.  Since I
 9     didn't have the underlying data for
10     the screenshot, for example, here,
11     this is other data that Uber had in
12     its possession that it did not produce
13     so I'm analyzing the data that it did
14     have in a few ways.  I've also
15     produced a comprehensive timeline of
16     all of the data that -- or of all the
17     time based data that Uber -- that I
18     had for these drivers and trips so I
19     produced that in my report as well.
20  BY MS. LEVY:
21     Q.   I want to make sure I understood
22  your last point which is:  Is it your
23  testimony that Uber did not produce data,
24  any additional data underlying these
25  incidents?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 360

1                      KELLER
2        A.   So there's reports in this
3    screenshot that I don't have, or not in
4    this screenshot but for other drivers that
5    I don't have.  Uber did not produce that
6    data.  It's outside the time frame that
7    Uber produced data.
8        Q.   Okay.  I understand.  But for
9    the -- do you understand that Uber did, in
10   fact, produce Bliss and Jira tickets about
11   these drivers that appear in the safety
12   lens, you understand that that data was
13   produced?
14            MS. WILKINS:  Object to form.
15            THE WITNESS:  I understand that
16        Uber produced pdf copies of those but
17        what I'm saying is in the safety data
18        that's in the secured BDO environment,
19        that's outside of -- because that data
20        ends in 2022, many of the incidents
21        that are discussed in the tickets that
22        are pdf copies are not in that data as
23        well as some of the pre -- the events
24        that happened prior to the incidents
25        affecting the plaintiffs.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 361

1                      KELLER

2    BY MS. LEVY:

3        Q.   The analysis that we've been

4    through with Mr. Turay that we've just

5    talked about, you did the same for the

6    other drivers that are in Appendix B,

7    Edwin Castaneda, Jeffrey Richardson, Felix

8    Perez Rodriguez and Michael Le --

9    apologies, let me ask it in a more simple

10   way.

11            Your analysis with respect to the

12   other drivers in Appendix B follows the

13   same methodology with the same limitations

14   that we just discussed with Mr. Turay;

15   correct?

16       A.   A point of clarification, I think

17   we're talking about Appendix D as in dog.

18   I thought I heard you say B as in boy.

19       Q.   Sorry, I meant to say D.

20       A.   For D as in dog Appendix, I wrote

21   a script that generated the same image for

22   all of the drivers in the exact same way

23   so it ran as a loop and so for each driver

24   it generated the same analyses.  And if

25   there was data available, it was displayed

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 362

1                        KELLER
2       in their section of the report.
3            Q.   We talked about at the beginning
4       of this deposition some of the work you've
5       done in other -- before MK Analytics in
6       other career -- points in your career, and
7       my question is:  In any of the work that
8       you've done in other cases, have you done
9       any of these same analyses that we talked
10      about for Mr. Turay?  Have you ever done
11      these analyses in any other litigation or
12      any other job besides this case?
13               MS. WILKINS:  Object to form.
14               THE WITNESS:  I write profiles
15           all the time.  I think we were talking
16           when I was first at the -- when we
17           were talking about my time at the
18           union, I would write profiles of the
19           companies that were on the other side
20           of the bargaining table analyzing the
21           information that I could find on them.
22           When I was at the Attorney General's
23           office, I would write profiles up on
24           the investigative leads that I had for
25           the office, including recently we've

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 363

```
 1                    KELLER
 2      written -- MK Analytics has written
 3      profiles on potential gun trafficking
 4      leads.
 5           I in the opioids litigation wrote
 6      profiles on the prescribers to show
 7      the richness of the data and exemplify
 8      that to the court.  So writing
 9      profiles is something that I've done a
10      number of times throughout my career.
11 BY MS. LEVY:
12      Q.   And is this the first time that
13 you've analyzed individual drivers and
14 their history with respect to sexual
15 assault and sexual misconduct?
16           MS. WILKINS:  Object to form.
17           THE WITNESS:  So throughout my
18      career, I've worked with various types
19      of data.  The methodology that I use
20      throughout my work remains the same.
21      The tool sets will often be similar
22      but the subject matter will change and
23      so in this case I may be using the
24      same methodology as a data analyst but
25      applying it to that of drivers, to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 364

1              KELLER

2          that of rides, to that of sexual

3          assaults, but the methodology where

4          I've been admitted as an expert a

5          number of times including in federal

6          court remains the same.

7     BY MS. LEVY:

8          Q.   Have you provided your data or

9     your analysis to anybody else other than

10    the attorneys that you are working on in

11    this case?

12         A.   Have I provided the data to

13    anybody else?

14         Q.   Yes.

15         A.   Absolutely not.

16         Q.   And have you had any contact with

17    any press or media about the work that

18    you've done in this case?

19         A.   Absolutely not.

20         Q.   Have you or anybody on your staff

21    had any contact with The New York Times

22    about the work that you have done in this

23    case or the data that you've looked at?

24         A.   Absolutely not.

25              MS. LEVY:  I believe that we're

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 365

1                    KELLER

2         close to time.  I would like to go off

3         the record and check and see if I have

4         any other questions that we're going

5         to do today and I'll ask your

6         indulgence for like 30 seconds to do

7         that but don't go away.

8              THE VIDEOGRAPHER:  Going off the

9         record.  The time is 8:25 p.m. Eastern

10        time.

11             (Discussion off the record.)

12             THE VIDEOGRAPHER:  We're back on

13        the record.  The time is 8:26 p.m.

14             MS. LEVY:  I am going to leave

15        the deposition open for purposes of

16        evaluating whether there are

17        additional questions we need to ask

18        and whether we would like to go to the

19        court and get clearer answers to some

20        of the questions but subject to that,

21        I thank you for your time today,

22        Ms. Keller, and Counsel.  I know it's

23        late wherever you are.  It's even

24        later where we are and we appreciate

25        your time.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1                         KELLER
2              MS. WILKINS:  We are just
3         slightly over time.  If you have
4         additional questions right now that
5         you feel have not been answered, I
6         invite you to ask them now and am
7         willing to indulge you in a bit more
8         time.  Otherwise we will object to any
9         efforts to reopen this.
10             MS. LEVY:  I understand we are
11        going to have to agree to disagree
12        about that.
13             MS. WILKINS:  I have a few
14        additional questions.  I should
15        hopefully be very, very quick.  Do you
16        need a break before that?
17             MS. LEVY:  No.
18   EXAMINATION
19   BY MS. WILKINS:
20        Q.  Ms. Keller, did your political
21   views affect your opinions in this case in
22   any way?
23        A.  Absolutely not.  That is not a
24   factor in any of the cases that I have
25   been a part of, especially not this case.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 367

1                         KELLER
2          Q.   Does your political views affect
3     your judgment in conducting your research
4     to reach your opinions in this case in any
5     way?
6          A.   The same answer that my
7     methodology is that of a data scientist or
8     data analyst.
9          Q.   Earlier today, quite awhile ago,
10    you were asked to look at some documents
11    about allegations that were made against
12    certain individuals who have relationships
13    with The New School, with the Service
14    Employees International Union and with the
15    New York Attorney General's office.  Do
16    you recall that questioning generally?
17         A.   Yes.
18         Q.   Do you recall that you were shown
19    three documents about that topic?
20         A.   I recall being shown some
21    documents.  I don't remember how many.
22         Q.   Do you have any personal
23    knowledge as to whether the allegations
24    against any of the individuals identified
25    in those documents were true or not?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 368

1                    KELLER

2        A.    Many of the -- I think all of the

3    allegations occurred after I had left my

4    position in those organizations, whether I

5    was a student or working at the union or

6    working at the Attorney General's office

7    so the allegations were after my time

8    there, and I also was not aware of any of

9    the allegations personally.

10       Q.    Do you know whether the

11   allegations that were made against those

12   individuals would be defined as sexual

13   misconduct, sexual assault, sexual

14   harassment or anything else?

15       A.    I'm not aware of the specifics of

16   the allegations so I would be theorizing

17   one way or the other.

18       Q.    Earlier today you were asked a

19   series of questions about whether you have

20   authored any publications related to

21   sexual assault or sexual misconduct.  Do

22   you recall those questions?

23       A.    Yes.

24       Q.    Was there something unclear to

25   you about the question that was being

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 369

```
1                          KELLER
2     asked of you?
3         A.   So that was early in our
4     deposition.  I was not sure what Ms. Levy
5     meant by sexual assault and misconduct, if
6     she was using the terms defined by Uber or
7     some other term.  Because I had authored a
8     number of reports specifically about using
9     data in investigations, I wasn't sure what
10    the truthful answer would be.  If asking
11    about have I authored a study specific to
12    sexual assault in the way that or
13    misconduct that Uber defines it, I have
14    not authored publications in that context.
15        Q.   We've talked a lot about S-RAD
16    scores and the data that Uber uses to
17    evaluate S-RAD scores and the data that
18    has been produced in this litigation with
19    respect to S-RAD scores.
20             Has Uber produced in this
21    litigation data that allows you to
22    determine how a particular S-RAD score
23    equates to an estimated increased risk of
24    sexual assault occurring on that ride?
25        A.   So hopefully I understand what
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 370

1              KELLER

2      you're asking.  Uber has not produced data

3      that I need to contextualize that S-RAD

4      score.  Was it -- and that would be in the

5      supply plans and I think I spoke about

6      this earlier.  The supply plans would show

7      the volume of S-RAD -- I'm sorry.  I

8      thought I saw somebody at the door and

9      it's late here.  Let me start over.

10             So Uber had -- has not produced

11     data that would allow me to contextualize

12     a particular S-RAD score and I think I

13     discussed this a little bit earlier is

14     that would be in the supply plan data.  So

15     every trip that was requested, whether it

16     was the plaintiffs' trips or any trip that

17     resulted in a sexual assault or misconduct

18     in the safety data, Uber has not produced

19     the supply plans for those trips, so I am

20     unable to see if that was the highest

21     S-RAD score available or if it was the

22     lowest, I don't have an ability to

23     determine where that S-RAD score fell.

24     Nor has Uber produced the inputs to that

25     score other than what it's produced for

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 371

1                    KELLER

2       the plaintiff trips.  I don't have those

3       inputs for other trips that were scored on

4       the platform.  I don't have those inputs,

5       those scores of those inputs, the values

6       like I have for the plaintiffs for other

7       trips that occurred on the platform.  Uber

8       has not produced that data, just to name a

9       few examples of datasets that I know Uber

10      has in its possession but has not

11      produced.

12          Q.   You mentioned today a few times

13      supply plans or supply plan data.  What

14      does that mean?

15          A.   So when you request or anybody on

16      the platform requests a trip, Uber calls

17      that a supply plan or a driver rider

18      pairing, so that supply plan looks at all

19      trips that are available to service that

20      ride.  And it -- when so far as S-RAD it

21      then scores those supply plans for their

22      risk of assault according to the S-RAD

23      model.

24          Q.   If Uber had produced its supply

25      plan data, is there additional analysis

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 372

```
 1                    KELLER
 2      that you would have done using that data?
 3           A.   So I think I talked about this a
 4      little bit.  I would be able to analyze if
 5      there were trips with lower S-RAD scores
 6      that could have been dispatched or trips
 7      with higher S-RAD scores, that's the type
 8      of analysis I could run for the
 9      plaintiffs' trips.  I could run that same
10      type of analysis if there was a link to
11      the safety data through trip UUID, which
12      is a unique identifier assigned to a trip.
13      If that identifier plus the S-RAD score
14      was produced, I would be able to -- I
15      would want to analyze what the supply
16      plans were for a trip in the safety data.
17      I would want to look at were there trips
18      available with higher scores, with lower
19      scores as compared to the trip in the
20      safety data that was ultimately
21      dispatched.  I could probably name a few
22      other examples but I know it's getting
23      late but there's a number of analyses that
24      I would like to run and I know I had said
25      this in my report, I reserve the right to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 373

1                        KELLER

2        run said analyses if that data had been

3        produced.

4            Q.    Talking about reserving the

5        right, are you reserving the right to

6        supplement your opinion with respect to

7        what metrics Uber could have included or

8        considered in S-RAD model based on the

9        review that you intend to do of the Flack

10       raw data that was just recently produced?

11           A.    Because the Flack data was just

12       produced, I have not had a chance to fully

13       review it for its contents and how it

14       relates to the other datasets that I

15       analyzed in this report.  So yes, I would

16       like to reserve that right and have the

17       time to adequately analyze the dataset

18       that I've been waiting for.

19           Q.    Are you also reserving the right

20       to supplement your opinions with respect

21       to Uber's dispatch of trips above Uber's

22       S-RAD flagging thresholds based on a

23       review of the Flack raw data that was

24       recently produced after you served your

25       current report?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 374

1              KELLER
2     A.   Because the Flack data includes
3  years including years that were not
4  produced in the Bliss and Jira data, I'm
5  interested in reviewing that data for a
6  number of things including how it relates
7  to the plaintiffs' trips, so in short I
8  reserve my right to make additional
9  analyses from that data.
10          MS. WILKINS:  That's all I have,
11     thank you.
12          MS. LEVY:  I just in my bonus 12
13     or 14 minutes that you've given me,
14     just a couple more follow-ups.
15  FURTHER EXAMINATION
16  BY MS. LEVY:
17     Q.   Is a woman more likely to be
18  assaulted in her own home or while taking
19  an Uber ride?
20          MS. WILKINS:  Object to form,
21     object to this being outside the scope
22     of Ms. Keller's opinions as she has
23     talked about many, many times today.
24          THE WITNESS:  So the answer is
25     the same answer to the other questions

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 375

1                     KELLER

2          related to this.  My analysis centers

3          on the data Uber had in its possession

4          and what it did with that data, how it

5          analyzed that data, how it built S-RAD

6          using some of that data versus what it

7          told the public in its safety reports.

8     BY MS. LEVY:

9          Q.   You don't know if a woman is more

10    likely to be assaulted in her own home or

11    while taking an Uber, you don't know the

12    answer to that, do you?

13              MS. WILKINS:  Same objection.

14              THE WITNESS:  That would be a

15          different analysis than what I've

16          done.  That's not necessary for me to

17          do because my analysis centers on the

18          information that Uber has in its

19          possession.

20    BY MS. LEVY:

21         Q.   Is a rider more likely to be

22    sexually assaulted in an Uber or struck by

23    lightning?

24              MS. WILKINS:  Same objections.

25          This is outside the scope of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 376

```
 1                    KELLER
 2      Ms. Keller's opinions and I believe
 3      you asked that identical or a nearly
 4      identical question earlier so it's
 5      been asked and answered.
 6  BY MS. LEVY:
 7      Q.   You don't know the answer to that
 8  question either, do you?
 9           MS. WILKINS:  Same objection.
10           THE WITNESS:  The same answers I
11      gave to the previous question and the
12      number of -- the numerous questions
13      related to this that you've asked me
14      before, it's not necessary for my
15      analysis because what I set forth to
16      do is analyze what Uber had in its
17      possession, the data it had in its
18      possession, how it analyzed that data,
19      how it built a machine algorithm using
20      that data and what it told the public
21      about that data.
22  BY MS. LEVY:
23      Q.   And you've looked at no data and
24  done no comparison of the frequency or
25  rate of sexual assault on Uber compared to
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 377

```
 1                     KELLER
 2      anywhere else; correct?
 3               MS. WILKINS:  I am going to
 4          object to that question as asked and
 5          answered at least probably 20 times in
 6          this deposition.  And I'm going to
 7          instruct the witness not to answer.
 8          Ms. Levy, I'm glad to afford you a few
 9          additional minutes of time here.  Now
10          it will be beyond the seven hours.
11          The questions you're asking are
12          outside the scope of the redirect and
13          they have been asked and answered many
14          times.  If you have new questions or
15          questions that fall within the scope
16          of redirect, I'm happy to allow the
17          witness to answer them, but we're not
18          going to recover testimony we have
19          covered numerous times today.
20               MS. LEVY:  You're instructing the
21          witness not to answer that question?
22               MS. WILKINS:  I am.
23      BY MS. LEVY:
24          Q.   Are you going to follow your
25      counsel's instruction?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 378

1                    KELLER

2        A.   Yes.

3        Q.   With the skills you have and from

4    your education and experience, it would be

5    possible, even though you haven't done it,

6    to study the rate and frequency of sexual

7    assault elsewhere, outside of Uber, that

8    would be something that is doable;

9    correct?

10            MS. WILKINS:  Object to form.

11            THE WITNESS:  I don't know how

12        you're defining rate.  I don't know

13        how you're defining study.  I have my

14        skill set as a data analyst.  If there

15        are datasets that I can analyze, I

16        will take that into consideration.  I

17        don't know what datasets exist

18        nationwide or that would be -- that

19        would allow me to do such an analysis.

20        I haven't considered that so I would

21        be theorizing beyond what I've already

22        included in my report.

23    BY MS. LEVY:

24        Q.   Looking at the prevalence of

25    sexual assault or sexual misconduct

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 379

```
 1              KELLER
 2    incidents anywhere else besides Uber is
 3    outside the scope of what you were asked
 4    to do and what you did in this case?
 5         MS. WILKINS:  Object again, and
 6         I'm again going to again instruct the
 7         witness not to answer.  This is the
 8         same question that's been asked many,
 9         many, many times today, Ms. Levy.  If
10         you have questions about Ms. Keller's
11         opinions that are in her report, I
12         will allow her to answer those
13         questions.  She has told you many,
14         many, many times that she is not
15         comparing Uber's incident rates to
16         anything other than what Uber has told
17         the public.  So if you're asking
18         questions about comparisons to
19         anything other than what Uber has told
20         the public, I'm going to instruct
21         Ms. Keller not to answer those
22         questions and we're going to close the
23         deposition.
24         MS. LEVY:  With Ms. Wilkins'
25         fervent representation on the record
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 380

1                       KELLER

2          that your opinions are contained in

3          the report, I am satisfied that we can

4          conclude for the day.  I am leaving

5          the deposition open, as I mentioned

6          before, reserving rights to petition

7          the court or seek additional time with

8          Ms. Keller.  We can conclude for

9          today.

10             MS. WILKINS:  I'm going to object

11         with the misrepresentation of what I

12         just said, but with that said we can

13         move on and close the deposition.

14             MS. LEVY:  Thank you very much.

15         It's nice to see you again,

16         Ms. Keller.  Have a great rest of your

17         evening.

18             THE VIDEOGRAPHER:  We are off the

19         record at 8:42 p.m. Eastern time and

20         this concludes today's testimony given

21         by Lacey Keller.  The total must be of

22         media used was 6 and will be retained

23         by Veritext.

24             (Time noted:  8:43 p.m.)

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 381

1

2                    C E R T I F I C A T E

3       STATE OF NEW YORK      )

4                             : ss.

5       COUNTY OF NASSAU       )

6

7           I, CATHI IRISH, a Registered

8       Professional Reporter, Certified Realtime

9       Reporter, and Notary Public within and for

10      the State of New York, do hereby certify:

11          That LACEY KELLER, the witness whose

12      deposition is hereinbefore set forth, was

13      duly sworn by me and that such deposition

14      is a true record of the testimony given by

15      the witness.

16          I further certify that I am not

17      related to any of the parties to this

18      action by blood or marriage, and that I am

19      in no way interested in the outcome of

20      this matter.

21          IN WITNESS WHEREOF, I have hereunto

22      set my hand this 27th day of October,

23      2025.

24

25

                    CATHI IRISH, RPR, CRR, CLVS

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 382

1

2        --------------- I N D E X ---------------

3        WITNESS              EXAMINATION BY      PAGE

4        LACEY KELLER         MS. LEVY           6, 374

5                             MS. WILKINS        366

6

7

8        --------------- EXHIBITS ---------------

9        EXHIBIT NUMBER     DESCRIPTION        PAGE

10       Exhibit 1, expert report             9

11       Exhibit 2, Appendix C                14

12       Exhibit 3, article titled SEIU Has   30

13       A Sexual Predator Problem

14       Exhibit 4, article titled Student    34

15       Sues University Over Response to

16       Sexual Misconduct

17       Exhibit 5, article from The          69

18       New Yorker

19       Exhibit 6, statement from Attorney   74

20       General James

21       Exhibit 7, MK Analytics website      86

22       page

23       Exhibit 8, document Bates labeled    134

24       UBER_JCCP_MDL_000356814

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 383

1

2      Exhibit 9, 2017-2018 Safety Report      171

3      Exhibit 10, Appendix A                 276

4      Exhibit 11, Appendix D                 340

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 384

```
 1

 2              *** ERRATA SHEET ***

 3     NAME OF CASE:  In Re:  Uber Technologies,

 4     Inc., Passenger Sexual Assault Litigation

 5     DATE OF DEPOSITION:  October 27, 2025

 6     WITNESS:  Lacey Keller

 7

 8     PAGE LINE        FROM               TO

 9     ____|____|_____|_____

10     ____|____|_____|_____

11     ____|____|_____|_____

12     ____|____|_____|_____

13     ____|____|_____|_____

14     ____|____|_____|_____

15     ____|____|_____|_____

16     ____|____|_____|_____

17     ____|____|_____|_____

18     ____|____|_____|_____

19

20                            _____

                                LACEY KELLER

21

22

       Witness and sworn to before me

23     this ____ day of _____, 2025.

24

       _____  _____

25      (Notary Public)   My Commission Expires:
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 385

```
 1

 2

         10/27/2025 - In Re:  Uber Technologies,

 3      Inc., Passenger Sexual Assault Litigation

 4             ACKNOWLEDGEMENT OF DEPONENT

 5         I, Lacey Keller, do hereby declare

 6      that I have read the foregoing transcript,

 7      I have made any corrections, additions, or

 8      changes I deemed necessary as noted on the

 9      errata to be appended hereto, and that the

10      same is a true, correct and complete

11      transcript of the testimony given by me.

12

13      _____  _____

14         LACEY KELLER                DATE

15

16

17      *IF NOTARY IS REQUIRED

18

19

20      SUBSCRIBED AND SWORN TO BEFORE ME

21      THIS_____ DAY OF_____, 20___.

22

23

24            _____

25             NOTARY PUBLIC
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 386

1    JENNIFER LEVY, ESQ.

2    jlevy@kirkland.com

3                    October 28, 2025

4    RE: In Re: Uber Rideshare Cases v.

5        10/27/2025, Lacey Keller (#7684484)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   (Erratas-CS@veritext.com).

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25