**<u>Exhibit K</u>**

# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

———————————

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

Case No. 3:23-md-03084-CRB

———————————

REPORT OF VERONIQUE VALLIERE

This Report relates to the following Wave 1 Case:
Case No. 24-cv-7940 (B.L.)
Case No. 24-cv-7821 (A.R.2)
Case No. 24-cv-7019 (LCHB128)
Case No. 23-cv-6708 (Dean)
Case No. 24-cv-4900 (WHB 832)

SEPTEMBER 26, 2025

Highly Confidential – Subject to Protective Order

# VERONIQUE N. VALLIERE, PSY.D.
# VALLIERE & COUNSELING ASSOCIATES, Inc.

Forensic Treatment Services                                          P.O. Box 864
drvalliere@vallierecounseling.com                          Fogelsville, PA  18051
                                                        Telephone: (610) 530-8392
                                                               Fax:  (610) 530-8940

## EXPERT REPORT OF VERONIQUE N. VALLIERE, PSY.D.

**DATE:**          September 26, 2025

**SUBJECT**:       Forensic Psychologist Expert Opinion
                   J.D. v. Uber Technologies
                   A.R.2 v. Uber Technologies
                   B.L. v. Uber Technologies
                   LCHB128 v. Uber Technologies
                   WHB 823 v. Uber Technologies

## SUMMARY OF OPINIONS

I have been retained as an expert to provide an expert analysis of Uber ridesharing and the enhanced risk of sexual assault and sexual misconduct of women using Uber.  Lawsuits have been filed on behalf of victims of sexual assault or maltreatment of Uber passengers by Uber drivers.

In my role as an expert on sexual assault, sexual offenders, and victims of sexual assault, I will provide education and my opinion regarding the issues discussed below in this report.  To summarize, some of my main points are:

1. The rideshare environment is ripe for exploitation and utilization by sexual offenders for numerous reasons.  It enables sexual offenders to use the Uber service, gaining access to potential victims by becoming Uber drivers.  Uber has received hundreds of thousands of reports of sexual assault and sexual misconduct occurring on Uber.  Uber has informed the public about only a small fraction of these reports.

2. Because it is widely known (and acknowledged by Uber employees) that sexual maltreatment is underreported, the reports made by victims of sexual maltreatment during Uber services should have been understood by Uber as representative of a greater issue.  And, Uber should have been aware that the Uber rideshare environment is ripe for the occurrence of sexual offenses.

3. In fact, reports reveal that Uber knew that sexual assault was underreported, as well as the clearly documented risk issues associated with a higher rate of sexual assault during Uber rides.  Uber's own documents identify such issues as sex of assailant (male), sex of victim (female), time of day and day of week (night and weekends), intoxication, and proximity to a bar as significant factors raising the risk of sexual assault and incidence of reported sexual assault.  Uber has never informed the public about these high-risk factors.

4. Uber's own studies revealed numerous driver factors that were predictive of a risk for future sexual misconduct, including sexual assault.  Some of these risk factors include a history of prior interpersonal conflict reports, dangerous driving, 1-star ratings, a history of ride

anomalies, and personality features associated with problematic interpersonal conduct, including sexual misconduct.

5.  Given the statistics on the number of reported acts of sexual assault and sexual misconduct occurring on Uber, as well as the factors Uber knew increased the risk of sexual assault and incidence of reported sexual assault, Uber should provide warnings and information directly to passengers about Uber drivers committing sexual violence toward Uber passengers. Passengers would then be made aware of the potential dangers and be able to make informed decisions about when, how, and whether to use Uber's mode of transportation. Instead, as discussed in this report, Uber chose to portray itself as a safe mode of transportation, in particular to women, intoxicated passengers, and passengers traveling on weekends, holidays, and during late night and early morning hours.

6.  Uber's failure to institute adequate training, protections, and responses to reports of sexual assault may serve to embolden sexual offenders in the system. There is evidence that the systems in place that Uber promoted as enhancing safety were not monitored or relied upon by Uber, further telegraphing to offending drivers that consequences to sexual assault and sexual misconduct were not enforced or serious. There is evidence gathered by Uber that, in fact, drivers with incidents of misconduct grow emboldened, engaging in future misconduct more rapidly following each incident.

7.  Uber specifically focused on holding itself out as "safe" and as sensitive to and protective of the vulnerabilities of women drivers and passengers based on its own documents and testimony, as I discuss in my report. Uber publicized its alliance with sexual assault victim advocates and announced strategies for training drivers that were not followed. Uber targeted safety and trust issues to attract more women customers and drivers while failing to address the risks Uber poses to women. Uber's statements in this regard can and did create trust among passengers such as vulnerable women based on safety sentiment that Uber measures. In fact, Uber's marketing materials not only targeted women, but directly portrayed women in the *situations Uber had already identified as higher risk for sexual assault,* like out at night drinking, targeting the specific situations in which women felt least safe.

8.  Uber states its rides are safe and reliable and that Uber thoroughly vets its drivers, although its screening process is limited, Uber promotes safety and endorsed its drivers. Endorsing its drivers and presenting a veneer of safety effectively supported and enabled potential victims to get in a car with a stranger because they called an "Uber."

9.  Because victims' responses to sexual violence are unique to the victims' particular circumstances, each victim will have a distinct and personal reaction to and outcome from a sexual assault or act of sexual misconduct. Victims may have significant practical reasons that drive them to continue to use Uber or may have independently attempted to engage in protective measures while using Uber.

10.  In December 2019, Uber first reported on five of the most "serious" types of sexual assault, including acts of penetration, unwanted indecent touching, and forced oral assault. Uber did not report, and to this day has not reported, the far greater number of sexual assaults and acts of sexual misconduct that have been reported to Uber. Injury and damage from a sexual assault cannot be determined through a formula based on the features of an assault or the abuse. A formula's reliance on stereotypical and misinformed beliefs about what creates trauma or injury during sexual maltreatment is inaccurate and potentially harmful, as is creating an arbitrary cutoff at five types of sexual assault. Factors such as penetration or force during a sexual assault do not consistently predict injury in victims. The reinforcement

of the idea that specific aspects of a sexual assault cause trauma only serves to reinforce myths about sexual assault, sexual abuse, trauma, and victim response. In fact, both sexual assault and sexual misconduct, as Uber defines them, can have life-long consequences.

11. The "taxonomy" Uber utilizes relies on language that mitigates and camouflages the criminal nature of the acts they are measuring. For example, Uber uses the term "non-consensual sexual penetration" instead of rape to describe the sexual assault they are measuring. Additionally, describing acts of sexual assault and sexual misconduct on scales of "seriousness" obfuscate the offender's intentions and the victim's psychological trauma. Offenders may engage in paraphilic behaviors with "less serious" sexual violence or may be practicing for escalation by testing the system or the victims.

12. Misinformation about the methods and motives of sexual offenders, despite Uber's alliance with victim advocates and sexual assault experts, has allowed Uber to promote "safety features" as deterrents to sexual assault. Additionally, Uber has ignored specific knowledge about offenders related to risk of future sexual assault or sexual misconduct by its drivers, namely that prior reports of misconduct and disrespect for passenger safety are a predictor of future abuse of passengers. Uber itself has stated that sexual crimes are often opportunistic and show patterns and predictors. This means that the acts of sexual offenders are often preventable. Tools for deterrence are defined in the literature and by Uber's own research, as factors like supervision and real-time monitoring, education, and clearly defined consequences are proven deterrents to opportunistic assaults. Mandatory dash cams, clearly delineated definitions of unacceptable behavior, and consistent predictable consequences serve and have served as effective mitigators for the opportunity for sexual assault and sexual misconduct, as the offender may perceive the risks of the behavior and of being caught as higher than the benefits.

13. An offender's interactions and method of abusing and exploiting a victim of sexual assault affects the victim's response to the assault and injury. An offender can use threats, camouflage, apology, stalking, or acting like nothing happened to confuse, control, and manipulate the victim. The Uber platform inherently provides offenders means to increase the chance of victim compliance and silence, like potentially the victims' home address or other information about the victims that magnifies the victims' feeling of threat or fear of retaliation. This has been acknowledged by Uber itself.

14. Uber's safety guidelines for sexual assault and misconduct are not clear or adamant. It has not posted a "zero tolerance" policy anywhere for sexual maltreatment, against either the drivers or the passengers. The most adamant statement Uber makes is on its website where it is written that sexual assault or sexual misconduct is "prohibited." Uber has not disclosed to passengers or fully educated them on the hundreds of thousands of reports it has received of sexual assaults and sexual misconduct occurring on Uber. Uber's guidelines for safety refer to "respect" and "consent," and a "no-sex" rule between drivers and passengers. The guidelines refer to prevention of sexual assault as a "shared responsibility" of "all of us," which dilutes the issues of sexual assault and misconduct and spreads the accountability to the victim and bystanders, while directing it away from Uber. Uber's efforts to disavow its responsibility to sexual assault and to cloud its role in sexual assault can be used by offenders and against victims. Clear policies of "no tolerance" eradicates gray areas for offenders and victims. Clear policies also eliminate any need for interpretation that can be manipulated by offenders or confuse victims about sexual misconduct.

15. Proper training and education can reduce the risk of sexual assault and sexual misconduct. Training and education about a zero tolerance policy, consent and intoxication, the consequences of violations, and the impact of sexual misconduct on victims is critical in the

onboarding process and after any violation, if that violation does not rise to a level requiring deactivation.  Uber internally recognized this but was slow to act and did not maintain a zero tolerance policy for sexual assault and sexual misconduct.  Uber's failure to institute adequate training, protections, and responses to reports of sexual assault served to embolden sexual offenders in the system.  There is evidence that the systems in place that Uber stated enhanced safety (such as driver training, investigations of sexual assault and sexual misconduct reports, and driver deactivations) were not monitored or relied upon by Uber, leaving sexual offenders on the platform to continue to drive female riders.  This further telegraphed to offending drivers that consequences of committing sexual assault and sexual misconduct were not enforced or serious.

16. Many measures that Uber promotes as "safety features" do not appreciably reduce the risk of sexual assault and sexual misconduct but they enhance the perception of safety for riders as Uber itself has studied and acknowledged.  Unfortunately, these features while providing sexual assault and sexual misconduct victims with minimal protection, foster a false sense of safety. Yet Uber has developed effective methods to identify and eliminate risky drivers, even those who might be involved in future incidents of interpersonal conflict, including sexual assault and misconduct that it is not effectively deploying.

My opinions are intended to provide education and expertise about sexual maltreatment (what Uber defines as sexual violence which includes sexual assault and sexual misconduct), victim response to sexual maltreatment, and offender behavior to provide important context for understanding and evaluating the risks and responses of Uber.  As discussed below, I have over 30 years of experience in the area of sexual assault and in studying and evaluating thousands of sexual assault victims and offenders.  My opinions are supported further by the information provided in the documents and materials (see Appendices A and B).  I have not interviewed or evaluated any party.  This evaluation is not to determine if the sexual assault or misconduct occurred or to evaluate the individual plaintiff or offender in the case, but rather to identify and describe issues that highlight the risk of Uber for potential victims and to spotlight the problematic issues in Uber's response to this risk.  Additionally, I am not offering opinions about Uber's branding and marketing but giving an opinion on the psychological impact of Uber's statements based on its analysis, research and testimony about its marketing and its impact on consumers.  I reserve the right to supplement my opinions to the extent new information, documents or testimony, including from upcoming depositions, become available.  I provide all of these opinions below with a reasonable degree of professional certainty.

## BACKGROUND AND QUALIFICATIONS

My current C.V. is attached (Appendix C).  I am a licensed clinical psychologist and have worked in the field of interpersonal violence for over 30 years.  I received my doctorate in Clinical Psychology from the Graduate School of Applied and Professional Psychology of Rutgers University in January 1993.  I became licensed as a Psychologist in May 1995.  I have gained my knowledge about sexual offenders and their behaviors through academic study, clinical work treating hundreds of victims of assault, and evaluation, interview, and treatment of thousands of identified sexual offenders.  Through this work, I have learned how victims have responded to assault and sexual harassment.

I am owner/operator of two outpatient treatment centers, one for victims of violence and the other for offenders of violence.  I provide treatment, evaluations, and consultation, as well as supervise the work of numerous other clinicians.  I have served as an expert in courts across the country and internationally with all branches of the military.  I have served as a consultant and expert witness in over 150 courts martials and many other trials as an expert in clinical psychology, forensic psychology, victim dynamics and response to violence/abuse, trauma, and offender risk, dynamics, and rehabilitation potential.  I have also served as an evaluator in civil court in cases involving damages to victims related to abuse or assaults they have experienced at the hands of an individual or involving the neglect or failure to act by

an agency or organization. I have served on the Pennsylvania Sexual Offender Assessment Board since 1997, performing thousands of offender evaluations.

I also act as a consultant and trainer for many agencies and organizations. I have trained nationally and internationally for such agencies as the Federal Bureau of Investigation (FBI), U.S. Department of Defense (DOD), U.S. Department of Justice (DOJ), Bureau of Indian Affairs, all branches of the military, and for other countries. I have testified regarding sexual assault in the military to the U.S. Congress, and to the Pennsylvania Congress regarding several laws and issues involving sexual assault and violence. I have consulted with the DOD and the DOJ in policy creation about the same.

I have served as an expert on sexual assault and domestic violence for the mainstream media and have appeared on television and radio shows. For example, I served as an expert in the sexual assault trial of Bill Cosby.

Finally, I have authored books about victims of sexual violence and sexual offenders: *Understanding Victims of Interpersonal Violence* (2019), *Unmasking the Sexual Offender* (2023), and *Successful Prosecution of Intimate Violence* (2023) by Routledge Press. *Understanding Victims of Interpersonal Violence* reviews and discusses sexual assault and victim responses to such assaults. *Unmasking the Sexual Offender* explores the motivations, techniques, and dynamics of sexual offenders and their behavior.

## COMPENSATION

Valliere & Counseling Associates, Inc. is being compensated for its time at hourly rates and at cost for its out-of-pocket expenses. My hourly rate is $450.00, up to $4500.00 per day. The compensation paid to Valliere & Counseling Associates, Inc. is not contingent upon the nature or substance of my findings or the outcome of this matter.

## MATERIALS CONSIDERED

Please see Appendices A and B.

## METHODOLOGY

To render the opinions offered, I have reviewed documentation, evidence, and depositions from Uber and the investigation related to my opinions. I requested documents related to Uber's policies, deposition testimony and internal documents related to safety, screening, training, deactivation, preventative safety measures, advertising/marketing, cameras and other safety features, and factors that increase the risks of sexual assault and sexual misconduct and reviewed these documents. Additionally, I also asked the attorneys to provide me with any relevant documents which are also included in Appendix A. I have reviewed news articles, Uber's website, and case examples in depositions of Uber drivers committing sexual violence toward Uber riders. I am familiar with and rely upon the research on sexual assault, sexual offender behavior, victim response, risk issues, and deterrence of sexual and criminal behavior through my over 30 years in the field of sexual and interpersonal violence.

For decades, I have been engaged in the evaluation and treatment of sexual offenders and sexual assault victims, as well as training and education of others (including law enforcement) in the prevention, investigation, intervention, and prosecution of sexual assault. I relied on my experience and expertise in these arenas in the review of these documents to arrive at the opinions I have outlined below. Finally, I have reviewed articles and information regarding Uber, as well as reviewed Uber's own assessments, conclusions and deposition testimony from PMKs (Person Most Knowledgeable) or 30b6s about Uber's marketing and branding impact to discuss the psychological perspective.

I requested that the attorneys provide me with updated relevant deposition testimony as it became available. I thoroughly reviewed the relevant documents which were largely Uber internal documents and testimony and considered different perspectives, including Uber's, which is what I typically do in any evaluation I conduct. I was given access to Everlaw, if needed, to conduct any searches of Uber's internal documents. I used the same approach I used in gathering the documents and data and evaluating and analyzing them to arrive at my opinions as I routinely use to conduct a sexual assault investigation and evaluation. I used my 30+ years of expertise supported with my training, a literature review, that included peer-reviewed publications from the European Journal of Psychotraumatology and Harvard Review of Psychology, and review of relevant documents to conduct my analysis and reach my opinions.

## INTRODUCTION

Uber is a multinational rideshare company originally established in the United States in 2009, after "Travis Kalanick and Garrett Camp found themselves stuck in Paris on a snowy evening, unable to find a taxi" (uber.com). It launched in 2011 in San Francisco and has grown tremendously in the last 14 years to include a variety of services in many countries, over 600 worldwide (uber.com). Uber has become synonymous with rideshare. The word Uber has become a noun and a verb, not just an adjective. People order an Uber or "Ubered" to their destination.

Uber currently states it's comprised of "go-getters" who imagine "the way the world moves." "Movement is what we power. It's our lifeblood," Uber's values page states on its website (uber.com). Uber's objectives during Travis Kalanick's tenure as CEO (resigning in June 2017) focused primarily on growth (UBER-MDL3084-000114641, Burke Ex. 1901). Upon taking over as CEO in August 2017, Dara Khosrowshahi updated Uber's values, which currently include ambition, being "trip obsessed," caring "deeply about our impact," embedding "safety into everything we do," and "seeing the big picture and the details." "Do the right thing. Period," is the last listed value.

Yet, over the course of its history, Uber has faced a number of controversies involving sexual harassment, sexual assault, failing to address safety issues, releasing private information of victims of sexual abuse, and using methods to "dig up dirt" on complainants and victims reporting against Uber (EEOC, 2019; Fowler, 2020; Nadolny & Kelly, 2019; UBER000032843, Parker Ex. 601). In 2017, the #DeleteUber campaign became viral, associated with a boycott regarding Uber because of many issues calling into question its values, including its handling of sexual assault and sexual harassment (Isaac, 2017). Uber has been repeatedly sued by female victims of sexual assault and maltreatment, both passengers and drivers (Hoskins, 2022). In 2017, Uber was fined nearly $9 million dollars in Colorado for allowing drivers with improper background checks to drive for Uber (Yurieff, 2017). A survey conducted by Pollfish in 2018 indicated that nearly one in four women had an "uncomfortable" encounter with an Uber driver (Alarms.org, 2020; Dickson, 2018).

Uber has received hundreds of thousands of reports of sexual assault and sexual misconduct in the US alone. For example, in the year 2017, the first year for which Uber tracked reports of sexual violence, Uber received 71,711 reports of "sexual violence." It made none of these reports public. By the end of 2019, in the US alone, Uber had 268,292 *cumulative* reports of sexual violence between 2017 and 2019. Through 2021, the cumulative reports of sexual violence in connection with Uber rides grew to 346,451. By the end of 2024, Uber had received 558,918 reports of sexual violence in connection with Uber rides ("Supplemental Information Provided by Defendants Pursuant to the Parties Agreement Dated April 4, 2025," McDonald Ex. 3117; Gaddis Ex. 4905; Appendix B – News Stories about Uber's Sexual Assaults and Data).

Following criticism in the media of how Uber handled sexual assault, abuse, or misconduct, Uber promised to release a safety report, describing the report as "real-world safety-focused transparency report" about sexual misconduct during Uber rides (Singh, 2019,

https://money.cnn.com/2018/04/30/technology/uber-driver-sexual-assault/index.html).  Uber's first safety report was published in December 2019 (UBER000001302, Boman Ex.3/ UBER_JCCP_MDL_000007083, Chang Ex. 749).

Before its release of the safety report in December 2019, Uber had not publicly disclosed the number of sexual violence reports it had received (McDonald Dep., Apr. 24, 2025, at 260-262; Hasbun Dep., Apr. 10, 2025, at 58-59, Nilles Dep., June 30, 2025 at 223).  In the report Uber released in December 2019, Uber relied on a taxonomy of 21 types of sexual acts, listed from "most severe" to "least severe" (UBER000001302, Boman Ex. 3, UBER_JCCP_MDL_000007083, Chang Ex. 749).

Uber published data on only five (of 21) categories, calling the five categories the "most severe" acts of sexual assault or misconduct.  These five categories included "non-consensual kissing of a non-sexual body part, attempted non-consensual sexual penetration, non-consensual touching of a sexual body part, non-consensual kissing of a sexual body part, and non-consensual sexual penetration." The data did not include other egregious sexually abusive acts, like masturbation, indecent exposure, making threats of sexual assault, solicitation of sex, or others.  By only disclosing five categories, Uber only disclosed 5,981 reports of sexual violence in its first report, a fraction of the reports of sexual violence that Uber was aware of.

Further, Uber failed to disclose, as part of its reports, information that passengers and others could use to stay safe.  For example, Uber considered but chose not to disclose in the reports its internal analysis that showed that sexual assault is more likely to occur on the nights and weekends or involve alcohol (Ross Dep., June 11, 2025, at 194-196, UBER_JCCP_MDL_0019, Ross Ex. 1049; Nilles Dep., August 7, 2025, at 435-448, UBER_JCCP_MDL_003231342, Nilles Ex. 1884; UBER_JCCP_MDL_000031720, Nilles Ex. 1885; UBER_JCCP_MDL_002658347, Wong Ex. 1244; UBER000225, Wong Ex. 1248, UBER_JCCP_MDL_003204225, Ross Ex. 1060, UBER_JCCP_MDL_003902618039, Nilles Ex. 1725).  One of the reasons Uber chose not to do so was because of business implications (UBER_JCCP_MDL_001720345, Ross Ex. 1049).  Disclosing this information would have given passengers needed information that they could have used to stay safer.

As even Uber acknowledges, sexual assaults are underreported (UBER000001302, Boman Ex. 3 UBER_JCCP_MDL_000007083, Chang Ex. 749; McDonald Dep., Apr. 24, 2025, at 230-241; UBER_JCCP_MDL_001101922, McDonald Ex. 3132; UBER_JCCP_MDL_001144266, McDonald Ex. 3133; Nilles Dep., May 5, 2025, at 19, 193, 197; UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809; UBER_JCCP_MDL_001114231, Nilles Ex. 3317; UBER_JCCP_MDL_000960861, Nilles Ex. 3318; UBER_JCCP_MDL_000251111, Breeden Ex. 276; Childs Dep., June 5, 2025, at 36-37; Gaddis Dep., July 11, 2025, at 65-66).  Uber's own first safety report cites the belief that "nearly three out of every four sexual assaults go unreported to police," admitting that Uber has no data to support that underreporting to Uber differs from this, whether it is more or less severe (Gaddis Dep., July 11, 2025, at 65-66).  In a 2017 Sexual Assault / Misconduct Reduction Strategy document, Uber recognized that "we know that there is a high likelihood of underreporting of incidents and behaviors on our platform — due to unintuitive reporting feedback flows, societal influences, and a prevalent belief that we will not act on the information" (Breeden Dep., March 13, 2025, at 248, UBER_JCCP_MDL_000251111, Breeden Ex. 276, Nilles Dep., June 30, 2025, at 95-96).  In fact, Uber acknowledged that at least one condition of the rideshare environment itself could "alone" lead to even more under reporting – the fact that the assailant may have the victim's home address (UBER_JCCP_MDL_000032174, McDonald Ex. 3131; UBER000051856, Kaiser Ex. 417).  Uber is aware that not only is sexual assault underreported generally, it is further underreported to Uber because Uber knows victims do not trust Uber to act on the information (UBER_JCCP_MDL_0000323152, Parker Ex. 649; UBER_JCCP_MDL_000251111, Breeden Ex. 276).  Therefore, it can be assumed that the number of incidents significantly exceeds the number of reports Uber has received.

When passengers complained about sexual assault or maltreatment by Uber drivers, drivers frequently were allowed to remain as Uber drivers or passengers. Until sometime in 2019, Uber had a "three strike" policy for sexual assault and sexual misconduct. Although drivers could be deactivated based on a single, extreme incident, Uber often required multiple reports of sexual assault or sexual misconduct before deactivating a driver (Baker Dep., November 13, 2024, at 152, 195-196; Brown Dep., March 13, 2025, at 82-84, 117, 119-121, 128-131, 172-173). A document outlining IRT Training references a "three strike" rule, indicating that a driver would only be deactivated after three complaints of sexual misconduct (UBER_JCCP_MDL_001504282, Anderson Ex. 3253; Brown Dep., Mar. 13, 2025, at 83, 156-57). Some victims were simply prevented from being paired again with their assailant drivers. Numerous safety concerns were identified by leaders in 2016, which included inconsistent enforcement of deactivation of drivers and failure to comply with the requirements to re-run background checks (UBER_JCCP_MDL_003399309). A year later, in 2017, Uber acknowledged that its "business model provides a unique challenge" to solving its sexual assault problem and that its three-strike system was not backed by research (UBER_JCCP_MDL_0000323152, Parker Ex. 649; UBER_JCCP_MDL_000251111, Breeden Ex. 276). Under the three strikes policy, ███████████████████████████████████ ████████████ (UBER_JCCP_MDL_000257902).

In 2019, Uber finally updated its deactivation policy for sexual assault and sexual misconduct, moving away from the three strikes policy to a "Serious Interpersonal Conflict Standard" (SIPC) that ███████████████████████████████████████ (Brown Dep., June 17, 2025, at 118-120; UBER_JCCP_MDL_000366728; Brown Ex. 1710; Brown Dep., Mar. 13, 2025 at 26, 128-129, 158-159). ████████████████████████████████████ ████████████████████████████████ (Brown Dep., March 14, 2025, at 359; Brown Dep., June 17, 2025, at 320-321, UBER_JCCP_MDL_000366728, Brown Ex. 1710). ██████████████████████████████████████████████ ████████████████████████████████████████████ (Brown Dep., June 17, 2025, at 320-321).

Additionally, ███████████████████████████████████████ ██████ (Brown Dep., June 17, 2025, at 21-23). Notably, only ratings of the driver's last 500 trips are averaged, and trips where the rider gives no rating are not included in the average (Uber.com; UBER_JCCP_MDL_002574011).

As of May 2020, Uber could not quantify the impact of their deactivation strategy as there was no "consistent, categorical understanding" of why someone was deactivated (UBER000184809; Uber's Second Amended Responses to Plaintiffs' Second Set of Interrogatories (Response No. 16)).

When offenders are not held accountable, monitored, and redirected away from problematic behavior, that behavior can escalate. Even as Uber's Sytske Besemer outlines in a 2017 report entitled "Sexual Misconduct Policy Revamp Q2 2017," education of offenders with low level misconduct on appropriate behavior combined with "crystal clear consequences" for persistent or more significant behaviors are the interventions that Uber should impose and do so quickly. (UBER_JCCP_MDL_000252298, Fuldner Ex. 434/Chang Ex. 766, Chang Dep., May 29, 2025, at 277-279). "Drivers should feel like there is a guardian watching over them," Besemer writes, "so if they do engage in inappropriate behaviors the likelihood of a consequence is high" (p. 5). Three notations can convey the alternative message that the likelihood of consequences is mitigated.

Interviewers receiving reports of sexual assault were not required to have expertise in investigation, sexual assault, interviewing victims or offenders, or identifying behaviors of concern

(UBER_JCCP_MDL_00001950471, Joyce Ex. 199).  In fact, Uber readily admitted when discussing deactivation policies: "Our purpose/goal is not to be the police-our bar is much lower and our goal is to protect the company and set the tolerable risk level for our operations" (UBER_JCCP_MDL_000502028, Luu MDL Ex. 238; UBER_JCCP_MDL_001718754, Luu MDL Ex. 237).  Even though Uber instituted victim-centered training, the standards for determining whether a report was to be confirmed or conclusive were not well defined and would be considered "conclusive" only if the driver admitted the offense, there was video proof of it, or law enforcement turned over evidence of it (UBER_JCCP_MDL_000908311, Shuping Ex. 2911; UBER-MDL3084-000253990, Luu Ex. 1400; UBER_JCCP_MDL_003913231, Brown Ex. 1097, Brown Dep., June 17, 2025, at 146-149; UBER_JCCP_MDL_005587254, Brown Ex. 1096, Brown Dep., June 17, 2025, at 134-142; UBER_JCCP_MDL_001754542).  Uber's three-notation policy creates gray areas offenders can exploit and allows those who exhibit behavior known by Uber to be leading indicators of sexual assault to continue driving Uber passengers.

To this day, issues of investigation are confusing.  Uber team members state that it is not the investigators' job to determine the victim's credibility.  (Brown Dep. Dated July 16, 2025, at 342). ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Uber, however, does not share its policies, procedures, or standards regarding sexual assault and misconduct with drivers or riders, including how and under what circumstances a driver will be removed for sexual maltreatment.  Internal documents show that Uber keeps these secret because they will reveal that Uber ████████████████████████████████████████████████████████████████████████████ (Brown Dep., June 17, 2025, at 317-327, UBER_JCCP_MDL_000366728, Brown Ex. 1710; Brown Dep., March 13, 2025, at 126-135).  In short, Uber's deactivation policies (both before and after 2019) create gray areas offenders can exploit and allow drivers who exhibit behavior known by Uber to be leading indicators of sexual assault to continue driving Uber passengers.

Uber has identified that safety and trust are primary factors in a female driver or female passenger deciding to drive for or ride with Uber (UBER_JCCP_MDL_000889155):



Here, Uber admits that "both trust and safety" "have a *direct impact* on rider...behavior."  Women need to trust that they are safe if they are going to let down normal defenses and put themselves in a position of vulnerability, for example, by getting into a vehicle with a stranger. Uber understood this (Ross Dep., June 11, 2025, at 233-235).  Because Uber knew it needed to make women trust that Uber was safe for female riders in order to get women to take Uber rides, Uber put significant effort into creating the

perception of safety for its women passengers so they would trust Uber to be safe (Ross Dep., June 11, 2025, at 107-113, UBER000205949, Ross Ex. 1043). Using marketing that "tap[ped] into the emotions," Uber sought to establish in passengers a feeling of safety (Ross Dep. dated June 11, 2025, at 107-113).

In fact, Uber set goals to increase "perception" or "feeling" of safety rather than better ensuring actual safety. As a result, people, primarily women, continued to be victimized using Uber's rideshare service (Ross Dep., June 11, 2025, at 41-42, 69-70, 111-112, 161-162; UBER_JCCP_MDL_000250691, Ross MDL Ex. 1056; UBER000205949, Ross MDL Ex. 1043; Fuldner Dep., March 27, 2025, at 524-525; UBER_JCCP_MDL_000172793, Fuldner Ex. 414; UBER_JCCP_MDL_002655853, Ross Ex. 1063; Childs Dep., June 5, 2025, at 22-23). In testifying about user surveys, Uber's Head of Safety, Mr. Fuldner testified that "external research" indicated that women passengers change travel patterns "based on perceptions of safety" (Fuldner Dep. March 27, 2025, at 524-525). Obviously, perceptions of safety are different from actual safety; sexual offenders foster and exploit perceptions of safety and trust in order to gain access to victims, like as coaches, priests, and others endorsed by a trusted organization.

## OPINION

*As a practical and representative means of reference, offenders will be referred to as male using masculine pronouns. In contrast, the victims of sexual misconduct will be referred to as female using feminine pronouns. This represents the statistical majority of the gender of offenders versus victims. It is not meant to exclude any gender or identity from identification as a victim or an offender. In Uber's case, in particular, most of the reported victims of sexual misconduct by far are women, and the vast majority of the offenders are men.*

Sexual assault or violation is one of the most profound, destructive, life-altering events that one human can exact on another. Victims of sexual abuse, such as a sexual assault, can experience physiological effects from the stress and trauma, like headaches, fatigue, gastrointestinal disorders, or illness. Psychological effects can include depression, anxiety, nightmares, acute stress, and Posttraumatic Stress Disorder. Victims can develop symptoms of trauma, including Posttraumatic Stress Disorder, anxiety, depression, and somatic symptoms. Victims may experience a disruption of sexual, psychological, and emotional functioning. They may suffer from fear, phobias, flashbacks, and intrusive memories. Many victims undergo an alteration in their lifestyle, like becoming more socially withdrawn, changing their behavior, or foregoing previously pleasurable activities. Hypervigilance and paranoia may develop, especially in light of the fact that Uber drivers – the victims' assailants – may know where the victim lives. Trauma is fluid and can develop and persist over time. Most victims of sexual maltreatment demonstrate some alteration, whether it is developing distrust of certain people or situations or a change in their perception of themselves and the world. If a victim encounters disbelief, blaming, or shaming, the traumatic response can be magnified. Victims who blame themselves can struggle more, particularly if they were intoxicated at the time of the assault.

Although these cases involve assaults by Uber drivers who are mainly strangers to their victims, most sexual assaults are committed by an offender previously known to the victim. The idea that sexual assault produces physical injury lives on, although they may not produce physical injury. Of the thousands of convicted offenders I have interviewed or evaluated, only a small portion used a weapon or were physically violent in their sexual assaults.

Sexual maltreatment, including harassment and assault, is a form of instrumental violence that serves the offender's needs – emotionally, interpersonally, psychologically, and sexually. Harassing, violating, and abusive behaviors are not accidental, especially when they motivate a victim to take action. Offending and offensive behaviors occur in a society or within a company that tolerates and excuses abuse while socializing victims, particularly women, to be placating, non-confrontational, and tolerant of offender mistreatment. Sexual abuse and maltreatment typically lack the "hard evidence" decision-makers seek to "prove" a victim's claims. Despite the pervasive understanding that sexual maltreatment is

underreported, there is a continued reliance on myths, biases, and misinformation in assessing and intervening in sexual misconduct, resulting in a low rate of prosecution of offenders (Cossins, 2020).

In the specific case of Uber, where Uber has received over half a million reports of sexual violence, the offender has violated the norms of the victim and the context so significantly that hundreds of thousands of victims have overcome the barriers to reporting. This is serious and it begs the question of why? Why is Uber so attractive to offenders and so problematic for women?

## Sexual Offenders and the Uber Rideshare Environment

There are unique features to the Uber rideshare environment that allow sexual offenders to sexually assault and maltreat female passengers and drivers. The rideshare environment is so attractive to offenders that some offenders pretend to be Uber drivers! (e.g., O'Brien & Griffin (April 9, 2019), "Uber didn't do enough to warn women about series of rapes by fake Uber drivers in LA, lawsuit alleges," CNN Business, https://www.cnn.com/2019/04/09/tech/uber-fake-driver-scheme-lawsuit; UBER_JCCP_MDL_000258743, Shuping Ex. 2913, Ross Dep., June 12, 2025, at 390; Sheridan Dep., May 15, 2025, at 65). Ms. Ross and Ms. Breeden, in their depositions, agreed that Uber knew an isolated setting with a stranger created a risk of sexual assault (Ross Dep. June 12, 2025, at 390; Breeden Dep, March 13, 2025, at 105-106).

Offenders use behaviors that facilitate their sexual abuse of others as well as exploit environmental and societal conditions to succeed. Some offenders take jobs that offer opportunities to offend. Uber, in particular, affords an offender predetermined conditions that make sexually abusing others easier. These include, but are not limited to: the public's ignorance of sexual offenders; ready victim access and ease of victim selection; offender control of the environment; isolation and other victim vulnerabilities; presumption of relationship, safety, and trust; access to and control of information; endorsement by and protection of the company; and the inherent burden shifting of the response from the offender to the victim (UBER_JCCP_MDL_00516734, Esteves Ex. 1586; Esteves Dep., July 15, 2025, at 91-93).

Becoming an Uber driver is not difficult, which apparently is a feature of Uber's business model (Nilles Dep., May 29, 2025, at 571-573, 582-583; UBER_JCCP_MDL_00323152, Parker Ex. 649). An offender driving an Uber can gain access to rides where he will gain close proximity to women, often alone, and in the confined circumstances of his car, a vehicle he, as the driver, has familiarity with and control over. The passenger is matched by Uber with the driver. Uber sends the driver to the passenger. The passenger will voluntarily get into his car, even alone and/or late at night or when intoxicated, because she called an "Uber." The Uber drivers are not supervised and can choose what times of day and what parts of town they want to work. Once in the car, alone with the victim, the driver has an opportunity to evaluate his potential victim, talk to her, find out personal details, and engage in escalating behavior. As discussed below, particularly in an isolated, confined environment such as a moving car at night, the potential victim often will simply attempt to placate or appease the driver, to avoid confrontation or further escalation. After an assault by an Uber driver, many victims will experience fear of retaliation particularly because they fear the driver has acquired personal information about her (such as her name, where she lives, or where she was dropped off). Uber's own longtime employee even testified that she does not get dropped off at her house (Page Dep., May 21, 2025, at 153)!

Generally, people do not understand people who commit sexual offenses or engage in sexual maltreatment of others. To cope with this lack of understanding, the public relies typically on myths, inaccurate assessments of risk, stereotypes, or ineffective protections to evaluate an offender, level of risk, a claim of assault, or a victim's credibility. This misinformation has been perpetuated by Uber through a lack of intervention regarding sexual offenders and the failure to provide sexual safety (UBER_JCCP_MDL_002655853, Ross Ex. 1063). Even as recently as in October 2024 while discussing users, Uber continues to understand that "in anonymous environments," people may act more aggressively or unethically because they believe the risk of consequences is lower ("Safety Planning

2025" Ross Ex. 1063).  Offenders are more likely to act on opportunity when the chances of success are greatest.  Pairing an offender or potential offender with a woman in a vehicle creates a significant opportunity.

Because the public truly does not understand sexual offenders, Uber can and has exploited this ignorance to provide the illusion of safety on Uber while avoiding the true measures that could mitigate risk (Ross Dep., June 11, 2025 at 161-162, June 12, 2025, at 450-451, 458-472, 474-489, Ross Ex. 1068; Luu Dep., February 27, 2025, at 59-60, UBER_JCCP_MDL_000907562, Luu Ex. 207; Akamine Dep., May 19, 2025, at 189-191, UBER_JCCP_MDL_000551951, Akamine Ex. 874).  As Uber employee Hollis Shoor wrote in an internal email dated December 1, 2018, "As we have been saying in our internal research, riders are taking safety into their own hands" (UBER_JCCP_MDL_000221494; Anderson Ex. 3227; Burke Dep., March 20, 2025, at 345-354; UBER000039105, Burke Ex. 1911).

<u>"Getting into a Stranger's Car" - Branding and Presumption of Relationship, Safety, and Trust</u>

From childhood, people are schooled that sexual offenders are dangerous strangers and that sexual assault can be prevented by making "good choices," like never getting into a car with a stranger.  Uber rides are specifically that – getting into a car with a stranger.  To succeed in light of this early conditioning, Uber must mitigate the deeply rooted fear of getting into a car with a stranger.  To prosper, Uber must convince passengers, particularly women, that they are not getting into a car with a stranger, particularly male.  They are getting into a car with a driver who has been vetted, deemed safe, and endorsed by Uber – a company who takes this responsibility seriously.

Feelings of trust and safety are foundational to the decision to take risks, particularly for allowing vulnerability, whether it is sharing intimate information or, for women, allowing themselves the freedom to date, drink, or rely on someone not to sexually assault them - or get into a car with a stranger (especially after drinking).  When a potential victim feels safe or believes she is mitigating her risk because she trusts her decisions, she will be more likely to allow herself to be vulnerable or in a risk situation.  Offenders know this, putting in significant effort to appear trustworthy, develop strategies to put potential victims at ease, or exploit positions of trust afforded to them by their role or job, lowering the guard of the potential victim.  Uber knew and knows the importance of trust; trust and feelings of safety in an Uber is an imperative to attracting women passengers, particularly at times of risk.  Headlining one slide in a presentation, it stated "Uber Must Be Synonymous With Safety To Win With Female Consumers."  (Ross Dep., June 11, 2025, UBER_JCCP_MDL_002323084, Ross Ex. 1054, at 6), Uber undeniably identified women's concerns about being sexually assaulted.  As women are most frequently victimized in society, Uber acknowledges that "women have a higher sensitivity to safety" (Ross Dep., June 11, 2025, at 248-249).

Uber has marketed itself as safe, especially toward women.  Mr. Elizabeth Ross, Uber's Head of Product Marketing for Safety, testified that part of what Uber tries to achieve with its marketing is to build trust in the brand and make sure that people, particularly women, feel safe when using Uber (Ross Dep., June 11, 2025, at 70, 188). Uber has represented that: "Safety is the biggest drive of trust among Riders..." and that "lack of safety fundamentally changes people's behavior and decision-making" (Nilles Dep., June 30, 2025, at 109-110, UBER_JCCP_MDL_000172793, Fuldner Ex. 414).  Uber and its representatives have targeted women to increase female passengers and drivers.  To target women, Uber has promoted a "perception of safety," because safety is a woman's number one concern in choosing a rideshare service (Ross Dep., June 11, 2025, at 250, 255-256; UBER_JCCP_002323084, Ross. Ex. 1054; UBER-MDL3084-000067465).

Safety is a focus of Uber's marketing, as Ms. Ross testified, and at the forefront of its website, and reiterated in its branding.  (*See, e.g.,* https://www.uber.com/us/en/safety/; Ross. Dep., June 11, 2025, at 107-113, 214, 226-230; UBER_JCCP_MDL_002323084, Ross Ex. 1054; UBER_JCCP_MDL_000180990, Ross Ex. 1053; UBER_JCCP_MDL_000250691, Ross Ex. 1056; Ross. Dep., June 12, 2025, at 430, 591-

596, UBER-MDL3084-000061685, Ross Ex. 1064; UBER_JCCP_MDL_000045534, Ross Ex. 1086; UBER_JCCP_MDL_002410662).

As part of Uber's branding and marketing efforts focused on women's safety, Uber developed relationships with and provided funding to the National Sexual Violence Resource Center (NSVRC), RAINN and Raliance, anti-sexual violence organizations, along with other organizations related to eliminating violence against women (UBER_JCCP_MDL_000020964; UBER_JCCP_MCL_000123100).  Uber announced that it was committing $5,000,000 to the cause of fighting violence against women (https://www.uber.com/newsroom/driving-change-together/) in the Driving Change campaign.  Uber paid NSVRC in connection with the development of the 21-category taxonomy system Uber uses to categorize reports of sexual assault and sexual misconduct on the Uber platform (US Safety Report 2017-2018; UBER_JCCP_MDL_000122430).

Uber's internal documents reveal Uber's interest in exploiting and managing the role of advocacy agencies.  The former Head of Women's Safety in a June 2018 document noted the need to do "External work to help the report land well," in discussing the Transparency Report.  This included for NSVRC to validate the taxonomy and a list of events and publications to schedule to support the Transparency Report, again including NSVRC in publishing and presenting at conferences (UBER_JCCP_MDL_001737430, Chang Ex. 759, Chang Dep., May 9, 2025, at 230-233).  Additionally, the Overview document stated the "The first report may split the sexual assault data from other safety incidents to allow us to release the sexual assault portion ahead of schedule if required or if advantageous for the business" (*Id.*).  Internal Uber documents indicate Uber employees were exerting pressure on the organizations and seeking to "build a story to influence NSVRC on the taxonomy" and to "get NSVRC to change the way Sexual Assault tickets are classified."  One particular document shows Uber employees seeking to "take one of the NSVRC types (Soliciting Sexual Act) out of Serious IPC definition as it was creating a spike in Serious IPC incident rate" (UBER000101624, Chang Ex. 760, Chang Dep., at 233-234; UBER000132483, Chang Ex. 761, Chang Dep., at 235-239).  In other words, Uber was specifically managing how incidents were classified in order to influence the reporting numbers.

In a document titled "T-Report ELT Decision Memo" dated Sept. 9, 2019 (UBER_JCCP_MDL_001687372, Chang Ex. 764) before the first Safety Report was published in December 2019, Uber internally stated, "Advocates will likely expect (and pressure) us to release more than just the five most severe categories, indeed they already expect more categories than we currently are prepared to publish in 2019."  Ultimately, Uber "narrowed down" the numbers to reflect only the "five most serious categories," even though Uber employees understood that advocates gave "strong recommendations" to include "as many categories as possible," pushing the advocate imperatives to:

- Capture the most accurate reality and range of survivor experiences with sexual misconduct and assault
- Decrease the longstanding sexual violence data debt and give an unprecedented perspective on noncriminal categories (something we've already revealed we capture from our taxonomy). (p. 5)

Uber stated that its reason for including only the "five most serious categories" was that only those categories met "rigorous internal data quality standards."  In fact, it appears that Uber's true concern was withholding as many reports as possible in its Safety Report, without losing the backing of sexual assault advocates.  As one Uber document notes, it would be "significantly more difficult to defend reporting" fewer categories and "still retain advocate endorsement" (UBER_JCCP_MDL_001687372, Chang Ex. 764, Chang Dep., May 9, 2025, at 246-249; UBER_JCCP_MDL_000122325, Chang Ex. 762, Chang Dep., at 239-242).

Even with Uber's stated concerns about properly categorizing all types of reports, that does not explain

why Uber chose to withhold the overall number of sexual assault/sexual misconduct reports, or an estimate thereof, along with a list of categories into which those reports may fall. Reporting on all of the categories and disclosing the actual number of sexual violence incidents on the Uber platform would at least let the public know the scope of the sexual assault/sexual misconduct problem and not minimize certain acts of sexual maltreatment and violence as compared to others. By doing this, Uber could have promoted itself as addressing all forms of violence on the platform, and communicated to victims and women that sexual maltreatment and violence in all forms is meaningful, destructive, and deserves to be reported. Finally, it would have allowed Uber to characterize its partnership with advocates as more genuine.

The 21-category Sexual Violence Taxonomy helps create many discrete categories of sexual violence that may allow Uber to allow offenders to remain on the platform without deactivation when driver offenders commit what Uber's taxonomy treats as lower-level sexual misconduct incidents. Sexual violence or maltreatment, because of the reasons I have outlined, is not typically defined on such a granular level. The Department of Justice which regularly prosecutes offenders uses a general definition of sexual assault to include "any nonconsensual sexual act proscribed by federal, tribal, or state law, including when the victim lacks capacity to consent" (https://www.justice.gov/ovw/sexual-assault). Similarly, RAINN broadly defines sexual assault as "any sexual contact or behavior that happens without clear, voluntary, and informed consent" (https://rainn.org/get-the-facts-about-sexual-assault-rape). Reporting on the number of sexual violence incidents does not require alignment with categories; it requires acknowledgement of sexually intrusive, violating, or abusive behavior for a victim. Categorizing sexual violence into more or less serious supports rape myths, myths about trauma, and misunderstanding of offenders' intent. Portraying incidents of sexual violence as more or less serious camouflages the *offenders' seriousness or threat*. As I have repeatedly stated, "less serious" sexual violence is often a precursor to more escalated events.

Training commissioned by Uber from organizations involved in the anti-violence against women movement underscores many of the issues I have highlighted in this report. For example, in October 2016, Uber received training from the Arizona Coalition to End Sexual and Domestic Violence (UBER_JCCP_MDL_000253573). That training highlighted the following points, among others:

- Sexual violence includes sexual harassment and sexual coercion
- Rape is not a miscommunication between offenders and victims
- False allegations of sexual maltreatment are rare
- Sexual assault is underreported
- There are significant barriers to reporting sexual violence
- Victims are targeted through accessibility, vulnerability, and a lack of credibility

Uber received other trainings in sexual assault and sexual misconduct (e.g., UBER_JCCP_MDL_000960861, Nilles Ex. 3318), and even referenced the training given by RAINN in Uber's 2019 Safety Report (US Safety Report 2017-2018). That training underscored these and other points discussed in my report concerning issues with under reporting and the behaviors of sexual offenders, including that most offenders do not have criminal records and will repeatedly offend if not stopped.

Uber's touting of its purported partnerships with sexual assault groups engender a perception that Uber is a true partner in stopping sexual violence against women, thereby advancing Uber's marketing objective of increasing women's feelings of safety. Uber's advertising of these partnerships and the professed endorsement of anti-sexual violence agencies have the psychological impact of promoting trust in Uber. How, one could ask, could RAINN or these other agencies promote a company that did not take violence against women seriously? RAINN endorses Uber as a safe alternative for women, has contributed to Uber's training and work on safety protocols, and shares "Tips for safer ridesharing" on their website

(https://rainn.org/strategies-to-reduce-risk-increase-safety/tips-for-safer-ridesharing/).  Using these partnerships, Uber continues promoting the *perception* that it takes its responsibility for safety for women using Uber seriously.

*Under-reporting of Sexual Violence*

In fact, Uber does not take this responsibility seriously.  Internally, Uber has repeatedly acknowledged that it has a "sexual assault problem" and did not assist women with safety (UBER_JCCP_MDL_ 001283906, Hasbun Ex. 2707). As Mr. Hasbun wrote, "The truth is we aren't helping.  You help yourself with the tools we give you" (*Id.*).  Messages indicate Uber's need to "change the narrative" to regain women's trust – a statement that belies an intention to take action for safety (UBER_JCCP_MDL_ 000434414, Sheridan Ex. 3811).  The notes from a 2015 Safety Advisory Board meeting included, "[D]rivers are not strangers – they're people from trusted organizations" (UBER_JCCP_MDL_001115339, Boman Ex. 1505/Cardenas Ex. 1229).  The promotion of the idea that a driver and passenger have a relationship has a profound impact on perception and the psychology involved with sexual assault and misconduct for victim/offender decision-making.  Uber understood that putting passengers in an isolated setting like a car with a complete stranger can create a risk of sexual assault and that it needed to address that "threat of interpersonal violence" (Ross Dep., June 12, 2025, at 390-393).  Ms. Ross, as a representative, testified that Uber is trying to "build trust" for its users and was "making sure people feel comfortable with the decision they're making to get into a car with someone they don't know." (Id. at 417-418).  Promoting this "relationship" and Uber's endorsements of its safe drivers disables "stranger danger."  Uber's promoted endorsements of drivers through Uber's screening process was identified as the "biggest opportunity to increase safety perceptions," reiterating the importance of Uber's relationships to and endorsement of Uber drivers to Uber passengers (Ross Dep., dated June 11, 2025, at 231-238, UBER_JCCP_000180990, Ross Ex. 1053).

It is not only the perceived relationship between the offender and victim that has a significant impact on the situation; *it is the relationship between Uber and its drivers that does as well.*  Users of Uber assume



that Uber sufficiently vets its drivers and that Uber is aware of the potential problems in safety with its rideshare.  Uber states that with Uber "safety never stops" (https://www.uber.com/en-IN/newsroom/safety-never-stops/).  Given this, users may not be armed with the vigilance and fear that guides instinct or interpretation of behavior.  The same inappropriate or abusive behavior a victim would not tolerate on the subway may be excused, tolerated, or minimized by a victim using Uber because the driver is endorsed by Uber, is friendly, or understood with an assumption of trust and safety.  A stranger in the subway is presumed dangerous; an Uber driver is presumed safe.

And, while trying to engender a perception of safety, trust, and friendly drivers, Uber does not advise passengers of the true number of sexual assaults and acts of sexual misconduct reported to Uber or when sexual assault and sexual misconduct is more likely to occur.  (UBER_JCCP_MDL_ 001283906, Hasbun Ex. 2707; Gaddis Dep., July 11, 2025, at 75; Childs Dep., June 5, 2025, at 36-37; McDonald Dep., October

7, 2024, at 77-78; Fuldner Dep., March 26, 2025, at 56-57; Breeden Dep., March 14, 2025, at 21-22). Uber's publicized numbers only include five of the 21 categories of misconduct, even when "less serious" events can be injurious to women.

Uber admits that it has not disclosed to the public 97% of the sexual assault and sexual misconduct reports that it has received. Failing to disclose 97% of sexual assault and sexual misconduct incident reports misrepresents the true risk of Uber riders being victimized by Uber drivers and gives female riders a false sense of security-- even if those are "less serious incidents, like allegations of staring or asking personal questions."

The actual number of sexual assault and sexual misconduct reports that Uber has hid from the public is significant. The 97% of reports that Uber has never disclosed to the public includes tens of thousands of reports of sexual assault and sexual misconduct every year, and totals more than half a million sexual assault and sexual misconduct incident reports since 2017.

Number of Sexual Assault and Sexual Misconduct Incident Reports That Uber Received Annually Compared to the Number Disclosed in U.S. Safety Reports



Source: Number of Dominant Tickets by Category for 2017-2022 Incidents Included Within Flack "On Trip Incidents" Data Tables (Figure from Keller Report).

*Minimizing Reports of Sexual Violence*

Uber attempts to portray the incidents it chose not to report to the public as "less serious," focusing on the reports that may include "allegations of staring or asking personal questions," characterizing them in a way as to quantify and minimize the impact of these incidents as negligible.  However, the remaining categories of "less serious" acts of sexual assault and misconduct include very serious acts that can have a devasting traumatic impact on the victim, including things like attempted kissing of a sexual body part, attempted touching of a sexual body part, masturbation, indecent exposure, and being photographed or videotaped in a sexual way without consent.

Number of Sexual Assault and Sexual Misconduct Incidents Per Subcategory Per Year



Source: Number of Dominant Tickets by Category for 2017-2024 Incidents Included Within Flack "On Trip Incidents" Data Tables (Table from Keller Report).

This list of "less serious" events could include being grabbed by the neck or wrist, being shown graphic sexual depictions of violence, experiencing a threat of rape, or being glared at during a threat of violence. An offender could describe violating acts he wanted to perform on the victim or had performed on others, talk about a sexual fantasy, or interrogate a woman about her sex life or living situation in a threatening or disturbing way.  A "less serious" event could be the offender's attempted kissing or touching of any sexual body part, but also any intimate body part that would not be considered sexual, like neck, hand, or foot.  What is arousing and sexual to an offender cannot necessarily be traditionally defined.  An offender who is aroused by feet or hair could commit a sexual assault of a victim without touching any categorically defined sexual body part, causing the same amount of trauma and injury to a victim as an

assault that included genital contact. A voyeuristic sexualized leer can be frightening and traumatic as well. Keeping this information from the public, while at the same time telling the public that the sexual assault and misconduct incident reports that Uber does not report are *only* "less serious incidents, like allegations of staring or asking personal questions" gives women a false sense of safety that makes them feel safe getting into a car with a stranger, as well as reiterates myths about sexual assault, sexual harm, and trauma.

Uber consistently attempts to qualify and mitigate some of the acts of sexual violence as unimportant or "less serious," identifying "staring" or "personal questions" as the bulk of the reported sexual violence on the platform (e.g. Uber's August 6, 2025 blog post, http://www.uber.com/newsroom/ubers-safety-record). While indeed the numbers of reports of staring, leering, or personal questions far exceed the reports of rape or sexual assault, there are a number of issues to keep in mind with how Uber is characterizing the reported numbers.

First, acts falling within each of these 21 categories may constitute sexual violence. *Sexual violence* is the umbrella that covers each and every discrete type of event used by Uber to categorize sexual assault or misconduct on the Uber platform. These events are not simple personal questions or looks, as Uber would like to portray. These events are classifiable, by Uber's own system of categorization, as at least sexual misconduct, which Uber defines in its safety report as "non-physical conduct (verbal or staring) of a sexual nature that happens without consent *or has the effect of **threatening or intimidating** a user against whom such conduct is directed* (US Safety Report 2017-2018, at 4). It is disingenuous to portray reported incidents that are threatening or intimidating enough to make someone so uncomfortable that she takes time to file a report against the driver as "only" staring or "just" personal questions. To be classified in this taxonomy, the behavior <u>must</u> fall under the umbrella of sexual violence and meet Uber's own definition of sexual misconduct.

Second, Uber has identified all acts of sexual misconduct, regardless of what category of "seriousness" the act falls under, as precursors to more egregious acts of sexual misconduct (UBER_JCCP_MDL_001729997, Nilles Ex. 1729, Nilles Dep., July 23, 2025, at 324-326, 341-351). Uber's own research has demonstrated that when a driver is reported for "creepy" behavior, a behavior that falls into any of the 21 categories, or behavior that makes a passenger uncomfortable, that driver is more likely to be reported for a sexual assault in the future (UBER_JCCP_MDL_001687315, Wong Ex. 2806; UBER_JCCP_MDL_000031720, Wong Ex. 2804). Sexual misconduct may be an indicator of escalating future behavior, reinforcing my assertion that offenders are emboldened by successful violations of norms and boundaries occurring without meaningful consequences.

Finally, even though Uber knows that sexual violence is vastly underreported and that there are significant barriers to reporting any kind of sexual maltreatment, Uber downplays the reporting of personal questions, staring, or "less serious" incidents of sexual violence, as if these events are somehow overreported by passengers who are simply too sensitive to personal questions or staring. By failing to take these reports as serious and representing reported incidents of sexual violence as inconsequential, Uber is reinforcing myths about women and sexual violence, as well as dismissing their responsibility to address and intervene in these acts of sexual violence. Uber attempts to portray itself as anti-violence against women while dismissing incidents of serious concerns for its women passengers.

*Failure to Educate About Risks*

From the evidence and depositions I have reviewed, Uber is aware that sexual assaults and sexual misconduct happen daily on Uber. Sexual assaults can be deterred when potential targets are educated and made aware of the potential dangers of sexual assault, and yet Uber provides no such awareness to its passengers. To the contrary, it touts safety. Uber misleads in an even greater way by failing to advise women passengers about the highest risk situations in an Uber, namely alone with a male driver, after

drinking, proximity to a bar, time of day and day of week (night and weekends), or other risk factors like the age of the driver and rider, riding in the front seat, the rider is alone, low driver ratings, new drivers/drivers with few trips, a history of prior interpersonal conflict reports, dangerous driving, 1-star ratings, a history of ride anomalies, and personality features associated with problematic interpersonal conduct or even by simply admitting that generally the vast majority of SA are committed in male driver/female rider pairings that Uber itself has identified as increasing the risk of sexual assault (UBER_JCCP_MDL_001755017, Payne Ex. 2527/Wong Ex. 2807; UBER_JCCP_MDL_000964270, Wong Ex. 2803; UBER_JCCP_MDL_000031720, Wong Ex. 2804; UBER_JCCP_MDL_001687315, Wong Ex. 2806; UBER000204698, Wong Ex. 2808/Wong Ex. 1248; UBER_JCCP_MDL_003504225, Ross 1060).

To reiterate, in order to ensure female ridership, Uber has acknowledged it works to build trust with the public in its brand (Ross Dep., June 11, 2025, at 63-67). As Ms. Ross stated, "Generally, we are trying to make sure people trust and feel safe when using an Uber" (Id. at 188). Ms. Ross also agreed that she is confident that customers "knowing that Uber brand and that safety sentiment that is cultivated around that brand, that is one of the things that customers rely on when they decide to get into a car driven by someone they've never met before" (Id. at 236). Uber's documents confirm that Uber's best practice was to repeatedly mention safety to help build trust with users and make them feel safe. (Id. at 111-112, UBER000205949, Ross Ex. 1043). Uber was aware if people did not trust Uber or feel Uber was safe, they would not use Uber or stop using Uber (Id. at 233-234). Uber knew that trust and safety of its platform impacts activation, trial, repeat usage, loyalty, and the likelihood of recommending the product thus making it critical to Uber's business health (UBER000168512; UBER_JCCP_MDL_000898405).

What Uber also knew were the risks of truly educating its women passengers about Uber drivers committing sexual violence toward Uber riders to its efforts to construct an image of safety, for instance not wanting the Safety Report to be a "consumer moment" (Ross Dep., June 11, 2025, at 164-165). While trying to engender a perception of safety, trust, and friendly drivers, Uber does not advise passengers of the true number of sexual assaults and acts of sexual misconduct reported to Uber or when sexual assault is more likely to occur. Nor does Uber disclose to the passenger, that she may be at a higher risk of being sexually assaulted if Uber matched her with a riskier driver or that other passengers may have reported to Uber that the driver Uber paired the passenger with sexually assaulted them. Despite these deficits in providing information to women passengers, Uber insisted that it provided enough information to allow a woman passenger to make an educated decision about choosing Uber, even during higher risk times (Ross Dep., June 11, 2025, at 250-252, UBER_JCCP_MDL_003664785, Ross Ex. 1046; Wong Dep., April 16, 2025, at 112).

Sexual assaults can be deterred when potential targets are educated and made aware of the potential dangers of sexual assault, and yet Uber provides no such awareness to its passengers. If Uber was transparent and warned about these things, women would decide if they want to trust and use Uber. If they decide to do so, and Uber discloses this information, then women will be more vigilant (Ross Dep., June 11, 2025, at 251-252).

Cognitive and social psychology has shown us that when individuals are educated about risks, they develop a more accurate perception of their situation, one that is based on facts, not emotions or biases. Additionally, people engage in more risk preparedness, or readiness and alertness to address an impending unsafe situation. Subsequently, people, in particular women, can make educated choices, be more vigilant, engage in more risk-reducing behavior, and utilize safety measures more readily to protect themselves from sexual assault. Uber acknowledges the value of education regarding sexual assault, forming a partnership with RAINN, to provide education for drivers. However, the education they choose to provide does not include the identified risks of sexual violence by Uber drivers toward Uber passengers.

Uber's efforts to attract women drivers and customers are visible not just to women but also to offenders. Offenders seek environments where victims are accessible. Uber broadcasts to potential offenders that

this is the service that can provide access to more victims, especially when the consequences for violating women are so low.

Uber promotes itself as a "good choice" for riders, including women, who are intoxicated (Esteves Dep., July 15, 2025, at 72; Ross Dep., June 11, 2025, at 301-302; Ross Dep., June 12, 2025, at 489-491, UBER_JCCP_MDL_002743399, Ross. Ex. 1070), highlighting their partnership with Mothers Against Drunk Driving (UBER-MDL3084-000002859, Fuldner Ex. 397), even though intoxication is an identified risk factor for riders, particularly women, in Uber's own research to increase the risk of sexual assault while using an Uber (UBER_JCCP_MDL_003039568, Esteves Ex. 1583; UBER_JCCP_MDL_003504225, Ross Ex. 1060). The refrains that "sexual assault happens everywhere" or that "sexual assault or misconduct is rare" on the Uber platform given their statistics are problematic messages by Uber. Their statistics are misleading, based on all rides given. It is obvious that the risks associated with a ride with multiple male passengers during the day has no comparison to the risks associated with a ride taken by a lone intoxicated woman with a male driver after midnight. To blame the woman Uber rider for getting into a car with a stranger when she is raped is simply disingenuous. The woman rider has made an educated choice not to get into a stranger's car, but to get in the car of an Uber driver, a choice that Uber itself has marketed as a good choice. She has chosen to lower her risk and choose what is supposed to be the safest option, one promoted by Uber (Ross Dep., June 11, 2025, at 305-306, Ross Ex. 1057).

Not only are the drivers endorsed by Uber, which purports to screen, supervise, and consequent them, Uber protects its drivers at the expense of victims. Offenders with multiple reports of interpersonal conflict were not necessarily deactivated; there are examples of repeated complaints against drivers who learn that there are no consequences for offending or offensive behavior (Graves Dep, May 13, 2025, at 221-222; UBER_JCCP_MDL_003340515, Page Ex. 4103; UBER_JCCP_MDL_00230090, Freivogel Ex. 55; UBER_JCCP_MDL_001523846, Whaling Ex. 3008). Uber had a three-strike policy for a number of years, and today it has a three-notations policy. It has never had a zero tolerance policy. Investigators of reports of misconduct were previously to evaluate the reliability and conclusiveness before enacting a consequence on a driver, ultimately determining if the victim is "sufficiently believable," in other words, if the event even happened (UBER_JCCP_MDL_003913231, Brown MDL Ex. 1097; UBER_JCCP_MDL_000032174, McDonald Ex. 3131). Offenders become aware when the protection of the company exceeds the protection of victims. Offenders with multiple reports of interpersonal conflict were not necessarily deactivated. All of these actions or inactions may serve to embolden an offender.

<u>Safety and Sexual Offenders: Identifiable Risk Factors and Effectiveness of Safety Features</u>

Over the years, Uber has progressively instituted features that it has promoted as associated with increased safety for its riders and drivers (Esteves Ex. 1991, Safety Features M. Esteves Deposition Aid August 28, 2025; Aug. 6, 2025 Uber Newsroom; www.uber.com/newsroom/ubers-safety-record/). In 2015, Uber launched Phone Anonymization which protected rider and driver phone numbers. In 2016, Uber required "real-time ID Check" (Aug. 6, 2025 Uber Newsroom (*Id.*). In 2018, Uber instituted an in-app 911 Button (piloted Rapid SOS) and also Trusted Contacts that allows riders to share trip status with one or more contacts and also set an emergency contact. In 2019, Uber introduced RideCheck, an in-app program that monitors the driver's location and driving behavior for anomalies (*Id.*) In 2020, Pin Verification was launched for riders to ensure the right Uber driver was connected with the right matched passenger. In 2021, Uber implemented optional audio recording and activated the feature in 2022 as Record My Ride which gives riders the ability to audio record the trip (*Id.*) Record My Ride was piloted in 2022-2023 and rolled out in the US in 2024. It gives drivers the option of choosing to turn on Record My Ride within the app; the driver's app will use the driver's phone's camera and microphone to record trips (Esteves Ex. 1991, Safety Features M. Esteves Deposition Aid, August 28, 2025; Record My Ride - Frequently Asked Questions | Driving & Delivering | Uber Help, https://help.uber.com/en/driving-and-delivering/article/record-my-ride---frequently-asked-questions?nodeId=7f86cc51-2c3e-4888-8dc1-0ac2b6337b92). In 2022, the Safety Live Agent was launched. The same year, Uber launched the Industry Sharing Program where Uber shares driver deactivation information with its competitors to

ensure they are deactivated from their platforms (Payne Dep., April 2, 2025, at 85). Uber launched Safety Risk Assessed Dispatch (S-RAD) in 2022 in the United States and S-RAD 2.0 in 2024. Uber disclosed S-RAD to the public for the first time in August 2025 in response to the New York Times article titled "Uber's Festering Sexual Assault Problem" which raised a July 2018 report that provided Uber could use SRAD scores to select optimal pairings of drivers and riders to prevent sexual assaults (Aug. 6, 2025 Uber Newsroom; www.uber.com/newsroom/ubers-safety-record/; https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html). Finally, most recently, Uber rolled out women preferences in 2025 in San Francisco, Los Angeles and Detroit, a feature that allows women riders and drivers to choose each other (https://www.uber.com/newsroom/women-preferences/). Uber's internal data shows that in other countries where this type of matching is available, the rate of sexual assault is reduced. The women-women pairing was recently implemented and is not available throughout the United States yet.

While giving the impression of increased safety against sexual assault, most of the instituted features have significant deficits or little to no evidence that they contribute to preventing Uber drivers from committing sexual violence towards Uber riders. From a psychological perspective, these features, particularly for experienced sexual offenders, offer the victims little protection while creating a false sense of security for these same women as confirmed by Uber's documents and testimony. The former CEO, Travis Kalanick, recognized early on that features like adding a button to call for help do little for safety and are about perception of safety acknowledging that "once you get in the actual incident prevention game, safety is not about rider-side or driver-side features. It's about what the root causes of certain accidents or incidents and creating a system that incentivizes safe behavior and outcomes" (UBER-MDL3084-000045388, Kalanick Ex. 1351). Mr. Kalanick stated "Safety should be first focused on preventing incidences versus responding to them. And responding to incidents is typically not about safety. It's about service." He goes on to state:

> For example, the feature request mentioned in this question doesn't really improve safety. Responding to an accident doesn't make the ride safer but does make the rider feel more comfortable once an accident has happened. And if someone really needed help immediately following an accident, wouldn't they be better off calling 911. (UBER-MDL3084-000045388, Kalanick Ex. 1351, *Kalanick Dep., July 3, 2025, at 213-214*).

The Head of Safety, Gus Fuldner, has testified that Uber wants to implement solutions that are effective where you can track the effectiveness of those solutions (Fuldner Dep., March 27, 2025, at 76). It seems though that a number of the safety features that Uber has implemented are not effective at reducing sexual assault and misconduct and/or not measured to track the effectiveness including Ridecheck, Share My Ride or the Emergency Button (Nilles Dep., July 23, 2025, at 337, 374-375; Luu Dep., February 27, 2025, at 59-60, UBER_JCCP_MDL_000907562, Luu Ex. 207; Ross, June 12, 2025, at 106-107, 114-128, 130-145, Ross Ex. 1068; Fuldner Dep., March 27, 2025, at 301-302; MDL_JCCP_MDL_000251968, Fuldner Ex. 454).

Offenders quickly become aware of the limitations or deficits of safety features. And, as Uber acknowledges, offenders "may not take the consequences of their actions seriously if they feel they won't be caught" (UBER000146708). Uber was advised of this as early as 2017 by their Criminal Justice Researcher Sytske Besemer, who advised Uber repeatedly throughout the document "Sexual Misconduct Policy Revamp Q2 2017" that: "The severity of a crime doesn't matter, the certainty of punishment is much more important" and "crystal clear consequences" critical for deterrence of sexual misconduct. (UBER_JCCP_MDL_000252298, Fuldner Ex. 434/Chang Ex. 766, Fuldner Dep. March 27, 2025, at 481 486). Finally, despite the new safety features, the rate of sexual assault and sexual misconduct (total incidents of all 21 categories) has gone up from an average of one reported incident of sexual assault and sexual misconduct every 10 minutes in 2022 to one every seven minutes in 2023 to one every six minutes in 2024 (Gaddis Dep., July 8, 2025, at 46-51). Based on the de-duplicated Flack data, it shows

that there is an average of one reported incident of sexual assault and sexual misconduct every 10 minutes in 2022 to one every seven and a half minutes in 2023 to one every 6.4 minutes in 2024.

Average Frequency of Sexual Assault and Sexual Misconduct Incidents Per Year in Minutes



Source: Number of Dominant Tickets by Category for 2017-2024 Incidents Included Within Flack "On Trip Incidents" Data Tables (Figure from Keller Report).

*Background Checks*

To become an Uber driver, a background check is required and Motor Vehicle Review (US Safety Report 2017-2018 at 21; UBER_JCCP_MDL_000868150, Luu Ex. 225).

There is no additional screening like an interview or in person meeting that I discuss below. There is no supervisor assigned. There is no fingerprinting. All these decisions hope to make the onboarding process easy for new drivers but the result is that the Uber knows very little about its drivers that its matching with its passengers to provide a "safe ride." These additional efforts to screen or assess drivers bring a higher level of investment, accountability, and thoroughness to the process. Offenders may avoid a higher level of scrutiny and accountability.

For Uber, there is a reliance on the idea that an offender is identifiable through a background check. In fact, a background check is the barest minimum that would protect the public, only identifying *convicted* sexual offenders whose criminal history has not been expunged, who have committed a sexual crime that rose to the level of assault or requiring registration on a sexual offender registry, or who otherwise have been convicted of certain crimes that were within the geographical and time scope of the particular background check at the particular time. (Nilles Dep., June 30, 2025, at 154-156). It is widely known that sexual assault is significantly underreported, and a very small fraction of reported sexual assaults ever result in a conviction (Brown Dep., June 17, 2025, at 170-171, UBER000182899, Brown Ex. 1100). Therefore, as evidenced further by the numerous reports of sexual assault and misconduct Uber has received, many sexual offenders will not be screened out by a background check.

Additionally, background checks are only as good as they are conducted, followed by enforced. Uber has a documented history of failing to conduct proper background checks, failing to re-run background

checks, and failing to bar drivers based on issues revealed in these checks.  Uber was contacted by a parole officer regarding "a lot of drivers with felonies" on parole driving for Uber (UBER_JCCP_MDL_000440631, Nilles Ex. 3301).  It has been investigated and fined for failing to perform proper background checks (Kelly, 2017; Yurieff, 2017).  In a 2016 internal e-mail Uber acknowledged that it had failed in its promise to re-run background checks in numerous markets. (UBER_JCCP_MDL_003399309).  Uber's background checks only went back seven years at that time (Hasbun Dep., Apr. 10, 2025, at 159-161).  Theoretically, someone who served more than seven years in prison could pass a background check on their release!

Uber has documented failures at even the most basic type of protection it could provide its passengers (UBER_JCCP_MDL_001563463, Payne Ex. 3401; UBER_JCCP_MDL_001055985, Whaling Ex. 3006; UBER_JCCP_MDL_000026890, Whaling Ex. 3007; Nilles Dep., May 5, 2025, at 19-24, 27-28; UBER_JCCP_MDL_000197554, Nilles Ex. 3302; Nilles Dep., June 30, 2025, at 200-204, UBER_JCCP_MDL_000447888, Nilles Ex. 1313).  Yet, the public and passengers rely on Uber's statements that it vets drivers, conducts rigorous screening, and problematic drivers can be selected out through background checks; they are not strangers unknown to Uber and, therefore, to the passenger.  Worse, Uber knows the public and passengers look to its background check system as a safety feature and rely on it.  This is not an accident, but core to Uber building trust knowing that "riders rely on driver quality to feel safe" (Brown Dep., June 17, 2025, at 277, UBER_JCCP_MDL_000118663, Brown Ex. 1112).  The "We Hear You" campaign was launched in direct response "in the wake of the Safety Report" to "reassure primarily female riders that Uber is committed to their safety" (UBER_JCCP_MCL_000095992, Fuldner Ex. 452, Fuldner Dep., March 27, 2025, at 568-569; Nilles Dep., July 10, 2025, at 87-89; UBER_JCCP_MDL_000548326, Luu Ex. 236, Luu Dep., Feb. 27, 2025, at 292-294).

Uber itself has recognized the that the "credibility of background check results is highly questionable" (UBER_JCCP_MDL_000562617, Fuldner Ex. 429).  They additionally know that "background checks and fingerprints are not correlated with incident likelihood (UBER_JCCP_MDL_000031164; UBER_JCCP_MDL_002473691).  Yet, background checks are one of the safety features relied upon by the public to assure and confirm the perception of safety on the Uber platform.  It does not institute fingerprinting, even resisting implementation with Uber Teen, as fingerprinting, though it provides a more thorough screening, is more costly and creates more "driver friction" than simple name-based background checks (UBER_JCCP_MDL_005439619).  According to Uber in an internal document, the biggest threat to growth is forcing submission of fingerprints (UBER000146708).

Beyond criminal background checks using an AI name-based search by Checkr that takes just minutes and less than $30, Uber does no other screening to identify potential sexual offenders (Nilles Dep., May 29, 2025, at 560-561, 585, UBER_JCCP_MDL_002125316).  It does not generally ask for employment history, where it could determine whether someone was terminated previously for sexual misconduct (Nilles Dep,, June 30, 2025, at 117).  It does not look into military or education records or professional license disciplinary proceedings, where there could be evidence of sexual offenses (Nilles Dep., June 30, 2025, at 115, 117-118).  Uber does not ask or look into any civil proceedings, such as lawsuits for assault or battery (Nilles Dep., May 29, 2025, at 118, Nilles Dep., June 30, 2025, at 118).  Uber doesn't ask for references, or conduct interviews, or even perform a basic internet or social media search (Nilles Dep., May 29, 2025, at 124-127).  And, Uber knows nothing about a driver's history before arriving in this country.  Uber requires only one year driving history in the United States (Nilles Dep., May 29, 2025, at 12-13, 130-133).

Again, Uber's assertion that it conducts a robust background check fosters a false sense of security and safety for passengers (Nilles Dep., June 30, 2025, at 106-108, 109-112, UBER_JCCP_MDL_000172793, Fuldner Ex. 414).  It also contributes to the boldness of offenders, who, as noted, become drivers with problematic histories, who use false identification, or who use fake licenses.

*Identifiable Risk Factors, Deactivation, and Sexual Offenders: Cerebro/uSights*

Ironically, Uber itself has researched and developed an effective means to eliminate some risky drivers and identify drivers who demonstrate significant risk to engage in future incidents of interpersonal conflict, including sexual assault. Despite repeated protests that sexual assault cannot be absolutely predicted or eliminated, Uber has identified ways to decrease risk by screening drivers and making safer driver/rider dispatches.

Finding that women's safety entailed additional risks, Uber identified predictors for sexual assault against women. Through the research, Uber found that 50% of drivers deactivated for sexual assault had an incident of interpersonal conflict prior to the reported sexual assault (UBER_JCCP_MDL_001729997, Nilles Ex. 1729, Nilles Dep., July 23, 2025, at 324-326, 341-351). The strongest predictors were verbal disputes, comments or gestures, personal questions, flirting, or discriminatory remarks, characterized by Uber's taxonomy of sexual misconduct as low severity acts. As I have previously explained, sexual offenders test the victim and the environment with progressively bold and violating behaviors. In fact, through Uber's own findings, they have proven that there is a decreasing average time period between reported incidents in offending drivers (UBER_JCCP_MDL_001144266 at 001144274, McDonald Ex 3133). Sexual offenses are typically preceded by other exploitive or antisocial behaviors. When these behaviors happen with the same victim, it is referred to as grooming. However, in the same methods sexual offenders use to learn about and test a selected victim, they learn about and test an environment for its tolerance of misconduct. Because these behaviors can be identified and consequented or addressed, the offender can quickly learn that the Uber platform is intolerant of these violating behaviors.

*Cerebro/uSights*

As early as 2015, Uber recognized the need to identify drivers who would be predisposed to dangerous driving or interpersonal conflict. In a document entitled "Cerebro: Validation Analysis Strategy", Uber acknowledges that ███████████████████████████████████████████████████████ (UBER_JCCP_MDL_000572555). In 2016, Uber developed Cerebro, an in-house psychometric assessment, that could serve as a screening tool for drivers (Fuldner Dep., March 27, 2025, at 447-451 UBER_JCCP_MDL_000476020, Fuldner Ex. 427, UBER_JCCP_MDL_000553924, Fuldner Ex. 428). Uber ███████████████████████████

(UBER_JCCP_MDL_001115040).

Through its evolution, Uber provided specific examples of its use to prevent or deter sexual assault and misconduct. For example in Uber's Global Results outside the U.S., it was noted that ██████████ ██████████ (UBER_JCCP_MDL_000562617, Fuldner Ex. 429).

██████████ (UBER_JCCP_MDL_002253930). A finding in the same report revealed that lower-██████████ (UBER_JCCP_MDL_000562617, Fuldner Ex. 429).

Cerebro, over the years, evolved, with a changing name from Cerebral to uSights in 2020, the current iteration of the tool. USights is described as a pre-first trip screening method and risk assessment tool (UBER_JCCP_MDL_000413295). It was designed to "improve safety outcomes by preventing risky drivers from onboarding," touted by Uber as the "most effective predictive tool of its kind" (UBER_JCCP_MDL_002003018). In a document entitled "uSights Comms and Marketing Playbook," Uber

asserted that the instrument could ████████████████████ (That same report references how to ████████████████ ████████ (UBER_JCCP_MDL_002002847).

████████████ (Id. at 10).  A commenter to the statement added, █████

Yet, Uber acknowledged fully that ████████ (Id. at 11).  Again, uSights data found that ████████████ In fact, a report from November 2020 revealed that drivers who failed the test had a ████ (UBER_JCCP_MDL_002002958).  The use of this instrument, ████████████ On page 1 of the report, it stated, ███ While the instrument was not available for examination, a summary of the tested character traits included traits known in the psychological literate as related to ████ As in Mr. Wong's deposition, it is correctly asserted that ████████████ (Wong Dep., April 16, 2025, at 251, UBER_JCCP_MDL_001115040, Wong Ex. 2814).

Despite knowing that "background checks and fingerprints are not correlated with incident likelihood, Uber is no longer active with uSights (UBER_JCCP_MDL_000031164).  Uber has asserted that while it ████████████ (Nilles Dep., June 30, 2025, at 137:3-18).  Mr. Fuldner also testified that ████████ He further testified that ████ (Fuldner Dep., March 27, 2025, at 458-467, UBER_JCCP_MDL_000487379, Fuldner Ex. 430).

While Uber intended to use Cerebro/uSights as an alternative to background checks, nothing limits Uber from potentially using these tools in addition to background checks.  Risk assessments tools are constantly utilized in the evaluation, treatment, and management of sexual offenders.  As an expert in sexual offenders, I am aware of a constant search for ways to prevent and decrease the incidents of sexual offense behavior.  Uber's research of these risk factors and personality traits is a direct acknowledgement again that something can be done to decrease sexual assault in the high-risk environment.  Yet it is not.

*RideCheck, Share Your Ride, GPS, 911 Button, and Optional Audio Recording.*

RideCheck is an in-app safety feature that is designed to identify certain ride anomalies, specifically long stops, midway/early drop-offs, and route deviations. (Esteves Dep., August 28, 2025, at 173-175).  When a ride meets certain characteristics (an anomaly is identified), RideCheck will send a push notification with a menu of safety options that can be clicked to respond (Id. at 19-20).  The person who responds (if they are able), whether the driver or rider, can select whether there is no issue, identify the issue, or request help if necessary.  If there is no response to the push notification for three minutes, it will be followed by a robocall to the rider (Id. at 20-21, 184).  If there is no response to the robocall, there is no further follow-up by Uber (Id. at 21).  There are no circumstances under which Uber proactively investigates or contacts law enforcement based on anomalies detected related to Ridecheck alone

(Esteves Dep., July 15, 2025, at 21-22). It is up to the rider to respond to the push notification and contact law enforcement in the case of an emergency and Uber does not intervene (Esteves Dep., July 15, 2025, at 19-20).

RideCheck was deemed a "Hero feature" for safety by Uber, a top feature to be marketed to promote the perception of safety for women in their campaign "Stand for Women's Safety" (UBER_JCCP_MDL_000254469).  Superficially, RideCheck appears to provide some added safety to a driver/rider experience (UBER_JCCP_MDL_003019132,Esteves Ex. 2018, Tab No. 9).  However, even by Uber's own admission, Uber "can't really say if it does or does not make people safer" as they "don't have the data" (Esteves Dep., July 15, 2025, at 15; UBER_JCCP_MDL_003019132, Esteves Ex. 2018 Tab No. 9; Esteves Dep., August 28, 2025, at 185-187, UBER_JCCP_MDL_003603034, Esteves Ex. 2019).

In fact, Uber has admitted that there is no evidence its RideCheck feature has any impact on reducing sexual assault incidents on Uber (UBER_JCCP_MDL_003019132, Esteves Ex. 2018 Tab No. 9; Ross Dep., June 12, 2025, at 450-451, 474-483, 495-501; Ross Ex. 1068; Nilles Dep., July 23, 2025 at 374-375; Childs Dep., June 5, 2025, at 332-333; Esteves Dep., July 17, 2025 at 86).  Uber has admitted that RideCheck was intended to make women "feel" safer, as opposed to actually reducing the risk or incidence of sexual assault or sexual misconduct (Esteves Dep., July 15, 2025, at 15-16).

There are numerous issues that limit RideCheck's effectiveness and deterrence of sexual assault, despite the fact that specific trip anomalies are associated with sexual assault (UBER_JCCP_MDL_000188659; UBER000226515; Brown Dep., July 15, 2025, at 126-127).

Uber's corporate witness on RideCheck testified that Uber cannot show that RideCheck is effective in reducing safety incidents (Esteves Dep., July 15, 2025, at 15; Esteves Dep., August 28, 2025, at 197-205, 282-283, UBER_JCCP_MDL_003017771 at 993, Esteves Ex. 2020).  And, if the victim is incapacitated, cannot access or does not have control of her phone, has a dead battery, or is not aware of the anomaly, the notifications or alerts are meaningless.  (UBER_JCCP_MDL_003211390, Esteves Ex. 1580; Esteves Dep., July 15, 2025, at 70-71, UBER_JCCP_MDL_000516734, Esteves Ex. 1586).

Alerts are triggered within parameters defined by Uber (UBER_JCCP_MDL_000516734, Esteves Ex. 1586). For instance, a long stop is defined as 5-8 minutes long, depending on the city.  However, if traffic is detected, the long-stop will not trigger (UBER_JCCP_MDL_003211390, Esteves Ex. 1580).  The robocall comes three minutes after the long stop, if the passenger has not interacted with the alert and the vehicle still has not moved.  Midway drop offs require a drop off with varying distance requirements based on trip length and time of day (Esteves Dep., July 15, 2025 at 25-26, 30-31, 104).

Although a driver may be deterred from sexually assaulting his rider if he believes Uber is actively watching the ride in real time, will intervene, and there will be consequences of his actions, I have not seen evidence of this (Esteves Dep., August 28, 2025, at 183-185, UBER_JCCP_MDL_003603034, Esteves Ex. 2019).  These limitations mean Ridecheck does little to nothing to halt a rape that is in progress, nor does Ridecheck preclude an offender from leaving a victim on the side of the road after a rape.  Sexual assault does not take long.  Even consensual sexual intercourse lasts an average of 3 – 7 minutes (Waldinger et al, 2005).  An offender who is in a rush or extremely aroused can quickly complete a rape or assault in just a couple minutes.

The limitations of Ridecheck are even more salient for a guest passenger.  If a victim has been placed in an Uber by someone else, or using someone else's app, she is considered a guest rider.  A guest rider will not receive any notifications or help options, as these will go to the account holder's app.  There are no protections through RideCheck for a guest.  Guest riders are frequently intoxicated individuals who need to get home with someone else's help (UBER_JCCP_MDL_002024004; Esteves Dep., July 15, 2025, at 63-65, 70-71).

RideCheck does not integrate other Uber features and risk assessment tools. For example, Uber did not integrate S-RAD into RideCheck and has no plans to do so. (Esteves Dep., July 15, 2025, 103). It does not maintain cumulative information like a driver history of trip anomalies for consideration for the next trip where RideCheck is triggered (Esteves Dep. July 15, 2025, at 107). Finally, RideCheck does not address a driver "lingering" at a drop-off site (Esteves Dep. July 15, 2025, at 38, 96-98, 100-101, 108). Driver lingering is, according to Uber, "a very common pattern of sexual assault with drunk riders" (UBER_JCCP_MDL_003039568). However, Uber is aware that a history of RideCheck triggers, or deviations from routes (long stops, midway endpoints, and destination lingering) are all signs of potential sexual assault (Brown Dep., July 15, 2025, at 126-128). But Uber does not look for patterns in its own data or use the data it has on these deviations to protect passengers (Esteves Dep. August 28, 2025, at 190-193, 207-208; Esteves Dep., July 15, 2025, at 215, 217).

Despite the fact that Uber has identified certain indicators on which rides pose a greater risk for sexual assault, Uber has not made any adjustments to make RideCheck more responsive in those circumstances (e.g., particularly for a risky ride based on a SRAD score, drivers with a history of 1-star reviews, drivers nearing their DACT threshold, drivers with histories of long stops, drivers with histories of midway drop-offs, drivers with histories of lingering, drivers with histories of route deviations, pickups within 15 meters of a bar, opposite gender pairings or nighttime rides) (Esteves Dep., July 15, 2025, at 105-111). Instead, Uber uses the information only in a backward-looking manner once a sexual assault has been reported, and Uber is conducting an investigation to decide whether to remove the driver after the fact (Esteves Dep., July 15, 2025, at 213-219).

It is unlikely that a sexual offending driver will not test and quickly learn the limitations of RideCheck. It will be clear how the system works quickly to the driver who stops, ends a trip early, or even experiences the tool in the normal course of driving. Speeding, which can be monitored by RideCheck, appears to go unmonitored. Anomalies do not impact the "S-RAD profile or anything else about the driver" (Esteves Dep., July 15, 2025, at 195). The presence of RideCheck triggers will never trigger a notation for a driver (Esteves Dep., July 15, 2025, at 198). The RideCheck trigger is not significant deterrent to a potential sexual offender.

Once again, Uber has offered a tool to let riders "help themselves" without actually enhancing safety, only promoting the illusory perception of safety to riders. RideCheck has potential to provide enhanced safety if it did not simply replicate the problems for passengers in danger to seek help. Instead, Uber can promote a tool that makes people feel safer without making them safer from sexual assault or misconduct and prove to drivers that nothing will be done when RideCheck anomalies are detected, adding nothing to deter them.

*Share Your Ride*

Share Your Ride was introduced by Uber as an in-app option as well. However, even though Uber promotes it is a safety tool for riders, Share Your Ride relies on the driver's GPS tracking, *not the passenger's* (Esteves Dep., July 15, 2025, at 60-61). If an Uber driver drops the passenger off abruptly in an unexpected location, Share Your Ride continues to track the driver and gives no information about the passenger. A victim may be stranded somewhere while the person waiting for them continues to anticipate her arrival. If a driver turns off the Uber app, the rider's location is no longer available. Also, as Ms. Esteves testified in her deposition, RideCheck "precision is very low" and it has "unreliable GPS data for riders" (Esteves Dep., July 15, 2025, at 50, 56). It would be more effective if a passenger uses her own phone to share an ETA, something available on most smart phones, as a passenger's own phone uses her GPS, not the driver's.

Even if Share Your Ride were able to reliably track the rider's location, at best, it alerts a loved one of the trip status, for example, if the trip ended unexpectedly (Esteves Dep., August 28, 2025, at 285-286).

Given how quickly sexual assaults occur, it is highly unlikely if not impossible that a loved one could notice an anomaly and intervene or seek intervention in time to prevent a sexual assault.

Share Your Ride is not special to Uber. It is a feature anyone can utilize in various apps and smartphones. But because Uber has incorporated it into their application, Uber further promotes the perception that it is safety oriented, garnering the trust of the passenger without educating the passenger about the fact that the driver's GPS is being used (UBER_JCCP_MDL_005497691; UBER_JCCP_MDL_001720345, Ross Ex. 1049). When Uber depends on the driver's data, the driver has more control. As I have stated, this feature is not a deterrent to offenders; they have continued to sexually assault and mistreat victims whether the victim has this feature herself or Uber provided it. Uber's witnesses, including Mr. Fuldner, have testified that they have not measured the effectiveness of Share My Ride (and Trusted Contacts) in preventing sexual assault (Fuldner Dep, March 27, 2025, at 565; Wong Dep., April 16, 2025, at 12, 467-468) or analyzed if any of their safety features have any impact on the rate of Uber drivers committing sexual assault and sexual misconduct on the Uber platform (Esteves Dep., Aug. 28, 2025, Esteves Ex. 1991 and documents cited UBER_JCCP_MDL002631458, UBER_JCCP_MDL001682455, UBER_JCCP_002073153, UBER_JCCP_MDL_002656939, UBER_JCCP_MDL003279841, UBER_JCCP_MDL_002656378, UBER000142462).

*GPS, 911 Button, Dashcams and Optional Audio-Recording*

GPS tracking is the backbone of the RideCheck and Share Your Ride features. GPS, whether through Ridecheck, Share Your Ride, or independently, is only useful before or during an offense if it is vigilantly monitored and there is an immediate way to intervene in any acts, and I have not seen evidence here that GPS provides a way to immediately intervene to stop sexual assaults in an Uber. After an offense, use of GPS monitoring only provides corroborative evidence if it matches with a victim's report of an assault or misconduct. An offender can prepare for explaining deviations from a route or delays revealed by GPS monitoring, saying a client has to stop to go to the bathroom or vomit, or requested some other deviation, like stopping to check for her phone she thought she forgot at the bar.

Given that GPS provides neither a reliable means to intervene in real time nor reliable, incontrovertible corroborating evidence, GPS does not substantially deter drivers from deviating for the purpose of sexually assaulting a rider (reiterating the findings of RideCheck or Share Your Ride). Furthermore, Uber investigates deviations *only* if a passenger reports a safety incident, to corroborate or disprove a reported event. If the report is delayed, as the majority of reports are, there is no direct, immediate confrontation of the driver's behavior, making the intervention useless. The driver can claim a lack of memory or provide an explanation for the deviation that cannot then be verified. In one example, a victim reported a sexual assault in the San Francisco area, Uber looked at the GPS and confirmed it supported the passenger's story, but Uber declined to remove the driver because the passenger no longer wanted to keep communicating with Uber about the event (UBER_JCCP_MDL_000387036, Whaling Ex. 3005).

An example of GPS' uselessness as a deterrent when a 12-year-old was sexually assaulted by an Uber driver (Nilles Dep., July 23, 2025, at 376-389, UBER_JCCP_MDL_003279797, Nilles Ex. 1731). This incident demonstrates not only that the GPS did not deter the driver from deviating from the route, but it was also not monitored or challenged in real time. It was only investigated after the victim reported. Real time monitoring and intervention by Uber with outreach to law enforcement with Ridecheck triggers would a potential deterrent. Additionally, if Uber had confronted its drivers immediately regarding these types of deviations and instituted consequences, it would have confirmed to each driver that he was being monitored, that that Uber was taking responsibility for passenger safety, and drivers would be held accountable.

It is redundant but necessary to highlight the illusory nature of the safety provided by Uber's use and failure to monitor GPS. As Ms. Esteves stated, the "main purpose of checking GPS for drivers is to make the platform available" (Esteves Dep., July 15, 2025, at 49). Uber's business relies on the use of driver

GPS to match drivers and passengers. The real-time monitoring of GPS is in service to matching drivers and riders, not to ensure safety. Unmonitored GPS is not a deterrent nor an effective means to safety, but a source of information only after an assault has occurred.

Uber publicizes its own in-app 911 button and in-app audio-recording as safety features. The 911 feature ignores the barriers to reporting in real-time for victims and is only used when an emergency potentially arises. While audio recording can serve as a deterrent especially if Uber required every driver to use the feature, the concern is placing that responsibility in the rider's hands to know about the feature and then to activate it if its optional (Esteves Ex. 1991). The 911 button assumes that the rider has control of and access to her phone and the audio app assumes the same, or that the rider knew of the feature and turned it on before the ride (Uber does not automatically record rides). Also, initiating a 911 call or turning on audio recording would alert the driver to the victim's intention, potentially escalating a situation. The multiple layers of helpers required to get help in the Uber app may be a deterrent or ineffective at preventing an assault. Seeking help in the app routes the call to Uber's ADT agents, who may "seek to de-escalate a situation" or then inform law enforcement. Help-seeking may be time consuming; police in some areas may not be able to respond rapidly or calling may further endanger the victim. For example, a driver may opt to dump a victim in an unsafe area alone. Because the app only relies on driver GPS, a victim may be stranded if calling for help using the in-app features (Esteves Dep., July 15, 2025, at 61). If there are guest riders, there are additional barriers to help seeking or recording. Neither the 911 button or non-mandatory audio-recording for the driver have a significant means to help the rider before or during a sexual assault, and at best, are helpful after a sexual assault occurs. In fact, Uber has no evidence that the 911 button actually reduces the risk or incidence of sexual assault (Fuldner Dep., March 27, 2025, at 301-302). Finally, Uber has admitted that the 911 button is intended to make women *feel* safer (Id.).

For passengers in trouble, the presence of a 911 button (similar to the Live Help from ADT Safety Agent) does not resolve the barriers to help-seeking and dangers presented by alerting a perpetrator that a victim is going to report. This 911 button serves as another means to give an impression of safety without actually increasing safety. It also, as many of the features do, provides another means to blame the victim for not seeking help or preventing a sexual assault. As offenders understand how hard it is for victims to seek help in such a terrifying and confusing event, the ability to call 911 is not a deterrent, even if in the unlikely case the victim is able to because she still has the phone in her hand while being assaulted.

If Uber required cameras with mandatory recording in cars with passenger and driver consent to participate in Uber, these barriers for help-seeking or reporting may be lessened. Cameras provide real time recording. Though a perpetrator can turn a camera off, that in and of itself can be used to corroborate a victim's allegations and reveal the offender's consciousness of guilt. Additionally, Uber can require mandatory cameras that cannot be disengaged. If Uber controls the camera, it can only allow the camera to be disengaged once the rider and driver are no longer in close proximity. Cameras are real-time monitoring, where Uber can use its technology to be a continuous bystander, the benefits of which I discuss below in terms of deterrence (UBER_JCCP_MDL_000251111, Breeden Ex. 276). They create a level of self-consciousness and enhance a feeling of risk for offenders. With mandatory in-car cameras, the offender has less control of the environment, is not able to invent a course of events (like "she started flirting first"), or give a deceptive or inaccurate depiction of a victim (e.g., "she wasn't that drunk"). Additionally, with a camera that is deactivated, an offender is still in a position of accountability, needing to explain why he could not or did not engage the camera, or even more, why he disengaged the camera at a time a reported incident was occurring. For the victim, a camera can provide hope of corroboration. She has "proof" or evidence, decreasing her chance to be confronted with the dismissal of allegations because she is told it is a "he said, she said" situation with "no proof." Fear of being disbelieved is a salient barrier to victims.

Uber knows that cameras/dashcams are a deterrent and can ensure accountability for wrongdoers (Fuldner Dep, March 26, 2025, at 100-101; UBER_JCCP_MDL_002655853, Ross Ex. 1063). Cameras are a known deterrent for sexual assault based on general deterrence theory and according to Uber's own research and testimony by its own employees (UBER_JCCP_MDL_000131396, Fuldner Ex. 2219; Fuldner Dep., March 26, 2025, at 100-101; Akamine Dep., May 19, 2025, at 287). Uber, in its internal documents, has concluded that "drivers who installed dashcam have reduced incident rate across all categories" (UBER_JCCP_MDL_000864943, Cinelli Ex. 463, Cinelli Dep., March 28, 2025, at 103-104). In the "Safety Planning 2025," (UBER_JCCP_MDL_002655853, Ross Ex. 1063), Uber explicitly stated, "We know that recording tools, such as dashcams and audio recordings, act as significant deterrents to misconduct and unsafe behavior" and "provide crucial evidence in post-incident investigations" (slide 12). Given the vague requirements of investigation regarding conclusivity of reports, this evidence may greatly benefit victims. Cameras decrease anonymity and provide the real-time monitoring and supervision that contributes to deterrence and prevention when made mandatory. Of the safety features discussed here, mandatory in-car cameras are the only option likely to act as a significant psychological deterrent to potential offenders, who will assess the genuine risks involved in assaulting someone in front of a camera.

*Ratings*

At the end of every trip, both drivers and riders rate their experience (UBER_JCCP_MDL_000303417 at -422). Since at least 2017, Uber has used ratings as a way to build trust and increase riders' "safety perceptions" and finding that: "Ratings pull the vast majority of the weight today in ensuring safety perceptions among riders – hugely valuable" (Id.). But Uber only discloses to riders a drivers' average star rating over the last 500 trips (Brown Dep., June 17, 2025, at 61; UBER_JCCP_MDL_0005389723). Uber does not disclose to riders many other known facts about the drivers it has paired with riders, such as a driver's preference to drive at night and on weekends, negative ratings, certain tags in negative ratings, complaints of unsafe conduct, long stops & early drop offs or prior accusations of sexual misconduct (Brown Dep., July 15, 2025, at 174-178, 187-191). It is concerning that Uber is aware that riders place great weight in ratings which provides them with a false sense of safety that they are being matched with a safe driver. But Uber is not disclosing key information about the driver to the rider to allow the rider to make an informed decision about who she is getting in the car with.

<u>Sex Offenders and Stereotypes</u>

Sexual abusers are adept at circumventing supposed preventions, including laws against sexual maltreatment. They are adept at camouflaging offense behavior or setting a stage for plausible deniability. They exploit faulty ideas and stereotypes about victims, offenders, intentions, and safety. Stereotypes depict the offender as creepy, weird, generally criminal, or easily identifiable.

Quite the opposite is true. Offenders rely on presenting a façade that garners the perception of trust, harmlessness, friendliness, and prosociality. When a potential passenger can cancel a ride if she does not like the driver's look or the driver's first impression makes her uncomfortable, it is good business for drivers to dress appropriately, have a clean car, and be friendly. It is good for business if the driver is generally pleasant, accommodating, and responsible to most customers, earning high ratings. Offenders target particular individuals based on opportunity, victim characteristics, situational factors, and their own needs. They cannot continue to have access to potential victims or succeed in offending if they are broadcasting danger or criminality. The rating system, used to convey a sense of trust, becomes a weapon for offenders, rather than a meaningful tool for riders to protect themselves.

Shockingly, even when Uber is able to identify a driver as "creepy," "weird," or problematic, it may fail to address the problem! Through its own information and research, Uber found that "many safety incidents are predictable" (UBER_JCCP_MDL_003231342, Wong Ex. 2811). It found that sexual assaults by Uber drivers were 12 times more likely to be caused by a driver with one or more previous sexual misconduct

complaints and that drivers who committed sexual assault were more likely to have prior interpersonal conflict reports (UBER_JCCP_MDL_001687315, Wong Ex. 2806). The same document indicated that drivers who committed sexual assaults or misconduct had at least one one-star rating and were 15 times more likely to have feedback containing the word "kiss." Another finding showed that problematic drivers had prior feedback containing the word "creepy" (UBER_JCCP_MDL_000031720, Wong Ex. 2804). Uber should evaluate rider feedback and follow-up and investigate if Uber is aware that specific feedback is a predictor of sexual violence (UBER_JCCP_MDL_003273474; Brown Dep., August 26, 2025, at 279).

Another stereotype relied upon by Uber to abdicate responsibility for prevention of sexual assault is that of a lust-driven, undeterrable sexual offender. Over and over throughout the evidence, Uber cites sexual offending happens everywhere and a determined offender cannot be deterred. This stereotype is simply false. While there are offenders who are dysregulated and driven in the moment, most offenses are instrumental, planned, and designed to succeed. Especially for offenders who prey upon vulnerable, intoxicated women during opportune times, deterrence can be successful. Uber provides access to vulnerable victims and significant opportunity to offend. While it is true that complete prevention of sexual assault is impossible, such as between two passengers who are riding in an Uber, there are available deterrents that can significantly decrease the risk of sexual assault in the rideshare environment. There is much Uber can do to prevent its drivers from sexually assaulting passengers. In fact, Uber itself proposed a simple intervention that could deter sexual assault during high-risk times. In a document entitled, "Point in Time Messaging," it said that law enforcement endorsed that "sometimes all that is needed is a reminder at the right time to deter certain behavior" (UBER_JCCP_MDL_000258366, Faiz MDL Ex. 794/Sheridan Ex. 3804).

<u>Sex Offenders and Opportunistic Crime, Instrumental Decision-making, Deterrence, and Prevention</u>

Individuals who commit sexual offenses are often characterized as sexually deviant, impulsive, and insatiably driven to commit sex crimes. Therefore, it can be said that sex crimes cannot be prevented or deterred because if someone "really wants to commit a sexual offense, he will." While that is true that all sexual assaults cannot be prevented, it is completely inaccurate to claim that sexual assault cannot be prevented in many circumstances and that sexual offenders cannot be deterred.

There are some sexual offenders that compulsively driven through paraphilic urges that take significant or unplanned risks or disregard potential consequences. However, having worked with and evaluated thousands of sexual offenders, it is clear that the vast majority of offenders engage in a process of instrumental, strategic, and progressively sophisticated decisions, incorporating their learning and experience with victims, the systems in which they operate, and the society at large. Sexual assault is a criminal behavior and can be understood with crime theory. The crime triangle is a term used to describe the elements that facilitate and impact criminal behavior, particularly opportunistic crime. The crime triangle consists of factors presented by the offender, the victim, and the opportunity.

Rideshare is a clear crime triangle on its own, with motivated and undeterred offenders (some previously identified as such), opportunity provided by Uber for the driver to work in the rideshare environment, and high-risk victims who may be intoxicated, can be isolated, and are dependent on the offender. In fact, Uber's own research identifies this triangle in a document entitled "Personal Safety Deep Dive: Sexual Assault Focused" was produced in June 2018 (UBER_JCCP_MDL_001755017, Payne Ex. 2527/ Wong Ex. 2807). In this document, there is powerful and compelling information that provided clear, concrete information to Uber about sexual assault during Uber rides and the specific identified risk factors to be addressed in three areas:  driver, rider, and trip circumstances.

Individuals who commit sexual crimes and misconduct may not be driven by deviant sexual interests, but by personality traits that facilitate egocentric, exploitive, and gratifying criminal behavior, like sexual offenses. While there is no way to perfectly predict who will commit a sexual offense, Uber ignored reports of obvious acts and signs of antisocial features, disregard for the rules, and indifference to the

rights or safety of passengers that are risk indicators for future bad acts. Uber, based on its own research and data as noted above, did predict the risk of sexual assault through an algorithm it developed using multiple factors and circumstances that it knows increase the risk of sexual assault and misconduct, including reports of drivers' inappropriate or unsafe acts. Many offenders are motivated to sexually exploit others through antisocial traits. Most sexual offenders do not have diagnosable deviant sexual arousal patterns.

Particularly in cases of opportunistic sexual offense of age appropriate or non-deviant targets, sexual assault is motivated by the sexual desire of the offender, which is non-deviant and facilitated by antisocial or narcissistic traits that allow the offender to violate the rights of others, break the law, and seek egocentric gratification. These are not offenders that are compelled to act upon strong deviant urges, but offenders who seek and take advantage of opportunities to gratify themselves. They lack the internal barriers to harming others, like empathy, respect for the rights of others, or commitment to safety or the rules of society. Individuals, specifically men, who hold beliefs that reflect themes of sexism, misogyny, male dominance/privilege, sexual objectification, or entitlement, are at greater risk for committing sexual assaults, particularly when given opportunity (Valliere, 2023). Those individuals in particular make instrumental choices to act on or resist gratification based on risk or likelihood of success. These types of offenders are far more common than those with paraphilic disorders. Uber matches these offenders to passengers and gives them access (opportunity) in an environment that is isolated and within a situation with minimal risk of consequences (no zero tolerance, no "crystal clear" consequences by Uber). Victims of ride share assaults are far more likely to have additional risk factors for victimization. They are easily isolated. They are in the driver's personal car. They are exposed to a risk situation with a potential offender. More importantly, they are more likely to be intoxicated or impaired. As discussed, Uber encourages drunk passengers to use Uber.

Because an individual seeks or makes opportunities to commit a sexual assault, the assault is not governed by the person's compulsion or impulse. That decision is therefore more greatly impacted by deterrence efforts. Given that fact, deterrence theory is more applicable to an analysis of sexual assault during Uber rides than issues related to sexual offender recidivism. Deterrence research shows that the likelihood of being caught, the speed of the consequence, and the severity of the punishment are elements that effectively contribute to deterring crime. Given this, the potential offender must be aware of all these elements to factor them into criminal decision-making. Defining behavior as problematic, including criminalizing behavior, increasing the certainty of detection, and changing an individual's perception about their behavior and the penalties for them all have a positive impact on deterrence (for a summary see Johnson, 2019).

Uber knew this. "All behaviour is a combination of motivation and ease" is a quote from a training "to reduce the incident of sexual assault occurring on Uber trips during party hours" created in April 2019 for Uber (UBER_JCCP_MDL_000257689, Childs Ex. 1012). In this training document, Uber clearly acknowledges an understanding of the motivations of perpetrators and the ease of committing a sexual assault during high-risk periods, including when a victim is intoxicated. Additionally, the training asserts that "by dialing up the risks and consequences" of offending, Uber can make offending and the decision to do so more difficult. This included promoting the perception that Uber works closely with law enforcement, that offense behavior is "observable" by Uber, and that Uber encourages reporting and takes it seriously. The consequences will outweigh the benefits. In another training, Uber is educated about the factors offenders use to target victims – ease, accessibility, and vulnerability (UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809). The training outlines the dynamics of sexual assault. Uber's failure to monitor GPS and investigate deviations highlights its inability to adhere to its own training and information.

*Impact of Education and Training*

It is highly likely that there are Uber drivers who engage in sexual maltreatment because they are

uneducated about the boundaries of inappropriate behavior, sexual harassment or abuse, or norms expected professionally or in an Uber. Education to address defining problematic behaviors and sexual concepts, like consent and intoxication, as well as defining the parameters of misconduct and maltreatment to these offenders can have a preventative impact on initial or future misconduct, particularly when accompanied by clear consequences (UBER_JCCP_MDL_000252298, Fuldner Ex. 434/Chang Ex. 766).

When Uber announced its partnership with RAINN, part of Uber's basis in doing so, was "to expand sexual misconduct and assault education to all US drivers" (UBER_JCCP_MDL_000123100). Uber acknowledged that deactivation alone isn't enough to keep the platform safe from risky users because dangerous behaviors are "probably way underreported" and since riders only provide ratings on drivers on 46% of trips, "more than half of the time we don't even know if it was a good or bad experience" (UBER_JCCP_MDL_000250170, Cinelli Ex. 461 at 14 - Title: "Education is a new tool our team is developing to address high safety incident rates."). Uber's own education experiments showed that drivers who completed sexual assault and sexual misconduct educations saw 10% lower SA/SM incident rate (UBER_JCCP_MDL_000250170, Cinelli Ex. 461 at 17). While Uber committed to rollout mandatory training in 2019, as of mid-2021 the mandatory training was not fully rolled out due to "supply concerns" (UBER_JCCP_MDL_000392485, Cinelli Ex. 475 and Cinelli Dep., March 28, 2025 at 164-174). Mr. Cinelli testified that he was balancing safety and business concerns and approved changes to extend the time period for education for drivers. While Uber was aware training was essential for its drivers to help reduce sexual assault and sexual misconduct on Uber's platform it was slow to roll out training on prevention of sexual misconduct and consent until 2019/2020 (Brown Dep., March 14, 2025, at 337-344, UBER_JCCP_MDL_000573350, Brown Ex. 1735; Fuldner Dep., March 27, 2025, at 362-371,).

*Impact of Zero Tolerance Policies*

Uber repeatedly asserts that there is "no sex, no matter what in an Uber." But "no sex, no matter what" is not the same as a zero-tolerance policy for sexual maltreatment and sexual violence. This statement conveys that there is no sex in an Uber, whether it is between amorous passengers, a driver and a passenger, or two strangers sharing a ride. "No sex, no matter what" does not address sexual violence or sexual misconduct. Clearly, "sex" is not the same as sexual assault. This is nowhere near the same as unequivocally saying Uber will not tolerate sexual assault or sexual misconduct on the Uber platform with resulting consequences.

Uber understands what a zero tolerance policy is, adopting one for use of alcohol or drugs for drivers during an Uber ride. In Uber's Community Guidelines, Uber boldly asserts a Zero Tolerance Policy, followed by clear definitions of impaired driving and reports, as well as concrete, again clearly defined

Last modified: 8/6/2024

# Zero Tolerance Policy

Every driver or delivery person who uses the Uber platform has a responsibility to drive safely and follow the established rules of the road. Uber has a zero-tolerance policy for the use of alcohol or drugs by drivers using Uber's Driver app. If we receive reports of suspected impaired driving, the driver or delivery person may lose access to their account, as stated in their agreement with Uber.*

Retrieved on Sept. 22, 2025 from https://w ww.uber.com/legal/en/document/?country=united-states&lang=en&name=zero-tolerance-policy&uclick_id=6f57a6ee-1b1d-4f83-a165-0054d0be73da

consequences for drivers. The guidelines give specific steps for riders to take to ensure safety and report the driver. Uber does not offer the same clarity in regard to sexual violence. Uber should communicate the same unequivocal messaging for sexual violence and the clear consequences of the conduct.

A Zero Tolerance policy for any type of sexual misconduct does not have to include permanent deactivation, but drivers and passengers should have the same well-defined expectations and potential interventions or consequences for those reported. The intervention, depending upon the misconduct, could include supervisory counseling, training, participating in an educational module, a written contract with outlined expectations, or other types of remediation, and should also include closer monitoring, as sexual misconduct can be a precursor to sexual assault. Any type of sexual assault by the driver should result in deactivation and reporting.

Training about a zero tolerance policy is essential to help reduce sexual assault and sexual misconduct on Uber's platform. If drivers are trained that there is absolutely no sexual contact tolerated while driving for Uber, issues of consent should not arise. However, training and education about consent and intoxication, the consequences of violations, and the impact of sexual misconduct on victims is critical in the onboarding process and after any violation, if that violation does not rise to a level requiring deactivation. There should be a means to assure that training or education as an intervention is received by the driver, not just a link to a video to be viewed. Investigators should be familiar with the education that drivers receive and are accountable for, so the driver cannot use ignorance of the expectations to mitigate their accountability for their behavior.

*Victim Access, Victim Selection, and Trust*

Once a victim "trusts" the offender (or in this case Uber) enough to enter a car, the offender can begin to engage in offensive behavior. The offender can assess the victim's level of intoxication or passivity, whether she is alone or meeting people, whether her end stop is isolated or public. The offender's question as to whether the ride provides opportunity for sexual assault can begin to be answered. The offender's violating behavior begins when a passenger is already in the car, making "cancelling" a ride much more complicated and placing the victim at risk. Behaviors that qualify as harassing, violating, inappropriate, or "creepy" behaviors can be grooming and testing behaviors of sexual offenders. Offenders learn to successfully offend in steps, over a process, escalating in environments where their behavior succeeds, is tolerated, is easily camouflaged, or goes unreported. Offenders offend when they are comfortable. Grooming behavior is the behavior of offenders that increases the opportunity for assault, minimizes victim resistance, and reduces the chance of disclosure.

The first task of an offender is to select an appropriate victim by identifying a target, assessing the victim's vulnerabilities, and indoctrinating the victim into the abuse. By its nature, ridesharing offers an offender ready access to victims. An Uber driver can place himself alone with a potential victim without any effort other than being paired by Uber with a passenger. A sexual offender who has a sexual interest in post-pubescent targets does not need to insinuate himself into an unfamiliar or atypical environment. An offender who wishes to sexually assault an adult victim simply must pick her up. He does not have to engage in any effort to have access to a potential victim, because she requested and gets into the Uber voluntarily.

The driver can select a potential victim easily. He can choose to drive at times that make access to a potentially vulnerable victim, like late at night, after bars close or around a college town or event. Drivers can choose to accept victims at times and in places that give greater opportunities to commit offenses. In fact, Uber knows that drivers, particularly male, who drive late at night, early in the morning, or on weekends, are a greater risk to potential victims (UBER_JCCP_MDL_001755017, Payne Ex. 2527/ Wong Ex. 2807).

Uber actually encourages drivers to drive during nights and weekends where drivers are likely to encounter intoxicated women going home alone, offering promotions and incentives like this one: "SPECIAL INVENTIVES FOR PNC MUSIC PAVILION PICK-UPS" from "Friday, August: 7th 10pm - 12am (midnight)" and "Sunday, August 9th: 10pm - 12am (midnight)"; encourages drivers to sign-on during "busy hours" including "Friday Night 7pm-3am" and "Saturday Night 7pm-3am"; notes "All Weekend -

Alphia Phi Alpha Conference - Bars & Clubs in Uptown - Look for increased late night demand".
(UBER_JCCP_MDL_000584033).  These times for rides provide drivers with greater opportunity to find a
victim alone, perhaps intoxicated, heading to a location with few witnesses.  Likely, a victim will not be
successful in help-seeking at 3:00 a.m.

By Uber's own analysis and experts' opinions, intoxicated victims of ride share assaults are far more likely
to have additional risk factors for victimization.  Uber itself knew that intoxicated women riders with male
drivers were at significant higher risk of sexual assault in an Uber as early as 2015 or 2016
(UBER_JCCP_MDL_000323562, Parker Ex. 613).

Alcohol is the drug most commonly associated with sexual assault, whether it is used by the victim or the
perpetrator (Grubb & Turner, 2012).  Alcohol intoxication is exploited by offenders as it makes victims
more vulnerable.  Alcohol intoxication can contribute to a victim's confusion and self-blame.  A woman
who has been drinking might blame herself for "getting raped" or, if there was alcohol involved, might
not label the attack as rape at all (Kahn et al., 2003).

Not only does research suggest that alcohol use raises a risk of sexual assault, but it also supports the
premise that sexual assault is taken less seriously when alcohol is involved, not only by the victim, but by
juries as well.  This is true even in cases when the victim was too intoxicated to resist physically (Kahn et
al., 2003).  Research demonstrates that victims are blamed more consistently when they are intoxicated
and are less likely to report the assault (Grubb & Turner, 2012).  In cases when the victim is very
intoxicated or unconscious, the victim faces being blamed more when reporting, mainly because the
offender has not had to use force, or the victim did not resist (Brown et al., 2018), even though that
victim cannot consent.  Officers are less likely to call in a detective or arrest the suspect if the victim is
intoxicated (Venema, 2016).

Uber's awareness of these particularly dangerous times for women did not stop or change their marketing
strategy (UBER_JCCP_MDL_002289722).  In fact, Uber acknowledged directly that "around the world, not
everyone can move safely/freely" (UBER_JCCP_MDL_000230347, Lake Ex. 2006).  Despite this, Uber's
advertising campaigns are aimed at attracting women to Uber in the most vulnerable situations for them
based on Uber's own documents and testimony (MDL Dkt. 269-1, Appendix A: Uber Safety
Advertisements; Ross Dep., June 12, 2025, at 390-394, UBER_JCCP_MDL_002655853, Ross Ex. 1063;
Childs Dep., June 5, 2025, at 22-23; Hazelbaker Dep., June 17, 2025, at 293).

Uber places the responsibility for safety to others (avoid drunk driving) and on the passenger while
promising to provide safety to that same passenger, in direct contradiction to what Uber knows is
dangerous.  A prime example is the ad "Reasons to Ride an Uber," focused on individuals drinking who
should get an Uber (https://www.youtube.com/watch?v=xQC_bGRyGkc).  Uber promotional documents
were aimed at invoking the perception of trust and safety, particularly for women
(UBER_JCCP_MDL_001532685).  The tragedy of Uber's campaigns is that Uber was inviting women into a
situation where they not only had a significantly enhanced risk of being sexually assaulted, but also into a
situation where their credibility was compromised and the chance of any prosecution for their assault was
minimized (Ross Dep., June 11, 2025, at 291, 300-302, 305-306, Ross Ex. 1057).

It is of paramount importance for Uber to train its drivers specifically about rides with intoxicated
passengers and the standards of conduct.  Uber's standards of conduct should provide a zero tolerance
policy against sexual assault or sexual misconduct.  Uber should ensure it unequivocally communicates
with drivers that sexual assault or misconduct is flatly prohibited and triggers mandatory deactivation,
and that an intoxicated person can never consent (Breeden Dep., March 14, 2025, at 311; Nilles Dep.,
July 23, 2025, at 202-206, UBER_MDL_001719681, Nilles Ex. 1723).  This training, and informing
passengers that the training is mandatory for drivers, would serve a number of purposes.  It would
eliminate the professed confusion offenders often purport about what is appropriate or inappropriate
behavior, decrease claims of a "misunderstanding" or miscommunication with victims, and form a clear

boundary regarding exploitation of vulnerable passengers.  For the victims, this information can help minimize excuse-making for offender behavior, define clear lines of behavior that may prompt greater reporting, and provide boundaries that protect against victim self-blame.  When a victim knows that there is no such thing as consent for a driver with any passenger, but particularly an intoxicated passenger, the victim can readily identify the assault as a reportable violation that is not allowed or tolerated by Uber.

Additionally, as Uber understands that the times and types of trips (male driver, pickup near a bar, lone intoxicated female passenger), Uber should utilize its technology (e.g. S-RAD) and monitor driver issues (frequent late night) and risk indices.  Uber should also educate passengers about these particular riskier rides so that the passengers can be more aware, make more informed choices, and report problematic behavior more readily.  If Uber communicated a zero tolerance policy and information on intoxication to passengers as well as drivers, a victim may be much less reluctant to report violations of drivers.

_Control of the Environment, Isolation, and Access to Information_

As an Uber driver, an offender perceives that he has complete control of the environment.  He typically has use of his own vehicle.  The offender's vehicle is comfortable to him.  It will have his DNA as well as the passenger's.  The vehicle may have child locks that prevent a victim from getting out or rolling down windows.  The friendly driver who provides drinks and snacks may be providing drugs that could incapacitate the victim.  The driver is in his car with his own resources.

If the passenger is in a place unknown to her, she will have no idea what is "off the route".  She will not know the neighborhood or be able to be alert to deviations or problems with the driver's trip choice.  The minute a passenger gets in a car, she does not know what will happen.  But she has come to trust that Uber has taken care of her safety and need not be on alert.

A necessary task for someone who sexually mistreats or assaults another is to isolate the victim.  Once a passenger gets in a car with an offender, that passenger is isolated.  The passenger is entirely dependent on the offender to act responsibly and safely.  The passenger's options are limited if that ride starts to go wrong.  Again, Uber itself identified the danger inherent to a potential victim when she is riding (or driving) alone with another.

For instance, if the driver begins to touch her, the passenger's options can endanger her.  A physical confrontation can cause the driver to drive dangerously.  A provocative confrontation can endanger the victim with an unpredictable offender.  Polite resistance can embolden the offender.  Jumping out of the car is dangerous.  In confronting an offender, the victim risks being left deserted or dropped off in a dangerous situation.  The victim faces provoking an offender who is already acting in a threatening, frightening, or uncomfortable way.

Many passengers use rideshares (and Uber) because they have been drinking.  Alcohol use creates an obvious vulnerability for a potential victim.  If a victim is intoxicated, she may be slow to or unable to identify risk.  She may fall asleep in the car and be unable to prevent or resist proactively.  Her credibility is compromised.  The victim may have limited memory.  Societally, when a victim has been drinking, she faces consequences, as discussed.  An offender can, in Uber investigations, easily state that sexual contact was consensual with an intoxicated passenger.  As Uber's own documents state, this is likely to cause some investigative confusion or doubt; "Some tickets are dismissed for questionable content, or if the arbitrator deems the act to be consensual (e.g. rider writes in and says driver kissed her, driver says rider kissed him)" (UBER_JCCP_MDL_00032174, McDonald Ex. 3131; UBER000051856, Kaiser Ex. 417).  In cases of rape, when the victim is very intoxicated or unconscious, the victim faces being blamed more when reporting, mainly because the offender has not had to use force or the victim did not resist (Brown et al., 2018).  The offender can use the victim's intoxication to deflect his own behavior, claiming the victim was belligerent or unruly and is just reporting the offender for kicking her out of the car or not letting her drink.

Uber does have a "no consent" policy, which they define as "no sex, no matter what" between passengers and drivers (UBER_JCCP_MDL_000043441, Nilles Ex. 3313). It is unclear when this policy was created, when and who are educated about it, and how it is enforced, particularly given information about investigations that implies acceptance of a consent "excuse" as of 2024 (UBER-MDL3084-DFS00159710; UBER_JCCP_MDL_002590503). This is different than a zero tolerance policy. Even when discussing Uber Teen, the issue of consent is discussed (UBER_JCCP_MDL_000366558-UBER_JCCP_MDL_000366564) as the driver for Uber Teens may have no history of post-trip contact or consensual sexual history. Consensual versus non-consensual is discussed in a document entitled "Sexual Misconduct – Deprecated" (UBER_JCCP_MDL_002590503). The issue of consent repeatedly arises, confounding the policy of "no consent" and leaving it up to investigators to determine consent. It is a confusion ripe for exploitation by offenders, especially given the individualistic response to trauma and victim vulnerability. An impaired intoxicated victim cannot consent, but an offender can claim she "wasn't that drunk." A zero tolerance policy leaves no room for manipulation. Also, the likelihood that a consensual encounter would be reported is very small. As Uber has asserted, it will not perpetuate myths about high levels of false reporting or place the burden of proof on them, which can re-traumatize and discourage reporting (UBER_JCCP_MDL_003037618, p. 12).

A driver can collect information about a potential victim in a role as a driver. A driver who brings a lone female home late at night can quickly discover where she is going, if she lives with anyone, if she has a dog, what the home's security is like, or how isolated the location is. Simple social engagement can provide the offender with a potential victim's workplace, social situation, or lifestyle. A friendly, intoxicated, or chatty passenger can give an offender a great deal of information, even if she is not alone on that ride. An offender who threatens a victim with the fact that he "knows where she lives" is weaponizing and terrorizing a victim with the truth. Uber itself acknowledges this.

<u>Shifting the Burden to the Victim</u>

When it becomes the victim's burden to report the violations and then feel responsible for the consequences to the offender, the offender has successfully transferred responsibility for the offending and how to stop it to the victim.

In a car with a perpetrator, it is solely the victim's responsibility to stop the assault. The victim has to become as persistent in resisting as the offender is in pursuing the sexual maltreatment. The victim faces all the risk – the risk of being harmed, stalked, abandoned, retaliated against, or further provoking the offender. The victim's decisions and behaviors are questioned constantly. Why didn't she report? Why didn't she get out, cancel the ride, get in the car with a man, kick him out of her car, call for help, alert 911, and on and on.

Offenders' ability to shift this burden is facilitated by systemic issues, Uber's in particular. The victim must cancel a ride but risks penalties or bad ratings for cancellations. A victim has to give "evidence" of maltreatment. A victim must overcome the barriers to reporting.

The features added by Uber shift the burden to the victim as well. Uber's safety team clearly acknowledges this. Not only has Uber failed to do proper screening or background checks or intervened in the drivers' precursor behavior and risk factors it knows about (and have proven with its own research), but also many of the tools it offers shift the burden to the victim. Uber employees admit that "riders are taking safety into their own hands," (UBER_JCCP_MDL_000221494, Anderson Ex. 3227). As Andrew Hasbun stated, "The truth is we aren't helping. You help yourself with the tools we give you."

While, under the system Uber has created, every victim bears some responsibility for seeking help, offenders know and exploit victims' reluctance to report and the barriers to victim reporting. They are aware of the collateral consequences of reporting for victims, their fear of retaliation, and the arduous,

sometimes retraumatizing process of being subject to repeat questioning, investigation, and skepticism. Countless offenders that I have interviewed in my practice have said simply, "I knew s/he wouldn't tell." When I have explored this with them, they explained their confidence at success, their deep understanding of victim behavior, and their effective ability to lie and deceive.  They have caused disbelief in victims by discrediting the victim, completely denying the behavior, or portraying the behavior as consensual.  Without a hard, black line defining their behavior as intolerable, offenders are incredibly successful at confusing the issue or discrediting the victim.  The line is blurry even in the sexual assault of minors, particularly teens, who offenders portray as provoking their sexual interest or lying about assault in retaliation.  It is sometimes only the hard black line of the law regarding consent that results in the perpetrators' convictions.  That is why a zero tolerance policy for sexual contact and violence is necessary for rideshares and that Uber at least shares responsibility for deterring offender behavior.

**Uber, Sexual Assault, Women, and Victims**

Despite the optimistic and superficially pro-woman strategy, Uber did not acknowledge the real issues for women, particularly regarding psychological and physical safety.  Women are sexually harassed, maltreated, and victimized.  Even "low-level" incidents of violation and harassment can cause fear or trauma, reminding women of their ultimate vulnerability to be more severely assaulted.

This is even more disappointing in light of the trainings and partnerships Uber has engaged in – Uber and its employees have been trained in sexual assault and about victims and offenders, and Uber's own internal analyses.  In 2014, Uber was trained by RAINN in a program entitled, "Working with Victims of Sexual Assault" (UBER_JCCP_MDL_000150947, Nilles Ex. 3312).  Yet, the safety issues and problematic engagement of women has persisted.

In October 2016 (UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809), Uber created a document entitled "Understanding Sexual Violence: Training Facilitation Guide," which appeared to be created in conjunction with the Arizona Coalition to End Sexual and Domestic Violence.  In this training guide, many issues were addressed regarding sexual assault, victims, and offenders.  This guide included sections on:

- Types and prevalence of sexual violence;
- Dynamics of sexual assault;
- Effects of victimization;
- Rape myths and victim blaming;
- Sexual assault reporting; and,
- Responding appropriately to survivors.

From this guide, Uber had information that:

- Many forms of sexual misconduct belonged under the umbrella of sexual violence, including sexual harassment and coercion;
- Sexual violence is underreported;
- 98% of perpetrators are male;
- Rape is planned and not an act of "uncontrollable passion;"
- Victims are targeted through the offender's assessment of their accessibility, vulnerability, and credibility;
- Victims experience neurobiological effects of trauma that affects response and memory;
- Rape myths persist, including information about low false report rates and the commonality of failure to resist; and,
- Significant barriers to reporting including fear of retaliation or not being believed exist.

Dating back to at least 2015, Uber performed studies illuminating specific risk factors associated with higher incidence of reports of sexual assault during Uber rides (UBER_JCCP_MDL_001755017, Payne Ex. 2527/ Wong Ex. 2807; UBER_JCCP_MDL_000964270, Wong Ex. 2803; UBER_JCCP_MDL_000031720, Wong Ex. 2804; UBER_JCCP_MDL_001687315, Wong Ex. 2806; UBER_JCCP_MDL_001755017, Wong Ex. 2807; UBER000204698, Wong Ex. 2808; UBER_JCCP_MDL_000323562, Parker Ex. 613).

In March 2016, Uber was aware that "many safety incidents are predictable." A document by Sunny Jeon entitled, "Bouncer v3," which updated a 2015 document, provided an overview of an "intelligent decision system" that could anticipate and prevent safety incidents, including sexual misconduct, during Uber rides (UBER_JCCP_MDL_003231342, Wong Ex. 2811). Uber has acknowledged that "if safety incidents are predictable, they are preventable" (Nilles Ex. 1884; UBER_JCCP_MDL_000031720, Nilles Ex. 1885; Nilles Dep., at 435-436), citing the identifiable "patterns and precursors" Uber has found in their own research (Nilles Ex. 1884; UBER_JCCP_MDL_000031720, Nilles Ex. 1885, Nilles Dep., at 444).

This system was able to identify the times during which safety incidents were more likely and the patterns related to misconduct. The predictive models could have a greater than 80% precision rate. Safety messaging was found to be effective at reducing safety incidents. Though the refrain from Uber is that "one sexual assault is too many" (e.g., Boman Dep., Mar. 5, 2025, at 146; Brown Dep., Mar. 13, 2025, at 192; Hasbun Dep., Apr. 10, 2025, at 82-83), the information that could help passengers take control of their safety was not conveyed to passengers or drivers. Uber has not provided safety information to women regarding the highest risk time to ride or drive, nor outlined the conditions that raised their risk for sexual assault in an Uber (Ross Dep., June 11, 2025, at 145-146, 308).

By November 2016, the sexual assault problem became so acute that Uber created a Sexual Assault Strike Team (Brown Dep., March 14, 2025, at 337-344, UBER_JCCP_MDL_000573350, Brown Ex. 1735; UBER_JCCP_MDL_001724095; Fuldner Dep., March 27, 2025, at 362-371,). In 2017, Uber brought in experts and researched how it could eliminate sexual assault from its platform (UBER_JCCP_MDL_001724095).

A document entitled "Personal Safety Deep Dive: Sexual Assault Focused" was produced in June 2018 (UBER_JCCP_MDL_001755017, Payne Ex. 2527/ Wong Ex. 2807). This document is a compilation of the research and information gathered by Uber regarding sexual assault during Uber rides. In this document, there is powerful and compelling information that provided clear, concrete information to Uber about sexual assault during Uber rides and the specific identified risk factors to be addressed. Sexual assault comprised the most serious interpersonal conflicts, notably with the most "significant reputational risk" (p. 6). The team divided risk factors into three areas: driver, rider, and trip circumstances. Very clear and definable risk factors were identified that increased the risk of sexual assault during Uber rides. Most offenders were male, whether riders or drivers, while almost all victims were female (riders or drivers). Sexual assaults were generally committed during late night riders, typically during weekend hours. Sexual assault occurred more often in rides that originated in the proximity of bars. Over half the reported assaults included intoxicated riders with male perpetrators. A third had a lone rider. (UBER_JCCP_MDL_ 001283906, Hasbun Ex. 2707). As previously described, Uber pairs drivers to riders and has constructed its own "crime triangle" (see above) and was well-aware of the risk factors of each element of that triangle.

"Reducing the Rate of Sexual Assault" was another report produced by Valerie Shuping (UBER_JCCP_MDL_000258743, Shuping Ex. 2913). This report reiterates that sexual assault is Uber's most serious interpersonal conflict incident in the US and Canada, again referencing the "outsized reputational risk." The report indicated that only about 30% of drivers and 38% of passengers who were reported for sexual assault were deactivated. Six percent of the reported drivers had prior sexual assault reports. The report noted that a "stricter standard" that looked at other interpersonal conflict reports was to be implemented as individuals with prior reports are more likely to get reported in a "more serious" incident.

While Uber knew that Uber drivers were committing sexual violence towards Uber riders and that it was prevalent, Uber was slow to act on prevention and deactivation (Fuldner Dep., March 26, 2025, at 166-169, UBER_JCCP_MDL_003281797, Fuldner Ex. 2208; Chang Dep., May 9, 2025, at 293-299, UBER_JCCP_MDL_003400768, Chang Ex. 767; UBER_JCCP_MDL_001840632, Kansal Ex. 4203).  Failures at deactivation led drivers to commit future sexual assaults (Fuldner Dep., March 26, 2025, at 166-169, UBER_JCCP_MDL_003281797, Fuldner Ex. 2208).

### Adhering to Myths about Sexual Assault

There is a misinterpretation or minimization by Uber of the severity of behavior that does not rise to the level of "assault."  For example, only "five of the most serious" types of sexual assault were reported to the public by Uber in Uber's December 2019 Safety Report or the reports thereafter.  In that document, Uber reported on the five most "serious" types of sexual assault, including acts of penetration, unwanted indecent touching, and forced oral assault.  Uber did not report, and to this day has not reported, the far greater number of sexual assaults and acts of sexual misconduct that have been reported on Uber.

Additionally, in its report, Uber avoided the use of language that portrays the types of sexual offenses in its report accurately.  Instead of saying **rape**, an egregious criminal offense with severe penalties, Uber reports numbers on "non-consensual sexual penetration."  Uber uses the same minimizing language throughout its report; language serving to minimize and camouflage the criminal sexual assaults occurring on Uber.  All "non-consensual" sexual acts are criminal assaults, sexual offenses chargeable under different terms in all states.  This includes, for example, oral assault, involuntary deviate sexual intercourse, forced sodomy, indecent assault, sexual assault, or attempted sexual assault – the criminal language for the "categories" reported by Uber.  This strategic use of language mutes the understanding of the very serious attacks, only the "most severe," that Uber has chosen to report.  Additionally, if Uber promotes a "no consent" policy, by its own rules, consent is not an issue, so the use of "non-consensual" is unnecessary, serving only to mitigate the criminal, assaultive aspect of the sexual act.  Uber's language is specifically chosen to dull what it is reporting, criminal acts of a life-altering nature.

Injury and damage from a sexual assault cannot be determined through a formula based on the features of an assault or the abuse.  Uber's own testimony and documents support this understanding (Nilles Dep., May 5, 2025, at 156-159, 166-167, 252-262; UBER_JCCP_MDL_000150947, Nilles Ex. 3312; UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809).  A formula's reliance on stereotypical and misinformed beliefs about what creates trauma or injury during sexual maltreatment is inaccurate and potentially harmful, as is creating an arbitrary cutoff at five types of sexual assault.  Factors such as penetration or force during a sexual assault do not consistently predict injury in victims.  The reinforcement of the idea that specific aspects of an assault cause trauma only serve to reinforce myths about sexual assault, sexual abuse, trauma, and victim response.  Many offender behaviors are related to sexual deviance, are grooming behaviors, or are behaviors that lead to an escalation.

Uber's guidelines refer to prevention of sexual assault as a "shared responsibility" of "all of us," which dilutes the issues of sexual assault and misconduct and spreads the accountability to the victim and bystanders, while directing it away from Uber.  Nor has Uber disclosed to passengers or educated them on the numerous reports it has received of sexual assaults and sexual misconduct occurring during Uber rides.

People believe that false allegations of sexual abuse or maltreatment are common.  In fact, sexual assault is significantly underreported, and false allegations are rare.  Uber's own testimony and documents support this understanding (Nilles Dep., May 5, 2025, at 175-77, 181-84; UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809).  On top of that, successful prosecution of sexual violence in the US remains low.  Recent statistics, according to RAINN's website (https://www.rainn.org/statistics/criminal-justice-system), indicate that only 25 of 1000 perpetrators of

sexual assault will be incarcerated; only 310 of the 1000 sexual assaults are reported.  The fact that sexual assault is underreported and under-prosecuted is not unknown to many offenders.  In fact, most offenders have multiple victims.

The barriers for victims to report are significant.  Recantation is common for victims of sexual assault, especially when faced with significant barriers or fears of retaliation.  Uber's own testimony and documents support this understanding (Nilles Dep., May 5, 2025, at 183-184; McDonald Dep., Apr. 24, 2025, at 226-228; UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809).  Many victims fear antagonizing the perpetrator.  This fear is accentuated when the perpetrator has intimate knowledge of the victim.  Very few "strangers" know where victims live or that they are staying alone in a hotel.  The Uber driver has access to the passenger's name and other information.  When the driver takes the passenger home, he knows where she lives.

Also, as I discuss in Chapter 6 of *Understanding Victims of Interpersonal Violence* (2019), we have faulty expectations of victim memory generally, notwithstanding the impact of trauma.  Trauma has a basic physiological impact on the encoding, organization and retrieval of memory.  Repeated interviews will continually increase the likelihood that details can be obtained or contradicted in the interviews.  Delay of disclosure or not telling at all is the most common response to sexual assault by victims.  Uber's own testimony and documents support this understanding (Nilles Dep., May 5, 2025, at 251-252; UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809).

There is the idea that sexual assault takes a long time or could be detected easily through GPS or examination of timing or tracking information.  An offender can sexually assault or abuse a victim in seconds, while driving, or during a brief stop.  The true nature of a sexual offense goes against the idea that there will be "evidence" of a sexual offense.  There is no "evidence" left if an offender indecently assaults a victim, exposes himself while driving, engages in unwanted kissing, or exposes the victim to pornography.  While the most escalated or "egregious" type of sexual assault may leave DNA evidence, there are problems here, too.  The driver's DNA would be expected to be found in his car, or he can explain it away as evidence of consensual sex.  Without significant education about the nature of sexual offenders, sexual assaults, and victim behavior, any person left to evaluate "evidence" will do so inaccurately.

Despite years of knowing that hundreds of thousands of women and users of Uber have been sexually assaulted and harassed, Uber has done little to promote sensitivity, education, and responsivity regarding the issue.  Most blatantly, failing to report and disclose sexual assault and misconduct of all types hides the problem.  But even more, Uber claims to take a "victim-centric approach."  Specifically, it purports to be victim-centric when involving law enforcement with reports of assault.  Uber waits to involve law enforcement until after the victim decides to report an incident to law enforcement.  Knowing that Uber will not turn over a report of a sexual assault to law enforcement proactively can serve to embolden offenders.

*Problematic Investigatory Procedure*

When a victim files a report to Uber, there are various problematic issues that the victim faces.  Uber offers training on how to interact with victims using empathic statements and to avoid blaming victims (e.g., UBER_JCCP_MDL_000043441, Nilles Ex. 3313).  However, there is evidence that there is no follow-up with victims (UBER000017036) and that the determination of "sufficiently believable" reports (UBER_JCCP_MDL_000032174, McDonald Ex. 3131; UBER000051856, Kaiser Ex. 417) is based on an investigator's opinion.

For years, Uber relied on a three-strike policy for most offenses (Brown Dep., Mar. 13, 2025, at 82-83, 128-133; UBER_JCCP_MDL_001504282, Anderson Ex. 3253; UBER_JCCP_MDL_0000323152, Parker Ex.

649).  It relied on a two-strike policy for certain sexual assaults like rape (*Id.*)  So, essentially, Uber allowed its drivers to rape one of its passengers before it fired the driver.[1]

The investigation relies on information that is not reliable, like driver and passenger ratings, which do not capture or reflect the potential risk of offending.  The fact that the investigator is to look at prior allegations against a driver reveals that drivers with Uber can receive multiple complaints and still be a driver for Uber.  As discussed, for most offenses, Uber previously maintained a "three strike policy," had failures to deactivate offending drivers, and did not follow up with re-running background checks until 2018 (Nilles Dep., June 30, 2025, at 256-257).  At that time Uber implemented continuous driving screening technology to monitor and flag new criminal offenses (US Safety Report 2017-2018 at 4).

The investigator not only calls the victim but then calls the driver or accused, clearly alerting the driver that a complaint has been made by that same victim.  The anonymous nature of complaints is violated for the victim, increasing the danger of retaliation by the offender.  In order to investigate, the investigator gives the offender details about the case to "remind" the offender of the ride (e.g., UBER000017032).  Obviously, an offender remembers whom he sexually assaulted.  During the investigation, he can discover who reported him.  Additionally, many victims experience secondary trauma or victimization due to the investigation process.  Many of the concerns I have highlighted throughout this report were known by Uber and taught by trainers to Uber (e.g., UBER_JCCP_MDL_000043441, Nilles Ex. 3313).  This same training requires a minor victim to necessarily report in the presence of a guardian, magnifying the barriers of reporting for minors.  The issue of mandated reporting was not addressed for Uber investigators or report center operators until around October 2022 when Uber implemented mandatory reporting for minors (Childs Dep., June 5, 2025, at 137-139, 208-210, UBER_JCCP_MDL_000366554, Childs Ex. 1014).

### *Trauma, Injury, and the Definition of Assault*

Failing to identify any type of sexual misconduct or maltreatment as serious is the type of belief regarding sexual maltreatment that perpetuates rape myths, emboldens offenders, and dismisses trauma and injury to victims.  Rape myths are a set of false beliefs about offenders, victims, and trauma that impact the perception and evaluation of sexual assault.  These beliefs generally excuse sexual violence and blame the victim.  One type of myth regarding sexual assault is that only a violent, penetrative sexual assault is a "real" sexual assault can be the source of significant injury for victims.

Trauma is highly individualized and can be caused by events that are not deemed "egregious" by others.  Sexual harassment and physical boundary violations can terrify a lone passenger, especially when the offending party may have access to that passenger's location, address, name, and other information.  Violations seen or defined as "low-level" can produce significant fear in victims.  An offender who puts his hand on a victim's leg while he drives reveals his propensity for violation, his entitlement, his disregard for the victim, and his potential for escalation to that victim, who then must complete the ride while managing the offender and hypervigilant for danger.  A passenger with a history of abuse may be retraumatized by the piercing of her sense of safety when she had every expectation of being safe.

---

[1] For years, Uber would only remove a driver for a "conclusive" report.  A report would be deemed conclusive only where (i) the driver admitted it; (ii) there was objective evidence like video evidence; or (iii) law enforcement provided strong evidence of an assault.  Because most offenders will not confess to an act that could put them in jail, because Uber does not require cameras, and because Uber does not proactively report to police, it is rare that any report would be deemed "conclusive." When it received a report of sexual assault and the driver had a previous inconclusive report on his record, Uber "recommend[ed]" that the driver be barred from driving for Uber (UBER_JCCP_MDL_001754542).  Uber's policy and practice in effect was to allow an Uber driver to rape at least one passenger before it chose to fire him.

*The Impact of Fear During and After an Incident*

Fear is a salient experience of victims during and after a violating incident.  Even the most "low-level" acts can make a victim afraid, impacting behavior and decision-making.  Understanding a victim's fear must include understanding the context of the victim.  In the case of an Uber driver, that context includes the isolation in a car, not knowing whether the behavior at issue will escalate, and potentially the knowledge that the offender knows where the victim lives or where she is going.  That is powerful.

The physiological impact of fear can produce misunderstood effects on victims' behavior, contributing to more significant trauma, blame, shame, and feelings of helplessness.  When something unexpected and frightening happens, a victim may freeze.  Suppose the victim is in shock or disbelief; in that case, she may be unable to fully process what is happening, perhaps experiencing a sense of helplessness or shame about being unable to defend herself or react.  Feeling helpless can lead many victims to a diminished sense of competency, greater self-recrimination and confusion, and an amplified feeling of vulnerability.

During an assault or maltreatment, a victim must assess the viability of resistance or confrontation.  Some victims respond by placating the offender.  Some victims "laugh it off" uncomfortably or try to distract the offender.  The emotion of fear makes victims overestimate the risk of harm, decreasing a victim's likelihood of engaging in risky options like fighting back (Baron, 2007).  Fear may cause an overestimation of the danger of resistance, an exaggerated assessment of the perpetrator's capacity for violence, or feelings of peril when considering an unfamiliar behavior.  For a victim who is socialized to be polite, avoid confrontation, or has no training in self-defense, fear will guide the victim to do what is familiar.

Thinking under stress is difficult.  Trauma impacts executive functioning, our higher-level decision-making, so victims rely on ingrained behaviors and habits (Kozlowska et al., 2015).  Victims report being unable to think, confused, or focusing on seemingly "crazy" thoughts.  Planning an intervention or escape can be impossible.  A victim might become exhausted after a trauma, unable even to consider productive action.  This inability is referred to as quiescent immobility, occurring when the trauma is over, and there is relative safety (Kozlowska et al., 2015), like when a victim goes to sleep after being assaulted because the driver has delivered her home to her bed.  If a victim's decisions contradict "common sense" to an uneducated interviewer, the victim is likely to be disbelieved.

A victim can experience fear after an assault that impacts her behavior or dissuades reporting.  Again, the offender has information on the victim, causing fear of retaliation.  The victim may fear that reporting the offender may alert the offender that she might take action.  If the victim does not understand what happens with or after a report, the victim does not know the information that the offender has.  She might fear that no one will believe her.  The consequences of disclosure are a source of profound anxiety and fear for victims.  The victim may fear being blamed for the assault or even for getting in an Uber.

Victims of abuse and assault can often experience feelings of shame, embarrassment, guilt, or self-blame.  The very experience of being assaulted is confusing and humiliating, violating the victim's physical and emotional integrity.  Shame, stigma, and self-blame are significant barriers to disclosure for both male and female victims, victims of color, and LGBTQ+ victims (Calton et al., 2016; Lowe & Rogers, 2017). Victims can feel self-blame or shame from believing they deserved the abuse, "allowed" it to happen, or brought it on themselves because of their choices.

*Additional Internal Factors Influencing Victim Response*

Victims of sexual harassment and maltreatment often behave in unpredicted or unexpected ways, or, in layman's terms, ways that "defy common sense" especially toward the perpetrator.  Studies show that many people have strong expectations of how a victim "should" act if she is a "real" victim.  However,

research and clinical experience demonstrate that there is no way to predict how a victim will react to sexual harassment and abuse.  There is a wide array of factors that influence a victim's response.

As I discuss in my book *Understanding Victim Response to Interpersonal Violence* (2019), victim behavior in response to sexual assault or maltreatment is sometimes described as "counter-intuitive," which refers to behaviors or responses that seem to be a mismatch with our expectations of how "real" victims act. Examples of victim behavior that would be considered counterintuitive include failing to forcibly resist an assault, failing to escape when the opportunity presents itself, having continued contact with the offender, failing to report the incident, or acting "normal" following a sexual or physical assault.  In fact, there is no such thing as "counterintuitive" victim behavior.  All victims respond to assault in individualized ways for a myriad of reasons.

Part of what makes victim response to intimate violence unique are the characteristics unique to each and every one of us that contribute to our reactions and decision-making.  Along with shame or self-blame, victims carry the influence of culture and religion.  If a victim is assaulted or maltreated by someone of a different race or culture, the victim's response to that behavior may vary.  She may excuse the behavior as a cultural difference.  Her own culture may require that she submit to a male.  There may be language barriers that impact a victim's interpretation of events.  She may feel targeted because of her race or fear being perceived as racist if she reports.  A victim's religion may discourage talking about sex or implicitly blame her for being in a vulnerable situation.

Passengers who are victimized may have prior histories of victimization or experience with law enforcement or investigations that conflict with reporting assault.  A victim may freeze or dissociate.  A previous history of victimization may have taught the victim she would not be believed, that the abuse "wasn't that bad," that "all men are like that," or that maltreatment is an expected result of being around men.  The victim may be socialized to be pleasing and passive, to "not cause trouble," taking it upon herself to change something (like never ride again or only ride in the day) instead of holding the offender accountable. Each victim must navigate her decision-making around all the elements that impact her response regarding sexual maltreatment.

Appeasement is a primary survival strategy seen in animals, including humans, used when faced with a threat to physical or psychological safety (Cantor & Price, 2007).  It is thought to be rooted in the same physiological system that determines freeze, flight, or fight (Cantor & Price, 2007; Bailey et al., 2023), the responses that occur in of extreme fear or danger.  It is motivated by a powerful urge to survive by increasing a sense of safety and decreasing the threat.

Appeasement is characterized by the victim's attempt to soothe, calm, or de-escalate their attacker (Cantor & Price, 2007; Bailey et al., 2023).  A victim may achieve this by decreasing or eliminating resistance, appearing to submit to or cooperate with their attacker, or engaging in soothing behavior, like talking to, helping, or changing the mood of the situation.  It especially occurs when there is asymmetry in the relationship of power or control, like when an Uber driver is in control of a destination and can overpower a victim with size, strength, or capability.  When a victim determines, through a process of experience and assessment, that there is no way to stop an attack through resistance, appeasement is a powerfully effective survival strategy.  A victim may engage in this after finding that efforts to resist are ineffective or result in an escalation of danger.  For example, after telling the perpetrator to stop several times or finding that struggling increases the force, a victim may act in submission to the rapist by "going along with" the sexual assault or "just giving in and letting it happen."

When viewed by an uneducated viewer and without adequate victim information or interview, an offender can exploit appeasement by manipulating the interpretation of the behavior.  For example, after isolating, coercing, and terrorizing a victim, an offender can claim that the victim "wanted it" because she gave up or gave in to the sexual assault.

*External Factors Influencing Victim Behavior*

External issues are those issues that are societal, practical, or outside the victim's psychosocial makeup. Many issues impact a victim's decisions during and following sexual maltreatment in the context of Uber. As noted, a victim may accommodate the abuse or misconduct to reach a safe place or desired destination. She may submit in hopes of appeasing the offender, as in the case of a driver who persistently asks for "just a kiss." A victim may report due to anger or distress that comes from another, like a victim whose friend or boyfriend witnesses or hears about the misconduct. A victim may have prior negative experiences with reporting or with authorities including law enforcement that inhibit reporting. A minor victim may fear reporting because she rode in an Uber without permission or did something she could have gotten into trouble for, like going to her boyfriend's.

When alcohol is involved in the context of the assault, things may be even more complicated for the victim. Victims are aware that they are blamed if they have been drinking. If the victim is underage and has been drinking, the potential collateral consequences may be a strong deterrent for reporting. The victim may be protecting another who may have served her alcohol or fear legal ramifications for underage drinking. She may fear being accused that her underage drinking gave her a "motive to lie" about being sexually assaulted, particularly if confronted by the perpetrator about her use.

Numerous practical issues can affect a victim's decision-making regarding ridesharing (and Uber). While it would be simple to think that a victim who has been assaulted could just avoid ridesharing (and Uber), that may not be possible for that victim. Victims may also have significant practical reasons that compel them to continue to use Uber or have attempted to engage in protective measures for themselves while using Uber. Evaluating the credibility of a victim's claims based on whether that victim uses Uber again is akin to believing someone was not involved in a mass shooting because they go back to the same Walmart in their community. It simply does not make sense.

## Conclusions

The Uber environment provides conditions that make it ideal for offensive behavior. The general nature of the isolation of the victim, power of the offender, and vulnerability inherent to women passengers and drivers should be recognized and addressed by Uber, especially given the focus on marketing safe rides to women and to those intoxicated based on its internal documents and testimony. Through its policies and lack of policies, Uber has facilitated the offenders' exploitation of its rides and endangered and betrayed women. Even knowing that sexual misconduct and sexual assault are underreported, Uber failed to adopt a zero tolerance policy for any sexual maltreatment, placing their women passengers and drivers at greater risk.

In conclusion:

1. Sexual assault and sexual misconduct against women are foreseeable in the rideshare environment. The rideshare environment is ripe for exploitation and utilization by sexual offenders for numerous reasons. It enables sexual offenders to use the Uber service, gaining access to potential victims by becoming Uber drivers. Uber should have been and was aware that the Uber rideshare environment is ripe for the occurrence of sexual offenses. By enticing women to use Uber under the promise of safety and trust, Uber has contributed to and increased the risk without addressing it.

2. Uber knew that female riders were at risk of sexual assault and sexual misconduct by their Uber drivers but did not warn female riders of that risk. Uber has received hundreds of thousands of reports of sexual assault and sexual misconduct occurring on Uber. However, Uber has informed the public about only a small fraction of the hundreds of thousands of reports of sexual assault and sexual misconduct that it has received. Uber first disclosed incidents of sexual assault and

sexual misconduct on its platform in December 2019.  Yet, Uber only disclosed what Uber characterized as the five of the most "serious" types of sexual assault, including acts of penetration, unwanted indecent touching, and forced oral assault.  Uber did not disclose, and to this day has not disclosed, the far greater number of sexual assaults and acts of sexual misconduct that have been reported to Uber.  More, because it is widely known (and acknowledged by Uber employees) that sexual maltreatment is underreported by victims, the reports made by victims of sexual maltreatment and violence during Uber rides should have been understood by Uber as representative of a greater issue.  Additionally, Uber should have been and is aware that the Uber rideshare environment is ripe for the occurrence of sexual offenses.

3. Uber knew risk factors or circumstances that increase the risk of a female rider experiencing sexual assault and sexual misconduct but did not warn riders of those risk factors or circumstances.  Uber's own documents and studies identify the following as significant factors raising the risk that a driver would sexually assault a passenger and incidence of such reports and other sexual assaults including sex of assailant (male), sex of victim (female), time of day and day of week (night and weekends), intoxication, proximity to a bar, a history of prior interpersonal conflict reports, and 1-star ratings.  Uber has never informed the public about these high-risk factors.

4. Uber should have warned riders of the true risk of Uber drivers committing sexual violence toward Uber riders.  Also, Uber should have identified the factors that Uber knew increased the risk of sexual assault and incidence of reported sexual assault.  Uber should provide warnings and accurate, complete information directly to riders about sexual assaults and sexual misconduct occurring on Uber.  Riders would then be made aware of the potential dangers and be able to make informed decisions about when, how, and whether to use Uber.

5. In addition to providing incomplete and misleading information about the true prevalence and risk factors for sexual assault and sexual misconduct, Uber also misled riders that it was safe for women.  Uber chose to portray itself as a safe mode of transportation, in particular to women, intoxicated passengers, and passengers traveling on weekends, holidays, and during late night and early morning hours based on its own documents and testimony.  Uber targeted safety and trust issues to attract more women customers and drivers while failing to address the risks Uber poses to women.  In fact, Uber not only targeted female riders, but directly claimed to be safe for female riders in the *situations Uber had already identified as higher risk for sexual assault,* like out at night drinking.  In doing so, Uber targeted women's psychological vulnerabilities, claiming to be a safe place in the specific situations in which women feel least safe. Uber did so not only through its marketing campaigns, but also by publicizing its claimed alliance with sexual assault victim advocate groups.  Uber's own documents and testimony show that these tactics did in fact work to create trust among passengers such as female riders, particularly those in circumstances Uber knew to be vulnerable for sexual assault and sexual misconduct, like alone and at night or while intoxicated.

6. Uber mislead female riders about the effectiveness and comprehensiveness of its driver screening measures.  By promoting its brand as safe and promoting that Uber thoroughly vets its drivers, Uber endorsed its drivers.  According to Uber's documents and testimony, this created a feeling in potential riders that an Uber ride was "safe" because it was an "Uber," rather than just a stranger's vehicle.  By endorsing its drivers and presenting a veneer of safety, Uber induced women to get in a car with a stranger according to Uber's documents corporate representatives' testimony.

7. Uber created an environment where offenders felt "safe" committing sexual assault and sexual misconduct.  Uber's failure to institute adequate training, protections, and responses to reports of

sexual assault may serve to embolden sexual offenders in the system.  Sexual assault and sexual misconduct are crimes of opportunity and Uber telegraphed minimal oversight with the basic and quick screening necessary to become an Uber driver.  There is evidence that the systems in place that Uber promoted as enhancing safety (such as driver training, investigations of sexual violence reports, and driver deactivations) were not monitored or relied upon by Uber, leaving sexual offenders on the platform to continue to drive female riders.  This telegraphed to offending drivers that consequences of committing sexual assault and sexual misconduct were not enforced or serious.  Additionally, there is evidence that Uber knew that drivers with prior incidents of sexual assault and sexual misconduct did in fact grow emboldened, engaging in further misconduct more rapidly following each incident.

8.  A woman's continued use of Uber after experiencing sexual assault or sexual misconduct by her Uber driver has no bearing on whether she experienced psychological trauma or the breadth of her psychological trauma.  Because victims' responses to sexual assault and sexual misconduct are unique to the victims' particular circumstances, each victim will have a distinct and personal reaction to and outcome from experiencing sexual assault or sexual misconduct.  Victims may have significant practical reasons that drive them to continue to use Uber or may have independently attempted to engage in protective measures while using Uber.

9.  Injury and damage from a sexual assault or sexual misconduct cannot be determined through a formula based on the features of the abuse.  A formula's reliance on stereotypical and misinformed beliefs about what creates trauma or injury during sexual violence is inaccurate and potentially harmful, as is creating an arbitrary cutoff at five types of sexual violence.  Factors such as penetration or force during a sexual assault do not consistently predict injury in victims.  The reinforcement of the idea that only specific aspects of a sexual violence cause trauma reinforces myths about sexual assault, sexual abuse, trauma, and victim response.  In fact, both sexual assault and sexual misconduct, as Uber defines them, can have life-long consequences.  Additionally, the "taxonomy" Uber utilizes relies on language that mitigates and camouflages the criminal nature of the acts they are measuring.  For example, Uber uses the term "non-consensual sexual penetration" instead of rape to describe the sexual assault they are measuring.  Additionally, describing acts of sexual violence on scales of "seriousness" obfuscate the offender's intentions and the victim's psychological trauma.  Offenders may engage in paraphilic behaviors with "less serious" Sexual Violence or may be practicing for escalation by testing the system or the victims.

10.  Uber could have done more to prevent or deter sexual assault and sexual misconduct against female riders.  Uber itself has stated that sexual crimes are often opportunistic and show patterns and predictors.  This means that the acts of sexual offenders are often preventable.  Additionally, Uber has ignored specific knowledge about offenders related to risk of future sexual assault or sexual misconduct by its drivers, namely that prior reports of misconduct and disrespect for passenger safety are a predictor of future abuse of passengers.  Additionally, mandatory cameras and training are known to be effective in reducing sexual assault and sexual misconduct. Deterrence research shows that the likelihood of being caught, the speed of the consequence, and the severity of the punishment are elements that effectively contribute to deterring crime.

11.  Proper training and education can reduce the risk of sexual assault and sexual misconduct.  Training and education about a zero tolerance policy, consent and intoxication, the consequences of violations, and the impact of sexual assault and sexual misconduct on victims is critical in the onboarding process and after any violation, if that violation does not rise to a level requiring deactivation.  Uber internally recognized this but was slow to act and did not maintain a zero-tolerance policy for sexual assault and sexual misconduct.

12. Measures that Uber promotes as "safety features" such as GPS Tracking, RideCheck, the Emergency Button or Share My Ride do not appreciably reduce the risk that a driver will feel "safe" in committing sexual assault and sexual misconduct. Further, misinformation about the methods and motives of sexual offenders, despite Uber's alliance with victim advocates and sexual assault experts, has allowed Uber to promote "safety features" as deterrents to sexual assault.

13. An offender's interactions and method of abusing and exploiting a victim of sexual assault affects the victim's response to the assault and injury. An offender can use threats, camouflage, apology, stalking, or acting like nothing happened to confuse, control, and manipulate the victim.

14. Uber's policies against sexual assault and sexual misconduct are not sufficiently clear or adamant. It has not posted a "zero tolerance" policy anywhere for sexual assault and sexual misconduct, against either the drivers or the passengers. The most adamant statement Uber makes is on its website where it is written that sexual assault or sexual misconduct is "prohibited." Uber's guidelines for safety refer to "respect" and "consent," and a "no-sex" rule between drivers and passengers. The guidelines refer to prevention of sexual assault as a "shared responsibility" of "all of us," which dilutes the issues of sexual assault and misconduct and spreads the accountability to the victim and bystanders, while directing it away from Uber. Uber's efforts to disavow its responsibility to prevent sexual assault and sexual misconduct and to cloud its role in sexual assault and sexual misconduct can be used by offenders and against victims. Clear policies of "no tolerance" eradicate gray areas for offenders and victims. Clear policies also eliminate any need for interpretation that can be manipulated by offenders or confuse victims about sexual misconduct.

I have provided all of these opinions to a reasonable degree of psychological certainty.

Veronique N. Valliere, Psy.D.
Licensed Psychologist

## References

Alarms.org (2020, January 14).  Is Uber safe?  How safe are Uber and Lyft for women?  *Alarms.org*.
    https://www.alarms.org/uber-lyft-womens-safety-report/

Bailey, R., Dugard, J., Smith, S.F., & Porges, S.W. (2023).  Appeasement: Replacing Stockholm Syndrome as a
    definition of a survival strategy.  *European Journal of Psychotraumatology, 14(1).*  doi:
    10.1080/20008066.2022.2161038.

Baron, J. (2007).  *Thinking and Deciding (4ᵗʰ Edition).*  Cambridge University Press.

Brown, A., Horton, J., & Guillory, A. (2018).  The impact of victim alcohol consumption and perpetrator use of force
    on perceptions in an acquaintance rape vignette. *Violence and Victims, 33(1),* 40-52.
    http://dx.doi.org/10.1891/0886-6708.VV-D-16-00099

Calton, J., Cattaneo, L.B., & Gebhard, K. (2016).  Barriers to help-seeking for Lesbian, Gay,
    Bisexual, Transgender, and Queer victims of intimate partner violence.  *Trauma, Violence, & Abuse, 17(5),* 585-
    600.  doi:  10.1177/1524838015585318.

Cantor, C., & Price, J. (2007).  Traumatic entrapment, appeasement and complex post-traumatic stress disorder:
    Evolutionary perspectives of hostage reactions, domestic abuse and the Stockholm syndrome.  *Australian & New
    Zealand Journal of Psychiatry, 41(5),* 377–384.  https:// doi.org/10.1080/00048670701261178

Cossins, A. (2020).  *Closing the Justice Gap for Adult and Child Sexual Assault.*  Palgrave McMillan.

Dickson, G. (2018, November 30).  Women are having #MeToo issues with their Uber and Lyft drivers, survey says.
    *Fort Worth Star – Telegram.*  https://www.star-telegram.com/news/traffic/your-commute/article222314585.html

Fowler, S. (2020, February 17).  I spoke out against sexual harassment at Uber.  The aftermath was more terrifying
    than anything I faced before.  *Time.* https://time.com/5784464/susan-fowler-book-uber-sexual-harassment/

Grubb, A. & Turner, E. (2012).  Attribution of blame in rape cases: A review of the impact of
    rape myth acceptance, gender role conformity and substance use on victim blaming.  *Aggression and Violent
    Behavior,* 17 (5), 443-452.

Hoskins, P. (2022, July 14).  Uber sued in US over sexual assault claims.  *BBC.org.*
    https://www.bbc.com/news/business-62158976

Isaac, M. (2017, January 31).  What you need to know about #DeleteUber.  *New York Times.*
    https://www.nytimes.com/2017/01/31/business/delete-uber.html

Johnson, B. (2019, Jan).  Do criminal laws deter crime? Deterrence theory in criminal justice policy:  A primer.
    Retrieved from https://www.house.mn.gov/hrd/pubs/deterrence.pdf

Kahn, A., Jackson, J., Kully, C., Badger, K., & Halvorsen (2003).  Calling it rape:  Differences
    in experiences of women who do or do not label their sexual assault as rape.  *Psychology of Women Quarterly,*
    27, 233-242.  doi: 10.1111/1471-6402.00103.

Kozlowska, K., Walker, P., McLean, L., & Carrive, P. (2015).  Fear and the defense cascade: Clinical implications and
    management.  *Harvard Review of Psychiatry, 23*(4), 263–287.  doi:  10.1097/HRP.0000000000000065

Lowe M. & Rogers, P. (2017).  The scope of male rape: a selective review of research, policy
    and practice.  *Aggression and Violent Behavior, 35,* 38–43.  doi:  10.1016/j.avb. 2017.06.007.

Nadolny, T. & Kelly, C., (2019, October 4).  Uber shares personal rider information in sexual assault cases with a
    claims company without informing alleged victims.  *USA Today.*
    https://www.usatoday.com/story/news/investigations/2019/10/04/uber-uses-claims-company-for-settlements-
    sexual-assault-cases/3857008002/

Singh, S. (2016, December 9).  "Breaking down Uber's first safety transparency report."  *New America.*  https://www.newamerica.org/oti/blog/breaking-down-ubers-first-safety-transparency-report/#:~:text=Dec.,States%20in%202017%20and%202018.

US Equal Employment Opportunity Commission (2019, December 18).  Uber to pay $4.4 million to resolve EEOC Sexual Harassment and Retaliation charge.  *EEOC.gov.*  https://www.eeoc.gov/newsroom/uber-pay-44-million-resolve-eeoc-sexual-harassment-and-retaliation-charge

Valliere, V. (2019).  *Understanding Victims of Interpersonal Violence:  A Guide for Investigators and Prosecutors.*  Routledge Press.

Valliere, V. (2023).  *Unmasking the Sexual Offender.*  Routledge Press.

Venema, R. (2016).  Police officer schema of sexual assault reports:  Real rape, ambiguous cases, and false reports.  *Journal of Interpersonal Violence, 31(5),* 872-899.  doi:  10.1177/0886260514556765

Waldinger, M., Quinn, P., Dilleen, M., Mundayat, R., Schweitzer, D., &  Boolell, M. (2005).  A multinational population survey of intravaginal ejaculation latency time. *The Journal of Sexual Medicine*, 2(4), 492–497.  https://doi.org/10.1111/j.1743-6109.2005.00070.x

Yurieff, K. (2017, November 20).  Uber fined $8.9 million in Colorado for problematic background checks.  *CNN.*  https://money.cnn.com/2017/11/20/technology/uber-colorado-background-checks-fine/index.html

**APPENDIX A**
List of Materials Considered

All Citations and References in the Expert Report, Including the References Listed Above:
*(some may have been reviewed but not referenced)*

**Depositions**

Michael Akamine Deposition and Exhibits (5/19/25 and 5/20/25)
Brooke Anderson Deposition and Exhibits (05/01/25 and 05/02/25 and 5/6/25)
William Anderson Deposition and Exhibits (9/26/23)
Matthew Baker Deposition and Exhibits (11/13/24)
PMK (Emilie Boman) Deposition and Exhibits (3/5/25 and 4/1/25)
Tracy Breeden Deposition and Exhibits (3/13/25 and 3/14/25)
30(b)(6) (Gregory Brown) Deposition and Exhibits (6/17/25)
30(b)(6) (Gregory Brown) Deposition and Exhibits (July 15-16, 2025 and August 25-26, 2025)
PMK (Gregory Brown) Deposition and Exhibits (3/13/25 and 3/14/25 and 5/7/25)
30(b)(6) (Jamie Brown) Deposition and Exhibits (August 6, 2025)
Jordan Burke Deposition and Exhibits (3/20/25 and 3/21/25)
Faiz Bushra Deposition and Exhibits (5/13/25)
Philip Cardenas Deposition and Exhibits (2/26/25)
Frank Chang Deposition and Exhibits (5/9/25)
30(b)(6) (Heather Childs) Deposition and Exhibits (6/5/25)
Dennis Cinelli Deposition and Exhibits (3/28/25)
30(b)(6) (Chad Dobbs) Deposition and Exhibits (8/21/25)
30(b)(6) (Mariana Esteves) Deposition and Exhibits (7/15/25 and 8/28/25)
Chadd Fogg Deposition and Exhibits (2/5/25)
Cory Freivogel Deposition and Exhibits (12/10/24 and 2/6/25)
Henry (Gus) Fuldner Deposition and Exhibits (3/26/25 and 3/27/25 and 4/29/25)
30(b)(6) (Todd Gaddis) Deposition and Exhibits (7/11/25)
PMK (Todd Gaddis) Deposition and Exhibits (7/8/25 and 7/9/25 and 7/11/25)
Catherine Gibbons Deposition and Exhibits (6/5/25)
Ryan Graves Deposition and Exhibits (5/13/25)
Andrew Hasbun Deposition and Exhibits (4/10/25 and 4/11/25)
Cassandra Hawk Deposition and Exhibits (4/8/25)
Jill Hazelbaker Deposition and Exhibits (6/17/25)
Rachel Holt Deposition and Exhibits (12/12/24 and 4/9/25)
Jordan Hornback Deposition and Exhibits (3/31/25)
Nairi Hourdajian Deposition and Exhibits (2/7/25)
Meghan Joyce Deposition and Exhibits (2/26/25)
Roger Kaiser Deposition and Exhibits (11/19/24 and 4/22/25)
Travis Kalanick Deposition and Exhibits (7/3/25)
Sachin Kansal Deposition and Exhibits (5/28/25)
Dara Khosrowshahi Deposition and Exhibits (7/1/25)
Carly Lake Deposition and Exhibits (3/20/25 and 3/21/25)
Jenny Luu Deposition and Exhibits (2/27/25)
PMK (Katherine McDonald) Deposition and Exhibits (4/24/2025)
30(b)(6) (Katherine McDonald) Deposition and Exhibits (4/25/25)
Katherine McDonald Deposition and Exhibits (10/7/24 and 5/7/25)
30(b)(6) (Hannah Nilles) Deposition and Exhibits (6/30/25)
30(b)(6) (Hannah Nilles) Deposition and Exhibits (7/10/25)
30(b)(6) (Hannah Nilles) Deposition and Exhibits (7/23/25 and 8/7/25)
PMK (Hannah Nilles) Deposition and Exhibits (5/5/25 and 5/14/25 and 5/29/25)

30(b)(6) (Hannah Nilles) Deposition and Exhibits (August 7, 2025)
Jodi Page Deposition and Exhibits (5/21/25)
Katherine Parker Deposition and Exhibits (12/3/24 and 2/14/25)
PMK (Rebecca Payne) Deposition and Exhibits (4/2/25 and 4/3/25 and 5/2/25 and 5/12/25 and 5/13/25)
Andi Pimentel Deposition and Exhibits (10/15/24 and 3/27/25)
Cameron Poetzcher Deposition and Exhibits (6/4/25)
David Richter Deposition and Exhibits (2/24/25)
Brad Rosenthal Deposition and Exhibits (10/24/23)
30(b)(6) (Elizabeth Ross) Deposition and Exhibits (6/11/25 and 6/12/25)
Danielle Sheridan Deposition and Exhibits (5/15/25 and 5/16/25)
Valerie Shuping Deposition and Exhibits (4/17/25 and 4/18/25)
Nicholas Silver Deposition and Exhibits (11/21/24)
Troy Stevenson Deposition and Exhibits (10/21/24)
Joseph Sullivan Deposition and Exhibits (6/25/25)
Michael Sullivan Deposition and Exhibits (3/26/25)
Pat Twomey Deposition and Exhibits (5/29/25)
Kayla Whaling Deposition and Exhibits (2/28/25 and 4/22/25)
30(b)(6) (Sunny Wong) Deposition and Exhibits (6/25/25)
PMK (Sunny Wong) Deposition and Exhibits (4/16/25)
30(b)(6) (Sunny Wong) Deposition and Exhibits (7/23/25)
Defendants' Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC's Responses to Topics 3-15 of All
Plaintiffs' Notice of 30(b)(6) Deposition of Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC
(Recordkeeping) with Exhibits (7/2/25)

## Pleadings

### For Plaintiff J.D.:

**Master Long Form Complaint**, filed at ECF 269 in *In re:* Uber Technologies, Inc., Passenger Sexual
Assault Litigation.
**Plaintiff First Amended Bellwether Complaint and Demand for Jury Trial**, filed at ECF 2506 in *In
re:* Uber Technologies, Inc., Passenger Sexual Assault Litigation, No. 3:23-cv-06708 (N.D. Cal.).

### For Plaintiff LCHB128:

**Master Long Form Complaint**, filed at ECF 269 in *In re:* Uber Technologies, Inc., Passenger Sexual
Assault Litigation.
**Plaintiff's First Amended Short Form Complaint and Demand for Jury Trial**, directly filed on
March 14, 2025 at ECF 2509 as a member case (No. 3:24-cv-7019) in MDL 3084, *In re: Uber
Technologies, Inc., Passenger Sexual Assault Litigation* (N.D. Cal.).

### For Plaintiff A.R.:

**Master Long Form Complaint**, filed at ECF 269 in *In re:* Uber Technologies, Inc., Passenger Sexual
Assault Litigation.
**Plaintiff Short Form Complaint and Demand for Jury Trial**, directly filed on November 8, 2025 as a
member case (No. 3:24-cv-07821) in MDL 3084, In re: Uber Technologies, Inc., Passenger Sexual Assault
Litigation (N.D. Cal.).

### For Plaintiff WH 832:

**Master Long Form Complaint**, filed at ECF 269 in *In re:* Uber Technologies, Inc., Passenger Sexual
Assault Litigation.

**Plaintiff First Amended Bellwether Complaint and Demand for Jury Trial**, filed at ECF 2513 in *In re:* Uber Technologies, Inc., Passenger Sexual Assault Litigation, No. 3:24-cv-4900 (N.D. Cal.).

**For Plaintiff B.L.:**

**Master Long Form Complaint**, filed at ECF 269 in *In re*: Uber Technologies, Inc., Passenger Sexual Assault Litigation.

**Plaintiff Initial Complaint.** On August 9, 2024, Plaintiff B.L. filed her Complaint against Uber in the Superior Court of the State of California, County of San Francisco. Case No. CGC-24-617115. The case was later transferred and coordinated into the JCCP Case. 5188 by Order of the Court on October 14, 2024.

**Plaintiff Short-Form Complaint.** On November 11, 2024, Plaintiff B.L. filed her Short-Form Complaint against Uber at ECF 1 in *In re:* Uber Technologies, Inc., Passenger Sexual Assault Litigation, No. 3:24-cv-7940.

**Plaintiff First Amended Bellwether Complaint and Demand for Jury Trial**, filed at ECF 2092 in *In re:* Uber Technologies, Inc., Passenger Sexual Assault Litigation, No. 3:24-cv-7940 (N.D. Cal.).

**Plaintiff Second Amended Bellwether Complaint and Demand for Jury Trial**, filed at ECF 3925 in *In re:* Uber Technologies, Inc., Passenger Sexual Assault Litigation, No. 3:24-cv-7940 (N.D. Cal.).

**Other**

Safety Feature Timeline, Wong Ex. 1237
UBER_JCCP_MDL_003504225, Sheridan Ex. 3802
UBER_JCCP_MDL_001504282, Anderson Ex. 3253
UBER_JCCP_MDL_000221494, Anderson Ex. 3227
UBER000032843, Parker Ex. 601
UBER_JCCP_MDL_0032174, McDonald Ex. 3132
UBER_JCCP_MDL_002574011
UBER_JCCP_MDL_001144266, McDonald Ex. 3133
UBER000116047
UBER_JCCP_MDL_000253572, Nilles Ex. 3308B/Wong Ex. 2809
UBER_JCCP_MDL_001114231, Nilles Ex. 3317
UBER_JCCP_MDL_000960861, Nilles Ex. 3318
UBER_JCCP_MDL_000440631, Nilles Ex. 3301
UBER_JCCP_MDL_000197554, Nilles Ex. 3302
UBER_JCCP_MDL_000043441, Nilles Ex. 3313
UBER_JCCP_MDL_0000323152, Parker Ex. 649
UBER_JCCP_MDL_000251111, Breeden Ex. 276
UBER_JCCP_MDL_000366728, Brown Ex. 1710
UBER_JCCP_MDL_005587254, Brown Ex. 1096
UBER000184809
UBER_JCCP_MDL_002590503
UBER000141720
UBER000051603, Stevenson Ex. 210
UBER_JCCP_MDL_000255128, Sheridan Ex. 3801
UBER_JCCP_MDL_0002410662
UBER_JCCP_MDL_0001441337
UBER_JCCP_MDL_000257689, Childs Ex. 1012
UBER-MDL3084-000001336
UBER000031720
UBER_JCCP_MDL_000252298, Fuldner Ex. 434/Chang Ex. 766
UBER_JCCP_MDL_002340605
UBER_JCCP_MDL_000177686

UBER_JCCP_MDL_003390034
UBER_JCCP_MDL_003610540
UBER_JCCP_MDL_001732404
UBER_JCCP_MDL_003671804
UBER_JCCP_MDL_003046461
UBER_JCCP_MDL_000250691, Ross MDL Ex. 1056
UBER000205949, Ross MDL Ex. 1043
UBER_JCCP_MDL_002323084, Ross MDL Ex. 1054
UBER_JCCP_MDL_000180990, Ross Ex. 1053
UBER-MDL3084-000061685, Ross Ex. 1064
UBER_JCCP_MDL_000045534, Ross Ex. 1086
UBER000116045, Holt Ex. 816
UBER_JCCP_MDL_ 001283906, Hasbun Ex. 2707
UBER_JCCP_MDL_001755017, Payne Ex. 2527/ Wong Ex. 2807
UBER_JCCP_MDL_003019132, Payne Ex. 2518
UBER_JCCP_MDL_000323562, Parker Ex. 613
UBER_JCCP_MDL_000964270, Wong Ex. 2803
UBER_JCCP_MDL_001687315, Wong Ex. 2806
UBER_JCCP_MDL_001755017, Wong Ex. 2807
UBER_JCCP_MCL_000095992
UBER000204698, Wong Ex. 2808
UBER_JCCP_MDL_003231342, Wong Ex. 2811
(UBER_JCCP_MDL_000032174, McDonald Ex. 3131
UBER000051856, Kaiser Ex. 417
UBER_JCCP_MDL_002002958
UBER-MDL3084-000002859
UBER_JCCP_MDL_003039568
UBER_JCCP_MDL_003504225
UBER000146708
UBER_JCCP_MDL_000562617, Fuldner Ex. 429
UBER_JCCP_MDL_00057255
UBER_JCCP_MDL_001115040, Wong Ex. 2814
UBER_JCCP_MDL_001523846, Whaling Ex. 3008
UBER_JCCP_MDL_002253930
UBER_JCCP_MDL_000413295
UBER_JCCP_MDL_002003018
UBER_JCCP_MDL_002002847
UBER_JCCP_MDL_000508824
UBER_JCCP_MDL_000031164
UBER_JCCP_MDL_003211390, Esteves Ex. 1580
UBER_JCCP_MDL_002026377
UBER_JCCP_MDL_000254469
UBER_JCCP_MDL_002024004
UBER_JCCP_MDL_002618039
UBER_JCCP_MDL_001729997
UBER_JCCP_MDL_003306684
UBER_JCCP_MDL_002632983
UBER_JCCP_MDL_002658347
UBER_JCCP_MDL_002590503
UBER_JCCP_MDL_003037618
UBER-MDL3084-DFS00159710
UBER_JCCP_MDL_000366558 - UBER_JCCP_MDL_000366564
UBER_MDL3084-DFS00159711

UBER_JCCP_MDL_000434414, Sheridan Ex. 3811
UBER_JCCP_MDL_000230347, Lake Ex. 2006
UBER_JCCP_MDL_000483966
UBER_JCCP_MDL_000925759
UBER_JCCP_MDL_000003208
UBER_JCCP_MDL_000005921
UBER_JCCP_MDL_000003255
UBER_JCCP_MDL_000005945, Anderson Ex. 3246
UBER_JCCP_MDL_000007338, Boman Ex. 1527
UBER_JCCP_MDL_000007439
UBER_JCCP_MDL_000016187
UBER_JCCP_MDL_000016470
UBER_JCCP_MDL_000019678
UBER_JCCP_MDL_000020049
UBER_JCCP_MDL_000020835
UBER_JCCP_MDL_000521037
UBER-MDL3084-000074199, Albrecht Ex. 903
UBER-MDL3084-000111918
UBER-MDL3084-000114641, Burke Ex. 1901/Anderson Ex. 3202
UBER000035244
UBER000139274
UBER_JCCP_MDL_001115339, Boman Ex. 1505/Cardenas Ex. 1229
UBER_JCCP_MDL_000464515, Holt Ex. 809
UBER_JCCP_MDL_000112808, Boman Ex. 1510
UBER000035030, McDonald Ex. 23
UBER000001197, Silver Ex. 501
UBER_JCCP_MDL_001455278, Boman Ex. 1525
UBER_JCCP_MDL_001720325, Boman Ex. 1515
UBER_JCCP_MDL_000365413, Boman Ex. 1559
UBER000001386, Silver Ex. 508
2021-2022 US Safety Report, Silver Ex. 512
UBER000001302, Boman Ex. 3/McDonald Ex. 3
UBER_JCCP_MDL_000514613, Kaiser Ex. 402
UBER_JCCP_MDL_000411801, Anderson Ex. 3244
UBER000025884, Freivogel Ex. 717
UBER_JCCP_MDL_000208167, Anderson Ex. 3256
UBER000101624, Kansal Ex. 903
"Uber Trips with Reports of Sexual Assault or Sexual Misconduct (U.S. Only)," Anderson Ex. 3206
UBER_JCCP_MDL_003399309 Valliere, Veronique page 28
UBER_JCCP_MDL_00001950471, Joyce Ex. 199
UBER_JCCP_MDL_000502028, Luu Ex. 238
UBER_JCCP_MDL_001718754, Luu Ex. 237
UBER_JCCP_MDL_000908311, Shuping Ex. 2911
UBER-MDL3084-000253990/UBER_JCCP_MDL_000253990, Luu Ex. 1400
UBER_JCCP_MDL_003913231, Brown Ex. 1097
UBER_JCCP_MDL_001754542
UBER_JCCP_MDL_000889155
UBER_JCCP_MDL_000258743, Shuping Ex. 2913
UBER_JCCP_MDL_00230090, Freivogel Ex. 55
UBER_JCCP_MDL_000258366, Faiz Ex. 794/Sheridan Ex. 3804
UBER_JCCP_MDL_001532685
UBER_JCCP_MDL_002707235
UBER_JCCP_MDL_002063229

UBER_JCCP_MDL_000504037
UBER000001302, Boman Ex. 3
UBER_JCCP_MDL_000007083, Chang Ex. 749
UBER_JCCP_MDL_001720345, Ross Ex. 1049
UBER_JCCP_MDL_003231342, Nilles Ex. 1884
UBER_JCCP_MDL_000031720, Nilles Ex. 1885
UBER_JCCP_MDL_003204225, Ross Ex. 1060
UBER_JCCP_MDL_00025790228
UBER_JCCP_MDL_000172793, Fuldner Ex. 414
UBER_JCCP_MDL_002655853, Ross Ex. 1063
UBER_JCCP_MDL_00516734, Esteves Ex. 1586
Ross Ex. 1068
UBER_JCCP_MDL_000907562, Luu Ex. 207
UBER_JCCP_MDL_000551951, Akamine Ex. 874
UBER000039105, Burke Ex. 1911
UBER-MDL3084-000067465
UBER_JCCP_MDL_001737430, Chang Ex. 759
UBER000101624, Chang Ex. 760
UBER000132483, Chang Ex. 761
UBER_JCCP_MDL_001687372, Chang Ex. 764
UBER_JCCP_MDL_000253573
UBER000001302
UBER_JCCP_MDL_003664785, Ross Ex. 1046
UBER_JCCP_MDL_002743399, Ross. Ex. 1070
UBER_JCCP_MDL_003039568, Esteves Ex. 1583
Ross Ex. 1057
UBER_JCCP_MDL_003340515, Page Ex. 4103
Esteves Ex. 1991, Safety Features M. Esteves Deposition Aid
MDL3084-000045388, Kalanick Ex. 1351)
MDL_JCCP_MDL_000251968, Fuldner Ex. 454
UBER_JCCP_MDL_000868150, Luu Ex. 225
UBER000182899, Brown Ex. 1100
UBER_JCCP_MDL_001563463, Payne Ex. 3401
UBER_JCCP_MDL_001055985, Whaling Ex. 3006
UBER_JCCP_MDL_000026890, Whaling Ex. 3007
UBER_JCCP_MDL_000447888, Nilles Ex. 1313
UBER_JCCP_MDL_000118663, Brown Ex. 1112
UBER_JCCP_MCL_000095992, Fuldner Ex. 452
UBER_JCCP_MDL_000548326, Luu Ex. 236
UBER_JCCP_MDL_002473691
UBER_JCCP_MDL_005439619
UBER_JCCP_MDL_002125316
UBER_JCCP_MDL_000572555
UBER_JCCP_MDL_000476020, Fuldner Ex. 427
UBER_JCCP_MDL_000553924, Fuldner Ex. 428
UBER_JCCP_MDL_000487379, Fuldner Ex. 430
Esteves Ex. 2018
UBER_JCCP_MDL_003603034, Esteves Ex. 2019
UBER_JCCP_MDL_000188659
UBER000226515
UBER_JCCP_MDL_003017771, Esteves Ex. 2020
UBER_JCCP_MDL_000387036, Whaling Ex. 3005
UBER_JCCP_MDL_003279797, Nilles Ex. 1731

UBER_JCCP_MDL_000131396, Fuldner Ex. 2219
UBER_JCCP_MDL_000864943, Cinelli Ex. 463
UBER_JCCP_MDL_000303417
UBER_JCCP_MDL_0005389723
UBER_JCCP_MDL_003273474
UBER_JCCP_MDL_000123100
UBER_JCCP_MDL_000573350, Brown Ex. 1735
UBER_JCCP_MDL_000584033
UBER_JCCP_MDL_002289722
UBER_MDL_001719681, Nilles Ex. 1723
UBER_JCCP_MDL_000150947, Nilles Ex. 3312
UBER_JCCP_MDL_001724095
UBER_JCCP_MDL_003281797, Fuldner Ex. 2208
UBER_JCCP_MDL_003400768, Chang Ex. 767
UBER_JCCP_MDL_001840632, Kansal Ex. 4203
UBER000017032
UBER_JCCP_MDL_000366554, Childs Ex. 1014
"In re Uber Technologies, Inc., Passenger Sexual Assault Litigation (Case No.: 3:23-MD-03084
CRB) Supplemental Information Provided by Defendants Pursuant to the Parties' Agreement,
Dated April 4, 2025," McDonald Ex. 3117
"In re Uber Technologies, Inc., Passenger Sexual Assault Litigation (Case No.: 3:23-MD-03084
CRB) Incident Report Classification for 2023-2024," Gaddis Ex. 4902
"Uber Trips with Report of Sexual Assault or Sexual Misconduct (U.S. Only)," Gaddis Ex. 4905
Uber 2009-2024 Incident Data (Demonstrative)
Uber's Second Amended Responses to Plaintiffs' Second Set of Interrogatories, dated May 28, 2025
Incident Report Classification of Dominant Tickets for 2017-2024, dated September 12, 2025
Table and Figures Pulled from the Report of Lacey Keller
UBER000017036
UBER000239412

**APPENDIX B**

1. **2012 Cleveland Park Rape**
   a. **Kalanick Ex. 1340**, "Uber Driver Arrested for Rape: Anouar Habib Trabelsi Arrested, Not Charged with Sexual Assault of Femail Passenger in Washington, D.C. (UPDATED), Huff Post, 3/14/2013
2. **2014 Boston Rape**
   a. **CBS News Article**, "DA: DNA Links Former Uber Driver to Esplanade, South Boston Assaults," 7/14/2015
3. **Buzzfeed**
   a. **Hourdajian Ex. 104** "Internal Data Offers Glimpse At Uber Sex Assault Complaints. " Buzzfeed, 3/6/2016
   b. **Hourdajian Ex. 105** "Uber Responds to Buzzfeed Story on Sex Assault Complaints," Buzzfeed, 3/8/2016
   c. **Hourdajian Ex. 106**, "Uber Apologizes for "Imperfect (And Fictitious)" Rebuttal of Buzzfeed News Claim," BuzzFeed, 3/7/2016
4. *CNN Article 2018/2019*
   a. https://www.cnn.com/2018/05/05/us/weekend-reads-may-5-trnd
   b. https://www.cnn.com/videos/cnnmoney/2018/05/15/uber-drivers-sexual-assault-abuse-lawsuit-policies-griffin-dnt-newday.cnn
   c. https://www.cnn.com/2018/09/28/tech/uber-driver-sexual-assault
5. **Nilles Ex. 1307,** "An Uber driver was asked to take a woman home. He drove her to a motel instead, police say." Washington Post, 10/2016
6. **Nilles Ex. 1308,** "Napa Woman Shares Terrifying Experience with Uber Driver," fox40.com, 9/24/2016
7. **Nilles Ex. 1319,** ABC WCVB Video re Chelmsford, MA Sexual Assault in Uber, February 2025
8. **Nilles Ex. 1320,** Fox Philadelphia Video re Montgomery County, PA Sexual Assault in Uber, March 2025
9. **Nilles Ex. 1321,** CBS Miami Video re Sexual Assault in Uber, March 2025
10. **Childs Ex. 1015** NBC DFW Video, "Disturbing details revealed in alleged assault on 12-year-old rider by Uber driver in North Texas," 7/22/2024
11. **Childs Ex. 1016** KOMO News Video, "King County Uber/Lyft driver charged with second degree rape of 13-year-old passenger," 11/4/2021
12. **Washington Post video,** "When rides go Wrong. How Uber's investigations unit works to limit the company's liability," 9/26/2019.
13. **Daily Dot Article 2022**: https://www.dailydot.com/irl/uber-driver-breaks-into-home/
14. **Egyptian Streets Article 2024**: https://egyptianstreets.com/2024/09/10/uber-unveils-new-safety-measures-in-the-wake-of-recent-incidents/
15. **Mass Live Article, 2025:** https://www.masslive.com/news/2025/02/uber-calls-rape-allegation-horrifying-what-safety-measures-are-in-place.html
16. **News12 Article, 2024:** https://longisland.news12.com/women-recount-scary-uber-experience-following-viral-post
17. **7KBZK Article, 2025:** https://www.kbzk.com/news/local-news/safety-questions-arise-after-uber-driver-allegedly-arrested-for-dui-in-bozeman-with-passenger-in-the-back

18. **WCVB Article, 2025:** https://www.wcvb.com/article/massachusetts-uber-driver-accused-of-sexually-assaulting-passenger-feb-18-2025/63832798
19. **Fox29 Article, 2025:** https://www.fox29.com/news/uber-driver-accused-groping-female-passenger-following-her-her-door-montgomery-county
20. **CBS News Article, 2025**: https://www.cbsnews.com/miami/news/uber-driver-accused-of-sexually-assaulting-passenger-in-miami-police-say/
21. **New Canaan Advertiser Article, 2025**: https://www.ncadvertiser.com/journalinquirer/article/east-hartford-police-uber-driver-sex-assault-boafo-20251360.php
22. **WSB-TV 2 Article, 2025:** https://www.wsbtv.com/news/local/atlanta/atlanta-hawks-reporter-says-uber-driver-attacked-her-over-car-ac/EBOHAOPIH5HWZL5BYNGI7WVRZQ/
23. **ABC 7 Article, 2024:** https://abc7chicago.com/post/uber-driver-allegedly-damaged-south-suburban-familys-home-car-after-son-gave-1-star-rating-following-trip-orland-square-mall/15233002/
24. **Youtube Video, "The Signs – a PSA from PAVE and Ride Responsibly Starring Pamela Anderson"** https://www.youtube.com/watch?v=bb9ZxP4rgSk, 1/8/2018
25. **Youtube Video, "The Driving Game – A Ride Responsibility PSA Starring Pamela Anderson"** https://www.youtube.com/watch?v=KwGs9Du9NUc, 11/2/2016
26. **Youtube Video by LoeyBug,** "The Scariest Night of My Life (the Uber attempted kidnapping)" https://www.youtube.com/watch?v=PCciv0solTo, 4/3/2022
27. **Order Instituting Rulemaking on Regulations Relating to Passenger Carriers Ridesharing and New Online-Enabled Transportation Services:** CPUC decision
28. **California Code, PEN 11105** https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=11105&lawCode=PEN
29. **Applicant Agencies, Fingerprints & Background Checks:** https://oag.ca.gov/fingerprints/agencies#:~:text=Agency%20Authorization,you%20of%20the%20next%20steps.&text=If%20you%20have%20any%20questions,@doj.ca.gov.
30. **Teen Rides are being shut down in California:** https://www.benedelman.org/pdf/uber-teen-california-20dec2024.pdf
31. **CPUC Decision Dec 16, 2024:** https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M549/K477/549477126.PDF
32. **Stateline Article, 2025**: https://stateline.org/2025/06/18/uber-lyft-oppose-some-bills-that-aim-to-prevent-assaults-during-rides/
33. **Colorado Sun Article, 2025:** https://coloradosun.com/2025/04/23/uber-exit-colorado-threat-rideshare-safety-bill/
34. **KKTV Article, 2025:** https://www.kktv.com/2025/05/07/uber-reiterates-threat-pull-out-colorado-after-legislature-passes-rideshare-bill/
35. **CNN Article, 2025:** https://www.cnn.com/2025/06/02/us/boulder-colorado-antisemitic-attack-mohamed-soliman-invs
36. **Gazette Article, 2025:** https://gazette.com/news/crime/mohamed-soliman-job-colorado-springs/article_ab82667c-9f9f-4efa-8687-5e9ecf349413.html (webpage available)
37. **Fox 4 Article, 2025**: https://www.fox4now.com/local/news/lee-county/former-uber-driver-sentenced-to-life-in-prison-for-raping-lee-county-passenger
38. **Wavy Article, 2024:** https://www.wavy.com/news/crime/familys-worst-nightmare-uber-driver-accused-of-raping-killing-woman/

Valliere, Veronique                                                                 page 60

39. **03.18.2025 Uber Letter to Chair Britto:**
   https://www.rilegislature.gov/senators/SenateComDocs/Commerce/S0598%20Uber.pdf

40. **05.27.2022 Uber Statement in Response to San Diego Sexual Assault Allegations:**
   https://ewscripps.brightspotcdn.com/8d/78/e78bc5bd40029d684dafa229aed8/statement-uber.pdf

   a. **ABC 10 Article, 2022:** https://www.10news.com/news/local-news/san-diego-news/san-diego-law-firm-suing-uber-lyft-following-sexual-assault-allegations

**APPENDIX C**

**CV, Publications, and Prior Testimony**

# Veronique Nicole Valliere, Psy.D.

726 Church Street, P.O. Box 864, Fogelsville, PA  18051
(610) 530-8392   FAX (610) 530-8940
Forensic Treatment Services, 732 Turner Street, Allentown, PA  18102
(610) 433-1529    FAX (610) 289-4883
www.vallierecounseling.com • drvalliere@vallierecounseling.com

## EDUCATIONAL HISTORY

January, 1993- Received Doctorate in Psychology, Clinical Psychology.  Department of Clinical Psychology, Graduate School of Applied and Professional Psychology, Rutgers, The State University, Piscataway, NJ.  08854.  APA Accredited program.

May, 1987 - Bachelor of Arts degree, **Magna cum laude.**  Psychology, St. Mary's College of Maryland, St. Mary's City, MD.

## AREAS OF EXPERTISE

- Sexual offenders - behavioral analysis, risk assessment, rehabilitative potential, treatment, and management.  Evaluations and/or treatment of well over 2000 offenders.
- Victims of interpersonal violence (sexual assault/abuse, psychological abuse, and physical abuse), both child and adult - victim response to assault, factors impacting victim behavior, disclosure, "counterintuitive" behavior, offender influence over victim, treatment, and impact of assault.  Worked with hundreds of victims and educated about victim response through work with perpetrators.
- Domestic violence – perpetrators and victims, relationship/abuse dynamics, risk of recidivism and lethality, impact on children, and treatment.  Works with hundreds of offenders in outpatient violence intervention, as well as victims.

## LICENSURE/MEMBERSHIPS

- Licensed by Commonwealth of Pennsylvania as Psychologist.  May, 1995.
- Licensed by State of New York as a Psychologist.  May 2024.
- Authorized for PsyPact, interstate compact for telehealth practice across over 30 states.
- Listed in National Register of Health Services Providers in Psychology since 2003.
- Senior Advisor, Lasso Safe, non-profit for psychological, physical, and sexual safety for athletes (2022 – present).
- Member of the American Psychological Association.  January, 1994 - present.
- Clinical Member of the Association for the Treatment of Sexual Abusers.  July, 1995 - present.
- Member, American Professional Society on the Abuse of Children, April, 2012 – present.
- Committee Member of the Pennsylvania Sexual Offender Management Team.  October, 2005 – May, 2007.
- Member, Committee Chair, Lehigh Valley Task Force Against Sexual Abuse.  Sept., 1993 - March, 1996.

## RELEVANT PUBLICATIONS

- Valliere, V. N. (2023).  Unmasking the Sexual Offender.  Routledge Press.
- Valliere, V. N. (2023).  Current issues in understanding sexual victimization.  In R. Lovell & J.
- Langhinrichsen-Rohling (Eds.) Sexual Assault Kits and Reforming the Response to Rape.
  Routledge Press.
- Valliere, V. N. (2019).  Understanding Victim Response to Interpersonal Violence.
  Routledge Press.
- Ryan, B. & Valliere, V. (2023).  Successful Prosecution of Intimate Violence:  Making it
  Offender-
  Focused.  Routledge Press.
- Valliere, V. N. (2024).  To tell or not to tell:  Is that the question?  Victim decision-making.
  In M. Miller, L. Yelderman, M. Huss, & J. Cantone (Eds) The Cambridge Handbook of
  Psychology and Legal Decision-Making.  Cambridge University Press.

## HONORS/APPOINTMENTS/ACHIEVEMENTS

- Appointed to the Pennsylvania State Board to Assess Sexually Violent Predators by
  Pennsylvania Governor Thomas Ridge.  Four year appointment.  June, 1997.  *Continuously
  reappointed since original appointment.*
- Expert used in Commonwealth v. William Cosby
- Tedx Talk – "Sexual Assault and the V Word," September 9, 2016.
- Appeared on national news media – "PBS News Hour" and "CBS Morning Show"
- Awarded the Albert Nelson Marquis Lifetime Achievement Award in 2019
- Provided training to the FBI on Sexual Offenders and the DOJ on Counterintuitive Victim
  Behavior.
- Provided training for the National Advocacy Center (NAC), Charleston, SC
- Provide training for the Bureau of Indian Affairs on perpetrators and victims.
- Consulted/trained the Department of Defense on Sexual Assault at the Military Academies.
- Served as an expert witness in over 100 courts martials for all branches of the military.
- Provide training to the ARMY for new prosecutors on sexual offenders and victim behavior, as
  well as presented at USAEUR Sharp Conference and for TJAG Graduate Courses in
  Charlottesville.
- Presented trainings on perpetrators and victims for Alberta Crown Prosecutors, Ontario Police,
  and RCMP in Toronto.
- Co-lead a national webinar on "Explaining Victim Behavior in Sexual Assault Cases: Deciding
  When and Understanding How to Introduce Expert Testimony," sponsored by Battered
  Women's Justice Project and AEquitas.
- Participated in re-writing Interviewing Child Victims and Witnesses of Sexual Abuse, a
  Department of Justice Publication, 2012 (in press).
- Expert Witness used for one of the "Top 100 Verdicts of 2010," involved in 25 million dollar jury
  award to victim of sexual assault.
- Testified during a public hearing to the Pennsylvania House Judiciary Committee on House Bill
  2255, on use of expert testimony to explain victim behavior.  September 8, 2010.
- Testified in front of the U.S. Congress during a HEARING OF THE NATIONAL SECURITY AND
  FOREIGN AFFAIRS SUBCOMMITTEE OF THE HOUSE OVERSIGHT AND GOVERNMENT REFORMS
  COMMITTEE SUBJECT: SEXUAL ASSAULT IN THE MILITARY PART III: CONTEXT AND CAUSES, June
  25, 2009.
- Presented the award for "Outstanding Community Provider" from Pennsylvania Coalition
  Against Rape, 2007.
- Trained nationally and internationally on sexual offenders, domestic violence, and victims and

victim behaviors.
- Board of Directors, Edison Court Inc., which includes Mathom House – residential adolescent sexual offender treatment and Raven Hill Psychological Services from 2009 - 2014.
- Provided training on sexual offenders to the Department of Defense Task Force Against Sexual Assault in Alexandria, Virginia.  Used as a trainer for the military TCAP Trial Advocacy Training (2006 – present).
- Prison Rape Elimination Act Curriculum Development Committee Member (2007 – 2009)
- Qualified as an expert witness in the field of clinical and forensic psychology, child abuse, sexual abuse, trauma and victimization, and assessment and evaluation of sexual offenders in the following counties in Pennsylvania:  Lehigh, Northampton, Berks, Bucks, Butler, Montgomery, Philadelphia, Carbon, Monroe, Pike, Northumberland, Schyulkill, Lackawanna, Luzerne, Lancaster, Cambria, Franklin, Fulton, Mercer, Centre, Columbia, York, Allegheny.
- Used as an expert witness in sexual offenders, victims, and sexual abuse in Pennsylvania, New Jersey, Texas, Wyoming, Germany, Italy.
- Graduated *magna cum laude*, St. Mary's Honors Student, St. Mary's Scholar.  May, 1987.
- Keynote Speaker for the Child Abuse Prevention Month Kick-Off Celebration, April, 1999.
- Nominated and Selected for "Who's Who in American Universities and Colleges, 1986".
- "Division Award in Human Development," presented to student in psychology who has given the
  most to the department of psychology/human development and demonstrates the most promise for the field.  May, 1987.
- "Dean's Award for Contribution to Student Life," presented to the Doctor of Psychology Student who has done the most to foster and enhance the quality of life at the Graduate School of Applied and Professional Psychology.  May, 1990.
- Interviewed and quoted in a number of popular magazines and news media, including Washington Post, Huffington Post, The Atlantic, People, Self, Good Housekeeping, and New York Times.

## EMPLOYMENT HISTORY and TRAINING EXPERIENCE

**President/Owner**, Valliere & Counseling Associates, Inc., Fogelsville and Allentown, PA.  Owns and operates two outpatient treatment facilities.  Valliere & Counseling Associates is an outpatient treatment facility for victimization and other mental health issues, serving children, adolescents, and adults.  Provides administration, supervision, assessment and therapy.  Forensic Treatment Services is an outpatient violent offender program, treating perpetrators of sexual and intimate abuse.  Provides evaluation, treatment, supervision, management, and consultation. March, 2003 – present.

**Clinical Assistant Professor** – Philadelphia College of Osteopathic Medicine, Philadelphia, PA. Provide clinical training to pre-doctoral students in pre-doctoral practicum placement.  2014 – present.

**Consultant/Trainer** – Fox Valley Technical College/Amber Alert Training.  Provide trainings and consult with Amber Alert staff on victims and perpetrators.  2012 – 2017.

**Consultant,** Aequitas – The Prosecutor's Resource on Violence Against Women.  Train prosecutors on sexual offenders and victims, including non-intuitive victim behavior and trauma nationally. September, 2009 – 2013.

**Faculty,** National Center for the Prosecution of Sexual Violence, American Prosecutor's Research Institute, Virginia. Travel throughout the country to assist in training nation's prosecutor's in the prosecution of sexual crimes.  Lecture about sexual offenders, dealing with victim's,

understanding sexual offense patterns, and assist in skill building exercises for trials with prosecutors. March, 2006 – Summer, 2009.

**Consultant**, Archdiocese of Philadelphia, Philadelphia, PA.  March, 2007 – February, 2010.

**Consultant/Trainer** – Pennsylvania State Board of Probation and Parole – February, 2009 – June, 2009.  Trained hearing examiners and Parole Board Members on identifying and interviewing violent offenders to facilitate improved risk assessment and release decisions.

**Psychologist**, Private Practice, Fogelsville, PA.  Providing therapy and assessments. August, 1996 – February, 2003 (see above).

**Director of Outpatient Services**. Confront and Forensic Treatment Services, Allentown, PA.  Promoted to full directorship and supervision of Confront, a mental health/drug and alcohol outpatient program and Forensic Treatment Services, an outpatient sex offender treatment program.  Maintained responsibilities of clinical supervisor role.  Additionally, performed fiscal management, supervised operations management, supervised contract therapeutic staff, and performed various administrative tasks.  October, 1994 – February, 2003.

**Clinical Consultant**, Mentor Network.  Providing clinical consultation for treatment and assessment of sexually aggressive youth in foster care.  June, 2002 – 2004.

**Clinical Director**, Confront, Allentown, PA.  Promoted to full directorship and supervision of Confront.  Maintained responsibilities of clinical supervisor role.  April, 1994 - October, 1994.

**Clinical Supervisor**, Confront, Allentown, PA.  Provide individual and group therapy for substance abusers, victims of sexual abuse, sex offenders, and domestic violence perpetrators in an outpatient setting. May, 1993 - April, 1994.

**Predoctoral Intern**, The Brandywine Center, Devereux Foundation, Glenmoore, PA. APA approved internship site.  September, 1991 - September, 1992.

**Visiting Faculty**, Princeton University, Princeton, NJ. February, 1990 - June, 1990.

## DOCTORAL DISSERTATION

"Relationships among alcohol abuse/dependency diagnoses, alcohol expectancies, and offenses in convicted sex offenders."

## PUBLICATIONS/POSTERS/PAPERS

- Ryan, B. & Valliere, V. (2023).  Successful Prosecution of Intimate Violence:  Making it Offender-Focused.  Routledge Press.
- Valliere, V. N. (2024).  To tell or not to tell:  Is that the question?  Victim decision-making.  In M. Miller, L. Yelderman,
    M. Huss, & J. Cantone (Eds) *The Cambridge Handbook of Psychology and Legal Decision-Making.* Cambridge University Press.
- Valliere, V. N. (2023).  Promoting rape, murder, and child sexual assault?  Basics about the dangerous subculture
       of Incels. *Family & Intimate Partner Violence Quarterly, 16(1), 49-54.*
- Valliere, V. N. (2023).  Promoting rape, murder, and child sexual assault?  Basics about the dangerous subculture
       of Incels. *Sexual Assault Report, 26(6), 97 – 100.*

- Valliere, V. N. (2023).  Unmasking the Sexual Offender.  Routledge Press.
- Valliere, V. N. (2023).  Current issues in international sexual victimization.  In R. Lovell & J. Langhinrichsen-Rohling (Eds.) Sexual Assault Kits and Reforming the Response to Rape.  Routledge Press.
- Valliere, V. N. (2019).  Understanding Victim Response to Interpersonal Violence.  Routledge Press.
- Valliere, V. N. (2016)  Toby Tries a Taco.  Authorhouse.  (illustrated children's book)
- Valliere, V. N. (2007).  "Understanding the Non-Stranger Rapist."  The Voice, Volume 1, No. 11.  National District
    Attorneys Association.
- Valliere, V. N. (1997).  Relationships between alcohol use, alcohol expectancies, and sexual offenses in convicted offenders.  In Schwartz and Cellini (Eds.) The Sexual Offender: Volume II.  Kingston, NJ:  Civic Research Institute.
- Valliere, V. & Lessig, R. (1995, October 13).  Alcohol, sex offending, and treatment:  Examining the relationship between drinking and sex offending.  Poster presented at the 14th annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers, New Orleans, LA.
- Valliere, V. N. (1994, October).  Responsibility as a therapeutic tool.  The Interchange, p. 10,12.
- Valliere, V. N. (1993, December).  Five ways psychoeducation can enhance your practice.  The Interchange, p. 4.
- Valliere, V. N. (1993, December).  Cognitive techniques with sexually abused clients.  The Interchange, p. 10.
- Valliere, V. N. (1993, October).  The surprising benefit of rituals for client healing  The Interchange, p. 4.
- Valliere, V. N. (1993, September).  How to keep yourself going.  The Interchange. p. 4.
- Valliere, V. N. (1993, August).  Is it really clinical depression?  The Interchange, p. 11.
- Valliere, V. N. (1993, August).  Using play therapy to diagnose problems.  The Interchange, p. 12.
- Glidden, L., Valliere, V. N., Herbert, S. L. (1988).  Adopted children with mental retardation:  Positive family impact, Mental Retardation, 26, 119 -125.
- Pettinati, H. M., Evans, B. D., Jensen, J., Meyers, K., Valliere, V., & Ergin, A. (1990, May, 16).  Cocaine abuse:  Changes in Axis-II with treatment.  Poster presented at annual meeting of American Psychiatric Association, New York.
- Meyers, K., Jaeger, J. L., Valliere, V. N., Jensen, J. M., Pettinati, H. M., Evans, B. D.,  & Sargiotto, P. (1990, June 11).  HIV-risk behaviors among a middle class population:  Adolescent and adult substance users.  Poster presented at the Annual Scientific Meeting of the Committee on Problems of Drug Dependence, Richmond, VA.
- Jensen, J. M., Pettinati, H. M., Evans, B. D., Meyers, K., & Valliere, V. N. (1990, June 13). Impulsivity and substance users:  Changes with treatment and recovery.  Poster presented at the Annual Scientific Meeting of the Committee on Problems of Drug Dependence, Richmond, VA.
- Jensen, J. M., Pettinati, H. M., Meyers, K., & Valliere, V. (1990, August 12).  Impulsivity and substance abusers:  State versus trait?  Paper presented at the annual meeting of the American Psychological  Association, Boston.

## TRAININGS/INSERVICES

*This list is not comprehensive.  Dr. Valliere has trained for state wide forensic and judicial conferences and provided other trainings not listed below including*

*Founder and Organizer of* **"Right From the Start: Understanding, Investigating, and Intervening in Violence towards Women and Children" Conference**, *held annually since 2010, Macungie, PA.*

Trained/presented at the following national conferences
- Conference on Crimes Against Women, Dallas, TX
- Conference on Crimes Against Children, Dallas, TX
- Elimination of Violence Against Women, Dallas, TX
- Congress of the International Association of Law and Mental Health, Prague, Czech. (2017)
- National Advocacy Center, Charleston, SC

Trained for various agencies/associations in the following states/Districts:  California, Colorado, Florida,

Valliere, Veronique                                                                page 66

Kentucky,
    Louisiana, New Jersey, Oregon, South Carolina, Texas, Wyoming, Washington, Washington DC.

Trained internationally on interpersonal violence in: Canada; St. Thomas; Czech Republic.

## OTHER RELEVANT EXPERIENCE

- Approved internship supervisor for: Bryn Mawr School of Social Work; Chestnut Hill University; Kutztown University; DeSales University; John Jay School of Criminal Justice; Marywood University; Philadelphia College of Osteopathic Medicine; Fairleigh Dickinson; and Lehigh University.
- Approved provider by the Pennsylvania Sexual Offenders Assessment Board to provide sexual offender treatment for Sexually Violent Predators.
- Appeared on numerous television broadcasts and radio shows addressing topics of domestic violence, teen dating violence, victim issues, and sexual offenders.
- Qualified to train on the administration of the Static-99 Actuarial Risk Instrument.
- Appeared on "Smart Talk: Public Awareness and Sexual Offenders" television broadcast on May 5, 2005 on WITF-TV.
- Provided training in the supervision and management of paroled sexual offenders to Philadelphia State Parole Special Unit agents.
- Invited trainer for Pennsylvania Judges, Pennsylvania Polygraph Association, Pathways Conference, Forensic Nursing Conference, Forensic Mental Health Conference, and numerous other organizations.

### TESTIMONIAL EXPERIENCE (JANUARY 2019 – MAY 2025)

I have provided testimony or given depositions in the following hearings/cases during the named time period. This list does not include my involvement in evaluations or consultations for cases in which I have not testified or given a deposition. In cases involving civil commitment or juveniles, I have only provided initials due to reasons of confidentiality. All cases referring to county District Attorney's occurred in Pennsylvania.

### Criminal Trials/Courts Martials

**2019**
| | |
|---|---|
| US v Wallace | US Navy |
| Commonwealth v Velazquez | Centre County District Attorney |
| Commonwealth v Travers | Pennsylvania Attorney General |
| Commonwealth v Ivy | Mercer County District Attorney |
| Commonwealth v Rogers | Franklin County District Attorney |
| US v Gaytan | US Navy |
| Commonwealth v Thompkins | Blair County District Attorney |
| **2020** | |
| US v Bitsilly | United States Attorney General |
| **2021** | |
| Commonwealth v Berta-Vega | Northampton County District Attorney |
| Commonwealth v Brown | Franklin County District Attorney |
| **2022** | |
| Commonwealth v Farmer | Northampton County District Attorney |
| Commonwealth v Norris | Clearfield County District Attorney |
| Commonwealth v Santiago | Northampton County District Attorney |
| **2023** | |
| Commonwealth v Nixon | Montgomery County District Attorney |
| Commonwealth v Thomas | Pennsylvania Attorney Generals Office |

Valliere, Veronique                                                    page 67

Commonwealth v Pringle                Columbia County District Attorney
Commonwealth v Selman                 Franklin County District Attorney
Commonwealth v Horton                 Fulton County District Attorney
Commonwealth v Heefner                Franklin County District Attorney
Commonwealth v Baum                   Armstrong County/PA AG office
Commonwealth v Horton                 Fulton County District Attorney
Commonwealth v Nakonechi              Pennsylvania Attorney General
US v Salazar                          United States Attorney General
**2024**
US v Aguilar                          United States Attorney General
Commonwealth v Nattress               Pennsylvania Attorney General Office
Commonwealth v Roberts                Pennsylvania Attorney General Office
Commonwealth v Lenhart                Pennsylvania Attorney General Office
Commonwealth v Klingensmith           Clearfield County District Attorney
Commonwealth v Sheffer                Pennsylvania Attorney General Office
Commonwealth v Vladinsky              Centre County District Attorney
**2025**
US v Pratt                            US Army Trial Defense Team
Commonwealth v Sheffer                Pennsylvania Attorney General Office
Commonwealth v Vladinsky              Pennsylvania Attorney General Office
Commonwealth v Bisler                 Pennsylvania Attorney General Office
Commonwealth v Munoz                  Delaware County District Attorney
US v McCoy                            US Department of Justice
US v Grover                           US Department of Justice

## Civil Lawsuits

DeNicola v Massage Envy – deposition (2022)
Professional Affairs Board Hearing re: Weaver (2021)
Myer v Housing Authority (2023)
Doe v. Waldman (2023)
Doe v. Deutsche Bank – deposition (2023)
LYFT Rideshare Cases – deposition (2023)
Stokes v Georgetown College – deposition (2024)
Doe v School District of Camden et al. – trial testimony (2024)
Craft v Tutor – Deposition (2024)
Alvarado v City of Philadelphia et al – trial testimony (2024)
Tresslar v Northampton County – deposition – non-expert witness (2025)
Jane Doe v. Uber Technologies, Inc. – deposition and trial testimony (2025)
Jane Doe v. Lyft – Deposition (2025)

## Sexual Violent Predator Hearings
## (all counties are Pennsylvania counties)

**2019**
Commonwealth v Dueno                  Northampton County District Attorney
Commonwealth v Martinez Olacio        Berks County District Attorney
Commonwealth v Branch                 Montgomery County District Attorney
Commonwealth v Mull                   Northampton County District Attorney
Commonwealth v Norberto               Montgomery County District Attorney
Commonwealth v Rodriguez              Berks County District Attorney
Commonwealth v Santiago               Montgomery County District Attorney
Commonwealth v Hood                   Lehigh County District Attorney
Commonwealth v Perez                  Berks County District Attorney
**2020**
Commonwealth v Bodnari                Berks County District Attorney
Commonwealth v Pagan                  Montgomery County District Attorney

Valliere, Veronique                                                    page 68

| | |
|---|---|
| Commonwealth v Garcia | Northampton County District Attorney |
| Commonwealth v Seidel | Northampton County District Attorney |
| Commonwealth v Cruz | Berks County District Attorney |
| Commonwealth v Ehrhart | Berks County District Attorney |
| Commonwealth v Ricketts | Lehigh County District Attorney |
| Commonwealth v Santiago | Lehigh County District Attorney |
| **2021** | |
| Commonwealth v Garcia | Berks County District Attorney |
| Commonwealth v Morris | Berks County District Attorney |
| Commonwealth v Sloan | Berks County District Attorney |
| Commonwealth v Hunsicker | Lehigh County District Attorney |
| Commonwealth v Birney | Bucks County District Attorney |
| Commonwealth v Alacan | Berks County District Attorney |
| Commonwealth v Zapata | Berks County District Attorney |
| Commonwealth v Perez | Berks County District Attorney |
| Commonwealth v Gaydos | Berks County District Attorney |
| **2022** | |
| Commonwealth v Melo | Berks County District Attorney |
| Commonwealth v Biondo | Berks County District Attorney |
| Commonwealth v Breidenstein | Berks County District Attorney |
| Commonwealth v Ward | Montgomery County District Attorney |
| Commonwealth v Dove | Berks County District Attorney |
| Commonwealth v Martinez | Berks County District Attorney |
| Commonwealth v Pisarchuk | Montgomery County District Attorney |
| Commonwealth v Troupe | Bucks County District Attorney |
| Commonwealth v Maguina | Northampton County District Attorney |
| Commonwealth v Velez-Zargoza | Bucks County District Attorney |
| Commonwealth v Baez-Bentacourt | Montgomery County District Attorney |
| Commonwealth v Roman-Rosa | Berks County District Attorney |
| Commonwealth v Boyer | Berks County District Attorney |
| **2023** | |
| Commonwealth v Seibert | Northampton County District Attorney |
| Commonwealth v VanderDuim | Berks County District Attorney |
| Commonwealth v Amos | Northampton County District Attorney |
| Commonwealth v Swaby | Northampton County District Attorney |
| Commonwealth v Rutherford | Berks County District Attorney |
| Commonwealth v Hartman | Berks County District Attorney |
| Commonwealth v Corby | Lehigh County District Attorney |
| Commonwealth v Hummel | Bucks County District Attorney |
| Commonwealth v White | Montgomery County District Attorney |
| Commonwealth v Leslie | Bucks County District Attorney |
| Commonwealth v Graham | Berks County District Attorney |
| Commonwealth v Lutz | Berks County District Attorney |
| Commonwealth v Rivera-Santos | Berks County District Attorney |
| Commonwealth v Morris | Montgomery County District Attorney |
| Commonwealth v Samuels | Berks County District Attorney |
| **2024** | |
| Commonwealth v O'Reilly | Berks County District Attorney |
| Commonwealth v Wilson-Rodriguez | Berks County District Attorney |
| Commonwealth v Cordero-Menendez | Lehigh County District Attorney |
| Commonwealth v Pena | Bucks County District Attorney |
| Commonwealth v Hunter | Northampton County District Attorney |
| Commonwealth v Rosenberger | Bucks County District Attorney |
| Commonwealth v Boyer | Northampton County District Attorney |
| **2025** | |
| Commonwealth v Hunter | Northampton County District Attorney |
| Commonwealth v Hill | Bucks County District Attorney |
| Commonwealth v Munoz | Lehigh County District Attorney |

Valliere, Veronique                                                                 page 69

Commonwealth v Petrie              Berks County District Attorney
Commonwealth v Force              Northampton County District Attorney
Commonwealth v Gerhard            Lehigh County District Attorney


**Civil Commitment Hearings/Family Court or Juvenile Hearings**

Commonwealth v DC – Annual Hearing
Commonwealth v RY – Annual Hearing
Commonwealth v JS – Annual Hearing
Commonwealth v TS – Annual Hearing
Commonwealth v CR – Annual Hearing
Commonwealth v HR – Annual Hearing
Commonwealth v SS – Annual Hearing
Commonwealth v DS – Annual Hearing
Commonwealth v BN – Annual Hearing
Commonwealth v DW – Annual Hearing
Commonwealth v CR – Annual Hearing
Commonwealth v OK – Annual Hearing
Commonwealth v MC – Annual Hearing
Commonwealth v LC  – Annual Hearing