**<u>Exhibit L</u>**

# EXHIBIT 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2                   SAN FRANCISCO DIVISION
 3                         -   -   -
 4
 5     In Re:                       :  Case No. 3:23-md-
                                    :  03084-CRB (LJC)
 6                                  :
       UBER TECHNOLOGIES,           :
 7     INC., PASSENGER SEXUAL :
       ASSAULT LITIGATION           :
 8
 9
                           -   -   -
10
11                 FRIDAY, OCTOBER 24, 2025
12
                           -   -   -
13
14
15        Remote Zoom Videotape Deposition of
16     VERONIQUE VALLIERE, Psy.D., taken pursuant to
17     Notice, in Allentown, Pennsylvania, commencing
18     at approximately 9:15 a.m., on the above date,
19     before Rose A. Tamburri, RPR, CM, CCR, CRR,
20     USCRA Speed and Accuracy Champion and Notary
21     Public.
22                         -   -   -
23
24
25        Job No. CS7675941
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1   APPEARANCES:
 2
 3

         CHAFFIN LUHANA LLP
 4       BY:  ROOPAL P. LUHANA, ESQUIRE
         600 Third Avenue, 12th Floor
 5       New York, New York  10016
         (888) 480-1123
 6       luhana@chaffinluhana.com
         Representing the Plaintiffs and
 7       The Witness
 8
 9
10       KIRKLAND & ELLIS
         BY:  COHL LOVE, ESQUIRE
11       601 Lexington Avenue - Floor 50
         New York, New York  10022
12       (212) 909-3366
         cohl.love@kirkland.com
13
         Representing the Defendant,
14       Uber Technologies, Inc.
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1
 2     ALSO PRESENT:
 3
           MACKENZIE DELANEY, ESQUIRE
 4
           ASHER TRANGLE, ESQUIRE
 5
           ELLYN HURD, ESQUIRE
 6
           TARA DOYLE, ESQUIRE
 7
           BETH WILKINS, ESQUIRE
 8
           AN TRUONG, ESQUIRE
 9
           STASJA DRECUN, ESQUIRE
10
           THERESA FRYAN
11
           BEN PELTA-HELLER, VIDEOGRAPHER
12
           JAKE FRANKS, CONCIERGE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1                    I N D E X
2
   TESTIMONY OF:  DR. VERONIQUE VALLIERE
3
       By Mr. Love.........................9, 410
4
       By Ms. Luhana....................378, 416
5
6
7
                    E X H I B I T S
8
   EXHIBIT NO.        DESCRIPTION        PAGE NO.
9
   Exhibit 1      Notice of Deposition        14
10
   Exhibit 2      Invoice dated October       62
11                 22, 2025
12 Exhibit 3      Invoice dated July 2,        66
                   2025
13
   Exhibit 4      Excerpt - Page 140          86
14                 Unmasking the Sexual
                   Offender by
15                 Veronique Valliere
16 Exhibit 5      Excerpt - Page 52 -         97
                   Unmasking the Sexual
17                 Offender by
                   Veronique Valliere
18
   Exhibit 6      Excerpt - Page 50          102
19                 Unmasking the Sexual
                   Offender by
20                 Veronique Valliere
21 Exhibit 7      Understanding the          116
                   Non-Stranger Rapist by
22                 Veronique Valliere
23 Exhibit 8      Excerpt - Page 10          135
                   Unmasking the Sexual
24                 Offender by
                   Veronique Valliere
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                       E X H I B I T S, Continued:
 2   Exhibit 9          RAINN - Facts &                222
                        Statistics:  The Scope of
 3                      The Problem
 4   Exhibit 10         Uber US Safety Report -        226
                        Bates Nos.
 5                      UBER000025547 - 630
 6   Exhibit 11         Transcript of                  241
                        Proceedings dated September
 7                      11, 2025
 8   Exhibit 12         UBER_JCCP_MDL_000208845 -      250
                        Metadata - Bates Nos.
 9                      UBER000228068 - 73
10   Exhibit 13         Addendum to Report of          258
                        Veronique Valliere dated
11                      October 20, 2025
12   Exhibit 14         Uber Newsroom Article          269
                        Dated November 5, 2017
13
     Exhibit 15         Transcript of Videotaped       276
14                      Deposition of Veronique
                        Valliere, Psy.D. dated
15                      July 18, 2025
16   Exhibit 16         Excerpt - Page 86              295
                        Unmasking the Sexual
17                      Offender by
                        Veronique Valliere
18
     Exhibit 17         Expert Report of               302
19                      Veronique Valliere dated
                        September 20, 2022
20
     Exhibit 18         Color Photocopies of           376
21                      Photographs
22   Exhibit 19         Expert Report of               379
                        Veronique Valliere dated
23                      September 26, 2025
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                      Page 6

1    DEPOSITION SUPPORT INDEX
2
     DIRECTION TO WITNESS NOT TO ANSWER
3
     Page       Line
4
     None
5
6
     REQUEST FOR PRODUCTION OF DOCUMENTS
7
     Page       Line        Description
8
       18         25        Articles relied on by
9                           Dr. Valliere but not
                            Identified in her Report
10
       67         14        Invoice
11
12
13
     STIPULATIONS
14
     Page       Line
15
     None
16
17   PREVIOUSLY MARKED EXHIBITS REFERRED TO
18   EXHIBIT NUMBER                  PAGE REFERENCED
19   None
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 7

1              (Whereupon, the deposition

2     commenced at approximately 9:15 a.m.)

3                        -   -   -

4              THE COURT REPORTER:  The attorneys

5     participating in this deposition acknowledge

6     that I am not physically present in the

7     deposition room, and that I will be reporting

8     this deposition remotely.

9              They further acknowledge that, in

10    lieu of an oath administered in person, I will

11    administer the oath remotely.

12             The parties further agree that if

13    the witness is testifying from a state where I

14    am not a Notary, that the witness may be sworn

15    in by an out-of-state Notary.

16             If any party has an objection to

17    this manner of reporting, please state it now.

18             Hearing none, we can proceed.

19                        -   -   -

20             THE VIDEOGRAPHER:  Good morning.

21             We are going on the record at

22    9:15 a.m. on Friday, October 24th, 2025.

23             This is Media Unit 1 of the

24    video-recorded deposition of Dr. Veronique

25    Valliere, taken by counsel in the matter of In

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1  Re: Uber Rideshare cases, filed in the United

2  States District Court for the Northern

3  District of California, San Francisco

4  Division.

5           My name is Ben Pelta-Heller

6  representing Veritext.  I'm the videographer.

7  The court reporter is Rose Tamburri from the

8  firm Veritext.

9           Counsel and all present, including

10  remotely, will now state their appearances and

11  affiliations for the record, and will the

12  reporter please swear in the witness.

13           MR. LOVE:  Cohl Love for Uber, and

14  I'm with Kirkland & Ellis.

15           MS. LUHANA:  Roopal Luhana of

16  Chaffin Luhana for the plaintiffs.

17           THE WITNESS:  Dr. Veronique

18  Valliere, witness.

19           MS. DELANEY:  Mackenzie Delaney on

20  behalf of Uber, Kirkland & Ellis.

21                    -  -  -

22           ...VERONIQUE VALLIERE, Psy.D.,

23  after having first been duly sworn and/or

24  affirmed, was examined and testified as

25  follows...

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 9

```
 1                       -   -   -
 2                   EXAMINATION
 3                       -   -   -
 4   BY MR. LOVE:
 5       Q.   Good morning, Dr. Valliere.
 6       A.   Good morning.
 7       Q.   Nice to meet you.
 8       A.   Yes.
 9       Q.   My name is Cohl Love.  I'll be asking
10   you some questions today.
11            Could you just please state your
12   full name for the record.
13       A.   Dr. Veronique Nicole Valliere.
14       Q.   And can you hear and see me all
15   right?
16       A.   I can.
17       Q.   If that changes at any time, please
18   just let me know and we can figure it out or
19   take a break if we need to.
20            Okay?
21       A.   Sure.
22       Q.   Where are you currently?
23       A.   In Allentown, Pennsylvania.
24       Q.   And what room are you in?
25       A.   A conference room at a hotel.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

```
 1      Q.    Okay.

 2            And I know Ms. Luhana is in the

 3   room with you.  Is anyone else there?

 4      A.    No.

 5      Q.    Do you have any materials or

 6   documents with you?

 7      A.    I do.  I have a clean copy of my

 8   report, my addendum, my CV and my invoice.

 9      Q.    Anything else with you?

10      A.    No.

11      Q.    And do you have anything open on your

12   screen other than this Zoom?

13      A.    No.

14      Q.    I'll just ask that if you have to

15   open something else, that you let me know, and

16   you not open anything else unless you're

17   instructed to do so or asked to do so during

18   this deposition.

19            Okay?

20      A.    Sure.

21            MS. LUHANA:  Counsel, I will note

22   that we do have the exhibits open in the

23   background, as well as realtime playing.

24            MR. LOVE:  Understood.  Can the

25   witness see the realtime?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 11

1              MS. LUHANA:  Yes.

2              MR. LOVE:  Okay.  All right.

3      BY MR. LOVE:

4          Q.   I know you sat for many depositions,

5      so I won't go over all the ground rules, but

6      just let's make sure we give verbal responses,

7      no uh-uhs or uh-huhs or nodding or shaking of

8      your head today.

9              And then wait until my questions

10     are done before you start answering, and I'll

11     try to do the same when you're answering.  And

12     I'll wait until you're done before I ask my

13     next question.

14              Does that make sense?

15         A.   Yes.

16         Q.   Okay.

17              What did you do to prepare for

18     today's deposition?

19         A.   I reviewed my report, I reviewed my

20     addendum, I met with Attorney Luhana and

21     reviewed a few documents for refreshers.

22         Q.   And which documents were those?

23         A.   I can't remember.

24         Q.   Okay.

25              Did any -- did any of them refresh

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 12

1    your recollection about anything?

2         A.    No.    I just checked for accuracy in

3    my report, but my opinions haven't changed

4    or -- or modified in any way from my report.

5         Q.    Okay.

6              You said you met with Ms. Luhana.

7    When did you meet with Ms. Luhana?

8         A.    Yesterday.

9         Q.    And for how long did you meet with

10   her?

11        A.    Hmm, approximately, I think, six or

12   seven hours.

13        Q.    I'm sorry, could you state that one

14   more time?

15        A.    Six or seven hours.    Around seven, I

16   think.

17        Q.    Was anyone else on that call?

18        A.    No.

19        Q.    And did you meet with Ms. Luhana any

20   other time?

21        A.    A few brief phone calls over the last

22   week or so.

23        Q.    How many times would you say?

24        A.    I think three.

25        Q.    And how long were those calls?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 13

1      A.    A half hour, 40 minutes.

2      Q.    And did you discuss your testimony

3   here today, without giving me any specifics

4   about what you talked about?

5      A.    I'm sorry, did -- did I discuss my

6   testimony?

7      Q.    Yes.

8      A.    Yes.

9      Q.    Okay.

10           And have you looked over your

11   testimony from trial this last September?

12     A.    Yes.

13     Q.    When did you look that over?

14     A.    A week-and-a-half ago or so.

15     Q.    And did you review your deposition

16   testimony in the Uber JCCP matter that you

17   gave this last summer?

18     A.    Yes.

19     Q.    When did you look that over?

20     A.    At some time last -- this week.

21           MR. LOVE:  Now, I'd like to bring

22   up Tab 1, please, Ms. Delaney.  And that

23   should go into the Exhibit Share for you, Dr.

24   Valliere.

25           MS. DELANEY:  Just a moment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1    Working on it.

2    BY MR. LOVE:

3         Q.    While we're getting that pulled up,

4    did you look at a Deposition Notice in

5    conjunction with your deposition testimony

6    here today?

7         A.    I did.

8         Q.    And did you notice that there was a

9    list of documents that were requested at the

10   end of that Deposition Notice?

11        A.    Yes.

12        Q.    Okay.

13              Did you look for those documents?

14        A.    You -- can you be specific about

15   which documents?  Sorry.

16        Q.    Sure.

17              So the exhibit should be posted

18   now, if you can see that.

19              (Whereupon, a document was marked,

20   for identification purposes, as Exhibit 1.)

21              THE WITNESS:  Nothing's coming up

22   on ours.

23              MR. LOVE:  Ms. Delaney, could we

24   maybe just share this on the screen for the

25   witness?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

1              MS. DELANEY:  Yes.  Sure thing.

2    Just a moment.

3              MR. LOVE:  Thank you.

4              MS. LUHANA:  Is it in Exhibit

5    Share, counsel?

6              MR. LOVE:  Yes, it is.

7              MS. LUHANA:  We can share it on

8    the screen, but we probably should resolve

9    this and make sure we're able to see the

10   exhibits on the screen.

11             So it's been posted, you said,

12   counsel?

13             MR. LOVE:  Yes.

14             MS. LUHANA:  I don't see it here.

15   Let me refresh it maybe.

16   BY MR. LOVE:

17      Q.   Can you see this document on the

18   screen, Dr. Valliere?

19      A.   Yes, I can.

20             MR. LOVE:  Roopal, for this

21   document, is it okay if we just use this for

22   now and then we can resolve the Exhibit Share

23   later?

24             MS. LUHANA:  Yeah.

25             MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

1          Can we please scroll down to the
2     duces tecum.  Thank you.
3     BY MR. LOVE:
4        Q.    Dr. Valliere, did you look over this
5     list of documents that was asked?
6        A.    I did.
7        Q.    Okay.
8              And did you look for each category
9     of these documents?
10       A.    Yes.  I modified my CV.  I wasn't
11    able to go back and do every seminar or
12    presentation I ever gave, but I gave a broad
13    umbrella of the topics I presented on and most
14    of the agencies, or many of the agencies.
15             And I had my cases on my CV.  And
16    I don't produce the invoice -- I don't believe
17    there is any other documents that were not
18    previously produced or that Uber has not
19    produced.
20             MS. LUHANA:  Counsel, if you want
21    to direct her to a specific request, maybe
22    that's helpful.
23             MR. LOVE:  I think she was
24    answering my question and I will direct her to
25    the ones that I would like to focus on now.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 17

1   BY MR. LOVE:

2       Q.   So if you can look at No. 7, it says,

3   "All documents, materials or things relied

4   upon You as a basis for Your opinion in this

5   action."  {Sic}

6               Did you produce all documents that

7   you looked at when creating your report?

8       A.   I produced a list, not the actual

9   documents, but a list that -- on my appendix.

10      Q.   Are there documents that you relied

11  on or reviewed in connection with your report

12  that have not been produced in this action?

13      A.   Nothing that I referred to or cited,

14  no.  I mean, I'm not quite sure how to answer

15  that, because there's a whole body of

16  literature about sex offenders or

17  victimization or things like that, but not one

18  specific document that I'm -- that you are not

19  aware of.

20               MS. LUHANA:  And, counsel, we

21  produced responses to this, and to the extent

22  these documents are publicly available, we

23  noted such.  And to the extent she had any

24  documents she relied on, she included it in

25  her appendices and her Materials Considered

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 18

1    list.

2                MR. LOVE:  Understood.  The

3    witness can testify to that.  Thank you.

4    BY MR. LOVE:

5        Q.   So, Doc --

6                MS. LUHANA:  That's fine.  We

7    provided responses to it and produced those to

8    defendants yesterday, so I was just providing

9    that clarification.

10   BY MR. LOVE:

11       Q.   Dr. Valliere, you said that there's a

12   body of literature that you relied on that you

13   didn't necessarily produce.

14               Did you note every article or

15   literature that you relied on when coming to

16   your conclusions in your report?

17               MS. LUHANA:  Objection.  Objection

18   to form.

19               THE WITNESS:  No.  I normally talk

20   about a body of literature.  I'm talking about

21   30 years of study and the body of scientific

22   research and everything that -- that builds

23   the foundation of my expertise.

24               MR. LOVE:  Okay.

25               To the extent that you have not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 19

1  identified articles that have been relied on
2  in your report, I would call for production of
3  a list of those documents, and Roopal, we can
4  talk about that later.
5            MS. LUHANA:  Sure.  We'll take it
6  under advisement.
7  BY MR. LOVE:
8     Q.   Going to No. 10, it says, "All notes,
9  calculations, memoranda, drawings, models,
10  illustrations, diagrams, recordings or records
11  generated or utilized by You in connection
12  with Your involvement in this Action."  {Sic}
13            Did you produce all of those?
14            MS. LUHANA:  Objection to form.
15            Go ahead.
16            THE WITNESS:  Yes, I don't have
17  any of those.
18            MR. LOVE:  We can go ahead and
19  pull this down.
20  BY MR. LOVE:
21     Q.   Did you bring any materials with you
22  other than the ones that you've mentioned
23  today?
24     A.   No.
25            MS. LUHANA:  And, counsel, can we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 20

1   just go off record and fix the Exhibit Share

2   first before we proceed?

3              MR. LOVE:  Yes.

4              THE VIDEOGRAPHER:  Going off the

5   video record.  The time is 9:26 a.m.

6              (Whereupon, a recess was taken at

7   the above time.)

8              THE VIDEOGRAPHER:  We are back on

9   the video record.  The time is 9:27 a.m.

10  BY MR. LOVE:

11     Q.   Dr. Valliere, you have your own

12  counseling business; right?

13     A.   Yes.

14     Q.   And that business has a clinical

15  practice and a forensic practice; is that

16  correct?

17     A.   Correct.

18     Q.   What percentage of your work is

19  clinical versus expert litigation work?

20              MS. LUHANA:  Object to form.

21              Go ahead.

22              THE WITNESS:  Well, our primary,

23  in the agency, I have numerous clinicians

24  under me, and so the business, as a whole, is

25  primarily clinical in the two different

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 21

1   facilities.

2           And then I do some -- and I -- I

3   assume by forensic work, you mean this kind of

4   work?

5           MR. LOVE:  Yes, litigation work,

6   or -- or crim -- criminal work as well.

7           THE WITNESS:  And in criminal

8   work, you mean court work or working with

9   offenders?

10          MR. LOVE:  Any work where you are

11  testifying in court or writing a report for a

12  Court or a litigation or proceeding.

13          THE WITNESS:  Well, we often are

14  in court with many of our clients because

15  they're court-mandated, so we do do a lot of

16  work with the court system, like probation,

17  parole, child protection.

18          But when we're talking about

19  litigation in terms of civil or criminal

20  expert testimony, it's probably, in the whole

21  agency, about 10 percent of the work.

22  BY MR. LOVE:

23      Q.   And what about you personally, how

24  much percentage would you say you do compared

25  to clinical work?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1     A.   It is probably -- this year, it's
2  heavier duty because of this case in
3  particular, or the past cases.  So probably
4  right this moment, it's about 50 percent.
5  Generally, it's about 15 or 20 percent.
6     Q.   And how many physical locations do
7  you have for your practices?
8     A.   Two.
9     Q.   Two.
10          What are those locations?
11    A.   One is 726 Church Street in
12  Fogelsville, PA, and the other is 732 Turner
13  Street in Allentown, PA.
14    Q.   How close are those together?
15    A.   Hmm, maybe about 10 miles apart, 8 or
16  10 miles.
17    Q.   You could drive between them fairly
18  easily?
19    A.   Oh, yes.
20    Q.   Okay.
21          What business do you conduct at
22  the -- the 726 Church Street address?
23    A.   That is -- is an office where mostly
24  client care goes on.
25    Q.   So that's devoted mostly to clinical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

```
 1   work?

 2       A.    Yes.

 3       Q.    Okay.

 4             So you treat patients out of that

 5   office?

 6       A.    Treat patients.  Sometimes I conduct

 7   virtual evaluations through there -- or

 8   clinical evaluations.

 9       Q.    And when you say --

10       A.    And my clinicians are there as well.

11       Q.    And when you say "treat patients," do

12   some of them come into that office to be

13   treated there?

14       A.    Yes, absolutely.

15       Q.    How often would you say?

16       A.    To me personally or -- it -- it is

17   full of clients multiple days a week.

18       Q.    Okay.

19             And how many clinicians work out

20   of that office?

21       A.    Four.

22       Q.    What conditions do you see patients

23   for?

24       A.    Any kind of mental health condition,

25   and -- well, I wouldn't say any.  Our
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 24

1  specialty is trauma, victimization, behavioral

2  issues with children, depression, anxiety.

3  There are some conditions that we don't treat.

4       Q.    And what conditions do you not treat?

5       A.    Like specifically, like, severe

6  eating disorders or severe psychosis.  Things

7  that are extremely acute and may require a

8  higher level of care.

9       Q.    Now, at the Turner Street address,

10 what kind of business do you conduct out of

11 there?

12      A.    That houses both a general clinic for

13 mental health issues, but it also houses, in a

14 different building -- the building is three

15 separate buildings with one address.

16            So there, we do the Violent

17 Offenders Program, a lot of forensic

18 evaluations or evaluations for family court or

19 child protection on risk of child abuse, and

20 we have a protective parenting program.  We

21 treat children who are victims there.  And

22 that's, you know, where we have the offender

23 program.

24      Q.    Okay.

25            And how many clinicians work out

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 25

1    of that office?

2        A.    Seven.

3        Q.    And you said you treat children

4    victims there.

5                Do you also treat adult victims

6    there?

7        A.    Yes.

8        Q.    Okay.

9                And you said seven clinicians

10   there and four at the other address.  Are any

11   of those overlapping, or are they individual

12   people?

13       A.    No.  The four split their time

14   between both of the offices.

15       Q.    Okay.

16                So out of the seven that work at

17   the Turner Street address, four of them also

18   work at the other address?

19       A.    Correct.

20       Q.    Do you conduct therapy sessions at

21   any other physical location?

22       A.    No, just virtually.

23       Q.    Does anyone else that works at

24   Valliere Consulting or Counseling provide

25   therapy at any other physical location?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1     A.    Not to my knowledge.

2     Q.    What determines whether a patient is

3  going to be treated at one location or

4  another?

5     A.    Sometimes it's where they're located,

6  and there will never be somebody being treated

7  for a violent offense or in the Violent

8  Offender Program at the -- the Fogelsville

9  office.

10    Q.    Why is that?  Sorry.

11    A.    There are safety reasons, but also,

12  we're unable -- we keep the offender

13  population fairly separated physically.  Like

14  I said, with the 732 office, it's three row

15  homes converted, and so there are separate

16  entrances in separate facilities so we can

17  keep the population separated that is there.

18    Q.    So when you say that there's --

19  there's separate entrances, are you just

20  saying there's -- they're next door to each

21  other?

22    A.    Yes, it's three row homes.

23    Q.    And there's a specific building for

24  offenders?

25    A.    Correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27

1      Q.   And no -- no one else is treated in
2   that building?
3      A.   Right.
4      Q.   But other -- other patients are
5   treated next door?
6      A.   Two doors down, yes.
7      Q.   Two doors down.  Okay.
8           How many employees do you have at
9   Valliere Counseling?
10      A.   There's seven of us clinically, two
11   administrative staff, and a third
12   administrative staff who also does
13   maintenance.
14      Q.   Any social workers?
15      A.   Yes.
16      Q.   How many?
17      A.   Two.
18      Q.   And are you -- you're considering
19   those clinicians?
20      A.   Absolutely.
21      Q.   Okay.
22           Any legal counsel?
23      A.   No.
24      Q.   So in total, there are, other than
25   yourself, there are 10 people that work for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 28

```
 1   Valliere Counseling?
 2       A.    Let me count.  I think -- I think,
 3   including me, there are 10.
 4       Q.    Including you.
 5             So when you said there's seven
 6   clinicians, one of those is -- is yourself?
 7       A.    Correct.
 8       Q.    Okay.
 9             What's your hiring process like?
10       A.    I do interviews.  I have the person
11   come in for a team interview, review their
12   resume obviously, and background, do a
13   reference check.  They have to be -- pass a
14   State Police background check, a ChildLine
15   check, and submit fingerprints.
16             And then there's a probationary
17   period when they become part of the team.
18       Q.    Okay.
19             So you said you check their
20   background.  How do you check their
21   background?
22       A.    In Pennsylvania, we have a State
23   Police check that checks their entire criminal
24   record in Pennsylvania.  They have a child
25   abuse check, which is a child protection --
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 29

1    we're echoing -- a child protection check that

2    spans, I believe it's every 10 years.  And

3    then we do the FBI fingerprint.

4        Q.    Okay.

5              So for the State Police background

6    check, is that -- how far does that reach

7    geographically?

8        A.    I -- I'm not sure.  I believe it's at

9    least Pennsylvania, but they also have to

10   report any criminal history in any place else

11   to us on the resume.  They have to ensure

12   that.

13       Q.    Okay.  So just -- I just want to make

14   sure that I'm clear.

15             So you ask in, like, an

16   application for them to -- any applicant --

17   withdrawn.

18             You ask applicants to tell you

19   their criminal background; right?

20       A.    At least, yes.

21       Q.    But the State Police background

22   check, you are not sure if that extends to any

23   crimes outside of the state?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  I'm not sure about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

```
 1   that.  That's why we do the FBI national
 2   fingerprint.
 3               I also check their licensure
 4   status, if they're licensed.
 5               MR. LOVE:  Okay.  We'll get to
 6   that.
 7   BY MR. LOVE:
 8       Q.   So the State Police background check,
 9   you said that checks all crimes.  So is there
10   a time limit on that check?
11       A.   Not to my knowledge.
12       Q.   Okay.
13               Do you know what database they
14   use?
15       A.   It's a Pennsylvania State Police
16   check.
17       Q.   And does that check for past sexual
18   offenses?
19       A.   It checks for any kind of criminal
20   convictions.
21       Q.   Does it check for arrests?
22       A.   I -- I don't know.
23       Q.   Does it check for acquittals?
24       A.   Like I said, I don't know.  There is
25   a -- we also run them through the Pennsylvania
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 31

1    docket, which does track arrests and
2    acquittals and any docket number, regardless
3    of the -- the disposition.
4        Q.   When you say "Pennsylvania docket,"
5    you mean the court dockets?
6        A.   Yes.
7        Q.   So that wouldn't cover arrests;
8    right?
9        A.   It does.  Anything that gets a docket
10   number would get an arrest.  So if somebody is
11   arrested, it shows that they're arrested, but
12   it's been dismissed or nolle prossed or things
13   like that.
14       Q.   If someone is arrested but does not
15   get charged with a crime, that would not be
16   covered by a court docket; correct?
17               MS. LUHANA:  Objection to form.
18               THE WITNESS:  I'm not entirely
19   sure.
20               MR. LOVE:  Okay.
21   BY MR. LOVE:
22       Q.   Now, you said there's a child
23   background check that goes back 10 years?
24       A.   Correct.
25       Q.   What database does that use?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 32

```
 1      A.   It uses Pennsylvania's Child Abuse --
 2   any -- so any reports of child abuse that are
 3   indicated, validated or founded come up in
 4   that.
 5      Q.   And is that only within the state?
 6      A.   Correct.
 7           MS. LUHANA:  Objection to form.
 8   BY MR. LOVE:
 9      Q.   So if there was some sort of child
10   abuse incident that happened outside of
11   Pennsylvania, that check wouldn't cover it,
12   that check in particular?
13           MS. LUHANA:  Objection to form.
14           THE WITNESS:  It -- it may, if the
15   case was transferred into Pennsylvania.
16           MR. LOVE:  Understood.
17   BY MR. LOVE:
18      Q.   So if there was a child abuse
19   incident that happened outside of Pennsylvania
20   that was not transferred to Pennsylvania, this
21   background check would not cover that offense;
22   correct?
23           MS. LUHANA:  Objection to form.
24           THE WITNESS:  I'm not -- I'm not
25   sure.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 33

1            MR. LOVE:   Okay.

2     BY MR. LOVE:

3        Q.    And that goes back 10 years, you

4     said?

5        A.    Right.   And it has to be renewed

6     every 10 years while they're employed.

7        Q.    The FBI fingerprint, how does that

8     work?

9        A.    We go to the -- a fingerprinting

10    place that runs your fingerprints through the

11    national FBI whatever, but it's the -- the

12    national fingerprint that we have to register

13    and get a report.

14       Q.    And what information comes in this

15    report?

16       A.    Whether or not the person has any

17    criminal history or issues related to

18    fingerprinting across the country.

19       Q.    Does that check check local crime

20    from each state?

21       A.    I don't know specifically what, but

22    it's considered with -- with any major crime

23    where you're fingerprinted, your fingerprints

24    would be accessible through the fingerprint

25    background check.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 34

1      Q.    Well, you would agree with me that

2   Pennsylvania has its own criminal database;

3   right?

4      A.    Right.

5      Q.    So -- and the FBI has a separate

6   criminal database; right?

7      A.    Well, to my understanding, the

8   fingerprint checks are required for any

9   individual who has any contact with children

10  in a mandatory kind of reporter way, or in any

11  kind of childcare taking way.  So it's

12  supposed to track nationally any crimes that

13  would be negative for children or any -- any

14  crime where you would have been fingerprinted

15  from, or if there are fingerprints related to

16  military or law enforcement service.

17     Q.    Fair enough.

18          But you're -- you're not positive

19  that that background check checks local

20  criminal databases; right?

21          MS. LUHANA:  Objection to form.

22  Mischaracterizes testimony.

23          THE WITNESS:  I'm not sure the

24  difference of what you're saying.

25          If somebody -- if -- if somebody

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 35

```
 1   has a criminal record, it would come up, so I
 2   don't know what you mean by "local."
 3              I mean, I doubt that if you get a
 4   speeding ticket or a summary offense, it will
 5   show up, but...
 6   BY MR. LOVE:
 7       Q.   Well, my question is -- is a little
 8   different.
 9              So the FBI checks the FBI database
10   for criminal history; right?
11       A.   I believe it checks the NCIC.  I
12   believe it's a national -- the whole criminal
13   background check across the country.
14       Q.   So you're saying "I believe," but
15   you're not positive that that's the case;
16   right?
17              MS. LUHANA:  Objection to form.
18              THE WITNESS:  I'm positive that
19   it's a national check for criminal behavior.
20              MR. LOVE:  Fair enough.
21   BY MR. LOVE:
22       Q.   But you're not sure if that runs
23   through, let's say, the Pennsylvania State
24   database; right?
25              MS. LUHANA:  Objection.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36

1    Mischaracterizes testimony.

2                THE WITNESS:  It's actually -- it

3    would include Pennsylvania.  If you commit a

4    crime in Pennsylvania, we would know from the

5    state, our own Pennsylvania crime check.  If

6    you commit a crime in Pennsylvania and some

7    other state, we would know about your

8    Pennsylvania crime and your other state crimes

9    through the fingerprint check.

10   BY MR. LOVE:

11       Q.   But that's not exactly my question,

12   Dr. Valliere, so I just -- I want to focus in

13   on my specific question.

14                You don't know if the -- the FBI

15   database may check for crimes in other states,

16   but you don't know if that check runs through

17   local criminal databases; right?

18                MS. LUHANA:  Objection to form.

19                Counsel, what local criminal

20   databases are you talking about?  You've asked

21   this question several times.

22                MR. LOVE:  The witness can answer

23   the question.  If she doesn't understand, she

24   can ask me.

25                THE WITNESS:  Well, I -- I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 37

1    understand what you mean by "local criminal."

2    If -- if -- if there's a national crime

3    database, like the NCIC, which I look at all

4    the time for when I evaluate sex offenders,

5    that's any arrest in any state, whatever

6    happens.

7            So I'm -- I don't understand what

8    you mean by "local."

9    BY MR. LOVE:

10       Q.   So when you run a Pennsylvania State

11   Police background check, that runs through the

12   Pennsylvania criminal database; right?

13       A.   As far as I know.

14       Q.   Okay.

15            And the FBI runs a check through

16   the FBI criminal database; right, or the NCIC?

17            MS. LUHANA:  Objection to form.

18            THE WITNESS:  Which encompasses

19   also Pennsylvania.

20   BY MR. LOVE:

21       Q.   But it doesn't encompass their

22   database; correct?

23            MS. LUHANA:  Objection to form.

24            THE WITNESS:  I -- I don't

25   understand.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 38

1    BY MR. LOVE:

2        Q.    Are you aware if Pennsylvania --

3    withdrawn.

4                Are you aware if the Pennsylvania

5    State Police partners with the FBI?

6                MS. LUHANA:  Objection to form.

7                THE WITNESS:  I don't -- really, I

8    don't understand what you're asking me.

9                If you file your fingerprints for

10   a crime in Pennsylvania, it goes into a

11   national database.  If you ask for fingerprint

12   background check, it will give you the whole

13   national database of fingerprints.

14   BY MR. LOVE:

15       Q.    But my question -- sorry, Doctor.

16               My question is just, do you know

17   if the Pennsylvania State Police partners with

18   the FBI?

19               MS. LUHANA:  Objection to form.

20               THE WITNESS:  I don't know if it's

21   a specific FBI-driven fingerprint.  It is a

22   background investigation that should produce

23   your criminal history, wherever it happened in

24   the United States.

25               MR. LOVE:  Okay.  But that's not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 39

1   my question.

2   BY MR. LOVE:

3        Q.   My question is, do you know if the

4   Pennsylvania State Police partners with the

5   FBI; yes or no?

6        A.   I don't even know what you mean by

7   partnering.  I don't understand that question,

8   I'm sorry.

9        Q.   Okay.  That's fine.

10            You said you check licensure.

11   What do you mean by that?

12        A.   If an individual promotes that they

13   have a state license to provide services to

14   clients, like a licensed social worker or a

15   licensed professional counselor or licensed

16   psychologist, we look at the status of their

17   license in Pennsylvania.

18        Q.   You just look at the status, you

19   don't -- withdrawn.

20            Do you check if there's a

21   disciplinary record for that person?

22        A.   That would be listed in their status,

23   if there's ever been a disciplinary.

24        Q.   Understood.

25            Would it also say if their license

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 40

1   has ever been suspended?

2        A.    Yes.

3        Q.    Have you ever run a background check

4   for a potential employee that's come back

5   positive for a past crime?

6        A.    Yes.

7        Q.    How did you handle that situation?

8        A.    I hired that person.  That's a

9   counselor I work with now who has had a long,

10  30-year ago, history of drug addiction, and

11  she became a therapist and a certified

12  addiction counselor and told me that she had a

13  criminal history prior to her recovery.

14       Q.    When did you hire her?

15       A.    Oh, she's been working with me for --

16  almost consistently for 30 years.

17       Q.    Okay.

18            Is there any other time that

19  you've had someone come -- run a background

20  check and had a potential employee come back

21  positive for criminal history?

22       A.    Yes.  A few years ago, someone

23  applied, and when we looked -- looked at his

24  name, he had been arrested for a sexual

25  offense.  It was in the media, it was in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 41

1  newspaper, and I declined to hire him.

2      Q.   When was that?

3      A.   Hmm, probably -- maybe during COVID.

4  Around that time.

5      Q.   And was there any other time other

6  than the two that you've already mentioned

7  that you've run a background check and it's

8  come back positive for a crime?

9           MS. LUHANA:  Objection to form.

10          Counsel, are you focused on a

11  particular time?

12          MR. LOVE:  No.  I'm just asking

13  generally.

14          THE WITNESS:  I believe when I've

15  worked for other agencies who also hired

16  recovering counselors, many counselors in the

17  drug and alcohol field are in recovery and

18  become certified addiction counselors, and

19  some of those had criminal -- obviously

20  criminal background checks.

21  BY MR. LOVE:

22      Q.   How many times would you say, for

23  Valliere Counseling, have you hired someone

24  who you ran a background check and they came

25  back positive for criminal history?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1            MS. LUHANA:  Objection to form.

2            THE WITNESS:  That I've hired?

3            MR. LOVE:  Yes.

4            THE WITNESS:  I can only think of

5    two, the counselor I mentioned and another

6    counselor who had a DUI.

7    BY MR. LOVE:

8        Q.   And when did you hire the counselor

9    with the DUI?

10        A.   Oh, 2002.

11        Q.   And when was the DUI?

12            MS. LUHANA:  Objection to form.

13            THE WITNESS:  Probably -- I have

14    no idea.  Maybe in the late '80s.

15    BY MR. LOVE:

16        Q.   Once an employee is hired at Valliere

17    Counseling, do you run background checks

18    again?

19        A.   Yes.  We have to do fingerprinting

20    every five years.  The State Police check

21    every -- I'm not sure when that one is, and

22    the ChildLine check.  It expires every 10

23    years, but we have to renew it every couple

24    years.

25        Q.   When you say you have to, is this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 43

1    mandated by a law?

2        A.   I'm not sure if it's mandated by a

3    state law, but it is mandated by some of the

4    contracts we have.  And I would do it anyway.

5    That's just been my general practice.

6        Q.   And when you say "contracts," what do

7    you mean by that?

8        A.   We have contracts with child

9    protection agencies which have standards of

10   regulatory background checks to ensure that

11   the children in their care are safe.

12       Q.   So your contracts with child

13   protection agencies mandate that you run

14   certain background checks?

15       A.   Correct.  And I'm sure they're

16   governed by state mandates for child welfare.

17       Q.   Do you have an ongoing monitoring

18   system where, if one of your employees commits

19   a crime, you would be alerted?

20              MS. LUHANA:  Objection to form.

21              THE WITNESS:  Except for just

22   working with them?

23              MR. LOVE:  Correct.

24   BY MR. LOVE:

25       Q.   If -- if one of your employees were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1  to commit a crime, would you get an alert from

2  some sort of -- from the police or some sort

3  of body that would let you know that they've

4  committed a crime?

5     A.   I don't think so, but I can't think

6  of a situation where I wouldn't know that.

7  We're closely involved with the D.A.'s Office

8  and law enforcement, and it would be -- it

9  would be hard for me to imagine a situation

10  where I would not know that.

11     Q.   But just to be clear, you don't have

12  an actual monitoring system that would alert

13  you if one of your employees committed a

14  crime?

15          MS. LUHANA:   Objection.   Asked and

16  answered.

17          THE WITNESS:   No formal external

18  agency that would send an alert to me, no.

19          MR. LOVE:   Okay.

20  BY MR. LOVE:

21     Q.   Dr. Valliere, how many patients do

22  you personally treat at one time?

23     A.   When you say "at one time," like --

24  like what's my caseload now?

25     Q.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

1          For, on average, how many -- how

2   many patients would you take on at the same

3   time?

4       A.   Like, my practice is not primarily

5   individual patients now.  I have a small

6   caseload and take on clients all the time for

7   evaluations or consultations.

8          So I maybe have an ongoing

9   caseload of five clients now, and then

10  depending on the week, whatever I get

11  assigned, if I'm supposed to evaluate somebody

12  or assist in the care of somebody as a

13  supervisor.

14      Q.   Okay.

15          And what about your practice; how

16  many clients would you say your practice has

17  at one time?

18      A.   Oh, that varies.

19          So most -- so I would say probably

20  an average of, with all the clinicians, maybe

21  100 at a time on an ongoing basis, or more,

22  depending on if they're getting evaluations or

23  assessments or they're in ongoing care.

24      Q.   So over the course of a year, how

25  many patients does your business treat?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

```
1              MS. LUHANA:  Objection to form.
2              THE WITNESS:  That's a little bit
3    difficult because some are long-term clients.
4    So I would say anywhere between 150 and 250.
5    BY MR. LOVE:
6        Q.   Okay.
7              And you said on a week-to-week
8    basis, you get assigned.  How often are you
9    actually in a room treating a patient?
10       A.   It depends on the week.  Sometimes
11   it's five hours a week.  Sometimes -- for
12   instance, this week, I was in with patients, I
13   think, seven hours.  Some weeks it's
14   zero hours if I'm traveling.
15       Q.   Now, we talked a little bit about
16   this, but your business treats a variety of
17   different patients; right?
18       A.   Correct.
19       Q.   Do you treat victims of sexual
20   assault?
21       A.   Yes.
22       Q.   And sexual offenders?
23       A.   Correct.
24       Q.   Do you treat perpetrators of child
25   abuse?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 47

1      A.    Yes.

2      Q.    And perpetrators of child sex abuse?

3      A.    Yes.

4      Q.    And then you also provide basic

5    therapy and mental health services; right?

6      A.    That's right.

7      Q.    Even to people who have not

8    experienced any trauma or sexual abuse?

9      A.    Correct.

10      Q.    And then you also provide youth

11    counseling services; right?

12      A.    We -- we treat people from age 5 to

13    80.

14      Q.    How do you know if someone you're

15    treating is a sexual offender or not?

16      A.    Most often, their main -- they've

17    been convicted and are mandated.

18            Occasionally, people come in who

19    have allegations and they need an evaluation

20    or assessment.  And some are self-identified

21    who are seeking help for thoughts, fantasies

22    or urges, or are pre-conviction, who want to

23    get started in therapy.

24      Q.    So most of the sexual offenders you

25    treat are self-identifying or are identified

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

1    for you?

2              MS. LUHANA:  Objection to the

3    form.

4              THE WITNESS:  That's right.

5    BY MR. LOVE:

6        Q.   Are you aware if you treat any sexual

7    offenders who do not identify as sexual

8    offenders?

9        A.   I -- I don't quite understand that

10   question.

11       Q.   Sure.  Let me -- let me reword it.

12              So are you positive that some --

13   someone you treat -- withdrawn.

14              Well, sexual offenders are -- are

15   good at concealing themselves; right?

16       A.   They can be, yes.

17       Q.   So is it possible that some of your

18   clients are sexual offenders and you don't

19   know?

20       A.   I guess it's possible.

21       Q.   And are there clients who come to you

22   that don't claim to be sexual offenders that

23   you later find out are sexual offenders?

24              MS. LUHANA:  Objection to form.

25              THE WITNESS:  Yes.  We usually

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 49

1    identify that during the course of their

2    therapy, that they are.

3    BY MR. LOVE:

4        Q.    And how do you identify that?

5                MS. LUHANA:  Objection to form.

6                Counsel, are you talking about

7    people she's treating?

8                MR. LOVE:  The witness can ask me

9    if she's confused.

10                THE WITNESS:  How do we identify

11    if someone were -- I lost the question, I'm

12    sorry.

13                MR. LOVE:  No problem.

14    BY MR. LOVE:

15        Q.    So you said that you usually -- if

16    someone doesn't identify as a sexual offender

17    and you later find out they are, you are able

18    to identify that in the course of treatment.

19                I'm just asking how -- how do you

20    identify that?

21                MS. LUHANA:  Objection to form.

22                THE WITNESS:  Well, the truth

23    is -- is that even people who are identified

24    by the Court as sexual offenders say they're

25    not, so they deny their involvement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

```
 1          People may present and be vague or
 2    hedge about, say, being in trouble on the
 3    Internet.  And through our expertise and
 4    questioning and ability to deal with denial
 5    and engage in the appropriate kind of
 6    treatment, we can get people to either reveal
 7    that they are -- have committed a sex offense,
 8    or break through their denial and get them
 9    into some level of acceptance.
10          MR. LOVE:  Okay.
11    BY MR. LOVE:
12      Q.   When a patient comes in off the
13    street to request services, you don't run a
14    background check on that patient, do you?
15      A.   No.
16      Q.   And in your intake forms, do you ask
17    if they've committed any crimes?
18      A.   We ask about a variety of problematic
19    behaviors, including crimes.
20      Q.   Now, part of your practice is to
21    treat parents who present a danger to
22    children; right?
23      A.   Yes.
24      Q.   Whether that danger is violence?
25      A.   It -- it may be physical violence,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 51

1   sexual violence or psychological maltreatment

2   or neglect, substance abuse.

3       Q.   And sometimes those parents actually

4   have committed those offenses against their

5   children; right?

6       A.   Oh, absolutely.

7       Q.   And in some of those cases, your goal

8   is to reunify that parent with their child?

9            MS. LUHANA:  Objection to form.

10           THE WITNESS:  It's not necessarily

11  our goal.  It may be tasked by the Court that

12  that's the ultimate goal, but that does not

13  always work out.

14           MR. LOVE:  Understood.

15  BY MR. LOVE:

16      Q.   But as a clinician, it is one of your

17  goals to at least try to reunify a parent with

18  their child, even if they committed abuse

19  against their child?

20           MS. LUHANA:  Objection to form.

21           THE WITNESS:  It may be, it may

22  not be.

23  BY MR. LOVE:

24      Q.   Now, I just want to ask about your

25  practice and your licensure to make sure that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 52

1    I understand the bounds of it.

2              So you're a psychologist; right?

3       A.    Correct.

4       Q.    Which means you're not a medical

5    doctor?

6       A.    Right.

7       Q.    You're not a psychiatrist?

8       A.    Right.

9       Q.    And you can't prescribe medication?

10      A.    I cannot.

11      Q.    Okay.

12              And you're not an expert in

13   Rideshares; right?

14              MS. LUHANA:  Objection to form.

15              THE WITNESS:  I would say I'm an

16   expert in sexual assault and Rideshare and how

17   it comports with the risk of sexual assault

18   and sex offenders and victims.

19   BY MR. LOVE:

20      Q.    But you're not an expert in Rideshare

21   services; correct?

22              MS. LUHANA:  Objection to form.

23              THE WITNESS:  I'm not sure what an

24   expert in Rideshare is.  I'm an expert in how

25   Rideshare and sexual assault go together,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 53

1   which is what my opinion reflects.

2   BY MR. LOVE:

3       Q.   Well, you testified this last

4   September; right?

5       A.   I'm sorry -- testified to what last

6   September?

7       Q.   You -- you testified in court in

8   September; correct?

9       A.   Correct.

10      Q.   And you said, "I'm not an expert on

11  Rideshare platforms"; right?

12              MS. LUHANA:  Objection to form.

13              Counsel, do you have something to

14  show her?

15              MR. LOVE:  I'm asking her a

16  question and I'll show her a document if I

17  need to.

18  BY MR. LOVE:

19      Q.   Do you recall -- apologies.

20      A.   I guess I'm -- you're right, I said

21  that, but I'm talking about I'm an expert in

22  Rideshare and sexual assault, which is what is

23  reflected in my opinion.

24      Q.   But just --

25      A.   I don't understand what a Rideshare

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

```
 1   expert, other than outside the scope of my
 2   opinion, would be.
 3       Q.   Okay.
 4            So understanding that you are an
 5   expert in sexual assault in Rideshares, that
 6   -- that's what you're testifying to, you are
 7   not an expert in Rideshare services generally;
 8   correct?
 9            MS. LUHANA:  Objection to form.
10            THE WITNESS:  I guess I don't know
11   what areas I would need to be an expert in for
12   this opinion.
13            MR. LOVE:  But that wasn't my
14   question, though, Dr. Valliere.
15   BY MR. LOVE:
16       Q.   My just -- my question is just, you
17   are not a Rideshare expert; correct?
18            MS. LUHANA:  Objection.  Calls for
19   a legal conclusion.
20            THE WITNESS:  I -- I -- I guess --
21   can you specify the area of Rideshare
22   expertise that would apply to my opinion that
23   I'm not an expert in and maybe that will be
24   helpful?
25            MR. LOVE:  Sure.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1    BY MR. LOVE:

2        Q.    You're not an expert in any safety

3    mechanisms and how they affect Rideshares;

4    correct?

5                MS. LUHANA:  Objection to form.

6                THE WITNESS:  I guess I -- in

7    terms of in relationship to my opinion, I

8    would talk about safety measures and how it

9    impacts deterrence or prevention or the

10   psychology of a victim or consumer.

11   BY MR. LOVE:

12       Q.    But you've never conducted any

13   studies about how those safety features

14   actually affect Rideshares; right?

15               MS. LUHANA:  Object to form.

16               THE WITNESS:  I have not conducted

17   studies, no.

18               MR. LOVE:  Okay.

19   BY MR. LOVE:

20       Q.    And -- withdrawn.

21               You're not an expert in -- in

22   public transportation; right?

23               MS. LUHANA:  Objection.  Calls for

24   a legal conclusion.

25               THE WITNESS:  In -- can you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

```
 1   specify an expert in public transportation?  I
 2   feel like I have expertise in sexual assault
 3   in some of those areas, but...
 4   BY MR. LOVE:
 5      Q.   So putting sexual assault aside, you
 6   are not an expert in transportation services
 7   generally; right?
 8              MS. LUHANA:  Objection to form.
 9   It's asking for a legal conclusion here.
10              THE WITNESS:  I am not, and I -- I
11   wouldn't give an opinion on that, just in
12   sexual assault.
13              MR. LOVE:  Okay.
14   BY MR. LOVE:
15      Q.   And you're not a marketing expert?
16              MS. LUHANA:  Objection to the
17   form.  Calls for a legal conclusion.
18              THE WITNESS:  I would say while I
19   don't have a formal degree in marketing, I --
20   marketing is steeped in the types of
21   psychology I am an expert in, like cognitive
22   psychology, social psychology, biases,
23   consumer sentiment and behavior, the kind of
24   issues with tapping into consumer emotions,
25   risk decision-making.  Those kind of things, I
```

Page 57

1    am an expert in.

2    BY MR. LOVE:

3        Q.    You don't have a degree in marketing,

4    do you?

5              MS. LUHANA:  Objection to form.

6    Asked and answered.

7              THE WITNESS:  I do not have a

8    degree in marketing.

9    BY MR. LOVE:

10        Q.    You've never taken classes in

11    marketing?

12              MS. LUHANA:  Objection to form.

13    Mischaracterizes her testimony.

14              MR. LOVE:  I'm not characterizing

15    any testimony; I'm asking her a question.

16    BY MR. LOVE:

17        Q.    You've never taken any classes in

18    marketing; correct?

19        A.    I've taken classes in consumer

20    behavior decision-making and how it affects

21    people's assessment of risk.  So many of the

22    concepts used in marketing, I have taken

23    classes in.

24        Q.    You have not been trained by someone

25    with a marketing degree?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1              MS. LUHANA:  Objection to form.

2              THE WITNESS:  No.

3    BY MR. LOVE:

4        Q.   You've never taken any public

5    relations classes?

6              MS. LUHANA:  Objection to the

7    form.

8              THE WITNESS:  I'm not sure.

9    That's a pretty broad area, and there's --

10   again, much of psychology goes into public

11   relations, forming relations, presenting,

12   getting the messages through the target

13   audience, organizing social psychology,

14   working with social groups.

15             So again, a lot of the -- the term

16   "public relations" is too broad.  I have a lot

17   of information as a psychologist about public

18   relations.

19   BY MR. LOVE:

20       Q.   But you have never taken any class

21   that is labeled a public relations class;

22   correct?

23             MS. LUHANA:  Objection to form.

24             THE WITNESS:  I can't be sure of

25   that.  Those are the types of classes that,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 59

```
 1    when you're getting a bachelor's degree, you
 2    may have public relations, so I don't know.
 3    BY MR. LOVE:
 4        Q.   You can't recall one that you've
 5    taken?
 6        A.   I cannot.
 7        Q.   Okay.
 8             And you don't have a degree in
 9    public relations?
10             MS. LUHANA:  Objection to form.
11             THE WITNESS:  I don't have a
12    degree in public relations, no.
13    BY MR. LOVE:
14        Q.   You're not a regulatory expert?
15             MS. LUHANA:  Objection to form.
16    Calls for a legal conclusion.
17             THE WITNESS:  No, I'm not a public
18    regular -- regulatory expert.
19    BY MR. LOVE:
20        Q.   You're not an expert in statistics?
21             MS. LUHANA:  Objection to form.
22    Calls for a legal conclusion.
23             THE WITNESS:  I've had quite a few
24    classes in statistics and understanding data.
25    BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 60

1      Q.    You're not an expert in statistics;
2  right?  You would not hold yourself out as an
3  expert in statistics?
4              MS. LUHANA:  Objection to form.
5  Asked and answered.
6              THE WITNESS:  I do not work in the
7  statistics industry.
8  BY MR. LOVE:
9      Q.    And you don't have a degree in
10  statistics?
11             MS. LUHANA:  Objection to form.
12  Asked and answered.
13             THE WITNESS:  I don't have a
14  specific degree in statistics, just education
15  about statistics.
16  BY MR. LOVE:
17     Q.    And you would not hold yourself out
18  as an expert in epidemiology, would you?
19             MS. LUHANA:  Objection to form.
20  Calls for a legal conclusion.
21             THE WITNESS:  I understand
22  epidemiology, we use it in psychological
23  research, but I do not work as an
24  epidemiologist.
25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

1      Q.   And you do not have a degree in

2   epidemiology?

3      A.   Correct.

4      Q.   You don't work in law enforcement?

5              MS. LUHANA:  Objection to form.

6              THE WITNESS:  I train law

7   enforcement, I educate them and I work closely

8   with them, including consultation.  I am not a

9   law enforcement officer.

10  BY MR. LOVE:

11     Q.   And you don't have any sort of degree

12  in law enforcement; correct?

13             MS. LUHANA:  Objection to form.

14             THE WITNESS:  A -- a degree in law

15  enforcement?  I -- I don't have a criminal

16  justice degree, I just am a forensic

17  psychologist, which does a lot of criminal

18  justice study, information, consultation, and

19  much of my treatment is steeped in

20  criminology.

21  BY MR. LOVE:

22     Q.   And you would not hold yourself out

23  as an expert in corporate governance; right?

24             MS. LUHANA:  Objection to form.

25  Calls for a legal conclusion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                            Page 62

1              THE WITNESS:  I would not.

2              MR. LOVE:  Let's pull up Tab 35,

3    please.

4              MS. DELANEY:  Would you like to

5    mark it as an exhibit, Cohl?

6              MR. LOVE:  Yes.  Let's mark that

7    as Exhibit 2, please.  Thank you, Ms. Delaney.

8              (Whereupon, a document was marked,

9    for identification purposes, as Exhibit 2.)

10             MS. DELANEY:  Okay.  It is added

11   to the file share.  I can go ahead and

12   screen-share it as well if you'd like.

13             MR. LOVE:  Can you see that, Dr.

14   Valliere, on your end?

15             THE WITNESS:  Yep.  It just came

16   up.

17             MR. LOVE:  Perfect.  So no need to

18   screen-share, Ms. Delaney.

19   BY MR. LOVE:

20        Q.   So this is your invoice; correct?

21        A.   Yes.

22        Q.   When did your work that's identified

23   on this invoice begin?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  Sometime in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 63

1    spring of this year.

2    BY MR. LOVE:

3        Q.    And it ends on October 22nd, 2025?

4                MS. LUHANA:  Objection.

5                THE WITNESS:  Correct.  The work

6    doesn't end, the -- the invoice ends, yes.

7                MR. LOVE:  Right.

8    BY MR. LOVE:

9        Q.    And there is a chunk -- a large chunk

10   sum here of $43,087.50.

11               How much of that was time spent

12   talking to the attorneys in this case?

13       A.    Hmm, probably about 10 percent.

14       Q.    Okay.

15               And how much was reviewing

16   documents?

17       A.    Probably about 70 percent.

18       Q.    And when you say -- when I say

19   "reviewing documents," what I'm referring to

20   is -- withdrawn.

21               When you say -- when you talk

22   about reviewing documents, are you talking

23   about reviewing documents that you reviewed

24   for this particular report, or reviewed for

25   this case in general?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 64

1      A.   Are you talking about the previous

2   Uber case?

3      Q.   Maybe I can -- I can make that a

4   little clearer.

5             Did you re-review any documents

6   that you used in your -- your prior report for

7   the JCCP?

8      A.   Possibly.

9      Q.   Do you recall any specific ones that

10  you did re-review?

11     A.   I -- I looked at the Safety Report

12  again, community guidelines, and maybe some

13  other specific documents where I wanted to get

14  more clarity or just needed to remind myself.

15     Q.   How many would you say you

16  re-reviewed?

17     A.   Oh, I --

18             MS. LUHANA:  Objection to form, to

19  the extent you remember.

20             THE WITNESS:  I have no idea.

21  BY MR. LOVE:

22     Q.   Could you give me your best

23  estimation?

24             MS. LUHANA:  Objection to form.

25  Asked and answered.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 65

1    BY MR. LOVE:

2        Q.    In other words, was it more than 10

3    documents?

4                MS. LUHANA:    Objection to form.

5    Asked and answered.

6                THE WITNESS:    Prob -- probably 10

7    or 20.

8                MR. LOVE:    Okay.    Thank you for

9    that, Dr. Valliere.

10   BY MR. LOVE:

11       Q.    And then how much of this time was

12   spent actually drafting any revisions to your

13   report?

14               MS. LUHANA:    Objection to form.

15               THE WITNESS:    I think what's left

16   is 20 percent, if my math is right.

17               MR. LOVE:    Okay.

18   BY MR. LOVE:

19       Q.    And when you were -- when you revised

20   your report, you used the JCC report as a base

21   for the report in this action; correct?

22               MS. LUHANA:    Objection to form.

23               THE WITNESS:    Yeah, I added a lot

24   to it, but much of the -- the information can

25   be reiterated.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1              MR. LOVE:  Right.

2    BY MR. LOVE:

3        Q.    Much of -- much of the information

4    that is in the JCCP report is identical to

5    what's in the MDL report; right?

6              MS. LUHANA:  Objection.

7              THE WITNESS:  I -- I don't know if

8    much, but I'll -- definitely some is.

9              MR. LOVE:  Okay.  Now if we could

10   pull up Tab 34 and mark that as Exhibit 3.

11              (Whereupon, a document was marked,

12   for identification purposes, as Exhibit 3.)

13              MS. DELANEY:  Just added.

14              MR. LOVE:  Thank you, Ms. Delaney.

15   BY MR. LOVE:

16       Q.    Dr. Valliere, can you see your

17   invoice from July 18, 2025?

18       A.    Yes.

19       Q.    Okay.

20              So when did the work for this

21   invoice begin?

22       A.    Either late in 2024 or the very, very

23   beginning of 2025.

24       Q.    Okay.

25              And it ended July 2nd, 2025, this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 67

```
 1    invoice?
 2        A.   Yes.
 3        Q.   So over the course of six to
 4    seven months, you billed $15,750; correct?
 5        A.   Yes.  And there was some additional
 6    hours I found in another invoice that I
 7    submitted, another invoice.
 8        Q.   How many hours?
 9        A.   I -- I -- I didn't review it, but I
10    think it was like 17 maybe.
11        Q.   Has that invoice been produced?
12        A.   I have no -- I have given it to the
13    attorneys.  I don't know.
14             MR. LOVE:  Okay.  I'm going to go
15    ahead and call for production of that, because
16    I don't believe that Uber has received it.
17    And Roopal, we can talk about that off the
18    record.
19             MS. LUHANA:  Sure.
20    BY MR. LOVE:
21        Q.   Is there any reason as to why this
22    invoice is so much smaller than your invoice
23    for the last couple of months?
24             MS. LUHANA:  Objection to form.
25             THE WITNESS:  Yes.  I spent --
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 68

 1   there were -- this invoice reflects

 2   information from Uber prior to 2020, and so

 3   there was a lot of supplementary information,

 4   new documents, new depositions, new evidence,

 5   new discovery that came in, including more

 6   recent news articles, all of those things.

 7             There's significantly more

 8   information to glean.

 9   BY MR. LOVE:

10       Q.   When you say "news articles," did you

11   review -- did you rely on news articles in

12   coming to your conclusions in this case?

13             MS. LUHANA:  Objection to form.

14             THE WITNESS:  Only the conclusion

15   that Uber has an ongoing sexual assault

16   problem that has not been solved.

17   BY MR. LOVE:

18       Q.   So your conclusion that Uber has an

19   ongoing sexual assault problem, at least in

20   part, relies on news articles?

21             MS. LUHANA:  Objection to form.

22   Mischaracterizes the testimony.

23             THE WITNESS:  News articles are

24   just examples of that this is a persistent

25   problem up to 2025.  It doesn't form my

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 69

 1    opinion.
 2                    MR. LOVE:  Okay.
 3    BY MR. LOVE:
 4        Q.    And any article that you relied on,
 5    did you identify that in your report or your
 6    Materials Considered list?
 7        A.    I believe it is Appendix B.
 8        Q.    And any article that you relied on
 9    would be included in Appendix B?
10                    MS. LUHANA:  Objection to form.
11                    THE WITNESS:  Yes.
12    BY MR. LOVE:
13        Q.    Did you review more documents in the
14    last couple of months than you reviewed in
15    conjunction with this invoice that you
16    submitted on July 2nd, 2025?
17        A.    Absolutely.
18                    MR. LOVE:  Oh, we can -- oh, I
19    guess you can put that away, Dr. Valliere.
20    Okay.
21    BY MR. LOVE:
22        Q.    In your report, you have not come to
23    any conclusions about any individual
24    plaintiff's case in this action; correct?
25                    MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

```
1              THE WITNESS:  Right.  It -- I
2    understand the basics of -- the basics of the
3    Complaints and believe that my general opinion
4    would serve to identify elements in those
5    Complaints, but I did not -- I didn't
6    interview or evaluate any particular person.
7    BY MR. LOVE:
8       Q.   So you don't intend to offer any
9    case-specific opinions at trial; right?
10              MS. LUHANA:  Objection to form.
11              THE WITNESS:  Other than --
12              MS. LUHANA:  Objection to legal
13    conclusion.
14              THE WITNESS:  I'm sorry.
15              (Court reporter clarification.)
16              THE WITNESS:  Other than how my
17    opinions in my report conform or comport with
18    the allegations, nothing specific towards
19    them.
20    BY MR. LOVE:
21       Q.   And you're not offering any opinions
22    that sexual misconduct did or did not occur in
23    any particular Uber ride; correct?
24              MS. LUHANA:  Object to form.
25              THE WITNESS:  I am not.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 71

 1   BY MR. LOVE:

 2       Q.   You're not offering any opinions as

 3   to whether Uber acted reasonably with regard

 4   to any particular investigation; correct?

 5               MS. LUHANA:  Objection to form.

 6               THE WITNESS:  No, not specifically

 7   targeted towards a particular case.

 8   BY MR. LOVE:

 9       Q.   You're not offering any opinions as

10   to any particular plaintiff's allegations?

11               MS. LUHANA:  Objection to form.

12               THE WITNESS:  No, just other

13   identifying things that could be applied to

14   that case that may come out of my report.

15   BY MR. LOVE:

16       Q.   And you're not offering any opinions

17   as to any particular plaintiff's mental health

18   or historical or alleged trauma; correct?

19               MS. LUHANA:  Objection to the

20   form.

21               THE WITNESS:  No.  I just talk

22   about general impact of trauma and the -- and

23   the potential damages of being sexually

24   assaulted in my report.

25   BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 72

1      Q.    You did not interview any plaintiff

2   in this action; right?

3      A.    I didn't.

4      Q.    You did not interview any individuals

5   in connection with their conclusions in this

6   action?

7      A.    Any particular individuals?  In this

8   case, no.

9      Q.    And you have not evaluated any

10   plaintiff in connection with your opinions in

11   this action?

12      A.    That's right.

13      Q.    And you don't intend to do so before

14   trial?

15              MS. LUHANA:  Objection to form.

16              THE WITNESS:  Not to my knowledge.

17   BY MR. LOVE:

18      Q.    Now, you wrote in your report that

19   you are not offering opinions about Uber's

20   branding and marketing, so I want to make

21   sure.

22              You are not offering any opinions

23   about Uber's marketing; correct?

24              MS. LUHANA:  Objection to form.

25              Counsel, do you want to show her

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

```
 1   the report or something specific?
 2                MR. LOVE:  I will show her the
 3   report if she needs to see the report.
 4                THE WITNESS:  Well, I don't -- I
 5   don't recall that specific statement, but what
 6   I am offering opinions on is how just the
 7   psychology of marketing and how it may
 8   psychologically impact decision-making on
 9   potential victims.
10   BY MR. LOVE:
11      Q.   Nothing beyond that?
12                MS. LUHANA:  Objection to form.
13                THE WITNESS:  I -- I don't think
14   so.
15   BY MR. LOVE:
16      Q.   You would say that offenders often
17   hide in plain sight; correct?
18                MS. LUHANA:  Objection to form.
19                THE WITNESS:  They can.
20   BY MR. LOVE:
21      Q.   You would say they have an excellent
22   capacity for presenting themselves in a
23   pro-social way?
24                MS. LUHANA:  Objection to form.
25                THE WITNESS:  I do think they do,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

1   which is why we have to be diligent in all

2   efforts to be preventative and -- and

3   proactive and engage in deterrence efforts.

4              MR. LOVE:  Great.

5   BY MR. LOVE:

6      Q.   They're incredibly skilled at

7   concealing actions; right?

8              MS. LUHANA:  Objection to form.

9              THE WITNESS:  They can be, yes.

10  BY MR. LOVE:

11     Q.   And they commit offenses everywhere

12  without getting caught; right?

13             MS. LUHANA:  Objection to form.

14             THE WITNESS:  I think that's too

15  broad of a statement, but I -- that can happen

16  if the environment allows that and is tolerant

17  of -- or provides characteristics that can

18  allow an offender to get away with things.

19  BY MR. LOVE:

20     Q.   Well, you've had clients that have

21  offended in -- in various different places

22  that you would think are safe from sexual

23  assaults; right?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  I have had clients

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 75

1  when there is no offend and things that give

2  the impression or illusion of safety or

3  presumption of safety, when, in fact, it

4  really wasn't safe.

5  BY MR. LOVE:

6      Q.   So, for example, you -- you had a

7  client who sexually abused a little girl in

8  the middle of church; right?

9      A.   That's -- yes, I did.

10     Q.   And when -- and when that happened,

11  her mother was sitting right next to her;

12  right?

13              MS. LUHANA:  Objection to form.

14              Doctor, I would advise you, if

15  you're going into a confidential case and

16  going to discuss the specifics of it, to the

17  extent there's a confidentiality agreement

18  covering the case.

19              (Court Reporter Clarification.)

20              THE WITNESS:  I believe this is an

21  example of an offender from my book, so

22  there's no confidentiality issues, yes.

23              And -- and that's a perfect

24  example of where, when the decision-makers are

25  convinced that something's safe, their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 76

1    identification of risk becomes problematic.

2    BY MR. LOVE:

3        Q.    So typically, people would think that

4    when you're around your parents, you're safe

5    from sexual assault; right?

6                MS. LUHANA:  Objection to form.

7                THE WITNESS:  Not just being

8    around their parents, but in the environment

9    of a church setting, which promotes an

10   illusion of trust, dictates that you're safe

11   and creates an environment where people let

12   their guards down and an environment of

13   familiarity.

14               MR. LOVE:  So I just want to make

15   sure that the answer is clear for the record.

16   BY MR. LOVE:

17       Q.    So even though you would typically

18   think that this environment was safe, it was

19   not; right?

20               MS. LUHANA:  Objection to form.

21   Asked and answered.

22               THE WITNESS:  It -- it -- it could

23   have been safe.  It was not safe because of

24   the elements I discussed that are related to

25   some of the lack of deterrence in the Uber

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 77

1  model, that when somebody or some -- something

2  becomes familiar, promotes itself as safe and

3  trustworthy, like the offender did with the

4  parent, the assessment of risk and

5  decision-making about that safety gets

6  compromised for the potential supervisor or

7  victim.

8  BY MR. LOVE:

9      Q.   Well, it wasn't safe also because

10 there was a sexual offender; right?

11             MS. LUHANA:  Objection to form.

12             Counsel, what are we talking about

13 here?  What wasn't safe?  I think --

14             MR. LOVE:  If the witness doesn't

15 understand the question, she can ask me to

16 clarify.  I would ask that you stop with

17 speaking objections and coaching the witness.

18             MS. LUHANA:  I'm not coaching the

19 witness.

20 BY MR. LOVE:

21     Q.   Dr. Valliere --

22             MS. LUHANA:  I'm just asking for

23 the record.

24             MR. LOVE:  Dr. Valliere, I'll

25 clarify my question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 78

```
 1            MS. LUHANA:  You're asking an
 2  ambiguous question, so I just wanted clarity
 3  so we have a clean record, counsel.
 4  BY MR. LOVE:
 5     Q.   Dr. Valliere, we were talking about
 6  an instance when one of your clients offended
 7  in the middle of a church.
 8            And I just want to be clear that
 9  that environment wasn't safe, at least in
10  part, because there was a sexual offender
11  there; right?
12            MS. LUHANA:  Objection to form.
13            THE WITNESS:  And that offender
14  was trusted.
15  BY MR. LOVE:
16     Q.   You would agree that most often, no
17  one will know about an offense other than the
18  offender and the actual person who is
19  victimized; right?
20            MS. LUHANA:  Objection to form and
21  the hypothetical.
22            THE WITNESS:  I'm -- can you be a
23  little more clear about your question in terms
24  of --
25            MR. LOVE:  Sure.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 79

1  BY MR. LOVE:

2      Q.   So in terms of a sexual offense,

3  usually the only two people that know about

4  that offense are the offender and the victim;

5  right?

6              MS. LUHANA:  Objection to form.

7              THE WITNESS:  Given that there are

8  no witnesses, no monitoring, no capturing of

9  that behavior.

10  BY MR. LOVE:

11      Q.   So that's a yes?

12              MS. LUHANA:  Objection.

13  Mischaracterizes her testimony.

14              THE WITNESS:  With those

15  conditions that I outlined.

16              MR. LOVE:  Okay.

17  BY MR. LOVE:

18      Q.   And most offenders have multiple

19  victims; right?

20              MS. LUHANA:  Objection to the

21  hypothetical.

22              THE WITNESS:  Most offenders have

23  multiple victims that go unreported or un --

24  unconvicted.

25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Now, you spoke about this in your

2    book, but offenders are very adept at

3    analyzing and assessing risks; right?

4              MS. LUHANA:  Objection to form.

5              THE WITNESS:  I would agree with

6    that, as well as assessing environments that

7    are not protective.

8    BY MR. LOVE:

9      Q.   And it's your opinion that they have

10   a greater knowledge of risk and consequences

11   than the general public; right?

12             MS. LUHANA:  Objection to form and

13   the hypothetical.

14             THE WITNESS:  That's what makes

15   their -- the -- the critical nature of

16   deterrence and prevention so salient for me,

17   is that they can assess an environment, a

18   potential victim.  They can assess the

19   responsivity of the environment to a crime.

20             So that's why I stress repeatedly

21   in my report of the responsibility of people

22   who provide environments that can be very

23   fertile for sexual assault to put deterrence

24   in there.

25             MR. LOVE:  Understood.  But you --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 81

1    you didn't exactly answer my question, so I

2    just want to make sure we have a clear

3    response on the record.

4    BY MR. LOVE:

5        Q.   You would agree with me that

6    offenders have a greater knowledge of risk and

7    consequences than the public; correct?

8              MS. LUHANA:  Objection to form and

9    hypothetical.

10             THE WITNESS:  I -- I thought I did

11   answer that in saying I agree, which is what

12   makes it imperative to engage in as much

13   deterrence as we can, because deterrence is

14   effective for that very reason.

15             MR. LOVE:  Understood.

16   BY MR. LOVE:

17       Q.   And they're, like you said, adept at

18   finding vulnerabilities; right?

19             MS. LUHANA:  Objection to form and

20   mischaracterizes her testimony.

21             THE WITNESS:  They can be adept

22   at -- at finding and exploiting

23   vulnerabilities, not only in victims, but in

24   environments like in --

25             MR. LOVE:  You mean -- apologies.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1            THE WITNESS:  Well, and that's,
2     again, something that, when you provide an
3     environment with those vulnerabilities, is a
4     big responsibility to try to plug those holes.
5     BY MR. LOVE:
6        Q.   Offenders are also good at creating
7     vulnerabilities; right?
8            MS. LUHANA:  Objection to form and
9     the hypothetical.
10            THE WITNESS:  When they have
11     access to victims, the creation of
12     vulnerability is more an ongoing interpersonal
13     process, not necessarily relevant to my
14     opinion in this case, but that would be, like,
15     through an ongoing relationship or a process
16     of interacting with a potential victim, like
17     drugging them or getting them intoxicated.
18     BY MR. LOVE:
19        Q.   And it's your opinion that offenders
20     are also skilled at developing plausible
21     deniability; right?
22            MS. LUHANA:  Objection to the form
23     and the hypothetical.
24            THE WITNESS:  Again, that's what
25     makes it really critical in -- in an

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 83

1    environment like Uber to not rely on unskilled

2    investigators or the offender's statement to

3    confirm or disconfirm.

4            That's why investigations are a --

5    need skilled investigators who are trained in

6    this because they are very good at confusing

7    the issue.

8            So somebody promoting an

9    investigation or saying that they did

10   investigate, yeah, it relies on the offender's

11   ability to obscure the truth is not an

12   efficient investigation.

13           MR. LOVE:  Okay.

14           I'm going to move to strike that

15   response as nonresponsive, and I'm going to

16   ask that you answer the question that I'm

17   asking.

18           MS. LUHANA:  Counsel --

19   BY MR. LOVE:

20       Q.   Do you believe --

21           MS. LUHANA:  -- she did answer it,

22   and -- and I don't think it's improper to move

23   to strike from the record.  {Sic}

24           MR. LOVE:  Okay.

25   BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 84

1      Q.   You believe that offenders are

2   skilled at developing plausible deniability;

3   yes?

4              MS. LUHANA:  Objection to form.

5   Asked and answered.

6              THE WITNESS:  It -- like I said,

7   it's not just that I believe it; it is a skill

8   that they have, especially in terms of victim

9   blaming and camouflaging their behavior and

10  confusing uneducated public or investigators

11  about their true actions.

12  BY MR. LOVE:

13     Q.   You have referred to offenders as

14  expert puppet masters?

15             MS. LUHANA:  Objection to form.

16             THE WITNESS:  Probably.

17  BY MR. LOVE:

18     Q.   And on the other hand, there's no way

19  to control a sexual offender; right?

20             MS. LUHANA:  Objection to form, to

21  the hypothetical.

22             THE WITNESS:  I disagree with

23  that, because in terms of the use of the word

24  "control" is one thing, but I run an

25  outpatient sex offender program where we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 85

1    engage in very effective management and

2    prevention of offenders in the community.

3                And so offenders can be deterred,

4    they can be managed, and sexual offenses can

5    be prevented; otherwise, I would not do this

6    work.

7                MR. LOVE:  Dr. Valliere, that was

8    not my question.  My question was control, and

9    you said control is one thing.

10               I want to focus on control.

11   BY MR. LOVE:

12       Q.   You cannot control a sexual offender;

13   correct?

14               MS. LUHANA:  Objection to form.

15   Asked and answered.

16               THE WITNESS:  I'm not quite sure

17   what you mean by the word "control," because

18   ultimately, offenders can be controlled by

19   incarceration, to a certain degree.

20               So I'm -- I'm not sure what you

21   mean by "control."

22               MR. LOVE:  Okay.

23               THE WITNESS:  I don't know if

24   control -- when we're talking about human

25   beings, without some heinous oppression,

Page 86

1   people cannot be controlled.

2            MR. LOVE:  Ms. Delaney, can we

3   pull up the page that we're referencing here?

4            MS. DELANEY:  Yes.

5            MR. LOVE:  Thank you.

6            (Whereupon, a document was marked,

7   for identification purposes, as Exhibit 4.)

8   BY MR. LOVE:

9       Q.   Dr. Valliere, this is a page from

10  your book; correct?

11           MS. LUHANA:  Counsel, can I just

12  wait to -- I want to pull it up so she can see

13  it.  It's kind of small on the screen.

14           MR. LOVE:  Can we zoom in, please,

15  Ms. Delaney.

16           And, counsel, I don't believe that

17  we have a PDF version of this, but we can work

18  on getting that, if it's all right, if we can

19  just move forward with this one page for now

20  and then put that into the Exhibit Share on

21  the break.

22           MS. LUHANA:  So what are -- what

23  are you showing the Doctor?

24           MR. LOVE:  If you can see, Dr.

25  Valliere, Bullet 3, can you read that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1                THE WITNESS:  I can.

2                It's a page from my book, and this

3     is -- you are taking out of context.

4                This is a page for people who hope

5     to be in a relationship with an offender, and

6     I would tell this to any person, that you

7     can't control your partner.  You cannot

8     control a family member.

9                And this is different.  I would

10    never talk about management or containment or

11    deterrence with a family member of an

12    offender.

13               So on this page, I'm advising, I

14    believe, if you -- if you want to love or be

15    in a relationship with an offender, understand

16    it's not your responsibility to control them.

17               MR. LOVE:  Okay.

18    BY MR. LOVE:

19       Q.   Dr. Valliere, I'm just going to read

20    this section and tell me if I'm reading it

21    correctly.

22               "You cannot control the offender.

23    You can participate in supporting them in the

24    right way.  You can educate yourself.  You can

25    hold the offender accountable.  But you cannot

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

1    be the control agent.  You can never truly

2    supervise the offender.  You can only hold the

3    offender responsible for their choices."

4              Did I read that correctly?

5              MS. LUHANA:  Objection to form.

6              THE WITNESS:  You did read that

7    correctly, but that doesn't --

8              MR. LOVE:  Okay.

9              THE WITNESS:  -- apply to this

10   opinion and the responsibility --

11             MR. LOVE:  That wasn't -- Dr.

12   Valliere, that was not my question.  My

13   question was did -- did you -- did I read it

14   correctly?

15             MS. LUHANA:  Let her finish her

16   response, and I believe she wasn't -- hadn't

17   completed her response.

18             Go ahead, Dr. Valliere.

19             THE WITNESS:  It -- this needs to

20   be taken into context of being a partner or

21   child or friend of an offender, not somebody

22   who has the capability of engaging in

23   preventative or deterrent efforts with an

24   offender.

25             I would never say this to a parole

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

1    agent, for instance.  I would never say this

2    to one of my clinicians, and I would never

3    certainly say it to somebody in charge of an

4    organization that needs to be responsible for

5    engaging in some actions to manage an

6    offender.

7           MR. LOVE:  Okay.  I'm going to

8    move to strike that as nonresponsive.  It was

9    not responsive to my question.  If you would

10   like to shed more light, your counsel is going

11   to have time to ask her own questions, but

12   right now, I would ask that you simply answer

13   my questions and my questions alone.

14           Ms. Delaney, we can pull this

15   down.

16           MS. LUHANA:  Counsel, is this a

17   good time for a break?  We've been going for,

18   I think, over an hour.

19           MR. LOVE:  Sure.  Can we go off

20   the record, please.

21           THE VIDEOGRAPHER:  Going off the

22   video record.  The time is 10:36 a.m.

23           (Whereupon, a recess was taken at

24   the above time.)

25           THE VIDEOGRAPHER:  We are back on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

```
 1   the video record.  The time is 10:43 a.m.
 2              This begins Media Unit No. 2.
 3   BY MR. LOVE:
 4       Q.   Welcome back, Dr. Valliere.
 5       A.   Thank you.
 6       Q.   Did you speak with your counsel on
 7   break?
 8       A.   In terms of?
 9       Q.   Just did you speak at all?  And don't
10   give me the content of your conversation or
11   anything, but did you speak to her?
12       A.   Yes.
13       Q.   And did you talk about this --
14       A.   We talked about going to the bathroom
15   and things.
16       Q.   Perfect.
17       A.   Okay.
18       Q.   Did you talk about the substance of
19   your testimony at all?
20       A.   No.
21       Q.   Okay.
22              We were talking about your book a
23   little bit, so I want to talk a little bit
24   more about that.
25              And in your experience, offenders
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 91

1    sometimes commit offenses because they believe

2    a victim will not report them; right?

3                MS. LUHANA:  Objection to form.

4    Hypothetical.

5                THE WITNESS:  In -- I need to, you

6    know, cherry-picking pieces out of my book

7    forgets about the context, right?  And the

8    context of most offenders is they're in

9    relationships with their victims.  And so some

10   of the things you said like puppet master or

11   the victims won't tell, offenders know very

12   well that when -- when a victim is attached to

13   them, or they know very well the barriers

14   victims have to reporting, whether it's a

15   stranger offense or in a relationship.

16                So they do pick victims that won't

17   tell or won't report.  And it's -- so it's,

18   again, I reiterate that the offenders in my

19   book are varied.  The offenders that I talk

20   about who generally offend in Uber rides

21   are -- are different than, say, the child sex

22   offender or -- or somebody who ingratiates

23   themself into a family to offend.

24                So I just want to provide a

25   different context and talk about the offenders

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 92

1  in Uber who are more instrumental, criminal

2  and opportunistic than many of the ones that I

3  describe in my book.

4            MR. LOVE:  Okay.  I'm going to

5  move to strike that as nonresponsive.

6            I did not ask you about Uber.  I

7  am asking you a simple question about your

8  book.

9  BY MR. LOVE:

10     Q.   Your book discusses offenders in

11  general; correct?

12     A.   All different types of offenders,

13  yes.

14     Q.   Right.

15            And in your book, you say that

16  offenders will offend when they think that the

17  victim will not report them; correct?

18            MS. LUHANA:  Objection to form.

19            THE WITNESS:  I mean, Uber knows

20  and we know very well that all sexual offenses

21  are under-reported, and that includes

22  offenders know that victims don't report.

23            MR. LOVE:  That didn't answer my

24  question.

25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 93

1    Q.   Offenders will offend because they

2   know that victims will not report them; yes or

3   no, Dr. Valliere?

4              MS. LUHANA:  Objection to form.

5   Asked and answered.

6              THE WITNESS:  I believe I -- I

7   said that sexual assault is vastly

8   under-reported; something that Uber knows and

9   we know, and offenders also know.  So they do

10   know that victims will not tell.

11   BY MR. LOVE:

12    Q.   And because they know that, they will

13   offend; yes?

14              MS. LUHANA:  Objection to form.

15              THE WITNESS:  That's not the only

16   factor that facilitates or deters offending is

17   whether or not a victim will tell.

18   BY MR. LOVE:

19    Q.   Understood that that's not the only

20   factor, but it is a factor; correct?

21              MS. LUHANA:  Objection to form.

22   Asked and answered.

23              THE WITNESS:  When they feel like

24   they can get away with it, for whatever

25   reason, it -- it helps them make the decision

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1   to offend.

2           MR. LOVE:  Okay.

3   BY MR. LOVE:

4       Q.   Now, you conducted a study of

5   offenders and whether they believed their

6   victim would tell or not; correct?

7           MS. LUHANA:  Objection to form.

8           THE WITNESS:  It was a survey of

9   the offenders in my program.

10  BY MR. LOVE:

11      Q.   And 80 percent of them believed that

12  their -- their victim would never tell anyone;

13  right?

14          MS. LUHANA:  Objection to form.

15          THE WITNESS:  Those -- all of

16  those offenders were offenders in

17  relationships with their victims, and they may

18  have been children or they may have been

19  partners.

20          And so there's a difference

21  between their assessment of telling in the

22  context of a relationship and what I analyzed

23  in the Uber setting.  So let's just be clear

24  about that.

25          In that survey, I had no offenders

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 95

```
 1   who engaged in instrumental, opportunistic
 2   offending.  All of them were in relationships
 3   of one form or another with their victim.
 4              MR. LOVE:  Okay.
 5   BY MR. LOVE:
 6      Q.   And the result of that survey was
 7   that 80 percent of them said that they
 8   believed their victim would never tell;
 9   correct?
10              MS. LUHANA:  Objection to form.
11   Asked and answered.
12              THE WITNESS:  Because the victims
13   loved them or were afraid of them or other
14   reasons in the interpersonal context.
15   BY MR. LOVE:
16      Q.   So that's a yes; 80 percent of them
17   said that the victim would never tell?
18              MS. LUHANA:  Objection to form.
19   Mischaracterizes testimony.
20              THE WITNESS:  That's true.
21              I'm trying to give a context to
22   something that you're taking a piece of.
23              MS. LUHANA:  Doctor, you can
24   answer the question, you know, as -- as you
25   wish.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

1    BY MR. LOVE:

2        Q.   And when a victim is intoxicated,

3    those rates of disclosure go down; correct?

4                MS. LUHANA:  Objection to form.

5                THE WITNESS:  When victims are

6    intoxicated, there are factors that create

7    more barriers to reporting, including

8    self-blame, fear of being blamed by others,

9    shame and those kind of things, and not being

10   taken seriously by those who they report to.

11               MR. LOVE:  I'm sorry, did someone

12   else speak?

13               MS. LUHANA:  No.

14               MR. LOVE:  Okay.  I just wanted to

15   be sure.  I thought I heard something.

16   BY MR. LOVE:

17       Q.   Okay.

18               And because of -- of those factors

19   that you -- you talked about, you said factors

20   create more barriers, including self-blame,

21   fear of being blamed by others, shame.

22   Because of those factors that result from

23   being intoxicated, they're less likely to

24   report; right?

25               MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1            THE WITNESS:  Yes.  There are more
2    barriers when alcohol is involved.
3    BY MR. LOVE:
4        Q.   And so their disclosure rates when
5    they're -- when a victim is intoxicated, the
6    disclosure rate goes down; correct?
7            MS. LUHANA:  Objection to form.
8            THE WITNESS:  I don't know if
9    there's a comparison of rates.  Sexual assault
10   is under-reported in general, so I don't know
11   if there's a way to know that -- we do know
12   that victims who are intoxicated have more
13   barriers to reporting, are less likely to want
14   to report, and are less supported by the
15   environment.
16           MR. LOVE:  Okay.
17           Can we pull up page 53, please,
18   Ms. Delaney.
19           MS. DELANEY:  Yes, just a second.
20           MR. LOVE:  And we'll mark this as
21   Exhibit 5.
22           (Whereupon, a document was marked,
23   for identification purposes, as Exhibit 5.)
24   BY MR. LOVE:
25       Q.   Dr. Valliere, do you see, halfway

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    through that paragraph in the middle of the

2    page where it says, "Disclosure rates go down

3    when a victim was intoxicated at the time of

4    the offense as does the likelihood that the

5    victim will be able to physically resist"?

6              MS. LUHANA:  Counsel, we're not

7    able to pull -- I guess the exhibit isn't

8    showing, Exhibit 5 yet.  Can we just wait 'til

9    it's up?

10             MR. LOVE:  Sure.

11             MS. DELANEY:  It's going to take

12   me a minute to screenshot and add this as an

13   exhibit.

14             MS. LUHANA:  Oh, okay.

15             MR. LOVE:  I'll only be asking

16   about this one sentence for now, if that's

17   okay.  We can wait for the exhibit or --

18             MS. LUHANA:  Yeah, let's wait.  I

19   want her to have the opportunity to review

20   what you're showing her, as opposed to just a

21   snippet.

22             MR. LOVE:  Okay.  We can come back

23   to that then.  Ms. Delaney, just let me know

24   whenever you're ready.

25   BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

```
 1      Q.   The opportunist -- the opportunistic
 2   sexual offender is always ready to offend;
 3   right?
 4             MS. LUHANA:  Objection to form,
 5   and the hypothetical.
 6             THE WITNESS:  It -- "always" is --
 7   is maybe an overstatement.  I'm sure I wrote
 8   that.  But they -- they assess opportunity and
 9   are willing to exploit it, again, which is why
10   deterrence is so important and efforts to
11   protect people are -- are effective.
12   BY MR. LOVE:
13      Q.   As a professional in this skill,
14   Dr. Valliere, you are careful about the words
15   you choose; right?
16             MS. LUHANA:  Objection to form.
17             THE WITNESS:  That's a pretty
18   broad question.
19   BY MR. LOVE:
20      Q.   Well, you know that words hold
21   meaning; yes?
22      A.   Words hold meaning?  I -- I'm -- I'm
23   not sure -- I'm not sure what you're asking.
24   I think that's obvious.
25      Q.   Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 100

1              And the difference between saying
2      "most of the time" and "all of the time" is a
3      pretty big difference; right?
4              MS. LUHANA:  Objection to form.
5              THE WITNESS:  Sure.  But I don't
6      want to give the impression that the word
7      "always" in that statement means people are
8      walking around every minute with an erection
9      or a -- you know, they're ready to -- they
10     have this insatiable, unmanageable lust.
11              "Always," in that context, would
12     indicate that offenders, in the right
13     environment, without consequences or without
14     fear of the consequences, who are not being
15     supervised or managed or overseen, are quickly
16     willing to take advantage of that opportunity.
17              So they are assessing their
18     environment.
19              MR. LOVE:  Okay.  And we'll take a
20     look at that page after this.
21              Do you see Exhibit 5 in the chat?
22              MS. LUHANA:  Yes, now we do.
23     We'll pull it up.  Thank you.
24     BY MR. LOVE:
25         Q.   And, Dr. Valliere --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 101

1          MS. LUHANA:  Can we just look at
2     the rest of the page and scroll?
3          MR. LOVE:  Unfortunately, due to
4     the form, it will not allow us to -- I mean, I
5     can -- I can pull that up on the screen for
6     you and show you and have Dr. Valliere scroll
7     wherever she wants to scroll, of -- of course.
8          But unfortunately, through the
9     Exhibit Share, I can't send the book because
10    the book is not available.
11         MS. LUHANA:  Okay.  Understood.
12         You're just showing from the book.
13    Understood.  Okay.  I just want her to have
14    the opportunity to read the -- the contents.
15         MR. LOVE:  Sure.
16         So, Ms. Delaney, can we pull up
17    that page one more time.
18    BY MR. LOVE:
19       Q.   And -- and, Dr. Valliere, feel free
20    to -- to tell us wherever you want to scroll,
21    whatever you want to read, whatever you need
22    to review to answer the question and -- and we
23    can do that for you.
24       A.   Thanks.
25         MS. LUHANA:  Thank you, counsel.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1           MR. LOVE:  Just for context, what
2    I'll be directing you to is in the second
3    paragraph on the page about halfway through
4    where it starts "Disclosure," but let me know
5    whenever you're ready.
6           THE WITNESS:  I am ready, thanks.
7    BY MR. LOVE::
8      Q.   And it says there, "Disclosure rates
9    go down when a victim was intoxicated at the
10   time of the offense as does the likelihood
11   that the victim will be able to physically
12   resist"; right?
13     A.   Correct.  That's what that study
14   found.
15     Q.   Okay.
16          MR. LOVE:  And can we go to
17   page 50, Ms. Delaney.
18          MS. LUHANA:  So is this another
19   exhibit that's up?
20          MR. LOVE:  It -- it will be, yes.
21          (Whereupon, a document was marked,
22   for identification purposes, as Exhibit 6.)
23          MR. LOVE:  Feel free,
24   Dr. Valliere, to -- to let us know wherever
25   you want to scroll.  I'll be directing you to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 103

1    the third full paragraph on this page at

2    the -- the very first sentence.  And let me

3    know whenever you're ready.

4                THE WITNESS:  Do you want me to

5    wait until it comes up?

6                MS. LUHANA:  Can you see it?  I

7    just want to make sure you have an opportunity

8    to read it.

9                THE WITNESS:  I can see it here.

10               MS. LUHANA:  We're just trying to

11   pull it up, counsel.

12               MS. DELANEY:  Do you want me to

13   put this as an exhibit now?

14               MR. LOVE:  Yes, please.

15               MS. DELANEY:  Okay.

16               MR. LOVE:  But, Dr. Valliere, if

17   you can see it on the screen, can we just use

18   the screen-share while that's -- while that's

19   working?

20               MS. LUHANA:  Can she have the

21   ability, after you ask a question, so she can,

22   like, look at the document and scroll, so she

23   can see what the context is, as I said,

24   counsel?

25               MR. LOVE:  Right.  And like I

Page 104

1    said, we will scroll wherever she wants to

2    scroll; just let us know.

3                    MS. DELANEY:  I cannot

4    screen-share and add this as an exhibit at the

5    same time.  So I can do -- I can add it as an

6    exhibit now or after the questioning,

7    whichever you'd prefer.

8                    MS. LUHANA:  Okay.  Just going

9    forward, maybe it makes sense for us to add

10   the exhibit and then screen-share so that

11   we're all on the same page.

12                    MR. LOVE:  Okay.

13   BY MR. LOVE:

14       Q.   For now, Dr. Valliere, do you need

15   any more context than what's on the page for

16   me to ask about this first sentence in this

17   third paragraph?

18       A.   Just to be clear, taking one sentence

19   out of a book, we do need a lot more context.

20   Because I believe, in the page you were

21   showing me, I was talking about opportunities

22   are different per offender, per what they

23   define as, you know, and are unique to their

24   needs.

25                    So again, while that sentence says

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 105

1    the opportunist is always ready to offend,

2    that opportunity is individually defined for

3    what they identify in terms of the victim, the

4    environment and the potential consequences.

5        Q.    Okay.  I just want to be clear.

6             It says, "the opportunist is

7    always ready to offend"; right?

8        A.    Yes, that's what it says.

9        Q.    And "always ready to offend" is in

10   italics; right?

11       A.    That --

12            MS. LUHANA:  Objection.  Document

13   speaks for itself.

14            THE WITNESS:  Yes, it is in

15   italics.

16            MR. LOVE:  Okay.  We can pull this

17   down, Ms. Delaney.  Thank you.

18   BY MR. LOVE:

19       Q.    Dr. Valliere, what is hindsight bias?

20            MS. LUHANA:  Objection to form.

21            THE WITNESS:  Hindsight bias is

22   that bias we have when we retrospectively look

23   at something and believe that our decisions

24   either inevitably led to a consequence, which

25   may or may not be true, or our failure to act

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 106

1    inevitably led to a consequence.

2              So it's analyzing past behaviors

3    or past situations based on the -- the known

4    information in the future.

5    BY MR. LOVE:

6        Q.   And your opinion is that people

7    should not do that when looking at sexual

8    offenses; correct?

9              MS. LUHANA:   Objection to form and

10   the hypothetical.

11             THE WITNESS:   My opinion to that

12   is that when it comes to victim-blaming, that

13   hindsight bias can be incredibly destructive,

14   and you can't go backwards and say the victim

15   made a number of problematic choices that

16   raised their own risk given the outcome

17   because they did not have the outcome.

18             So in the context of my opinion in

19   this case, blaming a victim for getting into

20   an Uber drunk at night when -- when she feels

21   that Uber has promoted itself as trustworthy

22   and a good option to get home, is -- is a

23   problematic hindsight because she felt like

24   she made a good decision at that time.

25             MR. LOVE:   Okay.   And I'm not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 107

1  going to be asking about any examples in this

2  case, so we can just stick to hindsight bias

3  generally, and I want to -- I want to clarify

4  your opinion on that.

5  BY MR. LOVE:

6      Q.   So you said that --

7          MS. LUHANA:  Counsel, I will just

8  direct her to answer the question as she feels

9  is best, she sees fit, so go ahead.

10 BY MR. LOVE:

11     Q.   You said, "My opinion to that is that

12 when it comes to victim blaming, hindsight

13 bias can be incredibly destructive."

14          Is it your opinion that hindsight

15 bias is acceptable to use in other places?

16          MS. LUHANA:  Objection to form.

17 Objection to the hypothetical.

18          THE WITNESS:  Certainly.

19          For instance, in -- in my program

20 in managing sex offenders, we -- we look

21 backwards to see what we could have done

22 better, what we could have done to deter an

23 offender's behavior, what signs we could have

24 seen or what things we could have instituted

25 that would have prevented an offense.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 108

1         It's in terms of victim-blaming in
2    the context of the victim not knowing that the
3    result would be that that victim was going to
4    be sexually assaulted and that the Rideshare
5    environment is unsafe or, you know, I
6    really -- to take statements that are broadly
7    applicable and not apply them to my opinion in
8    Uber is -- it's just inaccurate.
9         So if we stick to my opinion that
10   I presented about Rideshare, it's wrong to go
11   back and think that a victim or friends of a
12   victim who thought putting their -- their
13   drunk friend in an Uber was a good idea at the
14   time, but then when she gets raped, realizes
15   oh, that -- that wasn't a good idea because we
16   didn't know Uber wasn't safe.  That's
17   problematic.
18        For Uber to look backwards and say
19   we have our victims getting sexually assaulted
20   in a Rideshare, what could we do better,
21   that's appropriate.  Like if this driver had a
22   camera, maybe he wouldn't have raped.  If --
23   if we would have reached out when there was a
24   long stop, those are the kind of responsible
25   hindsight retrospective analyses we need to

Page 109

1    do.

2           But to go back and say the victim

3    brought this on themselves because they were

4    drunk and got in an Uber is just wrong.

5           MR. LOVE:  Okay.  I'm going to

6    move to strike that as nonresponsive.

7    BY MR. LOVE:

8        Q.   I'm asking about your general

9    practice and general understanding of

10   hindsight bias in your practice as it does not

11   pertain to victim-blaming, as I stated in my

12   question.  And I just want to make sure I

13   understand that part particularly.

14          So when you say that it's okay to

15   look back at things that could have been

16   identified, are you saying your opinion is

17   that red flags that you view in hindsight as

18   red flags could have indicated to someone that

19   a sexual assault was going to happen?

20          MS. LUHANA:  Objection to form,

21   objection to the hypothetical, and

22   mischaracterizes her testimony.

23          THE WITNESS:  I think -- I'm not

24   quite sure --

25          MR. LOVE:  I can -- I can clarify,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

1    if -- if I can.

2                THE WITNESS:  Okay.

3    BY MR. LOVE:

4        Q.    Okay.

5                So if -- if you see a red flag

6    that someone might sexually offend, after the

7    fact, is it okay to say that that person

8    should have caught that offense?

9                MS. LUHANA:  Objection to form.

10   Hypothetical.

11               THE WITNESS:  It's -- I'm sorry, I

12   really -- I think what I'm talking about is a

13   retrospective analysis of signs, symptoms or

14   actions that could have been taken as a

15   responsible individual to intervene in,

16   prevent or deter an offender's behavior.

17               So, for instance, if -- if, in my

18   program, an offender offends, it's our

19   responsibility to look back and say we did not

20   call his probation officer when we heard he

21   was drinking.  We did not act when he didn't

22   show up for his group therapy.

23               So we can look back.  They were

24   not necessarily red flags at the time, but we

25   need to learn from that situation and be like

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 111

1    next time, we need this.

2              MR. LOVE:  Understood.  So I

3    think -- I think we can get on the same page.

4    BY MR. LOVE:

5       Q.   So you said that they weren't red

6    flags at the time, and -- and that's what I'm

7    trying to get at.

8              Is it okay to look back and say

9    that, in that example, you did something wrong

10   because there was a red flag?

11             MS. LUHANA:  Objection to form.

12             THE WITNESS:  This gets a little

13   complicated because once -- for instance,

14   in -- in Uber's case, once you learn something

15   can be instituted or identified or seen as a

16   red flag, like all other risk factors that

17   Uber has already identified, and you continue

18   to ignore those, that's a problem.

19             Just like if I have an offender

20   and I continue to ignore problematic behaviors

21   or things that I have identified already as

22   indices of risk, and I fail to do anything

23   about that, then that is wrong.

24             MR. LOVE:  That's not exactly my

25   question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 112

1    BY MR. LOVE:

2        Q.    So let's take your example.

3              One of your offenders has missed a

4    group session and you don't do anything about

5    that.  And later, they offend and you see that

6    as a retroactive red flag.

7              Can you say that you not calling

8    the offender when they missed their group

9    session was negligent?

10             MS. LUHANA:  Objection to the

11   form, the hypothetical, and legal reference to

12   being negligent.

13             THE WITNESS:  Not the first time,

14   but if 1,000 or 10,000 or 100,000 of my

15   offenders miss a group therapy session and I

16   understand that that could be a problem and I

17   don't do anything about it, then -- then I'm

18   wrong.

19             And over the course of the years,

20   I understand that through my learning, through

21   my own clinical experience, if A happens, I

22   need to intervene.  I don't let A happen

23   500,000 times.

24             MR. LOVE:  Okay.

25             THE WITNESS:  So that's the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

1    problem.

2    BY MR. LOVE:

3        Q.    Sexual offenders know that their

4    offenses are immoral; right?

5                MS. LUHANA:  Objection to form and

6    the hypothetical.

7                THE WITNESS:  Immoral?

8    BY MR. LOVE:

9        Q.    Sexual offenders know that -- that

10   their actions, their offenses, are wrong;

11   right?

12                MS. LUHANA:  Objection to form.

13   Hypothetical.

14                THE WITNESS:  I -- I don't think I

15   agree with that.  Some do, some don't.

16   BY MR. LOVE:

17       Q.    In your experience, you have never

18   treated an adult offender in our society that

19   does not understand their legal act -- their

20   actions are illegal; correct?

21                MS. LUHANA:  Objection to the

22   form.

23                THE WITNESS:  That's completely

24   different than wrong or immoral.

25                MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1    BY MR. LOVE:
2        Q.    And so I'm asking you now.
3                So yes or no; in your experience,
4    you have never treated an adult offender in
5    our society that does not understand their
6    actions are illegal?
7                MS. LUHANA:  Objection to form and
8    hypothetical.
9                THE WITNESS:  Ultimately, yes.
10               MR. LOVE:  Okay.
11   BY MR. LOVE:
12       Q.    And they know that they harm their
13   victims; right?
14               MS. LUHANA:  Objection to form.
15               THE WITNESS:  At some point during
16   their treatment, they understand they harm
17   their treat -- their victims.
18   BY MR. LOVE:
19       Q.    Now, you've written quite a few books
20   on this; right, and articles?
21               MS. LUHANA:  Objection to form.
22               THE WITNESS:  I've written on sex
23   offenders?
24               MR. LOVE:  Yes.
25               THE WITNESS:  I've written one

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 115

1    book and one article and one book chapter on
2    alcohol and sex offenders.
3    BY MR. LOVE:
4        Q.    You've written two books on
5    successfully prosecuting sexual violence;
6    correct?
7        A.    I've written one book on successful
8    prosecution of interpersonal violence.
9        Q.    And you also wrote a book,
10   Understanding Victims of Interpersonal
11   Violence, a Guide for Investigators and
12   Prosecutors?
13       A.    Right.
14       Q.    Okay.
15             And then you wrote an article
16   called Understanding the Non-Stranger Rapist;
17   right?
18       A.    Correct.
19       Q.    And that was for the National
20   District Attorneys Association?
21       A.    Yes.
22       Q.    And the American Prosecutors Research
23   Institute?
24       A.    They're the same, I think, or a
25   subset of -- one is a subset of the other.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 116

1      Q.   And in that article, you give advice

2   on how to conduct a prosecution of a sexual

3   offender; right?

4           MS. LUHANA:  Objection to form.

5           THE WITNESS:  I -- I'm sorry, I

6   can't remember.  That was a -- a long time

7   ago.

8           MR. LOVE:  That's okay.

9           Can we pull up Tab 22, please, and

10  we'll mark this as Exhibit 7.

11          (Whereupon, a document was marked,

12  for identification purposes, as Exhibit 7.)

13  BY MR. LOVE:

14     Q.   So, Dr. Valliere, once you have that

15  pulled up, you recognize this as the article

16  we were just talking about; right?

17     A.   I do.

18     Q.   Okay.

19          And if you could scroll to the

20  last page where it says, "Recommendations and

21  Conclusions," and just let me know when you're

22  there.

23          MS. LUHANA:  And, Doctor, if you

24  want to read the article, you can as well.

25          THE WITNESS:  Yeah, let me -- give

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

```
 1   me a second to read this.
 2               MS. LUHANA:  Take your time.
 3               MR. LOVE:  For -- for context, I
 4   will only be directing you to a couple of
 5   portions under Recommendations and
 6   Conclusions.  I don't know if that helps your
 7   review at all.  Let me know whenever you're
 8   ready.
 9               (Whereupon, the witness reviews
10   the exhibit.)
11               MS. LUHANA:  You can scroll to the
12   top, too, if you want.
13               (Whereupon, the witness reviews
14   the exhibit.)
15               THE WITNESS:  Okay.
16               MR. LOVE:  Okay.
17   BY MR. LOVE:
18       Q.   So that first sentence under
19   Recommendations and Conclusions, it gives tips
20   on how to conduct a direct examination of a
21   witness; correct?
22       A.   Yes.
23       Q.   And it talks about the need to
24   address weaknesses of the case?
25               MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

1  The document speaks for itself.

2              THE WITNESS:  Right.  Weaknesses

3  are in quotes.

4              MR. LOVE:  Okay.

5  BY MR. LOVE:

6      Q.   And then in the next paragraph, you

7  discuss how to do a cross-examination; right?

8              MS. LUHANA:  Objection to form.

9  The article speaks for itself.

10             THE WITNESS:  Right.

11             And this is the context of a

12  person-to-person sexual assault, not relevant

13  to my opinion with Uber.

14             MR. LOVE:  Okay.  That wasn't my

15  question.

16  BY MR. LOVE:

17     Q.   But you -- you do talk about how to

18  prepare a victim for cross-examination;

19  correct?

20             MS. LUHANA:  Objection to the

21  form.

22             THE WITNESS:  Not fully, but I

23  give a tip, right.

24             MR. LOVE:  Okay.

25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 119

1      Q.   And then at the -- the very end, the

2   last sentence that starts with "They use

3   prosocial skills" --

4      A.   Correct.

5      Q.   -- can you read that?

6      A.   "They use prosocial skills, social

7   biases, and stereotypes that surround rape to

8   make sex offenses covert."

9               Keep going?

10     Q.   Yes, please.

11     A.   "Prosecutors can successfully expose

12   rapists by communicating all of these ideas to

13   the jury and portraying a so-called 'nice'

14   offender as the rapist that he is."

15     Q.   When you look at a case against a

16   sexual offender, or alleged sexual offender,

17   excuse me, do you automatically assume that

18   that person is guilty?

19               MS. LUHANA:  Objection to form.

20   Hypothetical.

21               THE WITNESS:  I don't understand

22   your question.

23               MR. LOVE:  Sure.

24   BY MR. LOVE:

25     Q.   When you approach a case where you're

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 120

1   involved in a criminal prosecution, do you

2   believe that it is the victim or the alleged

3   offender who needs to bring forward evidence

4   for that case?

5       A.   That's never my role in any criminal

6   case.   I'm not the fact-finder or the

7   investigator.

8       Q.   Have you said that the burden --

9   apologies.   Withdrawn.

10              Society places a burden on

11  survivors of sexual assault to come forward

12  with evidence of that assault; right?

13              MS. LUHANA:   Objection to form and

14  the hypothetical.

15              THE WITNESS:   In general, the

16  victim has the burden, and that's why we have

17  to do everything we can do to help victims.

18  BY MR. LOVE:

19      Q.   And your opinion is that we should

20  lift that burden off of the victim and place

21  it where it belongs on to the offender;

22  correct?

23              MS. LUHANA:   Objection to form.

24  Hypothetical.

25              THE WITNESS:   In terms of stigma,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

1    credibility, working as a community to help

2    the victim overcome barriers of reporting, do

3    what we can do to prevent and deter and

4    provide safe environments.

5                MR. LOVE:  Okay.

6    BY MR. LOVE:

7        Q.   Now, you wrote a book called

8    Unmasking the Sexual Offender.  When did you

9    publish that?

10       A.   I believe it's 2023.

11       Q.   Was that before or after you started

12   working on Rideshare cases?

13               MS. LUHANA:  Objection to form.

14               THE WITNESS:  Oh, it was before.

15   I wrote it before.  It was just published -- I

16   think I submitted it for publication sometime

17   in 2022.

18   BY MR. LOVE:

19       Q.   And when did you first start working

20   with attorneys on the Lyft case?

21       A.   2023.

22       Q.   Now, you -- one of your opinions is

23   that Uber should fingerprint their drivers;

24   correct?

25       A.   I think it would be helpful, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1      Q.    Are you aware that Uber requires each

2   driver to provide a driver's license?

3      A.    I would hope so.

4      Q.    And are you aware that they require a

5   Social Security card?

6      A.    Yes.

7      Q.    And are you aware that they require

8   another form of ID, such as a passport?

9      A.    Probably.

10      Q.    You would agree with me that it's

11   pretty easy to identify someone with a

12   license, a passport and a Social Security

13   card; right?

14            MS. LUHANA:  Objection to form.

15            THE WITNESS:  I don't know if I

16   would agree or disagree with that because

17   Uber's had problems with that, so I -- I don't

18   know if I would agree or disagree with that,

19   not without an in-person -- I mean, we

20   could -- you asked me about my screening

21   process.  We collect ID and Social Security

22   cards as well, but we also have face-to-face

23   interviews, so...

24   BY MR. LOVE:

25      Q.    With an ID and a Social Security

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 123

1  card, is it pretty easy for you to identify

2  someone?

3                 MS. LUHANA:  Objection to form.

4                 THE WITNESS:  Not without meeting

5  them.  I have no idea.  If I were to get that

6  and never saw that person face-to-face, that

7  could be anybody's.  I don't know.

8  BY MR. LOVE:

9      Q.   But you can look at the ID and see

10  the picture and the name; right?

11                 MS. LUHANA:  Objection to form.

12                 THE WITNESS:  But if I'm never

13  meeting that person face-to-face, how would I

14  compare that ID to that individual?

15                 I don't --

16                 MR. LOVE:  Dr. Valliere --

17                 THE WITNESS:  I'm a little

18  confused.

19  BY MR. LOVE:

20      Q.   Dr. Valliere, my question is just,

21  when you look at an ID, you can see the

22  picture and you can see the name; yes?

23      A.   IDs have pictures and names on them,

24  yes.

25      Q.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 124

1           And then you can compare that to

2    the passport, which also has a picture and a

3    name; correct?

4           MS. LUHANA:  Objection to form.

5           THE WITNESS:  Yes, but I thought

6    you were talking about identifying a person

7    with those two forms of ID.

8           MR. LOVE:  I'm just asking -- the

9    only question that I'm asking you to answer is

10   the one posed right now.

11   BY MR. LOVE:

12       Q.   So now that we've established that

13   you can compare the passport to the ID, then

14   you can also compare the name on both of those

15   documents to the name on the Social Security

16   card; right?

17           MS. LUHANA:  Objection to form.

18           THE WITNESS:  That they -- all

19   three may have the same name on them?  Is that

20   what you're asking me?

21           MR. LOVE:  Correct.

22   BY MR. LOVE:

23       Q.   You can compare them; yes?

24       A.   Sure.

25       Q.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 125

```
 1              And then you can look at the
 2    pictures and see whatever picture --
 3    withdrawn.
 4              You know that when drivers apply,
 5    they have to send a picture of themselves;
 6    right?
 7        A.   They have to send a picture.
 8        Q.   Yes.
 9              And then you're also aware that
10    there's Real-Time ID Check; right?
11        A.   Right.
12        Q.   And so every time they start driving
13    the car, Uber requires them to take a picture
14    of themselves?
15              MS. LUHANA:  Objection to form.
16              THE WITNESS:  That -- the driver
17    has to take a picture of themselves, like a
18    selfie for Uber; is that what you're asking?
19              MR. LOVE:  Correct.
20    BY MR. LOVE:
21        Q.   You're aware that that has to happen;
22    right?
23        A.   Right.
24        Q.   Okay.
25              And so you can compare the -- the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1    image from the ID that you've compared to the

2    passport and the Social Security numbers'

3    names to the image that you get from the

4    Real-Time ID Check; correct?

5              MS. LUHANA:  Objection to form.

6              THE WITNESS:  I'm -- I'm sorry,

7    I'm getting lost in all these steps.

8              So you're saying the selfie can be

9    compared to the passport and the license?

10   BY MR. LOVE:

11      Q.   Well, if you look at a picture on a

12   license and you look at a picture that is sent

13   in a Real-Time ID Check, you can compare the

14   two; right?

15      A.   Sure.

16              MS. LUHANA:  Objection.

17              MR. LOVE:  Okay.

18   BY MR. LOVE:

19      Q.   You also know that Uber does

20   background checks; correct?

21              MS. LUHANA:  Objection to form.

22              THE WITNESS:  I do know that they

23   use the agency named Checker.

24   BY MR. LOVE:

25      Q.   And that checks for all known sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 127

1    misconduct and assaults; correct?

2              MS. LUHANA:  Objection to form.

3              THE WITNESS:  I don't agree with

4    that.  It checks a national registry which

5    compiles arrests for sex offenses, but the

6    accuracy or -- or comprehensiveness of that is

7    not -- is not completely known.

8              MR. LOVE:  Well, I didn't ask

9    about accuracy.

10   BY MR. LOVE:

11       Q.   I'm just saying, they do check for

12   all known sexual misconduct.  I'm not saying

13   whether or not they find all known sexual

14   misconduct, but the background check does

15   check for all known sexual assault or

16   misconduct; correct?

17             MS. LUHANA:  Objection to form.

18             THE WITNESS:  I don't agree with

19   that because it doesn't check for arrests,

20   complaints, civil actions, licensure, reports,

21   custody issues.

22             It checks -- as far as I know, it

23   checks for convictions only.

24   BY MR. LOVE:

25       Q.   Dr. Valliere, just a few moments ago,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 128

1   you testified, "It checks a national registry
2   which compiles arrests for sex offenses."
3               Are you now saying that it does
4   not check for arrests?
5       A.   Yes, I am saying arrests because a
6   registry doesn't check for arrests.  That was
7   a misstatement.
8               A registry checks for registered
9   sex offenders, and that's not necessarily even
10  all sex offenders.  It depends on what state
11  laws are or who's on their registry.
12      Q.   Okay.
13              And in your opinion, is it --
14  withdrawn.
15              If someone was arrested for a
16  sexual offense, but then acquitted, is it
17  right to attribute that sexual offense to that
18  person?
19              MS. LUHANA:  Objection to form.
20              THE WITNESS:  I think it's
21  important to know.
22              MR. LOVE:  That wasn't my
23  question.
24  BY MR. LOVE:
25      Q.   Is it acceptable to attribute that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 129

1  sexual offense to that person?

2              MS. LUHANA:  Objection to form.

3              THE WITNESS:  I think it's

4  important to know because arrests for sexual

5  offense and -- and it depends on why that case

6  did not go forward.  It's extremely important

7  information.

8              MR. LOVE:  I understand that your

9  opinion is that you should know it.

10  BY MR. LOVE:

11     Q.   My question, is it -- is, is it okay

12  to attribute that sexual offense to that

13  person; yes or no?

14              MS. LUHANA:  Objection to form.

15  Asked and answered.

16              THE WITNESS:  I -- you can only

17  say that that person was not convicted of a

18  sex offense, not whether they did it or not.

19              MR. LOVE:  Right.

20  BY MR. LOVE:

21     Q.   And in our society, until you are

22  proven to be guilty beyond a reasonable doubt,

23  you shouldn't be attributed with a sex

24  offense; correct?

25              MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1               THE WITNESS:  That's not -- that's

2     not true, because in the -- in the child

3     protection, if you're indicated or founded for

4     a sexual offense, you're held responsible for

5     being guilty for that sexual offense, just not

6     criminally culpable.

7     BY MR. LOVE:

8         Q.   So your opinion is that if someone is

9     arrested for a sexual offense, that record

10    should follow that person?

11              MS. LUHANA:  Objection.  Misstates

12    her testimony.

13              THE WITNESS:  My opinion is if you

14    are in charge of an environment that lends

15    itself readily and specifically to sexual

16    assault, that your responsibility to know if

17    somebody is arrested for a sex offense is

18    important in your decision-making as to

19    whether or not you want to take that risk or

20    not.

21              MR. LOVE:  Not my question.

22    BY MR. LOVE:

23        Q.   If someone is arrested for a sexual

24    offense, should that record follow them; yes

25    or no?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

```
 1              MS. LUHANA:  Objection to form.
 2    Asked and answered.
 3              THE WITNESS:  Like I said, if I'm
 4    in charge of Uber, I would want to know that
 5    somebody was arrested for a sexual offense
 6    and --
 7              MR. LOVE:  Dr. Valliere, I didn't
 8    ask about Uber.
 9              MS. LUHANA:  Counsel, let her
10    finish.  Let her finish -- let --
11              MR. LOVE:  She is not answering
12    the question.
13              MS. LUHANA:  She is answering the
14    question.  She is doing her best to answer the
15    question and you continue to interrupt her.
16              Please allow her to give her
17    response before you ask another question.
18              THE WITNESS:  As a person who
19    works with sex offenders and understands sex
20    offenders, I do believe that knowing somebody
21    is arrested for a sexual offense is very
22    important information.
23              That's the best I can answer you.
24    BY MR. LOVE:
25         Q.   If someone was arrested for a sexual
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

1    offense and you knew it and they applied to

2    work with you, would you reject that

3    application?

4        A.    I would.

5        Q.    If someone was arrested for a sexual

6    offense and later acquitted of that offense,

7    and they applied to work with you, would you

8    reject that application?

9            MS. LUHANA:  Objection to form.

10   Objection, hypothetical.

11           THE WITNESS:  That's a complicated

12   question.  There's many, many reasons why

13   people get acquitted that have nothing to do

14   with whether or not they committed a sex

15   offense.  So I would have to know much -- much

16   more information.

17   BY MR. LOVE:

18       Q.    If you knew that someone that applied

19   to work with you was accused of sexual

20   assault, would you reject that application?

21           MS. LUHANA:  Objection to the

22   question and the hypothetical.

23           THE WITNESS:  Again, that's a very

24   complicated -- fabricated reports of sexual

25   assault are very small, and I would take that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 133

1    into account.  And I would have to know many

2    more details before I would be able to answer

3    that question.

4    BY MR. LOVE:

5        Q.    So is it your opinion that if someone

6    was accused of sexual assault, Uber should

7    have rejected an application --

8                MS. LUHANA:  Objection.

9    BY MR. LOVE:

10       Q.    -- by them as a driver?

11               MS. LUHANA:  Objection to form.

12   Objection, hypothetical.

13               THE WITNESS:  It's my opinion that

14   if you are making money off of hiring people

15   to be in a situation with highly --

16   potentially highly vulnerable victims and you

17   know that one of the risk factors for your

18   drivers is allegations of prior misconduct,

19   then it's very important to know specific

20   details about that situation.

21               And if you're not getting specific

22   details about that situation and you're not

23   interviewing people and you're not digging

24   into that allegation, and you want a cut and

25   dry thing, it's probably your best idea to not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 134

1    hire that person.

2    BY MR. LOVE:

3        Q.   You agree with me that it's common

4    knowledge that women are at risk of sexual

5    assault in their daily lives?

6              MS. LUHANA:  Objection to form.

7    Hypothetical.

8              THE WITNESS:  You know, that's --

9    that's a terrible question for me because it's

10   just ingenuous.  It's a broad, sweeping

11   statement.  It's designed to bring attention

12   to the fact that women are at risk without any

13   context.

14             I am not at risk of being sexually

15   assaulted day-to-day if I'm living alone in my

16   house and I have a good security system.  So

17   to make a broad sweeping statement like that

18   just ignores all the other risk issues and --

19   and environmental and psychological factors

20   that go into that statement.

21             MR. LOVE:  Ms. Delaney, can we

22   pull up page 11.

23             MS. DELANEY:  Yes.  Would you like

24   me to make that an exhibit first before I

25   screen-share?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 135

1                MR. LOVE:  Yes, please.

2                MS. DELANEY:  Okay.  Just a

3     moment.

4                MR. LOVE:  And this will be marked

5     as Exhibit 8.

6                (Whereupon, a document was marked,

7     for identification purposes, as Exhibit 8.)

8     BY MR. LOVE:

9        Q.   Dr. Valliere, you believe our country

10    has a culture of what you would call a rape

11    culture; correct?

12               MS. LUHANA:  Objection to form.

13               THE WITNESS:  I believe I discuss

14    rape culture in my book as a contributor.  I

15    don't believe the whole country at all times

16    has rape culture.  There is rape culture in

17    our country.

18               MR. LOVE:  Okay.

19               MS. LUHANA:  Counsel, the document

20    hasn't come up yet.

21               MR. LOVE:  I'm not -- I didn't ask

22    about it yet.

23               MS. LUHANA:  Okay.  So we can --

24               MS. DELANEY:  I just -- it's

25    uploaded.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 136

1          MS. LUHANA:  I see it now.

2          And I have the same request so she

3    can see the context, if you can allow her.

4          MR. LOVE:  Yep.  We will

5    screen-share it and you can let us know

6    wherever you'd like to scroll, Dr. Valliere.

7          THE WITNESS:  Sure.

8          MS. LUHANA:  If you want to time

9    to review it, please do so.

10         MR. LOVE:  For context, I'll be

11   asking about the third to last sentence in

12   that paragraph under Rape Culture.

13         THE WITNESS:  Okay.

14   BY MR. LOVE:

15     Q.   That sentence says, "When rape

16   culture exists, women live in fear of rape";

17   right?

18     A.   Absolutely, but to weaponize that to

19   excuse -- to just say women just need to walk

20   around worried about being sexually assaulted

21   is inappropriate.

22     Q.   No one -- no one is -- is using that

23   as a weapon.  I'm just asking if you believe

24   that women do live in fear of rape?

25         MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 137

1           THE WITNESS:  I think women in --
2      in particular context take their fear of rape
3      in -- in their decision-making, yes.
4           MR. LOVE:  We can pull that down.
5      BY MR. LOVE:
6          Q.   You'd also agree with me that it's
7      common knowledge, drinking alcohol comes with
8      risks; right?
9           MS. LUHANA:  Objection to form.
10           THE WITNESS:  And again, I -- I
11      disagree that Uber does not weaponize these
12      kind of statements because they apply them
13      with broad strokes, shifting the burden of
14      risk-taking on to the victim, while promoting
15      Ride -- their Rideshare as safe and as a
16      viable option when alcohol is involved.
17           So while alcohol does involve
18      risks, especially in certain contexts, Uber
19      has specifically said lower your risk by
20      taking an Uber.
21           MR. LOVE:  That wasn't an answer
22      to my question, though, Dr. Valliere.
23      BY MR. LOVE:
24          Q.   My question is, you would agree that
25      it's common knowledge that drinking alcohol

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

1  comes with risks?

2              MS. LUHANA:  Objection to form.

3  Asked and answered.

4              THE WITNESS:  I believe it's

5  knowledge that drinking alcohol in certain

6  environments come with risks.  I don't think

7  generally people think that drinking alcohol

8  comes with risks if they're in a safe

9  environment.

10  BY MR. LOVE:

11      Q.   You would agree with me that a woman

12  who goes out at night and drinks at a bar is

13  more on her guard than a woman who is at home,

14  like you said, under security surveillance;

15  right?

16              MS. LUHANA:  Objection to form and

17  objection to the hypothetical.

18              THE WITNESS:  That's -- that's

19  totally individualistic.  I could be out

20  having drinks with my husband and not feel at

21  risk at all.

22              So it's too generic of a statement

23  to say women who go out and drink alcohol

24  feel unsafe.

25              MR. LOVE:  That's not -- that's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 139

1   not exactly what I asked.

2   BY MR. LOVE:

3       Q.   I asked would a woman who goes out

4   and drinks at a bar be more on her guard than

5   one who was under security surveillance?

6               So is the answer to that question

7   you can't answer that?

8               MS. LUHANA:  Objection to form and

9   the hypothetical.

10              THE WITNESS:  And I don't believe

11  you asked anything about security

12  surveillance.

13              MR. LOVE:  I can reread my

14  question.

15  BY MR. LOVE:

16      Q.   "You would agree with me that a woman

17  who goes out at night and drinks at a bar is

18  more on her guard than a woman who is at home,

19  like you said, under security surveillance;

20  right?"

21              MS. LUHANA:  Objection to form and

22  the hypothetical.  Asked and answered.

23              THE WITNESS:  That's too

24  individualistic.

25              MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 140

```
 1              THE WITNESS:  It -- it depends.
 2    BY MR. LOVE:
 3        Q.   Now, we've talked about this before,
 4    but I just -- I want to make sure that we have
 5    a clear answer.
 6              Do you believe that there is no
 7    environment that is 100 percent free of the
 8    risk of sexual assault?
 9              MS. LUHANA:  Objection to form.
10    Objection to the hypothetical.
11              THE WITNESS:  In the extreme
12    situation, I do not believe that if an
13    offender is determined to offend, that they
14    will offend.
15              But it is not true that every
16    environment is at risk or can be a high risk.
17    It's never a zero risk, but it's -- there are
18    environments that are much higher risk and
19    there's many things we can do that will deter
20    offenders.
21    BY MR. LOVE:
22        Q.   Just to make sure I understand, I
23    understand that there are higher risks and
24    lower risks, but you said there is never zero
25    risk.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 141

```
 1              So there is no place that has zero
 2   risk of sexual assault; is that correct?
 3      A.   Well --
 4              MS. LUHANA:  Objection to form,
 5   asked and answered and hypothetical.
 6              THE WITNESS:  Well, let me amend
 7   that.  There is a zero risk if there's not a
 8   perpetrator.
 9              MR. LOVE:  Fair enough.
10   BY MR. LOVE:
11      Q.   Other than if there is not a
12   perpetrator, there is no place where there is
13   no risk; right?
14              MS. LUHANA:  Objection to form.
15   Hypothetical.
16              THE WITNESS:  Right.  You
17   cannot -- if there is a perpetrator present,
18   there may be some risk.
19              MR. LOVE:  Okay.
20   BY MR. LOVE:
21      Q.   One reason that you talk about, in
22   your report, that Uber is ripe for a sexual
23   assault is that a driver sees where the
24   passenger is being picked up and dropped off,
25   which increases the fear of the driver
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

1   returning; is that correct?

2                MS. LUHANA:  Objection to form.

3                THE WITNESS:  When -- when a

4   victim feels exposed like that, it may be an

5   issue for that victim.

6   BY MR. LOVE:

7       Q.   And if a passenger takes a Lyft, the

8   driver would see where they were picked up or

9   dropped off; right?

10               MS. LUHANA:  Objection to form.

11  Hypothetical.

12               THE WITNESS:  I would assume so.

13  That's a characteristic of Rideshare.

14  BY MR. LOVE:

15      Q.   And if someone took a taxi, they

16  would see where the passenger was picked up

17  and dropped off; right?

18               MS. LUHANA:  Objection to form.

19               THE WITNESS:  They would see where

20  they're picked up and dropped off, but not

21  necessarily have the same information.

22  BY MR. LOVE:

23      Q.   What do you mean by that, by "same

24  information"?

25      A.   When I'm -- when I'm in a taxi and I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

1  tell them where to take me, they don't

2  necessarily know I'm going home or not home.

3  I don't have a profile, I don't have a rating.

4  There's other information that is shared on

5  Rideshare.

6      Q.   Uber does not share a home address

7  with drivers for -- for their -- withdrawn.

8           Uber does not share their

9  passengers' home addresses with drivers;

10  correct?

11           MS. LUHANA:  Objection to form.

12           THE WITNESS:  They share the

13  address.

14  BY MR. LOVE:

15      Q.   You -- okay.  You said, "When I'm in

16  a taxi and I tell them where to take me, they

17  don't know -- they don't necessarily know I'm

18  going home or not home."

19           Neither does an Uber driver.  The

20  same is true for an Uber driver; correct?

21      A.   I'm not exactly sure what an Uber

22  driver has, but the victim will know if it's

23  their home address or not, and it's -- it's

24  conveyed digitally versus me giving verbally

25  an address.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 144

1      Q.   Okay.  And -- and we'll get to that

2   part, but I just want to be very clear here.

3               Uber does not give a driver an

4   address and say this is the passenger's home

5   address; correct?

6               MS. LUHANA:  Objection to form.

7               THE WITNESS:  I don't know what --

8   if it -- Uber labels it or not.

9   BY MR. LOVE:

10     Q.   That's not something that you thought

11  would be important to your analysis here?

12              MS. LUHANA:  Objection to form.

13              THE WITNESS:  It's really the

14  impact on the victim.  If the victim feels

15  like the Uber knows where their home is and

16  that that person can return, that's pretty

17  impactful in victim decision-making.

18              MR. LOVE:  Sure.

19  BY MR. LOVE:

20     Q.   So if a victim believes that a taxi

21  knows where they live and can return, that's

22  impactful in decision-making; correct?

23              MS. LUHANA:  Objection to form.

24              THE WITNESS:  First of all, this

25  is -- my report has nothing to do with taxis

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 145

```
 1    or comparison or saying one's safer than the
 2    other.  So I'm worried about what a victim
 3    perceives for Uber drivers happening.
 4                   MR. LOVE:  That's fine.
 5    BY MR. LOVE:
 6        Q.   But my question -- oh, sorry, I
 7    didn't mean to interrupt you.
 8        A.    It -- it -- the -- it's just whether
 9    or not a taxi driver knows you're home or not
10    isn't relevant to my opinion of Uber.
11        Q.    Okay.
12                   But my question is still, if a
13    passenger perceives that a taxi knows where
14    they live, that's impactful on their decision
15    to get into a taxi or not; correct?
16                   MS. LUHANA:  Object to the form
17    and hypothetical.
18                   THE WITNESS:  I can only answer
19    that from my personal experiences and
20    conversation is, I have never heard anyone say
21    that they're not dropped off at home when they
22    take a taxi.
23                   I have heard that numerous times,
24    including from male passengers, that they're
25    worried about their Rideshare driver knowing
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1   where they lived.

2            MR. LOVE:  That didn't answer my

3   question, Dr. Valliere.

4            THE WITNESS:  It did as best as I

5   could answer in that it -- I don't -- I have

6   never heard of or experienced, myself, issues

7   in my decision-making and worrying about a

8   taxi driver know about being home.

9            MR. LOVE:  Right.  And that is not

10  my question.

11  BY MR. LOVE:

12     Q.   My question is, if a victim believes

13  that a taxi knows where they live and can

14  return, that is impactful on decision-making?

15            MS. LUHANA:  Coun -- counsel --

16  BY MR. LOVE:

17     Q.   Yes or no?

18            MS. LUHANA:  Objection to form

19  and -- and hypothetical.

20            She's asked and answered this the

21  best she could and she's said as much, and

22  you've --

23            MR. LOVE:  She --

24            MS. LUHANA:  -- and you've asked

25  this like five times.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 147

1          MR. LOVE:  She has not answered
2    the question.
3          MS. LUHANA:  She has answered the
4    question.
5          MR. LOVE:  Okay.  Well, we can
6    agree to disagree, but unless you're
7    instructing her not to answer, I'm going to
8    ask the question and seek an actual answer to
9    my question.
10          MS. LUHANA:  She gave an answer.
11    Just 'cause you don't like the answer doesn't
12    mean she didn't give an answer.
13          MR. LOVE:  Okay.
14    BY MR. LOVE:
15      Q.   Dr. Valliere, you said if an Uber --
16    if a victim perceives that an Uber knows a
17    victim's home address, that that's impactful
18    on their decision-making.
19          The same is true for taxi drivers;
20    correct?
21          MS. LUHANA:  Objection to form and
22    the comparison.
23          THE WITNESS:  I did not look at
24    victim decision-making in a taxi.  I
25    understand victims making and Uber's own

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 148

1    employee saying they won't -- their
2    understanding that victims are worried about
3    Uber drivers knowing their home and their --
4    Uber's own employees saying I don't get
5    dropped off at home.
6              I did not look at any
7    documentation or statements of victims riding
8    in taxis.
9    BY MR. LOVE:
10       Q.   Based on your psychological
11   expertise, is a passenger's perception that a
12   driver knows where they live impactful on
13   their decision whether or not to get in the
14   car?
15             MS. LUHANA:  Objection to form.
16   Objection to the hypothetical.
17             THE WITNESS:  Based on my
18   psychological expertise, it's the condition
19   and the type of driver that affects the
20   victim's awareness.
21             An Uber driver psychologically is
22   different than an employee for a limo or a
23   taxi service.  And in my psychological
24   expertise, when you have a driver that is
25   unmonitored, that you're uncomfortable with,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 149

1  that you feel is creepy or asks you personal

2  questions, you're going to care if that driver

3  knows where you live.

4  BY MR. LOVE:

5     Q.    When a passenger orders an Uber, they

6  know that the Uber is going to know where they

7  drop them off; right?

8              MS. LUHANA:  Objection to form.

9              THE WITNESS:  That Uber as a

10  corporation is going to know?

11  BY MR. LOVE:

12     Q.    They know that -- when someone orders

13  an Uber, they know that their driver is going

14  to see where they get dropped off; right?

15     A.    Correct.  Which is why many people

16  don't get dropped off directly at their house.

17     Q.    You would agree with me that Uber

18  cannot know about an offense that is not

19  reported; right?

20              MS. LUHANA:  Objection to form.

21              THE WITNESS:  Hmm, that's a tricky

22  question.  I think that Uber can, with all the

23  documents I looked at, Uber can know that

24  there are indices of potential, very

25  problematic behaviors that occur in their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

```
 1    monitoring, and they can do -- they can look
 2    into that.
 3               But the specifics of that
 4    incident, unless they are able to attain it,
 5    they will not know.
 6               MR. LOVE:  Okay.
 7    BY MR. LOVE:
 8       Q.   And if they don't know about an
 9    offense, they -- they cannot take consequences
10    or enact consequences for that offense;
11    correct?
12               MS. LUHANA:  Objection to the form
13    and the hypothetical.
14               THE WITNESS:  You mean after
15    something has happened?  Uber knows a lot
16    about the risk issues for offenses and the
17    issues of deterrence.  It -- if they never
18    find out about something, you're right, they
19    can't take consequences.  They can do
20    everything they can do to find out about it,
21    though.
22    BY MR. LOVE:
23       Q.   Now, if an Uber driver had a clear
24    background check, all good ratings, no
25    complaints, and he sexually assaulted a
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 151

1    passenger, Uber could not have reasonably

2    foreseen that; correct?

3                  MS. LUHANA:  Objection to form.

4    Calls for a legal conclusion and the

5    hypothetical.

6                  THE WITNESS:  Are -- that's a

7    little bit complicated.  If they -- if those

8    are the only things that Uber knows, then

9    perhaps not.

10                  But if this driver had numerous

11   RideCheck triggers, had other interpersonal

12   complaints, had one-star ratings, had long

13   stops, lingering, those kind of things, they

14   could be suspicious.

15                  And if they had supervision in

16   place, like cameras, they could be assured of

17   knowing what happened.

18   BY MR. LOVE:

19       Q.   So I want to talk about one-star

20   ratings first, because you mentioned that.

21                  So is it your opinion that if

22   someone gets a one-star rating, Uber should

23   deactivate that driver?

24                  MS. LUHANA:  Objection to form and

25   objection to the hypothetical.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 152

1              THE WITNESS:  Is it my opinion?
2    No.
3              It's what -- what is true is that
4    one-star ratings are risk predictors that Uber
5    is aware of.  And what -- I don't have an
6    opinion, if somebody gets a one-star rating,
7    they should immediately be deactivated, unless
8    that one-star rating comes from egregious
9    behavior towards a rider.
10             MR. LOVE:  Okay.
11   BY MR. LOVE:
12      Q.   So how many one-star ratings would it
13   take for you to say that Uber should
14   deactivate a driver?
15             MS. LUHANA:  Objection to the
16   form.  Objection to the hypothetical.
17             THE WITNESS:  Uber should go with
18   its own evidence that a one-star rating is a
19   risk factor.  I don't have to have an opinion
20   on whether or not that person should be
21   deactivated.  Uber should be attending to that
22   as their own identified risk factor.
23   BY MR. LOVE:
24      Q.   So you'd agree with me that one-star
25   ratings are not exclusive or unique to sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 153

1    offenders; right?

2                MS. LUHANA:  Objection to form.

3    Objection to the hypothetical.

4                THE WITNESS:  I'm sorry, that --

5    that --

6                MR. LOVE:  Sure.  Let me rephrase.

7    BY MR. LOVE:

8        Q.   Drivers that are not sexual offenders

9    also get one-star ratings; right?

10                MS. LUHANA:  Objection to form.

11    Hypothetical.

12                THE WITNESS:  I would assume so,

13    yes.

14                MR. LOVE:  Right.

15    BY MR. LOVE:

16        Q.   So -- withdrawn.  Okay.

17                Your opinion is that having safety

18    features enhances the perception of safety; is

19    that correct?

20                MS. LUHANA:  Objection to form.

21                THE WITNESS:  My opinion is

22    that -- I'm sorry?

23                MR. LOVE:  What was the objection,

24    counsel?

25                MS. LUHANA:  What safety features

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 154

```
 1   are you talking about, counsel?
 2              MR. LOVE:  Any safety features
 3   generally.
 4   BY MR. LOVE:
 5        Q.   In your opinion --
 6              MS. LUHANA:  You should define
 7   safety features if you are asking for a
 8   question -- a question like that.  What safety
 9   features?
10              MR. LOVE:  It's -- it's in her
11   report, so I'm just asking about her own
12   opinion.
13              MS. LUHANA:  Why don't you -- why
14   don't you pull up the report and provide
15   context as to the safety features you're
16   discussing, counsel?
17              MR. LOVE:  Because I don't need to
18   do that.  I'm asking her opinion as an expert.
19              MS. LUHANA:  You asked me for my
20   objection.  I'm explaining my objection to
21   you.
22              MR. LOVE:  Okay, okay.  Thank you.
23   It's on record.
24   BY MR. LOVE:
25        Q.   Dr. Valliere, in your opinion, having
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 155

 1   safety features enhances the perception of
 2   safety; correct?
 3              MS. LUHANA:  Objection to form.
 4              THE WITNESS:  What I'm talking
 5   about there is unless a particular safety
 6   feature is directly linked to reducing sexual
 7   assault, it can falsely assure or assuage
 8   people that there's some level of
 9   effectiveness or increase in safety, which has
10   not been proven.
11              MR. LOVE:  Okay.
12   BY MR. LOVE:
13       Q.   But whether -- whether a safety
14   feature is effective or not effective,
15   implementing a safety feature increases the
16   perception of safety; correct?
17              MS. LUHANA:  Objection to form.
18   Hypothetical.
19              THE WITNESS:  Are -- are we
20   talking about a specific statement in my
21   report now, 'cause I think I say that
22   specifically for different safety features
23   that -- and refer to Uber's own documents that
24   talk about safety features, enhancing
25   perception of safety in their drivers without

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 156

1    actually contributing to true safety.

2              MR. LOVE:  Right.

3    BY MR. LOVE:

4       Q.   And what I'm asking you is in your --

5    your psych -- your opinion as a psychol --

6    psychologist, my apologies, in your opinion as

7    a psychologist, does that same increased

8    perception of safety happen, whether the

9    safety feature is effective or not effective?

10             MS. LUHANA:  Objection to form.

11   Objection to the hypothetical.

12             THE WITNESS:  In my -- as a

13   psychologist, I would say that there are many

14   ways to falsely increase people's trust and

15   perception of safety to affect their

16   decision-making in -- in a way that is not

17   truly informed or --

18             MR. LOVE:  Right.

19             THE WITNESS:  -- in a way that

20   makes an illusion of safety without providing

21   safety.

22             MR. LOVE:  I understand that

23   that's your opinion, Dr. Valliere.

24   BY MR. LOVE:

25      Q.   I'm asking, does that same increased

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 157

1    perception of safety occur when a safety

2    feature is actually effective?

3                MS. LUHANA:  Objection to form and

4    -- and the hypothetical.

5                MR. LOVE:  Withdrawn.

6    BY MR. LOVE:

7        Q.    In other words, is there a time where

8    it's not a false increased perception of

9    safety; a safety feature is implemented, it's

10   effective and it increases the perception of

11   safety?

12               MS. LUHANA:  Objection to the form

13   and the hypothetical.  What safety feature are

14   we talking about?

15               THE WITNESS:  If -- if you're

16   talking about a real safety feature like --

17   like cameras as a deterrence, Uber knows that

18   that's a real safety feature that actually

19   adds real deterrence.

20               So can we be specific in terms of

21   particular safety features?

22               MR. LOVE:  Sure.

23   BY MR. LOVE:

24       Q.    So having dashcams increases the

25   safe -- the perception of safety; correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 158

1              MS. LUHANA:  Objection to form.

2              THE WITNESS:  It -- well, as Uber

3     rightly knows, it doesn't just increase the

4     perception of safety; it is an effective

5     deterrent.

6              MR. LOVE:  But that's not my

7     question, Dr. Valliere.  My question is about

8     the perception of safety, okay?  So please

9     just answer my question.

10    BY MR. LOVE:

11        Q.   Dashcams, in your opinion, increase

12    the perception of safety; yes or no?

13              MS. LUHANA:  Objection to -- to

14    form.  Asked and answered and hypothetical.

15              THE WITNESS:  This is the thing,

16    it's not -- there's a difference between a

17    perception of safety and actual safety.  And

18    it's not just my opinion that dashcams

19    increase a -- a perception of safety.

20    Dashcams, by Uber's own information, actually

21    increases safety.

22    BY MR. LOVE:

23        Q.   I'm not asking about the actual

24    effects of dashcams on safety; I'm asking

25    about passengers' perceptions of safety, and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 159

1   you talk about that a lot in your opinion as

2   an expert -- expert psychologist, how they

3   perceive safety, how they perceive marketing,

4   how they perceive branding.

5            And I'm asking a very, very simple

6   question, and that is just, do dashcams

7   increase the perception of safety?

8            MS. LUHANA:  Objection to form and

9   the hypothetical, and asked and answered

10  several times.

11           THE WITNESS:  There's a big

12  difference between a perception of safety and

13  true safety.

14  BY MR. LOVE:

15      Q.   Well, if you have real safety, right,

16  you still perceive that safety; correct?

17           MS. LUHANA:  Objection to form and

18  hypothetical.

19           THE WITNESS:  I think people feel

20  safer with dashcams.

21           MR. LOVE:  Okay.

22  BY MR. LOVE:

23      Q.   Now, you believe that live monitoring

24  would deter sexual offenders; right?

25           MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 160

1              THE WITNESS:  The feeling of
2      supervision, real-time supervision and
3      monitoring, is an aspect of deterrence that
4      works.
5      BY MR. LOVE:
6          Q.   You don't have any studies that you
7      cite that support that; correct?
8                  MS. LUHANA:  Objection to form.
9              THE WITNESS:  I'm not sure if I
10     put a certain study.  I think I referenced
11     Uber's documentation, Uber's report by
12     Bessemer that talks about that, Uber's studies
13     of monitoring of dashcams and deterrence
14     theory about monitoring.
15     BY MR. LOVE:
16         Q.   But you're unaware of any actual
17     studies that show that dashcams are --
18     increase safety; correct?
19                  MS. LUHANA:  Objection.  Asked and
20     answered.
21                  MR. LOVE:  Withdrawn.
22     BY MR. LOVE:
23         Q.   You are unaware of any studies that
24     actually show that dashcams deter sexual
25     offenders; correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 161

1          MS. LUHANA:  Objection.  Asked and
2     answered.
3          THE WITNESS:  I believe there's
4     numerous references that I have in my report
5     to Uber's own information that shows
6     deterrence from dashcams, so I did not go look
7     for other studies when Uber, itself,
8     understands that.
9     BY MR. LOVE:
10        Q.   So that is a yes to my question; you
11    are unaware of any studies that show that
12    dashcams deter sexual offenders?
13         MS. LUHANA:  Objection to form.
14    Misstates her testimony.
15         THE WITNESS:  Other than Uber's
16    own studies?  I'm sure I am aware of some.  I
17    did not cite any more, and I didn't need to.
18    Uber, itself, knows that that's a deterrent.
19    BY MR. LOVE:
20        Q.   You're aware that RideCheck actually
21    monitors GPS data in real-time; correct?
22         MS. LUHANA:  Objection to form.
23         THE WITNESS:  It's my
24    understanding that RideCheck monitors the
25    driver's GPS, not the rider's.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 162

1           MR. LOVE:  Okay.

2    BY MR. LOVE:

3       Q.   And when Uber -- when an Uber is

4    stopped for an extended period of time, that

5    RideCheck will send an alert; right?

6           MS. LUHANA:  Objection to form.

7           THE WITNESS:  It will send an

8    alert to the driver and the rider if the rider

9    has the app open and if the rider even used

10   the app and is not a guest rider.

11   BY MR. LOVE:

12      Q.   If the rider used the app, it sends

13   an alert whether that app is open or not;

14   correct?

15          MS. LUHANA:  Objection to form.

16          THE WITNESS:  Right, if they use

17   the app.  But if it's a rider that did not use

18   the app, they will not get an alert.

19          MR. LOVE:  Right.

20   BY MR. LOVE:

21      Q.   Whoever booked the ride for them

22   would get that alert, though; right?

23      A.   Oh --

24          MS. LUHANA:  Objection to form and

25   hypothetical.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

```
 1              THE WITNESS:  I believe the user
 2    of the app does.
 3    BY MR. LOVE:
 4       Q.   And that's in real-time; right, that
 5    you would get that alert?
 6              MS. LUHANA:  Objection to form and
 7    the hypothetical.
 8              THE WITNESS:  If in real-time you
 9    mean based on Uber's standards of what's
10    acceptable delay, they have different
11    timeframes.  So in real-time, it's not
12    immediately when the driver stops, it's after
13    Uber's self-defined period of time.
14    BY MR. LOVE:
15       Q.   You would agree with me that it would
16    be pretty unreasonable to send an alert every
17    time a driver stopped; right?
18              MS. LUHANA:  Objection to -- to
19    form.
20              THE WITNESS:  I'm not advocating
21    either way.
22              MR. LOVE:  Okay.
23              THE WITNESS:  I'm just defining.
24              MR. LOVE:  Okay.
25    BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 164

```
 1      Q.   Now, if that alert goes unanswered,
 2   Uber follows up with a phone call; right?
 3            MS. LUHANA:  Objection to form and
 4   hypothetical.
 5            THE WITNESS:  It's -- a period of
 6   time has to go by, and then there's a
 7   robocall, not a phone call from a person.
 8            MR. LOVE:  Okay.
 9   BY MR. LOVE:
10      Q.   And if that goes unanswered --
11   withdrawn.
12            If someone doesn't answer that
13   alert and that robocall, is it your opinion
14   that Uber should reach out to the police?
15            MS. LUHANA:  Objection to form and
16   to the hypothetical.
17            THE WITNESS:  I don't have an
18   opinion on that.  That's not part of my
19   opinion.  I don't believe that those are
20   sufficient steps.
21   BY MR. LOVE:
22      Q.   Do you have -- do you have a
23   practical way to make that -- make those steps
24   sufficient?
25            MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 165

1              THE WITNESS:  I don't feel like my
2    task was to give Uber answers about this, but
3    to analyze how these did or did not work.  And
4    that, like I said, these contribute to a
5    perception of safety and have not been -- have
6    not been studied for effectiveness, and also
7    do not sufficiently override the barriers that
8    victims may face.
9              I don't know if a victim who's
10   getting sexually assaulted, that would be okay
11   to answer a robocall.
12   BY MR. LOVE:
13      Q.   So to be clear, you have no way to
14   make RideCheck safer?
15              MS. LUHANA:  Objection to form.
16   Misstates her testimony.  That's not her
17   opinion.
18              THE WITNESS:  Yes.  That -- that
19   is not what I said, that I have no way of
20   making it more practical.
21              I said I was not tasked to give
22   Uber answers in ways to make it more practical
23   or effective.
24   BY MR. LOVE:
25      Q.   But you cannot offer a way that makes

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

1    it more effective right now?

2                MS. LUHANA:  Objection to form and

3    hypothetical.

4                THE WITNESS:  I'm really not

5    willing to offer such opinions and go down

6    that -- that's not in my report.  That's not

7    in the scope of what I was asked to do.

8    BY MR. LOVE:

9        Q.   So to be clear, you were asked to

10   decide whether or not safety features are

11   effective, but not give any alternatives to

12   how they could be effective?

13               MS. LUHANA:  Objection to form.

14               THE WITNESS:  No.  My job was to

15   look at the -- look at the Rideshare

16   environment, analyze the -- how inviting it is

17   for sex offenders in the vulnerability of the

18   system, look at the safety features and

19   discuss the psychology or psychological impact

20   of those features on decision-making of

21   riders, as well as their effectiveness as a

22   deterrence; not provide solutions for Uber,

23   which it already has in its own documentation.

24               Uber knows what's effective and

25   not effective, and so the information I got on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 167

```
1    their safety features comes specifically
2    from -- from them and their proposed and
3    rejected interventions or changes or
4    modifications.
5    BY MR. LOVE:
6        Q.   You conducted no studies about the
7    efficiency or safety of any safety feature on
8    the Uber app; correct?
9             MS. LUHANA:  Objection to form.
10            THE WITNESS:  No, I rely on Uber's
11   own information and internal documentations
12   and depositions to make my statements about
13   effectiveness and contribution to perception
14   of safety.
15   BY MR. LOVE:
16       Q.   Are you aware of any studies, outside
17   of documents that you reviewed that were
18   produced in this action, that show the
19   effectiveness or safety of any Rideshare
20   feature?
21            MS. LUHANA:  Objection to form.
22            THE WITNESS:  I -- I did not
23   investigate any other external studies.  What
24   Uber knows was sufficient for understanding my
25   opinion.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 168

```
 1   BY MR. LOVE:
 2       Q.   And to be clear, your expertise is
 3   not on making rides safer; correct?
 4               MS. LUHANA:  Objection to form.
 5               THE WITNESS:  I would disagree
 6   with that.  I think that a lot of my points
 7   and understanding of offenders and
 8   understanding of victims and deterrence could
 9   make rides more effective.
10   BY MR. LOVE:
11       Q.   You have no training in making safety
12   features for car -- Rideshare apps; correct?
13               MS. LUHANA:  Objection to form.
14               THE WITNESS:  I have a lot of
15   training in managing and deterring and
16   preventing sexual assault.
17               MR. LOVE:  That wasn't my
18   question.
19   BY MR. LOVE:
20       Q.   My question was, you have no training
21   in making safety features for Rideshare apps;
22   correct?
23               MS. LUHANA:  Objection to form.
24   Asked and answered.
25               THE WITNESS:  I do not have
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 169

1  training specifically in making safety in
2  apps.
3            MR. LOVE:  Okay.
4            THE WITNESS:  Safety features in
5  apps.
6  BY MR. LOVE:
7      Q.   You're also unable to identify any
8  instance where Uber misrepresented how any of
9  their safety features worked; right?
10           MS. LUHANA:  Object to form.
11           THE WITNESS:  I don't quite
12  understand that question.
13  BY MR. LOVE:
14     Q.   Well, you can't identify any instance
15  where Uber misrepresented how the 911 button
16  worked; right?
17           MS. LUHANA:  Objection to the
18  form.
19           THE WITNESS:  I don't know if I
20  looked at that as an issue.  The -- my opinion
21  is based on that the promotion of these
22  ineffective safety features create a semblance
23  or an illusion of trust, illusion of safety,
24  while not actually impacting true safety.
25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1    Q.   You referenced promotion of safety

2    features.  So what I'm asking about is, in the

3    materials that you allege promoted these

4    safety materials, Uber does not misrepresent

5    how these safety features worked; correct?

6              MS. LUHANA:  Objection.  Misstates

7    what's in the report.

8              MR. LOVE:  I -- I wasn't -- I was

9    not stating anything in her report.

10             MS. LUHANA:  The prior question

11   was about her opinion, and she talked about

12   promotion of safety and what she disclosed in

13   her opinion, and so this question was a

14   follow-up to that.

15             MR. LOVE:  Okay.  I'll reread my

16   question, Dr. Valliere.

17   BY MR. LOVE:

18      Q.   "You referenced promotion of safety

19   features.  What I'm asking is in the materials

20   you allege promoted these safety materials,

21   Uber does not misrepresent how those safety

22   features work; correct?"  {Sic}

23             MS. LUHANA:  Objection to the form

24   and the hypothetical.

25             THE WITNESS:  I -- while the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 171

1   method of the safety features is not

2   misrepresented, the effectiveness of them is

3   not transparent.

4            MS. LUHANA:  Counsel, we've been

5   going for a while.  When do you want to break

6   for lunch?

7            MR. LOVE:  Do you have 10 more

8   minutes in you?

9            MS. LUHANA:  Doctor?

10           THE WITNESS:  I'm okay.

11           MS. LUHANA:  Yeah, we're okay.

12  BY MR. LOVE:

13      Q.   One of your opinions is that Uber

14  should implement dashcams.

15           You're not aware of any legal

16  implications of having dashcams in a car;

17  correct?

18           MS. LUHANA:  Objection to form and

19  asking for a legal conclusion.

20           THE WITNESS:  Right.  I'm not --

21  I'm sure that there are privacy issues that

22  can be dealt with as they are in other

23  mandatory places where there are cameras.

24  BY MR. LOVE:

25      Q.   But just to be clear, you are not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 172

1    aware of those private -- of -- withdrawn.

2                You're not aware of how those

3    privacy issues may impact the use of dashcams

4    in Rideshares; right?

5                MS. LUHANA:  Objection to form.

6                THE WITNESS:  Not specifically

7    state by state, region by region.

8    BY MR. LOVE:

9        Q.   You don't know in what states a

10   passenger would have to give explicit consent

11   to be recorded; correct?

12               MS. LUHANA:  Objection to form.

13               THE WITNESS:  No, but if Uber

14   incorporated consent and mandatory dashcams as

15   part of their service, consent would be given

16   by the user.

17   BY MR. LOVE:

18       Q.   But you're not an attorney; right?

19               MS. LUHANA:  Objection.

20               THE WITNESS:  No, but I'm a

21   customer of things that have dashcams in them.

22   BY MR. LOVE:

23       Q.   And you don't know the actual legal

24   -- legal implications of a contract; correct?

25               MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 173

1   Asked and answered.

2              THE WITNESS:  Yeah, I'm not an

3   attorney.

4   BY MR. LOVE:

5      Q.   You don't know what's enforceable or

6   not in a contract; correct?

7              MS. LUHANA:  Objection to form.

8              THE WITNESS:  It -- it -- this --

9   that's too vague of a question.  I'm not an

10  attorney, so I'm not a contract attorney, no.

11             MR. LOVE:  Okay.

12  BY MR. LOVE:

13     Q.   You don't know the resources that it

14  would take to distribute dashcams to every

15  single Uber driver across the country;

16  correct?

17             MS. LUHANA:  Objection to form.

18             THE WITNESS:  It -- yeah, that's

19  not a concern of mine or a part of my opinion.

20  BY MR. LOVE:

21     Q.   And you don't know what resources it

22  would take to monitor all of those drivers and

23  make sure that they're utilizing dashcams

24  properly; correct?

25             MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 174

1              THE WITNESS:  Like I said, that's
2    outside the scope of my opinion.  My opinion
3    is that that would be an actual safety
4    feature.
5    BY MR. LOVE:
6       Q.   You don't know what resources it
7    would take to maintain those dashcams and
8    replace broken or defective parts?
9              MS. LUHANA:  Objection to form.
10             THE WITNESS:  No.
11   BY MR. LOVE:
12      Q.   You are aware that Uber considered
13   those things and legal implications when they
14   talked about the possibility of dashcams;
15   correct?
16             MS. LUHANA:  Objection to form.
17             THE WITNESS:  That's in their
18   documentation.
19   BY MR. LOVE:
20      Q.   With a dashcam --
21             MR. LOVE:  Actually, this would be
22   a good breaking point, if you want to break
23   now.
24             MS. LUHANA:  Great.
25             MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 175

1                    THE VIDEOGRAPHER:  Going off the
2       video record.  The time is 12:07 p.m.
3                    (Whereupon, a luncheon recess was
4       taken at the above time.)
5                    THE VIDEOGRAPHER:  We are back on
6       the video record.  The time is 12:53 p.m.
7                    This begins Media Unit No. 3.
8       BY MR. LOVE:
9           Q.   All right, Dr. Valliere.
10                   We were talking about dashcams
11      before we went on break.  You would agree with
12      me that a dashcam cannot see below the
13      dashboard in the front seat; correct?
14                   MS. LUHANA:  Objection to form.
15                   THE WITNESS:  It depends where it
16      is and how it's angled.
17      BY MR. LOVE:
18          Q.   Okay.
19                   So if someone was sitting in the
20      front seat, for example, the dashcam would not
21      pick up their lap; correct?
22                   MS. LUHANA:  Objection to form.
23      Hypothetical.
24                   THE WITNESS:  I'm not sure.  There
25      are a variety of dashcams, so that's too

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 176

1   specific for me to be able to answer.

2   BY MR. LOVE:

3       Q.   Okay.

4           Is there any way that a dashcam on

5   the windshield of a car could see past the

6   dashboard into the seat?

7           MS. LUHANA:  Objection to form.

8   Hypothetical.

9           THE WITNESS:  Like I said, I'd --

10  I'd have to see.  I've seen plenty of videos

11  online that show the whole entirety of the

12  car.

13          So I'm not familiar with every

14  style of dashcam, where it goes, all of that

15  stuff.

16          MR. LOVE:  Okay.

17  BY MR. LOVE:

18      Q.   You would agree with me that if the

19  dashcam could not see the lap of the person

20  sitting in the passenger seat, that a sexual

21  offense could occur in the car that would not

22  be picked up by that dashcam; correct?

23          MS. LUHANA:  Objection to form and

24  the hypothetical.

25          THE WITNESS:  Yeah, that's --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 177

1   that's a little too vague.  If there were

2   audio, if it was audio recording, if there --

3   if you could see facial expressions or

4   gestures that corroborated something.

5              So that's -- I can't agree or

6   disagree with that.

7   BY MR. LOVE:

8      Q.   You can't agree that it's possible

9   that it would not pick it up?

10             MS. LUHANA:  Objection to form to

11  the hypothetical.

12             THE WITNESS:  I mean, of course

13  it's possible.

14  BY MR. LOVE:

15     Q.   In other words, a sexual offender

16  could reach over out of sight of the dashcam

17  and touch a passenger; right?

18             MS. LUHANA:  Objection to form and

19  the hypothetical.

20             THE WITNESS:  If you're asking is

21  it possible to engage in a surreptitious

22  gesture that a camera couldn't pick up, yes.

23  But that doesn't mean the whole offense can't

24  be captured.

25             MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1    BY MR. LOVE:

2        Q.    And you wouldn't be surprised if an

3    offender did do that; right?

4                MS. LUHANA:  Objection to form and

5    hypothetical.

6                THE WITNESS:  Would I be

7    surprised?  I -- again, that's -- it depends.

8    BY MR. LOVE:

9        Q.    Now, the driver can just turn a dash

10   camera off; right?

11               MS. LUHANA:  Objection to form.

12               THE WITNESS:  It depends who's in

13   control of that dash camera.

14   BY MR. LOVE:

15       Q.    Well, it would be in the driver's

16   car; right?

17       A.    Right.

18               MS. LUHANA:  Objection to form.

19   BY MR. LOVE:

20       Q.    On the driver's dash?

21       A.    But if it was managed by someone else

22   or mandatory to be kept on, like in taxicabs,

23   I don't believe they can disengage their

24   dashcams in some taxicabs, so I don't -- it

25   depends.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 179

1    Q.    You said you don't believe.

2          What evidence do you have to

3    support that taxis cannot turn off their

4    dashcams?

5          MS. LUHANA:  Object to form.

6          THE WITNESS:  I believe it's a

7    conversation I had with a taxi driver.

8    BY MR. LOVE:

9    Q.    What taxi driver?

10   A.    Do you want me to provide the name of

11   a taxi driver that I asked about a camera?

12   Q.    Yes, if -- if it goes to your

13   opinions, which it seems like it does, that a

14   taxi keeps -- has to keep their camera on,

15   then we need to know the basis of that

16   opinion.

17          So if you had a conversation with

18   a taxi driver, we'd like to know what taxi

19   driver you had a conversation with.

20          MS. LUHANA:  Objection to form.

21   Mischaracterizes her testimony.

22          THE WITNESS:  I don't think I put

23   anything about that opinion in my report.

24   It's my experience.

25          MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 180

1              THE WITNESS:  And I have no idea

2    of the name of the taxi driver.

3    BY MR. LOVE:

4       Q.   When was this conversation?

5       A.   Oh, I don't know.

6       Q.   Okay.

7              And you can't name any studies

8    that say that a -- a taxi cannot turn off

9    their camera; right?

10             MS. LUHANA:  Objection to form.

11             THE WITNESS:  Right.

12   BY MR. LOVE:

13      Q.   You don't know of any regulation that

14   requires a taxi to keep their camera on;

15   right?

16             MS. LUHANA:  Objection to form.

17             THE WITNESS:  Not off the top of

18   my head.

19   BY MR. LOVE:

20      Q.   You can't provide any rules from any

21   taxi company that says that a dash camera has

22   to be in the car and kept on at all times in a

23   taxi; correct?

24             MS. LUHANA:  Objection to form.

25   Scope of opinion.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 181

```
 1              THE WITNESS:  Yeah, I have not
 2   investigated any of that to write my Uber
 3   report.  You just asked me a question.  I told
 4   you my experiential understanding.
 5              MR. LOVE:  Counsel, I'd ask that
 6   you keep your objections to form.  It's not
 7   appropriate to be speaking objections.
 8              MS. LUHANA:  Counsel, I'm just --
 9   I want a clean record, so I'm being clear as
10   to what you're asking, but understood.
11              MR. LOVE:  Okay.
12   BY MR. LOVE:
13      Q.   So if an Uber driver has a dashcam in
14   the car, it's possible that they could turn it
15   off; right?
16      A.   If --
17              MS. LUHANA:  Objection to the form
18   and the hypothetical.
19              THE WITNESS:  If it's set up that
20   way, it's possible.
21              MR. LOVE:  Right.
22   BY MR. LOVE:
23      Q.   And even if Uber requires them to
24   keep it on, they could still turn it off;
25   right?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 182

1              MS. LUHANA:  Objection to form and

2      hypothetical.

3              THE WITNESS:  If Uber required

4      them to keep it on and they shut it off during

5      a report, it would corroborate some victims'

6      statements, if not the video, provide a video

7      recording, and it also could be evidence of

8      consciousness of guilt.

9      BY MR. LOVE:

10         Q.    Okay.

11              So a driver could bring a

12     passenger to their destination and then turn

13     the camera off; right?

14              MS. LUHANA:  Objection to form and

15     hypothetical.

16              THE WITNESS:  If the -- yeah,

17     there are a million scenarios that you could

18     propose, and I -- they're all theoretically

19     possible.  But it -- if -- if a driver brought

20     a victim to her home and the victim called and

21     reported, I was sexually assaulted after the

22     driver stopped at my house and turned his

23     camera off, then there would be other means,

24     including the camera being shut off, to

25     corroborate that, like a long stop with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 183

1   RideCheck, or something like that.

2   BY MR. LOVE:

3       Q.    But it would be after the ride;

4   right?  Withdrawn.

5               So if -- if an Uber driver brings

6   a passenger to their destination and ends the

7   ride because it's the end of their destination

8   and then shuts off the camera, then that

9   wouldn't be evidence that Uber could use.

10  It's after the ride; correct?

11              MS. LUHANA:  Objection to form.

12  Hypothetical.

13              THE WITNESS:  It -- it would -- I

14  don't understand.  It wouldn't be evidence.

15  If -- if it corroborates the victim's

16  allegations, timing and description of

17  behavior, Uber could surely use that as

18  corroboration.

19  BY MR. LOVE:

20      Q.    So is it your opinion that Uber

21  should require drivers to have dashcams that

22  are on 24/7 when they're in their car?

23      A.    I don't think that's what I said at

24  all.

25      Q.    So once they arrive when they turn

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 184

1    that camera off -- withdrawn.

2            It's also possible that a driver

3    could then drop off a passenger at their

4    destination, drive away, turn off their

5    camera, and then return to that destination;

6    right?

7            MS. LUHANA:  Objection to form and

8    the hypothetical.

9            THE WITNESS:  Of course.  That's

10   why these victims fear Uber drivers.  That's

11   one of the things that I've talked about

12   already.

13   BY MR. LOVE:

14       Q.   And that would not be caught on

15   camera; correct, that offense?

16           MS. LUHANA:  Objection to form and

17   the hypothetical.

18           THE WITNESS:  I have no idea.

19   Does the person have surveillance cameras?  I

20   mean, that's -- I don't know what you're

21   asking me really.

22   BY MR. LOVE:

23       Q.   It would not be caught on the dashcam

24   in the car; correct?

25       A.   If the --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 185

```
 1              MS. LUHANA:  Objection to form.
 2              THE WITNESS:  If the dashcam was
 3    off, it would not record.
 4              MR. LOVE:  Okay.
 5    BY MR. LOVE:
 6       Q.   Now, you said that a dashcam being
 7    turned off could be used as evidence and that
 8    would deter a driver; right?
 9              MS. LUHANA:  Objection to form and
10    the hypothetical.
11              THE WITNESS:  I don't think that's
12    what I said, but I do think a camera and
13    knowing that camera is monitored and knowing
14    that turning off a camera can -- can be
15    interpreted as consciousness of guilt, that
16    on-time, real-time monitoring can be a
17    deterrent to an offender.
18    BY MR. LOVE:
19       Q.   But your opinion is that GPS is not a
20    deterrent?
21              MS. LUHANA:  Objection to form and
22    misstates her testimony.
23              THE WITNESS:  I don't --
24              MR. LOVE:  Again -- again, Roopal,
25    please keep your objections to objection to
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 186

1    form.  It is not appropriate for you to coach

2    the witness and I did not characterize her

3    testimony.

4              MS. LUHANA:  You said "your

5    opinion is."

6              MR. LOVE:  "Your opinion," yes.

7    She's here to opine on a lot of things.  She's

8    an expert.  Her opinion, I'm asking her

9    opinion currently.

10             MS. LUHANA:  Okay.  I thought you

11   were saying that was her prior opinion.

12   That's her opinion.

13             Okay.  Understood, counsel.

14   BY MR. LOVE:

15       Q.   Your opinion, Dr. Valliere, is that

16   GPS does not deter; correct?

17             MS. LUHANA:  Objection to form.

18             THE WITNESS:  I believe in my

19   report, I discuss this at length in terms of

20   GPS only being as good as it is monitored, and

21   it's generally, unless there's real-time

22   monitoring in intervention, it can be used as

23   after the fact.

24             And when offenders understand very

25   quickly that there is no real-time monitoring

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 187

1  on GPS, then, again, we're talking about

2  shifting the burden to the victim to report as

3  opposed to being monitored in real-time.

4  BY MR. LOVE:

5      Q.   You just said that dashcams serve as

6  a deterrent even if they're off; correct?

7              MS. LUHANA:  Objection to form.

8              THE WITNESS:  It -- it -- the --

9  it's not about the dashcam being off; it's

10  about the process of disconnecting a dashcam

11  when they're required to be on.  And the idea

12  that there's an expectation that when you're

13  acting as a driver, your dashcam is ongoing

14  while you're in that role.

15              MR. LOVE:  Sure.

16  BY MR. LOVE:

17      Q.   So if GPS is ongoing while a driver

18  is driving; correct?

19              MS. LUHANA:  Objection to form.

20              (Court Reporter Clarification.)

21              MR. LOVE:  Yes.

22  BY MR. LOVE:

23      Q.   The GPS is ongoing while a driver is

24  taking a trip; correct?

25              MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 188

1            THE WITNESS:  It's necessary for
2    the app to work and the -- a person to get a
3    ride.  GPS is inherent in the whole
4    functioning.
5            MR. LOVE:  Right.
6    BY MR. LOVE:
7       Q.   So the GPS will record where that
8    driver is going; correct?
9            MS. LUHANA:  Objection to form.
10            THE WITNESS:  Correct.
11    BY MR. LOVE:
12       Q.   And so if he deviates from that ride,
13    then that GPS could be used to corroborate a
14    victim's story; correct?
15            MS. LUHANA:  Objection to form.
16    Hypothetical.
17            THE WITNESS:  I think the evidence
18    that there are hundreds of thousands of sexual
19    misconducts on Uber rides is proof that GPS,
20    in and of itself, is not a deterrent.
21            MR. LOVE:  Dr. Valliere, that was
22    not my question.
23    BY MR. LOVE:
24       Q.   My question was, the GPS would show
25    if a driver deviated from a ride; yes or no?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 189

1            MS. LUHANA:  Objection to form.

2            THE WITNESS:  If the driver is

3   being monitored and GPS is in real-time

4   monitoring and use -- and those deviations are

5   intervened with, then GPS may be more in

6   effect -- more effective.

7            At this point, GPS is only used

8   after the fact if there is a report of a

9   problem.

10  BY MR. LOVE:

11     Q.   Is there a reason you can't answer my

12  question?

13            MS. LUHANA:  Counsel, she's doing

14  her best to answer your questions, which are

15  pretty broad.

16            MR. LOVE:  My question is -- my

17  question is pretty straightforward.

18            MS. LUHANA:  It's not.

19  BY MR. LOVE:

20     Q.   A GPS -- a GPS -- a GPS on a ride

21  would record if a driver deviated from the

22  route; correct?

23            MS. LUHANA:  Objection to form.

24  Asked and answered.

25            THE WITNESS:  Your -- your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 190

1   questions are not straightforward; they lack

2   context.  And in the context of sexual assault

3   in an Uber, which is where my expert opinion

4   is, an offender can easily explain a GPS

5   deviation by saying she had to stop and throw

6   up or she has to go to the store.

7            So just because it deviates from

8   the ride does not mean that will be a

9   deterrent, especially if the offender has

10  experience with explaining away deviations or

11  never having their deviations questioned.

12  BY MR. LOVE:

13     Q.   And similarly, an Uber driver could

14  explain why a camera was turned off; correct?

15            MS. LUHANA:  Objection to form.

16            THE WITNESS:  Not as easily if

17  it's a requirement.  If Uber says there's no

18  excuses to turn off a camera, explaining a way

19  -- breaking a rule is still a rule violation.

20  BY MR. LOVE:

21     Q.   Well, hold on.

22            There's no excuses for deviating

23  from the route either, is there?

24     A.   There --

25            MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 191

 1              THE WITNESS:  There are if it's at
 2   the rider's request.
 3              MR. LOVE:  Okay.
 4   BY MR. LOVE:
 5      Q.   What if the rider requests that they
 6   turn off the camera?
 7              MS. LUHANA:  Objection to form and
 8   hypothetical.
 9              THE WITNESS:  Then if it's
10   mandatory by Uber, that request goes un --
11   unfulfilled.
12   BY MR. LOVE:
13      Q.   Well, you can't record someone
14   without their consent; correct, first of all?
15              MS. LUHANA:  Objection to form.
16              THE WITNESS:  If the rules about
17   getting into an Uber are that you are going to
18   record, you agree to that rule, just like I
19   can't go into Walmart and ask them to turn off
20   the cameras, because I understand there are
21   cameras in that store, and by entering that
22   store, that gives my consent, and I can't
23   personally go to that Walmart manager and say,
24   I don't want to be on that camera.
25   BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 192

1      Q.   Okay.

2           An Uber driver could easily say

3  that a camera is broken; right?

4           MS. LUHANA:  Objection to the form

5  and the hypothetical.

6           THE WITNESS:  Then if Uber has a

7  rule about you must have a camera, then they

8  can't take an Uber ride while their camera is

9  broken.

10  BY MR. LOVE:

11      Q.   Okay.

12           But these are all excuses that

13  they could set forth; correct?

14           MS. LUHANA:  Objection to the

15  form.

16           THE WITNESS:  Excuses aren't

17  meaningful in the context of the report of a

18  sexual assault, which is why -- where Uber

19  would be investigating this.

20           And when there are hard and fast

21  rules, your excuses don't matter.

22  BY MR. LOVE:

23      Q.   But your contention is that a rider

24  who says that a passenger asked them to

25  deviate from the route can explain away the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 193

1    GPS deviations?

2              MS. LUHANA:  Objection to form.

3              THE WITNESS:  A -- let me read

4    your question.

5              MR. LOVE:  Withdrawn.

6              THE WITNESS:  "A rider who says

7    that a passenger" --

8              MR. LOVE:  Withdrawn.

9    BY MR. LOVE:

10       Q.   Your contention is that a driver who

11   says that a passenger asked them to deviate

12   from the route can explain away the GPS

13   deviations?

14              MS. LUHANA:  Objection to form.

15              THE WITNESS:  They may be able to,

16   but if that deviation coincides with a report

17   of a sexual assault, then that explanation

18   should be deeply investigated or not accepted

19   as a reason.

20   BY MR. LOVE:

21       Q.   So GPS would act as a deterrent;

22   correct?

23              MS. LUHANA:  Objection to form.

24   Asked and answered.

25              THE WITNESS:  Even by Uber's own

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 194

```
 1   internal standards, it's clear that GPS does
 2   not act as a deterrent.
 3   BY MR. LOVE:
 4       Q.   My question to you is that in your
 5   opinion, because it can be used as evidence
 6   after the fact, it could be used as a
 7   deterrent; correct?
 8               MS. LUHANA:  Objection to form.
 9               THE WITNESS:  I do not agree with
10   that.
11   BY MR. LOVE:
12       Q.   And yet for dashcams, because they
13   can be used as evidence after the fact, they
14   would be deterrents?
15               MS. LUHANA:  Objection to -- to
16   form.
17               THE WITNESS:  Dashcams are
18   real-time supervision and provide documented
19   evidence of what is actually happening.  You
20   asked a different --
21               MS. LUHANA:  Counsel, please allow
22   her to finish her response before you ask
23   another question.
24               Go ahead, Doctor.
25               THE WITNESS:  You did not say if
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 195

1   they are turned off.  If they are required, if

2   dashcams are required, they would act as a

3   deterrent.  And by Uber's own documentation,

4   they have proof of deterrents.

5              MR. LOVE:  Okay.

6   BY MR. LOVE:

7       Q.   And your opinion is that even if the

8   driver turned it off, it would act as

9   corroborating evidence to report a sexual

10  assault, and because drivers know that, it

11  would be a deterrent for sexual assaults; yes?

12             MS. LUHANA:  Objection to form.

13             THE WITNESS:  What I said was --

14  is that turning off a camera, if it's a rule

15  violation, could be corroboration of a

16  victim's statement, as well as consciousness

17  of guilt.

18             So a -- a offender would have to

19  make an instrumental decision to break the

20  rules and risk consequences already by turning

21  off the camera during a sexual assault.

22  BY MR. LOVE:

23      Q.   And as you stated just earlier,

24  deviations from a GPS can corroborate a story

25  or a -- a report of sexual assault after the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 196

1    fact, and so just like dashcams that are

2    turned off, they can be deterrents; right?

3              MS. LUHANA:  Objection to the

4    form.

5              THE WITNESS:  I guess I'm confused

6    with your focus on GPS.  Because GPS is

7    inherent in the Uber app and Uber has hundreds

8    of thousands of sexual assaults, that, in

9    itself, shows that GPS is not a deterrent to

10   sexual misconduct or sexual assaults.

11             MR. LOVE:  Dr. Valliere, that's

12   not my question.  I'm going to ask you to

13   focus on my question.

14   BY MR. LOVE:

15      Q.   You talked about the driver turning

16   off a camera can be evidence after the fact of

17   a sexual assault that corroborates the report

18   and thus deters sexual assault.

19             You also testified that deviations

20   from the route on a GPS can be used to

21   corroborate a story and thus be evidence that

22   supports a report of sexual assault.

23             So they are both deterrents to

24   sexual assault; correct?

25             MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 197

1             THE WITNESS:  That is absolutely

2   not correct, and that's what I'm trying to

3   explain to you.

4             Just because two pieces of --

5   you're trying to equate video recording or

6   issues with cameras or a specific action an

7   individual takes with GPS.

8             It is obvious and clear that GPS

9   does not act as a deterrent in whatever form.

10  GPS in Uber has been used when a victim

11  reports to corroborate victims' reports.  But

12  even in those reports, they've been explained

13  away.  In cameras, if it needs to always be

14  on, there's no way to explain away turning off

15  a camera.

16            So this is -- this is different.

17  I have offenders on GPS during my -- their --

18  their treatment with me.  It's only a

19  deterrent when they are being monitored and

20  asked about it in real-time and they know

21  somebody's watching them.

22            MR. LOVE:  Okay.

23  BY MR. LOVE:

24     Q.   Is evidence that corroborates a

25  report of sexual assault after the fact a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 198

1    deterrent?

2                 MS. LUHANA:  Objection to form and

3    the hypothetical.

4                 THE WITNESS:  It -- it depends.

5    BY MR. LOVE:

6        Q.   If a driver knows that a decision

7    that they make will be used as evidence to

8    corroborate sexual assaults, are they less

9    likely to take that action?

10                MS. LUHANA:  Objection to form.

11    Objection to hypothetical.

12                THE WITNESS:  It -- it depends.

13    That's way too broad of a question.

14                MR. LOVE:  It's actually really

15    not a broad question at all, so maybe if you

16    can explain what you're not getting or what's

17    not making any sense or it's too big for you.

18    BY MR. LOVE:

19        Q.   My question is simply, is -- if a

20    driver knows that a decision they make could

21    be used as evidence against them after the

22    fact, would that deter them from taking that

23    decision or making that decision?

24                MS. LUHANA:  Objection to form and

25    the hypothetical.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 199

1            THE WITNESS:  You're actually not
2   correct.  It is not a simple question.  It's a
3   very broad question that's very complicated in
4   terms of answering in the context of sexual
5   assault and sexual offenders.
6            For instance, a sexual offender
7   takes a drunk victim home and engages, and I'm
8   not even talking about in an Uber, and engages
9   in raping that victim, and that victim goes to
10  the police and says yes, we were drinking.
11  Yes, we went home and he raped me.
12            All the offender has to do is say
13  yes, we were drinking, yes, I went to her
14  home, and yes, we had consensual sex.  All of
15  that comports with one another.
16            So sexual assault, sexual
17  offenders and victim behavior are all very
18  complicated.
19            If GPS, in and of itself, was a
20  deterrent, Uber would not have the sexual
21  assault problem that it has because GPS is
22  inherent in the Uber app.
23            MR. LOVE:  Okay.  So I still don't
24  think you actually answered my question, so.
25  Again, I just want to focus in on my question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 200

 1   And if something is confusing about the

 2   question, please explain that to me, and I

 3   will try to reword the question so that it

 4   makes sense.

 5               MS. LUHANA:  Counsel, she's

 6   already told you that it's a complicated

 7   question.  She's tried her best to answer it

 8   like several times.

 9               If you -- why don't you ask

10   another question then?

11               MR. LOVE:  I can conduct my own

12   examination.  Thank you.

13   BY MR. LOVE:

14      Q.   Dr. Valliere, do you believe that

15   evidence of sexual assault is a deterrent to

16   sexual offenders?

17               MS. LUHANA:  Objection to form.

18               THE WITNESS:  If it is evidence

19   that is clear and unequivocal, like a video

20   recording, yes.  If it is evidence that can be

21   manipulated, misunderstood or explained away,

22   no, not necessarily.

23               MR. LOVE:  Thank you.

24   BY MR. LOVE:

25      Q.   Sexual offenders can be pretty bold

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 201

1    with their offending; right?

2                 MS. LUHANA:  Objection to form and

3    the hypothetical.

4                 THE WITNESS:  It depends on the

5    offender.  Some are not bold at all.  Some can

6    be bold.

7    BY MR. LOVE:

8       Q.   You mention in your report the

9    possibility of using point-in-time messaging.

10                You would agree with me that Uber

11   can't know when a driver is about to commit a

12   sexual assault; correct?

13                MS. LUHANA:  Objection to form.

14                THE WITNESS:  What --

15                MR. LOVE:  Withdrawn.  Let me

16   clarify.

17                THE WITNESS:  Okay.

18   BY MR. LOVE:

19      Q.   Uber can't read its drivers' minds;

20   right?

21                MS. LUHANA:  Objection to form.

22                THE WITNESS:  As long as it hasn't

23   developed the technology yet, I'm not sure.

24   But I believe point-in-time messaging was

25   something that Uber's law enforcement expert

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

1  recommended, or was in Uber's document.

2            I don't believe -- unless you show

3  me, I don't believe that's something that I

4  specifically spoke about.

5            MR. LOVE:  Okay.

6  BY MR. LOVE:

7     Q.   So is it your contention that

8  point-in-time messaging would not help?

9            MS. LUHANA:  Objection to form.

10           MR. LOVE:  I just want -- I just

11  want to make sure.

12           MS. LUHANA:  Objection to form.

13           THE WITNESS:  I believe that in my

14  report, and we can look for it, but I believe

15  I was referencing a law enforcement

16  professional that recommended to Uber to do

17  point-in-time messaging.

18           MR. LOVE:  Okay.  But my -- my

19  question is a little different.

20  BY MR. LOVE:

21     Q.   So is it your opinion that that would

22  be helpful, or no?

23           MS. LUHANA:  Objection to form.

24           THE WITNESS:  I believe that it

25  would be helpful to both drivers and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 203

1    passengers to do messaging about risk factors

2    that exist in that ride in real-time.

3                    MR. LOVE:  Okay.

4    BY MR. LOVE:

5        Q.   You are not aware of any studies that

6    show that that would be effective; right?

7                    MS. LUHANA:  Objection to form.

8                    THE WITNESS:  I cannot name a

9    study, but I do know that warning people about

10   risk changes their evaluation of risk, level

11   of guardedness and level of awareness of

12   appropriate behavior, which is the same

13   framework that I believe the Uber expert said

14   that point-in-time messaging would alert

15   people to high-risk times and put them on

16   point with that.

17   BY MR. LOVE:

18       Q.   So when you say "notify of the

19   risks," you're saying these notifications

20   would only be sent out at high-risk times for

21   sexual assault?

22                   MS. LUHANA:  Objection to form.

23                   THE WITNESS:  No.  I think they

24   could be sent out in high-risk rides with all

25   the risk factors that Uber knows about their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 204

1   drivers and their riders and the pairing, as

2   well as times, places or situations where risk

3   issues exist.

4   BY MR. LOVE:

5        Q.   Sexual assault cannot be predicted;

6   right?

7               MS. LUHANA:  Objection to form.

8               THE WITNESS:  Uber, itself,

9   repeatedly says that because sexual assault

10  can often be predicted with their risk factors

11  in their own studies, that it can be

12  preventable.  That phrase comes up numerous

13  times in their own documentation.

14              MR. LOVE:  Okay.

15  BY MR. LOVE:

16       Q.   In your opinion, sexual assault

17  cannot be predicted; correct?

18              MS. LUHANA:  Objection to form.

19              THE WITNESS:  That is not my

20  opinion.

21  BY MR. LOVE:

22       Q.   So you believe sexual assaults can be

23  predicted?

24              MS. LUHANA:  Objection to form.

25              THE WITNESS:  It's not a -- for --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 205

1  it's not that positive/positive,

2  false/positive.  You know, it's not that

3  quadrant kind of prediction where it is going

4  to happen or isn't going to happen.

5          But we can estimate that the risk

6  that a sexual assault will happen will go

7  higher and higher and higher as these risk

8  factors add up.

9          And given the particular offender,

10  that offender's behavior can be assessed as

11  growing in risk that something will happen,

12  given what you know about that offender.

13          So the ultimate yes or no

14  prediction is very difficult.  But you can

15  predict that the risk is going to be much

16  higher and you can predict who -- who may act

17  on that risk at a much greater rate.

18  BY MR. LOVE:

19     Q.   So what I'm hearing you say, and

20  correct me if I'm wrong, is that you can

21  assess risks and identify risks, but you

22  cannot predict yes or no if sexual assault is

23  going to happen.

24          MS. LUHANA:  Objection to form.

25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 206

1      Q.   Is that right?

2              MS. LUHANA:  Objection to form.

3      Mischaracterizes testimony.

4              THE WITNESS:  In -- the ultimate

5      yes or no about predicting is difficult.  For

6      instance, if Uber has a driver that has

7      one-star ratings, prior IPC events, has a

8      shorter driving history, their age.  If the

9      driver has all the risk factors, and they, at

10     environmentally risky times, weekends, nights,

11     late hours, whatever, pick up a lone,

12     intoxicated woman driver, {sic} they can do

13     things -- that's a predictable risk situation,

14     and so Uber can say, this is a really

15     high-risk time.

16             This driver, because of all his

17     risk factors and his prior reports of sexual

18     misconduct, is very likely to -- to go on to

19     commit a sexual assault, and they make an

20     intervention.

21             MR. LOVE:  Ah.

22             THE WITNESS:  Then they've changed

23     the prediction, right?  They've prevented

24     something.

25             And so when you're capable of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 207

```
 1   preventing something, then you're not capable
 2   of -- of measuring prediction.  That's the
 3   problem with prediction.  If I really think
 4   you're going to do something and I'm right,
 5   but I intervene, then I'm automatically wrong
 6   'cause you didn't do it.
 7              MR. LOVE:  Okay.
 8   BY MR. LOVE:
 9      Q.   Assuming there's no intervention,
10   sexual assault still cannot be predicted; yes
11   or no, correct?
12              MS. LUHANA:  Objection to form.
13              THE WITNESS:  That's too general
14   of a question to answer in yes or no.  It
15   really is.
16              You cannot ultimately predict
17   human behavior with 100 percent accuracy in
18   any situation, but you can intervene to
19   prevent it.
20              MR. LOVE:  Understood.
21   BY MR. LOVE:
22      Q.   Your opinion is that there's little
23   evidence that -- well, I guess -- withdrawn.
24              There's little evidence that
25   community notifications prevent sexual
```

Page 208

```
 1    assaults; right?
 2              MS. LUHANA:  Objection to form.
 3              THE WITNESS:  It's -- it's not a
 4    incredibly effective way to prevent sexual
 5    assault, no.
 6    BY MR. LOVE:
 7       Q.   But they do give a false sense of
 8    security; right?
 9              MS. LUHANA:  Objection to the
10    form.
11              THE WITNESS:  "Community
12    notification."  Now, that's complicated.  I
13    believe this is a legislative issue that
14    promotes some sense of safety that doesn't
15    necessarily ensure safety.
16              MR. LOVE:  Okay.
17    BY MR. LOVE:
18       Q.   I want to briefly talk about the
19    taxonomy that was created for Uber.  You take
20    issue with the -- the actual naming of the
21    taxonomy; correct?
22              MS. LUHANA:  Objection to form.
23              THE WITNESS:  I take issue with
24    the ways that some of the categories are
25    labeled, but my biggest issue with the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 209

```
 1    taxonomy is that Uber doesn't report all the
 2    incidents of sexual violence.
 3                MR. LOVE:  I'm not going to be
 4    asking about that; I'm just going to be asking
 5    about the naming.
 6    BY MR. LOVE:
 7        Q.  So one of the issues that you have is
 8    that you believe there is no such thing as
 9    non-consensual sex; right?
10                MS. LUHANA:  Objection to form.
11                THE WITNESS:  It -- if it's
12    non-consensual sex, it's sexual assault.
13                MR. LOVE:  Right.
14    BY MR. LOVE:
15        Q.  And you despise the term
16    "non-consensual sex"?
17                MS. LUHANA:  Objection to form.
18                THE WITNESS:  I despise it?  I --
19    I think -- I wouldn't use the word "despise."
20                I think it's inaccurate language
21    that mitigates and muffles what is actually
22    happening.
23    BY MR. LOVE:
24        Q.  You would not say that you despise
25    the term "non-consensual sex"?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 210

```
 1            MS. LUHANA:  Objection to form.
 2            If -- counsel, are you referring
 3    to something, a document?
 4            MR. LOVE:  Again, if the witness
 5    is confused, the witness can ask me.  I'm
 6    asking a question.  The witness can answer.
 7            MS. LUHANA:  Understood.
 8            THE WITNESS:  I don't know where
 9    you get the word "despised."  I may have said
10    that.  I'm -- I am against a lot of language
11    that cloaks the reality of sexual assault.
12            MR. LOVE:  Okay.
13    BY MR. LOVE:
14       Q.   But taxonomy, in your opinion, should
15    use the word "rape"; right?
16            MS. LUHANA:  Objection to form.
17            THE WITNESS:  In my opinion, yes.
18    BY MR. LOVE:
19       Q.   You would agree with me that rape and
20    non-consensual sex are synonymous?
21            MS. LUHANA:  Objection to form.
22            THE WITNESS:  You know, that's a
23    tricky question to answer because rape is
24    legally defined as some things.
25            I would say that when somebody
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 211

1   engages in sexual acts without the other

2   party's consent, it is sexual assault and

3   sexual violence.

4   BY MR. LOVE:

5       Q.   Taking it out of the legal context,

6   just in a generic, typical way of

7   understanding the word, rape is synonymous

8   with non-consensual sex; correct?

9               MS. LUHANA:  Objection to the

10  form.

11              THE WITNESS:  Rape is rape, and I

12  don't believe there's something as -- I don't

13  believe there is non-consensual sex.  It's

14  sexual assault.

15  BY MR. LOVE:

16      Q.   Would you consider calling a rider

17  lazy to be sexual misconduct?

18              MS. LUHANA:  Objection to form.

19  Hypothetical.

20              THE WITNESS:  I have no idea what

21  you're asking me.  I'm sorry.  Lazy how?

22  You're lazy in giving me a blow job?  That

23  would be pretty -- that would be sexual

24  misconduct.  I don't understand.

25              MR. LOVE:  Right.  I didn't put

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 212

```
 1  that context on it.  So I'm just asking it in
 2  just the context that I'm asking.
 3  BY MR. LOVE:
 4      Q.   Just if a driver calls a passenger
 5  lazy, that is not sexual misconduct; right?
 6              MS. LUHANA:  Objection to the form
 7  and the hypothetical.
 8              THE WITNESS:  I'd have to have a
 9  con -- I'd have to have a context.
10  BY MR. LOVE:
11      Q.   Dr. Valliere, the context is the
12  driver calls the rider lazy.  He says, "You
13  are lazy."
14              Is that sexual misconduct; yes or
15  no?
16              MS. LUHANA:  Objection to the form
17  and hypothetical.
18              THE WITNESS:  It -- how did that
19  come to be that a driver would -- I need to
20  understand that.
21              Say they were discussing her
22  husband's dissatisfaction with her as a sexual
23  partner and the driver says, you're lazy.
24  I --
25  BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 213

1      Q.   But, Dr. Valliere, you are -- you are
2   adding that context, and so I'm ask -- I'm
3   asking you in just the context that a driver
4   just says, you are lazy, and that is it, and
5   there is no sexual context around it, there's
6   no sexual activity happening, the ride -- the
7   driver says, you are lazy, to a rider, that is
8   not sexual misconduct; correct?
9              MS. LUHANA:  Objection to form.
10             THE WITNESS:  I'm sorry, I can't
11  answer that without a context.  I literally
12  can't, because that can mean so many things.
13             So you're saying by the very
14  granular definition of the word "lazy," does
15  that imply sex?  Not necessarily.
16  BY MR. LOVE:
17      Q.   Well, I've given you context; right?
18             This is the context.  A rider gets
19  in the car.  The driver says, you're lazy.
20             Is that sexual misconduct?
21             MS. LUHANA:  Objection to the form
22  and the hypothetical.
23             THE WITNESS:  So out of the blue,
24  with no prior interaction, with no prior
25  engagement with the client, this guy just

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

1    says, you're lazy, to somebody getting in

2    their car?

3              MR. LOVE:  Yes.

4    BY MR. LOVE:

5        Q.   Is something confusing about that?

6        A.   It's very confusing.

7        Q.   Okay.

8        A.   Like, I just can't imagine why that

9    would happen if the driver wasn't being

10   derogatory, devaluing or abusive in some way.

11             So --

12       Q.   But I'm not asking you to pontificate

13   on why it was happening.  I'm asking you a

14   very straightforward question.

15             A rider gets into a car.  A driver

16   says, you're lazy.  Sexual misconduct; yes or

17   no?

18             MS. LUHANA:  Objection to form and

19   the hypothetical.

20             THE WITNESS:  I cannot answer

21   that.  If he's talking about her appearance,

22   if he's talking about that she's not dressed

23   sexy.

24             This is -- this is a very

25   confusing question because you're asking me to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 215

1   interpret and opine on human behavior in a
2   vacuum, and human behavior doesn't exist in a
3   vacuum.
4              MR. LOVE:  If the witness
5   continues to not answer my questions and be
6   evasive, then we are going to have to seek
7   additional time for this deposition and hold
8   it open.
9              MS. LUHANA:  Counsel --
10             MR. LOVE:  So I don't know if you
11  want to take a break and talk about that or
12  not, but we will seek additional time if the
13  witness continues to be evasive at a very,
14  very straightforward question.
15             MS. LUHANA:  Counsel, she's trying
16  her best to answer your questions and you're
17  asking very broad questions and so she's doing
18  her best here.
19             MR. LOVE:  I -- I -- you know, I'm
20  not going to get into an argument on the
21  record, but I will put my position that it's a
22  very straightforward question.  It was
23  confined to a very specific context.  It was
24  very detailed.
25             It's not a hard question.  It's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 216

1    not broad, and it can be answered easily.  And

2    so if the witness continues to be evasive, we

3    will hold this deposition open and seek more

4    time.

5                   MS. LUHANA:  She did answer your

6    question; you're just not happy with the

7    response.  And you -- you can seek whatever

8    relief you need, counsel.

9    BY MR. LOVE:

10       Q.   Dr. Valliere, I'm going to ask one

11    more time.

12                   If a rider gets into a car and the

13    driver says, you're lazy, you should have

14    walked, and that is it, that is the whole

15    context, the whole context of the interaction

16    is right there, that's it, is that sexual

17    misconduct?

18                   MS. LUHANA:  Objection to form.

19    Objection to the hypothetical.

20                   THE WITNESS:  I think you're

21    asking the wrong person to simplify human

22    behavior.  I'm a clinician, and human behavior

23    results from intention and motivation and

24    impact on the other person.

25                   So if -- I can't say yes or no.  I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 217

```
 1   can say superficially, if that driver is being
 2   degrading and devaluing to the rider about her
 3   physical ability to walk, then all I can tell
 4   you is that's completely inappropriate and
 5   degrading, and that -- that's markers of
 6   somebody who may be at risk for sexual
 7   misconduct in the future.
 8   BY MR. LOVE:
 9       Q.   Doctor, sexual misconduct?
10            MS. LUHANA:  What?  Objection to
11   form.
12            THE WITNESS:  In the vacuum of two
13   sentences and -- it's still really hard.  In
14   the vacuum of you're lazy, you should have
15   walked, with no other implication, no staring,
16   no indication to the client's sexuality or
17   dress or whatever, in and of itself, without a
18   broader context, it would be hard to qualify
19   that as sexual misconduct.
20   BY MR. LOVE:
21       Q.   You said in one of your answers, "I'm
22   a clinician" -- sorry, "I think you're asking
23   the wrong person to simplify human behavior.
24   I'm a clinician, and human behavior results
25   from intention and motivation and impact on
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

1    the other person."

2                    So is it your -- are you

3    contending that you cannot opine on intention,

4    motivation and impact on a person?

5                    MS. LUHANA:  Objection.

6    Mischaracterizes her testimony.

7                    THE WITNESS:  I think I'm saying

8    the exact opposite; that unless I know more

9    about the situation, the intention and the

10   impact, I cannot just blankly say this is yes

11   or no sexual misconduct based on a couple

12   words.

13                   MR. LOVE:  Understood.  Okay.

14   BY MR. LOVE:

15       Q.   A rider gets into a car and the

16   driver asks what their credit score is.

17   That's the whole context.  No other context.

18                   Sexual misconduct; yes or no?

19                   MS. LUHANA:  Objection to form and

20   the hypothetical.

21                   THE WITNESS:  Again, this is --

22   why would somebody do that?  That's what I'm

23   asking myself.  Immediately I would say, if

24   somebody asks a stranger that, my immediate

25   question is why would they violate somebody's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

```
 1   personal and psychological integrity like that
 2   and what is going on here?  So that's why I --
 3   I'm having a hard time.
 4            These are not normal interpersonal
 5   interactions between strangers without some
 6   kind of context.
 7            If you go into a bank and your
 8   lender asks you, as a stranger, what's your
 9   credit score, that's not sexual harassment.
10   But I don't know what -- I don't know why
11   somebody would do that.
12            So that's my -- that's what I
13   would be looking to find out before I
14   interpret that behavior as one thing or
15   another.
16            Are those specific words sexual?
17   Not necessarily.
18   BY MR. LOVE:
19      Q.   Okay.
20            A driver telling a rider that
21   she's pretty, but making no advance, is that
22   sexual misconduct?
23            MS. LUHANA:  Objection to form and
24   the hypothetical.
25            THE WITNESS:  I would say yes.  I
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 220

```
 1   do -- I would not appreciate that as a
 2   stranger locked in a car and a woman, so that
 3   starts to violate interpersonal boundaries and
 4   makes somebody uncomfortable.
 5            MR. LOVE:  Understood.
 6   BY MR. LOVE:
 7       Q.   You are aware of the organization
 8   RAINN; correct?
 9       A.   Yes.
10       Q.   It's an anti-sexual assault nonprofit
11   organization?
12       A.   Yes.
13       Q.   It's actually the largest one;
14   correct?
15       A.   I don't --
16            MS. LUHANA:  Objection to form.
17            THE WITNESS:  I don't know if it's
18   the largest.
19   BY MR. LOVE:
20       Q.   It is reputable, though; right, it's
21   reputable?
22       A.   Correct.  It's well known.
23       Q.   Well, you -- you cite to RAINN on a
24   pretty regular basis; right?
25            MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1              THE WITNESS:  I don't think I cite
2     to it on a regular basis.  I have used their
3     statistics.
4     BY MR. LOVE:
5         Q.   You cited to RAINN in your report;
6     correct?
7         A.   I cited to their statistics, as well
8     as Uber's partnership with RAINN, and RAINN's
9     endorsement of Uber.
10        Q.   And you cited to their statistics in
11    your book as well; right?
12        A.   I think it's the same statistic, yes.
13        Q.   So you have no reason to believe that
14    their statistics are not reliable; right?
15             MS. LUHANA:  Objection to form.
16             THE WITNESS:  I have no reason to
17    believe that the statistic I use is not
18    reliable, but that's not a comment on the
19    overall organization.
20    BY MR. LOVE:
21        Q.   So what differentiates the one
22    statistic that you used in this report and any
23    other statistic that RAINN puts on its
24    website?
25             MS. LUHANA:  Objection to form and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222

1   the hypothetical.

2                  THE WITNESS:  I don't know all the

3   statistics they put on their website.  That

4   statistic comes from a particular analysis of

5   a crime report that I also double-checked.

6                  MR. LOVE:  Okay.

7                  If we could pull up -- actually,

8   yeah.  If we could pull up Tab 10, please,

9   Ms. Delaney.

10                 MS. DELANEY:  This will be

11  Exhibit 9; correct?

12                 MR. LOVE:  Yes.

13                 (Whereupon, a document was marked,

14  for identification purposes, as Exhibit 9.)

15  BY MR. LOVE:

16      Q.   And, Dr. Valliere, once that's up, if

17  you could just flip to page 5 for me and let

18  me know when you're there.

19      A.   Okay.  We're here.

20      Q.   That says 1 in every 6 U.S. women

21  experiences attempted or completed rape;

22  correct?

23      A.   Yeah, it's right there.

24                 MS. LUHANA:  Sorry.  Go ahead.  We

25  weren't on that page yet.  No worries.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 223

1              THE WITNESS:  I'm sorry, the 1 in

2      6 women have experienced or attempted

3      completed rape?  That's what that says, yes.

4      BY MR. LOVE:

5          Q.   And that sounds right, based on your

6      experience; right?

7          A.   That sounds right based on the

8      statistics I'm aware of.

9          Q.   Okay.

10             And that's about 17 percent of

11     women; right?

12             MS. LUHANA:  Objection to form.

13             THE WITNESS:  I'll trust your

14     math.

15     BY MR. LOVE:

16         Q.   So a woman, in her daily life, has a

17     17 percent chance of being sexually assaulted?

18             MS. LUHANA:  Objection to form.

19             THE WITNESS:  That's not an equal

20     formula.  That's -- that's not proper logic.

21     BY MR. LOVE:

22         Q.   Well, 17 percent of women have

23     experienced attempted rape or rape; right?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  Correct, but that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 224

1    doesn't mean that every woman has the same

2    chance of being raped.

3                    MR. LOVE:   Right.

4    BY MR. LOVE:

5        Q.   But on average, the -- the U.S. woman

6    has about a 17 percent chance of encountering

7    attempted or completed rape?

8                    MS. LUHANA:   Objection to form.

9                    THE WITNESS:   No.   There are women

10   in much less risky situations that their

11   chance of being raped are much lower.

12   BY MR. LOVE:

13       Q.   You're -- you're talking about a

14   particular woman, though.

15                    I'm asking you to consider the

16   average woman in the United States, which this

17   speaks to; 17 percent of women throughout the

18   United States are either sexually -- either

19   attempted -- experienced either attempted or

20   completed rape.

21                    So the average woman in the United

22   States has about a 17 percent chance of

23   experiencing an attempted or completed rape;

24   correct?

25                    MS. LUHANA:   Objection to the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 225

1    form.

2              THE WITNESS:  That's not -- that's

3    not logical.  Saying 17 percent of women who

4    are raped does not equal every single woman

5    has a 17 percent chance of being raped.

6              So I will agree that 17 percent of

7    women in America are raped.  I will not agree

8    that every woman has a 17 percent chance of

9    being raped.

10             MR. LOVE:  But I didn't -- okay.

11   I'm -- let me try to clarify.

12             I'm not asking you about every

13   single woman individually.

14   BY MR. LOVE:

15       Q.   I'm saying, on average, a woman in

16   the United States has a 17 percent chance of

17   experiencing attempted rape or completed rape?

18             MS. LUHANA:  Objection.

19   BY MR. LOVE:

20       Q.   Do you understand -- do you

21   understand the difference that I'm trying to

22   make between an average person and every

23   individual person?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  Yes, but what you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 226

1  said is so that -- so an average woman in the

2  United States has a 17 percent chance of being

3  raped.  No.  17 percent of women in America

4  are raped on average.

5  BY MR. LOVE:

6     Q.   It also says 1 in every 33 men in the

7  United States have experienced attempted or

8  completed rape; right?

9     A.   Correct.

10    Q.   And that's about three percent of

11 men; correct?

12              MS. LUHANA:  Objection to form.

13              THE WITNESS:  Yes.

14 BY MR. LOVE:

15    Q.   And does that sound right to you,

16 based on your experience?

17              MS. LUHANA:  Objection to form.

18              THE WITNESS:  It -- when it comes

19 to rape, yes.

20              MR. LOVE:  Okay.

21              If we could pull up Tab 11, and

22 we'll mark that as Exhibit 10.

23              (Whereupon, a document was marked,

24 for identification purposes, as Exhibit 10.)

25              MR. LOVE:  And for the record,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 227

1  this is marked as UBER_JCCP_MDL_000007083.

2          MS. LUHANA:  It's trying to

3  upload.  It's a big file.  I think it actually

4  worked.

5          MR. LOVE:  Yes.  Thank you.

6  BY MR. LOVE:

7      Q.   Dr. Valliere, once you get that,

8  could you please turn to the page that has the

9  Bates stamps ending in 7141 in the bottom

10  right-hand corner.

11      A.   7141?

12      Q.   Yes.

13          MS. LUHANA:  We'll pull it up, but

14  it's still loading.

15          MR. LOVE:  Gotcha.

16          (Brief pause.)

17          THE WITNESS:  We got like 40 more

18  pages to go, yeah.

19          MR. LOVE:  If it helps, it's

20  page 59 of the actual document, itself.

21          THE WITNESS:  Yeah.  We got it.

22  Thank you.

23  BY MR. LOVE:

24      Q.   So can you see that chart at the top

25  of the page?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 228

```
 1        A.    Yes.
 2        Q.    Okay.
 3              The second row that says,
 4   "Attempted Non-Consensual Penetration," {sic}
 5   that's attempted rape; yes?
 6        A.    Yes.
 7        Q.    And for 2017, it was .00003 percent
 8   of total trips; correct?
 9              MS. LUHANA:  Objection to form.
10              THE WITNESS:  That's what it says,
11   yes.
12   BY MR. LOVE:
13        Q.    And then the last column before the
14   total says, "Non-Consensual Sexual
15   Penetration," and that is completed rape;
16   correct?
17              MS. LUHANA:  Objection to form.
18              THE WITNESS:  Yes.
19   BY MR. LOVE:
20        Q.    And the percentage trips in 2017 was
21   -- is .00002 percent; correct?
22              MS. LUHANA:  Objection to form.
23              THE WITNESS:  That's what it --
24   sorry.  That's what it says.
25   BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 229

```
 1      Q.   So the two of them together, those
 2   two categories, would be .00005 percent of
 3   trips in 2017; correct?
 4              MS. LUHANA:  Objection to form.
 5              THE WITNESS:  Yes.
 6   BY MR. LOVE:
 7      Q.   And if you go to 2018, the total of
 8   those two categories would be .00004 percent?
 9              MS. LUHANA:  What -- what's the
10   question?
11              THE WITNESS:  Yes.
12              MS. LUHANA:  Objection to form.
13              THE WITNESS:  Yes.
14   BY MR. LOVE:
15      Q.   You would agree that that's much,
16   much, much lower than 17 percent; correct?
17              MS. LUHANA:  Objection to form.
18              THE WITNESS:  These -- comparing
19   these stats, I -- I -- I won't do, because
20   they're not meaningful.
21   BY MR. LOVE:
22      Q.   Dr. Valliere, I am simply asking a
23   straightforward math question.  .00004 percent
24   is much less than 17 percent; yes?
25              MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 230

1              THE WITNESS:  Well, you're asking

2      a math question in the context of incident

3      rates of sexual assault, and there's no way to

4      compare those two numbers.

5              MR. LOVE:  Understood that that's

6      your opinion.

7      BY MR. LOVE:

8          Q.   But now I'm going to ask just a math

9      question outside of that context.

10             Taking it completely on its own as

11     an individual question, 17 percent is much

12     higher than .00004 percent; correct?

13             MS. LUHANA:  Objection to form.

14             THE WITNESS:  We cannot take it

15     out of the context and -- and make this simple

16     math.

17             So if this was zero context at

18     all, then you're right about the numbers.  But

19     it is not zero context, it's a way to try to

20     get me to agree that Uber has less of an

21     incident rate than RAINN states that there is.

22     And they're apples and oranges in terms of the

23     numbers.

24     BY MR. LOVE:

25         Q.   Well, Dr. Valliere, I'm not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 231

```
 1   attempting to do anything.  I took the
 2   question out of context so that you could
 3   answer it without having to agree to that
 4   context, and that is the purpose of my
 5   questions, which is why I've been trying to
 6   clarify them for you.
 7              When I say that something is out
 8   of context, that means the question is taken
 9   out of context.  So when I ask you a simple
10   math question, I'm just looking for a simple
11   answer just to that math question.  I'm not
12   trying to trick you here; okay?
13      A.   Well, I -- I'm sorry, respectfully,
14   that's not okay, 'cause it is a trick, because
15   there's no reason for you to ask that question
16   out of the context of my report and my
17   contention that the Rideshare is -- is right.
18              And comparing all rides and -- and
19   putting sexual assault of -- of women in the
20   context of every single Uber ride is just
21   ingenuous.  It's -- it's just simply
22   ingenuous, because the risks are not equal
23   between rides whatsoever.
24              MR. LOVE:  Okay.
25   BY MR. LOVE:
```

Page 232

1      Q.   The -- the RAINN statistic is how

2  many women have experienced sexual assaults as

3  to the number of how many women are in the

4  country; correct?

5             MS. LUHANA:  Objection to form.

6             MR. LOVE:  Withdrawn.

7  BY MR. LOVE:

8      Q.   The RAINN statistic is how many women

9  have experienced attempted or completed rape

10  in their lifetime as compared to the number of

11  women in the United States; correct?

12            MS. LUHANA:  Objection to form.

13            THE WITNESS:  Well, first of all,

14  let's talk about that it's reported rapes.

15            MR. LOVE:  Sure.

16            THE WITNESS:  Not actual rapes.

17            And second of all, that's why I

18  won't agree that the average woman has a

19  17 percent chance of being raped, because the

20  chance of being raped for any woman rises and

21  falls with a whole bunch of different other

22  factors.

23            So statistics, by just saying, you

24  know, 17 percent is not as meaning -- is -- is

25  not applicable to -- to these stats with every

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 233

1    single ride.

2              Uber rides include rides that are

3    zero risk of sexual assault at all.

4              MR. LOVE:  Okay.  But that's not

5    my question.  It's a very straightforward

6    question.

7    BY MR. LOVE:

8       Q.   This statistic right here from RAINN,

9    1 in 6 U.S. women, compares the number of

10   women that have experienced attempted or

11   completed rape in their lifetime in the United

12   States to the number of women in the United

13   States; correct?

14              MS. LUHANA:  Objection to the

15   form.

16              THE WITNESS:  That's my

17   understanding of that statistic.

18              MR. LOVE:  Okay.

19   BY MR. LOVE:

20      Q.   And in the Safety Report, these

21   numbers represent the number of reports of

22   attempted and completed rape as to the number

23   of completed rides for the year; correct?

24              MS. LUHANA:  Objection to form.

25              THE WITNESS:  This is -- this is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 234

1    what you're not understanding.  The frequency

2    of women getting raped includes women who are

3    raped by partners and fathers and people in

4    relationships.

5              The applicable statistic would be

6    how many women in the United States get raped

7    by complete strangers in a high-risk situation

8    versus how many women get raped by a lone male

9    driver in an Uber.

10             MR. LOVE:  Okay.  Dr. Valliere,

11   I'm going to move to strike that as

12   nonresponsive.  It didn't answer my question.

13   My question is very straightforward.  Please

14   focus on my question and provide an answer for

15   my question.

16   BY MR. LOVE:

17       Q.   My question --

18             MS. LUHANA:  That's improper to

19   move to strike the testimony.

20             MR. LOVE:  I'm sorry?

21             MS. LUHANA:  It's improper to move

22   to strike the testimony.

23             MR. LOVE:  I -- I disagree.  Okay.

24             MS. LUHANA:  Judge Cisneros ruled

25   on that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 235

```
 1              (Court Reporter Clarification.)
 2              MS. LUHANA:  Judge Cisneros has
 3    issued an order stating that it's improper to
 4    move to strike testimony in -- in a
 5    deposition.
 6              MR. LOVE:  If that's the case, I
 7    was unaware.
 8    BY MR. LOVE:
 9       Q.   In any case, my question is very
10    simple.  I -- I just want to know if your
11    understanding of this chart here is that it's
12    comparing the number of reports for the row
13    that says, "Attempted Non-Consensual Sexual
14    Penetration," it's comparing the number of
15    attempted rapes to the number of completed
16    rides within 2017; yes or no?
17              MS. LUHANA:  Objection to the
18    form.
19              THE WITNESS:  I need to reread
20    your question.
21              (Pause.)
22              THE WITNESS:  That's what your
23    chart shows, yes.
24    BY MR. LOVE:
25       Q.   And then for the last row, it's
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 236

1    comparing the reports of rape -- of completed

2    rape to the number of completed rides for

3    2017?

4                MS. LUHANA:  Objection to the

5    form.

6                THE WITNESS:  And this is in the

7    world, you said?

8                MR. LOVE:  No.  I don't believe

9    so.  I believe this -- no, it's not.  This --

10   if you scroll to the --

11               MS. LUHANA:  The prior question

12   said "the world," if that's...

13               MR. LOVE:  If -- if I misspoke,

14   then I misspoke.  My apologies.  This is the

15   Safety Report for just the United States, so

16   it would just be the United States.

17   BY MR. LOVE:

18      Q.   Is it your understanding that --

19   well, let me clarify now.

20               Is it your understanding that the

21   second row under column 2017 compares the

22   reports of attempted rape to the total rides

23   completed within the United States in 2017?

24               MS. LUHANA:  Objection to form.

25               THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 237

1           MR. LOVE:  Okay.

2    BY MR. LOVE:

3        Q.    And is it your understanding of this

4    chart that the last row that says

5    "Non-Consensual Sexual Penetration" compares

6    completed -- reports of completed rape to the

7    number of completed rides within the United

8    States for the year of 2017?

9               MS. LUHANA:  Objection to the

10   form.

11              THE WITNESS:  Yes, that's what it

12   says.

13   BY MR. LOVE:

14       Q.    And the same goes for the 2018

15   column; right?

16              MS. LUHANA:  Objection.  Objection

17   to form.

18              THE WITNESS:  Yes.

19              MR. LOVE:  Okay.  We can -- we can

20   pull this down or put this aside.

21   BY MR. LOVE:

22       Q.    You've reviewed the 2019 to 2020

23   Safety Report as well?

24       A.    Yes.

25       Q.    And you know there's a similar chart

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 238

 1   in there; right?

 2               MS. LUHANA:  Objection to form.

 3               THE WITNESS:  Correct.

 4   BY MR. LOVE:

 5       Q.   And you would agree that the rows in

 6   that chart are the same, do the same thing as

 7   the rows in -- in the chart from that report

 8   that we just looked at; right?

 9               MS. LUHANA:  Objection to form.

10               THE WITNESS:  I think so, yes.

11   BY MR. LOVE:

12       Q.   And the same goes for the 2021-2022

13   report?

14               MS. LUHANA:  Objection to form.

15               THE WITNESS:  Yes.

16               MR. LOVE:  Okay.

17   BY MR. LOVE:

18       Q.   Rates of sexual violence generally

19   have been steadily rising in the United States

20   throughout the last decade; correct?

21               MS. LUHANA:  Objection to form.

22   Hypothetical.

23               THE WITNESS:  When you said rapes

24   of sexual -- just sexual assault in general?

25   Is that what you're saying?  I'm sorry.

Page 239

1    BY MR. LOVE:

2        Q.    Rates of sexual violence have been

3    steadily rising in the U.S. through the last

4    decade?

5                MS. LUHANA:  Objection to form.

6                THE WITNESS:  I don't know if it's

7    been steadily rising, but it has been rising.

8                MR. LOVE:  Okay.

9    BY MR. LOVE:

10       Q.    And global statistics demonstrate the

11   same trend; right?

12               MS. LUHANA:  Objection to form.

13               THE WITNESS:  Yes, I believe so.

14   BY MR. LOVE:

15       Q.    And rates got worse during the COVID

16   pandemic?

17               MS. LUHANA:  Objection to form.

18               THE WITNESS:  Rates of reporting

19   definitely got worse, rates of reported sexual

20   assault.

21   BY MR. LOVE:

22       Q.    Sorry, to clarify, do you mean there

23   were more reports?

24               MS. LUHANA:  Objection to form.

25               THE WITNESS:  I believe there were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 240

```
 1   more reports, which suggest that the overall
 2   rate also rose.
 3               MR. LOVE:  Okay.
 4   BY MR. LOVE:
 5       Q.   Now, you're aware that between 2017
 6   and 2024, the rate of sexual assault and
 7   misconduct in Uber rides went down; correct?
 8               MS. LUHANA:  Objection to form.
 9               THE WITNESS:  That is not my
10   understanding.
11               MR. LOVE:  Okay.
12   BY MR. LOVE:
13       Q.   Do you remember giving trial
14   testimony in September?
15       A.   I do.
16       Q.   And you were discussing rates and you
17   said my colleague corrected you in her
18   deposition?
19               MS. LUHANA:  Objection to form.
20               Counsel, is there something you
21   want to show her?
22   BY MR. LOVE:
23       Q.   Do you remember that, Dr. Valliere?
24       A.   I believe you're taking that out of
25   context.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 241

```
 1       Q.   Okay.
 2       A.   So we can look at it.
 3            MR. LOVE:  Yep.  Can we pull up
 4  Tab 17, please.  And we'll mark that as
 5  Exhibit -- Exhibit 11.
 6            (Whereupon, a document was marked,
 7  for identification purposes, as Exhibit 11.)
 8            MS. DELANEY:  It's loading.  It
 9  might take a moment since there are so many
10  pages.
11            MR. LOVE:  Understood.
12  BY MR. LOVE:
13       Q.   Let me ask you this:
14            Are you aware that the number of
15  sexual assaults -- reported sexual assaults
16  and sexual misconduct in Uber rides went down
17  between 2017 and 2024?
18            MS. LUHANA:  Objection to form.
19            THE WITNESS:  I believe I have a
20  chart in my report that I can review capturing
21  that, if you'd like me to review that.  But we
22  would probably have to compare what she
23  corrected in my deposition testimony as well,
24  because that was the misstatement.  It was
25  about the number of categories, to my
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 242

 1  recollection.

 2          MR. LOVE:  Okay.  Well, we'll take

 3  a look at your --

 4          MS. LUHANA:  What page?

 5          MR. LOVE:  One second.  It hasn't

 6  come up for me.

 7          Okay.  It's page 834.

 8          MS. LUHANA:  Okay, but 834...

 9          MR. LOVE:  Lines 2 to 17.

10          (Whereupon, the witness reviews

11  the exhibit.)

12          MS. LUHANA:  So you could, Doctor,

13  scan through whatever you want to, the

14  testimony to understand it.

15          THE WITNESS:  I would probably

16  need to see my deposition to have the full

17  context.

18          MS. LUHANA:  Yeah.

19  BY MR. LOVE:

20     Q.   Well, Dr. Valliere, it says -- so the

21  -- the top question on line 2 says:

22          "QUESTION:  And for example, you

23  told us that having reviewed all of the stuff

24  that came to you from the lawyers, you were of

25  the view that the documents showed that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 243

1    between 2017 and 2024, the rate of sexual

2    assault and sexual misconduct in Ubers was

3    increasing.

4              "Do you remember telling us that?"

5              And you answered, "Right.  And you

6    corrected me on that during the deposition.

7    So it's really been going up since the

8    pandemic again after all the safety features

9    were institute."

10             Did I read that correctly?

11        A.    You read it correctly.

12        Q.    Okay.

13             And then my colleague asked you:

14             "QUESTION:  You told us in your

15    deposition that you understand -- that your

16    understanding of the numbers discussed in

17    these depositions and the documents was an

18    increase from 2017 to 2024.  And that's not

19    right; right?"

20             And you answered, "You're right.

21    I was incorrect in my deposition.  I fixed it

22    since."

23             Correct?

24        A.    Correct.

25        Q.    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 244

1           So the numbers of sexual assault
2    between 2017 and 2024 in Ubers was not going
3    up; correct?
4           MS. LUHANA:  Objection to form.
5           THE WITNESS:  It went down during
6    the pandemic.
7    BY MR. LOVE:
8       Q.   And that's when you said that rates
9    were going up in the country; right?
10          MS. LUHANA:  Objection to form.
11          THE WITNESS:  Right.  They're
12   going -- they're in -- they're increasing
13   steadily since the pandemic.
14          MR. LOVE:  That -- that wasn't my
15   question.
16          I'm asking now about the -- the
17   U.S. statistic which you testified to a moment
18   ago.
19   BY MR. LOVE:
20      Q.   And you said that during -- during
21   the COVID pandemic, the statistics of reported
22   assaults went up; correct?
23          MS. LUHANA:  Objection to form.
24          THE WITNESS:  Right.  Like I said
25   in my testimony, I included the pandemic in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 245

1  that -- that timeframe, and I was wrong about
2  that.  Right.
3              MR. LOVE:  Okay.
4  BY MR. LOVE:
5     Q.   You issued an addendum to your report
6  on October 10th, 2025; correct?
7     A.   Yes.
8     Q.   And counsel for plaintiffs asked you
9  to write that up; right?
10    A.   They --
11             MS. LUHANA:  Object to form.
12             Are you -- are you getting into
13  communications with counsel?
14             MR. LOVE:  No, I'm just asking if
15  it was requested, which would be her
16  directive.
17             MS. LUHANA:  I mean, I think we
18  can go through the addendum and she can answer
19  the question.
20             MR. LOVE:  Right.  We're going to.
21  BY MR. LOVE:
22    Q.   But did counsel ask you to write that
23  addendum?
24             MS. LUHANA:  Objection.
25             THE WITNESS:  They provided new

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1    and updated information, as I requested in my

2    report, which added to my opinion,

3    supplemented my opinion, and instead of

4    modifying my report to add that new

5    information, I wrote an addendum.

6                    MR. LOVE:  Understood.

7    BY MR. LOVE:

8        Q.   How did you decide which materials to

9    review?

10       A.   It was a deposition with -- a

11   relevant deposition with exhibits that were

12   provided to me because they were taken.

13       Q.   And you reviewed that because -- only

14   because plaintiffs provided it to you?

15                   MS. LUHANA:  Objection to form.

16   That's not what she said.

17                   MR. LOVE:  I'm -- I'm asking.

18                   MS. LUHANA:  Oh.

19                   MR. LOVE:  I didn't say that's

20   what she said.

21   BY MR. LOVE:

22       Q.   Did you review that just because

23   plaint -- withdrawn.

24                   Did plaintiff provide you any

25   other documents other than the deposition and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 247

```
 1   exhibits to that deposition?
 2       A.   Not to my recollection.  It was -- it
 3   was a brand new deposition that was taken with
 4   all the exhibits that was relevant to the
 5   scope of my opinion in my report.
 6       Q.   Okay.
 7            Did you ask counsel to search for
 8   communications with the National Sexual
 9   Violence Resource Center?
10            MS. LUHANA:  Objection to the
11   form.  You're getting into communications with
12   us and that's improper, counsel.
13            MR. LOVE:  I'm just asking if she
14   requested documents, which goes to her -- the
15   credibility of her opinion and what she
16   reviewed.
17   BY MR. LOVE:
18       Q.   I'm not asking you to get into any
19   substantive communications with your counsel.
20   I -- I don't want to know what you guys talked
21   about.
22            I'm just asking, did you request
23   specific documentation from plaintiffs'
24   counsel, and the category that I asked about
25   was National Sex -- communications with the
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 248

1   National Sexual Violence Resource Center.

2            Did you ask for any of those

3   communications?

4            MS. LUHANA:  Counsel, is this just

5   for the addendum or the whole report?

6            MR. LOVE:  The addendum.

7            THE WITNESS:  I think in my

8   ongoing request in my methodology is that I

9   would be apprised of any new information that

10  was relevant to the scope of my opinion, pro

11  or against my opinion.

12           MR. LOVE:  Sure.

13  BY MR. LOVE:

14     Q.   But did you specifically ask for

15  communications with the National Sexual

16  Violence Resource Center?

17           MS. LUHANA:  Objection to form.

18           THE WITNESS:  I did not

19  specifically ask for those documents.  I --

20  that was provided as evidence in the whole

21  deposition, which was relevant to the scope of

22  my opinion.

23  BY MR. LOVE:

24     Q.   Did you ask if the -- well, okay.

25           Did you ask if there was

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 249

```
 1    communications between Uber and Karen Baker?
 2              MS. LUHANA:  Objection to form.
 3              THE WITNESS:  I did not get into,
 4    like I keep saying, information that's
 5    relevant to the scope of my opinion.  I did
 6    not go through every single person,
 7    everything, single type of communication.
 8              I think that broad category of
 9    inclusivity to the scope of my opinion was
10    sufficient.
11              MR. LOVE:  Okay.
12    BY MR. LOVE:
13       Q.  So you said your continuing request
14    asked for any documents that were relevant to
15    your opinion, whether they were for or against
16    that opinion; right?
17              MS. LUHANA:  Objection to form.
18              THE WITNESS:  Right.  In -- and
19    that's part of my methodology.
20              MR. LOVE:  Okay.
21    BY MR. LOVE:
22       Q.  In your addendum, you talk about a
23    document that is a chat between two Uber
24    employees.
25              Do you recall that?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 250

1      A.   Yes, but I can review it if you have

2    it pulled up.

3                MR. LOVE:  Let's pull up Tab 26.

4    And we'll mark this as Exhibit 12.

5                (Whereupon, a document was marked,

6    for identification purposes, as Exhibit 12.)

7    BY MR. LOVE:

8      Q.   And while that's going on,

9    Dr. Valliere, when you say that's been a

10   continuing request, when did you first put

11   that request in your methodology?

12               MS. LUHANA:  Objection to form.

13   BY MR. LOVE:

14     Q.   In other -- in other words, did you

15   include that request for documents in the

16   draft of your JCCP report?

17               MS. LUHANA:  Objection to form.

18   Now you're getting into draft reports.  That's

19   possible that it's counsel.

20               MR. LOVE:  Apologies.  I didn't

21   mean draft.

22   BY MR. LOVE:

23     Q.   Did -- did you report -- did you

24   ask -- put that request in your methodology in

25   your JCCP report?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 251

```
 1      A.    I do --
 2              MS. LUHANA:  Objection to -- to
 3   form.
 4              THE WITNESS:  I do not think I was
 5   specific about my methodology in the JCC
 6   report as I was in this one.
 7   BY MR. LOVE:
 8      Q.    Did you have a continuing request to
 9   counsel to give you any relevant documents?
10              MS. LUHANA:  Objection to form.
11              THE WITNESS:  It -- it was
12   understood that I would -- I would add any
13   relevant things, and I did produce an addendum
14   in that report as well.
15   BY MR. LOVE:
16      Q.    My question is just did -- did you
17   ask counsel to give you any relevant documents
18   that came up throughout the course of -- of
19   the case?
20              MS. LUHANA:  Objection to the
21   question and to the extent you're getting into
22   communications now with other counsel outside
23   the MDL.
24              MR. LOVE:  Again, not asking for
25   substantive communications with Dr. Valliere.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 252

1   I --
2                   MS. LUHANA:  She -- she --
3                   MR. LOVE:  I'm just clarifying for
4   the witness.  I wasn't -- I wasn't arguing
5   with you.
6   BY MR. LOVE:
7       Q.   Dr. Valliere, I'm not asking you for
8   any substance of the conversations.  I just
9   want to know -- I'm just trying to ask if you
10  had a similar outstanding request for relevant
11  documents, like were you seeking relevant
12  documentation to your opinions since you
13  produced a report in the JCCP?
14                  MS. LUHANA:  Objection to the
15  form.
16                  THE WITNESS:  If things came up
17  that could impact my opinion, it's understood
18  that I would take that into consideration.
19                  MR. LOVE:  Right.  Understood.
20  BY MR. LOVE:
21      Q.   I'm asking now, was it understood by
22  counsel that they would give that to you?
23                  MS. LUHANA:  Objection.  Objection
24  to form.
25                  And as you are aware, counsel, the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 253

1    JCCP report was a narrow time period, so I...

2                   MR. LOVE:  Sure.

3                   MS. LUHANA:  Have you -- yeah.

4                   THE WITNESS:  I'm sorry, I can't

5    speak to what other people understand.

6                   (Overlapping Speakers.)

7                   MR. LOVE:  Right.  Maybe -- maybe

8    I can explain -- maybe I can explain a little

9    better.

10   BY MR. LOVE:

11       Q.   I'm -- I'm -- I understand that you

12   would absolutely include anything relevant

13   that you received, but I'm trying to get at do

14   you know if you received everything relevant?

15                  So was there a -- an outstanding

16   request -- you said there's an outstanding

17   request to counsel for any relevant

18   documentation in your MDL report.

19                  I'm just asking if there was also

20   any outstanding request to counsel when you

21   wrote your JCCP report for any relevant

22   documentation?

23                  MS. LUHANA:  Objection to form and

24   outside the scope of this litigation as well.

25                  THE WITNESS:  Yeah.  I -- all I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 254

```
 1   can say is it's just my understanding if -- if
 2   the -- if there was more to substantiate or
 3   contradict the focus in my report or what I
 4   addressed that was substantive to my opinion,
 5   I would get it.
 6              MR. LOVE:  Okay.
 7   BY MR. LOVE:
 8      Q.   Looking at Exhibit 12, are you aware
 9   that this document was produced in August of
10   2024?
11      A.   I don't know when it was produced.
12      Q.   So I'll represent to you that this
13   was produced in August of 2024, over a year
14   ago, and you did not receive it before this
15   addendum; correct?
16              MS. LUHANA:  Objection to form.
17              THE WITNESS:  I -- I'm not sure.
18   I don't know if I did or didn't.
19   BY MR. LOVE:
20      Q.   Well, you hadn't cited it in any of
21   your reports before this addendum; correct?
22              MS. LUHANA:  Objection to form.
23              THE WITNESS:  That's right.  It --
24   it may not have crossed my mind or been as
25   salient to me to think about this in my first
```

Page 255

1    report.
2    BY MR. LOVE:
3        Q.    But you had it?
4                MS. LUHANA:  Objection to form.
5                THE WITNESS:  I don't know.  Oh,
6    I'm sorry.
7    BY MR. LOVE:
8        Q.    And now that you -- withdrawn.
9                So it -- it may not have been as
10   salient to you until you wrote this addendum;
11   is that -- is that what you're saying?
12               MS. LUHANA:  Objection to form.
13   Misstates her testimony.
14               MR. LOVE:  Again, didn't state
15   testimony.  I asked a question.
16               THE WITNESS:  It -- it -- there
17   are a number of things that affected my
18   attention to this, not only the deposition,
19   but the -- my experience at the JCCP trial and
20   how Uber had been utilizing partnerships to,
21   again, change the psychology of their users.
22   And that became more apparent during trial, so
23   I focused more on addressing it in my
24   subsequent report.
25   BY MR. LOVE:

```
 1      Q.   But you didn't address it in your
 2   subsequent report; correct?
 3      A.   I did.
 4      Q.   You didn't address this document in
 5   your subsequent report; correct?
 6      A.   I addressed the partnership and the
 7   relationship.  I don't -- I don't know if I
 8   addressed this particular document.
 9      Q.   Well, it's not on your Materials
10   Considered list for your initial report;
11   right?
12      A.   It -- it may not be.  It may be.
13           But it was in my addendum because
14   I attended to it more, given the testimony and
15   the deposition.
16      Q.   Okay.
17           If you could scroll down to
18   page -- the last page of this document.
19           MS. LUHANA:  Page 7?
20           MR. LOVE:  Yes.
21   BY MR. LOVE:
22      Q.   You cite this in your document and
23   your -- apologies, in your addendum and quote,
24   ██████ ███ ███ ███████████████████
25   ███████████████{sic}; correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 257

1              MS. LUHANA:  Objection.  Misstates

2    her addendum, her opinion.

3              THE WITNESS:  I'm sorry, where do

4    you -- is this in my report, are you saying,

5    or my addendum?

6    BY MR. LOVE:

7       Q.   In your addendum, you quoted this

8    document; correct?

9       A.   Let me review and I'll tell you

10   where.

11      Q.   Well, Dr. Valliere, first of all,

12   please don't review any documents that I have

13   not asked you to review.

14              MS. LUHANA:  Counsel, you're

15   asking her a question about her addendum.  She

16   wants to review her addendum and you asked her

17   to review it.  You said it.

18              MR. LOVE:  I did not ask her to

19   review the addendum, and if she would like to,

20   she can ask, and I will of course give her the

21   opportunity.

22              But right now, I'm just asking if

23   you used this document in your addendum.

24   BY MR. LOVE:

25      Q.   Do you need to review your addendum

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 258

1    to know whether you relied on this document?

2        A.    I do need to look at it specifically

3    to make sure that you're accurately

4    representing my addendum versus my report.

5        Q.    Okay.

6               MR. LOVE:  Let's pull up Dr.

7    Valliere's addendum and enter it.  It's

8    Tab 23, and we will enter it as Exhibit 13.

9               (Whereupon, a document was marked,

10   for identification purposes, as Exhibit 13.)

11              MR. LOVE:  You can find this on

12   page 2 of your addendum.

13              THE WITNESS:  Okay.

14   BY MR. LOVE:

15       Q.    So at the very bottom, do you see

16   where you used this document, the last

17   paragraph, about halfway through, you say, "In

18   the chat, Mr. Maredia stated █████████████

19   ████  ███████

20              Do you see that?

21       A.    Yes, I do.

22       Q.    Okay.

23              So now if you could turn back to

24   the document, itself.  On the last page.  It

25   states, █████  ████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 259

1    ██████████ {sic}; right?

2        A.    Yes.

3        Q.    Okay.

4              Your belief is that ████████

5    ███ ██ ██ ████ ████████████████

6    █████; right?

7              MS. LUHANA:  Objection to form.

8              THE WITNESS:  That is how I

9    interpreted it, yes.

10   BY MR. LOVE:

11       Q.    And it's your understanding that

12   after this ask, ███████████████████

13   ██ ████████; correct?

14             MS. LUHANA:  Objection to form.

15             THE WITNESS:  I'm sorry, I don't

16   know what ████ ████████████████████.

17   BY MR. LOVE:

18       Q.    Okay.

19             In your report, at page 2, same

20   paragraph, last sentence, you write, ██████

21   ████ ████ ██ █████████████████

22   ████ ██ ███████████████████████

23   ████ ██ ██ █████████████████

24   ████ ████ ████

25             So is it your -- withdrawn.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 260

```
1     ████████ ██████████████████████████
2     ████████  ███  ███  ██████████
3                 MS. LUHANA:  Objection to the
4     form.
5                 THE WITNESS:  It is my
6     understanding that ██████████, and I believe
7     it's also in the deposition.
8                 MR. LOVE:  Okay.
9     BY MR. LOVE:
10       Q.   According to this document,
11    Exhibit 12, ████████████████████████████;
12    right?
13                MS. LUHANA:  Objection to form.
14                THE WITNESS:  According to what
15    this text says, yes.
16    BY MR. LOVE:
17       Q.   Nothing in the document suggests that
18    ██████  ██████████  ████████████████; right?
19                MS. LUHANA:  Objection to form.
20                THE WITNESS:  I'd have to review
21    the whole document.  I'm not sure, off the top
22    of my head.
23    BY MR. LOVE:
24       Q.   Okay.
25                You don't recall anything -- well,
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 261

1   you didn't write anything in your addendum

2   about ████ ██████████████████████████; right?

3            MS. LUHANA:  Objection to form.

4            THE WITNESS:  Again, I -- if

5   you're referring to that specific paragraph,

6   no, I did not.  But I didn't -- I don't know

7   if I mentioned it anywhere else in my whole

8   addendum.

9   BY MR. LOVE:

10      Q.   And then in your addendum, in that

11  paragraph, the first sentence says, ████████

12  ███████████ ██████ █████████████████████████

13  █████ █████ ████████ ████████████████████

14  ████████████ ████ ████████████████████████████

15  ████ █████████ ████ █████████████████

16           MS. LUHANA:  Objection.

17           Counsel, should we go back to the

18  addendum again?  We have the document up for

19  the chat.

20           MR. LOVE:  Sure.  I'm -- I was

21  just reading from her report.

22           MS. LUHANA:  Do you have -- I

23  just -- so where are you reading from?

24           MR. LOVE:  The same paragraph,

25  first sentence.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 262

1          MS. LUHANA:  Okay.  Sorry.  Go

2     ahead.

3     BY MR. LOVE:

4          Q.   What are you relying on to say that

5     ██████  ████████████████████████████████████

6     ████████████████

7               MS. LUHANA:  Objection to form.

8               THE WITNESS:  The other exhibits

9     and the citations I made.

10    BY MR. LOVE:

11         Q.   But none of those documents actually

12    say, ██████  ██████████  ██████████████████████████

13    ████; correct?

14         A.   I believe that I refer to numerous

15    other statements about that in my addendum.

16         Q.   And --

17         A.   About public posts and whether or not

18    the nonprofits were all in.

19               So this one paragraph doesn't

20    represent the full analysis.

21         Q.   Sure.  Sure.

22               But nothing in your addendum

23    quotes a sentence where Uber says, ████████████

24    ████████████  ████████  ████████████████████████████████

25    ██████████████████  ████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 263

1    right?

2                    MS. LUHANA:  Object to the form of

3    the question.

4                    THE WITNESS:  I would have to

5    read, because I believe it does outline -- my

6    whole addendum does outline documents that

7    say -- that talk about tweets and talk about

8    statements and talk about whether the

9    nonprofits were in and whether they would

10   adopt media statements, and ███████

11   ████████  ████  ██████████████████████

12   ████  ████

13   BY MR. LOVE:

14       Q.   Let me put is this way.

15                    If there was a statement that

16   said that -- from Uber ███████████████████

17   ████  ██  ████  █████████, you certainly would

18   have quoted that in your addendum; right?

19                    MS. LUHANA:  Objection to the form

20   of the question.

21                    THE WITNESS:  If it was that black

22   and white, yes.  But I think my addendum

23   outlines pretty elaborately ███████████████

24   ██████████  ████  ████████████████████

25   ██████████  ████  ██████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 264

1  ████████  ███████  █████  █████████████████

2  ███████  ████████  █████  ████████████████

3          And the whole point of my addendum

4  was to talk about how Uber used these

5  partnerships to, again, foster a sense of

6  trust with their riders while not revealing

7  that these relationships could be potentially

8  viewed as compromised and allow the consumer

9  to weigh for themselves the weight of these

10 endorsements.

11 BY MR. LOVE:

12    Q.   You're not insinuating that these

13 organizations would act against sexual assault

14 victims, are you?

15          MS. LUHANA:  Objection to form.

16          THE WITNESS:  No.  But what I

17 would say is that in most professional

18 relationships, including mine, when I go to

19 trainings, that if I provide an endorsement or

20 an opinion, I can't be conflicted in that

21 opinion, financially or otherwise.  And if I

22 am, I have to reveal that.  And Uber did not

23 do that in these cases.

24          MR. LOVE:  And we'll get to that

25 in one moment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 265

1   BY MR. LOVE:

2       Q.   But you're also not saying that these

3   organizations don't promote safety for women;

4   right?

5            MS. LUHANA:  Objection to form.

6            THE WITNESS:  I'm talking about

7   Uber in my opinion, not these organizations.

8   BY MR. LOVE:

9       Q.   So the answer to my question is yes,

10  you are not insinuating or saying that these

11  organizations do not promote safety for women?

12           MS. LUHANA:  Objection to form.

13  Misstates her response.

14           THE WITNESS:  It -- well,

15  hopefully, if Uber has been as opaque with

16  their behaviors and statistics with these

17  organizations as they have with the rest of

18  the public, they may inadvertently be

19  endorsing something they don't believe in.

20           But I am not saying anything about

21  the characteristics of these nonprofit

22  organizations.

23           MR. LOVE:  All right.

24  BY MR. LOVE:

25      Q.   Now, you say that Uber did not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 266

```
 1   disclose these payments; right?
 2             MS. LUHANA:  Objection to form.
 3             THE WITNESS:  I'm saying the
 4   public is not aware that Uber's -- of how
 5   Uber -- how the -- the true nature of these --
 6   the relationship between Uber and these
 7   nonprofits and how Uber wrote and constructed
 8   certain content for them to endorse, et
 9   cetera.
10             MR. LOVE:  Okay.
11   BY MR. LOVE:
12       Q.   Turning to your addendum, do you have
13   that open?
14       A.   Yes.
15       Q.   On page 2, the third paragraph down,
16   or the second one after the bullets that
17   starts "Unfortunately," that reads,
18   "Unfortunately, Uber has not disclosed the
19   financial arrangements it has -- has with
20   these nonprofit advocacy groups to the public
21   so the public is aware that of the" --
22   sorry -- "that these are not impartial
23   relationships but in fact paid relationships
24   that require Uber approval."
25             Did I read that correctly?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 267

1      A.   You did.

2      Q.   Okay.

3           Now, you are aware that Uber

4  actually made a public statement about the

5  fact that they were paying these

6  organizations; correct?

7           MS. LUHANA:  Objection to form.

8           THE WITNESS:  What I'm aware of is

9  that Uber promoted itself as contributing and

10 donating to those organizations out of a

11 concern for victims of sexual assault, not

12 that they were managing and paying for their

13 public statements or asking for permission for

14 their public statements ███████████████

15 ████  ████  ████.

16 BY MR. LOVE:

17     Q.   So just to be clear, the payments

18 that were made were disclosed to the public;

19 yes?

20           MS. LUHANA:  Objection to form.

21           THE WITNESS:  I do not believe

22 they were portrayed as payments at all, but

23 contributions or donations.

24           Payments, to me, implies service.

25 Donations implies charity.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 268

1    BY MR. LOVE:

2        Q.   In any case, they did make it public

3    that they were giving money to these

4    organizations; yes?

5                MS. LUHANA:  Objection to form.

6                THE WITNESS:  Without --

7                MR. LOVE:  With -- withdrawn.

8                Can we pull up Tab 24, please.

9                MS. LUHANA:  And, counsel, we've

10   been going for a while.  When is our next

11   break?

12               MR. LOVE:  Yeah.  We can go for a

13   break in five minutes.

14               MS. LUHANA:  Okay.

15               MR. LOVE:  If you can hang on that

16   long.

17               MS. LUHANA:  Okay.  We're going to

18   another exhibit?

19               MR. LOVE:  Yeah.

20               MS. LUHANA:  Okay.

21   BY MR. LOVE:

22       Q.   Do you have that exhibit,

23   Dr. Valliere?

24       A.   Not quite yet.

25               MR. LOVE:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 269

1          THE WITNESS:  It should be up now.
2    Now, it is, yeah.
3          (Whereupon, a document was marked,
4    for identification purposes, as Exhibit 14.)
5    BY MR. LOVE:
6      Q.   All right.
7           And you've seen this before;
8    right?
9      A.   Yeah.
10     Q.   Okay.
11          Now, I just want to direct your
12   attention to the very bottom of page 1, and
13   that reads, "The $5 million commitment over
14   five years will fund program -- programmatic
15   partnerships focused on prevention."
16          Did I read that correctly?
17     A.   Absolutely.
18     Q.   So Uber released a statement that
19   says that they gave $5 million to these
20   organizations; yes?
21     A.   I guess that's where -- where we part
22   ways.  I feel like this promotion shows that
23   it's a no-strings-attached donation to fund
24   efforts and initiatives for sexual assault
25   victims.  You referred to it as I would see it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 270

1  as payments.  You used the word "payments."  I

2  agree it's payments for endorsements.

3      Q.    I -- I understand your opinion about

4  what these payments are and how they're

5  advertised.  But all I'm asking is, they said

6  that they gave $5 million from their hands to

7  these organizations' hands; correct?

8      A.    They -- they committed to fund

9  prevention initiatives, right, not to get

10  endorsements and have them sign off on public

11  releases of statements.

12     Q.    Okay.

13              MR. LOVE:  We can take a break.

14  Can we go off the record?

15              THE VIDEOGRAPHER:  Going off the

16  video record.  The time is 2:29 p.m.

17              (Whereupon, a recess was taken at

18  the above time.)

19              THE VIDEOGRAPHER:  We are back on

20  the video record.  The time is 2:41 p.m.

21              This begins Media Unit No. 4.

22  BY MR. LOVE:

23     Q.    Dr. Valliere, I just have a couple of

24  follow-up questions and then we'll move on to

25  a new topic.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 271

 1              You have represented defendants in

 2    civil litigation; right?

 3              MS. LUHANA:  Objection to form.

 4              THE WITNESS:  Yes.

 5    BY MR. LOVE:

 6       Q.   And you don't advertise that you get

 7    paid by defendants on your website; right?

 8              MS. LUHANA:  Objection to form.

 9              THE WITNESS:  I'm a little

10    confused.  I don't advertise that I get paid

11    by anyone, I don't think.

12              MR. LOVE:  Right.

13    BY MR. LOVE:

14       Q.   So you don't disclose how much you

15    get paid by a defendant company or

16    organization on your website?

17              MS. LUHANA:  Objection to form.

18              THE WITNESS:  Not on my website,

19    but during the times I'm giving opinions, I

20    am.

21              MR. LOVE:  Sure.

22    BY MR. LOVE:

23       Q.   But you don't disclose your

24    representation or a payment to any of your

25    patients; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 272

1          MS. LUHANA:  Object to form.

2          THE WITNESS:  I'm -- I'm not sure

3   I understand.  My pat -- my patients pay me to

4   give them services, and all I can say is I

5   assume they know I get paid by anybody who

6   hires me for my services.

7   BY MR. LOVE:

8       Q.   But you don't tell your patients that

9   you get hired by defense corporation --

10  defendants in civil litigation -- withdrawn.

11          You do not tell any of your

12  patients that you have represented defendants

13  in civil litigation; correct?

14          MS. LUHANA:  Objection to form.

15          THE WITNESS:  I don't tell my

16  patients who I represent in any way, shape or

17  form.

18          MR. LOVE:  Okay.

19  BY MR. LOVE:

20      Q.   And then you say that -- it's your

21  opinion that if Uber had disclosed its

22  partnerships with advocacy groups, that riders

23  would take that into account when deciding

24  whether or not to use Uber?

25          MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 273

1          THE WITNESS:  That's not exactly

2    what I said.  I think they do disclose their

3    partnerships.  I think they banner their

4    partnerships with survivor organizations to

5    promote an idea that they're fully invested in

6    women's safety.

7          I think the truth is not

8    represented well in that these are

9    ████████████████  █████  ████████████████████████

10   ████  ██  █████████  ████  ██████████████████████.

11          MR. LOVE:  Understood.

12   BY MR. LOVE:

13      Q.   To be clear, you have no studies that

14   you cite that show that that has an effect on

15   whether or not a consumer decides to use the

16   corporation; correct?

17          MS. LUHANA:  Objection to form.

18          THE WITNESS:  I don't think it

19   needs a study.  When I'm required -- for

20   instance, when I train or give an opinion

21   about something, I have to -- like, for

22   instance, when I go and give a training for

23   the DOJ, I have to disclose all my

24   relationships that may or may not influence my

25   opinion, so that the weight of my opinion is

Page 274

1  going to be judged by the train -- the

2  trainees.  And any potential conflict of

3  interest out there in this exchange of

4  information has to be announced.

5            MR. LOVE:  But that's not my

6  question.

7  BY MR. LOVE:

8            My question is, you do not have a

9  survey that supports that consumers take that

10  into account when deciding whether or not to

11  use Uber; correct?

12            MS. LUHANA:  Objection to form.

13            THE WITNESS:  I do not have a

14  specific study, but it's clear that people

15  weigh compromised relationships differently.

16  BY MR. LOVE:

17     Q.   You did not conduct a systematic

18  survey of Uber riders or sexual assault

19  victims?

20            MS. LUHANA:  Objection to form.

21            THE WITNESS:  About -- I have

22  never conducted a study on Uber riders or

23  drivers.

24  BY MR. LOVE:

25     Q.   You would agree with me that some of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 275

```
1   the patients that you treat are from

2   vulnerable populations; correct?

3              MS. LUHANA:  Objection to form.

4              THE WITNESS:  Absolutely.

5   BY MR. LOVE:

6       Q.   And particularly, prior sexual

7   assault victims are more vulnerable to sexual

8   assaults; correct?

9       A.   That is true.  Being sexually

10  assaulted raises your risk of being sexually

11  assaulted again.

12      Q.   And the same goes for children; they

13  are at more -- an increased risk of sexual

14  assault; correct?

15             MS. LUHANA:  Object to form.

16             THE WITNESS:  They're -- they're

17  vulnerable.

18  BY MR. LOVE:

19      Q.   And women as well?

20             MS. LUHANA:  Objection to form.

21             THE WITNESS:  Women can be

22  vulnerable, yes.

23             MR. LOVE:  Okay.

24  BY MR. LOVE:

25      Q.   So you do your best to create a safe
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 276

1   environment for them in your business; right?

2       A.    I do.

3               MS. LUHANA:  Objection to form.

4               THE WITNESS:  Oh, I'm sorry.

5   BY MR. LOVE:

6       Q.    And when a patient first comes to

7   you, you don't think that they're scared of

8   being sexually assaulted; right?

9               MS. LUHANA:  Objection to form.

10              THE WITNESS:  I can't agree with

11  that.

12              MR. LOVE:  Okay.  Can we pull up

13  Tab 30.  And we'll mark this as Exhibit 15.

14              (Whereupon, a document was marked,

15  for identification purposes, as Exhibit 15.)

16  BY MR. LOVE:

17      Q.    While it's coming up, Dr. Valliere,

18  you believe that your business comes with a

19  reputation of trust; correct?

20              MS. LUHANA:  Objection to form.

21              THE WITNESS:  I do.

22              And to modify my other answer, I

23  do not believe that clients come in and expect

24  to be sexually assaulted by my staff.  But

25  there are clients that come in with a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 277

1    generalized fear of being sexually assaulted,

2    so...

3                    MR. LOVE:  Okay.

4                    THE WITNESS:  To clarify your

5    question.

6    BY MR. LOVE:

7        Q.   And there's an idea that if someone's

8    a doctor, they're not going to sexually

9    assault you; correct?

10                   MS. LUHANA:  Objection to form.

11                   THE WITNESS:  I believe that most

12   people rely on professionalism and role and

13   position and there's an inherent trust in

14   that.

15   BY MR. LOVE:

16       Q.   To be clear, your website does not

17   include a warning that says, "Be careful.  We

18   treat sexual offenders next door"; right?

19                   MS. LUHANA:  Objection to form.

20                   THE WITNESS:  My website has both

21   treatment programs, and we structure our hours

22   so that there's no -- there's no overlap of

23   victims and perpetrators.

24                   MR. LOVE:  That wasn't --

25                   THE WITNESS:  But I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 278

1    specifically have that banner.

2              MR. LOVE:  Okay.

3    BY MR. LOVE:

4        Q.   You don't -- you don't have any

5    warning that there are sexual offenders

6    treated at your practice; correct?

7              MS. LUHANA:  Objection to form.

8              THE WITNESS:  We inform people

9    around us that we provide violent offender

10   treatment, but I don't have a banner on my

11   website.

12   BY MR. LOVE:

13       Q.   You do put on your website that you

14   treat vulnerable -- vulnerable populations;

15   right?

16             MS. LUHANA:  Object to form.

17             THE WITNESS:  I'm -- in terms of

18   women and children or -- I'm not -- I don't

19   know if I have the specific term "vulnerable

20   population" on my website.  I'm not sure.

21             MR. LOVE:  Sure.

22   BY MR. LOVE:

23       Q.   You say that you treat children;

24   right?

25       A.   Right.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 279

1      Q.    You say that you treat women?

2      A.    Correct.

3      Q.    You say that you treat victims in

4  sexual assaults?

5      A.    Yes.

6      Q.    And sexual offenders could see your

7  website; right?

8              MS. LUHANA:  Objection to form.

9              THE WITNESS:  I guess, presumably,

10  some of them may who have been in treatment.

11  BY MR. LOVE:

12     Q.    Particularly the ones that are

13  treated right next door; right?

14             MS. LUHANA:  Object to form.

15  Hypothetical.

16             THE WITNESS:  That's theoretical.

17  We -- I mean, we do not allow the offenders we

18  treat on the Internet, so it would be hard for

19  them to see that.

20  BY MR. LOVE:

21     Q.    None of the offenders that you treat

22  have access to Internet?

23     A.    Correct.  To our knowledge.  They

24  may, but they're not allowed to.

25     Q.    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 280

```
1              And that -- that -- your
2    website -- those announcements on your website
3    can tell a sexual offender where there are
4    more victims; right?
5              MS. LUHANA:  Objection to form.
6              THE WITNESS:  An offender would
7    never come to my program seeking victims.
8    There's too much supervision, there's too many
9    consequences.  They know they'll be reported.
10   There's never a time when the victim or
11   somebody vulnerable would be unsupervised and
12   unprotected.
13             So it's not even close to my point
14   about Uber advertising and marketing to women
15   or parties that market to women or other
16   environments that specifically provide an
17   unsupervised and unconsequented environment
18   for sexual assault.
19   BY MR. LOVE:
20      Q.   Your addresses are published on your
21   website; right?
22      A.   Right.
23      Q.   And Uber drivers, they don't identify
24   themselves as sexual offenders; right?
25             MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 281

1              THE WITNESS:  I don't understand.

2    BY MR. LOVE:

3        Q.   You do not --

4        A.   Do they --

5        Q.   You have not heard of one example

6    where a -- an Uber driver has represented or

7    identified themself as a sexual offender

8    themselves; correct?

9              MS. LUHANA:  Object to form.

10             THE WITNESS:  Like when they

11   applied for their job or...

12             MR. LOVE:  At any point in time.

13             THE WITNESS:  Oh, I have no idea.

14             MR. LOVE:  Right.

15   BY MR. LOVE:

16       Q.   You have not seen a single example of

17   any Uber driver ever representing that they

18   were a sexual offender; correct?

19             MS. LUHANA:  Objection to form.

20             THE WITNESS:  No.  I just have

21   seen Uber drivers that have prior reports of

22   sexual assault or sexual misconduct that

23   continue on the platform.

24   BY MR. LOVE:

25       Q.   You treated a man who you refer to in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 282

1    your book as Richard.  Do you know who I'm
2    talking about?
3        A.    Can you give me some more details,
4    please?
5        Q.    Sure.
6                He was a pedophile that worked at
7    a carnival.  Does that ring a bell?
8        A.    I think.  I think so, yeah.
9        Q.    Okay.
10               He used his position at the
11   carnival to meet young boys; right?
12       A.    Right.
13       Q.    Between 10 and 12?
14       A.    Yes.
15       Q.    And he would sexually assault them?
16       A.    Right.
17       Q.    And you treated him; right?
18       A.    Correct.
19       Q.    And as you were treating him, you
20   noticed that he was doing well?
21       A.    I think I described that, yes.  He
22   started improving.
23       Q.    Right.
24               He cleaned up; yeah?
25               MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 283

1              THE WITNESS:  Right.

2    BY MR. LOVE:

3        Q.    He got a job?

4              MS. LUHANA:  Objection to form.

5              THE WITNESS:  Correct.

6    BY MR. LOVE:

7        Q.    He stopped wearing clothes that he

8    was wearing to attract children?

9              MS. LUHANA:  Objection to form.

10             THE WITNESS:  Yes, he did.

11   BY MR. LOVE:

12       Q.    And to be clear, he stopped wearing

13   those clothes because you confiscated them;

14   right?

15             MS. LUHANA:  Objection to form.

16             THE WITNESS:  Right.  And it was

17   against the rules, correct.

18   BY MR. LOVE:

19       Q.    And so you assigned him to help with

20   a new group member?

21       A.    Right.

22       Q.    What was the help that you thought

23   Richard could provide?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  Richard was further

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 284

1    along in the program and knew some of the

2    concepts and issues that he could help this

3    individual with.

4    BY MR. LOVE:

5        Q.   Was this like a mentorship situation?

6            MS. LUHANA:  Objection to form.

7            THE WITNESS:  I wouldn't call it

8    that, but this guy had trouble reading and

9    writing, and -- and so he was helping him out.

10           MR. LOVE:  Okay.

11   BY MR. LOVE:

12       Q.   How long had you been treating

13   Richard at this point when you assigned him to

14   help out?

15           MS. LUHANA:  Objection to form.

16           And, Doctor, do you -- do you

17   recall this situation that you can testify to

18   it?

19           THE WITNESS:  I do.

20           MS. LUHANA:  Okay.

21           THE WITNESS:  This was at the very

22   beginning of when I started taking over the

23   program, so I personally was underneath the

24   program supervisor at that point and had been

25   working with him, not personally for very

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 285

1    long, but his therapist had been the leader of

2    the program.

3                So I'm not sure how long he was in

4    before I became involved.

5    BY MR. LOVE:

6        Q.   How many meetings did you have with

7    him?

8                MS. LUHANA:  Objection to form.

9                THE WITNESS:  Oh, I have no --

10               MS. LUHANA:  She said she doesn't

11   recall.

12               THE WITNESS:  Yeah, I have no

13   idea.  This was in like 1993 or something.

14   BY MR. LOVE:

15       Q.   How did you assign Richard to this

16   new patient?

17       A.   It was --

18               MS. LUHANA:  Objection to form.

19               THE WITNESS:  It was a team

20   decision that we just said, Richard, maybe you

21   can help this guy out.  It wasn't a formal

22   assignment.

23   BY MR. LOVE:

24       Q.   Did you assign him while you were on

25   property of your business?

Page 286

```
 1            MS. LUHANA:  Objection to form.
 2            To the extent you recall.
 3            THE WITNESS:  I don't -- I guess I
 4   don't understand.  It was during a treatment
 5   group and it wasn't my business at the time;
 6   it was somebody else's business.
 7   BY MR. LOVE:
 8      Q.   Were other people there?
 9      A.   It was a treatment group.
10      Q.   Who -- who was there when you
11   assigned him to -- to help out?
12            MS. LUHANA:  Objection to form.
13            To the extent you recall, Doctor.
14            THE WITNESS:  It would have been
15   other team members, another therapist and
16   group members.
17   BY MR. LOVE:
18      Q.   Now, the new member that you assigned
19   him to was a young adult man who, as you said,
20   had trouble reading; right?
21      A.   To my recollection, yes.
22      Q.   He was developmentally challenged?
23      A.   No.
24      Q.   An adult who couldn't read was not
25   developmentally challenged?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 287

```
 1              MS. LUHANA:  Objection to the
 2   form.
 3              THE WITNESS:  You can be
 4   illiterate without being intellectually
 5   disabled.
 6              MR. LOVE:  Okay.
 7   BY MR. LOVE:
 8      Q.   You knew that Richard had sexually
 9   abused other males; right?
10              MS. LUHANA:  Objection to form.
11              THE WITNESS:  Correct.  Young
12   males.
13   BY MR. LOVE:
14      Q.   Was this new patient also a sexual
15   offender?
16      A.   Yes.
17      Q.   And was -- he was in your care as
18   well?
19              MS. LUHANA:  Objection to form.
20              THE WITNESS:  In my care meaning
21   receiving outpatient treatment, yes.
22   BY MR. LOVE:
23      Q.   And you told him that Richard was
24   going to help him; right?
25              MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 288

1            THE WITNESS:  I didn't

2    particularly say Richard was going to help

3    him.  We recommended that they work together

4    because it looked like a good idea.

5            MR. LOVE:  Right.

6    BY MR. LOVE:

7        Q.   So you represented that that man

8    should trust Richard?

9            MS. LUHANA:  Objection to form.

10           THE WITNESS:  Unfortunately -- I

11   wouldn't say trust, I would say receive help

12   from him.  We had no clue.  This was a very

13   painful lesson for all of us, and we had no

14   clue that this would happen.

15   BY MR. LOVE:

16       Q.   Well, did you make sure that when

17   they met, they were supervised?

18       A.   No.

19       Q.   Did you tell Richard that he needed

20   to record their meetings?

21           MS. LUHANA:  Objection to form.

22           THE WITNESS:  Oh, not in the '90s,

23   absolutely not.

24   BY MR. LOVE:

25       Q.   Did you tell --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 289

1      A.   This is -- these mistakes are why I
2    know so much and I hold these
3    responsibilities, especially when there is
4    evidence that these could work.  And ever
5    since then, I've changed my program.
6      Q.   Did you monitor their meetings in any
7    way?
8              MS. LUHANA:  Objection to form.
9              THE WITNESS:  Not outside of the
10   therapeutic setting.
11   BY MR. LOVE:
12     Q.   So you have no idea how often they
13   met?
14             MS. LUHANA:  Objection to form.
15             THE WITNESS:  I -- I don't have
16   recollection, but this was -- I do recall they
17   only had met a couple times outside of the
18   therapeutic setting.
19   BY MR. LOVE:
20     Q.   And on one occasion, Richard brought
21   that man back to his house; right?
22             MS. LUHANA:  Object to form.
23             THE WITNESS:  Right.
24   BY MR. LOVE:
25     Q.   He waited for the man to pass out?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 290

1              MS. LUHANA:  Objection to form.

2              THE WITNESS:  Not pass out.

3              MR. LOVE:  Can we pull up page 37,

4      please?

5              Never mind.

6              THE WITNESS:  I believe he went to

7      sleep, and I could be wrong.

8              MR. LOVE:  Never mind.  It's okay.

9      BY MR. LOVE:

10        Q.   Once that man was asleep, Richard

11     sexually assaulted him; right?

12        A.   Correct.

13             MS. LUHANA:  Object to form.

14     BY MR. LOVE:

15        Q.   Are you at fault for that incident?

16             MS. LUHANA:  Object to form.

17             THE WITNESS:  I believe partly

18     from my ignorance and -- and not knowing how

19     fluid and opportunistic offenders were.  It

20     was very early in my career.

21     BY MR. LOVE:

22        Q.   Should the man that was assaulted sue

23     you?

24             MS. LUHANA:  Objection to form.

25             THE WITNESS:  If,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 291

1  organizationally, I continued to put victims

2  at risk, I would deserve to be sued.  But that

3  has not happened again, because I understood

4  the importance of changing things, monitoring,

5  and being aware of how sex offenders act.

6            And certainly if there was a rash

7  of sexual assaults in my organization, I would

8  deserve to be sued.

9  BY MR. LOVE:

10    Q.   When you took these actions, were you

11  being negligent?

12            MS. LUHANA:  Objection to form.

13  Calls for a legal conclusion.

14            THE WITNESS:  I do not believe

15  that mistakes that are made are negligent.  I

16  believe that repeated failures to act on

17  knowledge that someone has that could deter or

18  prevent can -- can rise to levels of

19  negligence, not in a -- and that's -- I'm not

20  a lawyer, so I won't say it legally.

21            But clinically -- so we do

22  everything we can do to deter and be

23  preventative and be vigilant and take our

24  responsibilities seriously, and this was a

25  very harsh learning lesson.  But it happened

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 292

1    once.

2    BY MR. LOVE:

3        Q.   Did you act with malice?

4            MS. LUHANA:  Objection to form.

5    Calls for a legal conclusion.

6            THE WITNESS:  I -- I don't

7    understand what mal -- what you're asking when

8    you say "did I act with malice."

9    BY MR. LOVE:

10       Q.   Were you -- were you callous in your

11   decision to put this man who had sexually

12   offended with another man?

13           MS. LUHANA:  Objection to form.

14   Calls for a legal conclusion.

15           THE WITNESS:  Yeah, I don't know

16   what you mean by callous or legal or malice,

17   sorry.

18   BY MR. LOVE:

19       Q.   Was there an inquiry on your license?

20       A.   No.

21       Q.   Did you report this?

22           MS. LUHANA:  Object to form.

23           THE WITNESS:  There's nothing to

24   report.  The police were involved.  We did

25   contact law enforcement and encourage the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 293

1   victim to contact law enforcement.

2   BY MR. LOVE:

3       Q.   Did anyone report this to the

4   disciplinary -- disciplinary board?

5                MS. LUHANA:  Objection.

6                THE WITNESS:  There is absolutely

7   nothing to report.

8   BY MR. LOVE:

9       Q.   Did you continue to treat Richard?

10      A.   No, he went to jail.

11      Q.   Did you continue to treat the victim?

12      A.   Yes.

13      Q.   For how long?

14      A.   I have no idea.

15      Q.   What happened to him after the

16  assault?

17      A.   I don't know what you mean.

18      Q.   What -- what happened to him?  How

19  was his treatment?  Did he recidivate?  Did he

20  get better?  What happened?

21               MS. LUHANA:  Objection to form.

22               THE WITNESS:  He didn't -- to my

23  knowledge, while in our treatment, he did not

24  recidivate.  He did get better.  I don't

25  recall what -- what eventually happened.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 294

1              MR. LOVE:  Okay.

2    BY MR. LOVE:

3       Q.   Now, you say that you only had this

4    happen once; right?

5       A.   Where an offender offended another

6    offender, yes.

7       Q.   Okay.

8              But you -- you've had other

9    patients recidivate, though?

10      A.   A couple.

11      Q.   Are you aware that 10.9 percent of

12   treated offenders recidivate within 4.7 years

13   of being released?

14             MS. LUHANA:  Objection to form.

15             THE WITNESS:  That is probably

16   under-representative.  That's re-arrested or

17   re-convicted in that timeframe.

18   BY MR. LOVE:

19      Q.   And how many -- how many have --

20   withdrawn.

21             How many of your patients have

22   recidivated?

23             MS. LUHANA:  Objection to form.

24             THE WITNESS:  I can tell you that

25   it's one -- I think two known recidivists in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 295

1  the last 18 years.

2  BY MR. LOVE:

3      Q.   And you said "known."

4           There very well may be ones that

5  you do not know about; correct?

6           MS. LUHANA:  Objection to form.

7           THE WITNESS:  Sure.

8  BY MR. LOVE:

9      Q.   Do you remember a person that you

10  called Roland in your book?

11     A.   I don't.

12          MR. LOVE:  Could we pull up

13  page 86, please.  And we'll enter this as

14  Exhibit 16.

15          MS. DELANEY:  Yes.  It will just

16  take me a minute to make it an exhibit.

17          MR. LOVE:  Absolutely.

18          (Whereupon, a document was marked,

19  for identification purposes, as Exhibit 16.)

20          THE WITNESS:  I am glad you're

21  reading my book, though.

22          MR. LOVE:  Pretty good book.

23          THE WITNESS:  Thanks.

24  BY MR. LOVE:

25     Q.   While this is -- is being pulled up,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 296

1    Dr. Valliere, you said two in the last

2    18 years.  Can you tell me about those two

3    instances?

4                MS. LUHANA:  Objection to form.

5                To the extent you are not

6    breaching any confidentiality, Doctor, you can

7    go into it.

8                THE WITNESS:  It was well over 10

9    years ago, an individual sexually assaulted a

10   child after claiming he was unable to come to

11   treatment for medical reasons, but he was

12   still a patient.  He just -- he -- he was

13   taking a leave of absence for medical reasons.

14               And then there was a re-arrest of

15   someone who had been in treatment, but had

16   been negatively discharged years after his

17   negative discharge occurred.

18               MR. LOVE:  Okay.  I believe the --

19   the exhibit is up, if you want to take a look

20   at that.

21   BY MR. LOVE:

22       Q.   And you will see --

23               MS. LUHANA:  Are we going --

24   BY MR. LOVE:

25       Q.   -- in -- in the second paragraph,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 297

1   you'll see the name Roland.

2          MS. LUHANA:  Can -- counsel, can

3   we just be able to scroll so she has content?

4          MR. LOVE:  Yep.

5          Can we have the screen whenever

6   you have a second, Ms. Delaney.

7          And then if you would like us to

8   scroll anywhere, Dr. Valliere, just let us

9   know, but I'll be asking about Roland.

10         THE WITNESS:  Okay.

11  BY MR. LOVE:

12     Q.   Does that refresh your recollection

13  on -- on who Roland is?

14     A.   Yes.

15     Q.   Okay.

16         And you thought he was making

17  progress like Richard; right?

18         MS. LUHANA:  Objection to form.

19         THE WITNESS:  Right.

20  BY MR. LOVE:

21     Q.   He had cleaned up; right?

22         MS. LUHANA:  Objection to form.

23         THE WITNESS:  Yes.

24  BY MR. LOVE:

25     Q.   He was exhibiting all traditional

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 298

```
 1   therapeutic markers for progress and

 2   pro-sociality?

 3             MS. LUHANA:  Objection to form.

 4             THE WITNESS:  Right.

 5   BY MR. LOVE:

 6        Q.   He got a job?

 7        A.   Exactly.

 8        Q.   And then he re-offended?

 9             MS. LUHANA:  Object to form.

10             THE WITNESS:  Right.

11   BY MR. LOVE:

12        Q.   You didn't catch any signs that he

13   was going to re-offend; right?

14             MS. LUHANA:  Objection to form.

15             THE WITNESS:  If I -- this was

16   also at the very, very beginning in 1994, and

17   this is before, again, I was taking over the

18   program for someone else.  And this is what

19   taught me about the pro-social presentation.

20             So I didn't know him enough to

21   catch any, but now, what Roland did teach me

22   is when people change in treatment like this,

23   it's -- that you have to pay attention.

24   BY MR. LOVE:

25        Q.   Well, Richard had already taught you
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 299

1   that; right?

2                MS. LUHANA:  Objection to form.

3                THE WITNESS:  That was all around

4   the same timeframe.

5                MR. LOVE:  Okay.

6                THE WITNESS:  The program I took

7   over was not run the same way as the program I

8   run now.  In the '90s, that kind of treatment

9   was basically kind of in its infancy, so it

10  was much different.

11               MR. LOVE:  We can pull this down,

12  Ms. Delaney.

13  BY MR. LOVE:

14      Q.   Dr. Valliere, you previously acted as

15  an expert witness for Pittston Area School

16  District; is that right?

17      A.   I -- I'm not sure of the school

18  district, but I have been an expert for a

19  school district.

20      Q.   And that was a case where a band

21  director had sexually abused several children?

22      A.   That's right.

23      Q.   And the kids' families sued the

24  school district for being negligent and

25  allowing the abuse; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 300

```
 1            MS. LUHANA:  Objection to form.
 2            THE WITNESS:  I believe -- I can't
 3   remember who the plaintiffs were, but I know
 4   they were the victims.  I don't know who --
 5   how many people they sued.
 6   BY MR. LOVE:
 7      Q.   A school is somewhere that the public
 8   expects to be safe; right?
 9            MS. LUHANA:  Objection to form.
10            THE WITNESS:  Absolutely.
11   BY MR. LOVE:
12      Q.   The public does not expect teachers
13   to sexually abuse students; right?
14            MS. LUHANA:  Objection to form.
15            THE WITNESS:  They -- they don't,
16   and there's a big outcry when somebody does,
17   rightly so.
18   BY MR. LOVE:
19      Q.   Because parents have to have trust
20   that they can send their kids to school;
21   right?
22      A.   Absolutely.
23      Q.   But just because there was sexual
24   abuse that occurred in an environment that is
25   presented as safe does not mean that there was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 301

```
 1   a failure to prevent abuse; correct?
 2             MS. LUHANA:  Objection to form.
 3             THE WITNESS:  Not always.
 4             And like in my further testimony,
 5   comparing a school to the -- to Uber is really
 6   problematic.  That's a very complicated case
 7   and there's very little overlap, except that,
 8   I mean, Uber promotes itself as safe.  As does
 9   a school has a responsibility to be safe, so
10   does Uber.
11   BY MR. LOVE:
12       Q.   Your opinion in that case was that
13   the school was not negligent; right?
14             MS. LUHANA:  Objection to form.
15             THE WITNESS:  Correct.
16   BY MR. LOVE:
17       Q.   The school did nothing wrong in your
18   view?
19             MS. LUHANA:  Objection to form.
20             THE WITNESS:  I don't think --
21   I -- I wouldn't say it -- nothing.  I don't
22   think I said nothing.  I think I analyzed a
23   very complicated situation and explained why
24   this offending could be undetected by the
25   school, and what actions they did to be
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 302

1    proactive and preventative, which is

2    completely unlike Uber.

3                    MR. LOVE:  Okay.

4    BY MR. LOVE:

5        Q.   But they didn't do something wrong

6    enough that you would consider them negligent;

7    right?

8                    MS. LUHANA:  Objection to form.

9                    THE WITNESS:  I think my ultimate

10   opinion was that the offender circumvented

11   many of the things that the school instituted.

12                   MR. LOVE:  Okay.

13   BY MR. LOVE:

14       Q.   The band director in that case, he

15   sexually abused children on school grounds;

16   right?

17                   MS. LUHANA:  Object to form.

18                   THE WITNESS:  I would have to

19   review that case.  It's -- I believe that that

20   is not exactly accurate.

21                   MR. LOVE:  Okay.  Can we pull up

22   Tab 18, and we'll mark this as Exhibit 17.

23                   (Whereupon, a document was marked,

24   for identification purposes, as Exhibit 17.)

25                   THE WITNESS:  Can I just ask, I'm

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 303

```
 1    a little concerned with confidentiality.  This
 2    is in the public domain, this report?
 3                   MR. LOVE:  Yes, it is.
 4                   THE WITNESS:  Okay.
 5    BY MR. LOVE:
 6        Q.   Okay.
 7                   So if you scroll down to page 4,
 8    at the bottom, you'll see a bullet point list.
 9                   MS. LUHANA:  Doctor, if you want
10    to take your time to review this.
11                   THE WITNESS:  Yes.
12                   (Whereupon, the witness reviews
13    the exhibit.)
14                   THE WITNESS:  Okay.
15                   MR. LOVE:  Okay.
16    BY MR. LOVE:
17        Q.   And if you look at the paragraph
18    right before that, the -- the band director
19    was convicted of sexually abusing nine victims
20    between 13 and 17 years old during his tenure;
21    right?
22        A.   Right.
23        Q.   But it's likely that there were a lot
24    more; right?
25                   MS. LUHANA:  Objection to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 304

1              THE WITNESS:  It's --

2              MS. LUHANA:  Speculation.

3              THE WITNESS:  It's definitely

4    possible, but I don't know.

5    BY MR. LOVE:

6       Q.   He worked at the school for eight

7    years; right?

8              MS. LUHANA:  Objection to form.

9              THE WITNESS:  I would have to

10   look.  I don't know how long he was at that

11   school by looking at this.  It doesn't refresh

12   my recollection.

13             MR. LOVE:  Okay.  We'll -- we'll

14   refer you to it when we get to it.  Let's look

15   at the bullet point list for now.

16   BY MR. LOVE:

17      Q.   Can you read the first four bullets

18   on that list, please.

19      A.   "Daring a student to put a 'mushroom

20   print' on the bus window by having the student

21   press his penis against foggy glass;

22             "Having a student expose his penis

23   and making another student touch it;

24             "Ordering a victim to put his

25   penis on another student's head;

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 305

1          "Telling students to have 'sword
2   fights' in the bus with their bare penises,
3   sometimes after putting glow in the dark paint
4   on their penises."
5      Q.   These actions were done in front of
6   other students; right?
7              MS. LUHANA:  Objection to form.
8              THE WITNESS:  It -- sometimes.
9   There was a group of students engaged in this.
10  BY MR. LOVE:
11     Q.   And at least for the first and fourth
12  bullet points, these things happened on a bus;
13  right?
14     A.   Right, but that -- you asked me about
15  being on school premises.
16     Q.   Right.
17             And that school bus had a camera;
18  right?
19     A.   Oh, I have no idea.
20     Q.   Are you aware of school buses that
21  don't have cameras?
22             MS. LUHANA:  Objection to form.
23             THE WITNESS:  This is --
24             MS. LUHANA:  Speculation.
25             THE WITNESS:  Yeah, this is years

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 306

1    ago in a rural school district.  I don't know

2    anything about the requirements of cameras on

3    buses.

4    BY MR. LOVE:

5        Q.    Later in the report, which I can

6    direct you to page 8, in the third paragraph

7    up, you mention someone that testified for the

8    band director, and I'm just going to read,

9    without using names.  "Mr. X claimed that he

10   was 'present at 90% of the band trips as a

11   band parent on the bus and never saw him once

12   go to the back of the bus.'"

13              Do you see that?

14       A.    Yes.

15       Q.    So parents were present on that bus

16   as well; right?

17              MS. LUHANA:  Objection to form.

18              THE WITNESS:  Parents were present

19   on a bus at some point with this teacher.  It

20   doesn't say that this is the exact bus, the

21   exact trip, the exact situation that the abuse

22   occurred.

23              MR. LOVE:  Okay.

24   BY MR. LOVE:

25       Q.    And if you look at page 8 at the very

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 307

1   bottom, where it says, "Hiding in Plain
2   Sight," the third line down, you'll see, "He
3   engaged in abusive behavior on the bus,
4   amongst the present of -- presence of parents
5   and other students."
6              Do you see that?
7      A.   Yes.
8      Q.   So he committed sexual abuse on a bus
9   with parents on that bus with him?
10             MS. LUHANA:  Objection to form.
11             THE WITNESS:  The complication in
12  this case is that he would get kids to abuse
13  one another or engage in this sex play or this
14  acting out with one another.  He would not
15  masturbate on the bus.  He would not do these
16  things.
17             So it is still sexually abusive
18  behavior, but he got the students to do it to
19  each other, which is a different dynamic.
20  BY MR. LOVE:
21     Q.   You certainly don't mean to insinuate
22  that those children are at fault for that
23  inappropriate behavior; correct?
24             MS. LUHANA:  Objection to form.
25             THE WITNESS:  No.  That's why I'm

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 308

1   calling it abusive behavior, is that he had a
2   way of organizing kids to be sexually
3   inappropriate with each other, which I
4   consider victimization, but no one could ever
5   pinpoint him as re -- or the viewers could not
6   see him as responsible for it necessarily.
7   BY MR. LOVE:
8       Q.   If you could go back to the bullet
9   point list on page 4, and read the fifth and
10  sixth bullets, please.
11      A.   "Masturbating into his own hand, then
12  hitting students in the face or head full of
13  semen; {sic}
14              "Making students masturbate in
15  their own hands and hit each others in the
16  head full of semen."  {Sic}
17      Q.   Did this take place on school
18  grounds?
19              MS. LUHANA:  Objection to form.
20              THE WITNESS:  I can't remember,
21  but not to my knowledge.  They would go on
22  band trips and do other things.  He had --
23  most of the victim behavior occurred outside
24  of the school setting.
25              The victimizing behavior, I'm

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 309

```
 1    sorry, not the victim behavior.  Well, the
 2    victim behavior, too.
 3    BY MR. LOVE:
 4        Q.   But this didn't happen in front of
 5    other kids; right?
 6              MS. LUHANA:  Objection to form.
 7              THE WITNESS:  Most of the other
 8    kids were involved.
 9    BY MR. LOVE:
10        Q.   And the materials you reviewed, you
11    didn't see any indication that any
12    administrator at this school asked why these
13    children had semen on their face and heads?
14              MS. LUHANA:  Objection to form.
15              THE WITNESS:  There was no
16    indication that any administrator ever saw
17    semen on a kid's face or head.
18              MR. LOVE:  Right.
19    BY MR. LOVE:
20        Q.   And there was no indication that any
21    teacher saw or asked about semen on these
22    children; right?
23              MS. LUHANA:  Objection to form.
24              THE WITNESS:  Exactly.
25              I think the school did as much as
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 310

1    it could do, and, in fact, he was deterred by

2    offending in the school because staff asked

3    him what he was doing.  There were cameras

4    that he had to avoid.  He knew that being on

5    school property and being monitored in

6    real-time by other teachers was a deterrent

7    for him.  He didn't have control of that

8    environment.

9    BY MR. LOVE:

10       Q.   You just said he evaded cameras.  So

11   he did commit these offenses, or at least some

12   of them, on school grounds; correct?

13              MS. LUHANA:  Objection to form.

14              THE WITNESS:  I don't know which

15   behavior, but he specifically avoided the

16   cameras.  And avoiding a camera in a giant

17   school building is completely different than

18   avoiding a dash camera.

19   BY MR. LOVE:

20       Q.   But nobody on those school grounds

21   ever saw any of this behavior; right?

22              MS. LUHANA:  Objection to form.

23              THE WITNESS:  I'd have to read the

24   whole report, but it's my -- and I will reread

25   the whole report if you need me to, but it's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 311

1  my recollection he was confronted and

2  counseled about his behavior, which is why he

3  moved it outside of the school.

4              MS. LUHANA:  Dr. Valliere, take

5  your time to review this report.  You've had

6  so many questions asked about that, so please

7  review it.

8              Counsel, she's going to read the

9  report since you've asked her some questions

10  about it.

11             MR. LOVE:  Okay.  We need to go

12  off the record, please.

13             MS. LUHANA:  We don't need to go

14  off the record.  That's time on the record.

15  You have been asking questions about this

16  report.  She needs an opportunity to review

17  it.

18             MR. LOVE:  We can discuss -- we

19  can discuss this, but I'd like to discuss it

20  off the record.

21             MS. LUHANA:  No, we're not going

22  off the record.  She can review documents that

23  you're asking her questions about.  She needs

24  the opportunity to review the documents.

25  There's no need to go off the record.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 312

1           MR. LOVE:  There is a need to go
2     off the record.  I -- we cannot sit here and
3     let -- and go through every page of this
4     document to eat up my -- the entire deposition
5     time that we have.
6           MS. LUHANA:  You've continued to
7     ask her numerous questions.
8           Doctor, what -- what year is this
9     report from?
10          MR. LOVE:  2023.
11          MS. LUHANA:  You've asked her
12    questions for a report she's written two plus
13    years ago, and so she should have the
14    opportunity to run through the report and --
15    and on your time because you're asking her
16    these questions.
17          MR. LOVE:  I disagree, and we need
18    to go off the record so that we can discuss
19    and I can discuss with my team.
20          MS. LUHANA:  This is part of your
21    time, though.  You're --are you going to
22    continue asking her questions about this
23    report?
24          MR. LOVE:  Yes, I am.
25          MS. LUHANA:  So then she has to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 313

1    have an opportunity to review it on the

2    record.

3              MR. LOVE:  That's fine.  So -- so

4    we need to go off the record.

5              MS. LUHANA:  No, no.

6              MR. LOVE:  So -- so that I --

7    excuse me.  We need to go off the record so

8    that I may discuss this with my team

9    internally.  If she wants to stop reviewing

10   while we're off the record, that's fine, but I

11   need to go off the record so that I can

12   discuss with my team internally.

13             MS. LUHANA:  What are you -- what

14   are you discussing?  If -- if you're going to

15   continue to ask her questions about this

16   report, she needs an opportunity, and it

17   counts against your time.  You can't have a

18   witness do --

19             MR. LOVE:  Understood.

20             MS. LUHANA:  -- and have her

21   review off-the-record time and then ask

22   questions thereafter.

23             MR. LOVE:  I understand your

24   opinion, okay?  You've made your position

25   very --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 314

1              (Overlapping Speakers.)

2              MS. LUHANA:  You've made your

3      position -- excuse me.  You've made your

4      position very clear.

5              I already said that Dr. Valliere

6      can stop reviewing the report, but I need to

7      go off the record.

8              MS. LUHANA:  Okay.

9              MR. LOVE:  Thank you.

10             THE VIDEOGRAPHER:  Going off the

11     video record.  The time is 3:21 p.m.

12             (Whereupon, a recess was taken at

13     the above time.)

14             THE VIDEOGRAPHER:  We are back on

15     the video record.  The time is 3:33 p.m.

16             This begins Media Unit No. 5.

17             MR. LOVE:  So, just for the

18     record, counsels have discussed off the

19     record, and we are allowing Dr. Valliere time

20     to review this report that she wrote two years

21     ago that she was crossed on less than a month

22     ago at trial.

23             If it's a reasonable time and we

24     can get through our questions, we -- that's

25     fine.  But if this takes too long,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 315

1    particularly given the evasiveness of the

2    witness in the beginning of today's

3    deposition, and the tactics to run out the

4    time on our deposition, we will be seeking

5    Court intervention and leaving this deposition

6    open.

7              MS. LUHANA:  And, counsel, we

8    disagree with your assessment of the

9    situation.  The witness should have reasonable

10   time to review the document on the record.

11   Your entitled to ask her questions, but she

12   needs an opportunity to read the document, as

13   we've done for prior witnesses, were done on

14   the record.

15              And I disagree with your

16   characterization of Dr. Valliere's responses

17   today.  She's been very cooperative and she's

18   answered your vague, broad, general blanket

19   questions to the best of her ability.

20              So, Dr. Valliere, please take your

21   time and review the document.

22              (Whereupon, the witness reviews

23   the exhibit.)

24              MS. LUHANA:  And, counsel, do you

25   recall, when she was asked questions about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 316

1   this at the trial, whether she was given the

2   expert report to review?

3              MR. LOVE:  I don't recall, but

4   it's been raised as an issue in this

5   litigation, so it's something she should have

6   reviewed.

7              MS. LUHANA:  Okay.  I understand

8   your position.

9              (Whereupon, the witness reviews

10  the exhibit.)

11             THE WITNESS:  Okay.

12  BY MR. LOVE:

13     Q.   Okay, Dr. Valliere.

14             So we were discussing the fifth

15  and sixth bullet points in that list.

16     A.   Right.

17     Q.   Did that conduct take place on school

18  grounds?

19     A.   No, it did not.  There's nothing in

20  my report that suggests that any of this

21  conduct took place on school grounds, except

22  for him encouraging other student behavior, to

23  engage with other students.

24     Q.   In your report, it discusses this

25  band director evading the cameras on school

Page 317

1    grounds; correct?

2            MS. LUHANA:  Objection to form.

3            THE WITNESS:  It talked about him

4    evading behavior, but that doesn't mean it --

5    it does not mean he, himself, engaged in his

6    openly sexually abusive behavior on school

7    grounds.

8            This is a great -- this is really

9    a great case to talk about and compare and

10    contrast with the Uber environment, because in

11    this report, I describe environments that are

12    not -- that help sex offenders get away with

13    it, that protect sex offenders, that ignore

14    information and do not provide an environment

15    that is protective of students.

16            This guy engaged in long-term

17    grooming and indoctrination of students, and I

18    put in here specifically that he was not

19    opportunistic, so --

20    BY MR. LOVE:

21        Q.   Dr. Valliere, I'm sorry.

22            MS. LUHANA:  Counsel, let her

23    finish --

24            MR. LOVE:  Dr. Valliere -- Dr.

25    Valliere, I'm so sorry, but we cannot eat up

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 318

```
 1    time by giving testimony that was not asked
 2    for.  This is nonresponsive.
 3              MS. LUHANA:  She -- you can't cut
 4    her off, counsel.
 5              MR. LOVE:  This is not responsive.
 6              MS. LUHANA:  Finish your response.
 7    Doctor, finish your response.
 8              Are you -- are you cutting her
 9    off?  That's improper.
10              Go ahead, finish your response,
11    Doctor.
12              THE WITNESS:  Well, it -- to
13    compare this unique, unusual situation to my
14    opinion or solicit my opinions about Uber are
15    in direct contrast and contradiction.
16              My stance on the Uber that I
17    explained in my report is incredibly different
18    than the issues presented in this report.
19              MR. LOVE:  Once again,
20    Dr. Valliere, I will instruct you to answer my
21    question and my question alone.  Your counsel
22    will have the opportunity to ask you questions
23    and allow you to say whatever you want to say,
24    but right now, it's my turn to ask questions,
25    and I only get a limited time.  So please
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 319

1   answer my questions and only my questions.

2   BY MR. LOVE:

3       Q.   This fifth and sixth bullet, that

4   took place on the bus?

5       A.   I can't remember.  This band director

6   took the students off premises very often.

7       Q.   Can you read the next four bullets, 7

8   through 10.

9       A.   "Having students touch themselves to

10  erection to display their penises -- the size

11  of their penises;

12              "Touching students and having

13  touch -- students touch each other in an

14  escalating pattern until they touched

15  students' genitalia;

16              "Had victims put their own fingers

17  into their rectums or dares."  {Sic}

18              Did I do the right number?  I'm

19  sorry.

20              "Making students masturbate into

21  food items and make other students eat it

22  knowingly or by tricking them."

23      Q.   When you say "making students," what

24  do you mean by that?

25      A.   It's my understanding that he would

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 320

1   goad students into this and that they had a --

2   sort of a club, a secret band club, that these

3   were some of the hazing-like initiations to

4   join.

5       Q.   And when you say "having students,"

6   you mean the same thing?

7               MS. LUHANA:  Objection to form.

8               THE WITNESS:  Right.  Verbally

9   telling them to do it.

10  BY MR. LOVE:

11      Q.   So I want to be really clear, because

12  in September, you said in your testimony, the

13  kids were doing this to other kids.  They

14  weren't directly attributed to the band

15  director.

16              At that time, you were not trying

17  to insinuate that the kids were at fault for

18  that behavior; right?

19              MS. LUHANA:  Objection to --

20  objection to form.

21              THE WITNESS:  Oh, absolutely not.

22  These kids were engaged in this behavior at

23  the direction of -- of the offender.

24              MR. LOVE:  Right.

25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 321

1     Q.    The band leader was the source of all
2    sexual misconduct; correct?
3                MS. LUHANA:  Objection to form.
4                THE WITNESS:  He -- I can't say
5    that he's responsible for what these kids did.
6                Part of the difficulty with this
7    is some of the kids began initiating it on
8    their own, which camouflaged and clouded some
9    of the identification of the perpetrator.
10   BY MR. LOVE:
11    Q.    Where, in this report, do you say
12   that some of the kids started doing it on
13   their own unprompted?
14                MS. LUHANA:  Objection to form.
15                THE WITNESS:  I don't think I used
16   those words.  I just know that that's part of
17   the facts of this case, and that's why I
18   described this as hard to identify, 'cause in
19   some ways, it looked like hazing.
20                Once these initiations became
21   established, it -- it was taken -- it took on
22   a little bit of a life of its own.
23   BY MR. LOVE:
24    Q.    All of the conduct is attributable to
25   the band director, though; correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 322

1           MS. LUHANA:  Objection to form.

2           THE WITNESS:  He was the

3    ultimately responsible offender.

4    BY MR. LOVE:

5        Q.   So when you say -- when you said

6    in -- in your testimony, "So saying he

7    sexually assaulted people on the bus is not

8    accurate," was that a mistake?

9           MS. LUHANA:  Objection to form.

10          Counsel, are you referring to her

11   trial testimony?

12          MR. LOVE:  Yes.

13          MS. LUHANA:  Are you going to show

14   that trial testimony?

15          MR. LOVE:  I don't think I need

16   to.  I read directly from it.  But if Dr.

17   Valliere would like to see it, then I will

18   show you.

19          MS. LUHANA:  Okay.

20          THE WITNESS:  Well, I -- I would,

21   because my -- my correction is wording.

22          MR. LOVE:  So then it's

23   Exhibit 17 -- not 17, Tab 17.  Sorry.  It's

24   Exhibit 11, page 888, lines 11 to 19.

25          MS. LUHANA:  888, you said?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 323

```
 1            MR. LOVE:  Um-hmm.
 2            THE WITNESS:  So a hundred and --
 3     124.
 4            MS. LUHANA:  And, counsel, on
 5     page 888?
 6            MR. LOVE:  Lines 11 to 19.
 7     BY MR. LOVE:
 8       Q.   The question asked was, "And many --
 9     we can agree that all of these multiple lists
10     are sexual misconduct; correct?  {Sic}
11            "ANSWER:  There's a greater
12     context to this.  This teacher was having kids
13     do things to other kids so they weren't
14     directly attributed to him.  So this is a very
15     complicated case.  So saying he sexually
16     assaulted people on the bus is -- is not
17     accurate.  There was sexual behavior on the
18     bus that the kids encouraged other people to
19     do."
20            So when you say, "saying he
21     sexually assaulted people on the bus is not
22     accurate," was that a mistake?
23       A.   No.  He sexually abused people, but
24     he did not directly sexually assault anybody
25     himself on the bus.  And he was not convicted
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 324

1    for any sexual assaults on the bus.

2             So there's sexual misconduct,

3    there's sexual abuse, there's sexual coercion,

4    but sexual assault is defined by actually

5    putting his own hands on somebody else.  So

6    that wasn't a mistake.

7        Q.   You would agree with me that an adult

8    authority figure telling children to have

9    sword fights with their penises is sexual

10   abuse; correct?

11            MS. LUHANA:  Objection to form.

12            THE WITNESS:  Absolutely.  That's

13   what I just explained.  It was sexual abuse,

14   not sexual assault.

15   BY MR. LOVE:

16       Q.   You would agree with me that putting

17   glow-in-the-dark paint on child's -- the

18   children's penises is sexual assault; correct?

19            MS. LUHANA:  Objection to form.

20            THE WITNESS:  He did not put

21   glow-in-the-dark paint on anybody's penis.  He

22   had the kids do it to themselves.

23   BY MR. LOVE:

24       Q.   Can you read the next two bullets,

25   please, 11 to 12.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 325

1              MS. LUHANA:  So we're going back

2     to --

3              THE WITNESS:  The report?

4              MS. LUHANA:  -- the report?  Is

5     that what you're asking?

6              MR. LOVE:  Yes.

7              MS. LUHANA:  And what page in the

8     report?

9              MR. LOVE:  It's page 4.

10             MS. LUHANA:  Thank you.

11             THE WITNESS:  The last two, you

12    said?

13             MR. LOVE:  The next two, which

14    would be 11 to 12, five up from the bottom.

15             THE WITNESS:  "Soliciting naked

16    pictures from students;

17             "Attaining nude images from

18    students, including of" a particular person

19    "exposing his penis or erection; {sic}

20             "Exposing his own erect penis to

21    students;

22             "Asking students about their penis

23    size and whether they were circumcised;"

24             And "Playing 'Truth Or Dare' with

25    students and former students and daring them

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 326

1    to perform sex acts."  {Sic}

2    BY MR. LOVE:

3        Q.   When you discuss photos, how did he

4    obtain those photos?

5                MS. LUHANA:  Objection to form.

6                THE WITNESS:  It was through text

7    messaging, I believe, or some kind of social

8    media exchange.

9    BY MR. LOVE:

10       Q.   Did he take any of those photos,

11   himself?

12               MS. LUHANA:  Objection to form, to

13   the extent you know.

14               THE WITNESS:  I don't believe

15   he -- I believe the students produced their

16   own images.

17   BY MR. LOVE:

18       Q.   You certainly agree that this is

19   serious sexual abuse; correct?

20       A.   Absolutely.

21       Q.   And when you say "Exposing his own

22   erect penis to students," where did that

23   occur?

24               MS. LUHANA:  Objection to form.

25               THE WITNESS:  Like where was he?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 327

 1              MR. LOVE:  Correct.

 2              THE WITNESS:  I'm not entirely

 3    sure, and I'm not entirely sure if it was done

 4    over, like, video.

 5    BY MR. LOVE:

 6        Q.   So you can't be sure where this

 7    happened?

 8        A.   It was not in the school.

 9        Q.   So you're sure that it did not happen

10    in the school, but you can't say where it

11    happened?

12              MS. LUHANA:  Objection to form.

13              THE WITNESS:  I can say it --

14    it -- in my best recollection, it happened on

15    trips or in his own home.  He had kids in his

16    home.

17    BY MR. LOVE:

18        Q.   Your ultimate opinion in this report

19    is that the school was not negligent; right?

20              MS. LUHANA:  Objection to form.

21              THE WITNESS:  I think my ultimate

22    opinion is that the school did not provide an

23    environment which ignored or protected

24    offenders, or produced -- or was an

25    environment that knowingly allowed, in a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 328

```
 1    negligent way, sexual assault to go on.
 2                MR. LOVE:  Okay.
 3    BY MR. LOVE:
 4        Q.   And nowhere in this report do you say
 5    this man's acts did not happen on school
 6    grounds; right?
 7                MS. LUHANA:  Objection to form.
 8                THE WITNESS:  I think -- I don't
 9    think I put that, but if it had happened on
10    school grounds, I would have put it.  So I
11    reflected some of the evidence.
12    BY MR. LOVE:
13        Q.   Well, you did write that he evaded
14    cameras on school grounds; right?
15        A.   Right.
16                And that was when he was
17    indoctrinating some of the kids or having them
18    do sexual things to each other.
19        Q.   Okay.
20                And you don't think that it was
21    important to your opinion that some of these
22    acts did not happen at the school?
23                MS. LUHANA:  Objection to form.
24                THE WITNESS:  I don't understand
25    the question.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 329

1  BY MR. LOVE:
2      Q.   Well, you didn't include in your
3  report, like you just said, that some of these
4  acts did not happen on school grounds.  You
5  didn't find that important to your opinion?
6              MS. LUHANA:  Objection to form.
7              THE WITNESS:  It was in evidence
8  that was available else wheres, including his
9  police reports and things like that.
10             MR. LOVE:  But that's not my
11  question.
12  BY MR. LOVE:
13     Q.   My question is, you came to an
14  opinion in this report, and you didn't cite
15  any of that evidence or talk about it in this
16  report; correct?
17             MS. LUHANA:  Objection to form.
18  Misstates the record.
19             THE WITNESS:  I think I cited a
20  lot of evidence.  I have a huge list of things
21  that I reviewed.
22  BY MR. LOVE:
23     Q.   But nowhere in this report do you
24  cite something to say that these acts did not
25  happen on school grounds; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 330

1              MS. LUHANA:  Objection to form.

2              THE WITNESS:  And I did not say it

3    happened on school grounds.

4    BY MR. LOVE:

5        Q.   Well, you did.  You said, "He avoided

6    cameras on school grounds," so that he could

7    sexually abuse; right?

8              MS. LUHANA:  Object to form.

9              THE WITNESS:  He avoided cameras

10   so he could engage the kids in some of this

11   sexual hazing behavior.

12   BY MR. LOVE:

13       Q.   Which is sexual abuse; correct?

14       A.   Correct.

15       Q.   Okay.

16             So he committed some sexual abuse

17   on campus, and nowhere in this report did you

18   write that other sexual abuse did not happen

19   on the campus; right?

20             MS. LUHANA:  Objection to form.

21   Misstates what's in the record.

22             THE WITNESS:  Yeah.  The -- the

23   report speaks for itself, so...

24             MR. LOVE:  Okay.

25   BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 331

1     Q.   Can you read the next bullet, the one

2     starting "Asking."  Oh, sorry, no, the one

3     starting with "Having."

4     A.   "Having victims lick one another's

5     anal area and eat each other's pubic hair;

6              "Having students pull down

7     another's pants in front of people;

8              "Threatening to disseminate sexual

9     photos of people if they did not continue to

10    participate or told about the abuse;

11             "Coercing a former student to suck

12    his penis";

13             And "Creating a sexualized,

14    coercive environment for students who wished

15    to have his mentorship and be involved in his

16    successful band 'clique.'"

17    Q.   All of those are certainly sexual

18    abuse; correct?

19    A.   Absolutely.  This was a very deviant,

20    sophisticated offender.

21    Q.   And some of that conduct happened on

22    school grounds; correct?

23             MS. LUHANA:  Objection to form.

24    Asked and answered.

25             THE WITNESS:  Some of the conduct

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 332

1    did, yes, with the -- not his direct sexual

2    assaults of students, but the other behaviors.

3    BY MR. LOVE:

4        Q.   Where you say, "Asking students about

5    their penis size and whether they were

6    circumcised," which is the second one up from

7    the bottom on page 4, how did the band

8    director ask those questions?

9            MS. LUHANA:  Objection to form.

10           THE WITNESS:  I don't understand

11   what you're asking.

12   BY MR. LOVE:

13       Q.   Did he ask -- did he conceal the way

14   that he asked those questions?

15           MS. LUHANA:  Objection to form, if

16   you know.

17   BY MR. LOVE:

18       Q.   He used the language "Are you?"

19   Right?

20       A.   If I have quotes in there, it's what

21   the victims reported.

22       Q.   Okay.

23           And it was part of a larger scheme

24   of abuse; right?

25           MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 333

```
 1            THE WITNESS:  Those were some of
 2   the questions he used in grooming them.
 3            MR. LOVE:  Right.
 4   BY MR. LOVE:
 5       Q.   He would ask "Are you," and they
 6   would understand that to mean are you
 7   circumcised; is that right?
 8            MS. LUHANA:  Objection to form.
 9            THE WITNESS:  I don't recall.
10   BY MR. LOVE:
11       Q.   Other students were interested in why
12   he was asking them questions; right?
13            MS. LUHANA:  Objection to form.
14            THE WITNESS:  I -- I don't recall.
15   I don't recall.  Whatever my report says is
16   what -- they had all these little code things
17   that other band members would be interested
18   in.
19   BY MR. LOVE:
20       Q.   And none of the teachers ever asked
21   about that code; right?
22       A.   As far as I know, other teachers
23   never necessarily knew about that.  There was
24   no evidence that other people knew.
25       Q.   He announced it over the loudspeaker;
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 334

1   correct?

2            MS. LUHANA:  Object to the form.

3            THE WITNESS:  I don't -- I can't

4   remember if he did or the other kids, but they

5   were just innocuous and interpreted as

6   something that the band clique did.

7   BY MR. LOVE:

8       Q.  Because no one ever asked about it;

9   right?

10           MS. LUHANA:  Objection to form.

11           THE WITNESS:  I can't agree or

12  disagree with that.  I don't know who asked

13  about it or how it was explained.  It was

14  never a chronic or identified issue of the

15  school's negligence.

16  BY MR. LOVE:

17      Q.  When you say, "Sexual acts in 'Truth

18  or Dare,'" {sic} the last bullet on -- on

19  page 4, what sexual acts are you talking

20  about?

21           MS. LUHANA:  Objection to form.

22           To the extent you remember.

23           THE WITNESS:  I -- I have no idea.

24  I can't remember.

25           It could have been the acts listed

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 335

1    in the other bullet points.  I'm not sure what

2    the specific things were.

3    BY MR. LOVE:

4        Q.    And in the second to last bullet, you

5    write, "among other things."  What do you mean

6    by that?

7                MS. LUHANA:  Objection to form, to

8    this entire line of questioning about a report

9    from two years ago.

10                THE WITNESS:  I think in a --

11    that's -- that's just a transition to creating

12    the sexualized environment.  There were other

13    uncharged or subtle behaviors that were

14    individualized or whatever, but the "among

15    other things," meaning the list above, he

16    created the sexualized and coercive

17    environment.

18                MR. LOVE:  Okay.

19    BY MR. LOVE:

20        Q.    Nowhere in this report do you say

21    that the school ran a background check on this

22    band director; correct?

23                MS. LUHANA:  Objection to form.

24                THE WITNESS:  That was not at all

25    my referral issue, and there's regulations

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 336

1   about teachers and he was fully incorporated

2   as a teacher.

3   BY MR. LOVE:

4       Q.   But nowhere did you mention anything

5   about a background check in this report;

6   correct?

7               MS. LUHANA:  Objection to form.

8               THE WITNESS:  No, I wouldn't.

9   BY MR. LOVE:

10      Q.   What is a red flag?

11              MS. LUHANA:  Counsel, are you

12  referring to something in the report?

13              MR. LOVE:  I'm asking a question.

14              MS. LUHANA:  Object -- objection

15  to form.

16              THE WITNESS:  Can you be -- a red

17  flag in what context?

18              MR. LOVE:  Sure.

19  BY MR. LOVE:

20      Q.   Do you consider a red flag a sign

21  that -- or withdrawn.

22              Do you consider a sign that

23  someone might be an offender a red flag?

24      A.   There are ideas that offenders can be

25  identified by certain stereotypical things

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 337

```
 1   that we might consider red flags or risk
 2   behaviors.
 3               I think I -- in this report, I
 4   talk about there's research that says that red
 5   flags -- generic ideas of red flags are hard
 6   to identify in ongoing relationships between
 7   perpetrators and their victims.
 8               This is kind of different than
 9   what Uber has in its studied and identified
10   risk factors.
11       Q.   So the language that you just said is
12   not quite within your report, so if you could
13   turn to page 13.
14       A.   Sure.
15       Q.   The very first sentence reads,
16   "Unfortunately" --
17               MS. LUHANA:  Counsel, wait.  She's
18   scrolling to get there so...
19               THE WITNESS:  Give me a second.
20               MS. LUHANA:  Yeah, can she just --
21   can she just have the document in front of
22   her.
23               THE WITNESS:  Oh, my.
24               MS. LUHANA:  13.
25               THE WITNESS:  Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 338

1          MS. LUHANA:  Okay.  Where?

2    BY MR. LOVE:

3      Q.   The very first sentence reads,

4    "Unfortunately, research does not support the

5    premise that grooming behaviors or 'red flags'

6    are easily identified at the time they are

7    occurring."

8               Did I read that correctly?

9      A.   Yes.

10     Q.   Even when people are trained to

11   identify red flags for sexual abuse, they're

12   often inaccurate in recognizing sex offender

13   behaviors; right?

14     A.   You do understand that's in the

15   context of grooming, which is the process of

16   engaging.

17               I say in there "identify grooming

18   or red flags."  So we're talking about

19   offenders who establish ongoing relationships

20   with their victims and interpreting that as

21   offensive relationships.

22               That's completely different than

23   risk factors.

24     Q.   That wasn't an answer to my question,

25   Dr. Valliere.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 339

1              My question is, even after being
2      specifically trained to identify grooming or
3      red flags, people were inaccurate in
4      recognizing sex offender behaviors; correct?
5                   MS. LUHANA:  Objection to the
6      form.
7                   THE WITNESS:  Right, but I'm
8      adding a context of what kind of sex offending
9      we're talking about, which is not the kind of
10      sex offending I talk about in my report and
11      opinion to Uber.
12              So I just want to make it clear
13      that all sex offenders are unique, the ways
14      they offend are unique, and I specifically
15      talk about offenders who are very different
16      than Mr. Carter relevant to my Uber opinion.
17      BY MR. LOVE:
18         Q.   The detection of sexual offenders
19      relies primarily on disclosure of the victim;
20      right?
21                   MS. LUHANA:  Objection to form.
22                   THE WITNESS:  In -- in the most
23      part, yes.  Unless there is video or other
24      types of objective evidence of an assault.
25      BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 340

1      Q.   It does not rely on red flags; right?

2           MS. LUHANA:  Objection to form.

3           THE WITNESS:  It can rely on

4    identifying risk factors like we've talked

5    about all along, which can also be interpreted

6    as red flags in a different context.

7           In this context, I'm using

8    grooming behaviors.

9           MR. LOVE:  Okay.

10   BY MR. LOVE:

11     Q.   Could you turn to page 14, first

12   paragraph, third line down.  It says, "The

13   detection of child abuse still relies

14   primarily on the disclosure of the victim, not

15   the identification of 'red flags' or policies

16   that will prevent sexual abuse."

17          Did I read that correctly?

18     A.   Excuse me.  Sure.

19     Q.   And it says "child abuse."

20          Does that also pertain to the

21   sexual abuse of women?

22          MS. LUHANA:  Objection to form.

23          THE WITNESS:  It applies to sexual

24   assault that community guidelines or school

25   policies are not going to present sexual

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 341

1    assault, which is why, in my Uber report, I go

2    about all the steps to deterrence that only a

3    policy will not.  It's the enforcement of that

4    policy, consequences, monitoring of that

5    policy and clear and -- and clearly defined

6    rules and crystal clear consequences in a

7    meaningful way.

8    BY MR. LOVE:

9        Q.    Identification of problematic

10   behaviors are red flags.  Those are influenced

11   by hindsight bias; right?

12               MS. LUHANA:  Objection to form.

13               THE WITNESS:  Not necessarily.

14   Identification, like I spell out in my Uber

15   report, they have, by their own research,

16   identified risk factors and things that are

17   predictive or indicative of a risk for future

18   sexual assault.

19               That's completely different than

20   red flags.  Those are researched and

21   established factors that can help identify and

22   deter and prevent sexual assault, or the

23   potential for sexual assault.

24   BY MR. LOVE:

25       Q.    So your question, in and of itself --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 342

1    your answer to my question, in and of itself,

2    explains that you are not talking about my

3    question about red flags.  You said that's

4    completely different from red flags.  My

5    question was about red flags, so let's try

6    this one more time.

7              Identification of problematic

8    behaviors, or red flags, are highly influenced

9    by hindsight bias; correct?

10             MS. LUHANA:  Objection to form.

11   Asked and answered.

12             THE WITNESS:  In the context of

13   looking back on an offender's relationship

14   with a victim with whom they have a

15   relationship, red flags are influenced by

16   hindsight bias.

17             In the context of opportunistic

18   offenders or things like that, those could be

19   considered risk factors.

20   BY MR. LOVE:

21      Q.   If you could turn to page 13, first

22   paragraph, second sentence.  It reads,

23   "Identification of problematic behaviors or

24   'red flags' of child abuse is typically done

25   in retrospect and is highly influenced by

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 343

1    hindsight bias."

2              Nowhere in that sentence does it

3    say, in the context of the relationship of the

4    victim and the offender; correct?

5              MS. LUHANA:  Objection to form.

6              THE WITNESS:  Nowhere in that

7    sentence, but in the entire report, we're

8    talking about an offender who groomed and

9    established relationships.  That's the whole

10   purpose of my entire report.

11             So to pick one sentence out and

12   say nowhere in this sentence says anything

13   about the relationship totally neglects the

14   entire rest of the report and why this is such

15   a unique case and how I explain the sex

16   offender behavior in this report.

17   BY MR. LOVE:

18       Q.   People labeled the band director as

19   weird; right?

20             MS. LUHANA:  Objection to form.

21             THE WITNESS:  No.  It says,

22   "Rumors included vague allegations that he was

23   weird."

24   BY MR. LOVE:

25       Q.   And they retroactively applied those

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 344

1    allegations as red flags; right?

2            MS. LUHANA:  Objection to form.

3    Mischaracterizes the report.

4            THE WITNESS:  Yes.  It's more

5    specific than that.  For in -- hindsight bias

6    with an offender who is engaged with victims

7    starts to characterize all those behaviors

8    that are considered normative in the time of

9    the relationship later as red flags.

10           That's the problem with hindsight

11   bias when we're examining relationships

12   backward, already understanding that offenses

13   had occurred.

14   BY MR. LOVE:

15       Q.   So in the second paragraph of page 13

16   on the fourth line, it says, "However, to

17   equate this retrospective, hindsight view of

18   Mr. Carter to enabling him and overlooking

19   clear indices of sexual abuse of children is

20   simply not fair or accurate."

21           Did I read that correctly?

22       A.   Correct.

23           But again, that's different --

24   completely different than my opinion in the

25   Uber where they directly evidentiary --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 345

1  evidence -- in an evidentiary way link things,

2  like a driver who's being weird or creepy or

3  kissed, to predictions and future risk of

4  sexual assault.  That's not the same thing.

5          Uber has the alternative to go

6  forward with their information, whereas this

7  is about viewing a relationship that -- that

8  uncovers sexual assault and going backwards

9  and interpreting relation -- interpreting

10  behavior that looks normal at the time as a

11  red flag.

12      Q.  So is it your opinion that any time

13  an Uber driver gets a review that uses the

14  word "creepy," that Uber driver should be

15  deactivated?

16          MS. LUHANA:  Objection to form.

17          THE WITNESS:  Well, unfortunately,

18  in -- in the way you question me, you always

19  take me to the ultimate extreme, he should be

20  deactivated.

21          What Uber should do is attend to

22  those and monitor and understand that the

23  factors that they've identified as indices of

24  potential for future offenses should dictate

25  their decisions with that driver going

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 346

1    forward.

2             They know that -- I'd have to look

3    at my report, I outline it all in there, that

4    drivers who are described as creepy or who

5    have IPC incidents are the drivers much more

6    likely to commit future acts of sexual

7    assault.  So they can do different things

8    about that.

9             Did I say anywhere that any of

10   these one single indices should result in

11   deactivation?  I have never said that and

12   would not.  Uber just doesn't act on those

13   things.

14   BY MR. LOVE:

15       Q.   You also don't provide anything that

16   Uber should do when getting a review that says

17   creepy; right?

18             MS. LUHANA:  Objection to form.

19   Misstates her opinions in her report.

20             THE WITNESS:  Well, my task is to

21   look at why the Uber environment is ripe for

22   sexual offending and everything that I lay out

23   and what Uber knew.  It is not to solve Uber's

24   problems with that, but to highlight that they

25   know the things that I already knew in my

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 347

1    opinion, and been -- and haven't made choices

2    about that.

3                    MR. LOVE:  Understood.

4    BY MR. LOVE:

5        Q.   So, again, nothing in your opinion

6    said what Uber should do in the face of one of

7    these indices; right?

8                    MS. LUHANA:  Objection to form.

9    Misstates her -- the opinions in her report.

10                   THE WITNESS:  I think I provide

11   issues around deterrence that give general

12   advice, but I was not hired by Uber to solve

13   their sexual assault problem.

14                   I was hired to look at all the

15   elements and all the documents and all the

16   issues involved, and highlight the issues that

17   they're having to help elucidate why hundreds

18   of thousands of sexual assaults have gone on

19   in that platform.

20   BY MR. LOVE:

21       Q.   In this band director case, before

22   the band director, the school had another

23   instance of sexual abuse reported; correct?

24       A.   Yes.  There was another teacher.

25       Q.   Just the year before; right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 348

1      A.   I -- I -- I don't know exactly when.
2      Q.   And that teacher was convicted of
3  sexual misconduct?
4           MS. LUHANA:  Objection to form.
5           THE WITNESS:  Correct.  The school
6  did everything, again, to expose and not
7  protect that perpetrator.
8  BY MR. LOVE:
9      Q.   Well, so if you could go to page 1 of
10  your report.
11           MS. LUHANA:  This is still
12  Exhibit 17?
13           THE WITNESS:  This -- the Carter
14  report?
15           MR. LOVE:  Yes.
16           THE WITNESS:  Okay.
17  BY MR. LOVE:
18      Q.   In the second paragraph, three
19  sentences up, it says, "The claim asserts that
20  the Pittston Area School District has a
21  'history of endangering students,' citing
22  other cases of sexual abuse in the district,
23  namely a case in 2017 involving a female
24  teacher, Colleen McGarry."
25           Did I read that correctly?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 349

1        A.    Yes.

2        Q.    First of all, now that you know this

3    was in 2017, it was a year before they caught

4    Mr. Carter; correct?

5                MS. LUHANA:  Objection to form.

6                THE WITNESS:  I can't remember

7    when Mr. Carter was -- so I guess it was --

8    I'll trust you that it was 2018.

9                Yes, it was 2018.

10               MR. LOVE:  Okay.

11   BY MR. LOVE:

12       Q.    And you say, "citing other cases of

13   sexual abuse, namely Colleen McGarry."  {Sic}

14               What other case are you referring

15   to?

16               MS. LUHANA:  Objection to form.

17               THE WITNESS:  That -- that does

18   not reflect my opinion; that reflects the

19   Complaint in which I disagreed with the

20   Complaint that they had one other case.

21               There was nothing systemically to

22   suggest that they did anything to protect it.

23   And I'm always critical of an -- of an

24   environment that would just transfer a

25   teacher, not report, not cooperate with law

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 350

1    enforcement, similar to what the Catholic
2    church did with priests.
3              You know, this school district in
4    no way engaged in any of that behavior to
5    protect their own self or their reputation.
6    BY MR. LOVE:
7       Q.   The band director, himself, actually
8    reported sexual abuse of a student; correct?
9              MS. LUHANA:  Objection to form.
10             THE WITNESS:  I believe so.
11   BY MR. LOVE:
12      Q.   And that was not reporting himself;
13   right?
14      A.   No, he did not report himself.
15      Q.   And it was not reporting Colleen
16   McGarry, was it?
17             MS. LUHANA:  Object to form.
18             THE WITNESS:  I -- I can't recall.
19   BY MR. LOVE:
20      Q.   Now, your ultimate opinion, if you
21   look at the bottom of that paragraph that we
22   were just looking at -- oh, sorry.
23             MS. LUHANA:  Still on page 1,
24   counsel?
25             MR. LOVE:  Yes.  Yes.  I actually

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 351

```
 1   have the wrong cite, though.
 2   BY MR. LOVE:
 3       Q.   Your ultimate opinion was that there
 4   was no action or omission by the school
 5   district that caused or allowed the sexual
 6   abuse to occur; is that correct?
 7               MS. LUHANA:  Objection to form.
 8               Counsel, should she go to the last
 9   page?  Is that what --
10               MR. LOVE:  I'm just asking if that
11   was her ultimate opinion.
12               THE WITNESS:  I'd have to read the
13   verbiage of my ultimate opinion.
14               (Whereupon, the witness reviews
15   the exhibit.)
16               THE WITNESS:  I believe that the
17   ultimate opinion that you quoted would be a
18   legal opinion.  I believe that I analyzed this
19   situation and said that in my opinion, the
20   school did not enable or provide an
21   environment which protected, ignored, or
22   facilitated his abuse of these children
23   knowingly.
24   BY MR. LOVE:
25       Q.   And you said policies could be
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 352

1    improved; correct?

2                MS. LUHANA:  Objection to form.

3                THE WITNESS:  Sure.  Policies can

4    be improved, right.

5    BY MR. LOVE:

6        Q.   But despite policies, offenders will

7    offend; correct?

8                MS. LUHANA:  Objection to form.

9                THE WITNESS:  Right.  Especially

10   when they're not -- there's no deterrence or

11   consequences for those policies, violations.

12   BY MR. LOVE:

13       Q.   Now, there was no official school

14   policy on sexual assault at Pittston School

15   District, was there?

16               MS. LUHANA:  Objection.

17               THE WITNESS:  There is certainly

18   policies about sexually abusing children.

19   BY MR. LOVE:

20       Q.   At Pittston School District, was

21   there a -- a sexual abuse policy?

22               MS. LUHANA:  Objection to the form

23   of the question.

24               THE WITNESS:  In my knowledge,

25   legally, and in schools, there is policies and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 353

```
 1   laws against sexually abusing students.
 2              MR. LOVE:  Sure.
 3   BY MR. LOVE:
 4      Q.   There's laws against sexually
 5   assaulting anyone; correct?
 6      A.   Right.
 7      Q.   Okay.
 8              But this school, at least
 9   according to your report -- withdrawn.
10              There is no mention of a sexual
11   assault policy by the school in your report;
12   correct?
13              MS. LUHANA:  Objection to form.
14              THE WITNESS:  That may be true,
15   but that doesn't mean they didn't have a
16   policy.
17              MR. LOVE:  Okay.
18   BY MR. LOVE:
19      Q.   The only thing that you reference is
20   what teachers called The Golden Rule of
21   working in schools; right?
22              MS. LUHANA:  Objection to form.
23              THE WITNESS:  Right.  That was
24   colloquially mentioned in that school
25   environment, that every teacher who was
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 354

1    deposed or talked about, The Golden Rule is

2    you don't abuse the children.

3    BY MR. LOVE:

4        Q.   But that wasn't the rule, was it?

5              MS. LUHANA:  Objection to form.

6              THE WITNESS:  Well, do you want me

7    to swear?  I'll be glad to.

8              MR. LOVE:  Please.  Please do.

9    Let me know what the actual rule is.

10             THE WITNESS:  I'm being directed

11   not to.  It's in my report.

12             MR. LOVE:  Okay.

13   BY MR. LOVE:

14       Q.   But it was don't...curse word...the

15   kids; right?

16       A.   Right.

17       Q.   Not don't abuse the kids?

18       A.   Right.

19       Q.   Okay.

20       A.   I didn't want to swear on the record.

21       Q.   And you thought that that was a zero

22   tolerance policy?

23             MS. LUHANA:  Objection to form.

24             THE WITNESS:  No.  I talked about

25   that as the colloquial understanding that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 355

1  there was a general knowledge, using that

2  illustrative for example of everybody knew not

3  to do that and that it was just a hard stop.

4  BY MR. LOVE:

5      Q.   Well, you saw that as them

6  understanding there was serious consequences

7  to abusing the children; right?

8              MS. LUHANA:  Objection to form.

9              THE WITNESS:  I thought that, as

10  an indices, that that environment, in even the

11  most crude and colloquial way, knew that you

12  do not sexually abuse kids, bottom line.

13              MR. LOVE:  Not exactly my

14  question.

15  BY MR. LOVE:

16      Q.   So my question is, that rule showed

17  you, or that colloquial rule showed you that

18  Mr. Carter understood the consequences of

19  sexual abuse?

20              MS. LUHANA:  Objection to form.

21              THE WITNESS:  Well, that -- that

22  wasn't your question, but he did know the

23  consequences of the sexual abuse --

24              MR. LOVE:  Right.

25              THE WITNESS:  -- because he took

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 356

1    effort to hide it.

2    BY MR. LOVE:

3        Q.    And any sexual abuser knows that

4    legally what they're doing is wrong; right?

5                MS. LUHANA:  Objection to form.

6                MR. LOVE:  Withdrawn.

7    BY MR. LOVE:

8        Q.    Now, you write, on page 14, in the

9    first paragraph, about halfway through, it

10   says, "To believe that 'if only' an offender

11   knew the policy prohibiting abuse or

12   inappropriate behavior, he would not engage in

13   it simply defies reality."

14               Did I read that correctly?

15       A.    You did.

16       Q.    So whether or not an offender knows

17   about a policy that would prohibit their

18   behavior does not actually prevent or deter a

19   sexual offender; correct?

20               MS. LUHANA:  Objection to form.

21               THE WITNESS:  Exactly.

22               That's why I have such a hard time

23   that Uber promotes its community guidelines as

24   sufficient education for riders and passengers

25   about sexual assault on the platform.

Page 357

1            Not only aren't they policies,
2    they're just guidelines.
3    BY MR. LOVE:
4        Q.   So to clarify, it doesn't matter
5    whether an offender knows or doesn't know
6    about a policy; right?
7                MS. LUHANA:   Objection to form.
8                THE WITNESS:   It's not as simple
9    as that.   It matters if they know about the
10   rules, if the rules are clearly defined and
11   enforced and there are consequences for that
12   policy.
13               It's not the policy in and of
14   itself.   It's not a paragraph on a website
15   under community guidelines that says no sex no
16   matter what.   It's zero tolerance for sexual
17   assault.
18               If there's tol -- if you sexually
19   assault somebody in our environment, we will
20   cooperate.   We will not protect you.   We will
21   make action for the victim.   And in the
22   meantime, we'll do what we can do to deter you
23   by not letting you alone in the school room,
24   putting up cameras, making you sign off on
25   mandatory trainings, every year on mandatory

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 358

1    reporting, and have other teachers enlisted as

2    in monitoring your behavior if -- and bringing

3    it to the administration and encouraging that.

4    BY MR. LOVE:

5        Q.   I want to follow up on a couple

6    things that you just said.

7                One, you wrote here that it

8    matters not if an offender knows about the

9    policy, it would not prevent sexual abuse;

10   right?

11               MS. LUHANA:  Objection to form.

12   BY MR. LOVE:

13       Q.   That's what this opinion says?

14       A.   And that's what I just said.  It's

15   not the policy in and of itself that matters.

16       Q.   Okay.

17               And for training, you said that

18   Uber should have better training, essentially.

19   But this school failed to give legally

20   mandated training to Mr. Carter; right?

21               MS. LUHANA:  Objection to form.

22               THE WITNESS:  I don't know that

23   that's true.  I believe he was a mandated

24   reporter and there was mandated training.  And

25   he knew he was a mandated reporter.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 359

1   BY MR. LOVE:

2       Q.   Nowhere in here do you say that he

3   was given mandated reporter training; right?

4           MS. LUHANA:  Objection to form.

5           THE WITNESS:  I'd have to review

6   again.  I know I talk about mandated training

7   in there and that he was aware he was a

8   mandated reporter.

9           MR. LOVE:  Okay.

10  BY MR. LOVE:

11      Q.   So if you go to page 7, the second

12  paragraph, about halfway through, it says,

13  "Additionally, I do not believe that mandated

14  reporter training for Mr. Carter or Mr. V

15  would have prevented the sexual abuse"; right?

16          MS. LUHANA:  Objection to form.

17          THE WITNESS:  That's completely

18  different than you saying he did -- the school

19  did not provide mandating training -- mandated

20  trainer reporting.

21  BY MR. LOVE:

22      Q.   Well, it says "would have"; right?

23          MS. LUHANA:  Objection to form.

24          THE WITNESS:  Okay.  I'm -- I'm a

25  little unclear about what you're getting at or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 360

```
 1   what you're asking me.  Sorry.
 2   BY MR. LOVE:
 3       Q.   This sentence indicates that they did
 4   not provide the mandated training; right?
 5                MS. LUHANA:  What sentence are you
 6   looking at, counsel?  One for --
 7                MR. LOVE:  The one I just read.
 8                MS. LUHANA:  Where -- it's on
 9   page -- we're not -- I don't think.  Okay,
10   sorry.
11                THE WITNESS:  No, it's -- it's
12   right there.
13                MS. LUHANA:  Okay.
14                THE WITNESS:  This is a -- this is
15   an analysis of something that the -- that was
16   presented in the Complaint that more stringent
17   mandatory reporting, training, could have been
18   preventative.
19                And I'm saying there's no
20   necessary evidence of that 'cause he knew he
21   was a mandated reporter.  He used ChildLine.
22   And so you might be picking apart verbiage at
23   a much deeper level.
24                MR. LOVE:  Okay.
25   BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 361

1    Q.   Let's go down to the third paragraph

2    under the next bolded title, and it starts

3    "Second."

4                MS. LUHANA:  What page?

5                MR. LOVE:  Same page.

6                THE WITNESS:  Right.  It's right

7    here.

8    BY MR. LOVE:

9    Q.   And it says, "Second, the idea that

10   if Mr. Carter had been given a training, he

11   would not have abused or continued to abuse

12   the victims is illogical."

13                This indicates that he was not

14   given a training; correct?

15                MS. LUHANA:  Objection to form.

16                THE WITNESS:  This is a specific

17   training that the school would have reiterated

18   individual than the state training.  Everybody

19   has to take a state training every year.

20                And for the school to reiterate

21   that training doesn't say anything about

22   preventative, that it would have prevented

23   this offense.

24   BY MR. LOVE:

25   Q.   If you could go to the last sentence

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 362

1    on that page, it says, "No policy or,

2    including the mandated reporter policy or

3    training, would have prompted him to report

4    something he knew was wrong, illegal, and

5    potentially had consequences for him,

6    something he stated as reported by" --

7    redacted -- "in his deposition."

8              So this indicates that, in fact,

9    it was the mandated reporter policy and

10   training that was not given to him; correct?

11             MS. LUHANA:  Objection to form.

12             THE WITNESS:  This is getting into

13   something I can't recall the intricacies of,

14   so...

15   BY MR. LOVE:

16        Q.   Now, if you could go to page 12.  The

17   very first sentence says, "A brief examination

18   of the available facts in the sexual abuse

19   case of Colleen McGarry would not, in my

20   opinion, trigger a need for an overhaul of

21   policy or unusually increased vigilance for

22   the Pittston Area School District."

23             And then if you read the last

24   sentence of the second paragraph, it says,

25   "There is little reason to generalize from her

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 363

```
 1   case, her behavior, or her conviction,
 2   especially given that she was one case for 190
 3   teachers and 266 support staff."
 4              190 teachers and 266 support
 5   staff.  That's 456 employees; right?
 6        A.    Yeah.
 7        Q.    And one out of 456 is .219 percent?
 8              MS. LUHANA:  Objection to form.
 9              THE WITNESS:  Oh.
10   BY MR. LOVE:
11        Q.    I'll represent to you that one out of
12   456 is .219 percent and that is higher than
13   the Uber incident rate; correct?
14              MS. LUHANA:  Objection to form.
15              THE WITNESS:  They are not
16   complete -- they are not comparable
17   whatsoever.
18   BY MR. LOVE:
19        Q.    I'm not asking about comparability,
20   I'm just asking if it's higher?
21              MS. LUHANA:  Objection to form.
22   BY MR. LOVE:
23        Q.    Is .219 higher than the Uber incident
24   rate?
25              MS. LUHANA:  Objection to form and
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 364

1    the comparison.

2              THE WITNESS:  You know, it is so

3    easy to play with numbers and get them out of

4    context, and I'm not -- if you were just

5    asking me a general math question and I could

6    answer that.

7              But this is in the context of

8    comparing apples to oranges and offenders to

9    offenders.  These type of offenders are not

10   even comparable to the offenders in my opinion

11   in the -- in Uber, my Uber report.

12             MR. LOVE:  Go again.

13   BY MR. LOVE:

14      Q.   As a simple math question .219 is

15   higher than the Uber incident rate; yes or no?

16             MS. LUHANA:  Objection to form and

17   the comparison.

18             THE WITNESS:  I'm sorry, but

19   you -- you can't ask in a deposition a simple

20   math question so that me, as a witness, can

21   say I agree that this is less than that.

22             This is about comparing incidents

23   of sexual assault and the 500 and some

24   thousand incidents of sexual assault and

25   offenders in -- of children in a school

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 365

```
 1   district who have long-term relationships with
 2   their victims versus offenders who use the
 3   Rideshare opportunity to opportunistically
 4   offend.
 5              MR. LOVE:  Dr. Valliere, I
 6   understand the context.  I understand your
 7   opinion about comparing them.  You've already
 8   stated it and your counsel will get a chance
 9   to ask you questions.  But you do have to
10   answer my question and you have not.
11              MS. LUHANA:  Counsel, she has
12   answered your question.
13   BY MR. LOVE:
14      Q.   Is -- is --
15              MS. LUHANA:  You're -- you're
16   specifically asking about an incident rate, so
17   it's not just pure math because you're tying
18   in trips into it as well.  So it's a very
19   different --
20              (Overlapping Speakers.)
21              MR. LOVE:  I am asking if one
22   number is larger than another number.  It is a
23   straightforward question.  That's all I'm
24   asking.
25   BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 366

1     Q.   Is .219 higher than the number we saw

2   for Uber incident rate?

3              MS. LUHANA:   Objection to form.

4   Asked and answered.   Improper comparison.

5              THE WITNESS:   It is an improper

6   comparison because this is number of people.

7   What you're talking about is number of rides.

8              MR. LOVE:   I'm not --

9              THE WITNESS:   One percent if you

10  give a thousand rides, it changes the numbers

11  all together.   This is not an incident rate

12  comparison.

13  BY MR. LOVE:

14     Q.   Is there something confusing about

15  the question in and of itself?

16     A.   Yes.   You are talking about

17  percentage of teachers versus percentage of a

18  billion rides.   That is completely

19  inappropriate.

20              If you told me percentage of

21  teacher interactions per one time spent with a

22  student compared to percentage of driver

23  interactions with a potential victim, that

24  would be more comparable.

25     Q.   But, Dr. Valliere, I'm not comparing

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 367

1    them.  I'm just asking --

2        A.   And they're --

3        Q.   -- if one number is higher than the

4    other.  That is it.

5        A.   Well, if there's no comparison,

6    there's no reason to say that one is higher

7    than another.  They're not equal numbers to

8    compare or say one is higher than one is not.

9             Because I could ask you how many

10   oranges are in a grocery store versus how many

11   passengers in an airplane, and they had -- and

12   say well, the incident rate of oranges is

13   lower than the number of passengers in an

14   airplane.  It doesn't make any sense

15   whatsoever.

16       Q.   Sure.

17            That's what I'm asking you to do,

18   just -- just the numbers.  Just the numbers.

19       A.   I'm not willing to compare those in

20   the context of sex offending and sexual

21   assault rates.

22       Q.   I am taking it out of the context,

23   Dr. Valliere.  There is no context.  I'm

24   asking you if a number is higher than a

25   number.  That's it.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 368

1              Is .219 higher than .00002; yes or
2      no?

3              MS. LUHANA:  Objection to form.
4      Vague question.

5              THE WITNESS:  With zero context,
6      zero incidents, zero prevalence, zero ability
7      of what you're even measuring, those numbers
8      are different, and the .2 whatever number you
9      said is higher than .0002.

10             MR. LOVE:  Okay.
11     BY MR. LOVE:

12         Q.   Certainly --

13         A.   If you compare incidents and
14     prevalence, they have to be measuring exactly
15     the same thing.

16         Q.   Certainly, Dr. Valliere, you would
17     not hold Uber to a higher standard of care
18     than a school that cares for children; right?

19             MS. LUHANA:  Objection to form.

20             THE WITNESS:  I would.

21     BY MR. LOVE:

22         Q.   You would hold Uber to a higher
23     standard of care than a school that looks
24     after children?

25             MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 369

1              THE WITNESS:  I would, because
2    Uber creates -- Uber profits off of a specific
3    environment that makes it far greater risk of
4    sexual assault to vulnerable victims; risk
5    situations that they, themselves, have
6    studied, identified and quantified and
7    continue to fail to intervene in.
8              Schools have instituted many,
9    many, many things to further protect their
10   students and prevent any kind of incidents.
11   That's the whole point.
12              I'm not comparing schools to Uber,
13   but I am holding Uber accountable for knowing,
14   being trained on, doing their own studies on
15   the fact that sexual assault is highly -- that
16   environment is highly ripe for sexual assault.
17              They know the risk factors.  They
18   know the issues with education, training and
19   deterrence and consequenting in their own
20   environment.  So schools already have a far
21   higher standard to live up to than Uber has
22   held itself to.
23   BY MR. LOVE:
24       Q.   To be clear, the only safety
25   mechanism -- sorry.  Withdrawn.  I'm going to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 370

1    use your words.

2                The only thing to further their

3    student safety and prevent any kind of

4    incident that you mention in this report is

5    having cameras in the school that the offender

6    could avoid; correct?

7                MS. LUHANA:  Objection to form.

8    Misstates the report.

9                THE WITNESS:  Yeah, that's not

10   what I've said at all.

11   BY MR. LOVE:

12       Q.   You don't identify, in this report,

13   any other safety mechanism that the school

14   implemented?

15               MS. LUHANA:  Objection to form.

16               THE WITNESS:  That was not my task

17   in this report.

18               MR. LOVE:  But that's not my

19   question.

20               THE WITNESS:  The whole issue --

21   you -- it has to be your question because when

22   I am giving a report, my -- my report wasn't

23   to analyze the school's safety issues.  Mine

24   was to analyze was this particular offender in

25   this particular circumstance with these

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 371

1    particular victims easily identifiable by any
2    observer.
3              It was not to do a safety analysis
4    of the structure of the school.  It was not at
5    all the same referral issue as I was asked to
6    do in Uber.  So I wouldn't mention those
7    things.  I wouldn't talk about those things.
8              MS. LUHANA:  Counsel, we've been
9    going for a while.  Is now a good time for a
10   break?
11             MR. LOVE:  If I can get past this
12   one point, it would be a great time for a
13   break.
14             MS. LUHANA:  Okay.
15             MR. LOVE:  I just have a few more
16   questions to follow up on that.
17             MS. LUHANA:  Still on this report?
18             MS. LUHANA:  Yep.
19             MR. LOVE:  On what we were just
20   talking about.
21   BY MR. LOVE:
22      Q.   So your task in this report was to
23   decide whether or not this school allowed the
24   sexual abuse to happen; correct?
25             MS. LUHANA:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 372

1              THE WITNESS:   No.   My task in this

2     report was this report came to fruition

3     because of the Complaint that alleged those

4     things.

5              My task was to analyze the -- the

6     influence of the offender in the environment,

7     look at the victim behavior and -- right

8     there, and see these referral questions;

9     whether there was a preventative impact of

10    mandatory reporting, whether the conviction of

11    a prior sex offender should have signified a

12    systematic problem, talk about the victims'

13    reluctance to disclose and the secret nature

14    of abuse, the consistency and reliability on

15    relying on red flags, the effectiveness of

16    policy as a deterrent and the description and

17    explanation of the techniques, manipulations

18    used by sex offenders to succeed in committing

19    abuse without detection.

20              There is nothing in there about

21    negligence, safety features or anything.

22    BY MR. LOVE:

23        Q.    The very last --

24        A.    Those were my specific tasks.

25        Q.    The very last sentence in this report

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 373

1    before "I have provided all these opinions to

2    a reasonable degree of psychological

3    certainty" --

4                    MS. LUHANA:  So it's on the last

5    page, counsel?

6                    MR. LOVE:  Yes.

7                    MS. LUHANA:  Okay.  One second.

8    It's on page 16, I think.

9                    THE WITNESS:  I think it's 14

10   really, I think two pages are referenced.

11   BY MR. LOVE:

12       Q.   The very last sentence says "There

13   is" --

14                   MS. LUHANA:  I'm not there yet.

15   Just wait a second.

16                   There we go.  Okay.  Sorry.  No

17   worries.

18   BY MR. LOVE:

19       Q.   The very last sentence is, "There is

20   little in his behavior to suggest that he was

21   enabled, protected, or supported in his

22   offending through acts of blindness,

23   negligence, omission, or commission by the

24   system that he utilized for access to his

25   victims and for his status and authority."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 374

1          Did I read that correctly?

2     A.    Right.

3     Q.    And the only safety mechanism that

4   you mention in this report is cameras?

5     A.    I don't --

6               MS. LUHANA:  Objection to form.

7               THE WITNESS:  I don't believe I

8   even mention cameras as a safety mechanism.  I

9   addressed other things that I was asked to

10  address.  I was not evaluating safety features

11  at all in this report.

12  BY MR. LOVE:

13    Q.    So whether or not you were asked to

14  review them, there is nothing else

15  safety-related mentioned in this report that

16  the school implemented for the students'

17  safety; correct?

18              MS. LUHANA:  Objection to form.

19              THE WITNESS:  It does have to do

20  with whether or not I'm asked.

21  BY MR. LOVE:

22    Q.    Well, I'm asking you to answer this

23  question, regardless of that fact.

24              Nothing in this report mentions

25  any other policy, facility or mechanism by

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 375

1  which the school attempted to keep children

2  safe; correct?

3              MS. LUHANA:  Objection to form.

4              THE WITNESS:  Correct.

5              MS. LUHANA:  Misstates --

6  misstates what's in the report.

7              THE WITNESS:  I stay -- when I am

8  given a task, I stay within my referral

9  issues.

10             MR. LOVE:  Thank you.  We can go

11  off the record.

12             THE VIDEOGRAPHER:  Going off the

13  video record.  The time is 4:41.

14             (Whereupon, a recess was taken at

15  the above time.)

16             THE VIDEOGRAPHER:  We are back on

17  the video record.  The time is 4:52 p.m.

18             This begins Media Unit No. 6.

19  BY MR. LOVE:

20     Q.   Dr. Valliere, most sexual assault is

21  perpetrated by someone the survivor knows; is

22  that right?

23             MS. LUHANA:  Objection to form.

24             THE WITNESS:  Yeah, generally.

25  BY MR. LOVE:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 376

1      Q.   Yet as a society, we continue to
2   overestimate the danger of strangers; right?
3              MS. LUHANA:  Objection to form.
4              THE WITNESS:  I -- we -- yes, we
5   do overestimate the danger of strangers in
6   terms of risk for sexual assault.
7   BY MR. LOVE:
8      Q.   And women fear being sexually
9   assaulted by a stranger as opposed to an
10   acquaintance; correct?
11              MS. LUHANA:  Objection to form.
12              THE WITNESS:  That's generally
13   true, yes.
14              MR. LOVE:  If we can pull up
15   Tab 20.  This will be Exhibit 18.
16              (Whereupon, a document was marked,
17   for identification purposes, as Exhibit 18.)
18              MR. LOVE:  Dr. Valliere, let me
19   know when you have that open.
20              THE WITNESS:  My addresses?
21              MR. LOVE:  Yes.
22   BY MR. LOVE:
23      Q.   Now, this is -- is where you treat
24   your patients; correct?
25      A.   Yeah, those three buildings -- the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 377

```
 1   three rightmost buildings to that -- in that
 2   image.
 3       Q.   So on the far right, the brownish
 4   brick building, who do you treat there?
 5       A.   With the dark blue shutters?
 6       Q.   Are they dark blue?  Yes.
 7       A.   Oh, that's the -- under that tree and
 8   around the side is the entrance to the
 9   offender program.
10       Q.   Okay.
11            And then what about the middle
12   door?
13       A.   We don't use that.  That's --
14            (Overlapping Speakers.)
15       Q.   And the next -- and the next door
16   over?
17       A.   That's where we treat other people,
18   not -- not offenders.
19       Q.   And there's no security in these
20   buildings; right?
21            MS. LUHANA:  Objection to form.
22   BY MR. LOVE:
23       Q.   Like a security guard?
24       A.   There's no -- we never needed a
25   security guard.  There's a security alarm
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 378

1  system that everybody has.

2          MR. LOVE:  Okay.  We can pull

3  that -- put that aside.  And if you just give

4  me one minute, I think I might be done.

5          (Pause.)

6          MR. LOVE:  This is all the

7  questions I have for you right now.  Thank

8  you, Dr. Valliere.

9          THE WITNESS:  The best surprise of

10  the day.

11          MS. LUHANA:  Great.  Counsel, I

12  may have some questions, so let's take a -- I

13  wasn't expecting this.  Let's take a 10 to

14  15-minute break.

15          MR. LOVE:  Sounds good.  Let's go

16  off the record, please.

17          THE VIDEOGRAPHER:  Going off the

18  record.  The time is 4:55 p.m.

19          (Whereupon, a recess was taken at

20  the above time.)

21          THE VIDEOGRAPHER:  We are back on

22  the video record.  The time is 5:36 p.m.

23  BY MS. LUHANA:

24      Q.  Good evening, Dr. Valliere.

25      A.  Good evening.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 379

1      Q.   It's been a long day.  I just have
2   some -- some questions for you, so I hope...
3            MS. LUHANA:  Let's please mark, as
4   Exhibit 19, your report that has been
5   submitted in this case from September 26th.
6            (Whereupon, a document was marked,
7   for identification purposes, as Exhibit 19.)
8   BY MS. LUHANA:
9      Q.   So, Dr. Valliere, you expressed
10  earlier on, counsel had asked you about the
11  documents you relied on to come to your
12  conclusions in preparing and submitting this
13  report.
14            Do you recall that?
15     A.   I do.
16     Q.   Okay.
17            And he mentioned documents that
18  were provided to you by the attorneys that
19  were involved.
20            Do you recall that discussion?
21     A.   Yes.
22     Q.   So can you please provide, in terms
23  of your methodology, what you did in this case
24  for your report to arrive at your opinions?
25     A.   Sure.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 380

1              I laid it out in great --

2              MR. LOVE:  Object to form.  Object

3      to form.

4              THE WITNESS:  I laid it out in

5      significant detail on page 5 and 6 of my

6      report.  But foundationally, I relied on my

7      decades of expertise in sexual offenders,

8      criminology, victim behavior and different

9      areas of psychology, my understanding of the

10     research and the literature in the field, to

11     have the expertise to come to this.

12              And then for this specific

13     methodology, it doesn't differ from any other

14     way I do forensic or clinical evaluations in

15     that I review documentation.  In this case, I

16     reviewed Uber documentation, internal

17     documents, marketing efforts, evidence,

18     deposition, policies, ads, internal documents

19     regarding all the safety features, screening,

20     background checks, everything I opined on in

21     my report.

22              And I also asked the attorneys to

23     provide information and documents that I felt

24     would be relevant to my report, as well as had

25     access to Everlaw to do searches that were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 381

```
 1   necessary.
 2              I looked at old and current
 3   depositions that were relevant, and by "old" I
 4   mean preceding my report, 36 -- 3 -- 30(b)(6)
 5   witnesses in evidence.  So I did that.
 6              And none of these -- this is what
 7   I do in -- in common standard practice, is you
 8   look at documents that provide information and
 9   try to get a full picture of the issue
10   involved from both sides.
11   BY MS. LUHANA:
12      Q.   And so do you believe you had all the
13   evidence you needed to support your opinions
14   here?
15      A.   I do.
16              MR. LOVE:  Object to form.
17   BY MS. LUHANA:
18      Q.   And you, in fact, requested documents
19   related to Uber's policies, as well as
20   deposition testimony and marketing documents,
21   screening, training, deactivation documents,
22   amongst other things?
23              MR. LOVE:  I object to form, and I
24   objected to the last question as well, but it
25   doesn't look like it made it on to the record.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 382

1    So objection to both of the last questions.

2                    THE WITNESS:  Yes.

3    BY MS. LUHANA:

4        Q.   Doctor, counsel had previously asked

5    you about your expertise and whether you had

6    specifically formal education or degrees in

7    marketing, as well as public relations,

8    whether you had -- you were a regulatory

9    expert, had formal education statistics,

10   corporate governance --

11                   (Court Reporter Clarification.)

12   BY MS. LUHANA:

13       Q.   It was -- you were asked -- let me

14   retract the question and rephrase it.

15                   Doctor, earlier, counsel had asked

16   you whether you had formal education in

17   marketing, in public relations, in statistics,

18   in law enforcement, in cover -- corporate

19   governance, as well as if you were a

20   regulatory expert.

21                   Do you recall that line of

22   questioning?

23       A.   I do.

24                   MR. LOVE:  Objection to form.

25   BY MS. LUHANA:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 383

1      Q.   So, Doctor, do you believe the only
2  way to have expertise in any of these areas is
3  only through formal education?
4            MR. LOVE:  Object to form.
5            THE WITNESS:  No, especially in
6  the context of rendering my opinion, which was
7  about sexual assault on the Uber platform.
8            MS. LUHANA:  Okay.
9  BY MS. LUHANA:
10     Q.   And so can you explain to me the
11  kinds of expertise and experience and training
12  that you have?
13     A.   I have expertise in general
14  psychology and information about what
15  influences the way people think and feel.  I
16  have understanding of consumer sentiment,
17  building relationships, what building a sense
18  of familiarity does to risk assessment and
19  people's risk assessment.
20            I understand the biases that are
21  utilized and supported in decision-making.  I
22  understand things about sex offenders, women,
23  psychology, victim behavior, risk analysis,
24  and I understand how to interpret all the
25  documents that I relied on from Uber and their

Page 384

1  own -- and how to understand how Uber's own

2  statements and documentation support some of

3  the opinions I had pre-established.

4      Q.    Doctor, counsel had asked you

5  questions about your book, Unmasking the

6  Sexual Offender.

7              Do you recall that?

8      A.    Yes.

9      Q.    And he had asked about when it was

10  published.

11              However, when did you submit the

12  book for publication; do you recall?

13              MR. LOVE:  Object to form.

14              THE WITNESS:  I wrote it

15  through 2021 and into 2022, and I believe I

16  submitted it for my final drafts -- not my

17  final drafts, my initial manuscript in

18  June 2022, and then received the edited

19  manuscript back for review in September of

20  2022.  And then finalized it.

21              MS. LUHANA:  Okay.

22  BY MS. LUHANA:

23      Q.    And you were asked about when you

24  were -- became involved in the Lyft matter.

25              Can you provide some context of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 385

```
 1    when you were involved in the Lyft matter?
 2                I believe you testified about it
 3    previously, so can you explain when you were
 4    reached out to discuss the Lyft matter?
 5                MR. LOVE:  Objection.
 6                THE WITNESS:  Oh, sorry.
 7                To my best recollection, it was
 8    early in 2022 that I was contacted to talk
 9    just about victim behavior because my victim
10    book had already come out by Attorney Boundas,
11    for just some general questions, and then
12    asked to work specifically on the Lyft case to
13    talk about initially victim behavior, then
14    offender behavior.
15                I began work on that Lyft report
16    either very, very late in 2022, like December,
17    but I know I was working on it in
18    January 2023, and I believe my first report I
19    provided in February 2023, and the deposition
20    was in March 2023.
21    BY MS. LUHANA:
22        Q.   You were asked questions previously
23    about comparing one picture, let's say, a
24    picture of someone -- a driver's license
25    versus, let's say, a picture on a passport.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 386

1              Do you recall that?
2      A.    I do.
3      Q.    Do you think that's an appropriate
4  way to do a background check?
5              MR. LOVE:  Object to form.
6              THE WITNESS:  It's not anything I
7  would ever use or rely on as a background
8  check.
9  BY MS. LUHANA:
10     Q.    And -- and do you know the accuracy
11  of comparing one picture to another picture to
12  identify if it's the same person?
13             MR. LOVE:  Object to form.
14             THE WITNESS:  By a human being, I
15  have no idea.  I imagine you'd have to have
16  some -- something else for that.
17  BY MS. LUHANA:
18     Q.    Some kind of facial recognition or
19  something like that technology to assess the
20  identity and the similarity of the same people
21  on those two pictures?
22             MR. LOVE:  Object to form and
23  leading.
24             THE WITNESS:  Yeah.  You'd have to
25  have some kind of technology or something.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 387

1           MS. LUHANA:  Okay.

2    BY MS. LUHANA:

3       Q.   Doctor, do you remember talking about

4    Richard, who was an offender that you

5    discussed in -- in your book, Unmasking the

6    Sexual Offender?

7       A.   I do.

8       Q.   Okay.

9              And so how long ago was that

10   incident?

11      A.   I believe it was 1993 or 1994 when I

12   was just beginning my career and just

13   barely -- like I said, I was taking over an

14   offender program that was being run much

15   differently than I began to run it.

16      Q.   And so that was -- you were asked

17   questions about some incident that took place

18   about 32 years ago?

19           MR. LOVE:  Object to form.

20           THE WITNESS:  Correct.

21   BY MS. LUHANA:

22      Q.   And so how old were you when -- when

23   that incident took place?

24      A.   Oh, 27.

25      Q.   So you were in your 20s?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 388

1      A.    Maybe 28.

2            MR. LOVE:  Object to form.

3    BY MS. LUHANA:

4      Q.    And early on -- that was early on in

5    your practice; correct?

6            MR. LOVE:  Object to form.

7            THE WITNESS:  Yes, right at the

8    beginning.

9    BY MS. LUHANA:

10     Q.    And so there were some -- some

11   lessons and teachings from what transpired

12   with that incident; correct?

13           MR. LOVE:  Object to form and

14   leading.

15           THE WITNESS:  Yes.

16   BY MS. LUHANA:

17     Q.    And so can -- can you provide us with

18   what -- what takeaways you have from that

19   situation?

20     A.    Well, there's so many that change in

21   progress, even if it -- in -- in offenders,

22   may serve their deviant behavior versus

23   pro-social behavior, like doing better,

24   cleaning up or appearing more pro-socially;

25   that someone's sexual deviance is more fluid

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 389

1  and can't be only defined by the victim in

2  that particular case.  Just thinking that this

3  person would only abuse young boys was a

4  mistake and that there were other things and

5  other things that aroused him; to do a more

6  thorough assessment of what somebody's

7  motivation to help another person is.

8           So there were many lessons.

9      Q.   And we were shown Exhibit 18

10  previously and a picture of your practices and

11  where they're located.

12           Do you recall that?

13      A.   Yes.

14      Q.   Okay.

15           And so you had testified earlier

16  about the offender program and a space for

17  that versus where victims, for example, are

18  treated; correct?

19      A.   Correct.

20           MR. LOVE:  Object to form.

21           THE WITNESS:  Yes.

22           MS. LUHANA:  What's your

23  objection?

24           MR. LOVE:  Leading.

25           MS. LUHANA:  She had testified

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 390

1   earlier about that; correct?  Anyway.

2   BY MS. LUHANA:

3       Q.   So -- so, as I said, you had

4   testified earlier about the offender program

5   and that space versus where victims are

6   treated; correct?

7       A.   Yes.

8       Q.   Okay.

9            And so what's the policy you have

10  in terms of when you're treating victims

11  versus when you're treating offenders?

12           MR. LOVE:  Object to form.

13           THE WITNESS:  That we will never

14  be treating a certain -- so when we treat

15  offenders in the one building, we do not treat

16  children or potential targets in the other

17  building.  The hours are different.

18           Additionally, we treat most of our

19  victims at the Fogelsville location, only some

20  who have to be in -- you know, have

21  transportation issues or whatever.

22           But the days -- there are

23  delineated days and hours, so there's no

24  overlap of sex offenders and potential

25  targets.

Page 391

1   BY MS. LUHANA:

2      Q.    And why do you do that so there's no

3   overlap?

4      A.    Well, we don't want to provide any

5   opportunity for there to become familiarity of

6   people passing by in the same location.  We

7   have separate waiting rooms.  We have

8   separate -- so it's -- it -- it's -- the

9   people, the offenders don't go into the other

10  building whatsoever.

11             So it just creates very clear

12  boundaries and so there's no opportunity to

13  form any kind of type of familiarity or

14  relationship between the clients.

15     Q.    So it would address potential safety

16  concerns; correct?

17     A.    Absolutely.

18             MR. LOVE:  Object to form.

19  BY MS. LUHANA:

20     Q.    Doctor, in -- in terms of -- you

21  testified about the Richard -- a couple

22  situations earlier on in your practice that

23  you discussed in your book.

24             Since that time, has there ever

25  been a situation where an offender has

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 392

1   assaulted a victim in your practice?

2            MR. LOVE:  Object to form.

3            THE WITNESS:  Definitely not one

4   that they met in the practice.  There's never

5   been any of our offenders who have assaulted

6   anyone that they had access to, staff,

7   clients, other offenders in the program, in my

8   program.

9   BY MS. LUHANA:

10     Q.    Okay.

11            Has there ever been a scenario

12   where one of your staff or a clinician has

13   assaulted or engaged in sexual misconduct with

14   an offender or a victim?

15            MR. LOVE:  Object to form.

16            THE WITNESS:  No.  No, absolutely

17   not.

18   BY MS. LUHANA:

19     Q.    So let's go to Exhibit -- is 18 your

20   report?

21     A.    19.

22     Q.    19.  Let's go to Exhibit 19.

23     A.    It's up.

24     Q.    And let's turn -- let's turn to

25   page 16 first, okay.  And let's look at the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 393

1    bar graph on page 16.

2              Do you see that there?

3      A.   I do.

4      Q.   And you see these are the number of

5    sexual assaults and sexual misconduct incident

6    reports that Uber received annually compared

7    to the number disclosed in the U.S. Safety

8    Reports; correct?

9      A.   Yes.

10     Q.   Okay.

11             And so for 2017, what was

12   disclosed in the Safety Report, what number of

13   sexual assault and sexual misconduct

14   instances?

15             MR. LOVE:  Objection to form.

16             THE WITNESS:  2,936.

17   BY MS. LUHANA:

18     Q.   And what was the overall number of

19   incidences that were truly reported to Uber

20   that Uber did not disclose in the Safety

21   Report?

22             MR. LOVE:  Object to form.

23             THE WITNESS:  71,080.

24   BY MS. LUHANA:

25     Q.   And so when we go from 2017 to 2018,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 394

1    what was the number reported in 2018 of sexual

2    assault and sexual misconduct incident reports

3    that Uber received that it reported in its

4    Safety Reports?

5         A.    3,045.

6         Q.    And what was the total number

7    actually reported the -- the majority of which

8    Uber didn't disclose?

9         A.    93 -- 93,464.

10        Q.    Okay.

11              And now looking at 2019, what was

12   the number that reported by Uber of sexual

13   assault and sexual misconduct in certain

14   Safety Reports?

15              (Technical difficulties.)

16              THE VIDEOGRAPHER:  Going off the

17   video record.  The time is 5:54 p.m.)

18              (Technical difficulties.)

19              THE VIDEOGRAPHER:  We are back on

20   the video record.  The time is 5:56 p.m.

21   BY MS. LUHANA:

22        Q.    Doctor, we were talking about

23   Exhibit 19, and so looking at page 16, where

24   the number of sexual assault and sexual

25   misconduct incident reports that Uber received

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 395

```
 1    that reported in Safety Reports versus the
 2    total number, the majority of which were not
 3    disclosed.
 4            So let's look at 2017, and you had
 5    testified how many were reported in the Safety
 6    Report in 2017 by Uber?
 7            MR. LOVE:  Object to form.
 8            THE WITNESS:  2,936.
 9    BY MS. LUHANA:
10        Q.  And what was the total number that
11    were reported to Uber, the majority of which
12    were not disclosed?
13            MR. LOVE:  Object to form.
14            THE WITNESS:  71,080.
15    BY MS. LUHANA::
16        Q.  And then looking at 2018, what was
17    the number that was disclosed by Uber of
18    sexual assault and sexual misconduct incidents
19    in its Safety Report?
20        A.  3,045.
21        Q.  And what was the total number that
22    were reported to Uber of sexual assault and
23    sexual misconduct incidences, the majority of
24    which were not disclosed?
25            MR. LOVE:  I object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 396

1          THE WITNESS:  93,464.

2    BY MS. LUHANA:

3        Q.   And same for 2019.

4             What was disclosed in the safety

5    reports?

6        A.   2826.

7        Q.   And what was the total --

8             MR. LOVE:  Object to form.

9    BY MS. LUHANA:

10        Q.   And what was the total number, in

11    fact, reported to Uber, the number of sexual

12    assaults and sexual misconduct incidences in

13    2019?

14             MR. LOVE:  Object to form.

15             THE WITNESS:  99,201.

16    BY MS. LUHANA:

17        Q.   Okay.

18             Then looking at 2020, please

19    provide the number of sexual assault and

20    sexual misconduct incidences reported in the

21    Safety Reports.

22             MR. LOVE:  Object to form.

23             THE WITNESS:  998.

24    BY MS. LUHANA:

25        Q.   And the -- the total number that was

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 397

```
 1   reporter to Uber in 2020?
 2               MR. LOVE:  Object to form.  Sorry.
 3               THE WITNESS:  41,360.
 4   BY MS. LUHANA:
 5       Q.    And let's go through 2021, the number
 6   that was reported in the Safety Report of
 7   sexual assault and sexual misconduct incident
 8   reports?
 9       A.    1,008.
10               MR. LOVE:  Object to form.
11   BY MS. LUHANA:
12       Q.    And what -- what was the total number
13   of sexual assaults and sexual misconduct
14   incident reports in 2021, the majority which
15   were not disclosed?
16               MR. LOVE:  Object to form.
17               THE WITNESS:  34,790.
18   BY MS. LUHANA:
19       Q.    And then same for 2022.
20               What was the number of sexual
21   assault and sexual misconduct incidences that
22   were reported in the Safety Report?
23               MR. LOVE:  Object to form.
24               THE WITNESS:  1,637.
25   BY MS. LUHANA:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 398

1      Q.   And what was the total number that

2  Uber had received, the majority of which were

3  not disclosed, of sexual assault and sexual

4  misconduct incidences in 2022?

5            MR. LOVE:  Object to form.

6            THE WITNESS:  52,933.

7  BY MS. LUHANA:

8      Q.   And so, Doctor, if you look at from

9  2017 to 2018, did the number of incidences

10  increase?

11            MR. LOVE:  Object to form.

12            THE WITNESS:  Yes.

13  BY MS. LUHANA:

14      Q.   And if you look at 2018 to 2019, did

15  the number of sexual assaults and sexual

16  misconduct reports increase?

17      A.   Yes.

18            MR. LOVE:  Object to form.

19  BY MS. LUHANA:

20      Q.   And so it increased from 2017 to 2018

21  to 2019; correct?

22            MR. LOVE:  Object to form.

23            THE WITNESS:  Yes.

24  BY MS. LUHANA:

25      Q.   And then, as you had testified, the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 399

1   number went down during COVID time from 2020

2   to 2021; correct?

3        A.    That's right.

4        Q.    And then it perceived the number of

5   sexual assault and sexual misconduct incident

6   reports from '21 to 2022 increased; correct?

7                MR. LOVE:  Object to form.

8                THE WITNESS:  That's right.

9   BY MS. LUHANA:

10       Q.    And so then let's take a look at

11  page 17, and you'll see this is the number of

12  sexual assaults and sexual misconduct

13  incidences per subcategory per year.

14               Do you see that there?

15               MR. LOVE:  Object to form.

16               THE WITNESS:  I do.

17  BY MS. LUHANA:

18       Q.    And you'll see, it's the total number

19  of incidences reported based on the Flack data

20  of sexual assault and sexual misconduct

21  reports that Uber received from 2017 to 2024;

22  correct?

23       A.    Yes.

24       Q.    And what you see there is that the

25  numbers increased from 2021 to 2022; correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 400

```
 1       A.   Yes.
 2              MR. LOVE:  Object to form.
 3  BY MS. LUHANA:
 4       Q.   And the number of sexual assault and
 5  sexual misconduct incidences that were
 6  reported to Uber from 2022 to 2023 increased;
 7  correct?
 8              MR. LOVE:  Object to form and
 9  leading.
10              THE WITNESS:  Yes.
11  BY MS. LUHANA:
12       Q.   And then the number from 2023 to 2024
13  of sexual assault and sexual misconduct
14  incidences reported to Uber increased;
15  correct?
16              MR. LOVE:  Object to form.
17              THE WITNESS:  Yes, they do.
18  BY MS. LUHANA:
19       Q.   So they steadily increased from 20 --
20  post COVID, 2021 to 2024 every year; correct?
21              MR. LOVE:  I object to form.
22              THE WITNESS:  Yes.
23  BY MS. LUHANA:
24       Q.   And let's turn to page 22 of your
25  report, and you'll see this chart here of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 401

1    Average Frequency of Sexual Assault, Sexual

2    Misconduct Incidences Per Year in Minutes;

3    correct?

4        A.    That's right.

5        Q.    And so what you see is the -- how

6    many minutes a sexual assault or a sexual

7    misconduct occurred year over year; correct?

8              MR. LOVE:  Object to form.

9              THE WITNESS:  Yes.

10   BY MS. LUHANA:

11       Q.    Okay.

12             So in -- in COVID, in 2021, what

13   was reported to Uber is that there was a

14   sexual assault or sexual misconduct incident

15   every 15.1 minutes; correct?

16             MR. LOVE:  Object to form.

17             THE WITNESS:  That's correct.

18             MR. LOVE:  Assumes facts.

19   Leading.

20   BY MS. LUHANA:

21       Q.    And then the time between a sexual

22   assault and sexual misconduct occurring

23   increases from 2022, 2023 to 2024; correct?

24             MR. LOVE:  Object to form.

25   Assumes facts.  Leading.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 402

```
 1              THE WITNESS:  The time between
 2    sexual assaults decreases.  It goes from
 3    15 minutes all the way to 6 minutes, one
 4    happening every 6 minutes, right.
 5              MS. LUHANA:  Correct.
 6    BY MS. LUHANA:
 7      Q.   So the -- the -- the numbers are
 8    increasing.  However, the number of minutes
 9    are taking place is decreasing, so they're
10    happening more often; correct?
11      A.   Exactly.
12              MR. LOVE:  Object to form.
13    Assumes facts.  Leading.
14    BY MS. LUHANA:
15      Q.   Dr. Valliere, in your opinions, you
16    provide that -- in your report, Exhibit 19,
17    you provide that Uber has misled the public
18    about its sexual assault problem; correct?
19              MR. LOVE:  Object to form.
20              THE WITNESS:  Yes.
21    BY MS. LUHANA:
22      Q.   Can you please provide how Uber has
23    misled the public about its sexual assault
24    problem?
25              MR. LOVE:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 403

1              THE WITNESS:  Well, Uber has not
2    been transparent about the true number of
3    incidents of sexual violence.  They have
4    failed to report and identify women passengers
5    in particular about the highest risk issues on
6    the platform, including what they have
7    identified as risk factors in their own
8    research, like a male driver when you're
9    alone, if you've been drinking, proximity to a
10   bar, time of day and week, age of the driver,
11   riding in the front seat, one-star reviews of
12   the driver, new drivers, the driver's history
13   of interpersonal conducts, and all the risk
14   factors that go to being related to predicting
15   which drivers will commit sexual assaults that
16   I outlined on 18 and 19 of my report.
17   BY MS. LUHANA:
18       Q.   Let's take a look at that.
19              So in your report, you go through
20   the various risk factors that Uber is aware of
21   that increase the risk of sexual assault on
22   its platform; correct?
23              MR. LOVE:  Object to form.
24              THE WITNESS:  Correct.
25   BY MS. LUHANA:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 404

1      Q.   And it does not disclose these things

2   to end users; correct?

3                MR. LOVE:  Object to form.

4                THE WITNESS:  That's right.

5   BY MS. LUHANA:

6      Q.   And you opine there are preventive

7   steps that Uber could take to prevent sexual

8   assault from happening; right?

9                MR. LOVE:  Object to form.

10               THE WITNESS:  Yes.

11  BY MS. LUHANA:

12     Q.   And what preventive steps can it

13  take?

14     A.   Educating riders about all these risk

15  issues; engaging in changes in onboarding to

16  assure a better and more robust onboarding

17  process; clear education of drivers that

18  define the intolerable behavior on the Uber

19  platform in terms of sexual misconduct, making

20  it very concrete; not only providing the

21  education, but connecting that education and

22  behavior to crystal clear consequences;

23  engaging in monitoring and supervision, better

24  monitoring and supervision of offenders by

25  either means of more engagement with their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 405

1   drivers or instituting safety features that

2   provide that kind of monitoring; as well as,

3   in the onboarding process, they've identified

4   certain personality factors that are related

5   to those who engage in future acts of

6   interpersonal conduct.

7            They can do different ways of

8   maintaining and -- and compiling information

9   on their offenders that are associated with

10  sexual assault, like ride anomalies and things

11  like that.

12       Q.   In terms of the safety features that

13  provide that kind of monitoring, what are you

14  referring to?

15            MR. LOVE:  Object to form.

16            THE WITNESS:  Well, the -- the

17  cameras are known deterrents, and there could

18  be things that Uber also knows are highly

19  impactful and preventative, like blocking

20  matching of high-risk rides and riders; the --

21  combining SRAD data with the RideCheck.

22            Oh, I lost my train of thought.

23  I'm sorry.  Women to women matching.  Those

24  are some examples of things that Uber knows

25  very well are preventative.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 406

1              MS. LUHANA:  Okay.  Thank you,
2      Doctor.
3              You can take this exhibit down and
4      can you please put up report that -- I'm
5      sorry, Exhibit 17.
6      BY MS. LUHANA:
7          Q.   So, Doctor, you testified a great
8      deal about Exhibit 17 in your report in the
9      Carter case; correct?
10         A.    In this deposition, yes.
11         Q.    And so in terms of the testimony that
12     you just gave right now in terms of steps that
13     Uber can take to prevent sexual assault and
14     sexual misconduct, you describe something more
15     holistic as opposed to just one potential
16     policy deterring conduct; correct?
17             MR. LOVE:  Object to form.
18     BY MS. LUHANA:
19         Q.    Let's take a look at your conclusion
20     here in this report on page 14.
21             And counsel previously had asked
22     you a great deal about how you testified that
23     the policy wasn't enough of a deterrent.
24             Do you recall that?
25         A.    I do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 407

```
 1      Q.    Okay.
 2            And can you read the second to
 3   last sentence in the first paragraph there,
 4   starting with "In my decades."
 5      A.    "In my decades of experience, it is
 6   exposure, management, consequences, and
 7   containment that are effective in preventing
 8   sexual abuse with known offenders.  Rules and
 9   laws set up the structure and expectation that
10   the system will react appropriately and
11   protectively when offenders are exposed."
12   {Sic}
13            MR. LOVE:  Where -- where is she
14   reading from, counsel?
15            MS. LUHANA:  Page 14.
16            MR. LOVE:  Where on page 14?
17            MS. LUHANA:  It's page 14, the
18   first paragraph, the last two sentences she
19   just read.
20            MR. LOVE:  Thank you.
21            THE WITNESS:  Sorry about that.
22            MR. LOVE:  No problem.
23   BY MS. LUHANA:
24      Q.    So that's essentially stating that a
25   policy alone isn't a sufficient deterrent, and
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 408

1    it takes a multi-faceted holistic system to

2    prevent sexual abuse in this context; correct?

3                MR. LOVE:  Object to form.

4                THE WITNESS:  Correct.

5                MS. LUHANA:  Let's take this down

6    and let's put up Exhibit 13.

7    BY MS. LUHANA:

8        Q.   And, Doctor, this is your addendum in

9    the case, and let's look at page 1 -- well,

10   before I -- I get to page 1, in terms of NGO

11   support for Uber, would you agree that NGO

12   support for Uber helps support its business?

13               MR. LOVE:  Object to form.

14               THE WITNESS:  I do.

15   BY MS. LUHANA:

16       Q.   Would you agree that NGO support

17   helps Uber's reputation?

18               MR. LOVE:  Object to form.

19               THE WITNESS:  Yes.

20   BY MS. LUHANA:

21       Q.   Would you agree that NGO support

22   helps consumer preference for Uber?

23               MR. LOVE:  Object to form.

24               THE WITNESS:  Yes.

25   BY MS. LUHANA:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 409

1      Q.   And would you agree that NGO support

2   helps Uber with having regulatory impact?

3                MR. LOVE:  Object to form.

4                THE WITNESS:  I agree that Uber

5   believes that.

6                MS. LUHANA:  Okay.

7                THE WITNESS:  I don't know that

8   particularly.  The rest is psychology that I

9   can certainly agree with.

10  BY MS. LUHANA:

11     Q.   And -- and let's look at your

12  addendum, the first page of it, the last

13  paragraph, where you say, "Ms. Boman's

14  testimony showed that the major purpose of

15  these payments, thus enlistment of

16  endorsements from these nonprofits for Uber,

17  was to help bolster Uber's reputation and

18  brand perception."  {Sic}

19                Did I read that correctly?

20     A.   You did.

21     Q.   And can you read the next sentence

22  here where you're citing an Uber document, as

23  well as citing -- which is Boman Exhibit 2045,

24  as well as Boman's testimony.  Can you please

25  read that out loud?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 410

```
 1                MR. LOVE:  Object to form.
 2                THE WITNESS:  "The Driving Change
 3    campaign notes, 'These funds should be an
 4    ongoing consistent commitment Uber makes, in
 5    part, because these partnerships are
 6    essential.  Women's safety issues pose a
 7    significant risk to the business, not only in
 8    reputation, but consumer preference and
 9    regulatory impact.'"
10                MS. LUHANA:  Thank you.  You can
11    take that down.
12                Doctor, I have no further
13    questions.
14                MR. LOVE:  Dr. Valliere, I just
15    have a couple of follow-ups for you.
16                If we could go off the record for
17    two minutes, I can get those sorted out and
18    then ask briefly.
19                THE VIDEOGRAPHER:  Going off the
20    video record.  The time is 6:12 p.m.
21                (Whereupon, a recess was taken at
22    the above time.)
23                THE VIDEOGRAPHER:  We are back on
24    the video record.  The time is 6:16 p.m.
25    BY MR. LOVE:
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 411

1      Q.   Dr. Valliere, you told your counsel

2   that the way that you used your methodology

3   for this case doesn't differ from any other

4   way that you do clinical evaluations; is that

5   correct?

6              MS. LUHANA:  Objection to form.

7              THE WITNESS:  In that I seek

8   collateral information and relevant

9   documentation to incorporate into my opinion.

10  BY MR. LOVE:

11     Q.   But in your clinical practice, you

12  don't interpret it marketing ads; right?

13             MS. LUHANA:  Objection to form.

14  Misstates testimony.

15             THE WITNESS:  Not unless it was

16  necessary.

17  BY MR. LOVE:

18     Q.   You don't look at corporate documents

19  for a clinical review; correct?

20             MS. LUHANA:  Objection to form.

21             THE WITNESS:  Not in a clinical

22  assessment.  Only if I'm asked to evaluate a

23  system.

24  BY MR. LOVE:

25     Q.   You don't opine on what a company is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 412

 1  thinking or feeling; correct?

 2              MS. LUHANA:  Objection to form.

 3              THE WITNESS:  Like I said, in --

 4  in a clinical assessment, the referral issue

 5  is different.  I'm not usually asked to think

 6  about a company or interpret that.

 7              If I'm asked to do that and look

 8  at company documents and evaluate policies, I

 9  do.

10  BY MR. LOVE:

11      Q.   And you've never been the part --

12  part of a C suite; correct?

13              MS. LUHANA:  Objection to form.

14              THE WITNESS:  I don't know what

15  that is.

16  BY MR. LOVE:

17      Q.   You've never been the CEO of a

18  company?

19      A.   Well, I'm the CEO of my own company,

20  but that's a small -- small agency.

21      Q.   You've never been -- you've never

22  worked in a large corporation as an executive;

23  correct?

24              MS. LUHANA:  Objection to form.

25              THE WITNESS:  Not a -- a large.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 413

1    I've been an executive in nonprofit

2    organizations.

3    BY MR. LOVE:

4        Q.   You have no formal training in

5    managing or running a large business; correct?

6             MS. LUHANA:  Objection to form.

7             THE WITNESS:  I -- I guess it

8    depends what you mean "large."  A large, not

9    sole proprietor corporation, no.

10   BY MR. LOVE:

11       Q.   Now, you also said, and I want to

12   read it so I get it right, that you rely --

13   relied on documentation, Uber's own statements

14   and documentation to support some of the

15   opinions that you had pre-established.

16            When you say "pre-established,"

17   you had come to your opinions before you

18   looked at Uber statements and documentation?

19            MS. LUHANA:  Objection to form.

20            THE WITNESS:  No.  My opinion that

21   Rideshares are a ripe environment for sexual

22   assault, I knew that a long time ago because

23   of the situation it puts offenders in and the

24   opportunity it affords them.

25            Since I have been fully in charge

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 414

1  of the sex offender program, they have never

2  been allowed to be limo drivers, taxi drivers,

3  side gigs with Uber, any Lyft share, Door

4  Dash, Eats, any of that, because of the issues

5  that I'm aware of.

6  BY MR. LOVE:

7      Q.   So to be clear, you came to your

8  opinion that Rideshares are a ripe environment

9  for sexual assault before ever looking at an

10 Uber document?

11            MS. LUHANA:  Objection to form.

12            THE WITNESS:  Yeah.

13            MS. LUHANA:  Misstates testimony.

14            THE WITNESS:  I think the -- it --

15 just by the nature of the Rideshare

16 environment, it's a very high risk environment

17 and it doesn't need to be Uber or whatever.

18 It's the environment, itself.

19            And then examination of Uber's

20 documents revealed clearly that they knew the

21 same thing.

22            MR. LOVE:  Okay.

23 BY MR. LOVE:

24      Q.   Now, if you could pull up Exhibit 19,

25 I just have a couple of questions, and then

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 415

1    I'm done.  And we'll go to page 16 and look a
2    at that graph that we were looking at before
3    when counsel was asking you questions.
4        A.    Okay.
5        Q.    Did you find that chart?
6        A.    I did.  It's here.  Sorry.
7        Q.    No problem.
8              So looking at 2017, the number of
9    incidents in purple is 71,080; right?
10       A.    Correct.
11       Q.    And in 2022, the number in purple is
12   52,933; correct?
13       A.    Yes.
14       Q.    So between 2017 and 2022, the number
15   of incidents went down; right?
16             MS. LUHANA:  Objection to form.
17             THE WITNESS:  Well, it went up and
18   then it went down.
19   BY MR. LOVE:
20       Q.    But just between those two numbers;
21   right, it went down?
22             MS. LUHANA:  Objection to form.
23             THE WITNESS:  So the point, just
24   between the number -- I'm sorry --
25             MR. LOVE:  Let me -- let me

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 416

1    clarify.

2            THE WITNESS:  Yes, please.  I lost

3    track of it.

4    BY MR. LOVE:

5        Q.    There are -- there are less reports

6    of incidents in purple in 2022 than there were

7    in purple in 2027; correct -- or 2017.

8    Apologies.

9        A.    Yes.  Thanks.

10       Q.    And there are less incidents in

11   safety airports in blue in 2022 than there are

12   in blue in 2017?

13       A.    Right.  Attributable to COVID, right.

14           MR. LOVE:  Okay.  That's all the

15   questions I have.  Thank you, Dr. Valliere.

16           MS. LUHANA:  I have a few more

17   questions.

18   BY MS. LUHANA:

19       Q.    Dr. Valliere, if you look at your

20   report, let's turn to page 17.  And so if you

21   look at 2017, what is the total number of

22   sexual assault and sexual misconduct

23   incidences reported to Uber?

24       A.    71,080.

25       Q.    And then let's look at 2024.  What is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 417

 1  the total number of sexual assault, sexual

 2  misconduct incidences reported to Uber?

 3              MR. LOVE:  Object to form.

 4              THE WITNESS:  82,838.

 5  BY MS. LUHANA:

 6      Q.   So the number of sexual assault and

 7  sexual misconduct incidences reported to Uber

 8  has increased comparing 2017 to 2024; correct?

 9              MR. LOVE:  Object to form.

10              THE WITNESS:  That's right.

11  BY MS. LUHANA:

12      Q.   And, Doctor, in terms of methodology

13  that you utilized in arriving at your opinions

14  here, you testified that you used the same

15  analysis and evaluation that you used outside

16  of litigation that you used typically in your

17  practice as a psychologist; correct?

18              MR. LOVE:  Object to form.

19              THE WITNESS:  Right.

20  BY MS. LUHANA:

21      Q.   And you relied on your expertise,

22  including your 30 years of experience,

23  training and internal document review in

24  addition to reviewing Uber's internal

25  documents to arrive at your opinions in your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 418

 1   report; correct?
 2           MR. LOVE:  Object to form.
 3           THE WITNESS:  Yes.
 4   BY MS. LUHANA:
 5      Q.   Okay.
 6           You were also asked about some
 7   marketing opinions that you provided in this
 8   case.  And so if you'd take a look at your
 9   report, let me pull up the page number.  It's
10   page 4.
11           And so if you look at page 4, the
12   last paragraph before your Background and
13   Qualifications, you say here you are giving an
14   impact on the psychological impact of --
15           MR. LOVE:  Counsel, could you
16   point me to the sentence you're reading?
17           MS. LUHANA:  Sure.  It's -- I
18   just -- it's the last paragraph before
19   Background and Qualifications.
20   BY MS. LUHANA:
21      Q.   So you go on to say the opinions that
22   you're offering here are what, Dr. Valliere?
23           MR. LOVE:  Object to form.
24           THE WITNESS:  It's giving an
25   opinion on the psychological impact of Uber's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 419

1    statements based on its analysis, research and

2    testimony about its marketing and its -- its

3    impact on consumers.

4              MS. LUHANA:  Thank you, Doctor.  I

5    have no further questions.

6              MR. LOVE:  I think that's it.

7    You're free to go.

8              THE WITNESS:  Thank you.

9              THE VIDEOGRAPHER:  Going off the

10   video record.

11              (Whereupon, the deposition

12   concluded at 6:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 420

1                  C E R T I F I C A T E
2
3              I do hereby certify that I am a
    Notary Public in good standing, that the
4    aforesaid testimony was taken before me,
    pursuant to notice, at the time and place
5    indicated; that said deponent was by me duly
    sworn to tell the truth, the whole truth, and
6    nothing but the truth; that the testimony of
    said deponent was correctly recorded in
7    machine shorthand by me and thereafter
    transcribed under my supervision with
8    computer-aided transcription; that the
    deposition is a true and correct record of the
9    testimony given by the witness; and that I am
    neither of counsel nor kin to any party in
10   said action, nor interested in the outcome
    thereof.
11
              WITNESS by hand and official seal
12   this 24th day of October, 2025.
13
14
15
                              _____
16                              Notary Public
17   Job No. CS 7675941
18
19
20
21
22
23
24
25