**Exhibit N**

# Exhibit C

# PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case 3:23-md-03084-CRB |
|  | MDL NO. 3084 |
|  | Honorable Charles R. Breyer |

This Document Relates to:

*A.R. v. Uber Technologies, Inc., et al.*,
No. 3:24-cv-07821

*B.L. v. Uber Technologies, Inc., et al.*,
No. 24-cv-7940

*JD v. Uber Technologies, Inc., et al.*,
No. 3:23-cv-06708

*LCHB 128 v. Uber Technologies, Inc., et al.*,
No. 3:24-cv-7019

*WHB 823 v. Uber Technologies, Inc., et al.*,
No. 3:24-cv-4900

*WHB 318 v. Uber Technologies, Inc., et al.*,
No. 3:24-cv-05230

## EXPERT REPORT OF VIDA THOMAS

I have been retained by Kirkland and Ellis LLP, on behalf of Defendants Uber Technologies, Inc.,

and Rasier, LLC, to opine on standard human resources practices for investigating and responding to

allegations of sexual assault of an employee or independent contractor in the workplace, and how this

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY



INVESTIGATIONS | TRAININGS | MEDIATIONS

traditional workplace paradigm compares to Uber's policies and practices for investigating and responding to allegations of sexual assault involving riders or drivers on its platform. I am prepared to testify regarding standard practices, how Uber's policies and practices meet those standards, and how Uber's handling of AR's, BL's, JD's, LCHB 128's, WHB 823's and WHB 318's reports of sexual assault also met those standards.

### I. Professional Background

1.  I am Managing Partner of Oppenheimer Investigations Group (OIG) and have been an attorney since 1993. For 27 years, from 1993 to 2020, I specialized in employment law, defending businesses in employment civil lawsuits brought pursuant to federal and state law, and counseling businesses on all aspects of employment law compliance, including Title VII and the California Fair Employment Act's prohibitions on sexual harassment, discrimination, and retaliation in employment. As part of my practice, I advised businesses and their human resources professionals on responding to complaints of sexual assault. I also advised colleges and universities on compliance with Title IX, including responding to student complaints of sexual assault.

2.  Since January 2020, I have been a partner at a law office focused on conducting such investigations and supervise other attorneys who work for me and conduct workplace investigations. I have served as the law firm's managing partner since 2023. In these roles, I stopped providing advice to businesses, and since then I have engaged exclusively in neutral work including conducting impartial workplace investigations; providing sexual harassment prevention training to employees, independent contractors, and elected officials; training investigators on conducting effective workplace investigations; as well as employee coaching and mediation.

3.  Throughout my career, including from 1994 to the present, I have conducted impartial investigations of complaints of harassment, discrimination, retaliation, and other forms of alleged misconduct at work (including sexual assault and threats of violence), as well as whistleblower complaints. I have provided this service for both public entities and private sector businesses, as well as private and public colleges and universities. I have conducted hundreds of impartial investigations in the workplace and on college and university campuses.

4.  In 2000, I began training businesses, human resource professionals, employees, and contractors in preventing and responding to workplace harassment, discrimination, retaliation, sexual assault, threats of violence and whistleblower complaints, and in conducting workplace investigations. I have provided such trainings continuously since that time.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

5.  In 2009, I became a member of California Association of Workplace Investigators (CAOWI), now known as the Association of Workplace Investigators (AWI). From 2016 through 2019, I was on the AWI Board's Training Institute Committee. I am currently a Board member of AWI, which now has over 2,700 members throughout the United States, Canada, Europe, New Zealand, and Australia.

6.  I worked on the AWI committee that researched and wrote "Guiding Principles" for workplace investigators. These Guiding Principles have assisted in establishing acceptable practices for investigating workplace harassment.[1] I attended and completed AWI' s Workplace Investigation Training Institute, a rigorous week-long course for workplace investigators that has been offered multiple times per year since 2012. I have served as faculty at AWI's Training Institute since 2016.

7.  I have completed T9 Mastered Title IX investigation training, which included training on conduct trauma-informed interviews of victims of sexual assault.

8.  A copy of my CV and a list of all other cases in which I have testified as an expert at trial or by deposition are attached to this report as **Exhibits A and B**. My hourly rate is $750.

## II.  Materials Reviewed and Methodology

9.  The materials I reviewed in forming my opinions are set forth in **Exhibit C**.

10.  I have based my opinions on the materials I have identified, applying my education, training, knowledge, and experience concerning employment law, proper human resource management, and workplace investigations. My opinions are expressed to a reasonable degree of professional certainty or probability.

11.  Please be advised that if there are any additional depositions, investigations, policies, reports, memos, audio/video recordings, photos, or other materials produced in this case, a supplemental report may be necessary; thus, I reserve the right to supplement my opinions and/or this report.

## III.  Summary of Opinions

12.  Based on my review of the evidence in this case, it is my opinion that:

  a.  Uber's background-check process meets generally accepted standards in the HR industry;

  b.  Uber was not on notice that AR's, BL's, JD's, LCHB 128's, WHB 823's and WHB 318's drivers would sexually assault a rider;

  c.  Uber's Urgent Support Logic investigation methodology permits a sufficiently thorough investigation of sexual assault complaints; and

---

[1] AWI Guiding Principles for Conducting Effective Workplace Investigations can be found here:
https://www.awi.org/resource/resmgr/files/publications/AWI-Guiding-Principles-Broch.pdf.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

    d.   Uber's investigations of the alleged sexual assaults of AR, BL, JD, LCHB 128, WHB 823 and WHB 318 were consistent with generally accepted standards for conducting a workplace investigation.

## IV. Summary of Background Facts

### A. AR

13. Based on my review of the relevant materials, AR alleges that on August 10, 2023, at approximately 12:41 a.m., she was picked up by a driver using the Uber app, in San Francisco, California. AR alleges that at the driver's (Michael Le's) invitation, she sat in the front seat of his car. (AR Second Am. Pl. Fact Sheet at 10.)

14. AR alleges the following. The driver started chatting and asking her questions, then turned off the Uber app on his phone. Le drove about 3 or 4 blocks down the road and pulled over. He then reached over and kissed AR on the lips twice before she unlocked the door and exited the vehicle. AR alleges she then called a friend to pick her up but ended up taking the bus home. (*Id.*)

15. On August 11, 2023 at 9:31 a.m., AR reached out to Uber using Uber's in-app support. (UBER-MDL-3084-DFS00054846; Deposition of AR, Exhibit 2.) However, it appears that other than reporting a "safety incident involving a driver," AR did not provide sufficient information informing Uber of what she alleged had occurred. (UBER-MDL-3084-DFS00054846.) That same day at 11:16 a.m., an Uber Trust and Safety Specialist emailed AR to obtain additional details. (*Id.*) AR did not respond to the communication. (*Id.*)

16. When AR's attorneys first reported the alleged sexual assault to Uber on December 31, 2024, Uber deactivated Le's account. (UBER-MDL3084-DFS00160114-118.)

17. AR testified that she did not file a police report regarding the alleged sexual assault. (Deposition of AR, p. 87:2-6.)

### B. BL

18. Based on my review of the relevant materials, BL alleges that at approximately 3:30 a.m. on August 12, 2022, she was picked up by a driver using the Uber app, in Campbell, California.

19. BL alleges as follows. When the driver (Edwin Castaneda-Orozco) arrived, BL got into the back seat. (BL's First Am. Pl. Fact Sheet at 9.) During the ride, Castaneda-Orozco, who did not speak English, reached back and started to touch BL under her clothes. BL alleges that during the ride, Castaneda-Orozco repeatedly put his hand inside BL's vagina as he was driving the car. (*Id.*) When they arrived at BL's destination (an apartment complex), Castaneda-Orozco pulled the car over and parked.

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

(*Id.*) BL alleges that when she had difficulty opening the car door because it was locked, she started banging on the car door. Castaneda-Orozco came around to BL's car door and opened the car door. (*Id.*) BL alleges that as she stood in the car doorway, Castaneda-Orozco gave her a hug. BL alleges she returned the hug because she thought he was trying to comfort her. (*Id.*) However, BL alleges that when she released the hug, Castaneda-Orozco kept holding her, then laid her down in the back car seat. He allegedly started groping her under her clothes, pulled BL's pants down, moved her bathing suit to the side, and raped her. (*Id.*)

20.  Later during August 12, 2022, BL filed a report with the Campbell Police Department. (Deposition of BL, Exhibit 11.) That same day, when the Police Department informed Uber's Trust and Safety team that it had opened an active investigation of Castaneda-Orozco for suspected rape, Uber placed a safety lock on Castaneda-Orozco's account so he could no longer provide rides using the Uber app. (UBER-MDL3084-DFS00061375-61378.)

**C.  JD**

21.  Based on my review of the relevant materials, JD alleges that sometime on the evening of November 15, 2023, she was picked up by a driver using the Uber app in Tempe, Arizona. JD alleges that she was intoxicated, which is why she requested the ride.

22.  JD alleges as follows. The driver, Hussan Turay, immediately asked if the man who had put JD in the vehicle was her boyfriend and if they had sex that night. JD alleges that Turay continued to make lewd and inappropriate comments, which she ignored. (JD's Plaintiff Fact Sheet at 9.) JD further alleges that while her eyes were closed, Turay said he had to stop the vehicle. (*Id.*) She alleges that he pulled the car over, entered the back seat, and forced himself on top of JD. She alleges that she tried to fight off Turay but was unable to. JD alleges that Turay raped her. (*Id.*)

23.  JD alleges that on November 15, 2023, she contacted the Tempe Police Department and the Chandler Police Department and reported the rape. (JD's Plaintiff Fact Sheet at 14.) That same day, JD also reported the alleged assault using the Uber In-App support. (Deposition of JD, Exhibit 12.) Immediately upon receiving JD's report, Uber temporarily deactivated Turay's account. (UBER-MDL3084-DFS00003701.) On November 17, 2023, Uber permanently deactivated Turay's account. (*Id.*)

**D.  LCHB 128**

24.  Based on my review of the relevant materials, LCHB 128 alleges that on the evening of June 28, 2024, she was picked by a driver using the Uber app in Phoenix, Arizona. The driver's name was Felix Perez Rodriguez. LCHB 128 alleges that though she initially got in the back seat of Rodriguez's

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

vehicle, he suggested she move to the front seat because her bags were taking up space in the back seat. (LCHB 128's Amended Bellwether Complaint, pp. 2:17 – 3:2.) LCHB 128 agreed and moved to the front seat. (*Id.*) LCHB 128 alleges that while Rodriguez was driving on the freeway, he touched her thighs, breasts and genitals through her clothing, asking her "Is this okay?" (Amended Bellwether Complaint, p. 3:4-8.) LCHB 128 alleges she answered "no," but Rodriguez continued groping her until they arrived at the destination. (*Id.*)

25.  On the morning of June 29, 2024, LCHB 128 reported the alleged sexual assault to Uber using In-App Support. (UBER-MDL3084-DFS00049324-327.) LCHB 128 also reported the alleged sexual assault to the Phoenix Police Department. (*Id.*) That same day, an Uber Trust and Safety Specialist telephoned LCHB 128 and obtained additional details, and placed a temporary hold on Rodriguez's account. (*Id.*) Also on that same day, the Trust and Safety Specialist telephoned Rodriguez and obtained his statement. (*Id.*) Rodriguez denied the allegations. (*Id.*) Nonetheless, Uber immediately deactivated Rodriguez's account and banned him from the platform. (*Id.*)

**E.  WHB 823**

26.  Based on my review of the relevant materials, WHB 823 alleges that on March 26, 2019, at approximately 1:54 a.m., she was picked up by a driver using the Uber app in Raleigh, North Carolina. (WHB 823's Amended Plaintiff Fact Sheet at 5 – 9.) WHB 823 alleges that the driver, Jeffery Richardson, was very friendly at first, striking up a casual conversation with her when she climbed into his vehicle. (*Id.*) WHB 823 alleges that when they made it to her destination, Richardson turned and grabbed her upper thigh and told her he wanted to lick it. (*Id.*) WHB 823 alleges she told Richardson "no," and left the vehicle. (*Id.*)

27.  WHB 823 did not report the alleged sexual assault to Uber. (Deposition of WHB 823, p. 37:17-19.) She also did not report the alleged assault to the police. (Deposition of WHB 823, pp. 169:25 – 170:2.) On February 2, 2023, when Uber was informed of the alleged sexual assault by WHB 823's attorneys, Uber placed a temporary safety lock on driver Jeffery Richardson's account. (UBER-MDL3084-DFS00074490-491.)

**F.  WHB 318**

28.  Based on my review of the relevant materials, WHB 318 alleges the following. At approximately 4:00 p.m. on March 20, 2021, she was picked up by a driver using the Uber app in Charlotte, North Carolina. (WHB 318's Amended Bellwether Complaint at 2.) WHB 318 alleges that during the trip the driver, Douglas Reitzen, told WHB 318 that he had a job opportunity for her, and that

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

he had "special favors" that his wife/girlfriend was not satisfying. (WHB 318's Fourth Amended Plaintiff Fact Sheet at 10.) WHB 318 alleges that she told Reitzen she did not do that type of work, and that she already had a job. (*Id.*) WHB 318 further alleges that when Reitzen stopped at a stop light, he turned back and reached towards WHB 318's chest. (*Id.*) Before he could touch her, she slapped his hand down. (*Id.*) Reitzen then grabbed WHB 318's knee and squeezed her knee, which startled and shocked her. (*Id.*) Reitzen told WHB 318 he would not harm her and that "it was just for pleasure." (*Id.*) WHB 318 alleges that she did not want to upset Reitzen, so she politely told him he was being unprofessional and that she did not do that type of work. (*Id.*) Reitzen told WHB 318 it was only for pleasure and that he would make sure WHB 318 was pleasured just like him. (*Id.*)

29.  WHB alleges that about 2 blocks before the car reached her destination, she opened the car door. (Id.) (Id.) Reitzen told her she could not do that because it would cost him his job. WHB 318 told him she did not care and got out of the car at the stop light. (*Id.*)

30.  According to the documents I reviewed,  WHB 318 did not report the incident to Uber. (UBER-MDL3084-DFS00073411.) WHB 318's attorneys reported the incident to Uber on February 3, 2022. (Id.) On February 9, 2022, Uber placed a temporary safety lock on Reitzen's account. (*Id.*)

**V.  Applicable Standards**

31.  Over the course of 30-plus years as an employment attorney, I advised private businesses and public entities, college, universities, and their human resources professionals on responding to complaints of sexual assault. That advice was informed by my understanding of applicable employment laws and compliance guidelines, the evolution of which is summarized in the following paragraphs. Though I understand that Uber and its drivers are not in an employer/employee relationship, the principles and standards governing the traditional employment relationship are helpful in evaluating Uber's handling of the matters at issue here. Though employers have more control over employees than businesses have over independent contractors, businesses still desire to evaluate and investigate their independent contractors to comply with legal and ethical requirements, ensure quality control and promote accountability. Therefore, using employment principles and standards as a guide can be useful in the present context in the absence of existing similar standards specific to independent contractors.

32.  After the passage of the 1964 Civil Rights Act (Title VII), enforcement agencies, such as the U.S. Equal Employment Opportunity Commission (EEOC) and the California Department of Fair Employment and Housing (DFEH), developed protocols for investigating different types of discrimination and for retaliation for complaining about discrimination. Employers facing complaints of

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

discrimination then followed suit by enacting policies, training their workforces, investigating complaints, taking appropriate disciplinary action when they found there was discrimination or harassment, and ensuring that those who complained about discrimination and harassment were not subject to retaliation. In fact, over time (and certainly before the alleged incidents in these lawsuits) statutes and regulations relating to discrimination and harassment came to include affirmative duties to prevent harassment, discrimination, and retaliation from occurring.

33. U.S. Supreme Court cases such as *Burlington Industries, Inc. v. Ellerth*[2] and *Faragher v. City of Boca Raton*[3] set forth some of the things employers could and should do to prevent and respond to types of sexual assault and misconduct and provided a benefit (protection from liability) for employers who did so. California courts did the same.[4] These cases also contributed to increased awareness in the business owner community of what constituted a proper investigation of worker complaints.

34. As a result of *Faragher* and *Ellerth*, the EEOC established guidance for employers and businesses on preventing and responding to unlawful harassment.[5] These guidelines covered how employers and businesses should go about conducting investigations.[6] At the same time, employers, business organizations, and attorneys advising employers became engaged in training human resource professionals on how to properly investigate a charge of discrimination and harassment. In 2016, the California Department of Fair Employment and Housing (now the Civil Rights Division), published its *Workplace Harassment Prevention Guide for California Employers*, providing guidance on, among other things, important components of an effective workplace investigation.

35. To comply with these obligations, employers and businesses have developed standards for preventing and responding to workplace complaints of sexual assault, harassment, misconduct, discrimination, threats of violence and retaliation, and how to investigate a complaint. These well-accepted standards were developed over time, and I have gained knowledge of these standards over my 30-plus years advising employers and businesses, conducting my own investigations, and training others to conduct investigations that meet these standards.

---

[2] 524 U.S. 742 (1998).
[3] 524 U.S. 775 (1998).
[4] *Cofran v. Rollins Hudig Hall Intl., Inc*., 17 Cal. 4th 93 (1998); *Silva v. Lucky Stores, Inc*., 65 Cal App. 4th 256 (1998).
[5] The EEOC published an updated Guidance in April 2024. However, the 1999 Guidance was in effect during the period at issue here.
[6] EEOC Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors. EEOC Notice Number 915.002 (6/18/99).

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY



INVESTIGATIONS | TRAININGS | MEDIATIONS

36. These standards include a timely, fair, and thorough investigation conducted by an unbiased investigator that comes to a reasoned and fair decision. An investigation is fair if it provides due process (essential fairness) for both the complaining party and the party against whom the complaint is lodged. These well-accepted standards also require that an investigator be trained not only in the basics of employment law, but also in the skills of conducting effective interviews, identifying and gathering relevant evidence, assessing witness credibility, analyzing the evidence, and writing a cogent report. I regularly teach these investigative skills at AWI's Training Institute, as well as provide training to OIG's private and public clients.

37. According to these standards, the trained investigator gathers all relevant evidence, beginning with an interview of the complainant whenever possible.[7] After interviewing the complainant, the investigator should interview the respondent and percipient witnesses.[8] When interviewing these individuals, note taking is an important part of conducting a thorough investigation. On this topic, Michael Robbins writes in *Workplace Investigations: Understanding Standard Practice, Bender's California Labor & Employment Bulletin (June 1, 2010): "Another important aspect of conducting a thorough investigation is that the investigator should take and retain detailed notes of all interviews"*

38. After all available, relevant evidence is gathered, the investigator should carefully weigh the evidence and make findings (using a preponderance of the evidence standard) that logically flow from the evidence collected.[9]

39. I evaluated the facts of these cases through the lens of my experience training and evaluating investigators over the last 30 years in the employment law field. Based on my evaluation, I am of the opinion that Uber's practices for investigating alleged sexual assault or misconduct claims by both riders and drivers was consistent with the standards for investigation that I have observed in other contexts (i.e., workplace harassment claims and assaults on college campuses) where the investigating party has a greater degree of control over the parties involved in the alleged assault.

---

[7] In *Workplace Investigations: Understanding Standard Practice, Bender's California Labor & Employment Bulletin* (June 1, 2010), author Michael Robbins writes: *"Standard practice is to begin the investigation by talking to the person (or persons) who brought forward the concerns that are the subject of the investigation (i.e., the complaining party). This is because the best way to obtain all the details about the allegations is to hear them from the person raising the concerns."*

[8] In *The Essential Guide to Workplace Investigations* (Nolo, 2 ed., 2010), Lisa Guerin writes, *"The heart of any investigation is gathering information—and the most basic way to do that is by asking people questions."*

[9] As AWI says in its *Guiding Principles*, the investigator should *"identify other relevant witnesses, information and documentation.* AWI also states that the *"investigator should consider what potentially relevant evidence may exist, including witnesses, documents, and electronic information, and how to obtain them."*

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

## VI.    Opinions

### A.    Uber's Background-Check Process Meets Generally Accepted Standards in the HR Industry.

40.  Based on my 30+ years practicing employment law, advising employers and conducting workplace investigations, it is my experience that to minimize incidents of sexual misconduct in the workplace and prevent negligent hiring claims, companies often rely on background checks when hiring to verify a candidate's history.[10] Criminal background checks can disclose a criminal history that increases the likelihood an applicant would engage in criminal behavior on the job. Typically, where a criminal background check reveals a criminal conviction related to the job duties of the position for which the candidate is being considered (e.g., a teacher candidate with a criminal conviction for assaulting a minor), that criminal history will disqualify the candidate from consideration. For positions that require a high security clearance or interact with vulnerable populations, such as children or the elderly, employers often conduct annual criminal background checks after the employee is hired.

41.  Where driving is a required duty of the job, a check of the candidate's driving record can alert an employer to traffic infractions and vehicle accidents that suggest the candidate's driving history poses a potential public safety issue with respect to the potential for future accidents. For employees or independent contractors who are hired for the sole purpose of driving, it is not unusual for a company to subscribe to the state's driving record monitoring service (e.g., California DMV's Pull Notice Program) to ensure the company is alerted in real time when an employee or contractor loses a driver's license or has an accident or traffic infraction that could implicate the employee or contractor's ability to perform his or her job safely.

42.  Uber conducts background checks on drivers both prior to onboarding and during their time on the Uber app. Prior to onboarding, prospective drivers submit their full name, date of birth, social security number, driver's license number, copy of a valid driver's license, profile picture to be cross-referenced for identity validation, proof of vehicle registration, and proof of vehicle insurance, and Uber verifies the prospective driver's identity. (UBER_JCCP_MDL_00l103507 at 526-27; UBER_JCCP_MDL_001852418 at 439-40.) Uber's accredited background check vendor then collects and reviews the prospective driver's Motor Vehicle Record for driving privileges, restrictions, and violations and conducts a Social Security Number (SSN) Trace to obtain aliases and address history to aid

---

[10] As mentioned previously, by referring to employer practices, I do not suggest that Uber and drivers using the Uber app are in an employer-employee relationship.

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY



INVESTIGATIONS | TRAININGS | MEDIATIONS

in a record search. (UBER_JCCP_MDL_00l103507 at 526-28; UBER_JCCP_MDL_001852418 at 440.)
Uber's vendor then initiates a criminal background check, searching the National Criminal Database,
federal court records, state court records, federal and state sex offender registries, the vendor's proprietary
global watchlist, and local court records for crimes, infractions, and charges. (*Id.*) The vendor then utilizes
professional researchers to conduct additional research as needed. (*Id.*) Uber disqualifies any individual
with a criminal felony conviction in the previous seven years. (*Id.*) Any criminal conviction for sexual
assault, sex crimes against children, murder/homicide, terrorism, and kidnapping, at any time in the
individual's history, automatically disqualifies the individual from consideration. (*Id.*) Live interviews are
not a part of Uber's criminal background check. This is not unusual, given the limited utility of a live
interview in determining whether a candidate will commit a crime in the future. I am unaware of any
studies showing that in a live interview, a job candidate displays body language or other demeanor
evidence signaling a propensity towards criminal behavior.

43.  Uber also pursues background checks after onboarding. Beginning in certain markets in 2017,
Uber updated its background check policies to require annual recertification of drivers' criminal
background checks and motor vehicle driving history records. (UBER_JCCP_MDL_00l103507 at 528;
UBER_JCCP_MDL_003561529 at 532.) By 2018, annual recertification became an Uber requirement in
all U.S. markets. (UBER_JCCP_MDL_001852418 at 441.) Uber also uses continuous checking
technology, which continually monitors real-time data sources for changes in a person's criminal record
information. (UBER_JCCP_MDL_001852418 at 441; UBER_JCCP_MDL_003561529 at 532.) In place
since 2018, this system reviews proprietary information from Uber's vendors, which check online
criminal databases and arrest records. (*Id.*) In my experience, many companies use criminal background
checks as a pre-hire measure. I am unaware of a company that performs annual criminal background
checks on employees, other than those in certain security-related positions. Thus, Uber's practice goes
beyond what is typical in the employment or contractor context.

**B.  Uber Was Not on Notice that Michael Le, Edwin Castaneda-Orozco, Hassan Turay, Felix
     Perez Rodriguez, Jeffery Richardson or Douglas Reitzen Would Sexually Assault a Rider.**

44.  When a sexual assault occurs in the workplace, it is not uncommon for people to ask whether
the business should have known that the sexual assault would occur. In the cases at issue here, assuming
the truth of the plaintiffs' allegations, the facts do not suggest that Uber was aware of or could have
uncovered facts through diligent HR processes that would lead it to suspect or anticipate that AR's driver
Michael Le, BL's driver Edwin Castaneda-Orozco, JD's driver Hassan Turay, LCHB 128's driver Felix

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

Rodriguez, WHB 823's driver Jeffery Richardson or WHB 318's driver Douglas Reitzen, would sexually assault a rider. At the time these alleged sexual assaults occurred, Uber had received no information, through its background check system, rider complaints or rider ratings, suggesting that any of these drivers had a history of sexual assault or other criminal behavior that would make a sexual assault more likely to occur.

### Michael Le

45.  Consistent with its policies, Uber conducted a criminal background and motor vehicle check on Michael Le (born Hung Quang Le) on July 23, 2022 and July 25, 2022, before his first trip. Le's motor vehicle report contained no moving violations or other infractions. (Michael Le July 23, 2022 Checkr Motor Vehicle Report, UBER-MDL3084-DFS00054724–725; Michael Le July 27, 2022 SambaSafety Report, UBER-MDL3084-DFS00054679.) The criminal background check also revealed no criminal history of sexual assault or any other crime. (Michael Le July 25, 2022 Checkr Background Check, UBER-MDL3084-DFS00054709-712.)    A criminal background check generated on June 27, 2023 disclosed that a "Hung Q Le" in Jefferson Parish, Louisiana, had pled guilty to misdemeanor traffic charges. (Michael Le June 27, 2023 Checkr Background Check, UBER-MDL3084-DFS00054704-707.) The motor vehicle report generated on June 26, 2023, disclosed that Le had been in a motor vehicle accident in Oakland, California, on March 1, 2023. (Michael Le June 26, 2023 Checkr Motor Vehicle Report, UBER-MDL3084-DFS00054716-717.) The report did not indicate whether Le was at fault. (*Id.*) A criminal background check generated on June 3, 2024 came back clear. (Michael Le June 3, 2024 Checkr Background Check, UBER-MDL3084-DFS00054713.) Subsequent motor vehicle reports generated on July 16, 2023, July 25, 2023, May 31, 2024, July 7, 2024, and November 19, 2024 disclosed no additional traffic accidents, violations or other infractions.[11]

46.  During Le's time as a driver using the Uber app, Uber received 4 rider complaints about him. All of these complaints were received after AR's alleged assault (which, as noted above, AR did not report as an assault until December 2024). One rider reported that Le had dropped off the rider's mother at an unsafe location. Another rider brought a complaint after Le was involved in an auto accident while transporting the rider. (UBER-MDL3084-DFS00054838-840.) A third rider complained that when Le's

---

[11] Michael Le July 16, 2023 SambaSafety Report, UBER-MDL3084-DFS00054679 at 680; Michael Le July 25, 2023 SambaSafety Report, UBER-MDL3084-DFS00054679 at 684; Michael Le May 31, 2024 Checkr Motor Vehicle Report, UBER-MDL3084-DFS00054726; Michael Le July 7, 2024 SambaSafety Report, UBER-MDL3084-DFS00054679 at 683; Michael Le November 19, 2024 SambaSafety Report, UBER-MDL3084-DFS00054679 at 681.

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

car experienced mechanical problems during the ride, Le dropped the rider off at an unsafe location. (UBER-MDL3084-DFS00054843-845.) A fourth rider complained that when she left her purse in Le's vehicle, he kept the purse and forced her to pay him $75 to get her driver's license and credit card back. (UBER-MDL3084-DFS00054777-804.)

47.  During Le's time as a driver using the Uber app, Uber received 2,139 ratings from riders. (UBER-MDL3084-BS-0006265.) Of those 2,139, he received only 22 ratings (1% of the total) that were below a 4 out of 5. (*Id.*) None of the riders left a comment. (*Id.*)

### Edwin Castaneda-Orozco

48.  Before Edwin Castaneda-Orozco's first trip, Uber conducted a criminal background and motor vehicle check on him on June 24, 2022. (Edwin Castaneda-Orozco June 24, 2022, Checkr Background Check, UBER-MDL3084-00061342-345.) The criminal background check on Castaneda-Orozco revealed no criminal history of sexual assault or any other crime. (*Id.*) Castaneda-Orozco's motor vehicle report disclosed a citation on December 7, 2021 for driving with "expired or no registration or title." (Edwin Castaneda-Orozco June 24, 2022, Checkr Motor Vehicle Report, UBER-MDL3084-00061339-340.)

49.  During Castaneda-Orozco's as a driver using the Uber app, and he received 362 ratings from riders. UBER-MDL304-BW-00006254.) Of those 362, only four were below a rating of 4 out of 5. (*Id.*) None of the riders left a comment. (*Id.*) Other than the alleged incident reported by BL, no other safety-related complaints were ever made against Castaneda-Orozco.

### Hassan Turay

50.  Uber conducted a motor vehicle check and a criminal background on Hasan Turay on December 7, 2016 and December 22, 2016, respectively, before his first ride. (Hassan Turay December 7, 2016 Checkr Motor Vehicle Report, UBER-MDL3084-B2-00012056-058; Hassan Turay December 22, 2016 Checkr Background Check, UBER-MDL3084-DFS00003621-624.) The criminal background check on Turay revealed no criminal history of sexual assault or any other crime. (Hassan Turay December 22, 2016 Checkr Background Check, UBER-MDL3084-DFS00003621-624.) The motor vehicle report indicated that Turay had a valid, unexpired driver's license, but had "insufficient driving history." (Hassan Turay December 7, 2016 Checkr Motor Vehicle Report, UBER-MDL3084-B2-00012056-058.) Turay then provided Checkr with information reflecting that he did have sufficient driving history. (Hannah Nilles Dep. 317:20-318:21 (Aug. 7, 2025).) Criminal background and motor vehicle checks conducted on March 6, 2017 (UBER-MDL3084-DFS00003619-620) and January 4, 2018 (UBER-

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY



MDL3084-DFS00003615-618), September 10, 2018 (UBER-MDL3084-DFS00003647-3650) and June 29, 2020 (UBER-MDL3084-DFS00003643-3646) also came back clear. Criminal background and motor vehicle checks conducted on May 2, 2022, also came back clear. (UBER-MDL3084-DFS00003635-3638; UBER-DL3084-DFS00003633-3634.) Uber also conducted a criminal background and motor vehicle check on Hassan Turay on April 4, 2023 and April 9, 2023. (Hassan Turay April 9, 2023, Checkr Background Check, UBER-MDL3084-DFS00003627-3630; Hassan Turay April 4, 2023 Checkr Motor Vehicle Report, UBER-MDL-DFS00003631-3632.) Both reports came back clear. (*Id.*) Uber conducted a criminal background and motor vehicle check again on Turay on June 5, 2023 and June 6, 2023. (Hassan Turay June 6, 2023 Checkr Background Check, UBER-MDL3084-DFS00003611-3614; Hassan Turay June 5, 2023 Checkr Motor Vehicle Report, UBER-MDL3084-DFS00003625-3626.) Both reports came back clear. (*Id.*)

51.  During Hassan Turay's time as a driver using the Uber app, Uber received two reports about him from riders. The first rider reported on March 24, 2019 that Turay had made them feel uncomfortable by engaging in behavior such as staring, making comments about the rider's appearance, and asking the rider personal questions about relationship status. (UBER-MDL3084-DFS00003696.) After receiving the complaint, Uber reached out to Turay and informed him that continued reports of similar behavior may result in permanent account deactivation. (*Id.*)

52.  The second report, received from a rider on April 18, 2023, accused Turay of kissing the rider, touching the rider sexually and calling them a "nigger bitch." (UBER-MDL3084-DFS00003690-3691.) Upon receiving the report, Uber immediately placed a temporary lock on Turay's account and blocked future pairings of Turay and the rider. (*Id.*) An investigation was conducted by Uber Trust and Safety Investigator Kelsey Bacon. (*Id.*) When Bacon attempted to contact the rider, the phone number the rider had provided was invalid. (*Id.*) The rider also did not respond to Bacon's outreach through Uber's in-app communications system. (*Id.*) When he was interviewed, Turay denied the alleged conduct. Bacon's review of the GPS data concerning the trip showed no trip deviation or other concerning information. (*Id.*) Bacon's review of the rider's history on the Uber app showed that the rider, whose Uber account was only 11 days old, had filed four complaints on four different trips. In three of those complaints, the rider alleged that the driver had called the rider a sexist, homophobic or racist slur. (*Id.*) Based on his investigation, Bacon concluded that the rider complaint against Turay was invalid, and Turay's account was reactivated. (*Id.*)

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

53.  During his time as a driver using the Uber app, Turay received 5,375 ratings from riders. (UBER-MDL3084-B2-00006259.) Of those 5,375 ratings, 111 (2%) were below a rating of 4 out of 5. (*Id.*) Those riders who left comments, left positive ones. (*Id.*)

### Felix Perez Rodriguez

54.  Uber conducted a criminal background and motor vehicle check on Felix Perez Rodriguez on October 31, 2017, before his first trip. (Felix Perez Rodriguez October 31, 2017, Checkr Motor Vehicle Report & Background Check, UBER-MDL3084-DFS00049170-172.) The criminal background check on Perez Rodriguez revealed no criminal history of sexual assault or any other crime. (*Id.*) The motor vehicle report came back clear. (*Id.*) Criminal background and motor vehicle checks obtained on September 18, 2018 (UBER-MDL3084-DFS00049189-192), August 5, 2019 (UBER-MDL3084-DFS00049185-188), October 12, 2020 (UBER-MDL3084-DFS00049181-184), September 15, 2021 (UBER-MDL3084-DFS00049176-189), August 18, 2022 (UBER-MDL3084-DFS00049157-160 and DFS000049173-175), and May 31, 2023 (UBER-MDL3084-DFS00049161-164 and DFS00049196-198), showed no criminal history of any kind, nor any motor vehicle violations. A criminal background search obtained on May 7, 2024 showed no criminal history. (UBER-MDL3084-DFS00049193-195.)

55.  During Perez Rodriguez's time as a driver using the Uber app, Uber received one previous rider complaint about him. In the complaint, received by Uber on October 29, 2022, the rider complained that Perez Rodriguez's vehicle was unsafe and that he "drove fast with sudden braking." (UBER-MDL3084-DFS00049253-254.) During that same time period, Perez Rodriguez received 9,238 ratings from riders. (UBER-MDL3084-W-00006257.) Of those 10,416, Perez Rodriguez received 353 (3.4%) that were below a 4 out of 5. The only arguably negative comment left by a rider was, "You need to learn English." (*Id.*)

### Jeffery Richardson

56.  Uber conducted a criminal background and motor vehicle check on Jeffery Richardson on November 8, 2018, before his first trip. (Jeffery Richardson November 8, 2018, Checkr Motor Vehicle Report & Background Check, UBER-MDL3084-DFS00074473-477.) The criminal background check on Richardson revealed that on September 3, 1996 and June 18, 1998, he pled guilty to violating a local noise ordinance. (*Id.*) His motor vehicle report came back clear. (*Id.*)

57.  Richardson did not consent to rerunning his background check in May 2019. (UBER-MDL3084-BW-00007775; Hannah Nilles Ex. 1868 (Annotated Driver Status & Flow).) As a result, he was moved to inactive status and was no longer permitted to drive on the platform. (*Id.*)

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

58.  During Richardson's time as a driver using the Uber app, he received 694 ratings from riders. (UBER-MDL3084-BW-00006262.) Of those 694, he received 10 ratings (1.4%) that were below a 4 out of 5. (*Id.*)

59.  Based on the documents I reviewed, it is my understanding that during Richardson's time as a driver using the Uber app, Uber did not receive any complaints about him from riders.

### Douglas Reitzen

60.  Uber conducted a criminal background and motor vehicle check on Douglas Reitzen on January 8, 2017, before his first trip. (Douglas Reitzen January 8, 2017, Checkr Motor Vehicle Report & Background Check, UBER-MDL3084-DFS00073388-391; Reitzen January 11, 2017, Checkr Consumer Report, UBER-MDL3084-DFS00073363-366.) The criminal background check on Reitzen revealed no criminal history of sexual assault or any other crime. (*Id.*) The motor vehicle check came back clear. (*Id.*) Criminal background and motor vehicle checks obtained on July 13, 2018 came back clear. (UBER-MDL3084-DFS00073375-378.) Criminal background and motor vehicle checks obtained on August 24, 2019 also came back clear. (UBER-MDL3084-DFS00073384-387.) Criminal background and motor vehicle checks obtained on September 29, 2020 (UBER-MDL3084-DFS00073371-374) and October 8, 2020 (UBER-MDL3084-DFS00073367-370) also came back clear. The criminal background check obtained on September 20, 2021 (UBER-MDL3084-DFS00073379-383) came back clear. However, the motor vehicle report obtained on that date revealed that Reitzen had been in a vehicle accident on April 14, 2021, after the alleged incident involving WHB 318. (*Id.*)  A motor vehicle report obtained on December 18, 2022 came back clear with the exception of the April 14, 2021 vehicle accident. (UBER-MDL3084-DFS00159934-936.)

61.  During Reitzen's time as a driver using the Uber app, he received 102 ratings from riders. (UBER-MDL3084-BW-00006253.) Of those 102, he received no ratings that were below a 5. (Id.)

62.  Thus, in the time leading up to the alleged assaults of AR, BL, JD, LCHB, WHB 823 and WHB 318, Uber had no prior information that Le, Castaneda-Orozco, Turay, Perez Rodriguez, Richardson or Reitzen posed a danger of sexual assault to riders.

### C.  Uber's Urgent Support Logic Investigation Methodology Permits a Sufficiently Thorough Investigation of Sexual Assault Complaints.

63.  In 2018, Uber created a Sexual Misconduct and Sexual Violence Taxonomy to more accurately reflect the complexities of reported safety incidents. (UBER_JCCP_MDL_001103507 at 532.) Uber also rolled out the "Stand for Safety" initiative, enabling the Community Operations team to

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

enhance the handling of customer safety complaints, including sexual assault. (UBER-MDL3084-000062052-67.)

64. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

65.  In early 2019, ██████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

66. Uber's Urgent Support Logic workflow for investigating allegations by riders or drivers of sexual misconduct and sexual assault, was consistent with the generally accepted standards for conducting a fair investigation. A fair investigation should provide due process (essential fairness) for both the complaining party and the party who the complaint is lodged against. This includes a trained investigator gathering all relevant evidence by, among other things, interviewing the complainant(s), respondent, and percipient witnesses, if any. This should be followed by a conclusion and resolution that is consistent with the gathered evidence.

67. Uber's investigation methodology is consistent with—and in some ways exceeds—the standards for investigation that I have observed in other contexts (i.e., workplace harassment claims and assaults on college campuses) where the investigating party has a greater degree of control over the parties involved in the alleged assault. For one thing, Uber's methodology mandates deactivation of a driver after a single report of the most severe categories of sexual assault, a standard that is more protective of sexual assault survivors. In addition, the Urgent Support Logic "triage workflow" system goes further than the traditional workplace investigation process, because it helps reduce the impact of investigator unconscious bias. Mandating that all investigators follow the same steps, and make decisions

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

based on the same objective criteria, removes the subjective and arbitrary decision-making that can leave an investigator vulnerable to their biases.

### D. Uber's Investigations of the Alleged Sexual Assaults Were Consistent with Generally Accepted Standards for Conducting a Workplace Investigation.

68.  In each of the cases at issue here, Uber followed its Urgent Support Logic by determining they were Category A complaints, resolving them quickly following their receipt, and deactivating the drivers.

69.  After AR reported an unspecified safety incident on August 11, 2023, an Uber Trust and Safety Specialist emailed AR to obtain additional details. (UBER-MDL-3084-DFS00054846.) AR did not respond. (*Id.*) When AR's lawyers first reported the alleged sexual assault to Uber on December 31, 2024, Uber deactivated driver Michael Le's account. (UBER-MDL-3084-DFS00054846; UBER-MDL3084-DFS00160114-118.)

70.  BL did not report her alleged assault to Uber, but she did file a report with her local police department the day after the alleged assault. (Deposition of BL, Exhibit 11.) That same day, when the Police Department informed Uber's Trust and Safety team that it had opened an active investigation of Castaneda-Orozco for suspected rape, Uber placed a safety lock on driver Edwin Castaneda-Orozco's account so he could no longer provide rides using the Uber app. (UBER-MDL3084-DFS00061375-61378.)

71.  JD reported her alleged sexual assault to Uber on November 15, 2023. Immediately upon receiving JD's report, Uber temporarily deactivated driver Hussan Turay's account. (UBER-MDL3084-DFS00003701.) On November 17, 2023, Uber permanently deactivated Turay's account. (*Id.*)

72.  LCHB 128 reported her alleged sexual assault to Uber on June 29, 2024. That same day, an Uber Trust and Safety Specialist telephoned LCHB 128 and obtained additional details, and placed a temporary hold on Perez Rodriguez's account. (UBER-MDL3084-DFS00049324.) Also on that same day, the Trust and Safety Specialist telephoned Perez Rodriguez and obtained his statement. (*Id.*) Perez Rodriguez denied the allegations. (*Id.*) Nonetheless, Uber immediately deactivated Rodriguez's account and banned him from the platform. (*Id.*)

73.  WHB 823 did not report her alleged sexual assault to Uber or to the local police. (Deposition of WHB 823, pp. 37:17-19; 169:25-170.2.) On February 2, 2023, when Uber was informed of the alleged sexual assault by WHB 823's attorneys, Uber placed a temporary safety lock on driver Jeffery Richardson's account. (UBER-MDL3084-DFS00074490-491.) Richardson had been moved to inactive

HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY



OPPENHEIMER
INVESTIGATIONS
GROUP LLP

INVESTIGATIONS | TRAININGS | MEDIATIONS

status on the Uber platform years prior, in May 2019, because he did not consent to re-running his background check. (UBER-MDL3084-BW-00007775.)

74. WHB 318 did not report the alleged sexual assault to Uber until after she filed the instant lawsuit. (UBER-MDL3084-DFS00073411.) Thus, Uber was deprived of the opportunity to investigate the allegation using the Urgent Support Logic methodology.

75. The investigations that did occur followed Uber's Urgent Support Logic methodology and were consistent with the accepted standards for conducting workplace investigations. They were timely, fair, and thorough. Drivers Le, Castaneda-Orozco, Turay, Perez Rodriguez, Richardson and Reitzen were permanently deactivated because Uber's policies mandated this result. Not all businesses that follow the traditional workplace investigation model would have fired a contractor for a single, unconfirmed allegation of sexual assault. In this regard, Uber's policies and processes possibly are more protective of complainants than well-accepted standards in the HR industry.

76. I reserve the right to supplement this report and to expand or modify my opinions based on review of material as it becomes available through ongoing discovery and through any additional work. If you have any questions about this report, please do not hesitate to contact me.

Sincerely,

*Vida Thomas*

Vida Thomas

Managing Partner

Date: September 26, 2025

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT A

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# VIDA L. THOMAS

1811 10th Avenue, Sacramento, California 95818

**(916) 306-8371**                                                    vida@oiglaw.com

---

**LEGAL EMPLOYMENT**       **Oppenheimer Investigations Group** ♦ Berkeley, CA
January 2020 – Present

<u>Managing Partner and Co-Owner</u>
Conducted independent workplace investigation for public and private employers.
Supervise attorney investigators.  Conducted employee training regarding
harassment, discrimination and retaliation prevention, diversity and inclusion, and
how to conduct workplace investigations. Served as legal counsel to public agency
discipline appeal boards during employee discipline appeal hearings.  Served as
hearing officer in public agency discipline appeal hearings. Served as expert
witness in state and federal employment lawsuits.

**Stoel Rives, LLP** ♦ Sacramento, CA
March 2018 – January 2020

<u>Of Counsel and Head of California Employment Unit</u>
Conducted outside workplace investigations for public and private employers.
Conducted Title IX and Title 5 investigations for public and private colleges and
universities, community colleges, and K-12 school districts.  As the head of the
firm's California employment practice unit, provided employment advice and
counseling for    private sector employers concerning compliance with federal and
California employment and wage and hour laws. Conducted employee training on
topics    including sexual harassment, discrimination and retaliation prevention, how
to conduct workplace investigations, and diversity and inclusion. Served as legal
counsel to public agency discipline appeal boards during employee discipline
appeal hearings.  Served as hearing officer in public agency discipline appeal
hearings.

**Weintraub Tobin Chediak Coleman Grodin** ♦ Sacramento, CA
November 2014 – February 2018

<u>Of Counsel and Head of Investigations Unit</u>
Conducted workplace investigations for public and private employers.  Provided
employment advice and counseling for private sector employers concerning
compliance with federal and state employment and wage and hour laws.

**Carlsen Thomas, LLP** ♦ Sacramento, CA
January 2000 – April 2013

Co-owner of a boutique employment law firm providing employment advice, independent
work place investigations and employee training.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Kronick, Moskovitz, Tiedemann &** Girard ◆ Sacramento, CA
June 1993 – December 1999

<u>Associate and Senior Associate</u>
Worked in the Employment and Labor Litigation section handling all phases of litigation in discrimination, harassment, retaliation and wrongful termination lawsuits filed against public and private employers in state and federal courts, conducting workplace investigations, and employee training.

**PRIOR NON-LEGAL EMPLOYMENT**

**Sacramento First National Bank** ◆Sacramento, CA
Construction Loan Processor ◆ September 1987 – March 1991
Maintained portfolio of residential loans from loan origination to completion of construction.

**The Golden 1 Credit Union** ◆ Sacramento, CA
Mortgage Loan Processor ◆ September 1986 – September 1987
Handled home loans from application through submission to escrow.

**EDUCATION**

University of the Pacific, McGeorge School of Law
   *Juris Doctor, 1993*
California State University, Sacramento
   *B.S. Degree in Business Administration, 1990*

**PROFESSIONAL & COMMUNITY ACTIVITIES**

- Pacific McGeorge School of Law Diversity & Inclusion Advisory Committee, 2019 to Present
- San Joaquin SHRM, Board Member, 2015 to Present
- Association of Workplace Investigators Teaching Faculty, 2016 to Present
- AWI Board Member, 2011-2012, 2023-present
- AWI Best Practices Committee Chair, 2011-2012
- Sacramento Employer Advisory Council, Board Chair, 2007-2008
- Pacific McGeorge School of Law Alumni Board Member, 2006-2008
- Wiley Manual Bar Association of Sacramento, Treasurer, 2007
- Anthony M. Kennedy Inn of Court, Associate Member, 2000 and 2001
- Sacramento County Bar Association Minority Hiring and Retention Committee, Chair - 1998/99, Co-Chair – 1999/2000
- California State Bar Ethnic Minority Relations Committee, 1997/1998
- Chemical Dependency Center for Women, Board Chair, 1999 and 2000

**HONORS & AWARDS**
◆ Best of the Bar – Sacramento Business Journal – 2017
◆ Women Who Men Business – Sacramento Business Journal – 2023
◆ Champions for DEI Award – Sacramento Business Journal – 2024
◆ Top Women Lawyers – California Daily Journal – 2024

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**PUBLISHED ARTICLES**

- Comstock's – *Migroaggression or Dog Whistle? What They are and How to Tell the Difference*, November 2021
- SHRM – *Viewpoint: Tips for Creating Virtual Anti-Harassment Training During the Pandemic* with Christina Ro-Connolly, August 25, 2020
- Bloomberg Law – *"INSIGHT: Conducting Effective Workplace Investigations Without The Workplace,"* with Alezah Trigueros,, Issue date: August 13, 2020

**QUOTED COMMENTS**

- *KRON 4 News – "Colleague of San Jose VTA shooter feared he might 'go postal."* Air date: June 10, 2021
- *Daily Journal – "Remote working hasn't lessened worker disputes, lawyers say."* Issue date: November 13, 2020

**TRAININGS**

- Unconscious Bias in a Law School Environment for McGeorge School of Law 1L Students – August 2022 and August 2023
- One-Day Investigations Training – University of Cape Town, South African – May 2022 & October 2023
- Diversity & Inclusion Training for Wescom Credit Union – February 27, 2020
- Diversity & Inclusion Training for Diamond Pet Foods – September 2019
- Two-Day Workshop on Advanced Workplace Investigation Technique, for the County of San Luis Obispo – July 2018
- One-Day Workshop on Advanced Workplace Investigation Techniques, for California Employment Development Department – March 2018
- One-Day Workshop on Conducting Effective Workplace Investigations, for California Employment Development Department – January 2016
- One-Day Workshop on Conducting Effective Workplace Investigations, for various Weintraub Tobin Clients – March 3, 2016
- Two-Day Workshop on Conducting Effective Workplace Investigations, for the Santa Clara Valley Transit Agency – July 23-24, 2015
- One-Day Workshop on Conducting Effective Workplace Investigations, for the California Employment Development Department – January 2015
- One-Day Workshop: Mastering the Art of Employment Investigations, for the Labor and Employment Section of the Bar Association of San Francisco and the California Association of Workplace Investigators – June 1 and 3, 2010
- Half-Day Pre-Conference Training Program: How to Conduct Employment Investigations, for the State Bar of California Labor and mployment Law Section Annual Meeting – October 22, 2009

**SPEAKING ENGAGEMENTS**

- ELearn Webinar: Workplace Investigations – CA Public Employers Labor Relations Association

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

September 2022
September 2023

- ***Microaggression or Dog Whistle? How to Differentiate and Investigate"*** *for Fresno SHRM – March 30, 2022*
- **"*Microaggression or Dog Whistle? How to Differentiate and Investigate"*** *for CALPELRA Annual Conference with Christina Ro-Connolly – November 17, 2021*
- **"*Microaggression or Dog Whistle? How to Differentiate and Investigate"*** *for the AWI Annual Conference, with Christina Ro-Connolly – October 14, 2021*
- ***"Understanding and Reducing Unconscious Bias*** *for the CalSHRM's 2021 Californnia State HR Advocacy & Legislative Conference – April 16, 2021*
- ***"The Latest Developments in Title IX Investigations, Including Navigating the Intersection of Race & Gender"*** *for the Berkeley Center for Comparative Equality and Anti-Discrimination Law 2021 Conference on Sexual Harassment in Education, with Natasha Baker and Nyoki Sacramento – January 29, 2021*
- ***"Dynamex and AB 5: What Do They Mean for the Arts?"*** *for the Wedding Planners International Association – February 20, 2020*
- ***"Developments in Sexual Harassment Law"*** *for the Berkeley Center for Comparative Equality and Anti-Discrimination Law – February 7, 2020*
- ***"Dynamex and AB 5: What Do They Mean for the Arts?"*** *for the Capitol Film    Arts Alliance – January 21, 2020*
- ***"Why I Learned to Love AB 5"*** *for  the Sacramento County Bar Association Board & Leadership Retreat – January 11, 2020*
- ***"The Calm After the Storm? Post-Investigation Issues"*** *for the San Joaquin SHRM Annual Conference – January 8, 2020*
- **"*Do Generous Leave Policies Contribute to Pay Disparities?"*** *for Northstate SHRM Annual Conference – October 9, 2019*
- ***"Dynamex and AB 5: What Do They Mean for the Arts?"*** *for the California Arts Coalition – December 2019*
- ***"Removing Inherent Bias from Employment Decisions"*** *for San Joaquin SHRM – August 14, 2019*
- ***"Independent Contractor Status and the Arts"*** *for California Lawyers for the Arts – June 2019*
- **"*Do Generous Leave Policies Contribute to Pay Disparities?"*** *for Central California SHRM Annual Conference – March 12, 2019*
- ***"Managing the Underperformer: Discipline and Termination"*** *February 28, 2019*
- ***"Supervisors: Train Them or . . . They'll Cost You"*** *for the Northstate SHRM Annual Conference – October 2018*
- ***"Supervisors: Train Them or . . . They'll Cost You"*** *for the CalSHRM Legislative Conference – April 2018*
- ***"Workplace Investigations Basics"*** *with Terri Abad Levenfeld, for the Association of Workplace Investigators – April 11, 2018*
- ***"Beyond the Basics: Advanced Workplace Investigations Techniques"*** *for Central California SHRM Annual Conference – March 8, 2018*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

- *"Internal Investigations and Attorney-Client Privilege: How it is Preserved or Refuted",* for NBI, Inc. – January 2018
- *"Tough, Tougher, Toughest: Navigating Difficult Situations in Interviews"* with Amy Oppenheimer and Alezah Trigueros, CALPELRA Annual Conference – April 2017
- *"The Immigration Landscape for the California Employer"* for the San Joaquin SHRM – February 22, 2017
- *"Behind the Doors of the HR Office,"* for the Greater Stockton Employer Advisor Council – September 18, 2015
- *"Improve Your Workplace Investigations"* for Women in Winesense – September 16, 2015
- *"Conducting Better Workplace Investigations"* for the Central Valley SHRM – August 19, 2015
- *"It Was Colonel Mustard in the Library: Workplace Investigations"* for CalSHRM Annual Conference – June 19, 2015
- *"The Basics of Investigating Workplace Complaints of Harassment, Discrimination and Retaliation"* for the California State Bar Cyber Institute – January 6, 2011
- *"How to Conduct an Effective Workplace Investigation"* for the California Employers Association – August 11, 2010
- *"Workplace Investigations: How to Make Them Legal and Fair*" for the Sacramento Employer Advisory Council - March 3, 2009
- *"Workplace Investigations: How to Make Them Legal and Fair*" for the California Association of Equal Rights Professionals' Annual Conference – June 6, 2008
- *"Sending the Right Message: Investigating Workplace Discrimination and Harassment"* for the Pacific McGeorge School of Law Alumni Association MCLE Program – January 12 and 26, 2008

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT B

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**<u>List of Cases in which Vida L. Thomas has Testified</u>**

**Prepared on April 28, 2025**

**<u>Testimony in Depositions</u>**

1. *Tadasha Stephens v. California Commerce Club, Inc.*, JAMS Case No.
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged she was terminated for theft as a pretext for gender and age discrimination.
   - Expert opinion on: Sufficiency of defendant's pre-termination investigation.

2. *Zolie Breeland v. Downey Unified School District,* Los Angeles County Superior Court Case No. 19NWCV00711
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged she was terminated based on pregnancy.
   - Expert opinion on: Sufficiency of defendant's interactive process and reasonable accommodations.

3. *Cecelia Valdovinos v. Cushman-Wakefield,* U.S. District Court, Northern District of California, Civil No. 1:17-cv-00309
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged she was sexually harassed, retaliated against and constructively discharged.
   - Expert opinion on: Sufficiency of defendant's response to plaintiff's internal complaints; sufficiency of defendant's investigation.

4. *Keith Armstrong v. City of Tacoma*, Pierce County Superior Court of the State of Washington, Case No. 20-2-07394-1
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged he was disciplined and terminated in retaliation for opposing discrimination.
   - Expert opinion on: Sufficiency of defendant's progressive discipline; sufficiency of defendant's investigation of plaintiff's complaints; whether defendant took sufficient measures to protect plaintiff from retaliation.

5. *Jane Doe v. Uber Technologies, Inc.,* U.S. District Court, Northern District of California, Case No. 3:19-cv-03310-JSC – retained by defendant, testified in deposition
   - Retained by defendant.
   - Allegations: Plaintiff alleged her assault by a former Uber driver was the result of Uber's failure to contact the police when other Uber riders reported driver's misbehavior.

- Expert opinion on: Well-accepted standard in the HR industry regarding when and whether an employer should contact law enforcement after an employee reports an assault.

6. *David Phillips-Kerley v. City of Fresno*, U.S. District Court for the Eastern District of California, Case No. 1:18-cv-00843-AWI-BAM
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged that he was disciplined because of his race, and retaliated against for bringing complaints.
   - Expert opinion on: Adequacy of defendant's investigation of plaintiff's complaints; whether defendant took adequate steps to protect plaintiff from retaliation.

7. *Bonnie Louise Gawf v. City of Monterey, et al.,* Monterey County Superior Court, Case No. 20CV003232 – retained by defendant, testified in deposition
   - Retained by defendant.
   - Allegations: Plaintiff alleged she was laid off because of her age.
   - Expert opinion on: Whether defendant's policies regarding and implementation of lay off met well-established HR standards.

8. *Victoria Dale v. Higher Class Healing, et al.* – Riverside County Superior Court, Case No. MCC1900397
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged she was terminated due to her pregnancy.
   - Expert opinion on: Whether defendant's termination decision met well-established HR standards.

9. *Shannon Turner v. TDR Systems, -* Circuit Court for Charles County Maryland, Case No. C-08-CFV-21-000543
   - Retained by plaintiff.
   - Allegations: Plaintiff alleged that defendant had failed to adequately investigate the possibility that plaintiff's supervisor was sexually harassing her.
   - Expert opinion on: Whether defendant's investigation met well-established HR Standards

10. *Ashley Emery v. Southeast Personnel Leasing, Inc. and Planting Justice, -* Alameda County Superior Court, Case No. RG19006938
    - Retained by plaintiff.
    - Allegations: Plaintiff alleged that after she was sexually assaulted by a coworker, defendant failed to investigate her complaint properly, denied her request for an accommodation, and fired her in retaliation for bringing the complaint.
    - Expert opinion on: Adequacy of employer's sexual assault investigation; whether employer met its obligation to accommodate plaintiff.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11. *Caryn Devins Strickland v. U.S., et al.,* U.S. District Court for the Western District of North Carolina, Asheville Division, Civil No.: 1:20-cv-00066-WGY
    - Retained by plaintiff.
    - Allegations: Plaintiff alleged that sexual harassment, retaliation and constructive discharge.
    - Expert opinion on: Adequacy of defendant's investigation of plaintiff's complaints; whether defendant took adequate steps to protect plaintiff from retaliation.

12. *Amy Ayers, Dwayne Pugh, Rodney James, and Deborah Bates-Pettaway v. Sacramento Municipal Utility District, et al.*, Superior Court of the State of California for the County of Sacramento, Case No.: 34-2022-00313429
    - Retained by defendant.
    - Allegations: Plaintiffs alleged they were denied promotions and full-time status because of their race and that they were retaliated against when they complained.
    - Expert opinion on: Adequacy of defendant's investigations of plaintiff's complaints.

13. *Quentin Brown v. APL Maritime, LTD, et al.*, United States District Court for the Northern District of California, Case No.: 4:22-CV-06999-DMR
    - Retained by defendant.
    - Allegations: Plaintiff alleged defendant company failed to conduct a timely investigation of his sexual assault complaint.
    - Expert opinion on: Adequacy of defendant company's investigation.
    -

14. *EEOC v. Fresh Venture Foods, LLC,* United States District Court for the Central District of California, Case No. 2:21-cv-07679 CBM(DFMx)
    - Retained by plaintiff intervenors
    - Allegations: Anonymous plaintiff intervenors alleged defendant company failed to adequately investigate claims of harassment
    - Expert opinion on: Adequacy of defendant company's investigations in relation to anonymous plaintiff intervenors.

15. *Villanueva v. County of Los Angeles, et. al.,* United States District Court for the Central District of California, Case No. 2:24-cv-04979-SVW-JC
    - Retained by defendant county
    - Allegations: That the county investigated two complaints against former Sheriff Alex Villanueva and placed a do not rehire note in his personnel file to retaliate against him for his political commentary.
    - Expert opinion on: Adequacy of the defendant county's investigation into two complaints against former Sheriff Alex Villanueva and the appropriateness of adding a do not rehire notation to his file.

**Testimony at Trial**

*Shannon Turner v. TDR Systems,* - Circuit Court for Charles County Maryland, Case No. C-08-

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CFV-21-000543
- Retained by plaintiff
- Allegations: Plaintiff alleged that defendant had failed to adequately investigate the possibility that plaintiff's supervisor was sexually harassing her
- Expert opinion on: Whether defendant's investigation met well-established HR standards

# EXHIBIT C

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# <u>Documents Considered List</u>

**Articles**
- AWI Guiding Principles for Conducting Effective Workplace Investigations
- EEOC Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, EEOC Notice Number 915.002, June 18, 1999
- The Essential Guide to Workplace Investigations, Nolo, 2 ed., July 12, 2010
- Workplace Investigations: Understanding Standard Practice, Bender's California Labor & Employment Bulletin, June 1, 2010

**Depositions**
- Deposition of Plaintiff A.R., with Exhibits, July 1, 2025
- Deposition of Plaintiff B.L., with Exhibits, June 25,2025
- Deposition of Gregory Brown, with Exhibits, March 13, 2025
- Deposition of Plaintiff J.D., with Exhibits, June 27, 2025
- Deposition Hannah Nilles, with Exhibits, August 7, 2025
- Deposition of Plaintiff WHB 823, with Exhibits, July 10, 2025
- Deposition of Plaintiff LCH 128, with Exhibits, June 25, 2025

**Produced Documents**
- UBER-MDL3084-00061342
- UBER-MDL3084-00061339
- UBER-MDL3084-DFS00054724
- UBER-MDL3084-DFS00054679
- UBER-MDL3084-DFS00054709
- UBER-MDL3084-DFS00054704
- UBER-MDL3084-DFS00054716
- UBER-MDL3084-DFS00054713
- UBER-MDL3084-DFS00054726
- UBER-MDL3084-DFS00073388
- UBER-MDL3084-DFS00073363
- UBER-MDL3084-DFS00073375
- UBER-MDL3084-DFS00073384
- UBER-MDL3084-DFS00073371
- UBER-MDL3084-DFS00073367
- UBER-MDL3084-DFS00073379
- UBER-MDL3084-DFS00159934
- UBER-MDL3084-DFS00074473
- UBER-MDL3084-BW-00007775
- UBER-MDL3084-DFS00049170
- UBER-MDL3084-DFS00049189
- UBER-MDL3084-DFS00049185
- UBER-MDL3084-DFS00049181
- UBER-MDL3084-DFS00049176
- UBER-MDL3084-DFS00049157
- UBER-MDL3084-DFS00049173
- UBER-MDL3084-DFS00049161

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- UBER-MDL3084-DFS00049196
- UBER-MDL3084-DFS00049193
- UBER-MDL3084-DFS00003621
- UBER-MDL3084-DFS00003619
- UBER-MDL3084-DFS00003615
- UBER-MDL3084-DFS00003647
- UBER-MDL3084-DFS00003643
- UBER-MDL3084-DFS00003635
- UBER-MDL3084-DFS00003633
- UBER-MDL3084-DFS00003627
- UBER-MDL3084-DFS00003631
- UBER-MDL3084-DFS00003611
- UBER-MDL3084-DFS00003625
- UBER_JCCP_MDL_001103507
- UBER_JCCP_MDL_001852418
- UBER_JCCP_MDL_003561529
- UBER-MDL3084-DFS00003701
- UBER-MDL3084-DFS00054846
- UBER-MDL3084-000062052
- UBER-MDL3084-DFS00003696
- UBER-MDL3084-DFS00003690
- UBER-MDL3084-DFS00049253
- UBER-MDL3084-DFS00054838
- UBER-MDL3084-DFS00054843
- UBER-MDL3084-DFS00054777
- UBER_JCCP_MDL_000323792
- UBER-MDL3084-DFS00049324
- UBER-MDL3084-DFS00074490
- UBER-MDL3084-DFS00073411
- UBER-MDL3084-DFS00160114
- UBER-MDL3084-DFS00061375
- UBER_JCCP_MDL_000366728
- UBER-MDL3084-BW-00006253
- UBER-MDL3084-BW-00006262
- UBER-MDL3084-BW-00006257
- UBER-MDL3084-BW-00006259
- UBER-MDL304-BW-00006254
- UBER-MDL3084-BW-0006265
- UBER-MDL3084-BW-00012056

**Legal Documents**
- *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)
- *Silva v. Lucky Stores, Inc.,* 65 Cal App. 4th 256 (1998)
- *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)
- *Cofran v. Rollins Hudig Hall Intl., Inc.*, 17 Cal. 4th 93 (1998)
- Amended Bellwether Complaint and Demand for Jury Trial, *In Re: LCHB128 v. Uber Technologies, Inc., et al.*, No. 3:24-cv-7019, United States District Court, Northern District of California, San Francisco Division, March 14, 2025
- Plaintiff B.L. First Amended Plaintiff Fact Sheet, *In Re: B.L. v. Uber Technologies, Inc., et*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

*al.;* No. 3:24-CV-7940, United States District Court, Northern District of California, San Francisco Division

- Plaintiff J.D. First Amended Fact Sheet, *In Re: Uber Technologies, Inc., et al,;* No. 3:23-CV-06708
- Plaintiff WBH 832 First Amended Fact Sheet, *In Re: WHB 832 v. Uber Technologies, Inc., et al,;* No. 3:24-CV-04900
- Amended Bellwether Complaint and Demand for Jury Trial *In Re: WHB 318 v. Uber Technologies, Inc.*, No. 3:24-CV-04889, March 14, 2025
- Plaintiff WHB 318 Fourth Amended Fact Sheet *In Re: WHB 318 v. Uber Technologies, Inc.*, No. 3:24-CV-04889
- Plaintiff A.R. Second Amended Fact Sheet, *In Re: Uber Technologies, Inc., et al,;* No. 3:24-CV-07821

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT D

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## COMPENSATION FOR VIDA THOMAS

| | |
|---|---|
| Consultation and Preparation | $750/hr |
| Testimony | $750/hr |
| Personal vehicle/lodging/travel related expense reimbursement | N/A |
| Copying/printing document reimbursement and mailing reimbursement | .25/page |
| Legal intern time | $150/hr |
| Writer-editor/paralegal time: | $225/hr |