**Exhibit O**

1  [Submitting counsel below]

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

                   OF NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN FRANCISCO DIVISION
11

12
   **IN RE: UBER TECHNOLOGIES, INC.,**          No. 3:23-md-03084-CRB
13 **PASSENGER SEXUAL ASSAULT**
   **LITIGATION**                               **PLAINTIFFS' MOTION TO EXCLUDE**
14                                              **EXPERT TESTIMONY**

15                                              Judge:  Honorable Charles R. Breyer
   This Document Relates to:                    Date:    January 6, 2026
16                                              Time:    10:00 A.M. PT
   *Jaylynn Dean v. Uber Techs., Inc.*,         Ctrm.:  6-17th Floor (zoom)
17 No. 23-cv-06708
                                                **PROVISIONALLY FILED UNDER SEAL**
18                                              **PURSUANT TO ECF 4332**

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................. 1

LEGAL STANDARD ...................................................................................... 3

ARGUMENT .................................................................................................... 4

I.      EXPERT REPORT OF VICTORIA STODDEN ................................. 4

    A.      Dr. Stodden's "Orders of Magnitude" opinion is unreliable and irrelevant. ......... 5

        1.      Dr. Stodden did not use reliable statistical methodology to compare Uber's SA/SM incident reports to California public transportation survey results ................................................................ 6

            a.      Dr. Stodden's opinions are unreliable because she compares numbers with incompatible units. ..................................................... 7

            b.      Dr. Stodden's calculations are unreliable because she did not evaluate statistical significance or uncertainty, or account for variability. .................................................. 8

            c.      Uber acknowledges that its incident numbers cannot be used to make reliable comparisons to other data sets........................... 11

        2.      Dr. Stodden did not use reliable methodology to draw population inferences from samples........................................................ 12

            a.      Uber's SA/SM incident reports are not representative of the SA/SM incident rate on Uber. ....................................... 13

            b.      California Public Transportation incident rates used by Dr. Stodden are unreliable, nonrepresentative samples. ..................... 15

         3.      Dr. Stodden's comparison of Dr. Chandler's estimated incident rates to public transportation surveys are unreliable.............................. 19

    B.      Dr. Stodden's comparisons to California public transportation surveys are irrelevant to an Arizona case.................................................. 19

    C.      Dr. Stodden's data reliability opinions are unreliable........................................... 20

    D.      Dr. Stodden's opinions as to homicide, fatal traffic accidents, and lightning strikes are irrelevant and unreliable. ...................................... 21

II.     EXPERT REPORT OF VIDA THOMAS ........................................................ 22

III.    EXPERT REPORT OF JASON MORRIS ......................................................... 23

    A.      Mr. Morris's "industry standards" opinions are irrelevant and unhelpful because they are not based on any actual industry standards............................. 23

    B.      Mr. Morris's "industry standards" opinions are irrelevant because they do not help the jury evaluate the efficacy of Uber's background checks. ................. 25

    C.      Mr. Morris's "industry standards" opinions are unreliable................................... 27

**TABLE OF CONTENTS**
(continued)

Page

IV.   EXPERT REPORT OF ERIC PIZA ............................................................... 28

    A.   Dr. Piza's opinions about Uber's safety features and perpetrator perception
        are unreliable. .............................................................................................. 29

    B.   Dr. Piza's statements regarding technological and operational feasibility
        are outside his expertise and unsupported. ............................................... 31

    C.   Dr. Piza's testimony regarding RAINN and Urban Institute constitutes
        improper personal opinions. ...................................................................... 34

V.    EXPERT REPORT OF JOSEPH OKPAKU ................................................... 34

    A.   Mr. Okpaku's opinions on whether Uber is a common carrier are irrelevant. ...... 35

        1.   How regulators "treat" Uber and what legislators "intended" are
            improper and unhelpful legal conclusions. ................................. 35

        2.   How regulators "treat" Uber and what legislators "intended" are
            irrelevant to whether Uber is a common carrier. ........................ 36

    B.   Mr. Okpaku's "industry standard" opinions are unreliable. ..................... 38

    C.   The portions of Mr. Okpaku's "control" opinions based on driver
        motivation and contractual interpretation should be excluded. ............... 40

        1.   Drivers' "motivators" are not relevant to whether they are
            employees. .................................................................................. 40

        2.   Mr. Okpaku's interpretations of Uber contracts are irrelevant and
            improper legal opinion. .............................................................. 41

    D.   Mr. Okpaku's "dashcams are not required" opinion is not evidence of
        reasonable care and should be excluded. .................................................. 41

CONCLUSION ........................................................................................................ 41

— 

x

.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*BP Prods. N. Am., Inc. v. Grand Petrol., Inc.*,
2021 WL 4482138 (N.D. Cal. Sept. 30, 2021) ........................................................ 35

*Brewer v. BNSF Rwy. Corp.*,
2016 WL 11709319 (D. Mon. Apr. 22, 2016) .......................................................... 36

*Engler v. Gulf Interstate Eng'g, Inc.*,
258 P.3d 304 (Ariz. App. 2011) ............................................................................... 40

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
424 F. Supp. 2d 1229 (E.D. Cal. 2005) .................................................................... 36

*Crow Tribe of Indians v. Racicot*,
87 F.3d 1039 (9th Cir. 1996) .................................................................................... 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........................................................................................... *passim*

*Doubt v. NCR Corp.*,
2014 WL 3897590 (N.D. Cal. Aug. 7, 2014) .............................................................. 4

*Grodzitsky v. Am. Honda Motor Co.*, Inc.,
957 F.3d 979 (9th Cir. 2020) .............................................................................. 25, 39

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
254 F.3d 825 (9th Cir. 2001) .................................................................................... 39

*In re Bextra & Celebrex Mktg., Sales Practices, & Prods. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) .............................................................. 10, 36

*In re Uber Rideshare Cases*,
2025 WL 2631565 (Cal. Super. Jul. 31, 2025) ........................................................ 38

*In re Uber Rideshare Cases*,
2025 WL 2631568 (Cal. Super. Aug. 29, 2025) .................................................... 2, 23

*In re: Lipitor (Atorvastatin Calcium) Mkt., Sales Prac. & Prods. Liab. Litig.*,
174 F. Supp. 3d 911 (D.S.C. 2016) ............................................................................ 9

*Jinro Am. Inc. v. Secure Investments, Inc.*,
266 F.3d 993 (9th Cir. 2001) .................................................................................... 32

*Kidwell-Bertagnolli v. Cnty. Of Sonoma*,
2024 WL 1589468 (N.D. Cal. April 10, 2024) .................................................... 25, 39

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) ...................................................................... 30

*Kumho Tire v. Carmichael*,
526 U.S. 137 (1999). ................................................................................................... 4

*Laumann v. Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015) ........................................................................ 8

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lord Abbett Mun. Income Fund, Inc. v. Asami,*
2014 WL 3417941 (N.D. Cal. Jul. 11, 2014)........................................................... 22

*Lowrey v. Montgomery Kone, Inc.,*
42 P.3d 621 (Ariz. App. 2002)............................................................................... 37

*Magallon v. Robert Half Int'l, Inc.,*
743 F. Supp. 3d 1237 (D. Or. 2024) ............................................................... *passim*

*Moussouris v. Microsoft Corp.,*
311 F. Supp. 3d 1223 (W.D. Wash. 2018)............................................................. 13

*Murray v. Uber Techs., Inc.,*
486 F. Supp. 3d 468 (D. Mass. 2020) ................................................................... 38

*Nationwide Transp. Finance v. Cass Info. Sys., Inc.,*
523 F.3d 1051 (9th Cir. 2008)........................................................................ 35, 36

*Nunez v. Pro Transit Mgmt. of Tucson, Inc.,*
271 P.3d 1104 (Ariz. 2012)............................................................................ 35, 37

*O'Connor v. Uber Techs., Inc.,*
82 F. Supp. 3d 1133 (N.D. Cal. 2015) .................................................................. 40

*Perez v. Circle K. Convenience Stores, Inc.,*
564 P.3d 623 (Ariz. 2025)..................................................................................... 37

*S. Pac. Co. v. Hogan,*
108 P. 240 (Ariz. 1910)......................................................................................... 37

*Santiago v. Phoenix Newspapers, Inc.,*
794 P.2d 138 (Ariz. 1990)............................................................................... 40, 41

*State Farm Fire &Cas. Co. v. Electrolux Home Prods., Inc.,*
980 F. Supp. 2d 1031 (N.D. Ind. 2013) .................................................................. 7

*State v. Christian,*
66 P.3d 1241 (Ariz. 2003)............................................................................... 36, 38

*States v. Diaz,*
876 F.3d 1194 (9th Cir. 2017).......................................................................... 2, 22

*Stephens v. Union Pacific R.R. Co.,*
935 F.3d 852 (9th Cir. 2019)................................................................................ 28

*United States ex rel. Miller v. ManPow, LLC,*
2023 WL 9005796 (C.D. Cal. Nov. 22, 2023)....................................................... 36

*United States v. Finley,*
301 F.3d 1000 (9th Cir. 2002)................................................................................ 4

*United States v. Scholl,*
166 F.3d 964 (9th Cir. 1999)................................................................................ 36

*Wilks v. Manobianco,*
352 P.3d 912 (Ariz. 2015)..................................................................................... 38

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES**

Ariz. Stat. § 28-9552(E) ............................................................................................ 7

**RULES**

Federal Rule of Evidence 702 ................................................................. *passim*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs move to exclude the expert testimony, or portions thereof of, of Uber experts Victoria Stodden, Vida Thomas, Jason Morris, Eric Piza, an Joseph Okpaku for failing to meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**Victoria Stodden**. Uber offers the testimony of Dr. Stodden, a statistician, to compare Uber's purported safety to that of California public transportation systems. *See* Ex. I (Expert Report of Victoria Stodden, dated September 26, 2025). Despite her proffered expertise, Dr. Stodden did not perform reliable statistical analysis. To start, Dr. Stodden compares two very different data sets, which among other things, are derived from dissimilar collection methods and disparate units of measurement. For example, Uber's data was collected through user reports as filtered by Uber, whereas public transportation data was collected through surveys of public transportation users. Dr. Stodden compounds this error by applying different denominators to her data sets; for Uber she used total number of rides during the reporting period, whereas for California public transportation she used total number of survey respondents (with no regard for total number of rides). Dr. Stodden acknowledged the discrepancies in her data sets, and her methodology, but made no effort to fix these issues (e.g., convert the data into comparable units). Her resulting opinions are therefore unreliable. Even if she had used appropriate methodology, her opinions are nonetheless irrelevant to this litigation. She calculates only what Uber publicly disclosed in Safety Reports which does not equate actual relative safety, and her comparator to California public transportation data has no relevance in an Arizona case. Also irrelevant are Dr. Stodden's comparisons between her purported Uber sexual assault and sexual misconduct rates with those of homicide, fatal traffic incidents, and lightning strikes

**Vida Thomas.** Uber offers the testimony of Ms. Thomas, a lawyer, to opine that Uber was not "on notice" that Plaintiff Dean's driver would assault a rider. Ex. C (Expert Report of Vida Thomas dated September 26, 2025) at 3. But in doing so, Ms. Thomas applies no methodology whatsoever. Her analysis is merely a rote recitation of the facts and then her personal opinion as to what conclusion should be drawn. Such an opinion does not "amount[] to 'scientific knowledge,

1   [that] constitutes 'good science,'… 'derived by the scientific method." *Daubert,* 43 F.3d 1311,

2   1316 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 590, 593). Moreover, her opinion as to whether

3   Uber was or was not "on notice" is well within the commonsense province and understanding of

4   the jury, for which no expert assistance is needed. *See States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir.

5   2017) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("'When an expert

6   undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but

7   rather attempts to substitute the expert's judgment for the jury's'")). For this very reason, Ms.

8   Thomas's "on notice" opinion was excluded by the JCCP Court in the related Uber proceeding. *See*

9   *In re Uber Rideshare Cases*, 2025 WL 2631568, at *6 (Cal. Super. Aug. 29, 2025) (MIL Order).

10  The same exclusion should apply here.

11       **Jason Morris.** Uber offers the testimony of Mr. Morris, a consultant on background

12  screenings, to address the sufficiency of Uber's background checks. *See* Ex. D (Expert Report of

13  Jason B. Morris dated September 26, 2025). Mr. Morris opines on how Uber's screening practices

14  "meet and exceeded" industry standards but fails to articulate any industry standards beyond the

15  requirement to follow the law. *Id.*, at 3, 8-9. These opinions are irrelevant and unreliable.

16       **Eric Piza.** Uber offers the testimony of Dr. Piza, a criminologist, to opine on "the potential

17  crime prevention impact of video surveillance cameras." Ex. F (Expert Report of Eric L. Piza dated

18  September 26, 2-25), at ¶ 1. His opinions on this matter are largely inadmissible. *First,* Dr. Piza

19  says that dash cameras would be ineffective at deterring crime because of Uber's many other safety

20  features. But this opinion is based on unreliable methodology. Specifically, while Dr. Piza

21  maintains that crime-deterrence should be evaluated through a perpetrator's perception of certainty,

22  severity, and celerity (speed) of punishment, he admits that he considered *no* evidence or data on

23  any of these factors to support his conclusion. Instead, he *guessed* the severity of punishment would

24  be "pretty high" and, on certainty and celerity, *assumed* that drivers were aware of and understood

25  all referenced safety features. *Second,* Dr. Piza attempts to opine on the technological and

26  operational feasibility of implementing cameras at Uber. For example, he opines that it is not

27  technologically feasible to have active monitoring integrated into the Uber platform, and that it

28  would require an "unreasonable amount of resources" to implement a mandatory dash camera

1  program. These feasibility opinions should be excluded because Dr. Piza lacks the requisite

2  qualifications and basis for his conclusions. He has no technological experience or expertise (he

3  has never even operated a dash camera) to opine on technological feasibility, and no industry

4  experience or knowledge to opine on what is "reasonable" resource allocation for a multibillion-

5  dollar company like Uber.

6      **Joseph Okpaku.** Uber offers the testimony of Mr. Okpaku, a lobbyist and former Lyft

7  executive, to opine (1) on "[t]he industry standard with respect to safety in the rideshare industry

8  has been established by the statutory and regulatory requirements for companies like Uber;" (2)

9  "Uber has always exceeded the industry standard of safety for the rideshare industry;" (3)

10  "Companies like Uber maintain little to no significant control over third-party rideshare drivers

11  because the drivers fundamentally control if, when, how much, and for how long they choose to

12  make themselves available to provide rides through the Uber app;" and (4) "Transportation network

13  companies have been treated by regulators as distinct from common carriers." Ex. A (Expert Report

14  of Joseph Okpaku dated September 26, 2025) at 5-6. These opinions consist of improper legal

15  conclusions, unreliable methodologies, and irrelevant commentary. Mr. Okpaku impermissibly

16  interprets statutes and legislative intent, relies on unsupported assertions rather than data or

17  scientific analysis, and offers opinions—such as those about "industry standards," "driver control,"

18  and "dashcam requirements"—that either misstate the law or lack any reliable foundation.

19              **LEGAL STANDARD**

20      Admissibility of expert testimony is governed by Fed. R. Evid. 702, as elucidated by

21  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Expert testimony is

22  admissible only if (1) the expert's scientific, technical, or other specialized knowledge will help the

23  trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on

24  sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4)

25  the expert has reliably applied the principles and methods to the facts of the case. *See* Fed. R. Evid.

26  702; *see also Daubert,* 509 U.S. at 593-94.

27      The Supreme Court in *Daubert* "charged trial judges with the responsibility of acting as

28  gate-keepers to 'ensure that any and all scientific testimony or evidence admitted is not only

1    relevant, but reliable.'" *United States v. Finley*, 301 F.3d 1000, 1007-08 (9th Cir. 2002) (quoting

2    *Daubert*, 509 U.S. at 593-94). The Court "articulated a two-step inquiry for determining whether

3    scientific evidence or testimony is admissible." *Id*. at 1008. *First*, the trial court must assess

4    reliability by making a "preliminary assessment of whether the reasoning or methodology

5    underlying the testimony is scientifically valid and of whether that reasoning or methodology

6    properly can be applied to the facts in issue." *Id*. (quoting *Daubert*, 509 U.S. at 592-93). Reliability

7    requires that the testimony be rooted in "a reliable basis of knowledge and experience of the

8    relevant discipline." *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999). *Second*, "the court must

9    ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact." *Finley*,

10    301 F.3d at 1008. Expert testimony helps the trier of fact "when it provides information beyond the

11    common knowledge of the trier of fact." *Id*.

12        The proponent of the expert testimony bears the burden of showing admissibility by a

13    preponderance of the evidence. Fed. R. Evid. 702.

## **ARGUMENT**

15        Plaintiffs move to exclude the following expert opinions.

### I.    EXPERT REPORT OF VICTORIA STODDEN

17        If permitted to testify, Dr. Victoria Stodden, Uber's statistics expert, will tell the jury that

18    Uber is "orders of magnitudes safer" than public transportation. *See, e.g.,* Ex. I (Expert Report of

19    Victoria Stodden dated September 26, 2025) ("Stodden Report") at § VI; Ex. J (Expert Rebuttal

20    Report of Victoria Stodden dated October 24, 2025) at §VII.B. But Dr. Stodden can only reach this

21    conclusion by disregarding the most basic, fundamental statistical principles. In place of proper

22    methodology, Dr. Stodden instead makes statistically invalid comparisons between public

23    transportation users and Uber users, employing an approach that is riddled with errors and

24    assumptions. Her results are unreliable conclusions that serve only to mislead the trier of fact.

25        Courts "have repeatedly rejected reliance on statistics where the statistical evidence is based

26    on small or incomplete data sets and inadequate statistical techniques." *Doubt v. NCR Corp.*, 2014

27    WL 3897590, at *8 (N.D. Cal. Aug. 7, 2014). Here, Dr. Stodden purports to compare the sexual

28    assault/sexual misconduct (SA/SM) "incident rate" on Uber to surveys conducted by California

1    public transportation. However, she did not use a reliable, representative sample to infer either the

2    Uber incident rate or the public transportation rate. Instead, she used user reports of sexual

3    assault/sexual misconduct (SA/SM) to Uber that Uber has repeatedly said are *not* representative of

4    the number of SA/SM incidents. Then, to calculate Uber's "incident rate," she divided that non-

5    representative number by the total number of rides Uber sold, without considering or correcting for

6    biases introduced by this method. Then, to infer the rate of SA/SM on public transportation, Dr.

7    Stodden reviewed surveys of California-only public transportation systems and divided the number

8    of participants who answered "yes" to questions asking whether they experienced or witnessed

9    "sexual assault or rape" on public transportation by the total number of survey participants. Dr.

10   Stodden did not consider the number of rides those users took or the total number of rides on the

11   respective public transportation systems, like she did for her Uber incident rate. This inconsistent

12   methodology minimizes the Uber "incident rate," and inflates beyond credibility what she calls the

13   "incident rate" for public transportation. The final calculation—division of her calculated public

14   transportation "rates" by her calculated Uber "rates"—is junk statistical analysis and should not go

15   to the jury.

16        Further, Dr. Stodden's opinions are irrelevant to Jaylynn Dean. Her comparison of public

17   transportation to Uber rests entirely on mismatched data from California, whereas Plaintiff Dean's

18   sexual assault occurred in Arizona. Also irrelevant are Dr. Stodden's comparisons between her

19   purported Uber SA/SM rates and what Dr. Stodden calls "other relevant rates"—homicide, fatal

20   traffic incidents, and lightning strikes.

21        Dr. Stodden's opinions are unreliable and irrelevant and should be excluded.

22   **A.    Dr. Stodden's "Orders of Magnitude" opinion is unreliable and irrelevant.**

23        In Section VI of her report, Dr. Stodden opines that "Uber is orders of magnitude safer than

24   relevant public transportation options…" Stodden Report at § VI, ¶¶ 19-31. To reach this

25   conclusion, Dr. Stodden eschews the most fundamental concepts of basic statistics: selecting a

26   representative sample, testing statistical significance, and calculating measures of confidence or

27   error. Instead, she assembles disparate data sets and then compounds this error by applying

28   unreliable (in fact, blatantly incorrect) methodology to compare the numbers. Dr. Stodden admits

1    that she is *not* using statistics to reach her conclusions and claims instead to use just basic math.

2    But basic math is not reliable methodology to make the comparisons she makes between Uber and

3    public transportation.

**1.    Dr. Stodden did not use reliable statistical methodology to compare Uber's SA/SM incident reports to California public transportation survey results.**

6        Dr. Stodden calculates the incident rate for Uber as the ratio of the number of Uber SA/SM

7    incident reports during a certain timeframe, divided by the total number of rides Uber sold within

8    that same timeframe. *See* Stodden Report at ¶¶ 26, 28, Tables 1 and 2.[1] For the incident rate for

9    public transportation, Dr. Stodden looked at nine surveys of California public transportation users,

10   determined the number of riders in each survey who answered "yes" to questions asking whether

11   they had experienced or witnessed sexual assault or rape on public transportation, and divided the

12   "yes" answers by the total number of survey participants in the respective survey. *See* Stodden

13   Report at ¶¶ 26-28, Tables 1 and 2; Ex. K (Deposition of Victoria Stodden dated October 21, 2025)

14   ("Stodden Dep.") at 142:22-143:19. Dr. Stodden calls these numbers the "rate" of sexual assault or

15   rape on public transportation systems, but they are survey responses, not incident rates. Ex. L

16   (Deposition of John Chandler dated November 7, 2025) ("Chandler Dep.") at 313:11-13.

17       For her comparative analysis, Dr. Stodden divided each of the nine California public

18   transportation "rates" by her calculated Uber "rate" and reported the result as the "multiple of rate"

19   of public transportation riders who experienced or witnessed sexual assault or rape "over Uber's

20   reported incident rate" of SA/SM. *See* Stodden Report at ¶¶ 26-28, Tables 1 and 2. Under this

21   framework, Dr. Stodden concludes that incident rates on public transportation (not limited to

22   California) are "orders of magnitude" higher than on Uber.

23

24

---

25   [1] Dr. Stodden calculated the "rates" summarized in Table 1 using the number of sexual assault
     incident reports Uber disclosed in its most recent (2021-2022) U.S. Safety Report, encompassing
26   five categories of sexual assault. The "rates" summarized in Table 2 are calculated using the number
     of incident reports Uber received for all categories of sexual assault and misconduct in 2024,
27   encompassing 21 categories of sexual assault and sexual misconduct plus two additional
     "insufficient information" categories for incidents where Uber did not collect sufficient information
28   to categorize the incident into one of the 21 categories. Uber has not disclosed the 2024 numbers
     in a Safety Report.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> **a.     Dr. Stodden's opinions are unreliable because she compares numbers with incompatible units.**

An obvious problem with Dr. Stodden's methodology is that she compares two ratios with different units, simply by dividing them by each other, without first converting the units to allow for comparison. Nothing more than basic math is needed to understand that "comparing survey responses to self-reporting responses is inappropriate from a statistical perspective because those fractions are measuring entirely different quantities, with units that cannot be reconciled." *See* Ex. M (Expert Rebuttal Report of John Chandler dated October 24, 2025) ("Chandler Rebuttal Report") at ¶ 19. Not only are the core instrumentalities at odds (surveys to self-reported incidents), but the subunits of measurements are also mismatched: the California surveys asked whether a respondent had experienced or witnessed sexual assault or rape (which is not a "rate" at all), whereas the Uber data reflected reports made to Uber over certain taxonomy categories.

To illustrate this issue, consider comparing 20 miles per hour to 30 kilometers per hour. Dr. Stodden's approach would simply divide 30 by 20, without adjusting the units. Dr. Stodden's approach gives not just the wrong answer (30 kph is 1.5 times faster than 20 mph) but is entirely directionally incorrect—20 mph is actually faster than 30 kph. Without a conversion factor, a reliable comparison is not possible. But this is exactly what Dr. Stodden does, and as a result, it is impossible to determine with any certainty whether the numbers she calculates (as summarized on Tables 1 and 2 of her report are even directionally correct. As explained by Plaintiffs' expert, Dr. John Chandler, the simple truth is that "[t]he municipal Transportation Surveys do not measure the same thing as the Uber incident data measures[.]" Chandler Rebuttal Report at ¶ 33. Dr. Stodden could have tried to align the Uber rates with the survey, but she did not do so. *See id.* Absent such efforts, Dr. Stodden's opinions are unsound, violating a foundational statistical principle in "obscuring the unit of analysis." *Id.; see also State Farm Fire &Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013) ("[w]hen conducting a comparative analysis, to meet the reliability that *Daubert* demands, an expert must 'select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges'"").

1    There are statistical tests that can be used to compare rates between two groups, so long as

2    the data is reliably adjusted for comparison. *See* Chandler Rebuttal Report at ¶ 22. But, despite her

3    advanced training in statistics, Dr. Stodden "did not run a statistical model" for this analysis and

4    instead attempts to pass off her approach as basic "arithmetic." Stodden Dep. at 257:1-258:21.

5    However, arithmetic and statistics are not the same thing.

6        Dr. Stodden's statistics result in absurd findings. For example, Dr. Stodden compared the

7    number of incidents Uber reported in its 2021-2022 Safety Report over the number of rides Uber

8    sold in 2021-2022 (2,717 incidents and 1.9 billion rides), to the number of "yes" survey responses

9    collected by the LA County Metropolitan Transportation Authority (LACMTA) over the number

10   of survey responses. Divining the two ratios, Dr. Stodden concluded that the "multiple of rate of

11   'experienced or witnessed sexual assault or rape' over Uber's reported incident rate of sexual

12   assault in 2021-2022" is 118,354. In other words, Dr. Stodden claims that Uber is 118,354 times

13   safer than LACMTA. Stodden Report at Table 1. Applying Dr. Stodden's methodology, it would

14   be appropriate to multiply the number of Uber reported incidents (2,717) by Dr. Stodden's

15   calculated "multiple of rate" (118,354) to estimate the number of sexual assaults on LACMTA in

16   2024. *See* Chandler Rebuttal Report at ¶ 27.[2] The result is an estimate of nearly 322 million assaults

17   on the LACMTA; nearly the entire population of the United States and larger than the entire 2024

18   ridership of LACMTA.[3] *See Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 310, 317-20

19   (S.D.N.Y. 2015) (excluding statistics expert whose model yielded "absurd" results).

20                           **b.    Dr. Stodden's calculations are unreliable because she did
                                    not evaluate statistical significance or uncertainty, or
21                                   account for variability.**

22       Perhaps the most fundamental teaching of introductory statistics is the concept of measuring

23   certainty and accounting for variability by evaluating statistical significance and confidence. In

24   statistics, certainty analyses evaluate whether a relationship between two or more factors is

25   statistically significant; the level of statistical significance is regularly measured using a confidence

26

27   [2] Dr. Stodden's multiplier numbers compare Uber's 2021-2022 incident reports to LACMTA
     survey results for 2024, purportedly representing how much "safer" Uber is than LACMTA.

28   [3] https://opa.metro.net/MetroRidership/

interval. *See, e.g.,* Stodden Dep. at 45:1-50:9; Chandler Rebuttal Report at ¶ 21. Had Dr. Stodden used a statistical modeling method, she would have evaluated whether the comparison she makes between Uber and public transportation is statistically significant and provided measures of uncertainty or confidence. However, Dr. Stodden does not provide any measure of statistical significance, certainty, or variability; there is not a single confidence interval in her report—indeed, she could not calculate one because she used only basic arithmetic and not statistical modeling. *See* Stodden Dep. at 259:12-260:18. Without measures of statistical significance and uncertainty or confidence, Dr. Stodden cannot hold her opinions to a reasonable degree of scientific certainty. *See* Chandler Rebuttal Report at ¶ 21; *In re: Lipitor (Atorvastatin Calcium) Mkt., Sales Prac. & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 926 (D.S.C. 2016) (excluding expert opinion where proponent failed to show that use of non-statistically significant "trend" data was generally accepted in the relevant field, supported by peer-reviewed literature, or governed by statistical standards).

There are numerous sources of uncertainty in Dr. Stodden's analysis. Indeed, Dr. Stodden recognizes "methodological differences between Uber's and public transportation providers' reports" including "differences in the relevant population (U.S. vs. California), data collection processes (in-app reporting vs. field surveys), sampling (rider reporting vs. survey sampling), the scope of questions (incident reporting vs. questionnaires), information collected (in-ride incident vs. experience over a period of time) and taxonomy of sexual misconduct (Uber's Sexual Violence Taxonomy vs. 'sexual assault and rape'). Stodden Report at ¶ 22. But rather than using the required statistical tools and methods necessary to address these numerous methodological differences, Dr. Stodden summarily dismisses them and uses the public transportation reports "[n]otwithstanding any methodological differences." *Id.* at ¶ 23.[4]

The methodological differences are stark, and Dr. Stodden's failure to address them is fatal. For example, Dr. Stodden failed to address the different methodologies used to collect Uber's

---

[4] At deposition, Dr. Stodden recognized the problems introduced by these differences yet did not account for any of them in her analysis. *See* Stodden Dep. at 216:17-21 (public transportations surveys were anonymous, unlike reporting to Uber); *id.* at 217:16-219:1 (public transportation survey participants were not required to identify the ride where the incident occurred, asked to identify the perpetrator, or provide details about the incident); *id.* at 239:8-240:15 (Uber does not count SA/SM incident reports unless it can verify that the ride occurred).

incident report data versus the California public transportation numbers (that is, incident reports to Uber versus survey responses). *See* Stodden Dep. at 216:22-217:7. This is a significant methodological error on Dr. Stodden's part, as evidenced by a comparison of *Uber survey responses* to the California public transportation survey responses. Uber performed its own survey to collect data from users about sexual assault and misconduct, which Dr. Stodden did not consider for her report and was not aware existed. *See* Stodden Dep. at 234:12-16. According to Uber's survey, █████████████████████████████████████████████████████████████████

███████████████. If Dr. Stodden's methodology was reliable it would be possible to divide ███ by the incident rates Dr. Stodden calculated (0.00014% and 0.00566%) to determine how much higher the survey incident rate is compared to Dr. Stodden's calculation. Using Dr. Stodden's methodology, Uber's SA/SM incident rate, according to Uber's own survey, is ██████████████████

than Dr. Stodden's calculations. Continuing with Dr. Stodden's methodology (if it was reliable), the ████████████████ from Uber's survey can be compared to the public transportation surveys. Performing the exact same math that Dr. Stodden did to reach her conclusions but comparing survey to survey results (rather than incident report numbers to survey results) leads to drastically different conclusions. The numbers Dr. Stodden summarizes in Tables 1 and 2 decrease dramatically. Rather than a range of 54 to 118,354, the range reduces to ██████████████. Only five of the public transportation systems have an "order of magnitude" above 1. That is, four of the five systems fall below 1, which means that they are actually less "safe" than Uber—or in other words, Dr. Stodden's calculations are not even directionally correct. Stated plainly, if Dr. Stodden had used Uber's own survey data as the comparison between Uber and public transportation, her conclusion would have been that Uber and public transportation have similar safety profiles.[5]

Moreover, there is no evidence that the data aligns on understanding of "sexual assault or rape" and Uber's self-designated taxonomy categories. Additionally, Dr. Stodden compares Uber's 2021-2022 numbers to the results of 2024 public transportation surveys. *See* Ex. O, 2019-2020

---

[5] The point here is not only is Dr. Stodden's methodology flawed, but she cherry-picked the data she used to reach her opinions. Opinions based on cherry-picked evidence are unreliable. *See In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding opinion that was based on "cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts [it]."

Uber Safety Report, at 18; Ex. P, 2021-2022 Uber Safety Report, at 13, 19-21. Further, for her calculations summarized in Table 1, Dr. Stodden compared Uber's 2021-2022 numbers with 2024 numbers from the California public transportation surveys. Not only are the years mismatched, but Dr. Stodden cherrypicked the lowest numbers she possibly could to represent Uber's "incident rate." Uber's 2021-2022 incident numbers are lower than any other years Uber has reported, and significantly lower than the 2024 numbers that Dr. Stodden relies on in Table 2 and could have relied on for her Table 1 comparisons.[6]

Although Dr. Stodden repeatedly admits in her rebuttal report that "[c]ontrolling for other possible explanations and utilizing benchmarks are best practices in statistical and data analysis to avoid the presentation of misleading results, and not doing so likely biases the results," she does not heed her own instruction. Stodden Rebuttal Report at ¶¶ 8a, 8c, 11, 27; *see also* Chandler Rebuttal Report, at ¶ 25 (setting out a chart that illuminates the various differences between the data used by Dr. Stodden).

### c.    Uber acknowledges that its incident numbers cannot be used to make reliable comparisons to other data sets.

Further, Dr. Stodden performs these comparisons even though Uber has repeatedly said that such comparisons *should not be done.*  In its Safety Reports, Uber admonishes: [a]s a result of our approach, *meaningful comparisons to other data sets are not possible*" (Ex. O, 2019-2020 Uber Safety Report, at 58) (emphasis added)), and *"[w]hile there are many similarities between our data and the national numbers, a direct comparison cannot be made due to demographic and methodological differences."* Ex. P, 2021-2022 Uber Safety Report, at 30 (emphasis added); *see also* Ex. O, 2019-2020 Uber Safety Report, at 47; Ex. N, 2017-2018 Uber Safety Report, at 47. Despite Uber's own prohibitions, Dr. Stodden nonetheless compares numbers from Uber's 2021-2022 Safety Report (Table 1) and Uber's 2024 SA/SM incident report numbers (gathered by the same process and thus subject to the same admonitions) (Table 2) to 2024 California public

---

[6] Table 1 summarizes Dr. Stodden's calculations based on the number of incidents reported to Uber in the 5 categories disclosed in Uber's 2021-2022 Safety Reports. Uber's data shows that for those 5 categories, Uber received 142 reports per 100 million trips in 2021 (1091 incidents), 148 reports per 100 million trips in 2022 (1660 incidents), 174 reports per 100 million trips in 2023 (2405 incidents), and 172 reports per 100 million trips in 2024 (2612 incidents). Ex. R (Expert Report of Lacey Keller dated September 26, 2025) at Table 1 and Figure 5.

transportation survey data.[7] And she does so despite Uber's clear position that SA/SM incident report numbers should not be compared to *survey results*. *See* Ex. N, 2017-2018 Uber Safety Report, at 58 (referencing the National Intimate Partner and Sexual Violence Survey, Uber states, *"a direct comparison cannot be made to Uber's data due to substantial methodological differences"*) (emphasis added). Similarly, although the 2019-2020 Safety Report and the 2021-2022 Safety Report warn "[i]n addition, COVID-19's impact on how society moved affected how, where, and when people used Uber, which makes yearly comparisons a challenge without contextualizing the safety incident rates of the public at large," Dr. Stodden compares the 2021-2022 Covid year numbers to the results of 2024 public transportation surveys. *See* Ex. O, 2019-2020 Uber Safety Report, at 16; Ex. P, 2021-2022 Uber Safety Report, at 13.

### 2. Dr. Stodden did not use reliable methodology to draw population inferences from samples.

Even if it were not egregiously flawed methodology to divide the California survey results by Uber's incident report numbers and represent it as a comparison of rates, Dr. Stodden's opinions are unreliable because she failed to ensure her samples were representative, or to account for sample bias.

The California public transportation survey results and Uber's incident report numbers are both samples of larger populations—California public transportation users and Uber users. To reach her "orders of magnitude safer" opinion, Dr. Stodden uses these samples to draw conclusions about SA/SM incident rates on Uber and on public transportation systems as a whole. To make this sample to population inference, Dr. Stodden must apply proper statistical inference techniques. In other cases, Dr. Stodden has explained the proper methodology. *See* Stodden Dep. at Ex. 2073, ¶¶ 14-21 (Stodden Declaration submitted in *McLaren v. UPS Store, Inc., et al.*, Case No. 3:21-cv-14424, dated Sept. 30, 2022). Where, as here, "a researcher does not have the ability to obtain data on every unit within a population, then the researcher can sample a subset of the population and use

---

[7] Dr. Stodden criticizes Plaintiffs' expert, Lacey Keller, for relying on Uber's 2024 SA/SM incident data on the basis that the data has not been fully audited or validated. *See* Stodden Rebuttal Report at ¶¶ 18b, 34. Yet Dr. Stodden relies on that same data for the opinions she summarized in Table 2 of her report. Accordingly, and for the same reasons discussed herein, Dr. Stodden's rebuttal opinions as to the 2024 data are unreliable and should be excluded.

1    statistical inference tools to deduce conclusions about the characteristics of the population." *Id.* at

2    ¶ 14. "However, in order to draw valid inferences from the sample to the population, it is important

3    that a sample represent the whole population." *Id.* (internal brackets and quotations omitted).

4          Dr. Stodden elucidated upon this proper methodology at her deposition in this case,

5    cautioning that "if the sample is not drawn well from the population, certainly bias can be

6    introduced. *See* Stodden Dep. at 38:14-39:13. "[T]o make reliable inferences back to the

7    population, [a sample] would have to be representative of that population…in some way that's

8    related to the inferences that you want to make." *Id.* at 42:10-14. If a statistician seeks to use a

9    sample to infer information about the population, they need to be "really aware of" any problems

10   with the sample and "take steps … [to] fix some of the problems if it's possible or do some kind of

11   work to understand the impact on [the] results." *Id.* at 32:20-33:11. In short, proper inference

12   methodology requires (1) choosing a representative sample aimed at avoiding bias; and (2) using

13   statistical methods to quantify and/or fix any bias (or error) introduced by the sampling method.

14         Dr. Stodden did not apply her own guidance in this case: (1) the data on which she relies—

15   Uber's SA/SM incident report numbers and the California public transportation systems surveys of

16   "experienced or witnessed" sexual assault or rape—are not representative samples; and (2) she

17   made no effort to identify resulting problems and biases in the data, let alone attempt to fix them.

18   *See, e.g.*, *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018)

19   ("Opinions that are derived from erroneous or incomplete data are appropriately excluded.").

20                        a.    **Uber's SA/SM incident reports are not representative of**
21                              **the SA/SM incident rate on Uber.**

22         As noted above, to calculate her purported Uber SA/SM incident "rates," Dr. Stodden

23   utilizes the data Uber collected from Uber users who report SA/SM incidents to Uber. But the

24   incident report numbers cannot be used to determine the Uber SA/SM incident rate because the

25   reports to Uber are not a representative sample of SA/SM incident rates among all Uber users. Just

26   as Uber has admonished against using these numbers to make comparisons to other data sets, Uber

27   also cautioned that the incident report numbers are "neither a representative national sample, nor,

28   necessarily, a representation of the size or scope of sexual assaults," and are "not intended to be a

representation of the size or scope of sexual assaults." Ex. P, 2021-2022 Uber Safety Report, at 13; *see also* Ex. O, 2019-2020 Uber Safety Report, at 16, 47; Ex. N, 2017-2018 Uber Safety Report, at 16, 47. Notwithstanding these warnings, Dr. Stodden uses the data to make statistical inferences as to the population of Uber riders as a whole. *See* Stodden Report at ¶¶ 24- 28, Tables 1 and 2.

Dr. Stodden's inferences regarding Uber incident rates are therefore unreliable. The data is not an unbiased, representative sample of the sort Dr. Stodden admits is necessary to draw statistical inferences. *See* Stodden Dep. at 32:20-33:11 (testifying that a "good data scientist" must "be really aware of" and take steps to fix problems and "do some kind of work to understand the impact on [the] results"); *id.* at Ex. 2073, ¶¶ 14-19; *see also, e.g.,* Chandler Rebuttal Report at ¶¶ 23-25 (explaining Uber Safety Report data is not a sample in any meaningful sense). Indeed, Uber itself recognized that because the data in the Safety Reports are "not the result of a nationally random sample," the process of collecting reports this way "*could cause a sampling bias.*" Ex. N, 2017-2018 Uber Safety Report, at 47 (emphasis added). Yet Dr. Stodden makes no mention of this known flaw, let alone attempts to account for problems in her analysis.

The unreliability of using data from Uber users reports to Uber as a sample to represent the SA/SM incident rate on Uber is dramatically amplified by the issue of underreporting, a flaw that Uber recognizes:

> [W]hen interpreting the data in this report, one must consider the societal reality of potential under-reporting, particularly for incidents of sexual assault, which has been widely documented in external research. For sexual assault, this is dependent on a number of victim identification factors such as an individual having access to, knowledge, and/or desire to reach Uber reporting channels, and/or those who are able to identify an incident as potentially sexually violent or unwanted… it is important to consider that the data in this report is only based on what is reported to Uber or that Uber became aware of through previously discussed channels.

Ex. N, 2017-2018 Uber Safety Report, at 47.[8] Despite this issue being expressly flagged by Uber, Dr. Stodden did not account for bias problems with underreporting in her analysis. *See* Stodden Report at ¶¶ 22-23; Stodden Dep. at 240:17-244:2l; Ex. N, 2017-2018 Uber Safety Report, at 6 (stating that sexual violence is underreported by approximately 75% in general); Ex. Q, (Expert

---

[8] Uber omitted this admonishment from subsequent Safety Reports (including the 2021-2022 report that Stodden relies on), but there is no reason that it did not continue to apply. The data in later reports was collected by the same process and suffers the same limitations and biases.

Report of Veronique Valliere dated September 26, 2025) ("Valliere Report") at 7 (explaining that underreporting to Uber may be even worse than underreporting generally). Dr. Stodden also did not consider other biases attributable to difficulties in reporting, which were known to Uber, including that women may not report because they were afraid that their drivers knew where they live (*see* Stodden Dep. at 240:17-241:2; Valliere Report at 7), and that Uber's reporting processes leveraged procedures that may discourage reporting. *See* Valliere Report, at 7 (in comparison to an anonymous survey, Uber requires survivors to provide sufficient information to corroborate the alleged incident, which may further discourage survivors from completing a report).[9] When asked about these oversights, Dr. Stodden replied, "I did not try to investigate the reasons for underreporting rates or what underreporting rates might be. It was not part of my assignment on this report." Stodden Dep. at 241:19-242:2; *see also id.* at 232:14-234:11. This is an egregious error given that she admits such biases "would affect the rates that are reported." *Id.* at 234:2-234:11.

Accordingly, the numbers Dr. Stodden represents as the sexual assault and sexual misconduct incident rates on Uber are not reliable and will confuse the trier of fact. Her opinions based on those numbers should be excluded.

> **b.    California Public Transportation incident rates used by Dr. Stodden are unreliable, nonrepresentative samples.**

Dr. Stodden's methodology for calculating the "rate" of sexual assault on California public transportation is even more flawed. Namely, the figures she incorrectly represents as "rates" are in fact survey responses, and these survey responses cannot be used to reliably infer the rate of sexual assault incidents on public transportation.

*First*, Dr. Stodden misrepresents her calculations as the "rate" of sexual assault on public transportation, but it is not a rate. The California public transportation surveys asked riders whether they had experienced or witnessed sexual assault within the previous six to twelve months. *See, e.g.,* Stodden Dep. at 16:17-21, 161:11-162:11, 261:12-23. The surveys did not provide information as to how many *rides* occurred within that same time frame. With no disclosed basis, and following no generally accepted statistical methodology, Dr. Stodden took the number of "yes" answers and

---

[9] As discussed more fully below, anonymous surveys show significantly higher rates of SA/SM on Uber than the incident rate Dr. Stodden calculated.

divided that number by the total number of survey responses (all "yes" responses plus all "no" responses). *See* Stodden Dep. at 142:22-143:19; 263:17-264:5. She then presents this as the inferred "rate" of sexual assault or rape on public transportation systems. *See* Stodden Dep. at 142:22-143:19. In other words, Dr. Stodden erroneously concludes that all survey responses equals all rides. This is a logically flawed conclusion.[10] Indeed, in criticizing one of Plaintiffs' experts, Dr. Stodden explained why her own methodology is incorrect: "It is statistically inappropriate to present data on the absolute number of reported incidents per year…without accounting for the total number of rides in a given year *because the total number of reported incidents is correlated with the number of rides*." Stodden Rebuttal Report at ¶8b (emphasis added); *see also* Chandler Rebuttal Report, at ¶¶ 12-25.

To illustrate the magnitude of bias and error, consider again Dr. Stodden's opinion that Uber is 118,354 times safer than the LA County Metropolitan Transportation Authority. (LACMTA), based on 7,760 survey response with a 17% "yes" rate. *See* Stodden Report at Table 1. Dr. Stodden's analysis does not account for the number of trips each survey respondent took during the study timeframe. For Dr. Stodden's math to be correct, she must assume that each survey participant took only a single trip, since Dr. Stodden treats the survey result fraction as a *rate per ride*. This is, of course, exceptionally unlikely, not least because many people taking public transportation one way may want to return. If each rider took just two trips within the survey period (15,520 trips), then only 8.5% of trips experienced or witnessed sexual assault or rape (1,139/15,520=8.5%)—half of what Dr. Stodden calculated. If each survey respondent took one trip per week (26 trips each over the six-month period, or 201,760 total trips across the 7,760 respondents), the "118,354 times safer" figure is reduced by a factor of 25 (1,319/201,760=0.65%). If each survey respondent took 2 trips per weekday (e.g., to and from work), the figure is reduced from 118,354 by a factor of 253 to 467.

$$\frac{17\%}{0.001436\%} = 118,354 \quad \frac{8.5\%}{0.001436\%} = 60,714 \quad \frac{0.65\%}{0.001436\%} = 4,642 \quad \frac{0.065\%}{0.001436\%} = 467$$

---

[10] It is also in direct contrast to the "rate" she calculates for Uber, where data regarding total number of trips during the reporting period was the denominator. *See* Stodden Report at Tables 1 and 2.

1    The same analysis can be done for the lowest number in Dr. Stodden's analysis, "54 times

2    safer," with respect to the Bay Area Rapid Transit system. *See* Stodden Report at Table 2. That

3    survey considered a one-year timeframe and only 5 of 1626 survey respondents indicated that they

4    had experienced sexual assault or rape in that year.[11]  Dr. Stodden's "54 times safer" figure is

5    reduced to 4.5 if those survey respondents took just one ride per month during that year[12] and goes

6    down to 1.0 if the survey respondents took just 1 ride per week during that year (in other words, no

7    meaningful difference between BART and Uber).

8    Dr. Stodden's willful blindness to ridership data is particularly egregious when considering

9    that for some, if not all, of the California public transportation systems, ridership numbers are

10   publicly available. For example, LA County Metropolitan Transportation Authority (LACMTA)

11   had 311,253,565 riders during the 2024 survey year,[13]  or approximately 155 million riders in the

12   six-month survey period. Conservatively assuming each one of those riders took only 1 ride in

13   2024, according to Dr. Stodden's rationale, an estimated 17% of those riders experienced or

14   witnessed sexual assault or rape during that timeframe, or more than 26 million riders, or more than

15   26 million sexual assaults or rapes on LACMTA in 2024. These examples illustrate why it is

16   essential to use reliable statistical methods to infer conclusions about populations—and why Dr.

17   Stodden's opinions, that did not use recognized methods of inferential necessary to draw these

18   conclusions—are unreliable.

19   *Second,* even if the California public transportation survey numbers were reliable proxies

20   for "rates," they are nonetheless unreliable because they are based on convenience sampling,[14] a

21   procedure that Dr. Stodden admits is bad methodology:

22

23   [11] *Id.*; "BARTStreetHarassmenSurveyResults2024,"
     https://www.bart.gov/sites/default/files/2024-11/BARTStreetHarassmenSurveyResults2024.xlsx

24   [12] In fact, 85% of the BART survey respondents reported using BART at least once per month and
25   75% used BART at least one day per week. *Id.* This information comes directly from the data Dr.
     Stodden used to reach her opinions, but Dr. Stodden ignores it.

26   [13] *See* Chandler Rebuttal Report, at ¶ 27.

27   [14] The public transportation operators collected survey responses by sending researchers out on
     trains and buses and talked to people waiting in stations and at bus stops. *See* Stodden Dep. at
28   212:11-214:7. Thus, respondents were solicited purely by convenience and proximity, as opposed
     to collection methodology designed to obtain a representative sample.

1
2
3
4
5

[A] "sample of convenience" is a standard label used in statistical sampling when a population is sampled without using probability methods. Classic examples of samples of convenience would include a journalist interviewing passers-by on the street corner outside the news office, or a researcher sending a poll to his or her social media followers. The most important difference in a sample of convenience (as opposed to a simple random sample) is that easily accessible sample units, those that are "at hand," are more likely to be chosen for the sample. This creates bias when attempts are made to extrapolate from a sample of convenience to the population.

6   Stodden Dep. at Ex. 2073, ¶18; *see also id.* at 40:6-14 (acknowledging that "if you want to have

7   the best chance of doing reliable inferences from your sample back to the population as we have

8   been discussing, generally speaking, … you probably would not choose a convenience sample");

9   *id.* at 40:19-22 (stating "convenience samples are often characterized as a sampling mechanism that

10  may not be done with thought to how it represents the population"). In prior litigation, Dr. Stodden

11  asserted that data collected from convenience sampling is unreliable because it inherently contains

12  biases that are impossible to quantify or fix:

13
14
15

Regardless of the sampling method used, extrapolation from a sample to a population is not error free since the sample is only one part of the population. However, a sample of convenience introduces potential bias (and thus greater likelihood of error) into the extrapolation, whereas a sample made using a probability method does not.

16      …

17
18
19

Non-sampling error…is the error that occurs during data collection and in the way the sample has been selected…Importantly, the non-sampling error present in samples of convenience cannot be estimated with standard methods. This makes it difficult, if not impossible, to understand and quantify the amount of error in a population estimate derived from a sample of convenience.

20  *Id.* at Ex. 2073, ¶¶ 19, 21.

21      Despite knowing that the data relied on was inherently flawed, Dr. Stodden made no effort

22  to identify and fix those issues (as she maintains a "good data scientist" should), or even to quantify

23  the potential error rate.  There are abundant uncorrectable sources of bias or error in the California

24  public transportation data upon which Dr. Stodden relied. Dr. Stodden does not address them in her

25  report. For example, Dr. Stodden failed to consider that some public transportation operators

26  offered monetary incentives for participation (*see* Stodden Dep. at 215:3-12),[15] or that riders who

27
28

---

[15] *See also* Long Beach Transit Safety Survey Final Report, ETC Institute, Feb. 3, 2025, at p. 64 (available at: https://ridelbt.com/wp-content/uploads/2025/02/LBT-State-Safety-Final-Report-Feb-3-2025.pdf).

had experienced "something traumatic like sexual assault or rape or even sexual harassment…could make a person more willing to participate in a survey." *id.* at 215:13-216:16. Both factors introduce bias into the sampling—especially if people who have experienced sexual assault are more likely to respond to a survey than people who have not. *See* Chandler Rebuttal Report at ¶¶ 30-32. But Dr. Stodden did not consider, adjust for, or quantify that possibility. She also did not consider whether riders responded to a survey more than once (*see* Stodden Dep. at 220:25-222:18; 223:9-225:14); whether any quality control was done to confirm that reported incidents actually occurred within the 6 or 12-month survey period (*see id.* at 217:16-21, 218:5-11); or whether the respondent understood what was meant by "sexual assault or rape" (*see* Chandler Rebuttal Report at ¶ 25). Additionally, although Dr. Stodden admits that asking whether riders had experienced *or witnessed* a sexual assault could result in double-counting of incidents, she did nothing to adjust for this data bias. *See* Stodden Dep. at 137:13-138:14; 139:2-140:23; 220:10-14.

The numbers Dr. Stodden represents as incident rates on public transportation are not reliable and her opinions based on those numbers should be excluded.

> **3.    Dr. Stodden's comparison of Dr. Chandler's estimated incident rates to public transportation surveys are unreliable.**

In her rebuttal report, Dr. Stodden uses the same faulty methodology addressed above to compare Plaintiffs' experts' analysis of Uber incident rates considering underreporting to public transportation surveys. *See* Stodden Rebuttal Report at ¶¶ 60-61, Table 2. Those opinions should be excluded for the same reasons discussed herein.

> **B.    Dr. Stodden's comparisons to California public transportation surveys are irrelevant to an Arizona case.**

Dr. Stodden has not undertaken to evaluate the rate of sexual assault on public transportation in any area outside of a discrete set of locations in California.[16] She acknowledges this gap in her analysis:

> "I understand from counsel that the litigation involves cases from Arizona, California, and North Carolina. I conducted a search for publicly available data on sexual assault rates on public transportation systems in these three States. I have

---

[16] LA County, San Francisco, Orange County, Santa Clara Valley, San Diego, Long Beach, Almeda County, and the Bay Area. *See* Stodden Report at Table 1.

identified data on reported incited rates for California, which I discuss in Section VI.B. *I have not identified similar data for Arizona or North Carolina*."

Stodden Report at ¶ 19, n.23 (emphasis added). Accordingly, even if Dr. Stodden used reliable methodology to support her opinions comparing Uber SA/SM incident numbers to California public transportation (she has not), her opinions are still irrelevant as to Jaylynn Dean's case, or any case where the incident trip took place outside of one of the areas in California covered by the public transportation surveys Dr. Stodden relies on.

## C.    Dr. Stodden's data reliability opinions are unreliable.

In Section V of her report, Dr. Stodden opines that it was appropriate for Uber to disclose in its U.S. Safety Reports only the incident numbers for the categories of sexual assault that Uber refers to as the "five most serious" categories and not for the remaining 16 categories in its Sexual Misconduct and Sexual Violence taxonomy. She reaches this conclusion on the basis that these five categories have the "highest degree of reliability in classification across Uber auditors— specifically, these categories typically have an aggregate auditor alignment within Uber's internal Safety Taxonomy experts over 80%."[17] Stodden Report at ¶ 16; Stodden Dep. at 249:21-250:1. Dr. Stodden concludes that it was appropriate, from a statistical perspective, for Uber not to disclose data for 16 of the 21 categories of SA/SM incidents because Uber's internal auditors did not agree on how to classify those incidents into the 21 categories at a rate of at least 80%. *See* Stodden Report at § V.

This opinion is in direct contrast to Dr. Stodden's reliance on the public transportation survey results, which she acknowledges were not audited. *See* Stodden Dep. at 219:16-220:3. The critical flaw here is not Dr. Stodden's hypocrisy but rather, her unsupported assumptions. Dr. Stodden opines that it was appropriate for Uber to exclude incident numbers for 16 categories of SA/SM from its Safety Reports because Uber did not reach 80% auditor alignment on those categories. But this is not what the Safety Reports say. In fact, Uber's Safety Reports are entirely silent on what the auditor alignment was for any of the 16 nondisclosed categories, for any year.

---

[17] "Alignment is" defined by Uber as 'the rate of agreement when 2 auditors are separately shown the same facts and come to the same conclusion on the classification of an incident." Stodden Report at ¶ 16.

1    Instead, they only indicate, generally, what auditor alignment was reached for the five reported

2    categories. Ex. N, 2017-2018 Uber Safety Report, at 16, 42 (auditor alignment was at least 85% for

3    all four categories except attempted rape, which was 78%); Ex. O, 2019-2020 Uber Safety Report,

4    at 16 (auditor alignment was over 85% for all categories except attempted rape; attempted rape

5    alignment level was not disclosed); Ex. P, 2021-2022 Uber Safety Report (entirely silent on auditor

6    alignment levels for any category, including the five disclosed). Further, none of the Safety Reports

7    represent that any of the 16 categories *did not* reach any particular level of alignment, whether it be

8    78%, 80%, 85%, or any other level. There is simply *no information* about the auditor alignment

9    level for any category outside of the four disclosed. In fact, the Safety Reports do not represent that

10   incidents from the 16 categories underwent auditing at all, and Dr. Stodden admitted that she does

11   not know what the auditor alignment was for any of the 16 categories for any year. *See* Stodden

12   Dep. at 245:3-10, 247:23-249:1. Dr. Stodden's opinion that Uber did not reach 80% auditor

13   alignment on any of the 16 categories is thus entirely unsupported by the Safety Reports or any

14   other document Dr. Stodden relies on. *See* Stodden Report at ¶ 16; Stodden Dep. at 250:21-25.

15           **D.    Dr. Stodden's opinions as to homicide, fatal traffic accidents, and lightning
                    strikes are irrelevant and unreliable.**

16

17           In Section E, paragraph 31, of her report, Dr. Stodden asserts that her calculated "rates" of

18   sexual assault and misconduct among other users of Uber's rideshare platform are extremely low

19   compared to "other relevant rates." Specifically, she compares sexual assault incident report

20   numbers to rates of homicide, fatal traffic accidents, and lightning strikes. These comparisons are

21   irrelevant and unreliable.

22           On relevance, incident rates of homicide, traffic accidents, and lightning strikes have

23   nothing to do with this case, and will neither help the trier fact understand the evidence nor assist

24   them in determining a fact in issue. The opinion is also unreliable. Dr. Stodden provides only a

25   perfunctory data recitation, devoid of any discernable methodology to ensure proper data

26   comparison. Insofar as she maintains that this somehow mimics the comparative analysis she tried

27   to do with public transportation data, a cursory review of her one paragraph shows otherwise.

28   Simply put, no analysis exists; there is no effort to ensure her data points are appropriate for

comparison, to align the data across geography and timeframe, to identify and rectify any biases in the data, and to apply appropriate analysis as to how she extrapolates the data to her larger conclusions as to all Uber rides. Case in point: her reference to lightning strike data is based on a CDC information page titled *Lightning and Your Safety*, which provides probability data regarding lightning strikes "anyplace on Earth." Stodden Report at ¶ 31, n.61.

## II.    EXPERT REPORT OF VIDA THOMAS

Plaintiffs move to exclude opinion 12(b) from the report of Vida Thomas, where she opines that "Uber was not on notice that … [Dean's] … driver[] would sexually assault a rider[.]" Ex. C (Expert Report of Vida Thomas dated September 26, 2025) ("Thomas Report") at ¶¶ 12b, 44-62. This is an unreliable, subjective lay opinion that is untethered to any scientific methodology and improperly invades the province of the jury. It should be excluded.

Ms. Thomas, a lawyer and managing partner of an investigations firm, opines on "human resources practices" for responding to allegations of sexual assault. *See* Thomas Report at ¶¶ 1-12. But her opinion as to whether Uber was "on notice" that the driver in the *Dean* case would sexually assault a passenger is not based on any human resources practices or standards, but rather simply her determination of what ultimate outcome the jury should reach on a limited subset of facts. *See id.* at ¶¶ 44-62. In her lead-in to this opinion, Ms. Thomas states only that it is "not uncommon for people to ask whether the business should have known that the sexual assault would occur." *Id.* at ¶ 44. She provides no methodology, benchmark, or standard as to how one should approach this question within the context of this case. Instead, she cites a limited set of facts as to the driver, from which she infers there was "no notice." *Id.* at ¶¶ 44-62.

"'When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *Diaz*, 876 F.3d at 1197. Here, Ms. Thomas instructs the jury on what conclusion they must reach on the facts. She concedes as much in her report: "*the facts do not suggest* that Uber was aware of or could have uncovered facts through a diligent HR processes that would lead it to suspect or anticipate" that the specific driver in each bellwether case would sexually assault the plaintiffs. Thomas Report at ¶ 44 (emphasis added). Fact-finding is not expert, reliable methodology. *See, e.g., Lord Abbett*

1    *Mun. Income Fund, Inc. v. Asami,* 2014 WL 3417941, at *13 n.8 (N.D. Cal. Jul. 11, 2014)

2    (excluding expert opinion "based upon her interpretation of the evidence" where "her opinion

3    merely summarize[d] the record evidence and gratuitously interpret[ed] it").

4         Exclusion is further warranted because whether Uber was "on notice" requires no expertise.

5    It is well within the commonsense province and understanding of the jury. Indeed, the JCCP Court

6    struck this same opinion on this very basis. *See In re Uber Rideshare Cases*, 2025 WL 2631568 at

7    *6 (MIL Order) (excluding Thomas's opinion that Uber was "not on notice" as the "jury is perfectly

8    capable of drawing its own conclusions from the evidence"; "the question of whether Uber was on

9    notice that any of the drivers in question would sexually assault a passenger is 'one of such common

10   knowledge that [people] of ordinary education could reach a conclusion as intelligently as the

11   witness'"). This Court should do the same.

12   **III.    EXPERT REPORT OF JASON MORRIS**

13        The Court should preclude Jason Morris, Uber's background check expert, from offering

14   testimony or opinions as to Uber's compliance with federal law and that Uber met and exceeded

15   "industry standards."

16        Mr. Morris opines that Uber used screening practices that "meet and exceeded" industry

17   standards (Opinion Nos. 2 and 4). *See* Ex. D (Expert Report of Jason Morris dated September 26,

18   2025) ("Morris Report") at 3, 8-9, 11-13, 15; Ex. E (Expert Rebuttal Report of Jason Morris dated

19   October 24, 2025) ("Morris Rebuttal Report") at 2, 6-7. This testimony is irrelevant and unhelpful

20   because Mr. Morris fails to articulate *any* industry standards beyond the requirement to follow the

21   law, let alone standards relevant to the issue of background check efficacy. And Mr. Morris's

22   opinions purporting to compare Uber's practices to those of other industries or employers are

23   unreliable because he has no data from which to make such a comparison. *See* Morris Report at 8-

24   9, 11-12.

25        **A.    Mr. Morris's "industry standards" opinions are irrelevant and unhelpful**
          **because they are not based on any actual industry standards.**

26

27        Mr. Morris's "industry standards" opinions are irrelevant because they fail to identify any

28   standard beyond merely complying with existing laws. *See* Morris Report at 3-4, 8-11. In addition,

1    they are not helpful, because they do not help the jury evaluate the efficacy of Uber's background

2    checks.

3        Mr. Morris identifies two sources of industry standards: (1) the Professional Background

4    Screening Association (PBSA) Background Screening Organization Accreditation Program – US

5    Employment Screening Accreditation and Audit Criteria; and (2) a single Society of Human

6    Resource Management (SHRM) article titled "When Background Screens Turn Up Criminal

7    Records."[18] *See* Morris Report at 8–9; *see id.* at Ex. C (materials considered). These "industry

8    standards" opinions should be excluded because "industry standards" testimony grounded in the

9    PBSA accreditation guidelines and a single SHRM article is unreliable, irrelevant, and unhelpful

10   to the jury.

11       The article and the PBSA accreditation guidelines do not specify the practices employers

12   or consumer reporting agencies (CRAs) must or should undertake *other than* adopting policies that

13   comply with the law and using a third-party to conduct the background check.[19] They also do not

14   identify what specific screening options are appropriate or warranted. Testimony about "industry

15   standards" is irrelevant if the alleged standards are nothing more than compliance with the law and

16   can be satisfied simply by selecting a third-party that is accredited by PBSA. *See Magallon*, 743 F.

17   Supp. 3d at 1250 (excluding "industry standard" testimony where expert "has not articulated

18   relevant industry standards, has explained that essentially there are no industry standards relevant

19   to this dispute, and has generally conceded that "industry standards" are no more than compliance

20   with FCRA"). Yet that is all the PBSA accreditation guidelines do. The PBSA accreditation

21   guidelines focus on "meeting requirements for compliance with the Fair Credit Reporting Act

22   (FCRA) and Driver Privacy Protection Act (DPPA)."[20] Accordingly, these accreditation guidelines

23   require that CRAs "have and follow" policies related to information security, quality assurance,

24   ────────────────────

[18] Other SHRM guidance, including formal white papers, were not consulted.

25   [19] PBSA, *PBSA Background Screening Organization Accreditation Program – US Employment
     Screening Accreditation Standard and Audit Criteria*,
26   https://pubs.thepbsa.org/pub.cfm?id=B4F2C99A-FE77-6374-1FE9-0953F3B2B347 (last
     accessed Nov. 9, 2025).

27   [20] PBSA, *Frequently Asked Questions About Accreditation*, "Comparing the U.S. and General
     Accreditation Programs," https://www.thepbsa.org/accreditation/accreditation-faq/  (last accessed
28   Nov. 9, 2025).

and customer education. Beyond specifying that the CRA's policies must "comply with all provisions of all applicable law," the accreditation guidelines do not specify the contents or parameters of these policies.[21]  In other words, the "accreditation guidelines" are nothing more than requirements that CRAs establish legally compliant policies.

Courts routinely exclude expert testimony on "industry standards" where an expert fails to articulate the industry standards they purport to apply. *See, e.g.*, *Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 985–86 (9th Cir. 2020) (excluding expert opinion where expert failed to cite industry standards); *Kidwell-Bertagnolli v. Cnty. Of Sonoma*, 2024 WL 1589468, at *14 (N.D. Cal. April 10, 2024) (excluding expert opinion on industry standards where expert failed to "identify these industry standards").

Mr. Morris failed to identify the standards applied to Uber, as an employer, or Checkr, as Uber's consumer reporting agency (background check) vendor. *See* Morris Report at 3-4, 8-11. He points to the PBSA accreditation guidelines as a source of industry standards but does not at any point compare Uber's conduct to specific prohibitions or prescriptions within those standards. *See id.* Nor could he, as the PBSA accreditation guidelines do not establish any practices or standards of conduct to which employers or CRAs should adhere *other than* adopting legally-compliant policies.[22] This is not sufficient. In *Magallon*, the court precluded expert testimony that the defendant "'exceeds' or 'surpasses' industry standards" where the expert but "did not identify any specific 'industry standards' in her report." 743 F. Supp. 3d at 1250. Instead, the expert conceded that industry standards were "no more than compliance with FCRA." *Id.* Because the expert failed to articulate specific industry standards, the court held that such testimony was inadmissible as irrelevant. *See id.* The court should exclude Mr. Morris's "industry standards" testimony on the PBSA guidelines for the same reason.

**B.**      **Mr. Morris's "industry standards" opinions are irrelevant because they do not help the jury evaluate the efficacy of Uber's background checks.**

Even if the PBSA accreditation guidelines were industry standards, they—along with one

---

[21] PBSA, *PBSA Background Screening Organization Accreditation Program*, supra note 5.
[22] *Id.*

referenced SHRM article—are irrelevant to this case and unhelpful to the jury because they do not address key issues related to the *efficacy* of Uber's background checks, such as how to conduct a background check or for how long, beyond legal compliance. Neither the PBSA accreditation guidelines nor the SHRM article concern: the qualifications of employees reviewing records, the databases to search, the lookback period to use, the state's law that governs the applicable lookback period, the methods for retrieving court records, or the categories of records to search (whether arrest, conviction, or civil).[23] Expert testimony must be "relevant to the task at hand" in that it "logically advances a material aspect of the proposing party's case." *Bextra*, 524 F. Supp. 2d at 1171 (quotations omitted). Here, Mr. Morris's opinions lack a valid connection to the "pertinent fit inquiry" (*id.*); namely, whether Uber "implement[ed] adequate safety and background screening practices" (Morris Report, at 3).

      *First*, even if the PBSA accreditation guidelines were deemed "industry standards," they do not establish any safety-related standards. Instead, they contain requirements for policies on information security, customer education, and quality assurance.[24] The purpose of these requirements is *not* to ensure that employers and CRAs are screening out applicants that pose a safety risk, but rather compliance with the FCRA, which is designed to prevent unlawful disclosures of information on job applicants.[25] In other words, the PBSA accreditation guidelines can, at most, be considered standards for how to comply with the laws intended to protect Uber's *drivers*.[26] They do not provide any real guidance on how to accurately identify safety risks posed by employment applicants, which is the heart of the background check issue in this case.[27]

      *Second*, even though the SHRM offers substantial guidance on how to identify risky candidates, Mr. Morris did not consider any of it. Instead, his opinion is based on only one SHRM article, which address steps to take *after* such person has been identified. These recommendations have no bearing on this case where Checkr did not locate criminal records for the drivers here. *See*

---

[23] *Id.*

[24] *Id.*

[25] *Id.*; *see also* PBSA, *Frequently Asked Questions*, supra note 6.

[26] *See id.*

[27] *See id.*

-26-

Morris Report at 11-17. The SHRM article contains guidance on what to do "when a job candidate's background check reveals a criminal record[.]"[28] Indeed, the recommendations to use a "consistent adjudication matrix designed to reduce bias and ensure legal defensibility," "[i]ndividualized assessment protocols that evaluate the relevance of records to the role," and "[a]utomated, yet auditable workflows to ensure timely and lawful pre-adverse and adverse action notifications"[29] all relate to the steps employers should take *if* and *when* a criminal record is returned to comply with the law. For example, Mr. Morris leans heavily on Uber's use of an "adjudication matrix" as recommended by the SHRM article. *See* Morris Rebuttal Report at 2, 6-7. However, as he acknowledges, the purpose of this matrix is "consistency, transparency, and defensibility," not risk-prevention. *Id.* at 6. The SHRM article does not provide standards as to what employers should do to *locate* records indicative of risk, such as the length of a lookback period to use, the jurisdictions to search, the types of records (convictions, arrests, civil) to review or the qualifications of reviewers.[30]

Plaintiffs have not alleged Checkr failed to adequately adjudicate identified criminal records or otherwise failed to provide *drivers* with adequate notice; rather, the allegation is that Checkr failed to locate records indicative of risk in the first instance. The PBSA accreditation guidelines and SHRM article are therefore immaterial to the claims in this case such that opinions based solely on them are irrelevant and should be excluded.

### C.    Mr. Morris's "industry standards" opinions are unreliable.

Mr. Morris further opines that Uber's screening practices exceed the practices of other employers or industries. *See* Morris Report at 8-9. Expert opinions are inadmissible unless supported by sufficient facts or data. *See* Fed. R. Evid. 702(b). This requires that an expert "rely on

---

[28] Roy Maurer, *When Background Screens Turn Up Criminal Records* (May 5, 2024), https://www.shrm.org/topics-tools/news/risk-management/background-screens-turn-criminal-records (last accessed Nov. 9, 2025).

[29] *Id.; see also* Morris Report at 9.

[30] Mr. Morris's unsupported assertion that "a search for criminal records would not yield civil records," improperly assumes, without support, that background checks should only be conducted for criminal records. Morris Report at 18. However, civil records contain pertinent information about the safety risk of applicants, including domestic violence records detailing incidents of physical or sexual violence against women.

1   'facts or data in the case that the expert has been made aware of or personally observed,' not merely

2   assumptions and speculation." *Stephens v. Union Pacific R.R. Co.*, 935 F.3d 852, 856-57 (9th Cir.

3   2019) (quoting Fed. R. Evid. 703). Mr. Morris's conclusory comparisons between Uber's screening

4   practices and the unidentified practices of unspecified "gig economy" and "traditional" employers

5   does not satisfy this requirement. And even if Mr. Morris had adequate data about Uber's own

6   practices, he has not reviewed data about the practices of any *other* employer in the gig economy

7   or traditional employment settings. *See* Morris Report, at Ex. A (materials considered).[31] Nowhere

8   in his Report or Rebuttal Report does Mr. Morris identify the other employers to which he is

9   comparing Uber, or the specific practices they purportedly utilize that are less "robust" than those

10  of Uber. This is pure *ipse dixit* and must be excluded.

11  **IV.    EXPERT REPORT OF ERIC PIZA**

12          Uber submits a report from Dr. Eric Piza, a criminologist, to present opinions regarding

13  dash cameras ("dashcams"). But his experience in this regard is nonexistent. Dr. Piza has never

14  owned or used a dashcam, let alone set one up in a vehicle and understanding how they operate.

15  *See* Ex. G (Deposition of Eric Piza dated October 30, 2025) ("Piza Dep.") at 82:12-19 (testifying

16  he has never "hooked [a dashcam] up [or] tested it"). His dashcam experience begins and ends with

17  an anecdotal reference to one time when his father purchased a dashcam and showed it to him. *See*

18  *id.* at 82:12-19. And yet, Uber plans to use him to offer opinions as to the deterrent impact of

19  dashcams, and the technological and operational feasibility of use. *See* Ex. F (Expert Report of Eric

20  Piza dated September 26, 2025) ("Piza Report"). Unsurprisingly, many of Dr. Piza's opinions fall

21  far afield of his qualifications, and are otherwise unsupported by sufficient facts, data, or a reliable

22  methodology.

23          *First*, Plaintiffs move to exclude Dr. Piza's opinion that dashcams would be ineffective

24  because "[t]he many other safety features on the Uber platform already generate the perception that

25  perpetrators of criminal conduct would be identified and thus likely deter criminal conduct." Piza

26  Report at ¶¶ 3(b), 33-46. This opinion has no basis in facts, data, or reliable methodology. *Second*,

27  ─────────────────────────

28  [31] Mr. Morris compares Uber to employers in the "gig economy" and "traditional employment settings" (Morris Report at 8), effectively setting up a comparison between Uber and *every other* employer and industry.

1  Plaintiffs move to exclude Dr. Piza's opinions regarding the technological and operational

2  feasibility of implementing dashcams at Uber. *See id.* at § VI.C, ¶¶ 47-50 Dr. Piza lacks the requisite

3  qualifications to opine on such issues, and the opinions are unreliable as lacking foundation in facts,

4  data, and methodology.

5      A.    **Dr. Piza's opinions about Uber's safety features and perpetrator perception are unreliable.**

6  Dr. Piza opines that "[t]he many other safety features on the Uber platform already generate

7  the perception that perpetrators of criminal conduct would be identified and thus likely deter

8  criminal conduct." Piza Report at ¶ 3(b). As part of this opinion, he concludes that "[d]ashcams

9  would not meaningfully increase offender perception of certainty or celerity of punishment given

10  the safety features already utilized on the Uber platform." *Id.* at § VI.

11  Dr. Piza's methodology for this opinion consists of examining a potential crime-deterrent

12  through the lens of an offender's perceived "certainty, severity, and celerity (i.e., speed or

13  swiftness)" of punishment. Piza Report at ¶ 12. Even if such analysis could be considered reliable,

14  Dr. Piza did not properly apply his own methodology. *See* Fed. R. Evid 702(d) (to be admissible,

15  expert opinion must reflect "reliable application of the principle and methods to the facts of the

16  case").

17  Dr. Piza explained that proper assessment of certainty and celerity, vis-à-vis safety features,

18  requires consideration of what individuals knew and understood of said features. *See* Piza Dep. at

19  207:2–7. Yet he reviewed no data on whether drivers were even *aware* of these features, let alone

20  the degree to which they had knowledge as to functionality and consequence. *See id.* at 228:11-16

21  (testifying he had "no data" about "the impact of an offender's perception of risk of any of the

22  safety features that [he] cited in [his] report"); *id.* at 228:20-24 (agreeing he had "no actual data to

23  measure the deterrent effect of these features individually or collectively"); *id.* at 229:19-22

24  (agreeing that he had "no idea [of] the driver awareness level of any of these features"); *id.* at

25  201:11-25 (acknowledging "no documentation or studies" behind his conclusion that drivers would

26  believe Uber is collecting and storing their GPS data and stating there is "no science behind that");

27  *id.* at 99:4-9 (stating he did not review any data regarding the percentage of drivers who are actually

28

punished as a result of sexual assault or sexual misconduct reports). Instead, he merely lists off various Uber features (*see* Piza Report at ¶¶ 36-45), and then delivers a single, conclusory paragraph asserting that the addition of mandatory dashcams would likely have only "limited impact" on potential offenders' perceived risk:

> Given the security measures already in place, the addition of [] mandatory dashcams would likely have a limited impact on an offender's perception of risk. Committing crime on the Uber platform is already risky for the offender: drivers are easily identified, the Uber app collects real-time GPS data, and riders have various means of seeking emergency assistance and reporting incidents to Uber or police during or after a ride and providing information that makes apprehension likely and swift.

*Id.* at ¶ 46. Dr. Piza concedes this analytical gap, agreeing that his conclusion in this respect was based on "an assumption about what [he] think[s] [an active Uber user] understands." Piza Dep. at 199:9-15. *See Klein v. Meta Platforms, Inc.,* 766 F. Supp. 3d 956, 967 (N.D. Cal. 2025) (noting "there must be a sound foundation in the evidence to support every step on the way to their conclusions").

On severity, Dr. Piza explained that this element requires "evaluating the effectiveness of video surveillance cameras and other types of interventions, [and] understanding what the legal punishment is for specific types of actions and specific types of crimes." Piza Dep. at 95:5-18. Because punishments can come in various forms (e.g., penalties, employment termination, jail time), a proper analysis of the severity element requires consideration of the specific crime and punishment at hand. *See id.* at 95:19-96:15 (agreeing that the "perception of the severity can change depending on the criminal or class of people you're trying to deter"). But Dr. Piza's report omits consideration and analysis of this element entirely. *See id.* at 96:19-97:8 (agreeing it is a "fair" assessment that "there's no part of [his] report that discusses how severe an Uber driver might perceive any type of punishment to be"). He did not research what types of punishments could be imposed and considered no data as to how many drivers reported for sexual assault or sexual misconduct actually received some type of punishment or consequence. *Id.* at 98:17-99:9. According to Dr. Piza, he "guess[ed]" that severity of punishments could range "pretty high" but "[hadn't], like, done any, like official research on that[.]" *Id.* at 92:6-15. And, with respect to percentage of drivers actually punished, he considered no data because "that wasn't provided to

1  [him]." *Id.* at 99:4-9.[32] When questioned on this analytical omission, Dr. Piza disclaimed severity

2  as "inconsequential if the other two aren't sufficient." *Id.* at 99:24-100:2. Given the deficiencies in

3  his certainty and celerity analysis (discussed above), his decision to ignore severity is illogical.

4      Further invalidating his opinion is the fact that Dr. Piza has no reliable understanding of

5  the safety features used to support his perpetrator-perception conclusion. Thus, even if his

6  subjective perceptions of the deterrent impact of safety features were admissible (they are not), his

7  frame of reference is non-existence, rendering his conclusions purely speculative. *See, e.g.* Piza

8  Dep. at 221:5-222:24 (admitting he never navigated to or tested Uber's 9-1-1 feature, and

9  "assum[ed]" it would be faster than calling 911 based on his "gut" but admitting "I don't know");

10  *id.* at 202:19-203:11 ("I've just been assuming that Uber is able to collect all of that [GPS]

11  information in addition to the rider and driver information"); *id.* at 204:23-205:24 (admitting he's

12  "not sure" what anomalies RideCheck detects).

13      Dr. Piza's opinion regarding the deterrent impact of safety features on the Uber platform

14  should be excluded.

15      **B.**   **Dr. Piza's statements regarding technological and operational feasibility are outside his expertise and unsupported.**

16

17      Dr. Piza next opines that "[t]he complementary policies and safeguards needed for video

18  cameras to prevent violent crime cannot realistically be implemented for the millions of rides on

19  the Uber platform." Piza Report at § VI.C, ¶¶ 47-50. Specifically, he maintains that Uber would

20  need tens of thousands of camera operators to monitor rides in real time because video analytics

21  software would be "challenging" due to poor lighting in vehicles. He further concludes this would

22  be "practically impossible" and "not feasible" from a technological standpoint and would "require

23  an unreasonable amount of resources" due to Uber's scale from an operational standpoint. *See e.g.,*

24  Piza Report at ¶ 17 (actively monitored surveillance "not feasible on the Uber platform"), ¶ 49

25  ("[i]ncorporating video analytics to assist proactive monitoring would also be challenging" and

26  _____

27  [32] Indeed, when Dr. Piza was asked about how Uber goes about punishing drivers who had been reported for sexual assault or sexual misconduct, he testified (incorrectly) that his belief was that any alleged offense would result in *automatic deactivation. See* Piza Dep. at 98:22-99:3. In other words, Dr. Piza has no idea how consequences at Uber work and thus his opinions about the deterrent effect of any of these features are unreliable.

28

"[w]atching live footage for every single ride in the United States…would require an unreasonable amount of resources"), ¶ 51 (active monitoring and real-time response "are practically impossible on the Uber platform due to Uber's scale"). These opinions should be excluded because Dr. Piza is not qualified to opine on the technical or operational feasibility of implementing dashcams, and because he does not ground these opinions in sufficient facts or data.

Before a witness may come "before the jury cloaked with the mantle of an expert…care must be taken to assure that a proffered witness truly qualifies as an expert" through "knowledge, skill, experience, training, or education." *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Here, Dr. Piza does not possess any knowledge, skill, experience, training, or education that would qualify him to opine on the technological feasibility of integrating dashcams with the Uber platform. He has no experience, knowledge, or training in software engineering (*see* Piza Dep. at 72:19-22), no formal training in artificial intelligence, and would not consider himself an expert in artificial intelligence. *See id.* at 246:24-247:2, 82:6-11; *see also* Piza Report at Ex. A (Curriculum Vitae).[33] He is therefore not qualified to opine on whether it is technologically feasible for Uber to integrate dashcams into the Uber app and implement monitoring, machine learning, or algorithmic systems of review. Indeed, Uber itself implicitly recognizes that such questions demand separate expertise, submitting, on rebuttal, a different expert to opine on feasibility issues. *See* Ex. H (Expert Rebuttal Report of Christopher Wilson dated October 24, 2025). Dr. Piza identifies no comparable credentials to this separate technology expert, underscoring that these opinions fall well outside his expertise.

Likewise, Dr. Piza does not have the requisite qualifications regarding relevant operational feasibility, *i.e.*, business and industry standards regarding staffing and resource allocation, or logistical capabilities of private rideshare companies, to conclude it would be infeasible for Uber to adopt a mandatory dashcam program. *See* Piza Report at ¶¶ 1, 4-7; *see also id.* at Ex. A (Curriculum Vitae). He admits he has no training or experience in operations, accounting, finance, or business. *See* Piza Dep. at 246:15-17, 247:3-7. Nor is he an expert in corporate logistics. *See id.*

---

[33] To put Dr. Piza's experience in clear context, despite offering opinions as to technological feasibility of dashcams, Dr. Piza has *never used* a dash camera, let alone set one up in a vehicle to understand how they work and what is or is not feasible. *See* Piza Dep. at 82:12-13.

at 72:13-15. Because Dr. Piza is not qualified to opine on technological and operational feasibility, those portions of his report should be excluded. *See* Piza Report at § VI.C.

Even if qualified, Dr. Piza provides no reliable methodology for his feasibility opinions. Dr. Piza opines that contemporaneous human review of dashcams would be required because poor lighting in vehicles at night would make video analytics assistance challenging. *See* Piza Report at ¶¶ 49, 51. He cites a single study on deep learning–based weapon detection, which he concedes bears no meaningful connection to this context. *See id.*; Piza Dep. at 174:18-175:24 ("I'm not sure [if this article discusses dash cameras] … they didn't give a tremendous amount of detail about the source of the video. I should've looked a little further into it, I apologize"). Moreover, Dr. Piza confirmed he has no insight into Uber's individual technological capabilities (*see id.* at 179:22-180:3), has not reviewed any documents about what Uber is technologically capable of developing (*see id.* at 238:6-10), has never reviewed Uber's back-end technologies (*see id.*, 238:14-17, 80:8-14), and did not speak with anyone at Uber, including engineers, to conduct research for his opinions (*see id.*, 250:18-25). Instead, Dr. Piza's opinions on Uber's technological capabilities are based solely on extrapolation from his experience working with police forces, as well as interactions with "vendors" who approach him about research partnerships. But he made no effort to ascertain whether these were appropriate comparisons. *See id.* at 80:15-81:5; *id.* at 77:13-78:2 (stating he doesn't "know for sure" whether a police department has the same technological capabilities as Uber.)

On operational feasibility, Dr. Piza's report cites no evidence regarding Uber's operational capabilities to support his conclusion that implementing dashcams would be "impossible" or require "unreasonable" resources for Uber. Piza Report at ¶¶ 49, 51. Indeed, there is no consideration at all as to what resources are available to Uber to even discern what is reasonable and possible versus unreasonable and impossible. Dr. Piza has not even reviewed Uber's annual budget and does not know Uber's net worth (*see id.* at 8-10; *see also* Piza Dep. at 247:15-17), to form a general understanding of the company's capabilities. He concludes, without any reliable bases, that an international, multibillion-dollar company is simply not capable of implementing a mandatory dashcam program.

Dr. Piza is not qualified to opine on technological and operational opinions, and his attempts to do so lack basis in reliable methodology. Those opinions should be excluded.

### C. Dr. Piza's testimony regarding RAINN and Urban Institute constitutes improper personal opinions.

At his deposition, Dr. Piza testified that of the documents he relied on in forming his opinions, Uber's Safety Reports were "probably one of the more helpful ones." Piza Dep. at 21:6-7. Dr. Piza further testified that this was (at least in part) because "I saw that Uber worked in close consultation with very reputable research centers…to develop their methodology." Dr. Piza continued to address RAINN and the Urban Institute's involvement in creating Uber's safety reports, describing the Urban Institute as "reputable" and RAINN as "preeminent" in advancing the rights of sexual violence survivors. *Id.* at 21:15-22:6, 24:5-11, 26:13-17. Yet Dr. Piza conceded he has no specialized knowledge or experience with either organization, apart from having a colleague who worked at the Urban Institute more than seven years ago and citing some of its research in his own work. *See id.* at 25:8-28:4. He has never collaborated with the Urban Institute or RAINN in any official capacity and had not read any RAINN publications before his retention in this case. *See id.* at 25:8-25, 26:3-9. Any views Dr. Piza offers regarding these institutions therefore reflect only his personal beliefs and are not entitled to the credibility of expert testimony.[34]

## V. EXPERT REPORT OF JOSEPH OKPAKU

Plaintiffs move to exclude the opinions of Uber's lobbyist expert Joseph O. Okpaku. *See* Ex. A (Expert Report of Joseph Okpaku dated September 26, 2025) ("Okpaku Report"). Mr. Okpaku's opinions are based solely on his experience as a member of Lyft's "Government Relations team" from 2010 to 2019. *Id.* at 3. He asserts that his testimony is helpful to the jury because "[d]uring [his] time at Lyft, [he] reviewed every piece of legislation being considered for the ridesharing industry" and "testified … at city or state legislative hearings and regulatory proceedings" and "before Congress." *Id.* And Mr. Okpaku cites his participation in discussing the "economic costs and benefits of the gig economy, the intersection of the gig economy and long-

---

[34] Plaintiffs' counsel requested Uber agree that Dr. Piza will not offer opinions regarding the credibility of RAINN or Urban Institute at trial. Ex G, Piza Dep., at 167:10-18. Uber's counsel declined. *Id.* at 167:19-24.

1    standing employment-related classifications, and the impact of the gig economy on certain

2    segments of society." *Id.*

3        Mr. Okpaku offers four opinions:  (1) on "[t]he industry standard with respect to safety in

4    the rideshare industry has been established by the statutory and regulatory requirements for

5    companies like Uber;" (2) "Uber has always exceeded the industry standard of safety for the

6    rideshare industry;" (3) "[c]ompanies like Uber maintain little to no significant control over third-

7    party rideshare drivers because the drivers fundamentally control if, when, how much, and for how

8    long they choose to make themselves available to provide rides through the Uber app;" and (4)

9    "[t]ransportation network companies have been treated by regulators as distinct from common

10   carriers." Okpaku Report at 5-6. As set forth below, each opinion should be excluded.

11       A.      **Mr. Okpaku's opinions on whether Uber is a common carrier are irrelevant.**

12       Mr. Okpaku opines that "[t]ransportation network companies have been treated by

13   regulators as distinct from common carriers." Okpaku Report at 6, 29-36. He also opines on how

14   the California legislature "intended" Uber "to be treated," and (without evidence) that Arizona and

15   North Carolina "modeled" their TNC statutes "off of the regulatory framework that had been

16   decided upon by the [California Public Utilities Commission]." *Id.* at 10, 31.[35] These irrelevant and

17   improper opinions should be excluded.

18       1.      **How regulators "treat" Uber and what legislators "intended"**
             **are improper and unhelpful legal conclusions.**
19

20       Experts may not offer legal opinions because "legal opinions have no place in a jury trial

21   and usurp the role of the judge and jury." *BP Prods. N. Am., Inc. v. Grand Petrol., Inc.*, 2021 WL

22   4482138, at *1 (N.D. Cal. Sept. 30, 2021). For that reason, experts may not testify as to the meaning

23   of statutes or regulatory decisions. *See Nationwide Transp. Finance v. Cass Info. Sys., Inc.*, 523

24   F.3d 1051, 1058-59 (9th Cir. 2008).

25       Mr. Okpaku's common-carrier analysis is improper legal opinion. The basis of his opinion

---

[35] Although briefing is limited to the first bellwether case in Arizona (*see* ECF 4332), because Mr. Okpaku ties together his opinions across the three states, it is necessary to also address his statements about California and North Carolina. Unlike California and North Carolina, Arizona does not assign common carriers non-delegable duties, only a duty of ordinary care. *Compare* PTO 17 at 31-35 (California) *and* PTO 28 at 22-23 (North Carolina), *with Nunez v. Pro Transit Mgmt. of Tucson, Inc.*, 271 P.3d 1104, 1106-09 (Ariz. 2012).

in all three states is that "TNCs have not been treated like common carriers under the CPUC regulations and subsequent legislation in California," an approach "modeled" in Arizona. Okpaku Report at 10, 29-31. But this is simply interpreting rulemaking (as "conceptualization of TNCs as something distinct from TCPs") and legislation (as "adopt[ing] the CPUC's basic regulatory framework"). *Id.* at 29-31. Interpreting rules and statutes is for the Court to do, not an expert. *See, e.g.*, *Nationwide Transp.*, 523 F.3d at 1058. Experts "do not testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations." *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (citation omitted). While Uber may "use briefing to persuade the Court that [its] interpretation of the law is superior," it may not usurp the Court's role in determining what the law is and instructing the jury on its determinations. *See CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1236-37 (E.D. Cal. 2005).

Mr. Okpaku's opinions regarding what the California legislature "intended" and how Arizona and North Carolina "modeled" their TNC statutes on these supposed "intentions" are even more improper. "Intent" and "model" are irrelevant compared to the actual plain text of the Arizona statute . *See, e.g.*, *State v. Christian*, 66 P.3d 1241, 1243 (Ariz. 2003) (noting "the best and most reliable index of a statute's meaning is the plain text of the statute"); *United States ex rel. Miller v. ManPow, LLC*, 2023 WL 9005796, at *8-9 (C.D. Cal. Nov. 22, 2023) (excluding expert report "rife with impermissible statutory and regulatory interpretation" including "the definitions and purpose of certain statutory … requirements," the "intent behind certain … regulations," and "even … Congress's intent in designing and enacting" the statute); *Brewer v. BNSF Rwy. Corp.*, 2016 WL 11709319, at *2 (D. Mon. Apr. 22, 2016) (excluding testimony concerning "congressional intent in enacting" a statute because "it is the function of the Court to instruct the jury on relevant law").

### 2. How regulators "treat" Uber and what legislators "intended" are irrelevant to whether Uber is a common carrier.

In addition to offering improper legal opinions, Mr. Okpaku's opinions are not helpful to the jury because they are wrong. *See Nationwide Transp.*, 523 F.3d at 1059 (excluding opinions where "legal conclusions not only invaded the province of the trial judge, but [also] constituted

1   erroneous statements of law" and were therefore "not only superfluous but mischievous"). As

2   relevant to the Arizona law governing the *Dean* case, Mr. Okpaku argues that (1) the California

3   regulatory regime does not "treat" Uber as a common carrier; (2) the California statute "adopted

4   the CPUC's basic regulatory framework," indicating "an intent to treat TNCs distinctly"; and (3)

5   Arizona's TNC statute "was modeled off of the regulatory framework" used in California. Okpaku

6   Report at 10, 29-31.

7       The fatal flaw in these opinions is that the TNC statute in Arizona (as well as the one in

8   California which Mr. Okpaku cites to as the "model") does *not* say that Uber is *not* a common

9   carrier—an inconvenient fact Mr. Okpaku concedes in a footnote. Okpaku Report at 32, n.83. The

10  Court previously analyzed TNC statutes that expressly exempted companies like Uber from

11  common-carrier status. *See* PTO 17 at 31 & n.11 (Texas); PTO 18 at 5-6 (Florida). The Court

12  explained that "[t]he language is clear and unequivocal, and Plaintiffs ask the Court to read

13  limitations into the statute—such as a distinction between the "regulatory" and "common law"

14  definitions of common carrier—*that are just not there.*" PTO No. 17 at 31 n.11 (emphasis added).

15  Now, the roles are reversed. It is Uber, through Mr. Okpaku, who invites the Court to exclude Uber

16  from common-carrier status  based on something that is "just not there" in the statute. *Id.* The Court

17  should again decline the invitation.

18      In Arizona, the definition of a common carrier is determined by common law. *See, e.g.,*

19  *Perez v. Circle K. Convenience Stores, Inc.*, 564 P.3d 623, 629 (Ariz. 2025); *Nunez*, 271 P.3d at

20  1106-09; *see also, e.g.*, *Lowrey v. Montgomery Kone, Inc.*, 42 P.3d 621, 626 n.7 (Ariz. App. 2002)

21  (citing, among others, California, Montana, Illinois, and Alabama law); *S. Pac. Co. v. Hogan*, 108

22  P. 240, 241 (Ariz. 1910) (citing federal common law). Arizona's TNC statute does *not* absolve

23  Uber of liability as a common carrier for purposes of tort liability. Mr. Okpaku concedes this point.

24  *See* Okpaku Report at 32, n.83 (conceding Arizona TNC bill is "silent on the common carrier

25  issue"); Ex. B (Deposition of Josph Okpaku dated November 5, 2025) at 226:10-13 (Q. "Is it true

26  you don't have opinions as to the common carrier question under Arizona law?" A. "Right.  The

27  Arizona law is silent to that issue"). The statute provides only that "[a] transportation network

28  company shall be regulated pursuant to this article and not as a vehicle for hire." Ariz. Stat. § 28-

1   9552(E). The "plain text of the statute" evinces a focus on regulatory issues, with no mention of

2   tort liability. *Christian*, 66 P.3d at 1243; *see also, e.g.*, *Murray v. Uber Techs., Inc.*, 486 F. Supp.

3   3d 468, 475 (D. Mass. 2020) (reaching similar conclusion under similar Massachusetts law). And

4   even if the statute were ambiguous, Arizona courts "interpret statutes with every intendment in

5   favor of consistency with the common law." *Wilks v. Manobianco*, 352 P.3d 912, 915 (Ariz. 2015)

6   (citation omitted). Mr. Okpaku's "expertise" cannot displace cardinal principles of statutory

7   interpretation. Indeed, Judge Schulman in the JCCP rejected the same argument on California law

8   (which, again, Mr. Okpaku cites as the "model" for Arizona). As Judge Shulman noted:

9   > [I]t is significant that the Legislature enacted the TNC statutes in 2014 without
10  > amending Civil Code section 2168. Had the legislature intended to exempt
    > rideshare companies from common carrier status for the purpose of tort liability, it
11  > easily could have amended Civil Code section 2168 to accomplish this objective.
    > Likewise, Proposition 22, enacted by the voters in the November 2020 election, is
12  > silent on the subject of rideshare companies' status as common carrier.

13  *In re Uber Rideshare Cases*, 2025 WL 2631565, at *9, n.10 (Cal. Super. Jul. 31, 2025) (MSJ Order).

14  This Court should reach a similar conclusion regarding Arizona's statute.

15          **B.      Mr. Okpaku's "industry standard" opinions are unreliable.**

16          Mr. Okpaku's "industry-standard" opinions (Opinion Nos. 1 and 2) rest almost entirely on

17  a recitation of regulatory history, as opposed to any discernible methodology. He defines the

18  "standard of safety" for the rideshare industry by summarizing California regulatory decisions,

19  California Public Utilities Code provisions, and other state regulatory frameworks, and then asserts

20  that Uber "has always exceeded" those legal requirements. Okpaku Report at 11-14. These are not

21  opinions based on a reliable methodology, but unreliable regulatory interpretation. The reasoning—

22  that because Uber's app features go beyond statutory requirements, Uber has "always exceeded"

23  industry safety standards—is a legal syllogism, not a testable expert conclusion. *See Gen. Elec. Co.*

24  *v. Joiner*, 522 U.S. 136, 146 (1997) (excluding *ipse dixit* reasoning unsupported by data); *Magallon*

25  *v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1250 (D. Or. 2024).

26          Mr. Okpaku's deposition confirms the absence of any analytical framework. He

27  acknowledged that his opinions were based on nothing more than the materials he reviewed, his

28  past experience and knowledge of the ridesharing industry, and certain (limited) studies cited to in

his report. *See* Okpaku Dep. at 160:25-161:7. And while he asserts that "Uber has always exceeded the industry standard of safety," he never defines what that "industry standard" is. Okpaku Report, at 5, 14.; *see Grodzitsky*, 957 F.3d at 985–86 (excluding expert opinion where expert failed to cite industry standards); *Kidwell-Bertagnolli*, 2024 WL 1589468 at *14 (excluding expert opinion on "industry standards" where expert failed to "identify these industry standards"); *Magallon*, 743 F. Supp. 3d at 1250.

Mr. Okpaku's report contains no peer-reviewed study or quantitative analysis comparing Uber's safety outcomes to other carriers. Instead, he simply infers superiority from Uber's app features, such as GPS tracking and 911 integration, without showing that those features improve safety outcomes. *See* Okpaku Report at 17-18. For example, Mr. Okpaku lists Uber features, like ratings, GPS tracking, Share Your Trip, 911 integration, RideCheck, and background checks, and asserts these are not legally required. He then leaps to the conclusion that Uber has therefore "always exceeded" standards. *Id.* But he concedes significant data limitations and underreporting and performs no empirical analysis demonstrating that these measures reduce sexual assaults. *Id.*; *see also* Okpaku Dep. at 245:1-4, 174:16-24, 176:17-177:1. And he concedes that national-level taxi data are lacking and that federal datasets are incomplete, yet at the same time draws definitive comparative conclusions. *See id.*, 167:7-8; Okpaku Report at 19.

Finally, Mr. Okpaku's claim that ridesharing is "substantially safer" than taxis is unsupported by *any* reliable data. *See* Okpaku Report at 19-21; Okpaku Dep. at 183:1-18. Indeed, he admits there is "a lack of data to support a direct statistical comparison" and acknowledges underreporting of sexual assault. *See* Okpaku Report at 20; Okpaku Dep. at 237: 23-238:1 (Q. "based on your experience would you agree that sexual assault is an underreported crime? A. Yes"). Again, such *ipse dixit* testimony is inherently unreliable and confusing to the jury. It is also irrelevant. Even if Uber was "safer" than some other form of transportation, that fact would not establish Uber's reasonable care in preventing sexual assaults on its platform. These irrelevant opinions, untethered to actual data, are inherently unreliable and should be excluded. *See*, *e.g.*, *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (expert testimony may not rest merely on "unsupported speculation and subjective beliefs").

C.    **The portions of Mr. Okpaku's "control" opinions based on driver motivation and contractual interpretation should be excluded.**

Mr. Okpaku opines that Uber does not "exercise the same degree of control over drivers that a company exercises over employees or agents." Okpaku Report at 21. To begin, the opinion is based on the wrong legal standard: employee status is triggered by the "right to control" regardless of whether the right is exercised. *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 141 (Ariz. 1990) (citation omitted). That problem aside, two portions of Mr. Okpaku's "control" opinion must be excluded.

1.    **Drivers' "motivators" are not relevant to whether they are employees.**

Mr. Okpaku's control opinion is primarily based on his view of what motivates rideshare drivers. *See, e.g.,* Okpaku Report at 21 (asserting that the "*key appeal* of ridesharing for drivers has always been the fact that ridesharing allows drivers to completely control when they work") (emphasis added). But a person's motivations for pursuing a particular occupation, and subjective perceptions on what is or is not "appealing," have nothing to do with whether they are an employee or an independent contractor for purposes of vicarious tort liability. *Cf. Engler v. Gulf Interstate Eng'g, Inc.*, 258 P.3d 304, 311 (Ariz. App. 2011) ("The reason workers' compensation law is not controlling in a tort action is that workers' compensation law and respondeat superior serve different purposes and, therefore, differ in scope and application.") (citation omitted).

Numerous employment relationships involve freedom and flexibility, but this "does not in itself preclude a finding of an employment relationship." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1152 (N.D. Cal. 2015) (applying similar California law). "The more relevant inquiry is how much control Uber has over its drivers *while they are on duty* for Uber. The fact that some drivers are only on-duty irregularly says little about the level of control Uber can exercise over them when they *do* report to work." *Id.* Nothing in the relevant Arizona law assigns relevance to the worker's "motivators." Mr. Okpaku's opinions on this issue are irrelevant and should be excluded.

### 2. Mr. Okpaku's interpretations of Uber contracts are irrelevant and improper legal opinion.

Mr. Okpaku opines that Uber's driver "agreements contain clear, unambiguous language denoting the nature of the relationship between Uber and third-party drivers." Okpaku Report at 23. This opinion is irrelevant: "Contract language does not determine the relationship of the parties, rather the objective nature of the relationship is determined upon an analysis of the totality of the facts and circumstances of each case." *Santiago*, 794 P.2d at 141. And this opinion is unreliable and unhelpful: "The interpretation of a contract is an issue of law …. Expert testimony is not proper for issues of law." *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1046 (9th Cir. 1996).

### D. Mr. Okpaku's "dashcams are not required" opinion is not evidence of reasonable care and should be excluded.

Mr. Okpaku's opinion that dashcams are not required, and therefore Uber's failure to mandate them is consistent with reasonable care (*see* Okpaku Report at 19), merely restates the same faulty legal-minima argument discussed above. The absence of a statutory or regulatory requirement does not establish that Uber acted reasonably, nor does it provide a reliable basis to assess whether a company exercising due care would have implemented such a measure. Expert testimony that simply equates legal compliance with reasonable care misstates the law, offers no specialized expertise, and risks misleading the jury into believing that the standard of care is defined by the lowest level of regulatory obligation. *See e.g., Magallon*, 743 F. Supp. 3d at 1250 (testimony about "industry standards" is irrelevant if the alleged standards are nothing more than compliance with the law).

Mr. Okpaku's opinion on dashcams is also devoid of any methodology. He does not analyze whether dashcams are feasible, effective, or widely used within comparable transportation services, he reviews no studies or research to support his claims; and he identifies no empirical data or methodology linking dashcam use (or absence) to sexual-assault prevention. *See* Okpaku Report at 19; Okpaku Dep. at 175:13-178:17. There is no foundation to his opinion, let alone a reliable one, and it thus fails to meet Rule 702 and *Daubert*.

### CONCLUSION

1        For these reasons, the above opinions of experts Victoria Stodden, Vida Thomas, Eric Piza,

2 Jason Morris, and Joseph Okpaku, should be excluded in whole or in part.

3    Dated: November 10, 2025                    Respectfully submitted,

4

5                              By: */s/ Sarah R. London*
                                  Sarah R. London (SBN 267083)

6

7                                 **GIRARD SHARP LLP**
                                601 California St., Suite 1400

8                                 San Francisco, CA 94108
                                Telephone: (415) 981-4800
                                slondon@girardsharp.com

9

10                              By: */s/ Rachel B. Abrams*
                                Rachel B. Abrams (SBN 209316)

11                                 **PEIFFER WOLF CARR KANE
                                CONWAY & WISE, LLP**

12                                 555 Montgomery Street, Suite 820
                                San Francisco, CA 94111

13                                 Telephone: (415) 426-5641
                                Facsimile: (415) 840-9435

14                                 rabrams@peifferwolf.com

15                              By: */s/ Roopal P. Luhana*
                                Roopal P. Luhana

16

17                                 **CHAFFIN LUHANA LLP**
                                600 Third Avenue, 12th Floor

18                                 New York, NY 10016
                                Telephone: (888) 480-1123

19                                 Facsimile: (888) 499-1123
                                luhana@chaffinluhana.com

20                                 *Co-Lead Counsel*

21

22

23

24

25

26

27

28

1

**<u>FILER'S ATTESTATION</u>**

2

     I am the ECF User whose ID and password are being used to file this document. In

3

compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

4

5

Dated:  November 10, 2025         By:    */s/ Ellyn Hurd*

6

                             Ellyn Hurd

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' OMNIBUS *DAUBERT* MOT.
CASE NO. 3:23-MD-03084