**<u>Exhibit P</u>**

# Exhibit B

# PLAINTIFF'S MOTION TO PARTIALLY EXCLUDE THE EXPERT REBUTTAL TESTIMONY OF LINDSAY ORCHOWSKI, PH.D.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

----------------------------------------X
IN RE: UBER TECHNOLOGIES, INC.,
PASSENGER SEXUAL ASSAULT LITIGATION


Case No. 24-cv-7940 (B.L.)
Case No. 24-cv-7821 (A.R.2)
Case No. 24-cv-7019 (LCHB128)
Case No. 23-cv-6708 (Dean)
Case No. 24-cv-4900 (WHB 832)
----------------------------------------X


*** HIGHLY CONFIDENTIAL ***


VIDEOTAPED DEPOSITION

OF

LINDSAY ORCHOWSKI, PH.D.

TUESDAY, NOVEMBER 11, 2025

HELD REMOTELY


Reported by:
CANDIDA BORRIELLO
Stenographic Reporter
JOB NO. 7005600-001

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1

2                    DATE:  November 11, 2025

3                    TIME:  9:03 a.m. (Eastern Time)

4

5

6      Deposition of LINDSAY ORCHOWSKI, PH.D., held

7    REMOTELY, before Candida Borriello, Court

8    Reporter and Notary Public of the State of

9    New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1

 2    A P P E A R A N C E S:

 3
      Appearing on Behalf of MDL Plaintiffs:
 4
      CHAFFIN LUHANA LLP
 5            600 Third Avenue
              12th Floor
 6            New York, New York 10016
              (888) 480-1123
 7    BY:     ROOPAL LUHANA, ESQ.
      EMAIL:  Luhana@chaffinluhana.com
 8
                        - and -
 9
      CHAFFIN LUHANA LLP
10            615 Iron City Drive
              Pittsburgh, Pennsylvania 15205
11            (412) 345-8144
      BY:     MICHAEL SWEET, ESQ.
12    EMAIL:  Sweet@chaffinluhana.com

13

14    HAUSFELD
              One Marina Park Drive
15            Suite 1410
              Boston, Massachusetts 02210
16            (617) 207-0602
      BY:     STEVE ROTMAN, ESQ.
17    EMAIL:  srotman@hausfeld.com

18

19    Appearing on Behalf of Uber Defendants
      and the Witness:
20
      KIRKLAND & ELLIS LLP
21            609 Main Street
              Houston, Texas 77002
22            (713) 836-3531
      BY:     ALEXANDRA CARITIS, ESQ.
23    EMAIL:  alexandra.caritis@kirkland.com

24
          (Appearances continued on next page.)
25
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1

2    A P P E A R A N C E S:   (Continued)

3

4    ALSO PRESENT:

5

          MJ ZIMDAHL, Videographer
6
          LANCE HOEPPNER, Trial Technician
7
          REENEE GANGOPADHYAY, Paralegal
8         Chaffin Luhana LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1

2            THE VIDEOGRAPHER:  Good morning.

3     We are going on the record today at

4     14:03 UTC time on November 11, 2025.

5            Audio and video recording will

6     continue to take place until all

7     parties agree to go off the record.

8     Please note that microphones are

9     sensitive and may pick up whispering

10    and private conversations.

11           This the video recorded proceeding

12    of Dr. Lindsay Orchowski taken in the

13    matter of In Re:  Uber Technologies,

14    Inc., Passenger Sexual Assault

15    Litigation.  This proceeding is being

16    held via remote videoconference.

17           My name is MJ Zimdahl, and I'm a

18    videographer on behalf of US Legal

19    Support.  I'm not related to any party

20    in this action, nor am I financially

21    interested in the outcome.

22           The court reporter is Candida

23    Borriello, also on behalf of US Legal

24    Support.

25           Counsel will state their

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1

2         appearances for the record, after

3         which the court reporter will enter

4         the statement for remote proceedings

5         into the record and swear in the

6         witness.

7              MS. LUHANA:  Roopal Luhana,

8         Chaffin Luhana, for the MDL

9         plaintiffs.

10             MR. SWEET:  Michael Sweet, Chaffin

11        Luhana, MDL plaintiffs.

12             MS. CARITIS:  Alexandra Caritis,

13        Kirkland & Ellis, for Uber defendants

14        and the witness.

15             MR. ROTMAN:  Steve Rotman, MDL

16        plaintiffs, Hausfeld.

17             MS. GANGOPADHYAY:  Reenee

18        Gangopadhyay, paralegal at Chaffin

19        Luhana for plaintiffs.

20   L I N D S A Y   O R C H O W S K I,

21     called as a witness, having been

22     duly sworn by a Notary Public,

23     was examined and testified as

24     follows:

25                    - oOo -

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2

 3     EXAMINATION BY

 4     MS. LUHANA:

 5        Q.   Good morning, Dr. Orchowski.  My

 6     name is Roopal Luhana.  I'll be asking you

 7     questions today on behalf of the MDL

 8     plaintiffs.

 9             Can you please state your full

10     name?

11        A.   Yes, Lindsay Marie Orchowski.

12        Q.   Have you ever been deposed before,

13     Doctor?

14        A.   No, this would be my first

15     experience here.  There was a time in

16     graduate school where I was in a clinical

17     psychology practicum and one of the reports

18     that I wrote for one of the children I was

19     assessing was included in a legal proceeding.

20     So I was on the stand in that case, but I

21     don't believe it was a deposition.

22        Q.   But you gave testimony there.  So

23     have you ever given testimony in court other

24     than that experience in grad school?

25        A.   No.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        Q.   So if I -- I just want to run
 3   through the ground rules of this deposition
 4   so we're all clear.  If I ask you a question
 5   and you don't understand the question, please
 6   let me know and I'll do my best to rephrase
 7   it, okay?
 8             And if you answer my question, I
 9   will assume you understood the question; is
10   that fair?
11        A.   Sounds good.
12        Q.   And that's another important thing,
13   you nodded your head previously, all your
14   responses have to be verbal so the court
15   reporter can take that down, okay?
16        A.   Thank you.
17        Q.   So please make sure I finish --
18   wait until I finish with my question until
19   you answer.  And let's do our best not to
20   talk over one another so we have a clear
21   record.
22             Does that make sense?
23        A.   Sounds good.
24        Q.   And so -- and during the
25   deposition, you understand you're not
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2   permitted to have any other open devices with
3   you?
4             THE COURT REPORTER:  You nodded
5        again.
6             THE WITNESS:  Okay.  I'm gonna get
7        used to that.
8        A.   Yes.
9        Q.   So asides from the computer that
10  you're on, the laptop you're on, and your
11  phone, are there any other electronic devices
12  with you?
13       A.   No.  And I've just turned my phone
14  over.
15       Q.   Okay.  And you understand that
16  you're not allowed to communicate with your
17  attorneys via your phone during the
18  deposition?
19       A.   Yes.
20       Q.   Doctor, have you prepared any notes
21  with you that you've brought with you today?
22       A.   I have a copy of the report that
23  I've written with me and I also have a copy
24  of the report that I've reviewed.
25       Q.   And what report is that that you've
```

```
 1        L. Orchowski - Highly Confidential
 2   reviewed?
 3        A.    The report by Dr. Valliere.
 4        Q.    Doctor, do you read the news?
 5        A.    I do.
 6        Q.    What newspapers do you read?
 7        A.    Generally what comes to my feed on
 8   Apple News.
 9        Q.    Okay.  And any other newspapers
10   asides from what you received from your feed
11   in Apple News?
12        A.    I receive some magazines, so I have
13   a magazine from Dartmouth College that I
14   receive.  I have the APA Monitor that I
15   receive, it's like a publication for
16   psychologists that comes to me.
17        Q.    Do you read the New York Times?
18        A.    From time to time when it comes up
19   on my news feed.
20        Q.    Okay.  Doctor, would you agree that
21   sexual assault has far-reaching consequences
22   for victims?
23            MS. CARITIS:  Objection.  Form.
24        Scope.
25        Q.    You can answer.
```

```
 1          L. Orchowski - Highly Confidential
 2          A.    The statement that sexual assault
 3    has far-reaching consequences for victims is
 4    often something that is written in scientific
 5    publications.
 6          Q.    Well, my question is different.  My
 7    question is:  Would you agree that sexual
 8    assault has far-reaching consequences for
 9    victims?
10               MS. CARITIS:  Same objections.
11               And Doctor, just so you know, when
12          I object, except for privilege, if I
13          object to form or something along
14          those lines, you can still answer
15          Ms. Luhana's objection [sic].  Thank
16          you for pausing to allow me to object,
17          but you -- you're free to answer after
18          I've made that objection for the
19          record.
20               THE WITNESS:  Okay.  Thank you.
21               (Audio distortion.)
22               THE COURT REPORTER:  There's a
23          little bit of audio distortion.
24          There's a little bit of audio
25          distortion, I can't hear the witness.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2               THE WITNESS:  I'll try that again.

 3          A.   So for many individuals who

 4     experience sexual victimization, there could

 5     be a number of consequences.

 6          Q.   Okay.  You'd agree that the

 7     psychological consequences associated with

 8     sexual assault are wide-ranging including

 9     symptoms of post-traumatic stress disorder?

10               MS. CARITIS:  Form and scope.

11          A.   Yeah.  So the text that you're

12     referring to sounds like text that is

13     commonly discussed in research articles

14     citing the psychological consequences of

15     sexual assault.

16          Q.   My question is slightly different.

17               My question is, do you agree that

18     the psychological consequences associated

19     with sexual assault are wide-ranging,

20     including symptoms of post-traumatic stress

21     disorder?

22               MS. CARITIS:  Form and scope.

23          A.   The psychological consequences of

24     sexual assault for some individuals indeed

25     can include post-traumatic stress disorder as
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    well as other consequences.
 3        Q.   Doctor, would you agree that the
 4    response to trauma is highly individual and
 5    that there is no single pattern or formula?
 6            MS. CARITIS:  Objection.  Form.
 7        Scope.
 8        A.   That also sounds like another
 9    commonly discussed component of trauma that's
10    in the scientific literature that reactions
11    to traumatic experiences can really vary.
12    There's really no one pathway.
13        Q.   So Doctor, I understand you're
14    referring to literature, but these questions
15    I'm asking you in your professional capacity
16    as an expert here.
17            And so my question once again would
18    be, would you agree that the response to
19    trauma is highly individual and that there is
20    no single pattern or formula?
21            MS. CARITIS:  Same objections.
22        A.   So it would be of my professional
23    opinion that the responses to trauma do vary.
24        Q.   Trauma, especially PTSD symptoms,
25    can include avoidance and emotional numbing,
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   including complications of sexual

 3   functioning.

 4             Would you agree with that?

 5             MS. CARITIS:  Form.  Scope.

 6        A.   Could you repeat the question?

 7        Q.   Sure.

 8             Trauma, especially PTSD symptoms,

 9   can include avoidance and emotional numbing

10   including complications in sexual

11   functioning?

12             MS. CARITIS:  Same objections.

13        A.   Yeah, I'm a bit confused by the

14   phrasing of the question because PTSD itself

15   isn't a form of trauma, but rather a

16   psychological diagnosis.

17        Q.   But would you agree with that

18   statement in how it's framed?

19             MS. CARITIS:  Form.  Scope.  She

20        just said she didn't.

21        Q.   Doctor, are you aware that you had

22   posted -- you were a guest speaker on a talk

23   for the 82nd Combat Aviation Brigade.

24             Do you recall that in 2021?

25        A.   Can you provide the place of that
```

1       L. Orchowski - Highly Confidential

2   presentation?

3       Q.   Sure.  It was on YouTube and the

4   talk was called What Works in Sexual Assault

5   Prevention.

6            Do you recall that talk?

7       A.   What was the location of the talk?

8       Q.   It was for the 82nd Combat Aviation

9   Brigade and you did a talk via Zoom.

10      A.   Oh, so this was a Zoom presentation

11  for Pegasus Priority Initiative.

12      Q.   I believe so.  Do you recall that

13  talk?

14      A.   It's been a while since the

15  presentation and I haven't watched it via

16  YouTube, but that does sound like something

17  that I've done on my CV.

18      Q.   Okay.  So I will represent that's a

19  direct quote from something you presented at

20  that talk where you said:

21           Trauma, especially PTSD symptoms,

22  can include avoidance and emotional numbing,

23  including complications and sexual

24  functioning.

25           So would you agree with that

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2    statement today?

 3            MS. CARITIS:  Form.  Scope.

 4        A.   So I think if I could go back in

 5    time, and I had a really lovely ability to

 6    have the most clear statements while I'm

 7    giving a talk, I would reword that to be a

 8    bit more specific in my words.

 9            We talk about PTSD, that's a

10    psychological diagnosis.  And trauma

11    specifically can include a lot of different

12    after-effects including PTSD, including

13    things like difficulties in sexual

14    functioning.

15            So if I could reword that talk, I

16    think I would've been more precise.

17        Q.   And what would you say?  Would you

18    say trauma can include avoidance and

19    emotional numbing, including complications in

20    sexual functioning?

21            MS. CARITIS:  Objection.  Form.

22        Scope.

23        A.   Again, if I could go back and

24    reword that to be more precise, I would talk

25    about the symptoms of things like PTSD,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2    including numbing and avoidance and also
 3    consequences of trauma including symptoms
 4    such as difficulties in sexual functioning.
 5          Q.   Can you discuss what other symptoms
 6    of trauma you're aware of?
 7               MS. CARITIS:  Objection.  Form.
 8               Roopal, just so I don't have to
 9          keep doing this, can I have a standing
10          objection to form and scope for
11          discussions concerning psychological
12          symptoms or her personal and
13          professional opinions regarding the
14          impact of sexual assault on victims?
15               MS. LUHANA:  No, I prefer you make
16          the statement so we have a clear
17          record, make the objections.  She is
18          an expert and she is a psychologist
19          here testifying and so this is well
20          within the scope.
21          Q.   So Doctor, go ahead and answer the
22    question.
23               MS. CARITIS:  For the record,
24          she's here today to respond to
25          Dr. Valliere and she did not see any
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          of the plaintiffs here, did not treat

 3          them in any sort of clinical setting,

 4          so this is well beyond the scope of

 5          her report.  Understood your point and

 6          I will continue to object to each

 7          individual question as I see fit.

 8              MS. LUHANA:  We can agree to

 9          disagree.  And your objections, Alex,

10          should be limited to scope -- I mean,

11          sorry, form.

12          Q.   Go ahead, Doctor.  You were

13   discussing --

14          A.   Can you repeat the question?

15          Q.   It was -- you were discussing what

16   you believe the symptoms of trauma are.

17              MS. CARITIS:  Objection.  Form.

18          Scope.

19          A.   There can be a number of different

20   after-effects of trauma, PTSD is one common

21   one.  Other things, for example, depression,

22   anxiety, physical symptoms as well.

23          Q.   And what types of physical

24   symptoms?

25              MS. CARITIS:  Form.  Scope.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          A.   Depending on the type of trauma,

 3     individuals may have gastrointestinal

 4     problems, for example, concerns with sexual

 5     functioning, for example.

 6          Q.   Anything else?

 7               MS. CARITIS:  Form.  Scope.

 8          A.   It would really depend on -- depend

 9     on the type of trauma.

10          Q.   And so what types of trauma are

11     there?

12               MS. CARITIS:  Form.  Scope.

13          A.   Trauma can be wide-ranging across

14     the lifespan, include things like a first

15     childhood experiences.

16          Q.   Doctor, I'm focused on trauma from

17     sexual violence when you're an adult.

18               MS. CARITIS:  Form.  Scope.

19          A.   I'm not sure what you're asking.

20          Q.   So my question is some of the

21     symptomatology, the physical symptoms of

22     trauma from sexual violence when you're an

23     adult.

24               MS. CARITIS:  Same objections.

25          A.   So again, it would depend on the
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     kind of assault, if there were any injuries
 3     sustained at the time of the assault.  So
 4     physiological injuries could be broad-ranging
 5     depending on the type of assault.
 6          Q.   Can you discuss those?  I'm trying
 7     to get an understanding of the types of
 8     injuries, and I believe you've written a
 9     great deal about it.  So I'm trying to get
10     your understanding as a psychological -- as a
11     psychologist about the psychological injuries
12     of trauma of sexual violence.  So can you
13     please explain?
14               MS. CARITIS:  Form.  Scope.
15          A.   So one specific physiological
16     injury that we've done a bit of publication
17     on, not much, is looking at sexual
18     functioning following the assault.  But the
19     majority of my work as a psychologist is
20     really focused on psychological
21     after-effects, so I can't speak much to
22     physiological injuries.
23          Q.   Okay.  Sexual assault victims often
24     live with persistent feelings of unsafety in
25     everyday environments.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2               Would you agree with that?
 3               MS. CARITIS:  Form.  Scope.
 4          A.   Could you repeat the question?
 5          Q.   Sure.
 6               Sexual assault victims often live
 7     with persistent feelings of unsafety in
 8     everyday environments.
 9               MS. CARITIS:  Same objections.
10          A.   The statement sounds like a
11     generalization about sexual assault
12     survivors.  Many survivors are resilient and
13     don't live every day with fear and for some
14     that may be the experience.  So I hesitate to
15     make any claim that applies to all survivors.
16          Q.   I'm not saying all survivors.  I'm
17     saying some may live with persistent feelings
18     of feeling unsafe in everyday environments as
19     a result of sexual trauma.
20               Would you agree with that?
21               MS. CARITIS:  Form.  Scope.
22          A.   Could you repeat the statement one
23     more time?
24          Q.   Sure.
25               My question to you is:  Some
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    survivors of sexual assault may live with
 3    persistent feelings of feeling unsafe in
 4    everyday environments as a result of the
 5    sexual assault trauma.
 6             MS. CARITIS:  Same objections.
 7        A.   And so your qualification here is
 8    really about the persistence of feeling
 9    unsafe?
10        Q.   No, just generally may have feeling
11    of feeling unsafe, sometimes they're
12    persistent, sometimes they may not be.  I'm
13    just discussing one of the results of trauma
14    of -- from sexual assault can lead you
15    feeling unsafe in everyday environments.
16             Would you agree with that?
17             MS. CARITIS:  Same objections.
18        A.   I don't think I've done any
19    research personally to look at persistent
20    feelings of safety or lack of safety in
21    everyday environments.
22        Q.   How about general feelings of --
23             (Cross-talk.)
24        Q.   I apologize, Doctor.  I didn't mean
25    to interrupt you.
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2               What about general feelings of
 3    unsafety in everyday environments as a result
 4    of being a victim of sexual assault?
 5               MS. CARITIS:  Same objections.
 6          A.   Yeah.  Again, I can't recall any
 7    other research that I've done that's looking
 8    at general feelings of a measure of unsafety
 9    in everyday environments.
10          Q.   What about your -- just your
11    experience as a psychologist treating
12    patients, have you treated a patient, a
13    sexual assault survivor, who had feelings
14    of -- feeling -- have had persistent feelings
15    of unsafety in everyday environments?
16               MS. CARITIS:  Same objections.
17          A.   Thinking of my caseload, no, I
18    don't think that's come across in any of my
19    clinical encounters.
20          Q.   Okay.  How often are you treating
21    survivors of sexual assault?
22          A.   I see patients on a weekly basis.
23          Q.   That's wasn't my question.  My
24    question was about treating survivors of
25    sexual assault, how often are you treating
```

```
 1        L. Orchowski - Highly Confidential

 2    survivors of sexual assault?

 3        A.    I see patients on a weekly basis

 4    and my patients include survivors of sexual

 5    assault.

 6        Q.    We'll get to that later in terms of

 7    your caseload.

 8             Doctor, anxiety disorders and panic

 9    attacks are commonly triggered by reminders

10    of assault.

11             Would you agree with that?

12             MS. CARITIS:  Objection.  Form.

13    Scope.

14        A.    I disagree with the statement

15    "common," there's a lot of heterogeneity how

16    folks respond to reminders of assaults.

17        Q.    So would you agree that anxiety

18    disorders and panic attacks are triggered by

19    reminders of assault?

20             MS. CARITIS:  Same objections.

21        A.    Yeah.  Again, I would say it

22    depends, really depends on the individual.

23    There's no one common response.

24        Q.    So therefore, just so I'm clear,

25    you're saying sexual assault survivors can be
```

```
 1         L. Orchowski - Highly Confidential
 2    triggered by reminders of assault with
 3    anxiety disorders and panic attacks?
 4              MS. CARITIS:  Form.  Scope.
 5         A.   No, that's not what I said.  I'll
 6    repeat that I said the responses to sexual
 7    assault are heterogeneous.
 8         Q.   Sure.  But that can be one
 9    response, right, an anxiety disorder and
10    panic attack can be triggered by a reminder
11    of an assault for some survivors?
12              MS. CARITIS:  Form.  Scope.
13         A.   Can you repeat the question?
14         Q.   My question is:  Anxiety disorder
15    and panic attacks can be triggers as when
16    sexual assault survivors are reminded of the
17    assault?
18              MS. CARITIS:  Form.  Scope.
19         A.   I would disagree.  Being reminded
20    of an assault doesn't cause an anxiety
21    disorder.
22         Q.   I'm not saying it causes it, it
23    can -- well, would you agree that it can
24    trigger anxiety or potentially a panic
25    attack?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2              MS. CARITIS:  Form.  Scope.
 3          A.    For some individuals, being
 4    reminded of a traumatic experience could lead
 5    to a sense of anxiety.
 6          Q.    Depression following sexual assault
 7    may lead to health complications and feelings
 8    of self harm.
 9              Would you agree with that?
10              MS. CARITIS:  Form.  Scope.
11          A.    It is not uncommon for individuals
12    to have psychological consequences following
13    sexual assault, such as depression.  And
14    there are also research studies suggesting
15    that something like self harm could also be a
16    consequence of sexual victimization.
17          Q.    Sexual dysfunction and aversion to
18    intimacy are -- can be immediate and
19    long-term psychological issues that result
20    from sexual assault.
21              Would you agree?
22              MS. CARITIS:  Form.  Scope.
23          A.    I would likely use different words.
24    I would say that consequences of sexual
25    victimization can, for some individuals,
```

1        L. Orchowski - Highly Confidential

2    include concerns relating to sexual

3    functioning.

4        Q.    Would you agree that the effects of

5    sexual trauma for some may extend for years

6    or decades after the event?

7            MS. CARITIS:  Form.  Scope.

8        A.    The experiences of sexual

9    victimization can extend -- the consequences

10   of sexual victimization can extend after an

11   assault.  I'm not aware of literature that

12   suggests precisely how long consequences last

13   for.

14       Q.    Would you agree that without proper

15   support or therapy, recovery can be

16   significantly impaired?

17           MS. CARITIS:  Objection.  Form.

18       Scope.

19       A.    That's actually a really

20   interesting question.  The field thinks a lot

21   about this notion of spontaneous recovery and

22   resilience.  And in fact it's a really big --

23   big thing the field is interested in right

24   now is kind of moving from a focus on the

25   consequences of sexual assault, as you've

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2    been discussing, to really looking at how

 3    many folks are resilient following

 4    experiences of victimization.

 5             So one of the things in the line of

 6    questioning so far is really not attending to

 7    the growth that is experienced by many

 8    survivors regardless of whether or not they

 9    seek therapy.  So the work going on right now

10    in the field is really looking at even

11    something called post-traumatic growth, how

12    for many survivors there is a sense of

13    resilience.

14             So I'm glad you brought that up.  I

15    can't speak to kind of the number of

16    survivors who seek therapy, but also would

17    raise the point that there are many survivors

18    that likely don't seek therapy, and the field

19    is really interested in right now on -- in

20    this notion of resilience.

21        Q.   Doctor, that wasn't my question.  I

22    appreciate your response, but my question is

23    focused on the folks that haven't gotten

24    proper support or therapy.

25             Would you agree that recovery for
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   some can be significantly impaired?
 3            MS. CARITIS:  Same objections.
 4        A.   Yeah, I don't --  I don't think I
 5   can -- I can speak to that.  I'm not -- I'm
 6   not sure.  I know folks (audio distortion) --
 7            THE COURT REPORTER:  I'm sorry.
 8            There is a little bit of distortion
 9            again.  Is it only on my end?
10            MS. CARITIS:  It's been really
11            good, Doctor, but right there you did
12            cut out a teensy bit.
13        A.   Yeah, I don't think I can speak to
14   that question.
15        Q.   Okay.  Doctor, would you agree that
16   sexual assault can disrupt family, work and
17   social relationships?
18            MS. CARITIS:  Form.  Scope.
19        A.   For some individuals it could have
20   consequences that reach relationships.
21        Q.   Doctor, would you agree victims
22   often experience stigma or fear of not being
23   believed?
24            MS. CARITIS:  Same objections.
25        A.   It would depend on the particular
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    individual, but there is research looking at

3    stigma associated with sexual victimization.

4        Q.   And would you agree that some

5    victims can experience stigma or fear of not

6    being believed, in your professional capacity

7    as an expert here today?

8             MS. CARITIS:  Same objections.

9        A.   I believe there's some research out

10   there looking at fear of being believed.

11       Q.   Doctor, I'm -- you're an expert

12   here and you're a psychologist and I

13   understand you're referencing the research.

14   But I'd like to know your professional

15   opinion as to if victims may experience

16   stigma or fear of not being believed?

17            MS. CARITIS:  Same objections.

18       A.   I prefer to ensure that I'm rooting

19   my statements in a specific research article.

20   So I'll state again that there -- I believe

21   there is research out there looking at fear

22   of being believed as well as stigma as

23   components of the experience of survivorhood.

24       Q.   Doctor, you're a practicing

25   psychologist, correct?

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          A.    That is correct.

 3          Q.    So you hold opinions of your own,

 4     maybe based on the research, but you hold

 5     opinions on your own.  So I'm looking for

 6     your professional opinion here whether

 7     victims may experience stigma or fear of not

 8     being believed?

 9               MS. CARITIS:  Form.  Scope.

10          A.    In -- my purpose in preparing this

11     report is really to rebut the Valliere

12     report.  So I apologize if I don't have some

13     of the articles that I wish I could refer to

14     here off the tip of my tongue.  And knowing

15     that this is a court proceeding, I don't want

16     to say anything or cite a research article.

17     But I can say broadly generally it is my

18     opinion that there is research out there

19     connecting fear of being believed to

20     survivorhood.

21          Q.    Would you agree survivors may lose

22     employment, academic or even professional

23     standing due to the impact of sexual assault?

24               MS. CARITIS:  Same objections.

25          A.    So the consequences -- I believe
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2    there is research out there looking at
 3    academic consequences, also consequences of
 4    sexual assault that extend to the workplace.
 5         Q.   Doctor, remember that presentation
 6    that I referenced earlier, that Zoom
 7    presentation you did in 2021?  That's a
 8    direct quote from it.  So would you like to
 9    rephrase that statement now for us today
10    thinking back on it and the question is --
11    let me reframe.  Let me ask the question
12    again.
13              Would you agree that survivors may
14    lose employment, academic or even
15    professional standing due to the impact of a
16    sexual assault?
17              MS. CARITIS:  Objection.  Form.
18         Scope.
19         A.   So your question is whether I want
20    to rephrase what I said in the presentation?
21         Q.   My question is, do you agree with
22    your prior statement or do you want to
23    rephrase it as you did the earlier one today?
24              MS. CARITIS:  Form.  Scope.
25         A.   You know, so without the specific
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2    text of my presentation of the articles that

 3    I'm referring to, today I'm comfortable

 4    saying broadly that the consequences of

 5    assault can include, for some individuals,

 6    academic or workplace consequences.

 7        Q.    Doctor, some victims may develop

 8    substance abuse problems as a means of

 9    coping.

10            Would you agree with that?

11            MS. CARITIS:  Form.  Scope.

12        A.    Substance abuse is a common

13    consequence of the sexual victimization as

14    well.

15        Q.    Doctor, would you agree long-term

16    economic harm may result from the inability

17    to work, maintain personal or professional

18    relationships or maintain stable housing as a

19    result of sexual assault?

20            MS. CARITIS:  Same objections.

21        A.    Yeah.  So there's a lot of

22    components to that question, I would refer

23    you to a Peterson, et al., article in 2017

24    published by Peterson and members of the

25    Centers of Disease Control that looked at the

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   US economic burden of sexual victimization.
 3   That article reports specifically on the
 4   lifetime burden of sexual violence, which
 5   includes many different kinds of economic
 6   costs.
 7        Q.   So do you, in your professional
 8   capacity, hold that opinion?  And once again,
 9   I'll reference that Zoom 2021 presentation
10   and this is pulled from that presentation, so
11   do you still agree with the statement that
12   long-term economic harm may result from
13   inability to work, maintain personal or
14   professional relationships or maintain stable
15   housing as a result of sexual assault?
16             MS. CARITIS:  Objection.  Form.
17             Roopal, to the extent you have the
18             presentation, it might be helpful for
19             her to see what she said and what
20             you're reading.  If you want her to
21             just go off her memory, she, of
22             course, can do that, but it looks like
23             you might be reading from something
24             directly.
25             MS. LUHANA:  Understood, Counsel.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          Q.   Go ahead, Doctor.

3          A.   Can you repeat the question?

4          Q.   Would you agree that long-term

5     economic harm may result from inability to

6     work, maintain personal or professional

7     relationships or maintain stable housing as

8     the result of sexual assault?

9               MS. CARITIS:  Same objections.

10         A.   My sense is that I was referring to

11    the Peterson article, which lists a number of

12    the different economic consequences that can

13    be associated with sexual victimization.  So

14    I'd refer to the Peterson article for

15    something very specific on the different

16    kinds of consequences.

17         Q.   Outside the Peterson article in

18    your professional capacity as a psychologist,

19    what is your opinion?

20              MS. CARITIS:  Same objections.

21         A.   Yeah, I would say there's a number

22    of potential economic consequences of sexual

23    victimization.

24              MS. LUHANA:  Let's go ahead and

25         pull up and let's mark RL1 as

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential

2        Exhibit 1, that's Dr. Orchowski's

3        rebuttal.  And let's go ahead and mark

4        as Exhibit 2, the depo notice, which

5        is RL2.

6              Actually, let's pull up first the

7        depo notice, which is Exhibit 2.

8              (Exhibit 1, Rebuttal Expert Report

9        of Lindsay Orchowski, Ph.D., was

10       marked for identification.)

11             (Exhibit 2, Notice of Deposition,

12       was marked for identification.)

13       Q.   Doctor, have you seen this notice

14  previously?

15             MS. CARITIS:  Could you scroll

16       through just a few pages so she could

17       take a look?

18       A.   Yes, I've seen this.

19       Q.   Let's focus on the second page,

20  let's put it there.

21             So Doctor, did you bring any of the

22  requested materials to the deposition with

23  you?

24       A.   I refer to the attorneys here for

25  that information.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2        Q.   Well, let's actually run through

 3   it.

 4             So the first thing here asks for a

 5   copy of your CV.  And is that what was

 6   produced as Exhibit B to your rebuttal

 7   report?

 8        A.   Yeah, my CV is included in the

 9   report.

10        Q.   Okay.  I actually misspoke.  It's

11   Exhibit A to the rebuttal report; is that

12   right?

13        A.   Do you want me to check to make

14   sure it's Exhibit A?

15        Q.   Yes, please.

16        A.   Yes, my CV is included as

17   Exhibit A.

18        Q.   Okay.  And then it asks for a list

19   of all publications you authored or

20   contributed to, if not included in your CV.

21             And have you produced all those?

22        A.   Everything that I produced is

23   included in my CV.

24        Q.   Okay.  Number 3 asks for a list of

25   cases in which you have testified either at

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential
2     trial or in deposition, if not included with
3     your expert report.
4              So has that been included with your
5     expert report?
6          A.   To my knowledge, this is the only
7     trial or deposition that I've testified in.
8     I'm not -- I don't think that the graduate
9     school experience would be included as any
10    formal kind of experience in this regard.
11         Q.   So Number 4 is a complete list of
12    all the materials you considered that
13    informed your opinions or influenced your
14    testimony in this matter, including, but not
15    limited to, all published and unpublished
16    literature, documents, depositions,
17    transcripts, articles, interview and data
18    reviewed or relied on by you in formulating
19    your opinions offered in this case, including
20    those items not listed on your materials
21    considered list.
22              Have you produced all those?
23         A.   So I'll note for my report, I
24    reviewed the Valliere report and should be --
25    and what should be considered including in
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   that is all of the sources that Valliere
 3   cited.  So I was provided with a copy of
 4   everything included in Valliere's report.  So
 5   I want to make sure that's included in the
 6   list of materials that is referenced.
 7        Q.   So Doctor, if you take a look
 8   at Exhibit 1, which is your report, and
 9   Exhibit A -- I'm sorry, Exhibit B to your
10   report, it includes the list of materials
11   cited and considered, correct?
12        A.   Yes, includes the list of materials
13   cited and considered.
14        Q.   However it doesn't list any of the
15   underlying materials that Dr. Valliere
16   included in her report, does it?
17             MS. CARITIS:  Form.
18        A.   That is likely my naivety.  As I
19   mentioned, this is my first time here.  So
20   for me as a scientist, when I review
21   something, I make sure I look at their
22   primary sources.  So that was one thing that
23   I did ask the legal team is to ensure that
24   they provide me with all of the sources that
25   Valliere cited.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1            L. Orchowski - Highly Confidential

 2                  I'd be happy to amend that.  But

 3      when I'm citing expert report of Valliere,

 4      for me that includes all of the sources that

 5      she's also citing.

 6            Q.   Yeah, you didn't list them on

 7      Exhibit B, correct?

 8            A.   I'd be happy to amend that.

 9            Q.   Doctor -- okay.  Doctor, did you

10      put together Exhibit B?

11                  MS. CARITIS:  Form.

12            A.   Yes, this includes all of the

13      things that I listed.

14            Q.   That's not my question.  I said,

15      did you put together Exhibit B?

16                  (Cross-talk.)

17                  MS. CARITIS:  Form.

18                  THE WITNESS:  Sorry.

19                  MS. CARITIS:  Go ahead.

20            A.   I provided a list of all the

21      materials and -- cited and considered, yes.

22            Q.   So you provided this list to

23      counsel and counsel put together Exhibit B?

24                  MS. CARITIS:  Form.  Objection to

25            the extent this calls for any drafts
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          or privilege putting it together.

3               Doctor, you can broadly talk about

4          your understanding about how the

5          materials considered list was

6          generated, but we're not going to get

7          into any discussions with counsel with

8          drafts.  As you know, Roopal.

9          Q.   Doctor, I don't mean to get into

10    any discussions of drafts.  However, I'm

11    entitled to know the facts and data you

12    considered in forming your opinions and part

13    of that is a materials you consider.

14               And so I'm focused on Exhibit B

15    that was produced with your report in this

16    final version, did you put this final version

17    together?

18               MS. CARITIS:  Objection.  Form.  I

19          just want to be clear, are you asking

20          if she put together the report or if

21          she literally made the materials

22          considered?  I just don't understand

23          the question.

24               MS. LUHANA:  Counsel, please limit

25          your objections to form.  You're

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2        making speaking objections and
3        attempting to coach the witness,
4        which, as you know, is improper.
5            MS. CARITIS:  Not coaching the
6        witness, it's an unclear objection
7        understood.  Form.
8        Q.   Doctor, did you put together
9   Exhibit B?  Is this what you put together for
10  your report, Exhibit B?
11       A.   This is my list of materials and
12  references cited and considered.
13       Q.   Doctor, that's not what I asked.
14           My question is, did you put
15  together Exhibit B?
16       A.   I guess I'm confused in what you
17  asked.  This is the list that I provided in
18  my report.
19       Q.   The list that you provided in your
20  report, but this, Exhibit B, is attached to
21  your report, and I'm asking you, did you put
22  this together or did someone else?
23       A.   Yes, I made this.
24       Q.   Okay.  Let's go to all sources of
25  data or other information considered or
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2    relied upon by you in forming your opinions
 3    in this matter.
 4              Did you provide all of those?
 5         A.    (Document review.)
 6              Yeah, so the list of materials
 7    cited and considered is complete in regards
 8    to everything that I've cited in the report.
 9    I guess I'm -- there's a lot of information
10    that has gone into building my professional
11    expertise, and certainly I didn't cite
12    everything I've read along in the past
13    20 years.  But specific to this report, yes,
14    I've provided the information that I've
15    considered and relied upon in forming the
16    opinions of this matter.
17              I'll also note that regarding the
18    report of Dr. Valliere, I would include in
19    that expert report her citation of any
20    sources listed in that report, which I was
21    also provided with and have been able to
22    access as I've made this opinion.
23         Q.    Number 6 says:
24              All documents or materials you
25    reviewed since the date of your report that
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     you have not specifically identified in your

3     report in preparation for your expected

4     testimony.

5          A.    I have nothing to add.

6          Q.    So to the extent you relied on a

7     specific source, it was cited in your report;

8     is that correct?

9               MS. CARITIS:   Form.

10          A.    I'll go back to noting there's a

11     lot of professional knowledge that I've

12     accumulated.   When I have cited specific

13     professional sources, I have included them in

14     this list.

15          Q.    However -- I understand with your

16     professional sources, I'm focused on --

17     actually, withdrawn.   We'll get to that.

18               Let's look at Number 7 and

19     itemization of the hours spent and

20     compensation paid or to be paid for your work

21     in this matter and your staff's work in this

22     matter, including all invoices you have

23     submitted to counsel.

24               Have you produced those?

25          A.    Yes.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        Q.   Documents sufficient to show your
 3   ride history on the Uber app.
 4             Have you produced those to counsel?
 5        A.   I'll direct that to counsel.  I'm
 6   happy to make any of my Uber profile
 7   available.  I don't think I've ever even
 8   looked at it myself.
 9             MS. LUHANA:  Okay.  Let's take
10        this down.
11        Q.   Doctor, where are you located
12   today?
13        A.   I'm in Providence, Rhode Island.
14        Q.   Okay.  And I see you have counsel
15   present on the Zoom.  Can you please identify
16   counsel?
17        A.   Alexandra is here today.
18        Q.   And when were you retained as an
19   expert in this case?
20        A.   Very -- I can pull the date back
21   up.  It's likely listed on the invoice,
22   should be kind of right around like
23   October 10th-ish.
24        Q.   Okay.  And do you know how they
25   found out about you or how they found you?
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        A.    I don't.  That would be -- that
 3   would be interesting to know.
 4        Q.    And who first contacted you about
 5   being an expert?
 6        A.    Christopher.
 7        Q.    Christopher who?
 8        A.    Last name Talbot.
 9        Q.    Doctor, were you aware of Uber's
10   sexual assault problem at the time they
11   reached out to you?
12              MS. CARITIS:  Form.
13        A.    I had heard one thing on Apple News
14   in conversation and that was my only
15   awareness of it.
16        Q.    What was the assignment that you
17   were paid to do here?
18        A.    I had a specific task to review
19   Dr. Valliere's report and provide a
20   scientific opinion on it?
21        Q.    Did defense counsel ask you to make
22   any assumptions?
23        A.    What do you mean by that?
24        Q.    Well, did they ask you to assume
25   anything for the purpose of forming your
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2   opinions in your report?

3        A.   No, I don't believe so.  I'm not

4   quite sure what you mean.  But my specific

5   task was to review Dr. Valliere's report and

6   provide a scientific assessment.

7        Q.   Do you know what individual cases

8   your report is being submitted for?

9        A.   No, I don't.  I was provided with

10  all the materials that I was cited by the

11  Valliere report, but I'm not aware of

12  individual cases.

13       Q.   Did you ask?

14       A.   My report is really specific to

15  Dr. Valliere's report.

16       Q.   So you didn't ask about what

17  individual cases your report is being

18  submitted for?

19       A.   No, that's wasn't my tasking.  My

20  tasking was specific to Dr. Valliere's

21  report.

22       Q.   Doctor, were you provided with a

23  copy of the master complaint in this case?

24       A.   Can you describe what that is?

25       Q.   The master allegations in this

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   case, were you provided with a copy of that
 3   complaint?
 4        A.   I was provided with a copy of
 5   Dr. Valliere's report and anything that was
 6   cited in that report.
 7        Q.   So sitting here today, Doctor,
 8   since you're providing an opinion on
 9   Dr. Valliere's report, my question to you is,
10   did you review the master complaint?
11        A.   Would you be able to show it to me
12   and then I can let you know if I've seen it?
13        Q.   Well, they were the allegations in
14   this case that you're testifying about
15   brought by the sexual assault survivors
16   against Uber.
17             So do you recall seeing a
18   complaint?
19        A.   Yeah, if you'd be willing to show
20   it to me, I'd be happy to review and see if
21   it's something that was included in the
22   materials.
23        Q.   Doctor, but as a part of your
24   assignment that you were paid to do, you said
25   you reviewed the underlying materials to
```

1        L. Orchowski - Highly Confidential

2    Dr. Valliere's report, correct?

3        A.   So I was specifically engaged to

4    reviewed Dr. Valliere's report and provide a

5    scientific opinion.  If there were materials

6    provided that when she's referencing things

7    in the report, I have access to all those

8    files.  So I was making my report, my method

9    included cross-referencing those.

10        Q.   So Doctor, my question is, do you

11   recall reviewing the master complaint in this

12   case sitting here today?

13        A.   To answer that question, I'd like

14   to see a copy of that to ensure that I know

15   what you're talking about.

16        Q.   So sitting here today, you can't

17   recall whether you saw it or not?

18        A.   To answer your question, I'd like

19   to be provided with a copy of it so I can

20   better answer your question.

21        Q.   Well, Doctor, prior to issuing your

22   opinions in this case, you said you reviewed

23   certain documents, correct?

24        A.   I reviewed a copy of Dr. Valliere's

25   report and the documents that are cited in

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   her report.
 3        Q.   So my question is, do you recall
 4   reviewing the complaint sitting here today?
 5   So that's a yes or no question, Doctor.  Do
 6   you recall reviewing the master complaint?
 7        A.   If you could provide me with a copy
 8   of the master complaint, I'd be happy to take
 9   a look at it.
10        Q.   That's not answering my question
11   and it's a very easy question, Doctor.
12             Do you remember reviewing the
13   master complaint in this case, yes or no?
14             MS. CARITIS:  Form.  I'm not sure
15        she knows what you're referring to.
16             MR. LUHANA:  It's titled the
17        Master Complaint, Counsel.  No
18        speaking objections.  It's the
19        master -- it's the allegations in this
20        case.
21        Q.   Doctor, where would you go to
22   locate the materials that were provided to
23   you by counsel?
24             MS. CARITIS:  Form.
25        A.   I would -- so counsel provided me
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2    with a shared account of the files.  They
 3    have -- there's many different files there,
 4    which is why I'm having trouble making -- I
 5    want to answer your question honestly and
 6    correctly, but without a specific direction
 7    to which file you're talking about, I just
 8    want to be clear.
 9          Q.   But sitting here today, you can't
10    answer that question without me pulling up
11    the document; is that right?
12          A.   I would feel more comfortable
13    answering your question if you could pull up
14    the document, please.
15          Q.   That's not my question.
16               Sitting here today, you're not able
17    to answer whether you reviewed the master
18    complaint without me pulling it up; is that
19    right?
20               MS. CARITIS:  Form.
21          A.   I'm someone that likes a lot of
22    precision.  So in order to answer your
23    question, I want to make sure I'm not giving
24    you any false information.  So it would be --
25    I would request that I can see what you're
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    talking about because the term "master
 3    complaint" is not one that -- being a
 4    psychologist, not familiar with the legal
 5    realm.  I'm not sure I know what you're
 6    talking about.
 7        Q.   Well, are you aware of the
 8    allegations that were brought in this case
 9    against Uber by sexual assault survivors who
10    were assaulted by Uber drivers?
11             MS. CARITIS:  Form.
12        A.   I'm aware of what was discussed in
13    the Valliere report.
14        Q.   But my question is about the
15    underlying documents to the Valliere report.
16             So the master complaint contains
17    the allegations that were brought in this
18    case that you're providing testimony for
19    against Uber by sexual assault survivors who
20    were assaulted by Uber drivers.
21             So do you recall seeing that
22    complaint?
23             MS. CARITIS:  Form.
24        A.   I'm not -- I'm not sure I can
25    answer your question.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1      L. Orchowski - Highly Confidential

 2      Q.   Doctor, did you review the

 3   individual complaints in the bellwether

 4   cases?

 5      A.   I reviewed the files that were

 6   linked to the Valliere report.

 7      Q.   And how much time did you take

 8   reviewing the files?

 9      A.   The time is listed on the invoice.

10      Q.   Well, sitting here today, do you

11   recall how much time generally you spent

12   reviewing the underlying documents that

13   Dr. Valliere cited in her report?

14      A.   We could pull up the invoice.

15      Q.   Okay.  We'll get to that.

16          So sitting here today you can't

17   give me that answer without looking at your

18   invoice?

19      A.   I believe the invoice was --

20   were -- I would say at least -- so the whole

21   report preparation process after I was

22   retained has over 15 hours of work.  It

23   also -- yeah, so over 15 hours of work.

24      Q.   Doctor, did you first review

25   Dr. Valliere's report before you made the

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   decision to be retained as a rebuttal expert
 3   in this case?
 4             MS. CARITIS:  Form.
 5        A.  (No response.)
 6        Q.  Doctor, I didn't ask a difficult
 7   question.  Is there a reason you're taking
 8   such long pauses to respond to my questions?
 9             MS. CARITIS:  Form.
10             Argumentative.  She's allowed to take
11             as long as she needs.
12             MS. LUHANA:  It's a simple
13             question, Counsel.  And there is no
14             coaching.  Your objections are limited
15             to form, so please keep them that way.
16        Q.  Doctor, did you review
17   Dr. Valliere's report before you made the
18   decision to be retained as a rebuttal expert?
19        A.  I'm giving some thought to
20   timeline.  I really appreciate the time
21   you're giving me and all your patience.  I
22   know I'm new to this, so maybe you're a bit
23   frustrated at the time I'm taking, I just
24   really want to get this right.
25             (Cross-talk.)
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        Q.   Doctor, I appreciate that, but I
 3   think you were retained in this case you just
 4   said only about a month ago, correct?
 5        A.   Yeah, it was very recent.
 6        Q.   It was very recent.
 7             So in terms of your memory of
 8   whether you reviewed Dr. Valliere's report
 9   before you made the decision to be retained
10   as a rebuttal expert would be something I
11   would hope that you'd be able to remember --
12             MS. CARITIS:  Object.
13        Q.   -- so would you be able to -- would
14   you be able to share with me if you reviewed
15   her report before you made the decision to be
16   retained as a rebuttal expert?
17             MS. CARITIS:  Form.
18        A.   Is it okay if I pull up my timeline
19   on this or are you looking for an answer?  I
20   just want to get it right.
21        Q.   Sure.
22             MS. LUHANA:  You can pull up the
23        invoice, which is -- I guess we
24        haven't marked the invoice.  We can --
25        we can go ahead and mark the invoice,
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        it's Exhibit 3 which is RL3.

3        A.    Yeah.  Can we pull it up on the

4    screen?

5              (Exhibit 3, Lindsay Orchowski,

6        Ph.D's Expert Witness Invoice, was

7        marked for identification.)

8        A.    Thank you for this.

9              (Document review.)

10             MS. CARITIS:  Doctor, you can

11        just -- it's okay to testify to your

12        best recollection.  I think Ms. Luhana

13        is just trying to get a general sense.

14        So you can tell her your --

15             (Cross-talk.)

16        A.    Yes.

17             MS. LUHANA:  Counsel.

18        A.    My recollection is that I was

19    approached by Christopher about this case.  I

20    signed a confidentiality agreement to see if

21    this was something I can offer an opinion on.

22    I was provided with a report, it felt like

23    something that I was able to offer an opinion

24    on, so then I was engaged.

25        Q.    Okay.  When did you start working

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    on this report?
 3        A.    As my official work on the report
 4    started on the 11th.
 5        Q.    When was the last time you saw your
 6    report?
 7        A.    I have it in front of me right now.
 8        Q.    Okay.  Before the deposition today.
 9        A.    I've been reviewing it in
10    preparation, so I saw it today, I looked at
11    it yesterday.
12        Q.    Okay.  And in your report, you
13    stated --
14            MS. LUHANA:  You can take this
15        down.
16        Q.    In your report, you stated you
17    evaluated Dr. Valliere's opinions to reach
18    your opinions, correct?
19        A.    That's correct.
20        Q.    And I want to know, what
21    specifically did you review to form your
22    opinions?
23            So we can take a look at Exhibit 1,
24    and let's pull up Exhibit B.
25            And so here, Doctor, as you noted
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   it only states that what you had looked at
 3   was the expert report of Dr. Valliere.  And
 4   let's go -- it lists a number of
 5   publications, so I believe the rest of it is
 6   just publications; is that correct?  We can
 7   scroll through it.
 8           MS. CARITIS:  Feel free to flip on
 9       your own copy, Doctor, if you have one
10       and that's --
11           THE WITNESS:  Yeah, I have it.
12           (Document review.)
13       Q.   So let's go back to the first page
14   of Exhibit B.
15           So as I said, Doctor, I'm entitled
16   to know the basis of your opinions and
17   exactly what documents you're relying on.  We
18   only have Dr. Valliere's report listed here.
19           What other documents specifically
20   did you rely on in forming your opinions?
21           MS. CARITIS:  Form.
22       A.   So one of the things I mentioned
23   earlier was that in reviewing Dr. Valliere's
24   report, I was also provided with any of the
25   documents that are referenced.  So for
```

1       L. Orchowski - Highly Confidential

2    example, the files that Valliere references.

3    So those would be included.  And then the

4    publications listed are also the things that

5    informed my opinions.

6       Q.   Doctor, do you have a file of those

7    documents that you're referencing that are

8    not listed on Exhibit B here?

9            MS. CARITIS:  Form.

10      A.   So those were provided by the legal

11   team, so they exist there on their -- on

12   their server.

13      Q.   So they exist on their server.

14   Were you -- so how were these documents

15   transmitted to you?

16           MS. CARITIS:  Objection.  Form.

17      A.   So I was given access through a

18   share file, so like a shared -- a shared

19   link, like a Box file.

20      Q.   And can you still access that

21   today?

22      A.   I haven't tried, so I'm not sure.

23      Q.   When's the last time you accessed

24   those documents?

25      A.   I haven't worked on the report

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   since the 24th.
 3        Q.    And when were those documents
 4   provided to you?
 5        A.    I could -- I could check back in
 6   correspondence, but I -- likely right after I
 7   started working on the report, so kind of
 8   preliminary review with the Valliere files
 9   was right around early October, so provided
10   with any of the files I would need to do a
11   review of the Valliere report.
12        Q.    So Doctor, were you provided, based
13   on your invoice, which is Exhibit 3, it notes
14   that you began initial case review on
15   October 11th.
16             So would you have been provided
17   with all these documents, the underlying
18   documents you relied on on October 11th or
19   around that time?
20        A.    Around that time seems fair, yeah.
21        Q.    How many documents were there?
22        A.    There are hundreds.
23        Q.    Hundreds?  Can you -- 900, 300, how
24   many?
25        A.    There are hundreds.
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2        Q.   Well, can you give me your best

 3   estimate?  You like to be very precise, so

 4   I'm looking for that precision, Doctor, here.

 5        A.   I really can't make a guess.  I'm

 6   going to say there are hundreds of documents

 7   that exist in this file.

 8        Q.   Well, were they close to a thousand

 9   or was it close to 200?  Now I would like an

10   estimate, because you didn't list all the

11   documents that you relied on in your --

12             MS. CARITIS:  Objection.

13        Q.   -- Exhibit B of your report.

14   Therefore I have no idea to know what you

15   actually used to form your opinions.  And I'm

16   entitled to that information, Doctor.

17             So I would like your best estimate

18   here as to how many documents were provided

19   to you by counsel to come up with your

20   opinions?

21             MS. CARITIS:  Objection.  Form.

22        And Roopal, I'm happy at break to send

23        you an amended reliance list that

24        explicitly says "and all documents

25        cited herein to the report" if that

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1           L. Orchowski - Highly Confidential

2           will short circuit this.  She's

3           already testified to that.  And I'm

4           happy to serve -- I can put it

5           together at break if that will help.

6                MS. LUHANA:  Let's talk about that

7           counsel off the record.

8           Q.   Doctor, can you please give me your

9      best estimate here?

10               MS. CARITIS:  Form.

11          A.   To the best of my recollection,

12     there are hundreds of documents.

13          Q.   So I'm just trying, Doctor, just

14     work with me here, I'm trying to understand

15     what you relied on for your opinions.  And as

16     I said, I'm entitled to that.

17               So was it 150 or 900 documents?

18          A.   What I really would need to do this

19     was look at the Valliere report and kind of

20     count out the ones on the reference list if

21     you think that would be helpful.

22          Q.   No, Doctor.  Because I want to look

23     at and discuss the documents that you were

24     provided by counsel, and that's the focus

25     here today on your opinions.  And so --

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2               MS. CARITIS:  I think you and I
 3          can short circuit.  This is -- if we
 4          could go off the record for a second.
 5          I'm sorry to cut you off.  I know
 6          we've been spending a lot of time on
 7          this and I just want to kind of --
 8               MS. LUHANA:  I don't want to go
 9          off the record, Counsel.
10          Q.   Doctor, if you want a break, we can
11     do that.  But I want to finish this line of
12     questioning and we can take a break.
13               But can you just give me an
14     estimate of how many documents, please,
15     Doctor?
16               MS. CARITIS:  Form.
17          A.   I'll state again that there are
18     hundreds of documents.  I would be happy to
19     provide that full list of all of the
20     documents.  I don't want to make an estimate
21     that doesn't get a number right.  But there
22     are hundreds of documents that were provided
23     that are included and referenced in the
24     Valliere report.
25          Q.   Okay.  And then did you review
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2    hundreds of documents to come to your

 3    opinion, Doctor?

 4        A.   So when there was something that

 5    was cited that was of relevance, I had the

 6    opportunity to go and look at that document.

 7        Q.   Can you please describe the

 8    documents you had access to?

 9             MS. CARITIS:  Form.  Asked and

10        answered.

11        A.   So these are many different kinds

12    of documents, so some are, kind of, emails,

13    for example, lots of different kinds of

14    correspondence, some are documentation of,

15    for example, like PowerPoint slides that were

16    provided by RAINN, many different kinds of

17    files.

18        Q.   And what else?

19        A.   Yeah.  And I'm sorry, I might need

20    a break.  I'm getting tired.  So happy to

21    continue talking about this, but I think if

22    it would be possible to take a break that

23    would be good.

24        Q.   Sure.  We can take a break right

25    after you answer this question and then we'll
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   go to break.
 3        A.   So to the best of my recollection,
 4   many different types of documents, PowerPoint
 5   slides, email correspondence, et cetera.
 6        Q.   Anything else?
 7        A.   I have nothing else to add at this
 8   time.
 9             MS. LUHANA:  Okay.  We can take a
10        break.
11             THE VIDEOGRAPHER:  The time is
12        15:07 UTC time and we are off the
13        record.
14             (Off the record.)
15             THE VIDEOGRAPHER:  The time is
16        15:23 UTC time and we're back on the
17        record.
18   BY MS. LUHANA:
19        Q.   Doctor, you understand you're under
20   oath?
21        A.   I do.
22        Q.   Doctor, anything preventing you
23   from telling the truth today?
24        A.   No.
25        Q.   During the break, did you discuss
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential
 2    your testimony with your counsel?
 3        A.   She told me that it's okay to
 4    (audio distortion).
 5             THE COURT REPORTER:  I'm sorry.
 6        There was audio distortion again.
 7        A.   She let me know just to keep on
 8    going.
 9        Q.   Doctor, prior to the break, we
10    discussed that the defense counsel provided
11    you with documents; is that correct?
12        A.   Yes, I was provided with access to
13    documents.
14        Q.   Okay.  Did you ask them to provide
15    you any additional documents?
16        A.   I asked them to provide me with
17    anything that was referenced in the Valliere
18    report.
19        Q.   Did you confirm they provided you
20    with all the documents that Dr. Valliere
21    cited?
22        A.   No, I don't believe I have asked
23    them for confirmation, I had everything that
24    I needed to evaluate the report.
25        Q.   Were you given access to run your

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2     own searches in a database to review all the

 3     documents that were produced in this

 4     litigation?

 5          A.    I did see in Valliere's report that

 6     there is such a database.  I never requested

 7     that.  My report is really specific to taking

 8     a scientific evaluation to Dr. Valliere's

 9     report given my expertise in sexual assault

10     prevention.

11          Q.    Doctor, outside of this litigation,

12     when you cite to materials you consider or --

13     well, let me withdraw that.

14              Doctor, outside this litigation,

15     you cite to materials you consider, however

16     in this case, were you then hired as an

17     expert to rebut Dr. Valliere's opinions.  In

18     your actual report, is it true that you do

19     not cite to Dr. Valliere's report at all?

20              MS. CARITIS:  Form.

21          A.    I'm not sure what you mean.  So my

22     report is directly related to the claims made

23     by Dr. Valliere's report, so I'm not -- I'm

24     not quite sure what you mean.

25          Q.    Well, do you provide any citations

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential

2   to what you're referencing in Dr. Valliere's

3   report by citing to a page number?  Do you

4   provide a citation in your report when you're

5   discussing criticisms of Dr. Valliere's

6   report?

7        A.   You're correct, I do not -- I don't

8   think I have any page numbers specific to the

9   Valliere report.

10       Q.   So why is that?

11       A.   I had a very limited time to

12  prepare this report, so I considered citing

13  specific examples.  Ultimately, I provided

14  scientific references rather than listing

15  specific things in the Valliere report.  If

16  you would like specific page numbers, I'm

17  sure I can go through it today and provide

18  some examples if you'd like, but it was

19  really a matter of time constraints.  As you

20  know, I was retained very recently to do this

21  work.

22       Q.   So, Doctor, you didn't think it was

23  important to cite specifically to

24  Dr. Valliere's report in your rebuttal report

25  of her?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2              MS. CARITIS:  Objection.  Form.
 3         A.   So no, that's not what I said at
 4    all.  Had I had more time, I would be happy
 5    to do that.
 6         Q.   So you didn't carefully put this
 7    report together, it was a rushed report
 8    you're saying?
 9              MS. CARITIS:  Objection.
10         A.   That's also not -- that's also not
11    what I said.
12         Q.   However, you wouldn't do something
13    that you'd typically do outside of this
14    litigation where you actually do cite to
15    things you consider in your publications, you
16    did not do that here when you were hired by
17    defendants to rebut Dr. Valliere's report; is
18    that correct?
19              MS. CARITIS:  Objection.  Form.
20         A.   I'm not sure what you mean.
21         Q.   Well, outside this litigation, when
22    you consider things, you cite to references.
23              In your rebuttal report here, you
24    make no cites to Dr. Valliere's report; is
25    that correct?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        A.   This is the first time I've ever
 3   done this kind of reporting, so I'm not sure
 4   how it should relate to my other kind of --
 5   like, when I'm doing like a research article,
 6   for example.
 7        Q.   Doctor, let's pull up Exhibit 1.
 8             MS. CARITIS:  And yeah, Doctor,
 9        that's your report, so if it's easier
10        for you to...
11             THE WITNESS:  Thanks, got it.
12        Q.   Let turn to page 3.  And it's
13   under -- let's go to Assignment and
14   Methodology, and it's a sentence where it
15   says:
16             I evaluated Dr. Valliere's
17   opinions.
18             MS. CARITIS:  Sorry, I'm not with
19        you.  Where are we?
20             MS. LUHANA:  It's the third or
21        fourth sentence I believe.
22        Q.   I evaluated Dr. Valliere's opinions
23   using the same methods I employ in my
24   academic work by considering the arguments
25   and sources in light of the empirical
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   research and my knowledge and experience, and
 3   so on and so forth.
 4            So my question to you here is:  You
 5   claim that you use the same methods you
 6   employ in academic work, and in your academic
 7   work you provide citations to things you
 8   consider.  However, when you've been hired as
 9   an expert here, in your rebuttal report where
10   you were hired to rebut Dr. Valliere's
11   opinions, you provide no citations to
12   Dr. Valliere's report; is that correct?
13            MS. CARITIS:  Objection.  Form.
14       Misstates the report.
15       A.   Yeah, I think it's -- I think
16   it's -- I've used the same kind of methods in
17   my academic work, sometimes I use citations,
18   sometimes I don't.  And so here really when I
19   was looking at the Valliere report, I was
20   evaluating it with its regard to the
21   scientific literature.
22       Q.   Okay.  Let's go to the first
23   sentence there, it states you were retained
24   by counsel for defendants to review and
25   respond to Dr. Valliere's opinions; is that
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   correct?  Did I read that correctly?
 3        A.   Yes, I was retained by counsel for
 4   defendants to review and respond to
 5   Dr. Valliere's opinions.
 6        Q.   So in responding to Dr. Valliere's
 7   opinions in your report, you chose not to
 8   cite her actual report; is that true?
 9             MS. CARITIS:  Objection.  Form.
10        Misstates the report.
11        A.   I believe my report is in direct
12   response to Valliere's opinions.  Whether or
13   not it includes a specific page number, I
14   wasn't aware that that would be kind of
15   problematic in this regard.  But you're
16   correct, I'm looking at the report and I
17   don't think I provide a specific page number.
18   However, I'm absolutely responding to her
19   report.
20        Q.   Okay.  But would you think that is
21   something important to do when you're
22   drafting a rebuttal report?
23        A.   As I --
24             MS. CARITIS:  Sorry, Doctor.  Just
25        let me get --
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2               THE WITNESS:  Yeah, you go ahead.
 3               MS. CARITIS:  Objection.  Form.
 4               You may answer.
 5          A.   As I've said, this is the first
 6     work that I've done in an expert report.  So
 7     if there are standards that page numbers are
 8     needed for this kind of report, I was not
 9     aware of that.
10          Q.   So it's not were they're needed.
11     My question to you is, you're a psychologist
12     who holds precision in high regard, as you've
13     testified to earlier.  And so in your
14     rebuttal report, I am just noting that you
15     didn't cite to Dr. Valliere's report.
16               So was that not important to you
17     sitting here today to do so?
18               MS. CARITIS:  Form.
19          A.   I would disagree that I'm not
20     referencing her report.  My report is in
21     direct relation to Dr. Valliere's opinions.
22          Q.   Doctor, in your work outside
23     litigation when you cite to materials you
24     consider -- scratch that.
25               Doctor, in your work outside this
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2   litigation, you cite to materials you
3   consider, yet in providing your rebuttal
4   report, you do not cite to any of Uber's
5   underlying documents that Dr. Valliere relied
6   on in forming her opinions; is that true?
7        A.   Yes, I don't include -- if you're
8   looking for page numbers or specific
9   references to Uber documents, I don't cite
10  those in the report.
11       Q.   So in the report, you don't cite to
12  one single internal Uber study; is that
13  correct?
14       A.   My report is very specific to
15  Dr. Valliere's report.
16       Q.   Okay.  And you understand the
17  purpose of Dr. Valliere's report -- scratch
18  that.
19            Doctor, are you aware that
20  Dr. Valliere reviewed countless depositions
21  in forming her opinions of Uber employees?
22            MS. CARITIS:  Objection.  Form.
23       A.   Depositions are cited in her
24  report.
25       Q.   Are you aware that she reviewed
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   countless Uber internal documents to provide
 3   her opinions in her report?
 4        A.   Uber documents are also cited in
 5   her report.
 6        Q.   And she cites to those throughout
 7   her report, correct?
 8        A.   She does.
 9        Q.   And she cites to deposition
10   testimony as well, correct?
11        A.   She does.
12        Q.   And she cites to Uber analysis, she
13   cites to Uber data, correct?
14        A.   She does.
15        Q.   And in your report, you don't cite
16   to any Uber documents that she relied on to
17   form her opinions; is that true?
18        A.   Purpose of my report was not to
19   analyze Uber documentation, it was to provide
20   a scientific review of Dr. Valliere's report.
21        Q.   Okay.  Let's pull up actually your
22   report again, which is Exhibit 1, page 3.
23   And the first sentence there, can you read
24   that to me?
25        A.   I was retained by counsel for
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   defendants to review and respond to

 3   Dr. Veronique Valliere's opinions regarding

 4   the Uber Rideshare platforms, drive sign-up

 5   and screening process, environmental

 6   safeguards and risk reduction measures and

 7   the sufficiency of its sexual misconduct

 8   taxonomy.

 9        Q.   So Dr. Valliere's reports and her

10   opinions were about Uber's rideshare

11   platform; is that correct?

12        A.   Yes, I believe that's correct.

13        Q.   And you were hired -- retained by

14   counsel for defendants to respond to those

15   opinions about the Uber Rideshare platform,

16   correct?

17             MS. CARITIS:  Form.

18        A.   Yes.  I was retained to review and

19   evaluate her report.

20        Q.   Regarding the Rideshare -- Uber

21   Rideshare platform; is that right?

22        A.   Yes, I'm sorry if I'm -- I'm

23   missing the question here.

24        Q.   Dr. Valliere's opinions were

25   regarding the Uber Rideshare platform, and
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   you were responding to those opinions in your
 3   rebuttal report, correct?
 4        A.   Yes, her report is about the Uber
 5   Rideshare platform, and my rebuttal is in
 6   response to Dr. Valliere's report.
 7        Q.   And your report does not include a
 8   single citation to any of Uber's documents;
 9   is that correct?
10             (Audio distortion.)
11        A.   There's no citation with respect to
12   Dr. Valliere's report and I did not cite the
13   secondary sources that she referenced.
14        Q.   Doctor, you're aware that
15   Dr. Valliere reviewed countless depositions
16   and Uber internal documents to arrive at her
17   opinions, correct?
18        A.   Yes, I see the -- I see what she
19   cited in her report.
20        Q.   But you didn't include that in your
21   analysis -- in your rebuttal, right?
22             MS. CARITIS:  Form.
23        A.   I wouldn't -- I wouldn't agree with
24   that.  I've reviewed her report and her
25   analysis of those documents.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        Q.   So where would I find your
 3   consideration of those internal Uber
 4   documents in your report?  Can you please
 5   look through your report and tell me where I
 6   would find your discussion of Uber documents
 7   that Dr. Valliere reviewed in your report?
 8             MS. CARITIS:  Objection.  Form.
 9        A.   My task was to review
10   Dr. Valliere's opinions in the report.  I was
11   not engaged to evaluate Uber documents.  My
12   opinions are very specific to a scientific
13   analysis of the suggestions that Valliere
14   proposes for prevention and screening.
15        Q.   You didn't answer my question.
16             My question is, where would I find
17   your consideration of those internal document
18   in your report?
19             MS. CARITIS:  Form.
20        A.   Yeah, I think the -- the -- a key
21   consideration is just because something isn't
22   cited with a page number doesn't mean it's
23   not considered.  So I think it's difficult to
24   say, is it everywhere, is it somewhere?  My
25   perspectives are specific to Valliere's
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    reports and -- and how she's referencing

3    those documents.  I'll take it -- I take it

4    all together.  So I would have to just say

5    that just because there isn't a page number

6    cited, that these aren't something that I

7    read and considered.  I read and considered

8    the ones that were relevant in helping to

9    form my opinion.

10            MS. LUHANA:  Move to object as

11        unresponsive.

12        Q.   Let's go back to my question.

13    Let's focus on that.

14            MS. LUHANA:  Candida, can you

15        repeat my question?

16            (Referred to portion of the record

17        was read back by the court reporter.)

18        Q.   Uber's internal documents, where

19    would I find that -- let's retract that

20    question.

21            Where would I find your discussion

22    of Uber's internal documents that

23    Dr. Valliere considered in forming her

24    opinions in your report?

25            MS. CARITIS:  Form.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          A.    (Document review.)

3              Do you mind repeating the question

4     one more time?

5          Q.   Where would I find your discussion

6     of Uber's internal documents that

7     Dr. Valliere considered in forming your

8     opinions in your report?

9          A.    My report is specific to

10    Dr. Valliere's opinions.  My report does not

11    include a page number reference to the Uber

12    internal documents.

13         Q.    That's not -- I didn't ask for a

14    page number reference, Doctor.  My question

15    is pretty simple.  Where would I find your

16    discussion of Uber's internal documents that

17    Dr. Valliere considered in forming her

18    opinions in your report.

19             Are there -- are they anywhere to

20    be found in your report?  And if so, can you

21    please provide them to me right now?

22             MS. CARITIS:  Form.

23         A.    Yeah, my task was not to review

24    Uber internal documents, it was to respond

25    specific to Valliere's report.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          Q.    Doctor, Dr. Valliere's report

3   considered Uber internal documents, you're

4   aware of that, right, in arriving to your

5   opinions?

6          A.    Yes.

7          Q.    But your task wasn't to evaluate

8   those opinions and discuss that in your

9   rebuttal report?

10          MS. CARITIS:  Form.

11          A.    That's not what I said.  I said my

12   task was to respond to Dr. Valliere's report.

13   I acknowledge that she cites Uber documents.

14   Reviewing, kind of, citing Uber documents was

15   not a part of my methodology.

16          Q.    So we both agree that Dr. Valliere

17   reviewed internal Uber documents, correct?

18          A.    Dr. Valliere has internal Uber

19   documents in her report, yes.

20          Q.    And Dr. Valliere considers those

21   documents in forming her opinions, you would

22   agree?

23          MS. CARITIS:  Form.

24          (Audio distortion.)

25          MS. CARITIS:  We lost you there,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        Doctor.  I think when you sit back --

3              THE WITNESS:  I'm sorry.

4              MS. CARITIS:  Yeah.

5        A.   So in reviewing Dr. Valliere's

6    methodology, I believe she talks about review

7    of internal Uber documents as a component of

8    her report.

9        Q.   But you know where in your report

10   discuss those internal Uber documents that

11   helped form her opinions; is that true?

12             MS. CARITIS:  Form.

13       A.   Yeah, my task was to evaluate the

14   opinions of Dr. Valliere, not to evaluate

15   Uber internal documents.

16       Q.   But part of Dr. Valliere's opinions

17   consisted of a review of Uber's internal

18   documents, you'd agree with that, right?

19       A.   That seems fair.

20       Q.   And yet, you have no discussion of

21   those internal Uber documents in your report,

22   correct?

23       A.   My task was to review

24   Dr. Valliere's opinion.  Insomuch as she

25   references those documents, those were also

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2    things that were taken into account.  I don't

 3    discuss the Uber internal documents

 4    specifically in my rebuttal report to

 5    Dr. Valliere.  That wasn't the task that I

 6    was assigned.

 7        Q.   Do you discuss them anywhere

 8    generally in your report, Uber internal

 9    documents?  Actually, retract that.

10             Doctor, let's pull up your report,

11    which is Exhibit 1.  And let's go to the last

12    page of your report, which is page 13.

13             Doctor, this is your signature,

14    correct?

15        A.   It is.

16        Q.   And when did you sign this report?

17        A.   The day that I provided it to

18    counsel, right around the last week of

19    October.  I could check the exact date on the

20    invoice, probably be right around the 24, I

21    believe.  I'm guessing on that.  So right

22    around the 24th is my guess without...

23        Q.   Okay.  And you drafted this final

24    report, correct?

25        A.   I did.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        Q.   Okay.  Let's turn to page 12.

3   Let's zoom in on Section 8, scroll down a

4   bit.

5             Doctor, do you see on page 12 here

6   of your report that Kirkland & Ellis

7   International, LLP footer?

8        A.   I do.  I don't know how that got in

9   there, but I would welcome the opportunity

10  to -- it's almost like the footer got put up

11  into the document, so I would welcome the

12  opportunity to provide a document with that

13  cut and paste out of there.  I'm not sure how

14  that got in there.

15       Q.   Where did you get that footer from?

16            MS. CARITIS:  Form.

17       A.   I am not sure how that got put into

18  the PDF copy.

19       Q.   My question was different.  Where

20  did you get that footer from?

21            MS. CARITIS:  Form.

22       Q.   It's your final report that you

23  signed, you just testified to that, correct?

24            MS. CARITIS:  Form.

25       A.   Yes, I would be happy to provide an

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    updated copy.

3        Q.   That wasn't my question, Doctor.

4             My question is, this is -- you just

5    testified that you signed off on this final

6    report; is that correct?

7        A.   Yes, this is the final report.  I

8    would be happy to correct the typo.

9        Q.   Doctor, my question is, where did

10   you get this footer from -- withdraw that

11   question.

12            Doctor, defense counsel here today

13   representing you and who retained you is from

14   Kirkland & Ellis; is that correct?

15       A.   That's correct.

16       Q.   And this is a Kirkland & Ellis

17   International, LLP footer in your final

18   report; is that correct?

19       A.   I'm not sure if it's a footer, but

20   it is absolutely -- absolutely the name of

21   the LLP.

22       Q.   Where did it come from?

23            MS. CARITIS:  Form.  Asked and

24       answered.

25       A.   I'm afraid I can't let you -- I'm

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2    not sure how to answer it, how it got there.

 3          Q.   So you have no idea how this footer

 4    got into your report?

 5          A.   I do not.

 6          Q.   Let's go to page 3 of your report.

 7    And under Assignment and Methodology, it's

 8    the sentence before -- it's the end of the

 9    paragraph, the sentence before the last

10    sentence:

11               All of the opinions I offer in this

12    report are held to a reasonable degree of

13    psychological certainty.

14               Doctor, you've expressed all your

15    opinions to a reasonable degree of

16    psychological certainty, correct?

17          A.   Yes, I feel like the opinions that

18    I offer in this report are to the best of my

19    knowledge.

20          Q.   Well, you didn't say to the best of

21    your knowledge.  You said to a reasonable

22    degree of psychological certainty.

23               So I'm just confirming that you've

24    expressed your opinions to a reasonable

25    degree of psychological certainty as you

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    stated here in your report; is that correct?
 3        A.   Yes, that's correct.
 4        Q.   Do you normally express your
 5    opinions to a reasonable degree of
 6    psychological certainty?
 7             MS. CARITIS:  Form.
 8        A.   In professional practice?  When I'm
 9    at the grocery store?  I'm not really sure
10    what you're getting to there.
11        Q.   Well, you're here as an -- in an
12    expert capacity, so I'm focused on your
13    professional expert capacity here.
14        A.   Okay.
15        Q.   And I'm focused on the report,
16    Doctor, that's before you on the screen.
17        A.   Okay, that's helpful.
18             Absolutely, when I'm working in a
19    professional context, I try to be as
20    scientific and precise as possible.
21        Q.   So you normally express your
22    opinions to a reasonable degree of
23    psychological certainty; is that correct?
24        A.   If I'm understanding what you mean
25    by that correctly, yes.
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2          Q.   Well, those aren't my words,
 3     Doctor, those are your words.  So I'm just
 4     asking you, this is normally how you express
 5     your opinions.  It's not a trick question,
 6     you have it in your report and you've
 7     included this in your report.  So my question
 8     to you is, you are expressing your opinions,
 9     do you normally do -- scratch that.
10          So do you normally express your
11     opinions to a reasonable degree of
12     psychological certainty as you stated here in
13     your report?
14          A.   Yes, the opinions I offer in the
15     report are expressed to a reasonable degree
16     of psychological certainty.
17          Q.   Okay.  So reasonable degree of
18     psychological certainty, what percentage is
19     that to you?
20          A.   That's an interesting question.  I
21     don't think I've ever put a number to it.
22          Q.   Okay.  Well, I would like you to
23     express what percentage of certainty do you
24     have in this case?
25               MS. CARITIS:  Objection.  Form.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        A.    I don't think I can answer that

3    question.  I'm not really sure how to put a

4    numerical value to an expression of

5    scientific confidence.

6        Q.    You said "reasonable degree," what

7    is reasonable degree to you; is it

8    50 percent, is it 75 percent?  I'm just

9    trying to get an understanding what a

10   reasonable degree of psychological certainty

11   is to you in a percentage.

12           MS. CARITIS:  Form.

13       A.    Yeah (audio distortion).

14           THE COURT REPORTER:  I'm sorry.

15       You broke up again.

16           THE WITNESS:  Oh, sorry.  I will

17       speak louder.

18       A.    I'm not sure how to answer that and

19   put it in a percent form.

20       Q.    So you can't, sitting here --

21   sitting here today, express what percentage

22   of certainty you're expressing your opinions

23   to in this case; is that correct?

24           MS. CARITIS:  Form.

25           THE WITNESS:  Sorry, Alexandra.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          A.    This is really a qualitative

 3     concept to me.  To a reasonable degree is

 4     something that I think of as a qualitative

 5     concept that you're reasonably sure.  It's

 6     not something I thought of as a percentage.

 7          Q.    Okay.  So you have no opinion today

 8     on what percentage of certainty you have in

 9     this case that you've expressed your opinions

10     to?

11               MS. CARITIS:  Form.

12          A.    I'm not quite sure how to put

13     certainty in a percentage form.

14          Q.    Would you be able to estimate for

15     me?

16               MS. CARITIS:  Form.

17          A.    The question doesn't feel really in

18     my expertise.  I'm a scientist, so kind of

19     knowing what, you know, how to put this into

20     a percentage form, I don't have a benchmark

21     to do that.

22          Q.    Okay.  Set that aside, let's take

23     this down.

24               Doctor, how did you prepare for

25     your deposition?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        A.   I reread my report.  I reread
 3   Valliere's report.  Also had the opportunity
 4   to meet with counsel so they could tell me a
 5   little bit about what this process might be
 6   like.
 7        Q.   Okay.  And what did you review --
 8   let me ask this.  Did you -- scratch that.
 9             Did you individually prepare for
10   this deposition?
11        A.   Do you mean spending time on my
12   own?
13        Q.   Correct.
14        A.   Yes.
15        Q.   Okay.  So what did -- tell me
16   everything you did individually to prepare
17   for your deposition?
18        A.   I reread the report that I wrote
19   and I reread Valliere's report.
20        Q.   And when did you do that?
21        A.   This morning as well as also
22   sometime over the past couple of days.
23        Q.   And how many hours did you spend
24   doing so?
25        A.   So there's hours documented on the
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   invoice that I believe were for the 7th of
 3   November, so a few hours reading there.  And
 4   then since I submitted the invoice, I've also
 5   had sometime reviewing the report, so say
 6   several additional hours of reading and
 7   familiarizing myself.
 8        Q.   Actually, that's a good idea.
 9   Let's put the invoice up, which is Exhibit 3
10   so we can walk through it.  Let's scroll
11   down.
12             And Doctor, you reference the
13   November 7th deposition prep, and I see
14   you've noted here deposition preparation on
15   November 5th, 6th and 7th; is that correct?
16        A.   Yes.
17        Q.   And I think there's a typo there
18   because I believe that should be November 6,
19   2025, correct?
20        A.   Yes, that is -- that should be
21   2025.
22        Q.   Okay.  And so this preparation that
23   you did for your deposition, did you do on
24   your own without counsel?
25        A.   So there were sessions with counsel
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   and also sessions without counsel.
 3        Q.   Okay.  So let's speak about that.
 4             So did you meet with counsel to
 5   prepare for your deposition?
 6        A.   Yes.  As I mentioned, I met with
 7   them, they walked me through some points of
 8   what to expect.
 9        Q.   When was that?
10        A.   So I think we had the meetings on
11   the 5th and the 7th and then I reviewed
12   documents in between.  So then my independent
13   review was on the 6th.
14        Q.   Okay.  So you met with counsel on
15   the 5th for 1.5 hours and then again on the
16   7th for two hours; is that correct?
17        A.   Yes, that's correct.
18        Q.   And who did you meet with?
19        A.   Alexandra and also Chris.
20        Q.   And how did you meet with them?
21        A.   Via Zoom, like a tele Teams
22   meeting.
23        Q.   Okay.  And did you meet with them
24   again to prepare for your deposition after
25   that point, after November 7th?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        A.   No.  I've met with them, we
 3   touched base in the morning to make sure
 4   everything -- my comms were working okay, so
 5   I saw them this morning.
 6        Q.   Okay.  So that's -- you prepared
 7   with counsel for 3.5 hours before this
 8   deposition.  And how long did you meet with
 9   them today?
10        A.   About 15 minutes this morning.
11        Q.   Okay.  And did you prepare with
12   them otherwise beyond that time that you just
13   discussed?
14        A.   No.
15        Q.   Okay.  Did you meet with anyone
16   outside of counsel to prepare for this
17   deposition?
18        A.   No.
19        Q.   Okay.  And so in terms of preparing
20   for this deposition, you said you had spent
21   two hours on November 6th doing review on
22   your own, correct?
23        A.   Yes.
24        Q.   Did you talk to any other defense
25   experts in preparing for your deposition?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          A.    No.

 3          Q.    And so Doctor, the total amount

 4    of -- you've been compensated thus far for

 5    your work in this case is $14,000 -- $14,125;

 6    is that right?

 7          A.    This is the invoice I've submitted,

 8    I haven't received any compensation so far,

 9    but this invoice has gone in.

10          Q.    Okay.  And what is your expert --

11    your expert rate is $500 per hour?

12          A.    Yes.

13          Q.    How did you come up with that

14    amount?

15          A.    I consulted a colleague who does

16    this work who suggested this amount.

17          Q.    Who did you consult with?

18          A.    A colleague who also does expert

19    witness testimony.

20          Q.    And what's the colleague's name?

21          A.    His name is Dennis Reidy.

22          Q.    And what is his title?

23          A.    Dr. Dennis Reidy, he's a former CDC

24    employee and a faculty member at Georgia

25    State University.
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        Q.   Okay.  Has he consulted with
 3   Kirkland & Ellis before, to your knowledge?
 4             MS. CARITIS:  Form.
 5        A.   Yeah, I'm not aware.
 6        Q.   Okay.  So Doctor, in going through
 7   your invoice, I would like you to walk me
 8   through this.
 9             You said you had reviewed
10   Dr. Valliere's report, correct, initially --
11        A.   Yes.
12        Q.   -- when you were retained?
13             And so where is that reflected on
14   your invoice?
15        A.   I didn't charge for any pre-review
16   that I did for the case when I was deciding
17   whether or not to take this on.
18        Q.   So your time for the pre-review is
19   not reflected on your invoice?
20        A.   It was before I was retained.  So
21   being new to this work, I didn't have any
22   agreement to charge for any hours, so it
23   didn't feel fair to me to expect someone to
24   pay me for time before I was officially
25   hired.
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2          Q.    So -- okay.  So when was that?

 3          A.    So those were the days -- so after

 4     I was provided with a disclosure agreement, a

 5     confidentiality agreement, I was provided

 6     with the materials, had some time to decide

 7     whether or not I felt like this was something

 8     that I could take on.  So that time before I

 9     received an official retainer agreement, I

10     didn't charge for any of those hours.

11          Q.    So Doctor, before you were retained

12     in the case, defendants gave you

13     Dr. Valliere's report and all the documents,

14     and you pre-reviewed those documents?

15               MS. CARITIS:  Objection.  Form.

16          A.    No.  So what I'm speaking about is

17     when this case was introduced to me, when

18     this opportunity to provide the rebuttal was

19     provided to me, I did not charge for any of

20     that consideration of whether this was a task

21     that I would want to take on.

22          Q.    So when were you contacted to do

23     so?

24          A.    I believe right around October 8th.

25          Q.    By who?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          A.   By --

3               (Cross-talk.)

4               THE COURT REPORTER:  I'm sorry,

5          by -- there was cross-talk there, I

6          think.  Was there an objection,

7          Alexandra?

8               MS. CARITIS:  Form.

9               THE COURT REPORTER:  And your

10         answer, Doctor?

11         A.   Yes, contacted by Chris Talbot.

12         Q.   And what did he provide you with?

13              MS. CARITIS:  Form.

14         A.   He didn't provide me with anything.

15    He asked if I would be interested in talking

16    about, you know, my expertise and its

17    relevance.

18         Q.   Got it.  So it was just a

19    conversation with Mr. Talbot?

20         A.   Yeah.

21         Q.   Understood.

22              So my question was about, that was

23    pretty roundabout, I apologize for that,

24    there was a disconnect here.

25              So my question is, is:  You

```
 1        L. Orchowski - Highly Confidential
 2    reviewed Dr. Valliere's report.  And so is
 3    that reflected as the initial case review on
 4    this invoice?
 5        A.   So to clarify, I think there's two
 6    times that -- so there was a period when I
 7    looked at the report and just needing to say,
 8    like, is this something I could take on and
 9    offer an opinion on.  And so that initial --
10    so that's not the work on 10/11, so that was
11    after I was reviewed and started, you know,
12    really analyzing was on the 11th.  But
13    there's that time before where -- where I was
14    provided with a confidentiality statement
15    that allowed me to look and see is this
16    something I can take on.  So any
17    consideration that I did before that is not
18    reflected on the invoice, it wasn't something
19    that I felt like I could charge for because I
20    wasn't specifically retained on the case.
21        Q.   Okay.  So tell me everything you
22    did there before you were retained on this
23    case.  Because all work prior to your
24    retention wouldn't be confidential, so I want
25    to know every conversation you had, exactly
```

 1        L. Orchowski - Highly Confidential

 2    what was done.

 3        A.    So I talked with Chris Talbot,

 4    Alex, I think other legal professionals such

 5    as Alex around these calls.  They wanted to

 6    learn about my expertise, kind of my work in

 7    sexual assault prevention, kind of what kind

 8    of scientific experience that I have that is

 9    relevant to prevention of sexual violence.

10        Q.   And so how long was that

11    discussion?

12        A.   I would say like a half-hour call.

13        Q.   Okay.  Anything else before the

14    October 11th date on your invoice of what you

15    did?

16        A.    There might've been more than one

17    call.  Again, I'm new to this arena of doing

18    any kind of expert analysis, so I believe I

19    met for two -- two calls with the team, yeah.

20    Two calls with the team just to discuss the

21    process, what would be expected of me and my

22    relevant expertise.

23        Q.   And how long were those calls?

24        A.    I would say about a half-hour.

25        Q.   Okay.  So in total, three calls or

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2    in total two calls that are half-hour each?
 3          A.   Either two or three.  I'm not sure.
 4    I could look on my calendar to find out.
 5          Q.   Okay.  Anything else?
 6          A.   No, not that I can think of.
 7          Q.   Okay.  So let's start with your
 8    invoice now on October 11th.
 9               What is initial case review?
10          A.   So that, I read and reread
11    Valliere's report, and going through,
12    looking, kind of tracing out documents that
13    kind of -- ones that interested me, I would
14    take a look and start to form opinions.
15          Q.   And so how long was the initial
16    case review for you, if you had to break it
17    down?  I see that you noted 3.5 hours for
18    initial case review and document analysis.
19    So if you could break that up for me, that
20    would be helpful.
21               MS. CARITIS:  Form.
22          A.   I'm not quite sure how to break it
23    up.  So like when I review a document, I'll
24    kind of look at secondary sources as they're
25    of interest to me, so I would think of those
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2    two links as linked together.

 3        Q.   Okay.  So Dr. Valliere's report is

 4    about 48, 49 single space pages.  So roughly,

 5    how long did you take to review that report

 6    in the first -- on October 11th?

 7        A.   I would -- I have documented

 8    3.5 hours.

 9        Q.   So that was all the time you took

10    to review her report then?

11             MS. CARITIS:  Form.

12        A.   On this day, yes.

13        Q.   And then research, literature

14    review, document analysis, can you break down

15    the time as to how much you spend doing each?

16             MS. CARITIS:  Form.

17        A.   No, I don't.  I'm afraid I can't

18    differentiate between the amount of time for

19    each.  Oftentimes my processing, you know,

20    looking things up, reading an article, going

21    back to the main source, so it -- I would say

22    it's more integrated.

23        Q.   Okay.  So this literature review

24    noted on 10/14 and literature review on

25    10/15, what does that consist of?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        A.   When looking at the literature, I'm
 3   looking to see what articles have been
 4   published.
 5        Q.   Okay.  What type of articles and
 6   are they referenced anywhere?
 7        A.   Yeah.  So articles that were useful
 8   for my report are all materials references in
 9   the materials cited section.
10        Q.   Okay.  So the articles you
11   considered for this literature review are
12   included in Exhibit B of your report?
13        A.   Yes, I -- there are other things
14   that, you know, if I'm looking up on like a
15   PubMed search and something isn't, you know,
16   literature is broad, so there may be things
17   that you come across that just aren't
18   relevant to the task at hand.  But the ones
19   that were relevant to my opinion are included
20   in Exhibit B.
21        Q.   So it looks like the maximum amount
22   of time that you have literature review noted
23   on this invoice is four hours; is that
24   correct?  That would be the max because it
25   includes the research and document analysis;
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential

2    is that accurate, Doctor?

3              I didn't hear you, I'm sorry.

4         A.   Oh, apologies.  Yes, four hours for

5    literature review.

6         Q.   Which would be, as I said, the

7    maximum because it includes research and

8    document analysis as well; is that correct?

9              (Audio distortion.)

10             THE COURT REPORTER:  I'm sorry,

11        Doctor.  There was distortion again.

12             THE WITNESS:  Oh, sorry.  Okay.

13        A.   Yeah.  So when I'm preparing the --

14   under draft expert report preparation as

15   well, I wouldn't exclude kind of looking up

16   an additional article when doing that as

17   well.  But that time focused on 10/14 and

18   10/15 was more focused on reviewing the

19   literature.

20        Q.   Okay.  Did you review the

21   literature Dr. Valliere cited in her report

22   or would that be reflected on your invoice?

23        A.   So there was very little citation

24   to review from Dr. Valliere's report.  So

25   when I'm thinking of literature review, I
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     would define that as going out to do searches
 3     of the literature, not specific to reviewing
 4     Dr. Valliere's report.
 5          Q.   Okay.  Doctor, and I noted, like,
 6     in your report in Exhibit B, I think you cite
 7     about over, like, 60 publications.  And so it
 8     took you about four hours to do that; is that
 9     right?
10               MS. CARITIS:  Form.
11          A.   Yes.
12               THE WITNESS:  I'm sorry, Alex.
13          Q.   In terms of drafting your expert
14     report, how long did that take you?
15          A.   If we were to add up the hours from
16     the 17th to the 24th.
17          Q.   Well, I want to understand, yeah,
18     how much total time you spent on drafting
19     your expert report.  I want to have an
20     understanding, Doctor, like how much time you
21     spent on document analysis and how much time
22     you spent on drafting your report.  So if we
23     can try to assess that based on this invoice,
24     that would be helpful.
25               So let's start with how long you
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2      took to draft your expert report.  How long

3      did you take to draft your report?

4          A.   So I would count up the hours from

5      the 17th to the 24th, so the 17th is when I

6      started writing.

7          Q.   Okay.  So it looks like about

8      21 hours; is that correct?

9          A.   So the time between the --

10         Q.   I apologize, that's wrong.

11         A.   We're both checking our math here.

12              MS. CARITIS:  We're all not

13         mathematicians for a reason.

14         A.   So the time between the 17th to the

15      24th is closer to 13.

16         Q.   13.5 hours, that's correct, right?

17         A.   I don't have my calculator out

18      here, but that sounds about right.

19         Q.   Okay.  And so that also includes

20      document analysis time, right?

21         A.   Yeah.  So as I was working on the

22      report, I was going back and forth between

23      the Valliere report and also the opinions

24      that I was formulating and writing.

25         Q.   So if you were to give an estimate,

1         L. Orchowski - Highly Confidential

2    what estimate would you give that you took to

3    draft your report based on your invoice here?

4              MS. CARITIS:  Form.

5         A.   So if we consider it as a gestalt,

6    I would include all the time before

7    deposition preparation, does it all fit

8    together to help me form the opinion.  If we

9    want to get really precise in writing time,

10   we can start from the 17th onward, but if --

11   so let's say if there were 5 and a half hours

12   of deposition preparation and 28.25 total

13   hours, that would be 23. -- 22.75.

14        Q.   Doctor, that's just removing the

15   deposition prep, I understand that would be

16   22.7 hours.

17             And so in terms of drafting your

18   report, like we said, based on this invoice,

19   it looks like about 13 hours were spent at

20   maximum drafting your report, would you agree

21   with that?

22             MS. CARITIS:  Form.

23        A.   I would say 13 hours writing, but

24   the time beforehand was also useful in

25   putting together the analysis.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.    And it looks like the maximum

 3    amount, if I've calculated it correctly, of

 4    document analysis is about 21 hours; is that

 5    correct?

 6        A.    That sounds about right.

 7        Q.    Okay.  So it looks like the total

 8    amount of time that you spent on initial case

 9    review, document analysis, your literature

10    review and preparing your report, the total

11    is 22.75 hours; is that right?

12        A.    That sounds right.

13        Q.    Okay.  And part of that time, we

14    don't know how much, but part of that time

15    the maximum of which included document

16    analysis, which could've been 21 hours, but

17    that includes drafting your report; is that

18    right?

19        A.    I'm sorry, I got lost in that

20    question.

21        Q.    So it looks like -- I'm trying to

22    understand how much time you spent on each

23    task and your invoice breaks it down some,

24    right?  And so it looks like you spent a

25    total of 22.75 hours doing all your work in
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2      this case outside of deposition preparation,

3      correct?

4          A.   Yes.

5          Q.   Okay.  And now I'm trying to

6      understand how much time you spent on

7      document analysis, and it looks like document

8      analysis combined with a number of other

9      tasks, the max you spent on document analysis

10     is 21 hours; is that correct?

11         A.   Okay.  So we get to that number by

12     having the 27 -- wait, we get to that number,

13     but with the 22.75, we take out the phone

14     call, that sounds about right.

15         Q.   Okay.  Are there any bills that you

16     haven't submitted -- that you've been

17     submitted that not -- haven't been paid yet?

18     I guess this one.

19         A.   Yeah, this is the only bill

20     submitted.  I spent sometime since the 7th

21     continuing to read over and then any time

22     today, so that will all -- so nothing since

23     the -- everything is included on this

24     invoice.

25         Q.   Okay.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2              MS. LUHANA:  And Lance, can we
 3          pull up -- I don't think we marked it
 4          yet, let's mark it as Exhibit 4, which
 5          is RL4, which is Dr. Valliere's report
 6          from September 26, 2025.  And let's go
 7          to -- let's go to page -- I believe
 8          it's 49 of the report.  Okay.  That's
 9          good.
10              (Exhibit 4, Report of Veronique
11          Valliere, was marked for
12          identification.)
13          Q.   So Dr. Orchowski, as you could see
14     this is Dr. Valliere's report, correct?
15          A.   That's correct.
16          Q.   And this is -- this is her
17     references to the report, so you have that
18     page.  Let's -- so it lists a number of
19     references.  And let's now scroll to page 50
20     as well.  And now let's go to --
21              MS. CARITIS:  Sorry, I just want
22          to take a -- I couldn't really see it.
23          Could you make it like a full page?
24          Is that possible?  Perfect, thanks so
25          much.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1           L. Orchowski - Highly Confidential

 2      Q.    Now let's go to page 51.

 3           Doctor, this is Dr. Valliere's list

 4   of materials considered.  And as you can see

 5   these are all the documents, the deposition

 6   transcripts of Uber witnesses, in addition to

 7   other witnesses that she had reviewed and

 8   including their exhibits.  So that list is

 9   here.  And if we scroll to the next page,

10   you'll see additional depositions, it's over

11   60 some depositions, each hundreds of pages

12   and numerous exhibits.  And then you note

13   here the pleadings, which I had asked you

14   about, which you weren't able to recall, the

15   master complaint and things are listed here.

16           And then if we go to the next page,

17   then these are all the documents that she had

18   specifically cited in her report which number

19   in the hundreds, 3, 400, and they go pages

20   and pages and pages.  Let's keep on going

21   through these pages.

22           Do you see that reflected here in

23   her materials considered list where she cites

24   all the documents that are reflected in her

25   report?  Do you see that, Doctor?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          A.    Yes, I see them on the page.

3          Q.    Okay.  And your testimony here

4    today is that in 21 hours you reviewed all of

5    these documents that Dr. Valliere considered

6    to form her opinions and drafted your report

7    and reviewed Dr. Valliere's report; is that

8    correct?  Is that your testimony today?

9               MS. CARITIS:  Objection.  Form.

10         A.    Yeah, I disagree with that

11   statement.  So as I mentioned earlier in my

12   methodology when I reviewed the report, I

13   would look at the primary search documents

14   that felt relevant to my scientific analysis.

15         Q.    Doctor, we're not discussing

16   feelings here.  How did you decide what felt

17   relevant to your opinions?

18              MS. CARITIS:  Objection.  Form.

19         A.    Yeah, I'm happy to change my

20   language there.

21              So when doing the analysis,

22   documents that were relevant to the analysis

23   I had the opportunity to take a look at in

24   order to inform my opinion.

25         Q.    So you didn't review all the

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   documents that Dr. Valliere considered to

 3   form her opinions?

 4        A.   That's correct.  My analysis

 5   focused on the opinions presented in her

 6   report specific to the prevention of sexual

 7   violence and my scientific expertise.

 8        Q.   So how did you determine which

 9   documents to review and not review?  I would

10   like a list of those documents that you

11   actually reviewed to come to your opinions.

12             MS. CARITIS:  Objection.  Form.

13        If we're gonna make that a request for

14        every expert, we're both gonna to be

15        in for it.

16             But Doctor, to the extent you can

17        recall sitting here today, document --

18        specific documents you reviewed, of

19        course you can speak to that.

20        A.   Yeah, I would need sometime to go

21   back and consider that request.

22        Q.   So Doctor, sitting here today,

23   which of Dr. Valliere's opinions were

24   specific to the prevention of sexual

25   violence?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential

2          A.   Yeah, I'm happy to outline those in

3    the opinion section of my report where I have

4    specific opinions noted that are relevant to

5    scientific -- scientific approaches to the

6    prevention of sexual violence.  I'm happy to

7    go through that section of my report.

8          Q.   However, I'm focused on

9    Dr. Valliere's report because you were

10   responding to Dr. Valliere's report.  And I

11   want to know, going through Dr. Valliere's

12   report, which opinions did you consider were,

13   as you said, specific to the prevention of

14   sexual violence in her report?  So let's

15   actually --

16         A.   Yeah, yeah.  Actually, I have one

17   and I can kind of change the statement that I

18   made earlier.  So --

19         Q.   Dr. Valliere -- I mean,

20   Dr. Orchowski, I want to turn to

21   Dr. Valliere's report.

22              MS. CARITIS:  She was answering

23         your question, Roopal.  Are you

24         withdrawing that question?

25              MS. LUHANA:  No, I said I'm
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential

2          focused on Dr. Valliere's report.  So

3          I want to go to Dr. Valliere's report,

4          that's my question.

5              MS. CARITIS:  You asked another

6          question, but that's fine.

7              MS. LUHANA:  No, that actually is

8          the last question, Counsel, I see

9          here.

10         Q.   So I want to turn to Dr. Valliere's

11    report, which is Exhibit 4.  So --

12             MS. LUHANA:  Actually, take this

13         down.  Let's take a five-minute break.

14         Is that fine, Doctor?

15             THE WITNESS:  Yeah, that's great

16         timing.  Thank you.

17             THE VIDEOGRAPHER:  All right.  The

18         time is 16:24 UTC time and we are off

19         the record.

20             (Off the record.)

21             THE VIDEOGRAPHER:  The time is

22         16:36 UTC time and we're back on the

23         record.

24    BY MS. LUHANA:

25         Q.   Doctor, let's go to Exhibit 1,
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   which is your report, and in particular
 3   Exhibit A to your report.  I want to just
 4   talk about your CV.
 5            So is your CV up to date?
 6        A.   This is dated 8/26/25.  I believe
 7   it is accurate to the best of my knowledge.
 8   I do my best to keep up with it.  And it's 80
 9   pages, so it gets a little unwieldy
10   sometimes.
11        Q.   Doctor, it looks like it was
12   updated August 26, 2025, correct?
13        A.   Yes, so that is the date for this
14   version.
15        Q.   Why did you update it then, do you
16   know?
17        A.   I try to do my best to update it as
18   often as I can.  And quite honestly,
19   sometimes I'll do continual updates to it, so
20   you might find some things on here that were
21   published more recently, but I didn't change
22   that updated kind of header at the top.  So,
23   I'm aware -- I'm aware of that.  So that is
24   definitely when I updated that header, but I
25   wouldn't be surprised if there's some more
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     recent things on here.  So things change

3     often on a daily with new work coming out.

4          Q.   Okay.  We just request to the

5     extent you update your CV, please provide a

6     copy of it in advance of trial if you're

7     testifying, okay?

8          A.   Yes, happy to do it.

9          Q.   Have you done any work with public

10    transit agencies?

11         A.   So Rhode Island Department of

12    Transportation was interested in some drunk

13    driving prevention, so I know I've gone to

14    their conference.  But I haven't, you know,

15    been employed by Department of Transportation

16    specifically, but I recall going to one of

17    their conferences specifically related to

18    drunk driving prevention.

19         Q.   You attended one of their

20    conferences, but I haven't done any work for

21    them?

22         A.   No, I haven't been employed by

23    RITO -- RITA.

24         Q.   Okay.  And then how about any other

25    transportation work have you done?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1              L. Orchowski - Highly Confidential

2         A.    Not that I can think of.

3         Q.    Doctor, you're a staff psychologist

4    with a background in clinical psychology; is

5    that correct?

6         A.    That's correct.  I'm a staff

7    psychologist, my background is in patient and

8    clinical psychology.  I have specializations

9    in applied quantitative psychology and also

10   family and child therapy.

11        Q.    And you're a professor also?

12        A.    Yes, professor of research.

13        Q.    Okay.  So does the director of

14   research advancement, is that your position

15   as a professor of research or is that

16   separate?

17        A.    So I have multiple designations.

18   So I -- my faculty appointment is through the

19   Department of Psychiatry and Behavioral

20   Health, which is within our medical school

21   here at Brown.  My employer is at the

22   hospital, so kind of what you would consider

23   an academic medical school, where our faculty

24   are across multiple different hospitals

25   within our ivy league system.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2              So for my particular group at Brown
 3    University Health, which includes folks
 4    that -- at Miriam Hospital, Rhode Island
 5    Hospital, Newport Hospital, there are several
 6    hospitals employers that are through Brown
 7    University Health.  I serve as the director
 8    of research for our particular group here at
 9    the hospital.
10         Q.   Okay.  And so if you had a
11    breakdown -- if we had to do a breakdown in
12    terms of time allocated between your role,
13    let's say as a professor versus, you know,
14    doing research versus staff psychologist,
15    what would that be in this for this year?
16         A.   This gets into, like, kind of how
17    time and effort allocations are made.  So the
18    vast majority of my time is allocated to
19    research, and I had time very small amount
20    allocated to clinical work.
21              So -- but in terms of my job code,
22    my job code is as staff psychologist, and
23    then we have a certain amount of time and
24    effort, you would call it, allocated to
25    specific things that comprise our day-to-day
```

1      L. Orchowski - Highly Confidential

2    activities.

3      Q.   So can you kind of give me a

4    breakdown, like, in the week's time

5    generally, like, how much time you're

6    allocating to research versus clinical work?

7      A.   Yeah, so I am over 90 percent in

8    research.

9      Q.   Okay.  And in terms of 10 percent

10   in clinical work, what does that consist of?

11     A.   That consists of outpatient

12   psychotherapy.

13     Q.   And what type of patients are you

14   treating?

15     A.   My current role is in the adult

16   outpatient division, so these are all

17   individuals over the age of 18.

18     Q.   Okay.  And so what type of

19   disorders are you treating, or diagnoses?

20     A.   So our group is really a

21   generalized practice.  So it could be any

22   range of diagnoses.  I'm one of the

23   clinicians that oftentimes will receive

24   referrals for substance use, PTSD, trauma

25   across lifespan, but oftentimes there's

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   comorbid concerns that come with this, so

 3   depression, anxiety.  Really runs the gamut

 4   and we tend to have quite a generalist,

 5   eclectic caseload and outpatient division.

 6        Q.   So are you treating offenders who

 7   commit sexual assaults in your practice?

 8        A.   So at the moment, I do not have any

 9   offenders in my practice.  So right now focus

10   predominantly on treating victims.

11            If I have -- if there's someone,

12   I'm thinking about my current caseload, I

13   wouldn't describe anyone as someone that, to

14   my knowledge, has been referred specifically

15   for offender treatment.

16        Q.   Have you ever in the past treated

17   offenders, and if so, when?

18        A.   Yes.  So throughout my practice,

19   I've had folks that have been on my caseload

20   that come to me and disclose that --

21            (Court Reporter clarification.)

22        A.   That they've harmed someone.

23        Q.   Are there folks that you've treated

24   that have committed sexual assault?

25        A.   I believe so, yes.
```

1        L. Orchowski - Highly Confidential

2        Q.   And when was the last time you

3   treated someone who committed sexual assault?

4        A.   So this was in the case of when I

5   was at Ohio University, I was working in an

6   after hours clinic where it was very common

7   for folks to, you know, they would receive

8   notice that they had been accused of a sexual

9   assault.  So I was often one of the first

10  people that they came to when they received

11  that notice from kind of what would be

12  similar to like a Title IX process.

13       Q.   And when was that; you were at Ohio

14  University?

15       A.   Yeah, yeah, so this was I would say

16  between like 2006 to 2008.

17       Q.   Okay.  And so do you treat sexual

18  assault survivors as well?

19       A.   Yes, I have survivors on my

20  caseload.

21       Q.   Okay.  And in terms of the time

22  that you've spent on research and clinical

23  work, you describe that as 90 percent on

24  research and 10 percent clinical work; is

25  that correct?

```
 1           L. Orchowski - Highly Confidential
 2           A.    That would be my current breakdown.
 3      When I started in this role, I was hired as a
 4      full-time psychologist.  I had just completed
 5      a three years post-doctoral fellowship, one
 6      at the Center for Alcohol and Addiction
 7      Studies focused on the intersection of
 8      substance use and violence.  I took a third
 9      year fellowship after my Ph.D. --
10           THE COURT REPORTER:  Can you slow
11           down a little bit.
12           THE WITNESS:  Sorry.
13           A.    Yes, my third year of fellowship is
14      at Women & Infant Hospital and it was focused
15      on the intersection of HIV, STI,
16      victimization, intimate partner violence.
17      And then the first job I got here at the
18      hospital, at Rhode Island Hospital, was as a
19      staff psychologist.  At the time I was
20      waiting for research money to come through, I
21      had applied for several federal grants, this
22      is back right when the -- there was a lot of
23      challenges with federal funding, so I had
24      several grants pending at the time, but kind
25      of -- I had a great fortune of a clinical
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   position here at the hospital that was
 3   affiliated with Brown University's Medical
 4   School, so delighted to join the staff.  And
 5   then when I had some research grants that
 6   started, I was able to reduce the amount of
 7   time I was working clinically and then
 8   increase that time that I was working in
 9   research.
10        So the split between research and
11   clinical work has changed over time depending
12   on the research grants that I'd been working
13   on.
14        Q.   So let's go back, like, 2023.  How
15   much time was spent doing clinical work
16   generally versus research?
17        A.   Same split, so predominantly
18   research.
19        Q.   90 percent research, 10 percent
20   clinical work you would say?
21        A.   Yes.
22        Q.   Okay.  2024, did that split change?
23        A.   No, still predominantly research.
24        Q.   Okay.  And so when was -- when do
25   you recall it being predominantly clinical
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2    work versus research in the past?
 3         A.   So that would've been when I first
 4    started this position, so my academic
 5    appointment staff psychologist, 2012.
 6         Q.   And so what would the split have
 7    been in 2012?
 8         A.   When I started, I was 100 percent
 9    clinical work.  And then I had a grant
10    started that moved me up to 50/50, 50 percent
11    clinical work, 50 percent research.
12         Q.   And when was that grant?
13         A.   So the first research grant that I
14    had funded was by the NIH, National
15    Institutes of Alcohol Abuse and Alcoholism,
16    and that was working with college men who
17    were heavy drinkers and at high risk for
18    sexual aggression to develop a sexual assault
19    prevention program for these college men with
20    a -- who are engaging in heavy drinking.  So
21    I'm looking for the date of that specific
22    research grant.
23         Q.   Do you recall if it was generally
24    in 2013, 2012?
25         A.   That one started 2012.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2          Q.   So 2012, it shifted pretty quickly

 3     to 50 percent clinical work, 50 percent

 4     research.  And then what about thereafter?

 5          A.   The next grant that was funded was

 6     by the Center for Disease Control and

 7     Prevention, that was preventing sexual

 8     aggression among high school boys.  We worked

 9     with about over 20 high schools in Rhode

10     Island and in Massachusetts to implement and

11     evaluate our rape crisis center, sexual

12     assault prevention program, so that work

13     started in 2014.

14          Q.   So Doctor, I'm just trying to

15     figure out, I understand you're trying to

16     provide the information as to the grants you

17     were working on, but I'm just trying to

18     understand your split between clinical work

19     and research.

20               So it looks like it shifted in 2012

21     to being 50 percent clinical work and

22     50 percent research.  And then gradually, did

23     it increase to be more clinical -- I mean

24     more research, which is where you are today?

25          A.   Yes, that's correct.

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.   Okay.  Doctor, are there any

 3   instances where you issued an expert report,

 4   but haven't given testimony?

 5        A.   No, this is my first time doing any

 6   kind of expert work.

 7        Q.   Have you testified before Congress

 8   previously?

 9        A.   So I previously was appointed by

10   the Secretary of Defense to a congressional

11   advisory committee called Defense Advisory

12   Committee for the Prevention of Sexual

13   Misconduct, that was DAC-PSM.  So I don't

14   think that that work officially counts as

15   congressional testimony.  So we were a body

16   of expert reports that was appointed by the

17   Secretary of Defense that had expertise in

18   sexual assault prevention, and our tasking

19   was to review a series of questions that were

20   -- review a series of questions relevant to

21   sexual assault prevention for the military

22   and then provide reports.  I don't believe

23   that that would constitute any kind of

24   congressional testimony though.  But I was

25   involved in that committee.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.   So you didn't testify before

 3   Congress, correct, that's what you are

 4   testifying to?  That's all I'm looking for --

 5            (Cross-talk.)

 6        A.   Yeah, yeah.  No, like, oral --

 7        Q.   Yeah.  No testimony before

 8   Congress.

 9            Have you ever testified before a

10   Grand Jury?

11        A.   No.

12        Q.   Have you testified before any

13   federal agency?

14        A.   No.  So I'm thinking of

15   participating in a grant review.  So I used

16   to review grants for National Institutes of

17   Health or Centers for Disease Control and

18   Prevention, that really was the scientific

19   grant review process.  I don't think I would

20   consider that any kind of, like, testimony

21   or...

22        Q.   Okay.  Doctor, you're serving as an

23   expert witness on behalf of Uber, correct,

24   the defendant in this case against -- against

25   individuals that have claimed they have been
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    sexually assaulted by Uber drivers, you're
 3    aware of that, right?
 4        A.   Yes, I'm aware of that.
 5        Q.   Do you intend to be at trial in
 6    this case that's set in Phoenix beginning in
 7    January 2025 [sic]?
 8        A.   I'm available to support the work.
 9    I haven't been formally asked to do so to my
10    awareness, but if there's further work that's
11    needed of me, I would be available for that.
12        Q.   Okay.  Doctor, do you agree that an
13    expert should not form her opinions before
14    looking at the evidence?
15        A.   So the evidence base of opinions is
16    very important, so it's a -- kind of a
17    cornerstone of science that data drives
18    knowledge.
19        Q.   Doctor, thank you for that, but my
20    question was:  Do you agree that an expert
21    should form her opinions before -- that an
22    expert should not form her opinions before
23    looking at the evidence?  So I think that's
24    what you're saying, but you didn't answer the
25    question.  It's not a trick question, I'm
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2     just -- I am trying to dissect what you said.

 3     And I understand you're being considerate and

 4     thinking through it.

 5            So you agree with me that an expert

 6     should not form her opinions before looking

 7     at the evidence?

 8        A.   So review of evidence should

 9     absolutely be a component of forming an

10     opinion.

11        Q.   Do you agree an expert should base

12     her evidence -- opinion on what the evidence

13     shows?

14            MS. CARITIS:  Form.

15        Q.   Actually, I will withdraw that

16     question.

17            Do you agree that an expert should

18     be thorough in reviewing evidence relevant to

19     her opinion?

20        A.   That seems fair.  So I think it's

21     important to look thoroughly at evidence

22     provided to you.

23        Q.   Do you agree that an expert should

24     be willing to change her opinion if new

25     evidence becomes available to her?
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          A.    Yeah, that sounds like good

3     science.   This is a bedrock of what we do in

4     science, we're continually asking questions,

5     and often good science comes with new

6     questions that it raises.   So that -- that

7     comment, that continual review of evidence,

8     that feels very similar to what we do as

9     scientists.

10          Q.    Doctor, you testified that you're a

11    psychologist, correct?

12          A.    Yes, clinical psychologist.

13          Q.    You're not a psychiatrist?

14          A.    No, I don't prescribe any

15    medication.

16          Q.    You're not a medical doctor?

17          A.    No, I don't have an MD, I have a

18    Ph.D.

19          Q.    You're not an expert in rideshare?

20          A.    No, my expertise is in clinical

21    psychology, sexual assault prevention.   I --

22    I am not involved in any research

23    specifically about rideshare companies.

24          Q.    You're not an expert in rideshare

25    services?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1           L. Orchowski - Highly Confidential

2           A.    I've taken some rideshares, but my

3    research has not specifically focused on

4    rideshare specifically.  I focus broadly on

5    sexual assault prevention strategies.

6           Q.    You don't hold yourself out as an

7    expert in rideshare services, do you?

8           A.    I think that's fair to say that

9    none of my work focused on rideshares.

10          Q.    You're not an expert in any safety

11   mechanisms and how they affect rideshare?

12               MS. CARITIS:  Form.

13          A.    I would say -- so with regards to

14   safety mechanisms, absolutely my research has

15   focused on sexual assault prevention

16   strategies, and that includes strategies that

17   individuals can take to reduce their risk of

18   harm which I would say are, you know, we

19   could also phrase as safety measures.  Have I

20   conducted a study specifically on the

21   application to that rideshare environments?

22   No.

23          Q.    Yeah.  My question is, and it's

24   correlated to being an expert, you don't hold

25   yourself out as an expert on safety

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1       L. Orchowski - Highly Confidential

 2    mechanisms as to how they affect rideshare,

 3    do you?

 4       A.    I think so, safety measures -- some

 5    of our research clearly on sexual assault

 6    prevention, we could think about how it

 7    applies or does not apply to specific

 8    environments.  But broadly with regard to

 9    rideshare specifically, I have not published

10    in the area of ride shares.

11       Q.    Have you --

12            (Cross-talk.)

13       A.    Sorry.  I was gonna say with

14    regards to prevention.

15       Q.    Have you studied the rideshare

16    industry and what safety mechanisms to apply

17    to prevent sexual assault?

18       A.    I'm aware of the research

19    literature that's published in this area.  So

20    I work as an editor for several journals, so

21    I'm a senior consulting editor for Psychology

22    of Violence, associate editor for Psychology

23    of Women Quarterly, also a co-editor for

24    Journal of Child Sexual Abuse, which looks

25    across the lifespans in this context, you

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1         L. Orchowski - Highly Confidential

2    know, just broadly in terms of how violence

3    can occur in a number of spaces.  So I'm

4    aware of some research studies that are out

5    there in the literature on these topics, but

6    I would not say that this is the primary area

7    my work focuses on.

8         Q.   So you're aware of research --

9    literature on rideshare discussing -- you're

10   talking about?

11        A.   There's been some articles

12   published specific to ride shares.

13        Q.   And have you included those in your

14   report?

15        A.   Yes, one of them, for example, is

16   Ison, et al., 2023, you're just constantly

17   on --

18             THE COURT REPORTER:  I'm sorry.

19        Can you please -- you have to slow

20        down when you're reading.

21             THE WITNESS:  I'm sorry.

22        A.   So one is the Ison, et al., you're

23   constantly on alert women --

24             THE COURT REPORTER:  I'm sorry.

25        I'm not catching that.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        Q.    Doctor, can you slow down and
 3   reference where in your report you're looking
 4   to?
 5        A.    Yeah.  So this is page 2 of
 6   Exhibit B, the reference to Ison, I-S-O-N,
 7   Forsdike, Henry, Hooker and Taft:
 8             "You're just constantly on alert."
 9   Women and gender-diverse people's experiences
10   of sexual violence on public transport.
11        Q.    Doctor, I said rideshare and this
12   mentions public transport.  Does this discuss
13   Uber Rideshare or Lyft Rideshare in this
14   publication?
15        A.    I'm sorry, I didn't -- I didn't --
16   it wasn't clear to me that rideshare wouldn't
17   be a part of transport.
18        Q.    Well, it's talking about public
19   transport and does it discuss -- my question
20   to you is, does this discuss rideshare in
21   this article?
22        A.    We can pull up the article if it
23   would be helpful to go through it.
24        Q.    Well, sitting here today, do you
25   recall it discussing rideshare?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2         A.   I prefer to pull it up and we could
3    take a look.  That's also another one on this
4    list, Tillewein & Cox, that is specific to
5    rideshare, it is on page 4.
6         Q.   You can pull this down.
7              Doctor, we were talking about you
8    not being an expert in the rideshare industry
9    and you testified that you never conducted
10   any studies about safety features that
11   actually impact rideshare, correct?
12        A.   Correct.
13        Q.   You're not an expert in public
14   transportation, correct?
15        A.   (Audio distortion.)
16        Q.   I'm sorry, you went out.
17        A.   (Audio distortion.)
18             THE COURT REPORTER:  I didn't get
19        that whole thing.  You're not coming
20        in clear.
21             THE WITNESS:  How's that?
22             THE COURT REPORTER:  Much better.
23             THE WITNESS:  Okay.  I'll stay
24        close to the computer here.
25        A.   So I am not an expert in public
```

```
 1        L. Orchowski - Highly Confidential
 2    transport.
 3        Q.   You're not a marketing expert,
 4    correct?
 5        A.   I do not work in marketing.
 6        Q.   You're not a regulatory expert,
 7    correct?
 8        A.   I do not work in regulatory.
 9        Q.   You're not an expert in statistics,
10    correct?
11        A.   My training is heavily in
12    statistics.  I teach a course on
13    psychometrics and assessment at Rhode Island
14    College.  I teach several courses in research
15    methodology.  My specializations in graduate
16    school for my Ph.D. was in applied
17    quantitative psychology, which included
18    multiple years of advanced statistics, as
19    well as calculous.  So statistics is part of
20    what I do on a day-to-day basis.
21        Q.   Are you a statistician?
22        A.   I do a lot of statistics as part of
23    my job, but I'm not -- my Ph.D. is not in
24    biostatistics, I'm a clinical psychologist.
25    And many of us are highly trained in
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    statistics and rely on them to do the work

3    that we do.  So wouldn't be uncommon for me

4    to be the statistician on the papers that I'm

5    writing.  So I work with data on a daily

6    basis, the collection of data, the analysis

7    of data.  I'm not sure what your standards

8    are for saying that someone is a

9    statistician, sometimes it feels like that's

10   my role if I'm working with data.

11       Q.   I understand it may feel like that,

12   but do you have a degree in statistics?

13       A.   And so insofar as much as I have a

14   degree in advanced quantitative methods that

15   is specific to statistics I would say that

16   advanced statistical training is absolutely

17   part of my degree.

18       Q.   But you don't hold yourself out as

19   a statistician even though you do some work

20   with statistics and data, correct?

21       A.   To be clear, my Ph.D. is in

22   clinical psychology.  This includes advanced

23   statistical training, and the work that I do

24   on a daily basis does include statistics.

25       Q.   Okay.  Do you hold yourself out as

```
 1        L. Orchowski - Highly Confidential
 2    an expert in epidemiology?
 3        A.    It's the question of what makes
 4    someone an expert.  A lot of the work that we
 5    do in prevention is related to public health,
 6    and epidemiologists are folks that I work
 7    with on a daily basis in terms of
 8    collaborations in public health.  So be very
 9    specific about my degree is in clinical
10    psychology, but a lot of times the work that
11    we do does dovetail into epidemiological
12    questions, right.  So if we look at the
13    prevalence of something, if we want to
14    predict the likelihood of something, I would
15    say those are epidemiological questions.
16    There's a lot of overlap between fields.  So
17    psychologists working in public health are
18    often asking and answering those kinds of
19    questions about prevalence and risk.
20             So I think to the extent that my
21    work overlaps in those areas, absolutely.
22    You see a lot of work in sexual assault
23    prevention crosses over into epidemiology.
24    Is my degree a Ph.D. in epidemiology?  No.
25    My degree is in clinical psychology, but a
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    lot of the work that I do does have that

3    crossover into that space.

4        Q.   So Doctor, I appreciate the

5    response, but you don't have a degree in

6    epidemiology; is that correct?

7        A.   Correct, my Ph.D. is not in

8    epidemiology.

9        Q.   You don't have a degree in law

10   enforcement?

11       A.   No, I do not have a degree in law

12   enforcement.

13       Q.   You don't hold yourself as an

14   expert in corporate governance?

15       A.   No, I do not hold training in

16   corporate governance.

17       Q.   Okay.  Doctor, when's a good time

18   for a lunch break?

19           MS. LUHANA:  Let's go off the

20       record.

21           THE VIDEOGRAPHER:  The time is

22       17:06 UTC time and we are off the

23       record.

24           (Off the record.)

25           THE VIDEOGRAPHER:  The time is

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        17:53 UTC time and we are back on

 3        record.

 4   BY MS. LUHANA:

 5        Q.   Doctor, you'd agree that context

 6   matters, right?

 7             MS. CARITIS:  Form.

 8        A.   Yes, I agree.

 9        Q.   Without appropriate context, what

10   you're opining on can be misleading, correct?

11             MS. CARITIS:  Form.

12        A.   I think broadly in any kind of

13   science, especially when we're talking about

14   sexual assault, that the context that things

15   are occurring in is important.

16        Q.   Well, it's not just science, it's

17   any time you're discussing a certain

18   situation, sexual assault or otherwise,

19   without appropriate context, things can be

20   misleading, right?

21             MS. CARITIS:  Form.

22        A.   (Audio distortion) context matters.

23             THE COURT REPORTER:  The beginning

24        of that was a little distorted.

25        A.   Probably in a human experience
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   context matters.
 3            MS. LUHANA:  Lance, can you please
 4        pull up Exhibit 1, which is
 5        Dr. Orchowski's report as well as
 6        Exhibit 4, which is Dr. Valliere's
 7        report?  And can you put them side by
 8        side?  Great.
 9            And let's look to page 3 of
10        Dr. Orchowski's report there,
11        Exhibit 1.  And can you just highlight
12        under Assignment and Methodology, "I
13        was retained by counsel for
14        defendants," that first line, that
15        whole sentence.  And then go to
16        Dr. Valliere's report first page
17        there, after the cover sheet, the
18        first -- perfect.  And then just
19        highlight the first sentence there.
20        Q.   Dr. Orchowski, as you see before
21   you it's your report and Dr. Valliere's
22   report.  And can you read that first sentence
23   of Dr. Valliere's report?
24        A.   The report notes:
25            I've been retained as an expert to
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2    provide an expert analysis of Uber

 3    ridesharing and the enhanced risk of sexual

 4    assault and sexual misconduct of women using

 5    Uber.

 6        Q.   And can you read the first sentence

 7    of your report under your Assignment and

 8    Methodology?

 9        A.   I was retained by counsel for

10    defendants to review and respond to

11    Dr. Veronique Valliere's opinions regarding

12    the Uber Rideshare platforms, driver sign-up

13    and screening process and environmental

14    safeguard and risk-reduction measures, and

15    the sufficiency of sexual misconduct

16    taxonomy.

17        Q.   So in responding to Dr. Valliere's

18    report, we've discussed this some, but in

19    your report, there is no specific discussion

20    of Uber documents present, correct?

21        A.   So in the report, I'm focused on my

22    assessment of Dr. Valliere and I do not

23    include citation of specific Uber documents,

24    but it is something that was provided to me

25    and included in my analysis.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          Q.    However, Dr. Valliere relied on

 3     Uber documents to come to her opinions; isn't

 4     that so?

 5          A.    Yeah, she cites those in her

 6     report.

 7          Q.    And so my question to you is:  In

 8     your report outside of citations, there is no

 9     discussion of those Uber documents in your

10     report?

11          A.    My task was really to apply a

12     scientific lens based on my expertise in

13     sexual assault prevention to evaluate the

14     conclusions of Dr. Valliere's report.  I was

15     able to access the Uber documents that she

16     references when they were useful to my

17     analysis.

18               MS. LUHANA:  Objection.

19          Nonresponsive.

20          Q.    I appreciate you trying to answer

21     the question that I pose, but you didn't, so

22     let me retry again.

23               In your report, outside of

24     citations -- outside of no citations to Uber

25     internal documents, there is no discussion of
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   any Uber documents in your report, correct?

 3        A.   I mean, I would disagree.  So for

 4   example, on page 4, I note under the first

 5   section of my report that Valliere states,

 6   quote:

 7             Uber's research of these risk

 8   factors and personality traits is a direct

 9   acknowledgment again of something that can be

10   done to decrease sexual assault in these high

11   risk environments.  Unquote.

12             So here, this is a bit relevant to

13   our prior discussion, I do have some quotes

14   to Valliere's report in this document, so I

15   want to clarify that from earlier.

16             But also here in discussing

17   Valliere's analysis of the Uber documents, I

18   do feel like my report is weighing in on her

19   assessment of those documents --

20        Q.   Doctor, where --

21             (Cross-talk.)

22        A.   Oh, sorry.

23        Q.   Go ahead, finish.

24        A.   It even -- even without citing a

25   specific Uber document.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.   Well, we'll get to page 4 and

 3   your -- the conclusions that you've reached

 4   in your report.

 5             But my question is much simpler:

 6   Is there any discussion in your report of any

 7   Uber internal documents?

 8        A.   My task was very much to evaluate

 9   Dr. Valliere's report.  So to the extent that

10   her report is based on Uber documents, my

11   opinions and discussion in the report have

12   relevance to her opinions and the extent to

13   which she discusses those documents.

14        Q.   Where is the discussion of any Uber

15   documents in your report; where is that

16   discussion, where would I find it?

17        A.   And I think what you're referring

18   to is looking for citations of specific Uber

19   documents.  And I'll clarify again that my

20   report does not cite specific Uber documents,

21   however, we can look at page 11 and discuss

22   ways that Valliere's report and my analysis

23   of it discusses those things.

24             So for example, in Valliere's

25   report, she discusses kind of how, for
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    example, I'm looking at page 11, an example

3    of Valliere's discussion of the

4    underreporting rates of sexual assault in a

5    population based literature of sexual

6    assault, which are discussed with relevance

7    to Uber incident data.

8             So in Valliere's report, she

9    discusses underreporting and she discusses

10   Uber data.

11       Q.   So where is your specific

12   discussion of those internal documents?  Do

13   you reference any Uber studies in your

14   report?

15       A.   I'm -- so I'll clarify again.  I do

16   not reference by with a citation a specific

17   Uber document.  Instead, my analysis focuses

18   on Valliere's discussion of Uber documents.

19       Q.   Did you discuss any of the studies,

20   Uber studies -- withdraw that question.

21            Do you discuss any internal Uber

22   studies that Dr. Valliere discusses in her

23   report in your rebuttal report?

24       A.   My recall is very squarely and

25   narrowly focused on Valliere's report.  I did

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     not do an independent analysis of specific

3     Uber documentation, that was not what I was

4     asked to do.  I was asked to review and

5     provide an opinion on Dr. Valliere's report.

6          Q.   But Dr. Valliere's conclusions

7     are -- well, withdraw that.

8               Let's move on to -- let's keep

9     Exhibit 1 up and take Exhibit 4 down.  And

10    let's go to your summary opinions, Doctor.

11              So I believe you have six summary

12    opinions in your report and they start on

13    page 3.  So at the bottom of page 3, can you

14    read that first bullet point there of your

15    summary opinions?

16         A.   Despite desire to identify

17    individuals at risk for committing sexual

18    assault, research has yet to identify systems

19    that can accurately predict whether an

20    individual without a criminal history of

21    committing sexual offenses will commit sexual

22    assault in the future.

23         Q.   What is the basis for this opinion

24    in your report?

25         A.   So at the end of Valliere's report,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2     if we want to go there.

 3          Q.   No, I'm asking you in your report.

 4     What is the basis of this opinion?

 5          A.   So, we can go to that section of

 6     the scientific limitations of predictive

 7     screenings for sexual offenses, so I'll draw

 8     you there to page 4 of --

 9          Q.   Valliere's report?

10          A.   Yes.  Valliere states that Uber's

11     research of these risk factors and

12     personality traits --

13               THE COURT REPORTER:  I'm sorry.

14          You have to please slow down.

15               THE WITNESS:  Oh, I'm sorry.

16          A.   I'll stay close to the computer.

17               MS. CARITIS:  She's reading from

18          the bottom of page 4, we're just

19          trying to keep up on the screen.

20          Yeah, Scientific Limitations, yep.

21          A.   So the basis for this opinion, I

22     start this discussion on the bottom of

23     page 4.  This section of the report goes

24     through the Scientific Limitations of

25     Predictive Screening for Sexual Offending.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   And it's linked to the section of Valliere's
 3   report that states that:
 4             Uber's research of risk factors and
 5   personality traits is direct acknowledgment
 6   again that something can be done to decrease
 7   sexual assault in the high risk environment.
 8             I disagree with that claim.
 9   Specifically the assertion fails to consider
10   the significant limitations and shortcomings
11   of the research literature regarding the
12   predictive screening for sexual offending.
13             This opinion is based on Yang,
14   et al's meta-analysis as well as other
15   components of my expertise in this field.
16   The Yang meta-analysis specifically looks at
17   risk assessment tools for the prediction of
18   violence suggesting that methods only achieve
19   moderate levels of accuracy.  There's another
20   systematic review in meta-analysis of risk
21   assessments for violence in 73 studies where
22   there's almost 25,000 total participants.
23   This one also found that measures have low to
24   moderate predictive -- positive predictive
25   values and higher negative predictive values,
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2    meaning that they're better at identifying

3    individuals who will not be violent than

4    those who will be.  When this happens a

5    significant number of individuals who are

6    judged by assessment tools as having high

7    likelihood for harm are incorrectly

8    classified and do not go on to offend.

9               The section of the report also

10   discusses how given that false positives are

11   especially high in ethnic minorities.

12   Reliance on risk assessments for the

13   determination of violence proclivity can also

14   result in biased decision-making, especially

15   for members of protected classes.

16               Few risk assessment tools have also

17   been studied in ethnic minority samples.

18   Taken together these literature reviews point

19   to widespread problems relating to the

20   occurrence of false positives with risk

21   assessment.

22               This section of the report also

23   goes on to more specifically discuss Point 1,

24   looking at other studies that have looked at

25   screening populations.  So broadly, the

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    screening measures that we have for looking
 3    at prediction of sexual offenses are
 4    insufficient to predict whether or not
 5    someone will offend.
 6            So in this second paragraph, that's
 7    now on page 5, I also talk about measures
 8    that we have for evaluating violence
 9    proclivity, specifically these measures are
10    often studied among individuals within the
11    criminal justice population, so individuals
12    that have already come to the attention of
13    law enforcement, which is very different from
14    someone that has no prior criminal history.
15    We also have these measures that have been
16    developed for psychiatric inpatient settings
17    looking at who might be likely to be violent
18    in this population.
19            There's an issue there with these
20    measures because as psychiatric inpatient
21    samples also criminal justice samples do vary
22    considerably from the general population.
23            So there's really not a good basis
24    for assuming that existing risk assessments
25    of proclivity could be applied to new
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     settings.  This would also be the case, for

3     example, if we had assessments of sexual

4     offending.  It would be difficult to apply

5     those measures of the sexual offending to a

6     new population.

7               Generally, if we look at screening

8     measures that developed or validated for use

9     in specific population citing in context and

10    when these measures are transported to new

11    settings, this seems that the population

12    setting in context dissimilar, which may not

13    be true, this is the one of the main concerns

14    that I have with the Valliere report because

15    it's often not clear where what she's talking

16    about is relevant to Uber specifically, there

17    isn't research cited.  And we want to be

18    careful that any kind of screening measures

19    are measures that are suggested for use in

20    sexual assault prevention are appropriate for

21    use in a specific population.

22          Q.   So Doctor, you're just going

23    through your report and I can read your

24    report as well.  I am looking specifically

25    for the basis for your opinion and if you

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     could provide the citation.  So on page 4 and

3     page 5 is what you've gone through for your

4     first bullet point there, is that accurate?

5          A.   Yeah.  So the first opinion is

6     documented throughout page 4 and page 5 and

7     goes on to page 6.  So we do have a long list

8     of research which supports the point that is

9     even though our field has spent a lot of work

10    trying to identify individuals at risk for

11    committing sexual assault, our research has

12    yet to identify systems that can accurately

13    predict.  So I'm happy to continue and

14    articulate this, but all of the research

15    studies in this -- in this section of the

16    report would speak to this point.

17         Q.   Well, I'm trying to understand

18    exactly what you're citing in support and be

19    clear about it because you've cited, you

20    know, six summary opinions, and I want to be

21    sure of the facts you're relying on and the

22    studies you're relying on.

23              And so with Bullet Point 1, you

24    mentioned on page 4 you start out with a

25    criticism of Valliere and you cite to Douglas

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   2017 there, correct, at the bottom?

 3        A.   (Audio distortion.)

 4        Q.   That is the start, right.  So what

 5   is Douglas 2017, is that noted in Exhibit B?

 6        A.   (Audio distortion.)

 7             THE COURT REPORTER:  I'm sorry.

 8        You're cutting out.

 9             THE WITNESS:  Oh, sorry.  I'll

10        speak closer.

11        A.   Why don't we go to that article so

12   we can review it?

13        Q.   No, I don't want to do that right

14   now, your counsel can do that with you.  My

15   question is, is this listed in Exhibit B on

16   your materials considered list because this

17   is something you clearly considered?

18        A.   I hope it would be.  If it is not,

19   that would be an omission on my part.  But

20   absolutely Douglas, et al. is something I

21   considered.  So if we want to take a look at

22   it.

23        Q.   Yeah, let's take a look at

24   Exhibit B then.  Can we flip to the second

25   page if that's in alphabetical order, it
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     should be.  So is it there listed on your
 3     materials considered list, Doctor?
 4          A.    (Document review.)
 5               I'm terribly sorry.  So I have
 6     omitted this from the list.  I'd be happy to
 7     provide it for you.  This is my error.
 8          Q.    So this may be because you were in
 9     a rush to finish this report as you've
10     testified to earlier, what is --
11               MS. CARITIS:  Objection.  Form.
12               (Cross-talk.)
13               MS. LUHANA:  I'm not done with my
14          question.
15          A.    I would disagree, I was not in a
16     rush to finish this report.  I don't think I
17     ever stated that on record.
18          Q.    You did testify to that.  Are you
19     changing your testimony now?
20               MS. CARITIS:  Objection.  Form.
21          Q.    Good God.
22          A.    Do you have words on record that I
23     felt rushed, because I disagree with that, I
24     would like to amend that.  I did not feel
25     rushed in completing this report.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2        Q.   So you're changing your testimony
3    now?
4             MS. CARITIS:  Objection.  Form.
5        She asked you if she did say that.
6        She'd like you to read that back to
7        her.  To the extent she has to revise,
8        she will.
9             MS. LUHANA:  Counsel, you can run
10       through it with her, and please keep
11       your objections to form.
12       Q.   Doctor --
13            (Cross-talk.)
14            MS. CARITIS:  -- your questions
15       appropriate to the witness.
16            MS. LUHANA:  I'm trying to find
17       out what she's relied on.  I'm having
18       a difficult time assessing what she
19       relied on 'cause it's not cited in her
20       report.
21            MS. CARITIS:  It's cited,
22       literally she just read you it, cited
23       literally multiple times on the pages
24       she just read.
25            MS. LUHANA:  Counsel, you can do
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          what you want during your examination.

3          Q.   Doctor, Douglas 2017, what article

4     is that?  It's not listed in Exhibit B.  Can

5     you tell me what article that is?

6          A.   (Audio distortion.)

7               THE COURT REPORTER:  Can anybody

8          else understand her?

9               MS. LUHANA:  No.

10              MS. CARITIS:  Why don't we take a

11         quick minute.

12              And Dr. Orchowski, can you say

13         some words to make sure we can hear

14         you and then we'll --

15              THE WITNESS:  (Audio distortion.)

16              MS. CARITIS:  It's pretty muffled.

17              THE WITNESS:  How's that?

18              MS. CARITIS:  Better.

19         Q.   What article is this, Doctor, that

20    you're referencing here?

21         A.   I'm happy to provide you with the

22    full citation, it looks like it was left out

23    of my reference list.

24         Q.   But at this time sitting here, I

25    think you reference it a couple times in your

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential
2    report.  Do you remember what Douglas 2017
3    is?  And if you don't, that's fine.  I'm just
4    trying to see if you have, you know, any
5    recollection of it.
6          A.   I would be happy to get you the
7    full information for the reference.  Again,
8    my apologies that this was omitted, it was
9    not my intention to leave anything out.
10         Q.   Okay.  And Doctor, in this first
11   bullet point, the references that you went
12   through, you referenced on page 3 and page 4,
13   page 5 and you also said throughout your
14   report.  I'm trying to hone in on that, but
15   anything else that you're relying on for that
16   first bullet point summary opinion in your
17   report?
18              MS. CARITIS:  Form.
19         A.   When you say "relying on," you're
20   looking for me to provide a single citation,
21   'cause broadly I would direct you to
22   Section 4, which spans from page 4, 5, 6
23   and 7, this assertion is something that draws
24   on a wide range of articles and literature.
25   I just want to be sure I'm understanding the
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    question.
 3        Q.   Okay.  Yeah.  So you're saying it's
 4    all encompassing, it's all throughout the
 5    report, there isn't -- I'm trying to
 6    understand the facts and citations you're
 7    relying on to come to this conclusion, and
 8    your opinion is it's throughout your report?
 9            MS. CARITIS:  Objection.  Form.
10        A.   What I would -- what I will say is
11    that this summary, which is a summary
12    statement, summarizes the content that is
13    ascribed between page 4, 5, 6 and 7.
14        Q.   And what you're relying on to come
15    to these opinions is cited on page 4, 5, 6
16    and 7; is that correct?
17        A.   I'm relying on these citations as
18    well as my analysis of the Valliere report.
19    So this opinion is really in response to
20    Valliere's claim that Uber's research of risk
21    factors is a direct acknowledgment that
22    something can be done.  I disagree with that
23    claim.  As discussed on these pages and as
24    summarized in the summary point, our field in
25    sexual assault prevention despite its desire
```

1        L. Orchowski - Highly Confidential

2    to identify individuals at risk for

3    committing sexual assaults, we have yet to

4    identify systems that can accurately predict

5    whether an individual without a criminal

6    history is likely to commit sexual assault in

7    the future.

8        Q.    Doctor, context is important.  Do

9    any of the studies that you're relying on for

10   that opinion discuss rideshare?

11           MS. CARITIS:   Form.

12       A.    To my knowledge, there is not a

13   peer-reviewed scientific publication that

14   looks at the predictive accuracy of

15   likelihood to commit a sexual offense in

16   rideshare.  I would be happy to look at the

17   Tillewein and Cox article again because they

18   really look at kind of the research in this

19   area and where a call for the research is to

20   go, making a call for the need for more

21   information on this.

22           But to my knowledge, I am not aware

23   of a study that suggests that we have a

24   measure that can accurately predict in our

25   peer-reviewed scientific literature that we

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    can predict with a crystal ball who is going

3    to commit a sexual offense.  I'm not aware of

4    such a research study.

5        Q.    So Doctor, you have not looked at

6    Uber studies that predict the increased risk

7    of sexual assault in this analysis and you

8    don't rely on those for your opinion here?

9            MS. CARITIS:  Form.

10       Q.    Because they're not peer-reviewed,

11   correct?

12           MS. CARITIS:  Form.

13       A.    In these, I looked at Valliere's

14   report and her citation of Uber

15   documentation.

16       Q.    Doctor, are you relying on Uber's

17   studies to come to this conclusion here?  Are

18   you relying on Uber's studies of predictive

19   screening to assess the risk of sexual

20   assault occurring on Uber's platform to come

21   to this conclusion?

22           MS. CARITIS:  Form.

23       A.    I am aware of Dr. Valliere's

24   discussion of Uber documentation.  I am also

25   aware of the scientific literature that

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   suggests for sexual assault as well as other
 3   kinds of criminal offenses that we do not
 4   have a system to accurately predict who will
 5   and who will not be violent.
 6        Q.   Doctor, to come to this conclusion,
 7   you didn't, as we've discussed, include any
 8   internal Uber data, studies, analysis,
 9   testimony or documents in your report; is
10   that correct?
11             MS. CARITIS:  Form.
12        A.   I'm going to go back to clarify
13   that I reviewed Valliere's research.  I
14   reviewed Valliere's report which included
15   citation of Uber documents.  I reviewed Uber
16   documents that were relevant to forming my
17   opinion.  As an expert in the science of
18   sexual assault prevention, I have a very
19   narrow scope.  My scope was not to evaluate
20   Uber documentation.  My scope was to evaluate
21   Valliere's claims.
22             So as I'm talking about in this
23   summary, Valliere made a claim specifically
24   that something can be done to decrease sexual
25   assault in a high risk environment.  In this
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1         L. Orchowski - Highly Confidential

2    first bullet point and in the report, I

3    disagree with that claim and throughout

4    pages 4 through 7, I cite research suggesting

5    that we do not have accurate systems to

6    predict who will or who will not offend.

7         Q.   Okay.  Actually, let's go to --

8    since we're on that topic, let's go to page 4

9    where you lodge this criticism of

10   Dr. Valliere.  And it's at the bottom there,

11   right, can we highlight that?

12         So Valliere states that Uber's

13   research of these risk factors and

14   personality traits is a direct acknowledgment

15   again that something can be done to decrease

16   sexual assault in the high risk environment.

17         Doctor, you don't include a cite

18   here as we've stated before to Valliere's

19   report, correct?

20         A.   Would you like me to look at the

21   page number?

22         Q.   Let's pull it up actually.  Let's

23   go to Exhibit 4 and let's put it side by

24   side.  What page is it, Doctor?  You didn't

25   note it in your report.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2               MS. CARITIS:  Form.
 3          Argumentative.
 4          A.   I'll be happy for you to pull it up
 5     for me though, thank you.
 6          Q.   What page?
 7               MS. CARITIS:  Would you like her
 8          to review the Valliere report for the
 9          quote she included?  Is that what
10          you're asking her to do right now?
11               MS. LUHANA:  I would like her to
12          find the citation which she's relying
13          on to include this in her rebuttal
14          report, yes.
15          Q.   Doctor, do you recall what she was
16     discussing here?
17          A.   Do we want to move on for that
18     question because I was looking for the report
19     here?
20          Q.   It's related to this line of
21     questioning.
22               MS. CARITIS:  You can take a look
23          at page 25 if you'd like to find the
24          citation, Dr. Orchowski, that counsel
25          is referring you to.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2              THE WITNESS:  Thank you.

3              MS. LUHANA:  I'm not referring her

4          to it, I want her to refer to it.

5              MS. CARITIS:  You literally asked

6          her for the page in the report.

7              MS. LUHANA:  I did.

8              MS. CARITIS:  She doesn't have

9          access, so it's -- she's -- it's gonna

10         take a long time for her to search

11         through an 80-page document.  So if

12         we'd like to direct her to what you're

13         talking about we can do that.

14         A.   I got it, I see it on page 25.

15    Thank you.  Thank you.

16             Uber's research of these --

17             THE COURT REPORTER:  Doctor.

18         Doctor.  Doctor, you have to slow

19         down.

20             THE WITNESS:  Sorry.

21         A.   So Uber's research of these risk

22    factors and personality traits is a direct

23    acknowledgment again that something can be

24    done to decrease sexual assault in the high

25    risk environment.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential

 2         Q.   So what predictive screening,

 3    Doctor, was Dr. Valliere referring to here?

 4    You didn't mention that in your report, nor

 5    cite the Uber documents, but what is she

 6    referring to here?

 7              MS. CARITIS:  Form.

 8         A.   Would you like me to discuss that

 9    section of the report?

10         Q.   Let's look at the -- let's go to

11    page 24.

12         A.   Yeah.

13         Q.   Not of your report, do you see

14    Cerebro and uSights here?

15         A.   Yeah, that's what I'm looking at.

16         Q.   So Doctor, what predictive

17    screening was Dr. Valliere referring to with

18    that statement?

19         A.   So would you like me to read from

20    the report?

21         Q.   I would like you to -- if you

22    choose to read from the report, you can, but

23    do you understand when you came to this

24    conclusion in your rebuttal what Dr. Valliere

25    was referring to?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential

2               MS. CARITIS:  Form.

3          A.    Could you clarify the question

4    again?  Do you want me to read from the

5    report?

6          Q.    Doctor, Dr. Valliere's statement

7    about Uber's research of these risk factors

8    and personality traits being a direct

9    acknowledgment again that something can be

10   done to decrease sexual assault in the high

11   risk environment is referring specifically to

12   Cerebro and uSights; is that correct?

13              MS. CARITIS:  Form.

14              MS. LUHANA:  Lance, actually, take

15         Exhibit 1 down.  And let's keep

16         Exhibit 4 and let's highlight some of

17         these things so Dr. Orchowski can

18         refresh her recollection.  Can you

19         blow it up some?  And go down to the

20         Cerebro section, perfect.

21              MS. CARITIS:  And if you could,

22         please, so she can have an

23         understanding of this context, let her

24         see starting at page 20 where this

25         section begins.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2            MS. LUHANA:  Alex, it's my
 3        examination.
 4            MS. CARITIS:  She needs to --
 5            (Cross-talk.)
 6            MS. LUHANA:  Please do not
 7        direct -- no, no, please do not direct
 8        the witness.
 9            MS. CARITIS:  Okay.  Then please
10        send her this document, she can't pull
11        it down.
12            MS. LUHANA:  She has -- she has
13        Dr. Valliere's report in front of her.
14            MS. CARITIS:  Okay.
15            (Cross-talk.)
16            MS. LUHANA:  It's a hard copy of
17        it.
18            MS. CARITIS:  So Dr. Orchowski,
19        just make sure you are taking a look
20        at the section she's referring to.  I
21        forgot you had a hard copy, so I
22        apologize.  But you can look at the
23        hard copy, you don't need to be led
24        into this section up on the screen,
25        but I forgot you have a hard copy.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Thank you for that reminder.

 3        Q.   Doctor, are you aware of what

 4    Cerebro is?

 5        A.   So on page 24, Cerebro is described

 6    as a validation analysis strategy.  There's a

 7    document that Valliere discusses

 8    acknowledging that it's ███████████████

 9    ████████████████████████████

 10   ███████████████████████████████████

 11   ████████████████████████████████████

 12   ██████████████████████████████████

 13   ███████████████████████████████████

 14   ████████████████████████████████████

 15   ██████████████████████████

 16   ██████████████████████████████

 17   ███████████████████████████████

 18   ███████████████████████████

 19   ███████████████████████████████

 20   ████████████████.

 21            Throughout it's evolution, Uber

 22   provided specific examples of its use to

 23   prevent or deter sexual assault and

 24   misconduct.  For example in Uber's global

 25   results outside the US, it was noted that
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2    ████████████████████████████████████████

 3    ███████████████████████████████████████████████

 4    ████████████████████████████████████████

 5    ███████████████████

 6          Q.    Doctor, I'm not asking you to read

 7    out loud the expert report.

 8                My question is the predictive

 9    screening that Dr. Valliere was referencing

10    related to Cerebro and uSights; is that

11    correct?

12                MS. CARITIS:   Form.

13          A.    So my understanding of Valliere's

14    section of the report is starting on page 20,

15    there's a discussion of safety and sexual

16    offenders, identifiable risk factors and

17    effectiveness of various safety procedures.

18    And this discussion of Cerebro is included in

19    this section of the report discussing various

20    safety features and screening procedures.

21          Q.    Doctor, why don't you -- let's

22    scroll down to page 25 here, and right

23    before, Dr. Valliere says:

24                Uber's research of these risk

25    factors and personality traits is a direct

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2   acknowledgment again that something can be

3   done to decrease sexual assault in the high

4   risk environment.

5            Let's scroll down.  Further.  Keep

6   on going, right there.  That paragraph says:

7            While Uber intended to use Cerebro

8   and uSights as alternative to background...

9   nothing limits Uber from potentially using

10  these tools in addition to background checks.

11           Did I read that correctly?

12       A.   Yes, you read that correctly.

13       Q.   Doctor, you didn't reference Uber's

14  validation study in your report or any

15  discussion of the validation study, did you?

16       A.   No, I don't specifically reference

17  the validation study.

18       Q.   Do you reference Cerebro or uSights

19  or any of Uber's testing of those programs in

20  your report?

21       A.   As I mention before, I don't

22  reference specific Uber documents.  I'm

23  specifically commenting on Valliere's report.

24       Q.   Doctor, I don't understand.

25  Valliere's report discusses Cerebro and

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     uSights as alternatives to background checks.

3     Yet you didn't evaluate these documents for

4     your discussion in your rebuttal report?

5          A.   That is not what I -- that's --

6     that's not what I said.

7          Q.   Is it anywhere to be found in your

8     expert report?

9               MS. CARITIS:  Form.

10          A.   So speaking to utility of, despite

11     a desire to identify risks -- individuals at

12     risk for committing sexual assault, which is

13     something that Valliere and I are both very

14     much interested in, I would disagree with the

15     premise that there could be a system that

16     accurately predicts whether an individual

17     without a history of committing sexual

18     offenses will commit sexual assault in the

19     future.

20          Q.   Doctor, have you evaluated the data

21     that Uber has available to it about its

22     drivers?

23               MS. CARITIS:  Form.

24          A.   To the extent that I reviewed

25     Valliere's report, I'm aware of what is cited

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    in the report.
 3        Q.   Doctor, in fact, in terms of your
 4    report, we've established you do not cite to
 5    any discussion of internal Uber documents,
 6    correct?
 7        A.   We seem to be talking about this
 8    point a lot and I've clarified that although
 9    there's not a specific citation, it does not
10    mean that I am not aware of these documents.
11        Q.   I'm not talking about your
12    awareness.  I'm talking about discussion,
13    consideration and it being discussed in your
14    report.  There's no discussion of any
15    validation studies in your report of Uber,
16    correct?
17        A.   Your question is about
18    consideration or discussion.  Although I do
19    not cite them specifically, I have considered
20    these.
21        Q.   Really, considered in the 21 hours
22    you reviewed over 600 documents, 60 plus
23    depositions with all the exhibits that
24    Valliere cited?
25            MS. CARITIS:  Objection.  Form.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        Misstates testimony.  Argumentative.

3              You may answer if you can, Doctor.

4        I'm not sure there was a question

5        actually, but you can try.

6        A.    Is there a question there?

7        Q.    Yeah.  In 21 hours, Doctor, you

8     reviewed all the underlying documents, in

9     21 hours you reviewed all the underlying

10    documents and wrote your report for this

11    matter and you reviewed documents thoroughly,

12    you're testifying to, that include the over 3

13    to 600 documents cited in Dr. Valliere's

14    report including all the depositions as well

15    as the underlying exhibits cited?

16              MS. CARITIS:  Objection.  Form.

17        Misstates testimony.

18        A.    We have never said that I reviewed

19    every single document on the list.  What I

20    have said in my prior discussions is that I

21    reviewed Dr. Valliere's report, had the

22    opportunity to review any documents that was

23    linked to that report.  I reviewed what I

24    thought would be useful to my opinion.

25        Q.    Doctor, did you cite to -- let's

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     pull up Dr. Valliere's report, Exhibit 4,

3     and on the same page, page 24, scroll up here

4     on Cerebro and uSights.  As you see,

5     Dr. Valliere is talking about Cerebro and

6     uSights, Doctor, and she cites Mr. Fuldner's

7     testimony here.

8               Did you review Mr. Fuldner's

9     testimony and discuss it in your report?

10     A.   I do not discuss Fuldner's

11     testimony in my report, and I'm unaware right

12     now.  We can pull up that specific document,

13     it'll help me remember if this was one of the

14     ones I reviewed.

15     Q.   Doctor, did you discuss the Cerebro

16     validation analysis strategy in your report?

17     A.   My analysis was specific to

18     Dr. Valliere's report.  I did not do a

19     specific independent analysis of Cerebro or

20     Uber's use of it.

21     Q.   Well, it's not an independent

22     analysis, Dr. Valliere discusses and analyzes

23     the validation analysis strategy document.

24               My question is, did you include

25     discussion of that in your report?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1            L. Orchowski - Highly Confidential
 2       A.    One of the things I'm very clear on
 3    in the report is that I disagree with
 4    Valliere's assertion that we have systems
 5    that can accurately predict who will or who
 6    will not offend.
 7       Q.    Doctor, you haven't reviewed all
 8    the documents that Dr. Valliere reviewed, so
 9    wouldn't that be an important thing to do to
10    actually assess what is in those documents
11    before reaching the conclusions you're
12    reaching?
13            MS. CARITIS:  Form.
14       A.    The task is a narrow assessment of
15    the claims made in Valliere's report.  I
16    reviewed what I thought would be useful in
17    forming my opinion.  My career is focused on
18    sexual assault prevention, and I'm aware of
19    the research literature of our ability from a
20    scientific perspective and a clinical
21    perspective of the tools that are out there
22    to predict who will offend.
23            It's my scientific opinion that
24    despite desire to identify individuals at
25    risk for committing sexual assault, we do not
```

```
 1          L. Orchowski - Highly Confidential

 2     have systems that can accurately predict

 3     whether an individual without a criminal

 4     history will offend.

 5          Q.   What is that based on, though?

 6     What is that based on in this case if you

 7     haven't reviewed the internal Uber studies,

 8     data, analysis where they have found ways to

 9     predict the risk of sexual assault

10     effectively?

11          MS. CARITIS:  Objection.  Form.

12          Q.   Your opinion is not based on -- if

13     you were not tasked, and I understand you

14     said repeatedly, you were not tasked to

15     review internal Uber documents, correct,

16     that's what you've testified to?

17          A.   To the extent that there were

18     linked at Valliere's report, I've had an

19     opportunity to consider them.  I am not here

20     to do an independent evaluation of Uber's

21     business decisions.

22          Q.   It's not Uber's business -- it's

23     the underlying documents.  If you haven't

24     reviewed the same documents Dr. Valliere

25     reviewed in coming to her opinions, your
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    critique would only be limited to what you

3    think the materials show, not what they

4    actually contain; isn't that true?

5            MS. CARITIS:  Form.

6        A.   Well, I would disagree, I would

7    disagree because my critique is specific to

8    what Valliere discusses.

9        Q.   But --

10       A.   Insomuch as she has done an

11   analysis of these documents.  I am aware of

12   how she has presented these documents.

13       Q.   But you haven't reviewed the

14   documents, Doctor.  You haven't discussed the

15   documents, right?  You haven't reviewed the

16   internal Uber analysis data and studies they

17   have done on preventing sexual assault on

18   their platform; is that right?

19       A.   I have reviewed the documents that

20   I thought would be useful to me in crafting

21   this opinion.

22       Q.   So your critique is only limited to

23   the documents you believe would have been

24   useful to you in crafting your opinion,

25   correct?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2              MS. CARITIS:  Form.  Form.

 3        A.   Could you repeat the question?

 4        Q.   Doctor, your critique is only

 5   limited to the documents you believe would

 6   have been useful to you in crafting your

 7   opinion, correct?

 8              MS. CARITIS:  Form.

 9        A.   I'm taking some time to answer this

10   because I feel like I've answered the

11   question in different ways before.  So I

12   think I'm confused in what this question is

13   getting at and how I could provide you with

14   an answer that would satisfy your question.

15        Q.   Doctor, have you done any analysis

16   of the Uber documents that Dr. Valliere

17   relied on that are evident and disclosed in

18   your report itself?  Is there any --

19              (Cross-talk.)

20        A.   Yes, I've examined Uber documents.

21        Q.   Is that's not the question, Doctor.

22              There is no discussion of any Uber

23   internal documents in your report that

24   Dr. Valliere relied on to reach your

25   opinions?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential

 2         A.   And maybe that's a good

 3    clarifying -- maybe that's a good clarifying

 4    question, just because I'm not citing the

 5    document does not mean that I haven't seen it

 6    or considered it.

 7         Q.   That's not my question.  My

 8    question is, there's no discussion of any

 9    Uber internal documents in your report that

10    Dr. Valliere relied on to reach your

11    opinions?

12         A.   That didn't sound like a question,

13    it sounded like a statement, respectfully.

14         Q.   It's a question.  Is that true?

15         A.   Could you rephrase it?

16         Q.   Doctor, if a company's

17    responsibility is to provide safe transport,

18    right, if a company's responsibility is to

19    provide safe transport and it knows women are

20    being assaulted and it has tools to reduce

21    sexual assault, you think it should wait for

22    a journal article to be printed, published

23    before something is done?

24              MS. CARITIS:  Form.

25         A.   Answering that is really outside of
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   the scope of what I've been asked to do in
 3   this expert witness testimony, which is to
 4   provide an analysis of Valliere's report.  I
 5   don't see a section of Valliere's report that
 6   responds to that issue.
 7        Q.   No, the entire report is based on
 8   her opining on the ways Uber can reduce
 9   sexual assault on this platform, including
10   what we've gone through, which is the use of
11   Cerebro to prevent sexual assaults.
12             Do you see that here on in
13   Dr. Valliere's report?
14             MS. CARITIS:  Form.
15        A.   Is there a specific question here?
16        Q.   Doctor, you didn't cite to any of
17   these documents that are referenced in the
18   Cerebro/uSights section in Dr. Valliere's
19   report in your report, correct?
20             MS. CARITIS:  Form.  Asked and
21        answered.
22        A.   I'll state again, I reviewed
23   Valliere's report.  I reviewed what I thought
24   would be useful in crafting my opinion,
25   although this report does not include a
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2    specific citation to a specific document, I
3    did not intend that to mean or have anyone
4    assume that I have not examined Uber
5    documents, have not looked at them or have
6    not considered them.  To do so would be
7    misrepresenting my opinion.
8         Q.   Well, where have you discussed the
9    Uber internal documents in your report?  Can
10   you please find me one Uber document that
11   Dr. Valliere has referenced throughout her
12   report in your report?  Please find that for
13   me.  Let's take this down and please find
14   that cite for me.
15         MS. CARITIS:  Form.  Asked and
16         answered.  We've said multiple times
17         she's testified she did not cite an
18         Uber document in the report.
19         Q.   The question is still there for
20   you, Doctor.
21         A.   Can you restate it again?  There
22   was a part in the middle that wasn't clear.
23         MS. LUHANA:  Can you please read
24         back the question, Candida?
25              (Referred to portion of the record
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          was read back by the court reporter.)

3          A.   So I think where we're getting

4    stuck is that I don't have a specific

5    citation to an internal Uber document despite

6    reviewing Valliere's report and the materials

7    she cites.  As a result, I'm aware of the

8    Uber documentation and have reviewed some of

9    these in preparing this opinion.

10              If we're looking for specific

11    examples, we can look at page 12 where

12    there's a discussion of review of Uber's

13    taxonomy developed with a national sexual

14    violence resource center.

15          Q.   You don't have any discussion of

16    these internal documents that Dr. Valliere

17    has cited about Cerebro and uSights listed in

18    your report, correct?

19          A.   A significant portion of my report

20    discusses a scientific opinion about the

21    ability to take risk and protective factors,

22    which are described in that section of

23    Valliere's report.  And I offer the opinion

24    that despite this desire to identify

25    individuals at risk, which Valliere and I

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2    both agree is an important thing that books

 3    are very interested in.  However, research

 4    has yet to identify systems that can

 5    accurately predict whether an individual

 6    without a criminal history is likely to

 7    offend.

 8          Q.   What are your current opinions on

 9    Cerebro?

10              MS. CARITIS:  Form.  Scope.

11          A.   (Document review.)

12          Q.   Doctor?

13          A.   I'm reviewing the section of the

14    report.  Thank you for your time.

15          Q.   Doctor, where in your rebuttal

16    report will I find your views on your

17    analysis on Cerebro?

18          A.   As we've discussed, Cerebro is

19    included in Dr. Valliere's discussion ranging

20    from page 20 to page 25 onward of

21    identifiable risk factors and effectiveness

22    of safety features.

23              MS. LUHANA:  Objection as

24         nonresponsive.

25          Q.   Doctor, where in your rebuttal

1        L. Orchowski - Highly Confidential

2    report will I find your opinions on Cerebro;

3    where are they, where are they discussed?

4              MS. CARITIS:  Form.

5        A.    To the extent to which my report

6    discusses the scientific evidence about our

7    ability to predict risk for sexual violence

8    and who will offend, these opinions are

9    discussed on page 4 through 7 of the report.

10   It is my opinion that we do not have reliable

11   scientific systems to accurately predict who

12   will and who won't offend.  One critical

13   component of this is that systems were

14   predicting low base rate behavior, such as

15   sexual assault, often improperly and over

16   identify individuals as prone to violence who

17   are not.

18       Q.    Doctor, you didn't discuss the

19   validation study for Cerebro in your report,

20   did you?

21             MS. CARITIS:  Objection.  Form.

22        Asked and answered.

23       A.    I'll repeat again.  My task is very

24   focused on providing a scientific opinion

25   grounded in research of sexual assault

 1      L. Orchowski - Highly Confidential

 2   prevention specific to Dr. Valliere's claims.

 3      Q.   Doctor, are you focused on only

 4   published research?

 5      A.   It's a complex question.

 6      Q.   It's really not.

 7           MS. CARITIS:  If you're going to

 8           ask the question, please provide her

 9           an opportunity to answer.

10           You may answer, Doctor.

11           THE WITNESS:  Thank you.

12      A.   As a scientist, I do think it's a

13   complex question because there's a lot of

14   things that we can consider evidence.  A case

15   study, could that be evidence, right?  A

16   correlational study, could that be evidence?

17   A meta-analysis, a meta-synthesis, types of

18   research.  Not all research is created equal,

19   and this is something I do go into in this

20   report.

21           (Cross-talk.)

22      Q.   I'm sorry if I'm unclear.  I am

23   focused only on your rebuttal report in the

24   Uber litigation discussing Uber Rideshare.

25   And so my question to you is in providing

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    your rebuttal report, you are only focused on

3    published research; is that correct?

4        A.   I'm going to be really specific

5    about what we mean by evidence and

6    publication.  There are places in my report

7    where I reference things that are

8    peer-reviewed research.  So for example, in

9    places in my report I reference the

10   proceedings of the DAC-PSM.  So this would

11   traditionally not be identified as

12   peer-reviewed research.

13          I believe your question was if I'm

14   only interested in peer-reviewed research.

15   So I'll clarify, that evidence comes in many

16   forms, data comes in many forms, science

17   comes in many forms, and I reference many

18   different things in this report, including

19   things that are not a scientific journal

20   article.  So I would not characterize myself

21   as someone who is solely interested in

22   peer-reviewed research.  Anything -- I think

23   that's -- that would be an unfair

24   characterization of my expertise and my

25   methodology for this report.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        Q.   Doctor, I --

3        A.   Instead what I would offer is that

4    in this report I aim to provide a scientific

5    perspective that is grounded in most rigorous

6    of scientific study.  So it's possible to

7    ground an analysis in scientific research

8    that perhaps isn't very rigorous, but instead

9    as noted in my methodology section, I try to

10   present scientific review that's grounded in

11   things like meta-synthesis or systematic

12   reviews meta-analysis.  We think of this as

13   the top of the hierarchy of evidence where

14   it's a synthesis of multiple studies, and

15   when you have multiple studies of something,

16   it really gives you more confidence in the

17   opinions.

18            So I would -- I would offer that

19   characterization that there are multiple

20   different kinds of research.  There are also

21   data points including ones noted in this

22   report that would not be classified as a

23   peer-reviewed research study.

24        Q.   Doctor, my question was focused on

25   published research, not peer-reviewed

 1          L. Orchowski - Highly Confidential

 2     research.

 3               So again, my question is, are you

 4     just focused on published research to arrive

 5     at your opinions?

 6          A.   So my opinions are based on my long

 7     history as a sexual assault prevention

 8     researcher, clinician, Title IX officer, so

 9     my expertise is grounded in all of those

10     things.  And in this rebuttal report, I've

11     prioritized sources that offer the highest

12     level of scientific expertise.  There are

13     sources in here that would be published if we

14     consider putting something online as

15     published.  I suppose you could say that that

16     is published because it's available to the

17     public.  There are many different ways to

18     define what "published" means, so I just want

19     to offer a characterization to that is that

20     you know...

21          Q.   With all due respect, I appreciate

22     your expertise, which you've provided and

23     focussed on the rebuttal report.  My question

24     again is, your rebuttal report is looking at

25     published research to arrive at your

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1      L. Orchowski - Highly Confidential
 2   opinions; is that correct?
 3      A.   I would say it's one of many
 4   considerations that informed my opinions.
 5      Q.   Is there Uber's research that
 6   you -- we've already discussed, you haven't
 7   cited any internal Uber documents or internal
 8   research in your rebuttal report; is that
 9   correct?
10      A.   So I'll clarify again, my report is
11   based on a review of Valliere's report.  To
12   the extent that she is discussing Uber's
13   practices, such as Cerebro, I have reviewed
14   that information.  I have also reviewed
15   internal documents as cited in the report
16   that were useful to helping me form an
17   opinion.  Although, my report does not
18   specifically cite an Uber document, this does
19   not mean that they were not considered in my
20   evaluation of the Valliere report.
21      Q.   But there is no actual discussion
22   of any Uber internal documents in your
23   report, correct?
24           MS. CARITIS:  Asked and answered.
25      Q.   Withdraw the question.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2              Let's go to Summary of Opinions and

3      let's look at the second bullet point.

4              MS. LUHANA:  Can we pull up the

5          doctor's Exhibit 1?

6          Q.   And actually the first bullet

7      point, Doctor, you read that, correct, the

8      Summary of Opinion you read the first bullet

9      point?

10         A.   Yes, I've read summary 1.

11         Q.   Right.  And there is no mention of

12     Uber here; is that correct, in the first

13     summary opinion?

14         A.   You are correct that that sentence

15     does not state the word "Uber."

16         Q.   That sentence doesn't contain

17     reference to Dr. Valliere either, correct?

18             MS. CARITIS:  Form.

19         A.   I disagree.  All of the opinions I

20     offer are in direct relation to Valliere's

21     report.

22         Q.   Dr. Orchowski, that's not my

23     question.  It's a clear question, I'd really

24     appreciate if you answer it.

25             The first bullet point does not

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   reference Dr. Valliere's name anywhere, does
 3   it?
 4             MS. CARITIS:  Objection.  Form.
 5             But you may answer, Doctor, yeah.
 6        If you see the word Valliere in that
 7        section.
 8             MS. LUHANA:  Can you please not
 9        coach her, Counsel?  It's a
10        straightforward question, she
11        understands it.
12             MS. CARITIS:  I was objecting to
13        the preamble, but she can answer the
14        question.
15             MS. LUHANA:  No, you were
16        directing the witness.
17        A.   The question feels hard for me to
18   answer because in my interpretation, you're
19   asking if my bullet point is in reference to
20   something Valliere said and of course it is,
21   my report in its in entirety is in response
22   to what --
23             (Cross-talk.)
24        Q.   I hear you, Doctor.  But it doesn't
25   state Dr. Valliere in the first summary
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1      L. Orchowski - Highly Confidential
 2   opinion there, does it?
 3      A.   So it looks like we have a
 4   difference of opinion.  I would love to add
 5   and amend this, if I could for you, to make
 6   very clear that these points are in direct
 7   relevance to Dr. Valliere's points.
 8      Q.   That's fine.  But the point is, the
 9   first bullet point does not reference
10   Dr. Valliere.  Would you agree with me there,
11   right?
12           MS. CARITIS:  Objection.  Form.
13      A.   I would disagree, this bullet point
14   is in direct reference to Valliere's report.
15      Q.   Is her name listed there,
16   referenced there in the first bullet point?
17      A.   So it appears you're asking me to
18   look at the semantics of the question.  If
19   we're looking at the semantics, I would say,
20   no, Dr. Valliere's name is not referenced in
21   this sentence.  This does not mean that the
22   sentence that I wrote is not in direct
23   relation to the Valliere report.
24           MS. LUHANA:  Object as
25      nonresponsive to everything after
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          "sentence."

3          Q.   Doctor, the second bullet point

4     there doesn't mention Uber anywhere in that

5     statement, correct?

6               MS. CARITIS:  Form.

7          A.   So if we're looking at semantics,

8     the word "Uber" is not found in that

9     sentence, or in the paragraph.

10         Q.   Doctor, words matter, don't they,

11    and context matters, would you agree?

12              MS. CARITIS:  Objection.  Form.

13         A.   I think we talked about this

14    earlier that context does matter.

15         Q.   Okay.  Dr. Valliere, her name isn't

16    listed anywhere in this bullet point,

17    correct, in your summary opinion?

18         A.   We've talked about these sentences

19    on the page, they're in direct response to

20    the Valliere report.

21              MS. LUHANA:  Object as

22         nonresponsive.

23         Q.   Doctor, my question was,

24    Dr. Valliere's name is not referenced

25    anywhere in this second summary bullet point,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    correct?

3        A.    If you're asking me to look at the

4    semantics of the sentence and the paragraph,

5    Dr. Valliere's name is not written in this

6    paragraph.

7        Q.    Okay.  And in terms of the support

8    for this opinion, everything you're relying

9    on here for this opinion is reflected in your

10    report, correct, with the citations that you

11    have in your report?

12        A.    I'm not sure what you're asking.

13        Q.    Well, I'm trying to understand,

14    it's important for me, with this deposition,

15    to understand the basis of your opinions and

16    what facts you're relying on.  And so the

17    facts that you state you're relying on are

18    included in your citations in your rebuttal

19    report, correct?

20        A.    We mentioned earlier that I need to

21    re-add in the Douglas, et al., citation.  My

22    apologies for this omission.

23        Q.    But other than that, I mean, I

24    would think that throughout your rebuttal

25    report, you're referencing this summary

1        L. Orchowski - Highly Confidential

2    opinion and the things that you're relying on

3    are cited in your report, correct?

4        A.   So one of the things that we talked

5    about earlier is that my report does not

6    include a specific citation to Uber

7    documents.  This does not mean that I haven't

8    reviewed Valliere's report, I'm not aware of

9    the Uber documents.  In fact, I reviewed

10   Valliere's report, I am aware of the Uber

11   documents that she discusses in that report.

12   I've had access to them and I've reviewed

13   what I thought would be useful.  A lack of

14   citation of these specific Uber documents in

15   forming my opinions should not be taken to

16   mean that they're not considered in forming

17   my opinion.

18       Q.   And Doctor, we've repeatedly said

19   not only were Uber documents not cited in

20   your report, they are not specifically

21   discussed in your report, correct?

22            MS. CARITIS:  Asked and answered.

23       A.   So I'll repeat, to the extent to

24   which my report is a direct analysis of

25   Valliere's report and her presentation of

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   Uber documentation, which I've had access to,

 3   which I have considered, my report is a

 4   direct scientific discussion of the

 5   documentation included in her report.

 6        Q.   But have you discussed -- is there

 7   any discussion of S-RAD in your report?

 8        A.   Fundamental component of my report

 9   is to disagree with the claim that there are

10   prevention measures that can reliably be used

11   to prevent sexual misconduct.  So to the

12   extent to which my rebuttal of Valliere's

13   report addresses this issue, I would offer

14   that this report can be used in relevance to

15   S-RAD.

16        Q.   Where would I find your discussion

17   of S-RAD in your report; where is the

18   analysis, is it there anywhere to be found in

19   your report?

20             MS. CARITIS:  Objection.  Form.

21        Q.   Can you please point me to the page

22   that discusses S-RAD in your report, if any?

23             MS. CARITIS:  Objection.  Form.

24        A.   So I would offer (audio

25   distortion).
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

  1        L. Orchowski - Highly Confidential

  2            THE COURT REPORTER:  You were

  3        muffled again.

  4            THE WITNESS:  I'll go closer.

  5        A.   So I'll offer broadly, the summary

  6    opinions are relevant to a scientific

  7    evaluation of prevention measures for sexual

  8    misconduct, risk assessment tools that have

  9    been developed to assess proclivity for

 10    violence.  I do not apply to the general

 11    population.  And our current understanding of

 12    these tools is for use in higher risk

 13    populations, they have questionable accuracy,

 14    we lack reliable and validated tools and

 15    methods that can reliably predict future

 16    sexual offending.

 17            MS. LUHANA:  Move to object as

 18        unresponsive.

 19        Q.   Can you please point me to your

 20    discussion?  Doctor, what is S-RAD?

 21        A.   My understanding of S-RAD is that

 22    it is a part of the considerations and

 23    strategies considered for prevention of

 24    sexual misconduct.

 25        Q.   What does it stand for?  What are

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   you looking to, Doctor, to find what S-RAD

 3   stands for?

 4        A.    Pardon me?

 5        Q.    What are you looking to right now

 6   to find what S-RAD stands for?  I just want

 7   the ladies and the gentlemen of the jury to

 8   know.

 9        A.    Thank you.

10             MS. CARITIS:  Objection.

11        Argumentative.  Move to strike the

12        preamble.

13        A.    I'm going to take a minute to

14   respond if that's okay.

15             MS. CARITIS:  Feel free to look at

16        whatever you need to.

17             THE WITNESS:  Thank you.

18             MS. CARITIS:  And once she answers

19        the question, we've been going at

20        about hour and 20, so when you're at a

21        logical breaking point, a break would

22        be nice.

23             MS. LUHANA:  Sure.

24        A.    (Document review.)

25        Q.    Doctor, what are you looking to to
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     find what S-RAD means, what it stands for,

3     can you please tell me?

4          A.   I'm still taking some time to

5     review the Valliere report, if that's okay.

6          Q.   Okay.  So it's in the Valliere

7     report.  It would be found nowhere in your

8     report; is that right?

9          A.   As we have discussed, my report was

10    to specifically offer a scientific opinion of

11    the Valliere report that is grounded in the

12    scientific evidence base of sexual assault

13    prevention.  To the extent that Valliere

14    reviews Uber documents, I considered and

15    reviewed those documents.

16         Q.   That's not my question.  My

17    question is what does S-RAD mean?  And you're

18    looking to Dr. Valliere's report.  So my

19    question to you is, where is your discussion

20    of S-RAD in your report?

21              (Cross-talk.)

22              MS. CARITIS:  Asked and answered.

23         A.   I was finishing my statement.  I

24    was about to finish that as we've discussed,

25    my report does not cite specific Uber

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     documentation.  Because my report does not

3     cite specific Uber documentation should not

4     be taken to imply that these documents were

5     not considered in my evaluation of the

6     Valliere report.

7          Q.   So where would I look to find what

8     your analysis is of Uber's documents --

9               MS. CARITIS:  Form.

10         Q.   -- in your report?

11         A.   Have we moved on from the S-RAD

12    question?

13         Q.   I would like you to find the

14    answer, but you're looking to Valliere's

15    report which indicates to me it's nowhere to

16    be found in your report, would you agree?

17              MS. CARITIS:  Objection.  Form.

18         Argumentative.

19         A.   I don't agree with your

20    characterization, no.

21         Q.   Doctor, this is -- I don't

22    understand what -- my questions aren't

23    difficult.  I am trying to ask you simple

24    questions of where you're referencing

25    Uber's -- your discussion of Uber's

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    documents.
 3            So first I asked you what S-RAD
 4    means.  And can you, sitting here today, tell
 5    me what S-RAD means?
 6        A.   My understanding of S-RAD is that
 7    is a component of the sexual assault
 8    prevention strategies and considerations that
 9    were explored by Uber.
10        Q.   What does S-RAD stand for?
11        A.   If you'd like me to continue
12    looking in Valliere report, I want to make
13    sure I get the abbreviation correct for you
14    so I could do that and then I could look to
15    the specific source document that outlines
16    that abbreviation if you like.
17        Q.   Can you please look in your report
18    to find where S-RAD is?
19            MS. CARITIS:  Objection.  Form.
20        Asked and answered.
21        Q.   It's nowhere in your rebuttal
22    report, right?  You don't reference S-RAD; is
23    that correct?
24        A.   As we've discussed, I don't
25    reference specific Uber documents in my
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2    rebuttal report of Valliere.

 3        Q.   But -- okay.  But you're not -- you

 4    don't discuss S-RAD specifically, correct?

 5        A.   My entire report should be a

 6    consideration of a scientific evaluation of

 7    the sexual assault prevention strategies that

 8    are outlined by Valliere which include

 9    reference to the Uber documentation listed in

10    that report.  Just because I have not

11    included the name S-RAD does not mean that

12    that prevention strategy was not considered

13    as a part of my review of this report.

14        Q.   Sure.  You're saying you considered

15    it, I hear you.  I want it reflected in your

16    rebuttal report, where is the S-RAD

17    discussion to be found in your rebuttal

18    report?

19            MS. CARITIS:  Objection.  Form.

20        A.   And I'm thankful of this

21    educational experience that you're providing

22    to me.  As I mentioned, this is my first time

23    doing any expert witness report and I will be

24    sure after this experience today to reference

25    all of the documents.  So I apologize that I

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    can't give you that citation, but I do thank
 3    you for your educational experience.
 4        Q.   I'm not talking about all of the
 5    documents.  None of the Uber documents have
 6    been referenced, which you've given testimony
 7    to already.  So let's go to --
 8        A.   Would it be okay if we take a
 9    break?
10            MS. CARITIS:  Yeah, thank you.
11        Please.
12            MS. LUHANA:  Sure, let's take a
13        break.
14            THE VIDEOGRAPHER:  All right.
15        Time is 19:10 UTC time and we are off
16        the record.
17            (Off the record.)
18            THE VIDEOGRAPHER:  The time is
19        19:24 UTC time and we are back on the
20        record.
21    BY MS. LUHANA:
22        Q.   Let's pull up Exhibit 1 and go back
23    to the summary of opinions.  Doctor, I want
24    you -- we were looking at Bullet Point 3, I
25    believe.  Doctor, looking at Bullet Point 3,
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    I believe you testified already there is no

3    reference of Uber there or Dr. Valliere

4    specifically in that bullet point, correct?

5        A.    Again, I'm not sure what you mean

6    by a "reference," but if we're meaning that

7    Uber is not in this paragraph, that is

8    correct.

9        Q.    And Dr. Valliere is not listed in

10   this paragraph either, correct?

11       A.    As we talked about before, this

12   paragraph does not include Dr. Valliere's

13   name, but is in direct response to her

14   report.

15       Q.    Understood, okay.

16            So you state there's no single

17   factor that can predict risk for violence

18   there, do you see that there in the center?

19       A.    Yes, I see that.

20       Q.    Are you stating that Dr. Valliere

21   has indicated that?

22       A.    So hearing this in this paragraph,

23   it -- what I'm speaking to here is the state

24   of science, in my opinion as a sexual assault

25   prevention expert, the field has documented

1        L. Orchowski - Highly Confidential

2    various correlates, right, things that are

3    statistically associated with sexual violence

4    on a population level.  And what this

5    paragraph is speaking to is that there may be

6    correlates of violence, right, there's a

7    single factor that might be associated with

8    violence.  But we do not have one yes or no

9    button that can reliably predict who will be

10   violent.  We do not have that crystal ball.

11        MS. LUHANA:  Object as

12        nonresponsive.

13        Q.   Doctor, my question was just are

14   you stating that Dr. Valliere has indicated

15   that there is no single factor that can --

16   has she asserted that there's a single factor

17   that can predict risk for violence or is this

18   your separate opinion?  So my question is,

19   like, there is no reference to Dr. Valliere

20   here, you've testified to that.  However,

21   there is a statement that there is also no

22   single factor that can predict risk for

23   violence.

24        So my question to you is, are you

25   attributing that Dr. Valliere, in her report,

1        L. Orchowski - Highly Confidential

2    has opined that there's a single factor that

3    can predict risk for violence?

4        A.    There are statements in the

5    Valliere report where she makes claims that I

6    disagree with where she suggests strategies

7    that could be used to predict who would be

8    violent.

9        Q.    That doesn't answer my question.

10        My question is, are you asserting

11    that she's indicating that a single factor

12    can predict risk for violence in her report?

13    It's a yes or no.

14        A.    There are sections of her report

15    where she makes claims that a factor should

16    be used or could have been used to predict

17    risk for future harm, which is a claim that I

18    disagree with.  There are sections of her

19    report that she says that Uber could have

20    used this or Uber could have used that.  I

21    disagree that any single factor that she

22    discusses in her report would be sufficient

23    to predict who might be at risk for future

24    harm.

25        Q.    And we've already discussed that,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     you haven't discussed any internal Uber

3     documents.  But to the extent you thought

4     that was important for your discussion, you

5     would've included that in your rebuttal

6     report, correct?

7          A.    I'm not sure what you're asking.

8          Q.    Well, you didn't discuss any

9     internal Uber documents or S-RAD or Cerebro

10    or uSights or any of the other Uber

11    deposition testimony that Dr. Valliere is

12    relying on.

13              So my question to you is if you

14    thought that was important, you would've

15    included it in your rebuttal report, correct?

16              MS. CARITIS:  Form.

17         A.    I don't think that's a fair

18    characterization to make any assumptions of

19    what I did or didn't think was important in

20    terms of my methodology.  As I stated before,

21    I don't have reference here to specific Uber

22    documents.  This isn't because I don't think

23    they're not important.

24              So to clarify, as a scientific

25    expert, I am aware that Dr. Valliere's report

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2     is providing a review of many different risk

 3     prediction tools, Cerebro, S-RAD.  Have I

 4     cited them specifically in this report?  No.

 5     What I am providing in this report is my

 6     scientific opinion that there is not a

 7     reliable way to predict who or who won't be

 8     violent.  And all of my scientific

 9     experiences and including, and what I've seen

10     in the Valliere report, we do not have a

11     sufficient tool to accurately predict who

12     would or wouldn't be harmful.

13          Q.   Doctor, I'm just trying to find --

14     I find it hard to believe because there is no

15     discussion of any of these predictive tools

16     in your report, yet you're concluding that

17     Uber's tools to predict, you know, sexual

18     assault on its platform are not reliable, yet

19     there's no discussion of them.  So I just

20     don't understand where I would look to to

21     find your analysis of any of these documents.

22               Can you please help me find where

23     that lies in your report, any of that

24     discussion?

25               MS. CARITIS:  Form.

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2          A.    I think we just covered this.  So
 3     what you're really looking for a citation of
 4     specific-Uber documents.  And we said this
 5     before in this discussion, my report does not
 6     include specific reference to Uber documents.
 7     It doesn't mean that they weren't considered.
 8              What I'm asserting in this report
 9     is that I have reviewed Valliere's claims,
10     one specifically comes to mind in reference
11     to this discussion, so Point 10 and Point 11
12     of her conclusion that Uber could've done
13     more to prevent or deter sexual assault and
14     sexual misconduct.  These discussions of
15     S-RAD, these discussions of Cerebro point to
16     Valliere's discussion of risk assessment
17     tools.  I am not aware in any of my work with
18     the military and any of my work in sexual
19     assault prevention of any risk assessment
20     tool that has accurate predictive validity of
21     who would be likely to predict sexual
22     violence.  We do not have a failsafe tool to
23     do that.
24          Q.    Doctor, are you aware of the data
25     that Uber has on its drivers?
```

1        L. Orchowski - Highly Confidential

2            MS. CARITIS:  Form.

3        A.   I'm aware of what's been provided

4    through Valliere's report in reference to

5    Uber documents.

6        Q.   Yeah.  So tell me about it.  What

7    data does Uber collect on Uber's drivers?

8    And they conducted over a billion trips and

9    so give me -- and your understanding because,

10    you know, you've gone through all these

11    documents, what data does Uber collect on its

12    drivers?

13            MS. CARITIS:  Objection.  Form.

14        A.   Data collection is beyond scope.

15    I'm happy to offer some of the things that I

16    recall now.  So for example, there are rating

17    systems, drivers are rated by passengers, for

18    example.  That would be just one example.

19        Q.   Well, it's not beyond the scope

20    because Uber utilizes that for predicative

21    screening.  So I want your understanding of

22    what data you've analyzed to come to the

23    conclusion that Uber's predictive tools are

24    ineffective, what -- what data are you

25    considering for that conclusion?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2            MS. CARITIS:  Form.

 3        A.   My understanding of the tools that

 4   are cited in the Uber documents referenced in

 5   Valliere's report is that these systems rely

 6   on correlates and data, data collected on

 7   individuals.  So for example, a rider report

 8   or stars, these kind of data are collected in

 9   aggregate.  My understanding of this data is

10   that we do not have a one-to-one way to

11   accurately predict with a crystal ball who

12   will be violent.  This is similar to the

13   research with criminal populations, this is

14   similar to the research in psychiatric

15   populations that I reference in my report,

16   that across fields, and it looks like

17   including within rideshare, as much as folks

18   in this field, and this is why we do this, is

19   to try to understand, can this be prevented.

20   What I'm articulating in this rebuttal report

21   is that we do not have accurate failsafe risk

22   assessment tools.

23        Q.   That wasn't my question.

24            MS. LUHANA:  Object as

25        nonresponsive.
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2          Q.    What data is Uber collecting to

 3     utilize its predictive tools for sexual

 4     assault?

 5              MS. CARITIS:  Objection.  Form.

 6          A.    My understanding, we can broadly

 7     characterize this as characteristics of

 8     individuals, characteristics of rides.

 9          Q.    Is that your answer?

10          A.    Would you want me to go into --

11          Q.    Yeah, I want you to explain.  I

12     mean, you've come to the conclusion that

13     there are no predictive tools that are

14     reliable and Uber has concluded that they're

15     very reliable, so I want to have an

16     understanding of what data you've utilized to

17     come to this conclusion?

18              MS. CARITIS:  Objection.  Form.

19          Q.    So what Uber data has Uber

20     collected for these predictive tools that

21     you've reviewed?

22              MS. CARITIS:  Form.  Asked and

23          answered.

24          A.    I don't feel like I can go into

25     further detail right now without going back

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential
2     into source documents.  I can tell you as an
3     expert in violence prevention, there is no
4     single risk factor or correlate that can
5     accurately predict who will or won't be
6     violent.  In fact, when we look at predictors
7     of sexual violence, even something as simple
8     as whether or not someone has offended in the
9     past, studies will even look at past violence
10    as a predictor of future violence.  We see
11    that many people who predicted -- who have
12    engaged in sexual violence in the past, do
13    not go on to do it in the future.
14             Our systems, as much as we would
15    like them to be better, are not sufficient to
16    predict risk for sexual offending.
17        Q.   Doctor --
18             MS. LUHANA:  Objection as
19        nonresponsive.
20        Q.   What Uber data has Uber collected
21    for these predictive tools that you've
22    reviewed?
23             MS. CARITIS:  Objection.  Form.
24        Q.   You've concluded they're
25    ineffective.  I want to have an understanding
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2     and I would like you to answer the question.

 3               MS. CARITIS:  Objection.  Form.

 4          A.   Do you want me to take a minute to

 5     go back and read the section of the report

 6     from Valliere?

 7          Q.   No, I want you to tell me your

 8     opinions for your rebuttal report.

 9               MS. CARITIS:  She's provided her

10          answer and you just keep -- you're

11          asking her --

12               MS. LUHANA:  Alex.  Alex, please.

13          Q.   Can you -- I am entitled, Doctor,

14     to the facts and opinions you're relying on

15     to reach your conclusions in your rebuttal

16     report.

17               And so what data has Uber collected

18     for these predictive tools that you have

19     reviewed?

20          A.   I've stated earlier that my

21     understanding is that Uber's collecting

22     characteristics of rides and characteristics

23     of drivers.  In my report, I discuss how

24     things like correlates are not sufficient to

25     predict violence.  This is in relation, so if

```
 1        L. Orchowski - Highly Confidential

 2    we want to get into some of the evidence from

 3    my scientific background that is related here

 4    is that there are multi-facetted risk and

 5    predicative factors that can contribute to

 6    risk of sexual violence.  And even these

 7    correlates do not accurately predict who

 8    would or would not harm in the future.  So

 9    there's been over 191 studies that have been

10    published by a review of Andra Teten Tharp.

11    Andra was associated with the Division of

12    Violence Prevention for the Centers of

13    Disease Control.  She went on to lead the

14    military response for sexual violence as

15    well.  In this research study, she looked at

16    factors for perpetration by adolescents and

17    adults, male and female perpetrators.  She

18    looked at all different kinds of

19    characteristics.  So there are societal

20    characteristics, there's relationship

21    factors, there's individual risk factors.

22    Even across these 191 studies, even if we

23    know things that may be associated, right,

24    this is a correlation, and correlation does

25    not mean causation, even when we know factors
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     that are associated with risk for violence,
 3     these correlates do not reliably predict who
 4     will and who won't offend.
 5                So I think it's laudable that there
 6     is data being collected to try to understand
 7     what is happening in this particular
 8     situation, but to believe that any tool is
 9     out there that could be a failsafe one-to-one
10     prediction without error would be amiss --
11          Q.   Doctor, I just --
12                (Cross-talk.)
13          A.   -- our ability to predict human
14     behavior.
15          Q.   Doctor, you're not answering my
16     questions and this is what you've been doing
17     most of the day.  I -- your counsel will have
18     an opportunity to ask you questions?
19                MS. LUHANA:  So objection as
20           nonresponsive to everything after the
21           first sentence of your response.
22          Q.   So Uber's collecting
23     characteristics of rides and characteristics
24     of drivers.  What does that entail?  What is
25     it collecting about the characteristics of
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   rides and characteristics of drivers that
 3   you've reviewed?
 4        A.   I'm gonna take a minute to pull
 5   this out of Valliere's report for you.
 6        Q.   Is it discussed in your report
 7   because you allege that you considered all
 8   the data to come to the conclusion that these
 9   predictive tools are not effective.
10        So please describe to me the data
11   Uber is collecting on its drivers and the
12   characteristics and also where it's found in
13   your rebuttal report?
14        MS. CARITIS:  Objection.  Form.
15        Misstates testimony and her report.
16        MS. LUHANA:  I think we need to go
17        off the record, Counsel.  This is
18        unproductive.  The doctor can't answer
19        any of my questions and can't
20        reference her report, and this has
21        been all day.
22        MS. CARITIS:  Yeah, for the
23        record, I mean, I disagree, she's
24        trying to find you answers.  I think
25        she's trying to do what you asked her
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2     to do.  If you'd like to go off the
 3     record and have her take another
 4     second to look.
 5          MS. LUHANA:  I think so because
 6     now this is extraord- -- -orbitant
 7     amount of time that's been wasted on
 8     this.
 9          MS. CARITIS:  It's not a waste.
10     She's trying to answer your questions.
11     She's trying to answer your questions
12     as best as she can, and when you're
13     asking her a question that is not
14     clear to her, she doesn't understand
15     what you're saying, she's trying to
16     find the answer because she thinks
17     that's what you want her to do.  So we
18     can go off the record for a second.
19          What are we looking for right now?
20     Candidly, I don't know what we're
21     looking for right now.
22          MS. LUHANA:  She's looking for
23     the data that Uber is collecting on
24     the characteristics of its drivers
25     and riders to come to her conclusion
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential

2        that --

3             MS. CARITIS:  I have no idea what

4        that means.

5             MS. LUHANA:  Well, she gave the

6        answer so she said they're collecting

7        the characteristics of drivers and

8        riders, I want to understand what that

9        means.  What's the --

10            (Cross-talk.)

11       A.   I offered stars, I offered user

12   reports, so characteristics of drivers and

13   rides.  And we're getting stuck.

14       Q.   And what else?

15            MS. CARITIS:  Doctor, if the

16       answer is you don't know, that's an

17       answer.

18            And Roopal, I'm not trying to -- I

19       just really am trying to help.  I'm

20       not sure she -- so I will not --

21            (Cross-talk.)

22       A.   At this moment, I cannot pull up

23   out of my brain kind of the specific report

24   that lists all of these things that folks are

25   collecting.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1           L. Orchowski - Highly Confidential

2           Q.   Okay.  So is -- and I won't find it

3      in your report either; is that accurate?  I

4      won't find the data that Uber has collected

5      for its predictive tools to consider?

6           A.   And this is where we're going back

7      and forth that I have not cited specific Uber

8      documents in the report.

9           Q.   Okay.  And Doctor, in terms of what

10     you have cited in your rebuttal report, the

11     studies that you've cited and the

12     publications, but for the one that you

13     identified, do not apply to rideshare,

14     correct?

15               MS. CARITIS:  Form.

16          A.   Are we moving forward now?

17          Q.   Yeah.  You answered my question,

18     so...

19          A.   Are we back on record?  I wasn't

20     sure if this was back on the record.

21          Q.   I don't think we ever went -- we

22     didn't go off record, I don't believe.

23               MS. CARITIS:  Candida, can you

24          please reread the last question so the

25          doctor knows what she's answering?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential

2              (Referred to portion of the record

3          was read back by the court reporter.)

4          A.   Which studies are we referring to?

5          Q.   So to reach your opinions in your

6     report, the studies that you're citing

7     including all the publications in Exhibit B,

8     but for the Tillewein study that you

9     reference, do not relate to rideshare,

10    correct?

11         A.   I disagree with that.  Many of

12    these studies are broad in relation to

13    violence and could have applicability to a

14    number of different environments.  So for

15    example, there are studies in here that have

16    to do with positive predictive value of

17    assessments which are absolutely relevant to

18    thinking about our ability to predict sexual

19    violence.

20         Q.   Sure.  But none of them -- I

21    understand that, you can extrapolate

22    potentially, you're saying you can, I

23    understand that.  But none of them, but for

24    that Tillewein study, specifically discuss

25    rideshare, correct?
```

```
 1         L. Orchowski - Highly Confidential

 2         A.   So if we're getting down to whether

 3    the word "rideshare" is included in these

 4    specific citations, certainly the Tillewein

 5    uses the word "rideshare."  If we're talking

 6    about whether broad research on what is known

 7    about violence is included in this reference

 8    in this report, the answer is absolutely yes.

 9    And there are a number of scientific concepts

10    such as predictive utility that can be

11    applied no matter the situation.  These are

12    broad statistical concepts that would have

13    applicability to predicting behavior in any

14    context, including rideshare.

15         Q.   Okay.  But they are not discussing

16    rideshare, correct?  I understand

17    applicability, Doctor, but these studies

18    don't reference rideshare.

19         A.   So if we take a study, for example,

20    the study that I reference here, which is a

21    really nice example of positive predictive

22    value, it is a broad guide to misinterpreting

23    the results of screen tests, it was published

24    in 2022, it does not mention the word

25    "rideshare."
```

```
 1          L. Orchowski - Highly Confidential
 2          Q.   So my question is in terms of
 3     documents you're relying on and looking at
 4     Exhibit B and the publications you have cited
 5     in your report, but for the Tillewein
 6     publication, none of them are specifically
 7     discussing rideshare, correct?
 8          A.   The word "rideshare" is not
 9     discussed in these publications with the
10     exception of Tillewein.  And there's also a
11     broad article Ison, et al., which discusses
12     public transportation.
13          Q.   Great.  Let's go back to your
14     report and let's look at Bullet Point 4.
15               So Doctor, you say:
16               Well designed systematic reviews
17     have repeatedly found that for adult men,
18     there is no effective strategy for preventing
19     sexual aggression.
20               Correct?
21          A.   Correct.
22          Q.   Okay.  However, if you turn to
23     page 9 of your report, let's go there.  The
24     first sentence of the second paragraph you
25     say:
```

```
 1          L. Orchowski - Highly Confidential

 2              Sexual assault prevention programs

 3    for men are underdeveloped in comparison to

 4    other approaches, and you say, but they show

 5    limited effects in reducing rates of sexual

 6    aggression over long-term follow-up periods.

 7              So is it -- is it completely not

 8    effective or is it limited effectiveness?

 9    What is -- what is your conclusion here?

10              MS. CARITIS:  Form.

11        A.    This is a really exciting area of

12    the literature, right, because as of the

13    DeGue article and also some of my own work

14    has looked at prevention program specifically

15    among men.  So a recent book that I published

16    also specifically focused on engaging men and

17    boys in sexual assault prevention.  And what

18    we know about prevention programs

19    specifically for men and boys is that

20    historically, prevention programs were

21    evaluated sometimes on something as simple as

22    knowledge, maybe attitudes, but we really

23    didn't know, does it work.

24              So for the DeGue article, one thing

25    to really know about that specific article is
```

```
1          L. Orchowski - Highly Confidential
2     that DeGue has a review of the literature and
3     simply states that of all of the programs out
4     there, very few are specific to men.  And
5     then if we look at those articles, very few
6     of those even examine, does this program
7     reduce rates of sexual assaults.  And I don't
8     know, but most folks, you know, if they're
9     going to engage in something, they want to
10    know that it works, right.  If you have a
11    medication from your doctor, you want to know
12    it's been tested in a randomized trial, does
13    this actually reduce the thing that we're
14    trying to address.
15             Now, some of that problem with
16    DeGue was because for a long time, folks
17    didn't think that you could accurately
18    assess, you know, the effectiveness of a
19    program, but we have assessment measures that
20    can assess whether or not someone has engaged
21    in sexual violence.
22             So that's Mary Koss' early research
23    in 1980s.  She developed a sexual experience
24    scale, this is a scale I'm a part of the
25    redevelopment of, it's undergone two
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    revisions.  And this measure, people will
 3    respond using behaviorally specific questions
 4    as to whether or not they've engaged in
 5    something that meets legal definitions of
 6    sexual assault.
 7            So one thing that you'll see in the
 8    DeGue study is that of the programs for men,
 9    very few looked at whether or not they reduce
10    rates of sexual assault.  Now, Wright later
11    on has an extension of this literature and
12    again looks at now do we have programs that
13    are actually looking at this really critical
14    component of reducing rates of sexual
15    aggression.  Now, there are some limited
16    programs, right, limited effects, but there's
17    nothing long-term.
18            So one program, for example, that I
19    was involved in the evaluation of showed a
20    reduction in rates of sexual aggression
21    perpetration, so that's men reporting that
22    they engaged in sexual violence --
23        Q.   Doctor, I just have to interject.
24    Doctor.  Doctor, you're not answering my
25    question and I'm not asking complicated
```

1        L. Orchowski - Highly Confidential

2    questions.

3            In your conclusion, you stated

4    there was no effectiveness.  However, in your

5    report, you're noting limited -- there's some

6    effectiveness to it.  And then later on you

7    indicate that they're mixed results there of

8    qualitative review, also documents mixed

9    results of harassment training outcomes.

10            So which is it?  Is your conclusion

11    that there is some effectiveness or no

12    effectiveness, because words matter, Doctor?

13            MS. CARITIS:  Form.

14        A.   Well, let me explain the rate study

15    a little bit more, I think that will help

16    me --

17        Q.   I don't -- I don't need you to

18    explain the study because we have limited

19    time and I'm just trying to understand.

20    You're stating here there is some limited

21    effects and there are mixed results.  Whereas

22    in your conclusion, you're saying there is no

23    effectiveness.

24            Which is it, Doctor?

25        A.   We do not have a sexual assault

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1         L. Orchowski - Highly Confidential

2    prevention program for adult men that shows

3    long terms effects in reducing rate of sexual

4    assault.

5         Q.   Okay.  Doctor, you can move back to

6    her summary opinions.

7              Doctor, have you implemented sexual

8    assault or harassment trainings for a profit

9    company?

10        A.   I've been involved in the

11   evaluation of a program for a for-profit

12   company, yes.

13        Q.   Have you implemented a program?

14        A.   Personally, no.  No, I'm not -- so

15   the programs I implemented are in the context

16   of research grants.

17        Q.   Okay.  And so how about for

18   rideshare, you haven't implemented any sexual

19   assault or harassment trainings for

20   rideshare, correct?

21        A.   No.

22        Q.   Have you reviewed for the rideshare

23   industry what is effective for sexual assault

24   or harassment trainings?

25              MS. CARITIS:  Form.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        A.    As a part of my literature review

3    for this proposal, I examined what is

4    currently being discussed in the literature.

5        Q.    But for rideshare specifically,

6    have you reviewed whether Uber has conducted

7    any experiments to see if their particular

8    trainings are effective?

9        A.    At the current moment, I'm not

10   aware of any.

11       Q.    So you haven't reviewed whether

12   Uber has conducted any experiments to see if

13   their particular training is effective,

14   correct?

15       A.    I haven't seen a randomized

16   controlled trial of Uber's effectiveness.

17   There was a really interesting report,

18   though, that did come out that looked at some

19   longitudinal data suggesting that when Uber

20   implements a rideshare, sexual assault in New

21   York City actually went down.  So I did see

22   that.  I didn't include it in the report

23   because it wasn't a randomized trial, it was

24   a prevention program, but there's some

25   versioning of data out there.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1            L. Orchowski - Highly Confidential

 2            Q.    So you're focused -- my question

 3    wasn't on randomized trials, Doctor.  Have

 4    you reviewed whether Uber has conducted any

 5    experiments to see if their particular

 6    training is effective?

 7            A.    I'm not aware of an experimental

 8    trial of Uber's program specifically, no.

 9            Q.    An experimental trial or any

10    experiments to see if particular training is

11    effective; is that right?

12            MS. CARITIS:  Form.

13            A.    In my mind an experimental trial

14    and experiment would be the same thing.

15            Q.    Okay, that's fine.  Fair.

16            So have you reviewed any documents

17    that have assessed what training would be

18    effective in the rideshare context to prevent

19    sexual assault?

20            MS. CARITIS:  Form.

21            A.    Yeah, several of the things that I

22    read in preparation for this report provided

23    some speculation whether research literature

24    should go and some of those also discussed in

25    the -- in the article that discuss rideshare
```

1        L. Orchowski - Highly Confidential

2    specifically.  So that was the Tillewein and

3    Cox investigating implications of sexual

4    assault with ridesharing.

5        Q.   So you believe that article

6    discussed rideshare training in what would be

7    effective?

8        A.   They call -- they make a call for

9    research to examine what kind of trainings or

10   prevention might be effective.

11       Q.   No.  I'm saying -- so what

12   documents that have assessed what training

13   would be effective in the rideshare context.

14            So my question is, have you

15   reviewed any documents that have assessed

16   what training would be effective in the

17   rideshare context to prevent sexual assault?

18       A.   To the extent that the Valliere

19   report discusses prevention measures, I'm not

20   aware of a study that has looked at rideshare

21   specifically in evaluating a prevention

22   program, for example, a training, an

23   education and training program for a

24   rideshare, no.

25       Q.   Doctor, you're narrowing it.  I'm

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential
2    not looking for a study, I'm just looking or
3    any document that have assessed what training
4    would be effective in the rideshare context
5    to prevent sexual assault.
6              MS. CARITIS:  Form.
7          Q.   So have you reviewed any documents
8    that have assessed what training would be
9    effective in the rideshare context to prevent
10   sexual assault?
11             MS. CARITIS:  Form.
12             Sorry.  Did you say something?  We
13        couldn't hear you if you did.
14        A.   I cannot think of a document of
15   evaluating the effectiveness of a rideshare
16   specific training.
17        Q.   Okay.  Doctor, in Bullet Point 4,
18   Uber isn't noted anywhere here in Bullet
19   Point 4, correct?
20        A.   We discussed this on a previous
21   point that the word "Uber" does not appear in
22   this paragraph.
23        Q.   Thank you.
24             And Dr. Valliere similarly does not
25   appear in this paragraph, correct?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2          A.   We've also discussed this
 3    previously that the name "Dr. Valliere" is
 4    not referenced in this paragraph.  It's not
 5    to mean that this paragraph isn't explicitly
 6    in reaction to the report of Dr. Valliere
 7    that I reviewed.
 8          Q.   Okay.  You can take this down.
 9               Doctor, you discuss the public
10    health approach to the prevention of sexual
11    violence in your report, right?
12          A.   Yes.
13          Q.   And you opined that Uber steps
14    align with the public health model, right?
15          A.   Yes.  So what I saw was defining
16    the problem, collection of data, identifying
17    correlates with a movement towards working
18    towards prevention that would be in alignment
19    with the public health approach.
20          Q.   And Doctor, do you recall that
21    presentation that I had referenced earlier
22    where you were a guest speaker in 2021 that
23    was a Zoom presentation that was What Works
24    in Sexual Assault Prevention.  Do you recall
25    me referencing that YouTube talk that you
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2    gave earlier today?
3        A.   The talk itself is hazy, but I do
4    recall you referencing it.
5        Q.   Okay.  And there you discussed
6    public health approach and you discussed a
7    story of a fisher with respect to the
8    bystander?
9        A.   Fisher in the river, yes.  Fisher
10   in the river.  It's a public health story
11   about kind of going upstream to identify
12   risks for farm before they happen.
13       Q.   Can you tell us -- can you share
14   the story with us?
15       A.   Still a couple of different ways,
16   but it's often told in public health classes.
17   The story goes a little bit like this, that's
18   there is a fisher at a river and notices that
19   individuals are kind of, you know, falling in
20   the water is one version, and so they would
21   race in and jump in to try to save them and
22   then kind of pull them out of the water and,
23   you know, go along with their day.  They got
24   quite frustrated, right, because they kept
25   getting interrupted.  And, you know,
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    eventually after pulling many people out of

3    the river, they decided they need to go

4    upstream and look to see what was happening.

5    So that parable is often utilized to discuss

6    how when we are faced with -- if faced with a

7    public health concern, it's useful, rather

8    than focusing efforts solely on dealing with

9    the folks falling in the river, and when we

10   think about sexual assault that's our work in

11   supporting victims, it's vital.  It's not to

12   say we shouldn't be supporting victims,

13   right, you've gotta notice, you've gotta

14   provide folks strategies for folks to get

15   help.  That's the whole idea of getting in

16   the river, you've gotta go and help.

17            So the parable focuses on just

18   focusing on just going in to help and

19   providing victim support services, you know,

20   isn't getting upstream to try to identify

21   what are some of the things that we could do.

22   Ideally, it's not just one fisher, it's

23   people going together, it's people stepping

24   up as bystanders.  And also some will even

25   argue it's about, you know, doing whatever

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    you can to be safe and not fall in the river

3    in the first place, right.  So doing things

4    that help protect yourself from harm.

5              So that story is often used in

6    public health approach to really kind of

7    focus not just on tertiary prevention, which

8    is addressing the folks who are harmed, but

9    also looking to see what we could do in terms

10   of prevention.

11       Q.   And so that's generally like about

12   empowering communities, right, you would look

13   at that in terms of the public health

14   approach with the bystander approach.

15             Would you agree?

16       A.   Well, there the issue is more

17   broadly.  So I think I would agree that

18   that's one way is bystander intervention, but

19   generally think of sexual assault prevention,

20   this is a complex thing, and just like we

21   wouldn't want one thing for cancer

22   prevention, we want to do multiple things.

23   You wear your sunscreen, you don't smoke, all

24   of these things.  And even folks who, you

25   know, do smoke sometimes don't get cancer,

```
 1          L. Orchowski - Highly Confidential
 2     there's no one-to-one relation.  We gotta do
 3     a lot of things.  And even when we do a lot
 4     of things, stuff still happens, people still
 5     fall in the river.  But it really speaks to
 6     this notion of comprehensive prevention, more
 7     than one strategy, right.  So this is also
 8     reflected in my broad work in prevention is
 9     that we want to have strategies that empower
10     potential victims that's not sufficient.  But
11     we also want to look at what we can be doing
12     to support other people.  So if I'm, you
13     know, with someone, how can I keep my friend
14     safe as a bystander.  Someone says something
15     inappropriate, I can let them know as a
16     bystander, hey, I'm not cool with that.  And
17     also for the folks who might have the
18     potential to harm, how can we provide them
19     with skills and training as much as we can to
20     try to reduce the risk.
21          Q.   So I mean, but the bystander
22     approach you'd agree it's focused on shifting
23     social norms and peer behavior, right, it's
24     spreading that responsibility across society?
25               MS. CARITIS:  Form.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2        A.   Yeah, I would agree.  So kind of

 3   the idea of the bystander approach, it's

 4   almost -- it's sometimes misinterpreted to

 5   just mean see something do something.  But

 6   ideally the bystander approach is when I see

 7   something and say something, other people

 8   recognize that I care about this and

 9   recognize that this isn't something that is

10   okay, right.  So letting people know that

11   you're not okay with a joke, for example, you

12   know.  Maybe the joke's already happened, but

13   they get the message that other people aren't

14   cool with it.

15        Q.   So you'd agree that bystander

16   approach wouldn't work when an Uber driver is

17   assaulting an Uber passenger, right?

18             MS. CARITIS:  Form.  Scope.

19        A.   Did you say would work or wouldn't?

20        Q.   Would not.

21        A.   To answer this question fully

22   scientifically, I would want to know about

23   the cases, I would want to see a trial.  But

24   if I'm gonna answer the question just with a

25   really practical response here, a bystander

```
 1        L. Orchowski - Highly Confidential
 2    approach requires that someone else is there.
 3    And if I'm riding one-on-one, you know,
 4    someone might not be there to let someone
 5    know, hey, I'm not okay with that, with what
 6    you just said.  You know, this could be, you
 7    know, in any kind of confluence, right, it
 8    could be a driver saying something to the
 9    passengers in the back seat.  It could be,
10    you know, it could be in any confluence, but
11    I think a difficulty with bystander
12    intervention assumes that someone else is
13    there to help.
14              And there was one study -- actually
15    two studies that I did that showed that we
16    asked men if they had done something to
17    deliberately walk someone home when they
18    didn't want to or offer them alcohol when
19    they didn't want to.  And we asked them, did
20    it continue, like, were you successful or
21    like were you successful engaging someone in
22    unwanted sexual contact.  Or we asked them,
23    did you try to do this?  And some people said
24    yes, I did it, and it went forward.  And some
25    people said, yes, I tried it and it didn't go
```

```
1         L. Orchowski - Highly Confidential
2    forward.
3              The interesting thing about this,
4    and I think speaks to your question, not a
5    single one of those attempted grievances,
6    trying to get someone alcohol when they don't
7    want to drink, trying to take someone to an
8    isolated location when they didn't want to go
9    or trying to initiate an unwanted sexual
10   advance, none of them stopped.  I think in
11   one study we might've had a few, but one
12   study, none of them stopped because of
13   bystander intervention, which really speaks
14   to the point that oftentimes people aren't
15   there in that moment.
16             So that's one of the reasons why
17   bystander intervention generally isn't
18   considered a sufficient strategy.  We do
19   advocate a comprehensive, you know,
20   prevention approach.  Albeit even with
21   prevention approach, those of us in the field
22   who do this work know that even after the
23   program, there will still be people that
24   experience harm and still be people that
25   continue to participate.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.   Doctor, have you ever heard of,

 3   like, cameras, intervention cameras being

 4   used as bystanders?

 5             MS. CARITIS:  Form.  Scope.

 6        A.   So I was aware of the cameras that

 7   came out in the report.  I am not kind of a

 8   detection expert, so I am not aware of that

 9   literature, but that would be -- I -- the

10   issue with -- for me, personally, of thinking

11   of a camera as a bystander, the camera can't

12   talk back.  When I think of a bystander is

13   someone who's gonna give corrective feedback

14   to the person who's engaging in harm in the

15   moment to try to tell them that their

16   behavior is not okay.  So that -- I wouldn't

17   equate a camera to a bystander because the

18   feedback is really what the bystander needs

19   to do.

20        Q.   Doctor, you'd agree that the

21   bystander approach doesn't create legally

22   enforceable duties?

23             MS. CARITIS:  Form.  Scope.

24        A.   I've never heard of that actually.

25        Q.   So with Uber, you're aware that
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2   Uber controls who drives for Uber, right?

3              MS. CARITIS:  Objection.  Form.

4       Scope.

5       A.   I'm aware they have hiring

6   processes.

7       Q.   But you're aware that Uber controls

8   whether a driver is on the platform or not on

9   the platform?

10             MS. CARITIS:  Objection.  Form.

11      Scope.

12      A.   I'm aware that they can have --

13  they can remove individuals from the platform

14  and have a say of who was on the platform.

15      Q.   And Uber controls which safety

16  policies to enforce, you're aware of that?

17             MS. CARITIS:  Objection.  Form.

18      Scope.

19      A.   I -- to make a broad assumption, I

20  would think that any company would be setting

21  their own policies.

22      Q.   So yeah, they would have their own

23  policies to enforce if they would like,

24  correct?

25             MS. CARITIS:  Form.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        A.   Yes, I believe any company would be

 3   the one setting their own policies.

 4        Q.   And whether a driver can pick up a

 5   passenger depends on Uber's screening and

 6   monitoring systems, would you agree with

 7   that?

 8             MS. CARITIS:  Objection.  Form.

 9        Scope.

10        A.   I'm not sure I can speak to that

11   actually.

12        Q.   Okay.  And are you aware of the

13   systems -- those systems involve technology

14   and data that Uber can use to prevent sexual

15   assault on its platforms?

16             MS. CARITIS:  Objection.  Form.

17        Scope.

18        A.   So I feel like there's two things

19   that you're asking here, so it's, like, maybe

20   a double-barreled question, so I'll address

21   the first first.

22             Yes, I'm aware that there's

23   information that Uber collects about the

24   rides.  To the extent to which that

25   information could be used to prevent assault,
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     scientifically it would be my opinion that we
 3     don't have enough information to reliably
 4     suggest that information about the specific
 5     characteristics of a ride of how that would
 6     translate into a prevention initiative.  That
 7     would be effective in preventing violence.
 8          Q.   Sure.  But you're saying
 9     scientifically, but it can use its data to
10     block pairings or prevent rides from
11     occurring, right?
12              MS. CARITIS:  Objection.  Form.
13     Scope.
14          A.   Not being someone who -- you know,
15     it would seem that a company could do that.
16     You know, I'm not -- I haven't, you know, I'm
17     just gonna answer -- your answer is could
18     they do that, it seems reasonable to assume
19     that a company could.
20          Q.   Okay.  You're aware that Uber can
21     remove unsafe drivers from its platform,
22     right?
23          A.   Yes, I'm aware.
24          Q.   And have you reviewed Uber's
25     deactivation policies?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        A.   To the extent that they're

 3   discussed in the Valliere report, I'm aware

 4   what Valliere has discussed in the report.

 5   Can I comment specifically today about

 6   deactivation policies?  I can't comment any

 7   further.

 8        Q.   Well, do you know anything about

 9   their deactivation policies and when they

10   choose to deactivate a driver?

11             MS. CARITIS:  Objection.  Form.

12        Asked and answered.

13        A.   I can tell you broadly that I'm

14   aware of what Valliere has discussed in the

15   report and to the extent that I've reviewed

16   secondary documents, but I can't provide

17   additional detail at this time.

18        Q.   Okay.  And you haven't discussed

19   that in your report, right, anything about

20   Uber's deactivation policies.

21             Withdrawn.

22             You're aware that Uber has access

23   to background checks, complaint data --

24   actually, that's withdrawn too.

25             Have you conducted any study that
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2    shows that a public health prevention model
 3    reduces sexual assault by Uber drivers?
 4              MS. CARITIS:  Form.
 5         A.   I have personally never been in a
 6    study that looks specifically at Uber
 7    drivers.  It is possible there may have been
 8    an Uber driver in my study somewhere
 9    sometime, we never asked them to disclose,
10    right, who they work for in a study.  But
11    Uber, no, I've never done a study
12    specifically with Uber drivers.
13         Q.   You didn't -- have you ever tested
14    your theory in a rideshare context?
15              MS. CARITIS:  Form.
16         A.   I'm not sure --
17              (Cross-talk.)
18         Q.   Any model --
19         A.   I'm not sure what theory you're
20    referring to.
21         Q.   To reduce sexual assault by Uber
22    drivers, have you ever tested that rideshare
23    context?
24              MS. CARITIS:  Form.
25         A.   What theory are you referring to?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          Q.   Withdrawn.

 3               Did you review any of Uber's safety

 4     engineering documents and discuss them in

 5     your report?

 6          A.   So I'm going to separate that into

 7     two questions.  So the first was specific to

 8     safety engineering documents so -- and were

 9     three Uber documents on the Uber web page

10     that are the safety report, so I think that's

11     what you're referring to there.

12          Q.   No.

13          A.   So safety documentation there, so

14     that would be one.  So, you know, insofar as

15     Valliere discusses various safety strategies,

16     so kind of like specific features in the app,

17     I'm aware of those safety documents that are

18     referenced in the report.

19               And then I'll answer the question

20     second because I think we've been down this

21     road before, and I'll note that although my

22     report does not give a citation to specific

23     policies, my broad scientific discussion of

24     prevention measures for sexual violence which

25     also include safety measures offers the
```

1        L. Orchowski - Highly Confidential

2   opinion that we do not have effective sexual

3   violence prevention strategies.

4        Q.    Doctor, did you review any of

5   Uber's risk analysis documents?

6        A.    Can you be more specific as to

7   which those are?

8        Q.    Anything that's evaluating the risk

9   of sexual assault on its platform, have you

10  reviewed those documents and discussed them

11  in your report?

12       A.    Are you referring to things like

13  S-RAD or those kinds of programs?

14       Q.    Yeah, anything, Women2Women using a

15  dashcam, S-RAD, Cerebro, uSights, do you have

16  any of those discussions in your rebuttal

17  report?  And this is specifically referenced.

18  I mean, can I look at your rebuttal report

19  and can I find where it states S-RAD,

20  Cerebro, uSights, Women2Wwomen matching, is

21  that mentioned anywhere in your report that

22  specific terminology?

23       A.    So if we look at my report, I do

24  not mention specific terminology in the

25  report.  And I've also mentioned, while this

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential

 2    terminology is not in the report, it does not

 3    mean that I'm not considering this

 4    information when I offer the scientific

 5    opinion that Dr. Valliere's suggestion that

 6    we can predict who would be violent or that

 7    there's an effective prevention strategy

 8    available, we disagree with those claims, and

 9    my report broadly offers a rebuttal to those

10    claims.

11         Q.   Are you familiar with the hazard

12    hierarchy?

13              MS. CARITIS:  Form.

14         A.   Are you speaking to the taxonomy of

15    different types of assaults on the platform?

16         Q.   No, hazard hierarchy.

17         A.   No, I'm not familiar.

18         Q.   You understand that Uber's a

19    for-profit company?

20         A.   I do.

21         Q.   Are you aware that it's in the

22    business of providing rides in exchange for

23    compensation?

24              MS. CARITIS:  Form.

25         A.   I understand that Uber is a
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2    rideshare company and I would assume that as
3    a for-profit company, they are, you know,
4    working in a business that is looking to
5    exchange, you know, looking for a profit.
6         Q.    Are you aware that Uber has a duty
7    to provide a safe ride to its passengers?
8              MS. CARITIS:  Objection.  Form.
9    Scope.
10        A.    So the documents that I reviewed in
11   Valliere's report, as well as Uber's document
12   and safety documents, they state very clearly
13   that safety is important.
14        Q.    To provide a safe ride to its
15   passengers, that's part of Uber's duty, would
16   you agree?
17             MS. CARITIS:  Form.  Scope.
18        A.    I'm reluctant to comment on the
19   word "duty" because the interpretation of
20   that feels like something that could get
21   sticky.  But in reviewing the documents, I
22   would say that, you know, I'm not -- I'm not
23   here to comment on, you know, company duties.
24   I don't work in business, but I do work, you
25   know, I can offer an opinion on Valliere's
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2    report and the documentation I've reviewed

 3    and would say that Uber comments a commitment

 4    to safety -- comments on a commitment to

 5    safety or has expressed this clearly.

 6        Q.   Okay.  In terms of Uber's

 7    responsibility to provide safe rides, you

 8    would agree that includes a responsibility to

 9    take steps that work to prevent its

10    passengers from being sexually assaulted by

11    its drivers, right?

12            MS. CARITIS:  Form.  Scope.

13        A.   I'm taking some time here because I

14    want to be sure that this is in my area of

15    expertise to comment on as a sexual assault

16    prevention scientist who doesn't work in

17    business practices.

18        Q.   But Dr. Valliere comments on this

19    and so you're responding to her report, so I

20    would appreciate your response to this

21    answer.

22            MS. CARITIS:  Objection.  Form.

23        Q.   And you can say I don't know.  I

24    mean, I'm just trying to understand.

25        A.   When I reviewed the (audio
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    distortion).
 3        Q.   Sorry, Doctor.  You're cutting out.
 4    Candida is gonna to be like...
 5        A.   You know, I -- can you repeat the
 6    question?
 7        Q.   Sure.
 8             Would you agree part of Uber's
 9    responsibility is to take steps that work to
10    prevent passengers from being sexually
11    assaulted by its drivers?
12             MS. CARITIS:  Form.  Scope.
13        A.   I think broadly not being someone
14    who is an expert in corporate ethics, I
15    cannot -- I don't know specifically in terms
16    of a company's responsibility for safety.  I
17    can think of, you know, laws in college
18    environment in Title IX and what colleges are
19    legally obligated to do.  But the question of
20    company responsibility to safety feels like a
21    step outside of my expertise in sexual
22    assault prevention and really the evidence
23    about what works in prevention.  Happy to
24    speak about what works, but really company
25    ethics and responsibilities feel like a
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     business practice.
 3          Q.   I'm confused, Doctor.  We talked
 4     about the bystander approach where you're
 5     impressing on bystanders to take steps to
 6     assist with sexual assault and other things
 7     that are occurring to intervene and make a
 8     difference.  Yet, when I'm asking about
 9     Uber's responsibility to take steps that work
10     to prevent passengers from being sexually
11     assaulted by its drivers, you are unable to
12     provide an opinion; is that correct?
13               MS. CARITIS:  Objection.  Form.
14          A.   Yeah, I haven't -- I haven't
15     studied the, like, business ethics of company
16     responsibility in this specific setting.
17          Q.   I mean -- well, would you think it
18     would be appropriate for Uber to take steps
19     that work to prevent passengers from being
20     sexually assaulted by its drivers?
21               MS. CARITIS:  Form.  Scope.
22          A.   I can comment on what works in my
23     knowledge on developing sexual assault
24     prevention programs.
25          Q.   Okay.  So you don't have an opinion
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   on that question, you're saying?
 3        A.   No, I don't have an opinion.
 4        Q.   Okay.  Okay.  Doctor, let's go to
 5   page 4 of your report, which is Exhibit 1.
 6   Actually, let's go to page 9.  Okay.  And
 7   let's look at the section for Prevention
 8   Standards in Taxi and Rideshare Industries,
 9   and you state that:
10             Valliere opines without scientific
11   support that the acts of sexual offenders are
12   often preventable.
13             And you don't have a cite to
14   Dr. Valliere's report.  However, I believe
15   there are a number of places where
16   Dr. Valliere makes these statements.  But
17   sitting here right now, do you know what the
18   basis of Dr. Valliere's statement was here?
19             MS. CARITIS:  Form.
20        A.   I'm not sure what you mean.
21        Q.   In terms of this statement, do you
22   know what she was attributing it to; what the
23   basis and support for this statement was?
24             MS. CARITIS:  Form.
25        A.   If we go to the section of the
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   report where she's talking about preventive
 3   measures, should we find that there?
 4        Q.   No, no.  But my question here is,
 5   do you understand what the source of this
 6   statement was for Dr. Valliere, sitting here
 7   looking at your report, 'cause I can't tell
 8   from what you quoted here, and we've talked
 9   about context being important, but do you
10   know what Dr. Valliere was citing here?
11             MS. CARITIS:  Form.
12        A.   I would offer it was often unclear
13   what Dr. Valliere was citing because there
14   weren't references to science.  So this was a
15   point I made in my report that oftentimes
16   it's not clear if she's citing a research on
17   folks who sexually offend against children
18   and folks who --
19             THE COURT REPORTER:  Doctor, you
20        have to slow down.
21        A.   So to repeat that, I would say that
22   there are often places in the report where I
23   am not clear that Valliere -- what research
24   Valliere is referring to because she does not
25   cite specific studies.  So sometimes it's not
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     clear if she's looking at the research on
 3     sexual offenses towards children, sexual
 4     offenses for undetected perpetrators, or
 5     sexual offenses among incarcerated offenders,
 6     each of those are separate sources of
 7     literature.  So if we could go to the place
 8     in the report, it would help me get some more
 9     context for that.
10          Q.   Doctor, so you don't know sitting
11     here what Dr. Valliere was citing as you just
12     testified to.  However, you didn't provide a
13     cite here for your report, right?
14          A.   I --
15               (Cross-talk.)
16          A.   That's a mischaracterization that I
17     testified that I --
18          Q.   Is it?
19          A.   -- don't know what Valliere was
20     reporting.  I said broadly there are many
21     places in her report where she does not cite
22     which body of research she is referring to.
23               If we can go to the specific place
24     in the report where the quote, "the acts of
25     sexual offenders are often preventable," I
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    recognize did not include a page number, I
 3    will happy to do this in the future or
 4    provide a revised report so these kinds of
 5    confusing points we can move past them more
 6    quickly.  But if we can go to this area of
 7    the report, I'm happy to speak more about the
 8    context.
 9        Q.   But it would be important, right,
10    to see what she's citing here, you'd agree?
11            MS. CARITIS:  Objection.  Form.
12            Would you like her to control F and
13            find what she's citing?
14            MS. LUHANA:  Counsel, yeah, my
15            question is, but it would be important
16            to know what she's citing, correct?
17            MS. CARITIS:  Objection.  Form.
18        Q.   Doctor, let's put up the report.
19    But I want an answer to the question, Doctor,
20    it's important to know what she's citing for
21    you, correct?
22            MS. CARITIS:  Objection.  Form.
23            MS. LUHANA:  Lance, can you please
24            put up Exhibit 4 next to.
25            MS. CARITIS:  Roopal, I did a
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential
2          control F, if you'd like me to direct
3          the witness, but if you'd like her to
4          find it herself, of course that's your
5          prerogative.
6               MS. LUHANA:  No, I will direct her
7          to it, but I have a question pending,
8          I was waiting for a response.
9          A.   Before I can answer that question,
10    I'd like to find this piece in the report
11    please.
12         Q.   Okay, that's fine.  I mean, there's
13    several places she cites it, but let's go to
14    page 39.  And if we go to page 39 of
15    Dr. Valliere's report, it's the second
16    paragraph there, and it says:
17               In March 2016, Uber was aware that
18    many safety incidents are predictable.
19               MS. CARITIS:  That's a different
20          sentence than what she read you to in
21          her report.
22               MS. LUHANA:  Her -- the sentence
23          in her report is, we'll pull it up
24          actually next to --
25               MS. CARITIS:  Preventable, it's
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        right on the screen.

3              MS. LUHANA:  Yeah, I understand.

4              MS. CARITIS:  Okay.  You read

5        "predictable."  "Preventable" appears

6        on page 48 of Valliere's.

7              MS. LUHANA:  There are several

8        cites to this, Alex.

9        Q.    So Uber has acknowledged if safety

10   incidents are predictable, they are

11   preventable.

12              Do you see that in the center of

13   this paragraph?  I just wanted to review the

14   entire paragraph because it is citing

15   internal Uber documents as you can see.

16              MS. CARITIS:  Just to be clear,

17        for the record, you're reading

18        Valliere's report and that's what

19        we're highlighting now, I just want to

20        be very clear for the record.

21              MS. LUHANA:  Right.

22        Q.    And so you say:

23              Valliere opines without scientific

24   support that the acts of sexual offenders are

25   often preventable.

```
 1         L. Orchowski - Highly Confidential
 2              And you see here Uber has
 3    acknowledged that if safety incidents are
 4    predictable, they're preventable, that's
 5    attributed to an Uber document, right,
 6    Doctor?
 7              MS. CARITIS:  Objection.  Form.
 8         A.   So if we're talking about this
 9    statement, Uber has acknowledged, quote, that
10    if safety incidents are predictable they are
11    preventable.  I see the citation there to
12    Nilles, EX 184 UBER_JCCP_MDL Nilles, Nilles.
13    So those are citations there.
14         Q.   It's to Nilles and it's also a
15    document referencing Sunny Jeon, which was an
16    intelligent decision system that was studied
17    by Uber.
18              But Doctor, is there any reason you
19    removed the reference to Uber when citing
20    Valliere's report in your rebuttal report?
21              MS. CARITIS:  Objection.  Form.
22         Misstates her report.  She's citing a
23         different portion of the report.
24              MS. LUHANA:  Alex.
25         A.   Can we go to the portion of the
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   report that I'm citing?
 3            MS. CARITIS:  You're mis- -- I
 4        don't know if you're doing it on
 5        purpose, but this is a different
 6        portion --
 7            MS. LUHANA:  Alex, please don't
 8        coach.  You can take your time to
 9        conduct your examination of the
10        doctor.
11        Q.   But Doctor, do you see Uber, in
12   March 2019, said Uber was aware, as
13   Dr. Valerie was saying, that many safety
14   incidents are predictable.
15            Do you see that up top right there?
16            MS. CARITIS:  Form.
17        Q.   And Dr. Valliere says, Uber has
18   acknowledged that safety incidences are
19   predictable, they are preventable.  And it
20   references the Nilles documents.
21            Did you review these documents when
22   you had come to this conclusion in your
23   report?
24            MS. CARITIS:  Form.
25        A.   I can't recall today if I reviewed
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   these or not.
 3        Q.   So this prior sentence here about
 4   where Dr. Valliere and what she's quoting
 5   provides context, correct?
 6             MS. CARITIS:  Objection.  Form.
 7        Misstates the report.
 8        A.   Can we go back to the question
 9   here?
10        Q.   So does this provide you context
11   that Dr. Valliere, when she was making the
12   statement that the acts of sexual offenders
13   are often preventable is actually based on
14   Uber documents?
15             MS. CARITIS:  Objection.  Form.
16        A.   So as we're discussing this
17   specific point, which is different from the
18   point that I've referenced on page 9 of my
19   report, so if we focus on your question of
20   Valliere's references here, so she is
21   referencing Uber documents here.  So I would
22   agree that she is referencing Uber documents.
23        Q.   And she's referencing Uber
24   documents that directly state that if safety
25   incidences are predictable, they are
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   preventable, correct?

 3        A.   I see that sentence, yes.

 4        Q.   But you state in your report

 5   Dr. Valliere opines without scientific

 6   support that the acts of sexual offenders are

 7   often preventable, correct?

 8             MS. CARITIS:  Form.

 9        A.   It is my scientific opinion in

10   reviewing Valliere's report and my own

11   expertise as someone who has been involved in

12   numerous trials of sexual assault prevention,

13   that even with correlates, even with

14   predictors of safety, prevention efforts

15   often fail.

16             We have folks even after they sit

17   through a 12-hour program that still go on to

18   perpetrate.  And I've met folks in my

19   interventions who still go on to perpetrate,

20   and these are interventions who are helpful

21   in comparison to a control group for some

22   people.  Some referring to the --

23             THE COURT REPORTER:  I'm sorry,

24        Doctor.  Doctor --

25        Q.   Doctor, I will interject --
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential

2              THE COURT REPORTER:  Excuse me.

3         I'm trying to interrupt.

4              MS. LUHANA:  Candida, I get it.

5              THE COURT REPORTER:  You're going

6         very fast.  I didn't get the names you

7         were stating.

8              THE WITNESS:  Okay.  I'll go back

9         to it.

10        Q.   Doctor.  Doctor, I want to focus my

11   questions here.

12             MS. LUHANA:  Objection as

13        nonresponsive.

14        Q.   So it is your opinion that Uber's

15   conclusion that if safety incidences are

16   predictable, they are preventable is not

17   sufficient support for Dr. Valliere to make

18   the statement that the acts of sexual

19   offenders are often preventable?

20             MS. CARITIS:  Form.

21        A.   I did not make those two (audio

22   distortion).  So what I'm specifically

23   discussing on page 9 is that acts of sexual

24   offenders are often preventable, that claim

25   does not have sufficient scientific support.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1           L. Orchowski - Highly Confidential

2           Q.   Doctor, but --

3                (Cross-talk.)

4                MS. CARITIS:  That's directly

5           answering your question.

6                MS. LUHANA:  No, it's not,

7           because --

8           Q.   Doctor, we're unclear of what part

9      of Dr. Valliere's report you're quoting, and

10     here it says, The acts of sexual offenders

11     are often preventable.  Dr. Valliere is

12     quoting an Uber document directly.

13               My question is very specific.  Is

14     this Uber document insufficient scientific

15     support for you?

16               MS. CARITIS:  Form.

17          A.    It seems like we're taking what

18     I've written on page 9 out of context that

19     acts of sexual offenders are often

20     preventable, which I know that Valliere

21     opines without scientific support.  I go on

22     in that section of the report to discuss the

23     research that we have on the effectiveness of

24     sexual assault prevention.

25          Q.    That doesn't answer my question,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   Doctor.
 3        A.   In my report --
 4             (Cross-talk.)
 5        Q.   Doctor, I am focused on --
 6             (Cross-talk.)
 7        A.   I wasn't finished.  Can I finish,
 8   please?
 9        Q.   Unfortunately this entire
10   deposition you evaded my questions, and we
11   may have to go to the court and ask for
12   additional time with you.
13             MS. CARITIS:  Good luck.  We
14        object to that.
15             MS. LUHANA:  I will go to Judge
16        Cisneros with this because you have
17        been extremely evasive and taken very
18        long for simple questions that are
19        asked and not answered the questions
20        being asked.  I would like you to
21        listen carefully to the question I'm
22        asking.
23        Q.   So Dr. Valliere here is quoting an
24   Uber document directly for the statement that
25   the acts of sexual offenders are preventable.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1       L. Orchowski - Highly Confidential
 2   And my question to you is, is that not
 3   support enough for her statement; is that
 4   your conclusion?
 5       A.   Without being able to locate the
 6   quote that you have in my report and its
 7   connection to the statement, I am not able to
 8   evaluate that.
 9       Q.   Okay.
10            MS. LUHANA:  Let's pull up the
11       document, actually.  Let's pull up
12       Nilles Exhibit 1884, which was one of
13       the documents that Dr. Valliere had
14       cited.  It's RL5 and I guess it would
15       be Exhibit 5 here.
16            (Exhibit 5, Bouncer v3 document,
17       Bates UBER_JCCP_MDL_003231342, was
18       marked for identification.)
19       Q.   Let's go to the first page of the
20   document and highlight the summary, please.
21   And this is a document from Sunny Jeon who
22   was a data scientist in the trust and safety
23   for Uber from March 28, 2016.
24            Doctor, why don't you please read
25   the summary for the ladies and gentlemen of
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2     the jury.

 3          A.   This document provides an overview

 4     of Bouncer, an intelligent decision system

 5     for anticipating and preventing safety

 6     incidents on the Uber platform, (e.g.,

 7     accidents and interpersonal conflicts).

 8     Statistical machine learning models predict

 9     whether drivers will or will not be involved

10     in a safety incident 7, 14, 30 and 60 days

11     into the future.  High risk users are

12     targeted interventions that prevent safety

13     incidents in randomized controlled trials.

14     The key performance indicator is reduction in

15     safety incidents.

16          Q.   Thank you.

17               And let's go to the next page and

18     up top.  Can we just highlight:

19               Although safety incidents are rare

20     and may appear random, many safety incidences

21     are predictable.

22               Did I read that correctly?

23          A.   Yes, you read that correctly.

24          Q.   And then you'll see a bullet point

25     here talking about safety incidents rates

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     increasing dramatically between 1 and 3 a.m.
 3     on Saturday nights, Sunday mornings, on
 4     holidays and other days of major social
 5     gatherings.
 6               And if you scroll down further,
 7     that first sentence there states:
 8               If safety incidents are
 9     predictable, they are preventable.
10               So Doctor, in terms of
11     Dr. Valliere's statement that safety
12     incidents are predictable and preventable,
13     and citing to this document, your conclusion
14     is that this isn't sufficient support for her
15     to make that statement?
16               MS. CARITIS:  Form.
17          Q.   Is that true?
18          A.   I'm basing my evaluation as a
19     sexual assault prevention scientist, in the
20     sexual assault literature, we have risk
21     factors, we have correlates, and this
22     statement here is a broad generalization of
23     kind of prevention theory.  Specifically in
24     my report specific to my expertise in sexual
25     assault prevention science, we may know risk
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1      L. Orchowski - Highly Confidential
 2   factors, we may know correlates, it doesn't
 3   mean we have an effective sexual assault
 4   prevention strategy.
 5      Q.   Doctor, have you discussed the
 6   Bouncer intelligent decision system in your
 7   report, specifically, have you referenced it?
 8      A.   As we have discussed before, I
 9   don't reference specific types of prevention
10   measures such as S-RAD or Bouncer in my
11   report.  This does not mean they aren't taken
12   into consideration.
13      Q.   So, Doctor, in terms of
14   Dr. Valliere attributing this statement to
15   Uber and stating safety incidences are
16   predictable, they're preventable, that isn't
17   sufficient support for you for her to assert
18   that in your report; is that correct?
19      A.   When I'm doing an assessment, I am
20   basing this as noted in my methodology, also
21   based on what the science shows about sexual
22   assault prevention.  Very much agree that
23   there are risk factors, that are correlates.
24   And in looking at these kinds of modeling,
25   Uber was setting out to look at some of these
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    things.  This is exciting work as a
 3    preventionist.
 4            It is my scientific opinion,
 5    however, that even knowledge of correlates is
 6    insufficient for prevention approach.
 7        Q.   So you disagree with Uber that if
 8    safety incidents are predictable, they are
 9    preventable, according to their intelligent
10    system that they formulated in 2016?
11            MS. CARITIS:  Form.
12        A.   My scope is not to agree or
13    disagree with Uber.  My scope is as a
14    scientist to comment on what we know about
15    sexual assault prevention.  And it is my
16    opinion to specifically address the Valliere
17    report, and I would disagree that we have
18    strategies to suggest that an effective
19    prevention strategy exists for sexual
20    assault.  And that's not just specific to
21    rideshare, but this would be for other
22    communities as well.  Our field does not have
23    an effective solution for identifying who is
24    going to perpetrate or how to prevent harm.
25        Q.   Apparently Uber concluded that
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2     they're able to predict safety incidents,

 3     including sexual assaults to prevent them,

 4     and you're stating you disagree with their

 5     findings, is that so?

 6               MS. CARITIS:  Form.

 7          A.   That question feels out of scope.

 8     If I were to do an analysis of Uber -- of

 9     this specific statement which is quite broad.

10          Q.   Doctor, you're criticizing

11     Dr. Valliere's --

12               MS. LUHANA:  Is there feedback?

13          Are you guys getting feedback?

14               THE WITNESS:  There is feedback.

15               MS. CARITIS:  That might be my

16          typing, I have all nails.

17               THE COURT REPORTER:  It's an echo.

18          It's an echo.

19               MS. CARITIS:  Oh, it's not my

20          typing.  Good.

21               MS. LUHANA:  Yeah, I don't think

22          it's your typing.  I mean, I'm still

23          hearing it and you probably stopped

24          typing, Alex.

25               MS. CARITIS:  I don't hear
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2         anything, let me make sure it's not
3         me.
4              MS. LUHANA:  Hello.  I can hear
5         feedback from me and feedback from
6         you, Doctor, so...
7              THE COURT REPORTER:  I don't hear
8         it now.  When Alex muted, I didn't
9         hear it.
10        A.   Let me try answering your question
11    a different way.
12        Q.   No.  Let's -- I --  you've answered
13    the question already.
14              And so your criticism of
15    Dr. Valliere is because Dr. Valliere --
16    scratch that.
17              Dr. Valliere is relying on Uber
18    documents to reach her conclusion and
19    opinion, and you disagree with the basis of
20    the support she has for her conclusion,
21    correct?
22        A.   I would disagree.  I think she's
23    relying on other things other than Uber
24    documents.  She has her 20 plus years of work
25    in the field.  She has other things that she
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    discusses also without citation.  So there's

3    a lot that she appears to be relying on.

4        Q.   Doctor, let's -- let's -- that is

5    true, but this specific statement is

6    attributable to Uber.  And so let's look at

7    the other places in her report where she

8    references the statement.

9            So let's go to page 3 of

10   Dr. Valliere's report.  Actually, let's

11   withdraw that.  Let's move on.

12           MS. LUHANA:  How much -- let's

13       actually take a break.  Go off the

14       record?

15           THE VIDEOGRAPHER:  The time is

16       20:46 UTC time and we are off the

17       record.

18           (Off the record.)

19           THE VIDEOGRAPHER:  The time is

20       21:00 UTC time and we're back on

21       record.

22   BY MS. LUHANA:

23       Q.   Doctor, let's go back to your

24   report around -- let's turn to page 11, so

25   that's Exhibit 1 page 11.  And if we scroll

1        L. Orchowski - Highly Confidential

2    down to the third paragraph.

3            Doctor, you say:

4            An example is Valliere's discussion

5    of the underreporting rates of sexual assault

6    in the population-based literature on sexual

7    assault, which are discussed with relevance

8    to Uber incident data.

9            And then you state:

10           Reporting dynamics vary by setting

11    and Uber's anonymous reporting mechanisms,

12    lack of any requirement that the rider report

13    to law enforcement in the first instance, and

14    rider demographics make such extrapolation of

15    population-level sexual assault data

16    ungeneralizable to this context.

17           So Doctor, looks like you're

18    criticizing Dr. Valliere for her discussion

19    of underreporting rates of sexual assault; is

20    that correct?

21        A.    The point that I'm making here is

22    that the reporting systems on the Uber

23    platform are unique to this platform.  So if

24    we have information about likelihood to

25    report in different settings, likely to

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    report to your resident advisor or likelihood

3    to report to your doctor, or likelihood to

4    report to the police.  Each of those has very

5    different likelihood estimates depending on a

6    situation.  So I think this is a matter of

7    context.

8              So this section of the report, I'm

9    making the point where at times I had

10   concerns that there was broad literature just

11   generally about reporting, which there are

12   many studies about reporting suggesting that

13   in different contexts reporting varies.  And

14   the point I'm making here is that it's

15   inappropriate to generalize studies about

16   specific studies, for example, reporting to

17   the police or reporting to your doctor or

18   resident advisor to a specific context.

19        Q.   Are you aware of what Dr. Valliere

20   was relying on when she was making statements

21   about underreporting and she was relying

22   on -- are you aware sitting here what she was

23   relying on when she was making statements

24   about underreporting on the Uber platform?

25              MS. CARITIS:  Form.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2          A.    (Audio distortion.)

 3          Q.    I'm sorry, you are cutting out

 4     again.

 5          A.    How's that?

 6          Q.    Good.

 7          A.    There are several different

 8     sections in the report where Valliere talks

 9     about reporting, whether that is a -- for

10     example, when she's discussing 911 button or

11     also just talking broadly about reports that

12     came to Uber.  So I'm aware of several places

13     where Valliere talks about reporting.

14          Q.    My question was, do you know what

15     she's relying on when she's discussing

16     underreporting?

17               MS. CARITIS:  Form.

18          A.    I'm aware of various Uber documents

19     that she references in the report.

20          Q.    And so you think it's improper for

21     Dr. Valliere to rely on Uber documents which

22     conclude that sexual assault is underreported

23     on the platform?

24               MS. CARITIS:  Form.

25          A.    No, that's not what I'm saying.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     I'm raising a broad point here that when
 3     giving a scientific opinion, my task for this
 4     report was to give a scientific evaluation of
 5     the claims made in Valliere's report.  And
 6     this broad section of the report notes my
 7     concerns of places in the report where
 8     Valliere appears to be speaking broadly about
 9     general trends in sexual assault literature.
10     And it wasn't clear to me kind of how this
11     was specifically applicable to the rideshare
12     environment.
13          Q.   So you don't cite the report, but
14     let's go to the report, Exhibit 4.  You don't
15     cite where you have concerns about the
16     statement she made in her report, correct,
17     here, Doctor?
18          A.   You're correct.  As we've
19     discussed --
20          Q.   Okay.
21          A.   -- in other sections.
22          Q.   So let's go to page 7 of
23     Dr. Valliere's report and scroll down, it's
24     the last paragraph there.  Yes, perfect.
25               So it states -- she states:
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2             As even Uber acknowledges, sexual
 3    assaults are underreported.
 4             And she cites to exhibits from the
 5    Boman deposition.  Do you see that there,
 6    Doctor?
 7        A.   Second to last sentence, correct?
 8        Q.   No.  It's the first sentence, As
 9    even Uber acknowledges, sexual assaults are
10    underreported, correct?
11        A.   Oh, yes, I see it.
12        Q.   And you see she cites to the Boman
13    deposition?
14        A.   Yes, I see that.
15        Q.   Do you recall who Ms. Boman is,
16    sitting here today?
17        A.   No, I can't speak to that.
18        Q.   And she cites to a Chang deposition
19    exhibit.
20             Do you know who Mr. Chang is?
21        A.   As we discussed, I've had an
22    opportunity to review these documents, but
23    right now in this moment I can't specifically
24    say that I do.
25        Q.   Okay.  And then she cites to the
```

1        L. Orchowski - Highly Confidential

2    McDonald deposition.

3            Do you know who Ms. McDonald is?

4        A.   At this moment I can't recall.

5        Q.   Okay.  And she also cites to the

6    Nilles deposition.

7            Do you know who Ms. Nilles is?

8        A.   At this moment, I can't recall.

9        Q.   Okay.  Then she cites to a Wong

10   exhibit as well.

11           Do you know who Mr. Wong is?

12       A.   We were just reviewing a report

13   that I believe was Wong.  Is this the same

14   one or a different one?

15       Q.   It's the same one, Mr. Sunny Wong,

16   yes.

17       A.   So we just looked at that one.

18       Q.   Yeah.  Do you know who Ms. Breeden

19   is?

20       A.   I do not know Ms. Breeden.

21       Q.   Ms. Childs?

22       A.   I do not know Ms. Childs.

23       Q.   Dr. Gaddis?

24       A.   I do not know Mr. Gaddis.

25       Q.   Okay.  And so she cites to all

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    these depositions and exhibits saying even
 3    Uber acknowledges sexual assaults are
 4    underreported.
 5            And then if we go to the statement
 6    that says:
 7            In a 2017, sexual
 8    assault/misconduct strategy reduction
 9    strategy document, Uber --
10            MS. LUHANA:  Lance, do you see
11        that in the center in a -- yeah.  Can
12        you just highlight that entire
13        sentence?  And I would like
14        Dr. Orchowski to read that out loud.
15            THE COURT REPORTER:  Slowly,
16        please.
17    A.    Yes.
18    Q.    Slowly.
19    A.    Okay.  In a 2017, sexual
20    assault/misconduct reduction strategy
21    document, Uber recognized that, quote, we
22    know that there is a high likelihood of
23    underreporting incidents and behaviors on our
24    platform due to unintuitive reporting
25    feedback flows, societal influence and a
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    prevalent belief that we will not act on
 3    information.
 4        Q.   Thank you.  And she cites to
 5    Ms. Breeden and Ms. Nilles's deposition.  And
 6    you said you don't know who they are sitting
 7    here today.  And then the next sentence goes
 8    on to say -- can you read that out loud,
 9    Dr. Orchowski?
10        A.   In fact, Uber acknowledged that at
11    least one condition of the rideshare
12    environment itself alone could lead to more
13    underreporting - the fact that the assailant
14    may have the victim's home address.
15        Q.   Okay.  And it cites to Ms. McDonald
16    and Mr. Kaiser.
17             Do you know who Mr. Kaiser is?
18        A.   So you're asking me if I know these
19    people, so to clarify, these are not people
20    that I have met.  It's possible that I may
21    have reviewed these reports in preparing my
22    opinions.  So I just want to be very clear, I
23    do not know Mr. McDonald.  I do not know
24    Kaiser.
25        Q.   Yeah.  Dr. Orchowski, I am not
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   assuming you know these people personally.
 3   My question is, do you know who they are in
 4   the company because these were all the
 5   deposition transcripts that Dr. Valliere had
 6   included and reviewed and cited.  And so I
 7   want to know, sitting here today, whether you
 8   know whether any of these employees who they
 9   are?
10        A.   I am not aware.  I can't recall
11   today what their specific roles are in the
12   company.
13        Q.   Yeah.  And then that last sentence:
14             Uber is aware that not only sexual
15   assault -- not only is sexual assault
16   underreported generally, it is further
17   underreported to Uber because Uber knows
18   victims do not trust Uber to act on the
19   information.
20             And it cites a Parker exhibit as
21   well as a Breeden exhibit.
22             Do you know who Ms. Parker is?
23        A.   No, I'm not familiar with
24   Ms. Parker.
25        Q.   Okay.  And let's go now to -- so
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     these were all the citations to

3     Dr. Valliere's report as we've gone through

4     which show that Uber is aware that sexual

5     assaults are underreported on its platform,

6     correct?

7               MS. CARITIS:  Form.

8          A.   Could you repeat the question?

9          Q.   Sure.

10              These are all the citations to

11    Dr. Valliere's report that we've gone through

12    which indicate that Uber is aware that sexual

13    assaults are underreported on its platform,

14    correct?

15              MS. CARITIS:  Form.

16         A.   So correct, this a section of

17    Valliere's report where she's using Uber

18    documentation to discuss underreporting.

19         Q.   Okay.  Let's go to page 14 of

20    Dr. Valliere's report.  And let's go to,

21    Training condition by Uber, that in the

22    center of the page there.  And it says:

23              Uber received other trainings in

24    sexual assault.

25              I apologize, it's the first

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   sentence.
 3             Trainings commissioned by Uber from
 4   organizations involved in the anti-violence
 5   against women movement underscores many of
 6   the issues I have highlighted in my report.
 7             Do you see that there?
 8        A.   I do.
 9        Q.   And it says:
10             The training highlighted the
11   following points, among others:
12             And one of the bullet points there
13   states that sexual assault is underreported.
14             Did I read that correctly?
15        A.   Yes, you're reading that correctly.
16        Q.   Okay.  And let's go to page 33 of
17   Dr. Valliere's report.  Okay.  And it's the
18   first full paragraph there starting with,
19   When Uber announced.
20             Okay.  And Doctor, can you read
21   that second sentence starting with, Uber
22   acknowledged?
23        A.   Uber acknowledged that deactivation
24   alone isn't enough to keep the platform safe
25   from risky users because dangerous behaviors
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     are, quote, probably way underreported, since
 3     riders only provide ratings on drivers on
 4     46 percent of trips, more than half of the
 5     time -- quote, more than half of the time we
 6     don't even know if it was a good or bad
 7     experience.
 8          Q.   And this is citing Mr. Cinelli.
 9               Are you aware of who Mr. Cinelli is
10     at Uber?
11          A.   No, I'm not aware of his role.
12          Q.   And you see it's a direct quote
13     from the document where it says that
14     dangerous behaviors are probably way
15     underreported?
16          A.   I can see that quote.
17          Q.   Okay.  Did I read that correctly,
18     that quote?
19               MS. CARITIS:  Form.
20          A.   You read probably way underreported
21     correctly.
22          Q.   Okay.  Now let's go to page 40 of
23     Dr. Valliere's report and -- sorry.  I'm
24     trying to find the reference.  Give me a
25     second.  Okay.  It's that third paragraph
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2    starting, Injury and damage from sexual
 3    assault.  So if we could pull that up.  Can
 4    you read that second sentence out loud there?
 5          A.   Uber's own testimony and documents
 6    support this understanding.
 7          Q.   That actually is not the right
 8    quote I was looking for, I apologize.  It's
 9    page 40 at the bottom right there, People
10    believe.  It says:
11               People believe that false
12    allegations of sexual abuse or mistreatment
13    are common.
14               And then goes on to state:
15               In fact, sexual assault is
16    significantly underreported and false
17    allegations are rare.  Uber's own testimony
18    and documents support this understanding.
19               And Doctor, you see she's citing to
20    Ms. Nilles's testimony and Mr. Wong's
21    exhibit.
22               Do you see that there?
23          A.   I see that there.
24          Q.   Okay.  And so let's turn back to
25    your report where you make this assertion on
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1            L. Orchowski - Highly Confidential
2     page 11 about Dr. Valliere's report including
3     broad statements about an example in
4     Dr. Valliere's -- it's the third paragraph.
5            So an example is Valliere's
6     discussion of the underreporting rates.  And
7     you said, she makes broad statements about
8     underreporting generally and it applies it to
9     the Uber platform.
10           What are you referring to in her
11    report?
12        A.   So I think we just discussed one,
13    that last statement that false reports are
14    believed to be common.  So we could pull that
15    back up.  So that would be an example of a
16    broad statement that is without citation.
17    And as a researcher --
18        Q.   Doctor, she cited to Ms. Nilles'
19    testimony there, as well as Mr. Wong's
20    document, so --
21        A.   So you asked me for an example of a
22    broad statement and I just gave one.
23        Q.   We're talking about underreporting
24    rates of sexual assault and we went through
25    several examples.  And so you're referring to
```

```
 1        L. Orchowski - Highly Confidential
 2    that one sentence that we just read, that's
 3    what you're referring to as a broad statement
 4    that there isn't support for?
 5        A.   Yes, that is an example of a broad
 6    statement.
 7        Q.   Okay.  And --
 8        A.   One clarification here is my point
 9    throughout this section of the report is that
10    there are multiple occasions where broad
11    statements are made about sexual assault in
12    general.  And this is a very unique context,
13    and the literature just isn't there with
14    rideshare research.  This is a growing field.
15    We have a report in -- by -- in 2024 that I
16    reference in the reference section, we've
17    talked about it a couple times, it calls for
18    research in this area, we don't know how
19    population based research could apply here.
20    Could it be that we have higher
21    underreporting here?  Maybe.  Could it be we
22    have lower?  Maybe.  Could it be just the
23    same?  We don't know.
24             And as a scientist, I am very much
25    interested in evaluating things based on
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2   data.  So that's what I'm calling for here.

 3        Q.   So once again, in terms of Uber's

 4   evaluation of all the data on underreporting,

 5   I do not see it reflected and discussed in

 6   your rebuttal report, correct?

 7        A.   We've covered this topic that my

 8   report doesn't cover specific citations of

 9   Uber documents.  And this is not meant to

10   imply that I did not consider or not aware of

11   these documents or of their discussion in the

12   report.

13        Q.   Doctor, are you familiar with what

14   a crime triangle is?

15        A.   This is something -- this is

16   something that I believe Valliere had talked

17   about in the reports.  I could find it where

18   she mentions this.

19        Q.   No.  But I'm trying to get your

20   understanding of it.  Are you familiar with

21   what a crime triangle is without referring to

22   Dr. Valliere's report?

23             MS. CARITIS:  Form.

24        A.   This is not a common component of

25   sexual assault prevention research for
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    adults.  So in fact the documents that I

3    referenced on CDC frameworks do not mention a

4    crime triangle.

5        Q.   But CDC is for public health,

6    correct?

7        A.   My understanding is that CDC has a

8    lot of purposes, public health being one of

9    them.

10        Q.   Okay.  So let's go to page 12 of

11    your report.  That's 13.  I believe, the page

12    before.

13              So under that second paragraph you

14    say:

15              Valliere's report --

16              Is there a reason you don't refer

17    to her as Dr. Valliere?

18              MS. CARITIS:  Form.

19        A.   No.

20        Q.   Okay.  Valliere's report claims

21    that Uber constructed an environment which

22    caused sexual violence to occur.

23              Do you see that statement there?

24        A.   I do.

25              And actually, as I think back to

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     that last question, it's very common to

3     psychology we just refer to folks by the last

4     name.  So it's like we would say Orchowski,

5     et, al., or Valliere, et al., or just

6     someone's last name.  So I feel this is a

7     form of writing in APA form.  So I hope that

8     clarifies.

9          Q.   So can you read the second part of

10    that the second sentence there?

11         A.   Valliere's report claims that Uber,

12    quote, constructed an environment which

13    caused sexual violence to occur.  But this

14    claim rests on a logical fallacy, in essence,

15    that whenever misconduct occurs on the Uber

16    platform, it must somehow have been caused by

17    conditions created by Uber.

18         Q.   Okay.  So now let's look at -- of

19    course, we don't have the cite, but let's

20    pull up Dr. Valliere's report, and I believe

21    we're on page 39 of it.  And at the bottom,

22    the paragraph before the last paragraph,

23    sorry, and she says here:

24              As previously described, Uber pairs

25    drivers to riders and has constructed its own

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    crime triangle (see above) and was well aware
 3    of the risk factors of each of the element of
 4    the triangle.
 5             Do you see that there?
 6        A.   Yes, I see that statement.
 7        Q.   Okay.  And let's go to page 31.
 8    And she describes a crime triangle there,
 9    it's at the bottom, the second-to-last
10    paragraph, I believe.  And do you see she
11    says:
12             Rideshare is a clear crime triangle
13    on its own with motivated and undeterred
14    offenders (some previously identified as
15    such), opportunity provided by Uber for the
16    driver to work in the rideshare environment,
17    and high risk victims who may be intoxicated
18    can be isolated and are dependent on the
19    offender.
20             Do you see that there?
21        A.   I see that.
22        Q.   And there is this analysis in
23    Uber's own research identifying this
24    triangle, entitling -- the document's
25    entitled Personal Safety Deep Dive:  Sexual
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2    Assault Focused from June 2016.
3             Do you see that there?
4        A.   I see that.
5        Q.   Do you know who Payne is?
6        A.   I cannot say today that I know
7    Payne.
8        Q.   Okay.  And Mr. Wong we said you
9    don't know who Mr. Wong is, but for the
10   document I showed you earlier, correct?
11       A.   No, we've reviewed the Wong
12   document.  I want to be clear, what I'm
13   saying today that off the top of my head I
14   cannot recall who these folks are does not
15   mean I have not seen these documents,
16   considered them.
17       Q.   Do you know who the head of safety
18   is at Uber?
19            MS. CARITIS:  Form.
20       A.   Currently, no, I do not.
21       Q.   What about law enforcement?
22            MS. CARITIS:  Form.
23       A.   I have a very -- okay.  I had a
24   very specific tasking to evaluate Valliere's
25   report, so getting to know the law
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   enforcement personnel affiliated with Uber or
 3   knowing the staff particularly that I'm
 4   placed with Uber right now wasn't specific to
 5   evaluating Valliere's report.
 6        Q.   Doctor, are you aware that
 7   Dr. Valliere reviewed and considered all
 8   their deposition testimony and provided
 9   specific references in her report to these
10   individuals at the company?
11            MS. CARITIS:  Form.  Asked and
12        answered.
13        A.   I've seen Valliere's description of
14   her references, yes.
15        Q.   So do you see it says in this
16   document:
17            There's powerful and compelling
18   information that provided clear, concrete
19   information to Uber about sexual assault
20   during Uber Rides and the specific identified
21   risk factors to be addressed in these three
22   areas of driver, rider and trip
23   circumstances.
24            Do you recall what this document
25   discussed?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential

 2              MS. CARITIS:  Form.

 3      A.    At the present moment, we can pull

 4   up the document, but I don't recall what it

 5   discussed right now.

 6      Q.    Okay.  And above she talks about

 7   the crime triangle there.  She says the crime

 8   triangle, above this paragraph there says:

 9              The crime triangle is a term used

10   to describe the elements that facilitate and

11   impact criminal behavior, particularly

12   opportunistic crime.  The crime triangle

13   consists of factors presented by the

14   offender, the victim, and the opportunity.

15              Did I read that correctly?

16      A.    You did.

17      Q.    Do you recall reviewing any

18   documents from an Uber criminologist?

19      A.    I'm not sure what you're referring

20   to.

21      Q.    Uber hired a criminologist.  And my

22   question to you is, do you recall the

23   criminologist that Uber had hired and her

24   discussion of this?

25              MS. CARITIS:  Form.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2          A.    I can't recall right now which
 3     specific document you're referring to.
 4          Q.    Would you consider sexual assault a
 5     crime of opportunity?
 6                MS. CARITIS:   Form.
 7          A.    Is that a question for me?
 8          Q.    Uh-huh.
 9          A.    So it depends on the theoretical
10     model.  So some -- so there's public health
11     models, there's a more personality focused
12     models.  The model I work with the most is
13     the integrated model of sexual aggression,
14     and we have a chapter in this -- in the book
15     that reviews all the different various
16     theoretical, etiological models of sexual
17     aggression.  And -- and I believe that, you
18     know, we would likely classify opportunity in
19     some of those models.  So for example, the
20     confluence model doesn't have a particular
21     focus on opportunity, but some other models
22     do.
23                So my broad synthesis of the
24     literature as a sexual assault prevention
25     researcher would be that for some
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     individuals, so for some perpetrator
 3     profiles, it can be.
 4              We did a research study in 2011
 5     where we asked college students whether or
 6     not they were gonna engage in 11 -- about 10
 7     or 11 different forms of sexual aggression
 8     over the course of a college semester.  Some
 9     reported that they were going to and they
10     did.  And some reported they weren't gonna do
11     any of those things and they did.  So there's
12     a lot of question as to kind of the different
13     factors of why.
14          Q.   Doctor --
15              (Cross-talk.)
16          A.   So for some people, it does appear
17     that it could be a crime of opportunity.
18              MS. LUHANA:  Object as
19              nonresponsive to everything before the
20              "so for some people."
21          Q.   Doctor, you can take this down.
22              I want to talk about some of the
23     publications that you've engaged in.
24              Typically, how long does it take
25     you to research and write a paper?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          A.    It depends.  (Audio distortion.)

3          Q.    You're cutting out.

4          A.    Sometimes my lab is doing papers in

5     a day now, so that would be at the kind of

6     the quick end of the spectrum.  I work as the

7     director of the research for practice and

8     policy core of our center for --

9               THE COURT REPORTER:  I'm sorry.

10          Doctor, you have to slow down.

11               THE WITNESS:  I'm sorry, Candida.

12          A.    So going back.  Sometimes we have

13     papers in a day.  So I work with this on my

14     research team and also in my role as director

15     for the Center for Biomedical Research,

16     Excellence and Injury Control.  We also host

17     this with our investigators where we bring

18     together teams to -- to look at data and

19     collaborate on a paper.  So I would say at

20     the very minimum end of the spectrum that we

21     can do this in a day.  At the very large end

22     of the spectrum, depending on how long the

23     data collection takes, data analysis take, it

24     might take much longer, and even longer to

25     find publication outlet that's a good fit.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    So there's a very wide range.

3        Q.   So in terms of the hours of

4    research that you're putting in sometimes a

5    day's worth of research you're saying to

6    publish a paper?

7        A.   Well, I don't think that's an

8    accurate characterization.  So the research

9    process from conceptualization to data

10   collection to data analysis and then data

11   write-up.  So what I was specifically

12   responding to in your last question was how

13   long does it take to write a paper.

14       Q.   Oh, no.  I meant like in terms of

15   what's involved in doing the research and

16   finding the references and collecting the

17   data to publish a paper, how long does that

18   take?

19       A.   So you're talking about a research

20   study that I might run myself, like if I'm

21   going out to collect new data or secondary

22   data where it already exists?

23       Q.   Secondary data where it exists.

24       A.   Okay.  That's a much more finite

25   task.  If we have secondary data that -- that

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential
2   would fit for our paper in a day, so we
3   generate research hypotheses collaboratively.
4        Q.   So you finish your research in a
5   day on secondary data.  So let's look at one
6   of your papers which I think you looked at
7   secondary data.
8        A.   To clarify, not all papers are in a
9   day.  There are many secondary papers that
10  take longer to refine.  But if you wanted the
11  shorter end of the spectrum, our lab hosts
12  papers in a day and some papers take much
13  longer to develop.  It really depends.
14       Q.   When you're talking about papers,
15  these are like voluminous, like, publication
16  that's 10, 15, 20 pages would take a day's
17  time you're saying?
18       A.   No, the average publication length
19  is generally 30 to 40 pages.  But, yes, our
20  team it capable of -- a team of five of us,
21  we just completed a paper in a day recently.
22       Q.   So it's a team of five all putting
23  in time to complete a paper.  Understood.  So
24  it's not just one individual completing the
25  paper in a day's time.  That's helpful to
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential

2    know.

3            Doctor, you would agree

4    comprehensive approach is necessary to

5    decrease the risk of sexual assault

6    regardless of the industry, right?

7            MS. CARITIS:  Form.

8        A.    I have written papers that advocate

9    for taking a more comprehensive approach to

10   sexual violence.  A really important caveat

11   there is that while I would advocate a

12   comprehensive approach where we're doing lots

13   of different things, I also see Uber doing

14   lots of different things that are noted in

15   this report, so that would be moving in this

16   right direction.  I do not believe that even

17   with a comprehensive approach that we have a

18   strategy in place that is effective for truly

19   preventing sexual assault.

20           MS. LUHANA:  Move to -- objection

21       as unresponsive as to that last

22       sentence.

23       Q.    In some of your publications, you

24   discuss the importance of comprehensive

25   reform which includes increasing awareness of
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    sexual violence, right?
 3        A.   Could you repeat that?
 4        Q.   Sure.
 5             In some of the publications that
 6    you've written, you've discussed the
 7    importance of comprehensive reform which
 8    includes increasing awareness of sexual
 9    violence?
10        A.   I would say that awareness is one
11    of many components of a prevention approach.
12        Q.   Okay.  Let's mark as Exhibit 6, RL6
13    which is your paper entitled Integrating
14    Sexual Assault Resistance, Bystander, and
15    Men's Social Norms Strategies to Prevent
16    Sexual Victimization.
17             (Exhibit 6, Sexual Assault
18        Resistance, Bystander, and Men's
19        Social Norms Strategies to Prevent
20        Violence on College Campuses:  A Call
21        to Action, was marked for
22        identification.)
23        Q.   Doctor, are you familiar with this
24    paper?
25        A.   Yes, very well.
```

```
 1        L. Orchowski - Highly Confidential
 2        Q.   And you authored this and published
 3   it in 2020, correct?
 4        A.   Yes.  I authored it with Katie
 5   Edwards, Jocelyn Hollander, Victoria Banyard,
 6   Charlene Senn, and Christine Gidycz.
 7        Q.   And this was about preventing
 8   sexual violence on college campuses?
 9        A.   Yes, each of us are college sexual
10   assault prevention researchers, we do that as
11   a part of your work.  So this paper, we
12   really came together to discuss current
13   approaches in the field and how they might be
14   put together specifically for college
15   students.
16        Q.   And in fact, you call this A Call
17   to Action, right?
18        A.   That's in the title, yes.
19        Q.   So let's turn to page 812.  And if
20   we can hone in on Figure 1 and it's entitled
21   the Logic model:  Risk reduction, resistance
22   education and self-defense programs, correct,
23   Doctor?
24        A.   That's correct.
25        Q.   And you discuss increasing
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1          L. Orchowski - Highly Confidential

 2    disclosure and reporting of the assault as a

 3    primary outcome, right, here?

 4          A.    Yes, I see that there.

 5          Q.    And you believe that's important,

 6    right, in this logic model for risk

 7    reduction?

 8          A.    Yeah.  So risk reduction,

 9    resistance education and self-defense

10    programs are typically focused on individuals

11    who are apt to be a victim of sexual

12    violence, so these programs have been tested

13    specifically for women.

14          Q.    Okay.  And some of the key

15    components, you look to the left, are sharing

16    sexual assault information and that's

17    personally relevant expanded definitions of

18    sexual assault as well as risk factors.

19          Do you see that there in the key

20    components?

21          A.    Yes, I see that, that's the top

22    box.

23          Q.    Okay.  And then discussing of

24    strategies for setting boundaries in risky

25    everyday situations.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1           L. Orchowski - Highly Confidential

2               You see that there?

3       A.    Yes, I see that.

4       Q.    So it's all about raising awareness

5    and discussing this critical information,

6    right?

7       A.    No, I would clarify the discussion

8    of strategies is typically through

9    self-defense.  I'm a per diem self-defense

10   instructor and in our prevention programs, we

11   teach active, verbal and physical defense

12   strategies.  So that discussion would also

13   include active practice and modeling.

14      Q.    Sure.  So it's awareness and

15   self-defense strategy.  Understood.

16               Okay.  And you believe that a

17   comprehensive approach requires that

18   prevention efforts to address violence before

19   it happens, that's important to do, right?

20      A.    Can you repeat that question?  I

21   was caught up because I think prevention for

22   me is -- doesn't stop at awareness.  So the

23   key thing there was really the discussion of

24   strategies and boundary setting through

25   self-defense and active practice.  So I was

1        L. Orchowski - Highly Confidential

2     still thinking about that question when you

3     mentioned the next one.  So if you could

4     repeat it, that would be great.

5             MS. LUHANA:  Objection as

6         nonresponsive.

7        Q.   I was focused on asking that a

8     comprehensive approach requires that

9     prevention efforts address violence before it

10    happens, correct?  And I think you stated

11    such, if we scroll down this paper here.

12       A.   Right.  So that -- what you're

13    talking about a primary prevention.  So you

14    would think back to early efforts to address

15    sexual assault, might have been focused on

16    providing victims with therapy.  We think

17    about a public health approach.  And as we

18    talked about the parable of the fisher and

19    the river, primary prevention would be

20    focusing efforts on taking steps to prevent

21    sexual assault before it happens.

22       Q.   So it's not -- it's not about

23    therapy, it's doing everything beforehand and

24    raising that awareness to decrease sexual

25    assault, correct?

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential

2          A.    No, I disagree.

3                MS. CARITIS:  Form.

4                THE WITNESS:  Sorry, Alex.

5          A.    I disagree in the logic model, we

6    talk there about how increasing disclosure

7    and reporting would be a component of

8    prevention.  We recognize that individuals

9    who complete a prevention program, whether

10   victims or potential perpetrators are apt to

11   either engage or experience the behavior

12   afterward because no prevention program is

13   currently 100 percent effective.  And as a

14   result, encouraging help seeking afterwards

15   through a disclosure and reporting is a part

16   of logic model we just discussed.

17         Q.    Yeah, it's a combination of

18   efforts.  I wasn't saying it's mutually

19   exclusive.  It's one part of a larger, as you

20   describe it, comprehensive approach, right?

21         A.    Yes, there's a lot of things -- a

22   lot of things that can be done.

23         Q.    And you believe that to prevent

24   sexual assault, risk must also be targeted,

25   right?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1           L. Orchowski - Highly Confidential

2           A.    What do you mean by that?

3           Q.    I think you -- it's specifically in

4    the document, let's go to page 821.  It's in

5    the second column there and it's the second

6    paragraph there, second -- yeah.

7                 So do you see you say:

8                 A comprehensive approach also

9    requires that prevention include efforts to

10   address violence before it happens, but also

11   target risk when it is evident and provide

12   after care to address incidents that occur on

13   campus.

14                Did I read that correctly, Doctor?

15          A.    Yes, you read that correctly.

16          Q.    And then you also go on to state

17   that:

18                A proactive comprehensive sexual

19   assault prevention approach includes

20   targeting norms, change on campus, distal

21   targets for change as well as providing

22   students with skills to recognize and respond

23   to risk for sexual violence for themselves as

24   well as their peers and, i.e., proximal

25   targets for change.
```

1        L. Orchowski - Highly Confidential

2            Did I read that correctly?

3        A.   Yes, you read that correctly.   You

4    also left out that prevention approaches are

5    reactive rather than proactive.

6        Q.   Sure, that's fine.

7            So you would agree with me that you

8    believe that to prevent sexual assault, risks

9    must also be targeted, correct?

10       A.   So there's two things that I want

11   to clarify here.   So there is something

12   called a targeted prevention strategy.   Are

13   you talking about aligning prevention

14   programs with risk and protective factors,

15   like targeting risk, like let's address these

16   risks, or are you talking about targeted

17   selective prevention, 'cause that would be a

18   separate thing.

19       Q.   The former, like evaluating

20   whatever the risk factors are and addressing

21   those.

22       A.   Yes.   So that's a part of the

23   public health approach, that's also what

24   we're talking about here that if you were

25   going to have programming, that you should

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1         L. Orchowski - Highly Confidential

2    follow logic models and logic models should

3    be based in awareness of those correlates.

4         Q.   And so you read here too often --

5    you agree that too often prevention

6    approaches are reactive rather than

7    proactive, you would agree with that

8    statement, right?

9         A.   Yeah.  What I mean there is

10   sometimes, like, we'll -- programs will be

11   asked to be implemented on a college campus

12   after, you know, after something happens so,

13   you know, for example, we'll be asked to come

14   in and do a self-defense program after

15   there's been a hate crime in a community, and

16   I think preventionists would agree that these

17   kind of ongoing prevention efforts would be

18   preferred -- only preferred to a response

19   that is only after something that has

20   happened.

21        Q.   Sure, I understand that.  And then

22   you go on to say:

23             A proactive comprehensive sexual

24   assault prevention approach also includes,

25   like, giving students these skills as we went

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     through to recognize and respond to risk for

3     sexual violence.

4               That's correct, right?

5          A.   Yes.  And so what we mean by the

6     recognize and respond, that's the AAA model

7     of self-defense.  So we want to train women

8     in how to acknowledge, assess and react in

9     response.

10         Q.   Fantastic, we'll get to the AAA

11    model.

12              So let's go to page 9 -- 819.  And

13    so the first column, second paragraph there.

14    And I believe you state here that prevention

15    starts with accurate risk recognition.  You

16    say in the center:

17              As we discuss in more detail below,

18    although the ideal ordering of program

19    components has yet to be empirically

20    evaluated, consistent with the social

21    ecological approach to prevention, we

22    recommend that programs that engage women and

23    men be administered first to address proximal

24    risk factors for sexual violence.

25              You agree with that, right?

```
 1          L. Orchowski - Highly Confidential
 2          A.   So here in this document, we were
 3     trying to tackle this notion of what you
 4     should do first, right, so kind of just want
 5     to build that scaffold on what should they do
 6     first.  And ultimately our team thought that
 7     some of the primary prevention programs that
 8     are skill based might be most applicable
 9     first.
10          Q.   Right.  And so you emphasize, like,
11     individuals need clear information about when
12     and where risks arise, correct?
13          A.   That would be one component.  So
14     the, you know, the -- generally the risk --
15     the AAA model --
16          Q.   Doctor, I'll get to that.  I
17     just -- that is one component.  I don't want
18     to -- we have limited time and I just want to
19     move along here.
20               So I believe you said you agree
21     that that's one component is to share clear
22     information about when and where risk arise,
23     correct?
24          A.   I just want to be clear that that's
25     for women and not for men.  The --
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1      L. Orchowski - Highly Confidential

2      Q.   Understood.

3      A.   -- AAA model has never been applied

4    to men.

5      Q.   Got it.  I understand that.  But I

6    just want to be clear that one component is

7    giving clear information about when and where

8    risk arise to women here.

9      A.   Yes, that would be considered a

10   component of a prevention approach.

11     Q.   And you'd agree that a program

12   can't prevent what it doesn't acknowledge,

13   right?

14          MS. CARITIS:  Form.

15     A.   That's interesting.  Well, this is

16   actually fascinating.  There are spillover

17   effects.  So one of the programs we did for

18   men actually reduced their pornography use,

19   and we didn't talk about pornography use at

20   all.  So our spillover effect, so that is a

21   really interesting statement.  You know,

22   pragmatically I can see how that

23   generalization would be, you know, something

24   that would make sense.  We do have research

25   evidence that there are often things that

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    prevention programs in sexual assault address
 3    that are not a component of the program.
 4        Q.   Sure, that's different.  But I'm
 5    saying, like, when risk information is
 6    withheld, people can't accurately assess
 7    risk, right?
 8             MS. CARITIS:  Form.
 9        A.   We're not -- I just -- we're not
10    using the highlighted anymore, right?
11        Q.   I mean, we were because that was
12    the first to address proximal risk factors
13    for sexual violence, so that was the focus.
14             So Doctor, when risk information is
15    withheld, people can't accurately assess
16    risk, right?
17             MS. CARITIS:  Form.
18        A.   I mean, this is an interesting
19    question because (audio distortion).
20             THE COURT REPORTER:  Doctor.
21        Q.   You're cutting out, Doctor.
22             I mean, I'm going through -- this
23    is your publication and you're discussing
24    sharing risk factors to raise awareness to
25    prevent sexual assault and that being one
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   component of it.  However, if you withheld
 3   that information, people then wouldn't be
 4   accurately able to assess risk, right?
 5        A.   (Audio distortion.)
 6        Q.   Doctor, we can't hear you.
 7        A.   Sorry.  I think you're confusing
 8   the term proximal risk factor.
 9             So risk factor, you could use that
10   term in, like, the characteristics of
11   situations that, quote, increase risk.  But
12   proximal risk factors, we can look at the
13   tables in this report, proximal risk factors
14   also include things like attitudes, rape myth
15   acceptance, enhance to sexist belief.  Like,
16   when we use the term "proximal risk factors"
17   in prevention research, we're not just
18   talking about the characteristics of
19   situations that increase risk, that is a
20   very -- kind of very targeted use of that
21   word in the AAA model.  But this statement
22   here is much broader, there are many
23   proximal, quote, risk and protective factors.
24        Q.   Sure.
25        A.   So when we use that term, the best
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   way to think about that is really in relation
 3   to Andra Tharp's work where she documented
 4   those kind of 67 different risk and
 5   protective factors.  Those are proximal risk
 6   factors so.  So when we think about that in
 7   that list, I just want to be really clear
 8   that we're not just talking about
 9   characteristics of situations.  In fact,
10   that's almost, like, a knowledge thing.  Many
11   programs, both for women, men and bystanders
12   have a broad range of, quote, proximal risk
13   factors for engagement or experience of
14   sexual violence, things like your knowledge
15   of a self-defense skill.
16             So I want to be really clear that
17   we're talking about the same thing here.
18        Q.   We're talking about the same thing,
19   but I'm just focused on the one component.  I
20   understand there are additional components,
21   but you'd agree transparency about risk is
22   key in sexual violence protection?
23             MS. CARITIS:  Form.
24        A.   Yeah, I think it depends on how
25   you're using that word "risk."  If you're
```

1          L. Orchowski - Highly Confidential

2     transparent about the likelihood of sexual

3     assault, that's a very different term of,

4     like, how risky is this environment versus

5     when we're using proximal risk factors here,

6     we're talking about array of things

7     identified by Andra Tharp and colleagues in

8     that research study that are targeted in the

9     programs, including bystander programs,

10    programs for men and programs for women,

11    these are not just situations of assault

12    of risk --

13             (Cross-talk.)

14        Q.   I'm focused about risk related to

15    sexual assault, which is what we've been

16    discussing here.  And you would agree with

17    me, Doctor, that transparency about risk is

18    key in sexual assault prevention, it's one

19    component of it, correct?

20             MS. CARITIS:  Form.

21        A.   I continue to think we're talking

22    about two different things.  I think proximal

23    risk factors, things like attitudes, beliefs

24    are a vital first step in prevention.  As I

25    note here, not all prevention includes a

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    discussion of, quote, risk factors for sexual

3    assault.

4        Q.    Okay.  But you don't think raising

5    awareness about certain risk factors and

6    risky situations is important to raise

7    awareness about preventing sexual assault?

8        A.    There's some programs actually that

9    think that providing a discussion about risky

10   opportunities for sexual assaults could

11   actually increase harm if there's a potential

12   perpetrator in the audience.  So it's a very

13   nuanced thing.  I wouldn't feel comfortable

14   saying that all programs need to start with a

15   discussion of transparency of risk.

16       Q.    So in your work, you describe the

17   assess, acknowledge, act model as effective

18   in lowering rates of sexual assault, correct?

19       A.    That is based on the work of

20   Charlene Senn, it's about a 12-hour program,

21   it's currently being utilized in Canada,

22   across the United States, also currently

23   being deployed with the military NAS

24   Jacksonville.  That is a program for women,

25   it includes active self-defense instruction,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     it's for college women specifically.  We
 3     don't have as robust data for high school
 4     folks or for military yet.
 5          Q.   Doctor, I apologize, I wasn't
 6     asking you to describe it.  My question was
 7     in your work you describe the assess,
 8     acknowledge, act model, right?  It's a yes or
 9     no.
10          A.   I'm aware of that model, yes.
11          Q.   Okay.  Let's turn to page 813 here.
12     And it's the second column.  Second column.
13     Yeah, sorry.  And if we go to -- scroll down
14     further, keep on -- I mean, it mentions on
15     top up there, sorry, it states there it's the
16     Enhanced Access, Acknowledge, Act program,
17     correct, Doctor?  You see that there?
18          A.   I see it, yes.
19          Q.   Okay.  And then if we scroll down,
20     this provides the details to the program and
21     it states:
22               Women who participated --
23               Scroll up a little bit, we missed
24     it, right there.
25               Women who participated in the EAAA
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   program reported significantly lower rates of
 3   sexual assault victimization compared to
 4   women who received brochures on sexual
 5   assault and an opportunity to ask questions.
 6            Do you see that there?
 7        A.   I see that.
 8        Q.   Okay.  So this model works only if
 9   the environment provides cues that let women
10   assess the risk, right?
11            MS. CARITIS:  Form.
12        A.   I'm not sure I can answer that.  I
13   don't think we have -- I don't think we can
14   make that conclusion based on the data that
15   we have.
16        Q.   What are you assessing; what's the
17   first step of assessment, Doctor?
18        A.   You asked me a question about how
19   we know the program works, we don't know --
20   we don't know.  There are still women who
21   experience victimization after completing
22   this program, and we don't know the
23   particular contextual factors that made them
24   nonresponsive to the program and other people
25   responsive.
```

```
 1          L. Orchowski - Highly Confidential

 2              So I would argue that we don't have

 3     sufficient data to look at the mechanisms of

 4     which component of this model are responsible

 5     for its effectiveness.  And even when

 6     individuals show change on these factors,

 7     including their ability to assess, their

 8     ability to acknowledge and their self-defense

 9     skills, they may still experience sexual

10     victimization.

11              MS. LUHANA:  Objection as

12          nonresponsive, Doctor.

13              If we scroll down further here.

14          Is that the end of that?  That

15          shouldn't be the end.  Scroll up

16          further, sorry, it's still 813 we're

17          on.

18          Q.   So this is a 12-hour program you

19     discuss, and then you go on to state that:

20              Women who participated in the EAAA

21     program reported significantly lower rates of

22     sexual assault victimization compared to

23     other women.

24              Right?

25              So you acknowledge that the program
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     was effective, you'd agree with me?

3          A.   Yes, this program showed decrease

4     in rates of violence.

5          Q.   Okay.  And then in addition, the

6     first step of the program is assessing a

7     situation as potentially risky.

8               Do you see that there?

9          A.   Yes, I'm familiar with the program.

10          Q.   So the first step of assessment is

11     assessing if the -- the assessment only works

12     if the environment provides cues that let

13     women assess the risk, wouldn't you agree?

14               MS. CARITIS:  Form.

15          A.   I'm not sure what you mean.  I'm

16     highly experienced in this program and I'm

17     not sure that that's a part of the

18     curriculum.

19          Q.   So what's the assessment portion of

20     the program?  I believe it says it's to --

21     the women must first assess the situation as

22     potentially risky.  Right, that's the first

23     step there?

24          A.   That's one sentence to describe a

25     multiple hour program.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.   Doctor, it's a sentence you put in

 3   in your publication, right, that one

 4   sentence.

 5        A.   And I want to clarify that this is

 6   a complex 12-hour long program with multiple

 7   components that cannot be reduced to one

 8   sentence of assessing scenarios.  There's

 9   internal valuations, like, and what factors

10   is it about myself that kind of, you know,

11   maybe I -- maybe I'm not fully present in a

12   situation, so we might want to assess

13   ourselves in a situation.  You know, do I

14   tend to zone out?  Am I not so mindful, for

15   example.

16        Q.   Doctor, honestly --

17             MS. LUHANA:  Object as

18        nonresponsive.

19        Q.   Can you read that first -- that

20   sentence there as to what assessment is

21   defined by in your publication here?  It

22   says:

23             Following Norris and colleagues'

24   research and psychological barriers to

25   resistance, they argued that, what does that
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

 1      L. Orchowski - Highly Confidential

 2  say?

 3      A.   So this is a theoretical --

 4      Q.   Can you read that?

 5           (Cross-talk.)

 6      Q.   I've asked you to read.

 7      A.   I will answer your question and I

 8  will read.

 9      Q.   I'm asking you to read that

10  sentence, please.

11      A.   Following Norris and colleagues'

12  research on psychological barriers to

13  resistance, they argued that women must first

14  assess a situation as potentially risky then

15  acknowledge that a rape is potentially

16  underway before being able to act effectively

17  to resist it.

18      Q.   Thank you, Doctor.

19           So a women entering an Uber ride

20  has no chance to assess the risk if Uber

21  suppresses information, right?

22           MS. CARITIS:  Form.

23      A.   I disagree with that statement.

24  Individuals can assess environments for risk

25  any time.

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.    Are you aware of Uber's knowledge

 3   that certain factors make an Uber ride far

 4   riskier to increase the risk of sexual

 5   assault and that Uber hasn't disclosed those

 6   risk factors to the public?

 7             MS. CARITIS:  Form.

 8        A.    I believe we've talked about places

 9   in Valliere's report where she discusses

10   strategies that Uber has used to collect

11   data, we've talked about them today.

12        Q.    That wasn't my question, Doctor.

13             MS. LUHANA:  Candida, can you read

14        the question again?

15             (Referred to portion of the record

16        was read back by the court reporter.)

17             MS. CARITIS:  Same objection.

18        A.    This feels like it's two questions.

19   The first I answered is that I'm aware of the

20   sections of Valliere's report where she

21   discusses Uber's data collection efforts.

22   I'm also aware of statements that she makes

23   in the report where she claims that they have

24   not disclosed this to the public.

25        Q.    Have you reviewed Uber documents
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     that disclose the increased risk of assault

3     on Uber's platform that haven't been

4     disclosed to the public?

5               MS. CARITIS:  Form.

6          A.   Yeah, I can't speak as to which

7     specific documents have or have not been

8     disclosed.

9          Q.   No.  Have you reviewed, I said,

10    Uber documents that disclose the increased --

11    that discuss -- have you reviewed Uber

12    documents that discuss the increased risk of

13    sexual assault on its platform that have not

14    been disclosed to the public?

15              MS. CARITIS:  Form.

16         A.   So I'm not quite sure I can answer

17    that, I'm sorry.

18         Q.   You'd agree that companies should

19    be transparent about the risk of its

20    products?

21              MS. CARITIS:  Form.

22         A.   I can't speculate on business

23    practices, that's not my expertise.

24         Q.   Well, would you think it would be

25    good practice for a company to be -- do you

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2    think a company shouldn't be transparent
 3    about the risk of its products?
 4              MS. CARITIS:  Form.
 5         A.   I'm a clinical psychologist with
 6    expertise in sexual assault prevention, I
 7    cannot speculate on business practices.
 8         Q.   So if a company --
 9         A.   Outside of my scope.
10         Q.   So if a company knew about the
11    increased risk of sexual assault on its
12    platform, do you think as a psychologist with
13    expertise in sexual assault prevention that
14    that's something the company should disclose?
15              MS. CARITIS:  Objection.  Form.
16         A.   Yeah, I don't have an opinion on
17    that.
18         Q.   You'd agree that a company should
19    do everything it can to protect its customers
20    from being sexually assaulted?
21              MS. CARITIS:  Form.
22         A.   That's a complex question.  I don't
23    have an opinion at this time.
24         Q.   Okay.  Doctor, in this publication
25    here, you highlight the Ohio University
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    program as a good example of sexual assault

3    risk reduction, right?

4        A.    Could we go to where that's

5    located?

6        Q.    Page 813.  Do you remember doing

7    so, highlighting it as a good example?

8            (Cross-talk.)

9        A.    It's been a while -- it's been a

10   while since I read this report, but I

11   wouldn't be surprised.  Chris Gidycz was one

12   of the researchers in this area and developed

13   the Ohio University program and has also done

14   work with men as well.  So her work is

15   commonly cited, so I wouldn't be surprised if

16   we cited it here.

17       Q.    Okay.  It's the first column to the

18   left bottom, right there.

19            Do you see:

20            The Ohio University Sexual Assault

21   Risk Reduction Program is a good example of

22   this evolution.

23            Do you see that there?

24       A.    Yeah, I see that.

25       Q.    And can you read the starting with

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    Early iterations?
 3        A.   Early iterations of the program
 4    were brief, didactic programs that attempted
 5    to impress upon participants the seriousness
 6    and personal relevance of sexual assault,
 7    challenge rape myths, identify risky
 8    situations, target behaviors, i.e., such as
 9    alcohol consumption, isolation of the
10    incident site, non-assertive behavior and
11    ineffective sexual communication.
12        Q.   So Doctor, the Ohio University
13    program shared detailed data with
14    participants identified risky situations and
15    target behaviors about alcohol and isolation
16    of location as risk factors, right?
17            MS. CARITIS:  Form.
18        A.   No, I disagree with that assertion.
19    I'm highly familiar with this program.  In
20    fact, I studied it for my Master's thesis as
21    well as dissertation.  So there is no highly
22    detailed data on risk factors included here.
23        Q.   Okay.  But do you see that you've
24    stated here that what was shared with
25    participants was to identify risky
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     situations, that's what you wrote there,
 3     right?
 4               MS. CARITIS:  Form.
 5          A.   Yes, and your question was about
 6     data.
 7          Q.   Okay.  So that was participants --
 8     what was shared with participants was to
 9     identify risky situations and also target
10     behaviors about alcohol consumption and
11     isolation of instant site, correct?
12               MS. CARITIS:  Objection.  Form.
13          A.   So these are components that are
14     discussed in the program.
15          Q.   Okay.  Yeah, so that transparency
16     at the participant level telling -- was about
17     telling women about some patterns of risk,
18     right?
19          A.   These are -- these are findings
20     specific to colleges that are shared with
21     folks.
22          Q.   So if Uber, Doctor, has data
23     showing elevated assault risk -- the elevated
24     risk of assault, sexual assault under certain
25     circumstances, for example, late night hours,
```

Lindsay Orchowski, Ph.D.    Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2    intoxication or repeated driver complaints,
3    disclosing those risk factors would serve the
4    same preventive function, wouldn't you agree?
5              MS. CARITIS:  Form.
6         A.   I'm not sure actually (audio
7    distortion).
8              THE COURT REPORTER:  Doctor, your
9         audio was distorted again.
10        A.   Okay.  I'm not sure.  My task was
11   to evaluate the Valliere report and not to
12   design a prevention program.
13        Q.   I'm not saying that you were --
14   your task was to design a prevention program.
15   I'm just asking you if Uber has data showing
16   elevated risk of sexual assault, disclosing
17   that would serve a preventive function,
18   right, in reducing the risks or preventing
19   sexual assault?
20        A.   Without -- without data, I don't
21   know whether or not it would.
22        Q.   Well, did you -- did you look at
23   data in terms of the increased risk factors
24   of certain scenarios including the increased
25   risk of sexual assaults in Ubers late at
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2    night?

 3        A.   I've seen in Valliere's report

 4    where she notes that there was increased risk

 5    of assault late at night.  I've seen that,

 6    yes.

 7        Q.   Well, no.  Have you looked at Uber

 8    documents and studies which have confidence

 9    intervals and found statistically significant

10    increased risk of sexual assault late at

11    night in an Uber?

12             MS. CARITIS:  Form.

13        A.   So I'll make two points here:

14    First, they should have confidence intervals

15    is just knowing that something is at

16    increased risk, it doesn't state that it's

17    certain to occur.  And something that's

18    statistically significant just means that

19    there's an association that is unlikely via

20    inferential statistics to have occurred by

21    chance.  There's also a high risk of --

22             (Cross-talk.)

23        Q.   Doctor, I really have to -- Doctor.

24    Doctor, that wasn't my question.  Please.

25             MS. LUHANA:  Object as

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        nonresponsive.

 3        Q.   Have you looked at Uber documents

 4   and studies which have confidence intervals

 5   and have found statistically significant

 6   increased risk of sexual assault late at

 7   night in an Uber?

 8             MS. CARITIS:  Form.

 9        A.   So my job was to respond to

10   Valliere's report.  I'm aware that she cites

11   Uber documents that refers to Uber's

12   prevention strategies.  I maintain my

13   professional opinion that the data I have

14   reviewed does not suggest that there is a

15   strategy that we are aware of in the

16   scientific literature that could be effective

17   in preventing every assault.

18             MS. LUHANA:  Object as

19        nonresponsive.

20        Q.   My question is just, did you look

21   at those Uber documents?  Sitting here today,

22   did you look at Uber documents that provided

23   statistically significant increased risk of

24   sexual assaults in Ubers late at night?

25             MS. CARITIS:  Form.
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2        A.   Which Uber document that reported a

3   statistically significant increase, I can't

4   tell you, but I have looked at Uber documents

5   that report on the prevention measures and

6   data.

7        Q.   Do you recall when those documents

8   were dated?

9        A.   No, I don't.

10       Q.   Do you recall who drafted those

11  documents?

12       A.   No, I don't.

13       Q.   Do you recall what the increased

14  risk of sexual assault was on the platform

15  late at night?

16       A.   No, I don't recall.  I didn't see

17  any evidence that would convince me based on

18  my scientific opinion that Uber had data it

19  would suggest it could reliably prevent

20  sexual assault.

21           MS. LUHANA:  Move to strike

22       everything as nonresponsive after "no,

23       I don't recall."

24           MS. CARITIS:  Sorry.  Just really

25       quick, just so I don't -- what was the

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          page that you guys were -- just had up

3          on the screen?

4               MS. LUHANA:   812.

5               MS. CARITIS:   Thank you.

6          Q.   Doctor, do you recall what that

7     study was based on?

8          A.   Which study are we referring to?

9          Q.   The one that showed -- I mean,

10    there's several, however, the one study I was

11    referencing about the statistically

12    significant increased risk of sexual assault

13    late at night in an Uber, do you know what

14    data that study was collecting and relying

15    on?

16         A.   No, I'm sorry.  I can't recall that

17    right now.

18         Q.   Do you know what any of the studies

19    are relying on when they're calculating any

20    Uber documents, and there are several that

21    are referenced in Dr. Valliere's report, what

22    are they relying on -- what are the source

23    documents they're relying on to do the

24    analysis to find the increased risk of sexual

25    assault on the Uber platform in certain

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     circumstances, for example, like late at

3     night?

4          A.   I'm aware that Uber had several

5     ongoing initiatives to try to understand the

6     characteristics of rides, so the time of the

7     ride, location of the ride, characteristics

8     of the driver, for example, star ratings.

9          Q.   Right.  But -- no, no.  My question

10     is what are the source documents that they're

11     relying on for all these studies, Doctor;

12     what is that?

13               MS. CARITIS:  Form.

14          A.   I'm sorry, I can't provide you with

15     an answer.

16          Q.   You don't recall sitting here today

17     what all these studies are evaluating --

18     strike that.

19               Sitting here today, you don't know

20     the source that Uber is using to find that

21     Uber Rides are statistically significantly --

22     statistically significantly increase the risk

23     of sexual assault in an Uber late at night?

24               MS. CARITIS:  Form.

25          A.   In the documents that I reviewed, I

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1          L. Orchowski - Highly Confidential
2    did not see evidence that there was a
3    reliable strategy to prevent sexual assault.
4              MS. LUHANA:  Object as
5         nonresponsive.
6         Q.   My question is about the source.
7    Like, how is Uber calculating these rates of
8    increased risk of sexual assault on the
9    platform and what are they using for it?
10             So in your review of these
11   documents, can you please provide me with the
12   sources?
13             MS. CARITIS:  Form.
14        A.   You're asking me to cite a specific
15   document, I'm not able to do that right now.
16        Q.   Oh, no, it's not a specific
17   document, it's the data that they're relying
18   on, where is the data coming from, to your
19   knowledge?  And all these studies actually
20   reference the underlying data that they're
21   using to calculate the increased risk of
22   sexual assault.  So I'm asking you, do you
23   know what the source is of that information?
24             MS. CARITIS:  Form.
25        A.   If this is just a general question
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2      that Uber has access to the data of where

3      rides are picked up, that what ratings there

4      are, Uber has internal data about the use of

5      their platform.  Is that what you're looking

6      for?

7          Q.   No.  I'm looking -- it's a specific

8      source that they're utilizing to calculate

9      the increased risk of sexual assault, and I

10     want to know where you -- if you know where

11     it came from?

12          MS. CARITIS:  Form.

13          A.   I'm sorry, I don't know how to

14     answer.

15          Q.   Are you aware if Uber informs women

16     of an increased risk of sexual assault in

17     Ubers late at night?

18          MS. CARITIS:  Form.

19          A.   No, I'm not aware specifically.

20          Q.   Are you aware if Uber informs women

21     of an increased risk of sexual assaults in

22     Ubers while intoxicated?

23          MS. CARITIS:  Form.

24          A.   No, I'm not aware specifically.

25          Q.   Are you aware if Uber informs women

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1           L. Orchowski - Highly Confidential
 2     that a driver may have prior reports of
 3     sexual misconduct or sexual assault against
 4     him?
 5               MS. CARITIS:  Form.
 6           A.   No, I'm not aware.
 7           Q.   Are you aware if Uber disclosed the
 8     actual number of sexual misconduct and sexual
 9     assault reports it's received to its
10     consumers?
11               MS. CARITIS:  Form.
12           A.   This is a point noted in Valliere's
13     report that I also discuss in my report as
14     well.  Her contention is that she raises the
15     belief that she believes that Uber is, quote,
16     hiding something because other forms of
17     sexual assault that aren't restricted to the
18     five named aren't included in the safety
19     report.  And this is something I talk about
20     in my report that the types of assaults that
21     are discussed in that safety report and
22     include that five align with well-documented
23     forms of sexual assault that are also noted
24     in other forms of research.
25                   So I'm aware of this issue that
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   Valliere raises.
 3             MS. LUHANA:   Object as
 4        nonresponsive.
 5        Q.   My question was just, are you aware
 6   if Uber has disclosed the actual number of
 7   sexual misconduct and sexual assault it's
 8   received to its consumers?
 9             MS. CARITIS:  Objection.  Form.
10        A.   Yeah, I'm not quite sure how to
11   answer this.
12        Q.   Either you're aware or you're not.
13             MS. CARITIS:  I think, like --
14        well, form.
15        A.   Yeah, I've said what I've learned
16   on Valliere's report.  And I also cite what I
17   know from reviewing those documents that I'm
18   aware of -- I'm aware of what is disclosed in
19   Valliere's report and also what has been
20   discussed in the source documents.
21        Q.   Doctor, if Uber believes one of its
22   riders is at risk for being sexually
23   assaulted, do you believe Uber should notify
24   the rider?
25             MS. CARITIS:  Form.  Scope.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          A.    I don't have enough -- I don't have

3      an opinion to raise on that.

4          Q.    You don't believe Uber -- if Uber

5      believes one of its riders is at risk of

6      being sexually assaulted, Uber should inform

7      the rider?

8                MS. CARITIS:  Form.

9          A.    I don't have an opinion on that.

10         Q.    Would you agree that a company

11     should -- Uber should use safety features

12     that actually work to prevent sexual assault?

13               MS. CARITIS:  Form.

14         A.    I wish there were safety features

15     that worked to prevent sexual assault.  I've

16     reviewed Uber's use of safety features and

17     these are many of the other kinds of safety

18     features that researchers are also deploying

19     in apps, such as uSafeUS, which include

20     reporting features.  It would be great to be

21     living in a world where we knew more about

22     what worked.

23         Q.    Doctor, if Uber had safety features

24     that actually worked to prevent sexual

25     assault, if they did, do you believe they

1        L. Orchowski - Highly Confidential

2    should use them?

3            MS. CARITIS:  Form.

4        A.    I'm not aware of any strategy right

5    now that is effective in preventing all

6    sexual assaults, but if there was research

7    evidence that was documented across several

8    studies that this works, it would be great to

9    implement those strategies in all sectors of

10   society, so not just Uber.  But when we start

11   developing programs that work, as a

12   prevention scientist, I want the field to

13   move forward.

14           MS. LUHANA:  Okay.  I think now is

15       a good time for a break.

16           THE VIDEOGRAPHER:  All right.  The

17       time is 22:16 UTC time and we are off

18       the record.

19           (Off the record.)

20           THE VIDEOGRAPHER:  The time is

21       22:28 UTC time and we're back on the

22       record.

23   BY MS. LUHANA:

24       Q.    Doctor, do you use Uber?

25       A.    I have, yes.

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential

 2        Q.   How often?

 3        A.   Depends on when I travel.  Few

 4   times a year for conferences.

 5        Q.   And are you ever traveling late,

 6   alone at night when you're taking those

 7   Ubers?

 8        A.   Yeah.

 9        Q.   Have you ever been intoxicated

10   while taking an Uber alone?

11        A.   I can't think of a time, no.  I

12   also generally don't drink, so that could be

13   important to know.

14        Q.   Doctor, do you use Lyft?

15        A.   I think I've tried them once.  Not

16   regularly though, no.

17        Q.   Has your use of Uber changed any

18   since you've gotten involved in this

19   litigation about a month ago?

20        A.   No.

21        Q.   And do you allow your 14-year old

22   to use Uber?

23        A.   He doesn't have a phone.  And also,

24   I drive him everywhere, so he wouldn't have

25   an occasion.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2          Q.   Okay.  Do you use public

3     transportation, Doctor?

4          A.   From time to time, yes.

5          Q.   How often?

6          A.   So Amtrak.  Sometimes if, you know,

7     it's cheaper to take a bus or a subway from

8     the airport to the hotel, do that, but only

9     when I -- only when I travel.  I live in the

10    suburbs, so I have -- tend to drive most

11    places.

12         Q.   Okay.  Have you ever gotten a

13    notification while you've been alone at night

14    in taking an Uber that there was an increased

15    risk of assault when you were in the vehicle?

16         A.   No, not that I recall, no.

17         Q.   Have you ever received an alert or

18    any information about your driver's prior --

19    let me scratch that.

20              Have you ever gotten a notification

21    in an Uber that the driver that you've been

22    matched with had prior reports of sexual

23    misconduct or sexual assault?

24         A.   Not that I'm aware of.

25         Q.   Is that -- would that be important

```
1          L. Orchowski - Highly Confidential
2     information for you when you're getting into
3     a car with an Uber driver?
4               MS. CARITIS:  Form.
5          A.   It's hard to speculate how I would
6     react.  I've never been in that kind of
7     situation before.
8          Q.   But I'm saying, so say Uber had
9     matched you with a driver who had prior
10    reports of sexual assault or misconduct, is
11    there -- is that information you would want
12    to know if you're getting in that Uber late
13    at night alone by yourself?
14              MS. CARITIS:  Form.
15         A.   It's an interesting professional
16    question to noodle on in terms of what I know
17    about prior offenses, not necessarily
18    predicting future offenses.  So I'm actually
19    not sure.  I haven't thought about it and I
20    didn't consider that for this report.
21         Q.   So I'm asking you, if your prior
22    driver let's say had a report of sexual
23    misconduct of grabbing another passenger's
24    breasts during an Uber ride and then
25    thereafter you were matched with that same
```

```
 1        L. Orchowski - Highly Confidential

 2   driver who continued to be on the platform

 3   and you were in that Uber ride alone at night

 4   by yourself, is that something you'd want to

 5   know about that driver?

 6            MS. CARITIS:  Form.  Scope.

 7        A.   (Audio distortion.)

 8            THE COURT REPORTER:  I'm sorry?

 9            THE WITNESS:  I'm sorry.

10        A.   I haven't thought about that

11   before.  It would be a really -- it would

12   be -- yeah, I need some time to think about

13   how I'd respond.  It's an interesting

14   personal question.

15        Q.   It's not a personal question.  In

16   fact, you know, Dr. Valliere talks about

17   deactivation policies, and specifically

18   drivers continuing to be on the platform who

19   had prior reports of sexual misconduct and

20   assault.

21            And so my question to you is, is

22   that information that would be important for

23   you to know when Uber is matching you with a

24   driver where you're getting in a car late at

25   night alone by yourself?
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1           L. Orchowski - Highly Confidential

 2                MS. CARITIS:  Objection.  Form.

 3           Scope.

 4           A.   It sounds like when you said "you"

 5      in the question, I took it to mean a personal

 6      question, rather than one based on my

 7      evaluation of the Valliere report.  So when I

 8      reviewed the report, I didn't consider kind

 9      of my own personal reaction to whether I

10      would personally want to have that

11      information, so I'm not prepared to respond

12      to that right now.

13           Q.   Well, no, I want you to answer it

14      personally 'cause we're talking about your

15      personal Uber use, and that's some of the

16      things that we've asked for in your

17      Deposition Notice, right?  And so this goes

18      directly into your use of Uber and whether it

19      would be important information for you to

20      have that a driver that you've been matched

21      with had prior reports of sexual misconduct,

22      like grabbing a woman's breasts in a prior

23      ride and that driver being sent to you?

24                MS. CARITIS:  Objection.

25           Q.   Would you want to know that
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1        L. Orchowski - Highly Confidential

 2    information about that driver?

 3            MS. CARITIS:  Objection.  Form.

 4        Scope.

 5        A.    It's an interesting question and

 6    I'm not prepared to respond.

 7        Q.    So you can't answer the question

 8    about if that's important information for you

 9    to know?

10        A.    It raises a lot of questions for

11    me.  You know, I devoted my career to sexual

12    assault prevention.  I know the research

13    suggests that a prior history of offending

14    doesn't necessarily mean that someone would.

15    So I think I would be -- I would really be

16    considering it.  So like right now this is a

17    first time I've heard this question, it

18    wasn't something that I considered in the

19    Valliere report, so I need to think about it.

20        Q.    Can you think about it?

21        A.    I teach self-defense for a living,

22    so there's a lot of personal factors.  I

23    think unrelated to Uber's business practices

24    that I'm thinking about, if you want me to

25    answer a personal question, and my response

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    really is, I don't feel prepared to give you
 3    a solid answer.
 4        Q.   So you don't think that prior
 5    reports of a driver of sexual assault and
 6    sexual misconduct that you've been sent --
 7    scratch that.
 8            Doctor, you don't think it's
 9    important information for you to know if a
10    driver that you've been matched with by Uber
11    had prior reports of sexual misconduct or
12    sexual assault?
13            MS. CARITIS:  Objection.  Form.
14        Asked and answered.
15        A.   Yeah, I can't speculate how I'd
16    respond in that circumstance.
17        Q.   Doctor, I asked you earlier --
18    Doctor, I asked you earlier if Uber had
19    safety features that actually worked to
20    prevent sexual assault, do you believe they
21    should use them and your response was, you're
22    not aware of any strategy right now that's
23    effective in preventing all sexual assaults.
24            So my question isn't focused on all
25    sexual assaults, the goal is to prevent as
```

```
 1          L. Orchowski - Highly Confidential
 2     much sexual assault as you can.  And in your
 3     publications and otherwise, we've discussed
 4     taking a comprehensive strategy to prevent
 5     sexual assault.
 6              And so if Uber had safety features
 7     that actually worked to prevent some level of
 8     sexual assault, do you believe they should
 9     use them?
10              MS. CARITIS:  Form.
11          A.   So the question is, if there's
12     something that is a failsafe solution to
13     prevent sexual assault, it should be used?
14          Q.   Doctor, that -- why does it have to
15     be failsafe?  I mean, if you're not
16     preventing a hundred percent of the assaults,
17     but you're preventing 50 percent of that, why
18     wouldn't you use those preventive measures to
19     prevent sexual assault if that was possible?
20          A.   This is a question for the field,
21     right?  So what constitutes effectiveness,
22     right?  So the question is, you know, if
23     anything might work, should we use it?  You
24     know, what if we -- what if that approach
25     also causes harm?  What if there's unintended
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     consequences?  So to my -- my evaluation of

3     the research is that we don't have a strategy

4     that is effective in long-term prevention of

5     rates of sexual assault.  Particularly when

6     we're talking about prevention of

7     perpetration behavior, which is really what

8     we're focused on in this report today --

9               Sorry, I lost my train of thought.

10    I'll stop there.

11         Q.   So once again, I'm not asking for a

12    failsafe measure.  I'm just stating if Uber

13    knows that women are being sexually assaulted

14    and has tools to reduce that sexual assault,

15    do you believe it should wait for a journal

16    article to be published before doing

17    something?

18              MS. CARITIS:  Form.  Asked and

19         answered.

20         A.   Yeah, I would disagree that Uber

21    has knowledge that there are effective

22    strategies that they could use to prevent

23    sexual assault.

24         Q.   You didn't find that in any of the

25    documents, the Uber documents that you may

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     have reviewed?
 3          A.   I'm aware of correlates that have
 4     been identified, but as I note in my report,
 5     identification of a correlate does not mean
 6     this is able to predict who or who wouldn't
 7     engage in sexual violence.
 8          Q.   Did you haven't -- you didn't --
 9     you don't recall coming across any studies
10     that -- where Uber found effective measures
11     to reduce sexual assault?
12               MS. CARITIS:  Form.
13          A.   Yeah, in my review of the science
14     and my scientific expertise, I do not believe
15     we have a strategy out there that is
16     effective in reducing rates of sexual
17     assault.
18               MS. LUHANA:  Object as
19          nonresponsive.
20          Q.   Doctor, I'm asking you, you didn't
21     come across any studies where Uber found
22     effective measures to reduce sexual assault?
23               MS. CARITIS:  Form.
24          A.   There is nothing that I reviewed in
25     Valliere's report or the documents provided
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   to me that would suggest that Uber is aware
 3   of a strategy that they could be taking to
 4   prevent sexual assault.
 5        Q.   So do you recall seeing a Sunny
 6   Jeon study from 2017?
 7        A.   At this moment, no, I can't recall
 8   what that study is referencing.
 9        Q.   Doctor, do you recall reviewing any
10   S-RAD documents?
11        A.   I'm aware of S-RAD as one of the
12   several components that Uber's been looking
13   into in order to identify correlates of
14   sexual violence, yes.
15        Q.   Doctor, do you know now what S-RAD
16   stands for?
17        A.   No, sorry, I still don't remember
18   the abbreviation.
19             MS. LUHANA:  Okay.  I don't have
20        any further questions at this time.
21             MS. CARITIS:  If it's okay with
22        you, Candida, I'll probably go ahead
23        for my short redirect so we can all
24        get out of here.
25             THE COURT REPORTER:  Of course.
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    EXAMINATION BY

3    MS. CARITIS:

4        Q.   Good afternoon, now evening,

5    Dr. Orchowski.  My name is Alex Caritis.

6    We've met before, right?

7        A.   Yes.

8        Q.   And you understand that I represent

9    the Uber defendant in this case?

10       A.   Yes.

11       Q.   I just have a few questions for

12   you.

13            MS. CARITIS:  If we could start --

14       and I'm so sorry, Lance, if I could

15       bother you to put up Exhibit 6 that

16       was previously entered by plaintiff's

17       counsel.

18       Q.   And Doctor, this is the paper that

19   you discussed with Ms. Luhana a moment ago.

20   You are an author in this report.  Do you

21   recall discussing a portion of this paper

22   with plaintiff's counsel a moment ago?

23       A.   Yes, I recall.

24       Q.   Okay.  And I'm gonna direct you to

25   page 813, it is a portion of the document

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1         L. Orchowski - Highly Confidential
 2    that you discussed with plaintiff's counsel
 3    specifically concerning a program at the Ohio
 4    State University.  And --
 5              MS. CARITIS:  Thank you, Lance.
 6         My eyes are awful.
 7         Q.   And you were discussing this --
 8    this section right here, the Ohio -- excuse
 9    me, the Ohio University Sexual Assault Risk
10    Reduction Program.  And the article writes
11    it's a good example of this evolution.
12              So what is this section talking
13    about?  You discussed the early program with
14    Ms. Luhana, what did this study actually find
15    about the early iterations of the Ohio
16    University program?
17              MS. LUHANA:  Object to form.
18         A.   So this is an interesting study
19    because the prevention program itself was
20    really focused on didactic information, so
21    really that kind of -- if we're thinking
22    about the assess, acknowledge and act model,
23    it provided information to folks.  But the
24    preventive overall was generally not
25    effective, so it was clear based on the data
```

1        L. Orchowski - Highly Confidential

2    that it had to expand.

3            This program was also published

4    before the Norris article which really gave

5    the feel, the sense that it's not just

6    knowing the risk factors.  Knowledge enough,

7    not sufficient.  It's the acknowledge, right?

8    It's, how do I talk myself out of this,

9    right?  If I know this is risky, they say,

10   oh, no, it must be fine.  Really that

11   acknowledge step of the psychological

12   barriers to resistance.

13           So after the Hanson & Gidycz study

14   didn't have great outcomes, then this program

15   was iterated to include the Norris studies of

16   really recognizing that awareness alone is

17   not sufficient.  So it would then progress to

18   including more active practice in

19   self-defense, going from just a few hours to

20   going to multiple sessions and really having

21   much more active practice that moved beyond

22   session situations.

23       Q.   So to be clear, did the early

24   iteration of the program that includes the

25   identifying of risky situation, did the

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2    research find that that aspect, this early
3    program, was effective?
4              MS. LUHANA:  Object to form.
5         A.   No.  So I would say this early
6    program was not effective.
7         Q.   You talked also a little bit about
8    a program that you did find was effective and
9    I believe you called it the EAAA program.
10   Could you just provide the jury, if possible,
11   a two to three sentence summary of what the
12   EAAA program entailed?
13        A.   Yeah.  So Charlene's program is a
14   four-session program that has modules on
15   assessing risk, acknowledging risk, which is
16   really the psychological barriers to
17   resistance.  It's not just didactically
18   knowing what the risk factors are, that would
19   be insufficient, but it's really processing
20   through psychological barriers.  In other
21   words, how have you potentially been
22   socialized to respond in these situations.
23   So that's the second one.
24              And then the next one is a Wen-Do
25   self-defense course, it's a feminist
```

1        L. Orchowski - Highly Confidential

2    empowerment self-defense course that is

3    taught specifically by Wen-Do trainers,

4    includes verbal assertiveness, boundary

5    setting, and specific physical self-defense

6    skills.

7            Now the fourth session is really

8    fascinating, it is a sexual health course.

9    So it is modeled off of like a college based

10   sexual health course, right?  So it covers

11   things like STI risk, HIV risk, but really

12   talks about kind of how to -- how to handle

13   sexual boundary settings, how to know what

14   you want, how to know what you don't want.

15   So it really is about sexual communication.

16   So that's the E part, and it kind of brings

17   in that sexual health curriculum to it.

18       Q.   In the EAAA program, who was the

19   target audience?

20       A.   This program was designed for

21   college women.

22       Q.   Okay.  I'd like to now -- we can

23   take this paper down.  And I want to now talk

24   to you a little bit about sections of your

25   report that you discussed with plaintiffs'

```
 1        L. Orchowski - Highly Confidential

 2   counsel, and your report was marked as

 3   Exhibit 1.

 4            MS. CARITIS:  And Lance, if I

 5        could trouble you to please pop that

 6        up on the screen for us.

 7        Q.   Do you recall plaintiffs' counsel

 8   talking to you and suggesting that you did

 9   not cite to Dr. Valliere's report in this

10   rebuttal report?

11        A.   Yes, I recall that.

12            MS. CARITIS:  Okay.  Could we turn

13        to page 4, please, Lance?

14        Q.   Okay.  At the bottom on the first

15   sentence of Scientific Limitations of

16   Predictive Screening, do you quote

17   Dr. Valliere's report in this section?

18            (Cross-talk.)

19            MS. LUHANA:  Objection to form.

20            THE COURT REPORTER:  Repeat the

21        answer, please.

22        A.   Yes, that's a quote.  That's a

23   quote to Dr. Valliere's report.

24        Q.   Okay.  Could we turn to page 9 of

25   your report, please?
```

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2            In your second section, it's called

3    Prevention Standards in Taxis and Rideshares.

4    In the first intro section of this report, do

5    you quote to Dr. Valliere's report at all?

6        A.   Yes, this is a quote of her report

7    right there on the first sentence.

8        Q.   Okay.  If we could go to page 11,

9    please, of the report, your next section,

10   your third section.  This one, I see the last

11   sentence of this report, I see the word in

12   bold "offenders."

13           Do you recall where that quote

14   comes from?

15       A.   Yes, that is a quote from the

16   report as well.

17       Q.   Okay.  And we have two more

18   sections in your report, I just want to

19   confirm whether or not you were referring to

20   Dr. Valliere there too.

21           MS. CARITIS:  Page 12, please.

22       Thank you Lance.

23       Q.   Page 12 middle of the page right

24   after a cite to Sniffen, 2018, do you quote

25   or cite Dr. Valliere's report in this section

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
1         L. Orchowski - Highly Confidential
2    we're looking at here?
3         A.   Yes, there are quotes in the report
4    there as well.
5         Q.   Okay.  Now let's look at the last
6    section, Valliere Overstates Organizational
7    Causation and Constructed Opportunity.
8              Do you cite to Dr. Valliere's
9    report in this section?
10        A.   Yes, the citation there of
11   construction by Uber.
12        Q.   Okay.  And Dr. Orchowski, we just
13   walked through the various sections of your
14   report and the references to Dr. Valliere's
15   report.  Just to be very clear, does your
16   rebuttal report address every single opinion
17   or sentence in Dr. Valliere's report?
18             MS. LUHANA:  Objection to form.
19        A.   No, my report is very targeted and
20   specific to my expertise in sexual assault
21   prevention.  There are aspects of her report
22   I also don't comment on in my report.
23        Q.   And if you don't comment on those
24   sections, is that necessarily because you
25   agree with them or because you didn't feel
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    qualified to speak to them?
 3        A.    Those sections were outside of the
 4    scope.
 5        Q.    Counsel for plaintiff also asked
 6    you a lot of questions about why you didn't
 7    cite Uber documents in your rebuttal report.
 8            Do you recall those discussions?
 9        A.    Yes, I recall.
10        Q.    Okay.  Plaintiffs' counsel also
11    noted that Dr. Valliere cites many, many Uber
12    documents in her report.
13            Do you recall discussing that with
14    counsel?
15        A.    Yes, I recall.
16        Q.    Okay.  First question on this
17    point, Doctor, were you provided access to
18    all of the documents that Dr. Valliere cited
19    in the portions of her report that you were
20    rebutting?
21        A.    Yes.
22            MS. LUHANA:  Objection to form.
23        Q.    Did you review every single
24    document cover to cover cited on
25    Dr. Valliere's reliance list?
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2        A.    No.
 3        Q.    Why not?
 4        A.    I really focused on the material
 5   that was most relevant to the opinions I was
 6   forming about the report.
 7        Q.    Okay.  Plaintiffs' counsel pointed
 8   you to a few specific places in
 9   Dr. Valliere's report where she cites Uber
10   documents.  And I'd like to take a quick look
11   at that.
12             MS. CARITIS:  Lance, if I could
13        trouble to you to please put up
14        Exhibit 4, which was previously
15        marked, it's Dr. Valliere's report.
16        Q.    And if we could please go to
17   page 39, this is section of the report that
18   we discussed earlier in the deposition.
19             And do you recall, Dr. Orchowski,
20   talking about this second paragraph,
21   particularly the portion where Valerie
22   writes:
23             Uber has acknowledged that if
24   safety incidents are predictable, they are
25   preventable.
```

1          L. Orchowski - Highly Confidential

2              Do you recall talking about that

3      particular quote that appeared in an Uber

4      document?

5          A.    I recall this discussion.

6          Q.    Okay.  Doctor, how many years have

7      you been working in sexual assault

8      prevention?

9          A.    Since 2003, so over 20 years.

10         Q.    Okay.  And in your 20 years of

11     experience, have you identified any program

12     that is able to effectively prevent sexual

13     assault or sexual misconduct?

14             MS. LUHANA:  Objection to form.

15         A.    No, in terms of work, I would not

16     say we have an effective solution for

17     preventing sexual assault.

18         Q.    Okay.  And in evaluating

19     Dr. Valliere's proposed prevention measures,

20     do you think it's appropriate for her to rely

21     on internal Uber documents like this instead

22     of peer-reviewed literature?

23             MS. CARITIS:  Object to form.

24         A.    The concerns that I have with

25     Valliere's report is the lack of reference to

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2     scientific literature.  I'm a scientist and
 3     the methods of science of evaluating
 4     hypotheses and showing data either in support
 5     or not in support of a research question and
 6     a hypothesis is really central to the method
 7     that I use for knowledge generation.  It's,
 8     you know, part of -- part of our Ph.D. in
 9     psychology is using science to generate
10     knowledge.  So while I don't object to anyone
11     using these documents, I think they're just
12     one document that would be better
13     supplemented also by referencing scientific
14     literature.
15          Q.   Okay.  Counsel showed you the
16     source document for this quote, if safety
17     incidents are predictable, they are
18     preventable.  And I believe it was marked as
19     Exhibit 5.  Do you recall looking at that
20     source document from Uber that is quoted in
21     Dr. Valliere's report?
22          A.   I do, I recall.
23          Q.   Okay.  Does seeing that -- did
24     seeing that document and hearing Uber write,
25     if safety incidents are predictable, they are
```

1          L. Orchowski - Highly Confidential

2     preventable, change your opinion that there

3     are, in fact, effective measures to prevent

4     sexual assault?

5               MS. LUHANA:  Object to form.

6          A.   That doesn't change my opinion.

7          Q.   Why not?

8          A.   So this generalization if safety

9     incidents are predictable then they are

10     preventable, this assumes that we can predict

11     with 100 percent accuracy, which is not

12     reflective in any of the sources that were

13     provided to me.  I am not aware of any

14     predictive model that is 100 percent

15     accurate.  And with the low base rate event,

16     such as this, a model even with a small

17     variation in predictive value is likely to

18     cause a lot of error in its predictions.  So

19     I disagree with the statement that we have a

20     solution to prevent violence.

21          Q.   Plaintiffs' counsel also talked to

22     you about a typo --

23               MS. CARITIS:  We can take that

24          down, Lance.  Thank you so much.

25          Q.   Talked you about a typo on page 12

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     of your expert report.  Do you recall

3     discussing that typo?

4          A.    I do.

5          Q.    Okay.  Doctor, to be very clear,

6     who wrote your expert rebuttal report that

7     we're talking about today?

8          A.    I wrote the report.

9          Q.    Okay.  Do you have any idea how

10    that typo appeared in the body of the report?

11         A.    I gave counsel a Word copy of my

12    report, and my guess, although speculative,

13    is that it came in there when it was PDF, but

14    I'm not entirely sure.

15              MS. CARITIS:  Thank you.  I have

16         no further questions at this time.

17              MS. LUHANA:  I have a few

18         questions.

19    FURTHER EXAMINATION BY

20    MS. LUHANA:

21         Q.    Doctor, defense counsel just walked

22    you through some quotes that you had to

23    Dr. Valliere's report in your rebuttal

24    report, however there were no pin cites to

25    Dr. Valliere's report in your report,

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    correct?

3        A.    That's correct, I don't include

4    page numbers.

5        Q.    Any references to page numbers from

6    her report that you're citing, right?

7        A.    That's correct.

8              MS. CARITIS:  Form.

9        Q.    And let's go to Exhibit 6.  Just

10   talked about the Ohio University Sexual

11   Assault Risk Reduction Program, right?  Do

12   you recall that?

13       A.    Yes, I do.

14       Q.    Okay.  Let's go to that same page,

15   813.  So right here, as we've gone through,

16   we previously discussed Ohio University

17   Sexual Assault Risk Reduction Program, right,

18   and you mentioned that it was a good example,

19   correct?

20             MS. CARITIS:  Form.

21       A.    It's a good example of how sexual

22   assault risk reduction programs for women

23   have evolved over time to become more

24   effective.

25       Q.    And if we scroll now to the second

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     column, up top, you continue to talk about

3     the Ohio State program.  And then you say:

4               Although the findings are somewhat

5     equivocal, recent iterations of this program

6     reduced rates of sexual victimization for

7     some groups of women over follow-up periods

8     ranging from two to seven months.

9               Did I read that correctly?

10         A.   I believe you called it the Ohio

11    State program and folks from Ohio have a big

12    difference between Ohio University and Ohio

13    State.  So just to clarify, it's Ohio

14    University.  You did read that sentence

15    correct.

16         Q.   I apologize.  Okay.  So it was

17    effective in reducing the rate of sexual

18    victimization, correct?

19         A.   So that was the 2015 study, and I

20    was a part of writing the grant for that

21    study, administering it, it was very complex.

22    So when we look --

23         Q.   Doctor, I'm just asking --

24              (Cross-talk.)

25         Q.   Doctor --

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1          L. Orchowski - Highly Confidential
 2          A.   To be very clear, some rates went
 3     up, some rates went down.
 4               (Cross-talk.)
 5          Q.   But you know that here that --
 6     although that, you know, it was somewhat
 7     equivocal, recent iterations you said reduced
 8     rates of sexual victimization, correct?
 9          A.   Only for some groups of women.
10          Q.   And so that's the thing, right,
11     with sexual assault prevention, there is no
12     failsafe measure that is going to reduce
13     sexual assault by a hundred percent, correct?
14          A.   In all the programs that have been
15     evaluated so far, we have folks in the sample
16     that have continued to experience
17     victimization or go on to perpetrate even
18     despite participation.
19          Q.   I'm not talking about this program
20     now, I'm just focused on comprehensive
21     strategy to reduce sexual assault.  There
22     isn't a one-size-fits-all approach to
23     reducing sexual assault, correct?
24          A.   We do not have -- we do not have a
25     silver bullet, if you will.  There is not a
```

1          L. Orchowski - Highly Confidential

2     strategy.

3          Q.   Correct.  However, if there are

4     effective measures that can reduce sexual

5     assault some, it makes sense to implement

6     those measures, correct, even though it's not

7     a hundred percent reduction in sexual

8     assault?

9               MS. CARITIS:  Form.

10         A.   It's real question of feasibility,

11    right.  So the program here, this EAAA

12    program that does have --

13         Q.   Doctor, I'm not focused on this

14    document.  We can take this down.

15              I'm just talking generally about

16    effective measures to reduce sexual assault

17    was my question.

18         A.   Yeah.  If it was feasible to give

19    the EAAA program to every girl --

20         Q.   Doctor, we're not talking about the

21    EAAA program right now, Doctor.  I'm just

22    saying, if there are effective measures that

23    can reduce sexual assault some, it makes

24    sense to implement those measures even though

25    they won't eradicate sexual assault by a

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    hundred percent, right?

3            MS. CARITIS:  Form.

4        A.   It goes back to this question, if

5    anything might work, should we do it?  Bring

6    this back to specifically with the Valliere

7    report, which I was asked to review, I

8    disagree with the information provided in the

9    report that there was an effective prevention

10   strategy that Uber was aware of that they --

11   that they could implement.

12       Q.   Doctor --

13           MS. LUHANA:  Non- -- I object as

14       nonresponsive.

15           Candida, can you just read my

16       question again so the doctor hopefully

17       can answer it.

18           (Referred to portion of the record

19       was read back by the court reporter.)

20       A.   So this is a hypothetical.  It

21   would depend on what that measure was and

22   also what its risk for harm was.

23       Q.   Women2Women matching, that's a

24   measure that Uber has taken in a couple

25   cities now.  And predominantly the offenders

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2    are men who are committing sexual assault
 3    against women.  So that's a measure that can
 4    be utilized to eliminate some sexual assaults
 5    on the platform, correct?
 6            MS. CARITIS:  Form.  Scope.
 7        A.   I'm not aware of specific data on
 8    the Women2Women approach.
 9        Q.   Have you looked at documents
10    talking and discussing the Women2Women
11    approach?
12        A.   I've seen it cited as one strategy
13    that's discussed in the Valliere report, yes.
14        Q.   So utilizing the Women2Women
15    approach would be one approach to reduce
16    sexual assault on Uber right?
17        A.   It would depend on its
18    effectiveness, and without knowing the
19    effectiveness and also the risks associated
20    with it, I can't speak on that right now.
21        Q.   What are the risks associated with
22    it, Doctor?
23        A.   I'm not -- I can't speculate on any
24    potential risk, but any prevention strategy
25    that we look at, we look at potential
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1        L. Orchowski - Highly Confidential
 2   iatrogenic effects.
 3        Q.   So you're not speculating on this
 4   right now, I understand.
 5             Okay.  Doctor, you testified that
 6   you didn't review all the documents that
 7   Dr. Valliere relied on on arriving at her
 8   opinions on that report; is that right?
 9        A.   That's correct.  I was provided
10   with all of the documents, I reviewed the
11   ones that were relevant to me in forming my
12   opinion.
13        Q.   So you're critique is only limited
14   to the ones that you believed were relevant
15   in informing your opinion, right?
16             MS. CARITIS:  Form.
17        A.   I have a very targeted -- targeted
18   report, so I'm sure there are documents that
19   I didn't review that also kind of are
20   associated with areas of the report that I
21   really don't speak to.
22        Q.   So there may be depositions and
23   documents that you may have not reviewed,
24   right?
25        A.   That's possible.  I can't imagine
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

 1         L. Orchowski - Highly Confidential

 2    with my knowledge of the scientific

 3    literature that there is a document that

 4    presents findings that suggests that there is

 5    a sexual assault prevention program that is

 6    effective in preventing assault.

 7         Q.   But Doctor, since you never read

 8    them, those documents, you only read a subset

 9    of documents, not everything Dr. Valliere

10    relied on, so since there is a subset of

11    documents that you didn't review from

12    Dr. Valliere's report, it would be fair to

13    say you have no way of knowing whether they

14    contained anything of importance, right?

15              MS. CARITIS:  Form.

16         A.   I disagree.  There were sections of

17    the report that I didn't speak to because

18    they were beyond the scope.  So documents

19    that were affiliated with that section of the

20    report, I don't believe those would be

21    relevant to my analysis which was very

22    specific to sexual assault preventive

23    measures.

24         Q.   And so you wouldn't know if other

25    documents in her report contained important

Lindsay Orchowski, Ph.D.   Highly Confidential
November 11, 2025

```
1        L. Orchowski - Highly Confidential

2    information related to the prevention of

3    sexual assault because you did not review

4    those documents; wouldn't that be a fair

5    statement, Doctor?

6             MS. CARITIS:  Form.

7        A.   There is no evidence that I'm aware

8    of in the scientific literature or otherwise

9    that suggests that we have the capability to

10   predict someone's behavior in the future.  So

11   I disagree that there is likely something in

12   one of those documents that I didn't look at

13   because they weren't relevant to my report

14   that would have changed my opinion.

15       Q.   But still there were some subset of

16   documents that Dr. Valliere relied on that

17   you didn't review, correct?

18       A.   Yes, there are documents I did not

19   review.

20       Q.   Doctor, you mentioned the typo

21   which was actually the Kirkland & Ellis

22   footer that was on page 12 of your expert

23   report, and you believe the way it got there

24   was because you sent a Word copy of your

25   report to defense counsel and then the PDF
```

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1          L. Orchowski - Highly Confidential

2     version had that footer there; is that right?

3     Is that what your testimony was?

4          A.   Yes, that's correct.

5               MS. LUHANA:  Can you please --

6          Counsel, we'd request that she produce

7          her final copy of her Word report

8          because there's a difference in what

9          was produced to us and apparently what

10         was produced to you, and so we want a

11         copy of that Word document.

12              MS. CARITIS:  We object and we

13         won't be doing that, but we're happy

14         to talk about it, but we object.

15         Q.   Doctor, when did you send that

16    final Word copy of the report to counsel?

17              MS. CARITIS:  Asked and answered.

18         She already told you that.

19         A.   So the last day I believe on my

20    invoice I have work documented on that is the

21    24th I believe.  But I do not know the

22    precise date and time without looking at my

23    email.

24         Q.   So October 24th is when you sent a

25    final Word copy to defense counsel of your

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1        L. Orchowski - Highly Confidential

2    report?

3        A.   It -- the date that aligns with the

4    last day that I document work on the report,

5    yes.

6        Q.   And the copy that you had sent

7    didn't have the Kirkland & Ellis footer on

8    page 12?

9        A.   I don't believe so.

10           MS. LUHANA:  Counsel, as I said,

11       we'd ask for a copy of the final Word

12       report.

13           MS. CARITIS:  Yep, we object.

14       Unless you want to exchange drafts for

15       all of your experts, we object.

16           MS. LUHANA:  It's not a draft

17       because she said she sent the final

18       over to you.

19           MS. CARITIS:  Roopal, that's

20       clearly outside the scope.  We'll talk

21       about it.  It's also ridiculous.  It's

22       a typo.  But if you're gonna make a

23       stink about it, I'll take it back to

24       my team and we can leave it at that.

25       I'm objecting on the record, I'll take

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

```
 1       L. Orchowski - Highly Confidential

 2       it back.

 3           MS. LUHANA:  Okay.  We'll discuss.

 4       That's all the questions I have,

 5       Doctor.  Thank you for your time.

 6           THE WITNESS:  Thank you, all.

 7           MS. CARITIS:  Can we go off the

 8       record?

 9           THE VIDEOGRAPHER:  The time is

10       23:07 UTC time.  That concludes the

11       deposition.  Thank you, everyone.

12        (Concluded at 6:07 p.m. Eastern Time)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        L. Orchowski - Highly Confidential

2

3                    J U R A T

4

5

6          I, LINDSAY ORCHOWSKI, do hereby

7       certify under penalty of perjury that

8       I have read the foregoing transcript

9       of my deposition taken on the 11th of

10      November, 2025; that I have made such

11      corrections as appear noted herein in

12      ink, initialed by me; that my

13      testimony as contained herein, as

14      corrected, is true and correct.

15

16

17      _____
                    LINDSAY ORCHOWSKI

18

19

     Subscribed and sworn to before me
20
     This _____ day of _____, 20___.
21

22  _____
                 NOTARY PUBLIC
23

24

25

1      L. Orchowski - Highly Confidential

2      ------------------I N D E X------------------

3

   WITNESS:       LINDSAY ORCHOWSKI
4
   EXAMINATION BY:
5   PAGE

6   MS. LUHANA                                    7

7   MS. CARITIS                                  357

8   MS. LUHANA                                   370

9

10     ----------------E X H I B I T S--------------

11

   NUMBER                DESCRIPTION          PAGE
12

13   Exhibit 1   Rebuttal Expert Report of     36
                 Lindsay Orchowski, Ph.D.
14
   Exhibit 2   Notice of Deposition           36
15
   Exhibit 3   Lindsay Orchowski,             56
16                Ph.D.'s Expert Witness
                 Invoice
17
   Exhibit 4   Report of Veronique           110
18                Valliere

19   Exhibit 5   Bouncer v3 document,         269
                 Bates
20                UBER_JCCP_MDL_003231342

21   Exhibit 6   Sexual Assault              305
                 Resistance, Bystander,
22                and Men's Social Norms
                 Strategies to Prevent
23                Violence on College
                 Campuses: A Call to
24                Action

25

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1           L. Orchowski - Highly Confidential

2              (Index continued on next page.)

3
     ---------------R E Q U E S T S---------------
4

5   Copy of updated CV                          117

6   Final copy of Word report                   380

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lindsay Orchowski, Ph.D.  Highly Confidential
November 11, 2025

1       L. Orchowski - Highly Confidential

2           C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF RICHMOND       )

6

7        I, CANDIDA BORRIELLO, a Stenographic

8    Court Reporter and Notary Public for and

9    within the State of New York, do hereby

10   certify:

11       That the witness, LINDSAY ORCHOWSKI,

12   whose examination is hereinbefore set forth

13   was duly sworn and that such examination is a

14   true record of the testimony given by that

15   witness.

16       I further certify that I am not

17   related to any of the parties to this action

18   by blood or by marriage and that I am in no

19   way interested in the outcome of this matter.

20       IN WITNESS WHEREOF, I have hereunto

21   set my hand this 13th day of November, 2025.

22

23   _____
              CANDIDA BORRIELLO

24

25

1       L. Orchowski - Highly Confidential

2       ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:        IN RE UBER LITIGATION
     Dep. Date:        NOVEMBER 11, 2025
4    Deponent:         LINDSAY ORCHOWSKI

5    Pg. Ln.  Now Reads         Should Read      Reason

6    ____ ____  _____  _____  _____

7    ____ ____  _____  _____  _____

8    ____ ____  _____  _____  _____

9    ____ ____  _____  _____  _____

10   ____ ____  _____  _____  _____

11   ____ ____  _____  _____  _____

12   ____ ____  _____  _____  _____

13   ____ ____  _____  _____  _____

14   ____ ____  _____  _____  _____

15   ____ ____  _____  _____  _____

16   ____ ____  _____  _____  _____

17   ____ ____  _____  _____  _____

18   ____ ____  _____  _____  _____

19   ____ ____  _____  _____  _____

20                  _____
                       LINDSAY ORCHOWSKI
21
     SUBSCRIBED AND SWORN BEFORE ME,
22
     This____ day of_____, 20___.
23
     _____
24              Notary Public

25   My Commission Expires:_____