Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC,
and RASIER-CA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB (LJC)<br><br>**DECLARATION OF SUNNY WONG**<br><br>Judge:      Hon. Charles R. Breyer<br>Courtroom:  6 – 17th Floor |

I, Sunny Wong, having personal knowledge of the following, state:

1. I am a Director, Applied Science – Safety at Uber. I was first employed by Uber in 2018. In my current role, I am responsible for leading the Safety Science team at Uber, which includes a global team of data scientists and applied scientists, supporting new product and policy development through experimentation, causal inference, modeling, insights, and metrics. I offer this Declaration in the above-captioned matter in support of the Motion to Seal filed by Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber"). The facts set forth herein are true and correct and are based on my own personal knowledge, and I could and would competently testify thereto if called to testify in this matter.

2. I have reviewed the September 26, 2025 Expert Reports of Lacey R. Keller, Cynthia Rando, CHFP, and Bruce Weiner and the October 27, 2025 Deposition of Lacey Keller. I have also reviewed Uber's proposed redactions to these materials (the "Redacted Materials").

3. The Redacted Materials should be protected from disclosure to Uber's competitors because they reveal Uber's confidential and proprietary business research, technology, and trade secrets. Specifically, the Redacted Materials divulge competitively sensitive information and details concerning Uber's confidential and proprietary trip-matching safety assessment technology called Safety Risk Assessment Dispatch, or S-RAD.

4. The Redacted Materials are excerpts from Mr. Weiner, Dr. Keller, and Ms. Rando's expert reports and Ms. Keller's deposition that quote from or summarize competitively sensitive information in Uber's confidential documents related to the S-RAD technology. As detailed below, the Redacted Materials describe specific variables that are programmed into the S-RAD technology, inputs and data points utilized by the technology, detailed product development and testing information such as results of internal experiments evaluating precision and recall metrics at different settings, details of the technology's development process and design trials, historical information regarding features and variables utilized in different iterations of S-RAD models over time, reasons and internal business rationales for certain design decisions related to S-RAD, and confidential information about how the S-RAD technology functions.

5. These details of S-RAD are unknown to Uber's competitors, and their disclosure would result in a competitive disadvantage to Uber. Uber operates in a highly competitive space, and the time,

money, and effort spent in researching and developing proprietary technologies can be used by other companies to harm Uber's competitive advantage. Addressing challenges that face the ridesharing industry is a key part of Uber's business, and disclosure of research, processes, and technology that Uber has developed and continues to refine would be injurious to Uber's competitive standing.

6. I am personally familiar with this proprietary and highly confidential information about S-RAD through my work leading the Safety Science team at Uber. That team is responsible for creating, experimenting, researching, auditing, and updating the S-RAD technology.

7. Uber has expended significant time and money in the research and development of S-RAD and has maintained documents and communications related to that research and development under strict confidentiality. To my knowledge, S-RAD and its level of sophistication is unique to Uber. It is the result of years of research and testing by Uber's product managers, software engineers, and data scientists, who meticulously collected and analyzed data from several countries and regions to advance this proprietary technology. Even within Uber, documents concerning S-RAD have not been widely disseminated, and have been generally provided only to employees who work on issues related to the technology.

8. Indeed, Plaintiffs' expert Dr. Keller characterized Uber's development of S-RAD as something "Uber has chosen to do … behind closed doors" while telling "the public nothing about that." 10/27/2025 Keller Dep. at 151:16-21. Despite Uber's efforts to maintain secrecy, however, the existence of S-RAD and certain general aspects of the technology have recently been disclosed to the public following an apparent violation of the Protective Order in which sealed materials filed in the JCCP proceeding were provided to the *New York Times*, which then published an article disclosing S-RAD's existence. Uber subsequently published an article on its website responding to certain inaccuracies in the *New York Times* article; Uber's article acknowledged S-RAD's existence and provided some limited and general information about S-RAD. Certain additional information concerning S-RAD was also disclosed through the JCCP proceedings. Although some general information about S-RAD is now known, public disclosure concerning the details of S-RAD, which Uber has not revealed publicly and has gone to great lengths to safeguard, would cause competitive harm to Uber.

9. Uber and its competitors participate in a highly competitive market. Information concerning S-RAD is therefore of great interest to Uber's competitors and could be leveraged against

Uber to its competitive disadvantage. In addition, disclosure of information concerning S-RAD could potentially allow competitors to reverse-engineer Uber's proprietary tool, which could harm Uber's competitive standing. In particular, competitors could unfairly benefit from the release of highly confidential information concerning S-RAD by trying to "copy" Uber's software code using the confidential information in the Redacted Materials that relates to the functionality, variables, and data inputs relevant to the S-RAD technology and the impact of those variables on the technology's effectiveness. Given Uber's efforts to safeguard details concerning the S-RAD technology, Uber's competitors would only be able to do so if information concerning S-RAD is released in connection with this litigation.

10. Further, public disclosure of information about the details of S-RAD to the public, such as information about variables that impact S-RAD scores and trip-matching functions, may allow users of the Uber platform or other individuals to take steps to undermine or circumvent S-RAD's effectiveness.

11. For all of these reasons, it is essential that competitively sensitive information related to S-RAD be maintained under seal.

**The Redacted Materials in the September 26, 2025 Expert Report of Bruce Weiner**

12. Mr. Weiner cites Uber's confidential internal product development and testing documents, in which Uber studied the effect of adjusting the S-RAD trigger rate to different levels, as well as documents disclosing the actual trigger rate utilized by Uber's S-RAD technology and the specific rationales for selecting that trigger rate. *See, e.g.*, Weiner Report at ¶¶ 141, 155, 156, 168, 169.

13. Mr. Weiner cites Uber's confidential formal product documentation, in which Uber defines specific marketplace impact metrics that inform its target S-RAD thresholds. *Id.* at ¶ 157.

14. Mr. Weiner excerpts or discusses confidential Uber documents with details about the specific factors that Uber determined to be potentially predictive of sexual assaults and which formed the basis of the variables and inputs into the S-RAD technology. *Id.* at ¶¶ 151, 153.

15. Similarly, Mr. Weiner recounts the internal and external data points that Uber utilized in an earlier predecessor technology called Bouncer, through which Uber sought to predict and prevent safety incidents, as well as the accuracy and precision metrics of that technology and Uber's internal analysis of the technology's impact on Uber's business growth and competitive position. *Id.* at ¶¶ 139, 140.

16. Mr. Weiner cites to confidential Uber documents analyzing the precise metrics that constitute an effective control group in its product testing experimentation. He also cites to the metrics Uber actually uses in its S-RAD control groups to conduct ongoing testing. *Id.* at ¶¶ 165, 169.

17. The proposed redactions are narrowly tailored to protect Uber's competitively sensitive information. Disclosure of this information would cause competitive harm to Uber for the reasons discussed in Paragraphs 3-10 above.

**The Redacted Materials in the September 26, 2025 Expert Report of Lacey Keller and October 27, 2025 Deposition of Lacey Keller.**

18. Dr. Keller cites Uber's confidential internal product development and testing documents, in which Uber studied the effect of adjusting the S-RAD trigger rate or threshold to different levels, as well as documents disclosing the actual trigger rate or threshold utilized by Uber's S-RAD technology and the specific rationales for selecting this trigger rate or threshold. Keller Report at 4; *id.* ¶¶ 9.4, 62.4, 62.5, 72, 73; *id.* at Figure 16; *id.* at n.166; Keller Dep. at 282:22, 283:6, 295:10, 319:14.

19. Dr. Keller excerpts or discusses confidential Uber documents with details about the specific factors that Uber determined to be potentially predictive of sexual assaults and which formed the basis of the variables and data inputs into the S-RAD technology, as well as information about how those variables changed in different iterations of the S-RAD model from the first developed versions through the present, and the relative importance of each variable in influencing the S-RAD score. Keller Report at ¶¶ 62.1, 65, n.170, Appendix F; Keller Dep. at 325:18-20. Similarly, Dr. Keller describes in detail certain "precursors" that Uber had identified as correlated with sexual assault. Keller Report at ¶¶ 50-51, 53-54, 56,-[1] Figure 9-11; Keller Dep. at 209:6-9.

20. Dr. Keller cites to confidential Uber documents explaining the metrics Uber uses to create S-RAD control groups in order to conduct ongoing product testing, and the methodology Uber uses to conduct various types of product testing and experimentation on the S-RAD technology. Keller Report at ¶¶ 62.9, 64, 69.1; Keller Dep. at 293:3, 306:6.

21. Dr. Keller details the back-end functioning of the S-RAD technology in instances when a trip pairing exceeds the applicable S-RAD threshold, including circumstances and parameters under which

---

[1] The redacted portion of Paragraph 56 is also quoted in Paragraph 44 of the Rebuttal Report of Victoria Stodden, and Uber seeks a corresponding redaction there.

Uber will dispatch such a pairing. She also includes detail from confidential Uber documents studying the volume of such trips and correlated incident data. Keller Report at ¶¶ 62.7, 62.8, 68, 69.3, 70, 71, n.151; Keller Dep. at 140:21, 140:25-141:3, 141:14, 141:19, 141:22-23, 294:21-24, 295:4-6, 310:14-16, 310:18-19, 311:14-17, 312:4-6, 312:8, 312:14, 320:1, 326:10, 326:12-13, 327:14-15, 327:17-18.

22. Dr. Keller cites information about how S-RAD trips are scored, including the range of the potential scores. She also cites the actual S-RAD score of each trip taken by each of the Bellwether Plaintiffs, as well as the specific data inputs and metrics that went into each score. Keller Report at ¶¶ 62.3, 66, 76; *id.* at Table 3; *id.* at App'x D at 7; Keller Dep. at 148:15-18, 294:6-8.

23. The proposed redactions are narrowly tailored to protect Uber's competitively sensitive information. Disclosure of this information would cause competitive harm to Uber for the reasons discussed in Paragraphs 3-10 above.

**The Redacted Materials in the September 26, 2025 Report of Cynthia Rando, CHFP**

24. Ms. Rando excerpts and discusses confidential Uber documents with details about the specific factors that Uber determined to be potentially predictive of sexual assaults and which formed the basis of the variables and data inputs into the S-RAD technology. Rando Report at ¶¶ 157, 160.

25. The proposed redactions are narrowly tailored to protect Uber's competitively sensitive information. Disclosure of this information would cause competitive harm to Uber for the reasons discussed in Paragraphs 3-10 above.

1  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 21, 2025

*Sunny Wong*
_____
SUNNY WONG