Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC,
and RASIER-CA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:23-md-03084-CRB (LJC)<br><br>**DECLARATION OF GREG BROWN**<br><br>Judge:     Hon. Charles R. Breyer<br>Courtroom: 6 – 17th Floor |

I, Greg Brown, having personal knowledge of the following, state:

1. I am the Director, Head of Central Safety, at Uber. I was first employed by Uber from 2014 through 2020, during which time I worked as Operations and Logistics Manager (July 2014 – September 2015); Senior Operations Manager (September 2015 – November 2017); Program Lead, Safety (November 2017 – August 2019); and Senior Program Lead, Safety & Risk (August 2019 – December 2020). When I returned to Uber in 2022, I initially worked as Director of Safety, United States & Canada (September 2022 – August 2024). Since August 2024, I have served in my current role. In that role, I am responsible for overseeing, organizing, and implementing global risk programs, and ensuring, where applicable, that Uber's safety policies and standards are appropriately globalized. I offer this Declaration in the above-captioned matter in support of the Motion to Seal filed by Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber"). The facts set forth herein are true and correct and are based on my own personal knowledge, and I could and would competently testify thereto if called to testify in this matter.

2. I have reviewed the September 26 Export Report of Bruce Weiner ("Weiner Report"), the October 28, 2025 Deposition of Bruce Weiner ("Weiner Deposition"), the September 26, 2025 Expert Report of John Chandler, Ph.D. ("Chandler Report"), the October 24, 2025 Rebuttal Report of John Chandler, Ph.D. ("Chandler Rebuttal"), the October 24, 2025 Rebuttal Report of Victoria Stodden, Ph.D. ("Stodden Rebuttal"), the September 26, 2025 Expert Report of Lacey R. Keller ("Keller Report"), the October 27, 2025 Deposition of Lacey Keller ("Keller Dep."), the September 26, 2025 Report of Thomas R. Tremblay ("Tremblay Report"), the September 26, 2025 Report of Veronique Valliere ("Valliere Report"), the October 24, 2025 Deposition of Veronique Valliere ("Valliere Deposition"), the November 11, 2025 Deposition of Lindsay Orchowski, Ph.D. ("Orchowski Deposition"), the October 24, 2025 Rebuttal Report of Lindsay D. Cameron, Ph.D. ("Cameron Rebuttal"), the September 26, 2025 Expert Report of Vida Thomas ("Thomas Report"), Plaintiffs' November 10, 2025 Motion to Exclude Expert Testimony ("Plaintiffs' Motion"), and the Incident Report Classification of Dominant Tickets for 2017-2024 produced by Uber in this litigation ("Incident Report Classification"). I have also reviewed Uber's proposed redactions to these materials (the "Redacted Materials").

3. The Redacted Materials should be protected from disclosure to Uber's competitors because they reveal Uber's confidential and proprietary research, technology, business strategies, raw data, and internal decision-making related to Uber's strategic plans in a highly competitive market. Specifically, the Redacted Materials divulge competitively sensitive information and details concerning Uber's proprietary driver screening procedures, driver retention strategy, safety feature performance assessments and experimentation methods, user deactivation policies and procedures, the internal incident investigation process, and Uber's strategic resource allocation and investment prioritization, all of which is unknown to Uber's competitors and would result in a competitive disadvantage to Uber if made publicly available. Uber has spent significant time and resources developing its proprietary procedures, processes, plans, priorities, and product features. Further information about the type of confidential and competitively sensitive information contained in the Redacted Materials is set forth below.

4. The confidential information sought to be redacted is only made available to internal Uber employees who need to know about, work from, analyze, or prepare the confidential information. It is not generally available to any and all employees within Uber and is restricted based on document access procedures.

5. I am personally familiar with the confidential information discussed in this declaration through my work as it relates to overseeing, improving, and implementing global risk programs and Uber's safety policies and standards.

6. Disclosure of the nature and details of the confidential information outlined below, which Uber has not revealed publicly and has taken precautions to safeguard, would cause competitive harm to Uber by providing its competitors with internal information regarding some of the key components of Uber's operational strategies. Uber and its competitors participate in a highly competitive market. Information concerning Uber's resource allocation, investment priorities, safety feature performance, driver screening and retention strategies, deactivation and investigative processes, survey data, and other raw data is therefore of great interest to Uber's competitors in developing their own processes, strategies, and products and could be leveraged against Uber to its competitive disadvantage.

7. In addition, disclosure of information concerning Uber's internal procedures, methodologies, and strategies could potentially allow competitors to inappropriately co-opt and adopt the

same, which could harm Uber's competitive standing. In other words, Uber's competitors could use the confidential information to alter or improve their own respective businesses, which, given Uber's efforts to safeguard the information, would severely diminish Uber's hard-earned competitive advantage.

8. Public disclosure of the Redacted Materials would also reveal Uber's confidential safety-related goals and priorities to its competitors. Permitting Uber's competitors access to this competitively sensitive strategic information could harm Uber by allowing competitors to develop strategies and programs to counter initiatives that Uber is contemplating or working on.

9. Further, disclosure of information about the details of Uber's proprietary driver screening procedures, deactivation policies, and investigative procedures to the public may allow users of the Uber platform or other individuals to take steps to undermine or circumvent the effectiveness of these safety measures.

10. The proposed redactions, described in more detail below, are narrowly tailored to protect Uber's competitively sensitive information.

11. **Strategic resource allocation and prioritization.** The Weiner Report and the Weiner deposition contain confidential information about Uber's strategic resource allocation decisions, including technology investment priorities and phases. Weiner Rpt. ¶¶ 101, 116-17, 122-23, 269(e); Weiner Dep. at 243:9-13, 243:25-244:1, 244:18-21, 245:19-20, 245:25-246:1, 324:9-11, 328:5, 328:13-14, 403:4. They provide specific percentages of technology resources and dollar figures allocated to different areas of the business, representing Uber's feature investment decisions and strategy over multiple years. Weiner Rpt. ¶¶ 101, 116-17, 122-23 & n.146, 269(e); Weiner Dep. at 243:9-13, 243:25-244:1, 244:18-21; 245:19-20, 245:25-246:1, 324:9-11, 328:5, 328:13-14, 403:4. In addition, the Weiner Report contains information from confidential Uber documents related to Uber's estimated annual costs of various safety-related categories, as well as Uber's internal analysis and assessment of those costs. Weiner Rpt. ¶¶ 89-90. The Chandler Report similarly contains figures outlining Uber's marketing budget and strategy, including specific dollar allocations on various campaigns and business priorities. Chandler Rpt. ¶¶ 147, 167, 175, 178, Figures 49, 52, 59, 60, 62. The Keller Report includes a confidential internal revenue-related figure. Keller Rpt. ¶ 59. Disclosure of Uber's resource allocation decisions, financial priorities, and budgeting numbers and strategies would provide competitively sensitive information to Uber's competitors that they

could use to gain insight into Uber's allocation of resources and financial position, providing competitors with an unfair competitive advantage over Uber.

12. **Safety feature performance and experimentation.** The Weiner Report contains Uber's internal assessment of its Real Time ID ('Motumbo') safety product, including specific product configurations. Weiner Rpt. Ex. C ¶ 13. It also quotes from documents summarizing Uber's methodology for conducting product testing or impact analyses and the results of those tests and analyses. *Id.* The Cameron Rebuttal describes Uber's experimentation processes on certain safety features, including the parameters and results of those experiments. Cameron Rebuttal at 58. Publicly disclosing this information would provide Uber's competitors with the benefits of the insights of Uber's proprietary research, assessments, product testing, and experiments without investing the same resources or efforts. Uber's competitors could use this information to develop strategies and programs to counter, preempt, or differentiate themselves from Uber's initiatives and features.

13. **Risk Assessments.** The Chandler Report contains confidential information about Uber's internal risk assessment approaches, including the factors and data inputs to a particular risk assessment model and methodology. Chandler Rpt. ¶ 161. Public disclosure of the information would cause competitive harm to Uber by providing its competitors with confidential information regarding Uber's internal approaches to risk assessment, which competitors could utilize and implement to their own competitive advantage. Additionally, disclosure would cause competitive harm to Uber by providing its competitors with confidential information regarding the data points and specific factors that Uber uses to create new metrics, which Uber's competitors could leverage against Uber to its competitive disadvantage.

14. **Driver screening and retention.** The Tremblay Report contains quotes from confidential internal evaluations of Uber's driver screening procedures, including the impact of screening procedures on risk assessment and compliance. Tremblay Rpt. at 23. The Cameron Rebuttal contains Uber's assessment of the economic impact that each driver has on Uber, internal strategies for retaining drivers, and Uber's assessment of retention efforts required to meet demand. Cameron Rebuttal at 48-49, 52, 57. Disclosure of this information would result in competitive harm to Uber by providing its competitors with confidential information that Uber's competitors could leverage against Uber to its competitive disadvantage. As noted above, Uber and its competitors participate in a highly competitive market.

1  Information concerning how Uber is obtaining and retaining drivers to achieve compliance and meet the
2  market demand is therefore of great interest to Uber's competitors in screening and retaining their own
3  work force and could be leveraged against Uber to its competitive disadvantage.

4      **15.**    **Cerebro and uSights.** The Valliere Report contains a discussion of internal Uber
5  documents related to Cerebro and Usights, two iterations of an in-house psychometric assessment that
6  could be used in driver screening. Valliere Rpt. at 24-25. The Valliere Report contains specific details
7  about Uber's testing and results, as well as its strategy concerning the deployment of those tools. *Id.* Uber
8  also seeks to redact portions of the Orchowski Deposition that include these portions of the Valliere
9  Report. Orchowsksi Dep. at 170:8-20; 171:2-5. Information concerning Uber's in-house psychometric
10 driver screening tools and related strategies is competitively sensitive. Public disclosure of this
11 information would harm Uber, because the information could be leveraged by Uber's competitors in
12 developing their own psychometric screening tools and strategies.

13     **16.**    **Deactivation and investigation processes.** The Thomas Report outlines Uber's Urgent
14 Support Logic workflow, including the specific steps and investigative procedures followed by Uber when
15 an incident is reported, and the circumstances under which a report will be considered resolved. Thomas
16 Rpt. ¶¶ 64-65. The Valliere Report describes Uber's internal deactivation policies, and the circumstances
17 under which drivers and riders will or will not be deactivated as a result of various types of incident
18 reports. Valliere Rpt. at 8. The Valliere Report also quotes from confidential Uber testimony describing
19 the documents and materials considered during the investigation process. *Id.* at 9. The Keller Report also
20 contains internal Uber screenshots (including of Uber's "Investigations Workbench"), which show what
21 data Uber collects concerning drivers, and how it organizes and manages that data. Keller Rpt. App'x D,
22 Figures 1, 5-6, 10-11, 15-16, 20-21, 25. The Cameron Rebuttal also includes sensitive information about
23 Uber's deactivation and reactivation policies and strategies. Cameron Rebuttal at 58. Unsealing these
24 documents would result in competitive harm to Uber because Uber's main competitors could replicate
25 Uber's investigative and deactivation processes, which Uber has invested significant human and financial
26 capital to develop and operationalize. Moreover, revealing Uber's investigative and deactivation processes
27 to the public could allow third-party users of the Uber app to undermine and exploit Uber's methodologies
28

for investigating and deactivating riders and drivers, including through fraudulent activity, compromising safety to the detriment of users and drivers.

17. **Survey data.** The Chandler Rebuttal contains results of Uber's confidential research studies and survey data reflecting user safety experiences, perceptions, and beliefs. Chandler Rebuttal Figures 2[1]-5, ¶¶ 70, 72-74. Plaintiffs' Motion also cites one of these same surveys, and presents calculations purportedly using the survey results. Mot. at 10:7-8, 10:11, 10:13, 10:17. Publicizing this information could put Uber at a competitive disadvantage by providing Uber's competitors with the benefits of Uber's proprietary research insights, enabling competitors to modify or tweak their own safety experiences by free-riding on Uber's investment of time and financial resources. The information could also allow Uber's competitors to assess weak spots in the Uber experience from users' perspectives, and tailor their own products to differentiate themselves or compete with Uber in those specific areas.

18. **Uber's relationships with non-profit organizations.** The Valliere Deposition contains discussion of internal Uber documents related to Uber's strategies involving and relationships with non-profit organizations. Valliere Dep. at 256:24-25, 258:18-19, 258:25-259:1, 259:4-6, 259:12-13, 259:16, 259:20-24, 260:1-2, 260:6, 260:11, 260:18, 261:2, 261:11-15, 262:5-6, 262:12-13, 262:24-25, 263:10-12, 263:16-17, 263:23-264:2, 267:14-15, 273:9-10. Publicizing this information would provide Uber's competitors with valuable confidential information about Uber's confidential strategies in this area, which the competitors could potentially leverage in competing with Uber and use in their own relationships with non-profits.

19. **Data regarding Reports of Sexual Assault/Sexual Misconduct.** The Chandler Report, the Chandler Rebuttal, the Stodden Rebuttal, and the Incident Report Classification contain certain raw data (as well as calculations using that data) from Uber's internal systems, in particular Uber's Flack system. Chandler Rpt. ¶ 195; *id.* at Figures 63-67, 76-78; *id.* at App'x D ¶ 17; *id.* at Data Tables 1-3; Chandler Rebuttal at 21 n.65; Stodden Rebuttal ¶¶ 8.f, 9, 14 & nn.20-22, 17, 22, 29.c, 35, 44, 47, 58.a.-c. & nn.138 & 142; *id.* at Figures 2A & 2B; Keller Rpt. ¶¶ 9.1, 9.2, 30, 33, 35, 43-43.7 & nn. 62-64, 45-49, 78-80; *id.* at Table 1; *id.* at Figures 2, 4, 8; Keller Dep. at 229:6, 229:8, 229:10, 229:13, 260:22, 261:19, 264:10-11; Valliere Rpt. at 17; Incident Report Classification at 6-73 (rows containing category data).

---

[1] The Chandler Rebuttal has two figures labeled 2, and Uber is seeking to redact both of them.

1  Certain top-level raw data (total annual counts of sexual assault and sexual misconduct reports) from Uber's internal systems has been made public through the JCCP trial, as well as prior to that trial via a leak of sealed JCCP records to the *New York Times* in violation of the Protective Order. Uber is therefore not seeking to seal any of its raw top-level annual data. However, data concerning the breakdown of those topline numbers into taxonomy categories has not been made public and has instead been kept confidential within Uber. Moreover, these category data (which were produced from Uber's Flack system) are particularly sensitive, because the data reflect not merely how the reports come into Uber or how a human decisionmaker would classify them, but also the logic employed by the Flack system to choose a dominant category and eliminate duplication. The release of this data to Uber's competitors would provide them with insight that they could leverage in competing with Uber.

20.  The Keller Report also contains information about how the data are stored, labeled, and organized, and concerns the fields of information that are maintained by Uber. Keller Rpt. ¶¶ 18.2, 19.1-19.4; *id.* at App'x A. ¶¶ 25.2.1-25.2.4, 25.3, 25.4.1-25.4.4, 28.1-28.4, 30, 34-35, 40, 41.1-41.6, 42-43. The Incident Report Classification includes additional confidential information about how Uber stores, organizes, manages, and classifies its data. Incident Report Classification at 1-2, 5. This is also sensitive and confidential information that would be valuable to Uber's competitors to copy in their own data collection, organization, and analysis.

21.  For all of these reasons, it is essential that the competitively sensitive information set forth herein be maintained under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 21, 2025

*Gregory Brown*
GREG BROWN