1    [Submitting counsel below]

2

3

4                    UNITED STATES DISTRICT COURT

5                  OF NORTHERN DISTRICT OF CALIFORNIA

6                     SAN FRANCISCO DIVISION

7

8    **IN RE: UBER TECHNOLOGIES, INC.,**          No. 3:23-md-03084-CRB
     **PASSENGER SEXUAL ASSAULT**
9    **LITIGATION**                                **PLAINTIFF'S OPPOSITION TO**
                                                   **DEFENDANTS' MOTION FOR PARTIAL**
10                                                 **SUMMARY JUDGMENT**

11   This Document Relates to:                     Judge: Honorable Charles R. Breyer
                                                   Date:  January 6, 2026
12   *Jaylynn Dean v. Uber Techs., Inc.*,          Time:  10:00 A.M. PT
     N.D. Cal. No. 23-cv-06708                     Ctrm.:  6-17th Floor
13   D. Ariz. No. 25-cv-4276
                                                   **REDACTED**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 1

I.    In the face of known risks, Uber promoted itself as safe transportation for women. ......... 1

    A.    Uber's business model creates a risk of sexual assault. ........................................... 1

    B.    Uber advertised itself as a provider of safe transportation for women, and Jaylynn Dean trusted Uber to provide it. ................................................................ 2

    C.    Uber provides transportation by matching riders with drivers, and Uber knows it must make the safest match possible. ............................................................ 3

II.   Uber recklessly paired Jaylynn Dean with Hassan Turay. ................................................. 4

    A.    Uber knew Ms. Dean's trip carried a high risk for sexual assault. ......................... 4

    B.    Uber did not try to make the safest match possible for Ms. Dean, but instead, knowingly chose a high-risk match. ......................................................... 5

    C.    When Uber matched Mr. Turay with Ms. Dean, it was aware of red flags indicating a high risk of sexual assault. ........................................................... 7

    D.    Uber tried to remain ignorant about sexual misconduct by Mr. Turay during prior Uber rides. .............................................................................................. 9

III.  Uber knew that mandatory video recording and woman:woman matching would deter sexual assault, but chose not to implement either program. .................................... 11

ARGUMENT ............................................................................................................. 12

I.    Plaintiff's respondeat superior and ostensible agency claims may proceed to trial. ......... 12

    A.    The Arizona Labor Code does not preclude respondeat superior or ostensible agency claims against Uber. ............................................................... 12

        1.    The text does not encompass common-law vicarious liability. ................ 12

        2.    Context shows focus on labor issues, not vicarious liability. .................. 14

        3.    Arizona requires explicit statements to preclude common law liability. ................................................................................................ 14

        4.    Uber's trial court orders support Plaintiff's position. ............................ 15

    B.    Sufficient evidence supports Plaintiff's ostensible agency claim. ......................... 15

        1.    Plaintiff relied on agency because, based on Uber's representations, she sought services from Uber, not its drivers. ......................................... 15

        2.    Whether Uber's Terms of Use defeat reliance is a fact question. ............. 17

    C.    In Arizona, sexual torts may be within the scope of employment. ........................ 19

II.   Plaintiff's Gender Matching theory properly challenges the design of Uber's app. ......... 21

III.  Uber's compliance with Arizona's TNC statute does not preclude punitive damages. ................................................................................................................ 21

    A.    A.R.S. § 12-689 applies only to certain products liability claims ........................ 23

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | Page |
|---|---|---|---|
| | B. | Plaintiff's two products liability claims do not involve an "object." | 24 |
| | C. | Even if A.R.S. § 12-689 applied to non-products claims, it exempts from punitive damages only "actions" approved by the government. | 25 |
| | D. | Plaintiff seeks punitive damages for actions not authorized by statute. | 26 |
| | E. | Uber's atextual interpretation of the statute leads to absurd results. | 29 |
| | F. | In any event, whether Uber complied with the TNC statute is a fact question. | 30 |
| CONCLUSION | | | 30 |

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Bolin*,
    247 P.2d 617 (Ariz. 1952) ................................................................................. 13

*Antone v. Greater Ariz. Auto Auction*,
    155 P.3d 1074 (Ariz. App. 2007) ....................................................................... 23

*Brown v. Ariz. Dep't of Real Est.*,
    890 P.2d 615 (Ariz. App. 1995) .................................................................... 12, 17

*Casey v. Wright Med. Tech., Inc.*,
    2020 WL 736306 (D. Ariz. Feb. 13, 2020) ........................................................ 23

*Chandrasekhar v. Koszyk-Szewczyk*,
    2023 WL 11909594 (Ariz. Super. Ct. July 11, 2023) ......................................... 17

*City of Sunrise v. Ariz. Corp. Comm'n*,
    437 P.3d 865 (Ariz. 2019) ............................................................................ 13, 24

*Coulbourn v. Air & Liquid Sys. Corp.*,
    No. 13-8141, ECF 896 (D. Ariz. May 12, 2016) ................................................ 25

*Coulbourn v. Crane Co.*,
    728 F. App'x 679 (9th Cir. 2018) .................................................................. 25, 26

*Craten v. Foster Poultry Farms, Inc.*,
    2018 WL 834937 (D. Ariz. Feb. 13, 2018) ........................................................ 27

*Doe v. Roman Cath. Church of Diocese of Phoenix*,
    533 P.3d 214 (Ariz. App. 2023) ......................................................................... 20

*Engler v. Gulf Interstate Eng'g, Inc.*,
    258 P.3d 304 (Ariz. App. 2011), *aff'd*, 280 P.3d 599 (Ariz. 2012) ................... 14

*Engler v. Gulf Interstate Eng'g, Inc.*,
    280 P.3d 599 (Ariz. 2012) .................................................................................. 20

*Fadely v. Encompass Health Valley of the Sun Rehab. Hosp.*,
    515 P.3d 701 (Ariz. App. 2022) ............................................................. 16, 17, 18

*Fann v. State*,
    493 P.3d 246 (Ariz. 2021) .................................................................................. 13

*Fields v. Elected Offs.' Ret. Plan*,
    320 P.3d 1160 (Ariz. 2014) ................................................................................ 13

*Grubb v. Do It Best Corp.*,
    279 P.3d 626 (Ariz. App. 2012) ......................................................................... 23

*Hess v. Bumbo Int'l Tr.*,
    2014 WL 12527216 (D. Ariz. Sept. 11, 2014) ................................................... 26

*Higgins v. Assmann Elecs., Inc.*,
    173 P.3d 453 (Ariz. App. 2007) ......................................................................... 19

**TABLES OF EXHIBITS AND EXPERT REPORTS**
**(continued)**

*Iman v. Bolin*,
    404 P.2d 705 (Ariz. 1965) ............................................................................. 13

*In re Sky Harbor Hotel Props., LLC*,
    443 P.3d 21 (Ariz. 2019) ............................................................................... 16

*Kaplan v. Coldwell Banker Res Affils.*,
    59 Cal. App. 4th 741 (1997) .......................................................................... 18

*Larson v. Berumen*,
    1997 WL 608676 (9th Cir. Oct. 27, 1997) ............................................... 20, 21

*Markow v. Rosner*,
    3 Cal. App. 5th 1027 (2016) ..................................................................... 18, 19

*Matter of Conservatorship of Chalmers*,
    571 P.3d 885 (Ariz. 2025) ............................................................................. 23

*McBroom v. Ethicon, Inc.*,
    2022 WL 604889 (D. Ariz. Mar. 1, 2022) ..................................................... 25

*Menendez v. Paddock Pool Constr. Co.*,
    836 P.2d 968 (Ariz. App. 1991) ..................................................................... 24

*Orca Commc'ns Unlimited, LLC v. Noder*,
    337 P.3d 545 (Ariz. 2014) ............................................................................. 15

*Reed v. Gershweir*,
    772 P.2d 26 (Ariz. App. 1989) ....................................................................... 15

*Rochon v. Grant*,
    2017 WL 1180221 (Ariz. App. Mar. 30, 2017) .............................................. 23

*Santiago v. Phoenix Newspapers, Inc.*,
    794 P.2d 138 (Ariz. 1990) ............................................................................. 12

*Smith v. Am. Exp. Travel Related Servs. Co., Inc.*,
    876 P.2d 1166 (Ariz. App. 1994) ................................................................... 21

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002) ........................................................................................ 13

*State ex rel. Conway v. Super. Ct.*,
    131 P.2d 983 (Ariz. 1942) ............................................................................. 13

*State of the Netherlands v. MD Helicopters, Inc.*,
    478 P.3d 230 (Ariz. 2020) ......................................................................... 13, 14

*State v. Brown*,
    577 P.3d 14 (Ariz. 2025) ........................................................................... 14, 24

*State v. Estrada*,
    34 P.3d 356 (Ariz. 2001) ............................................................................... 29

*State v. Schallock*,
    941 P.2d 1275 (Ariz. 1997) ................................................................. 19, 20, 21

## TABLES OF EXHIBITS AND EXPERT REPORTS
### (continued)

*Stencel v. Lyft*,
    2024 WL 4008752 (N.D. Cal. Aug. 29, 2024)........................................................... 21

*Tavilla v. HealthSouth Valley of the Sun Rehab. Hosp*,
    2014 WL 117313 (Ariz. App. Jan. 14, 2014) .......................................................... 16

*Torres v. Goodyear Tire & Rubber Co., Inc.*,
    786 P.2d 939 (Ariz. 1990).......................................................................................... 23

*Trisha A. v. Dep't of Child Safety*,
    446 P.3d 380 (Ariz. 2019) .......................................................................................... 14

*United States v. Pascoe*,
    2024 WL 3527254 (W.D. Ky. July 24, 2024)........................................................... 24

*Watts v. Medicis Pharm. Corp.*,
    365 P.3d 944 (Ariz. 2016) .......................................................................................... 24

*Wilks v. Manobianco*,
    352 P.3d 912 (Ariz. 2015)........................................................................................... 15

## STATUTES

A.R.S. § 1-201 ............................................................................................................. 13, 14

A.R.S. § 12-682 .................................................................................................................. 24

A.R.S. § 12-689 ............................................................................................................. passim

A.R.S. § 12-689(A)(1) ...................................................................................................... 25

A.R.S. § 12-689(A)(2) ................................................................................................. 22, 25

A.R.S. § 12-689(D)(1) ...................................................................................................... 22

A.R.S. § 12-689(D)(4) ................................................................................................. 22, 24

A.R.S. § 12-689(D)(6) ........................................................................................ 22, 23, 25

A.R.S. § 12-820.04 ............................................................................................................ 30

A.R.S. § 23-1361 ............................................................................................................... 14

A.R.S. § 23-1502 ............................................................................................................... 14

A.R.S. § 23-1603 ............................................................................................................... 12

A.R.S. § 23-1603(A) ................................................................................................... 12, 13

A.R.S. § 23-420 ................................................................................................................. 14

A.R.S. § 23-479 ................................................................................................................. 14

A.R.S. § 23-491.10 ............................................................................................................ 14

A.R.S. § 23-909 ................................................................................................................. 14

A.R.S. § 28-9552 ............................................................................................................... 27

A.R.S. § 28-9552(C) .......................................................................................................... 29

A.R.S. § 28-9555 ............................................................................................................... 28

**TABLES OF EXHIBITS AND EXPERT REPORTS**
**(continued)**

A.R.S. § 28-9555(B)(2) .......................................................................................... 29

A.R.S. § 28-9555(B)(4) .......................................................................................... 30

A.R.S. § 32-1982 .................................................................................................. 14

A.R.S. §§ 28-9551-58 ............................................................................................ 30

A.R.S. §§ 28-9554(B)-(C) ...................................................................................... 28

A.R.S. Title 23 ..................................................................................................... 14

**OTHER AUTHORITIES**

Restatement (Second) of Agency (1958) ................................................................. 16

Restatement (Third) of Torts: Prod. Liab. (1998) ................................................... 23

## TABLES OF EXHIBITS AND EXPERT REPORTS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1 | June 11-12, 2025, 30(b)(6) Deposition of Elizabeth Ross |
| 2 | Ex. 3308-B to the 30(b)(6) Deposition of Hannah Nilles |
| 3 | Ex. 434 to the Deposition of Gus Fuldner |
| 4 | Ex. 2707 to the Deposition of Andrew Hasbun |
| 5 | Ex. 1110 to the 30(b)(6) Deposition of Greg Brown |
| 6 | Ex. 2005 to the 30(b)(6) Deposition of Mariana Esteves |
| 7 | August 28, 2025, 30(b)(6) Deposition of Mariana Esteves |
| 8 | June 27, 2025, Deposition of Jaylynn Dean |
| 9 | June 30, 2025, 30(b)(6) Deposition of Hannah Nilles |
| 10 | Ex. 1052 to the 30(b)(6) Deposition of Elizabeth Ross |
| 11 | August 25-26, 2025, 30(b)(6) Deposition of Greg Brown |
| 12 | Ex. 1966B to the 30(b)(6) Deposition of Greg Brown |
| 13 | Ex. 1693 to the 30(b)(6) Deposition of Greg Brown |
| 14 | Ex. 1092 to the 30(b)(6) Deposition of Greg Brown |
| 15 | Ex. 2000 to the 30(b)(6) Deposition of Mariana Esteves |
| 16 | March 26-27, 2025, Deposition of Gus Fuldner |
| 17 | June 25, 2025, 30(b)(6) Deposition of Sunny Wong |
| 18 | July 15, 2025, 30(b)(6) Deposition of Greg Brown |
| 19 | July 16, 2025, 30(b)(6) Deposition of Greg Brown |
| 20 | Ex. 2003 to the 30(b)(6) Deposition of Mariana Esteves |
| 21 | July 23, 2025, Deposition of Hassan Turay |
| 22 | Turay Driver's License, UBER-MDL3084-BW-00027896 |
| 23 | Ex. 1884 to the 30(b)(6) Deposition of Hannah Nilles |
| 24 | Ex. 283 to the Deposition of Tracey Breeden |
| 25 | Ex. 613 to the JCCP Deposition of Kate Parker |
| 26 | Intentionally omitted |
| 27 | Ex. 1692 to the 30(b)(6) Deposition of Greg Brown |
| 28 | August 7, 2025, 30(b)(6) Deposition of Hannah Nilles |
| 29 | Ex. 1239 to the 30(b)(6) Deposition of Sunny Wong |
| 30 | Ex. 2067A to the 30(b)(6) Deposition of Sunny Wong |
| 31 | July 23, 2025, 30(b)(6) Deposition of Sunny Wong |
| 32 | Ex. 1240 to the 30(b)(6) Deposition of Sunny Wong |
| 33 | Ex. 1249 to the 30(b)(6) Deposition of Sunny Wong |
| 34 | Ex. 1248 to the 30(b)(6) Deposition of Sunny Wong |
| 35 | Ex. 3900 to the Deposition of Michael Akamine |
| 36 | July 23, 2025, 30(b)(6) Deposition of Hannah Nilles |
| 37 | Ex. 636 to the Deposition of Roger Kaiser |
| 38 | Ex. 1062 to the 30(b)(6) Deposition of Elizabeth Ross |
| 39 | Ex. 1049 to the 30(b)(6) Deposition of Elizabeth Ross |
| 40 | Ex. 1570 to the 30(b)(6) Deposition of Todd Gaddis |
| 41 | Ex. 1736 to the 30(b)(6) Deposition of Greg Brown |
| 42 | Ex. 1102 to the 30(b)(6) Deposition of Greg Brown |
| 43 | Ex. 1930 to the 30(b)(6) Deposition of Greg Brown |
| 44 | Document Bates UBER_JCCP_MDL_000108957 |
| 45 | Ex. 1104 to the 30(b)(6) Deposition of Greg Brown |
| 46 | Ex. 1101 to the 30(b)(6) Deposition of Greg Brown |
| 47 | Ex. 617 to the JCCP Deposition of Kate Parker |
| 48 | July 1, 2025, Deposition of Dara Khosrowshahi |
| 49 | Ex. 1100 to the 30(b)(6) Deposition of Greg Brown |
| 50 | July 11, 2025, Deposition of Todd Gaddis |
| 51 | June 17, 2025, 30(b)(6) Deposition of Greg Brown |

## TABLES OF EXHIBITS AND EXPERT REPORTS
### (continued)

| | |
|---|---|
| 52 | Ex. 1883 to the 30(b)(6) Deposition of Hannah Nilles |
| 53 | October 14, 2025, 30(b)(6) Deposition of Sunny Wong |
| 54 | July 15, 2025, 30(b)(6) Deposition of Mariana Esteves |
| 55 | Ex. 2071 to the 30(b)(6) Deposition of Sunny Wong |
| 56 | Ex. 2202 to the Deposition of Gus Fuldner |
| 57 | Ex. 1243 to the 30(b)(6) Deposition of Sunny Wong |
| 58 | Ex. 645 to the Deposition of Roger Kaiser |
| 59 | May 13, 2025, Deposition of Rebecca Payne |
| 60 | Ex. 2549 to the Deposition of Rebecca Payne |
| 61 | Ex. 1197 to the Deposition of Jill Hazelbaker |
| 62 | Uber Techs., Inc. 2025 Proxy Statement |
| 63 | Document Bates ACCURATE001 |
| 64 | Document Bates UBER-MDL3084-BW-00012056 |
| 65 | Document Bates CHECKR000891 |
| 66 | Document Bates UBER_JCCP_MDL_005696277 |
| 67 | Document Bates CHECKR000894 |
| 68 | Second August 7, 2025, 30(b)(6) Deposition of Hannah Nilles |
| 69 | Turay 2016 Georgia Driver's License, UBER-MDL3804-BW-00027874 |
| 70 | Document Bates UBER-MDL3084-DFS00003621 |
| 71 | Expert Report of Robert Johnson |
| 72 | Ex. 1055 to the 30(b)(6) Deposition of Elizabeth Ross |
| 73 | Expert Report of Jason Morris |

| EXPERT REPORT | LOCATION |
|---|---|
| Chandler Report | ECF 4342 |
| Drumwright Report | ECF 4352-1 |
| Feldis Report | ECF 4344-1 |
| Johnson Report | Exhibit 71 |
| Keller Report | ECF 4338 |
| Morris Report | Exhibit 73 |
| Rando Report | ECF 4348 |
| Tremblay Report | ECF 4350 |
| Valliere Report | ECF 4340 |
| Weiner Report | ECF 4346 |

1

**INTRODUCTION**

2        Jaylynn Dean was raped by an Uber driver. Uber knew that the circumstances of her

3    ride—a young woman, near a bar, late at night—were among the most dangerous. Rather than

4    protect her, Uber targeted its marketing to women just like her and rides just like hers. Uber also

5    knew the driver was dangerous, based on both his driving history and Uber's own risk-assessment

6    algorithm. On top of that, Uber refused to adopt safety measures that would have protected Ms.

7    Dean. Except for fraud and GPS Alert strict products liability claims (which Ms. Dean will not

8    pursue), Uber's motion should be denied.

9

**BACKGROUND**

10   **I.**    **In the face of known risks, Uber promoted itself as safe transportation for women.**

11        Uber built its success by encouraging women to trust the company to provide safe rides.

12    Until 2023, Uber was unprofitable. *See* Ex. 71 at slide 4. Emerging from the scandal-plagued

13    Kalanick years and COVID, Uber decided that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 72 at slide 4. The key? ▮▮▮▮▮▮▮

15    ▮▮▮ *Id.* at slide 20. How to do it? ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16    ▮▮▮ *Id.* The strategy paid off big: Uber turned a $2.2 billion profit in 2023, a $9.8 billion

17    profit in 2024, and never looked back. Ex. 71 at slide 4. Jaylynn Dean, raped in November 2023,

18    was the price of this strategy.

19    **A.**    **Uber's business model creates a risk of sexual assault.**

20        Uber knew putting passengers in an isolated setting with a complete stranger creates a risk

21    of sexual assault. Ex. 1 at 390:2-9. It knew that predators ▮▮▮▮▮▮▮▮▮▮▮

22    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2 at 3585. By 2017, Uber's

24    research confirmed: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26    ▮▮▮▮ Ex. 3 at .0005. From 2017 through 2024, an incident "was reported to Uber [on

27    average] every eight (7.7) minutes." Keller Rpt. at 20. By 2018, Uber's Head of Global Safety

28    Communications stated the obvious: ▮▮▮▮▮▮▮▮▮▮▮ Ex. 4 at -908.

**B.**    Uber advertised itself as a provider of safe transportation for women, and Jaylynn Dean trusted Uber to provide it.

Uber knew that the key to getting women to use the platform was safety, and that women like Ms. Dean rely on Uber's safety marketing. It is ███████████ that ███████████ ███████████████████████████ Ex. 9 at 110:18-25. That is the point of Uber's marketing, to ███████████████ Ex. 10 at -159497. Uber spends billions annually on marketing. Drumwright Rpt. at 75-76. Uber gives riders assurance so they will give up control: ███████████████████████████████ ███████████████████████████████ ███ Ex. 10 at -159561-62.

Uber concluded: ███████████████████████████ ██████ Ex. 5 at -67467. The ██████ is not in random drivers to provide a safe ride, but in *Uber* to do so. Ex. 10 at -159499 (███████████████████████████████) (emphasis supplied). Accordingly, Uber's core safety message is that *Uber* provides the rides, not drivers acting independently: ███████████; ████████████████; ██ ███████████ Ex. 1 at 560:6-567:4 (emphases added). Uber "describes *itself* as providing rides to people." *Id.* at 556:6-14 (emphasis added). Uber held itself out as responsible for a safe ride: ███████████████ *Id.* at 142:24-143:20 (emphasis added). Uber ███████████████ ███████████████████████ Ex. 6 at -9181 (emphasis added); *see also* Ex. 7 at 99:11-103:8. Because trust in *Uber* is the company's strategy to get people in cars, passengers, especially women, believe in and rely on the fact that Uber is responsible for the transportation through its drivers—not that it is merely a clearinghouse for people to find rides. *See* Drumwright Rpt. at ¶¶ 62, 171-92; *see also* Valliere Rpt. at 11 ("The passenger will voluntarily get into his car, even alone and/or late at night or when intoxicated, because she called an 'Uber.'").

Jaylynn Dean saw and relied on these specific messages. For example, when she went into the app store to download the Uber app in November 2023, she was met with and reassured by Uber's promise of safety, a promise grounded in the "*we*" providing transportation: "Request and Ride *with Uber*." Ex. 38 at -7298 (emphasis added). The app description stated: "Join the millions

1   of riders who *trust Uber* for their everyday travel needs." *Id.* at -7311 (emphases added). She saw

2   messages in the app store, as well as on social media. Ex. 8 at 194:19-195:13, 263:8-21. As Uber

3   intended, Ms. Dean did not do her own research but relied on what she had seen and heard about

4   Uber's safety. *Id.* at 190:15-192:14.

5           Uber assurances continue throughout the user experience. Whenever Ms. Dean requested

6   a ride from Uber, Uber presented a photograph of the Uber driver, along with a star rating graphic

7   and numerical rating. Ex. 11 at 298:25-299:5; Ex. 18 at 173:19-174:8; Ex. 12. Uber presented the

8   graphic and number to create a ▓▓▓▓▓▓▓▓▓ Ex. 13 at -2667, even though it knew that star

9   ratings were ▓▓▓▓▓▓ Ex. 14 at slide 9; *see also* Ex. 11 at 367:10-16. Uber knew that star

10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11  ▓▓▓▓▓▓▓▓ Ex. 15 at -322930. Uber also bombards its passengers with safety messaging

12  directly to their inboxes and phones. *See* Chandler Rpt. at 101-02 (Ms. Dean received 2,670

13  messages between April 2023 and March 2025, an estimated 73% of which were safety-focused).

14          **C.    Uber provides transportation by matching riders with drivers, and Uber**
15              **knows it must make the safest match possible.**

16          Uber is a transportation provider. It "offers to sell rides to people," and "does, in fact, sell

17  rides to people." *See* Ex. 1 at 556:20-557:1. But Uber does not function like Airbnb or other

18  platforms that allow the customer to browse and then select from independent providers. Instead,

    when a passenger wants a ride, she uses the Uber app to send the request to Uber. *See* Ex. 16 at
19
    84:9-15. When Uber receives a ride request, it pairs and dispatches a particular driver. *See* Ex. 17
20
    at 131:16-20. Uber chooses which driver to dispatch. *See id.* at 133:20-134:3; *see also* Ex. 18 at
21
    157:9-159:6. Uber does not give riders a menu of drivers to choose from. *See* Ex. 19 at 359:4-14.
22
    A rider has no input into which driver is dispatched to her. *See* Ex. 18 at 159:7-10.
23
            Uber's "technology for matching Uber drivers and riders is central to how Uber runs its
24
    transportation network. Its proprietary algorithms process more than 30 million potential pairings
25
    per minute." Weiner Rpt. at ¶ 134. Uber knows it ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
26
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 17 at 191:10-13. It knows it needs
27
    to make the safest match possible: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
28

1    ████████ Ex. 20 at -4362.

2    **II.    Uber recklessly paired Jaylynn Dean with Hassan Turay.**

3         **A.    Uber knew Ms. Dean's trip carried a high risk for sexual assault.**

4         On November 15, 2023, at 12:20 a.m., Ms. Dean, a 19-year old woman, had no input

5    regarding which driver Uber selected for her. Ex. 18 at 159:7-11; Ex. 8 at 21:2-7. Uber chose to

6    match her with Hassan Turay, a 49-year-old man. *See id.* at 157:7-13; Ex. 21 at 7:16-17; Ex. 22.

7         Uber had the power to make a safe match: ████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████ Ex. 23 at -1343.

10   And Uber knew Ms. Dean was extra vulnerable to sexual assault.

11        *First*, the gender pair. Uber knew that ████████████████████████

12   ████████████ Ex. 24 at -1626, and that ████████████████████

13   ████████ for sexual assault. Ex. 25 at -3562. *Second*, the circumstances. Ms. Dean's ride was

14   requested after midnight. *See* Ex. 27; Ex. 18 at 153:1-9. Uber knows that ████████████

15   ████████████████ Ex. 23 at -1343; Ex. 28 at 434:11-439:9. The sexual

16   assault rate increases ████████████ Ex. 29 at -.9.

17        Worse, Ms. Dean's pickup location was from an area populated with bars. The pickup

18   location was listed in Google Maps as a "Kitchen Bar." Tremblay Rpt. at Schedule A.1 p. 14 ¶ vi.

19   There were 3 bars within 150 meters. Ex. 30 at row 57 (████████████ is 3); Ex. 31 at

20   177:8-14 ████████████████████████████████████████

21   ████████████████). Uber knows that ████████████████████

22   ████████████████████████████ Ex. 32 at -.2;

23   *see also* Ex. 17 at 176:16-23 ████████████████████████████). Trips that

24   end in sexual assaults are ██ more likely to be requested from areas ████████████

25   Ex. 33 at -.7. The risk ████████████████████ Ex. 34 at -.12.

26        The root cause of this elevated risk, as Uber knows, is intoxication: ████████████

27   ████████████████████████████ Ex. 35; *see also* Ex. 36

28   at 241:19-243:10. Yet Uber targeted people who had been drinking. Valliere Rpt. at ¶ 7. It did so

1   because it knew that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 37 at .0018. Uber knowingly

2   put riders like Ms. Dean at risk. *See id.* at .0015 (identifying ▓▓▓▓▓▓▓▓▓▓▓).

3          Uber concealed the elevated risk of sexual assault when of riding Uber while intoxicated,

4   or late at night, since (in Uber's words) disclosure could ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 39 at -0358. As intended, the ads that Ms.

7   Dean saw made her believe that Uber was a safe option for people who had been drinking. Ex. 8

8   at 190:15-192:14. Ms. Dean never saw Uber say anything about potential risks. *Id.* at 263:18-24.

9          **B.     Uber did not try to make the safest match possible for Ms. Dean, but instead,**
              **knowingly chose a high-risk match.**

10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11  ▓▓▓▓▓▓▓▓▓. Ex. 53 at 361:12-17; Ex. 17 at 149:7-11. ▓▓▓▓▓▓▓▓

12  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 17 at 131:11-20. ▓▓▓▓▓▓▓▓

13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 39:12-17; Ex. 32 at -.16;

14  Ex. 53 at 365:21-24. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15  ▓▓▓▓▓▓▓▓▓. *Id.* at 361:12-17 and 367:23-368:2.

16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17  Ex. 32 at -.3. If acted on responsibly, S-RAD is powerful and effective. ▓▓▓▓▓▓

18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19  ▓▓▓▓▓▓▓▓▓ Ex. 17 at 33:18-23. It ▓▓▓▓▓▓▓▓

20  ▓▓▓▓▓▓▓▓▓▓ Ex. 29 at -.3. ▓▓▓▓▓▓▓▓

21  ▓▓▓▓▓▓ *See* Ex. 17 at 42:15-43:3, 47:3-24; Ex. 53 at 361:12-17.

22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Weiner Rpt. at ¶¶ 155, 168-169. ▓▓▓▓

25  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 53 at 409:14-410:17; Ex. 31 at

26  265:2:-271:1; Ex. 57 at -.5. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

27  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 53 at 365:15-20,

28

1   411:11-412:16.

2          The night Uber sent Mr. Turay to drive Ms. Dean,

3                                                              Ex. 53 at 403:15-

4   404:11; Ex. 56. Uber knew that, in general,

5          . Ex. 17 at 171:13-23. And Uber knew that                              .

6   Ex. 53 at 409:2-8; Ex. 55.

7                              . *Id.* at 369:19-22, 380:16-381:4; Ex. 55. And it was

8                                                              . ECF 4483-3.

9          Nonetheless, Uber did not intervene and look for an alternate driver for Ms. Dean. Ex. 53

10  at 411:22-413:14, 426:24-427:11. Nor did Uber warn Ms. Dean that

11                                                              , or give her option to wait for a

12  safer pairing. Instead, Uber sent Mr. Turay to Ms. Dean with no warning. It did so because

13                                                              . *Id.* at 399:25-

14  400:3. Uber                                      Weiner Rpt. at ¶ 155.

15

16                        Ex. 17 at 155:23-156:17, 159:1-5.

17

18                              Ex. 53 at 396:12-24.

19

20                        *Id.* at 385:24-391:10.

21

22                                          *Id.* at 398:19-399:9.

23                                          Weiner Rpt. at

24  ¶ 156.

25

26                              Ex. 17 at 127:14-129:17.

27

28

1

**C.**    **When Uber matched Mr. Turay with Ms. Dean, it was aware of red flags indicating a high risk of sexual assault.**

2

3    Uber knew Mr. Turay posed a high risk of sexual assault based on multiple red flags in his

file. Since 2016, when Uber hired Mr. Turay, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 23 at -1343. In November 2023,

5

when it matched Ms. Dean (a 19-year-old woman getting picked up after midnight from a bar

6

location) with Mr. Turay, it knew of multiple such ▓▓▓▓▓▓▓▓▓▓▓▓ for Mr. Turay.

7    **Feedback tags:** At the end of every ride, Uber constrains rider feedback about drivers to a

8

multiple-choice menu of feedback tags. Rando Rpt. at ¶¶ 135-43. Back in 2017, when riders

9

could add open-text feedback, words like "inappropriate behavior," "flirt," "creepy," and "rude"

10

signaled a 15x higher risk of future sexual assault. Weiner Rpt. at ¶ 148. Now, Uber's menu

11

provides "no option for 'sexual assault,' 'sexual misconduct,' 'driver misconduct,' 'inappropriate

12

behavior,' or 'safety issue.'" Rando Rpt. at ¶¶ 155-56. Despite this, tags still provide a ▓▓▓▓

13

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 46 at

14

slide 6; *see also* Rando Rpt. at ¶ 145. Uber had ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15

▓▓▓▓▓▓▓▓▓ Ex. 44 at -8960. Specifically, Uber found that ▓▓▓▓▓▓▓▓

16

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 43 at -3495.

18    Before it matched him with Ms. Dean, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Tremblay Rpt. at Schedule A.1, p.

20

11, ¶ 6; Ex. 11 at 272:6-273:2. In addition, during a single year, ▓▓▓▓▓▓▓▓▓▓

21

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22

*Id.* at 277:10-279:1; *see also* Ex. 43 at -3480 ▓▓▓▓▓▓▓▓▓▓▓. Uber's feedback

23

interface provides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25

▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 11 at 279:2-14.

26    **One-star ratings**: While a stray bad review is not necessarily a "red flag," ▓▓▓▓

27

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

28

1    Ex. 33 at -.11. In 2017, Uber concluded that the

2    Ex. 52 at 15.

3    Ex. 53 at 431:8-16.

4    *Id.* at 430:4-431:7. He had received 62

5    1-star ███ ratings. Tremblay Rpt. at Schedule A.1, at p. 10, ¶ 2.

6    Ex. 18 at 119:1-5.

7    *Id.* at 119:6-13, 129:5-130:1.

8    **GPS "midway drop-off" anomalies**:

9    Ex. 17 at 221:17-222:4.

10    Ex. 18 at

11    126:10-127:2.

12    *Id.* at 126:19-127:2, 127:10-19. For example,

13    *Id.* at 143:5-24.

14    Before Uber matched him with Ms. Dean, there had already been 95 previous so-called

15    "midway drop offs" involving Mr. Turay. Tremblay Rpt. at Schedule A.1, at p. 11, ¶ 7.

16

17    Ex. 54 at 217:8-17; Ex. 11 at 420:2-17. Uber does not follow up

18    on these known potential warning signs even if there is *no response* to its outreach. Ex. 54 at

19    103:22-104:8, 215:20-25. This case demonstrates the hollowness of this gesture:

20    Ex. 18 at 141:5-20.

21    **GPS "long stop" anomalies**:

22    Ex. 54 at 25:21-26:3.

23    Ex. 18 at 127:10-19; *see also* Ex. 11 at 80:4-9, 417:7-

24    418:4. For example, in another of the Wave 1 bellwether cases, the driver raped the rider for eight

25    minutes and ███████ Ex. 11 at 446:5-21. Before Uber

26    matched him with Ms. Dean, there had already been 119 long stop anomalies for Mr. Turay.

27    Tremblay Rpt. at Schedule A.1, at p. 11, ¶ 7. ███████ Ex. 54 at 217:8-17.

28

1

**D.**     <u>Uber tried to remain ignorant about sexual misconduct by Mr. Turay during prior Uber rides.</u>

2

When Uber chose to match Ms. Dean with Mr. Turay, ████████████████████

3

████████████████████████████████████████████████████████████████

4

Ex. 40 at -.005. ████████████████████████████████████████████████████

5

████████████████████████████ Ex. 33 at -.9. Yet Uber designed its reporting systems to

6

discourage sexual misconduct reporting, willfully depriving itself of critical information that

7

might have been reported by Mr. Turay's prior riders.

8

████████████████████████████████████████████████████████████████

9

████████████████████████████████████████ Ex. 40 at -.005. It said:

10

████████████████████████████████████████████████████████████████

11

████████████████████████████████████ *Id*. Uber knew it needed to

12

████████████████████████████████████ Ex. 41 at -.0006-7. It recognized the

13

need to ████████████████████████ *Id*. This was a time-critical safety issue: ████████

14

████████████████████████████████████████████████████████████████

15

████████████████████████████████████████████████████ *Id.*.

16

Uber never tried to fix its reporting systems. Rando Rpt. at ¶ 59. ████████████

17

████████████████████████████████████████████████████████████████

18

████████████████████████████████████████████████████████████████

19

████████████████████ Ex. 42 at 2. It also found: ████████████████████

20

████████████████████████████████████ *Id*. And: ████████████████████

21

████████████████████████████████████████████████████████████████

22

████████████████ . at 10. Uber claims to proactively gather incident reports through other

23

"reporting channels," but each is fraught with usability problems. Rando Rpt. at 33-45.

24

Instead, the most likely place for passengers to report low-level sexual misconduct like

25

leering or flirting ("early-warning signals") is the Feedback and Ratings Screen that pops up at

26

the end of every Uber trip. *Id.* at ¶¶ 135-143. But Uber constrained the Feedback and Ratings

27

Screen to a multiple-choice menu that does not include sexual misconduct or sexual assault. *Id.* at

28

PL'S SUMM. J. OPP'N
CASE NO. 3:23-MD-03084

¶ 155. And Uber refused to modify the Screen to improve sexual misconduct reporting. At one point, ██████████████████████████████████████ Ex. 43 at -3480. ████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
Ex. 44 at -8959. ████████████████████████
████████████████████████████████████████

*Id.* at -8957. That was the end of the conversation.
████████████████████████████████████████
████████████████████████████████████████
Ex. 45 at slide 10.
████████████████████████████████████████
████████████████████████████████████████
Ex. 46 at slide 9. It apparently went with option three: do nothing. Rando Rpt. at ¶ 146.

Uber's decision to deprive itself of "early warning" signals that would have helped it protect riders, was no accident. Uber does not want to know the full scale of its sexual assault problem. ████████████████████████████████

Ex. 47 at 1. Uber's executives have a strong disincentive to fix the reporting system.
████████████████████████████████, Ex. 16 at 76:10-77:8, and reports may reduce gross bookings and earnings—the ultimate metric of their compensation. *See* Ex. 62 at 51 (revenue growth maxed compensation regardless of safety performance). The company has so successfully stuck its head in the sand that ████████
████████████████████████████████
Ex. 48 at 110:19-111:10, 235:16-18, 277:25-278:5.

Had Uber tried to learn more about Mr. Turay, it would have. This lawsuit revealed, for example, that he repeatedly engaged in sexually inappropriate conduct, including flirting and asking passengers intimate sexual questions about their orgasms. *See* Ex. 21 at 77-78. It is hard to know the full scale of underreporting and the safety impact when it comes to drivers like Mr. Turay. That is by design. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 49 at -2901. ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Ex. 50 at 72:12-16, 112:19-24; *see also* Ex. 51 at 171:12-172:3, 172:21-173:20.

**III.   Uber knew that mandatory video recording and woman:woman matching would deter sexual assault, but chose not to implement either program.**

Uber knows it should make sure ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 20 at -4362. It knows that ▓▓▓▓▓▓▓▓▓▓▓▓▓ and that ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 58 at -2230. Mandatory dashcams were technologically feasible. Feldis Rpt. at 2-3. Yet, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 18 at 104:16-21. By his own admission, a mandatory dashcam would have deterred Mr. Turay from raping Ms. Dean. *See* Ex. 21 at 118:25-119:9.

Similarly, Uber failed to offer a woman:woman matching option ("W2W"). ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Ex. 59 at 1002:16-1003:21. Nonetheless, for years, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 60 at -2272. Uber claims that W2W was not "feasible," but, tellingly, once Ms. Dean and others like her came forward, Uber finally invested in and rolled out W2W. *See* Ex. 7 at 249:3-6.

\*      \*      \*

Uber has systematically chosen to prioritize growth, cost avoidance, and competition over protecting riders from sexual assault. *See* Weiner Rpt. at ¶¶ 116-133. ▓▓▓▓▓▓▓▓▓▓▓▓

me



Ex. 28 at 471:12-22.

Ex. 61 at -4015.

Ex. 28 at 471:12-22.

## ARGUMENT

I. **Plaintiff's respondeat superior and ostensible agency claims may proceed to trial.**

    A. **The Arizona Labor Code does not preclude respondeat superior or ostensible agency claims against Uber.**

Uber argues that A.R.S. § 23-1603 precludes vicarious liability by defining Uber drivers as independent contractors. Mot. § V.A.1. As an initial matter, the statute says nothing about Uber's liability for ostensible agency. Because ostensible agency turns on estoppel, not actual principal-agent relationships, an ostensible agent need not be any particular type of actual agent (employee or independent contractor). *See, e.g., Brown v. Ariz. Dep't of Real Est.*, 890 P.2d 615, 621 (Ariz. App. 1995) ("When a principal has intentionally or inadvertently induced a third person to believe an agency exists, an apparent or ostensible agency is created.").

The Arizona statute also does not affect Uber's common-law respondeat-superior liability. The statute provides: "A qualified marketplace contractor shall be treated as an independent contractor for all purposes under state and local laws, regulations and ordinances, including employment security laws … and workers' compensation laws …." A.R.S. § 23-1603(A). The crucial limitation is "state and local laws, regulations, and ordinances." Uber highlights the phrase "for all purposes," but the statute is clear that the only "purposes" that matter are those "under" the identified provisions of law. Common law principles are not "regulations" or "ordinances." So, the issue comes down to whether "state and local laws" include the common law of respondeat superior. *See Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 141 (Ariz. 1990) (setting out the common-law "right-to-control" test). They do not.

        1. **The text does not encompass common-law vicarious liability.**

The Arizona Supreme Court explains that the term "'Law' may have a broad or narrow

1  meaning, depending on context and legislative intent." *State of the Netherlands v. MD*

2  *Helicopters, Inc.*, 478 P.3d 230, 233 (Ariz. 2020). The "word is frequently used in a restricted

3  sense as meaning an act of the legislature only." *State ex rel. Conway v. Super. Ct.*, 131 P.2d 983,

4  986 (Ariz. 1942)[1] (quoted with approval in *MD Helicopters*); *see also Fann v. State*, 493 P.3d

5  246, 260 n.7 (Ariz. 2021) ("In Arizona, when the constitution authorizes taking an action 'by

6  law,' it refers to statutory law."); *Iman v. Bolin*, 404 P.2d 705, 708 (Ariz. 1965) ("[T]he word

7  ['law'] is often confined or refers only to statutes or legislative enactments.").

8      Here, "state and local laws" means positive enactments, not common law. *First*, the

9  Arizona code includes a "General Provision" concerning "[a]doption of the common law," which

10 distinguishes between "[t]he common law" and "the … laws of this state." A.R.S. § 1-201. So,

11 when a subsequent statute refers to "the...laws of this state," it does not include common law. And

12 the language here ("state … laws") is no different from "laws of this state."

13     *Second*, the term appears in the phrase "state and local laws." A.R.S. § 23-1603(A). States

14 and localities both promulgate positive enactments, but neither enacts common law, making the

15 phrase "most naturally read as not encompassing common-law claims..." *Sprietsma v. Mercury*

16 *Marine*, 537 U.S. 51, 62-63 (2002) (interpreting "a state or local law or regulation").

17     *Third*, Arizona courts avoid statutory interpretations that "render" text "superfluous."

18 *Fields v. Elected Offs.' Ret. Plan*, 320 P.3d 1160, 1164 (Ariz. 2014). Here, if "laws" meant any

19 legal principle at all, including common law, then the term would also encompass "regulations"

20 and "ordinances," rendering those words superfluous. *See Sprietsma*, 537 U.S. at 63 ("If 'law'

21 were read broadly so as to include the common law, it might also be interpreted to include

22 regulations, which would render the express reference to 'regulation' … superfluous.").

23     *Fourth*, the canon "[n]oscitur a sociis" applies "when several terms are associated in a

24 context suggesting the terms have some quality in common." *City of Sunrise v. Ariz. Corp.*

25 *Comm'n*, 437 P.3d 865, 870 (Ariz. 2019). Here, the words "laws" is associated with "regulations"

26 and "ordinances"—all positive enactments.

27     *Fifth*, Arizona courts apply the "presumption of consistent usage canon," under which "a

28

---

[1] *Overruled on other grounds*, *Adams v. Bolin*, 247 P.2d 617, 621 (Ariz. 1952).

word or phrase is presumed to bear the same meaning throughout a text." *Trisha A. v. Dep't of Child Safety*, 446 P.3d 380, 384 (Ariz. 2019) (citation omitted). When Arizona statutes cite "state or local laws," they typically do not mean common law. *See* A.R.S. § 32-1982 ("criminal conviction under any … state or local laws"); *id.* § 45-189 ("[S]tate or local laws imposing land or water use restrictions, or acreage limitations, or production quotas."); *id.* § 49-243 ("financial assurance … pursuant to other … state or local laws"). In contrast, when the Arizona legislature refers to the common law, it does so expressly—at least six times in the Labor Code alone. *See* A.R.S. §§ 23-909, 23-420, 23-491.10, 23-479, 23-1361, 23-1502.

### 2.    Context shows focus on labor issues, not vicarious liability.

Context matters too. *See MD Helicopters*, 478 P.3d at 233. Section 23-1603 modified the Labor Code, which addresses only matters concerning the economic relationship between workers and employers: the Industrial Commission, employment practices, workers' compensation, union rights, etc. *See* A.R.S. Title 23. When the Arizona legislature modifies tort liability, it typically places such provisions in Title 12 ("Courts and Civil Proceedings").

The legislature made this choice against a legal backdrop that has long treated workers' compensation and respondeat superior as distinct areas of law with different rules. The "reason workers' compensation law is not controlling in a tort action is that workers' compensation law and respondeat superior serve different purposes and, therefore, differ in scope and application." *Engler v. Gulf Interstate Eng'g, Inc.*, 258 P.3d 304, 311 (Ariz. App. 2011), *aff'd*, 280 P.3d 599 (Ariz. 2012). Given that well-established principle, it would be strange for the legislature to eliminate liability through the Labor Code, which does not govern vicarious liability. *See, e.g.*, *State v. Brown*, 577 P.3d 14, 25 (Ariz. 2025) ("We presume that the Legislature knows the existing law when it enacts or modifies a statute.") (citation and alteration omitted).

### 3.    Arizona requires explicit statements to preclude common law liability.

In Arizona, the "common law … shall be the rule of decision in all courts of this state" unless "repugnant to or inconsistent with the … laws of this state." A.R.S. § 1-201. Accordingly, courts require that if "the legislature seeks to preempt a [common-law] cause of action, the law's text or at least the legislative record should say so explicitly." *Orca Commc'ns Unlimited, LLC v.*

1    *Noder*, 337 P.3d 545, 547 (Ariz. 2014) (citation omitted). Courts "interpret statutes with every

2    intendment in favor of consistency with the common law." *Wilks v. Manobianco*, 352 P.3d 912,

3    915 (Ariz. 2015) (citation omitted). Here, the text evinces concern with labor relations, not tort

4    liability to third persons. The statute does not mention tort liability at all. Under Arizona's settled

5    interpretive framework, that silence is dispositive.

6    **4.    Uber's trial court orders support Plaintiff's position.**

7    Uber cites three unpublished trial court cases. Mot. at 13 n. 13. Those cases support

8    Plaintiff, not Uber. Each case, even though it referenced § 23-1603, analyzed the plaintiffs'

9    vicarious liability claims under the common-law "right to control" standard. For example, in

10    *Davis v. Doordash, Inc.*, No. 22-2745 (Ariz. Super. Ct. May 9, 2025) [filed at ECF 4398-5], the

11    court noted the defendant's argument that its driver was an independent contractor under § 23-

12    1603, and then ignored it entirely. *Id.* at 3. Instead, the court, citing *Santiago*, applied the

13    common-law test. *See id.* at 3-4 (concluding that "DoorDash does not … control the method and

14    means of its driver's work" and only has a right of "limited control"). If the statute displaced the

15    common-law analysis, then *Davis* would have said so.

16    **B.    Sufficient evidence supports Plaintiff's ostensible agency claim.**

17    An "apparent or ostensible agent is one where the principal has intentionally or

18    inadvertently induced third persons to believe that such a person was his agent although no actual

19    or express authority was conferred on him as agent." *Reed v. Gershweir*, 772 P.2d 26, 28 (Ariz.

20    App. 1989) (citations omitted). Here, Uber, through its branding and messaging, induced Ms.

21    Dean to believe she was receiving transportation services from *Uber* (acting through "Uber

22    drivers") not from random "independent drivers." Uber's Terms of Use do not defeat that reliance

23    as a matter of law: they failed to unambiguously convey the crucial fact of who was responsible

24    for providing safe transportation. Moreover, they were contradicted by the company's marketing,

25    creating at a minimum a triable fact for the jury.

26    **1.    Plaintiff relied on agency because, based on Uber's**
          **representations, she sought services from Uber, not its drivers.**

27    A principal is liable for ostensible agency where it "represents that another is his servant

28

or other agent and thereby causes a third person justifiably to rely upon the care or skill of such

apparent agent….” Restatement (Second) of Agency § 267 a (1958); *see also In re Sky Harbor*

*Hotel Props., LLC*, 443 P.3d 21, 23 (Ariz. 2019) (“[W]e generally following the Restatement

when it sets forth sound legal policy….”) (citation omitted); *Fadely v. Encompass Health Valley*

*of the Sun Rehab. Hosp.*, 515 P.3d 701, 706 (Ariz. App. 2022) (citing Restatement § 267 for the

legal standard). Accordingly, a plaintiff relies where she “submit[s] herself to the care or

protection of an apparent servant in response to an invitation from the defendant to enter into such

relations with such servant.” Restatement § 267, cmt. a; *see also, e.g.*, *Tavilla v. HealthSouth*

*Valley of the Sun Rehab. Hosp*, 2014 WL 117313, at *3 (Ariz. App. Jan. 14, 2014) (unpublished)

(citing authority framing the question as “whether, because of the hospital’s manifestations, the

plaintiff believed the hospital was providing the pertinent medical care as opposed to simply

acting as a situs for the physician to provide health care as an independent contractor”).

        Here, Uber promotes itself as safe based on the claim that it is *Uber*, not random people,

providing rides. Uber does so because trusting *Uber* is the only way people get in the car. Every

ride is requested from Uber through the Uber app. When Ms. Dean downloaded the Uber app, she

saw specific messages urging her to “ride *with Uber*” and “*trust Uber* for [her] travel needs.” Ex.

38 at 7298, 7311 (emphases added); Ex. 8 at 190:15-191:16, 194:19-195:15. Based on those ads

and others, she thought Uber was safe. Ex. 8 at 263:8-24. Uber also bombarded her with direct

safety advertising. *See* Chandler Rpt. at 101-02. Because *Uber* promoted safe transportation with

*Uber*, Ms. Dean believed that she was accessing a safe transportation service from *Uber*, not from

Hassan Turay. Dean Decl. at ¶¶ 3-5. Uber selected Mr. Turay for Ms. Dean; there was no menu or

option to choose among drivers. She “submitted [her]self to the care or protection” of Hassan

Turay “in response to an apparent invitation from” Uber to do so. Restatement § 267, cmt. a.

        In asserting that Ms. Dean did not rely, Uber cites only fraud cases, even though

ostensible agency is a theory of estoppel, not fraud. *See* PTO 17 at 24. But even under Uber’s

legal standard (“act or refrain from acting based on the defendant’s representation”), Ms. Dean

relied to her detriment: based on Uber’s representations, she used Uber only because she thought

it was providing and responsible for safe transportation; she does not seek rides from random

1   people on the street. Dean Decl. at ¶ 7; *see also, e.g.*, Restatement § 267, cmt a (requirement is

2   only "reliance upon the manifestation as exposes the plaintiff to the negligent conduct"); *Brown*,

3   890 P.2d at 621 (requiring only that the principal "intentionally or inadvertently induced a third

4   person to believe an agency exists").[2]

5                          **2.      Whether Uber's Terms of Use defeat reliance is a fact question.**

6           Uber argues that its Terms preclude ostensible agency as a matter of law. They do not.

7   Uber relies on *Fadely*, which found no agency based on a hospital's consent form. This case is

8   different than *Fadely* in three crucial ways.

9           *First*, in *Fadely*, the form was "designed to make sure that Plaintiff had the information

10  she needed to make an informed decision about being admitted to [the hospital]." 515 P.3d at 706.

11  The "two-page" form made clear who was responsible for treating the patient according to the

12  standard of care: "independent practitioners who 'practice independent under their state license

13  and privileged granted by the hospital,' 'maintain sole responsibility for their medical judgment

14  and professionalism,' and 'bill and collect for their services independent from the hospital.'" *Id.*

15  In *Chandrasekhar v. Koszyk-Szewczyk*, 2023 WL 11909594 (Ariz. Super. Ct. July 11, 2023), the

16  court distinguished *Fadely* where a form stated that "doctors and surgeons are not 'employees or

17  agents' of the hospital," but did "not clearly identify who is ultimately responsible for the

18  patient's care." *Id.* at *2. The difference matters: ostensible agency is not about whether the

19  plaintiff understood legal concepts like "employee" and "independent contractor," but whether

20  she understood herself to be seeking services from a company as opposed to an individual.

21          Here, the Terms are twenty-two pages, not two, with the relevant language appearing on

22  page twelve. Mot., Ex. 4 at § 3. The Terms employ the same technical language found insufficient

23  in *Chandrasekhar* and not the functional, plain statements that drove the result in *Fadely*. *See id.*

24  ("Independent third-party providers are not actual agents, apparent agents, ostensible agents, or

25  employees …"). Confusingly, the Terms state "UBER" is a "PROVIDER" of "THE SERVICES,"

26  all-caps. *Id.* Eleven pages earlier, the Terms of Use define "Services," initial-caps, like this:

27
28  _____
    [2] Uber's suggestion that Plaintiff was too intoxicated to have an impression of from whom she
    sought services mis-cites a portion of the police report as referring to the entire ride rather than
    the assault, ignores her earlier decision to download the app, and, at most, raises fact issues.

These Terms of Service ("Terms of Service") constitute a legally binding agreement between you and Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber") governing your use of Uber's personalized, multipurpose, digital marketplace platform ("Uber Marketplace Platform") and any related content or services, including mobile and/or web-based applications ("Applications" or the "Uber App," and together with the Uber Marketplace Platform, the "Services").

*Id.* at 1. How Ms. Dean was supposed to understand this to mean that she was not seeking transportation from Uber is a mystery, especially in light of Uber's marketing reassuring her that's exactly what she was doing.

*Second*, in *Fadely*, the form was provided to, and signed by, the patient immediately before receiving treatment. 515 P.3d at 706 ("on admission"). Here, Uber says Ms. Dean assented to the Terms on April 14, 2023, *seven months* before she even downloaded the Uber app and was assaulted. *See* ECF 3020-10. Even then, the only assent Uber can show occurred in connection with Uber Eats. *See id.* (showing assent on "eats_iphone").[3] This is as if, in *Fadely*, the hospital issued a lengthy consent form in the cafeteria that said, "all service providers in this hospital are independent contractors" and then argued it negated ostensible agency for the neurosurgeon. Unsurprisingly, Ms. Dean does not remember reading the Terms. Dean Decl. at ¶ 6.

*Third*, there was no indication in *Fadely* that the hospital affirmatively advertised it would provide the services, and then tried to contradict its own messaging through terms of use. Plaintiffs can rely on overt messages suggesting agency even in the face of contractual disclaimers stating the opposite. For example, in *Kaplan v. Coldwell Banker Res Affils.*, 59 Cal. App. 4th 741 (1997), the court denied summary judgment where the plaintiff, even though he was "a sophisticated real estate investor and superior court judge," "did not notice the small print disclaimer language" and instead relied on the "sign" with the name of the alleged principal prominently displayed. *Id.* at 747.[4] Here, whether Ms. Dean (not an experienced industry professional) reasonably relied on Uber's public statements and not its Terms is a fact question.

---

[3] The Court previously found assent through Uber Eats sufficient to bind Plaintiff to Uber's forum selection clause, but the issue here is not contract formation but reasonableness of reliance.

[4] Uber cites *Markow v. Rosner*, 3 Cal. App. 5th 1027 (2016). But there, the plaintiff "chose [the doctor] to be his physician," and also "read" the relevant form "on 25 occasions" and "signed at least eight" additional forms. *Id.* at 1039-42. The court also emphasized that "the disclaimer was not hidden in fine print amidst other, more prominent language," but "was [] the only portion of the [] form that requires the patient to initial it." *Id.* at 1043. Every fact is different here.

**C.**     **In Arizona, sexual torts may be within the scope of employment.**

Uber contends that sexual torts are per se outside the scope of employment in Arizona. That is incorrect. In Arizona, acts "may be found in the scope even if forbidden or done in a forbidden manner, and even if consciously criminal or tortious." *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 461 (Ariz. App. 2007). In *State v. Schallock*, 941 P.2d 1275 (Ariz. 1997), the Arizona Supreme Court, applying the factors in Restatement § 229, found sexual assault within the scope of employment based on "the time and place of the conduct" and "the previous relation between master and servant." *Id.* at 1282. The court emphasized that "[a]lmost all of [the employee's] improper acts took place at [the employer's] office or related location … and were within or incidental to business hours or sessions." *Id.* Regarding the relation, the court found important "whether the master has reason to expect that such an act will be done." *Id.* at 1282-83. The court explained that the employer was aware of the pattern of misbehavior and so "should have anticipated even the final sexual assaults and rapes." *Id.*

The court found a triable question of fact even though the "tortious act" was obviously not "motivated … to serve the master," but rather arose from "solely ... personal motives." *Id.* at 1283. The court explained: "[T]he act in question is not the ultimate tortious act but rather conduct related to the tort." *Id.* In "fondling the file clerks and offering advancement for sex, [the employee] was both serving the master by running the office—a task he was explicitly authorized to do—and serving his personal desires." *Id.*

Applying *Schallock*, the *Higgins* court affirmed a jury verdict where a supervisor assaulted another employee at her home and, while doing so, told her she was fired. 173 P.3d at 292. The court acknowledged that "the acts took place outside the office on a holiday weekend," the employer "had no reason to expect the [employee] to act in such a manner," and "[f]iring [the other employee] appeared to further only [the supervisor's] personal interests." *Id.* at 297. Nevertheless, the court affirmed the verdict because part of the conduct—the firing—was within the employee's "authority." *Id.* Then, in *Larson v. Berumen*, 1997 WL 608676 (9th Cir. Oct. 27, 1997), the Ninth Circuit, affirming employer liability, explained that *Schallock* applied where "an employee was added in accomplishing the tort by the existence of the agency relation." *Id.* at *1

1    (quotation marks omitted). And the court rejected efforts "to distinguish *Schallock* on the ground

2    that it was a hostile work environment case in which the offending supervisor's conduct was or

3    should have been known to his superiors." *Id.* at *1.

4         Uber relies on *Doe v. Roman Cath. Church of Diocese of Phoenix*, 533 P.3d 214 (Ariz.

5    App. 2023), which interpreted *Schallock* narrowly as "applicable only to cases involving

6    longstanding abuse and harassment in the workplace by a manager with authority to hire and fire,

7    promote and demote, and instruct and control subordinates the manager victimizes." *Id.* at 223-24

8    (citation omitted). But these limitations are not evident in *Schallock* itself, are inconsistent with

9    *Higgins*, and were rejected by the Ninth Circuit in *Larson*. In any event, *Doe* is distinguishable;

10   there, defendants "lacked notice that [the employee] posed a sexual danger to children." 533 P.3d

11   at 224. Here, Uber had multiple red flags about Mr. Turay, in addition to its own risk analysis,

12   and, by failing to investigate low ratings or suspicious feedback tags, communicated to him that

13   his behavior was permissible—just like the employer in *Schallock*.

14        More fundamentally, the Uber environment parallels the "managerial" context in

15   *Schallock*. As the Arizona Supreme Court later emphasized, the "employee in *Schallock* was able

16   to carry out his harassment in part because he was a supervisor, and the harassment occurred as

17   part of his 'supervision' of the plaintiff." *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 603

18   (Ariz. 2012). Just so here: Turay "was able to carry out his" sexual assault "in part because he

19   was" an Uber driver, and the assault "occurred as part of his" transporting Ms. Dean. *Schallock*

20   emphasized that the manager "had the power to … instruct and control" his subordinates. 941

21   P.2d at 1282. So too here: Uber "affords an offender predetermined conditions that make sexually

22   abusing others easier," including "control of the environment[,] isolation and other victim

23   vulnerabilities." Valliere Rpt. at 11. The result is "significant power imbalances," Tremblay Rpt.

24   at 10-11, dynamics that, as with a supervisory relationship enable sexual assault: A victim may

25   "simply attempt to placate or appease the driver, to avoid confrontation or further escalation" or

26   "will experience fear of retaliation particularly because they fear the driver has acquired personal

27

28

1    information about her" such as her name and address. Valliere Rpt. at 11.[5]

2    **II.    Plaintiff's Gender Matching theory properly challenges the design of Uber's app.**

3         In PTO 28, the Court held Plaintiff's Gender Matching theory sounded in product defect

4    because "the lack of an in-app option for Gender Matching by definition concerns a functionality

5    of the app." PTO 28 at 17. The Court found "decisive" that the Gender defect "target[s]" the "end

6    results for certain users," as opposed to (like the "Safe Ride Matching" defect), the "inner

7    workings of Uber's algorithm." *Id.* at 18.

8         Now, Uber says an actionable product feature must have no incidental effect on the

9    company's back-end functions. Uber bases this claim on the fact that offering a gender-match

10   option would require determining gender.[6] But the "target" of the feature remains same: an

11   "option" that "allow[s] an individual to control how they experience the Uber app." *Id.* at 17-18.

12        On Uber's logic, a button to contact Uber would not be an actionable product feature

13   because, for the button to have any utility, Uber would have to answer the phone. Or consider

14   another defect the Court identified (not pleaded in this case)—"biometric scanning for drivers."

15   PTO 17 at 47. To make that feature work, Uber would have to collect drivers' biometric identity.

16   But the need to do so does not transform a biometric scanner—an app feature that uses the

17   physical phone—into a service flaw rather than a product defect. Just so with Gender Matching.

18   **III.    Uber's compliance with Arizona's TNC statute does not preclude punitive damages.**

19        Uber does not contest that the evidence in this case is sufficient to support an award of

20   punitive damages. Instead, Uber argues that an Arizona products-liability statute, A.R.S. § 12-

21   689, precludes punitive damages because Uber is permitted to operate as a transportation network

22   company in Arizona and complied with the minimal requirements of Arizona's TNC statute—

23   even though those requirements have virtually nothing to do with the conduct that Plaintiff

24   alleges creates liability.

---

25   [5] Uber cites *Smith v. Am. Exp. Travel Related Servs. Co., Inc.*, 876 P.2d 1166 (Ariz. App. 1994),
26   but *Schallock* expressly overruled *Smith* as cited by Uber. *See Schallock*, 941 P.2d at 1281;
     *Larson*, 1997 WL 608676, at *1. Uber cites *Stencel v. Lyft*, 2024 WL 4008752 (N.D. Cal. Aug.
27   29, 2024), but that case mis-interpreted *Schallock* as requiring ratification of the tort. *See id.* at *5.
     [6] Mr. Weiner explains only that Uber *already developed* a gender-inference tool, making a
28   Gender Matching *product feature* feasible. Weiner Rpt. at ¶ 222.

1    Uber's interpretation of § 12-689 is breathtakingly broad and a far overreach. On Uber's

2    reading, it is immune from punitive damages for any conduct that harms a passenger, no matter

3    how attenuated that conduct is from the scope of the TNC statute. It is off the hook for its

4    ██████████████████████ marketing, marketing to intoxicated people, ignoring warning signs,

5    and disregarding its own risk analysis. The text of the statute does not permit, let alone require,

6    such an extreme interpretation. Consider the relevant language in full:

7        A manufacturer, service provider or seller is not liable for exemplary or punitive
8        damages if … [t]he product, activity or service complied with all statutes of this
         state or the United States or standards, rules, regulations, orders or other actions of
9        a government agency pursuant to statutory authority that are relevant and material
         to the event or risk allegedly causing the harm and the product, activity or service
10       complied at the time the product left the control of the manufacturer or seller.

11   A.R.S. § 12-689(A)(2). The word "service" does not mean everything a regulated entity does.

12   Instead, the term is defined as "actions that … involve predominantly the performance of a

13   service as distinguished from manufacture or sale of a product and that are regulated, approved,

14   or licensed by a government agency." *Id.* § 12-689(D)(6) (emphasis added).[7] The word "product,"

15   in turn, is defined as "any object possessing intrinsic value, capable of delivery … and produced

16   for introduction into trade or commerce." *Id.* §12-689(D)(4).

17       The text imposes three requirements for immunity, none met here. *First*, the claim must be

18   one for products liability (and only one involving an "object"), otherwise the prerequisite that

19   "the product left the control of the manufacturer or seller" and the reference to the "predominant

20   purpose" test make no sense. *Second*, a defendant's specific "actions" must be approved by the

21   government. *Third*, there must be government restrictions "that are relevant and material to the

22   event or risk" at issue, defined at a level of generality congruent to the "actions." If the phrase

23   "event or risk" meant the cause of the harm at the highest level of generality (like riding in an

24   Uber, or being harmed by an Uber driver), the statute would confer immunity even when no

25   relevant regulations existed. That cannot be right.

26

27   ───────────────
     [7] Uber does not rely on the statute's reference to "activity," A.R.S. § 12-689(A)(2), but that term,
28   similarly, encompasses only "[a]n action, pattern of operation or practice that is regulated,
     approved, licensed or otherwise required by a government agency," *id.* § 12-689(D)(1).

1    **A.    A.R.S. § 12-689 applies only to certain products liability claims.**

2    In the 13 years since A.R.S. § 12-689 was enacted, no case has ever applied it outside of a

3    products liability claim. *See*, *e.g.*, *Casey v. Wright Med. Tech., Inc.*, 2020 WL 736306, at *7 (D.

4    Ariz. Feb. 13, 2020) (design and warning claims concerning FDA-approved device). In non-

5    products cases, even those involving licensed and regulated entities, courts do not even mention

6    § 12-689. *See, e.g.*, *Rochon v. Grant*, 2017 WL 1180221, at *1-4 (Ariz. App. Mar. 30, 2017)

7    (medical malpractice). For good reason: the statute's text and context limit its application only to

8    products claims—and even among those claims, only ones involving "objects."

9    Start with the text. The language requires that the "service" comply with specified statutes

10   "at the time the product left the control of the manufacturer or seller." For claims that do not

11   involve a "product," the statute makes no sense. Similarly, "Service" is defined as "actions" that

12   "involve predominantly the performance of a service as distinguished from manufacture or sale of

13   a product …." A.R.S. § 12-689(D)(6). If the statute applied to "actions" generally, there would be

14   no reason to reference the "predominant purpose" test, which determines "*who* in the chain of

15   distribution of a product can be liable under a product defect theory." PTO 17 at 44; *see also*

16   *Grubb v. Do It Best Corp.*, 279 P.3d 626, 627-28 (Ariz. App. 2012) (applying similar test under

17   Restatement (Third) of Torts: Prod. Liab. § 20 (1998)).

18   Related provisions and the broader scheme confirm that § 12-689 applies only to products

19   liability claims. *See Matter of Conservatorship of Chalmers*, 571 P.3d 885, 889 (Ariz. 2025)

20   ("Context is *always* relevant to statutory interpretation. If a provision is part of a broader statutory

21   scheme, context can tell us the overall objective."). The provision appears in Title 12, Chapter 6

22   ("Special Actions and Proceedings by Individual Persons"), Article 9, titled "Product Liability."

23   Arizona courts refer to Article 9 as "Arizona's product liability statutes." *E.g.*, *Antone v. Greater*

24   *Ariz. Auto Auction*, 155 P.3d 1074, 1076 (Ariz. App. 2007). And they explain that the purpose of

25   Article 9 "was to address the perceived crisis of rising products liability insurance rates and to

26   promote new product development by controlling or regulating product liability law." *Torres v.*

27   *Goodyear Tire & Rubber Co., Inc.*, 786 P.2d 939, 947 (Ariz. 1990. So, the "statutory scheme" has

28   the "objective" of setting rules for one species of claims: "Product Liability" claims.

1    For that reason, § 12-682, titled "Limitation," provides that "[t]he previously existing

2    common law of products liability is modified only to the extent specifically stated in this article"

3    (meaning Article 9). A.R.S. § 12-682. The implication is that Article 9 does not modify anything

4    *other* than the "common law of products liability." *See City of Surprise*, 437 P.3d at 870

5    ("*Expressio unius est exclusio alterius*—the expression of one item implies the exclusion of

6    others—is appropriate when one term is reasonably understood as an expression of all terms

7    included in the statutory grant or prohibition."). Article 9 is titled "Product Liability" and has an

8    express "Limitation" referring only to the "common law of products liability"—the text is

9    "reasonably understood" to speak to products liability and nothing else.

10    **B.    Plaintiff's two products liability claims do not involve an "object."**

11    The bulk of Plaintiff's claims are clearly exempt from § 12-689. Plaintiff's negligence and

12    vicarious liability claims do not go to product design or product warnings.

13    Even Plaintiff's two products liability claims—Gender Matching and App-Based Ride

14    Recording design defects, are unaffected by § 12-689. No statute approved the design of Uber's

15    app (Uber does not contend otherwise). More fundamentally, the statute-specific definition of

16    "product"—including only "object[s]"—does not include intangible digital applications. The

17    Arizona legislature adopted a special definition "[f]or the purposes of this section" narrower than

18    the standards that otherwise decide the boundaries of strict products liability—a choice the Court

19    should understand as deliberate. *See Brown*, 577 P.3d at 25 (legislature knows existing law).

20    The word "object" implies tangibility. *See Watts v. Medicis Pharm. Corp.*, 365 P.3d 944,

21    953 (Ariz. 2016) ("'object' is defined as '… a discrete visible or tangible thing.'"); *United States*

22    *v. Pascoe*, 2024 WL 3527254, at *2-3 (W.D. Ky. July 24, 2024) ("The plain meaning of 'object'

23    … is a *material* thing. As such, the term 'object' … cannot refer to … an intangible item."). And

24    this Court has already rejected the argument that the Uber app is "tangible." PTO 17 at 42. This

25    Court found the app could be a product only to the extent it's "distribution and use is sufficiently

26    analogous to the distribution and use of tangible personal property." *Id.* That reasoning is not

27    available under the circumscribed definition imposed by § 12-689(D)(4).

28

1

**C.    Even if A.R.S. § 12-689 applied to non-products claims, it exempts from punitive damages only "actions" approved by the government.**

2

3

Uber argues that this statute means that a "service provider" is immune if "it complied"

4

with relevant statutes. Mot. at 22. But that is not what the statute says. The pre-condition is that

5

the "*service*" complied—not the "service provider." A.R.S. § 12-689(A)(2). And "service" does

6

not mean everything a regulated entity does. Instead, the term is defined as "*actions* … that are

7

regulated, approved, or licensed by a government agency." *Id.* § 12-689(D)(6). The statute also

8

requires compliance with statutes "relevant and material to the event or risk allegedly causing the

9

harm." A.R.S. § 12-689(A)(2). The necessary implication is that there *are* relevant "statutes"

10

concerning the "action." It cannot be the case that an unregulated action by a party that is licensed

11

by the government is immunized from punitive damages because, there being no statutes, the

12

action by definition complied with all statutes. That would make no sense.

13

Consistent with the text, courts explain that the point of the statute is to exempt from

14

exemplary damages *government-approved conduct*. The statute means "that a manufacturer's

15

conduct does not rise to th[e] level of egregiousness" sufficient to support punitive damages

16

"when the product alleged to have caused harm was approved by a government agency."

17

*McBroom v. Ethicon, Inc.*, 2022 WL 604889, at *5 (D. Ariz. Mar. 1, 2022) (citation omitted).

18

Proper application of the statute requires measuring the theories of liability against the

19

specific "actions" approved by statute or regulation. Two cases are illustrative. Both apply the

20

parallel sub-section concerning product design, which, like the "service" sub-section, turns on the

21

existence and scope of "relevant and material" government determinations. A.R.S. § 12-

22

689(A)(1). *First, Coulbourn v. Crane Co.*, 728 F. App'x 679 (9th Cir. 2018), was a wrongful-

23

death action against the supplier of asbestos-containing products to the Navy. The defendants

24

argued that § 12-689 precluded punitive damages because "the product … was designed,

25

manufactured, packaged, labeled, and sold according to strict specifications … of the … Navy."

26

*Coulbourn v. Air & Liquid Sys. Corp.*, No. 13-8141, ECF 896, at 4 (D. Ariz. May 12, 2016). The

27

district court disagreed: "[N]o Navy regulation or specification prevented Defendants from

28

warning about the asbestos hazards associated with their products." *Id.* The Ninth Circuit

1   affirmed: "Crane put forward no evidence that the Navy 'approved' of its failure to warn of the

2   dangers of asbestos. The Navy therefore had not approved of the product in the 'relevant and

3   material respect,' as required under the statute." *Coulbourn*, 728 F. App'x at 682. It did not matter

4   that the Navy had approved the *designed* inclusion of asbestos and the product *label*; the Navy

5   had not specifically approved the *failure to warn* of the asbestos, so no immunity.

6       *Second*, in *Hess v. Bumbo Int'l Tr.*, 2014 WL 12527216 (D. Ariz. Sept. 11, 2014), parents

7   sued a child seat manufacturer when their child fell out of the seat while it was sitting on the

8   floor, claiming the seat was defective for its failure to "safely maintain an infant in a seated

9   position." *Id.* at *1, 4-5. The manufacturer claimed immunity under § 12-689 because the CPSC

10  had approved "warnings advising consumers that children can escape from the seat and advising

11  against placing the seat on raised surfaces." *Id.* at *1. The government-approved warning was

12  plainly "relevant and material" to the alleged defect in the seat: failure to "entirely prevent

13  children from getting out of it." *Id.* at *4. If "children can escape from the seat," as the

14  government-approved warning stated, then obviously the seat does not "prevent children from

15  getting out of it." *Id.* Nevertheless, the court agreed with the plaintiffs that the "recall did not

16  address the injury at issue in this case: the dangers of using the Bumbo Seat on the floor." *Id.* at

17  *9. Even though the government-approved warning was pertinent to the *general* risk of children

18  escaping the seat, it was insufficiently tied to the *specific* risk of children escaping the seat while

19  it was on the floor. *See id.* ("The 2007 recall approved warning language to prevent the use of the

20  Bumbo Seat on *elevated surfaces*.") (emphasis added).

21       **D.    Plaintiff seeks punitive damages for actions not authorized by statute.**

22       Here, as in *Coulbourn* and *Bumbo*, the actions supporting Ms. Dean's claims were not

23  authorized by Arizona's TNC statute. And there were no statutes or regulations "material and

24  relevant to the events or risks" causing her harm. At most, if § 12-689 applies at all, the Court

25  should instruct the jury not to award punitive damages for actions that complied with the TNC

26  statute (minimum standards and privacy protections in background checks).

27       The root cause of punitive damages liability in this case is not the existence of a rideshare

28  platform regulated by statute, but Uber's conscious disregard of known and substantial risks to

1   passenger safety. In an effort to ███████████████████ Ex. 72 at slide 4, Uber made

2   intentional business decisions to market itself as providing safe transportation to women,

3   including women riding late at night and while intoxicated. Having held itself out as providing

4   safe rides, Uber then knowingly ignored red flags, failed to act on predictive safety warnings, and

5   paired Ms. Dean with a driver that Uber itself identified as posing a high risk of sexual assault.

6       None of those "actions" were approved, authorized, or compelled by Arizona's TNC

7   statute. Arizona law does not regulate how Uber markets its services, performs rider-driver

8   matching, responds to red flags, proceeds with explicitly identified risky matches, or adopts

9   additional safety measures such as a dashcam. Uber's punitive-damages exposure arises from its

10  discretionary, profit-driven decisions, not from any government approved conduct.

11      Uber's citation to *Craten v. Foster Poultry Farms, Inc.*, 2018 WL 834937 (D. Ariz. Feb.

12  13, 2018), a case about contaminated poultry, is illustrative. There, the court found § 12-689

13  precluded punitive damages because "the government agency responsible for regulating the safety

14  of its products allowed them to be sold to the public." *Id.* at *4. Here, the Arizona Department of

15  Transportation, unlike a food inspector, is not "responsible for regulating the safety" of Uber

16  rides. The only thing that the "Department" regulates is the minimum statutory requirements;

17  once those are satisfied, the "department *shall* issue" a TNC "permit." A.R.S. § 28-9552

18  (emphasis supplied). There is no imprimatur of approval on the marketing, matching, monitoring,

19  or investigating practices triggering liability in this case. And, unlike the "inspection and approval

20  of [the] chicken for sale" in *Craten*, 2018 WL 834937, at *4, there is no government review or

21  approval in connection to the specific driver, passenger, or ride in this case.

22      Because Uber's "actions" were essentially unregulated, there were also no statutory

23  requirements "relevant and material to the event or risk" underlying the claims. By Uber's lights,

24  "event or risk" must be read at the highest level of generality—the "risk" of riding with Uber or

25  the "risk" of being harmed by a driver. But such an interpretation grants Uber unlimited immunity

26  based on a minimal regulatory scheme. Here, the pertinent "risk" is that of a young, intoxicated

27  woman using Uber at night, and the "event" that of Uber matching her with a man whom it knew

28  to be dangerous. Indeed, this case is much easier than *Coulbourn* or *Hess*; in both, government

1    approvals were closely related to the failure-to-warn liability theories. *See Coulbourn*, 728 F.

2    App'x at 682 (product label); *Hess*, 2014 WL 12527216, at \*4, 9 (warning).

3         Uber lists every one of the TNC requirements, but those requirements have little

4    relationship to Plaintiff's claims. Arizona requires criminal background checks for TNC drivers,

5    A.R.S. § 28-9555; but Plaintiff's claims are not based on criminal background check deficiencies.

6    To be sure, Uber's background checks are not irrelevant in this trial. Uber will rely on Mr.

7    Turay's lack of criminal record as a defense, and Plaintiff will rebut by explaining how Uber

8    knew that Mr. Turay's lack of criminal convictions did not give Uber license to ignore all of the

9    information it learned about him from *after* he was on-boarded as a driver, as well as its risk-

10   analysis of the ride. *See* Valliere Rpt. at 22-23 ("Uber … know[s] that 'background checks and

11   fingerprints are not correlated with incident likelihood.'"). But an inadequate background check is

12   not what the case is really about; rather, it's about all of the information Uber gathered as Mr.

13   Turay drove for the company and when he was matched with Ms. Dean.

14        Also relevant is how Uber *marketed* its background checks; but, while Arizona required

15   Uber to run a criminal background check, the state did not authorize the company to recklessly

16   promote itself for complying with that requirement. Uber knows that ▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Drumwright Rpt. at ¶ 213 (quoting Uber document). So,

18   the company set out to, and did, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮ *Id.* Uber's marketing emphasized that it conducted "annual background

20   screenings on every driver so that you can ride with peace of mind." *Id.* at ¶ 225 (citing ads).

21   Uber promoted itself as safe based on background checks when it knew that background checks

22   did little to promote safety. Internally, the company was candid: ▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮ *Id.* at ¶ 205 (quoting Uber document).

24        The other TNC requirements that Uber highlights have nothing to do with this case. This

25   case does not involve "driver alcohol and drug use." Mot. at 23. Uber says that the statute

26   "requires procedures for passenger complaints," *id.* at 23-24, but omits that those "procedures"

27   and "complaints" concern *only* the irrelevant drug-and-alcohol policy. *See* A.R.S. §§ 28-9554(B)-

28   (C). Finally, Uber cites the requirement that Uber display the driver's picture and plate number.

1   *Id.* § 28-9552(C). Even if Plaintiff were still pursuing her fraud claim, this requirement would

2   have no connection to Uber's decision to provide additional information like a star rating.

3       **E.      Uber's atextual interpretation of the statute leads to absurd results.**

4       Arizona courts "interpret and apply statutory language in a way that will avoid an

5   untenable or irrational result," even where, unlike here, the "plain text" points to that result. *State*

6   *v. Estrada*, 34 P.3d 356, 360 (Ariz. 2001) (collecting examples).

7       The TNC statute requires only that Uber prevent Mr. Turay from driving if he has a

8   "serious" criminal conviction. *See* A.R.S. § 28-9555(B)(2). On Uber's view, because Mr. Turay

9   had not been (and still has not been) convicted of a crime, the company is immune from punitive

10  damages no matter what it later learned about him and what it did to put passengers at risk. Uber

11  could dispatch known assailants—drivers whom Uber conclusively determined assaulted

12  passengers or those with warrants out for arrest or even those with pending criminal charges for

13  murder or other horrific crimes—merely because Uber complied initially with the statute, and

14  there is not yet any criminal conviction. Uber could re-hire and dispatch *Mr. Turay* tomorrow,

15  despite what happened to Ms. Dean. No punitive damages.

16      Uber's conduct in this case was terrible. Under Uber's interpretation of § 12-689, the

17  conduct could be 100 times worse—no punitive damages. Mr. Turay could be a serial rapist, and

18  Uber could know it. But as long as he isn't caught by the authorities, no punitive damages. This

19  also creates perverse incentives—why would Uber cooperate with law enforcement if it knows

20  that it will be punished only if a person drives after being convicted?

21      Uber claims immunity for targeting intoxicated women, even though no statute regulates

22  those activities. On Uber's theory, it could outright lie to passengers. Uber could have told

23  Jaylynn Dean through direct message, "Out late at the bar? Our drivers will get you home safe,

24  100% of the time. We guarantee your safety." Forget the sexual context: Uber could know Mr.

25  Turay always drives at 90+ mph; he crashes and kills a person. No punitive damages.

26      Uber's understanding of § 12-689 also requires the Court adopt an absurd interpretation of

27  the *TNC statute*. That statute, eight sections long, touches on permitting, process, trade dress, fare

28  disclosure, driver drug and alcohol use, background checks, vehicle fitness, local taxes, and

1   insurance. *See* A.R.S. §§ 28-9551-58. There is no indication that the 2015 legislature that enacted

2   the scheme thought it was, indirectly through the products liability laws, essentially eliminating

3   punitive damages for rideshare companies. To the contrary, when the legislature seeks to

4   eliminate punitive damages for one sector or activity, it says so. *See*, *e.g.*, A.R.S. § 12-820.04.

5       **F.      In any event, whether Uber complied with the TNC statute is a fact question.**

6           Under the TNC statute, Uber "may not allow a person to act as a … driver who … [d]oes

7   not possess a valid driver license." A.R.S. § 28-9555(B)(4). Mr. Turay moved to the United States

8   in 2013. Ex. 21 at 14:6-12. He first applied to Uber in 2014, but was rejected because his Arizona

9   driver's license was only a few months old. Ex. 63 at 2. He then reapplied in December 2016,

10  now with a Georgia license. Uber's contractor Checkr rejected Mr. Turay, for two reasons: (1) his

11  license had been issued only in October and (2) it was already "suspended" or "cancelled." *See*

12  Ex. 64 (report) at -12058; Ex. 65 (Ltr. from Checkr to Turay) at -892; Ex. 66 (Uber:

13  ████████████████). (This may have been because he had already applied for an Arizona

14  license, which he acquired in March 2017, cancelling the Georgia license.) ████████████

15  ████████████████████ Ex. 67. Mr. Turay apparently persuaded Checkr (and, by

16  extension, Uber) to accept him. *See* Ex. 68 at 314:12-17 (████████████████████

17  ████████████); Ex. 73 (████████████████).

18  ████████████████████████████████████

19  ████████████████████████████. Ex. 70 at -3623-24. ████████

20  ████████████████████████. The jury may find the other fact

21  false too: Mr. Turay's license was ████████████ and Uber let him drive anyway, in

22  violation of Arizona law.

23          This failure is not surprising. Uber's top objective that year was ████████ even as

24  Uber knew that its ████████████████████████████████████

25  ████████████████████████████████████ Tremblay

26  Rpt. at 12, 23 (citing Uber documents). One of those ████████ was Mr. Turay.

27                              **CONCLUSION**

28          Except for the fraud and GPS-Alert product claims, Uber's motion should be denied.

1    Dated: December 10, 2025                    Respectfully submitted,

2
                                                By: /s/ Sarah R. London
3                                                  Sarah R. London (SBN 267083)

4                                               **GIRARD SHARP LLP**
                                                601 California St., Suite 1400
5                                               San Francisco, CA 94108
                                                Telephone: (415) 981-4800
6                                               slondon@girardsharp.com

7                                               By: /s/ Rachel B. Abrams
                                                   Rachel B. Abrams (SBN 209316)
8
                                                **PEIFFER WOLF CARR KANE**
9                                               **CONWAY & WISE, LLP**
                                                555 Montgomery Street, Suite 820
10                                              San Francisco, CA 94111
                                                Telephone: (415) 426-5641
11                                              Facsimile: (415) 840-9435
                                                rabrams@peifferwolf.com
12
                                                By: /s/ Roopal P. Luhana
13                                                 Roopal P. Luhana

14                                              **CHAFFIN LUHANA LLP**
                                                600 Third Avenue, 12th Floor
15                                              New York, NY 10016
                                                Telephone: (888) 480-1123
16                                              Facsimile: (888) 499-1123
                                                luhana@chaffinluhana.com
17
                                                *Co-Lead Counsel*
18
19                              **FILER'S ATTESTATION**

20    I am the ECF User whose ID and password are being used to file this document. In

21   compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

22   Dated: December 10, 2025            By:    /s/ Andrew R. Kaufman
                                                Andrew R. Kaufman
23

-31-