# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE:  UBER TECHNOLOGIES,   Case No. 3:23-md-03084
INC., PASSENGER SEXUAL                    CRB
ASSAULT LITIGATION

_____

This Document Relates to:

ALL ACTIONS

_____

VIDEO DEPOSITION OF UBER TECHNOLOGIES, INC.'s

30(b)(6) CORPORATE REPRESENTATIVE - TODD GADDIS

San Francisco, California

Friday, July 11, 2025

STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491

JOB NO. 6919226-001

Todd Gaddis
July 11, 2025

1   attached hereto.)

2        MS. GOLDENBERG:  And for anybody else on

3   Zoom, Mr. Gaddis has that binder in person, so I

4   don't think we'll have a copy online, but we'll try

5   and get one later.

6      Q.   (By Ms. Goldenberg)  All right.

7   Mr. Gaddis, you also understand that you've been

8   designated on three different deposition notices to

9   testify today?

10     A.   That's correct.

11        MS. GOLDENBERG:  Okay.  So why don't we

12   pull those up one at a time.

13        Let's start with tab 100, please.

14        (Exhibit 1556 was marked for

15   identification by the Court Reporter and is

16   attached hereto.)

17     Q.   (By Ms. Goldenberg)  Okay.  So,

18   Mr. Gaddis, you'll see here that this is one of the

19   deposition notices that you've been designated on,

20   and this is the knowledge of sexual assault notice

21   where you've been designated on topics on 1 through

22   4 and 14.

23        Does that sound right to you?

24     A.   Yes.

25        Can I just ask one question?

1          Should I be seeing the attorney on the

2    screen?  I can't see her on either screen now.

3          MS. GOLDENBERG:  Oh.  Why don't we go off

4    the record for a minute and fix that, because you

5    should be able to see me.

6          MR. COX:  Sounds good.

7          THE VIDEOGRAPHER:  Going off the record

8    at 9:12 a.m.

9          (Recess taken.)

10          THE VIDEOGRAPHER:  And we're back on the

11    record at 9:14 a.m.

12      Q.   (By Ms. Goldenberg)  All right.

13    Mr. Gaddis, are you prepared to testify on topics 1

14    through 4 and 14 in this notice which we've marked

15    as Exhibit 1556?

16      A.   Let me just review the -- the numbers

17    real quick just to make sure.

18      Q.   Sure.

19      A.   Yes.  I'm prepared on those topics.

20          MS. GOLDENBERG:  Okay.  Why don't we take

21    this one down, and let's put up tab 101, please.

22          (Exhibit 1557 was marked for

23    identification by the Court Reporter and is

24    attached hereto.)

25          MS. GOLDENBERG:  And we'll mark this as

Todd Gaddis
July 11, 2025

1    Exhibit 1557.

2        Q.   (By Ms. Goldenberg)  And you'll see,

3    Mr. Gaddis, that is the transportation and business

4    notice, and you have been designated on topics 5

5    through 7 in this one.

6            Is that your understanding?

7        A.   Let me just take a look.

8            Okay.  Yes.

9            MS. GOLDENBERG:  All right.  Let's take

10   this down, and we'll put tab 102, please, which is

11   the last deposition notice.  And we'll mark this as

12   Exhibit 1558.

13           (Exhibit 1558 was marked for

14   identification by the Court Reporter and is

15   attached hereto.)

16       Q.   (By Ms. Goldenberg)  And on this notice,

17   my understanding is you're here on the whole thing.

18           Does that look right to you?

19       A.   Yes, it does.

20       Q.   (By Ms. Goldenberg)  Okay.  So let's take

21   those down.  And let's go into our first topic

22   here.

23           In the knowledge of sexual assault

24   notice, the first topic that you're here to talk

25   about is the time line of Uber's knowledge

**Todd Gaddis**

**EX 1556**

R.R. 07.11.25

1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

2

3

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC.,** **PASSENGER SEXUAL ASSAULT** **LITIGATION** | No. 3:23-md-03084-CRB |
| | **ALL PLAINTIFFS' AMENDED NOTICE OF** **30(b)(6) DEPOSITION OF UBER** **TECHNOLOGIES, INC., RASIER, LLC, AND** **RASIER-CA, LLC** |
| This Document Relates to: All Cases | |
| | Judge: Honorable Charles R. Breyer |

4

5

6

7

8

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, all Plaintiffs will take the

9

deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC

10

(collectively "Uber") through one or more of their designees on the topics listed below. This

11

deposition will be taken before a duly qualified Notary Public, at the time and place specified and via

12

Zoom Video Conferencing, and continued from day to day thereafter, Sundays and holidays excepted,

13

until completed, on behalf of all Plaintiffs. Pursuant to Federal Rules of Civil Procedure Rules

14

30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony

15

by audio and video technology in addition to the stenographic method.  Notice is hereby given that

16

the video is intended for use at trial.

17

18

WITNESS:    **Uber Technologies, Inc., Rasier, LLC, and Rasier-CA,**
            **LLC (Todd Gaddis, Topics 1-4 and 14)**

19

DATE:       **July 11, 2025**

20

TIME:       **9:00 AM Pacific Time**

21

22

LOCATION:   **Kirkland & Ellis**
            **555 California Street, 27th Floor**
            **San Francisco, CA 94104**

23

24

Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of

25

the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on

26

which each person will testify. And if Uber intends to have a custodian whose deposition is already

27

scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs

28

request that Uber provide notice of the same at least ten (10) business days in advance of that

witness' deposition.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce and permit inspection and copying of the documents and/or tangible things specified in Attachment A to this notice at the time and place of deposition.

## INSTRUCTIONS

1.    For purposes of interpreting or construing the scope of this Notice, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual topic or request. This includes, without limitation, the following:

   a.   The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

   b.   The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

   c.   Construing the singular form of the word to include the plural and the plural form to include the singular;

   d.   Construing the masculine to include the feminine, and vice-versa;

   e.   The use of any tense of any verb shall also include all other tenses of that verb;

   f.   A term or word defined herein is meant to include both the lower and uppercase reference to such term or word;

   g.   Any Bates number referenced herein shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members;

   h.   Construing the term "including" to mean including but not limited to.

2.    Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives,

general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3. In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4. Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

## DEFINITIONS

1. "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

2. "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form. The term "DOCUMENT" includes all drafts of a

"DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original.  The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

3.      "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

4.      "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

5.      "LOCATION DATA" includes coordinates, GPS data, satellite data, and latitude-longitude data.

6.      "PERSONAL TRANSPORTATION" means transportation of people in passenger vehicles.

7.      "RATE" refers to all of the following: the absolute number, frequency, incidence, as well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly category of Ride is specified, for that category of Ride).

8.      "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

9.      "RESEARCH" means observation, testing, surveys, experimentation, and the collection, interpretation, and evaluation of data.

10.     "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

11.     "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

12.     "RIDER APP," "UBER APP," "UBER APPLICATION," "UBER APP," or "APP" means Uber's mobile device application that is used by Drivers and Riders to coordinate, provide, or order Uber Rides, including apps used by both DRIVER or RIDER, and including the Uber Driver Application.

13.     "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

14.     "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

15.     "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

16.     "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

17.     "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

18.     "TRANSPORTATION SYSTEM" or "TRANSPORTATION NETWORK" refers to the entire system for providing and/or facilitating Rides, between Riders and Drivers. The Transportation System may include but is not limited to Driver recruitment, Driver screening, Driver training, instructions for Drivers, policies and guidelines that apply to Drivers, Rider recruitment, Rider screening, Rider training, instructions for Riders, policies and guidelines that apply to Riders, the way in which a Rider requests a Ride, or someone else may request a Ride on behalf of a Rider, the way in which Drivers are matched with Riders via the Uber App, the way in which a Driver accepts a Ride, where and how Drivers and Riders are instructed to meet one another, the way in which Drivers and Riders and directed to identify one another and confirm that identity, the trade dress or other markings used to help identify Drivers' vehicles, maps and driving instructions, ways in which destinations can be changed, stops can be added, additional Riders can be added, where and how a Driver drops a Rider off, what components of the Ride are supported by technology, devices, or services external to the Uber App, what Fares are charged, the amount of the Fares, the way in which Fares are charged, how much of the Fare is shared with the Driver, what the Driver and Rider each are told about the Fare(s), discounts if any provided, customer support or other services provided before during and after a Ride, devices hardware and software that supports the Ride, safety buttons, features to share a Ride with a third party, GPS and/or other monitoring by Uber of a Ride, automation to detect unusual or unwanted activity during a Ride, video and/or audio recording during a Ride, and/or the lack of any of these things or features.

19.     "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

20.     "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period of time, when a Ride is no longer in progress.

21.     "UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a DRIVER have stopped at a location other than the intended destination, and/or otherwise deviated or detoured from a planned route for a RIDE, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign, or slight temporary route deviation).

22.     "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a Rider may interact with.

## DEPOSITION TOPICS

1. The timeline of Uber's knowledge regarding Uber Drivers engaging in Sexual Misconduct and/or Sexual Assault of Uber Riders (including, from 2012 to the present, what, when, and how it learned about reports of Sexual Misconduct and/or Sexual Assault).

2. For each year, from 2012 to the present, the numbers and classifications of Sexual Misconduct and Sexual Assault incidents reported to Uber by Riders.

3. Uber's knowledge that Sexual Assault and Sexual Misconduct are underreported (including but not limited to the timeline of Uber's knowledge; any Research Uber conducted, experts Uber hired, and/or data Uber collected, related to the reporting rate; the factors that Uber understood contributed to underreporting; and whether Uber understood that those factors applied to Rider Reports of Sexual Assault and/or Sexual Misconduct to Uber).

4. The true Rate of Sexual Assault and Sexual Misconduct on Uber's platform, after accounting for underreporting.

5. The timeline of Uber's efforts, if any, to make sure that, when a Driver committed Sexual Assault or Sexual Misconduct of a Rider, Uber found out about it (including, from 2012 to the present, what Uber did and when; how it tried to make sure those efforts were effective; who was in charge of those efforts; who was involved in those efforts; and how those efforts were documented).

6. The complete version history, from 2012 to the present, for the Uber App's User Experience for a Rider who, when prompted by the App at the end of a Ride to leave feedback regarding the Driver, wanted to report a Sexual Assault or Sexual Misconduct.

7. The product development process, from 2012 to the present, for the Uber App's User Experience for a Rider who, when prompted by the App at the end of a Ride to leave feedback regarding the Driver, wanted to report Sexual Assault or Sexual Misconduct.

8. Everything Uber did, from 2012 to the present, to encourage (or discourage) Riders who had experienced Sexual Assault or Sexual Misconduct to report it to Uber (including but not limited to everything Uber did to make it easy or difficult for Riders to report; how much money Uber spent doing so; who was in charge of these efforts (and what expertise they had; how much Uber spent on these efforts; and what reliability and user testing Uber conducted).

9. Riders' one-star ratings of Drivers (including but not limited to Uber's Research regarding the association between one-star ratings and unreported Sexual Assault and Sexual Misconduct; its knowledge that one-star ratings were associated with unreported Sexual Assault and Sexual Misconduct; its decision-making about whether to follow up on one-star ratings; why it did not follow up on one-star ratings; and the User Experience designed for Riders who gave one-star ratings).

10. Unplanned Rider-Driver Proximity (including but not limited to Uber's gathering and/or monitoring of Location Data, its gathering and/or monitoring of data about Unplanned Rider-Driver Proximity, its decision-making about whether to investigate incidents or patterns of Unplanned Rider-Driver Proximity, its attempts if any to investigate Unplanned Rider-Driver Proximity, Uber's Research regarding whether Unplanned Rider-Driver Proximity is associated with Sexual Assault and Sexual Misconduct; Uber's knowledge that Unplanned Rider-Driver Proximity is associated with Sexual Assault and Sexual Misconduct; why Uber did not investigate Unplanned Rider-Driver Proximity).

11. Unplanned Stops (including but not limited to Uber's gathering and/or monitoring of GPS data, its gathering and/or monitoring of data about Unplanned Stops, its decision-making about whether to investigate incidents or patterns of Unplanned Stops, its attempts if any to investigate Unplanned Stops, Uber's Research regarding whether Unplanned Stops are associated with Sexual Assault and Sexual Misconduct; Uber's knowledge that Unplanned Stops are associated with Sexual Assault and Sexual Misconduct; why Uber did not investigate Unplanned Stops).

12. Uber's process for investigating reported Sexual Assault and/or Sexual Misconduct, including each version thereof, from 2012 to the present (including but not limited to scripts,

flowcharts, policies, channels of communication (e.g., phone interviews, in-App messages), organizations involved, management structure involved, personnel involved (their job requirements, job descriptions, and expertise or lack thereof), software platforms used, classification systems used, and documentation).

13. Uber's quality assurance related to its investigation of Sexual Assault and/or Sexual Misconduct (including quality assurance related to timing, response rate, follow-up, use of telematics, use of other resources and data, and incident classifications; and including what policies, experts, leaders, and processes Uber used in its quality assurance).

14. Uber's Safety Reports (including but not limited to why Uber published its Safety Reports, what it said about its Safety Reports, how and why it chose which data to report, how it assured the quality of that data and reporting, and what impact the Safety Reports had on Uber's reputation).

15. Uber's knowledge, from 2012 to the present, that certain Risk Factors are associated with an elevated rate or risk of Sexual Assault and/or Sexual Misconduct (including what it knew and when).

## **SCHEDULE B**

### **DOCUMENTS TO BE PRODUCED**

1. Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

2. All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

3. The custodial file of the deponent, to the extent s/he is not already a custodian.

4. Documents reflecting any and all versions, from 2012 to the present, of the Uber App's User Experience for a Rider who wanted to report a Sexual Assault or Sexual Misconduct.

5. Documents reflecting the product development process, from 2012 to the present, for the (Uber App) User Experience for a Rider who wanted to report Sexual Assault or Sexual Misconduct. (This includes the design description document, product requirements document, documents reflecting the software development life cycle, documents reflecting the project management system).

6. The witness must bring to the deposition a laptop or other computer capable of logging into the platform(s) that Uber's investigators use when they are investigating a reported Safety Incident, such that the witness is able to demonstrate the architecture of the platform(s), and

the way in which the investigator's resources are organized, linked, accessed, viewed, and interacted with.

7. The witness must bring to the deposition a laptop or other computer capable of logging into Uber's platform(s) for storing current and past policies (including but not limited to playbooks, operational guidelines, protocols, and scripts), such that the witness is able to demonstrate the architecture of the platform(s), and the way in which the policies are organized, linked, accessed, viewed, and interacted with.

10

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the undersigned caused a copy of the foregoing to be served via electronic mail on July 7, 2025, to counsel for Defendants Uber Technologies, Inc., Rasier LLC and Rasier-CA, LLC, at the following email addresses:

**Kirkland & Ellis LLP**
Alli Brown
alli.brown@kirkland.com
Chris Cox
christopher.cox@kirkland.com
Jessica Davidson:
jessica.davidson@kirkland.com
Jennifer Levy
jlevy@kirkland.com
Rupal Joshi
rupal.joshi@kirkland.com

**O'Melveny and Meyers LLP**
Sabrina Strong
sstrong@omm.com
Jonathan Schneller
jschneller@omm.com
Joshua Revesz
jrevesz@omm.com
Louis Fisher
lfisher@omm.com

**Shook, Hardy & Bacon LLP**
Michael B. Shortnacy
mshortnacy@shb.com
Patrick L. Oot, Jr.
oot@shb.com
Christopher V. Cotton
ccotton@shb.com
Alycia A. Degen
adegen@shb.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*



Todd Gaddis

EX 1557

R.R. 07.11.25

1
2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

3
4

**IN RE: UBER TECHNOLOGIES, INC.,
PASSENGER SEXUAL ASSAULT
LITIGATION**

5
6
7

This Document Relates to:
  All Cases

No. 3:23-md-03084-CRB

**ALL PLAINTIFFS' AMENDED NOTICE OF
30(b)(6) DEPOSITION OF UBER
TECHNOLOGIES, INC., RASIER, LLC, AND
RASIER-CA, LLC**
Judge: Honorable Charles R. Breyer

8
9
10
11
12
13
14
15
16

      Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, all Plaintiffs will take the
deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC
(collectively "Uber") through one or more of their designees on the topics listed below. This
deposition will be taken before a duly qualified Notary Public, at the time and place specified, and
continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of
all Plaintiffs. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice
is given that the deposing party intends to record the testimony by audio and video technology in
addition to the stenographic method.  Notice is hereby given that the video is intended for use at trial.

17
18
19
20
21
22

| **WITNESS:** | **Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (Todd Gaddis, Topics 5-7)** |
|---|---|
| **DATE:** | **July 11, 2025** |
| **TIME:** | **9:00 a.m. Pacific Time** |
| **LOCATION:** | **Kirkland & Ellis**<br>**555 California Street, 27th Floor**<br>**San Francisco, CA 94104** |

23
24
25
26
27
28

      Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of
the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on
which each person will testify. And if Uber intends to have a custodian whose deposition is already
scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs
request that Uber provide notice of the same at least ten (10) business days in advance of that

1    witness' deposition.

2        Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce

3    and permit inspection and copying of the documents and/or tangible things specified in Attachment

4    A to this notice at the time and place of deposition.

5                                    **INSTRUCTIONS**

6        1.    For purposes of interpreting or construing the scope of this Notice, the terms shall be

7    given their most expansive and inclusive interpretation unless otherwise specifically limited by the

8    language of an individual topic or request. This includes, without limitation, the following:

9        a.    The terms "each," "every," "any," and "all" are synonymous with one another and with

10            "each and every" and "any and all;"

11

12        b.    The connectives "and" and "or" are used inclusively and not exclusively and shall be

13            construed either disjunctively or conjunctively as to require the broadest possible

14            response;

15        c.    Construing the singular form of the word to include the plural and the plural form to

16            include the singular;

17

18        d.    Construing the masculine to include the feminine, and vice-versa;

19        e.    The use of any tense of any verb shall also include all other tenses of that verb;

20        f.    A term or word defined herein is meant to include both the lower and uppercase

21            reference to such term or word;

22

23        g.    Any Bates number referenced herein shall be construed to refer not only to the specific

24            page number identified but to the entirety of the document associated with that Bates

25            number, including any family members;

26        h.    Construing the term "including" to mean including but not limited to.

27        2.    Unless otherwise indicated, the name of any Person, party or business organization

28    shall specifically include all past and present employees, officers, directors, agents, representatives,

general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3.      In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4.      Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

5.      If Uber is unable to state any of the budget numbers, ridership numbers, or other figures for its Transportation Network, which are requested here, then it should be prepared to provide the closest available numbers that it does track, for example the budget, ridership, or other figures for its entire "Mobility" business segment, as tracked in its Annual Report.

### DEFINITIONS

1.      "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

2.      "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of

1    telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm;

2    microfiche; tape or disc recordings; and computer print-outs.  The term "DOCUMENT" also

3    includes electronically stored data from which information can be obtained either directly or by

4    translation through detection devices or readers; any such document or writing is to be produced in a

5    reasonably legible and usable form.  The term "DOCUMENT" includes all drafts of a

6    "DOCUMENT" and all copies that differ in any respect from the original, including any notation,

7    underlining, marking, or information not on the original.  The term also includes information stored

8    in, or accessible through, computer or other information retrieval systems (including any computer

9    archives or back-up systems), together with instructions and all other materials necessary to use or

10    interpret such data compilations.

11          3.    "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier

12    who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose

13    of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include

14    potential or prospective Drivers.

15          4.    "DRIVER APP" means Uber's mobile phone application that is used by Drivers to

16    offer Rides.

17          5.    "PERSONAL TRANSPORTATION" means transportation of people in passenger

18    vehicles.

19          6.    "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a

20    taxi or Charter Party Carrier.

21          7.    "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride

22    was coordinated through the Uber Application and regardless of whether the Rider was the person

23    who ordered the ride or owner of the account used to order the ride.

24          8.    "RIDER APP," "UBER APP," "UBER APPLICATION," "UBER APP," or "APP"

25    means Uber's mobile device application that is used by Drivers and Riders to coordinate, provide, or

26    order Uber Rides, including apps used by both DRIVER or RIDER, and including the Uber Driver

27    Application.

28

4

9.    "ROLLOUT" includes introduction, offering, announcement, advertising, marketing, and initial version of something.

10.    "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

11.    "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

12.    "TRANSPORTATION SYSTEM" or "TRANSPORTATION NETWORK" refers to the entire system for providing and/or facilitating Rides, which may include but is not limited to Driver recruitment, Driver screening, Driver training, instructions for Drivers, policies and guidelines that apply to Drivers, Rider recruitment, Rider screening, Rider training, instructions for Riders, policies and guidelines that apply to Riders, the way in which a Rider requests a Ride, or someone else may request a Ride on behalf of a Rider, the way in which Drivers are matched with Riders via the Uber App, the way in which a Driver accepts a Ride, where and how Drivers and Riders are instructed to meet one another, the way in which Drivers and Riders and directed to identify one another and confirm that identity, the trade dress or other markings used to help identify Drivers' vehicles, maps and driving instructions, ways in which destinations can be changed, stops can be added, additional Riders can be added, where and how a Driver drops a Rider off, what components of the Ride are supported by technology, devices, or services external to the Uber App, what Fares are charged, the amount of the Fares, the way in which Fares are charged, how much of the Fare is shared with the Driver, what the Driver and Rider each are told about the Fare(s), discounts if any provided, customer support or other services provided before during and after a Ride, devices hardware and software that supports the Ride, safety buttons, features to share a Ride with a third party, GPS and/or other monitoring by Uber of a Ride, automation to detect unusual or unwanted activity during a Ride, video and/or audio recording during a Ride, and/or the lack of any of these things or features.

13.    "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

## DEPOSITION TOPICS

1.  The timeline of Uber's Rollout of Personal Transportation (including but not limited to when and how it announced and described UberCab, UberX, and "peer-to-peer" rides).
2.  Uber's role in changing the way people are transported in the United States and globally (including numbers of people who used various modes of personal transportation before introduction of Uber's Transportation Network, and for each year since).
3.  The nature and function of Uber's Transportation Network (including but not limited to a detailed description of the product(s) and/or service(s) Uber offers, and who is eligible to be a Rider).
4.  Uber's annual revenue and profits from its Transportation Network, for each year from 2012 to present.
5.  The number of Rides that have taken place via Uber's Transportation Network, for each year from 2012 to the present (including globally, in the United States, for each state; and annually as well as per weekday and weekend day; and the number of Rides provided to female Riders).
6.  The number of unique Riders and Drivers who actively used Uber's System, for each year from 2012 to the present (including globally, in the United States, and for each state).
7.  The turnover rate (including the rates of onboarding and the rates of attrition or "churn" as Uber calls it) for Riders and Drivers respectively in the United States, for each year from 2012 to the present, and broken down by each state.
8.  The sources of Uber's revenue from its Transportation Network Operations (including what percent of that revenue is derived from Riders' payments for Rides, versus other sources, specifying the other sources, if any).

9. Uber's costs and expenses related to its Transportation Network, for each year from 2012 to the present, including its budget/expenditures for each of the following: marketing, advertising, lobbying, safety (including specifically safety research and testing, safety technology and products, safety operations and services, and any other specific aspects of safety).

10. Uber's costs and expenditures, for each year from 2012 to the present, spent for the purpose of preventing Sexual Assault and Sexual Misconduct in connection with Rides (including the amounts spent, and what specifically those amounts were spent on).

11. Uber's payments to nonprofit organizations whose work involves combatting sexual violence (including the amount(s), date(s), and circumstances of the payment(s)).

12. How Uber's Transportation System is intended to function (including ride requests, matching, pick up, riding, fares, payment, drop off, monitoring, Rider and Driver communications, and the role of the Uber App and Driver App in facilitating those processes).

13. Uber's control over its Transportation System, including its control over the Drivers who use its Transportation System.

## **SCHEDULE B**

### **DOCUMENTS TO BE PRODUCED**

1. Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

2. All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

3. The custodial file of the deponent, to the extent s/he is not already a custodian.

4. Documents reflecting the timeline of Uber's Rollout of Personal Transportation (including but not limited to when and how it announced and described UberCab, UberX, and "peer-to-peer" rides).

14. Documents reflecting Uber's annual revenue and profits from its Transportation Network, for each year from 2012 to present.

15. Documents reflecting the number of Rides that have taken place via Uber's Transportation Network, for each year from 2012 to the present (including globally, in the United States, for each state; and annually as well as per weekday and weekend day; and the number of Rides provided to female Riders).

7

16. Documents reflecting the number of unique Riders and Drivers who actively used Uber's System, for each year from 2012 to the present (including globally, in the United States, and for each state).

17. Documents reflecting the turnover rate (including the rates of onboarding and the rates of attrition or "churn" as Uber calls it) for Riders and Drivers respectively in the United States, for each year from 2012 to the present, and broken down by each state.

18. Documents reflecting the sources of Uber's revenue from its Transportation Network Operations (including what percent of that revenue is derived from Riders' payments for Rides, versus other sources, specifying the other sources, if any).

19. Documents reflecting Uber's costs and expenses related to its Transportation Network, for each year from 2012 to the present, including its budget/expenditures for each of the following: marketing, advertising, lobbying, safety (including specifically safety research and testing, safety technology and products, safety operations and services, and any other specific aspects of safety).

20. Documents reflecting Uber's costs and expenditures, for each year from 2012 to the present, spent for the purpose of preventing Sexual Assault and Sexual Misconduct in connection with Rides (including the amounts spent, and what specifically those amounts were spent on).

21. Documents reflecting Uber's payments to nonprofit organizations whose work involves combatting sexual violence (including the amount(s), date(s), and circumstances of the payment(s)).

22. Graphics (including flowcharts and/or diagrams in Uber's possession) that depict how Uber's Transportation System is intended to function (including ride requests, matching, pick up, riding, fares, payment, drop off, monitoring, Rider and Driver communications, and the role of the Uber App and Driver App in facilitating those processes).

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the undersigned caused a copy of the foregoing to be

served via electronic mail on July 7, 2025, to counsel for Defendants Uber Technologies, Inc., Rasier

LLC and Rasier-CA, LLC, at the following email addresses:

**Kirkland & Ellis LLP**
Alli Brown
alli.brown@kirkland.com
Chris Cox
christopher.cox@kirkland.com
Jessica Davidson:
jessica.davidson@kirkland.com
Jennifer Levy
jlevy@kirkland.com
Rupal Joshi
rupal.joshi@kirkland.com

**O'Melveny and Meyers LLP**
Sabrina Strong
sstrong@omm.com
Jonathan Schneller
jschneller@omm.com
Joshua Revesz
jrevesz@omm.com
Louis Fisher
lfisher@omm.com

**Shook, Hardy & Bacon LLP**
Michael B. Shortnacy
mshortnacy@shb.com
Patrick L. Oot, Jr.
oot@shb.com
Christopher V. Cotton
ccotton@shb.com
Alycia A. Degen
adegen@shb.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

9

Todd Gaddis

EX 1558

R.R. 07.11.25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| This Document Relates to:<br> All Cases | **ALL PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC REGARDING TOPICS IDENTIFIED BELOW**<br><br>Judge: Honorable Charles R. Breyer |

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, all Plaintiffs will take the deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") through one or more of their designees on the topics listed below. This deposition will be taken before a duly qualified Notary Public, at the time and place specified, and via Zoom Video Conferencing, and continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of all Plaintiffs. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony by audio and video technology in addition to the stenographic method.  Notice is hereby given that the video is intended for use at trial.

| | |
|---|---|
| **WITNESS:** | **Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (Todd Gaddis, all topics)** |
| **DATE:** | **July 11, 2025** |
| **TIME:** | **9:00 a.m. Pacific Time** |
| **LOCATION:** | **Kirkland & Ellis**<br>**555 California Street, 27th Floor**<br>**San Francisco, CA 94104** |

Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on which each person will testify. And if Uber intends to have a custodian whose deposition is already scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs request that Uber provide notice of the same at least ten (10) business days in advance of that

1  witness' deposition.

2        Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce

3  and permit inspection and copying of the documents and/or tangible things specified in Attachment

4  A to this notice at the time and place of deposition.

5                                    **INSTRUCTIONS**

6        1.      For purposes of interpreting or construing the scope of this Notice, the terms shall be

7  given their most expansive and inclusive interpretation unless otherwise specifically limited by the

8  language of an individual topic or request. This includes, without limitation, the following:

9        a.   The terms "each," "every," "any," and "all" are synonymous with one another and with

10            "each and every" and "any and all;"

11

12       b.   The connectives "and" and "or" are used inclusively and not exclusively and shall be

13            construed either disjunctively or conjunctively as to require the broadest possible

14            response;

15       c.   Construing the singular form of the word to include the plural and the plural form to

16            include the singular;

17

18       d.   Construing the masculine to include the feminine, and vice-versa;

19       e.   The use of any tense of any verb shall also include all other tenses of that verb;

20       f.   A term or word defined herein is meant to include both the lower and uppercase

21            reference to such term or word;

22

23       g.    Any Bates number referenced herein shall be construed to refer not only to the specific

24            page number identified but to the entirety of the document associated with that Bates

25            number, including any family members;

26       h.   Construing the term "including" to mean including but not limited to.

27       2.       Unless otherwise indicated, the name of any Person, party or business organization

28  shall specifically include all past and present employees, officers, directors, agents, representatives,

general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3. In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4. Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

## DEFINITIONS

1. "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

2. "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form. The term "DOCUMENT" includes all drafts of a

"DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original.  The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

3.      "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

4.      "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

5.      "LOCATION DATA" includes coordinates, GPS data, satellite data, and latitude-longitude data.

6.      "PERSONAL TRANSPORTATION" means transportation of people in passenger vehicles.

7.      "RATE" refers to all of the following: the absolute number, frequency, incidence, as well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly category of Ride is specified, for that category of Ride).

8.      "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

9.      "RESEARCH" means observation, testing, surveys, experimentation, and the collection, interpretation, and evaluation of data.

10.     "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

11.     "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

12.     "RIDER APP," "UBER APP," "UBER APPLICATION," "UBER APP," or "APP" means Uber's mobile device application that is used by Drivers and Riders to coordinate, provide, or order Uber Rides, including apps used by both DRIVER or RIDER, and including the Uber Driver Application.

13.     "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

14.     "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

15.     "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

16.     "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

17.     "SEXUAL VIOLENCE" shall mean SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

18.     "TRANSPORTATION SYSTEM" or "TRANSPORTATION NETWORK" refers to the entire system for providing and/or facilitating Rides, between Riders and Drivers. The Transportation System may include but is not limited to Driver recruitment, Driver screening, Driver training, instructions for Drivers, policies and guidelines that apply to Drivers, Rider recruitment, Rider screening, Rider training, instructions for Riders, policies and guidelines that apply to Riders, the way in which a Rider requests a Ride, or someone else may request a Ride on behalf of a Rider,

the way in which Drivers are matched with Riders via the Uber App, the way in which a Driver accepts a Ride, where and how Drivers and Riders are instructed to meet one another, the way in which Drivers and Riders and directed to identify one another and confirm that identity, the trade dress or other markings used to help identify Drivers' vehicles, maps and driving instructions, ways in which destinations can be changed, stops can be added, additional Riders can be added, where and how a Driver drops a Rider off, what components of the Ride are supported by technology, devices, or services external to the Uber App, what Fares are charged, the amount of the Fares, the way in which Fares are charged, how much of the Fare is shared with the Driver, what the Driver and Rider each are told about the Fare(s), discounts if any provided, customer support or other services provided before during and after a Ride, devices hardware and software that supports the Ride, safety buttons, features to share a Ride with a third party, GPS and/or other monitoring by Uber of a Ride, automation to detect unusual or unwanted activity during a Ride, video and/or audio recording during a Ride, and/or the lack of any of these things or features.

19.    "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

20.    "UNIQUE TRIP" shall mean and refer to each RIDE offered by the UBER APP that is represented by a unique UUID.

## DEPOSITION TOPICS

1. For each year, from 2012 to the present, the numbers and classifications of Sexual Misconduct and Sexual Assault incidents reported to Uber by Riders.

2. The true Rate of Sexual Assault and Sexual Misconduct on Uber's platform, after accounting for underreporting.

3.   Uber's Safety Reports (including but not limited to why Uber published its Safety Reports, what it said about its Safety Reports, how and why it chose which data to report, how it assured the quality of that data and reporting, and what impact the Safety Reports had on Uber's reputation).

4.   For each month in the year 2023, specify by category, the number of Sexual Violence Incidents in the United States that YOU categorized into each of the 21 categories in Uber's Sexual Misconduct and Sexual Violence Taxonomy or categorized as "Insufficient Information" or "Parent Category Usage Tracking."

5.   For each month in the year 2024, specify by category, the number of Sexual Violence Incidents in the United States that YOU categorized into each of the 21 categories in Uber's Sexual Misconduct and Sexual Violence Taxonomy or categorized as "Insufficient Information" or "Parent Category Usage Tracking."

6.   Identify the "200 gender-based violence prevention experts" referenced in the introduction (page 9) of Uber's 2017-2018 U.S. Safety Report.

7.   Identify all individuals who were a part of the "specialized audit team" referenced in Uber's 2017-2018 U.S. Safety Report, page 9.

8.   Identify all individuals who were a part of the "specialized audit team" referenced in Uber's 2019-2020 U.S. Safety Report, page 45.

9.   Identify whether a "specialized audit team" reviewed the data reported in Uber's 2021-2022 U.S. Safety Report and if so, identify all individuals who were part of that team.

10. Identify the uuid of all users of the Uber platform who were banned from the platform, at any time from 2009 to present, based on "a statement of experience from the survivor and/or [other] relevant facts (e.g., GPS data, timestamps, videos/photos, in-app communications)" or any other information, as referenced in Uber's 2017-2018 U.S. Safety Report, page 26.

11. Identify the uuid of all drivers who have been banned from YOUR platform for the most serious safety incidents and that you shared with YOUR ridesharing peers at all times from 2009 to present, as addressed on page 31 of YOUR 2017-2018 U.S. Safety Report, including the date and all details shared with YOUR ridesharing peer.

12. Identify the uuid of all drivers who have been banned from YOUR platform for the most serious safety incidents and that you shared with YOUR ridesharing peers at all times from 2009 to present, as addressed on page 31 of YOUR 2017-2018 U.S. Safety Report, including the date and all details shared with YOUR ridesharing peer.

13. Identify the number of "trained safety support agents," "trained agents," or "specialized team of Uber agents" employed by YOU by year, as identified in YOUR 2017-2018 U.S. Safety Report (page 12), 2019-2020 U.S. Safety Report (page 31), 2021-2022 U.S. Safety Report (page 8), including details of the number of agents in each position and the number of agents in each position during each year.

14. Identify each of the "more than 10 different reporting channels" referenced in YOUR 2017-2018 U.S. Safety Report (p. 15), 2019-2020 U.S. Safety Report (p. 11), and 2021-2022 U.S. Safety Report (p. 8) from which Uber receives user reports including the dates or date range during which reports were received from that channel, the corresponding number of reports received through that channel during that time frame, and a description of the means by which reports were received from that channel.

15. Identify the job titles and number of agents possessing that title for each year from 2009 to present who were authorized to deactivate driver accounts based on Sexual Violence Incident reports.

16. Identify the members of the RALIANCE external validation team referenced in YOUR 2019-2020 U.S. Safety Report (Appendix 1) and 2021-2022 U.S. Safety Report (p. 27) and the year(s) in which they were members of the team.

8

17. Identify the amount of payment, by trip uuid, received by YOU for each trip resulting in a Sexual Violence Incident that was included in any of YOUR U.S. Safety Reports, specifically Table 12 of YOUR 2017-2018 U.S. Safety Report, Tables 13 through 17 of YOUR 2019-2020 U.S. Safety Report, and table 4 of YOUR 2020-2021 U.S. Safety Report.

18. Identify the uuid of all drivers who has been deactivated, and not subsequently reactivated, from YOUR platform as a result of any report(s) of any incident(s) categorized under any of the twenty-one categories in Uber' Sexual Misconduct and Sexual Violence Taxonomy including the date of deactivation.

## **<u>SCHEDULE B</u>**

### **DOCUMENTS TO BE PRODUCED**

1. For each month in the year 2023, specify by category, the number of Sexual Violence Incidents in the United States that YOU categorized into each of the 21 categories in Uber's Sexual Misconduct and Sexual Violence Taxonomy or categorized as "Insufficient Information" or "Parent Category Usage Tracking."

2. For each month in the year 2024, specify by category, the number of Sexual Violence Incidents in the United States that YOU categorized into each of the 21 categories in Uber's Sexual Misconduct and Sexual Violence Taxonomy or categorized as "Insufficient Information" or "Parent Category Usage Tracking."

3. Identify the "200 gender-based violence prevention experts" referenced in the introduction (page 9) of Uber's 2017-2018 U.S. Safety Report.

4. Identify all individuals who were a part of the "specialized audit team" referenced in Uber's 2017-2018 U.S. Safety Report, page 9.

5. Identify all individuals who were a part of the "specialized audit team" referenced in Uber's 2019-2020 U.S. Safety Report, page 45.

6. Identify whether a "specialized audit team" reviewed the data reported in Uber's 2021-2022 U.S. Safety Report and if so, identify all individuals who were part of that team.

7. Identify the uuid of all users of the Uber platform who were banned from the platform, at any time from 2009 to present, based on "a statement of experience from the survivor and/or [other] relevant facts (e.g., GPS data, timestamps, videos/photos, in-app communications)" or any other information, as referenced in Uber's 2017-2018 U.S. Safety Report, page 26.

8. Identify the uuid of all drivers who have been banned from YOUR platform for the most serious safety incidents and that you shared with YOUR ridesharing peers at all times from 2009 to present, as addressed on page 31 of YOUR 2017-2018 U.S. Safety Report, including the date and all details shared with YOUR ridesharing peer.

9. Identify the uuid of all drivers who have been banned from YOUR platform for the most serious safety incidents and that you shared with YOUR ridesharing peers at all times from 2009 to present, as addressed on page 31 of YOUR 2017-2018 U.S. Safety Report, including the date and all details shared with YOUR ridesharing peer.

10. Identify the number of "trained safety support agents," "trained agents," or "specialized team of Uber agents" employed by YOU by year, as identified in YOUR 2017-2018 U.S. Safety Report (page 12), 2019-2020 U.S. Safety Report (page 31), 2021-2022 U.S. Safety Report (page 8), including details of the number of agents in each position and the number of agents in each position during each year.

11. Identify each of the "more than 10 different reporting channels" referenced in YOUR 2017-2018 U.S. Safety Report (p. 15), 2019-2020 U.S. Safety Report (p. 11), and 2021-2022 U.S. Safety Report (p. 8) from which Uber receives user reports including the dates or date range during which reports were received from that channel, the corresponding number of reports received through that channel during that time frame, and a description of the means by which reports were received from that channel.

12. Identify the job titles and number of agents possessing that title for each year from 2009 to present who were authorized to deactivate driver accounts based on Sexual Violence Incident reports.

13. Identify the members of the RALIANCE external validation team referenced in YOUR 2019-2020 U.S. Safety Report (Appendix 1) and 2021-2022 U.S. Safety Report (p. 27) and the year(s) in which they were members of the team.

14. Identify the amount of payment, by trip uuid, received by YOU for each trip resulting in a Sexual Violence Incident that was included in any of YOUR U.S. Safety Reports, specifically Table 12 of YOUR 2017-2018 U.S. Safety Report, Tables 13 through 17 of YOUR 2019-2020 U.S. Safety Report, and table 4 of YOUR 2020-2021 U.S. Safety Report.

15. Identify the uuid of all drivers who has been deactivated, and not subsequently reactivated, from YOUR platform as a result of any report(s) of any incident(s) categorized under any of the twenty-one categories in Uber' Sexual Misconduct and Sexual Violence Taxonomy including the date of deactivation.

16.  Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

17. All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

18. The custodial file of the deponent, to the extend s/he is not already a custodian.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the undersigned caused a copy of the foregoing to be served via electronic mail on July 7, 2025, to counsel for Defendants Uber Technologies, Inc., Rasier LLC and Rasier-CA, LLC, at the following email addresses:

**Kirkland & Ellis LLP**
Alli Brown
alli.brown@kirkland.com
Chris Cox
christopher.cox@kirkland.com
Jessica Davidson:
jessica.davidson@kirkland.com
Jennifer Levy
jlevy@kirkland.com
Rupal Joshi
rupal.joshi@kirkland.com

**O'Melveny and Meyers LLP**
Sabrina Strong
sstrong@omm.com
Jonathan Schneller
jschneller@omm.com
Joshua Revesz
jrevesz@omm.com
Louis Fisher
lfisher@omm.com

**Shook, Hardy & Bacon LLP**
Michael B. Shortnacy
mshortnacy@shb.com
Patrick L. Oot, Jr.
oot@shb.com
Christopher V. Cotton
ccotton@shb.com
Alycia A. Degen
adegen@shb.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com
*Co-Lead Counsel for Plaintiffs*

Case No. 3:23-MD-3084-CRB