# EXHIBIT 1

**Pages 1 - 41**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Charles R. Breyer, Judge

```
IN RE: UBER TECHNOLOGIES,      )
INC., PASSENGER SEXUAL ASSAULT )
LITIGATION                     )   No. 23-MD-03084 CRB
                               )
_____)
```

San Francisco, California
Friday, December 5, 2025

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

> GIRARD SHARP, LLP
> 601 California Street, Suite 1400
> San Francisco, California 94108-2819
> **BY: SARAH R. LONDON, ATTORNEY AT LAW**

> PEIFFER WOLF CARR KANE CONWAY & WISE LLP
> 555 Montgomery Street, Suite 820
> San Francisco, California 94111-2560
> **BY: RACHEL B. ABRAMS, ATTORNEY AT LAW**

> WALKUP, MELODIA, KELLY & SCHOENBERGER
> 650 California Street, 26th Floor
> San Francisco, California 94108-2615
> **BY: KHALDOUN BAGHDADI, ATTORNEY AT LAW**

For Defendants Uber Technologies and Rasier, LLC:
> KIRKLAND & ELLIS LLP
> 555 California Street, 27th Floor
> San Francisco, California 94104
> **BY: LAURA E. VARTAIN, ATTORNEY AT LAW**

> KIRKLAND & ELLIS LLP
> 401 West Fourth Street
> Austin, Texas 78701
> **BY: KIM BUENO, ATTORNEY AT LAW**

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter

---

**Page 2**

1    Friday - December 5, 2025                        2:02 p.m.

2                    P R O C E E D I N G S

3                           ---o0o---

4         **THE COURTROOM DEPUTY:**   Calling Civil

5    Action C 23-MD-03084, In Re Uber Technologies, Inc., Passenger

6    Sexual Assault Litigation.

7         Counsel, please state your appearances.

8         **MS. LONDON:**   Good afternoon, Your Honor.  Sarah London

9    on behalf of the plaintiffs.

10        **MS. ABRAMS:**   Good afternoon, Your Honor.  Rachel

11   Abrams on behalf -- from Peiffer Wolf on behalf of the

12   plaintiffs.

13        **MR. BAGHDADI:**   Good afternoon, Your Honor.  Khaldoun

14   Baghdadi on behalf of the plaintiffs.

15        **THE COURT:**   Ms. Vartain, you're not shy, are you?

16        **MS. VARTAIN:**   I'm here, and I'm joined by my colleague

17   Kim Bueno -- good afternoon, Your Honor -- on behalf of the

18   Uber defendants.

19        **MS. BUENO:**   Good afternoon.

20        **THE COURT:**   Good afternoon.

21        So, thank you very much.  I received the joint case

22   management statement.

23        And let me -- let me go right away to the Arizona trial,

24   which is on tap.  We should confirm dates, but I don't think

25   there's a change or anything.

---

**Page 3**

1         However, I want to address the issue of the length of the

2    trial because I know that the parties came to a stipulation as

3    to time, but I thought that the stipulation at least should be

4    reconsidered by this Court in terms of what is actually

5    required.

6         So as I understood the stipulation, it is -- and I'm

7    digging it out here somewhere.  Perhaps you can remind me, but

8    I think it was, like, 80 hours or something like that.  What

9    was it?

10        **MS. LONDON:**   Yes, Your Honor.

11        **THE COURT:**   And it was divided a particular way.

12   There was a ratio.  I don't know what the ratio is.

13        **MS. LONDON:**   It was, Your Honor.

14        **THE COURT:**   Okay.  80 hours.

15        And what do you -- what does one contemplate a normal

16   trial day -- I'll give you my opinion, but it can be informed

17   by your judgments.  And I'm going to ask you about the state

18   court proceeding because I think that that's pretty instructive

19   on a number of fronts.

20        But I assume that we could get in five hours a day.  Is

21   that -- if we started at 9:30 and went to 4:30 -- I won't take

22   an hour for lunch.  I'll probably take 45 minutes for lunch.

23   My recesses are in the neighborhood of 15 minutes, never

24   shorter.  Sometimes they're 20 minutes, you know.  But I'm

25   pretty good at keeping the army marching in these things.

---

**Page 4**

1         So, so if you talk about an hour and a half, basically,

2    out of the day, maybe -- and some slippage here, say you say

3    it's two hours out of the day, you start at 9:30 and you go to

4    4:30, that's eight hours; right?  Have I done my math right or

5    not?

6         **MS. BUENO:**   Seven hours, I believe.

7         **THE COURT:**   Thank you.  I did it wrong.  Exactly.

8         Seven hours, and you subtract from that two hours, you get

9    five, which is where I sort of came out, that you can get in

10   about a five-hour day.

11        All right.  So a five-hour day -- now I do the math --

12   divided into 80, goes 2 -- goes 1 -- goes 16 days; right?

13        **MS. LONDON:**   Yes, Your Honor.

14        **THE COURT:**   Have I done that math right?

15        **MS. BUENO:**   Yes.

16        **MS. LONDON:**   Yes.

17        **THE COURT:**   I'm doing it on the fly, so okay.

18        Okay.  16 days.  Now let's just figure out where we are in

19   the calendar.  So 16 days is -- 16 days would put us into

20   February in trying this case.

21        All right.  Now I go back to -- let's assume five hours is

22   realistic and I know the number of days I'm going to -- you

23   know, we're going to go four days a week.  The first week,

24   we'll go Tuesday through Friday.  Second day we'll go -- second

25   week, Tuesday through Friday.  And then we'll have some

**5**

1  discussions whether we ought to go Monday through Thursday as
2  distinct from Tuesday through Friday.
3      I'm not wedded to one thing or another.  It helps
4  out-of-town lawyers to start on Tuesday, to get there.  It
5  doesn't help them leave.  So, you know, everything's
6  trade-offs.
7      Anyway, but you see there, that means in the first
8  two weeks of January, starting with the trial -- because jury
9  selection will have already taken place -- we are -- we are,
10  you know -- well, we're halfway there under your 80-hour
11  estimate.  Have I done that right?
12      MS. LONDON:  Well, it looks to me like, Your Honor, if
13  we start on January 13th and we were to go at least, let's just
14  say, 12 -- we get in 12 trial days before February.  So that
15  would be -- you know, the 30th would be the 12th trial day.
16      THE COURT:  Yeah.
17      MS. LONDON:  And if we ended up needing to go into a
18  fourth week, then that's still the first week of February.
19      THE COURT:  Right.
20      MS. LONDON:  So that's right.
21      THE COURT:  Yeah.  But what I'm saying is we'll have
22  completed two weeks of -- in the first two weeks of testimony,
23  which is the nuts and bolts of the cases -- I mean, in
24  40 hours, even though you've asked for 80, in 40 hours, if you
25  haven't established the nuts and bolts of the case, I don't

**6**

1  know what's going on, you know, to tell you the truth.  That is
2  one way to look at it.
3      But my question is a little different because you've had a
4  dry run.  You've had a dress rehearsal.  Wasn't even a dress
5  rehearsal.  Wasn't even a rehearsal.  You had a full trial.
6      And Judge Schulman tells me that it was -- I think he
7  said -- I have an email from him, but I just don't remember.
8  I think he said 13 days.  Does that sound right?
9      MS. VARTAIN:  Yes.
10      MS. BUENO:  Yes, Your Honor --
11      THE COURT:  I mean, you --
12      MS. BUENO:  -- we just confirmed.
13      THE COURT:  Okay.  So, in other words, 13 days.  And
14  in those 13 days, everything happened except the deliberations.
15  And I don't even know.  I think jury -- was jury selection part
16  of the 13 days?  No.  So it started with opening -- there were
17  two days of jury selections or something like that.  So that's
18  out.  So we're really talking about the case, the presentation
19  of the case being 13 days.
20      So 13 days, if I do the math right here -- and you may
21  check me on this -- is 65 hours, which is what I'm giving you
22  guys, not 80.
23      MS. BUENO:  I think that's plenty, Your Honor, from
24  defendants' perspective.
25      THE COURT:  Yeah.  Now, let me tell you what I do so

**7**

1  everybody understands the sort of peculiar way I operate.
2      In terms -- I have to believe that a certain amount of
3  this time will be devoted to deposition reading, either by way
4  of -- either you have a video or you don't.  I don't know.  I
5  assume you have the video for all of these things.  Fine.
6      And I'm going to give you some guidance on that, because
7  what I do in the video is I play the video once and in it, the
8  direct -- I try -- as Uber has pointed out -- and they're
9  right -- and maybe I should have addressed this earlier before
10  you all went crazy with these designations.  Uber -- plaintiffs
11  play what they want, Uber plays what it wants, all at one time.
12  And we don't go back and forth.  We just do it.
13      And, Plaintiff, the time is yours.
14      Uber, the time is yours.
15      That's how it works.  And that's because that's the way it
16  works in real life.  I mean, there are exceptions.  I
17  understand some sentence is read, so forth.  That is a --
18  that's a disaster.  I don't know who came up with that idea.
19      Well, but, I mean, the idea itself makes sense in the
20  microcosm of trials -- of trials.  That is, if somebody says
21  "X" and, to understand X, you have to say "Y," I can understand
22  you shouldn't have to wait two days to say "Y"; right?
23      Okay.  Number one, none of these are going to take that
24  long, I don't think; and, number two, you know, nothing's
25  perfect in this world, and this is a way to address that

**8**

1  problem.
2      I see, Ms. Abrams, do you have your hand up?  Is that
3  right, or is that just some technical glitch?
4      MS. ABRAMS:  I don't, Your Honor.  Sorry.
5      THE COURT:  All right.  Well, it's up.  I don't know
6  what that means.
7      Okay.  Anyway, that's the way I want to do it, which
8  really means that when you prepare your testimony for your --
9  for showing it, you just -- you know, provided that there's
10  some exchange here, you map it all out and you make judgments.
11  You see, all the time you're going to be making judgments, and
12  the judgments are going to be going to your time.
13      So I'm less concerned about trying to sit around and rule
14  as to is this really explanatory and therefore, under the rules
15  of evidence, would come in to make it -- to give meaning to it,
16  fair meaning to it or not.  Arguments -- as we well know,
17  lawyers can argue anything and frequently give convincing
18  arguments, to which at the end you'd say it doesn't matter.
19  It's a great argument.  It doesn't matter.
20      So I'm ruling today it doesn't matter and saying to you
21  what will matter to you, by the way, what will matter to you is
22  the time.  That's going to matter.  So -- so that's the way I
23  deal with it.
24      So I'm sort of getting maybe to the end of a lot of these
25  discussions or maybe not.  But the way I want to do it is I cut

9

1  your time down to 65 hours. Whatever the portion was that you
2  applied to 80 hours, we simply use that ratio for 65. That's
3  fair. And then we'll do it on that basis.
4      And moving forward, now I've talked about the
5  designations. Figure that one out. You really have to decide
6  how you want to use your time. You've got to make that
7  decision. So that's a big -- that's right. I mean, you can go
8  on and on or not. You know, you'll figure it out.
9      And my guess is, my guess is that the earlier bellwether
10 probably was quite instructional on -- in the direction that
11 you take the case. You know, now, I know -- I know Case 1 said
12 this, so you see if you can meet all the things in Case 1; and
13 you get Case 2 and it's the opposite or something else. I
14 don't know. So you'll figure it out. But at least you have
15 some guideposts here to be very helpful in preparing your case.
16 I think that's the bottom line.
17     Okay. Now, let me move on to what I thought was really --
18 I'm not going to say "the only," but the one that sort of hit
19 me from left field is the -- is the purported assailant in this
20 case, because I think -- I think it's -- oh, I don't know. You
21 can tell me, since you've done a lot of discovery.
22     Is this the usual case, where the assailant has been --
23 the purported assailant -- I mean, you know what I'm talking
24 about. I'm not forming any judgments -- it happened, didn't
25 happen. But is it usually the case that you have the

10

1  deposition of the purported assailant? Has that happened in
2  more than just a handful?
3      MS. BUENO:  Your Honor, this is Kim Bueno for Uber.
4      Yes, we have had the drivers in these cases be deposed,
5  like Mr. Turay here. There are many cases where they're not,
6  but there are certainly many where there are.
7      THE COURT:  Okay. So that -- by the way, thank you
8  for -- I mean, that disabuses me of some notion that I had,
9  which was the drivers will never show up. And I'm wrong. They
10 do in a certain -- in a meaningful percentage, I guess is the
11 answer.
12     MS. BUENO:  I don't have that percentage, Your Honor.
13 We can find that out for you. But I --
14     THE COURT:  Well, you don't need --
15     MS. BUENO:  -- am aware of --
16     THE COURT:  -- to tell me.
17     You don't need to tell me. I mean, again, I wanted to
18 make sure this is a bellwether, and so I didn't want to --
19     MS. BUENO:  Understood.
20     THE COURT:  -- try the one- -- I didn't want to try
21 the one-off, you know, that some driver showed up so now we're
22 going to try that one, because when the day is over, the fact
23 that there is a driver who is testifying could make a
24 difference to the outcome of the case. Not necessarily, but
25 could. And if it did, that's one more variable which makes it

11

1  less bellwether-ish; right?
2      I mean, a bellwether is to try to control the variables so
3  that it's -- so that the result is, quote, more apples to
4  apples. That's the theory of it. Let's not argue whether it's
5  right or not. It's the theory of it. Okay. That's why we're
6  all doing it. You're spending a ton of money and time doing
7  it, and I'm doing it because I'm interested.
8      Okay. So there we are on that.
9      Now, as I understand the position of the parties, both
10 parties have essentially agreed, subject to some concerns, that
11 a deposition can be used rather than -- rather than the
12 testimony -- live testimony, which would be an exception to the
13 rule. But my view is, hey, if the parties agree to it, why
14 not? You know, why not? Why not do it? They agree to it. I
15 mean, they're not asking anything egregious. But since they
16 both say yes, that's fine.
17     Now, what Uber has said is, "But wait, Judge. There's one
18 caveat that we want to put on," the caveat being that
19 certain -- I'll call it a certain quantum of evidence, as
20 represented by post-incident statements or acts, would not be
21 admitted. I understand that is -- that's Uber's position.
22     MS. BUENO:  With one clarification, Your Honor, if I
23 may. It's post-deposition evidence.
24     THE COURT:  Okay. Post-deposition.
25     MS. BUENO:  Both parties -- post -- exactly. So

12

1  things that were not able to be addressed in the deposition
2  that are hearsay would not be admissible.
3      But with that caveat, then, yes, Uber would be in
4  agreement with Mr. Turay's deposition being played by both
5  sides as opposed to the live testimony.
6      THE COURT:  So there are two answers to that.
7      Answer Number 1 is, if that evidence comes in, what then?
8  That is to say -- I mean, obviously, if it's -- I assume you're
9  going to move for its exclusion.
10     MS. BUENO:  Yes, Your Honor. And just so you're clear
11 on what it is, Mr. --
12     THE COURT:  I don't know.
13     MS. BUENO:  -- Turay, he was -- he was deposed by both
14 sides in a lengthy deposition.
15     Following the deposition, we, meaning Uber, received a
16 production from plaintiffs of a text message that Mr. Turay
17 sent to the plaintiffs' counsel in which he -- I don't have the
18 exact language with me, but he apologized to the plaintiff for
19 his acts.
20     My understanding is plaintiffs would like to get that text
21 message into evidence. It's hearsay. He's not coming to
22 trial. So our position is simply, if they want to play his
23 video, that's fine. We don't oppose that request. But if they
24 want to give the jury this text message and admit that into
25 evidence with this apology, then they need to bring him live.

13

1    THE COURT:   Or, in the alternative, redepose him.

2    MS. BUENO:   That's an option as well.

3    THE COURT:   Well, I think I turn to the plaintiff's and

4  say: Your call. I'm not saying it wouldn't come in, but

5  I think -- I think the following. I think what you think. You

6  figured it all out.

7    If you want him there live, you get him there live. If

8  you don't want him live and you're willing -- even though you

9  don't have, quote, that right, by way of stipulation, you can

10  get him there not live subject to this, quote, statement.

11    And now, then, you make a decision. Do I want to offer

12  that, or am I not going to offer it? If you don't offer it, we

13  just go ahead. Very nice. If you want to offer it, I think I

14  have to give him -- give Uber the ability to redepose him on

15  this one issue.

16    So I'm not asking you for your decision today. Got it?

17    MS. LONDON:   Understood, Your Honor.

18    THE COURT:   And do you have any problem with that,

19  Ms. Bueno?

20    MS. BUENO:   No, Your Honor. I think that plaintiffs

21  need to make a decision about which course of action they

22  prefer.

23    THE COURT:   Yeah. It's all up to them. They should

24  just make it and make it in a -- you know, it's important to

25  make it timely. We're a month away.

14

1    And I can't see how a deposition on this issue would last

2  longer than an hour. I'd be glad to put a time limit on it or

3  whatever is reasonable.

4    But I think you have to make it. And you don't have to

5  make it today, but, obviously -- obviously, the time is running

6  against you. So you make it when you think you can make it.

7    MS. LONDON:   We understand -- we understand,

8  Your Honor.

9    And the only thing I would just add to the context of this

10  is, this text message was produced to Uber and it formed, in

11  part, some of the basis for one of expert's -- the expert's

12  conclusions regarding his opinions.

13    So I understand Your Honor's rulings. I understand the

14  state of play. I just wanted to point out, in terms of our --

15  just the overall context of this and where the current

16  evidentiary record is, it is part of the basis of an expert's

17  opinion. It is not necessarily something standalone that we're

18  planning to offer into evidence.

19    So we will take the Court's under- -- guidance on this.

20  We will follow the evidentiary rules. And we understand where

21  Uber is at and what choices are in front of us.

22    THE COURT:   Do we think that he can -- do you think

23  your expert can testify about this message, absent its

24  admissibility?

25    MS. LONDON:   Well, Your Honor, I mean, the rules are

15

1  clear about, you know, under Rule 26, what an expert can form

2  the basis on, including things that would be hearsay or

3  inadmissible, so long as it would be part and parcel of the

4  kind of thing the expert would consider.

5    It's not something that we would necessarily publish to

6  the jury. It's not something that we would seek to admit

7  through that expert. But out of completeness, I wanted to

8  share with the Court the context in which it is currently in

9  the state of play.

10    And it doesn't mean, Your Honor, that we would even offer

11  the expert's opinion on that topic at all. It is just that is

12  the record as it currently is and --

13    THE COURT:   Okay.

14    MS. LONDON:   -- you know, we have to make some

15  decisions.

16    THE COURT:   Make your judgments.

17    And, by the way --

18    MS. LONDON:   Yes.

19    THE COURT:   -- I'm not pointing any fingers at anybody

20  in this thing.

21    I'm just trying to get it in a form that everybody starts

22  the trial and that's the understanding.

23    MS. LONDON:   Yes, Your Honor.

24    THE COURT:   Then everything's fine. Okay. I mean,

25  that's fine. That's fine.

16

1    I'm trying figure out what else I have to decide.

2    MS. LONDON:   Your Honor, may I ask just a question

3  about the trial time limits?

4    THE COURT:   Yes.

5    MS. LONDON:   So one issue that we still haven't pinned

6  down from Uber on is their position on bifurcation and --

7    THE COURT:   Oh, yeah. Wait. There are two issues.

8  I'm going through my --

9    MS. LONDON:   Okay.

10    THE COURT:   -- my mind here, and it's been sorely

11  tested today already for two hours.

12    Let's talk about Uber's witnesses that you want live and

13  they haven't committed themselves to producing.

14    So my question, Ms. Bueno, is: What do you think?

15  You know, you see what's going on. And one thing I don't like,

16  I get really annoyed with, like, surprises; and trial lawyers,

17  I know, don't like them either. So I think -- I think we have

18  to be very up-front with it.

19    You know, is this person -- are you going to produce these

20  people? They are, I think -- they are beyond the subpoena

21  power of the Court. I think it's recognized that it would be a

22  voluntary act. But, you know, there are upsides and downsides,

23  as we all know, of not producing people.

24    So when are you going to tell them -- "when," that's like

25  a specific question. When are you going to tell them, as to

17

1  the three people -- I understand there are three -- whether
2  they will be produced?
3      MS. BUENO:   Right now, Your Honor.
4      I think we have spelled it out in the CMC statement, but I
5  will just make very clear, we are not going to produce the
6  three individuals that plaintiffs have requested live at trial.
7  We think they are outside of the subpoena range.  Rule 45 does
8  not permit that.
9      I know there's been a very interesting legal discussion
10 about the interplay between Rule 45 and Rule 43.  We've done a
11 lot of research into it and believe that the Ninth Circuit law
12 is very clear that if someone is outside of the subpoena range,
13 that does not allow a party to compel their attendance via Zoom
14 or some other remote means.
15     THE COURT:   Okay.  So what you're saying is, "It's
16 clear we're not producing them, and we think legally we're not
17 required to do so."
18     And to which I now turn to the plaintiffs and say:  That's
19 their position.  If you disagree with that position, you should
20 file a motion.
21     MS. LONDON:   Very good, Your Honor.
22     Our concern is not that that's wrong.  The issue is, what
23 is our -- what will Uber be allowed to do in terms of
24 cherry-picking who it will make available to trial?
25     So if Uber is intending to bring three different witnesses

18

1  that it would prefer to be live --
2      THE COURT:   Well, put it --
3      MS. LONDON:   -- we think it should be --
4      THE COURT:   -- in your motion.
5      MS. LONDON:   -- foreclosed from doing that.
6      THE COURT:   Put it in your motion.  What relief are
7  you seeking?  Spell it all out, and then I'll decide.
8      MS. LONDON:   Will do, Your Honor.
9      THE COURT:   I'm a -- I'm a big guy.  I can decide
10 those things.  Right.  That's -- I can do it.
11     MS. LONDON:   And we have --
12     MS. BUENO:   For Your Honor's --
13     MS. LONDON:   And we have -- Your Honor, we have also
14 served trial deposition subpoenas for these three witnesses,
15 and we will be seeking relief to be permitted to take those
16 trial depositions.  And optimally, Your Honor, you know, in
17 your courtroom, we would love to -- because so many key
18 documents have come in since these witnesses were deposed --
19 and we'll put this in our motion -- including documents Uber
20 has held on long past time for privilege and finally produced
21 or documents that were custodial files of these witnesses that
22 were important witnesses, we believe it's critical, for the
23 jury to get a complete picture here, that these witnesses be
24 testifying.  And so we would -- we are going to seek leave to
25 testify -- to depose them before trial if they're not coming

19

1  live, but we'll also seek the remedy of --
2      THE COURT:   Okay.
3      MS. LONDON:   -- avoiding cherry-picking.
4      THE COURT:   The uncertainty has been eliminated.  Now
5  you have to move quickly.
6      MS. LONDON:   Very good, Your Honor.
7      THE COURT:   Because I'm not continuing dates.
8      MS. BUENO:   Yes.
9      MS. LONDON:   We understood.  We understand.
10     THE COURT:   Right.  Okay.
11     MS. BUENO:   And, Your Honor, obviously, we would like
12 an opportunity to respond, as I know you'll give us.
13     THE COURT:   No, you will.  You will.  You'll get all
14 the opportunity you want because I don't want to listen to
15 Ms. Vartain yell at me that -- so you'll get all the
16 opportunity you want.
17     MS. BUENO:   Okay.  And just --
18     MS. LONDON:   Your Honor -- oh, sorry.
19     There was, Your Honor, one more surprise piece, though, is
20 that I believe we had asked Ms. Bueno to -- or counsel for Uber
21 to tell us who they are planning to bring live.  And is that
22 something that they are prepared to tell us today?
23     MS. BUENO:   Absolutely.
24     So Your Honor is clear, the three witnesses that the
25 plaintiffs have sought to bring live into your courtroom, they

20

1  have been deposed for hours and hours and hours -- one of them,
2  17-plus hours.  And the reason that that happened during
3  discovery was because plaintiffs said, "We need all this extra
4  time to make sure we're ready for trials."
5      So it's our position that if they want to bring these
6  witnesses, they've had ample time to depose them.  And indeed,
7  they've been deposed about Ms. Dean's specific case as well.
8  One of them is case-specific testimony.  So that's already been
9  provided, which is why we'll oppose any request for a trial
10 deposition because they already have video depositions to play.
11     So then as far as who we are bringing, by agreement of the
12 parties, our witness lists are due on Monday.  So who we are
13 going to include on the witness list will include -- and I'm
14 happy to tell Your Honor now -- will include some witnesses
15 that we'll be -- probably may call, depending on Your Honor's
16 rulings.
17     There is an MSJ that's outstanding.  There is a claim for
18 vicarious liability, for example, that we think should be
19 dismissed.  If it's not going to be dismissed, then we have a
20 witness who will come and talk about the control, independent
21 contractor issues, et cetera.  So that person will be on our
22 list.
23     And there will be other witnesses that are on our list,
24 depending on what the plaintiffs pursue.
25     Your Honor's aware there are issues, for example, of

21

1  allegations we should have had dashcams. There are certain
2  company witnesses that deal with that. There are certain
3  company witnesses that deal with safety features called --
4      THE COURT:   Yeah, but I think -- I think, Ms. Bueno,
5  that all you have to do -- and when I say "all," I'm not
6  minimizing it; but you simply say, "If Issue Number 1 is going
7  to be tried, adjudicated, here are the five witnesses that we
8  need on that issue. Issue Number 2, here are the three
9  witnesses."
10     MS. BUENO:   Yes.
11     THE COURT:   I think that's all they're asking you -- I
12 don't know if it's all they're asking you to do. But
13 I think -- I think in response to what you have said, that's
14 what you should do. That's what I would say.
15     MS. BUENO:   And we are prepared to do that, no
16 problem.
17     THE COURT:   Yeah. And do that on Monday. You can say
18 whatever you want to say. I think it's better that if you have
19 a conversation, don't have it in front of me.
20     MS. BUENO:   Okay.
21     THE COURT:   Just have a conversation.
22     And I'm sure they would appreciate getting names to the
23 extent that --
24     MS. BUENO:   And they will, absolutely. We have those
25 and we'll provide those, no problem.

22

1      THE COURT:   It'll be a two-way street. I promise you
2  that.
3          (Audio distortion.)
4          (Official Reporter clarifies.)
5      THE COURT:   Nothing important.
6      I'm reminded of that great -- do you remember George Burns
7  and Gracie Allen? That may be all before your time. But they
8  were wonderful. They had exactly the right sense of humor.
9      So at the end of every show, they would be gathered --
10 they would have sort of a little dialogue of what's happening.
11 And Gracie turns to George and says, "George, do you know our
12 friend Malcolm has died?" And George takes a long pull on his
13 cigar and he says, "Oh, Gracie, that's terrible news. What did
14 he die of?" And she said, "Nothing serious."
15     So I don't know how that was -- nothing that I said was
16 serious, and you didn't have to hear.
17     Okay. Anyway, I just wanted to tell the story because
18 it's such a great story.
19     What is next that I have --
20     MS. LONDON:   Your Honor, back to this point about not
21 knowing about their position on bifurcation. As I read their
22 position, it suggests they want multiple phases of liability,
23 which, frankly, would absolutely cascade beyond 65 hours.
24     So I don't think -- that's not -- it would not be our
25 position that they should get to do some punitive damages

23

1  liability phase after the first phase. But we just haven't
2  gotten clarification from Uber on their position on
3  bifurcation, and once we nail that down, I would feel more
4  comfortable not quibbling with your 65-hour cap.
5      THE COURT:   Well, I have to wonder, realistically,
6  what it means to bifurcate in this case, and the reason is the
7  following:
8      Number one, I doubt that we will find a single juror that
9  is of the opinion that Uber has not been successful as a
10 company and all of what that means. I don't think they will
11 think Uber is underfunded or on the brink of extinction.
12 I think they actually will think that Uber has probably made a
13 lot of money. So usually, you don't want punitive damages out
14 there to be put into the -- into the mix because the jury will
15 come to the conclusion, "Oh, they have a lot of money; just pay
16 it," that sort of thing. That's number one. I just don't
17 think that's a realistic concern of Uber's.
18     Number two, it strikes me that the -- and, again,
19 you know, I'm on the outside of this case. So I don't know
20 enough about the case to know whether or not it is being
21 formulated the particular way I'm about to describe. There
22 were a number of steps that Uber took over time to introduce
23 various, quote, safety measures, however one wants to call
24 them. Certain measures were taken over time which changed the
25 way Uber operated from Day 1 to Day 10. Okay. And my guess is

24

1  the plaintiffs will spend a fair amount of time talking about
2  the implementation of these issues.
3      In doing so, it's also my guess that they want to vent,
4  that is, present to the jury, if they believe it to be
5  correct -- if they believe it to be correct -- the reluctance
6  of Uber to install, take Step 2, 3, 4, 5, and 6, if there is
7  such a thing; their weighing of costs, if there is such a
8  thing, as part and parcel of demonstrating that these steps,
9  whatever they may be, could have been taken earlier and were
10 not taken because of some perceived downside, whether it be
11 cost, whether it be exposure, whatever it is.
12     Those are the -- those are the nuts and bolts, generally,
13 of a punitive damage case. They are: You know what to do and
14 you didn't do it, and therefore, your behavior was willful in
15 that regard. It moves it out of, quote, just simple negligence
16 into some other areas, or at least it suggests that it does.
17     And I don't know the law, Ms. Bueno. I'm not going to
18 argue to you that "Oh, by the way, it all comes in or it
19 doesn't come in" and so forth. I'm just giving you a broad
20 picture of how I understand the case to be at this juncture.
21     So I don't know what is accomplished by bifurcation here.
22 I don't know. You know, if Uber feels strongly about it, to
23 bifurcate it, they have to make their motion; and I'll rule on
24 it, you know, considering their arguments and considering the
25 arguments in opposition.

**25**

1    It's just that it doesn't leap out. Things over years
2    tend to leap out to us. Yes, this is this; this is that. It
3    doesn't leap out here. Maybe it's there. I mean, after all,
4    you did go through a trial once without bifurcation.
5        MS. BUENO:  Mm-hmm.
6        THE COURT:  Okay. And it turned out okay.
7    So, you know, be that as it may, every trial is different,
8    so forth. But I do want you to -- I do want you to give some
9    thought to that, sooner rather than later because --
10       MS. BUENO:  Yes, Your Honor.
11       THE COURT:  -- we really have to plan.
12    I know Arizona is very pleasant in January, but --
13       MS. BUENO:  January.
14       THE COURT:  -- you know, we've got other places to go.
15    North Carolina. Texas. I've got a big travel schedule
16    all set out. Do you want to know what it is? Just look at the
17    weather forecast.
18                    (Laughter.)
19       THE COURT:  You won't be disappointed. We're all in
20    this together.
21    Okay. What else do you want me to deal with?
22       MS. LONDON:  Your Honor, do you already know, or who
23    should we ask when we will get questionnaires back?
24       THE COURT:  Okay. Let me tell you what I've done on
25    the questionnaires. I have chopped and diced. I have

**26**

1    formulated a questionnaire that incorporates some, but not
2    all -- some. I mean, I took out a fair amount from both sides.
3        You know, I love these questionnaires. They are carefully
4    drafted for vast sums of money by the experts. You know, do
5    you read *Field & Stream*? Because if you subscribe to
6    *Field & Stream*, you're more likely to vote for the plaintiff or
7    for the defendant, so forth.
8        All of that I just tossed by the boards, and I tried to
9    make the questionnaire manageable and important, in my view.
10       They have been sent out. You will get -- and I think
11    Lashanda will be able to tell me. I think within a week to
12    ten days, you will get their response. The idea is to give you
13    the questionnaires, to have you work with them as long as
14    possible.
15       What it won't have, so you know, it will not have their
16    names. And while, were the case tried here, I think we do give
17    names, the case is in Arizona. The practice is not to give
18    names. And I'm trying to emulate, to the extent I can, the
19    Arizona practice because that's what -- that's why we're there.
20    That's why Uber put in the forum selection clause. So
21    that's -- and that's the point of the bellwether.
22       So you can take a look at it, and then we should have a
23    further conversation. Obviously, if there are people that both
24    sides agree should not be called in, I like to get rid of them
25    early. So you can certainly submit a list, a joint list, of

**27**

1    people who you think should be excused if you both agree, if
2    you both agree. If you don't, then we're going to have to --
3    then we deal with it on a -- probably on a cause matter on
4    the day of jury selection.
5        But I have found -- again, based upon my experience, I
6    have found that when -- the interesting thing about
7    questionnaires is not just what they tell you, but what they
8    don't tell you. And sometimes you have no idea, with what they
9    are telling you, they either strongly believe or think it's an
10    idea.
11       You know, you see this all the time in the criminal
12    context. All the time. Why doesn't the defendant testify if
13    the defendant didn't do anything wrong? There are all sorts of
14    things.
15       In the civil context, you may get things like "I don't
16    believe in giving damages," that sort of thing, or "I believe
17    big corporations are always doing something sly," and all of
18    that. And while those may very well justify a challenge for
19    cause, it's really a question of whether that belief is so
20    strongly held that it will potentially influence their
21    judgment, thereby rendering them partial or unable to be fair.
22       The only way you can ferret that out is through voir dire,
23    and that's something that I conduct. And by the way, I let you
24    conduct it too. So, you know, you're not going to be muzzled.
25    The muzzle you're going to wear is, I guarantee you, we're

**28**

1    going to have a jury the first day. None of this -- none of
2    this, you know, lengthy proceedings.
3        I intend -- and you can talk me out of it. I intend to
4    have nine jurors, maybe eight, probably nine. And each side
5    will get three challenges, peremptory challenges.
6        So that's the way I look at it. If you have different
7    views, you're free to express them, obviously, obviously. But
8    I will not turn the jury selection process into an encounter
9    session. I will -- you know, if somebody's got a problem when
10    they were three years old, I apologize for that, but I've got
11    to move on rather than explore the depth of their problem in a
12    particular way.
13       Now, obviously, somebody who's been assaulted, somebody
14    who's been accused of a violation of -- you know, of normative
15    behavior, of assaulting somebody or being assaulted, they're
16    highly relevant in this case in which it is a sexual assault
17    and in which the defense in the case was it was not -- it was
18    consensual, one of the defenses. I mean, there's more, but I
19    mean -- well, that's the bottom-line defense, I suppose, in a
20    way.
21       I don't know -- if the jury believes that it was a
22    consensual sexual act, I'm not quite sure where we go from
23    there other than that Uber prevails, I would think, but maybe
24    not. Maybe not. Maybe I don't know. Hey, there's a lot going
25    on.

29

1    So I'm willing -- I'm just saying that that seems to me
2  very, very key issues to try to ferret out in the voir dire.
3  And so I wouldn't necessarily -- I would necessarily if you
4  both agree the person should be recused, but I don't want to
5  see in a pretrial filing, "We think 6, 7, and 8 should be
6  recused and the other side disagrees." Save it. Just save it,
7  because the answer is: You may be right, but let's save it for
8  the -- let's get a complete context.
9    And then you'll either make your motion; you won't. And
10  I'll either grant it or I'll deny it. The idea isn't to do
11  everything 12 times.
12    Okay. What else?
13    MS. BUENO:   We had --
14    MS. LONDON:   Your Honor --
15    MS. BUENO:   -- a few -- we had a few issues to
16  address.
17    I believe Ms. London and I probably are thinking about
18  some of the same ones.
19    One of the disputes was about motions in limine. We have
20  agreed that December 16th we will serve or file our motions
21  in limine, but defendants would like to have both response
22  briefs and replies. Plaintiffs don't believe replies are
23  necessary. And so --
24    THE COURT:   I don't think replies are necessary.
25    First of all, I've got to tell you about motions

30

1  in limine. Okay. I hate them. And I'm not the only judge who
2  hates them. And why do we hate them? Because we are deciding
3  something in a partial vacuum; we are deciding it outside the
4  context of the case.
5    And so there are certain things that are entirely
6  appropriate for motions in limine and certain things which are
7  much closer calls. And I have no problem deciding a
8  motion in limine in a case in which it's not even a close
9  question. But I'm telling you, nobody needs a reply for that.
10    MS. BUENO:   Understood.
11    THE COURT:   You don't need a reply for that. And
12  let's --
13    MS. BUENO:   The other --
14    THE COURT:   Okay. So that's my answer. Go ahead.
15    MS. BUENO:   I didn't mean to interrupt, Your Honor.
16    THE COURT:   No. You can interrupt me all the time.
17    MS. BUENO:   The other issue that we'd like your
18  guidance on relates to the exhibit lists and the witness lists.
19    Uber's position is that there should be some good faith
20  limitation to those so we're not dealing with thousands of
21  exhibits.
22    Uber has proposed a 500 exhibit limit, which we think is
23  very reasonable. It's five times what plaintiffs offered in
24  the other trial. We think there's no way there's anywhere
25  close to 500 exhibits that are being offered.

31

1    So we think that there needs to be some reasonable
2  number to allow us then to tee up issues with Your Honor.
3    THE COURT:   Well, I think --
4    MS. BUENO:   And then --
5    THE COURT:   I think there should be some limitation
6  here. I mean, we have -- you have a data bank of how many
7  documents? A million? Two million? I don't know. Whatever
8  it is, whatever that number is, that's fine. That's good.
9    But you're going to identify -- you see, you're going
10  to -- the issues are going to be identified. The witnesses are
11  going to be identified vis-à-vis the issues.
12    And it seems to me -- I don't know whether the number is
13  100, 500, 1,000. I don't know. I would say let's do it at 500
14  with the right of a party to come back and explain why the
15  501st document should be admitted.
16    MS. LONDON:   Your Honor, if I may, I will tell you --
17  this comes from the famous quote, "I would have made the" --
18  "My exhibit list is long only because I didn't have time to
19  make it shorter."
20    This is our position that we are in. We are doing
21  everything we can to streamline. We want to have a tight case.
22  We understand the time limits. We have no interest in
23  bombarding the jury or the other side with exhibits. That's
24  not going to happen.
25    But in the interest of organizing a list and identifying

32

1  the exhibits that may be used with our experts or with --
2  obviously, here, a lot of the exhibits will come in through
3  deposition testimony. We just don't know which ones are going
4  to be played. We have categories of documents that we are
5  working on and streamlining and organizing. But creating some
6  sort of, like, artificial list that it must be 500 by this
7  date, with a requirement that we have to explain each one in
8  addition, it's going to just endlessly cause administrative
9  problems.
10    THE COURT:   Well, let me ask you this: Is really your
11  quarrel that you're not in a position now to draft an exhibit
12  list? Okay. So when do you think you will be?
13    MS. LONDON:   So I think -- we've proposed dates for
14  exchanging with each other exhibit lists. I think it was,
15  you know, perhaps December --
16    MS. BUENO:   December 10th. 10th.
17    MS. LONDON:   But that would be the initial list, and
18  then we're going to keep working on it, with a final list to
19  provide to the Court where we can focus on the disputes that
20  matter.
21    THE COURT:   Let's see the list. Let's -- rather than
22  working --
23    MS. LONDON:   Okay.
24    THE COURT:   -- with a number, let's see what the lists
25  are; and if it appears that it's too open-ended, I'll chop it

Case 3:23-md-03084-CRB    Document 4672-2    Filed 12/15/25    Page 10 of 12

**33**

1   off.

2        But I want everybody to -- I want everybody to have at

3   least the flexibility, when an issue comes up -- because

4   lawyers will see all the time that that which they thought was

5   unimportant becomes important and that which was important

6   becomes less important.  And so I want to give you flexibility

7   in this box, in this time period.

8        That's why I'm not limiting -- I'm not going to limit the

9   number of depositions.  I'm not going to limit this.  I'm not

10  going to limit that.  Sure, I'll be glad to say at the end of

11  the day, "Okay.  You've identified 100, 240 documents.  Let's

12  keep the use of the documents under 300," or something like

13  that, or something like that.  Let's see if it's a problem.

14       This is one of those things, I don't really think there's

15  going to be a problem.  I've actually never, ever had it as a

16  problem.  I've had a problem where somebody comes in with an

17  exhibit and they haven't shown the other side the exhibit.

18  That's a problem.

19       And I guess in a way, Ms. Bueno is saying, "If it's not on

20  the list, I don't know how we can be sure that we've seen it."

21       But it'll be told to you.  You'll have enough time.

22            MS. BUENO:   Yes, Your Honor.

23            MS. LONDON:   Thank you, Your Honor.

24            MS. BUENO:   I think our concern -- and I will preview

25  for you, I think what's going to happen is we are going to get

**34**

1   a list with thousands of exhibits, we are going to get a

2   witness list that is extremely voluminous, and we're going to

3   get tens of hundreds of hours of deposition clips.  And our

4   point simply is, we're a few weeks away from trial.  We need to

5   get it streamlined so we know at trial we're going to be --

6            THE COURT:   Well, how can they -- how can they do that

7   if, in fact, I've only given them X number of hours to try the

8   case?

9            MS. BUENO:   Perfect.  Exactly.

10           THE COURT:   How could they do it?

11           MS. BUENO:   That's our point.  So why are we going to

12  be then trying to deal with objections to 5,000 documents?  Why

13  are we going to be trying to deal with counters and objections

14  to hours of videotape that will not be played?  I think we will

15  be wasting Your Honor's time --

16           THE COURT:   Well --

17           MS. BUENO:   -- with filings.

18           THE COURT:   -- because they have to make a submission

19  in good faith; and if they don't, they listen to -- they hear

20  me.

21           MS. BUENO:   Okay.

22           THE COURT:   It's not pleasant.

23  Right, Ms. Vartain?  Right.

24           MS. VARTAIN:   It's not -- it can be unpleasant.

25  That's true, I suppose.

**35**

1            THE COURT:   That's right.

2        I mean, the Government comes in with 50,000 documents.

3   They came in one case, they had 5 million on their exhibit

4   list.  You know, it wasn't --

5            MS. VARTAIN:   Never my exhibit lists, Your Honor.

6            THE COURT:   Not yours.  Other Government.

7            MS. BUENO:   Understood.  Okay.  Well, we will bring

8   Your Honor any questions --

9            THE COURT:   You will --

10           MS. BUENO:   -- or disputes.

11           THE COURT:   Ms. Bueno, you're going to love this case.

12           MS. BUENO:   I am.

13           THE COURT:   You are working with the best lawyers

14  around.  You're going to have a great time.

15           MS. BUENO:   I know that's true.  I know that's true.

16       I think the other issue, as far as deadlines, then, would

17  be on deposition designations, which are the video cuts.

18  Plaintiffs have proposed to do it kind of on a rolling basis.

19       We would like to do it with a date certain so we know the

20  universe, and I think that's going to help for a variety of

21  reasons.  First of all, it's going to force the parties to

22  streamline these videos to get them ready for trial so there's

23  no delay.  But it's also going to help us be able to tell

24  plaintiffs' counsel -- and I know they want to know -- who

25  we're bringing, because once we understand, for example, which

**36**

1   company witnesses they're bringing and what they're focused on,

2   we can get more clarity about how the case is going to proceed.

3            THE COURT:   What is the rolling -- what rolling

4   basis --

5            MS. LONDON:   Yes, Your Honor.

6            THE COURT:   -- are you talking about?

7            MS. LONDON:   Yes, Your Honor.  The Court's standing

8   order provides -- what? -- four days, or something, before

9   the witness is about to be played that the parties would submit

10  that transcript.  We are proposing nine days before to give a

11  little extra time before that witness's testimony we anticipate

12  playing.

13       The reason for rolling these out and doing them in that

14  order, first of all, it's going to be better work product.  We

15  are going to have a clearer picture of what kind of case we are

16  trying when we hear openings, when we see their -- you know,

17  when the Court rules on motions in limine, when -- or summary

18  judgment or *Daubert* or any of these other things.

19       What Uber is providing is that we submit all potential

20  affirmative designations in two weeks.  We can't do it,

21  Your Honor.  We can't meet that deadline.

22           THE COURT:   No, that's out of the question.  Okay.

23  Don't worry about that.  That's not going to happen.

24       Okay.  I'm just -- I am concerned -- I do -- I don't -- I

25  rather like the idea of rolling out because it gives a thought

**37**

1 process to it, and I do think you get a better product and a
2 more meaningful result.
3     On the other hand, I'm also opposed to surprise, and
4 that's the other side of it, and especially a surprise that
5 can't be satisfactorily addressed in the time given. All
6 surprises can ultimately, you know, be addressed, but this case
7 has to be tried in our lifetime; right? It has to be tried as
8 it goes out and so forth.
9     So I think it would benefit both sides to sit down and
10 work out a little schedule here. Okay?
11     MS. LONDON: Sounds good, Your Honor. Thank you.
12     THE COURT: Anything else?
13     MS. LONDON: One -- one topic on what should go on the
14 exhibit list that I think we could use a little bit of guidance
15 on, Your Honor.
16     We had reached, I think, a disagreement about whether
17 documents to be used on cross-examination with a witness that
18 comes live needs to be disclosed or not.
19     I mean, as of right now, I'm not sure that Uber's going to
20 provide anybody live, so maybe that's not an issue.
21     But in preparing our exhibit list and to meet our
22 deadline, we were anticipating that only a certain category of
23 documents would be included. That would be documents that
24 somebody was going to use on direct examination or anticipated
25 using on direct examination.

**38**

1     We want -- we put our positions in the CMC, Your Honor.
2     THE COURT: Well, don't --
3     MS. LONDON: We hope to get a resolution.
4     THE COURT: Don't both sides have to provide
5 documents? Not the impeachment documents. I got that. But
6 I think you do. I mean, I think you should. I think you
7 should, if you're going to call a witness or you're going to
8 cross-examine a witness and you're going to use these
9 documents, other than for impeachment purposes, that you
10 produce -- you put it on your list and advise the parties of
11 that.
12     I don't like -- I don't want to sit around waiting for
13 rebuttal in this thing.
14     MS. LONDON: Understood, Your Honor. Okay.
15     THE COURT: No rebuttal. No rebuttal.
16     MS. BUENO: One question for clarification. The
17 65 hours, does that contemplate opening and closings as well,
18 Your Honor?
19     THE COURT: Yes.
20     MS. BUENO: Okay. Do you have a limit for either of
21 those?
22     THE COURT: No.
23     MS. BUENO: Thank you.
24     THE COURT: You're going to have a good time. You're
25 going to be able to figure out how to use your time.

**39**

1     MS. BUENO: Got it.
2     THE COURT: I'm not going to figure out how to use
3 your time.
4     MS. BUENO: Got it.
5     THE COURTROOM DEPUTY: Judge, I just wanted to let the
6 parties know that the juror questionnaires, you should be
7 receiving it on December 19th.
8     MS. BUENO: Excellent. Thank you.
9     MS. LONDON: Thank you. Thank you.
10     THE COURT: Thank you.
11     Anything else?
12     THE COURTROOM DEPUTY: Do we have a deadline --
13     THE COURT: See, it's almost two minutes and the
14 Government Zoom terminates. We don't pay for...
15     THE COURTROOM DEPUTY: Judge, is there a deadline for
16 the opposition for motions in limine?
17     THE COURT: Have we done that? Work out a schedule.
18 Yes.
19     MS. VARTAIN: I think we gave the Court a schedule.
20     THE COURT: Okay. Fine. No replies. The reply will
21 come from me.
22     THE COURTROOM DEPUTY: And we have a deadline for the
23 final exhibit list to be submitted to the Court? Did you
24 provide that date as well?
25     MS. VARTAIN: No.

**40**

1     MS. LONDON: I believe we did -- we didn't agree to
2 that? I thought we did.
3     MS. BUENO: We agreed to --
4     MS. VARTAIN: No.
5     MS. BUENO: -- the initial submission on
6 December 10th.
7     We did not agree to a final, but we're happy to work that
8 out.
9     THE COURT: Work that out. Work that out.
10     MS. LONDON: We will do that, Your Honor.
11     And as far as having another case management conference,
12 Your Honor, shall we do that after this trial?
13     THE COURT: After this trial?
14     MS. LONDON: Well, we're -- the next time we're
15 together, Your Honor, is January 6th. We could do another case
16 management conference during the pretrial conference.
17     THE COURT: We'll talk about it when we get there.
18     MS. LONDON: Okay. That sounds good, Your Honor.
19     MS. VARTAIN: Also, I was wrong. We did not agree on
20 a motions in limine opposition date. So we'll have to get that
21 to the Court unless you want to handle it differently.
22     THE COURT: I want you to get an agreement. Thank you
23 very much.
24     Okay. Anything else? We're at 3 o'clock.
25     MS. LONDON: No. Thank you.

41

1          THE COURT:   Well, I'm exhausted, so I'm signing off

2     now.  And you guys are working.

3          So, thank you very much.  Have a nice holiday.  And I'm

4     sure we'll be in touch.

5          MS. VARTAIN:   Thank you, Your Honor.

6          MR. BAGHDADI:   Thank you, Your Honor.

7          MS. LONDON:   Thank you, Your Honor.

8          MS. BUENO:   Thank you.

9          THE COURT:   Good-bye.

10          THE COURTROOM DEPUTY:   Thank you.

11     Thank you, Ana.

12     That concludes this afternoon's proceedings.

13          (Proceedings adjourned at 3:01 p.m.)

14               ---o0o---

15

16               **CERTIFICATE OF REPORTER**

17          I certify that the foregoing is a correct transcript

18     from the record of proceedings in the above-entitled matter.

19

20     DATE:  Friday, December 12, 2025

21

22

23     _____  _____

24        Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                  Official United States Reporter

25