# EXHIBIT R

1  Laura Vartain Horn (SBN 258485)
   **KIRKLAND & ELLIS LLP**
2  555 California Street, Suite 2700
   San Francisco, CA 94104
3  Telephone: (415) 439-1625
   laura.vartain@kirkland.com
4
   Allison M. Brown (Admitted *Pro Hac Vice*)
5  **KIRKLAND & ELLIS LLP**
6  2005 Market Street, Suite 1000
   Philadelphia, PA 19103
7  Telephone: (215) 268-5000
   alli.brown@kirkland.com
8
   Jessica Davidson (Admitted *Pro Hac Vice*)
9  **KIRKLAND & ELLIS LLP**
10 601 Lexington Avenue
   New York, NY 10022
11 Telephone: (212) 446-4800
   jessica.davidson@kirkland.com
12
13 *Attorneys for Defendants*
   UBER TECHNOLOGIES, INC.,
14 RASIER, LLC, and RASIER-CA, LLC

15 *[Additional Counsel Listed on Signature Page]*

16              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
17                  **SAN FRANCISCO DIVISION**

18 IN RE: UBER TECHNOLOGIES, INC.,        Case No. 3:23-MD-03084-CRB
19 PASSENGER SEXUAL ASSAULT
   LITIGATION                            **DEFENDANTS UBER TECHNOLOGIES,**
                                         **INC., RASIER, LLC, AND RASIER-CA,**
20                                        **LLC'S OPPOSITION TO PLAINTIFF'S**
                                         **MOTION TO EXCLUDE EXPERT**
21 This Document Relates to:             **TESTIMONY**

22 *Jaylynn Dean v. Uber Techs., Inc.*,   Judge:       Hon. Charles R. Breyer
23 No. 23-cv-06708                        Courtroom:   6 – 17th Floor

24
                                         Judge:       Mag. Lisa J. Cisneros
25                                        Courtroom:   G – 15th Floor

26                                       **PUBLIC VERSION**

27

28

---

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF THE ISSUES TO BE DECIDED ..................................... 1

III.   LEGAL STANDARD ..................................................................................... 2

IV.    ARGUMENT .................................................................................................. 2

       A.    Dr. Victoria Stodden's Opinions Regarding The Rate Of Reported Sexual
             Assaults Are Both Relevant And Reliable. .................................................. 2

             1.    Dr. Stodden's "Orders of Magnitude" Opinion Is Reliable. ................... 3

                   a.    Dr. Stodden's Comparisons Are Methodologically Sound ............. 5

                   b.    Dr. Stodden Properly Relies On Uber Data And California
                         Public Transportation Surveys. .................................................. 9

                   c.    The Uber Survey Data Corroborate Dr. Stodden's Opinions. ........... 12

                   d.    Plaintiff's Remaining Arguments Lack Merit. ............................... 14

             2.    Dr. Stodden's Opinions Have Relevance Outside Of California. ............. 15

             3.    Plaintiff Misreads Dr. Stodden's Opinions Regarding Data Reliability ........ 16

             4.    Dr. Stodden's Comparisons To Other Rates Are Relevant And Reliable.
                   ................................................................................................ 18

       B.    Vida Thomas's Opinion Regarding Uber's Lack Of Notice Is Reliable And
             Appropriate Expert Testimony. ................................................................ 19

       C.    Jason Morris's Opinions On Industry Standards For Background Checks Are
             Relevant And Reliable. ........................................................................... 21

       D.    Dr. Eric Piza Is Well Qualified To Opine On The Effectiveness And
             Feasibility Of Dashcams And His Opinions Are Reliable. ............................ 24

             1.    Dr. Piza Is Extensively Qualified To Opine On Dashcams. ................... 25

             2.    Dr. Piza's Dashcam Opinions Are Reliable And Amply Supported. ........... 27

                   a.    Dr. Piza's Opinion Regarding The Deterrent Impact Of Uber's
                         Safety Features Is Reliable .......................................................... 27

                   b.    Dr. Piza's Expert Opinion On Technological Feasibility Is
                         Reliable. ................................................................................ 30

3.   Dr. Piza's Testimony Regarding RAINN And The Urban Institute Are Not Personal Opinions. ...................................................................... 31

E.   Joseph Okpaku's Opinions Regarding The History, Safety Standards, And Characteristics Of The Rideshare Industry Are Relevant And Reliable ................... 32

1.   Mr. Okpaku's Opinions Regarding Industry Standards Are Reliable. ........... 32

2.   Mr. Okpaku's Opinions Concerning Drivers' Autonomy Are Relevant And Admissible. .................................................................................. 35

3.   Mr. Okpaku's Opinions Regarding Dashcams Are Relevant And Reliable. ................................................................................................. 36

V.   CONCLUSION .................................................................................................. 36

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ....................................................................................2

*Bergen v. F/V St. Patrick*,
    816 F.2d 1345 (9th Cir. 1987), *modified on reh'g in irrelevant part*, 866 F.2d 318
    (9th Cir. 1989)...........................................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)............................................................................................ *passim*

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ............................................................................19, 20

*Engilis v. Monsanto Co.*,
    151 F.4th 1040 (9th Cir. 2025) ...................................................................................2

*Erickson v. ING Life Ins. & Annuity Co.*,
    No. CV09-204-S-EJL, 2011 WL 4583829 (D. Idaho Sept. 29, 2011) .............25, 26

*FinancialApps, LLC v. Envestnet, Inc.*,
    No. 19-1337-GBW-CJB, 2023 WL 6037242 (D. Del. Sept. 13, 2023)....................12

*Finjan, Inc. v. Cisco Sys. Inc.*,
    No. 17-cv-00072-BLF, 2020 WL 13180005 (N.D. Cal. Apr. 21, 2020) ..................10

*Geiger v. Creative Impact Inc.*,
    No. CV-18-01443-PHX-JAT, 2020 WL 3268675 (D. Ariz. June 17, 2020)....................28, 30

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..........................................................................................19, 34

*Gilbert v. Lands' End, Inc.*,
    158 F.4th 839 (7th Cir. 2025) ...................................................................................10

*Grodzitsky v. Am. Honda Motor Co.*,
    957 F.3d 979 (9th Cir. 2020) .....................................................................................22

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ...............................................................................33, 35

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ...................................................................................11

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

*Holbrook v. Lykes Bros. S.S. Co.*,
    80 F.3d 777 (3d Cir. 1996)..................................................................................29

*Hunter v. Elanco Animal Health Inc.*,
    No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) .......................18

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)..................................................................................10

*In re Bard IVC Filters Prods. Liab. Litig.*,
    No. MDL 15-02641-PHX DGC, 2018 WL 495607 (D. Ariz. Jan. 22, 2018) ........................12

*In re CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litig.*,
    No. ML 11-2274 DSF, 2013 WL 8844095 (C.D. Cal. Oct. 7, 2013) ...................................11

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014)...............................................................................36

*In re Flint Water Cases*,
    No. 16-10444, 2023 WL 6279521 (E.D. Mich. Sept. 26, 2023)..........................................6, 15

*In re Harley-Davidson, Inc. Sec. Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009).........................................................................18

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    174 F. Supp. 3d 911 (D.S.C. 2016)............................................................................14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720 (MKB), 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) ...........................15

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
    318 F. Supp. 2d 879 (C.D. Cal. 2004) ........................................................................25

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    No. 3:09-MD-02100-DRH, 2011 WL 6301625 (S.D. Ill. Dec. 16, 2011)..............................28

*Inc. v. Shah*,
    No. SA CV 13-01321 DMG, 2014 WL 12603075 (C.D. Cal. Dec. 2, 2014)...........................6

*Kidwell-Bertagnolli v. Cnty. of Sonoma*,
    No. 3:20-cv-03291-JSC, 2024 WL 1589468 (N.D. Cal. Apr. 10, 2024)................................22

*Kirk v. Clark Equip. Co.*,
    991 F.3d 865 (7th Cir. 2021) ....................................................................................11

*Klein v. Meta Platforms, Inc.*,
    766 F. Supp. 3d 956 (N.D. Cal. 2025) ........................................................................19

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................23

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

*Lord Abbett Municipal Income Fund, Inc. v. Asami*,
  No. C-12-03694 DMR, 2014 WL 3417941 (N.D. Cal. July 11, 2014) ................................20

*Magallon v. Robert Half Int'l, Inc.*,
  743 F. Supp. 3d 1237 (D. Or. 2024) .........................................................................22, 34

*Manpower, Inc. v. Ins. Co. of Pa.*,
  732 F.3d 796 (7th Cir. 2013) ...............................................................................................10

*McLaren v. The UPS Store, Inc.*,
  No. 3:21-cv-14424 (D.N.J. Sept. 30, 2022) ........................................................................11

*Monroe v. Zimmer U.S. Inc.*,
  766 F. Supp. 2d 1012 (E.D. Cal. 2011).........................................................................28, 30

*MS Amlin Marine NV v. Delta Marine Indus. Inc.*,
  348 F.R.D. 658 (W.D. Wash. 2025) ....................................................................................33

*Odyssey Wireless, Inc. v. Apple Inc.*,
  No. 15-cv-01735-H-RBB, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ............................5

*Palantir Techs. Inc. v. Abramowitz*,
  No. 19-cv-06879-BLF, 2022 WL 22913842 (N.D. Cal. Nov. 3, 2022) .................................6

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010)..............................................2, 28

*Sommerville v. Union Carbide Corp.*,
  149 F.4th 408 (4th Cir. 2025) ...............................................................................................12

*Thomas v. Newton Int'l Enters.*,
  42 F.3d 1266 (9th Cir. 1994) ................................................................................................25

*Torliatt v. Ocwen Loan Servicing, LLC*,
  570 F. Supp. 3d 781 (N.D. Cal. 2021) .................................................................................33

*United States Fid. & Guar. Co. v. Ulbricht*,
  576 F. Supp. 3d 850 (W.D. Wash. 2021)..............................................................................34

*United States v. Diaz*,
  876 F.3d 1194 (9th Cir. 2017) ..............................................................................................20

*United States v. Gwaltney*,
  790 F.2d 1378 (9th Cir. 1986) ..............................................................................................21

*United States v. Holguin*,
  51 F.4th 841 (9th Cir. 2022) .................................................................................................23

*United States v. Morales*,
  108 F.3d 1031 (9th Cir. 1997) ..............................................................................................20

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

1

*V5 Techs., LLC v. Switch, Ltd.*,
   501 F. Supp. 3d 960 (D. Nev. 2020) .......................................................................31

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
   No. CV 15-6480, 2021 WL 2352016 (E.D. Pa. June 9, 2021) ..............................29

*Wolkowitz v. Lerner*,
   No. SA CV 07-777-CAS, 2008 WL 1885770 (C.D. Cal. Apr. 21, 2008) ........................25, 26

**Statute**

Cal. Pub. Util. Code § 99178 (West 2024) ........................................................................3

**Rule**

Fed. R. Evid. 702 ................................................................................................. *passim*

**Other Authority**

Kaye & Friedman, "Reference Guide on Statistics" in *Reference Manual on Scientific
   Evidence* 228 (2011) ..............................................................................................18

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

## I.    INTRODUCTION

Plaintiff has moved to exclude certain opinions of Defendants' experts Dr. Victoria Stodden, Vida Thomas, Jason Morris, Dr. Eric Piza, and Joseph Okpaku. Plaintiff's motion should be denied in its entirety. As set forth below, all of the challenged testimony is well within the experts' qualifications, based on a reliable methodology and highly relevant to this litigation:

- Dr. Victoria Stodden, a professor in the Department of Industrial and Systems Engineering at the University of Southern California, properly opines that "the rate of reported incidents for rides on Uber's platform is orders of magnitude lower than rates reported for public transportation." Stodden Rep. ¶ 12 (Mot. Ex. I) (emphasis omitted). Dr. Stodden reached her opinion based on her knowledge and experience and a sound analysis of relevant safety data.

- Vida Thomas is an expert on workplace investigations of sexual assault complaints. As relevant here, Ms. Thomas properly opines that Uber did not have any information from which it could have concluded that Mr. Turay posed a risk of sexually assaulting a rider. Thomas Rep. at 3 (Mot. Ex. C). Ms. Thomas reached her opinion based on her knowledge and experience, as well as her assessment of Uber's policies and procedures and other relevant materials.

- Jason Morris, an expert in the background screening industry for over three decades, properly opines (among other things) that Uber's background check practices met and exceeded industry standards. Morris Rep. at 2 (Mot. Ex. D). Mr. Morris's opinion is appropriately based on his extensive and specialized experience, as well as his review of Uber's policies and procedures.

- Dr. Eric Piza, a professor of criminology and criminal justice at Northeastern University, properly opines that the use of dashcams would be ineffective in deterring criminal behavior in light of the driver's control of the dashcam's use and because Uber's other safety features already provide deterrence. He appropriately based his opinions on his vast experience, empirical research, and literature review.

- Joseph Okpaku is an expert in the history, characteristics, and safety standards of the rideshare industry. He properly opines that Uber has always exceeded the industry standard for safety in the rideshare industry, that rideshare companies have little control over drivers, and that regulators have treated rideshare companies as distinct from common carriers. Okpaku Rep. at 5-6 (Mot. Ex. A). His conclusions are based on his deep knowledge and experience in the rideshare industry, having himself worked at "gig economy" companies, including competitors of Uber.

## II.    STATEMENT OF THE ISSUES TO BE DECIDED

Is the testimony of Defendants' experts admissible at trial where it is well within the experts' qualifications, based on a reliable methodology, and highly relevant to this litigation?

---

1

## III.   LEGAL STANDARD

Under Federal Rule of Evidence 702, the party offering testimony of a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" must demonstrate to the Court by a preponderance of the evidence that (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. A witness may only offer opinion testimony if he or she qualifies as an expert "by knowledge, skill, experience, training, or education[.]" *Id*.

In exercising its gatekeeping function, "the trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (citation omitted). "Generally, expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry and reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025) (citation, internal quotation and alteration marks omitted). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

## IV.   ARGUMENT

### A.   Dr. Victoria Stodden's Opinions Regarding The Rate Of Reported Sexual Assaults Are Both Relevant And Reliable.

Victoria Stodden, a Stanford-trained statistician and a tenured professor at the University of Southern California, has offered the opinion "that the rate of reported [sexual assault and sexual misconduct] incidents for rides on Uber's platform is orders of magnitude lower than rates reported for public transportation." Stodden Rep. ¶ 12 (emphasis omitted). In an effort to deprive the jury of

2

this important context, Plaintiff launches a barrage of attacks on Dr. Stodden's opinions, dedicating almost half of her omnibus *Daubert* motion to her report. None of Plaintiff's arguments has merit.

     *First*, Plaintiff argues that the methodology Dr. Stodden uses to compare safety on rides arranged through the Uber app and safety on public transportation is flawed. But Plaintiff's attacks on Dr. Stodden's methodology are really attacks on the assumptions she employs, and disagreements over an expert's assumptions go to the weight, not the admissibility, of the testimony. *Second*, Plaintiff argues that Dr. Stodden's opinions are not relevant because she relies on California public transportation surveys. But the point of Dr. Stodden's testimony is to place Plaintiff's safety figures— which are nationwide in scope, and similarly not based on where a particular trip took place—in proper context. And the best available data comes from California, because a 2023 California law required the largest transit operators in the state to collect and publish that information. *See* Cal. Pub. Util. Code § 99178 (West 2024). *Third*, Plaintiff argues that Dr. Stodden's data reliability opinions are unreliable. Plaintiff's argument, however, is based entirely on a misreading of Dr. Stodden's report. *Finally*, Plaintiff argues that the Court should exclude Dr. Stodden's comparisons of the incident rate on rides arranged through the Uber app to rates of homicide, fatal traffic accidents, and being struck by lightning, on the grounds that those opinions are irrelevant and unreliable. But these comparisons are relevant because, as with the public-transportation rates, they place the safety of rides arranged through the Uber app into context that will be understandable and helpful for lay jurors. Nor are they unreliable. Dr. Stodden simply compares the rate of reported sexual-assault and sexual-misconduct incidents with these other rates. For these reasons, Plaintiff's motion to exclude Dr. Stodden's opinions should be denied in its entirety.[1]

## 1.    Dr. Stodden's "Orders of Magnitude" Opinion Is Reliable.

     Plaintiff principally argues that Dr. Stodden's opinion that rides arranged on the Uber app are "orders of magnitude" safer than public transportation options is unreliable. This argument is meritless

---

[1]    Plaintiff does not challenge Dr. Stodden's opinion that Uber's and Lyft's reported incident rates for the five most serious categories of sexual assault are similar, and similarly low. *See* Stodden Rep. ¶¶ 29-30. Nor—with one exception discussed below, *see infra* n.8—does Plaintiff challenge any of the opinions in Dr. Stodden's rebuttal report.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

and should be rejected. "To contextualize rates of alleged sexual assault and misconduct on rides on the Uber platform," Dr. Stodden "compare[s] them to available incident rates reported for other transportation options." Stodden Rep. ¶ 19. "Comparing" Uber's "reported incident rates to rates reported on public transportation such as buses and trains is instructive because several studies show that rides with drivers matched on ride-sharing platforms are seen by consumers as substitutes for public transit services." *Id.* ¶ 21.

A 2023 California law "required the 10 largest transit operators in California (by ridership) to collect and publish survey data on the occurrence of sexual misconduct." *Id.* ¶ 25. As Dr. Stodden explained at the recent JCCP trial, the surveys conducted under this law yielded the best data she had "to look to try and figure out what the rates of sexual misconduct and sexual assault are on common carriers." 9/19/25 JCCP Tr. 2338:7-2339:6 (Ex. 1) ("[T]his [data] is what I found. . . . I didn't see anything else.").[2] Nine of those transit operators "asked respondents whether they directly experienced or witnessed sexual assault or rape when using the public transit service in the past year" or the past six months (depending on the transit operator).[3] Based on that survey data, Dr. Stodden calculated sexual assault rates for those various transit operators and then compared those rates to (i) the reported incident rates for the five most serious categories of sexual assault on rides on the Uber platform,[4] as reported in Uber's publicly available 2021-2022 Safety Report, *see* Stodden Rep. ¶¶ 24-27; and (ii) the reported incident rates for *all* categories of sexual assault and misconduct on rides arranged on the

---

[2]    Dr. Stodden's September 19, 2025, JCCP trial testimony predated her October 21, 2025, deposition testimony in this case.

[3]    San José State University's Mineta Transportation Institute developed a model survey instrument, but each transportation authority was able to "design their own survey instruments." Stodden Dep. 225:18-226:6 (Mot. Ex. K). In her report, Dr. Stodden describes the nine surveys on whose data she relies. *See* Stodden Rep. ¶¶ 26-27 and nn.32-47. The tenth transit operator, Sacramento Regional Transit, "did not ask respondents questions assessing whether they experienced or witnessed different types of unsafe behaviors (such as sexual assault)" but instead "asked a broader question." *Id.* at 11, tbl. 1, n.1.

[4]    These categories are: (i) non-consensual kissing of a non-sexual body part; (ii) attempted non-consensual sexual penetration; (iii) non-consensual touching of a sexual body part; (iv) non-consensual kissing of a sexual body part; and (v) non-consensual sexual penetration. Stodden Rep. ¶ 16 n.16.

4

Uber platform, which come from Uber's Incident Report Classification for 2023-2024, *see id.* ¶¶ 28-30.

These comparisons are—as Dr. Stodden put it in her deposition—"fairly straightforward and basic" multiplication and division. Stodden Dep. 257:22-258:12. For example, the "reported incident rate[] for the five most serious categories of sexual assault reported by Uber" was about "1 in 700,000 rides in 2021-22." Stodden Rep. ¶ 31. By comparison, 18 out of 606 San Francisco Municipal Transportation Agency respondents (about 1 in 34) "reported sexual assault or rape as [having] 'happened to me,' a rate that is about 20,700 times higher" than the 1 in 700,000 Uber rate. *Id.* ¶ 26.b n.33. And "[t]he same survey reported about ~1 in 9 respondents 'saw it happen to others,' which is about 77,000 times higher" than the Uber rate. *Id.* ¶ 26.b n.34.

Plaintiff argues that the comparisons Dr. Stodden makes and the data on which she relies are unreliable. This argument should be rejected. And although Plaintiff contends that certain Uber survey data contradict Dr. Stodden's opinions, those data—even if taken at face value—only corroborate her opinions.[5]

a.    Dr. Stodden's Comparisons Are Methodologically Sound.

Plaintiff principally argues that Dr. Stodden's comparisons of sexual assault rates on rides on the Uber platform and sexual assault rates on public transportation are unreliable because "she compares two ratios with different units[] simply by dividing them by each other, without first converting the units to allow for comparison." Mot. at 7.

In truth, Plaintiff's objection is not really about Dr. Stodden's methodology, which involves "fairly straightforward and basic" arithmetic. Stodden Dep. 257:22-258:12. Rather, Plaintiff's *real* complaint is that she believes Dr. Stodden should have made different assumptions in comparing the data. But "[d]isagreements with the factual assumptions underlying an expert's conclusions go to the weight to be afforded the testimony and not its admissibility." *Odyssey Wireless, Inc. v. Apple Inc.*,

---

[5]    The opinions are also highly relevant. If Plaintiff describes trips arranged on the Uber app as risky through the use of absolute safety figures, Uber must be able to contextualize those figures by comparing them to safety figures on alternative modes of transit.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

No. 15-cv-01735-H-RBB, 2016 WL 7644790, at \*14 (S.D. Cal. Sept. 14, 2016) (citation omitted). Indeed, Plaintiff admits that her problem with Dr. Stodden's analysis is not any errors in her multiplication or division, but that "[f]or [her] math to be correct, she must *assume* that each survey participant took only a single trip." Mot. at 16 (emphasis added). Plaintiff argues that Dr. Stodden should have "align[ed] the Uber rates with the [public transporation] survey[s]" by dividing the public transportation sexual assault rates she developed by "the number of trips each survey respondent took during the study timeframe." Mot. at 7, 16. "Dr. Stodden," Plaintiff continues, "could have tried to align the Uber rates with the survey, but she did not do so." *Id.* at 7.

Put differently, Plaintiff faults Dr. Stodden for not implementing *her* preferred assumptions. But Plaintiff does not identify any data reflecting the number of rides taken, or the number of sexual assaults or rapes witnessed or experienced, by the survey respondents who reported witnessing or experiencing sexual assault or rape on public transportation. As such, by dividing Dr. Stodden's rates by "number of trips," Mot. at 16-17, Plaintiff necessarily makes two assumptions of her own: first, Plaintiff assumes the number of rides taken by survey respondents, *see, e.g.*, *id.* (calculating rates based on various assumptions, including "two trips within the survey period," "one trip per week," "2 trips per weekday," and "one ride per month"); and second, Plaintiff assumes that no matter how many rides those respondents took, they only experienced or witnessed a *single* sexual assault or rape—an assumption undercut by certain survey responses. *See, e.g.*, Stodden Rep. ¶ 26.a n.32 ("The LACMTA Report shows that 3% of respondents 'often' experienced or witnessed 'sexual assault or rape' when using the metro in the past six months . . . ."). Plaintiff does not point to any data endorsing these assumptions of her own. But even if she had, Plaintiff's challenges to Dr. Stodden's "underlying assumptions" "go to the weight of [her] testimony, not its admissibility." *Palantir Techs. Inc. v. Abramowitz*, No. 19-cv-06879-BLF, 2022 WL 22913842, at \*9 (N.D. Cal. Nov. 3, 2022); *see also mophie, Inc. v. Shah*, No. SA CV 13-01321 DMG (JEMx), 2014 WL 12603075, at \*5 (C.D. Cal. Dec. 2, 2014) ("[T]he reasonableness of the assumptions underlying the experts' lost profit analysis [is] a

1  matter for the jury's consideration in weighing that evidence.") (citation, internal quotation and

2  alteration marks omitted).[6]

3       Plaintiff also mischaracterizes Dr. Stodden's opinions as trying to quantify precisely how much

4  safer Uber is than public transportation. But Dr. Stodden does not, in fact, "claim[] that Uber is 118,354

5  times safer than" the Los Angeles County Metropolitan Transportation Authority ("LACMTA"), or

6  that Uber is "'54 times safer' [than] the Bay Area Rapid Transit ["BART"] system." *Contra* Mot. at

7  8, 17.[7] Instead, Dr. Stodden acknowledges that the rates she developed are "estimates," Stodden Dep.

8  224:20–225:14—owing in part to the "methodological differences between Uber's and [the] public

9  transportation providers' reports," Stodden Rep. ¶ 22. Dr. Stodden candidly testified that her

10  comparisons are "not perfect"—but because "the differences" between the Uber rates and the public

11  transportation rates "are so great," those differences are "instructive" and "set some context for how

12  safe riding Uber is" relative to public transportation. Stodden Dep. 265:5-12; 9/19/25 JCCP Tr.

13  2334:22-2336:11.

14       Notably, Dr. Stodden's actual opinion—that Uber is orders of magnitude safer than public

15  transportation, *see* Stodden Rep. ¶ 23—would remain true under Plaintiff's competing assumptions.

16  For example, Plaintiff purports to modify Dr. Stodden's math to incorporate the assumption that "each

17  [LACMTA] survey respondent took 2 trips per weekday," arguing that this assumption "reduce[s]"

18  the 118,354 rate-multiple "to 467." Mot. at 16. Even accepting the validity of this assumption and

19  Plaintiff's calculations, if Uber is 467 times safer than LACMTA, any fair observer would deem Uber

20  to be "orders of magnitude safer" than LACMTA. And even when Plaintiff cherry-picks "the *lowest*

21  [rate-multiple] in Dr. Stodden's analysis," Mot. at 17 (emphasis added), implementing her competing

22  assumptions renders Uber's safety at parity with BART's. *See id.* ("Dr. Stodden's '54 times safer'

23      [6]    Plaintiff also argues that it is improper to compare "surveys to self-reported incidents." Mot.
24  at 7. Plaintiff "can certainly challenge the comparison between these datasets in cross-examination
    . . . but their attacks on this comparison do not support excluding [Dr. Stodden's] testimony." *In re*
25  *Flint Water Cases*, No. 16-10444, 2023 WL 6279521, at *5-6 (E.D. Mich. Sept. 26, 2023) (rejecting
    argument "that it is unreliable to compare . . . data based on clinical interviews with data . . . based
26  on survey responses").

        [7]    Although Plaintiff puts the phrase "54 times safer" in quotes and cites to Dr. Stodden's
27  report, that phrase is found nowhere in her report.

28

1    figure . . . goes down to 1.0 if the survey respondents took just 1 ride per week during that year (in

2    other words, no meaningful difference between BART and Uber)."). But because all of Dr. Stodden's

3    other rate-multiples are greater—and typically, orders of magnitude greater, *see* Stodden Rep. at 11

4    tbl. 1; *id.* at 17 tbl. 2—even Plaintiff's cherry-picked BART calculation does nothing to undermine

5    Dr. Stodden's actual opinion: that Uber is orders of magnitude safer than public transportation

6    generally.[8]

7         Plaintiff's efforts to demonstrate the supposed "absurd[ity]" of Dr. Stodden's opinions, Mot.

8    at 8 & 17, only undercut her arguments. Plaintiff first argues that "[a]pplying Dr. Stodden's

9    methodology, it would be appropriate to multiply the number of Uber reported incidents (2,717) by

10   Dr. Stodden's calculated 'multiple of rate' (118,354) to estimate the number of sexual assaults on

11   LACMTA." Mot. at 8 (citing Chandler Rebuttal Rep. ¶ 27). By doing so, Plaintiff claims to derive "an

12   estimate of nearly 322 million assaults on the LACMTA"—an "absurd finding[]" that, they contend,

13   undercuts Dr. Stodden's analysis. *Id.*

14        But Plaintiff never explains *why* this calculation is "appropriate." It makes no logical sense

15   (other than, of course, to produce a huge number). Based on the data, Dr. Stodden determined that the

16   *rate* of experiencing or witnessing sexual assault or rape on LACMTA "is about 118,400 times higher

17   than the *rate* of alleged sexual assault on rides on the Uber platform in 2021-22." Stodden Rep. ¶ 26.a

18   (emphases altered). That rate multiple compares the LACMTA rate (about 1 in 6) to the Uber rate

19   (about 1 in 700,000). *See id.* There is no principled reason to multiply the 118,354 *rate multiple* by the

20   number of reported sexual assault incidents on Uber-facilitated rides nationwide (2,717) because the

21   latter figure is not a rate, so the corresponding product ("nearly 322 million") cannot somehow predict

22   the number of sexual assaults on LACMTA; instead, it produces a patently meaningless (albeit highly

23   prejudicial) figure.

24

25   [8]     The same analysis applies to Dr. Stodden's opinions in her rebuttal report about the relative
26   safety of Uber "even after adjusting the incident rate on the Uber platform for [alleged] under-
     reporting per Dr. Chandler's [methodologically infirm] opinions." Stodden Rebuttal Rep. ¶¶ 60-61
27   (Mot. Ex. J). *Contra* Mot. at 19 (arguing that Dr. Stodden's opinions in her rebuttal report "should be
     excluded for the same reasons discussed herein").

28   DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
     Case No. 23-cv-06708

                                                    8

Plaintiff also argues that because LACMTA had "approximately 155 million riders in the six-month survey period," "[c]onservatively assuming each one of those riders took only 1 ride in 2024, according to Dr. Stodden's rationale, an estimated 17% of those riders experienced or witnessed sexual assault or rape during that timeframe" such that "more than 26 million riders" experienced or witnessed "more than 26 million sexual assaults or rapes on LACMTA in 2024." Mot. at 17. But Plaintiff's assumption that each of those "approximately 155 million riders" "took only 1 ride in 2024," *id.*, would imply that about *half of the population of the United States* traveled on LACMTA in a six-month period in 2024. While Plaintiff is free to pose implausible hypotheticals to Dr. Stodden at trial and cross her on them, her ability to derive fantastical numbers from unlikely assumptions or meaningless calculations does not render Dr. Stodden's opinions inadmissible.

> b.     Dr. Stodden Properly Relies On Uber Data And California Public Transportation Surveys.

Plaintiff also argues that Dr. Stodden's "orders of magnitude" opinion is inadmissible because the Uber and public transportation data on which she relies "are not representative samples," and she "made no effort to identify resulting problems and biases in the data, let alone attempt to fix them." Mot. at 12-13; *see generally id.* at 12-19. As a threshold matter, even Plaintiff's expert Dr. Chandler admits that "[t]he Uber Safety Report data is not a sample[.]" Chandler Rebuttal Rep. ¶ 23 (Mot. Ex. M); *accord id.* ¶ 25. Instead, he explains, it is "a census of what it purports to measure," *id.* ¶ 43—the *actual* number of sexual assault reports for the five most serious categories of sexual assault. Plaintiff's position that "Uber's incident report numbers are [a] sample[] of [a] larger population[]," Mot. at 12, is simply wrong and alone warrants rejection of Plaintiff's objection.[9]

Plaintiff's remaining arguments about the data fare no better. She argues that Uber's "sexual assault and sexual misconduct incident rates" are unreliable because sexual assault incidents are often

---

[9]     Plaintiff's misunderstanding appears to stem from her misreading of a disclaimer in Uber's Safety Reports. *See* Mot. at 13-14 (quoting Mot. Ex. P, 2021-2022 Uber Safety Report at 13). That disclaimer explained that Uber's "data and [its] user base are neither a representative national sample nor, necessarily, a representation of the size or scope of sexual assaults, motor vehicle fatalities, or fatal physical assaults *in other contexts.*" Mot. Ex. P, 2021-2022 Uber Safety Report at 13 (emphasis added). In other words, Uber simply cautioned readers that its sexual assault data was not a representative sample of sexual assault in the *national population at large.*

under-reported. *Id.* at 14-15. And she contends that the California public transportation data are "unreliable because they are based on convenience sampling" in that they were derived from surveys of people waiting for public transportation. *Id.* at 17-19. But a court's obligation to ensure that an expert used reliable methods "does not ordinarily extend to the reliability of the conclusions those methods produce." *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 849 (7th Cir. 2025) (quoting *Stollings v. Ryobi Techs.*, 725 F.3d 753, 865 (7th Cir. 2013)). "District courts can 'usurp[ ] the role of the jury . . . if [they] unduly scrutinize[ ] the quality of an expert's data and conclusions rather than the reliability of the methodology the expert employed." *Id.* (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) ("[I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony."), *aff'd sub nom.*, *Microsoft Corp. v. i4i Ltd. P' Ship*, 564 U.S. 91 (2011). Instead, "[t]he relative weakness or strength of the factual underpinnings of [an] expert's opinion goes to weight and credibility, rather than admissibility." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (citation omitted), *modified on reh'g in irrelevant part*, 866 F.2d 318 (9th Cir. 1989); *see also, e.g.*, *Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-cv-00072-BLF, 2020 WL 13180005, at *9 (N.D. Cal. Apr. 21, 2020) ("Disputes on the factual underpinnings of an expert's analysis go to its weight, not admissibility.").

Perhaps recognizing that her data-source complaints are issues for cross-examination and not admissibility, Plaintiff attempts to recast those objections as methodological in nature. Those arguments fail as well.

For example, Plaintiff argues that Dr. Stodden should have "account[ed] for bias problems with [potential] underreporting" in the Uber data. Mot. at 14. But this is not an issue inherent only to Uber's data. "[S]exual assault . . . is underreported" "in general," and to the extent there is any underreporting in the Uber data, that issue would likely affect the public transportation data as well. Stodden Dep. 240:17-241:18; 295:4-296:12.

More fundamentally, Dr. Stodden testified that she was *not* aware of any data-driven method to quantify any such under-reporting, explaining that "[i]t's a really hard problem." *Id.* 292:14-

10

293:10. Notably, Plaintiff does not explain *how* Dr. Stodden should have attempted to quantify any such under-reporting.[10] Plaintiff is free to cross-examine Dr. Stodden at trial as to why she did not attempt to quantify possible under-reporting in Uber's data. But her decision not to engage in unreliable guesswork is hardly a methodological flaw; rather, it exhibits sound judgment.

Plaintiff also complains that Dr. Stodden did not "fix," "adjust," or "quantify" the California public transportation survey data to account for potential error. Mot. at 18-19. But as Dr. Stodden explained in an earlier report that Plaintiff attached to her motion, "non-sampling error present in samples of convenience cannot be estimated with standard methods," which "makes it difficult, if not impossible, to understand and quantify the amount of error in a population estimate derived from a sample of convenience." Pls.' Stodden Dep. Ex. 2073, Stodden Rep. in *McLaren v. The UPS Store, Inc.*, No. 3:21-cv-14424 (D.N.J. Sept. 30, 2022), ¶ 21 (Mot. Ex. K). In fact, Plaintiff herself deems the "bias or error in the California public transportation data" to be "*uncorrectable*." Mot. at 18 (emphasis added). As above, the decision not to adjust these data haphazardly is not a flaw in Dr. Stodden's methodology. *Daubert* "do[es] not require experts to accomplish the impossible." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 877 (7th Cir. 2021). Dr. Stodden acknowledged the limitations of the survey data, but "notwithstanding [the] differences between how the data are collected," the fact that "the rates didn't even come close . . . swamp[s] the differences in the data collection" and thus provides "a useful contextual clue about the safety . . . on Uber." 9/19/25 JCCP Tr. 2342:25-2343:10.

In sum, although the California public transportation survey data have some limitations, "no data set is perfect." *In re CitiMortgage, Inc. Home Affordable Modification Program ("HAMP") Litig.*, No. ML 11-2274 DSF (PLAx), 2013 WL 8844095, at *2 (C.D. Cal. Oct. 7, 2013) ("The question under *Daubert* is not whether an expert's report relies on and analyzes perfect data—if that were the

---

[10]    Although Plaintiff's expert Dr. Chandler attempted to build a model that supposedly "accounted" for under-reporting in Uber's data, *see* Chandler Rep. ¶¶ 187-200 (Doc. 4342-1), his model is demonstrably unreliable. *See* Stodden Rebuttal Rep. ¶¶ 49-59; Defs.' Mot. To Exclude Opinions of Pls.' Expert Dr. John Chandler (Doc. 4341) at 7-11. At any rate, "even when using Dr. Chandler's estimated number of incidents for the five most serious categories on rides on the Uber platform in 2021–22, Uber still remains orders of magnitude safer than public transportation alternatives." Stodden Rebuttal Rep. ¶¶ 60-61.

11

1    inquiry, there would be no data-based expert testimony in federal court . . . .”). Particularly given

2    Plaintiff's own expert's inability to proffer any better data, *see* 11/7/25 Chandler Dep. 325:3-17 (Mot.

3    Ex. L) (“I do not have data that tells me the rate of sexual assaults on public transportation . . . .”),

4    Plaintiff's contentions about the alleged “inadequacies” of the survey data are, at most, matters for

5    “[v]igorous cross-examination,” not exclusion. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th

6    Cir. 2002); *see also In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018

7    WL 495607, at *5 (D. Ariz. Jan. 22, 2018) (“Under *Daubert*, an expert need not base his or her opinion

8    on the best possible evidence, regardless of availability, but upon ‘good grounds based on what is

9    known. . . . And *Daubert* makes clear that disputes about the facts underlying an expert's opinions are

10    best addressed through the adversarial process and then by the jury as the ultimate fact-finder.”)

11    (citation omitted).

12                    c.    The Uber Survey Data Corroborate Dr. Stodden's Opinions.

13        Plaintiff also argues that certain Uber survey data disprove Dr. Stodden's opinions. In truth,

14    Plaintiff misinterprets those data, which actually *corroborate* Dr. Stodden's opinions that Uber is

15    orders of magnitude safer than public transportation.[11]

16        Plaintiff argues that an Uber survey purportedly revealed that “███████████ reported that

17    a driver made a sexual advance or touched the rider inappropriately.” Mot. at 10. According to

18    Plaintiff, this supposed ███████—which Plaintiff describes as “Uber's SA/SM incident rate”—

19    shows that, using Dr. Stodden's methodology, “Uber and public transportation have similar safety

20    profiles.” *Id.* This argument fails because Plaintiff misinterprets the survey and its results.

21

22    [11]    Plaintiff also argues that Dr. Stodden engaged in improper “cherry-pick[ing]” by not
      considering the Uber survey. Mot. at 9-10 & n.5. But “[c]herry-picking data means engaging in a
23    result-driven analysis that undermines principles of the scientific method.” *Sommerville v. Union
      Carbide Corp.*, 149 F.4th 408, 426 (4th Cir. 2025) (citation, internal quotation and alteration marks
24    omitted). Plaintiff acknowledges—citing Dr. Stodden's deposition testimony—that Dr. Stodden
      “was not aware” that this data even “existed.” Mot. at 10; *see* Stodden Dep. 234:12-16 (“To my
25    knowledge, I don't know of Uber carrying out such a survey.”). Accordingly, Dr. Stodden
      indisputably did not engage in cherry-picking. *See, e.g., FinancialApps, LLC v. Envestnet, Inc.*, No.
26    19-1337-GBW-CJB, 2023 WL 6037242, at *6 (D. Del. Sept. 13, 2023) (“So how could McDuff
      have intentionally ‘cherry-picked' data by excluding that projection and crediting others, when he
27    did not even know that the projection existed in the first place?”).

28    DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
      Case No. 23-cv-06708

*First*, the survey at issue did not ask whether a driver had "made a sexual advance or touched me inappropriately" to *all* respondents; rather, it posed that question only to the *subset of respondents* who reported that they had encountered an experience with ridesharing that made them feel unsafe. *See* UBER-MDL3084-000067582 at 67626, 67628-29 (Ex. 2); UBER_JCCP_MDL_001102150 at 98-99 (Ex. 3). The survey data revealed that ███ of respondents who solely used Uber for ridesharing reported an incident with ridesharing that made them feel unsafe; ███ of those respondents reported that they "never" had a ridesharing experience that made them feel unsafe. UBER_JCCP_MDL_001102150 at 91 (Ex. 3). Accordingly, only ███ of Uber-only survey respondents were even asked whether a driver had "made a sexual advance or touched [them] inappropriately."

*Second*, Plaintiff's ███ figure reflects that, of the respondents who reported an unsafe ridesharing experience, ███ of them reported that a driver had made a sexual advance or engaged in inappropriate touching. *See* UBER_JCCP_MDL_001102150 at 99 (Ex. 3). But that ███ figure includes respondents who used non-Uber ridesharing platforms in addition to or instead of Uber, and thus includes experiences on other platforms. Of the ███ of *Uber-only* respondents who reported an unsafe ridesharing experience, only ███ of those respondents reported that a driver had made a sexual advance or inappropriately touched them. *See id.*

For these reasons, even if Dr. Stodden had considered these survey results, the correct figure to use would not have been ███. Rather, it is ███ the product of ███ (the percentage of Uber-only respondents who reported an unsafe ridesharing experience) and ███ (the proportion of those respondents who reported a sexual advance or inappropriate touching). In other words, Plaintiff's misreading of the survey data inflated the correct figure by a factor of ███ Assuming that the ███ figure would, as Plaintiff contends, place Uber at parity with public transportation from a safety perspective, *see* Mot. at 10, the survey data—taken at face value—only *corroborate* Dr. Stodden's opinion: that Uber is orders of magnitude safer than public transportation.

Case 3:23-md-03084-CRB    Document 4676-3    Filed 12/05/25    Page 22 of 46

d.      Plaintiff's Remaining Arguments Lack Merit.

Plaintiff levels three ancillary complaints about Dr. Stodden's "orders of magnitude" opinions, but once again, all of her arguments are matters for cross-examination.

*First*, Plaintiff complains that Dr. Stodden "does not provide any measure of statistical significance, certainty, or variability," arguing that "[w]ithout measures of statistical significance and uncertainty or confidence, Dr. Stodden cannot hold her opinions to a reasonable degree of scientific certainty." Mot. at 9. The single case that Plaintiff cites merely holds that "studies without statistical significance are insufficient to support a causation opinion" being pressed by an expert for the plaintiff (who bears the burden of proof on that element). *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 926 (D.S.C. 2016). But even if that principle applied to a defense expert, Dr. Stodden explained that "if there were statistical tests" to measure the statistical significance of the calculations that she makes, "the differences in the orders of magnitude are so big" that "they would surely show significant differences." Stodden Dep. 265:24-268:2. "[T]he differences are so huge and the orders of magnitude so large," Dr. Stodden continued, that she "was comfortable letting the numbers speak for themselves as descriptive statistics." *Id.* 269:2-20.

*Second*, Plaintiff argues that "Dr. Stodden compares Uber's 2021-2022 numbers to the results of 2024 public transportation surveys"—which Plaintiff contends is cherry-picking because "Uber's 2021-2022 incident numbers are lower than any other years Uber has reported." Mot. at 10-11. But Dr. Stodden explained that she used data from Uber's 2021-2022 Safety Report because that report contains "Uber's most recent reported incident rates for the five most serious categories of sexual assault." Stodden Rep. at 11 tbl. 1 n.1. And at any rate, Plaintiff admits that Dr. Stodden *also* compared the public transportation data to Uber's "2024 numbers . . . in Table 2" of her report, Mot. at 11. Thus, Plaintiff's arguments about cherry-picking fall flat.

*Finally*, Plaintiff argues that Uber "admonishes" the public not to make any comparisons using its data. Mot. at 11-12. They point to a line in Uber's 2019-2020 Safety Report explaining that "[a]s a result of [the company's] approach, meaningful comparisons to other data sets are not possible." Mot. Ex. O (2019-2020 Uber Safety Report) at 58. But this actually cuts *against* Plaintiff. Uber explained

14

that "meaningful comparisons to other data sets are not possible" because Uber's process for "collecting sexual assault data" is "intentionally broad and overinclusive." *Id.* For example, Uber "uses broader definitions of sexual assault than most criminal codes and research entities"; it "aggregates incidents from" an "[i]ncreasing number of reporting channels"; it "takes survivor reports at face value"; and it includes incidents where "safety support agents were unable to reach the survivor after an initial report was made," or where "the report is [later] withdrawn." *Id.* In other words, Uber cautioned against making comparisons because Uber casts a ***wider*** net than other typical sources of sexual assault data; thus, Dr. Stodden's comparisons (if anything) ***understate*** Uber's safety advantage relative to public transportation.

### 2.      Dr. Stodden's Opinions Have Relevance Outside Of California.

Plaintiff also argues that Dr. Stodden's opinions about Uber's relative safety are not relevant "to Jaylynn Dean's [Arizona] case, or any case where the incident trip took place outside of one of the areas in California covered by the public transportation surveys Dr. Stodden relies on." Mot. at 19-20. But the point of Dr. Stodden's testimony is not to argue that Uber was a safer option than public transportation alternatives for any particular plaintiff in a particular geography. Rather, the purpose is "[t]o contextualize rates of alleged sexual assault and misconduct on rides on the Uber platform," Stodden Rep. ¶ 19—such as Plaintiff's expert Lacey Keller's opinion that "[f]rom 2017 through 2024, an SA/SM Incident was reported to Uber at an average frequency of every eight . . . minutes." Keller Rep. ¶ 28 (Mot. Ex. R).

Dr. Stodden's opinions put Ms. Keller's opinions—which are based on *nationwide* incident figures, *see id.* ¶ 31 n.53—into the proper context. Ms. Keller seeks to portray Uber as an unsafe platform with alleged sexual assaults happening every few minutes (because of the sheer number of rides arranged on the app), while Dr. Stodden places Uber's relative safety into context by comparing it to a natural alternative to Uber: public transportation. And the California public transportation data was the best data Dr. Stodden found on that point. *See* 9/19/25 JCCP Tr. 2338:7-2339:6. The fact that Dr. Stodden's underlying data is from California is a matter for cross-examination, and does not support exclusion in non-California cases. *See, e.g.*, *In re Flint Water Cases*, 2023 WL 6279521, at

*5-6 ("VNA can certainly challenge the comparison between [nationwide and Flint-specific] datasets in cross-examination . . . but their attacks on this comparison do not support excluding this testimony."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2022 WL 15053250, at *28-29 (E.D.N.Y. Oct. 26, 2022) (rejecting argument that expert's reliance on global profitability figures in a case involving a United States market renders the expert's opinion inadmissible).[12]

### 3.    Plaintiff Misreads Dr. Stodden's Opinions Regarding Data Reliability.

Plaintiff also criticizes Dr. Stodden's opinion that it was appropriate for Uber to report incident rates for the five most serious categories of sexual assault instead of "reporting all possible statistical data." Stodden Rep. ¶¶ 16-18. Plaintiff's argument that Dr. Stodden's opinions in this regard are unreliable rests on a fundamental misunderstanding of what Dr. Stodden is saying.

Dr. Stodden explains that Uber partnered with three organizations to develop a "Sexual Violence Taxonomy" that classifies unwanted sexual experiences into two broad categories—sexual assault and sexual misconduct—which are then further divided into 21 distinct subcategories (such as non-consensual touching of a sexual body part). *See* Stodden Rep. ¶ 14. Uber also "created a specialized auditing team to review all its safety incident reports and classify reported incidents of sexual misconduct and assault according to the 21 categories specified in the taxonomy." *Id.* ¶ 15.

"Uber presents the results of its auditors' classification for five" of those 21 "categories of sexual assault in its Safety Reports" because, among other things, "these five categories have the highest degree of reliability in classifications across Uber auditors[.]" *Id.* ¶ 16. "[S]pecifically, these categories typically have an aggregate auditor alignment with Uber's internal Safety Taxonomy experts of over 80%, where alignment is defined by Uber as 'the rate of agreement when 2 auditors are separately shown the same facts and come to the same conclusion on the classification of an incident.'" *Id.*

---

[12]    Of course, if Plaintiff prevails on her position that the only relevant safety data is that which pertains to the specific geographic area where each individual plaintiff took her ride, then Plaintiff should be held to that position—and all of her experts' geographically nonspecific safety opinions (including Ms. Keller's "every eight minutes" opinion) should be excluded as well.

Those representations are borne out by Uber's Safety Reports. Uber's 2017-2018 Safety Report explains that it "includes categories of sexual assault which, in aggregate, have at least [an] 85%" alignment rate. Uber 2017-2018 Safety Report at 42 (Mot. Ex. N); *see also* Uber 2019-2020 Safety Report at 16 (Mot. Ex. O) ("[A]s with our first report, we set aggregated classification confidence benchmarks of 85% as minimum for sexual assault . . . ."). "The only individual category of sexual assault in this report that did not reach 85% auditor alignment on its own was Attempted Non-Consensual Sexual Penetration, which reached 78% auditor alignment with Safety Taxonomy experts." Uber 2017-2018 Safety Report at 42.[13] "Despite this category not reaching the 85% auditor alignment [benchmark], Uber felt it was crucial to include it as it is one of the most serious forms of sexual assault that are reported in connection to the Uber platform." Uber 2017-2018 Safety Report at 42. Put differently, the Uber Safety Reports reported the four categories of sexual assault with the highest alignment rate, as well as Attempted Non-Consensual Sexual Penetration, whose alignment rate was not far behind. Dr. Stodden opines that "it was appropriate for Uber to publish the reported incident rates for the five categories that have the highest degree of consistency across Uber auditors, as these categories of claimed sexual assault could be measured with a high level of reliability." Stodden Rep. ¶ 17.

In challenging Dr. Stodden's data reliability opinions, Plaintiff contends that "Dr. Stodden concludes that it was appropriate, from a statistical perspective, for Uber not to disclose data for 16 of the 21 categories of SA/SM incidents because Uber's internal auditors did not agree on how to classify those incidents into the 21 categories at a rate of at least 80%" and that her opinion is "that Uber did not reach 80% auditor alignment on any of the [other] 16" categories. Mot. at 20-21. Plaintiff contends that this supposed opinion is unreliable because "Uber's Safety Reports are entirely silent on what the auditor alignment was for any of the 16 nondisclosed categories[.]" *Id.* at 20.

---

[13]     The four categories of sexual assault with alignment rates at or above 85% are: non-consensual kissing of a non-sexual body part; non-consensual touching of a sexual body part; non-consensual kissing of a sexual body part; and non-consensual sexual penetration. *See* Uber 2017-2018 Safety Report at 14-15; Uber 2019-2020 Safety Report at 14.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

Plaintiff's challenge fundamentally mischaracterizes Dr. Stodden's opinion. Contrary to Plaintiff's claim, Dr. Stodden is not opining "that Uber did not reach 80% auditor alignment on any of the [other] 16" categories. *Contra* Mot. at 21. The only time Dr. Stodden mentioned an 80% figure is when she noted that the five sexual-assault categories that Uber reported "typically have an aggregate auditor alignment . . . of over 80%," Stodden Rep. ¶ 16—a representation that Plaintiff admits *is correct*. *See* Mot. at 21 (recognizing that the 2017-2018 "auditor alignment was at least 85% for all four categories except attempted rape" and that the 2019-2020 "auditor alignment was over 85% for all categories except attempted rate"). Plaintiff's misreading of Dr. Stodden's data-reliability opinions clearly does not justify excluding them.[14]

### 4. Dr. Stodden's Comparisons To Other Rates Are Relevant And Reliable.

Dr. Stodden also contextualizes alleged incident rates on rides arranged by the Uber app by comparing them to rates of other fairly rare events: homicides, fatal traffic accidents, and being struck by lightning. Plaintiff argues that these comparisons "have nothing to do with this case, and will neither help the trier [of] fact understand the evidence nor assist them in determining a fact in issue." Mot. at 21. To the contrary, as Uber explains in its motion to exclude the opinions of Plaintiff's expert Lacey Keller, presenting raw figures and rates *without* comparing them to some sort of context or baseline renders those figures irrelevant or, at minimum, unfairly prejudicial. *See, e.g.*, *Hunter v. Elanco Animal Health Inc.*, No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173, at *18 (S.D. Ind. Aug. 17,

---

[14] Plaintiff also criticizes Dr. Stodden for opining that Uber's decision to report sexual assault data with the highest auditor alignment was reasonable while simultaneously "rel[ying] on the public transportation survey results, which she acknowledges were not audited." Mot. at 20. Plaintiff misunderstands Uber's auditing process. Those who report an incident to Uber do not themselves classify the alleged sexual assault or misconduct into one of the 21 categories; that is done by Uber's specialized auditing team, often based upon incomplete or imperfect information. *See* Stodden Rep. ¶ 15 ("Uber uses a 'survivor-central approach' where survivors are not required to provide evidence of the assaults they may have suffered."). That is why auditor alignment rates are important: because two reviewers may review the same incident description but classify the incident differently. As Dr. Stodden explains, "a reliable classification process . . . requires that 'different evaluators should rate the same cases in essentially the same way.'" *Id.* ¶ 17 (quoting Kaye & Friedman, "Reference Guide on Statistics" in *Reference Manual on Scientific Evidence* 228 (2011)). The California public transportation surveys, on the other hand, do not involve third-party classification; those surveys simply asked respondents to report whether they had experienced or witnessed sexual assault or rape. *See id.* ¶ 25. As such, the public transportation data do not carry the same auditing concerns.

2022) ("The First Amended Complaint also lacks any statistics or data to place the allegations of 'excess demand' or 'excess inventory' in context—an omission that hinders a finding that the defendants issued false and misleading statements."); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 986 (E.D. Wis. 2009) (allegation that certain dealerships had between 3,000 and 5,000 units per day of excess inventory "is not very helpful" in the absence of "comparisons to historical inventory levels" or "'normal' inventory levels"). Dr. Stodden's comparisons help contextualize Uber's relative safety, which Plaintiff's experts distort through their use of absolute, out-of-context figures that will confuse and mislead the jury. Most jurors understand that homicides, fatal traffic accidents, and lightning strikes are fairly rare. And Uber's safety rates compare favorably to those rates.

Plaintiff also complains that Dr. Stodden's opinions are "devoid of any discernable methodology to ensure proper data comparison." Mot. at 21-22. But Dr. Stodden derived the relevant comparator rates from the Centers for Disease Control and the Federal Reserve Bank of St. Louis, and then compared them to the relevant Uber safety rates. *See* Stodden Rep. ¶ 31. Plaintiff is free to cross-examine Dr. Stodden about the underlying data's "geography and timeframe" and any supposed "biases in the data," Mot. at 21-22, but her critiques of the data do not undermine the methodologically sound nature of Dr. Stodden's opinions.

**B.    Vida Thomas's Opinion Regarding Uber's Lack Of Notice Is Reliable And Appropriate Expert Testimony.**

Plaintiff only moves to exclude one of Vida Thomas's four expert opinions: that Uber did not have any information from which it could have concluded that Mr. Turay posed a risk of sexually assaulting a rider. According to Plaintiff, Ms. Thomas's opinion constitutes unreliable fact-finding and concerns an issue the jury can decide without expert assistance. Neither objection has merit. Ms. Thomas's opinion is an extrapolation from her other opinions, to which Plaintiff does not object, and is properly the subject of expert testimony. Plaintiff's motion should therefore be denied.

*First*, Ms. Thomas's notice opinion does not constitute improper fact-finding by an expert. Rather, this opinion is a corollary of Ms. Thomas's other opinions, which Plaintiff concedes *are*

admissible. "An expert's job is to consider existing data and make inferences, hypotheses, and extrapolations." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 967 (N.D. Cal. 2025). Experts "regularly 'extrapolate from existing data'" to draw their conclusions, and courts grant them "wide latitude" to do so. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). That is precisely how Ms. Thomas arrived at her notice opinion here. Ms. Thomas is simply extrapolating from (a) her opinion (which Plaintiff does not seek to exclude) that Uber's background check process meets generally accepted standards in the HR industry; and (b) her observation that Uber conducted background checks consistent with its standard process on the driver in *Dean*. Ms. Thomas's opinion follows as well from (a) her opinion (which Plaintiff does not seek to exclude) that Uber's methodology for investigating sexual assault complaints is sufficiently thorough; and (b) her observation that Uber investigated at least one prior complaint against the driver in *Dean* and deemed it invalid.

Because Ms. Thomas is making straightforward extrapolations from opinions that Plaintiff concedes are admissible, the cases cited by Plaintiff are inapposite. For example, *United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017), concerned the prohibition on an expert offering a legal conclusion, something that Plaintiff does not contend Ms. Thomas has done here. In *Diaz*, a criminal narcotics case, the expert's opinion "encompasse[d] the entirety of an element of a crime," down to the point where the expert's opinion was phrased using words that "adopted the language" of the elements of the criminal statute at issue. *Id.* at 1197-98. That case has no bearing on a situation like this one, where an expert merely offers an opinion in the form of a corollary from another opinion. And Plaintiff's reliance on *Lord Abbett Municipal Income Fund, Inc. v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941 (N.D. Cal. July 11, 2014), is equally misplaced. There, the purported expert "opinion merely summarize[d] the record evidence and gratuitously interpret[ed] it." *Id.* at *13 n.8. Here, by contrast, Ms. Thomas takes the record evidence and analyzes it in light of Ms. Thomas's other expert opinions, a practice that falls well within the "wide latitude" of expert testimony under *Daubert*. *See Elosu*, 26 F.4th at 1026.

*Second*, Plaintiff is also incorrect that the question whether Uber was on notice is a matter of common sense not requiring expert testimony. In the Ninth Circuit, expert testimony is admissible if "the subject matter at issue is beyond the common knowledge of the average layman." *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997). "The general test . . . is whether the jury can receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381-82 (9th Cir. 1986). Here, the ways in which large companies such as Uber aim to prevent incidents of sexual assault by screening the drivers operating on their platform and investigating alleged incidents of sexual assault is a complex topic. It is certainly beyond the common knowledge of the average lay person. Therefore, it is more likely than not that Ms. Thomas's expert opinion will appreciably help the jury in analyzing the relevant facts.

Notably, Plaintiff cites no federal precedent for the proposition that Ms. Thomas's opinion is a matter of common sense. And while she points out that the JCCP trial court credited this argument in excluding the same opinion by Ms. Thomas on that ground, that decision should not be followed. As previously discussed, Ms. Thomas's notice opinion entails extrapolating from Uber's background check process, as compared to the broader HR industry. The JCCP court viewed the issue of notice far too narrowly, failing to grapple with the fact that an average lay juror has little or no experience on the topic of Ms. Thomas's testimony, nor, more generally, how information is shared within a large enterprise such as Uber.

For the foregoing reasons, the Court should deny Plaintiff's Motion and admit Ms. Thomas's opinion that Uber did not have notice that Plaintiff's driver posed any risk of sexually assaulting a rider.

## C.     Jason Morris's Opinions On Industry Standards For Background Checks Are Relevant And Reliable.

Plaintiff moves to exclude two of the ten opinions offered by Uber's background check expert, Jason Morris. Specifically, Plaintiff seeks to exclude Opinions No. 2 and 4 of Mr. Morris's report, each of which states that aspects of Uber's background check process "met and exceeded industry standards." Mot. at 23 (quoting Morris Report at 3). Plaintiff argues that these opinions are irrelevant

and unreliable because they do not identify any standard, do not address the efficacy of Uber's background checks, and are unsupported. To the contrary, Mr. Morris clearly identifies the industry standards, those standards bear on the accuracy or efficacy of a background check, and his opinions are properly based on his three decades of specialized experience in the background screening industry. Plaintiff's motion should be denied.

*First*, Plaintiff contends that "Mr. Morris's 'industry standards' opinions are irrelevant because they fail to identify any standard beyond merely complying with existing laws." Mot. at 23. But that argument is foreclosed by even a cursory review of Mr. Morris's report, which is replete with citations to applicable industry standards.

As Plaintiff correctly notes, Mr. Morris opines that the industry standard for a company like Uber is to conduct background checks by partnering with a third-party consumer reporting agency ("CRA") that is accredited by the Professional Background Screening Association ("PBSA"). Mot. at 24; Morris Rep. at 8-9 (Mot. Ex. D). Plaintiff suggests that "the PBSA accreditation guidelines do not specify the practices . . . consumer reporting agencies (CRAs) must or should undertake *other than* adopting policies that comply with the law," Mot. at 24, but that is simply not true. To the contrary, the PBSA accreditation standards Mr. Morris cites span 26 pages and incorporate numerous criteria that are not just "comply[ing] with the law." *See* PBSA Accreditation Standards (cited in Morris Rep. at 8 n.10). For example, to be accredited by the PBSA, a CRA must: (a) hold an information security certification; (b) vet new public record researchers; and (c) follow reasonable procedures to assure maximum possible accuracy, among many other requirements. *See* PBSA Accreditation Standards at 1, 14, 16 (PBSA accreditation standards 1.1, 4.2, and 5.1, respectively). And while it is true that the PBSA does, in addition to these other things, require accredited CRAs to follow state and federal consumer reporting and privacy laws, *see id.* at 5-6, that fact does not remotely undermine Mr. Morris's opinion that following those laws is part of the industry standard. Indeed, Plaintiff's own background check expert, David Sawyer, agrees that "[u]sing an accredited CRA and aligning with PBSA guidelines is a bare minimum." Sawyer Rep. at 27 (Ex. 4).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

Viewed in this context, the cases Plaintiff cites are plainly inapposite. Plaintiff cites *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985-86 (9th Cir. 2020); *Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1250 (D. Or. 2024); and *Kidwell-Bertagnolli v. Cnty. of Sonoma*, No. 3:20-cv-03291-JSC, 2024 WL 1589468, at *14 (N.D. Cal. Apr. 10, 2024), for the proposition that an expert's opinion about industry standards is inadmissible when that expert fails to articulate what the industry standard is. But that is not the case here, where Mr. Morris clearly states that the industry standard for a company like Uber is to conduct background checks in partnership with a PBSA-accredited CRA.

*Second*, Plaintiff argues that even if Mr. Morris has identified an applicable industry standard, his opinions are nevertheless irrelevant because the standard he identifies does not relate to the "*efficacy*" of Uber's background checks, such as how to conduct a background check or for how long." Mot. at 26. Again, however, Plaintiff is mischaracterizing the industry sources that Mr. Morris relies on. In fact, the PBSA accreditation standards cited in Mr. Morris's report *do* relate to the "efficacy" of the background checks performed by a PBSA-accredited CRA. For example, the PBSA standards require that an accredited CRA: (a) employ qualified individuals with sufficient "jurisdictional knowledge" to understand the relevant "jurisdictional court differences" where a particular background check is being conducted; (b) "follow procedures to reasonably ensure the accuracy and quality of all work product"; and (c) "follow procedures to ensure that data compiled and stored is accurate." PBSA Accreditation Standards at 10, 18 (standards 2.17, 2.19, and 5.5, respectively). All of these criteria bear on the accuracy or efficacy of a background check.[15]

*Third*, Plaintiff asserts that Mr. Morris's industry standards opinions are mere "*ipse dixit*" because they rely on his own observations that Uber's screening practices are more robust than those of similarly situated companies. Mot. at 28. However, courts universally recognize that an expert like Mr. Morris may "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *see also United States v. Holguin*, 51 F.4th 841, 856 (9th Cir. 2022) (noting that "[e]xperience alone" may be "a reliable basis

---

[15]    As Plaintiff acknowledges, Mr. Morris also cites background check industry standards promulgated by the Society for Human Resource Management ("SHRM"). Mot. at 26-27.

23

for . . . expert testimony"). Here, Mr. Morris's industry standard opinions are rooted in three decades of specialized experience in the background screening industry. That experience includes, among other things, (a) co-founding and serving as president of a CRA; (b) serving as the Chair of the PBSA and the PBSA Background Screening Credentialing Council; and (c) consulting with various organizations in the public and private sectors about their background check processes. *See* Morris Rep. at 2 & Ex. C (CV). Mr. Morris plainly has the requisite experience to reliably opine that Uber's background check practices are superior to those of other companies.

For the foregoing reasons, the Court should deny Plaintiff's motion to exclude certain of Mr. Morris's opinions.

### D.    Dr. Eric Piza Is Well Qualified To Opine On The Effectiveness And Feasibility Of Dashcams And His Opinions Are Reliable.

Plaintiff seeks to exclude only two of Dr. Eric Piza's expert opinions: (1) that dashcams would be ineffective because "'[t]he many other safety features on the Uber platform already . . . deter criminal conduct'" Mot. at 28 (quoting Piza Rep. at 1); and (2) that "'complementary policies and safeguards needed for video cameras to prevent violent crime cannot realistically be implemented for the millions of rides on the Uber platform,'" *id.* at 31 (quoting Piza Rep. at 14-15).[16] Plaintiff also seeks to exclude Dr. Piza's mere reference to RAINN and the Urban Institute as "reputable" organizations. Plaintiff's challenges to Dr. Piza's opinions are meritless for multiple reasons. *First*, Plaintiff's assertion that Dr. Piza has "nonexistent" relevant experience, Mot. at 28, is frivolous. Dr. Piza is a renowned criminologist, a tenured professor of criminology, and an extensive criminal justice researcher who has received repeated accolades and recognition for his publications and research related to the deterrent effect of video surveillance on violent crime. *Second*, Plaintiff fundamentally misunderstands Dr. Piza's stated methodology, essentially ignoring his vast experience, empirical

---

[16]    Although Plaintiff seeks to broadly exclude Dr. Piza's "opinion regarding the deterrent impact of safety features on the Uber platform," Mot. at 31, Plaintiff does not discuss—and thus provides no basis to exclude—Dr. Piza's opinion pertaining to dashcam deterrence and driver control of dashcams—i.e., that "dashcams are not likely to deter sexual misconduct where the dashcam is in the driver's personal vehicle and the driver controls the circumstances of the dashcam's use," Piza Rep. at 15 (Mot. Ex. F); *see also id.* at 1.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

research and literature review undertaken to form his deterrence opinions. *Lastly*, Dr. Piza's testimony that RAINN and the Urban Institute are "reputable" is based on his pre-litigation experience and does not constitute an impermissible personal opinion. For all of these reasons, Dr. Piza's opinions satisfy the requirements of Rule 702 and should be admitted.

### 1.    Dr. Piza Is Extensively Qualified To Opine On Dashcams.

Ninth Circuit courts have made clear that "Federal Rule of Evidence 702 [] contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). The Court need only determine that the proffered expert has "minimal qualifications necessary to offer expert testimony on the subject" through "'knowledge, skill, experience, training or education.'" *Erickson v. ING Life Ins. & Annuity Co.*, No. CV09-204-S-EJL, 2011 WL 4583829, at *2 (D. Idaho Sept. 29, 2011) (quoting Fed. R. Evid. 702). For this reason, any claim of a "'lack of specialization affects the weight of the expert's testimony, not its admissibility.'" *Wolkowitz v. Lerner*, No. SA CV 07-777-CAS, 2008 WL 1885770, at *3 (C.D. Cal. Apr. 21, 2008) (citation omitted); *see also In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) ("A court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified.").

Dr. Piza easily satisfies this standard. Dr. Piza received his Ph.D. in Criminal Justice from Rutgers University. Piza Rep. at 1. He has extensive experience working in crime analytics, including serving as Research Director for Crime Analytics at Rutgers School of Criminal Justice/Center on Public Security and Geographic Information Systems Specialist for the Newark, New Jersey Police Department. *Id*. Dr. Piza is "currently the Lipman Family Professor of Criminology & Criminal Justice at Northeastern University in Boston, MA" and was selected for this prestigious, tenured position "due to [his] scientific contributions to real-world security and public safety issues." *Id*. As part of his employment as a tenured professor of criminology, Dr. Piza "routinely read[s] and review[s] scientific publications on criminology, surveillance, and deterrence research" and "attend[s] conferences, participat[es] in professional organizations, and discuss[es] research with my professional colleagues."

*Id*. at 2. Indeed, Dr. Piza "had professional expertise in studying surveillance policy design and assessment prior to working on this case." *Id*. at 3.

Dr. Piza has also "maintained an active research agenda throughout [his] career," "publishing 71 peer-reviewed journal articles related to criminology" and receiving "more than $6.7 million in competitive research funding[.]" *Id*. at 1-2. Importantly, Dr. Piza's extensive research "centers on topics with direct relevance to the current case, including video surveillance cameras, body-worn cameras, crime prevention, and criminal investigations." *Id*. at 2. This includes "a couple of dozen peer-reviewed journal articles on the topic of video surveillance" that Dr. Piza "conducted [him]self." Piza Dep. 263:6-16 (Mot. Ex. G); *see also* Piza Rep. at 5 (Dr. Piza "led a systematic review and meta-analysis of 80 prior studies evaluating the effect of video surveillance cameras on crime reduction"). He is also actively "involved in evidence-based crime prevention," which is "the process of using data to analyze crime problems, help develop potential solutions to those problems and . . . [to] evaluate whether or not those interventions are delivering the anticipated benefits." Piza Dep. 254:10-19. Dr. Piza's research is renowned, with a recent article published in the *International Journal of Environmental Research and Public Health* ranking him "as the sixth-most-influential crime prevention scholar" and an "analysis of articles published in *Criminology & Public Policy* . . . identified three of [his] articles as among the 50 most influential articles" in the field. Piza Rep. at 2.

Plaintiff's motion to exclude Dr. Piza entirely ignores this wealth of expertise. Instead, Plaintiff argues that Dr. Piza's "experience . . . is nonexistent" because "Dr. Piza has never owned or used a dashcam, let alone set one up in a vehicle[.]" Mot. at 28. Plaintiff further claims that Dr. Piza is not qualified to opine on "the technological [and operational] feasibility of integrating dashcams with the Uber platform" because he has "no formal training" in software engineering, artificial intelligence and "corporate logistics." *Id*. at 32-33; Piza Dep. 246:18-247:2. Plaintiff's argument is entirely unfounded. Dr. Piza's opinions are centered on the deterrence capability of dashcams, *see* Piza Rep. at 1, and whether "safeguards needed for video cameras to prevent violent crime" can "realistically be implemented," *id.* at 14. Dr. Piza is *not* providing step-by-step dashcam installation instructions and expressly disclaimed any opinion on "the question of technological feasibility of live-streaming video

from dashcams." *Id*. Because Plaintiff's specific complaints about Dr. Piza's qualifications are irrelevant to his actual opinions, any so-called "absence of knowledge on the mechanical [or technical] aspects" of dashcams does not "render[] h[im] unqualified." *Erickson*, 2011 WL 4583829, at *2.

In short, Dr. Piza's decades of experience in criminology, including his extensive research experience specifically evaluating the effect of video surveillance cameras on crime reduction, more than qualify him to testify as an expert in this litigation on that issue.

### 2.    Dr. Piza's Dashcam Opinions Are Reliable And Amply Supported.

Plaintiff also argues that Dr. Piza "has no basis in facts, data, or reliable methodology" to opine that dashcams "would not meaningfully" decrease crime "given the safety features already utilized on the Uber platform,'" Mot. at 28-29 (quoting Piza Rep. at 9), or that "complementary policies and safeguards needed for video cameras to prevent violent crime cannot realistically be implemented," Mot. at 32 (quoting Piza Rep. at 14). Plaintiff's arguments all fail.

#### a.    Dr. Piza's Opinion Regarding The Deterrent Impact Of Uber's Safety Features Is Reliable.

As Dr. Piza explains in his report, "Plaintiffs . . . suggest that mandatory dashcams would have prevented sexual misconduct on the platform."[17] Piza Rep. at 9. To rebut this "suggest[ion]," Dr. Piza relied on "empirical research that has explored the effect of other video surveillance technology on crime" that raise "doubt[s] about the efficacy of dashboard cameras," *id*.; *see also* Piza Dep. 255:20-256:10, including "a couple of dozen peer-reviewed journal articles on the topic of video surveillance" that he "conducted [him]self," *id.* 263:6-16.[18] Dr. Piza also "reviewed case materials specific to Uber's safety policies," "various safety features (including internal pilot studies), and safety reports." Piza Rep. at 3; Piza Dep. 255:20-256:10. Based on his review of the empirical publications and Uber's documents, Dr. Piza arrived at his opinion that "given the other safety features already utilized on the Uber platform, crime commission is already risky for drivers and it is unlikely that the addition of a

---

[17]    Notably, Mr. Turay testified that "if I opted for the camera that Uber had" the camera might have turned off when he ended the trip prior to the alleged assault or "maybe I would have turned it off manually." Turay Dep. 118:25-119:13 (Ex. 5).

[18]    Dr. Piza relied on video surveillance research because no peer-reviewed articles specifically addressing the deterrent impact of dashcams exist. Piza Dep. 261:23-262:2.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

camera would increase a potential offender's perception of risk." Piza Rep. at 16. As courts have recognized, Dr. Piza's methodology, in which he relied on his decades-long experience in criminology and extensive empirical research to opine on the deterrent effect of dashcams on sexual assault, is sound. *See, e.g.*, *Primiano*, 598 F.3d at 567 ("Dr. Weiss's background and experience, and his explanation of his opinion, leave room for only one conclusion regarding its admissibility. It had to be admitted."); *Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *8 (D. Ariz. June 17, 2020) ("When an expert's opinion is based on the 'application of extensive experience,' it is based on reliable principles and methods."); *Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1028 (E.D. Cal. 2011) ("testimony that is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions expressed were 'derived by the scientific method'") (citation omitted); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6301625, at *7 (S.D. Ill. Dec. 16, 2011) (holding expert's "method of forming her opinions is reliable as based on epidemiologically based journal articles published in reputable sources").

Plaintiff completely ignores these steps of Dr. Piza's proffered methodology. Instead, Plaintiff argues that Dr. Piza's "examining a potential crime-deterrent through the lens of an offender's perceived 'certainty, severity, and celerity (i.e., speed or swiftness)' of punishment" was unreliable. Mot. at 29-31. But Plaintiff's argument is based on a fundamental misunderstanding of Dr. Piza's methodology and is baseless for several reasons.

*First*, although Plaintiff criticizes Dr. Piza for not analyzing the certainty, severity, and celerity factors for drivers who use the Uber platform, Mot. at 30-31, Dr. Piza explained that his opinions are based on years of deterrence research that emphasizes that video surveillance does not lead to greater certainty, severity, and celerity. *E.g.*, Piza Rep. ¶ 14. Dr. Piza further "extrapolat[es] from the larger scientific literature on video surveillance cameras to a rideshare environment" to explain why it is unlikely offenders would view dashcams as increasing their risk of committing sexual assault on the Uber platform. Piza Dep. 100:7-16; *see also id.* 101:23-102:4. And as set forth above, this is an indisputably reliable methodology.

28

In any event, Dr. Piza *did* appropriately analyze the certainty, severity, and celerity of apprehension on Uber. As Dr. Piza explained (and Plaintiff completely ignores), Dr. Piza's report amply discusses the most "important" certainty factor in deterrence research—i.e., how Uber's "safety features create an environment where identification of perpetrators and punishment of perpetrators is more certain than it is in other environments." Piza Dep. 91:11-24, 98:5-16, 239:7; *see also* Piza Rep. at 11-13 (discussing Uber "safety features that increase the likelihood of apprehension"). His review of Uber's documents provides the basis for his opinion that "anyone accused of [sexual assault] is automatically de-platformed at least for a period of time." Piza Dep. 98:17-99:3. And although Plaintiff criticizes Dr. Piza for not "analy[zing] th[e severity] element entirely," Mot. at 30-31, Dr. Piza explained that the severity factor is "rendered inconsequential" where the certainty and celerity factors[19] are satisfied, Piza Dep. 99:19-100:2. Dr. Piza also explained that for severity in the context of sexual assault, "if someone's considering sexually assaulting someone," "the criminal justice response" is the "more important" consideration than Uber's punishment response. Piza Dep. 242:14-25. Thus, there is no basis for Plaintiff's claim that Dr. Piza did not reliably analyze the potential deterrent impact of dashcams on an offender's perception of risk.

*Second*, Plaintiff posits that Dr. Piza's assessment of the certainty and celerity factors was unreliable because Dr. Piza had "no data" on drivers' awareness and knowledge of Uber's safety features. Mot. at 29-30. But it is nonsensical to require (as Plaintiff suggests) Dr. Piza to compile consumer survey data of drivers and their knowledge of basic Uber features, such as Uber's use of GPS data. *See, e.g.*, Piza Dep. 199:3-6; *id.* 200:9-14. And such data is not even necessary for Dr. Piza's opinions due to his specific review of "interviews with incarcerated offenders" and "offenders detained by police illustrates" about "why many offenders do not view surveillance cameras as increasing the risk of crime commission," Piza Rep. at 4, and his vast experience working on research projects, such as "projects involv[ing] the analysis of GPS data of police vehicles," *id.* 199:19-24, that provide unique and particularized insight into perception of safety features. Moreover, accepting Plaintiff's argument

---

[19] Dr. Piza explained that the relevant "research has difficulty distinguishing" between certainty and celerity. Piza Dep. 91:15-24.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

would effectively and improperly reverse the burden of proof. *E.g.*, *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996) (the Rule 702 "test is different" for defense experts because the burden of proof is one that "the defense d[oes] not bear"); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. CV 15-6480, 2021 WL 2352016, at *14 (E.D. Pa. June 9, 2021) ("'defendants' experts have a less demanding task'" and thus have "'no burden to produce models or methods of their own'") (citation omitted).

*Lastly*, Plaintiff's broad claim that Dr. Piza "has no reliable understanding of [Uber's] safety features," Mot. at 31, is baseless. Dr. Piza provided numerous citations to Uber's internal documents and external reports that provided a factual basis for his knowledge of Uber's safety features. *See, e.g.*, Piza Rep. at 12-13. And he explained that "[a]ll of [his] opinions regarding the potential public safety benefits of these features" were rooted in "the scientific research." Piza Dep. 220:4-12.

For all these reasons, Dr. Piza has a sound factual basis and methodology to opine that dashcams "'would not meaningfully'" decrease crime "'given the safety features already utilized on the Uber platform.'" Mot. at 29 (quoting Piza Rep. at 9).

### b. Dr. Piza's Expert Opinion On Technological Feasibility Is Reliable.

Dr. Piza opines that "complementary policies and safeguards needed for video cameras to prevent violent crime cannot realistically be implemented for the millions of rides on the Uber platform" Piza Rep. at 14. Specifically, he describes the feasibility of actively (as opposed to passively) monitoring 33 million rides a day in real time and the ability of Uber—which is "not a law enforcement agency"—to "respond to incidents" in real time. *Id.* at 14-15; Piza Dep. 232:20-25. Plaintiff admits (but glosses over) that Dr. Piza's opinions are based on his firsthand "experience working with police forces," his "knowledge of both the research on" "video surveillance" and "computer vision programs" and what he has "been shown [on technological capabilities] by vendors of private companies." Mot. at 33; Piza Dep. 79:21-80:7, 80:21-81:5. This is an indisputably sound methodological basis for Dr. Piza's "feasibility" opinions. *E.g.*, *Geiger*, 2020 WL 3268675, at *8; *Monroe*, 766 F. Supp. 2d at 1028.

Plaintiff nevertheless focuses on "Uber's individual technological capabilities" and "Uber's operational capabilities," arguing that because Dr. Piza has no specific "understanding of the

30

1    company's capabilities," he has no reliable basis to opine that Uber is "not capable of implementing a

2    mandatory dashcam program." Mot. at 33. But Plaintiff fundamentally misunderstands Dr. Piza's

3    feasibility opinion, which (as described above) is focused on the feasibility of actual crime deterrence,

4    and *not* on Uber's technical and operational "capab[ilities]" of implementing dashcams. And his report

5    clearly and explicitly "[l]eav[es] aside the question of technological feasibility of live-streaming video

6    from dashcams." Piza Rep. at 14. Again, Plaintiff's attacks on Dr. Piza's methodology are aimed at

7    opinions he does not even offer; accordingly, they should be disregarded.

8             3.    **Dr. Piza's Testimony Regarding RAINN And The Urban Institute Are Not Personal Opinions.**

9             Lastly, Plaintiff asks the Court to exclude Dr. Piza's so-called "views" on RAINN and the

10   Urban Institute, taking issue with Dr. Piza's description (in response to Plaintiffs' counsel's question)

11   of the Urban Institute as "reputable" and RAINN as "preeminent" in advancing the rights of sexual

12   violence survivors. Mot. at 34 (citations omitted). Although Plaintiff classifies Dr. Piza's testimony as

13   "personal beliefs," she ignores Dr. Piza's pre-litigation experience with these organizations. For

14   example, Dr. Piza explained that prior to becoming an expert in this litigation, he "cited a lot of Urban

15   Institute research throughout [his] career." Piza Dep. 25:13-14, 28:5-29:3. And although Plaintiff

16   states that Dr. Piza "had not read any RAINN publications before his retention in this case," Mot. at

17   34, that is false. What Dr. Piza said was that he had "never read any . . . RAINN reports directly," but

18   prior to being retained in this case, he "was familiar with [RAINN's] website," Piza Dep. 26:3-9, and

19   interacted with RAINN the "same way [he] interacted with the Urban Institute," *id.* 25:22-26:2.[20]

20   Because it is well-accepted that an expert can "rely upon his own experience and facts or data that he

21   personally observed" in providing expert opinions, *V5 Techs., LLC v. Switch, Ltd.*, 501 F. Supp. 3d

22   960, 964 (D. Nev. 2020) (rejecting argument that opinions were "personal opinions"), Dr. Piza's

23   experience-based description of RAINN and the Urban Institute as "reputable" is not an improper

24   opinion.

25   _____

26   [20]    Given this experience, it strains credulity to claim (as Plaintiff does) that Dr. Piza has no basis to understand that RAINN and the Urban Institute are "reputable" merely because he "never

27   collaborated with [the organizations] in any official capacity." Mot. at 34.

28   DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
     Case No. 23-cv-06708

1

**E.     Joseph Okpaku's Opinions Regarding The History, Safety Standards, And Characteristics Of The Rideshare Industry Are Relevant And Reliable.**

2

Plaintiff seeks to preclude Uber's expert Joseph Okpaku from testifying that: (1) the industry

3

standard with respect to safety in the rideshare industry has been established by the statutory and

4

regulatory requirements for companies like Uber, and Uber exceeds the industry standard for safety in

5

the rideshare and for-hire industries; (2) Uber lacks control over independent third-party drivers; and

6

(3) industry standards do not support the use of dashcams. Plaintiff argues that these opinions are legal

7

opinions, irrelevant, or unreliable. As explained below, Mr. Okpaku's opinions are not legal opinions.

8

Rather, they relate to key factual issues for the jury—the degree of care and diligence owed by

9

rideshare companies and whether Uber breached that duty of care—and they are well-supported by

10

Mr. Okpaku's knowledge, experience, and research.

11

Plaintiff also contends that Mr. Okpaku's opinion that rideshare companies "have been treated

12

by regulators as distinct from common carriers" is an impermissible legal conclusion. However, this

13

is not an opinion Mr. Okpaku will be offering at trial. As Plaintiff notes, Mr. Okpaku testified at his

14

deposition that he does not have an opinion as to the common carrier question in Arizona. Because

15

there is no opinion to admit or exclude in this case, the issue is moot and the Court need not address

16

it.

17

Plaintiff's motion should therefore be denied in its entirety.

18

**1.     Mr. Okpaku's Opinions Regarding Industry Standards Are Reliable.**

19

As the JCCP court recognized, Mr. Okpaku's opinions regarding industry standards are

20

"relevant and admissible as to the standard of due care and whether Uber has satisfied that standard."

21

JCCP Order, at 17 (Ex. 6). While Plaintiff argues that Mr. Okpaku's definition of the industry

22

standards is unreliable, Mot. at 38, and (conversely) that "he never defines what that 'industry

23

standard' is," *id*. at 39, neither objection has any merit.

24

Mr. Okpaku's report clearly identifies that the current "California regulatory and statutory

25

framework for [rideshare companies] . . . represents the industry standard for safety in ridesharing[.]"

26

Okpaku Rep. at 11 (Mot. Ex. A). Not only was California the first state to establish such a framework,

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
Case No. 23-cv-06708

but Mr. Okpaku relies on the "breadth and depth of consideration given to safety issues during its development." *Id.* at 11. He further elaborates on the basis for his conclusion:

> As someone who has been deeply involved in legislative processes in numerous states on ridesharing issues as well as other issues, I can say that the depth of the CPUC inquiry and rulemaking was different and distinct from the typical legislative process. The CPUC process was conducted by CPUC board members and staff who had significant experience and expertise in transportation policy and standards. The rulemaking itself is a 75-page document, which demonstrates the depth and intricacy of the CPUC rulemaking process. Furthermore, the CPUC has continued to inquire into the [rideshare] industry since this original rulemaking. The length and attention on the [rideshare] industry by the CPUC differs from the typical process in which a bill might be enacted from just one legislative session. The CPUC has conducted a years-long inquiry into and assessment of the [rideshare] industry that is predicated, in the CPUC's own words, on ensuring safety. In my opinion, this level of attention to safety represents the industry standard for safety in ridesharing and exceeds what I have seen in other regulatory contexts.

*Id.* at 12.

Plaintiff objects that Mr. Okpaku's opinions concerning industry standards "rest almost entirely on a recitation of regulatory history, as opposed to any discernable methodology." Mot. at 38. Yet she also acknowledges that he bases his opinion on "the materials he reviewed, his past experience and knowledge of the ridesharing industry, and certain . . . studies cited to in his report." *Id.* at 38-39. That easily satisfies the requirements of Rule 702, particularly where (as here) Mr. Okpaku's expertise lies in his knowledge and experience rather than science. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) ("Given that, unlike scientific or technical testimony, the reliability of [expert's] testimony was not contingent upon a particular methodology or technical framework, the district court did not abuse its discretion in finding [expert's] testimony reliable based on his knowledge and experience."); *Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 792 (N.D. Cal. 2021) ("When experience is the foundation for expert testimony, the expert "must establish how his experience provides a basis for and leads to the conclusions that he reaches."). Moreover, "trial courts often allow experts to testify about regulations that support their standard-of-care opinions." *MS Amlin Marine NV v. Delta Marine Indus. Inc.*, 348 F.R.D. 658, 674 (W.D. Wash. 2025). Here, Mr. Okpaku's knowledge and experience provided a sound basis for his opinion that

33

1    California's regulatory and statutory framework provide the industry standard, and *Daubert* requires

2    no more.[21]

3        Plaintiff further objects to Mr. Okpaku's opinions that Uber exceeded the industry standards

4    and that ridesharing is safer than taxis because he does not cite studies or data in support of those

5    opinions. That is true as far as it goes, because no such studies have been attempted and no such data

6    exist. But that does not mean there is no foundation for his opinions. To the contrary, Mr. Okpaku

7    cites a laundry list of safety-focused features adopted by Uber that are not required by law, and that

8    are rare or nonexistent in the taxi industry. *See* Okpaku Rep. at 12-17 (Mot. Ex. A). And although the

9    safety benefits of these features are largely self-evident, Mr. Okpaku nevertheless explains how they

10   enhance rider safety. *See, e.g.*, *id.* at 14-16, 18-19 (explaining that sharing driver information with

11   riders provides a "significant safety advantage over taxis" because "riders are able to verify the identity

12   of the driver and confirm that the approved vehicle is being used before entering the vehicle"); *id.* at

13   14, 17, 19 (GPS tracking provides "a significant deterrent against aberrant behavior while transporting

14   a passenger, as it provides a digital record of where that driver was at any point that the driver was

15   active on the app."); *id.* at 18 (driver ratings are "not only a significant safety enhancer but also a

16   significant deterrent against aberrant behavior during a ride"). Because several of these features have

17   existed since Uber's inception and none is required by law, Mr. Okpaku concludes that "they represent

18   a level of transparency, safety and accountability that had never existed in the taxi industry and for the

19   most part still does not exist today. The existence of these features alone leads me to conclude that

20   Uber has met or exceeded the industry standard for safety since its inception." *Id.* at 17. *See United*

21   *States Fid. & Guar. Co. v. Ulbricht*, 576 F. Supp. 3d 850, 860 (W.D. Wash. 2021) (permitting expert

22   _____

     [21]    Plaintiff's cases are not to the contrary. *Joiner*, 522 U.S. 136, says only that a court can
23   exclude expert opinions that are not supported by the cited data. Its purported relevance here is
     unclear. In *Magallon*, the court excluded an expert's testimony that the industry standard was mere
24   compliance with the Fair Credit Reporting Act's pre-adverse action notice requirement. 743 F. Supp.
     3d at 1250. In that case, the defendant's compliance with that provision was the central legal
25   question at issue, so permitting the expert's testimony would have been tantamount to allowing the
     expert to opine on the ultimate issue of law. Here, by contrast, there is no allegation that Uber
26   violated any part of the California regulatory and statutory framework for rideshare companies.
     Thus, Mr. Okpaku's reference to that framework as the industry standard is not a legal conclusion in
27   disguise.

                                                        34
28

1    to testify both to the industry standard and whether a party's conduct was consistent with that

2    standard). Similarly, the rarity or absence of these features in taxis means "there are fewer deterrents

3    to a person who otherwise might be disposed to commit a crime while providing for-hire transportation

4    services to do so while driving for a taxi than while driving on a ridesharing platform." Okpaku Rep.

5    at 20. In short, Mr. Okpaku's report supplies substantial evidence supporting his opinions and there is

6    no basis to exclude them.

7                    **2.    Mr. Okpaku's Opinions Concerning Drivers' Autonomy Are Relevant
                            And Admissible.**

8            Plaintiff next objects to Mr. Okpaku's discussion of the lack of control exerted over drivers by

9    Uber and other rideshare companies, arguing that driver motivations are irrelevant and that his

10   discussion of platform access and/or technology service agreements drivers enter constitutes an

11   irrelevant legal opinion. Both arguments are meritless.

12           *First*, Plaintiff asserts that driver motivations "have nothing to do with whether they are an

13   employee or an independent contractor." Mot. at 40. That is plainly wrong. If rideshare drivers value

14   having complete autonomy over their schedule, which ride requests they accept, and whether they also

15   use a competitor's platform to connect with potential riders, that is at least probative of the lack of

16   control ridesharing companies have over drivers. Conversely, if Uber actually retained the right to

17   dictate those terms, which Plaintiff does not assert, one would not expect rideshare drivers to cite

18   freedom and flexibility as key reasons they choose to engage in such work.

19           *Second*, Plaintiff objects to Mr. Okpaku's discussion of agreements drivers enter prior to

20   gaining access to the Uber platform as an irrelevant legal opinion. This objection also fails. Mr.

21   Okpaku's report simply cites language in these agreements that is consistent with the drivers'

22   expectations regarding their autonomy and flexibility. These are factual statements about what the

23   contracts say, not legal interpretations. And Mr. Okpaku's opinion—"that drivers have significant

24   control over the amount of their participation on the Uber app, and that Uber does not exercise control

25   over drivers," Okpaku Rep. at 29—is a factual conclusion about the lack of control exercised by Uber,

26   not a legal conclusion about whether drivers are employees or independent contractors. *See Hangarter*,

27

28
                                                              35

373 F.3d at 1017 (expert testimony that certain conduct that may violate the law was admissible because expert did not conclude that defendants violated the law). In short, Mr. Okpaku's opinions are relevant and admissible.

### 3. Mr. Okpaku's Opinions Regarding Dashcams Are Relevant And Reliable.

Finally, Plaintiff seeks exclusion of Mr. Okpaku's "opinion that dashcams are not required, and therefore Uber's failure to mandate them is consistent with reasonable care." Mot. at 41. As an initial matter, Plaintiff misrepresents Mr. Okpaku's opinion. Mr. Okpaku is responding to Plaintiff's argument that Uber should have required the use of dashcams in drivers' cars, and concludes that Uber did not "f[a]ll below industry safety standards for ridesharing platforms by not requiring that drivers install a dashcam when no legislative or regulatory body throughout the United States has ever issued such a mandate for the ridesharing industry." Okpaku Rep. at 19. He expresses no conclusion regarding "reasonable care."

In any event, while Plaintiff objects that there is no foundation for this opinion, Mr. Okpaku's report details his research to determine whether any regulatory or legislative body in the United States has required ridesharing companies to have drivers install cameras in their cars. *Id.* As discussed above, there is no requirement under Rule 702 or *Daubert* that an expert opinion be supported by empirical data or any particular methodology. Here, Mr. Okpaku's knowledge, experience, and research provide sufficient support for his opinion. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 553-54 (C.D. Cal. 2014) ("The mere fact that [an expert] does not rely on a testable methodology does not render his testimony inadmissible under *Daubert*."). Accordingly, there is no basis to exclude his opinion regarding dashcams.

## V. CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiff's motion to exclude Defendants' experts.

1    DATED: December 10, 2025              Respectfully submitted,

2                                          /s/ Laura Vartain Horn

3                                          Laura Vartain Horn (SBN 258485)
                                           **KIRKLAND & ELLIS LLP**
4                                          555 California Street, Suite 2700
                                           San Francisco, CA 94104
5                                          Telephone: (415) 439-1625
                                           laura.vartain@kirkland.com
6
7                                          Allison M. Brown (Admitted *Pro Hac Vice*)
                                           **KIRKLAND & ELLIS LLP**
8                                          2005 Market Street, Suite 1000
                                           Philadelphia, PA 19103
9                                          Telephone: (215) 268-5000
                                           alli.brown@kirkland.com
10
11                                         Jessica Davidson (Admitted *Pro Hac Vice*)
                                           **KIRKLAND & ELLIS LLP**
12                                         601 Lexington Avenue
                                           New York, NY 10022
13                                         Telephone: (212) 446-4800
                                           jessica.davidson@kirkland.com
14
15                                         *Attorneys for Defendants*
                                           UBER TECHNOLOGIES, INC.,
16                                         RASIER, LLC, And RASIER-CA, LLC

17

18

19

20

21

22

23

24

25

26

27
                                           37
28   DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY
     Case No. 23-cv-06708

1

**CERTIFICATE OF SERVICE**

2      On December 10, 2025, I electronically filed the foregoing with the Clerk of the Court by using

3  the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF. All

4  copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

5

6                              */s/ Laura Vartain Horn*
7                              Laura Vartain Horn

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28