# EXHIBIT V

1 | [Submitting counsel below]

2

3

4 | UNITED STATES DISTRICT COURT

5 | OF NORTHERN DISTRICT OF CALIFORNIA

6 | SAN FRANCISCO DIVISION

7

8 | IN RE: UBER TECHNOLOGIES, INC.,
PASSENGER SEXUAL ASSAULT
9 | LITIGATION

10

No. 3:23-md-03084-CRB

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO EXCLUDE
EXPERT TESTIMONY**

11 | This Document Relates to:

12 | *Jaylynn Dean v. Uber Techs., Inc.*,
N.D. Cal. No. 23-cv-06708
13 | D. Ariz. No. 25-cv-4276

14

Judge: Honorable Charles R. Breyer
Date:  January 6, 2026
Time:  10:00 A.M. PT
Ctrm.:  6-17th Floor

**FILED UNDER SEAL**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  INTRODUCTION ............................................................................................................... 1

4  LEGAL STANDARD ......................................................................................................... 2

5  ARGUMENT ...................................................................................................................... 3

I.     Dr. Minette Drumwright's testimony is admissible. ................................................ 3

6      A.    Dr. Drumwright's marketing opinions are admissible. ................................. 4

7            1.    Dr. Drumwright's marketing opinions are relevant. ......................... 5

8            2.    Dr. Drumwright's marketing opinions are grounded in sufficient
                  facts and data. ..................................................................................... 8

9      B.    Dr. Drumwright's ethics opinions are admissible. ...................................... 10

10           1.    Dr. Drumwright's ethics opinions are relevant. .............................. 10

11           2.    Dr. Drumwright's analysis of Uber's corporate standards is not
                  impermissible narrative. ................................................................... 12

12           3.    Uber's remaining arguments against Dr. Drumwright's ethics
                  opinions should be rejected. ............................................................. 13

13
       C.    Dr. Drumwright may discuss Uber's failure to warn Plaintiff and the

14           public. ........................................................................................................... 15

15     D.    Dr. Drumwright may discuss the information available to Uber. ................ 16

II.    Dr. Veronique Valliere's testimony is admissible. ............................................... 17

16     A.    Dr. Valliere is qualified to offer her opinions. ........................................... 18

17     B.    Dr. Valliere's opinions are reliable. ............................................................ 22

18           1.    Dr. Valliere's analysis of the effect of Uber's marketing on
                  potential victims is reliable. ............................................................. 22

19           2.    Dr. Valliere's opinions concerning the risks of using Uber are

20                reliable. ............................................................................................. 23

21           3.    Dr. Valliere's opinions concerning Uber's failure to warn are
                  reliable. ............................................................................................. 25

22           4.    Dr. Valliere does not offer opinions concerning Uber's ethical
                  responsibilities. ................................................................................. 26

23
             5.    Dr. Valliere may testify about information available to Uber as

24                relevant to her opinions. ................................................................... 26

25           6.    Dr. Valliere's testimony is not impermissible narrative. ................. 27

III.   Jay Feldis's testimony is admissible. .................................................................... 29

26     A.    Mr. Feldis is qualified to opine on the technological feasibility of dashcam

27           technology in Uber vehicles. ........................................................................ 29

       B.    Mr. Feldis's feasibility opinions are reliable. ............................................. 31

28     C.    Mr. Feldis does not affirmatively offer deterrence opinions. ..................... 32

**TABLE OF CONTENTS**
(continued)

| | | | Page |
|---|---|---|---|
| IV. | | Bruce Weiner's testimony is admissible. | 32 |
| | A. | Mr. Weiner is qualified to opine on Uber's product development in light of foreseeable safety risks. | 33 |
| | B. | Mr. Weiner's opinions are the product of reliable principles and methods. | 35 |
| | | 1. Uber misrepresents Mr. Weiner's analysis. | 36 |
| | | 2. Mr. Weiner applied reliable industry standards. | 38 |
| | | 3. Mr. Weiner's methodology does not need to be "testable." | 39 |
| | C. | Mr. Weiner's opinions do not reflect impermissible state-of-mind or narrative testimony. | 39 |
| V. | | Lacey Keller's testimony is admissible. | 40 |
| VI. | | Dr. John Chandler's testimony is admissible. | 42 |
| | A. | Dr. Chandler's marketing opinions are admissible. | 43 |
| | | 1. Dr. Chandler's marketing opinions are not impermissible narrative. | 44 |
| | | 2. Dr. Chandler's marketing opinions are not speculative. | 46 |
| | | 3. Dr. Chandler's opinion that Uber's marketing fell below industry standards is relevant. | 47 |
| | | 4. Dr. Chandler does not impermissibly opine on state of mind. | 49 |
| | B. | Dr. Chandler's statistical analysis of Uber's Safety Reports is admissible. | 49 |
| | | 1. Dr. Chandler's analysis is not "educated guesswork." | 49 |
| | | 2. Dr. Chandler employed a reliable statistical methodology. | 51 |
| | C. | Dr. Chandler's analysis of Uber's communications with Ms. Dean is admissible. | 53 |
| | D. | Dr. Chandler's rebuttal to Dr. Stodden is admissible. | 54 |
| VII. | | Thomas Tremblay's testimony is admissible. | 56 |
| | A. | Mr. Tremblay is qualified to offer his opinions concerning Uber's failure to reduce the risk of sexual assault. | 57 |
| | B. | Mr. Tremblay's methodology is reliable to evaluate whether Uber's conduct increased the risk of sexual assault generally, and of Dean in particular. | 61 |
| | C. | Mr. Tremblay's references to "knowledge" are proper bases for his opinions and are not impermissible narrative. | 64 |
| | D. | Mr. Tremblay does not opine on the ultimate legal issue. | 65 |
| VIII. | | Cynthia Rando's testimony is admissible. | 66 |
| | A. | Ms. Rando is qualified to opine on Uber's reporting systems. | 67 |
| | B. | Ms. Rando's opinions are relevant to Plaintiff's claims. | 70 |

**TABLE OF CONTENTS**
(continued)

Page

C. Ms. Rando's opinions are reliable............................................................ 71

    1. Ms. Rando's usability opinions are the product of a reliable
methodology........................................................................................... 71

    2. Uber's characterization of Ms. Rando's opinions as "subjective
narrative" about "Safety Programs" misrepresents her report. ................. 73

D. Ms. Rando's evaluation of the information available to Uber concerning its
deficient reporting processes is admissible.............................................. 77

IX. Dr. Lindsay Cameron's testimony is admissible......................................... 78

A. Dr. Cameron applied a reliable methodology. ....................................... 78

B. Dr. Cameron's conclusions flow from her methodology..................................... 82

C. Dr. Cameron's opinions are relevant. ................................................... 83

CONCLUSION ............................................................................................ 85

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AAA Fire Prot., Inc. v. Orison Mktg., LLC*,
2019 WL 13195249 (D. Colo. Sept. 4, 2019) .................................................................... 22

*Active Sports Lifestyle USA LLC v. Old Navy, LLC*,
2013 WL 11239385 (C.D. Cal. Nov. 21, 2013) .................................................................. 45

*Adams v. United States*,
2009 WL 1324231 (D. Idaho May 8, 2009) ....................................................................... 65

*Alves v. Riverside County*,
2023 WL 2983583 (C.D. Cal. Mar. 13, 2023) ................................................................... 60

*Apple Inc. v. Corellium, LLC*,
2020 WL 5417197 (S.D. Fla. July 30, 2020) ..................................................................... 56

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) ........................................................... 13, 17, 27, 40

*Banda v. Herc Rentals, Inc.*,
2020 WL 353461 (N.D. Cal. Jan. 21, 2020) ...................................................................... 21

*Beard v. United States Postal Serv.*,
2019 WL 257978 (N.D. Cal. Jan. 18, 2019) ...................................................................... 32

*Benefit Cosms. LLC v. e.l.f. Cosms., Inc.*,
2024 WL 3558848 (N.D. Cal. July 25, 2024) .................................................................... 35

*Bernal v. Daewoo Motor Am., Inc.*,
2011 WL 13183093 (D. Ariz. Aug. 31, 2011) ................................................................... 20

*Bhoodai v. Employers Assurance Co.*,
2022 WL 4591239 (M.D. Ga. Sept. 29, 2022) ................................................................... 74

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
2024 WL 5483606 (N.D. Cal. Oct. 22, 2024) ........................................................ 31, 35, 69

*Blue Bottle Coffee, LLC v. Liao*,
2023 WL 6850573 (N.D. Cal. Oct. 16, 2023) .................................................................. 9, 47

*Blue Bottle Coffee, LLC v. Liao*,
2023 WL 9502073 (N.D. Cal. Nov. 30, 2023) ..................................................................... 2

*Boneta v. Am. Med. Sys., Inc.*,
2021 WL 6776245 (S.D. Fla. Oct. 6, 2021) ......................................................................... 5

*Boyer v. City of Simi Valley*,
2024 WL 993316 (C.D. Cal. Feb. 13, 2024) ........................................................................ 3

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ................................................................. 21

*Burrows v. 3M Co.*,
2022 WL 3346419 (W.D. Wash. Aug. 12, 2022) .................................................. 29, 45, 65

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998).............................................................. 54

*Cadena v. Am. Honda Motor Co., Inc.*,
2025 WL 3483436 (C.D. Cal. Dec. 3, 2025) .......................................... 2

*Campos v. Big Fish Games*,
2025 WL 3140399 (W.D. Wash. Nov. 10, 2025) ............................ 29, 59

*Chandler Gas & Store Inc. v. Treasure Franchise Co. LLC*,
2025 WL 3018829 (D. Ariz. Oct. 29, 2025) ..................... 34, 79, 82, 83

*Chavez v. S.F. Bay Area Rapid Transit Dist.*,
2024 WL 3092153 (N.D. Cal. June 21, 2024) ...................................... 34

*City of Huntington, W. Va. v. AmerisourceBergen Drug Corp.*,
157 F.4th 547 (4th Cir. 2025) .............................................................. 41

*City of Philadelphia v. Bank of Am. Corp.*,
2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023).......................................... 54

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014)................................................................ 80

*Cooper-Harris v. United States*,
2013 WL 12125527 (C.D. Cal. Feb. 8, 2013) ........................................ 9

*Counts v. Gen. Motors LLC*,
606 F. Supp. 3d 547 (E.D. Mich. 2022) ................................................ 45

*Courkamp v. Fisher-Price Inc.*,
2022 WL 4448323 (D. Ariz. Sept. 23, 2022)........................................ 75

*Cover v. Windsor Surry Co.*,
2017 WL 9837932 (N.D. Cal. July 24, 2017).......................... 16, 64, 77

*Crowley v. Chait*,
322 F. Supp. 2d 530 (D.N.J. 2004) ...................................................... 23

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)............................................................... 2, 24, 81

*Deitsch Plastics Co. v. Gredale LLC*,
602 F. Supp. 3d 1331 (C.D. Cal. 2022) .......................................... 31, 35

*Dominguez v. Wallick & Volk Inc.*,
2024 WL 3924714 (D. Ariz. Aug. 23, 2024)........................................ 46

*Duchimaza v. United States*,
211 F. Supp. 3d 421 (D. Conn. 2016) .................................................. 31

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)................................................................ 50

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .............................................................. 80

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ................................................................. 3

*Farmers Ins. Co. of Ariz. v. DNS Auto Glass Shop LLC*,
2024 WL 1256042 (D. Ariz. Mar. 25, 2024) ................................... 38, 75

*Favell v. Univ. of S. Cal.*,
2024 WL 5694655 (C.D. Cal. Nov. 13, 2024) ........................................ 43

*Fed. Trade Comm'n v. Amazon, Inc.*,
2025 WL 2460658 (W.D. Wash. Aug. 26, 2025) .................................... 35

*Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*,
692 F.3d 507 (6th Cir. 2012) .................................................................. 2

*FinancialApps v. Envestnet, Inc.*,
2023 WL 5289444 (D. Del. Aug. 14, 2023) ........................................... 35

*Focal Point Films, LLC v. Sandhu*,
2020 WL 5760355 (N.D. Cal. Sept. 28, 2020) ................................. 13, 44

*Fogle v. CSX Transportation*,
2009 WL 2020782 (E.D. Ky. July 9, 2009) ........................................... 58

*FTC v. Qualcomm, Inc.*,
2018 WL 6460573 (N.D. Cal. Dec. 10, 2018) ................................... 37, 64

*Fujifilm Corp. v. Motorola Mobility LLC*,
2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) ...................................... 9, 72

*Gier v. Educ. Serv. Unit No. 16*,
66 F.3d 940 (8th Cir. 1995) ................................................................... 52

*Gomez v. Am. Med. Sys. Inc.*,
2021 WL 1163087 (D. Ariz. Mar. 26, 2021) ......................................... 64

*Gomez v. Am. Med. Sys. Inc.*,
2021 WL 12313068 (D. Ariz. June 17, 2021) ......................................... 5

*Grace v. Apple, Inc.*,
328 F.R.D. 320 (N.D. Cal. 2018) .................................................... 51, 53

*Graves v. Mazda Motor Corp.*,
675 F. Supp. 2d 1082 (W.D. Okla. 2009) .............................................. 74

*Guillory v. Domtar Indus. Inc.*,
95 F.3d 1320 (5th Cir. 1996) ................................................................. 53

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .............................. 10, 15, 29, 36, 48, 59

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) .............................................. 56

*Hilaire v. DeWalt Indus. Tool Co.*,
54 F. Supp. 3d 223 (E.D.N.Y. 2014) ..................................................... 30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Holley v. Gilead Scis., Inc.*,
2023 WL 2469632 (N.D. Cal. Feb. 27, 2023) ........................................................ 39

*Holman Enters. v. Fid. & Guar. Ins. Co.*,
563 F. Supp. 2d 467 (D.N.J. 2008) ..................................................................... 15

*Homyk v. ChemoCentryx, Inc.*,
2025 WL 1547625 (N.D. Cal. May 30, 2025) ............................................ 13, 27, 40, 44

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
2021 WL 765019 (N.D. Fla. Feb. 28, 2021) ............................................................ 44

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) ........................................................... 3

*In re Actimmune Mktg. Litig.*,
2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) ............................................................. 8

*In re Actos (Pioglitazone) Prods. Liab. Litig.*,
2014 WL 120973 (W.D. La. Jan. 10, 2014) .................................................. 13, 27, 40

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ...................................................................... 23

*In re Bard IVC Filters Prods. Liab. Litig.*,
2017 WL 6554163 (D. Ariz. Dec. 22, 2017) .......................................................... 20

*In re Baycol Prods. Litig.*,
532 F. Supp. 2d 1029 (D. Minn. 2007) ................................................................ 13

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
2013 WL 3282926 (S.D.W. Va. June 27, 2013) ......................................................... 5

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
2009 WL 1357234 (D. Kan. May 12, 2009) ....................................................... 14, 48

*In re Coll. Athlete NIL Litig.*,
2023 WL 8372788 (N.D. Cal. Nov. 3, 2023) .......................................................... 37

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ............................................................. 25, 39, 67

*In re Depakote*,
87 F. Supp. 3d 916 (S.D. Ill. 2015) .................................................................. 6, 7

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*,
369 F.3d 293 (3d Cir. 2004) .......................................................................... 6, 7

*In re Glumetza Antitrust Litig.*,
2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ....................... 12, 16, 26, 27, 40, 44, 64, 65

*In re Google RTB Consumer Priv. Litig.*,
2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) ............................................................ 3

*In re Hanford Nuclear Rsrv. Litig.*,
894 F. Supp. 1436 (E.D. Wash. 1995) ................................................................ 50

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   2022 WL 1814440 (N.D. Cal. June 2, 2022)4, 7, 8, 10, 11, 13, 16, 22, 26, 43, 44, 46, 48, 64, 80

*In re Meridia Prods. Liab. Litig.*,
   328 F. Supp. 2d 791 (N.D. Ohio 2004) ................................................................................. 42

*In re MyFord Touch Consumer Litig.*,
   291 F. Supp. 3d 936 (N.D. Cal. 2018) .................................................................................. 71

*In re Nat'l Prescription Opiate Litig.*,
   2019 WL 4165021 (N.D. Ohio Sept. 3, 2019) ..................................................................... 20

*In re Norplant Contraceptive Prods. Liab. Litig.*,
   1997 WL 81092 (E.D. Tex. Feb. 21, 1997) ........................................................................... 7

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................. 11, 13, 14, 48

*In re Roundup Prods. Liab. Litig.*,
   358 F. Supp. 3d 956 (N.D. Cal. 2019), *aff'd*, 997 F.3d 941 (9th Cir. 2021) ........................ 66

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) ................................................................................. 29

*In re Telescopes Antitrust Litig.*,
   348 F.R.D. 455 (N.D. Cal. 2025) ......................................................................................... 49

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ...................................................................... 51

*In re Uber Rideshare Cases*,
   JCCP No. 5188 (Cal. Super. Ct. Aug. 29, 2025) ................................................................. 7

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*,
   424 F. Supp. 3d 781 (N.D. Cal. 2020) ................................................................................ 68

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   500 F. Supp. 3d 940 (N.D. Cal. 2020) ................................................................................ 83

*In re Welding Fume Prods. Liab. Litig.*,
   2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) .................................................. 14, 16, 48, 64, 77

*In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*,
   2017 WL 1352860 (E.D. La. Apr. 13, 2017) ...................................................................... 16

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   2011 WL 6302287 (S.D. Ill. Dec. 16, 2011) ...................................................... 12, 13, 27, 40, 44

*In re Yazmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab. Litig.*,
   2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ..................................................................... 6, 7

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
   644 F. Supp. 3d 1075 (S.D. Fla. 2022), *appeals pending* (11th Cir. No. 23-13182) ................ 52

*In re: DePuy Orthopaedics, Inc.*,
   2016 WL 6271474 (N.D. Tex. Jan. 5, 2016) .................................................. 4, 10, 12, 13, 48

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re: Nat'l Prescription Opiate Litig.*,
2019 WL 3934470 (N.D. Ohio Aug. 20, 2019) .................................................. 41

*In re: Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
2016 WL 807377 (E.D. Pa. Mar. 2, 2016) .......................................... 7, 12, 27, 40, 44

*Insolia v. Philip Morris Inc.*,
53 F. Supp. 2d 1032 (W.D. Wis. 1999) .......................................... 9, 22, 47

*J.H. Kelly, LLC v. AECOM Tech. Servs., Inc.*,
605 F. Supp. 3d 1295 (N.D. Cal. 2022) .......................................... 66

*Jackson v. E-Z-GO Div. of Textron, Inc.*,
326 F. Supp. 3d 375 (W.D. Ky. 2018) .......................................... 30

*Johns v. Bayer Corp.*,
2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) .......................................... 9, 13, 47

*Johnson v. Ridge Tool Mfg. Co., Inc.*,
2025 WL 2430567 (N.D. Ill. Aug. 22, 2025), *appeal pending* (7th Cir. No. 25-2604) ............ 76

*Johnson v. Wyeth LLC*,
2012 WL 1204081 (D. Ariz. Apr. 11, 2012) .......................................... 13

*Jones v. United States*,
933 F. Supp. 894 (N.D. Cal. 1996) .......................................... 25

*Kamradt v. Esurance Ins. Co.*,
2024 WL 5356886 (W.D. Wash. Nov. 1, 2024) .......................................... 38, 63

*Kanuszewski v. Shah*,
583 F. Supp. 3d 1018 (E.D. Mich. 2022) .......................................... 81

*Kerrigan v. Maxon Indus.*,
223 F. Supp. 2d 626 (E.D. Pa. 2002) .......................................... 21

*King v. DePuy Orthopaedics Inc.*,
2023 WL 5624710 (D. Ariz. Aug. 31, 2023) .......................... 4, 5, 10, 11, 12, 13, 16, 39, 48

*Klein v. Meta Platforms, Inc.*,
766 F. Supp. 3d 956 (N.D. Cal. 2025) .......................................... 83

*Krause v. Cnty. of Mohave*,
459 F. Supp. 3d 1258 (D. Ariz. 2020) .......................................... 60

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020) .......................................... 9

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......................................... 83

*Labbe' v. Dometic Corp.*,
2025 WL 1755823 (E.D. Cal. June 25, 2025) .......................................... 30

*Lane v. Am. Airlines, Inc.*,
2024 WL 1200074 (E.D.N.Y. Mar. 20, 2024) .......................................... 62

- ix -

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lauderdale v. NFP Ret., Inc.*,
2022 WL 17324416 (C.D. Cal. Nov. 17, 2022)................................................................ 72

*Lewis v. Kern Cnty.*,
2025 WL 821895 (E.D. Cal. Mar. 13, 2025) ............................................................ 75, 82

*Liberty Life Ins. Co. v. Myers*,
2013 WL 524587 (D. Ariz. Feb. 11, 2013)............................................................... 12, 48

*Lightell v. State Farm Fire & Cas. Co.*,
2009 WL 5217087 (E.D. La. Dec. 31, 2009).................................................................. 50

*Lister v. Hyatt Corp.*,
2019 WL 6701407 (W.D. Wash. Dec. 9, 2019)............................................................. 73

*Longoria v. Kodiak Concepts LLC*,
2021 WL 1100373 (D. Ariz. Mar. 23, 2021) ............................................................... 32

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
97 F. Supp. 3d 485 (S.D.N.Y. 2015)............................................................................. 81

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017)........................ 80

*Mamani v. Berzain*,
2018 WL 1010582 (S.D. Fla. Feb. 22, 2018) ............................................................... 83

*Maney v. Oregon*,
2024 WL 1695083 (D. Or. Apr. 19, 2024) ................................................................... 25

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023) ......................................................................... 2

*Marshall v. RS 2018 Float, LLC*,
2024 WL 637487 (9th Cir. Feb. 15, 2024)................................................................... 34

*Martinez v. Cnty. of Alameda*,
2024 WL 1117952 (N.D. Cal. Mar. 13, 2024)............................................................. 15

*Martinez v. Coloplast Corp.*,
2022 WL 425206 (N.D. Ind. Feb. 11, 2002)........................................................... 31, 35

*McCalla v. ACE American Insurance Co.*,
2022 WL 2290552 (D. Ariz. June 24, 2022) ............................................................... 65

*McCoy v. DePuy Orthopaedics, Inc.*,
2024 WL 1705952 (S.D. Cal. Apr. 19, 2024).................................................... 16, 64, 77

*McDougall v. CRC Indus., Inc.*,
2023 WL 5515827 (D. Minn. Aug. 23, 2023) ............................................................. 59

*Messick v. Novartis Pharms. Corp.*,
747 F.3d 1193 (9th Cir. 2014)..................................................................................... 66

*Mihailovich v. Laatsch*,
359 F.3d 892 (7th Cir. 2004)....................................................................................... 66

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Miller v. Travel Guard Grp., Inc.*,
2023 WL 7106479 (N.D. Cal. Sept. 15, 2023) .................................................. 50

*MJC Supply, LLC v. Scottsdale Ins. Co.*,
2019 WL 2501480 (C.D. Cal. June 16, 2019) ................................................. 58

*Moller v. Cnty. of San Bernardino*,
2024 WL 5185640 (C.D. Cal. Jan. 2, 2024) ............................................. 17, 27, 40

*Montera v. Premier Nutrition Corp.*,
2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) ....................................................... 5, 45

*Morrison v. Quest Diagnostics Inc.*,
2016 WL 3457725 (D. Nev. June 23, 2016) .................................................. 53

*N.A.A.C.P. v. City of Myrtle Beach*,
504 F. Supp. 3d 513 (D.S.C. 2020) ......................................................... 84

*Narayanasamy v. Issa*,
435 F. Supp. 3d 388 (D.R.I. 2020) .......................................................... 85

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) ................................................................ 15

*Near v. Enerco Grp., Inc.*,
2025 WL 1865224 (D.S.C. Mar. 25, 2025) ..................................................... 72

*Norman v. State Farm Fire & Cas. Co.*,
2014 WL 6477889 (D. Colo. Nov. 19, 2014) ................................................. 50

*O'Bryant v. Johnson & Johnson*,
2022 WL 7670296 (D.N.J. Oct. 13, 2022) ..................................... 28, 40, 45, 64, 74

*O'Connor v. Uber Techs., Inc.*,
82 F. Supp. 3d 1133 (N.D. Cal. 2015) ......................................................... 85

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) .................................................................. 50

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .................................................................... 51

*Ono v. Head Racquet Sports USA, Inc.*,
2016 WL 6647949 (C.D. Cal. Mar. 8, 2016) ................................................. 54

*Optical Sols., Inc. v. Nanometrics, Inc.*,
2023 WL 8101885 (N.D. Cal. Nov. 21, 2023) ................................................... 3

*Oracle Corp. v. SAP AG*,
765 F.3d 1081 (9th Cir. 2014) ................................................................ 31

*Pascal v. Nissan N. Am., Inc.*,
2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) .............................................. 52

*Patterson v. Six Flags Theme Parks Inc.*,
2024 WL 2112376 (E.D. Cal. May 9, 2024) ........................................... 17, 27, 40

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*People v. Wilson*,
33 Cal. App. 5th 559 (2019) ............................................................. 42

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
461 F. Supp. 2d 271 (D.N.J. 2006) ................................................. 9, 47

*Pinterest, Inc. v. Pintrips, Inc.*,
2015 WL 2268498 (N.D. Cal. May 14, 2015) ....................... 27, 40, 44, 74

*Planned Parenthood Se., Inc. v. Strange*,
33 F. Supp. 3d 1381 (M.D. Ala. 2014) ............................................. 81

*Pooshs v. Phillip Morris USA, Inc.*,
287 F.R.D. 543 (N.D. Cal. 2012) ..................................................... 19

*Price v. L'Oreal USA, Inc.*,
2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ..................................... 9

*Pritchett v. I-Flow Corp.*,
2012 WL 1059948 (D. Colo. Mar. 28, 2012) ..................................... 13

*Qorvo, Inc. v. Akoustis Techs., Inc.*,
2024 WL 5334379 (D. Del. May 3, 2024) ......................................... 72

*Reinken v. Big Game Treestands*,
2018 WL 10625889 (N.D. Iowa Mar. 8, 2018) ................................... 22

*Repa v. Napierkowski*,
2022 WL 1522360 (W.D. Pa. May 13, 2022) ................................ 24, 46

*Roblox Corp. v. WowWee Grp. Ltd.*,
2024 WL 4057418 (N.D. Cal. Sept. 3, 2024) ................................ 28, 45

*Rodriguez v. JLG Indus., Inc.*,
2012 WL 12883784 (C.D. Cal. Aug. 3, 2012) ................................... 68

*Rogers v. Raymark Indus., Inc.*,
922 F.2d 1426 (9th Cir. 1991) ......................................................... 61

*Rosales v. Rollag*,
2024 WL 5103023 (D. Ariz. Dec. 13, 2024) ..................................... 42

*Rusoff v. The Happy Grp., Inc.*,
2024 WL 5339463 (N.D. Cal. Sept. 27, 2024) ................................... 34

*Salinero v. Johnson & Johnson*,
2019 WL 7753453 (S.D. Fla. Sept. 5, 2019) ..................................... 74

*Sanchez v. Bos. Sci. Corp.*,
2014 WL 4851989 (S.D.W. Va. Sept. 29, 2014) ............................... 46

*Santiago v. Phoenix Newspapers, Inc.*,
794 P.2d 138 (Ariz. 1990) .......................................................... 84, 85

*Scott v. AT&T Inc.*,
2025 WL 1892819 (N.D. Cal. July 9, 2025) ..................................... 55

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Self v. Perspecta Enter. Sols., LLC,*
2023 WL 2025238 (S.D. Cal. Feb. 15, 2023) ........................................... 59

*Shahinian v. Kimberly-Clark Corp.,*
2017 WL 11595343 (C.D. Cal. Mar. 7, 2017) ........................................ 32

*Simon v. Safeway, Inc.,*
173 P.3d 1031 (Ariz. App. 2007) ............................................................ 84

*Siqueiros v. Gen. Motors LLC,*
2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ..................... 28, 29, 40, 45, 59, 64, 74

*Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.,*
927 F. Supp. 2d 1069 (D. Or. 2013) ................................................ 17, 40

*Smith v. Ingersoll-Rand Co.,*
214 F.3d 1235 (10th Cir. 2000) .................................................... 66, 69, 73

*Snyder v. Bank of Am., N.A.,*
2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) ......................................... 31

*Stanley v. McCarver,*
92 P.3d 849 (Ariz. 2004) .......................................................................... 6

*Stephens v. Union Pac. R.R. Co.,*
935 F.3d 852 (9th Cir. 2019) .................................................................. 54

*Stiner v. Brookdale Senior Living, Inc.,*
665 F. Supp. 3d 1150 (N.D. Cal. 2023) ................................................. 72

*Teledyne Risi, Inc. v. Martin-Baker Aircraft Co., Ltd.,*
2018 WL 11352632 (C.D. Cal. April 24, 2018) ..................... 27, 40, 44, 74

*Thacker v. Ethicon Inc.,*
2025 WL 2028082 (E.D. Ky. July 21, 2025) ........................................ 74

*Todd v. Tempur-Sealy Int'l, Inc.,*
2016 WL 5462428 (N.D. Cal. Sept. 28, 2016) ................................. 29, 59

*Townsend v. Monster Beverage Corp.,*
303 F. Supp. 3d 1010 (C.D. Cal. 2018) ................................................. 54

*U.S. v. Tamman,*
782 F.3d 543 (9th Cir. 2015) ............................................................ 65, 84

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund
v. Teikoku Pharma USA,*
296 F. Supp. 3d 1142 (N.D. Cal. 2017) ..................... 12, 16, 27, 40, 44, 64

*United States v. Adams,*
444 F. Supp. 3d 1248 (D. Or. 2020) ...................................................... 39

*United States v. Chang,*
207 F.3d 1169 (9th Cir. 2000) ...................................................... 31, 35, 69

*United States v. Diaz,*
876 F.3d 1194 (9th Cir. 2017) ........................................................... 15, 66

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Hankey*,
203 F.3d 1160 (9th Cir. 2000).................................................................. 39, 42

*United States v. Hankison*,
2025 WL 2024510 (W.D. Ky. July 18, 2025) ............................................. 1

*United States v. Holmes*,
2021 WL 2035177 (N.D. Cal. May 21, 2021) ....................................... 10, 48

*United States v. Leroy*,
787 F. App'x 74 (3d Cir. 2019) ................................................................ 19

*United States v. Madril*,
2022 WL 2662885 (9th Cir. July 11, 2022) .............................................. 14

*United States v. Maurizio*,
2015 WL 5228031 (W.D. Pa. Sept. 8, 2015) ............................................ 19

*United States v. McCluskey*,
954 F. Supp. 2d 1224 (D.N.M. 2013) ...................................................... 26

*United States v. Pryba*,
678 F. Supp. 1225 (E.D. Va. 1988) .......................................................... 83

*United States v. Sanchez-Robles*,
927 F.2d 1070 (9th Cir. 1991)................................................................. 42

*United States v. Spurlock*,
2025 WL 1224720 (D. Nev. Apr. 25, 2025) ............................................. 26

*United States v. Weiner*,
578 F.2d 757 (9th Cir. 1978)..................................................................... 2

*Unknown Party v. Arizona Bd. of Regents*,
2022 WL 4481519 (D. Ariz. Sept. 27, 2022) ........................................... 62

*Valentine v. Pioneer Chlor Alkali Co.*,
921 F. Supp. 666 (D. Nev. 1996) ............................................................ 76

*Vaporstream, Inc. v. Snap Inc.*,
2020 WL 2543814 (C.D. Cal. Jan. 10, 2020) ........................................... 72

*Villalpando v. Exel Direct Inc.*,
2016 WL 1598663 (N.D. Cal. Apr. 21, 2016) ........................................... 26

*Vizio, Inc. v. Gemtek Tech. Co., Ltd.*,
2014 WL 10538995 (C.D. Cal. Aug. 27, 2014) ........................................ 35

*Walker v. AIU Ins. Co.*,
2025 WL 2495066 (D. Ariz. Aug. 29, 2025) ............................................ 39

*Walker v. Conagra Brands, Inc.*,
2023 WL 8885148 (C.D. Cal. Sept. 21, 2023)...................................... 38, 63

*Wason v. Shalala*,
1993 WL 192979 (D. Or. June 2, 1993) ................................................... 53

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Wolfe v. McNeil-PPC, Inc.*,
2011 WL 1673805 (E.D. Pa. May 4, 2011) ............................................... 14

*Wyatt Tech. Corp. v. Malvern Instruments, Inc.*,
2010 WL 11505684 (C.D. Cal. Jan. 25, 2010) ......................................... 21

*Zariczny v. Harley-Davidson, Inc.*,
2025 WL 3049974 (C.D. Cal. Sept. 8, 2025) ............................................ 25

*Zetz v. Bos. Sci. Corp.*,
644 F. Supp. 3d 684 (E.D. Cal. 2022) .............................................. 12, 48, 64

*ZP No. 332, LLC v. Huffman Contractors., Inc.*,
2025 WL 3083079 (E.D. Va. Nov. 4, 2025) .............................................. 72

## STATUTES

A.R.S. § 23-1603 ............................................................................................. 83

## OTHER AUTHORITIES

*Applying Human Factors and Usability Engineering to Medical Devices: Guidance for Industry and Food and Drug Administration Staff*, U.S. Food and Drug Administration,
2016 WL 497172 (Feb. 3, 2016) .................................................................. 71

Restatement (Second) of Agency § 220 ......................................................... 84

## RULES

Fed. R. Civ. P. 26(a)(2) ............................................................................. 12, 44

Fed. R. Civ. P. 30(b)(6) ......................................................................... 20, 23, 48

Fed. R. Evid. 403 ............................................................................ 14, 15, 26, 42

Fed. R. Evid. 702 ................................................................................... passim

# TABLE OF EXHIBITS

| DOCUMENT | LOCATION |
|---|---|
| Cameron Reb. Rpt. | ECF 4399 |
| Cameron Dep. | ECF 4399-1 |
| Chandler Rpt. | ECF 4342 |
| Chandler Reb. Rept. | ECF 4342-3 |
| Chandler Dep. | ECF 4342-1 (Vol. I) & ECF 4343-5 (Vol. II) |
| Drumwright Rpt. | ECF 4352-1 |
| Drumwright Supp. Rpt. | ECF 4394-3 |
| Drumwright Dep. | ECF 4352-2 |
| Excerpts of JCCP Trial Tr. | Exhibit 1 |
| Excerpts of Def. Opening Slides, JCCP Trial | Exhibit 2 |
| Feldis Rpt. | ECF 4344-1 |
| Feldis Dep. | ECF 4344 |
| *JCCP Sargon Order* | ECF 4344-2 |
| Keller Rpt. | ECF 4338 |
| Keller Dep. | ECF 4338-1 |
| *Lyft Rideshare Order* | ECF 4340-3 |
| Okpaku Rpt. | ECF 4357-1 |
| Rando Rpt. | ECF 4348 |
| Rando Dep. | ECF 4348-1 |
| Stodden Rpt. | ECF 4357-9 |
| Thomas Rpt. | ECF 4357-3 |
| Tremblay Rpt. | ECF 4350 |
| Tremblay Dep. | ECF 4350-1 |
| Tremblay Dep. Vol. II | Exhibit 4 |
| Valliere Rpt. | ECF 4340 |
| Valliere Supp. Rpt. | Exhibit 3 |
| Valliere Dep. | ECF 4340-2 |
| Weiner Rpt. | ECF 4346 |
| Weiner Dep. | ECF 4346-1 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## **INTRODUCTION**

2      According to Uber, Ms. Dean may call exactly zero experts to testify about the company's

3  conduct. No exaggeration: Plaintiff identified nine experts who may testify to liability in the *Dean*

4  trial, and Uber moved to exclude every single one. The only experts Uber declined to challenge

5  go to damages only. Uber manufactures problems with the entirety of Plaintiff's expert case only

6  by making every argument it can conjure, no matter how specious or attenuated from the core of

7  the experts' opinions, and by citing cases that, almost universally, have no bearing on the facts

8  here. This approach of "throwing everything possible at the Court and seeing what sticks," *United*

9  *States v. Hankison*, 2025 WL 2024510, at *4 (W.D. Ky. July 18, 2025), is inefficient,

10  unpersuasive, and a poor use of the Court's time.

11      Uber's motions center on two common themes. The first theme is that the only people

12  who can competently evaluate Uber's conduct work for Uber. Uber challenges essentially every

13  expert for not having expertise in the precise facts of this case. Plaintiff's product development

14  expert may not testify because he is not an expert in sexual assault. Plaintiff's sexual assault

15  expert may not testify because she is not an expert in marketing. And so on. Similarly, Uber

16  reasons that its own statistical expert may explain to the jury that Uber is safer than public

17  transportation, but Plaintiff's experts may not testify to the real rate of sexual assault on the Uber

18  platform. Why? Because Uber executives claim those facts do not matter. If the only experts who

19  could evaluate Uber's conduct worked for Uber, that would be convenient for the company, but

20  such a rule does not reflect the standards for admission of expert testimony.

21      Then, while maintaining that Uber and sexual assault is too unique a combination for any

22  expert to understand, Uber also says that Plaintiff's experts' opinions are too obvious, that they

23  rely too much on analysis of the company's own documents and testimony and veer into

24  impermissible "narrative" or "knowledge" testimony. At the same time, Uber criticizes experts

25  for applying any external documents or standards, such as when Plaintiff's dashcam expert

26  supports his opinions by citing non-Uber documents, or when Plaintiff's marketing experts cite

27  third-party standards governing corporate conduct. Again, the premise is that no one evaluates

28  Uber but Uber, through its documents and its witnesses.

1   The second theme is that every argument that can be made is worth making. Uber's

2   motions are replete with the sort of "nitpick[ing]" that Rule 702 does not condone. Fed. R. Evid.

3   702, advisory committee note, 2023 amendment. The result is a bombardment of factually

4   inaccurate, sparsely supported, and ill-defined arguments that present no serious bases for

5   exclusion. *See Markels v. AARP*, 689 F. Supp. 3d 722, 731 (N.D. Cal. 2023) ("Counsel is

6   cautioned not to waste judicial resources by merely piling on arguments which the opposing

7   party, and the Court, are required to address."); *United States v. Weiner*, 578 F.2d 757, 767 (9th

8   Cir. 1978) ("The trial judge need not accord the slightest heed to such a shotgun approach."). The

9   Court should see this abuse of process for what it is: an admission that Uber could find nothing

10  seriously objectionable about Plaintiff's experts' analyses. *See Fifth Third Mortg. Co. v. Chi. Title

11  Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012) ("When a party comes to us with nine grounds for

12  reversing the district court, that usually means there are none.").

13  Uber's motions to exclude should be denied.

14  ## LEGAL STANDARD

15  The proponent of expert testimony must establish, by the preponderance of the evidence,

16  that: (1) the expert has scientific, technical, or other specialized knowledge that will help the trier

17  of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on

18  sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4)

19  the expert's opinion reflects a reliable application of the principles and methods to the facts of the

20  case. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The

21  "reliability inquiry is a flexible one; courts have 'broad latitude to determine' what factors, if any,

22  are relevant." *Blue Bottle Coffee, LLC v. Liao*, 2023 WL 9502073, at *6 (N.D. Cal. Nov. 30,

23  2023) (quoting *Daubert*, 509 U.S. at 150, 153).

24  Uber suggests that the 2023 amendment to Rule 702 raised the bar significantly to admit

25  expert testimony, but that is not true. *See Cadena v. Am. Honda Motor Co., Inc.*, 2025 WL

26  3483436, at *9 (C.D. Cal. Dec. 3, 2025) (rejecting argument that "entire swath of Ninth Circuit

27  case law" was "impliedly overturned by the 2023 Amendments"). The amendment underscored

28  the preponderance standard, which was already the law of this Circuit. *See Engilis v. Monsanto*

1  *Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025); *see also id.* at 1049 (noting that "the amendment did

2  was 'simply intended to clarify' existing law") (quoting Fed. R. Evid. 702, advisory committee

3  notes, 2023 amendment); *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *2 n.3

4  (N.D. Cal. Apr. 4, 2024) ("The new language does not change the intent of the rule, rather it

5  provides further clarity.").

6        While the Court must ensure "proposed testimony meets the thresholds of relevance and

7  reliability," Rule 702 remains "concerned with the soundness of the expert's methodology, rather

8  than the correctness of the expert's conclusions." *Engilis*, 151 F. 4th at 1050 (internal quotation

9  marks omitted); *see also In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *2 (N.D.

10  Cal. Sept. 30, 2025) ("[E]xpert testimony does not fail Daubert just because a court thinks it is

11  'shaky.'") (quoting *Engilis*, 151 F.4th at 1050). So, for example, "if the court finds it more likely

12  than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not

13  read every single study that exists will raise a question of weight and not admissibility." Fed. R.

14  Evid. 702, advisory committee notes, 2023 amendment. And "nothing in the amendment requires

15  the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis

16  and methodology can support." *Id.*[1]

17                                   **ARGUMENT**

18  **I.    Dr. Minette Drumwright's testimony is admissible.**

19        Dr. Drumwright is an expert in marketing, strategic communications, ethics, corporate

20  social responsibility, and corporate governance. *See* Drumwright Rpt. Dr. Drumwright evaluated

21  how Uber marketed the safety of its business in light of the company's internal, industry, and

22  other standards. *Id.* at 5. Dr. Drumwright offers the following opinions:

23        •  In focusing its marketing and strategic communications almost exclusively on the
             perception of Uber's safety and user safety sentiment, Uber's marketing and strategic

24

---

25  [1] Every case Uber cites applying the amended rule would have reached the same outcome under
    the pre-amendment rule. *See Engilis*, 151 F.4th at 1055 (affirming order issued pre-amendment);

26  *Optical Sols., Inc. v. Nanometrics, Inc.*, 2023 WL 8101885, at *1 (N.D. Cal. Nov. 21, 2023)
    (excluding opinion that a design met the defendants' specifications when the expert merely

27  testified "why he made his design choices"); *Boyer v. City of Simi Valley*, 2024 WL 993316, at
    *1-2 (C.D. Cal. Feb. 13, 2024) (excluding one expert who calculated lost profits based only on

28  the plaintiff's representations and did not examine any actual data, and another who did review
    data but did not base his calculations on them).

communications were unreasonable, reckless, and irresponsible and failed to meet the norms, guidelines, and standards Uber had set for itself, as well as the those described by numerous leading professional organizations. *Id.* Such conduct included: (1) Misleading the public regarding the safety of Uber's rides and rigor of its background checks; (2) Targeting multiple vulnerable segments of the public while failing to disclose risks; and (3) Not implementing safety features. *Id.* at 5-6.

- Uber's public relations strategy was unreasonable, reckless, and irresponsible and fell short of the norms, guidelines, and standards Uber set for itself, as well as those described by numerous leading professional organizations. *Id.* Inappropriate tactics included:

    o Employing dark-PR tactics to attempt to "kill" and "squash and fog" media stories that would negatively affect passengers' perceptions of Uber's safety. *Id.*

    o Using nonprofit partners to "safetywash" Uber's brand image, including "ghostwriting" statements for those partners. *Id*; *see also* Drumwright Supp. Rpt. (detailing payments to nonprofits).

    o Downplaying the prevalence and extent of sexual violence incidents during Uber rides, creating "anti-warnings," and failing to be transparent to the public. Drumwright Rpt. at 6.

    o Addressing Uber's "women issue" using false narratives and "anti-warnings" to buffer Uber from criticism and oversight. *Id.*

Dr. Drumwright's testimony on similar matters has been admitted by multiple federal courts. *See King v. DePuy Orthopaedics Inc.*, 2023 WL 5624710, at *6 (D. Ariz. Aug. 31, 2023); *In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *20-22 (N.D. Cal. June 2, 2022); *In re: DePuy Orthopaedics, Inc.*, 2016 WL 6271474, at *4-5 (N.D. Tex. Jan. 5, 2016).

### A.    Dr. Drumwright's marketing opinions are admissible.

Dr. Drumwright has dedicated her decades-long career to the teaching and practice of marketing, advertising, and ethics in advertising and corporate conduct—first as an industry insider at a public relations firm and then as a professor and researcher at the University of Texas and Harvard University. Drumwright Rpt. at 7-12. As a University Distinguished Teaching Professor at Texas, Dr. Drumwright has a joint appointment in the Stan Richards School of Advertising and Public Relations in the Moody College of Communication and in the Business, Government & Society Department of the McCombs School of Business. *Id.* at 7. She serves as director of the Communications and Leadership Degree, a degree that she was instrumental in creating. *Id.* Dr. Drumwright has conducted extensive research not just on the above topics, but

1    also behavioral ethics, public relations, and strategic marketing communications. *Id.* at 10-12.

2          Dr. Drumwright applied her expertise to analyze Uber's marketing and public relations

3    efforts, contrast those actions against Uber's internal knowledge and statements, and weigh them

4    against generally applicable standards for marketing and corporate conduct. Those opinions

5    reflect application of a reliable methodology and so are admissible. *See, e.g.*, *Montera v. Premier*

6    *Nutrition Corp.*, 2022 WL 1225031, at *5 (N.D. Cal. Apr. 26, 2022) ("[C]ourts regularly admit

7    marketing testimony that explains what a company intended to convey through their marketing.");

8    *King*, 2023 WL 5624710, at *6 ("Dr. Drumwright may testify about marketing principles and

9    strategies, including the intended message and target audience of Defendants' advertising.").

10          **1.     Dr. Drumwright's marketing opinions are relevant.**

11          Uber argues Dr. Drumwright's opinions are irrelevant because they are general, not case-

12    specific opinions. Mot. at 4.[2] To be sure, Dr. Drumwright does not opine regarding any specific

13    Plaintiff—that was not her assignment, notwithstanding Uber's efforts at her deposition to elicit

14    plaintiff-specific facts. *See* Drumwright Dep. at 48:5-48:11 (A: "I just noted that they did get the

15    messages, which you would expect because they were pervasive messages." Q: "I've asked for

16    you to point me to the specific sections of the plaintiffs' depositions where they mention the

17    specific ads that you discuss in your report."). Instead, her opinions are relevant to all cases,

18    including Jaylynn Dean's.

19          Start with Plaintiff's negligence claim. Dr. Drumwright's analysis of Uber's marketing

20    helps the jury determine whether the company acted with ordinary care. *See, e.g.*, *Gomez v. Am.*

21    *Med. Sys. Inc.*, 2021 WL 12313068, at *5 (D. Ariz. June 17, 2021) (denying motion in limine in

22    negligence case to exclude marketing materials to which plaintiff was not exposed); *In re C.R.*

23    *Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2013 WL 3282926, at *6 (S.D.W. Va. June 27,

24    2013) (denying similar motion, and explaining that "[t]hese materials may be relevant to …

25    negligence and punitive damages"); *Boneta v. Am. Med. Sys., Inc.*, 2021 WL 6776245, at *5 (S.D.

26    Fla. Oct. 6, 2021) (similar).

27          Expert testimony regarding how Uber marketed its product, including which

28
_____

[2] Citations to "Mot." refer to the motion targeting the expert being discussed.

1  demographics it targeted, shows the jury how the company was negligent. *See*, *e.g.*, *In re*

2  *Depakote*, 87 F. Supp. 3d 916, 928 (S.D. Ill. 2015) ("Even without testimony that these materials

3  affected the decisions of Mrs. Kaleta's physicians …, this evidence is relevant on the issue of

4  what Abbott knew and when it knew about the scope of Depakote's birth defect risks and its

5  proper use in women of childbearing years. This evidence may also be relevant to the content of

6  the 1999 label if, as Plaintiffs suggest, they can show that Abbott's marketing strategy influenced

7  its label.").

8          Offering an unsafe ride while promoting a safe ride is different than offering an unsafe

9  ride while saying nothing, and different still than offering an unsafe ride while warning about the

10  risk. Dr. Drumwright's (and other experts') testimony explaining how Uber promoted the

11  perception of safety rather than actual safety goes directly to whether the company was negligent.

12  Uber's choices—to ignore risk factors, to match rides known to be risky, and to decline the use of

13  technology like dashcams—are exposed as negligent when measured against the company's

14  marketing and PR strategies. *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine)*

15  *Prods. Liab. Litig.*, 369 F.3d 293, 314 (3d Cir. 2004) ("[E]xcessive concern with the image and

16  marketing of the diet drugs at the expense of making efforts toward determining whether they

17  were safe could be probative as to whether [the manufacturer] breached a duty of care towards the

18  plaintiffs."); *In re Yazmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab. Litig.*,

19  2011 WL 6740391, at *10 (S.D. Ill. Dec. 22, 2011) ("[E]vidence about sales goals is certainly

20  relevant particularly when it may impact decision making regarding labeling. There is an inherent

21  tension between the desire for profit and scientific decisions that suggest warnings that may well

22  shrink the customer base because of cautionary tone stricken by the warnings.").

23          Marketing is relevant to other elements of negligence too. For example, duty. Uber's

24  safety marketing shows how Uber voluntarily undertook a duty to protect its passengers' safety.

25  *See Stanley v. McCarver*, 92 P.3d 849, 853 (Ariz. 2004). Marketing is also relevant to causation.

26  Dr. Drumwright explains, for instance, how Uber targeted intoxicated women at night, even

27  though it knew that those passengers were at increased risk of sexual assault. Drumwright Rpt. at

28  ¶¶ 295-98. Her testimony will help the jury evaluate the chain of causation between Uber's

1    negligent conduct and the injuries to Plaintiffs like Jaylynn Dean. And, of course, marketing goes

2    to whether the company was reckless for the purpose of evaluating punitive damages.

3            Uber relies on the JCCP court's decision excluding Dr. Drumwright's marketing opinions

4    because the only claim in those cases was negligence. *See In re Uber Rideshare Cases*, JCCP No.

5    5188, at 39 (Cal. Super. Ct. Aug. 29, 2025) [*JCCP Sargon Order*]. Respectfully, as explained

6    above, that conclusion is wrong: marketing is relevant to several elements of Plaintiff's

7    negligence claims. The JCCP court also misunderstood the decision in *JUUL* admitting Dr.

8    Drumwright's testimony. The *JCCP Sargon Order* distinguished *JUUL* as a "nationwide

9    multidistrict class action," *id.*; while that MDL did include class claims, the *Daubert* order

10   concerned Dr. Drumwright's ability to testify in individual personal-injury bellwether cases. *See

11   In re JUUL*, 2022 WL 1814440, at *1 ("Plaintiffs have identified 26 generic and case specific

12   experts in connection with both the B.B. personal injury bellwether trial and the personal injury

13   claims more generally."). There, as here, Dr. Drumwright did not offer any case-specific

14   opinions.

15           In any event, unlike the JCCP bellwether, several of the Wave 1 bellwethers involve

16   claims not litigated in the JCCP. Four Plaintiffs have common carrier claims, which turn on how

17   the company held itself out to the public. Several Plaintiffs, including Ms. Dean, have ostensible

18   agency claims, which require evaluation of how Uber marketed its services—i.e., whether Uber

19   provided transportation through drivers or instead the drivers provided the services

20   independently. Ms. Dean has a product liability claim as well, and Dr. Drumwright's analysis

21   goes to whether Plaintiff's use of the Uber app was foreseeable and reasonable. *See, e.g.*, *In re:

22   Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2016 WL 807377, at *8 (E.D.

23   Pa. Mar. 2, 2016) (marketing relevant to design defect claims).[3]

---

[3] Uber cites two cases, but neither is pertinent. In *In re Norplant Contraceptive Prods. Liab. Litig.*, 1997 WL 81092 (E.D. Tex. Feb. 21, 1997), the court excluded marketing not seen by the plaintiffs' physician, but in that case the only material issue was "the learned intermediary doctrine," which turns on "materials to which the physician was actually exposed." *Id.* at 1. The case did not involve negligence claims requiring the jury to evaluate the reasonableness of the defendant's actions, nor the other types of claims present here. In any event, *Norplant* is an outlier: many other, more recent cases have reached the opposite conclusion. *See Diet Drugs*, 369 F.3d at 314; *Depakote*, 87 F. Supp. 3d at 928; *Yaz*, 2011 WL 6740391, at *10. The other case—*In

2.    **Dr. Drumwright's marketing opinions are grounded in sufficient facts and data.**

Dr. Drumwright's opinions are based on application of her expertise to Uber's "marketing and strategic communications," including "ads, social media posts, blogs, and website stories." Drumwright Rpt. at 14. She reviewed not only the marketing itself, but also internal documents, including surveys, concerning the aim and effect of Uber's safety marketing. *Id.* at 14; *see also, e.g., id.* at ¶ 206 & n. 391 (citing Uber survey that showed "Uber's biggest vulnerability—and first priority for messaging—is safety."); *id.* at ¶ 168 & n.344 (discussing deposition testimony concerning safety perceptions); *id.* at ¶ 171 (discussing Uber marketing plans to "establish trust through assurance" and "[r]educe user's uncertainties for being in a car with a stranger"); *id.* at ¶ 174 (discussing Uber survey data showing "safety is important to unlock").

Uber argues that Dr. Drumwright's marketing opinions are speculative because she did not conduct consumer research, her own surveys, or interviews. Uber does not even acknowledge that Dr. Drumwright considered published scholarship on consumer safety perception, *see, e.g., id.* at ¶ 31, as well as Uber's own internal consumer research and surveys. *See, e.g., id.* at ¶¶ 168, 175, 202. Those documents are sufficient foundation for her opinions. *See DePuy*, 2016 WL 6271474, at *4 ("Dr. Drumwright has applied her specialized knowledge in the discipline of marketing, including the areas of marketing codes, regulations, and guidelines, to analyze the voluminous specific marketing representations made by Defendants, and this testimony is helpful to the factfinder."); *In re JUUL*, 2022 WL 1814440, at *20 (denying motion to exclude "Drumwright's assessment of consumer perception … as lacking fit and methodology and as unreliable" and explaining that "Drumwright's reliance on [the defendant's] own documents and research and publications is sufficient").

More generally, survey data are not required. The "Ninth Circuit has upheld the admissibility of experts relying primarily on knowledge and experience rather than a particular methodology or technical framework." *Cooper-Harris v. United States*, 2013 WL 12125527, at

---

*re Actimmune Mktg. Litig.*, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009)—was a Rule 12 order in a consumer class action discussing the allegations necessary to establish pharmaceutical payment injury. *Id.* at *11. The court had no occasion to discuss evidentiary or *Daubert* issues or anything involving a personal injury action.

1    *5 (C.D. Cal. Feb. 8, 2013). There "is no per se requirement that all expert testimony be

2    supported by empirical data." *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1737951, at *3

3    (N.D. Cal. Apr. 8, 2015). In particular, "expert reports regarding consumer perception need not be

4    based on scientific surveys" and "experts may testify based on their own experience." *Price v.

5    L'Oreal USA, Inc.*, 2020 WL 4937464, at *5 (S.D.N.Y. Aug. 24, 2020); *see also Blue Bottle

6    Coffee, LLC v. Liao*, 2023 WL 6850573, at *6 (N.D. Cal. Oct. 16, 2023) (whether opinion is

7    otherwise supported, "[t]hat [an expert] did not conduct a consumer survey or interview[s] goes to

8    the weight, not admissibility of her testimony"); *Krommenhock v. Post Foods, LLC*, 334 F.R.D.

9    552, 580 (N.D. Cal. 2020) (rejecting argument that "reasonable consumer" determination required

10   consumer survey evidence). These principles apply to Dr. Drumwright like any other.

11         Uber does not cite a single case excluding, for lack of foundation, a marketing expert's

12   analysis of a company's marketing. Uber cites *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F.

13   Supp. 2d 271, 277 (D.N.J. 2006), but in that case a rheumatologist—not a marketing expert—

14   sought to testify "on the prescribing practices and general understanding of all physicians." *Id.* at

15   276; *see also id.* (analogizing to an earlier case where a "doctor … had no specialized expertise

16   regarding sales or market analysis"). Unlike Dr. Drumwright's unchallenged expertise in

17   marketing, the doctor in *Pfizer* sought to testify as an "expert consumer." *Id.* at 277. Uber also

18   cites *Insolia v. Philip Morris Inc.*, 53 F. Supp. 2d 1032 (W.D. Wis. 1999), but in that case

19   (decided on summary judgment, not admissibility) the expert did not cite "*anything* that would

20   demonstrate the actual impact of tobacco industry advertising on the ordinary consumer." *Id.* at

21   1041 (emphasis in original). Here, Dr. Drumright's report is replete with citations to studies,

22   research, and Uber's own documents. Finally, for the proposition that "courts within the Ninth

23   Circuit" find insufficient "reliance on … a defendant's own internal documents," Uber cites one

24   case, *Johns v. Bayer Corp.*, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013), but that case said no

25   such thing. *See id.* at *28 (excluding expert because report offered no analysis whatsoever—11½

26   pages of 12-page report were synopsis).

27         Finally, it bears emphasis that Uber does not identify particularized elements of Dr.

28   Drumwright's analyses that it contends lack reliable foundation, necessitating denial of its

1    motion. Uber highlights one use of the word "problematic" in Dr. Drumwright's report, but that

2    observation concerns an ad about background checks that omitted limitations to those checks,

3    where Uber had identified internally that "[d]river screening plays a critical role in helping riders

4    feel safe" and had already settled lawsuits concerning misleading advertising about background

5    checks. Drumwright Rpt. at ¶¶ 213-25. Dr. Drumwright's analysis on that point is well supported.

6        **B.    Dr. Drumwright's ethics opinions are admissible.**

7        Dr. Drumwright applied her expertise in corporate conduct to opine on the ethics and

8    propriety of Uber's marketing and public relations tactics. These opinions are reliable and

9    admissible. *See In re JUUL*, 2022 WL 1814440, at *22 (admitting Dr. Drumwright's testimony

10   on the "standards of corporate conduct"); *King*, 2023 WL 5624710, at *6 (admitting "Dr.

11   Drumwright's opinions on Defendants' compliance with ethical standards"). Dr. Drumwright

12   measured Uber's conduct against its own "corporate ethics statements [and] codes," Drumwright

13   Rpt. at 45-61, as well as professional codes promulgated by "industry and professional

14   organizations" concerning "the norms, guidelines, and standards of professionals in marketing

15   and strategic communications." *Id.* at 61-67.

16       **1.    Dr. Drumwright's ethics opinions are relevant.**

17       Uber, echoing the JCCP, argues that Dr. Drumwright's ethics opinions "are irrelevant

18   because Plaintiff['s] claims turn on legal standards, not ethical ones." Mot. at 6. To start, this

19   argument has no application to Dr. Drumwright's extensive analysis of Uber's own internal codes

20   and standards, as even the JCCP recognized. *See JCCP Sargon Order* at 41. Dr. Drumwright's

21   opinions resting on third-party standards are admissible too.

22       Dr. Drumwright does not contend that these standards are legally binding, only that they

23   inform the jury's evaluation of the standard of care in marketing and public relations—industries

24   that Uber's conduct is part of. It is standard for experts to advise the jury on compliance with

25   industry standards. *See, e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016-17

26   (9th Cir. 2004); *United States v. Holmes*, 2021 WL 2035177, at *4-5 (N.D. Cal. May 21, 2021).

27   That is why three other federal courts rejected this same argument concerning this same expert.

28   *See DePuy*, 2016 WL 6271474, at *5 ("[O]pinions on ethical standards may be helpful to a jury

1    when ethical obligations are of consequence to the issues to be decided by the jury, such as … a

2    physician's standard of care in claims of negligence. … The ethical standards at issue here

3    include published industry standards, which are a valid source when looking to the applicable

4    standard of care."); *In re JUUL*, 2022 WL 1814440, at *20 (rejecting argument that

5    Drumwright's testimony should be excluded because the standards she invoked were

6    "inapplicable" and so her opinions were "lacking in fit," and explaining that "[w]hether the

7    marketing conduct violated norms like those [cited] can be explored on cross-examination"); *id*.

8    at *22 (explaining that "[t]he differences between ethics, standards, and legal requirements can be

9    explored on cross-examination and are not reasons for exclusion"); *King*, 2023 WL 5624710, at

10    *6 ("Defendants' challenge to these opinions bears on their weight rather than their admissibility.

11    Defendants can challenge the applicability and persuasiveness of these ethical standards through

12    cross-examination and the presentation of contrary evidence.").

13         Again echoing the JCCP, Uber targets as irrelevant Dr. Drumwright's testimony about

14    Uber's efforts to "kill" and "squash and fog" negative news stories about sexual violence

15    incidents. Mot. at 6. The JCCP decision on this point was based on the non sequitur that "[this

16    case] is a negligence case, not a case about how Uber interacts with the media." *JCCP Sargon*

17    *Order* at 41. This conduct is relevant. A core part of Plaintiff's case is the contention that Uber

18    consistently made choices to promote the perception of safety rather than actual safety, conduct

19    that not only failed to protect Ms. Dean, but actually increased the risk of harm by creating the

20    prevailing image of Uber as safe. *See, e.g.*, Drumwright Rpt. at 30, 69, 148. Dr. Drumwright's

21    analysis of Uber's media strategy shows how Uber recognized that "Safety is our largest

22    reputational challenge" and responded by "kill[ing] stories when possible and mitigat[ing] the

23    impact of incidents on our reputation." *Id*. at 149 (citing Uber documents).

24         None of the cases Uber cites supports exclusion. In *In re Rezulin Prods. Liab. Litig.*, 309

25    F. Supp. 2d 531 (S.D.N.Y. 2004), the experts conceded that "their opinions concerning purported

26    ethical standards [were] based on their personal, subjective views," making the opinions "so

27    vague as to be unhelpful." *Id*. at 543. Here, Dr. Drumwright relies on her decades of expertise and

28    established, objective standards (including Uber's own). Drumwright Rpt. at 45-67; *see also*

*DePuy*, 2016 WL 6271474, at \*5 (admitting Drumwright's testimony, and rejecting reliance on *Rezulin*).[4]

### 2. Dr. Drumwright's analysis of Uber's corporate standards is not impermissible narrative.

Uber contends that Dr. Drumwright may not "regurgitate[]" the content of Uber's own corporate standards. She does not do so. Using her expertise in corporate conduct, she applies those standards to form her opinions about the propriety of Uber's conduct. *See King*, 2023 WL 5624710, at \*6 (admitting Dr. Drumwright's testimony related to "Johnson & Johnson's corporate credo [and] company ethics policies"). It "is common, indeed, required, under Rule 26(a)(2), for an expert to summarize the facts and data considered in their report. [An expert's] testimony at trial must remain tethered to the expert opinion he provides, but he must be allowed to discuss facts apropos to those opinions." *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at \*20 (N.D. Cal. Aug. 25, 2021). Dr. Drumwright "of course, [is] allowed to identify the facts (documents, testimony) that support h[er] otherwise permissible opinions. Defendants are free to challenge [Dr. Drumwright] on the stand regarding h[er] interpretations of those documents and testimony." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1194 (N.D. Cal. 2017).

In any event, Uber's objection is misguided and, at best, premature. Courts permit factual narration where, as here, the facts are complex and narration would assist the jury. *See In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2011 WL 6302287, at \*8 (S.D. Ill. Dec. 16, 2011) ( "[T]he Court has broad discretion over the mode and order of examining witnesses and presenting evidence and may allow testimony in narrative form at trial if the Court finds that it would be helpful to the jury."); *see also, e.g.*, *Tylenol*, 2016 WL 807377, at \*9 ("[A] narrative may be admissible if it involves complicated facts which the expert can help extrapolate for the jury."). And objections that "testimony contains improper narrative … are better made at trial." *Homyk v. ChemoCentryx, Inc.*, 2025 WL 1547625, at \*10 (N.D. Cal. May

---

[4] The other two cases cited—*Zetz v. Bos. Sci. Corp.*, 644 F. Supp. 3d 684, 703 (E.D. Cal. 2022) and *Liberty Life Ins. Co. v. Myers*, 2013 WL 524587 (D. Ariz. Feb. 11, 2013)—did not involve expert testimony regarding ethics at all.

30, 2025); *see also Focal Point Films, LLC v. Sandhu*, 2020 WL 5760355, at *7 (N.D. Cal. Sept. 28, 2020) (denying similar objection as "premature"); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2014 WL 120973, at *10 (W.D. La. Jan. 10, 2014) ("The objection that testimony is 'narrative' is an objection as to form, foundation, or responsiveness, and must be presented at trial."); *YAZ*, 2011 WL 6302287, at *8 (noting that issues concerning narrative testimony should be "decided at trial in context specific situations").[5]

### 3.   Uber's remaining arguments against Dr. Drumwright's ethics opinions should be rejected.

Uber argues opinions about ethical obligations are inherently speculative. Uber has no answer to the courts that have admitted similar testimony. *See In re JUUL*, 2022 WL 1814440, at *20-22; *King*, 2023 WL 5624710, at *6; *DePuy*, 2016 WL 6271474, at *5. Uber again cites *Rezulin*, but there the experts conceded that "their opinions concerning purported ethical standards are based on their personal, subjective views." 309 F. Supp. 2d at 543.[6] Here, Dr. Drumwright relies on her own decades of expertise and established, objective standards (including Uber's own). Drumwright Rpt. at 45-67; *see also DePuy*, 2016 WL 6271474, at *5 (admitting Drumwright's testimony, and rejecting reliance on *Rezulin*).

Uber argues that Dr. Drumwright's opinions regarding Uber's "attempt[s] to 'kill' … media stories" lack foundation because "she was not aware of any specific instances in which Uber" was successful. Mot. at 8. That argument misrepresents her deposition testimony, where she explained that there was "ample documentation" of "Uber employees … talking about what they had done to kill or squash and fog news stories." Drumwright Dep. at 286:23-287:7; *see also* Drumwright Rpt. at 149-52 (discussing those facts). Uber says that Dr. Drumwright cannot "cite to any direct communications between Uber and media personnel," Mot. at 8; but she explained

---

[5] The cases Uber cites are not helpful. *See Pritchett v. I-Flow Corp.*, 2012 WL 1059948, at *7 (D. Colo. Mar. 28, 2012) (applying general rules, but not describing the facts at issue); *Johns*, 2013 WL 1498965, at *28 (11 ½ pages of 12-page report were synopsis); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1321 (S.D. Cal. 2020) (expert merely interpreted unambiguous contracts); *Johnson v. Wyeth LLC*, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012) (denying motion to exclude, and explaining that the court was "unwilling to exclude helpful expert testimony in its entirety based on conjecture about what might happen at trial").
[6] *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029 (D. Minn. 2007) is the same: the expert relied solely on his "personal views on the ethical obligations of" the defendant. *Id.* at 1053.

that, in her experience, those conversations would have happened orally and not in writing, and so the best evidence is "Uber's account of Uber squashing and fogging and killing news stories." Drumwright Dep. at 289:25-290:12. And, Uber argues that there is no evidence "that Uber's nonprofit partners decided to work with Uber due to the use of dark PR," Mot. at 8, but Dr. Drumwright's supplemental report lays out in detail how Uber understood that its financial relationships with non-profits were aimed at and premised upon cooperation with Uber's media strategy, including allowing Uber to ghostwrite for the organizations. *See* Drumwright Supp. Rpt. at 6-16 (discussing the ███████████ relationships); *id*. at 16-36 (ghostwriting).[7]

Finally, Uber argues that Dr. Drumwright's ethics opinions "boil down to accusations that Uber engaged in immoral, reprehensible conduct" and so are precluded by Rule 403. Mot. at 8-9 (citation omitted). Uber's position is false: Dr. Drumwright's opinions concern Uber's deviation from both internal and external standards of conduct, not mere morality. See *United States v. Madril*, 2022 WL 2662885, at *4 (9th Cir. July 11, 2022) ("Evidence regarding the ethical or professional responsibilities of a defendant is admissible when it is probative and relevant."). In the case Uber cites, *Wolfe v. McNeil-PPC, Inc.*, 2011 WL 1673805 (E.D. Pa. May 4, 2011), an expert derived his opinion on the defendants' marketing responsibilities solely from a Supreme Court opinion (a legal issue) and "common sense and ethical responsibility." *Id.* at *8. The comparison of these "subjective views of ethics," *id.*, to Dr. Drumwright's analysis (analysis that has been admitted by multiple courts), is specious.[8]

Uber's argument on this point is particularly wrong because the company plans on using the conduct Dr. Drumwright discusses in its own defense. In particular, Dr. Drumwright's supplemental report discusses how Uber directed more than $14 million to non-profits, relationships the company candidly described internally ████████████████

---

[7] Uber criticizes Dr. Drumwright for basing one of her opinions in part on the effectiveness of female pairings without being an expert in safety, but she relied on Uber's own data showing that offering an option to choose such pairings improved safety. *See* Drumwright Rpt. at ¶ 355.

[8] Uber's cases are not helpful because they did not involve experts applying objective standards to the industry conduct at issue. *See Rezulin*, 309 F. Supp. 2d at 543 ("personal, subjective views"); *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 2009 WL 1357234, at *3 (D. Kan. May 12, 2009) (testimony based on "basic moral rights," not objective standards); *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at *18 (N.D. Ohio Aug. 8, 2005) ("seven ethical principles" the expert asserted apply to "all modern businesses").

1    ██████████████████████. Drumwright Supp. Rpt. at 1-16. Uber says that this conduct

2    is minimally relevant, but Uber placed the support of these non-profits at the center of its defense

3    in the JCCP bellwether trial. *See* Ex. 1 (JCCP Trial Tr.) at 3137:4-9 (Uber counsel: "That doesn't

4    make any sense that an organization that has devoted its entire existence to eradicating sexual

5    violence would do something it didn't believe in, would partner with a company to do such an

6    unprecedented report for PR purposes."). Uber even introduced supportive hearsay from those

7    same non-profits, *see id.* at 1058:21-1059:4, and touted their support in its opening statement, *see*

8    Ex. 2 (opening slide). Uber may not rely on non-profit support in its defense and then preclude

9    Plaintiff's expert's response under Rule 403.

10        **C.        Dr. Drumwright may discuss Uber's failure to warn Plaintiff and the public.**

11        *First*, Uber argues that Dr. Drumwright's opinions that Uber's marketing failed to warn

12    about sexual assault risk and employed communications like its Safety Reports as "anti-

13    warnings" are impermissible legal opinions. Mot. at 9. But Dr. Drumwright is not opining that

14    Uber is liable on a failure-to-warn theory. Instead, she discusses Uber's factual lack of warnings

15    as support for her opinions about the company's marketing and communications. *See, e.g., United*

16    *States v. Diaz*, 876 F.3d 1194, 1198-99 (9th Cir. 2017) ("[I]t is sometimes impossible for an

17    expert to render his or her opinion on a subject without resorting to language that recurs in the

18    applicable legal standard."); *Hangarter*, 373 F.3d at 1017 ("[A] witness may properly be called

19    upon to aid the jury in understanding the facts in evidence even though reference to those facts is

20    couched in legal terms.") (citation omitted).[9]

21        *Second*, Uber says that Dr. Drumwright is not qualified to opine on Uber's warnings or

22    lack thereof. That is incorrect. Dr. Drumwright does not opine on the exact font, placement, and

23    words to be used in warnings, opinions that a "warnings expert" might offer. Rather, she is a

24    marketing expert opining on how Uber's marketing failed to warn (and in fact, acted to

25    _____

26    [9] Uber's cases involved classic legal conclusions. *See Nationwide Transp. Fin. v. Cass Info. Sys.,*
     *Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (expert discussing statutes and legal standards);

27    *Martinez v. Cnty. of Alameda*, 2024 WL 1117952, at *1 (N.D. Cal. Mar. 13, 2024) (opposing
     party did not "dispute that" the testimony "amounts to an impermissible conclusion of law");

28    *Holman Enters. v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (expert's
     "major thesis" was that defendants "did not breach the covenant of good faith and fair dealing").

1     affirmatively "anti-warn"). Her analysis of Uber's communications strategy is squarely within her

2     expertise. *See* Drumwright Dep. at 20-89:21 (explaining, in an excerpt misleadingly quoted by

3     Uber, that she is "qualified with respect to warnings" to the extent that warnings relate to "the

4     communications function of marketing … with respect to the product").

5            **D.**      **Dr. Drumwright may discuss the information available to Uber.**

6          Finally, Uber seeks to exclude testimony from Dr. Drumwright regarding what she

7     observed in Uber's documents on the basis that she may not offer opinions about the company's

8     "knowledge." Mot. at 10. To start, experts may testify to what a defendant "knew or should have

9     known." *Cover v. Windsor Surry Co.*, 2017 WL 9837932, at *17 (N.D. Cal. July 24, 2017); *see*

10    *also, e.g.*, *McCoy v. DePuy Orthopaedics, Inc.*, 2024 WL 1705952, at *17 (S.D. Cal. Apr. 19,

11    2024) ("Expert testimony regarding information available to a defendant is helpful and relevant to

12    determining whether the defendant acted reasonably, and does not improperly comment on the

13    defendant's state of mind.") (internal quotation marks and alterations omitted); *Welding*, 2005

14    WL 1868046, at *17 ("It is through the application of his expertise that Dr. Levy may allow the

15    trier of fact to better understand what the documents do (and don't) mean, and, thus, what the

16    defendants did (or didn't) know.").

17          In any event, Dr. Drumwright does not offer free-standing assessments of the company's

18    knowledge; rather, she compares Uber's internal information to its public statements. Experts are

19    permitted—indeed, required—to explain the "facts apropos to [their] opinions." *Glumetza*, 2021

20    WL 3773621, at *20; *accord United Food & Com. Workers*, 296 F. Supp. 3d at 1194. It makes no

21    difference that the relevant facts go to the company's knowledge. *See In re JUUL*, 2022 WL

22    1814440, at *14 ("[T]he knowledge of various defendants and witnesses about the topics

23    identified above is likely relevant and admissible if there is a basis in the record for those experts

24    to testify, e.g., from their review of defendants' documents or deposition testimony."); *In re*

25    *Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1352860, at *2 (E.D. La. Apr. 13, 2017)

26    ("Defendants' [state of mind] arguments go to the witness's conclusions, not her methodology or

27    qualifications, and accordingly may be dealt with by cross-examination at trial."). Uber cites to

28    *King*, 2023 WL 5624710, but that order admitted Dr. Drumwright's marketing and ethics

1    opinions, and separately explained that experts may touch on what a company "knew" when

2    opining on an appropriate topic, such as "notice of the risks." *Id*. at *4.[10]

3    **II.    Dr. Veronique Valliere's testimony is admissible.**

4          Dr. Valliere is a clinical psychologist and an expert on sexual assault, sexual offenders,

5    and sexual assault victims. *See* Valliere Rpt. Dr. Valliere offers the following opinions

6    concerning how Uber's product and marketing affect potential offenders and victims:

- The Uber rideshare environment is ripe for exploitation and utilization by sexual offenders. *Id*. at 1.

- Uber should have known that the reports of sexual misconduct during Uber rides were representative of a wider problem. *Id*.

- Uber identified factors associated with a higher rate of sexual assault during Uber rides, including time and day and proximity to a bar, but never disclosed those findings. *Id*.

- Uber identified driver-specific factors predictive of a risk for future sexual misconduct, including: prior interpersonal conflict reports, dangerous driving, one-star ratings, a history of ride anomalies, and certain personality features. *Id*. at 1-2.

- Given the number of reported incidents and the factors Uber knew increased the risk of sexual assault, Uber should have provided warnings and information to passengers about the risk. *Id*. at 2. Instead, Uber chose to portray itself as a safe mode of transportation, in particular to women, intoxicated passengers, and passengers travelling on weekends, holidays, and during late night and early morning hours. *Id*.

- Uber's failure to institute adequate training, protections, and responses to reports of sexual assault may serve to embolden sexual offenders in the system. *Id*.

- Uber holds itself out as "safe," sensitive to, and protective of the vulnerabilities of women passengers. *Id*. Uber publicized its alliance with sexual assault victim advocates and announced strategies for training drivers (strategies that were not followed). *Id*.; *see also* Ex. 3 (Valliere Supp. Rpt.) at 1. Uber's safety and trust marketing were intended to, and did, create trust among passengers such as vulnerable women. Valliere Rpt. at 1-2. Indeed, Uber's marketing not only targeted women, but directly portrayed them in situations Uber had already identified as higher risk for sexual assault. *Id*.

---

24    [10] Uber's remaining cases are distinguishable. *See Patterson v. Six Flags Theme Parks Inc.*, 2024

25    WL 2112376, at *3-4 (E.D. Cal. May 9, 2024) (excluding testimony that an employee "would be confused," an opinion that "lacks any analytical foundation"); *Moller v. Cnty. of San Bernardino*, 2024 WL 5185640, at *7 (C.D. Cal. Jan. 2, 2024) ("not clear exactly what opinion [expert]

26    intends to provide"); *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d

27    1069, 1078 (D. Or. 2013) (excluding opinions that "it does appear quite plausible that the reason for the dismissal was the allegation of alcoholism" and "it appears very likely that these actions … were significant in promoting the negative decision"); *Aya Healthcare Servs.*, 613 F. Supp. 3d

28    at 1322 (no knowledge testimony involved at all; instead, expert excluded for impermissibly interpreting unambiguous contract provisions).

- Uber promotes safety and endorses its drivers, encouraging potential victims to get in a car with a stranger because it is an "Uber." *Id.*

- Because victims' responses to sexual violence are unique to their particular circumstances, each victim will have a distinct and personal reaction to and outcome from a sexual assault or act of sexual misconduct. *Id.* Victims may have significant practical reasons that drive them to continue to use Uber or may have independently attempted to engage in protective measures while using Uber. *Id.*

- Uber's formula for reporting the five most "serious" types of sexual assault is arbitrary and does not reflect the offender's intent or the victim's injury. *Id.* at 2-3. Uber's Safety Reports could lull women into perceiving Uber rides as safer than they are, a problem exacerbated by Uber's payments to advocacy and non-profit organizations. Valliere Supp. Rpt. at 2-3.

- Uber promotes "safety features" as assault deterrence based on misinformation about sexual offenders' methods and motives. Effective deterrents mitigate sexual assault because offenders may perceive the risks of their behavior being greater than the benefits. Valliere Rpt. at 3.

- Offenders' methods of abuse and exploitation affect victims' response. *Id.* The Uber platform provides offenders means, like the victim's home address, to force victims' compliance and silence. *Id.*

- Uber's safety guidelines for sexual assault and misconduct are neither clear nor adamant. *Id.* Uber's guidelines shift responsibility and accountability away from Uber and toward the victim. *Id.* Clear and appropriate policies would eliminate "gray areas" that can be manipulated by offenders or confuse victims. *Id.*

- Proper training and education can reduce the risk of sexual assault and misconduct. *Id.* at 3-4. Uber does not maintain or apply such policies, telegraphing to offenders that the consequences of committing sexual assault and misconduct were not enforced or serious. *Id.*

- Many measures that Uber promotes as "safety measures" do not appreciably reduce the risk of sexual assault and misconduct, but instead merely enhance the perception of safety for riders, fostering a false sense of safety. *Id.* at 4. In fact, Uber has developed effective methods to identify and eliminate risky drivers, features it does not deploy. *Id.*

**A.    <u>Dr. Valliere is qualified to offer her opinions.</u>**

Dr. Valliere is a recognized leading expert on the victims, perpetrators, and causes of sexual assault. Valliere Rpt. at 4-5. She has more than three decades of experience in the field of interpersonal violence, operates treatment centers for victims and offenders of violence, has served as a consultant and expert witness in courts across the country, including in more than 150 courts martials, as well as consultations and trainings for federal law enforcement agencies, and

1    has written three books about victims and offenders of sexual violence. *Id.*[11]

2        Unable to assail Dr. Valliere's expertise on sexual assault offenses and prevention, Uber

3    mutates her report into opinions about "marketing and/or branding, corporate values, failure to

4    warn, and Uber's safety features." Mot. at 2. As demonstrated in her report and above, Dr.

5    Valliere opines on the ways Uber failed to prevent sexual assault on its platform: "My opinions

6    are intended to provide education and expertise about sexual maltreatment …, victim response to

7    sexual maltreatment, and offender behavior to provide important context for understanding and

8    evaluating the risks and responses of Uber." Valliere Rpt. at 4. Uber's "responses" include its

9    marketing and other conduct, but that does not transform Dr. Valliere's application of her

10   expertise to Uber's actions in those areas into freestanding "opinions" on marketing or safety

11   features. *See, e.g.*, *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 553 (N.D. Cal. 2012)

12   (admitting testimony of "public health" expert concerning "advertising and marketing in the area

13   of public health" and explaining that "[h]e can be designated as an expert in this limited area

14   without also being an expert in the total universe of commercial marketing and advertising").

15   Uber may (and does) challenge the foundations of Dr. Valliere's opinions as unreliable (as

16   discussed below, those challenges fail), but analysis of how Uber's conduct responded to risks of

17   sexual assault does not transform her opinions into anything other than what they are: a sexual

18   assault expert's opinions on sexual assault.

19       Another problem is that Uber challenges categories of Dr. Valliere's "opinions" without

20   identifying any actual opinions or testimony. *See In re Bard IVC Filters Prods. Liab. Litig.*, 2017

---

[11] *See also United States v. Leroy*, 787 F. App'x 74, 79 (3d Cir. 2019) ("We agree with the District Court that Dr. Valliere's testimony was reliable and relevant. Dr. Valliere has extensive academic experience in the field of psychology, and her robust clinical and forensic practice involves a similar patient population of sexual offenders and child abuse victims, which we find to be sufficient for the purposes of Rule 702 in this case. Her testimony was relevant because it assisted the jury in learning about specialized topics" related to victim and offender behavior.) (footnote omitted); *United States v. Maurizio*, 2015 WL 5228031, at *3 (W.D. Pa. Sept. 8, 2015) (admitting Dr. Valliere's testimony regarding "[v]arious victim behaviors," "[c]ommon victim reactions," "[w]hy victims, particularly victims of sexual abuse and child victims of abuse, often refuse to disclose their abuse or wait long periods of time before disclosing their abuse," "[c]ommon victim characteristics and or reactions during incidents of sexual abuse," "[c]ertain victim/offender dynamics," "[c]ommon victim characteristics and experience," "[v]arious offender characteristics[] and [] methods," and "the various strategies, methods and tactics employed by abusers").

1  WL 6554163, at *3 (D. Ariz. Dec. 22, 2017) ("Line drawing in the context of such generalized

2  arguments is not possible, and Defendants identify no specific testimony that the Court should

3  exclude."). Because Uber only "make[s] generic complaints about the types of opinions and

4  categories of testimony," this Court should deny the motion on this point as undeveloped and

5  premature at best. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4165021, at *3 (N.D. Ohio

6  Sept. 3, 2019) ("In essence, Defendants are asking the Court to issue an advisory ruling …

7  without detailing the specific opinions or testimony. The Court will not make non-specific rulings

8  on the record before it.").

9      Consider each category. *First*, without citing any particular testimony, Uber says that Dr.

10  Valliere may not offer "marketing" opinions—as if she analyzes branding. Mot. at 2. She does

11  not: "I am not offering opinions about Uber's branding and marketing but giving an opinion on

12  the psychological impact of Uber's statements based on its analysis, research and testimony about

13  its marketing and its impact on consumers." Valliere Rpt. at 4. In other words, she uses her

14  expertise as a psychologist to opine on the psychological impact of Uber's marketing. *See*

15  Valliere Dep. at 73:4-9 ("I am offering opinions on … the psychology of marketing and how it

16  may psychologically impact decision-making on potential victims."). Uber relies on the JCCP's

17  decision excluding portions of Dr. Valliere's testimony, but that court recognized that Dr.

18  Valliere was qualified "to testify on the potential psychological impact of such advertisements on

19  female passengers." *JCCP Sargon Order* at 36 n.24.

20      Dr. Valliere talks about how Uber's marketing "targeted … women," especially "in the

21  situations Uber had already identified as higher risk for sexual assault," promotion that "can and

22  did create trust among passengers such as vulnerable women based on safety sentiment that Uber

23  measures." Valliere Rpt. at 2. Dr. Valliere's conclusions are based in large part on Uber's own

24  documents and 30(b)(6) testimony discussing the effects of its marketing on women passengers,

25  documents that Dr. Valliere is qualified to analyze, from the perspective of a psychologist,

26  because she is an expert on victims of sexual assault. *See*, *e.g.*, *id*. at 9 ("Uber admits that 'both

27  trust and safety' 'have a direct impact on rider … behavior.") (citing Uber document); *id*. at 10

28  ("Using marketing that 'tap[ped] into the emotions,' Uber sought to establish in passengers a

1  feeling of safety.") (citing deposition).[12]

2  　　　*Second*, Uber seeks to exclude opinions on "government regulations or corporate

3  governance." Mot. at 3. Uber does not identify any specific opinions or testimony to exclude, so

4  the motion must be denied on this point. The only page of Dr. Valliere's report Uber cites (in the

5  background section) discusses that "Uber's policies against sexual assault and misconduct are not

6  sufficiently clear or adamant." Valliere Rpt. at 48. Dr. Valliere explains that Uber's policies,

7  which "spread[] the accountability to the victim and bystanders" and "away from Uber" are

8  reflective of the company's overall approach to the risk of sexual assault and contribute to "gray

9  areas for offenders and victims" that increase the risk. *Id.* Those are topics about preventing

10  sexual assault, not "corporate governance" more broadly.

11  　　　*Third*, Uber says that, because Dr. Valliere "has no training in developing safety features

12  for rideshare applications," Dr. Valliere may not testify about "Uber's Safety Features." Mot. at 3.

13  But she does not offer opinions on the design or effectiveness of safety features. Instead, she

14  opines that Uber has not taken sufficient actions to reduce the risk of sexual assault, opinions

15  based in part on Uber's own documents showing that it "has progressively instituted features that

16  it has promoted as associated with increased safety for its riders and drivers" when it knows that

17  those "features … are not effective at reducing sexual assault." Valliere Rpt. at 20-21.[13]

18  　　　*Fourth*, Uber argues Dr. Valliere may not testify about Uber's failure to warn because

19  "she has never drafted a consumer-facing warning and has no expertise in consumer warnings."

20  Mot. at 4. The JCCP rejected this argument, and this Court should too. *JCCP Sargon Order* at 37.

21

22  [12] Uber cites *Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, 2010 WL 11505684 (C.D. Cal. Jan.

23  25, 2010), for the proposition that "an expert offering opinions on consumer perceptions must be qualified as an expert in consumer perceptions." *Id.* at *8. Here, Dr. Valliere is an expert on potential and actual victims of sexual assault, including their "perceptions." Uber also cites

24  *Brown v. Google, LLC*, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022), but that case precluded a "security technologist" from opining about consumer expectations. *Id.* at *11.

25  [13] Uber cites cases where experts opined on how products should be designed, not on a company's increasing the risk of sexual assault by promoting features it knew were ineffective.

26  *See Banda v. Herc Rentals, Inc.*, 2020 WL 353461, at *10 (N.D. Cal. Jan. 21, 2020); *Kerrigan v. Maxon Indus.*, 223 F. Supp. 2d 626, 635 (E.D. Pa. 2002). Uber also relies on an order in a *Lyft*

27  case excluding Dr. Valliere's opinions, but the order is largely unreasoned and so unhelpful. *See* Mot., Ex. 4 at 8. In any event, as discussed above, Dr. Valliere does not offer "opinions about the

28  adequacy … of … safety measures," *id.*, but instead uses Uber's own assessments as bases to opine that Uber increased the risk of sexual assault.

1   As a psychologist with a specialty in sexual assault, Dr. Valliere is qualified to testify on how

2   warnings, or lack thereof, affect potential victims and offenders, and "how [they] detect, process,

3   understand, and evaluate information in their environment." *AAA Fire Prot., Inc. v. Orison Mktg.,*

4   *LLC*, 2019 WL 13195249, at *4 (D. Colo. Sept. 4, 2019) (admitting testimony of "human factors

5   psychologist" to discuss "[w]hether and how information would be understood"). Uber cites

6   *Reinken v. Big Game Treestands*, 2018 WL 10625889, at *12 (N.D. Iowa Mar. 8, 2018), but in

7   that case the expert, based on his expertise with "warnings for wilderness medical care and

8   firearms," sought to opine on the contents of a product warning for a tree stand. *Id.* at *12. Here,

9   Dr. Valliere is not opining on the words of a specific warning that should have been given, but

10  instead, based on her expertise of how warnings or lack of them affect victim and offender

11  behavior, on Uber's general failure to disclose the risks of sexual assault on its platform. *See*

12  Valliere Rpt. at 46 ("Riders would then be made aware of the potential dangers and be able to

13  make informed decisions about when, how, and whether to use Uber.").

14      **B.    Dr. Valliere's opinions are reliable.**

15          **1.    Dr. Valliere's analysis of the effect of Uber's marketing on potential
                    victims is reliable.**

16      Uber says that, to discuss Uber's marketing and its effects, Dr. Valliere was required to

17  conduct a survey, consumer research, or consumer interviews. Mot. at 4-5. But, as explained

18  above with respect to Dr. Drumwright, courts reject this argument. *See* § I.A.2, *supra*. Dr.

19  Valliere applies her experience to analyze Uber's documents showing how the company has

20  "targeted women to increase female passengers and drivers" because "safety is a woman's

21  number one concern in choosing a rideshare service" and concluding that those efforts have been

22  successful. Valliere Rpt. at 9-10, 12 (citing Uber documents and testimony). Her analysis is

23  reliable. *See, e.g.*, *In re JUUL*, 2022 WL 1814440, at *20 (in "assessment of consumer

24  perception," expert's "reliance on [the defendant's] own documents and research and publications

25  is sufficient").[14]

26      Uber claims that "Dr. Valliere cannot point to any … objective evidence supporting her

27

28  _____
    [14] Uber cites only *Insolia*, which, as explained above in the Drumwright section, decided the
    merits, not admissibility, and involved an expert not citing "anything." 53 F. Supp. 2d at 1041.

1    opinions regarding the factors consumers consider when deciding whether or not to" use Uber.

2    Mot. at 4. Saying so does not make it true. In fact, Dr. Valliere, informed by her expertise, relies

3    on Uber's own documents showing that "safety and trust are primary factors in a female…

4    passenger deciding to drive for or ride with Uber" and that "both trust and safety' 'have a direct

5    impact on rider … behavior." *See* Valliere Rpt. at 9 (citing Uber documents); *see also id*. at 10

6    (discussing 30(b)(6) deposition testimony extensively).[15]

7          **2.       Dr. Valliere's opinions concerning the risks of using Uber are reliable.**

8          Uber argues that Dr. Valliere, an expert in sexual assault, may not opine on the features of

9    the Uber environment that enable sexual assault. Mot. at 5. The JCCP court rejected this

10   argument, and this Court should too. *See JCCP Sargon Order* at 36 (explaining that "Dr.

11   Valliere's … opinion regarding the enhanced risk of sexual assault for women using Uber is

12   closely related to her area of expertise" and that Uber's objections "are proper subjects for cross-

13   examination, but do not warrant exclusion of her opinions").

14         Uber says that Dr. Valliere's analysis is unreliable because her review of the evidence

15   "was admittedly limited to documents hand-selected by Plaintiffs' counsel." Mot. at 5. This

16   statement, apparently recycled from Uber's JCCP briefing, is false: Dr. Valliere "asked the

17   attorneys to provide information and documents that [she] felt would be relevant to [her] report,

18   as well as had access to Everlaw to do searches that were necessary." Valliere Dep. at 380:22-

19   381:1. She "requested documents related to Uber's policies, as well as deposition testimony and

20   marketing documents, screening, training, deactivation documents, amongst other things." *Id*. at

21   381:18-382:2 (agreeing).[16] Dr. Valliere looked at all the evidence she deemed necessary "to get a

22

23   [15] Uber cites the *JCCP Sargon Order*, but that order believed a "survey" was necessary. In federal
     court, it is not. And Uber cites the *Lyft Rideshare* order, which is largely unreasoned and does not
24   even describe the bases of the opinions offered.

     [16] Even if Dr. Valliere had relied solely on information selected by counsel, exclusion would not
25   be appropriate. Uber "cites no authority for the proposition that an expert must independently sort
     through all of the discovery in a case in order to determine the relevant evidence. Such a rule
26   would be incredibly costly and time consuming for the expert, who necessarily would be
     duplicating the work that the attorneys in the case had already performed." *In re Arris Cable*
27   *Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018). The question under *Daubert* is
     whether the expert's opinion is based on reliable facts and data, not where those facts came from.
28   Uber cites *Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004), but that case presented an

1  full picture of the issue involved from both sides." *Id.* at 381:6-10.

2       Uber argues that Dr. Valliere "lacked information material" to her opinions, specifically

3  "studies regarding the safety or efficacy of any rideshare feature." Mot. at 6. Uber misrepresents

4  Dr. Valliere's analysis. Her risk opinions are not based on the "efficacy" of safety "features," but

5  instead the nature of the "isolated, confined" Uber environment, which offers "predetermined

6  conditions that make sexually abusing others easier," including "control of the environment[,]

7  isolation and other victim vulnerabilities." Valliere Rpt. at 11. Passengers are placed "in the

8  confined circumstances of [a driver's] car, a vehicle, he, as the driver, has familiarity with and

9  control over." *Id.* After "an assault ..., many victims will experience fear of retaliation

10  particularly because they fear the driver has acquired personal information about her (such as her

11  name, where she lives, or where she was dropped off)." *Id.* To the extent Dr. Valliere discusses

12  safety "features," she does not opine on their efficacy as a technical matter, but only on Uber's

13  conduct in promoting features it knows are not effective, or have not been measured for

14  effectiveness. *Id.* at 20-22.

15       Uber criticizes Dr. Valliere for her pre-existing familiarity with the risk of the Uber

16  environment ("the situation it puts offenders in and the opportunity it affords them") based on her

17  experience working with sex offenders who are not allowed to be Uber drivers. Valliere Dep. at

18  413:20-414:5. Her "examination of Uber's documents revealed clearly that they knew the same

19  thing." *Id.* at 414:19-20. Traditionally, that an expert's opinions were not developed solely for

20  litigation was considered a plus, not a negative. *See Daubert*, 509 U.S. at 584.

21       Finally, Uber argues that Dr. Valliere's opinions are simply wrong, but cites only the

22  conclusory *Lyft Rideshares* order (the *JCCP Sargon Order* came out the other way). Here, Dr.

23  Valliere's extensive reports lay out in detail the foundation for her opinions that Uber's conduct

24  increased the risk of sexual assault. Uber says that "Dr. Valliere's risk opinion" rests solely on the

25

26

27  unusual fact pattern where an expert was retained only to "test" certain "testimony" selected by
   counsel rather than "conduct independent analyses." *Id.* at 542. Nothing about Dr. Valliere's work
28  is analogous. Similarly unavailing is Uber's reliance on *Repa v. Napierkowski*, 2022 WL 1522360
   (W.D. Pa. May 13, 2022), which did not involve counsel-selected information at all. *See id.* at *3.

1  claim that the number of assaults is "significant." Mot. at 7.[17] Her report belies that falsehood,

2  recounting Uber's risk-enhancing conduct in exhaustive detail, including concealing risk factors,

3  portraying itself as safe especially for the passengers at greatest risk, failure to train and protect,

4  and promoting safety features that enhance the perception of safety rather than actual safety. *See*

5  Valliere Rpt. at 1-4. Uber says that the rate of incidents "is exceedingly small"—whether that is

6  so goes to Uber's defense on the merits and is irrelevant to the admissibility of Dr. Valliere's

7  testimony. Uber caricatures Dr. Valliere's opinions as "rides … are not safe." Mot. at 7. Many

8  rides are not, including Jaylynn Dean's; Dr. Valliere's report helps the jury understand why.[18]

9  **3.    Dr. Valliere's opinions concerning Uber's failure to warn are reliable.**

10  Dr. Valliere's opinion that Uber withheld material information from its passengers is not

11  based on "speculation," but on Dr. Valliere's review of Uber's own documents and testimony,

12  and her own expert understanding of what information matters to potential victims. *See, e.g.*,

13  Valliere Rpt. at 18-19 (Uber failed to disclose high-risk factors when "Uber knew" disclosure

14  would harm "its efforts to construct an image of safety," which in turn "is one of the things that

15  customers rely on when they decide to get into a car driven by someone they've never met

16  before"). That Uber's concealment prevented "informed decisions about when, how, and whether

17  to use Uber's mode of transportation" is a conclusion based on Dr. Valliere's decades of

18  experience with sexual assault victims. *Id.* at 2. *See* Valliere Dep. at 203:8-16 ("I [] know that

19  warning people about risk changes their evaluation of risk, level of guardedness and level of

20  awareness of appropriate behavior …."). Uber (again) criticizes Dr. Valliere for not conducting a

21  "survey," but none is required: experts may rely on "personal knowledge or experience." *Zariczny*

22  *v. Harley-Davidson, Inc.*, 2025 WL 3049974, at *5 (C.D. Cal. Sept. 8, 2025) (citation omitted).

23

24  _____

[17] Uber says that Dr. Valliere may not recite sexual assault statistics from Ms. Keller's report, but

25  it is common for experts to build on each other's conclusions, especially where both experts
testify. *See Maney v. Oregon*, 2024 WL 1695083, at *13 (D. Or. Apr. 19, 2024) (collecting

26  cases). In the only case Uber cites, the expert relied on survey data conducted by experts not
"before the court." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014).

27  [18] Uber cites *Jones v. United States*, 933 F. Supp. 894 (N.D. Cal. 1996), which excluded
testimony that cited articles that "came to different conclusions" than the experts did. *Id.* at 898.

28  Here, Uber's spaghetti-on-the-wall approach to *Daubert* briefing fails to identify even one
document Uber thinks Dr. Valliere got wrong.

### 4. **Dr. Valliere does not offer opinions concerning Uber's ethical responsibilities.**

Uber seeks to preclude Dr. Valliere from testifying as to various facts she considered by distorting that testimony into opinions about "the ethics of Uber's conduct." Mot. at 8. She does not offer any such opinions: variants of the word "ethic" appear once in Dr. Valliere's report, in a sentence discussing an Uber document admitting people act more unethically when they perceive the risk of consequences to be lower. Valliere Rpt. at 11. Uber does not want Dr. Valliere to testify to certain background on Uber's history included in the introduction to her report. *See id.* at 6. But experts are permitted to discuss the factual bases of their opinions. *See Glumetza*, 2021 WL 3773621, at \*20. The pertinence and prejudice of any specific facts are matters for Rule 403 at trial, not a *Daubert* motion. *See United States v. Spurlock*, 2025 WL 1224720, at \*6 (D. Nev. Apr. 25, 2025) (denying motion to exclude expert testimony, and explaining that the court "cannot resolve any Rule 403 objection without hearing the testimony and making a determination as to unfair prejudice in the context of trial").[19]

### 5. **Dr. Valliere may testify about information available to Uber as relevant to her opinions.**

Uber argues that Dr. Valliere may not discuss the contents of the company's documents and depositions because those discussions involve the company's "knowledge" or "state of mind." Mot. at 9. For the reasons explained in the corresponding argument concerning Dr. Drumwright, § I.D, those arguments should be rejected. *See also, e.g., In re JUUL*, 2022 WL 1814440, at \*14 ("Generally, 'state of mind' and 'intent' objections are better ruled on at trial: the context of the testimony and the purposes for which it is offered are critical."). The only two examples Uber presents illustrate the point. *First*, Dr. Valliere states that "Uber knows the public and passengers look to its background check system as a safety feature and rely on it." Valliere Rpt. at 23. This is not a bald opinion about knowledge, but rather a fact that supports Dr.

---

[19] *See also, e.g., Villalpando v. Exel Direct Inc.*, 2016 WL 1598663, at \*23 (N.D. Cal. Apr. 21, 2016) (denying *Daubert* motion, and explaining that "Plaintiffs may renew their relevance challenge at trial under Rule 403"); *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1290-91 (D.N.M. 2013) ("Rule … 403 is rarely appropriate as a basis for pretrial exclusion. Defendant's arguments to exclude evidence under Rule 403 are fact-bound determinations dependent upon the character of the evidence introduced at trial.") (citation omitted).

1    Valliere's analysis of how Uber "build[s] trust" and uses marketing to "'reassure primarily female

2    riders that Uber is committed to their safety'" all while "recogniz[ing] that the 'credibility of

3    background check results is highly questionable.'" *Id.* (quoting Uber documents). *Second*, Dr.

4    Valliere explains that Uber's construction of its Safety Reports reflects "a misinterpretation or

5    minimization by Uber of the severity of behavior that does not rise to the level of 'assault.'" *Id.* at

6    40. This is not a statement about Uber's "motives and intent," Mot. at 9, but rather an explanation

7    grounded in experience of how the Safety Report misrepresents the risks of sexual assault.[20]

8          **6.**     **Dr. Valliere's testimony is not impermissible narrative.**

9          Uber moves to preclude Dr. Valliere from discussing the contents of Uber's documents

10   and depositions that she reviewed in forming her opinions. Mot. at 9. But, as discussed in Section

11   I.B.2, *supra*, experts are permitted, and indeed required to, discuss the facts and data they

12   considered. *See Glumetza*, 2021 WL 3773621, at *20; *United Food & Com. Workers*, 296 F.

13   Supp. 3d at 1194. An "expert witness is permitted to compile documents, even materials that a lay

14   person would understand, and then explain how those materials inform and support his ...

15   opinions." *Pinterest, Inc. v. Pintrips, Inc.*, 2015 WL 2268498, at *3 (N.D. Cal. May 14, 2015).

16   Indeed, "this is one of the primary purposes of expert witnesses." *Teledyne Risi, Inc. v. Martin-*

17   *Baker Aircraft Co., Ltd.*, 2018 WL 11352632, at *7 (C.D. Cal. April 24, 2018). There is no bar to

18   "narrative" testimony that is helpful to the jury. *See YAZ*, 2011 WL 6302287, at *8; *Tylenol*, 2016

19   WL 807377, at *9. Moreover, objections to testimony as "narrative" do not demonstrate that an

20   expert's opinion is unreliable and so do not support pre-trial exclusion. *See, e.g.*, *Homyk*, 2025

21   WL 1547625, at *10; *Actos*, 2014 WL 120973, at *10 ("The objection that testimony is

22   'narrative' is an objection as to form, foundation, or responsiveness, and must be presented at

23   trial."); *YAZ*, 2011 WL 6302287, at *8 (noting that issues concerning narrative testimony should

24   be "decided at trial in context specific situations").

25

26   [20] Uber's cases did not involve similar testimony. *See* n. 10, *supra*; *Patterson*, 2024 WL 2112376,
     at *3-4 (excluding testimony that an employee "would be confused," an opinion that "lacks any
27   analytical foundation"); *Moller*, 2024 WL 5185640, at *7 ("not clear exactly what opinion
     [expert] intends to provide"); *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1322 (no knowledge
28   testimony involved at all; instead, expert excluded for impermissibly interpreting unambiguous
     contract provisions).

1     Uber cites *O'Bryant v. Johnson & Johnson*, 2022 WL 7670296 (D.N.J. Oct. 13, 2022), but

2     that case recognized that an expert "may, of course, rely on Defendants' documents to support

3     otherwise admissible expert testimony." *Id.* at *13. Judge Chen made the same point in *Siqueiros*

4     *v. Gen. Motors LLC*, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022): "An expert may review the record

5     evidence to extract factual bases from which to apply reliable methodologies in deriving an

6     opinion." *Id.* at *9.

7     The two examples Uber selects illustrate the point. Uber says that Dr. Valliere may not

8     quote a document in which Uber "acknowledges an understanding of the motivations of

9     perpetrators and the ease of committing a sexual assault during high-risk periods," Valliere Rpt.

10    at 32, but that statement supports Dr. Valliere's opinions (opinions that Uber elsewhere criticizes

11    for lacking foundation) regarding the risk of the Uber environment. The same is true of Dr.

12    Valliere's observations that Uber knew that intoxicated women riders were at risk: these facts

13    support her opinions that Uber increased the risks of sexual assault by affirmatively promoting

14    that use.

15    Finally, Uber says that Dr. Valliere's discussion of Uber's marketing material invades the

16    province of the jury. But "the Ninth Circuit has indicated that 'we must be cautious not to

17    overstate the scope of the average juror's common understanding and knowledge.'" *Roblox Corp.*

18    *v. WowWee Grp. Ltd.*, 2024 WL 4057418, at *5 (N.D. Cal. Sept. 3, 2024). Dr. Valliere analyzes

19    Uber's advertisements using her expertise on sexual assault victims, expertise the jury does not

20    have. *See, e.g.*, Valliere Rpt. at 35 ("Uber's advertising campaigns are aimed at attracting women

21    to Uber in the most vulnerable situations for them…. Uber places the responsibility for safety to

22    others … and on the passenger while promising to provide safety to that same passenger."). Uber

23    also ignores the context of Dr. Valliere's discussions of Uber's advertising; her point is that Uber

24    not only created an environment conducive to sexual assault, but also through its marketing

25    encouraged offenders and victims to access that environment in its most dangerous forms. *See id.*

26    at 34 ("Uber actually encourages drivers to drive during nights and weekends where drivers are

27    likely to encounter intoxicated women going home alone."). This is expert analysis, not

28

1    parroting.[21]

2    **III.    Jay Feldis's testimony is admissible.**

3         Jay Feldis is an electrical engineer who is an expert in the areas of digital video cameras

4    and the development and commercialization of electronic products. *See* Feldis Rpt. Mr. Feldis

5    offers the following opinions:

6    - By 2017, it was technically feasible to employ automatic cabin-facing dashcam video
         recording into Uber vehicles without drivers controlling the footage. *Id*. at 2-3.

7

8    - Dashcam technology was recognized at Uber in 2016 or earlier and evaluated
         inside Uber beginning in 2017. Pilot programs began in 2018 and continued into 2021.

9         The solutions proposed and investigated inside Uber during this time period were
         technically feasible and could have been implemented according to internal estimates.

10        The evidence does not support any claim by Uber that dashcams that automatically
         record audio and video for every ride are or were technologically infeasible. *Id*. at 3.

11   **A.    Mr. Feldis is qualified to opine on the technological feasibility of dashcam
              technology in Uber vehicles.**

12        Uber argues that Mr. Feldis is not qualified to opine on the feasibility of dashcam

13   technology. This is incorrect. Because Rule 702 "contemplates a broad conception of expert

14   qualifications," only a "minimal foundation of knowledge, skill, and experience" is required.

15   *Hangarter*, 373 F.3d at 1015-16 (internal quotation marks and emphasis omitted); *accord, e.g.*,

16   *Campos v. Big Fish Games*, 2025 WL 3140399, at *1 (W.D. Wash. Nov. 10, 2025). Accordingly,

17   an expert "need not demonstrate past experience investigating the precise issues in this litigation."

18   *Siqueiros*, 2022 WL 74182, at *5 (rejecting defendants' argument that aeronautical engineering

19   expert was not qualified to opine on automotive engineering); *see also Todd v. Tempur-Sealy*

20   *Int'l, Inc.*, 2016 WL 5462428, at *5-6 (N.D. Cal. Sept. 28, 2016) (admitting the testimony of a

21   chemist who worked primarily with pesticides to testify about mattresses); *In re Silicone Gel*

22   *Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004) ("A lack of

23   specialization affects the weight of the expert's testimony, not its admissibility.").

24        Mr. Feldis easily exceeds this low bar. He has performed "key roles leading hardware,

25   software, and program management teams through all stages of development from product

26

27   _____
     [21] Uber's comparison of Dr. Valliere to the expert in *Burrows v. 3M Co.*, 2022 WL 3346419
     (W.D. Wash. Aug. 12, 2022), is facile. There, the court could not discern any methodology in the

28   report, and the expert's analysis was limited to purely factual statements such as the "defendant
     uses the line, '[a] complete safety solution in the palm of your hand.'" *Id.* at *5.

conception and system design to manufacturing and retail launch." Feldis Rpt. at 2. His

experience includes eight years as an engineer developing wireless transmitter systems (which

involve the same technology as dashcams); thirteen years leading the engineering, design and

development of webcam digital video cameras; four years leading the development of mobile

phone test systems; and ten years as a consultant to technology companies on development and

commercialism of related products and systems. *Id*. The JCCP court rejected Uber's argument,

and this Court should too: "[W]hile Mr. Feldis may not have worked directly with dashcams, his

background and experience in the development of webcams, a closely similar device, and camera

technology in other devices, and his expertise in electronics and product development are

sufficient to qualify him to testify regarding the technical feasibility of such technology." *JCCP

Sargon Order* at 33; *see also, e.g., Labbe' v. Dometic Corp.*, 2025 WL 1755823, at *4 (E.D. Cal.

June 25, 2025) ("Mr. Spruill is qualified to provide expert testimony on fire origins and causation.

… [O]bjections based on Mr. Spruill's lack of experience with refrigerator technology in

particular instead go to the weight of his testimony."); *Jackson v. E-Z-GO Div. of Textron, Inc.*,

326 F. Supp. 3d 375, 388 (W.D. Ky. 2018) (explaining that engineering "experts need not even

have direct experience with the precise subject matter or product at issue") (citation omitted);

*Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 241-42 (E.D.N.Y. 2014) (collecting cases

permitting engineers to testify despite lacking experience with the particular product at issue).

　　　　Uber highlights Mr. Feldis's opinion that technology was available that would prevent

drivers from controlling the footage. But Uber never explains why an engineer with extensive

experience working with webcams cannot opine that technology was available to prevent

tampering with footage—what to do with footage is fundamental to what a webcam does. *See*,

*e.g.*, Feldis Rpt. at 2, 12 (discussing "3rd party services to manage cellular data transfer and video

storage); *id*. at 9 (explaining how "[e]ncryption tools and methods exist that can limit access to

recorded video according to predefined access control rules," with "[a]ccess control[]"

technologies "available by 2018").

　　　　Uber cites what appears to be a list of every case it could find excluding experts as lacking

case-appropriate qualifications. Not one precluded an engineer from testifying on an engineering

1    topic, let alone one like Mr. Feldis with experience with closely related technology. The cases

2    Uber marshals include decisions excluding plaintiffs themselves from testifying as an expert on

3    their own mortgage loan, *Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *4 (N.D. Cal. Nov.

4    3, 2020), or from offering their own employees as "expert" witnesses and opposing the motion to

5    exclude on the basis that the testimony was really that of "a lay witness," *Blockchain Innovation,*

6    *LLC v. Franklin Res., Inc.*, 2024 WL 5483606, at *8 (N.D. Cal. Oct. 22, 2024).[22]

7    ### B.    Mr. Feldis's feasibility opinions are reliable.

8        Uber argues that Mr. Feldis's opinions are not reliable because they are based only on

9    internet searches. Mot. at 4-5. That is false: Mr. Feldis also based his opinions on (1) "Uber's

10    internal documents" and depositions on the subject matter and (2) purchase and installation of

11    dashcam products. Feldis Rpt. at 3. The JCCP court rejected Uber's argument on this point "in

12    light of undisputed record evidence that Uber considered implementing dashcams and actually

13    provided incentives for drivers to install them in their vehicles." *JCCP Sargon Order* at 33.

14        Indeed, Uber takes issue only with one portion of Mr. Feldis's report, an illustration of the

15    history of dashcam technology. *See* Feldis Rpt. at 5. But Uber does not say that Mr. Feldis got

16    anything wrong, in this illustration or otherwise. Instead, Uber complains that portions of the

17    timeline are supported by footnoted citations to resources available on the internet, including

18    "press releases from the respective manufacturers," "historical articles," "product reviews," and

19    "manufacturer performance specifications." Feldis Rpt. at 3. As Mr. Feldis testified, using the

20    internet for such research is standard in his industry. *See* Feldis Dep. at 89:13-18. And courts have

21    rejected this same argument. *See*, *e.g.*, *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1095 (9th Cir.

22    2014) (affirming denial of Daubert motion, which was premised in part on expert's reliance on

23    internet research when conducting market survey, because movant "fail[ed] to explain why the

24

25    [22] *See also Martinez v. Coloplast Corp.*, 2022 WL 425206, at *2 (N.D. Ind. Feb. 11, 2002)
     (excluding expert on "regulatory" issues, such as "post-market surveillance," that are necessarily
26    product-type specific); *United States v. Chang*, 207 F.3d 1169, 1172-73 (9th Cir. 2000)
     (disallowing expert with "knowledge regarding the history of, and purpose for, the issuance of"
27    financial obligations from opining on a highly technical subject of whether a particular security
     was "counterfeit"); *Deitsch Plastics Co. v. Gredale LLC*, 602 F. Supp. 4 1331, 1335 (C.D. Cal.
28    2022) (excluding regulatory expert); *Duchimaza v. United States*, 211 F. Supp. 3d 421, 430-31
     (D. Conn. 2016) (excluding regulatory expert).

1   Internet is an inappropriate resource for conducting market research" and "had ample opportunity

2   to cross-examine [the expert] about his underlying sources and discredit them"); *Longoria v.*

3   *Kodiak Concepts LLC*, 2021 WL 1100373, at *15 (D. Ariz. Mar. 23, 2021) ("The Court accepts

4   that conducting internet research and extrapolating from it can be a reliable methodology.").[23]

5           **C.    Mr. Feldis does not affirmatively offer deterrence opinions.**

6           At deposition, Uber asked Mr. Feldis whether dashcams have a deterrence effect. *See*

7   Feldis Dep. at 72:18-77:16. Mr. Feldis's report does not opine on deterrence.

8   **IV.    Bruce Weiner's testimony is admissible.**

9           Bruce Weiner is an expert in technology, product development, and software engineering.

10  *See* Weiner Rpt. at ¶¶ 1-21. Mr. Weiner evaluates Uber's app development and design choices

11  against the findings of its own internal studies as well as industry standards for product

12  development in the context of known risks of physical harm. Mr. Weiner offers the following

13  opinions:

14      - Sexual violence between drivers and riders was a foreseeable risk from Uber's
           inception. *Id.* at 31-44.
15

16      - Uber failed to incorporate industry-standard risk-based practices into its product
           development, and instead prioritized growth, cost reduction, and competition over the
17         timely implementation of safety features that its own internal studies indicated could
           mitigate risks of sexual assault and misconduct. *Id.* at 44-62.

18      - Despite having the technical ability to identify high-risk trip pairings, Uber delayed
           and limited deployment of those capabilities, reflecting a prioritization of growth over
19         safety. *Id.* at 62-84.

20      - Uber possessed the technical ability to deploy mandatory audio and video recording
           features that its own studies associated with reductions in sexual assault and
21         misconduct, but delayed and restricted deployment of those measures. *Id.* at 85-106.

22      - Uber possessed the technical ability to match women passengers with women drivers,
           which it knew was associated with reduced incidents of sexual assault and misconduct,
23         but delayed and constrained the rolling out of such a feature. *Id.* at 106-16.

24      - Uber evaluated safety features with regards to how they affected perceptions of safety,

25

26  [23] Neither case Uber cites helps it. In *Shahinian v. Kimberly-Clark Corp.*, 2017 WL 11595343
    (C.D. Cal. Mar. 7, 2017), the expert sought to prove a negative—no "reported cases in the
    medical literature"—making the scope of his search the key issue. *Id.* at *7. And, in *Beard v.*
27  *United States Postal Serv.*, 2019 WL 257978, at *2-3 (N.D. Cal. Jan. 18, 2019), the expert sought
    to use "Google searches" to calculate "future medical-surgical costs," but had no basis to assume
28  the resources were accurate calculations of those figures. Here, all that the internet resources
    show is that "various dash cam brands" were in fact available on the market. Feldis Rpt. at 3.

not actual reductions in incidents, reflecting a prioritization of perception inconsistent with industry standards for product development. *Id.* at 119-26.

- The Uber app lacks a clear, dedicated, and intuitive reporting pathway for sexual assault and misconduct incidents, and so does not meet industry standards, especially in light of Uber's internal records documenting that sexual violence is underreported and that improved tools could increase reporting fidelity. *Id.* at 127-30.

A. **Mr. Weiner is qualified to opine on Uber's product development in light of foreseeable safety risks.**

Uber argues that Mr. Weiner is an information technologist who is not qualified to opine as to "safety" or "corporate priorities" on safety. Mot. at 3. This argument mischaracterizes both Mr. Weiner's background and his opinions.

Mr. Weiner's expertise is not limited to "information technology." Mot. at 3. Rather, he is an expert in technology, product development, and software engineering, with 37 years of experience in product development and technology management across a broad range of industries. *See*, *e.g.*, Weiner Rpt. at ¶¶ 1, 7-8, 18. His experience includes decades of managing and consulting with large corporations on product and software development lifecycles—the processes by which organizations design, develop, test, and maintain products and software—in accordance with industry standards. *Id.* at ¶¶ 9-17. In the course of this work, Mr. Weiner has played an integral role in advising companies on the development of consumer-facing software, including mobile applications—like the Uber app—and has evaluated the development of products and features geared toward physical safety of customers, e.g. risk management. *Id.* Mr. Weiner's education and experience make him well-qualified to offer opinions about Uber's product development and risk management processes, and it is those processes—not vague conceptions of "corporate priorities" and "safety risks"—to which his testimony is directed.

Uber next argues that Mr. Weiner is not qualified because his experience "has nothing to do with rideshare technology or features, sexual assault or misconduct, or risk management more broadly." Mot. at 4. Each portion of this argument fails. *First*, Uber can't seem to decide whether Mr. Weiner's expertise is too general (not "rideshare") or too specific (not "risk management"). Like Goldilocks's porridge, Mr. Weiner's expertise in product development is just right. Uber's suggestion that Mr. Weiner lacks required experience with "rideshare technology," if accepted,

1  would mean that the only experts qualified to testify in this case are current or former Uber or

2  Lyft employees. That is wrong: courts "have not drawn such hard industry-specific lines" in

3  evaluating expert testimony. *Chavez v. S.F. Bay Area Rapid Transit Dist.*, 2024 WL 3092153, at

4  *3 (N.D. Cal. June 21, 2024) (rejecting the argument that an expert "is not the right *kind* of

5  industrial hygienist"). There is "no requirement for an expert to be a specialist in a given field,"

6  and "[a]ny lack of specialized industry experience for [an expert] merely go[es] to the weight—

7  not admissibility—of his testimony." *Chandler Gas & Store Inc. v. Treasure Franchise Co. LLC*,

8  2025 WL 3018829, at *7 (D. Ariz. Oct. 29, 2025); *see also Marshall v. RS 2018 Float, LLC*, 2024

9  WL 637487, at *1 (9th Cir. Feb. 15, 2024) (rejecting exclusion based on "the experts' lack of

10  particularized expertise with railcars"); *Rusoff v. The Happy Grp., Inc.*, 2024 WL 5339463, at *4

11  (N.D. Cal. Sept. 27, 2024) ("[E]xperts are not required to have previous experience with the

12  product at issue …. A court abuses its discretion when it excludes expert testimony solely on the

13  ground that the witness's qualifications are not sufficiently specific if the witness is generally

14  qualified.") (citations omitted).

15       *Second*, Mr. Weiner is not testifying as an expert in "sexual assault or misconduct" (of

16  course, Uber moves to exclude Dr. Valliere, Plaintiff's sexual assault expert, as well). Nor does

17  he offer generalized "safety risk" opinions. *See* Weiner Dep. at 135:12-136:7. Rather, Mr. Weiner

18  addresses whether Uber followed industry product development standards, including those

19  requiring an evaluation of and response to foreseeable safety risks. *Id.* at 135:15-136:7, 142:23-

20  143:19; *see also id.* at 67:15-22, 77:20-78:4 (explaining that "every app is going to have risks"

21  and "[i]t is part of product development to manage [those] risks," which can be operational or

22  physical in nature). It is this framework—the intersection of product development and risk

23  management—on which Mr. Weiner is qualified to opine. *See* Weiner Rpt. at ¶¶ 1-21.

24       Uber does not support its argument with any cases involving experts even superficially

25  similar to Mr. Weiner, instead recycling the same ones discussed above with respect to Mr.

26  Feldis. In the leading case, *Blockchain*, the court precluded a party from offering its own

27  employee as an "expert" witness on the valuation of its patents; the proponent did not even

28  defend the testimony under Rule 702, instead asking it be admitted as that of "a lay witness."

2024 WL 5483606, at *8. And in *Chang*, the problem was that a witness had only "knowledge regarding the history of, and purpose for, the issuance of" financial obligations, but tried to opine on a technical subject of whether a particular security was "counterfeit." 207 F.3d at 1172-73. As one court explained, "*Chang* holds that an expert cannot testify on a topic they have no experience with—not that an expert must have a certain level of experience in the specific subject on which they intend to testify." *Fed. Trade Comm'n v. Amazon, Inc.*, 2025 WL 2460658, at *3 (W.D. Wash. Aug. 26, 2025). Here, Mr. Weiner has 37 years of experience in technology, product development, and software engineering, including applying industry-standard design, testing, and post-deployment evaluation methods to determine whether products and features achieve their stated operational goals and safety objectives. *See*, *e.g.*, Weiner Rpt. at ¶ 1.[24]

Uber says that Mr. Weiner's experience is insufficient because Uber presents "different types of risks, technologies, and industries." Mot. at 5. But again, *Daubert* requires only expertise and analysis grounded in it; it does not require an expert to specialize in the particular unique circumstances presented by the case. *See*, *e.g.*, *FinancialApps v. Envestnet, Inc.*, 2023 WL 5289444, at *9 (D. Del. Aug. 14, 2023) (admitting an expert qualified to offer "software development-related opinions," despite lack of "expertise in the narrow categories of software development" relevant to the case); *Vizio, Inc. v. Gemtek Tech. Co., Ltd.*, 2014 WL 10538995, at *7 (C.D. Cal. Aug. 27, 2014) (software development experience was sufficient to qualify an expert to testify about compliance with software development standards, especially where "report demonstrates that he considered a wide range of relevant data concerning [the defendant's] compliance with software development industry standards"); *Benefit Cosms. LLC v. e.l.f. Cosms., Inc.*, 2024 WL 3558848, at *2 (N.D. Cal. July 25, 2024) (concluding product design expert was sufficiently qualified despite lack of experience with cosmetic products specifically).

**B.    Mr. Weiner's opinions are the product of reliable principles and methods.**

To reach his conclusions, Mr. Weiner "review[ed] Uber's internal records, compare[d] its processes to recognized lifecycle standards, and evaluate[d] whether features—including those

---

[24] As explained earlier, Uber's two other cases involved purported "regulatory experts" testifying on products with different regulatory standards than those they had experience with. *See Martinez*, 2022 WL 425206, at *2; *Deitsch Plastics*, 602 F. Supp. 3d at 1335.

1   aimed at safety outcomes—were tested and measured against their stated objectives once

2   deployed." Weiner Rpt. at ¶ 23. Uber's argument that Mr. Weiner's process was not reliable is

3   just more of the same idea that no one can evaluate Uber other than Uber itself.

### 1.  Uber misrepresents Mr. Weiner's analysis.

5   Uber says that Mr. Weiner "repeatedly cites his experience as the basis for his opinion

6   without further explanation" and offers merely a "subjective review of corporate documents."

7   Mot. at 6-7. This contention is demonstrably false. To start, it is well-established that, "unlike

8   scientific or technical testimony" that requires "a particular methodology or technical

9   framework," Mr. Weiner's testimony may be "reliable based on his knowledge and experience."

10  *Hangarter*, 373 F.3d at 1018.

11  Mr. Weiner does not simply invoke his experience and stop there, as Uber suggests. Mr.

12  Weiner explained that he used a "structured analysis" that mirrors the analysis used across large-

13  scale technology-driven organizations. Weiner Rpt. at ¶ 24. Mr. Weiner began by establishing

14  explicit inclusion and exclusion to identify relevant documentation. *Id.* at ¶ 27. It is at this phase

15  that Mr. Weiner relied on his experience to enable him to determine the document types (i.e.

16  Objectives and Key Results, planning documents) that pertained to the product development

17  lifecycle. *Id* at ¶¶ 27, 40.[25]

18  Mr. Weiner next conducted a "staged, systematic search process," consisting of "broad"

19  searches to locate supporting and opposing documentation followed by more refined searches,

20  pulling in only document types that met the pre-established inclusion criteria. *Id.* at ¶¶ 24, 43;

21  Weiner Dep. at 317:6-13. As part of this step, Mr. Weiner gave substantial weight to Uber's own

22  representations to ensure consideration for "the observations and assessments of Uber personnel

23  who were directly involved." Weiner Rpt. at ¶ 43. Then, Mr. Weiner evaluated the documentation

24

25  [25] Uber takes Mr. Weiner's references to the concepts of "meta-analysis" and "peer-review" out of context. At no point does Mr. Weiner suggest that he conducted a meta-analysis in the
26  technical sense. By "meta-analysis," Mr. Weiner means that he had access to the entire fact record in this case and conducted a systemic, multi-step review. Weiner Rpt. at ¶ 25 n.11. And he
27  references "peer-review" only to point out that his "systematic, objective, and reproducible" approach to identifying relevant documents is "consistent with practices outlined in peer-
28  reviewed literature." *Id.* Regardless, Mr. Weiner need not establish a meta-analytic or peer-reviewed process. *See Hangarter*, 373 F.3d at 1018.

1   against his own experience and product development standards identified in his report. *Id.* at

2   ¶¶ 43, 97, 253; *see also* Weiner Dep. at 141:6-16, 318:8-319:8. This is exactly the kind of

3   experience-based testimony that courts consider reliable. *See FTC v. Qualcomm, Inc.*, 2018 WL

4   6460573, at *4 (N.D. Cal. Dec. 10, 2018) (finding experience-based testimony reliable where

5   expert described experience, reviewed voluminous documents, then formed opinions "based on

6   the foregoing personal experience"); *In re Coll. Athlete NIL Litig.*, 2023 WL 8372788, at *3

7   (N.D. Cal. Nov. 3, 2023) (concluding experience-based expert testimony was reliable where it

8   was based on experience and review of relevant data).

9       Uber's assertion that Mr. Weiner relies solely on his experience is based on a single

10   quotation from his deposition, taken out of context. *See* Mot. at 6. Mr. Weiner did not, as Uber

11   claims, "cite[] his experience as the basis for his opinion without further explanation," *id.*, but

12   rather corrected a "characterization of [his] career" made by Uber's counsel when discussing his

13   experience. Weiner Dep. at 43:17-44.16.[26] With respect to his methodology, Mr. Weiner

14   explained his structured analysis at length in both his deposition and report. *See* Weiner Rpt. at

15   ¶¶ 22, 24-25, 43, 97, 253; Weiner Dep. at 317:6-13, 318:8-319:8.

16       The only specific conclusion Uber challenges—that "Uber's Rider App lacked a dedicated

17   and intuitive reporting pathway for Sexual Violence"—is reliably supported. Mot. at 7. Mr.

18   Weiner "conducted in-app walkthroughs … to test the reporting pathways available to riders."

19   Weiner Rpt. at ¶ 258. He also "reviewed Uber's internal records regarding reporting flows and

20   tagging categories, which documented concerns about underreporting, low ticket completion

21   rates, and limitations in Uber's taxonomy for capturing Sexual Violence incidents." *Id.* (footnotes

22   citing to Uber documents omitted). And he explained that his experience-based opinion was

23   "supported by the ISO 31000" standard, a standard that Uber itself purported to apply. *Id.* at

24

---

25   [26] Weiner Dep. at 43:17-44:13 ("Q. You would agree though that a lot of your career was focused
     on the loyalty programs for airlines and car rental companies; is that right? … A: The

26   characterization of my career that way is something I think I need to just address with a clear
     clarification and that is my career over the 37 years that I've been working has been in product

27   development technology leadership and software engineering, and my opinions, as they have
     been enumerated in this report, are based on that career. Those industries, product development

28   for technology companies, have common elements that apply universally and as you've seen are
     documented in certain ISO standards.").

1   ¶¶ 31-34, 258.[27]

2           **2.    Mr. Weiner applied reliable industry standards.**

3           Mr. Weiner applied "recognized lifecycle standards", including: (1) "international

4   standards" concerning "lifecycle management, risk management, and quality assurance that are

5   widely recognized across technology domains;" (2) "structured practices from other safety-

6   critical industries … where technology design decisions have direct consequences for human

7   safety;" and (3) "peer practices and benchmarks from large-scale consumer technology

8   companies, particularly [ones that] have … structured safety programs[] or … risk-mitigation

9   features." Weiner Rpt. at ¶¶ 23, 29. Collectively, these standards "define the expectations for risk-

10  based governance in software product development where foreseeable human safety risks are at

11  stake." *Id.* at ¶ 30.

12          Uber argues that Mr. Weiner's industry standards opinions are unreliable because he

13  selected industry standards "based on his experience related to other industries." Mot. at 7. But, as

14  Mr. Weiner explained, the industry standards for product and software design, such as ISO and

15  IEC standards, are "universal[]," Weiner Dep. at 44:8-13, meaning they apply to the software and

16  product design lifecycle regardless of the specific product or company.

17          Uber critiques Mr. Weiner for relying on ISO Standards, but *Uber itself* purports to rely

18  on the same ISO standard Mr. Weiner applied. Weiner Rpt. at ¶¶ 31-34. Uber says that ISO

19  standards do not set "prescriptive requirements or instruct a company how it should set its

20  objectives." Mot. at 8. But as Mr. Weiner explained, while the ISO standards do not prescribe the

21  specific objectives a company should set, they do prescribe the framework that companies should

22  follow to establish those objectives. *See* Weiner Dep. at 235:3-18, 236:5-9, 237:21-24. Mr.

23  Weiner's opinions explain whether and how Uber adhered or did not adhere to that process.

24  _____

25  [27] The cases Uber cites look nothing like the facts here. In *Walker v. Conagra Brands, Inc.*, 2023 WL 8885148 (C.D. Cal. Sept. 21, 2023), the expert did not explain "what data [he] considered" or "why" the defendants' practices "fell short of the standards" he identified. *Id.* at *8. Here, Mr.

26  Weiner's report does both. In *Farmers Ins. Co. of Ariz. v. DNS Auto Glass Shop LLC*, 2024 WL 1256042 (D. Ariz. Mar. 25, 2024), the expert's report "never describe[d] []his analysis, what it

27  entailed, or what it found." *Id.* at *9. Mr. Weiner's report dispels the comparison. Finally, in *Kamradt v. Esurance Ins. Co.*, 2024 WL 5356886 (W.D. Wash. Nov. 1, 2024), the expert claims

28  to have "reviewed Defendants' claim handling standards and procedures" but in fact did not. *Id.* at *7. Again, there is nothing analogous here.

1    Weiner Rpt. at ¶¶ 94-96, 133 n.154, 269.[28]

2              **3.    Mr. Weiner's methodology does not need to be "testable."**

3        Uber argues that Mr. Weiner's methodology is unreliable because it is not testable. Mot. at

4    8.[29] The "mere fact that [an expert] does not rely on a testable methodology does not render his

5    testimony inadmissible under Daubert." *ConAgra Foods*, 302 F.R.D. at 553. This is particularly

6    true where, as here, this factor is "simply [] not applicable to this kind of testimony, whose

7    reliability depends heavily on the knowledge and experience of the expert, rather than the

8    methodology or theory behind it." *Walker v. AIU Ins. Co.*, 2025 WL 2495066, at *13 (D. Ariz.

9    Aug. 29, 2025) (quoting *United States. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)).[30]

10       **C.    Mr. Weiner's opinions do not reflect impermissible state-of-mind or narrative testimony.**

11

12       As it did with respect to Dr. Drumwright and Dr. Valliere, Uber argues that Mr. Weiner

13   impermissibly discusses "Uber's purported corporate knowledge and intent." Mot. at 9. As

14   before, this argument must be rejected: experts may testify "about what knowledge was available

15   to" a defendant. *Holley v. Gilead Scis., Inc.*, 2023 WL 2469632, at *9 (N.D. Cal. Feb. 27, 2023);

16   *see also* § I.D (Drumwright), II.B.5 (Valliere), *supra*; *King*, 2023 WL 5624710 at *4. Uber pulls

17   scattered sentences from a 134-page report to make it seem like Mr. Weiner offers "state of mind"

18   opinions. The two examples cited reflect objective conclusions based on Uber's conduct, not

19   speculative evaluations of the company's state of mind. *See* Weiner Rpt. at ¶ 126 (looking at

20   "patterns" of conduct to conclude that "safety was a substantially lower priority than growth, cost,

21   or competitive objectives"); *id.* at 106 (concluding that "delayed and constrained [] rollout of"

22

23   [28] Uber says Mr. Weiner "asserts that Uber should have collected additional information from drivers." Mot. at 8 n.4. His report makes no such assertion. *See* Weiner Rpt. at ¶ 243.

24   [29] Uber takes Mr. Weiner's use of the phrase "testable and repeatable" out of context. As is clear
25   from his report, Mr. Weiner meant that he relied on objective standards and documents that
     another expert could rely on as well. That supports, rather than detracts from, the admissibility of
26   his opinions, since another expert can look at the same standards and the same documents, making the analysis repeatable.

27   [30] Uber cites one case in which an expert opined on a particular "baseline" but "could not define
     this baseline in any objective way, nor could he explain the role it played in the actual comparison
28   he made in this case." *United States v. Adams*, 444 F. Supp. 3d 1248, 1260 (D. Or. 2020). Here,
     Mr. Weiner lays out in detail the standards he applied and the conclusions he drew from applying
     those standards to Uber's documents.

1    woman to woman matching despite knowledge of safety benefits reflected "prioritiz[ation]" of

2    "growth and legal-risk avoidance").[31]

3        Uber also argues that Mr. Weiner offers impermissible narrative. But, again, experts are

4    permitted to discuss the facts and data they considered. *See* §§ I.B.2 (Drumwright), II.B.6

5    (Valliere), *supra*; *Glumetza*, 2021 WL 3773621, at *20; *United Food & Com. Workers*, 296 F.

6    Supp. 3d at 1194; *Pinterest*, 2015 WL 2268498, at *3; *Teledyne*, 2018 WL 11352632, at *7.

7    Uber's cases affirm that experts "may, of course, rely on Defendants' documents to support

8    otherwise admissible expert testimony." *O'Bryant*, 2022 WL 7670296, at *13; *accord Siqueiros*,

9    2022 WL 74182, at *9. There is no bar to "narrative" testimony that is helpful to the jury. *See*

10   *YAZ*, 2011 WL 6302287, at *8; *Tylenol*, 2016 WL 807377, at *9. Moreover, objections to

11   testimony as "narrative" do not support pre-trial exclusion; at most, they support objections at

12   trial. *See, e.g.*, *Homyk*, 2025 WL 1547625, at *10; *Actos*, 2014 WL 120973, at *10; *YAZ*, 2011

13   WL 6302287, at *8.

14   **V.    <u>Lacey Keller's testimony is admissible.</u>**

15       Lacey Keller is a data scientist retained to evaluate the number, rates, and trends of sexual

16   assault and misconduct incidents reported to Uber between 2017 and 2024. *See* Keller Rpt. at 5-6.

17   Ms. Keller offers the following opinions:

18   - Uber's analyses show hundreds of thousands of incidents reported in the U.S. from
19     2017 through 2024. *Id.* at 8.

20   - Uber's U.S. Safety Reports disclosed 3% of the incidents reports that Uber received
     from 2017 through 2022. *Id.* at 8-9.

21   - Uber analyzed "precursors" to sexual assault and misconduct incidents, but did not
22     disclose them in its U.S. Safety Reports. *Id.* at 9.

23   - Uber cultivated a data-rich environment from its founding and implemented a
     machine learning algorithm nearly a decade later to "prevent sexual assaults." But,
24     since Uber deployed "S-RAD" in 2022, the company applies the program to only

---

25   [31] Uber's cases are distinguishable. *See* n. 10, *supra*; *Patterson*, 2024 WL 2112376, at *3-4
     (excluding testimony that an employee "would be confused," an opinion that "lacks any
26   analytical foundation"); *Moller*, 2024 WL 5185640, at *7 ("not clear exactly what opinion
     [expert] intends to provide"); *Siring*, 927 F. Supp. 2d at 1078 (excluding opinions that "it does
27   appear quite plausible that the reason for the dismissal was the allegation of alcoholism" and "it
     appears very likely that these actions … were significant in promoting the negative decision");
28   *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1322 (no knowledge testimony involved at all; instead,
     expert excluded for impermissibly interpreting unambiguous contract provisions).

████ of all trips, despite knowing that applying it more broadly would prevent sexual assaults and misconduct. *Id.* at 10.

- Uber collected data on the drivers and incidents in the bellwether cases. *Id.*

Ms. Keller's data analysis has been admitted by multiple federal courts. *See City of Huntington, W. Va. v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 558, 571 (4th Cir. 2025) (relying on Ms. Keller's testimony to reverse defense verdict); *In re: Nat'l Prescription Opiate Litig.*, 2019 WL 3934470, at *1 (N.D. Ohio Aug. 20, 2019) (denying *Daubert* motion); *City & Cnty. of S. F. v. Purdue Pharma L.P.*, No. 18-7591, ECF 1413 (N.D. Cal. June 1, 2022) (Ms. Keller testifying in bench trial before this Court).

Uber argues that Ms. Keller's analysis must be excluded because, in a negligence case about sexual assault on the Uber platform, the number of reports of sexual assault on the Uber platform is irrelevant. The argument is incorrect. The number of reported incidents goes to Uber's knowledge, whether it exercised ordinary care, whether its product is defective, and the recklessness of its conduct. (Uber also ignores the remainder of Ms. Keller's opinions concerning undisclosed reports, risk factors, and S-RAD—those opinions must be admitted regardless).

Uber argues that Ms. Keller's numbers are irrelevant absent some "baseline or some sort of comparison group." Mot. at 2. But the "baseline" is the number of reports that Uber publicly disclosed—3% of the total. Keller Rpt. at 26-34; *see also* Keller Dep. at 78:10-16 (explaining her task was to "compare and contrast what Uber … knew … and what it told the public"). This difference is relevant standing alone: it goes to Uber's efforts to misrepresent the safety of its platform, and also because the evidence shows Uber knew that drivers with prior reported incidents (of the sort Uber did not disclose to the public) were more likely to commit another, more serious incident. *See* Keller Rpt. at ¶ 53. The data are also directly responsive to Uber's defenses. In the JCCP trial, Uber's primary defense was the rate of sexual assault/misconduct on its platform; the company argued that the low rate showed its conduct was not negligent. *See* Ex. 1 (JCCP Trial Tr.) at 74:16-75:3, 3123:2-4. Here, too, Uber provides an expert report by Dr. Stodden that emphasizes that rate and purports to compare it to public transportation rates. Ms. Keller's analysis is relevant because it shows that the rates Uber represents are dramatically

1   understated. *See*, *e.g.*, *United States v. Sanchez-Robles*, 927 F.2d 1070, 1078 (9th Cir. 1991)

2   ("Where evidence is [] relevant to disproving a defense, it may be admitted.").[32]

3       Finally, Uber argues that the only purpose of Ms. Keller's numbers is "shocking the jury

4   with large numbers and alarming events," and so her analysis must be excluded under Rule 403.

5   This attempt to use Rule 403 to make the evidence one-sided must be rejected. The fact that Uber

6   receives hundreds of thousands of reports of misconduct that it does not report to the public (and

7   that its expert Dr. Stodden did not consider) may be prejudicial. But that is only because "relevant

8   evidence is inherently prejudicial." *Hankey*, 203 F.3d at 1172 (citation omitted); *see also Rosales

9   v. Rollag*, 2024 WL 5103023, at *14 (D. Ariz. Dec. 13, 2024) ("Virtually all evidence is

10  prejudicial or it isn't material.") (citation omitted). It "is only *unfair* prejudice, substantially

11  outweighing probative value, which permits exclusion of relevant matter under Rule 403."

12  *Hankey*, 203 F.3d at 1172 (citation omitted; emphasis added). The number of sexual

13  assault/misconduct incidents, in a case about negligence and sexual assault, is not excludable.

14  **VI.    Dr. John Chandler's testimony is admissible.**

15      Dr. John Chandler is a professor of marketing and data science. *See* Chandler Rpt. at 1.

16  Dr. Chandler has evaluated Uber's development of safety-as-a-brand and the ways in which Uber

17  focused on perception of safety. *Id*. at 6. He offers the following opinions:

18  - Uber's Safety-as-a-Brand: Uber's early marketing activity was dedicated to
      establishing its brand, fostering rapid growth, and allaying consumer fears about
19    safety. *Id*. at 6. Safety was one of the foundational qualities with which Uber wanted
      to be associated, and one Uber advertised persistently. *Id*. Uber saw safety as essential
20    to its brand identity and as a tool to expand and retain its user base. *Id*. at 7. Uber
      targeted its marketing at specific groups, especially women, to expand its user base by
21    building trust in its brand reputation as a safe company. *Id*. Uber's safety team
      operated within or in concert with the marketing department, rather than as a separate,
22    independent entity. *Id*.

23  - Perception of Safety: Uber's safety branding was generally focused on the perception
      of safety, rather than communicating accurate information about safety. *Id*. Uber's
24    safety branding was primarily measured internally via changes to consumer sentiment.
      *Id*. Uber's safety-as-a-brand strategies were often presented to employees without
25    empirical information on driver and rider safety. *Id*. Uber's public communications

26  _____

27  [32] None of the cases Uber cites is remotely similar because none involved statistics of a known
    risk that should guide a defendant's conduct. *See People v. Wilson*, 33 Cal. App. 5th 559, 568
    (2019) (testimony on the rate of "false allegations of child sexual abuse" to bolster victim
28  credibility); *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 807-08 (N.D. Ohio 2004)
    (flawed statistical comparison of adverse event reporting meant to show design defect).

and safety-as-a-brand marketing directly contradict or misrepresent its internal practices as a company. *Id.* Uber's safety messaging was ramped up in response to public scandals, and was used to reinforce the brand image despite lapses in safety. *Id.* When Uber provided information as part of its safety marketing, it provided, at most, general safety information, rather than information that would help a user make informed decisions about the risk of sexual assault or misconduct. *Id.* That safety information was designed primarily to reassure, rather than inform, consumers. *Id.* Uber possessed trip and incident data that would allow it to make users and potential users informed about the relative risks of using its platforms. *Id.* This information was not shared in transparent ways with consumers. *Id.*

- Uber's safety messaging fell below industry ethical norms. *Id.* at 8. At Uber, safety became a rhetorical strategy to recruit both passengers and drivers, even when Uber's service was not as safe as its branding content declared. *Id.* Uber's marketing team did not conduct itself responsibly when it engaged in safety-as-a-brand marketing that contradicted the empirical reality of its safety practices and the prevalence of incidents on its platform. *Id.*

- Uber sent the bellwether Plaintiffs extensive branded messaging touting the safety of the platform. *Id.* Uber's branding strategies and marketing communications with the bellwether Plaintiffs repeatedly fell below ethical industry standards. *Id.*

- Opinion Related to Uber's Safety Data: Dr. Chandler models the true rate of sexual assault/misconduct incidents on Uber's platform. *Id.* at 91-96.

- Opinions Rebutting Uber's Statistical Expert: Uber's expert Dr. Victoria Stodden opines that Uber is "orders of magnitude safer than relevant public transportation options." Stodden Rpt. at 8. Dr. Chandler explains that Dr. Stodden:

  o Reaches erroneous conclusions driven by failure to use generally accepted statistical principles and methods. *See* Chandler Reb. Rpt. at 1. She attempts to draw inferential conclusions without applying the necessary, basic statistical principles to do so. *Id.* at 1-2. Had Dr. Stodden followed statistical convention, her conclusions would have been vastly different. *Id.*

  o Omits necessary context that is essential to extend her conclusions to the facts of the bellwether cases. *Id.* at 2. Dr. Stodden's report consists largely of numerically invalid (and thus irrelevant) numerical comparisons, while ignoring relevant numbers that refute her opinions. *Id.*

  o Departs from standard, professional practices of data-driven communication and offers misleading, unqualified, and over-the-top conclusions. *Id.*

Dr. Chandler's testimony has been admitted by multiple federal courts. *See, e.g.*, *In re JUUL*, 2022 1814440, at *18 (denying motion to exclude Chandler's marketing opinions); *Favell v. Univ. of S. Cal.*, 2024 WL 5694655, at *5-6 (C.D. Cal. Nov. 13, 2024) (same).

### A.     Dr. Chandler's marketing opinions are admissible.

Dr. Chandler applies his marketing expertise and a rigorous review of the record in this case to offer opinions about Uber's "brand identity," i.e., "the identity and reputation of [the]

1   company in the minds of customers." Chandler Rpt. at ¶¶ 30-31.

2           1.      **Dr. Chandler's marketing opinions are not impermissible narrative.**

3           Uber repeats its most common argument: that Plaintiff's experts are not permitted to

4   analyze Uber's documents and the testimony of its witnesses because doing so is "nothing more

5   than [] regurgitation." Mot. at 3. That is not true: Dr. Chandler describes at length his data mining

6   methodology. *See* Chandler Rpt. at 8-9. Dr. Chandler's expertise, including 25 years in

7   marketing, allow him to understand Uber's marketing strategies and how they relate to branding

8   in ways that the average layperson cannot. *See* Chandler Dep. at 485:13-15 ("I would not have

9   been able to interpret the documents that I was analyzing without my extensive marketing

10  experience.").

11          More fundamentally, "there is nothing that is *per se* improper in [an expert's] inclusion in

12  h[is] report of a detailed fact section explaining the basis of h[is] opinions." *Focal Point*, 2020

13  WL 5760355, at *7. As explained several times above, *see* §§ I.B.2 (Drumwright), II.B.6

14  (Valliere), IV.C (Weiner), *supra*, it "is common, indeed, required, under Rule 26(a)(2), for an

15  expert to summarize the facts and data considered in their report. [An expert's] testimony at trial

16  must remain tethered to the expert opinion he provides, but he must be allowed to discuss facts

17  apropos to those opinions." *Glumetza*, 2021 WL 3773621, at *20; *see also In re JUUL*, 2022 WL

18  1814440, at *18 (denying motion to exclude Chandler's "summary of marketing documents and

19  events as impermissible narrative"); *United Food & Com. Workers*, 296 F. Supp. 3d at 1194;

20  *Pinterest*, 2015 WL 2268498, at *3; *Teledyne*, 2018 WL 11352632, at *7. Uber's argument is

21  hard to take seriously: had Dr. Chandler listed his conclusions *without* describing what he found

22  in the record to support them, no doubt Uber would move to exclude them as speculative.

23          In any event, there is no bar to "narrative" testimony that is helpful to the jury. *See YAZ*,

24  2011 WL 6302287, at *8; *Tylenol*, 2016 WL 807377, at *9. Moreover, objections that his

25  "testimony contains improper narrative … are better made at trial." *Homyk*, 2025 WL 1547625, at

26  *10; *see also In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at *41 (N.D.

27  Fla. Feb. 28, 2021) ("The Court will not issue a 'blanket ban' on discussions of internal

28  documents and declines to parse the experts' reports and depositions for statements that may

1    cross the line into improper factual narration.").

2         Each of the examples Uber cites reflects appropriate discussion of the "facts and data" Dr.

3    Chandler considered to support his opinions concerning Uber's brand reputation and efforts to

4    retain it. For example, Uber objects to Dr. Chandler's discussion of an email discussing Uber's

5    "safety fee," Mot. at 3, but that portion of Dr. Chandler's report shows how the email supports his

6    conclusion that Uber "create[d] a brand image around safety." *See* Chandler Rpt. at 42-43.

7    Experts are permitted—indeed, encouraged—to lay out their logical reasoning in just this manner.

8    The same is true of Dr. Chandler's discussion of a 2015 "proactive media campaign." *Id.* at 48.

9    Dr. Chandler uses this document to conclude that Uber's safety branding was a core characteristic

10   of the company's marketing, that "as trust in Uber's brand faltered, it repeatedly reasserted its

11   identity as a safe way to get a ride," even as it learned of information "that it was not as safe as its

12   branding content repeatedly declared." *Id.* at 23.

13        Uber argues that the jury is "equally capable" of analyzing Uber's branding, but courts

14   disagree. *See Roblox*, 2024 WL 4057418, at *4-5 ("game studies" expert permitted to testify on

15   appearances of online avatars); *Montera*, 2022 WL 1225031, at *5 ("Dr. Rucker's testimony

16   concerning general marketing principles, the marketing strategies at play for Joint Juice, and

17   Defendant's intended message and target audience are admissible."); *Counts v. Gen. Motors LLC*,

18   606 F. Supp. 3d 547, 570 (E.D. Mich. 2022) (admitting "qualitative content analysis of GM's

19   advertisements," and explaining that "the systematic observation and description of

20   communication materials [is a] methodological technique [] widely used in the social sciences,

21   including …communication, and marketing") (citation omitted); *Active Sports Lifestyle USA LLC

22   v. Old Navy, LLC*, 2013 WL 11239385, at *11-12 (C.D. Cal. Nov. 21, 2013) (denying motion to

23   exclude "marketing expert['s]" opinions regarding a company's "brand identity").

24        Dr. Chandler does not merely summarize the contents of advertisements, but instead

25   analyzes the company's efforts to build and maintain its "brand reputation."[33] He uses those

26   ---

[33] In *Burrows*, 2022 WL 3346419, the court could not discern any methodology in the report, and
27   the expert's analysis was limited to factual statements such as the "defendant uses the line, '[a]
      complete safety solution in the palm of your hand.'" *Id.* at *5. Uber's remaining cases are off
28   point. As addressed above, those cases repeat the general rule that experts may testify to the bases
      for their opinions. *See Siqueiros*, 2022 WL 74182, at *9; *O'Bryant*, 2022 WL 7670296, at *13.

1   findings to then opine on whether Uber's marketing prioritized perception over safety and, in so

2   doing, fell below industry standards. *See* Chandler Rpt. at ¶¶ 20-21.[34] Both the application of

3   technical marketing concepts and the resulting conclusions are appropriate for expert analysis.

4          Finally, after arguing that Dr. Chandler discusses too many Uber documents, Uber says he

5   did not analyze enough—that his analysis is too "selective." Mot. at 4. The fact that Dr. Chandler

6   "reviewed over 10,000 documents" using keyword searches and other "techniques from text

7   mining," before selecting "illustrative examples of the themes and patterns [he] uncovered," only

8   demonstrates the rigor of his work. Chandler Rpt. at ¶¶ 25-26; *see also* Chandler Dep. at 484:23-

9   485:5 ("In addition to performing searches against 2 million documents and more extensive

10  analysis of over 10,000 documents, I read dozens of depositions …."). In any event, Uber's

11  argument goes to cross-examination, not exclusion: if an expert has "a sufficient basis to support

12  an opinion, the fact that the expert has not read every single [document] that exists will raise a

13  question of weight and not admissibility." *Dominguez v. Wallick & Volk Inc.*, 2024 WL 3924714,

14  at *2 (D. Ariz. Aug. 23, 2024) (quoting Fed. R. Evid. 702, advisory committee note, 2023

15  amendment).[35]

16                    **2.      Dr. Chandler's marketing opinions are not speculative.**

17          Uber argues that Dr. Chandler's marketing opinions are speculative because he did not

18  conduct a survey. Instead, in evaluating how Uber's marketing affected consumers, he relied on

19  scholarship and internal company documents (including surveys). *See*, *e.g.*, Chandler Rpt. at ¶ 85.

20  As explained above with respect to Dr. Drumwright, this argument must be rejected. *See* § I.A.2,

21  *supra*; *see also In re JUUL*, 2022 WL 1814440, at *18 (denying motion to exclude Chandler's

22  "opinions on consumer perception … as unreliable and lacking in an accepted methodology," and

23  explaining that "Chandler may rely on his extensive relevant experience—along with his review

24

25  [34] Uber cites *Sanchez v. Bos. Sci. Corp.*, 2014 WL 4851989 (S.D.W. Va. Sept. 29, 2014), in
    which the expert's actual opinion—"what course of action [the defendant] should have taken"—

26  lacked any actual support, leaving only narrative description of "what [the defendant] did or did
    not do." *Id.* at *31. Dr. Chandler's opinions are, in contrast, fulsomely supported. Indeed, Uber's

27  arguments amount to the claim that his opinions are too-well supported.

    [35] Uber cites *Repa*, 2022 WL 1522360, but in that case, the entirety of the experts' "opinions"

28  consisted of five "bullet points … summariz[ing] witness testimony and draw[ing] credibility
    conclusions." *Id.* at *3. That case has no comparison to Dr. Chandler's extensive, detailed report.

of [the defendant's] own documents and identified research and publications—for his opinions on these topics").[36]

The only particular opinion Uber targets with this argument is Dr. Chandler's analysis of Uber's Safety Reports. Mot. at 5. Here, he uses his expertise in marketing and data science to analyze how Uber "frames statistics." Chandler Rpt. at 73-77. He explains that "[t]he organization of the reports de-emphasizes the scope and frequency of safety risks" and that Uber "consistently frames statistics in a way that makes incidents seem rare, rather than giving readers the statistics in ways that encourage understanding." *Id*. at 74. Uber says that, in order to explain to the jury why the Safety Reports are misleading, Dr. Chandler was required to conduct a survey. Again—courts routinely reject this argument. *See, e.g.*, *Blue Bottle*, 2023 WL 6850573, at *6. Dr. Chandler is an expert in analyzing marketing and data science; he does not need a survey to explain, for example, why presenting charts without a y-axis is misleading. *See* Chandler Rpt. at ¶¶ 157-58. While his reliance on Uber's own documents (such as internal dissent over the Safety Reports) supports his opinion, it would nonetheless be supportable based on his expertise alone.[37]

### 3. Dr. Chandler's opinion that Uber's marketing fell below industry standards is relevant.

Dr. Chandler explains that Uber's marketing fell below industry ethical standards published by the marketing industry associations (and reflected in the FTC's advertising rules). Chandler Rpt. at 20-22.

*First*, Uber argues that Dr. Chandler's marketing ethics opinions "are irrelevant because Plaintiffs' claims … turn on legal standards, not ethical ones." Mot. at 6. Dr. Chandler does not contend that these standards are legally binding, only that they inform the jury's evaluation of Uber's conduct under the standard of care in marketing applicable to industries that Uber is part of. To put it another way, the standards discussed by Dr. Chandler help the jury determine

---

[36] Uber repeats its reliance on inapposite cases. *See Pfizer*, 461 F. Supp. 2d 271 at 277 (a rheumatologist—not a marketing expert—sought to testify "on the prescribing practices and general understanding of all physicians"); *Insolia*, 53 F. Supp. 2d at 1041 (at summary judgment, expert did not cite "anything that would demonstrate the actual impact of tobacco industry advertising on the ordinary consumer").

[37] In the only case Uber cites, *Johns*, 2013 WL 1498965, the expert offered no analysis whatsoever—11½ pages of 12-page report were synopsis. *Id*. at *28.

1    whether Uber exercised reasonable care, the relevant "legal standard." It is typical for experts to

2    advise the jury on compliance with industry standards.[38]

3         Whether Uber is a "member" of marketing associations does not determine categorically

4    that the standards those associations publish are irrelevant to Uber's conduct. *See*, *e.g.*, *King*,

5    2023 WL 5624710, at *6 ("Defendants' challenge to these opinions bears on their weight rather

6    than their admissibility. Defendants can challenge the applicability and persuasiveness of these

7    ethical standards through cross-examination and the presentation of contrary evidence."); *In re*

8    *JUUL*, 2022 WL 1814440, at *22 (explaining that "[t]he differences between ethics, standards,

9    and legal requirements can be explored on cross-examination and are not reasons for

10   exclusion").[39] Indeed, Uber's 30(b)(6) witness, Elizabeth Ross, claimed that the same principles

11   Dr. Chandler distils from the industry standards *do* govern Uber's marketing. *See* Chandler Rpt.

12   at ¶ 53 n. 40 ("Q: [Y]ou told me that you agreed that one of the things that's important in Uber's

13   marketing is that that marketing be truthful, right? A. Yes. Q. That that marketing be accurate,

14   right? A. Yes. Q. That the marketing not be misleading, right? A. Yes.") (quoting deposition).

15        *Second*, Uber argues that its "ethical character" is not relevant and unduly prejudicial.

16   Mot. at 6-7. But Dr. Chandler does not opine on Uber's morality or ethics in the abstract; rather,

17   he gauges the company's marketing against articulated, concrete, third-party standards for

---

18

19   [38] *See*, *e.g.*, *Hangarter*, 373 F.3d at 1016-17; *Holmes*, 2021 WL 2035177, at *4-5; *DePuy*, 2016
20   WL 6271474, at *5 ("[O]pinions on ethical standards may be helpful to a jury when ethical
     obligations are of consequence to the issues to be decided by the jury, such as … a physician's
21   standard of care in claims of negligence. … The ethical standards at issue here include published
     industry standards, which are a valid source when looking to the applicable standard of care."); *In*
22   *re JUUL*, 2022 WL 1814440, at *20 (rejecting argument that testimony should be excluded
     because the standards the expert invoked were "inapplicable" and so her opinions were "lacking
23   in fit," and explaining that "[w]hether the marketing conduct violated norms like those [cited] can
     be explored on cross-examination").

24   [39] Uber cites *Rezulin*, but in that case the experts conceded that "their opinions concerning
     purported ethical standards [were] based on their personal, subjective views," making the
25   opinions "so vague as to be unhelpful." 309 F. Supp. 2d at 543; *see also DePuy*, 2016 WL
     6271474, at *5 (rejecting reliance on *Rezulin*). The two other cases cited—*Zetz*, 644 F. Supp. 3d
26   at 703, and *Liberty*, 2013 WL 524587, at *7—did not involve expert testimony regarding industry
     ethical standards at all. In the final two cases, the experts did not rely on objective standards at all.
27   *See Cessna*, 2009 WL 1357234, at *3 (testimony based on "basic moral rights," not objective
     standards); *Welding*, 2005 WL 1868046, at *18 ("seven ethical principles" the expert asserted
28   apply to "all modern businesses").

marketing. That "Uber's safety branding was generally focused on the *perception* of safety, rather than communicating accurate information about safety," Chandler Rpt. at 7, may or may not be "wrongful and immoral," Mot. at 7; regardless, it is relevant to negligence, apparent agency, and punitive damages. *See* § I.B.1, *supra*.

Uber's argument is particularly problematic because the conduct Dr. Chandler criticizes, such as the Safety Reports, is exactly what Uber touts in its own defense. *See* Ex. 1 (JCCP Trial Tr.) at 79:16-23 ("Because before Uber released a safety report … no other rideshare company and no other transportation company, and I would submit no other major public consumer company had done anything like it … an unprecedented bold move to release this kind of data."). Uber may not use Rule 702 to permit the jury to see only one side of a disputed fact question.

### 4.     Dr. Chandler does not impermissibly opine on state of mind.

As Dr. Chandler explained in his deposition, although he testified about information available to Uber, he does not offer opinions on the company's state of mind or intent. *See* Chandler Dep. at 191:10-17.

### B.     Dr. Chandler's statistical analysis of Uber's Safety Reports is admissible.

Dr. Chandler takes the number of sexual assault and misconduct incidents reported to Uber and, using measures of underreporting rates, estimates the true number of sexual assault and misconduct incidents on the platform. This analysis is admissible.

### 1.     Dr. Chandler's analysis is not "educated guesswork."

Uber seeks to exclude Dr. Chandler's analysis because, as he forthrightly acknowledged, statistical estimates are just that—estimates. Uber conflates statistical uncertainty (a fundamental statistical principle that is measured in any reliable statistical analysis) with unreliable guesswork.[40] It is impossible to estimate anything with "infinite precision," Mot. at 8; nevertheless, statistical models are regularly admitted so long as the methodology is sound. *See, e.g.*, *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 472 (N.D. Cal. 2025) ("reasonable estimates"); *Miller v. Travel Guard Grp., Inc.*, 2023 WL 7106479, at *8 (N.D. Cal. Sept. 15,

---

[40] Uber mis-quotes Dr. Chandler's deposition. He never said that his "model can misstate[] the number of incidents." Mot. at 8. Instead, he candidly acknowledges the "variability" of any statistical model. Chandler Dep. at 371:17-372:19.

2023) ("While Defendants may disagree with Mr. Fanoe's estimates, Mr. Fanoe provided a rationale for his calculations based on the data he reviewed."); *see also Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) ("As a general matter, so long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702.").[41]

Uber makes the remarkable argument that the true rate of sexual assault on its platform *does not matter*: that Uber's self-serving published numbers are "the relevant data." Mot. at 8. But Uber has made the purportedly low "rate" of sexual assaults the center of its defense in this litigation, for example through Dr. Stodden's report. *See* Ex. 1 (JCCP Trial Tr.) at 74:16-75:3, 3123:2-4 (touting rates in opening and closing). Uber claims that underreporting does not go to "Uber's knowledge and alleged liability," but Uber knows that sexual assault and misconduct are underreported. *See* Valliere Rpt. at 7.

Uber highlights one 2017 incident-category where Dr. Chandler's estimates of the true number of incidents came in below the number of reports received by Uber. Mot. at 8. As Dr. Chandler explained in his report and deposition, no statistical model is a perfect fit. But his model is "well calibrated" because its "95% predictive interval of expected" incident report "includes the actual counts for 163 of the 176 year-incident combinations (93% coverage)." Chandler Rpt. at App'x D ¶ 14; *see also* Chandler Dep. at 370:2-371:9. In fact, as he explained, "[m]ost values outside the posterior intervals are from 2017," Chandler Rpt. at App'x D ¶ 14, which "appears to have some systemic variation on the … way incidents are classified or counted," Chandler Dep. at 372:1-19.

Uber also highlights one data point in 2022 (the Parent Category Usage Tracking category) where Uber received 0 reports, but Dr. Chandler's model estimates 492. Again, his report explained that the model tended to produce higher-than-expected disparities for that one

---

[41] Uber cites *In re Hanford Nuclear Rsrv. Litig.*, 894 F. Supp. 1436 (E.D. Wash. 1995), but in that case the expert lacked "definitive data," was "unable to model," and presented a "mere projection." *Id.* at 1448. Uber's other cases did not even involve statistical evidence. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 747-48 (3d Cir. 2000); *Lightell v. State Farm Fire & Cas. Co.*, 2009 WL 5217087 (E.D. La. Dec. 31, 2009); *Norman v. State Farm Fire & Cas. Co.*, 2014 WL 6477889, at *4 (D. Colo. Nov. 19, 2014).

1    category (the reason being that the category reflected inadequately coded events and was a

2    category Uber *stopped using* in 2022). Chandler Rpt. at App'x D ¶ 14; *see also* Keller Rpt. at 34

3    & App'x B p. 5. The point is: "This is part of the modeling process" and does not show

4    unreliability. Chandler Dep. at 372:1-19; *see also, e.g.*, *Olean Wholesale Grocery Coop., Inc. v.*

5    *Bumble Bee Foods LLC*, 31 F.4th 651, 675-76 (9th Cir. 2022) (en banc) (affirming order that

6    "noted that most regressions models will fail one or more tests if enough are run, even if the

7    model is statistically sound"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at

8    *10 (N.D. Cal. Feb. 21, 2012) (admitting statistical model despite its calculation of "a negative …

9    overcharge" in one year, among other errors").[42]

10                    **2.    Dr. Chandler employed a reliable statistical methodology.**

11            Uber argues that Dr. Chandler blindly applied a methodology developed to identify sexual

12    assault on college campuses. Mot. at 9. That is not true. To marry the known (reported incidents)

13    with the unknown (unreported incidents), Dr. Chandler adapted a model originally developed to

14    estimate underreporting of sexual assault on college campuses—the Bradshaw model. *See*

15    Chandler Dep. at 357:25-359:6. He did not simply deem the model "readily applicable," Mot. at

16    9, but instead modified it to account for "using a different dataset." Chandler Dep. at 358:7-359:6;

17    *see also id.* at 359:16-25 ("The analogy that is coming to mind is like preparing a recipe. And so

18    you might have slightly different ingredients, but you might be both making an omelet or

19    something like that. And so we are constructing similar types of estimates appropriate for the

20    areas where our modeling is taking place with the data we have in hand, and so the ingredients or

21    the covariates are different."). So, for example, where "Bradshaw and Blei [used] covariates

22    related to the colleges where they gathered their data, so things like the number of students, the

23    fraction of the student body that is female, the geographic location of the college," Dr. Chandler

24    "uses[] number of rides and incidents." *Id.* at 360:24-361:5.

25            Uber says that Dr. Chandler ignored "limitations" in the Bradshaw model, but those

26    _____

27    [42] Uber's criticism that Dr. Chandler's model does not account for the estimated 1% false-report rate goes to weight, not admissibility. *See, e.g.*, *Grace v. Apple, Inc.*, 328 F.R.D. 320, 341 (N.D. Cal. 2018) ("[A]ssertions … that models were flawed owing to their failure to include this or that

28    variable are prototypical concerns that go to weight, not admissibility.") (internal quotation marks and alterations omitted).

1    "limitations" are fruit for cross-examination, not exclusion—if they are even that. Uber ignores

2    that those "limitations" largely *support* applying the model to Uber. For example, Uber highlights

3    the problem of "incorporating series victimization" in "national crime estimates." Mot. at 10. But

4    "series victimization" means "repeat victimizations of the same individual," such as in "intimate

5    partner violence." Mot., Ex. 9 at 3162. That may be a concern in modelling college campus

6    assault, but not when it comes to Uber. Similarly, Uber complains that the Bradshaw authors

7    cautioned that the degree of underreporting "varies widely among schools." Mot. at 9. Again, that

8    problem may apply to college campuses; it does not apply to Uber, which has always taken a

9    national approach to its sexual assault reporting.[43]

10       Next, Uber argues that Dr. Chandler "departed from the Bradshaw article's methodology

11   in a number of respects." Mot. at 10. Of course, just a few pages earlier, Uber avers that Dr.

12   Chandler applied the model too blindly. Both things cannot be true. All that Uber shows is that

13   Dr. Chandler, as he set out to do, adapted the model for "using a different dataset." Chandler Dep.

14   at 358:7-359:6; *see also* Mot. at 10 (criticizing using incident categories rather than schools). For

15   example, Dr. Chandler used as "covariates ... annual rides" and "annual counts of incident types,"

16   since those statistics will correlate with number of sexual assaults in Ubers (as opposed to

17   variables like "number of students"). *See* Chandler Dep. at 367:6-21. Uber muses that Dr.

18   Chandler did not "estimate[] the number of incidents for each vehicle," Mot. at 10, but never

19   explains why that would be meaningful (it would not be). Further, Uber criticizes Dr. Chandler

20   for using "a negative binomial distribution" rather than a "Poisson distribution." Mot. at 10. But,

21   as he explained, the "negative binomial" approach, while similar, "allows [for] more conservative

22   modeling assumptions." Chandler Dep. at 361:10-20. This is sound and careful statistical work.

23   Uber's criticisms (to the extent they are even criticisms) go to weight, not admissibility.[44]

24       Finally, Uber says that Dr. Chandler made unsupported "assumptions" about the data he

25   ─────────────────

26   [43] *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075 (S.D. Fla. 2022), *appeals pending* (11th Cir. No. 23-13182), considered an application of the Bradford-Hill analysis, which

27   turns on which studies the expert selects and how much weight they are given. *See id.* at 1186. The case has nothing to do with Dr. Chandler's standard adaptation of a statistical model.

28   [44] Uber cites more cases that do not involve statistical experts. *See Pascal v. Nissan N. Am., Inc.*, 2022 WL 19076763, at *17 (C.D. Cal. Dec. 21, 2022); *Gier v. Educ. Serv. Unit No. 16*, 66 F.3d 940, 943-44 (8th Cir. 1995).

used, but those "assumptions" are merely variables—like it being purportedly easier to report to Uber than the police—that Uber thinks Dr. Chandler should have considered. Mot. at 10. Failure "to include this or that variable" is not grounds for exclusion. *Grace*, 328 F.R.D. at 341. Uber is also factually wrong: Dr. Chandler explained that there's no "evidence that Uber did get more reports … than college campuses might get." Chandler Dep. at 205:7-13; *see also id.* at 206:2-21 (noting, for example, the driver "might know [the rider's] location or their home address"). In fact, the evidence shows otherwise—that "Uber recognized that …'there is a high likelihood of underreporting of incidents and behaviors on our platform – due to unintuitive reporting feedback flows, societal influences, and a prevalent belief that we will not act on the information.'" Valliere Rpt. at 7 (quoting Uber deposition). Indeed, Uber identified the same problem Dr. Chandler did—"the fact that the assailant may have the victim's home address." *Id.* (citing Uber documents). Last, Uber criticizes Dr. Chandler's model on the basis that he assumed "the same NCVS data could be applicable for all incident categories, even though Dr. Chandler acknowledged that 'the scale of under-reporting varies by incident type.'" Mot. at 10. Uber confuses Dr. Chandler's methodology. Dr. Chandler did *not* assume that the NCVS underreporting data alone is the most reliable metric for determining underreporting of each incident type to Uber. Instead, his model considers both the NCVS data *and* Uber's own incident count data. Rather than simply applying the same NCVS data to all incident categories (as Uber misstates), Dr. Chandler's model uses Uber's incident count to address that the underreporting rate might vary by incident type. To the extent Uber's challenges to what it labels "assumptions" have any merit at all, it may pursue those lines of inquiry on cross-examination.[45]

### C.    Dr. Chandler's analysis of Uber's communications with Ms. Dean is admissible.

Dr. Chandler analyzes the frequency, channels, and content of the messages with which Uber bombarded the Wave 1 Bellwether Plaintiffs, including Ms. Dean. *First*, Uber criticizes the analysis of messages to Dean because *Uber* failed to produce the content of the in-app

---

[45] Uber again relies on cases that did not even involve statistical modelling. *See Morrison v. Quest Diagnostics Inc.*, 2016 WL 3457725, at *4 (D. Nev. June 23, 2016); *Wason v. Shalala*, 1993 WL 192979, at *3 (D. Or. June 2, 1993); *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

communications, push notifications, and voice messages to her. Mot. at 11; *see* Chandler Rpt. at 101-02. For Dean (unlike the other Plaintiffs), Dr. Chandler therefore analyzed the content of the "complete" "email records" and found that 73% "included messages about safety." *Id.* Uber does not explain why this conclusion is unreliable—the jury may decide whether to extrapolate Dr. Chandler's findings to other communications channels. *Second*, Uber complains that Dr. Chandler did not do a "line by line" review of the messages. Mot. at 11. Instead, he employed a "systematic keyword analysis," Chandler Rpt. at ¶ 208 n. 214, backed up by "quality assurance checks," Chandler Dep. at 397:2-16. That an analysis of tens of thousands of messages may include some "false positives," Mot. at 11, just as it assuredly includes false negatives, is not a basis for exclusion. *See, e.g.*, *City of Philadelphia v. Bank of Am. Corp.*, 2023 WL 6160534, at *7 (S.D.N.Y. Sept. 21, 2023) ("[T]o the extent Defendants identify false positives at all, their objection does not undermine the workability of Dr. Schwert's models and goes, once again, to weight, not admissibility.").[46]

Finally, Uber argues that Dr. Chandler does not know if Plaintiffs saw any of Uber's messages. But Dr. Chandler identifies—for Plaintiff Dean alone—1,124 push notifications, 875 emails, 649 in-app communications, 7 intercom text messages, and 15 text messages. Chandler Rpt. at 101. These are not television or even social media ads, but direct statements to a single person's phone. Uber cannot seriously maintain that this barrage of messaging did not reach Dean.[47] *See* Drumwright Dep. at 44:10-23 (discussing academic research finding a "mere exposure effect that has demonstrated that people are affected by ads even when they don't remember the specific ad").

### D.    Dr. Chandler's rebuttal to Dr. Stodden is admissible.

Uber's motion against Dr. Chandler's rebuttal report is, like the Stodden report itself, rife

---

[46] Yet again, Uber fails to cite any cases involving data analysis or statistics. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

[47] It makes no sense to compare, as Uber does, this high-volume communication to a single person through several different channels, to cases where experts aim to establish "reach" to a broad population. *See Ono v. Head Racquet Sports USA, Inc.*, 2016 WL 6647949, at *11 n.10 (C.D. Cal. Mar. 8, 2016). Uber also cites *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018), but that case wasn't even a "reach" case; there, the expert opined without support on the identity of product purchasers. *Id.* at 1031-32.

with misrepresentations. Start with the beginning—Uber says that Dr. Chandler's "rebuttal report does not call into question … the methodology on which [Dr. Stodden's] calculations are based," Mot. at 2, but that is not true. Dr. Chandler, as illustrated by his detailed rebuttal report, identifies numerous fatal flaws with Dr. Stodden's methodology. Uber's arguments should be rejected. To the extent the Court permits Dr. Stodden to testify at all, it should also permit Dr. Chandler to explain the errors in her analysis.

*First*, Uber argues that Dr. Chandler states "Uber rides are statistically riskier," but does not "clarify *what* 'Uber rides are riskier *than*." Mot. at 12. This statement is false. Dr. Chandler explains:

> Had the Stodden Report followed statistical convention, its conclusions would have been vastly different. The Report would have had to acknowledge that Uber rides are statistically riskier than Uber has disclosed to the public and as represented in the Stodden Report. This is particularly true for women under conditions known to Uber: pickups late at night, near a bar, when the rider is alone, and has been drinking.

Chandler Reb. Rpt. at 2. The comparator is Dr. Stodden's analysis, which in turn parrots Uber's public disclosures.

*Second*, Uber says that Dr. Chandler's rebuttal is "rife with errors," but identifies only one error (switching Uber and Lyft). Mot. at 13. One (conceded) error does not make a report "rife with errors." *See*, *e.g.*, *Scott v. AT&T Inc.*, 2025 WL 1892819, at *2 (N.D. Cal. July 9, 2025) ("several discrete mistakes … go to weight, not admissibility"). The other "errors" Uber cites are not errors at all. Dr. Chandler explains that Dr. Stodden compares apples to oranges—reported Uber sexual assault and sexual misconduct incidents to proportion of public transit survey respondents answering "yes" to having experienced or witnesses sexual assault or rape on an anonymous survey." Chandler Reb. Rpt. at ¶ 25. Dr. Chandler discusses how Dr. Stodden ignored "two relevant surveys from 2018" concerning Uber "that align with the Transportation Surveys" Dr. Stodden used. *Id.* at ¶¶ 68-69. Dr. Chandler observed first that the proportion of respondents reporting a sexual advance or inappropriate touching was 3%—much higher than the numbers Dr. Stodden used. *Id.* at ¶ 70. And he also observed that she could have, but did not, compared questions asked on both sets of surveys regarding "feelings of safety" in general, which would have revealed that Uber riders felt "more unsafe" than public transportation passengers. *Id.* at

¶¶ 74, 77. Dr. Chandler does not ignore the difference between sexual assault and other safety issues; he just illustrates all of the data Dr. Stodden ignores in favor of inappropriate, unreliable calculations.[48]

    *Third*, Uber argues that Dr. Chandler's rebuttal of Dr. Stodden veers into attorney argument. Not so. Dr. Chandler explains how Dr. Stodden's report violates any number of fundamentals of statical analysis, fundamentals that are appropriately the subject of expert testimony. *See*, *e.g.*, *id*. at ¶ 22 (statistically significant relationships); *id.* at ¶ 23 (sample size); *Id.* at ¶ 25 (comparing non-comparable measures); *id.* at ¶¶ 26-30 (inappropriate ratios); *id.* at ¶¶ (42-48 (applying Dr. Stodden's methodology and reaching absurd results). Uber objects to the tone of Dr. Chandler's report, but tone is not a basis for exclusion.[49]

## VII.  **Thomas Tremblay's testimony is admissible.**

    Mr. Tremblay is a law enforcement and public safety expert with extensive experience relating to sexual assault. *See* Tremblay Rpt. Mr. Tremblay offers the following opinions:

- Driver sexual assault and misconduct was foreseeable to Uber. *Id*. at 1.

- Uber could have taken additional steps to prevent or substantially reduce the risk of an Uber rider being subjected to sexual assault or misconduct. *Id*.

- Uber's conduct increased the risk that an Uber rider would be subjected to sexual assault or misconduct. *Id*.

- Despite Uber's claimed "commitment to safety," Uber has not warned potential riders of the prevalence of sexual assault and misconduct committed by Uber drivers. *Id*. This position has compromised Uber's stated commitment to safety, limited rider prevention efforts, and put riders at greater risk. *Id*. Eliminating misleading assurances of safety, and warning potential riders of the prevalence of sexual assault and misconduct on the Uber platform, would enhance safety. *Id*.

- Despite Uber's claimed "commitment to safety," Uber has not warned potential riders regarding the high-risk factors of which Uber is aware (such as female rider riding alone with a male driver, being picked up near a bar, time of trip, day of week, intoxicated rider, drivers' history of feedback, rider in front seat, limited driver and/or rider history, drivers' one-star ratings and previous safety incidents). *Id*. at 2. This position has compromised Uber's stated commitment to safety, limited rider

---

[48] The one case Uber cites finds that an expert's mistakes did not "undermine his analysis" and instead "could be readily pointed out on cross-examination or corrected." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1165 (E.D. Wash. 2009). The court excluded the testimony due to other reliability issues. *Id.*

[49] The only case Uber cites—*Apple Inc. v. Corellium, LLC*, 2020 WL 5417197 (S.D. Fla. July 30, 2020)—involved an expert report that "solely provide[d] legal commentary on case law and ultimate conclusions"—hardly comparable to a statistics expert critiquing statistics. *Id.* at *4.

prevention efforts, and put riders at greater risk. *Id.* Eliminating misleading assurances of safety, and warning potential riders of actual identified high-risk factors, would enhance safety. *Id.*

- Uber can reduce risk of sexual assault and misconduct on the Uber platform by implementing effective response strategies and tools like: audio/video recording; women to women pairing; adequate education about sexual assault; and not matching risky drivers to riders especially when the ride involves identified high-risk sexual assault factors. *Id.* Uber's failure to do so has put Uber riders at greater risk of sexual assault and misconduct. *Id.*

- Crimes are dependent on sets of three elements: Ability, Desire, and Opportunity, or similarly Location, Offender, and Victim. *Id.* Uber controls all three elements and so is best situated to prevent sexual assault and misconduct. *Id.*

Mr. Tremblay also offers case-specific opinions, specifically that Uber's actions contributed to the sexual assault of Plaintiff Dean:

- Uber's lack of knowledge of the driver's history when onboarded, together with its failure to take certain steps it knows work to meaningfully reduce incidents of sexual assault and misconduct, caused the sexual assault of Plaintiff Dean. *Id.*, Schedule A.1 at 1. Uber failed to require video or audio recordings during the ride; failed to offer woman to woman pairing; failed to adequately educate the driver on sexual assault and misconduct and consent; failed to investigate or act on certain warning signs and high-risk factors of sexual assault / misconduct (including risk factors identified in S-RAD) when Uber paired the driver with Dean; and failed to disclose these warning signs and present and known risk factors to Plaintiff before the ride. *Id.*

### A. Mr. Tremblay is qualified to offer his opinions concerning Uber's failure to reduce the risk of sexual assault.

Due to his career in law enforcement and public safety, Mr. Tremblay has earned the national reputation as an expert in the prevention of sexual violence. As a career law-enforcement officer, Mr. Tremblay has extensive knowledge and training in addition to his decades of hands-on experience working with survivors of sexual violence, sexual offenders, and community members on efforts to investigate and prevent sexual violence. *Id.* at 3. Mr. Tremblay's decades-long career has included work as a rank-and-file police officer, a sexual assault investigator, police chief of Vermont's largest city, and the Public Safety Commissioner for the state of Vermont. *Id.* at 2. Mr. Tremblay's career has focused on sexual violence prevention in myriad industries, specifically including the "development and delivery" of the training around sexual assault prevention, response, awareness, and education within professional settings. *Id.* at 3-4. He also consulted and trained organizations and professional associations on "strategies for prevention, accountability, and reforms, for effective response to violence against women crimes

1    including sexual assault." *Id.* at 3. In addition, he served as faculty for the International

2    Association of Chiefs of Police (IACP) National Law Enforcement Leadership Initiative on

3    Violence Initiative and provided hundreds of consultations and trainings on sexual violence

4    prevention to victim advocates, regulatory agencies, and private sector businesses around the

5    world. *Id.* at 3-5.

6         Uber argues that Mr. Tremblay is not qualified to opine on Uber's "corporate knowledge

7    or conduct" and "marketing and other corporate statements about safety" because his experience

8    is limited to the areas of law enforcement or the criminal justice system. Mot. at 3. In support of

9    this argument, Uber principally relies on Mr. Tremblay's testimony that he is "an expert in more

10   than just law enforcement, but the broader criminal justice system as a whole." *Id.* at 3. Uber

11   ignores the rest of Mr. Tremblay's statement that he is "also frequently hired to consult and train

12   as an expert on sexual assault in the private sector" and for various public entities and so would

13   consider himself a sexual assault expert "across the board." Tremblay Dep. at 65:18-66:11; *see*

14   *also id.* at 252:16-25 ("I don't just work in law enforcement. I work in private sector. I work in

15   higher education. I work in the military. I work with government and … private businesses

16   around preventing and improving safety. So it's not just law enforcement."). He even consulted

17   for RAINN—one of Uber's non-profit partners—to develop sexual assault prevention, response,

18   and investigation policies of the cruise line industry. Tremblay Rpt. at 4.

19        Mr. Tremblay's opinions are grounded in his knowledge, training, and experience as a

20   whole, including his work as a police officer, his role as a government official, and his career as a

21   sexual assault prevention consultant for private and public industry. *See MJC Supply, LLC v.*

22   *Scottsdale Ins. Co.*, 2019 WL 2501480, at *2 (C.D. Cal. June 16, 2019) (stating "other relevant

23   experience which tips the scales" toward finding an expert qualified).[50]

---

[50] For this reason, Uber's reliance on *Fogle v. CSX Transportation* and *McDougall v. CRC Industries, Inc.*, is misplaced. In *Fogle*, a police officer with accident reconstruction experience was not qualified to opine on the design of railroad crossings. 2009 WL 2020782, at *3 (E.D. Ky. July 9, 2009). For example, the officer lacked training or experience with the cost analysis or maintenance considerations involved in designing that infrastructure. *Id.* Here, Mr. Tremblay's opinions involve identifying, responding to, and preventing sexual violence—the same subjects he has focused on for his entire career. In *McDougall*, an expert sought to testify about what a corporation *should* know about inhalant abuse not based on the corporation's own documents or

1       In addition to taking a cramped view of Mr. Tremblay's experience, Uber distorts the

2  topics of his opinions as "corporate conduct" or "marketing" as opposed to what they are—sexual

3  assault prevention. Mot. at 2-3. Rule 702 "contemplates a broad conception of expert

4  qualifications;" only a "minimal foundation of knowledge, skill, and experience" is required.

5  *Hangarter*, 373 F.3d at 1015-16 (internal quotation marks and emphasis omitted); *accord*, *e.g.*,

6  *Campos*, 2025 WL 3140399, at *1. Here, Mr. Tremblay testified that he has experience with the

7  subjects he opines on: sexual assault prevention in the private sector, "engaging with the

8  community" around safety-related warnings, and training organizations on avoiding misleading

9  safety representations. Tremblay Dep. at 42:10-43:4, 73:15-20, 157:14-19.

10      That an expert's qualifications are insufficiently specialized is not a basis to exclude them.

11  *See Self v. Perspecta Enter. Sols., LLC*, 2023 WL 2025238 at *5 (S.D. Cal. Feb. 15, 2023) ("[A]

12  lack of specialization affects the weight of the expert's testimony, not its admissibility.") (internal

13  quotation marks omitted); *see also Siqueiros*, 2022 WL 74182, at *5 (rejecting defendants'

14  argument that aeronautical engineering expert was not qualified to opine on automotive

15  engineering); *see also Todd*, 2016 WL 5462428, at *5-6 (admitting the testimony of a chemist

16  who worked primarily with pesticides to testify about mattresses).

17      None of the examples Uber cites support exclusion. *See* Mot. at 3. *First*, as Mr. Tremblay

18  explained, while he may not be a "marketing expert," as a "public official who has communicated

19  to cities, states, and … national audiences" regarding sexual assault," *id.* at 157:14-19, he

20  understands how community messaging, i.e., "communicating warnings," can reduce the risk of

21  sexual assault. *Id.* at 73:15-20. *Second*, Mr. Tremblay does not offer opinions regarding the

22  technical design of Uber's "RideCheck" feature, but instead opines on what Uber does and does

23  not do with the information it learns from the RideCheck notifications. *See* Tremblay Rpt. at 25-

24  26 (explaining that "Uber does not follow up on any RideCheck notification, even if there is no

25  response from the Rider, unless the Rider makes a separate report of a safety incident," and that

26  Uber's failure is an insufficient Response to identified high-risk factors). This testimony is about

27  _____

28  knowledge, but by speculating from known rates of inhalant abuse in the community, without
    regard for whether the corporation had that information. 2023 WL 5515827, at *11 (D. Minn.
    Aug. 23, 2023). Mr. Tremblay's analysis is grounded in the fact record in this case.

1    how a company should use the information it has (not the technology that produces the

2    information) to prevent sexual assault, and so does not require (and, indeed, would not be

3    appropriate for) an "expert in technology." Mot. at 3.[51]

4         Uber's reliance on *Alves v. Riverside County*, and *Krause v. County of Mohave*, is

5    misplaced because the experts in those cases did not have decades of hands-on, supervisory, and

6    training experience with the relevant subject matter like Mr. Tremblay. In *Alves*, the only

7    experience the proffered expert had with behavioral science came from his position as the

8    instructor at an institute "widely regarded as a purveyor of unreliable pseudoscientific analysis."

9    2023 WL 2983583, at *7 (C.D. Cal. Mar. 13, 2023). Mr. Tremblay, by contrast, has served in

10   faculty or advisor positions for well-regarded institutions including the IACP, the U.S.

11   Department of Justice Civil Rights Division and Office on Violence Against Women, the

12   Alliance for Hope International, End Violence Against Women International, the Conference on

13   Crimes Against Women, Research Triangle Institute, and the International Sexual Assault Kit

14   Initiative. *See* Tremblay Rpt. at 3-4.

15        In *Krause*, the police officer's experience lacked a connection to his testimony, because he

16   lacked any training or methodology for the technical process of measuring bullet trajectory. 459

17   F. Supp. 3d 1258, 1265-66. (D. Ariz. 2020). Here, Mr. Tremblay has "decades of hands-on

18   experience in the area of sexual assault prevention" not only as a police officer investigating

19   sexual assaults, but also as a government official directing policy on sexual assault investigation

20   and sexual offender management, and as a consultant to numerous industries. Tremblay Dep. at

21   42:10-13; *see also* Tremblay Rpt. at 3-5. A "big body" of his work has involved "trying to help us

22   understand the realities of that victim experience." Tremblay Dep. at 64:5-7, *see also id.* at 42:19-

23   43:4 ("I made the priorities of sexual assault and domestic violence a priority … throughout my

24   supervision and leadership message as a law enforcement leader and now … as a national

25

26   ---

[51] Uber also objects to Mr. Tremblay noting that, despite receiving hundreds of thousands of
27   reports of sexual assault or misconduct between 2017 and 2024, Uber's head of safety testified
     that it was not "true" that women are sexually assaulted in Ubers every day. Tremblay Rpt. at 14.
     It does not take a "statistician" to observe a cavalier response to sexual assault among Uber's
28   most senior safety executives. In any event, this observation is tangential to Mr. Tremblay's
     opinions and analysis.

consultant.").[52] Mr. Tremblay's "experience around sexual assault, sexual violence, crime prevention, public safety" in the public and private sectors makes him well-qualified to opine on exactly those issues as they relate to sexual assault prevention during Uber rides. Tremblay Dep. at 261:11-14.

### B.    Mr. Tremblay's methodology is reliable to evaluate whether Uber's conduct increased the risk of sexual assault generally, and of Dean in particular.

Mr. Tremblay's methodology in this case was to review documents and depositions from a repository of over two million documents produced in this action to identify relevant themes and topics, followed by a re-review of individual documents once topics had been identified. *See* Tremblay Rpt. at 6-7. Mr. Tremblay measured these documents using two methodologies of crime prevention that he has used throughout his cross-industry career in sexual assault prevention: the Crime Prevention/Problem Analysis Triangle Theory and SARA Model of Problem Solving for Reduction of Crime and Disorder. *Id.*

Uber argues this methodology does not reliably extend to prevention of *this* sexual assault because it was caused by Uber's "corporate conduct." Mot. at 4. But assault prevention is assault prevention, whether caused by corporate conduct or something else; Mr. Tremblay's methodology examines how to control the elements that give rise to crime, regardless of where it occurs. *See* Tremblay Rpt. at 2 ("The basics of the Crime Prevention / Problem Analysis Triangle recognize that crimes occur when three elements exist: Ability, Desire, and Opportunity, or similarly Location, Offender, and Target/Victim. Crime prevention and problem-solving efforts are enhanced with community engagement in the development of multidimensional and informed strategies directed at removing, or reducing, any one of the three elements. Essentially, Uber controls all three of these elements and has the opportunity educate, influence and monitor all three elements."). Uber derides Mr. Tremblay's methodology as one "used in policing," Mot. at 4, but simply ignores Mr. Tremblay's longstanding use of his same methodology across industries in

---

[52] Uber also cites *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991), but in that case, a pre-*Daubert* decision, the Ninth Circuit affirmed the decision to exclude the testimony of a proffered expert on insulation whose knowledge came from conversations with personal friends and family members. 922 F.2d 1426, 1429 (9th Cir. 1991). This secondhand knowledge bears no resemblance to Mr. Tremblay's decades of hands-on experience. *See* Tremblay Rpt. at 3.

1    the public and private sectors. *See* Tremblay Rpt. at 4-5 (recounting experience); *id.* at 6

2    (explaining that he applied the "same methodology" both in his "thirty years of experience in the

3    field of law enforcement" and "in the related field of criminal justice"); *id.* ("My methodology

4    mirrors the generally accepted analysis adopted by organizations, federal and state agencies and

5    regional and local law enforcement departments" with which he was involved).

6        Even if Uber was correct that the context of this case—the Uber platform and company

7    "conduct"—is novel, the fact that an expert first learned or developed their methodology as a law-

8    enforcement officer does not render it unreliable if used in another context. *See Unknown Party v.*

9    *Arizona Bd. of Regents*, 2022 WL 4481519, at *11-12 (D. Ariz. Sept. 27, 2022) (rejecting

10    argument that expert's methodology was unreliable because she applied "criminal-specific"

11    investigation standards when the expert applied "basic investigative techniques" that could be

12    used in different settings); *see also Lane v. Am. Airlines, Inc.*, 2024 WL 1200074, at *17

13    (E.D.N.Y. Mar. 20, 2024) (admitting testimony of expert in cruise ship security concerning sexual

14    assault prevention on airline, and explaining that "[t]o the extent Defendant believes [the expert's]

15    practical experience weakens his opinion, that experience can properly be explored on cross-

16    examination") (internal quotation marks omitted). Mr. Tremblay explained that this method can

17    be applied to identify risks and prevention strategies across industries and setting, "whether it's in

18    a taxi, an Uber, a national park, a big city or a small town." Tremblay Dep. at 82:11-20.

19        Uber argues Mr. Tremblay fails to explain how the methods he used as a law-enforcement

20    officer provide a sufficient basis for an opinion about Uber's approach to safety. Mot. at 4. But

21    Mr. Tremblay explained, in detail, how he could (and did) apply this method to the Uber context.

22    As Mr. Tremblay explained, the SARA model is a collaborative problem-solving tool to ensure

23    all steps are taken to prevent crime: scanning (understanding the totality and prevalence of the

24    problem); analysis (examination of root causes and risk factors); response (implementation of

25    initiatives to reduce risk factors, including community engagement); and assessment (analyzing

26    effectiveness of responses). *See* Tremblay Rpt. at 19-20. Relatedly, the Crime Prevention

27    Triangle recognizes that crimes occur when three elements exist: ability, desire, and opportunity

28    *or* location, offender, and target/victim. *Id.* at 10. Therefore, the theory holds, crime can be

1   reduced by eliminating or influencing one of the three elements by directing prevention efforts at

2   one (or more) of those elements. *Id.* Mr. Tremblay described the bases of these theories in detail,

3   *id.* at 6-7, as well as how he applied the theories in this case to his review of Uber's documents to

4   identify avenues of crime prevention available to Uber. *Id.* at 19-20; *see also* Tremblay Dep. at

5   46:13-47:16. For example, Mr. Tremblay explained he identified Uber documents and testimony

6   demonstrating efforts at scanning and analyzing the problem, including compiling sexual assault

7   risk factors, but not following up with an adequate response or analysis. *See*, *e.g.*, Tremblay Rpt.

8   at 18; Tremblay Dep. at 195:3-197:22; *see also id.* at 47:5-16. Specifically, Mr. Tremblay detailed

9   the actions Uber did take with respect to each step of this process, and those that were absent or

10  incomplete. Tremblay Rpt. at 15, 20, 24-31.

11         Unlike *Walker v. Conagra Brands, Inc.*, 2023 WL 8885148, at *8 , where the expert did

12  not specify "what data [he] considered, why it fell short of the standards [in his report], or how

13  those standards should be applied," Mr. Tremblay detailed the specific documents he considered,

14  the standards he was comparing them to, and why Uber failed to meet those standards. For

15  example, Mr. Tremblay explained Uber *did* perform the first two steps of the SARA problem-

16  solving model but fell short on the second two steps (response and assessment) because Uber

17  failed to implement features and processes it determined through testing could reduce sexual

18  assault, and failed to adequately test those features and processes it *did* have in place against

19  measures like sexual assault reduction (as opposed to safety perception). Tremblay Rpt. at 15-20,

20  24-31; *see also*, *e.g.*, Tremblay Dep. at 158:9-159:25 (Uber researched risk factors but promoted

21  risky rides); *id.* at 194:11-197:21 (Uber identified risk factors and cameras as solutions, but did

22  not implement). With respect to the Crime Prevention Triangle model, Mr. Tremblay explained

23  the data he reviewed showed that in the Uber context three elements were present: environment

24  (car), victim (passenger), and offender (driver), meaning that prevention efforts should be

25  directed at one or more of those elements under the theory, such as removing dangerous drivers.

26  *See* Tremblay Rpt. at 10, 19; *see also* Ex. 4 (Tremblay Dep. Vol. II) at 353:14-354:7.

27         Nor is this case anything like *Kamradt v. Esurance Ins. Co.*, where the expert's opinion

28  was a single, conclusory statement. 2024 WL 5356886, at *7. Here, Mr. Tremblay's opinions are

reliable because he "arrives at his conclusions with [his] experience in hand and after reviewing the available facts." *Qualcomm*, 2018 WL 6460573, at *4. Mr. Tremblay provided extensive explanation of the Crime Prevention and SARA models, how he used them in his career and how he reliably applied them here. Tremblay Rpt. at 10, 19, 30.

### C.    Mr. Tremblay's references to "knowledge" are proper bases for his opinions and are not impermissible narrative.

Uber argues that the Court should exclude opinions about Uber's knowledge. Mot. at 4-5.[53] But, as explained above, experts are permitted to discuss the bases for their opinions, including the information available to a defendant. *See* §§ I.D (Drumwright), II.B.5 (Valliere), IV.C (Weiner), VI.A.4 (Chandler), *supra*; *see also*, *e.g.*, *Cover*, 2017 WL 9837932 (experts may testify to what a defendant "knew or should have known"); *McCoy*, 2024 WL 1705952, at *17 ("Expert testimony regarding information available to a defendant is helpful and relevant to determining whether the defendant acted reasonably, and does not improperly comment on the defendant's state of mind.") (internal quotation marks and alterations omitted); *accord Welding*, 2005 WL 1868046, at *17; *see also Glumetza*, 2021 WL 3773621, at *20 (experts must explain the "facts apropos to [their] opinions"); *United Food & Com. Workers*, 296 F. Supp. 3d at 1194. It makes no difference that the relevant facts go to the company's knowledge. *See In re JUUL*, 2022 WL 1814440, at *14 ("[T]he knowledge of various defendants and witnesses about the topics identified above is likely relevant and admissible if there is a basis in the record for those experts to testify, e.g., from their review of defendants' documents or deposition testimony.").

As before, Uber's cases affirm the rule that experts may describe corporate documents, including the facts known to the company, for the purpose of explaining the bases of their opinions. *See Zetz*, 644 F. Supp. 3d at 703; *Gomez v. Am. Med. Sys. Inc.*, 2021 WL 1163087, at *4 (D. Ariz. Mar. 26, 2021); *O'Bryant*, 2022 WL 7670296, at *13; *Siqueiros*, 2022 WL 74182, at *9. For example, in *O'Bryant*, the court explained that experts may explain technical terms, draw inferences, and explain the basis of their opinions through commentary on documents. 2022 WL 7670296, at *13. Here, to the extent that Mr. Tremblay refers to Uber's knowledge, he refers not

---

[53] Uber also targets opinions about "intent," but does not identify any such opinions.

1  to Uber's corporate state of mind, but rather to corporate documents and depositions detailing

2  information that Uber had access to. *See* Tremblay Rpt. at 13-17, 22, 24 (referencing information

3  Uber "acknowledge[d]" in internal documents).[54]

4      Nor does Mr. Tremblay merely parrot the Uber documents and testimony he cites

5  throughout his report. Instead, he relies on these documents to make inferences about Uber's

6  sexual violence prevention strategies. *See, e.g.*, *Glumetza*, 2021 WL 3773621, at *20. As Mr.

7  Tremblay explained, he evaluated whether Uber adequately "[a]ssess[ed]" the sexual violence

8  problem, which necessitated gathering documents showing the information Uber had about the

9  nature and scope of sexual violence on the platform. *See* Tremblay Rpt. at 20. He also had to

10  examine Uber's "Response" to this information, which further required reviewing what Uber

11  did—and should have done—in light of the information in its possession. *Id.* This approach

12  requires intensive document analysis and explanation of inferences gathered from those

13  documents in the context of crime reduction theories and Mr. Tremblay's experience, which is

14  beyond the experience of a layperson on a jury.

15      **D.    Mr. Tremblay does not opine on the ultimate legal issue.**

16      Uber argues Mr. Tremblay's case-specific opinions that Uber's actions "were more likely

17  than not a substantial factor in causing" Ms. Dean's assault "usurp[s] the role of the jury by

18  deciding one of the ultimate legal questions" presented. Mot. at 6 (quoting Tremblay Rpt., Sch.

19  A-1 at 1). To reach this conclusion, Uber misapplies *U.S. v. Tamman*, in which the court excluded

20  expert testimony that a party "did not break the law" as an improper legal conclusion. 782 F.3d

21  543, 553 (9th Cir. 2015). Those circumstances differ markedly from the present case, where Mr.

22  Tremblay's opinions go to causation, a factual issue. *See J.H. Kelly, LLC v. AECOM Tech. Servs.,*

23  ---

24  [54] In *McCalla v. ACE American Insurance Co.*, 2022 WL 2290552, at *9-10 (D. Ariz. June 24, 2022), the expert sought to opine on "Defendants' motives or mindset." *Id.* at *10. In *Adams v. United States*, 2009 WL 1324231 (D. Idaho May 8, 2009). on which Uber also relies, the expert

25  claimed to be an expert on the defendant company itself, including its "corporate intent." *Id.* at *1. This is completely different than an expert, like Mr. Tremblay, making inferences from

26  corporate documents about the information a corporate defendant had access to and what, according to crime prevention principles, it should have done with it. *See* Tremblay Rpt. at 10, 15,

27  17, 19. Finally, *Burrows*, 2022 WL 3346419, does not, as Uber suggests, stand for the proposition that an expert may not rely on internal documents such as promotional materials. Instead, the

28  court declined to permit testimony where the expert simply applied dictionary definitions to promotional materials, instead of using "any sort of expertise." *Id.* at *5.

1   *Inc.*, 605 F. Supp. 3d 1295, 1306 (N.D. Cal. 2022) ("[Expert's] opinion… goes to factual

2   causation, and it is admissible."). As Mr. Tremblay explained, he addressed the factual causation

3   issue in terms of whether Uber's conduct contributed to the assault as a factual matter, in his

4   words, "substantial factor." *See* Ex. 4 (Tremblay Dep. Vol. II) at 399:7-23 ("Q: [D]o you agree …

5   that the driver caused Ms. Dean's sexual assault? A: I don't look at it … with one dimension. …

6   [T]he offender is responsible for their behavior. But in this situation, when we apply the crime

7   prevention strategies … Uber … has the opportunity as handler, manager, and guardian to help

8   reduce the likelihood of sexual assault.").

9       The fact that expert opinions use language that "recurs in the applicable legal standard"

10  does not transmute them into legal conclusions. *Diaz*, 876 F.3d at 1198-99. Experts are permitted

11  to use language that has meaning in "common parlance" in addition to the law. *See id.* This is true

12  for opinions related to whether a defendant's conduct was a "substantial factor" in causing the

13  plaintiff's injury. *See Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014); *In*

14  *re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 960 (N.D. Cal. 2019) (admitting expert's

15  opinion that defendant's conduct was a "substantial factor" in causing plaintiffs' injuries), *aff'd*,

16  997 F.3d 941 (9th Cir. 2021). Mr. Tremblay's reliance on common language, including

17  "substantial" and "cause" to offer factual opinions on crime reduction through the Crime

18  Prevention Triangle model are therefore admissible.

19  **VIII.  <u>Cynthia Rando's testimony is admissible.</u>**

20      Cynthia Rando is a certified Human Factors and Human Safety professional with over 20

21  years of experience. *See* Rando Rpt. at ¶ 7. Human Factors and Human Safety is a well-

22  recognized scientific discipline that establishes key usability principles that apply to product

23  design and engineering in safety-critical contexts. *See id.* at ¶ 14; *see also*, *e.g.*, *Mihailovich v.*

24  *Laatsch*, 359 F.3d 892, 919 (7th Cir. 2004) (human factors "is a recognized analytical approach

25  that is applied in a variety of contexts and may yield legitimate insights as to the hazards that

26  particular products and situations ... may pose in light of predictable human behavioral patterns");

27  *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243-44 (10th Cir. 2000) (affirming admission of

28  "human factors analysis" to analyze whether design was "unreasonably dangerous and defective,"

1   notwithstanding that expert had no "firsthand knowledge of the particular machine at issue"). As

2   Ms. Rando explains, the "integration of Human Factors" in the "design and implementation of

3   human-technology and interaction with interfaces … is essential for aligning technology with

4   real-world human capabilities, limitations, and expectations." Rando Rpt. at ¶ 14.

5          As a human factors expert, Ms. Rando assists the jury in understanding applicable human

6   factors standards. *See id.* at ¶¶ 12, 14, 21-40. She further shows how Uber failed to implement

7   human factors design standards in its in-app reporting procedures and did not address known

8   issues based on user data in its possession. *See id.* at 8, 16-58. Notably, whereas Uber made the

9   process of requesting a ride prominent, quick, and easy (thus demonstrating the company's

10  capability to apply sound human factors practices when doing so was profitable), its reporting

11  tools related to in-app reporting were obscure and overcomplicated, predictably depressing

12  reports of sexual assault. *See id.* at ¶ 8. Her testimony is admissible.

13         **A.      Ms. Rando is qualified to opine on Uber's reporting systems.**

14         Rule 702 "is broadly phrased and intended to embrace more than a narrow definition of

15  qualified expert." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550 (9th Cir. 2014). The "threshold

16  for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and

17  experience suffices." *Id.* at 550-51.

18         Ms. Rando far exceeds this "low" threshold. In additional to her more than 20 years of

19  experience as a Human Factors Professional, she holds a B.S. in Psychology, an M.S. in Human

20  Factors, and an M.B.A. *See* Rando Rpt. at ¶ 10. Her prior experience includes more than 10 years

21  of service at NASA's Johnson Space Center, where she was the lead Human Factors Engineer

22  and Human Safety Subject Matter Expert (*id.* at ¶ 7), and prior consulting work with consumer-

23  facing platforms regarding the development, design, and evaluation of reporting processes in

24  mobile applications (*see* Rando Dep. at 24:8-25:10, 26:13-15, 27:6-23). Currently, Ms. Rando is

25  the Founder and CEO of Sophic Synergistics, a consulting company focused on "work[ing] with

26  companies to help develop and design technology" including "applications, hardware [and]

27  systems." *Id.* at 27:15-19; Rando Rpt. at ¶ 7. Her analysis in this case falls squarely within her

28  professional domain.

1    Notwithstanding Ms. Rando's robust qualifications, Uber argues she is unqualified

2  because she does not have prior experience evaluating rideshare technology and sexual assault

3  reporting specifically. Mot. at 3. But, as noted above, an expert's knowledge need not be cabined

4  to Uber and sexual assault to be admissible. So long as the "expert's testimony is within the

5  reasonable confines of [her] subject area, a lack of particularized expertise generally goes to the

6  weight of the testimony, not its admissibility." *In re Viagra (Sildenafil Citrate) & Cialis*

7  *(Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 789 (N.D. Cal. 2020) (internal citations and

8  quotations omitted). Evaluating the design of human-machine interfaces, as Ms. Rando does here,

9  is a core aspect of human factors science. *See Rodriguez v. JLG Indus., Inc*., 2012 WL 12883784,

10  at *8 (C.D. Cal. Aug. 3, 2012) (collecting cases recognizing that "human factors" is a legitimate

11  and well-established applied science, frequently called upon to "evaluate human-machine

12  interfaces" and "designing and arranging things people use so that the people and things interact

13  most efficiently and safely.") (citations omitted); Rando Rpt. at ¶ 22.

14    In conducting her analysis, Ms. Rando applied widely recognized international standards,

15  accepted engineering practices, and established human factors frameworks regarding risk

16  identification and mitigation—all of which she explains are routinely implemented across diverse

17  industries. *See* Rando Rpt. at ¶¶ 12, 29, 33. For example, the ISO Standards that Ms. Rando relies

18  upon were developed to provide guidance on designing products and services to account for

19  human risks and limitations across all sectors. *See id*. at ¶ 23; Rando Dep. at 145:16-22 ("[T]he

20  [ISO standards] that I cite are general to any industry."). Indeed, Uber itself has referenced ISO

21  standards in corporate documents. *See* Rando Rpt. at ¶ 23 n.10. Cross-industry application of

22  these factors make sense as the process and standards for conducting a human factors analysis is

23  and should be "the same" from "an industry perspective[.]" Rando Dep. at 25:14-21, 26:2-6. Ms.

24  Rando's qualifications and application of these well-established principles—expressly intended to

25  transcend differences among industries—are not rendered (as Uber argues) unqualified and

26  inadequate merely because she has not previously evaluated a sexual assault reporting process or

27  rideshare application.

28    The Tenth Circuit's decision in *Smith* is instructive. In that case, a human factors expert

testified concerning defects in a "milling machine." 214 F.3d at 1243-44. Based "on a review of depositions and discovery material," the expert opined that the manufacturer "failed to conduct an adequate human factors analysis of the milling machine before marketing it." *Id.* He "also testified, from the standpoint of human factors analysis," that the machine was "unreasonably dangerous and defective." *Id.* While there was no evidence that the expert "possessed firsthand knowledge of the particular machine at issue," *id.*, as the Tenth Circuit explained, this was no barrier to expert admissibility: "the record disclos[ed] that [he was] amply qualified as [an] expert[] in [his] field[s], and [his] testimony was limited to matters within [his] field[] of expertise." *Id.* The same applies here. There can be no credible dispute that Ms. Rando is qualified in the field of Human Factors and Human Safety, and thus well able to opine on those industry standards and apply those standards to specific aspects of the Uber platform, including the in-app reporting features. *See* Rando Rpt. at ¶¶ 18-20.

Uber's reliance on *Blockchain*, 2024 WL 5483606, and *Chang,* 207 F.3d 1169, is misplaced, as it was when those cases were cited against Mr. Weiner and Mr. Feldis. *See* §§ III.A, IV.A, *supra*. In *Blockchain*, a trade secret misappropriation case, the plaintiff designated its own co-founder to opine on the value of its trade secrets. His only experience with valuations came from discussions with potential startup investors; he had no formal valuation training, no professional credentials or certifications in intellectual property valuation, and had never published on valuation topics. 2024 WL 5483606, at *7-8. Indeed, the proponent of the testimony did not even defend it under Rule 702; instead, it argued that the testimony was really that of "a lay witness." *Id.* In *Chang*, the Ninth Circuit affirmed exclusion of a proposed expert on whether a security was counterfeit. Although the witness had expertise in "the history of, and purpose for, the issuance of obligations like" the instrument at issue, he had no training or experience in identifying counterfeit securities. 207 F.3d at 1172-73.

Ms. Rando is worlds apart from the witnesses excluded in *Blockchain* and *Chang*. Unlike those individuals—who lacked meaningful training, education, or experience in their purported fields—Ms. Rando has decades of specialized, credentialed experience directly relevant to the opinions she offers here. Her testimony satisfies Rule 702's threshold for qualification, and any

1   alleged gaps in hyper-specific experience go to weight, not admissibility.

2        **B.    Ms. Rando's opinions are relevant to Plaintiff's claims.**

3        Uber argues Ms. Rando's opinions are irrelevant because Plaintiff does not allege she

4   tried to report an incident but was unable to do so because of Uber's inadequate in-app reporting

5   procedures.[55] Mot. at 4-5. The foundation for this argument is incorrect.

6        Part of Uber's defense to Plaintiff Dean's claim is that it had no notice that its driver

7   posed a risk of sexual assault. *See* Thomas Rpt. at 3. Plaintiff contends that Uber *did* have notice:

8   not only red flags in the driver's driving record, but also Uber's own analysis of high-risk factors

9   attendant to the particular ride. *See* Pl's Opp'n to Summ. J. at Background, §§ II.B-C. Plaintiff

10  further contends that Uber tried hard to remain ignorant about sexual misconduct by Mr. Turay

11  during earlier Uber ride, by designing systems that suppressed rather facilitated reports of sexual

12  assault and sexual misconduct. *See id.* at Background, § II.D. Ms. Rando's testimony will assist

13  the jury in deciding these questions of fact. For example, her opinions as to the inadequacies of

14  Uber's in-app reporting system will assist the jury in understanding why, even though the driver

15  was dangerous, Uber may not have received more overt reports of sexual misconduct: because, in

16  violation of human factors principles, the company made it exceedingly difficult to report such

17  misconduct. *See* Rando Rpt. at ¶¶ 118, 135, 141n. 97. Her testimony is therefore directly relevant

18  to a core disputed issue in the case.

19       Ms. Rando's testimony is relevant in a more general sense too. At this trial, Uber will

20  defend itself by pointing to the assertedly low "rate" of sexual assault on its platform, a claim

21  based on passenger reports. *See* Ex. 1 (JCCP Trial Tr.) at 74:16-75:3, 3123:2-4 (touting rates in

22  opening and closing); *see also* Stodden Rpt. at 8-19. Ms. Rando explains one reason those rates

23  understate the true number of incidents: Uber made them hard to report. *See* Rando Rpt. at

24  ¶¶ 118, 127, 141 n. 97, 142-43.

25

26

27

---

28  [55] As required by PTO 34, Plaintiff does not at this time address the relevance of Ms. Rando's opinions to any other bellwether.

C.    **Ms. Rando's opinions are reliable.**

1.    **Ms. Rando's usability opinions are the product of a reliable methodology.**

Uber's argument that Ms. Rando's usability assessments lack a reliable methodology is baseless. As set forth in her report, and reiterated during deposition, the usability assessments and corresponding opinions are based on "expert lead Heuristic Evaluations, which is a common and accepted approach in Human Factors[.]" Rando Rpt. at ¶ 164. The heuristic evaluation "look[s] at the Uber app from a perspective of [whether Uber applied] human factors and standards and practices appropriately in the design of the app[.]" Rando Dep. at 74:4-15. The evaluation is firmly rooted in decades of specialized expertise, application of human factors analysis, benchmarking against established ISO standards, and a Likert-type rating scale—which is a "widely accepted practice for evaluating user interfaces" for heuristic expert reviews. Rando Rpt. at ¶¶ 164-167; Rando Rpt. at App'x E.

This methodology is not novel: human factors experts like Ms. Rando are frequently called upon to perform usability evaluations. *See, e.g.*, *In re MyFord Touch Consumer Litig.,* 291 F. Supp. 3d 936, 944, 948 (N.D. Cal. 2018) (relying on similar usability assessment to deny summary judgment). Indeed, in another context, the FDA advocates "that manufacturers follow human factors or usability engineering processes during the development of new medical devices, focusing specifically on the user interface[.]"[56]

Uber criticizes Ms. Rando for not interviewing Uber users or Plaintiffs, conducting surveys, or researching user experiences. But this argument conflates a participant-driven usability test with Ms. Rando's expert-led heuristic human factors assessment, a distinction Ms. Rando explained at her deposition. *See* Rando Dep. at 263:15-21 ("We conducted an expert-driven…human heuristic assessment. I did not conduct a participant-driven usability test…[T]hey're different, and they don't…map to the same criteria."); *id.* at 83:21-22 (conducting user tests is "not the definition of a heuristics evaluation"); *id.* at 266:10-12 ("Again, we did not

---

[56] *Applying Human Factors and Usability Engineering to Medical Devices: Guidance for Industry and Food and Drug Administration Staff*, U.S. Food and Drug Administration, 2016 WL 497172 (Feb. 3, 2016)).

1    conduct a user test, so you are not going to get a survey from a user"); *see also id.*, 75:25-76:6;

2    99:18-24.[57] Ms. Rando explained that she "did exactly what the standards and the methodologies

3    dictated to be done in this context." *Id.* at 81:2-3.

4         Even so, there "is no per se requirement that all expert testimony be supported by

5    empirical data." *Fujifilm*, 2015 WL 1737951, at *3. And, given that her analysis is founded on

6    reliable human factors methodologies (the same that such experts typically rely on), any

7    purported failure to consider additional discrete data points goes to the weight of Ms. Rando's

8    opinions, not their admissibility. *See* Fed. R. Evid. 702, advisory committee note, 2023

9    amendment; *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1173-74 (N.D. Cal.

10   2023) ("[D]isputes regarding the data Dr. Flores took into account go to the weight of her opinion

11   rather than its admissibility."); *Qorvo, Inc. v. Akoustis Techs., Inc.*, 2024 WL 5334379, at *2 (D.

12   Del. May 3, 2024) ("Rule 702 … does not require an expert to use the best data, so long as there

13   are 'good grounds' for using the data on which they base their opinion.") (citation omitted);

14   *Vaporstream, Inc. v. Snap Inc.,* 2020 WL 2543814, at *7 (C.D. Cal. Jan. 10, 2020)

15   (disagreements with factual assumptions and considerations go to weight not admissibility).

16        Ultimately, Uber articulates nothing more than a misguided lay critique of Ms. Rando's

17   methodology, improperly imposing nonexistent requirements on a heuristic evaluation without

18   any authority beyond Uber's own unsupported say-so. *See ZP No. 332, LLC v. Huffman*

19   *Contractors., Inc.*, 2025 WL 3083079, at *7 (E.D. Va. Nov. 4, 2025) ("[N]either [Rule] 702 nor

20   *Daubert* requires an expert to use the method opposing counsel would select or even the best or

21   most recommended method."); *Lauderdale v. NFP Ret., Inc.*, 2022 WL 17324416, at *9 (C.D.

22   Cal. Nov. 17, 2022) (expert testimony should not be excluded "simply because [the parties]

23   disagree with the conclusions of the expert") (citation omitted).

24        Uber's reliance on *Near v. Enerco Grp., Inc.*, 2025 WL 1865224 (D.S.C. Mar. 25, 2025),

25   is misplaced, as *Near* bears no resemblance to Ms. Rando's evaluation. There, the expert opined

26   _____

27   [57] Uber's criticism that Ms. Rando lacked certain user data inadvertently proves Ms. Rando's
     point. The reason that data is missing is because Uber never collected or produced it—precisely

28   one of the defects in Uber's risk assessment and mitigation efforts.

1    that a heater warning was inadequate because it lacked an explicit clothing ignition hazard

2    warning—despite never seeing, operating, or interacting with the heater in any way. *Id.* at *6-7.

3    By contrast, Ms. Rando conducted multiple, hands-on analyses of Uber's in-app reporting

4    process. *See* Rando Rpt. at ¶¶ 18-20 & App'x E-G. In any event, the requirements imposed by

5    *Near* are more exacting than those of other courts admitting human factors testimony. *See Smith*,

6    214 F.3d at 1243-44 (no "firsthand knowledge of the particular machine at issue").

7         Uber also challenges Ms. Rando's consideration of users' mental and emotional states in

8    her usability assessment, arguing she did not speak directly with actual users. Again, Ms. Rando's

9    opinions did not require research into any specific individual's state of mind. Rather, she

10   incorporated "decades" of published research regarding how trauma affects the cognitive process.

11   Rando Dep. at 67:3-10. Considering how task flows perform under stressful, emotionally taxing

12   conditions is expressly contemplated under the ISOs and Environment of Use testing (*see* Rando

13   Rpt. at ¶¶ 167(a), (b)), and falls squarely within Ms. Rando's human factors expertise, which lies

14   at "the intersection of human psychology with technology and engineering" (*id.* at ¶ 21). *See*

15   *Lister v. Hyatt Corp.,* 2019 WL 6701407, at *12 (W.D. Wash. Dec. 9, 2019) ("[A]s a human

16   factors expert, Ms. Gill may testify to the foreseeability of [human] behavior"). Contrary to

17   Uber's claims, Ms. Rando's report explains how she accounted for these factors—finding, for

18   example, that Uber's long, confusing task flow is inconsistent with ISO Standards emphasizing

19   "minimizing cognitive load for users in emotionally taxing situations." *See id.* ¶ 170(b).

20                **2.    Uber's characterization of Ms. Rando's opinions as "subjective
                          narrative" about "Safety Programs" misrepresents her report.**

21

22        Uber attacks Ms. Rando's "opinions regarding Uber's safety programs," but it is unclear

23   which opinions Uber means. Mot. at 7. In any event, Ms. Rando does not offer abstract opinions

24   about Uber's "safety programs." Instead, she analyzes Uber's in-app reporting functions and the

     alternative reporting "channels" Uber purportedly relies on. *See* Rando Rpt. at ¶¶ 15, 103-162.

25

26        Uber claims Ms. Rando's opinions are "not grounded in reliable evidence," lack "specific

     evidence," and are unsupported by a methodology. Mot. at 7-8. At the same time, Uber criticizes

27

28   Ms. Rando for citing the very record evidence that forms the basis of her analysis, and concedes

1    that Ms. Rando expressly relies on her decades of human factors experience, established

2    behavioral science literature, and ISO standards. [58] Rather than identifying any actual

3    methodological defect, Uber shifts the goalposts, dismissing this methodology solely because Ms.

4    Rando lacks "rideshare industry" experience. *Id.* at 9. As discussed above, Rule 702 does not

5    impose such a hyper-specific subject-matter limitation. [59] In short, Uber's position is a moving

6    target: Uber faults Ms. Rando for not using evidence, then faults her for using it; and Uber claims

7    she offers no explanation, then complains about the explanations she gives. This is not a basis for

8    exclusion. [60]

9         Uber contends Ms. Rando's reliance on Uber's internal documents is improper, citing

10   *Siqueiros*, 2022 WL 74182, at *9, and *O'Bryant*, 2022 WL 7670296, at *12. As explained before,

11   both cases reiterate the foundational principle that experts are permitted to discuss the factual

12   bases of their opinions and analyze those documents for the jury. *See* §§ II.B.6, IV.C, VI.A.1,

13   *supra*. As explained earlier, "an expert witness is permitted to compile documents, even materials

14   that a lay person would understand, and then explain how those materials inform and support his

15   ... opinions." *Pinterest*, 2015 WL 2268498, at *3. Indeed, "this is one of the primary purposes of

16   expert witnesses." *Teledyne*, 2018 WL 11352632, at *7. Ms. Rando connects the dots between

17   established human factors principles, peer-reviewed research, her usability assessments, and

18   Uber's own data to arrive at her conclusions—classic expert testimony.

---

20   [58] Uber argues—without any cited authority—that Ms. Rando failed to explain how violation of ISO standards can lead to legal liability for Uber. Setting aside that it is not proper for any expert
21   to offer purely legal opinions, "ISO standards are trustworthy and relevant for the jury to discern the standard of due care[.]" *Bhoodai v. Employers Assurance Co.*, 2022 WL 4591239, at *9
22   (M.D. Ga. Sept. 29, 2022) (internal citations and quotations omitted); *see also Thacker v. Ethicon Inc.*, 2025 WL 2028082, at *2 (E.D. Ky. July 21, 2025) (expert testimony regarding ISO
23   compliance reliable).
     [59] Uber cites *Salinero v. Johnson & Johnson*, 2019 WL 7753453 (S.D. Fla. Sept. 5, 2019), where
24   a chemical engineer with no experience in medical devices was unqualified to opine on compliance with ISOs in the context of medical device risk management and quality systems. *Id.*
25   at *14. Unlike the witness in *Salinero*, Ms. Rando is qualified to opine on ISOs and risk assessments, which are precisely within her professional domain as a human factors expert.
     [60] Uber's reliance on *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082 (W.D. Okla. 2009) is
26   misplaced. There, the human factors expert conducted no testing and cited only two general
27   standards, offering no objective evidence. Here, Ms. Rando conducted multiple usability assessments and—as Uber admits—relied on objective evidence, including Uber's internal
28   documents.

1     Uber highlights Ms. Rando's opinion that Uber should have expected passengers to use

2 Uber's app to try to report sexual misconduct (rather than, for example, calling the company

3 separately). To be sure, Ms. Rando supports this opinion with facts derived from the record,

4 including that Uber (1) received evidence that passengers in fact did try to use the app that way;

5 (2) Uber received evidence that passengers through star ratings indicated safety; and (3) Uber

6 itself made in-app reporting the "path of least resistance." *See* Rando Rpt. at ¶¶ 78-85. But she

7 does not merely "regurgitat[e]," Mot. at 7, those documents. *See* §§ I.B.2, II.B.6, IV.C, VI.A.1,

8 *supra* (explaining why similar arguments against Plaintiff's other experts fail). Rather, she

9 explains that human behavior research—including the "default effect"—demonstrates that

10 individuals overwhelmingly choose the most obvious, default pathway, rarely deviating from that

11 status quo. *See* Rando Rpt. at ¶¶ 82-83. She supports this analysis with cited literature, recognized

12 behavioral science findings, and, yes, with Uber's own data showing how riders interacted with

13 reporting flows. *See id.* at ¶¶ 80-84. This is precisely how experts are supposed to apply their

14 expertise to the record of a specific case. *See Courkamp v. Fisher-Price Inc.,* 2022 WL 4448323,

15 at *5 (D. Ariz. Sept. 23, 2022) (application of "well-recognized" human factors principles to the

16 facts of the case, "scholarly sources," and extensive review of the record admissible).[61]

17     Next, Uber mischaracterizes Ms. Rando's opinions as speculative, claiming she cannot

18 reliably opine that, in order to know "whether and how often [a] risk is occurring, and whether

19 and to what extent any design controls are actually working to help mitigate that risk," it is

20 necessary to actually receive "user feedback and reporting." Mot. at 9. Uber says that, to reach

21 this conclusion, Ms. Rando needs "evidence from *actual* users of Uber's app." Mot. at 9. But

22 Uber itself acknowledges that "we know that there is a high likelihood of underreporting of

23 incidents…due to unintuitive reporting feedback flows," and that "[o]ne reason for underreported

24 safety incidents is that some riders do not know how to submit tickets or contact support." Rando

25

---

26 [61] Uber's cases do not support exclusion. In *Lewis v. Kern Cnty.*, 2025 WL 821895 (E.D. Cal. Mar. 13, 2025), there was not "any methodology or reasoning in the expert report[.]" *Id.* at *3.

27 And, in *Farmers Ins. Co. of Ariz. v. DNS Auto Glass Shop LLC*, 2024 WL 1256042 (D. Ariz. Mar. 25, 2024), the expert "never describe[d] [his] analysis, what it entailed, or what it found"—

28 the court read "his report in vain for any indication of the facts and data on which he relied or the methodology used in his analysis." *Id.* at *9.

1   Rpt. at ¶¶ 142, 144 (quoting Uber documents). Using her experience and literature, Ms. Rando

2   explains why a reasonable company would assess and solve that problem when conducting a risk

3   assessment, and how Uber fell short. *See* Rando Rpt. at ¶¶ 90-99, 134-35, 142-150. Uber cannot

4   credibly claim Ms. Rando's opinions are speculative when they are supported by Uber's own

5   documents acknowledging inaccurate data due to deficiencies in its reporting process.[62]

6          Finally, Uber states Ms. Rando was required to articulate an alternative design, citing

7   *Johnson v. Ridge Tool Mfg. Co., Inc.*, 2025 WL 2430567 (N.D. Ill. Aug. 22, 2025), *appeal*

8   *pending* (7th Cir. No. 25-2604). In *Johnson*, Ms. Rando opined that a machine user manual was

9   insufficient, contributing to the root cause of the plaintiff's injury. *Id.* at *6. These opinions were

10  excluded as irrelevant because the plaintiff did not read the user manual. *Id.* While the plaintiff

11  attempted to argue that Ms. Rando's opinion could encompass the warning label affixed to the

12  machine, the Court held that even if Ms. Rando's opinions could be interpreted as such, the lack

13  of a proposed alternative warning would make the opinion unreliable. *Id.* at *6-7.

14         Here, Ms. Rando has no warnings opinions. And putting together an alternative design

15  flow "wasn't the objective" of her assessment. Rando Dep. at 102:7-12. Rather, she looked "at

16  how, if at all, the [human factors] standards were applied and if they were applied appropriately.

17  And that was not the case." *Id.* at 102:12-15. *Ridge Tool* is thus inapplicable. Even so, Ms. Rando

18  indeed provides specific, detailed critiques to improve Uber's reporting flow. *See, e.g.*, Rando

19  Rpt. at ¶ 15 (reporting features not persistently visible, required multiple menu navigations, had

20  vague labels, had no immediate confirmation of report logging, took as many as 16 actions and

21  more than 20 minutes, were compromised by buried and nested menu options); Rando Dep. at

22  105:9-16, 106:12-18 ("within all of the assessment reports…we provide a lot of recommendations

23  to help Uber model better choices that are compliant with standards"; "I gave them design

24

---

25  [62] Uber's citation to *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 672 (D. Nev. 1996),
    is unhelpful. There, a doctor's opinion that plaintiffs' cognitive and emotional deficits were
26  caused by exposure to chemicals during a manufacturing plant accident was speculative because
    the doctor made no effort to rule out other possible etiologies, did not review pre-accident
27  evaluations of plaintiffs, and was not aware of any research indicating exposure to the chemical
    would cause cognitive impairment. *Id.* at 672. In contrast, Ms. Rando's opinions are well-founded
28  on the evidence and her own analyses.

recommendations based off their own design"); Rando Rpt. at App'x E-F (identifying specific and nuanced human factors issues at each step of the in-app reporting processes).

### D. Ms. Rando's evaluation of the information available to Uber concerning its deficient reporting processes is admissible.

In rendering her opinions, Ms. Rando noted Uber's internal data and documents acknowledging deficiencies in Uber's sexual assault and sexual misconduct reporting processes. *See* Rando Rpt. at ¶¶ 143, 145, 160. Uber argues that this is improper "state of mind" testimony. Not so. Ms. Rando's human factors analysis requires analyzing the nature of the risk and the organization's knowledge of that risk to determine whether accepted practices, such as iterative design improvements, were properly applied. *See id.* at ¶ 25 (fundamental principle of human factors/human safety is engaging in iterative risk assessments); *id.* at ¶ 27 (risk management is iterative process that is both proactive and reactive); *id.* at ¶ 162 ("Given the safety-critical nature of SA/SM and known underreporting, failing to follow up on indirect signals undermines hazard detection, risk control, and verification that mitigations are working"). The fact that Uber possessed concrete information about flaws in its reporting flow is necessary and relevant input for Ms. Rando's analysis. Along the same lines, Uber's records of problematic reporting directly inform and support Ms. Rando's usability and safety program assessments. Her application of objective evidence of known flaws in Uber's reporting flow is not the same as rank speculation about someone's "intent, motive, or state of mind," Mot. at 10, but rather typical expert analysis as to whether conduct aligns with provided industry standards.

As explained above, experts may testify to what a defendant "knew or should have known" if relevant to their opinions. *Cover*, 2017 WL 9837932, at \*17; *see also, e.g.*, *McCoy*, 2024 WL 1705952, at \*17 ("Expert testimony regarding information available to a defendant is helpful and relevant to determining whether the defendant acted reasonably, and does not improperly comment on the defendant's state of mind.") (internal quotation marks and alterations omitted); *Welding*, 2005 WL 1868046, at \*17 ("It is through the application of his expertise that Dr. Levy may allow the trier of fact to better understand what the documents do (and don't) mean, and, thus, what the defendants did (or didn't) know."); *see also* §§ I.D (Drumwright),

1    II.B.5 (Valliere), IV.C (Weiner), VI.A.4 (Chandler), VII.C (Tremblay).

2    **IX.    Dr. Lindsay Cameron's testimony is admissible.**

3        Dr. Cameron is an assistant professor of management at the Wharton School of the

4    University of Pennsylvania and an expert in organization and management, work, and

5    employment relations with a focus on the on-demand economy. Cameron Reb. Rpt. at 3-8. Her

6    academic research focused on algorithmic management and how it shapes organizational structure

7    and worker autonomy. *Id*. Dr. Cameron was retained to rebut the opinions of Uber's expert

8    Joseph Okpaku, a lawyer and a lobbyist, who opines that "[r]idesharing companies like Uber do

9    not exercise the same degree of control over drivers that a company exercises over employees or

10   agents." Okpaku Rpt. at 21-29. In response, Dr. Cameron offers the following opinions:

11   •    Mr. Okpaku's analyses are incomplete and often inaccurate, relying not on much
         peer-reviewed research, but instead his own personal observations of Lyft (his
12       former employer). *See* Cameron Reb. Rpt. at 8-9.

13   •    Through its algorithm and policies, Uber exercises control over drivers. *Id*. at 10-11.

14   •    While drivers choose when to log into the app (temporal flexibility), their choices
         are greatly limited once they are logged in. Drivers do not have substantial input into
15       what riders they are matched with, the pickup/destination of the rides, and the length
         of the ride. *Id*. at 10.
16
     •    While drivers are, technically, able to accept or reject a ride, those choices have
17       consequences that affect workers' standing on the platform. *Id*.

18   •    Algorithmic pricing determines workers' value and shapes their behavior,
         constituting control. *Id*. at 12.
19
     •    Mr. Okpaku's comparison of Uber to companies like Etsy, Ebay, and Airbnb is
20       specious, as those platforms do not involve algorithmic management of the labor
         process, controlling prices, matching, evaluation, and discipline. *Id*.
21
     •    Ratings systems, like evaluation systems, constitute a form of control. *Id*.
22
         **A.    Dr. Cameron applied a reliable methodology.**
23
         Uber does not overtly challenge Dr. Cameron's qualifications, and rightfully so. She
24
     received a Ph.D. in management from the University of Michigan, teaches graduate and doctoral-
25
     level classes on qualitative methodology, employment relations, and the on-demand economy,
26
     and has been studying Uber specifically "for the past ten years." *Id*. at 3; Cameron Dep. at
27
     286:18. Her research on the ride-hailing industry has included hundreds of interviews with
28

1   drivers, review of public documents by and about Uber, fielding surveys and financial diaries

2   with ride-hailing drivers, and spending time on driver forums and at organizations focused on

3   drivers' rights. *See* Cameron Reb. Rpt. at 6. Based on this research, she has published numerous

4   articles, several award-winning. *Id.* She has provided testimony before the Pennsylvania

5   legislature and served as a testifying expert on these topics. *Id.*; Cameron Dep. at 55:8-56:5, 57:3-

6   59:3. These qualifications permit Dr. Cameron to opine on the principles of organizational and

7   algorithmic management that give Uber control over its drivers. *See Chandler Gas*, 2025 WL

8   3018829, at *2 (finding expert's doctorate, teaching, and extensive background in the field,

9   coupled with published scholarship, consulting with industry participants, and previous testimony

10  as an expert in the subject area, sufficient to establish the "minimal foundation" required under

11  Rule 702 for expert qualification).

12      Rather than challenge Dr. Cameron's qualifications directly, Uber argues that her

13  "methods cannot form the basis of a reliable expert opinion." Mot. at 3. But that is just another

14  way of saying the expert is not qualified in the first place. Uber pretends as if Dr. Cameron

15  interviewed a few Uber drivers and prepared a report based on those interviews, like a

16  psychological expert opining on damages might do. That is not the case: she relied on her

17  extensive body of "published research" and "knowledge" gained through an academic career

18  studying these topics. *See* Cameron Dep. at 42:11-43:3 (explaining that her report did not rely on

19  any "specific interview or transcript").

20      Dr. Cameron's research, rooted in psychology and sociology, draws on the "norms and

21  standards of qualitative methodology in the organizational management field." Cameron Reb.

22  Rpt. at 13. Organizational scholars such as Dr. Cameron emphasize "in-depth immersion and

23  observation—to see things from the experiential point of view of actors in the field." *Id.* In her

24  work, she uses "grounded theory," an "iterative process [that] includes reading materials

25  carefully, iterative open and focused coding, creating analytical categories, writing memos,

26  engaging in academic conversations, and drafting reports." *Id.* at 14. Her research on the ride-

27  hailing industry utilizes the "[h]allmarks of qualitative research[:] long-term (participant)

28  observation, longitudinal interviews, and in-depth analysis of archival documents, such as

company materials or web forum postings." *Id.* at 4. Dr. Cameron's research has involved:

conducting in-depth, semi-structured interviews with more than 150 drivers and passengers, as

well as conversational interviews with more than 100 drivers while riding as a participant

observer; spending approximately 100 hours applying for, training, and working as a ride-hailing

driver for Uber; and hiring a research assistant who also drove and collected research data in so

doing. *Id.* at 13-14. These techniques are rigorous and reliable. *See* Cameron Dep. at 132:16-

133:20 (explaining that semi-structured interviews involve "a group of people that have been

theoretically sampled for a particular reason to answer a research question," an "interview

protocol," and "collecting data from multiple sources"). In addition, Dr. Cameron reviewed

documents by and about Uber, fielded surveys and financial diaries with ride-hailing drivers,

spent time on driver forums and at organizations focused on drivers' rights. Cameron Reb. Rpt. at

14. She has published numerous peer-reviewed articles based on this data.[63] *Id.* Ex. A.

    Uber critiques Dr. Cameron's methodology in preparing her expert report, but that

methodology is grounded in the academic literature of her field, and is the basis for her

published—and acclaimed—work. *Id.* at 14. Application of her own research and experience, in

conjunction with a review of relevant literature and analysis of Uber's documents, is a reliable

methodology. *See Elosu v. Middlefork Ranch Inc*., 26 F.4th 1017, 1024 (9th Cir. 2022) ("An

expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which

they render an opinion."); *City of Pomona v. SQM N. Am. Corp*., 750 F.3d 1036, 1044 (9th Cir.

2014) (methodology is reliable if published "in peer-reviewed literature" and "general[l]y

accept[ed]" in the field); *In re Juul,* 2022 WL 1814440, at *4 (recognizing "experts' experience,

review of relevant literature[], and review of [defendant's] own documents provide a reasoned

and reliable basis" for their opinions).

    Taken to its logical conclusion, Uber's criticisms of Dr. Cameron's approach would bar

---

[63] Publication distinguishes Dr. Cameron's work from that of the expert in *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A*., 209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017), whose two peer-reviewed publications did not contain the analysis that was the subject of his report. There, the court's concern the expert had not preserved the "vast majority" of his source material stemmed from the fact that the expert's methodology "ha[d] not been—and, for multiple reasons, c[ould] not be—tested or challenged in any objective sense." *Id*. at 644.

all expert opinion relying on qualitative data, no matter that the conclusions flowing from such data have survived peer-review scrutiny and received academic honors. *Daubert* itself recognized the probative value of "peer review and publication," noting that "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in the methodology will be detected." 509 U.S. at 593. Accordingly, courts routinely admit qualitative analysis as expert opinion. *See, e.g., Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) ("[T]hat an analysis may be qualitative does not mean that it is unreliable for the purposes of *Daubert*."); *see also id.* at 505 (noting that "technical or other specialized knowledge may be relevant and reliable, and therefore admissible under *Daubert*, even if the field of knowledge … does not readily lend itself to a formal or quantitative methodology") (internal quotation marks omitted).

The subject of Dr. Cameron's report—the ways that Uber controls drivers' work—is inherently qualitative. *See* Cameron Dep. at 136:6-8 ("Qualitative research is about how systems and organizational processes unfold."); *see also* Cameron Reb. Rpt. at 4 ("Qualitative methods are especially useful for studying emerging phenomena, such as the on-demand economy, because they allow for an in-depth examination of mechanisms and processes."). Uber's demand for "quantitative studies, research or tests," Mot. at 3, misunderstands the scope of Dr. Cameron's work and the nature of qualitative research. *See, e.g.*, *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1392 (M.D. Ala. 2014) (rejecting argument that sociology expert's "qualitative—as opposed to quantitative—research methods [were] insufficiently rigorous to form the basis for admissible expert opinions", noting that her "success in publishing in peer-reviewed journals . . . strongly supports the validity of her qualitative method of research"); *Kanuszewski v. Shah*, 583 F. Supp. 3d 1018, 1023 (E.D. Mich. 2022) (denying motion to exclude expert who applied qualitative methodology adopted from published literature).[64]

---

[64] Uber takes snippets of Dr. Cameron's deposition out of context. *First*, when Uber asked her about legal concepts like reliability, she confirmed that "reliability" *is* "a concept that applies to qualitative research." Cameron Dep. at 146:14-18. She merely explained differences between qualitative and quantitative research and how the term "triangulation" was the more appropriate term in her field to capture the same idea. *Id.* at 147:5-23. *Second*, the phrase "there is no right" did not apply to her "methodology." Mot. at 5. Instead, she made that statement in response to a

1    Uber's argument is hard to take seriously when measured against the opinions of its own

2    expert (Mr. Okpaku) whom Dr. Cameron rebuts. Mr. Okpaku is a lobbyist, not an academic, who

3    offers expert analysis of Uber's control over its drivers by virtue of his experience lobbying for

4    Lyft. *See* Okpaku Rpt. at 4-5. That experience, he claims, includes "direct experience with

5    hundreds if not thousands of rideshare drivers," and exactly two publications, both blog posts on

6    Medium.com promoting Lyft's "commitment to our community" and advocating against "new

7    rules" for ridesharing in New York City. *Id.* at 23 & Attachment A at 5. Uber never explains why

8    Dr. Cameron's published, peer-reviewed research based on qualitative investigation cannot

9    produce a reliable methodology to analyze control, but a lobbyist's puff pieces can.

10   Uber's citation to *Chandler Gas* shows why Dr. Cameron's testimony is admissible. In

11   that case the court excluded a qualitative analysis—"reading through a relatively arbitrary

12   collection of consumer reviews"—offered to support a quantitative conclusion that there was zero

13   "economic harm" caused by alleged misconduct. 2025 WL 3018829 at *4. In contrast, Dr.

14   Cameron's research is grounded in qualitative assessment of Uber's business model; she does not

15   veer into quantitative analysis. More importantly, in *Chandler Gas*, there was "no part of [the

16   expert's] background that qualifie[d] him to conduct a qualitative analysis of customer reviews."

17   *Id.* Here, Dr. Cameron's research has been widely recognized, lauded, and peer-reviewed.

18   **B.      Dr. Cameron's conclusions flow from her methodology.**

19   Uber makes much of Dr. Cameron's immersion research, ignoring that the hundreds of

20   semi-structured interviews she conducted with drivers are only one piece of the foundation for her

21   opinions. *See* Cameron Reb. Rpt. at 13-14 (detailing methodology in full); Cameron Dep. at

22   292:17-293:23 ("[I]t's more than just I drove for Uber for 100 hours. . . . I've interviewed people

23   longitudinally for seven years. – data, online forums, public documents from Uber for S1s to

24   advertisements to promotional materials, just scraping the web forums for the past ten years. . . .

25   it's really what I've eat, lived, breathed for the past 10 years."); *cf. Lewis*, 2025 WL 821895, at *3

26   (excluding expert who offered opinions "[w]ithout any methodology or reasoning in the expert

27

28   question about whether a hypothetical driver would be "right" if they "believe[d] that schedule
     flexibility is the best benefit of being a driver." Cameron Dep. at 75:10-18. As her report
     explained, subjective motivations do not detract from the control Uber exercises over its drivers.

1  report"). She also cites in her report dozens of examples of academic work—hers and others'—

2  supporting her conclusions. *See, e.g.*, Cameron Reb. Rpt. at 17-19 (discussing "how

3  organizational scholars define organizational control and its importance"). And she applied her

4  body of academic knowledge to the records in this case, citing or relying on dozens of Uber

5  documents. *See*, *e.g.*, Cameron Reb. Rpt. at ¶ 88.d (citing the record to explain how the "choice"

6  of whether to accept a ride is constrained by Uber); *id.* at ¶ 93 (discussing how driver incentives

7  are a form of control, and citing the record in this case to illustrate the incentives offered); *id.* at

8  Ex. B (material considered).

9         Dr. Cameron's analysis is nothing like the cases Uber cites.[65] Based on her interviews

10  with drivers and many other sources—research that has been subject to peer review, published,

11  and awarded—Dr. Cameron opines that Uber deploys organizational control through its

12  algorithmic management systems, which are integral to its business model and evident in its

13  relationship with drivers. *See* Cameron Reb. Rpt. at 3. She makes no unfounded predictions about

14  what Uber would do under hypothetical circumstances, *cf. Klein v. Meta Platforms, Inc.*, 766 F.

15  Supp. 3d 956, 967(N.D. Cal. 2025), and draws no baseless conclusions about specific events, *see*

16  *Mamani v. Berzain*, 2018 WL 1010582, at *4-5 (S.D. Fla. Feb. 22, 2018). Instead, she properly

17  "draw[s] a conclusion from a set of observations based on extensive and specialized experience."

18  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).

19         **C.      Dr. Cameron's opinions are relevant.**

20         Uber asserts that Dr. Cameron's opinions are irrelevant because, under A.R.S. § 23-1603,

21  Uber's "drivers ... are independent contractors as a matter of law." Mot. at 9. In her opposition to

22  partial summary judgment, Plaintiff explains why that statute, which governs things like workers'

23  ───────────────

24  [65] *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp.
    3d 940, 950 (N.D. Cal. 2020) (finding "free form," non-standardized conversations with 20
    respondents unreliable to serve as the basis for conjoint analysis); *Chandler Gas*, 2025 WL

25  3018829, at *4 (excluding economist whose methodology consisted of reading through "a
    relatively arbitrary collection" of 36 Google reviews "and nothing more," finding that "no part of

26  [expert's] background [] qualifies him to conduct a qualitative analysis of customer reviews retrieved
    through his own unexplained research on Google Maps"); *United States v. Pryba*, 678 F. Supp. 1225,

27  1232, 1234 (E.D. Va. 1988) (finding "one-man, eight-day, unscientific poll" that "look[ed] at what is
    going on in the community" unreliable, noting that expert "prepared no report[,] had only his notes,"

28  and sought to offer a sweeping conclusion about "the overwhelming majority" of adults in the
    community based on his conversations with people at "probably" 80 or 90 bookstores).

1  compensation and wages, does not modify Arizona's longstanding, common-law test for

2  respondeat superior liability. *See* Pl's Opp'n to Summ. J. at Argument, § I.A.

3      Under that test, the jury must determine whether drivers are subject to Uber's "control or

4  right to control." *Santiago v. Phoenix Newspapers, Inc*., 794 P.2d 138, 141 (Ariz. 1990) (quoting

5  Restatement (Second) of Agency § 220 (1958). The "right-to-control test requires an examination

6  of whether the employer reserves the right to supervise or control the method of performing the

7  contracted service or whether the employer's control is limited to the result, leaving the method to

8  the other party." *Simon v. Safeway, Inc*., 173 P.3d 1031, 1036 (Ariz. App. 2007).

9      Dr. Cameron's testimony goes directly to this determination. At trial, she will testify about

10  the ways that Uber controls the manner and means of the transportation service: matching drivers

11  to riders, determining the price of the ride, guiding the pace of drivers' work (e.g. determining

12  when the next ride is added to the queue), and evaluating drivers' performance. Cameron Reb.

13  Rpt. at 43. For example, Dr. Cameron explains that, though drivers may decline rides, Uber

14  makes it impossible to make an informed and reasoned choice, giving drivers only seconds to

15  accept or lose the ride. *Id*. at 44. Dr. Cameron also describes how Uber uses customer ratings to

16  increase managerial control, using ratings to affect drivers' access to future assignments. *Id*. at

17  27-28. And she walks through practices that ride-hailing companies like Uber use to promote a

18  "false sense of autonomy for drivers" while, in reality, imposing significant constraints on their

19  work. *Id*. at 32-35. Such testimony will help the jury determine that Uber drivers are employees.

20  *See Simon*, 173 P.3d at 1036. It will also be helpful to the jury because the concept of algorithmic

21  control is "not necessarily within the comprehension of laypersons." *N.A.A.C.P. v. City of Myrtle*

22  *Beach*, 504 F. Supp. 3d 513, 519 (D.S.C. 2020) (denying motion to exclude sociology expert,

23  finding testimony "sufficiently relevant and reliable to assist the trier of fact").

24      Uber criticizes Dr. Cameron for "admitting" that she did not consider any legal definition

25  of control in forming her opinions, Mot. at 9; but had she done so, Uber surely would have

26  claimed that her opinions were improper legal opinions. *See Tamman*, 782 F.3d at 552 ("In

27  general . . . an expert cannot testify to a matter of law amounting to a legal conclusion."). Uber

28  never explains why its own expert—Mr. Okpaku—is permitted to opine that Uber does not

1    control its drivers, but Dr. Cameron may not respond that it does.

2    Control is a fact question. *See O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1149-

3    52 (N.D. Cal. 2015) (applying the same test under California law, and denying summary

4    judgment on control question); *Narayanasamy v. Issa*, 435 F. Supp. 3d 388, 391 (D.R.I. 2020)

5    (same, Rhode Island law). In *Santiago*, for example, the court found a triable question of fact on

6    employee status where the employer "designated the time for pick-up and delivery, the area

7    covered, the manner in which the papers were delivered …, and the persons to whom delivery

8    was made." 794 P.2d at 143. The driver there "did the job as he was told, without renegotiating

9    the contract terms, adding customers and following specific customer requests relayed by" the

10    employer. *Id.* Dr. Cameron helps the jury understand why the same conclusion follows here.

11                                    **<u>CONCLUSION</u>**

12    For these reasons, Uber's motions to exclude should be denied.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: December 10, 2025                    Respectfully submitted,

                                            By: /s/ *Sarah R. London*
                                                Sarah R. London (SBN 267083)

                                            GIRARD SHARP LLP
                                            601 California St., Suite 1400
                                            San Francisco, CA 94108
                                            Telephone: (415) 981-4800
                                            slondon@girardsharp.com

                                            By: /s/ *Rachel B. Abrams*
                                                Rachel B. Abrams (SBN 209316)

                                            PEIFFER WOLF CARR KANE
                                            CONWAY & WISE, LLP
                                            555 Montgomery Street, Suite 820
                                            San Francisco, CA 94111
                                            Telephone: (415) 426-5641
                                            Facsimile: (415) 840-9435
                                            rabrams@peifferwolf.com

                                            By: /s/ *Roopal P. Luhana*
                                                Roopal P. Luhana

                                            CHAFFIN LUHANA LLP
                                            600 Third Avenue, 12th Floor
                                            New York, NY 10016
                                            Telephone: (888) 480-1123
                                            Facsimile: (888) 499-1123
                                            luhana@chaffinluhana.com

                                            *Plaintiffs' Co-Lead Counsel*

### FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: December 10, 2025          By:     /s/ *Andrew R. Kaufman*
                                          Andrew R. Kaufman