# EXHIBIT W

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

Case No. 3:23-md-03084-CRB

ADDENDUM TO REPORT OF VERONIQUE VALLIERE

This Report relates to the following Wave 1 Case:
Case No. 24-cv-7940 (B.L.)
Case No. 24-cv-7821 (A.R.2)
Case No. 24-cv-7019 (LCHB128)
Case No. 23-cv-6708 (Dean)
Case No. 24-cv-4900 (WHB 832)

October 20, 2025

**Confidential – Subject to Protective Order**

# VERONIQUE N. VALLIERE, PSY.D.
# VALLIERE & COUNSELING ASSOCIATES, Inc.

**Forensic Treatment Services**
drvalliere@valllierecounseling.com

P.O. Box 864
Fogelsville, PA 18051
Telephone: (610) 530-8392
Fax: (610) 530-8940

## ADDENDUM TO
## EXPERT REPORT OF VERONIQUE N. VALLIERE, PSY.D.

**DATE:** October 20, 2025

**SUBJECT:** Forensic Psychologist Expert Opinion
J.D. v. Uber Technologies
A.R.2 v. Uber Technologies
B.L. v. Uber Technologies
LCHB128 v. Uber Technologies
WHB 823 v. Uber Technologies

### SUPPLEMENTARY INFORMATION AND OPINION

On September 26, 2025, I submitted an expert report regarding the subject above, indicating that should additional documents and testimony become available, I would supplement my report. I submit this Addendum based on new materials, specifically Ms. Emilie Boman's 30(b)(6) testimony from October 1, 2025, exhibits, documents cited here and related documents on my List of Materials Considered. I provide these opinions with a reasonable degree of professional certainty.

I previously discussed how Uber's payments to nonprofit advocacy organizations that focus on sexual assault (Sept. 26, 2025 Valliere Report at 13-14) allowed Uber to claim partnerships with these organizations. In these claimed partnerships, Uber added to an aura of safety and credibility with riders, especially women. Ms. Boman's deposition provides additional support for that conclusion in a number of ways.

First, Ms. Boman's deposition revealed Uber's substantial payments to these organizations. She presented a "Deposition Aid" and testified about millions of dollars of payments Uber has made to specific nonprofit organizations through the years (Boman Ex. 2059, Boman Dep., Oct. 1, 2025, at 40), organizations with a reputation of combating sexual assault and promoting safety for women. These organizations were [redacted] Ms. Boman testified about [redacted] (UBER_JCCP_MDL_000911254, Boman Ex. 2041, Boman Dep., Oct. 1, 2025, at 133-137).

Second, Ms. Boman's testimony showed that a major purpose of these payments, thus enlistment of endorsements from these nonprofits for Uber, was to help bolster Uber's reputation and brand perception. As one document regarding the Driving Change campaign notes, "These funds should be an ongoing consistent commitment Uber makes, in part, because these partnerships are essential. Women's safety issues pose a significant risk to the business, not only in reputation, but consumer preference and regulatory impact" (UBER000231789, Boman Ex. 2045, Boman Dep., Oct. 1, 2025, at 176-180).

My prior report also describes how Uber's Safety Reports could lull women into perceiving Uber rides as safer than they are (Valliere Report at 13). Ms. Boman's testimony clarified the role that Uber's payments to advocacy and non-profit organizations played in this dynamic. For example, Ms. Boman testified about an internal document titled "Transparency report outreach plan – advocates" in which Uber stated that its "Key Results and Desired External Outputs" were to:

- Secure published, written product from 1-3 organizations tying this report to transparency reporting and corporate social responsibility, and calling on other companies to do the same.
- Secure statement of support and tweets from experts and advocates.
- Have high level pre-briefings with key stakeholders informing them of Uber's commitment to safety and to publishing a report.
- Blast email to select stakeholders (just prior to and at launch) with key points.

(UBER_JCCP_MDL_000124113, Boman Ex. 2054, Boman Dep., Oct. 1, 2025, at 264-274).

Other internal Uber documents discussed at Ms. Boman's deposition highlighted Advocate Themes and Draft Statements which seemed to be drafted by Uber but were presented to the public as statements by the advocates themselves (UBER_JCCP_MDL_001592811, Boman Ex. 2057; Boman Dep., Oct. 1, 2025, at 286-292). For example, a document drafted by Ms. Whaling, a member of Uber's Communications Team, included a statement for NSVRC to post for the Uber blog. The language there ultimately was included in the Foreword by Karen Baker, CEO of NSVRC, in Uber's 2019 Safety Report (Uber's Safety Report 2017-2018, UBER_JCCP_MDL_000093853, Boman Ex. 2056, UBER_JCCP_MDL_001592811, Boman Ex. 2057, Boman Dep., at 286-292).

Unfortunately, Uber has not disclosed the financial arrangements it has with these nonprofit advocacy groups to the public so the public is aware that these are not impartial relationships but in fact paid relationships that require Uber approval (Boman Ex. 2036, Boman Dep., Oct. 1, 2025, at 50-59). To this point, Ms. Boman testified that Uber paid Raliance ▮▮▮▮▮ (Boman Dep., at 29-30). As explained at the deposition, Raliance is a partnership between NSVRC, ValorUS, formerly CAL Casa, and the National Alliance to End Sexual Violence; additional testimony confirmed that Pennsylvania Coalition Against Rape (PCAR) was doing business as NSVRC (UBER000029029, Boman Ex. 2033, Boman Dep., at 27-28, 51-52).

If Uber were to fully describe and acknowledge the true nature of the relationship between Uber and the non-profits, users could evaluate and weigh Uber's professed endorsements with accuracy. In my experience as a professional, acknowledgement of the relationship, compensation, potential conflicts or biases, or other issues that may confound or complicate my opinions are required to allow the audience to weigh my opinions appropriately. In headlining itself as partnered with these specific non-profits without such transparency, Uber riders have an incomplete ability to assess the value of said partnerships in contributing to Uber's safety for women. As I have discussed in my report, when people are educated about risks, limitations, and compromises, they can make more accurate assessments in their decision-making.

Uber documents detail payments to these nonprofits but also outline Uber's ▮▮▮▮▮ ▮▮▮▮▮ (Uber_JCCP_MDL_00028845, Boman Ex. 2037; UBER_JCCP_MDL_0042153531). At Ms. Boman's deposition, a chat exchange with Gus Fuldner and Sarfraz Maredia, the day after the 2019 Safety Report was published, was discussed (Uber_JCCP_MDL_00028845, Boman Ex. 2037). In the chat, Mr. Maredia stated "▮▮▮▮▮ ▮▮▮▮▮" in response to the fact that a prominent women's advocate with Time's Up did not comment on the Safety Report. They both seemed to believe that ▮▮▮▮▮ ▮▮▮▮▮ (Uber_JCCP_MDL_00028845, Boman Ex. 2037, Boman Dep., Oct. 1, 2025, at 62-72).

These conflicts and the evidence that Uber was managing or dictating their partnerships were not overlooked or unknown by Uber.  Uber took specific steps to ensure that the partnerships *appeared* independent from Uber.  Uber employees expressed concerns that the messages would be too similar in that the nonprofits would simply repeat information provided to one another.  A chat from Dec. 5, 2019, between Brooke Anderson, Jodi Kawada Page and Andrew Hasbun, showed Ms. Anderson stating, "I want to make triple sure that the advocates statements don't crib from each other, or seem to borrow too much from Uber's.  I refined the ones in the blog post." (UBER_JCCP_MDL_000394403, Boman Ex. 2055).  Ms. Anderson seemed to indicate that this concern arose because she "woke up with major anxiety about the New York Times and others covering the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Uber_JCCP_MDL_000394403, Boman Ex. 2055, Boman Dep. Oct. 1, 2025, at 277-280).

To reiterate, all of these issues lend to the integrity and authority of the partnerships, to how educated consumers would evaluate the endorsements.  Women would be able to consider how Uber's exploitation of the needs of the nonprofit as a counterweight to the strength of the endorsement.  This would at least provide information about Uber, along with all the other information I have outlined in my report, that would make Uber's risk to women visible and defined, instead of creating an illusion of safety that precludes a victim to make informed consent in using an Uber.

I have provided these opinions to a reasonable degree of psychological certainty.

Veronique N. Valliere, Psy.D.
Licensed Psychologist