# EXHIBIT 3

GALIHER DEROBERTIS & WAXMAN LLP

L. RICHARD DeROBERTIS     3179
ILANA K. WAXMAN          8733
ALLISON M. AOKI          6912
ALYSSA R. SEGAWA         9798
CHRISTOPHER L. JOHNSON   11389
ELIZABETH A. NARDI       11343
VICTORIA M. CHANG        8920
820 Mililani Street, Suite 505
Honolulu, Hawai'i 96813-2935
Telephone: (808) 597-1400
Facsimile: (808) 591-2608

Attorneys for Plaintiff

**Electronically Filed
FIRST CIRCUIT
1CCV-24-0001560
30-OCT-2024
09:49 AM
Dkt. 1 CMPS**

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| JANE DOE WHBE 3, <br><br> Plaintiff, <br><br> vs. <br><br> UBER TECHNOLOGIES, INC., <br><br><br> Defendant. | CIVIL NO. _____ <br> (Other Non-Vehicle Tort) <br><br> **COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS** |

## COMPLAINT

Comes now Plaintiff Jane Doe WHBE 3, by and through her undersigned

attorneys GALIHER DeROBERTIS & WAXMAN LLP, for a complaint against the

above-named Defendant, alleges and avers as follows:

## PARTIES

### Plaintiff

1. Plaintiff Jane Doe WHBE 3 (Ms. Doe or Plaintiff) is an individual and a resident of California. She was sexually assaulted by her Uber driver (the Driver) in Honolulu, Hawai'i.

**Defendant**

2. Defendant Uber Technologies, Inc. (Uber) is a Delaware corporation with its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California, 94103. Defendant Uber may be served with process through its registered agent, CT Corporation System. CT Corporation System is located at 900 Fort Street Mall, Suite 1680, Honolulu, Hawai'i 96813.

## JURISDICTION

3. This Court has original jurisdiction over this civil action pursuant to Hawai'i Revised Statutes (HRS) §§ 603-21.5 and 634-35 because the relevant events occurred in the City of Mililani in the County of Honolulu, First Circuit Court of Hawai'i, State of Hawai'i.

4. By neither rule nor statute does another court have exclusive original jurisdiction over this matter.

5. This Court has personal jurisdiction over Uber.

6. This Court has specific jurisdiction over Uber because Plaintiff was raped by her Driver in Hawai'i. Uber marketed itself as a safe mode of transportation in Hawai'i. It targeted Hawai'i to provide transportation in Hawai'i. And Plaintiff was injured in Hawai'i.

7. A federal court would not have jurisdiction under 28 U.S.C. § 1331. Plaintiff affirmatively disclaims any damages or actions arising under the constitution, treaties, or laws of the United States. Federal law in no way forms an essential or

potential ingredient of Plaintiff's claims, and federal law does not create any of Plaintiff's causes of action. Moreover, Plaintiff's right to relief does not depend on resolution of a substantial question of federal law.

8.     Further, Plaintiff raises no claim of admiralty or maritime law, so there is no federal jurisdiction under 28 U.S.C. § 1333.

9.     Plaintiff sues no foreign state or agency, so there is no federal jurisdiction under 28 U.S.C. § 1330. Nor is there federal jurisdiction under 28 U.S.C. § 1346 because the United States is not a defendant. Plaintiff is also disclaiming any claim that any U.S. Federal Government Officer, Agency, or Department, injured Plaintiff while acting under the color of federal law.

10.     Under 28 U.S.C. § 1441(b)(2), this case is not removable on the basis of § 1332(a) because Uber is a California citizen. Plaintiff is also a citizen of California.

11.     Because there is no other basis of federal jurisdiction, this case is not removable.

## VENUE & JOINDER

12.     This complaint is initiated pursuant to HRS § 603-21.5(a)(3).

13.     Pursuant to HRS § 603-36(5), venue for this complaint is brought in the judicial circuit where the claim for relief arose.

## FACTUAL BACKGROUND

14.     Like thousands of other women, Ms. Doe WHBE 3 was sexually assaulted by an Uber driver.

15.     There is a sexual-assault epidemic on the Uber platform. Every day, scores of women are sexually assaulted or are the victims of sexual misconduct in Uber rides.

16.    Uber is aware of this because its passengers report these incidents of sexual assault and sexual misconduct to Uber. Yet Uber has failed to disclose this information to passengers. And it has worked — for years — to cover up the extent of its sexual-assault epidemic.

17.    Uber cares about growth and profits — not the safety of its passengers. And Uber knows that if the public or regulators knew how dangerous riding in an Uber alone at night is, Uber would make less money, which would mean less money for Uber's officers and directors.

18.    So Uber has fought to cover up the extent of its sexual-assault epidemic while at the same time both assuring passengers its product is safe and inviting passengers to use Uber after drinking.

19.    At the same time, Uber has refused to embrace common-sense safety measures like requiring cameras in cars or allowing women to elect to have female drivers. Doing so would affect Uber's business model and cost it money, so it won't take these simple steps to protect passengers.

20.    Rather than implement common-sense safety measures, Uber has lobbied state legislators to insulate itself from legal liability. Uber has chosen to protect itself, not its passengers.

21.    Uber knows its rides are a risk to women and that Uber has increased the risk of sexual assault for its passengers. Yet it has refused to take reasonable measures in the face of the risk Uber has created.

22.    Because of Uber's acts and omission, Ms. Doe WHBE 3, like thousands of other women, is now a sexual-assault survivor.

23.     The assault on Ms. Doe was reasonably foreseeable because Uber knows scores of women are sexually assaulted or the victims of sexual misconduct every day in Uber rides.

### Uber and the Uber Application

24.     Uber is a transportation company based in San Francisco, California. Its app-based transportation system is available throughout the United States, including Hawai'i, and internationally.

25.     Uber distributes a mobile application, the Uber App, in the regular course of its business. Uber is the designer, manufacturer, operator, and seller of the Uber App.

26.     Anyone from the public may download the Uber App.

27.     Customers of Uber download the Uber App to their mobile phones. Uber's customers use the Uber App to request and pay for transportation.

28.     Both Uber passengers and Uber drivers are subject to Uber's policies and procedures, of which Uber has ultimate authority to enforce or not enforce.

29.     Uber selects which driver will be matched with which rider, and the basis on which that match will occur.

30.     Uber decides what information will be provided to the passenger about the Uber driver. In doing so, Uber has decided that limited information should be provided. Uber does not disclose the complete identity of the Uber driver an Uber passenger is matched with. Uber only provides the Uber driver's first name.

31.     Uber does not provide the Uber driver's contact information. All communications must be made through, or to, Uber.

32.     Uber exercises significant control over Uber drivers and their vehicles. Vehicles must have four doors, be in good condition with no cosmetic damage, and be free of any commercial branding. Uber unilaterally decides the Community Guidelines.

33.     Uber assigns all Uber drivers to all Uber rides. An Uber driver cannot choose which rider to be matched with. Similarly, Uber's passengers have no ability to choose which Uber driver is assigned to them.

34.     Through its marketing, Uber holds itself out to the public as ready to take passengers from place to place for a fee.

35.     Under the common law, Uber is a common carrier, owing its passengers the highest degree of care.

36.     For decades, courts across this country have built common-carrier jurisprudence and held common carriers to a high duty of care because passengers are vulnerable. Passengers in a car are at the mercy of the driver.

37.     But Uber has never cared about its legal duties or the safety of its passengers. It has only cared about growth because that is what makes money for Uber's officers and investors. Uber also aims to supervise its drivers as little as possible so it can claim they are independent contractors and save money.

**Uber's business model puts its passengers at risk**

38.     Uber needs as many drivers on the road as possible, so passengers do not have to wait for rides. To get this number of drivers, Travis Kalanick, Uber's second CEO and, at one time, its largest shareholder, and the other executives at Uber made it as easy as possible for Uber drivers to sign up. They used a background-check system designed to get drivers approved as quickly and conveniently as possible.

39.    Uber hired Hirease, Inc. to do its background checks. Hirease brags that it can vet drivers within 36 hours. To have such a short turnaround, Uber eschewed industry standards used by other taxi companies and livery services. For example, Uber abandoned fingerprinting — which takes weeks — and running applicant drivers against FBI records. These shortcuts might have led to growth for Uber, but they also put people, including Plaintiff, in danger because Uber was matching women with improperly screened drivers.

40.    Uber also doesn't interview its drivers or meet them in person before they match them with Uber's passengers.

41.    Uber doesn't force its drivers to attend in-person training. For many years, Uber didn't train its drivers at all. Still today, Uber doesn't adequately train its drivers on sexual violence. Nor does Uber emphasize to its drivers that they will be fired and criminally prosecuted if they touch or harass an Uber passenger.

42.    Indeed, Uber's policy is that it won't report sexual violence it learns of to law enforcement. So Uber's policy is that if it learns from an Uber rider that she was sexually assaulted by an Uber driver, Uber will not report this sexual assault to law enforcement. Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the police on behalf of passengers when one of its drivers commits an act of sexual violence against an Uber passenger. This policy, put in place by Mr. Kalanick, is enforced today by Uber's current CEO, Dara Khosrowshahi.

43.    Uber has not adopted a zero-tolerance policy for sexual violence. Uber allows drivers to continue to drive for Uber even after Uber passengers have reported to Uber that the driver sexually assaulted or harassed them. Uber refuses to turn these

drivers into the police or to prevent them from driving for Uber because taking these steps would hurt Uber's growth.

44.    Uber also fails to adopt common-sense safety measures to protect its passengers, in part, because doing so would inhibit its ability to claim the drivers are simply independent contractors.

45.    For example, Uber refuses to require cameras in all rides. Video surveillance would deter acts of sexual assault and sexual harassment. Video surveillance would also allow police to arrest and charge sexual predators who drive for Uber. And video surveillance would allow sexual-assault survivors to corroborate their allegations.

46.    Uber also refuses to adopt other common-sense safety measures like allowing women to elect to have female drivers.

47.    Uber has not implemented effective policies for what Uber drivers should do when Uber passengers are incapacitated by intoxication. This lack of effective policymaking has created a void where sexual predators can feast.

**Uber is a Magnet for Sexual Predators**

48.    Uber markets itself as a safe way for people to get around after they have been drinking.

49.    Over the years, as Uber became more popular, predators recognized Uber's self-created safety failures. These predators realized that if they became Uber drivers — a process that Uber has deliberately made as easy and as open as possible — they would get to have women, late at night, and sometimes intoxicated, get into their cars, where they would have unsupervised control over them.

50.     In short, Uber has become a magnet for sexual predators. And these men, after pushing the boundaries for soft spots, have realized there is no push back from Uber. They have realized that Uber does not supervise them, will not report them to the police, and often will not fire them for sexual assault or sexual harassment. Uber's actions and inactions have only emboldened these sexual predators.

51.     The foreseeable use environments for the Uber App include drunk riders, to whom Uber specifically advertises its service and drivers who sign up for Uber thinking that it is an opportunity to meet sexual partners or engage in sexual activity.

52.     Uber has actual and constructive knowledge, based on its data and statistics, that women when riding alone with a male driver are in greater danger and at a higher risk of sexual assault or sexual harassment. Yet Uber has refused to disclose its stats on sexual assault and sexual harassment to the public or otherwise warn potential female passengers.

53.     Uber is aware that there are sexual predators on its platform who are using Uber to sexually assault women, yet it has not shared this information with the public.

54.     An elevated risk of sexual assault and sexual harassment was always a foreseeable consequence of how the Uber App was designed, distributed, and marketed.

55.     Uber had actual knowledge that its drivers were preying on its passengers and sexually assaulting them at alarming rates. When Uber passengers were sexually assaulted or sexually harassed, they sometimes report these incidents sexual violence to Uber. Sometimes Uber learned of sexual assaults and sexual harassment from law enforcement. These reports of sexual assault and sexual harassment put Uber on actual notice of the sexual-violence epidemic on its hands.

56.     The scant numbers Uber has released only begin to reveal the size and scope of Uber's sexual-violence epidemic.

57.     Under public pressure, because of the poor conduct of Uber's executives, including Mr. Kalanick, Emil Michael, and other Uber officers and directors, and because of news reports of Uber drivers sexually assaulting Uber Passengers, Uber released Uber's 2017–2018 US Safety Report.

58.     This report relied on a taxonomy of sexual assault that involves ten categories of sexual assault and 11 categories of what Uber refers to by the euphemism of *sexual misconduct*.

59.     But in its safety report, Uber did not disclose the figures for sexual assault and sexual misconduct for all 21 categories. Uber's refusal to disclose all 21 categories is part of its policy of refusing to warn the public or otherwise disclose to the public the true risks of sexual violence when riding in an Uber. Uber refuses to disclose this information to the public because such public disclosure would hurt its profitability. Indeed, Uber has at all times put profits over the safety of its passengers, especially its female passengers.

60.     Instead of disclosing all 21 categories, Uber only disclosed the figures for five categories. Still, those number are jaw dropping.

61.     In Uber's 2017 – 2018 US Safety Report, Uber reported that it received 2,936 reports of sexual assault in connection with an Uber ride in 2017 alone. Uber reported that in 2018, that number rose to 3,045 sexual assaults. That comes to over eight sexual assaults a day. And that doesn't include the other 16 categories of sexual assault and sexual misconduct that Uber refused to disclose. Nor does it include the reports that Uber deemed "inconclusive" and declined to otherwise categorize.

62.     On information and belief, Uber's cherry picking by only reporting five of the 21 categories vastly understates the size and scope of Uber's sexual-assault epidemic.

63.     Based on information Plaintiff's Counsel has received in connection with other lawsuits, in 2017 Uber received dozens of reports every single day of an Uber driver engaging in sexual assault or sexual misconduct against an Uber passenger. In 2018, dozens of women were sexually assaulted every day, based on Uber's internal documents. This pattern and practice of daily sexual assaults during Uber rides continues today. Thousands and thousands of women have become sexual assault survivors because they got into an Uber.

64.     The reports of sexual assaults and sexual harassment Uber receives dramatically underestimates the true magnitude of sexual assaults and sexual harassment that occur during Uber rides. First, sexual assault and sexual harassment generally is dramatically underreported. Second, many women who use Uber to acquire transportation are dropped off at their home, therefore fearful of reporting to Uber because the Uber driver knows how to find the rider again. Many riders are fearful that if they report sexual assault or sexual harassment to Uber, the Uber driver will identify her, find her, and retaliate.

65.     Despite Uber's knowledge of how pervasive sexual assault and sexual harassment was and is during Uber rides, Uber markets itself as a safe method of transportation, including for women.

66.     Uber represents to its potential passengers, on its website, all of the following:

a.      "The smart choice — Use Uber when you need a designated driver. You never know when a casual dinner with friends can become a big night out. Skip the part where you have to worry about who's OK to drive."

b.      "How we help keep you safe — We're committed to helping you get where you want to go with confidence, whether it's building emergency features in the app or making it easy for you to check your ride."

c.      "Ride with confidence — The Uber experience was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

d.      "Ride with confidence — Designing a safer ride – driver screenings – All potential drivers in the US must complete a screening before becoming an Uber driver-partner, and current drivers continue to be vetted for criminal offenses."

e.      "Ride with confidence — Designing a safer ride – On every trip, you can tap a button for safety tools and get help whenever you need it."

f.      "Ride with confidence — Designing a safer ride – An inclusive community – Through our joint efforts with cities and safety experts and by working together, we're helping to create safe journeys for everyone."

g.      "Our commitment to safety — You deserve to be able to move safely. To look forward to the opportunities ahead. To be connected to people and places that matter most. Which is why we're focused on your safety, from setting new standards to developing technology with the goal of reducing incidents."

h.    "How safety is built into your experience — Safety features in the app – Tap a button for emergency assistance. Share your trip details with loved ones. Our technology helps put peace of mind at your fingertips."

i.    "How safety is built into your experience — An inclusive community – Millions of riders and drivers share a set of Community Guidelines, holding each other accountable to do the right thing."

j.    "How safety is built into your experience – Coverage on every trip – We've put insurance from leading companies in place for every ride."

k.    "Building safer journeys for everyone – Rider safety – Uber driver-partners in the US go through a multi-point screening check for their driving and criminal history before they are authorized to take trips through the app. Every rider has access to safety features built into the app and a support team if you need them."

l.    "The future of safety – More than 200 Uber employees, from researchers and scientists to designers and engineers, are focused on building technology that puts safety at the heart of your experience."

m.    "Safe rides around the clock – Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber."

n.    "[W]herever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, and then working hard to improve them every day."

67.    Uber also ran advertisements, assuring the public it was a safe mode of transportation.

68.    For example, Uber ran the below advertisements before its drivers sexually assaulted Plaintiff.













69.     Uber's assurances of safety are tainted with fraud.

70.     In 2014, Uber's executives in San Francisco started charging Uber

passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber

announced the Safe Rides Fee, it told the public that the "Fee supports our continued

efforts to ensure the safest possible platform for Uber riders and drivers, including an

industry-leading background check process, regular motor vehicle checks, driver safety

education, development of safety features in the app, and insurance." The Safe Rides Fee

wasn't split with drivers. So it was pure revenue for Uber. Hundreds of millions of rides

had the Safe Ride Fee tacked on, making hundreds of millions in revenue for Uber. But

Uber never earmarked the money for improving safety or spent it on safety. Instead, it

pocketed the money while telling the world it was directing it to safety. As a former Uber

employee told a New York Times reporter" [w]e boosted our margins saying our rides were safer." It "was obscene."

71.    In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

72.    Riders, including Plaintiff, reasonably rely on Uber's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Uber as a result of this reliance.

73.    Uber knew its representations and promises about rider safety were false and misleading yet continued to allow riders to believe in the truth of these representations and promises and continued to profit from riders' reliance on those representations and promises.

74.    Indeed, Uber has spent millions and millions of dollars lobbying state and local authorities to try and escape the legal duties the law imposes on it.

75.    To try to repair its tattered reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.

76.    During his investigation, as detailed in the "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."

77.    Uber's culture of greed and misogyny started at the top with Travis Kalanick and Uber's officers and directors. It has had tragic consequences for thousands of women.

78.     Despite Uber's actual knowledge of its sexual-violence epidemic, it refused to warn the public, its passengers, women, or the Plaintiff of the risks of riding in an Uber. Indeed, Uber has never disclosed to the public the true extent of its sexual-violence epidemic. Because of Uber's failure to warn, Plaintiff was unable to take protective measures such as not riding in an Uber, not riding in an Uber at night, not riding in an Uber alone, and not riding in an Uber when intoxicated.

79.     But Uber hasn't only failed to warn. Uber has taken steps to cover up and hide from the public its sexual-violence epidemic.

80.      Despite Uber's actual knowledge of its sexual-violence epidemic, Uber has failed to adopt common-sense safety measures like requiring cameras in cars and allowing women to elect to have female drivers.

81.     The Uber platform creates or increases a risk to female passengers. It puts women alone in the car with men, who can avail themselves of the opportunity of having an isolated woman in the car by sexually assaulting or sexually harassing her.

82.     This harm to female passengers at the hands of Uber's drivers was foreseeable to Uber. Sexual assault and sexual harassment were in the scope of the risk that Uber created.

83.     Indeed, Uber was aware that the Uber platform and Uber rides created a risk of sexual assault and sexual harassment for Uber passengers. It knew that Uber rides put women in vulnerable situations — isolated in a car — that sexual predators could exploit. Indeed, Uber had actual knowledge, through the reports of sexual assault and sexual harassment Uber passengers were making to Uber, that this threat was real and was occurring every day.

84.    So Uber was aware that its female passengers were at risk and that its drivers, like the Driver, might avail themselves of the situation that Uber created — isolating women with men in cars — to sexually assault Plaintiff.

85.    Because of the reports of sexual assault Uber was receiving every day, Uber realized or should have realized the likelihood that a dangerous situation might be created for its female passengers and that drivers like the Driver might avail himself of the opportunity alone and in a car with Plaintiff to sexually assault her.

**Uber Protects Its Drivers**

86.    Uber protects its drivers who are accused of sexual assault as a way to protect itself, grow its business, and make money.

87.    It does not report sexual predators to police.

88.    It does not have a zero-tolerance policy for sexual assault. That is, it does not automatically fire drivers whom its passengers report sexually assaulted them.

89.    Uber does not always cooperate with law-enforcement who are investigating incidents of sexual assault or sexual harassment.

90.    Uber conceals the last names of its drivers, placing only the first names on ride receipts.

91.    When passengers report sexual violence to Uber, Uber does not volunteer the last names of drivers to the complaining passengers.

92.    And after 30 days, Uber removes the license-plate numbers from ride receipts. Uber's policy of removing license-plate numbers conceals, after 30 days, the true identities of the sexual predators from the sexual-assault survivors, making it more difficult for the survivors to bring these predators to justice. Because of Uber's policy of

removing the license plate, all sexual-assault survivors have to identify their predator drivers after 30 days are the driver's first name and a tiny headshot.

93.    Studies show that many sexual-assault survivors have a difficult time coming forward within 30 days. For those survivors unable to come forward within 30 days, Uber has effectively concealed from them the identities of their sexual abusers.

94.    By adopting this policy of removing the license-plate numbers from the ride receipts, Uber is aiding and abetting its sexual-predator drivers and conspiring with them to protect its predator drivers and itself.

**The Sexual Assault**

95.    On January 13, 2020, around 3:00 a.m., Ms. Doe WHBE 3 hailed an Uber to take her home from a restaurant in Mililani, Hawai'i.

96.    Uber dispatched the Driver to pick up Ms. Doe WHBE 3 and take her to her destination.

97.    Uber did not provide Ms. Doe WHBE 3 with the Driver's last name before the trip began, nor after the trip was completed.

98.    When the Driver and Ms. Doe WHBE 3 arrived at her destination, the Driver got into the back seat of the vehicle with Ms. Doe WHBE 3.

99.    The Driver raped Ms. Doe WHBE 3 in the backseat of the vehicle.

100.    Ms. Doe brought suit against Uber within the statute of limitations in California. Uber challenged the forum in California via a motion to dismiss on *forum non conveniens* grounds. Because of this forum fight, stipulations made by Uber to Plaintiff and the California Court, and the California's court's orders, Ms. Doe's suit against Uber in this forum is timely and not barred by the statute of limitations.

## CLAIMS

## COUNT ONE
## COMMON CARRIER NEGLIGENCE

101.    Plaintiff incorporates here the earlier and later paragraphs.

102.    Uber is a common carrier. Through its marketing, it holds itself out to the public as ready to take passengers from place to place for a fee.

103.    As a common carrier, Uber owes its passengers the highest degree of care.

104.    Uber's duty, as a common carrier, cannot be delegated to its drivers.

105.    As a common carrier, Uber has a special relationship with its passengers. As part of this special relationship, Plaintiff entrusted herself to the protection of Uber and relied on Uber to provide safe transportation.

106.    Uber breached its heightened duty of care by the following acts and omissions:

    a.   Failing to warn its passengers and the public about the extent of the risk of sexual assault from riding in an Uber;

    b.   Failing to require cameras in cars;

    c.   Failing to otherwise adequately supervise its drivers;

    d.   Failing to otherwise adequately train its drivers, including on consent, sexual assault and sexual harassment;

    e.   Failing to adequately screen its drivers;

    f.   Failing to allow female passengers to elect to have female drivers;

    g.   Failing to adopt a zero-tolerance policy related to sexual assault;

    h.   Allowing drivers accused of sexual assault and sexual harassment to continue driving for Uber; and

22

      i.   Such other acts and omissions as discovery will show.

107.    The Driver was not a mere third party but was the very man Uber elected to safely transport Plaintiff to her destination.

108.    Uber's breach of the heightened duty of care proximately caused injury to Plaintiff.

109.    Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

## COUNT TWO
## NEGLIGENCE

110.    Plaintiff incorporates here the earlier and later paragraphs.

111.    Uber owes a duty to its passengers.

112.    Included in this duty that Uber owed to Plaintiff was the duty not to expose her to the risk of reasonably foreseeable injuries.

113.    The risk of an Uber driver sexually assaulting women, like Plaintiff, while using Uber for transportation was sufficiently serious that a reasonable and prudent person would take precautions to avoid it.

114.    Uber knew, or should have known, that its acts or omissions would involve unreasonable risk of harm to women, like Plaintiff, through an Uber drivers' criminal acts of sexual assault.

115.    Uber breached its duty of care by the following acts and omissions:

      a.   Failing to warn its passengers and the public about the extent of the risk of sexual assault while using Uber App to obtain transportation;

23

  b. Failing to require cameras in vehicles Uber drivers use to transport users of the Uber App;

  c. Failing to adequately supervise its drivers;

  d. Failing to adequately train its drivers, including on consent, sexual assault, and sexual harassment;

  e. Failing to adequately screen or otherwise conduct proper background checks on Uber's drivers;

  f. Failing to allow female passengers to elect to be driven by a female Uber driver;

  g. Failing to adopt a zero-tolerance policy related to sexual assault;

  h. Allowing drivers accused of sexual assault or sexual misconduct to continue driving for Uber; and

  i. Such other acts and omissions as discovery will show.

116. Uber's above-mention breaches and unreasonable conduct created a situation that afforded an opportunity for the Driver to sexually assault Plaintiff. Indeed, Uber created the risk to Plaintiff or increased the risk to her. At the time Uber acted unreasonably it realized or should have realized the likelihood that it had created a dangerous situation that the Driver might avail himself to sexually assault Plaintiff.

117. Uber is liable to Plaintiff under the theories of liability set forth in Restatement (Second) of Torts § 302B.

118. The sexual assault that occurred to Plaintiff was in the scope of risk that Uber created.

119.    The Driver was not a mere third-party; he was the man Uber chose to transport Plaintiff safely to her destination.

120.    The Driver breached his duty of care by touching Plaintiff without her consent.

121.    Because Uber was aware that thousands of female passengers had been the victims of sexual assault and sexual harassment at the hands of Uber's drivers, and dozens of women were being sexually assaulted and harassed every day by predators sent to them by Uber, the sexual assault of Plaintiff by the Driver was reasonably foreseeable to Uber.

122.    Defendant's breach of the duty of care proximately caused injury to Plaintiff.

123.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## COUNT THREE
## NEGLIGENT UNDERTAKING

124.    Plaintiff incorporates here the earlier and later paragraphs.

125.    Under the common law, a duty may be assumed or undertaken. Once this duty is assumed or undertaken, the person assuming or undertaking the duty must exercise reasonable care.[1]

126.    Uber, through its public assurances of safety and through undertaking actions to get Plaintiff safely to her destination, such as agreeing to do so and matching Driver with Plaintiff, assumed the duty to get Plaintiff safely to her destination.

---

[1] *See* Restatement (Second) of Torts §§ 323 and 324A.

127.    This is particularly so because Uber had actual knowledge of the number sexual assaults occurring in connection with using the Uber App to obtain transportation.

128.    Uber assumed a duty to protect Plaintiff from an unreasonable risk of harm.

129.    Uber breached this duty in the following ways:

a.    Failing to warn its passengers and the public about the extent of the risk of sexual assault while using Uber App to obtain transportation;

b.    Failing to require cameras in vehicles Uber drivers use to transport users of the Uber App;

c.    Failing to adequately supervise its drivers;

d.    Failing to adequately train its drivers, including on consent, sexual assault, and sexual harassment;

e.    Failing to adequately screen or otherwise conduct proper background checks on Uber's drivers;

f.    Failing to allow female passengers to elect to be driven by a female Uber driver;

g.    Failing to adopt a zero-tolerance policy related to sexual assault;

h.    Allowing drivers accused of sexual assault or sexual misconduct to continue driving for Uber; and

i.    Such other acts and omissions as discovery will show.

130.    As such, Uber failed to carry out its assumed duty to provide for the safety of Plaintiff from attack and sexual assault.

131.    Because Uber was aware that thousands of female passengers had been victims of sexual assault at the hands of Uber drivers, and aware that dozens of women were being sexually assaulted every day by predators sent to them by Uber, the sexual assault of Plaintiff by the Driver was reasonably foreseeable to Uber.

132.    Uber's breach of the duty of care proximately caused injury to Plaintiff.

133.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## COUNT FOUR
## STRICT PRODUCTS LIABILITY — FAILURE TO WARN

134.    Plaintiff incorporates here the earlier and later paragraphs.

135.    The Uber App is a product.

136.    Uber manufactures, designs, sells, markets, advertises, labels, and distributes in the stream of commerce the Uber App.

137.    Consumers download the Uber App from a distribution source, such as Apple's App Store.

138.    Every feature of the Uber App was designed, developed, implemented, and controlled exclusively by Uber.

139.    Uber makes all decisions regarding the technical specifications and design of the Uber App, including but not limited to the user interface and coding that operate the Uber App.

140.    Uber made and distributed the Uber App in the regular course of its business.

141.    Uber made design, guarding, and warning choices which have affected the experience of users of the Uber App. Uber has controlled what features, including but not

limited to buttons, information sharing, camera usage, audio recording, women-to-women matching, and more that are involved in using the Uber App to access transportation.

142.    The Uber App reached Plaintiff without substantial change in its condition.

143.    Uber regularly communicates with its passengers through the Uber App.

144.    Plaintiff used the Uber App, seeking transportation from Uber. Uber elected the Driver to transport Plaintiff to her destination.

145.    Uber knew of the risk of sexual assault during Uber rides.

146.    Uber had a duty to warn Plaintiff that using the Uber App in the ordinary, customary, and reasonably foreseeable manner posed a danger to Plaintiff. Specifically, Uber had a duty to warn users and consumers that when using the Uber App, users were in danger of sexual assault or other sexual misconduct.

147.    Uber, however, did not warn Plaintiff through the App or otherwise of the risk of sexual assault during Uber rides.

148.    To the extent that Uber can be construed as having provided a warning regarding the risk of sexual assault while using the Uber App, the warning was inadequate.

149.    Because of the risk of sexual assault during Uber rides, the Uber App is unreasonably dangerous, and was so at the time Uber made and distributed the App.

150.    Uber rides were unreasonably dangerous even when Uber is used in a reasonably anticipated manner without knowledge of Uber's dangerous characteristics.

151.    Plaintiff used the Uber App in a reasonably anticipated manner.

152.    Plaintiff was injured as a direct result of the Uber App being manufactured and distributed without an adequate warning.

153.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## COUNT FIVE
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

154.    Plaintiff incorporates here each paragraph set forth above and below.

155.    As set forth in Counts One through Three above, Uber was negligent in failing to warn Plaintiff, and others like her, about the risks of using the Uber application; failing to implement common-sense safety features; failing to properly train and supervise its drivers; failing to properly screen its drivers; failing to adopt a zero-tolerance policy for sexual assault and sexual misconduct; marketing Uber as safe when Uber knew otherwise; and other acts and omissions as discovery will show. This negligence caused severe physical and mental injury to Plaintiff, which continues to this day.

156.    A reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the sexual assault Plaintiff suffered at the hands of Driver.

157.    As a direct result of Uber's negligence, Plaintiff has suffered, and continues to suffer, severe and permanent emotional distress and mental anguish, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, shame, rage, humiliation, and loss of enjoyment.

158.    Accordingly, Plaintiff is entitled to recovery against Defendant in an amount to be determined at trial.

## PUNITIVE DAMAGES

159.    Plaintiff incorporates here each paragraph set forth above and below.

160.     In committing the tortious acts and omissions set forth above, Uber acted outrageously, maliciously, oppressively, willfully, wantonly, recklessly, and in conscious disregard for, or with conscious indifference to, the rights of others, including Plaintiff, amounting to gross negligence or willful misconduct, warranting imposition of punitive damages against it.

161.     An award of punitive damages is appropriate in this case to deter Uber and others from engaging in similar conduct.

## DAMAGES

162.     Plaintiff incorporates here each paragraph set forth above and below.

163.     As a direct and proximate result of Defendant's conduct described above, Plaintiff sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss, and all other applicable damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor as follows:

164.     Plaintiff prays for judgment against Defendant on each of the claims and causes of action in this Complaint, and as follows:

(a) Awarding compensatory damages, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

(b) Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

(c) Punitive, or exemplary, damages for the wanton, willful, fraudulent, reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff. Plaintiff asks for an amount sufficient to punish Defendant and deter future similar conduct;

(d) Prejudgment interest;

(e) Post-judgment interest;

(f) Costs; and

(g) Such other and further relief as this Court deems just and proper.

/s/ Ilana K. Waxman
L. RICHARD DeROBERTIS
ILANA K. WAXMAN
ALLISON M. AOKI
ALYSSA R. SEGAWA
CHRISTOPHER L. JOHNSON
ELIZABETH A. NARDI
VICTORIA M. CHANG
Attorneys for Plaintiff

| **STATE OF HAWAIʻI**<br>CIRCUIT COURT OF THE<br>FIRST CIRCUIT | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER |
|---|---|---|

| PLAINTIFF                    VS. | DEFENDANT(S) |
|---|---|
| JANE DOE WHBE 3 | UBER TECHNOLOGIES, INC., |

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

JANE DOE WHBE 3
c/o GALIHER DEROBERTIS & WAXMAN LLP
820 Mililani Street, Suite 505
Honolulu, Hawaiʻi 96813-2935
Telephone: (808) 597-1400

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

GALIHER DEROBERTIS & WAXMAN LLP

820 Mililani Street, Suite 505

<u>Honolulu, Hawaiʻi 96813-2935</u> ,

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us | **Effective Date of 28-Oct-2019**<br>**Signed by: /s/ Patsy Nakamoto**<br>**Clerk, 1st Circuit, State of Hawaiʻi** |  |
|---|---|---|

 In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date.



