# EXHIBIT 12



Sarah R. London (State Bar No. 267083)
Simon Grille (State Bar No. 294914)
Maya Kalonia (State Bar No. 359755)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: slondon@girardsharp.com
Email: sgrille@girardsharp.com
Email: mkalonia@girardsharp.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC. PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>*LCHB128 v. Uber Technologies, Inc., et al.*<br>Case No. 3:24-cv-07019-CRB<br><br>*A.R. v. Uber Technologies, Inc., et al.*<br>Case No. 3:24-cv-07821<br><br>*B.L. v. Uber Technologies, Inc., et al.,*<br>Case No. No. 24-cv-7940<br><br>*Jaylynn Dean v. Uber Technologies, Inc., et al.,*<br>3:23-cv-06708<br><br>*WHB 832 v. Uber Technologies, Inc., et al.,*<br>3:24-cv-04900 | **MDL No. 3084 CRB**<br><br>**WAVE 1 PLAINTIFFS' SECOND AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC (GREG BROWN AS TO TOPICS 4A-D, 6A-G, 7A-D, 8A-N, 9A-E, 10A, B, C, E, AND F)** |

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, Wave 1 Plaintiffs will take the deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") through one or more of their designees on the topics listed below. This deposition will be taken before a duly qualified Notary Public, at the time and place specified, and continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of Plaintiff. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony by audio and video technology in addition to the stenographic method.  Notice is hereby given that the video is intended for use at trial.

| Witness | Date | Time | Location |
|---|---|---|---|
| Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (Greg Brown as to Topics 4a-d, 6a-g, 7a-d, 8a-n, 10a, b, c, e, and f) | July 15, 16, 28, and 29 | 9:00 a.m. Eastern Time | Nelson Mullins 151 Meeting Street, #600 Charleston, SC 29401 |

Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on which each person will testify. And if Uber intends to have a custodian whose deposition is already scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs request that Uber provide notice of the same at least ten (10) business days in advance of that witness' deposition.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce and permit inspection and copying of the documents and/or tangible things specified in Attachment A to this notice at the time and place of deposition.

## INSTRUCTIONS

1.    For purposes of interpreting or construing the scope of this Notice, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual topic or request. This includes, without limitation, the following:

      a.    The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

b.      The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

c.      Construing the singular form of the word to include the plural and the plural form to include the singular;

d.      Construing the masculine to include the feminine, and vice-versa;

e.      The use of any tense of any verb shall also include all other tenses of that verb;

f.      A term or word defined herein is meant to include both the lower and uppercase reference to such term or word;

g.      Any Bates number referenced herein shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members;

h.      Construing the term "including" to mean including but not limited to.

2.      Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3.      In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4.      Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

## DEFINITIONS

For the purposes of this Notice, the following words and terms shall bear the meanings as identified below. For any undefined term, the standard dictionary definition of the term applies.

1.      "ACCOUNT HISTORY" means the INFORMATION that UBER maintains about a DRIVER's account status, including but not limited to the Driver's name, status, status note, whether the status is current, the date and time the status began, the date and time the status ended, and the flow type.

2

2.      "ACTIVE" with respect to the DRIVER APP or UBER APP means that a person has an active account on that App and is authorized to use the App to either offer or request RIDES.

3.      "ACTIVE DRIVER" means someone with an active DRIVER APP account who is authorized to use the DRIVER APP to offer RIDES.

4.      "ACTIVE RIDER" means someone with an active UBER APP account who is authorized to use the UBER APP to request RIDES.

5.      "ADJUDICATION CRITERIA" are criteria for deciding, based on a Background Check, whether or not a person is eligible to be or continue to be a Driver.

6.      "ADVERTISING" and "ADVERTISEMENT" refer to COMMUNICATIONS via any COMMUNICATIONS CHANNELS aimed at promoting a product, service, or idea to a target audience.

7.      "AGREEMENT" means any Document that states the commitments, expectations, agreements, contracts, terms, and/or conditions between two or more entities and/or people. It includes but is not limited to Terms of Use and Community Guidelines.

8.      "ALL ACCOUNTS" means all Uber accounts and what Uber calls "flow types" associated with or linked to, a given Rider or Driver at any time, including but not limited to Uber Black accounts, Eat accounts, Freight accounts, Rider accounts, Driver accounts, or any other flow types or accounts possessed by, linked to, or affiliated with the Driver

9.      "BACKGROUND CHECK" means any search, survey, review, evaluation, downloading, and/or summarizing, of databases and/or court records, police records, law enforcement records, arrest records, department of motor vehicle records, and/or other official records, performed at any time and for any reason, to learn about a person's background and/or determine whether that person meets the minimum criteria to be a DRIVER.

10.     "BACKGROUND CHECK CONTRACTOR" means any business entity that Uber paid to conduct BACKGROUND CHECKS.

11.     "BACKGROUND CHECK FINDINGS" means information related to potential infractions, violations, and/or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

12.     "BACKGROUND CHECK PROCESS" means all the steps taken related to conducting a BACKGROUND CHECK, including information gathered from the DRIVER, information provided to the BACKGROUND CHECK CONTRACTOR, instructions to the BACKGROUND CHECK CONTRACTOR; information provided to UBER by the BACKGROUND CHECK CONTRACTOR, the geographic and temporal scope of the BACKGROUND CHECKS, the databases queried as part of the BACKGROUND CHECKS, the ADJUDICATION CRITERIA used as part of the BACKGROUND CHECKS, and the SCREENING decisions made and the process by which they were made).

13.     "BIOMETRICS" means biological data, including but not limited to fingerprints and face recognition.

14.     "PSYCHOLOGICAL SCREENING" means use of psychological and/or personality testing and/or questionnaires in its SCREENING of APPLICANTS. It includes but is not limited to the programs called "Cerebral," "Cerebro," and "Usights," and any former, subsequent, or alternative versions of those programs.

15.     "CANCELLATION RATE" means the percentage of ride requests that a DRIVER cancels compared to the total number of RIDE requests the DRIVER receives.

16.     "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

17.     "CHECKING REFERENCES" means contacting prior employers and/or other acquaintances of an APPLICANT to gather information from them about an APPLICANT.

18.     "CONSIDERED" means discussed, analyzed, presented on, RESEARCHED, did cost projections, solicited quotes and/or bids, ran a pilot program.

19.     "CONTRACTOR(S)" refers to any entities UBER paid to perform services or provide products.

20.     "CRIMINAL HISTORY" means any history of infractions, violations, misdemeanors, felonies, or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

21. "DATE OF UBER'S SAFETY TAXONOMY IMPLEMENTATION" as used herein shall refer to the date by which UBER had fully implemented its Sexual Misconduct and Violence Taxonomy (which implementation is described in Uber's 2018 Safety Report as occurring sometime in late 2018).

22. "DEACTIVATE" or "DEACTIVATION" includes any action that prevents someone from using either the DRIVER APP or UBER APP to offer RIDES or request RIDES and includes waitlisting, applying a safety lock, blocking, and deactivating, whether permanent or temporary.

23. "DISPLAYED STAR RATING" means the numerical rating, out of a maximum rating of 5, that UBER displayed as a RIDER or DRIVER's rating, usually next to an icon of a star.

24. "DISQUALIFY" "DISQUALIFIED" or "DISQUALIFYING" mean determining that a person does not meet the minimum criteria to be or continue to be a DRIVER.

25. "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control.  Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form.  The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any

notation, underlining, marking, or information not on the original.  The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

26.    "DRINKING-RELATED COMMUNICATIONS" are COMMUNICATIONS regarding alcohol, alcoholic beverages, the holidays, parties, celebrations, "Celebrate responsibly," "Celebrate safely," the "Safe Rides Pledge," "Stand Up, Don't Stand By," becoming a "Designated Rider," joint advertising by UBER and Mothers Against Drunk Driving (MADD), joint advertising by UBER and any alcohol-related brand, and any other COMMUNICATIONS that relate to the concept of getting home safely after drinking, whether that concept is conveyed through words, hashtags, or images.

27.    "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

28.    "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

29.    "FAILURE MODE" means a way in which something may fail to function as designed or intended.

30.    "HIGH RISK DRIVER" means someone who, if they are allowed to become a Driver, poses an elevated risk of committing SEXUAL ASSAULT, SEXUAL MISCONDUCT, or causing an INTERPERSONAL CONFLICT connected with a RIDE.

31.    "INCIDENT" means the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT that Plaintiff alleges she experienced in connection with a RIDE, and includes the immediate circumstances of that SEXUAL ASSAULT and/or SEXUAL MISCONDUCT.

32.    "INDUSTRY INFORMATION SHARING" means any program, plan, policy, agreement, contract, or practice of sharing information, and/or asking that information be shared, by and between Uber, Lyft, and other TRANSPORTATION NETWORK COMPANIES.

33.  "INFORMATION" means data, information, DOCUMENTS, and facts, that exist and/or are transmitted in any form whatsoever including text, images, audio, video, electronic, or otherwise.

34.  "INTERPERSONAL CONFLICT" means any event or incident that UBER classifies or classified as an "IPC" or "interpersonal conflict," including but not limited to SEXUAL ASSAULT, SEXUAL MISCONDUCT, arguments, altercations, rude behavior or words, and/or discriminatory behavior or words.

35.  "INVESTIGATION" means all actions UBER and/or its CONTRACTORS take in response to events or conduct reported to UBER involving one or more RIDER and/or DRIVER. Investigation includes but is not limited to COMMUNICATIONS, interviews, internal discussions, classifications, DEACTIVATION, reactivation, and review of INFORMATION.

36.  "INVESTIGATION DOCUMENTS" refer to all DOCUMENTS and INFORMATION related to UBER's INVESTIGATION of conduct, misconduct, an accident, incident, SEXUAL MISCONDUCT, SEXUAL ASSAULT, collision, or something else reported against a RIDER or a DRIVER. INVESTIGATION DOCUMENTS include TICKETS (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS), and the entire set of tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS).

37.  "LAW ENFORCEMENT" means police departments, sheriff's departments, other law enforcement agencies, officers, detectives, sheriffs, FBI agents, federal, state, or other law enforcement officials, and/or District Attorneys or other prosecutors, and their staff.

38.  "LOCATION DATA" means coordinates, GPS data, satellite data, and/or latitude-longitude data.

39.  "LOCATION TRACKING" means monitoring the location and movement of cellular devices, other devices, people, and/or vehicles.

40.    "LOW CREDIBILITY" refers to a determination that a particular RIDER or DRIVER lacks or may lack credibility. This includes but is not limited to a determination that a RIDER and/or DRIVER gives an unusual number of low ratings, engages in "over escalation," copies and pastes the same complaints repeatedly, or is otherwise flagged as showing abnormal patterns of reporting.

41.    "MARKETING" refers to the efforts to promote and/or sell something, including RESEARCH regarding customer/client/Rider preferences, behavior, and trends; relationship-building with potential or actual customers/clients/Riders; product development and design aimed at fulfilling customer/client/Rider preferences; and/or COMMUNICATIONS with a target audience through various COMMUNICATIONS CHANNELS to promote and/or sell something.

42.    "MATERIALS" mean any DOCUMENT, DATA, physical object, audio recording, video recording, or other item or material of any nature whatsoever.

43.    "METRIC" means a quantifiable measure.

44.    "MISCONDUCT" means, for TICKETS that post-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, conduct that relates to any of the following categories from Uber's Safety Taxonomy: (1) Sexual Assault, (2) Vehicle Crash or Claim, (3) Theft or Robbery, (4) Sexual Misconduct, (5) Physical Altercation, (6) Verbal Altercation, (7) Substance Abuse, (8) Inappropriate Post-Trip Contact, (9) Law Enforcement / Regulatory, (10) Potential Safety Concern. "MISCONDUCT" means, for TICKETS that pre-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, TICKETS initiated by a RIDER or by a third party on the RIDER's behalf, that relate to any form of misconduct or inappropriate behavior involving the Driver, including driving under the influence and complaints of interpersonal conflict (e.g., verbal altercations, theft, sexual misconduct, sexual assault, etc.), as well as speeding and other forms of unsafe driving.

45.    "OFFER CARD" means the complete INFORMATION presented to a RIDER about a DRIVER who is matched with the RIDER, including the complete USER EXPERIENCE that a RIDER viewing that INFORMATION would see. The OFFER CARD includes but is not limited to the DRIVER's name displayed, photograph displayed, the DRIVER's tier within the Uber Pro rewards program such as Uber Pro Diamond, the DISPLAYED STAR RATING, badges, compliments,

8

1  biographical information, the DRIVER's number of trips, number of months or years spent as a

2  DRIVER, and any other INFORMATION displayed (or which might be displayed if the RIDER clicks

3  on a link).

4     46.    "PERSONAL TRANSPORTATION" means transportation of people in passenger

5  vehicles.

6     47.    "PLAINTIFF" means the specific Plaintiff propounding these requests or, in the case of a

7  minor, on whose behalf these requests are propounded.

8     48.    "PUBLIC INFORMATION" means information that is available to the public, including

9  but not limited to online search results, news stories, blogs, websites, and social media.

10     49.    "RATE" refers to all of the following: the absolute number, frequency, incidence, as well

11  as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly

12  category of Ride is specified, for that category of Ride).

13     50.    "RESEARCH" means observation, focus groups, testing, reliability testing, usability

14  testing, analyses, root cause analyses, hazard assessments, failure mode and effects analyses, surveys,

15  studies, experimentation, pilot programs, and the collection, interpretation, and evaluation of data,

16  including data from use of Uber's Transportation Network in particular regions or countries.

17     51.    "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to

18  UBER.

19     52.    "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a

20  taxi or Charter Party Carrier.

21     53.    "RIDECHECK" means any program for using LOCATION DATA to identify and/or act

22  on UNPLANNED STOPS, ROUTE DEVIATIONS, and/or UNPLANNED RIDER-DRIVER

23  PROXIMITY. RIDECHECK includes the programs Uber calls "RideCheck" and "RideCheck+" as well

24  as any former, subsequent, or alternative versions of those programs, including GPS anomaly detection

25  and any other such programs, whether those programs were merely CONSIDERED or implemented.

26

27

28

54. "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

55. "UBER APP," "UBER APPLICATION," "RIDER APP," or "APP" means Uber's mobile device application that is used by Riders to coordinate, or order Uber Rides.

56. "RIDE LOG" means the INFORMATION UBER maintains about each RIDE a DRIVER provides, which includes but is not limited to the following information: Driver Name, Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback, for the whole time period when the Subject Driver was Active.

57. "RISK FACTORS" means factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

58. "RISK SENSITIVE MATCHING" means Uber's matching of RIDERS and/or particular RIDES with DRIVERS, where the risk of a SAFETY INCIDENT is a factor in determining who is matched with whom and/or whether the match occurs. This includes S-RAD (aka Safety Risk Assessed Dispatch), Geo Fencing, and all other prior, subsequent, and/or alternative versions of S-RAD.

59. "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background

check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

60.    "ROUTE DEVIATIONS" means any deviation or detour from a planned route for a RIDE, which is for an abnormal period of time (i.e. a period of time that is not consistent with a reasonable alternative route to the intended destination).

61.    "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

62.    "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

63.    "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

64.    "SAFETY INTERVENTION" means anything Uber did in an attempt to prevent or reduce the risk, duration, and/or severity of SEXUAL ASSAULT OR SEXUAL MISCONDUCT in connection with a specific RIDE, including but not limited to sending push notifications, otherwise communicating with the DRIVER and/or RIDER, contacting Law Enforcement, and/or contacting a security company or other third party.

65.    "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

66. "SAFETY LENS" means the software, program, and/or set of DOCUMENTS that UBER calls the "safety lens." It includes the entire family or universe of tabs, views, menus, popups, pulldowns, dropdowns, and buttons, and all the data, INFORMATION, DOCUMENTS and views that are linked together within, and accessible from Safety Lens.

67. "SAFETY TOOLKIT" means the set of features and resources that are part of the Uber App and/or Driver App and relate to safety during RIDES. The SAFETY TOOLKIT includes but is not limited to the "Share My Trip," "Emergency Assistance," In-App Reporting, live Help, and text 911 features.

68. "SCREEN" or "SCREENING" refers to interactions, actions, and information gathering in order to decide whether or not to allow an applicant to become a Driver.

69. "SCREEN OUT" or "SCREENING OUT" means to determine that a person is DISQUALIFIED for a position or job.

70. "SCREENING MEASURES" refers to ways, means, tools, resources, and/or actions (potential or actual) for SCREENING an applicant. They include but are not limited to gathering resumes, use of application forms, conducting interviews, CHECKING REFERENCES, googling someone or otherwise reviewing PUBLIC INFORMATION, BACKGROUND CHECKS, using psychometrics like CEREBRAL, using CJIS, and using biometrics.

71. "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

72. "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

73. "STAR RATING" means the number of stars a RIDER assigns to a DRIVER, out of maximum of five, when leaving feedback after a RIDE.

74. "SUBJECT DRIVER" means the DRIVER who is alleged to have committed the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT in this matter.

75. "SUBJECT RIDE" means the RIDE that PLAINTIFF alleges was connected with the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT she experienced.

76. "TELEMATICS" means LOCATION TRACKING; LOCATION DATA; collecting, monitoring, transmissions, and/or analysis of LOCATION DATA and patterns within LOCATION DATA; including the use of TRIGGERS, and notifications regarding LOCATION DATA and patterns.

77. "TELEMATICS TRIGGER" means a specific event or condition detected by a TELEMATICS system that prompts a notification, response, alert, or action. A TELEMATICS TRIGGER may include speed alerts, harsh braking alerts, geofencing alerts, and/or alerts based on proximity

78. "THIRD PARTIES" are entities or people other than the SUBJECT DRIVER and UBER.

79. "TICKET" means a customer support interaction or series of related customer support interactions, as well as DOCUMENTS used by UBER to track and/or manage those interactions and resulting investigations and/or dispositions. TICKET includes but is not limited to TICKETS sent, received, tracked, or organized via Uber's Zendesk software, JIRA software, Bliss software, or another software program.

80. TICKET-RELATED DOCUMENTS means all INFORMATION and DOCUMENTS attached or linked to the Ticket, including without limitation the Chronicle map snapshot, Chronicle animation, Voyager data, Voyager animation, comments, names of Uber personnel reflected in the tickets, and all Communications connected with the ticket, including the entire set of COMMUNICATIONS, tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, evidence, LOCATION DATA, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET. TICKET-RELATED DOCUMENTS include the entire USER EXPERIENCE that an agent and/or investigator who works for UBER would be able to see and/or access with regard to a specific investigation.

81.     "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

82.     "UBER PRO" refers to UBER's "Uber Pro" rewards program for DRIVERS.

83.     "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period of time, when a Ride is no longer in progress.

84.     "UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a DRIVER have stopped at a location other than the intended destination, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign).

85.     "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a user may interact with.

86.     "USER INTERACTIONS" mean all forms of engagement with an application's interface, including clicking buttons, swiping, tapping, scrolling, and any other actions that involve manipulating the app's elements.

87.     "VOYAGER DATA" means INFORMATION from UBER's Voyager software, including both the raw LOCATION DATA, and the analyses and presentations of that INFORMATION conducted by the Voyager software.

88.     "WOMAN" as used herein should be interpreted broadly to include anyone who identified herself as having a female (or nonbinary) gender, and also anyone whose inferred gender (based on, e.g., name) is female and who did not otherwise identify their gender.

89.    "WOMAN TO WOMAN MATCHING" means any product, software, or program for matching women (and/or nonbinary, transgender individuals, and/or those with inferred female gender) with other women (and/or nonbinary, transgender individuals, and/or those with inferred female gender). This includes what Uber refers to as Women2Women or W2W and any former, subsequent, or alternative versions of that program.

## DEPOSITION TOPICS

**Agreements**

1.    Each Agreement between Uber and the Subject Driver (including the effective date of each).

2.    Each Agreement between Uber and the Plaintiff (including the effective date of each).

    a.    As part of this topic, the deponent(s) should be prepared to discuss all facts supporting Uber's contention, if any, that Plaintiff's claims are subject to a forum selection clause or a choice-of-law clause.

**Driver Screening**

3.    Uber's Screening of the Subject Driver.

    As part of this topic, the deponent(s) should be prepared to discuss:

    a.    **All Information** Uber and/or its Contractors received from the Subject Driver in connection with Screening the Subject Driver (including but not limited to address history, social security number, name, date of birth, image of driver's license, driver's license information, insurance information, vehicle information).

    b.    **Background Check Process(es)** for the Subject Driver, including for All Accounts (including but not limited to Uber's policies, protocols, and/or instructions to its Background Check Contractor(s), interactions between Uber and its Background Check Contractor(s), Information the Background Check Contractor(s) made available to Uber, including the Background Check itself, any Background Check Findings, and conversations and decisions about the Background Check Findings).

    c.    **Any Additional Screening** Uber performed on the Subject Driver other than a Background Check (including but not limited to having the Subject Driver fill out an application, interviewing the Driver, checking the Subject Driver's references, searching Public Information about the Driver, and/or conducting Psychological Screening).

d.   **All Background Check Adjudication Criteria** that applied, at any time, to the Subject Driver, including the Adjudication Criteria that applied in each City and State where the Driver was authorized to offer Rides, and for each time period when the Driver was authorized to offer Rides.

e.   **All Information Regarding Uber's Screening of the Subject Driver** responsive to Topic 3 (a)-(d) in any country other than the United States where the driver was authorized to offer Rides for Uber.

**Driver History**

4.   The Subject Driver's status history with Uber.

As part of this topic, the deponent(s) should be prepared to discuss:

a.   The Subject Driver's Account History, including for All Accounts.

b.   Any status changes in the Account History, including the reason(s) for any such status changes.

c.   The Subject Driver's Uber Pro status (including each change to the Uber Pro status, Communications to the Subject Driver about his status, and the timing of each change in status, for the time period during which the Subject Driver was Active).

d.   The Subject Driver status history responsive to Topic 4 (a)-(c) in any country other than the United States where the driver was authorized to offer Rides for Uber.

5.   Uber's monitoring of the Subject Driver.

As part of this topic, the deponent(s) should be prepared to discuss:

a.   Uber's knowledge concerning cellular phones used by the Subject Driver (including but not limited to cell phone number(s), make and model of cell phone(s), and IP addresses used by the Subject Driver).

b.   All Voyager Data for the Subject Driver that resulted in a Telematics Trigger on any Ride at any time prior to and/or on the date of the Incident.

c.   All Location Data, including Voyager Data, reflecting Unplanned Stops, Unplanned Rider-Driver Proximity, and/or Route Deviations for the Subject Driver at any time prior to and/or on the date of the Incident, whether or not there was a resulting Telematics Trigger.

d.   Communications, at any time prior to or on the date of the Incident, between Uber and the Subject Driver related to any Telematics Triggers.

16

e.     Uber's Monitoring of the Subject Driver responsive to Topic 5 (a)-(d) in any country other than the United States where the driver was authorized to offer Rides for Uber.

6.     Negative reviews, reports, and/or complaints about the Subject Driver.

As part of this topic, the deponent(s) should be prepared to discuss:

a.     The Ride Log for the Subject Driver during the entire time any of the Subject Driver's Uber driver accounts were active, including but not limited to how to interpret the Ride Log.

b.     Any ride in which the Subject Driver was given a Star Rating of 0, 1, or 2 stars (including but not limited to any attempts by Uber to find out why the Subject Driver received that rating, and/or anything Uber learned about why the Subject Driver received that rating).

c.     All Safety Lens Documents (including the Safety Lens landing page and all associated Information, data, documents, and views linked together within Safety Lens) associated with any of the Subject Driver's Accounts.

d.     All Tickets for All Accounts for the Subject Driver, including but not limited to any Tickets that involved allegations of the following categories in Uber's Safety Taxonomy Sexual Assault, Sexual Misconduct, Theft or Robbery, Physical Altercation, Verbal Altercation, Substance Abuse, Inappropriate Post-Trip Contact, Law Enforcement/Regulatory and Potential Safety Concern and or any other form of misconduct or inappropriate behavior involving the Driver if those Tickets pre-date Uber's implementation of their Safety Taxonomy.

e.     For any Rider who gave the Driver a 1-star rating and/or reported Sexual Assault, Sexual Misconduct, and/or an Interpersonal Conflict against the Driver before the Subject Incident, if Uber determined the Rider had Low Credibility, how and why Uber made that determination.

f.     Uber's efforts to investigate the June 6, 2023 report of a person being "sexually harassed" by the Subject Driver [Bates 14123].

g.     Negative reviews, reports, and/or complaints about the Subject Driver responsive to Topic 6 (a)-(f) in any country other than the United States where the driver was authorized to offer Rides for Uber.

7.     Corrective and/or disciplinary action taken with respect to the Subject Driver.

As part of this topic, the deponent(s) should be prepared to discuss:

WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER
TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC
Case No. 3:23-md-03084-CRB

a.   Any Metrics Uber kept track of related to the Subject Driver, including but not limited to the Subject Driver's Cancellation Rate, and Displayed Star Rating, including the timing of changes to those Metrics.

b.   Any Deactivation of the Subject Driver, including but not limited to all Communications concerning the Subject Driver's participation in quality improvement aimed to improve the Subject Driver's chances of reactivation.

c.   All training Uber required the Subject Driver take at any time.

d.   Corrective and/or disciplinary action taken with respect to the Subject Driver responsive to Topic 7 (a)-(c) in any country other than the United States where the driver was authorized to offer Rides for Uber.

**Information about the Plaintiff**

8.   Uber's knowledge and information regarding the Plaintiff.

As part of this topic, the deponent(s) should be prepared to discuss:

a.   Plaintiff's Account History, including for All Accounts.

b.   The complete log of all Rides (including Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback) for every Ride where the Plaintiff was a Rider, for the whole time period when Plaintiff was Active.

c.   All photographs, surveillance, video recordings, and/or audio recordings of the Plaintiff.

d.   All Communications between Uber and Plaintiff, including all information Uber provided Plaintiff, in connection with All Accounts, and all Drinking Related Communications directed at Plaintiff.

e.   Uber's knowledge of any Background Checks and/or Criminal History for the Plaintiff, for All Accounts.

f.   Uber's Investigations (including but not limited to all JIRA Tickets) for All Accounts for the Plaintiff.

g.   All categories, descriptors, or account types that Uber assigned to the Plaintiff, and the dates for each. This includes but is not limited to the Plaintiffs membership in any rewards programs and paid memberships.

h.   Any Metrics Uber kept track of related to the Plaintiff, including but not limited to the Plaintiff's Cancellation Rate and Displayed Star Rating, including the timing of changes to those Metrics.

i.   Any Deactivation or Waitlisting of Plaintiff, including the reasons for same.

j.   For All Accounts for the Plaintiff, All Safety Lens Documents.

18

k. For All Accounts for the Plaintiff, all Ticket-Related Documents and/or Materials (including but not limited to Location Data and Voyager Data) for any Tickets that involved allegations of Sexual Assault and/or Sexual Misconduct.

l. Whether Uber ever determined the Plaintiff had Low Credibility (including but not limited to if Uber ever found a contradiction between a statement by the Plaintiff and any other Information, or if Uber ever determined Plaintiff communications reflecting "over escalation"), including any factual bases for such determination.

m. Any occasion(s) when the Plaintiff received a "Strike" from Uber. (This includes but is not limited to Communications related to the strike and Investigation Documents related to the Strike.)

n. Any occasions when the Plaintiff cancelled a Ride after being matched with a Driver.

**Subject Ride Incident Location Data**

9. Uber's knowledge relating to location data for the Subject Ride.

As part of this topic, the deponent(s) should be prepared to discuss:

a. All Location Data and Voyager Data reflecting the Subject Driver's movements and/or proximity to the Rider from the time the Subject Driver accepted the Subject Ride until two hours after the Subject Ride.

b. All Location Data and Voyager Data reflecting the Plaintiff's movements and/or proximity to the Driver from the time the Subject Rider requested the Subject Ride until two hours after the Subject Ride.

c. Uber's Fractal program concerning the Subject Ride.

d. The Chronicle Trip map animation that shows the movement of the Driver on the map from the time the Subject Ride was offered to the Driver through completion of the Ride or one hour after Ride completion if the latter data is available.

e. All Location Data for the Plaintiff for the period from 12 hours prior to 12 hours after the Subject Ride (including but not limited to Location Data for any other Ride taken by the Plaintiff during that time period).

**Other Incident Information**

10. All other information Uber has relating to the Subject Ride.

As part of this topic, the deponent(s) should be prepared to discuss:

WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC
Case No. 3:23-md-03084-CRB

a.  All photographs, surveillance, video recordings, and/or audio recordings that captured any part of the Subject Incident or Subject Ride.

b.  All User Interactions by the Subject Driver and/or the Plaintiff related to the Subject Ride. (This includes but is not limited to ride request, ride acceptance, trip started, trip ended, any in-app messaging, responses to Telematic Triggers, and any other inputs; pickup location input, drop-off location input, trip cancellation, interactions with the Offer Card, use of any Safety Toolkit features).

c.  Uber's Communications with the Rider, Communications with third parties, third party witness statements, Communications with the Driver, Communications with Law Enforcement, Ride Receipts, Communications regarding refunds, and Communications regarding appeasements (excluding attorney-client privileged Communications).

d.  Documents provided to Law Enforcement that relate to the Subject Incident.

e.  Uber's Investigation of the Subject Incident, including the complete, up-to-date Ticket and Ticket-Related Documents. (Ticket Related Documents includes but is not limited to the Documents accessible via the hyperlinks shown in Appendix A.)

f.  The Offer Card for the Subject Driver as it appeared on the day of the Incident.

## ATTACHMENT A

## DOCUMENTS AND THINGS TO BE PRODUCED

1.  Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

2.  All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

3.  The custodial file of the deponent, to the extent s/he is not already a custodian.

WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC
Case No. 3:23-md-03084-CRB

Dated: July 9, 2025

By: */s/Sarah R. London*
Sarah R. London
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: slondon@girardsharp.com

WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER
TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC
Case No. 3:23-md-03084-CRB

## **PROOF OF SERVICE**

I, Rupashree Gangopadhyay, hereby declare as follows:

I am employed by Chaffin Luhana LLP.  I am over the age of eighteen years and am not a party to this action.  On July 9, 2025, I caused a copy of the foregoing document to be served *via electronic mail* on the following:

**WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC**

on:

**Kirkland & Ellis LLP**
Alli Brown
alli.brown@kirkland.com
Chris Cox
christopher.cox@kirkland.com
Jessica Davidson:
jessica.davidson@kirkland.com
Jennifer Levy
jlevy@kirkland.com
Rupal Joshi
rupal.joshi@kirkland.com

**O'Melveny and Meyers LLP**
Sabrina Strong
sstrong@omm.com
Jonathan Schneller
jschneller@omm.com
Joshua Revesz
jrevesz@omm.com
Louis Fisher:
lfisher@omm.com

**Shook, Hardy & Bacon LLP**
Michael B. Shortnacy
mshortnacy@shb.com
Patrick L. Oot, Jr.
oot@shb.com
Christopher V. Cotton
ccotton@shb.com
Alycia A. Degen
adegen@shb.com

WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER
TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC
Case No. 3:23-md-03084-CRB

*Counsel for Defendants Uber Technologies, Inc.,*
*Raiser, LLC, and Raiser-CA, LLC*

I declare under penalty of perjury that the above is true and correct.  Executed on July 9, 2025 in Saint Louis, Missouri.

　　　　　　　　　　　*/s/ Rupashree Gangopadhyay*
　　　　　　　　　　　Rupashree Gangopadhyay

WAVE 1 PLAINTIFFS' AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC
Case No. 3:23-md-03084-CRB