# EXHIBIT 14

July 13, 2021

Page 387

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

COLLEEN CADAGIN, As           )
Executrix of the Estate of    )
ELIZABETH DRISCOLL,           )
deceased,                     )
                              )
     Plaintiff,               )   No. 18-L-572
v.                            )
                              )
JOHNSON & JOHNSON, et al.,    )
                              )
     Defendants.              )

— — —

DAILY COPY TRIAL TRANSCRIPT

TUESDAY, JULY 13, 2021
VOLUME 2B

— — —

Before the HONORABLE CHRISTOPHER KOLKER, Circuit Judge

Reported by Jennifer A. Dunn, RPR, CCR

GOLKOW LITIGATION SERVICES
P:  877.370.DEPS | F:  917.591.5672
deps@golkow.com

July 13, 2021

```
                                      Page 428
 1  microphone because I heard a little bit of feedback.
 2          Can everyone hear me okay if I don't use it?
 3  Okay.  All right.  Great.
 4          DEFENDANT'S OPENING STATEMENT
 5          MS. BROWN:  Good afternoon, everybody.  My
 6  name is Alli Brown, and I am here with my good friend and my
 7  colleague, Mike Brown, who you had a chance to meet this
 8  morning on behalf of the folks at Johnson & Johnson.
 9          And, first of all, a big thank you to
10  everyone for participating in what we know was a very long
11  and super hot jury selection process.  We are so grateful
12  that you stuck with us and then came back today and that
13  you're here with us today.
14          Now, the plaintiff's lawyer just said some
15  really bad things about Johnson & Johnson.  And just made
16  some extraordinarily serious allegations about the men and
17  the women who work there.
18          And unfortunately, sometimes that can be an
19  easy thing to do, right?  It can be real easy to point the
20  finger at a large international corporation like Johnson &
21  Johnson, especially in the interest of winning a lawsuit for
22  money.
23          And you guys were here, and you heard a lot
24  of people don't like corporations.  A lot of prospective
```

```
                                      Page 429
 1  jurors told us that.
 2          They told us that, you know, they had seen so
 3  much attorney advertising, they had seen so many news
 4  stories about talc or corporations, that they couldn't put
 5  that stuff aside and come into this case with an open mind.
 6          But you guys are all here because you told us
 7  you could do that, and we are so grateful for that, that you
 8  could put aside anything you might have heard on TV, any of
 9  the infomercials you might have seen at 3 o'clock in the
10  morning, that you can put all that stuff to the side, come
11  into this case with an open mind, and judge this case on the
12  evidence and on the facts.
13          And the evidence and the facts and the
14  science and the truth is going to be that Johnson's Baby
15  Powder is safe and did not cause Ms. Driscoll's cancer.
16          But what I'm afraid is going to go on here,
17  and what we already saw a little bit of this morning, is
18  going to be an effort to get you guys so mad at Johnson &
19  Johnson that you turn your eyes away from the evidence, away
20  from the facts, and away from the truth, and we saw it this
21  morning.
22          Counsel had a chart up here and on the screen
23  with all sorts of snippets of documents that she showed you
24  on the screen, and I would suggest to you that those
```

```
                                      Page 430
 1  documents are not a true picture of the testing and the
 2  science in this issue, and I want to show you just one or
 3  two of those to give you a flavor for what I think went on
 4  here this morning and what I'm afraid might go on here
 5  during this trial.
 6          Could I have the Elmo?  Thanks.
 7          One of the very first documents that was on
 8  the big board over here and also up on the screen is this
 9  one.  It is a 1964 memo from some scientists at Johnson &
10  Johnson, and the subject is:  "Cornstarch development."
11          And one of the things you're going to see a
12  lot of in this case, folks, are internal Johnson & Johnson
13  memorandum where the scientists and the doctors and the
14  researchers at Johnson & Johnson were studying things like
15  talc and cornstarch, testing the product, reviewing the
16  scientific literature, talking to experts, to make sure that
17  the product was safe.
18          But Counsel put this document up on the
19  timeline here in an effort, I thought, to suggest that
20  somehow, somebody, in 1964, thought there was a safety
21  problem with talc.  And she read this sentence talking about
22  replacing -- using cornstarch development as a condom
23  lubricant and it would replace talc because it was found to
24  be absorbed safely in the vagina, whereas talc was not.
```

```
                                      Page 431
 1          But she knows, because she has the other
 2  documents about this issue, what they're really talking
 3  about there.  And the absorption issue that they're talking
 4  about in this document has got nothing to do with ovarian
 5  cancer.
 6          Because one of the things you're going to
 7  learn about in this trial, and it's true for any foreign
 8  particle; cornstarch, talc, sand, splinters, when you get
 9  something like that inside your body, your body can have an
10  inflammatory response to -- to get the area cleaned out, it
11  turns red when you get a splinter, it's an irritant.  Your
12  body just forms a red sort of circle around it.
13          It has nothing to do with cancer.  It's your
14  body's reaction to a foreign particle.  And she knew that
15  that's what this document is about because she has this one,
16  Defendant's 8201.  It's a document from a couple of months
17  later dated November 3rd, 1964.
18          Again, more of the scientists at Johnson &
19  Johnson investigating cornstarch, investigating issues with
20  their products, and what they say at the bottom of this memo
21  explains what the absorption issue was.
22          The supplier further points out that there
23  are two possible advantages of starch in Baby Powder.  One,
24  is its ability to hold more than 50 percent water, and the
```

Page 464

1  always been our opinion and continues to be our opinion,
2  based on over 15 years of closely examining this product,
3  that it is free of asbestos."
4         You're going to see those documents and see
5  that testing.
6         And then you're going to hear about testing
7  that was done, not by Johnson & Johnson, not by experts
8  Johnson & Johnson was paying, but by the federal government,
9  by NIOSH in conjunction with Harvard, that literally went
10 into Johnson & Johnson's Vermont talc mine in the 1970s and
11 did a study of the workers to see if they were getting any
12 diseases, and tested the talc using the highest sensitive
13 methods; TEM, and concluded that that type of analysis,
14 analysis by transmission electron microscopy, revealed no
15 asbestos.  Published in the scientific literature in 1979.
16        You're going to hear, in fact, and see
17 evidence of decades of testing of Johnson's Baby Powder by
18 the government, by academic institutions, by J&J, by the
19 experts J&J hired, all that confirm and support the safety
20 of Johnson's Baby Powder.
21        So what I want to do, I want to leave you
22 with a couple of things to look out for as Plaintiff's
23 evidence comes to you in this case.
24        So, the way it works, and it's hard for me

Page 465

1  and Mike, who want to get up and talk to you right away, but
2  they have the burden of proof, right, they sued us, so they
3  have to go first, and that means we have to sit back and
4  wait our turn, which we will try patiently to do, but this
5  will be my last opportunity to talk to you before they start
6  their case, so I wanted to leave you with a couple things to
7  kind of be on the lookout as the evidence is coming for you.
8         Number one is a little bit of what we talked
9  about when I started today.  These efforts to just make you
10 mad at us, to make you mad at corporations, and to make you
11 mad at J&J.
12        And you saw it already kind of with an
13 advertisement that went up this morning, some kind of
14 advertisement for young girls.
15        There's no evidence in this case Ms. Driscoll
16 ever saw any kind of advertisement.  And so I would be
17 real -- I would have your antenna go up when you start
18 seeing marketing documents, advertisements, things that have
19 got nothing to do with Ms. Driscoll, and are only coming
20 into evidence to try to get you mad at us.
21        Number 2, reliance on foreign health
22 organizations.  Why in the world are we talking about what
23 other governments are doing when we got decades of analysis
24 being done by our government here in the United States?

Page 466

1         We heard this morning, and I wrote it down
2  because it's just not right, a statement that Health Canada
3  did an independent, I think the word was, evaluation of the
4  science here.  And what the evidence is going to be when it
5  comes to you is that Health Canada cited expert reports from
6  Plaintiffs' lawyers, experts Plaintiffs are paying in U.S.
7  litigation.
8         You're going to see that there's nothing
9  independent about what's going on in Canada.  I think it's
10 going to raise some red flags for you, but I would keep your
11 eye out for why in the world we're talking about another
12 country's regulatory scheme when we got a whole lot going on
13 right here.
14        I expect you're going to see tons of
15 documents from other companies, like the mining company that
16 we bought the talc from.  Other people's e-mails that never
17 went to anybody at Johnson & Johnson.
18        There is a couple of these gentlemen, you
19 know, from the '60s, the '70s, the '80s.  You're going to
20 see all of their memos.  It's almost all men on these memos
21 and these documents.
22        And the way they talk is not the way we talk
23 today, right.  And you're going to see memos that are going
24 to be taken out of context, like that Wehner letter you were

Page 467

1  shown today, trying to suggest that they mean something they
2  don't.  Or trying to suggest that Johnson & Johnson did
3  something or meant something that it never did.
4         So, look carefully at the documents you're
5  being shown.  Are you seeing the whole picture?  Is it
6  someone who even worked for us?  Is it anything that even
7  went to us?  How did we respond?  You know, have these
8  questions kind of going on in your head.
9         And then, finally, the whole case that's
10 coming to you, and it's going to start tomorrow, I think, is
11 based on sort of scare words, I would call them.  It's kind
12 of what -- what I said in the past is this kitchen sink
13 approach, right?
14        It's going to be, there are all these really
15 scaring things in Baby Powder, and that's what makes it
16 cause cancer; asbestos, fibrous talc, arsenic, you know,
17 mercury, you name it, those are going to be allegations that
18 will come to you over the next couple of days, and really
19 question why we're hearing that kind of evidence,
20 particularly in this case, where the plaintiff's tissue was
21 tested, and none of those things were found.
22        They're bringing in an expert here to say he
23 thinks he might have seen a couple particles of talc.  And
24 we'll talk about the significance of that, but what he's

July 13, 2021

Page 472

 1  night, something comes up and we have to have a conference
 2  or a meet -- a hearing in the morning.
 3         Not a meeting, a hearing, it's funny though.
 4  And sometimes there's a little bit of a delay.
 5         If so, like this week I know I have Judge
 6  Gleeson's courtroom and Judge Rudolf's courtroom available,
 7  which is a lot better place to hang out. We used to have
 8  chairs in the hallway and benches, but since they're
 9  replacing the windows, they've taken that out.
10         So with that being said, please don't talk
11  about the case even amongst yourselves. You've gotten a
12  good flavor with the opening statements.
13         Leave the notes on your seats, and we will --
14  and if you need your parking passes, see Elsa. Make sure to
15  wear your juror buttons tomorrow as well.
16         Again, don't talk about the case, don't do
17  any independent research. No Google searches about talc.
18         Again, we've gone through extensive arguments
19  and things on what evidence is allowed in the case and what
20  isn't allowed in the case, and that's the fair way to do it.
21         Okay. The attorneys will present evidence
22  that they believe helps the case, depending on the side
23  they're on.
24         So with that, again, please no social media.

Page 473

 1  You've heard a couple things about that, and if anybody
 2  tries to talk to you about the case, please let me know
 3  immediately.
 4         With that, I'll see you guys tomorrow morning
 5  at 9:00. It is now 4:13.
 6         (Court stood in recess at 4:13 p.m.)
 7      END OF VOLUME 2B.  PLEASE REFER TO VOLUME 3A.
 8             - - -

Page 474

 1                    CERTIFICATE
 2         I, Jennifer A. Dunn, Registered Professional
 3  Reporter and Certified Court Reporter, do hereby certify
 4  that on July 13, 2021, I was present and reported all of the
 5  proceedings had in the case of COLLEEN CADAGIN, Plaintiff,
 6  vs. JOHNSON & JOHNSON, et al., Defendants, Cause No.
 7  18-L-572.
 8         I further certify that the foregoing pages
 9  contain a true and accurate reproduction of the proceedings.
10
11
12
13
14
15         "/S/JENNIFER A. DUNN, RPR, CCR #485"