# EXHIBIT 28

Page 1

1  SUPERIOR COURT OF THE STATE OF CALIFORNIA
2  FOR THE COUNTY OF SAN FRANCISCO
3  HONORABLE ETHAN P. SCHULMAN
4  DEPARTMENT 604
5  ---oOo---
6
7
8  COORDINATION PROCEEDING        CASE No. CJC-21-005188
   SPECIAL TITLE [RULE 1550(b)]
9
   In Re: Uber Rideshare Cases
10  _____/
11
12
13
14  REPORTER'S TRANSCRIPT OF PROCEEDINGS
15  VOLUME 1 PAGES 1 - 248
16  MONDAY, SEPTEMBER 8, 2025
17
18
19
20
21  OFFICIAL STENOGRAPHIC REPORTER PRO TEM:
22  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
23  CA CSR LICENSE NO. 9830
24
25     Job No. CS7570149

Page 79

1  and working to solve this problem.  And this is one of
2  the key ways that Uber has done that.
3          Uber has -- Uber knows that we are not
4  experts on sexual assault and sexual violence.  And so
5  we looked to the experts to help guide us in how we
6  navigate this issue in society and on our platform.
7  We partnered with many nonprofit organizations who
8  exist only to try and solve this problem; for example,
9  the National Sexual Violence Resource Center, or
10 NSVRC.
11         We partnered with these organizations and we
12 said, Help us.  Help us figure out how to categorize
13 the complaints that we're getting and how to audit
14 this data and how to release a first-of-its-kind
15 safety report in the United States.
16         Because before Uber released a safety report,
17 and we've released three now, no other rideshare
18 company and no other transportation company, and I
19 would submit no other major public consumer company
20 had done anything like it.  And you're going to get to
21 see information in the safety report that calls it
22 unprecedented; an unprecedented bold move to release
23 this kind of data.
24         And the safety report explains what data was
25 categorized, what data was audited, what data people

```
                                                    Page 950
                                                          08:25
 1      SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2             FOR THE COUNTY OF SAN FRANCISCO
 3             HONORABLE ETHAN P. SCHULMAN
 4                    DEPARTMENT 304
 5                       ---oOo---
 6
 7
 8   COORDINATION PROCEEDING      CASE No. CJC-21-005188
     SPECIAL TITLE [RULE 1550(b)]
 9
     In Re: Uber Rideshare Cases
10   _____/
11
12
13
14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
15              VOLUME 5 PAGES 951 - 1169
16             FRIDAY, SEPTEMBER 12, 2025
17
18
19
20
21   OFFICIAL STENOGRAPHIC REPORTER PRO TEM:
22   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
23   CA CSR LICENSE NO. 9830
     Job No. CS7570153
24
25
```

Page 1007

```
 1   that was referencing a specific campaign.  I don't      10:08
 2   recall what that specific campaign was referencing.     10:08
 3           With regard to your question, we would seek     10:08
 4   to make sure that our partners were informed, if there  10:08
 5   was an incident, that they had the understanding and    10:09
 6   the access to talk to the right people within the       10:09
 7   company.  That was a part of our partnership that was   10:09
 8   deeply important to both us and to them.                10:09
 9           There were particular media components that     10:09
10   our experts wanted to be able to provide insights.  I   10:09
11   think one of the things that our experts struggled      10:09
12   with was this characterization that sexual violence or  10:09
13   sexual harassment is an Uber problem, because our       10:09
14   experts believe sexual harassment and sexual violence   10:09
15   is a societal problem.                                  10:09
16           And when you neglect that concept, there can    10:09
17   be this framing that everything is rosy and that        10:09
18   there's no problems anywhere, and our experts were      10:09
19   often keen to comment on that.                          10:09
20           And so I know our teams would give them a       10:09
21   heads-up, as an example, or seek to speak to them, and  10:09
22   to also give them background and training information.  10:10
23       Q  You remember back, I think it was in 2017,       10:10
24   there was a lot of internal commotion at Uber in your   10:10
25   department and the marketing department surrounding a   10:10
```

Page 1134

```
 1   makes, an inappropriate gesture that some -- maybe a       14:46
 2   sexually suggestive gesture that someone might make.       14:47
 3          It could also include, like as I mentioned,         14:47
 4   perhaps playing music that had sexually suggestive         14:47
 5   lyrics in it.  It encompassed sort of this really          14:47
 6   broad category of -- of language, behaviors.  Like,        14:47
 7   subtle body signals that could not only make someone       14:47
 8   feel uncomfortable, but that would also be considered      14:47
 9   inappropriate.                                             14:47
10          THE COURT:  Thank you.                              14:47
11          (As read):                                          14:47
12          "Were there any advocates that Uber worked          14:35
13   with on the taxonomy or the safety report who chose        14:47
14   not to endorse the final report?"                          14:47
15          THE WITNESS:  Not to my recollection at all.        14:47
16   As I mentioned, I was out on leave, and even then, it      14:47
17   sort of -- you could hear the feedback, and the            14:47
18   positive feedback, from those communities, so no.          14:47
19          THE COURT:  (As read):                              14:47
20          "For those organizations or advocates who did       14:35
21   endorse the report, including sharing their positive       14:48
22   feedback in the report itself, do you recall having        14:48
23   any nonpublic conversations with them about any more       14:48
24   critical or negative feedback that they may have had?"     14:48
25          THE WITNESS:  No, none whatsoever.  In fact,        14:48
```

```
                                                        Page 1135
 1    the exact opposite.  Many of these folks would say,      14:48
 2    you know, we -- we -- we are incredibly -- even before   14:48
 3    the report came out, they were, like, you know, This     14:48
 4    is incredible that you are going to do this.  I think    14:48
 5    the term "unprecedented" in that -- like, that was the   14:48
 6    tone of the conversation.  There was this belief that    14:48
 7    it would potentially kick off a deeper conversation      14:48
 8    for more people to follow suit.  And they were very --   14:48
 9    I don't know.  They were excited and very passionate     14:48
10    about that.                                              14:48
11            THE COURT:  All right.                           14:48
12            Does either side have any limited questioning    14:48
13    intended to clarify any of those answers to the          14:49
14    juror's questions?                                       14:49
15            MS. WEATHERFORD:  No.                            14:49
16            MR. PREMO-HOPKINS:  No questions from me,        14:49
17    Your Honor.                                              14:49
18            THE COURT:  Ms. Parker, you've been very         14:49
19    patient.  Thank you very much for your testimony.        14:49
20            THE WITNESS:  Thank you.                         14:49
21            THE COURT:  You're excused as a witness.         14:49
22            THE WITNESS:  Thank you very much.               14:49
23            THE COURT:  Ms. Weatherford or Mr. Taylor,       14:49
24    it's about ten of 3:00.  I understand that there's       14:49
25    more footage that you want to play to us.  Do you need   14:49
```

```
                                                    Page 3055

 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  FOR THE COUNTY OF SAN FRANCISCO

 3                  HONORABLE ETHAN P. SCHULMAN

 4                         DEPARTMENT 304

 5                            ---oOo---

 6

 7

 8    COORDINATION PROCEEDING         CASE No. CJC-21-005188

      SPECIAL TITLE [RULE 1550(b)]

 9

      In Re: Uber Rideshare Cases
10    _____/

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 VOLUME 14 PAGES 3056 - 3218

16                THURSDAY, SEPTEMBER 25, 2025

17

18

19

20

21    OFFICIAL STENOGRAPHIC REPORTER PRO TEM:

22    ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23    CA CSR LICENSE NO. 9830

24

25       Job No. CS7570162
```

```
                                                           Page 3143
1    He kept looking at me through the mirror, and it was      11:05
2    silent the whole car ride, and at least a hello would     11:05
3    have been fine."                                          11:05
4            Okay.  That's a fair complaint.  It's not         11:05
5    sexual misconduct.                                        11:05
6            "Assumed I was lazy because the train was two     11:05
7    minutes away, then said I look like I don't exercise.     11:05
8    That was extremely rude."                                 11:05
9            And it was, but it's not sexual misconduct.       11:05
10           "The driver was asking questions about my         11:05
11   credit ratings and tried to sell me credit services       11:06
12   and repeatedly tried to get personal information."        11:06
13           Also not okay.                                    11:06
14           But these are not instances of sexual             11:06
15   misconduct.  And these are part of the reasons why        11:06
16   this category was so hard to categorize and properly      11:06
17   account and figure out what was going on.  But half of    11:06
18   the case was focused on how we should have put these      11:06
19   numbers in the safety report.  That doesn't make any      11:06
20   sense.                                                    11:06
21           Some of you had some terrific questions from      11:06
22   Kate Parker.  Remember, she was the witness who did a     11:06
23   lot of the interacting with the nonprofits.  And some     11:06
24   folks asked, Well, were there advocates who worked        11:06
25   with us on the safety report who at the end said, I       11:06
```

```
                                                    Page 3144
 1    don't want to endorse it?                              11:06
 2           And Ms. Parker told you, Not at all.  In        11:06
 3    fact, the feedback was overwhelmingly positive.        11:06
 4           And someone asked a follow-up question that     11:06
 5    was also very good, saying, Well, behind the scenes,   11:06
 6    did any of these advocates ask questions or give       11:07
 7    feedback that was critical of the safety report?       11:07
 8           She told you, No, none whatsoever.  In fact,    11:07
 9    just the opposite.  I think the term unprecedented was 11:07
10    used.                                                  11:07
11           And what you heard is that finally, Uber's      11:07
12    safety report and Lyft's safety report that followed   11:07
13    got the attention of lawmakers in California, who woke 11:07
14    up and said, Wait, we don't have this kind of          11:07
15    information on any of these other forms of             11:07
16    transportation.  Maybe we should try to get it.        11:07
17           And so they passed a law that required the      11:07
18    top ten transit authorities to at least do a survey.   11:07
19    At least try to find out what the rates of sexual      11:07
20    assault and misconduct looked like on trains and buses 11:07
21    and taxis.  And when Dr. Stodden was here, she told    11:07
22    you about the results of some of those surveys.        11:07
23           Now, you heard Dr. Madigan was critical of      11:07
24    the surveys.  Dr. Stodden was critical of the surveys. 11:08
25    They are not apples to apples with the safety report,  11:08
```