# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

```
_____   )
                                 )
IN RE: UBER                      )
TECHNOLOGIES, INC.,              )
PASSENGER SEXUAL ASSAULT         )
LITIGATION                       )     Case No.
_____   )     3:23-md-03084 CRB
                                 )
This Order Relates To:           )
                                 )
ALL ACTIONS                      )
_____
```

DEPOSITION OF KATY MCDONALD

CONDUCTED REMOTELY

MAY 7, 2025

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348

Katy McDonald
May 07, 2025

```
 1   everybody's beautiful faces.  I'm trying to remove all
 2   of the --
 3            THE VIDEOGRAPHER:  Okay.  So if you hover
 4   over your screen, you should see the word view on the
 5   top right.
 6            MS. POLLOCK:  Yes.
 7            THE VIDEOGRAPHER:  If you click that, if you
 8   have it in speaker view --
 9            MS. POLLOCK:  There we go.  Thank you.
10            THE VIDEOGRAPHER:  Okay.  No problem.
11                        KATY MCDONALD,
12   having first been duly sworn, was examined and
13   testified as follows:
14       EXAMINATION BY COUNSEL FOR THE MDL PLAINTIFFS
15   BY MS. POLLOCK:
16       Q.   Good afternoon.  Could you please introduce
17   yourself to the jury?
18       A.   My name is Katy McDonald.
19       Q.   Are you currently employed by Uber?
20       A.   Yes.
21       Q.   What is your current job title?
22       A.   I am a director of data science.
23       Q.   And you started working at Uber back in 2014,
24   right?
25       A.   That's correct, yes.
```

1  paragraphs down, the paragraph beginning:  Thus, my

2  solution.  Could you read that, please, for the jury

3  and then the content of paragraph number 1?

4       A.   Yes.  Thus, my solution to our safety problem

5  requires two separate approaches.  Number one, safety

6  for riders.  Run a deep analysis on known

7  partner-drivers who have made Uber unsafe, i.e., gotten

8  in major accidents, been accused of assault/rape,

9  robbed riders.  What are the trends/patterns between

10 these drivers?  Can we predict their behavior and

11 proactively deactivate these partners?

12      Q.   All right.  So we -- it was on your mind back

13 in 2014 at this time that it could be possible to look

14 at the trends and patterns amongst drivers to see if

15 one could predict their behavior?

16      A.   I have --

17           MR. COX:  Object to the form.

18           Go ahead.

19      A.   I have always been passionate about safety,

20 and so while I don't recall this specific proposal, I'm

21 not surprised that my proposals around safety and

22 finding creative ways to connect data with improving

23 the safety of the platform for both riders and drivers.

24      Q.   And you proposed this concept in 2014 to

25 folks at Uber, correct?

1   and reliable data.

2        Q.   When riders feel good about safety, Uber felt
3   and you also felt that it would provide more business
4   to Uber, is that right?

5             MR. COX:  Object to the form.

6        A.   I am confused by the question.  Can you
7   repeat it, please?

8        Q.   Let's take a look at Exhibit 725, please,
9   which is folder 11.  Might have some clarity for you.

10            MR. COX:   11?

11            (Whereupon, Exhibit 725, Slack
12   Correspondence, was marked for identification.)

13       Q.   Are you ready, Ms. McDonald?

14       A.   Yes.

15       Q.   All right.  Do you recognize Exhibit 725 as a
16  communication exchange between yourself and Catherine
17  Gibbons on what's called a Slack channel dated
18  October 2, 2020?

19       A.   Yes.  I see it as a Slack exchange between
20  Catherine and myself in October of 2020.

21       Q.   All right.  And a Slack exchange means that
22  you and Ms. Gibbons were able to direct message each
23  other, correct?

24       A.   That's correct.

25       Q.   Similar to -- for folks on the jury that may

Katy McDonald
May 07, 2025

```
 1   not know what Slack is, similar to texting each other.
 2   Do you agree with that?
 3           MR. COX:  Object to the form.
 4       A.  Yes.  It's a messaging app, application.
 5       Q.  All right.  Thank you.  And so if you start
 6   at, just to orient ourselves, the first page of the
 7   document, you're reaching out to her and asking her for
 8   help with a Jira ticket, is that right?
 9       A.  Yes.  I see that.
10       Q.  All right.  And you ask a question about why
11   is contact 4 and contact 3 considered too vague,
12   correct?
13       A.  I see that as written, yes.
14       Q.  All right.  And then if we go back -- two,
15   three, four.  If we go back five pages to the Bates
16   number ending in 6134 on the bottom, are you with me?
17       A.  Yes.
18       Q.  All right.  Can you read what you've written
19   here on this page starting from the top, please?
20       A.  I see:  I'm also on a path to educate that
21   riders are the worst, and when we think about rider
22   safety, what we really need to wrap our head around are
23   we're just making the majority of riders feel good, and
24   that's fine.  We need them to feel good so that they
25   give us business.
```

1          Q.   All right.  And you are referring -- the
2     specific example, subject of this communication, about
3     a dispatch model in Latin America.  But there were also
4     dispatch models under evaluation and being studied in
5     the United States as well, true?
6               MR. COX:  Object to the form.
7          A.   I don't know.  I'm not as familiar with that.
8     I don't know.
9          Q.   You don't know one way or the other?
10              MR. COX:  Object to the form.
11         A.   My understanding from my work at Uber is the
12    safety issues that I'm highlighting here are rather
13    unique to Latin America, at least from when I was
14    involved in the work.  So I don't know if there was any
15    sort of discussion or work done for using this safe
16    dispatch model elsewhere outside of Latin America.
17         Q.   What was your role in balancing the safety
18    needs with the marketplace growth business needs?
19              MR. COX:  Object to the form.
20         A.   Can you clarify the question?
21         Q.   Well, I'm referring to your precise words
22    where you say:  We really have to balance safety with
23    the marketplace growth business.
24              And my question is, what was your role with
25    respect to this balancing act?

1               MR. COX:  Object to the form.
2          A.    I was not responsible for safe dispatch
3    model.  I believe I'm saying we here as in Uber,
4    likely.  I did not actually have any involvement in the
5    creation of safe dispatch model.  Again, I believe this
6    is at the time when Julia was onboarding to Uber, and
7    so it appears to me that this conversation is about me
8    explaining how different things at Uber work to her.
9          Q.    The page prior you are identifying to her
10   several factors, risk factors, so you have a
11   fundamental understanding of this concept, true?
12              MR. COX:  Object to the form.
13         A.    Can you clarify what concept you're referring
14   to here?
15         Q.    The idea of the safe dispatch, the subject of
16   your communication with her.
17         A.    Yes.  That's why I'm explaining it to her.  I
18   have an understanding, a general understanding of the
19   safe dispatch model.  I worked in 2017 on the risk team
20   and was familiar with similar safety issues at that
21   time.
22         Q.    And were you also familiar with similar
23   safety issues in the United States?
24         A.    No.  My work was very exclusively in Latin
25   America and parts of EMEA such as South Africa.

```
 1         Q.   But we know though at least as of 2021 Uber
 2   had developed a safe dispatch model for a country other
 3   than the United States, true?
 4         A.   Yes.  There was a safe dispatch model that as
 5   mentioned here was very focused on mitigating the risk
 6   that came with cash in particular as an anonymous
 7   payment option which was more largely available in
 8   Latin America.
 9         Q.   I'd like to move off of this communication
10   and direct your attention to communication -- first
11   I'll ask is, who is the gentleman named Todd Gaddis?
12              MS. POLLOCK:  We can take this exhibit down,
13   please.
14         A.   He's a data science manager at Uber.
15         Q.   Is he your direct report?
16         A.   No.
17         Q.   Are you his direct report?
18         A.   No.
19         Q.   All right.  Are you on the same team?
20         A.   Excuse me?  Yes.  We're on the wider -- same
21   data science team.
22         Q.   All right.  And there were times that you
23   communicated with him via Slack, true?
24         A.   Yes, over the course of my time I've
25   discussed and engaged with Todd, yes.
```

```
 1              : : :  CERTIFICATE OF REPORTER  : : :

 2

 3           I, Kaylee G. Wood, a Certified Shorthand
     Reporter, holding a valid and current license issued by
 4   the State of California, No. 14348, duly authorized to
     administer oaths, do hereby certify:
 5           That the witness in the foregoing deposition
     was administered an oath to testify to the whole truth
 6   in the within-entitled cause;
             That said deposition was taking down by me in
 7   shorthand at the time and place therein stated and
     thereafter transcribed into typewriting, by computer,
 8   under my direction and supervision.

 9           ( X )  Reading and signing was requested.

10           (   )  Reading and signing was waived.

11           (   )  Reading and signing was not requested.

12           Should the signature of the witness not be
     affixed to the deposition, the witness shall not have
13   availed himself/herself of the opportunity to sign or
     the signature has been waived.
14           I further certify that I am neither counsel
     for nor related to any party in the foregoing
15   depositions and caption named nor in any way interested
     in the outcome thereof.
16

17

18   Dated:    This 8th of May, 2025.

19             at San Diego, California.

20

21                         [signature: Kayleelachm]

22                         _____

23                         KAYLEE G. WOOD

24                         CSR NO. 14348

25
```