1  [Submitting counsel below]

2

3

4

5

6

7

8

9

10

11  UNITED STATES DISTRICT COURT

12  OF NORTHERN DISTRICT OF CALIFORNIA

13  SAN FRANCISCO DIVISION

14

15  IN RE: UBER TECHNOLOGIES, INC.,
    PASSENGER SEXUAL ASSAULT
16  LITIGATION

17

18  This Document Relates to:

19  *Jaylynn Dean v. Uber Techs., Inc.*,
    N.D. Cal. No. 23-cv-06708
20  D. Ariz. No. 25-cv-4276

21

22

No. 3:23-md-03084-CRB

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTIONS TO EXCLUDE EXPERT
TESTIMONY**

Judge: Honorable Charles R. Breyer
Date:  January 6, 2026
Time:  10:00 A.M. PT
Ctrm.:  6-17th Floor

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.     DR. VICTORIA STODDEN'S TESTIMONY SHOULD BE EXCLUDED. ................... 3

     A.     Dr. Stodden's "Orders of Magnitude" opinion is unreliable and irrelevant. .......... 3

           1.     Dr. Stodden did not use reliable statistical methodology ............................ 3

           2.     Dr. Stodden did not use reliable methodology to draw population inferences. ................................................................................................ 6

           3.     The Uber Survey illustrates the flaws in Dr. Stodden's methodology ................................................................................................ 7

     B.     Dr. Stodden's California-centric analysis is irrelevant to this Arizona case ........... 7

     C.     Dr. Stodden's data reliability opinions are unreliable ........................................... 8

     D.     Dr. Stodden's opinions as to homicide, fatal traffic accidents, and lightning strikes are irrelevant and unreliable. ..................................................................... 9

II.    VIDA THOMAS'S TESTIMONY SHOULD BE EXCLUDED IN PART. ..................... 9

III.   JASON MORRIS'S TESTIMONY SHOULD BE EXCLUDED IN PART. ................... 10

IV.   DR. ERIC PIZA'S TESTIMONY SHOULD BE EXCLUDED IN PART. ................... 11

     A.     Dr. Piza is unqualified to offer feasibility opinions, which are unreliable. .......... 12

     B.     Dr. Piza's opinions on Uber's existing features are unreliable. ........................... 13

     C.     Dr. Piza's personal views on RAINN and Urban Institute are unreliable. ........... 15

V.     JOSEPH OKPAKU'S TESTIMONY SHOULD BE EXCLUDED. ............................. 16

     A.     Mr. Okpaku's "industry standard" opinions are unreliable. ................................ 16

     B.     Mr. Okpaku's "control" opinions based on driver motivation and contractual interpretation are irrelevant and unreliable. ...................................... 17

     C.     Mr. Okpaku's "dashcams are not required" opinion is unreliable. ...................... 18

VI.   DR. LINDSAY ORCHOWSKI'S TESTIMONY SHOULD BE EXCLUDED IN PART ...................................................................................................................... 19

     A.     Dr. Orchowski's predictive screening and sexual assault risk factor opinions are unreliable. ...................................................................................... 20

     B.     Dr. Orchowski's predictive screening opinions are irrelevant. ........................... 22

     C.     Dr. Orchowski's causation opinions are inadmissible. ....................................... 23

CONCLUSION ................................................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

### CASES

Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ....................................................................... 23

Avila v. Ford Motor Co.,
796 F. Supp. 3d 593 (N.D. Cal. 2025) ........................................................................ 23

Cambridge Lane, LLC v. J-M Mfg. Co., Inc.,
2025 WL 1843110 (C.D. Cal. Feb. 24, 2025) ............................................................ 22

Claar v. Burlington N. R. Co.,
29 F.3d 499 (9th Cir. 1994) ........................................................................................ 21

Coordination Proceeding Special Title (Rule 3.550), In re Uber Rideshare Cases,
2025 WL 2631568 (Cal. Super. Aug. 29, 2025) ........................................................ 10

Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993) ........................................................................... 2, 9, 18, 19

Elosu v. Middlefork Ranch Inc.,
26 F.4th 1017 (9th Cir. 2022) ....................................................................................... 9

Fluence Energy, LLC v. M/V BBC Finland,
726 F. Supp. 3d 1086 (S.D. Cal. 2024) ........................................................................ 9

FTC v. Qualcomm Inc.,
2018 WL 6522134 (N.D. Cal. Dec. 11, 2018) ........................................................... 22

Geiger v. Creative Impact Inc.,
2020 WL 3268675 (D. Ariz. June 17, 2020) .............................................................. 14

Glam & Glits Nail Design, Inc. v. iGel Beauty, LLC,
2022 WL 3012522 (C.D. Cal. June 24, 2022) ........................................................... 21

GPNE Corp. v. Apple, Inc.,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ...................................................... 11, 19

Henry v. Quicken Loans Inc.,
2009 WL 3199788 (E.D. Mich. Sept. 30, 2009) ........................................................ 18

Holbrook v. Lykes Bros S.S. Co., Inc.,
80 F.3d 777 (3d Cir. 1996) .................................................................................... 15, 19

In re Citimortgage, Inc. Home Affordable Modification Program Litig.,
2023 WL 8844095 (C.D. Cal. Oct. 7, 2013) ................................................................ 7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Flint Water Cases,*

2023 WL 6279521 (E.D. Mich. Sept. 26, 2023) ........................................................................ 8

*In re Imperial Credit Indus., Inc. Sec. Litig.,*

252 F. Supp. 2d 1005 (C.D. Cal. 2003) ................................................................................... 20

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*

2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) ......................................................................... 8

*In re Processed Egg Prod. Antitrust Litig.,*

81 F. Supp. 3d 412 (E.D. Pa. 2015) ....................................................................................... 18

*In re TMI Litig.,*

193 F.3d 613 (3d Cir. 1999) .................................................................................................. 20

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.,*

2011 WL 6301625 (S.D. Ill. Dec. 16, 2011) ........................................................................... 14

*Kirk v. Clark Equip. Co.,*

991 F.3d 865 (7th Cir. 2021) ................................................................................................... 7

*Klein v. Meta Platforms, Inc.,*

766 F. Supp. 3d 956 (N.D. Cal. 2025) ................................................................................... 14

*Lauderdale v. NFP Ret., Inc.,*

2022 WL 17324416 (C.D. Cal. Nov. 17, 2022) ...................................................................... 21

*Lord Abbett Municipal Income Fund, Inc. v. Asami,*

2014 WL 3417941 (N.D. Cal. Jul. 11, 2014) ............................................................................ 9

*Magallon v. Robert Half Int'l, Inc.,*

743 F. Supp. 3d 1237 (D. Or. 2024) ................................................................................. 11, 17

*Monroe v. Zimmer U.S. Inc.,*

766 F. Supp. 2d 1012 (E.D. Cal. 2011) .................................................................................. 14

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC,*

713 F. Supp. 3d 660 (N.D. Cal. 2024) .............................................................................. 19, 20

*N. Am. Specialty Ins. Co. v. Myers,*

111 F.3d 1273 (6th Cir. 1997) ............................................................................................... 18

*Oddo v. Arocaire Air Conditioning & Heating,*

2020 WL 5267917 (C.D. Cal. May 18, 2020) ......................................................................... 21

*Odyssey Wireless, Inc. v. Apple, Inc.,*

2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ......................................................................... 3

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Plunkett v. Best Buy Co., Inc.*,
　2017 WL 4958579 (W.D. Wash. Oct. 31, 2017) ........................................................ 23

*Primiano v. Cook*,
　598 F.3d 558 (9th Cir. 2010) ..................................................................................... 14

*Santiago v. Phoenix Newspapers, Inc.*,
　794 P.2d 138 (Ariz. 1990) .......................................................................................... 18

*Shaver v. Libbey Glass LLC*,
　2024 WL 3050719 (C.D. Cal. Apr. 12, 2024) ............................................................ 21

*Twin K. Construction, Inc. v. UMA, Geotechnical Constr., Inc.*,
　597 F. Supp. 3d. 1204 (E.D. Tenn. 2022) ................................................................... 18

*U.S. Holguin*,
　51 F.4th 841 (9th Cir. 2022) ...................................................................................... 11

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
　2021 WL 2352016 (E.D. Pa. June 9, 2021) .......................................................... 15, 21

*Wolfe v. McNeil-PPC, Inc.*,
　2011 WL1673805 (E.D. Pa. May 4, 2011) ................................................................. 22

## RULES

Fed. R. Civ. P. 26(a)(2)(D)(ii) ........................................................................................ 22

Fed. R. Evid. 702 ..................................................................................................... passim

## TABLE OF EXHIBITS

| DOCUMENT | LOCATION |
|---|---|
| Pls' Omnibus Daubert Motion ("Mot.") | ECF 4358 |
| Pls' Mot. to Exclude Orchowski ("Orchowski Mot.") | ECF 4389 |
| Defendants' Opposition to Omnibus Daubert Motion ("Opp.") | ECF 4632 |
| Defendants' Opposition to Mot. to Exclude Orchowski ("Orchowski Opp.") | ECF 4629 |
| Morris Rpt. | ECF 4357-4 |
| Okpaku Rpt. | ECF 4357-1 |
| Piza Rpt. | ECF 4357-6 |
| Piza Dep. | ECF 4357-7 |
| Orchowski Rpt. | ECF 4385-3 |
| Orchowski Dep. | ECF 4385-4 |
| Stodden Rpt. | ECF 4357-9 |
| Stodden Dep. | ECF 4357-11 |
| Thomas Rpt. | ECF 4357-3 |
| Valliere Rpt. | ECF 4340-1 |
| Valliere Dep. | ECF 4340-2 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Uber's opposition largely fails to address the merits of Plaintiff's arguments. Rather than engage on specific legal and factual issues, Uber instead relies on misdirection and mischaracterization to confuse and obfuscate. Uber also routinely argues that certain opinions are reliable because the expert extrapolates, conceptualizes, or otherwise relies on materials, experience, and knowledge. But in each instance, the expert reports show otherwise. Uber's hollow reference to these terms cannot cure the flaws in these expert opinions.

**<u>Victoria Stodden</u>:** Uber argues that Plaintiff's challenges to Dr. Stodden's "orders of magnitude" opinions is merely a dispute regarding factual assumptions, not reliable methodology. To support this view, Uber misconstrues Plaintiff's arguments and then overloads its response with unnecessary and verbose facts and numbers to confuse and exhaust. But the truth remains—Dr. Stodden did not apply reliable methodology. She knew, but did not account for, the varied and significant disparities in her data sources, and she knew but ignored proper methodology regarding population inferences. The result is skewed outcomes that lead to absurd calculations. Moreover, her ultimate opinion—that Uber is orders of magnitude safer than California public transportation—is irrelevant to this Arizona case. Equally irrelevant is Dr. Stodden's decision to compare sexual assaults to homicides, fatal traffic accidents, and lightning strikes—a random collection of categories that have no relevance to this case.

**<u>Vida Thomas</u>:** Uber argues that Ms. Thomas's notice opinion should not be excluded because it is "extrapolated" from her other opinions regarding background checks and HR standards. Ms. Thomas's report shows otherwise. Her discussion of notice rests solely on a recitation of facts, followed by her determination that Uber had no notice that Plaintiff's Uber driver posed a danger of sexual assault to others. There is no extrapolation here. She merely recites the facts and then instructs the jury on outcome. Uber further argues that "notice" is a complex issue that requires understanding of the ways in which a large company addresses sexual assault; this argument was correctly rejected by the JCCP Court, and this Court should do the same.

**<u>Jason Morris</u>:** Uber tries to distract from Mr. Morris's unreliable and irrelevant "industry standards" opinions by citing to various provisions in the PBSA Accreditation Standards. But no

matter how many provisions of these standards it cites, Uber cannot (and does not) dispute that the PBSA is focused on legal compliance with the FCRA and DPPA and, as such, the provisions of the PBSA are limited to unlawful disclosure of information regarding applicants, rather than proper hiring screening standards. Uber also argues that Mr. Morris's conclusions are supported by "three decades of specialized experience" but this alone does not support his opinion that Uber's screening practices exceeded those of other, unidentified employers and industries. This "because he said so" argument fails under Rule 702 and *Daubert*.

**Eric Piza:** Uber cannot overcome the qualification flaws in Dr. Piza's feasibility opinions by merely reciting his criminology background. That Dr. Piza is qualified in one area does not mean that he is qualified in all others. Uber also cannot overcome the unreliability of Dr. Piza's opinions on the purported efficacy of certain Uber features by making vague reference to reliance on literature about surveillance cameras which, even if true, does not support opinions about how said Uber features work and whether they deter crime.

**Joseph Okapku:** On Mr. Okpaku's "industry standard," Uber admits that the standard offered is based solely on California law (which is irrelevant in an Arizona case) but tries to gloss over this point by arguing that subsequent opinions are properly based on materials reviewed, experience, and knowledge. The argument does not fix the problem. Mr. Okpaku's analysis still rests on the erroneous assumption that no industry standard exists, rendering his subsequent opinions nothing more than improper conclusions as to whether Uber complied with an out-of-state law. Similarly unavailing are Uber's arguments regarding Mr. Okpaku's irrelevant and unreliable opinions concerning driver motivations and contractual agreement, which ultimately do not dispute Plaintiff's point that driver motivations and contract terms are irrelevant.

**Lindsay Orchowski:** Since Uber's opposition was filed, Judge Cisneros struck much of Dr. Orchowski's rebuttal report. *See* ECF 4701 at 3-7. The remaining challenged opinions should be excluded. Uber tacitly concedes that Dr. Orchowski's opinions regarding predictive screening and sexual assault risk factors lack sufficient facts and data, arguing that Dr. Orchowski need not personally review any documents because a "rebuttal expert is permitted to discuss overlooked evidence and perceived flaws in the methodology of the original expert's testimony." Orchowski

Opp. at 5. But Dr. Orchowski does not discuss "overlooked evidence" (or any evidence at all) and does not identify any perceived flaws in Dr. Valliere's methodology (she merely presents an abstract opinion on predictive screening and risk factors that are divorced from the actual evidence in the case). Additionally, Dr. Orchowski's causation opinions should be excluded because they exceed the scope of permissible expert testimony. Her attempts to "point[] out logical flaws" in Dr. Valliere's report may be appropriate for cross examination or closing argument, but they are not a proper expert opinion. The jury can draw these conclusions themselves.

Plaintiff's motions to exclude should be granted.

## ARGUMENT

### I.   DR. VICTORIA STODDEN'S TESTIMONY SHOULD BE EXCLUDED.

Dr. Stodden's orders of magnitude opinions must be excluded. The errors in application of statistical tools and methodology, many of which Dr. Stodden acknowledged – but did not apply – render the opinions unreliable. Uber attempts to divert focus from these flaws, but close review of its arguments—which are dense in minutiae of facts and numbers but sparse in actual relevance to the arguments raised—reveals that Uber ultimately cannot dispute the core truth: Dr. Stodden did not apply a reliable methodology. Dr. Stodden's opinions should also be excluded because they pertain to California public transportation and thus have no relevance to an Arizona case. And with respect to Dr. Stodden's random comparisons to homicide rates, fatal traffic accidents, and lightning strikes, this opinion should be excluded because such comparisons are irrelevant.

### A.   Dr. Stodden's "Orders of Magnitude" opinion is unreliable and irrelevant.

#### 1.   Dr. Stodden did not use reliable statistical methodology.

Uber tries to minimize the flaws in Dr. Stodden's methodology by characterizing Plaintiff's challenges as a matter of disagreement on "different assumptions." Opp. at 5. But comparing incomparable measurements (among other errors), without first converting or attempting to convert the measurements into comparable units is not a matter of "different assumptions" but a fatal flaw in methodology; indeed, an error of basic statistics. This is distinct from Uber's citation to *Odyssey Wireless, Inc. v. Apple, Inc.*, 2016 WL 7644790, at *13 (S.D. Cal. Sept. 14, 2016), where the court declined to exclude a damages expert's opinion where expert assumed that the source of a price

difference was based on wireless technology and assumed certain royalty rates applied to two different products.

To be clear, there is no dispute that Dr. Stodden compared disparate units. *See* Mot. at 6-11. This includes calculating a ratio of Uber's SA/SM reports over *total rides*, but from California public transportation surveys, calculating a ratio of survey respondents who said yes to experiencing or witnessing sexual misconduct to *total number of respondents*, which is not an equivalent measure nor a sound methodology. *See* Mot. at 5-19. Dr. Stodden's opinion should be excluded on this basis alone.

Uber's fixation on insistences where Plaintiff used a variation of the term "assume" in her briefing as proof of its point is meritless. Neither Plaintiff's use of "assume," nor her presented hypotheticals to illustrate the absurdity of Dr. Stodden's results, transform faulty methodology into defensible factual assumptions. In her most significant methodological error, Dr. Stodden intentionally used disparate units with mismatched denominators (incidents per total number of rides versus incidents per total number of survey respondents) rather than assembling comparable measurements for comparison. That error is compounded by numerous additional missteps, each of which alone render her methodology unreliable: she compared data collected using disparate instrumentalities without accounting for differences in the ability of those instrumentalities to collect accurate, comparable data (proactive, self-reports of incidents from Uber riders versus survey responses from public transportation users), ignored the most basic, fundamental rules of statistics (failing to evaluate statistical significance, uncertainty, and variability), and made conclusions about populations based on samples that are not representative of those populations. *See* Mot. at 6-10. These are not different "assumptions"; they are acknowledged inconsistencies in data, *see* Stodden Rpt. at ¶¶ 22-23, that should have been accounted for in Dr. Stodden's methodology but were not.

Uber next argues that Dr. Stodden is not trying to quantify precisely how much safer Uber is than public transportation, but merely providing "estimates," and she does not claim that Uber is 118,354 times safer than LACMTA or 54 times safer than BART. *See* Opp. at 7. The point appears to be that imprecisions and imperfections in her analysis should be ignored as she is merely

presenting rough calculations. There is no such leeway for statistical expert opinions under Rule 702. Whether precise or estimates, her opinions must be reliable and they cannot meet that threshold if she does not apply reliable methodology. Moreover, the reframing to an "estimate" is irrelevant when Dr. Stodden's report so clearly indicates otherwise. Her headlining opinion is "Uber is Orders of Magnitude *Safer Than* Relevant Public Transportation Options," *see* Stodden Rpt. at § VI, and her corresponding Tables 1 and 2 clearly represent how many times safer she believed Uber to be as compared to certain California public transportation options. *See* Stodden Rpt. at Table 1 (calculating a "multiple of rate of 'experienced or witnessed sexual assault or rape' over Uber's reported incident rate of sexual assault in 2021-22 multiple rate" as 118,254); Stodden Rpt. at Table 2 (calculating a multiple rate of 54 for BART).

For the same reasons, Uber's harmless-error argument should be rejected. On this point, Uber contends that Dr. Stodden's flawed methodology is harmless because her opinion that Uber is orders of magnitude safer would remain true even under Plaintiff's "competing assumptions," *e.g.*, Plaintiff's presented hypotheticals that demonstrate the absurdity of Dr. Stodden's methodology. Opp. at 7. But the errors in Dr. Stodden's calculations are not harmless. An opinion as to a rate-multiple of 118,354 as opposed to 467 are significantly different results; indeed, wholly different opinions.

Uber argues that Plaintiff failed to explain why her application of Dr. Stodden's "rate multiple" of sexual assault or rape on LACTMA (a rate-multiple of 118,354)[1] to Uber reported incidents during that same time period (2,717) was appropriate. *See* Opp. at 8. Plaintiff, in fact, clearly explained why this was necessary. *See* Mot. at 8. To reiterate, Plaintiff's calculations follow Dr. Stodden's opinion to its natural conclusion. The result is absurd and this demonstrates the faulty nature of Dr. Stodden's methodology. Uber argues, without support, that you cannot multiply a rate-multiple (118,354) by Uber reported incidents (2,717) but this is precisely the outcome that

---

[1] Dr. Stodden compared the reported incident "rate" on Uber, calculated as the number of SA/SM reports in 2021-2022 over the number of rides in 2021-2022 (calculated as a percentage), to the "rate" of sexual assault on public transportation, which she calculates as percent of survey respondents who answered "yes" to surveys. She then compares these "rates" by dividing the public transportation "rate" by the Uber "rate" and reports them on Tables 1 and 2 as the "multiple of rate" on public transportation over Uber. Uber refers to these comparisons as Dr. Stodden's "rate-multiples."

Dr. Stodden is leading us to (though she inexplicitly stops short of the final calculations). If it is true, as Dr. Stodden asserts, that Uber is 118,354 times safer than LACMTA, then it should be appropriate to apply her "rate-multiple" to estimate the number of assaults on the LACMTA, by multiplying it by the actual number of Uber reported incidents. The outcome of 321,692,800 is absurd, and thus reflective of the unreliability of Dr. Stodden's methodology. The point of this exercise is to illustrate the fundamental problem with Stodden's methodology—that she did not use reliable methodology to calculate (or estimate) incident rates that can reliably be compared. If her methodology was reliable, this exercise would give a result that arguably estimates the rate of sexual assault on public transportation or at least passes the laugh test.

**2.  Dr. Stodden did not use reliable methodology to draw population inferences.**

Based on Dr. Stodden's own proffered methodology, "[if]…a researcher does not have the ability to obtain data on every unit within a population, then the researcher can sample a subset of the population and use statistical inference tools to deduce conclusions about the characteristics of the population." Stodden Dep. at Ex. 2073, ¶ 14. "However, in order to draw valid inferences from the sample to the population, it is important that a sample represent the population as a whole." *Id.* (internal brackets and quotations omitted). Further, if a statistician seeks to use a sample to infer information about the population, they need to be "really aware of" any problems with the sample and "take steps … [to] fix some of those problems if it's possible or do some kind of work to understand the impact on [the] results." *Id.* at 32:20-33:11. In short, proper inference methodology requires (1) choosing a representative sample aimed at avoiding bias; and (2) using statistical methods to quantify and/or fix any bias (or error) introduced by the sampling method.

Here, there is no dispute that Dr. Stodden did not have data on every unit within the representative population. There is no dispute that Dr. Stodden relied on Uber Safety Report data and California public transportation survey data to make population inferences. There is also no dispute that neither data source is an appropriate sample, let alone a representative one. *See, e.g.,* Opp. at 9 (conceding Uber Safety Report data is not a "sample"). And there is no dispute that Dr. Stodden was aware of biases and variations in her data sources. *See* Stodden Rpt. at ¶¶ 22-23.  But

Dr. Stodden did not use any statistical methods to quantify or account for those biases and variations. *See* Mot. at 13-19. Again, this is not an issue of factual assumptions but flawed methodology.

In its opposition, Uber deflects from the point by arguing that Plaintiff should first identify how Dr. Stodden should have accounted for each data bias, *see* Opp. at 10-11, but this merely proves the point. That Dr. Stodden does not even know how to reconcile her data sources with her own methodology speaks volumes to the unreliability of her application. Uber's citations are inapposite, for none disposes of Rule 702's requirement that an expert apply reliable methodology. *See, e.g., In re Citimortgage, Inc. Home Affordable Modification Program Litig.*, 2023 WL 8844095, at *2-3 (C.D. Cal. Oct. 7, 2013) (rejecting argument that expert failed to account for numerous discrepancies in several data fields because expert in fact clarified how he adjusted his analysis at a classwide level for shortcomings in the Treasury Data). Ultimately, Uber argues that Dr. Stodden should not be required to do the "impossible," Opp. at 11, but any impossibility is the result of her flawed application (e.g., using incompatible data sets), rather than unavoidable impossibility. *See, e.g., Kirk v. Clark Equip. Co.,* 991 F.3d 865, 877-78 (7th Cir. 2021) (applying Uber's cited "impossibility" language to accident recreation not reliable application of methodology and data).

### 3.    The Uber Survey illustrates the flaws in Dr. Stodden's methodology.

Uber argues that Plaintiff misinterpreted the Uber Survey, *see* Opp. at 12-13, but this argument misses the point. Plaintiff references the Uber Survey to emphasize Dr. Stodden's unreliable methodology and show how her outcome resulted in misleading statistics that deviated from even Uber's own surveys. Regardless of how Uber wants to characterize its survey data and parse out the percentages, the fact remains that Dr. Stodden did not bother to try to identify comparable data in her own client's possession.

### B.    Dr. Stodden's California-centric analysis is irrelevant to this Arizona case.

Uber does not dispute that Dr. Stodden's analysis is predicated on California data and thus calculates (flawed) rates relevant only to California. To work around an irrelevant analysis to an Arizona case, Uber argues that Dr. Stodden's testimony is "not to argue that Uber was a safer option

than public transportation alternatives for…plaintiff in a particular geography. Rather, the purpose is '[t]o contextualize rates of alleged sexual assault and misconduct on rides on the Uber platform.'" Opp. at 15 (citing Stodden Rpt. at ¶ 19). This is a distinction without a difference. To "contextualize" rates of assault and misconduct on Uber, Dr. Stodden compares it with *California* public transportation survey results and concludes that Uber is magnitudes safer. Whether or not Uber is safer than California transportation is irrelevant to ridership in Arizona. This is distinguishable from the cases cited by Uber where the challenged comparative was nationwide data to in-state data, and global profit numbers from a party's own financial documents—not, as here, comparison of nationwide data to out-of-state data. *See In re Flint Water Cases,* 2023 WL 6279521, at *5-6 (E.D. Mich. Sept. 26, 2023) (allowing comparison between nationwide APA data and CASPER data from Flint, Michigan); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250, at *28-29 (E.D.N.Y. Oct. 26, 2022) (allowing use of global profits identified in a party's own documents for purposes of an expert's damages analysis). Nationwide and global data includes Arizona, whereas California data does not.

### C.       Dr. Stodden's data reliability opinions are unreliable.

Dr. Stodden's opinions regarding the reported categories in Uber's Safety Report lack sufficient data and support and are therefore unreliable. Dr. Stodden cannot opine whether it was appropriate for Uber to disclose only five categories, *see* Stodden Rpt. at § V, because she has no basis to assert that opinion. *See* Mot. at 20-21. Uber argues that Plaintiff's argument misconstrues Dr. Stodden's opinion but then concedes that Dr. Stodden "opines that 'it was appropriate for Uber to publish the reported incident rates for the five categories that have the highest degree of consistency across Uber auditors….'" Opp. at 17 (citing Stodden Rpt. at ¶ 17). There is no misunderstanding here. And, importantly, as to Plaintiff's core objection that this opinion lacks sufficient facts and data, Uber presents no counter argument. While Uber argues that Dr. Stodden relied on representations in the Uber Safety Report, it tacitly concedes that this did not include any information about the auditor alignment process from which Dr. Stodden could derive a reliable opinion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.      Dr. Stodden's opinions as to homicide, fatal traffic accidents, and lightning strikes are irrelevant and unreliable.**

Homicide rates, fatal traffic accidents, and lightning strikes are not relevant to this case. These comparisons do not help the jury contextualize sexual assault and misconduct on the Uber platform and are offered solely to confuse the issues. Moreover, the opinion lacks methodology, including any discernable attempt to align the referenced rates into comparable data points.

## II.      VIDA THOMAS'S TESTIMONY SHOULD BE EXCLUDED IN PART.

Ms. Thomas's conclusion that Uber was "not on notice that…Hassan Turay…would sexually assault a rider" should be excluded. Uber attempts to defend this conclusion on two grounds: (1) that it is a "straightforward extrapolation from her other opinions"; and (2) that it addresses a "complex topic" that is "beyond the common knowledge of the average lay person." Uber is wrong on both counts.

*First*, Ms. Thomas's conclusion regarding "notice" does not extrapolate from her opinions regarding background check processes and generally accepted standards in the HR industry. Her report shows that her "notice" conclusion relies solely on a parroting of facts, *see* Thomas Rpt. at ¶¶ 50-53, followed by her determination that based on her facts a jury should conclude that Uber was on notice, *see id.* at ¶ 62 (concluding "Uber had no prior information that…Turay…posed a danger of sexual assault to riders"). This is precisely the type of "opinion" that was excluded in *Lord Abbett Municipal Income Fund, Inc. v. Asami,* 2014 WL 3417941, at *13, n.8 (N.D. Cal. Jul. 11, 2014) (excluding opinion that "merely summarizes the record evidence and gratuitously interprets it"). It is also the type of improper conclusion that usurps the role of the jury. *See Fluence Energy, LLC v. M/V BBC Finland*, 726 F. Supp. 3d 1086, 1101 (S.D. Cal. 2024) ("[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"). Uber's attempt to find support in *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022), is unavailing. *Elosu* dealt with whether an expert opinion was based on sufficient facts or data—not, as here, whether an expert may marshal the evidence and dictate to the jury the outcome. The latter falls squarely outside the mandates of Fed. R. Evid. 702 and *Daubert.*

*Second*, Uber's argument that "notice" is a "complex" issue that is "beyond the common knowledge of the average lay person," Opp. at 21, was correctly rejected by the JCCP Court. *See Coordination Proceeding Special Title (Rule 3.550), In re Uber Rideshare Cases*, 2025 WL 2631568, at *6 (Cal. Super. Aug. 29, 2025). The Court should do the same here. Moreover, even if Uber were correct that a jury would benefit from expert opinions regarding the "ways in which large companies such as Uber aim to prevent incidents of sexual assault by screening the drivers…and investigating alleged incidents of sexual assault," Opp. at 21, Uber will have the opportunity to do so as Plaintiff does not challenge those aspects of Ms. Thomas's report. But Uber cannot instruct the jury on the ultimate determination through the guise of an expert opinion.

Ms. Thomas's opinion that Uber was "not on notice" should be excluded.

### III.   JASON MORRIS'S TESTIMONY SHOULD BE EXCLUDED IN PART.

Mr. Morris's opinions regarding "industry standards" for background checks, and that Uber "met and exceeded" these standards, should be excluded.

Plaintiff moves to exclude Mr. Morris's "industry standard" opinion because he merely asserts compliance with existing laws; specifically, the PBSA accreditation guidelines. Uber counters that his report is "replete with citations to applicable industry standards," but notably points to none other than the PBSA. Opp. at 22.

The PBSA—as explained by the PBSA itself—is focused on "compliance with the Fair Credit Reporting Act (FCRA) and the Driver Privacy Protection Act (DPPA)." Mot. at 24, n.20. These, in turn, address unlawful disclosure of information regarding applicants, rather than proper screening standards prior to hiring. Uber deflects from this by pointing to random sections of PBSA accreditation standards. *See* Opp. at 22 (citing PBSA Accreditation Standards 1.1, 4.2, and 5.1). But it never addresses the foundational problem that, irrespective of individual sections, the overall purpose of the cited PBSA is compliance with the FCRA and DPPA, and, in turn, data protection for applicants rather than background screening standards to reduce risk.[2] The standards and resulting opinions are therefore not relevant to this case. For the reasons articulated in Plaintiff's

---

[2] That Plaintiff's expert, David Sawyer, also references the PBSA is not a cure to the deficiencies in Mr. Morris's analysis, as Mr. Sawyer identifies different PBSA documents and other reference materials; as opposed to sole reliance on an irrelevant PBSA Accreditation Standard.

opening brief, *Magallon* is strongly on point, and the Court should exclude Mr. Morris's "industry standard" testimony based on the PBSA.[3] *See* Mot. at 25.

Mr. Morris's opinion that Uber "met and exceeded" these standards should also be excluded for lack of sufficient facts and data. Specifically, Mr. Morris concludes that Uber's screening practices exceeded those of other, unidentified employers or industries, but he provides no facts or data to support this conclusion. In response, Uber argues that his "three decades" of experience is enough. Opp. at 24. It is not. *See, e.g., GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4-6 (N.D. Cal. Apr. 16, 2014) (finding expert's "'30 years of experience' alone does not constitute a sufficiently reliable and testable methodology" that can be tested; "Apple cannot cross-examine [expert] on his assertions, all of which fundamentally reduce to taking his opinion based on 30 years of experience for granted"). Uber's cases are distinguishable. Here, Mr. Morris does not provide expert testimony akin to the background or foundational testimony on gang structure and term meanings found in *U.S. Holguin*, 51 F.4th 841, 856-62 (9th Cir. 2022), but is asserting an opinion that Uber, *as compared to others*, exceeds a particular standard. But he provides no information as to the "others," or what they did or did not do as compared to Uber. All that is left is an opinion that effectively says Uber is better than everyone because Mr. Morris said so. This is not a reliable opinion, and it should be excluded.

## IV.    DR. ERIC PIZA'S TESTIMONY SHOULD BE EXCLUDED IN PART.

Uber's response sidesteps the core flaws in Dr. Piza's analysis. Rather than addressing that Dr. Piza's feasibility opinions fall outside his expertise, Uber simply recites Dr. Piza's criminology credentials, which are irrelevant to Uber's technological capabilities, business operations, and resource allocation. Nor does Uber address the absence of any factual foundation or analysis for Dr. Piza's opinions. Instead, Uber pivots, claiming that Plaintiff challenges opinions Dr. Piza never made, even though those opinions are expressly set forth in his report.

As to Dr. Piza's opinions on the efficacy of Uber's safety features, Uber asserts Dr. Piza relied on literature about surveillance cameras and an internal dashcam pilot study. But Uber offers

---

[3] Uber acknowledges that Plaintiff also challenges Mr. Morris's reliance on a single SHRM article but does not respond to any arguments raised on that point. *See* Opp. at 23, n.15.

no explanation for how research on surveillance cameras could meaningfully inform Dr. Piza's conclusions about the actual deterrent effect of Uber's features such as the in-app 9-1-1 button, Ride Check, and other tools unrelated to cameras. Nor does Dr. Piza identify any analytical process by which he applied that literature, leaving his opinions devoid of supporting facts, data, or methodology—and amounting to pure *ipse dixit*.

### A.    Dr. Piza is unqualified to offer feasibility opinions, which are unreliable.

Plaintiff moves to exclude Dr. Piza's opinions concerning the technological and operational feasibility of implementing dashcams. These opinions fall outside of Dr. Piza's claimed expertise and are not grounded in any methodology or foundation. In response, Uber reiterates Dr. Piza's credentials in criminology. However, Dr. Piza's feasibility opinions are untethered to that field. Instead, the feasibility opinions concern matters such as software engineering, artificial intelligence, business operations, accounting, finance, and corporate logistics—areas in which Dr. Piza admits he has no expertise whatsoever. *See* Mot. at 32.

Uber appears to concede this point, attempting to minimize the scope of Dr. Piza's feasibility opinions by arguing he is not providing "step-by-step dashcam installation instructions" or opining on the "technological feasibility of live-streaming video from dashcam." Opp. at 26-27. Yet Dr. Piza's report squarely contains feasibility determinations, including that monitoring dashcams would be "practically impossible," "not feasible," and would "require an unreasonable amount of resources" for Uber. *See* Mot. at 31-32.[4]

Even if these opinions fell within Dr. Piza's expertise, he fails to provide a reliable foundation. Dr. Piza's opinions about what is and isn't possible for Uber to implement do not turn on abstract criminological concepts; they are case-specific determinations that, by their very nature, demand an evidentiary foundation in the real-world details of Uber's technology and operations. Dr. Piza's opinions lack this foundation. Uber argues Dr. Piza reliably applies his "experience working with police forces," "video surveillance" research and "computer vision programs" and what he has "been shown…by vendors of private companies." Opp. at 30. But none of these sources

---

[4] Uber's contention that Plaintiff attacks Dr. Piza's methodology aimed at opinions he does not offer is readily disproven—Plaintiff expressly identified the challenged paragraphs of Dr. Piza's report. *See* Mot. at 31-32.

1    provide any Uber-specific facts or data about what Uber's platform can actually support from a

2    technological or operational standpoint—matters on which he expressly opines. As Dr. Piza

3    admitted, he has no insight into Uber's individual technical capabilities. *See* Mot. at 33. He likewise

4    conceded he has not reviewed any evidence regarding Uber's operational resources, budget, or

5    staffing and thus cannot assess what is "reasonable" or "possible" versus "unreasonable" or

6    "impossible" for the company. *Id.*

7           Uber cannot salvage Dr. Piza's feasibility opinions by invoking his general criminology

8    background or his non-Uber-specific experiences. These opinions are plainly outside his claimed

9    expertise and rest entirely on speculation rather than a reliable application of any methodology to

10   the facts of this case.

11          **B.      Dr. Piza's opinions on Uber's existing features are unreliable.**

12          Dr. Piza opines that Uber's existing safety features generate the perception that perpetrators

13   would be identified and thus deter criminal conduct. *See* Piza Rpt. at ¶ 3(b). These opinions turn on

14   how drivers purportedly perceive Uber's features, *see* Piza Dep. at 90:23-91:14, yet Dr. Piza

15   unequivocally testified that he reviewed no information regarding either the deterrent effect of

16   Uber's safety features or driver awareness of them, *see id.* at 227:11-228:2. Moreover, Dr. Piza's

17   report contains no explanation of how he reached these opinions. At his deposition, Dr. Piza simply

18   repeated that he "extrapolated" from research and literature. *Id.* at 102:3-4, 228:11-19.

19          Uber defends this analysis by claiming Dr. Piza relied on "research" and "peer-reviewed"

20   studies about whether video surveillance increases certainty, severity, or celerity of punishment,

21   including interviews with offenders regarding surveillance cameras. Opp. at 27, 29. This misses the

22   mark. Plaintiff challenges Dr. Piza's opinions on the efficacy of Uber's existing safety features—

23   not the efficacy of surveillance cameras. Uber's features, including "PIN verification," "Share My

24   Trip" and the in-app 9-1-1-button, *see* Piza Rpt., at ¶¶ 37-46, are distinct from surveillance cameras.

25   Uber does not explain how Dr. Piza "extrapolated" from criminology literature concerning camera

26   specific conclusions about the actual deterrent effect of Uber features.

27          Uber also asserts that Dr. Piza relied on research concerning "GPS data of police vehicles"

28   to support his opinions. Opp. at 29. In reality, Dr. Piza testified he has no understanding of what

data Uber stores as part of its RideCheck feature and, instead, "know[s] the type of data that we store from police vehicles, and I've just been assuming that Uber is able to collect all of that information[.]" Piza Dep. at 202:18-203:5. This exchange underscores the lack of factual foundation for Dr. Piza's opinions. Dr. Piza did not rely on or apply GPS research to his analysis of offender risk perception—he only used it to draw an unfounded assumption about how RideCheck works.

Uber also points to Dr. Piza's deposition testimony that he "reviewed case materials" specific to Uber, such as a dashcam pilot study, safety policies, safety features, and safety reports. Opp. at 27. That is misleading. As an initial matter, Dr. Piza did not cite the referenced pilot study in his report, nor did he base his opinions on it. *See* Piza Dep. at 229:23-230:2. More importantly, he repeatedly acknowledged that he possessed no data on the deterrent effect of the safety features and that all of his efficacy opinions were derived solely from literature, expressly stating, "[a]ll of my opinions" are "done by extrapolating." *Id.* at 220:6-12; *see also id.* at 189:4-6, 194:6-11, 202:6-13, 106:17-25, 209:24-210:4. Uber's post-hoc attempt to inject a foundation into Dr. Piza's opinions is disingenuous.

Nor does Uber's refrain that Dr. Piza "extrapolated from literature" cure the problem. Plaintiff does not dispute that literature review can be a valid methodology; the problem is that Dr. Piza does not apply it here. Simply asserting that literature supports his opinions is *ipse dixit*. "[T]here must be a sound foundation in the evidence to support every step on the way to [an expert's] conclusions." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 967 (N.D. Cal. 2025). Dr. Piza provides no such foundation here and it remains completely unclear exactly what literature he relied upon or how he applied it to the facts of this case. Uber's cited cases are thus inapposite. *See Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010) (where the expert offered an "explanation of his opinion"); *Geiger v. Creative Impact Inc.*, 2020 WL 3268675, at *8 (D. Ariz. June 17, 2020) (where the expert "applied his extensive experience…to the facts of [the] case"); *Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1027-28 (E.D. Cal. 2011) (noting "experts must explain the process by which they reached their conclusions"); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2011 WL 6301625, at *7 (S.D. Ill. Dec. 16, 2011) (the expert's education

1    and work provided her with the experience to "interpret…articles and studies and explain their

2    findings").

3        Further, Dr. Piza exhibited a basic lack of knowledge about Uber's safety features,

4    admitting he relied on his "gut" and "assum[ptions]" about how they function. Mot. at 31. Uber

5    only responds that Dr. Piza cited documents describing the features. *See* Opp. at 30. But simply

6    pointing to such documents does not cure the fundamental misunderstandings Dr. Piza's testimony

7    revealed about how the features actually work.

8        Finally, Uber argues that requiring Dr. Piza to ground his opinions in data imposes an

9    improper burden on Uber, citing *Holbrook* and *Winn-Dixie*. Opp. at 30. Those cases hold that

10    rebuttal experts need not propose alternative theories or meet the same burden of proof as plaintiff

11    experts but may instead focus solely on critiquing plaintiffs' evidence. Uber's argument is

12    misplaced. The issue here is not that Dr. Piza failed to carry a burden of proof; it's that Dr. Piza

13    offered conclusions divorced from any reliable factual foundation. Rule 702 is clear: every expert,

14    whether Plaintiff's or Uber's, must ground their opinions in sufficient facts or data and reliably

15    apply their methodology to the facts of the case. Dr. Piza has done neither here.

16        **C.    Dr. Piza's personal views on RAINN and Urban Institute are unreliable.**

17        Uber claims Dr. Piza can offer his personal opinions that RAINN and Urban Institute are

18    "reputable" and "preeminent" in advocating for sexual assault victims because Dr. Piza is "familiar

19    with RAINN's website" and "cited a lot of Urban Institute research throughout his career." Opp. at

20    31 (quoting Dr. Piza's testimony) (cleaned up). Uber goes further, equating Dr. Piza's subjective

21    impressions of these organizations with the type of personal observation that can legitimately

22    inform expert opinions. Not so. Dr. Piza is not drawing from personal observations to meaningfully

23    inform an opinion within his purported criminology expertise; instead, he offers unsupported

24    musings on subjects far outside his specialty. Expert testimony must be based on knowledge, skill,

25    experience, training, or education in the relevant subject matter, not casual acquaintance with a

26    website or occasional citation to published research. Dr. Piza's superficial familiarity with RAINN

27    and Urban Institute does not transform his personal beliefs into admissible expert testimony under

28    Rule 702. These opinions should be excluded as improper lay opinions.

1    **V.       JOSEPH OKPAKU'S TESTIMONY SHOULD BE EXCLUDED.**

2    As an initial matter, Uber asserts that Mr. Okpaku "does not have an opinion as to the

3    common carrier question in Arizona" and thus Plaintiff's argument on that issue is moot. Opp. at

4    32. If this is the case, then Mr. Okpaku's opinions related to Uber's common carrier status,

5    including how California legislature "intended" Uber to be treated, and that Arizona "modeled" its

6    TNC statute off of California's regulatory framework, should be excluded from the *Dean* trial as

7    irrelevant.

8    On the remaining issues, and as set forth below, Uber's responses largely fail to address the

9    specific arguments raised regarding relevance and reliability and thus exclusion is warranted.

10   **A.       Mr. Okpaku's "industry standard" opinions are unreliable.**

11   Regarding Mr. Okpaku's asserted "industry standard," Uber concedes that the proffered

12   standard is based solely on compliance with California law. *See* Opp. at 32-33 (acknowledging that

13   Mr. Okpaku's report "clearly identifies that the current 'California regulatory and statutory

14   framework…*represents the industry standard*'") (citing Okpaku Rpt. at 11) (emphasis added). An

15   industry standard that merely reiterates the law (and applicable law at that) is an improper expert

16   opinion. *See* Mot. at 38-39. Uber's opposition fails to counter this point. Instead, Uber ducks the

17   issue, arguing that Mr. Okpaku's *subsequent* opinions are valid because they are based on materials

18   reviewed, past experience, and knowledge of the ridesharing industry. *See* Opp. at 33. But the fact

19   remains that his opinion as to the applicable "industry standard" is fully encapsulated in California

20   law. Thus, any derivative opinions – even if based on materials reviewed and experience – is an

21   improper conclusion as to whether Uber complied with California law. Indeed, Uber admits that

22   Mr. Okpaku's subsequent opinions as to whether Uber met or exceeded the offered "industry

23   standard" is measured purely by whether Uber met or exceeded California law. *See* Opp. at 34

24   (acknowledging Mr. Okpaku's opinions as to Uber's safety features is based on whether they were

25   "required by law"). In this respect, Uber's case citations are distinguishable. While an expert may

26   reference laws and regulations in articulating their industry standard, no case supports what Uber

27   seeks to do here, which is to equate an industry standard to compliance with an out of state law.

28   In a footnote, Uber attempts to distinguish the facts of this case from that in *Magallon v.*

*Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1250 (D. Or. 2024), arguing that exclusion of the expert opinion in *Magallon* was warranted because there the expert sought to opine on compliance with the FCRA, which was "the central legal question at issue." Opp. at 34, n.21. Uber concludes that *Magallon* thus represents a clear instance of an expert improperly opining on an ultimate issue of law. *See id.* Uber argues that in contrast, here, "there is no allegation that Uber violated any part of the California regulatory and statutory framework for rideshare companies. Thus, Mr. Okpaku's reference to that framework as the industry standard is not a legal conclusion in disguise." *Id.* Uber's illogical reasoning underscores the impropriety of Mr. Okpaku's opinion. It is yet another concession that Mr. Okpaku presents no "industry standard" beyond California law, which Uber then acknowledges is irrelevant to this case. *Magallon* is squarely on point, excluding "industry standard" testimony where the expert "has not articulated relevant industry standards, has explained that essentially there are no industry standards relevant to this dispute, and has generally conceded that "industry standards" are no more than compliance with the law (e.g., FCRA).[5]

**B.     Mr. Okpaku's "control" opinions based on driver motivation and contractual interpretation are irrelevant and unreliable.**

*First,* Uber incorrectly argues that driver motivation is relevant because if rideshare drivers value having complete autonomy then that is "probative of the lack of control ridesharing companies have over drivers." Opp. at 35. To the contrary, driver values and beliefs do not dictate whether Uber's drivers are independent contractors or employees under Arizona law. Tellingly, Uber's response to this argument includes no supporting case law, and no dispute that Arizona law assigns *no relevance* to driver "motivators" when determining the level of control in the employment relationship. Mr. Okpaku's opinion on this issue is irrelevant.

*Second*, Uber maintains that Mr. Okpaku's opinions as to contractual interpretations are appropriate because they are "factual statements about what the contract says, not legal interpretation." Opp. at 35. His report shows otherwise. For example, Mr. Okpaku opines that the "agreements contain *clear, unambiguous language denoting the nature* of the relationship between Uber and third-party drivers." Okpaku Rpt. at 23 (emphasis added). This is not merely reciting

---

[5] Uber acknowledges that there are no studies or data to support Mr. Okpaku's opinions that Uber is safer than taxis. *See* Opp. at 34.

contract language but improperly interpreting and applying legal meaning to them. *See N. Am. Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir. 1997) (stating "[a]bsent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible"). More importantly, Uber does not dispute Plaintiff's point that under Arizona "[c]ontract language does not determine the relationship of the parties…." Mot. at 41 (quoting *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 141 (Ariz. 1990)).

Even if (as Uber argues), Mr. Okpaku is "simply cit[ing] language in these agreements," Opp. at 35, his testimony should be excluded as unnecessary and unhelpful. Members of the jury do not need an expert to recite and emphasize written passages under the cloak of an expert opinion. *See, e.g., Twin K. Construction, Inc. v. UMA, Geotechnical Constr., Inc.*, 597 F. Supp. 3d. 1204, 1215 (E.D. Tenn. 2022) ("[r]eading documents exchanged in [the] case and rendering opinions on what the documents state is not helpful to the jury"); *Henry v. Quicken Loans Inc.*, 2009 WL 3199788, at *5 (E.D. Mich. Sept. 30, 2009) (excluding expert report on the grounds that it is based largely on evidence that could be reviewed and understood by the trier of fact, including review of company documents and emails); *see also In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d 412, 421 (E.D. Pa. 2015) (noting if the expert "simply reads and interprets evidence ... as any juror might," their opinion is not necessary or proper).

Mr. Okpaku's opinions interpreting contractual language are irrelevant and unreliable.

### C.    Mr. Okpaku's "dashcams are not required" opinion is unreliable.

Plaintiff moved to exclude Mr. Okpaku's opinions as to dashcams because they lack any basis in a discernible methodology or data. *See* Mot. at 41. Uber responds with the superficial statement that "there is no requirement under Rule 702 or *Daubert* that an expert opinion be supported by empirical data or any particular methodology." Opp. at 36. True, but neither Rule 702 nor *Daubert* permit an expert to proffer opinions based on *no* methodology and *no* data, which Uber attempts here. While Uber argues that Mr. Okpaku supported his opinion with "knowledge, experience, and research," his report substantiates none of these points. In a scant paragraph, Mr. Okpaku rests his dashcam opinions on whether they were or were not regulated by California law. *See* Okpaku Rpt. at 19 (opining that dashcams are not expected industry standards because "even

though TNCs are extensively regulated in California, California does not require the use of dashcams in TNC vehicles"). Again, Arizona, not California, law applies here. And, Mr. Okpaku references vague "research,"[6] but only regarding whether they were required anywhere in the U.S. – not as to any discernable standard. *Id.* The result is merely his take on legal compliance masked as an industry standard.

## VI.    DR. LINDSAY ORCHOWSKI'S TESTIMONY SHOULD BE EXCLUDED IN PART

Much of Plaintiff's motion to exclude Dr. Orchowski's opinions is moot—on December 17, Judge Cisneros struck portions of Dr. Orchowski's Report at Section VIII (relating to opinions regarding bars, elevators, medical examinations, rooms, and proximity), and Section V (relating to whether Uber took steps that aligned with the public health framework, provided evidence of moving along the public health prevention framework, and actions consistent with the CDC's public health approach). *See* ECF 4701 at 3-7.

The remaining challenged opinions are inadmissible. Dr. Lindsay Orchowski, offered as a rebuttal expert, provides affirmative opinions about sexual assault on the Uber platform even though she did not rely on any documents produced in this case beyond Dr. Veronique Valliere's report. *See generally* Orchowski Rpt.; Orchowski Dep. at 47:16-21; 78:2-14; 80:13-25; 82:9-15. In apparent recognition that Dr. Orchowski's opinions do not pass muster under Rule 702 and *Daubert*, Uber suggests (incorrectly) that defense experts like Dr. Orchowski are held to a lower standard. *See* Orchowski Opp. at 2.[7] Not so. "Under *Daubert*, the district court judge must ensure that *all* admitted expert testimony is both relevant and reliable." *Moore v. GlaxoSmithKline*

---

[6] In fact, there is no source citation anywhere in this discussion to support Mr. Okpaku's opinions. All that remains is an amorphous reference to his "time serving as an expert witness," itself not a sufficient basis under Fed. R. Evid. 702. *See, e.g., GPNE Corp.*, 2014 WL 1494247 at *6 ("Apple cannot cross-examine [expert] on his assertions, all of which fundamentally reduce to taking his opinion based on 30 years of experience for granted").

[7] In support of this position, Uber relies on *Holbrook v. Lykes Bros S.S. Co., Inc.*, but *Holbrook* says nothing of the sort. *See id.* (citing 80 F.3d 777, 786 (3d Cir. 1996)). The *Holbrook* court only distinguished between plaintiff and defense experts with respect to whether such experts must offer medical opinions "to a reasonable degree of medical certainty." 80 F.3d at 786. Whether Dr. Orchowski offered her opinions "to a reasonable degree of medical certainty" is not at issue here and, in any event, courts in this District apply the same *Daubert* standard to plaintiff and defense experts. *See, e.g., Moore*, 713 F. Supp. 3d at 669-70 (applying same standard to plaintiffs' and defendant's experts).

*Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660, 669 (N.D. Cal. 2024) (quotations omitted) (emphasis added). Dr. Orchowski's opinions do not meet this standard.

### A.    **Dr. Orchowski's predictive screening and sexual assault risk factor opinions are unreliable.**

Dr. Orchowski's opinions are unreliable because she opined on Uber's company conduct and the feasibility of predictive screening tools Uber could use without considering internal Uber documents or studies, including those contrary to her opinions. *See generally* Orchowski Rpt.; *see also* Orchowski Dep. at 47:16-21; 78:2-14; 80:13-25; 82:9-15. Uber asserts that a review of its internal documents was unnecessary because Dr. Orchowski gleaned sufficient information about the contents of those documents from Dr. Valliere's Report. *See* Orchowski Opp. at 5. This is both factually and legally incorrect.

*First*, the record makes clear that Dr. Orchowski's opinions are not based on her review of any evidence produced in this case. Her report does not include a single reference to Cerebro/uSights, Uber's predictive screening tool, nor any of the steps Uber did (or did not) take to identify or address sexual assault risk factors. In addition, Dr. Orchowski could not point to any analysis or discussion in her report informed by Uber's documents or even Dr. Valliere's analysis of those documents. *See* Orchowski Dep. at 68:7-15; 78:2-14; 172:18-23; 176:18-20. This demonstrates what is obvious: reading someone else's summary of documents was not enough for Dr. Orchowski to grasp and apply their contents.

*Second*, even if portions of Dr. Orchowski's opinions had been informed by descriptions, summaries, or citations to Uber's company documents, this is not enough to establish reliability under Rule 702. "The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) (excluding opinion because "excerpts from [another expert's] opinions are not facts or data of a type reasonably relied upon by experts in the field in forming inferences or opinions upon the relevant subject."); *see also In re TMI Litig.*, 193 F.3d 613, 697-98 (3d Cir. 1999) (excluding expert testimony based on summaries of depositions, not depositions themselves).

This is particularly true where, as here, the documents Dr. Orchowski failed to review contradict her opinions. *See Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (excluding expert opinion where he attributed plaintiff's medical condition to chemical exposure but evidence he failed to review supported contrary conclusion). For example, Dr. Orchowski opined that "reliable systems that accurately predict who will and who will not engage in harm" have not yet been developed. Orchowski Rpt. at 8. However, in making this opinion, Dr. Orchowski failed to engage with or address Uber's own internal study validating the Cerebro/uSights tool, a predictive screening tool that performed the function Dr. Orchowski claimed was currently impossible. *Compare id. with* Valliere Rpt. at 25-26. Dr. Orchowski similarly failed to engage with or address Uber's own internal data identifying effective measures for preventing sexual assaults in Ubers (e.g., S-RAD), while claiming no such measure had been developed. *See* Orchowski Dep. 355:8-17. The failure to respond to, let alone review, this contrary evidence, renders Dr. Orchowski's opinions unreliable. *See Claar*, 29 F.3d at 502.

Uber cites a series of cases that, it claims, support the conclusion rebuttal experts are not required to review any underlying documents produced in a case. *See* Orchowski Opp. at 5-6. However, in every case Uber cites, the rebuttal expert *did* review and analyze at least some of the underlying documents produced in the case. *See id.* For example, in *Shaver v. Libbey Glass LLC*, the rebuttal expert identified "overlooked evidence" consisting of additional exhibits produced in the case. 2024 WL 3050719, at *3 (C.D. Cal. Apr. 12, 2024); *see also Oddo v. Arocaire Air Conditioning & Heating*, 2020 WL 5267917, at *12 (C.D. Cal. May 18, 2020) (reasoning expert did not need to perform their own testing because *in addition* to reviewing the opposing expert's report, he reviewed the underlying documents and evidence produced in the case); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 2352016, at *15 (E.D. Pa. June 9, 2021) (concluding expert did not need to develop own model where he reviewed underlying documents produced in the case); *Lauderdale v. NFP Ret., Inc.*, 2022 WL 17324416, at *7 (C.D. Cal. Nov. 17, 2022) (declining to exclude expert who reviewed some but not all underlying documents produced in a case); *Glam & Glits Nail Design, Inc. v. iGel Beauty, LLC*, 2022 WL 3012522, at *12 (C.D. Cal. June 24, 2022) (declining to exclude patent expert who reviewed patent produced in the case

but not additional patent history). In addition, in *Wolfe v. McNeil-PPC, Inc.*, the court declined to exclude an expert who reviewed the evidence produced in the case but "did not consult any learned treatise" that "defendants deem[ed] relevant." 2011 WL1673805, at *6 (E.D. Pa. May 4, 2011).

The opposite circumstances are present here: in lieu of reviewing the evidence produced in the case, Dr. Orchowski relied almost entirely on extraneous publications that Defendants alone deemed relevant. *See* Orchowski Rpt. at Ex B. Dr. Orchowski's opinions suffer from a fatal "methodological flaw: they do not consider all of the critical record evidence in this particular case," and therefore must be excluded as unreliable. *Cambridge Lane, LLC v. J-M Mfg. Co., Inc.*, 2025 WL 1843110, at *9 (C.D. Cal. Feb. 24, 2025).

### B.    Dr. Orchowski's predictive screening opinions are irrelevant.

Since Dr. Valliere offers a narrow opinion on predictive screening, limited to Uber's Cerebro/uSights tool, *see* Valliere Rpt. at 25-26, so too must Dr. Orchowski, who was offered only as a rebuttal expert. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii); *FTC v. Qualcomm Inc.*, 2018 WL 6522134, at *4 (N.D. Cal. Dec. 11, 2018) ("a rebuttal expert does not receive *carte blanche* to address the broad subject matter of the *case*, but rather to contradict or rebut evidence on the same subject matter as the other party's expert report." (quotations omitted)). However, Dr. Orchowski does not mention "Cerebro" or "uSights" by name or otherwise allude to the predictive screening tool Uber developed and validated. *See* generally Orchowski Rpt. Instead, Dr. Orchowski's predictive screening opinions concern tools other than the one at issue in this case: actuarial tools developed in institutional contexts like prisons or the military. *See* Orchowski Rpt. at 5-6. The efficacy of these other tools has no bearing on the efficacy of Uber's Cerebro/uSights tool and Dr. Orchowski, who fails to address Cerebro/uSights at all, provides no justification for the comparison. *See id.*; Orchowski Dep. 176:18-20 ("I did not do a specific independent analysis of Cerebro[/uSights] or Uber's use of it.").

Uber argues that Dr. Orchowski's opinion is that "research has not identified *any* 'system [] that can accurately predict whether an individual without a criminal history of committing sexual offenses will commit sexual assault, [].'"Orchowski Opp. at 7 (quoting Orchowski Rpt. at 3-4). The problem with this opinion is that the "research" Dr. Orchowski considered has no connection to the

1   rideshare industry but rather is derived from other industries. *See* Orchowski Rpt. at 5-6.  On the

2   other hand, there is research about predictive screening tools to assess driver risk in the rideshare

3   industry—Uber's own studies validating Cerebro/uSights—but Dr. Orchowski never reviewed this

4   study and does not rule it in or out. *Compare* Valliere Rpt. at 25-26 *with* Orchowski Rpt. The failure

5   to consider the discovery in this case, including Uber's own internal study directly contradicting

6   her opinions, is fatal. *See Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d

7   1031, 1041-42 (N.D. Cal. 2001) (excluding expert opinion for failure to consider "real-world

8   evidence"); *Plunkett v. Best Buy Co., Inc.*, 2017 WL 4958579, at *3 (W.D. Wash. Oct. 31, 2017)

9   (excluding expert opinion as irrelevant where expert "did not review any discovery produced by

10  Defendant when rend[er]ing her opinion.").

11      **C.**     **Dr. Orchowski's causation opinions are inadmissible.**

12          Dr. Orchowski's causation opinions are inadmissible because they exceed the scope of

13  permissible expert testimony. Uber demands that Dr. Orchowski be permitted to give jurors a lesson

14  in logic to correct a "causal fallacy" that it claims is present in Dr. Valliere's opinions. Orchowski

15  Opp. at 8-9. To the extent Uber is concerned jurors may make "inferences" that it disagrees with,

16  from Dr. Valliere's qualitative descriptions of the rideshare environment, *see* Orchowski Opp. at 9,

17  Uber is free to cross-examine Dr. Valliere or argue logic during closing arguments. But it is not

18  permitted to present "lawyer argument dressed up as expert opinion." *Avila v. Ford Motor Co.*, 796

19  F. Supp. 3d 593, 598 (N.D. Cal. 2025) (quotations omitted). Dr. Orchowski's attempts to "point[]

20  out logical flaws" in an expert report "are more appropriate for cross examination or closing

21  argument, rather than being within the purview of a rebuttal expert. The jury can draw these

22  conclusions themselves … without the need for expert testimony." *Id*. (citation omitted).

23                              **CONCLUSION**

24          For these reasons, the testimony of the above-listed experts should be excluded.

Dated: December 23, 2025                          Respectfully submitted,


By: /s/ *Sarah R. London*
    Sarah R. London (SBN 267083)

GIRARD SHARP LLP
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: /s/ *Rachel B. Abrams*
    Rachel B. Abrams (SBN 209316)

PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: /s/ *Roopal P. Luhana*
    Roopal P. Luhana

CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Plaintiffs Co-Lead Counsel*

1

**FILER'S ATTESTATION**

2          I am the ECF User whose ID and password are being used to file this document. In

3     compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

4     Dated: December 23, 2025                    By:     /s/ *Ellyn H. Hurd*

5                                                         Ellyn H. Hurd

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28