# EXHIBIT 3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

```
1              DR. LINDSEY CAMERON
2         UNITED STATES DISTRICT COURT
3        NORTHERN DISTRICT OF CALIFORNIA
4           SAN FRANCISCO DIVISION
5                 -  -  -
6   IN RE: UBER              :  Case No.
    TECHNOLOGIES, INC.,      :  3:23-md-03084-
7   PASSENGER SEXUAL ASSAULT :  CRB (LJC
    LITIGATION               :
8                            :
                             :
9                            :
                             :
10
11                -  -  -
12         REMOTE DEPOSITION OF
13         DR. LINDSEY CAMERON
14                -  -  -
15       Taken remotely, via Zoom, on
16  Wednesday, November 12th, 2025, beginning at
17  2:13 p.m., before Beau Dillard, RPR, a Notary
18  Public in and for the Commonwealth of
19  Pennsylvania.
20                -  -  -
21         VERITEXT LEGAL SOLUTIONS
            MID-ATLANTIC REGION
22
                  -  -  -
23
24
25    Job No. CS7737764
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

```
 1              DR. LINDSEY CAMERON
 2   A P P E A R A N C E S :
 3
         SIMMONS HANLY CONROY
 4       BY:  JO ANNA POLLOCK, ESQ.
              Kristina Berkover, ESQ.
 5       One Court Street
         Alton, IL 62002
 6       618-259-2222
         Jpollock@simmonsfirm.com
 7       Representing the Plaintiffs
 8
         KIRKLAND & ELLIS LLP
 9       BY:  GEOFFREY WYATT, ESQ.
              KATIE O'NEILL, ESQ.
10       1301 Pennsylvania Ave NW
         Washington DC 20004
11       202-389-3393
         Geoffrey.wyatt@kirkland.com
12       Representing Uber Technologies, Inc.,
13
14
15
                        -   -   -
16
     A L S O   P R E S E N T :  CHINYERE WOODS,
17                              CONCIERGE
18                              BEN PELTA-HELLER,
                                VIDEOGRAPHER
19
                        -   -   -
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 3

1              DR. LINDSEY CAMERON

2                 I N D E X

3                   -  -  -

4    EXAMINATION                              PAGE

5    DR. LINDSEY CAMERON

6    BY MR. WYATT                                9

7    BY MS. POLLOCK                            291

8                   -  -  -

9              E X H I B I T S

10                  -  -  -

11   NUMBER            DESCRIPTION           PAGE

12   Exhibit 1    TAB 01 - 20251024

13                Cameron Rebuttal Report      11

14

15   Exhibit 2    TAB 02 - CameronInvoice

16                SimmonsFinal Amount26AUG25   18

17

18   Exhibit 3    TAB 03 - 20251105 Defendants

19                Notice of Deposition for

20                Dr Lindsey Cameron (MDL)     25

21

22   Exhibit 4    TAB 03A - LindseyCameronCV -

23                Statement CV 2               27

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 4

1              DR. LINDSEY CAMERON

2    NUMBER            DESCRIPTION            PAGE

3    Exhibit 5    TAB 03B - 20251110 Responses

4                 and Objections to NOD of Cameron

5                                             30

6

7    Exhibit 6    Cameron Harvard Blitz 6APR    32

8

9    Exhibit 7    TAB 05 - 2021 Testimony      59

10

11   Exhibit 8    CameronInvoiceRetainer       84

12

13   Exhibit 9    TAB 07 - L Cameron dissertation

14                                             114

15

16   Exhibit 10   TAB 13 - Algorithmic Management -

17                Its Implications for Information

18                Systems Research             142

19

20   Exhibit 11   TAB 09 - Support for Social and

21                Cultural Capital (2018)

22                Kameswaran-Cameron-Dillahunt

23                (003)                        156

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1                   DR. LINDSEY CAMERON

2    NUMBER              DESCRIPTION            PAGE

3    Exhibit 12    TAB 10 - 20250926 Expert Report

4                  Joseph Okpaku (MDL 23-03084)  162

5

6    Exhibit 13    TAB 17 -what-is-qualitative

7                   -research -an-overview-

8                  and-guidelines            184

9                          -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1               DR. LINDSEY CAMERON

2              DEPOSITION SUPPORT INDEX

3

4    DIRECTION TO WITNESS NOT TO ANSWER

5    Page    Line

6    None

7

8    REQUEST FOR PRODUCTION OF DOCUMENTS

9    Page    Line      Description

10   None

11   40      22        Materials Provided

12

13   STIPULATIONS

14   Page    Line

15   7       1

16

17   QUESTIONS MARKED

18   Page    Line

19   None

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 7

1              DR. LINDSEY CAMERON

2                   -   -   -

3              The attorneys participating in

4      this deposition acknowledge that the

5      court stenographer is not physically

6      present in the deposition room and that

7      he will be reporting this deposition

8      remotely.

9                   They further acknowledge that,

10     in lieu of an oath administered in

11     person, the oath will be administered

12     remotely.  The parties and their counsel

13     consent to this arrangement and waive any

14     objections to this manner of reporting.

15                 The attorneys have indicated

16     their agreement to the above stipulation

17     off the stenographic record.

18                 It is stipulated and agreed to

19     by and between counsel for the respective

20     parties that all objections, except as to

21     form of the question, are reserved to the

22     time of trial.

23                   -   -   -

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 8

```
 1              DR. LINDSEY CAMERON
 2                   -   -   -
 3              THE VIDEOGRAPHER:
 4              Good afternoon.  We are going on
 5         the record at 2:13 p.m., on Wednesday,
 6         November 12th, 2025.
 7              This is Media Unit Number 1 of
 8         the video-recorded deposition of
 9         Lindsey Cameron taken by counsel in the
10         matter of In Re:  Uber Rideshare cases
11         filed in the United States District Court
12         for the Northern District of California,
13         San Francisco Division.
14              My name is Ben Pelta-Heller,
15         representing Veritext, I'm the
16         videographer.  The court reporter is
17         Beau Dillard from the firm Veritext.
18              Counsel and all present,
19         including remotely, will now state their
20         appearances and affiliations for the
21         record, and will the reporter please
22         swear in the witness.
23              MS. POLLOCK:  Did we say counsel
24         was entering their name?
25              Oh, I thought we weren't.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 9

```
 1              DR. LINDSEY CAMERON
 2                This is Jo Anna Pollock from
 3         Simmons Hanly Conroy.  Along with me
 4         today is Kirstina Berkover, and we are
 5         representing the Plaintiffs in the MDL.
 6                MR. WYATT:  And Geoffrey Wyatt
 7         from Kirkland & Ellis, with me is
 8         Katie O'Neill on behalf of Uber and the
 9         Uber Defendants.
10                      -  -  -
11                DR. LINDSEY CAMERON, after
12         having been first duly sworn, was
13         examined and testified as follows:
14                      -  -  -
15                   EXAMINATION
16                      -  -  -
17    BY MR. WYATT:
18         Q.      Good afternoon.
19         A.      Good afternoon.
20         Q.      Could you please state your full
21    name for the record?
22         A.      Lindsey Denise Cameron.
23         Q.      And is it okay if I refer to you
24    as Dr. Cameron this afternoon?
25         A.      That would be great.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

1              DR. LINDSEY CAMERON

2        Q.        And you understand you were

3    sworn in, you're testifying under oath today,

4    correct?

5        A.        Yes.

6        Q.        Okay.  Let's see if I can figure

7    out how to introduce an exhibit.

8        A.        Can you give me one second?

9                  It's not letting me see you.

10       Q.        Understood.

11                 No problem.

12                 MS. POLLOCK:  Yeah.

13                 That's up there.

14                 THE WITNESS:  Yeah.

15                 But it's not big.

16                 MS. POLLOCK:  Yeah.

17                 It's pinned on you.

18                 THE WITNESS:  I don't want that.

19                 Is that not possible?

20                 MR. WYATT:  Can we go off the

21       record for a minute?

22                 I'm fine to sort this out.

23                 THE VIDEOGRAPHER:  Going off the

24       video record.  The time is 2:15 p.m.

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 11

1               DR. LINDSEY CAMERON

2                     -   -   -

3               (Whereupon, a recess took place

4        from 2:15 p.m. to 2:16 p.m.).

5                     -   -   -

6               THE VIDEOGRAPHER:  We are back

7        on the video record.

8               The time is 2:16 p.m.

9   BY MR. WYATT:

10       Q.      Welcome back.

11              I'm going to mark your report as

12   Exhibit 1.

13                    -   -   -

14              (Whereupon the document was

15       marked, for identification purposes, as

16       Exhibit Number 1.)

17                    -   -   -

18   BY MR. WYATT:

19       Q.      And that should be available to

20   you in the share folder now.  And I'll also put

21   it on the screen.

22       A.      I also have a written copy right

23   in front of me.

24       Q.      Okay.  Same version that would

25   have been served on October 24th, 2025?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 12

1                  DR. LINDSEY CAMERON

2          A.       Yes.  Same version.

3          Q.       Okay.  Great.

4                   And if we scoot down to Page 60,

5    is that your signature right there?

6          A.       Yes.

7          Q.       Okay.  So this is your report,

8    assuming this is the same PDF as the paper

9    you've got there?

10         A.       Yes, sir.

11         Q.       It's Exhibit 1.  Okay.  Great.

12                  Do you believe, as of today,

13   that the report is still accurate?

14         A.       Yes.

15         Q.       And are all the opinions that

16   you plan to give at trial in this matter

17   contained in your report?

18         A.       There are some other, like,

19   supplemental citations I may think to mention,

20   but my opinion hasn't substantially change.

21         Q.       Okay.  And thanks for that.

22                  Do you have any specific

23   additional citations in mind or these are

24   things that may occur as we work through

25   things?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 13

1              DR. LINDSEY CAMERON

2        A.        I have two in mind and then

3    there's some that might just occur.

4        Q.        Okay.  Do you want to share

5    those two that you have in mind right now, and

6    I can just take a note?

7        A.        Right.  One is by -- it's two

8    authors.  I'm forgetting the name of the first,

9    the name of the second author is Johnston.  I

10   think it's 2019, 2020, and it's a critique of

11   the Holland Kruger study in 2018 that

12   Joseph Okpaku cited.

13            So in my rebuttal I mentioned

14   that report, that that citation of

15   Holland Kruger had been criticized by some

16   academics, but I didn't mention actual

17   academics who criticized it.  So that site that

18   I just mentioned, the Johnston one, is a

19   critique of that.

20            And then the other report I was

21   going to mention, I think it is Maffie 2023,

22   British Journal of Industrial Relations, it

23   talks about big data and theologizing source of

24   corporate power, and there he makes the

25   argument that Uber and researchers will have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 14

1              DR. LINDSEY CAMERON

2    the same data, you know, if Uber -- (inaudible)

3    has a set of researchers, but they'll set

4    different parameters and do different

5    statistical tests which have been made

6    different conclusions for their data.

7              So, they're -- I think they're

8    points in the paper where I sort of talk about

9    this without any additional citation, so those

10   are the two additional citations I would have

11   added to my report.

12        Q.       And so, just to clarify, in the

13   second citation, I understand how the first one

14   fits in.

15              The second one, though, you're

16   saying you make points in the report about how

17   different researchers will interpret the same

18   data in different ways and this report supports

19   that or is it something else?

20        A.       It's a different support -- it's

21   a different point that it would support, and

22   I'm not entirely sure where in the report I

23   actually make this argument, but it's probably

24   in something where I talk about how Uber uses

25   data in a very selective fashion or has been

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 15

1              DR. LINDSEY CAMERON
2    criticized about the way it uses its data, and
3    I would have cited that -- that Maffie piece
4    there.
5              So it could have -- it wouldn't
6    exactly have gone with the rebuttal to Okpaku,
7    but it's related to it.  It's where --
8    (inaudible) -- places I would have put that
9    citation at.
10        Q.      And what made you think of
11   Maffie 2023, if anything?
12        A.      Why?
13              I just -- I reread it recently,
14   maybe about two weeks ago and realized it fit.
15   I had seen the paper before, but I hadn't
16   really thought about it deeply and then I was,
17   like, oh, right, that would have been a good
18   report -- a good paper to cite.
19        Q.      Okay.  And do you have any
20   current plans to supplement your report or make
21   any changes to it, before trial?
22        A.      No.
23        Q.      Okay.  Beg your pardon?
24        A.      I said, no, I don't currently
25   have any plans.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 16

1          DR. LINDSEY CAMERON

2     Q.      Okay.  And I know you've been

3  deposed before.

4             Is that right?

5     A.      Yes.

6     Q.      And so you're familiar with how

7  the process works -- and verbal answers, and

8  yeses and noes rather than uh-uh and uh-huhs.

9     A.      I'm going to do my best and try

10  not to talk too fast for the court reporter.

11     Q.      I'll make the same pledge

12  because I have the same problem, and I will

13  also pledge not to -- or try, I will pledge to

14  try to not talk over you.

15             Sometimes I get excited,

16  sometimes witnesses get excited, I won't be

17  offended if you do it, please don't be offended

18  if I do it, but to make the court reporter's

19  job easier, let's try to give each other space

20  between questions and answers.

21     A.      Okay.

22     Q.      And if -- if you answer a

23  question, I'll assume that you understood the

24  question that I asked.

25             Is that okay?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 17

1              DR. LINDSEY CAMERON
2        A.        That's fair.
3        Q.        And, of course, therefore, if
4   you don't understand a question or you have a
5   question about the question, please raise that
6   and I'll do my best to rephrase.
7                  Is anything preventing you from
8   giving truthful or accurate testimony today?
9        A.        No.
10       Q.        All right.
11                 Breaks, if you need a break,
12   just let me know.  My only request is that if
13   I've asked a question, that you give the answer
14   before we take the break.
15                 I generally go about an hour and
16   then take breaks, but happy to go longer,
17   shorter, whatever is necessary, just let me
18   know.
19       A.        Okay.
20       Q.        Where are you physically located
21   today?
22       A.        Philadelphia.
23       Q.        Okay.  Is anybody there -- well,
24   I know your counsel is there with you, is that
25   right, Jo Anna Pollock?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 18

1              DR. LINDSEY CAMERON

2       A.       Correct.

3       Q.       Is there anybody else in the

4    room with the two of you?

5       A.       No.

6       Q.       And you mentioned you have your

7    report printed out with you.

8                Are there any other materials

9    with you, either printed out or at your

10   fingertips on your computer there?

11      A.       My laptop is in front of me.

12      Q.       Okay.  Do you have any materials

13   pulled up on the laptop for use at today's

14   deposition?

15      A.       No.

16      Q.       Okay.  All right.

17                So let me do the next exhibit,

18   give me a minute.

19                      -  -  -

20                (Whereupon the document was

21         marked, for identification purposes, as

22         Exhibit Number 2.)

23                      -  -  -

24   BY MR. WYATT:

25      Q.       This will be Exhibit 2.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 19

1           DR. LINDSEY CAMERON

2                I'll put this on screen.  Okay.

3                Can you see what I marked as

4    Exhibit 2 on the screen?

5        A.       I can see it.

6        Q.       And is this your invoice?

7        A.       Yes.

8        Q.       And it's dated, it looks like,

9    August 26th, 2025.

10               Is that right?

11       A.       Yes.

12       Q.       Is this the only invoice you've

13   sent to Plaintiffs so far for this case?

14       A.       No.  There was an invoice where

15   I sent the retainer, so that's in that second

16   line.

17       Q.       I see, but is it all -- so that

18   would have been a separate document or is

19   this -- would it be a single document that

20   reflects everything?

21       A.       No.  It would have been a second

22   document.  So I was paid $7,500 before, and

23   they --

24       Q.       Okay.

25       A.       -- when I sent the invoice.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 20

1              DR. LINDSEY CAMERON

2        Q.        Okay.

3                  And do you intend to submit any

4    additional invoices for your work on the report

5    or any other work after August 26th?

6        A.        Yes.

7        Q.        Do you have an estimate as to

8    the number of hours that would be reflected in

9    that next invoice, as of this morning, before

10   this deposition started?

11       A.        No more than 20 hours.

12       Q.        Okay.  And just looking at the

13   invoice here, it looks like it spans

14   June 24th -- I'm sorry.  Scratch that.

15                 Looking at the invoice, it looks

16   like it spans from June 18, 2024, through the

17   22nd of August.  And I assume that's, 2025.

18                 Is that correct?

19       A.        Correct.

20       Q.        Okay.  So 58.5 hours is the time

21   you spent working from June 2024 through

22   August 2025.

23                 Is that accurate?

24       A.        Yes.

25       Q.        Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 21

```
 1              DR. LINDSEY CAMERON
 2                   So were you retained in June of
 3    2024?
 4         A.        What exactly does retained mean?
 5         Q.        Were -- when were you hired by
 6    these Plaintiff's Counsel for this case?
 7         A.        I -- somewhere between May and
 8    June, because that was when the first invoice
 9    was sent.
10         Q.        Okay.  And somewhere between
11    May and June of 2024, last year.
12                   Is that correct?
13         A.        Yes.
14         Q.        Okay.  And there's no time
15    breakdown here.  Do you have a sense of when
16    these 58.5 hours billed here, were worked?
17         A.        They were -- they were worked
18    over that entire timeframe, from June 2024 to
19    August 2025.
20         Q.        Okay.  So was it, like, sort of
21    a gradual work process or were there certain
22    months that were busier than others in that
23    timeframe?
24                   MS. POLLOCK:  Object to form.
25                   THE WITNESS:  The summertime was
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 22

1              DR. LINDSEY CAMERON

2        busier -- the summer of 2025 was busier

3        than previously.

4   BY MR. WYATT:

5        Q.       Okay.

6                 And what did that work consist

7   of?

8                 MS. POLLOCK:  Object to form.

9                 THE WITNESS:  In summer 2025?

10  BY MR. WYATT:

11       Q.       Yes.

12       A.       I read a lot of documents.  I

13  met a lot with Jo Anna and people in her firm.

14  I wrote a lot of text.  I would say that's a

15  lot that happened in the summer of 2025.

16       Q.       Okay.  And what about before

17  summer of 2025?  What would you work on during

18  that period?

19       A.       We did meetings.

20                I can't remember if I looked at

21  any documents before summer of 2025.  If I did,

22  there weren't that many and the meetings were a

23  mix of in-person and virtual.

24       Q.       Okay.  When you mentioned that

25  you had read a lot of documents during the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 23

1           DR. LINDSEY CAMERON

2    summer of 2025, what kind of documents were you

3    talking about?

4           A.      All the documents that are

5    referenced in my report.

6           Q.      And by documents, are you

7    including documents produced in the litigation

8    and literature or one or the other?

9           A.      So I read literature all the

10   time.  I mean, I've studied Uber for almost ten

11   years, so I'm always in the literature,

12   thinking about the gig economy, so that doesn't

13   have a time window.

14              So I would say the documents

15   that I read a lot in the summer of 2025 were

16   related to this case, specifically.

17          Q.      Okay.  And were the 58.5 hours

18   listed here, inclusive of all the time you

19   spent drafting your report in this case?

20          A.      No.

21          Q.      Okay.  So some of the report

22   work continued past August 22nd.

23              Is that correct?

24          A.      Correct.

25          Q.      Do you know how much was after

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 24

                    DR. LINDSEY CAMERON

1   August 22nd versus before?

3       A.        Roughly 10 to 12.

4       Q.        And what's the unit on 10 to 12?

5       A.        Hours.

6       Q.        Hours.  Okay.  Okay.

7       A.        And -- but that's just writing

8   the report.  I mean, there's also a lot of this

9   me being in the literature and constantly

10  updating ideas that shape the report.

11                So I would say those 10 to 12

12  hours is the actual -- maybe that's just

13  writing, but the extra thinking that went into

14  what you saw between 22 August and whenever

15  this report was finished, was much greater than

16  10 to 12 hours.

17      Q.        Understood.  That makes sense.

18                And your report is titled,

19  A Rebuttal to Mr. Okapaku's Report.

20                Is that right?

21      A.        I'm looking for the title.

22                Yes.  That's what it says.

23  Report -- well, it just says Rebuttal Report of

24  Lindsey D. Cameron, Ph.D.

25      Q.        Okay.  That's fair.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

```
 1            DR. LINDSEY CAMERON
 2              Mr. Okapaku's name is not on the
 3   title, but it's titled The Rebuttal Report.
 4              Is that correct?
 5       A.      Exactly.
 6       Q.      Okay.  And what prompted you to
 7   issue an invoice at the end of August?
 8              MS. POLLOCK:  Object to form.
 9              THE WITNESS:  My work on the
10       case was paused.
11   BY MR. WYATT:
12       Q.      Okay.  Let me pull this down.
13              MR. WYATT:  I'm going to
14       introduce the notice of deposition as
15       Exhibit 3.  I'll share that as well.
16                    -  -  -
17              (Whereupon the document was
18       marked, for identification purposes, as
19       Exhibit Number 3.)
20                    -  -  -
21   BY MR. WYATT:
22       Q.      Okay.
23              Can you see this on the screen?
24       A.      Yes.
25       Q.      And this is titled, "Notice of
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1                DR. LINDSEY CAMERON

2    Remote Videotaped Deposition of Dr. Lindsey

3    Cameron."

4                Do you see that?

5        A.      Yes.

6        Q.      Have you seen this document

7    before today?

8        A.      I think it was emailed to me.

9                I have -- let me --

10               MS. POLLOCK:  Don't check your

11           emails.

12               THE WITNESS:  No.  I'm not

13           checking my emails.  I'm scanning for the

14           document.

15   BY MR. WYATT:

16       Q.      If we scan to the fourth page,

17   it's got a list of requests that you might have

18   seen or focused on previously.

19       A.      Yes.  I have seen this before.

20       Q.      Okay.  And let me just start --

21   I'm going to switch, actually, to the responses

22   in this document, but we'll start here.

23               So if you look at

24   Question Number 1, it says, "Your current and

25   up-to-date resume or Curriculum Vitae, to the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 27

```
1              DR. LINDSEY CAMERON
2    extent the prior CV you produced in this action
3    is no longer current and up-to-date."
4              Do you see that?
5         A.      Yes.
6              MR. WYATT:  And we'll mark this
7         exhibit -- oops.  I'm not doing it that
8         way.  Exhibit 4.
9                  -  -  -
10             (Whereupon the document was
11        marked, for identification purposes, as
12        Exhibit Number 4.)
13                 -  -  -
14   BY MR. WYATT:
15        Q.      And in response to our notice of
16   deposition and those requests, we -- we
17   received this copy of your CV, which is
18   20 pages long.
19             Is this a current CV for you?
20        A.      It's been updated since then.
21        Q.      Okay.  And what's been added
22   since then?
23        A.      One of those papers was
24   accepted.  So if you scroll up, I can give you
25   the number.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 28

1           DR. LINDSEY CAMERON

2       Q.       Sure.

3       A.       Paper -- Paper 2.

4       Q.       Is this Manuscripts Under Review

5   or further up?

6       A.       No. All the way up.  Number 2.

7       Q.       Oh, I see.

8                Number 2 under Peer-Reviewed

9   Publications?

10      A.       Yeah.

11      Q.       Okay.  And you're saying this

12  has been -- subsequent to this CV then being

13  produced, that was published or that was the

14  change from the original CV that you attached

15  to your report?

16      A.       Oh, that paper was just

17  accepted, I think, yesterday.  So it's been --

18      Q.       Okay.

19      A.       Yeah.  It's been updated on my

20  website now.

21      Q.       Okay.  Great.

22               And do you know what difference,

23  if any, there was between the CV that we

24  received the other day and the one that would

25  have been attached to your report at the end of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 29

1              DR. LINDSEY CAMERON

2    October?

3        A.      Oh, probably -- I don't think

4    either Number 1 or Number 2 were accepted at

5    the end of October.

6                And I also think there's one on

7    number -- Number 20, might not have come back

8    second-round review yet.

9                No.  Number -- no -- number --

10   do you see there's two number 20s, there's a

11   typo?

12       Q.      Oh, yeah.  Uh-huh.  Okay.

13       A.      So the second Number 20, I don't

14   think that had come -- oh.  Okay.  That had --

15   that looks like that's updated.  Okay then.

16               But on my website, my most

17   up-to-date version of the CV is there all the

18   time.

19               MS. POLLOCK:  That's what this

20       is.

21               THE WITNESS:  Oh, then I have a

22       typo?  Then thank you for letting me

23       know.

24   BY MR. WYATT:

25       Q.      Happy to help.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

```
 1                  DR. LINDSEY CAMERON
 2                  MS. POLLOCK:  Just for
 3          everyone's benefit, I pulled this off of
 4          your website yesterday or two days ago,
 5          just so that everyone is on the same
 6          page.
 7                  MR. WYATT:  Okay.
 8                  Appreciate that clarification.
 9                  All right.
10                  So let me take that down.
11   BY MR. WYATT:
12       Q.     And then I'll introduce this as
13   Exhibit 5.
14                     -   -   -
15                  (Whereupon the document was
16          marked, for identification purposes, as
17          Exhibit Number 5.)
18                     -   -   -
19   BY MR. WYATT:
20       Q.     And can you see that on the
21   screen?
22       A.     Yes.
23       Q.     Okay.  And this one is called,
24   "Plaintiff's Responses and Objections to
25   Defendant's Notice of Remote Videotaped
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 31

1              DR. LINDSEY CAMERON

2   Deposition of Lindsey Cameron."

3              Have you seen this document

4   before?

5        A.      I'm not sure.

6        Q.      Yeah.  I'll represent to you

7   that this is -- Plaintiff's take our notice and

8   then they put responses to it and then this is

9   what that document looks like, and I just have

10  a couple questions.

11             I'll -- I'll further represent

12  that it repeats the requests that are set forth

13  in the notice that we just looked at, so rather

14  than bouncing back and forth between the two

15  documents, I'll just read off of this one and

16  ask you some questions about it.

17             So we just looked at

18  Request Number 1, just to illustrate what I was

19  just talking about, your current and up-to-date

20  resume or CV.

21             Do you see that right there?

22        A.      Yes.

23        Q.      And then the response is,

24  "Documents were produced and since it's been

25  updated, Plaintiff will produce," and we just

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 32

1           DR. LINDSEY CAMERON

2    looked at that, right?

3         A.      Yes.

4         Q.      Okay.

5                 So moving on to

6    Request Number 2, which tracks, again, the

7    Number 2 request from the notice, "A list of

8    all articles, abstracts, studies, reports,

9    seminar materials, and so on, authored or

10   co-authored by You in the last ten years,

11   including the name of the article, the name of

12   the publication and the date it was published."

13                Do you see that?

14        A.      Yes.

15        Q.      And then in the response is,

16   "Subject to objections, documents responsive to

17   this request were previously produced.  In

18   addition, Plaintiff will produce one additional

19   presentation not publically available."

20                Do you see that?

21        A.      Yes.

22        Q.      Okay.  And then -- okay.

23                     -   -   -

24                (Whereupon the document was

25        marked, for identification purposes, as

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 33

 1              DR. LINDSEY CAMERON

 2         Exhibit Number 6.)

 3                  -  -  -

 4    BY MR. WYATT:

 5         Q.       And then I just introduced -- it

 6    didn't let me stamp it, but I introduced what I

 7    received this morning as Exhibit 6, which I'll

 8    put on the screen.

 9         A.       I see it.

10         Q.       Okay.  Great.

11                  And is this that document?

12         A.       Yes.

13         Q.       And it looks like it's a

14    PowerPoint dated April 6th, 2017, entitled

15    driver -- "Driving as Women's Work:  Insights

16    from Ridehailing Industry."

17                  Is that right?

18         A.       Yes.

19         Q.       What can you tell us about this

20    presentation?

21                  MS. POLLOCK:  Object to form.

22                  THE WITNESS:  So this -- this, I

23         think, was mistakenly cited in my

24         references, my work cited, but it's not

25         actually used in my report to make an

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

```
 1              DR. LINDSEY CAMERON
 2         argument, so it's just -- it's a typo,
 3         but because it was part of my references,
 4         Jo Anna asked me to give you a copy of
 5         the presentation, which I have now
 6         shared.
 7              It's a conference on gender, so
 8         I was thinking about how can my research
 9         fit?  And in it I talk about the
10         different smells that are in an Uber car
11         and how people have to police the smells
12         to make sure they smell nice, and so I
13         talk about odor work is a feminized form
14         of work.
15    BY MR. WYATT:
16         Q.      Okay.  And so this is not
17    something that you're relying on for your
18    opinions in this case, it's just cited by
19    accident, so in full disclosure you have
20    provided it to us.
21              Is that a fair summary?
22         A.      Yes.  That's it exactly.
23         Q.      Okay.  So we'll put that away.
24              And then returning to our
25    Exhibit 5 here.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 35

```
 1              DR. LINDSEY CAMERON
 2              Request Number 3 is, "A list of
 3    all cases, other than this one, in which You
 4    have, during the past four years, provided to
 5    the court or to counsel an expert disclosure or
 6    expert report, or in which You have given a
 7    deposition or testified in court."
 8              Do you see that?
 9        A.     Yes.
10        Q.     And there is a list of testimony
11    provided in Exhibit C to your expert report,
12    which is Exhibit 1 for this deposition.
13              Is that list still complete?
14        A.     Yes.
15        Q.     Okay.  And we'll talk about that
16    a little more in a minute.
17              Request Number 4 was, "To the
18    extent not previously produced, all invoices,
19    bills, billing records, time records and
20    expense records connected with your involvement
21    in the action."
22              Do you see that?
23        A.     Yes.
24        Q.     And we discussed the one invoice
25    that's been produced so far already, right?
```

Page 36

1                   DR. LINDSEY CAMERON

2          A.        No.  There were two, because

3    there would be the first one I sent for the

4    retainer.

5          Q.        Well, that's right.  There are

6    two, but we also looked at -- there's only been

7    one produced to me and we discussed that one,

8    correct?

9          A.        Okay.  Yes.

10                    We talked about the one you

11   showed me.

12         Q.        Okay.  And are there any other

13   time records or billing records that you have,

14   that set forth more detail or different

15   information than what's been produced so far?

16         A.        I keep track of hours on, like,

17   a little note pad and then I add them all up to

18   put in the invoice.

19         Q.        Okay.

20         A.        But there's no -- there's

21   nothing more than that, it's just one, two,

22   three, you know, it's just numbers.

23         Q.        Okay.  And then Request Number 5

24   says, "To the extent not previously produced,

25   all consulting contracts or retention letters

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 37

1              DR. LINDSEY CAMERON

2    concerning your involvement in this action

3    between you and any other person or entity,

4    including but not limited to the Plaintiff's

5    lawyers and any other organization."

6              Do you see that?

7    A.       Yes.

8    Q.       And then it says, see response

9    to Request Number 4 as the response.

10             Do you see that?

11   A.       Yes.

12   Q.       So we do not, as a part of the

13   response to Number 4, receive any contracts or

14   retention letters.

15             Do you have a contract or

16   retention letter for this case?

17   A.       I actually have no idea.

18   Q.       Okay.

19   A.       And --

20   Q.       Go ahead.

21             MS. POLLOCK:  Oh, I was -- I was

22        just going to -- we filed objections and

23        there's a stipulation on this point, I

24        believe, in agreement amongst the Parties

25        that we can talk about, but they haven't

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

```
 1              DR. LINDSEY CAMERON
 2       been produced for any of the experts.
 3              MR. WYATT:  Got it.  Okay.
 4              MS. POLLOCK:  And I'm trying to
 5         find that additional invoice for you, but
 6         it slipped by me and I'm trying to track
 7         it down.
 8              MR. WYATT:  Okay.  Great.
 9   BY MR. WYATT:
10       Q.     For Number 6, any final reports,
11   final declarations, final outlines or other
12   final writings.  And it says, "subject to the
13   foregoing objections, the documents responsive
14   to this request have been previously produced."
15              Is that a reference to your
16   report?
17       A.     I don't understand the question.
18       Q.     Is -- are there any other final
19   reports that you have or other final documents,
20   apart from your report?
21       A.     No.  This is the only finished
22   product I have.
23       Q.     Okay.  And then, Number 7, "All
24   documents, materials or things relied upon by
25   You as the basis for Your opinions in this
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 39

```
 1              DR. LINDSEY CAMERON
 2    Action."
 3              And the response is, "There are
 4    no responsive documents that are not already in
 5    Defendant's possession or otherwise equally
 6    accessible to it.  The documents produced in
 7    this litigation that were considered or relied
 8    upon by expert in forming her opinions are
 9    cited in the report or attachments thereto.
10    Other non-litigation documents listed in the
11    report are publically available or already in
12    Defendant's possession."
13              Do you see that?
14        A.    Yes.
15        Q.    And that -- is that referring to
16    the footnotes and other citations in the body
17    of your report and also Exhibit B, which is
18    called Materials Considered?
19        A.    That's what I believe that's
20    referring to.
21        Q.    Okay.  And if -- if you relied
22    on something and you -- you raised a couple of
23    documents at the start, if you relied on
24    something, would I expect to find it either
25    cited in the report itself or in Attachment B
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 40

1              DR. LINDSEY CAMERON

2    or else among those two documents we started

3    the deposition off with?

4         A.       Yes.  Though, I do want to say,

5    I reviewed, I think, a few depositions that I

6    didn't have a chance to look at thoroughly, so

7    I don't think we included that.

8              I don't think it's included as

9    materials I considered in this report.

10        Q.       Okay.

11        A.       And I -- honestly believe it

12   shaped my opinion, because I can't even

13   remember who the individuals were.

14        Q.       That anticipates my next

15   question.  So you can't remember any names of

16   the depositions you reviewed?

17        A.       If I told you they were

18   employees of Uber, that wouldn't be very

19   helpful, right?

20        Q.       I mean, it would narrow it down

21   slightly, but only slightly.

22              MR. WYATT:  Counsel, can you

23        provide us a list of materials you

24        provided the Witness that she considered

25        or skimmed, whatever --

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 41

```
 1              DR. LINDSEY CAMERON
 2              MS. POLLOCK:  Yeah.
 3              That's a distinction, skimmed
 4        versus actually considered, and so
 5        I'll -- I'll follow up with you on it.
 6              MR. WYATT:  Yeah.
 7              MS. POLLOCK:  I'll track them
 8        down and see what it's about.
 9              MR. WYATT:  Okay.
10  BY MR. WYATT:
11        Q.     Give me a minute here.  Sorry.
12              Get back on track.
13              Number 8 says, "All documents,
14  materials, notes, transcriptions, audio
15  recordings, survey responses, financial diaries
16  and analyses related to Your "in-depth
17  semi-structured interviews" conducted while
18  researching drivers on ridesharing platforms
19  including, but not limited to those related to
20  Your training and work as a ride-hailing driver
21  in the Washington, D.C. metro area, that form
22  the basis for your opinions on algorithmic
23  management and control."
24              Do you see that?
25        A.     Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1           DR. LINDSEY CAMERON
2       Q.       Then the response was,
3   "Plaintiff also specifically objects to this
4   request on the grounds that it seeks
5   information protected from disclosure,
6   including by the Institutional Review Board."
7               Do you see that?
8       A.       Yes.
9       Q.       We'll talk a little more about
10  this in your report.
11              Do you rely, in your report, on
12  the semi-structured interviews and other
13  conversations you had with drivers, as part of
14  your research, in formulating your opinions?
15              MS. POLLOCK:  Object to form.
16              THE WITNESS:  Not exactly.
17              I rely on my knowledge of being
18          an expert in all the published research I
19          have on this.
20              So, there's -- it forms my
21          general knowledge in the same way that,
22          like, I've read thousands of articles or
23          hundreds of articles about the gig
24          economy and it shapes my knowledge.
25              Do I actually go to a specific

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 43

1           DR. LINDSEY CAMERON
2        interview or transcript when writing this
3        report?  Not at all.
4    BY MR. WYATT:
5        Q.        Okay.  The response references
6    the Institutional Review Board.
7                 What does the Institutional
8    Review Board do that prevents production of
9    this type of material?
10               MS. POLLOCK:  Object to form.
11               THE WITNESS:  So from what my
12        understanding is, the IRB is to protect
13        the rights of research subjects.
14               And it was created after the
15        Tuskegee experiment, and we know the
16        whole history around that.
17               And so there's a confidentiality
18        waiver that all of my participants in my
19        study sign where I don't collect their
20        names, or I -- I delete any sort of
21        identifying data about them once the
22        research process is complete.
23               And that data is never shared
24        with anyone, besides me.  So even if
25        these papers go through peer-review, the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 44

                    DR. LINDSEY CAMERON

1

2           actual raw data is never shared with

3           anyone, that's always been protected.

4                   And that's the -- you know,

5           my -- all of my studies have to be

6           approved by Institutional Review Board.

7           This is sort of common norms in the

8           sciences.

9   BY MR. WYATT:

10          Q.      And so, I'm just trying to

11  understand how the IRB prevents you from

12  sharing materials -- well, let me scratch that.

13                  You mentioned that the intake

14  doesn't use drivers' names.  So are the

15  materials that exist already deidentified?

16          A.      No.  They're identified, because

17  they are -- because they're in my control, but

18  everything that I publish in deidentified.

19                  And there are a lot of different

20  security protocols I had around my collecting

21  the data and trying to keep it safe, because

22  Uber does have a pattern of history of

23  targeting individuals, drivers and other people

24  who speak out against it.

25                  So it's one of the reasons about

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 45

1              DR. LINDSEY CAMERON

2      why I was -- I'm very -- I was very protective

3      about the data and I have multiple safeguards

4      in place.

5           Q.      Okay.

6                   MR. WYATT:  I object to that

7           characterization, but -- just for the

8           record.

9      BY MR. WYATT:

10          Q.      Does -- would it be possible to

11     deidentify the information and produce the

12     deidentified versions of these materials?

13                  MS. POLLOCK:  Object to form.

14                  THE WITNESS:  The deidentified

15          pieces of data are in my published

16          research.

17     BY MR. WYATT:

18          Q.      Well, in their complete form?

19          A.      No.

20                  MS. POLLOCK:  Object to form.

21                  THE WITNESS:  So there's not an

22          entire interview transcript in any of my

23          data -- in any of my papers because

24          that's not how -- that's not how

25          researchers determine whether or not a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

```
 1              DR. LINDSEY CAMERON
 2        piece of research is valid or
 3        generalizable or rigorous.
 4  BY MR. WYATT:
 5        Q.       Right.  You're not -- you're not
 6  giving to the peer-reviewers, I understand,
 7  like, your whole set of interview transcripts.
 8                 That's what you're saying,
 9  correct?
10        A.       Correct.
11        Q.       Okay.  But I'm trying to get
12  down to the bottom of this language about the
13  information is protected from disclosure,
14  including by Institutional Review Board, so let
15  me ask the question this way.
16                 Is there anything other than the
17  Institutional Review Board that prevents
18  disclosure of these materials?
19                 MS. POLLOCK:  Object to form.
20                 THE WITNESS:  I'm not sure.
21  BY MR. WYATT:
22        Q.       Okay.  And then, is there a
23  written policy or is there some sort of
24  document you have from the Institutional Review
25  Board that says you cannot share these
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 47

```
 1              DR. LINDSEY CAMERON
 2   materials?
 3        A.       Oh, yes.
 4        Q.       And -- and what is
 5   that document?
 6              MS. POLLOCK:  Object to form.
 7              THE WITNESS:  I mean, any time
 8        that a -- I would like to do a research
 9        study, you have to submit a petition
10        to -- or application with your research
11        protocols to the Institutional Review
12        Board.
13              It gets reviewed by a committee
14        who has certain guidelines about how you
15        protect human subjects, so they aren't
16        exploited or hurt or harmed at some point
17        in the research process.
18              And so there's all this
19        documentation that happened around each
20        -- (inaudible) -- to get their approval.
21              And, you know, when you ask, is
22        there anyone besides the IRB that's
23        preventing this, the only reason people
24        participate in research studies in
25        general, and in mine, because I promised
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 48

```
 1              DR. LINDSEY CAMERON
 2       them confidentiality.
 3  BY MR. WYATT:
 4       Q.      And would it threaten their
 5  confidentiality if deidentified versions of the
 6  materials were produced?
 7                MS. POLLOCK:  Object to form.
 8                THE WITNESS:  That's a very
 9       broad question.  By deidentifying data,
10       do you -- you know, there's one way you
11       can think about it.
12                If I have three lines of an
13       interview, is that appropriately
14       deidentified?  It could be.  You know, I
15       do feel like most of my data in my
16       research studies are deidentified.
17                If I gave anybody a transcript,
18       there's no way that could be
19       deidentified.
20  BY MR. WYATT:
21       Q.      And why is that, the transcript
22  could be?
23                MS. POLLOCK:  Object to form.
24                THE WITNESS:  I mean, there's
25       one about -- I mean, there's just --
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 49

```
 1              DR. LINDSEY CAMERON
 2         there's so many different reasons, so
 3         I'll just try to give you a few.
 4              One is by you could be listening
 5         to someone's voice and that would be a
 6         way to identify them.  They could drop
 7         identifying details in the transcript
 8         about where they work or who they talked
 9         to or a specific incident they had.
10              So there's a lot of --
11         there's -- that is one of the reasons why
12         we don't -- you know, we have to protect
13         our subjects in doing this type of
14         research.
15   BY MR. WYATT:
16         Q.      Okay.  And then, just referring
17   back to the process you described about getting
18   permission from the -- the Institutional Review
19   Board, would there be, like, project or
20   article-specific documents from an IRB that you
21   would have that says, in essence, thou shall
22   not share information about these individuals?
23              MS. POLLOCK:  Object to form.
24              THE WITNESS:  Yeah.
25              I'm pretty sure that's in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1              DR. LINDSEY CAMERON

2         IRB, in the agreement that I signed with

3         the University.

4    BY MR. WYATT:

5         Q.      Okay.  So it's in the agreement.

6    It's not -- well, let me scratch that.

7              It's not in a broad IRB policy

8    statement, it would be specific to the projects

9    you're discussing.

10             Is that correct?

11        A.      Exactly.  Yeah.

12             Each project goes through it's

13   own Institutional Review Board.

14        Q.      Okay.  Okay.  Let me see.

15             And then Number 9 is, "All

16   interviews and statements taken by you or at

17   your direction, concerning this action,

18   including notes -- any notes, transcriptions,

19   video and/or audio recordings associated with

20   such."

21             Do you see that?

22        A.      Yes.

23        Q.      And then the response refers us

24   to 7 and 8.

25             Well, let me ask a clarifying

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 51

1           DR. LINDSEY CAMERON

2    question because that doesn't make a lot of

3    sense to me.

4               Did you take any interviews or

5    statements by you, concerning this action?

6        A.      No.

7        Q.      Okay.  So there's -- there's

8    just nothing responsive to Request Number 9?

9        A.      Seems that way.

10       Q.      Okay.  That was my assumption,

11   based on reading your report, but I -- since

12   there were no citations to anything like that

13   in there, but I just wanted to make sure I was

14   understanding it correctly.

15               Okay.  So for Number 10,

16   "Materials and documents provided to you or

17   received by you in connection with the action"

18   and it says, "Refer to Number 7", which I

19   assume is a reference to your materials

20   considered list, and we talked about that

21   already, right?

22       A.      Right.  The only thing -- I -- I

23   mean, just to be super clear, I received a

24   bunch of depositions -- I get all my documents

25   in hard copy.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52

1          DR. LINDSEY CAMERON

2      Q.      Okay.

3      A.      So I do have a whole box of

4  depositions that I mentioned before, I skimmed

5  a few of them.  I don't really remember

6  anything about them, so I just want to say they

7  were provided to me, but I didn't actually read

8  or review them.

9      Q.      And how did you decide what

10 materials you needed from the litigation, in

11 order to develop your opinions in this case?

12     A.      That is a long back and forth

13 process in which I had conversation with

14 Jo Anna and her team about what I would be

15 interested in, what they thought they had, and

16 sort of, like, we compiled this list and I

17 received the materials.

18             And then as I was starting to go

19 through things on my own, I prioritized what I

20 thought would be most important.

21     Q.      Okay.  Request Number 1, "All

22 notes, calculations, memoranda, drawings,

23 models, illustrations, diagrams, recordings or

24 records generated or utilized by you", refers

25 us back to Number 7.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

```
 1              DR. LINDSEY CAMERON
 2                  I assume there's nothing in this
 3     category that you have not produced to us?
 4         A.       I mean, I have little scattered
 5     pieces of notes on pieces of paper around, but
 6     nothing is not -- that's not in my report.
 7         Q.       Okay.  So there's no sort of
 8     separate exhibit or presentation or something
 9     that you put together that would be part of
10     your opinions in this case, that you've not
11     produced as part of your report, at least so
12     far?
13         A.       No.  Not at all.
14         Q.       Okay.  And then Number 12, "To
15     the extent not produced already, all other
16     information, documents, studies, texts,
17     treatises, objects or anything else that you
18     will use at trial."
19                  Is there anything that you plan
20     to use at trial that is not contained in your
21     report that you know of right now?
22         A.       No.
23                  Not that I know of right now.
24         Q.       Okay.
25         A.       But because I'm in the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 54

```
 1              DR. LINDSEY CAMERON
 2   literature, I might be thinking about something
 3   else, like those reports I had mentioned to you
 4   earlier.
 5         Q.      Okay.
 6              MS. POLLOCK:  And Geoffrey, just
 7         to round that out, I sent you by email
 8         that invoice from 2024, it's in your
 9         email inbox.
10              MR. WYATT:  Okay.  Great.
11              MS. POLLOCK:  It's just a super
12         simple document, if you want to mark it
13         or not.
14              MR. WYATT:  Yeah.  I'll do that
15         after the next break.
16              MS. POLLOCK:  Sure.
17   BY MR. WYATT:
18         Q.      Okay.  So shifting gears
19   slightly, who retained you in this case?
20         A.      Can I say Jo Anna?
21         Q.      Totally acceptable answer.  Yes.
22         A.      I think her firm is called
23   Simmons and something.
24         Q.      Okay.  And I think we talked
25   about this earlier, but you were retained in
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 55

1              DR. LINDSEY CAMERON
2    roughly May or June of 2024.
3                   Is that right?
4         A.       That sounds right.  Yes.
5         Q.       Okay.  And then you worked with
6    this firm or Jo Anna Pollock previously?
7         A.       No.
8         Q.       You have, though, testified in
9    other cases and other situations, involving
10   Uber.
11                  Is that right?
12        A.       Yes.
13        Q.       Okay.  And if we go back to
14   Exhibit 1, which is your report.  I think we're
15   all the way to the end.
16                  This is your list of prior
17   testimony.  We talked about it briefly a minute
18   ago, right?
19        A.       Yes.
20        Q.       And -- and this is complete as
21   of now as to prior testimony or other cases in
22   which you were involved as an expert?
23        A.       Correct.
24        Q.       And does this cover every case
25   in which you've been retained as an expert or

Page 56

```
 1                  DR. LINDSEY CAMERON
 2    only ones in which you testified, or is that
 3    the same universe of cases?
 4         A.        Only cases in which I've
 5    testified.
 6         Q.        Okay.  So are there other cases
 7    in which you've been retained as an expert
 8    witness, but have not been deposed or otherwise
 9    testified?
10                   MS. POLLOCK:  You can answer the
11         question yes or no.
12                   So as to protect any retention
13         by you, in terms of in a consulting --
14                   THE WITNESS:  So if I understand
15         the question, retain includes consulting
16         as well?
17    BY MR. WYATT:
18         Q.        Yes.  And Counsel is right, I'm
19    only asking yes or no, not for any details,
20    just have you had any other arrangements as a
21    consulting expert, outside of testifying?
22         A.        Yes.
23         Q.        Okay.  And are there any of
24    those that you are free to discuss or are they
25    all subject to confidentiality?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

1              DR. LINDSEY CAMERON

2        A.        Subject to confidentiality.

3        Q.        Okay.  Let's talk about the

4    first item on the list, which is testimony

5    provided for a hearing held by the

6    Pennsylvania State Senate Democratic Policy

7    Committee, 2019.

8                 Do you see that?

9        A.        Yes.

10        Q.        And do you recall what the

11    nature of the hearing was in 2019?

12        A.        No.  But the testimony is on my

13    website.

14        Q.        Okay.

15                 That's true for 2019 and 2021?

16        A.        Yes.  I think they're both on my

17    website.

18        Q.        Okay.  Do you recall whether the

19    2019 testimony was the -- on the same issues as

20    2021 or different issues, or you don't --

21        A.        I think they were pretty close,

22    pretty similar.

23        Q.        Okay.  And were you retained to

24    provide that testimony?

25        A.        What does retained mean?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 58

1                    DR. LINDSEY CAMERON

2         Q.        Hired, paid?

3         A.        No.  I was not hired or paid.

4         Q.        So how did it come to be that

5    you were appearing at these hearings?

6         A.        I think a colleague recommended

7    me for 2019.  And then I think in 2021, they

8    just asked me to come back.

9         Q.        Okay.

10        A.        They, being the State Senate.

11        Q.        Okay.  Got it.

12                   And were you testifying as an

13   expert at these hearings?

14        A.        I don't know what -- I don't

15   think I quite understand the question.

16        Q.        Yeah.  I don't mean it in a

17   technical sense, but was your expertise being

18   sought at these hearings?

19                   Was that the reason for your

20   testimony?

21        A.        I was -- yes, I was talking

22   about the research in the ride-hailing

23   industry.

24        Q.        Okay.  Looking at the second

25   item, that's the 2021 testimony at the same

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 59

```
 1              DR. LINDSEY CAMERON
 2    committee, correct?
 3         A.      Yes.
 4              MR. WYATT:  And let me introduce
 5         another exhibit here.
 6                   -  -  -
 7              (Whereupon the document was
 8         marked, for identification purposes, as
 9         Exhibit Number 7.)
10                   -  -  -
11              MR. WYATT:  This will be
12         Exhibit 7.
13    BY MR. WYATT:
14         Q.      And it should be up on the
15    screen now.
16              Do you see that?
17         A.      Yes.
18         Q.      Okay.  I think this is your 2021
19    testimony.
20              Are you able to determine that
21    by looking at it?
22         A.      Yes.
23              It looks -- it looks like it.
24         Q.      And I found this -- it sounds
25    like you have it on your website too.  We found
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 60

1            DR. LINDSEY CAMERON

2     this on Senator Nikil Saval's website.

3          A.      Yes.

4          Q.      Is that somebody you know from

5     these hearings or remember from these hearings?

6          A.      That name sounds familiar.

7          Q.      Okay.

8          A.      And I think on my website, I

9     might even link to his -- I might link to this

10    document, on Nikil's website.

11         Q.      Okay.  And then at the bottom

12    here on Page 1, help me understand how

13    testimony works in this committee.

14                 Would you have submitted this

15    written testimony and also appeared live to say

16    essentially the same thing or is it different

17    from that?

18         A.      From what I remember, I do not

19    remember if I shared a written product.  No.

20    Maybe I did, if it's on Nikil's website, but I

21    just remember -- I remember going up and

22    reading this.

23         Q.      Okay.  And so, last paragraph on

24    the first page, it says, "Out of the 13 percent

25    of the workforce that are in independent

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              DR. LINDSEY CAMERON
 2   contractor work arrangements, only one percent
 3   are working gig jobs with most of them being
 4   ride-hailing drivers."
 5              Do you see that?
 6       A.      Correct.
 7       Q.      So at this point in time, you're
 8   transcribing ride-hailing drivers as
 9   independent contractors, correct?
10              MS. POLLOCK:  Object to form.
11              THE WITNESS:  No.
12   BY MR. WYATT:
13       Q.      What's wrong about that?
14       A.      What I think -- so I say
15   independent contractor work arrangements, so
16   that's when individuals are not employees.
17              But I would want to say that the
18   way we use these words in our management
19   literature are different then I think from a
20   legal term of how you think about Uber
21   classification.
22              So I wouldn't -- I'm not making
23   an argument that I think these workers are
24   independent contractors nor am I making an
25   argument that I think these workers are
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 62

```
 1              DR. LINDSEY CAMERON
 2   employees, I'm just stating the facts that this
 3   moment, that these are the work arrangements
 4   that they're in.
 5        Q.      Okay.  That's understood.
 6                And so what are some of the
 7   differences between the literature you just
 8   described and the legal definitions of terms
 9   like this?
10                MS. POLLOCK:  Object to form.
11        And calls for a legal conclusion.
12                THE WITNESS:  To be honest,
13        that's outside of my realm of expertise.
14   BY MR. WYATT:
15        Q.      Okay.  But I think -- I'm
16   following up on a statement you just made.
17                You have a sense, though, that
18   there's a difference in meaning.
19                Is that a fair --
20        A.      Yes.  I do believe there's a
21   deep difference -- there's -- there's
22   differences in meeting in how we think about
23   these terms, how we think about control, just
24   because we're two different disciplines.
25        Q.      Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 63

1          DR. LINDSEY CAMERON

2               And we'll get into some of those

3     differences too as we go along here, but that's

4     helpful framing for going forward.

5               And then, if we can scroll -- or

6     I'm scrolling, so I'll scroll to Page 2, you

7     have a section called "What Control Looks Like

8     in Gig Work."

9               Do you see that?

10     A.        Yes.

11     Q.        And then it says, "In my

12     research, I identify five ways algorithms

13     control the work process."

14               Is that right?

15     A.        Correct.

16     Q.        And what do you mean by control,

17     as you use it here?

18     A.        You know, I -- I was thinking

19     the same thing.  I don't think that's the right

20     word.  I would use the word manage.

21     Q.        Okay.

22     A.        And so this is before my papers

23     had been published and peer-reviewed, and I'm

24     pretty clear -- I'm pretty sure that I use the

25     word manage instead of the word control right

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 64

1              DR. LINDSEY CAMERON

2    there.

3         Q.      Okay.  And what would you mean

4    by manage, if you replaced control with manage?

5         A.      So a manage would be those five

6    dimensions I'm talking about, you know, how did

7    they manage or direct a labor process?  And

8    they deal with the matching, in giving

9    instructions and setting prices.

10             And so my 2024 Administrative

11   Science Quarterly Article lays that out, like,

12   what is algorithmic management?

13        Q.      And when we use the words

14   control or manage in this sentence, is there --

15   is that word phrased with either a negative or

16   positive connotation or is it neutral?

17             MS. POLLOCK:  Object to form.

18             THE WITNESS:  So I -- I don't

19        think we can use the word manage and

20        control interchangeably, but it is

21        neutral.

22             I would agree with you it's

23        neutral.  You weren't saying it was

24        neutral, but I would say, yes, it is

25        neutral.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 65

1              DR. LINDSEY CAMERON

2    BY MR. WYATT:

3         Q.      Is it descriptive?  Is that a

4    good way to think about it rather than

5    pre-scripted or normative?

6              MS. POLLOCK:  Object to form.

7              THE WITNESS:  We don't use those

8         words in my field, so I don't think I can

9         answer that.

10   BY MR. WYATT:

11        Q.      Okay.  Fair enough.

12             I'm just trying to understand

13   it, but I think I do, based on your last

14   answer.

15             You also mention in the same

16   paragraph that "Photo verification compliance

17   with company guidelines, such as making sure

18   the person registered with the platform is the

19   one driving and that drivers wear masks."

20             I assume this latter part is the

21   reference to the COVID era?

22        A.      Yes.  Exactly.  It's 2021.

23        Q.      And so -- and you note that, and

24   "I'm sure many of you are familiar with these

25   systems are inherently racially biased."

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1              DR. LINDSEY CAMERON

2                   Is that referring to photo

3      verification systems?

4         A.         Photo verification, but also

5      algorithmic management systems in general are

6      racially biased, but I believe when you're

7      looking at that -- well, you see that in that

8      question, it says algorithms -- okay.

9                   "Algorithms have a harder time

10     detecting the features of darker-skinned

11     people."  So I would say algorithmic management

12     is racially biased.  Photo verification, I

13     would say is a subset within algorithmic

14     management.

15        Q.         Okay.  And you go on to say:

16     "Even in situations where control is not

17     actually exercised, i.e., there is only the

18     threat of a penalty of workers do not behave

19     accordingly, there is still control because

20     workers align their behaviors to the management

21     system."

22                   Do you see that?

23        A.         Correct.

24                   That isn't properly worded.

25        Q.         What's wrong with it?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 67

DR. LINDSEY CAMERON

1

2      A.       The -- the beginning, where I

3   say "Even in situations where control is not

4   actually exercised", that word should be

5   sanctioned.

6              Like, even when they're not

7   actual punishments, control is still being

8   exercised.  That's -- that's the key idea of

9   that sentence.

10     Q.       Okay.  And how is that?

11             How is control operating, even

12  if they're not actually being sanctioned?

13     A.       So you see what I have in

14  between the M line, the i.e.?

15     Q.       Yeah.

16     A.       There's only the threat of

17  penalty if workers do not behave accordingly,

18  there is still control because that threat of

19  penalty aligns individuals' behavior to

20  management systems.

21             And that's not just my research,

22  you know, that's Fuoco 77, that's Antibe and

23  Chan 2008, there's a lot of -- it's also

24  Antibe 2006, that's the -- you don't just need

25  punishment to be able to actually -- to have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              DR. LINDSEY CAMERON
 2   organizational control is what that statement
 3   is saying.
 4        Q.      Do you think photo verification
 5   serves an important safety service?
 6              MS. POLLOCK:  Object to form.
 7              THE WITNESS:  It possibly could.
 8              My expertise isn't safety.
 9   BY MR. WYATT:
10        Q.      Do you think there are ways to
11   obtain the safety result that photo
12   verification attempted to secure without
13   exerting some form of control?
14              MS. POLLOCK:  Object to form.
15              THE WITNESS:  Can you say that
16        one more time?
17   BY MR. WYATT:
18        Q.      It was a poorly worded question.
19   I was making it up as I went along.
20              Let me try again.
21              Is there a way to verify that a
22   driver is who the driver claims to be, without
23   exerting some form of control?
24              MS. POLLOCK:  Object to form.
25              THE WITNESS:  I'm not sure that
```

Page 69

```
 1            DR. LINDSEY CAMERON
 2      I can really answer this question,
 3      because, one -- the first part is, can
 4      you verify the driver is who they really
 5      are?
 6              Like, that's out -- that's
 7      outside of my scope of expertise, to talk
 8      about -- to understand photo
 9      verification.
10              I also feel like in the way you
11      phrased that question, there was a
12      miss -- we have a different
13      conceptualization of what is control.
14              Like, control, to me, is not yes
15      or no, it's not binary, it's like an
16      enactment of a larger organizational
17      system.
18 BY MR. WYATT:
19      Q.      I think you're right and I think
20 that's -- I'm actually asking the question to
21 try to flush out your definition of control and
22 that -- that explanation is helpful to my
23 understanding.
24              So let me ask you some other
25 questions like that, but I understand your
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

```
 1              DR. LINDSEY CAMERON
 2   answer, so I'll move on.
 3              And then, let's see -- on the
 4   next page, we have a section called
 5   "Consequences of Gig Work For Customers,
 6   Workers and Community."
 7              Do you see that?
 8       A.    Yes.
 9       Q.    And then, in Number 2, you
10   write, "Now, I'll share some of the research
11   about the benefits and drawbacks of gig work
12   for customers, workers and society more
13   generally", right?
14       A.    Yes.
15       Q.    And is that your -- is that --
16   does that continue to be your view that there
17   are benefits and drawback of gig work for
18   customers, workers and societies more
19   generally?
20       A.    Yes.
21       Q.    Okay.  And you write, "At the
22   micro -- at the more micro-level, there are
23   many benefits from driving.  In my data,
24   drivers mentioned that this work has helped
25   them become a person -- become a person as
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 71

1              DR. LINDSEY CAMERON

2    they're able to open a checking account and

3    apply for credit cards for the first time",

4    right?

5          A.        Correct.

6          Q.        And then it goes on to say,

7    "I've found that ride-hailing can increase

8    drivers personal and professional network to

9    help them access resources such as home

10   repairs, services, clients for other businesses

11   projects or other types of work", right?

12         A.        Yes.

13                   I wrote a paper about that.

14         Q.        Which paper was about that?

15         A.        You can see it right there,

16   Footnote 13.

17         Q.        Oh, yeah.  Okay.

18                   We'll talk about that paper in a

19   little bit.  I know that one.

20                   And then it says, "Most

21   importantly, because of the low barrier to

22   entry and scheduling flexibility, these

23   companies provide an opportunity for drivers to

24   earn who may not be able, or even want to,

25   secure traditional employment."

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 72

```
 1              DR. LINDSEY CAMERON
 2              Do you see that?
 3      A.      I see that.
 4      Q.      And then, "Several drivers I
 5  interviewed were able to supplement other
 6  earnings or flex their schedule around health
 7  issues or child/elder care."
 8      A.      That's true.
 9              I want to say, yes, I see that.
10  My opinions on that have evolved a bit since
11  2021 and it's coming out into my work -- more
12  recent work.
13      Q.      And we'll talk a little bit more
14  about that later, but I have a question, which
15  is, do you still believe that scheduling
16  flexibility is a benefit of ridesharing?
17              MS. POLLOCK:  Object to form.
18              THE WITNESS:  It's -- it's a
19          tricky -- it's a complex question to
20          answer, from a researcher's perspective.
21              At a very basic level, you can
22          say, yes, there is schedule flexibility
23          because I can open up the app and drive.
24              I think that when you look at it
25          from a more multifaceted complex way from
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 73

```
 1              DR. LINDSEY CAMERON
 2         a structural ethnographer, which I am,
 3         you realize that schedule flexibility is
 4         not as flexible as portrayed, and there's
 5         lots of constraints around it, is it
 6         really flexible?
 7              But I do know that many drivers
 8         talk about schedule flexibility as being
 9         a good thing and the reason why they like
10         driving.
11    BY MR. WYATT:
12         Q.      And should we credit those
13    drivers use of the benefits of flexibility or
14    should we be skeptical of those drivers use?
15              MS. POLLOCK:  Object to form.
16              THE WITNESS:  The answer is
17         both.
18    BY MR. WYATT:
19         Q.      Okay.  Say more about that.
20              MS. POLLOCK:  Object to form.
21              THE WITNESS:  That's not a
22         question.
23    BY MR. WYATT:
24         Q.      Can you explain what you mean by
25    the answer is both?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 74

DR. LINDSEY CAMERON

1

2     A.      So that goes to the heart of

3   what my -- my approach as a researcher, as

4   being a structural ethnographer, is that I look

5   at workers' individual experiences, but I also

6   look at how it's nested in water structural

7   forces, whether that's algorithmic management

8   or the economy or technology or cultural

9   narratives.

10                And so it's about using

11   individual narration, along with, how do you

12   understand organizations and society that helps

13   you become -- paint a better picture about what

14   is happening behind just the individual level.

15                And that's why I say it's both,

16   and that's why I am a structural ethnographer.

17     Q.      So, let's see.

18                We have a driver who tells you

19   they believe that the biggest benefit of being

20   a driver is the flexibility for their schedule.

21                What's the method we use to

22   evaluate whether that person is right about the

23   flexibility being the biggest benefit for them,

24   in being a driver?

25                MS. POLLOCK:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 75

```
 1              DR. LINDSEY CAMERON
 2                 THE WITNESS:  Can you say that
 3         one more time, please?
 4   BY MR. WYATT:
 5         Q.      Sure.
 6                 From the perspective of -- of --
 7   is the field structural ethnographer, is that
 8   what you said?
 9         A.      Yes.
10         Q.      From the perspective of the
11   field of structural ethnography, how do we
12   decide a driver is right when the driver tells
13   us that he or she believes that schedule
14   flexibility is the best benefit of being a
15   driver?
16                 MS. POLLOCK:  Object to form.
17                 THE WITNESS:  So my response
18         would be, there is no right.
19   BY MR. WYATT:
20         Q.      Okay.
21         A.      The individual could have their
22   individual value of feeling like this work is
23   flexible for whatever reason.
24                 And for my job as an
25   ethnographer is to look at that in contact --
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 76

1              DR. LINDSEY CAMERON

2    in context, you know, comparing what different

3    people say, comparing with archival, comparing

4    with what's happening in a societal,

5    organizational or a field level, to rate a more

6    broader perspective of what's happening.

7              And there is no right or wrong,

8    it's just different lenses of analysis.

9         Q.    Okay.  I'll pause for more

10   questions about that, but let's move on to the

11   next paragraph here.

12             It says, "Lastly, these

13   companies, or more precisely, drivers, save

14   lives.  One person every hour dies from a drunk

15   driving-related accident.  That is two people

16   in the course of this meeting.  Research from

17   various colleges, all find that incidents in

18   DUIs drop when a ride-hailing company enters a

19   city.  In Philadelphia, the number of drunk

20   driving arrests have dropped by 14 percent."

21             Do you see that?

22        A.    Yes.

23        Q.    Is that still an opinion you

24   hold about the benefits of drivers?

25        A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 77

1              DR. LINDSEY CAMERON

2              That's an opinion I still hold.

3      Q.      Okay.  And then --

4      A.      But -- but there's lots of

5  research that backs it up too.  It's not

6  just -- it's more than what I'm just citing

7  right here.

8      Q.      Okay.  And is that something

9  that you continue to study as part of your work

10  in this space?

11      A.      No.  I've never studied this.

12      Q.      Okay.  Okay.

13              But -- you have a citation here

14  and so you've looked it up once or twice for

15  purposes of fitting it into this testimony

16  anyway, is that fair?

17      A.      Yes.  One of the people on my

18  dissertation committee is connected to this

19  type of research, so I've -- I've read it.

20      Q.      Okay.  And then just to close

21  out this document, and you have a section also

22  on -- you covered benefits and this section is

23  on challenges, correct?

24      A.      Yes.

25      Q.      Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

1              DR. LINDSEY CAMERON

2                   And then one of the challenges

3    is in Paragraph C, you note, "Drivers can be

4    unfairly penalized and deactivated.  In my

5    work, drivers report being blocked based on

6    unsubstantiated customer complaints, such as a

7    customer saying the car smells like marijuana

8    or the driver is drunk and having no means to

9    appeal the decision."

10                  Do you see that?

11        A.        Yes.

12        Q.        Were you talking about Uber

13   specifically when you're referencing

14   unsubstantiated customer complaints?

15        A.        You know, when I interviewed

16   people, I call the company ride hail, because I

17   have Uber, Lyft and Juno on there.

18        Q.        I see.

19        A.        I can't specifically say it was

20   an Uber driver, but I have this data so much --

21   I mean, I have these people saying they've been

22   blocked unfairly so often, that I'm assuming

23   some of them have to be Uber drivers.

24        Q.        I see.

25                  And that -- and that answers

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 79

```
 1              DR. LINDSEY CAMERON
 2   another question I had, because I saw in some
 3   of your writings, referenced to Ride-Hailing,
 4   capital R, H, and I wasn't sure what that was,
 5   but this is a -- a placeholder that kind of
 6   covers all ride-hailing companies that you just
 7   described.
 8              Is that right?
 9        A.     Exactly.
10        Q.     Okay.  And do you have an
11   opinion about the right way to substantiate
12   customer complaints?
13              MS. POLLOCK:  Object to form.
14              THE WITNESS:  Honestly, no.
15        That's outside of my realm of expertise.
16   BY MR. WYATT:
17        Q.     And you provide some examples
18   here; car smells like marijuana, driver is
19   drunk.
20              Can you think of other examples
21   that you became familiar with, through your
22   work, that drivers cited as unsubstantiated
23   customer complaints that causes them to be
24   blocked?
25        A.     Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 80

1                    DR. LINDSEY CAMERON

2                    I think there is a time where a

3    driver was accused of touching a women or

4    saying something inappropriate, might have been

5    saying something inappropriate, and they were

6    blocked.

7                    Something about something being

8    broken in their car.  Like, Uber thought they

9    got into an accident or their car wasn't

10   drivable, but it was actually drivable.

11                   People talk about being scammed

12   by customers quite a bit, like, customers will

13   say, they did -- the ride dropped them off at

14   the wrong place or they took the wrong customer

15   and so then the driver gets reprimanded because

16   supposedly they didn't give the right person a

17   ride, and drivers are like that's not true, the

18   individuals were lying, they were in the car.

19                   So that's just a few of the

20   examples, but my research doesn't really focus

21   on this.  So that's just what I remember off

22   the top of my head.

23        Q.        Okay.  That's fair.

24                   And that's -- that's a few

25   examples.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 81

```
 1              DR. LINDSEY CAMERON
 2              Do you have an opinion about
 3    whether it was good or bad, that these
 4    individuals felt that they were deactivated
 5    based on unsubstantiated complaints, or is this
 6    just an observation?
 7              MS. POLLOCK:  Object to form.
 8              THE WITNESS:  Just -- I'm
 9         remembering another example, because I'm
10         going through my Roladex.
11              I think there was some
12         altercation between a customer and a
13         driver and the customer felt like -- the
14         driver felt the customer attacked them,
15         but then they were the ones that were in
16         trouble or they were the ones that were
17         blocked, but to answer your question, do
18         I have any conclusions about this?
19              I think I'm most concerned about
20         when drivers say they don't have a means
21         of recourse to get back on the platform.
22              I think personally -- or to like
23         adjudicate their claims.  I think that's
24         personally what concerns me the most, but
25         my research doesn't focus on this at all,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

```
 1              DR. LINDSEY CAMERON
 2         so it's not, like -- it's not, like, my
 3         research peer-reviewed opinion right
 4         there.
 5    BY MR. WYATT:
 6         Q.        Okay.  I appreciate that caveat.
 7                   So would you think about the
 8    problem differently if the block from the
 9    platform related to a report about a safety
10    issue, as compared to a smell or something
11    that's not safety related?
12                   MS. POLLOCK:  Object to form.
13                   THE WITNESS:  I feel like you're
14         asking me to think or speculate about
15         things that are way outside of my -- my
16         area of expertise.
17    BY MR. WYATT:
18         Q.        That's fair.
19                   And -- and to be fair, if your
20    response is, I don't have an opinion on that or
21    I haven't look at that or whatever, that's a
22    totally acceptable answer from my perspective.
23                   So if that's not one of your
24    opinions, we can move on.
25         A.        I mean, yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 83

1            DR. LINDSEY CAMERON

2            I felt if I was to answer that

3    question, I would just -- I wouldn't be telling

4    you what I actually know from my research, so I

5    really don't have an expert opinion on that.

6        Q.      Okay.  And -- and just to round

7    out this list we've been talking about, your

8    testimony in legislative settings and we've

9    covered two examples.

10           Is that the complete list of

11   legislative testimony that you've given?

12       A.      Yes.

13       Q.      Okay.

14       A.      And just for the record, I would

15   say my prior comment about, you know, I think,

16   you know, it's upsetting that workers may not

17   have a way to, like, address these grievances,

18   that's, again, not my expert opinion, that's

19   just my personal reaction to hearing their

20   stories.

21       Q.      Okay.  That's fair.

22           MR. WYATT:  How would now be for

23       a brief break?

24           THE WITNESS:  Sounds good.

25           MR. WYATT:  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 84

1           DR. LINDSEY CAMERON

2                THE VIDEOGRAPHER:  Going off the

3        video record.  The time is 3:25 p.m.

4                     -  -  -

5                (Whereupon, a recess took place

6        from 3:25 p.m. to 3:28 p.m.).

7                     -  -  -

8                THE VIDEOGRAPHER:  We are back

9        on the video record.  The time is 3:38

10       p.m., this begins Media Unit Number 2.

11   BY MR. WYATT:

12       Q.      All right.  Welcome back,

13   Dr. Cameron.

14               Ready to go?

15       A.      Ready.

16       Q.      All right.

17               I have received from your

18   counsel the retainer invoice that we discussed

19   and I'm going to introduce that as Exhibit 8,

20   just to identify it.

21                    -  -  -

22               (Whereupon the document was

23       marked, for identification purposes, as

24       Exhibit Number 8.)

25                    -  -  -

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 85

```
 1                DR. LINDSEY CAMERON
 2    BY MR. WYATT:
 3         Q.       And I'll share it, just so you
 4    can look at it quickly.
 5                  Does this look like that invoice
 6    dated May 23rd, 2024?
 7         A.       Yes.
 8         Q.       Sorry.  I didn't catch that.
 9         A.       Yes.
10         Q.       Okay.  Great.  I don't have any
11    questions about that.
12                  We were talking about your prior
13    testimony and I'll put that list back up for
14    us.
15                  And we're looking at Exhibit C
16    to your report, which is Exhibit 1 to this
17    deposition, and we talked about the first two
18    items, which were the legislative hearings, and
19    then there's six other items on the list, which
20    are all cases.
21                  Is that right?
22         A.       Correct.
23         Q.       Okay.  And it looks like
24    Numbers 3 through 7 out of 8, are cases that
25    were brought against Uber.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

```
 1                DR. LINDSEY CAMERON
 2                Is that correct?
 3      A.        Yes.  Number 7 is Uber and Lyft.
 4      Q.        I see that.  Okay.
 5                And were you retained as an
 6      expert on behalf of the plaintiff in -- in all
 7      these cases, including Number 8?
 8      A.        Which side is the -- I'm not
 9      sure which side is the plaintiff.
10      Q.        Oh, that's fair.
11                So that's -- in these cases,
12      that's going to be the side that is suing the
13      Uber, Lyft, Shipt, the companies.
14      A.        Yes.
15                Well, each one of those say
16      plaintiff on it, so I'm saying, yes, I was on
17      the plaintiff side.
18      Q.        Got it.  Okay.
19                And fair enough, you're not
20      steeped in plaintiff versus defendant, but I
21      think -- yeah.  Okay.  I think we're talking
22      about the same thing.  Okay.
23      A.        I just -- I just don't want to
24      make a mistake because I know we speak two
25      different languages.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 87

```
 1                  DR. LINDSEY CAMERON
 2        Q.        We do.
 3                  And that's clear on the record,
 4   so I think we're good for this one, but as
 5   those issues of legal versus academic or
 6   whatever the appropriate label for your field
 7   is, just flag those things for me and we'll
 8   work it through if we have to define terms or
 9   anything, I appreciate that.
10                  So you've testified against Uber
11   in at least five lawsuits before this one.
12                  Is that a fair summary?
13        A.        Yes.
14        Q.        Okay.  Can you describe at a
15   high level, what the cases against Uber were
16   about?
17        A.        At a high level, I believe those
18   cases are about -- the first one, two, three --
19   the four, that are all by Kherkher Garcia,
20   Number 6 was by Kherkher Garcia, was about
21   back -- like something about pay, I think.
22                  Like, classification was in
23   there, but I think they were really about
24   getting paid for -- for workers.
25                  And 7 was about, I think, worker
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 88

1              DR. LINDSEY CAMERON

2    classification, maybe, with also pay involved,

3    but I really just talked about control.

4          Q.      Okay.  And fair enough.

5              Your focussed on your role in

6    these cases, it sounds like you weren't super

7    deep in the specific facts of each case.

8                  Is that fair?

9          A.      That's correct.

10         Q.      Okay.

11             Generally speaking, were the

12   opinions in these cases also focused on topics

13   like organizational control and algorithmic

14   management?

15                 MS. POLLOCK:  Object to form.

16                 THE WITNESS:  Can you say the

17        question one more time?

18   BY MR. WYATT:

19         Q.      Sure.

20             Were your opinions in these

21   cases against Uber also about topics like

22   organizational control and algorithmic

23   management?

24                 MS. POLLOCK:  Object to form.

25                 THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 89

```
 1                 DR. LINDSEY CAMERON
 2    BY MR. WYATT:
 3         Q.        And I'm -- I'm not trying to be
 4    tricky, I just want to understand.
 5                   Is it basically the same topics,
 6    or is there one sort of very different from the
 7    one issues you're discussing in your report in
 8    this case?
 9         A.        I don't understand the question
10    now.
11         Q.        Were you addressing topics like
12    organizational control in each of these cases?
13         A.        Yes.  I was.
14                   Organizational control,
15    algorithmic management, yes.
16         Q.        Were there any other topics that
17    you addressed in these cases that you don't
18    touch on in the report, in this case?
19         A.        No.  I don't think so.
20                   I talk about more things in this
21    report than I did in the prior reports, but I
22    don't -- well, that's not true.
23                   There's some -- some of those
24    cases, because they're, like, with an
25    individual, there's, like, specific things
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 90

```
 1              DR. LINDSEY CAMERON
 2   around that individual that came into each of
 3   the report -- that -- that was, you know, I
 4   guess, the equivalent in this would be when I
 5   talked about, I think, the five bellwethers or
 6   the five individuals.
 7        Q.      Okay.  Okay.  That's understood.
 8                Okay.  So -- and you mentioned
 9   this already, but the Massachusetts AG case,
10   that one involved not just Uber, but also Lyft.
11                Is that right?
12        A.      Correct.
13        Q.      And tell me about your process.
14                Do you reuse parts of prior
15   reports in reports for subsequent cases, in
16   part, at least?
17                MS. POLLOCK:  Object to form.
18                THE WITNESS:  I have reused
19        parts of one case for another case, if
20        the questions are similar or related to
21        one another.
22   BY MR. WYATT:
23        Q.      Okay.  And --
24        A.      And if my opinion hasn't
25   changed.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              DR. LINDSEY CAMERON
2              MS. POLLOCK:  I want to -- my
3        objection wasn't noted in the record, if
4        you could please note it.
5              Thank you.
6    BY MR. WYATT:
7        Q.      Let me -- let me just focus that
8    question on one part of the report here, on
9    page -- oops.  Hold on a second.
10             That's the wrong copy.
11             If we go to Paragraph 86 of your
12   report, which is on Page 42.  I just want to
13   make sure I understood this and I -- my guess
14   is that this is a -- an artifact of a -- a
15   reuse issue, but I just want to make sure I
16   understood it correctly.
17             So in this sentence, it says, "I
18   will describe the mechanics of a driver
19   completing a ride, which at this level of
20   generality is virtually identical for both
21   companies."
22             By both companies, do you mean
23   Uber and Lyft?
24       A.      Correct.  That's an artifact
25   from the Massachusetts report.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 92

1                  DR. LINDSEY CAMERON

2        Q.        Okay.  And there might be a

3   couple other places where this happens, but if

4   that happens, you're -- I can assume both

5   companies really, for purposes of this case,

6   just means Uber.

7                  Is that fair?

8        A.        Exactly.

9                  And also, when you think about

10  my research, my research is about ride-hailing.

11  So I looked -- there's part of my theorizing

12  that -- that algorithmic management work is

13  very similar on Uber and Lyft and similar --

14  you know, similar sort of ride-hailing

15  companies.

16                 So often, many -- if you read my

17  papers, it's not so much, like, I'm pointing a

18  finger at Uber, I'm more speaking about the

19  industry more generally.  So, yes, if you see

20  artifacts in both companies, it's an artifact

21  from the Massachusetts case.

22       Q.        Okay.  And are you relying on

23  any materials that you reviewed in the

24  Massachusetts case to support your opinions in

25  this case?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 93

1                    DR. LINDSEY CAMERON

2          A.        I have access -- I don't have

3    any of the materials from the Massachusetts

4    case.  I shred everything at the end of the

5    report.

6          Q.        Okay.

7          A.        But I -- it's -- it's in my

8    head.  It's in my general knowledge.

9          Q.        Sure.  Okay.

10                   And would the same be true for

11   the other cases against Uber, that you would --

12   you would have had the materials for a time,

13   but shredded them and they're not forming any

14   of your opinions in this case either?

15         A.        Correct.  I'm a former CIA

16   officer, so that was part of my training.

17         Q.        Sure.  All right.

18                   Fair enough.  Fair enough.

19                   If anyone knows when to shred

20   stuff, it should be you.

21                   Is that fair?

22         A.        Yes, sir.

23                   MS. POLLOCK:  Objection.

24                   MR. WYATT:  I didn't mean it

25        that way.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

```
 1              DR. LINDSEY CAMERON
 2              I thank you for your service is
 3        where I was going with that, actually,
 4        but I went to -- to Argo, the movie about
 5        being out of Iran as the -- under siege.
 6              THE WITNESS:  Thank you.
 7              I appreciate it.
 8   BY MR. WYATT:
 9        Q.    Okay.  So -- let's see.
10              Let me just get us back to the
11   list here.  And then Number 8 is not a case
12   involved -- why -- oh, no, is it a case
13   involving ride-hailing companies or not, it's
14   Attorney General Versus Shipt, and I don't know
15   if Shipt is the only defendant?
16        A.    No.  It doesn't involve a
17   ride-hailing company.
18        Q.    What at a high level is that
19   case about, if you know?
20        A.    I don't.
21        Q.    Do you know if Mr. Okapaku is an
22   expert also in the Shipt case?
23        A.    I don't.
24        Q.    Okay.  So you didn't respond to
25   his opinion in that case, as far as you know?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 95

```
 1              DR. LINDSEY CAMERON
 2      A.        I didn't know he was part of
 3  that case.
 4      Q.        Okay.
 5                And in the Shipt case, are you
 6  also addressing issues of organizational
 7  control or is it about other topics?
 8                MS. POLLOCK:  No.  Hold on.
 9                I'm going to instruct the
10          Witness to be careful not to disclose any
11          information that is subject to any kind
12          of confidentiality arrangement you have,
13          if you haven't been disclosed yet, your
14          opinions.
15                MR. WYATT:  Oh, that's fair.
16                It only says deposition and
17          subject to protective order.
18                Okay.  That's fine.
19  BY MR. WYATT:
20      Q.        I mean, do you know at a high
21  level what the allegations in the case are?
22  Did I ask you that already?
23      A.        The case has settled.
24      Q.        Okay.
25      A.        So I think you can find out all
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 96

1              DR. LINDSEY CAMERON

2    the information you want that way.

3         Q.      Got it.  Okay.  All right.

4              Let's go earlier in your report,

5    and here you're describing your qualifications,

6    in Paragraph 4.

7              You're currently an assistant

8    professor in management at the Wharton School

9    of the University of Pennsylvania, is that

10   correct?

11        A.      Correct.

12        Q.      And you say in Paragraph 5, you

13   teach an executive course on the future of work

14   in graduate classes on managing emerging

15   enterprises, right?

16        A.      Correct.

17        Q.      And what topics do you cover in

18   those, in that courses, in those --

19        A.      In that -- yes.

20              In that course, I cover

21   motivation, incentive systems, job design,

22   hiring, performance appraisals, organization

23   design and high-performance work systems.

24        Q.      And do you teach classes that

25   are based on the work that you're relying on in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 97

1              DR. LINDSEY CAMERON

2    this case about the gig economy and

3    ride-hailing platforms?

4         A.      Yes.

5         Q.      And what's that course about or

6    what's that course called?

7         A.      The -- my class on motivation.

8    I talk a lot about the ride-hailing industry.

9         Q.      Okay.  And it says you also --

10        A.      Oh, well, there's another class

11   I talk more about the package delivery industry

12   which, sorry, you asked me about Uber.

13        Q.      Okay.  Okay.  Fair enough.

14              You also say you hold, in

15   Paragraph 4, a courtesy appointment in

16   sociology at the University of Pennsylvania.

17              Is that right?

18        A.      Yes.

19        Q.      And does that mean you teach

20   classes there as well?  What does a courtesy

21   appointment entail?

22        A.      No.  I don't teach classes in

23   sociology.  I just give talks in the sociology

24   department, and I review for sociology

25   journals, but, no, I don't teach in that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 98

1              DR. LINDSEY CAMERON

2    department.

3         Q.      Okay.  And then it says, you are

4    a faculty associate at the Harvard Law School's

5    Berkman Klein Center for Internet and Society,

6    right?

7         A.      Yes.

8         Q.      And what do you do in that role?

9         A.      I've given talks at

10   Berkman Klein.

11        Q.      Okay.  On what types?

12        A.      The gig economy.

13        Q.      Okay.  Do you teach any courses

14   on employment law?

15        A.      No.

16        Q.      Are you an expert in employment

17   law?

18        A.      No.

19              MS. POLLOCK:  Object to form.

20              Go ahead.

21   BY MR. WYATT:

22        Q.      It also says here, faculty

23   affiliated and prior fellow at the Data and

24   Society Research Institute in New York City,

25   right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 99

1                    DR. LINDSEY CAMERON

2          A.        Correct.

3          Q.        And what do you do in that role?

4          A.        So I was there for a year where

5     I was involved in, like, a research project

6     that they helped support.

7                    I gave talks.  They write a lot

8     of policy, briefs or give presentations, I give

9     feedback on.  I mean, so now, as a fellow, it's

10    more giving talks, giving feedback, going to

11    conferences they host, things like that.

12         Q.        Okay.  And same thing, like, do

13    you -- when you give talks here, is it on the

14    same topics we've been discussing?

15         A.        Yes.

16         Q.        Okay.  And then if we go to

17    Paragraph 7, it says, "As an organizational and

18    management scholar, my research is grounded in

19    the disciplines of psychology and sociology,

20    and my research program is primarily

21    qualitative and draws on the norms and

22    standards of qualitative methodology in the

23    organizational management field which

24    emphasizes in-depth immersion and observation."

25                    Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 100

1                    DR. LINDSEY CAMERON

2        A.        Yes.

3        Q.        And then it goes on to say,

4   "Research using qualitative methods is among

5   the most impactful, highly cited, and

6   ground-breaking in the field of organizational

7   management, evident in the numbers of awards

8   and citations as compared to studies that use

9   other research methodologies."

10                  Do you see that?

11       A.        Yes.

12       Q.        And what is this relevant to?

13                  You state qualitative methods is

14   amongst the most impactful.

15                  Compared to what other methods?

16       A.        Qualitative methodologies.

17       Q.        Okay.  And why is that?

18                  Why is that -- well, you say

19   most impactful.

20                  Are you saying more impactful

21   than qualitative methods?

22       A.        Yes.  I'd say more impactful

23   and -- and there is specific research I'm

24   drawing on.

25                  When you look at the number of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 101

1                      DR. LINDSEY CAMERON

2     best paper awards in our field, if you see that

3     as a recognition of impact, because it is

4     field-wide, they disproportionately vote to

5     qualitative papers.  I was just teaching this

6     on Monday.

7                      Six out of the past eight best

8     papers awards in a particular journal has gone

9     qualitative methods, and qualitative

10    researchers are probably only about 10 to 15

11    percent of the field in terms of number of --

12    of researchers.

13         Q.      And when you say the field,

14    like, which fields specifically are you --

15         A.      Organizational management,

16    organizational theory, organizational behavior.

17         Q.      -- okay.

18                 And so, that's the metric that

19    you're using, is awards and numbers of

20    citations within that field, qualitative versus

21    quantitative?

22                 Is that right?

23         A.      Awards.  I didn't -- I didn't

24    say -- well, I'm trying to think about

25    citations.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 102

1          DR. LINDSEY CAMERON

2               Off the top of my head, I don't

3    remember the -- the actual -- which study,

4    which says more citations go to qualitative

5    papers, but off the top of my head, I know

6    awards disproportionately go to those who do

7    qualitative research.

8          Q.      Okay.  And why do you think

9    qualitative research is awarded more frequently

10   than quantitative research in this field?

11         A.      Because it generates new

12   theories.

13         Q.      And are new theories valued more

14   highly than testing old theories or why does

15   that make something more likely to be awarded,

16   in your view?

17              MS. POLLOCK:  Object to form.

18              THE WITNESS:  In our field, and

19         I think in academia in general, the core

20         is how do you create new knowledge?

21              Quantitative research can just

22         test what is already existing, so there's

23         limited theoretical contribution there.

24              You use qualitative research

25         when you're trying to study something

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 103

```
 1              DR. LINDSEY CAMERON
 2        that's new or groundbreaking phenomenon,
 3        which is what the gig economy is.
 4                And so because qualitative
 5        research is a method poised to look at
 6        new and emerging phenomenon, it allows us
 7        to push what we know about theory and
 8        that's one of the reasons it receives so
 9        many awards.
10   BY MR. WYATT:
11        Q.      I see.
12                So academia places an emphasis
13   on development of new theories, is that what
14   you're saying?
15                MS. POLLOCK:  Object to form.
16                THE WITNESS:  I'm saying
17        academia values creating new knowledge.
18                And qualitative research is
19        suited to create new knowledge and
20        develop new theories, because it allows
21        you to look at new phenomenon, as opposed
22        to quantitative research, you are just
23        testing what is already known, so the
24        contribution is more limited.
25   BY MR. WYATT:
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

```
 1              DR. LINDSEY CAMERON
 2       Q.       And quantitative research is
 3   there to validate the new theories that
 4   qualitative research creates?
 5                Is that a right way to think
 6   about it?
 7                MS. POLLOCK:  Object to form.
 8                THE WITNESS:  Not quite.
 9   BY MR. WYATT:
10       Q.       In what way?
11                MS. POLLOCK:  Object to form.
12                THE WITNESS:  A quantitative
13           theory can never actually test the theory
14           that qualitative proposes, because
15           qualitative theory is much -- it's more
16           abstract.
17                It's more generalizable, it's
18           what we would consider like grand
19           socialist theory about how systems works.
20                You know, what a quantitative
21           measure can do is only test a very small
22           part of that and it can't -- you know, it
23           has to make lots of assumptions and its
24           measurements and what constructs it can
25           map on to.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

1                  DR. LINDSEY CAMERON

2                  So your -- I think the comment

3            of, can you -- do you test quantitative

4            theory with qualitative, just doesn't

5            make sense, from within the lens of our

6            profession.

7     BY MR. WYATT:

8            Q.        Okay.

9                       I think I understand that.

10                      So how does one know whether a

11    qualitative theory is correct?

12           A.        So there's a great book that I

13    cite in the report.  I think it's Small and

14    Calarco, 2022.  It's called Developing

15    Qualitative Literacy and they have six

16    different dimensions.

17                      I mean, these are people who are

18    not only award-winning qualitative researchers,

19    but like sit on the board of the

20    National Science Foundation for, like,

21    evaluating these research proposals, and I also

22    do work at the National Science Foundation.

23                      But if there's, like, six

24    different things about how can you test a

25    qualitative research and the theory is

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

1                  DR. LINDSEY CAMERON

2    rigorous.

3                  I'm not going to remember all

4    six, but I know they're in the paper, but it

5    includes, like, palpability of the data,

6    heterogenically, the rest are in there, but

7    there's -- there's a system of how do you

8    evaluate qualitative research.

9                  And I think qualitative research

10   goes to the peer-review process, just like

11   quantitative research.

12   BY MR. WYATT:

13       Q.      Do you know if theories

14   generated through the qualitative process have

15   been accepted to the form of expert opinion by

16   courts of law?

17                  MS. POLLOCK:  Object to form.

18                  THE WITNESS:  I don't even know

19       how to answer that question.

20   BY MR. WYATT:

21       Q.      Is that something that people in

22   academia think about when crafting theory as --

23   as whether those theories would be accepted in

24   a court of law?

25                  MS. POLLOCK:  Object to form.

Page 107

```
1              DR. LINDSEY CAMERON
2                   Calls for a legal conclusion and
3         complete hypothetical.
4                   THE WITNESS:  I've never thought
5         of this question before.  I don't know if
6         I can answer.  I don't think I can say
7         this question.
8    BY MR. WYATT:
9         Q.      Have you published your work
10   previously in law reviews or law journals?
11        A.      No.  I have not.
12                I have some qualitative work in
13   law journals, though.  Veena Dubal, if you're
14   familiar with her work?
15        Q.      I am not, but I'll take a look
16   at it.
17        A.      She publishes a lot about the
18   ride-hailing industry and Uber.
19                She's at UC Hastings.
20        Q.      How do you spell the last name?
21        A.      Dubal, D-u-b-a-l.
22        Q.      Okay.
23        A.      I actually have an article
24   coming out with her shortly.
25        Q.      Okay.  What about?
```

Page 108

1                    DR. LINDSEY CAMERON

2         A.        The concept is called Ghost

3    Variables.  So it's about how things, like,

4    race, gender, cast, immigration status,

5    actually shape work in the gig economy, but we

6    often don't see these variables and we're just

7    focused on the technology.

8         Q.        Is that also a qualitative

9    piece?

10        A.        It's more like a review essay.

11                  So a lot of -- it's almost like

12   an edited volume, so where people put in their

13   different pieces.  So my piece is theoretical.

14   I don't remember what type of data that Veena

15   is using in her piece.

16        Q.        Okay.  Switching gears slightly

17   to your -- your -- your studies, prior to your

18   current role.

19                  Your undergraduate and masters

20   degrees are in electrical engineering, computer

21   science and engineering management.

22                  Is that right?

23        A.        Correct.

24        Q.        And what was the path for you

25   from electrical engineering to structural --

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 109

1              DR. LINDSEY CAMERON
2      I'm missing the second word, but your current
3      role?
4          A.       Ethnographer.
5          Q.       Ethnographer.
6          A.        It's funny that you ask that,
7      we're actually not as unusual as you would
8      think.  There are quite a few of us who start
9      in engineering and then end up doing
10     qualitative research, but, you know, I was
11     living in the Middle East for many years and
12     decided it was time for a career change and was
13     thinking about should I get an MBA or a PhD,
14     and I mentor said, hey, you're really smart I
15     think you're going to want to get a PhD, that
16     you won't be satisfied with an MBA, and that's
17     why I ended up in the PhD program.
18         Q.       But teaching at business school,
19     so you kind of have the best of both worlds?
20         A.        I enjoy being -- I enjoy my
21     academic life.
22         Q.       Okay.  Okay.
23                  Did you study psychology or
24     sociology at all as an undergraduate or
25     master's student?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

```
 1               DR. LINDSEY CAMERON
 2        A.       I did take a class in psychology
 3   as an undergrad.  I'm trying to think.  I felt
 4   like I took -- and I think I took some that
 5   might have been sociology in public health,
 6   maybe, as an undergrad too.
 7               I'm not sure of my master's
 8   program.  I know I learned a lot about
 9   terrorist and counter-terrorism psychology, but
10   I can't remember if that was in my degree
11   program or that was more of my job because, you
12   know, I served in the Middle East for a long
13   time.
14        Q.       And what was your role when you
15   were in the Middle East?
16        A.       I worked with the U.S.
17   Intelligence Community.  I was an analyst.
18        Q.       And did that draw in your --
19   your undergrad background, your electrical
20   engineering and computer science skills?
21        A.       It did.  Also drew on my French
22   and Arabic skills.  It drew on my understanding
23   cultures, like culture and how people work and
24   think.  It was very interdisciplinary, my work
25   in the government.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 111

1              DR. LINDSEY CAMERON

2        Q.        Did you ever take any classes on

3   law in any of your -- in any of your education?

4        A.        No.

5        Q.        And then if we look at your CV,

6   you got your PhD in 2020?

7        A.        Correct.

8        Q.        And how long was that program?

9        A.        I entered in 2013.

10        Q.        And did you focus on

11   organizational management for that entire

12   period or no?

13        A.        My first year I was more micro,

14   I focused more on organizational behavior.  But

15   by my second -- beginning of my third year, I

16   was more in organizational theory.

17        Q.        Okay.  And then when did you

18   begin your project of driving on and speaking

19   with drivers on, you know, who used the Uber

20   platform?

21        A.        2016.

22        Q.        Okay.  And how long that that

23   project continue?

24              MS. POLLOCK:  Object to form.

25              THE WITNESS:  I would say it's

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 112

1            DR. LINDSEY CAMERON

2        not over.  This is all -- this is all my

3        research.  This is all I do.

4    BY MR. WYATT:

5        Q.      Okay.  Fair enough.

6                But it was -- I mean, there was

7    a -- there was a dissertation that some of the

8    work was done for.

9                Is that fair?

10       A.      Yes.  That's true.

11       Q.      And what was the kind of

12   dissertation era of this project?

13       A.      I finished my dissertation in

14   2020.

15       Q.      Okay.  And did you continue,

16   though, driving on the platform after 2020?

17       A.      No.

18       Q.      Did you continue interviewing

19   drivers and riders after 2020?

20       A.      Yes.

21       Q.      And do those interviews continue

22   to this day of drivers and riders?

23       A.      No.  So after 2020, I only

24   actually interviewed drivers.  I don't think I

25   interviewed riders after 2020, and I have not

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 113

```
 1                    DR. LINDSEY CAMERON
 2   interviewed a driver in the United States since
 3   2020, I believe.
 4          Q.       Okay.
 5          A.       Approximately I've interviewed
 6   drivers in other areas of the world since then,
 7   but I think that's when I stopped interviewing
 8   drivers in the United States, I think.
 9          Q.       And have your -- have your
10   opinions changed since your dissertation at
11   all?
12          A.       They've become much more refined
13   since my dissertation.  That is clear.
14          Q.       Okay.  Can you think of some
15   specific examples of the ways it's been more
16   refined?
17          A.       I mean just, you know, the way I
18   talk about autonomy and control, it's a
19   dissertation, so it's not nearly as precise as
20   the way I talk about autonomy and control and
21   flexibility right now.
22                   You know, there are different
23   levels of rigor that are required to graduate
24   with a dissertation versus getting a paper
25   published.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1          DR. LINDSEY CAMERON
2               And, you know, if -- like, one
3    of my papers has won like six or seven
4    different paper awards, so it's obviously a
5    very different -- or final product than what my
6    dissertation was.
7          Q.     Okay.  Let's -- sorry.
8               MR. WYATT:  Okay.
9               I'm introducing your
10         dissertation as Exhibit 9.  It should be
11         arriving in just a second.
12                    -  -  -
13              (Whereupon the document was
14         marked, for identification purposes, as
15         Exhibit Number 9.)
16                    -  -  -
17   BY MR. WYATT:
18         Q.     -- (inaudible) -- one second.
19              Okay.  Is this it?
20         A.     Yeah.  That's it.
21         Q.     Hopefully not giving you any --
22   (inaudible)?
23         A.     A little bit.
24         Q.     -- all right.
25              If we go to -- okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 115

1              DR. LINDSEY CAMERON

2                   If we go to Page 50, you write,

3      "Several factors distinguish ride-hailing

4      companies from liveries, resulting in their

5      classification and regulation as technology

6      companies.  While both ride-hailing drivers and

7      taxi drivers are independent contractors,

8      ride-hailing drivers own or lease vehicles from

9      an approved third-party vendor as opposed to

10     owning an medallion."

11                  Did I read that correctly?

12     A.        Yes.  You did.

13     Q.        Okay.  And is that still your

14     understanding of ridesharing companies and

15     their comparison and contrast from liveries and

16     taxis?

17                  MS. POLLOCK:  Object to form.

18                  THE WITNESS:  So one thing --

19          you know, are independent contractors, I

20          would say are classified as independent

21          contractors.

22                  I mean, I'm not making a

23          statement about whether or not -- what

24          the legal classification of these workers

25          should be, understanding what is in law,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 116

```
 1              DR. LINDSEY CAMERON
 2          but there is a lot more that
 3          distinguishes ride-hailing companies from
 4          taxis than just that first sentence that
 5          I have written.
 6      BY MR. WYATT:
 7          Q.       And what are some of those
 8      things, if you have anything specific in mind,
 9      that distinguished them from taxis?
10          A.       I would imagine, if we kept
11      reading, I would start listing some of them,
12      but the first thing that comes to mind is
13      algorithmic management.
14          Q.       Okay.  Anything else?
15          A.       Yeah.  Let me -- I'll sit here
16      and think for a minute.
17          Q.       Sure.
18          A.       So the algorithmic management
19      includes a lot of things about rating, pricing,
20      maybe where the vehicle can't -- or well --
21      where not the vehicle can travel to, that's
22      actually outside of algorithmic management.
23                   The safety checks for each --
24      for taxis and ride-hailing companies might be
25      different.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 117

1              DR. LINDSEY CAMERON

2                 By far the business model and

3       where profits go, or -- you know, the loyalty

4       programs that -- that ride-hailing companies

5       have, the taxi companies don't have is another

6       difference.

7                 I mean, this is not -- I'm

8       telling you what I know from knowing the --

9       like, my expertise, but I -- like, it's not

10      my -- I have not written a paper that compares

11      taxis versus ride-hailing drivers and I think

12      Nick Ochutu, in 2017, did.

13                I mean, other people have,

14      that's just not the type of paper I've written

15      before.

16           Q.      Okay.  Okay.

17                And I appreciate that.  Okay.

18                I think that's all the questions

19      I have on this for now.  We may come back to

20      this, but we'll take it down.

21                And shifting gears here to your

22      report, which I'll put back up here in a

23      minute, but you're here today as a -- as a

24      rebuttal expert.

25                Is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 118

1                    DR. LINDSEY CAMERON

2        A.        Yes.

3        Q.        And I think you're rebutting

4    certain opinions by Mr. Okapaku.

5                    Is that your understanding as

6    well?

7        A.        Correct.

8        Q.        Anybody else that you -- any

9    other expert on the Uber side that you're

10   responding to or intending to respond to?

11       A.        No.  I haven't -- I haven't read

12   anybody else's rebuttal report.  And -- oh, and

13   I just wanted to add, I think Veena Dubal has

14   written a lot comparing taxis to Uber drivers.

15       Q.        Okay.  Appreciate that.

16                   Do you have a view as to what

17   makes your report a rebuttal report?

18                   MS. POLLOCK:  Object to form.

19                   Calls for a legal conclusion.

20                   THE WITNESS:  Can you say it one

21       more time?

22   BY MR. WYATT:

23       Q.        Sure.

24                   Your report is titled Rebuttal

25   Report.  I'm just wondering if you have a view

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 119

```
 1               DR. LINDSEY CAMERON
 2    as to what makes it a rebuttal report.
 3               MS. POLLOCK:  Object to form.
 4               THE WITNESS:  I think what makes
 5          it a rebuttal report is I sort of go and
 6          dispute things that the other person said
 7          and provide rationale, reasoning,
 8          backing, about why I'm disagreeing about
 9          certain points they raised.
10    BY MR. WYATT:
11          Q.     Okay.  And do you think there
12    are parts of your report that would standalone,
13    even if you weren't responding to Mr. Okapaku
14    specifically?
15               MS. POLLOCK:  Object to form.
16               THE WITNESS:  What does that
17          mean, standalone for what?
18    BY MR. WYATT:
19          Q.     Well, is there a version of this
20    report that you could write that wouldn't be
21    responsive to any particular expert, but would
22    just be a report of yours on the issues you
23    discuss in the report?
24               MS. POLLOCK:  Object to form.
25               THE WITNESS:  It could be,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 120

1                    DR. LINDSEY CAMERON

2           depending on what question you ask.

3     BY MR. WYATT:

4           Q.        That's fair.

5                     And I guess what I'm getting at

6     is, you do address Mr. Okapaku in some parts of

7     your report but not others, is that fair?

8                     MS. POLLOCK:  Object to form.

9                     THE WITNESS:  I address

10          Mr. Okapaku directly in the first part

11          where I say, summary of -- what do I call

12          it?  Summary of Rebuttal Arguments.

13                   But then I -- the -- the other

14          part of the report, I sort of add in all

15          the reason, like, that's a summary and

16          then the rest of my report speaks to why

17          I'm able to have the rebuttal against

18          him.

19                   It's, like, providing the -- the

20          evidence or the data I need for the

21          summary claims.  So, in my mind, they

22          speak to one another.

23    BY MR. WYATT:

24          Q.        Okay.  So the first -- let's

25    see -- in Paragraphs 14 -- the section you just

Page 121

```
 1              DR. LINDSEY CAMERON
 2   described is called -- I'll start over.
 3                Part 3 of your report is
 4   Summary of Rebuttal Arguments RE, Joseph
 5   Okpaku's Report, correct?
 6        A.        Correct.
 7        Q.        And then Paragraphs 14 through
 8   25 kind of speak directly to Mr. Okapaku and
 9   his opinions, right?
10        A.        Correct.
11                MS. POLLOCK:  Object to form.
12   BY MR. WYATT:
13        Q.        And then, I'll represent to you,
14   Mr. Okapaku is not mentioned in Paragraphs 26
15   through 98, which is the rest of the report.
16                Is all of those -- are all of
17   those paragraphs, though, responding to
18   Mr. Okapaku?
19        A.        I see them as responding to
20   Mr. Okapaku, because in the paragraphs -- lets
21   say in Paragraph 14, I sort of have -- I think
22   actually Paragraph 16 is actually a better
23   example.
24                You know, I say -- the name of
25   the industry is ride-hailing, then I talk about
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

```
 1                DR. LINDSEY CAMERON
 2    algorithmic management by saying Uber matches
 3    workers and customers and then I say, see
 4    Section IX.
 5                So while the second half of the
 6    report doesn't actually say Mr. Okapaku's name,
 7    I don't see Paragraph 16 as standing on its own
 8    without Section IX, because Section IX is the
 9    one that provides all the research and the
10    detail to speak to it.
11         Q.     I see.
12                So 16 needs Section IX to flush
13    out what you're saying in 16.
14                Is that a summary of what you
15    just said?
16         A.     Yes.  I agree with you.
17         Q.     Okay.  But if we deleted
18    Paragraphs 14 through 25 and Section III and
19    left the rest of the report, would that report
20    standalone?
21                MS. POLLOCK:  Object to form.
22                Calls for a legal conclusion.
23                THE WITNESS:  So you asked me
24         that question before, and the question --
25         the -- the -- my response then is, well,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 123

```
 1              DR. LINDSEY CAMERON
 2        it would depend on what you want the
 3        report to be about, like, what the
 4        question is and whether or not it could
 5        actually standalone.
 6              I don't -- I don't know what the
 7        form of report is supposed to be.
 8  BY MR. WYATT:
 9        Q.        That's a totally fair response.
10              And I see, for example, in
11  Paragraph 2 of your report -- or actually
12  Paragraphs 1 and 2, under the heading,
13  Purpose of the Report, I have been asked -- and
14  then you kind of describe what you've been
15  asked to do.
16              Is that fair?
17        A.        Yes.
18        Q.        Okay.  So if I hear what you're
19  saying, you know, you've been asked to do a
20  thing and so whether the report would stand on
21  its own depends in part on whether you would
22  answer the question you've been asked to
23  answer.
24              Is that fair?
25              MS. POLLOCK:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 124

```
 1              DR. LINDSEY CAMERON
 2                THE WITNESS:  I agree.
 3                Yes.
 4   BY MR. WYATT:
 5        Q.      Okay.  Let me see.
 6                Let's go then to the specifics
 7   of the summary of the rebuttal, which starts at
 8   Paragraph 14 and I'll put this back on the
 9   screen so we can know --  be on the same thing.
10                All right.
11                In Paragraph 14, you write, "I
12   find the analysis and conclusions of
13   Joseph Okpaku's report incomplete and often
14   inaccurately.  Okpaku is not an academic and
15   has not received a PhD, though, I acknowledge
16   he's received a terminal degree in his field.
17   To the best of my knowledge, he does not teach
18   doctoral-level courses in any research
19   methodology and has not written any
20   peer-reviewed academic research", correct?
21        A.      Correct.
22        Q.      Okay.  Why is it important
23   whether Mr. Okapaku have a Phd, in your field?
24                MS. POLLOCK:  Object to form.
25                THE WITNESS:  So I didn't say he
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 125

```
 1              DR. LINDSEY CAMERON
 2       needed to have a Phd in my field, but
 3       there's a level of rigor, to be frank,
 4       that I didn't find in Joseph Okpaku's
 5       report.
 6              Even in reading his two medium
 7       articles, I found those to be puff
 8       pieces, you know, very -- and so the fact
 9       that he was not defining terms, not using
10       evidence that I would find rigorous or
11       critical, that all that made me not feel
12       like his report was incomplete and
13       inaccurate.
14              So does one need a PhD to be
15       able to have complete and accurate
16       results?  I mean, I'm sure there are
17       people that can do high-quality research
18       without a doctoral-level degree, but in
19       general, I found that his report was just
20       -- it was weak.
21   BY MR. WYATT:
22       Q.      And -- sorry.  Go ahead.
23       A.      I said it was weak, not
24   rigorous.
25       Q.      Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 126

```
 1              DR. LINDSEY CAMERON
 2              And if I asked why is it
 3   important that he doesn't teach doctoral
 4   courses and research methodology, would you
 5   have a similar answer?
 6              MS. POLLOCK:  Object to form.
 7              THE WITNESS:  I would say one of
 8         the ways you really get to know your
 9         craft is if you can teach other people
10         your craft.
11              And so, one, he hasn't sort of
12         -- in my mind, sort of shown the chops to
13         be able to do research.
14              And, two, he's not teaching,
15         which again, doesn't show the expertise
16         in being able to conduct research, but
17         also even being able to consume research.
18              I mean, some of the studies that
19         he cited were not considered rigorous or
20         well done or there was lots of research
21         he missed.
22              And so there's -- being able to
23         do research, there's also, can he even
24         evaluate research?
25              So I didn't see him making any
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 127

```
 1              DR. LINDSEY CAMERON
 2       sort of these intellectual moves I would
 3       expect one to do in a solid expert
 4       report.
 5  BY MR. WYATT:
 6       Q.       And what's the metric you're
 7  using to evaluate the solidness of an expert
 8  report?
 9       A.       Well, I mean, part of it is what
10  I wrote in Paragraph 14 to 25.  There are all
11  of these critiques that I made about different
12  claims he was making.
13              I'm also looking at what type of
14  research that he's drawing on, whether it's,
15  you know, what his experience is, what research
16  papers he's citing, what reports he's -- he's
17  bringing on, how is he defining terms?  How is
18  he logically building an argument from topic
19  sentence to supporting evidence?
20              These are all different parts
21  of, like, how I would evaluate the solidness of
22  research.  And it's the thing that I do every
23  single day, you know, teaching my students, but
24  also as -- you know, on editorial boards of
25  journals or doing peer-reviewed research.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 128

1              DR. LINDSEY CAMERON

2      Q.        And so are you holding

3   Mr. Okapaku to a standard that would apply to

4   academic research?

5                  MS. POLLOCK:  Object to form.

6                  THE WITNESS:  That's an

7          interesting question and I would say not

8          quite, because I've seen good expert

9          reports from people who don't have PhDs.

10                 And so I do not feel the quality

11         of Joseph Okpaku's work was at that

12         level.

13   BY MR. WYATT:

14      Q.        Okay.  But you're not aware of

15   what the standard is for the admissibility of

16   expert testimony in a court of law, correct?

17      A.        No.  Actually, I'm not.  No.

18      Q.        Okay.

19                 And do you know -- are you aware

20   that one of the issues that may come up in

21   these cases is whether it relates to the legal

22   question of control?

23      A.        I think that will come up.

24      Q.        And do you think it would be

25   helpful in understanding the answer to that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 129

```
 1              DR. LINDSEY CAMERON
 2   question to have a law degree?
 3                   MS. POLLOCK:  Object to form.
 4                   THE WITNESS:  I can't answer
 5        that question.
 6   BY MR. WYATT:
 7        Q.        Fair enough.
 8        A.        Because control is defined
 9   differently in different disciplines.  I don't
10   know how conclusions are made in a court of
11   law.
12        Q.        Is that something that you
13   evaluated in your research, is how control
14   specifically is defined differently in
15   different disciplines?
16        A.        No.
17        Q.        Does it come up in the research
18   that you do?
19                   I mean, do you ever read a --
20   something in literature and say, they're really
21   not using control the way that I think -- I
22   think about it?
23                   MS. POLLOCK:  Object to form.
24                   THE WITNESS:  No.  I mean, in my
25        reports, I try to be very explicit.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 130

1              DR. LINDSEY CAMERON

2                  I'm using it from an

3       organizational lens.

4    BY MR. WYATT:

5       Q.        Do you do a lot of reading in

6    your field such that you encounter sort of

7    other fields' approaches to concepts that you,

8    you know, kind of focus on in your own academic

9    work?

10      A.        Sorry.

11                I wasn't -- I wasn't quite done.

12      Q.        I'm sorry.  Go ahead, please.

13      A.        But my thought was going along

14   your line of questions.  But there is a paper

15   where I talk about consent, and I do have a

16   discussion, how do you think about consent from

17   sociological perspective, a legal perspective,

18   an ethics perspective, a psychological

19   perspective.

20                So I do think about them and I

21   use them to inform my organizational theory,

22   but I don't say this is right or this is wrong.

23      Q.        Okay.  So are you -- are you

24   addressing the methodology that Mr. Okapaku

25   used in his report or something else?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 131

1              DR. LINDSEY CAMERON

2              MS. POLLOCK:  Object to form.

3              THE WITNESS:  I'm objecting

4        to -- I mean, there -- I have issues with

5        many things in Okpaku's report.  It's not

6        just the methodology.

7    BY MR. WYATT:

8        Q.       Okay.  And we'll look at -- your

9    summary, I think, raises some of those things,

10   and so maybe that's the best way to talk

11   through it, but if there's other things that we

12   don't cover that you think are important,

13   please let me know.

14              Turning to Paragraph 15, for

15   example, you start with, "Because it depends so

16   heavily on anecdotal information and lacks

17   rigorous analytical methodology, his report

18   lacks accuracy, validity and generalizability."

19              Do you see that?

20       A.       Correct.

21       Q.       And what's the anecdotal

22   information you're referring to here?

23       A.       Oh, there's one section where he

24   says, there was a summer I was in Washington,

25   D.C. and saw -- I think there was a government

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 132

1              DR. LINDSEY CAMERON

2     shutdown or the metro was not working, and I

3     saw a lot of people driving from ride-hailing

4     and there's another example where he's, like,

5     and I met a teacher who drove for Lyft during

6     her summer breaks.

7                   And it's -- I mean, it's not --

8     it's not even journalist, like, journalists

9     look at qualitative data and sort of build up

10    inferences.  You don't even have to do academic

11    research at the rigor I am, but there is a way

12    of which it almost felt like he was

13    cherry-picking a few personal examples from his

14    life and putting it into the report, and that,

15    to me, didn't feel rigorous.

16        Q.        And you would not characterize,

17    I take it, like, a structured interview of the

18    driver as anecdotal information or would you?

19                  I don't know.

20                  MS. POLLOCK:  Object to form.

21                  THE WITNESS:  So to give a full

22         answer, a structure -- I don't do

23         structured interviews.  I do

24         semi-structured interviews.

25    BY MR. WYATT:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 133

1          DR. LINDSEY CAMERON

2     Q.      Okay.

3     A.        And a semi-structured interview

4  has a question behind it and you're

5  interviewing more than one person.  You're

6  interviewing, you know, a group of people that

7  have been theoretically sampled for a

8  particular reason to answer a research

9  question.

10          And you're often collecting data

11  from multiple sources, maybe you're getting

12  archival data or you're working on the job or

13  you're interviewing people at different levels

14  in the organization.

15          So that's not -- anecdotal is,

16  like, I talked to my barber down the street,

17  which is quite -- there's no interview

18  protocol.  There's no research question.

19  There's no multiple sources of data.  They're

20  quite -- they're quite different.

21     Q.        And so a couple questions about

22  that.  You mentioned that there would be a

23  group of people that have been theoretically

24  sampled for a particular reason.

25          What does theoretically sampled

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

1              DR. LINDSEY CAMERON
2    mean?
3         A.      So theoretical sampling, I'll
4    probably try to describe abstractly and then
5    more specific.
6              It's, like, you have a research
7    question about X and in the beginning, X can be
8    very vague.  And so you're talking to people,
9    you're -- you're interviewing people, you're
10   collecting archival data, maybe you're -- you
11   know, looking at maybe getting some other type
12   of digital data, maybe like digital-trace data.
13              And as you're thinking, okay,
14   the question is no longer X, the question I
15   think I'm really interested in is X prime.  So
16   now I'm going to look for things that are
17   related to X prime.
18              So there's, like, a narrowing of
19   your research question and you might only now
20   interview people who are X prime people,
21   because that matches to what the theory is, so
22   that's not clear.
23              I can give you an empirical
24   example, but that's what theoretical sampling
25   is.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 135

```
 1                DR. LINDSEY CAMERON
 2      Q.        No I think that's clear enough
 3  for me to ask my next question, which is, is
 4  this different from random sampling as one
 5  would do in quantitative research?
 6      A.        Yes.
 7                It is the complete opposite.
 8                I just taught my PhD class on
 9  this yesterday.  Yes.  There's two different
10  motivations that go behind sampling happens of
11  qualitative versus quantitative.
12                Quantitative will -- can either,
13  one, do a representative sample, like, if
14  you're doing a national survey or can be
15  random, for example, like RCT, a random control
16  trial, that's because quantitative research
17  cares about the average.
18                Qualitative research cares about
19  variance.  And so because of that, you do the
20  theoretical sampling that I talked about.
21      Q.        That makes sense, but then
22  aren't there challenges to extrapolating from a
23  qualitative sample to a broad population?
24      A.        That's where your theorizing
25  comes in, is can you -- the claims of knowledge
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 136

```
 1              DR. LINDSEY CAMERON
 2   that you make are different from -- from
 3   quantitative research versus qualitative.
 4              Quantitative research is good
 5   if -- if I need to get my knee replaced, will
 6   this knee replacement work?  Qualitative
 7   research is about how systems and
 8   organizational processes unfold.
 9              So it's more about how
10   mechanisms and the lie of how something
11   happens.  So it's just different knowledge
12   claims that you're making.
13        Q.      I think I understand that, but
14   if we want to know, say, whether drivers in
15   general feel controlled by gamification, to
16   take an example, wouldn't we have to do a
17   quantitative analysis of that to know the
18   answer?
19              MS. POLLOCK:  Object to form.
20              THE WITNESS:  No.
21              I mean, there are many papers
22         that talk about this that use qualitative
23         research that are peer-reviewed that have
24         won awards, including my own research.
25   BY MR. WYATT:
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 137

1          DR. LINDSEY CAMERON

2       Q.      Well, does your research make

3    claims, though, about sort of what drivers

4    generally experience?

5               MS. POLLOCK:  Object to form.

6               THE WITNESS:  One of my papers,

7          so I'm thinking about the one about

8          workplace games and workplace games are

9          different from gamification and we could

10         have a conversation about that if that

11         becomes important.

12              I argue how workplace games are

13         a form of control and keep people

14         embedded in their work, and I mean, I am

15         not the only person that's come to this

16         conclusion.

17              I mean, Burawoy has, Salis has,

18         Rachel Sherman, I mean, there's at

19         least -- there are a lot of people who

20         have made similar claims and often from

21         qualitative data.

22    BY MR. WYATT:

23       Q.      Are the claims in your report

24    generalizable?

25              MS. POLLOCK:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

1          DR. LINDSEY CAMERON

2              THE WITNESS:  I would say yes,

3       they're generalizable.

4              So one of the hallmarks about

5       qualitative research, if you're trying to

6       speak to theory and it's very abstract,

7       is generalizable.

8              And there is -- there are tables

9       that I use in my doctoral class that has

10      these words that you think about, what

11      does generalizable mean from a

12      quantitative perspective versus what does

13      generalizability mean in a qualitative,

14      so the same word will have different

15      meanings depending on your methods.

16             But, yes, my research is

17      considered generalizable, but I also

18      think beyond the fact that just the fact

19      that it's peer-reviewed and won a bunch

20      of awards, there are multiple people who

21      have found this exact same finding, like,

22      not even just in ride-hailing, though

23      that is -- (inaudible) -- 2019, and

24      Vanderbrand and Chan, 2022, have all

25      found control being linked to gains in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 139

```
 1              DR. LINDSEY CAMERON
 2         ride-hailing.
 3                   But people have found this exact
 4         same phenomenon in lawyers, for example,
 5         or factory workers.  So when you have
 6         multiple people finding the exact same
 7         finding in multiple -- the same research
 8         cite and multiple research sites, that
 9         signals generalizability.
10    BY MR. WYATT:
11         Q.       Okay.  So let's go back to your
12    dissertation for a second.  And this is on
13    Page 99, it's limitations and future research.
14                   Do you see that?
15         A.       Right.
16         Q.       And you write, "Several of the
17    study's limitations provide opportunities for
18    future research.  You note that participants
19    were predominantly men and all were living in
20    North America.  And future research could
21    explore the transferability of the model to
22    contexts with different gender and cultural
23    compositions", right?
24         A.       Yes.
25         Q.       And so is this a statement that
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 140

1              DR. LINDSEY CAMERON
2    at least the dissertation was limited, in terms
3    of its generalizability?
4         A.        This is being taken out of
5    context, because I don't know what study we're
6    talking about and we were just talking about
7    workplace games, and I -- I talked about how
8    the workplace games concept is transferable to
9    all these different sites.
10              So this is -- what -- what is --
11    what is a research question I'm trying to
12    answer?  It has to be tighter.  You know, what
13    I mentioned earlier, like, this -- you know,
14    it's a dissertation, so it's more abstract, can
15    see, how does this fit in other settings?
16              So I don't know what the
17    research question is.  I'm not sure what the
18    right other settings are.
19         Q.        Okay.  This is from your
20    dissertation, right?
21         A.        Right.  But it says this study.
22    I don't know what -- there's -- it's a
23    two-study dissertation and actually games was
24    not part of this dissertation at this stage.
25              So this -- I feel like this is

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

```
 1              DR. LINDSEY CAMERON
 2   just taking -- it's not a fair comparison when
 3   you were asking me for about games and
 4   generalizability and then pulling out this one
 5   sentence from an older piece of research.
 6        Q.        And I didn't mean -- I didn't
 7   mean to focus on games, but my question was
 8   whether -- was more focused on whether this is
 9   a statement about this type of research in
10   general, qualitative research, or if it's just
11   limited to whatever was discussed in this
12   dissertation.
13        A.        Say that one more time?
14        Q.        Yeah.  Is this limitation about,
15   you know, what I said is generalizability, is
16   that applicable to qualitative research in
17   general or is this specific to the
18   dissertation?
19                  MS. POLLOCK:  Object to form.
20                  THE WITNESS:  I don't think I
21        quite am following the question.
22   BY MR. WYATT:
23        Q.        Well, let me -- let me try a
24   different document.
25                  Hold on a second.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

```
 1              DR. LINDSEY CAMERON

 2                  Let's do this.

 3              MR. WYATT:  This will be

 4        Exhibit 10.

 5                    -   -   -

 6              (Whereupon the document was

 7        marked, for identification purposes, as

 8        Exhibit Number 10.)

 9                    -   -   -

10              MR. WYATT:  Let's open it up on

11        the screen.

12  BY MR. WYATT:

13        Q.      Do you see this article on the

14  screen?

15        A.      Yes.

16        Q.      And this is an article that

17  you're a coauthor of, right?

18        A.      Exactly.

19        Q.      2023, Algorithmic -- Algorithmic

20  Management:  Its Implications for Information

21  Systems Research?

22        A.      Uh-huh.

23        Q.      And --

24        A.      I just want to note that

25  Manuscript ID says.R1, I'm not sure if that's
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 143

```
 1              DR. LINDSEY CAMERON
 2    the final version, because R1 usually implies
 3    it's a revision.
 4         Q.       Okay.  And I think that's fine.
 5    It does say for review only, so maybe this is
 6    not the final version?
 7         A.       Uh-huh.
 8         Q.       But I will want to ask you some
 9    questions about it, so just give me a second.
10                  Let's see.
11                  Okay.  Do you see this
12    conclusion, key takeaways for information
13    systems research?
14         A.       Yes.
15         Q.       Okay.  And then if we go down
16    toward the bottom, it says, "Future research
17    from an IS perspective", and does that mean an
18    information systems' perspective?
19         A.       Yes.
20         Q.       Okay.  "May therefore continue
21    to use qualitative methods such as ethnography
22    and discourse analysis of online communities."
23                  Do you see that?
24         A.       Yes.
25         Q.       And then, it says, "They're also
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 144

1                DR. LINDSEY CAMERON

2    suitable to study among those developing or

3    implementing algorithmic management", which is

4    what we've been talking about, right?

5         A.        Yes.

6         Q.        And then while many examine

7    algorithmic management from a worker

8    perspective, we also see the need to adopt from

9    a managerial perspective, right?

10        A.        Yes.

11        Q.        "Specifically, in-depth

12   qualitative accounts of how managers respond to

13   the introduction of algorithmic management and

14   the act on algorithm-based insights are key."

15        A.        Yes.

16        Q.        And then it says, "At the same

17   time, such methods face limitations, including

18   generalizability."

19        A.        Uh-huh.

20        Q.        Isn't that saying that

21   qualitative research has limitations, including

22   generalizability?

23        A.        That is what that sentence says.

24                  I did not write that sentence.

25        Q.        Okay.

Page 145

1                    DR. LINDSEY CAMERON

2          A.         I think you saw there was six or

3     seven co-authors there.

4          Q.         I did.

5                     So do you agree with that

6     statement?

7          A.         When you're thinking about

8     generalizability, I do believe you're

9     describing it -- the way you're asking, is it

10    representative of all people?

11                    That's not how I understand

12    generalizability to mean from a qualitative

13    perspective.

14                    So generalizability, to me, is,

15    is it a general process that can be replicated

16    in other contexts?  Yes, I think that's what

17    qualitative research is good at.

18                    Will there be a mechanism that

19    might change?  For example, the way I find that

20    workplace games are created in ride-hailing is

21    actually different a bit than how lawyers do

22    workplace games.

23                    But in my mind that is still

24    generalizable even if, like, all the -- it's

25    almost like A leads to B leads to C, that's

Page 146

1              DR. LINDSEY CAMERON

2    what generalizable.

3                But A prime, B prime, some of

4    the distinctions may not be exactly the same

5    and that's what quantitative research is good

6    at.

7                So if you're going to push me

8    on, like, generalizability, does it transfer

9    exactly the same across contexts?  I'd be like

10   well, no, that's not generalizable, but I don't

11   hold generalizability to that same standard

12   because that's a quantitative standard, I hold

13   it to a qualitative standard.

14       Q.      Okay.  Okay.  That's helpful,

15   thanks.  Let me ask you about reliability.

16               Is reliability a concept that

17   applies to qualitative research?

18       A.      It does.

19       Q.      And how -- how does it apply?

20       A.      So I am not going to remember

21   right now, off the top of my head, but I

22   believe what -- okay.  Let me take that back.

23               I think reliability is the work

24   of quantitative research.

25               Like, I have -- I have a whole

```
1                DR. LINDSEY CAMERON
2   deck where I say, these are the words in
3   quantitative research and it's what they
4   translate to qualitative research.
5                I think reliability is a
6   quantitative word that we actually -- we use to
7   be triangulation in qualitative research.
8        Q.       Okay.  And what does
9   triangulation entail?
10       A.       Triangulation is, can you get
11  the same piece of data -- and by data, I don't
12  mean, like, the same word, but like the same
13  concept, the same theme from multiple sources.
14               So can you get it from
15  observation and archival and from interviews
16  about a game?  It's not as if -- reliability
17  would be, like, could somebody else look at my
18  same data set and produce the same results, and
19  that's not qualitative, that's a quantitative
20  approach.
21               So I believe -- and quantitative
22  research, I think the right translation is
23  triangulation.
24       Q.       Okay.
25               And is reproducibility not a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                DR. LINDSEY CAMERON

2    focus of qualitative research?

3        A.        No.  Not so much.

4        Q.        And why is that?

5        A.        Because -- so there's different

6    perspectives in qualitative research.

7                 There's a -- it goes all the way

8    from interpretive to positive.  A positive is

9    would have a belief that it should be

10   replicable, like, someone else should be able

11   to look at my data, be able to do counts of how

12   many times somebody uses a positive -- word,

13   and put that in a progression model, that's the

14   minority of qualitative research and that's not

15   what I do.

16                The interpretivist is social

17   construction of knowledge, and so that is, that

18   one person could look at my dataset and they

19   could write an article about, I don't know,

20   odor work or the feminization of gig work and,

21   I'll write something about control.

22                But even though we have

23   different perspectives, one of the things that

24   gives the research rigor and validity is the --

25   you know, I talked about those six parts, is

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                DR. LINDSEY CAMERON

2    the data heterogeneous, is it palatable, et

3    cetera, but also the fact that my findings have

4    been sort of bound by other researchers and

5    other disciplines shows there's rigor in a type

6    of research that is more socially constructed.

7        Q.        Okay.  Let's go back to your

8    report.  So we're continuing through the

9    summary of rebuttal points and we're at

10   Paragraph 16.  And you write, the name of

11   the -- well, actually let's back up.

12               End of paragraph, you say; "a

13   "few of these mistakes', referring to mistakes

14   made by Mr. Okapaku, are discussed as follows."

15               So that brings 16, which starts,

16   "The name of the industry is ride-hailing, not

17   ridesharing."

18               Do you see that?

19       A.        Correct.

20       Q.        And then you go on and say, this

21   is one of the mistakes -- let me find the

22   language.  Oh, I'm sorry.  I'm looking at the

23   wrong thing.

24               "Common for those with a

25   superficial understanding of the industry",

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1              DR. LINDSEY CAMERON

2    correct?

3         A.        Correct.

4         Q.        You understand that the term

5    ridesharing is widely used to describe rides

6    obtained with Uber or Lyft, correct?

7         A.        A lot of people have a

8    superficial understanding.

9         Q.        Okay.  Well, I mean, is this

10    just a disagreement of terminology or just most

11    people are just wrong about this?

12              MS. POLLOCK:  Object to form.

13              THE WITNESS:  I honestly believe

14         that most people are wrong, because if

15         you look at the origin of what the

16         sharing economy means, that's actually

17         not what Uber is actually doing.

18              I do see it as a form of

19         greenwashing, of using this word sharing

20         that implies some sort of social

21         reciprocity like a time bank, which is

22         really not what Uber is not based off of.

23              And, you know, Alex Black talks

24         about this more in her book, so I would

25         recommend -- like, I've not written a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 151

1               DR. LINDSEY CAMERON

2          paper about this explicitly, but I think

3          in her book, from the best I can

4          remember, she talks about how this was a

5          purposeful phrase used as Uber grew to

6          sort of, you know, make it seem more

7          friendly and appealing and more, like,

8          you know, peer-to-peer, like, you're

9          getting into a car with, like, your

10         cousin or something like that.

11               She describes it as, like, a

12         purposeful choice by the company, to use

13         the word sharing as opposed to hailing or

14         something else.

15   BY MR. WYATT:

16         Q.      But let me ask you this, I mean

17    do you think that Mr. Okapaku has only a

18    superficial understanding of the industry,

19    whether it's called ride-hailing or

20    ridesharing?

21               MS. POLLOCK:  Object to form.

22               THE WITNESS:  It's a good --

23         that's a really good question.

24               Instead of -- I -- I still -- I

25         think I still agree with the word

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 152

```
 1              DR. LINDSEY CAMERON
 2         superficial, but there's a way in which
 3         his perspective was not critical.
 4              It's almost like there's --
 5         there's a veneer in how the company --
 6         any company wants to present itself.
 7              And Mr. Okapaku was very much
 8         repeating the veneer, which, to me,
 9         felt -- like, a superficial engagement
10         of, you know, he -- he lists -- I spoke
11         at Aspen, I spoke at all these big events
12         and I read all this academic research and
13         I've done this for years, and that
14         supposed knowledge of studying the
15         industry in depth and being an insider
16         was not -- it wasn't relevant in his
17         report.
18              It didn't show -- I threw in his
19         report because there was a veneer, a
20         superficial level of understanding that
21         was expressed in the report.
22    BY MR. WYATT:
23         Q.    And I mean, so you're aware that
24    Mr. Okapaku worked at Lyft for five and a half
25    years, correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 153

1              DR. LINDSEY CAMERON

2       A.        I thought it was -- it was Lyft,

3   right?  Yes.

4       Q.        Yeah.

5       A.        That -- yes.  I'm aware that,

6   and there's a level of critical --  like,

7   critical thinking that I did not see evident in

8   that report.

9       Q.        And did you know that he

10  worked -- he sort of had a direct hand in

11  helping develop legislation in several states

12  that govern ridesharing or ride-hailing?

13      A.        Yes.

14                I remember him writing that.

15      Q.        Okay.  But nevertheless, you

16  stand on your claim that he has only a

17  superficial understanding of the ride-hailing

18  industry?

19                MS. POLLOCK:  Objection.

20                Argumentative.

21                THE WITNESS:  So what I think my

22          express wording was that he expressed

23          only a superficial understanding in his

24          report.

25                His actual understanding might

Page 154

```
 1              DR. LINDSEY CAMERON
 2         be different, that's what I saw in the
 3         report, is I did not see critical
 4         thinking in that report.
 5                  Like, a -- I didn't -- yeah.
 6                  I -- the -- from -- from using
 7         the anecdotal evidence about the time
 8         where I talked to a teacher and she was
 9         working over the summer, to using the
10         word ridesharing, to the reports he was
11         reciting, it didn't -- the level of
12         sophistication in the report didn't match
13         what I would have expected someone with
14         his insight and experience to have.
15    BY MR. WYATT:
16         Q.      In your view, does anything
17    about, you know, his expertise turn on whether
18    he uses the term ridesharing or ride-hailing?
19         A.      I mean that --
20                  MS. POLLOCK:  Object to form.
21                  It calls for a legal conclusion.
22                  THE WITNESS:  Say that question
23         one more time?  Sorry.
24    BY MR. WYATT:
25         Q.      Is part of your critique of
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 155

1              DR. LINDSEY CAMERON

2    Mr. Okapaku's ability to offer an opinion on

3    these issues turn on his use of the term

4    ridesharing or ride-hailing?

5          A.        That was just one of many things

6    that I saw in the report.  That's not, like,

7    the lynch pin of using the word ridesharing as

8    opposed to ride-hailing.

9          Q.        Okay.  And in fact, you've used

10   the word ridesharing in your only published

11   work, is that correct?

12         A.        I may have made that mistake

13   very early on.

14         Q.        But you've changed your mind

15   since then?

16         A.        Yes.  Yeah.  I'm an academic.

17                   This is -- this is what I think

18   about all the time.  My thoughts do evolve and

19   change.

20                   Because when you really do try

21   to understand what the sharing economy is

22   about, you do realize that's not actually what

23   most of the economies do.  They're not having

24   the same ethos as the sharing economy.

25         Q.        Let me show you one article.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 156

```
 1                 DR. LINDSEY CAMERON
 2                 MS. POLLOCK:  We've been going
 3         an hour.  I don't know if now is a good
 4         time for a break or after you get through
 5         this document?
 6                 MR. WYATT:  Let's just do this
 7         document, because it will close out this
 8         topic of ridesharing versus ride-hailing
 9         and it will only take, like, two minutes,
10         if that works for you?
11                 MS. POLLOCK:  Okay.
12                     -  -  -
13                 (Whereupon the document was
14         marked, for identification purposes, as
15         Exhibit Number 11.)
16                     -  -  -
17                 MR. WYATT:  All right.  So I'm
18         introducing what is Exhibit 11.
19  BY MR. WYATT:
20         Q.       I'm going to say it's going to
21  take two minutes, but I have not yet mastered
22  the introductions exhibits, so it takes less
23  than two minutes just to introduce it, but here
24  we are.
25                 Do you recognize -- this is on
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 157

                    DR. LINDSEY CAMERON

1   the screen -- this article?

2        A.      Yes.

3        Q.      Okay.  And the title -- you see

4   the title, Ridesharing Services, we don't need

5   to belabor it, but this is an article that uses

6   that term, correct?

7        A.      Yes.  It was an earlier article

8   that I've written in 2008 with -- the

9   co-authors in another academic discipline,

10  you'll see I'm the first author.

11               But I'm not actually sure the --

12  the field was still trying to figure out, is it

13  ridesharing or is it ride-hailing too at the

14  time we were writing that.

15       Q.      And to be clear, this is 2018,

16  correct, not 2008?

17       A.      Yeah.  Sorry if I misspoke.

18               2018.

19       Q.      Okay.  Do you know if these

20  authors, your co-authors, still use the term,

21  ridesharing?

22       A.      No.  I don't know.

23       Q.      Do you still work with these

24  folks on other academic projects?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1            DR. LINDSEY CAMERON

2      A.        No.  I don't.

3      Q.        Okay.

4            MR. WYATT:  Okay.  Yeah.

5            Why don't we stop right there

6      and take a break?

7            THE WITNESS:  Okay.

8            THE VIDEOGRAPHER:  Going off the

9      video record.  The time is 4:49 p.m.

10                 -  -  -

11            (Whereupon, a recess took place

12      from 4:49 p.m. to 5:04 p.m.).

13                 -  -  -

14            THE VIDEOGRAPHER:  We are back

15      on the video record.  The time is

16      5:04 p.m.

17            This begins Media Unit Number 3.

18  BY MR. WYATT:

19      Q.        Welcome back, Dr. Cameron.

20            We were talking about the

21  summary in your report of -- rebuttal to

22  Mr. Okapaku and we left off at Paragraph 16.

23            Do you remember that?

24      A.        Yes.

25      Q.        So let me put the report back on

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 159

1           DR. LINDSEY CAMERON
2    the screen.  And moving on to Paragraph 17, you
3    write, "Another example of Okpaku's inaccuracy
4    is that the word, control, a key concept in
5    this case, is not defined in his report."
6                    Do you see that?
7         A.       Yes.
8         Q.       What is your understanding of
9    why control is a key concept in this case?
10        A.       Because it was a lot of the
11   conversations that I had with Jo Anne was about
12   control.
13        Q.       And you say it is quite common,
14   further down, right here, "This
15   misunderstanding of control is quite common for
16   those with a surface-level understanding of the
17   on-demand economy", right?
18        A.       Correct.
19        Q.       And similar to the questions we
20   discussed previously, notwithstanding the fact
21   that Mr. Okapaku worked for Lyft for five and a
22   half years, your opinion is that he has a
23   surface-level understanding of the on-demand
24   economy, correct?
25        A.       My opinion is that he expressed

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 160

DR. LINDSEY CAMERON

1
2     a surface-level understanding, because he used
3     the word control, almost in a colloquial way,
4     not in a -- a way that actually had rigor or
5     teeth around it.
6                    I was surprised, to be honest,
7     given his amount of expertise or working in the
8     gig economy to see that in his report.
9         Q.       And part of what you're saying
10    here is part of the way he talks about control
11    is quite a common way for people to talk about
12    control.
13                   Is that correct?
14        A.       It's a common -- a common way
15    for those with a superficial understanding,
16    like, the general public will think, oh,
17    ride-hailing drivers have control because they
18    can chose when they went to work.
19                   Take aside the point of whether
20    or not they actually have choice when they want
21    to work, really what they're talking about is
22    schedule flexibility.  So there's, like, a
23    slippage in terms of the concept.
24                   And I do think many people have
25    a slippage of understanding what's really

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 161

1                  DR. LINDSEY CAMERON
2    happening in this form of work and use words
3    that are inaccurate.
4         Q.        And what's the definition of
5    control that you use in your report?
6         A.        We have to go through the report
7    to find which paragraph, but I know I define
8    it.
9         Q.        Yeah.  Let me try to shortcut
10   it.  Let me fast forward and you can tell me if
11   this is right or not.
12                  Would this be where it is, how
13   organizational scholars define organizational
14   control and its importance?
15        A.        Yes.
16                  It would be in that section.
17        Q.        Okay.  And down here in
18   Paragraph 36, it says, "In the management and
19   organizational literature, organizational
20   control is defined as any process that aligns
21   an individual worker's capabilities,
22   activities, and performance with the
23   organization's goals and aspirations", correct?
24        A.        Correct.
25        Q.        And is that the definition that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 162

```
 1              DR. LINDSEY CAMERON
 2   is your operating definition in this report?
 3        A.      It is.
 4        Q.      Okay.  Is it your view that how
 5   organizational scholars define organizational
 6   control is the relevant definition of control
 7   for this case?
 8        A.      I can't --
 9              MS. POLLOCK:  Object to form.
10              THE WITNESS:  -- oh, I can't
11        answer that question.
12   BY MR. WYATT:
13        Q.      Okay.
14              MR. WYATT:  And I'll close down
15        and introduce a new exhibit.
16                    -  -  -
17              (Whereupon the document was
18        marked, for identification purposes, as
19        Exhibit Number 12.)
20                    -  -  -
21              MR. WYATT:  This will be
22        Exhibit 12 and I'll put it on the screen.
23        This is the report of Mr. Okapaku.
24   BY MR. WYATT:
25        Q.      And you've seen this before,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 163

1                    DR. LINDSEY CAMERON

2    correct?

3            A.        Can you scroll down a little

4    bit?

5            Q.        Yeah.

6            A.        Yes.

7            Q.        Okay.  And if we go to Page 29

8    of his report, he has this concluding

9    paragraph, "For all of the above reasons, it is

10   my opinion that drivers have significant

11   control over the amount of their participation

12   on the Uber app, and that Uber does not

13   exercise control over drivers".

14                    Do you see that?

15           A.        Yes.

16           Q.        And he's not mentioning

17   organizational control, correct?

18           A.        Correct.

19           Q.        And he's also talking about --

20           A.        Wait.  That's not true.

21                    Uber does not exercise control

22   over its drivers.  To me, that sounds like

23   organizational control, even though he's not

24   using the word organizational in front.

25           Q.        Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 164

1              DR. LINDSEY CAMERON

2              But he's not using the word

3  organizational, correct?

4       A.       Correct.

5       Q.       And he -- he is talking also

6  about the amount of control that drivers have,

7  correct?

8       A.       True.  He's using the word

9  control in two different ways in the same

10  sentence.

11       Q.       And what is the way that you

12  would think about the control that drivers

13  assert, from your perspective?

14              MS. POLLOCK:  Object to form.

15  BY MR. WYATT:

16       Q.       If any?

17       A.       It's different in every article,

18  to be honest, because it depends on how I'm

19  trying to theorize it.

20              So when you think of my

21  2024 ASQ, which is probably my most famous

22  work, I think of it in terms of consent and

23  I -- I define it as, like, engagement tactics

24  or deviant tactics with the work, and those are

25  both examples that people have in choice of the

Page 165

1              DR. LINDSEY CAMERON

2     algorithmic management system.

3          Q.        Okay.

4          A.        I try not to do what Mr. Okapaku

5     has done, which uses the same word two

6     different ways in the same sentence because

7     that's unclear and imprecise.

8                    But the way the choices that

9     drivers have, I theorize that in different ways

10    in my research.

11         Q.        And that's probably a little bit

12    of my question, which is, you wouldn't use the

13    term organizational control in describing the

14    amount of control that drivers have, however

15    you would describe that, correct?

16         A.        You used the word control twice

17    in the same sentence, but I do agree with the

18    essence of your question.

19                    It's not organizational control

20    is what's done by the organization.  The amount

21    of choice that the workers have is something

22    different.

23         Q.        And is that how you would refer

24    to it for the drivers' side is choice?

25         A.        Each -- is different, depending

Case 3:23-md-03084-CRB    Document 4795-4    Filed 12/23/25    Page 167 of 378

```
1                    DR. LINDSEY CAMERON
2    on what I'm trying to theorize.
3         Q.        I see that.  You said that.
4                   Okay.  I understand that.
5                   But choice would be one concept
6    that you use in papers previously?
7         A.        Yes.
8         Q.        Okay.  And I mean, do you agree
9    that drivers have significant control over the
10   amount of their participation on the app?
11                  MS. POLLOCK:  Object to form.
12                  THE WITNESS:  That's
13        interesting.
14                  I think it really depends on
15        how -- because the -- the language is a
16        bit imprecise.  It depends on how you
17        want to define it.
18                  If he is trying to say, amount
19        of participation equals when I sign up
20        for the app or when I sign on, I would
21        say people do have a fair amount of
22        choice in choosing when they're going to
23        sign on.  There's influence, but I would
24        say they have more choice.
25                  If you're talking about what
```

Page 167

1                    DR. LINDSEY CAMERON

2          actually happens when you're logged into

3          the app, then I would disagree with that

4          part of the sentence.

5    BY MR. WYATT:

6          Q.        And what's that based on, the

7    disagreement with -- the part when you're

8    logged in?

9          A.        Well, that's most of my

10   research, that talks about once you're logged

11   in, you're under the algorithmic management and

12   its control system.

13                    So from that, what he's written

14   is actually not clear to me what he's referring

15   to.

16         Q.        Well, do you agree that drivers

17   have choice as to when to log out of the app,

18   once they're logged in?

19                    MS. POLLOCK:  Object to form.

20                    THE WITNESS:  I would say, you

21          know, for the most part, yes.  I mean,

22          people declining on multiple rides in a

23          row, they're asked to leave the app,

24          they're logged off.

25                    So it's not a full unequivocal

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 168

```
1              DR. LINDSEY CAMERON
2         yes, but I would say that people do have
3         more choice in choosing when to log in
4         and when to exit the app.
5    BY MR. WYATT:
6         Q.       Okay.  And if they're logged off
7    because of multiple denials, they can log back
8    in, right?
9         A.       I'm not entirely sure.
10                 I don't think that's true.
11                 Let me -- that.
12                 In times of doing my research,
13   that has not been true.  I don't know what is
14   true at this moment, but I do believe -- I
15   think it's my 2024 ASQ, I talk about people who
16   did not -- you know, cut off multiple rides in
17   a row and then were locked out of the app for a
18   period of time and that's, you know, other
19   people have talked about that.
20                 So my question -- and by other
21   people, I mean other researchers.  So what I'm
22   trying to say is, no, I don't believe that
23   people have always just been able to log back
24   in if they've been logged out.
25        Q.       Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 169

1            DR. LINDSEY CAMERON

2                 And do you know whether that was

3       true on the Uber platform or the Lyft platform

4       or both?

5            A.       I can't remember off the top of

6       my head.  No.

7            Q.       Okay.  Let me put your report

8       back up.  And we're still on Paragraph 17 where

9       we're talking about the definition of control.

10                And further down, you write,

11      "Even if we were to exchange the word Okpaku

12      uses, control, with the more accurate word,

13      temporal flexibility, I will argue that

14      workers' temporal flexibility is quite

15      limited."

16                Do you see that?

17           A.       Correct.

18           Q.       And that is different from what

19      you have said about flexibility in the past,

20      correct?

21                MS. POLLOCK:  Object to form.

22                THE WITNESS:  I don't know.

23      BY MR. WYATT:

24           Q.       Well, earlier we saw your

25      testimony from 2021 where you highlighted

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 170

```
 1                DR. LINDSEY CAMERON
 2    flexibility as one of the virtues of driving on
 3    the platform, correct?
 4                MS. POLLOCK:  Object to form.
 5                THE WITNESS:  I think I would
 6         need to see both pieces side by side to
 7         be able to give you a -- a -- an
 8         appropriate answer.
 9    BY MR. WYATT:
10         Q.      Okay.
11         A.      Because -- because I would also
12    want to note in that sentence, I don't think
13    you read the whole sentence and there was,
14    like, a caveat that was in parentheses, so I
15    also want to make sure we get the full meaning
16    of what was meant behind that sentence.
17         Q.      So I think it gets back to the
18    point you were making a minute ago, right, this
19    second sentence, "While drivers do have choice
20    on when to log into the app, temporal
21    flexibility in terms of the timing of their
22    shift, their choices are greatly limited once
23    they are logged into the app and subject to
24    algorithmic management and control."
25                Is that what you were referring
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 171

1                    DR. LINDSEY CAMERON

2    to?

3          A.        That was a follow-on sentence,

4    yes, that I think puts that previous sentence

5    in -- in more context.

6          Q.        Okay.  And so, if I can pull

7    back up the testimony we had, in the testimony,

8    you recall the benefits section and the

9    challenges section.

10         A.        Yes.

11         Q.        And then in the benefits

12   section, Part B was, "there are many benefits

13   to driving."

14                   And down here, "most

15   importantly, because of the low barrier to

16   entry and scheduling flexibility, these

17   companies provide an opportunity for drivers to

18   earn who may not be able or even want to secure

19   traditional employment."

20                   Do you see that?

21         A.        Yes.

22         Q.        And then it emphasizes, again,

23   the flexibility of the schedule around health

24   issues or child or elderly care, correct?

25         A.        Correct.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 172

```
1                 DR. LINDSEY CAMERON
2        Q.        So do you disagree with that
3   now, or --
4        A.        No.  No.  Those two statements
5   are not in contradiction with each other.
6        Q.        -- okay.
7                  So it is an important feature
8   that there's scheduling flexibility, but,
9   nevertheless, there are limitations to that
10  once you're in the app?
11                 Is that your --
12       A.        Correct.  There are limitations
13  once you're in the app and other -- but I also
14  do believe there are limits -- there are
15  constraints around this scheduling flexibility
16  of when you are -- sorry.
17                 Let me strike that and go back.
18                 Scheduling flexibility is around
19  the timing of the shift.  I'm saying there is
20  some choice that workers have around the timing
21  of the shift.
22                 There are ways that it's being
23  influenced by organizational control that I
24  have talked about.  That's not in -- that
25  doesn't -- I think those are true between both
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 173

1                   DR. LINDSEY CAMERON

2      documents.

3                        Once you log onto the app, the

4      amount of algorithmic management and control

5      intensifies over workers.

6           Q.      Okay.  And do you think it's

7      true that drivers can be their own boss on the

8      Uber or Lyft platforms?

9                   MS. POLLOCK:  Object to form.

10                  THE WITNESS:  What do you mean

11          by that?

12                       Could you rephrase that?

13     BY MR. WYATT:

14          Q.      Well, you note in one of your

15     papers that studies have shown -- and I can

16     show you the paper.  I'll just pull it up.

17                  MR. WYATT:  Scratch the

18          question.  Hold on a second.

19     BY MR. WYATT:

20          Q.      Support For Social and Capital

21     Development -- this is the article we were

22     looking at right before the break, right?

23          A.      Yes.

24          Q.      I think this is the one that

25     talks about bowling alone, which is one of the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

```
 1                DR. LINDSEY CAMERON
 2    first books I read in college, so it's a trip
 3    down memory lane for me.
 4                Up here at the top of the second
 5    column, it says, "Studies that contribute
 6    insights from stakeholders, such as drivers and
 7    passengers, find that driver benefits include
 8    flexible work schedules and the opportunity to
 9    be their own boss."
10                Do you see that?
11        A.        Uh-huh.  Yes.
12        Q.        Do you disagree with that, that
13    drivers can be their own boss?
14        A.        I believe that drivers believe
15    they can be their own boss.
16        Q.        Okay.
17        A.        And the way that I'm using it
18    here and I use it in another paper that's about
19    to come out, I use it as a form of narrative
20    discourse that gives workers a sense of
21    autonomy over their work.
22                And so it -- it serves a
23    purpose, that sort of phrase, but that's -- I
24    mean, that's -- but that's different from
25    whether or not I believe whether or not they
```

Page 175

```
1                    DR. LINDSEY CAMERON
2    are their own boss.
3    BY MR. WYATT:
4         Q.        And so let's answer that
5    question.  Do you believe that they're their
6    own boss?
7                    MS. POLLOCK:  Object to form.
8                    THE WITNESS:  I actually don't
9         think I'm qualified to answer that
10         question because that requires me to
11         think about like employment status and
12         things like that.
13    BY MR. WYATT:
14         Q.        Okay.  Okay.  That's all the
15    questions I have on this one.
16                    Let's skip that one.
17                    Are you offering an opinion
18    about whether Uber has control over drivers
19    under state law?
20         A.        No.
21         Q.        Okay.  I think you said this
22    before, but is -- is organizational control not
23    a binary concept, as you use it?
24         A.        Correct.  It's not binary.
25         Q.        And -- and why is that?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

 1          DR. LINDSEY CAMERON

 2              Like, what is it instead of

 3   binary, is it like a spectrum?

 4       A.      It's a spectrum, but the more

 5   the way that we describe it in my literature

 6   it's a set of processes, so there's lots of

 7   different processes that can direct people's

 8   behavior like incentives or gamification.

 9       Q.      And do all organizations, in

10   your view, exercise some level of control over

11   workers?

12       A.      Yes.

13       Q.      Okay.  Let's go back to your

14   report.  Let's go up to -- I have some

15   questions about your methodology, which I --

16   some of your descriptions or what I understand

17   is your descriptions of your methodology happen

18   in the methodology section, but some of them

19   happen earlier, like here in Paragraph 7, so --

20   so just tell me if that's not correct and I'll

21   read to you -- what I specifically have a

22   question about before I actually ask you a

23   question.

24              So that's just a prelude.

25              You say, "My research program is

Page 177

1              DR. LINDSEY CAMERON

2    primarily qualitative and draws on the norms

3    and standards of qualitative methodology in the

4    organizational management field, which

5    emphasizes in-depth immersion and observation,

6    to see things from the experiential point of

7    view of actors in the field", correct?

8         A.        Correct.

9         Q.        And is that -- I see reference

10   methodology there, is that a fair summary of

11   your -- your methods?

12        A.        Yes.

13                  MS. POLLOCK:  Object to form.

14   BY MR. WYATT:

15        Q.        Okay.  And in the papers that

16   you've written, are the participant analyses

17   and the semi-structured interviews that you

18   performed, at least part of the data that you

19   would analyze in a qualitative method?

20        A.        Not every paper has those two

21   types of data, but that is some of the data

22   I've used.

23        Q.        Okay.  Is -- is the qualitative

24   method subjective?

25                  MS. POLLOCK:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 178

```
 1              DR. LINDSEY CAMERON
 2              THE WITNESS:  All quantitative
 3        and qualitative are both subjective.
 4   BY MR. WYATT:
 5        Q.      Okay.
 6        A.      It's a fallacy to think any
 7   method is objective, but there is an
 8   interpretive stance, which is a social
 9   construction of the knowledge in qualitative
10   research.
11        Q.      Okay.  Help me understand the
12   distinction between interpretive stance and
13   subjectivity, please.
14        A.      I don't think I can -- I want --
15   I don't think they mean the same thing, but I
16   think they are overlapping, but I couldn't,
17   right now, off the top of my head, give you a
18   good definition about one versus the other.
19        Q.      Okay.  Let's take -- suppose you
20   and one other structural ethnographer were
21   riding, in a ride-hailing setting and
22   interviewing the same driver.
23              Could the two of you have
24   different understandings of what the driver is
25   telling you in the -- in the interview?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 179

1          DR. LINDSEY CAMERON

2              MS. POLLOCK:  Object to form.

3              Incomplete hypothetical.

4              THE WITNESS:  So we talked about

5      this earlier, about how at a general

6      level, people can be at the same research

7      setting and make two different

8      conclusions.

9              So when you're asking the

10     question, would we disagree about what

11     the writer is telling us, we would all

12     have the same words on the piece of

13     paper, so I mean, that doesn't change.

14             Given all the other data we

15     might have, maybe we just interview that

16     one driver in common and we look at other

17     drivers, we interview other people

18     differently or have different archival

19     data or different access to the company.

20             And depending on our research

21     question, we might tell two different

22     research reports, you might come to two

23     different conclusions, but it doesn't

24     mean one is right and one is wrong.

25  BY MR. WYATT:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 180

```
 1              DR. LINDSEY CAMERON
 2        Q.        So you could have -- as long as
 3   you had access to the same dataset, you would
 4   be working with the same data and there would
 5   be a shared understanding of what that is, but
 6   you could have different interpretations of the
 7   same data.
 8              Is that what you're saying?
 9              MS. POLLOCK:  Object to form.
10              THE WITNESS:  In a more
11        interpretive transition.
12              So remember I talked about
13        interpretive versus positive?  A
14        positivist, you would come up with the
15        same conclusions, but with an
16        interpretive standpoint, you could come
17        to different arguments that you would
18        develop from the data -- from a similar
19        dataset.
20   BY MR. WYATT:
21        Q.        Okay.
22        A.        And I can think of one of --
23   like, the Mann Gulch fire, I don't know if you
24   ever heard of it, it was a big wild fire, I
25   think, happened out west.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 181

1              DR. LINDSEY CAMERON

2                   I mean, there have been six or

3    seven different papers that have looked at the

4    public records, I think, and interviews from

5    that fire and it made different arguments about

6    how people respond to organizational threats

7    into organizing -- high-threat environments.

8                   So, yes, from the same set of

9    data you can draw -- make different

10   conclusions.

11        Q.       So -- and I think you said this

12   earlier, but is a purpose of qualitative

13   research to create theory?

14        A.       Correct.

15        Q.       Is novelty important in the

16   field of qualitative research?

17                   MS. POLLOCK:  Object to form.

18                   THE WITNESS:  By looking at a

19        phenomenon that's new, it helps you push

20        to create new theory.

21                   So it's not novelty for novelty

22        sake.  It's more about, how do you -- you

23        can challenge existing sets of knowledge

24        by looking at a phenomenon that is

25        rapidly -- that's emerging.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

```
 1                    DR. LINDSEY CAMERON
 2    BY MR. WYATT:
 3         Q.       Okay.
 4                   And can qualitative research be
 5    tested or is that a quantitative term?
 6                   MS. POLLOCK:  Form.
 7                   THE WITNESS:  We talked about
 8         this earlier and I described that it's
 9         not how one understands qualitative
10         research.
11    BY MR. WYATT:
12         Q.       Yeah.  Let me see if I can skip
13    though some of these.  Hold on a second.
14                   Is another way to think about
15    qualitative research and theory creation, that
16    it's hypothesis generating?
17                   MS. POLLOCK:  Object to form.
18                   THE WITNESS:  That's an
19         interesting question.  There is some
20         qualitative research that's hypothesis
21         generating.  It's not the type of
22         qualitative research I do, though.
23    BY MR. WYATT:
24         Q.       Do you think grounded theory is
25    a method of hypothesis generation?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 183

1            DR. LINDSEY CAMERON

2      A.       The type of -- I said I'm not

3  familiar with the type of research that

4  generates hypothesis.  I'm not sure if they use

5  a grounded theory technique or not.

6      Q.       Okay.  Sorry.

7               Just give me a second.

8               You use grounded theory as your

9  methodology, is that correct?

10     A.       Correct.

11     Q.       And Glaser & Strauss, from 1967,

12  you cite.

13               Who are Glaser & Strauss?

14     A.       I believe they were

15  anthropologists.

16     Q.       Are they sort of the inventor of

17  qualitative theory or just leaders in the

18  field?

19     A.       They're two leaders of ground

20  theory.  Not of qualitative research.

21     Q.       Grounded theory.

22               Is grounded theory like a

23  specific branch of qualitative research?

24     A.       Exactly.  There are many

25  branches within qualitative research.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 184

1              DR. LINDSEY CAMERON

2      Q.        And what are some of the others?

3      A.        There's one called

4  Phenomenology, which looks at more narrative

5  experiences.  There's another one that's also,

6  like, a narrative centered -- critical

7  theorists that have a different way.

8               I mean, you could also look at

9  qualitative data can be, like, content

10 analysis, or coming up with -- of data to run

11 then through a requestion.  So there's a lot of

12 variability in qualitative methods.

13     Q.        Okay.  I want to see if I

14 understand this, so I'm going to introduce the

15 next exhibit, 13, which I will show you in just

16 a second.

17                   -   -   -

18               (Whereupon the document was

19        marked, for identification purposes, as

20        Exhibit Number 13.)

21                   -   -   -

22 BY MR. WYATT:

23     Q.        This is an article called "What

24 is Qualitative Research?  An Overview and

25 Guidelines."

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 185

```
 1              DR. LINDSEY CAMERON
 2              Do you see that?
 3       A.     Yes.
 4       Q.     Do you know who Weng Marc Lim
 5   is?
 6       A.     No.  And I've never even heard
 7   of this journal.
 8       Q.     Okay.  Well, I'm just going to
 9   -- it's not cited by you and I'm just going to
10   ask you if you agree with something that says
11   he says and explain what grounded theory is, so
12   let me get to that page.
13       A.     What field is he in?
14       Q.     Let's see.
15              So if we go to this page here,
16   he says, "Grounded theory, as proposed by its
17   founders, Glaser & Strauss", who we were just
18   discussing, right?
19              "Hinges on the notion that the
20   validity of a theory is contingent upon the
21   process of its derivation.  This represents a
22   departure from the deductive methods that start
23   with theories to form hypothesis or
24   propositions which are then empirically tested
25   and verified", correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

```
 1              DR. LINDSEY CAMERON
 2                  MS. POLLOCK:  Object to form.
 3                  THE WITNESS:  I -- I -- I read
 4          those two same two sentences.
 5   BY MR. WYATT:
 6          Q.      Is that accurate, this
 7   represents the departure from deductive methods
 8   that empirically test and verified hypothesis?
 9                  MS. POLLOCK:  Object to form.
10                  Lack of foundation.
11                  THE WITNESS:  So I agree that
12          qualitative research does not start with
13          hypotheses and that's different from
14          deductive.
15                  I mean, I'm -- I'm -- I'm
16          listening to see what the follow-on
17          question is going to be.
18   BY MR. WYATT:
19          Q.      Okay.  So let me ask my next
20   question, I wasn't sure if you were done
21   answering.
22                  If we go to Page 207, it says
23   down here, "Grounded theory serves as a
24   foundational strategy for elucidating processes
25   and contributing to the theoretical lexicon,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 187

1              DR. LINDSEY CAMERON
2    focusing on theory construction, e.g.,
3    hypothesis generation, rather than theory
4    verification, e.g., hypothesis testing."
5              Is that correct, as far as you
6    understand grounded theory?
7              MS. POLLOCK:  Let me just remind
8         the Witness.  You have the ability to
9         read this whole article, rather than
10        just --
11             THE WITNESS:  Right.
12             MS. POLLOCK:  -- to the extent
13        you see fit.
14             MR. WYATT:  I'll object to the
15        coaching, but you can go ahead and
16        answer.
17             MS. POLLOCK:  I object to your
18        objection that's coaching.  I'm reminding
19        the Witness she's allowed to look at an
20        entire document, as she sees fit.
21             THE WITNESS:  So I want to
22        say -- is -- I would need more time,
23        because I'm -- I'm not entirely sure if
24        you're taking things out of context in
25        this article, because this person doesn't

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 188

1              DR. LINDSEY CAMERON

2         look like they're in my field, because

3         the journal is called a marketing journal

4         and I'm not in marketing.

5              In general -- and I mean,

6         there's a split -- he put Glaser &

7         Strauss 1967, but there was a split

8         between Glaser & Strauss in the early

9         '90s.

10             You also see in my cite of that

11        paper, I'm citing Charmaz, 2001, and

12        Golden-Biddle and Locke of 2006, which

13        are much closer to management theory, the

14        way I understand it, which is not the

15        pure definition that's used in Glaser &

16        Strauss, both because Glaser & Strauss

17        split in the '90s, but two, it's not the

18        way it's done in organizational

19        literature in the exact same way.

20             So there's a way of which I feel

21        like there's some sort of peacemaking

22        that's made out of turn that's making me

23        feel uncomfortable, so I would like time

24        to look at the article.

25             But at a general level, I would

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 189

1              DR. LINDSEY CAMERON

2          say grounded theory does help you focus

3          on creating new theory.

4    BY MR. WYATT:

5          Q.      Okay.  And totally fair, you

6    haven't read the article, but just as an

7    abstract principle, as you understand grounded

8    theory, from your own understanding, do you

9    agree that it focusses on theory construction

10   more than theory verification?

11                MS. POLLOCK:  Object to form.

12                THE WITNESS:  So I've said

13         earlier before that qualitative methods

14         is about constructing new theory, not on

15         verifying theory, that is more what

16         quantitative research does.

17   BY MR. WYATT:

18         Q.      Okay.

19         A.      And hypothesis generation is not

20   the only way to construct theory.

21         Q.      What are some other ways to

22   construct theory?

23         A.      I mean, it's -- if you read my

24   research, they all have different examples.

25                Often it can be a way of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 190

1              DR. LINDSEY CAMERON

2    creating -- creating a model, depicting a new

3    mechanism, showing a process.

4                   There are -- yes.

5                   And I would say actually,

6    thinking of hypothesis generation is what

7    qualitative research of grounded theories is

8    supposed to do, is actually a much older view

9    in my field and you don't see it as commonly

10   done, I would say, like, after 1995 or

11   something like that.

12                  It's not a frequent way that we

13   construct theory.  Some people still do it, but

14   it's not a majority way.  So that's, I feel a

15   lot is taken out of context, looking at this

16   random article in a journal that doesn't even

17   look highly ranked, Australian Asian Marketing

18   Research?  Like, how do I even know this is a

19   reputable source of data?

20        Q.      Do you agree that a limitation

21   of qualitative research is that it's

22   susceptible to researcher bias?

23                  MS. POLLOCK:  Object to form.

24                  THE WITNESS:  I wouldn't use the

25        word limitation.  In fact, if you look at

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 191

1          DR. LINDSEY CAMERON
2      the limitation section of most management
3      papers, they don't -- nobody says this.
4              What -- any research is subject
5      to bias.  So what is important is how you
6      have triangulation, how do you account
7      for any biases you might have in a way to
8      create a stronger research process.
9              So what you're describing,
10     really, isn't something that we
11     consider -- it's -- it's -- it's a way in
12     the qualitative research process, a way
13     to account for, because quantitative
14     research has bias in it as well.
15  BY MR. WYATT:
16     Q.      And how do you account for
17  qualitative bias and qualitative research?  I
18  think I know how to do it in quantitative
19  research, but I'm also familiar with
20  qualitative research.
21              How do you control for bias in
22  qualitative research?
23     A.      I think that would be an
24  interesting question to -- to ask you how you
25  think you account for quantitative research

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 192

1              DR. LINDSEY CAMERON

2    because most quantitative research doesn't

3    think there's bias in it.

4              But often, what you'll see is

5    individuals will write some sort of an appendix

6    where they're reflexus in their work.  They've

7    describe in their research methods section how

8    there was a surprise, so how they thought of

9    something as being X and then their mind

10   changed to Y.

11             And you'll see that very

12   commonly as a -- as something I describe in my

13   methods section.  And the fact that you can

14   sort of have validity in your change -- and

15   change the way you're thinking is a way to sort

16   of -- to show -- not so much as to say that,

17   like, you've controlled for the bias, that's a

18   quantitative word, but that you've recognized

19   it.

20             Also you collect data from

21   multiple sources.  So most of my studies have

22   multiple sources of data, like a ride-hailing

23   driver in multiple cities or interviewing

24   people in multiple cities, or -- from multiple

25   sources, so that's another way to sort of

Page 193

```
 1                DR. LINDSEY CAMERON

 2    account for biases.

 3         Q.      Is it important for qualitative

 4    research of algorithmic management to collect

 5    data on the platform or organizational level?

 6                MS. POLLOCK:  Object to form.

 7                THE WITNESS:  I think the real

 8         question is, important for what?

 9                It depends on what type of

10         argument you're trying to make.

11    BY MR. WYATT:

12         Q.      When would it be important?

13         A.      If I wanted to say something at

14    the firm level about -- and I'm kind of just

15    postulating right now because I don't ask these

16    types of research questions, but Möhlmann, et

17    all, 2022, M-ö with the two dots over it,

18    h-l-m-a-n-n, she has 2022 MISQ, where you've

19    interviewed, I think, platform -- like, actual

20    designers of the Uber technology.

21                And I think her research

22    question there was appropriate for that, but I

23    think she was looking at something more around

24    algorithmic design and so she needed to look at

25    designers of platforms for a research question.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

1                DR. LINDSEY CAMERON

2        Q.        I'm just going to go back to --

3    let's see -- Exhibit 10.  This is the

4    algorithmic management article, the one you

5    thought might not be the final version.

6                Do you remember that one that we

7    were talking about?

8        A.        Yes.  And that author, Möhlmann,

9    is actually one of the authors on that paper.

10       Q.        Oh, right here?

11       A.        Yep.

12       Q.        Got it.  Okay.

13                And so if we go to Page 10,

14   there's this table, "insights from the group

15   discussion on algorithmic management", right?

16       A.        Yes.

17       Q.        And here it says, in order to

18   fully grasp algorithmic management, it is

19   crucial to collect data on the platform or

20   organizational level, right?

21       A.        Yes.

22       Q.        And do you -- it sounds like you

23   agree with that in some circumstances, but not

24   others.

25                Is that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 195

1                DR. LINDSEY CAMERON
2                MS. POLLOCK:  Object to form.
3                THE WITNESS:  I would say that
4        architectural management is a really
5        large topic of study.
6                     There's some areas of
7        algorithmic management that you don't
8        need -- organizational level, to answer
9        your question.
10                    And there's some types of
11       research questions about how there's
12       algorithmic management that you would
13       want that.
14                    And I think Möhlmann's 2022
15       study is a good example of that.  She
16       looks at algorithmic management from a
17       different angle and she gets data from
18       those who work inside Uber the company.
19  BY MR. WYATT:
20       Q.      And let me ask you about this
21  last paragraph here, I'm going to read it and
22  then I'm going to ask you if you agree.
23               "Participant research, e.g.
24  researcher being an Uber driver themselves, is
25  valuable and helps widen perspectives and see a

Page 196

```
 1                  DR. LINDSEY CAMERON
 2    situation of workers on the ground.
 3                     A difficult aspect of this,
 4    however, is that the situation and design of
 5    platforms in each market can change quickly,
 6    and by the time a paper is published, the lived
 7    experiences by the researcher might not reflect
 8    the situation anymore."
 9                     Do you see that?
10        A.      Yes.
11        Q.      And do you agree with that?
12        A.      Yes.
13        Q.      Has that affected any of your
14    own research, looking back on it?
15                  MS. POLLOCK:  Object to form.
16                  THE WITNESS:  What do you mean,
17        has it affected any of my research?
18                  Can you say -- can you be a bit
19        more specific about what you're asking?
20    BY MR. WYATT:
21        Q.      Sure.
22                  So after you published an
23    article, have you ever gone back and looked at
24    it and thought, this doesn't really apply
25    anymore because the situation has changed?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 197

```
 1              DR. LINDSEY CAMERON
 2       A.       I think little pieces have
 3   changed.  I -- I'm not sure if Trip Radar was
 4   around when I collected the majority of my
 5   data, but my -- I do -- my overall theory, my
 6   overall argument, does stand, even though
 7   there's a little technical change in the app.
 8              But there are pieces that may
 9   be -- yeah -- one thing that changed, I think,
10   is Uber used to -- I felt -- people felt like
11   Uber used to match them based on geographic
12   proximity, and now there's a lot of more pieces
13   that I think go into the algorithm of that, I
14   think I also talk about that in my 2024 ASQ,
15   but those small empirical details changed.
16              Do I feel like my big argument
17   about algorithmic control, does that theory
18   still stand?  Yes.  And participant observation
19   is only a small part of all the data I
20   collected that goes into my research.
21       Q.       And what else goes into the
22   algorithm, beyond geographic proximity?
23       A.       What I believe also goes in and
24   that also comes from my research and also from
25   reading data from this report, might be the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 198

```
 1                    DR. LINDSEY CAMERON
 2    rating of the driver, whether maybe the rating
 3    of the customer, whether or not they've chosen,
 4    like, get rides to destination.
 5                    There's probably something I'm
 6    not sure, like, if they're on a quest or if
 7    they're in some sort of incentive program.
 8                    Like, for example, it used to be
 9    with the loyalty programs, you would get
10    priority matching if you were, like, at the
11    highest level, if you were, like, if you were
12    diamond or platinum.
13                    I also think about whether or
14    not someone has any safety violations in
15    their -- you know, in their history that might
16    affect who they might get matched with.
17                    So there are a lot of different
18    pieces, I think, that go into how the algorithm
19    gets matches, it's not just geographic
20    proximity.
21        Q.        And that's based on reading the
22    literature and reading the documents in this
23    case.
24                    Is that correct?
25        A.        Yep.  Exactly.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 199

1                    DR. LINDSEY CAMERON

2          Q.        Okay.

3                    Let me put your report back up.

4                    In Paragraph 8, you write, "as a

5     structural ethnographer, my approach to

6     research is worker-centered, seriously

7     considering workers' experience in my analysis

8     to develop broader claims about social

9     structures and processes."

10                   Do you see that?

11         A.        Correct.

12         Q.        And we've talked a little bit

13    about that today.  And I think we may have

14    talked about this as well, but just to be sure,

15    do you need a representative sample for

16    qualitative work like this?

17         A.        No.  You wouldn't want a

18    representative sample, you need to do

19    theoretical sampling.

20         Q.        That's right.

21                   And you said theoretical

22    sampling is not looking for -- because

23    representative looks at the median, the middle,

24    and not the whole picture.

25                   Is that right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 200

```
 1              DR. LINDSEY CAMERON
 2      A.         Exactly.
 3                 It's mean versus variance.
 4      Q.         Okay.  And so, statistical
 5   significance, is that a concept that applies in
 6   this situation or is that a --
 7      A.         Not at all.  Not at all.
 8      Q.         Okay.  And why not?
 9      A.         Statistical significance is
10   about you comparing two groups and whether or
11   not they're above or below some threshold.
12                 And I mean there's a whole
13   conversation about how statistics had decided
14   P less than .05 is the right number and how
15   that's grounded in, like -- like phrenology,
16   you know, the thing where they study people's
17   heads and determine if there are differences by
18   race.
19                 What I'm trying to say is, P
20   less than .05 is an arbitrary made-up number
21   when we compare groups, how we think there's
22   differences that has racial implications or
23   racial history behind it.
24                 That's not at all what we do in
25   qualitative research.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              DR. LINDSEY CAMERON

2              Qualitative research is about

3    going deep within, like, a phenomenon and

4    finding variance, maybe, between processes or

5    actions or events within that one process.

6         Q.      And you have referred earlier

7    today to this idea of triangulation, right?

8         A.      Correct.

9         Q.      And does triangulation also have

10   some sort of minimum number of samples you need

11   before you can really draw conclusions or not?

12        A.      No.  It really depends on what

13   your sample is.

14              Like, if I was studying the

15   Supreme Court and I had an NN9, that would be

16   great, you know, it doesn't -- your N could be

17   nine, your N could be 500, it depends on what

18   you're trying to get at.

19              N means sample size.

20        Q.      Yeah.  I got you there.

21              So what ingredients in

22   triangulation make you comfortable that the

23   conclusions you reach about drivers on the Uber

24   platform is generalizable?

25              MS. POLLOCK:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

1          DR. LINDSEY CAMERON

2               THE WITNESS:  Can you say that

3       one more time?

4    BY MR. WYATT:

5       Q.     Well, let me take a step back.

6    I'm linking triangulation and generalizability.

7               Are those two things related?

8       A.     Not quite, that's why I was

9    confused.

10      Q.     Okay.  Help me understand the

11   relationship between triangulation and

12   generalizability, do you need triangulation to

13   have generalizability?

14      A.     It's one of the things that

15   helps.  Generalizability is almost -- it's like

16   the outcome when you've done rigorous research,

17   and so triangulation is one of the components

18   that help make the research rigorous.

19      Q.     Okay.  Do you think for your

20   work, it would have been sufficient to -- to

21   make general conclusions, based on an interview

22   of just one driver on the Uber platform?

23               MS. POLLOCK:  Object to form.

24               THE WITNESS:  Not for the type

25       of research that I want to do -- not for

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 203

```
 1              DR. LINDSEY CAMERON
 2        the type of research questions I'm
 3        interested in, but there are people who
 4        have just interviewed one person and,
 5        like, followed them around for three
 6        years.
 7                  Here, again, I think you know
 8        Whitman 2013, she looks at ethological
 9        sensemaking and she lives with an Inuit
10        for three years and writes about
11        environment and change and management.
12                  So the end just differs, based
13        on your research, but on my research
14        question, no, just an N of one would have
15        been insufficient.
16   BY MR. WYATT:
17        Q.       And how did you decide when N
18   was enough for the purposes of your research?
19        A.       Theoretical saturation, which we
20   talked about before.
21        Q.       And remind me what theoretical
22   saturation is?
23        A.       Theoretical saturation is when
24   you are -- there's an iterative process of
25   which I cite this in Cameron 2022, why I
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 204

1              DR. LINDSEY CAMERON

2    collected data in like a tranche for a few

3    weeks.

4                  And I would analyze the data and

5    I would go and collect more data, and then I

6    would analyze it again, so this went back and

7    forth for 18 months.

8                  And toward the end of the

9    18 months, I was getting repetition across --

10   when I brought and collect data, it would just

11   confirm what I already had known and that's a

12   sign that you've reached theocratical

13   saturation and you can stop collecting data.

14        Q.      Okay.  All right.

15                Give me a second.

16                In Paragraph 10 you talked about

17   your own time driving on the Uber platform.

18                Do you see that?

19        A.      Yes.

20        Q.      Were you interviewing people

21   while work -- while working as a driver on the

22   platform?

23        A.      No.

24                Wait, do you mean interviewing

25   people in my car or interviewing drivers in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 205

```
 1                   DR. LINDSEY CAMERON
 2    general?
 3          Q.       Interviewing people in your car?
 4          A.       No.
 5          Q.       So how did you -- what was the
 6    output from the driving -- your driving
 7    experience that informed your research?
 8          A.       It's more -- it's like -- it's
 9    like a log of my rides and what happened on
10    each of the rides.
11          Q.       Okay.  So the -- the interviews,
12    the semistructured interviews and the
13    conversations, those were when you were not
14    driving yourself.
15                   Is that correct?
16          A.       Exactly.
17          Q.       Okay.  And what was the process
18    for one of these semistructured interviews, the
19    drivers?
20          A.       I would have a -- an interview
21    protocol and we would go through the interview
22    protocol.
23          Q.       And what would the interview
24    protocol consist of?
25          A.       Cameron 2022 has -- toward the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              DR. LINDSEY CAMERON
 2    bottom, it describes what the three different
 3    buckets are.
 4              They -- I can't remember off the
 5    top of my head, but they each -- there are
 6    three different themes that I ask questions
 7    around.
 8        Q.      Okay.  And that was kind of
 9    prepared in advance of the project and then
10    would be executed kind of in each driving
11    situation.
12              Is that how it worked?
13        A.      In each interview, correct, but
14    one of the things about theoretical samplings
15    that you're changing your interview as you're
16    collecting the data, because you're reading the
17    literature and getting sharper and sharper
18    about what your research question is.
19              So you don't ask the same
20    question in Interview 1 that you ask at
21    Interview 150.
22        Q.      And do you document your changed
23    approach in some ways?  Like, do you revise a
24    script or an outline or something --
25        A.      Yes.  I do analyze my outline
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              DR. LINDSEY CAMERON

2    after -- I think it was usually after every

3    five or seven interviews, I would revise it

4    some, but there are also semistructured

5    interviews, you also kind of go with the flow

6    of how -- what is important to the driver,

7    what's top of mind to them.

8         Q.      And do you still have those

9    outlines and protocols?

10        A.      So the best -- the best thing

11   that gets at this would be at the bottom of

12   Cameron 2022 where I, like, outline what I

13   cover in each chunk of the interview.

14        Q.      Okay.

15        A.      Because that stayed the same.

16        Q.      Okay.  And we talked before

17   about Mr. Okapaku's, you know, reliance on

18   anecdotal information and you've talked about

19   conversational interviews you've conducted in

20   addition to the semistructured interviews.

21             How are conversational

22   interviews different from the kinds of

23   anecdotal information Mr. Okapaku describes?

24        A.      The difference -- the

25   conversational interviews are actually more

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 208

```
 1                DR. LINDSEY CAMERON
 2   common in pure ethnography.  Like Vetchky
 3   (phonetic), 2003, relies on them quite a bit.
 4                Conversational interviews have a
 5   purpose behind them.  There's -- they're not
 6   the same as an interview protocol, but there is
 7   specific information or things that I'm asking
 8   them about in the conversational interview.
 9                But the majority of data that my
10   research is actually informed by are these
11   semistructured interviews, not the
12   conversational ones.
13                And there's also something about
14   the sheer amount of the number of
15   conversational interviews that make them
16   different from anecdotal and the fact that they
17   are housed within this larger research body,
18   which include driving, semistructured
19   interviews, archival, field surveys, financial
20   data, all these things make it not anecdotical.
21        Q.       And I think you mentioned
22   earlier you've done interviews both in
23   North America and outside.
24                Is that correct?
25        A.       Correct.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 209

1          DR. LINDSEY CAMERON
2      Q.      Do you know if you've
3  interviewed any drivers in Arizona?
4      A.      No.  I don't know.
5      Q.      Do you know if you've
6  interviewed any drivers in North Carolina?
7      A.      No.  I don't know.
8              I think the answer is no to
9  both, but I don't know.
10     Q.      And what about California?
11     A.      Yes.  I've interviewed drivers
12  in California.
13     Q.      You've worked with a research
14  assistant for some of this research that you
15  have done in the past.
16             Is that correct?
17     A.      Correct.
18     Q.      And the research assistant who
19  also was trained by you and collected research
20  data in a similar fashion.
21             Is that right?
22     A.      They -- they drove, so they had
23  driving logs they shared with me.
24     Q.      Okay.
25             So not -- not interviews, just

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 210

1                     DR. LINDSEY CAMERON

2       driving?

3             A.        In the North America data, I

4       conducted all the interviews.

5             Q.        Okay.  In Paragraph 10 here you

6       mention, "Outside of North America, my

7       ride-hailing datasets include interviews with

8       drivers, field notes from observations, forum

9       data and participants' artifacts."

10                     Do you see that?

11            A.        Correct.

12            Q.        And what is artifacts as you're

13      using in that context?

14            A.        Like, pictures.  Like screen

15      shots of them as they're driving, photos of

16      their cars, like, a lot of the rides are paid

17      in cash, so they have different places they hid

18      the cash in around the car.  Some of them do

19      strikes so they show pictures to me of like how

20      do we strike.  So artifacts basically mean,

21      like, visual images.

22            Q.        And we talked a little bit about

23      the kind of the timeline of your research in

24      this field and how in some ways it hasn't

25      ended.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 211

1          DR. LINDSEY CAMERON

2              But when was the last

3    semistructured interviews of someone that

4    you've done?

5          A.        This summer, August.

6          Q.        Okay.

7              And that was outside the U.S.

8              Is that right?

9          A.        Yes.  I'm trying to make sure

10   that's accurate.  Yeah.  I think it's August,

11   because I was teaching in September.

12         Q.        And is that the focus of your

13   current research, just out of the U.S. or not

14   necessarily?

15         A.        I'm -- I'm thinking for a

16   minute.  I've been writing a few conceptual

17   review pieces now, and in my empirical data

18   is -- yeah -- outside of North America right

19   now.  And I have a paper on DoorDash that's

20   about to come out.

21         Q.        Okay.  So you -- you continue to

22   do research elsewhere in the gig economy, not

23   just with respect to ride-hailing?

24         A.        Right.

25              If you look at that very last

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 212

1              DR. LINDSEY CAMERON

2    sentence, it mentions some of the other

3    companies I've studied, InstaCart, Task Rabbit,

4    Upwork.

5        Q.      Okay.  If we scoot forward to

6    the methodology section, there's three

7    paragraphs in the methodology section and I

8    think -- go through these and we can take

9    another break, if that makes sense?

10              So it's 26, 27 and 28, right?

11       A.      Yes.

12       Q.      Okay.  So in 26, you kind of

13   describe your academic background and current

14   focus, right?

15       A.      Correct.

16       Q.      Okay.  27 explains your research

17   program.  And I'm trying to condense this,

18   because we've talked about some of this stuff

19   before, but is that basically correct?

20       A.      Yes.  That's what Paragraph 27

21   talks about.

22       Q.      Okay.  And -- and you talk about

23   the -- the things we've been talking about,

24   semistructured interviews, conversational

25   interviews, right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 213

1                  DR. LINDSEY CAMERON

2         A.          Correct.

3         Q.          And are those methods that

4    you've used for this case?

5         A.          Are you asking if I conducted

6    interviews for this case?

7         Q.          Not exactly, because I think the

8    answer to that is no, because I think you

9    answered that previously.

10                    Is that right?

11        A.          Correct.  I didn't do any

12   interviews.

13        Q.          But we are in the methodology

14   section of your report here and so I'm just

15   trying to understand how these methods

16   described here relate to your opinions in this

17   case.

18        A.          So I see this Paragraph 27 is

19   more as a setup for the follow-on paragraph,

20   which is to say, I -- I collect a lot of

21   textual data and I analyze that data, draw

22   conclusions and write papers.

23                    And I use that similar grounded

24   theory approach that I've done to analyze all

25   this data in the U.S. and in the UK and like

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 214

1              DR. LINDSEY CAMERON

2    Brazil and all these places, I used a similar

3    sort of research methodology in going through

4    the data that I received from this case.

5         Q.        Okay.  So you're not doing

6    literally the same thing of interviewing

7    people, but you're using a grounded theory

8    approach to reviewing, I guess, the literature

9    and documents that you cite in this case?

10                  Is that the right way to think

11   about it?

12        A.        Exactly.

13        Q.        Okay.  And you mentioned here in

14   28, you say, this iterative process includes

15   reading materials carefully, iterative open and

16   focused coding, creating analytical categories,

17   writing memos, engaging in academic

18   conversations and drafting reports, correct?

19        A.        Correct.

20        Q.        Okay.  So did -- what, if any,

21   iterative open and focused coding did you do

22   here?

23        A.        So I mentioned -- so I get all

24   the paper in hard copy.

25                  So I have huge boxes of paper in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 215

1                   DR. LINDSEY CAMERON

2    my office and so I sort of skim through to

3    think about what's most important.  I think

4    the -- the data that comes directly from Uber

5    is most important.

6                   So then I start reading it and

7    thinking, okay, this is about, I don't know,

8    our rating system, this is about matching, and

9    I start creating all these little piles on my

10   floor.  This is the first round of coding of

11   the data.

12                  And then once I have a pile on,

13   say, algorithmic matching, I'll go through and

14   I'll starting putting it in smaller and smaller

15   piles and writing on pieces of paper, okay,

16   this fits to this, it fits to that, and that's

17   called focus coding, as I'm getting more

18   precise in my analysis and, like, moving things

19   between piles and seeing connections.

20        Q.       Okay.  Coding, in my head,

21   triggers spreadsheets.  So I want to ask, but I

22   get what you're saying.

23        A.       Oh, okay.

24        Q.       So creating analytical

25   categories, that sounds somewhat similar to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 216

DR. LINDSEY CAMERON

1

2    what you described, but is it something

3    different?

4          A.      Yes.

5                  Basically the -- the coding is

6    the fine grain of the data and then the -- the

7    category is, like, a level up or a level to, in

8    terms of abstraction.  So if they're -- they're

9    happening at the same time.

10         Q.      Okay.  And writing memos, did

11   you write memos as part of this exercise?

12         A.      I did but you can also think of

13   them as sections of the report, like,

14   everything went into the report.

15         Q.      Okay.  And you refer to engaged

16   in academic conversations.

17                 Can you tell me more about that?

18         A.      Yeah.  There are a few theories

19   in here that were new that I was thinking

20   about.

21                 One was on -- certification,

22   platform decay, another one was cultural

23   narratives, and so -- you know, if I have a

24   coauthor and I'm like, hey, you know a lot

25   about -- (inaudible) -- tell me about it?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 217

1          DR. LINDSEY CAMERON

2               And so, you know, I would talk

3    to them about the literature.  They would talk

4    to me about their ideas.

5               So I never would discuss

6    anything about the case, but there's a way of

7    which there's, like, a -- like, new ideas would

8    get clarified by talking about it to them.

9         Q.    Okay.

10              MR. WYATT:  Okay.  I think those

11        are my questions for methodology.

12              Is now a good time to take a

13        break?

14              MS. POLLOCK:  I think so.

15              THE WITNESS:  Yeah.

16              Sounds good.

17              MR. WYATT:  Okay.  You want to

18        just do ten minutes again?

19              THE WITNESS:  Great.

20              THE VIDEOGRAPHER:  Going off the

21        video record.  The time is 6:05 p.m.

22                   -  -  -

23              (Whereupon, a recess took place

24        from 6:05 p.m. to 6:20 p.m.).

25                   -  -  -

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 218

1              DR. LINDSEY CAMERON
2                  THE VIDEOGRAPHER:  We are back
3          on the video record.  The time is
4          6:20 p.m.  This begins
5          Media Unit Number 4.
6    BY MR. WYATT:
7          Q.        Welcome back, Dr. Cameron.
8          A.        Thank you.
9          Q.        So let me put your report back
10   up.  And we just finished the methodology
11   section and now we're in Section V, which is,
12   "Overview of on-Demand Labor Organizations and
13   Their Life Cycle."
14                  Do you see that?
15         A.        Yes.
16         Q.        And in Paragraph 29, you say "At
17   the most basic level, on-demand labor companies
18   are an intermediary that connect workers and
19   other parties, e.g., customers, clients,
20   merchants, to facilitate an economic exchange."
21                  Do you see that first sentence?
22         A.        Correct.
23         Q.        And does that apply to Uber, in
24   your view?
25         A.        Uber is an on-demand labor

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 219

1               DR. LINDSEY CAMERON
2    company.  I would not feel comfortable just
3    saying Uber is an intermediary, full stop.  To
4    me, that's too simple.  Though, I do know
5    there's some scholars in economics and
6    strategies that see differently than me.
7               But I would agree that Uber
8    connects workers and other parties to
9    facilitate an economic exchange.
10        Q.      Okay.  And what -- what more
11   than an intermediary do you view Uber as?
12               MS. POLLOCK:  Object to form.
13   BY MR. WYATT:
14        Q.      Or what else?
15        A.      So my research doesn't
16   particular tend to look at Uber as a noun.  It
17   looks at the processes that are underlining
18   Uber, so all the control that we've been
19   talking about.
20               And I'm just being thoughtful
21   here, because I know there are schools of
22   thought that don't -- when you just say
23   intermediary, they don't actually look at what
24   the intermediary does or how it has control or
25   ways that Uber claims -- or Uber, I don't think

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 220

1            DR. LINDSEY CAMERON

2    any gig economy company says they create

3    marketplaces when actually I don't see them

4    creating a marketplace.

5                 It's just -- it's a contested

6    term that's used differently across

7    disciplines, so I'm just trying to give you

8    more context on how I see it.

9        Q.      And just to flush out from my

10   own understanding, so you're suggesting that

11   intermediary can sort of downplay something

12   about the company in question and its role?

13       A.      I think it's -- to understand

14   them just as a digital intermediary, limits it.

15   I wouldn't say downplay, but limits.

16       Q.      Limits.  Okay.

17               And do you view Uber as a

18   transportation company?

19               MS. POLLOCK:  Object to form.

20               THE WITNESS:  I view it as an

21       on-demand company, to be honest.

22   BY MR. WYATT:

23       Q.      Okay.  Uber operates a digital

24   smart phone application, the Uber app, correct?

25       A.      Yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 221

```
 1              DR. LINDSEY CAMERON
 2                  MS. POLLOCK:  Object to form.
 3                  THE WITNESS:  I would agree that
 4          Uber operates an app.  Yeah.  It operates
 5          the app.  It designs the app.  It -- the
 6          app is an interface for control.
 7                  It's more than just -- it's more
 8          than just operating.  It doesn't just
 9          like buy it off the shelf and then
10          operate it, like a -- a robo call or a
11          little remote car, the relationship.
12    BY MR. WYATT:
13          Q.      And would you agree that the app
14    facilitates the provision of services by
15    drivers to riders?
16                  MS. POLLOCK:  Object to form.
17                  THE WITNESS:  I don't love the
18          word facilitate to service, because
19          that's something that's used more in the
20          e-con strategy literature, so I wouldn't
21          use those terms.  I would say it matches
22          workers with customers.
23    BY MR. WYATT:
24          Q.      Okay.
25                  Are you familiar with the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

                        DR. LINDSEY CAMERON

1
2       platform Access Agreement that drivers need to
3       sign to get access to the Uber platform as a
4       driver?
5               A.      I believe I've reviewed this as
6       one of the documents for this report.
7               Q.      When you onboarded as a driver,
8       if you recall, is that something that you
9       reviewed?
10              A.      I can't remember, but I'm sure I
11      did.
12              Q.      And you agree that drivers who
13      utilize the Uber app are not restricted from
14      driving on other similar platforms, correct?
15              A.      I agree.
16                      Drivers can multi-home if there
17      are multiple riding-hailing platforms in their
18      city.
19              Q.      And they can also work other
20      jobs if it works with their schedule, correct?
21              A.      I'd agree.  Yes.
22              Q.      And was it your experience that
23      drivers are responsible for their own expenses
24      when they drive on the app?
25                      MS. POLLOCK:  Object to form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 223

1            DR. LINDSEY CAMERON

2            THE WITNESS:  Yes.

3            It is my experience drivers are

4        responsible for, like, their mileage and

5        their gas and insurance, things like

6        that.

7   BY MR. WYATT:

8        Q.      And do you know, or maybe you

9   experienced this yourself, are drivers

10  responsible for paying taxes on their income

11  from driving on the app?

12       A.      Yes.  I do see drivers as being

13  responsible for paying for their taxes.

14       Q.      Okay.  Have you ever seen Uber's

15  algorithm management system?

16            MS. POLLOCK:  Object to form.

17  BY MR. WYATT:

18       Q.      Like the code?

19       A.      That's an interesting question.

20            I have seen decision trees that

21  led -- like, that tell you how -- Uber how to

22  respond or an Uber rep to respond when there

23  are -- there's some sort of problem.

24            And I do see that as code.

25            I mean, a decision tree is a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 224

```
 1              DR. LINDSEY CAMERON
 2    type of logic code.
 3         Q.      Okay.  Fair enough.
 4                 Have you seen the computer code
 5    behind it, though?
 6         A.      No.
 7                 I have not seen computer code.
 8         Q.      Do you know if the algorithm
 9    determines the pay rates for drivers?
10         A.      For rating the -- the documents
11    that were provided from me and everything
12    that's been published, and my own research, I
13    do believe the algorithmic management system
14    sets the pay rate for drivers.
15         Q.      And -- and similarly, does it
16    set what the customers are charged, the riders?
17         A.      Yes.  From what I can tell it
18    also sets what customers are charged.
19         Q.      And does the algorithm evaluate
20    required behaviors in any way?
21                 MS. POLLOCK:  Object to form.
22                 Incomplete hypothetical.
23                 THE WITNESS:  Yes.  It does.
24    BY MR. WYATT:
25         Q.      And how does it do that?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 225

```
 1              DR. LINDSEY CAMERON
 2               Like, in what ways?
 3       A.        It monitors telemetrics, so like
 4  acceleration, deceleration, speed and braking.
 5  It monitors how fast people are accepting rides
 6  or on-time arrival, things like that, and then,
 7  of course, there's the customer rating systems.
 8               The customers are inputting in
 9  ratings and those ratings are then averaged or
10  calculated by the algorithmic management system
11  and they influence the opportunities that are
12  presented to drivers, whether or not it's their
13  pay or what rides they get matched to or if
14  there are in the loyalty program.
15       Q.        And I think the answer to this
16  for this case is no, but I don't know about
17  your research.
18               Have you ever spoken with an
19  Uber representative about how the algorithm
20  works?
21       A.        You can check my 2024 ASQ.  I
22  briefly mention it, how Uber employee sort of
23  ended up in some of my job talks and had
24  comments for me about the algorithmic
25  management system, but that wasn't a formal
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

1              DR. LINDSEY CAMERON
2    interview.  That was somebody coming up to talk
3    to me at a talk.
4         Q.      Did you invite them to the talk
5    or they were just there?
6         A.      No.  They just showed up.
7              And similarly, you know I have
8    students that are former Uber employees who end
9    up bringing up Uber in class or talk to me
10   about it, but I mean, those -- that's not part
11   of my research at all.
12        Q.      Okay.  And it wasn't something
13   you specifically attempted to obtain for
14   forming your opinions in this case.
15              Is that right?
16        A.      No.  Not at all.
17              I mean, there's a fair amount of
18   research here.  I'm thinking of Christian 2020
19   that talks about how one can study algorithmic
20   management systems without actually getting
21   internal data from the platform company and
22   that's actually a very rigorous scientific way
23   to get data.
24              There's also a fair amount of
25   concern, some which I talk about in the report,

Page 227

```
 1              DR. LINDSEY CAMERON
 2   about researchers who have partnered with Uber
 3   and have their data have been called into
 4   question or not having rigorous scientific
 5   integrity.
 6              So from a theoretical
 7   perspective, I didn't need to work with any
 8   Uber employees or -- you know, -- to answer my
 9   research questions, but there are also these
10   other ethical questions that were also in play.
11        Q.      Okay.  And I think you mentioned
12   earlier you only skimmed the depositions, but
13   to the extent the depositions you received may
14   have discussed the algorithms, that's not
15   something you're relying on here either.
16              Is that right?
17        A.      Not in this case, but I've read
18   many depositions of Uber employees for other
19   cases, so they have informed my general
20   knowledge.
21        Q.      Do you by any chance remember
22   any names of folks that you've read in prior
23   cases?
24        A.      Let me think.
25        Q.      Just -- just your employees.  I
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 228

```
 1              DR. LINDSEY CAMERON
 2    don't want to know about other cases, but any
 3    Uber representatives that you recall testimony
 4    of?
 5          A.       No.  But if you're able to pull
 6    the public versions of my report, it will
 7    probably have -- it will have it referenced in
 8    there, I think.
 9          Q.       Okay.  Okay.  All right.
10                   So let's go to 32.  And you
11    refer here to the early stages of a platform --
12    platform organizations lifecycle, right?
13          A.       Yes.
14          Q.       And you say, "They may shift
15    their activities towards workers and customers
16    to capture more value", right?
17          A.       Yes.
18          Q.       And this process, in which there
19    is a slow degrade of the functionality of the
20    platform is called platform decay or the or --
21    previously, enshitification, is that right?
22          A.       Yeah.
23                   That's Cory Doctorow's word.
24          Q.       That's kind of an unpleasant
25    word, right?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 229

                    DR. LINDSEY CAMERON
1
2        A.       It is.  He -- he's -- he's --
3    he's -- he's done a lot of writing about
4    bringing forth that word.
5                    I think a really great example
6    he has is for social media platforms, how, you
7    know, the feeds become very cluttered and the
8    platform quality degrades.
9        Q.       And is that -- is his research
10   qualitative as well?
11       A.       I'm not sure.
12                I -- I -- it might be more
13   qualitative, but I'm not sure.  I think it is.
14       Q.       And is this -- I mean, this is
15   described as a general concept in your report,
16   but is this something that you believe applies
17   to the Uber platform?
18                    MS. POLLOCK:  Object to form.
19                    THE WITNESS:  I'm still making
20           up my mind about this, to be -- to be
21           completely transparent here.
22                    There has been a way, though,
23           because I've interviewed drivers over so
24           many years, there does seem to be a
25           decline in what drivers are getting paid.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 230

```
 1                 DR. LINDSEY CAMERON
 2                 And there does -- people are
 3        talking a lot about -- about not being
 4        able to get the matches they want, not
 5        being able to be in the areas, like, the
 6        surge pricing being more unpredictable.
 7                 So there is -- particularly when
 8        you've interviewed drivers -- the same
 9        driver over many years, especially
10        drivers who have been driving since 2013,
11        it does seem today's platform is not the
12        same platform of 2015.
13                 Now, back -- and giving drivers
14        their own iPhone to drive, you know, and
15        ice cream parties to celebrate that.
16                 So there does seem to be some
17        sort of degrade in service, but I haven't
18        studied this rigorously, so -- but I -- I
19        think there's some value in thinking
20        about this theory of platform decay.
21   BY MR. WYATT:
22        Q.      So this isn't something you
23   published on, is that fair, as it relates to
24   Uber specifically?
25        A.      No.  I haven't, but Mike Maffie
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 231

1                  DR. LINDSEY CAMERON

2    has, but I haven't published on platform decay.

3         Q.        Okay.  And so --

4         A.        That is actually not -- I have

5    a -- a -- a forthcoming article, the one I just

6    said was accepted, where I talk about platform

7    decay, but I do -- I have not empirically

8    studied platform decay.

9         Q.        Okay.  Okay.

10                  So Paragraph 35, you write,

11   "Research shows there are two crucial points

12   where drivers may leave ride-hailing,

13   onboarding after the first ride or after

14   significant rides.  Ride-hailing companies have

15   high turn rates with 50 to 96% annual

16   turnover."

17                  Do you see that?

18        A.        Yes.

19        Q.        How does that relate to

20   organizational control over drivers, or does

21   it?

22        A.        Can I see the paragraph right

23   before where we were talking about platform

24   decay?

25        Q.        That's a good question.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 232

```
 1                  DR. LINDSEY CAMERON
 2                  Let's see.
 3        A.        Yeah.
 4        Q.        Oops.
 5                  So is this more about platform
 6    decay than organizational control?
 7        A.        You know, I think when I was
 8    writing this paragraph, I was actually thinking
 9    about the loyalty programs and how loyalty
10    programs are designed to entice drivers to keep
11    driving around these different inflection
12    points.
13                  So I think actually where
14    it's -- that paragraph is, is probably not the
15    best place for it to be in that paragraph.
16        Q.        Okay.  So you would --
17        A.        Or best place -- a best place to
18    be in the report, that's what I meant to say.
19        Q.        Right.  You would move it down
20    to somewhere later in the report?
21        A.        Yeah.  I think so.
22        Q.        To where you talk about, like,
23    Uber Pro and those types of things?
24        A.        Yeah.
25        Q.        Okay.  And then, if we look
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233

```
 1                 DR. LINDSEY CAMERON
 2    ahead to the next section, that's where we get
 3    back into organizational control.
 4                 And I think we looked at that
 5    paragraph earlier because it's where the
 6    definition is, right?
 7         A.        Correct.
 8         Q.        And does organizational control
 9    apply to employees, as well as independent
10    contractors?
11         A.        So my answer is, people who are
12    classified as employees or independent
13    contractors, if I just sort of add a more
14    nuance version of what you just said, and given
15    I just wrote a report about drivers who are
16    classified as -- as independent contractors,
17    and I'm talking about organizational control, I
18    would say yes.
19         Q.        Okay.  And is organizational
20    control related to labor process theory?
21                 MS. POLLOCK:  Object to form.
22                 THE WITNESS:  Wow.  I'm
23         thinking, because that's a -- you --
24         you've put together two big concepts.
25    BY MR. WYATT:
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1                DR. LINDSEY CAMERON

2          Q.        Let me be less oblique about

3     it --

4          A.        Yes.

5          Q.        -- and you can answer a question

6     in context --

7          A.        Right.

8          Q.        -- rather than -- rather than

9     giving you an examine and ask for scores or

10    something.  Hold on a second.

11                So going back to this article,

12    which is the algorithmic management article,

13    which is -- let's see -- Exhibit 10.

14                Here it says, "Labor process

15    theory and adjacent Marxist approaches are

16    frequently used as the theoretical basis,

17    stressing aspect of control and power."

18                And so I'm trying to understand

19    if there's a link between labor process theory

20    and this concept of organizational control.

21          A.        True.  Just because you didn't

22    use the word organizational, you kind of -- you

23    queued me thinking about different literature

24    than this.

25                This is -- this is sometimes --

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

1              DR. LINDSEY CAMERON

2   organizational control and labor process theory

3   are two different theoretical veins, but labor

4   process theory very much talks about control.

5          Q.      Okay.  Control of labor.

6                  Is that right?

7          A.      Yeah.  I'd say -- let me sit

8   here and just think, because it's a really big

9   theory.  It's controlled labor.  It's control

10  of the work process.  It's the control of

11  managers.  It's control of a lot of different

12  things in the work process.  Yeah.  It includes

13  labor and it includes workers.

14         Q.      Is algorithmic control a kind of

15  organizational control?

16                 MS. POLLOCK:  Object to form.

17                 THE WITNESS:  That is a very big

18       question, but drawing on (phonetic),

19       2009, I would say yes.

20                 Or more accurately, algorithmic

21       management is a form of organizational

22       control.

23  BY MR. WYATT:

24         Q.      Okay.

25                 And do you consider yourself one

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

1              DR. LINDSEY CAMERON

2    of the earlier leading scholars on algorithmic

3    control?

4         A.        On algorithmic management?  One

5    of the leading scholars.  Yes.

6         Q.        Okay.  I'll try to get it right,

7    it's obviously written in my outline a

8    different way, but I'll try to make the

9    adjustment going forward.

10                  Algorithmic management.

11        A.        Yes.

12        Q.        And does Uber, with respect to

13   drivers, exert types of control, other than

14   algorithmic management?

15        A.        I would say yes.

16        Q.        And what are those other types

17   of control?

18        A.        Off the top of my head, I talked

19   about the cultural narratives in this report,

20   so I do see the cultural narratives as a form

21   of social-cultural control.

22                  Let me think.

23                  We have normative control, I

24   just wrote a paper on that, so that's another

25   form of control that's not algorithmic, but

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 237

1              DR. LINDSEY CAMERON

2      there are parts of algorithmic management

3      that's embedded within neo-normative control.

4                   Those are the two big examples I

5      can think of right now.

6              Q.      And generally speaking, are

7      there types of control that apply to workers

8      classified as employees that don't apply to

9      workers applied as independent contractors or

10     vice versa?

11             A.      My answer to this is, yes, this

12     is not my area of expertise, so I would read

13     Cappelli and Teller, 2013 or 2023, they both

14     talk about this.

15             Q.      Okay.  And do you know if Uber

16     provides drivers with any business

17     registrations or licenses?

18             A.      To the best of my knowledge,

19     they don't.

20             Q.      And Uber doesn't pay drivers a

21     salary or hourly rate, correct?

22             A.      I believe in certain cities they

23     do have a minimum hourly rate, such as

24     New York City and Seattle.

25             Q.      Okay.  But outside situations

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 238

```
 1              DR. LINDSEY CAMERON
 2    like that, in general, there wouldn't be an
 3    hourly rate, correct?
 4              MS. POLLOCK:  Object to form.
 5              THE WITNESS:  I'm not entirely
 6         sure all of the cities that have a
 7         minimum hourly rate, but for the cities
 8         where there's not a minimum hourly rate,
 9         then I would say, no, Uber does not pay
10         its driver a minimum hourly rate.
11    BY MR. WYATT:
12         Q.    And --
13         A.    Because I think Minneapolis
14    might also do a minimum hourly rate, if I'm
15    remembering.
16         Q.    And does Uber provide drivers
17    with the tools they need to complete their
18    work, like the car, for example?
19         A.    Uber does not provide a car, but
20    they -- they provide this app interface.
21         Q.    And you didn't consider any
22    legal definitions of control, in forming your
23    opinions in this case, right?
24         A.    Not at all.
25         Q.    Let's go to paragraph -- let's
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 239

1                DR. LINDSEY CAMERON

2    see -- let's get your report back up.  So we go

3    to Paragraph 37, you say, "there's conceptually

4    two dimensions of organizational control,

5    general and detailed", right?

6         A.        Correct.

7         Q.        And are both of those at issue

8    here, general and detailed?

9         A.        I believe so, but we'd need to

10   go in the report specifically for -- to see how

11   these two play out.

12        Q.        Okay.  And there's one example

13   that you give here in Paragraph 37 about

14   over -- some detail control, overprescribing

15   elements of detailed control, for example, how

16   long workers on the assemble line can go to the

17   bathroom.

18                  That specific example is not one

19   that really applies here, correct?

20        A.        No.  Just so you know, the way

21   this part of the report is laid out, there's a

22   section that's theoretical, then there's a

23   section that applies to Uber.

24                  So this entire section is more

25   the theoretical grounds.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 240

1          DR. LINDSEY CAMERON

2     Q.        Okay.  I appreciate that.

3              And my pauses are me skipping

4  questions, so these are good, I'm working

5  through my outline here.

6     A.        Pause away.

7     Q.        Okay.  So there's a method to

8  the awkward silence madness.  Okay.

9              So in Paragraph 41, you

10  mention -- and this is the theoretical section

11  here, but just so I can understand how it

12  applies, you say, "that there's -- that

13  Highland describes four levels of construction,

14  meaning, construction of algorithms.

15              First, an algorithm is designed

16  and planned such that it meets the needs of the

17  organization.  Second, the algorithm is

18  programed by programmers who place a particular

19  philosophical frame on the world that renders

20  it amenable to the work of code and algorithms.

21              Third, algorithm -- algorithms

22  are curated by data janitors.  And finally,

23  those who interact with the algorithms also

24  participate in the construction, such that

25  algorithmic decision only becomes effective

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 241

1                    DR. LINDSEY CAMERON
2    through usage."
3                    Do you see that?
4         A.         Correct.
5         Q.         Do these all apply to Uber or is
6    this not necessary, because this is general?
7         A.         Oh, well, I mean, it definitely
8    applies to Uber because Uber has an algorithmic
9    management system that runs underneath it.
10                   So it's a general statement that
11   I also believe applies to -- to any gig economy
12   company.
13        Q.         Great.  So all four of these
14   things apply whenever there's an algorithm
15   involved, is that --
16        A.         I would think so.
17        Q.         -- okay.
18        A.         And, you know, the main idea
19   here is that code or algorithms are not --
20   they're written by humans and there's biases
21   and social norms that are encoded in that, and
22   so that's the argument I'm making in that
23   paragraph.
24        Q.         Right.
25                   So to take -- to take one of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 242

1            DR. LINDSEY CAMERON

2    these and try to make it specific, in the next

3    paragraph, actually, you say, "Algorithmic

4    management systems reflect and embody broader

5    social-cultural values and can never be seen as

6    socially or politically neutral as just a

7    tool."

8              Do you see that?

9        A.      Correct.

10        Q.      What broader social-cultural

11    values are embodied in the algorithm --

12    algorithms utilized in the Uber app?

13        A.      So here I would direct you to

14    the work of Veena Dubal, and I hope I'm not --

15    I'm going to do my best to sort of paraphrase

16    her work as I read it.

17              She argues there's algorithmic

18    race discrimination that's done by the Uber

19    app, that the prices are set a certain way

20    that -- that workers are not paid a minimum

21    wage, and that it often goes to workers who are

22    black or brown or immigrants who are penalized

23    the most.

24              And so she, I think, in her

25    argumentation says, that's part of the larger

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 243

```
 1              DR. LINDSEY CAMERON
 2   system here in the United States where we
 3   devalue black and brown and immigrant bodies.
 4              So that would be an example of
 5   that.  I think I talked to you about the edit
 6   volume that -- that will be coming out shortly
 7   where I talk about how these ghost variables
 8   are embedded in algorithmic management systems.
 9              There's -- there's other pieces
10   in that edited volume that talk about the same
11   phenomenon happening in Uber.
12              So that would be an example.
13       Q.      Okay.  And are these things that
14   you've looked at in your research or you're
15   drawing mostly from Dubal and others from this?
16       A.      I'm drawing on other people's
17   research.  It's something I theoretically
18   engage with, but it's not where the empirical
19   part of my research is.
20       Q.      Okay.  And then -- let's see.
21   Let's go to Paragraph 43, and we're talking
22   about the four components of the algorithmic
23   management that lead to an intensification of
24   organizational control, right?
25       A.      Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 244

1              DR. LINDSEY CAMERON

2        Q.        And if we read further down in

3    this Paragraph 43, it says, "Some scholars have

4    are gone so far to call the control exercise by

5    on-demand organizations as an invisible cage,

6    because they implement a form of organizational

7    control in which the criteria for success are

8    largely invisible to workers and changes to

9    those criteria are unpredictable made solely by

10   the organization itself", correct?

11       A.        Correct.

12       Q.        Are you one of those scholars

13   that goes so far as to call control as an

14   invisible cage?

15            MS. POLLOCK:  Objection to form.

16            THE WITNESS:  That is an

17        interesting question.  I do not know the

18        answer to, because Rothman and I have

19        written several articles together.

20            So is it possible there has been

21        an article in which I view this invisible

22        cage that we are coauthors on, because

23        it's joint work.

24   BY MR. WYATT:

25       Q.        Well, I think this may be one of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              DR. LINDSEY CAMERON
2    those articles, but I am asking you for your
3    opinion, do you think that's a fair
4    description, an invisible cage?
5         A.      Of Uber specifically?
6         Q.      Yeah.
7         A.      I'm not entirely sure, to be
8    honest.
9         Q.      Okay.  Okay.
10              And then in Paragraph 44, you
11   write, "Several features contribute to the
12   intensification of control by algorithmic
13   management systems", right?
14        A.      Yes.
15        Q.      And you list a couple.
16              You say, embedded in cameras,
17   biometrics trackers and sensors, algorithms
18   record workers physical movements to prove
19   adherence to the rules and the regulations of
20   the organization, such as, by verifying worker
21   identities."
22              And we talked a little bit about
23   that before, right?  Identity verification?
24        A.      Correct.
25        Q.      And then, tracking drivers'

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246

1              DR. LINDSEY CAMERON

2  location, right?

3       A.      Correct.

4       Q.      Acceleration rate and braking

5  speeds for workers operating motor vehicles,

6  right?

7       A.      Correct.

8       Q.      And monitoring emails to assess

9  mood and productivity?

10      A.      Correct.

11      Q.      And, you know, going back to the

12  question of whether these things are good or

13  bad, like, do you have an opinion as to whether

14  it's a good or a bad thing to track drivers'

15  location?

16              MS. POLLOCK:  Object to form.

17              THE WITNESS:  No.  I don't

18      really have an opinion there.

19  BY MR. WYATT:

20      Q.      And so, you -- you -- is the

21  purpose of mentioning it here is that this is

22  -- good or bad, it's some form of control that

23  an on-demand platform can exercise that --

24      A.      Exactly.  Exactly.

25              That's what's important.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 247

1                    DR. LINDSEY CAMERON
2         Q.        -- okay.
3                   And so you're not weighing and
4    you're not making value judgments as to whether
5    or not these are good or bad things?
6         A.        No.  I'm trying not to.
7                   The title of one of my papers is
8    the Good Bad Job where I'm really trying to
9    hold multiple viewpoints and just talk about
10   control.
11        Q.        Okay.  And this is a general
12   opinion, we're still in general here, right?
13                  44?
14        A.        Yes.  We're still in general.
15        Q.        So, for example, monitoring
16   emails, I mean, I didn't see this come up
17   later.
18                  You're not opining that Uber
19   monitors emails or messages or anything of
20   their drivers, right?
21        A.        No.  I'm not.
22        Q.        Okay.  And, you know, one -- one
23   aspect here, tracking location, is that
24   something that goes into the algorithm for
25   matching drivers with riders?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 248

```
 1                 DR. LINDSEY CAMERON
 2        A.        Yes.
 3                  MS. POLLOCK:  Object to form.
 4                  THE WITNESS:  I see it as one of
 5        the ways tracking drivers' locations is
 6        used.
 7   BY MR. WYATT:
 8        Q.        Okay.  One of the ways is, it
 9   create the opportunities for riders and drivers
10   to connect, right?
11        A.        Yes.  That is one of the ways.
12        Q.        Okay.  And in that sense, at
13   least, it's not exerting control over the
14   drivers, correct?
15                  MS. POLLOCK:  Object to form.
16                  THE WITNESS:  No.  It's
17        definitely exerting control.
18   BY MR. WYATT:
19        Q.        Well, let me ask it differently.
20                  In that way, it's benefitting
21   drivers by creating opportunities to connect
22   with riders, correct?
23                  MS. POLLOCK:  Object to form.
24                  THE WITNESS:  I try to stay
25        neutral.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 249

1              DR. LINDSEY CAMERON

2                  I say it's matching the drivers,

3        because they're tracking locations and

4        that's a form of control.

5    BY MR. WYATT:

6        Q.        Okay.  But in your prior

7    writings, you have referred to these aspects of

8    the platform as benefits to drivers, correct?

9        A.        I don't believe I talked about

10   matching as being a benefit for drivers.

11       Q.        Oh, okay.

12                 But you have talked about

13   benefits to drivers in prior writing, I think

14   that's what we're looking at, right?

15       A.        Yeah.  I mean there are benefits

16   that Uber driving has for drivers.  Definitely.

17       Q.        Okay.  Okay.

18                 In Paragraph 45, you refer to,

19   "often workers are unaware of the changes

20   accomplished by the algorithmic management

21   system and their implications for their

22   economic livelihood", right?

23       A.        Correct.

24       Q.        And then, "Ride-Hailing

25   companies, can and often do instantly suspend

Page 250

1                    DR. LINDSEY CAMERON
2    driver's access to the app or sign them a less
3    profitable ride after a customer complaint,
4    even before the complaint is investigated",
5    correct?
6         A.        Yes.
7         Q.        And we talked about that a
8    little bit earlier, right?
9         A.        Correct.
10        Q.        And you cite your own research
11   here and we've referred to this article a
12   couple times today, right, Cameron 2022?
13        A.        Yes.  I mean, that's my own
14   research, but I also have seen evidence of that
15   in some of the documents I reviewed for other
16   cases.
17        Q.        Okay.  And we talked about some
18   of the examples earlier, right?
19        A.        Yes.
20        Q.        And there was one example,
21   right, we don't need to look at it unless you
22   want to, but there was one example in Cameron
23   2022 of a driver who was temporarily band from
24   the platform due to a dubious customer
25   complaint.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 251

1                    DR. LINDSEY CAMERON

2                    Do you remember that driver?

3          A.        No.

4          Q.        I don't think there's more

5     details about it, so I just wondered if you

6     remember what the issue was.  Okay.

7                    And so, one category that we

8     talked about earlier is that some drivers are

9     instantly suspended from the platform because

10    of a safety issue, correct?

11         A.        Yes.  I believe that can happen.

12         Q.        And do you have an opinion on

13    whether Uber's approach to suspending drivers,

14    based on safety complaints, is too harsh or not

15    harsh enough?

16         A.        I have no opinion about that.

17         Q.        Okay.  You do say that instant

18    deactivation favors the customers over workers,

19    right?

20         A.        I would agree.

21         Q.        Okay.  And do you think that's

22    unfair or wrong?

23                    MS. POLLOCK:  Object to form.

24                    Incomplete hypothetical.

25                    THE WITNESS:  I'm not sure if

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 252

```
1            DR. LINDSEY CAMERON
2        I -- I think what I mentioned earlier,
3        it's not so much the question of, like,
4        is it unfair or wrong.
5              It's more, is there, like -- I
6        think personally my concern is how is
7        there a way for drivers to get back on
8        the app, but like I said, that's more of
9        a personal thought and not my actual --
10       it's not what I do my research on.
11  BY MR. WYATT:
12       Q.     Okay.  And do you think there
13  are some safety violations severe enough that a
14  driver should not have an opportunity to get
15  back on the app?
16              MS. POLLOCK:  Object to form.
17              THE WITNESS:  My personal
18       opinion, yes.
19  BY MR. WYATT:
20       Q.     Okay.  And do you know that
21  there's an allegation in this case that before
22  2019, an initial allegation of sexual assault
23  should have been deemed sufficient to
24  automatically revoke a drivers' privileges?
25              MS. POLLOCK:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 253

1               DR. LINDSEY CAMERON

2               THE WITNESS:  No.

3               I don't know that.

4    BY MR. WYATT:

5        Q.        Okay.  Okay.

6        A.        And let me say, maybe it was

7    mentioned in the documents that I reviewed, but

8    I don't know that.

9        Q.        No.  That's fair enough.

10               There's a lot of documents in

11   this case, so -- but that's not something you

12   focused on for purposes of your report?

13               Is that fair?

14       A.        No.  Not at all.

15       Q.        And then, I'm going to scoot

16   ahead a little bit here for this question, in

17   Paragraph 95, is about the -- the title is

18   "Uber's Algorithmically Mediated Customer

19   Ratings System", right?

20       A.        Yes.

21       Q.        And actually, if we go down a

22   little bit further to -- (inaudible) -- we have

23   deactivation and reactivation, right?

24       A.        Yes.

25       Q.        And one thing you say here is

Page 254

1              DR. LINDSEY CAMERON

2    that you -- it looks like this is a quote, but

3    I can't tell because there's -- I can't tell,

4    you tell me.

5              It says, "This difficult

6    deactivation experience is echoed in a survey

7    of 810 earners, where two-thirds of the report

8    having been deactivated, the article uses this

9    term temporary to mean both permanent

10   deactivation and temporary waitlisting at some

11   point."

12             Does that quote maybe from this

13   document here, Uber --

14        A.      I would -- I would think most

15   likely.

16        Q.      Okay.  Do you know, like, who

17   these 810 earners were?  Was this, like, a

18   random sample or was this like a group of

19   people that experienced some kind of issue that

20   the two-thirds reported having been

21   deactivated?

22        A.      Oh, this would be Uber's data

23   right here, so we should pull up that document,

24   because I don't know off the top of my head.

25        Q.      Okay.  Okay.  Fair enough.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 255

1          DR. LINDSEY CAMERON

2              I mean, is it your experience

3    that two-thirds of drivers have been

4    deactivated at some point without knowing why?

5              MS. POLLOCK:  Object to form.

6              THE WITNESS:  So I think the

7          question you're asking is based on all

8          the data that I've collected, were

9          two-thirds of the drivers deactivated

10         without knowing why?

11   BY MR. WYATT:

12       Q.     Right.

13       A.     I mean, while I could answer

14   that question, I don't have a representative

15   sample, so I'm not sure if that's -- I don't

16   think it's fair to ask that research question

17   of my data, because that's not a question my

18   data could answer with any sort of, you know,

19   validity or rigor.

20       Q.     Okay.  Fair enough.

21       A.     I think this was a PowerPoint

22   that I saw that was written by individuals

23   working at Uber and it was something about how

24   they were trying to -- I think they were

25   basically reporting on drivers' experiences.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 256

1          DR. LINDSEY CAMERON

2     Q.        Okay.

3               Going back up to Paragraph 46.

4  We're still on the four ways that algorithmic

5  control works.

6               And in this one, you write,

7  "On-demand apps, for example, allow workers to

8  compete across multiple zones for assignments

9  and communicate in realtime with customers.

10  This often results in workers staying online to

11  work on the app at strange hours, which is

12  precisely one of the goals of an on-demand

13  organization."

14               Do you see that?

15     A.        Yes.

16     Q.        Okay.  You're -- you're not

17  opining here that Uber forces workers to work

18  at certain hours, correct?

19     A.        No.  Not the word force.

20               Encourage is a better word.

21     Q.        Okay.  Encourage.  But even if

22  it encourages drivers to do this, is this still

23  the drivers' choice, whether to do that or not?

24               MS. POLLOCK:  Object to form.

25               THE WITNESS:  I think it's

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 257

```
 1            DR. LINDSEY CAMERON
 2       really tricky when you're trying to ask
 3       these questions about choice around
 4       schedule flexibility.
 5                I think I mentioned earlier, the
 6       majority of rides on the platform are
 7       done by a minority of drivers and so
 8       there's an economic dependence that's on
 9       there.
10                So there is a way about how, if
11       I need to earn X-amount of money, then
12       I'm going to be up at 4:00 a.m. to take
13       people to the airport.
14  BY MR. WYATT:
15       Q.       And so that applies to a
16  minority of drivers is what you're saying, the
17  20 percent that do 80 percent of the work.
18                Is that right?
19       A.       The ones -- yes.
20                The ones that are economically
21  depended on the work.  Yeah.
22       Q.       Okay.  And so does that not
23  apply to the 80 percent who do only 20 percent
24  of the work?
25                MS. POLLOCK:  Object to form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

```
 1              DR. LINDSEY CAMERON
 2              THE WITNESS:  I'm not sure if it
 3         apply -- I -- it could apply to the
 4         80 percent as well.
 5              I think I'm more concerned
 6         about -- I tend to think more deeply
 7         about the 20 percent, because that's
 8         where the base, I would say, of Uber --
 9         of Uber's revenue comes from.
10              So it's a question around
11         intensification of control and I'm saying
12         when individuals are economically
13         dependent on the work, there's an
14         intensification of control as opposed to
15         those who may not be economically
16         dependent on the work.
17   BY MR. WYATT:
18        Q.      Okay.  And then Paragraph 47,
19   you refer to many on-demand organizations
20   running experiments on their workers.
21              What do you mean by experiments?
22        A.      Oh, well, this is very common on
23   platform strategy, often because these forms
24   grow, like, through network effects.
25              They tend not to have a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 259

```
 1                DR. LINDSEY CAMERON
 2   strategy, like, let's sit in a room and write
 3   out a plan for what we're going to do for the
 4   next six years.  They often will run tests on
 5   their networks.  I'm going to do a experiment
 6   in Chicago about this neighborhood in Chicago
 7   about raising surges, but not in this
 8   neighborhood of Chicago, and I'm going to
 9   compare the results and then that will inform
10   my strategy.
11                So it's very much using data
12   from the workers to drive the -- whatever
13   control mechanisms are put into place.  And I
14   mean, that's common across any -- company,
15   including Uber.
16        Q.       And is this another thing where
17   you're not passing a value judgment on the word
18   experiment, you're just using this to
19   illustrate a form of control?
20        A.       Exactly.
21                They're called AB testing.
22        Q.       Does the word experiment --
23   experimenting on people, is kind of a charged
24   phrase, no?
25        A.       It's true.  It's true.  It makes
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 260

1              DR. LINDSEY CAMERON

2    you think of the Milgram experiments, but no,

3    this is a form of strategy to run

4    experimentation on workers.

5              Now, granted you could argue

6    there's a level of coercion involved because

7    are there individuals really consenting to it.

8              I mean, there's a concept that

9    Robin brings up in 2024 called Boilerplate

10   Creek, that these terms or services change for

11   workers and they don't have a chance to read

12   it, they just accept and then the terms of the

13   experiment has changed again.

14             So there is a way that you could

15   think about it as being more coercive, but

16   here -- and so I do talk about workers are

17   unaware of the specifics of the experiments,

18   that's true, but overall, this is a form of

19   strategy.

20        Q.        Okay.  And in 49, kind of

21   continuing this concept, I think, you write,

22   let me find it -- "in ride-hailing, companies

23   can automize drivers and routes at the city

24   level in ways that are unobservable to

25   drivers", correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 261

```
 1                  DR. LINDSEY CAMERON
 2        A.        Correct.
 3                  And I think that should be
 4   atomize, not automize.
 5        Q.        Got it.  That's a good fix.
 6                  I wasn't even focused on that.
 7                  Okay.  So atomize drivers in
 8   routes at the city level in ways that are
 9   unobservable to drivers, correct?
10        A.        Correct.
11        Q.        But drivers are free to take
12   their own routes if they to want, correct?
13                  MS. POLLOCK:  Object to form.
14                  THE WITNESS:  Such -- I mean,
15           that's a very complex question.
16                  So do they have to use the Uber
17           GPS system?  They could possibly use
18           ways, but if they end up deviating in
19           some way that's not by their route,
20           that's not the suggested route, they can
21           be penalized for this, maybe go -- you
22           know, they'll be suspected of doing fraud
23           or maybe the customer will be upset and
24           ask for a partial refund.
25                  So there are ways in which
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

```
 1              DR. LINDSEY CAMERON
 2         there's a lot of strong encouragement to
 3         take the routes as directed by Uber.
 4   BY MR. WYATT:
 5         Q.      Okay.  And what's the source for
 6   the part about the penalties and upset riders?
 7         A.      I've seen it in other documents
 8   from Uber, that -- in another case about how
 9   drivers were suspected of fraud when they took
10   routes that were different.
11         Q.      Okay.  In Paragraph 50 you talk
12   about how, "Given this -- given that work on
13   closed labor market platforms is generally
14   locationally dependent, e.g., completed
15   in-person, these workers are less likely to be
16   active in online communities that would grow
17   information sharing amongst themselves."
18              Do you see that?
19         A.      Correct.
20         Q.      And is that something that
21   applies to Uber?
22         A.      Yes.
23         Q.      But you've also written, right,
24   about how drivers that you studied did use
25   online communities to --
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 263

```
 1                DR. LINDSEY CAMERON
 2        A.        Correct.
 3        Q.        -- correct?
 4        A.        Yeah.  It's true.
 5                  So I think the one thing that I
 6   would say is wrong about this sentence, that I
 7   say less likely.
 8                  And with qualitative research,
 9   you can't really do comparison to say more or
10   less likely, so that word is probably -- it's
11   not the best word, but just -- but I would say
12   in general, I have found more workers on
13   open-labor market platforms, like Upwork,
14   active on the forums as opposed to those on
15   closed-labor market platforms like Uber.
16                  But of course, there are still
17   Uber drivers that are on these forums, I just
18   tend to think there's a smaller number of them
19   comparatively as opposed to people who are
20   doing fully remote online work.
21        Q.        Okay.  And is that something
22   you've looked at closely, like, and have seen
23   studies on or is this just an impression --
24        A.        It's just an impression.
25        Q.        Okay.  And then, let's see.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 264

1           DR. LINDSEY CAMERON

2                The next section starts on

3   Page 26, "how on-demand organizations exercise

4   organizational control through algorithmically

5   mediated customer control", correct?

6        A.      Correct.  And I -- I want to

7   say, it's an impression, but I just want to

8   give a sense that it is a fair amount of

9   research.  I think I have an example in

10  Cameron 2022, like I say out of 63 drivers,

11  maybe 15 were on forums or something like that.

12                And I wrote a paper comparing

13  Upwork and Uber and it was, like, you know,

14  every Uber -- every Upwork person was on an

15  online forum.

16                So when I say my -- I mean,

17  there's just a difference when you're doing

18  online work and you're always on a computer

19  versus in-person.

20                So I just want to give a sense,

21  like, it is an impression, I haven't written an

22  empirical research study on it, but it's one

23  that I think is grounded in a fair amount of

24  research.

25       Q.      Okay.  In 54 you write,

Page 265

 1                    DR. LINDSEY CAMERON
 2    "on-demand organizations are unique in the
 3    extent to which they outsource performance
 4    management to customers and use algorithmic
 5    management to collect data and then influence
 6    worker behavior", correct?
 7         A.        Correct.
 8         Q.        Does customer feedback -- not in
 9    the on-demand economy, not affect -- let me
10    start over, too many nots.
11                   So somebody -- for a worker not
12    in the on-demand economy, are they influenced
13    by customer feedback?
14         A.        Yes.  They are.
15         Q.        Okay.  And how is it -- how --
16    how is it uniquely more so the case in
17    on-demand organizations?
18         A.        So if you read Cameron and
19    Rothman in 2022, I discuss this in depth, but
20    what I remember, just sort of at the high
21    level, it's about how customer -- you think
22    about a mystery shopper will come into the
23    store and then they'll say good or bad job of
24    selling you on these jeans and maybe your
25    manager will coach you next time to upsell your

Page 266

1              DR. LINDSEY CAMERON

2    jeans better.

3              I mean, their invasiveness is

4    the customer rating, directly influences what

5    your match is going to be next, or whether or

6    not you're going to be in this loyalty program

7    and get a preferred priority matching, or

8    whether or not you're going to be temporarily

9    deactivated.

10             So there's a intensification of

11   inputting customers into the -- the labor

12   process and this is what Maffie actually calls

13   laundering control.

14             He says often that

15   organization -- you know, on-demand companies

16   say we're not controlling workers, the

17   customers actually are, but honestly, the

18   customers are proxy for the organization in

19   this setting.

20             And, I mean, I talk about more

21   in this paper -- in this report, that it's more

22   than just the algorithmic management system,

23   there's all the normative suggestions that are

24   in, like, YouTube videos about how to service

25   customers, so it's like a particular type of --

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 267

1          DR. LINDSEY CAMERON
2    we call them scripts and service rules that
3    people need to follow.
4              So customers are a very
5    important mechanism of control in this setting.
6         Q.      I guess my question is, isn't it
7    true in most sales contexts that you need to
8    please the customer if you want to keep getting
9    business?
10        A.      That is true, if the extent that
11   I'm arguing is different here, the -- the
12   intense -- it's an intensification of control
13   by customers in this setting, along with
14   quantification that makes the on-demand economy
15   so distinct.
16        Q.      Okay.  And that's not something
17   that's been studied qualitatively, I assume,
18   this is all qualitative research?
19        A.      Let me think.
20              I'm not entirely sure.  There is
21   some quantitative research that's been coming
22   out.  I'm actually a reviewer for a lot of
23   quantitative pieces.  I'm not sure if it looks
24   at this explicitly, though, so I'm not sure.
25        Q.      Okay.  Just skimming here.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 268

```
 1              DR. LINDSEY CAMERON
 2              Okay.  So if we go to --
 3   skipping ahead, Paragraph 60 -- well, so, first
 4   of all, so now we're in the Section C, "How
 5   on-demand organizations influence the behaviors
 6   of customers."
 7              Do you see that?
 8        A.        Correct.
 9        Q.        Okay.  And then Paragraph 63
10   says, "On-demand organizations also shape
11   conditions -- the conditions around the service
12   encounter, such as the location of the service
13   encounter and the surveillance surrounding it."
14              It goes on to say, "On-demand
15   organizations also determine any surveillance
16   and control mechanisms to be used during the
17   service encounters, such as cameras or audio
18   recordings.".
19              And then it says, "Uber has been
20   offering subsidized dash cams to workers to
21   monitor in-car activities."
22              Do you see that?
23        A.        Yes.
24        Q.        And so, similar questions to
25   what I asked before.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 269

1              DR. LINDSEY CAMERON

2              Are you taking sort of a

3    position, good or bad, about the use of dash

4    cams and other surveillance tools?

5         A.       No.  It's just another form of

6    control.

7         Q.       Okay.

8         A.       Or can be used as a form of

9    control.

10        Q.       Okay.  And are you aware --

11   well, first of all, on the -- in connection

12   with driving on the Uber platform, are you

13   aware that use of dash cams is optional?

14        A.       Yes.  I am aware.

15        Q.       And are you aware that the

16   Plaintiff's theory in this case or one theory

17   in this case is that Uber should have required

18   drivers to use dash cams?

19              MS. POLLOCK:  Object to form.

20              Incomplete.  Lack of foundation.

21              THE WITNESS:  No.

22              I didn't know that.

23   BY MR. WYATT:

24        Q.       Okay.  Okay.

25              And if we go to 64, so next

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1              DR. LINDSEY CAMERON

2    section, "How on-demand companies use

3    algorithmic management to obfuscate their

4    organization -- organizational control over

5    workers", right?

6         A.        Yep.

7         Q.        And then, the first sentence of

8    64, "One way that organizations can avoid

9    fueling worker resentment and resistance, is to

10   superficially provide workers with a sense of

11   autonomy while also imposing significant

12   constraints", right?

13        A.        Exactly.

14        Q.        And so, what is the sense of

15   autonomy that you're talking about here?

16        A.        Oh, that's every paragraph

17   that's underneath it.  I provide -- there are

18   many different theoretical words for what this

19   sense of autonomy is.

20             So I mean, we're looking at one

21   right now, it's called Confident Confine

22   Choice, that helps workers feel like they have

23   a sense of autonomy.

24             One would be cultural narratives

25   about the drivers think that I'm their own

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 271

1              DR. LINDSEY CAMERON

2   boss, that gives them a sense of autonomy,

3   which is linked to schedule flexibility.

4              I think that's one of the key

5   mechanisms that make the gig economy so

6   enticing to workers is because it really has

7   this mechanism of control nailed down.

8        Q.      Okay.  So creating a sense of

9   you autonomy, it's part of a -- sorry.

10             Scratch that.

11             Is part of what sense of

12  autonomy implies that the autonomy is not real?

13             MS. POLLOCK:  Object to form.

14             THE WITNESS:  Not quite.

15             It's more that the autonomy is

16        nested within a larger set of control.

17             An example I sometimes use is

18        like if you offer your child broccoli or

19        brussel sprouts for dinner, like, they

20        have a sense of autonomy or choice to

21        choose, but either way they're eating

22        green vegetables and you're exerting

23        parental control.

24  BY MR. WYATT:

25        Q.      And how do you measure a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 272

```
 1              DR. LINDSEY CAMERON
 2    drivers' sense of autonomy?
 3         A.      So I do mostly qualitative
 4    research, so I don't measure anything.
 5         Q.      Well, how do you evaluate it?
 6         A.      I also wouldn't say I evaluate.
 7         Q.      How do you form an
 8    interpretation of it?
 9         A.      That -- so back earlier when I
10    talked about -- I'm research -- I'm reading the
11    transcripts, I'm collecting the data, and I'm
12    going to literature, and I'm doing this back
13    and forth area of tacking between coding and
14    memoing and theory, that's how I'm able to
15    interpret it.
16         Q.      When you did your semistructured
17    interviews and conversations, is this something
18    you would ask specifically about, like, do you
19    feel autonomy in this job?
20         A.      Oh, no.
21                 You would never do that.
22         Q.      Okay.  So how do you get at it
23    if that's a question of interest to you?
24         A.      So in qualitative research, you
25    would never ask someone a leading question like
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 273

1              DR. LINDSEY CAMERON

2    that, because you would get data that was

3    biased.

4              Back to an earlier conversation

5    we had about how do you account for bias in

6    this research, I would ask people, tell me

7    about your day working, what are some things

8    you really like about Uber, what are some

9    things you don't like?

10             So you keep the questions

11   incredible broad and open-ended and people tell

12   you what's important to them.

13        Q.      Okay.

14        A.      But you would -- you would never

15   ask anyone a question like that.

16        Q.      Okay.  Skipping ahead here.

17             Give me a minute.  Okay.

18             Let's skip up to 66.

19   Gamification.  You write, "Another way

20   organizations obfuscate control is by gamifying

21   work or applying elements of game playing,

22   e.g., point scoring, competition with others,

23   to work activities to encourage workers to work

24   longer hours.

25             By gamifying work, the work

Page 274

```
 1                DR. LINDSEY CAMERON
 2    itself becomes more fun and enjoyable while
 3    ensuring that workers' behaviors are aligned
 4    with the organization's interests, with the
 5    result being that workers are controlled."
 6                Do you see that?
 7        A.       Correct.
 8        Q.       Does it necessarily follow that
 9    the workers are being controlled because they
10    enjoy playing the games?
11        A.       The control comes from the fact
12    about how the technology is being designed in a
13    way to entice workers to play the game.
14                And the fact that it's fun keeps
15    them playing.  So it's not because I'm having
16    fun -- it's a process of how the control
17    happens.  And you might remember there was an
18    earlier paragraph that we went over how when I
19    talked about how you can't control people
20    through sticks, you have to control them
21    through carrots, and a gamification is one type
22    of carrots.
23        Q.       So just conceptually, just
24    taking a step back, does control exist anytime,
25    like, a workers and organizations' interests
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 275

1            DR. LINDSEY CAMERON

2    align in a way that leads the worker to work?

3               MS. POLLOCK:  Object to form.

4               THE WITNESS:  I think that

5        question is too broad for me to answer.

6    BY MR. WYATT:

7        Q.     I guess what I'm asking is, is

8    there an element I'm missing?  Like, does it

9    have to be something that's created by the

10   organization with some intent of controlling

11   the worker or is that not an element of it?

12       A.     Actually it doesn't have to be.

13   So I think in the next part of the paper I talk

14   about workplace games and that's actually not

15   organizational derived in the same way that

16   gamification is.

17       Q.     Okay.  So control can exist

18   theoretically without, you know, the

19   organization even intending to try to control

20   the worker?

21               MS. POLLOCK:  Object to form.

22               THE WITNESS:  That is a question

23       that you can answer, depending on the

24       level of analysis.

25               So when I talk about the theory

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 276

1              DR. LINDSEY CAMERON

2      of workplace games, I talk about how

3      there are elements within Uber's -- like

4      the Uber system, like, the customer in

5      the app, and the rating system, and how

6      much money they make on the score card,

7      which are, like, pieces of how Uber has

8      purposely designed its system that keeps

9      workers vested in the game which creates

10     a source of control.

11             Now, that is a bit different

12     from gamification, which is, from the

13     start, designed from the organization.

14             So I'd say in my workplace game

15     theory, it's less -- it's organizational

16     adjacent, but it's not organizationally

17     designed.

18             However, I know people, like

19     Michael Burroway, would disagree with me,

20     but he would say that even workplace

21     games are designed to protect managerial

22     interest over worker interest and that is

23     sort of built into the organization, but

24     he argues at a higher level of analysis

25     than what I do.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 277

1           DR. LINDSEY CAMERON

2               So it's a complicated answer to

3       your question or multi-speed, depending

4       on where you want to draw the line of

5       analysis at.

6   BY MR. WYATT:

7       Q.      Okay.  And I guess -- and I

8   appreciate that.  And just returning for a

9   second to gamification as opposed to workplace

10  games.

11              Isn't the worker also exercising

12  some control over how the worker spends his or

13  her time, for example, by choosing to engage in

14  gamified activities because they enjoy it?

15              MS. POLLOCK:  Object to form.

16              THE WITNESS:  Well, this is the

17      conversation we were having just a little

18      while ago about how the systems have to

19      allow for there to be some choice, some

20      autonomy within the larger system that is

21      control.

22              So, yes, to your point, yes, I

23      have some choice because I'm playing this

24      game and it's fun to sort of have it sort

25      of accrue the number of points I get, but

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

```
 1              DR. LINDSEY CAMERON
 2         ultimately, it's in a larger system of
 3         gamification that's meant to drive
 4         workers' behavior in a certain direction.
 5    BY MR. WYATT:
 6         Q.        Would you describe it as a
 7    dance, this balance between -- you know,
 8    exercise and control that -- allowing for
 9    autonomy within that framework?
10              MS. POLLOCK:  Object to form.
11              THE WITNESS:  I don't think I
12         quite go with dance, because there's an
13         definite power and balance here.
14              So I'm not sure if dance is the
15         right metapore, but it's dynamic, I would
16         agree with that.
17    BY MR. WYATT:
18         Q.        Okay.  And I mean, do you have a
19    view on whether gamification is a good or a bad
20    thing or is this just another neutral, that's a
21    form of control?
22         A.        It is another form of control.
23    I might have slightly more negative feelings
24    toward gamification because I feel like it
25    hides a lot of things.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 279

```
 1              DR. LINDSEY CAMERON
 2                  It obfuscates the control and it
 3    let's people not know that there's a clear
 4    power asymmetry in place.  So I don't think I'm
 5    fully neutral on gamification.
 6         Q.      Okay.  We talked earlier about
 7    how 80 percent of the work is done by
 8    20 percent of the drivers -- and this is
 9    actually meant to be quantitative, but the
10    concept is that most of the work is done by a
11    few drivers, right?
12         A.      Yeah.  80/20 isn't -- like,
13    that's the general economic principle.
14    There's -- I've seen the breakdowns in another
15    case that I've done that just sort of confirms
16    to the fact the majority of rides are given by
17    minority drivers, that's the big point I'm
18    trying to get across.
19         Q.      Okay.  And so for the majority
20    of drivers who do the least amount of work, are
21    they subject to less control?
22                  MS. POLLOCK:  Object to form.
23                  THE WITNESS:  I mean, it's an
24         interesting question, because that's not
25         how I think about control.  I think about
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 280

1              DR. LINDSEY CAMERON

2          control as more of, like, an

3          organizational process.  It's not so much

4          how it's exercised on one specific

5          individual.

6                  And I would agree, like I said

7          earlier, it's intensified for those who

8          are more economically dependent on the

9          work, but the problem with your question,

10         it's a different level of analysis than

11         what you're asking the question of, of

12         then what the concept of organizational

13         control is -- it's not a fair question.

14   BY MR. WYATT:

15         Q.      Sorry.

16                 I didn't mean to interrupt you.

17                 Are you done?

18         A.      Yeah.  I'm done.

19         Q.      Okay.  I just got excited

20   because I thought I had a crystallization of

21   what you were talking about.

22                 So are you saying that, like,

23   what you're doing is more of a description of

24   the process -- or an organizational process, or

25   less about measuring the impact on specific

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1              DR. LINDSEY CAMERON

2    progress?

3              MS. POLLOCK:  Object to form.

4              THE WITNESS:  If by specific

5         driver, do you mean, like, Joe in Newark,

6         New Jersey?

7    BY MR. WYATT:

8         Q.      It could be Joe or it could be

9    groups of drivers.  I'm just trying to

10   understand, it sounds like you're focussed on

11   the process within the organization and less

12   about how it actually manifests on the drivers

13   as a group.

14              Is that --

15        A.      I would -- I would say, in

16   general, it's a process on how it affects

17   drivers across the board, from, like, Alaska to

18   Maine.

19              And then there is data in the

20   five Bellwether cases where I show what it

21   looks like for these five specific drivers, but

22   the bulk of my theory or the bulk of the --

23   it's about this it how it works for Uber as a

24   system.

25        Q.      Okay.  I'm almost done, so I

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 282

```
 1                   DR. LINDSEY CAMERON
 2    would suggest we keep going, if that works for
 3    you?  I think I've got just a few questions
 4    left.
 5          A.       I'm great.
 6          Q.       Okay.  If we go to section --
 7                   MS. POLLOCK:  What does, what
 8          does almost done mean?
 9                   MR. WYATT:  I've got -- I've
10          got --
11                   MS. POLLOCK:  I've seen lawyers
12          disagree.
13                   MR. WYATT:  I've got one page of
14          an outline left.
15                   MS. POLLOCK:  Oh, okay.  Great.
16                   MR. WYATT:  Of an eight-page
17          outline.
18                   MS. POLLOCK:  Understood.
19                   We're good.
20                   MR. WYATT:  Okay.
21    BY MR. WYATT:
22          Q.       Okay.  Section 9, "How Uber uses
23    algorithmic management to exercise
24    organizational control over their workers and
25    influence their customers."
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 283

1               DR. LINDSEY CAMERON

2               Do you see that?

3       A.      Yes.

4       Q.      Okay.  And then, there's two

5   sections -- two Subsections, A, "Uber as the

6   quintessential on-demand organization," as one,

7   right?

8       A.      Correct.

9       Q.      And then the next one is, B,

10  "The usage of general and detailed control by

11  Uber by its algorithmic management system",

12  correct?

13      A.      Yes.

14      Q.      Okay.  And then, in -- in this

15  section, you -- you -- you say you discuss five

16  different components of their -- of Uber's

17  algorithmic management system, correct?

18      A.      Correct.

19      Q.      And it's matching, up-front

20  pricing, loyalty programs, incentives and

21  geotracking, right?

22      A.      Correct.

23      Q.      Okay.  And then, starting -- we

24  discussed the first two.

25              And then in Paragraph 90, you

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 284

```
 1              DR. LINDSEY CAMERON
 2    get to loyalty programs, right?
 3         A.        Correct.
 4         Q.        Okay.  Are you relying on any of
 5    your own prior research, outside of litigation,
 6    for your opinions on the loyalty programs?
 7                   MS. POLLOCK:  Object to form.
 8                   THE WITNESS:  I'm thinking.
 9                   So there's a sentence that says,
10         "unlike consumer loyalty programs, such
11         as airline rewards, these programs accept
12         workers granular interactions", that's
13         definitely an intellectual thought of
14         mine, but I feel like the majority of
15         this has come from case documents.  Yeah.
16    BY MR. WYATT:
17         Q.        And yet that puts a finger on
18    the what -- kind of prompt to my question.  I
19    do see citations in this section to litigation
20    documents and literature.
21         A.        Uh-huh.
22         Q.        But none of the literature
23    citations were to your literature, so I'm just
24    trying to draw lines in my own head between
25    which opinions are anchored in your -- you
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 285

```
1                  DR. LINDSEY CAMERON
2      know, your academic work versus what you've
3      read for this case.
4                  So in this section, this is a
5      thought that you identify as sort of
6      preexisting, this report of yours, but the rest
7      of it is largely based on litigation documents
8      and other people's research?
9          A.      So this entire section of the
10     report, not just these two paragraphs, is -- I
11     try to rely much more on case documents and not
12     my own research.
13                 I have had these thoughts about
14     loyalty programs well before this case.  I've
15     had it since the very first case, but I just --
16     that was data that I think I didn't -- I got
17     better quality data about that from case
18     documents, starting with my very first case I
19     did a few years ago.
20         Q.      Okay.  But again, to the extent
21     you're relying on litigation materials here,
22     you're only citing materials from this case,
23     correct?
24         A.      Correct.
25                 But the Massachusetts case had a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 286

```
 1               DR. LINDSEY CAMERON
 2   lot of data about this and it was very core to
 3   sort of forming my opinion and how to think
 4   about this, so I feel very confident about this
 5   section.
 6               There wasn't the same amount of
 7   high-quality data about the loyalty program in
 8   this -- this set of documents.
 9       Q.      Okay.  Looking ahead to 93, I
10   just -- I kind of had the same question on a
11   couple of these sections.
12               So 93, the incentives, same
13   thing, like, you're not relying here on your
14   prior published work, correct?
15       A.      Well, that's really not a fair
16   statement, though.  There's no way I could have
17   written this section of the report if I hadn't
18   been studying Uber for the past ten years.
19               So that there's so much general
20   knowledge I have about this company and knowing
21   this research, it would be impossible, there's
22   no way I could have written this.
23               So I am relying on all this, on
24   all my background knowledge to write this
25   section of the report, even though the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                 DR. LINDSEY CAMERON
 2   citations are just to this specific case.
 3        Q.        So I -- I hear what you're
 4   saying, but I guess my question is a little bit
 5   narrower than that.
 6                  You're not relying on any of the
 7   published work that you've done for this
 8   incentive piece specifically, right?
 9                  Unless I missed one?
10        A.        Am I citing my research?  No.
11                  But could I have written the
12   goal of my incentives is to induce drivers to
13   work for longer hours, oftentimes preferred by
14   Uber and continue working for Uber over the
15   long-term.
16                  I mean, that is things I've
17   talked about in Cameron 2024, in Cameron and
18   Rothman 2022.  Like, I had these ideas in my
19   other research papers, even if they're not
20   explicitly cited here, because they're not --
21   this isn't -- it's -- it's -- these are almost
22   like -- (inaudible) -- to me, what I'm citing
23   in here, as opposed to the theory I'm citing
24   from my other papers.
25        Q.        And are incentives something,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 288

1              DR. LINDSEY CAMERON
2    like, is that a topic that was covered in some
3    of your original research with drivers, like --
4         A.      Yeah.  Cameron 2024, there's a
5    whole section on incentives.
6         Q.      But is that something that came
7    up in your interviews with drivers?
8         A.      Yeah.
9              Came up in my interviews, came
10   up in my cargo data, came up in the online
11   form, came up as me as driving.
12        Q.      Okay.  And then, the importance
13   of Uber Pro plan and realtime incentives, is
14   that also something that would have come up in
15   research or did you get that specific about it?
16              MS. POLLOCK:  Object to form.
17              THE WITNESS:  I'm thinking.
18              The pay, overall pay is
19         important and in fact satisfaction, that
20         was important in, like -- it came out in
21         the early draft that didn't get
22         published, the paper changed and so that
23         it didn't come in.
24              But I remember thinking about
25         pay, because remember I talked about how

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 289

1              DR. LINDSEY CAMERON
2         I made all those categories as I was
3         content coding the data?
4              There's an early category I had
5         around pay and the thing is it wasn't as
6         theoretically interesting, which is why
7         it ends up not being in the report, or it
8         doesn't end up being in my published
9         research, but it's something I've been
10        thinking about.
11             The same with B, "The ability to
12        earn income plays a role whether people
13        sign up to drive.  If you read Cameron,
14        2022, and the boundary conditions and
15        future research, I talk about it.
16             What I'm getting at is, like,
17        empirically what is -- on all these cites
18        here that we have from the data case is
19        not the same what researchers find
20        theoretically interesting.
21             So I've thought many of these
22        ideas before, but they're not the core of
23        what informed my theoretical argument.
24             So, yeah.
25   BY MR. WYATT:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 290

```
 1                   DR. LINDSEY CAMERON
 2       Q.        Okay.  That's all I'm trying to
 3   figure out.  Is this something that came up in
 4   your experience or is it being pulled from the
 5   documents or both?
 6       A.        I would say the loyalty program
 7   data is the one that I really relied on case
 8   documents the most.
 9       Q.        Okay.
10                 And then 95, rating system.
11                 Is this also something that was
12   explored in your published work?
13       A.        Yeah.  Cameron and Rothman,
14   2022, is all about the customer rating system.
15       Q.        Okay.  And I did see that cite
16   in this section.
17                 95, F, Deactivation and
18   Revisitation, we talked about that.  I know
19   that's covered in your --
20       A.        Yeah.
21       Q.        -- work.
22                 96, Experimentation, we talked
23   about that --
24       A.        I don't talk about that -- I
25   don't talk about that very much in my research,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 291

1              DR. LINDSEY CAMERON

2    the experimenting.

3         Q.       Okay.  And what about

4    geotracking and monitoring?

5         A.       Yeah.  It's in Cameron, 2024.

6         Q.       Okay.

7              MR. WYATT:  Okay.

8              I have no further questions.

9              MS. POLLOCK:  All right.

10              We can go off the record,

11         please.

12              THE VIDEOGRAPHER:  Going off the

13         video record.  Time is 7:39 p.m.

14                   -  -  -

15              (Whereupon, a recess took place

16         from 7:39 p.m. to 7:42 p.m.).

17                   -  -  -

18              THE VIDEOGRAPHER:  We are back

19         on the video record.

20              The time is 7:42 p.m.

21                   -  -  -

22                   EXAMINATION

23                   -  -  -

24    BY MS. POLLOCK:

25         Q.       Dr. Cameron, I have the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 292

```
1                DR. LINDSEY CAMERON
2    opportunity to just ask you a couple of
3    follow-up questions from questions that you
4    were asked by counsel for Uber.
5                First, I want to direct your
6    attention to Paragraph 7 of your expert report,
7    which you can see before you on the screen.
8         A.      Yes.
9         Q.      All right.
10               And you were asked in the second
11   sentence of Paragraph 7, about whether this
12   sentence was a fair summary of your methodology
13   in this case.
14               Do you recall that question?
15        A.      Yes.
16        Q.      All right.
17               And were there other steps
18   involved in your methodology in this case that
19   were -- are not described in this sentence?
20        A.      By the word in-depth and
21   observation, it's more than just I drove for
22   Uber for 100 hours.
23               It includes, you know, I've
24   interviewed people longitudinally for seven
25   years, -- data, online forums, public documents
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 293

```
 1                    DR. LINDSEY CAMERON
 2     from Uber for S1s to advertisements to
 3     promotional materials, just scraping the web
 4     forums for the past ten years.
 5                    So when I mean emerging, it's
 6     not just me driving, it's, like, you know, it's
 7     really what I've eat, lived, breathed for the
 8     past ten years.
 9                    And then to think of the last
10     thing, to see things from the experiential view
11     of actors in this field doesn't mean that
12     workers say I like apples and then you just
13     take it as face value that they like apples.
14                    Like, there's a whole amount of
15     scientific evidence that you create because you
16     do this emergement, it allows to you extract or
17     theorize much broader than someone's
18     individual's experience.
19         Q.        As part of your methodology in
20     this case, did you take the opportunity to
21     review other published literature?
22         A.        Yes.  I read a fair amount of
23     outside literature for this case.
24         Q.        All right.
25                    MS. POLLOCK:  I have no further
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 294

```
 1              DR. LINDSEY CAMERON
 2      questions.
 3                  MR. WYATT:  Nothing from me
 4      either.  Thank you for your time.
 5                  MS. POLLOCK:  Happy birthday.
 6                  THE WITNESS:  Yeah.
 7                  Happy birthday.
 8                  THE VIDEOGRAPHER:  Going off the
 9      video record.  The time is 7:44 p.m.
10                  THE COURT REPORTER:  I'll start
11      with Jeff, my understanding is you would
12      like the final November 14th, and a rough
13      draft?
14                  MR. WYATT:  Yeah.  As soon as
15      possible on the rough.  Sorry.
16                  MS. POLLOCK:  Yes.  Please.
17                      -   -   -
18                  (DR. LINDSEY CAMERON was
19      excused.)
20                      -   -   -
21                  (Deposition concluded at
22      7:44 p.m.)
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 295

1                   DR. LINDSEY CAMERON
2                 C E R T I F I C A T E
3

COMMONWEALTH OF PENNSYLVANIA:
4
COUNTY OF PHILADELPHIA:
5
6          I, Beau Dillard, RPR, a Notary Public
     within and for the County and State aforesaid,
7    do hereby certify that the foregoing deposition
     of DR. LINDSEY CAMERON was taken before me,
8    pursuant to notice, at the time and place
     indicated; that said deponent was by me duly
9    sworn to tell the truth, the whole truth, and
     nothing but the truth; that the testimony of
10   said deponent was correctly recorded in machine
     shorthand by me and thereafter transcribed
11   under my supervision with computer-aided
     transcription; that the deposition is a true
12   record of the testimony given by the witness;
     and that I am neither of counsel nor kin to any
13   party in said action, nor interested in the
     outcome thereof.
14
           WITNESS my hand and official seal this
15   14th day of November, 2025.
16
17
18
           Beau Dillard, RPR
19         Notary Public
20
21
22
23
24
25

Page 296

1                    DR. LINDSEY CAMERON

2                 INSTRUCTIONS TO WITNESS

3

4        Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the appropriate

7    space on the errata sheet for any corrections

8    that are made.

9            After doing so, please sign the errata

10   sheet and date it.

11           You are signing same subject to the

12   changes you have noted on the errata sheet,

13   which will be attached to your deposition.

14           It is imperative that you return the

15   original errata sheet to the deposing attorney

16   within thirty (30) days of receipt of the

17   deposition transcript by you.  If you fail to

18   do so, the deposition transcript may be deemed

19   to be accurate and may be used in court.

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 297

```
 1              DR. LINDSEY CAMERON

 2                  - - - - -

 3              E R R A T A

 4                  - - - - -

 5   PAGE   LINE    CHANGE

 6   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 7   Reason for

 8   Change:_____

 9   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10   Reason for

11   Change:_____

12   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13   Reason for

14   Change:_____

15   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16   Reason for Change:

17   _____

18   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19   Reason for Change:

20   _____

21   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

22   Reason for Change:

23   _____

24   _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 298

1              DR. LINDSEY CAMERON

2          ACKNOWLEDGMENT OF DEPONENT

3       I, _____, do hereby

4    certify that I have read the foregoing pages __

5    to ___ and that the same is a correct

6    transcription of the answers given by me to the

7    questions therein propounded, except for the

8    corrections or changes in form or substance, if

9    any, noted in the attached Errata Sheet.

10

11    _____    _____

12    DATE          SIGNATURE

13

14

15              Subscribed and sworn to before

16    me this _____ day of _____,

17    2025.

18

19                   My commission expires:

20

21              _____

22

23

24    _____

25                   Notary Public

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[& - 2024]                                                                 Page 1

**&**

**&**   2:8 9:7
183:11,13
185:17 188:6,8
188:15,16

**0**

**003**   4:23
**01**   3:12
**02**   3:15
**03**   3:18
**03084**   1:6
**03a**   3:22
**03b**   4:3
**05**   4:9 200:14
200:20
**07**   4:13
**09**   4:20

**1**

**1**   3:12 6:15 8:7
11:12,16 12:11
26:24 29:4
31:18 35:12
52:21 55:14
60:12 85:16
123:12 206:20
**10**   4:16 5:3
24:3,4,11,16
51:15 101:10
142:4,8 194:3
194:13 204:16
210:5 234:13

**100**   292:22
**11**   3:13 4:20
156:15,18
**114**   4:14
**12**   5:3 24:3,4
24:11,16 53:14
162:19,22
**12th**   1:16 8:6
**13**   4:16 5:6
60:24 71:16
184:15,20
**1301**   2:10
**14**   76:20
120:25 121:7
121:21 122:18
124:8,11
127:10
**142**   4:18
**14th**   294:12
295:15
**15**   101:10
131:14 264:11
**150**   206:21
**156**   4:23
**16**   121:22
122:7,12,13
149:10,15
158:22
**162**   5:4
**17**   5:6 159:2
169:8
**18**   3:16 20:16
204:7,9

**184**   5:8
**1967**   183:11
188:7
**1995**   190:10

**2**

**2**   3:15,23 18:22
18:25 19:4
28:3,6,8 29:4
32:6,7 63:6
70:9 84:10
123:11,12
**20**   20:11 27:18
29:7,13 257:17
257:23 258:7
279:8
**20004**   2:10
**2001**   188:11
**2003**   208:3
**2006**   67:24
188:12
**2008**   67:23
157:9,17
**2009**   235:19
**2013**   111:9
203:8 230:10
237:13
**2015**   230:12
**2016**   111:21
**2017**   33:14
117:12
**2018**   4:21
13:11 157:16
157:19

**2019**   13:10
57:7,11,15,19
58:7 138:23
252:22
**202-389-3393**
2:11
**2020**   13:10
111:6 112:14
112:16,19,23
112:25 113:3
226:18
**2021**   4:9 57:15
57:20 58:7,25
59:18 65:22
72:11 169:25
**2022**   105:14
138:24 193:17
193:18 195:14
203:25 205:25
207:12 250:12
250:23 264:10
265:19 287:18
289:14 290:14
**2023**   13:21
15:11 142:19
237:13
**2024**   20:16,21
21:3,11,18
54:8 55:2
64:10 85:6
164:21 168:15
197:14 225:21
260:9 287:17
288:4 291:5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[2025 - 90s]**                                                      Page 2

**2025**  1:16 8:6
  11:25 19:9
  20:17,22 21:19
  22:2,9,15,17,21
  23:2,15 295:15
  298:17
**20250926**  5:3
**20251024**  3:12
**20251105**  3:18
**20251110**  4:3
**207**  186:22
**20s**  29:10
**21851**  295:18
**22**  6:11 24:14
**22nd**  20:17
  23:22 24:2
**23-03084**  5:4
**23rd**  85:6
**24th**  11:25
  20:14
**25**  3:20 121:8
  122:18 127:10
**26**  121:14
  212:10,12
  264:3
**26th**  19:9 20:5
**27**  3:23 212:10
  212:16,20
  213:18
**28**  212:10
  214:14
**29**  163:7
  218:16

**291**  3:7
**2:13**  1:17 8:5
**2:15**  10:24 11:4
**2:16**  11:4,8

**3**

**3**  3:18 25:15,19
  35:2 85:24
  121:3 158:17
**30**  4:5 296:16
**32**  4:7 228:10
**35**  231:10
**36**  161:18
**37**  239:3,13
**3:23**  1:6
**3:25**  84:3,6
**3:28**  84:6

**4**

**4**  3:22 27:8,12
  35:17 37:9,13
  96:6 97:15
  218:5
**40**  6:11
**41**  240:9
**42**  91:12
**43**  243:21
  244:3
**44**  245:10
  247:13
**45**  249:18
**46**  256:3
**47**  258:18
**49**  260:20

**4:00**  257:12
**4:49**  158:9,12

**5**

**5**  4:3 30:13,17
  34:25 36:23
  96:12
**50**  115:2
  231:15 262:11
**500**  201:17
**54**  264:25
**58.5**  20:20
  21:16 23:17
**59**  4:9
**5:04**  158:12,16

**6**

**6**  4:7 33:2,7
  38:10 87:20
**60**  12:4 268:3
**618-259-2222**
  2:6
**62002**  2:5
**63**  264:10
  268:9
**64**  269:25
  270:8
**66**  273:18
**6:05**  217:21,24
**6:20**  217:24
  218:4
**6apr**  4:7
**6th**  33:14

**7**

**7**  4:9 6:15
  38:23 50:24
  51:18 52:25
  59:9,12 85:24
  86:3 87:25
  99:17 176:19
  292:6,11
**7,500**  19:22
**77**  67:22
**7:39**  291:13,16
**7:42**  291:16,20
**7:44**  294:9,22

**8**

**8**  4:11 41:13
  50:24 84:19,24
  85:24 86:7
  94:11 199:4
**80**  257:17,23
  258:4 279:7
**80/20**  279:12
**810**  254:7,17
**84**  4:11
**86**  91:11

**9**

**9**  3:6 4:13
  50:15 51:8
  114:10,15
  282:22
**90**  283:25
**90s**  188:9,17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[93 - actually]**

**93** 286:9,12
**95** 253:17
290:10,17
**96** 231:15
290:22
**98** 121:15
**99** 139:13

**a**

**a.m.** 257:12
**ab** 259:21
**ability** 155:2
187:8 289:11
**able** 59:20
67:25 71:2,24
72:5 120:17
125:15 126:13
126:16,17,22
148:10,11
168:23 170:7
171:18 228:5
230:4,5 272:14
**above** 7:16
163:9 200:11
**abstract** 104:16
138:6 140:14
189:7
**abstraction**
216:8
**abstractly**
134:4
**abstracts** 32:8
**academia**
102:19 103:12

103:17 106:22
**academic** 87:5
109:21 124:14
124:20 128:4
130:8 132:10
152:12 155:16
157:10,25
212:13 214:17
216:16 285:2
**academics**
13:16,17
**acceleration**
225:4 246:4
**accept** 260:12
284:11
**acceptable**
54:21 82:22
**accepted** 27:24
28:17 29:4
106:15,23
231:6
**accepting**
225:5
**access** 71:9
93:2 179:19
180:3 222:2,3
250:2
**accessible** 39:6
**accident** 34:19
76:15 80:9
**accomplished**
249:20
**account** 71:2
191:6,13,16,25

193:2 273:5
**accounts**
144:12
**accrue** 277:25
**accuracy**
131:18
**accurate** 12:13
17:8 20:23
125:15 169:12
186:6 211:10
296:19
**accurately**
235:20
**accused** 80:3
**acknowledge**
7:4,9 124:15
**acknowledg...**
298:2
**act** 144:14
**action** 27:2
35:21 37:2
39:2 50:17
51:5,17 295:13
**actions** 201:5
**active** 262:16
263:14
**activities**
161:22 228:15
268:21 273:23
277:14
**actors** 177:7
293:11
**actual** 13:16
24:12 44:2

67:7 102:3
153:25 193:19
252:9
**actually** 14:23
26:21 33:25
37:17 41:4
42:25 52:7
66:17 67:4,12
67:25 69:20
80:10 83:4
94:3 104:13
107:23 108:5
109:7 112:24
116:22 121:22
121:22 122:6
123:5,11
128:17 140:23
145:21 147:6
149:11 150:16
150:17 155:22
157:12 160:4
160:20 167:2
167:14 175:8
176:22 190:5,8
194:9 207:25
208:10 219:23
220:3 226:20
226:22 231:4
232:8,13 242:3
253:21 266:12
266:17 267:22
275:12,14
279:9 281:12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| **add**  36:17 | **advance**  206:9 | **ahead**  37:20 | 224:13 225:10 |
| 118:13 120:14 | **advertisements** | 98:20 125:22 | 225:24 226:19 |
| 233:13 | 293:2 | 130:12 187:15 | 234:12 235:14 |
| **added**  14:11 | **affect**  198:16 | 233:2 253:16 | 235:20 236:2,4 |
| 27:21 | 265:9 | 268:3 273:16 | 236:10,14,25 |
| **addition**  32:18 | **affected**  196:13 | 286:9 | 237:2 240:25 |
| 207:20 | 196:17 | **aided**  295:11 | 241:8 242:3,17 |
| **additional** | **affects**  281:16 | **airline**  284:11 | 243:8,22 |
| 12:23 14:9,10 | **affiliated**  98:23 | **airport**  257:13 | 245:12 249:20 |
| 20:4 32:18 | **affiliations** | **alaska**  281:17 | 256:4 265:4 |
| 38:5 | 8:20 | **alex**  150:23 | 266:22 270:3 |
| **address**  83:17 | **aforesaid**  295:6 | **algorithm** | 282:23 283:11 |
| 120:6,9 | **afternoon**  8:4 | 144:14 197:13 | 283:17 |
| **addressed** | 9:18,19,24 | 197:22 198:18 | **algorithmically** |
| 89:17 | **ag**  90:9 | 223:15 224:8 | 253:18 264:4 |
| **addressing** | **ago**  15:14 30:4 | 224:19 225:19 | **algorithms** |
| 89:11 95:6 | 55:18 170:18 | 240:15,17,21 | 63:12 66:8,9 |
| 130:24 | 277:18 285:19 | 241:14 242:11 | 227:14 240:14 |
| **adherence** | **agree**  64:22 | 247:24 | 240:20,21,23 |
| 245:19 | 122:16 124:2 | **algorithmic** | 241:19 242:12 |
| **adjacent** | 145:5 151:25 | 4:16 41:22 | 245:17 |
| 234:15 276:16 | 165:17 166:8 | 64:12 66:5,11 | **align**  66:20 |
| **adjudicate** | 167:16 185:10 | 66:13 74:7 | 275:2 |
| 81:23 | 186:11 189:9 | 88:13,22 89:15 | **aligned**  274:3 |
| **adjustment** | 190:20 194:23 | 92:12 116:13 | **aligns**  67:19 |
| 236:9 | 195:22 196:11 | 116:18,22 | 161:20 |
| **administered** | 219:7 221:3,13 | 122:2 142:19 | **allegation** |
| 7:10,11 | 222:12,15,21 | 142:19 144:3,7 | 252:21,22 |
| **administrative** | 251:20 278:16 | 144:13 165:2 | **allegations** |
| 64:10 | 280:6 | 167:11 170:24 | 95:21 |
| **admissibility** | **agreed**  7:18 | 173:4 193:4,24 | **allow**  256:7 |
| 128:15 | **agreement**  7:16 | 194:4,15,18 | 277:19 |
| **adopt**  144:8 | 37:24 50:2,5 | 195:7,12,16 | **allowed**  187:19 |
| | 222:2 | 197:17 215:13 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**allowing** 278:8
**allows** 103:6,20
  293:16
**altercation**
  81:12
**alton** 2:5
**amenable**
  240:20
**america** 139:20
  208:23 210:3,6
  211:18
**amount** 160:7
  163:11 164:6
  165:14,20
  166:10,18,21
  173:4 208:14
  226:17,24
  257:11 264:8
  264:23 279:20
  286:6 293:14
  293:22
**amount26aug...**
  3:16
**analyses** 41:16
  177:16
**analysis** 76:8
  124:12 136:17
  143:22 184:10
  199:7 215:18
  275:24 276:24
  277:5 280:10
**analyst** 110:17
**analytical**
  131:17 214:16

215:24
**analyze** 177:19
  204:4,6 206:25
  213:21,24
**anchored**
  284:25
**anecdotal**
  131:16,21
  132:18 133:15
  154:7 207:18
  207:23 208:16
**anecdotical**
  208:20
**angle** 195:17
**anna** 2:4 9:2
  17:25 22:13
  34:4 52:14
  54:20 55:6
**anne** 159:11
**annual** 231:15
**answer** 6:4
  16:22 17:13
  54:21 56:10
  65:9,14 69:2
  70:2 72:20
  73:16,25 81:17
  82:22 83:2
  106:19 107:6
  123:22,23
  126:5 128:25
  129:4 132:22
  133:8 136:18
  140:12 162:11
  170:8 175:4,9

187:16 195:8
  209:8 213:8
  225:15 227:8
  233:11 234:5
  237:11 244:18
  255:13,18
  275:5,23 277:2
**answered**
  213:9
**answering**
  186:21
**answers** 16:7
  16:20 78:25
  298:6
**anthropologists**
  183:15
**antibe** 67:22,24
**anticipates**
  40:14
**anybody** 17:23
  18:3 48:17
  118:8,12
**anymore** 196:8
  196:25
**anytime** 274:24
**anyway** 77:16
**apart** 38:20
**app** 72:23
  163:12 166:10
  166:20 167:3
  167:17,23
  168:4,17
  170:20,23
  172:10,13

173:3 197:7
  220:24 221:4,5
  221:5,6,13
  222:13,24
  223:11 238:20
  242:12,19
  250:2 252:8,15
  256:11 276:5
**appeal** 78:9
**appealing**
  151:7
**appearances**
  8:20
**appeared** 60:15
**appearing** 58:5
**appendix** 192:5
**apples** 293:12
  293:13
**applicable**
  141:16
**application**
  47:10 220:24
**applied** 237:9
**applies** 146:17
  200:5 229:16
  239:19,23
  240:12 241:8
  241:11 257:15
  262:21
**apply** 71:3
  128:3 146:19
  196:24 218:23
  233:9 237:7,8
  241:5,14

| | | | |
|---|---|---|---|
| 257:23 258:3,3 | archival 76:3 | arrests 76:20 | asking 56:19 |
| applying | 133:12 134:10 | arrival 225:6 | 69:20 82:14 |
| 273:21 | 147:15 179:18 | arriving 114:11 | 141:3 145:9 |
| appointment | 208:19 | article 32:11 | 179:9 196:19 |
| 97:15,21 | area 41:21 | 49:20 64:11 | 208:7 213:5 |
| appraisals | 82:16 237:12 | 107:23 142:13 | 245:2 255:7 |
| 96:22 | 272:13 | 142:16 148:19 | 275:7 280:11 |
| appreciate 30:8 | areas 113:6 | 155:25 157:2,6 | aspect 196:3 |
| 82:6 87:9 94:7 | 195:6 230:5 | 157:8 164:17 | 234:17 247:23 |
| 117:17 118:15 | argo 94:4 | 173:21 184:23 | aspects 249:7 |
| 240:2 277:8 | argue 137:12 | 187:9,25 | aspen 152:11 |
| approach 74:3 | 169:13 260:5 | 188:24 189:6 | aspirations |
| 147:20 199:5 | argues 242:17 | 190:16 194:4 | 161:23 |
| 206:23 213:24 | 276:24 | 196:23 231:5 | asq 164:21 |
| 214:8 251:13 | arguing 267:11 | 234:11,12 | 168:15 197:14 |
| approaches | argument | 244:21 250:11 | 225:21 |
| 130:7 234:15 | 13:25 14:23 | 254:8 | assault 1:7 |
| appropriate | 34:2 61:23,25 | articles 32:8 | 252:22 |
| 87:6 170:8 | 127:18 193:10 | 42:22,23 125:7 | assemble |
| 193:22 296:6 | 197:6,16 | 244:19 245:2 | 239:16 |
| appropriately | 241:22 289:23 | artifact 91:14 | assert 164:13 |
| 48:13 | argumentation | 91:24 92:20 | assess 246:8 |
| approval 47:20 | 242:25 | artifacts 92:20 | assignments |
| approved 44:6 | argumentative | 210:9,12,20 | 256:8 |
| 115:9 | 153:20 | asian 190:17 | assistant 96:7 |
| approximately | arguments | aside 160:19 | 209:14,18 |
| 113:5 | 120:12 121:4 | asked 16:24 | associate 98:4 |
| apps 256:7 | 180:17 181:5 | 17:13 34:4 | associated |
| april 33:14 | arizona 209:3 | 58:8 97:12 | 50:19 |
| arabic 110:22 | arrangement | 122:23 123:13 | assume 16:23 |
| arbitrary | 7:13 95:12 | 123:15,19,22 | 20:17 51:19 |
| 200:20 | arrangements | 126:2 167:23 | 53:2 65:20 |
| architectural | 56:20 61:2,15 | 268:25 292:4 | 92:4 267:17 |
| 195:4 | 62:3 | 292:10 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**assuming** 12:8
78:22
**assumption**
51:10
**assumptions**
104:23
**asymmetry**
279:4
**atlantic** 1:21
**atomize** 261:4
261:7
**attached** 28:14
28:25 296:13
298:9
**attachment**
39:25
**attachments**
39:9
**attacked** 81:14
**attempted**
68:12 226:13
**attention** 292:6
**attorney** 94:14
296:15
**attorneys** 7:3
7:15
**audio** 41:14
50:19 268:17
**august** 19:9
20:5,17,22
21:19 23:22
24:2,14 25:7
211:5,10

**australian**
190:17
**author** 13:9
157:11 194:8
**authored** 32:9
32:10
**authors** 13:8
145:3 157:10
157:21,21
194:9
**automatically**
252:24
**automize**
260:23 261:4
**autonomy**
113:18,20
174:21 270:11
270:15,19,23
271:2,9,12,12
271:15,20
272:2,19
277:20 278:9
**available** 11:19
32:19 39:11
**ave** 2:10
**average** 135:17
**averaged** 225:9
**avoid** 270:8
**award** 105:18
**awarded** 102:9
102:15
**awards** 100:7
101:2,8,19,23
102:6 103:9

114:4 136:24
138:20
**aware** 128:14
128:19 152:23
153:5 269:10
269:13,14,15
**awkward** 240:8

**b**

**b** 3:9 39:17,25
107:21 145:25
146:3 171:12
283:9 289:11
**back** 11:6,10
29:7 31:14
41:12 49:17
52:12,25 55:13
58:8 81:21
84:8,12 85:13
87:21 94:10
117:19,22
124:8 139:11
146:22 149:7
149:11 158:14
158:19,25
168:7,23 169:8
170:17 171:7
172:17 176:13
194:2 196:14
196:23 199:3
202:5 204:6
218:2,7,9
230:13 233:3
234:11 239:2

246:11 252:7
252:15 256:3
272:9,12 273:4
274:24 291:18
**background**
110:19 212:13
286:24
**backing** 119:8
**backs** 77:5
**bad** 81:3
246:13,14,22
247:5,8 265:23
269:3 278:19
**balance** 278:7
278:13
**band** 250:23
**bank** 150:21
**barber** 133:16
**barrier** 71:21
171:15
**base** 258:8
**based** 51:11
65:13 78:5
81:5 96:25
144:14 150:22
167:6 197:11
198:21 202:21
203:12 251:14
255:7 285:7
**basic** 72:21
218:17
**basically** 89:5
210:20 212:19
216:5 255:25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[basis - boss]**                                                    Page 8

**basis** 38:25
  41:22 234:16
**bathroom**
  239:17
**beau** 1:17 8:17
  295:6,18
**beg** 15:23
**beginning** 1:16
  67:2 111:15
  134:7
**begins** 84:10
  158:17 218:4
**behalf** 9:8 86:6
**behave** 66:18
  67:17
**behavior** 67:19
  101:16 111:14
  176:8 265:6
  278:4
**behaviors**
  66:20 224:20
  268:5 274:3
**belabor** 157:6
**belief** 148:9
**believe** 12:12
  37:24 39:19
  40:11 62:20
  66:6 72:15
  74:19 87:17
  113:3 145:8
  146:22 147:21
  150:13 168:14
  168:22 172:14
  174:14,14,25

175:5 183:14
  197:23 222:5
  224:13 229:16
  237:22 239:9
  241:11 249:9
  251:11
**believes** 75:13
**bellwether**
  281:20
**bellwethers**
  90:5
**ben** 2:18 8:14
**benefit** 30:3
  72:16 74:19,23
  75:14 249:10
**benefits** 70:11
  70:17,23 73:13
  76:24 77:22
  171:8,11,12
  174:7 249:8,13
  249:15
**benefitting**
  248:20
**berkman** 98:5
  98:10
**berkover** 2:4
  9:4
**best** 16:9 17:6
  75:14 101:2,7
  109:19 124:17
  131:10 151:3
  207:10,10
  232:15,17,17
  237:18 242:15

263:11
**better** 74:13
  121:22 256:20
  266:2 285:17
**beyond** 138:18
  197:22
**bias** 190:22
  191:5,14,17,21
  192:3,17 273:5
**biased** 65:25
  66:6,12 273:3
**biases** 191:7
  193:2 241:20
**biddle** 188:12
**big** 10:15 13:23
  152:11 180:24
  197:16 233:24
  235:8,17 237:4
  279:17
**biggest** 74:19
  74:23
**billed** 21:16
**billing** 35:19
  36:13
**bills** 35:19
**binary** 69:15
  175:23,24
  176:3
**biometrics**
  245:17
**birthday** 294:5
  294:7
**bit** 71:19 72:10
  72:13 80:12

114:23 145:21
  163:4 165:11
  166:16 196:18
  199:12 208:3
  210:22 245:22
  250:8 253:16
  253:22 276:11
  287:4
**black** 150:23
  242:22 243:3
**blitz** 4:7
**block** 82:8
**blocked** 78:5
  78:22 79:24
  80:6 81:17
**board** 42:6
  43:6,8 44:6
  46:14,17,25
  47:12 49:19
  50:13 105:19
  281:17
**boards** 127:24
**bodies** 243:3
**body** 39:16
  208:17
**boilerplate**
  260:9
**book** 105:12
  150:24 151:3
**books** 174:2
**boss** 173:7
  174:9,13,15
  175:2,6 271:2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[bottom - cameron]                                                    Page 9

| | | | |
|---|---|---|---|
| **bottom** 46:12 60:11 143:16 206:2 207:11 | **bringing** 127:17 226:9 229:4 | **business** 109:18 117:2 237:16 267:9 | 122:22 154:21 266:12 |
| **bouncing** 31:14 | **brings** 149:15 260:9 | **businesses** 71:10 | **cameras** 245:16 268:17 |
| **bound** 149:4 | **british** 13:22 | **buy** 221:9 | **cameron** 1:1,13 2:1 3:1,5,13,20 |

**bottom** 46:12
60:11 143:16
206:2 207:11
**bouncing** 31:14
**bound** 149:4
**boundary**
289:14
**bowling** 173:25
**box** 52:3
**boxes** 214:25
**braking** 225:4
246:4
**branch** 183:23
**branches**
183:25
**brazil** 214:2
**break** 17:11,14
54:15 83:23
156:4 158:6
173:22 212:9
217:13
**breakdown**
21:15
**breakdowns**
279:14
**breaking** 100:6
**breaks** 17:11
17:16 132:6
**breathed** 293:7
**brief** 83:23
**briefly** 55:17
225:22
**briefs** 99:8

**bringing**
127:17 226:9
229:4
**brings** 149:15
260:9
**british** 13:22
**broad** 48:9
50:7 135:23
273:11 275:5
**broader** 76:6
199:8 242:4,10
293:17
**broccoli** 271:18
**broken** 80:8
**brought** 85:25
204:10
**brown** 242:22
243:3
**brussel** 271:19
**buckets** 206:3
**build** 132:9
**building**
127:18
**built** 276:23
**bulk** 281:22,22
**bunch** 51:24
138:19
**burawoy**
137:17
**burroway**
276:19
**busier** 21:22
22:2,2

**business**
109:18 117:2
237:16 267:9
**businesses**
71:10
**buy** 221:9

**c**

**c** 2:2 35:11 78:3
85:15 145:25
268:4 295:2,2
**cage** 244:5,14
244:22 245:4
**calarco** 105:14
**calculated**
225:10
**calculations**
52:22
**california** 1:3
8:12 209:10,12
**call** 78:16
120:11 221:10
244:4,13 267:2
**called** 30:23
39:18 54:22
63:7 70:4 97:6
105:14 108:2
121:2 151:19
184:3,23 188:3
215:17 227:3
228:20 259:21
260:9 270:21
**calls** 62:11
107:2 118:19

122:22 154:21
266:12
**cameras** 245:16
268:17
**cameron** 1:1,13
2:1 3:1,5,13,20
4:1,4,7,13,22
5:1 6:1 7:1 8:1
8:9 9:1,11,22
9:24 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1,24 25:1
26:1,3 27:1
28:1 29:1 30:1
31:1,2 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[cameron - carefully]**                                              Page 10

| | | | |
|---|---|---|---|
| 81:1 82:1 83:1 | 154:1 155:1 | 222:1 223:1 | 288:1,4 289:1 |
| 84:1,13 85:1 | 156:1 157:1 | 224:1 225:1 | 289:13 290:1 |
| 86:1 87:1 88:1 | 158:1,19 159:1 | 226:1 227:1 | 290:13 291:1,5 |
| 89:1 90:1 91:1 | 160:1 161:1 | 228:1 229:1 | 291:25 292:1 |
| 92:1 93:1 94:1 | 162:1 163:1 | 230:1 231:1 | 293:1 294:1,18 |
| 95:1 96:1 97:1 | 164:1 165:1 | 232:1 233:1 | 295:1,7 296:1 |
| 98:1 99:1 | 166:1 167:1 | 234:1 235:1 | 297:1 298:1 |
| 100:1 101:1 | 168:1 169:1 | 236:1 237:1 | **cameroninvo...** |
| 102:1 103:1 | 170:1 171:1 | 238:1 239:1 | 3:15 |
| 104:1 105:1 | 172:1 173:1 | 240:1 241:1 | **cameroninvo...** |
| 106:1 107:1 | 174:1 175:1 | 242:1 243:1 | 4:11 |
| 108:1 109:1 | 176:1 177:1 | 244:1 245:1 | **cams**  268:20 |
| 110:1 111:1 | 178:1 179:1 | 246:1 247:1 | 269:4,13,18 |
| 112:1 113:1 | 180:1 181:1 | 248:1 249:1 | **capabilities** |
| 114:1 115:1 | 182:1 183:1 | 250:1,12,22 | 161:21 |
| 116:1 117:1 | 184:1 185:1 | 251:1 252:1 | **capital**  4:21 |
| 118:1 119:1 | 186:1 187:1 | 253:1 254:1 | 79:4 173:20 |
| 120:1 121:1 | 188:1 189:1 | 255:1 256:1 | **cappelli**  237:13 |
| 122:1 123:1 | 190:1 191:1 | 257:1 258:1 | **capture**  228:16 |
| 124:1 125:1 | 192:1 193:1 | 259:1 260:1 | **car**  34:10 78:7 |
| 126:1 127:1 | 194:1 195:1 | 261:1 262:1 | 79:18 80:8,9 |
| 128:1 129:1 | 196:1 197:1 | 263:1 264:1,10 | 80:18 151:9 |
| 130:1 131:1 | 198:1 199:1 | 265:1,18 266:1 | 204:25 205:3 |
| 132:1 133:1 | 200:1 201:1 | 267:1 268:1 | 210:18 221:11 |
| 134:1 135:1 | 202:1 203:1,25 | 269:1 270:1 | 238:18,19 |
| 136:1 137:1 | 204:1 205:1,25 | 271:1 272:1 | 268:21 |
| 138:1 139:1 | 206:1 207:1,12 | 273:1 274:1 | **card**  276:6 |
| 140:1 141:1 | 208:1 209:1 | 275:1 276:1 | **cards**  71:3 |
| 142:1 143:1 | 210:1 211:1 | 277:1 278:1 | **care**  72:7 |
| 144:1 145:1 | 212:1 213:1 | 279:1 280:1 | 171:24 |
| 146:1 147:1 | 214:1 215:1 | 281:1 282:1 | **career**  109:12 |
| 148:1 149:1 | 216:1 217:1 | 283:1 284:1 | **careful**  95:10 |
| 150:1 151:1 | 218:1,7 219:1 | 285:1 286:1 | **carefully** |
| 152:1 153:1 | 220:1 221:1 | 287:1,17,17 | 214:15 296:5 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[cares - choosing]                                              Page 11

| | | | |
|---|---|---|---|
| **cares** 135:17,18 | **cases** 8:10 35:3 | **certification** | **characterizati...** |
| **cargo** 288:10 | 55:9,21 56:3,4 | 216:21 | 45:7 |
| **carolina** 209:6 | 56:6 85:20,24 | **certify** 295:7 | **characterize** |
| **carrots** 274:21 | 86:7,11 87:15 | 298:4 | 132:16 |
| 274:22 | 87:18 88:6,12 | **cetera** 149:3 | **charged** 224:16 |
| **cars** 210:16 | 88:21 89:12,17 | **challenge** | 224:18 259:23 |
| **case** 1:6 19:13 | 89:24 90:15 | 181:23 | **charmaz** |
| 21:6 23:16,19 | 93:11 128:21 | **challenges** | 188:11 |
| 25:10 34:18 | 227:19,23 | 77:23 78:2 | **check** 26:10 |
| 37:16 52:11 | 228:2 250:16 | 135:22 171:9 | 225:21 |
| 53:10 54:19 | 281:20 | **chan** 67:23 | **checking** 26:13 |
| 55:24 88:7 | **cash** 210:17,18 | 138:24 | 71:2 |
| 89:8,18 90:9 | **cast** 108:4 | **chance** 40:6 | **checks** 116:23 |
| 90:19,19 92:5 | **catch** 85:8 | 227:21 260:11 | **cherry** 132:13 |
| 92:21,24,25 | **categories** | **change** 12:20 | **chicago** 259:6,6 |
| 93:4,14 94:11 | 214:16 215:25 | 28:14 109:12 | 259:8 |
| 94:12,19,22,25 | 289:2 | 145:19 155:19 | **child** 72:7 |
| 95:3,5,21,23 | **category** 53:3 | 179:13 192:14 | 171:24 271:18 |
| 97:2 159:5,9 | 216:7 251:7 | 192:15 196:5 | **chinyere** 2:16 |
| 162:7 198:23 | 289:4 | 197:7 203:11 | **choice** 151:12 |
| 213:4,6,17 | **causes** 79:23 | 260:10 297:5,8 | 160:20 164:25 |
| 214:4,9 217:6 | **caveat** 82:6 | 297:11,14,16 | 165:21,24 |
| 225:16 226:14 | 170:14 | 297:19,22 | 166:5,22,24 |
| 227:17 238:23 | **celebrate** | **changed** 90:25 | 167:17 168:3 |
| 252:21 253:11 | 230:15 | 113:10 155:14 | 170:19 172:20 |
| 262:8 265:16 | **center** 98:5 | 192:10 196:25 | 256:23 257:3 |
| 269:16,17 | **centered** 184:6 | 197:3,9,15 | 270:22 271:20 |
| 279:15 284:15 | 199:6 | 206:22 260:13 | 277:19,23 |
| 285:3,11,14,15 | **certain** 21:21 | 288:22 | **choices** 165:8 |
| 285:17,18,22 | 47:14 118:4 | **changes** 15:21 | 170:22 |
| 285:25 287:2 | 119:9 237:22 | 244:8 249:19 | **choose** 271:21 |
| 289:18 290:7 | 242:19 256:18 | 296:12 298:8 | **choosing** |
| 292:13,18 | 278:4 | **changing** | 166:22 168:3 |
| 293:20,23 | | 206:15 | 277:13 |

chops   126:12
chose   160:18
chosen   198:3
christian
  226:18
chunk   207:13
cia   93:15
circumstances
  194:23
citation   13:14
  14:9,13 15:9
  77:13
citations   12:19
  12:23 14:10
  39:16 51:12
  100:8 101:20
  101:25 102:4
  284:19,23
  287:2
cite   15:18
  105:13 139:8
  183:12 188:10
  203:25 214:9
  250:10 290:15
cited   13:12
  15:3 33:23,24
  34:18 39:9,25
  79:22 100:5
  126:19 185:9
  287:20
cites   289:17
cities   192:23,24
  237:22 238:6,7

citing   77:6
  127:16 188:11
  285:22 287:10
  287:22,23
city   76:19
  98:24 222:18
  237:24 260:23
  261:8
claim   153:16
claims   68:22
  81:23 120:21
  127:12 135:25
  136:12 137:3
  137:20,23
  199:8 219:25
clarification
  30:8
clarified   217:8
clarify   14:12
clarifying
  50:25
class   97:7,10
  110:2 135:8
  138:9 226:9
classes   96:14
  96:24 97:20,22
  111:2
classification
  61:21 87:22
  88:2 115:5,24
classified
  115:20 233:12
  233:16 237:8

clear   51:23
  63:24 87:3
  113:13 134:22
  135:2 157:16
  167:14 279:3
clients   71:10
  218:19
close   57:21
  77:20 156:7
  162:14
closed   262:13
  263:15
closely   263:22
closer   188:13
cluttered   229:7
coach   265:25
coaching
  187:15,18
coauthor
  142:17 216:24
coauthors
  244:22
code   223:18,24
  224:2,4,7
  240:20 241:19
coding   214:16
  214:21 215:10
  215:17,20
  216:5 272:13
  289:3
coercion   260:6
coercive   260:15
colleague   58:6

collect   43:19
  192:20 193:4
  194:19 204:5
  204:10 213:20
  265:5
collected   197:4
  197:20 204:2
  209:19 255:8
collecting
  44:20 133:10
  134:10 204:13
  206:16 272:11
college   174:2
colleges   76:17
colloquial
  160:3
column   174:5
come   29:7,14
  58:4,8 117:19
  128:20,23
  129:17 137:15
  174:19 179:22
  180:14,16
  211:20 247:16
  265:22 284:15
  288:14,23
comes   116:12
  135:25 197:24
  215:4 258:9
  274:11
comfortable
  201:22 219:2
coming   72:11
  107:24 184:10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[coming - conclusion]                                    Page 13

226:2 243:6
267:21
**comment** 83:15
105:2
**comments**
225:24
**commission**
298:19
**committee**
47:13 57:7
59:2 60:13
77:18
**common** 44:7
149:24 159:13
159:15 160:11
160:14,14
179:16 208:2
258:22 259:14
**commonly**
190:9 192:12
**commonwealth**
1:18 295:3
**communicate**
256:9
**communities**
143:22 262:16
262:25
**community**
70:6 110:17
**companies**
71:23 76:13
79:6 86:13
91:21,22 92:5
92:15,20 94:13

115:4,6,14
116:3,24 117:4
117:5 171:17
212:3 218:17
231:14 249:25
260:22 266:15
270:2
**company** 65:17
76:18 78:16
94:17 151:12
152:5,6 179:19
195:18 219:2
220:2,12,18,21
226:21 241:12
259:14 286:20
**comparatively**
263:19
**compare**
200:21 259:9
**compared**
82:10 100:8,15
**compares**
117:10
**comparing**
76:2,3,3
118:14 200:10
264:12
**comparison**
115:15 141:2
263:9
**compete** 256:8
**competition**
273:22

**compiled** 52:16
**complaint**
250:3,4,25
**complaints**
78:6,14 79:12
79:23 81:5
251:14
**complete** 35:13
43:22 45:18
55:20 83:10
107:3 125:15
135:7 238:17
**completed**
262:14
**completely**
229:21
**completing**
91:19
**complex** 72:19
72:25 261:15
**compliance**
65:16
**complicated**
277:2
**components**
202:17 243:22
283:16
**compositions**
139:23
**computer**
18:10 108:20
110:20 224:4,7
264:18 295:11

**con** 221:20
**concept** 108:2
140:8 146:16
147:13 159:4,9
160:23 166:5
175:23 200:5
229:15 234:20
260:8,21
279:10 280:12
**concepts** 130:7
233:24
**conceptual**
211:16
**conceptualiz...**
69:13
**conceptually**
239:3 274:23
**concern** 226:25
252:6
**concerned**
81:19 258:5
**concerning**
37:2 50:17
51:5
**concerns** 81:24
**concierge** 2:17
**concluded**
294:21
**concluding**
163:8
**conclusion**
62:11 107:2
118:19 122:22
137:16 143:12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[conclusion - control]**                                   Page 14

154:21
**conclusions**
14:6 81:18
124:12 129:10
179:8,23
180:15 181:10
201:11,23
202:21 213:22
**condense**
212:17
**conditions**
268:11,11
289:14
**conduct**  126:16
**conducted**
41:17 207:19
210:4 213:5
**conference**
34:7
**conferences**
99:11
**confident**
270:21 286:4
**confidentiality**
43:17 48:2,5
56:25 57:2
95:12
**confine**  270:21
**confirm**  204:11
**confirms**
279:15
**confused**  202:9
**connect**  218:18
248:10,21

**connected**
35:20 77:18
**connection**
51:17 269:11
**connections**
215:19
**connects**  219:8
**connotation**
64:16
**conroy**  2:3 9:3
**consent**  7:13
130:15,16
164:22
**consenting**
260:7
**consequences**
70:5
**consider**
104:18 191:11
235:25 238:21
**considered**
39:7,18 40:9
40:24 41:4
51:20 126:19
138:17
**considering**
199:7
**consist**  22:6
205:24
**constantly**  24:9
**constraints**
73:5 172:15
270:12

**construct**
189:20,22
190:13
**constructed**
149:6
**constructing**
189:14
**construction**
148:17 178:9
187:2 189:9
240:13,14,24
**constructs**
104:24
**consulting**
36:25 56:13,15
56:21
**consume**
126:17
**consumer**
284:10
**contact**  75:25
**contained**
12:17 53:20
**content**  184:9
289:3
**contested**  220:5
**context**  76:2
140:5 171:5
187:24 190:15
210:13 220:8
234:6
**contexts**  139:22
145:16 146:9
267:7

**contingent**
185:20
**continue**  70:16
77:9 111:23
112:15,18,21
143:20 211:21
287:14
**continued**
23:22
**continuing**
149:8 260:21
**contract**  37:15
**contractor**  61:2
61:15
**contractors**
61:9,24 115:7
115:19,21
233:10,13,16
237:9
**contracts**  36:25
37:13
**contradiction**
172:5
**contrast**  115:15
**contribute**
174:5 245:11
**contributing**
186:25
**contribution**
102:23 103:24
**control**  41:23
44:17 62:23
63:7,13,16,25
64:4,14,20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

66:16,19 67:3
67:7,11,18
68:2,13,23
69:13,14,21
88:3,13,22
89:12,14 95:7
113:18,20
128:22 129:8
129:13,21
135:15 137:13
138:25 148:21
159:4,9,12,15
160:3,10,12,17
161:5,14,20
162:6,6 163:11
163:13,17,21
163:23 164:6,9
164:12 165:13
165:14,16,19
166:9 167:12
169:9,12
170:24 172:23
173:4 175:18
175:22 176:10
191:21 197:17
219:18,24
221:6 231:20
232:6 233:3,8
233:17,20
234:17,20
235:2,4,5,9,10
235:11,14,15
235:22 236:3
236:13,17,21

236:23,25
237:3,7 238:22
239:4,14,15
243:24 244:4,7
244:13 245:12
246:22 247:10
248:13,17
249:4 256:5
258:11,14
259:13,19
264:4,5 266:13
267:5,12
268:16 269:6,9
270:4 271:7,16
271:23 273:20
274:11,16,19
274:20,24
275:17,19
276:10 277:12
277:21 278:8
278:21,22
279:2,21,25
280:2,13
282:24 283:10
**controlled**
  136:15 192:17
  235:9 274:5,9
**controlling**
  266:16 275:10
**conversation**
  52:13 137:10
  200:13 273:4
  277:17

**conversational**
  207:19,21,25
  208:4,8,12,15
  212:24
**conversations**
  42:13 159:11
  205:13 214:18
  216:16 272:17
**copy** 11:22
  27:17 34:4
  51:25 91:10
  214:24
**core** 102:19
  286:2 289:22
**corporate**
  13:24
**correct** 10:4
  18:2 20:18,19
  21:12 23:23,24
  25:4 36:8 46:9
  46:10 50:10
  55:23 59:2
  61:6,9 63:15
  66:23 71:5
  77:23 85:22
  86:2 88:9
  90:12 91:24
  93:15 96:10,11
  96:16 99:2
  105:11 108:23
  111:7 118:7
  121:5,6,10
  124:20,21
  128:16 131:20

149:19 150:2,3
150:6 152:25
155:11 157:7
157:17 159:18
159:24 160:13
161:23,24
163:2,17,18
164:3,4,7
165:15 169:17
169:20 170:3
171:24,25
172:12 175:24
176:20 177:7,8
181:14 183:9
183:10 185:25
187:5 194:25
198:24 199:11
201:8 205:15
206:13 208:24
208:25 209:16
209:17 210:11
212:15,19
213:2,11
214:18,19
218:22 220:24
222:14,20
233:7 237:21
238:3 239:6,19
241:4 242:9
244:10,11
245:24 246:3,7
246:10 248:14
248:22 249:8
249:23 250:5,9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[correct - customers]                                    Page 16

251:10 256:18
260:25 261:2,9
261:10,12
262:19 263:2,3
264:5,6 265:6
265:7 268:8
274:7 283:8,12
283:17,18,22
284:3 285:23
285:24 286:14
298:5
**corrections**
296:5,7 298:8
**correctly** 51:14
91:16 115:11
295:10
**cory** 228:23
**counsel** 7:12,19
8:9,18,23
17:24 21:6
35:5 40:22
56:18 84:18
292:4 295:12
**counter** 110:9
**counts** 148:11
**county** 295:4,6
**couple** 31:10
39:22 92:3
133:21 245:15
250:12 286:11
292:2
**course** 17:3
76:16 96:13,20
97:5,6 225:7

263:16
**courses** 96:18
98:13 124:18
126:4
**court** 1:2 2:5
7:5 8:11,16
16:10,18 35:5
35:7 106:24
128:16 129:10
201:15 294:10
296:19
**courtesy** 97:15
97:20
**courts** 106:16
**cousin** 151:10
**cover** 55:24
96:17,20
131:12 207:13
**covered** 77:22
83:9 288:2
290:19
**covers** 79:6
**covid** 65:21
**craft** 126:9,10
**crafting** 106:22
**crb** 1:7
**cream** 230:15
**create** 102:20
103:19 181:13
181:20 191:8
220:2 248:9
293:15
**created** 43:14
145:20 275:9

**creates** 104:4
276:9
**creating** 103:17
189:3 190:2,2
214:16 215:9
215:24 220:4
248:21 271:8
**creation** 182:15
**credit** 71:3
73:12
**creek** 260:10
**criteria** 244:7,9
**critical** 125:11
152:3 153:6,7
154:3 184:6
**criticized** 13:15
13:17 15:2
**critique** 13:10
13:19 154:25
**critiques**
127:11
**crucial** 194:19
231:11
**crystallization**
280:20
**cs7737764** 1:25
**cultural** 4:21
74:8 139:22
216:22 236:19
236:20,21
242:5,10
270:24
**culture** 110:23

**cultures** 110:23
**curated** 240:22
**current** 15:20
26:24 27:3,19
31:19 108:18
109:2 211:13
212:13
**currently** 15:24
96:7
**curriculum**
26:25
**customer** 78:6
78:7,14 79:12
79:23 80:14
81:12,13,14
198:3 225:7
250:3,24
253:18 261:23
264:5 265:8,13
265:21 266:4
267:8 276:4
290:14
**customers** 70:5
70:12,18 80:12
80:12 122:3
218:19 221:22
224:16,18
225:8 228:15
251:18 256:9
265:4 266:11
266:17,18,25
267:4,13 268:6
282:25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**cut**  168:16

**cv**  3:23 27:2,17
    27:19 28:12,14
    28:23 29:17
    31:20 111:5

**cycle**  218:13

**d**

**d**  3:2 24:24
    107:21

**d.c.**  41:21
    131:25

**dance**  278:7,12
    278:14

**darker**  66:10

**dash**  268:20
    269:3,13,18

**data**  13:23 14:2
    14:6,18,25
    15:2 43:21,23
    44:2,21 45:3
    45:15,23 48:9
    48:15 70:23
    78:20 98:23
    106:5 108:14
    120:20 132:9
    133:10,12,19
    134:10,12,12
    137:21 147:11
    147:11,18
    148:11 149:2
    177:18,21,21
    179:14,19
    180:4,7,18

181:9 184:9,10
190:19 192:20
192:22 193:5
194:19 195:17
197:5,19,25
204:2,4,5,10,13
206:16 208:9
208:20 209:20
210:3,9 211:17
213:21,21,25
214:4 215:4,11
216:6 226:21
226:23 227:3
240:22 254:22
255:8,17,18
259:11 265:5
272:11 273:2
281:19 285:16
285:17 286:2,7
288:10 289:3
289:18 290:7
292:25

**dataset**  148:18
    180:3,19

**datasets**  210:7

**date**  26:25 27:3
    29:17 31:19
    32:12 296:10
    298:12

**dated**  19:8
    33:14 85:6

**day**  28:24
    112:22 127:23
    273:7 295:15

298:16

**days**  30:4
    296:16

**dc**  2:10

**deactivated**
    78:4 81:4
    254:8,21 255:4
    255:9 266:9

**deactivation**
    251:18 253:23
    254:6,10
    290:17

**deal**  64:8

**decay**  216:22
    228:20 230:20
    231:2,7,8,24
    232:6

**deceleration**
    225:4

**decide**  52:9
    75:12 203:17

**decided**  109:12
    200:13

**decision**  78:9
    223:20,25
    240:25

**deck**  147:2

**declarations**
    38:11

**decline**  229:25

**declining**
    167:22

**deductive**
    185:22 186:7

186:14

**deemed**  252:23
    296:18

**deep**  62:21 88:7
    201:3

**deeply**  15:16
    258:6

**defendant**
    86:20 94:15

**defendant's**
    30:25 39:5,12

**defendants**
    3:18 9:9

**define**  87:8
    161:7,13 162:5
    164:23 166:17

**defined**  129:8
    129:14 159:5
    161:20

**defining**  125:9
    127:17

**definite**  278:13

**definitely**  241:7
    248:17 249:16
    284:13

**definition**
    69:21 161:4,25
    162:2,6 169:9
    178:18 188:15
    233:6

**definitions**  62:8
    238:22

**degrade**  228:19
    230:17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[degrades - develop]                                                Page 18

degrades  229:8
degree  110:10
  124:16 125:18
  129:2
degrees  108:20
deidentified
  44:15,18 45:12
  45:14 48:5,14
  48:16,19
deidentify
  45:11
deidentifying
  48:9
delete  43:20
deleted  122:17
delivery  97:11
demand  159:17
  159:23 218:12
  218:17,25
  220:21 244:5
  246:23 256:7
  256:12 258:19
  264:3 265:2,9
  265:12,17
  266:15 267:14
  268:5,10,14
  270:2 283:6
democratic
  57:6
denials  168:7
denise  9:22
department
  97:24 98:2

departure
  185:22 186:7
depend  123:2
depended
  257:21
dependence
  257:8
dependent
  258:13,16
  262:14 280:8
depending
  120:2 138:15
  165:25 179:20
  275:23 277:3
depends  123:21
  131:15 164:18
  166:14,16
  193:9 201:12
  201:17
depicting  190:2
deponent  295:8
  295:10 298:2
deposed  16:3
  56:8
deposing
  296:15
deposition  1:12
  3:19 6:2 7:4,6
  7:7 8:8 18:14
  20:10 25:14
  26:2 27:16
  31:2 35:7,12
  40:3 85:17
  95:16 294:21

295:7,11 296:4
  296:13,17,18
depositions
  40:5,16 51:24
  52:4 227:12,13
  227:18
depth  41:16
  99:24 144:11
  152:15 177:5
  265:19 292:20
derivation
  185:21
derived  275:15
describe  87:14
  91:18 123:14
  134:4 150:5
  165:15 176:5
  192:7,12
  212:13 278:6
described
  49:17 62:8
  79:7 121:2
  182:8 213:16
  216:2 229:15
  292:19
describes
  151:11 206:2
  207:23 240:13
describing  96:5
  145:9 165:13
  191:9
description
  3:11 4:2 5:2
  6:9 245:4

280:23
descriptions
  176:16,17
descriptive
  65:3
design  96:21,23
  193:24 196:4
designed
  232:10 240:15
  274:12 276:8
  276:13,17,21
designers
  193:20,25
designs  221:5
destination
  198:4
detail  36:14
  122:10 239:14
detailed  239:5
  239:8,15
  283:10
details  49:7
  56:19 197:15
  251:5
detecting  66:10
determine
  45:25 59:20
  200:17 268:15
determines
  224:9
devalue  243:3
develop  52:11
  103:20 153:11
  180:18 199:8

**developing**
105:14 144:2
**development**
103:13 173:21
**deviant** 164:24
**deviating**
261:18
**diagrams** 52:23
**diamond**
198:12
**diaries** 41:15
**dies** 76:14
**difference**
28:22 62:18,21
117:6 207:24
264:17
**differences**
62:7,22 63:3
200:17,22
**different** 14:4,4
14:6,17,18,20
14:21 34:10
36:14 44:19
49:2 57:20
60:16 61:19
62:24 69:12
76:2,8 86:25
89:6 105:16,24
108:13 113:22
114:4,5 116:25
127:11,20
129:9,15
133:13,20
135:4,9 136:2

136:11 137:9
138:14 139:22
140:9 141:24
145:21 148:5
148:23 154:2
164:9,17 165:6
165:9,22,25
169:18 174:24
176:7 178:24
179:7,18,19,21
179:23 180:6
180:17 181:3,5
181:9 184:7
186:13 189:24
195:17 198:17
206:2,6 207:22
208:16 210:17
216:3 232:11
234:23 235:3
235:11 236:8
262:10 267:11
270:18 276:11
280:10 283:16
**differently** 82:8
129:9,14
179:18 219:6
220:6 248:19
**differs** 203:12
**difficult** 196:3
254:5
**digital** 134:12
134:12 220:14
220:23

**dillahunt** 4:22
**dillard** 1:17
8:17 295:6,18
**dimensions**
64:6 105:16
239:4
**dinner** 271:19
**direct** 64:7
153:10 176:7
242:13 292:5
**directed** 262:3
**direction** 6:4
50:17 278:4
**directly** 120:10
121:8 215:4
266:4
**disagree** 167:3
172:2 174:12
179:10 276:19
282:12
**disagreeing**
119:8
**disagreement**
150:10 167:7
**discipline**
157:10
**disciplines**
62:24 99:19
129:9,15 149:5
220:7
**disclose** 95:10
**disclosed** 95:13
**disclosure**
34:19 35:5

42:5 46:13,18
**discourse**
143:22 174:20
**discrimination**
242:18
**discuss** 56:24
119:23 217:5
265:19 283:15
**discussed** 35:24
36:7 84:18
141:11 149:14
159:20 227:14
283:24
**discussing** 50:9
89:7 99:14
185:18
**discussion**
130:16 194:15
**disproportion...**
101:4 102:6
**dispute** 119:6
**dissertation**
4:13 77:18
112:7,12,13
113:10,13,19
113:24 114:6
114:10 139:12
140:2,14,20,23
140:24 141:12
141:18
**distinct** 267:15
**distinction** 41:3
178:12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[distinctions - dr]                                    Page 20

| | | | |
|---|---|---|---|
| **distinctions** | **documentation** | 5:1 6:1 7:1 8:1 | 102:1 103:1 |
| 146:4 | 47:19 | 9:1,11,24 10:1 | 104:1 105:1 |
| **distinguish** | **documents**  6:8 | 11:1 12:1 13:1 | 106:1 107:1 |
| 115:3 | 22:12,21,25 | 14:1 15:1 16:1 | 108:1 109:1 |
| **distinguished** | 23:2,4,6,7,14 | 17:1 18:1 19:1 | 110:1 111:1 |
| 116:9 | 31:15,24 32:16 | 20:1 21:1 22:1 | 112:1 113:1 |
| **distinguishes** | 38:13,19,24 | 23:1 24:1 25:1 | 114:1 115:1 |
| 116:3 | 39:4,6,10,23 | 26:1,2 27:1 | 116:1 117:1 |
| **district**  1:2,3 | 40:2 41:13 | 28:1 29:1 30:1 | 118:1 119:1 |
| 8:11,12 | 49:20 51:16,24 | 31:1 32:1 33:1 | 120:1 121:1 |
| **division**  1:4 | 53:16 173:2 | 34:1 35:1 36:1 | 122:1 123:1 |
| 8:13 | 198:22 214:9 | 37:1 38:1 39:1 | 124:1 125:1 |
| **doctoral** | 222:6 224:10 | 40:1 41:1 42:1 | 126:1 127:1 |
| 124:18 125:18 | 250:15 253:7 | 43:1 44:1 45:1 | 128:1 129:1 |
| 126:3 138:9 | 253:10 262:7 | 46:1 47:1 48:1 | 130:1 131:1 |
| **doctorow's** | 284:15,20 | 49:1 50:1 51:1 | 132:1 133:1 |
| 228:23 | 285:7,11,18 | 52:1 53:1 54:1 | 134:1 135:1 |
| **document** | 286:8 290:5,8 | 55:1 56:1 57:1 | 136:1 137:1 |
| 11:14 18:20 | 292:25 | 58:1 59:1 60:1 | 138:1 139:1 |
| 19:18,19,22 | **doing**  27:7 | 61:1 62:1 63:1 | 140:1 141:1 |
| 25:17 26:6,14 | 49:13 109:9 | 64:1 65:1 66:1 | 142:1 143:1 |
| 26:22 27:10 | 127:25 135:14 | 67:1 68:1 69:1 | 144:1 145:1 |
| 30:15 31:3,9 | 150:17 168:12 | 70:1 71:1 72:1 | 146:1 147:1 |
| 32:24 33:11 | 214:5 261:22 | 73:1 74:1 75:1 | 148:1 149:1 |
| 46:24 47:5 | 263:20 264:17 | 76:1 77:1 78:1 | 150:1 151:1 |
| 54:12 59:7 | 272:12 280:23 | 79:1 80:1 81:1 | 152:1 153:1 |
| 60:10 77:21 | 296:9 | 82:1 83:1 84:1 | 154:1 155:1 |
| 84:22 114:13 | **doordash** | 84:13 85:1 | 156:1 157:1 |
| 141:24 142:6 | 211:19 | 86:1 87:1 88:1 | 158:1,19 159:1 |
| 156:5,7,13 | **dots**  193:17 | 89:1 90:1 91:1 | 160:1 161:1 |
| 162:17 184:18 | **downplay** | 92:1 93:1 94:1 | 162:1 163:1 |
| 187:20 206:22 | 220:11,15 | 95:1 96:1 97:1 | 164:1 165:1 |
| 254:13,23 | **dr**  1:1,13 2:1 | 98:1 99:1 | 166:1 167:1 |
| | 3:1,5,20 4:1 | 100:1 101:1 | 168:1 169:1 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[dr - drivers]**                                    Page 21

| | | | |
|---|---|---|---|
| 170:1 171:1 | 238:1 239:1 | **drafting** 23:19 | 192:23 195:24 |
| 172:1 173:1 | 240:1 241:1 | 214:18 | 198:2 202:22 |
| 174:1 175:1 | 242:1 243:1 | **draw** 110:18 | 204:21 207:6 |
| 176:1 177:1 | 244:1 245:1 | 181:9 201:11 | 222:4,7 230:9 |
| 178:1 179:1 | 246:1 247:1 | 213:21 277:4 | 238:10 250:23 |
| 180:1 181:1 | 248:1 249:1 | 284:24 | 251:2 252:14 |
| 182:1 183:1 | 250:1 251:1 | **drawback** | 281:5 |
| 184:1 185:1 | 252:1 253:1 | 70:17 | **driver's** 250:2 |
| 186:1 187:1 | 254:1 255:1 | **drawbacks** | **drivers** 41:18 |
| 188:1 189:1 | 256:1 257:1 | 70:11 | 42:13 44:14,23 |
| 190:1 191:1 | 258:1 259:1 | **drawing** | 61:4,8 65:19 |
| 192:1 193:1 | 260:1 261:1 | 100:24 127:14 | 70:24 71:8,23 |
| 194:1 195:1 | 262:1 263:1 | 235:18 243:15 | 72:4 73:7,13 |
| 196:1 197:1 | 264:1 265:1 | 243:16 | 73:14 76:13,24 |
| 198:1 199:1 | 266:1 267:1 | **drawings** 52:22 | 78:3,5,23 |
| 200:1 201:1 | 268:1 269:1 | **draws** 99:21 | 79:22 80:17 |
| 202:1 203:1 | 270:1 271:1 | 177:2 | 81:20 111:19 |
| 204:1 205:1 | 272:1 273:1 | **drew** 110:21,22 | 112:19,22,24 |
| 206:1 207:1 | 274:1 275:1 | **drivable** 80:10 | 113:6,8 115:6 |
| 208:1 209:1 | 276:1 277:1 | 80:10 | 115:7,8 117:11 |
| 210:1 211:1 | 278:1 279:1 | **drive** 72:23 | 118:14 136:14 |
| 212:1 213:1 | 280:1 281:1 | 222:24 230:14 | 137:3 160:17 |
| 214:1 215:1 | 282:1 283:1 | 259:12 278:3 | 163:10,13,22 |
| 216:1 217:1 | 284:1 285:1 | 289:13 | 164:6,12 165:9 |
| 218:1,7 219:1 | 286:1 287:1 | **driver** 33:15 | 165:14,24 |
| 220:1 221:1 | 288:1 289:1 | 41:20 68:22,22 | 166:9 167:16 |
| 222:1 223:1 | 290:1 291:1,25 | 69:4 74:18,20 | 170:19 171:17 |
| 224:1 225:1 | 292:1 293:1 | 74:24 75:12,12 | 173:7 174:6,13 |
| 226:1 227:1 | 294:1,18 295:1 | 75:15 78:8,20 | 174:14 175:18 |
| 228:1 229:1 | 295:7 296:1 | 79:18 80:3,15 | 179:17 201:23 |
| 230:1 231:1 | 297:1 298:1 | 81:13,14 91:18 | 204:25 205:19 |
| 232:1 233:1 | **draft** 288:21 | 113:2 132:18 | 209:3,6,11 |
| 234:1 235:1 | 294:13 | 174:7 178:22 | 210:8 221:15 |
| 236:1 237:1 | | 178:24 179:16 | 222:2,12,16,23 |

223:3,9,12
224:9,14
225:12 229:23
229:25 230:8
230:10,13
231:12,20
232:10 233:15
236:13 237:16
237:20 238:16
245:25 246:14
247:20,25
248:5,9,14,21
249:2,8,10,13
249:16 251:8
251:13 252:7
252:24 255:3,9
255:25 256:22
256:23 257:7
257:16 260:23
260:25 261:7,9
261:11 262:9
262:24 263:17
264:10 269:18
270:25 272:2
279:8,11,17,20
281:9,12,17,21
287:12 288:3,7
**driving** 33:15
65:19 70:23
73:10 76:15,20
111:18 112:16
132:3 170:2
171:13 204:17
205:6,6,14

206:10 208:18
209:23 210:2
210:15 222:14
223:11 230:10
232:11 249:16
269:12 288:11
293:6
**drop** 49:6
76:18
**dropped** 76:20
80:13
**drove** 132:5
209:22 292:21
**drunk** 76:14,19
78:8 79:19
**dubal** 107:13
107:21 118:13
242:14 243:15
**dubious** 250:24
**due** 250:24
**duis** 76:18
**duly** 9:12 295:8
**dynamic**
278:15

**e**

**e** 2:2,2,16,16
3:2,9 221:20
295:2,2 297:3
**e.g.** 187:2,4
195:23 218:19
262:14 273:22
**earlier** 54:4,25
96:4 140:13

157:8 169:24
176:19 179:5
181:12 182:8
189:13 201:6
208:22 227:12
233:5 236:2
250:8,18 251:8
252:2 257:5
272:9 273:4
274:18 279:6
280:7
**early** 155:13
188:8 228:11
288:21 289:4
**earn** 71:24
171:18 257:11
289:12
**earners** 254:7
254:17
**earnings** 72:6
**easier** 16:19
**east** 109:11
110:12,15
**eat** 293:7
**eating** 271:21
**echoed** 254:6
**economic**
218:20 219:9
249:22 257:8
279:13
**economically**
257:20 258:12
258:15 280:8

**economics**
219:5
**economies**
155:23
**economy** 23:12
42:24 74:8
97:2 98:12
103:3 108:5
150:16 155:21
155:24 159:17
159:24 160:8
211:22 220:2
241:11 265:9
265:12 267:14
271:5
**edit** 243:5
**edited** 108:12
243:10
**editorial**
127:24
**education**
111:3
**effective**
240:25
**effects** 258:24
**eight** 101:7
282:16
**either** 18:9 29:4
39:24 64:15
93:14 135:12
227:15 271:21
294:4
**elder** 72:7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[elderly - ethnographer]                                   Page 23

| | | | |
|---|---|---|---|
| elderly  171:24 | empirical | 273:11 | entirely  14:22 |
| electrical | 134:23 197:15 | ends  289:7 | 168:9 187:23 |
| 108:20,25 | 211:17 243:18 | engage  243:18 | 238:5 245:7 |
| 110:19 | 264:22 | 277:13 | 267:20 |
| element  275:8 | empirically | engaged  216:15 | entitled  33:14 |
| 275:11 | 185:24 186:8 | engagement | entity  37:3 |
| elements | 231:7 289:17 | 152:9 164:23 | entry  71:22 |
| 239:15 273:21 | employee | engaging | 171:16 |
| 276:3 | 225:22 | 214:17 | environment |
| ellis  2:8 9:7 | employees | engineering | 203:11 |
| else's  118:12 | 40:18 61:16 | 108:20,21,25 | environments |
| elucidating | 62:2 226:8 | 109:9 110:20 | 181:7 |
| 186:24 | 227:8,18,25 | enjoy  109:20 | equally  39:5 |
| email  54:7,9 | 233:9,12 237:8 | 109:20 274:10 | equals  166:19 |
| emailed  26:8 | employment | 277:14 | equivalent  90:4 |
| emails  26:11,13 | 71:25 98:14,16 | enjoyable | era  65:21 |
| 246:8 247:16 | 171:19 175:11 | 274:2 | 112:12 |
| 247:19 | enactment | enshitification | errata  296:7,9 |
| embedded | 69:16 | 228:21 | 296:12,15 |
| 137:14 237:3 | encoded  241:21 | ensuring  274:3 | 298:9 |
| 243:8 245:16 | encounter | entail  97:21 | especially |
| embodied | 130:6 268:12 | 147:9 | 230:9 |
| 242:11 | 268:13 | entered  111:9 | esq  2:4,4,9,9 |
| embody  242:4 | encounters | entering  8:24 | essay  108:10 |
| emergement | 268:17 | enterprises | essence  49:21 |
| 293:16 | encourage | 96:15 | 165:18 |
| emerging  96:14 | 256:20,21 | enters  76:18 | essentially |
| 103:6 181:25 | 273:23 | entice  232:10 | 60:16 |
| 293:5 | encouragement | 274:13 | estimate  20:7 |
| emphasis | 262:2 | enticing  271:6 | et  149:2 193:16 |
| 103:12 | encourages | entire  21:18 | ethical  227:10 |
| emphasizes | 256:22 | 45:22 111:11 | ethics  130:18 |
| 99:24 171:22 | ended  109:17 | 187:20 239:24 | ethnographer |
| 177:5 | 210:25 225:23 | 285:9 | 73:2 74:4,16 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[ethnographer - experiences]                                      Page 24

75:7,25 109:4
109:5 178:20
199:5
**ethnography**
75:11 143:21
208:2
**ethological**
203:8
**ethos** 155:24
**evaluate** 74:22
106:8 126:24
127:7,21
224:19 272:5,6
**evaluated**
129:13
**evaluating**
105:21
**events** 152:11
201:5
**everyone's** 30:3
**evidence**
120:20 125:10
127:19 154:7
250:14 293:15
**evident** 100:7
153:7
**evolve** 155:18
**evolved** 72:10
**exact** 138:21
139:3,6 188:19
**exactly** 15:6
21:4 25:5
34:22 42:16
50:11 65:22

79:9 92:8
142:18 146:4,9
183:24 198:25
200:2 205:16
213:7 214:12
246:24,24
259:20 270:13
**examination**
3:4 9:15
291:22
**examine** 144:6
234:9
**examined** 9:13
**example** 81:9
121:23 123:10
131:15 132:4
134:24 135:15
136:16 139:4
145:19 159:3
195:15 198:8
229:5 238:18
239:12,15,18
243:4,12
247:15 250:20
250:22 256:7
264:9 271:17
277:13
**examples** 79:17
79:20 80:20,25
83:9 113:15
132:13 164:25
189:24 237:4
250:18

**except** 7:20
298:7
**exchange**
169:11 218:20
219:9
**excited** 16:15
16:16 280:19
**excused** 294:19
**executed**
206:10
**executive** 96:13
**exercise** 163:13
163:21 176:10
216:11 244:4
246:23 264:3
278:8 282:23
**exercised** 66:17
67:4,8 280:4
**exercising**
277:11
**exert** 236:13
**exerting** 68:13
68:23 248:13
248:17 271:22
**exhibit** 3:12,15
3:18,22 4:3,7,9
4:11,13,16,20
5:3,6 10:7
11:12,16 12:11
18:17,22,25
19:4 25:15,19
27:7,8,12
30:13,17 33:2
33:7 34:25

35:11,12 39:17
53:8 55:14
59:5,9,12
84:19,24 85:15
85:16 114:10
114:15 142:4,8
156:15,18
162:15,19,22
184:15,20
194:3 234:13
**exhibits** 156:22
**exist** 44:15
274:24 275:17
**existing** 102:22
181:23
**exit** 168:4
**expect** 39:24
127:3
**expected**
154:13
**expense** 35:20
**expenses**
222:23
**experience**
127:15 137:4
154:14 199:7
205:7 222:22
223:3 254:6
255:2 290:4
293:18
**experienced**
223:9 254:19
**experiences**
74:5 184:5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[experiences - feelings]                                    Page 25

196:7 255:25
**experiential**
    177:6 293:10
**experiment**
    43:15 259:5,18
    259:22 260:13
**experimentat...**
    260:4 290:22
**experimenting**
    259:23 291:2
**experiments**
    258:20,21
    260:2,17
**expert**  5:3 35:5
    35:6,11 39:8
    42:18 55:22,25
    56:7,21 58:13
    83:5,18 86:6
    94:22 98:16
    106:15 117:24
    118:9 119:21
    127:3,7 128:8
    128:16 292:6
**expertise**  58:17
    62:13 68:8
    69:7 79:15
    82:16 117:9
    126:15 154:17
    160:7 237:12
**experts**  38:2
**expires**  298:19
**explain**  73:24
    185:11

**explains**  212:16
**explanation**
    69:22
**explicit**  129:25
**explicitly**  151:2
    267:24 287:20
**exploited**  47:16
**explore**  139:21
**explored**
    290:12
**express**  153:22
**expressed**
    152:21 153:22
    159:25
**extent**  27:2
    35:18 36:24
    53:15 187:12
    227:13 265:3
    267:10 285:20
**extra**  24:13
**extract**  293:16
**extrapolating**
    135:22

**f**

**f**  290:17 295:2
**face**  144:17
    293:13
**facilitate**
    218:20 219:9
    221:18
**facilitates**
    221:14

**fact**  125:8
    138:18,18
    149:3 155:9
    159:20 190:25
    192:13 208:16
    274:11,14
    279:16 288:19
**factors**  115:3
**factory**  139:5
**facts**  62:2 88:7
**faculty**  98:4,22
**fail**  296:17
**fair**  17:2 24:25
    34:21 62:19
    65:11 77:16
    80:23 82:18,19
    83:21 86:10,19
    87:12 88:4,8
    92:7 93:18,18
    93:21 95:15
    97:13 112:5,9
    120:4,7 123:9
    123:16,24
    129:7 141:2
    166:21 177:10
    189:5 224:3
    226:17,24
    230:23 245:3
    253:9,13
    254:25 255:16
    255:20 264:8
    264:23 280:13
    286:15 292:12
    293:22

**fallacy**  178:6
**familiar**  16:6
    60:6 65:24
    79:21 107:14
    183:3 191:19
    221:25
**famous**  164:21
**far**  19:13 35:25
    36:15 53:12
    94:25 117:2
    187:5 244:4,13
**fashion**  14:25
    209:20
**fast**  16:10
    161:10 225:5
**favors**  251:18
**feature**  172:7
**features**  66:10
    245:11
**feedback**  99:9
    99:10 265:8,13
**feeds**  229:7
**feel**  48:15 69:10
    82:13 125:11
    128:10 132:15
    136:15 140:25
    188:20,23
    190:14 197:16
    219:2 270:22
    272:19 278:24
    284:14 286:4
**feeling**  75:22
**feelings**  278:23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**fellow** 98:23
99:9
**felt** 81:4,13,14
83:2 110:3
132:12 152:9
197:10,10
**feminization**
148:20
**feminized**
34:13
**field** 65:8 75:7
75:11 76:5
87:6 99:23
100:6 101:2,4
101:11,13,20
102:10,18
124:16,23
125:2 130:6
157:13 177:4,7
181:16 183:18
185:13 188:2
190:9 208:19
210:8,24
293:11
**fields** 101:14
130:7
**figure** 10:6
157:13 290:3
**filed** 8:11 37:22
**final** 38:10,11
38:11,12,18,19
114:5 143:2,6
194:5 294:12

**finally** 240:22
**financial** 41:15
208:19
**find** 38:5 39:24
76:17 95:25
124:12 125:4
125:10 145:19
149:21 161:7
174:7 260:22
289:19
**finding** 138:21
139:6,7 201:4
**findings** 149:3
**fine** 10:22
95:18 143:4
216:6
**finger** 92:18
284:17
**fingertips**
18:10
**finished** 24:15
38:21 112:13
218:10
**fire** 180:23,24
181:5
**firm** 8:17 22:13
54:22 55:6
193:14
**first** 9:12 13:8
14:13 21:8
36:3 57:4
60:24 69:3
71:3 85:17
87:18 111:13

116:4,12
120:10,24
157:11 174:2
215:10 218:21
231:13 240:15
268:3 269:11
270:7 283:24
285:15,18
292:5
**fit** 15:14 34:9
140:15 187:13
187:20
**fits** 14:14
215:16,16
**fitting** 77:15
**five** 63:12 64:5
87:11 90:5,6
152:24 159:21
207:3 281:20
281:21 283:15
**fix** 261:5
**flag** 87:7
**flex** 72:6
**flexibility**
71:22 72:16,22
73:3,8,13
74:20,23 75:14
113:21 160:22
169:13,14,19
170:2,21
171:16,23
172:8,15,18
257:4 271:3

**flexible** 73:4,6
75:23 174:8
**floor** 215:10
**flow** 207:5
**flush** 69:21
122:12 220:9
**focus** 80:20
81:25 91:7
111:10 130:8
141:7 148:2
189:2 211:12
212:14 215:17
**focused** 26:18
88:12 108:7
111:14 141:8
214:16,21
253:12 261:6
**focusing** 187:2
**focussed** 88:5
281:10
**focusses** 189:9
**folder** 11:20
**folks** 157:25
227:22
**follow** 41:5
171:3 186:16
213:19 267:3
274:8 292:3
**followed** 203:5
**following** 62:16
141:21
**follows** 9:13
149:14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[footnote - front]                                    Page 27

| | | | |
|---|---|---|---|
| **footnote** 71:16 | 123:25 124:24 | 260:3,18 | **found** 59:24,25 |
| **footnotes** 39:16 | 126:6 128:5 | 261:13 269:5,8 | 71:7 125:7,19 |
| **force** 256:19 | 129:3,23 131:2 | 269:19 271:13 | 138:21,25 |
| **forces** 74:7 | 132:20 136:19 | 272:7 275:3,21 | 139:3 263:12 |
| 256:17 | 137:5,13,25 | 277:15 278:10 | **foundation** |
| **foregoing** | 141:19 150:12 | 278:21,22 | 105:20,22 |
| 38:13 295:7 | 150:18 151:21 | 279:22 281:3 | 186:10 269:20 |
| 298:4 | 154:20 161:2 | 284:7 288:11 | **foundational** |
| **forgetting** 13:8 | 162:9 164:14 | 288:16 298:8 | 186:24 |
| **form** 7:21 | 166:11 167:19 | **formal** 225:25 | **founders** |
| 21:24 22:8 | 169:21 170:4 | **former** 93:15 | 185:17 |
| 25:8 33:21 | 173:9 174:19 | 226:8 | **four** 35:4 87:19 |
| 34:13 41:21 | 175:7 177:13 | **forming** 39:8 | 240:13 241:13 |
| 42:15 43:10 | 177:25 179:2 | 93:13 226:14 | 243:22 256:4 |
| 45:13,18,20 | 180:9 181:17 | 238:22 286:3 | **fourth** 26:16 |
| 46:19 47:6 | 182:6,17 | **forms** 42:20 | **frame** 240:19 |
| 48:7,23 49:23 | 185:23 186:2,9 | 258:23 | **framework** |
| 61:10 62:10 | 189:11 190:23 | **formulating** | 278:9 |
| 64:17 65:6 | 193:6 195:2 | 42:14 | **framing** 63:4 |
| 68:6,13,14,23 | 196:15 201:25 | **forth** 31:12,14 | **francisco** 1:4 |
| 68:24 72:17 | 202:23 219:12 | 36:14 52:12 | 8:13 |
| 73:15,20 74:25 | 220:19 221:2 | 204:7 229:4 | **frank** 125:3 |
| 75:16 79:13 | 221:16 222:25 | 272:13 | **fraud** 261:22 |
| 81:7 82:12 | 223:16 224:21 | **forthcoming** | 262:9 |
| 88:15,24 90:17 | 229:18 233:21 | 231:5 | **free** 56:24 |
| 98:19 102:17 | 235:16,21 | **forum** 210:8 | 261:11 |
| 103:15 104:7 | 236:20,25 | 264:15 | **french** 110:21 |
| 104:11 106:15 | 238:4 244:6,15 | **forums** 263:14 | **frequent** |
| 106:17,25 | 246:16,22 | 263:17 264:11 | 190:12 |
| 111:24 115:17 | 248:3,15,23 | 292:25 293:4 | **frequently** |
| 118:18 119:3 | 249:4 251:23 | **forward** 63:4 | 102:9 234:16 |
| 119:15,24 | 252:16,25 | 161:10 212:5 | **friendly** 151:7 |
| 120:8 121:11 | 255:5 256:24 | 236:9 | **front** 11:23 |
| 122:21 123:7 | 257:25 259:19 | | 18:11 163:24 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

283:19

**fueling** 270:9

**full** 9:20 34:19
132:21 167:25
170:15 219:3

**fully** 194:18
263:20 279:5

**fun** 274:2,14,16
277:24

**functionality**
228:19

**funny** 109:6

**fuoco** 67:22

**further** 7:9
28:5 31:11
159:14 169:10
244:2 253:22
291:8 293:25

**future** 96:13
139:13,18,20
143:16 289:15

**g**

**gains** 138:25

**game** 147:16
273:21 274:13
276:9,14
277:24

**games** 137:8,8
137:12 140:7,8
140:23 141:3,7
145:20,22
274:10 275:14
276:2,21

277:10

**gamification**
136:15 137:9
176:8 273:19
274:21 275:16
276:12 277:9
278:3,19,24
279:5

**gamified**
277:14

**gamifying**
273:20,25

**garcia** 87:19,20

**gas** 223:5

**gears** 54:18
108:16 117:21

**gender** 34:7
108:4 139:22

**general** 42:21
47:25 66:5
93:8 94:14
102:19 125:19
136:15 141:10
141:17 145:15
160:16 179:5
188:5,25
202:21 205:2
227:19 229:15
238:2 239:5,8
241:6,10
247:11,12,14
263:12 279:13
281:16 283:10
286:19

**generality**
91:20

**generalizability**
131:18 138:13
139:9 140:3
141:4,15
144:18,22
145:8,12,14
146:8,11 202:6
202:12,13,15

**generalizable**
46:3 104:17
137:24 138:3,7
138:11,17
145:24 146:2
146:10 201:24

**generally** 17:15
70:13,19 88:11
92:19 137:4
237:6 262:13

**generated**
52:24 106:14

**generates**
102:11 183:4

**generating**
182:16,21

**generation**
182:25 187:3
189:19 190:6

**geoffrey** 2:9 9:6
54:6

**geoffrey.wyatt**
2:11

**geographic**
197:11,22
198:19

**geotracking**
283:21 291:4

**getting** 49:17
87:24 113:24
120:5 133:11
134:11 151:9
204:9 206:17
215:17 226:20
229:25 267:8
289:16

**ghost** 108:2
243:7

**gig** 23:12 42:23
61:3 63:8 70:5
70:11,17 97:2
98:12 103:3
108:5 148:20
160:8 211:22
220:2 241:11
271:5

**give** 10:8 12:16
16:19 17:13
18:18 27:24
34:4 41:11
49:3 80:16
97:23 99:8,8
99:13 132:21
134:23 143:9
170:7 178:17
183:7 204:15
220:7 239:13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[give - grounded]                                              Page 29

| | | | |
|---|---|---|---|
| 264:8,20 | 185:15 186:22 | 184:14 185:8,9 | **graduate** 96:14 |
| 273:17 | 187:15 194:2 | 186:17 194:2 | 113:23 |
| **given** 35:6 | 194:13 197:13 | 195:21,22 | **grain** 216:6 |
| 83:11 98:9 | 198:18 204:5 | 201:3 214:3 | **grand** 104:18 |
| 160:7 179:14 | 205:21 207:5 | 217:20 234:11 | **granted** 260:5 |
| 233:14 262:12 | 212:8 215:13 | 236:9 242:15 | **granular** |
| 262:12 279:16 | 228:10 238:25 | 246:11 253:15 | 284:12 |
| 295:12 298:6 | 239:2,10,16 | 256:3 257:12 | **grasp** 194:18 |
| **gives** 148:24 | 243:21 253:21 | 259:3,5,8 | **great** 9:25 12:3 |
| 174:20 271:2 | 261:21 268:2 | 266:5,6,8 | 12:11 28:21 |
| **giving** 17:8 | 269:25 278:12 | 272:12 282:2 | 33:10 38:8 |
| 46:6 64:8 | 282:6 291:10 | 291:12 294:8 | 54:10 85:10 |
| 99:10,10 | **goal** 287:12 | **golden** 188:12 | 105:12 201:16 |
| 114:21 230:13 | **goals** 161:23 | **good** 8:4 9:18 | 217:19 229:5 |
| 234:9 | 256:12 | 9:19 15:17,18 | 241:13 282:5 |
| **glaser** 183:11 | **goes** 50:12 71:6 | 65:4 73:9 81:3 | 282:15 |
| 183:13 185:17 | 74:2 100:3 | 83:24 87:4 | **greater** 24:15 |
| 188:6,8,15,16 | 106:10 148:7 | 128:8 136:4 | **greatly** 170:22 |
| **go** 10:20 17:15 | 197:20,21,23 | 145:17 146:5 | **green** 271:22 |
| 17:16 37:20 | 242:21 244:13 | 151:22,23 | **greenwashing** |
| 42:25 43:25 | 247:24 268:14 | 156:3 178:18 | 150:19 |
| 52:18 55:13 | **going** 8:4 10:23 | 195:15 217:12 | **grew** 151:5 |
| 63:3 66:15 | 11:11 13:21 | 217:16 231:25 | **grievances** |
| 84:14 91:11 | 16:9 25:13 | 240:4 246:12 | 83:17 |
| 96:4 98:20 | 26:21 37:22 | 246:14,22 | **ground** 100:6 |
| 99:16 102:4,6 | 60:21 63:4 | 247:5,8 261:5 | 183:19 196:2 |
| 114:25 115:2 | 81:10 84:2,19 | 265:23 269:3 | **groundbreaki...** |
| 117:3 119:5 | 86:12 94:3 | 278:19 282:19 | 103:2 |
| 124:6 125:22 | 95:9 99:10 | **govern** 153:12 | **grounded** |
| 130:12 135:10 | 106:3 109:15 | **government** | 99:18 182:24 |
| 139:11 143:15 | 130:13 134:16 | 110:25 131:25 | 183:5,8,21,22 |
| 149:7,20 161:6 | 146:7,20 156:2 | **gps** 261:17 | 185:11,16 |
| 163:7 172:17 | 156:20,20 | **gradual** 21:21 | 186:23 187:6 |
| 176:13,14 | 158:8 166:22 | | 189:2,7 190:7 |

200:15 213:23
214:7 264:23
**grounds** 42:4
239:25
**group** 133:6,23
194:14 254:18
281:13
**groups** 200:10
200:21 281:9
**grow** 258:24
262:16
**guess** 90:4
91:13 120:5
214:8 267:6
275:7 277:7
287:4
**guidelines** 5:8
47:14 65:17
184:25
**gulch** 180:23

**h**

**h** 3:9 79:4
193:18
**hail** 78:16
**hailing** 41:20
58:22 61:4,8
71:7 76:18
79:3,6 92:10
92:14 94:13,17
97:3,8 107:18
115:3,6,8
116:3,24 117:4
117:11 121:25

132:3 138:22
139:2 145:20
149:16 151:13
151:19 153:12
153:17 154:18
155:4,8 156:8
157:14 160:17
178:21 192:22
210:7 211:23
222:17 231:12
231:14 249:24
260:22
**half** 122:5
152:24 159:22
**hallmarks**
138:4
**hand** 153:10
295:14
**hanly** 2:3 9:3
**happen** 176:17
176:19 251:11
**happened**
22:15 47:19
180:25 205:9
**happening**
74:14 76:4,6
161:2 216:9
243:11
**happens** 92:3,4
135:10 136:11
167:2 274:17
**happy** 17:16
29:25 294:5,7

**hard** 51:25
214:24
**harder** 66:9
**harmed** 47:16
**harsh** 251:14
251:15
**harvard** 4:7
98:4
**hastings** 107:19
**head** 80:22
93:8 102:2,5
146:21 169:6
178:17 206:5
215:20 236:18
254:24 284:24
**heading** 123:12
**heads** 200:17
**health** 72:6
110:5 171:23
**hear** 123:18
287:3
**heard** 180:24
185:6
**hearing** 57:5,11
83:19
**hearings** 58:5
58:13,18 60:5
60:5 85:18
**heart** 74:2
**heavily** 131:16
**held** 57:5
**heller** 2:18 8:14
**help** 29:25
60:12 71:9

178:11 189:2
202:10,18
**helped** 70:24
99:6
**helpful** 40:19
63:4 69:22
128:25 146:14
**helping** 153:11
**helps** 74:12
181:19 195:25
202:15 270:22
**heterogeneous**
149:2
**heterogenically**
106:6
**hey** 109:14
216:24
**hid** 210:17
**hides** 278:25
**high** 87:15,17
94:18 95:20
96:23 125:17
181:7 231:15
265:20 286:7
**higher** 276:24
**highest** 198:11
**highland**
240:13
**highlighted**
169:25
**highly** 100:5
102:14 190:17
**hinges** 185:19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[hired - importantly]                                            Page 31

| hired 21:5 58:2 | 23:17 24:5,6 | ideas 24:10 | immigrants |
|---|---|---|---|
| 58:3 | 24:12,16 36:16 | 217:4,7 287:18 | 242:22 |
| hiring 96:22 | 256:11,18 | 289:22 | immigration |
| history 43:16 | 273:24 287:13 | identical 91:20 | 108:4 |
| 44:22 198:15 | 292:22 | identification | impact 101:3 |
| 200:23 | housed 208:17 | 11:15 18:21 | 280:25 |
| hold 76:24 77:2 | huge 214:25 | 25:18 27:11 | impactful |
| 91:9 95:8 | huh 29:12 | 30:16 32:25 | 100:5,14,19,20 |
| 97:14 141:25 | 142:22 143:7 | 59:8 84:23 | 100:22 |
| 146:11,12 | 144:19 174:11 | 114:14 142:7 | imperative |
| 173:18 182:13 | 284:21 | 156:14 162:18 | 296:14 |
| 234:10 247:9 | huhs 16:8 | 184:19 | implement |
| holding 128:2 | human 47:15 | identified | 244:6 |
| holland 13:11 | humans 241:20 | 44:16 | implementing |
| 13:15 | hundreds | identify 49:6 | 144:3 |
| home 71:9 | 42:23 | 63:12 84:20 | implications |
| 222:16 | hurt 47:16 | 285:5 | 4:17 142:20 |
| honest 62:12 | hypotheses | identifying | 200:22 249:21 |
| 160:6 164:18 | 186:13 | 43:21 49:7 | implies 143:2 |
| 220:21 245:8 | hypothesis | identities | 150:20 271:12 |
| honestly 40:11 | 182:16,20,25 | 245:21 | importance |
| 79:14 150:13 | 183:4 185:23 | identity 245:23 | 161:14 288:12 |
| 266:17 | 186:8 187:3,4 | iii 122:18 | important |
| hope 242:14 | 189:19 190:6 | il 2:5 | 52:20 68:5 |
| hopefully | hypothetical | illustrate 31:18 | 124:22 126:3 |
| 114:21 | 107:3 179:3 | 259:19 | 131:12 137:11 |
| host 99:11 | 224:22 251:24 | illustrations | 172:7 181:15 |
| hour 17:15 | | 52:23 | 191:5 193:3,8 |
| 76:14 156:3 | **i** | images 210:21 | 193:12 207:6 |
| hourly 237:21 | i.e. 66:17 67:14 | imagine 116:10 | 215:3,5 246:25 |
| 237:23 238:3,7 | ice 230:15 | immersion | 267:5 273:12 |
| 238:8,10,14 | idea 37:17 67:8 | 99:24 177:5 | 288:19,20 |
| hours 20:8,11 | 201:7 241:18 | immigrant | importantly |
| 20:20 21:16 | | 243:3 | 71:21 171:15 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[imposing - institutional]                                    Page 32

imposing
  270:11
impossible
  286:21
imprecise
  165:7 166:16
impression
  263:23,24
  264:7,21
inaccuracy
  159:3
inaccurate
  125:13 161:3
inaccurately
  124:14
inappropriate
  80:4,5
inaudible  14:2
  15:8 47:20
  114:18,22
  138:23 216:25
  253:22 287:22
inbox  54:9
incentive  96:21
  198:7 287:8
incentives
  176:8 283:20
  286:12 287:12
  287:25 288:5
  288:13
incident  49:9
incidents  76:17
include  174:7
  208:18 210:7

included  40:7,8
includes  56:15
  106:5 116:19
  214:14 235:12
  235:13 292:23
including  8:19
  23:7 32:11
  37:4 41:19
  42:6 46:14
  50:18 86:7
  136:24 144:17
  144:21 259:15
inclusive  23:18
income  223:10
  289:12
incomplete
  124:13 125:12
  179:3 224:22
  251:24 269:20
increase  71:7
incredible
  273:11
independent
  60:25 61:9,15
  61:24 115:7,19
  115:20 233:9
  233:12,16
  237:9
index  6:2
indicated  7:15
  295:8
individual  74:5
  74:11,14 75:21
  75:22 89:25

90:2 161:21
  280:5
individual's
  293:18
individuals
  40:13 44:23
  49:22 61:16
  67:19 80:18
  81:4 90:6
  192:5 255:22
  258:12 260:7
induce  287:12
industrial
  13:22
industry  33:16
  58:23 92:19
  97:8,11 107:18
  121:25 149:16
  149:25 151:18
  152:15 153:18
inferences
  132:10
inflection
  232:11
influence
  166:23 225:11
  265:5 268:5
  282:25
influenced
  172:23 265:12
influences
  266:4
inform  130:21
  259:9

information
  4:17 36:15
  42:5 45:11
  46:13 49:22
  53:16 95:11
  96:2 131:16,22
  132:18 142:20
  143:12,18
  207:18,23
  208:7 262:17
informed  205:7
  208:10 227:19
  289:23
ingredients
  201:21
inherently
  65:25
initial  252:22
inputting  225:8
  266:11
inside  195:18
insider  152:15
insight  154:14
insights  33:15
  144:14 174:6
  194:14
instacart  212:3
instant  251:17
instantly
  249:25 251:9
institute  98:24
institutional
  42:6 43:6,7
  44:6 46:14,17

46:24 47:11
49:18 50:13
**instruct** 95:9
**instructions**
64:9 296:2
**insufficient**
203:15
**insurance**
223:5
**intake** 44:13
**integrity** 227:5
**intellectual**
127:2 284:13
**intelligence**
110:17
**intend** 20:3
**intending**
118:10 275:19
**intense** 267:12
**intensification**
243:23 245:12
258:11,14
266:10 267:12
**intensified**
280:7
**intensifies**
173:5
**intent** 275:10
**interact** 240:23
**interactions**
284:12
**interchangea...**
64:20

**interdisciplin...**
110:24
**interest** 272:23
276:22,22
**interested**
52:15 134:15
203:3 295:13
**interesting**
128:7 166:13
182:19 191:24
223:19 244:17
279:24 289:6
289:20
**interests** 274:4
274:25
**interface** 221:6
238:20
**intermediary**
218:18 219:3
219:11,23,24
220:11,14
**internal** 226:21
**internet** 98:5
**interpret** 14:17
272:15
**interpretation**
272:8
**interpretations**
180:6
**interpretive**
148:8 178:8,12
180:11,13,16
**interpretivist**
148:16

**interrupt**
280:16
**interview** 43:2
45:22 46:7
48:13 132:17
133:3,17
134:20 178:25
179:15,17
202:21 205:20
205:21,23
206:13,15,20
206:21 207:13
208:6,8 226:2
**interviewed**
72:5 78:15
112:24,25
113:2,5 193:19
203:4 209:3,6
209:11 229:23
230:8 292:24
**interviewing**
112:18 113:7
133:5,6,13
134:9 178:22
192:23 204:20
204:24,25
205:3 214:6
**interviews**
41:17 42:12
50:16 51:4
112:21 132:23
132:24 147:15
177:17 181:4
205:11,12,18

207:3,5,19,20
207:22,25
208:4,11,15,19
208:22 209:25
210:4,7 211:3
212:24,25
213:6,12
272:17 288:7,9
**introduce** 10:7
25:14 30:12
59:4 84:19
156:23 162:15
184:14
**introduced**
33:5,6
**introducing**
114:9 156:18
**introduction**
144:13
**introductions**
156:22
**inuit** 203:9
**invasiveness**
266:3
**inventor**
183:16
**investigated**
250:4
**invisible** 244:5
244:8,14,21
245:4
**invite** 226:4
**invoice** 19:6,12
19:14,25 20:9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

20:13,15 21:8
25:7 35:24
36:18 38:5
54:8 84:18
85:5
**invoices**  20:4
35:18
**involve**  94:16
**involved**  55:22
88:2 90:10
94:12 99:5
241:15 260:6
292:18
**involvement**
35:20 37:2
**involving**  55:9
94:13
**iphone**  230:14
**iran**  94:5
**irb**  43:12 44:11
47:22 49:20
50:2,7
**issue**  25:7
82:10 91:15
239:7 251:6,10
254:19
**issues**  57:19,20
72:7 87:5 89:7
95:6 119:22
128:20 131:4
155:3 171:24
**item**  57:4 58:25
**items**  85:18,19

**iterative**
203:24 214:14
214:15,21
**ix**  122:4,8,8,12

**j**

**janitors**  240:22
**jeans**  265:24
266:2
**jeff**  294:11
**jersey**  281:6
**jo**  2:4 9:2 17:25
22:13 34:4
52:14 54:20
55:6 159:11
**job**  1:25 16:19
75:24 96:21
110:11 133:12
225:23 247:8
265:23 272:19
**jobs**  61:3
222:20
**joe**  281:5,8
**johnston**  13:9
13:18
**joint**  244:23
**joseph**  5:4
13:12 121:4
124:13 125:4
128:11
**journal**  13:22
101:8 185:7
188:3,3 190:16

**journalist**
132:8
**journalists**
132:8
**journals**  97:25
107:10,13
127:25
**jpollock**  2:6
**judgment**
259:17
**judgments**
247:4
**june**  20:14,16
20:21 21:2,8
21:11,18 55:2
**juno**  78:17

**k**

**kameswaran**
4:22
**katie**  2:9 9:8
**keep**  36:16
44:21 137:13
232:10 267:8
273:10 282:2
**keeps**  274:14
276:8
**kept**  116:10
**key**  67:8 143:12
144:14 159:4,9
271:4
**kherkher**  87:19
87:20

**kin**  295:12
**kind**  23:2 79:5
95:11 109:19
112:11 121:8
123:14 130:8
193:14 206:8
206:10 207:5
210:23 212:12
228:24 234:22
235:14 254:19
259:23 260:20
284:18 286:10
**kinds**  207:22
**kirkland**  2:8
9:7
**kirkland.com**
2:11
**kirstina**  9:4
**klein**  98:5,10
**knee**  136:5,6
**know**  14:2 16:2
17:12,18,24
23:25 28:22
29:23 36:22
43:15 44:4
47:21 48:10,14
49:12 53:21,23
58:14 60:4
63:18 64:6
67:22 71:19
73:7 76:2
78:15 83:4,15
83:16 86:24
90:3 92:14

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

94:14,19,21,25
95:2,20 102:5
103:7 104:20
104:22 105:10
106:4,13,18
107:5 109:10
110:8,12
111:19 113:17
113:22 114:2
115:19 117:3,8
121:24 123:6
123:19 124:9
125:8 126:8
127:15,23,24
128:19 129:10
130:8 131:13
132:19 133:6
134:11 136:14
136:17 140:5
140:12,13,16
140:22 141:15
148:19,25
150:23 151:6,8
152:10 153:9
154:17 156:3
157:20,23
161:7 167:21
168:13,16,18
169:2,22
180:23 185:4
190:18 191:18
198:15 200:16
201:16 203:7
207:17 209:2,4

209:5,7,9
215:7 216:23
216:24 217:2
219:4,21 223:8
224:8 225:16
226:7 227:8
228:2 229:7
230:14 232:7
237:15 239:20
241:18 244:17
246:11 247:22
252:20 253:3,8
254:16,24
255:18 261:22
264:13 266:15
269:22 275:18
276:18 278:7
279:3 285:2
290:18 292:23
293:6
**knowing** 117:8
255:4,10
286:20
**knowledge**
42:17,21,24
93:8 102:20
103:17,19
124:17 135:25
136:11 148:17
152:14 178:9
181:23 227:20
237:18 286:20
286:24

**known** 103:23
204:11
**knows** 93:19
**kristina** 2:4
**kruger** 13:11
13:15

**l**

**l** 2:16 4:13
107:21 193:18
**label** 87:6
**labor** 64:7
218:12,17,25
233:20 234:14
234:19 235:2,3
235:5,9,13
262:13 263:13
263:15 266:11
**lack** 186:10
269:20
**lacks** 131:16,18
**laid** 239:21
**lane** 174:3
**language** 46:12
149:22 166:15
**languages**
86:25
**laptop** 18:11,13
**large** 195:5
**largely** 244:8
285:7
**larger** 69:16
208:17 242:25
271:16 277:20

278:2
**lastly** 76:12
**laundering**
266:13
**law** 98:4,14,17
106:16,24
107:10,10,13
111:3 115:25
128:16 129:2
129:11 175:19
**lawsuits** 87:11
**lawyers** 37:5
139:4 145:21
282:11
**lays** 64:11
**lead** 243:23
**leaders** 183:17
183:19
**leading** 236:2,5
272:25
**leads** 145:25,25
275:2
**learned** 110:8
**lease** 115:8
**leave** 167:23
231:12
**led** 223:21
**left** 122:19
158:22 282:4
282:14
**legal** 1:21
61:20 62:8,11
87:5 107:2
115:24 118:19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[legal - lindsey]                                                    Page 36

| | | | |
|---|---|---|---|
| 122:22 128:21 | **levels** 113:23 | 19:1 20:1 21:1 | 111:1 112:1 |
| 130:17 154:21 | 133:13 240:13 | 22:1 23:1 24:1 | 113:1 114:1 |
| 238:22 | **lexicon** 186:25 | 24:24 25:1 | 115:1 116:1 |
| **legislation** | **licenses** 237:17 | 26:1,2 27:1 | 117:1 118:1 |
| 153:11 | **lie** 136:10 | 28:1 29:1 30:1 | 119:1 120:1 |
| **legislative** 83:8 | **lieu** 7:10 | 31:1,2 32:1 | 121:1 122:1 |
| 83:11 85:18 | **life** 109:21 | 33:1 34:1 35:1 | 123:1 124:1 |
| **lens** 105:5 | 132:14 218:13 | 36:1 37:1 38:1 | 125:1 126:1 |
| 130:3 | **lifecycle** 228:12 | 39:1 40:1 41:1 | 127:1 128:1 |
| **lenses** 76:8 | **likely** 102:15 | 42:1 43:1 44:1 | 129:1 130:1 |
| **letter** 37:16 | 254:15 262:15 | 45:1 46:1 47:1 | 131:1 132:1 |
| **letters** 36:25 | 263:7,10 | 48:1 49:1 50:1 | 133:1 134:1 |
| 37:14 | **lim** 185:4 | 51:1 52:1 53:1 | 135:1 136:1 |
| **letting** 10:9 | **limitation** | 54:1 55:1 56:1 | 137:1 138:1 |
| 29:22 | 141:14 190:20 | 57:1 58:1 59:1 | 139:1 140:1 |
| **level** 70:22 | 190:25 191:2 | 60:1 61:1 62:1 | 141:1 142:1 |
| 72:21 74:14 | **limitations** | 63:1 64:1 65:1 | 143:1 144:1 |
| 76:5 87:15,17 | 139:13,17 | 66:1 67:1 68:1 | 145:1 146:1 |
| 91:19 94:18 | 144:17,21 | 69:1 70:1 71:1 | 147:1 148:1 |
| 95:21 124:18 | 172:9,12 | 72:1 73:1 74:1 | 149:1 150:1 |
| 125:3,18 | **limited** 37:4 | 75:1 76:1 77:1 | 151:1 152:1 |
| 128:12 152:20 | 41:19 102:23 | 78:1 79:1 80:1 | 153:1 154:1 |
| 153:6 154:11 | 103:24 140:2 | 81:1 82:1 83:1 | 155:1 156:1 |
| 159:16,23 | 141:11 169:15 | 84:1 85:1 86:1 | 157:1 158:1 |
| 160:2 176:10 | 170:22 | 87:1 88:1 89:1 | 159:1 160:1 |
| 179:6 188:25 | **limits** 172:14 | 90:1 91:1 92:1 | 161:1 162:1 |
| 193:5,14 | 220:14,15,16 | 93:1 94:1 95:1 | 163:1 164:1 |
| 194:20 195:8 | **lindsey** 1:1,13 | 96:1 97:1 98:1 | 165:1 166:1 |
| 198:11 216:7,7 | 2:1 3:1,5,20 | 99:1 100:1 | 167:1 168:1 |
| 218:17 260:6 | 4:1 5:1 6:1 7:1 | 101:1 102:1 | 169:1 170:1 |
| 260:24 261:8 | 8:1,9 9:1,11,22 | 103:1 104:1 | 171:1 172:1 |
| 265:21 275:24 | 10:1 11:1 12:1 | 105:1 106:1 | 173:1 174:1 |
| 276:24 280:10 | 13:1 14:1 15:1 | 107:1 108:1 | 175:1 176:1 |
| | 16:1 17:1 18:1 | 109:1 110:1 | 177:1 178:1 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| 179:1 180:1 | 247:1 248:1 | **link** 60:9,9 | 285:7,21 |
| 181:1 182:1 | 249:1 250:1 | 234:19 | **little** 35:16 |
| 183:1 184:1 | 251:1 252:1 | **linked** 138:25 | 36:17 42:9 |
| 185:1 186:1 | 253:1 254:1 | 271:3 | 53:4 71:19 |
| 187:1 188:1 | 255:1 256:1 | **linking** 202:6 | 72:13 114:23 |
| 189:1 190:1 | 257:1 258:1 | **list** 26:17 32:7 | 163:3 165:11 |
| 191:1 192:1 | 259:1 260:1 | 35:2,10,13 | 197:2,7 199:12 |
| 193:1 194:1 | 261:1 262:1 | 40:23 51:20 | 210:22 215:9 |
| 195:1 196:1 | 263:1 264:1 | 52:16 55:16 | 221:11 245:22 |
| 197:1 198:1 | 265:1 266:1 | 57:4 83:7,10 | 250:8 253:16 |
| 199:1 200:1 | 267:1 268:1 | 85:13,19 94:11 | 253:22 277:17 |
| 201:1 202:1 | 269:1 270:1 | 245:15 | 287:4 |
| 203:1 204:1 | 271:1 272:1 | **listed** 23:18 | **live** 60:15 |
| 205:1 206:1 | 273:1 274:1 | 39:10 | **lived** 196:6 |
| 207:1 208:1 | 275:1 276:1 | **listening** 49:4 | 293:7 |
| 209:1 210:1 | 277:1 278:1 | 186:16 | **livelihood** |
| 211:1 212:1 | 279:1 280:1 | **listing** 116:11 | 249:22 |
| 213:1 214:1 | 281:1 282:1 | **lists** 152:10 | **liveries** 115:4 |
| 215:1 216:1 | 283:1 284:1 | **literacy** 105:15 | 115:15 |
| 217:1 218:1 | 285:1 286:1 | **literally** 214:6 | **lives** 76:14 |
| 219:1 220:1 | 287:1 288:1 | **literature** 23:8 | 203:9 |
| 221:1 222:1 | 289:1 290:1 | 23:9,11 24:9 | **living** 109:11 |
| 223:1 224:1 | 291:1 292:1 | 54:2 61:19 | 139:19 |
| 225:1 226:1 | 293:1 294:1,18 | 62:7 129:20 | **ljc** 1:7 |
| 227:1 228:1 | 295:1,7 296:1 | 161:19 176:5 | **llp** 2:8 |
| 229:1 230:1 | 297:1 298:1 | 188:19 198:22 | **located** 17:20 |
| 231:1 232:1 | **lindseycamer...** | 206:17 214:8 | **location** 246:2 |
| 233:1 234:1 | 3:22 | 217:3 221:20 | 246:15 247:23 |
| 235:1 236:1 | **line** 6:5,9,14,18 | 234:23 272:12 | 268:12 |
| 237:1 238:1 | 19:16 67:14 | 284:20,22,23 | **locationally** |
| 239:1 240:1 | 130:14 239:16 | 293:21,23 | 262:14 |
| 241:1 242:1 | 277:4 297:5 | **litigation** 1:7 | **locations** 248:5 |
| 243:1 244:1 | **lines** 48:12 | 23:7 39:7,10 | 249:3 |
| 245:1 246:1 | 284:24 | 52:10 284:5,19 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**locke** 188:12
**locked** 168:17
**log** 167:17
168:3,7,23
170:20 173:3
205:9
**logged** 167:2,8
167:10,18,24
168:6,24
170:23
**logic** 224:2
**logically**
127:18
**logs** 209:23
**long** 27:18
52:12 110:12
111:8,22 180:2
239:16 287:15
**longer** 17:16
27:3 134:14
273:24 287:13
**longitudinally**
292:24
**look** 26:23 40:6
72:24 74:4,6
75:25 82:21
85:4,5 100:25
103:5,21
107:15 111:5
131:8 132:9
134:16 147:17
148:11,18
150:15 179:16
184:8 187:19

188:2,24
190:17,25
193:24 211:25
219:16,23
232:25 250:21
**looked** 22:20
31:13,17 32:2
36:6 77:14
92:11 181:3
196:23 233:4
243:14 263:22
**looking** 20:12
20:15 24:21
58:24 59:21
66:7 85:15
127:13 134:11
149:22 173:22
181:18,24
190:15 193:23
196:14 199:22
249:14 270:20
286:9
**looks** 19:8
20:13,15 29:15
31:9 33:13
59:23,23 63:7
85:23 184:4
195:16 199:23
203:8 219:17
254:2 267:23
281:21
**lot** 22:12,13,14
22:15,25 23:15
24:8 44:19

49:10 51:2
67:23 97:8
99:7 107:17
108:11 110:8
116:2,19
118:14 130:5
132:3 137:19
150:7 159:10
184:11 190:15
197:12 198:17
210:16 213:20
216:24 229:3
230:3 235:11
253:10 262:2
267:22 278:25
286:2
**lots** 73:5 77:4
104:23 126:20
176:6
**love** 221:17
**low** 71:21
171:15
**loyalty** 117:3
198:9 225:14
232:9,9 266:6
283:20 284:2,6
284:10 285:14
286:7 290:6
**lyft** 78:17 86:3
86:13 90:10
91:23 92:13
132:5 150:6
152:24 153:2
159:21 169:3

173:8
**lying** 80:18
**lynch** 155:7

**m**

**m** 67:14 193:17
193:18
**machine**
295:10
**made** 14:5
15:10 62:16
125:11 127:11
129:10 137:20
149:14 155:12
181:5 188:22
200:20 244:9
289:2 296:8
**madness** 240:8
**maffie** 13:21
15:3,11 230:25
266:12
**main** 241:18
**maine** 281:18
**majority**
190:14 197:4
208:9 257:6
279:16,19
284:14
**make** 14:16,23
15:20 16:11,18
33:25 34:12
51:2,13 86:24
91:13,15
102:15 104:23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[make - md]**                                    Page 39

105:5 136:2
137:2 151:6
170:15 179:7
181:9 193:10
201:22 202:18
202:21 208:15
208:20 211:9
236:8 242:2
271:5 276:6
296:5
**makes** 13:24
24:17 118:17
119:2,4 135:21
212:9 259:25
267:14
**making** 61:22
61:24 65:17
68:19 115:22
126:25 127:12
136:12 170:18
188:22 229:19
241:22 247:4
**manage** 63:20
63:25 64:4,4,5
64:7,14,19
**management**
4:16 41:23
61:18 64:12
66:5,11,14,20
67:20 74:7
88:14,23 89:15
92:12 96:8
99:18,23 100:7
101:15 108:21

111:11 116:13
116:18,22
122:2 142:20
144:3,7,13
161:18 165:2
167:11 170:24
173:4 177:4
188:13 191:2
193:4 194:4,15
194:18 195:4,7
195:12,16
203:11 223:15
224:13 225:10
225:25 226:20
234:12 235:21
236:4,10,14
237:2 241:9
242:4 243:8,23
245:13 249:20
265:4,5 266:22
270:3 282:23
283:11,17
**manager**
265:25
**managerial**
144:9 276:21
**managers**
144:12 235:11
**managing**
96:14
**manifests**
281:12
**mann** 180:23

**manner** 7:14
**manuscript**
142:25
**manuscripts**
28:4
**map** 104:25
**marc** 185:4
**marijuana** 78:7
79:18
**mark** 11:11
27:6 54:12
**marked** 6:17
11:15 18:21
19:3 25:18
27:11 30:16
32:25 59:8
84:23 114:14
142:7 156:14
162:18 184:19
**market** 196:5
262:13 263:13
263:15
**marketing**
188:3,4 190:17
**marketplace**
220:4
**marketplaces**
220:3
**marxist** 234:15
**masks** 65:19
**massachusetts**
90:9 91:25
92:21,24 93:3
285:25

**master's**
109:25 110:7
**mastered**
156:21
**masters** 108:19
**match** 154:12
197:11 266:5
**matched**
198:16 225:13
**matches** 122:2
134:21 198:19
221:21 230:4
**matching** 64:8
198:10 215:8
215:13 247:25
249:2,10 266:7
283:19
**material** 43:9
**materials** 6:11
18:8,12 32:9
38:24 39:18
40:9,23 41:14
44:12,15 45:12
46:18 47:2
48:6 51:16,19
52:10,17 92:23
93:3,12 214:15
285:21,22
293:3
**matter** 8:10
12:16
**mba** 109:13,16
**md** 1:6

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[mdl - methodology]                                                Page 40

| | | | |
|---|---|---|---|
| **mdl**   3:20 5:4 | 200:3,12 | **mechanism** | 22:24 44:13 |
| 9:5 | 204:24 210:20 | 145:18 190:3 | 52:4 54:3 |
| **mean**   21:4 | 223:25 226:10 | 267:5 271:7 | 70:24 90:8 |
| 23:10 24:8 | 226:17 229:14 | **mechanisms** | 121:14 133:22 |
| 40:20 47:7 | 241:7 247:16 | 136:10 259:13 | 140:13 208:21 |
| 48:24,25 51:23 | 249:15 250:13 | 268:16 271:5 | 214:13,23 |
| 53:4 57:25 | 254:9 255:2,13 | **medallion** | 227:11 252:2 |
| 58:16 63:16 | 258:21 259:14 | 115:10 | 253:7 257:5 |
| 64:3 73:24 | 260:8 261:14 | **media**   8:7 | **mentioning** |
| 78:21 82:25 | 264:16 266:3 | 84:10 158:17 | 163:16 246:21 |
| 91:22 93:24 | 266:20 270:20 | 218:5 229:6 | **mentions**   212:2 |
| 95:20 97:19 | 278:18 279:23 | **median**   199:23 | **mentor**   109:14 |
| 99:9 105:17 | 280:16 281:5 | **mediated** | **merchants** |
| 112:6 113:17 | 282:8 287:16 | 253:18 264:5 | 218:20 |
| 115:22 117:7 | 293:5,11 | **medium**   125:6 | **messages** |
| 117:13 119:17 | **meaning**   62:18 | **meeting**   62:22 | 247:19 |
| 125:16 126:18 | 170:15 240:14 | 76:16 | **met**   22:13 |
| 127:9 129:19 | **meanings** | **meetings**   22:19 | 132:5 |
| 129:24 131:4 | 138:15 | 22:22 | **metapore** |
| 132:7 134:2 | **means**   78:8 | **meets**   240:16 | 278:15 |
| 136:21 137:14 | 81:20 92:6 | **memoing** | **method**   74:21 |
| 137:17,18 | 150:16 201:19 | 272:14 | 103:5 177:19 |
| 138:11,13 | **meant**   170:16 | **memoranda** | 177:24 178:7 |
| 141:6,7 143:17 | 232:18 278:3 | 52:22 | 182:25 240:7 |
| 145:12 147:12 | 279:9 | **memory**   174:3 | **methodologies** |
| 150:9 151:16 | **measure** | **memos**   214:17 | 100:9,16 |
| 152:23 154:19 | 104:21 271:25 | 216:10,11 | **methodology** |
| 166:8 167:21 | 272:4 | **men**   139:19 | 99:22 124:19 |
| 168:21 173:10 | **measurements** | **mention**   12:19 | 126:4 130:24 |
| 174:24 178:15 | 104:24 | 13:16,21 65:15 | 131:6,17 |
| 179:13,24 | **measuring** | 210:6 225:22 | 176:15,17,18 |
| 181:2 184:8 | 280:25 | 240:10 | 177:3,10 183:9 |
| 186:15 188:5 | **mechanics** | **mentioned** | 212:6,7 213:13 |
| 189:23 196:16 | 91:18 | 13:13,18 18:6 | 214:3 217:11 |

| | | | |
|---|---|---|---|
| 218:10 292:12<br>292:18 293:19<br>**methods** 100:4<br>100:13,15,21<br>101:9 138:15<br>143:21 144:17<br>177:11 184:12<br>185:22 186:7<br>189:13 192:7<br>192:13 213:3<br>213:15<br>**metric** 101:18<br>127:6<br>**metro** 41:21<br>132:2<br>**michael** 276:19<br>**micro** 70:22,22<br>111:13<br>**mid** 1:21<br>**middle** 109:11<br>110:12,15<br>199:23<br>**mike** 230:25<br>**mileage** 223:4<br>**milgram** 260:2<br>**mind** 12:23<br>13:2,5 116:8<br>116:12 120:21<br>126:12 145:23<br>155:14 192:9<br>207:7 229:20<br>**mine** 47:25<br>284:14 | **minimum**<br>201:10 237:23<br>238:7,8,10,14<br>242:20<br>**minneapolis**<br>238:13<br>**minority**<br>148:14 257:7<br>257:16 279:17<br>**minute** 10:21<br>18:18 35:16<br>41:11 55:17<br>116:16 117:23<br>170:18 211:16<br>273:17<br>**minutes** 156:9<br>156:21,23<br>217:18<br>**misq** 193:18<br>**missed** 126:21<br>287:9<br>**missing** 109:2<br>275:8<br>**misspoke**<br>157:18<br>**mistake** 86:24<br>155:12<br>**mistakenly**<br>33:23<br>**mistakes**<br>149:13,13,21<br>**misunderstan...**<br>159:15 | **mix** 22:23<br>**model** 117:2<br>139:21 148:13<br>190:2<br>**models** 52:23<br>**moment** 62:3<br>168:14<br>**monday** 101:6<br>**money** 257:11<br>276:6<br>**monitor** 268:21<br>**monitoring**<br>246:8 247:15<br>291:4<br>**monitors** 225:3<br>225:5 247:19<br>**months** 21:22<br>204:7,9<br>**mood** 246:9<br>**morning** 20:9<br>33:7<br>**motivation**<br>96:21 97:7<br>**motivations**<br>135:10<br>**motor** 246:5<br>**move** 70:2<br>76:10 82:24<br>232:19<br>**movements**<br>245:18<br>**moves** 127:2<br>**movie** 94:4 | **moving** 32:5<br>159:2 215:18<br>**multi** 222:16<br>277:3<br>**multifaceted**<br>72:25<br>**multiple** 45:3<br>133:11,19<br>138:20 139:6,7<br>139:8 147:13<br>167:22 168:7<br>168:16 192:21<br>192:22,23,24<br>192:24 222:17<br>247:9 256:8<br>**mystery** 265:22<br>**möhlmann**<br>193:16 194:8<br>**möhlmann's**<br>195:14<br><br>**n**<br><br>**n** 2:2,16 3:2<br>193:18,18<br>201:16,17,19<br>203:14,17<br>**nailed** 271:7<br>**name** 8:14,24<br>9:21 13:8,9<br>25:2 32:11,11<br>60:6 107:20<br>121:24 122:6<br>149:10,16 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[names - number]                                    Page 42

| | | | |
|---|---|---|---|
| **names** 40:15 | 257:11 267:3,7 | 189:3,14 190:2 | **notes** 41:14 |
| 43:20 44:14 | **needed** 52:10 | 216:19 217:7 | 50:18,18 52:22 |
| 227:22 | 125:2 193:24 | 237:24 281:6 | 53:5 210:8 |
| **narration** | **needs** 122:12 | **newark** 281:5 | **notice** 3:19 |
| 74:11 | 240:16 | **nice** 34:12 | 25:14,25 27:15 |
| **narrative** | **negative** 64:15 | **nick** 117:12 | 30:25 31:7,13 |
| 174:19 184:4,6 | 278:23 | **nikil** 60:2 | 32:7 295:8 |
| **narratives** 74:9 | **neighborhood** | **nikil's** 60:10,20 | **notion** 185:19 |
| 216:23 236:19 | 259:6,8 | **nine** 201:17 | **nots** 265:10 |
| 236:20 270:24 | **neither** 295:12 | **nn9** 201:15 | **notwithstandi...** |
| **narrow** 40:20 | **neo** 237:3 | **nod** 4:4 | 159:20 |
| **narrower** | **nested** 74:6 | **noes** 16:8 | **noun** 219:16 |
| 287:5 | 271:16 | **non** 39:10 | **novelty** 181:15 |
| **narrowing** | **network** 71:8 | **normative** 65:5 | 181:21,21 |
| 134:18 | 258:24 | 236:23 237:3 | **november** 1:16 |
| **national** 105:20 | **networks** 259:5 | 266:23 | 8:6 294:12 |
| 105:22 135:14 | **neutral** 64:16 | **norms** 44:7 | 295:15 |
| **nature** 57:11 | 64:21,23,24,25 | 99:21 177:2 | **nuance** 233:14 |
| **nearly** 113:19 | 242:6 248:25 | 241:21 | **number** 3:11 |
| **necessarily** | 278:20 279:5 | **north** 139:20 | 4:2 5:2 8:7 |
| 211:14 274:8 | **never** 43:23 | 208:23 209:6 | 11:16 18:22 |
| **necessary** | 44:2 77:11 | 210:3,6 211:18 | 20:8 25:19 |
| 17:17 241:6 | 104:13 107:4 | **northern** 1:3 | 26:24 27:12,25 |
| 296:5 | 185:6 217:5 | 8:12 | 28:6,8 29:4,4,7 |
| **need** 17:11 | 242:5 272:21 | **notary** 1:17 | 29:7,9,9,10,13 |
| 67:24 120:20 | 272:25 273:14 | 295:6,19 | 30:17 31:18 |
| 125:14 136:5 | **nevertheless** | 298:25 | 32:6,7 33:2 |
| 144:8 157:5 | 153:15 172:9 | **note** 13:6 36:17 | 35:2,17 36:23 |
| 170:6 187:22 | **new** 98:24 | 65:23 78:3 | 37:9,13 38:10 |
| 195:8 199:15 | 102:11,13,20 | 91:4 139:18 | 38:23 41:13 |
| 199:18 201:10 | 103:2,6,13,17 | 142:24 170:12 | 50:15 51:8,15 |
| 202:12 222:2 | 103:19,20,21 | 173:14 | 51:18 52:21,25 |
| 227:7 238:17 | 104:3 162:15 | **noted** 91:3 | 53:14 59:9 |
| 239:9 250:21 | 181:19,20 | 296:12 298:9 | 70:9 76:19 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[number - oh]                                              Page 43

84:10,24 86:3
86:7 87:20
94:11 100:25
101:11 114:15
142:8 156:15
158:17 162:19
184:20 200:14
200:20 201:10
208:14 218:5
263:18 277:25
**numbers**  36:22
85:24 100:7
101:19
**nw**   2:10

**o**

**o**  2:16
**o'neill**  2:9 9:8
**oath**  7:10,11
10:3
**obfuscate**
270:3 273:20
**obfuscates**
279:2
**object**  21:24
22:8 25:8
33:21 42:15
43:10 45:6,13
45:20 46:19
47:6 48:7,23
49:23 61:10
62:10 64:17
65:6 68:6,14
68:24 72:17

73:15,20 74:25
75:16 79:13
81:7 82:12
88:15,24 90:17
98:19 102:17
103:15 104:7
104:11 106:17
106:25 111:24
115:17 118:18
119:3,15,24
120:8 121:11
122:21 123:25
124:24 126:6
128:5 129:3,23
131:2 132:20
136:19 137:5
137:25 141:19
150:12 151:21
154:20 162:9
164:14 166:11
167:19 169:21
170:4 173:9
175:7 177:13
177:25 179:2
180:9 181:17
182:17 186:2,9
187:14,17
189:11 190:23
193:6 195:2
196:15 201:25
202:23 219:12
220:19 221:2
221:16 222:25
223:16 224:21

229:18 233:21
235:16 238:4
246:16 248:3
248:15,23
251:23 252:16
252:25 255:5
256:24 257:25
261:13 269:19
271:13 275:3
275:21 277:15
278:10 279:22
281:3 284:7
288:16
**objecting**  131:3
**objection**  91:3
93:23 153:19
187:18 244:15
**objections**  4:4
7:14,20 30:24
32:16 37:22
38:13
**objective**  178:7
**objects**  42:3
53:17
**oblique**  234:2
**observation**
81:6 99:24
147:15 177:5
197:18 292:21
**observations**
210:8
**obtain**  68:11
226:13

**obtained**  150:6
**obviously**
114:4 236:7
**occur**  12:24
13:3
**ochutu**  117:12
**october**  11:25
29:2,5
**odor**  34:13
148:20
**offended**  16:17
16:17
**offer**  155:2
271:18
**offering**  175:17
268:20
**office**  215:2
**officer**  93:16
**official**  295:14
**oftentimes**
287:13
**oh**  8:25 15:17
28:7,16 29:3
29:12,14,21
37:21 47:3
71:17 86:10
94:12 95:15
97:10 118:12
131:23 149:22
160:16 162:10
194:10 215:23
241:7 249:11
254:22 258:22
270:16 272:20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[oh - okay]**                                                                 Page 44

| | | | |
|---|---|---|---|
| 282:15 | 36:19,23 37:18 | 99:12,16 | 174:16 175:14 |
| **okapaku**  94:21 | 38:3,8,23 | 100:17 101:17 | 175:14,21 |
| 118:4 119:13 | 39:21 40:10 | 102:8 105:8 | 176:13 177:15 |
| 120:6,10 121:8 | 41:9 43:5 45:5 | 107:22,25 | 177:23 178:5 |
| 121:14,18,20 | 46:11,22 49:16 | 108:16 109:22 | 178:11,19 |
| 124:23 128:3 | 50:5,14,14 | 109:22 111:17 | 180:21 182:3 |
| 130:24 149:14 | 51:7,10,15 | 111:22 112:5 | 183:6 184:13 |
| 151:17 152:7 | 52:2,21 53:7 | 112:15 113:4 | 185:8 186:19 |
| 152:24 158:22 | 53:14,24 54:5 | 113:14 114:7,8 | 189:5,18 |
| 159:21 162:23 | 54:10,18,24 | 114:19,25 | 194:12 199:2 |
| 165:4 207:23 | 55:5,13 56:6 | 115:13 116:14 | 200:4,8 202:10 |
| **okapaku's** | 56:23 57:3,14 | 117:16,16,17 | 202:19 204:14 |
| 24:19 25:2 | 57:18,23 58:9 | 118:15 119:11 | 205:11,17 |
| 122:6 155:2 | 58:11,24 59:18 | 120:24 122:17 | 206:8 207:14 |
| 207:17 | 60:7,11,23 | 123:18 124:5 | 207:16 209:24 |
| **okay**  9:23 10:6 | 62:5,15,25 | 124:22 125:25 | 210:5 211:6,21 |
| 11:24 12:3,7 | 63:21 64:3 | 128:14,18 | 212:5,12,16,22 |
| 12:11,21 13:4 | 65:11 66:8,15 | 130:23 131:8 | 214:5,13,20 |
| 15:19,23 16:2 | 67:10 70:21 | 133:2 134:13 | 215:7,15,20,23 |
| 16:21,25 17:19 | 71:17 73:19 | 139:11 140:19 | 216:10,15 |
| 17:23 18:12,16 | 75:20 76:9 | 143:4,11,15,20 | 217:9,10,17 |
| 19:2,24 20:2 | 77:3,8,12,12,20 | 144:25 146:14 | 219:10 220:16 |
| 20:12,20,25 | 77:25 79:10 | 146:14,22 | 220:23 221:24 |
| 21:10,14,20 | 80:23 82:6 | 147:8,24 149:7 | 223:14 224:3 |
| 22:5,16,24 | 83:6,13,21,25 | 150:9 153:15 | 226:12 227:11 |
| 23:17,21 24:6 | 85:10,23 86:4 | 155:9 156:11 | 228:9,9 231:3 |
| 24:6,25 25:6 | 86:18,21,22 | 157:4,20 158:3 | 231:9,9 232:16 |
| 25:12,22 26:20 | 87:14 88:4,10 | 158:4,7 161:17 | 232:25 233:19 |
| 27:21 28:11,18 | 90:7,7,8,23 | 162:4,13 163:7 | 235:5,24 236:6 |
| 28:21 29:12,14 | 92:2,22 93:6,9 | 163:25 165:3 | 237:15,25 |
| 29:15 30:7,23 | 94:9,24 95:4 | 166:4,8 168:6 | 239:12 240:2,7 |
| 32:4,22,22 | 95:18,24 96:3 | 168:25 169:7 | 240:8 241:17 |
| 33:10 34:16,23 | 97:9,13,13 | 170:10 171:6 | 243:13,20 |
| 35:15 36:9,12 | 98:3,11,13 | 172:6 173:6 | 245:9,9 247:2 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[okay - organizational]**                                              Page 45

| | | | |
|---|---|---|---|
| 247:11,22 | **okpaku's** 121:5 | **operating** | **opportunity** |
| 248:8,12 249:6 | 124:13 125:4 | 67:11 162:2 | 71:23 171:17 |
| 249:11,17,17 | 128:11 131:5 | 221:8 246:5 | 174:8 252:14 |
| 250:17 251:6 | 159:3 | **opining** 247:18 | 292:2 293:20 |
| 251:17,21 | **old** 102:14 | 256:17 | **opposed** 103:21 |
| 252:12,20 | **older** 141:5 | **opinion** 12:20 | 115:9 151:13 |
| 253:5,5 254:16 | 190:8 | 40:12 76:23 | 155:8 258:14 |
| 254:25,25 | **onboarded** | 77:2 79:11 | 263:14,19 |
| 255:20 256:2 | 222:7 | 81:2 82:3,20 | 277:9 287:23 |
| 256:16,21 | **onboarding** | 83:5,18 90:24 | **opposite** 135:7 |
| 257:22 258:18 | 231:13 | 94:25 106:15 | **optional** 269:13 |
| 260:20 261:7 | **once** 43:21 | 155:2 159:22 | **order** 52:11 |
| 262:5,11 | 77:14 167:10 | 159:25 163:10 | 95:17 194:17 |
| 263:21,25 | 167:18 170:22 | 175:17 245:3 | **organization** |
| 264:25 265:15 | 172:10,13 | 246:13,18 | 37:5 96:22 |
| 267:16,25 | 173:3 215:12 | 247:12 251:12 | 133:14 165:20 |
| 268:2,9 269:7 | **ones** 56:2 81:15 | 251:16 252:18 | 240:17 244:10 |
| 269:10,24,24 | 81:16 208:12 | 286:3 | 245:20 256:13 |
| 271:8 272:22 | 257:19,20 | **opinions** 12:15 | 266:15,18 |
| 273:13,16,17 | **online** 143:22 | 34:18 38:25 | 270:4 275:10 |
| 275:17 277:7 | 256:10 262:16 | 39:8 41:22 | 275:19 276:13 |
| 278:18 279:6 | 262:25 263:20 | 42:14 52:11 | 276:23 281:11 |
| 279:19 280:19 | 264:15,18 | 53:10 72:10 | 283:6 |
| 281:25 282:6 | 288:10 292:25 | 82:24 88:12,20 | **organization's** |
| 282:15,20,22 | **oops** 27:7 91:9 | 92:24 93:14 | 161:23 274:4 |
| 283:4,14,23 | 232:4 | 95:14 113:10 | **organizational** |
| 284:4 285:20 | **open** 71:2 | 118:4 121:9 | 68:2 69:16 |
| 286:9 288:12 | 72:23 142:10 | 213:16 226:14 | 76:5 88:13,22 |
| 290:2,9,15 | 214:15,21 | 238:23 284:6 | 89:12,14 95:6 |
| 291:3,6,7 | 263:13 273:11 | 284:25 | 99:17,23 100:6 |
| **okpaku** 5:4 | **operate** 221:10 | **opportunities** | 101:15,16,16 |
| 13:12 15:6 | **operates** | 139:17 225:11 | 111:11,14,16 |
| 124:14 169:11 | 220:23 221:4,4 | 248:9,21 | 130:3,21 136:8 |
| | | | 161:13,13,19 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[organizational - papers]                                                Page 46

161:19 162:5,5
163:17,23,24
164:3 165:13
165:19 172:23
175:22 177:4
181:6 188:18
193:5 194:20
195:8 231:20
232:6 233:3,8
233:17,19
234:20,22
235:2,15,21
239:4 243:24
244:6 264:4
270:4 275:15
276:15 280:3
280:12,24
282:24
**organizationa...**
276:16
**organizations**
74:12 176:9
218:12 228:12
244:5 258:19
264:3 265:2,17
268:5,10,15
270:8 273:20
274:25
**organizing**
181:7
**origin**   150:15
**original**   28:14
288:3 296:15

**outcome**
202:16 295:13
**outline**   206:24
206:25 207:12
236:7 240:5
282:14,17
**outlines**   38:11
207:9
**output**   205:6
**outside**   56:21
62:13 69:7
79:15 82:15
116:22 208:23
210:6 211:7,18
237:25 284:5
293:23
**outsource**
265:3
**overall**   197:5,6
260:18 288:18
**overlapping**
178:16
**overprescribi...**
239:14
**overview**   5:7
184:24 218:12
**own**   50:13
52:19 115:8
122:7 123:21
130:8 136:24
173:7 174:9,13
174:15 175:2,6
189:8 196:14
204:17 220:10

222:23 224:12
230:14 250:10
250:13 261:12
270:25 284:5
284:24 285:12
**owning**   115:10

**p**

**p**   2:2,2,16
200:14,19
**p.m.**   1:17 8:5
10:24 11:4,4,8
84:3,6,6,10
158:9,12,12,16
217:21,24,24
218:4 291:13
291:16,16,20
294:9,22
**package**   97:11
**pad**   36:17
**page**   3:4,11 4:2
5:2 6:5,9,14,18
12:4 26:16
30:6 60:12,24
63:6 70:4 91:9
91:12 115:2
139:13 163:7
185:12,15
186:22 194:13
264:3 282:13
282:16 297:5
**pages**   27:18
298:4

**paid**   19:22 58:2
58:3 87:24
210:16 229:25
242:20
**paint**   74:13
**palatable**   149:2
**palpability**
106:5
**paper**   12:8 14:8
15:15,18 28:3
28:3,16 53:5
71:13,14,18
101:2 106:4
113:24 114:4
117:10,14
130:14 151:2
173:16 174:18
177:20 179:13
188:11 194:9
196:6 211:19
214:24,25
215:15 236:24
264:12 266:21
275:13 288:22
**papers**   27:23
43:25 45:23
63:22 92:17
101:5,8 102:5
114:3 127:16
136:21 137:6
166:6 173:15
177:15 181:3
191:3 213:22
247:7 287:19

287:24
**paragraph**
60:23 65:16
76:11 78:3
91:11 96:6,12
97:15 99:17
121:21,22
122:7 123:11
124:8,11
127:10 131:14
149:10,12
158:22 159:2
161:7,18 163:9
169:8 176:19
195:21 199:4
204:16 210:5
212:20 213:18
213:19 218:16
231:10,22
232:8,14,15
233:5 238:25
239:3,13 240:9
241:23 242:3
243:21 244:3
245:10 249:18
253:17 256:3
258:18 262:11
268:3,9 270:16
274:18 283:25
292:6,11
**paragraphs**
120:25 121:7
121:14,17,20
122:18 123:12

212:7 285:10
**parameters**
14:4
**paraphrase**
242:15
**pardon** 15:23
**parental**
271:23
**parentheses**
170:14
**part** 34:3 37:12
42:13 53:9,11
65:20 69:3
77:9 90:16
91:8 92:11
93:16 95:2
104:22 120:10
120:14 121:3
123:21 127:9
140:24 154:25
160:9,10 167:4
167:7,21
171:12 177:18
197:19 216:11
226:10 239:21
242:25 243:19
262:6 271:9,11
275:13 293:19
**partial** 261:24
**participant**
177:16 195:23
197:18
**participants**
43:18 139:18

210:9
**participate**
47:24 240:24
**participating**
7:3
**participation**
163:11 166:10
166:19
**particular**
101:8 119:21
133:8,24
219:16 240:18
266:25
**particularly**
230:7
**parties** 7:12,20
37:24 218:19
219:8 230:15
**partnered**
227:2
**parts** 90:14,19
119:12 120:6
127:20 148:25
237:2
**party** 115:9
295:13
**passenger** 1:7
**passengers**
174:7
**passing** 259:17
**past** 23:22 35:4
101:7 169:19
209:15 286:18
293:4,8

**path** 108:24
**pattern** 44:22
**pause** 76:9
240:6
**paused** 25:10
**pauses** 240:3
**pay** 87:21 88:2
224:9,14
225:13 237:20
238:9 288:18
288:18,25
289:5
**paying** 223:10
223:13
**pdf** 12:8
**peacemaking**
188:21
**peer** 28:8 43:25
46:6 63:23
82:3 106:10
124:20 127:25
136:23 138:19
151:8,8
**pelta** 2:18 8:14
**penalized** 78:4
242:22 261:21
**penalties** 262:6
**penalty** 66:18
67:17,19
**pennsylvania**
1:19 2:10 57:6
96:9 97:16
295:3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**people**  22:13
  34:11 44:23
  47:23 66:11
  76:3,15 77:17
  78:16,21 80:11
  105:17 106:21
  108:12 110:23
  117:13 125:17
  126:9 128:9
  132:3 133:6,13
  133:23 134:8,9
  134:20,20
  137:13,19
  138:20 139:3,6
  145:10 150:7
  150:11,14
  160:11,24
  164:25 166:21
  167:22 168:2
  168:15,19,21
  168:23 179:6
  179:17 181:6
  190:13 192:24
  197:10 203:3
  204:20,25
  205:3 214:7
  225:5 230:2
  233:11 254:19
  257:13 259:23
  263:19 267:3
  273:6,11
  274:19 276:18
  279:3 289:12
  292:24

**people's**  176:7
  200:16 243:16
  285:8
**percent**  60:24
  61:2 76:20
  101:11 257:17
  257:17,23,23
  258:4,7 279:7
  279:8
**performance**
  96:22,23
  161:22 265:3
**performed**
  177:18
**period**  22:18
  111:12 168:18
**permanent**
  254:9
**permission**
  49:18
**person**  7:11
  22:23 37:3
  65:18 70:25,25
  74:22 76:14
  80:16 119:6
  133:5 137:15
  148:18 187:25
  203:4 262:15
  264:14,19
**personal**  71:8
  83:19 132:13
  252:9,17
**personally**
  81:22,24 252:6

**perspective**
  72:20 75:6,10
  76:6 82:22
  130:17,17,18
  130:19 138:12
  143:17,18
  144:8,9 145:13
  152:3 164:13
  227:7
**perspectives**
  148:6,23
  195:25
**petition**  47:9
**ph.d.**  24:24
**phd**  109:13,15
  109:17 111:6
  124:15,23
  125:2,14 135:8
**phds**  128:9
**phenomenolo...**
  184:4
**phenomenon**
  103:2,6,21
  139:4 181:19
  181:24 201:3
  243:11
**philadelphia**
  17:22 76:19
  295:4
**philosophical**
  240:19
**phone**  220:24
**phonetic**  208:3
  235:18

**photo**  65:16
  66:2,4,12 68:4
  68:11 69:8
**photos**  210:15
**phrase**  151:5
  174:23 259:24
**phrased**  64:15
  69:11
**phrenology**
  200:15
**physical**  245:18
**physically**  7:5
  17:20
**picking**  132:13
**picture**  74:13
  199:24
**pictures**  210:14
  210:19
**piece**  15:3 46:2
  108:9,13,15
  141:5 147:11
  179:12 287:8
**pieces**  45:15
  53:5,5 108:13
  125:8 170:6
  197:2,8,12
  198:18 211:17
  215:15 243:9
  267:23 276:7
**pile**  215:12
**piles**  215:9,15
  215:19
**pin**  155:7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[pinned - pollock]** Page 49

| | | | |
|---|---|---|---|
| **pinned** 10:17 | 222:2,3 226:21 | **point** 14:21 | 68:24 72:17 |
| **place** 11:3 45:4 | 228:11,12,20 | 37:23 47:16 | 73:15,20 74:25 |
| 80:14 84:5 | 228:20 229:8 | 61:7 160:19 | 75:16 79:13 |
| 158:11 217:23 | 229:17 230:11 | 170:18 177:6 | 81:7 82:12 |
| 232:15,17,17 | 230:12,20 | 254:11 255:4 | 88:15,24 90:17 |
| 240:18 259:13 | 231:2,6,8,23 | 273:22 277:22 | 91:2 93:23 |
| 279:4 291:15 | 232:5 246:23 | 279:17 | 95:8 98:19 |
| 295:8 | 249:8 250:24 | **pointing** 92:17 | 102:17 103:15 |
| **placeholder** | 251:9 257:6 | **points** 14:8,16 | 104:7,11 |
| 79:5 | 258:23 269:12 | 119:9 149:9 | 106:17,25 |
| **places** 15:8 | **platforms** | 231:11 232:12 | 111:24 115:17 |
| 92:3 103:12 | 41:18 97:3 | 277:25 | 118:18 119:3 |
| 210:17 214:2 | 173:8 193:25 | **poised** 103:5 | 119:15,24 |
| **plaintiff** 31:25 | 196:5 222:14 | **police** 34:11 | 120:8 121:11 |
| 32:18 42:3 | 222:17 229:6 | **policy** 46:23 | 122:21 123:25 |
| 86:6,9,16,17,20 | 262:13 263:13 | 50:7 57:6 99:8 | 124:24 126:6 |
| **plaintiff's** 21:6 | 263:15 | **politically** | 128:5 129:3,23 |
| 30:24 31:7 | **platinum** | 242:6 | 131:2 132:20 |
| 37:4 269:16 | 198:12 | **pollock** 2:4 3:7 | 136:19 137:5 |
| **plaintiffs** 2:7 | **play** 227:10 | 8:23 9:2 10:12 | 137:25 141:19 |
| 9:5 19:13 | 239:11 274:13 | 10:16 17:25 | 150:12 151:21 |
| **plan** 12:16 | **playing** 273:21 | 21:24 22:8 | 153:19 154:20 |
| 53:19 259:3 | 274:10,15 | 25:8 26:10 | 156:2,11 162:9 |
| 288:13 | 277:23 | 29:19 30:2 | 164:14 166:11 |
| **planned** 240:16 | **plays** 289:12 | 33:21 37:21 | 167:19 169:21 |
| **plans** 15:20,25 | **please** 8:21 | 38:4 41:2,7 | 170:4 173:9 |
| **platform** 65:18 | 9:20 16:17 | 42:15 43:10 | 175:7 177:13 |
| 81:21 82:9 | 17:5 75:3 91:4 | 45:13,20 46:19 | 177:25 179:2 |
| 111:20 112:16 | 130:12 131:13 | 47:6 48:7,23 | 180:9 181:17 |
| 169:3,3 170:3 | 178:13 267:8 | 49:23 54:6,11 | 182:6,17 186:2 |
| 193:5,19 | 291:11 294:16 | 54:16 55:6 | 186:9 187:7,12 |
| 194:19 201:24 | 296:4,9 | 56:10 61:10 | 187:17 189:11 |
| 202:22 204:17 | **pledge** 16:11,13 | 62:10 64:17 | 190:23 193:6 |
| 204:22 216:22 | 16:13 | 65:6 68:6,14 | 195:2 196:15 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[pollock - process]                                        Page 50

201:25 202:23
217:14 219:12
220:19 221:2
221:16 222:25
223:16 224:21
229:18 233:21
235:16 238:4
244:15 246:16
248:3,15,23
251:23 252:16
252:25 255:5
256:24 257:25
261:13 269:19
271:13 275:3
275:21 277:15
278:10 279:22
281:3 282:7,11
282:15,18
284:7 288:16
291:9,24
293:25 294:5
294:16
**poorly** 68:18
**population**
  135:23
**portrayed** 73:4
**position** 269:3
**positive** 64:16
  148:8,8,12
  180:13
**positivist**
  180:14
**possession** 39:5
  39:12

**possible** 10:19
  45:10 244:20
  294:15
**possibly** 68:7
  261:17
**postulating**
  193:15
**power** 13:24
  234:17 278:13
  279:4
**powerpoint**
  33:14 255:21
**pre** 65:5
**precise** 113:19
  215:18
**precisely** 76:13
  256:12
**predominantly**
  139:19
**preexisting**
  285:6
**preferred**
  266:7 287:13
**prelude** 176:24
**prepared** 206:9
**present** 7:6
  8:18 152:6
**presentation**
  32:19 33:20
  34:5 53:8
**presentations**
  99:8
**presented**
  225:12

**pretty** 49:25
  57:21,22 63:24
  63:24
**preventing**
  17:7 47:23
**prevents** 43:8
  44:11 46:17
**previous** 171:4
**previously** 22:3
  26:18 32:17
  35:18 36:24
  38:14 55:6
  107:10 159:20
  166:6 213:9
  228:21
**prices** 64:9
  242:19
**pricing** 116:19
  230:6 283:20
**primarily**
  99:20 177:2
**prime** 134:15
  134:17,20
  146:3,3
**principle** 189:7
  279:13
**printed** 18:7,9
**prior** 27:2
  55:16,21 83:15
  85:12 89:21
  90:14 98:23
  108:17 227:22
  249:6,13 284:5
  286:14

**prioritized**
  52:19
**priority** 198:10
  266:7
**privileges**
  252:24
**pro** 232:23
  288:13
**probably** 14:23
  29:3 101:10
  134:4 164:21
  165:11 198:5
  228:7 232:14
  263:10
**problem** 10:11
  16:12 82:8
  223:23 280:9
**process** 16:7
  21:21 43:22
  47:17 49:17
  52:13 63:13
  64:7 90:13
  106:10,14
  145:15 161:20
  185:21 190:3
  191:8,12 201:5
  203:24 205:17
  214:14 228:18
  233:20 234:14
  234:19 235:2,4
  235:10,12
  266:12 274:16
  280:3,24,24
  281:11,16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[processes - published]    Page 51

**processes** 136:8 176:6,7 186:24 199:9 201:4 219:17
**produce** 31:25 32:18 45:11 147:18
**produced** 23:7 27:2 28:13 31:24 32:17 35:18,25 36:7 36:15,24 38:2 38:14 39:6 48:6 53:3,11 53:15
**product** 38:22 60:19 114:5
**production** 6:8 43:8
**productivity** 246:9
**profession** 105:6
**professional** 71:8
**professor** 96:8
**profitable** 250:3
**profits** 117:3
**program** 99:20 109:17 110:8 110:11 111:8 176:25 198:7 212:17 225:14

266:6 286:7 290:6
**programed** 240:18
**programmers** 240:18
**programs** 117:4 198:9 232:9,10 283:20 284:2,6 284:10,11 285:14
**progress** 281:2
**progression** 148:13
**project** 49:19 50:12 99:5 111:18,23 112:12 206:9
**projects** 50:8 71:11 157:25
**promised** 47:25
**promotional** 293:3
**prompt** 284:18
**prompted** 25:6
**properly** 66:24
**proposals** 105:21
**proposed** 185:16
**proposes** 104:14

**propositions** 185:24
**propounded** 298:7
**protect** 43:12 47:15 49:12 56:12 276:21
**protected** 42:5 44:3 46:13
**protective** 45:2 95:17
**protocol** 133:18 205:21 205:22,24 208:6
**protocols** 44:20 47:11 207:9
**prove** 245:18
**provide** 40:23 57:24 71:23 79:17 119:7 139:17 171:17 238:16,19,20 270:10,17
**provided** 6:11 34:20 35:4,11 40:24 51:16 52:7 57:5 224:11
**provides** 122:9 237:16
**providing** 120:19

**provision** 221:14
**proximity** 197:12,22 198:20
**proxy** 266:18
**psychological** 130:18
**psychology** 99:19 109:23 110:2,9
**public** 1:18 110:5 160:16 181:4 228:6 292:25 295:6 295:19 298:25
**publically** 32:19 39:11
**publication** 32:12
**publications** 28:9
**publish** 44:18
**published** 28:13 32:12 42:18 45:15 63:23 107:9 113:25 155:10 196:6,22 224:12 230:23 231:2 286:14 287:7 288:22 289:8 290:12 293:21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**publishes**
107:17
**puff** 125:7
**pull** 25:12
171:6 173:16
228:5 254:23
**pulled** 18:13
30:3 290:4
**pulling** 141:4
**punishment**
67:25
**punishments**
67:7
**pure** 188:15
208:2
**purpose** 123:13
174:23 181:12
208:5 246:21
**purposeful**
151:5,12
**purposely**
276:8
**purposes** 11:15
18:21 25:18
27:11 30:16
32:25 59:8
77:15 84:23
92:5 114:14
142:7 156:14
162:18 184:19
203:18 253:12
**pursuant** 295:8
**push** 103:7
146:7 181:19

**put** 11:20 15:8
19:2 31:8 33:8
34:23 36:18
53:9 85:13
108:12 117:22
124:8 148:13
158:25 162:22
169:7 188:6
199:3 218:9
233:24 259:13
**puts** 171:4
284:17
**putting** 132:14
215:14

**q**

**qualifications**
96:5
**qualified** 175:9
**qualitative** 5:6
99:21,22 100:4
100:13,16,21
101:5,9,9,20
102:4,7,9,24
103:4,18 104:4
104:14,15
105:4,11,15,18
105:25 106:8,9
106:14 107:12
108:8 109:10
132:9 135:11
135:18,23
136:3,6,22
137:21 138:5

138:13 141:10
141:16 143:21
144:12,21
145:12,17
146:13,17
147:4,7,19
148:2,6,14
177:2,3,19,23
178:3,9 181:12
181:16 182:4,9
182:15,20,22
183:17,20,23
183:25 184:9
184:12,24
186:12 189:13
190:7,21
191:12,17,17
191:20,22
193:3 199:16
200:25 201:2
229:10,13
263:8 267:18
272:3,24
**qualitatively**
267:17
**quality** 125:17
128:10 229:8
285:17 286:7
**quantification**
267:14
**quantitative**
101:21 102:10
102:21 103:22
104:2,12,20

105:3 106:11
135:5,11,12,16
136:3,4,17
138:12 146:5
146:12,24
147:3,6,19,21
178:2 182:5
189:16 191:13
191:18,25
192:2,18
267:21,23
279:9
**quarterly**
64:11
**quest** 198:6
**question** 7:21
16:23,24 17:4
17:5,5,13
26:24 38:17
40:15 46:15
48:9 51:2
56:11,15 58:15
66:8 68:18
69:2,11,20
72:14,19 73:22
79:2 81:17
83:3 88:17
89:9 91:8
106:19 107:5,7
120:2 122:24
122:24 123:4
123:22 128:7
128:22 129:2,5
133:4,9,18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[question - real]                                                    Page 53

134:7,14,14,19
135:3 140:11
140:17 141:7
141:21 151:23
154:22 162:11
165:12,18
168:20 173:18
175:5,10
176:22,23
179:10,21
182:19 186:17
186:20 191:24
193:8,22,25
195:9 203:14
206:18,20
220:12 223:19
227:4 231:25
234:5 235:18
244:17 246:12
252:3 253:16
255:7,14,16,17
258:10 261:15
267:6 272:23
272:25 273:15
275:5,22 277:3
279:24 280:9
280:11,13
284:18 286:10
287:4 292:14
**questions**  6:17
16:20 31:10,16
69:25 76:10
85:11 90:20
117:18 130:14

133:21 143:9
159:19 175:15
176:15 193:16
195:11 203:2
206:6 217:11
227:9,10 240:4
257:3 268:24
273:10 282:3
291:8 292:3,3
294:2 298:7
**queued**  234:23
**quickly**  85:4
196:5
**quintessential**
283:6
**quite**  58:15
80:12 104:8
109:8 128:8
130:11 133:17
133:20,20
141:21 159:13
159:15 160:11
169:14 202:8
208:3 271:14
278:12
**quote**  254:2,12

**r**

**r**  2:2,16 79:4
295:2 297:3,3
**r1**  143:2
**rabbit**  212:3
**race**  108:4
200:18 242:18

**rachel**  137:18
**racial**  200:22
200:23
**racially**  65:25
66:6,12
**radar**  197:3
**raise**  17:5
**raised**  39:22
119:9
**raises**  131:9
**raising**  259:7
**random**  135:4
135:15,15
190:16 254:18
**ranked**  190:17
**rapidly**  181:25
**rate**  76:5
224:14 237:21
237:23 238:3,7
238:8,10,14
246:4
**rates**  224:9
231:15
**rather**  16:8
31:13 65:4
187:3,9 234:8
234:8
**rating**  116:19
198:2,2 215:8
224:10 225:7
266:4 276:5
290:10,14
**ratings**  225:9,9
253:19

**rationale**  119:7
**raw**  44:2
**rct**  135:15
**reach**  201:23
**reached**  204:12
**reaction**  83:19
**reactivation**
253:23
**read**  22:12,25
23:9,15 31:15
42:22 52:7
77:19 92:16
115:11 118:11
129:19 152:12
170:13 174:2
176:21 186:3
187:9 189:6,23
195:21 227:17
227:22 237:12
242:16 244:2
260:11 265:18
285:3 289:13
293:22 296:4
298:4
**reading**  51:11
60:22 116:11
125:6 130:5
197:25 198:21
198:22 206:16
214:15 215:6
272:10
**ready**  84:14,15
**real**  193:7
271:12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| **realize** 73:3 155:22 | **reasons** 44:25 49:2,11 103:8 163:9 | **recognition** 101:3 | **reference** 38:15 51:19 65:21 177:9 |
| **realized** 15:14 | **rebuttal** 3:13 | **recognize** 156:25 | **referenced** 23:5 |
| **really** 15:16 52:5 69:2,4 | 13:13 15:6 24:19,23 25:3 | **recognized** 192:18 | 79:3 228:7 |
| 73:6 80:20 | 117:24 118:12 | **recommend** | **references** 33:24 34:3 |
| 83:5 87:23 | 118:17,24 | 150:25 | 43:5 |
| 88:3 92:5 | 119:2,5 120:12 | **recommended** | **referencing** |
| 109:14 126:8 | 120:17 121:4 | 58:6 | 78:13 |
| 129:20 134:15 | 124:7 149:9 | **record** 7:17 8:5 | **referred** 201:6 |
| 150:22 151:23 | 158:21 | 8:21 9:21 | 249:7 250:11 |
| 155:20 160:21 | **rebutting** 118:3 | 10:21,24 11:7 | **referring** 39:15 |
| 160:25 166:14 | **recall** 57:10,18 | 45:8 83:14 | 39:20 49:16 |
| 191:10 195:4 | 171:8 222:8 | 84:3,9 87:3 | 66:2 131:22 |
| 196:24 201:11 | 228:3 292:14 | 91:3 158:9,15 | 149:13 167:14 |
| 201:12 229:5 | **receipt** 296:16 | 217:21 218:3 | 170:25 |
| 235:8 239:19 | **receive** 37:13 | 245:18 291:10 | **refers** 50:23 |
| 246:18 247:8 | **received** 27:17 | 291:13,19 | 52:24 |
| 257:2 260:7 | 28:24 33:7 | 294:9 295:12 | **refined** 113:12 |
| 263:9 271:6 | 51:17,23 52:17 | **recorded** 8:8 | 113:16 |
| 273:8 286:15 | 84:17 124:15 | 295:10 | **reflect** 196:7 |
| 290:7 293:7 | 124:16 214:4 | **recordings** | 242:4 |
| **realm** 62:13 | 227:13 | 41:15 50:19 | **reflected** 20:8 |
| 79:15 | **receives** 103:8 | 52:23 268:18 | **reflects** 19:20 |
| **realtime** 256:9 | **recent** 72:12 | **records** 35:19 | **reflexus** 192:6 |
| 288:13 | **recently** 15:13 | 35:19,20 36:13 | **refund** 261:24 |
| **reason** 47:23 | **recess** 11:3 | 36:13 52:24 | **region** 1:21 |
| 58:19 73:9 | 84:5 158:11 | 181:4 | **registered** |
| 75:23 120:15 | 217:23 291:15 | **recourse** 81:21 | 65:18 |
| 133:8,24 296:6 | **reciprocity** | **refer** 9:23 | **registrations** |
| 297:7,10,13,16 | 150:21 | 51:18 165:23 | 237:17 |
| 297:19,22 | **reciting** 154:11 | 216:15 228:11 | **regulation** |
| **reasoning** 119:7 | | 249:18 258:19 | 115:5 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[regulations - reporter]**                                                    Page 55

| | | | |
|---|---|---|---|
| **regulations** | 60:19,21,21 | **replacement** | 122:6,19,19 |
| 245:19 | 80:21 102:3 | 136:6 | 123:3,7,11,13 |
| **relate**  213:16 | 106:3 108:14 | **replicable** | 123:20 124:13 |
| 231:19 | 110:10 146:20 | 148:10 | 125:5,12,19 |
| **related**  15:7 | 151:4 153:14 | **replicated** | 127:4,8 130:25 |
| 23:16 41:16,19 | 158:23 169:5 | 145:15 | 131:5,17 |
| 76:15 82:9,11 | 180:12 194:6 | **report**  3:13 5:3 | 132:14 137:23 |
| 90:20 134:17 | 206:4 222:10 | 11:11 12:7,13 | 149:8 152:17 |
| 202:7 233:20 | 227:21 251:2,6 | 12:17 13:14,20 | 152:19,21 |
| **relates**  128:21 | 265:20 274:17 | 14:11,16,18,22 | 153:8,24 154:3 |
| 230:23 | 288:24,25 | 15:18,20 18:7 | 154:4,12 155:6 |
| **relations**  13:22 | **remembering** | 20:4 23:5,19 | 158:21,25 |
| **relationship** | 81:9 238:15 | 23:21 24:8,10 | 159:5 160:8 |
| 202:11 221:11 | **remind**  187:7 | 24:15,18,19,23 | 161:5,6 162:2 |
| **relevant**  100:12 | 203:21 | 24:23 25:3 | 162:23 163:8 |
| 152:16 162:6 | **reminding** | 28:15,25 33:25 | 169:7 176:14 |
| **reliability** | 187:18 | 35:6,11 38:16 | 197:25 199:3 |
| 146:15,16,23 | **remote**  1:12 | 38:20 39:9,11 | 213:14 216:13 |
| 147:5,16 | 26:2 30:25 | 39:17,25 40:9 | 216:14 218:9 |
| **reliance**  207:17 | 221:11 263:20 | 42:10,11 43:3 | 222:6 226:25 |
| **relied**  38:24 | **remotely**  1:15 | 51:11 53:6,11 | 228:6 229:15 |
| 39:7,21,23 | 7:8,12 8:19 | 53:21 55:14 | 232:18,20 |
| 290:7 | **renders**  240:19 | 78:5 82:9 | 233:15 236:19 |
| **relies**  208:3 | **rep**  223:22 | 85:16 89:7,18 | 239:2,10,21 |
| **rely**  42:11,17 | **repairs**  71:10 | 89:21 90:3 | 253:12 254:7 |
| 285:11 | **repeating** | 91:8,12,25 | 266:21 285:6 |
| **relying**  34:17 | 152:8 | 93:5 96:4 | 285:10 286:17 |
| 92:22 96:25 | **repeats**  31:12 | 105:13 117:22 | 286:25 289:7 |
| 227:15 284:4 | **repetition** | 118:12,17,17 | 292:6 |
| 285:21 286:13 | 204:9 | 118:24,25 | **reported** |
| 286:23 287:6 | **rephrase**  17:6 | 119:2,5,12,20 | 254:20 |
| **remember** | 173:12 | 119:22,23 | **reporter**  8:16 |
| 22:20 40:13,15 | **replaced**  64:4 | 120:7,14,16 | 8:21 16:10 |
| 52:5 60:5,18 | 136:5 | 121:3,5,15 | 294:10 |

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[reporter's - research]**                                Page 56

| | | | |
|---|---|---|---|
| **reporter's** | 52:21 | 126:13,16,17 | 191:17,19,20 |
| 16:18 | **requestion** | 126:20,23,24 | 191:22,25 |
| **reporting**  7:7 | 184:11 | 127:14,15,22 | 192:2,7 193:4 |
| 7:14 255:25 | **requests**  26:17 | 127:25 128:4 | 193:16,21,25 |
| **reports**  32:8 | 27:16 31:12 | 129:13,17 | 195:11,23 |
| 38:10,19 54:3 | **required** | 132:11 133:8 | 196:14,17 |
| 89:21 90:15,15 | 113:23 224:20 | 133:18 134:6 | 197:20,24 |
| 127:16 128:9 | 269:17 | 134:19 135:5 | 199:6 200:25 |
| 129:25 154:10 | **requires** | 135:16,18 | 201:2 202:16 |
| 179:22 214:18 | 175:10 | 136:3,4,7,23,24 | 202:18,25 |
| **represent**  31:6 | **reread**  15:13 | 137:2 138:5,16 | 203:2,13,13,18 |
| 31:11 121:13 | **research**  4:18 | 139:7,8,13,18 | 205:7 206:18 |
| **representative** | 5:7 34:8 42:14 | 139:20 140:11 | 208:10,17 |
| 135:13 145:10 | 42:18 43:13,22 | 140:17 141:5,9 | 209:13,14,18 |
| 199:15,18,23 | 45:16 46:2 | 141:10,16 | 209:19 210:23 |
| 225:19 255:14 | 47:8,10,17,24 | 142:21 143:13 | 211:13,22 |
| **representatives** | 48:16 49:14 | 143:16 144:21 | 212:16 214:3 |
| 228:3 | 58:22 63:12 | 145:17 146:5 | 219:15 224:12 |
| **representing** | 67:21 70:10 | 146:17,24 | 225:17 226:11 |
| 2:7,12 8:15 9:5 | 76:16 77:5,19 | 147:3,4,7,22 | 226:18 227:9 |
| **represents** | 80:20 81:25 | 148:2,6,14,24 | 229:9 231:11 |
| 185:21 186:7 | 82:3 83:4 | 149:6 152:12 | 243:14,17,19 |
| **reprimanded** | 92:10,10 98:24 | 165:10 167:10 | 250:10,14 |
| 80:15 | 99:5,18,20 | 168:12 176:25 | 252:10 255:16 |
| **reproducibility** | 100:4,9,23 | 178:10 179:6 | 263:8 264:9,22 |
| 147:25 | 102:7,9,10,21 | 179:20,22 | 264:24 267:18 |
| **reputable** | 102:24 103:5 | 181:13,16 | 267:21 272:4 |
| 190:19 | 103:18,22 | 182:4,10,15,20 | 272:10,24 |
| **request**  6:8 | 104:2,4 105:21 | 182:22 183:3 | 273:6 284:5 |
| 17:12 31:18 | 105:25 106:8,9 | 183:20,23,25 | 285:8,12 |
| 32:6,7,17 35:2 | 106:11 109:10 | 184:24 186:12 | 286:21 287:10 |
| 35:17 36:23 | 112:3 122:9 | 189:16,24 | 287:19 288:3 |
| 37:9 38:14 | 124:18,20 | 190:7,18,21 | 288:15 289:9 |
| 42:4 51:8 | 125:17 126:4 | 191:4,8,12,14 | 289:15 290:25 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| **researcher** 74:3 190:22 195:24 196:7 | 82:20 122:25 123:9 | **return** 296:14 **returning** 34:24 277:8 | **revoke** 252:24 **rewards** 284:11 **ride** 41:20 |
| **researcher's** 72:20 | **responses** 4:3 26:21 30:24 31:8 41:15 | **reuse** 90:14 91:15 | 58:22 61:4,8 71:7 76:18 |
| **researchers** 13:25 14:3,17 45:25 101:10 101:12 105:18 149:4 168:21 227:2 289:19 | **responsible** 222:23 223:4 223:10,13 | **reused** 90:18 **revenue** 258:9 **review** 28:4 29:8 42:6 43:6 43:8,25 44:6 46:14,17,24 47:11 49:18 50:13 52:8 97:24 106:10 108:10 143:5 211:17 293:21 | 78:16 79:3,6 80:13,17 91:19 92:10,14 94:13 94:17 97:3,8 107:18 115:3,6 115:8 116:3,24 117:4,11 121:25 132:3 138:22 139:2 145:20 149:16 151:19 153:12 |
| **researching** 41:18 | **responsive** 32:16 38:13 39:4 51:8 119:21 | | |
| **resentment** 270:9 | **rest** 106:6 120:16 121:15 122:19 285:6 | | |
| **reserved** 7:21 | | | |
| **resistance** 270:9 | **restricted** 222:13 | **reviewed** 28:8 40:5,16 47:13 63:23 82:3 92:23 124:20 127:25 136:23 138:19 222:5,9 250:15 253:7 | 153:17 154:18 155:4,8 156:8 157:14 160:17 178:21 192:22 210:7 211:23 231:12,13,14 249:24 250:3 260:22 |
| **resources** 71:9 | **result** 68:11 274:5 | | |
| **respect** 211:23 236:12 | **resulting** 115:4 **results** 125:16 147:18 256:10 259:9 | | |
| **respective** 7:19 | | | |
| **respond** 94:24 118:10 144:12 181:6 223:22 223:22 | **resume** 26:25 31:20 | **reviewer** 267:22 | **ridehailing** 33:16 |
| | **retain** 56:15 | **reviewers** 46:6 **reviewing** 214:8 | **riders** 112:19 112:22,25 221:15 224:16 247:25 248:9 248:22 262:6 |
| **responding** 118:10 119:13 121:17,19 | **retained** 21:2,4 54:19,25 55:25 56:7 57:23,25 86:5 | **reviews** 107:10 **revise** 206:23 207:3 | |
| **response** 27:15 31:23 32:15 37:8,9,13 39:3 42:2 43:5 50:23 75:17 | **retainer** 19:15 36:4 84:18 **retention** 36:25 37:14,16 56:12 | **revision** 143:3 **revisitation** 290:18 | **rides** 150:5 167:22 168:16 198:4 205:9,10 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[rides - safeguards]                                    Page 58

| | | | |
|---|---|---|---|
| 210:16 225:5 | 93:17 96:3,15 | 245:13,23 | 220:12 289:12 |
| 225:13 231:14 | 97:17 98:6,25 | 246:2,6 247:12 | **room** 7:6 18:4 |
| 257:6 279:16 | 101:22 104:5 | 247:20 248:10 | 259:2 |
| **rideshare** 8:10 | 108:22 113:21 | 249:14,22 | **rothman** |
| **ridesharing** | 114:24 117:25 | 250:8,12,18,21 | 244:18 265:19 |
| 41:18 72:16 | 121:9 124:10 | 251:19 253:19 | 287:18 290:13 |
| 115:14 149:17 | 130:22 139:15 | 253:23 254:23 | **rough** 294:12 |
| 150:5 151:20 | 139:23 140:18 | 255:12 257:18 | 294:15 |
| 153:12 154:10 | 140:20,21 | 262:23 270:5 | **roughly** 24:3 |
| 154:18 155:4,7 | 142:17 144:4,9 | 270:12,21 | 55:2 |
| 155:10 156:8 | 146:21 147:22 | 278:15 279:11 | **round** 29:8 |
| 157:5,14,22 | 153:3 156:17 | 283:7,21 284:2 | 54:7 83:6 |
| **riding** 178:21 | 158:5 159:14 | 287:8 291:9 | 215:10 |
| 222:17 | 159:17 161:11 | 292:9,16 | **route** 261:19,20 |
| **right** 11:22 | 168:8 170:18 | 293:24 | **routes** 260:23 |
| 12:5 13:5,7 | 173:22,22 | **rights** 43:13 | 261:8,12 262:3 |
| 15:17 16:4 | 178:17 179:24 | **rigor** 113:23 | 262:10 |
| 17:10,25 18:16 | 185:18 187:11 | 125:3 132:11 | **row** 167:23 |
| 19:10 24:20 | 193:15 194:10 | 148:24 149:5 | 168:17 |
| 30:9 31:21 | 194:15,20 | 160:4 255:19 | **rpr** 1:17 295:6 |
| 32:2 33:17 | 199:20,25 | **rigorous** 46:3 | 295:18 |
| 35:25 36:5 | 200:14 201:7 | 106:2 125:10 | **rules** 245:19 |
| 40:19 46:5 | 204:14 209:21 | 125:24 126:19 | 267:2 |
| 51:21,22 53:21 | 211:8,18,24 | 131:17 132:15 | **run** 184:10 |
| 53:23 55:3,4 | 212:10,14,25 | 202:16,18 | 259:4 260:3 |
| 55:11,18 56:18 | 213:10 214:10 | 226:22 227:4 | **running** 258:20 |
| 63:14,19,25 | 226:15 227:16 | **rigorously** | **runs** 241:9 |
| 69:19 70:13 | 228:9,12,16,21 | 230:18 | |
| 71:4,11,15 | 228:25 231:22 | **robin** 260:9 | **s** |
| 74:22 75:12,18 | 232:19 233:6 | **robo** 221:10 | **s** 2:2,16,16 3:9 |
| 76:7 77:7 79:8 | 234:7 235:6 | **roladex** 81:10 | **s1s** 293:2 |
| 79:11 80:16 | 236:6 237:5 | **role** 88:5 98:8 | **safe** 44:21 |
| 82:3 84:12,16 | 238:23 239:5 | 99:3 108:18 | **safeguards** |
| 85:21 90:11 | 241:24 243:24 | 109:3 110:14 | 45:3 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[safety - second]**                                    Page 59

| | | | |
|---|---|---|---|
| **safety** 68:5,8,11 | **saw** 24:14 79:2 | 186:22 191:3 | 108:21 110:20 |
| 82:9,11 116:23 | 131:25 132:3 | 194:17 220:2 | **sciences** 44:8 |
| 198:14 251:10 | 145:2 154:2 | 234:14 242:25 | **scientific** |
| 251:14 252:13 | 155:6 169:24 | 244:3 254:5 | 226:22 227:4 |
| **sake** 181:22 | 255:22 | 266:14 268:10 | 293:15 |
| **salary** 237:21 | **saying** 14:16 | 268:19 284:9 | **scoot** 12:4 |
| **sales** 267:7 | 28:11 46:8 | **says.r1** 142:25 | 212:5 253:15 |
| **salis** 137:17 | 64:23 68:3 | **scammed** 80:11 | **scope** 69:7 |
| **sample** 135:13 | 78:7,21 80:4,5 | **scan** 26:16 | **score** 276:6 |
| 135:23 199:15 | 86:16 100:20 | **scanning** 26:13 | **scores** 234:9 |
| 199:18 201:13 | 103:14,16 | **scattered** 53:4 | **scoring** 273:22 |
| 201:19 254:18 | 122:2,13 | **schedule** 72:6 | **scraping** 293:3 |
| 255:15 | 123:19 144:20 | 72:22 73:3,8 | **scratch** 20:14 |
| **sampled** 133:7 | 160:9 172:19 | 74:20 75:13 | 44:12 50:6 |
| 133:24,25 | 180:8 215:22 | 160:22 171:23 | 173:17 271:10 |
| **samples** 201:10 | 219:3 257:16 | 222:20 257:4 | **screen** 11:21 |
| **sampling** 134:3 | 258:11 280:22 | 271:3 | 19:2,4 25:23 |
| 134:24 135:4 | 287:4 | **schedules** | 30:21 33:8 |
| 135:10,20 | **says** 24:22,23 | 174:8 | 59:15 124:9 |
| 199:19,22 | 26:24 36:24 | **scheduling** | 142:11,14 |
| **samplings** | 37:8 38:12 | 71:22 72:15 | 157:2 159:2 |
| 206:14 | 41:13 46:25 | 171:16 172:8 | 162:22 210:14 |
| **san** 1:4 8:13 | 49:21 51:18 | 172:15,18 | 292:7 |
| **sanctioned** | 60:24 63:11 | **scholar** 99:18 | **script** 206:24 |
| 67:5,12 | 66:8 71:20 | **scholars** 161:13 | **scripted** 65:5 |
| **satisfaction** | 76:12 91:17 | 162:5 219:5 | **scripts** 267:2 |
| 288:19 | 95:16 97:9 | 236:2,5 244:3 | **scroll** 27:24 |
| **satisfied** 109:16 | 98:3,22 99:17 | 244:12 | 63:5,6 163:3 |
| **saturation** | 102:4 131:24 | **school** 96:8 | **scrolling** 63:6 |
| 203:19,22,23 | 140:21 143:16 | 109:18 | **seal** 295:14 |
| 204:13 | 143:25 144:16 | **school's** 98:4 | **seattle** 237:24 |
| **saval's** 60:2 | 144:23 161:18 | **schools** 219:21 | **second** 10:8 |
| **save** 76:13 | 174:5 185:10 | **science** 64:11 | 13:9 14:13,15 |
| | 185:11,16 | 105:20,22 | 19:15,21 29:8 |

| | | | |
|---|---|---|---|
| 29:13 58:24 | **security** 44:20 | 177:6,9 182:12 | 250:14 262:7 |
| 91:9 109:2 | **see** 10:6,9 19:3 | 184:13 185:2 | 263:22 279:14 |
| 111:15 114:11 | 19:5,17 25:23 | 185:14 186:16 | 282:11 |
| 114:18 122:5 | 26:4 27:4 28:7 | 187:13 188:10 | **sees** 187:20 |
| 139:12 141:25 | 29:10 30:20 | 190:9 192:4,11 | **selective** 14:25 |
| 143:9 170:19 | 31:21 32:13,20 | 194:3 195:25 | **selling** 265:24 |
| 173:18 174:4 | 33:9 35:8,22 | 196:9 199:10 | **semi** 41:17 |
| 182:13 183:7 | 37:6,8,10 | 204:18 210:10 | 42:12 132:24 |
| 184:16 204:15 | 39:13 41:8,24 | 213:18 218:14 | 133:3 177:17 |
| 234:10 240:17 | 42:7 50:14,21 | 218:21 219:6 | **seminar** 32:9 |
| 277:9 292:10 | 57:8 59:16 | 220:3,8 223:12 | **semistructured** |
| **section** 63:7 | 61:5 63:9 66:7 | 223:24 231:17 | 205:12,18 |
| 70:4 77:21,22 | 66:22 67:13 | 231:22 232:2 | 207:4,20 |
| 120:25 122:4,8 | 70:3,7 71:15 | 234:13 236:20 | 208:11,18 |
| 122:8,12,18 | 72:2,3,9 74:17 | 239:2,10 241:3 | 211:3 212:24 |
| 131:23 161:16 | 76:21 78:10,18 | 242:8 243:20 | 272:16 |
| 171:8,9,12 | 78:24 86:4 | 247:16 248:4 | **senate** 57:6 |
| 176:18 191:2 | 92:19 94:9 | 256:14 262:18 | 58:10 |
| 192:7,13 212:6 | 99:25 100:10 | 263:25 268:7 | **senator** 60:2 |
| 212:7 213:14 | 101:2 103:11 | 268:22 274:6 | **sense** 21:15 |
| 218:11,11 | 108:6 120:25 | 283:2 284:19 | 24:17 51:3 |
| 233:2 239:22 | 121:19 122:3,7 | 290:15 292:7 | 58:17 62:17 |
| 239:23,24 | 122:11 123:10 | 293:10 | 105:5 135:21 |
| 240:10 264:2 | 124:5 126:25 | **seeing** 215:19 | 174:20 212:9 |
| 268:4 270:2 | 131:19 139:14 | **seeks** 42:4 | 248:12 264:8 |
| 282:6,22 | 140:15 142:13 | **seem** 151:6 | 264:20 270:10 |
| 283:15 284:19 | 143:10,11,23 | 229:24 230:11 | 270:14,19,23 |
| 285:4,9 286:5 | 144:8 149:18 | 230:16 | 271:2,8,11,20 |
| 286:17,25 | 150:18 153:7 | **seems** 51:9 | 272:2 |
| 288:5 290:16 | 154:3 157:4,11 | **seen** 15:15 26:6 | **sensemaking** |
| **sections** 216:13 | 159:6 160:8 | 26:18,19 31:3 | 203:9 |
| 283:5 286:11 | 163:14 166:3 | 128:8 162:25 | **sensors** 245:17 |
| **secure** 68:12 | 169:16 170:6 | 223:14,20 | **sent** 19:13,15 |
| 71:25 171:18 | 171:20 174:10 | 224:4,7 242:5 | 19:25 21:9 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[sent - similar]                                          Page 61

36:3 54:7
**sentence** 64:14
   67:9 91:17
   116:4 127:19
   141:5 144:23
   144:24 164:10
   165:6,17 167:4
   170:12,13,16
   170:19 171:3,4
   212:2 218:21
   263:6 270:7
   284:9 292:11
   292:12,19
**sentences** 186:4
**separate** 19:18
   53:8
**september**
   211:11
**seriously** 199:6
**served** 11:25
   110:12
**serves** 68:5
   174:22 186:23
**service** 68:5
   94:2 221:18
   230:17 266:24
   267:2 268:11
   268:12,17
**services** 71:10
   157:5 221:14
   260:10
**set** 14:3,3 31:12
   36:14 46:7
   147:18 176:6

181:8 224:16
   242:19 271:16
   286:8
**sets** 181:23
   224:14,18
**setting** 64:9
   178:21 179:7
   266:19 267:5
   267:13
**settings** 83:8
   140:15,18
**settled** 95:23
**setup** 213:19
**seven** 114:3
   145:3 181:3
   207:3 292:24
**several** 72:4
   115:3 139:16
   153:11 244:19
   245:11
**severe** 252:13
**sexual** 1:7
   252:22
**shape** 24:10
   108:5 268:10
**shaped** 40:12
**shapes** 42:24
**share** 11:20
   13:4 25:15
   46:25 49:22
   70:10 85:3
**shared** 34:6
   43:23 44:2
   60:19 180:5

209:23
**sharing** 44:12
   150:16,19
   151:13 155:21
   155:24 262:17
**sharper** 206:17
   206:17
**sheer** 208:14
**sheet** 296:7,10
   296:12,15
   298:9
**shelf** 221:9
**sherman**
   137:18
**shift** 170:22
   172:19,21
   228:14
**shifting** 54:18
   117:21
**shipt** 86:13
   94:14,15,22
   95:5
**shopper** 265:22
**shortcut** 161:9
**shorter** 17:17
**shorthand**
   295:10
**shortly** 107:24
   243:6
**shots** 210:15
**show** 126:15
   152:18 155:25
   173:16 184:15
   192:16 210:19

281:20
**showed** 36:11
   226:6
**showing** 190:3
**shown** 126:12
   173:15
**shows** 149:5
   231:11
**shred** 93:4,19
**shredded** 93:13
**shutdown**
   132:2
**side** 86:8,9,12
   86:17 118:9
   165:24 170:6,6
**siege** 94:5
**sign** 43:19
   166:19,20,23
   204:12 222:3
   250:2 289:13
   296:9
**signals** 139:9
**signature** 12:5
   295:18 298:12
**signed** 50:2
**significance**
   200:5,9
**significant**
   163:10 166:9
   231:14 270:11
**signing** 296:11
**silence** 240:8
**similar** 57:22
   90:20 92:13,13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

92:14 126:5
137:20 159:19
180:18 209:20
213:23 214:2
215:25 222:14
268:24
**similarly**
224:15 226:7
**simmons**  2:3
9:3 54:23
**simmonsfinal**
3:16
**simmonsfirm...**
2:6
**simple**  54:12
219:4
**single**  19:19
127:23
**sir**  12:10 93:22
**sit**  105:19
116:15 235:7
259:2
**site**  13:17
**sites**  139:8
140:9
**situation**  196:2
196:4,8,25
200:6 206:11
**situations**  55:9
66:16 67:3
237:25
**six**  85:19 101:7
105:15,23
106:4 114:3

145:2 148:25
181:2 259:4
**size**  201:19
**skeptical**  73:14
**skills**  110:20,22
**skim**  215:2
**skimmed**  40:25
41:3 52:4
227:12
**skimming**
267:25
**skinned**  66:10
**skip**  175:16
182:12 273:18
**skipping**  240:3
268:3 273:16
**slightly**  40:21
40:21 54:19
108:16 278:23
**slippage**  160:23
160:25
**slipped**  38:6
**slow**  228:19
**small**  104:21
105:13 197:15
197:19
**smaller**  215:14
215:14 263:18
**smart**  109:14
220:24
**smell**  34:12
82:10
**smells**  34:10,11
78:7 79:18

**social**  4:20
148:16 150:20
173:20 178:8
199:8 229:6
236:21 241:21
242:5,10
**socialist**  104:19
**socially**  149:6
242:6
**societal**  76:4
**societies**  70:18
**society**  70:12
74:12 98:5,24
**sociological**
130:17
**sociology**  97:16
97:23,23,24
99:19 109:24
110:5
**solely**  244:9
**solid**  127:3
**solidness**  127:7
127:21
**solutions**  1:21
**somebody**  60:4
147:17 148:12
226:2 265:11
**someone's**  49:5
293:17
**somewhat**
215:25
**soon**  294:14
**sophistication**
154:12

**sorry**  20:14
41:11 85:8
97:12 114:7
125:22 130:10
130:12 149:22
154:23 157:18
172:16 183:6
271:9 280:15
294:15
**sort**  10:22 14:8
21:20 43:20
44:7 46:23
52:16 53:7
89:6 92:14
119:5 120:14
121:21 126:11
126:12 127:2
130:6 132:9
137:3 149:4
150:20 151:6
153:10 174:23
183:16 188:21
192:5,14,15,25
198:7 201:10
214:3 215:2
220:11 223:23
225:22 230:17
233:13 242:15
255:18 265:20
269:2 276:23
277:24,24
279:15 285:5
286:3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[sought - stipulation]                                    Page 63

**sought** 58:18
**sounds** 55:4
  59:24 60:6
  83:24 88:6
  163:22 194:22
  215:25 217:16
  281:10
**source** 13:23
  190:19 262:5
  276:10
**sources** 133:11
  133:19 147:13
  192:21,22,25
**space** 16:19
  77:10 296:7
**spans** 20:13,16
**speak** 44:24
  86:24 120:22
  121:8 122:10
  138:6
**speaking** 88:11
  92:18 111:18
  237:6
**speaks** 120:16
**specific** 12:22
  42:25 49:9,20
  50:8 88:7
  89:25 100:23
  113:15 116:8
  134:5 141:17
  183:23 196:19
  208:7 239:18
  242:2 280:4,25
  281:4,21 287:2

288:15
**specifically**
  23:16 42:3
  78:13,19
  101:14 119:14
  129:14 144:11
  176:21 226:13
  230:24 239:10
  245:5 272:18
  287:8
**specifics** 124:6
  260:17
**spectrum** 176:3
  176:4
**speculate** 82:14
**speed** 225:4
  277:3
**speeds** 246:5
**spell** 107:20
**spends** 277:12
**spent** 20:21
  23:19
**split** 188:6,7,17
**spoke** 152:10
  152:11
**spoken** 225:18
**spreadsheets**
  215:21
**sprouts** 271:19
**stage** 140:24
**stages** 228:11
**stakeholders**
  174:6

**stamp** 33:6
**stance** 178:8,12
**stand** 123:20
  153:16 197:6
  197:18
**standalone**
  119:12,17
  122:20 123:5
**standard** 128:3
  128:15 146:11
  146:12,13
**standards**
  99:22 177:3
**standing** 122:7
**standpoint**
  180:16
**start** 26:20,22
  39:23 109:8
  116:11 121:2
  131:15 185:22
  186:12 215:6,9
  265:10 276:13
  294:10
**started** 20:10
  40:2
**starting** 52:18
  215:14 283:23
  285:18
**starts** 124:7
  149:15 264:2
**state** 8:19 9:20
  57:6 58:10
  100:13 175:19
  295:6 296:6

**statement** 3:23
  50:8 62:16
  68:2 115:23
  139:25 141:9
  145:6 241:10
  286:16
**statements**
  50:16 51:5
  172:4
**states** 1:2 8:11
  113:2,8 153:11
  243:2
**stating** 62:2
**statistical** 14:5
  200:4,9
**statistics**
  200:13
**status** 108:4
  175:11
**stay** 248:24
**stayed** 207:15
**staying** 256:10
**steeped** 86:20
**stenographer**
  7:5
**stenographic**
  7:17
**step** 202:5
  274:24
**steps** 292:17
**sticks** 274:20
**stipulated** 7:18
**stipulation**
  7:16 37:23

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[stipulations - supplement]                                    Page 64

| | | | |
|---|---|---|---|
| **stipulations** | 132:17,23,24 | 57:2 95:11,17 | **suggesting** |
| 6:13 | 133:3 177:17 | 170:23 191:4 | 220:10 |
| **stop** 158:5 | **structures** | 279:21 296:11 | **suggestions** |
| 204:13 219:3 | 199:9 | **subjective** | 266:23 |
| **stopped** 113:7 | **student** 109:25 | 177:24 178:3 | **suing** 86:12 |
| **store** 265:23 | **students** | **subjectivity** | **suitable** 144:2 |
| **stories** 83:20 | 127:23 226:8 | 178:13 | **suited** 103:19 |
| **strange** 256:11 | **studied** 23:10 | **subjects** 43:13 | **summary** 34:21 |
| **strategies** | 77:11 212:3 | 47:15 49:13 | 87:12 120:11 |
| 219:6 | 230:18 231:8 | **submit** 20:3 | 120:12,15,21 |
| **strategy** 186:24 | 262:24 267:17 | 47:9 | 121:4 122:14 |
| 221:20 258:23 | **studies** 32:8 | **submitted** | 124:7 131:9 |
| 259:2,10 260:3 | 44:5 47:24 | 60:14 | 149:9 158:21 |
| 260:19 | 48:16 53:16 | **subscribed** | 177:10 292:12 |
| **strauss** 183:11 | 100:8 108:17 | 298:15 | **summer** 22:2,9 |
| 183:13 185:17 | 126:18 173:15 | **subsections** | 22:15,17,21 |
| 188:7,8,16,16 | 174:5 192:21 | 283:5 | 23:2,15 131:24 |
| **street** 2:5 | 263:23 | **subsequent** | 132:6 154:9 |
| 133:16 | **study** 13:11 | 28:12 90:15 | 211:5 |
| **stressing** | 43:19 47:9 | **subset** 66:13 | **summertime** |
| 234:17 | 77:9 102:3,25 | **subsidized** | 21:25 |
| **strike** 172:17 | 109:23 140:5 | 268:20 | **super** 51:23 |
| 210:20 | 140:21,23 | **substance** | 54:11 88:6 |
| **strikes** 210:19 | 144:2 195:5,15 | 298:8 | **superficial** |
| **strong** 262:2 | 200:16 226:19 | **substantially** | 149:25 150:8 |
| **stronger** 191:8 | 264:22 | 12:20 | 151:18 152:2,9 |
| **structural** 73:2 | **study's** 139:17 | **substantiate** | 152:20 153:17 |
| 74:4,6,16 75:7 | **studying** | 79:11 | 153:23 160:15 |
| 75:11 108:25 | 152:14 201:14 | **success** 244:7 | **superficially** |
| 178:20 199:5 | 286:18 | **sufficient** | 270:10 |
| **structure** | **stuff** 93:20 | 202:20 252:23 | **supervision** |
| 132:22 | 212:18 | **suggest** 282:2 | 295:11 |
| **structured** | **subject** 32:16 | **suggested** | **supplement** |
| 41:17 42:12 | 38:12 56:25 | 261:20 | 15:20 72:5 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[supplemental - talk]                                              Page 65

| | | | |
|---|---|---|---|
| **supplemental** 12:19 | 229:13 238:6 245:7 251:25 255:15 258:2 267:20,23,24 278:14 | **sworn** 9:12 10:3 295:9 298:15 | **tables** 138:8 **tacking** 272:13 **tactics** 164:23 164:24 |
| **support** 4:20 6:2 14:20,21 92:24 99:6 173:20 | | **system** 66:21 69:17 106:7 165:2 167:12 215:8 223:15 | **take** 13:6 17:14 17:16 30:10 31:7 51:4 107:15 110:2 |
| **supporting** 127:19 | **surface** 159:16 159:23 160:2 | 224:13 225:10 225:25 241:9 | 111:2 117:20 132:17 136:16 |
| **supports** 14:18 | **surge** 230:6 | 243:2 249:21 | 146:22 156:9 |
| **suppose** 178:19 | **surges** 259:7 | 253:19 261:17 | 156:21 158:6 |
| **supposed** 123:7 152:14 190:8 | **surprise** 192:8 **surprised** 160:6 | 266:22 276:4,5 276:8 277:20 278:2 281:24 | 160:19 178:19 202:5 212:8 217:12 241:25 |
| **supposedly** 80:16 | **surrounding** 268:13 | 283:11,17 290:10,14 | 241:25 257:12 261:11 262:3 |
| **supreme** 201:15 | **surveillance** 268:13,15 269:4 | **systems** 4:18 65:25 66:3,5 67:20 96:21,23 | 293:13,20 **takeaways** 143:12 |
| **sure** 14:22 28:2 31:5 34:12 46:20 49:25 51:13 54:16 63:24 65:17,24 68:25 75:5 79:4 86:9 88:19 91:13,15 93:9,17 110:7 116:17 118:23 125:16 140:17 142:25 157:12 168:9 170:15 183:4 186:20 187:23 196:21 197:3 198:6 199:14 211:9 222:10 229:11 | **survey** 41:15 135:14 254:6 **surveys** 208:19 **susceptible** 190:22 **suspected** 261:22 262:9 **suspend** 249:25 **suspended** 251:9 **suspending** 251:13 **swear** 8:22 **switch** 26:21 **switching** 108:16 | 104:19 136:7 142:21 143:13 143:18 225:7 226:20 242:4 243:8 245:13 277:18 | **taken** 1:15 8:9 50:16 140:4 190:15 295:7 **takes** 156:22 **talk** 14:8,24 16:10,14 34:9 34:13 35:15 37:25 42:9 57:3 69:7 71:18 72:13 73:8 80:11 89:20 97:8,11 113:18,20 121:25 130:15 |
| | | **t** | |
| | | **t** 2:16 3:9 295:2 295:2 297:3 **tab** 3:12,15,18 3:22 4:3,9,13 4:16,20 5:3,6 **table** 194:14 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| 131:10 136:22 | **talking** 23:3 | 126:3,9 | **temporal** |
| 160:11 168:15 | 31:19 58:21 | **teacher** 132:5 | 169:13,14 |
| 197:14 212:22 | 64:6 78:12 | 154:8 | 170:20 |
| 217:2,3 226:2 | 83:7 85:12 | **teaching** 101:5 | **temporarily** |
| 226:3,4,9,25 | 86:21 134:8 | 109:18 126:14 | 250:23 266:8 |
| 231:6 232:22 | 140:6,6 144:4 | 127:23 211:11 | **temporary** |
| 237:14 243:7 | 158:20 160:21 | **team** 52:14 | 254:9,10 |
| 243:10 247:9 | 163:19 164:5 | **technical** 58:17 | **ten** 23:10 32:10 |
| 260:16 262:11 | 166:25 169:9 | 197:7 | 217:18 286:18 |
| 266:20 275:13 | 194:7 212:23 | **technique** | 293:4,8 |
| 275:25 276:2 | 217:8 219:19 | 183:5 | **tend** 219:16 |
| 289:15 290:24 | 230:3 231:23 | **technologies** | 258:6,25 |
| 290:25 | 233:17 243:21 | 1:6 2:12 | 263:18 |
| **talked** 36:10 | 270:15 280:21 | **technology** | **term** 61:20 |
| 49:8 51:20 | **talks** 13:23 | 74:8 108:7 | 150:4 154:18 |
| 54:24 55:17 | 97:23 98:9 | 115:5 193:20 | 155:3 157:7,21 |
| 85:17 88:3 | 99:7,10,13 | 274:12 | 165:13 182:5 |
| 90:5 133:16 | 150:23 151:4 | **teeth** 160:5 | 220:6 254:9 |
| 135:20 140:7 | 160:10 167:10 | **telemetrics** | 287:15 |
| 148:25 154:8 | 173:25 212:21 | 225:3 | **terminal** |
| 168:19 172:24 | 225:23 226:19 | **tell** 33:19 90:13 | 124:16 |
| 179:4 180:12 | 235:4 | 161:10 176:20 | **terminology** |
| 182:7 199:12 | **targeting** 44:23 | 179:21 216:17 | 150:10 |
| 199:14 203:20 | **task** 212:3 | 216:25 223:21 | **terms** 56:13 |
| 204:16 207:16 | **taught** 135:8 | 224:17 254:3,3 | 62:8,23 87:8 |
| 207:18 210:22 | **taxes** 223:10,13 | 254:4 273:6,11 | 101:11 125:9 |
| 212:18 236:18 | **taxi** 115:7 | 295:9 | 127:17 140:2 |
| 243:5 245:22 | 117:5 | **teller** 237:13 | 160:23 164:22 |
| 249:9,12 250:7 | **taxis** 115:16 | **telling** 83:3 | 170:21 216:8 |
| 250:17 251:8 | 116:4,9,24 | 117:8 178:25 | 221:21 260:10 |
| 272:10 274:19 | 117:11 118:14 | 179:11 | 260:12 |
| 279:6 287:17 | **teach** 96:13,24 | **tells** 74:18 | **terrorism** |
| 288:25 290:18 | 97:19,22,25 | 75:12 | 110:9 |
| 290:22 | 98:13 124:17 | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[terrorist - think]

Page 67

| | | | |
|---|---|---|---|
| **terrorist** 110:9 | **theme** 147:13 | **theory** 101:16 | 149:23 178:15 |
| **test** 102:22 | **themes** 206:6 | 103:7 104:13 | 197:9 200:16 |
| 104:13,21 | **theocratical** | 104:13,15,19 | 207:10 214:6 |
| 105:3,24 186:8 | 204:12 | 105:4,11,25 | 246:14 253:25 |
| **tested** 182:5 | **theologizing** | 106:22 111:16 | 259:16 263:5 |
| 185:24 | 13:23 | 130:21 134:21 | 278:20 286:13 |
| **testified** 9:13 | **theoretical** | 138:6 181:13 | 289:5 293:10 |
| 35:7 55:8 56:2 | 102:23 108:13 | 181:20 182:15 | **things** 12:24,25 |
| 56:5,9 87:10 | 134:3,24 | 182:24 183:5,8 | 38:24 52:19 |
| **testifying** 10:3 | 135:20 186:25 | 183:17,20,21 | 82:15 87:7 |
| 56:21 58:12 | 199:19,21 | 183:22 185:11 | 89:20,25 99:11 |
| **testimony** 4:9 | 203:19,21,23 | 185:16,20 | 105:24 108:3 |
| 17:8 35:10 | 206:14 227:6 | 186:23 187:2,3 | 116:8,19 119:6 |
| 55:17,21 57:4 | 234:16 235:3 | 187:6 188:13 | 131:5,9,11 |
| 57:12,19,24 | 239:22,25 | 189:2,3,8,9,10 | 134:16 148:23 |
| 58:20,25 59:19 | 240:10 270:18 | 189:14,15,20 | 155:5 175:12 |
| 60:13,15 77:15 | 289:23 | 189:22 190:13 | 177:6 187:24 |
| 83:8,11 85:13 | **theoretically** | 197:5,17 | 202:7,14 |
| 128:16 169:25 | 133:7,23,25 | 213:24 214:7 | 206:14 208:7 |
| 171:7,7 228:3 | 243:17 275:18 | 230:20 233:20 | 208:20 212:23 |
| 295:9,12 | 289:6,20 | 234:15,19 | 215:18 223:5 |
| **testing** 102:14 | **theories** 102:12 | 235:2,4,9 | 225:6 232:23 |
| 103:23 187:4 | 102:13,14 | 269:16,16 | 235:12 241:14 |
| 259:21 | 103:13,20 | 272:14 275:25 | 243:13 246:12 |
| **tests** 14:5 259:4 | 104:3 106:13 | 276:15 281:22 | 247:5 273:7,9 |
| **text** 22:14 | 106:23 185:23 | 287:23 | 278:25 287:16 |
| **texts** 53:16 | 190:7 216:18 | **thereof** 295:13 | 293:10 |
| **textual** 213:21 | **theorists** 184:7 | **thereto** 39:9 | **think** 12:19 |
| **thank** 29:22 | **theorize** 164:19 | **thing** 51:22 | 13:10,21 14:7 |
| 91:5 94:2,6 | 165:9 166:2 | 60:16 63:19 | 15:10 26:8 |
| 218:8 294:4 | 293:17 | 73:9 86:22 | 28:17 29:3,6 |
| **thanks** 12:21 | **theorizing** | 99:12 115:18 | 29:14 33:23 |
| 146:15 | 92:11 135:24 | 116:12 123:20 | 40:5,7,8 48:11 |
| | | 124:9 127:22 | 54:22,24 55:14 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

57:16,21 58:6
58:7,15 59:18
60:8 61:14,19
61:20,23,25
62:15,22,23
63:19 64:19
65:4,8,13 68:4
68:10 69:19,19
72:24 79:20
80:2 81:11,19
81:22,23 82:7
82:14 83:15
86:21,21 87:4
87:21,23,25
89:19 90:5
92:9 95:25
101:24 102:8
102:19 104:5
105:2,9,13
106:9,22 107:6
109:8,15 110:3
110:4,24
112:24 113:7,8
113:14 116:16
117:11,18
118:3,13 119:4
119:11 121:21
128:23,24
129:21,22
130:16,20
131:9,12,25
134:15 135:2
136:13 138:10
138:18 141:20

143:4 145:2,16
146:23 147:5
147:22 151:2
151:17,25
153:21 155:17
160:16,24
164:12,20,22
166:14 168:10
168:15 170:5
170:12,17
171:4 172:25
173:6,24 175:9
175:11,21
178:6,14,15,16
180:22,25
181:4,11
182:14,24
191:18,23,25
192:3 193:7,19
193:21,23
195:14 197:2,9
197:13,14
198:13,18
199:13 200:21
202:19 203:7
207:2 208:21
209:8 211:10
212:8 213:7,8
214:10 215:3,3
216:12 217:10
217:14 219:25
220:13 225:15
227:11,24
228:8 229:5,13

230:19 232:7
232:13,21
233:4 235:8
236:22 237:5
238:13 241:16
242:24 243:5
244:25 245:3
249:13 251:4
251:21 252:2,6
252:12 254:14
255:6,16,21,24
256:25 257:5
258:5,6 260:2
260:15,21
261:3 263:5,18
264:9,23
265:21 267:19
270:25 271:4
275:4,13
278:11 279:4
279:25,25
282:3 285:16
286:3 293:9
**thinking** 23:12
24:13 34:8
54:2 63:18
109:13 134:13
137:7 145:7
153:7 154:4
190:6 192:15
211:15 215:7
216:19 226:18
230:19 232:8
233:23 234:23

284:8 288:17
288:24 289:10
**third** 111:15
115:9 240:21
**thirds** 254:7,20
255:3,9
**thirty** 296:16
**thoroughly**
40:6
**thou** 49:21
**thought** 8:25
15:16 52:15,20
80:8 107:4
130:13 153:2
192:8 194:5
196:24 219:22
252:9 280:20
284:13 285:5
289:21
**thoughtful**
219:20
**thoughts**
155:18 285:13
**thousands**
42:22
**threat** 66:18
67:16,18 181:7
**threaten** 48:4
**threats** 181:6
**three** 36:22
48:12 87:18
203:5,10 206:2
206:6 212:6

**threshold**
  200:11
**threw** 152:18
**tighter** 140:12
**time** 7:22 10:24
  11:8 20:20
  21:14 23:10,13
  23:18 29:18
  35:19 36:13
  47:7 61:7 66:9
  68:16 71:3
  75:3 80:2 84:3
  84:9 88:17
  93:12 109:12
  110:13 118:21
  141:13 144:17
  150:21 154:7
  154:23 155:18
  156:4 157:15
  158:9,15
  168:18 187:22
  188:23 196:6
  202:3 204:17
  216:9 217:12
  217:21 218:3
  225:6 265:25
  277:13 291:13
  291:20 294:4,9
  295:8
**timeframe**
  21:18,23
**timeline** 210:23
**times** 148:12
  168:12 250:12

**timing** 170:21
  172:19,20
**title** 24:21 25:3
  157:4,5 247:7
  253:17
**titled** 24:18
  25:3,25 118:24
**today** 9:4 10:3
  12:12 17:8,21
  26:7 117:23
  199:13 201:7
  250:12
**today's** 18:13
  230:11
**together** 53:9
  233:24 244:19
**told** 40:17
**took** 11:3 80:14
  84:5 110:4,4
  158:11 217:23
  262:9 291:15
**tool** 242:7
**tools** 238:17
  269:4
**top** 80:22 102:2
  102:5 146:21
  169:5 174:4
  178:17 206:5
  207:7 236:18
  254:24
**topic** 127:18
  156:8 195:5
  288:2

**topics** 88:12,21
  89:5,11,16
  95:7 96:17
  99:14
**totally** 54:21
  82:22 123:9
  189:5
**touch** 89:18
**touching** 80:3
**toward** 143:16
  204:8 205:25
  278:24
**towards** 228:15
**trace** 134:12
**track** 36:16
  38:6 41:7,12
  246:14
**trackers** 245:17
**tracking**
  245:25 247:23
  248:5 249:3
**tracks** 32:6
**traditional**
  71:25 171:19
**trained** 209:19
**training** 41:20
  93:16
**tranche** 204:2
**transcribed**
  295:10
**transcribing**
  61:8
**transcript** 43:2
  45:22 48:17,21

49:7 296:17,18
**transcription**
  295:11 298:6
**transcriptions**
  41:14 50:18
**transcripts**
  46:7 272:11
**transfer** 146:8
**transferability**
  139:21
**transferable**
  140:8
**transition**
  180:11
**translate** 147:4
**translation**
  147:22
**transparent**
  229:21
**transportation**
  220:18
**travel** 116:21
**treatises** 53:17
**tree** 223:25
**trees** 223:20
**trial** 7:22 12:16
  15:21 53:18,20
  135:16
**triangulation**
  147:7,9,10,23
  191:6 201:7,9
  201:22 202:6
  202:11,12,17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[tricky - uber]                                                      Page 70

**tricky** 72:19
89:4 257:2
**triggers** 215:21
**trip** 174:2
197:3
**trouble** 81:16
**true** 57:15 72:8
80:17 89:22
93:10 112:10
163:20 164:8
168:10,13,14
169:3 172:25
173:7 234:21
259:25,25
260:18 263:4
267:7,10
295:11
**truth** 295:9,9,9
**truthful** 17:8
**try** 16:9,13,14
16:19 49:3
68:20 69:21
129:25 134:4
141:23 155:20
161:9 165:4
236:6,8 242:2
248:24 275:19
285:11
**trying** 38:4,6
44:10,21 46:11
65:12 89:3
101:24 102:25
110:3 138:5
140:11 157:13

164:19 166:2
166:18 168:22
193:10 200:19
201:18 211:9
212:17 213:15
220:7 234:18
247:6,8 255:24
257:2 279:18
281:9 284:24
290:2
**turn** 154:17
155:3 188:22
231:15
**turning** 131:14
**turnover**
231:16
**tuskegee** 43:15
**twice** 77:14
165:16
**two** 13:2,5,7
14:10 15:14
18:4 29:10
30:4 31:14
36:2,6,21 40:2
62:24 76:15
83:9 85:17
86:24 87:18
125:6 126:14
135:9 140:23
156:9,21,23
164:9 165:5
172:4 177:20
178:23 179:7
179:21,22

183:19 186:4,4
188:17 193:17
200:10 202:7
231:11 233:24
235:3 237:4
239:4,11 254:7
254:20 255:3,9
283:4,5,24
285:10
**type** 43:9 49:13
77:19 108:14
117:14 127:13
134:11 141:9
149:5 182:21
183:2,3 193:9
202:24 203:2
224:2 266:25
274:21
**types** 71:11
98:11 177:21
193:16 195:10
232:23 236:13
236:16 237:7
**typo** 29:11,22
34:2

|     **u**     |

**u** 107:21
**u.s.** 110:16
211:7,13
213:25
**uber** 1:6 2:12
8:10 9:8,9
13:25 14:2,24

23:10 34:10
40:18 44:22
55:10 61:20
78:12,17,20,23
80:8 85:25
86:3,13 87:10
87:15 88:21
90:10 91:23
92:6,13,18
93:11 97:12
107:18 111:19
118:9,14 122:2
150:6,17,22
151:5 163:12
163:12,21
169:3 173:8
175:18 193:20
195:18,24
197:10,11
201:23 202:22
204:17 215:4
218:23,25
219:3,7,11,16
219:18,25,25
220:17,23,24
221:4 222:3,13
223:21,22
225:19,22
226:8,9 227:2
227:8,18 228:3
229:17 230:24
232:23 236:12
237:15,20
238:9,16,19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[uber - use]**                                                                                           Page 71

| | | | |
|---|---|---|---|
| 239:23 241:5,8 | **unclear** 165:7 | 69:23 110:22 | **universe** 56:3 |
| 241:8 242:12 | **uncomfortable** | 115:14,25 | **university** 50:3 |
| 242:18 243:11 | 188:23 | 118:5 128:25 | 96:9 97:16 |
| 245:5 247:18 | **under** 10:3 | 149:25 150:8 | **unobservable** |
| 249:16 254:13 | 28:4,8 94:5 | 151:18 152:20 | 260:24 261:9 |
| 255:23 256:17 | 123:12 167:11 | 153:17,23,25 | **unpleasant** |
| 258:8 259:15 | 175:19 295:11 | 159:8,16,23 | 228:24 |
| 261:16 262:3,8 | **undergrad** | 160:2,15,25 | **unpredictable** |
| 262:21 263:15 | 110:3,6,19 | 180:5 189:8 | 230:6 244:9 |
| 263:17 264:13 | **undergraduate** | 220:10 294:11 | **unsubstantiat...** |
| 264:14 268:19 | 108:19 109:24 | **understandings** | 78:6,14 79:22 |
| 269:12,17 | **underlining** | 178:24 | 81:5 |
| 273:8 276:4,7 | 219:17 | **understands** | **unusual** 109:7 |
| 281:23 282:22 | **underneath** | 182:9 | **updated** 27:20 |
| 283:5,11 | 241:9 270:17 | **understood** | 28:19 29:15 |
| 286:18 287:14 | **understand** | 10:10 16:23 | 31:25 |
| 287:14 288:13 | 10:2 14:13 | 24:17 62:5 | **updating** 24:10 |
| 292:4,22 293:2 | 17:4 38:17 | 90:7 91:13,16 | **upsell** 265:25 |
| **uber's** 223:14 | 44:11 46:6 | 282:18 | **upset** 261:23 |
| 251:13 254:22 | 56:14 58:15 | **unequivocal** | 262:6 |
| 258:9 276:3 | 60:12 65:12 | 167:25 | **upsetting** 83:16 |
| 283:16 | 69:8,25 74:12 | **unfair** 251:22 | **upwork** 212:4 |
| **uber's** 253:18 | 89:4,9 105:9 | 252:4 | 263:13 264:13 |
| **uc** 107:19 | 136:13 145:11 | **unfairly** 78:4 | 264:14 |
| **uh** 16:8,8,8 | 150:4 155:21 | 78:22 | **usage** 241:2 |
| 29:12 142:22 | 166:4 176:16 | **unfold** 136:8 | 283:10 |
| 143:7 144:19 | 178:11 184:14 | **unique** 265:2 | **use** 18:13 44:14 |
| 174:11 284:21 | 187:6 188:14 | **uniquely** | 53:18,20 61:18 |
| **uk** 213:25 | 189:7 202:10 | 265:16 | 63:17,20,24 |
| **ultimately** | 213:15 220:13 | **unit** 8:7 24:4 | 64:13,19 65:7 |
| 278:2 | 234:18 240:11 | 84:10 158:17 | 73:13,14 74:21 |
| **unaware** | 281:10 | 218:5 | 100:8 102:24 |
| 249:19 260:17 | **understanding** | **united** 1:2 8:11 | 130:21 136:22 |
| | 43:12 51:14 | 113:2,8 243:2 | 138:9 143:21 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

147:6 151:12
155:3 157:21
161:2,5 165:12
166:6 174:18
174:19 175:23
183:4,8 190:24
213:23 221:21
234:22 261:16
261:17 262:24
265:4 269:3,13
269:18 270:2
271:17
**used** 33:25
111:19 130:25
150:5 151:5
155:9 160:2
165:16 177:22
188:15 197:10
197:11 198:8
213:4 214:2
220:6 221:19
234:16 248:6
268:16 269:8
296:19
**uses** 14:24 15:2
148:12 154:18
157:6 165:5
169:12 254:8
282:22
**using** 74:10
100:4 101:19
108:15 125:9
127:7 129:21
130:2 150:19

154:6,9 155:7
163:24 164:2,8
174:17 210:13
214:7 259:11
259:18
**usually** 143:2
207:2
**utilize** 222:13
**utilized** 52:24
242:12

**v**

**v** 218:11
**vague** 134:8
**valid** 46:2
**validate** 104:3
**validity** 131:18
148:24 185:20
192:14 255:19
**valuable**
195:25
**value** 75:22
228:16 230:19
247:4 259:17
293:13
**valued** 102:13
**values** 103:17
242:5,11
**vanderbrand**
138:24
**variability**
184:12
**variables** 108:3
108:6 243:7

**variance**
135:19 200:3
201:4
**various** 76:17
**veena** 107:13
108:14 118:13
242:14
**vegetables**
271:22
**vehicle** 116:20
116:21
**vehicles** 115:8
246:5
**veins** 235:3
**vendor** 115:9
**veneer** 152:5,8
152:19
**verbal** 16:7
**verification**
65:16 66:3,4
66:12 68:4,12
69:9 187:4
189:10 245:23
**verified** 185:25
186:8
**verify** 68:21
69:4
**verifying**
189:15 245:20
**veritext** 1:21
8:15,17
**versa** 237:10
**version** 11:24
12:2 29:17

119:19 143:2,6
194:5 233:14
**versions** 45:12
48:5 228:6
**versus** 24:2
41:4 86:20
87:5 94:14
101:20 113:24
117:11 135:11
136:3 138:12
156:8 178:18
180:13 200:3
264:19 285:2
**vested** 276:9
**vetchky** 208:2
**vice** 237:10
**video** 8:8 10:24
11:7 50:19
84:3,9 158:9
158:15 217:21
218:3 291:13
291:19 294:9
**videographer**
2:18 8:3,16
10:23 11:6
84:2,8 158:8
158:14 217:20
218:2 291:12
291:18 294:8
**videos** 266:24
**videotaped**
26:2 30:25
**view** 70:16
102:16 118:16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[view - window]                                                Page 73

| | | | |
|---|---|---|---|
| 118:25 154:16 | 91:2,12,15 | 132:11 145:9 | **we've** 83:7,8 |
| 162:4 176:10 | 96:2 109:15 | 145:19 148:7 | 99:14 144:4 |
| 177:7 190:8 | 123:2 136:14 | 152:2 160:3,4 | 156:2 199:12 |
| 218:24 219:11 | 142:24 143:8 | 160:10,11,14 | 212:18,23 |
| 220:17,20 | 160:20 166:17 | 164:11 165:8 | 219:18 250:11 |
| 244:21 278:19 | 170:12,15 | 174:17 176:5 | **weak** 125:20,23 |
| 293:10 | 171:18 178:14 | 182:14 184:7 | **wear** 65:19 |
| **viewpoints** | 184:13 187:21 | 188:14,18,19 | **web** 293:3 |
| 247:9 | 195:13 199:17 | 188:20 189:20 | **website** 28:20 |
| **violations** | 202:25 215:21 | 189:25 190:12 | 29:16 30:4 |
| 198:14 252:13 | 217:17 228:2 | 190:14 191:7 | 57:13,17 59:25 |
| **virtual** 22:23 | 230:4 250:22 | 191:11,12 | 60:2,8,10,20 |
| **virtually** 91:20 | 261:12 264:6,7 | 192:15,15,25 | **wednesday** |
| **virtues** 170:2 | 264:20 267:8 | 214:10 217:6 | 1:16 8:5 |
| **visual** 210:21 | 277:4 292:5 | 224:20 226:22 | **weeks** 15:14 |
| **vitae** 26:25 | **wanted** 51:13 | 229:22 236:8 | 204:3 |
| **voice** 49:5 | 118:13 193:13 | 239:20 242:19 | **weighing** 247:3 |
| **volume** 108:12 | **wants** 152:6 | 248:20 252:7 | **welcome** 11:10 |
| 243:6,10 | **washington** | 257:10 260:14 | 84:12 158:19 |
| **vote** 101:4 | 2:10 41:21 | 261:19 270:8 | 218:7 |
| **w** | 131:24 | 271:21 273:19 | **weng** 185:4 |
| | **water** 74:6 | 274:13 275:2 | **went** 24:13 |
| **wage** 242:21 | **way** 15:2 27:8 | 275:15 286:16 | 68:19 94:4 |
| **wait** 163:20 | 28:6 42:21 | 286:22 | 160:18 204:6 |
| 204:24 | 46:15 48:10,18 | **ways** 14:18 | 216:14 274:18 |
| **waitlisting** | 49:6 51:9 | 63:12 68:10 | **west** 180:25 |
| 254:10 | 55:15 61:18 | 113:15 126:8 | **wharton** 96:8 |
| **waive** 7:13 | 65:4 68:21 | 164:9 165:6,9 | **whitman** 203:8 |
| **waiver** 43:18 | 69:10 72:25 | 172:22 189:21 | **wide** 101:4 |
| **want** 10:18 | 79:11 82:15 | 206:23 210:24 | **widely** 150:5 |
| 13:4 40:4 52:6 | 83:17 93:25 | 219:25 225:2 | **widen** 195:25 |
| 54:12 61:17 | 96:2 104:5,10 | 248:5,8,11 | **wild** 180:24 |
| 71:24 72:9 | 113:17,20 | 256:4 260:24 | **window** 23:13 |
| 86:23 89:4 | 129:21 131:10 | 261:8,18,25 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| **winning** 105:18 | 166:12 167:20 | **won** 114:3 | 161:2 179:12 |
| **witness** 6:4 | 169:22 170:5 | 136:24 138:19 | 270:18 |
| 8:22 10:14,18 | 173:10 175:8 | **wondered** | **work** 12:24 |
| 21:25 22:9 | 178:2 179:4 | 251:5 | 20:4,5 21:21 |
| 25:9 26:12 | 180:10 181:18 | **wondering** | 22:6,17 23:22 |
| 29:21 33:22 | 182:7,18 186:3 | 118:25 | 25:9 33:15,24 |
| 40:24 42:16 | 186:11 187:8 | **woods** 2:16 | 34:13,14 41:20 |
| 43:11 45:14,21 | 187:11,19,21 | **word** 63:20,20 | 49:8 61:2,15 |
| 46:20 47:7 | 189:12 190:24 | 63:25,25 64:15 | 62:3 63:8,13 |
| 48:8,24 49:24 | 193:7 195:3 | 64:19 67:4 | 70:5,11,17,24 |
| 56:8,14 61:11 | 196:16 202:2 | 109:2 138:14 | 71:11 72:11,12 |
| 62:12 64:18 | 202:24 217:15 | 147:6,12 | 75:22 77:9 |
| 65:7 68:7,15 | 217:19 220:20 | 148:12 150:19 | 78:5 79:22 |
| 68:25 72:18 | 221:3,17 223:2 | 151:13,25 | 87:8 92:12 |
| 73:16,21 75:2 | 224:23 229:19 | 154:10 155:7 | 96:13,23,25 |
| 75:17 79:14 | 233:22 235:17 | 155:10 159:4 | 105:22 107:9 |
| 81:8 82:13 | 238:5 244:16 | 160:3 163:24 | 107:12,14 |
| 83:24 88:16,25 | 246:17 248:4 | 164:2,8 165:5 | 108:5 110:23 |
| 90:18 94:6 | 248:16,24 | 165:16 169:11 | 110:24 112:8 |
| 95:10 102:18 | 251:25 252:17 | 169:12 190:25 | 128:11 130:9 |
| 103:16 104:8 | 253:2 255:6 | 192:18 221:18 | 136:6 137:14 |
| 104:12 106:18 | 256:25 258:2 | 228:23,25 | 146:23 148:20 |
| 107:4 111:25 | 261:14 269:21 | 229:4 234:22 | 148:20 155:11 |
| 115:18 118:20 | 271:14 275:4 | 256:19,20 | 157:24 160:18 |
| 119:4,16,25 | 275:22 277:16 | 259:17,22 | 160:21 161:2 |
| 120:9 122:23 | 278:11 279:23 | 263:10,11 | 164:22,24 |
| 124:2,25 126:7 | 281:4 284:8 | 292:20 | 174:8,21 192:6 |
| 128:6 129:4,24 | 288:17 294:6 | **worded** 66:24 | 195:18 199:16 |
| 131:3 132:21 | 295:12,14 | 68:18 | 202:20 204:21 |
| 136:20 137:6 | 296:2 | **wording** | 222:19 227:7 |
| 138:2 141:20 | **witnesses** 16:16 | 153:22 | 235:10,12 |
| 150:13 151:22 | **women** 80:3 | **words** 61:18 | 238:18 240:20 |
| 153:21 154:22 | **women's** 33:15 | 64:13 65:8 | 242:14,16 |
| 158:7 162:10 | | 138:10 147:2 | 244:23 256:11 |

Veritext Legal Solutions

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[work - wyatt]**                                                              Page 75

| | | | |
|---|---|---|---|
| 256:17 257:17 | 173:5 174:20 | 276:2,14,20 | **written**  11:22 |
| 257:21,24 | 176:11 196:2 | 277:9 | 46:23 60:15,19 |
| 258:13,16 | 199:7 218:18 | **works**  16:7 | 116:5 117:10 |
| 262:12 263:20 | 219:8 221:22 | 60:13 104:19 | 117:14 118:14 |
| 264:18 273:21 | 228:15 235:13 | 156:10 222:20 | 124:19 150:25 |
| 273:23,23,25 | 237:7,9 239:16 | 225:20 256:5 | 157:9 167:13 |
| 273:25 275:2 | 242:20,21 | 281:23 282:2 | 177:16 236:7 |
| 279:7,10,20 | 244:8 245:18 | **world**  113:6 | 241:20 244:19 |
| 280:9 285:2 | 246:5 249:19 | 240:19 | 255:22 262:23 |
| 286:14 287:7 | 251:18 256:7 | **worlds**  109:19 | 264:21 286:17 |
| 287:13 290:12 | 256:10,17 | **wow**  233:22 | 286:22 287:11 |
| 290:21 | 258:20 259:12 | **write**  70:10,21 | **wrong**  61:13 |
| **worked**  21:16 | 260:4,11,16 | 99:7 115:2 | 66:25 76:7 |
| 21:17 55:5 | 262:15 263:12 | 119:20 124:11 | 80:14,14 91:10 |
| 110:16 152:24 | 266:16 268:20 | 139:16 144:24 | 130:22 149:23 |
| 153:10 159:21 | 270:5,10,22 | 148:19,21 | 150:11,14 |
| 206:12 209:13 | 271:6 273:23 | 149:10 159:3 | 179:24 251:22 |
| **worker**  87:25 | 274:3,5,9,13,25 | 169:10 192:5 | 252:4 263:6 |
| 144:7 199:6 | 276:9 278:4 | 199:4 213:22 | **wrote**  22:14 |
| 245:20 265:6 | 282:24 284:12 | 216:11 231:10 | 71:13 127:10 |
| 265:11 270:9 | 293:12 | 245:11 256:6 | 233:15 236:24 |
| 275:2,11,20 | **workforce** | 259:2 260:21 | 264:12 |
| 276:22 277:11 | 60:25 | 264:25 273:19 | **wyatt**  2:9 3:6 |
| 277:12 | **working**  20:21 | 286:24 | 9:6,6,17 10:20 |
| **worker's** | 61:3 132:2 | **writer**  179:11 | 11:9,18 18:24 |
| 161:21 | 133:12 154:9 | **writes**  203:10 | 22:4,10 25:11 |
| **workers**  61:23 | 160:7 180:4 | **writing**  24:7,13 | 25:13,21 26:15 |
| 61:25 66:18,20 | 204:21 240:4 | 43:2 153:14 | 27:6,14 29:24 |
| 67:17 70:6,12 | 255:23 273:7 | 157:15 211:16 | 30:7,11,19 |
| 70:18 74:5 | 287:14 | 214:17 215:15 | 33:4 34:15 |
| 83:16 87:24 | **workplace** | 216:10 229:3 | 38:3,8,9 40:22 |
| 115:24 122:3 | 137:8,8,12 | 232:8 249:13 | 41:6,9,10 43:4 |
| 139:5 165:21 | 140:7,8 145:20 | **writings**  38:12 | 44:9 45:6,9,17 |
| 169:14 172:20 | 145:22 275:14 | 79:3 249:7 | 46:4,21 48:3 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[wyatt - ö]**                                                                 Page 76

| | | | |
|---|---|---|---|
| 48:20 49:15 | 158:4,18 | 289:25 291:7 | 291:5 294:6,14 |
| 50:4 54:10,14 | 162:12,14,21 | 294:3,14 | **year**   21:11 99:4 |
| 54:17 56:17 | 162:24 164:15 | **x** | 111:13,15 |
| 59:4,11,13 | 167:5 168:5 | **x**   3:2,9 134:7,7 | **years**   23:11 |
| 61:12 62:14 | 169:23 170:9 | 134:14,15,17 | 32:10 35:4 |
| 65:2,10 68:9 | 173:13,17,19 | 134:20 192:9 | 109:11 152:13 |
| 68:17 69:18 | 175:3,13 | 257:11 | 152:25 159:22 |
| 73:11,18,23 | 177:14 178:4 | **y** | 203:6,10 |
| 75:4,19 79:16 | 179:25 180:20 | **y**   192:10 | 229:24 230:9 |
| 82:5,17 83:22 | 182:2,11,23 | **yeah**   10:12,14 | 259:4 285:19 |
| 83:25 84:11 | 184:22 186:5 | 10:16 28:10,19 | 286:18 292:25 |
| 85:2 88:18 | 186:18 187:14 | 29:12 31:6 | 293:4,8 |
| 89:2 90:22 | 189:4,17 | 41:2,6 49:24 | **yep**   194:11 |
| 91:6 93:24 | 191:15 193:11 | 50:11 54:14 | 198:25 270:6 |
| 94:8 95:15,19 | 195:19 196:20 | 58:16 67:15 | **yeses**   16:8 |
| 98:21 103:10 | 202:4 203:16 | 71:17 86:21 | **yesterday** |
| 103:25 104:9 | 217:10,17 | 114:20 116:15 | 28:17 30:4 |
| 105:7 106:12 | 218:6 219:13 | 141:14 153:4 | 135:9 |
| 106:20 107:8 | 220:22 221:12 | 154:5 155:16 | **york**   98:24 |
| 112:4 114:8,17 | 221:23 223:7 | 157:18 158:4 | 237:24 |
| 116:6 118:22 | 223:17 224:24 | 161:9 163:5 | **youtube**   266:24 |
| 119:10,18 | 230:21 233:25 | 182:12 197:9 | **z** |
| 120:3,23 | 235:23 238:11 | 201:20 211:10 | **zones**   256:8 |
| 121:12 123:8 | 244:24 246:19 | 211:18 216:18 | **zoom**   1:15 |
| 124:4 125:21 | 248:7,18 249:5 | 217:15 220:25 | **ö** |
| 127:5 128:13 | 252:11,19 | 221:4 228:22 | **ö**   193:17 |
| 129:6 130:4 | 253:4 255:11 | 232:3,21,24 | |
| 131:7 132:25 | 257:14 258:17 | 235:7,12 245:6 | |
| 136:25 137:22 | 262:4 269:23 | 249:15 257:21 | |
| 139:10 141:22 | 271:24 275:6 | 263:4 279:12 | |
| 142:3,10,12 | 277:6 278:5,17 | 280:18 284:15 | |
| 151:15 152:22 | 280:14 281:7 | 288:4,8 289:24 | |
| 154:15,24 | 282:9,13,16,20 | 290:13,20 | |
| 156:6,17,19 | 282:21 284:16 | | |

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.