LAURA VARTAIN HORN (SBN: 258485)
    laura.vartain@kirkland.com
**KIRKLAND & ELLIS LLP**
555 California Street, 30th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625

ALLISON M. BROWN (*Pro Hac Vice* admitted)
    allison.brown@kirkland.com
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

JESSICA DAVIDSON (*Pro Hac Vice* admitted)
    jessica.davidson@kirkland.com
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723

Counsel for Defendants
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC
*[Additional Counsel Listed on Following Pages]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, | Case No. 3:23-md-03084-CRB |
| | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| This Document Relates to: | |
| *Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Judge:       Hon. Charles R. Breyer |
| | Courtroom:   Courtroom 6 – 17th Floor |

SABRINA H. STRONG (SBN: 200292)
   sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
   jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

PATRICK L. OOT, JR. (*Pro Hac Vice* admitted)
   oot@shb.com
**SHOOK, HARDY & BACON LLP**
1800 K Street NW, 10th Floor
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

ALYCIA A. DEGEN (SBN: 211350)
   adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
   mshortnacy@shb.com
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (*Pro Hac Vice* admitted)
   ccotton@shb.com
255 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

1

**TABLE OF CONTENTS**

2
                                                                                                    **Page**

3   I.      INTRODUCTION...................................................................................................... 1

4   II.     ARGUMENT................................................................................................................ 2

5           A.      The Qualified Marketplace Statute Requires Summary Judgment on
                    Respondeat Superior. ......................................................................................... 2

6                   1.      "For All Purposes Under State . . . Laws" Encompasses the Law of
7                           Respondeat Superior.................................................................................. 2

                    2.      Plaintiff's Contrary Arguments Are Unpersuasive................................... 6

8           B.      The Undisputed Facts Warrant Summary Judgment on Apparent Agency. .......... 8

9           C.      As a Matter of Arizona Law, Turay's Alleged Tortious Conduct Is Outside
10                  the Scope of Any Employment or Agency.......................................................... 10

11          D.      Plaintiff's Gender Match Product-Liability Theory Impermissibly Targets
                    Uber's Services ................................................................................................ 12

12          E.      Uber's Compliance With Arizona's TNC Statute Precludes an Award of
                    Punitive Damages. ........................................................................................... 13

13                  1.      The Plain Text of A.R.S. § 12-689 Forecloses Plaintiff's Attempt to
14                          Limit Its Protection to Product-Liability Cases...................................... 13

15                  2.      Section 12-689 Reaches Product-Liability Cases Involving
                            Intangible Products................................................................................. 15

16                  3.      Section 12-689(A)(2) Required Uber Only to Comply With All
17                          Relevant and Material Laws.................................................................... 16

                    4.      No Genuine Fact Dispute Precludes Summary Judgment under
18                          Section 12-689........................................................................................ 17

19   III.    CONCLUSION.......................................................................................................... 18

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008)..................................................................................... 6, 7

*Antone v. Greater Ariz. Auto Auction*,
155 P.3d 1074 (Ariz. Ct. App. 2007) ................................................................ 14

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995)........................................................................................... 6

*Chandrasekhar v. Koszyk-Szewczyk*,
2023 WL 11909594 (Ariz. Super. Ct. July 11, 2023).......................................... 9

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)........................................................................................... 3

*City of Phoenix v. Glenayre Elecs., Inc.*,
393 P.3d 919 (Ariz. 2017).................................................................................. 6

*Colson v. Maghami*,
2010 WL 2744682 (D. Ariz. July 9, 2010).......................................................... 9

*Coslett v. Uber Techs., Inc., et al.*,
No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023)....................................... 5

*Coulbourn v. Crane Co.*,
728 F. App'x 679 (9th Cir. 2018) ..................................................................... 16

*Courtland v. GCEP-Surprise, LLC*,
2013 WL 3894981 (D. Ariz. July 29, 2013)........................................................ 9

*Davis et al. v. DoorDash, Inc. et al.*,
No. C20222745 (Ariz. Super. Ct. Aug. 22, 2025)............................................... 5

*Delgado v. S. Pac. Transp. Co.*,
763 F. Supp. 1509 (D. Ariz. 1991)..................................................................... 4

*Doe v. Roman Cath. Church of Diocese of Phoenix*,
533 P.3d 214 (Ariz. Ct. App. 2023), *review denied* (Dec. 15, 2023)............... 10, 12

*Engler v. Gulf Interstate Eng'g*,
280 P.3d 599 (Ariz. 2012)........................................................................ 8, 10, 11

*Fadely v. Encompass Health Valley of the Sun Rehab. Hosp.*,
515 P.3d 701 (Ariz. Ct. App. 2022) ................................................................ 8, 9

*Fann v. State*,
493 P.3d 246 (Ariz. 2021).................................................................................. 4

*Garcia v. Butler in & for Cnty. of Pima*,
487 P.3d 256 (Ariz. 2021)................................................................................ 14

*Hess v. Bumbo Int'l Tr.*,
2014 WL 12527216 (D. Ariz. Sept. 11, 2014).................................................. 16

1

## TABLE OF AUTHORITIES
### (continued)

2
Page(s)

3

*Higgins v. Assmann Elecs., Inc.,*
4
   173 P.3d 453 (Ariz. Ct. App. 2007) ................................................................. 11

*Iman v. Bolin,*
5
   404 P.2d 705 (Ariz. 1965) ............................................................................... 4

6
*In re Cent. Bank of Willcox,*
   205 P. 915 (Ariz. 1922) ................................................................................... 3
7
*Kaplan v. Coldwell Banker Residential Affiliates, Inc.,*
8
   59 Cal. App. 4th 741 (1997) .......................................................................... 10

9
*Kilpatrick v. Superior Court,*
   466 P.2d 18 (Ariz. 1970) ................................................................................. 3

10
*Klosa v. Uber Techs., Inc., et al.,*
   No. CV2019-000428 (Ariz. Super. Ct. Aug. 23, 2022) .................................. 5
11

*Larson v. Berumen,*
12
   125 F.3d 858 (9th Cir. 1997) .......................................................................... 11

13
*Laurence v. Salt River Project Agric. Improvement & Power Dist.,*
   528 P.3d 139 (Ariz. 2023) ............................................................................... 2
14
*Marcello v. Bonds,*
15
   349 U.S. 302 (1955) ........................................................................................ 6

16
*Maricopa Cnty. Special Health Care Dist. v. Jackson,*
   577 P.3d 457 (Ariz. Ct. App. 2025) ............................................................... 5

17
*McBroom v. Ethicon, Inc.,*
   2022 WL 604889 (D. Ariz. Mar. 1, 2022) .................................................... 17
18

*Mejak v. Granville,*
19
   136 P.3d 874 (Ariz. 2006) ............................................................................. 14

20
*Menendez v. Paddock Pool Constr. Co.,*
   836 P.2d 968 (Ariz. Ct. App. 1991) ............................................................. 16

21
*Robarge v. Bechtel Power Corp.,*
22
   640 P.2d 211 (Ariz. Ct. App. 1982) ............................................................... 8

23
*Robles v. Preciado,*
   79 P.2d 504 (Ariz. 1938) ................................................................................. 3

24
*Roy v. Indus. Comm'n,*
   397 P.2d 211 (Ariz. 1964) ............................................................................... 4
25

*Sanchez v. Maricopa Cnty.,*
26
   572 P.3d 101 (Ariz. 2025) ............................................................................... 8

27
*Shute v. Frohmiller,*
   90 P.2d 998 (Ariz. 1939) ................................................................................. 4
28

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) .................................................................................... 7

*SPUS8 Dakota LP v. KNR Contractors LLC*,
  641 F. Supp. 3d 682 (D. Ariz. 2022) ...................................................... 10

*State ex rel. Conway v. Superior Court*,
  131 P.2d 983 (Ariz. 1942) ........................................................................ 4

*State of the Netherlands v. MD Helicopters, Inc.*,
  478 P.3d 230 (Ariz. 2020) ........................................................................ 4

*State v. Arana*,
  843 P.2d 652 (Ariz. 1992) ........................................................................ 5

*State v. Estrada*,
  34 P.3d 356 (Ariz. 2001) ........................................................................ 15

*State v. Schallock*,
  941 P.2d 1275 (Ariz. 1997) ............................................................. 10, 11

*State v. Wise*,
  671 P.2d 909 (Ariz. 1983) ........................................................................ 3

*Torres v. Goodyear Tire & Rubber Co., Inc.*,
  786 P.2d 939 (Ariz. 1990) ...................................................................... 15

*Wyatt v. Wehmueller*,
  806 P.2d 870 (Ariz. 1991) ........................................................................ 6

**Statutes**

A.R.S. § 1-212 ............................................................................................ 15

A.R.S. § 1-213 .............................................................................................. 3

A.R.S. § 12-2506 ....................................................................................... 2, 5

A.R.S. § 12-681 ........................................................................................ 3, 13

A.R.S. § 12-682 ........................................................................................... 15

A.R.S. § 12-683 .................................................................................. 3, 13, 15

A.R.S. § 12-684 ........................................................................................... 13

A.R.S. § 12-685 ........................................................................................... 13

A.R.S. § 12-689 ....................................................................................*passim*

A.R.S. § 13-103 ............................................................................................ 7

A.R.S. § 13-4439 .......................................................................................... 8

A.R.S. § 16-402 ............................................................................................ 8

A.R.S. § 20-385 .......................................................................................... 14

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3    A.R.S. § 21-236................................................................................................8

4    A.R.S. § 23-420................................................................................................7

5    A.R.S. § 23-479................................................................................................7

     A.R.S. § 23-491.10...........................................................................................7

6    A.R.S. § 23-909................................................................................................7

7    A.R.S. § 23-1502..............................................................................................8

8    A.R.S. § 23-1603........................................................................................*passim*

9    A.R.S. § 25-112................................................................................................4

     A.R.S. § 26-168................................................................................................8

10   A.R.S. § 28-9552............................................................................................16

11   A.R.S. § 28-9555............................................................................................17

12   A.R.S. § 32-1982..............................................................................................7

13   A.R.S. § 36-2239............................................................................................14

14   A.R.S. § 40-365..............................................................................................14

     A.R.S. § 41-1461..............................................................................................8

15   A.R.S. § 45-189................................................................................................7

16   A.R.S. § 49-243................................................................................................7

17   MUPLA § 102.................................................................................................16

18   **Other Authorities**

19   *Law*, Black's Law Dictionary (12th ed. 2024).................................................3

     Restatement (Second) Torts...........................................................................15

20   Restatement (Third) of Agency.................................................................10, 11

21   **Regulations**

22   44 Fed. Reg. 62,714, 62,717 (1979)..............................................................16

23

24

25

26

27

28

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.    INTRODUCTION**

Plaintiff's twelve-page fact section fails to identify a single disputed fact precluding summary judgment on the grounds raised in Uber's motion.

***Vicarious Liability.*** Plaintiff concedes that Arizona's Qualified Marketplace Statute makes Turay an independent contractor "***for all purposes*** under state . . . laws," but argues this command reaches only "positive enactments," not common law. Even if that were correct, it would not help Plaintiff because Arizona codifies respondeat superior liability by statute. Regardless, the statute's plain language and unbroken Arizona law preclude Plaintiff's strained reading. Plaintiff likewise identifies no fact question on apparent agency: Even crediting her vague and self-serving claims that she saw ads urging her to "Ride with Uber," such ads would not represent that drivers are Uber's agents, let alone negate her agreement to terms unequivocally disclaiming agency. Further, Plaintiff's only argument that the alleged assault could fall within the scope of employment or agency rests on precedents expressly confined to managerial harassment of subordinates, which is not present here.

***Fraud.*** Plaintiff concedes that Uber is entitled to summary judgment on her fraud claim.

***Product Liability.*** Plaintiff likewise concedes summary judgment on her GPS Alert product theory. And she does not dispute that a Gender Match feature would require extensive engineering to change Uber's matching of riders and drivers—a function this Court has deemed a service. Plaintiff argues this theory nevertheless sounds in product liability because Gender Match could be activated through an in-app button. But this Court has ruled that similar features are services. As those rulings reflect, tying product liability to how a service is accessed would erase any boundary between products and services.

***Punitive Damages.*** Plaintiff's attempt to confine Arizona's punitive damages safe harbor to product-liability claims would rewrite the statute and nullify its protections for "service providers." And contrary to Plaintiff's claim that the statute requires government "approval," the provision at issue requires only *compliance* with laws relevant to the "risk allegedly causing the harm." The Arizona Transportation Network Company ("TNC") statute requiring criminal

1   background checks and sex-offender-registry reviews is plainly relevant and material to the risk

2   of sexual assault by drivers. Plaintiff does not dispute Uber complied with it, and cannot generate

3   a fact dispute by (incorrectly) asserting Turay lacked a valid license six years before the incident.

4   **II.    ARGUMENT**

5       **A.    The Qualified Marketplace Statute Requires Summary Judgment on
             Respondeat Superior.**

6

7       Plaintiff contends that Arizona's Qualified Marketplace Statute applies only to "positive

8   enactments," not common law doctrines, and therefore does not make Turay an independent

9   contractor for purposes of her respondeat superior theory. Opp. 12-15. Even if that were correct, it

10  would make no difference because Arizona has codified respondeat superior liability. But

11  Plaintiff is wrong: Arizona courts uniformly interpret statutory references to "state laws" to

12  encompass common law. Plaintiff cites no contrary authority and offers no good reason to depart

13  from that unbroken caselaw.

14          **1.    "For All Purposes Under State . . . Laws" Encompasses the Law of
                Respondeat Superior.**

15

16      Plaintiff's argument fails out of the gate because a "positive enactment" governs

17  respondeat superior liability here. Under A.R.S. § 12-2506(A), a "personal injury" defendant is

18  generally liable for damages only "in direct proportion to [its] percentage of fault." Respondeat

19  superior survives this general rule through a statutory exception making a party "responsible for

20  the fault of another person" if "[t]he other person was acting as an agent or servant of the party."

21  A.R.S. § 12-2506(D)(2); *see, e.g., Laurence v. Salt River Project Agric. Improvement & Power*

22  *Dist.*, 528 P.3d 139, 148 (Ariz. 2023) (overruling common law respondeat superior holding based

23  in part on § 12-2506). Under Plaintiff's own reading, the Qualified Marketplace Statute means

24  that Turay is not Uber's "servant" (i.e., employee) under the "positive enactment" of A.R.S. § 12-

25  2506(D)(2). So, absent a viable agency theory, Uber "is liable only for the amount of damages

26  allocated to [it] in direct proportion to [*its*] fault"—not the fault of Turay. A.R.S. § 12-2506(A).

27  The Court need look no further to enter summary judgment on respondeat superior.

28

1    In any event, Plaintiff's reading is incorrect. The statute declares that Turay is "an

2    independent contractor for all purposes under state . . . laws," and that language by its plain

3    meaning encompasses common law respondeat superior. A.R.S. § 23-1603(A). Arizona courts

4    typically give statutory "words and phrases . . . their ordinary meaning." *State v. Wise*, 671 P.2d

5    909, 911 n.3 (Ariz. 1983); *see* A.R.S. § 1-213. The core dictionary definition of "law" as "[t]he

6    aggregate of legislation, *judicial precedents*, *and accepted legal principles*" plainly encompasses

7    common law. Black's Law Dictionary (12th ed. 2024) (emphasis added). Accordingly, "[a]t least

8    since *Erie*," courts "have recognized [that] the phrase 'state law' [includes] common law as well

9    as statutes and regulations," and have held that phrases like "State and municipal law" do "not

10   admit of a distinction between positive enactments and common-law rules of liability." *Cipollone*

11   *v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992) (cleaned up). In short, Plaintiff's attempt to carve

12   respondeat superior out of the statute finds no support in the text, plain dictionary definitions, or

13   the caselaw.

14       That ordinary meaning makes particular sense in Arizona, which has adopted the common

15   law by statute. Plaintiff argues that Arizona's statute "adopt[ing]" the common law "distinguishes

16   between '[t]he common law' and 'the . . . laws of this state.'" Opp. 13 (citing A.R.S. § 1-201).

17   But the Arizona Supreme Court says the opposite: "the common law is by statutory adoption ***a***

18   ***part of the laws of the state***." *In re Cent. Bank of Willcox*, 205 P. 915, 916 (Ariz. 1922)

19   (emphasis added). For Plaintiff's claims, the enmeshment of common law with "positive

20   enactments" is further reflected by Arizona legislation on product-liability claims, *see, e.g.*,

21   A.R.S. §§ 12-681–12-683; a provision "imbedd[ing]" "the common-law action of negligence . . .

22   in the constitution," *Kilpatrick v. Superior Court*, 466 P.2d 18, 24 (Ariz. 1970); and the

23   codification of respondeat superior in personal injury actions, *see supra* at 2-3. Given this

24   pervasive enshrinement of common law, it would defy logic to artificially carve out common law

25   from Arizona "state . . . laws."

26       Arizona courts thus uniformly interpret phrases like "law of the state," including when

27   used in the Labor Code, to encompass state common law. In *Robles v. Preciado*, 79 P.2d 504

28   (Ariz. 1938), the Arizona Supreme Court held that a statute making employers who fail to comply

1  with workmen's compensation obligations "liable in an action under *any other law of the state*"

2  permitted a suit for "common-law . . . negligence." *Id.* at 508-09 (emphasis added). Similarly,

3  Arizona law determines whether a "[m]arriage [is] valid by *the laws* of the place where

4  contracted." A.R.S. § 25-112(A) (emphasis added). And in applying that test, Arizona workmen's

5  compensation cases count common law doctrines among the state "laws" defining marriage. *See,*

6  *e.g., Roy v. Indus. Comm'n*, 397 P.2d 211, 213-14 (Ariz. 1964) (recognizing "common-law

7  marriage" under the "law of Texas").

8       These cases accord with other decisions—including Plaintiff's own authorities—

9  interpreting statutory terms like "law" and "state law." For example, *State of the Netherlands v.*

10 *MD Helicopters, Inc*., rejected the argument that a "reciprocal law" under the Foreign-Country

11 Money Judgments Recognition Act refers only to statutes. 478 P.3d 230, 236 (Ariz. 2020). The

12 court explained that because the legislature "did not include any language . . . restricting 'law' to

13 a legislative act," the term "law" broadly encompasses "jurisprudence" and "common law." *Id.* at

14 238-39. The "absence of restrictive language is particularly telling," the court added, because

15 Arizona precedents made "the legislature . . . indisputably aware that 'law' includes more than

16 statutes." *Id.* at 239.

17      Likewise, in *State ex rel. Conway v. Superior Court*, 131 P.2d 983 (Ariz. 1942) (cited at

18 Opp. 13), the court noted that "law" can encompass "constitutions, statutes, the common law and

19 the various rules which the courts . . . adopt," and held that because the phrase "provided by law"

20 was "not meant as a restriction," it encompassed "not only statutes but rules of courts." *Id.* at 986

21 (emphasis added); *see also, e.g., Delgado v. S. Pac. Transp. Co.*, 763 F. Supp. 1509, 1517 (D.

22 Ariz. 1991) (A.R.S. § 40-423, which imposes liability on public service corporations for violating

23 the "constitution or laws of the state," is "merely declarative . . . of the common law"). Plaintiff

24 fails to cite a single Arizona decision interpreting a statutory reference to "laws" to exclude the

25 common law.[1] Uber is aware of none.

26 _____

27 [1] The holding in *Fann v. State*, 493 P.3d 246 (Ariz. 2021), that "by law" in the Arizona
Constitution refers to statutory law rested on separation of powers principles, not textual ones.

28 *See id.* at 260 n.7 (citing *Shute v. Frohmiller*, 90 P.2d 998, 1001-03 (Ariz. 1939)). Plaintiff also
cites *Iman v. Bolin*, 404 P.2d 705 (Ariz. 1965) (en banc), but that case held that "laws of this

1    There is no reason to think the legislature intended this statute to be the first. It decreed

2    that a qualifying worker "shall be treated as an independent contractor *for all purposes* under state

3    and local laws, regulations and ordinances." A.R.S. § 23-1603(A) (emphasis added). The phrase

4    "all purposes . . . does not lend itself to any exceptions." *State v. Arana*, 843 P.2d 652, 653 (Ariz.

5    1992); *see Maricopa Cnty. Special Health Care Dist. v. Jackson*, 577 P.3d 457, 462 (Ariz. Ct.

6    App. 2025) ("'[a]ll' means all," and "expressly excludes exemptions or limitations"). And the

7    legislature described the affected "laws" in the broadest terms at its disposal—not just "local

8    laws" but also "ordinances"; not just "state . . . laws" but also "workers' compensation laws."

9    A.R.S. § 23-1603(A). It would upend this deliberately broad command to hold that "for all

10   purposes" means "all purposes *except* common law principles adopted by A.R.S. § 1-201 and

11   respondeat superior principles codified at A.R.S. § 12-2506(D)(2)."

12       Contrary to Plaintiff's contention, the trial court orders cited by Uber endorse this

13   conclusion.[2] *Klosa* invoked A.R.S. § 23-1603(A) to find that a rideshare driver was an

14   independent contractor "for all purposes," and thus Uber was "not liable" in respondeat superior.

15   *Klosa* at 2-3 (¶¶ 4-8). The court reached the "control" test only to reject an actual agency theory

16   not asserted in this case. *Id.* at 3 (¶ 9). *Coslett* similarly "agree[d] with Uber" that under A.R.S.

17   § 23-1603 the driver is an independent contractor "for all purposes," such that Uber was "entitled

18   to summary judgment" on respondeat superior. *Coslett* at 1-2. The court then separately

19   determined that the claim failed "[e]ven under common law." *Id.* at 2.[3] The plain language of

20   A.R.S. § 23-1603(A) requires the same result here.

21

22

23

24   State" excluded the state constitution, not common law—and it did so because otherwise the
     ballot initiative would have impermissibly amended the state constitution. *See id.* at 363-64.
25   [2] *See Coslett v. Uber Techs., Inc., et al.*, No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023);
     *Klosa v. Uber Techs., Inc., et al.,* No. CV2019-000428 (Ariz. Super. Ct. Aug. 23, 2022); *Davis et*
26   *al. v. DoorDash, Inc. et al.*, No. C20222745 (Ariz. Super. Ct. Aug. 22, 2025).
     [3] *Davis* did not "ignore[]" the Qualified Marketplace Statute; the defendant never raised it.
27   Relying instead on A.R.S. § 23-1601—which creates a rebuttable presumption of independent
     contractor status—the court applied the common law test to determine if the presumption was
28   rebutted. *Davis* at 3.

## 2. Plaintiff's Contrary Arguments Are Unpersuasive.

Plaintiff argues that Uber's reading violates the presumption against abrogating the common law because the Qualified Marketplace Statute does not "explicitly" reference the common-law control test. Opp. 14. Putting aside Arizona's codification of respondeat superior, Arizona does "not require the legislature 'to employ magical passwords' to accomplish its manifest intent." *City of Phoenix v. Glenayre Elecs., Inc.*, 393 P.3d 919, 924 (Ariz. 2017). The phrase "all purposes" is sufficiently comprehensive to abrogate the common law. *Cf. Marcello v. Bonds*, 349 U.S. 302, 310 (1955) (holding the term "sole and exclusive procedure" "expressly supersede[d]" the Administrative Procedure Act, under which "modifications must be express").

At minimum, the statute modifies common law liability by "necessary implication." *Wyatt v. Wehmueller*, 806 P.2d 870, 873 (Ariz. 1991) (en banc). In *Wyatt*, a statutory scienter requirement precluded holding a client liable for his attorney's false filing notwithstanding common-law agency principles imputing attorneys' knowledge to clients. The statute's "knowing" requirement "abrogates th[e] common law [agency] principle, by necessary implication," even though the statute made no reference to the common law. *Id.* at 873-74; *see Glenayre Elecs., Inc.*, 393 P.3d at 925 (broad statutory language "overrides" common law doctrine "by necessary implication"). So too here.

Nor can the *noscitur a sociis* canon override the legislature's broad command. Opp. 13. *Noscitur a sociis* applies when "strong[] contextual cues" support a limited reading—*e.g.*, when the term "discoveries" is "contained in a list of three words, all of which applied to the oil, gas, and mining industries and could not conceivably all apply to any other industry." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008). Where "nothing in the overall statutory context suggests" that other terms in a list "were the exclusive focus of the provision," a broad term like "any" "sweeps as broadly as its language suggests." *Id.* Nothing in the Qualified Marketplace Statute suggests that "regulations" or "ordinances" were meant to be limiting. Quite the opposite: The legislature made Turay an independent contractor "for all purposes" and then endeavored to list every form of law subject to its authority. A.R.S. § 23-1603(A). *Noscitur a sociis* does not shrink such an intentionally comprehensive list. *See Babbitt v. Sweet Home Chapter of Cmtys. for*

*a Great Or.*, 515 U.S. 687, 698 (1995) (holding that *noscitur a sociis* would defeat statute's "broad purpose" to provide "comprehensive protection").

Plaintiff's reliance on the canon against superfluity fails for similar reasons. For starters, Plaintiff's reading does not cure the superfluity: Even if the common law were excluded, the statute would cover not only "local laws" but also "ordinances," not only "state . . . laws" but also "employment" and "workers' compensation laws." A.R.S. § 23-1603(A). That incurable overlap demonstrates the legislature's intent to cover the waterfront—not to limit the statute's reach. *See Ali*, 552 U.S. at 227 (rejecting superfluity argument where "technically unnecessary examples may have been inserted out of an abundance of caution") (quotation omitted). It is more reasonable to conclude the Arizona legislature used these overlapping terms to "remove any doubt" about the statute's breadth than to limit the phrase "state . . . laws." *Id.*[4]

Plaintiff also argues that Arizona statutes do not typically use "state or local laws" to mean common law. Opp. 13-14. But the statutes she cites are limited to "positive enactments" by their subject matter, not the phrase "state or local laws." For instance, a statute referring to "criminal conviction[s] under . . . state or local laws," *see* Opp. 14 (citing A.R.S. § 32-1982), does not cover common law because "common law offenses . . . are abolished" in Arizona, not because it refers to "state or local laws." A.R.S. § 13-103(A); *see* A.R.S. §§ 45-189(E)(5), 49-243(N)(6) (regulatory statutes governing water "production quotas" and aquifer "financial assurance"). To the extent consistent usage is relevant, it supports Uber, given the uniform Arizona precedent interpreting "law" and "state law" to encompass the common law. *See supra* at 3-4.[5]

---

[4] Plaintiff's reliance on *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), in support of its superfluities argument is misplaced. That case held that a preemption clause reaching "a [state or local] law or regulation" pre-empted statutes and regulations, not common law, largely because the Act expressly included a savings clause preserving common law liability, "permit[ting] a narrow reading that excludes common-law actions." *Id.* at 63 (quotations omitted).
[5] Plaintiff also argues that when the Legislature wants to include common law, it uses that term expressly. Opp. 14. But the statutes she cites show the opposite. In nearly every instance, the Labor Code references the common law to exclude or limit its application, not to cover it. *See* A.R.S. §§ 23-420(F), 23-479(F), 23-491.10(F) (stating in identical language that the ALJ "is *not bound by common law* or statutory rules of evidence") (emphasis added); A.R.S. § 23-909(C) (providing that an election of insurance "shall *not* render the employer liable for damages of

Plaintiff yet again ignores plain text in trying to limit the Qualified Marketplace Statute to "labor issues." Opp. 14. The statute covers state laws "*including*" certain labor and employment laws, and "the term 'includes' is a 'term of enlargement,'" not limitation. *Sanchez v. Maricopa Cnty.*, 572 P.3d 101, 110 (Ariz. 2025) (quotation omitted). So even under Plaintiff's interpretation, "state . . . laws" would encompass the Arizona Civil Rights Act (ACRA), a "positive enactment" that predicates liability on the existence of an employer/employee relationship, *see* A.R.S. § 41-1461(6), (7), and other "positive enactments" affording protections to employees for voting (A.R.S. § 16-402), jury duty (A.R.S. § 21-236), military duty (A.R.S. § 26-168), and crime victim proceedings (A.R.S. § 13-4439). Plaintiff offers no logical explanation why the legislature would mandate independent contractor treatment in such varied contexts, but not vicarious liability.

Indeed, that outcome would invert basic Arizona principles. Whereas Arizona's workmen's compensation laws "liberally construe[]" employment "to benefit the injured employee," *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 603 (Ariz. 2012), vicarious liability has always applied a "narrower concept" to "limit [the] burden of [employers'] liability" to "an indefinite number of third persons," *Robarge v. Bechtel Power Corp.*, 640 P.2d 211, 213 (Ariz. Ct. App. 1982) (quotations omitted). It is implausible that the legislature would flip this approach—making vicarious liability broader than workmen's compensation eligibility—through the phrase "state . . . laws." The better (and correct) reading is that it meant what it said when it instructed that Turay is an independent contractor "for all purposes."

**B.      The Undisputed Facts Warrant Summary Judgment on Apparent Agency.**

Plaintiff argues that her apparent agency claim survives because advertisements urging her to "ride with Uber" led her to reasonably believe Uber was providing her services. Opp. 16. But the test is whether Uber "led or misled Plaintiff to think that [Turay was Uber's] agent[] or employee[]." *Fadely v. Encompass Health Valley of the Sun Rehab. Hosp.*, 515 P.3d 701, 706 (Ariz. Ct. App. 2022). Advertisements to "ride with Uber" say nothing about drivers'

common law") (emphasis added); A.R.S. § 23-1502(A) (common law claims "*may only be established*" by satisfying statutory elements) (emphasis added).

1    employment status. *See, e.g.*, *Courtland v. GCEP-Surprise, LLC*, 2013 WL 3894981, at *9 (D.

2    Ariz. July 29, 2013) ("[S]ignage and advertising, without more, is not sufficient . . . to establish

3    apparent agency[.]"); *Colson v. Maghami*, 2010 WL 2744682, at *12-13 (D. Ariz. July 9, 2010)

4    ("[Plaintiff's] reliance on the [company's] brand signage . . . fails to account for the Arizona cases

5    holding that a franchisor's corporate identity does not provide a basis for a finding of apparent

6    agency.").

7         Regardless, as Uber explained, Mot. at 14-15, and as the Court has held, Plaintiff agreed

8    to and is bound by Uber's Terms. Those Terms include an unambiguous contractual disclaimer of

9    agency that precludes "either the representation or justifiable reliance needed for an apparent

10   agency." *Fadely*, 515 P.3d at 706. Plaintiff seeks to distinguish *Fadely* by pointing to

11   *Chandrasekhar v. Koszyk-Szewczyk*, 2023 WL 11909594 (Ariz. Super. Ct. July 11, 2023), an

12   unpublished trial court opinion distinguishing *Fadely* where the relevant agreement "[did] not tell

13   the patient that the doctors 'practice independently' from the hospital, or that the hospital does not

14   'control' the 'medical services' the doctors provide," but only that doctors "are not employees or

15   agents of the Hospital." *Id.* at *1-2. Putting aside that Uber's independent-contractor model is

16   highly publicized and widely understood by the public, Uber's Terms informed Plaintiff not only

17   that Uber provides "third-party services" through "independent drivers" who are "not actual

18   agents, apparent agents, ostensible agents, or employees of Uber in any way," but also that "Uber

19   does not control, manage, or direct any third-party providers," and that "[i]t is up to [the driver] to

20   decide whether or not to offer Third-Party Services to you or at all." Mot. Ex. 4, §§ 3, 7. Even

21   under *Chandrasekhar*, Plaintiff's agreement to those comprehensive disclaimers foreclose

22   apparent agency.

23        Plaintiff criticizes the length of Uber's Terms, and notes that she assented to them "in

24   connection with Uber Eats" services and not rideshare services, but concedes that "[t]he Court

25   previously found assent through Uber Eats sufficient to bind Plaintiff" with respect to rideshare

26   services. Opp. 18 & n.3. The same is true for apparent agency: Under *Fadely*, the inquiry does not

27   turn on the length of the Terms or the precise moment of Plaintiff's assent, but rather her

28   unambiguous contractual notice and agreement that Turay was not Uber's agent. *See Fadely*, 515

1    P.3d at 706 (disclaimer "drew a proverbial line between the employees and independent

2    practitioners" and "inform[ed] [the plaintiff] of the independent relationship between [the doctors

3    and hospital]").[6]

4        What is more, Plaintiff identifies no facts supporting a finding of reliance. She concedes

5    she must have "act[ed] or refrain[ed] from acting based on the [defendant's] representation."

6    *SPUS8 Dakota LP v. KNR Contractors LLC*, 641 F. Supp. 3d 682, 697 (D. Ariz. 2022). But it is

7    undisputed that Plaintiff did not request the ride at issue, did not accept Turay as her driver, and

8    did not recall looking at the app before entering Turay's car—SM ordered the ride on Plaintiff's

9    behalf. *See* Mot. 15. Accordingly, no jury could conclude that Plaintiff relied on any

10   representation that Turay was Uber's agent.

11       **C.    As a Matter of Arizona Law, Turay's Alleged Tortious Conduct Is Outside
            the Scope of Any Employment or Agency.**

12

13       Summary judgment on vicarious liability is independently warranted because the sexual

14   assault Plaintiff alleges "occur[red] within an independent course of conduct not intended by

15   [Turay] to serve any purpose of" Uber. *Engler*, 280 P.3d at 602 & n.1 (quoting and adopting

16   Restatement (Third) of Agency § 7.07).

17       Plaintiff analogizes Turay's alleged sexual assault to the decade-long harassment held to

18   potentially fall within a supervisor's scope of employment in *State v. Schallock*, 941 P.2d 1275

19   (Ariz. 1997). But *Schallock*'s holding "is narrowly applicable to cases involving longstanding

20   abuse and harassment in the workplace by a manager with authority" over the "subordinates the

21   manager victimizes." *Doe v. Roman Cath. Church of Diocese of Phoenix*, 533 P.3d 214, 223-24

22   (Ariz. Ct. App. 2023), *review denied* (Dec. 15, 2023). Plaintiff's contention that "these limitations

23   are not evident in *Schallock*" (Opp. 20) is baffling: *Schallock* stressed that its outcome turned on

24   "factors peculiar to supervisory sexual harassment cases," which "distinguishe[d] the case from

25

26   [6] *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* found a triable issue of "ostensible
27   agency" where the alleged principal disclaimed agency only in the fine print of a public
     advertisement indicating the agent "was part of the Coldwell Banker organization." 59 Cal. App.
28   4th 741, 744, 747-48 (1997). Here, there is no evidence that Uber advertised drivers as its agents,
     and it expressly disclaimed an agency relationship in a binding agreement that Plaintiff accepted.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

1   the great majority of cases." 941 P.2d at 1281-82. The Arizona Supreme Court has since

2   reaffirmed that *Schallock* "provides little guidance" in the "great majority of cases" because it

3   involved "managerial sexual harassment" that "occurred as part of [the employee's] supervision

4   of the plaintiff." *Engler*, 280 P.3d at 603-04 (quotations omitted).[7]

5         This case does not remotely resemble the "'managerial' context in *Schallock*." Opp. 20.

6   The employee in *Schallock* "was both serving the master by running the office—a task he was

7   explicitly authorized to do—and serving his personal desires." *Schallock*, 941 P.2d at 1283; *see*

8   *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 456, 461-62 (Ariz. Ct. App. 2007) (employer's

9   failure to repudiate CEO's termination of plaintiff during assault allowed finding employer

10  "accepted that the termination was in furtherance of its business") (cited at Opp. 19). The conduct

11  at issue here, by contrast, neither served Uber's interests nor turned on authority or power that

12  Uber conferred on Turay. *Compare Larson v. Berumen*, 125 F.3d 858 (9th Cir. 1997) (finding

13  fact question on scope of employment where sheriff deputy's assault was "grounded in an

14  employee's use of the employer's authority").

15        Plaintiff contends Turay "was able to carry out his sexual assault in part because he was

16  an Uber driver, and the assault occurred as part of his transporting Ms. Dean." Opp. 20

17  (quotations omitted). But under the Restatement (Third) of Agency § 7.07, the fact that "tortious

18  conduct by an employee takes place in the context of an identifiable employee-actor's interaction

19  with a third party . . . is insufficient to . . . subject[] the employer to vicarious liability."[8] *Id.* cmt.

20

---

21  [7] Plaintiff also argues the Court should apply *Schallock* because Uber ignored "red flags" about
    Turay. Opp. 20. But the "red flags" Plaintiff cites—that 1% of Turay's ratings were one-star and
22  that prior rides had generated GPS alerts for "mid-way drop-offs" and "long stops," *id.*—did not
    give notice *of the conduct at issue*, i.e., sexual assault. They thus do not implicate *Schallock*'s
23  finding of a fact issue on scope of employment where the employer had notice of *the specific
    course of sexual harassment the plaintiffs alleged. Schallock*, 941 P.2d at 1282. The same is true
24  for Turay's deposition testimony that he "flirt[ed]" with riders—which Plaintiff does not suggest
    Uber knew at the time of the alleged encounter. Opp. 11. Nothing in *Schallock* suggests that an
25  alleged failure to address a one-star rating, long stops, or flirtation puts **sexual intercourse with
    riders** within the scope of Turay's duties.
26  [8] Plaintiff has stipulated that "[t]he Court's ruling that 'the scope of liability under an apparent
    agency theory is limited by the usual scope-of-employment rules' . . . applies to Plaintiffs'
27  apparent agency claims (G.2) under the laws of Arizona." Stipulation and Order Re: Mots. to
    Dismiss Pursuant to the Laws of Arizona et al. (Dkt. 1932) at 3 ¶ 12 (quoting PTO 17 at 25).
28

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

1    b. Just as placing a teenager in counseling with his assailant did not make the *Doe* defendant

2    liable for acts done "solely to gratify [the employee's] personal, apparently sexual desires," 533

3    P.3d at 222, Uber's connection of riders and independent drivers does not bring sexual assaults

4    committed by those drivers within the scope of their alleged employment or agency.

5         **D.    Plaintiff's Gender Match Product-Liability Theory Impermissibly Targets**
         **Uber's Services.**

6

7         Plaintiff asserts that the omission of Gender Match qualifies as a product defect because it

8    would have only an "incidental effect on the company's back-end functions." Opp. 21. But her

9    own expert acknowledges that "[c]ore to any feasible Gender Match function is a "matching and

10   . . . machine learning gender identification model . . . used to support matching/dispatch." Mot.

11   Ex. 6 (Weiner Rep.) at ¶¶ 221-22, 232. Implementation would thus require "fundamentally

12   alter[ing] the inner workings of Uber's algorithm, and by extension its ride service"—precisely

13   what led the Court to dismiss Plaintiff's Safe Ride Matching product claim. *See* PTO 28 at 15-18.

14        Plaintiff argues that Gender Match is a product feature because, even if it requires this

15   backend service, it would take the form of an "option" in the app. Opp. 21. But that would erase

16   the boundary this Court has drawn between products and services, permitting Plaintiff to

17   repackage claims "target[ing] Uber's algorithm for matching riders and drivers" as design-defect

18   claims simply by demanding a corresponding in-app toggle. PTO 28 at 16.

19        Finally, Plaintiff's "contact Uber" and "biometric scanning" analogies do not salvage her

20   product theory. Adding a "live support" or "biometric scan" button to an app may seem like a

21   straightforward undertaking; but the back-end apparatus required to make such options function

22   at scale—staffing, training, authentication, escalation protocols, and systems for millions of

23   requests—are not. As this Court has already held, a claim that the provider should have

24   maintained such infrastructure sounds in the adequacy of its service, not product liability. Plaintiff

25   does not dispute that Gender Match could function only if Uber built and ran such systems to

26   govern matching of riders and drivers. That is not a product. *See* PTO 28 at 16.

27

28

E.   **Uber's Compliance With Arizona's TNC Statute Precludes an Award of Punitive Damages.**

The plain text of A.R.S. § 12-689 reflects a legislative judgment that punitive damages are inappropriate when a service provider complies with relevant regulations, and Uber's compliance triggers that protection here. To avoid this result, Plaintiff urges a "product liability" limitation that contravenes the statute's text, produces absurd results, and would not even help Plaintiff given her assertion of product-liability claims. No fact issue remains: Arizona directly regulates the risk of criminal conduct by rideshare drivers, and Plaintiff identifies nothing refuting Uber's evidence that it complied with those material laws.

1.   **The Plain Text of A.R.S. § 12-689 Forecloses Plaintiff's Attempt to Limit Its Protection to Product-Liability Cases.**

The statute's plain text forecloses Plaintiff from limiting A.R.S. § 12-689's punitive-damages bar to "certain products liability claims." Opp. 23. The statute protects "service provider[s]," § 12-689(A), and defines the relevant "services" to encompass "*all* actions . . . engaged in for other persons for a consideration, which . . . involve predominantly the performance of a service." A.R.S. § 12-689(D)(6) (emphasis added). Far from defining such services through product liability, it explicitly "distinguishe[s]" them from the "manufacture or sale of a product" that is the exclusive domain of Arizona product-liability law. *Id.*; *see, e.g.*, A.R.S. § 12-681(5) ("'Product liability action' means any action brought *against a manufacturer or seller . . .*") (emphasis added). And it assigns product-related services such as "repairs" to "sellers," a category separate and distinct from "service providers." A.R.S. § 12-689(D)(5). By embracing "all" services and expressly distinguishing services from the "manufacture" or "sale" of a product, the statute plainly protects service providers beyond product-liability claims.

Adjoining provisions confirm this conclusion. Where the legislature meant to limit a rule to product-liability cases, it did so explicitly. *See* A.R.S. §§ 12-683, 12-684, 12-685 (stating rules applicable *"[i]n any product liability action"*) (emphases added). Section 12-689 contains no such limiting language. The "legislature's use of restrictive language in one section of the statute

1    but not in the other section indicates that it intended the restriction to apply only where it was

2    designated." *See Garcia v. Butler in & for Cnty. of Pima*, 487 P.3d 256, 260 (Ariz. 2021).[9]

3          Plaintiff's product-only reading would nullify the statute's protections for "service

4    providers." Arizona product liability imposes duties only on "product manufacturers and sellers,"

5    *Antone v. Greater Ariz. Auto Auction*, 155 P.3d 1074, 1076 (Ariz. Ct. App. 2007), but the statute

6    defines "service providers" as "*distinguished* from [the] manufacture or sale of a product." A.R.S.

7    § 12-689(D)(6) (emphasis added). The legislature would not have minted an express protection

8    for "service providers" only to confine that protection to claims that could not be asserted against

9    them in the first place. *See Mejak v. Granville*, 136 P.3d 874, 876 (Ariz. 2006) (en banc) (statutes

10   must be interpreted "so that no provision is rendered meaningless, insignificant, or void").[10]

11         Plaintiff argues that "[f]or claims that do not involve a 'product,'" it would "make no

12   sense" for A.R.S. § 12-689(A)(2) to condition a service provider's protection on whether the

13   "service complied at the time the product left the control of the manufacturer or seller." Opp. 22-

14   23. But a literal reading of that condition produces absurd results even for product claims,

15   conditioning immunity on a service provider's compliance months or years *before* it delivered the

16   service, merely because that is when "the product left the control of the manufacturer or seller."

17   *Id*. While §12-689(A)(2) extends protections to a "product, activity or service," it makes perfect

18   sense that its timing condition applies only to products, since "services" and "activities" are finite

---

19

20   [9] Similarly, § 12-689(C)(3) cautions that "[t]his section shall not be construed to . . . [a]ffect the liability of a service provider based on rates filed with and reviewed by a government agency."

21   Arizona requires rate-filing only for services like insurance companies, utilities, and ground ambulance services—not product companies. *See, e.g.*, A.R.S. § 20-385(A) (insurance); A.R.S.

22   § 40-365 (utilities); A.R.S. § 36-2239 (ambulances). And, in addition to "services," the statute bars punitive damages for an "activity" that complies with relevant laws, § 12-689(D)(2), which it

23   defines to include "an action, pattern of operation or practice." § 12-689(D)(1); *see* § 12-689(A). Such sweeping protection would be nonsensical in a statute focused only on the limited conduct

24   subject to product liability.

25   [10] Plaintiff's argument that "there would be no reason to reference the 'predominant purpose' test" if the statute extended beyond product liability (Opp. 23) thus gets things backwards: If the

26   legislature meant to limit the statute to product liability, it would not have defined covered "services" *using a test that precludes product liability*. Nor is it conceivable that the legislature

27   would drastically limit the statute by obliquely referencing a "predominant purpose" test that Arizona courts do not apply. *See, e.g.*, *Antone*, 155 P.3d at 1076 (applying "stream of commerce"

28   test for product liability).

1   events that cannot be altered after delivery to defeat regulatory compliance. *Cf.* Restatement

2   (Second) of Torts § 402A cmt. g ("The seller is not liable when he delivers the product in a safe

3   condition, and subsequent mishandling . . . make[s] it harmful"). Any textual anomaly should be

4   resolved by recognizing that the compliance of a service or activity can be rationally measured

5   only at the time it is performed—not by a "hypertechnical construction[]" that produces

6   "irrational result[s]" and "frustrate[s] the legislature's intent" to protect service providers that

7   comply with material obligations. *State v. Estrada*, 34 P.3d 356, 360-61 (Ariz. 2001) (en banc)

8   (quotations omitted). Uber complied with all regulations material to Plaintiff's claims at *all*

9   relevant times. *See infra* at 17-18. That record satisfies any sensible reading of § 12-689.

10      Plaintiff gets no further observing that the statute falls in an Article of the Arizona code

11   captioned "Product Liability." Opp. 23. "[H]eadings to sections . . . do not constitute part of the

12   law," A.R.S. § 1-212, and, as earlier noted, where that Article articulates a rule specific to "a

13   product liability action," it says so expressly, A.R.S. § 12-683; *see supra* at 13. Nor does a 1990

14   decision stating that the Article's purpose was to "control[] or regulat[e] product liability law"

15   shed light on the legislature's intent 22 years later when it enacted Section 12-689. Opp. 23

16   (quoting *Torres v. Goodyear Tire & Rubber Co.*, 786 P.2d 939, 947 (Ariz. 1990)). And an earlier

17   statute stating that the "common law of products liability is modified only to the extent

18   specifically stated in" the Article, A.R.S. § 12-682, says nothing about whether the Article's

19   provisions apply beyond product liability. Opp. 24.

20          **2.    Section 12-689 Reaches Product-Liability Cases Involving Intangible
               Products.**

22      Plaintiff errs further in proposing an additional limitation on the statute for intangible

23   products. Uber respectfully disagrees with the Court's ruling that "the Uber app is a product" for

24   purposes of product-liability law. *See* PTO 17 at 41-46. But so long as that ruling remains the law

25   of the case, Section 12-689 governs even under Plaintiff's "product-liability-only" reading.

26      After maintaining throughout this litigation that product-liability law covers the Uber app,

27   Plaintiff now contends that the app is *not* a product for purposes of § 12-689(D)(4), which defines

28   a "product" as any "object possessing intrinsic value." Opp. 22, 24. Plaintiff cannot have it both

1   ways. The statute's "product" definition adopts verbatim the Model Uniform Product Liability

2   Act (MUPLA), which Arizona courts, like others, draw on to define common-law product

3   liability. *See* MUPLA § 102(C), 44 Fed. Reg. 62,714, 62,717 (1979); *Menendez v. Paddock Pool*

4   *Constr. Co.*, 836 P.2d 968, 976 (Ariz. Ct. App. 1991) (relying on MUPLA to define "product"). If

5   the Uber app is sufficiently "analogous to [a] tangible appliance" to fall under product-liability

6   law, it is sufficiently analogous to fall under the textbook definition the legislature employed in §

7   12-689. PTO 17 at 42. There is only so far Plaintiff can bend the statute without breaking

8   common sense: if the legislature's intent to regulate product-liability law were powerful enough

9   to graft an unwritten product-liability limitation onto § 12-689, *see supra* at 13-15, it would surely

10  foreclose reading the statute's hornbook definition to deny protection to providers of previously

11  unrecognized products.

12      Uber complied with applicable regulations at all relevant times—including when the

13  purported product left its control. Accordingly, Section 12-689 would preclude punitive damages

14  even under Plaintiff's unsupported product-only reading.

15              **3.    Section 12-689(A)(2) Required Uber Only to Comply With All
                        Relevant and Material Laws.**

16

17      In arguing that Section 12-689 applies only to actions "approved" by the government,

18  Plaintiff relies on cases addressing Section 12-689(A)(1), which bars punitive damages where a

19  product complied with "terms of an approval . . . or similar determination of a government

20  agency." *See* Opp. 25-26 (citing *Coulbourn v. Crane Co.*, 728 F. App'x 679 (9th Cir. 2018) &

21  *Hess v. Bumbo Int'l Tr.*, 2014 WL 12527216 (D. Ariz. Sept. 11, 2014)). But Uber's motion rests

22  on Section 12-689(A)(2), which makes no mention of "approval," requiring only that Uber have

23  "complied" with laws "relevant and material to the event or risk allegedly causing the harm."

24  Opp. 25. By its plain terms, the provision requires compliance—not approval. [11]

25

26

27

28  [11] Nevertheless, as noted, the Arizona Department of Transportation's issuance and continued renewal of Uber's TNC permit anyway constitutes "approval" of Uber's services, confirming Uber "meets the requirements" of the TNC statute. A.R.S. § 28-9552(B); *see* Mot. 23 & n.21.

Plaintiff argues that Arizona's TNC statutes are not "material and relevant" because she asserts obligations exceeding Uber's statutory duties, such as a duty to act on "red flags." Opp. 27. But § 12-689 asks whether Uber complied with laws "relevant and material to the ***event or risk*** allegedly causing the harm," not laws regulating the ***specific omission*** the plaintiff alleges. A.R.S. § 12-689(A)(2) (emphasis added). The "event or risk" at issue in this case is sexual assault by a driver. *Id.* And Arizona's TNC statute imposes obligations "relevant and material" to that risk, requiring a background check and sex-offender registry screening while prohibiting drivers convicted of a serious offense or who are registered sex offenders. A.R.S. § 28-9555. Plaintiff may believe these statutes are inadequate, but § 12-689(A)(2) requires only that they be relevant and material to the risk of sexual assault. They indisputably are.

Plaintiff argues that it would be "irrational" to immunize Uber from punitive damages if, for example, it permitted "known assailants" without a conviction to drive on its platform. Opp. 29. To be clear, Uber does not permit known assailants to offer their services through its app. But Arizona, for compelling policy reasons, sets the bar at conviction. And the animating premise of § 12-689(A)(2) is that Plaintiff cannot obtain punitive damages by second guessing Arizona law's adequacy. Far from "irrational," that outcome furthers Arizona's "policy decision" that punitive damages are an "excessive penalty" when regulated actors comply with government safety standards. *McBroom v. Ethicon, Inc.*, 2022 WL 604889, at *5 (D. Ariz. Mar. 1, 2022) (collecting cases).

### 4. No Genuine Fact Dispute Precludes Summary Judgment under Section 12-689.

Plaintiff disputes neither that Uber complied with its background check and sex-offender screening obligations nor that Turay lacked any statutorily disqualifying conviction. She nevertheless seeks to generate a fact dispute by arguing a jury could find Turay lacked a valid driver's license when he completed an initial screening in 2016, and "Uber let him drive anyway, in violation of Arizona law." Opp. 30. This is false. *See* Declaration of Hannah Nilles ISO Defs.' Mot. for Partial Summ. J. (Dkt. No. 4356-2) ¶¶ 30-31. Regardless, Plaintiff concedes that Turay at a minimum acquired a valid Arizona license in 2017—six years before her alleged assault.

Opp. 30. No less important, license verification targets safe driving, not criminal propensity, and relies on a Motor Vehicle Record check—a procedure wholly distinct from Uber's comprehensive criminal background checks. *See* Nilles Decl. ¶¶ 9-11, 30. Plaintiff does not explain how any alleged issue with Turay's license in 2016 could be "relevant and material" to the risk he would commit a sexual assault in 2023. Under § 12-689, her failure to identify any genuine fact dispute on Uber's compliance with laws relevant and material to the risk she alleges warrants summary judgment on punitive damages.

## III.    CONCLUSION

For the foregoing reasons, Uber respectfully requests that the Court grant summary judgment in its favor on the relevant claims and theories asserted by Jaylynn Dean.

Dated:  December 23, 2025                **O'MELVENY AND MYERS LLP**

By:  /s/  Jonathan Schneller
SABRINA H. STRONG
JONATHAN P. SCHNELLER
**KIRKLAND & ELLIS LLP**
LAURA VARTAIN HORN
ALLISON M. BROWN
JESSICA DAVIDSON

**SHOOK, HARDY & BACON LLP**
PATRICK L. OOT, JR.
ALYCIA A. DEGEN
MICHAEL B. SHORTNACY
CHRISTOPHER V. COTTON

*Counsel for Defendants*