Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

Kim Bueno (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
401 W. 4th Street, Austin, TX 78701
Telephone: (512) 355-4390
kim.bueno@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>*Jaylynn Dean v. Uber Techs., Inc.*, No. 23-cv-06708 | Case No. 3:23-MD-03084-CRB<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S CORRECTED REPLY IN SUPPORT OF ITS MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Judge:     Hon. Charles R. Breyer<br>Courtroom:  6 – 17th Floor |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

I.    DR. DRUMWRIGHT'S OPINIONS SHOULD BE EXCLUDED....................................2

      A.    Dr. Drumwright's Marketing Opinions Are Inadmissible......................................2

      B.    Dr. Drumwright's Ethics Opinions Are Inadmissible..............................................4

      C.    Dr. Drumwright's Failure-To-Warn Opinions Should Be Excluded.......................8

      D.    Dr. Drumwright's Opinions Regarding Uber's Knowledge Should Be
            Excluded. ................................................................................................................9

II.   DR. VALLIERE'S OPINIONS SHOULD BE EXCLUDED IN PART...........................10

      A.    Several Of Dr. Valliere's Proposed Opinions Go Far Beyond Her
            Expertise. ..............................................................................................................10

      B.    Dr. Valliere Lacks A Reliable Basis For Her Opinions About Uber's
            Conduct, Marketing, Ethics, And Knowledge. .......................................................13

            1.    Dr. Valliere's Marketing Opinions Are Inadmissible.................................13

            2.    Dr. Valliere's "Enhanced Risk" Opinions Are Rank Speculation.
                  ....................................................................................................................14

            3.    Dr. Valliere Lacks A Reliable Basis For Her Failure-To-Warn
                  Opinions.....................................................................................................15

            4.    Dr. Valliere's Opinions On Corporate Values Should Be
                  Excluded. ...................................................................................................15

            5.    Dr. Valliere's Opinions Regarding Uber's Knowledge Should
                  Be Excluded. ..............................................................................................16

            6.    Dr. Valliere Should Not Be Allowed To Simply Summarize
                  Company Documents...................................................................................17

III.  MR. FELDIS'S OPINIONS SHOULD BE EXCLUDED.................................................18

      A.    Mr. Feldis Is Not Qualified To Testify In This Case................................................18

      B.    Mr. Feldis's Opinions Are Not Based On A Reliable Methodology.....................19

IV.   DR. CAMERON'S OPINIONS SHOULD BE EXCLUDED...........................................21

V.    MS. KELLER'S OPINIONS SHOULD BE EXCLUDED. .............................................25

VI.   DR. CHANDLER'S OPINIONS SHOULD BE EXCLUDED. .......................................26

i

A. Dr. Chandler's Marketing Opinions Are Unreliable...............................................26

B. Dr. Chandler's Safety Report "Estimates" Are Fundamentally Flawed..............28

C. Dr. Chandler's Testimony Regarding Uber's Communications With Plaintiff Is Unreliable...................................................................................29

D. Plaintiff's Opposition Highlights The Unreliability Of Dr. Chandler's Opinions...................................................................................29

VII. MR. TREMBLAY'S OPINIONS SHOULD BE EXCLUDED. ......................................30

A. Mr. Tremblay Is Not Qualified to Offer Corporate Conduct Opinions. ................30

B. Plaintiff Has Not Established That Mr. Tremblay's Law Enforcement-Derived Methodology Can Be Reliably Applied To Uber's Corporate Conduct. ........................................................................................32

C. Mr. Tremblay Offers Impermissible Opinions Concerning Uber's Knowledge And Improperly Summarizes Company Documents.........................33

D. Mr. Tremblay's Opinions on Ultimate Legal Issues Should Be Excluded. .....................................................................................33

VIII. THE COURT SHOULD EXCLUDE MR. WEINER'S OPINIONS. .............................34

A. Mr. Weiner Is Not Qualified. .................................................................35

B. Mr. Weiner's Method Is Not Reliable. ......................................................36

C. Mr. Weiner's Opinions Should Be Excluded As Impermissible Testimony. ...................................................................................39

IX. MS. RANDO'S OPINIONS SHOULD BE EXCLUDED. ..........................................39

A. Ms. Rando Lacks Relevant Experience To Opine On The Usability Of Sexual Assault Reporting Technology In The Rideshare Industry.......................39

B. Ms. Rando's Opinion Is Not Relevant To Any Issue In This Litigation. .............40

C. Ms. Rando Lacks An Appropriate Methodology................................................41

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Allison v. McGahn Med. Corp.*,
5
    184 F.3d 1300 (11th Cir. 1999) ...................................................................22

6

*Alves v. Riverside Cnty.*,
    No. EDCV192083JGBSHKX, 2023 WL 2983583 (C.D. Cal. Mar. 13, 2023) .....................31

7

*Aya Healthcare Servs. v. AMN Healthcare, Inc.*,
8
    613 F. Supp. 3d 1308 (S.D. Cal. 2020).................................................................17

9

*In re Bard IVC Filters Prods. Liab. Litig.*,
    No. MDL 15-02641-PHX DGC, 2018 WL 11446831 (D. Ariz. Jan. 22, 2018) ...................17
10

11

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
    No. 21-cv-08787-TSH, 2024 WL5483606 (N.D. Cal. Oct. 22, 2024) ...................................40

12

*Bulone v. Monsanto Co.*,
13
    No. 24-4241, 2025 U.S. App. LEXIS 24840 (9th Cir. Sept. 25, 2025)................................1, 5

14

*Burrows v. 3M Co.*,
    No. C19-1649-RSL, 2022 WL 3346419 (W.D. Wash. Aug. 12, 2022) ...................................26
15

16

*Carlos Rivera v. Ford Motor Co.*,
    No. CV 18-07798 DSF, 2020 WL 4001914 (C.D. Cal. Mar. 12, 2020)...................................19

17

*Cole v. Keystone RV Co.*,
18
    No. C18-5182RBL, 2020 WL 3969993 (W.D. Wash. July 14, 2020)...................................41

19

*In re Coll. Athlete NIL Litig.*,
    No. 20-CV-03919 CW, 2023 WL 8372788 (N.D. Cal. Nov. 3, 2023)...................................38
20

21

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014)...................................................................37

22

*Cover v. Windsor Surry Co.*,
23
    No. 14-cv-05262-WHO, 2017 WL 9837932 (N.D. Cal. July 24, 2017) ...............................10

24

*Davis v. Lockheed Martin Corp.*,
    705 F. Supp. 3d 1345 (M.D. Fla. 2023)...................................................................22
25

26

*In re DePuy Orthopaedics, Inc.*,
    No. 3:11-MD-2244-K, 2016 WL 6271474 (N.D. Tex. Jan. 5, 2016) ...................................3, 5

27

28

iii

*Elosu v. Middlefork Ranch, Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ..............................................................................22

*Engilis v. Monsanto Co.*,
    151 F.4th 1040 (9th Cir. 2025) ..................................................................... *passim*

*Federal Trade Commission v. Qualcomm Inc.*,
    No. 17-CV-00220-LHK, 2018 WL 6460573 (N.D. Cal. Dec. 10, 2018) ..........33, 38

*Fujifilm Corp. v. Motorola Mobility LLC*,
    No. 12-CV-03587-WHO, 2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) ...............41

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................................................38

*In re Harley-Davidson, Inc. Sec. Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009)...................................................................25

*Highland Cap. Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)....................................................................17

*Homyk v. ChemoCentryx, Inc.*,
    No. 21-CV-03343-JST, 2025 WL 1547625 (N.D. Cal. May 30, 2025) ..............6, 39

*Hunter v. Elanco Animal Health Inc.*,
    No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) ......25

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
    524 F. Supp. 3d 1007 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595
    (9th Cir. Mar. 28, 2022) .......................................................................................34

*Johns v. Bayer Corp.*,
    No. 09CV1935 AJB (DHB), 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) ......4, 13

*Johnson v. Costco Wholesale Corp.*,
    No. CV-17-02710-PHX-SMB, 2021 WL 461937 (D. Ariz. Feb. 9, 2021) ............34

*Johnson v. Ridge Tool Mfg. Co.*,
    No. 21 C 1939, 2025 WL 2430567 (N.D. Ill. Aug. 22, 2025)................................40

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    No. 19-md-02913-WHO, 2022 WL 1814440 (N.D. Cal. June 2, 2022) ..................3

*Kanuszewski v. Shah*,
    583 F. Supp. 3d 1018 (E.D. Mich. 2022)...............................................................22

*King v. DePuy Orthopaedics Inc.*,
    No. CV-23-00196-PHX-SMB, 2023 WL 5624710 (D. Ariz. Aug. 31, 2023)....................9, 38

iv

*Lucido v. Nestle Purina Petcare Co.*,
  217 F. Supp. 3d 1098 (N.D. Cal. 2016) ...................................................................12

*In re Lyft Rideshare Cases*,
  No. CJC-20-005061 (Sept. 30, 2025) .................................................................12, 13

*Martinez v. Coloplast Corp.*,
  No. 2:18-CV-220, 2022 WL 425206 (N.D. Ind. Feb. 11, 2022) ...........................36

*McCoy v. DePuy Orthopaedics, Inc.*,
  No. 22-CV-2075 JLS (SBC), 2024 WL 1705952 (S.D. Cal. Apr. 19, 2024) ...........10, 16

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ...............................................................................33

*In re MyFord Touch Consumer Litig.*,
  No. 3:13-cv-03072-EMC (ECF 356) ......................................................................41

*In re Onglyza*,
  93 F.4th 339 (6th Cir. 2024) ..................................................................................19

*Patterson v. Six Flags Theme Parks Inc.*,
  No. 2:21-CV-02398-KJM-AC, 2024 WL 2112376 (E.D. Cal. May 9, 2024) ..........9

*Planned Parenthood Se., Inc. v. Strange*,
  33 F. Supp. 3d 1381 (M.D. Ala. 2014) ..................................................................22

*Plunkett v. Best Buy, Inc.*,
  745 F. App'x 725 (9th Cir. 2018) ...........................................................................42

*In re Prempro Prods. Liab. Litig.*,
  554 F. Supp. 2d 871 (E.D. Ark. 2008), *aff'd in part, rev'd in part*, 586 F.3d 547
  (8th Cir. 2009) ..........................................................................................................7

*Pritchett v. I-Flow Corp.*,
  No. 09-CV-02433-WJM-KLM, 2012 WL 1059948 (D. Colo. Mar. 28, 2012) ........16

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................................27

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y. 2005) ...............................................................19, 36

*In re Roundup Prods. Liab. Litig.*,
  358 F. Supp. 3d 956 (N.D. Cal. 2019) ...................................................................33

*Sanchez v. Bos. Sci. Corp.*,
  No. 2:12-cv-05762, 2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014) ...............26, 28

v

*Simon v. Safeway, Inc.*,
    173 P.3d 1031 (Ariz. Ct. App. 2007) ........................................................................24

*Siqueiros v. Gen. Motors LLC*,
    No. 16-cv-07244-EMC, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) .............................4, 10, 13

*Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*,
    927 F. Supp. 2d 1069 (D. Or. 2013) ........................................................................17

*Stephens v. Union Pac. R.R. Co.*,
    935 F.3d 852 (9th Cir. 2019) ..................................................................................29

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (7th Cir. 2010) ..................................................................................36

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ................................................................7, 16

*Trivitis, Inc. v. Ocean Spray Cranberries, Inc.*,
    No. 10CV0316 JM MDD, 2012 WL 1944827 (S.D. Cal. May 29, 2012) .........................9, 12

*Unknown Party v. Ariz. Bd. of Regents*,
    No. CV-18-01623-PHX-DWL, 2022 WL 4481519 (D. Ariz. Sept. 27, 2022) .......................31

*Valentine v. Pioneer Chlor Alkali Co.*,
    921 F. Supp. 666 (D. Nev. 1996) ............................................................................42

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
    No. 1:20-cv-00946, 2025 U.S. Dist. LEXIS 221602 (D.N.J. Nov. 10, 2025) ................ *passim*

*Walker v. AIU Ins. Co.*,
    No. CV-23-01641-PHX-JAT, 2025 WL 2495066 (D. Ariz. Aug. 29, 2025) .........................37

*In re Welding Fume Prods. Liab. Litig.*,
    No. 1:03-CV-17000, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) ...................................10

*Willard v. City of Everett*,
    637 F. App'x 441 (9th Cir. 2016) ..........................................................................41

**Statutes**

A.R.S. § 23-1603 ......................................................................................................23, 24

**Rules**

Fed. R. Evid. 403 .......................................................................................................7, 16

Fed. R. Evid. 702 ................................................................................................... *passim*

Fed. R. Evid. 702, 2000 Advisory Committee Notes .........................................................32, 38

vi

Fed. R. Evid. 702(b)................................................................................................................15

Fed. R. Evid. 702(d)...............................................................................................................23

**Other Authorities**

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff's opposition brief mischaracterizes Uber's arguments as "nitpicking" that is better suited for cross-examination. Opp'n at 1-2. In truth, however, Uber's motions challenge threshold issues of admissibility, including Plaintiff's experts' qualifications; their failure to ground their highly speculative opinions in any discernible (much less a reliable) methodology; and their improper attempt to usurp the role of jurors. These are threshold issues that require exclusion of the challenged opinions (as Judge Schulman largely recognized in his *Sargon* ruling).

To the extent Plaintiff addresses the substance of Uber's arguments, her responses fail.

***First***, Plaintiff insists that all of her experts satisfy what she repeatedly claims is a "minimal" standard of qualifications. But the burden is on Plaintiff to demonstrate, by a preponderance of the evidence, that her experts have the requisite knowledge or experience to offer their proffered opinions. And Plaintiff's position—essentially, that ***any*** knowledge or experience (no matter how generalized and divorced from the particulars of her experts' opinions) suffices—misunderstands the relevant legal standard.

***Second***, Plaintiff repeatedly dismisses Uber's reliability challenges as matters of weight that can be sorted out by jurors during cross-examination at trial. But that is not correct. Uber's challenges concern fundamental methodological defects, such as Dr. Drumwright's and Dr. Valliere's speculation about the effects of Uber's marketing; Dr. Chandler's unfounded statistical extrapolation from a single, inapposite article; and Mr. Feldis's haphazard research in opining on the feasibility of dashcams. These challenges raise "critical questions of the sufficiency" of the expert's basis for his or her opinion and must resolved by the Court, which "'cannot abdicate its role as gatekeeper,' nor 'delegate[] that role to the jury.'" *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049-50 (9th Cir. 2025) (noting that "[b]efore the [2023] amendment, 'many courts' had erroneously held 'that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility'") (citing Fed. R. Evid. 702 advisory committee's note to 2023 amendment); *see also Bulone v. Monsanto Co.*, No. 24-4241, 2025 U.S. App. LEXIS 24840, at *4-5

1

(9th Cir. Sept. 25, 2025) (rejecting plaintiff's argument that the "district court improperly assumed a factfinding role in the *Daubert* proceeding" by finding expert's reliance on inapposite studies to be unreliable, which "centered . . . on the *methods* [the expert] employed and her *application* of those methods, just as Federal Rule of Evidence 702 contemplates").

***Third***, Plaintiff does not seriously attempt to refute Uber's various other challenges, including, for example, that many of Plaintiff's experts inappropriately regurgitate internal company documents that are well within the comprehension of any lay juror, or seek to tell jurors what Uber knew or intended based on those very documents. Instead, the gist of Plaintiff's response is that the Court should just deal with these challenges at trial. But there is no reason to defer resolving these arguments, particularly since they apply to multiple experts, and their resolution will help narrow the issues for trial and ultimately simplify the parties' and the Court's work going forward.

In sum, Plaintiff's opposition brief essentially asks the Court to abdicate its role as gatekeeper and permit her experts to testify based solely on their own say-so. Such a loose approach to Rule 702 was never the law—which is precisely what the recent amendments to Rule 702 were designed to clarify. *See In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 1:20-cv-00946 (RMB/SAK), 2025 U.S. Dist. LEXIS 221602, at *2-3 (D.N.J. Nov. 10, 2025) ("This Court cannot do that – essentially taking the expert's word for it – without abandoning its gatekeeping responsibility.") (citing Fed. R. Evid. 702, Advisory Committee's note to 2000 amendments and Fed. R. Evid. 702, Advisory Committee's note to 2023 amendments").

## I.     DR. DRUMWRIGHT'S OPINIONS SHOULD BE EXCLUDED.

In recent months, two California courts have excluded Dr. Drumwright for many of the same reasons why her opinions should be excluded here. Plaintiff's attempt to overcome the logic underlying those rulings fails.

### A.     Dr. Drumwright's Marketing Opinions Are Inadmissible.

As set forth in Uber's opening brief, Dr. Drumwright's opinions about the supposed purpose and effect of Uber's marketing practices should be excluded because they are irrelevant and based entirely on speculation. Mot. at 3. Plaintiff's opposition fails to demonstrate otherwise.

1   **First**, as Judge Schulman explained in excluding substantively similar marketing opinions, Dr.

2   Drumwright should not be permitted to "testify that any given Plaintiff relied on a specific

3   advertisement or marketing practice, or speculate that she reasonably could have done so, in choosing

4   to utilize Uber's platform." JCCP Order at 39 (Dkt. 4470-25). Plaintiff contends that the JCCP court's

5   decision was "wrong" and that Dr. Drumwright's far-flung marketing opinions are "relevant to all

6   cases, including" individual plaintiffs like Ms. Dean. Opp'n at 5, 7. Plaintiff then lists broad ways in

7   which she believes "Dr. Drumwright's analysis of Uber's marketing helps the jury," including

8   determining the general standard of care and "show[ing] the jury how the company was negligent."

9   *Id.* at 5-6. But, as the JCCP Court already acknowledged, ""this is not a broad-based class or other

10  challenge to Uber's overall marketing and advertising practices." JCCP Order at 39.[1] Rather, this is a

11  case about one individual plaintiff—Ms. Dean—and whether Uber is liable **with respect to Ms. Dean**.

12  And because Plaintiff has not identified any evidence tying Dr. Drumwright's marketing opinions to

13  Ms. Dean, Opp'n at 9, her marketing opinions are irrelevant.

14  **Second**, Dr. Drumwright's marketing opinions about the supposed effect of Uber's marketing

15  practices on the general public are separately inadmissible because they are not based on any objective

16  evidence (such as a consumer perception survey or even interviews of riders or drivers who use the

17  Uber platform). Mot. at 4-5. In response, Plaintiff argues that Dr. Drumwright's reliance on her own

18  general marketing experience, "the marketing itself" and "also internal documents" is sufficient.

19  Opp'n at 8. In so arguing, Plaintiff relies on outdated (i.e., pre-Rule 702 amendment) cases holding

20  that experts' reliance on "past experiences" for their "opinions regarding the purpose and impact of

21  [the defendant's] marketing efforts" goes "to the weight of these experts' opinions and not their

22  exclusion." *In re Juul Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 19-md-02913-WHO,

23  2022 WL 1814440, at *4 (N.D. Cal. June 2, 2022) (cited in Opp'n at 8); *In re DePuy Orthopaedics,*

24  *Inc.*, No. 3:11-MD-2244-K, 2016 WL 6271474, at *5 (N.D. Tex. Jan. 5, 2016) (cited in Opp'n at 8)

[1] Plaintiff also attempts to distinguish the JCCP ruling on the ground that "several of the Wave 1 bellwethers involve claims not litigated in the JCCP." Opp'n at 7. But Plaintiff fails to explain how Dr. Drumwright's general marketing opinions not tethered to any individual plaintiff would be relevant for those claims, either.

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

("[a]ny contention . . . as to the accuracy of Dr. Drumwright's [marketing] conclusions is more appropriately an attack made on the weight of the testimony at trial rather than its admissibility"). But as the Ninth Circuit has recently made clear, pursuant to amended Rule 702, it is "erroneous" to hold that "the sufficiency of an expert's basis" is a "question[] of weight and not admissibility"; rather, when "[p]roperly applied, Rule 702 requires that challenges to an expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion." *Engilis*, 151 F.4th at 1049. Here, Dr. Drumwright's wholesale failure to base her opinions on ***any*** empirical evidence about the supposed purpose and effect of Uber's marketing means that those opinions are nothing more than the expert's own say-so, which clearly does not suffice under recently amended Rule 702.

Plaintiff's argument that Dr. Drumwright reviewed Uber's marketing materials and internal documents cannot salvage her opinion either because "the jury is in as good a position as the expert to draw conclusions from the evidence[.]" *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022). Consistent with this standard, as Uber explained in its opening brief, mere reliance on "third-party market research reports and [a defendant]'s own internal documents" is not a sufficiently reliable methodology to opine on "the impact of marketing on consumer behavior." *Johns v. Bayer Corp.*, No. 09CV1935 AJB (DHB), 2013 WL 1498965, at *27-28 (S.D. Cal. Apr. 10, 2013) (cited in Mot. at 5). While Plaintiff claims that *Johns* "said no such thing," Opp'n at 9, the court there clearly excluded an expert's marketing opinion that was "nothing more than a synopsis of Bayer's marketing . . . quoting extensively from both third-party market research reports and Bayer's own internal documents." *Id.* at *28. Dr. Drumwright's marketing opinions fail for the same reasons.

## B.    Dr. Drumwright's Ethics Opinions Are Inadmissible.

Dr. Drumwright's extensive commentary on Uber's ethics is also inadmissible for a variety of reasons. *See* Mot. at 5-9.

***First***, as the JCCP court previously held in excluding Dr. Drumwright's substantively identical ethics opinions, Dr. Drumwright's opinions are "based in large part on the 'professional norms and

4

standards' of numerous organizations," and "if Uber had a duty to warn [] of the risks of sexual assault on its platform, that duty would not stem from the standards of marketing and advertising associations." JCCP Order at 39-40. Earlier this month, another court agreed with the JCCP court ruling and excluded Dr. "Drumwright's opinion that Defendants['] 'actions were inconsistent with industry standards for corporate responsibility'" on the basis that "the industry standards cited by [Dr.] Drumwright do not 'apply to Defendants, who are not members of the organizations that sponsor them.'" *Social Media Cases*, JCCP5255, at 1-3 (Dec. 3, 2025) (Ex. 1). The *Social Media* court further noted that Dr. Drumwright's ethics opinions are not "relevant" because "the standards of corporate responsibility that [Dr.] Drumwright invokes do not set up a standard of care for the [Defendant] companies' interactions." *Id.* at 3; *see also id.* at 5 ("Any relevance of expert testimony regarding 'industry standards' is limited, given that a jury is capable of assessing the alleged failure to warn based on the underlying facts of this case."). These rulings apply with equal force here.

Plaintiff nonetheless argues that Dr. Drumwright's discussion of ethics standards that are inapplicable to Uber[2] is still relevant because these ethical standards "inform the jury's evaluation of the standard of care in marketing and public relations." Opp'n at 10. Plaintiff misses the point. Because the ethics standards do not apply to Uber or govern Uber's actions, such standards do not set the appropriate "standard of care in marketing" ***for Uber*** (to the extent such a thing even exists). Plaintiff's own cited case recognizes as much, holding that ethical standard opinions are only "helpful to a jury when ethical obligations ***are of consequence to the issues to be decided by the jury***, such as an attorney's ethical obligations in a breach of fiduciary duty claim or a physician's standard of care in claims of negligence." *In re DePuy Orthopaedics, Inc.*, 2016 WL 6271474, at *5 (holding that Dr. Drumwright's ethics testimony was relevant to a physician's "standard of care"). No such universal standard of care for marketing is applicable here. JCCP Order at 39-40.[3]

---

[2] Dr. Drumwright acknowledged at her deposition that the ethics codes and standards she cites in her report are not specific to Uber, *see, e.g.*, Drumwright Dep. 154:11-25 (Dkt. 4351-1, Ex. 2), and they do not govern Uber's actions, *e.g.*, *id.* 167:3-11; *id.* 167:23-25.

[3] Plaintiff also cites cases holding that references to inapplicable ethical standards are a matter for cross-examination, not exclusion. *See* Opp'n at 11. As set forth above, that approach is "erroneous" and amended Rule 702 now requires exclusion. *Engilis*, 151 F.4th at 1049; *see also Bulone*, 2025 U.S. App. LEXIS 24840, at *4-5 (affirming exclusion of expert causation evidence; an expert who relies

5

1    Plaintiff also claims that Uber's "argument has no application to Dr. Drumwright's extensive

2    analysis of Uber's own internal codes and standards, as even the JCCP recognized." Opp'n at 10. But

3    Plaintiff is distorting a portion of the JCCP court's ruling. What Judge Schulman said was that Dr.

4    Drumwright's opinion that Uber violated its own corporate ethics statements was "a more appropriate

5    subject for expert testimony," but **only** if Dr. Drumwright "refrain[ed] from offering improper opinions

6    regarding Uber's state of mind." JCCP Order at 41. As set forth below, Dr. Drumwright does not.

7    The JCCP court also recognized that "Dr. Drumwright's opinions regarding Uber's alleged use

8    of its "soft power to 'kill' and 'squash and fog' media stories that would negatively impact public

9    perceptions of Uber's safety are irrelevant[.]" *Id.* In response, and in direct conflict with the JCCP

10    court's ruling, Plaintiff asserts only that "[t]his conduct is relevant." Opp'n at 11. But Plaintiff does

11    not—and cannot—explain how any speculative allegations of Uber's use of "soft power" have

12    anything to do with Ms. Dean's case.

13    ***Second***, Dr. Drumwright's report regurgitates cherry-picked statements from Uber related to

14    so-called ethical obligations that are better presented through documents or fact witnesses. Mot. at 7

15    (collecting cases). In response, Plaintiff argues that Dr. Drumwright "does not do so," but rather

16    "applies those standards to form her opinions about the propriety of Uber's conduct." Opp'n at 12.

17    This claim ignores that Dr. Drumwright's report contains ***16 pages*** of pasted statements from Uber

18    documents and employees, including corporate values statements, passages from Uber's "codes of

19    conduct," employee handbooks and community guidelines, with absolutely zero expert analysis.

20    Drumwright Rep. at 45-61 (Dkt. 4351-1, Ex. 2). Plaintiff alternatively argues that any objections to

21    improper narrative testimony ""are better made at trial."" Opp'n at 12 (citation omitted). But even

22    Plaintiff's cited case on that point recognizes that "an expert may not 'merely read, selectively quote

23    from, or regurgitate the evidence,'" *Homyk v. ChemoCentryx, Inc.*, No. 21-CV-03343-JST, 2025 WL

24    1547625, at *6 (N.D. Cal. May 30, 2025) (cited in Opp'n at 12-13), and because Dr. Drumwright's

25    report previews that she will do just that, the Court should preclude her from doing so ***in advance of***

26

27    _____
     on studies that suffer from "flaws and limitations . . . undermine[s] the reliability" of the opinions and
     is not a matter of simply "doubt[ing] [the expert's] 'credibility[]'" (citation omitted).

28
DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

*trial*. *See In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337 (S.D. Fla. 2010) (excluding advocacy-oriented narrative testimony of expert prior to trial and expressly noting that another court concluded that it "should have struck" the testimony rather than addressing it at trial) (citing *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 879-87 (E.D. Ark. 2008) (noting that experience revealed that allowing narrative testimony is "subject to abuse"), *aff'd in part, rev'd in part*, 586 F.3d 547 (8th Cir. 2009)).

**Third**, Dr. Drumwright's ethics opinions are also speculative. Mot. at 7-8. Plaintiff urges the Court to find that Dr. Drumwright's ethics opinions are not speculative because certain other courts have admitted her ethics opinions in other cases. Opp'n at 13. But as set forth above, the most on-point case addressing these kinds of opinions is the decision entered in the JCCP barring them. JCCP Order at 39-40. In any event, Plaintiff's reliance on other cases cannot compensate for Dr. Drumwright's inability to substantiate any of her ethics opinions here. For example, in response to Uber's examples where Dr. Drumwright provided absolutely no support for her ethics opinions—e.g., she could not cite to any direct communications between Uber and media personnel reflecting Uber's supposed use of "dark" public relations, Mot. at 8—Plaintiff points to Dr. Drumwright's testimony that "those conversations would have happened orally and not in writing." Opp'n at 13-14. Even if true, that fact provides no basis for Dr. Drumwright to simply assume those "dark PR" communications ever happened, which is "little else than her own say-so[.]" *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *45 (offering "little else than her own say-so" is "[n]ot the product of a reliable methodology").

**Lastly**, Dr. Drumwright's opinions are unduly prejudicial, as the JCCP court has already held in excluding substantively similar ethics opinions. JCCP Order at 39-40. Plaintiff, once again, entirely ignores this ruling. Plaintiff claims that Dr. Drumwright's ethics opinions are not prejudicial because they entail her subjective comparisons of Uber's conduct to "internal and external standards of conduct, not mere morality." Opp'n at 14. But this is a distinction without a difference; Dr. Drumwright's subjective conclusion that Uber acted unethically is precisely the sort of morality accusation that Rule 403 precludes. *See* Mot. at 8-9 (citing cases); *Social Media Cases*, JCCP5255, at

5 (Ex. 1) (excluding Dr. Drumwright's "industry standard" ethics opinions as prejudicial; "The testimony would likely confuse the jury by leading jurors to believe that, for example, a Defendant's failure to comply with 'the University of Texas at Austin's 'Good Systems' initiative' would be equivalent to a failure to comply with duties imposed by California tort law.").

Plaintiff also suggests—without citation to any supportive authority—that because defense counsel mentioned Uber's support of nonprofit organizations and attempts to eradicate sexual assault at the first JCCP bellwether trial, Dr. Drumwright should be given carte blanche to opine on the ethics of Uber's interactions with nonprofit organizations at this trial. Opp'n at 14-15. But Uber has every right to present facts pertaining to its support of nonprofit organizations. This does not mean Dr. Drumwright can put an expert spin on those facts to ultimately tell the jury that Uber acted unethically based on nothing more than her own subjective opinion.

### C.     Dr. Drumwright's Failure-To-Warn Opinions Should Be Excluded.

As set forth in Uber's opening brief, Dr. Drumwright's failure-to-warn opinions are inadmissible legal opinions, and in any event, she is not qualified to offer them. Mot. at 9. Plaintiff's responses lack merit.

*First*, Plaintiff claims that Dr. Drumwright's opinion is proper because she "is not opining that Uber is liable on a failure-to-warn theory." Opp'n at 15. But the JCCP court disagreed, holding that Dr. Drumwright's "opinions that Uber had a duty to warn female passengers of the risk of sexual assault on its platform and that it breached that duty" "amount to [] inadmissible" legal opinion. JCCP Order at 40-41. Plaintiff does not address this holding.

*Second*, Plaintiff concedes that Dr. Drumwright is not a "warnings expert," but nonetheless claims that her opinions "on how Uber's marketing failed to warn" is "within her expertise." Opp'n at 15. They are not, as the *Social Media* JCCP court recognized in explicitly finding that Dr. "Drumwright is not an expert on warnings and how they should be given" and thus, "she is not qualified to address whether any disclosures that Defendants did make were sufficient." *Social Media Cases*, JCCP5255, at 4. As noted above, Plaintiff, as the proponent of Dr. Drumwright's testimony, must meet her "burden of proving" that Dr. Drumwright is qualified by a preponderance of the

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

evidence. *See, e.g.*, *Trivitis, Inc. v. Ocean Spray Cranberries, Inc.*, No. 10CV0316 JM MDD, 2012 WL 1944827, at *4 (S.D. Cal. May 29, 2012) (excluding expert where proponent "fail[ed] to meet its threshold showing that Mr. Larson is qualified as an expert"); *Engilis*, 151 F.4th at 1049 ("a proponent of expert testimony must always establish the admissibility requirements of Rule 702 by a preponderance of the evidence"). Plaintiff's mere incantation of Dr. Drumwright's credentials as a "*marketing*" expert does not suffice to show she has the requisite qualifications to opine on the completely distinct topic of *warnings*.

### D.    Dr. Drumwright's Opinions Regarding Uber's Knowledge Should Be Excluded.

As set forth in Uber's opening brief, Dr. Drumwright's opinions concerning Uber's supposed corporate knowledge, motives and intent are inadmissible because "issues related to 'state of mind are properly for the trier of fact.'" Mot. at 10 (quoting *Patterson v. Six Flags Theme Parks Inc.*, No. 2:21-CV-02398-KJM-AC, 2024 WL 2112376, at *3 (E.D. Cal. May 9, 2024)) (citing cases). Courts have repeatedly excluded Dr. Drumwright's opinions on this ground as well. JCCP Order at 41 (Judge Schulman holding that Dr. Drumwright must "refrain from offering improper opinions regarding Uber's state of mind (e.g., what it intended or was motivated by)"); *King v. DePuy Orthopaedics Inc.*, No. CV-23-00196-PHX-SMB, 2023 WL 5624710, at *6 (D. Ariz. Aug. 31, 2023) ("[T]he Court finds that Dr. Drumwright is not permitted to opine on [defendant's] state of mind by giving opinions on the company's supposed knowledge, intent, or motivations."); *Social Media Cases*, JCCP5255, at 4 (holding that Dr. Drumwright "may not review Defendants' documents and offer an opinion about what Defendants knew and/or intended").

Plaintiff fails to address any of these holdings.[4] Instead, Plaintiff claims that "experts may testify to what a defendant 'knew or should have known.'" Opp'n at 16. But the cases cited by Plaintiff undercut her argument. For example, Plaintiff cites a case that merely held that "what [the defendant] knew or should have known" regarding wood science was not an improper "*legal* conclusion" and did

---

[4] Although Plaintiff ignores the holding in *King* excluding Dr. Drumwright's state-of-mind opinions, 2023 WL 5624710, at *6, Plaintiff notes that the court allowed another expert to touch on "when Defendants had notice of the risks," but only *after* expressly noting that the expert was not opining on Defendants' "state of mind." *Id.* at *4.

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

1   not discuss the propriety of corporate knowledge opinions. *Cover v. Windsor Surry Co.*, No. 14-cv-

2   05262-WHO, 2017 WL 9837932, at *17 (N.D. Cal. July 24, 2017) (emphasis added) (cited in Opp'n

3   at 16);[5] *see also In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at

4   *17 (N.D. Ohio Aug. 8, 2005) (cited in Opp'n at 16) (not addressing propriety of corporate knowledge

5   opinions). Indeed, another case cited by Plaintiff expressly acknowledges that "experts generally

6   cannot opine on a defendant's subjective knowledge or intent." *McCoy v. DePuy Orthopaedics, Inc.*,

7   No. 22-CV-2075 JLS (SBC), 2024 WL 1705952, at *17 (S.D. Cal. Apr. 19, 2024) (cited in Opp'n at

8   16) (permitting expert to opine on "the information available to them" but "not on Defendants' state

9   of mind"). In short, none of these cases supports what Dr. Drumwright seeks to do here, which is to

10  opine on what Uber knew or reasonably should have known.

11          Plaintiff also claims that, in any event, "Dr. Drumwright does not offer free-standing

12  assessments of the company's knowledge" but rather "compares Uber's internal information to its

13  public statements." Opp'n at 16. Not so. Dr. Drumwright's report plainly shows that she is offering

14  opinions on what Uber supposedly knew. *See* Mot. at 10; *see also, e.g.*, Drumwright Rep. at 86 (Dr.

15  Drumwright opining about what "Uber executives have known" about background checks). Even if

16  Plaintiff's characterization were correct, "the jury is in as good a position as the expert to draw

17  conclusions from the evidence." *Siqueiros*, 2022 WL 74182, at *9. Thus, Dr. Drumwright's so-called

18  expert "spin" on documents purporting to show Uber's knowledge is unwarranted. *See Social Media

19  Cases*, JCCP5255, at 4-5 (excluding Dr. "Drumwright's recounting of what she believes the

20  underlying facts are" because such topics are "questions for the jury directly—not proper subjects for

21  expert testimony").

22  **II.    DR. VALLIERE'S OPINIONS SHOULD BE EXCLUDED IN PART.**

23          **A.     Several Of Dr. Valliere's Proposed Opinions Go Far Beyond Her Expertise.**

24          As set forth in Uber's opening brief, Dr. Valliere's opinions on marketing and/or branding,

25

26  ───────────────
    [5] In addition, the *Cover* court permitted the expert to opine on what the defendant "should have known"
27  due to the expert's "well-founded" knowledge on the topic and "specific . . . expertise in the field of wood science and wood manufacturing." *Id.* Dr. Drumwright indisputably does not have similar
28  "specific" experience in the rideshare industry that would allow her to opine on Uber's knowledge.

corporate values, failure to warn and Uber's safety features extend far beyond Dr. Valliere's self-described expertise in sexual assault. Mot. at 2-4. Plaintiff does not dispute that Dr. Valliere has no expertise on any of these topics, claiming instead that Dr. Valliere is a mere "sexual assault expert" with "opinions on sexual assault." Opp'n at 19. This grossly understates the breadth of Dr. Valliere's opinions.

**Marketing.** Plaintiff concedes that Dr. Valliere seeks to testify about "how Uber's marketing 'targeted . . . women.'" Opp'n at 20 (quoting Valliere Rep. at 2). Dr. Valliere herself cites to Uber's advertisements, opining that "Uber's advertising campaigns are aimed at attracting women to Uber in the most vulnerable situations[.]" Valliere Rep. at 35 (Dkt. 4470-23, Ex. 1). These are quintessential marketing opinions that Dr. Valliere is undisputably not qualified to offer. And while Plaintiff claims that Dr. Valliere can testify on the "impact of Uber's marketing," Opp'n at 20, the JCCP court plainly held that "Dr. Valliere is not qualified to testify regarding . . . the purported impact of its advertisements on the general population" because nothing in her report or C.V. "reflect[s] any relevant skill or experience in marketing[.]" JCCP Order at 35.[6]

**Corporate Values.** Plaintiff claims that Uber "does not identify any specific opinions or testimony to exclude" and that Dr. Valliere's opinions are "about preventing sexual assault, not 'corporate governance.'" Opp'n at 21. In the same breath, Plaintiff points to testimony in "Dr. Valliere's report [that] Uber cites" in which Dr. Valliere purports to opine on "'Uber's policies against sexual assault and sexual misconduct[.]'" *Id.* (quoting Valliere Rep. at 48); *see also* Valliere Rep. at 33 (opining on Uber's Community Guidelines). But Dr. Valliere is indisputably not qualified to opine on Uber's corporate values.

**Uber's Safety Features.** Plaintiff argues that Dr. Valliere "does not offer opinions on the design or effectiveness of safety features." Opp'n at 21. Plaintiff apparently ignores that Dr. Valliere

---

[6]    Plaintiff misconstrues the JCCP court's holding, claiming that the "court recognized that Dr. Valliere was qualified 'to testify on the potential psychological impact of such advertisements on female passengers.'" Opp'n at 20 (quoting JCCP Order at 36 n.24). But the JCCP court merely recognized that "*[i]f* Plaintiffs can present case-specific evidence regarding Uber's marketing through another witness that supports their characterization, they may elicit Dr. Valliere's opinions on the potential psychological impact[.]" JCCP Order at 36 n.24 (emphasis added). Just like the Plaintiffs in the JCCP, Ms. Dean has made no such showing here.

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

1   devotes ***pages*** of her report to discussing Uber's specific safety features in-depth, including

2   RideCheck, Share Your Ride, GPS, 911 Button, and audio recording. *See* Valliere Rep. at 25-30. As

3   another court recently held in excluding Dr. Valliere's opinions pertaining to "Lyft safety analysis and

4   Lyft's safety measures," Dr. Valliere does "not have the requisite expertise" to opine on these topics.

5   *See In re Lyft Rideshare Cases*, No. CJC-20-005061, at 8 (Sept. 30, 2025) (Dkt. 4339-1, Ex. 4).[7]

6        ***Failure to Warn.*** Plaintiff contends that "Dr. Valliere is qualified to testify on how warnings,

7   or lack thereof, affect potential victims and offenders," Opp'n at 22, but fails to identify any training,

8   education, or experience that Dr. Valliere has with respect to warnings. Dr. Valliere's professed

9   "specialty in sexual assault" does not provide her with the requisite "specialized knowledge" to opine

10  on warnings. *See Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1103 (N.D. Cal. 2016)

11  (holding veterinarian was not qualified "to provide opinions about what a reasonable consumer would

12  consider material when deciding whether to purchase dog food"). Thus, Plaintiff has not met her

13  "burden of proving" Dr. Valliere has the requisite qualifications. *See, e.g.*, *Trivitis, Inc.*, 2012 WL

14  1944827, at *3-4 (excluding expert where proponent "fail[ed] to meet its threshold showing that Mr.

15  Larson is qualified as an expert"); *Engilis*, 151 F.4th at 1050 ("a proponent of expert testimony must

16  always establish the admissibility requirements of Rule 702 by a preponderance of the evidence").

17  Additionally, the JCCP court did not hold (and indeed, never discussed), whether Dr. Valliere was

18  qualified to opine on warnings. Rather, the JCCP court only addressed whether Dr. Valliere's failure-

19  to-warn opinions amounted to a legal conclusion. JCCP Order at 37.

20        In short, Plaintiff's arguments with respect to Dr. Valliere's qualifications are disingenuous

21  because she simultaneously "disclaim[s] any intent on Dr. Valliere's part to offer opinions on

22  marketing, safety features, warnings" or corporate values, but then "immediately contradict[s]" herself

23  by arguing those opinions are admissible. JCCP Order at 36 n.24. Plaintiff has not—and cannot—

24  demonstrate that Dr. Valliere is qualified to opine on marketing, corporate values, Uber's safety

25

26  ───────────────
    [7] Plaintiff claims this order is "largely unreasoned and so unhelpful," Opp'n at 21 n.13, but does not—
27  and cannot—show that it was wrongly decided. Nor does Plaintiff cite any authority permitting an
    expert to opine on safety-related issues where he or she indisputably lacks any specialized knowledge
    or experience regarding such issues.
28

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

1    features and failure to warn. Accordingly, her opinions on these topics must be excluded.

2    **B.    Dr. Valliere Lacks A Reliable Basis For Her Opinions About Uber's Conduct, Marketing, Ethics, And Knowledge.**

3            1.    Dr. Valliere's Marketing Opinions Are Inadmissible.

4    Uber explained in its opening brief that because Dr. Valliere cannot point to any data, study or

5    other objective evidence supporting her opinions regarding the factors consumers consider when

6    deciding to utilize Uber rideshare services, her marketing opinions are inadmissible. Mot. at 4-5. The

7    JCCP court and the *Lyft* court recently held as much, precluding Dr. Valliere from offering marketing

8    opinions where she did not "conduct any survey of how Uber's advertisements affected the general

9    public or women customers in particular." JCCP Order at 35-36; *see also In re Lyft Rideshare Cases*,

10   No. CJC-20-005061, at 7 (Sept. 12, 2025) (Ex. 2).[8]

11   Plaintiff nonetheless claims that "Dr. Valliere was [not] required to conduct a survey, consumer

12   research, or consumer interviews" "to discuss Uber's marketing and its effects," because Dr. Valliere's

13   claimed expertise in sexual assault (not marketing) and her subjective review of (select) Uber

14   documents somehow permits her to opine on "Uber's marketing and its effects" on the general

15   population. Opp'n at 22-23. As set forth above, Plaintiff's reliance on outdated (i.e., pre-Rule 702

16   amendment) cases does not support this position because "Rule 702 requires that challenges to an

17   expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that

18   an expert has a sufficient basis to support an opinion." *Engilis*, 151 F.4th at 1049. Dr. Valliere's lack

19   of any empirical evidence (coupled with her undisputed lack of marketing qualifications) means that

20   her marketing opinions are nothing more than her own say-so, which clearly does not suffice under

21   recently amended Rule 702. And Plaintiff's reliance on Dr. Valliere's review of "Uber's own

22   documents" to cobble together a methodology cannot salvage her opinions because "the jury is in as

23   good a position as the expert to draw conclusions from the evidence[.]" *Siqueiros*, 2022 WL 74182,

24   at *9; *see also Johns*, 2013 WL 1498965, at *28 (excluding expert's marketing opinion that was

26   _____

[8] Plaintiff brushes aside these holdings in a mere footnote, claiming that the JCCP court "order believed a 'survey' was necessary" and the *Lyft* order was "largely unreasoned." Opp'n at 23 n.15. These efforts to diminish the two courts' well-reasoned decisions are meritless, particularly given Plaintiff's failure to cite any on-point cases reaching a different conclusion.

13

1    "nothing more than a synopsis of Bayer's marketing . . ., quoting extensively from both third-party

2    market research reports and Bayer's own internal documents").

3    2.    Dr. Valliere's "Enhanced Risk" Opinions Are Rank Speculation.

4    As set forth in Uber's opening brief, Dr. Valliere's broad opinions on the alleged "enhanced

5    risk of sexual assault and sexual misconduct of women using Uber" and the "unique features to the

6    Uber rideshare environment" that supposedly make it ripe for sexual assault should be excluded as

7    rank speculation. Mot. at 5 (quoting Valliere Rep. at 1, 11). Plaintiff's arguments to the contrary lack

8    merit.

9    *First*, Plaintiff claims that although Dr. Valliere's "enhanced risk" opinions are based solely

10    on her review of Uber's documents and deposition testimony, she "looked at all the evidence she

11    deemed necessary" to formulate her paid-for expert opinion. Opp'n at 23. But Plaintiff misses the

12    point. Dr. Valliere's methodology is based exclusively on documents hand-selected for her by

13    Plaintiffs' counsel in this litigation, thus seriously calling into question the reliability of her

14    methodology. *See* Mot. at 5-6. In any event, Dr. Valliere did not, in fact, look at all documents

15    "necessary" for her opinions. Dr. Valliere's deposition testimony is rife with examples that

16    demonstrate her lack of fundamental information material to her "enhanced risk" expert opinions,

17    including her wholesale lack of any "investigat[ion]" into studies regarding the safety or efficacy of

18    rideshare features. Mot. at 6 (quoting Valliere Dep. 167:16-25 (Dkt. 4470-25, Ex. L)). Plaintiff

19    attempts to excuse Dr. Valliere's lack of knowledge of safety features by claiming that Dr. Valliere

20    "does not opine on the[] *efficacy*" of the safety features, but rather opines "only on Uber's conduct in

21    promoting features it knows are not *effective*, or have not been measured for *effectiveness*." Opp'n at

22    24 (citing Valliere Rep. at 20-22) (emphasis added). But it is nonsensical to assert (as Plaintiff does)

23    that Dr. Valliere should be allowed to opine that Uber promoted ineffective safety features without the

24    baseline knowledge of whether those safety features were actually ineffective. It is also false that Dr.

25    Valliere does not opine on the efficacy of Uber's safety features; in fact, she devotes pages of her

26    report to Uber's specific safety features, including RideCheck, Share Your Ride, GPS, 911 Button,

27    and audio recording, *see* Valliere Rep. at 25-30, including her explicit and unsupported claim that

28

14

safety features "give an impression of safety without actually increasing safety," *id.* at 29—i.e., are ineffective.

**Second**, Plaintiff does not dispute that Dr. Valliere ignored evidence that belies her opinion that "the actual number of sexual assault[s] [in Ubers] . . . is significant," including that the rate of incidents is exceedingly small. Mot. at 7 (quoting Valliere Rep. at 16). Rather, Plaintiff claims that if this is true and Dr. Valliere is "simply wrong," "that . . . goes to Uber's defense on the merits and is irrelevant to the admissibility of Dr. Valliere's testimony." Opp'n at 24-25. Not so. Dr. Valliere's mere assumption that Uber is not safe is foundational to her "enhanced risk" opinions, and thus, under recently amended Rule 702, the onus was on Dr. Valliere to meaningfully address evidence in the record that undermines that core premise of her conclusions and explain why it does not invalidate them. *See In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *28 (excluding expert who "routinely ignored facts and data that were inconvenient to her ultimate conclusion, demonstrating the conclusion-driven nature of her testimony").

### 3.    Dr. Valliere Lacks A Reliable Basis For Her Failure-To-Warn Opinions.

Dr. Valliere's failure-to-warn opinions are also inadmissible because they are pure ipse dixit. Mot. at 7-8. Plaintiff claims that Dr. Valliere's failure-to-warn opinions are based on her "understanding of what information matters to potential victims" and her "review of Uber's own documents and testimony." Opp'n at 25. But Plaintiff cannot demonstrate that Dr. Valliere has a reliable or factual basis for any "understanding" of how potential victims perceive warnings because she did not so much as "speak to a single plaintiff or driver who uses the Uber platform on that subject." JCCP Order at 36. Such wholesale failure to substantiate her failure-to-warn opinions means that Plaintiff has "failed to establish that [Dr. Valliere's] testimony [is] 'based on sufficient facts or data.'" *Engilis*, 151 F. F.4th at 1053 (citing Fed. R. Evid. 702(b)); *see also In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *45 (offering "little else than her own say-so" is "not the product of a reliable methodology").

### 4.    Dr. Valliere's Opinions On Corporate Values Should Be Excluded.

As Uber explained in its opening brief, Dr. Valliere's proposed commentary on Uber's

15

1    "values" and the ethics of Uber's conduct is inadmissible because: (1) the opinions are not the proper

2    subject of expert testimony; (2) Dr. Valliere fails to apply any objective standard to her ethics opinions;

3    and (3) the opinions are not relevant. Mot. at 8-9. Plaintiff does not address—much less dispute—

4    these points. Rather, Plaintiff claims that Dr. Valliere is "not offer[ing] any such opinions" because

5    "the word 'ethic' appear[s] once in Dr. Valliere's report." Opp'n at 26. But Uber provided multiple

6    examples of Dr. Valliere's inappropriate corporate "values" and ethics opinions in its opening brief,

7    which Plaintiff fails to address. *See* Mot. at 8. And Plaintiff ignores that Dr. Valliere references Uber's

8    "values" multiple times in her report, including "question[ing] [Uber]'s values." Valliere Rep. at 6.

9    These opinions are inadmissible.

10        Plaintiff also claims that "Uber does not want Dr. Valliere to testify to certain background on

11    Uber's history[.]" Opp'n at 26. That is not the point. As Uber explained, such evidence of "Uber's

12    history" "is better presented through introduction of documents or non-expert testimony," *Pritchett v.

13    I-Flow Corp.*, No. 09-CV-02433-WJM-KLM, 2012 WL 1059948, at *7 (D. Colo. Mar. 28, 2012)

14    (citation omitted), rather than Dr. Valliere—a mere sexual assault expert who simply reviewed select

15    Uber documents and seeks to put her own "spin" on Uber's history. And while Plaintiff also claims

16    that this issue can be addressed through a Rule 403 objection "at trial," Opp'n at 26, Uber's argument

17    implicates Rule 702 and, thus, should be resolved at this stage of the proceedings. *See In re Trasylol*,

18    709 F. Supp. 2d at 1337 (objections to summaries of fact evidence by experts should be decided before

19    trial).

20            5.    Dr. Valliere's Opinions Regarding Uber's Knowledge Should Be Excluded.

21        Dr. Valliere's opinions concerning Uber's supposed corporate knowledge, motives, and intent

22    are also inadmissible. Mot. at 9. Plaintiff claims that "experts may testify to what a defendant 'knew

23    or should have known,'" Opp'n at 16, 26, but as set forth above, even Plaintiff's cited cases

24    acknowledge that "experts generally cannot opine on a defendant's subjective knowledge or intent."

25    *McCoy*, 2024 WL 1705952, at *17 (cited in Opp'n at 16) (permitting expert to opine on "the

26    information available to them" but "not on Defendants' state of mind") (citation omitted). And none

27    of Plaintiff's authority supports what Dr. Valliere seeks to do here, which is to opine on what Uber

28                                                      16

"knew."

Plaintiff's examples underscore this point. Plaintiff claims that Dr. Valliere should be able to opine that "'Uber knows the public and passengers look to its background check system as a safety feature and rely on it'" because this a "a fact that supports Dr. Valliere's analysis[.]" Opp'n at 26-27 (quoting Valliere Rep. at 23). But expert opinion regarding a corporation's knowledge is not "a fact"; rather, such opinions "draw[] . . . an inference from the facts of the case." *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013). It is also not up to Dr. Valliere to determine the "fact" of what Uber knew—such conclusions are properly reserved for the trier of fact. *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020) (expert's state-of-mind conclusions were inadmissible because such "testimony intrudes on the province of the jury, wh[ich] is capable of evaluating the same evidence and drawing conclusions without [the expert's] proffered testimony").

6.    Dr. Valliere Should Not Be Allowed To Simply Summarize Company Documents.

Lastly, Dr. Valliere's "opinions" that merely consist of her summarizing company documents under the guise of expert testimony should be excluded from trial. Mot. at 9-10. In response to this argument, Plaintiff claims that there is "no bar to 'narrative' testimony that is helpful to the jury." Opp'n at 27. Plaintiff is incorrect. Courts have repeatedly and consistently recognized that while an expert "may explain the factual basis for [her] opinions," she is "not [] permitted to gratuitously comment on factual evidence or engage in lengthy factual narratives." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 11446831, at *4 (D. Ariz. Jan. 22, 2018). Nor can an expert "simply rehash[] otherwise admissible evidence about which [s]he has no personal knowledge." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) ("an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence") (citation omitted). As set forth in Uber's opening brief, Dr. Valliere's expert report is rife with instances where she merely parrots Uber documents that jurors can easily understand and interpret. Mot. at 9-10. For example, Dr. Valliere copied and pasted an Uber document into her report, Valliere Rep. at 9, with the following "analysis" that amounts to nothing more than

17

1    repeating the document's contents: "[h]ere, Uber admits that 'both trust and safety' 'have a *direct*

2    *impact* on rider…behavior.'" *Id.* (quoting UBER_JCCP_MDL_000889155). This is not an "analy[sis

3    of] Uber's advertisements using her expertise on sexual assault victims," Opp'n at 28, as Plaintiff

4    claims, but a mere regurgitation of an internal Uber document. This testimony—and other improper

5    narratives included throughout Dr. Valliere's report—is impermissible expert testimony that should

6    be excluded from trial.

7    **III.    MR. FELDIS'S OPINIONS SHOULD BE EXCLUDED.**

8           Mr. Feldis's opinions should be excluded for two primary reasons. First, his supposed expertise

9    in engineering and product development does not qualify him to offer opinions related to the

10   technological feasibility of a hypothetical product he has never developed. And second, he applied an

11   unreliable and subjective methodology that consisted of Google searches and reliance on unrelated

12   work experience that Plaintiff classifies as "involv[ing] the same technology as dashcams," Opp'n at

13   30, without any support or basis.[9] Plaintiff is unable to refute either argument.

14          **A.    Mr. Feldis Is Not Qualified To Testify In This Case.**

15          Plaintiff's Opposition mischaracterizes Mr. Feldis's opinions in an attempt to demonstrate that

16   he is qualified to offer them at trial, suggesting that he is merely opining "on the feasibility of dashcam

17   technology" generally. Opp'n at 29. But that is not correct. Mr. Feldis offers a very specific and

18   technical opinion that it was technologically feasible to automatically record every ride arranged via

19   the Uber platform without the driver controlling the footage. Feldis Rep. at 13 (Dkt. 4343-1, Ex. 2).

20   In other words, he opines that Uber could put a dashcam in every independent vehicle used by drivers

21   who use the Uber platform to connect with potential riders, monitor the camera in some way so that

22   Uber could initiate recording during a trip, and ensure that footage could be shared with Uber (and not

23   accessed at any time by the driver) in the event of a safety report.[10] This opinion thus goes well beyond

24   a chronology of when dashcams were an available technology and covers a raft of other issues

25   _____
     [9] Plaintiff states in her Opposition that Mr. Feldis's report does not include deterrence opinions, and
26   her Opposition does not substantively respond to Uber's arguments to exclude his deterrence opinions.
     Opp'n at 32. Accordingly, the Court should grant Uber's motion at least to this extent as unopposed.

27   [10] Plaintiff's reliance on Judge Schulman's Order is misplaced because Mr. Feldis offered a different
     opinion in the JCCP.

28
     DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
     Case No. 3:23-md-03084-CRB

pertaining to the implementation of that technology in the ridesharing context, and Mr. Feldis is not qualified to opine on those matters. As discussed in Uber's Opening Brief, Mr. Feldis's broad expertise as a product developer and his work with web cameras 20 years ago is insufficient to qualify him to opine regarding the technological feasibility of a networked mandatory dashcam program across the Uber platform.[11] It is undisputed that Mr. Feldis has never worked with dashcams outside this litigation, has no experience integrating a dashcam, camera, or any product into a passenger vehicle, has never developed an app and is not an app developer, and last worked on a camera project in 2021. Feldis Dep. 67:5-8; 70:22-71:2; 72:15-17; 126:25-2 (Dkt. 4343-1, Ex. 1). While Plaintiff argues that Rule 702 only requires a "minimal" foundation of qualifications, Opp'n at 29, she has not come close to laying the requisite foundation given her failure to refute Uber's argument that Mr. Feldis's experience is far removed from the *specific* subject matter of his proffered opinions. *Carlos Rivera v. Ford Motor Co.*, No. CV 18-07798 DSF (PJWX), 2020 WL 4001914, at *6 (C.D. Cal. Mar. 12, 2020) (plaintiff failed to lay sufficient "foundation" because even though proffered expert was "an expert in some of the fields related to this case . . . nothing in his background, training, or experience even suggests he is qualified to give an opinion concerning value").

### B.    Mr. Feldis's Opinions Are Not Based On A Reliable Methodology.

Plaintiff's attempt to salvage Mr. Feldis's unreliable methods depends again on an improper framing of his opinions. Specifically, Plaintiff focuses on the availability of dashcam technology itself, while ignoring the much broader scope of Mr. Feldis's opinions, which also address the feasibility of placing such technology in every driver's car and monitoring each ride while preventing interference by the driver.[12] These opinions lack support in Mr. Feldis's reliance materials or his experience.

Plaintiff argues that Mr. Feldis relied on Uber documents and depositions in addition to the

---

[11] In total, other than his work at Logitech from 1993-2006 working on web cameras, Mr. Feldis has only worked on five projects even tangentially related to cameras: a doorbell camera, a charging station sensor, a FedEx delivery robot, a baby monitor, and a recycling robot. Feldis Dep. 59:8-66:25.

[12] Mr. Feldis seeks to offer two opinions: 1) that "by 2017 it was technically feasible to employ cabin-facing dashcam video recording into rideshare vehicles that records audio and video *for every ride without drivers controlling the footage*"; and 2) "To the extent that Uber claims that dashcams that automatically record audio and video for every ride are or were technologically infeasible, the materials I reviewed do not support that claim." Feldis Rep. at 2 (emphasis added).

Google searches noted in Uber's motion. But Mr. Feldis does not claim that such materials support his opinions. *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005) ("The subject of [a Rule 702] motion is the proposed testimony of experts, not the theories of the lawyers."). Instead, he asserts only that "the materials I reviewed do not support th[e] claim" that "dashcams that automatically record audio and video for every ride are or were technologically infeasible." Feldis Rep. at 2. This assertion misstates the burden of proof. *See In re Onglyza*, 93 F.4th 339, 345 (6th Cir. 2024) (affirming exclusion of expert who opined that there was an "absence of 'compelling' evidence" disproving causation because such testimony "reverses the burden of proof"). The fact that Mr. Feldis did not find any documents addressing the infeasibility of his imagined dashcam system does not somehow prove that such a hypothetical system was in fact feasible. And Mr. Feldis admits he did not review any Uber documents testing the technological feasibility of an automatic, mandatory dashcam program without driver control (the question at issue here) and that he "obviously did not review all of the documents in the case." Feldis Dep. 197:8-14.

Plaintiff also references Mr. Feldis's sporadic "purchase and installation of dashcam products," Opp'n at 31, but this reliance is also misplaced. That Mr. Feldis installed three dashcams in his own car offers no insight on the technological feasibility of Uber installing or requiring drivers to install dashcams in millions of vehicles and Uber (not the driver) controlling the initiation of the recording and the resulting footage.

At bottom, Mr. Feldis's feasibility opinion is based on nothing more than his own "say-so," which is not a reliable methodology. *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *45 (offering "little else than her own say-so" is "[n]ot the product of a reliable methodology"). Mr. Feldis did not research the number of independent vehicles operated by drivers utilizing the Uber platform. Feldis Dep. 134:19-23. He admitted he would "defer to an app designer" on how to actually connect a camera to the Uber application. He did not research and could not name a single company that could actually build millions of dashcams for Uber. *Id.* 126:25-127:3; 135:8-15. And despite concluding that Uber could rely on a fleet telematics company to automatically record all rides, Mr. Feldis admitted he never worked with a fleet telematics company and that he "can't say I'm aware one way or the other" whether

1    any fleet telematics company is equipped to work with millions of different vehicles, as opposed to a

2    standardized fleet. *Id.* 162:3-12. In short, Mr. Feldis's opinions are not the product of a reliable

3    methodology and should be excluded.

4    **IV.    DR. CAMERON'S OPINIONS SHOULD BE EXCLUDED.**

5          The Court should exclude the testimony of Dr. Lindsey Cameron, Plaintiff's proffered rebuttal

6    expert to Uber's expert Joseph Okpaku. As explained in Uber's opening brief, Dr. Cameron's opinions

7    suffer from three fundamental flaws that each independently render them inadmissible. First, the

8    methodology described in Dr. Cameron's report is, by her own description, subjective and unscientific,

9    and therefore unreliable. Second, her opinions about Uber do not actually follow from that

10   methodology, or seemingly any methodology at all. And third, her opinions are irrelevant because the

11   question of whether Uber "controls" the independent drivers who use its platform, the subject of Dr.

12   Cameron's opinions, is already answered in the negative by an Arizona statute. Plaintiff's responses

13   on each of these points are unavailing.

14         ***First***, Plaintiff misconstrues Uber's arguments about the reliability of Dr. Cameron's

15   "structural ethnography" method. The issue is not that Dr. Cameron's methods are qualitative rather

16   than quantitative *per se*. The issue is that the methodology Dr. Cameron describes, according to her

17   own deposition testimony—and unlike other qualitative methods—does not follow the scientific

18   method, because it does not start with a hypothesis and then gather (qualitative or quantitative) data to

19   confirm or falsify that hypothesis. Cameron Dep. 182:14-183:5 (Ex. 3)[13] (Q. "Is another way to think

20   about qualitative research and theory creation, that it's hypothesis generating?" A. "That's an

21   interesting question. There is some qualitative research that's hypothesis generating. It's not the type

22   of qualitative research I do, though. . . . I'm not familiar with the type of research that generates

23   hypothesis."). Instead, Dr. Cameron's described method consists of gathering anecdotes and drawing

24   subjective conclusions from them—conclusions that are not reproducible or reliable in the sense that

25   another person looking at the same anecdotal data would not necessarily draw the same conclusions.

26

27   ---
     [13] The final version of Dr. Cameron's deposition transcript was not available when Uber filed its
28   opening brief.

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

1    *Id.* 147:16-20 (A. "Reliability would be, like, could somebody else look at my same data set and
2    produce the same results, and that's not qualitative, that's a quantitative approach."); *id.* 148:8-23
3    ("That's not what I do.").

4    Plaintiff's opposition brief offers no authorities suggesting that a concededly unscientific
5    methodology like this one is reliable and admissible under Rule 702 and *Daubert*. Instead, Plaintiff
6    relies on the uncontroversial but inapposite point that the "hallmarks of qualitative research: long-term
7    (participant) observation, longitudinal interviews, and in-depth analysis of archival documents" can
8    form the basis of reliable methodology. Opp'n at 79 (cleaned up). But this is emphatically *not* the
9    methodology that Dr. Cameron purports to have applied. Far from "long-term" observations and
10   "longitudinal interviews," Dr. Cameron instead conducted a series of one-off "conversational" or
11   "semi-structured" interviews of riders and drivers who use the Uber platform, asking an unknown
12   series of questions on undisclosed topics, and asserting conclusions about Uber that are (purportedly)
13   based on the interview participants' answers.[14] *Id.* at 80. This process much more closely resembles
14   the anecdotal methods that courts have rejected in *Chandler Gas*, *Pryba*, and *In re Volkswagen*, Mot.
15   at 4, than the rigorous, scientific qualitative study that the court accepted in *Kanuszewski v. Shah*, 583
16   F. Supp. 3d 1018, 1023 (E.D. Mich. 2022), on which Plaintiff relies. Opp'n at 81.

17   Plaintiff offers two further arguments, but neither is persuasive. First, Plaintiff notes that peer-
18   reviewed research in Dr. Cameron's field utilizes the methodology she purports to apply, and that
19   some of Dr. Cameron's work using this methodology has been published in peer-reviewed academic
20   journals. *Id.* at 80-81. But courts have expressly stated that peer review is not sufficient by itself for
21   admissibility under *Daubert*. *See Allison v. McGahn Med. Corp.*, 184 F.3d 1300, 1313 (11th Cir.
22   1999); *Davis v. Lockheed Martin Corp.*, 705 F. Supp. 3d 1345, 1350 n.6 (M.D. Fla. 2023). While it
23   may be one relevant factor among many, the Court is still obligated to apply its independent
24   gatekeeping role. *See Engilis*, 151 F.4th at 1047.

---

[14]   As explained in Uber's opening brief, Dr. Cameron's opinions must be excluded for the additional
reason that she failed to produce any of the data she purportedly collected from her research, including
notes and transcripts from her interviews of drivers and passengers. Without these materials, Uber has
no ability to test whether Dr. Cameron's conclusions about Uber have any basis in the interview
participants' answers. Plaintiff offers no response on this point.

1    Plaintiff also cites a handful of cases in which courts permitted an expert to rely on the expert's

2    own personal knowledge or experience as "the requisite 'facts or data' on which they [may] render an

3    opinion." *Elosu v. Middlefork Ranch, Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022); Opp'n at 80-81 (citing,

4    *e.g.*, *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1392 (M.D. Ala. 2014)). But these

5    cases involved experts with extensive, specialized, first-hand experience. *E.g.*, *Planned Parenthood*,

6    33 F. Supp. 3d at 1391-92 (permitting expert with "extensive background in law enforcement"

7    including experience as undercover officer for NYPD and 23 years at FBI, to testify about abortion at

8    law enforcement clinics). Dr. Cameron spent a mere 100 hours "applying for, training, and working

9    as a ride-hailing driver" on the Uber platform. Cameron Rep. ¶ 10 (Dkt. 4470-27, Ex. M). That limited

10    experience is not sufficient to form the basis of a reliable expert opinion.

11    ***Second***, even if Dr. Cameron's structural ethnography method were reliable, Plaintiff provides

12    no reason to believe that Dr. Cameron's opinions about Uber actually follow from that methodology,

13    or any methodology at all. As explained in Uber's opening brief, there is a striking dichotomy in Dr.

14    Cameron's report: although she spends the bulk of her report describing the methodology outlined

15    above, when she finally turns to offering her opinions that Uber exercises control over the drivers on

16    the platform, there is nothing connecting those opinions to the preceding methodology. *See* Mot. at 6-

17    7 (Dkt. 4397). Dr. Cameron does not explain, for example, how her interviews with drivers or

18    passengers who use the Uber platform led her to adopt the control opinions that she offers. Nor does

19    she explain how her limited experience as a driver using the Uber platform supports or gives rise to

20    her opinions. Rather, as explained in Uber's opening brief, Dr. Cameron's opinions consist of

21    generalized claims about characteristics of the Uber algorithm and how Uber allegedly exercises

22    control over independent drivers, and she fails to ground those conclusions in any methodology

23    whatsoever.

24    Plaintiff seems to misunderstand this argument and offers no real response other than to assert

25    that "Dr. Cameron's immersion research" is "only one piece of the foundation for her opinions." Opp'n

26    at 82. But this is not a real answer because it does explain how Dr. Cameron's conclusions about Uber

27    actually follow from the methodology that she purports to apply. And if they do not, then they are

28    

23

1    plainly inadmissible. *See* Fed. R. Evid. 702(d) Advisory Committee Notes on 2023 Amendment to

2    Fed. R. Evid. 702 ("[Rule 702(d)] does not permit the expert to make claims that are unsupported by

3    the expert's basis and methodology."); Mot. at 6-7 (Dkt. 4397) (citing cases).

4          ***Third***, Plaintiff's arguments about relevance are wrong as a matter of law. Dr. Cameron's

5    opinions all go to the issue of whether Uber exercises control over drivers who use the Uber platform.

6    That issue would be relevant if it bore on the broader question of whether the third-party drivers were

7    employees or independent contractors of Uber. But, as explained in Uber's opening brief, an Arizona

8    statute enacted in 2016 effectively classifies drivers using platforms like Uber and Lyft as independent

9    contractors as a matter of law. Mot. at 8-9 (Dkt. 4397); *see* A.R.S. § 23-1603. The issues of control

10   that are the subject of Dr. Cameron's opinions are therefore irrelevant.

11         Plaintiff responds that A.R.S. § 23-1603 "governs things like workers' compensation and

12   wages, [but] does not modify Arizona's longstanding, common-law test for respondeat superior

13   liability." Opp'n at 83-84. This argument is flatly inconsistent with the text of the statute, which

14   provides that "qualified marketplace contractors" (e.g., drivers who use rideshare platforms) are

15   "independent contractor[s] *for all purposes under state and local laws*." A.R.S. § 23-1603 (emphasis

16   added). "All purposes" plainly includes respondeat superior liability. Moreover, Uber's opening brief

17   cites three decisions in which Arizona courts relied on A.R.S. § 23-1603 to grant summary judgment

18   to Uber and DoorDash, including on respondeat superior liability. Plaintiff provides no reason for this

19   Court to ignore that black-letter law.

20         Finally, even if this Court were to apply Arizona's common law control test, Dr. Cameron's

21   opinions would still be irrelevant. The old common law "right-to-control test requires an examination

22   of whether the employer reserves the right to supervise or control the method of performing the

23   contracted service or whether the employer's control is limited to the result, leaving the method to the

24   other party." *Simon v. Safeway, Inc.*, 173 P.3d 1031, 1036 (Ariz. Ct. App. 2007). But Dr. Cameron

25   does not opine that Uber "reserve[d] the right to supervise or control the method of performing" the

26   ridesharing service. She instead opines that Uber matches drivers and passengers, provides incentives

27   for drivers to use the Uber app during peak times, offers a feedback and rating system, etc. *See* Mot.

28

at 2 (Dkt. 4397); Cameron Rep. ¶¶ 72, 88-98 (Dkt. 4470-27, Ex. M). None of this constitutes "supervis[ing] or control[ing] the method of performing." Dr. Cameron's opinions are therefore irrelevant, and the Court should exclude her for this additional and independent reason.

## V.    MS. KELLER'S OPINIONS SHOULD BE EXCLUDED.

In its opening brief, Uber explained that Ms. Keller's opinions about absolute numbers of alleged sexual assault or sexual misconduct incidents are meaningless, and thus inadmissible, absent a baseline or some sort of comparison group. *See generally* Dkt. 4337 at 1-4 (Motion). In response, Plaintiff argues that "[t]he number of reported incidents goes to Uber's knowledge, whether it exercised ordinary care, whether its product is defective, and the recklessness of its conduct." Opp'n at 41.

But that is not true. The number of reported incidents is only relevant to questions of liability when put into context. For example, a plaintiff could never prove liability against a car manufacturer simply because 1,000 of its cars were involved in motor vehicle accidents in a given year. Motor vehicle accidents happen. A 1,000-accident metric is only relevant when placed into context with other data, such as how many of the company's cars are on the road, and other manufacturers' rates of motor vehicle accidents. For this reason, courts routinely hold that absolute numbers—like those provided by Ms. Keller—are meaningless without context. *See Hunter v. Elanco Animal Health Inc.*, No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173, at *18 (S.D. Ind. Aug. 17, 2022) ("The First Amended Complaint also lacks any statistics or data to place the allegations of 'excess demand' or 'excess inventory' in context—an omission that hinders a finding that the defendants issued false and misleading statements."); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 986 (E.D. Wis. 2009) (allegation that certain dealerships had between 3,000 and 5,000 units per day of excess inventory "is not very helpful" in the absence of "comparisons to historical inventory levels" or "'normal' inventory levels").

Plaintiff next argues that Ms. Keller **does** provide a "baseline" with which to compare Ms. Keller's numbers: "the number of reports that Uber publicly disclosed—3% of the total." Opp'n at 41. But that is not a baseline, because it does not compare Uber's incident rate with the sexual assault rate

in any other mode of transportation or in society at large.

Finally, Plaintiff argues that Ms. Keller's opinions about absolute numbers are "directly responsive to Uber's defense[]" that the "low rate" of sexual assault and misconduct on rides arranged through the Uber app "showed its conduct was not negligent." *Id.* at 41. But Ms. Keller's absolute numbers do not respond at all to that defense, precisely because—as Uber explained in its opening brief—Ms. Keller did *not* undertake any analysis about "how sexual misconduct related to the Uber platform compares to the outside world." Dkt. 4337 at 2. As such, Ms. Keller's opinions do nothing to "show[] that the rates Uber represents are dramatically understated." *Contra* Opp'n at 41-42.

## VI.    DR. CHANDLER'S OPINIONS SHOULD BE EXCLUDED.

Plaintiff's opposition confirms that Dr. Chandler's opinions are not based on a reliable methodology and should be excluded.

### A.    Dr. Chandler's Marketing Opinions Are Unreliable.

Plaintiff's efforts to resuscitate Dr. Chandler's marketing opinions all fail.

***First***, Plaintiff does not dispute that large portions of Dr. Chandler's report simply repeat and editorialize on the documents and evidence in this case, but insists nonetheless that his narrative is appropriate to provide a foundation for his opinion. This argument misses the point. There is nothing wrong with an expert laying out the factual basis for his opinions; Uber has not argued otherwise. Having laid out those facts, however, the expert must then apply some sort of methodology or analysis that will assist the jury in assessing the evidence. Otherwise, the expert simply usurps the jury's factfinding role.

Dr. Chandler never undertook that critical step. Instead of providing expert or specialized analysis, he simply catalogues cherry-picked[15] pieces of evidence and draws his own subjective conclusions from that material, a task that is well within the province of the jury. *See generally* Chandler Rep. ¶¶ 20-21 (Dkt. 4470-9, Ex. D); *see Burrows v. 3M Co.*, No. C19-1649-RSL, 2022 WL 3346419, at *5 (W.D. Wash. Aug. 12, 2022) (expert "invade[d] . . . province" of jury where his opinion

---

[15] Contrary to Plaintiff's argument, Uber never asserted that Dr. Chandler "discusses too many [] documents." Opp'n at 46. Rather, the point is that he relied only on documents and evidence that the jury is capable of evaluating itself.

was based on review of defendant's promotional materials).[16] As a result, the Court is left only with Dr. Chandler's word that no one could "interpret the documents" without his "extensive marketing experience." Opp'n at 44 (quoting Chandler Dep.). Such assurances are insufficient, of course, and his testimony should therefore be excluded.

**Second**, Dr. Chandler's testimony about how Uber's marketing supposedly impacted consumers is speculative because he did not rely on any concrete evidence or conduct any independent surveys. Plaintiff points to an internal 2014 consultant report, Opp'n at 46 (citing Chandler Rep. ¶ 85), but that document says nothing about Uber's marketing across time or how it affected consumers during the timeframe when Plaintiff has used the Uber app. And Dr. Chandler identified no other evidence establishing either that the data in the report is misleading or that consumers were actually misled by Uber's Safety Reports.

**Third**, Dr. Chandler's ethics opinions are inadmissible because they are irrelevant and prejudicial. A jury's only role is to apply the law to the facts of the case to determine whether liability should be imposed on the defendant. It does not sit as an arbiter of a trade association's ill-defined, non-binding ethical standards. Plaintiff nevertheless attempts to bootstrap those materials into this case by arguing that they will "help the jury determine whether Uber exercised reasonable care, the relevant 'legal standard.'" Opp'n at 47-48. Unsurprisingly, Plaintiff cites no authority for the proposition that "reasonable care" can be determined in reference to ethical guidelines promulgated by an outside organization with which Uber has no relationship.

Plaintiff argues that *In re Rezulin* can be distinguished because the experts in that case conceded that their opinions on ethical standards were based on their subjective views. Opp'n at 48 n.39. But she conveniently ignores the rest of the court's holding:

---

[16] Plaintiff argues that *Sanchez v. Bos. Sci. Corp.*, No. 2:12-cv-05762, 2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014), is distinguishable, supposedly because "the expert's actual opinion" in that case "lacked any actual support, leaving only narrative description." Opp'n at 46 n.34. But the *Sanchez* court's holding focused on "the majority of [the expert's] opinion [which] simply recites what [the Defendant] did or did not do." *Sanchez*, 2014 WL 4851989, at *31. The court found that those opinions, addressing defendant's "knowledge, state of mind, and legal conclusions," were "not appropriate subjects of expert testimony," and these flaws "permeate[d] his entire expert report." *Id.*

> Even assuming that the ethics testimony *were* based on a reliable foundation, it would not assist the fact-finder in determining any factual dispute in this case. The principal issues here are whether the defendants breached their legal duties to the plaintiffs in the manufacturing, labeling and marketing of Rezulin and, if so, whether any such breaches were proximate causes of injury. While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is *not* relevant to these lawsuits.

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004) (emphasis added). That holding is directly on point.

Plaintiff also points to testimony from an Uber witness that truthfulness in marketing is important to Uber, *see* Opp'n at 48, and argues that "the same principles Dr. Chandler distil[l]s from the industry [ethical] standards **do** govern Uber's marketing," *id.* But general statements about truthfulness in marketing obviously do not serve to bind Uber to anything. Nor does it make sense to argue, as Plaintiff does, *id.* at 49, that if Uber relies on its Safety Reports in its defense, that opens the door to expert testimony on ethics. "[A] party's … ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *Sanchez*, 2014 WL 4851989, at *4.

**Finally**, Plaintiff concedes that Dr. Chandler cannot testify as to Uber's knowledge or state of mind. *See* Opp'n at 49 (arguing that Dr. Chandler "does not offer opinions on the company's state of mind or intent" (citing Chandler Dep. 191:10-17)); *Sanchez*, 2014 WL 4851989, at *4 ("a party's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury"). This, too, requires exclusion of his opinions.

### B. Dr. Chandler's Safety Report "Estimates" Are Fundamentally Flawed.

Plaintiff's opposition confirms that Dr. Chandler's "estimates" should be excluded.

**First**, Dr. Chandler's *estimates* of sexual assault and sexual misconduct incidents are irrelevant and unreliable because Uber has produced data showing the *actual* number of incidents. In his report, Dr. Chandler represents that "Uber's published Safety Reports provide partial counts of sexual assault and misconduct incidents," contending that the Safety Reports disclose only about "3.2% of all reported incidents." Chandler Rep. at 91 & n.192 (Dkt. 4470-9, Ex. D). Dr. Chandler thus built a model that purported to "estimate the true incident rate on its platform." *Id.* at 91.

Dr. Chandler's estimates are irrelevant because Uber has since produced the data pertaining to sexual assault incident reports, also known as the Flack Data. *See* Dkt. 4341, Mot. at 8 & nn. 5 & 8. Plaintiff does not dispute that the Flack Data is reliable. To the contrary, Plaintiff compares Dr. Chandler's estimates to the Flack Data, and excuses disparities between Dr. Chandler's estimates and the Flack Data by arguing that "no statistical model is a perfect fit" and that Dr. Chandler's bad estimates "do[] not show unreliability." Opp'n at 50-51. But Plaintiff fails to explain how Dr. Chandler's estimates have any relevance given the existence of the Flack Data.

**Second**, Plaintiff confirms that Dr. Chandler's efforts to "estimate" under-reporting are not peer-reviewed and have never been validated as reliable. Plaintiff admits that Dr. Chandler relied on a technique published in a 2024 academic article that attempted to estimate under-reporting of sexual assault on college campus—and then "modified" nearly everything about that nascent technique. Opp'n at 51-53. Plaintiff also admits that Dr. Chandler uses different covariates, different data, and even a different distribution. *See id.* In other words, Dr. Chandler invented a completely new under-reporting model that has not been validated as reliable by anyone other than himself. If the Court were to "tak[e] [Dr. Chandler's] word" that his model is valid, it would effectively "abandon[] its gatekeeping responsibility." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *2.

## C.   Dr. Chandler's Testimony Regarding Uber's Communications With Plaintiff Is Unreliable.

Plaintiff acknowledges that Dr. Chandler purported to "analyze[] the . . . content of [Uber] messages" to Plaintiff that he did not even possess. Opp'n at 53-54. Instead, Plaintiff blames this lapse on her contention that "Uber failed to produce th[is] content." *Id.* Even if true, that does not make Dr. Chandler's "analysis" reliable. Without that content, any opinions Dr. Chandler formed about those communications are inherently speculative, and are therefore unreliable. *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (an "expert's opinion must rest on facts or data . . . not merely assumptions and speculation") (internal quotations and citation omitted).

The same is true with respect to Dr. Chandler's opinion that Uber's messages "reached Plaintiffs in high volume and at high frequency." Chandler Rep. at 111 (Dkt. 4470-9, Ex. D). Plaintiff does not dispute that Dr. Chandler has no idea whether any particular Plaintiff actually saw any of

29

1    these messages. Opp'n at 54. Instead, she argues that, based on the volume of push notifications,

2    emails, and the like, "Uber cannot seriously maintain that this barrage of messaging did not reach

3    Dean." *Id.* But consumers ignore such messages all the time. Dr. Chandler could have *asked* Plaintiffs

4    whether they actually saw this messaging. He did not. Accordingly, his opinions about the "reach" of

5    that messaging are nothing more than speculation, and should be excluded.

6         **D.    Plaintiff's Opposition Highlights The Unreliability Of Dr. Chandler's Opinions.**

7         Plaintiff "concede[s]" that Dr. Chandler's rebuttal report made a significant error—"switching

8    Uber and Lyft"—but argues that Dr. Chandler's opinions are otherwise sound. *Id.* at 55-56. In so

9    arguing, Plaintiff only highlights another obvious error Dr. Chandler made. Plaintiff argues that Dr.

10   Chandler "discusses how Dr. Stodden ignored" a survey that supposedly showed "that the proportion

11   of respondents reporting a sexual advance or inappropriate touching was 3%—much higher than the

12   numbers Dr. Stodden used." *Id.* at 55. But as Uber explained in its Opposition To Plaintiff's Motion

13   To Exclude Expert Testimony, this proposition misreads the survey data in two fundamental ways: (1)

14   the survey at issue did not ask all respondents whether a driver had made a sexual advance or engaged

15   in inappropriate conduct; rather, it posed that question only to the subset of respondents who reported

16   that they had encountered an experience with ridesharing that made them feel unsafe, and (2) the 3%

17   figure includes respondents who used non-Uber ridesharing platforms in addition to or instead of Uber.

18   *See* Dkt. 4632 at 12-13 (Defs.' Opp'n). Accounting for Dr. Chandler's errors, the "3%" rate Dr.

19   Chandler advances is *really* 0.21%. Dr. Chandler's demonstrably sloppy analysis underscores why his

20   rebuttal opinions should be excluded.

21   **VII.    MR. TREMBLAY'S OPINIONS SHOULD BE EXCLUDED.**

22        As Uber explained in its opening brief, Mr. Tremblay's law enforcement background does not

23   qualify him to provide the corporate conduct opinions he proffers in this case. Nor are his opinions

24   based on a reliable methodology or helpful to the jury. Plaintiff's arguments in response all lack merit.

25        **A.    Mr. Tremblay Is Not Qualified to Offer Corporate Conduct Opinions.**

26        Mr. Tremblay's primary experience is as a law enforcement officer, and in his C.V. and his

27   report, he emphasizes his 30 years of law enforcement experience. Tremblay Rep., Ex. A at 1 (Dkt.

28

4470-21, Ex. J) ("distinguished thirty-year career in policing service"); Tremblay Rep. ¶ 9 ("I served thirty years as a law enforcement officer…."). As Uber explained in its opening brief, this law enforcement background does not qualify Mr. Tremblay to provide his expansive corporate conduct opinions, which touch on almost every aspect of Plaintiff's case. Mot. at 2-3 (Dkt. 4349).

Plaintiff argues in response that Mr. Tremblay is qualified because he is "'frequently hired to consult and train as an expert on sexual assault in the private sector' and for various public entities…." Opp'n at 58. But Mr. Tremblay's C.V. shows that very few of his engagements were with private sector entities; instead, almost all of his training and consultation engagements were with police departments, other government entities, and at conferences. Tremblay Rep., Ex. A at 6-37. Moreover, as the "Consultation and Training" headings suggest, most of these engagements involve training. *Id.*; *see also* Opp'n at 57 (Tremblay's career has "specifically include[d] the 'development and delivery' of the training around sexual assault prevention, response, awareness and education within professional settings"). Leaving aside whether Mr. Tremblay's law enforcement background, along with this additional consulting and training experience, might qualify Mr. Tremblay to opine on topics such as the sufficiency of Uber's sexual assault training or its investigative procedures following an incident,[17] they provide no basis for his exceedingly broad opinions on issues such as what steps Uber should have taken to reduce the risk of sexual assault, Uber's development and consideration of particular initiatives like S-RAD, dashcams, or women-matching, or Uber's supposed failures in warning its users of risks.

Plaintiff also argues that Uber mischaracterizes Mr. Tremblay's opinions as involving "corporate conduct" rather than "sexual assault prevention." Opp'n at 59. But it is actually Plaintiff who attempts to recharacterize her expert's opinions. The alleged "prevention" opinions here all revolve around corporate conduct. As Plaintiff concedes, Mr. Tremblay's methodology in this case was to "review documents and depositions," *id.* at 61, and then opine on what he found in those

---

[17]   For example, in *Unknown Party v. Ariz. Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 4481519, at *10 (D. Ariz. Sept. 27, 2022) (cited in Opp'n at 62), the court permitted a former prosecutor to testify as to "basic investigative standards" in the context of a Title IX investigation, although not as to any Title IX-specific opinions.

1    documents and depositions about Uber's conduct. Mr. Tremblay's opinion is thus about corporate

2    conduct, a topic on which Mr. Tremblay has no particular expertise, either as to Uber or the private

3    sector more generally.

4         In any event, even if Plaintiff's characterization were accepted, Mr. Tremblay also has very

5    little experience with "sexual assault prevention in the private sector," Opp'n at 59, as discussed above.

6    For this reason, too, Plaintiff's qualification argument fails.

7         Plaintiff attempts to distinguish *Alves v. Riverside Cnty.*, No. EDCV192083JGBSHKX, 2023

8    WL 2983583 (C.D. Cal. Mar. 13, 2023), but the case is directly on point. In *Alves*, the court excluded

9    a law enforcement expert's opinions on behavioral science, explaining that the expert's "long career

10   in law enforcement might qualify him as an expert in some subjects, ***but not in the subjects for which***

11   ***he is offered here***, namely disciplines of behavioral science." *Id.* at *8 (emphasis added). Similarly,

12   here, while Mr. Tremblay may be qualified to opine on some topics related to law enforcement and

13   training, neither his law enforcement career nor his follow-up work as a consultant and trainer (almost

14   entirely outside of the private sector) qualify him to opine about Uber's corporate conduct as it relates

15   to the initiatives it did or did not pursue in the rideshare sector.

16        **B.    Plaintiff Has Not Established That Mr. Tremblay's Law Enforcement-Derived**
          **Methodology Can Be Reliably Applied To Uber's Corporate Conduct.**
17
          Plaintiff criticizes Uber for characterizing (or, in her words, "derid[ing]") Mr. Tremblay's
18
     methodology as "one 'used in policing,'" Opp'n at 61 (citing Mot. at 4), but then acknowledges Mr.
19
     Tremblay's testimony "that he applied the 'same methodology' both in this 'thirty years of experience
20
     in the field of law enforcement' and 'in the related field of criminal justice.'" *Id.* at 62. Whether Mr.
21
     Tremblay's field is described as policing (as Mr. Tremblay himself called it during his deposition,
22
     Tremblay Dep. 189:3 (Dkt. 4349-1, Ex. 2)) or by using the terms "law enforcement" or "criminal
23
     justice," Uber's basic point stands: Mr. Tremblay did not explain how either a "law enforcement" or
24
     a "criminal justice" methodology can or should be extended to the corporate conduct issues in this
25
     case. *See* Mot. at 3-4.
26
          Contrary to Plaintiff's argument that Mr. Tremblay's methodology was sufficiently reliable
27
     because he supposedly "detailed the specific documents he considered, the standards he was
28
                                                   32

comparing them to, and why Uber failed to meet those standards," Opp'n at 63, Mr. Tremblay did not explain why those "law enforcement" or "criminal justice" standards could or should be applied to evaluating corporate conduct in the rideshare industry—i.e., why Uber's conduct should be viewed through a criminal justice lens in this civil litigation. *See also* Fed. R. Evid. 702, 2000 Advisory Committee Notes (expert should explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"). Although Mr. Tremblay explained the basics of ***what he did***—reviewed documents and reached opinions based on them—he did not explain ***why that was a reliable and sufficient methodology based on his law enforcement experience***. Plaintiff asserts that "assault prevention is assault prevention," Opp'n at 61, but this conclusory statement cannot take the place of an actual reasoned explanation from Mr. Tremblay.

Reviewing documents and reaching opinions based on them may be sufficient if the expert's experience is directly related to the subject matter of the opinions, as in the *Qualcomm* case that Plaintiff cites. *Federal Trade Commission v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 WL 6460573, at *4 (N.D. Cal. Dec. 10, 2018) (expert "used his experience as a patent license negotiator to opine on topics ***relating to that very subject area***") (emphasis added). But here, where Mr. Tremblay's law enforcement background is remote from the corporate conduct issues on which he wishes to opine, he needed to explain why his method was sufficient and appropriate under Rule 702. For this reason, too, his corporate conduct opinions should be excluded.

### C.    Mr. Tremblay Offers Impermissible Opinions Concerning Uber's Knowledge And Improperly Summarizes Company Documents.

In its opening brief, Uber argued that under well-established caselaw, Mr. Tremblay should not be permitted to testify concerning Uber's knowledge or to summarize Uber documents. Mot. at 4-6. Plaintiff argues, as she does with respect to her other experts, that "experts are permitted to discuss the bases for their opinions." Opp'n at 64. But Mr. Tremblay's opinions concerning Uber's knowledge and his regurgitation of the contents of Uber's documents go well beyond "discussing the bases for [his] opinions." Accordingly, these opinions should be excluded.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.    Mr. Tremblay's Opinions on Ultimate Legal Issues Should Be Excluded.

Plaintiff cannot dispute that Mr. Tremblay's opinion that Uber's actions "were more likely than not a substantial factor in causing" her assault purports to answer one of the ultimate legal questions in this case. Mot. at 6. It is improper to usurp the jury's function in this manner.

Plaintiff's caselaw, which involves medical causation, is not to the contrary. *See Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1195 (9th Cir. 2014) (expert testimony that plaintiff's bisphosphonate use was a substantial factor in causing her medical condition); *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 960 (N.D. Cal. 2019) (expert testimony that glyphosate was a substantial factor in causing plaintiffs' medical condition) (both cited in Opp'n at 66). This is because "expert testimony is necessary to prove medical causation, which is that the accident caused the injury." *E.g.*, *Johnson v. Costco Wholesale Corp.*, No. CV-17-02710-PHX-SMB, 2021 WL 461937, at *3 (D. Ariz. Feb. 9, 2021) (citation omitted); *see also In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1033 (S.D. Cal. 2021) ("here, as in other complex pharmaceutical products liability cases, general causation requires expert evidence because the existence of a causal relationship between a substance and the particular harm alleged is outside the common knowledge of lay jurors"), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022) (citation omitted). Here, Mr. Tremblay seeks to testify about legal causation, not medical causation. Mr. Tremblay should not be permitted to usurp the jury's role by opining on the ultimate legal issue of whether Uber's actions "were more likely than not a substantial factor" in causing Ms. Dean's assault.

## VIII.    THE COURT SHOULD EXCLUDE MR. WEINER'S OPINIONS.

As Uber explained in its opening brief, ECF 4345, Mr. Weiner's opinions should be excluded for several reasons. His supposed expertise in technology and product development does not qualify him to offer his wide-ranging opinions concerning Uber's approach to safety. His unreliable and subjective methodology is based on his work experience (primarily in the banking technology industry), which he extends to the rideshare industry without explanation as to why such extension is justified. And much of his report simply summarizes Uber documents, which does not constitute proper expert testimony. Plaintiff's arguments in response are meritless.

34

1

### A.    Mr. Weiner Is Not Qualified.

2      Plaintiff contends that Uber mischaracterized Mr. Weiner's background and opinions when it

3  argued that he is "an information technologist who is not qualified to opine as to 'safety' or 'corporate

4  priorities' on safety." Opp'n at 33 (citing Mot. at 3). But Plaintiff fundamentally mischaracterizes both

5  Mr. Weiner's opinions and background.

6      ***First***, Plaintiff insists that Mr. Weiner is "not testifying as an expert in 'sexual assault or

7  misconduct'" and is not offering "generalized 'safety risk' opinions." *Id.* at 34. But this unduly narrow

8  framing of Mr. Weiner's proposed testimony is belied by Plaintiff's own characterization of Mr.

9  Weiner's opinions earlier in her brief where she expressly states that Mr. Weiner seeks to opine that

10 "[s]exual violence between drivers and riders was a foreseeable risk from Uber's inception"; that Uber

11 "prioritized growth . . . over . . . ***safety***"; and that Uber did not adequately "evaluate[] ***safety*** features .

12 . . . ." *Id.* at 32 (citations omitted) (emphases added); *see also* Weiner Rep. ¶ 22 (Dkt. 4470-3, Ex. A)

13 (Mr. Weiner was "asked" by Plaintiff's counsel to address "how safety-related objectives—such as

14 the prevention of Sexual Assault and Sexual Misconduct—were considered, prioritized, and

15 implemented within that [product development] framework") (footnotes omitted). Thus, contrary to

16 Plaintiff's conclusory claims on page 34 of her brief, her descriptions on page 32 and Mr. Weiner's

17 own words establish that Mr. Weiner is clearly seeking to wade into the area of rideshare safety.

18     ***Second***, Plaintiff claims that Mr. Weiner has "played an integral role in advising companies

19 on the development of consumer-facing software, including mobile applications…." Opp'n at 33. But

20 virtually none of that work involved the sorts of physical safety-related risks at issue here. Mr.

21 Weiner's full-time job since 2012 (when the rideshare industry existed in only nascent form) has been

22 working for the Federal Reserve Bank of New York, where he has focused on "monetary policy

23 implementation technology [and] consumer banking technology." Weiner Dep. 24:12-17 (Dkt. 4470-

24 5, Ex. B). Notably, Mr. Weiner was only able to identify two work engagements that were "specific

25 instances where I have had the personal experience of working on what you and I now agree to call

26 physical safety." *Id.* 119:5-8. He further testified that he "highlighted [these] particular examples for

27 the judge in this case where my experience was most like the safety risk that we were looking at in

28

35

this particular case." *Id.* 180:5-15. That Mr. Weiner purposefully identified those examples shows that he himself believed that safety-related expertise is necessary here. And his testimony that he has "not used the word safety even once" in describing his credentials, *id.* 121:10-13, is tantamount to a ***disclaimer*** of any expertise in that area and necessarily trumps Plaintiff's reimagined characterizations of Mr. Weiner's background.

In short, the gist of Plaintiff's arguments is that "Product Development" is a single, undifferentiated field—no matter what product or what risks or other considerations are involved— and that Mr. Weiner's banking industry and earlier experience thus transfers to analyzing physical safety risks in the rideshare industry. This argument misunderstands Rule 702's qualifications requirement and should be rejected. *See Martinez v. Coloplast Corp.*, No. 2:18-CV-220, 2022 WL 425206, at *3 (N.D. Ind. Feb. 11, 2022) (excluding expert despite her "impressive credentials and decades of experience in product development" because her experience was in pharmaceutical products rather than medical device products).[18]

### B.    Mr. Weiner's Method Is Not Reliable.

As explained in Uber's opening brief, Mr. Weiner's purported application of his "experience" to his review of Uber's internal company documents does not constitute any discernible, much less a reliable, methodology. Mot. at 5-9. While Plaintiff accuses Uber of taking Mr. Weiner's reliance on his experience "out of context," Opp'n at 37, Mr. Weiner ***repeatedly*** referenced his "37 years of experience," including in the first paragraph of his report. Weiner Rep. ¶ 1. Indeed, when Mr. Weiner was asked how another expert would repeat his work, his response depended on that expert having the exact same experience as he did: "'I would hand that new expert the same questions that I was asked, make available to them my 37 years of experience and learnings over that time period, and ask them to put themselves in front of the Everlaw system with two million records, and review the process of

---

[18] Plaintiff contends that *Martinez* is distinguishable because the products at issue there (i.e., medical devices) were governed by "different regulatory standards" than the ones the expert had experience with (i.e., pharmaceutical drugs). Opp'n at 35 n.24. This proffered distinction is self-defeating because not even Plaintiff claims that Mr. Weiner has any experience with the rideshare industry. Moreover, as already discussed in text, Mr. Weiner has disclaimed having any specialized knowledge or experience with respect to product safety, further highlighting why he is even less competent to serve as an expert in this case than the expert in *Martinez*.

answering those questions using this methodology to see if they came to the same conclusion as what I posited.'" Weiner Dep. 315:15-316:18. Just as Plaintiff's counsel cannot salvage Mr. Weiner's qualifications to serve as an expert in this case, she likewise cannot plug the holes in his deficient methodology by rewriting Mr. Weiner's report and testimony. *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005) ("The subject of [a Rule 702] motion is the proposed testimony of experts, not the theories of the lawyers."); *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (7th Cir. 2010) (expert's "opinion cannot escape its own logic").

Plaintiff also concedes that Mr. Weiner's purported "experience"-based "methodology" is not testable, but claims that is not fatal under Rule 702 because testability is just one factor under *Daubert*. Opp'n at 39. However, one of Plaintiff's cited cases did not even involve a challenge based on testability and is inapposite. *See Walker v. AIU Ins. Co.*, No. CV-23-01641-PHX-JAT, 2025 WL 2495066, at *14 (D. Ariz. Aug. 29, 2025) ("[T]he mere fact that Mr. Beringer did not review the same materials as Plaintiffs' claims handling expert does not render him unreliable and mandate preclusion.") (citation omitted). And in the other case, the court found that the challenged opinions "***are*** testable because they can be independently verified or objectively challenged." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 554 (C.D. Cal. 2014) (emphasis added). Moreover, Plaintiff ignores that Mr. Weiner expressly states that his "'methodology is designed to be testable and repeatable.'" Mot. at 8 (citing Weiner Rep. ¶ 44). Plaintiff's concession that his methodology is not repeatable invalidates the very premise of Mr. Weiner's proffered methodology and highlights the results-oriented nature of Mr. Weiner's proposed testimony.

Uber also addressed Mr. Weiner's unsuccessful attempts to embellish his opinions with scientific language[19] and references to industry standards. Mot. at 6-8. As Uber explained, Mr. Weiner's use of such standards was largely not based on objective criteria. *Id.* at 7-8. And to the extent he attempted to invoke the objective standards of the International Organization for Standardization ("ISO"), those references likewise do not provide a basis for his opinions, which address "Uber's

---

[19] Plaintiff argues that Uber took Mr. Weiner's references to a meta-analysis and peer review out of context. But it is clear that Mr. Weiner's use of those terms was intended to put a gloss of scientific credibility on his subjective, experience-based opinions. Mot. at 6.

DEFENDANTS' CORRECTED REPLY IN SUPPORT OF MOTIONS TO EXCLUDE EXPERT TESTIMONY
Case No. 3:23-md-03084-CRB

development and *prioritization* of safety-related features." Weiner Rep. ¶ 40 (emphasis added). Plaintiff concedes that "ISO standards do not prescribe the *specific objectives* a company should set," Opp'n at 38 (emphasis added), but Mr. Weiner repeatedly opines on *Uber's priorities*—i.e., its objectives. *E.g.*, Weiner Rep. at 44 (Opinion 2 – "[Uber] prioritized growth, cost reduction, and competition over the timely implementation of safety related features…"); *id.* ¶ 116 ("Uber's own documents show that its consistent priorities have been growth, cost avoidance, and competitive pressures."); *id.* at 62 (Uber's actions "reflect[ed] a prioritization of marketplace metrics over risk-based safety governance"); *id.* ¶ 155 ("Uber prioritized financial considerations over sexual assault prevention"). Thus, Plaintiff's own characterization of the ISO standards confirms that "[t]here is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation and internal quotation marks omitted).

Plaintiff's cases—holding that, in some circumstances, experts can review materials and render opinions based on them—are inapposite. In those cases, unlike here, the expert did not purport to ground his or her opinions in a methodology that could be replicated. In addition, the expert's experience was *directly related to his or her opinions*; thus, it is not surprising that those courts found that the witnesses had explained "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, 2000 Advisory Committee Notes. For example, in *Federal Trade Commission* 2018 WL 6460573, at *4, the court found that the expert "has used his experience as a patent license negotiator to opine on topics *relating to that very subject area*." (emphasis added). *See also In re Coll. Athlete NIL Litig.*, No. 20-CV-03919 CW, 2023 WL 8372788, at *3 (N.D. Cal. Nov. 3, 2023) (expert "relied on his decades of experience in negotiating professional sports media rights to estimate that about one half of the total value of sports broadcasts is attributable to athletes' contributions"). Here, as Uber has explained, not only do Mr. Weiner's 37 years of experience have nothing to do with safety, the rideshare industry or any other facts in this case, but Mr. Weiner has also not sufficiently explained why that irrelevant background provides a reliable basis for his opinions against Uber.

**C.    Mr. Weiner's Opinions Should Be Excluded As Impermissible Testimony.**

In its opening brief, Uber also moved to exclude Mr. Weiner's opinions for the additional reasons that they improperly opine on Uber's state of mind and/or summarize Uber documents. Mot. at 9-10. Plaintiff argues, as she does with respect to her other experts, that experts may testify as to what knowledge was available to a defendant, and discuss the facts and data they considered. Opp'n at 39-40. But Plaintiff once again mischaracterizes her own expert's opinions. For example, Mr. Weiner expressly claims that "Uber's internal records confirm the company ***knew*** Sexual Violence was underreported and that reporting design contributed to this problem[.]" Weiner Rep. ¶ 263 (emphasis added). While Plaintiff's counsel is entitled to argue that baseless state-of-mind theory to the jury, Plaintiff may not present it to the jury with the imprimatur of an expert. *King*, 2023 WL 5624710, at *6 ("What DePuy purportedly knew, intended, or was motivated by falls outside the scope of expert testimony. . . . These types of state of mind issues are squarely within the province of the jury.") (citation omitted). Nor may Mr. Weiner "merely read, selectively quote from, or regurgitate the evidence," as even Plaintiff's own authority recognizes. *Homyk*, 2025 WL 1547625, at *6 (cited in Opp'n at 40) (citation omitted). In short, Plaintiff does not seriously attempt to refute Uber's argument that Mr. Weiner opines on Uber's knowledge and intent and regurgitates the contents of Uber's documents, all of which goes well beyond the permissible purposes of expert testimony. Accordingly, his knowledge and narrative opinions should be excluded.

**IX.    MS. RANDO'S OPINIONS SHOULD BE EXCLUDED.**

**A.    Ms. Rando Lacks Relevant Experience To Opine On The Usability Of Sexual Assault Reporting Technology In The Rideshare Industry.**

Plaintiff fails to identify any relevant experience that qualifies Ms. Rando to opine on Uber's in-app reporting systems. Plaintiff does not dispute that Ms. Rando has no experience in the rideshare industry, has never been involved in designing UI/UX interface of mobile applications, and does not have any training or experience related to reporting sexual assaults or sexual misconduct. Opp'n at 67-68. Rather, Plaintiff cites to Ms. Rando's general experience as a "Human Factors Professional." *Id.* at 67. Ms. Rando, however, is not offering an opinion on "human factors" generally. She is offering a specific opinion on the usability of sexual assault reporting technology in the rideshare industry—an

39

1    opinion that Ms. Rando believes requires consideration of users' "goal[s]" in using the app, Rando

2    Rep. ¶ 176 (Dkt. 4470-7, Ex. C), and their "mental and emotional states" at the time of an alleged

3    assault, *id*. ¶ 173.

4         Plaintiff attempts to overcome this disconnect by noting that Ms. Rando has "prior consulting

5    work" with "consumer-facing platforms," Opp'n at 67, but she fails to identify ***what*** prior consulting

6    work Ms. Rando has done, with which consumer platforms, and ***how*** this experience relates to the

7    review of sexual assault reporting mechanisms for a rideshare technology company. Nor can she: at

8    best, Ms. Rando's CV and deposition testimony refer to consulting experience in the "medical

9    software domain space" and in the "aerospace sector under government contracts." Rando Dep. 24:8-

10   23 (Dkt. 4397-2, Ex. 2). Her general experience does not qualify her to opine on Uber's in-app

11   reporting procedures concerning sexual assaults and sexual misconduct. *Blockchain Innovation, LLC*

12   *v. Franklin Res., Inc.*, No. 21-cv-08787-TSH, 2024 WL5483606, at *9 (N.D. Cal. Oct. 22, 2024)

13   ("[w]hile a witness 'can qualify as an expert through practical experience in a particular field,' it must

14   be shown that the experience relates to issues in dispute….").

15        **B.    Ms. Rando's Opinion Is Not Relevant To Any Issue In This Litigation.**

16        Plaintiff also fails to tie Ms. Rando's opinions to the facts of this case. Neither Ms. Dean nor

17   any other bellwether Plaintiff was unable to report her alleged incident due to Uber's in-app reporting

18   mechanisms, which Plaintiff does not dispute in her Opposition. Opp'n at 70.

19        Plaintiff instead argues that "Uber may not have received more overt reports of sexual

20   misconduct" for the bellwether drivers because "the company made it exceedingly difficult to report

21   such misconduct." *Id.* at 70. But Plaintiff has presented ***no evidence***—and prior to her Opposition, ***no***

22   ***allegation***—that any rider wanted to but could not report one of the bellwether drivers for sexual

23   misconduct, and certainly not because of any problem with app design.

24        Plaintiff also argues that Ms. Rando's testimony is "relevant in a more general sense" because

25   the "low" rate of sexual assault on Uber's platform may be a result of "Uber ma[king incidents] hard

26   to report." (*Id.* at 70.) But again, Ms. Rando does not argue that Uber's app design caused

27   underreporting at all, let alone estimate the app design's impact on underreporting. Rando Rep. ¶ 5.

28

40

1   At best, Plaintiff argues that Ms. Rando's opinion is relevant because it responds to arguments raised

2   by Uber's experts Vida Thomas (about notice) or Dr. Victoria Stodden (about rates of sexual assault).

3   Opp'n at 70. But Ms. Rando is an affirmative expert. She did not produce a rebuttal report responding

4   to either Ms. Thomas or Dr. Stodden; nor has she indicated that she has read either report. As such,

5   her opinion is not relevant.

6       In short, the alleged inadequacy of Uber's in-app reporting procedures does not move the

7   needle on whether Ms. Dean was injured due to Uber's conduct. As a result, Ms. Rando's opinions on

8   such procedures should be excluded, as they have been previously, in similar circumstances. *See*

9   *Johnson v. Ridge Tool Mfg. Co.*, No. 21 C 1939, 2025 WL 2430567, at *6 (N.D. Ill. Aug. 22, 2025)

10  (holding that because "Plaintiff did not read the user manual prior to operating the machine . . . any

11  opinion from Rando related to the user manual is irrelevant and therefore inadmissible"); *see also*

12  *Willard v. City of Everett*, 637 F. App'x 441, 442 (9th Cir. 2016) (upholding exclusion of "human

13  factors expert" because "[h]er proposed testimony wasn't relevant"); *Cole v. Keystone RV Co.*, No.

14  C18-5182RBL, 2020 WL 3969993, at *9 (W.D. Wash. July 14, 2020) (excluding human factors

15  expert's opinion "about the risks of formaldehyde exposure" because "there is no evidence of any

16  formaldehyde exposure in this case").

17      **C.    Ms. Rando Lacks An Appropriate Methodology.**

18      Plaintiff's Opposition also fails to demonstrate that Ms. Rando applied an appropriate

19  methodology.

20      ***First***, while Ms. Rando purports to speak on behalf of "Uber riders" and their experiences with

21  Uber's in-app reporting procedures, Rando Rep. ¶ 83, she conducted no interviews or surveys of any

22  actual user of the Uber app and possesses no credentials to speculate about what they were thinking.

23  Instead, she relies almost entirely on internal Uber documents. The flaws in Ms. Rando's analysis are

24  not merely an issue, as Plaintiff implies, of dictating a particular method for expert analysis, Opp'n at

25  72; they are a matter of failing to identify any accepted methodology that allows her to render opinions

26  about what consumers were thinking.

27      Plaintiff cites Ms. Rando's own report and deposition testimony as evidence that her analysis

28

41

1    is "widely accepted," *Id.* at 71, but "[t]his Court cannot do that – essentially taking the expert's word

2    for it – without abandoning its gatekeeping responsibility." *See In re Valsartan*, 2025 U.S. Dist. LEXIS

3    221602, *2-3. Plaintiff also relies on *In re MyFord Touch Consumer Litig.* and *Fujifilm Corp. v.*

4    *Motorola Mobility LLC* in support of her position that Ms. Rando's methodology was appropriate.

5    Opp'n at 71-72. But in both of those cases, unlike here, the human factors expert ***did conduct***

6    ***consumer interviews and surveys***. *See In re MyFord Touch Consumer Litig.*, No. 3:13-cv-03072-

7    EMC, (ECF 356) Berman Decl., Ex. 19 (expert performed a "driving study with 24 participants that

8    focused on measuring both subjective and objective measures of driver distraction"); *Fujifilm Corp.*

9    *v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 1737951, at *3 (N.D. Cal. Apr. 8,

10    2015) (expert considered "contemporaneous accounts of consumer behavior and preferences" in

11    addition to "market data" and "industry reports"). Plaintiff's self-serving evidence cannot cure the

12    fatal flaws in Ms. Rando's methodology.

13        ***Second***, Ms. Rando's opinions are speculative. As explained above, Plaintiff's alleged basis

14    for offering Ms. Rando is that other riders could have had negative experiences with the bellwether

15    drivers, who in turn could have been deterred from reporting because of negative app experiences, and

16    who otherwise could have reported such incidents to Uber, which Uber in turn could have used as a

17    basis to remove the bellwether drivers from the Uber platform before the bellwether plaintiffs took

18    their rides. Opp'n at 70. Plaintiff also alleges that Uber's app design could have made it difficult to

19    report, which could have reduced the reported rates of sexual assault, though she does not (and cannot)

20    quantify by how much. *Id.* Ms. Rando (and Plaintiff) cannot make such leaps in logic. *See, e.g.*,

21    *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 672 (D. Nev. 1996) (Such "speculation [and]

22    conjecture [is] inadmissible[.]") (citation omitted); *Plunkett v. Best Buy, Inc.*, 745 F. App'x 725 (9th

23    Cir. 2018) (upholding exclusion of human factors expert's opinions because they "were based on

24    speculation").

25        Ms. Rando also makes numerous inferences about "users' mental and emotional states." Rando

26    Rep. ¶ 169. Plaintiff attempts to justify these opinions on the ground that Ms. Rando considered

27    "research regarding how trauma affects the cognitive process." Opp'n at 73. But Ms. Rando admittedly

28

42

1  is not an expert in "sexual assault." Rando Dep. 37:1-4; *see also id*. 41:18-42:7, 43:4-10, 44:2-8

2  (referencing Ms. Rando's lack of publications and experience concerning "sexual assault or sexual

3  misconduct"). Her general qualifications in the field of "human factors" do not qualify her to opine on

4  the mental and emotional states of victims of sexual assaults and sexual misconduct, particularly

5  without the benefit of interviews or surveys. For this reason, too, her opinions should be excluded.

6    DATED: December 29, 2025                Respectfully submitted,

7                                         */s/ Laura Vartain Horn*

8                                       Laura Vartain Horn (SBN 258485)
   **KIRKLAND & ELLIS LLP**
9  555 California Street, Suite 2700
   San Francisco, CA 94104
10 Telephone: (415) 439-1625
   laura.vartain@kirkland.com

11 Allison M. Brown (Admitted *Pro Hac Vice*)
   **KIRKLAND & ELLIS LLP**
12 2005 Market Street, Suite 1000
   Philadelphia, PA 19103
13 Telephone: (215) 268-5000
   alli.brown@kirkland.com

14

15 Jessica Davidson (Admitted *Pro Hac Vice*)
   **KIRKLAND & ELLIS LLP**
16 601 Lexington Avenue
   New York, NY 10022
17 Telephone: (212) 446-4800
   jessica.davidson@kirkland.com

18 Kim Bueno (Admitted *Pro Hac Vice*)
   **KIRKLAND & ELLIS LLP**
19 401 W. 4th Street, Austin, TX 78701
   Telephone: (512) 355-4390
20 kim.bueno@kirkland.com

21 *Attorneys for Defendants*
   UBER TECHNOLOGIES, INC.,
22 RASIER, LLC, And RASIER-CA, LLC

23

24

25

26

27

28

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 29, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: *<u>/s/ Laura Vartain Horn</u>*
Laura Vartain Horn