# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

───────────────

# IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

## Case No. 3:23-md-03084-CRB

───────────────

## SUPPLEMENTAL REPORT OF MINETTE E. DRUMWRIGHT, Ph.D

**This Report relates to the following Wave 1 Cases:**
**Case No. 24-cv-7940 (B.L.)**
**Case No. 24-cv-7821 (A.R.2)**
**Case No. 24-cv-7019 (LCHB128)**
**Case No. 23-cv-6708 (Dean)**
**Case No. 24-cv-4900 (WHB 832)**

## OCTOBER 22, 2025

Confidential – Subject to Protective Order

## I.    Introduction

1.    I write to supplement my expert report of September 26, 2025 ("Opening Report"), based on additional material made available after the disclosure of my Opening Report.[1] The additional material does not change my initial opinions, but it provides new evidence and additional bases for my opinions, especially as they pertain to the impropriety of the manner in which Uber uses its nonprofits partners to "safetywash" its reputation.

2.    In ¶413 of my Opening Report, my opinion was the following:

**Uber's PR was unreasonable, reckless, and irresponsible when employing dark-PR tactics to get its nonprofit partners to "safetywash" its brand image, and in doing so, Uber's marketing and strategic communications fell short of the norms, guidelines, and standards Uber had set for itself, as well as those described by numerous leading professional associations.**

3.    As discussed in ¶¶413-437 of my Opening Report, Uber used dark-PR tactics to get its nonprofit partners to "safetywash" its reputation. Safetywashing is the "strategic practice of promoting, marketing, and branding safety practices without full disclosure of negative information to improve the image of the organization."[2] Manipulating relationships in ways that compromise the integrity or independence of a key partner (*e.g.*, a nonprofit organization) is a dark-PR tactic.

4.    The crucial role that nonprofit organizations play in Uber's strategic communications around safety is reinforced by the 30(b)(6) deposition testimony of Emilie Boman, taken October 1, 2025. The testimony and exhibits from that deposition provided additional information that prompted additional analysis and review of Uber's documents.

---

[1] See my "Supplemental Materials Considered" list in Appendix A.

[2] *See* Ninan, Johan and Clegg, Stewart, "Safetywashing: The Strategic Use of Safety in the Construction Industry," *Journal of Management in Engineering*, 40 (4) (2024), p. 1: https://doi.org/10.1061/JMENEA.MEENG-5838.

## II.    Uber's Payments to Nonprofits

5.    Uber's payments to nonprofits that promote Uber's work are highly problematic and particularly egregious. As I elaborate below, Uber's funding was contingent on these nonprofits supporting Uber by serving as "brand ambassadors" who participated in Uber's safetywashing and allowed Uber to ghostwrite their op-eds and social media posts and script their statements and media interviews. Uber selected and funded nonprofit organizations in ways that were transactional and *quid pro quo*: Uber's funding in exchange for positive support. If the nonprofit support was not strong enough, Uber withdrew or lessened funding. Moreover, Uber failed to be transparent about the manner in which it was funding nonprofits.

6.    Uber provided ***at least*** ▮▮▮▮▮ million to support 242 nonprofits globally with at least ▮▮▮▮▮ of that total provided to nonprofits in the US.[3] These data represent the "floor" or minimum amounts because at Uber "[p]urchase orders were not mandatory until 2020, therefore pre-2020 information is incomplete."[4] Thus, the actual amounts are likely to be substantially higher. "Data not found" was listed for 165 of the nonprofit organizations that Uber has supported indicating that "no purchase orders were readily accessible and as a result, any amounts paid to such organizations cannot be readily verified."[5]  For instance, the earliest date listed for Uber providing funds to RAINN was 2018,[6] but internal documents indicate that Uber had a partnership with RAINN at least as early as 2014.[7]

7.    The two nonprofits that Uber contributed the most to were RAINN, which received ▮▮▮▮▮ between 2018 and 2024,[8] and Raliance, which received ▮▮▮▮▮ between

---

[3] Boman 30(b)(6) Deposition, October 1, 2026 - Deposition Aid, Ex. 2059, exact amounts = ▮▮▮▮▮▮▮▮▮.
[4] *Id*., p. 1.
[5] *Id.*
[6] *Id*., p. 7.
[7] Hourdajian Dep. Ex. 108, UBER_JCCP_MDL_000570221.
[8] Boman Deposition Aid, Ex. 2059, pp. 7-8, exact amount = ▮▮▮▮▮

2018 and 2025.[9] Raliance, which is a subsidiary of the Pennsylvania Coalition Against Rape ("PCAR"),[10] operates in partnership with the National Sexual Violence Resource Center ("NSVCR"), ValorUS (formerly "CAL Casa") and the National Alliance to End Sexual Violence. ("NAESV")[11] Uber's contributions to all organizations in the partnership total at least ██████████:[12] PCAR (Data not found),[13] Raliance (████████),[14] NSVRC (██████),[15] ValorUS (Data not found),[16] NAESV (██████).[17] Raliance and its sister organizations received ***at least*** ████████ ***from Uber*** in the 12 months (December 2018-November 2019) before November 21, 2019 when Raliance released a publication, "Examining Uber's Use of the Sexual Misconduct and Violence Taxonomy and the Development of Uber's United States Safety Report," praising Uber for the accuracy and rigor of its first Safety Report—PCAR (DATA NOT FOUND),[18] Raliance (████████),[19] NSVRC (████████),[20] ValorUS (DATA NOT FOUND),[21] NAESV (██████:[22]

> This project set out to assess Uber's integration of the taxonomy into its system of receiving and accurately categorizing complaints from platform users – the verification analysis – and Uber's approach to developing the US Safety Report – the systems assessment. Through the data collection and analysis activities we conducted, ***we learned that Uber has implemented the Sexual Misconduct and Violence Taxonomy with accuracy, employing strong quality assurance processes***

---

[9] *Id.*, pp. 2-3, exact amount = ████████.
[10] Boman Dep., p. 28.
[11] Boman Dep., p. 27-28.
[12] Exact amount = ████████.
[13] Boman Deposition Aid, Ex. 2059, p. 27 "Data not found" was the notation Uber made for 165 of the nonprofits listed as Uber partnerships in Boman Deposition Aid, Ex. 2059. It indicates that "no purchase orders were readily accessible and as a result, any amounts paid to such organizations cannot be readily verified." At Uber "[p]urchase orders were not mandatory until 2020, and therefore pre-2020 information is incomplete" (see Boman Deposition Aid, Ex. 2059, p. 1).
[14] *Id.*, pp. 2-3, exact amount = ████████.
[15] *Id.*, p. 4.
[16] *Id.*, p. 14.
[17] *Id.*, p. 6, exact amount = ████████.
[18] Boman Deposition Aid, Ex. 2059, p. 27.
[19] *Id.*, pp. 2-3, exact amount = ████████.
[20] *Id.*, p. 4.
[21] *Id.*, p. 14.
[22] *Id.*, p. 6-7, exact amount = ████████.

*to ensure ongoing accuracy. **They engage in a robust initial and ongoing training
process** that focuses on continual categorization alignment among employees who
use the taxonomy for both incident response and auditing purposes. These efforts
aim to produce reliable data across all categories, and our analyses conclude that
the goal has been largely achieved; **the sexual assault data in the taxonomy
categories included in the US Safety Report are statistically reliable. In general,
we found the processes to develop the US Safety Report focused on accuracy and
used rigorous data.**[23]*

8.   Raliance's publication turns a blind eye to the fact that the Safety Report only
provided data for five of the 21 categories in the taxonomy, and as such, downplayed the
prevalence and extent of sexual assault incidents in Uber rides and created anti-warnings (see
Opening Report ¶¶ 166-501.

9.   A robust stream of social science research has demonstrated that the judgments of
professionals ranging from accountants[24] to physicians[25] are influenced by money and other
incentives. Research dating back to the 1980s has demonstrated that physicians' requests to add
drugs to a hospital formulary as well as their prescribing behavior can be influenced by drug
company incentives such as funding for educational or research purposes or meals paid for by
the drug company.[26] Incentives need not be large to have influence. In one study, 61 percent of
physicians stated that industry promotions, such as free pens and free lunches, did not influence
their own prescribing behavior, but only 16 percent believed that other physicians were similarly

---

[23] https://www.raliance.org/wp-content/uploads/2019/12/Examining-Ubers-Use_102021.pdf at 11 (emphasis added).
[24] Bazerman, Max and Ann Tenbrunsel, *Blind Spots*. Princeton, NJ: Princeton University Press, 2021.
[25] Chren, Mary-Margaret and Seth Landefeld, "Physicians' Behavior and Their Interactions With Drug Companies:
A Controlled Study of Physicians Who Requested Additions to a Hospital Drug Formulary," *Journal of the
American Medical Asso*ciation, 1994, 271 (9): 684-689.
[26] Jerry Avorn, Milton Chen, and Robert Hartley, "Scientific verses Commercial Sources of Influence on the
Prescribing Behavior of Physicians," *American Journal of Medicine*, 1982, 73 (July): 4-8; James P. Orlowski and
Leon Watesaka, "The Effects of Pharmaceutical Firm Enticements on Physician Prescribing Patterns:  There's No
Such Thing as a Free Lunch," *CHEST*, 1992, vol. 102: 270-273; Ashley Wazana, "Physicians and the
Pharmaceutical Industry:  Is a Gift Ever Just a Gift," *Journal of the American Medical Association*, 2000, 283 (3)
373-380, 2000; Nicole Lurie, Eugene C. Rich, Deborah E. Simpson, Jeff Meyer, and David L. Schiedermayer, Jesse
L. Goodman, and W. Paul McKinney, "Pharmaceutical Representatives in Academic Medical Centers:  Interaction
with Faculty and Housestaff," *Journal of General Internal Medicine*, 5 (May/June) 240-243.

unaffected.[27] Small incentives such as pens have long been successful marketing techniques in other industries such as banking. For example, the Huntington Bank in Columbus, Ohio, has given away more than 32 million pens since its initial marketing promotion in 2010.[28]

10. Scholars have long voiced concerns about the ethical perils of nonprofits engaging in partnerships and related activities with companies. Weisbrod characterized partnerships between companies and nonprofits as creating a "world of minefields" for nonprofits that can cause them to fall prey to "losing their souls" or "losing sight of their social goals."[29] An imbalance of power between the company and the nonprofit occurs because the company provides the funding; as a result, the company can perceive that it "owns" the initiative and become "heavy handed" in getting the nonprofit to comply with its wishes.[30] A major concern for nonprofits interacting with companies is "mission drift," which occurs when nonprofits are pulled away from their altruistic and nonfinancial missions by commercial activities and interactions.[31] As such, partnerships between companies and nonprofits "may create an environment in which nonprofits must work especially hard to keep their charitable missions in focus."[32]

11. In contrast to Uber's nonprofit partners, UN Women[33] cancelled a partnership with Uber aimed to create one million jobs globally for women after the International Transport

---

[27] Michael A. Steinman, Michael G. Shlipak, and Stephen J. McPhee, "Of Principles and Pens: Attitudes and Practices of Medicine Housestaff toward Pharmaceutical Industry Promotions," *American Journal of Medicine*, 2001, 110: 7, 551-557.

[28] https://www.americanbanker.com/news/why-these-banks-still-give-away-millions-of-pens-a-year; https://www.columbusceo.com/story/business/2015/12/01/power-pen-ubiquitous-huntington-pen/22895506007/.

[29] Weisbrod, Burton H., "The Pitfalls of Profits," Standford Social Innovation Review, 2 (3), 2004, p. 43, 44, 46.

[30] Drumwright, Minette E. and Patrick E. Murphy, "Ethical Issues in Social Marketing and Persuasion" in *Handbook of Persuasion and Social Marketing,* ed., David Stewart, Santa Barbara, CA: Praeger, p. 190.

[31] Lutz, Fernanda Golbspan and Maira Petrini, "Mission Drift: What Leads and How to Avoid," *Encontro Da Anpa*d, 44, 2020.

[32] Weisbrod, Burton H. *To Profit or Not to Profit*. Cambridge, UK: Cambridge University Press, 1998, p. 305.

[33] In July 2010, the United Nations General Assembly created UN Women, the United Nations Entity for Gender Equality and the Empowerment of Women, to the challenges of gender equality globally; https://www.unwomen.org/en/about-us/about-un-women.

Federation ("ITF") raised objections about Uber's safety record with women and its treatment of drivers[34] including a lack of basic job protections and healthcare.[35] ITF asserted that "the creation of one million precarious, informal jobs will not contribute to women's economic empowerment and represents exactly the type of structural inequality within the labor market that the women's movement has been fighting for decades."[36] UN Women appeared to be able to keep its charitable mission in focus and avoid mission drift.

12. Given that even small incentives such as pens and free meals are motivating, Uber's payment of tens of thousands—and in some cases millions of dollars to nonprofits—reinforces my opinion in my Opening Report (see ¶¶ 413-437) that Uber motivated its nonprofit partners to safetywash its reputation. Because of the money Uber paid them, the nonprofits failed to scrutinize Uber or hold Uber accountable and/or agreed to praise Uber when they otherwise would not have done so. As such, the payments were highly unacceptable and particularly egregious. Moreover, they set the stage for "*quid pro quo*"[37] exchange relationships.

**III.** ███████████████████████████████████ **Uber's Inappropriate, Transactional, *Quid Pro Quo,* Exchange Relationships**

13. Sarfraz Maredia, Uber Vice President & Regional General Manager for US & Canada Mobility, characterized Uber's nonprofit partners as ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████."[38] Maredia's

---

[34] Alter, Charlotte, "UN Women Breaks Off Partnership with Uber," Time, March 23, 2015; https://time.com/3754537/un-women-breaks-off-partnership-with-uber/.
[35] "UN Women + Uber = A Vision for Precarious Work," International Transport Federation, March 12, 2015; https://time.com/wp-content/uploads/2015/03/no-to-un-women-uber-partnership.pdf.
[36] *Id.*
[37] "*Quid pro quo*" is a Latin phrase meaning "this for that."
[38] Boman Ex. 2037, UBER_JCCP_MDL_000208850. On Dec. 6, 2019, Mr. Sarfraz commented to Gus Fuldner ███████████████████████████████████████. *See also*, Bowman Oct. 1, 2025 Dep. at 68-72.

comment was prompted ██████████████████████████████████████████

████████████████████████████████████████████. [39]

      14. As I elaborate below, Uber's documents provide evidence that Uber had *quid pro quo* expectations of its nonprofit partners: positive comments about Uber in exchange for funding from Uber. This expectation appeared to shape the manner in which Uber selected nonprofit "partners" as well as how it funded them on an ongoing basis.  Uber's view of a "partner" appeared to connote a party that Uber could control and use to push its story. In September 2014, when Uber was choosing between a partnership with RAINN and It's On Us ("IOU"), a White House initiative, Matthew Hearns endorsed RAINN ████████████████ ███████████████████████████████████ in contrast Uber, ████████████████ ████████████████████ for the White House initiative:[40]

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[41]

---

[39] *Id.*
[40] Hourdajiian Ex. 108, UBER_JCCP_MDL_000570220
[41] *Id.*

15. Uber provided funding to IOU █████████████████████████ ████████████████████████████ as Brittany Anthony noted in an email in February 2021:[42]



16. In my opinion, Brittany Anthony's comment above clearly indicates that Uber expected to exchange funding for influence and access up to and including the Executive and Legislative branches of the Federal Government. This is evidence of Uber's highly problematic dark-PR tactics.

17. As noted above in ¶7, RAINN received more money from Uber than any other nonprofit in the US. Interestingly, Uber continued its partnership with RAINN despite criticism of RAINN's reputation. Tracey Breeden wrote to Gus Fuldner █████████████████████ █████████

[44]

18. Incredibly, Uber kept giving money to RAINN despite sustained criticism from 22 current and former RAINN employees that RAINN's leaders were racist and sexist, which was reported in *Business Insider*.[45] RAINN employees even petitioned to have CEO and Founder

[42] Uber paid ████████ to IOU between 2018 and 2025 according to Boman Deposition Aid, Ex. 2059, p. 11.
[43] UBER_JCCP_MDL_003895241 (emphasis added).
[44] Boman Ex. 2043, RAINN, UBER_JCCP_MDL_000433947.
[45] Boman Ex. 2046, UBER_JCCP_MDL_004530323.

Scott Berkowitz fired.[46] After learning about the *Business Insider* story, Uber's Roger Kaiser wrote, ███████████████████████████████████████████ to which Emilie Boman responded ███████████████████████████████[47] In my opinion, the evidence strongly suggests that Uber continued giving money to RAINN despite the concerns raised about it. RAINN was continuing to make positive comments about Uber,[48] and Uber was working with RAINN on a process to save Uber money in insurance costs (a hotline and survivor's fund).[49] ███████████████████████████████████████████ ████████████

19. Brittany Anthony lauded Raliance, the nonprofit receiving the second largest funding from Uber, for being "vocal supporters of Uber.███████████████████████ ███████████████████"[51]

20. One key criterion Uber imposed for funding nonprofits through its 2018-2019 Driving for Change program involved ███████████████████████████████████ ██████████████████████████████████████████ ██████ ███████ ███████████████████████████████████████████ ████████████████████████████████████ The listing in such a manner of these "Red flags" is highly unethical in that it embodies a transactional, *quid pro quo* exchange: Uber's money in exchange for positive support of Uber in the media from nonprofits.

[46] https://www.change.org/p/demand-resignation-of-scott-berkowitz-president-of-rainn-for-harming-survivors; https://www.instagram.com/rainnsurvivors/.
[47] Boman Ex. 2046, UBER_JCCP_MDL_004530323.
[48] Bowman Ex. 2040, UBER_JCCP_MDL_000914953.
[49] Boman Ex. 2049, UBER JCCP MDL 000118664.0001.
[50] Boman Ex. 2049, UBER JCCP MDL 000118664.0005.
[51] Boman Ex. 2033, UBER000029029.
[52] Boman Ex. 2040, UBER_JCCP MDL 000914948 at -4951.
[53] *Id.*

21. When reviewing the allocation of nonprofit funding, Andrew Bryne characterized

Uber's nonprofit partners ████████████████████████████████████████

████████████████████████ and he expressed dismay that Uber was expecting

████████████████████████████ from only four of the nine nonprofits receiving

Uber funding:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████[54]

22. Characterizing Uber's donations to nonprofits as ████████████████

████████████████████████████████████████ bemoaning that Uber is

████████████████████████████████, and portraying the amount of Uber's donations as

████████████████████████████████████████. In

addition, there is no mention of Uber desiring to learn from nonprofits or hear their honest

criticism. Bryne's approach is highly unethical in that it expresses a ████████████

████████████████████████████████████████████████

████████████████████

23. In response to a proposal to increase funding for RAINN, Bryne expressed

concern that ████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[54] *Id.*
[55] *Id.* (emphasis added).



24. Characterizing ███████████████████████████████████████

██████████████████████████████████████████████████████████

█████ further reinforces ███████████████████████████████████

███████████████████ The notion of purchasing nonprofit support through a market-based

process is highly inappropriate and highly unethical.

25. Byrne agreed to the increased funding for RAINN, but he was concerned that the

increase would ████████████████████████████████████████ however, he

agreed because █████████████████████████████████████████████

████

████████████████████████████████████████████████

26. Byrne reiterates █████████████████████████████████████

███████████████████ when he refers to Uber's increased donation to RAINN as a ██████████████

███████████████████ but relents because Uber ███████████ Byrne refers to the ████████

████████████████████ It is highly unethical and particularly egregious to view

nonprofits and their support as a market-based asset that can be purchased and used for corporate

purposes. This approach is illustrative of a PR department that has no conception of the ethical

practice of PR or of PR professionals serving in the role of organizational conscience in which

they provide ethical guidance for their companies.[57]

[56] *Id*. at -4949 (emphasis added).

[57] Neill, Marlene S. and Minette E. Drumwright (2012), "PR Professionals as Organizational Conscience," *Journal of Mass Media Ethics*, 27 (4), 221. Ryan, M., & Martinson, D.L. (1983) "The PR officer as corporate conscience." *Public Relations Quarterly*, 28 (2), 20-23; Bivins, T. H. (1992). "A systems model for ethical decision making in public relations." *Public Relations Review*, 18, 365-383. Bowen, S.A. (2008). "A state of neglect: Public relations as 'corporate conscience' or ethics counsel." *Journal of Public Relations Research*, 20, 271-296.

27. When Rachel Hass wrote that she thought that Uber's Driving Change partners would be more likely to go on the record to support Uber's Safety Report ███████████████ ███████████████████████████████████"[58] Bryne responded that he was █████████████████████████████████████████████████ ██████████████████



28. Again, Byrne's comment indicates that ███████████████████ ████████████████████████████████████████████████████ Byrne clearly views ███████████████████████████████████████ ████████████████████████████████████████████████████

Bryne's view is highly inappropriate and highly unethical.

29. In 2019, Uber had ████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████"[60] Instead of giving a fixed amount of ████████ Uber funded organizations at the ██████████████████████████ Demonstrating Uber's recognition that this approach represented a ██████████, Haas explained that the three organizations receiving ████████ each—███████████████████████████████ ███████████████████████████████████.[61]

████████████████████████████████████████████[62]

---

[58] Boman Ex. 2040, UBER_JCCP MDL_000914948 at -4951.
[59] *Id*. at -4949.
[60] *Id*. at -4949-4950.
[61] *Id*. at -4950.
[62] *Id*. (emphasis added).

30. Haas's comment portrays a ███████████████ that is highly unethical: less ███████████████████████████████ Haas's approach is highly unethical and embodies the unethical perspective that PR is a "profession for hire"[63] rather than the ethical perspective of PR professionals playing the role of "organizational conscience"[64] in which they raise and address ethical concerns responsibly.

31. ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████[65]████████████ ██████████████████████████.[66] In this context in which Uber has demonstrated its highly unethical and particularly egregious approach ██████████ ████████████████████████████████ ████████████████████████ and as such, is problematic.

32. In reviewing the funding of nonprofit organizations for Uber's 2019-2020 Driving Change initiative, Rachel Haas elaborated on the importance of Uber's nonprofit partnerships ██ ████████████████████████████ in a memo to Andrew Byrne:[67]

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[63] Bowen (2008), p. 282.
[64] Neill and Drumwright (2012), p. 221.
[65] Boman Ex. 2062, UBER_JCCP_MDL_002058964.
[66] Id.
[67] Bowman Ex. 2040, UBER_JCCP_MDL_000914948 at -4953.



33. The document addressing Driving Change funding in December 2021 attested to

34. Another rationale for the nonprofit partnerships was

because

35. The above comments are troublesome because they do not address anything related to what Uber can *learn* from nonprofits with respect to prevention of sexual assault and sexual misconduct, nor do they ask how the nonprofits might critique Uber's processes and help the company improve. Instead, they convey that Uber's relationships with these nonprofit organizations are aimed at getting their positive support in the media to blunt criticism of Uber, to benefit from their influence with politicians and regulators, and to compete effectively with Lyft.

36. In preparation for the release of its first Safety Report, Uber hired a consultant, Quadrant Strategies, to do research concerning the best way to address potentially negative

---

[68] *Id.* (emphasis added).
[69] Boman Ex. 2045, at UBER000231790 (emphasis added).
[70] Boman Ex. 2049, UBER JCCP MDL 000118664.0005.

reactions to the information regarding sexual violence in Uber rides. The Safety Report itself was being released by Uber not because of a desire for transparency, but instead to "get ahead" of the fact that its sexual assault problem was going to be tracked by outside entities.[71] Rather than let those outside entities tell the story, Uber decided to issue its own Safety Report so it could control the narrative.[72]  Quadrant Strategies conducted ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ In an April 2019 report, Quadrant Strategies informed Uber that ███████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████

███████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████

37. In this context, Uber's implementation of Quadrant Strategies' recommendations is highly problematic. As I opined in my Opening Report (see ¶¶ 413-437), Uber was simultaneously using dark-PR strategies to get nonprofits (*i.e.*, third-party expertise) to safetywash its reputation rather than using them to pursue "broader community benefits." Uber wrapped itself in the cloak of nonprofit approval, suggesting to the public that they work hand-

---

[71] UBER_JCCP_MDL_001255663.
[72] *Id.*
[73] Boman Ex. 2053, UBER_JCCP_MDL_001255663.
[74] Boman Ex. 2053, UBER_JCCP_MDL_001255663.0001.
[75] *Id.*

in-hand with nonprofit "partners."[76] But Uber's work with nonprofits was  targeted towards improving Uber's reputation.

      38. Moreover, Uber's Safety Report downplayed the prevalence and extent of sexual violence incidents on Uber rides, failed to warn of the risks and dangers, and provided anti-warnings (see Opening Report ¶¶ 166-501). As such, Uber's implementation of Quadrant Strategies' recommendations, combined with the perspective that Haas expressed— ███████ ████████████████████████████████—resulted in Uber doubling down on its dark-PR strategies to get nonprofits to safetywash for Uber upon the release of its Safety Report, including having one such non-profit write the forward of the Safety Report. This resulted in the public being further misled regarding the risks and dangers of Uber rides through safetywashing by nonprofits.

## IV.    Ghostwriting and Safetywashing Related to Uber's Safety Reports

      39. Ghostwriting occurs when a party (*e.g.*, a company) substantially contributes to a manuscript or statement attributed to another party (*e.g.*, a nonprofit) but is not identified in the byline or acknowledgements.[77] Ghostwriting raises serious ethical concerns because the endorsement appears to come from a third party (*e.g.*, a nonprofit organization) rather than from the company and is likely to have increased credibility because the source is a third party.[78] In the sciences and social sciences, ghostwriting is treated as research misconduct.[79] Scholars have

---

[76] https://www.uber.com/newsroom/driving-change-together/.
[77] Fosko, T.J., "Buying a Lie: The Harms and Deceptions of Ghostwriting," *University of Arkansas at Little Rock Law Review*, 35(1) 2012, 165-187.
[78] *Id.*
[79] Fusch, P.I., Ness, L.R., Booker, J.M., Fusch, G.E., "Ethical Implications of Plagiarism and Ghostwriting in an Open Society, *Journal of Social Change*, 9(1) 2017: 55-63.

proposed that academic medical faculty should be prohibited from publishing articles and editorials that are ghostwritten by company employees.[80]

40. On multiple occasions, Uber engaged in ghostwriting[81] for its nonprofit partners especially in conjunction with the release of Uber's Safety Reports. That is, Uber drafted, revised, or edited drafts of scripts, op-eds, blogs, or posts for its nonprofit partners in which they safetywashed Uber's reputation without revealing the company's contributions. The fact that Uber was ghostwriting for nonprofits was highly problematic in and of itself. As I elaborate below, Uber's ghostwriting was even more problematic because it was designed to reduce the negative impact of Uber's Safety Reports through safetywashing techniques such as framing sexual harassment as a societal problem rather than an Uber problems.[82]

41. Uber's ghostwriting to safetywash its reputation in the context of sexual assault and safety misconduct is particularly egregious and highly unacceptable, and it raises serious ethical concerns for multiple reasons. First, sexual assault and sexual misconduct are very serious and often devastating harms. Second, readers are less likely to scrutinize, think critically about a message, or use their cognitive defenses against persuasion if the message appears to be from a nonprofit organization that addresses preventing sexual assault and sexual misconduct— an objective, third party with relevant expertise—than they would if they knew that the message

---

[80] Brennan, Troyen, A., David J. Rothman, Linda Blank, David Blumenthal, Susan C. Chimonas, Jordan J. Cohen, Janlori Goldman, Jerome P. Kassirer, Harry Kimball, James Naughton, and Neil Smelser, "Health Industry Practices That Create Conflicts of Interest: A Policy Proposal for Academic Medical Centers," *JAMA*, 296(4), 2006: 429-433.
[81] In an article entitled, "Exorcizing Ghostwriting," the National Library of Medicine defines ghostwriting as "when someone substantially contributes to a manuscript, but is not mentioned in the byline or in the acknowledgements. At its extreme, ghostwriting is used by companies that pay professional writers to produce an article that supports the product of that company, while authorship is attributed to academic scientists. This practice conceals the involvement of the company and can affect perception of the effectiveness and safety of a product." Bosch, Xavier, "Exorcizing Ghostingwriting. . ." EMBO Reports, 2011 May 13;12(6):489–494. doi: 10.1038/embor.2011.87, https://pmc.ncbi.nlm.nih.gov/articles/PMC3128288/.
[82] UBER_JCCP_MDL_002340249, Boman Ex. 2054, UBER_JCCP MDL_000124113.

were coming from Uber.[83] As such, using nonprofits lends credibility to the ghostwriting. Contrast this with corporate advertising and other forms of commercial speech; when people read or hear that a communication is commercial speech, they can take that fact into account, can counterargue, and make their judgments accordingly. Third, safetywashing itself obscures the true dangers and risks of Uber rides and gives passengers a false sense of security. In my opinion, safetywashing provides passengers with a sense of security, which in light of the actual incidents occurring during Uber rides, was a false sense by definition (see Opening Report ¶¶ 438-501 for my discussion of anti-warnings and the statistics in the Safety Reports).

### A.   *Release of Uber's First Safety Report*

42. In my Opening Report in ¶¶ 438-501, I opine that Uber's Safety Reports provide evidence of safetywashing and anti-warnings because they downplay the prevalence and extent of sexual violence incidents by only revealing the incidents of sexual violence for five of the 21 categories, and they failed to warn vulnerable market segments (*e.g.*, young women) of the risks and dangers (*e.g.*, taking Ubers on nights, weekends, when drinking, near bars, in cars driven by men).[84] Moreover, they falsely reassured passengers and consumers that Uber rides were safe through statistics such as the following:



---

[83] Nebenzahl, Israel D. and Eugene D. Jaffe, "Ethical Dimensions of Advertising Executions," *Journal of Business Ethics*, 17(7), 1998: 805-815.
[84] Opening Report, ¶459.

43. On December 6, 2019, Rana Kortam, Uber's manager of global women's safety policy, ghostwrote an op-ed for Tracey E. Vitchers, executive director of It's On Us ("IOU"), in support of the release of Uber's first Safety Report:[85]

> Hi Tracey,
>
> Here is a suggested draft of the op-ed. This is your piece and the draft is just thought starters, so needless to say please make all the edits you want. Let me know when you're happy with it so we can pitch it ASAP while it's still hot, ideally in the next couple of hours.
>
> Thanks,
> Rana[86]

44. The op-ed published under Vitchers by-line[87] appeared in *Forbes* attributed only to Vitchers on December 12, 2019. It was almost identical to the draft created by Uber.[88]  The wording that is identical in Uber's draft and Vitchers' draft is in bold, italicized type and highlighted in yellow in the table below. The few differences in each version are in regular type:

---

[85] UBER_JCCP_MDL_000083883.
[86] *Id.*
[87] Id.
[88] UBER_JCCP_MDL_000096261, UBER_JCCP_MDL_000096262.

| UBER'S GHOSTWRITTEN DRAFT | VITCHERS' ECHOES IN FORBES |
|---|---|
| Yesterday/*last week* (UPDATE W/ RUN DATE) *Uber released a report confirming that it faces the same historic and entrenched issues we see in every corner of our country and society: sexual violence. Rightfully, many people are troubled by the numbers. Given Uber's size and scale, the numbers aren't surprising, but that doesn't make them any less difficult. Each data point represents a life changed forever.* | *Last week, Uber released a report confirming that it faces the same historic and entrenched issues we see in every corner of our country and society: sexual violence. Rightfully, many people are troubled by the numbers. Given Uber's size and scale, the numbers aren't surprising, but that doesn't make them any less difficult. Each data point represents a life changed forever.* |
| *But Uber is not the only company grappling with our national sexual assault crisis. These are issues that touch every company, organization, and campus in our country and far beyond it. My organization, It's On Us, as a national organization that works to combat college sexual assault, knows that sexual violence is all too common on college campuses across America. A recent survey from the American Association of Universities found that one-quarter of undergraduate women say they have been victims of sexual assault without consent since starting college.* | *But Uber is not the only company grappling with our national sexual assault crisis. These are issues that touch every company, organization, and campus in our country and far beyond it. My organization, It's On Us, as a national organization that works to combat college sexual assault, knows that sexual violence is all too common on college campuses across America. A recent survey from the American Association of Universities found that one-quarter of undergraduate women say they have been victims of sexual assault without consent since starting college,* and the numbers are higher for LGBTQ students and women of color. |
| *But Uber is the only company that is publicly talking about the problem and voluntarily providing the hard numbers to back it up.* | *But Uber is the only company* thus far *that is publicly talking about the problem and voluntarily providing the hard numbers to back it up.* |
| *By providing real and specific data about the most serious incidents, Uber has gone beyond the platitudes and policies of many companies. Caring about the issue of sexual assault is an important step. Developing* | *By providing real and specific data about the most serious incidents, Uber has gone beyond the platitudes and policies of many companies. Caring about the issue of sexual assault is an important step. Developing* |

| | |
|---|---|
| *sound policies and practices is another. But data is where the rubber meets the road.*<br><br>*Data is where accountability starts.* | *sound policies and practices is another. But data is where the rubber meets the road.*<br><br>*Data is where accountability* and a path to meaningful change *starts*. |
| *Regulations requiring disclosure have long been in place for colleges. The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics has, since 1990, required colleges and universities that receive federal funding to publicly report statistics of campus crime, including sexual assault, domestic or dating violence, and stalking. Passed in 1972, Title IX is a federal law aiming to end discrimination on the basis of gender in educational institutions, including requiring colleges and universities to "take immediate and effective steps to end sexual harassment and sexual violence".* | *Regulations requiring disclosure have long been in place for colleges. The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics has, since 1990, required colleges and universities that receive federal funding to publicly report statistics of campus crime, including sexual assault, domestic or dating violence, and stalking. Passed in 1972, Title IX is a federal law aiming to end discrimination on the basis of gender in educational institutions, including requiring colleges and universities to "take immediate and effective steps to end sexual harassment and sexual violence".* |
| *However, according to AAUW1, of over 11,000 campuses required to report crime data under the Clery Act, eighty-nine percent of college campuses reported ZERO incidences of rape in 2015. In 2016, this number was still unchanged. 2 These numbers are in sharp contrast to the Association of American Universities climate survey which polls over 180 thousand students from 33 public and private universities, which tell us that 13% of students and 26% of undergraduate women experienced nonconsensual sexual contact by physical force or inability to consent since they enrolled at the school.* | *However, according to AAUW, of over 11,000 campuses required to report crime data under the Clery Act, 89 percent of college campuses reported ZERO incidences of rape in 2015. In 2016, this number was still unchanged. These numbers are in sharp contrast to the Association of American Universities climate survey which polls over 180,000 students from 33 public and private universities, which tell us that 13 percent of students and 26 percent of undergraduate women experienced nonconsensual sexual contact by physical force or inability to consent since they enrolled at the school.* |
| *Zero is not real. And zero isn't safe.* | *Zero is not real. And zero isn't safe.* |
| | |

| | |
|---|---|
| *Zero avoids the issue of sexual assault and the accountability every company who does business with the public owes* the public. *When you aren't even counting reports of sexual assault and misconduct, how can you take meaningful or credible action to end them?* | *Zero avoids the issue of sexual assault and the accountability every company who does business with the public owes* us all. *When you aren't even counting reports of sexual assault and misconduct, how can you take meaningful or credible action to end them?* |
| *Safety can only happen when we have honesty and transparency about the sexual assault crisis. Real data is required for sound solutions that can address the root causes of these historic problems. Data shines a light on an issue, illuminating its depth and pervasiveness. It has the power to guide and measure efforts, and helps solutions extend beyond a company and reach across an industry.* | *Safety can only happen when we have honesty and transparency about the sexual assault crisis. Real data is required for sound solutions that can address the root causes of these historic problems. Data shines a light on an issue, illuminating its depth and pervasiveness. It has the power to guide and measure efforts, and helps solutions extend beyond a company and reach across an industry.* |
| *With the release of its US Safety Report, Uber has taken a major step forward and become a corporate leader in the fight against sexual assault and misconduct. My hope is that* other companies and organizations *take action and follow suit soon.* It's time *to make the data available to the public and empower real conversations about solutions.* | *With the release of its US Safety Report, Uber has taken a major step forward and become a corporate leader in the fight against sexual assault and misconduct. My hope is that others take action and follow suit soon.* It's On Us—including companies and organizations—*to make the data available to the public and empower real conversations about solutions.* |

45.    The op-ed conveyed Uber's key talking points "We know that sexual harassment and abuse can happen in any setting. . ."[89] and "Stop the silence: By being transparent with their safety record Uber aims to stop the silence surrounding gender-based violence, an issue that is far too common in our society."[90] Almost verbatim identical themes appeared in an Uber April 2019 briefing document as "KEY ADVOCATE THEMES": "This

---

[89] UBER_JCCP_MDL_002340249.
[90] UBER_JCCP_MDL_002029496.

isn't an Uber problem, it's a society problem"; "We haven't seen a company disclose this information proactively before."[91] The op-ed also echoes themes in a 2019 article by Tracey Breeden, Uber's Global Safety Communications Lead, on the Uber website: "[i]t [sexual harassment] can happen anywhere—in our homes, our schools, our workplaces, our transportation and even our public spaces."[92]

46.    Ghostwriting an editorial such as the above is highly unacceptable and particularly egregious because it falsely leads any readers of the editorial or of articles or posts that cite or link to the editorial to think that the editorial is the unprompted opinion of an objective third party with expertise in preventing sexual harassment, IOU, rather than commercial speech that is a product of Uber's public relations apparatus. As such, readers are less likely to scrutinize or think critically about the content in the manner that they would if they knew that the source was Uber, and thus, they are more likely to believe it.[93]

47.    Uber's ghostwriting did not stop with the op-Ed in Forbes. Uber ghostwrote numerous tweets for its nonprofit partners.[94]  When Uber's first Safety Report was released, Brooke Anderson worried ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

---

[91] Boman Ex. 2054, UBER_JCCP MDL_000124113.
[92] https://www.uber.com/en-BE/newsroom/driving-change-together/.
[93] Nebenzahl, Israel D. and Eugene D. Jaffe, "Ethical Dimensions of Advertising Executions," Journal of Business Ethics, 17(7), 1998: 805-815.
[94] Ex. 2055, UBER_JCCP _MDL_000394403 (discussing revisions to Raliance, Ebony [Tucker], NSVRC, and Karen Baker's tweets).
[95] Id.



48.    This practice is highly unacceptable and particularly egregious because it gives readers the false impression that the tweets are the unprompted and independent expressions of third parties with expertise in preventing sexual assault rather than communications written, coordinated, and managed by Uber. Had consumers known that these tweets were actually written by Uber, they could have taken the source into account, counterargued, and made their judgments accordingly. Instead, Uber used non-profits to create the misleading impression that these third-party non-profits were independently making positive posts relating to Uber's Safety Report.

49.    Below are examples of positive tweets in which nonprofit organizations applaud Uber for its "accountability and transparency" and for "leading the charge to make safety a priority."



**RAINN** ✔ @RAINN · 12/5/19

We appreciate @Uber's transparency on sexual violence. Understanding the problem is an important step in solving it. We'd love to see orgs in every industry track and analyze misconduct.

washingtonpost.com/technology/201...

💬 12    ⟲ 42    ♡ 109    📊    🔖    ⬆️

**NNEDV** @nnedv · 12/5/19

Replying to @nnedv and @Uber

"@Uber has been a longtime partner in standing against sexual assault – not just through accountability and transparency, but also by supporting survivors, eliminating barriers to reporting, and taking steps to prevent violence and harassment."
-@CindySouthworth #Safety4Survivors

💬 3    ⟲ 8    ♡ 8    📊    🔖    ⬆️



| Top | Latest | People | Videos | Photos |

**RALIANCE** @RALIANCEOrg · 12/5/19

Replying to @Amy_Siskind

These are not easy numbers to see, but sexual assault is not just one company's problem or issue. **Uber** is confronting these challenging issues head-on by releasing this data publicly rather than minimizing the numbers. More companies need to follow their lead.

💬    ⟲    ♡ 4    📊    🔖    ⬆️

**DC Rape Crisis Center (DCR...** · 12/5/19

Our partners at @Uber have rolled out their #Safetyreport and they are leading the charge to make safety a priority , and not an option. #Accountability

💬    ⟲    ♡ 3    📊    🔖    ⬆️

**NNEDV** @nnedv · 12/6/19

"That a company is willing to peel back the drapes and let us look into what is happening is, to me, the success," said @CindySouthworth, the executive vice president of NNEDV and a member of @Uber's safety advisory board.

Read more via @nytimes: nyti.ms/2YmGwJP



| Top | Latest | People | Videos | Photos |

**National Sexual Violence Re...** · 12/6/19

We worked with @urbaninstitute and @RALIANCEOrg to create an open-source classification system for incidents of sexual assault that made @uber's safety report possible. Learn more at: nsvrc.org/uber-taxonomy-... buff.ly/2sOFOFV

💬 1    ⟲ 5    ♡ 11    📊    🔖    ⬆️

50. These tweets are highly problematic in the context that I describe in my Opening Report in that Uber was safetywashing its reputation through these nonprofit "partners" as well as through its own endeavors:

  a. by focusing its marketing and strategic communications almost exclusively on the perception of safety and safety sentiment rather than safety itself (see Opening Report, ¶¶ 168-201);

  b. by using its marketing and strategic communication to mislead the public regarding the safety of Uber's rides and the rigor of its background checks (see Opening Report, ¶¶ 202-239);

  c. by targeting multiple vulnerable segments and failing to disclose the risks and dangers (see Opening Report, ¶¶ 240-328);

  d. by failing to implement safety features in a timely manner (see Opening Report, ¶¶ 330-381); and

  e. by downplaying the prevalence and extent of sexual violence incidents during Uber rides, creating antiwarnings, and failing to be transparent, disclose, or warn the public (see Opening Report, ¶¶ 166-501).

51. Tweets from some of these same nonprofit organizations that were issued prior to them receiving Driving Change funding show how receipt of that funding changed the tone of the nonprofits' tweets from critical, watchdog comments that call out ethical infractions by Uber (e.g., unjust firings, silencing journalists) and/or its drivers (e.g., rape by driver) to tweets that praise Uber (e.g., corporate courage by speaking out against sexual violence):



**National Sexual Violence Resource Center**
@NSVRC

Via @BostonGlobe: Uber driver is accused in rape, kidnapping of customer bostonglobe.com/metro/2014/12/... ✔

12:39 PM · Dec 19, 2014                                                    96

**Pennsylvania Coalition to Advance Respect (PCAR)**
@PCARORG

Uber fires 20 staff after harassment investigation
bbc.com/news/business-... ✔

2:15 PM · Jun 7, 2017                                                      97

**Pennsylvania Coalition to Advance Respect (PCAR)**
@PCARORG

Engineer says Uber hired firm to investigate her after she reported sexual harassment
theguardian.com/technology/201... ✔

1:12 PM · Mar 6, 2017                                                      98

**Pennsylvania Coalition to Advance Respect (PCAR)**
@PCARORG

See just how far Uber will go to silence journalists and attack women. Say No More  to THIS. owl.li/EAWON ✔

11:02 AM · Nov 21, 2014                                                    99

---

[96] https://x.com/NSVRC/status/546012060895547392.
[97] https://x.com/PCARORG/status/872532434558091264.
[98] https://x.com/PCARORG/status/838829647152443393.
[99] https://x.com/PCARORG/status/535840713414819841.



| Before | |
| --- | --- |
| After | |

52. The impact of Uber's work with nonprofits was not limited to positive tweets, op-eds, and reports. Uber's nonprofit partners also reflected Uber's key talking points when they gave interviews to the new media in support of the first Safety Report ("We haven't seen a company disclose this information proactively before; This isn't an Uber problem, it's a societal problem").[101] Indira Henard, executive director of the DC Rape Crisis Center was quoted in WUA9:

> "The numbers are gut-wrenching, and it's a hard truth," the Executive Director of the DC Rape Crisis Center Indira Henard said. "I think what we have to remember is a couple of things. One, those numbers reflect part of the story. And we also have to remember that sexual violence is one of the most under-reported crimes."

---

[100] https://x.com/NSVRC/status/1164145275335843842.
[101] Boman Ex. 2054, UBER_JCCP MDL_000124113.

Henard said the DCRCC also works with Uber to try and prevent sexual incidents. She said ***Uber is leading the charge in offering translucency by publishing its safety report***. "But more importantly, I think this data shows us is that ***sexual assault is a widespread problem, it is a global problem,***" Henard said.[102]

53. It is highly problematic and particularly egregious for companies to prompt nonprofit leaders to echo the company's talking points. Readers and viewers assume that the nonprofit leaders are providing their independent, unprompted, and unvarnished opinions. This is even more problematic when the talking points are misleading like the ones Uber issued, which seek to assure passengers that they are safe to take an Uber, rather than providing them with the information they need to assess the risk of taking an Uber.

54. The forward to Uber's first Safety Report was written by Karen Baker, who identified herself as the CEO of the National Sexual Violence Resource Center (NSVRC).[103] As demonstrated below, Baker's editorial reflected the themes identified as "KEY ADVOCATE MESSAGES" in an April 2019 Uber briefing document.[104] The similarities are in bold, italic type and highlighted in yellow:

| UBERS TALKING POINTS[105] | ECHOING UBER'S TALKING POINTS: BAKER'S FORWARD[106] |
|---|---|
| Uber did a ***bold***, brave thing today that sets a ***new bar on corporate responsibility.*** | The publication of this report is a ***bold*** step that builds off of that effort and sets ***a new bar for corporate responsibility*** and transparency. |
| ***We haven't seen a company disclose this information proactively before*** and that in itself is a big step forward. | ***Never before have we seen a company disclose this level of information proactively.*** |

---

[102] https://www.wusa9.com/article/features/producers-picks/uber-releases-safety-report/65-7e8482d7-d286-4a97-ad30-094f9569cfd7.

[103] Uber US Safety Report 2017-2018, p. 6, https://tb-static.uber.com/prod/udam-assets/drclg/UberUSSafetyReport_201718_FullReport.pdf.

[104] Boman Ex. 2054, UBER_JCCP MDL_000124113.

[105] Boman Ex. 2054, UBER_JCCP MDL_000124113.

[106] Uber US Safety Report 2017-2018, p. 6, https://tb-static.uber.com/prod/udam-assets/drclg/UberUSSafetyReport_201718_FullReport.pdf.

| | |
|---|---|
| *This isn't an Uber problem, it is a society problem*. Sexual assault is taking place in every form of transportation and industry, and *companies are just not telling you about it.* | … *sexual harassment and abuse occur in all industries because they are a part of our larger society*. All too often we have seen *institutions respond to this reality by dismissing, denying, and downplaying the data and the broader problem* |
| Underreporting: *We expect that numbers -* like they always do - *will go up in the future* which is counterintuitive but actually a good thing. *It means victims have more confidence that the company will take the incident seriously and do something about it.* | We also know that *reporting goes up when people know how to report and feel that their reports will be taken seriously.* |
| *We would love to see more companies do what Uber is doing, bringing sexual violence into the light, counting it consistently, and sharing data with the public.* | … business leaders have a unique opportunity to play a role in addressing the pervasive problem of sexual assault and harassment. *In order to contribute, they need to first accurately assess the nature and scope of sexual misconduct in their context.* |

55. Baker, who is CEO of PCAR/NSVRC and Managing Partner of Raliance,[107] acknowledged in her forward that she had been working with Uber and the Urban Institute for two years,[108] but she did not reveal that Uber had paid NSVRC ███████ prior to the release of the Safety Report,[109] or that Uber had paid NSVRC's sister organizations more than ███████ between the beginning of 2018 and May of 2019: Raliance (███████)[110] and National Alliance to End Sexual Violence (NAESV) (███████).[111]

56. Funding or any incentive—even a gift of minimal value—always risks creating a conflict of interest.[112] A conflict of interest occurs when one's primary interest (*e.g.*, one's

---

[107] https://www.linkedin.com/in/karen-baker-4bbb0723/.
[108] Uber paid the Urban Institute ███ between 2017 and 2018, Boman Deposition Aid, Exhibit 2059, p. 30.
[109] Boman Deposition Aid, Ex. 2059, p. 4.
[110] Boman Deposition Aid, Ex. 2059, p. 2., exact amount: ███████
[111] Boman Deposition Aid, Ex. 2059, p. 6., exact amount: ███████.
[112] Brennan, Troyen, A., David J. Rothman, Linda Blank, David Blumenthal, Susan C. Chimonas, Jordan J. Cohen, Janlori Goldman, Jerome P. Kassirer, Harry Kimball, James Naughton, and Neil Smelser, "Health Industry Practices That Create Conflicts of Interest: A Policy Proposal for Academic Medical Centers," *JAMA*, 296(4), 2006: 429-433.

professional judgment) is unduly influenced by a secondary interest (*e.g.*, financial gain).[113]
More specifically, a financial conflict of interest occurs when people are tempted to deviate from
their professional obligations for economic or other personal gain.[114] In this case, by paying non-
profits money (for example as part of its Driving Change initiative), a conflict of interest was
created. In business, a common practice is to reveal the conflict of interest (*e.g.*, the amount of
money received), so that others can take that into account when making their own judgments.
Scholars and ethicists recommend eliminating the conflict of interest rather than disclosing it
because it is easy and tempting to disclose a conflict of interest and then proceed as if it did not
exist.[115]

57. Uber's ghostwriting for its nonprofit partners in conjunction with the release of its
first Safety Report is problematic because the ghostwriting was not disclosed. By funding the
nonprofits, Uber created conflicts of interest. This resulted in significant ethical problems
because readers and viewers were misled. They had no way of knowing that statements, tweets,
op-eds, and other communications attributed to nonprofit leaders—which appeared to be
independent, unprompted, and unvarnished opinions of nonprofit leaders with expertise in
combatting sexual assault—were actually written, managed, and coordinated by Uber, which was
also providing these nonprofits with funds. As such, consumers were primed to believe the
ghostwritten materials without scrutinizing them, counterarguing, and taking the source in
account when making their judgments as they would if they had known that these were actually

---

[113] Thompson, Dennis F., "Understanding Financial Conflicts of Interest," *New England Journal of Medicine*, 329: 573-576.
[114] Brennan, Troyen, A., David J. Rothman, Linda Blank, David Blumenthal, Susan C. Chimonas, Jordan J. Cohen, Janlori Goldman, Jerome P. Kassirer, Harry Kimball, James Naughton, and Neil Smelser, "Health Industry Practices That Create Conflicts of Interest: A Policy Proposal for Academic Medical Centers," *JAMA*, 296(4), 2006: 429-433.
[115] *Id.*

statements from Uber and that Uber was funding the nonprofit.[116] These facts strongly reinforce my opinion that Uber's PR was unreasonable, reckless, and irresponsible in using dark-PR strategies to get its nonprofit partners to safetywash its reputation.

**B.    *Release of Uber's Second Safety Report***

58. In releasing its second Safety Report, Uber repeated and doubled down on the problematic ghostwriting and troubling conflicts of interest that accompanied the introduction of its first Safety Report creating ever more serious ethical concerns.

59. In February 2022, Uber scheduled "advocate briefings" with three of its nonprofit partners to ask for their support during the release of its second Safety Report: Scott Berkowitz, president and founder of RAINN; Deborah Vagins, president and CEO of NNEDV; and Indira Henard, executive director of the DC Rape Crisis Center (DCRCC).[117] The following were among Uber's "key talking points" for the briefings:[118]

> **Safety Report**
> We are proud to follow through on our commitment to continue to be transparent about the critical safety incidents that occur on our platform and we hope it will encourage other companies to report going forward.
>
> **Zero Isn't Safer**
> We know that zero reports of sexual assault does not mean that a company (or institution/platform) is safer.
>
> **Law Enforcement Reporting:**
> We continue to receive criticism from the media, regulators, and law enforcement on Uber's stance to not proactively report sexual assault to law enforcement. It would be incredibly helpful to have a current advocate resource (*e.g.* an Op-Ed, a blog, an online resource), on survivor agency and reasons why survivors may not want to report to law enforcement, so that we could direct critics to this resource.[119]

---

[116] Nebenzahl, Israel D. and Eugene D. Jaffe, "Ethical Dimensions of Advertising Executions," Journal of Business Ethics, 17(7), 1998: 805-815.
[117] UBER_JCCP_MDL_000483530.
[118] *Id.*
[119] *Id.*

60. In this context, Uber was priming its nonprofit partners to continue safetywashing its reputation while Uber was downplaying the prevalence and extent of sexual violence incidents during Uber rides, creating anti-warnings, and failing to be transparent, disclose, or warn the public (see Opening Report, ¶¶ 166-501).

61. In April 2022, Uber communication employees—Andrew Hasbun, Kristin Smith, Emilie Boman, and Elise Maiolino—worked on drafting statements to support the release of the second Safety Report for Dr. Indira Henard, executive director of the DC Rape Crisis Center, and the Honorable Bella Dinh-Zarr, Ph.D., MPH, former Vice Chairman and Acting Chairman of the National Transportation Safety Board (NTSB) in various messages.[120] Uber personnel wrote statements for nonprofit leaders that portrayed Uber's key safetywashing themes: lauding Uber for releasing its Safety Report and framing sexual assault as a societal problem rather than an Uber problem:

> ***When Uber published its first Safety Report in December 2019, it represented a turning point among major corporations reluctant to publicly share information. We know sexual harassment and abuse can happen in any setting but all too often it*** is kept secret. Secrecy doesn't make anyone safer.[121]

> The national statistics around sexual assault and road safety speak for themselves. A 2019 national study found that 81 % of women and 43% of men report experiencing some form of sexual harassment and/or assault in their lifetime ...[122]

62. Uber's ghostwriting messages for nonprofit leaders in this context is highly unacceptable and particularly egregious. First, the messages safetywash Uber's reputation by downplaying the risks and dangers of sexual assault and sexual misconduct on Uber's platform through techniques such as portraying them as societal problems rather than Uber problems. Second, consumers are led to believe that the messages are unprompted and independent

---

[120] UBER_JCCP_MDL_002054713, UBER_JCCP_MDL_002340273, UBER, UBER_JCCP_MDL_002340249.
[121] UBER_JCCP_MDL_002340249 at -0253.
[122] *Id*. at -0271.

messages of support from objective third parties when they are really messages written, coordinated, and managed by Uber. In contrast, if consumers knew that the messages were actually from Uber, they would have viewed the messages as commercial speech and taken that into account in processing them.[123]

63. On June 30, 2022, Elise Maiolino brokered a time for Indira Henard of DCRCC to talk with the *New York Times*:

> When would be a good time for you to speak to them in the next two hours? I am also attaching the doc we spoke about yesterday.[124]

64. For Uber to provide a small, local nonprofit such as DCRCC a national platform through the *New York Times* is a huge benefit that translates into valuable "earned media" visibility.[125] As such, it is another type of incentive that Uber provides DCRCC to continue safetywashing on its behalf, and as such, is problematic because research has demonstrated that even small gifts and incentives can be motivating.[126]

65. On July 1, 2022, Andrew Hasbun wrote to his Uber colleagues regarding public relations efforts related to the release of the second safety report including Henard's interview with the *New York Times* and tweets by Uber's nonprofit partners:[127]

> The New York Times wrote a thoughtful, detailed story about the report and included a quote from Indira Henard, a member of our Safety Advisory Board and Executive Director of the DC Rape Crisis Center, who said the report could help "dispel stigma" around reporting sexual assault. Advocacy groups voiced more public support on Twitter including Valor, DC Rape Crisis Center and NNEDV,

---

[123] Nebenzahl, Israel D. and Eugene D. Jaffe, "Ethical Dimensions of Advertising Executions," Journal of Business Ethics, 17(7), 1998: 805-815.
[124] UBER_JCCP_MDL_002029495.
[125] Earned media is exposure or publicity gained through news coverage rather than through paid advertising. It is especially valuable since it is not paid for in the manner that advertising is.
[126] Michael A. Steinman, Michael G. Shlipak, and Stephen J. McPhee, "Of Principles and Pens: Attitudes and Practices of Medicine Housestaff toward Pharmaceutical Industry Promotions," *American Journal of Medicine*, 2001, 110: 7, 551-557; https://www.americanbanker.com/news/why-these-banks-still-give-away-millions-of-pens-a-year; https://www.columbusceo.com/story/business/2015/12/01/power-pen-ubiquitous-huntington-pen/22895506007/.
[127] Hasbun Ex .584, UBER_JCCP_MDL_003221256.

with more to come. Responsibility.org called the report the "gold standard" for corporate responsibility and the Governors Highway Safety Association praised our "unwavering commitment" to road safety.[128]

66. Henard's quote in the *New York Times* article was the following:

Indira Henard, a member of Uber's Safety Advisory Board and the executive director of the D.C. Rape Crisis Center, said releasing data about sexual assaults could help dispel stigma around an underreported[129] type of crime.

67. Below are examples of some tweets by Uber's nonprofit partners in support of the

release of Uber's second Safety Report.



---

[128] Hasbun, Ex. 584, UBER_JCCP_MDL_003221256.
[129] Ironically, Uber dramatically underreported the number of sexual violence reports by only reporting five of the 21 categories in its in its own typology.



68. As I noted earlier, in another context that is free of company influence, tweets such as these might not be problematic. However, they are highly problematic and particularly egregious given the context that I describe in my Opening Report in which Uber is using its influence to get nonprofits to safetywash on its behalf while it is simultaneously safetywashing its reputation in various ways:

a.   by focusing its marketing and strategic communications almost exclusively on the perception of safety and safety sentiment rather than safety itself (see Opening Report, ¶¶ 168-201);

b.   by using its marketing and strategic communication to mislead the public regarding the safety of Uber's rides and the rigor of its background checks (See Opening Report, ¶¶ 202-239);

c.   by targeting multiple vulnerable segments and failing to disclose the risks and dangers (See Opening Report, ¶¶ 240-328);

d.   by failing to implement safety features in a timely manner (See Opening Report, ¶¶ 330-381); and

e.   by downplaying the prevalence and extent of sexual violence incidents during Uber rides, creating antiwarnings, and failing to be transparent, disclose, or warn the public (See Opening Report, ¶¶ 166-501).

69. Moreover, as I describe above (see §2), Uber was giving incentives to nonprofit organizations to post favorable comments about its safety while simultaneously safetywashing its reputation and creating anti-warnings.

## X.    Conclusion

70. The additional materials I reviewed did not change any of my opinions disclosed in my Opening Report. Instead, they reinforced and provided additional bases for my earlier opinions that Uber used dark-PR strategies to get its nonprofit partners to "safetywash" its brand image, and in doing so, Uber's marketing and strategic communications fell short of the guidelines that it set for itself, as well as those described by numerous leading professional organizations.

71. I reserve the right to further supplement my report as additional discovery is produced or additional fact deposition testimony is taken.

Minette Drumwright, Ph.D.

Dated: October 22, 2025

# APPENDIX A

## SUPPLEMENTAL MATERIALS CONSIDERED LIST

**All Citations and References in the Supplemental Expert Report**


**News Articles, Web Postings, Social Media Posts**

https://rainn.org/strategies-to-reduce-risk-increase-safety/tips-for-safer-ridesharing/

https://twitter.com/nnedv/status/1542655527695667200

https://www.businessinsider.com/rainn-crisis-racism-sexism-employees-say-hollywood-corporate-america-2022-2

https://www.change.org/p/demand-resignation-of-scott-berkowitz-president-of-rainn-for-harming-survivors

https://www.nomore.org/driving-real-change/

https://www.nomore.org/stand-up-dont-stand-by/

https://x.com/nnedv/status/1542655527695667200?s=46

https://www.linkedin.com/posts/tracey-breeden-68061b13_ubers-festering-sexual-assault-problem-activity-7358873867672604673-m2h7/


**Uber Website**

https://www.uber.com/en-QA/newsroom/driving-change-together/

https://www.uber.com/newsroom/driving-change-2021/

https://www.uber.com/newsroom/driving-more-change/

https://www.uber.com/newsroom/end-gender-based-violence-together/

https://www.uber.com/newsroom/working-together-to-drive-change/


**MDL and JCCP Depositions with Exhibits**

30(b)(6) Deposition of Emilie Boman, October 1, 2025, and all exhibits thereto

30(b)(6) Deposition of Sonny Wong. October 14, 2025, and all exhibits thereto

**Documents Produced**

NSVRC_00007

NSVRC_00011

NSVRC_49559

NSVRC_77845

UBER_JCCP_MDL_000000033

UBER_JCCP_MDL_000000042

UBER_JCCP_MDL_000000046

UBER_JCCP_MDL_000000767

UBER_JCCP_MDL_000003518

UBER_JCCP_MDL_000005786

UBER_JCCP_MDL_000007361

UBER_JCCP_MDL_000015903

UBER_JCCP_MDL_000016369

UBER_JCCP_MDL_000026934

UBER_JCCP_MDL_000026935

UBER_JCCP_MDL_000032133

UBER_JCCP_MDL_000059304

UBER_JCCP_MDL_000059511

UBER_JCCP_MDL_000064434

UBER_JCCP_MDL_000070476

UBER_JCCP_MDL_000072046

UBER_JCCP_MDL_000076162

UBER_JCCP_MDL_000082131

UBER_JCCP_MDL_000083883

UBER_JCCP_MDL_000094966

UBER_JCCP_MDL_000095398

UBER_JCCP_MDL_000110213

UBER_JCCP_MDL_000113188

UBER_JCCP_MDL_000114678

UBER_JCCP_MDL_000114748

UBER_JCCP_MDL_000119079

UBER_JCCP_MDL_000122430

UBER_JCCP_MDL_000130412

UBER_JCCP_MDL_000132186

UBER_JCCP_MDL_000157120

UBER_JCCP_MDL_000185443

UBER_JCCP_MDL_000195735

UBER_JCCP_MDL_000231670

UBER_JCCP_MDL_000231934

UBER_JCCP_MDL_000233135

UBER_JCCP_MDL_000236766

UBER_JCCP_MDL_000236776

UBER_JCCP_MDL_000242917

UBER_JCCP_MDL_000242919

UBER_JCCP_MDL_000253572

UBER_JCCP_MDL_000254541

UBER_JCCP_MDL_000254983

UBER_JCCP_MDL_000254983

UBER_JCCP_MDL_000255447

UBER_JCCP_MDL_000259077

UBER_JCCP_MDL_000277860

UBER_JCCP_MDL_000285218

UBER_JCCP_MDL_000304758

UBER_JCCP_MDL_000305180

UBER_JCCP_MDL_000306985

UBER_JCCP_MDL_000323978

UBER_JCCP_MDL_000325057

UBER_JCCP_MDL_000369378

UBER_JCCP_MDL_000369392

UBER_JCCP_MDL_000389572

UBER_JCCP_MDL_000418200

UBER_JCCP_MDL_000419963

UBER_JCCP_MDL_000441509

UBER_JCCP_MDL_000479229

UBER_JCCP_MDL_000483530

UBER_JCCP_MDL_000483668

UBER_JCCP_MDL_000484052

UBER_JCCP_MDL_000503282

UBER_JCCP_MDL_000505087

UBER_JCCP_MDL_000534228

UBER_JCCP_MDL_000534415

UBER_JCCP_MDL_000549564

UBER_JCCP_MDL_000549565

UBER_JCCP_MDL_000562534

UBER_JCCP_MDL_000863491

UBER_JCCP_MDL_000903731

UBER_JCCP_MDL_000914818

UBER_JCCP_MDL_000914829

UBER_JCCP_MDL_000915000

UBER_JCCP_MDL_000915060

UBER_JCCP_MDL_000917030

UBER_JCCP_MDL_000920758

UBER_JCCP_MDL_000924200

UBER_JCCP_MDL_000947114

UBER_JCCP_MDL_000960715

UBER_JCCP_MDL_000960864

UBER_JCCP_MDL_001115640

UBER_JCCP_MDL_001281875

UBER_JCCP_MDL_001439203

UBER_JCCP_MDL_001458756

UBER_JCCP_MDL_001458770

UBER_JCCP_MDL_001483065

UBER_JCCP_MDL_001551014

UBER_JCCP_MDL_001552890

UBER_JCCP_MDL_001593964

UBER_JCCP_MDL_001593972

UBER_JCCP_MDL_001609605

UBER_JCCP_MDL_001702555

UBER_JCCP_MDL_001719126

UBER_JCCP_MDL_001779170

UBER_JCCP_MDL_001779177

UBER_JCCP_MDL_001779205

UBER_JCCP_MDL_001779209

UBER_JCCP_MDL_001779220

UBER_JCCP_MDL_001779260

UBER_JCCP_MDL_001782202

UBER_JCCP_MDL_002023801

UBER_JCCP_MDL_002029495

UBER_JCCP_MDL_002029496

UBER_JCCP_MDL_002054713

UBER_JCCP_MDL_002319648

UBER_JCCP_MDL_002340249

UBER_JCCP_MDL_002340271

UBER_JCCP_MDL_002340273

UBER_JCCP_MDL_002365612

UBER_JCCP_MDL_002366455

UBER_JCCP_MDL_002377763

UBER_JCCP_MDL_002378540

UBER_JCCP_MDL_002380277

UBER_JCCP_MDL_002416877

UBER_JCCP_MDL_002476556

UBER_JCCP_MDL_002737977

UBER_JCCP_MDL_002738657

UBER_JCCP_MDL_002738661

UBER_JCCP_MDL_003221256

UBER_JCCP_MDL_003224160

UBER_JCCP_MDL_003230870

UBER_JCCP_MDL_003236469

UBER_JCCP_MDL_003294497

UBER_JCCP_MDL_003361819

UBER_JCCP_MDL_003565776

UBER_JCCP_MDL_003895241

UBER_JCCP_MDL_003895244

UBER_JCCP_MDL_004215353

UBER_JCCP_MDL_004570113

UBER_JCCP_MDL_004716518

UBER_JCCP_MDL_004939430

UBER_JCCP_MDL_004997995

UBER_JCCP_MDL_005355935

UBER_JCCP_MDL_005356608

UBER_JCCP_MDL_005369054

UBER_JCCP_MDL_005427491

UBER_JCCP_MDL_005483405

UBER_JCCP_MDL_005612906

UBER000018435

UBER000018525

UBER000024194

UBER000024571

UBER000029052

UBER000196549

UBER-MDL3084-000078461

UBER-MDL3084-000153590

UBER-MDL3084-000158396


**<u>Other Expert Reports</u>**

Expert Report of John Chandler

Expert Report of Joseph O. Okpaku

Expert Report of Victoria Stodden

Expert Report of Veronique Valliere