# EXHIBIT A

**Uber Rideshare Cases, MDL No. 3084**

**Submitted: October 24, 2025**

**Rebuttal Expert Report of Kristen M. Zgoba, Ph.D.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**<u>Table of Contents</u>**

Background and Qualifications..............................................................................................1

Compensation ......................................................................................................................2

Materials Considered ..........................................................................................................2

Assignment, Methodology, and Summary of Opinions.......................................................2

Opinions ..............................................................................................................................3

    I.     Comparative Risk and Contextualizing Uber's Sexual Misconduct Rates........................3

        Exposure Volume and Statistical Context...............................................................4

        Substitution and Risk Reduction.............................................................................5

        The Impossibility of a Zero-Risk Society ...............................................................6

    II.    Taxonomy and Data Integrity: Alignment with Federal Classifications............................7

        Comparability to Federal and Public-Health Systems .........................................7

        Linguistic Precision and Victim Acknowledgment...............................................7

    III.    Predictive Challenges and Opportunistic Offending .................................................8

    IV.    Uber Safety Measures and Data Transparency ....................................................9

        Voluntary Transparency and Data Disclosure ...................................................10

    V.    Effectiveness and Veracity of Background Checks .........................................10

    VI.    Perceived Underreporting and the "Dark Figure of Crime" ..........................11

Conclusion .........................................................................................................................13

## Background and Qualifications

My name is Kristen Zgoba. I received my Doctor of Philosophy (Ph.D.) in Criminology from Rutgers University, The State University of New Jersey, where I developed a specialized research focus on understanding the characteristics of sexual offending behavior, sexual assault recidivism, and the effects of policy interventions and prevention strategies for sexual violence. I am currently an Associate Professor at Florida International University in Miami, Florida, where I serve as Graduate Program Director and Chairperson of the Institutional Review Board. In these capacities, I oversee ethical review of human subject research and the academic training of graduate students in advanced criminological theory, statistical modeling, and program evaluation.

I teach graduate and undergraduate courses in sexual offending, corrections, research methods, and statistics, and have received formal certification in the administration and interpretation of the Static-99, the most widely used actuarial tool for assessing sexual offense recidivism risk. I was trained on this instrument directly by Dr. David Thornton, one of its co-authors. My scholarly expertise bridges both the clinical and empirical domains of sexual offending research, with emphasis on identifying risk factors, evaluating policy efficacy, and analyzing the real-world impact of sexual offense legislation.

Prior to joining academia, I served for fourteen years as Director of Research at the New Jersey Department of Corrections (NJDOC). During my tenure from 2004 through 2018, I directed large-scale research projects involving incarcerated and community-based correctional populations, including individuals convicted of sexual offenses housed at the Adult Diagnostic and Treatment Center—a facility nationally recognized for its treatment and evaluation of those convicted of sexual offenses. This experience provided extensive exposure to offender typologies, treatment outcomes, and longitudinal recidivism patterns. My applied research at NJDOC emphasized evidence-based corrections, evaluation of policy reforms, and the measurement of violence and reoffending within high-risk populations.

Over the course of my career, my primary area has been sexual offending behavior and legislation, encompassing studies of the Sex Offender Registration and Notification Act, Megan's Law, and other federal and state-level statutory frameworks. I am the author of more than sixty-five peer-reviewed publications, and numerous technical and governmental reports and book chapters, the vast majority of which address sexual abuse, offender rehabilitation, and policy outcomes. Most recently, I authored a meta-analysis synthesizing twenty-five years of empirical evaluations of sexual offense laws, which offers one of the most comprehensive examinations to date of legislative efficacy in reducing sexual recidivism. I also serve on the editorial boards for the *American Journal of Criminal Justice*, *Homicide Studies*, *Policing: An International Journal* and the *Journal of Experimental Criminology*.

I have qualified or testified as an expert witness in approximately twenty-three judicial proceedings involving individuals convicted of sexual offenses, providing expert interpretation of risk assessment, policy application and effectiveness, and recidivism research. My testimony has also extended to national policy forums, including the United States Sentencing Commission, where I addressed empirical findings on failure-to-register (FTR) sex offenses under the Adam Walsh Act. I presented my research at over forty professional conferences and symposia,

1

including academic, governmental, and practitioner venues. Recent presentations include invited talks at the Arizonans for Rational Sexual Offense Laws Conference and the Arizona State University Office of Gender-Based Violence, where I spoke on evidence-based strategies for reforming sexual offense policies.

In recognition of my scholarly contributions, I was awarded a Fulbright Research Scholarship in 2015 to study sexual offense prevalence and policy in the United Kingdom, enabling cross-national comparative analysis of registration and notification systems. As Principal Investigator, I have secured two federal research grants from the U.S. Department of Justice to evaluate the impact of Megan's Law and the Adam Walsh Act (AWA), focusing on their deterrent effects, cost-efficiency, and influence on community safety. Additionally, I recently obtained private research funding to examine the long-term recidivism outcomes of individuals removed from the Texas public sexual offense registry, a study that addresses one of the most important empirical questions in contemporary sex offense policy.

Across these professional experiences, I have maintained a consistent commitment to empirical rigor and methodological transparency in the study of sexual violence and offender management. My research integrates quantitative analysis with applied correctional knowledge, bridging academic inquiry and policy practice. Collectively, my education, professional appointments, research record, and expert testimony establish my qualifications to provide informed, evidence-based opinions in matters involving sexual assault, sexual offending behavior, and the evaluation of risk and recidivism. A complete curriculum vitae, including a full list of publications and grants from the last twenty years, is attached for reference as **Appendix A**. A list of testimony in the last four years is attached for reference as **Appendix B**.

## <u>Compensation</u>

I am being compensated for my time at an hourly rate of $450.00. My compensation is not contingent upon the substance of my opinions, the nature of my findings, or the outcome of this matter.

## <u>Materials Considered</u>

1) Empirical research cited in the reference list attached as **Appendix C**.
2) Expert report authored by Dr. Veronique Valliere (Dated September 2025), and select materials cited in her report.

## <u>Assignment, Methodology, and Summary of Opinions</u>

I was retained by counsel for Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC to evaluate and rebut the opinions of Dr. Veronique Valliere. I evaluated her opinions utilizing the same methods I employ in my academic work, which is to consider the arguments made and sources referenced through logical analysis against the backdrop of empirical research and the knowledge I have gained in the field of sexual offense research after decades of experience. Based on this review and analysis, I reached the following conclusions in response to Dr. Valliere, which I explain further in the "Opinions" section of this rebuttal report:

- Valliere's 2025 report fails to apply base-rate logic to Uber's sexual violence rate. The incident rate (~0.00002%- .006%) is exceedingly low when contextualized against billions of rides and far below national prevalence rates for sexual violence.
- Individuals who obtain rides on the Uber platform, particularly women, often view the platform as a harm-reduction tool that substitutes for higher-risk transportation options such as walking alone, taking a ride from a stranger or impaired driver, or driving impaired themselves, all of which elevate exposure to victimization or risk.
- Empirical studies demonstrate that Uber's entry into U.S. cities correlates with measurable decreases in alcohol-related crashes and reported sexual assaults, suggesting that ridesharing provides protective social and environmental effects.
- Absolute elimination of sexual violence is statistically and practically impossible; even institutions with comprehensive oversight—such as the military—continue to experience incidents, underscoring that zero-risk standards are unrealistic.
- Uber's sexual misconduct taxonomy mirrors federal and public health systems like the FBI's UCR/NIBRS and the CDC's NISVS, which differentiate offenses by severity to ensure analytical precision, proper classification, and policy utility.
- The company's use of behaviorally specific terminology, such as "nonconsensual sexual contact," aligns with federal research showing that descriptive language improves reporting accuracy and inclusivity compared to stigmatized legal terms like "rape." According to published research, many women often do not identify with such stark language, leading to fewer victim reports.
- Predicting opportunistic or first-time sexual assaults is empirically challenging; validated actuarial tools like the Static-99R estimate recidivism among known offenders, not spontaneous or situational crimes, making situational prevention the most effective approach.
- Uber's multilayered safety architecture—including GPS tracking, in-app safety features, real-time monitoring, and cross-platform driver deactivation—applies established criminological principles of surveillance and guardianship to deter opportunistic offenses.
- The company's voluntary publication of sexual misconduct data represents a rare act of transparency within the private sector, exposing Uber to public scrutiny while advancing industry standards for accountability and violence-prevention research.
- Empirical evidence shows that name-based, multi-identifier background checks are at least as accurate as fingerprint-based systems, if not more, and Uber's practice of continuous rescreening enhances ongoing safety and fairness in driver screening.
- The assumption that Uber's lower rate of reported sexual misconduct reflects underreporting is speculative; the platform's digital traceability, direct in-app reporting channels, and transparency initiatives likely reduce the traditional barriers that suppress disclosure elsewhere.

## Opinions

### I.    Comparative Risk and Contextualizing Uber's Sexual Misconduct Rates

The expert report authored by Valliere (2025) interprets Uber's internal safety data as evidence of exceptional risk to female passengers. I disagree.  Valliere's conclusion overlooks the principle of base-rate exposure—a cornerstone of sound risk assessment. Uber has facilitated

billions of rides across the United States since its inception, and when the number of reported sexual misconduct is considered relative to the total number of rides provided, the incident rate is exceedingly small—between 0.00002% and .006% (https://www.uber.com/newsroom/ubers-safety-record/). This proportion is markedly lower than the prevalence of sexual victimization in the general U.S. population, where approximately 20% of women report having experienced some form of sexual assault in their lifetimes (Smith et al., 2018). According to national survey data, 43.6% of women—an estimated 52.2 million individuals—have experienced some form of contact sexual violence, and 4.7% report such victimization within a single year (Smith et al., 2018).

Although the raw number of sexual misconduct allegations within Uber's taxonomy may initially appear elevated—and it is indisputable that even a single instance of victimization is deeply concerning—these figures must be interpreted within their statistical context. Ignoring this fact would be intellectually dishonest. Uber has provided riders with multiple complaint reporting mechanisms and channels which collectively encourage reporting, far beyond the reporting capabilities of other modes of transportation, thus undermining the suggestion that complaints were underreported. After adjusting for Uber's operational scale, the relative frequency of reported incidents remains far below the societal baseline for sexual violence. In other words, the presence of allegations does not signify an abnormally unsafe system but reflects the broader reality that sexual misconduct, while tragic, occurs across all social domains. No large-scale service involving millions of daily human interactions can achieve absolute risk elimination. Thus, Uber's own data, when properly contextualized, indicate not exceptional danger, but rather the occurrence of rare events within an otherwise low-risk environment.

### *Exposure Volume and Statistical Context*

Raw incident counts devoid of denominators produce misleading impressions of risk. A platform that facilitates hundreds of millions of rides annually will, by probability alone, encounter some number of criminal incidents. Unfortunately, as a comparison, traditional taxi and limousine services are under no requirement to collect or publicly report data on sexual misconduct, rendering direct statistical comparisons difficult. Nevertheless, available public perception data further contextualizes this issue. A 2020 national survey of 500 women conducted by a third-party, and cited in the Valliere report (2025), found that the majority of female riders consider Uber to be a safer form of transportation than taxis, public transit, or professional car services. According to the findings, simply receiving the drivers' photo alone makes almost 50% of women feel safe (Alarms.org, 2020). Importantly, most respondents reported that they had not reduced their use of Uber due to safety concerns, indicating sustained trust in the platform's safety measures. Many women also reported using rideshare services specifically to avoid walking alone at night or driving after drinking—behaviors known to elevate personal risk. These findings support the interpretation that riders view Uber not as an unusually hazardous environment, but as a protective alternative to less regulated or riskier forms of travel. In this context, Uber's reported incidents, while serious and deserving of attention, must be understood as statistically rare events occurring within a system that millions of women actively choose because it enhances, rather than compromises, their sense of safety.

4

***Substitution and Risk Reduction***

From a criminological perspective, Uber presents an inherently lower-risk environment for sexual misconduct compared to typical contexts in which such crimes occur. Decades of research demonstrate that the overwhelming majority of sexual violence—estimated at approximately 80%—is committed by someone known to the victim, such as an intimate partner, acquaintance, coworker, or family member. Only a small fraction of cases involve strangers (Smith et al., 2018). Decades of research have borne out this finding. Because rides on the Uber platform generally pair individuals who have no preexisting personal relationship and whose identities, routes, and interactions are digitally recorded, the opportunity structure for the type of sexual offending most prevalent in society is significantly reduced. Each trip is logged, monitored through GPS, and linked to verified profiles for both driver and passenger, creating a transparent record that deters the anonymity on which many opportunistic assaults depend and which can be absent from most other forms of transportation. Uber has continuously implemented a comprehensive array of safety features on the rideshare app designed to mitigate and enable reporting of driver misconduct. These features include, but are not limited to, driver screening and continuous background monitoring, real-time ID verification to confirm driver identity, anonymizing rider phone numbers, tracking all trips via GPS, RideCheck technology to detect irregular trip patterns, PIN code verifications, "Share My Trip" feature, optional audio recording during trips, and 911 emergency button. Uber also participates in a program to share information about drivers with other rideshare platforms (https://www.uber.com/newsroom/industry-sharing-safety/). Additionally, Uber partners with organizations such as RAINN to operate a survivor hotline, publishes U.S. Safety Reports documenting sexual assault statistics, and enforces a strict zero-tolerance policy toward sexual misconduct. In this way, environments like Uber—where interactions are brief, structured, and digitally traceable between two previously unacquainted individuals—represent a setting that lacks many of the relational and situational risk factors typically associated with sexual violence.

As such, a critical omission in Valliere (2025) is the substitution effect—i.e., the degree to which rideshare services replace higher-risk forms of nighttime transportation or risk-taking behavior. A number of U.S. public-health studies document that Uber reduces alcohol-impaired driving, pedestrian injury, and unplanned late-night walking, all of which are contexts strongly correlated with sexual victimization. Greenwood and Wattal (2017) found that Uber's entry into U.S. metropolitan areas led to a decline in alcohol-related traffic fatalities, indicating that a substantial portion of nighttime riders use Uber as a harm-reduction measure after consuming alcohol. The reduction was strongest in large metropolitan areas with high bar density and active nightlife, indicating that Uber's presence provided an accessible substitute for impaired driving. The effect was particularly notable during weekend nighttime hours, the time window when alcohol-involved crashes are most frequent. The study's authors concluded that ridesharing services serve a public safety function by providing "a viable alternative to drunk driving and other high-risk transportation decisions."

Additionally, rigorous peer-reviewed research suggests that ridesharing likely has a deterrent effect on sexual assault. In the 2021 peer-reviewed study *The Deterrent Effect of Ride-Sharing on Sexual Assault and Investigation of Situational Contingencies*, the authors study the staggered rollout of Uber across U.S. cities from 2005 to 2017 and precinct-hour level data in New York City to examine the relationship between Uber adoption and rape incidents. Their

results indicate that the entry of ridesharing into a city is associated with approximately a 6.3% **reduction** in rape occurrences, and further, that a 1% increase in Uber pickups in a given neighborhood correlates with a more than 3% decrease in the likelihood of sexual assault in that area (Park et al., 2021). Moreover, the deterrent effect is most pronounced in neighborhoods with limited transportation options and during times associated with elevated risk (e.g., weekend nights near bars). These findings support the argument that Uber reduces opportunities for sexual victimization by offering safer, more reliable mobility, particularly in environments where alternatives are less accessible. This work therefore supports the conclusion that Uber absorbs and mitigates risk that may otherwise manifest in environments with no surveillance, no traceability, and no third-party recordkeeping—conditions consistently linked to higher sexual assault rates.

### *The Impossibility of a Zero-Risk Society*

While Valliere (2025) suggests that Uber should create an assault-free environment, such a standard misrepresents the statistical reality of sexual violence in society and sets an unattainable standard. Despite this assertion, Valliere offers no objective framework, empirical support, or evidence-based methodology for how such a standard could be realistically achieved or measured. Despite decades of prevention efforts, comprehensive public sex offense registries, and Title IX-based educational interventions, sexual violence persists across every institutional setting. According to the RAINN website (https://rainn.org/get-informed/facts-statistics-the-scope-of-the-problem/), approximately 423,000 incidents of sexual violence occur annually in the United States. These crimes transpire in schools, workplaces, homes, and digital spaces—environments with direct oversight and zero-tolerance policies. The persistence of these offenses despite extensive criminalization and prevention frameworks underscores a central sociological point: sexual violence is a low-probability, high-impact behavior rooted in human deviance and situational opportunity, not in specific institutional failures alone.

No organization, public or private, has achieved complete elimination of sexual misconduct. Despite extensive prevention initiatives, training programs, and policy reforms across sectors, empirical data consistently demonstrate that sexual misconduct remains a societal problem that cannot be entirely eliminated, only mitigated through evidence-based prevention and response efforts. Hospitals, universities, and the U.S. military have all invested billions in education, vetting, and behavioral monitoring, yet sexual victimization endures (Porat et al., 2024). The authors note that complete prevention remains an aspirational ideal rather than a guaranteed outcome. Expecting Uber, which facilitates millions of interactions daily between strangers on the rideshare platform, to maintain a zero-risk profile imposes an impossible standard inconsistent with empirical social science. Such an unrealistic standard would be similar to expecting a police department to eliminate all crime within its jurisdiction, a hospital to guarantee that no patient will ever experience an infection, an airline to ensure that no accident will ever occur, or a university to end sexual misconduct on its campus. The appropriate benchmark is not elimination of all incidents but to reduce the *relative risk* through environmental design, safety features, deterrence, and accountability systems—the same standard applied in public health and workplace safety regulation.

## II.     Taxonomy and Data Integrity: Alignment with Federal Classifications

Valliere (2025) asserts that Uber's 21-category sexual misconduct taxonomy minimizes the seriousness of sexual violence by distinguishing between "serious" and "less serious" incidents. However, this distinction mirrors the classification logic used across multiple federal and public health systems that collect sexual violence data in the United States. The Federal Bureau of Investigation's Uniform Crime Reporting (UCR) and National Incident-Based Reporting System (NIBRS), for example, differentiate between high-severity offenses such as rape and aggravated sexual assault and lower-level or non-contact offenses such as indecent exposure and obscene communication (BJS, 2023; FBI, 2024). These distinctions are not intended to minimize any form of victimization but to ensure analytical consistency, legal precision, and reliable cross-jurisdictional comparisons.

### Comparability to Federal and Public-Health Systems

This tiered approach to classification has been a foundational element of federal data collection for decades. Similarly, the Centers for Disease Control and Prevention (CDC) employs a behavioral taxonomy in its National Intimate Partner and Sexual Violence Survey (NISVS) that distinguishes among "nonconsensual sexual penetration", "nonconsensual sexual contact" and "non-contact unwanted sexual experiences" (Smith et al., 2018). The CDC's definitions serve an epidemiological function—differentiating subtypes of sexual violence enhances measurement reliability and the capacity to design targeted interventions.

Outside of government, the national nonprofit RALIANCE, in partnership with the Urban Institute and Uber itself, developed the *Sexual Misconduct and Violence Taxonomy* to help industries classify reports of sexual harassment, misconduct, and assault in a standardized, evidence-based manner (Sniffen et al., 2018). This framework was created specifically to prevent underreporting, eliminate inconsistencies, and promote data integrity across private-sector organizations. Importantly, the Uber team played a direct role in its development. Drawing from anonymized reports submitted through the Uber platform, RALIANCE and the Urban Institute collaborated with Uber's safety and data scientists to build and test the taxonomy's categories. The classification system was refined through multiple iterations to ensure that similar behaviors were consistently coded within the same category, enhancing both precision and reliability in measurement (Sniffen et al., 2018). Other rideshare platforms such as Lyft have also utilized RALIANCE's taxonomy for sexual assault and sexual harassment. Uber's active participation in this process reflects its alignment with the nation's foremost sexual violence prevention experts and its commitment to advancing a rigorous, transparent model for documenting and understanding misconduct—one that strengthens rather than obscures the accuracy of reporting data.

### Linguistic Precision and Victim Acknowledgment

Valliere (2025) also suggests that Uber's decision not to use the term *rape* in its taxonomy constitutes neglect or minimization. However, decades of federally sponsored research demonstrate that categorical or legalistic labels such as rape can actually suppress disclosure and distort prevalence estimates. The National Research Council reports that respondents frequently do not self-identify as rape victims, even when their experiences meet legal definitions, because

of the term's stigmatizing or polarizing connotations (National Research Council, 2014). The report recommended using behaviorally specific language—asking about experiences such as "being forced into sexual intercourse" or "unwanted sexual touching"—to achieve more accurate and comprehensive reporting.

Similarly, Cohn and co-authors (2013) found that "non-acknowledgment of rape" is one of the primary barriers to both personal disclosure and formal reporting. Victims often refrain from labeling their experiences as rape due to fear of blame, uncertainty about consent, or social stigma. These findings are echoed in Worthen and Schleifer's (2024) analysis of post–#MeToo reporting trends using the National Crime Victimization Survey (NCVS), which found that reporting increases were largely driven by greater acknowledgment of "non-stranger" and "non-violent" assaults once broader, behaviorally descriptive language was adopted. Collectively, this research shows that strict reliance on binary or legal terminology like rape/not rape can discourage reporting, particularly among those whose victimization occurred in socially ambiguous contexts.

In this light, Uber's decision to use behaviorally specific categories—such as "nonconsensual sexual penetration" and "nonconsensual sexual contact"—is consistent with the best practices recommended by the CDC, National Research Council, and BJS for increasing victim acknowledgment and improving data integrity. This linguistic precision ensures inclusivity and accuracy in measurement, capturing experiences that victims themselves may hesitate to label under stigmatized legal terms. Rather than minimizing harm, such terminology reflects a research-based strategy to enhance transparency and validity in documenting sexual violence. Such granularity enables researchers and policymakers to identify precursor behaviors that might otherwise be lost in aggregate statistics. Simplifying all sexual misconduct into a single, undifferentiated measure would obscure critical nuances, hinder prevention efforts, and compromise data validity.

In sum, Uber's taxonomy reflects the same methodological principles that guide sexual-violence classification in the FBI's UCR and NIBRS systems, the CDC's NISVS, and the RALIANCE/Urban Institute industry taxonomy. Its behavioral terminology is supported by decades of federal research demonstrating that descriptive, non-legal language increases reporting accuracy and survivor acknowledgment. These structures collectively distinguish sexual offenses by severity not to minimize harm, but to strengthen data integrity, accountability, and transparency, the essential foundations of effective violence prevention.

### III.    <u>Predictive Challenges and Opportunistic Offending</u>

Valliere (2025) implies that it is incumbent upon Uber to both predict and eliminate opportunistic sexual misconduct. But the notion that Uber could identify or prevent all incidents of sexual misconduct through predictive monitoring reflects a misunderstanding or a misinterpretation of the science of risk assessment. Research by the U.S. Department of Justice has long established that sexual assault—particularly by individuals with no criminal history—is an unpredictable and low base-rate behavior (National Institute of Justice [NIJ], 2024). Most incidents in public settings are opportunistic, arising spontaneously from situational factors such as intoxication, misperceived social cues, or momentary disinhibition. Because these acts are not driven by stable offender traits, they often cannot be forecast using traditional predictive models.

8

As noted by the NIJ (2019), sexual violence often arises from situational opportunity and contextual disinhibition rather than enduring personality traits, which limits the predictive value of individual-level risk profiling.

It is also important to distinguish spontaneous, situational offending from the type of risk estimated by validated actuarial tools such as the Static-99R, which predict the likelihood of sexual recidivism among known convicted individuals. Those instruments rely on historical, static variables—such as prior sexual convictions, victim characteristics, and age—that are empirically linked to reoffending within correctional populations. They are not designed to identify first-time or opportunistic offenders in community settings (Hanson & Morton-Bourgon, 2009). Applying actuarial or algorithmic models to non-offending populations therefore creates logistical and empirical challenges and would likely produce false positives and negatives. For this reason, Uber's safety strategy appropriately focuses on situational prevention—through GPS tracking, verified identities, sustained background checks (including continuous monitoring so Uber receives alerts when new charge offenses occur) and rapid suspension following credible reports—approaches supported by empirical research as the most effective means of mitigating, though never entirely eliminating or predicting, sexual violence risk.

## IV.    Uber Safety Measures and Data Transparency

Contrary to Valliere's assertion that Uber's safety systems are merely symbolic, the company has implemented multiple layers of prevention, monitoring, and transparency consistent with evidence-based best practices in crime reduction. Valliere's report even acknowledges the efforts Uber undertook in this regard: Uber introduced a series of major safety enhancements beginning in 2018, including RideCheck (real-time motion monitoring to detect crashes or unusual stops), PIN Verification (to confirm correct driver–rider pairing), and Record My Ride (optional in-app audio recording for documentation of trips). In 2022, Uber also launched the Safety Live Agent feature, providing immediate access to trained safety support personnel during trips, and created the Industry Sharing Program to exchange driver deactivation data across rideshare platforms. Further developments included Safety Risk Assessed Dispatch (S-RAD)—which uses data to optimize algorithmic pairings between drivers and riders—and the Women's Preference pilot program, allowing female riders and drivers to match exclusively with one another in select U.S. locations (beta testing). Additional rider safety features listed on Uber's website include: GPS tracking, 24/7 incident support, Safety Toolkit, 2-way ratings, Phone number anonymization, On-Trip Reporting, Contact ADT safety agent, Emergency Contacts, Anonymous communications, dash-cam integration, and real-time identification for Uber drivers.[1]

Unlike Valliere's report, which offers no empirical evidence that these safety features do not work, empirical literature supports the premise that these measures can meaningfully reduce situational opportunities for sexual victimization. For example, continuous GPS tracking and the ability to record interactions increase the perceived certainty of apprehension—a cornerstone of deterrence theory—while ride-matching protocols and verified identity systems reduce

---

[1]    *Ride with Confidence*, Uber, https://www.uber.com/us/en/ride/safety/?uclick_id=d8c5781c-297f-4dd0-a6c7-3255b4ec915e (last visited 10/22/2025).

anonymity, a known facilitator of opportunistic sexual misconduct (Felson & Boba, 2010). Moreover, Uber's cross-platform driver-deactivation sharing reflects the kind of information integration long advocated for by the Department of Justice as essential for managing high-risk contexts in decentralized service industries.

Research on U.S. college campuses has shown that structured monitoring, environmental guardianship, and immediate response systems meaningfully lower sexual harassment and assault rates (Fisher, et al., 2010). Uber's safety architecture operationalizes these same principles through technological guardianship: GPS tracking, in-app audio recording, live safety agent access, and route monitoring serve as constant forms of surveillance and formal control. By combining environmental transparency with immediate accountability, Uber's model reflects empirically validated criminological principles that deter opportunistic offending, even though no system can ever fully eliminate or guarantee to predict such crimes.

### *Voluntary Transparency and Data Disclosure*

One of the most overlooked aspects of Uber's safety record is that the company voluntarily disclosed detailed sexual misconduct data—an unusual if not unprecedented action for a private corporation. Valliere (2025) acknowledges that Uber was the first U.S. company to publish a comprehensive *Safety Report* summarizing verified sexual-misconduct allegations, categorized according to its 21-category taxonomy. The decision was not mandated by law or regulation; it was undertaken as a proactive measure to enhance transparency, encourage public scrutiny, and establish accountability standards across the rideshare industry. In doing so, Uber exposed itself to reputational and legal risks that other transportation sectors—such as taxi, limousine, and public transit—have not assumed, since none are required to release comparable sexual-assault data.

By publishing its internal safety data, Uber invited empirical evaluation of its risks—a move that inherently opens the company to criticism, but also elevates it to a standard of accountability rarely observed among private-sector transportation providers. This act of voluntary disclosure thus represents not neglect, but the kind of institutional transparency long advocated for in federal violence-prevention policy.

## V.    Effectiveness and Veracity of Background Checks

Valliere's 2025 report questions the reliability of Uber's background-check process, emphasizing its lack of fingerprinting. However, contemporary evidence and my professional experience suggests that fingerprinting is not essential for conducting accurate or comprehensive criminal background checks. In many cases, reliance on fingerprint databases can actually diminish accuracy and fairness when compared to modern, name-based screening systems. Commercial background-screening firms routinely employ multiple identifiers—including legal name, known aliases, residential addresses, date of birth, race, and Social Security number—to match records with a high degree of precision. Drawing from ongoing research I am conducting on the verification of official criminal records among individuals convicted of sexual offenses, these methods have demonstrated substantial accuracy. In a sample of 600 cases, the commercially available background checks located criminal histories for approximately 92% of subjects using only these personal identifiers. This study, which also examines the

correspondence between private-sector criminal history data and official Texas Department of Public Safety records, provides additional empirical context for assessing the efficacy of non-fingerprint-based background screening (forthcoming study). Importantly, Uber's use of accredited private-screening systems that rely on these same multi-identifier matching protocols reflects adherence to evidence-based best practices in vetting and public safety risk management.

Empirical research and federal evaluations also show that fingerprint-based systems are not inherently more accurate or predictive of safety outcomes than name-based commercial checks (Duane et al., 2017). A review by the Government Accountability Office (GAO) reveals that fingerprint databases, including the FBI's Integrated Automated Fingerprint Identification System, often contain incomplete or outdated disposition data—particularly for arrests that did not result in convictions (Mauer, [GAO], 2015). Roughly half of all FBI fingerprint entries are missing this outcome data. This means that fingerprint checks can flag individuals who were arrested but never convicted, leading to false positives and potential discrimination. Consequently, fingerprint checks can yield misleading results and disproportionately flag individuals who were never convicted of a crime. By contrast, modern commercial screening systems—such as those Uber employs through accredited third-party vendors—often use real-time court data and are updated more frequently, producing more complete and timely information. Studies evaluating the validity of screening methods indicate that well-conducted, name-based background checks identify recent convictions at rates comparable to—or in some cases higher than—those detected through fingerprint-based systems (Duane et al., 2017; Mauer, 2015).

Furthermore, Uber's practice of conducting periodic and continuous background checks—rather than a single review at hiring—represents a best-practice approach consistent with recommendations from criminological and occupational-safety research. Continuous or intermittent monitoring enables the identification of new criminal charges or disqualifying offenses after onboarding, effectively closing a gap present in most traditional transportation industries. Research from the National Institute of Justice and related reentry studies show that criminal behavior risk declines sharply with time since last conviction, reinforcing the need for dynamic, time-sensitive assessment rather than static, one-time evaluation (Kurlychek et al., 2007). Thus, Uber's innovative decision to conduct regular re-screenings improves predictive validity and enhances public safety while maintaining fairness and accuracy in its hiring and monitoring process.

## VI.    Perceived Underreporting and the "Dark Figure of Crime"

Valliere (2025) suggested that the relatively low rate of sexual-assault allegations within Uber's rideshare platform may reflect *underreporting* rather than genuinely lower incidence. While this is a possible hypothesis, it remains speculative. The "dark figure of crime"—the gap between actual victimization and reported incidents—has long been recognized in criminology as a general feature of sexual violence data, not a rideshare-specific phenomenon. Yet the existence of unreported cases in society at large does not automatically justify the assumption that Uber's rate must also be higher than documented. Reporting behavior varies widely across contexts, and the presence of multiple structural deterrents to underreporting—such as verified digital records, in-app complaint channels, and visible reporting pathways—suggests that Uber's

11

reporting rate may in fact exceed those observed in traditional public spaces or private encounters.

From a criminological perspective, there is no empirical basis for presuming that "hidden" or an unreported share of Uber-related sexual assaults is disproportionately larger than that of the general population—indeed, the opposite is more likely. Several structural features of the Uber platform reduce the traditional barriers to reporting. Each trip is digitally logged, both parties are identifiable, and riders can file a report directly within the app at any time— conditions that increase the likelihood of disclosure. This stands in contrast to the majority of sexual assaults nationwide, where over 80% involve a known acquaintance or intimate partner, often without independent witnesses or formal documentation (Smith et al., 2018). Rides on the Uber platform, by contrast, occur in traceable and time-stamped environments, often with accompanying GPS data or recorded communications, reducing anonymity and increasing evidentiary support for victims who choose to report. These structural safeguards are inconsistent with the assumption that rideshare contexts suffer from greater-than-average underreporting.

Moreover, while it is true that "we don't know what we don't know," criminological interpretation demands evidence before imputing hidden risk. The argument that Uber's low assault rate must signify underreporting effectively treats the absence of evidence as proof of prevalence—a logical fallacy unsupported by empirical data. The reality may instead be that Uber's digital safeguards, driver screening, and in-app guardianship mechanisms have genuinely lowered the situational opportunities for sexual assault, thereby producing lower incidence rates. As such, the "dark figure of crime" should be acknowledged as a universal limitation of sexual violence data, not selectively applied to invalidate Uber's dataset. Without direct, methodologically comparable evidence showing systematic suppression of reporting within rideshare environments, it is equally reasonable, if not more plausible, to interpret Uber's exceptionally low rate as reflective of actual risk reduction rather than concealment. And again, the multiple means of channels available to report these incidents to Uber (especially lower severity, "inappropriate comments" categorizations) significantly undercuts any premise of underreporting.

From a policy perspective, Uber's transparency and reporting infrastructure arguably reduces rather than amplifies underreporting of sexual assault. Traditional transportation industries, such as taxis, private car services and limousines, rarely collect or publish standardized data on sexual misconduct, leaving such incidents almost entirely within the realm of unreported victimization. By contrast, Uber's decision to systematize incident classification, maintain verifiable trip records, and publicly disclose aggregate data creates a reporting environment that is more transparent and accountable than most private-sector settings. This structure not only enables empirical evaluation but also encourages victim acknowledgment by providing accessible, confidential channels for complaint. In this sense, Uber's safety model represents a partial correction to the historic undercounting of sexual offenses, narrowing the gap between true and reported incidence and setting a precedent for corporate responsibility in violence-prevention data.

**Conclusion**

Collectively, the empirical evidence indicates that Uber's sexual assault risk is statistically rare, contextually low, and subject to robust mitigation through situational prevention, environmental design, and transparency practices. The company's data classification aligns with federal standards, its prevention efforts reflect validated criminological principles, and its voluntary disclosure of safety data exemplifies corporate accountability. While no system can eliminate sexual misconduct entirely, Uber's safety infrastructure represents a model of continuous improvement and empirically grounded risk management rather than institutional neglect. I hold all of the opinions expressed in my report to a reasonable degree of psychological certainty.

_____

Kristen M. Zgoba, Ph.D.

13

# APPENDIX A

**CURRICULUM VITAE**
**OF**
**KRISTEN M. ZGOBA, Ph.D.**
**Associate Professor**
**Graduate Program Director**
**Florida International University**
**kzgoba@fiu.edu**

---

## KEY ACCOMPLISHMENTS

- Fulbright Research Scholar 2015 Cohort- US/UK
- American Correctional Association, Peter P. Lejins Correctional Research Award Winner
- Google Scholar Citation Score ~3800, h-index of 35
- ~70 Peer Review Publications, 95+ Publications
- Acquired Grant Funding as PI over $1,000,000
- Sexual Offense Policy Research Board Founding Member
- Testified before the United States Sentencing Commission
- Edna Mahan Correctional Facility for Women Board of Trustees
- Social Behavioral Institutional Review Board Chairperson, FIU
- Graduate Program Director
- Research Consortium Member of the *Safety and Justice Challenge*
- 2020 Outstanding Article of the Year, *American Journal of Criminal Justice*

## EDUCATION

| Degree | Institution | Field | Dates |
|---|---|---|---|
| Ph.D. | Rutgers University, NJ | Criminal Justice | 00-04 |

*Dissertation Title- Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: An Examination of Three Time Frames*

| | | | |
|---|---|---|---|
| M.A. | Rutgers University, NJ | Criminal Justice | 2000 |
| B.A. | Rutgers University, NJ | Psychology | 95-99 |

## FULL-TIME ACADEMIC EXPERIENCE

| Institution | Rank | Field | Dates |
|---|---|---|---|
| Florida International University | Graduate Program Director | | 24-present |
| Florida International University | Associate Professor | Criminal Justice | 22-present |
| Florida International University | Assistant Professor | Criminal Justice | 19-2022 |
| University of Central Florida | Assistant Professor | Criminal Justice | 18-2019 |

**PART-TIME ACADEMIC EXPERIENCE**

| Institution | Rank | Field | Dates |
|---|---|---|---|
| Rutgers University-Newark | Adjunct | Criminal Justice | 16-2018 |
| Michigan State University | Adjunct | Criminal Justice | 13-2019 |
| Rutgers University- New Brunswick | Adjunct | Criminal Justice | 01-2018 |

**NON-ACADEMIC EXPERIENCE**

| Place of Employment | Title | Dates |
|---|---|---|
| New Jersey Department of Corrections | Director of Research | 04-2018 |
| | Co-Chair/Chair Institutional Review Board | 05-2018 |

**EMPLOYMENT RECORD AT FIU**

| Rank | Dates |
|---|---|
| Graduate Program Director | 24-present |
| Associate Professor | 22-present |
| Assistant Professor | 2019-2022 |

**PUBLICATIONS IN DISCIPLINE**

**Papers in Peer-Review Journals**

**\*Denotes Graduate Student Co-Author**

66. Rich\*, J. & **Zgoba**, K. (2025). Unmasking Negative Affect in Older Incarcerated Individuals with Varying Criminal Histories. *Aging & Mental Health*.

65. Lyons\*, S. A., & **Zgoba**, K. (2025). College students' attitudes towards individuals convicted of a sexual offense. *Criminal Justice Studies*, 1–15. https://doi.org/10.1080/1478601X.2025.2479785

64. **Zgoba**, K. & Havertong\*, M. (2025). Unveiling the Nexus: Exploring the Influence of Personal and Situational Traits on Weapon Selection and Severity of Violence in Fatal and Non-Fatal Violence. *Homicide Studies.*

63. Silverthorn\*, R. & **Zgoba**, K. (2024). Unlocking the Truth: Exploring the Impacts of Solitary Confinement on Recidivism and the Need for Mental Health Support for Individuals with Mental Illnesses. *The American Journal of Criminal Justice.* DOI: 10.1007/s12103-024-09771-x

62. Liu, L., **Zgoba,** K. & Low, S. (2024). Aggression and School Misconduct Among Justice-Involved Youth: The Roles of Facility Environment, Adverse Childhood Experiences and Social Competency. *Youth Violence and Juvenile Justice.*
DOI: 10.1177/15412040241232

61. Liu, L. & **Zgoba,** K. (2024). "Examining a Triple Threat: The Intersection of Mental Health, Substance Use, and Re-entry of a Sample of Justice-Involved Persons". *Administration and Policy in Mental Health and Mental Health Services Research.*

60. **Zgoba,** K., Liu, L. & Matthews*, D. (2023). "Twenty-Five Years of Advances in Research: An Investigation of Characteristics and Correlates of Sexual Offense Recidivism". *International Journal of Environmental Research & Public Health.* DOI:/10.3390/ijerph20136212

59. Yan, S., **Zgoba,** K. & Pizarro, J. (2023). "Restrictive Housing Placement and Length of Stay: A Latent Class Analysis With Mixed Distributions". *Criminal Justice Policy Review, 34(5).*
DOI: 10.1177/08874034231184

58**. Zgoba,** K. & Mitchell, M. (2022). "A Meta-Analysis of the Effectiveness of Sexual Offense Registration and Notification Policies on Recidivism". *Journal of Experimental Criminology* (19), *71–96.* DOI:/10.1007/s11292-021-09480-z.

       ** Mitchell, M., **Zgoba**, K. & Piquero, A. (2021, December 16). Sex offender registry laws don't work. Here's what might. *Tampa Bay Times.*  [article link]

57. D'Alessio, S., Stolzenberg, L., Guerette, R. & **Zgoba**, K. (2022). "The Effect of Self Defense Laws on Firearm use Among Offenders. *Crime & Delinquency.*
DOI:10.1177/0011128722107762.

56. Guerette, R. T., Przeszlowski, K*., Lee-Silcox, J*. & **Zgoba**, K. (2021). "Improving Policing through Better Analysis: An Assessment of a Crime Analysis Training & Enhancement Project within an Urban Police Department." *Police, Practice and Research: An International Journal, 22(4).*DOI: /10.1080/15614263.2020.1861448.

55. Pizarro, J., **Zgoba**, K. & Pelletier*, K. (2021). Firearm Use in Violent Crime: Examining the Role of Premeditation and Motivation in Weapon Choice. *Journal of Primary Prevention* (42), 77–91. DOI:/10.1007/s10935-020-00595-z.

54. Baker, T., **Zgoba,** K. & Gordon, J. (2021). "Incarcerated for a Sex Offense: In-Prison Experiences and Concerns about Reentry". *Sexual Abuse: A Journal of Research and Treatment, 33(2), 135-156.*DOI: 1079063219884588.

53**. Zgoba,** K. & Clear, T. (2020). "A Review of the Reality of Violent Offending and the Administration of Justice". *Criminal Justice Policy Review.* DOI: 0887403420919471.

52. **Zgoba,** K., Pizarro, J. & Salerno, L**.** (2020). "Assessing the Impact of Restrictive Housing on Inmate Post-Release Criminal Behavior. *American Journal of Criminal Justice* (45), 102–125. doi.org/10.1007/s12103-019-09496-2.

- 2020 *American Journal of Criminal Justice* Outstanding Article Award

51. Cowan*, D., **Zgoba**, K., Guerette, R. & Levenson, J. (2020). "Do Views on Sex Offending Vary by Nationality? A Comparative Analysis of Community Sentiment Toward Sex Offense Legislation in the United States and United Kingdom". *International Journal of Offender Therapy and Comparative Criminology.* DOI: /0306624X20964168.

50**. Zgoba,** K., Reeves, D., Tamburello, A. & Debilio, L. (**2020**). **"**Criminal Recidivism in Inmates with Mental Illness and Substance Use Disorders". *The Journal of the American Academy of Psychiatry and the Law.* DOI: https://doi.org/10.29158/JAAPL.003913-20.

49. Baker, T., Ray, J. & **Zgoba**, K. (2020). "Race Differences in the Effects of Early School Behavior Problems and Substance use Type on Lifetime Arrest". *Deviant Behavior, 1-12.* DOI:10.1080/01639625.2020.1815252.

48. Meldrum, R. C., Jackson, D. B., **Zgoba**, K., & Testa, A. (2020). "Sleep duration, handgun carrying, and taking a handgun to school: An analysis of a statewide sample of Florida youth". *Sleep Health: Journal of the National Sleep Foundation,6,* 153- 158*.* DOI: 10.1016/j.sleh.2019.11.008.

47. Guerette, R., **Zgoba, K.,** Comerford*, C. & Salerno, L. (2020). "The Journey to Crime Among Sexual Offense Acquaintance and Non-Acquaintance Cases" *Victims & Offenders: An International Journal of Evidence-Based Research, Policy, and Practice, 15*(1), 119-139. DOI.org/10.1080/15564886.2019.1661318

46. Pizarro, J., **Zgoba**, K., Salerno, L. & Circo*, G. (2020). "The Processing of Homicides in the Courts: An Examination of Multiple Case Outcomes in the Context of Little Ethnic Variability". *Race and Justice: An International Journal, 10*(4),400-423. DOI:10.1177/2153368718759401.

45. **Zgoba**, K., Tewksbury, R., & Mustaine, E. (2019). Who gets the biggest bang for the buck? A review of minimum wage and purchasing power in prison commissaries versus superstores. *Journal of Crime and Justice*, *43(*1), 36-48. DOI.org/10.1080/0735648X.2019.1619614

44. Salerno, L. & **Zgoba,** K. (2019). "Disciplinary Segregation and its Effects on In-Prison Outcomes." *The Prison Journal, 100*(1), 74-97. DOI:10.1007/s12103-019-09496-2

43**. Zgoba,** K. & Cowan*, D. (2019). "Sexual Offense Legislation Across the Pond: A Review of Community Sentiment Towards the United Kingdom's Implementation of Sarah's Law". *Sexual Abuse: A Journal of Research and Treatment, 32*(4), 476-496. DOI:1079063219847671.

- 4 -

42**. Zgoba**, K. M., Jennings, W. G., & Salerno, L. M. (2018). "Megan's Law 20 years later: An empirical analysis and policy review". *Criminal Justice and Behavior*, *45*(7), 1028-1046. DOI.org/10.1177/0093854818771409.

41. Hsieh\*, M. L., Hamilton, Z., & **Zgoba**, K. (2018). "Prison experience and reoffending: Exploring the relationship between prison terms, institutional treatment, infractions, and recidivism for sex offenders. *Sexual Abuse: A Journal of Research and Treatment*, *30*(5), 556-575. DOI.org/10.1177/1079063216681562.

40**. Zgoba**, K. M., & Salerno, L. M. (2017). A three-year recidivism analysis of state correctional releases". *Criminal Justice Studies*, *30*(4), 331-345. DOI.org/10.1080/1478601X.2017.136464.

39. Beaudry-Cyr\*, M., Jennings, W.G., **Zgoba**, K., & Tewksbury, R. (2017).  "Examining the Continuity of Juvenile Sex Offending into Adulthood and Subsequent Patterns of Sex and General Recidivism". *International Journal of Offender Therapy & Comparative Criminology*, *61*(3) 251- 268. DOI.org/10.1177/0306624X15594442.

38**. Zgoba,** K. (2017). "Memorialization Laws in the United Kingdom: A Response to a Moral Panic or an Increased Occurrence?" *American Journal of Criminal Justice, 42*(3), 628-643.

37**. Zgoba**, K., Miner, M., Letourneau, E., Levenson, J., Knight, R., Thornton, D. (2016). "A Multi-state Recidivism Study Using Static-99 and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act." *Sexual Abuse: A Journal of Research and Treatment, 28*(8), 722-740.

36. Levenson, J. S. & **Zgoba**, K. (2016). "The Impact of Community Protection Policies on Sexual Reoffense Rates in Florida". *International Journal of Offender Therapy & Comparative Criminology*, 60 (10), 1140- 1158.

35. Jennings, W.G., & **Zgoba**, K. (2015). "An Application of an Innovative Cost-Benefit Analysis Tool for Determining the Implementation Costs and Public Safety Benefits of SORNA with Educational Implications for Criminology and Criminal Justice". *Journal of Criminal Justice Education*, 26, 147-162.

34. Jennings, W.G., **Zgoba**, K., Donner, C., Henderson, B., & Tewksbury, R. (2014). "Considering Specialization/Versatility as an Unintended Collateral Consequence of SORN". *Journal of Criminal Justice*, 42, 184-192.

33. Jennings, W.G., **Zgoba**, K., Maschi, T., & Reingle\*, J. (2014). "An Empirical Assessment of the Overlap Between Sexual Victimization and Sex Offending". *International Journal of Offender Therapy & Comparative Criminology*, 58, 1466-1480.

32. Pizarro, J.M., **Zgoba**, K. M. & Haugebrook, S. (2014). "Supermax and Recidivism: An Examination of the Recidivism Covariates among a Sample of Supermax Ex-Inmates." *The Prison Journal*, *94*(2), 180-197.

31. Jennings, W.G., **Zgoba**, K., Piquero, A.R., & Reingle*, J. (2013). "Offending Trajectories among Native-Born and Foreign-Born Hispanics to Late Middle Age". *Sociological Inquiry*, 83, 622-647.

30. **Zgoba**, K., Jennings, W.G., Maschi, T., & Reingle*, J. (2012). "An Exploration into the Intersections of Early and Late Sexual Victimization and Mental and Physical Health among an Incarcerated Sample of Older Male Offenders". *Best Practices in Mental Health: An International Journal*, 8, 82-98.

29. **Zgoba**, K. & Levenson, J. (2012). "Failure to Register as a Predictor of Sex Offense Recidivism: The Big Bad Wolf or a Red Herring?" *Sexual Abuse: A Journal of Research and Treatment*, 24, 328-349.

28. Jennings, W., **Zgoba**, K. & Tewksbury, R. (2012) "A Comparative Longitudinal Analysis of Recidivism Trajectories and Collateral Consequences for Sex and Non-Sex Offenders Released Since the Implementation of Sex Offender Registration and Community Notification". *The Journal of Crime and Justice,* 35(3), 327-334.

27. Ragusa-Salerno, L.M.**,** & **Zgoba**, K. (2012). "Taking Stock of 20 Years of Sex Offender Laws and Research: An Examination of Whether Sex Offender Legislation Has Helped or Hindered Our Efforts". *Journal of Crime and Justice,* 35(3), 335-355.

26. Tewksbury, R., Jennings, W. & **Zgoba**, K. (2012) "A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN". *Behavioral Science & the Law,* (30) 308–328.

25. Ackerman, A., Harris, A., Levenson, J. & **Zgoba**, K. (2011) "Who are the People in Your Neighborhood? A Descriptive Analysis of Individuals on Public Sex Offender Registries". *International Journal of Law and Psychiatry*, 34(3), 149-159.

24. Maschi, T., Morgen, **Zgoba,** K., Courtney, D. & Ristow, J. (2011). "Age, Cumulative Trauma, and Post Traumatic Stress Symptoms among Older Adults in Prison: The Role of Subjective Experience". *The Gerontologist* 51(5), 675-686.

23. Pizarro, J., **Zgoba**, K. & Jennings, W. (2011). "Assessing the Interaction of Offender and Victim Lifestyle Characteristics for Differentiating Homicide Incidents: Results from a Hierarchical Agglomerative Cluster Analysis Approach". *The Journal of Criminal Justice*, 39(5), 367–377.

22. Neuilly, M., **Zgoba,** K., Tita, G. & Lee, S. (2011). "Predicting Recidivism in Homicide Offenders Using Classification Tree Analysis". *Homicide Studies,* 15(2), 154-176.

21**. Zgoba,** K. (2011). "Residence Restriction Buffer Zones and the Banishment of Sex Offenders: Have We Gone One Step Too Far?". *Criminology & Public Policy,* 10(2), 391-400.

20. **Zgoba,** K.,Veysey, B, Dalessandro, M. (2010). "Do the Best Intentions Predict Best Practices: An Analysis of the Effectiveness of Megan's Law". *Justice Quarterly,* 27(5), 667-691.

19. Veysey, B. & **Zgoba,** K. (2010). "Reducing Risk of Sex Offenses Reconsidered: Changes in Predictors of Recidivism Over Time". *Criminal Justice and Behavior: An International Journal,* 37(5), 583-595.

18. Haugebrook, S., **Zgoba,** K., Maschi, T. (2010). "Trauma, Stress, Health and Mental Health Issues among Ethnically Diverse Older Adult Prisoners: A Correctional Healthcare Concern". *Journal of Correctional Healthcare,* 16(3), 220-229.

17. Tewksbury, R. & **Zgoba**, K. (2010). "Perceptions and Coping with Punishment: How Registered Sex Offenders Respond to Stress, Internet Restrictions and the Collateral Consequences of Registration". *International Journal of Offender Therapy and Comparative Criminology,* 54(4), **537-551.**

16. Levenson, J., LeTourneau, E., Armstrong, K. & **Zgoba**, K. (2010). "Failure to Register as a Sex Offender and Recidivism". *Justice Quarterly,* 27(3), 305-331.

15. **Zgoba**, K., Levenson, J. & McKee, T. (2009). "Examining the Impact of Sex Offender Residence Restrictions on Housing Availability". *Criminal Justice Policy Review,* 20(1), 91-110.

14. **Zgoba**, K. & Levenson, J. (2008). "Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: A Statistical Examination of Three Time Frames". *Victims & Offenders,* 3(1), pp. 10-30.

13. **Zgoba,** K., Haugebrook, S. & Jenkins, K. (2008) "New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism". *Criminal Justice and Behavior: An International Journal,* 35(3), pp. 375-387.

12. Veysey, B. M., **Zgoba,** K., & Dalessandro, M. (2008). "A Preliminary Step Towards Evaluating the Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005". *Justice, Research & Policy,* 10 (2), pp. 1-18.

11. Levenson, J., **Zgoba,** K. & Tewksbury, R. (December 2007). "Sex Offender Residence Restrictions: Sensible crime policy or flawed logic?" *Federal Probation.* 71(3), 2-9.

10. Roberts, A. & **Zgoba**, K. (September/October 2007). "The Offending Histories and Patterns of 350 Male and Female Inmates". *Aggression and Violent Behavior: A Review Journal,* 12, pp. 493-507.

9. Neuilly, M. & **Zgoba**, K. (2006). "Assessing the Possibility of a Pedophilia Panic and Contagion Effect between France and the United States". *Victims & Offenders,* 1(3), pp. 1-29.

8. Simon, L.M.J. & **Zgoba**, K. (December/January 2005). "Therapeutic Jurisprudence and Sex Offender Policies: Part II". *Sex Offender Law Report,* 7(1), pp. 1-16.

7. Simon, L.M.J. & **Zgoba**, K. (October/November 2005). "Therapeutic Jurisprudence and Sex Offender Policies: Part I". *Sex Offender Law Report,* 6(6).

6. Witt, P. & **Zgoba**, K. (April/ May 2005). "Psychological Treatment of Sex Offenders: Current Status". *Sex Offender Law Report*, 6(3).

5. **Zgoba**, K. & Simon, L. (2005). "Recidivism Rates of Sex Offenders Up to Seven Years Later: Does Treatment Matter?" *Criminal Justice Review,* 30(2), pp. 155-173.

4. **Zgoba,** K.M. (2004). "The Amber Alert: An Effective Solution to Missing Children?" *Journal of Psychiatry & Law*, 32(1), pp. 71-88.

3. **Zgoba**, K.M. (2004). "Spin Doctors and Moral Crusaders: The Moral Panic behind Child Safety Legislation." *Criminal Justice Studies: A Critical Journal of Crime, Law & Society*, 17(4), pp. 385-404.

2. **Zgoba,** K., Sager, W. & Witt, P. (2003) "Evaluation of New Jersey's Sex Offender Treatment Program at the Adult Diagnostic and Treatment Center: Preliminary Results." *Journal of Psychiatry & Law* (31), pp. 133- 164.

1. Potchak M.C., McGloin J.M., **Zgoba** K. (2002) "A Spatial Analysis of Criminal Effort: Auto Theft in Newark, New Jersey." *Criminal Justice Policy Review*, 13(3), pp. 257-285.

**Proceedings**

**Zgoba,** K. Failure to Register as a Sex Offender. Testimony to the United States Sentencing Commission on March 13, 2014: Washington, DC.

**Chapters in Books**

**Zgoba,** K. & Salerno, L. (2026). Collaborative Research on Mental Health Training for Corrections Officers: Bridging the Gap Between Practitioners and Academics. In the Division of Corrections & Sentencing Edited book (Accepted- final titles still pending).

**Zgoba,** K. (2026). Sex Offender Notification Laws and Violent Crime. In Edited book by Jesenia Pizarro, Hank Fradella and Terry Skolnick. (Accepted- final titles still pending).

**Zgoba, K.** & Tewksbury, R. & (2021, June). "SORN and Law Enforcement". In *Sex Offender Registration and Community Notification Laws: An Empirical Evaluation*. Edited by Wayne Logan and J.J. Prescott. Cambridge University Press: Cambridge, UK.

**Zgoba**, K. (2016). "The National Institute of Justice". In *The Encyclopedia of Crime and Punishment*. Edited by Wesley Jennings. Wiley-Blackwell Publishing: Hoboken, New Jersey.

**Zgoba**, K. & Dayal, N. (2016). "Recidivism". In *The Encyclopedia of Crime and Punishment*. Edited by Wesley Jennings. Wiley-Blackwell Publishing: Hoboken, New Jersey.

**Zgoba**, K. and Ragbir, D. (2016). "Sex Offender Registration and Notification Act (SORNA): Sexual Violence". In *Evidence Based Policy and Prevention*. Edited by Cynthia Calkins and Elizabeth Jeglic. Springer Publishing Company: New York, New York.

**Zgoba,** K. (2016). "The Aftermath of Sex Offender Registration and Other Controls". In *The Oxford Handbook of Sex Offences and Sex Offenders*. Edited by Teela Sanders & Brian Francis. Oxford University Press: New York, New York.

Levenson, J. S. & **Zgoba,** K. (2014). **"**Sex Offender Residence Restrictions: The Law of Unintended Consequences". In *Sex Offender Laws: Failed Policies, New Directions, 2nd Edition*. Edited by Richard Wright. Springer Publishing Company: New York, New York.

Haugebrook, S. & **Zgoba**, K. (2007). "Prison Group Counseling". In *Correctional Group Counseling and Treatment*. Edited by Albert Roberts. Prentice Hall: Upper Saddle River, NJ.

Simon, L. & **Zgoba**, K. (2006). "Prevention of Sex Crimes against Children: Legislation, Prevention and Investigation." In *Situational Prevention and Child Sex Offending* (Volume 19). Edited by Richard Wortley & Stephen Smallbone. Criminal Justice Press: Monsey, NY.

**Zgoba**, K. (2004). "Megan's Law and its Effect on Incarcerated and Released Sex Offenders." In *Encyclopedia of US Prisons and Correctional Facilities,* Sage Publications: Thousand Oaks, CA.

## Government Reports or Monographs

Levenson, J. S. & **Zgoba,** K. (2015). "Sex Offender Policies in Florida: Impact on Recidivism Trends over 20 Years". Final Report for Florida Department of Law Enforcement; Tallahassee, Florida.

**Zgoba**, K., Miner, M., Letourneau, E., Levenson, J., Knight, R., Thornton, D. (December 2012). "A Multi-state Recidivism Study Using Static-99 and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act". National Institute of Justice, U.S. Department of Justice;

Washington, DC.

Tewksbury, R., Jennings, W. & **Zgoba**, K. (2012). "Sex Offenders: Recidivism and Collateral Consequences". Document Number 238060. National Institute of Justice, U.S. Department of Justice; Washington, DC.

**Zgoba**, K. & Bachar, K. (April 2009). "Sex Offender Registration and Notification: Limited Effects in New Jersey." In Short: Toward Criminal Justice Solutions, NCJ 225402.  National Institute of Justice, U.S. Department of Justice; Washington, DC.

**Zgoba**, K., Witt, P. & Dalessandro, M. (2008).  "Megan's Law: Assessing the Practical and Monetary Efficacy".  Document Number 225370. National Institute of Justice, U. S. Department of Justice; Washington, DC.

**Zgoba**, K. & Wolff, N. (2003). "Comparative Analysis of Sexual Offender Treatment and Legislation." Final Report for the New Jersey Department of Corrections; Trenton, NJ.

**Zgoba**, K. (2002). "Bullying and DARE Projects in Linwood Middle School, North Brunswick, New Jersey." Final Report for *C.O.P.S. Department*; Washington, D.C.

Book Reviews

**Zgoba**, K. (2006). Ending Intimate Abuse: Practical Guidance and Survival Strategies.  Oxford University Press: New York, New York.

**Zgoba**, K. (2004). Crime Control and Women, Feminist Implications of Criminal Justice Policy, edited by Susan L. Miller (Thousand Oaks, CA: Sage Publications, 1998), In the *Journal of Psychiatry and Law,* Federal Legal Publications.

**OTHER PUBLICATIONS**

**Zgoba**, K., Miner, M., Knight, R., Letourneau, E., Levenson, J. & Thornton, D. (May/June 2013). "Findings from a Recent Multi-State Evaluation of Sex Offender Risk & Recidivism Using the Adam Walsh Act Tiers". *Corrections Today,* American Correctional Association, pp. 92-95.

**Zgoba**, K. (2008). "Evaluating the Impact of Megan's Law". *Justice, Research & Policy Digest,* 1-2.

Mitchell, M., **Zgoba,** K. & Piquero, A. (2021). Opinion Editorial. "Sex offender registry laws don't work. Here's what might." *Tampa Bay Times.*

https://www.tampabay.com/opinion/2021/12/16/sex-offender-registry-laws-dont-work-heres-what-might-column/

**PRESENTED PAPERS, LECTURES, EXHIBITIONS, AND PERFORMANCES**

March 11-15, 2025 Denver, CO- Academy of Criminal Justice Sciences
- Unmasking the Differences in Negative Affect for Older Incarcerated Individuals

November 12- 15, 2024 San Francisco, CA- American Society of Criminology
- The Development of Evidence on Sexual Offense Policies
- Life Beyond the List: Examining the Effectiveness of Removing Individuals from the Sexual Offense Registry

September 26, 2024 Arizona State University- Arizonans for Rational Sex Offense Laws
- Addressing the Risk and Correlates of Sexual Violence

November 15-18, 2023 Philadelphia, PA- American Society of Criminology
- Do Individual Characteristics Determine Weapon Choice and Degree of Violence
- Roundtable: Advice for Surviving and Succeeding in a Tenure Track Position, and Beyond
- Poster: Unlocking the Truth: Exploring the Impacts of Solitary Confinement on Recidivism and the Need for Mental Health Support for Individuals with Mental Illnesses

May 17, 2023 Phoenix, AZ- Office of Gender-Based Violence at Arizona State University School of Social Work
- Addressing the Risks and Correlates of Sexual Violence

April 28- 29, 2023 St. Paul, MN- Sex Offense Litigation and Policy Resource Center National Convening
- The Policy Implications of a Twenty-Five Year Meta-Analysis of Sex Offender Registration and Notification

November 15- 19, 2022 Atlanta, GA- American Society of Criminology
- The Policy Implications of a Twenty-Five Year Meta-Analysis of Sex Offender Registration and Notification

March 15-19, 2022 Las Vegas, NV- Academy of Criminal Justice Sciences
- The Effectiveness of Sex Offender Registration and Notification: A Meta-Analysis of Twenty-Five Years of Findings

November 13-16, 2019 San Francisco, CA- American Society of Criminology
- Who's in Administrative Segregation: The Effect of Inmate Type on Post-Release Behavioral Outcomes
- An Exploratory Analysis of Female Placement in Restrictive Housing

November 13-17, 2018 Atlanta, GA- American Society of Criminology

- Administrative Segregation and Offender Recidivism: Does Placement in Administration Segregation Affect Inmate Post-Release Offending Behavior?
- An Exploration of the Reality of Violent Offending in a Sample of Inmates

November 15- 18, 2017 Philadelphia, PA- American Society of Criminology
- A Longitudinal Analysis of the Criminal Career Patterns of Juvenile and Adult Sex Offenders
- A Comparative Analysis of Journey to Crime Patterns among Acquaintance and Non-Acquaintance Sex Offenders

November 15-19, 2016 New Orleans, LA- American Society of Criminology
- A Life Course Analysis of the Criminal Behavior of 500 Sexual Offenders: Phase III
- American and British Policy: A Comparison of Community Sentiment Toward Sex Offense Legislation Across the Pond
- Exploring the Conviction and Sentencing of Homicide Offenders in the Context of the Liberation Hypothesis

April 4, 2016 Newark, NJ- National Science Foundation Meeting at Rutgers University
- The Chicken or the Egg: What Came First, Research or Policy?

May 5, 2015 Belfast, Ireland- Public Protection Arrangements Northern Ireland and Probation Board Northern Ireland
- Building Bridges: Lessons Learned from Multiple National Institute of Justice Grants on Sexual Offense Legislation in the United States

April 22, 2015 Pucklechurch, England- Her Majesty's Prison Ashfield
- Building Bridges: Lessons Learned from Multiple National Institute of Justice Grants on Sexual Offense Legislation in the United States

March 24, 2015 Bristol, England- University of the West of England
- Building Bridges: Lessons Learned from Multiple National Institute of Justice Grants on Sexual Offense Legislation in the United States

November 17-21, 2015 Washington, DC- American Society of Criminology
- A Forty-Year Life Course Analysis of a Sample of One Thousand Released Sex Offenders: Phase II
- Memorialization Laws in the United Kingdom: A Response to a Moral Panic or an Increased Occurrence

November 18-22, 2014 San Francisco, CA- American Society of Criminology
- Sex Offender Buffer Zones: Are They Really Protecting Children?
- A Forty-Year Life Course Analysis of a Sample of One Thousand Released Sex Offenders: Phase 1

May 28- 30, 2014 Cleveland, OH- National Seminar for Federal Defenders
- Representing a Client in a Sexual Offense Case

March 19, 2014- Philadelphia, Pennsylvania- University of Pennsylvania
- Distinguished Lecture Series- "Results from Two National Institute of Justice Grants: Federal Sex Offender Laws and their Effect on Recidivism"

March 13, 2014- Washington DC- United States Sentencing Commission
- Provided testimony of federal sentences for sexual offenders charged with failure to register crimes.

November 13-16, 2013 Atlanta, GA- American Society of Criminology
- Supermax & Recidivism: An Examination of the Recidivism Covariates Among a Sample of Supermax Ex-Inmates

January 28-30, 2013 Houston, TX- American Correctional Association
- Final Results: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers

April 18, 2013 Newark, NJ- Rutgers University School of Criminal Justice
- Distinguished Lecture Series- "Results from Two National Institute of Justice Grants: Federal Sex Offender Laws and their Effect on Recidivism"

November 14-17, 2012 Chicago, IL- American Society of Criminology
- Final Results: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers

October 17-19, 2012 Denver, CO- Association for the Treatment of Sexual Abusers
- Final Results: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers
- A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN

September 2012 Atlantic Beach, FL- Southern Criminal Justice Association
- Considering specialization/versatility as an unintended collateral consequence of SORN

November 15-19, 2011 Washington, DC- American Society of Criminology
- Preliminary Findings and Discussion of the Adam Walsh Act: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers
- What Older Prisoners Report About How They Cope with the Prison Experience: Implications for Prison Treatment

- A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN
- Trauma Among Younger and Older Prisoners: Does Age Make a Difference?

November 3-4, 2011 Toronto, Canada- Association for the Treatment of Sexual Abusers
- Preliminary Findings and Discussion of the Adam Walsh Act: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers
- A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN

July 24-27, 2011 Chicago, IL- American Probation and Parole Association
- Preliminary Findings and Discussion of the Adam Walsh Act: Title 1 of the Sex Offender Registration Notification Act

June 13- 15, 2011 Washington DC- National Institute of Justice Annual Conference
- Reducing Risk of Sex Offenses Reconsidered: Changes in Predictors of Recidivism Over Time

November 17-20, 2010 San Francisco, CA, American Society of Criminology
- Assessing the Interaction of Offender and Victim Lifestyle Characteristics for Differentiating Homicide Incidents
- Adventures in SORN-Land: Using Sex Offender Registry Data to Promote Informed Practice
- Who are the People in Your Neighborhood: A Descriptive Analysis of Individuals on Sex Offender Registries
- Does History Always Repeat Itself? Failure to Register as a Predictor of Sexual Recidivism

October 31-November 1, 2010 Louisville, KY- International Community Corrections Association
- Sex Offender Policies and Legislation

August 1-3, 2010 Chicago, IL- American Corrections Association Summer Conference
- Sex Offender Management, Treatment and Civil Commitment: An Evidence-Based Analysis Aimed at Reducing Sexual Violence

June 14- 15, 2010 Washington DC- National Institute of Justice Annual Conference
- Sex Offenders in the Community: Post-Release, Registration, Notification and Residency Restrictions

March 11-14, 2009 Boston, MA- American Criminal Justice Society
- Author Meets Critic: Sex Offender Laws: Failed Policies, New Directions by Richard Wright

June 15-17, 2009 Washington DC- National Institute of Justice Annual Conference
- Establishing the Practical Efficacy and Monetary Value of Megan's Law: Phase Two

- 14 -

August 19- 22, 2009 Tenth Crime Mapping Research Conference, sponsored by the Mapping and Analysis for Public Safety (MAPS) program of the National Institute of Justice- New Orleans, LA
- Speaker on Mapping Sex Offender Residences in the 21st Century

November 4- 7, 2009 Philadelphia, PA- American Society of Criminology
- Reducing Risk of Sex Offenses Reconsidered: Changes in Predictors of Recidivism over Time

November 14- 18, 2008 St. Louis, MI- American Society of Criminology
- Establishing the Practical Efficacy and Monetary Value of Megan's Law: Phase Two

October 22- 24, 2008 Atlanta, GA- Association for the Treatment of Sexual Abusers
- Establishing the Practical Efficacy and Monetary Value of Megan's Law: An Empirical Analysis

July 21- 22, 2008 Washington DC- National Institute of Justice Annual Conference
- Sex Offender Residency Restrictions in New Jersey

June 19, 2008 Harvard Kennedy School- Ash Center for Democratic Governance and Innovation
- Webinar on "Sex Offender Residency Restrictions: Implementation and Impact"

November 12- 17, 2007 Atlanta, GA- American Society of Criminology
- A Preliminary Step towards Evaluating the Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005

October 31-November 3, 2007 San Diego, CA- Association for the Treatment of Sexual Abusers
- A Preliminary Step towards Evaluating the Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005

October 2006 Atlantic City, NJ- The New Jersey American Correctional Association
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism

October 30- November 4, 2006 Los Angeles, CA- American Society of Criminology
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism
- Part II- Domestic Violence Mandatory Arrest Policies and Actual Arrest Rates: A Comparative Analysis

February 2005 Honolulu, HI- Western Society of Criminology
- Therapeutic Jurisprudence in the Criminal Justice System

March 2005 Correctional Education Association Leadership Forum, Council of Directors, Annapolis, MD
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism"

April 2005 Trenton, NJ- Residential Community Release Program- Community Providers Conference
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism"

April 2005 New Brunswick, NJ- Rutgers University
- The Structure of New Jersey State Prisons: From Geography to Social Dynamics"

May 2005 Trenton, NJ- National Advisory Council Meeting
- The Expansion of New Jersey's Analysis of the Effect of a GED on Inmate Re-offending

August 8- 15, 2005 Philadelphia, PA- International Society of Criminology
- A Retrospective Examination of the Offending Histories and Re-offending Patterns of 300 Homicide Offenders

October 2005 New Brunswick, NJ- Rutgers University
- The Structure of New Jersey State Prisons: From Geography to Social Dynamics
- The Development of Ethical Research Protocol in State Government

October 2005 Atlantic City, NJ- The International Community Corrections Association
- Prison Treatment Programs and the Subsequent Impact on Inmates

November 14- 18, 2005 Toronto, Canada- American Society of Criminology
- A Retrospective Examination of the Offending Histories and Re-offending Patterns of 300 Homicide Offenders
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism
- Domestic Violence Mandatory Arrest Policies and Actual Arrest Rates: A Comparative Analysis

October 2004 New Brunswick, NJ- Rutgers University
- Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: An Examination of Three Time Frames

November 17-20, 2004 Nashville, TN- American Society of Criminology
- Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: An Examination of Three Time Frames
- The Pedophilia Panic in France and the United States

September 8- 11, 2004 Agen, Dordogne, France- French Society of Criminology
- A Cross- National Analysis of Moral Panics in the United States and France

- 16 -

<u>November 18-24, 2003 Denver, CO- American Society of Criminology</u>
- Recidivism Rates of Sex Offenders up to Seven Years Later: Does Treatment Matter?

<u>October 8, 2003 St. Louis, MI- Association for the Treatment of Sexual Abusers</u>
- Collaboration between Academia and the Department of Corrections: Why Bother?

<u>November 13-16, 2002 Chicago, IL- American Society of Criminology</u>
- A Ten-Year Longitudinal Analysis of Sex Offender Recidivism.

<u>September 2002 Woodbridge, NJ- Association for the Treatment of Sexual Abusers</u>
- A Ten-Year Longitudinal Analysis of Sex Offender Recidivism

<u>November 4-9, 2001 Atlanta, GA- American Society of Criminology</u>
- An Examination of New Jersey Civil Commitment Statutes: How Does It Compare to Other States?
- Tracking Offender Residence for Auto Thefts in Newark, New Jersey

**WORKS IN PROGRESS**
*Denotes graduate student

**<u>Papers submitted for review</u>**

Rich*, J. & **Zgoba**, K. (2025).  "Navigating Prison Life: The Impact of Social Support Across Age and Criminal History". *American Journal of Criminal Justice.*

**<u>Other completed papers</u>**

N/A

**<u>Research in Progress</u>**

**Zgoba**, K., Mitchell, M., Pizarro, J. & Silverthorn*, R. "Painting Restrictive Housing Pink: An Exploratory Review of Female Disciplinary Incarceration".

Mitchell, M. **& Zgoba,** K. "A Meta-Analysis of Juvenile Sexual Offense Registration and Notification Effectiveness".

**Zgoba,** K. & Salerno, L. "Results from the LEMHWA Funding on Correctional Officer Trauma and Menta Heath".

Levenson, J. **& Zgoba**, K. "A 30-Year Review of a Sample of Individuals Placed in Civil Commitment in Florida".

**Zgoba**, K. & Socia, K. "Life Beyond the List: Examining the Implications and Effectiveness of Removing Individuals from the Sexual Offense Registry".

**Zgoba**, K. & Dressler, W. "In Their Own Words: Prison Administrators' Perceptions on the Benefits and Challenges of Implementing the Prison Rape Elimination Act (PREA)"

**FUNDED WORK**

*Grant Award- Fall, 2023- Fall, 2025*
Vital Projects Fund, Inc.
Role: **Principal Investigator** (no additional PIs).
**$100,000** awarded Fall 2023.
This grant supports a study to conduct the first analysis of removing individuals from the online sexual offense registry. Random samples of those removed from the registry in one state will be compared on offending patterns to those who remain on the registry.

*Grant Award- Fall, 2023- Fall, 2025*
Arnold Ventures, LLC.
Role: **Co- Investigator** (Principal Investigators Todd Clear and Robert Apel, Rutgers University, awarded **780,000.00**).
This grant supports the work being done with the New Jersey Criminal Sentencing and Disposition Commission regarding proposed sentencing reductions. The research team is examining criminal data over two decades for sources of racial disparity in New Jersey's criminal justice system and the impact of recent legislative and sentencing changes on subsequent dispositions. Furthermore, we are forecasting how sentence reductions would affect criminal justice populations.

*Grant Award- Fall, 2023- Fall, 2024*
United Nations Development Programme, Solicitation No. UNDP-SLV-00143
Capacity Development Plan for National Institutions, El Salvador
Role: **Co-Principal Investigator** (Principal Investigator Jose Miguel Cruz, FIU).
This grant was awarded to the investigators at FIU, but ultimately was revoked due to provisions in the guidelines with which FIU could not comply (offer El Salvadoran participants international certification from FIU). The grant was intended to fund the researchers to train El Salvadoran prison officials and stakeholders on prison reentry topics.

*Grant Award- Fall, 2022- Fall, 2024*
Community Oriented Policing Services, Law Enforcement Mental Health Wellness Act.
Role: **Co-Principal Investigator** (Principal Investigator Laura Salerno, New Jersey Department of Corrections).
**$175,000** awarded December 2022.

This grant supports the implementation of SAMHSA-approved trauma informed services for correctional officers in New Jersey. Mental health services, peer-to-peer support programming and family services will be provided and evaluated in a population that demonstrates higher levels of suicide.

*Grant Award- Fall, 2021-Spring, 2023*
Arnold Ventures, LLC.
Role: **Research Associate** (Principal Investigators Todd Clear and Robert Apel, Rutgers University, awarded **1,000,000.00**).
This grant supports the work being done with the New Jersey Criminal Sentencing and Disposition Commission. Particularly, the research team is examining criminal data over two decades for sources of racial disparity in New Jersey's criminal justice system and the impact of recent legislative and sentencing changes on subsequent dispositions.

*Grant Award- 2016*
Bureau of Justice Assistance, Edward Byrne Memorial Justice Assistance Grant (JAG) **$190,000.00** awarded September 2016.
Role: **Co-Principal Investigator** (Principal Investigator Jennifer Malinowski, New Jersey Department of Corrections)
This grant supplied funding to create a new data mart that would allow for active offender monitoring within numerous state law enforcement agencies.  In an effort to ensure compliance with recent legislative changes in New Jersey a new repository to track real time offender information was created and maintained.

*Grant Award- 2015*
**$5,000.00**
National Institute of Justice
Bridging Research and Practice
Role: **Principal Investigator**
This grant supplied funding to lecture on two previous National Institute of Justice grant studies. Three lectures took place between March and April 2015 in England and Northern Ireland on how the findings of the studies pertain to those functioning in practitioner roles.

*Grant Award 2015 Cohort*
Fulbright Police Research and Criminal Justice Scholar Award
Fulbright Commission, US, UK
Role: **Principal Investigator**
*A Multi-Phase Outcome Evaluation of Sarah's Law in the United Kingdom*
This project determined if 1) the implementation of Sarah's Law (Child Sex Offender Disclosure Scheme) and the Violent and Sex Offender Register in designated areas of the UK decreased the rate of sexual crimes; 2) matched samples of sex offenders released post law implementation had lower rates of sexual recidivism and; 3) if the community, law enforcement and stakeholder express increased "self-protective" measures for their families, increased community safety, and validate the need for sex offender disclosure laws.

*Grant Award- 2010 FRS #638479*
**$100,000.00** awarded September 2010
The John A. Hartford Foundation
Role: **Consultant** (Principal Investigator Tina Maschi, Fordham University)
*Exploring the Relationship between Trauma, Coping Resources and Physical and Mental Well-being among Older Adults in Prison-* The specific aims of this study were to describe the types and frequencies of reported lifetime traumatic experiences of an older sample of prison inmates. This study also sought to examine the relationships of coping resources to trauma, stressors and well-being and to explore a possible moderating or mediating effect.

*Grant Award- 2009- IJ- CX-0203*
**$76, 502.00** awarded September 24, 2009-March 31, 2012
National Institute of Justice
Role: **Consultant** (Principal Investigator Wesley Jennings, University of South Florida)
*Sex Offenders: Recidivism and Collateral Consequences-* This study identified the recidivism trajectories of a sample of sex offenders and non-sex offenders post-release from the New Jersey Department of Corrections. Both samples of offenders had been released from the custody of the NJDOC and will be/ were under the supervision of the New Jersey State Parole Board. Special attention was devoted to identifying if and how the likelihood and frequency of recidivating is affected by the collateral consequences that many offenders face upon their release back into the community.

*Grant Award- 2008- MU-MU-0001*
**$507,073.00** awarded July 31, 2008-December 31, 2012
National Institute of Justice
Role: **Principal Investigator**
*A Multi-State Recidivism Study Using Static 99 Risk Scores and Tier Guidelines for the Adam Walsh Act-* This study tested the predictive validity of both the Adam Walsh tier designations and the Static 99 and 2002. This was the first study of its kind to determine the effectiveness of the mandatory federal law. In addition to the research responsibilities, under this grant the PI was responsible for overseeing the sub-grants of 5 state universities and one state agency.

*Grant Award- 2007-IJ-CX-0037*
**$296,656.00**
National Institute of Justice
Role: **Consultant** (Co- Principal Investigators Cynthia Mercado and Elizabeth Jeglic, John Jay College of Criminal Justice)
*Sex Offender Management, Treatment and Civil Commitment: An Evidence Based Analysis Aimed at Reducing Sexual Violence-* This study used a sample of NJ sex offenders who were treated and a sample of civilly committed sex offenders to ascertain recidivism risk and re-offending patterns.

*Grant Award- 2006-IJ-CX-0018.*

**$38,252.00** awarded September 1, 2006- December 31, 2008
National Institute of Justice
Role: **Principal Investigator**
*Megan's Law: An Empirical Analysis*- This study was the first of its kind awarded by the
Department of Justice to test the effectiveness of the federal version of Megan's Law.  It 1)
established prevalence rates of sexual offenses prior and post Megan's Law, 2) statistically
compared recidivism of sex offenders subjected to Megan's Law and those who are not and 3)
completed a cost-effectiveness analysis of the federal law.

## Pending Decision

*Submitted May 2025*
Community Oriented Policing Services, Law Enforcement Mental Health Wellness Act.
Role: **Co-Principal Investigator** (Principal Investigator Laura Salerno, New Jersey Department
of Corrections).
**Requested Amount: $200,000**
This grant will supports the implementation of SAMHSA-approved trauma informed services for
correctional officers in New Jersey. Mental health services, peer-to-peer support programming
and family services will be provided and evaluated in a population that demonstrates higher
levels of suicide.

## Grant Proposals Submitted but not Funded

**FEDERAL APPLICATIONS**

Grant Year Award 2022- Office of Victims of Crime, Solicitation Number O-OVC-2022-
171319. Role: Co-Principal Investigator (with Co-PI Maureen Kenny, Florida International
University).  Requested Contract Amount- $457,000.00

Grant Year Award 2022- National Institute of Justice, Human Trafficking
Role: Co-Principal Investigator (with Co-PI Maureen Kenny, Florida International University).
Requested Contract Amount- $800,000.00

Grant Year Award 2022- National Institute of Justice, Juvenile Justice
Role: Co-Principal Investigator (with Co-PI Lin Liu, FIU and Sabina Low, Arizona State
University). Requested Contract Amount- $400,000.00

Grant Year Award 2022- Bureau of Prisons, Solicitation Number 15BNAS21Q00000040. Role:
Principal Investigator (with Co-PI Stephen Gies, Development Services Group). Requested
Subcontract Amount- $405,000.00 (Full Amount $1,405,000.00).

Grant Year Award 2021- Community Oriented Policing Services- COPS. Role: Co- Principal
Investigator (with PI Laura Salerno, New Jersey Department of Corrections). *Law Enforcement
Mental Health and Wellness Act*. Requested Amount- $140,000.00.

- 21 -

Grant Year Award 2020- Bureau of Justice Assistance's Comprehensive Opioid, Stimulant, and Substance Abuse Program. Role: Principal Investigator. *Addressing Substance Use Disorders in America's Jails: Clinical Guidelines for Withdrawal Management.* Requested Amount: $298,000.00

Grant Award Year 2020- National Institute of Justice, NIJ-2020-17327. Role: Principal Investigator (with PIs: Ojmarrh Mitchell and Jesenia Pizarro-Terrill, Arizona State University). *An Assessment of the Community- and Individual-Level Effects of Plea Bargaining in Firearms Offenses on Crime.* Requested Subcontract Amount- $123,000.00

Grant Award Year 2020- National Institute of Justice, NIJ-2020-17296. Role: Co-Principal Investigator (PI: Laura Salerno, NJDOC). *Correctional Officer Wellness: Implementation and Evaluation of Stress Reduction and Suicide Prevention Interventions Utilizing a Randomized Sample.* Requested Subcontract Amount- $103,000.00

Grant Award Number 2019-15365- National Institute of Justice. Role: Co-Principal Investigator (PI: Stephen Gies, Development Services Group). *A Space to Feel Safe: A Multisite Evaluation of GPS to Monitor Intimate Partner Violence Defendants.* Requested Subcontract Amount- $145,000.00

Grant Award Number 2018- 14001- National Institute of Justice. Role: Principal Investigator (with PIs: Rob Guerette, FIU & Wesley Jennings, Texas State University). *The Impact of Police Officer Body Worn Cameras on the Prosecution of Violence Against Women: A National Survey of Prosecutor Sentiment and a Multi-State Review of Case Outcomes.* Requested Amount- $688,000.00

Grant Award Number 2018- 14023- National Institute of Justice. Role: Principal Investigator. *An Examination of Federal Recommendations on Inmate Disciplinary Segregation: A Review of Quality of Life and In-Prison Behavioral Outcomes.* Requested Amount- $186,097.00

Grant Award Number 2018-13702- National Institute of Justice. Role: Co- Investigator (PI: Stephen Gies, Development Services Group). *Space to Feel Safe: A Multi-Site Evaluation of GPS to Monitor IPV Defendants*. Requested Subcontract Amount- $168,701.00

Grant Award Number 2018-13702- National Institute of Justice. Role: Principal Investigator (with PIs: Rob Guerette, FIU & Wesley Jennings, Texas State University). *The Impact of Police Officer Body Worn Cameras on Incidents of Violence Against Women: A Multi-State, Multi-Site Panel of Field Experiments.* Requested Subcontract Amount- $200,380.00

**PRIVATE APPLICATIONS**

Grant Year Award 2024- John D. and Catherine T. MacArthur Foundation's Safety and Justice Challenge. Role: Principal Investigator (with Co-Is Melba Pearson and Besiki Kutateladze,

- 22 -

Florida International University). *Systematic Injustice: Tracking Racial and Ethnic Disparities Across Criminal Case Processing.* Requested Amount: $375,000.00

Grant Year Award 2023- Arnold Ventures. Role: Principal Investigator (with Co-PI: Zachary Hamilton, University of Nebraska, Omaha and Co-I: Melba Pearson, Florida International University). *A Multi-State Examination of Legal and Financial Obligation Policies and their Effect on Community Reentry and Racial Equity*. Requested Amount: $750,000.00.

Grant Year Award 2022- Philip Morris International, PMI 3rd Round of Funding. Role: Principal Investigator (with Co-PI Maureen Kenny, Florida International University). Requested Amount- $650,000.00.

Grant Year Award 2021- John D. and Catherine T. MacArthur Foundation's Safety and Justice Challenge. Role: Principal Investigator (with Co-PI: Besiki Kutateladze). *Exploring Prosecutorial Discretion in the Plea-Bargaining Process.* Requested Amount- $250,000.00

Grant Award Year 2020- National Collaborative on Gun Violence Research. Role: Co-Principal Investigator (PI: Jesenia Pizarro-Terrill). *In Their Own Words: An Examination of the Pathways, Drives, and Motives of Firearm Use Among Violent Offenders.* Proposal Invited. Requested Subcontract Amount- $123,000.00

Grant Award Year 2019- Arnold Ventures. Role: Co-Principal Investigator (PI: Stephen Gies, Development Services Group). *A Multisite Evaluation of Pretrial Electronic Monitoring for Intimate Partner Violence Defendants.* Requested Subcontract Amount- $145,000.00

**FIU APPLICATIONS**

Grant Award Year 2020- Florida International University Grantsmanship Program. Role: Principal Investigator. *Using Real-Time Data to Detect Suicide Risk in Local Jails: The Creation of an Active Suicide Risk Monitoring System (SRMS).* Requested Amount- $25,000.00

Grant Award Year 2021- Florida International University- The Research Center in Minority Institutions. Role: Principal Investigator. *Using Real-Time Data to Detect Suicide Risk in At Risk Populations in Prison.* Requested Amount- $50,000.00

**PROFESSIONAL HONORS, PRIZES, FELLOWSHIPS**

| | | |
|---|---|---|
| 2020 | Outstanding Article of Year | American Journal of Criminal Justice |
| 2018 | Part Time Lecturer Award | Rutgers University- New Brunswick |
| 2015 | Bridging Research & Policy Award | National Institute of Justice |
| 2014 | Research Scholar Award | Fulbright Commission |

- 23 -

| | | |
|---|---|---|
| 2013 | Peter P. Lejins Award for Excellence in Correctional Research | American Correctional Association |
| 00-04 | Graduate Assistantship | Rutgers University-Newark |
| 2000 | Graduate Scholar Excellence Award | Rutgers University-Newark |
| 1997 | Dean's Scholar Award | Rutgers University-New Brunswick |
| 1997 | Psi Chi National Honor Society | Rutgers University-New Brunswick |
| 96-98 | Dean's List | Rutgers University-New Brunswick |

## INSTITUTIONAL SERVICE

### Department

| | | |
|---|---|---|
| 2025 | ICJ Workshop- Working Outside of Academia | Presenter |
| 2025 | Tenure Track Search Committee | Member/Search Advisor |
| 2024 | Graduate Program Director | |
| 2024 | ICJ Student Comp Workshop | IRB Rep |
| 2024 | Tenure Track Search Committee | Member |
| 2024 | PhD. Student Evaluation Committee | Member |
| 2023 | ICJ Workshop – Faculty Research Panel | Presenter |
| 2023 | PhD. Student Evaluation Committee | Member |
| 2022 | ICJ Workshop - Publishing & Rapid Research Networking | Presenter |
| 2022 | PhD. Student Evaluation Committee | Member |
| 2021 | PhD. Student Evaluation Committee | Member |
| 2020 | Instructor Search Committee | Member |

| 2020 | PhD. Student Evaluation Committee | Member |
|------|-----------------------------------|--------|
| 2018 | Faculty Search Committee. Department of Criminal Justice, University of Central Florida. | Member |
| 2018 | Masters Curriculum Committee. Department of Criminal Justice, University of Central Florida. | Member |

**University**

| 2025 | SIPA Green School Panel on how to keep your research moving forward | |
|------|----------------------------------------------------------------------|--|
| 2025 | Undergraduate Research Competition | Evaluator |
| 2023 | Science Communication Conference | Attendee |
| 2020-present | Institutional Research Board. Florida International University. | Chair |
| 2019-2020 | Institutional Research Board. Florida International University. | Member |

**OFFICES HELD IN PROFESSIONAL SOCIETIES**

N/A

**OTHER PROFESSIONAL ACTIVITIES AND PUBLIC SERVICE AT FIU**

| 2025 | IRB Committee Member Renewal Training |
|------|----------------------------------------|
| 2025 | Export Control Training |
| 2025 | Honorlock Training |
| 2025 | Simple Syllabus Training |
| 2025 | FERPA Training |
| 2025 | Research Security: What Researchers Need to Know in Today's Federal and State Environment presented by ORED |
| 2024 | The Best Practices in Hiring Training |
| 2024 | University Search & Screen Training |

| | |
|---|---|
| 2024 | 'Don't Fear AI -Embrace It- Feedback, Idea Generation and Beyond' Training |
| 2024 | CITI Institutional Research Board Chair Training |
| 2024 | FERPA Training |
| 2024 | Cybersecurity Training |
| 2024 | Export Controls, Foreign Influence and Research Security Updates Presentation |
| 2023 | Exploitation and Coercion: The Reality of Human Trafficking in the United States |
| 2023 | When Robots Learn to Write, What Happens to Learning, Center for the Advancement of Teaching |
| 2023 | AI, Academics & Integrity Workshop |
| 2022 | CITI Basic Refresher Training Course |
| 2022 | Employee Code of Conduct Certification |
| 2022 | Strategies and Tactics for Recruitment to Increase Diversity and Excellence (STRIDE) Training |
| 2022 | Innovations Workshop: Adopting a Learning-Centered Approach to Teaching |
| 2022 | Innovations Workshop: Best Practices in Providing Feedback |
| 2022 | Cybersecurity Training |
| 2022 | Innovations Workshop: Introduction to Feedback Box |
| 2022 | Outside Activity/Conflict of Interest Faculty Training |
| 2022 | Evidence-Based Teaching Workshop |
| 2021 | Background and Criminal History Check Requirements Policy |
| 2021 | Cybersecurity Training |
| 2021 | Tenure and Promotion Workshop |
| 2021 | CITI Institutional Research Board Chair Training |

| | |
|---|---|
| 2020 | Safety and Justice Challenge Consortium Membership with Dr. Kutateladze |
| 2020 | National Institute of Health Grant Writing Workshop |
| 2020 | Cybersecurity Training |
| 2020 | Tenure and Promotion Workshop |
| 2020 | Provost Hybrid Program Certification Training |
| 2020 | The FIU Remote Teach Ready Badge |
| 2020 | Research Center in Minority Institutions (RCMI) Pilot Proposal Workshop |
| 2020 | FERPA Basics Training |
| 2020 | Panthers Protecting Panthers: COVID-19 Safety Certificate |
| 2020 | At-Risk for University & College Faculty Certification |
| 2019 | National Science Foundation Grant Writing Workshop |
| 2019 | Inclusion, Diversity, Equity, & Access (IDEA) Training |
| 2019 | Strategies and Tactics for Recruitment to Increase Diversity and Excellence (STRIDE) Training |
| 2019 | CITI Institutional Research Board Member Training |

**OTHER PROFESSIONAL ACTIVITIES AND PUBLIC SERVICE OUTSIDE FIU**

| | |
|---|---|
| 2024 | Academy of Criminal Justice Sciences Founder's Award Committee Member |
| 2022-present | Editorial Board Member, *Homicide Studies* |
| 2020-present | Editorial Board Member, *Journal of Experimental Criminology* |
| 2016-present | Editorial Board Member, *Policing: An International Journal* |
| 2020-present | Editorial Board Member, *American Journal of Criminal Justice* |
| 2018-2022 | Edna Mahan Correctional Facility for Women- NJ Department of Corrections Board of Trustees |

| 2016-2018 | Aresty Research Faculty Review Board, Rutgers University, New Brunswick |
|---|---|
| 2016-2018 | Aresty Research Mentor, Rutgers University, New Brunswick |
| 2016 | Criminal Justice Alumni and Career Mentoring Participant, Rutgers University, New Brunswick |
| 2016 | Outside Reader for Dissertation Committee of Laura Ragusa, Rutgers University, Newark |
| 2016-present | Council Member, Sexual Offense Policy Research Working Group |
| 2015-2018 | Co-author, New Jersey DOC Performance Indicators, https://www.nj.gov/transparency/performance/corrections/ |
| 2015 | Appointed Member of the Strategic Planning Committee "Envisioning Tomorrow's University", Rutgers University and University of Medicine & Dentistry, New Jersey |
| 2015 | Council Member, Prison Rape Elimination Act (PREA) Sexual Assault Advisory Council |
| 2013 | Council Member, New Jersey Governor Christie's Information Technology Strategic Planning Committee |
| 2013-present | Research Council Board Member, American Correctional Association |
| 2011 | Federal Grant Reviewer, Office of Juvenile Justice and Delinquency Prevention (OJJDP) |
| 2010 | Council Member, New Jersey Governor Jon Corzine's Advisory Council Against Sexual Violence |
| 2009 | Council Member, New Jersey Governor Jon Corzine's Crime Plan- *Another Chance Initiative* |
| 2009 | Board of Directors for the Megan's Law Analysis, Violence Institute at the University of Medicine and Dentistry, New Jersey |
| 2008 | Invited Participant to the Prison Administrator's Workshop on the National Inmate Survey, Bureau of Justice Statistics (BJS) |

2008            Committee Member, New Jersey State Bar Association's Subcommittee on
                Megan's Law

Reviewed journal articles for the following peer-reviewed journals:

*Journal of Qualitative Criminology*
*American Journal of Criminal Justice*
*Journal of Research on Crime and Delinquency*
*Journal of Psychiatry and Law*
*Security Journal*
*Criminal Justice Policy Review*
*Crime & Delinquency*
*Criminology & Public Policy*
*Criminal Justice and Behavior: An International Journal*
*Homicide Studies*
*Victims & Offenders*
*Justice Quarterly*
*Sexual Abuse: A Journal of Research & Treatment*
*Journal of Experimental Criminology*
*Journal of Crime & Justice*
*Criminal Justice Studies*

**Membership in Academic and Professional Organizations:**

2001-present       American Society of Criminology

2016-present       Sexual Offense Policy Research Board (A Founding Member)

2013-present       American Corrections Association Research Council (Lifetime
                   Member due to 2013 Peter P. Lejin's Award)

2013-2015          Academy of Criminal Justice Sciences

2006-2012          Association for the Treatment of Sexual Abusers

**Graduate Students Advised (As Dissertation/Thesis Committee Member)**

2024-present. Emilie Christiansen (Department of Criminology & Criminal Justice, Florida
International University). Serving as comprehensive committe member.

2024-present. Salpi Kevorkian (Department of Criminology & Criminal Justice, Florida
International University). Serving as dissertation committee member.

- 29 -

2024- present. Jessica Rich (Department of Criminology & Criminal Justice, Florida International University). Serving as comprehensive exam chair.

2023- present. Myah Havertong (Department of Criminology & Criminal Justice, Florida International University). Serving as comprehensive exam committee member.

2023- present. Rachel Silverthorn (Department of Criminology & Criminal Justice, Florida International University). Serving as chair of dissertation committee.

2022- present. Dylan Matthews (Department of Criminology & Criminal Justice, Florida International University). Serving as chair of dissertation committee.

2022- 2025. Synari Lyons (Department of Criminology & Criminal Justice, Florida International University). Serving as chair of comprehensive exam.

2022- present. Kevin Ortiz (Department of Psychology, Florida International University). Serving as a dissertation committee member.

2022- 2025. George Connolly (Department of Educational Policy Studies). Served as a dissertation committee member.

2022-2023. Christina Bellasalma (Department of Criminology & Criminal Justice, Florida International University). Served as comprehensive exam committee member.

2022-2023. Rachel Silverthorn-West (Department of Criminology & Criminal Justice, Florida International University). Served as chair of comprehensive exam.

2021- 2023. Raymond Douglas Partin (Department of Criminology & Criminal Justice, Florida International University). Served as a dissertation committee member.

2021- 2023. Wendy Dressler (Department of Criminology & Criminal Justice, Florida International University). Served as dissertation committee member.

2021. Sashane McDonald (Department of Criminology & Criminal Justice, Florida International University). Served as chair of dissertation committee. Stepped down as chair.

2021. Raymond Douglas Partin (Department of Criminology & Criminal Justice, Florida International University). Served as comprehensive exam committee member.

**Graduate Student Advising/Mentoring**

2024-present    Gaby Zelaya, Florida International University, Digital Assistant
2023-present    Amirhossein Mazaheri, Florida International University, Digital Assistant
2022-2023       Myah Havertong, Florida International University, Digital Assistant

| 2021-2022 | Sadhika Soor, Florida International University, Teaching Assistant |
| 2020-2021 | Raymond D. Partin, Florida International University, Teaching Assistant |
| 2019- 2020 | Minju Kim, Florida International University, Research Assistant Advisor |
| 2018- 2019 | Devin Cowan, University of Central Florida, Research Assistant Advisor |

Authored several letters of recommendation for students who applied for admission to law schools and various graduate programs. A list is available upon request.

## MEDIA INTERVIEWS

The Star Ledger- Newark, New Jersey- 2006, 2007, 2008, 2009, 2010, 2011
The Philadelphia Inquirer- Philadelphia, Pennsylvania- 2007, 2008, 2010, 2011, 2012, 2013, 2015
The Associated Press, 2008, 2009, 2010
New Jersey Network, Trenton, New Jersey 2009
The Washington Post, 2009
The Economist, 2009
The Boston Globe- Boston, Massachusetts, 2008, 2009, 2010, 2011
The Cape May Herald- Cape May, New Jersey, 2008
The Human Rights Watch, 2008
CNN, Atlanta, 2011
USA Today, 2011, 2023
Correctionsone.com, 2014, 2015
Crime Report, 2015
Al Jazeera America, 2015

## MISCELLANEOUS

Expert witness- A detailed list of approximately twenty-five court cases and decisions are available upon request.

# APPENDIX B

**APPENDIX B**
**Kristen Zgoba, Ph.D.**
**TRIAL/DEPOSITION TESTIMONY LAST FOUR YEARS**

| | |
|---|---|
| **Case name or description:** | State of New Jersey v. Moriba Herron |
| **Attorney:** | James Maynard, Morristown, NJ |
| **Date of Testimony:** | 2020-2021 |

| | |
|---|---|
| **Case name or description:** | State of New Jersey v. J. Russell |
| **Attorney:** | James Maynard, Morristown, NJ |
| **Date of Testimony:** | 2021 |

| | |
|---|---|
| **Case name or description:** | State of New Jersey v. Bruce Davis |
| **Attorney:** | Jesse DeBrosse, New Jersey Office of the Public Defender |
| **Date of Testimony:** | 2021 |

| | |
|---|---|
| **Case name or description:** | State of New Jersey v. CC, Registrant |
| **Attorney:** | Jesse DeBrosse, New Jersey Office of the Public Defender |
| **Date of Testimony:** | 2021 |

| | |
|---|---|
| **Case name or description:** | In the matter of Robert Berardo |
| **Attorney:** | Andrew Olesnycky, Stahl Gasiorowski, P.C. |
| **Date of Testimony:** | 2022 |

| | |
|---|---|
| **Case name or description:** | Sentencing hearing for Michael McGowan |
| **Attorney:** | Jude Faccidomo, Ratzan & Faccidomo, LLC |
| **Date of Testimony:** | 2022 |

# APPENDIX C

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**REBUTTAL EXPERT REPORT OF KRISTEN M. ZGOBA, PH.D.**
**List of Materials Cited and Considered**

| EXPERT REPORTS |
|---|
| Expert Report of Dr. Veronique Valliere, dated September 26, 2025 |

| PUBLICATIONS |
|---|
| Alaggia, R. & Wang, S. (2020). "I never told anyone until the #metoo movement": What can we learn from sexual abuse and sexual assault disclosures made through social media? *Child Abuse & Neglect 103 (2020) 104312* |
| Allen, W. (2007) The Reporting and Underreporting of Rape. *Southern Economic Journal*, Vol. 73, No. 3, 623-641 |
| Bachman, R. (1993). Predicting the Reporting of Rape Victimizations. Have Rape Reforms Made a Difference? Vol. 20 No. 3 September 1993 254-270. *SAGE Publications* |
| Bachman, R. (1998). The Factors Related to Rape Reporting Behavior and Arrest. New Evidence from the National Crime Victimization Survey. *Criminal Justice and Behavior*, Vol. 25, No. 1, 8-29 |
| Bureau of Justice Statistics. (2023). *National Incident-Based Reporting System (NIBRS)*. U.S. Department of Justice, Office of Justice Programs |
| Chen, Y. & Ullman, S. (2010). Women's Reporting of Sexual and Physical Assaults to Police in the National Violence Against Women Survey. *SAGE Publications*, 16(3), 262-279 |
| Cohn, A. M., Zinzow, H. M., Resnick, H. S., & Kilpatrick, D. G. (2013). Correlates of reasons for not reporting rape to police: Results from a national sample of women. *Journal of Interpersonal Violence, 28*(3), 455–473 |
| Duane, M., La Vigne, N., Lynch, M. & Reimal, E. (2017). Criminal Background Checks: Impact on Employment and Recidivism. *Urban Institute* |
| Federal Bureau of Investigation. (2024). *Uniform Crime Reporting Program*. U.S. Department of Justice |
| Felson, M., & Boba, R. L. (Eds.). (2010). Crime and everyday life. *SAGE Publications* |
| Felson, R., Messner, S., Hoskin, A. & Deane, G. (2002). Reasons for Reporting and Not Reporting Domestic Violence to the Police. *Criminology,* Vol. 40 No. 3, 617-648 |
| Fisher, B. S., Daigle, L. E., & Cullen, F. T. (2010). Unsafe in the ivory tower: The sexual victimization of college women. *SAGE Publications* |

1

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| PUBLICATIONS |
|---|
| Greenwood, B. N., & Wattal, S. (2017). Show me the way to go home: Ridesharing and drunk driving fatalities. *Information Systems Research, 28*(3), 574–588 |
| Hanson, R. K., & Morton-Bourgon, K. E. (2009). The accuracy of recidivism risk assessments for sexual offenders: a meta-analysis of 118 prediction studies. *Psychological assessment*, *21*(1), 1 |
| Kim, Y. (2020). Organizational resilience and employee work-role performance after a crisis situation: Exploring the effects of organizational resilience on internal crisis communication. *Journal of Public Relations Research, 32*(1–2), 47–75 |
| Kurlychek, M. C., Brame, R., & Bushway, S. D. (2007). Enduring risk? Old criminal records and predictions of future criminal involvement. *Crime & Delinquency*, *53*(1), 64-83 |
| Maurer, D. C. (2015). Criminal History Records: Additional Actions Could Enhance the Completeness of Records Used Employment-Related Background Checks for Employment-Related Background Checks. *Government Accounting Office (GAO)* |
| Park, J., Pang, M. S., Kim, J., & Lee, B. (2021). The deterrent effect of ride-sharing on sexual assault and investigation of situational contingencies. *Information Systems Research*, *32*(2), 497-516 |
| Porat, R., Gantman, A., Green, S. A., Pezzuto, J. H., & Paluck, E. L. (2024). Preventing sexual violence: A behavioral problem without a behaviorally informed solution. *Psychological Science in the Public Interest*, *25*(1), 4-29 |
| Sniffen, C., Durnan, J., & Zweig, J. (2018). Helping industries to classify reports of sexual harassment, sexual misconduct, and sexual assault. *Washington, DC: RALIANCE*. https://www.raliance.org/wp-content/uploads/2018/11/helping-industries.pdf |
| Smith, S. G., Zhang, X., Basile, K. C., Merrick, M. T., Wang, J., Kresnow, M., & Chen, J. (2018). The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief. *Atlanta, GA: CDC* |
| Thompson, M., Sitterle, D., Clay, G. & Kingree, J. (2007) Reasons for Not Reporting Victimizations to the Police: Do They Vary for Physical and Sexual Incidents? *Journal of American College Health*, 55:5, 277-282, DOI: 10.3200/JACH.55.5.277-282 |
| Tjaden, P. & Thoennes, N. (2000). Full Report of the Prevalence, Incidence, and Consequences of Violence Against Women. Findings from the National Violence Against Women Survey. *National Institute of Justice*. |
| Worthen, M. G., & Schleifer, C. (2024). # MeToo and sexual violence reporting in the National Crime Victimization Survey. *Journal of interpersonal violence*, *39* (21-22), 4215-4259 |

| MISCELLANEOUS DOCUMENTS |
|---|
| Alarms.org (2020, January 14). Is Uber safe? How safe are Uber and Lyft for women? Alarms.org. https://www.alarms.org/uber-lyft-womens-safety-report/ |
| National Institute of Justice. (2024). *Advancing situational and developmental approaches to prevent sexual violence.* U.S. Department of Justice. https://nij.ojp.gov/topics/articles/advancing-situational-and-developmental-approaches-prevent-sexual-violence |

| MISCELLANEOUS DOCUMENTS |
|---|
| National Research Council. 2014. *Estimating the Incidence of Rape and Sexual Assault*. Washington, DC: The National Academies Press. https://doi.org/10.17226/18605 |
| *Ride with Confidence*, Uber, https://www.uber.com/us/en/ride/safety/?uclick_id=d8c5781c-297f-4dd0-a6c7-3255b4ec915e |
| https://www.uber.com/newsroom/ubers-safety-record/ |
| https://www.uber.com/newsroom/industry-sharing-safety/ |
| https://rainn.org/get-informed/facts-statistics-the-scope-of-the-problem/ |