# EXHIBIT 1

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1                    ATTORNEY PREMO-HOPKINS:  Ms. Nilles is
 2         here and ready to answer any and all of your
 3         questions about the B.L. case and the documents
 4         that were produced.  Obviously I would object to
 5         your characterization of anything as a document
 6         dump.  You are welcome to ask whatever questions
 7         you want about Lizeth Rosas and her account and how
 8         it may be linked.
 9                    Ms. Nilles is prepared to answer those
10         questions today, and so we can switch to the other
11         four cases now.  That's fine.
12                    ATTORNEY PETERS:  Let's shift to the
13         matter of Jaylin Dean versus Uber.
14                    VIDEO TECHNICIAN:  Is that the new time
15         you want me to run?
16                    ATTORNEY PETERS:  Yes, please.  MJ,
17         would you start the clock.
18                    VIDEO TECHNICIAN:  I got you.
19                    ATTORNEY PETERS:  Several clocks.
20    BY ATTORNEY PETERS:
21    Q.   Do you understand, Ms. Nilles, that on November 15,
22         2023, Ms. Dean alleges that she was raped by her
23         Uber driver during an Uber trip and that Uber
24         driver is Hassan Turay?
25    A.   Yes, I understand that's what is alleged.
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1   Q.   You are here to speak on Uber's behalf about its

2        screening and onboarding of Mr. Turay; is that

3        right?

4   A.   Yes.

5   Q.   Mr. Turay has two different Uber accounts, right?

6   A.   Yes.

7   Q.   They are known duplicate accounts to Uber, right?

8   A.   Yes.  This would fall into what we consider good

9        dupes or, like, allowed dupes.

10  Q.   So Uber knew about them and it was okay with them

11       remaining dupes, right?

12  A.   We have policies that allow for multiple accounts

13       that are separate flows and once we have linked

14       them.  So one is an Eats account and one is a

15       peer-to-peer account.

16  Q.   All right.  Just to my question --

17  A.   Yes, we knew about them.

18  Q.   Uber knew about them and in this instance these

19       were duplicate accounts that were okay with Uber;

20       is that right?

21  A.   Yes.

22  Q.   Mr. Turay first applied to drive for Uber on

23       July 24, 2014; is that right?

24  A.   I have got my paper copies, so I'm just going to

25       reference these to make sure we have the dates

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      correct.

2                  ATTORNEY PETERS:  Vince, if we could go

3          to Tab 4B, please.  That will be Exhibit 1853.

4                  MARKED FOR IDENTIFICATION:

5                  DEPOSITION EXHIBIT 1853

6                  Metadata

7                  2:14 p.m.

8                  MARKED FOR IDENTIFICATION:

9                  DEPOSITION EXHIBIT 1854

10                 Turay Status and Flow

11                 2:15 p.m.

12     BY ATTORNEY PETERS:

13     Q.  Actually, both tab 4A and 4B will be together 1853.

14         Tab 4A has the metadata sheet.  And then let's stay

15         on this one, though, which is 4B, the spreadsheet

16         itself.

17                 Can you confirm, please, Ms. Nilles,

18         this is a copy of the status and flow logs for the

19         Hassan Turay account ending in AD49?

20     A.  Yes.

21     Q.  That is the first of two accounts that was created,

22         right?

23     A.  Yes.

24     Q.  That account was created in -- on July 24, 2014,

25         right?

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1   A.   Yes.

2   Q.   That's when he applied to drive for Uber as part of

3        peer-to-peer, right?

4   A.   Yes.

5   Q.   On July 25, 2014, if we zoom in on the status for

6        that second line, it says "pending interview."

7                      Do you see that?

8   A.   Yes.

9   Q.   What does that mean?

10  A.   I don't know.

11  Q.   So you could speak on behalf of Uber, try to find

12       out what that meant at that time?

13  A.   Yes.  And I wasn't able to find anybody who knew

14       what that meant since it was so old.

15  Q.   In your research, did you learn that Uber did

16       conduct interviews of drivers back in 2014 as a

17       matter of onboarding?

18  A.   I did not learn that.  I asked a bunch of people in

19       my team what that might have meant and no one was

20       sure.  I don't know what it means.

21  Q.   Did you learn the opposite, it was not customary

22       for Uber to conduct interviews in 2014 or were you

23       unable to learn one way or the other?

24                      ATTORNEY PREMO-HOPKINS:  Object to form.

25  A.   I don't think it was customary to conduct

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1      interviews, but I didn't find evidence that we were

 2      conducting interviews, I would say.

 3   BY ATTORNEY PETERS:

 4   Q.  Did any find any policies or documents that

 5      describe one way or the other whether in 2014 it

 6      was standard protocol to interview drivers during

 7      onboarding?

 8   A.  I did not find anything like that.

 9   Q.  One way or the other, right?

10   A.  That's right.

11   Q.  He was rejected from the peer-to-peer service on

12      August 18, 2014, right?

13   A.  Yes.

14   Q.  In your notes for your depo aid version of the flow

15      sheet, you say that that was due to insufficient

16      driving history; is that right?

17   A.  Yes, that's right.

18   Q.  What did you base that on?

19   A.  So there was a hiring report done at that time in

20      2014 who we -- I don't think the company exists

21      anymore.  No.  Sorry.  We don't have a contract

22      with them anymore.  When we reached out to them,

23      they said because of privacy rules, they cannot

24      provide us any information nor did they have it

25      anymore.
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1                    But there was an account note,

2        somebody -- Investigation Workbench there is a

3        section for notes.  I haven't really seen it used

4        before.  But I did see that there was an account

5        note somebody had written.  I don't know who, maybe

6        an agent.  Failed background check, unable to

7        confirm one-year licensing duration.

8    Q.   That was not -- that document was not produced to

9        us, I believe.  Are you saying that is -- is that

10       something you are able to look at yourself using

11       the Investigation Workbench when you go into the

12       system?

13   A.   Technically, my team looked at it for me.  This is

14       that note.  But yes, I believe so.  He pulled it up

15       while I was on a call.  I think I did see it.  But

16       I can't quite remember.  But yes, you should be

17       able to see it.

18   Q.   How do you know that that -- what did you say?

19   A.   Go ahead.

20   Q.   How do you know that that note refers to the

21       August 18th, 2014, rejection and not the subsequent

22       rejection, June 17th, 2018?

23   A.   Because it says the account note was made on

24       August 18, 2014.  It's in my 30(b)(6) notes.  Can

25       you see that?  I put the exact account note in

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1       there.
 2  Q.   I saw that for a different -- one of these cases,
 3       but not for this one, I don't think.  Give me a
 4       second.
 5                  What you produced was the actual motor
 6       vehicle record check, not, like, a screenshot of
 7       Workbench, but the report from whoever, HireEase --
 8       actually, it's Checkr, right?
 9  A.   That's a different date.  What I'm referring to is
10       the status and flow with my note on it.  I just
11       added what the account note says.  So the status
12       and flow document for account AD49 with my notes on
13       it says this.
14  Q.   Let's go to Tab 151.
15  A.   Yes.  Here it is.
16                  ATTORNEY PETERS:  Zoom in just a little
17       bit, please, Vince, especially, like, the top
18       portion.
19  BY ATTORNEY PETERS:
20  Q.   Can you confirm that this is your annotated version
21       of the status and flow log for the tour A account
22       that was set up in 2014?
23  A.   Yes.
24  Q.   When you said that you gave the quote, are you
25       referring to that far right-hand column where it
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    says account note from August 18th, 2014, that

2    says:  "Failed background one check, unable to

3    confirm one-year licensing duration"?

4  A.  Yes.

5             ATTORNEY PETERS:  Counsel, we don't have

6    that document, the underlying source for that.

7  A.  I don't think -- well, never mind.

8             ATTORNEY PREMO-HOPKINS:  You have the

9    contents of it.  Ms. Nilles has testified to it.

10   To the extent you are making a request for another

11   document, you can make it.

12            ATTORNEY PETERS:  We requested all of

13   the documents of all types consistent with the ESI

14   order which show the screening -- the reasons for

15   rejection, the screening process, the

16   communications, the comms with Checkr, the comms

17   with HireEase, and whatever were relied on, and we

18   requested for these depositions all reliance

19   materials that the witness is using to be able to

20   answer the questions to the extent they're not

21   included in that, so it's not a new request at all,

22   but something that, you know --

23  A.  I think that is easily solvable.  It's not a

24   document per se.  There was an account note in his

25   Investigation Workbench.  I'm sure we can get that

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1      for you.  It's just a little tab.  It says account
 2      note from August 18th, and this is what it says.
 3      I'm sure we can find that.
 4   BY ATTORNEY PETERS:
 5   Q.  Just with respect to the date August 18th, 2014, is
 6       that the creation date of that note or is that a
 7       date provided in the note or what makes you think
 8       that's the date that goes with this note?
 9   A.  I believe that was the creation date of the note.
10   Q.  What happened to the pending interview?
11   A.  What do you mean?
12   Q.  Like, did the interview -- did an interview take
13       place of Mr. Turay?
14   A.  I already told you I don't know what that line
15       means.
16   Q.  Is there a place where Uber keeps track of whether
17       it actually interviewed a person?
18   A.  I have never seen a document that says we do
19       interview anyone.  So I'm confused about that entry
20       and wasn't able to find anybody to explain it to
21       me.  I don't think he was interviewed.
22   Q.  When you say you don't think he was interviewed, is
23       there anything you are basing that on other than, I
24       guess, guessing?
25                  ATTORNEY PREMO-HOPKINS:  Object to form.
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

 1   A.   I guess it's in my personal capacity.  I just never

 2        heard of a case where a driver was interviewed.

 3        That's not to say it's never happened ever.  But I

 4        don't think that has ever been our general

 5        practice.

 6   BY ATTORNEY PETERS:

 7   Q.   Have you looked back at other drivers who were

 8        onboarded in 2014 to figure out what process they

 9        went through in that year?

10   A.   No.

11   Q.   When did you first start working for Uber?

12   A.   2019.

13   Q.   In preparation for this deposition, did you speak

14        with anybody who was involved with driver

15        onboarding in 2014?

16   A.   I wasn't able to find anybody who was -- is still

17        with the company.

18   Q.   In what region was Mr. Turay onboarded?

19   A.   The U.S.

20   Q.   Was it the Phoenix area?

21   A.   Please hold.

22   Q.   To be specific, I'm talking about when he was

23        actually onboarded.

24   A.   I think yes -- I think so.  I'm trying to keep all

25        the facts straight here.  I think it was in the

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      same place.

2   Q.   You know that at that time in 2014 screening and

3        onboarding and were conducted in a regionally

4        controlled manner and had not yet been centralized

5        the way that it currently is, right?

6   A.   What do you mean by that?

7   Q.   Are you aware in 2014, which was the early days of

8        Uber's peer-to-peer or rideshare, whatever you want

9        to call it, the regional teams managed onboarding

10       and screening, it was not the same in each region?

11              ATTORNEY PREMO-HOPKINS:  Object to form.

12  BY ATTORNEY PETERS:

13  Q.   Do you know that?

14  A.   Where did you get that information?

15  Q.   I'm not the witness.  I have read a lot of things

16       that have indicated that.

17              ATTORNEY PREMO-HOPKINS:  You are reading

18       facts to the witness and asking her to affirm

19       whether they're true or not.  She can answer to the

20       best of her knowledge.

21  BY ATTORNEY PETERS:

22  Q.   I'm not reading anything.  I'm asking are you aware

23       that it was more of a regional process for

24       onboarding and screening in 2014?  If you are not

25       aware, that's fine.

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1              ATTORNEY PREMO-HOPKINS:  That question
 2      she already answered.
 3              ATTORNEY PETERS:  No, she hasn't.  Could
 4      you please, Counsel, please stop.
 5  A.  Yes.  It was done regionally.  That's not to say it
 6      was different everywhere.
 7  BY ATTORNEY PETERS:
 8  Q.  Did you speak with anybody who was familiar with
 9      the Phoenix region process for onboarding in 2014?
10  A.  No.  I would like to add context.  He never took
11      any trips on this account.
12  Q.  Right.
13  A.  There is no reason to further investigate because
14      the account actually was never active fully and he
15      never took any trips here.
16  Q.  Right.  He was rejected as a driver in 2014 under
17      this account, right?
18  A.  Because he failed to meet the licensing history
19      which is clearly noted here.
20  Q.  How do you know that is the reason for the
21      rejection?
22  A.  Because there is an account note that says it.  I'm
23      not sure what else to say there.
24              ATTORNEY PETERS:  That's a -- that's a
25      key document, Counsel, that we don't have.
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1           ATTORNEY PREMO-HOPKINS:  What document?

2           ATTORNEY PETERS:  Whatever document,

3     account note, the screenshot, the document that

4     says the reason for this rejection is actually a

5     failed background check, not what it looks like

6     from the documents that we had until yesterday,

7     pending interview, and then rejected.  That's what

8     we did have.

9           Last night I get notes that say, oh,

10    that's actually due to a failed background check.

11    But we don't have a background check.  We don't

12    have a failed background check.  We don't have a

13    document that says this was a rejection due to

14    failed background check as opposed to maybe

15    something that went wrong in an interview.  I'm

16    being told this without the documents to back it

17    up.

18          We don't need to fight about it, but I

19    am marking it.  We have got to deal with -- I have

20    got to leave this open so we can figure out that

21    topic.

22          ATTORNEY PREMO-HOPKINS:  Just for the

23    record, I think this is something that is very

24    easily solvable.  Ms. Nilles has explained to you

25    the documentation issue around hirees as you asked

```
 1      a number of questions about that document and I
 2      told you repeatedly that the document did not exist
 3      with regard to HireEase' background check.  And
 4      Ms. Nilles has explained to you why that is the
 5      case.
 6                  To the extent that there is going to be
 7      a hang-up around whether or not that is actually
 8      the account note that is in Uber's system, we can
 9      figure out a way to solve that while Ms. Nilles is
10      here today.
11  BY ATTORNEY PETERS:
12  Q.  Let's keep going.  Mr. Turay, after being rejected,
13      it looks like he tried to apply one more time for
14      peer-to-peer September 13, 2016?  Do you see that?
15      And then on that same date it looks like he
16      switched over to Uber Eats.
17  A.  So he didn't apply, per se.  He didn't go through,
18      like, the background check process.  I would assume
19      he just reaccessed his account and changed flow
20      types to Uber Eats.
21  Q.  Go ahead?
22  A.  Because he doesn't actually go through a background
23      check on that account until December.
24  Q.  And then after that date, everything with this
25      account that started in 2014 is all Uber Eats; is
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      that right?

2   A.  Yes.  As I mentioned, he never took trips.

3      Actually, everything below this point is related to

4      the status changes on his linked account.  So as

5      safety incidents came in or changes came in on that

6      account, agents were applying them to this account

7      even though he had never taken trips and was never

8      fully active on the Eats account.  Yes, it was

9      always in the Eats flow.

10  Q.  Got it.  Then 2016 a background check was conducted

11     which he failed for insufficient driving history,

12     right?

13  A.  Yes.

14  Q.  Was that the same across the two account?  Like,

15     was that a background check really done for the

16     other account or was that one really done for this

17     Eats account?

18  A.  It's a little confusing, honestly, what happened at

19     this time related to background checks.  From what

20     I can tell -- let me just reference the actual

21     documents, the background checks.  Please hold.

22              So I think that what happened is he --

23     what I think happened is based on these dates,

24     because the December 7, 2016, corresponds with

25     December 7th, 2016, of the opening of his official

Hannah Nilles Volume II Highly Confidential
August 07, 2025

 1        account, his primary account that he actually uses.

 2                 I did some investigations asking my team

 3        and other folks about what the process would have

 4        been at this time, and they explained to me that it

 5        would have been extremely cumbersome to switch back

 6        to P-to-P on an account and they would have had to

 7        call support and sit on the phone for hours.

 8                 It looks like he abandons this account

 9        and decides he is not going to further pursue Eats,

10        creates the new account, and the background check

11        is conducted on 12/7/16, likely for that -- let me

12        just look.  Hold on.

13    Q.  Can you say what you're looking at right now?

14    A.  Yeah.  I'm looking at the actual Checkr background

15        check results.  I'm referencing the dates of those

16        and the status and flow to make sure I have the

17        timeline correct.

18                 So I think what happens -- here is what

19        I think happened.  In his Uber Eats account, the

20        one you have on the screen, he comes back to this

21        account and says, okay, I'm going to, you know,

22        work -- I'm going to work on Uber.

23                 They run a background check on that

24        account, on that Eats account.  The report comes

25        back and it's the one that says suspended where it

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    says insufficient licensing history and that was

2    conducted on December 7, 2016, at 6:56 p.m.  They

3    said, you don't have enough licensing history.

4              He then goes back to Checkr to give his

5    driver's license history, and is, I believe, rerun

6    for this other P-to-P account that starts on 7692,

7    and proves to Checkr by providing an older license

8    that he has enough driving history, because the

9    original Checkr background check says first issue

10   date 2016, and then the next one says first issue

11   date 2008.

12             I would assume he went back to them with

13   an older license and said, actually, I do have

14   enough licensing history and here it is.  That's

15   when he then gets active on his P-to-P account and

16   does not ever attempt to get back on the Uber Eats

17   account.

18   Q.  Right.  So you did provide some helpful context of

19   putting together a bunch of pieces.  I'm a little

20   more narrow right now.  My question is just

21   June 17, 2018, when Mr. Turay and this Uber Eats

22   account that is on the screen, when he applies and

23   is rejected for failing the background check, is

24   that an action that -- that failure of that

25   background check, is that unique to this account,

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      the Uber Eats account?

2   A.  June 17, 2018?  So we're skipping ahead in time?

3   Q.  Yes.  So June -- June 17, 2018.  I don't see an

4       actual background check associated with that status

5       change.

6             You don't see that status change, that

7       rejection based on the background check on the

8       other status and flow log, right?  For his other

9       account?  It's only on this one?

10  A.  Right.  And I don't see any associated actual

11      background check with that.

12            ATTORNEY PETERS:  Let's go to Tab 8,

13      please.  This will be Exhibit 1855, report.

14            MARKED FOR IDENTIFICATION:

15            DEPOSITION EXHIBIT 1855

16            Metadata

17            2:38 p.m.

18            MARKED FOR IDENTIFICATION:

19            DEPOSITION EXHIBIT 1856

20            Spreadsheet

21            2:38 p.m.

22  BY ATTORNEY PETERS:

23  Q.  It says report for Hassan Turay, suspended.  This

24      is a background check that was conducted

25      December 7th, 2016, which is the date we just saw

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1      that he had applied again.

 2  A.  Yes.

 3  Q.  And then if we look at Page 3 it says license

 4      issued October 25, 2016.

 5              Do you see that?

 6  A.  I see that, yes.

 7  Q.  So this was -- he failed this driver's -- driving

 8      history check because his driver's license was

 9      issued October 25, 2016, and he is applying

10      December of 2016, and that's less than a year,

11      right?

12  A.  Yes.  Then he goes back to Checkr and gives them a

13      new license.

14  Q.  Let's do it in bite-size pieces.  One question at a

15      time.  I'm going to object as nonresponsive.

16              My question is, the reason that at this

17      time, December 2016, he failed this driving history

18      check is because the driving history check

19      conducted by Checkr in December of 2016 showed that

20      he had only had a license since October of 2016,

21      which is less than a year, right?

22  A.  Correct.

23  Q.  Then he passes --

24              ATTORNEY PETERS:  We can take that down.

25      Let's go to his other account, Tab 152.
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1   BY ATTORNEY PETERS:

 2   Q.  Is this the status and flow log for the other Turay

 3       account, the one that started in 2016 and has an

 4       UUID that starts with 7692?

 5   A.  Yes.

 6                   ATTORNEY PREMO-HOPKINS:  For the record,

 7       can you scroll down, just because we're only

 8       looking at your electronic copy.  I couldn't see

 9       the bottom because of the -- where I have my Zoom

10       images.

11   BY ATTORNEY PETERS:

12   Q.  Mr. Turay was activated as a peer-to-peer driver

13       for the first time on what date?

14   A.  12/23/2016.

15   Q.  We were just looking at a background check -- a

16       driving history check that he had failed in

17       December of 2016.  What was it that caused him to

18       pass -- or to be activated after he had failed in

19       the background check?

20   A.  He went back to Checkr and gave him -- gave them

21       his driver's license that showed a longer history.

22   Q.  What are you basing that on?

23   A.  My team looked in the Checkr portal and said that

24       he successfully confirmed their current or previous

25       driver's license on December 22, 2016, at 9:13 a.m.
```

1      I think that is another document, if needed, we

2      could produce for you.

3   Q.  It's needed.  There are a lot of things we could

4      probably put on the record that are more attorney

5      issues later on.  I'm just going to save them and

6      kind of keep going.

7   A.  My team investigated this, looked at the Checkr

8      portal.  And it says in the Checkr portal that he

9      successfully confirmed his license on December 22,

10     2016.

11  Q.  That's by -- you say by coming to a Green Light hub

12     as opposed to uploading something?

13  A.  No.  He would have probably directly communicated

14     with Checkr because in the Checkr portal, that's

15     where we get that information.

16              So when a background check is done,

17     there is, like, a pre-adverse action letter sent

18     that says hey, you may not meet these criteria.  If

19     you want to dispute anything on this consumer

20     report, let us know, and then they have a direct

21     communication with them to correct any information.

22  Q.  Have you seen a copy of the driver's license that

23     he supposedly gave to Checkr?

24  A.  I honestly can't remember because I looked at so

25     many documents.  I think I might have, but I'm not

1        sure.

2                    ATTORNEY PETERS:  Counsel, that's

3        another thing we don't have, is any driver's

4        license showing that he was licensed.  In fact, I'm

5        fairly confident it doesn't exist.  If it does, we

6        want to have it.

7                    ATTORNEY PREMO-HOPKINS:  All right.

8        We'll check on that for you.

9                    ATTORNEY PETERS:  Thank you.

10                   Let's go to Tab 7.  That will be

11       Exhibit 1857.

12                   MARKED FOR IDENTIFICATION:

13                   DEPOSITION EXHIBIT 1857

14                   Metadata

15                   2:43 p.m.

16   BY ATTORNEY PETERS:

17   Q.  This is a report for Mr. Turay, you can see at the

18       top?

19                   ATTORNEY PETERS:  Let's go to the next

20       page, please.

21   BY ATTORNEY PETERS:

22   Q.  And this is a report, you can see at the bottom,

23       that was created December 19, 2016, completed

24       December 22, 2016.

25                   Do you see that?

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    A.   Yes.

2              ATTORNEY PETERS:  Let's go to the next

3         page, please.

4    BY ATTORNEY PETERS:

5    Q.   The motor vehicle record section states that there

6         is a driver's license issue date of October 25,

7         2016, the same as we saw before.  There's a first

8         issue date given of January 31st, 2008.

9              Do you see that?

10   A.   Yes.

11   Q.   Again, it sounds like you can't tell me if that is

12        based on a date that is actually on a driver's

13        license versus something else that caused Checkr to

14        believe -- strike that.

15             What is that based on, saying that

16        that's the first issue date?

17   A.   That's what I told you.  He would have communicated

18        directly with Checkr.  I have no reason to believe

19        Checkr would have falsified this information.  He

20        would have communicated with Checkr, provided his

21        true licensing history, and then they approved and

22        cleared the report and sent it to us, because he

23        was able to prove that he had longer licensing

24        histories.

25   Q.   Does Uber allow Checkr to base licensing history on

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      any information other than actually being shown a

2      copy of a driver's license?

3   A.  The licensing history, I believe, is actually done

4      through the motor vehicle -- through the DMV.  I'm

5      not sure exactly what happened in this process,

6      again, because it would have been the consumer and

7      the consumer reporting agency.  They get the actual

8      records from the DMV.

9   Q.  Does Uber as part of its instructions to Checkr,

10     does it allow Uber to rely on information other

11     than the DMV history for purposes of determining

12     the first issue date for a driver's license?

13  A.  No, not to my knowledge.

14  Q.  You are saying that you believe this first issue

15     date is not actually based on the DMV record; is

16     that right?

17  A.  That's not what I said.  I said it would have been

18     a conversation between Mr. Turay and Checkr to

19     resolve the question of how long was his licensing

20     history.  He would have had to prove or they would

21     have -- I don't know what they discussed.  All I

22     know is Checkr got the information it needed to say

23     that he had a driving history from 2008 to the

24     present.

25  Q.  That was not what whatever Checkr relied on to get

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1     that date of 2008, it wasn't the DMV history,

2     right?

3  A.  It would have to be the DMV history.  That's where

4     they get information.

5  Q.  I thought you said it was based on a direct

6     conversation with Mr. Turay.

7  A.  I'm saying that's how they would have resolved the

8     dispute about what was on his consumer report.  I

9     wasn't privy to that information.  I don't think

10    they would just take his word for it.  I don't know

11    what information he gave them to say, hey, look

12    again, go back to the DMV, because actually this is

13    wrong.  That's how I imagine the conversation went.

14 Q.  As part of your preparation for this deposition did

15    you speak with anybody at Checkr by any means, by

16    verbal or email or anything, to try to find out

17    what was actually underlying this first issue date

18    of 2008?

19 A.  I did not, because this is an active litigation.  I

20    did not reach out.

21 Q.  Does Uber within the portal that it has with Checkr

22    have the ability to check on anything to see more

23    information, whatever underlying notes, for

24    example, Checkr has?

25              ATTORNEY PREMO-HOPKINS:  With regard to

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      this issue, first issue date?

2                  ATTORNEY PETERS:  Sure.

3   A.  I think it would have to be a thing we were going

4       to follow up and get you from the Checkr portal,

5       because I don't know exactly what it looks like.  I

6       mean, I know what the Checkr portal looks like, but

7       I don't know where that note was written.

8                  ATTORNEY PREMO-HOPKINS:  I'm sorry.  I

9       just think we're mixing things.  Okay.

10                 ATTORNEY PETERS:  I don't know what you

11      want me to do, Mark.

12                 ATTORNEY PREMO-HOPKINS:  I'm done

13      talking.  I'm done talking.

14  BY ATTORNEY PETERS:

15  Q.  Have you clicked within Checkr portal to try to

16      find all the information that is available about

17      this determination, if that's what it is, that

18      Mr. Turay was licensed in 2008?

19  A.  I instructed my team to do so.

20  Q.  What did they find?

21  A.  It's what I have already said to you and what's in

22      my 30(b)(6) notice.  Checkr portal:  Hassan

23      successfully confirmed a current or previous

24      driver's license on December 22, 2016, at 9:13 a.m.

25      It's in my 30(b)(6) notes.  In that document.

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    Q.    Right.  I think what is getting confusing is you're

2          saying that Checkr must have actually gotten this

3          information from the DMV.  Where are you getting

4          that from, that it was from the DMV, that they

5          confirmed the 2008 issue date?

6    A.    Because Checkr is a consumer reporting agency and

7          under the law, they are required to provide

8          complete and accurate information.  So they would

9          have had to do their own investigation.  But if you

10         want to know further details on that, you would

11         have to ask Checkr.

12               They can only publish a consumer report

13         with accurate information.  For them to put it on

14         here, I don't believe they would have just taken

15         his word for it.  They would have to verify it

16         somehow, but you would need to ask Checkr.

17   Q.    Are you aware that Mr. Turay testified at

18         deposition under oath that he immigrated to the

19         United States in 2013?

20   A.    I'm not aware, no.

21   Q.    Does Uber allow -- as part of Uber's process when

22         it requires at least a year of driving history, is

23         that country specific or is it any driver's license

24         in any country?

25   A.    It's country specific.  But, again, since he

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      immigrated in 2013, he would have been way beyond

2      that anyway.

3  Q.  You don't know that he got a driver's license in

4      2013 or 2014 or 2015, right?

5  A.  Presumably no, but going off this motor vehicle

6      record, which is our source of truth, it says

7      January 31st, 2008, and I have no reason to

8      discredit that.

9  Q.  Do you think people can get driver's licenses in a

10      country they have not moved to yet?

11              ATTORNEY PREMO-HOPKINS:  Object to form.

12  A.  I don't think I was insinuating that, no.

13  BY ATTORNEY PETERS:

14  Q.  Have you seen any information to suggest that

15      Mr. Turay obtained a driver's license any time

16      between 2013 up until October of 2016?

17  A.  I don't remember if I -- which of his driver's

18      license I've looked at.

19  Q.  He first became an active --

20              ATTORNEY PETERS:  We can take that down.

21  BY ATTORNEY PETERS:

22  Q.  He first became an active driver December 23rd,

23      2016.  Did he remain active after that date?

24  A.  Since when, since December 23rd, 2016 -- well, then

25      he goes through -- over the course of the account's

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    life cycle, different changes, document uploads and

2    stuff.

3  Q.  Was he ever actually waitlisted or deactivated

4    where it wasn't just for a document upload or

5    something like that before the subject incident?

6  A.  If it wasn't related to a document upload, that's a

7    question for Greg Brown.

8  Q.  Okay.  Let's talk about Uber's what it calls

9    multilevel safety screening of Mr. Turay.  The

10   entirety of its screening process for Mr. Turay was

11   to get his Social Security, date of birth, and name

12   from him, to have him upload his driver's license,

13   registration, insurance, and profile photo, to

14   check his driving history and check his criminal

15   background, both of the latter pieces through

16   Checkr, right?

17 A.  Yes.

18 Q.  The driving history check that Uber did when it

19   onboarded him was done within the same -- it was

20   started and completed within the same minute,

21   right?  That's Exhibit 1855, which we looked at.

22 A.  Which one is that?  Sorry.  Let me finish this.

23   1855.  You are talking about this insufficient

24   driving history one?

25 Q.  Right.

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    A.  Yes, it appears to be.

2                ATTORNEY PETERS:  We can take that back

3        down.  Thank you, Vince.

4    BY ATTORNEY PETERS:

5    Q.  The criminal background check was just focusing on

6        the criminal part of it, costs Uber between $7 to

7        $14, depending on whether they got a bulk rate for

8        it, right?

9    A.  Yes.

10   Q.  The whole screening process costs approximately

11       $30, give or take, right?

12   A.  Yes, that's correct.

13   Q.  The entirety of the paperwork that was generated

14       from the criminal background check and driving

15       history check are the two documents that are --

16       that we have looked at the Checkr driving history

17       check and the Checkr criminal history check, right?

18   A.  Yes.

19   Q.  Uber did not conduct a criminal background check in

20       Sierra Leone, correct?

21   A.  Correct.

22   Q.  Did not conduct one in Guinea, right?

23   A.  Correct.

24   Q.  It did not conduct one in Ghana, right?

25   A.  Right.  We only conducted one in the United States.

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
1   Q.   Uber did not know how long Mr. Turay had been
2        living in the United States when it did the
3        background check, right?
4   A.   Correct.
5   Q.   Did not make any effort to try to find out how long
6        he had been in the U.S., right?
7   A.   We don't have any processes that look for how long
8        someone has been in the U.S. beyond the Social
9        Security number.
10  Q.   In this instance for Mr. Turay, Uber did not do
11       anything else -- do anything to try to find out how
12       long he had been in the United States, right?
13  A.   Right.
14  Q.   As far as Uber knew, he may have only been in the
15       U.S. -- I guess there's the 2008, whatever that is.
16       If his driver's license was actually issued in
17       October of 2016 and there wasn't a prior driver's
18       license, then that would mean that at the time Uber
19       onboarded him in December of 2016, he had only been
20       in the U.S. for a few months, right?
21                 ATTORNEY PREMO-HOPKINS:  Object to form.
22  A.   You just told me that he testified he arrived in
23       2013.
24  BY ATTORNEY PETERS:
25  Q.   Right.  But as far as the information available to
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    Uber, if it's looking at his driver's license that

2    he provided to Uber, there is nothing to indicate

3    he had been there longer than a few months, right?

4  A.  We're not looking at his driver's license.  We were

5    looking at the report from Checkr which confirms

6    his licensing history.  That's how we met that

7    requirement.

8  Q.  Uber's criminal background check is supposed to,

9    it's designed to try to find out whether Uber's

10    drivers have ever committed rape, murder, or other

11    serious violent crimes, right?

12           ATTORNEY PREMO-HOPKINS:  Object to form.

13    Scope.

14  A.  Within that country.

15  BY ATTORNEY PETERS:

16  Q.  Isn't it important to Uber in onboarding Mr. Turay

17    to know whether he had ever committed rape, murder,

18    or a serious violent crime in any country?

19           ATTORNEY PREMO-HOPKINS:  Object to form.

20  A.  That's incredibly difficult to ascertain and there

21    are wildly different standards for background

22    checks across the world and many places don't even

23    have them.  In the case of Africa, specifically,

24    you have to go in person to obtain a physical

25    document, a police report that's, by the way,

Hannah Nilles Volume II Highly Confidential
August 07, 2025

 1        easily falsified and would have to present it in

 2        person, not digitally.  It's not possible.  No, we

 3        don't do that.

 4                    ATTORNEY PETERS:  Object as

 5        nonresponsive.

 6   BY ATTORNEY PETERS:

 7   Q.   My question is, isn't it important to Uber when

 8        it's onboarding or screening Mr. Turay to know

 9        whether he had ever communicated rape or murder or

10        a serious violent crime in another country?  Isn't

11        that something important to Uber?

12                    ATTORNEY PREMO-HOPKINS:  Object to form,

13        scope.

14   A.   I don't know if I can comment on what's important.

15        I can tell you what's feasible and realistic.

16   BY ATTORNEY PETERS:

17   Q.   As a person speaking for Uber about its screening

18        of Mr. Turay, you would agree that that is

19        something that would be relevant to whether he's

20        fit as an Uber driver is whether he had ever

21        committed rape, murder, or another serious violent

22        crime in any country, right?

23                    ATTORNEY PREMO-HOPKINS:  Object to form.

24   A.   To the extent that it would be possible to get that

25        information in a hypothetical sense, yes, but I

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1      don't think that's operationally possible across

 2      the world.

 3  BY ATTORNEY PETERS:

 4  Q.  Did Uber do anything to make up for the fact that

 5      it couldn't check Mr. Turay's background in the

 6      places -- other places he lived as an adult such as

 7      doing psychometric testing?

 8  A.  No.

 9              ATTORNEY PREMO-HOPKINS:  Object to form.

10  A.  No.  We don't have any evidence that the

11      psychometric testing that we did test was

12      effective.

13              ATTORNEY PETERS:  Object to everything

14      after "no" as nonresponsive.

15  BY ATTORNEY PETERS:

16  Q.  Mr. Turay was born in 1974, right?

17  A.  I don't have his driver's license in front of me.

18      Yes, I have his background check.  Yes, I can see

19      that.

20  Q.  That would mean by the time he was onboarded by

21      Uber in 2014, he was 42 years old, give or take,

22      right?

23  A.  Sure.

24  Q.  So a background check that only looks at a few

25      years of his life would be missing the majority of
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1      his adult life, right?

2                  ATTORNEY PREMO-HOPKINS:  Object to form.

3      A.  Yes, necessarily.

4      BY ATTORNEY PETERS:

5      Q.  Did Uber feel that onboarding a driver who had been

6          living most of his life outside the U.S. without

7          checking his background outside the U.S. was

8          putting a rider like Ms. Dean in danger?

9                  ATTORNEY PREMO-HOPKINS:  Object to form.

10         Scope.

11     A.  Uber did what is possible to screen Mr. Turay.

12     BY ATTORNEY PETERS:

13     Q.  Did Uber recognize that onboarding a driver who had

14         been living most of his life outside the U.S.

15         without checking his background outside the U.S.

16         was putting riders like Ms. Dean in danger?

17                 ATTORNEY PREMO-HOPKINS:  Object to form.

18     A.  I think that's implying that we could easily get a

19         background check for countries like Sierra Leone

20         and that is just not possible.

21     BY ATTORNEY PETERS:

22     Q.  If you could just answer the question, not what you

23         think I'm implying.  I'm not trying to imply.  I'm

24         not trying to go into feasibility.

25                 My question is:  Did Uber feel that

Hannah Nilles Volume II Highly Confidential
August 07, 2025

 1      onboarding a driver who had been living most of his

 2      life outside the U.S. without checking his

 3      background outside the U.S. was putting riders like

 4      Ms. Dean in danger?

 5              ATTORNEY PREMO-HOPKINS:  Object to form.

 6  A.  I don't think Uber, as a company, can feel.  I'm

 7      telling you what is operationally possible and what

 8      was considered by the safety team.

 9  BY ATTORNEY PETERS:

10  Q.  Did Uber recognize that as a risk?

11  A.  Yes.

12  Q.  Was that something Uber tried to address for

13      drivers like Mr. Turay where it wasn't conducting a

14      background check for the places he spent most of

15      his life living?

16  A.  We attempted to do psychometric testing on other

17      regions and it didn't bear out that it provided a

18      meaningful safety benefit, as I have already

19      testified.

20  Q.  Did Uber ask Mr. Turay whether he had any criminal

21      background?

22  A.  No.

23  Q.  Did it --

24  A.  I said no beyond the background check that Checkr

25      conducted.

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    Q.    I'm just asking about whether Uber actually asked

2          Mr. Turay whether he had any criminal background

3          anywhere.

4    A.    Did we ask him to self-certify if he had a criminal

5          background, no.

6    Q.    Did it ask for a list of prior employers?

7    A.    No.

8    Q.    Did it ask for any references at all?

9    A.    No, we don't ask for references.

10   Q.    Did it ask for a resume?

11   A.    No.

12   Q.    Did it ask for fingerprints?

13   A.    No.

14   Q.    Did it -- did Uber interview him in any way, shape,

15         or form?

16   A.    Not to my knowledge.

17   Q.    Did it do any research of its own like Google or

18         social media?

19   A.    No.

20   Q.    There is a looks like a HireRight report for 2024

21         for Mr. Turay.  Have you seen that?

22   A.    Yes.

23   Q.    Why is there a HireRight report for 2024 when it

24         looks like he was rejected November 17, 2023?

25   A.    Yeah.  I think we continued to order the report.

Hannah Nilles Volume II Highly Confidential
August 07, 2025

1    He was doing Uber health trips which do a separate

2    check.  It's not a background check in the same way

3    that Checkr does.  It's like looking to see if

4    there are any conflicts of interest.

5              I'm trying to remember what it is.  It's

6    something to do with people who are paid by the

7    government.  It's to financially deconflict so

8    we're not paying -- I would need to reference what

9    it is exactly, a check to make sure there's not a

10   conflict of interest for healthcare providers.

11             So we continued to, for whatever reason,

12   order the report on him despite the fact he was not

13   taking trips.

14   Q.  Is it true he was banned and rejected as of

15   November 17, 2023, and did not have any -- took no

16   trips after that date?

17   A.  I think that's a question for Greg Brown.

18   Q.  Okay.  With respect to the HireRight report, does

19   that reflect any reapplication by Mr. Turay?

20   A.  No.

21   Q.  You think it's just something that was done as an

22   automated matter; is that right?

23   A.  Yes.

24   Q.  Did the background check that Uber conducted in the

25   U.S. convince Uber that Mr. Turay would be a safe

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1      driver?

 2                  ATTORNEY PREMO-HOPKINS:  Object to form.

 3      Vague.

 4  A.  I don't think you can ever be convinced that

 5      someone is going to be safe.

 6  BY ATTORNEY PETERS:

 7  Q.  Did Uber feel comfortable based on his $7 or $13,

 8      $14 background check that it would be safe to send

 9      Mr. Turay to pick up solo women riders late at

10      night like Ms. Dean?

11  A.  I don't think Uber can feel comfortable one way or

12      the other.  I think we conducted the background

13      check that we have discussed at length.

14  Q.  Did Uber feel comfortable -- I'm sorry.

15                  Did Uber have any concerns as a company

16      about -- based on a background check like this one

17      conducted in a country where the driver had not

18      been very long living, sending that driver to pick

19      up solo women riders late at night?

20                  ATTORNEY PREMO-HOPKINS:  Objection to

21      form.

22  A.  Again, I don't think Uber as a company can feel

23      concerned.  I think I have given the explanations

24      about how the process works and potential risks and

25      limitations we have talked about and discussed.
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1   BY ATTORNEY PETERS:

 2   Q.  Was there any notation made on Mr. Turay's account

 3       at the time of screening based on the

 4       incompleteness of the background check that would

 5       flag him as being at any higher risk?

 6               ATTORNEY PREMO-HOPKINS:  Object to form.

 7   A.  The background check was as complete as any other

 8       background check conducted by Checkr.

 9   BY ATTORNEY PETERS:

10   Q.  Are you saying all of Checkr's background checks

11       are for people who haven't lived in the place where

12       the background check was being done for very long?

13               ATTORNEY PREMO-HOPKINS:  Object to form.

14   A.  No.  I'm saying Checkr would have followed the same

15       process they follow for all drivers in the

16       United States.  I'm saying it would have been the

17       same process in terms of completeness.

18   BY ATTORNEY PETERS:

19   Q.  Did Uber flag Mr. Turay's account as being one that

20       represented extra risk based on the fact that its

21       screening consisted of a background check that was

22       conducted in a place where Mr. Turay had not lived

23       for very long?

24               ATTORNEY PREMO-HOPKINS:  Object to form.

25   A.  Are you suggesting because he was an immigrant, we
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
 1        should have flagged him for extra risk?
 2   BY ATTORNEY PETERS:
 3   Q.  I'm not at all suggesting that.
 4             Because Uber did not conduct a
 5        background check in the place where he had actually
 6        been living for most of his adult life, did Uber
 7        flag him as extra risk?
 8             ATTORNEY PREMO-HOPKINS:  Object to form.
 9   A.  I don't think there is data that would suggest that
10        immigrants are extra risky.
11   BY ATTORNEY PETERS:
12   Q.  What about Ms. Lebaron when her driver was
13        onboarded in Columbia, was he flagged as extra
14        risky because a background check was only being
15        conducted in a country where he had not lived very
16        long?
17             ATTORNEY PREMO-HOPKINS:  Object to form.
18   A.  I don't think the fact that somebody immigrates to
19        a country necessarily makes them extra risky.
20   BY ATTORNEY PETERS:
21   Q.  Does the fact that Uber does not conduct a
22        background check in a place where a driver has
23        lived make them risky?
24             ATTORNEY PREMO-HOPKINS:  Object to form.
25   A.  I don't have data to support that.  But it's a
```

Hannah Nilles Volume II Highly Confidential
August 07, 2025

```
1        possible risk factor, yes.

2    BY ATTORNEY PETERS:

3    Q.  Did Uber do anything to flag that on Mr. Turay's

4        account?

5                    ATTORNEY PREMO-HOPKINS:  Object to form.

6    A.  To flag what?

7    BY ATTORNEY PETERS:

8    Q.  There was a potential risk factor that Uber had not

9        conducted a background check in the places where he

10       had been living?

11   A.  No.

12   Q.  I'm going to shift to another case if we want to

13       take a break?

14   A.  Sure.

15                   ATTORNEY PREMO-HOPKINS:  Why don't we

16       take a quick lunch break, like, 20 minutes, and we

17       can come back at the bottom of the hour.

18                   ATTORNEY PETERS:  You said how many

19       minutes?

20                   ATTORNEY PREMO-HOPKINS:  20 to on my

21       watch, come back at the bottom of the hour, break

22       for lunch.

23                   ATTORNEY PETERS:  12:30?

24                   ATTORNEY PREMO-HOPKINS:  Yes.

25                   VIDEO TECHNICIAN:  I'll take us off the
```