# Exhibit A

```
1  LAURA VARTAIN HORN (SBN: 258485)
   laura.vartain@kirkland.com
2  KIRKLAND & ELLIS LLP
   555 California Street, 30th Floor
3  San Francisco, CA 94104
   Telephone: (415) 439-1625
4
   Kim Bueno (Pro Hac Vice admitted)
5  kim.bueno@kirkland.com
   401 W. 4th St.
6  Austin, TX 78701
   Telephone: (512) 355-4390
7
   Allison M. Brown (Pro Hac Vice admitted)
8  alli.brown@kirkland.com
   2005 Market Street, Suite 1000
9  Philadelphia, PA 19103
   Telephone: (215) 268-5000
10
   JESSICA DAVIDSON (Pro Hac Vice admitted)
11 jessica.davidson@kirkland.com
   601 Lexington Avenue
12 New York, NY 10022
   Telephone: (212) 446-4723
13

14 Counsel for Defendants
   UBER TECHNOLOGIES, INC.,
15 RASIER, LLC, and RASIER-CA, LLC
   [Additional Counsel Listed on Following Pages]
16
```

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, | Case No. 3:23-md-03084-CRB  **DEFENDANTS' TRIAL BRIEF REGARDING PRE-TRIAL LEGAL ISSUES** |
| This Document Relates to: *Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Judge: Hon. Charles R. Breyer  Courtroom: Courtroom 6 – 17th Floor  Date Filed: January 5, 2026  Trial Date: January 13, 2026 |

SABRINA H. STRONG (SBN: 200292)
sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

PATRICK L. OOT, JR. (Pro Hac Vice admitted)
oot@shb.com
**SHOOK, HARDY & BACON, LLP**
1800 K Street NW, 10th Floor
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

ALYCIA A. DEGEN (SBN: 211350)
adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
mshortnacy@shb.com
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (Pro Hac Vice admitted)
ccotton@shb.com
255 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................................. 1

II.  ARGUMENT .................................................................................................................... 2

    A.   No Evidence Supports Plaintiff's Argument That S-RAD Predicted A "High Risk" Of Assault Or That Uber Should Have Paired Plaintiff With A Different Driver.................................................................... 2

    B.   Evidence of Uber's Regulatory Compliance and Safety Measures Cannot Establish Employee or Agent Status .................................................. 3

    C.   Impropriety Of Misleadingly Labeling Independent Drivers At Trial..................... 6

    D.   Inflammatory And Argumentative Witness Examination Including Baseless Accusations Of Criminality.................................................................. 6

    E.   No Viable Liability Theory Based On Marketing Statements ................................ 7

    F.   The Trial Evidence Will Preclude Punitive Damages Under § 12-689(A)(3)........................................................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Coslett v. Uber Techs., Inc., et al.*,
   No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023) .......................................................... 5

*Danial v. Indus. Comm'n*,
   434 P.3d 592 (Ariz. Ct. App. 2019) ....................................................................................... 4

*Frutiger v. USAA Gen. Indem. Co.*,
   2019 WL 2232524 (D. Ariz. May 23, 2019) ........................................................................... 9

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*,
   748 F. Supp. 1399 (D. Ariz. 1990) ......................................................................................... 3

*Ibrahim v. Indus. Comm'n of Ariz.*,
   2024 WL 4442832 (Ariz. Ct. App. Oct. 8, 2024) ................................................................... 4

*Jordan v. Ducharme*,
   983 F.2d 933 (9th Cir. 1993) .................................................................................................. 6

*Klosa v. Uber Techs., Inc., et al.*,
   No. CV2019-000428 (Ariz. Super. Ct. Aug. 23, 2022) ......................................................... 5

*Koepke v. Carter Hawley Stores, Inc.*,
   682 P.2d 425 (Ariz. Ct. App. 1984) ....................................................................................... 5

*Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2003) .................................................................... 4

*Murray v. Principal Fin. Grp., Inc.*,
   2009 WL 10674191 (D. Ariz. July 14, 2009), *aff'd*, 613 F.3d 943 (9th Cir.
   2010) ...................................................................................................................................... 4

*Razak v. Uber Techs., Inc.*,
   2024 WL 3584324 (E.D. Pa. July 30, 2024) .......................................................................... 5

*Reed v. Indus. Comm'n*,
   534 P.2d 1090 (Ariz. Ct. App. 1975) ..................................................................................... 4

*Salamon v. Our Lady of Victory Hosp.*,
   514 F.3d 217 (2d Cir. 2008) ................................................................................................... 4

*Santiago v. Phoenix Newspapers, Inc.*,
   794 P.2d 138 (Ariz. 1990) ...................................................................................................... 4

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ............................................................................................................... 9

*United States v. Cornejo*,
   1996 WL 107271 (N.D. Cal. Mar. 5, 1996) ........................................................................... 7

*United States v. Shryock*,
   342 F.3d 948 (9th Cir. 2003) .................................................................................................. 7

*United States v. Taren-Palma*,
   997 F.2d 525 (9th Cir. 1993), *overruled in part on other grounds by United
   States v. Shabani*, 513 U.S. 10 (1994) ................................................................................... 2

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Wills*,
   88 F.3d 704 (9th Cir. 1996) .................................................................................................. 7

*Young v. Env't Air Prods., Inc.*,
   665 P.2d 88 (Ariz. Ct. App. 1982), *aff'd as modified*, 665 P.2d 40 (Ariz. 1983) ...................... 6

**Statutes**

A.R.S. § 12-689(A) .................................................................................................................... 9

A.R.S. § 12-689(A)(2) ............................................................................................................... 9

A.R.S. § 23-1602 ....................................................................................................................... 4

A.R.S. § 28-§ 9552(D) .............................................................................................................. 4

A.R.S. § 28-9552(B) ............................................................................................................... 10

A.R.S. § 28-9555(A) ................................................................................................................. 4

**Rules**

Fed. R. Evid. 403 ...................................................................................................................... 6

## I. INTRODUCTION

Plaintiff's summary-judgment and jury-instructions briefing previews a variety of trial arguments and liability theories foreclosed by Arizona law and this Court's prior rulings. Several of those issues pertain to Plaintiffs' vicarious liability and punitive damages claims, and are thus subject to Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC's (collectively, "Uber") pending motion for partial summary judgment, and would present live disputes only in the event that the Court denies Uber's motion with respect to those claims. To the extent these issues are not ultimately resolved by Uber's summary-judgment motion, Uber respectfully submits that Arizona law and federal procedural law will preclude Plaintiff from:

1. Arguing that the Safety Risk Assessment Dispatch Score ("S-RAD") for Plaintiff's pairing with independent driver Hassan Turay indicates that Plaintiff's ride was "high risk" and that Uber should have therefore paired Plaintiff with a "safer" alternative;

2. Arguing that Uber's compliance with state regulatory requirements constitutes evidence of "control" for purposes of negligence and vicarious liability;

3. Referring to "Uber vehicles," "Uber drivers," "Uber riders," Uber's supposed "hiring" and "firing" of drivers, or any other terms implying control or the existence of an employment or agency relationship between Uber and Mr. Turay, all of which presuppose the answer to factual disputes that the jury will be tasked with resolving;

4. Inflammatory and argumentative witness examinations that baselessly accuse Uber of "criminal" conduct;

5. Pursuing liability on the basis of generic marketing statements of the sort the Court has already found non-actionable in dismissing Plaintiff's fraud claims; and

6. Pursuing punitive damages, which the trial evidence will foreclose not only on the grounds stated in Uber's summary judgment motion, but also under A.R.S. § 12-689(A)(3), a statutory safe harbor for "practices" that comply with applicable legal requirements or are authorized by a government agency.

1  II.    **ARGUMENT**

2     **A.     No Evidence Supports Plaintiff's Argument That S-RAD Predicted A "High Risk" Of Assault Or That Uber Should Have Paired Plaintiff With A Different Driver**.

Plaintiff's opposition to Uber's Motion for Partial Summary Judgment argues that Uber's Safety Risk Assessment Dispatch ("S-RAD") model indicated Turay was a "high risk" pairing for Plaintiff and that Plaintiff should have been given a pairing with a lower S-RAD score. *See* Dkt. 4622-3 ("MPSJ Opp.") at 4–6. No trial evidence will support presenting that argument to the jury. *See United States v. Taren-Palma*, 997 F.2d 525, 532 (9th Cir. 1993) (per curiam) ("Arguments must be based on the evidence at trial."), *overruled in part on other grounds by United States v. Shabani*, 513 U.S. 10 (1994).

S-RAD is a machine-learning algorithm designed to optimize pairings between riders and drivers in order to reduce the chance of interpersonal conflict, including sexual misconduct. The S-RAD model assigns a "risk score" between ▮▮▮ to every potential pairing of rider, available driver, and route, based on over fifty factors, such as time of day, location of the pick-up, and rider and driver histories. Potential pairings whose S-RAD scores fall above a certain threshold—▮▮▮▮▮▮▮▮▮▮▮▮▮▮—are "downranked" and presumptively filtered out of consideration for a given ride request. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The ▮ S-RAD score for Plaintiff's pairing with Turay fell well below the ▮ threshold for downranking in the Phoenix area at the time of Plaintiff's ride. Accordingly, the S-RAD model did not filter out or downrank the pairing.

S-RAD scores do not translate into predicted probabilities of sexual assault—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Only one in 700,000 rides on the Uber platform (0.0002 percent) result in complaints of one of the five most severe categories in Uber's sexual assault and misconduct taxonomy. And only one in 20,900 (0.005 percent) results in any report of sexual misconduct at all. Even within the small subset of rides with above-threshold S-RAD scores, the incidence of reported sexual misconduct is less than 1 in 12,000 (0.0079 percent). While the S-

1  RAD model accounts for risk factors associated with sexual assault, it cannot be used to predict
2  when this minute risk will materialize or assign probabilities of assault to any particular ride.

3        Plaintiff's opposition to Uber's partial summary judgment motion argues that the ▇ S-
4  RAD score for Plaintiff's pairing with Turay indicated a "high risk of sexual assault" and that
5  Uber therefore should have "look[ed] for" and recommended a "safer" driver to Plaintiff.  MPSJ
6  Opp. at 4, 6.  No trial evidence will support that argument.  To start, given the extremely low
7  incidence of assault in Uber-facilitated rides, Plaintiff's observation that the score was higher than
8  the ▇ nighttime average in Phoenix sheds no light on the actual risk posed by the pairing—and
9  her observation that the score exceeded the ▇ daytime average could serve only to mislead
10 given that time of day is a critical factor reflected in S-RAD scores.  And to whatever extent a
11 score of ▇ indicates a higher (though still infinitesimally small) risk than a lower-scored
12 pairing, there is no evidence that a lower-scored pairing was available when Plaintiff's
13 companion requested a ride for her in the early morning hours of a weekday in suburban Phoenix,
14 much less that such an alternative would have been feasible in light of potential wait times, other
15 ride requests requiring accommodation, and the many other factors influencing Uber's pairing of
16 riders and drivers.  Because no evidence supports either the characterization of the S-RAD score
17 at issue as "high risk" or the assertion that a different pairing was feasible or preferable, there will
18 be no valid basis to present such argument to the jury as a basis for liability.  *See, e.g., Harkins*
19 *Amusement Enters., Inc. v. Gen. Cinema Corp.*, 748 F. Supp. 1399, 1413 (D. Ariz. 1990) ("The
20 jury may not speculate, but, acting upon probabilities and inferences it may base its verdict on a
21 just and reasonable estimate derived from the relevant data.").

22       **B.**    **Evidence of Uber's Regulatory Compliance and Safety Measures Cannot Establish Employee or Agent Status**.
23

24       Uber's pending summary judgment motion explains why Plaintiff's vicarious liability
25 claims fail as a matter of law.  Dkt. 4377-2 ("MPSJ") at 10–13, 15–18.  If those claims
26 nevertheless go to the jury, Arizona law would preclude Plaintiff from arguing that steps Uber
27 took to comply with Arizona regulations or to promote safety—for example, its requirement for
28 independent drivers to display Uber trade dress while providing rides facilitated using Uber's

1  technology—evidences Uber's control over Turay under Arizona's "right to control" test. *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 141 (Ariz. 1990).

Arizona regulates Uber as a "transportation network company," or "TNC," imposing extensive requirements that drivers must satisfy before they "may accept trip requests," including that drivers (1) submit applications with pertinent information about their identities and vehicles, (2) meet vehicle-safety and emissions requirements, A.R.S. § 28-9555(A), and (3) "display trade dress" on their vehicles, *id.* § 9552(D). Such rules are "not imposed by [Uber] as a means of controlling [Turay] but [are] rules imposed by governmental agencies on [Uber], which, in turn, imposed them on its drivers." *Reed v. Indus. Comm'n*, 534 P.2d 1090, 1094 (Ariz. Ct. App. 1975). They therefore cannot be used to establish that Turay is an employee rather than an independent contractor. *Id.*

Across "a variety of scenarios," Arizona courts hold that "[s]imply requiring [a worker] to comply with laws and regulations . . . does not rise to the level of control an employer has over an employee." *Murray v. Principal Fin. Grp., Inc.*, 2009 WL 10674191, at *6 n.4 (D. Ariz. July 14, 2009) (Title VII case applying common law principles), *aff'd*, 613 F.3d 943 (9th Cir. 2010); *see Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2003) (control exercised to "ensure compliance with various safety and security regulations" is "qualitatively different" from control indicative of employee status); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 230 (2d Cir. 2008) ("policies that merely reflect professional and governmental regulatory standards may not typically impose the kind of control that marks an employment relationship"). For example, "government-required control is not normally ascribed to an employer under the control test," *Danial v. Indus. Comm'n*, 434 P.3d 592, 595 n.2 (Ariz. Ct. App. 2019), and the Arizona legislature has codified that principle, prohibiting "consider[ation] for the purposes of determining independent contractor or employment status" any action by "an employing unit" to "comply with any statute, rule, or code, . . . or any requirement of licensing, professional or ethical standards" for labor-law purposes. A.R.S. § 23-1602; *see also Ibrahim v. Indus. Comm'n of Ariz.*, 2024 WL 4442832, at *3 (Ariz. Ct. App. Oct. 8, 2024). The rationale is simple: When regulated entities impose requirements on workers to comply with laws and regulations, the entity

is not exercising control over the workers; instead, *the state* is exercising regulatory control over the entire industry in question, including regulated entities and workers alike.

Applying these principles, Arizona courts have prohibited consideration of Uber's regulatory compliance in vicarious-liability cases, as it does not constitute "competent evidence" of "control" for purposes of distinguishing between employees and independent contractors. Dkt. 4398-4, *Klosa v. Uber Techs., Inc., et al.*, No. CV2019-000428, at 3–4 (¶¶ 11–12) (Ariz. Super. Ct. Aug. 23, 2022) (concluding Uber cannot be liable for driver's negligence as a matter of law); Dkt. 4398-3; *Coslett v. Uber Techs., Inc., et al.*, No. CV 2018-005515 at 2 (Ariz. Super. Ct. Mar. 14, 2023) (rejecting employee status where "many of [Plaintiff's] asserted proofs of Uber's control over [drivers] are mandated by the statutes"); *see also Razak v. Uber Techs., Inc.*, 2024 WL 3584324, at *10–11 (E.D. Pa. July 30, 2024) (drivers are independent contractors as a matter of law under FLSA economic realities test; purported "control" by Uber was merely compliance with applicable laws that did not suggest employee status). That same rule applies here. Arizona law forecloses Plaintiff from using evidence that Uber enforced state-law requirements for independent drivers to establish control for purposes of determining employment versus independent contractor status.

The same is true for measures Uber takes to promote driver and rider safety–such as Community Guidelines reminding drivers to observe rules of the road and avoid distractions. The promotion of policies to help "ensure customer safety" does not equate to "control over the **actual manner** in which the work is done." *Koepke v. Carter Hawley Stores, Inc.*, 682 P.2d 425, 430 (Ariz. Ct. App. 1984). Rather, for an employer-employee relationship to exist, "the employer must be able to actually control the method or manner of doing the details of the work." *Id.* Where, as here, the worker retains control over "work schedules and operational procedures," general policies intended to help ensure customer safety do not demonstrate the requisite "authority to direct or the manner in which the contractors work[]," *id.* at 431, and cannot establish a worker's status as an employee rather than an independent contractor.

1    **C.    Impropriety Of Misleadingly Labeling Independent Drivers At Trial**.

2    Plaintiff's proposed jury instructions preview that Plaintiff will attempt at trial to sway the

3    jury's assessment of both negligence liability and employment status using phrasing implying

4    Uber's control over the rides at issue—such as "Uber vehicles," "Uber drivers," "Uber riders,"

5    "Uber ride," Uber's "hiring" and "firing," "monitoring," or "tracking" of drivers, or referring to

6    Uber as a "transportation company." Such terms would improperly assume the answer to

7    disputed factual questions by suggesting that Uber employs or otherwise controls drivers and

8    controls the vehicles in which rides are provided. Plaintiff may contend that such phrases are

9    mere colloquialisms—but just as Uber would not be permitted to question witnesses about the

10    "consensual encounter," "Turay's unforeseeable conduct," or its "state-of-the-art app," Plaintiff

11    cannot be permitted to bombard the jury with colloquialisms suggesting the answer to essential

12    factual disputes. *See Young v. Env't Air Prods., Inc.*, 665 P.2d 88, 92 (Ariz. Ct. App. 1982)

13    (holding that counsel "properly objected" to question asking whether plaintiff was "working for

14    the same employer" as third party, which "call[ed] for a legal conclusion from the witness" in

15    case where employment status was disputed), *aff'd as modified*, 665 P.2d 40 (Ariz. 1983). If the

16    jury is asked to resolve Turay's employment status or to assess Uber's control over vehicles as

17    part of the negligence analysis, it must do so based on the evidence alone. Plaintiff cannot short-

18    circuit her evidentiary burden using colloquialisms that threaten to "confuse the issues or mislead

19    the jury" by suggesting the answer to these disputed questions. *Jordan v. Ducharme*, 983 F.2d

20    933, 938 (9th Cir. 1993); Fed. R. Evid. 403.

21    **D.    Inflammatory And Argumentative Witness Examination Including Baseless
22            Accusations Of Criminality**.

23    Plaintiff's recent deposition examination suggests that, at trial, Plaintiff intends to present

24    examination and argument baselessly accusing Uber of engaging in criminal conduct. In

25    particular, at the December 30, 2025 deposition of Detective Oscar Lopez—who led the Tempe

26    Police Department's investigation into Plaintiff's allegations against Turay—Plaintiff's counsel

27    improperly engaged in highly inflammatory questioning, lacking any evidentiary basis,

28    suggesting that Uber criminally obstructs justice:

1  • "Have you ever suspected that Uber has this LERT [Law Enforcement Response]
2     team so that they could influence investigations into crimes that work for Uber?"
3     Lopez Rough at 22:16-24.
4  • "Are you aware that Uber through its app automatically destroys audio recordings that
5     were made on the driver's phone after seven days? … After … hearing that, have you
6     considered the fact that Uber has that policy to **intentionally destroy evidence**…" *Id.* at
7     111:25-112:8 (emphasis added).
8  • Would "it be obstruction of [justice] that Uber consistently fails to provide these
9     documents to you?; "you would … consider potential charges against them for
10    obstruction of justice…. [T]his is a pattern. This is criminal?" *Id.* at 251:13-252:6.

These "highly prejudicial question[s]" appear calculated to taint the witnesses and inflame juror passions against Uber without any "specific basis" in evidence. *United States v. Cornejo*, 1996 WL 107271, at *12 (N.D. Cal. Mar. 5, 1996) (prejudicial questioning lacking specific factual basis constituted reversible prosecutorial misconduct); *see United States v. Wills*, 88 F.3d 704, 710 (9th Cir. 1996) ("asking questions on cross-examination without a proper factual foundation" constitutes "prosecutorial misconduct"); *United States v. Shryock*, 342 F.3d 948, 980 (9th Cir. 2003) (affirming preclusion of argumentative questioning).  No evidence supports Plaintiff's inflammatory innuendo.  To give just one example, Plaintiff's counsel equated Uber's default data-retention period for in-app audio recordings with obstruction of justice, but Plaintiff will present no evidence that this policy is intended to corruptly obstruct justice rather than minimize the retention of sensitive data and protect privacy in the 99.999 percent of rides that do not lead to a report of sexual assault or misconduct.  *See supra* at 2.  Because Plaintiff can establish no evidentiary foundation for such questioning, they will have no basis to engage in such intentionally prejudicial tactics at trial.

E.   **No Viable Liability Theory Based On Marketing Statements**.

Plaintiff's summary-judgment opposition suggests she will argue at trial that generic statements about safety in Uber's marketing support her liability theories.  *See* MPSJ Opp. at 2-3.  For the reasons explained in Uber's summary judgment briefing, the generic statements cited by

1  Plaintiff—for instance, "Ride safely with Uber," *id.* at 2—do not support liability under either a
2  voluntary undertaking or negligent misrepresentation theory. Nor, in light of the Court's
3  dismissal of Plaintiff's safety-advertising fraud claims, can such generic marketing statements
4  serve as a nebulous basis for liability under Plaintiff's ordinary negligence claims.

5  The Court dismissed Plaintiff's fraud claim based on "Designated Driver" marketing
6  because statements such as "Stay safe tonight. Use Uber" are "directly analogous to the type of
7  language other courts have readily identified as non-actionable puffery." PTO 28 at 7. The Court
8  observed that the advertisement to "Stay safe tonight. Use Uber" "did not guarantee passengers'
9  absolute safety from <u>all</u> possible risks associated with taking an Uber ride while drunk, but rather
10 only the risks associated with the passenger driving themselves." *Id.* at 8.[1] That reasoning
11 applies equally to the marketing materials that Plaintiff now claims caused her to download the
12 app, such as "Request and ride **with Uber**," and "Join the millions of riders who **trust Uber** for
13 their everyday travel needs." MPSJ Opp. at 2-3 (emphasis Plaintiff's). As the Court has ruled,
14 such advertisements did not "convey[] anything more than a generic encouragement" to use the
15 Uber platform, and cannot serve as a basis to hold Uber liable. PTO 28 at 7 (dismissing
16 Designated Driver Marketing Fraud claim).

17 Plaintiff now appears to argue that these marketing materials are nevertheless relevant to
18 her negligence claim because she "did not do her own research but relied on what she had seen
19 and heard about Uber's safety" before downloading the app. MPSJ Opp. at 2. Putting aside that
20 the advertisements at issue cannot be reasonably interpreted as safety representations, *see supra*,
21 that is not a viable theory of negligence. As Judge Schulman ruled in the first JCCP bellwether,
22 permitting Plaintiff to offer "Uber's marketing and advertising materials . . . for the purpose of
23 showing that [a plaintiff was] influenced by Uber's marketing to utilize the platform . . . would
24 effectively resurrect Plaintiffs' [already dismissed] fraud-based claims." Aug. 29, 2025 JCCP
25 MIL Order at 53. The same is true here: To the extent "a cause of action for negligent marketing

---

[1] Uber moved for summary judgment on Plaintiff's remaining driver-notification fraud theory, contending it failed for lack of "any evidence from which a reasonable juror could conclude that she relied on allegedly incomplete Driver Notifications." MPSJ at 20. Plaintiff then abandoned her fraud claim in her summary-judgment opposition. MPSJ Opp. at 1.

. . . exists under Arizona law," it would not "be any different than one for negligent misrepresentation." *Frutiger v. USAA Gen. Indem. Co.*, 2019 WL 2232524, at *4 (D. Ariz. May 23, 2019). Plaintiffs' failure to identify any actionably misleading statements under Arizona law should foreclose them from relying on generic marketing statements as a basis for liability. The relevant question before the jury will be whether Uber took adequate steps to discharge any duty it owed to protect Plaintiff from allegedly being assaulted by Turay.[2] Generic marketing statements are irrelevant to that question and cannot support liability.

### F. The Trial Evidence Will Preclude Punitive Damages Under § 12-689(A)(3).

As Uber's pending motion for partial summary judgment explains, A.R.S. § 12-689(A)(2) bars Plaintiff's punitive-damages claim as a matter of law because Uber—a "service provider"—"complied with all statutes of this state or the United States or standards, rules, regulations, orders or other actions of a government agency pursuant to statutory authority that are relevant and material to the event or risk allegedly causing the harm." MPSJ at 22 (quoting A.R.S. § 12-689(A), (A)(2)). If, however, Plaintiff's punitive damages claim proceeds to trial, the evidence will also foreclose that claim as a matter of law under § 12-689(A)(3).

Subsection (A)(3) provides that a "service provider" is "not liable for exemplary or punitive damages" if "[t]he act or transaction forming the basis of the claim involves terms of service, contract provisions, representations or other practices authorized by, or in compliance with, the rules, regulations, standards or orders of, or a statute administered by, a government agency." A.R.S. § 12-689(A)(3). The trial evidence will demonstrate that the "act or transaction forming the basis" of Plaintiff's claim—Uber's pairing of Plaintiff with Turay—involved "practices" fully "in compliance with" applicable Arizona law. Arizona law regulates whom rideshare companies can (and cannot) permit to offer services through their apps, requiring criminal and sex-offender-registry background checks and specifically enumerating disqualifying conditions. Uber complied with those requirements here: It performed all required background checks on Turay, who had no convictions disqualifying him from serving as a rideshare driver

---

[2] Marketing evidence is irrelevant to Plaintiff's claim for punitive damages for similar reasons. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (punitive damages require "nexus to the specific harm suffered by the plaintiff").

under Arizona law.

In addition, the Arizona Department of Transportation's issuance and renewal of Uber's TNC permit reflects the agency's finding that Uber complied with the requirements of Arizona's TNC scheme more broadly—a finding Plaintiff has never challenged in this litigation. *See* A.R.S. § 28-9552(B); MPSJ at 23 & n.21. Through that regulatory blessing, the relevant "government agency" repeatedly "authorized" Uber's practices of permitting qualified drivers such as Turay to use the Uber platform to connect with and provide rides to those who request them, including Plaintiff. *See* A.R.S. § 12-689(A)(3); MPSJ Opp. at 27 (issuance of TNC permit reflects compliance with statutory requirements). Plaintiff believes that Uber should have done more than Arizona's TNC statute required—but under Section 12-689(A)(3), she will not be able to recover punitive damages on that theory.

Dated: January 5, 2026                                **KIRKLAND & ELLIS LLP**

By: /s/ *Laura Vartain Horn*

**KIRKLAND & ELLIS LLP**
LAURA VARTAIN HORN
KIM BUENO
ALLISON M. BROWN
JESSICA DAVIDSON

**O'MELVENY & MYERS LLP**
SABRINA H. STRONG
JONATHAN SCHNELLER

**SHOOK, HARDY & BACON, LLP**
PATRICK L. OOT, JR.
ALYCIA A. DEGEN
MICHAEL B. SHORTNACY
CHRISTOPHER V. COTTON

*Counsel for Defendants*