# Exhibit C

# EXHIBIT 8

## EXHIBIT FILED UNDER SEAL

```
            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
             SAN FRANCISCO DIVISION


                  ***CONFIDENTIAL***

          VIDEOTAPED 30(b)(6) DEPOSITION OF
          UBER TECHNOLOGIES, INC.,
          RASIER, LLC, and RASIER-CA, LLC
          GREG BROWN

    IN RE: UBER TECHNOLOGIES, INC.,
    PASSENGER SEXUAL ASSAULT LITIGATION

                        MDL No. 3084 CRB

    _____


    DEPONENT:          GREG BROWN

    DATE:              July 15, 2025

    TIME:              9:43 a.m.

    LOCATION:          NELSON MULLINS
                       CHARLESTON, SC

    REPORTED BY:       JESSICA BOLANOS
```

```
 1        A.   I understand you want a yes/no answer, I
 2   think it just merits a bit more context around
 3   that --
 4        Q.   Why can't --
 5        A.   -- particular circumstance.
 6        Q.   Sorry.  Why can't you answer that with a
 7   yes?
 8        A.   I don't think I can speak for the
 9   expectations of all users on the platform.
10        Q.   With respect to the topic that you're
11   designated on, which is Uber's training of
12   Mr. Turay, did Uber tell Mr. Turay that he would
13   be trusted by riders not to take advantage of
14   them sexually?
15        A.   Yeah, my understanding is that would
16   have been conveyed in the community guidelines
17   that I believe would have been furnished to him.
18        Q.   You believe the community guidelines
19   explain the reason behind the no-sex rule or the
20   no-contact rule, that it's because of that trust
21   that riders have in drivers?
22        A.   I -- I don't know whether the community
23   guidelines opine upon the reason as you
24   mentioned.
25        Q.   Do they -- did Uber ever communicate to
```

Greg Brown   Confidential
July 15, 2025

1  Mr. Turay that when he transports people who are
2  intoxicated, that they may be less able to
3  respond to voice their nonconsent, they may be
4  too scared, they may be too surprised to run,
5  scream, or say something?  Did they teach him
6  that?
7       A.   I would have to re-review the
8  educational content to be able to answer
9  confidently as to whether or not that specific
10 phrasing or circumstantial scenario was opined
11 upon, but I'm not sure whether or not the
12 educational content specifically would have
13 included that type of language.
14      Q.   As you sit here today as the person
15 speaking for Uber about its training of
16 Mr. Turay, you can't point the jury to a specific
17 communication where Mr. Turay said -- where Uber
18 said to Mr. Turay that intoxicated riders may not
19 be able to voice their nonconsent; is that
20 correct?
21      A.   As I mentioned, they're -- I would have
22 to re-review the content available in the
23 Learning Center for Mr. Turay.
24      Q.   Right.  But my question is:  As you sit
25 here today as the person speaking for Uber about

```
 1   its training of Mr. Turay, you can't at this time
 2   point to a specific communication where Mr. -- or
 3   Uber said to Mr. Turay that intoxicated riders
 4   might not be able to voice their nonconsent; is
 5   that correct?
 6        A.   Yeah, as I sit here, I -- I'm not sure.
 7        Q.   You can't, right?
 8        A.   I can't.
 9        Q.   What did Uber do when it onboarded
10   Mr. Turay to make sure that he understood and
11   appreciated the no-sex, no-contact rule in the
12   community guidelines?
13        A.   As I mentioned, in the course of
14   preparation, I understand that over time Uber
15   would have sent via email links to those
16   community guidelines, et cetera.  I believe circa
17   2021, Uber would have rolled out an affirmative
18   assent process or confirmation process associated
19   with its community guidelines as a mechanism to
20   help build better awareness, which I believe also
21   would have included the, I think as you said,
22   no-sex rule on Uber.
23             MS. PETERS:  Let's go ahead and
24   mark Tab 116 as Exhibit 1680.
25
```

Greg Brown   Confidential
July 15, 2025

```
 1   the nature of it.
 2   [redacted]
 3   [redacted]
 4   [redacted]
 5   [redacted]
 6   [redacted]
 7   [redacted]
 8   [redacted]
 9   [redacted]
10   [redacted]
11        Q.   So here we have a line in the data from
12   [redacted]
13   [redacted]
14   And if you look at the date and time, it's
15   11-15-23 at 12:38 a.m.  So that's during the
16   subject trip, right?
17        A.   Yeah, that's my understanding.
18   [redacted]
19   [redacted]
20   [redacted]
21   [redacted]
22   [redacted]
23        Q.   Is it possible that Uber actually is in
24   possession of audio-recording of the subject trip
25   up until the point that the driver pushed the
```

Greg Brown   Confidential
July 15, 2025

1   button to end the trip?
2           MS. LEVY:  Object to form and
3   foundation.  You can answer.
4      A.   I'm not sure.
5           MS. LEVY:  I will state for the
6   record this is the question you specifically
7   asked us to look into, and we are looking into
8   it.
9           MS. PETERS:  Okay.  I'm putting it
10  on my follow-up list.
11          MS. LEVY:  Great.
12          MS. PETERS:  Continued follow-up.
13     Q.   And just because you're the person
14  officially speaking for Uber on investigations,
15  have you looked to see whether there is any
16  audio-recording data?
17     A.   I have not.
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████████████████████████████████████████████
21  ████████████████████████████████████████████████
22  ████████████████████████████████████████████████
23  ████████████████████████████████████████████████
24  ████████████████████████████████████████████████
25  ████████████████████████████████████████████████