# **<u>Exhibit A</u>**

[Submitting counsel below]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE** |
| This Document Relates to: | |
| *Jaylynn Dean v. Uber Techs., Inc.*, N.D. Cal. No. 23-cv-06708 D. Ariz. No. 25-cv-4276 | Judge: Honorable Charles R. Breyer Date: January 6, 2026 Time: 10:00 A.M. PT Ctrm.: 6-17th Floor |

1

## **TABLE OF CONTENTS**

2

3    LEGAL STANDARD ................................................................................................ 1

4    ARGUMENT ......................................................................................................... 1

5    I.    SETTLEMENT NEGOTIATIONS ............................................................ 1

6    II.   REFERENCES IN VOIR DIRE TO SPECIFIC DAMAGES AMOUNTS ........................ 2

     III.  INSURANCE COVERAGE, CARRIERS OR THIRD-PARTY ADMINISTRATORS 2

7    IV.   MEDIA REPORTS .............................................................................. 3

8    V.    EVIDENCE REGARDING UBER'S MEDIA STRATEGY ............................................. 5

9    VI.   CONFIDENTIALITY PROVISIONS AND HARVEY WEINSTEIN ........................... 7

10   VII.  OTHER LAWSUITS, CLAIMS, OR JUDICIAL ACTIONS INVOLVING UBER OR
     ITS EMPLOYEES ............................................................................................... 8

11   VIII. UBER'S DE-ACTIVATION/RE-ACTIVATION DECISIONS CONCERNING
     OTHER DRIVERS ............................................................................................... 9

12   IX.   UBER'S HISTORICAL POLICIES (OR POLICIES THAT DID NOT APPLY TO
     THE DRIVER IN THE CASE BEING TRIED) ...................................................... 10

13   X.    ALLEGED COMPANY CULTURE ................................................................ 11

14   XI.   GREYBALLING ................................................................................ 12

15   XII.  CONDUCT OUTSIDE THE UNITED STATES ........................................... 12

16   XIII. REPTILE ARGUMENTS .......................................................................... 14

     XIV.  LOBBYING EFFORTS (INCLUDING AB 5 AND PROP 22) .................................... 15

17   XV.   ACTIONS BY UBER TO SUE, CROSS-CLAIM, DISMISS CROSSCLAIM, OR
18   HELP ANY DRIVER OBTAIN COUNSEL ............................................................ 16

     XVI.  SUPPOSED INADEQUACY OF BACKGROUND CHECKS .................................. 16
19
     XVII. THIRD-PARTY REPORTS (INCLUDING GIULIANI AND HOLDER) ................... 17
20
     XVIII.    GOVERNMENT INVESTIGATIONS AND CONSENT DECREES ..................... 18
21
     XIX.  ATTENDANCE AT TRIAL (SIZE OF DEFENSE TEAM OR ABSENCE OF
22   SPECIFIC PEOPLE) .......................................................................................... 19

     XX.   DISCOVERY & OTHER NON-TRIAL DISPUTES .................................................. 19
23
     XXI.  ANY SUGGESTION THAT MR. TURAY SUBMITTED A FAKE ID TO
24   UBER/CHECKR ............................................................................................... 21

     XXII. PRIOR COMPLAINTS, INCIDENTS, ALLEGATIONS, POOR RATINGS, AND
25   TEMPORARY RESTRICTIONS INVOLVING MR. TURAY .............................. 22

26   XXIII.    MR. TURAY'S NATIONALITY OR IMMIGRATION STATUS ......................... 25

     CONCLUSION .................................................................................................... 25
27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

*Aidini v. Costco Wholesale Corp.*, 2017 WL 10775082 (D. Nev. Apr. 12, 2017)........................ 15

*Alley v. County of Pima*, 2024 WL 1908965 (D. Ariz. May 1, 2024) ................................. 3

*Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2012 WL 3536797 (N.D. Cal. Aug. 13, 2013)...... 18

*Buonanoma v. Sierra Pac. Power Co.*, 2010 WL 3724254 (D. Nev. Sept. 16, 2010).................... 8

*Chaudhry v. Angell*, 2020 WL 1984180 (E.D. Cal. Apr. 27, 2020)........................................ 8

*Chavarria v. Mgmt. & Training Corp.*, 2018 WL 9538773 (S.D. Cal. Jan. 22, 2018)................... 2

*City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060 (9th Cir. 2017) ........................................ 1

*Classical Silk, Inc. v. Dolan Grp., Inc.*, 2016 WL 7638112 (C.D. Cal. Mar. 21, 2016)................. 3

*Ernst v. HB Aspen, Inc.*, 2008 WL 11338185 (C.D. Cal. Mar. 24, 2008) .................................... 24

*Gomez v. Am. Med. Sys. Inc.*, 2021 WL 12313068 (D. Ariz. June 17, 2021)................................ 8

*Griffiths v. Tucson, City of*, 2016 WL 7227553 (D. Ariz. Jan. 25, 2016)..................................... 24

*Hardesty v. Sacramento Metropolitan Air Quality Management District*, 2023 WL 4564748 (E.D. Cal. July 17, 2023)................................................................................................................. 15

*Hendricks v. A-Z Women's Center*, 2007 WL 9734381 (D. Nev. May 22, 2007) ........................ 24

*In re Bard IVC Filters Prods. Liab. Litig.*, 2019 WL 5872148 (D. Ariz. Feb. 11, 2021)............... 6

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753 (5th Cir. 2018) ............................................................................................................................... 12

*In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892 (N.D. Cal. 2017)................................ 4

*In re Levaquin Prods. Liab. Litig.*, 2010 WL 4676973 (D. Minn. Nov. 9, 2010) ........................ 13

*In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mex.*, 2012 WL 423862 (E.D. La. Feb. 8, 2012) ............................................................................................................................ 6

*In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009) ................................ 6

*In re Seroquel Prods. Liab. Litig.*, 601 F. Supp. 2d 1313 (M.D. Fla. 2009)................................. 13

*In re Tylenol (Acetaminophen) Marketing, Sales Practices & Prods. Liab. Litig.*, 181 F. Supp. 3d 278 (E.D. Pa. 2016)........................................................................................................... 13

*In re Uber Rideshare Cases*, JCCP, Superior Court, Case No. CJC-21-005188 (Aug. 29, 2025) ............................................................................................................................. passim

*In re Welding Fume Prods. Liab. Litig.*, 2010 WL 7699456 (N.D. Ohio. June 4, 2010) .............. 16

*Jackson v. Cnty. of San Bernardino*, 194 F. Supp. 3d 1004 (C.D. Cal. 2016)................................ 1

*Jenifer v. Fleming, Ingram & Floyd, P.C.*, 2008 WL 637636 (S.D. Ga. Mar. 7, 2008)................... 3

*Kelly v. Provident Life & Accident Ins. Co.*, 2012 WL 12845618 (S.D. Cal. Nov. 13, 2012) ...... 10

*Kinsel v. BMW of North America LLC*, 2023 WL 11899597 (D. Az. June 21, 2023)............... 1, 3

*Kirksey v. Schindler Elevator Corp.*, 2016 WL 7116223 (S.D. Ala. Dec. 6, 2016) ..................... 13

*Larez v. Holcomb*, 16 F.3d 1513 (9th Cir. 1994) ....................................................................... 3

*M.H. v. Cnty. of Alameda*, 2015 WL 894758 (N.D. Cal. Jan. 2, 2015) ........................................ 8

*McKnight v. Hinojosa*, 54 F. 4th 1069 (9th Cir. 2022) ................................................................ 8

*Monster Energy Co. v. Vital Pharms., Inc.*, 2022 WL 17218077 (C.D. Cal. Aug. 2, 2022) ......... 12

*Olson v. Walker*, 781 P.2d 1015, 1018 (Ariz. App. 1st Div. 1989) .............................................. 22

*Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, 2022 WL 20403763 (N.D. Cal. May 3, 2022) ............................................................................................................................... 19

*Point Ruston, LLC v. Pac. Nw. Reg'l Council of United Bhd. of Carpenters & Joiners of Am.*, 2010 WL 3766503 (W.D. Wash. Sept. 22, 2010) ........................................................... 24

*Sanchez v. City of Tucson*, 2016 WL 8669901 (D. Ariz. Sept. 30, 2016)............................... 22, 23

*State, Dept. of Admin. v. Schallock*, 941 P.2d 1275 (Ariz. 1997) ............................................... 22

ii

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc*., 2008 WL 4755611 (C.D. Cal. Jan. 7, 2008) .................. 13

*U.S. v. Lewis*, 493 F. Supp. 3d 858 (C.D. Cal. 2020)........................................................................ 1

*U.S. v. Lopez,* 991 F.2d 804, 1993 WL 118149 (9th Cir. Apr. 15, 1993).................................... 24

*U.S. v. Pacific Gas & Electric Co*., 178 F. Supp. 3d 927 (N.D. Cal. 2016) .......................... 16, 18

*United Food Group, LLC. V. Cargill, Inc*., 2014 WL 12925563 (C.D. Cal. Nov. 14, 2014)........ 20

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) .................................................................. 1

*Young v. Wolfe*, 2017 WL 985632 (C.D. Cal. Mar. 14, 2017)........................................................ 5

## RULES

Fed. R. Evid. 402 ............................................................................................................................... 1

Fed. R. Evid. 403 ............................................................................ 1, 6, 7, 12, 17, 18, 22

Fed. R. Evid. 404(b).................................................................................................... 23, 24

1

**LEGAL STANDARD**

2       A ruling on a motion in limine "is essentially a preliminary opinion that falls entirely

3   within the discretion of the district court." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060,

4   1070 (9th Cir. 2017) (citations and internal quotation marks omitted). "[M]otions in limine must

5   identify the evidence at issue and state with specificity why such evidence is inadmissible." *U.S.*

6   *v. Lewis*, 493 F. Supp. 3d 858, 861 (C.D. Cal. 2020) (cleaned up); *Jackson v. Cnty. of San*

7   *Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. 2016) ("Motions in limine that seek exclusion

8   of broad and unspecific categories of evidence, however, are generally disfavored."); *see also*

9   *Kinsel v. BMW of North America LLC*, 2023 WL 11899597, at *1 (D. Ariz. June 21, 2023)

10  (same). "The 'failure to specify the evidence' that a motion in limine 'seek[s] to exclude

11  constitutes a sufficient basis upon which to deny th[e] motion.'" *Lewis*, 493 F. Supp. 3d at 861

12  (alterations in original) (citation omitted).

13      Relevant evidence is generally admissible. Fed. R. Evid. 402. Relevant evidence may be

14  excluded if its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R.

15  Evid. 403. "Relevant evidence is inherently prejudicial; but it only unfair prejudice, substantially

16  outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United*

17  *States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (citation omitted). The rule's "major

18  function is limited to excluding matter of scant or cumulative probative force, dragged in by the

19  heels for the sake of its prejudicial effect." *Id.*

20                                      **ARGUMENT**

21  **I.       SETTLEMENT NEGOTIATIONS**

22      Plaintiff does not oppose exclusion of settlement negotiations to the extent the limitation

23  applies equally to all parties and does not restrict admissible evidence offered for purposes other

24  than proving liability or damages, including bias, notice, or credibility if Defendants open the

25  door.

26

27

28

1

## II.    REFERENCES IN VOIR DIRE TO SPECIFIC DAMAGES AMOUNTS

2      Plaintiff will not reference a specific dollar amount during voir dire so long as Defendants

3  likewise refrain. But Plaintiff must be permitted to ask prospective jurors whether they can fairly

4  consider awarding substantial damages, up to a certain range, if the evidence supports it. Courts

5  routinely allow general questioning about jurors' comfort with significant damages to expose bias

6  without anchoring jurors to a number. *See, e.g., Chavarria v. Mgmt. & Training Corp.*, 2018 WL

7  9538773, at *2–3 (S.D. Cal. Jan. 22, 2018) ("Plaintiff may, if he chooses, make limited and

8  appropriate references to potential damages in order to probe any biases potential jurors may have

9  related to civil damages awards."). The Uber JCCP Court denied Uber's similar motion to the

10  extent nothing prevents either party from inquiring about limits a jury would put on damages. *See

11  In re Uber Rideshare Cases*, JCCP, Superior Court, Case No. CJC-21-005188 (Aug. 29, 2025)

12  ("JCCP Order"), at 49-50, Ex. 1.[1] This Court should do the same—Uber's motion should be

13  denied to the extent it seeks to bar this permissible inquiry.

14
## III.    INSURANCE COVERAGE, CARRIERS OR THIRD-PARTY ADMINISTRATORS

15      Uber's request for a categorical exclusion of any insurance information should be denied.

16  The record shows that Uber responded to sexual assault primarily from a cost-benefit perspective,

17  addressing safety issues only to the extent that insurance costs savings outweighed downward

18  pressure on growth. Plaintiff must be permitted to show that, to the extent Uber addressed safety,

19  the company was motivated by insurance cost concerns as much as anything. *See, e.g.*,

20  UBER_JCCP_MDL_00337623, at Slide 32 (Ex. 1915 to Dobbs, US&C Safety & Insurance)

21  ("When making safety-related decisions, we compare annualized insurance savings to expected

22  supply replacement costs across a variety of driver cohorts based on their risk level. We make

23  decisions that are then a net benefit to Uber."), Ex. 2. For example, Uber documents show

24  Defendants analyzing "sexual misconduct liability" insurance claims for risk factors regarding

25

26

27

28  [1] All exhibits referenced herein are attached to the December 30, 2025 Declaration of Steven D. Cohn, Esq.

1  sexual assault, where Uber identifies gender, age, time of day, day of week, and other relevant

2  risk factors.[2]

3        Documents and testimony showing insurance considerations motivating Uber's safety

4  decision-making, risk modeling, and tolerance for sexual assault are relevant and not unfairly

5  prejudicial. Evidence showing how Uber evaluated, priced, and managed sexual assault risk—

6  including internal analyses of sexual misconduct claims—is not offered to show Uber's ability to

7  pay, but to establish notice, foreseeability, and motive. When insurance information helps a jury

8  understand a defendant's decision-making or risk assessment, courts have found it admissible.

9  *See*, *e.g.*, *Jenifer v. Fleming, Ingram & Floyd, P.C.*, 2008 WL 637636, at *1-2 (S.D. Ga. Mar. 7,

10  2008) (evidence of scope of malpractice insurance relevant to explain why law firm made certain

11  decisions in litigating plaintiff's case). The only case Uber cites—*Larez v. Holcomb*, 16 F.3d

12  1513 (9th Cir. 1994)—held only that "evidence of insurance … is not admissible on *the issue of*

13  *damages*." *Id.* at 1518 (emphasis added). Here, Plaintiff does not seek to introduce insurance-

14  related evidence as support for damages. A blanket exclusion would improperly sanitize Uber's

15  internal decision-making. At most, a limiting instruction is appropriate.

16  **IV.    MEDIA REPORTS**

17        Uber's motion seeks an impermissibly broad, categorical exclusion of all media reports

18  without identifying all specific evidence or articulating how particular articles would be used

19  improperly. That failure alone warrants denial. *See*, *e.g.*, *Kinsel*, 2023 WL 11899597, at *9;

20  *Classical Silk, Inc. v. Dolan Grp., Inc.*, 2016 WL 7638112, at *6 (C.D. Cal. Mar. 21, 2016)

21  (motions in limine seeking "to exclude broad categories of evidence are usually improper as the

22  court is almost always better situated to rule on evidentiary issues in their factual context during

23  trial.") (internal citation omitted). Moreover, Uber's argument rests on a mistaken premise that

24  media coverage is offered solely for the truth of the underlying allegations. Here, media reports

25  are independently relevant to notice, knowledge, foreseeability, motive, and Uber's state of mind,

26  all central issues in Plaintiff's negligence and punitive damages claims. *See*, *e.g.*, *Alley v. County*

27

28  [2] *See* UBER_JCCP_MDL_000475307, Ex. 3; UBER_JCCP_MDL_001717430 (10/1/25 Bowman Dep. Ex. 2048), Ex. 4; UBER_JCCP_MDL_000118664, Ex. 5; UBER_JCCP_MDL_00337623 at 337632), Ex. 2.

1    *of Pima*, 2024 WL 1908965, at *17 (D. Ariz. May 1, 2024) (finding 60 Minutes segment and

2    other media reports may be admissible when offered for non-hearsay reasons).

3        Media reports are admissible to show Uber's response to public scrutiny and its pattern of

4    minimizing, delaying, or reframing sexual violence disclosures to protect its brand. *See, e.g.*, *In re*

5    *Korean Ramen Antitrust Litig.*. 281 F. Supp. 3d 892, 936 (N.D. Cal. 2017) (finding plaintiffs can

6    introduce newspaper articles to show defendants' steps to conceal the alleged conspiracy). Uber's

7    internal communications demonstrate that executives tracked media coverage of sexual assault

8    incidents, assessed reputational risk, and calibrated disclosures accordingly. *See, e.g.*,

9    UBER_JCCP_MDL_002010063, Ex. 6; UBER_JCCP_MDL_001319387, Ex. 7. This evidence

10   goes to what Uber knew and when and what it did with that information—trying to "kill" and

11   "squash and fog" negative media stories. *See* Drumwright Rpt. at ¶¶ 382-412 (ECF No. 4352-1).

12   They also include statements from Uber in response—admissions of what type of conduct is

13   "monstrous" on the platform or Uber's resultant "outrage". *See, e.g.*, 6/5/25 H. Childs Dep.

14   (Exhibits 1015, 1016), Ex. 9.

15       The evidence also goes to rebut Uber's defenses. For example, at trial Uber will, as it did

16   in the JCCP trial, tout its "Safety Reports" as voluntary and "industry-leading." In reality, media

17   reports and resulting public pressure are the reasons Uber put out the Safety Reports, and Plaintiff

18   is entitled to respond to Uber's defense with its true motive. Finally, media reports diminished

19   trust in Uber, causing the company to double down on marketing to reassure passengers,

20   especially women, the service was safe.

21       Turning to the only two specific media reports Uber raises, the *USA Today* investigation

22   concerning Uber's use of Crawford is especially probative. Uber's own witnesses testified that

23   the article revealed, for the first time to senior leadership, that Uber was sharing sexual assault

24   survivors' personal information with a claims settlement firm without survivors' informed

25   consent, and that Crawford was contacting survivors under the guise of "support." *See* 4/10/25

26   Hasbun Dep. at 237:5-238:10, Ex. 9. Uber's Head of Global Safety Communications Andrew

27   Hasbun acknowledged that Uber internally recognized a fundamental distinction between

28   survivor support and claims settlement only after the article exposed these practices. *Id.* at

249:24-250:6. Shortly thereafter, Uber launched the RAINN hotline and fund. *See* 5/2/25 Anderson Dep. at 618:24-620:15, Ex. 10. This sequence shows Uber's motive for launching this hotline and fund, like its other purported victim-centered measures, were not altruistic, but done under only after media exposure and public pressure that risked their business.

The 2025 *New York Times* article is also relevant: Hannah Nilles, acting Head of Global Safety, identified a background interview Uber gave for the article as the first time Uber publicly acknowledged the existence of S-RAD, which Uber uses internally to "score" the risk of sexual assault on the rides it sends to Uber customers (without sharing with riders what that score is). *See* 8/7/25 Nilles Dep. at 432:4-6, Ex. 11. The jury is entitled to understand that Uber developed this tool and not only failed to use it appropriately but concealed its very existence from passengers like Jaylynn Dean and the public until prompted by questions from a NYT reporter. That article also prompted blog postings by Uber that reference the article and that Plaintiff's expert, Lacey Keller, may address in her testimony. The story also shows Uber's influence over its non-profit partners: right around the time of the NYT story, RAINN published a story on its website: "Tips for Safer Ridesharing."[3]

The JCCP Court held that Plaintiffs could not introduce media reports for the truth of the matter asserted but denied Uber's motion if such reports were offered for non-hearsay purposes, deferring such rulings until trial. *See* JCCP Order at 52. At the JCCP trial, Uber relied on non-profits like RAINN "vouching" for Ube's safety efforts; the New York Times story shows Uber's ability to influence those organizations when helpful to support the company's reputation. Uber's motion should be denied.[4]

## V.     EVIDENCE REGARDING UBER'S MEDIA STRATEGY

Uber seeks to exclude evidence of "Catch and Kill" media stories and "internal chats" about media strategy. Both are relevant and not unduly prejudicial.

---

[3] https://rainn.org/strategies-to-reduce-risk-increase-safety/tips-for-safer-ridesharing/

[4] Uber's case support is readily distinguishable. *See, e.g., Young v. Wolfe*, 2017 WL 985632, at *3-4 (C.D. Cal. Mar. 14, 2017) (fining newspapers articles on inmate assaults at county jail hearsay because they were offered for the truth of the matter asserted, but not opining on if party statements in reports are hearsay or if facts surrounding articles are admissible).

Uber's senior leadership viewed safety, and sexual assault in particular, as the company's "largest reputational challenge." *See* UBER_JCCP_MDL_000562614 (5/1/25 Anderson Ex. 3205)("CONTEXT: Safety is our largest reputational challenge. To date Uber's safety story has mostly been defined by negative incidents that garner media coverage."), Ex. 12. In its Safety Communications Plans, Uber acknowledged that sexual assault incidents occurred with sufficient frequency to create a "daily grind" of incident response, and that negative press posed a material threat to growth and user trust. *Id*. ("We need to build a strong foundation of positive and proactive safety PR to strengthen and turn the corner on this narrative. The challenge will be doing that amidst the daily grind of responding to incidents."). Rather than warning riders or implementing available safety measures, Uber developed strategies to "stabilize," "neutralize," delay, or "kill" unfavorable safety stories. *Id*. Trackers maintained by Uber catalogued specific sexual assault incidents, reporter inquiries, and the steps taken to suppress or deflect coverage. *See* UBER_JCCP_MDL_001441325 (5/1/25 Anderson Dep. Ex. 3207), Ex. 13. This is direct evidence of Uber's knowledge of ongoing risk and its decision to manage perception rather than reduce harm.

Uber's Slack communications among safety and communications personnel further demonstrate how the company responded when sexual assault allegations became public. These messages—created contemporaneously by employees acting within the scope of their duties—include discussions of discrediting survivors, reframing allegations, delaying confirmation to avoid damaging news cycles, and claiming Uber's cooperation with law enforcement to blunt scrutiny. *See. e.g.,* Bates UBER_JCCP_MDL_003340515 (5/21/25 Page Dep. Ex 4103), Ex. 14. These statements are admissible party admissions and business records. They show Uber's state of mind, priorities, and course of conduct in responding to known dangers. *See In re Bard IVC Filters Prods. Liab. Litig.,* 2019 WL 5872148, at *32 (D. Ariz. Feb. 11, 2021) (plaintiffs permitted to introduce evidence of defendant's strategic efforts to control or suppress negative media information, finding such evidence relevant and not excludable under Rule 403.)[5]

---

[5] Cases cited by Uber, including *In re Oracle Corp. Sec. Litig*., 2009 WL 1709050, at *n.16 (N.D. Cal. June 19, 2009) are inapposite. The *Oracle* Court did not find that Oracle employees'

1      This evidence is also highly probative of causation. Uber's deliberate efforts to suppress

2  information about sexual violence deprived passengers of material facts necessary to assess risk.

3  A reasonable jury may conclude that Uber's concealment strategy, rather than transparency or

4  meaningful safety intervention, was a substantial factor in Plaintiff's harm—as it contributed

5  materially to the understanding that Uber is a "safe" option for women in her position. The same

6  evidence supports punitive damages by demonstrating conscious disregard: Uber knew of the

7  scope of sexual violence on its platform, understood the risks to passengers, and nevertheless

8  chose to protect its brand image while continuing to solicit riders.

9      Rule 403 does not justify exclusion. The evidence is not unfairly prejudicial; it is

10  damaging because it reflects Uber's own decisions and motivations. Nor will it result in mini-

11  trials over media accuracy. Plaintiff will rely on Uber's public and internal reactions to media

12  inquiries, not litigate the truth of every reported incident. *See* UBER_JCCP_MDL_000562614

13  (5/1/25 Anderson Dep. Ex. 3205), Ex. 12; UBER_JCCP_MDL_001441325 (5/1/25 Anderson

14  Dep. Ex. 3207), Ex. 13. Any residual concern can be addressed through limiting instructions. But

15  excluding this evidence would improperly prevent the jury from understanding how Uber

16  evaluated, responded to, and concealed the known risk of sexual violence on its platform.[6]

17  **VI.    CONFIDENTIALITY PROVISIONS AND HARVEY WEINSTEIN**

18      Uber's confidentiality provisions in settlement agreements will be relevant if Uber opens

19  the door by claiming that there were relatively few reports of sexual misconduct before 2017 or if

20  it generally claims to be trauma-informed and survivor-centric (the use of abusive confidentiality

21  provisions show it was not). The JCCP Court denied Uber's motion as to such provisions. *See*

22

23  "comments" on the draft of a news article was hearsay, as Uber states. *Id*. Rather, the court found

24  that the employees' "repetition of the out of court statements in the news reports" was
    inadmissible hearsay to the "extent it is offered to prove what an article stated." *Id*.; *see also In re*

25  *Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mex.*, 2012 WL 423862, at *2 (E.D. La.
    Feb. 8, 2012) (finding "message from an iPhone which reads '[t]hanks for the shitty cement job,

26  Trent' was inadmissible because declarant testified "he was kidding" and it was not sent within
    the course and scope of employment).

27

28  [6] Kaya Whaling is not on Plaintiff's witness list. Plaintiff does not intend to affirmatively
    introduce her testimony cited in Uber's motion, subject to Uber opening the door.

1    JCCP Order at 53-54. This Court should follow suit. References to the broader "Me Too"

2    movement may be appropriate in voir dire to address juror bias regarding sexual assault reporting.

3          Plaintiff does not intend to reference Harvey Weinstein. But her expert Dr. Valliere, who

4    has spent her career treating sexual offenders, will discuss how predators operate to build trust

5    and exploit their victims and provide illustrative examples of predators of being charming,

6    building trust, and only then crossing boundaries and becoming more emboldened.

7    ## VII.    OTHER LAWSUITS, CLAIMS, OR JUDICIAL ACTIONS INVOLVING UBER OR ITS EMPLOYEES

8          Uber seeks a sweeping exclusion of all other lawsuits, claims, or judicial actions involving

9    the company or its employees, regardless of subject matter or purpose. Plaintiff does not intend to

10    introduce unrelated litigation such as Uber's IPO or trade secret disputes. Plaintiff may, however,

11    introduce evidence of lawsuits, enforcement actions, and judicial findings that directly concern

12    Uber's representations about safety and its handling of sexual assault risk, including the

13    *McKnight* Safe Rides Fee litigation and related consumer fraud actions by public prosecutors. *See*

14    *McKnight v. Hinojosa*, 54 F. 4th 1069 (9th Cir. 2022); UBER_JCCP_MDL_000890205, Ex. 15.

15    These proceedings are relevant because they address the same core issue presented here: Uber's

16    public portrayal of safety versus its internal knowledge of risk. Uber's internal documents

17    repeatedly reference these actions, including how the company should inform future marketing

18    and PR efforts. *Id*.

19          Such evidence is not offered to prove the truth of allegations in other cases or to invite

20    liability based on unrelated conduct. Rather, it may be offered to show Uber's state of mind and

21    notice. *See*, *e.g.*, *Chaudhry v. Angell*, 2020 WL 1984180, at *6 (E.D. Cal. Apr. 27, 2020) (finding

22    evidence that other lawsuits permissible when relevant and not unduly prejudicial). Evidence that

23    Uber was warned—through litigation, settlements, or judicial scrutiny—that its safety claims

24    were misleading bears directly on foreseeability and breach. It also rebuts any contention that

25    Uber was unaware of the dangers posed to riders or that its safety messaging was made in good

26    faith. And it is probative of intent and conscious disregard. *See Gomez v. Am. Med. Sys. Inc.*,

27

28

1  2021 WL 12313068, at *7 (D. Ariz. June 17, 2021) (finding evidence and argument related to

2  other lawsuits may be admissible to show notice of safety issues).[7]

3      More granularly, Uber's documents repeatedly reference the California district attorneys'

4  consumer fraud action in discussing what language is and is not appropriate in discussing Uber's

5  safety features. *See* UBER000205949 (Ex. 1043 to 6/11/25 Ross Dep.) (e.g. "Similarly, we

6  cannot claim that 'safety is #1' or 'our top priority.' We are specifically prohibited from using

7  language like this as a result of court litigation, so missteps here would create significant legal

8  and financial risks."), Ex. 16. The jury is entitled to compare those restrictions against how Uber

9  presents itself and those features to the public, including in representations and communications

10  made to Jaylynn Dean.

11  **VIII.  UBER'S DE-ACTIVATION/RE-ACTIVATION DECISIONS CONCERNING OTHER DRIVERS**

12      Uber seeks to exclude evidence concerning its decisions to deactivate, temporarily

13  suspend, or allow continued access to drivers accused of sexual misconduct other than the driver

14  who assaulted Plaintiff. Plaintiff does not seek to introduce this evidence to show propensity or to

15  relitigate the facts of other assaults. Rather, Plaintiff's expert Dr. Valliere explains how Uber's

16  lax deactivation policies encourage sexual offenders. *See* Valliere Rpt. at ¶¶ 3, 6-47 (ECF No.

17  4340). Her testimony helps the jury understand how Uber's safety efforts fell short. Uber's

18  deactivation policies also show how Uber prioritize growth over safety—internally, the company

19  valued existing drivers as ▮▮▮▮▮▮▮▮▮▮ than existing riders. *See*

20  UBER_JCCP_MDL_005031659, at Slide 123 (Ex. 1988 to 8/21/25 Dobbs Dep.), Ex. 17. As a

21  result, Uber was reluctant to deactivate and impede its growth.

22      More generally, evidence that Uber received prior reports of sexual assault or misconduct

23  by drivers, and how it responded to those reports, bears on whether the risk of future assaults was

24  foreseeable. A jury cannot evaluate whether Uber acted reasonably without understanding what

25  _____

26  [7] Uber's cited cases easily distinguishable. *See, e.g., Buonanoma v. Sierra Pac. Power Co.*, 2010
   WL 3724254, at *5 (D. Nev. Sept. 16, 2010) (finding employment discrimination complaints and

27  lawsuits by other employees "could unfairly bias the jury against [employer] for discriminatory
   acts that did not take place in this case []."); *M.H. v. Cnty. of Alameda*, 2015 WL 894758, at *13

28  (N.D. Cal. Jan. 2, 2015) (precluding cross examination of expert on the outcomes of his prior
   cases).

1    Uber knew about the prevalence of sexual violence on its platform and whether it treated such

2    reports as isolated anomalies or as indicators of a systemic danger. *See* 4/18/25 Shuping Dep.

3    409:20-411:7 ("A. …when I left, the sexual assault standard had a three notation -- like there

4    were three notations, and that actually included a lot of sexual misconduct reports. And it also had

5    a three-strike sexual misconduct standard, which included sexual assault…. Q. It is possible under

6    the notation standard for someone to commit three sexual misconduct incidents before they are

7    deactivated, correct? A. Yes."), Ex. 18.[8]

8        This evidence is also admissible to establish corporate knowledge, routine practice, and

9    conscious disregard. Where evidence shows that Uber routinely permitted drivers accused of

10   sexual misconduct to remain active, or reinstated them after cursory investigations, a reasonable

11   jury may infer that Uber knowingly accepted the risk of future assaults. *Id*. Such evidence is

12   particularly relevant to punitive damages, as it demonstrates whether Uber acted with willful

13   indifference to passenger safety.

14       **IX.    UBER'S HISTORICAL POLICIES (OR POLICIES THAT DID NOT APPLY TO THE DRIVER IN THE CASE BEING TRIED)**

15       Uber seeks to exclude evidence of its historical safety policies on the ground that certain

16   policies predated Plaintiff's assault or did not apply to Mr. Turay. Uber's motion perplexingly

17   ignores pertinent facts.[9] Uber references a 2018 policy as inapplicable, but Mr. Turay began

18   driving for Uber in 2016 and initially applied to drive for Uber in 2014. *See*

19   UBER_JCCP_MDL_003231342, Ex. 19. He drove for Uber for years under the "three-strike"

20   policy, as well as other lax policies. *Id*. How those policies shaped Turay's behavior and

21   expectations about conduct that would be condoned by Uber is squarely relevant to this case. That

22

23

---

24   [8] *See also* UBER_JCCP_MDL_001701663 (4/18/25 Shuping Dep. Ex. 587), Ex. 20;
     UBER_JCCP_MDL_0001220127 (4/18/25 Shuping Dep. Ex. 595), Ex. 21, (7/8/25 Gaddis Dep.

25   Ex. 4912 and 4913), Ex. 22.

26   [9] Its case support is also off topic. *See, e.g., Kelly v. Provident Life & Accident Ins. Co*., 2012 WL

27   12845618, at *2 (S.D. Cal. Nov. 13, 2012) (prohibiting expert from opinion on insurance policies
     not at issue because examples "of how other policy holders were treated, or how other claims

28   handlers were disciplined or rewarded" were not relevant).

the policy had changed by 2023 does not obviate its relevance.[10] As Plaintiff's expert Dr. Valliere will explain, loose consequence structures enable and embolden predators like Mr. Turay. *See* Valliere Rpt. at 1-4, 8, 31-34 (ECF No. 4340). And although Uber has formally eliminated the term "three strikes" policy, it has adopted a substantially similar "three notations" policy. Regardless of what terms are used, Uber has never had sufficiently clear consequences, which creates an environment that allows predators to access and assault passengers such as Jaylynn Dean. *Id*. at 8. The JCCP Court found such historical policies pertinent to punitive damages. *See* JCCP Order at 55-56. Here, these policies are not only relevant to punitive damages; they are also directly relevant to Plaintiff's underlying claims.[11]

## X.    ALLEGED COMPANY CULTURE

Plaintiff does not intend to introduce evidence, reference, or argument relating to the litigation surrounding "X to the X," the "Super Pumped" book or series (though reference may be made to "super pumped" as a corporate value), or Susan Fowler unless Defendants open the door to such evidence or argument.

As to "bro" culture, Plaintiff lacks sufficient detail to understand what exactly Uber is referring to, so that example should not be excluded. In general, evidence relating to Uber's culture is admissible where it bears directly on how the company understood, prioritized, and responded to sexual violence risks. To the extent Uber's internal norms minimized sexual misconduct, discouraged female participation, or deprioritized safety concerns raised by employees, that evidence is relevant to notice, foreseeability, and breach. *See, e.g.,* 8/7/25 H. Nilles Dep. at 471:12-22, Ex. 11; UBER_ JCCP_ MDL_ 000108957, Ex. 23; UBER_JCCP_MDL_003922272 (Ex. 2549 to Payne Dep), Ex. 24; UBER_JCCP_MDL_ 000484014 (Ex. 1197 J. Hazelbaker Dep.), Ex. 25.

---

[10] Uber's executives still refer to misconduct indications as "strikes." *See* 7/1/25 Dep. of D. Khosrowshahi at 161:1-16, Ex. 26; 4/22/25 Dep. of R. Kaiser at 92:14 -21, Ex. 27.

[11] Uber claims that this ruling would require bifurcation of the compensatory and punitive liability stages. Uber does not explain its reasoning but there is no basis for bifurcation.

Media coverage of notorious manifestations of Uber's culture involving the objectification and mistreatment of women is also relevant to show how drivers, including Plaintiff's driver, would understand the type of conduct that was condoned by Uber, a topic Dr. Valliere will also explain to the jury. Uber may claim that the most prominent examples of its problematic culture date back to 2017 and earlier.  But, as noted above, Plaintiff's driver began driving for Uber in 2016 and attempted to do so two years before that. Further, to the extent these widely publicized incidents took place outside the U.S., that is no reason to exclude them. *See infra.*

This evidence is also probative of punitive damages. Corporate culture informs whether harmful conduct resulted from isolated error or from institutional attitudes and incentives that tolerated or normalized risk. Where Uber's culture influenced decisions about safety investment, disclosure, or enforcement, the jury may consider that context in evaluating intent, conscious disregard, and reprehensibility. And Rule 403 does not warrant exclusion, as the evidence is not offered to inflame the jury but to explain how Uber's internal environment shaped the decisions that placed passengers at risk.[12]

## XI.    GREYBALLING

Absent some evidence or argument that opens the door to it, Plaintiff does not intend to introduce evidence, reference, and argument relating to "greyballing" as Uber defines that term in its motion.

## XII.    CONDUCT OUTSIDE THE UNITED STATES

Uber seeks to categorically exclude evidence of incidents, regulatory actions, and safety initiatives occurring outside the United States. The motion should be denied. Most obviously, Uber's foreign safety initiatives demonstrate feasibility and knowledge. Uber implemented

---

[12] Defendants cite *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784-87 (5th Cir. 2018) claiming that the court there found that an email with racial epithets was improper character evidence. Not so. The *DePuy* Court actually found that the email in question was "impermissible hearsay" and not valid impeachment evidence because there was no allegation that "racism infected DePuy's workplace culture." *Id*. Likewise, Defendants' reliance on *Monster Energy Co. v. Vital Pharms., Inc.*, 2022 WL 17218077, at *30 (C.D. Cal. Aug. 2, 2022) is also unavailing (excluding specific example of "terminated employees or threatened termination as retaliation" because proof was absent but limiting opinion to that example because the "Court cannot rule on such an overbroad category [entitled] [workplace] evidence").

women-matching options in multiple countries years before doing so in the United States, despite internal data showing that female riders preferred female drivers. *See* UBER_JCCP_MDL_001732337, Ex. 28; UBER_JCCP_MDL_001636209, Ex. 29; UBER_JCCP_MDL_000898569, Ex. 30; *see also* 5/13/25 Payne Dep. at 998:1-1005:4, Ex. 31. This evidence rebuts any claim that such measures were infeasible or speculative. That Uber eventually implemented women-to-women matching domestically in 2025 underscores feasibility and confirms evidence that Uber delayed adoption of this feature for economic reasons rather than safety limitations. *Id.*[13] The fact that someone else may have used Jaylynn Dean's account to order her ride is irrelevant; had W2W been offered, she would have had it set automatically in her app settings—as she did in her Lyft account. *See* 6/27/25 Dep. of J. Dean at 186:20-187:4, 190:8-14, 271:4-9, Ex. 32.

Similarly, Uber piloted a program called "Cerebro" in in the U.S. and other jurisdictions. *See* Valliere Rpt. at 24-25 (ECF No. 4340). Uber developed Cerebro in 2016 as a psychometric assessment that could serve as a screening tool for drivers, and it ██████████████████████ ████████████████████████████████████████████████████████████. *Id.* ██████████████████ ████████████████████████████████████████████████████. *Id.* Evidence regarding Cerebro, including evidence related to testing and analyses from markets outside of the U.S., are highly relevant and probative of what Uber knew and when regarding its driver screening efforts.

Excluding all foreign conduct would improperly deprive the jury of context necessary to evaluate foreseeability, causation, and punitive damages. *See, e.g., In In re Tylenol (Acetaminophen) Marketing, Sales Practices & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 307-08 (E.D. Pa. 2016) (holding evidence of foreign drug labeling and regulatory actions admissible to show defendants' notice and knowledge of safety risks); *In re Levaquin Prods. Liab. Litig.*, 2010 WL 4676973, at *5 (D. Minn. Nov. 9, 2010) (finding defendant's preliminary actions in Europe

---

[13] *See also* https://www.uber.com/newsroom/women-preferences

admissible as "the evidence not only speaks to defendants' notice but to motive, is relevant, and is not hearsay."); *Kirksey v. Schindler Elevator Corp*., 2016 WL 7116223, at *4-6 (S.D. Ala. Dec. 6, 2016) (holding evidence of foreign designs and the timeframe of their appearance was admissible to show that alternative, feasible safety features were available and existed at the time of the subject incident).[14]

The 2014 New Delhi rape is probative as well. That assault, and Uber's response to it, received global attention and was known to senior executives. *See* 7/3/25 Kalanick Dep. at 306:9-16, Ex. 33. Uber leadership recognized the reputational and business consequences of public disclosure of sexual violence, including demands for accountability and scrutiny of Uber's safety practices. *Id.* at 306:9-313:21. Internal evidence shows that Uber's response focused on managing publicity and mitigating brand damage. *Id.*[15] This evidence demonstrates the company's state of mind when it addressed other incidents of sexual misconduct in its operations. It also demonstrated to people interacting with the Uber ecosystem, including drivers, that Uber refused to accept responsibility for sexual assault and instead took efforts to minimize these incidents. Indeed, it was during this period that Turay sought to drive for Uber. The JCCP Court denied Uber's motion regarding this evidence. *See* JCCP Order at 57. This Court should do the same.

## XIII. REPTILE ARGUMENTS

Without specifying exactly what arguments they seek to preclude, Defendants nevertheless make a generic argument that any golden rule or reptile theory arguments should be precluded at trial. While Plaintiff has not yet determined what arguments she will make to the jury, Defendants' blanket assertion that the Court should rule pre-trial that no "reptile" or "golden rule" arguments should be made should be rejected. Plaintiff's counsel is fully aware of the

---

[14] In contrast, Uber's cited cases are distinguishable. *See, e.g., Sugar Ass'n, Inc. v. McNeil-PPC, Inc*., 2008 WL 4755611, at *2 (C.D. Cal. Jan. 7, 2008) (excluding evidence of foreign marketing and sale evidence because not relevant to Lanham Act violations); *In re Seroquel Prods. Liab. Litig*., 601 F. Supp. 2d 1313, 1318 (M.D. Fla. 2009) (excluding evidence of foreign regulatory actions and foreign label changes where foreign regulators took action related to drug label changes).

[15] *See also* UBER_JCCP_MDL_004753672, Ex. 34; UBER_JCCP_MDL_001711889, Ex. 35; UBER_JCCP_MDL_003441012, Ex. 36; UBER_JCCP_MDL_000564141, Ex. 37; UBER_JCCP_MDL_004216886, Ex. 38.

1    governing standards and will ensure that any arguments presented at trial conform to Ninth

2    Circuit law. For example, arguments concerning deterrence and reprehensibility are expressly

3    permitted where punitive damages are at issue. While the Ninth Circuit has not explicitly

4    addressed whether golden rule arguments should be categorically prohibited, many courts in this

5    circuit have denied motions in limine seeking to categorically exclude this type of evidence

6    where, as here, the motions do not identify the specific evidence they seek to exclude. *See, e.g.,*

7    *Hardesty v. Sacramento Metropolitan Air Quality Management District*, 2023 WL 4564748, at *4

8    (E.D. Cal. July 17, 2023) (citing *Aidini v. Costco Wholesale Corp*., 2017 WL 10775082, at *1 (D.

9    Nev. Apr. 12, 2017) ("Federal courts have hissed at motions based on this theory that seek a

10    broad prospective order untethered to any specific statements the other side will make."). This

11    Court should do the same and address any arguments if or when they arise; preemptive exclusion

12    of an undefined argument is unwarranted.

13    **XIV.    LOBBYING EFFORTS (INCLUDING AB 5 AND PROP 22)**

14            Uber seeks to exclude evidence of its lobbying efforts, including those related to

15    Assembly Bill 5 and Proposition 22, by invoking the *Noerr-Pennington* doctrine. Uber's

16    argument overreaches. Plaintiff does not seek to impose liability for Uber's petitioning activity or

17    to argue that lobbying itself constitutes negligence. Rather, evidence of Uber's lobbying may be

18    offered to rebut Uber's anticipated argument that regulations either justify its approach to certain

19    safety issues or limit or constrain its ability to implement more robust safety policies At

20    minimum, lobbying evidence is relevant if Uber opens the door in this manner: Where Uber

21    invokes a regulation or law as a justification for its actions, Plaintiff should not be precluded from

22    introducing evidence that that regulation is in place *because* of Uber's intensive lobbying.

23            Uber's lobbying efforts are directly intertwined with safety. Internal documents and

24    testimony show that Uber actively opposed regulations that would have required or encouraged

25    safety measures such as dashcams and enhanced disclosure of sexual assault risks.[16] These efforts

26

27    [16] *See* UBER_JCCP_MDL_001563463 (Payne Dep. Ex. 3401), Ex. 39;
       UBER_JCCP_MDL_001739193, Ex. 40; UBER_JCCP_MDL_001100749, Ex. 41;

28    UBER_JCCP_MDL_001072809 (Cardenas Dep. Ex. 1226), Ex. 42;

were not abstract policy debates; they reflected Uber's assessment that such measures would increase costs, slow growth, or expose the scope of sexual violence on the platform. *Id*. Evidence that Uber knowingly lobbied against measures it understood could reduce sexual assault risk is probative of foreseeability and breach, and of whether Uber prioritized business interests over rider safety.

*Noerr-Pennington* does not bar admission of this evidence, as Plaintiff does not seek to impose liability for lobbying activity. *See, e.g.*, *U.S. v. Pacific Gas & Electric Co*., 178 F. Supp. 3d 927, 960 (N.D. Cal. 2016) (holding evidence of defendant's lobbying activities and participation in drafting standards admissible); *In re Welding Fume Prods. Liab. Litig*., 2010 WL 7699456, at *93 (N.D. Ohio. June 4, 2010) (noting defendants could not use the First Amendment as a shield to keep out relevant evidence and finding lobbying documents showing defendants urged regulatory bodies not to lower exposure contain admissions against interest and are relevant to show defendants' knowledge of health effects).

## XV.    ACTIONS BY UBER TO SUE, CROSS-CLAIM, DISMISS CROSSCLAIM, OR HELP ANY DRIVER OBTAIN COUNSEL

Plaintiff will not affirmatively introduce evidence concerning whether Uber sued, cross-claimed against, dismissed claims involving, or assisted drivers in obtaining counsel. For the same reasons, Uber should not be able to introduce evidence or argument concerning whether Plaintiff sued the driver. The Court should not, however, allow a ruling on this motion to be used to exclude any other evidence of how Uber responds to reports of sexual misconduct.

## XVI.    SUPPOSED INADEQUACY OF BACKGROUND CHECKS

Uber seeks to exclude evidence and argument concerning its driver background checks, but that request mischaracterizes both Plaintiff's claims and the purpose for which the evidence is offered. As Plaintiff explained in her summary judgment opposition, this case is not principally about inadequate criminal background checks. But background checks are relevant in at least two ways.

---

UBER_JCCP_MDL_000031164 (Wong Dep. Ex. 2820), Ex. 43;
UBER_JCCP_MDL_001773711 (Cardenas Dep. Ex. 1203), Ex. 44;
UBER_JCCP_MDL_000084521 (Cardenas Dep.  Ex. 1204), Ex. 45;
UBER_JCCP_MDL_004752785, Ex. 46.

*First*, Uber will rely on Mr. Turay's lack of criminal record as a defense, and Plaintiff will rebut this by explaining how Uber knew that Mr. Turay's lack of criminal convictions did not give Uber license to ignore all of the information it learned about him *after* he was on-boarded as a driver, as well as its risk-analysis of the ride. *See* Valliere Rpt. at 22-23 ("Uber … know[s] that 'background checks and fingerprints are not correlated with incident likelihood.'").

*Second*, how Uber marketed its background checks is relevant. While Arizona required Uber to conduct criminal screening, it did not authorize Uber to recklessly promote compliance as proof of safety. Uber knew that "driver screening plays a critical role in helping riders feel safe," and deliberately sought to "amplify awareness of its driver screening efforts, especially among women." Drumwright Rpt. at ¶ 213 (ECF No. 4352-1). Uber's advertisements emphasized that it conducted "annual background screenings on every driver so that you can ride with peace of mind." *Id*. ¶ 225. These representations are probative of misrepresentation, reliance, and failure to warn.

Internally, Uber was candid about the limits of background checks. Company documents acknowledged that "background checks are a trust play, not a safety play." *Id*. ¶ 205. Despite this knowledge, Uber continued to market background checks as a central safety feature while declining to implement measures more closely tied to preventing sexual assault—and the become even more important in light of the minimal information Uber has about its drivers' past. *Id*. ¶¶ 202-226. Evidence of this disconnect between internal knowledge and external messaging goes directly to foreseeability, breach, causation, and punitive damages.

And Rule 403 does not warrant exclusion of this evidence. The evidence will be narrowly presented to explain what Uber knew about the limitations of its background checks, how it chose to portray them to riders, and how those choices fit within Uber's broader safety calculus. Excluding this evidence would improperly prevent the jury from evaluating whether Uber acted reasonably and honestly in addressing known risks of sexual assault.

## XVII.     THIRD-PARTY REPORTS (INCLUDING GIULIANI AND HOLDER)

Uber seeks to exclude all third-party reports prepared on its behalf, including the Giuliani and Holder reports, without distinguishing between the reports themselves and evidence

1   concerning the circumstances under which they were commissioned, edited, and used. Uber's

2   motion should be denied to the extent it does not specify the evidence it seeks to exclude. *See*

3   *supra*. Plaintiff does not intend to introduce the Holder Report. Nor does Plaintiff seek to admit

4   the Giuliani Report for the truth of its conclusions. Rather, Plaintiff may introduce evidence

5   regarding Uber's decision to commission the Giuliani Report, its substantial involvement in

6   drafting and revising it, and the manner in which Uber selectively relied on the report to bolster

7   public safety claims while disregarding internal criticisms.

8        This evidence is not hearsay and is not unduly prejudicial. It is offered to show Uber's

9   state of mind, knowledge, and course of conduct—not to prove that Giuliani Partners' opinions

10  were correct. *See Pacific Gas & Electric Co*., 178 F. Supp. 3d at 947 (finding investigative report

11  admissible to show defendant's state of mind). It also rebuts Uber's anticipated claims that it

12  relied in good faith on independent experts. Rule 403 does not justify exclusion, as the probative

13  value of showing how Uber curated and deployed third-party validation substantially outweighs

14  any risk of confusion. Excluding this evidence would improperly prevent the jury from

15  understanding how Uber used the appearance of independent review to reassure the public while

16  internally discounting known safety concerns.

17  **XVIII.    GOVERNMENT INVESTIGATIONS AND CONSENT DECREES**

18       Plaintiff does not intend to introduce evidence, reference, and argument relating to the

19  government investigations and consent decrees Uber references in its motion. This must,

20  however, go both ways: Uber's regulatory expert Mr. Okpaku relies extensively on California

21  regulatory history in opining that Uber's conduct met industry standards. *See* Okpaku Rpt. at 6-14

22  (ECF No. 4357-1). What is good for the goose is good for the gander: if Plaintiff may not

23  introduce evidence of CPUS investigations, then Mr. Okpaku may not do so either to support the

24  reasonableness of Uber's conduct in a different state altogether. And if Mr. Okpaku opens the

25  door, then all of this evidence should come in.[17]

26

27

28

---

[17] The CPUC investigations would be more relevant in a California trial.

1

2

**XIX.    ATTENDANCE AT TRIAL (SIZE OF DEFENSE TEAM OR ABSENCE OF SPECIFIC PEOPLE)**

3

4

5

6

7

8

9

10

11

12

Plaintiff does not oppose exclusion of commentary regarding the size of trial teams or the routine presence or absence of parties during trial, so long as the limitation applies equally to all parties. But if Uber elects to not make available certain corporate witnesses to testify live at trial, Plaintiff may comment on that absence during trial and closing. In evaluating the evidence, the jury may properly consider Uber's failure to explain or deny matters within its control. *See, e.g., Apple, Inc. v. Samsung Electronics Co., Ltd*., 2012 WL 3536797, at * 1 (N.D. Cal. Aug. 13, 2013) (party may "properly argue to the jury the possibility of drawing [an adverse] inference from the absence of a witness" if witness "was peculiarly within the adversary's power to produce.") (citation omitted.) The JCCP Court held that Plaintiffs may comment on Uber's failure to call a specific witness at trial. *See* JCCP Order at 60-61. This Court should do likewise.

**XX.    DISCOVERY & OTHER NON-TRIAL DISPUTES**

13

14

15

16

17

18

19

20

21

22

23

24

25

In general, "discovery disputes" (like any disputes over and subsequent amendments to Plaintiff's Fact Sheet) are irrelevant and inadmissible. But Uber's motion is overbroad. Plaintiff should be permitted to present evidence that she requested certain information from Uber and what, if any, information was provided in response. This is relevant and admissible to explain, for example, why Plaintiff's experts did not consider certain information (e.g., because it was requested from Uber but not produced) and why Plaintiff's experts were not able to perform certain analyses (e.g., because doing so would require information or data Uber objected to providing). *See*, *e.g., Oracle America, Inc. v. Hewlett Packard Enterprise Co*., 2022 WL 20403763, at *2 (N.D. Cal. May 3, 2022) (permitting plaintiff to introduce evidence of the information it asked for from defendant and the information defendant provided in response, such evidence being "similar in form and effect to responses to interrogatories or requests for admission").

26

27

28

Likewise, Plaintiff should be permitted to present evidence as to the sequencing and form of production. Among Uber's many critiques of Plaintiff's experts are the time and expense allotted to their work. But Uber often produced piecemeal information, out of order, in

complicated formats, or only after experts had reasonably relied on what was represented as a complete data set. *See* ECF No. 4060. Plaintiff should be permitted to present this testimony to explain the significant time and attention Plaintiff's experts had to expend to sort through and reconcile these documents.

Another example is gender inference data. Uber recognized that, based on its data, female riders have an increased risk of sexual assault particularly when paired with male drivers. *See, e.g.*, UBER_JCCP_MDL_003040649 (May 2024 PowerPoint) at 458 ("At Uber Sexual Incident Rates are ▮ higher for women Riders and Drivers), 473 ("SASM Incident Rate by User Gender…When drivers and riders have the same gender, the incident rate [sic] tend to be almost 2x lower"), 474 ("SASM Incident Rate by Reporter Gender…For both type of reporters, when driver and rider women, the incident rate [sic] ted to be more than 2x lower"), 465 ("SASM Incident Rate Trend by User Gender…Same gender tend to have the smallest IR and they tend to be more stable"), Ex. 47. Nonetheless, Uber claimed not to possess data about the gender of individuals involved in sexual assault and sexual misconduct reports, including the reporting party or the reported-against party. *See* 8/18/25 Decl. of Todd Gaddis, Ex. 48; 3/24/25 Convenience Descriptions, Ex. 49; Defs' 8/18/25 Resps. to Pls' Rogs and Reqs for Admission, No. 2, Ex. 50; 10/7/24 K. McDonald Dep. at 102:8-11, Ex. 51. And the sexual assault/sexual misconduct incident data Uber did produce does not include any information about gender.

Plaintiff should also be permitted to present evidence as to any factual (as opposed to legal) explanation provided regarding why certain information could not be produced. For example, if Uber (or one of its employees and representatives) had represented that certain information requested was never collected by Uber in the first instance, or was not retained by Uber, Plaintiff should be permitted to present such explanation to the jury. Plaintiff's theory of liability includes that a responsible company would have, from the outset, worked to identify risk factors on its platform, conducted research and gathered related data, tested and analyzed any mitigation efforts to ensure efficacy, and continually reviewed and analyzed the information to fix and improve its efforts. Evidence pertaining to these issues, including explanations about whether certain documents did or did not exist, information was or was not collected, or how long

1  information was or was not retained, are relevant to these issues and should not be excluded. Such

2  evidence speaks to whether Uber knew or should have known of the prevalence of sexual assault

3  on its platform and whether Uber was acting reasonably in identifying, studying, and mitigating

4  those concerns. *See United Food Group, LLC. V. Cargill, Inc*., 2014 WL 12925563, at *3 (C.D.

5  Cal. Nov. 14, 2014) ("a party may establish that records are missing and argue to the jury any

6  reasonable inference that such facts establish [].").

7       Uber also seeks a blanket exclusion on "privilege assertion." But Uber's document

8  productions show that Uber employees habitually labeled documents "privileged" in a

9  coordinated effort to shield them from public view. This is how Uber itself kept crucial business

10  documents in the ordinary course of business and reflect what information Uber specifically did

11  not disclose publicly. Uber is not entitled to abuse the privilege protections and then modify

12  documents after the fact to sanitize its image for the jury or confuse whether such material was

13  publicly disclosed.

14       Further, as explained in Plaintiff's motions in limine, Uber has withheld over 110,000

15  documents in whole or in part on the basis of attorney-client and work-product privileges,

16  including communications and documents bearing directly on its alleged "legal considerations"

17  behind refusals to adopt safety measures. Because Uber refused to disclose the advice it

18  purportedly relied upon, Plaintiff seeks to exclude that evidence. But should the Court deny

19  Plaintiff's motion, then Plaintiff should be permitted to explain why the lack of any evidence as to

20  Uber's purported "legal considerations" defense.

21       The JCCP Court denied Uber's motion regarding discovery disputes in the JCCP instead

22  noting that the Court will address such issues during trial. *See* JCCP Order at 61. This Court

23  should go further and deny Uber's motion outright.

24  **XXI.     ANY SUGGESTION THAT MR. TURAY SUBMITTED A FAKE ID TO UBER/CHECKR**

25       Uber asks the Court to exclude any evidence, argument, or suggestion that the driver in this

26  case, Hassan Turay, submitted a fake 2008 driver's license to access the Uber platform in 2016.

27  But, as explained in Plaintiff's opposition to summary judgment, evidence regarding whether Uber

28  let Mr. Turay drive on a license purportedly issued in 2008 (when he did not move to the United

States until 2013) shows that Uber violated Arizona TNC laws. Should the Court agree with Uber that compliance with such laws precludes punitive damages, whether Uber in fact complied becomes centrally relevant.[18]

More generally, Plaintiff's expert Dr. Valliere will explain that lax systems like this one— not enforcing rules about what is required to be a driver—telegraphs to predators that the company does not take rules seriously, and that drivers can get away with pushing boundaries without fear of consequences. *See* Valliere Rpt., *supra*. Further, Uber's own corporate witness, Hannah Nilles, explained that in Uber's view the "fidelity of any information on any document that a driver is providing [Uber]" is relevant to assessing the safety of that driver. *See* 7/10/25 Dep. of H. Nilles at 90:21, Ex. 52. Consequently, Turay's failure to provide true and valid documentation, and Uber's failure to detect that, are plainly relevant to Uber's reasonableness in allowing Turay to drive for Uber.

## XXII. PRIOR COMPLAINTS, INCIDENTS, ALLEGATIONS, POOR RATINGS, AND TEMPORARY RESTRICTIONS INVOLVING MR. TURAY

Uber seeks to bar evidence of prior complaints against Mr. Turay, including allegations of sexual misconduct, dangerous driving, and interpersonal disputes. Uber's motion should be denied. The probative value of these complaints is high. Uber's own internal research recognizes that such complaints are warning signs of potential future violence by drivers. *See* Pl's S.J. Opp at 16-20 (ECF No. 4621). Thus, this evidence goes to whether Uber had notice that Mr. Turay posed a risk of sexual assault to Plaintiff. *See e.g.*, *Sanchez v. City of Tucson*, 2016 WL 8669901, at *5 (D. Ariz. Sept. 30, 2016) (negligent supervision requires showing employer "knew or should have known"

---

[18] As explained in Plaintiff's opposition to summary judgment, Mr. Turay moved to the United States in 2013. He first applied to Uber in 2014 but was rejected because his Arizona driver's license was only a few months old. He then reapplied in December 2016, now with a Georgia license. Uber's contractor Checkr rejected Mr. Turay, for two reasons: (1) his license had been issued only in October and (2) it was already "suspended" or "cancelled." (This may have been because he had already applied for an Arizona license, which he acquired in March 2017, cancelling the Georgia license.) Mr. Turay then called Checkr about "Driver license: status." Mr. Turay apparently persuaded Checkr (acting as Uber's agent and thus, by extension, Uber) to accept him. That same day, the company cleared Mr. Turay, with its new report stating that his Georgia license was valid and had been issued on January 31, 2008. The first fact was false: Mr. Turay did not live in this country in 2008. The jury may find the other fact false too: Mr. Turay's license was "suspended" or "cancelled" and Uber let him drive anyway, in violation of Arizona law.

1    the employee was unfit); *State, Dept. of Admin. v. Schallock*, 941 P.2d 1275, 1283 (Ariz. 1997)

2    (scope of employment inquiry considers whether "the master has reason to expect that such an act

3    will be done."); *Olson v. Walker*, 781 P.2d 1015, 1018 (Ariz. App. 1st Div. 1989) (punitive damages

4    warranted where a defendant "consciously disregard[s] the substantial risk of harm created by his

5    conduct."). Uber's vague and speculative assertions of prejudice, confusion, or "mini-trials" under

6    Rule 403 cannot overcome the weight of the relevance of the prior complaints.

7        Uber argues that rider complaints about Mr. Turay unrelated to sexual misconduct are

8    irrelevant. But Uber's own internal documents acknowledge that conduct-related issues other than

9    sexual misconduct can serve as markers of a driver's risk of committing acts of violence, including

10   sexual assault. *See* Pl's S.J. Opp at 16-20 (ECF No. 4621). These reports are specifically considered

11   by Uber in forming their sexual assault risk score. *See* 10/14/25 S. Wong Dep. at 432:24-434:7, Ex

12   53. And prior acts need not mirror the misconduct at issue, so long as they are probative of the

13   individual's unfitness for the position. *See Sanchez*, 2016 WL 8669901, at *6 (D. Ariz. Sept. 30,

14   2016) ("no specific requirement" that prior accusations must be for identical misconduct; "Rather,

15   by requiring a showing of causation, the standard requires the unfitness to indicate that an injury

16   such as Plaintiff's may occur."). Uber's claim that non-sexual misconduct complaints are irrelevant

17   is therefore both inaccurate and misleading. They are directly probative of whether Uber was

18   repeatedly placed on notice that Mr. Turay was a danger to riders, something Uber's own internal

19   research confirms.

20       Next, Uber argues that because it unilaterally (and in one instance, belatedly) deemed other

21   sexual misconduct allegations against Mr. Turay not credible, they are necessarily irrelevant. Uber

22   is incorrect. As explained in Plaintiff's motions in limine, Uber's limited and selectively disclosed

23   post-litigation investigation into the validity of the first complaint ("Jennifer") should be excluded.

24   As of the time of the incident, Uber had deemed that complaint valid, had reaffirmed it was properly

25   documented as recently as April 2023, and Uber's expert witness, Vida Thomas, noted the incident

26   and Uber's response to it without any reference to discrediting information. *See* UBER-MDL3084-

27   DFS00159600 (Turay's Safety Lens Report post-dating November 15, 2023); Ex.54: UBER-

28

1    MDL3084-DFS00003713 (JIRA investigation report from April 2023 Sexual Assault complaint),

2    Ex. 55; V. Thomas Report at 14 (ECF No. 4688-5).

3        Uber disregarded the April 2023 report in part because it could not get the reporting party

4    on the phone, and because the account holder had made several other reports in the same week

5    (though none other were concerning sexual assault). But the account holder was named "Kevin"

6    and in the single attempt Uber made to speak with the reporting party, the outgoing message for

7    the voicemail Uber reached was a man. *See* UBER-MDL3084-DFS00159677, Ex 56. But the

8    passenger making the report was plainly a woman and, more importantly, Mr. Turay himself

9    reported that the passenger who reported was a woman leaving from a domestic violence shelter,

10   and he reported the ride with suspiciously detailed recall. *See* UBER-MDL3084-DFS00003692,

11   Ex. 57; UBER-MDL3084-DFS00003741, Ex. 58. At minimum, Plaintiff should be permitted to

12   introduce evidence of Uber's cursory investigation as relevant to its lack of care concerning Turay.

13       Further, Uber argues that Mr. Turay's other sexual misconduct allegations are inadmissible

14   character evidence. But Plaintiff is not offering the evidence to prove Mr. Turay acted in conformity

15   with prior conduct, but to show that Uber knew or should have known he posed a foreseeable danger

16   and did not take any action to address that danger in time to protect Plaintiff. Under Rule 404(b),

17   evidence offered to establish knowledge is explicitly admissible as an exception to the prohibition

18   against character evidence.

19       Finally, Uber's contention that prior complaints of sexual misconduct have only "marginal"

20   probative value is unfounded. As explained in Plaintiff's motions in limine, Uber received and

21   documented multiple rider complaints against Mr. Turay, including both sexual misconduct and

22   other behavior indicative of potential violence. These reports, at a minimum, go to notice and are

23   not unduly prejudicial.[19]

24   _____

25   [19] Uber's cited case *Griffiths v. Tucson, City of*, 2016 WL 7227553, at *4 (D. Ariz. Jan. 25, 2016)
     supports Plaintiff's position. In *Griffiths*, the court excluded evidence that the alleged harasser
26   had privately sent sexual messages to another employee because the conduct was never reported
     to the employer. *Id*. Thus, the employer had no notice of the messages. *Id*. But the *Griffiths* Court
27   refused to exclude evidence that the harasser engaged in other problematic behavior that was
     reported to the employer "because it has some tendency to make it more likely [the employer]
28   was on actual or constructive knowledge of [the harasser's] propensity to engage in sexually

**XXIII.    MR. TURAY'S NATIONALITY OR IMMIGRATION STATUS**

Uber seeks to exclude any reference to Mr. Turay's nationality, immigration status, or ethnicity. Plaintiff has no intention of offering such evidence for any inflammatory or improper purpose. And Plaintiff does not plan to reference Mr. Turay's lawful or unlawful documentation status. But Uber's motion should be denied as overboard because it would exclude relevant evidence including, as discussed above, relating to the timing of his issued driver's licenses—facts that bear on whether he was licensed to drive when Uber hired him. *See Point Ruston, LLC v. Pac. Nw. Reg'l Council of United Bhd. of Carpenters & Joiners of Am.*, 2010 WL 3766503, at *1 (W.D. Wash. Sept. 22, 2010) (barring reference to legality or illegality of immigration status, but holding that mention that a person is from a different country did not violate that prohibition and "[t]he nature of this case and the evidence needed by both parties will not permit such a restrictive and unnecessary ruling.").[20]

**CONCLUSION**

For these reasons, Defendants' motions should be denied as described herein.

---

harassing conduct" and "[t]he jury is entitled to resolve factual disputes concerning this evidence." *Id*. Just so here. Uber indisputably had notice of the complaints against Mr. Turay but took no action. Uber's other support is equally unavailing. *See Hendricks v. A-Z Women's Center*, 2007 WL 9734381, at *4 (D. Nev. May 22, 2007)(excluding evidence of other medical malpractice suits as proof physician acted in conformity but noting court would consider at trial whether the evidence was permissible for other reasons under Rule 404(b)); *Ernst v. HB Aspen, Inc*., 2008 WL 11338185, (C.D. Cal. Mar. 24, 2008)(in wrongful termination case excluding evidence plaintiff's coworkers had complained she was rude but noting evidence would be relevant if the employer had actually relied upon the complaints in making the termination decision).

[20] Uber's cite to *U.S. v. Lopez,* 991 F.2d 804, 1993 WL 118149, at *5 (9th Cir. Apr. 15, 1993) is off base. In *Lopez*, the Ninth Circuit held that the district court erred in allowing a witness to testify that the criminal defendant was Colombian, as the evidence was offered solely to suggest he appeared Hispanic, matching witness descriptions of the perpetrator. *Id*. The Court found only the defendant's actual appearance relevant to that determination. *Id*. No such issues arise in this case.

1    Dated: December 30, 2025                    Respectfully Submitted,

2                                                By: */s/ Sarah R. London*
3                                                Sarah R. London (SBN 267093)
                                                 **GIRARD SHARP LLP**
4                                                601 California St., Suite 1400
                                                 San Francisco, CA 94108
5                                                Telephone: (415) 981-4800

6                                                By: */s/ Rachel B. Abrams*
7                                                Rachel B. Abrams (SBN 209316)

8                                                **PEIFFER WOLF CARR KANE CONWAY
                                                 & WISE, LLP**
9                                                555 Montgomery Street, Suite 820
                                                 San Francisco, CA 94111
10                                               Telephone: (415) 426-5641
                                                 Facsimile: (415) 840-9435
11                                               rabrams@peifferwolf.com

12                                               By: */s/ Roopal P. Luhana*
13                                               Roopal P. Luhana

14                                               **CHAFFIN LUHANA LLP**
15                                               600 Third Avenue, 12th Floor
                                                 New York, NY 10016
16                                               Telephone: (888) 480-1123
                                                 Facsimile: (888) 499-1123
17                                               luhana@chaffinluhana.com

18                                               *Co-Lead Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: December 30, 2025

By:    */s/ Roopal Luhana*
Roopal Luhana