# **Exhibit S**

# EXHIBIT 50

## EXHIBIT FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Christopher Cox (*Admitted Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4753
christopher.cox@kirkland.com

Laura Vartain Horn
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC,
And RASIER-CA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB (LJC) |
| | **DEFENDANTS' UBER TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC'S AUGUST 18, 2025 OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR ADMISSION IN LIEU OF 30(b)(6) DEPOSITIONS** |
| This Document Relates to: | |
| ALL ACTIONS | |
| | Judge:        Hon. Lisa J. Cisneros |
| | Courtroom:    G – 15th Floor |

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## PRELIMINARY STATEMENT

Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC ("Defendants" or "Uber") are providing written responses to the 15 Interrogatories ("Interrogatories") and two Requests for Admission ("Requests") contained in Plaintiffs' July 30, 2025 email to counsel for Defendants. Pursuant to the parties' agreement, Defendants are providing these responses in lieu of producing a witness to testify in response to certain topics in All Plaintiffs' Notice of 30(b)(6) Deposition of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC, served February 26, 2025 ("Transportation Business Notice") and All Plaintiffs' Notice of 30(b)(6) Deposition of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC, served May 16, 2025 ("Revenue Notice") (together "Notices").

Throughout the course of this litigation, corporate representative and other witnesses have testified about the subject matters raised in the Notices and in these Interrogatories. Among others, Todd Gaddis testified as an Uber corporate representative regarding ride, rider, and driver data, executive compensation, and other issues raised in the Notices and Interrogatories. In connection with that testimony, Uber also provided Plaintiffs with comprehensive data summaries directly addressing various topics raised in the Interrogatories, including the number of trips that occurred on the Uber platform in the United States broken down by state and weekend/weekday, among others. Accordingly, Uber generally objects to the Interrogatories to the extent the Interrogatories are duplicative of 30(b)(6) topics about which Uber has provided testimony or other responsive information.

## INTERROGATORIES

### INTERROGATORY NO. 1:

For each year from 2012 to the present, IDENTIFY Uber's annual revenue and profits from its Transportation Network.

### ANSWER:

Uber states that it does not maintain readily attainable financials limited to its Rides or Mobility business in the United States for the time period identified in this Interrogatory. In response to this Interrogatory, Uber states that the following table sets out revenue and segment adjusted EBITDA

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

information for the Rides or Mobility[1] business for the period 2017 to the present, subject to the qualifications and definitions set forth in Uber's SEC filings, which are referenced below and incorporated herein. Uber is providing this information notwithstanding its objection to the relevance and use of such information for all purposes (including but not limited to use in connection with jury arguments related to punitive damages) on grounds that the information sought pertains to revenue from global operations outside of the United States and to the extent that it includes business lines or financial line items beyond those at issue in this litigation as set forth in footnotes 4 through 8 below. Uber specifically reserves its rights to supplement with U.S. only Rides or Mobility business financials for use at trial, should information pertaining to Uber's business financials be deemed admissible, given the scope of this litigation is focused only on U.S. Mobility.

| Year End | Segment Adjusted EBITDA – Rides/Mobility (in millions) | Revenue or Adjusted Net Revenue – Rides/Mobility (in millions) |
|---|---|---|
| 2017[2] | 388 | 6,733 |
| 2018[3] | 1,541 | 9,165 |
| 2019[4] | 2,071 | 10,622 |
| 2020[5] | 1,169 | 6,089 |

[1] Beginning in 2020, the "Rides" segment of Uber's business transitioned to the "Mobility" segment, as reflected in proxy statements published beginning in 2021. As noted in Uber's 2021 10-K, "Mobility" refers to products that connect consumers with Mobility Drivers who provide rides in a variety of vehicles, such as cars, auto rickshaws, motorbikes, minibuses, or taxis. Mobility also includes, among other things, activity related to Uber's financial partnerships offerings. *See* Uber 2021 10-K, found at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/c94d88c9-fe59-4487-8e68-ccb030ea49b0.pdf at 4. A true and correct copy of Uber's 2021 10-K is attached hereto as **Exhibit A**.

[2] "Segment Adjusted EBITDA" for Rides for years 2017-2019 is defined in Uber's 2019 10-K as revenue less the following expenses: cost of revenue, operations and support, sales and marketing, and general and administrative and research and development expenses associated with Uber's segments. "Rides Adjusted Net Revenue" is defined as Rides revenue less (i) excess Driver incentives and (ii) Driver referrals. Rides Adjusted Net Revenue for Rides includes previously reported Other Core Platform revenue of $390 million for the year ended December 31, 2017. *See* Uber 2019 10-K, found at https://s23.q4cdn.com/407969754/files/doc_financials/2019/ar/Uber-Technologies-Inc-2019-Annual-Report.pdf, pages 71 and 73. A true and correct copy is attached hereto as **Exhibit B.**

[3] *See* FN 2; *see also* Ex. B at 71, 73.

[4] *See* FN 2; *see also* Ex. B at 71, 73.

[5] "Segment Adjusted EBITDA" for Mobility (formerly Rides) for years 2020-2021 is defined in Uber's 2021 10-K as revenue less the cost of revenue, exclusive of depreciation and amortization, operations and support, sales and marketing, and general and administrative and research and development expenses associated with Uber's segments. Segment Adjusted EBITDA also excludes non-cash items, certain transactions not indicative of ongoing performance and/or items

3

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| 2021[6] | 1,596 | 6,953 |
|---|---|---|
| 2022[7] | 3,299 | 14,029 |
| 2023[8] | 4,963 | 19,832 |
| 2024[9] | 6,497 | 25,087 |

management believes are not reflective of Uber's ongoing core operations. Uber does not report "Adjusted Net Revenue" for Mobility in its 2021 10-K, but rather reports revenue for the Mobility segment. The 10-K defines "Mobility Revenue" as fees paid by Mobility Drivers for the use of the Uber platform(s) and related services to facilitate and complete Mobility services and, in certain markets, revenue from fees paid by end-users for connection services. Mobility revenue also includes "immaterial revenue streams" such as Uber's partnerships products and Vehicle Solutions. Revenue from Vehicle Solutions is accounted for as an operating lease, as defined under ASC 842. *See* Ex. A at 58-59, 96.

[6]    *See* FN 5; *see also* Ex. A at 58-59, 96.

[7]    "Segment Adjusted EBITDA" for Mobility for 2022 is defined in Uber's 2022 10-K as revenue less the cost of revenue, exclusive of depreciation and amortization, operations and support, sales and marketing, and general and administrative and research and development expenses associated with Uber's segments. Segment Adjusted EBITDA also excludes non-cash items, certain transactions not indicative of ongoing performance and/or items management believes are not reflective of Uber's ongoing core operations. The 10-K defines "Mobility Revenue" as fees paid by Mobility Drivers for the use of the Uber platform(s) and related services to facilitate and complete Mobility services and, in certain markets, revenue from fees paid by end-users for connection services. Mobility revenue also includes "immaterial revenue streams" such as Uber's financial partnerships products. Additionally, in certain markets where Uber is responsible for Mobility services, fees charged to end-users are also included in revenue, while payments to Drivers in exchange for Mobility services are recognized in cost of revenue, exclusive of depreciation and amortization. *See* Uber 2022 10-K, found at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/052088cc-f222-413c-b314-2e79d5677f5d.pdf, pages 56-57 and 94. A true and correct copy is attached hereto as **Exhibit C.**

[8]    "Segment Adjusted EBITDA" for Mobility for 2023 is defined in Uber's 2023 10-K as revenue less the cost of revenue, exclusive of depreciation and amortization, operations and support, sales and marketing, and general and administrative and research and development expenses associated with Uber's segments. Segment Adjusted EBITDA also excludes non-cash items, certain transactions not indicative of ongoing performance and/or items management believes are not reflective of Uber's ongoing core operations. The 10-K defines "Mobility Revenue" as fees paid by Mobility Drivers for the use of the Uber platform(s) and related services to facilitate and complete Mobility services and, in certain markets, revenue from fees paid by end-users for connection services. Mobility revenue also includes "immaterial revenue streams" such as Uber's financial partnerships products. Additionally, in certain markets where Uber is responsible for Mobility services, fees charged to end-users are also included in revenue, while payments to Drivers in exchange for Mobility services are recognized in cost of revenue, exclusive of depreciation and amortization. *See* Uber 2023 10-K, found at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/6fabd79a-baa9-4b08-84fe-deab4ef8415f.pdf, pages 57 and 94. A true and correct copy is attached hereto as **Exhibit D.**

[9]    "Segment Adjusted EBITDA" for Mobility in 2024 is described in Uber's 2024 10-K as excluding non-cash items or items that management does not believe are reflective of its ongoing core operations. The 10-K defines "Mobility Revenue" as fees paid by Mobility Drivers for the use of the Uber platform(s) and related services to facilitate and complete Mobility services and, in certain markets, revenue from fees paid by end-users for connection services. Mobility revenue also includes "immaterial revenue streams" such as Uber's financial partnerships products. Additionally, in certain markets where Uber is responsible for Mobility services, fees charged to end-users are also included in revenue, while payments to Drivers in exchange for Mobility services are recognized in cost of revenue, exclusive of depreciation and amortization. *See* Uber 2024 10-K, found at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001543151/a05d1617-4787-43eb-8018-5ccf90c7ecf8.pdf, pages 94 and 118. A true and correct copy is attached hereto as **Exhibit E.**

DEFENDANTS' UBER TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC'S AUGUST 18, 2025 OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR ADMISSION IN LIEU OF 30(b)(6) DEPOSITIONS                     Case No. 3.23-md-03084-CRB (LJC)

To the extent that this Interrogatory seeks additional information, Uber objects on the grounds that it is overbroad, is unduly burdensome, is beyond the scope of relevance under Rule 26, and is not proportional to the needs of this case.

**INTERROGATORY NO. 2:**

For each year from 2012 to the present, IDENTIFY the TOTAL number of rides that occurred on the Uber Transportation Network (i) globally; (ii) in the United States; (iii) within each state within the United States, (iv) on weekdays, (v) on weekends, and (vi) rides provided to female riders.

**ANSWER:**

Uber states that this Interrogatory is based on Topic 5 of the "Transportation Business" 30(b)(6) Notice, about which Todd Gaddis was tendered to testify (and did testify) on July 11, 2025.  Further, in advance of that deposition, on July 3, 2025, Uber provided to Plaintiffs a data summary that included information responsive to subparts (ii), (iii), (iv) and (v) of this Interrogatory.  *See* Gaddis July 11, 2025 Deposition, Exhibit 1574, which is re-attached here as **Exhibit F**.  Accordingly, Uber refers Plaintiffs to the foregoing responsive testimony and exhibits previously provided.  During his testimony, Mr. Gaddis confirmed the accuracy of the information provided in the summary.  *See* Gaddis July 11, 2025 Dep. at 168:11 – 169:5.

Finally, as explained by Mr. Gaddis during his deposition, Uber does not possess reliable information responsive to subpart (vi) regarding rides taken by female riders because Uber does not collect or maintain comprehensive documentation confirming the gender of riders.   Mr. Gaddis testified that, while Uber collects documentation from riders who are also drivers which identify gender (such as driver's licenses) and therefore has data regarding certain riders, such data pertains to only a fraction of the riders who use the platform and is not representative of the gender mix on the overall platform.  *Id.* at 173:19 – 174:6 ("[T]his is based on riders who have a driver account. And because of the biased nature where the driver accounts have a higher male population, I would say it's probably not a fair representation to compare proportions in the riders because we are only looking at the driver documents."); *see also id.* at 174:11 – 175:21 (A: "I'm aware that there's certain inference models that try to identify [gender] based on the name of the rider. Unfortunately, when you're dealing with names, there can be names that go

across genders, such as Jordan. So there are some inherent issues referencing an inferred dataset"; Q: "Uber didn't consult any of those inferred datasets in producing these responses, right?" A: "That's correct. This is specific to the actual documented gender that we have."). Uber reserves the right to supplement this response should additional relevant information become available.

To the extent that this Interrogatory seeks additional information, specifically subpart (i) seeking global information, Uber objects to this Interrogatory as overbroad, unduly burdensome, beyond the scope of relevance, and not proportional to the needs of this case, which relates entirely to rides in the United States.

**INTERROGATORY NO. 3:**

For each year from 2012 to the present, IDENTIFY the number of unique Riders and unique Drivers who used Uber's transportation network (i) globally; (ii) in the United States; (iii) and within each state within the United States.

**ANSWER:**

Uber states that this Interrogatory is based on Topic 6 of the "Transportation Business" 30(b)(6) Notice, about which Todd Gaddis was tendered to testify (and did testify) on July 11, 2025. Further, in advance of that deposition, on July 3, 2025, Uber provided to Plaintiffs data summaries that included information responsive to subpart (ii) of this Interrogatory. *See* Gaddis July 11, 2025 Deposition, Exhibits 1575-76, which are re-attached here as **Exhibits G and H**. Accordingly, Uber refers Plaintiffs to the foregoing responsive testimony and exhibits previously provided.

Further, Mr. Gaddis explained during his July 11 deposition why Uber does not have comprehensive or reliable state-by-state data regarding the number of drivers or riders using the platform. As to drivers, Mr. Gaddis explained that Uber does not operate on a state-by-state model, with some independent drivers living in a different state from that in which they use the Uber application as a driver. *See* Gaddis July 11, 2025 Deposition at 176:23 – 177:21; 178:19 – 179:8 ("And couple things to keep in mind with that is a driver could live in one state and operate in another state. They can move over time. Certain markets allow you to drive in multiple states. So if you completed trips in DC, Maryland, and Virginia in a day, it's very hard to associate them to a specific state. So drivers don't necessarily

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

associate with an individual state."). Mr. Gaddis also testified that not all riders report their home addresses to Uber, so Uber does not collect documentation or otherwise have comprehensive data readily available about many riders' states of residence. *Id.* at 178:15 – 180:12 ("A couple things is not every user actually inputs [their home address in the application]. So there might be – only a percentage of people do that. Also it's very sensitive information."). Uber reserves the right to supplement this response should additional relevant information become available.

To the extent that this Interrogatory seeks additional information, specifically subpart (i) seeking global information, Uber objects to this Interrogatory as overbroad, unduly burdensome, beyond the scope of relevance, and not proportional to the needs of this case, which relates entirely to rides in the U.S.

**INTERROGATORY NO. 4:**

For each year from 2012 to the present, IDENTIFY for the United States (a) the number of Drivers Uber approved to drive, (b) the number of drivers Uber deactivated, (c) the number of Drivers who terminated their accounts, (d) the rate of attrition or "churn" for Drivers. Identify the same information ((a) to (d)) for each state within the United States.

**ANSWER:**

Uber refers Plaintiffs to the data compilation attached as **Exhibit I**, which provides available information responsive to this Interrogatory. With respect to subpart (b), Uber states that Exhibit I identifies, for each year, the number of drivers who were deactivated for any reason for some period of time; the status of some of those drivers may have subsequently changed. As to subpart (c), Uber states that it does not have reliable data regarding deletion of driver accounts on a yearly basis. As described on its website, drivers may request to delete their accounts; however, due to legal and regulatory requirements, Uber maintains data for 7 years following such a request. For subpart (d), Uber defines a "churned" driver as one who has not completed a trip for a period of 28 or more days. Uber further refers to and incorporates herein its response to Interrogatory no. 3.

**INTERROGATORY NO. 5:**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

For each year from 2012 to the present, IDENTIFY for the United States (a) the number of Riders Uber approved to ride, (b) the number of Riders Uber deactivated, (c) the number of Riders who terminated their accounts, (d) the rate of attrition or "churn" for Riders. Identify the same information ((a) to (d)) for each state within the United States.

**ANSWER:**

Uber refers Plaintiffs to the data compilation attached as **Exhibit J**, which provides available information responsive to this Interrogatory.  With respect to subpart (b), Uber states that Exhibit J identifies, for each year, the number of riders who were banned for any reason for some period of time; the status of some of those riders may have subsequently changed.  For subpart (d), Uber defines a "churned" rider as one who has not completed a trip for a period of 84 or more days.  Uber further refers to and incorporates herein its response to Interrogatory no. 3.

**INTERROGATORY NO. 6:**

For each Wave 1 Bellwether Plaintiff, identify how much the Driver was paid for the Ride at the time of the Subject Incident, whether Uber required the Driver to return any of the fare from the Subject Ride, whether the Driver did return to Uber any of the fare from the Subject Ride, and identify how much Uber received from the Subject Ride. Identify and DESCRIBE any promotions, discounts, bonuses, incentives, rebates, rewards, surge pricing, or other similar feature applicable to the Subject Ride.

**ANSWER:**

Uber states that it does not make payments to drivers using the application, including the drivers involved in the rides at issue.  Rather, riders pay drivers directly through the Rides platform, and riders appoint Uber as their limited agent for payment collection for their rides. Uber is a pass-through intermediary that facilitates that transaction. In the course of facilitating that transaction, the full rider payment is as follows:  (1) the driver receives the fare, gratuity, and any other charges (e.g., for cleaning or repairs caused by the rider) less taxes and the service fee, if applicable, that drivers agree to pay Uber on each ride; and (2) Uber collects any applicable fees (e.g. regulatory fees). Drivers can agree to pay various fees or bills they owe Uber or others through the same platform, but those transactions are separate

from the driver-rider transaction—there is no "adjustment" or "withholding" from the primary transaction. For example, at times, some drivers may have entered into agreements to use funds held in a third-party account to pay for products or services (e.g., vehicle finance payments, vehicle rental or lease payments, mobile device usage charges, etc.). In addition, drivers agree that their earnings in their driver account may be used to satisfy a court order of garnishment against the driver.

Uber has various driver promotions to offer extra earning opportunities. Drivers may choose to pursue these additional earnings opportunities, when available, by driving at busy times and places, by completing a set of trips over multiple days, or by opting in to participate prior to a promotional period. The availability of driver promotions varies based on market factors, such as forecasted rider demand and driver availability. Uber usually offers opportunities to earn extra to limit anticipated market imbalance, such as during rush hour. For example, surge pricing is automatically activated by Uber's technology and detects shifts in rider demand and driver availability. It allows drivers to earn extra at times and in areas where demand is high. One promotion is Boost+, which pays drivers extra for completed trips that begin in a specific area (blue zones in the map) within a specific time window. Drivers can check the Opportunities section of the Driver App to see if they are eligible for Boost+ and sign up to the session that best fits each driver's schedule. Another driver promotion is Quest. Under Quest, drivers may earn extra by taking advantage of promotions for completing a certain number of trips over multiple days. The more trips they complete, the higher their potential to earn. For example, a driver could earn an extra $100 for completing 30 trips over 3 days. Drivers can further earn via tips. Riders always have the option to tip their driver in the Uber App and 100% of all tips are directly paid to each driver.

Specifically, as to the subject rides, Uber states that it does not maintain standalone records of the requested promotions, discounts, or incentives as requested by Plaintiffs, but instead records such information on the applicable trip receipt, all of which have been produced for the trips at issue. Each trip receipt shows details for that specific ride, including whether there was an active promotion or if there was a refund issued to a rider. Available information regarding the subject rides is set out below:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| Plaintiff | Initial Cost to Rider | Pricing Components | Relevant Bates # |
|---|---|---|---|
| LCHB 128 | $24.94 *(Trip Fare & Booking Fee Later Refunded)* | • Trip Fare: $15.79<br>• Booking Fee: $4.15<br>• Tip: $5.00 | UBER-MDL3084-BW-00028017 |
| A.R. | $11.84 | • Time: $4.43<br>• Base Fare: $2.20<br>• Distance: $1.67<br>• Wait Time: $0.51<br>• Booking Fee: $2.24<br>• Access for All Fee: $0.10<br>• CA Driver Benefits: $0.32<br>• San Francisco City Tax: $0.37 | UBER-MDL3084-BW-00028155 |
| B.L. | $25.92 | • Trip Fare: $8.17<br>• Marketplace Fee: $1.80<br>• Temporary Fuel Surcharge: $0.55<br>• CA Driver Benefits: $0.30<br>• Access for All Fee: $0.10<br>• Lost Item Return Fee: $15.00 (charged post-trip) | UBER-MDL3084-BW-00028166 |
| WHB 832 | $18.40 | • Trip Fare: $15.65<br>• Tolls, Surcharges, Fees: $2.75 | UBER-MDL3084-BW-00048509 |
| Jaylynn Dean | $5.63 *(Fully Refunded)* | • Time: $0.61<br>• Distance: $2.44<br>• Base Fare: $2.54<br>• Booking Fee: $1.92<br>• Promotion: -$1.88 | UBER-MDL3084-BW-00027901 |

Uber reserves the right to supplement this response should additional relevant information become available.

**INTERROGATORY NO. 7:**

DESCRIBE the variables, metrics, or other factors YOU used to determine what each Bellwether Plaintiff was charged for the Subject Ride, what portion of that charge would be given to the Driver, and what portion Uber would receive.

**ANSWER:**

Uber states that the amounts charged to each of the five bellwether plaintiffs for the subject rides are identified in Uber's response to Interrogatory no. 6 and Uber refers to and incorporates herein its response to that interrogatory.

Insofar as this Interrogatory seeks information regarding Uber's pricing model, Uber states that it utilizes a dynamic pricing model that takes into account multiple, varying real-time factors, including but not limited to: (1) time of day; (2) day of the week; (3) rider-controlled route selection; (4) driver availability and rider demand at a hyperlocal level; (5) long-term rider demand patterns across routes and areas of a city; (6) traffic; (7) estimated distance; (8) estimated time; and (9) forecasts about market conditions. Uber states that it does not — and did not at the time of the subject rides — employ a static pricing model.

**INTERROGATORY NO. 8:**

For each year from 2012 to present, identify for the United States the average percentage of each fare that (a) the Driver received, and (b) Uber received. Identify the same information ((a) to (b)) for each state within the United States.

**ANSWER:**

By agreement of counsel, in satisfaction of this topic, Uber states that, beginning in approximately 2016, drivers began paying Uber a service fee in exchange for Uber's facilitation of each ride. As referenced in Uber's response to Interrogatory no. 7, Uber's pricing model is dynamic and market dependent.

The service fee is not static and is the difference between what a rider pays and what a driver earns on a trip, excluding tips, tolls, certain fees, taxes, and surcharges. A service fee is not always charged to the driver. If the amount the rider has paid is the same or less than the driver's earnings, Uber does not

receive a service fee.  This may happen, for example, where a trip takes much longer than predicted, or if the rider received a promotion. Moreover, Uber states that there is not an "average" service fee that Uber receives; rather, each region's service fee is directly impacted by state-specific factors and pricing regulations.

Accordingly, Uber is unable to provide the requested "average" percentage of fares received by drivers and Uber, on either a global level or in individual state markets.   Notwithstanding, Uber incorporates its response to Interrogatory no. 6, insofar as this Interrogatory seeks subject ride-specific information.

To the extent that this Interrogatory seeks additional information, Uber objects on the grounds that Uber does not keep its data in the manner requested and the Interrogatory is overbroad, unduly burdensome, and not reasonably proportionate to the needs of the case.  Uber reserves the right to supplement this response should additional relevant information become available.

**INTERROGATORY NO. 9:**

DESCRIBE the variables, metrics, or other factors YOU use to determine what a Rider will be charged for a particular Ride, what portion of that charge will be given to the Driver, and what portion Uber shall receive. If these variables, metrics, or factors change depending on the circumstances, DESCRIBE those circumstances and how they affect YOUR decisions about what a Rider will be charged for a particular Ride, what portion of that charge will be given to the Driver, and what portion Uber shall receive.

**ANSWER:**

Uber refers Plaintiffs to its responses to Interrogatory nos. 6-8 above.  Uber reserves the right to supplement this response should additional relevant information become available.

**INTERROGATORY NO. 10:**

IDENTIFY the annual compensation for each member of the Executive Leadership Team.

**ANSWER:**

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Uber states that it has identified in the table below total compensation for 2024 for its named

2  executive officers (whose titles are identified below) as well as for Gus Fuldner (SVP, Safety & Core

3  Services).

| Name | Title | Total Compensation[10] |
|---|---|---|
| Dara Khosrowshahi | Chief Executive Officer & Director | $28,878,200 |
| Prashanth Mahendra-Rajah | Chief Financial Officer | $1,951,280 |
| Jill Hazelbaker | SVP, Marketing and Public Affairs | $9,951,280 |
| Nikki Krishnamurthy | SVP & Chief People Officer | $7,707,370 |
| Tony West | SVP, Chief Legal Officer & Corporate Secretary | $10,561,521 |
| Gus Fuldner | SVP, Safety & Core Services | ███████ |

14  To the extent that this Interrogatory seeks additional information, Uber objects on the grounds that

15  it seeks information that is beyond the scope of relevance under Rule 26, is disproportionate to the needs

16  of the case, and seeks disclosure of information that would violate the privacy rights of individuals who

17  are not parties to this action.

19  **INTERROGATORY NO. 11:**

20  DESCRIBE the specific process by which the annual compensation was determined and set for

21  each member of the Executive Leadership Team from 2018 to present.

22  **ANSWER:**

23  Uber states that its annual executive compensation programs for the period 2018 to the present --

24  including compensation philosophy, objectives and governance, compensation components, and the

---

10  For Uber's Named Executive Officers (Dara Khosrowshahi, Prashanth Mahendra-Rajah, Jill Hazelbaker, Nikki Krishnamurthy, and Tony West), total compensation has been calculated by totaling the values from the following columns in the 2025 Proxy Statement (attached hereto as **Exhibit K**): (i) "2024 Base Salary" (page 41); (ii) "FY24 Incentive Payout," which represents the actual annual bonus paid based on 2024 performance (page 45); and (iii) "Total Equity," which represents the equity award amounts approved by the Compensation Committee for 2024 (page 47).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  process for determining executive compensation -- are described in detail in its initial registration

2  statement (S-1) and annual proxy statements, to which Uber refers Plaintiffs for their full content.  Set out

3  below is an overview of these programs.

4      Additional information about Uber's processes for setting annual compensation for its executives

5  is set forth below.

6  **2018 Executive Compensation**

7      Uber's Form S-1 Registration Statement outlines Uber's philosophy toward executive

8  compensation in 2018.[11] Specifically, Uber stated that the total compensation package for its executive

9  officers in 2018 consisted primarily of a combination of base salary, annual bonuses and long-term

10 incentives, which included ongoing performance-based equity awards. *Id.* at 225.  The Registration

11 Statement further states that the executive compensation program had historically been weighted toward

12 equity grants, which primarily consisted of RSUs and stock options, as well as bonuses linked to achieving

13 various financial, revenue and other performance goals. *Id.* Further, Uber did not affirmatively set out to

14 apportion executive compensation in any specific cash-to-equity ratio in 2018, nor did it apportion

15 compensation between annual and long-term compensation; rather, individual executive compensation

16 packages may have skewed more heavily toward cash or equity depending upon individual negotiations.

17 *Id.*

18     Additionally, in 2018, the Compensation Committee was primarily responsible for "establishing,

19 reviewing, and approving [Uber's] overall compensation strategy, cash and incentive compensation, and

20 equity-based grants for [its] executive officers." *Id.* at 226. The Compensation Committee considered a

21 number of factors when reviewing and approving executive compensation, including individual

22 negotiations, company and individual performance, criticality of each executive's role to the company,

23 recommendations from the CEO and compensation consultants, and peer companies. *Id.* In 2018, the CEO

24 worked closely with Uber's compensation consultants and Compensation Committee in managing the

25 executive compensation program. *Id.* at 227. Additionally, in 2018, Uber's compensation consultants

26 _____

[11]    *See* Form S-1 Registration Statement:
        https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm#toc647752_14. A true and
        correct copy is attached hereto as **Exhibit L**.

14

prepared and presented to the CEO and Compensation Committee a Peer Group Report, which recommended a peer group for purposes of evaluating executive officer compensation in 2018. *Id.*

Uber also used equity incentives as a "key component of [its] total compensation package for executive officers" in order to "attract and retain the highest level of talented and experienced executive officers, align[] [its] executive officers' incentives with the long-term interests of [the] company and [its] stockholders, and focus[] [its] executive officers on achieving [its] strategic goals and furthering [its] mission." *Id.* at 229. Equity grants to executive officers in 2018 consisted of a combination of RSU grants and stock option grants, which were granted to certain executive officers. *Id.* Additional information about Uber's 2018 executive compensation can be found on pages 224-229 of its Form S-1 Registration Statement.

**2019 Executive Compensation**

Uber's 2020 Proxy Statement[12] outlines Uber's philosophy toward executive compensation in 2019. Specifically, Uber stated that its Compensation Committee aimed to "align executive interests with long-term stockholder value creation and to link compensation to the key drivers of our business." *See* Ex. M at 48. Accordingly, the objectives of Uber's executive compensation program were to (i) attract and retain talent; (ii) align with stockholders; (iii) reward executive officers for their performance and motivate them to achieve Uber's short and long-term goals; and (iv) reinforce cultural norms by promoting "doing the right thing, working tirelessly to earn the trust of [Uber's] consumers and users, acting like owners, valuing ideas over hierarchy, making big bold bets, and celebrating our differences." *Id.* at 49. Among other things, Uber notes in its 2020 Proxy Statement that it has established a "number of policies and practices . . . to support [its] compensation philosophy, improve [its] compensation governance, and drive performance that aligns executives' and stockholders' interests." *Id.* These include, among other things: (i) soliciting stockholder feedback on Uber's compensation program; (ii) designing a risk-based compensation program for executives; (iii) maintaining stock ownership guideline for executive officers

---

[12]    *See* 2020 proxy statement: https://s23.q4cdn.com/407969754/files/doc_financials/2019/ar/Uber-Technologies-Inc-2020-Proxy-Statement.pdf.  A true and correct copy of Uber's 2020 proxy statement is attached hereto as **Exhibit M**.

and directors; (iv) ensuring executive accountability through a robust clawback policy; (v) retaining an independent compensation consultant; and others. *Id.* at 49-50.

The 2020 Proxy Statement notes that the total compensation package for Uber's executive officers consists primarily of an employment agreement, base salary, annual cash bonus and long-term equity incentives. *Id.* at 53 and 56. Each component of the compensation package considers the following:

- **Employment Agreement:** The 2020 Proxy Statement notes that each named executive officer's employment agreement generally has no specific term and provides for at-will employment. *Id.* The agreements set forth each executive's "initial base salary, eligibility for an annual cash incentive opportunity, certain employee benefits, the terms of certain equity grants, and, in some cases, accelerated vesting of equity awards and/or severance benefits upon a qualifying termination of employment." *Id* at 53.

- **Base Salary:** The 2020 Proxy Statement also notes that Uber provides "base salary as a fixed source of compensation for our executive officers for their day-to-day responsibilities." *Id.* Initial based salaries were established "primarily based on individual negotiations with the executive officers when they joined [Uber]." *Id.*

- **Annual Cash Bonus:** The annual cash bonus program "creates a direct relationship between individual bonus amounts and key business performance measures that align with the interests of our key stakeholders." *Id.* The actual bonus each executive earns is "conditioned upon the achievement of certain individual and company-wide performance goals established by the Compensation Committee, which may differ for each executive officer." *Id.*

- **Long-Term Equity Incentives**: Equity incentives allows Uber to "attract and retain the highest level of talented and experienced executive officers, aligns . . . incentives with the long-term interests of [Uber] and [Uber's] stockholders, and focuses [Uber's] executive officers on achieving [its] strategic goals and furthering [its] mission." *Id.* at 56. PRSUs are "granted to certain executive officers to drive the achievement of key financial, operational, and strategic objectives, which aligns the interests of [Uber's] executives and stockholders." *Id*. at 57

The 2020 Proxy Statement further outlines the compensation-setting governance and process. *Id.* at 50-52. Uber's board of directors was responsible for overseeing the activities of the Compensation Committee. The Compensation Committee, management and Uber's independent compensation consultants work closely to manage the executive compensation program. *Id.* at 50. The Proxy Statement notes that the Compensation Committee focused on peer company practices, as well as company-wide and individual performances, to motivate executive officers to achieve strategic goals and align their interests with those of Uber's stockholders. *Id.* at 52. Uber's compensation consultants also prepared a comparator group report for the Compensation Committee to evaluate Uber's executive officer

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

compensation in 2019, which compared Uber's practices to those of other U.S.-based publicly traded and privately held companies in related industries. *Id.* In discussing the peer group review, Uber noted in the 2020 Proxy Statement that it "expect[]s that our executive compensation program may change as our business and needs evolve, and as we continue to align our overall executive compensation philosophy and program with those of other leading U.S. publicly-traded companies." *Id.* Additional information about the specific roles Uber's Compensation Committee, management and compensation consultants played in managing Uber's executive compensation program can be found on pages 50 and 51 of Uber's 2020 Proxy Statement. *Id.* at 50-51.

**2020 Executive Compensation**

Uber's 2021 Proxy Statement[13] outlines Uber's philosophy toward executive compensation in 2020. Similar to its 2020 Proxy Statement, Uber noted in the 2021 Proxy Statement that "the primary focus of [its] compensation philosophy and program is on the long-term elements of target total compensation." *See* Ex. N at 52. The Proxy Statement further states that the executive compensation program was designed to achieve the following objectives: (i) attract and retain talent; (ii) align with stockholders; (iii) reward executive officers for their performance and motivate them to achieve Uber's short and long-term goals; and (iv) reinforce cultural norms by promoting "doing the right thing, working tirelessly to earn the trust of [Uber's] consumers and users, acting like owners, valuing ideas over hierarchy, making big bold bets, and celebrating our differences." *Id.* at 52. Uber further noted that it believes "it is important that the compensation structure we establish provides us an adequate level of flexibility to enable us to incentivize management to adjust priorities and make the strategic decisions that are often necessary for us to succeed in the dynamic market in which we operate." *Id.* Among other things, Uber notes in its 2021 Proxy Statement that it has established a "number of policies and practices . . . to support [its] compensation philosophy, improve [its] compensation governance, and drive performance that aligns executives' and stockholders' interests." *Id.* at 53. These include, among other things: (i) soliciting stockholder feedback on Uber's compensation program; (ii) designing a risk-based

---

[13]  *See* 2021 proxy statement:  https://s23.q4cdn.com/407969754/files/doc_financials/2021/ar/FINAL-Typeset-Definitive-Proxy.pdf.  A true and correct copy of Uber's 2021 proxy statement is attached hereto as **Exhibit N.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

compensation program for executives; (iii) maintaining stock ownership guidelines for executive officers and directors; (iv) ensuring executive accountability through a robust clawback policy; (v) retaining an independent compensation consultant; and others. *Id.*

The 2021 Proxy Statement notes that the total compensation package for Uber's executive officers consists primarily of a combination of a base salary, annual cash bonus and long-term equity incentives. *Id.* at 55. Each component of the compensation package considers the following:

- **Base Salary:** Based on each executive's "skills, experience, and performance, value in the marketplace and criticality of the role, as well as internal pay equity" and provides "fixed source of compensation for day-to-day responsibilities." *Id.*

- **Annual Cash Bonus:** The annual cash bonus is intended to "[d]rive[] achievement of key corporate performance goals." *Id.* The actual awards are based on individual and company performance. *Id.*

- **Long-Term Equity Incentives:** PRSUs "are designed to encourage [Uber's] executives to achieve strong goals in key performance metrics selected to drive long-term performance and stockholder value creation." The equity award size is based on "the competitive marketplace, criticality of the role to key performance objectives, internal pay equity, and performance of the executive." *Id.*

The 2021 Proxy Statement further outlines the compensation-setting governance and process. *Id.* at 52-54.  In carrying out its responsibilities, the Compensation Committee again retained independent compensation consultants and advisors to advise the Compensation Committee on Uber's "executive compensation program, how the program compares to peer company compensation practices, and other executive compensation-related matters." *Id.* at 52-53. The 2021 Proxy Statement notes that the Compensation Committee again considered peer company practices, as well as company-wide and individual performances, to motivate executive officers to achieve strategic goals and align their interests with those of Uber's stockholders. *Id.* In late 2020, as part of its normal peer group review, the Compensation Committee analyzed its peer group based on the current state of the Company, the talent market and the broader competitive market and decided to make certain changes to the peer group for purposes of analyzing the 2021 compensation group. *Id.* at 54. Additional information about the specific roles Uber's Compensation Committee, management and compensation consultants played in managing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Uber's executive compensation program can be found on page 53 of Uber's 2021 Proxy Statement. *Id.* at

2    53.

3    **2021 Executive Compensation**

4        Uber's 2022 Proxy Statement[14] outlines Uber's philosophy toward executive compensation in

5    2021.  Similar to its 2020 and 2021 Proxy Statements, Uber noted in the 2022 Proxy Statement that "the

6    primary focus of [its] compensation philosophy and program is on the long-term elements of target total

7    compensation." *See* Ex. O at 54.  The Proxy Statement further states that the executive compensation

8    program was designed to achieve the following objectives: (i) attract and retain talent; (ii) align with

9    stockholders; (iii) reward executive officers for their performance and motivate them to achieve Uber's

10   short and long-term goals; and (iv) reinforce cultural norms by promoting "doing the right thing; bringing

11   the mindset of a champion; being obsessed with creating the best marketplace for drivers and couriers,

12   riders, eaters, and merchants; building with heart; standing for safety; [and] seeing the forest and the trees."

13   *Id.* at 52.  Among other things, Uber notes in its 2022 Proxy Statement that it has established a "number

14   of policies and practices . . . to support [its] compensation philosophy, improve [its] compensation

15   governance, and drive performance that aligns executives' and stockholders' interests." *Id.* at 55.  These

16   include, among other things: (i) soliciting stockholder feedback on Uber's compensation program; (ii)

17   designing a risk-based compensation program for executives; (iii) maintaining stock ownership guidelines

18   for executive officers and directors; (iv) ensuring executive accountability through a robust clawback

19   policy; (v) retaining an independent compensation consultant; and others. *Id.*

20       The 2022 Proxy Statement notes that the total compensation package for Uber's executive officers

21   consists primarily of a combination of a base salary, annual cash bonus and long-term equity incentives.

22   *Id.* at 57. Each component of the compensation package considers the following:

23   - **Base Salary:** Based on each executive's "skills, experience, and performance, value in the
     marketplace and criticality of the role, as well as internal pay equity" and provides "fixed source
24   of compensation for day-to-day responsibilities." *Id.* at 58.

25

26

27   [14]   *See* 2022 proxy statement: https://s23.q4cdn.com/407969754/files/doc_financials/2022/ar/Final-2022-Proxy-(1).pdf. A
     true and correct copy of Uber's 2022 proxy statement is attached hereto as **Exhibit O.**

28

- **Annual Cash Bonus:** The annual cash bonus is intended to "[d]rive[] achievement of key corporate performance goals." *Id.* The actual awards are based on individual and company performance. *Id.*

- **Long-Term Equity Incentives:** PRSUs "are designed to encourage [Uber's] executives to achieve strong goals in key performance metrics selected to drive long-term performance and stockholder value creation." The equity award size is based on "the competitive marketplace, criticality of the role to key performance objectives, internal pay equity, and performance of the executive." *Id.*

It further outlines the compensation-setting governance and process. *Id.* at 54-57.  In carrying out its responsibilities, the Compensation Committee again retained independent compensation consultants and advisors to advise the Compensation Committee on Uber's "executive compensation program, how the program compares to peer company compensation practices, and other executive compensation-related matters.". *Id.* at 56. The 2022 Proxy Statement notes that the Compensation Committee again considered peer company practices, as well as company-wide and individual performances, to motivate executive officers to achieve strategic goals and align their interests with those of Uber's stockholders. *Id.* For 2021, as part of its normal peer group review, the Compensation Committee analyzed its peer group based on the current state of the Company, the talent market and the broader competitive market and decided to make certain changes to the peer group for purposes of analyzing the 2021 compensation group. *Id.* at 56. Additional information about the specific roles Uber's Compensation Committee, management and compensation consultants played in managing Uber's executive compensation program can be found on pages 54 through 67 of Uber's 2022 Proxy Statement. *Id.* at 54-67.

**2022 Executive Compensation**

Uber's 2023 Proxy Statement[15] outlines Uber's philosophy toward executive compensation in 2022.  Similar to its previous Proxy Statements, Uber noted in the 2023 Proxy Statement that "the primary focus of [its] compensation philosophy and program is on the long-term elements of target total compensation." *See* Ex. P at 43.  The Proxy Statement further states that the executive compensation program was designed to achieve the following objectives: (i) attract and retain talent; (ii) align with

---

[15]    *See* 2023 proxy statement: https://s23.q4cdn.com/407969754/files/doc_financials/2023/Stockholders2023/final-2023-proxy.pdf. A true and correct copy of Uber's 2023 proxy statement is attached hereto as **Exhibit P.**

DEFENDANTS' UBER TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC'S AUGUST 18, 2025
OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR ADMISSION IN
LIEU OF 30(b)(6) DEPOSITIONS                    Case No. 3.23-md-03084-CRB (LJC)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

stockholders; (iii) motivate executives to achieve Uber's short and long-term goals; and (iv) reinforce Uber's mission and values. *Id.* at 43. Among other things, Uber notes in its 2023 Proxy Statement that it has established a "number of policies and practices . . . to support [its] compensation philosophy, improve [its] compensation governance, and drive performance that aligns executives' and stockholders' interests." *Id.* at 45. These include, among other things: (i) soliciting stockholder feedback on Uber's compensation program; (ii) designing a risk-based compensation program for executives; (iii) maintaining stock ownership guidelines for executive officers and directors; (iv) ensuring executive accountability through a robust clawback policy; (v) retaining an independent compensation consultant; and others. *Id.*

The 2023 Proxy Statement notes that the total compensation package for Uber's executive officers consists primarily of a combination of a base salary, annual cash bonus and long-term equity incentives in the form of RSUs, PRSUs and stock options (for Mr. Khosrowshahi). *Id.* at 47-60. Each component of the compensation package considers the following:

- **Base Salary:** Based on each executive's "skills, experience, and performance" and provides "fixed source of compensation for day-to-day responsibilities." *Id.* at 48.

- **Annual Cash Bonus:** The annual cash bonus is intended to "[d]rive[] achievement of key corporate performance goals." *Id.* The actual awards are based on individual and company performance. *Id.*

- **Long-Term Equity Incentives:** PRSUs "are designed to encourage [Uber's] executives to achieve strong goals in key performance metrics selected to drive long-term performance and stockholder value creation." The equity award size is based on "the competitive marketplace, criticality of the role to key performance objectives, internal pay equity, and performance of the executive." *Id.*

The 2023 Proxy Statement further outlines the compensation-setting governance and process. *Id.* at 45-47. Uber's Compensation Committee oversees and provides strategic direction to management regarding all aspects of Uber's executive compensation programs, utilizing independent outside consultants for guidance and at times seeking input from Uber's CEO. *Id.* at 45. The 2023 Proxy Statement notes that the Compensation Committee again considered a peer group when evaluating executive officer compensation. *Id.* at 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Additional information about the specific roles Uber's Compensation Committee, management

2    and compensation consultants played in managing Uber's executive compensation program can be found

3    on pages 43 through 60 of Uber's 2023 Proxy Statement. *Id.* at 43-60.

4    **2023 Executive Compensation**

5    Uber's 2024 Proxy Statement[16] outlines Uber's philosophy toward executive compensation in

6    2023.  Similar to its previous Proxy Statements, Uber noted in the 2024 Proxy Statement that "the primary

7    focus of [its] compensation philosophy and program is on the long-term elements of target total

8    compensation." *See* Ex. Q at 43.  The Proxy Statement further states that the executive compensation

9    program was designed to achieve the following objectives: (i) attract and retain talent; (ii) align with

10   stockholders; (iii) motivate executives to achieve Uber's short and long-term goals; and (iv) reinforce

11   Uber's mission and values.  *Id.*  Among other things, Uber notes in its 2024 Proxy Statement that it has

12   established a "number of policies and practices . . . to support [its] compensation philosophy, improve

13   [its] compensation governance, and drive performance that aligns executives' and stockholders' interests."

14   *Id.* at 44.  These include, among other things: (i) soliciting stockholder feedback on Uber's compensation

15   program; (ii) designing a risk-based compensation program for executives; (iii) maintaining stock

16   ownership guidelines for executive officers and directors; (iv) ensuring executive accountability through

17   a robust clawback policy; (v) retaining an independent compensation consultant; and others. *Id.*

18   The 2024 Proxy Statement notes that the total compensation package for Uber's executive officers

19   consists primarily of a combination of a base salary, annual cash bonus and long-term equity incentives

20   in the form of RSUs, PRSUs and stock options (for Mr. Khosrowshahi). *Id.* at 47-59.  Each component of

21   the compensation package considers the following:

22
- **Base Salary:** Based on each executive's "skills, experience, and performance" and provides "fixed
23   source of compensation for day-to-day responsibilities." *Id.* at 47.

24
- **Annual Cash Bonus:** The annual cash bonus is intended to "[d]rive[] achievement of key
25   corporate performance goals." *Id.*  The actual awards are based on individual and company
   performance. *Id.*

26

27   ---

[16]   *See* 2024 proxy statement: https://s23.q4cdn.com/407969754/files/doc_financials/2024/Stockholders2024/final-2024-proxy.pdf. A true and correct copy of Uber's 2024 proxy statement is attached hereto as **Exhibit Q.**

28

- **Long-Term Equity Incentives:** PRSUs "are designed to encourage [Uber's] executives to achieve strong goals in key performance metrics selected to drive long-term performance and stockholder value creation." The equity award size is based on "the competitive marketplace, criticality of the role to key performance objectives, internal pay equity, and performance of the executive." *Id.*

The 2024 Proxy Statement further outlines the compensation-setting governance and process. *Id.* at 44-46. The 2024 Proxy Statement notes that Uber's Compensation Committee oversees and provides strategic direction to management regarding all aspects of Uber's executive compensation programs, utilizing independent outside consultants for guidance and at times seeking input from Uber's CEO. *Id.* at 44. It further notes that the Compensation Committee again considered peer company practices, as well as company-wide and individual performances. *Id.* at 46. Additional information about the specific roles Uber's Compensation Committee, management and compensation consultants played in managing Uber's executive compensation program can be found on pages 43 through 59 of Uber's 2024 Proxy Statement. *Id.* at 43-59.

**2024 Executive Compensation**

In Uber's 2025 Proxy Statement,[17] Uber provided the following regarding its 2024 compensation philosophy: "In order to promote long-term stockholder value creation, link the compensation of our executive officers to our long-term strategic goals and key drivers of our business, and align pay with performance, the primary focus of our compensation philosophy and program is on the long-term elements of target total compensation." *See* Ex. K at 36. Uber further indicates that its executive compensation program is designed to achieve the following objectives: attract and retain talent; alignment with stockholders; pay-for-performance; and reinforce its mission and values. *See id.* at 36.

The 2025 Proxy Statement notes that the total compensation package for Uber's executive officers consists primarily of a combination of a base salary, annual cash bonus and long-term equity incentives in the form of RSUs, PRSUs and stock options (for Mr. Khosrowshahi). *Id.* at 40. Each component of the compensation package considers the following:

---

[17]   *See* 2025 proxy statement: https://s23.q4cdn.com/407969754/files/doc_events/2025/May/05/2025-Proxy-Statement.pdf. A true and correct copy of Uber's 2025 proxy statement is attached hereto as Exhibit K.

- **Base Salary:** Based on each executive's "skills, experience, and performance" and provides "fixed source of compensation for day-to-day responsibilities." *Id.*

- **Annual Cash Bonus:** The annual cash bonus is intended to "[d]rive[] achievement of key corporate performance goals." *Id.* The actual awards are based on individual and company performance. *Id.*

- **Long-Term Equity Incentives:** PRSUs "are designed to encourage [Uber's] executives to achieve strong goals in key performance metrics selected to drive long-term performance and stockholder value creation." The equity award size is based on "the competitive marketplace, criticality of the role to key performance objectives, internal pay equity, and performance of the executive." *Id.*

In the 2025 Proxy Statement, Uber also details how executive compensation is determined, including explaining the respective roles of management, consultants, and Uber's Compensation Committee. *Id.* at 36-39. As described more fully in the Proxy Statement, Uber's Compensation Committee "approves the form and amount of compensation to be paid or awarded to each executive officer, each year" and "oversees and administers" the executive compensation program (including design, metrics, goals, and outcomes). *Id.* at 38.

In addition to its proxy statements, Uber has also previously tendered a witness in the JCCP action to testify about various components of executive compensation at Uber. A true and correct copy of the transcript from Mr. Gaddis's July 8, 2025 deposition is attached hereto as **Exhibit R.** During his July 8, 2025 deposition in the JCCP action, Todd Gaddis testified about various compensation metrics outlined in Uber's 2020-2025 proxy statements. *See* Ex. R at 191:20 – 267:15. Specifically, Mr. Gaddis testified that each named executive officer's total compensation consists of various components, including salary, bonus, stock awards, option awards, non-equity incentive plan compensation and all other compensation. *Id.* at 193:11 – 194:3.

During his July 8, 2025 deposition, Todd Gaddis testified about an internal Uber document regarding various metrics considered in establishing executives' PRSUs. *See* **Exhibit S**; *see also* Ex. R. at 136:10 – 142:22; 149:8 – 165:14; 169:21 – 183:25. Specifically, Mr. Gaddis testified that in 2018, Uber's CEO was eligible to receive performance-based restricted stock units based on a safety improvement goal of at least 10% over a three-year period. *Id.* at 149:15 – 151:24. Mr. Gaddis further

1    testified that the individuals eligible to receive PRSUs in 2019 expanded to Uber's chief people officer
2    and chief legal officer. Ex. R at 152:12 – 152:22; *see also* Ex. S.  In 2020, the reduction of critical sexual
3    assaults was a component of the PRSU award available to Uber's CEO, chief people officer and chief
4    legal officer. Ex. R at 155:3 – 155:12. Specifically, at that time, the PRSU award was tied to a goal to
5    reduce critical sexual assault incidents – or incidents falling within the top five most serious categories of
6    sexual assault and misconduct in Uber's taxonomy – in the United States by a total of 15% between the
7    years 2020 to 2022. *Id.* at 156:13 – 156:23. Mr. Gaddis testified that in 2021, Uber expanded the executives
8    eligible to receive PRSUs to all Uber executive leadership team members. *Id.* at 161:12 – 161:18; *see also*
9    Ex. S.  The 2021 PRSU sexual assault reduction goal for Uber's ELT was a three-year global reduction,
10   from 2021 to 2023, of critical sexual assaults by 10%. Ex. R at 162:19 – 163:25.  Mr. Gaddis testified that
11   in 2022, the sexual assault reduction goal for Uber's ELT was a part of those executives' PRSU
12   compensation. *Id.* at 173:24 – 175:8.  Specifically, the 2022 PRSU sexual assault reduction goal for Uber's
13   ELT was to reduce critical sexual assaults by 10% from 2022 to 2024.  Mr. Gaddis testified that in 2023,
14   the reduction of sexual assaults remained a component of the PRSU award for all of Uber's executive
15   leadership team members. *Id.* at 177:9 – 177:15.  Executives' PRSU eligibility was tied to a goal to reduce
16   critical sexual assault incidents globally by 10% during the period from 2023 to 2025. *Id.* at 177:9 –
17   178:11.  Finally, Mr. Gaddis testified that in 2024, the reduction of sexual assaults remained a component
18   of the PRSU award for Uber's ELT. *Id.* at 180:20 – 181:1. Specifically, executives' 2024 PRSU award
19   was tied to a goal of reducing global critical sexual assaults by 10% between 2024 and 2026.  *Id.*

20           For years 2020 to 2024, Mr. Gaddis clarified that Uber executives eligible for PRSUs based on
21   critical sexual assault reductions could still receive a portion of the potential PRSU award if only a portion
22   of the reduction goal was achieved. *See id.* at 158:20 – 159:25; 170:7 – 171:7; 175:9 – 176:3; 178:19 –
23   179:13; 182:2 – 182:13. Mr. Gaddis also testified about how, beginning in 2021, PRSU awards started
24   including the "total stockholder return" or "TSR" modifier. *Id.* at 171:6 – 171:11. The modifier compares
25   the 3-year annualized TSR of Uber against the TSR of the companies included in the S&P 500. *Id.* at
26   235:10 – 235:23. The TSR modifier operates such that in some scenarios, it could increase an executive's
27   PRSU award regardless of whether a certain target was satisfied. *Id.* at 172:12 – 173:12. The TSR modifier

28

25

range was also between 70% and 130% for years 2022, 2023 and 2024. 176:4 – 177:4; 180:5 – 180:11; 183:3 – 183:8.

**INTERROGATORY NO. 12:**

IDENTIFY and DESCRIBE the reasoning and basis for each KPI applied to formulate the annual compensation for each member of the Executive Leadership Team from 2018 to present.

**ANSWER:**

Uber states that various performance metrics (sometimes referred to as "key performance indicators" ("KPI") or "objectives and key results" ("OKR")) have been used to determine executive compensation (or components thereof) since 2018. Such metrics utilized in determining the total compensation for Uber's named executive officers are described in each of Uber's proxy statements issued between 2020 through 2025 and are outlined and summarized below. The remainder of this response to Interrogatory no. 12 addresses the KPIs and/or OKRs applicable to the annual cash bonus component of Uber's executive compensation program for 2019 through 2024. Uber refers Plaintiffs to its response to Interrogatory no. 13 for information about the metrics applicable to PRSUs granted by Uber to the Executive Leadership Team.

**2019 Compensation**

Uber's 2020 Proxy Statement identifies five "Key Companywide Objectives" against which performance was assessed at the end of the year to evaluate each executive's annual bonus award. *See* Ex. M at 54. The Compensation Committee did not assign any specific weight to any of the priorities, and in evaluating performance, the Compensation Committee considered additional factors and/or gave varying degrees of weight to specific factors. The five objectives included:

- **Power the Platform:** Invest in user growth, cross-sell and deepen customer engagement.

- **Stand for Safety:** Reduce safety incidents and increase transparency and trust in Uber's commitment to safety.

- **Global Expansion & the Road to a Billion:** Expand ridership, unlock new countries, identify additional opportunities for strategic transactions.

- **Road to Profitability:** Increase usage of premium product Gross Bookings, improve unit economics and cost base.

26

- **One Uber Culture:** Increase employee engagement and diversity, decrease attrition.

*Id.* at 54.

## 2020 Compensation

Uber's 2021 Proxy Statement describes the continued evolution of its annual cash bonus plan which, for 2020, involved adding three categories of goals that were equally weighted: (i) key financial targets, (ii) strategic and operational priorities, and (iii) six key OKRs. Uber stated that the OKRs furthered its long-term strategy and were used by investors to evaluate Uber's financial, environmental and societal performance. *See* Ex. N at 57. No specific weighting was assigned to any priority but the priorities as a group were assigned, and the Compensation Committee had the flexibility to give greater or less weight to specific factors. *Id.* The six OKRs considered included:

- **Platform Foundations:** In 2020, Uber "engage[d] [its] user base" and grew Delivery on U4B by a multiple of 30 in 2020.

- **Stand for Safety:** Uber "significantly reduced the rate of sexual assault incidents and reduced the rate of global safety incidents per million trips."

- **Hardcore Efficiency:** Uber "improved total operating costs as a % of Gross Bookings by 1.6% from 2019."

- **Invest in Driver Success:** Uber developed a financial assistance policy to aid active Drivers diagnosed with COVID and supported various initiatives to protect flexibility available to Drivers as independent contractors.

- **Product Obsession:** Uber rolled out various technology enhancements and products that enabled the company to tap into new markets and business lines.

- **Mission & Culture:** Uber established a taskforce to quickly respond to the needs of its consumers, Drivers and employees.

*Id.* at 59.

## 2021 Compensation

Uber's 2022 Proxy Statement identifies the following strategic and operational priorities considered for Uber's 2021 annual cash bonus plan:

- **Sprint to profitability:** Uber exceeded its goal of having a positive adjusted EBITDA by Q4 2021.

- **Maintain or gain category position for Delivery and Mobility globally:** Uber exceeded its goal of maintaining or gaining its category position for Delivery and Mobility in top countries in 2021.

27

- **Built robust membership program across Mobility and Delivery:** Uber partially met its goal of increasing membership across Mobility and Delivery.

- **Progress on Regulatory Front:** Uber met its goal of having a champion IC+ model with key US and Global wins.

*See* Ex. O at 60.

**2022 Compensation**

Uber's 2023 Proxy Statement identifies five key strategic and operational priorities that the Compensation Committee believed "furthered [Uber's] long-term strategy and aligned with [its] missions and values as a company." *See* Ex. P at 52. The achievement of each metric was weighted equally and accounted for 40% of the annual cash bonus. *Id.* The five strategic goals included:

- **Build robust membership program across Mobility and Delivery:** Uber exceeded its internal target of a 20% Gross Bookings coverage.

- **Maintain or gain category position for Mobility and Delivery globally:** Uber's 2022 category position for Delivery reached an all-time high in several key markets.

- **Create and implement DEI strategies that move Company-wide DEI goals forward:** Each executive officer created and implemented DEI strategies for their respective organizations and some forward progress was made.

- **Improve employee retention:** Uber reduced voluntary attrition by 35%.

- **Best platform for Drivers and Couriers:** Monthly active Drivers and Couriers increased by 23%.

*Id.* at 52.

**2023 Compensation**

Uber's 2024 Proxy Statement identifies five key strategic and operational priorities that were considered as part of executives' annual cash bonus for the year 2023. *See* Ex. Q at 51. Each priority was weighted equally in the bonus formula. *Id.* The priorities included the following:

- **Build robust membership program across Mobility and Delivery:** Uber exceeded its target of increasing membership by 50%.

- **Maintain or gain category position for Mobility and Delivery globally:** In 2023, Uber maintained a strong category position for its Mobility business and gained the category position in the majority of its top markets.

- **Incorporate Company culture into day to day:** Uber's internal employee survey results remained positive.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- **Climate change:** Uber made progress in its goal of increasing the percentage of zero-emission vehicle miles on the Uber platform.

- **Best platform for Drivers and Couriers:** Uber announced several improvements to the Uber Driver app and made earnings on the platform fairer and safer. New safety features were released.

*Id.* at 51.

**2024 Compensation**

Uber's 2025 Proxy Statement identifies four key strategic and operational priorities that were considered as part of executives' annual cash bonus for the year 2024. *See* Ex. K at 42-43. Each priority was weighted equally in the bonus formula. *Id.* The priorities included the following:

- **Build a robust membership program across Mobility and Delivery:** Uber significantly exceeded its goal of increasing total membership.

- **Maintain or gain category position for Mobility and Delivery countries:** Uber met its goal of increasing its Mobility business in a majority of its top markets.

- **Best platform for Drivers and Couriers:** Uber exceeded its goal by announcing over 20 improvements to the Driver and Courier experience, increasing monthly active Drivers and Couriers.

- **Leadership hiring slate:** Uber partially met its goal of having a varied hiring slate of candidates worldwide.

*Id.*

**INTERROGATORY NO. 13:**

IDENTIFY and DESCRIBE the reasoning and basis for all PRSU awards made to any member of the Executive Leadership Team from 2018 to present, including all metrics considered in determining each PRSU award.

**ANSWER:**

Uber directs Plaintiffs to its responses to Interrogatory nos. 10-12 for information about executives' total compensation, including the components of that compensation and metrics included in calculating that compensation, for certain Uber executives between 2018 and 2024.

In addition to disclosing this information in its proxy statements, Uber has also previously tendered a witness in the JCCP action to testify about various components of executive compensation at

29

Uber.  During his July 8, 2025 deposition, Todd Gaddis testified about an internal Uber document regarding various metrics considered in establishing executives' PRSUs. *See* Ex. S; *see also* Ex. R at 136:10 – 142:22; 149:8 – 165:14; 169:21 – 183:25. Specifically, Mr. Gaddis testified that in 2018, Uber's CEO was eligible to receive performance-based restricted stock units based on a safety improvement goal of at least 10% over a three-year period. *Id.* at 149:15 – 151:24. Mr. Gaddis further testified that the individuals eligible to receive PRSUs in 2019 expanded to Uber's chief people officer and chief legal officer. *Id.* at 152:12 – 152:22; *see also* Ex. S.  In 2020, the reduction of critical sexual assaults was a component of the PRSU award available to Uber's CEO, chief people officer and chief legal officer. Ex. R at 155:3 – 155:12. Specifically, at that time, the PRSU award was tied to a goal to reduce critical sexual assault incidents – or incidents falling within the top five most serious categories of sexual assault and misconduct in Uber's taxonomy – in the United States by a total of 15% between the years 2020 to 2022. *Id.* at 156:13 – 156:23. Mr. Gaddis testified that in 2021, Uber expanded the executives eligible to receive PRSUs to all Uber executive leadership team members. *Id.* at 161:12 – 161:18; *see also* Ex. S.  The 2021 PRSU sexual assault reduction goal for Uber's ELT was a three-year global reduction, from 2021 to 2023, of critical sexual assaults by 10%. Ex. R at 162:19 – 163:25. Mr. Gaddis testified that in 2022, the sexual assault reduction goal for Uber's ELT was a part of those executives' PRSU compensation. *Id.* at 173:24 – 175:8. Specifically, the 2022 PRSU sexual assault reduction goal for Uber's ELT was to reduce critical sexual assaults by 10% from 2022 to 2024.  Mr. Gaddis testified that in 2023, the reduction of sexual assaults remained a component of the PRSU award for all of Uber's executive leadership team members. *Id.* at 177:9 – 177:15. Executives' PRSU eligibility was tied to a goal to reduce critical sexual assault incidents globally by 10% during the period from 2023 to 2025. *Id.* at 177:9 – 178:11. Finally, Mr. Gaddis testified that in 2024, the reduction of sexual assaults remained a component of the PRSU award for Uber's ELT. *Id.* at 180:20 – 181:1. Specifically, executives' 2024 PRSU award was tied to a goal of reducing global critical sexual assaults by 10% between 2024 and 2026.  *Id.*

For years 2020 to 2024, Mr. Gaddis clarified that Uber executives eligible for PRSUs based on critical sexual assault reductions could still receive a portion of the potential PRSU award if only a portion of the reduction goal was achieved. *See id.* at 158:20 – 159:25; 170:7 – 171:7; 175:9 – 176:3; 178:19 –

179:13; 182:2 – 182:13. Mr. Gaddis also testified about how, beginning in 2021, PRSU awards started including the "total stockholder return" or "TSR" modifier. *Id.* at 171:6 – 171:11. The modifier compares the 3-year annualized TSR of Uber against the TSR of the companies included in the S&P 500. *Id.* at 235:10 – 235:23. The TSR modifier operates such that in some scenarios, it could increase an executive's PRSU award regardless of whether a certain target was satisfied. *Id.* at 172:12 – 173:12. The TSR modifier range was also between 70% and 130% for years 2022, 2023 and 2024.  176:4 – 177:4; 180:5 – 180:11; 183:3 – 183:8.

Uber considered other metrics in determining PRSU awards for members of the ELT between 2018 and 2024.  Specifically, beginning in 2021, all ELT members were eligible for PRSUs that considered the following metrics, broken down by year of eligibility:

**FY 2021 Award (PY 2021-2023):**

| Metric | Weighting |
|---|---|
| Adjusted EBITDA Margin (On Revenue) | 40% |
| Revenue Growth | 40% |
| Women Level 5+ (globally) | 5% |
| URP Level 4+ (US only) | 5% |
| Reduce Critical Sexual Assault | 5% |
| Reduce Motor Vehicle Crash Fatalities | 5% |
| Relative TSR | 70% - 130% Modifier |

**FY 2022 Award (PY 2022-2024):**

| Metric | Weighting |
|---|---|
| Adjusted EBITDA Margin (on GBs) | 40% |
| Gross Bookings Growth | 40% |
| Women Level 5+ (globally) | 5% |
| URP Level 4+ (US only) | 5% |
| Reduce Critical Sexual Assault | 5% |
| Reduce Motor Vehicle Crash Fatalities | 5% |
| Relative TSR | 70% - 130% Modifier |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**FY 2023 Award (PY 2023-2025):**

| Metric | Weighting |
|---|---|
| Adjusted EBITDA Margin (on GBs) | 40% |
| Gross Bookings Growth | 40% |
| Women Level 5+ (globally) | 5% |
| URP Level 4+ (US only) | 5% |
| Reduce Critical Sexual Assault | 5% |
| Reduce Motor Vehicle Crash Fatalities | 5% |
| Relative TSR | 70% - 130% Modifier |

**FY 2024 Award (PY 2024-2026):**

| Metric | Weighting |
|---|---|
| Adjusted EBITDA Margin (on GBs) | 40% |
| Gross Bookings Growth | 40% |
| Reduce Scope 1 and 2 GHG Emissions | 3.33% |
| Increase % of EV miles (US & Canada) | 3.33% |
| Increase % of EV miles (Europe) | 3.33% |
| Reduce Critical Sexual Assault | 5% |
| Reduce Motor Vehicle Crash Fatalities | 5% |
| Relative TSR | 70% - 130% Modifier |

In addition to the above, Uber provides information in each of its 2020 – 2025 proxy statements about the metrics considered in awarding executives PRSUs for each given year.

**INTERROGATORY NO. 14:**

IDENTIFY all RSUs or metrics involving Sexual Assault that are applied to determine the annual compensation for each member of the Executive Leadership Team.

**ANSWER:**

Uber directs Plaintiffs to its responses to Interrogatory nos. 11-13, which identify the metrics considered in calculating executives' total compensation, including the metrics related to the reduction of

32

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

critical safety incidents.  These metrics have included, among other things, a goal of reducing critical sexual assault incidents on a global scale by at least 10% for years 2021-2024, and by 15% across the United States for 2020. Additionally, as discussed herein, Uber has established strategic objectives utilized to assess executives' eligibility for an annual bonus that consist of, among other things, reducing safety incidents and implementing improvements to the platform that increased driver safety.

**INTERROGATORY NO. 15:**

IDENTIFY all RSUs or metrics involving Sexual Misconduct that are applied to determine the annual compensation for each member of the Executive Leadership Team.

**ANSWER:**

Uber directs Plaintiffs to its responses to Interrogatory nos. 11-13, which identify the metrics considered in calculating executives' total compensation, including the metrics related to the reduction of critical safety incidents.  These metrics have included, among other things, a goal of reducing critical sexual assault incidents on a global scale by at least 10% for years 2021-2024, and by 15% across the United States for 2020. Additionally, as discussed herein, Uber has established strategic objectives utilized to assess executives' eligibility for an annual bonus that consist of, among other things, reducing safety incidents and implementing improvements to the platform that increased driver safety.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

ADMIT that Uber controls (a) the fare Riders are charged for each Ride they take, (b) for each Ride, the portion of the fare for that ride that the Driver receives, and (c) for each Ride, the portion of the fare for that ride that the Uber receives.

**ANSWER:**

Uber denies this Request as phrased.  By way of qualification, Uber states that fares charged to riders using the Uber application are influenced by, among other factors, supply and demand in the relevant marketplace as well as applicable local and state taxes and fees.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1

2  **REQUEST FOR ADMISSION NO. 2:**

3      ADMIT that for [EACH Bellwether Plaintiff's] Subject Ride, Uber determined (a) the fare the

4  Bellwether Plaintiff was charged for the Subject Ride, (b) for each Ride, the portion of the fare for that

5  ride that the Driver received, and (c) for each Ride, the portion of the fare for that ride that Uber received.

6  **ANSWER:**

7      Uber denies this Request as phrased.  By way of qualification, Uber states that fares charged to

8  riders using the Uber application are influenced by, among other factors, supply and demand in the

9  relevant marketplace as well as applicable local and state taxes and fees.

10

11

12  Dated:  August 18, 2025                    By: */s/ Christopher Cox*
                                                    CHRISTOPHER COX

13
                                             Christopher Cox (*Admitted Pro Hac Vice*)
14                                           **KIRKLAND & ELLIS LLP**
                                             601 Lexington Avenue
15                                           New York, NY 10022
                                             Telephone: (212) 446-4753
16                                           christopher.cox@kirkland.com

17
                                             *Attorney for Defendants*
18                                           UBER TECHNOLOGIES, INC.,
                                             RASIER, LLC and RASIER-CA, LLC

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' UBER TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC'S AUGUST 18, 2025
OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR ADMISSION IN
LIEU OF 30(b)(6) DEPOSITIONS                    Case No. 3.23-md-03084-CRB (LJC)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**PROOF OF SERVICE**

I, the undersigned, am at least 18 years old and not a party to this action.  I am employed in the County of Cook. My business address is Kirkland & Ellis LLP, 333 Wolf Point Plaza, Chicago, Illinois, 60654.

On the date set forth below, I caused the following document:

**DEFENDANTS' UBER TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC'S AUGUST 18, 2025 OBJECTIONS AND RESPONSES TO CERTAIN OF PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR ADMISSION IN LIEU OF 30(b)(6) DEPOSITIONS**

to be served on the parties by providing a true copy thereof as follows:

William Smith
Alex Walsh
**ANAPOL WEISS**
130 N. 18th St., #1600
Philadelphia, PA 19103
wsmith@anapolweiss.com
awalsh@anapolweiss.com

Maya Kalonia
Sarah London
**GIRARD SHARP**
601 California Street, Suite 1400
San Francisco, CA 94108
mkalonia@girardsharp.com
slondon@girardsharp.com

*Attorneys for Plaintiffs*

☒      **VIA EMAIL OR ELECTRONIC SUBMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 18, 2025, in Chicago, Illinois.

_/s/ Katie O'Neill_____

DEFENDANTS' UBER TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC'S AUGUST 18, 2025 OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR ADMISSION IN LIEU OF 30(b)(6) DEPOSITIONS          Case No. 3.23-md-03084-CRB (LJC)